# EXHIBIT-27

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | )<br>)<br>)<br>) | MDL No. 2592<br><br>Judge Eldon E. Fallon |

# Expert Report of Suzanne Parisian, MD

By: _Suzanne Parisian_          Date: _10/12/2016_

**Suzanne Parisian, MD**

**EXPERT REPORT**

**SUZANNE PARISIAN, M.D.**

**In RE: XARELTO (Rivaroxaban) Products Liability Litigation (MDL-2592)**

**Table of Contents**

I.   QUALIFICATIONS ................................................................................................. 1

II.  OVERVIEW .......................................................................................................... 7

   A.  PURPOSE OF REVIEW ................................................................................. 7

   B.  DEPOSITIONS REVIEWED ......................................................................... 8

   C.  RELIANCE LIST ............................................................................................ 9

   D.  PUBLICLY AVAILABLE FDA DOCUMENTS AND MEDICAL LITERATURE ...................... 9

III.  OPINIONS.............................................................................................................. 9

   A.  OPINION 1 ...................................................................................................... 9

   B.  OPINION 2 ...................................................................................................... 9

   C.  OPINION 3 .................................................................................................... 10

   D.  OPINION 4 .................................................................................................... 10

   E.  OPINION 5 .................................................................................................... 10

   F.  OPINION 6 .................................................................................................... 11

   G.  OPINION 7 .................................................................................................... 11

   H.  OPINION 8 .................................................................................................... 11

   I.  OPINION 9 .................................................................................................... 12

   J.  OPINION 10 .................................................................................................. 12

   K.  OPINION 11 .................................................................................................. 13

   L.  OPINION 12 .................................................................................................. 13

   M.  OPINION 13 .................................................................................................. 14

   N.  OPINION 14 .................................................................................................. 14

   O.  OPINION 15 .................................................................................................. 14

   P.  OPINION 16 .................................................................................................. 15

IV.  BAYER HEALTHCARE'S DEVELOPMENT OF BAY 59-7939 (RIVAROXABAN) ................. 15

a.  BAYER'S '*GO/NO-GO*' PLAN FOR BAY 59-7939 WAS AS A FIXED DOSE, NO MONITORING ORAL ANTICOAGULANT ........................................................... 15

b.  DEFENDANTS' PRECLINICAL INVESTIGATION OF '*HIGHLY POTENT*' FACTOR XA INHIBITOR AND USE OF PROTHROMBIN TIME (PT) FOR MONITORING THE ANTICOAGULANT EFFECT ................................................................ 16

c.  IN 2002 BAYER SUBMITTED THE IND FOR BAY 59-7939 ............................... 20

d.  BAYER HAS ALWAYS MEASURED XARELTO'S ANTICOAGULATION EFFECT IN PATIENTS USING COMMON LAB TESTS (PT, aPTT, AND HEPTEST) .......................... 20

e.  BAYER 59- 7939 PHARMACODYNAMICS/PHARMACOKINETICS (PK/PD) PERMITTING MONITORING OF PLASMA CONCENTRATION BY ROUTINE CLOTTING TESTS ................................................................ 21

f.  BAYER WAS AWARE OF THE SLOW ABSORPTION ASSOCIATED WITH '*FLIP-FLOP*' PHARMACOKINETICS FOR BAY 59-7939 ................................................ 22

g.  BAY 59-7939 "FLIP FLOP" PHARMACOKINETICS: A HIGHER DOSE IS LESS SAFE AND NOT MORE EFFECTIVE ................................................................ 23

h.  BAYER PURSUES A CHRONIC ATRIAL FIBRILLATION INDICATION USING DATA FROM ITS OTHER CLINICAL STUDIES ........................................................ 25

i.  IN 2003 BAYER BEGINS TO PLAN FOR ROCKET-AF STUDY ......................... 26

j.  BAY 59-7939 BAYER SEEKS A UNITED STATES BUSINESS PARTNER FOR XARELTO'S SALES AND DEVELOPMENT IN UNITED STATES ...................... 28

k.  OCTOBER 2005: BAYER AND JANSSEN ("DEFENDANTS") ENTER INTO AGREEMENT FOR XARELTO DEVELOPMENT AND SALES IN THE UNITED STATES ................................................................ 37

V.  FDA'S FIRST NDA APPROVAL (NDA 22-406) OF XARELTO (RIVAROXABAN) FOR VTE PREVENTION POST HIP/KNEE REPLACEMENT SURGERY MARKETING IN THE UNITED STATES ................................................................ 39

a.  DEFENDANTS' VIEW OF XARELTO AS ONE OF SEVERAL NOACS RACING TO MARKET ................................................................ 40

b.  DEFENDANTS SUBMIT XARELTO NDA 22-406 ON JULY 28, 2008 WHICH APPEARED TO BE MOVING DOWN THE 'TRACK' TO BE THE FIRST NOAC NDA APPROVAL ... 40

c.  DEFENDANTS "*PUSH BACK*" AGAINST FDA'S CONCERNS ABOUT FOUR-FOLD INCREASED BLEEDING RISK WITH DOUBLING OF DOSE OF XARELTO [Study 10942 (ODIXA-HIP)] ................................................................ 43

d.  DEFENDANTS PHASE II VTE-P SAFETY STUDIES WITH PK AND PREDICTIVE MODELING USING APPLIED LOGISTIC REGRESSION (STUDIES 10942, 10944, 10945 AND 11527) AND PK ANALYSIS PK 000131 (STUDIES 11527 AND 10944) ................. 48

e.  PK000131: DEFENDANTS' POPULATION PK, PD AND PK/PD ANALYSIS ................. 77

f.  FDA'S 2009 CLINICAL PHARMACOLOGY REVIEW ....................................... 85

g.  2010 FDA'S CLINICAL PHARMACOLOGY REVIEW ........................................................ 93

h.  XARELTO VTE-P FDA ADVISORY COMMITTEE MEETING MARCH 19, 2009 .......... 100

i.  DEFENDANTS INTERNALLY PROPOSE TO DRAFT A LABORATORY TESTS SECTION FOR THE XARELTO LABEL, BUT ONLY AS A "*CONTINGENCY*" .............. 106

j.  RECORD INVESTIGATOR COMPLAINTS TRIGGER FDA'S INSPECTION AND IDENTIFICATION OF '*UNRELIABILITY*' OF BAYER'S RECORD STUDIES ................ 109

k.  REVIEW OF XARELTO VTE-P NDA HALTED BY MULTIPLE ISSUES, INCLUDING RECORD UNRELIABILITY, MANUFACTURING QUALITY ISSUES, LIVER TOXICITY AND CONCERNS ABOUT DOSE ...................................................................................... 110

VI.  DEFENDANTS SUBMITTED 'COMPLETE RESPONSE' AND DRAFT XARELTO VTE-P LABEL TO FDA ON DECEMBER 27, 2010 .................................................................................. 119

a.  DEFENDANTS RECEIVE FDA'S LABEL COMMENTS ON JUNE 13, 2011 ................... 119

b.  DEFENDANTS' JUNE 16, 2011 RESPONSE PROPOSED SIGNIFICANT CHANGES TO COUNTER FDA LABEL CHANGES, TO WHICH FDA PROVIDED FEEDBACK ON JUNE 24, 2011 ..................................................................................................................................... 126

c.  DEFENDANTS PARTICIPATE IN A REQUESTED JUNE 23, 2011 TELECONFERENCE WITH THE CLINICAL PHARMACOLOGY GROUP ON JUNE 23, 2011 (SECTIONS 7 AND 12 OF USPI) ....................................................................................................................... 132

VII.  FDA'S SUMMARY REVIEW AND NDA APPROVAL OF XARELTO VTE-P SUPPORTS DEFENDANTS' USE OF NEOPLASTIN PT, APTT, AND HEPTEST FOR MONITORING XARELTO'S ACTIVITY ..................................................................................................................... 140

VIII. NDA 022406 XARELTO VTE-P WAS CONDITIONALLY APPROVED ................................... 144

a.  COMMITMENT TO "*ENHANCED PHARMACOVIGILANCE PLAN*" TO STUDY RISKS OF MAJOR BLEEDING AND UPDATE LABEL ............................................................................ 145

b.  PERFORM REQUIRED STUDIES FOR DOSING AND DOSING RECOMMENDATIONS ........................................................................................................................................................ 145

c.  DEVELOP A 5MG DOSE TABLET FOR 'PROPER DOSE TITRATION'. ......................... 146

d.  DEFENDANT REQUESTED FDA CLARIFY WHAT WAS MEANT BY "ENHANCED PHARMAOVIGILANCE" ...................................................................................................... 146

e.  DEFENDANTS' "ENHANCED PHARMACOVIGILANCE PLAN" INCLUDED DEVELOPMENT OF BLEEDING QUESTIONNAIRES TO OBTAIN COAGULATION AND DOSING INFORMATION ...................................................................................................... 146

f.  FDA HAS NOT TAKEN ACTION TO PREVENT/RESTRICT/HINDER DEFENDANTS ADDING "PRIMARY PT LANGUAGE" TO ITS LABEL ..................................................... 147

IX.  NDA 022406 SUPPLEMENTS ............................................................................................ 151

a.  EINSTEIN- TREATMENT OF DVT/ PE (STUDY 11702) ..................................... 151

b.  EINSTEIN EXTENSION AND THE REDUCTION IN THE RISK OF RECURRENCE OF DVT AND PE COMPARED TO PLACEBO ........................................................................ 155

X.   NDA SUPPLEMENTS S-001, S-002, and S-003-[EINSTEIN STUDIES] ......................................155

    a.   NDA SUPPLEMENT S-004....................................................................................156

    b.   NDA SUPPLEMENT S-007....................................................................................156

    c.   NDA SUPPLEMNT S-009 ......................................................................................156

    d.   NDA SUPPLEMENT S-010....................................................................................156

    e.   NDA SUPPLEMENT S-012....................................................................................157

    f.   NDA SUPPLEMENT S-105 CHANGES BEING EFFECTED (CBE) .................................157

XI.   FDA AND NDA 20-2439- XARELTO 'SPAF' INDICATION .......................................................157

    a.   DEFENDANTS MET WITH FDA TO DISCUSS THE DESIGN OF THE ROCKET AF
CLINICAL STUDY FOR APPROVAL OF A SPAF INDICATION......................................157

    b.   AS EARLY AS 2006, FLAWS ARE APPARENT IN ROCKET AF DESIGN
CONTRIBUTING TO 'SUBOPTIMAL PERFORMANCE OF WARFARIN' .....................159

XII.   DEFENDANTS' ROCKET AF STUDY FOR SPAF INDICATION ...............................................168

    a.   DEFENDANTS CHOSE TO INVESTIGATE A SINGLE 20 MG ONCE A DAY DOSE WITH
NO DRUG MONITORING OR TITRATION...............................................................171

    b.   CALCULATION OF MEDIAN TIME IN THERAPEUTIC RANGE (TTR) .........................175

    c.   ROCKET DID NOT INVESTIGATE COMBINED P-GP CYP3A4- PGP INHIBITORS AND
INDUCERS, OR PROVIDE MEANS FOR ADEQUATE DRUG TITRATION TO REDUCE
PATIENT RISKS AS REQUESTED BY FDA .......................................................175

    d.   CONCERNS ABOUT PREMATURE UNBLINDING AND SUBSEQUENT PROTOCOL
CHANGES IN ROCKET ....................................................................................179

    e.   ROCKET AF Utilized Non-Inferiority Study Design ...........................................181

    f.   MARCH 14, 2011 FDA REQUESTED CLINICAL INFORMATION ABOUT INR POC FOR
ROCKET ........................................................................................................184

    g.   DURING THE JUNE 6, 2011 MEETING, FDA DISCUSSES CONCERNS ABOUT DOSE,
TTR, HYPERCOAGUABILITY REBOUND AT SWITCHING, AND LACK OF
SUPERIORITY TO WARFARIN .........................................................................185

    h.   FDA REFERRED TO XARELTO DATA AS NOT ESTABLISHING A '*WIDE
THERAPEUTIC INDEX*'....................................................................................186

    i.   THE SEPTEMBER 8, 2011 FDA CARDIORENAL PRODUCTS ADVISORY COMMITTEE
FOR XARELTO FOR SPAF INDICATION ...........................................................188

    j.   FDA RECOMMENDS 'CONDITIONAL' APPROVAL OF XARLETO SPAF WITH SAME
POST-APPROVAL COMMITMENTS AS XARELTO FOR VTE-P ..................................211

    k.   FDA AND DEFENDANTS NEGOTIATE A LAUNCH LABEL FOR THE SPAF
INDICATION...................................................................................................213

l.   DEFENDANTS ENCOURAGE USE OF XARELTO IN PATIENTS WITH CONGESTIVE HEART FAIULE DESPITE KNOWING THEY DO NOT HAVE AN APPROVED INDICATION ................................................................................................. 248

m.   DEFENDANTS ENCOURAGE XARELTO USE IN HOSPITALIZED MEDICALLY ILL PATIENTS DESPITE LACK OF AN FDA APPROVED INDICATION ............................. 252

XIII. POINT-OF-CARE INR MONITORING FOR ROCKET AF ......................................... 255

a.   BACKGROUND HEMOSENSE/ALERE ................................................................ 255

b.   DEFENDANTS RECEIVE TWO FDA HEMOSENSE WARNING LETTERS DESCRIBING DEFECTIVE INRATIO DEVICE ......................................................................... 256

c.   OTHER HEMOSENSE INC. (ALERE) RECALLS ................................................. 259

d.   BRITISH MEDICAL JOURNAL (BMJ) UNCOVERS RECALLED INRATIO AS POC DEVICE USED IN ROCKET FOR APPROVAL OF XARELTO ........................................ 262

e.   DEFENDANTS' ROCKET AF TASK FORCE ....................................................... 264

f.   GROWING CONCERN AMONGST PHYSICIANS ABOUT FAULTY DEVICE USED IN ROCKET ............................................................................................................ 264

g.   FDA's JANUARY 2016 LETTER AND DEFENDANTS' FEBRUARY RESPONSE REGARDING USE OF THE INRATIO DEVICE IN ROCKET ........................................... 265

h.   DEFENDANTS DOWNPLAY THE SIGNIFICANCE OF THE FLAWS IN ROCKET TO PHYSICIANS ..................................................................................................... 268

XIV. REGULATORY ACTIONS REGARDING POC DEVICES FOR MONITORING WARFARIN 273

a.   FDA 510(k) CLEARANCE OF HEMOSENSE ALERE INRATIO DEVICE ........................ 273

b.   FDA CONVENED A PUBLIC DOAC DIAGNOSTIC TESTING WORKSHOP OCTOBER 2015 .................................................................................................................. 275

c.   FDA OFFICIALLY CALLED FOR VOLUNTARY REMOVAL OF ALERE'S INRATIO SYSTEMS FROM THE UNITED STATES MARKET ......................................................... 278

d.   FDA HARMONIZES NOAC LABELS ................................................................. 283

e.   EMA AND ALERE .......................................................................................... 284

XV. DEFENDANTS ENCOURAGE XARELTO FOR ACUTE CORONARY SYNDROME (ACS) DESPITE THE INCREASED RISK OF BLEEDING AND FDA'S REFUSAL TO APPROVE THE INDICATION (TWICE) ................................................................................................ 287

XVI. EUROPEAN MEDICINES AGENCY (EMA) AND DEFENDANTS' ACTIONS WITH XARELTO ...................................................................................................................................... 295

a.   IN 2008, EMA REQUIRED DEFENDANTS TO DEVELOP AND VALIDATE COMMERCIAL LABORATORY METHODS FOR MONITORING XARELTO ............... 295

b.   DEFENDANTS WERE REQUIRED TO RESPOND TO EMA'S REQUESTS FOR XARELTO SAFETY AND EFFICACY INFORMATION ..................................................... 301

XVII. THREE PUBLIC MEETINGS FOR DOACS AND TDM ............................................ 335

a.  PUBLIC MEETING #1: FDA WORKSHOP REGARDING IN VITRO DIAGNOSTIC TESTING FOR DOACS ........................................................................... 335

b.  PUBLIC MEETING #2: EMA WORKSHOP ON THE ROLE OF PK/PD MEASUREMENTS AND DOACS ........................................................................... 353

c.  PUBLIC MEETING #3: CARDIAC SAFETY RESEARCH CONSORTIUM (CRSC) THINK TANK ON DECEMBER 3, 2015 ........................................................................... 360

XVII. HIGHLIGHTS OF ISSUES IN DEFENDANTS' MANAGEMENT OF CLINICAL TRIALS .... 364

a.  BAYER'S SLOPPINESS WITH RECORD 4 REPORTEDLY CREATED HUGE FINANCIAL LOSSES FOR JANSSEN AND TRIGGERED RE-NEGOTIATION OF THE COLLABORATION AGREEMENT WITH BAYER ........................................................................... 364

b.  AS EARLY AS 2008, DEFENDANTS WERE AWARE THE ROCKET 20 MG OD DOSE WAS "TOO HIGH" ........................................................................... 365

c.  DEFENDANTS DID NOT USE A LIFESCAN J&J POC INR DEVICE IN THE ROCKET CLINICAL TRIAL ........................................................................... 367

d.  THE CONVANCE RECHECK PROGRAM IN ROCKET ........................................................................... 367

e.  DEFENDANTS' PLANNED 'ROCKET II STUDY' TO FIND A SAFER DOSE NEVER OCCURRED ........................................................................... 369

XVIII.  DEFENDANTS' MARKETING OVERSTATED BENEFITS AND DOWNPLAYED RISKS 375

a.  DEFENDANTS DISTRIBUTED FLAWED AND UNRELIABLE STUDIES TO EXPAND MARKETING CLAIMS AND SUPPORT XARELTO'S 'SUPERIORITY' ........................ 375

b.  DEFENDANTS MARKETED ROCKET AF TO CAPTURE A BILLION DOLLAR MARKET WITH CLAIMS OF "SUPERIOR PROTECTION", ONCE-A-DAY FIXED DOSE, NO MONITORING AND CONVENIENCE ........................................................................... 381

c.  DEFENDANTS USE ITS ROCKET STUDY AND INVESTIGATORS TO TELL PHYSICIANS THAT XARELTO IS 'SUPERIOR' TO WARFARIN BEFORE OBTAINING FDA APPROVAL ........................................................................... 382

d.  DEFENDANTS' STRATEGIC PLATFORM FOR LAUNCH WAS BASED ON CLAIMS OF SUPERIOR EFFICACY/SUPERIOR PROTECTION OF XARELTO COMPARED TO WARFARIN ........................................................................... 383

e.  DEFENDANTS' MARKETING DOWNPLAYS THE INCREASED RISK FOR BLEEDING WITH XARELTO ........................................................................... 384

f.  DEFENDANTS TARGET SPECIFIC PHYSICIAN GROUPS AND ATTEMPT TO OVERCOME BARRIERS FOR XARELTO PRESCRIBING ........................................................................... 385

g.  DEFENDANTS TARGET STABLE WARFARIN PATIENTS USING FEAR OF BLEEDING, NEED FOR CONSISTENT PROTECTION, AND CONVENIENCE ........................................................................... 388

h.  DEFENDANTS SPECIFICALLY TARGETED ELIQUIS PATIENTS ........................................................................... 389

i.  DEFENDANTS IMPLEMENTED AN AGGRESSIVE DCT MARKETING CAMPAIGN TO COMPETE WITH ELIQUIS ........................................................................... 390

j.    DEFENDANTS PLAN TO SPECIFICALLY TARGET 2,400 ELIQUIS HIGH
PRESCRIBERS .................................................................................................... 390

XIX. DIRECT TO CONSUMER (DTC) MARKETING .......................................................... 391

a.    DEFENDANTS TARGET STABLE WARFARIN PATIENTS ............................................... 391

b.    THE USE OF CELEBRITY ENDORSEMENTS .................................................................. 394

c.    FDA IDENTIFIES MISLEADING CLAIMS IN DTC ADVERTISING ............................... 395

## I.   QUALIFICATIONS

1. In August 1995, I founded MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the regulation of products by the United States Food and Drug Administration ("FDA"). I received my medical degree from the University of South Florida in 1978 and Board Certification in Anatomic and Clinical Pathology in 1989. I also received a Masters in Biology from the University of Central Florida. I have been a general practitioner and President of Mountain Emergency Physicians. I am the author of FDA Inside and Out, published in May 2001, which is a text about the FDA's history and procedures.

2. From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander. During that time, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the FDA. Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology, Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3. From 1991 to 1993, I was a FDA Medical Officer in the Office of Health Affairs ("OHA"), a staff office within CDRH, FDA. In OHA, I provided regulatory support to both FDA's Office of Compliance and FDA's Office of Device Evaluation. My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports ("AER") and medical literature and review of product labeling, promotions, advertising, and corporate records. As to compliance with the Food Drug and Cosmetic Act ("FDCA"), I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of reports voluntarily submitted directly to FDA by health care providers, patients and others. I presided over 162 health risk assessments convened to advise FDA on overall health risk issues for the public. Along with others, I made recommendations to FDA regarding regulatory actions that should be undertaken by FDA, health care providers, user groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and in an administrative hearing as FDA's expert witness.

4. An example of a drug safety issue that I helped identify and manage for FDA as its medical officer involved ACE Inhibitors ("ACEI"). FDA had received adverse experience reports in its MedWatch databases of serious adverse events and deaths occurring in renal patients taking ACEI drugs for regulation of blood pressure. From reviewing the MedWatch AERs, the renal patients shared a common precipitating event - blood exposure to certain types of hemodialyzer membranes during a dialysis session shortly after taking a dose of ACEI. ACEI had been a class of drugs first approved by FDA for marketing in the 1980s. There had been relatively little safety information about these drugs and none regarding hemodialysis safety. When a patient would take an ACEI and then have their blood exposed to a specific type of membrane surface,

whether for hemodialysis or LDL apheresis, a sudden, life-threatening anaphylactoid reaction could be triggered.

5. As the only FDA medical officer involved in this safety issue, I reviewed both drug and device adverse event reports, reviewed medical literature, performed a health risk assessment as described per 21 CFR Part 7, and, ultimately, made a clinical recommendation to FDA to a reasonable degree of medical certainty. Health care providers needed to be quickly informed by FDA of the ACEI membrane association. FDA and the pharmaceutical and medical device industries needed help to identify the etiology of the reaction. Physicians needed recommendations as to emergency treatment. No other FDA medical officer was assigned involvement in the work-up or handling of this drug/device safety issue. Working with an FDA epidemiologist, I helped design and issue FDA's epidemiologic study to quickly obtain additional data for FDA and the involved industries. The epidemiologic study was in the form of a questionnaire contained in FDA's Safety Alert and was designed to help capture the overall risk to the public; to raise awareness of the issue for medical providers; to define the pharmacological mechanisms involved; and to trigger the appropriate label changes for both the involved drugs and devices in order to protect the public. As a result, I helped draft the current ACEI class drug warning about the risks of membrane surface exposure and anaphylactoid reaction.

6. From March 1993 to December 1993, I was a Medical Officer in the Office of Device Evaluation ("ODE"), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology Devices, FDA. From January 1993 through June 1995 I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for pre-marketing evaluation of new product applications and clinical trials that support safety and effectiveness, which, if proven, allow a company to begin marketing within the United States. In ODE, I participated in the review of proposed clinical trials, the review of pre-marketing applications (including review of animal toxicology and biocompatibility data), and training new medical officers and scientific reviewers in application, clinical trial, and labeling evaluation. I was the primary reviewing medical officer in charge of pre-marketing approval applications required for adherence to drug guidances published by FDA's Center for Drug Evaluation and Research's ("CDER") and for presentation at the FDA Advisory Panel with members from CDRH and CDER. I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling. I consulted as a medical officer on INDs for combination products including drugs and biologics. While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for health risk assessments, health hazard evaluations, annual report requirements, adverse event reporting, and labeling review.

7. I was an initial instructor in FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and pre-marketing applications. I had primary responsibility for review of marketing applications and labeling and was required to teach medical officers the process for evaluation and review required by

2

FDCA directed to product marketing. I was also charged with training medical officers on the process for health risk assessment and health evaluation per 21 CFR Part 7.

8.  Regarding post-market surveillance of marketed products, I participated with FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, product labeling, product complaints and adverse event reports submitted to FDA. I was the primary clinician involved in several of FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services to FDA. My awards have included Department of Health and Human Services and Food and Drug Administration Employee of the Month.

9.  I was sent by FDA to serve as an official Agency representative at medical meetings and seminars and to help identify and monitor conduct of manufacturers for potential deviations from regulations governing prohibited and promotional activities. At those events, I was required to provide official guidance as to FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

10. While at FDA, I helped draft Agency documents, guidance documents for the industry outlining the requirements for obtaining FDA's marketing approval and the FDA Safety Alerts directed to healthcare providers and their patients. I also provided FDA's comments for voluntary warnings, physician and user notifications, and voluntary industry standards. I was one of FDA's liaisons with the National Institutes of Health ("NIH") for issues involving ENT, renal, respiratory, and women's health. I was also FDA's first liaison for the Office of Alternative Medicine. In that position, I was required to provide support to the Health Care Financing Agency regarding FDA's approval of products and issues involving hemodialysis. As part of my work, I was assigned responsibility for product adverse event reporting to the Department of Defense and Veterans Administration.

11. One of my assigned responsibilities at FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post-marketing experience, and available manufacturing documents gathered by FDA or provided to FDA by the manufacturer or other regulatory agencies. I then used those facts and documents to (a) make a clinical determination for FDA pursuant to the FDCA to a reasonable degree of medical certainty, and (b) recommend the courses of action available to FDA to protect the public health. I was also required by FDA to advise and train other FDA employees regarding the review of facts of a case or issue and the requirements of the FDCA, and how to make a determination to a reasonable degree of medical certainty regarding the clinical impact of the Agency's actions to the public. The health risk assessment process is further described in 21 CFR Part 7. During my tenure at FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for the evaluation, marketing and labeling review of new products. I organized national conferences with industry representatives and physicians to discuss

and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

12. At the Armed Forces Institute of Pathology, Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and (a) make a final determination, to a reasonable degree of medical certainty, as to the cause of death, and (b) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as to the FBI and CIA.[1]

13. Since leaving FDA, and founding MD Assist, Inc., I continue to provide regulatory information to individuals, manufacturers, and organizations regarding FDA's requirements, related to AER, labeling, and postmarket issues.  I have consulted on premarket applications and safety issue for devices, biologics and drugs. In 1997, I was requested by FDA to participate in a panel of outside experts convened to comment on changes proposed in requirements for medical device labeling. I have consulted with manufacturers and lectured at conferences and seminars regarding FDA, pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action ("CAPA"), and Good Manufacturing Practices (GMP).

14. In August of 1995, after leaving the FDA, I founded and remain President of MD Assist, Inc. ("MDA"), a regulatory and medical consulting firm specializing in matters involving the FDA, regulation of medical products and issues regarding public health. At MDA, I continue to use my medical and FDA-acquired training and skills to help design and market new medical products; present marketing applications to FDA; design, conduct and review clinical studies; create and evaluate marketing applications; draft product labeling; investigate potential adverse events; review biocompatibility data; and instruct about the requirements of the FDA.

15. I have helped manufacturers, primarily startup companies, with initial product design, clinical investigation, labeling and marketing of new drugs and devices intended to be implanted in the central nervous system (brain, spine or ear), as well as urological, gynecological, and gastrointestinal tracts, or to be used as a treatments or diagnostic tools for the mouth or lungs or eyes. I have consulted with industry entities regarding clinical and laboratory investigation, review of data, labeling, financing, marketing, and insurance reimbursement of products, including drugs, devices, biologics, and combination products intended for treatment or diagnosis of cancer, pulmonary disease, or infection.

---

[1] While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths occurring in military hospitals, to a reasonable degree of medical certainty, appeared to have been associated with an unanticipated drug/device effect. I reported my findings as a MedWatch report to FDA. As an AFIP Medical Examiner, I was able to trigger FDA to investigate a major drug regulatory safety action which resulted in the protection of public health.

16. As stated above, I am the author of <u>FDA Inside and Out</u>, which I published in May 2001. It is a textbook about the history and rules and regulations of the FDA. The book has been used as a graduate school textbook at universities in courses teaching about the FDA. As of January 2011, it is currently listed as a library reference book about the FDA at 71 libraries, including for the FDA Biosciences Library, Center for Disease Control and Prevention (CDC), Harvard, Massachusetts Institute of Technology, University of Maryland, United States Naval Academy, Quintiles, Armed Forces Medical Library, and the British Library. I have lectured to industry about all aspects of FDA and its requirements. I have also lectured about the FDA and the drug and device approval process to medical students, graduate students and law students.

17. Since 1997, I have been involved in providing support for litigation. My primary role in litigation utilizes the same methodology and role I have for consulting for industry on FDA issues. I review and evaluate corporate documents and statements, medical and scientific literature, relevant FDA documents in terms of the Food Drug and Cosmetic Act and implementing regulations. Just as I began to do for the FDA, I discuss the FDA's relevant requirements in terms of history, procedures, role and the role and requirements of manufacturers. I then relate the actions of a company (or companies) for the products involved in terms of known and knowable information and regulatory requirements based on my training and experience. As I first did for the FDA, I utilize a review of FDA's documents, manufacturer's documents, scientific and medical literature product history, adverse event reports, pre-clinical and clinical information to formulate risk versus benefit opinions made to a degree of reasonable and professional certainty regarding the documented actions of a manufacturer in terms of duties, obligations and compliance with the Act and implementing regulations.

18. Based on the work I have done, using the methodology I was first trained to use at FDA for clinical review and health risk assessment, as well as my scientific and medical education, professional training, and experience, I have reached the following opinions regarding the actions of the Bayer Healthcare, Inc.  and Janssen Pharmaceutical Inc., a subsidiary Johnson & Johnson Company ("Defendants") with joint development, testing and marketing of XARELTO (Rivaroxaban) in the United States for reduction of the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation (SPAF) (approved November 4, 2011). The documents reviewed for both Defendants are the same general types of documents I would have reviewed at the FDA, including the medical literature, adverse events reports, complaints, marketing application documents, and communications with FDA.

19. My expert opinions are based on my medical background, training , both clinical and beginning with FDA  and the same methodology of review and analysis used in my regulatory practice.  In terms of the report design, the opinions with the relevant regulations are then followed by the BASES OF OPINIONS. Each opinion is made to a reasonable degree of medical, scientific and professional certainty regarding the shared regulatory responsibilities and actions of Defendants for United States sales of XARELTO (rivaroxaban). XARELTO is a direct Factor Xa inhibitor and belongs to the drug class commonly referred to as the new (or novel) oral anticoagulants, but officially

titled by the FDA as a class of "*Non-Vitamin K dependent Oral Anticoagulants*" (NOAC) (as well as the larger class of "Direct Oral Anticoagulants" or "DOAC"). The class of NOAC drugs was developed by sponsors to provide physicians and patients with alternative options for oral anticoagulation therapy to Coumadin (warfarin sodium)[2] (a synthetic vitamin-K dependent oral anticoagulant approved in 1954), the

---

[2] Warfarin, known by brand name Coumadin was introduced in 1948 as a pesticide against rats and mice. (i.e. rodenticide often called "coumarins"- produce life-threatening bleeding in rodents) . Warfarin is a synthetic derivative of dicumarol a mycotoxin anticoagulant discovered in spoiled sweet clover-based animal feeds. The name warfarin stems from its discovery at the University of Wisconsin- "*WARF*" as the Wisconsin Alumni Research Foundation, and the "*arin*" is from the link to coumarin. In the 1950s it was found to be effective and relatively safe for preventing thrombosis (blood clots) and thromboembolism. It was approved as a drug in 1954 and is the most widely prescribed oral anticoagulant in North America. The shortcomings of treatment are that it interacts with other medications and some foods (particularly green leafy vegetables that contain large amounts of vitamin K1. Its activity has to be monitored by periodic blood testing for the determination of international normalized ration (INR) and prescription of dosing. A high INR predisposes patients to increased risk of bleeding, while an INR in the therapeutic target range (TTR) ensures an adequate yet safe dose. An INR below the TTR increases supports a low dose of warfarin and an increased risk of thromboembolic events. The action of warfarin requires two to three days before remaining active clotting factors have time to naturally disappear. A single dose of warfarin is active for 2 to 5 days. The pharmacologic action of warfarin can be reversed by administration of vitamin K1. Warfarin is contraindicated in pregnancy since it passes through the placental and can cause bleeding in the fetus. Coumarins are known teratogens that cause birth defects.

Newer **Point of Care** (POC) testing has been available for the patient's monitoring of INR daily in terms of the warfarin dose. POC involves a simple finger stick. Patients are making increasing use of self-testing and home monitoring of oral anticoagulation. International guidelines on home testing were published in 2005. A 2006 systematic review and meta-analysis of 14 randomized trials showed home testing led to a reduced incidence of complications (thrombosis and major bleeding) and improved the time in TTR. POC is now reimbursed by Medicare. However, FDA held a Public Workshop in 2016 on March 18, 2016 to present new data regarding the risk of "POC Prothrombin Time/International Normalized Ratio Devices for Monitoring Warfarin Therapy." To improve the clinical management of warfarin and to aid with the development of safe and effective POC and patient self-testing PT/INR devices.

When a physician begins warfarin therapy (warfarnization) for a patient, the doctor will aim to reach a INR of 2-3 in most cases. A target INR may be 2.5-3.5 (or even 3.0-4.5) in patients with one or more mechanical heart valves. The first three days of "warfarinization" the levels of protein C and protein S (anticoagulation factors) will drop faster than procoagulation proteins (factor II, Vii, IX and X) producing an imbalance towards increased clotting. Therefore, bridging anticoagulant therapies (usually heparin) are often used to reverse this temporary hypercoagulable (clot prone) state. The maintenance dose of warfarin for a patient can fluctuate significantly depending on the amount of vitamin K1 in the diet. Foods high in vitamin K1 are parsley, cilantro, dill, cruciferous vegetables such as cabbage, broccoli and the darker lettuces and leafy green vegetables. Certain vegetable oils can be high in vitamin K1. Therefore, the dose of warfarin will continue to require monitoring and adjustment.

Warfarin is best as an anticoagulant in areas of "*slowly running blood*"- such as the veins and blood pooled behind artificial heart valves and natural valves as well as pooled blood in dysfunction cardiac atria. It is prescribed to prevent/treat/reduce clots in patients with atrial fibrillation (AFib), artificial heart valves, DVT and PE- with risks of clots in *veins*. It is also used in patients with antiphospholipid syndrome, and will occasional be prescribed post myocardial infarction (MI) but is considered less effective preventing a new clot in coronary arteries. Prevention of clotting in arteries is usually done by prescription of antiplatelet drugs which act by a different mechanism. Approved drug alternatives to warfarin (promoted without a need for drug monitoring or dose titration)- ie convenience for the patient- are Pradaxa (dabigatran), Eliquis (apixaban), edoxaban, Xarelto (rivaroxaban) – approved for use in patients with non-valvular AFib. Xarelto is approved for its effects in the veins for prevention/treatment/ reduction of DVT and PE.

current gold standard for oral anticoagulation for patients with risk of thrombosis and thromboembolism.

20. This export report is intended to be no unsupported opinions offered about the 'state of mind' or 'intent' of either of the Defendants regarding its actions for development, approval and commercialization of XARELTO in the United States.

21. I have attached a copy of my most recent Curriculum Vitae attached as APPENDIX A and a list of my last four years of deposition and court testimony as APPENDIX B. I am charging $500/hour for review and $1000/hour for deposition or court testimony.

## II.   OVERVIEW

### A.  PURPOSE OF REVIEW

22. I have attempted to focus my Expert Report specifically on FDA-related regulatory issues for XARELTO, which was approved by FDA (NDA 22439) in November 2011 for stroke prevention in patients with atrial fibrillation, and its subsequent marketing in the United States. The regulatory discussion must also include Defendants' conduct and findings in its other FDA approved indications for XARELTO beginning July 1, 2011: 1) Deep Vein Thrombosis (DVT) and Pulmonary Embolism (PE) prophylaxis in patients undergoing orthopedic hip or knee replacement surgeries ("VTE-P")(NDA 22406 July 1, 2011- 10mg immediate release); and 2) treatment of DVT and/or PE and reduction in recurrence of DVT and/or PE ("VTE-T") and commitment to the Pediatric Research Equity Act (PREA) to develop pediatric indications (NDA 22406-Supplement S-001, S-002, and S-003 approved November 2, 2012 ).

23. The regulatory discussion also must include FDA's denial of the NDA for the indication of Acute Coronary Syndrome ("ACS") based on its flawed ATLAS clinical studies (*see* FDA Advisory Panel Meeting May 23, 2012),[3] and the January 2014 Advisory Panel meeting to review approval of the 2.5 mg dose for AC, which was also subsequently denied.[4] In terms of showing the corporate histories of both sets of Defendants,[5] and poor attention and control of its clinical studies, there must be a description of FDA's identification of inadequacies and shortcomings in the conduct of Defendants' clinical studies and audits including RECORD 4, EINSTEIN, ATLAS,

---

The common side effect of warfarin is hemorrhage (bleeding). The risk of bleeding is small but definite (a median annual rate of **1-3%** has been reported." [see Holbrook, et al. *Evidence-based management of anticoagulant therapy: Antithrombotic Therapy and Prevention of Thrombosis*, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. Chest (2012) 141(2 Suppl): e152S-84S. PMC 3278055. PMID 22315259] The most catastrophic risk of warfarin bleeding is in the brain (intracerebral hemorrhage/hemorrhagic stroke) and the spinal cord. The risk of bleeding greatly increases once the patient's INR is > 4.5.

[3] XARELTO_BPAG_02515034; XARELTO_BPAG_02515046.

[4] XARELTO_BPAG_00055741.

[5] Bayer Healthcare Pharmaceuticals, Inc, Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG ("Bayer"); Janssen Research & Development LLC, Janssen Ortho LLC, Jansen Pharmaceuticals Inc., Johnson & Johnson("Janssen"); also referred to herein as "Defendants" or "Sponsor(s)".

MAGELLAN, CHF, as well as ROCKET. These studies and FDA's actions with Defendants for approval and denial of indications are provided to show the interaction history with FDA and the Defendants' internal corporate histories, knowledge and notice about the performance dose-response risks of XARELTO in terms of major bleeding risk and its subsequent failure to adequately label and warn physicians and patients.

24. The United States regulatory discussion must also touch upon various interactions between Defendants and the European Union's European Medicines Agency (EMA) for XARELTO as it relates to sales in the United States. The EMA is included to again provide corporate actions and notice to Defendants, and also to contrast Defendants' actions with different regulatory bodies in terms of FDA, again as related to United States physicians and the safety of their patients.

25. Sanjay Jalota, of Janssen's Regulatory Affairs, who interacted with FDA, testified that Bayer conducted RECORD (1-4) for the hip and knee indication, EINSTEIN for the DVT/PE indication, and MAGELLAN for the proposed medically ill patients indication; and Janssen conducted ROCKET for the atrial fibrillation (AFib) indication and ATLAS for the proposed Acute Coronary Syndrome (ACS) indication.[6] Neither the medically ill indication nor the ACS indication resulted in FDA approval. Through an October 1, 2005 Collaboration Agreement[7] with Bayer, the developer of rivaroxaban, Janssen became involved in the worldwide development and United States sales of XARELTO. Bayer retained responsibility for XARELTO manufacturing and marketing outside the United States and for overseeing drug safety throughout the world including the United States.

## B. DEPOSITIONS REVIEWED

26. I have reviewed the following Bayer corporate depositions and exhibits:
Dr. Andrea Derix (Vol I&II); Dr. Tomasz Dyszynski; Dr. Martin Homering (Vol I&II); Dr. Andrea Horvat-Broecker; Dr. Dagmar Kubitza (Vol I&II); Dr. Frank Misselwitz; Dr. Wolfgang Mueck(Vol I&II); Dr. Theodore Spiro (Vol I&II); Dr. Juergen Weber (Vol I&II); Dr. Stefan Willmann; Dr. Martin van Eickels; Dr. Bernard Glombitza; Mr. Andy Hargreaves.

27. I have reviewed the following Janssen corporate depositions and exhibits:
Dr. Paul Burton (Vol I,&II) ; Dr. William Byra (Vol I&II) ; Dr. Peter DiBattiste (Vol I&II); Susan Geiger; Paul Herman (Vol I&II); Sanjay Jalota (Vol I&II); Sigmond Johnson (Vol I&II); Andrea Kollath (Vol I&II) ; Kenneth Todd Moore; Michael Moye (Vol I&II) ; Dr. Christopher Nessel (Vol I&II) ;  Dr. Gary Peters; Alla Rhoge; Gregg Ruppersberger (Vol I&II); Troy Sarich; Nauman Shah; Elizabeth Wood; Christopher Major; Kimberly Nessel; Bernadette O'Brien; Purve Patel; Anne Vosatka; Dr. Shujian Wu; and Dr. Zhong Yuan.

---

[6] Jalota depo 3/3/16, p. 81: L 1-24; Jalota depo 3/4/16, p. 683: L 1-9.
[7] Derix Exhibit 73

### C.  RELIANCE LIST

28. I have also reviewed additional documents as cited within my report, and/or listed on my Reliance List (APPENDIX C).

### D.  PUBLICLY AVAILABLE FDA DOCUMENTS AND MEDICAL LITERATURE

29. I have also obtained public FDA documents from FDA's website, including FDA's Advisory Panel and Public Workshop transcripts and briefing materials, and CDER's published XARELTO NDA 202439 and NDA 022406, including accompanying review materials, labels, and notifications.

## III.  OPINIONS

All opinions set forth in my report are stated to a reasonable degree of medical certainty. I reserve the right to modify or supplement this report and my opinions.

### A.  OPINION 1

Pharmaceutical manufacturers throughout the drug development process have a duty to define the pharmacologic properties of its drug for a therapeutic indication and to remain the knowledgable expert about the pertinent adverse effects.  Prescription drugs sold to the public are required to be adequately labeled and sold with recommendations for a safe and effective dose.  Before FDA's NDA approval of XARELTO for stroke and systemic embolism prevention for patients with nonvalvular Atrial Fibrillation (SPAF), Defendants already had a 'consensus'[8] internally that the 20mg/15mg OD dose for AF patients was too high.  Without providing monitoring recommendations or the ability for a physician to adjust a patient's dose, certain patients were placed at increased risk of major bleeding without additional benefit.  Despite the increased risk of XARELTO for major bleeding and death, and having received the FDA's multiple recommendations to modify and/or lower the dose based on patient risk including for SPAF ,Defendants continue to sell XARELTO for SPAF at 20mg OD without providing adequate warnings for patients.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC§ 352(a)(f)(1)(2), (n); 21 CFR§ 201.57; 21 CFR§ 314.50

### B.  OPINION 2

Defendants, from the dose ranging Phase IIb Study 11527 and Study 19044 (PK000131) with rivaroxaban plasma concentration measurements (PK), knew of the inter-individual variability and differences (slow/fast) in patient absorption over time of a single dose of rivaroxaban.  Such information, along with a narrow therapeutic window (bounded on one hand by a risk of major bleeding and the other side by loss of efficacy) should have placed a reasonable NOAC manufacturer on notice to carefully study, identify and develop recommendations for therapeutic drug monitoring ("TDM") and proper dose

---

[8] Burton Exhibit 55

titration in specific populations, and situations, at increased risk (and when "one size does not fit all"). Defendants have been informed by the FDA (as well as the EMA and other health authorities) and physicians that to improve patient safety, there must be methods for periodic monitoring of anticoagulation effect, dose titration and updating the label. Despite those many requests, Defendants continued to not adequately study the exposure-risk benefits of XARELTO.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC§ 352(a)(f)(1)(2), (n); 21 CFR §201.57; 21CFR§ 314.80; 21 CFR §312

## C. OPINION 3

XARELTO as sold by Defendants has the highest risk of major bleeding among the NOACs. The FDA Medical Officer Reviews indicated that XARELTO should be reserved by physicians to a second or third choice of anticoagulant for AF and that there was no reason to switch a patient successfully managed with warfarin to XARELTO. However, XARELTO has become the most frequently prescribed NOAC in the United States for SPAF and now has surpassed warfarin prescritions for AF patients. Defendants market XARELTO aggressively as a once a day drug and overstate unsupported benefits.

**Applicable Regulations**: 21 USC 331(a)(b); 21 USC 352(a)(f)(1)(2), (n); 21 CFR 201.57

## D. OPINION 4

Defendants obtained FDA's approval for the SPAF indication based on the ROCKET trial, which utilized a faulty investigational INR point-of-care (POC) device for the management of the warfarin patients. The flaw in the POC device generated lower INRs for the warfarin patients, thereby increasing the bleeding risk for warfarin patients, and contributing to the finding of non-inferiority (not superiority) for the safety of XARELTO. Moreover, the poor INR control seen in the warfarin treatment group was a symptom of the poor quality and oversight for the investigation. Further, Defendants obtained NDA approval of VTE prevention in hip/knee surgeries using portions of its flawed RECORD studies. The DVT/PE prevention indication was also granted as a supplemental NDA based on the original VTE prevention indication using the flawed RECORD studies. The proposed ACS indication was denied twice based on significant flaws and loss of patient data with Defendant's ATLAS studies. Such a history of poor control of the performance and oversight of its international clinical trials undermines the reliability of XARELTO placingpatients at increased risk of bleeding.

**Applicable Regulations:** 21 CFR§ 812; 21 CFR§ 314.50

## E. OPINION 5

As early as 2008, the 20mg OD dose for Xarelto for the SPAF indication (i.e., 15/20mg OD) was shown to be too high and carried an increased risk of bleeding. Defendants planned for a ROCKET II study with lower and BID dosing, but it was halted shortly after receipt of comments by Marketing advising not to pursue the study based on

10

potential harm to sales .  ROCKET II was to be performed to optimize dose and help reduce the risk of bleeding. Defendants' actions have placed United States atrial fibrillation patients at increased risk for bleeding from too high exposure to XARELTO.

**Applicable Regulations: 21 USC§ 352(a)(f)(f)(2); 21 CFR§ 314.70**

### F.  OPINION 6

FDA's drug labeling requires a manufacturer to identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. Defendants have not provided an adequate label with updated laboratory and risk information, Defendants proposed a Section 5 Laboratory Tests section (based on the Lovenox label) as a contingency[9] if pushed by FDA for creation of such a section. Using common laboratory studies, Defendants identified and utilized rivaroxaban's linear concentration-effect relationship for a biomarker of anticoagulant effect and reflection of plasma concentration at Cmax and Ctrough (by PT max and PT trough).  According to Bayer's Dr.  Mueck (2014), prolongation of the PT (using Neoplastin) was correlated with the rivaroxaban plasma concentrations in a linear relationship.[10] Defendants knew there was a relationship between XARELTO PT levels (as a measurement of anticoagulation effect) and bleeding risk, and PT could be used to identify patients at increased risk of bleeding.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 1.21, 21 CFR§ 201.57

### G.  OPINION 7

Measurement of PT (using Neoplastin Plus or another appropriately sensitive reagent) in XARELTO patients can be helpful in identifying patients at increased risk for serious adverse events based upon a patients' anticoagulant response to XARELTO.  Obtaining PT  allows a physician in clinical decision-making to determine if XARELTO is the appropriate drug for a patient and to decide whether the patient should continue on XARELTO therapy.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 1.21, 21 CFR§ 201.57

### H.  OPINION 8

Defendants failed as the ROCKET-AF sponsor to adequately identify a suitable point-of-care (POC) device for reliable management of warfarin and patient safety for the ROCKET trial beginning with the due diligence stage. Defendants failed to validate the acceptable performance of the ALERE/HemoSense INRatio POC device. Defendants failed as IND and clinical trial sponsor to: 1)  select a safe and effective device or method for determination of warfarin management; 2) adequately monitor the performance of the POC INRatio device during ROCKET worldwide; 3) implement back-up methods

---

[9] XARELTO_JANSSEN_05911809.
[10] Mueck, et al. Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban, *Clin Pharmacokinet* (2014) 53:1-16.

including laboratory testing to protect patient safety; 4) investigate and report adverse events and failures of the device to the appropriate Adverse Event database; 5) adequately instruct and provide an algorithm to investigators for warfarin management. Such actions by Defendants in the role of sponsor of a worldwide pivotal clinical study, served to underestimate the true bleeding risk for AF patients on XARELTO as compared to warfarin.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 312

## I.   OPINION 9

At the ROCKET TASK FORCE meeting held in September 2015, Defendants acknowledged the following: a flaw in the algorithm associated with incorrect readings with the INRatio device.; that 3400 devices used in ROCKET were included in Alere's recall in December 2014; 32% of POC values were greater than .5 units different from paired lab values; and that INRs of 3.1 to 12.2 fell below the lab measurements and had the risk for overanticoagulation and fatal bleeding. [9]

**Applicable Regulations:** 21 CFR§ 820; 21 USC 331(a)(b; 21 CFR§ 314.50

## J.   OPINION 10

a.   Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclsoures for ROCKET and adverse events associated by:

- Failing to adequately report, investigate, and document erroneous/discrepant INR readings occurring during ROCKET to the clinical trial database and reports for regulatory agencies, (including the FDA).

- Failing to adequately report erroneous/discrepant INR values and associated adverse events for ROCKET to the IDMC and Executive Committee.

b.   Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosure about ROCKET and associated adverse events requested of them by by FDA:

- Failing to identify and report erroneous/discrepant INR values and associated adverse events (including but not limited to the Covance Recheck Program) in response to the FDA's March 2011 Information Request.

- Failing to report discrepant INR values in response to the January 12, 2016 FDA Information Request.

---

[9] Nessel Exhibit 40

- Failing to inform FDA about the CoVance Recheck program in response to the January 12, 2016 FDA Information Request.

**Applicable Regulations**: 21 CFR §314.80; 21 CFR§ 314.81, 18 USC § 1001

## K.  OPINION 11

The XARELTO label is inadequate in the following ways:

a.  Xarelto has a comparable risk of major bleeding to that of warfarin. However, in contrast to the warfarin label, the Xarelto label does not contain a black box warning about the risk of major bleeding. By including a black box warning about bleeding risk in one product's label and not the other's, it improperly suggests to physicians and patients that one is safer than the other when it is not supported by substantial evidence.

b.  It does not contain the distribution of patient PK values observed in the clinical trial program. Because the range and distribution of observed exposures was large, and due to the relationship between exposure and outcomes, this is important information for physicians.

c.  There is no recommendation for physicians to measure the levels of XARELTO or the drug effect (e.g., PT Neoplastin) in a patient's blood in order to adjust the dose and/or discontinue the drug to avoid unnecessary risk.

d.  It does not have the same plasma concentration information and the commercial use of anti-factor XA calibrators and control required in the European label. Defendants have also failed to provide data on the correlation between plasma concentrations, major bleeding, and efficacy.

e.   It fails to include adequate instructions on helpful laboratory testing (e.g,. prothrombin time).

f.  It fails to provide physicians with the severity and frequency of post-marketing bleeding risk reported.

**Applicable Regulations:** 21 USC§ 352(a)(f)(1)(2); 21 CFR§ 314.70

## L.  OPINION 12

A United States pharmaceutical manufacturer has a duty to exercise reasonable care to avoid foreseeable injury to the users of its products. Further, a manufacturer has a duty to adequately test its products commensurate with the dangers involved and to minimize the risk of foreseeable injury.
Defendants failed to exercise reasonable care and adequately test its products in that Defendants failed to conduct any dose-ranging studies in patients with atrial fibrillation to

13

determine the safest effective dose. As a result, despite being aware of Xarelto's pharmacological profile that indicated either a lower dose or a twice-daily dose would place patients at a lower bleed risk while maintaining a level of Xarelto to effectively reduce the risk of stroke, Defendants failed to conduct any testing in the ROCKET AF study of either a lower dose or twice daily dosing. Defendants also failed to voluntarily update its labeling to provide adequate instructions for use and warnings to ensure the safety of patients.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC §352(a)(f)(1)(2)(n); 21 CFR §314.50; 21 CFR§ 201.57; 21 CFR §314.70

## M. OPINION 13

Defendants' failure to test either a lower dose pill or twice-daily dose as initially planned but not investigated, for ROCKET II, and make such a lower dose pill or twice-daily dose available for use renders Xarelto unreasonably dangerous as designed. Further, a safer alternative design existed; primarily, a lower dose pill with periodic laboratory testing that would reduce the risk of bleeding.

**Applicable Regulations:** 21 CFR§ 314.50; 21 CFR§ 314.70; 21 USC §352(a)(f)(1)(2)(n)

## N. OPINION 14

Defendants' engaged in direct-to-consumer (DTC) marketing by TV, internet, placement in doctor's offices, third party support groups, to specifically target patients that were well managed on warfarin and encourage a switch to XARELTO[10].  Patients were encouraged to ask physicians for XARELTO for the lifestyle convenience, but Defendants failed to inform patients or physicians of the potential increased risks for major bleeding and lack of a reversal agent.

**Applicable Regulations**: 21 USC§ 352(a)(f)(f)(2), 21 CFR 202.1; 21 CFR 1.21, 21 CFR 201.57

## O. OPINION 15

Defendants' sales representatives actively promoted XARELTO for unapproved clinical indications by use of publications by Defendants' Research and Development department. These publications were not balanced or accurate, and overstated benefits without adequately providing risks to health care providers. The publications were distributed by Janssen to support claims like 'superiority' or unapproved efficacy of Xarelto for expanded, unapproved indications, for example ACS, medically ill patients, and congestive heart failure. Also, Defendants' EINSTEIN studies were used to support superiority of XARELTO compared to warfarin for ROCKET.  Futher, sales representatives circulated the May 9, 2009 Lancet article by Turpie, et al. regarding the

---

[10] Herman Exhibit 5

RECORD 4 study with no correction or update for physicians, or Lancet, indicating that the FDA concluded that the entire RECORD 4 study was flawed and unreliable. [11] This article was further revised in 2013, yet still not corrected, to help with sales.

**Applicable Regulations:** 21 CFR§ 314.70; 21 USC 331(a)(b); 21 CFR 201.128; 21 CFR 202.1

### P.  OPINION 16

Defendants acted unscientifically  by persisting in pursuit of a marketing goal from 2002[12] to sell a once-a-day, direct oral anticoagulant (DOAC) tablet, requiring no monitoring or laboratory testing despite the foreseeable risks for bleeding and potential harm for patients.. The Defendants' marketing plan was to provide a drug taken permanently by AF patients as more convenient than warfarin but with greater risk for bleeding and death for certain United States patient groups. Defendants continue to make these Xarelto marketing claims as a once a day single dose or "one size fits all" without adequate warnings and dose information and despite the contrary science for rivaroxaban seen throughout its development, recommendations of physicians and experts, and the post-market reports of increased life-threatening bleeding risks for patients.

**Applicable Regulations:** 21 CFR§ 314.50; 21 CFR§ 314.70; 21 USC §352(a)(f)(1)(2)(n); 21 USC §331(a)(b); 21 CFR§ 1.21

## IV.  BAYER HEALTHCARE'S DEVELOPMENT OF BAY 59-7939 (RIVAROXABAN)

### a.  BAYER'S '*GO/NO-GO*' PLAN FOR BAY 59-7939 WAS AS A FIXED DOSE, NO MONITORING ORAL ANTICOAGULANT

30. In June 25, 2002, Bayer created a "*Go-No-Go*" plan for the development of BAY 59-7939, a factor Xa inhibitor, as to acceptable versus not acceptable findings in Phase I to Phase IIa testing, Phase IIa to Phase IIb testing, and finally Phase IIb to Phase III testing. For the Phase I to Phase IIa period, a "NO GO" with development would be "toxicity, lack of dose-response, intolerable high inter- and intra-individual variations." Specific criteria for stopping development (NO-GO): "Impossible to reach inhibition of factor Xa activity in plasma of 70% in peak or 30% in trough by three times a day (tid) dosing." The "GO" criteria for that phase included the definition of a dose response; inter- and intra-individual variations were low; and the drug allowed for unmonitored dosing.  At the Phase II a to Phase IIb stage the "NO GO" criteria were: toxicity, lack of dose-response, too narrow a therapeutic window, and more than tid dosing required.  Specific NO-GO criteria also included all the doses tested were shown to be inferior to enoxaparin (Lovenox).  The GO criteria included the clinically effective dose did not cause major bleeding >4%.  For the later Phase IIb to Phase III, the "NO GO" Specific criteria included: Therapeutic index too narrow, unable to go for "fixed, unmonitored

---

[11] Burton Exhibit 17
[12] Derix Exhibit 73

dose." The GO criteria included "Clinically effective dose does not cause major bleeding >4%."[13]  Throughout the process, Bayer was seeking to develop a one dose fits all drug, which did not require monitoring, and had an acceptable major bleeding rate of < 4%.

31. Wolfgang Mueck, Ph.D., Head of Clinical Pharmacokinetics/ Cardiovascular at Bayer Healthcare AG in Wuppertal, Germany, became involved with the rivaroxaban project in 2002, when he took over responsibility for XARELTO PK/PD Modeling from Frank-Peter Thiel. He became an official member of the XARELTO Project Team in 2003 when he replaced Dr. Barbara Voith. He remained a primary member of the Xarelto Project Team until 2012.  He was also Head of Pharmacokinetics and Pharmacodynamics Modeling and Simulation for Clinical Pharmacokinetics at Bayer.[14]

32. A 2003 Frank-Peter Thiel email described Phase I studies (PK/PD) with BAY 59-7939 conducted with and producing individual modeling in normal healthy male volunteers: Study 10847-multiple dosing conditions, administration after food)[15] dosing of 5mg OD, BID, and three times a day (TID), and 10 mg TID all given after food; 5-10-15-20-30 mg tablets in Study #10846  modeling  a 10mg tablet fasting versus with food; and a Pop PK/PD simulation with tablets fasting (Study 10842- single dose, fasted conditions).[16]

33. In terms of PK/PD development at Bayer, there is an August 8, 2002 Simulation /Curve for TOPFIT Program through day 7 with modeling of multiple dose 5mg OD for Study 10847 (above in email). As a Population PK/PD study in normal healthy male volunteers it measured Concentration [μg/L], FXa Inhibition [%], and PT ratio.[17]

34. Dr. Mueck testified that he understood when he joined the XARELTO Project Team that "the objective was […] to develop a new oral anticoagulant where no monitoring was necessary," which was "the only criterion."[18]  He also agreed to the definition of "drug-level monitoring" as taking blood samples from patients, such as PT, "to determine whether or not there should be any change of the drug dose for a particular patient."[19]

b. **DEFENDANTS' PRECLINICAL INVESTIGATION OF '*HIGHLY POTENT*' FACTOR XA INHIBITOR AND USE OF PROTHROMBIN TIME (PT) FOR MONITORING THE ANTICOAGULANT EFFECT**

35. According to Perzborn (2005)[20] Bayer's focus for product development was to find an oral anti-coagulant FXa inhibitor which showed good oral bioavailability and predictable pharmacokinetics, and did not require routine coagulation monitoring.  BAY 59-7939

---

[13] Mueck Exhibit 16
[14] Mueck Exhibit 2; Mueck Exhibit 3; Mueck Depo 2/23/16, p. 17: L 11-20.
[15] Mueck Exhibit 11
[16] Mueck Exhibit 12
[17] Mueck Exhibit 2; Mueck Exhibit 3
[18] Mueck depo 2/23/16, p. 158: L 5-10
[19] Mueck depo 2/23/16, p. 38: L 15-22
[20] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor*. Journ of Thrombo and Haemost (2005) 3: 514-521.

competitively inhibits human FXa ($K_i$ 0.4nm) **with >10,000-fold greater selectivity** than other serine proteases; and also inhibited prothrombinase activity ($IC_{50}$ 2.1nm).[21] Therefore, BAY 59-7939, at the very beginning of development, was shown to be a '*highly potent*' FXa inhibitor with the potential to produce significant anticoagulant effects. Due to these characteristics, Bayer should have used reasonable care in its dose development and optimization and creation of use recommendations for healthc care providers.

36. During Bayer's initial *in vivo* studies with rats and rabbits (according to Perzborn (2005)[22]), BAY 59-7939 was shown in the rat venous stasis model to reduce venous thrombosis (fibrin-rich, platelet poor thrombi) dose dependently and arterial (fibrin and platelet-rich) thrombus in arteriovenous (AV) shunt model in rats and rabbits. In terms of efficacy and product development, BAY 59-7939 required only slight inhibition of FXa to reduce venous thrombi (32% at $Ed_{50}$[23]); arterial thrombus formation reduction in rats and rabbits required stronger inhibition of FXa (74%, 92% at $ED_{50}$). The calculated plasma concentrations of BAY 59-7939 in the rabbit at $ED_{50}$ were 14-fold lower than calculated plasma concentrations for $ED_{50}$ in rats, correlating with a 14-fold lower $IC_{50}$[24] for FXa inhibition in the rabbit compared with the rat.  Bleeding times in both rats and rabbits were not significantly affected by antithrombotic activity of BAY 59-7939. Based on these initial studies, BAY 59-7939 was selected as Bayer's next potential direct oral anticoagulant compound for further clinical development. (Perzborn (2005)).[25]

37. In its preclinical oral administration studies in rats and also dogs, BAY 59-7939 showed high oral bioavailability (in dogs 60-86%).[26]  The antithrombotic effect of BAY 59-7939 was primarily attributed to its strong inhibition of FXa; and *in vitro* it was not seen to directly affect platelet aggregation.[27] However, BAY 59-7939 *in vivo* potentially decreased platelet activation indirectly by altering thrombin generation and thrombin-induced platelet aggregation.[28] So BAY 59-7939 carried potential anticoagulant effects for both venous and arterial systems.

---

[21] $IC_{50}$= The half maximal inhibitory concentration is the measure of the effectiveness of a substance in inhibiting a specific biological or biochemical function.

[22] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor*. Journ of Thrombo and Haemost (2005) 3: 514-521.

[23] $ED_{50}$ = Effective Dose for 50% - the median effective dose for 50% of the population that use the drug.

[24] $IC_{50}$ = The half maximal inhibitory concentration is the measure of the effectiveness of a substance in inhibiting a specific biological or biochemical function.

[25] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor*. Journ of Thrombo and Haemost (2005) 3: 514-521.

[26] Weinz C, Buetehorn U, Daeher HP, Kohlsdoffer C et al. *Pharmacokinetics of BAY 59-7939- an oral, direct Factor Xa inhibitor- in rats and dogs.* Pathophysiol Haemost Thromb (2004) 33: (Suppl 2) PO054.

[27] Perzborn EP, Strassburger J, Wilmen A, et al. *Biochemical and pharmacologic properties of BAY 59-7939 , an oral, direct Factor Xa inhibitor.* Pathophysiol Haemost Throm (2004); 33 (Suppl 2) Abstract PO079; Hoppensteadt D, neville B, Maddenini J, Perzborn E, Misselwitz F, Fareed J. *Comparative anticoagulant and antiprotease actions of BAY 59-7939- an oral, direct Factor Xa inhibitor- and enoxaparin and fondaparinux*. Pathophysiol Haemost Thromb (2003): 33 (suppl2).

[28] Kaiser B, Jeske W, Walenga JM, Fareed J. *Inactivation of factor Xa by the synthetic inhibitor DX-9065a causes strong anticoagulant and antiplatelet actions in human blood*.  Blood Coagul Fibrinolysii (1999); 10:495-501.

38. Perzborn (2005)[29] wrote that Factor Xa lies at the convergence of both the intrinsic and extrinsic coagulation pathways.  Therefore, direct inhibition of FXa by BAY 59-7939 is expected as its measurable anticoagulant effect to show prolongation of both PT and aPTT.  The prothrombin time (PT) assay even in pre-clinical stages was shown to be more sensitive for demonstrating BAY 59-7939 plasma anticoagulation effects than the aPTT assay.  *In vivo*, Bayer's authors demonstrated a "dose-dependent prolongation of PT in rats and rabbits."  Using the rabbit AV-shunt model, there was a strong correlation seen between PT and BAY 59-7939 plasma concentration ($r$=0.98).  This suggested to the investigators that PT could be used by Bayer to characterize the anticoagulant efficacy of BAY 59-7939 in humans.  "*In clinical phase I studies, good correlation between plasma levels of BAY 59-7939 and prolongation of clotting times was observed*." (Kubitza (2003))[30].

39. In preclinical studies, at anti-thrombotic 'effective' doses, neither the rat tail-bleeding time or rabbit ear-bleeding time (EBT) were significantly altered. The effect seen in the rat (lack of bleeding time change) was thought possibly attributable to the rat's higher normal baseline PT.  Although these clotting results may not be directly applicable to humans, the authors indicated "they may provide an estimation of bleeding tendency in humans".  In Phase I clinical studies conducted in healthy males (Kubitza (2003)[31]), BAY 59-7939 did not produce evidence of significantly increased bleeding times, or signs and symptoms of bleeding across a wide range of oral doses. [32] The Phase I results in healthy volunteers suggested to Bayer's investigators there was a relatively 'wide therapeutic window' available for BAY 59-7939 between antithrombotic (anti-clot/anti-clotting) 'efficacy' (benefit) and 'bleeding tendency'(risk).[33]

40.  Since BAY 59-7939 was shown in preclinical studies to be a highly potent inhibitor of FXa in rats and rabbits, Bayer continued to use these animal models for further investigation of the ability of BAY 59-7939 to prevent thrombus formation for established venous and arterial thrombosis models.  BAY59-7939 pre-clinically showed a potential dose-dependent antithrombotic activity for both venous and arterial thrombi, with the highest potency and best potential for a commercial role in the venous model.

[29] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor*. Journ of Thrombo and Haemost (2005) 3: 514-521.

[30] Kubitza D, Becka M, Wensig g, et al. *Single dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhbitior in healthy male subjects.* Blood 2003: 102: Abstract 3010; Kubitza D, Becka M, et al. *Multiple dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhibitor in healthy male subjects*. Blood (2003) 102: Abstract 3004.

[31] *Id.*

[32] Kubitza D, Becka M, Wensig g, et al. *Single dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhbitiro in healthy male subjects.* Blood (2003): 102: Abstract 3010. ; Kubitza D, Becka M, et al. *Multiple dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhibitor in healthy male subjects.* Blood (2003): 102: Abstract 3004.

[33] Leadley RJ Jr. Coagulation factor Xa inhibition: biological background and rationale. *Curr Top Med Chem* 2001; 1: 151-9.

The differences (venous vs arterial thrombosis) in the two models were thought to reflect the greater role and involvement of platelets in formation of arterial thrombosis (AT) compared to venous thrombosis (VT).

41. Other published animal models for other direct FXa inhibitor drugs had shown a moderate increase in PT and aPTT at proposed antithrombotic doses.[34] For BAY 59-7939 there was a potent inhibitor of FXa, even at 'low or moderate levels' of anticoagulation: 1.8-, 3.2-, and 1.2-fold there were increases in PT produced in the rat venous model and both the rat and rabbit AV shunt models. The data suggested that potent inhibition of FXa by BAY 59-7939 ('efficacy') could be achieved at relatively low doses. Thus, a low dose could produce a low to moderate increase in systemic anticoagulation (as measured by PT).

42. BAY 59-7939 was shown to inhibit endogenous FXa potently in both human and rabbit plasma ($IC_{50}$ 21 nm) when compared to rat plasma ($IC_{50}$ 590nm) (i.e., $IC_{50}$ dose of 21nm vs 590nm).  Anticoagulant effects in human plasma capable of producing a doubling of PT and aPTT were detectable at 0.23 and 0.69 uM, respectively.  The measureable anticoagulant effects in human plasma at low BAY 59-7939 levels could be monitored by PT and aPTT.

43. Using laboratory studies, Bayer identified for the anticoagulant effect of BAY 597939 a linear concentration-effect relationship with PT.  As a result, in 2003 Bayer internally referred to the blood clotting parameter PT as "the most relevant parameter for safety monitoring in clinical setting."[35] Table 2 shows the differences in effect of BAY 59-7939 on inhibition of FXa ($IC_{50}$) for human, rabbit and rat plasma and the concentration required of each to double PT and APTT.  The $IC_{50}$ (buffer) shows in terms of BAY 59-7939 inhibition potency human>rabbit>rat, $IC_{50}$ (plasma) human=rabbit>rat.

**Table 2** Effect of BAY 59-7939 on inhibition of human, rabbit, and rat Factor Xa (FXa) in buffer, plasma FXa, and the concentrations required to double the prothrombin time (PT) and activated partial thromboplastin time (aPTT) in vitro ($CT_2$)

| Species | FXa (buffer) $IC_{50}$ (nM) | FXa (plasma) $IC_{50}$ (nM) | PT $CT_2$ (µM) | APTT $CT_2$ (µM) |
|---------|-----------|-----------|-----------|-----------|
| Human | $0.7 \pm 0.01$ | $21 \pm 1.0$ | $0.23 \pm 0.02$ | $0.69 \pm 0.09$ |
| Rabbit | $0.8 \pm 0.01$ | $21 \pm 2.0$ | $0.12 \pm 0.01$ | $1.97 \pm 0.48$ |
| Rat | $3.4 \pm 0.02$ | $290 \pm 20.0$ | $0.30 \pm 0.02$ | $2.89 \pm 0.19$ |

Results expressed as mean ± SEM.

36

---

[34] Leadley RJ Jr. Coagulation factor Xa inhibition: biological background and rationale. *Curr Top Med Chem* 2001; 1: 151-9.

[35] Mueck Exhibit 12

[36] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor.* Journ of Thrombo and Haemost (2005) 3: 514-521.

19

c. **IN 2002 BAYER SUBMITTED THE IND FOR BAY 59-7939**

44. Bayer first submitted an Investigational New Drug Application (IND) to FDA to begin human clinical studies with rivaroxaban in the United States on May 29, 2002 followed by a protocol amendment on July 3, 2002 and a meeting with FDA on October 10, 2002.[37] A Type C [38]meeting was held on July 25, 2003, with the first annual report submitted to FDA on July 29, 2003.

45. On October 11, 2002 there was a meeting between Bayer and FDA (CDER's Division of Gastrointestinal & Coagulation Drug Products) to discuss Bayer's phase I and phase II clinical development options for BAY 59-7939. FDA sent Bayer the agency's minutes on December 13, 2002 via Gautam Shah, Ph.D., Deputy Director, Regulatory Affairs.[39] According to the minutes, FDA's Medical Officer Kathy Robie-Suh, MD, Ph.D. was the medical team leader for Hematology assigned to the Bayer project. Bayer's attendees at the FDA meeting included D. Kubitza, MD, and F. Misselwitz, MD.

d. **BAYER HAS ALWAYS MEASURED XARELTO'S ANTICOAGULATION EFFECT IN PATIENTS USING COMMON LAB TESTS (PT, aPTT, AND HEPTEST)**

46. Bayer's BAY 59-7939 was under clinical development in 2003 for several different indications including DVT. The study compound itself was intended to fill "one of the greatest current unmet medical needs"… "an oral anticoagulant that overcomes the interactions, safety concerns and need for monitoring that have limited the use of warfarin." As part of a Phase I characterization, Dr. Kubitza and Bayer had performed a single dose study (Study 10842), multiple ascending dose studies (Study 10847)[40] in young healthy male volunteers, and used relevant biomarkers of 'factor Xa inhibition and anticoagulant effectiveness, PT, PTT, heparin test (HepTest).'

47. Dr. Kubitza sent a copy of FDA's meeting minutes to Dr. Mueck on April 7, 2003.[41] According to the FDA's minutes, on July 21, 2002, Bayer requested a meeting to obtain feedback on its proposed Phase I and Phase II clinical plans. In advance of the meeting, Bayer sent FDA a September 6, 2002 background package, which indicated that Bayer planned to measure plasma levels of factor Xa activity and PT as biomarkers of pharmacodynamic (PD) activity. Bayer told FDA "…commercially available methods will be used to measure PT and the activity of factor Xa." Bayer then asked FDA a series

---

[37] XARELTO_JANSSEN_06628658

[38] **Type C meeting** = Any meeting other than a Type A or B regarding the development and review of a product. Type C meetings are to occur within 75 days of FDA receipt of a written request for a meeting. The requester can request a written response to the sponsor's questions rather than a face-to-face meeting, videoconference, or teleconference. Longest time permitted between written request and meeting (75 days).

[39] Mueck Exhibit 4

[40] Kubitza D, Becka M, Wensig g, et al. *Single dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhbitiro in healthy male subjects.* Blood (2003): 102: Abstract 3010; Kubitza D, Becka M, et al. *Multiple dose escalation study investigating the pharmacodynamics, safety and pharmacokinetics of BAY 59-7939 an oral, direct Factor Xa inhibitor in healthy male subjects.* Blood (2003): 102: Abstract 3004.

[41] Mueck Exhibit 5

of questions to capture the FDA's response. Question #1 was Bayer's question to the FDA asking whether FDA agreed with Bayer's response and its plans to use commercial and available biomarkers of coagulation and not develop its own test method for BAY 59-7939 (the FDA's response is in bold):

> …*Bayer plans to use these widely available and routine biomarkers in case drug – level monitoring or dose-adjustments may be needed in individual patients, Bayer is not planning to develop its own methods or own drug-related standard for this purpose. Does the Agency concur?*
>
> - **Please provide adequate evidence that the commercially available methods are sensitive, specific, and have been properly validated.**
>
> - **Address whether the drug affects factor IIa**
>
> - **Also determine INR and aPTT, since these are commonly used clinically to assess clotting.[42]**

48. Also, the FDA indicated that Bayer would have to address overdose recommendations in its development plan prior to marketing.

49. A Draft Report on the Exploratory Population PK/PD of Rivaroxaban in Young Healthy Males (Study 10847), dated April 29, 2003, was sent from Krueger to investigator Dr. Frank-Peter Thiel with the intended sign-off by Dr. Mueck. The potential biomarkers for therapeutic efficacy against thromboembolism were "<u>factor Xa inhibition, PTT, PT and HepTest.</u>" The secondary objective was to refine the established concentration-effect relationships for potential thromboembolic (TE) biomarkers.

e. **BAYER 59- 7939 PHARMACODYNAMICS/PHARMACOKINETICS (PK/PD) PERMITTING MONITORING OF PLASMA CONCENTRATION BY ROUTINE CLOTTING TESTS**

50. Dr. Mueck was sent a Bayer Business Plan with Strengths, Weakness, Opportunities (SWOT) Analysis for BAY 59-7930. Listed among "Strengths" was XARELTO's Preclinical Assessment, Human Experience in Phase I: "Bay 59-7939 was very well tolerated in humans at single doses up to 80mg and multiple doses up to 30 mg BID for 5 days." Another "Strength" was "[t]he pharmacodynamic behavior of BAY 59-7939 is dose dependent but not dose proportional." The analysis indicated that available global clotting tests (such as PT) could be used for drug monitoring. Bayer wrote about its ability to use PT for monitoring patient plasma concentration:

> - *The pharmacodynamics effects are closely related to the pharmacokinetics of the drug, allowing even the monitoring of plasma concentrations by global clotting tests (like PT)[43]*

---

[42] Mueck Exhibit 4
[43] Mueck Exhibit 8

21

51. In his deposition, Dr. Mueck agreed to the following key points about the actions and risks of rivaroxaban, use of patients' prothrombin times (PT) for monitoring doses and bleeding risk, and 75% increase in blood levels in patients taking rivaroxaban with food. Based on his experience and knowledge of BAY 59-7939 (Rivaroxaban/XARELTO). Dr. Mueck testified:

> *1) that higher doses of rivaroxaban result in patient higher exposure[44];*

> *2) higher rivaroxaban plasma concentrations, whether measured directly or indirectly via PT, leads to a higher bleeding risk[45];*

> *3) there exists such a close linear relationship between concentration and PT such that PT may serve as an exposure marker "for the time being"[46];*
> *4) only a linear intercept model is necessary to describe the concentration-effect relationship for PT measures, the "most relevant parameter for safety monitoring in clinical settings"[47];*

> *5) and taking rivroxaban with food results in 74% higher exposure ($C_{MAX}$)) then without food.[48]*

## f. BAYER WAS AWARE OF THE SLOW ABSORPTION ASSOCIATED WITH '*FLIP-FLOP*' PHARMACOKINETICS FOR BAY 59-7939

52. According to Bayer in 2003, "the physiochemical characteristics of BAY 59-7939 exhibited a "low solubility in the range of (water solubility: ?? mg/L), which is most likely the main influencing factor for absorption behavior effects depending on the dose finally required to achieve therapeutic efficacy." For a single dose (SD) study, Bayer determined that the relative oral bioavailability decreased with increasing dose from 100% at the lowest dose level used (1.25mg) to about 20% at 80mg. In terms of the upper compartment and lower compartment GI effects for BAY 59-7939's absorption and concentration delivered to the normal healthy male volunteer patient anticipated to have higher GIT transit and absorption times (*in contrast to an elderly or sick patient with changes in upper and lower GI transit time and resulting in changes in delivery of BAY 59-7939):

> *SD study also suggested that the absorption in the upper gastrointestinal tract (GIT) was insufficient due to the constraints of a limited solubility and its transit time in the GIT. The concentration-time profile of the apparent oral two compartment model might be mainly determined by substantial contribution of absorption in the lower GIT causing flip-flop kinetics. ...the oral two compartment model used in SD study might primarily be necessary to*

---

[44] Mueck depo 2/23/16 p. 83: L 16-22
[45] Mueck depo 2/23/16 p. 420: L 7-20; p. 426: L 12-20
[46] Mueck depo 2/23/16 p. 176: L11 – p. 177: L1
[47] Mueck depo 2/23/16 p. 110: L9 – p. 111: L12
[48] Mueck depo 2/23/16 p. 140: L5 – p. 141: L10

> *describe differences in absorption kinetics in different GIT segments with faster, but limited, absorption in the upper GIT and slower absorption in the lower GIT. For the SD study, fasted conditions were selected whereas for the present MD study fed conditions were chosen, because of a potentially faster, more complete and less variable absorption of a poor water soluble compound.*[49]

53. Bayer was aware of the potential for significant GI effects to occur with BAY-59 7939 based on differences in patients' gut absorption. There were differences in absorption of an oral dose of BAY59-7939 seen in normal healthy volunteers based on the location of the BAY59-7939 tablet. If a tablet had greater time either in the upper or lower GI tract it affected drug delivery. Absorption of rivaroxaban was a function of the time in the upper GI tract (*site of faster absorption) versus the lower GI tract (*site of slower absorption). In terms of the potential for GI effects and the rate of intestinal absorption and concentration seen in normal healthy volunteers, at the highest dose of 30mg bid differences were seen when compared to lower dose levels. Bayer called this apparent lower efficacy from a higher dose, versus a higher effectiveness from a lower dose, "flip-flop kinetics." Bayer proposed: one potential explanation might be that the absorption capacity in the upper gastrointestinal tract (GIT) is insufficient to absorb a larger dose (tablet) of BAY 59-7939, because of absorption characteristics determined by low *in-vivo* solubility in the intestinal fluid. Thus, substantial absorption contributions for the tablet were shifted towards the <u>lower GIT,</u> which might increase the importance of the apparent terminal elimination phase determined by <u>slow absorption causing flip-flop kinetics</u>. These hypotheses about effects of GI absorption, starting dose on drug delivery and flip flop kinetics were reportedly to be verified by Bayer by later clinical studies.

54. Defendants would later in 2005 and 2006 conduct Study 11527 and Study 10944, in which Defendants obtained plasma concentration information (PK) for rivaroxaban. Defendants later combined the two studies into PK000131[50] to have over 700 patients with PK data. PK 000131 divided the patients' observed points into slow absorption and fast absorption, using ka- the absorption dissociation, in terms of the reached plasma concentrations at pre-specified timepoints. The Study 11527 and Study 10944 'Visual Predictive CP' tables added to the PK000131 report between 2007 to 2008 (Amendment A) clearly showed the scattered inter-individual variability of plasma concentration (both low and high) for each dose and over time.

55. (See further discussion of slow and fast absorption and changes in plasma concentration in PK000131, phase IIb dose ranging Study 11527 and Study 10944 below).

g. **BAY 59-7939 "FLIP FLOP" PHARMACOKINETICS: A HIGHER DOSE IS LESS SAFE AND NOT MORE EFFECTIVE**

---

[49] Mueck Exhibit 12
[50] XARELTO_BHCP_00004205

56. On November 8, 2003 in Orlando, FL Bayer held an "Expert Meeting BAY 59-7939 in Atrial Fibrillation." Bayer described the "flip-flop kinetics' seen in its Study 10942 and RECORD studies as a loss of reduction of VTE with an increased dose compared to lower dose.  However, it provided no PK/PD explanation to the Experts, calling it "unclear" and that it "cannot be explained at this time."  The highest dose (30mg) of XARELTO paradoxically was not shown to correspond to the optimal dose for prevention of VTE.  A lower dose was more favorable for reducing VTE and held a lower risk of bleeding.

> *The increase in total VTE with the 30mg dose after decrease in the incidence rates from 2.5 to 20mg cannot be explained at this time. Whether the 30mg or possibly the 20mg results are chance findings is currently unclear.  A 16% VTE incidence rate for enoxaparin is in line with the published data.[51]*

57. Bayer discussed with the assembled Experts that it had identified in its eight (8) day VTE studies the dependency of dose on bleeding risk.  Defendants reference the results of these same short-term VTE safety studies to avoid conducting additional pahse II dose ranging studies for its stroke and systemic emboli prevention trial for patients with nonvalvular atrial fibrillation (SPAF). A pre-specified threshold number (stopping point) of bleeding events was reached for the 30mg BID treatmentarm , thus stopping  further dose escalation beyond 30mg BID (60m total daily dose or "TDD").  The increase in patient bleeding <u>beyond</u> 20 mg was statistically significant.  So Bayer had identified in 2003 the risk of bleeding in the prevention of VTE population in terms of dose, with the increased risk of bleeding beyond 20 mg BID (40mg TDD) deemed unacceptable in terms of no support for additional antithrombotic benefit and increased risk of bleeding:

> **Safety**
>
> *The most common adverse events were nausea, insomnia, pyrexia, constipation, and vomiting. ~~Drug related adverse event rates were higher with the BAY 59-7939 20mg bid dose group (41%) than with any other treatment group (22-27%). The most common drug related adverse events (incidence rate >5%) was nausea, hematoma, prolonged aPTT, and insomnia.~~[52]*
>
> *Bleeding events with BAY 59-7939 increased dose-dependently. ...Doses of 20mg and 30mg bid BAY 59-7939... increased the incidence of major bleeding events...The increase of bleeding events beyond 20mg was statistically significant (P=0.0135). The pre-specified number of bleeding events was reached upon completion of the 30 mg bid dose step, thus precluding further dose escalation.[53]*

58. In terms of the planned rational for conducting no additional dosing study for SPAF, Bayer told its experts that FDA recommended testing multiple doses (dosing derived from a DVT trial) for the pivotal SPAF trial.  However, the EMEA and Canadian authorities had already accepted Bayer's proposed one-dose approach protocol, as the

---

[51] Mueck Exhibit 19
[52] Mueck Exhibit 19
[53] Mueck Exhibit 19

same international study would be conducted and submitted for SPAF to the EMEA, Health Canada and FDA.  The Experts at the meeting recommended to Bayer  that it investigate two doses for efficacy and safety for SPAF and then decide upon a single one dose for further study based on the outcome:

> *It is challenging to use two doses for hard endpoints in clinical studies. Bayer should investigate the possibility to use two doses in the lead-in period of a combined phase II/III study for safety reasons and to decide then upon one dose in the further study conduct.*[54]

## h.  BAYER PURSUES A CHRONIC ATRIAL FIBRILLATION INDICATION USING DATA FROM ITS OTHER CLINICAL STUDIES

59. Bayer was already planning to obtain a SPAF indication for XARELTO in 2003. DrMueck was sent October 17, 2003 Global Project Team Minutes for BAY 59-7939. The minutes discussed Bayer's plans to conduct an international SPAF study for indications and marketing.  According to Bayer, the EMEA[55] "accepted the dose-finding study in DVT as a model for atrial fibrillation." (Health Canada had already accepted this approach).  The start of the Phase IIb in prevention of DVT protocol was in November 2003. Bayer was to "continue all efforts for obtaining approval of a once daily development of BAY 59-7939 for nonvalvular atrial fibrillation."  Results of the Phase IIa (ODIXa-HIP)[56] study showed "dose-dependent increase in bleeding events; doses ≥20 mg BID (40mg TDD) significantly increase bleeding."[57]

60. In the Draft of the document to be provided to the assembled Experts at the Expert Meeting on November 8, 2003,[58] Bayer included its ODIXA-Hip Study (Study 10942) in the prevention of VTE for patients undergoing total hip replacement and the results of advice meetings it had held with regulatory authorities on clinical development program for stroke prevention in atrial fibrillation (SPAF).

61. Bayer wrote:  *"The Factor Xa inhibitor BAY 59-7939 has emerged as one of the most promising compounds in the Bayer development portfolio."*  Bayer was planning to bridge its VTE studies including Phase II and Phase III (RECORD, EINSTEIN, MAGELLAN) so "no separate phase II study" for SPAF would be required for FDA, EMEA, and Health Canada for approval.  Bayer gave the following rationale for conducting no additional Phase II dosing study for SPAF and VTE prevention: "both indications therapeutic oral anticoagulation is achieved with an INR of 2-3 and that the respective dose of BAY 59-7939 has to be equipotent to standard therapy."  The draft

---

[54] Mueck Exhibit 19
[55] EMEA or EMA= European Medicines Agency also EMA
[56] ODIXa-HIP is Study 10942- it is the BID dosing study for VTE-P.  It is followed by Defendants' phase IIb dosing study Study 11527 (the OD study) (ODIXa-OD.HIP) (see discussion of both studies below). The phase III studies were the RECORD studies.  The VTE studies were able to be used (bridged) by Defendants for support of phase III ROCKET AF study and 20mg OD dose.
[57] Mueck Exhibit 10
[58] Mueck Exhibit 19

document contained the following statement about hemorrhage and overdosage which was subsequently deleted prior to distribution to the experts:

> *Because of warfarin's proven benefit in these patient populations, clinical effects of new anticoagulant drugs should preferably be tested for non-inferiority or equivalence rather than for superiority.*

> - *Experts required that management of overdose needs to be addressed in development*

> *Recombinant FVII may be used as an antidote for BAY 59-7939, although no confirmed data are available yet.* ~~Overdosage following administration of BAY 59-7939 may lead to hemorrhage complications due to pharmacodynamics properties of the compound.~~ *Bleeding complications should be treated with fresh frozen plasma and as clinically indicated.*[59]

## i.   IN 2003 BAYER BEGINS TO PLAN FOR ROCKET-AF STUDY

62. Bayer proposed that for SPAF it would use a '**primary composite endpoint' defined by BAYER as**: ischemic stroke, systemic cardiogenic thromboembolism, and death due to CV thromboembolism. **Bayer would also use a 'secondary endpoint':** any stroke, systemic cardiogenic thromboembolism, and death due to CV thromboembolism". The **Safety endpoint** would be: "death, major bleeding (including fatal bleeding and hemorrhagic stroke), and adverse events/serious adverse events (including major acute CV events)."

63. According to Bayer in 2003, some regulatory agencies had already questioned its proposal to use the 'primary composite endpoint' and preferred that Bayer adopt isntead "all stroke" as the only endpoint. According to Bayer, 'Cardiogenic thromboembolism,' one of its proposed secondary endpoints, was not usually used as an endpoint since one of the final results of this condition is 'stroke,' which seemed to be redundant for risk of stroke in the proposed composite endpoints.

64. Bayer also proposed reporting "transient ischemic attack ("TIA")": since all patients with a suspected cerebrovascular accident will be subjected to CT/MRI, only *confirmed strokes will be part of the endpoint*. This included patients with the initial clinical diagnosis of TIA, but later confirmed a stroke. Some agencies were concerned that symptomatic TIA together with potentially old lesions in CR/MRI may be counted by Bayer as an endpoint.

65. The "Expert's Comment" for Bayer's proposed design of the SPAF protocol, including the difficulty of the adjudication committee to assess death due to CV thromboembolism, there could be an under-appreciation (under-reporting) of the SPAF deaths as proposed by Bayer in the protocol:

---

[59] Mueck Exhibit 19

> *Since "death due to CV thromboembolism" is difficult to assess by adjudication committees, many deaths may not be attributed to the appropriate etiology. No other trials used this endpoint in the AF indication. It was proposed to sue "cardiogenic thromboembolism" only as the respective event without stating death specifically.[60]*

- **Bayer Holds Expert Meeting to Discuss XARELTO for VTE**

66. On December 4, 2003 Bayer held an Expert Meeting BAY 59-7939 Factor Xa Inhibition VTE Program in San Diego, CA.[61]  The VTE protocol used a range of 2.5 mg BID to 30 mg bid.  The only once a day dose was 30mg OD.  "The DVT incidence rate of 30% was postulated to occur with the lowest dose groups and 10% in the highest BAY 59-7939 groups.  The rate of major bleeding with Low Molecualr Weight Heparins LMWHs (e.g., enoxaparin; Lovenox) is 1.5-2.5% (published literature).  The prevention of VTE was dose-dependent in the range of 2.5 to 20mg BID.  Incidence rates for VTE and the primary composite endpoint for an oral dose of rivaroxaban: 2.5mg BID 23.7%; 5mg BID 22.7%; 10 mg BID 19.6%; 20mg BID 9.8%; 30 mg BID 17.0%, and 30mg OD 14.5%.  This was to be compared to enoxaparin 40 mg OD sub cutaneous (SC) 17.4%."[62]

- **Bayer Holds Expert Meeting for XARELTO and Atrial Fibrillation**

67. On February 13, 2004, Bayer sent out an internal email titled "Subject: Minutes Expert Meetings Bay 59-7939 Orlando/San Diego."  The email said that to date, Bayer held seven (7) expert meetings five (5) on VTE Prevention; two (2) on Atrial Fibrillation) in support of development of BAY 59-7939. "Again, both meetings [on Afib] have proven pivotal in crafting a competitive strategy for our key asset BAY 59-7939"[63]  The minutes describe that the experts had reacted positively to Bayer's plan to introduce a 'once-a-day' dosing for chronic indications such as atrial fibrillation following presentation of Bayer's ODIXa-HIP 30mg OD arm for VTE.

> *Based on the presentation of 30mg OD arm of ODIXa-HIP at the December meeting all experts felt that the availability of a once-daily effective dose would add to the strengths of the compound especially in chronic indications, e.g. atrial fibrillation.[64]*

68. According to Bayer, as with the discussion for the Experts for SPAF, the increase in total VTE with the 30mg dose after an apparent decrease in the incidence rates from 2.5 to 20mg (i.e., flip flop) reportedly could not be explained. There was an increased dose when the benefit was lost with Bayer's unique primary composite endpoint.[65]

69. As of June 6, 2004, the Clinical Development Program Review Committee "Conclusions" put the probabilities of technical success "comparing OD (once a day) to

---

[60] Mueck Exhibit 19
[61] Mueck Exhibit 21
[62] Mueck Exhibit 21
[63] Mueck Exhibit 20
[64] Mueck Exhibit 20
[65] Mueck Exhibit 21

BID (twice a day) development: 85 percent for VTE,[66] and 55 percent for Stroke Prevention in A. fib."[67]  The CDP-RC also concluded that it was "encouraged by the (limited) data obtained so far with the OD dosage regimen."[68]

## j.  BAY 59-7939 BAYER SEEKS A UNITED STATES BUSINESS PARTNER FOR XARELTO'S SALES AND DEVELOPMENT IN UNITED STATES

70.  By early 2005, Bayer was seeking to partner with one of several large pharmaceutical companies, including Wyeth, Takeda, AstraZeneca, Novartis, Pfizer, Scion/J&J, to sell XARELTO in the United States.  There are a series of Due Diligence Meeting Minutes with each of the potential partners in 2005.  Bayer would enter into a collaborative agreement with Johnson & Johnson to co-develop and market XARELTO in the United States.[69]  Bayer planned to continue to market XARELTO outside the United States.

71.  There were a series of Due Diligence Meetings with major pharmaceutical manufacturers as Bayer attempted to identify a pharmaceutical partner for United Stated sales of XARELTO.  Of interest are Bayer's responses to industry players in the due diligence process.  Each of the potential pharmaceutical collaborators asked questions or raised similar concerns about dose and monitoring, and regarding patients with 'high absorption,' 'high dose effects,' and the paradoxical loss of efficacy with higher doses of rivaroxaban for VTE.

- **Novartis**

72.  The Due Diligence process began with a set of March 10, 2005 Draft Due Diligence Novartis minutes, issued May 1 and 2.[70]  The minutes recorded the "Questions raised by Novartis" as well as additional information given verbally by members of Bayer during the group discussions/presentations to Novartis.  For example, Novartis asked: "Why is there no anti-Xa activity at trough?" Bayer responded: "We do not use an anti-Xa assay, but a chromogenic Xa assay.  Due to the sensitivity of the Xa assay it cannot be said if there is no activity at trough. Thrombin generation assay does show an activity after 24 hours."[71]  Bayer's Dr. Frank Misselwitz told Novartis that the high rate of VTE with the 30mg bid dose compared to the 20mg bid dose may be related to "transfusion." [72] He provided no mention of potential GI absorption effect (i.e., flip flop effect).  Novartis was also told by Bayer that the Japanese PK/PD safety AFib study was performed at the request of the Japanese Authority using both an OD and BID dose.  Sections of Bayer's minutes with Novartis are provided to show that Bayer was hearing from other

---

[66] VTE= venous thromboembolic event- such as deep venous thrombotic events (DVT) and pulmonary embolism (PE).  Pooling of blood in the venous system and blood clotting with risk of potential release of a clot or portion of the clot to the rest of the body to produce symptoms of decreased blood flow.
[67] Mueck depo 2/23/16, p. 241: L 6-24; Mueck Exhibit 22.
[68] Mueck Exhibit 22
[69] Mueck depo 2/23/16, p. 213: L6 – p. 214: L20
[70] Kubitza Exhibit 32; Kubitza Exhibit 33
[71] Kubitza Exhibit 33
[72] Study 10942 – 30mg bid (17%) VTE compared to 20mg bid (10%). See discussion of Study 10942 and Study 11527 below.

pharmaceutical manufacturers (as potential US collaborators) concerns about rivaroxaban in 2005 and were pondering the meaning of the Study 10942 data, namely that the higher dose was not more effective.  In 2005, Bayer was already locked into marketing only an OD dose. This type of concern from other manufacturers about dosing should have sparked Bayer's concern to follow up and adequately determine the significance of the dosing regimen and how it would impact patient safety and Bayer's plans for a DOAC with no monitoring or dose titration (bolding and underlining added for emphasis):

> *Novartis: Why is the OD and the BID regimen not combined in all clinical studies?*

> *FM: The efficacy and safety of the OD regimen was established late during the dose-escalating phase II trial.*

> ***Novartis: Why did the French Health Authority ask not to do the 30mg bid arm in the ODIXa-HIP2 trial[73]?***

> *FM: There was no concern in the then ongoing phase IIb ODIXa-HIP2 trial, the French Health Authority considered the rate of bleeding and SAEs in the 30mg bid arm of the open-label phase II a ODIXa-HIP study too high. Bayer stopped the 30mg bid dose arm of the European phase IIb ODIXa-HIP2 trial in all countries for consistency reasons.  In the **North American phase** IIb ODIXa-KNEE trial the 30 mg bid was not stopped [74] and no safety concerns were raised by the Ethics Committee, the Health Authority or the Data and Safety Monitoring Board throughout the study.*

> *Novartis: What is the difference between Minor bleeding and non-major clinically relevant bleedings?*

> *FM: Non-major clinically relevant bleedings include, e.g. minor extra-surgical site bleeds or long-lasting nose bleeds.  The category was established as a sensitive safety measure in addition to major bleedings.*

> *Novartis: is there any plan to explore **lower doses**?*

> *FM: An amendment is going to include a lower dose in the OD trial.*

> *Novartis: Is there a need for dose adaptation due to body weight?*

> *FM: There is no need to dose adaptation due to body weight.  This is based on analyses in the body weight range from 45 kg to 173 kg.*

> *Novartis: Is phase III planned with more than one dose?*

> *FM: The same **one dose** is planned to be used for both prevention indications (HF/THR) and both regions (EU/NA)*

73. Additional information given verbally during the presentation:

---

[73] ODIXa-HIP2 trial is Study 10944 with the discontinuation by the French Authority of the 30mg bid arm based on increased bleeding.   By 2005, Bayer was engaged in other VTE studies with 30mg BID.
[74] XARELTO_BHCP_00004442

*The Japanese PK/PD safety trial in A'Fib patients is performed upon the request of the Japanese Health Authority.  In this trial both the <u>OD and the BID regimens is tested.</u>*

**Novartis: Why was the 2X 30 mg not so effective (17% VTE incidence rate) as 2X 20mg (10% VTE incidence rate)?**

**FM:** *The difference is not statistically significant.  Possible explanations for this observation include a **country effect** or a paradoxically occurring higher rate of VTEs due to the use of **more transfusions in the higher dose**.* [75]

- **Scios/Johnson & Johnson (Janssen)**

74. In the Due Diligence Meeting March 10 and 11, 2005 with Scion/ J&J involved questions raised by **Scios/J&J** and additional information given verbally to Bayer's EP= Elisabeth Perzbom.[76]  In 2005, Bayer told it was already planning its Atrial Fibrillation study using once a day dosing, despite the results of Study 10942 which demonstrated better outcomes with BID dosing, including less bleeding.[77] J&J, like Novartis, asked about the 30mg BID dose and increased VTE risk compared to the 20mg BID dose. J&J asked Bayer if it considered the high peak to trough ratios for AFib patients to be a problem. J&J asked if Bayer had the correlation of PK, PT and efficacy (i.e., exposure-response) completed in 2005.  Bayer answered that the Pop PK/PD model was 'ongoing.' J&J also asked about the need to be able to use dose titration in the clinical trials. (Bolding added for emphasis).

<u>*Preclinical Pharmacology*</u>
**Scios/J&J:** *What was your decision tree for the selection of the development compound?*

**EP:** *It was based on our SAR.  An abstract on SAR from the American Society of Chemistry meeting is available (main author S. Roehrig)*[78].

<u>*Toxicology*</u>

**Scios/J&J:** *Is the dog more sensitive to anticoagulation?*

**EP:** *BAY 59-7939 is 5 to 6 times less potent in inhibiting canine factor Xa than human factor Xa in plasma (120nM (canine) versus 22nM (human)*

<u>*Clinical Pharmacology*</u>

**Scios/J&J: What does the 30mg single dose trough level correspond to in BID terms?**

---

[75]  Kubitza Exhibit 36
[76]  Kubitza Exhibit 36
[77] *See* discussion of Study 10942 (phase IIa) and 11527 (phase IIb) below.
[78] E. Perzborn, Strassburger J, Wilmen A, Pohlman J, Roehrig S. *In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939- an oral, direct Fctor Xa inhibitor*. Journ of thrombo and Haemost. (2005) 3: 514-521.

*DR: It corresponds to 10mg BID.*

**Scios/J&J: Comparing 30 mg OD versus 30 mg BID in the ODIXa-HIP trial[79], why does 30 mg OD have a lower VTE rate?**

**FM: The ODIXa-HIP trial was a dose-escalating open-label trial so that the results have to be interpreted with some caution.  The increase in VTE at the highest dose may be due to the higher rate of transfusions in that dose.**

*Scios/J&J: What is the plasma concentration for BAY at 30mg?*

*DK: It is above 300 ug/L.*

*Scios/J&J: Is there a ceiling effect?*

*DK: We observed a maximum of 70% factor Xa inhibition. Also absorption is limited at high doses.*

**Scios/J&J: Do you expect the high peak to trough ratio to be a problem in A' Fib?**

*DK: This will depend on the therapeutic window.  The dose-finding studies in DVT treatment are ongoing LMWHS show better safety when given OD.[80] FM: Within the arterial indications one should distinguish between A'Fib and indications like ACS. Thrombi in A'Fib are expected to be largely similar to venous thrombi. In ACS it is conceivable that higher trough activity could be beneficial in a situation where a plaque rupture occurs.[81]*

*Scios/J&J: Will you pick a higher dose for the ER formulation?*

*DK: There is decrease in absorption in the lower GI tract.*

<u>Regulatory</u>

**Scios/J&J: Was the FDA informed of the stop of the 30mg dose arm in the European trial?**

*SP: Yes. No action was asked for by the FDA.[82]*

<u>Clinical development</u>

*Scios/J&J: Do we have access to all SAEs of the ongoing trials?*

*FM: Yes.*

---

[79] XARELTO_BHCP_00004220

[80] This statement by Dr. Kubitza is not supported by Study 10942 [XARELTO_BHCP_00004220]; and also not a comparison of bleeding to Study 11527 [XARELTO_BHCP_00006068].

[81] This statement contraindicates Defendants statement to the EMA for LEG 036 in 2015 and its plan to develop a predictive Exposure-Response model 'pooling all indications'.  Defendants maintained in 2015 there is no difference in rivaroxaban and patient populations.  It is used as its argument against dose titration and plasma concentration (PT) monitoring for risk of major bleeding.

[82] FDA was told the dose was not dropped due to safety reason, but rather to ensure consistency of protocols.

*Scios/J&J: What is the correlation between PK, PT and efficacy?*

*FM: The population PK/PD model is ongoing.*

*Scios/J&J: Is it possible that you will do a BID development in A'Fib?*

*FM: This is possible. <u>We plan for an OD development, however.</u>*

*Scios/J&J: A higher risk but not higher efficacy in this group could be more relevant in the chronic indications A'Fib or ACS.*

*FM: We have defined a subgroup of "fragile patients" consisting elderly, low-BMI women. In this subgroup BAY behaves comparable to enoxaparin.*

*Scios/J&J: Do you have to modify the dose in ongoing trials?*

*FM: No. After the enrollment of more than 50 patients in the OD treatment trials there is no modification planned.[83]*

75. In her deposition, Bayer's Dr. Dagmar Kubitza was asked about Study 10942[84], specifically, if it showed increase in VTE at the highest dose and the speculation that the higher rate of VTE with the higher dose was 'due to transfusions' by Dr. Misselwitz. She said it may be due to the citrate in the transfused blood to prevent blood from clotting. She was also shown a document written by Dr. Misselwitz in which he stated that "the increase in VTE at the highest dose may be due to the higher rate of transfusions in that dose." (bolding added for emphasis)

*Q. So he is suggesting that transfusions are leading to increase in VTE?*
*A. So whenever you transfuse, you are transfusing blood that is old and therefore might…might contain thrombogenic mass. And therefore, transfusions, in general may led to a higher VTE rate.*

*Q. That's what Frank Misselwitz was telling J&J in this partner development meeting, due diligence meeting in March 2005, was that the highest dose was resulting in higher bleeding rates, resulting in more transfusions, which ends up leading to more clots.*

*Q. **He was explaining the question why the 30-milligram once-daily dose behaved as it did.***

*Q. **Right. 30-milligram BID dose actually more VTEs in the study, right?***

*A. **I do not recall these. I was not involved in the Phase II trials, so I do not recall the details of that study[85]***

---

[83] Kubitza Exhibit 36
[84] See discussion below of Study 010942 phase II bid ODIXa-Hip dosing study as well Study 11527 phase IIb ODIXa-OD.HIPand Clinical Pharmacology Review by FDA's Office of Pharmacology
[85] Kubita depo 3/1/16, p. 422: L9 – p. 424: L14

- **Takeda**

76. The BAY 59‑7939 Due Diligence Meeting of April 11 and 12, 2005 was with Takeda. Dagmar Kubitza (DK) described a patient with "*high absorption*" based on an individual showing a "**wide dose range**" and tendency for higher response and "**high absorption.**" Takeda was informed that, as a result, Bayer eliminated the use of 40mg in its future clinical trials and commented that since "**efficacy has been shown in low doses, there is no need to go to higher doses**."[86]  Specifically, there appeared to be limited absorption ability above 40mg as shown by the Phase IIb Study 11527, which demonstrated a wide range of efficacy at lower OD doses.

> *Takeda: Please comment on the INR range of BAY*

> *FM: During further development we will have to determine the therapeutic range of BAY.  This may be defined in terms of, e.g. PT or INR*

> *Takeda: In phase I you used various doses.  What is your maximal dose?*

> *DK: A wide dose range was established in phase I.  At high doses there is a dose cap due to limited absorption.  A study in elderly subjects ?60 years has established the ceiling of 40mg taken with food, underline beyond which no substantial increase in PK or PD can be observed.  In this study one woman had a high absorption.  Based on this individual we think that some subjects may show a tendency for higher response.  Therefore, we will not use doses above 40mg in future clinical trials.  Looking at the efficacy that has been shown in low doses in the phase IIb trials there is no need to go to higher doses.[87]*

- **Wyeth (Pfizer)**

77. On May 3 and 4, 2005, a Due Diligence Meeting occurred with **Wyeth** and Bayer about BAY 59‑7939.[88] Wyeth asked about the support for once-a-day dosing with rivoarxaban when the PK supported BID dosing.  Bayer responded that it did have data showing that rivaroxaban could work as once a day.  In addition, Dr. Kubitza indicated that PT could be used for monitoring PD for special patient populations.  Use of PT monitoring could prevent the effects of PD doubling of anticoagulant effects in certain patients. Wyeth was told by Bayer that PK/PD modeling was ongoing. Wyeth asked about availability of safety/efficacy correlation data (exposure-response) to PT, and Bayer answered that the analysis was still ongoing and there was no obvious sign of such correlation (VTE prevention/Bleeding risk). Wyeth ased why a VTE indication was even being pursued by Bayer when it wanted approval for SPAF.  Bayer's response was that obtaining approval of a VTE indication first lowered the risks of not obtaining an AFib approval.  Bayer stated that Study 11527 had shown that BAY 59-79 was more effective (more potent) than first thought and less drug was needed (10% vs 30%) to be effective.

---

[86] Kubitza Exhibit 38
[87] Kubitza Exhibit 38
[88] Kubitza Exhibit 40

**Wyeth:** *Please comment on the fact that the pharmacodynamics point to a once daily drug, while the pharmacokinetics do not.*

**KW**: *We pursue three options for obtaining a once daily drug: 1) research on a backup compound, 2) galenical development of an extended release formulation, 3) demonstrating the clinical efficacy of the IR tablet administered once daily. Our goal is to move the IR table to market, based on available data we assume that the IR tablet works as a once daily drug.*

**Wyeth:** *Why is the exposure after administration of 10mg solution and 80 mg tablet the same?*

**DK:** *The reason is the limited solubility. The single dose study has shown that the pharmacokinetic profile is linear from 5 mg to 15 mg of Bay, while it becomes non-linear beyond that. We have done an absorption site study to better understand this effect.*

**Wyeth:** *Why does the half-life depend on dose?*

**DR:** *The half- life changes due to the delayed absorption at higher doses.*

**Wyeth:** *Is the assay non-linear?*

**DK:** *Yes, there is a ceiling effect. At high concentrations also the PT measurement is expected to exhibit a ceiling effect.  We use the PT since it is widely available. <u>Measurements of PT could be an option for monitoring the pharmacodynamics activity</u>.*

**Wyeth:** *Do you have a correlation between PT and efficacy?*

**DK:** *The population PK/PD modeling is ongoing.* **FM**: *The PT at trough may be zero, but looking at the PT at peak concentration of BAY such a consideration may be possible.*

**Wyeth**: *So do you need monitoring?*

**FM:** *We do not expect a need for monitoring. <u>Using the PT we have the option of monitoring should it be needed in special populations like</u>, e.g. patients with severe renal impairment.*

**Wyeth**: *Will you use aPTT?*

**FM:** *We will use PT. <u>By PT monitoring we could, e.g. prevent the doubling of the pharmacodynamics effect in special populations.</u>*

**Wyeth:** *When will PT be measured?*

**FM:** *12h after administration of BAY.*

**Wyeth**<u>*: Do you have a correlation of safety/efficacy to PT?*</u>

34

*FM: This analysis is ongoing. So far there is no obvious sign of such a correlation.*

*Wyeth: Is there a regulatory reason to do pivotal trials in VTE prevention at all?*

*AD: By having the approval for VTE prevention the regulatory risk for A'Fib approval is lowered.*

*Verbal information to Wyeth:*

*Originally we expected that a factor Xa inhibition of a least 30% would be needed to be effective. The phase IIb results in VTE prevention have shown that BAY is effective when only 10% of factor Xa are inhibited.*[89]

- **AstraZeneca**

78. There was a Bay 59-7939 Due Diligence Meeting on June 22 and 23, 2005 with Astra Zeneca (AZ).[90] AZ had sought FDA's NDA approval of ximelagatran (Exantra) for a SPAF indication in 2004, an early oral thrombin inhibitor requiring no monitoring, which was denied. The supporting clinical trials were SPORTIF III and SPORTIF V. Exantra was withdrawn worldwide in 2006 by AZ based on hepatic toxicity.[91] AZ asked Bayer questions about the PK/PD of rivaroxaban, including why some patients did not show an expected Day 3 fall in plasma curves. Bayer attributed the lack of fall to certain subgroups with 'slow absorption' for the first few days, but stated that the plasma curve would normalize with time. However, there was no known correlation of a 'slow absorption pattern' in the first 3 days associated with gender, age, or creatinine clearance. AZ also asked about methods for dose adjustment, laboratory tests discussed in the label and Bayer's rationale for PT recommendations. (underlining added for emphasis)

*AZ: To which PT prolongation does the 2.5 mg dose correspond?*

*FM: 1.8-2.5 seconds.*

*AZ: What is the reason, that some patients do not show a fall in the plasma curves on day 3?*

---

[89] Kubitza Exhibit 40
[90] Kubitza Exhibit 41
[91] Ximelagatran- a potent thrombin inhibitor was the initially DOAC seeking NDA approval for VTE-P, VTE-T and SPAF. It was expected to replace warfarin. Its efficacy was well documented. It was to be taken orally, as fixed dose with no monitoring and had been generally well tolerated in the clinical trial population, but a small proportion (5-6%) taking the drug for 3-6 months had shown elevated liver enzymes which caused FDA to reject the initial NDA in 2004. Further development was officially discontinued in 2006 by AZ. So at the time of this 2005 meeting, AZ ahd received an FDA denial of approval for its DOAC. The pahse III clinical trials was SPORTIF III and SPORTIF V were alsmost identical except that **SPORTIF III** was open label and conducted primarily in Europe and **SPORTIF V** was double-blind and conducted in North America. The studies were the largest AF studies conducted to date and showed a dramatic consistency in efficacy, but differences in benefit of warfarin. The FDA had concerns understanding why one would not obtain the exact or comparable efficacy with warfarin in the two studies. Based on SPORTIF V the double-blind study, the FDA concluded there was very little evidence that Exanta was effective at reducing the risk of the combined incidence of stroke or systemic embolic events. **Also on the primary endpoint, both studies failed to show a difference between Exant and warfarin.** (http://www.fda.gov/ohrms/dockets/ac/04/briefing/2004-4069b1.htm)

> *FM: There seems to be <u>subgroups of slow absorption in the first days</u>. It normalizes over time. There is no correlation to any safety or efficacy parameters, gender, age, or creatinine clearance.*
>
> *AZ: How do you plan to cover tests in the labelling?*
>
> *FM: The PT method is available worldwide. In case we plan to refer to PT based on the data from phase III trials.*
>
> *AZ: Do you plan to use coagulation tests to provide guidance for dose adjustment?*
>
> *FM: We anticipate that the phase II trials demonstrate that there is no need for dose adjustments for efficacy reasons. Correlation of coagulation tests with safety could be helpful for special populations and dose adjustments for safety.[92]*

79. In her deposition, Dr. Kubitza was asked about Astra-Zeneca's suggestion that Bayer look at the correlation of PT exposure, anti-Xa activity and outcomes (Exposure-Response-PK/PD). The EMA CHMP made the same request officially starting in 2008 (as a FUM 014[93]) and in the LEG[94] 036 request in 2015 (see discussion of LEG 036 below). It was officially requested by the FDA in 2008 by the Office of Clinical Pharmacology at the Mid Cycle meeting (December 2, 2008), which also mentioned FDA's strong recommendation that Defendants develop a 5mg lower dose for dose titration for use in special patient populations. FDA then documented the Defendants' commitment in two NDA approval letters as a post-approval commitments made by Defendants in July 2011 (NDA 22406 (VTE-P)) and in November 2011(NDA 20-2439 (SPAF)). Dr. Kubitza testified in 2016 the requested exposure-esponse data, development of a lower dose 5mg tablet and instructions for titration remain still unanswered by Defendants:

> *Q. ...you have not done anything to correlate either PT exposure, anti-Xa activity to expected outcomes in the patient population based in that information, have you?*
>
> *A. The population PK analysis actually looked at covariates, but it also looked at concentrations and which of them had similar, higher, lower effects on bleeding as compared to the comparator arm.*
>
> *Q. In the ten-an-a-half years since AstraZeneca asked this question regarding looking at the relationship between exposure and outcomes and looking at studies to determine this information, in ten-and-a-half years since that time, Bayer's not*

---

[92] Kubitza Exhibit 41
[93] FUM= EMA Follow-up Method- a required action post-licensing by the Marketing Authorization Holder (MAH). For licensing and marketing of XARELTO in Europe for VTE-P, a FUM 014 was described in the Letter of Undertaking. MAH was to validate a modified commercially available test to estimate the PD activity of riva (or riva plasma concn) that could be sued in the clinical setting. After development of that method, to include recommendations in the SPC to include the methodology for monitoring PK progress to report regularly to the CHMP with first report at 6 months and then with each PSUR. The Rapporteur provided a plasma concentration range of 20ng/mL (low) – 500 ng/mL (high). [Source Derix Exhibit 36]
[94] LEG= EMA's Legally Binding Measure, Category of a Post-Authorization Measure (PAM) directly requested by the CHMP

*provided any information in the product labels for this drug that would provide information for doctors to consider regarding exposure levels, whether measured by exposure measurements, PT, Xa activity, and potential clinical efficacy outcomes or safety outcomes. Is that a fair statement?*

*A. No.[95]*

**k.  OCTOBER 2005: BAYER AND JANSSEN ("DEFENDANTS") ENTER INTO AGREEMENT FOR XARELTO DEVELOPMENT AND SALES IN THE UNITED STATES**

80. On October 1, 2005, Bayer Healthcare AG and Ortho-McNeil Pharmaceutical, Inc. ("Defendants") entered into a Collaborative Development and License Agreement.[96] Bayer held the Bayer Patent Rights and Know-How for BAY 59-7939 including its manufacturer and pharmaceutical compilations and compositions.  J&J had the significant experience in development, marketing, promotion and sale of pharmaceuticals and "believes it can make significant contributions to the successful development of the compound and successful commercialization of the product in the USA.   Bayer and J&J wanted to collaborate on the worldwide development of the product and then have J&J commercialize XARELTO in the USA.[97] The compound of the collaboration agreement was BAY 59-7939.  A Joint Steering Committee (JSC) was to be established of Bayer and Johnson & Johnson for BAY 59-7939.  The JSC was to have decision making authority and responsibility for the activities relating to the worldwide development of the BAY 59-7939 compound and the commercialization of the Product in the USA.  J&J was to use "Commercially Reasonable Efforts" to promote, market and sell the product in the United States with respect to each approved indication during the term in accordance with the terms of the agreement.

81. J&J was to create and develop promotional materials for use in the USA consistent with the strategic guidelines agreed upon by the JSC. J&J was to make regular presentations to the Marketing Committee regarding the form and substance of proposed promotional materials and marketing campaigns.  If Bayer had reasonable belief, and provided J&J with its reasoning in writing, that the Promotional materials were likely to have a negative impact on Bayer's business interests under this agreement, (for example, sales outside the USA) J&J was to give  due consideration to Bayer's concerns.

*Section 5.6 Product Claims.*

*J&J shall use Commercially Reasonable Efforts to ensure that no claims or representations in respect of the compound, the product of the respective characteristics thereof are made by or on behalf of its (by members of its sales force or otherwise) that have not been approved by the JSC or which do not represent an accurate summary or explanation of the labeling of the Product or a portion thereof.*

---

[95] Kubitza depo 3/1/16, p. 482: L11 – p. 483: L23
[96] Derix Exhibit 73
[97] Also in the agreement was the co-promotion of Elmiron to the urology market in the USA by Bayer and J&J.

### 6.1 Milestone Payments

*a. Initial Payment. Within five (5) business days of the execution date…J&J shall make a non-refundable payment to Bayer of fifteen million dollars.*

82. There were milestones for payments from J&J to Bayer based on the clinical trials and NDA approval.  For VTE –P, the first enrollment of the first patient in the phase III clinical trial J&J will pay Bayer $10,000,000.  The first enrollment of a patient in the phase III SPAF = $5,000,000. Sixty days after an NDA filing for VTE-P (or VTE-T) = $20,000.000, and 60 days after NDA filing SPAF = $20,000,000; sixty days after NDA filing for Acute Coronary Syndrome (ACS) = $10,000,000.  Obtaining NDA approval of VTE-P or VTE-T, NDA approval SPAF, = $40,000,000 each.  Approval of an NDA for Prophylactic treatment of DVT/PR for general surgery, or NDA approval for DVT/PE in medically ill patients was a payment of $20,000,000.  For NDA approval of a subsequent VTE-P or VTE-T NDA approval = $10,000,000.  NDA approval for acute treatment of DVT/PR $5,000,000. NDA approval of ACS = $20,000,000. NDA approval of product for treatment of peripheral vascular disease = $40,000,000. NDA approval for treatment of heart failure = $15,000,000.

83. J&J was to pay Bayer royalties during the period from Launch date until expiration of the last to expire Bayer Patent rights based on increasing percentage of annual Net Sales in the USA.  For the portion of annual Net Sales in the USA less than two hundred and fifty million dollars (US $250,000,000), sixteen percent (16%) of such Net Sales; for annual Net Sales > $250,000,000 but less than $500,000,000, 18% of Net Sales. For annual Net Sales greater than $500,000,000 but less than one billion dollars ($1,000,000,000), twenty percent (20%) of Net Sales;  For annual Net Sales greater than $1,00,000,000 but less than ($1,500,000,000), twenty five percent (25%) of Net Sales; for annual Net Sales greater than $ 1,500,000,000 but less than two billion dollars ($2,000,000,000), twenty seven percent (27%) of Net Sales; for annual Net Sales greater than $2,000,000,000, thirty percent (30%) of such Net Sales.

84. Under "*Regulatory Matters,*" prior to Launch Date (in USA), Bayer was to be solely responsible for maintaining the IND and preparing and submitting an NDA and applying for final regulatory approval in the US.  Upon request of Bayer, J&J may assist Bayer in maintaining the IND and preparing the NDA.  Upon the Launch Date, Bayer shall transfer and assign ownership of the IND and compound and the NDAs over to J&J. After such transfer, J&J will be solely responsible for maintaining the IND for the compound and preparing and submitting an NDA and applying for final regulatory approval in the USA in order to enable marketing, distribution and sale of the product on a commercial basis.

85. Further , while J&J is the NDA holder, Bayer shall have the right to object to the labeling initially submitted for the product in the USA for each indication or any proposed variations of modification to any labeling that has received FDA approval, in each case solely on the grounds that such labeling will have a material adverse effect on the commercialization  of the product by Bayer outside the USA; and provided , further that Bayer shall not be entitled to object to any variations or modifications to any labeling

required by Law or the FDA.  In the event Bayer exercises it right to object provided for in the preceding sentence, the Parties shall resolve such objection by mutual agreement.

86. **Drug Safety Information**- Bayer shall be responsible for compliance with drug safety and adverse event regulations worldwide, including in the USA.  There is to be a "*Pharmacovigilance Agreement*" with 90 days of signing the agreement.  Bayer will create and maintain a master drug safety database which shall cross-reference any Adverse Event relating to the product occurring anywhere in the world, including the USA.  J&J shall submit all data collected by it with respect to Adverse Events relating to the product to Bayer.

87. According to the agreement **Section 7.10 "Events Affecting Integrity or Reputation"**: Parties are to notify each other as soon as practicable of any circumstances of which they are aware which arise whereby the integrity and reputation of the product are threatened by the unlawful activity of any third party in relation to the product.[98]

## V.    FDA'S FIRST NDA APPROVAL (NDA 22-406) OF XARELTO (RIVAROXABAN) FOR VTE PREVENTION POST HIP/KNEE REPLACEMENT SURGERY MARKETING IN THE UNITED STATES

88. On March 15, 2007, there was a Type A[99] Teleconference held with FDA; March 20, 2007 a Type C Pre-clinical meeting; and on March 22, 2007, Defendants submitted a revised Statistical Analysis Plan (SAP) plan for RECORD 3 Study.  On June 13, 2007, Defendants submitted a RECORD 4 Protocol Amendment 1, version 2.1 and on June 22, 2007 Defendants provided FDA with a RECORD 3 Abstract prior to its public release.  On June 29, 2007 there was a teleconference between FDA and Defendants to discuss the results of RECORD 1 and 3 trials for VTE-Prevention.

89. Along with a request for a Type C 'Pre-NDA' meeting on July 24, 2007, Defendants submitted a carton mock-up and draft label. In preparation for the Type C Pre-NDA meeting, Defendants submitted a briefing package and annual report to FDA.  The FDA's response was received on September 24, 2007 for the upcoming September 27, 2007 FDA Pre-NDA meeting.  FDA requested long term safety data and a projected NDA submission date.  On October 12, 2007 Defendants submitted a briefing package for a Type B CMC Pre-NDA meeting. Defendants submitted a briefing package for the Type B Pre-NDA eCTD meeting on November 9, 2007, but the CMC Pre-NDA meeting was cancelled November 15, 2007 based on "all issue resolved."

---

[98] Derix Exhibit 73

[99] **Type A meeting** = meeting that is necessary for an otherwise stalled product development program to proceed ( a critical path meeting) or to address an important safety issue. Type A meeting should be scheduled to occur within 30 days of FDA receipt of a written request for a meeting.  **Type B** meeting are Pre-IND meetings, Pre-emergency use authorization; certain end-of-phase, Pre-New drug application, psot-action meetings requested 3 or more months after an FDA regulatory action other than an approval (ie issuance of a compelte response letter), meeting regarding REMS or postmarketing requirements. A Type B meeting is usually scheduled within 60 dyas of FDA's recipt of the written request.

90. On March 20, 2008 FDA requested a "Stat" teleconference with Defendants, held on March 25, 2008, with official minutes issued by FDA on April 4, 2008, and Defendants' official response submitted April 15, 2008.  On May 29, 2008, Defendants submitted a copy of the RECORD 4 press release.  On July 16, 2008 a letter of authorization was received allowing FDA to refer to the Bayer VTE IND for support of the Janssen NDA.  Over July 24-28, 2008, 24 Clinical Study Reports submitted to FDA.

### a.  DEFENDANTS' VIEW OF XARELTO AS ONE OF SEVERAL NOACS RACING TO MARKET

91. Defendants had requested a priority review from the FDA for its XARELTO NDA, based on public health benefit, as an alternative to warfarin for VTE, which was denied.[100] According to Janssen's 2008 Commercial Strategy Plan,[101] Janssen anticipated that XARELTO for the limited and short-term use indication of VTE-P would be the first NOAC approved by the FDA an out on the US market. Janssen internally recognized that the first NOAC to get to market (even with a narrow therapeutic indication and short-term use) had an advantage.  In the anticoagulation market "each day of development is critical" and it is "critical that we stay ahead of competition across all indications."[102]

### b.  DEFENDANTS SUBMIT XARELTO NDA 22-406 ON JULY 28, 2008 WHICH APPEARED TO BE MOVING DOWN THE 'TRACK' TO BE THE FIRST NOAC NDA APPROVAL

92. Pursuant to the chronology taken from Defendants' PTE Appendix of Significant Regulatory Activities and the XARELTO VTE-P NDA:[103] On July 28, 2008, Bayer submitted an NDA based on Bayer's IND data from its RECORD 1-4 studies. On August 4, 2008, the sponsors amended the RECORD 4 Study (MRR AA41857). On August 6, 2008, FDA was informed by Bayer it transferred its IND and NDA over to Janssen effective August 15.  The RECORD 4 Study Report was received on August 11, 2008.[104] RECORD 2 was rivaroxaban for 35 days, enoxaparin for only 12 days, with a potential for underestimation of enoxaparin effect.  RECORD 3 used unapproved lower enoxaparin dose for patients post knee replacement surgery: 40 mg dose, potential for under-estimation of enoxaparin effect.  RECORD 1 & 2 involved patients post hip replacement surgery, and RECORD 3 & 4 involved patients post-knee replacement surgery.  Venography on Day 12 (knee) and Day 35(hip), follow-up for one additional months, central adjudication of major outcomes.[105] According to the FDA presentation at the March 19, 2009 Advisory Committee meeting, RECORD 1: 4541 randomized, ~89% completed, ~30% excluded from mITT; RECORD 2: 2509 randomized, ~88% completed, ~31% excluded from mITT; RECORD 3: 2531 randomized, ~90% completed, ~33% excluded from mITT; and RECORD 4: 3148 randomized, ~90%

---

[100] Geiger Exhibit 44
[101] Geiger Exhibit 39
[102] Geiger Exhibit 39
[103] XARELTO_JANSSEN_06628658
[104] XARELTO_JANSSEN_06628658
[105]http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm143643.htm

completed, ~39% excluded from mITT.[106]  RECORD Studies Rivaroxaban N=6183; Enoxaparin N=6200. Major bleeding Riva (0.4%) vs Enox (0.2%).  In RECORD, the incidence of liver-related deaths was Riva (0.06%) vs Enox (0%), ischemic stroke was Riva (0.19%) vs Enox (0.11%), cardiovascular events 0-9 days after discontinuation of the drug was Riva (11) vs Enox (3).[107]

93.  Defendants submitted an original NDA (NDA 22-406) to the FDA on July 28, 2008 for XARELTO to market a 10 mg once a day (OD or QD), with no monitoring required, for the prophylaxis of deep vein thrombosis (DVT and pulmonary embolism (PE) ("VTE-P") in patients undergoing total hip replacement (maximum of 35 days) or total knee replacement surgery (maximum of 14 days).[108]  In support of this approval, Defendants provided FDA with Bayer's RECORD 1-4 studies.

94.  On August 13, 2008, 29 Pre-Clinical Study Reports were submitted to FDA in the NDA. On October 3, 2008, FDA requested additional information for Defendants' **MAGELLAN** study, XARELTO use in medically ill hospitalized patients.  On October 6, 2008, FDA's NDA filing letter had a Chemistry Manufacturing and Controls (CMC) (Pharmaceutical Quality) request for Defendants. Defendants were to submit Clinical Pharmacology sets of study data on October 15, 2008.  There was a call held with FDA "re: CMC and Labeling Comments in FDA's filing letter" and a proposal for two future meetings.  On October 31, 2008, there was a follow-up call with FDA and a meeting held for issues with CMC, NDA Questions, Trade Name and concerns about Liver toxicity. On November 4, 2008 there was submission of information on a Multiple Bleeding Event Analysis accompanied by Cardiac ECG datasets.  On November 6, 2008 Defendants submitted safety data, including information on CMC, Integrated Summary of Safety (ISS) and unblinded serious adverse events (SAEs) from RECORD.

95.  RECORD 4 was a VTE prevention study in patients undergoing elective orthopedic total knee replacement surgery. For RECORD 4, on November 14, 2008, Defendants submitted RECORD 4 trial data obtained from Dr. Craig Loucks,[109] a Colorado Orthopedic Surgeon and RECORD 4 investigator, followed by a November 21, 2008 submission in response to the FDA's Office of Compliance Requests.  On November 25, 2008, Defendants provided its fourmonth safety update: "Ongoing Clinical Studies".  A November 25, 2008 submission was of Case Report Forms (CRF) for clinical studies.  On December 1, 2008 a letter came from FDA: "November 17, 2008 with Official Meeting Minutes."

---

[106] *Id.*

[107] *Id.*

[108] XARELTO_JANSSEN_04186735

[109] Dr. David Craig Loucks is an orthopedic surgeon from the Denver, CO area.  FDA has issued a CDER Notice of Initiation of Disqualification Proceedings and Opportunity to Explain (NIDPOE) on August 18, 2009.  The proceeding followed FDA inspection of his investigational site between April 15, 2008 and May 7, 2008.  FDA wrote in the NIDPOE:" We believe that you have repeatedly or deliberately submitted false information to the Sponsor or FDA in required reports and repeatedly violated regulations governing the proper conduct of clinical studies involving investigational products."[21 CFR 312.70(a); 21 CFR 312.60; 21 CFR 312.62(b); 21 CFR 312.66. His status as a clinical investigator is RESTRICTED as of August 16, 2010.

96. On December 4, 2008, FDA sent a 'Mid-Cycle Completed Review' (CR) letter (see discussion of FDA's Completed Review letter below) to Janssen.  FDA's December 5, 2008 CR letter requested that the Sponsor respond to specific requests for FDA to receive updated Statistical, CMC, and Clinical Pharmacology sections necessary for continued review of the NDA.

97. On December 8, 2008, Dr. Susan Thompson (FDA's DSI) issued a standard NDA Routine Sponsor Monitor Inspection, required prior to an original NDA approval. On December 12, 2008 there was a letter from FDA titled: "NDA Clinical Section Review: RFI, follow-up on Mid-Cycle Questions, CMC teleconference, SSP and Clinical Questions." On December 16, 2008 Defendants filed their response to FDA's Information Request (IR) Letter, providing statistical datasets.

98. On December 19, 2008 there was a response from Defendants to FDA's IR letter providing CMC, Stats, Clinical Pharmacology and on December 24, 2008 Unblinded SAEs.  On December 30, 2008, an FDA fax was received regarding an inspection conducted in Shanghai, China.  On January 27, 2009 there was a teleconference with Division Director regarding the upcoming FDA Advisory Committee meeting scheduled for March 19, 2009. Defendants responded to FDA's IR letter[110] questions from January 29, 2009 through February 22, 2009 and provided a 6month safety update on February 2, 2009.  There was a teleconference with FDA on February 2, 2009 to plan for Janssen's role at the FDA's Advisory Committee Meeting scheduled for March 19, 2009.

99. On February 5, 2009, one month before the FDA Advisory Committee Meeting, Defendants' XARELTO horse appeared to have stumbled in the race to be the first NOAC on the US market, and the roadblock for the horse was increased rivaroxaban plasma concentration, and significantly increased bleeding risk for certain subgroups of patients and dose. Defendants received a "Discipline Review Letter"[111] (DR)[112] from FDA, regarding the review discipline of Clinical Risk and Pharmacokinetics/Pharmacodynamics. FDA had judged that Defendants' initial response to FDA's IR letter for bleeding risk and dose was still not adequate.

---

[110] Information Review (IR) letters do not stop the CDER review clock and are not considered action letters. The FDA asks for information to assist the reviewers or to convey deficiencies identified in the application to the Sponsor in advance of issuance of an action letter, they do not signal completion of a review cycle. The applicant could begin preparing a response, and subsequently reduce the time for the review at FDA and potentially expedite the availability for the public.

[111] Guidance for Industry Information Request and Discipline Review Letters Under the Prescription Drug User Fee Act, issued November 2001 (www.fda.gov/downloads/guidancecomplianceregulatoryinforamtion/guidances/ucm172134.pdf) defined section 735(1) of the FFDCA (21USC 379g(1)) (PDUFA products). Result of November 1997 re-authorization of PDUFA as part of the Food and Drug Administration Modernization Act (FDAMA) of 1997

[112] The Discipline Review Letter refers to review of FDA by experts in a specific discipline and request for information for the review.  Specific disciplines at CDER- clinical, chemistry, manufacturing and controls, non-clinical pharmacology and toxicology and bioavailability section, as described per PDUFA2.Deficiencies are identified in particular specific discipline(s) in the letter. They are not considered action letters by the FDA and do not stop the review clock.

c.  **DEFENDANTS "*PUSH BACK*" AGAINST FDA'S CONCERNS ABOUT FOUR-FOLD INCREASED BLEEDING RISK WITH DOUBLING OF DOSE OF XARELTO [Study 10942 (ODIXA-HIP)]**

100.  On December 5, 2008, FDA issued an Information Request (IR) Letter to Janssen requesting additional information to support Defendants' decision not to develop a 5mg tablet of rivaroxaban for dose titration for certain populations at increased risk.  FDA also requested to receive additional explanation about the 40% increase in rivaroxaban plasma concentration seen in normal healthy Japanese subjects, but not detected in other ethnicities, including the Chinese.[113]

101.  Janssen submitted its response letter to FDA on December 18, 2008, providing Defendants a rationale as to why it would not  pursue selling less than a 10 mg dose in the United States for VTE-P in patients undergoing orthopedic surgery for total lower joint replacement.  Janssen contended that a 10 mg once a day dose had been shown to be effective for VTE-P in its RECORD 1-4 studies when compared to standard treatment with enoxaparin (Lovenox).  It contended that the same 10mg dose was effective for all special patient populations without a need for dose titration or any type of monitoring for bleeding risk.  Defendants argued that 10 mg was the acceptable dose in terms of risk for major bleeding versus benefit (efficacy) for VTE-P for all patients even with mild to moderate renal impairment, mild hepatic disease and following administration of CYP3A4 inhibitors.  As support, Defendants provided its Phase 2 dose ranging Study 10942 (ODIXa-HIP) as well as phase IIb 11527 (ODIXA-OD.HIP). According to Defendants, XARELTO did not require any titration or dose monitoring for short-term use for VTE-P. To further support the claim, Defendants reasoned XARELTO had only a single target of action, factor Xa, a predictable PK across many patient subgroups, and had phase 2 evidence to support a "wide therapeutic range" of safety and efficacy. As a result, Defendants concluded there was no further need for it to develop, test or sell a lower and potentially less effective dose of XARELTO.

102.  At the time of the NDA for VTE-P, FDA was reviewing Defendants' Phase 2 ATLAS studies with multiple dosing arms (2.5mg BID, 5mg BID, 10mg QD, 5mg OD); Phase 3 ATLAS studies with 2.5mg BID, 5.0 mg BID; Phase 3 MAGELLAN studies using only a 10mg OD; Phase 3 EINSTEIN studies with 10mg OD; and the Phase 3 ROCKET AF study with a single 20mg OD dose arm.

103.  In terms of Defendants' 'one dose fits all' marketing and sales goal, a study performed in Japanese patients at the request of the Japanese regulatory agency had Defendants having to now explain to FDA's reviewers an approximate 40% increase in XARELTO exposure (plasma concentration) occurring in young healthy Japanese subjects, was an effect not seen with any other ethnic groups. Defendants claimed that the variation of exposure in Japanese healthy volunteers was "moderate" and "within the normal magnitude of inter-individual variability." Defendants maintained that there was no support that XARELTO had shown inter-ethnic differences in its Phase I trials.[114] It maintained a 40% increase in

---

[113] XARELTO_JANSSEN_05935635
[114] XARELTO_JANSSEN_04186735

rivaroxaban plasma levels in healthy adults was clinically acceptable, despite the potential increased risk for bleeding.

104.   The responses given by Defendants to FDA were not sufficient.  FDA subsequently issued a "Discipline Review Letter" on February 9, 2009 with the NDA review continuing.  FDA identified that dosing and safety issues of major bleeding risks continued to be its two major concerns for rivaroxaban.

105.   After reading the Defendants' response and rationale, FDA told Janssen that it was <u>not persuaded</u> by Defendants' December 18, 2008 response.  This position was reiterated by FDA's Office of Clinical Pharmacology members at a December Mid-Cycle meeting with Defendants and again at a later teleconference.  FDA was not persuaded that it was not necessary to provide a dose lower than 10mg to permit titration in some patient populations at increased risk of bleeding.  Using the data from Defendants' Phase IIb dose ranging Study 11527 (see discussion below of FDA Clinical Pharmacology Review 2008), FDA provided:

> *Table 1 in your response to FDA reports a greater than 4 fold increase in major bleeding (0.7% vs 4.3%) when exposure is increased two fold from the proposed dose. This suggests that even a 1.5 fold increase in exposure may double the risk of major bleeding. This is an important safety concern.*[115]

106.   The FDA pointed out to Defendants that without the ability of a physician to titrate a patient downwards to reduce the rivaroxaban plasma exposure and risk of bleeding (anticoagulation activity), a single 10mg dose, as was proposed by the Sponsor for VTE-P, would place certain subgroups of patients at increased risk of major bleeding. This concern was based on Defendants' Pharmacodynamic (PD) data, which FDA had reviewed in the NDA submission.  The FDA identified examples of patient populations that it thought might be at increased risk for bleeding from having higher concentration/increased anticoagulant effect of rivaroxaban, and would need to have the ability for dose titration:

> *a. Moderate to severe renal impairment*

> *b. Mild to severe impairment when used with CYP 3A4 inhibitor*

> *c. Moderate to severe hepatic impairment*

> *d. Concurrent use of moderate or strong CYP 3A4 inhibitor plus a moderate or strong CYP 3A4 inhibitor plus a moderate or strong P-gp inhibitor.*[116]

107.   The FDA expressed concern about the 40% increase in plasma concentration detected in Japanese healthy patients compared to other ethnic groups, for example Chinese volunteers.  The FDA pointed out to Janssen that the Japanese subjects in the Phase I

---

[115] XARELTO_BHCP_00015504
[116] XARELTO_BHCP_00015504

study were younger and lighter weight than the rest of the subjects Defendants had tested in RECORD.[117]

108. In preparation for a later teleconference call with the FDA planned for February 9, 2009 to discuss issues in FDA's Clinical Pharmacology Discipline Review Letter, Defendants' Dr. DiBattiste, Dr. Gary Peters and Dr. Scott Berkowitz and others, as members of the Joint Rivaroxaban Team, met to discuss the FDA's concerns about dose and bleeding risk, to develop a strategy for the meeting and to deal with potential requests.  Regarding FDA's issue with seeing a 4-fold increase in major bleeding between a10 mg and 20 mg BID dose, Defendants agreed that its response should be that the dose-response relationship to bleeding was not actually a 4-fold increase, but more likely an artifact of the small population used in the study.  The support would be that other Phase 2 orthopedic surgery studies, the escalation in risk of bleeding seen with doubling of dose (10mg to 20 mg) once a day had been only increased by 50% and not the *4-fold increased* described by FDA and the NDA data.[118]

109. In terms of FDA's concerns about titrating a patient's dose based on a patient's renal impairment, Defendants determined it would not agree to FDA's request for a lower dose for this population since a lower dose could also reduce efficacy for VTE-P.  Dr. Gary Peters indicated he preferred to "argue the efficacy pretty strongly" with FDA and wondered if Defendants should be willing to give up using 10mg with patients on potent inducers (i.e., "our efficacy argument becomes more consistent if we don't try to say the 10mg with inducers is also effective enough").  Dr. DiBattiste's concern was, "Can we give up the argument on inducers without giving the appearance that we are doing it simply to win a different argument?  Either way, worth considering, I guess."[119]

110. Dr. DiBattiste is recorded as having presented a proposed strategy for the group to deal with FDA in the Teleconference.  His strategy was for the group to ask FDA numerous questions, appear concerned, and eventually "lead" FDA towards making certain conclusions including the conclusion that the questions could only be answered in Phase 3 studies.[120]

111. Dr. Peters expressed his concern about the FDA's position that Janssen needed to have a lower dose, i.e. 5mg tablet. His thought was that it would affect efficacy and that it had not been studied.  He posed several key questions that the team should ask FDA. For example, "How a 5mg would affect efficacy?" His question in 2008 before approval of any NOAC as an alternative to warfarin was, "What is more important to the Agency preventing VTE or avoiding bleeding?"[121]

112. To help the Rivaroxaban team prepare for FDA's TC meeting, Dr. Mueck sent a February 6, 2009 email to Dr. Scott Berkowitz, Mr. Jolata, and others. Dr. Mueck told the team it

---

[117] XARELTO_BHCP_00015504
[118] XARELTO_JANSSEN_03832750
[119] XARELTO_JANSSEN_03832750
[120] XARELTO_JANSSEN_03832750
[121] XARELTO_JANSSEN_03832750

needed to "*push back*" on FDA because if FDA's hypothesis was correct FDA is saying XARELTO is a "*really dangerous drug*". Based on what he had seen clinically in the trials, he would not accept XARELTO was a "really dangerous drug." However, in terms of the development of a 5mg dose he called that a "strategic decision". He conceded that FDA's point about "undesired overdose effect" (increased plasma concentration) with CYP3A4/P-gp was "scientifically valid". Nevertheless, his message was to "*push back*" on FDA.[122]

113. On February 6, 2009, still before the scheduled TC with FDA, there was an internal email chain between Dr. DiBattiste and Dr. Peters indicating there had not been enough variation in the patient populations in Phase II and Phase IIII RECORD studies to be able to support to FDA a lack of bleeding risk or lack of need for dose titration in patients deemed by FDA at high risk. Defendants were unable to support what level of increased drug exposure (30%, 50%, 100%) would be considered as clinically acceptable for FDA in terms of bleeding risk and efficacy for VTE-P.[123]

114. The Defendants' rivaroxaban team discussions included internal dissemination and analyses of RECORD 1-4 integrated analyses tables. The RECORD tables were analyzed according to population characteristics, exposure markers and bleeding rates divided per quartile. Dr. Mueck confirmed that the tables showed a *doubling* of the mean rate of bleeding in the highest exposure quartile. [124]

115. The RECORD tables showed the Defendants that patients in that highest quartile of rivaroxaban plasma concentrations shared a significant prolongation of PT (clotting time) > than 50 seconds and also had the highest risk for major bleeding. While the patients in the lower three quartiles had PT (clotting time) of 11 seconds and a lower risk for major bleeding. [125] This review of the RECORD table information was emailed by Martin Homering, Ph. D., Bayer Statistical Sciences, to members within Bayer and Janssen on February 7, 2009 in response to Dr. Mueck's concerns for responding to FDA's February 5, 2009 Discipline Review Letter. This information does not appear to have been discussed with FDA at the TC, and supports the risk of bleeding based on PT prolongation, drug concentration and need for therapeutic drug monitoring.[126]

116. This information about the prolongation of PT in the top quartile (highest risk group) (>50 seconds) with increased bleeding risk versus PT of 11 seconds and lower bleeding risk was available to Defendants in 2009 even using the flawed RECORD data and before Defendants' Teleconference with FDA. Defendants also identified that its RECORD 4 study, later determined to be an unreliable study by FDA, had the highest bleeding risk with most patients in the upper quartile exposure level and prolonged PT. There was no discussion that Defendants should voluntarily add that information about PT to its drug's label showing that prolonged PT is associated with a risk of bleeding. A place where

---

[122] Mueck Exhibit 27
[123] Kollath Exhibit 4
[124] Mueck depo 2/23/16 p.293: L7 – p. 294: L22; Mueck Exhibit 29.
[125] Mueck depo 2/23/16 p.296: L20 – p. 298: L22.
[126] Mueck Exhibit 28

such measuring information could have been added to the United States label is Section 5.4 Laboratory tests. That information, along with availability of the requested 5mg lower dose, would permit some form of dose titration and help reduce patient bleeding risk. The PT information could also be better described in Section 12.2 Pharmacodynamics.

117. Dr. Homering wrote about the differences in bleeding risk versus PT with the Neoplastin Assay, the assay used by Bayer throughout its preclinical and clinical studies, including RECORD 4 (R4), when compared to RECORD 1-3 (R 1-3):

> ...the upper quartile based on PT Neoplastin at day 6 peak compared to the 3 lower quartile shows higher rates for any bleeding, but also major+ NMCR bleeding.[127]

118. The Rivaroxaban Team members participated in the teleconference with FDA on February 9, 2009. During that TC, FDA continued to reiterate its position to Defendants that there were several patient subgroups at risk of unacceptably high bleeding if a doubling of rivaroxaban exposure occurred. The FDA continued to recommend that the Defendants develop a 5-mg dose or scored 10mg dose for use by these subgroups at risk to provide the physician with an option and the ability to titrate the dose.

119. As had been planned by the Rivaroxaban Team, according to the Summary, the Defendants' plan was to maintain to FDA that the agency was focusing on increased bleeding rates from relatively small Phase II studies, with wider confidence intervals. However, FDA was recorded by the Team as not having been convinced by the Team. FDA continued to express concern about the subgroups at increased risk of bleeding without Defendants either selling a lower dose or providing titration recommendations. According to Defendants' meeting minutes, the FDA continued to take the position that "the lack of lower strength presentation could be an approvability issue" and that "the AdCom's input would be sought to decide this issue."[128]

120. On February 25, 2009, a Janssen official response to the FDA's February 5, 2009 Discipline Review Letter was submitted. Defendants, as part of its "push back" efforts, determined internally that a doubling of the dose and increased bleeding risk of only 50% was clinically acceptable. Janssen continued to indicate it disagreed with the FDA's discipline review letter and the need for a 5mg dose.[129]

121. Dr. Mueck would later testify in 2016 that he continued to stand by his original recommendations for Defendants to "push back" against the FDA's concerns about the risks associated with increased dose and major bleeding.[130] As he said in the February 9, 2009 email, for Defendants not to have pushed back at FDA on this point would be for Defendants to accept that XARELTO is "a really dangerous drug" since the data suggested by FDA would mean that two-thirds of the patient population prescribed

---

[127] Mueck Exhibit 28
[128] XARELTO_JANSSEN_00091396
[129] Kollath Exhibit 7
[130] Mueck depo 2/23/16, p. 273: L 13-23; Mueck Exhibit 27

XARELTO would fit within the range of sufficient exposure for bleeding placing, as he said, a "large proportions of our patients…at considerable risk."[131]

**d.  DEFENDANTS PHASE II VTE-P SAFETY STUDIES WITH PK AND PREDICTIVE MODELING USING APPLIED LOGISTIC REGRESSION (STUDIES 10942, 10944, 10945 AND 11527) AND PK ANALYSIS PK 000131 (STUDIES 11527 AND 10944)**

- **Defendants' Phase II VTE-P Exposure-Response Studies**

122. Defendants' plan, as part of FDA's required streamlining process for manufacturers, was to have its VTE safety studies (Phase II and Phase III RECORD) for approval of VTE-P (and Phase III for VTE-T) be sufficient for FDA to support approval of its Phase III ROCKET AF study for the SPAF indication without a need for additional Phase II safety (and dose ranging) studies.   Defendants intended to bridge the information available in the other clinical studies already under review by FDA. PK analysis with the Phase II studies were submitted as PK000131 using Study 11527 and Study 10944.

123. According to the FDA's published Clinical Pharmacology Review for NDA 22-406 VTE-P, Defendants submitted four dose ranging Phase 2 studies comparing efficacy and safety of rivaroxaban with enoxaparin in VTE-P for hip replacement, Studies **10942**, **10944** and **11527**, and for knee replacement, Study **10945**.

- **STUDY 10942**

124. The Defendants' principle study for hip replacement patients was VTE-prevention Study No. 010942 (phase IIa), which was a dosing study perfomed using BID dosing and 30mOD dose arm compared to 40 mg OD enoxaparin.  The final report for Study 10942 (ODIXa-HIP) was completed on December 7, 2004. The Phase IIa study is of note in that rivaroxaban was compared to enoxaparin OD and used a wide (12-fold) dose range (2.5mg BID to 30mg BID). Subjects received rivaroxaban for 8 days (median range: 1-12 days). Administration of enoxaparin was 12 to 16 hours prior to scheduled surgery, as 40mg OD subcutaneous injection.

125. The original protocol was dated October 9, 2002 and it was amended four times.[132]  The first subject was enrolled on December 15, 2002, and the last treated patient wascompleted on December 19, 2003.  Amendment 2, dated May 17, 2003, was applicable for all participating centers and added that blood and urine sampling in subjects randomized to BAY 59-7939 treatment be obtained for pharmacokinetic measurements at pre-selected centers.[133] Amendment 3, dated May 23, 2003, added the use of the lower 2.5mg bid dose step to the trial.  Amendment 4, dated August 12, 2003, added 30mg and 40mg OD arms.[134]  In Study 010942, the first dose investigated was a

---

[131] Mueck depo  2/23/16, p. 273: L 13-23; Mueck Exhibit 27
[132] XARELTO_BHCP_00004220 at p. 47
[133] XARELTO_BHCP_00004220 at p. 47
[134] XARELTO_BHCP_00004220 at p. 48

48

5mg BID dose which was chosen as the first stage of minimally effective therapeutic dose according to pharmacodynamics (PD) and pharmacokinetic (PK) data obtained in healthy subjects.  After completion of the first 2 dose steps (5mg BID and 10mg BID) indicated better therapeutic effects than anticipated, a 2.5mg BID dose arm was added (Amendment 3). A dose of 30mg BID was later considered by the Steering Committee as the maximum tolerated dose and as a result, the 40mg BID was not tested.  The study was open label with a comparison to enoxaparin.  "Although pharmacokinetic and pharmacodynamics measurements from subjects randomized to BAY 59-7939 treatment had been foreseen in selected centers (added by Amendment 1 and 2), only few data were collected.  For this reason, a meaningful pharmacokinetic evaluation was not possible"[135]

126. Across all dose ranges(including the 2.5mg BID of 5mg TDD), the results were positive and appeared to indicate a wider potential dose range for rivaroaxaban efficacy than first considered.  However, it was an unblinded study with widely overlapping confidence intervals and an open-label design.  Study 010942 showed less bleeding risk with BID (twice daily dosing) compared to the once-a day doses (and later the OD dosing in Study 11527 (see below).  In Study 10942, the risk of bleeding increased compared to enoxaparin proportional to the daily dose (TDD). The greater the TDD, the higher the risk.  There were two deaths in this short study, both in patients given rivaroxaban treatment: one death in a patient due to a pulmonary embolism (PE) in the 2.5mg BID arm; and one death of unknown causes in the 30mg OD arm.  "None of the deaths was considered related to study drug" according to investigators. [136] Venography was used for assessment of VTE status.

127.  Figure 14.2/2.13 (below) shows a Dose-Response (Exposure-Efficacy) relationship that is rather wide in terms of choice of an acceptable dose.  The solid line in the center of the figure represents "primary efficacy endpoints", with the dotted lines representing the upper and lower 95% confidence intervals.  The primary endpoint was evaluated 5-9 days after surgery and was based solely on the assessments made by the separate adjudication committees (Safety Committee and the Bleeding Committee). The per-protocol (PP) analysis population was valid to look at the performance of the primary efficacy analysis. The Intent-to-treat (ITT) analysis was performed as a supportive analysis.  The dose-response relationship of BAY 59-7939 was investigated by Defendants using a statistical trend test.  Subsequent to the trend test, each individual BAY 59-7939 treatment group was compared to enoxaparin.

128. In the interim analysis for this protocol, major bleeding events were continuously monitored by the Steering Committee in an unblinded manner for each of the dose stages. Stopping rules were pre-specified in the protocol. Termination of a dose stage was recommended prematurely in the case that the lower limit of the 2-sided 95% CI for the event rate of major bleeding exceeded 5%, or if 6 or more major bleeding reports had been observed (reported) in the corresponding dose stage (30mg BID).

---

[135] XARELTO_BHCP_00004220 at p. 39
[136] XARELTO_BHCP_00004220 at p. 3

129. The Defendants engaged in predictive simulation (adaptive logistic regression modeling) to develop its best fit curves and lines for use in the Figures produced, just as they would continue to propose to do in 2015 (see below LEG 036 response and 3 PublicMeetings in 2015). The protocols described the intentional use of scant/sparse blood sampling. There were complete pharmacokinetic (PK) profiles obtained from only five (5) subjects and sampling from other subjects was limited. Due to the paucity of available PK data, no analysis of PK data was performed.[137]

130. Regarding efficacy, the investigators concluded that the reduction of VTE incidence rates by BAY 59-7939 was dose-dependent in the range of 2.5 to 20mg BID with incidence rates declining from 22.2% (2.5 bid) to 10.2% (20mg BID) compared with 16.8% in the enoxaparin group. Paradoxically the VTE incidence rate in the 30mg BID dose group was 17.4% BAY 59-7939 and greater than the 10mg BID, 30mg OD, and 20mg BID (10.2%) with lower incidence rates. Major VTE incidence rates occurring with 30mg BID and enoxaparin were called similar. The higher incidence rate of VTE at 30mg BID dose compared to the 20mg BID could not be explained by the investigators at the time.[138] In terms of safety, discontinuations of study drug due to adverse events were reported in 13 subjects (17.6%) all receiving 30mg BID. Defendants indicated that of the 13subjects, in retrospect three were incorrectly discontinued by investigators based on seeing an increased INR value (2.76, 3.1 and 3.9) with no evidence of bleeding. Seeing an increase in INR values had caused the investigators for those 3 patients to falsely discontinue rivaroxaban.

131. The "Handling of Problem Data" for the protocol was to be done during the data review meeting. Due to the small number of subjects available in some of the participating countries, it was decided to pool the countries into country 1 and 2 regions for primary evaluation of efficacy. Pooled country #1: Belgium, France and the Netherlands; Pooled Country #2: Denmark, Norway, Sweden and the UK.

132. Study 10942 had 642 subjects enrolled, 641 randomized, 625 treated and 583 completing the study. The number of subjects with premature termination was highest in the 30mg BID group. Adverse events were the most frequent reason for premature termination. Of the 641 randomized, 625 were valid for safety analysis, 491 were for intent to treat (ITT) analysis and 466 were valid per protocol (PP) analysis.

133. Defendants wrote about Figure 11-3 (below) as providing a 'monotonous dose-response relationship'[139] for rivaroxaban with efficacy endpoint from 2.5 mg bid to 20mg bid (5mg- 40mg TDD), but that the "incidence rate" (VTE of 17%) observed at 30mg bid (60mg TDD) was unable to be explained by investigators in terms of its support for a "monotonous dose-response relationship," (see section titled "Bayer seeks United States Business Partner- Due Diligence Responses 2005", Dr. Misselwitz and Dr. Kubitza responses about 30mg (17%) BID results).[140] The incidence rate on the X-axis of Figure

---

[137] XARELTO_BHCP_00004220 at p. 83
[138] This was also inquired about in Due Diligence discussions in 2005 by other manufacturers.
[139] XARELTO_BHCP_00004220 at p. 75
[140] Kubitza Exhibit 32; Kubitza Exhibit 33

11-3 below is the incidence of VTE (*i.e.,* efficacy).  Figure 11-3 depicts the modeling of dose versus efficacy for VTE –P.  TDD doses from 5mg OD to 60 mg OD (other than 30 mg OD) fall within the effective range (based on Defendant's applied logistic regression model using dose as a covariate.)

> *As shown in ...Figure 11-3 there appears to be a monotonous dose-response relationship between BAY 59-7939 with regard to the incidence rate of the primary efficacy endpoint up to the dosage of 20mg bid, as the deviations seen in the lowest dose group may be due to random variation.  However, the incidence rate observed in the highest dose group (30mg bid) is not in line with the assumption of a monotonous dose-response relationship.*[141]



Figure 11-3: Dose-response relationship of BAY 59-7939 with respect to the primary efficacy endpoint (subjects valid for ITT analysis)

Note: The solid line represents the dose-response curve estimated by logistic regression. The dotted lines represent the point wise lower and upper 95% confidence limits. Dots represent observed frequencies. The applied logistic regression model includes total daily dosage as a covariate.
Source: Figure 14.2/2.3.2

[142]

134. It should be noted that the study was powered to detect a trend in the dose-response relationship, but not to detect differences between individual treatment groups.[143]

---

[141] XARELTO_BHCP_00004220 at p. 75
[142] XARELTO_BHCP_00004220 at p. 75
[143] XARELTO_BHCP_00004220 at p. 77



Figure 12-1: Dose relationship of BAY 59-7939 with respect to post-operative major bleeding (subjects valid for safety analysis)

Note: The solid line represents the dose-response curve estimated by logistic regression. The dotted lines represent the point wise lower and upper 95% confidence limits. Dots represent observed frequencies. The applied logistic regression model includes dosage as a covariate.
Source: Figure 14.3.1/11.3

[144]

135. Figure 12-1 (above) is an applied logistic regression model of incidence rate of post-operative major bleeding as the Y-axis and the X-axis is the covariate of dose.  The 5mg TDD (2.5 mg BID) falls below the 95% CI and is comparable to enoxaparin in bleeding risk.  The figure shows that increasing dose (5mg BID= 10mg TDD) corresponds to an increasing risk of post-operative bleeding (other than with the lowest dose (2.5mg BID)). The risk of post-operative bleeding is directly proportion to BAY 59-7939 dose.

136. More than 90% of first post-operative major bleeding events occurred on the day of surgery or within 3 days after surgery and less than 10% of post-oprative bleeding events started 4 or 5 days after surgery.  The Steering Committee evaluated the 30 mg BID (60TDD) dose as the maximum tolerated dose and decided to stop further dose escalation because of the increased risk of post-operative bleeding events observed in this group. As a result, the 40mg BID (80TDD), which was planned for the the study protocol, was not tested.

---

[144] XARELTO_BHCP_00004220 at p. 104



Figure 12-3: Dose-response relationship of BAY 59-7939 with respect to the primary efficacy endpoint (PP population) and post-operative major bleeding (safety population)

Note: Dots represent the incidence of VTE, squares the incidence of post-operative major bleeding. The solid lines represent the dose-response curve of BAY 59-7939 estimated by logistic regression for VTE and post-operative major bleeding, respectively. The applied logistic regression model includes dosage as a covariate.
Source: Figure 14.2/2.3.1 and Figure 14.3.1/11.3.

Figure 12-3: Dose-response relationship with respect to primary efficacy endpoints and post-operative bleeding. This is an applied logistic regression model. Defendants did not include the prior dotted lines for the 95% and 5% confidence intervals.  This chart places a wide range of BAY59-7939 doses available near the calculated curves. 30mg BID (60 mg (TDD)) clearly falls outside of both curves. (The dots are incidence of VTE, and the squares are major bleeding with the covariate of dose.)[145]  Defendants did not investigate a 15mg BID dose on 30mg OD.

137. Study 11527 also has a similar figure (Figure 12.3), but with the confidence intervals included (see below).

- **Coagulation Parameters (Study 10942)**

138. Measurements of Factor Xa activity is represented in Table 11-19 (below), as well as PT (Table 11-20). Samples for Factor Xa activity were obtained in the pre-specified sampling window of 2-4 hours after the tablet dose for peak; and trough 2 hours before next dose.

---

[145] XARELTO_BHCP_00004220 at p. 109

139. Table 11-19 is the change in Factor Xa activity based on dose and time of sampling at peak on Days 3 and 5 and then at trough on Day 9. The greatest evidence of residual inhibition of Factor Xa activity (reduction in Factor Xa) was 30mg BID, with the greatest decrease in FXa activity (-) detected on Day 9 at trough.  In contrast, the 30mg OD at Day 9 at trough had evidence of returned (+) Factor Xa activity similar to 2.5mg BID and 5mg BID.  With increasing 'BID' dosing after 10 mg BID, there remained residual inhibition of Factor Xa activity (10mg BID - 30mg BID) as seen in a (-) value at Day 9 trough.  This helps support a difference between the OD and BID dosing (10mg BID-30mg BID) and retention of inhibition effects on Factor Xa activity related to dose.

Percent changes from baseline for factor Xa activity and PT in subjects receiving BAY 59-7939 are presented in Table 11-19 and Table 11-20 (PP population). The results for the ITT population are presented in Tables 14.2/7.1.2 and 14.2/7.2.2.

**Table 11-19: Factor Xa activity - percent change from baseline (PP population)**

| Visit | BAY 59-7939 2.5 mg bid (n = 63) Mean ± SD | BAY 59-7939 5 mg bid (n = 63) Mean ± SD | BAY 59-7939 10 mg bid (n = 55) Mean ± SD |
|---|---|---|---|
| Day 3 (peak) | -25.2 ± 10.5 | -27.1 ± 16.7 | -32.0 ±  9.7 |
| Day 5 (peak) | -12.5 ± 12.6 | -12.7 ± 24.5 | -27.1 ± 12.1 |
| Day 9 (trough) | 3.7 ± 13.9 | 6.5 ± 29.4 | -1.5 ± 15.7 |

| Visit | BAY 59-7939 30 mg od (n = 73) Mean ± SD | BAY 59-7939 20 mg bid (n = 59) Mean ± SD | BAY 59-7939 30 mg bid (n = 46) Mean ± SD |
|---|---|---|---|
| Day 3 (peak) | -39.4 ± 11.6 | -36.8 ± 12.3 | -40.1 ± 10.5 |
| Day 5 (peak) | -32.6 ± 17.1 | -30.0 ± 13.7 | -37.7 ± 12.7 |
| Day 9 (trough) | 5.0 ± 18.4 | -7.4 ± 23.7 | -9.8 ± 13.4 |

Note: Only subjects on BAY 59-7939 with non-missing baseline as well as post-baseline measurements taken within pre-specified time windows (peak: 2 – 4 h after tablet intake, trough: within 2 h prior to intake) were considered.
Source: Table 14.2/7.1.1

146

**Table 11-20: Prothrombin time (PT) - percent change from baseline (PP population)**

| Visit | BAY 59-7939 2.5 mg bid (n = 63) Mean ± SD | BAY 59-7939 5 mg bid (n = 63) Mean ± SD | BAY 59-7939 10 mg bid (n = 55) Mean ± SD |
|---|---|---|---|
| Day 3 (peak) | 9.5 ± 9.3 | 24.1 ± 50.2 | 29.2 ± 59.0 |
| Day 5 (peak) | 2.1 ± 9.0 | 6.2 ± 11.3 | 13.8 ± 11.5 |
| Day 9 (trough) | -0.3 ± 8.4 | -0.8 ±  9.9 | 2.2 ± 10.5 |

| Visit | BAY 59-7939 30 mg od (n = 73) Mean ± SD | BAY 59-7939 20 mg bid (n = 59) Mean ± SD | BAY 59-7939 30 mg bid (n = 46) Mean ± SD |
|---|---|---|---|
| Day 3 (peak) | 50.4 ± 39.0 | 33.1 ± 20.9 | 44.1 ± 28.7 |
| Day 5 (peak) | 29.5 ± 21.0 | 29.5 ± 20.2 | 34.8 ± 25.1 |
| Day 9 (trough) | -0.2 ±  8.4 | 8.4 ± 14.9 | 6.5 ± 12.4 |

Note: Only subjects on BAY 59-7939 with non-missing baseline as well as post-baseline measurements taken within pre-specified time windows (peak: 2 – 4 h after tablet intake, trough: within 2 h prior to intake) were considered.
Source: Table 14.2/7.2.1

147

---

[146] XARELTO_BHCP_00004220 at p. 79
[147] XARELTO_BHCP_00004220 at p. 80

54

140. For Table 11-20: PT % change in the PP population.  PT is a measure of the effective anticoagulation effects of rivaroxaban.   The % change in PT for the BID dosing was greatest on Day 3, with the anticoagulion effect proportional to dose.  The one exception was the 30mg OD which produced the greatest change in PT on Day 3.  The 30mg BID (60 TDD) by Day 5 produced the greatest PT change.  On Day 9 at baseline (trough), slight changes in PT were detectable for 10mg BID- 30mg BID groups (+) (prolonged PT).  By Day 9 and PTtrough, (*as above with Table 11-20 and the inhibition of Factor Xa) the 30mg OD resembled the 2.5mg BID and 5mg BID (-) with lowered PT (*i.e.,* 30mg OD lost the anticoagulation effects).

141. Study 10942 is different from the following studies, since it provided a 9 Day trough value for clotting parameters.

- **Bleeding  Risk (Study 10942)**

BAY 59-7939  /010942        1 - 99
07 December 2004

**Table 12-8: Incidence rates of all bleeding events (safety population)**

| Bleeding classification | BAY 59-7939 2.5 mg bid (N = 76) n (%) | BAY 59-7939 5 mg bid (N = 80) n (%) | BAY 59-7939 10 mg bid (N = 68) n (%) | BAY 59-7939 30 mg od (N = 88) n (%) |
|---|---|---|---|---|
| Any bleeding event | 9 (11.8%) | 9 (11.3%) | 13 (19.1%) | 19 (21.6%) |
| Any major bleeding event | 1 ( 1.3%) | 2 ( 2.5%) | 5 ( 7.4%) | 4 ( 4.5%) |
| Any non-major bleeding | 8 (10.5%) | 8 (10.0%) | 8 (11.8%) | 15 (17.0%) |
| Clinically relevant bleeding | 2 ( 2.6%) | 1 ( 1.3%) | 4 ( 5.9%) | 6 ( 6.8%) |
| Minor bleeding | 6 ( 7.9%) | 7 ( 8.8%) | 4 ( 5.9%) | 9 (10.2%) |

| Bleeding classification | BAY 59-7939 20 mg bid (N = 77) n (%) | BAY 59-7939 30 mg bid (N = 74) n (%) | Enoxaparin 40 mg od (N = 162) n (%) |
|---|---|---|---|
| Any bleeding event | 15 (19.5%) | 18 (24.3%) | 12 (7.4%) |
| Any major bleeding event | 5 ( 6.5%) | 9 (12.2%) | 0 (0.0%) |
| Any non-major bleeding | 12 (15.6%) | 13 (17.6%) | 12 (7.4%) |
| Clinically relevant bleeding | 5 ( 6.5%) | 7 ( 9.5%) | 4 (2.5%) |
| Minor bleeding | 7 ( 9.1%) | 8 (10.8%) | 9 (5.6%) |

Note: Bleeding events starting more than 2 days after last study medication intake not considered.
Source: Table 14.3.1/11.1 (category: all bleeding events)

[148]

142. For Table 12-8, with increasing doses of BAY 59-7939, bleeding events tended to increase as well. The incidence rates seen in the lower dose groups (2.5mg BID and 5.9 mg BID) were slightly higher (similar) in comparison to those seen in the enoxaparin group.

143. According to Table 12-12: Dose Relationship of Bay 59-7939 (as shown below), with respect to major post-operative bleeding (above), a 'trend test' was performed using a

---

[148] XARELTO_BHCP_00004220 at p. 99

logistic regression model and total daily dose (TDD) of rivaroxaban as a covariate, which resulted in a p=0.0008 [Table 14.3.1/11.3].[149]  This is evidence of a trend in the dose relationship of rivaroxaban with respect to post-operative major bleeding events.  This population in Study 10942 received twice daily dosing.

BAY 59-7939  /010942                    1 - 107
07 December 2004

Table 12-12: Incidence rates of major VTE (PP population) and of post-operative major bleeding (safety population)

| Endpoint | BAY 59-7939 2.5 mg bid (%) | BAY 59-7939 5 mg bid (%) | BAY 59-7939 10 mg bid (%) | BAY 59-7939 30 mg od (%) |
|---|---|---|---|---|
| Major VTE | 11.1% | 7.9% | 3.6% | 1.4% |
| Death (VTE related) | 1.6% | 0.0% | 0.0% | 0.0% |
| Pulmonary embolism | 3.2% | 0.0% | 0.0% | 1.4% |
| DVT, proximal | 9.5% | 7.9% | 3.6% | 0.0% |
| Post-operative major bleeding | 0.0% | 2.5% | 2.9% | 4.5% |
| Sum[a] | 11.1% | 10.4% | 6.5% | 5.9% |

| Endpoint | BAY 59-7939 20 mg bid (%) | BAY 59-7939 30 mg bid (%) | Enoxaparin 40 mg od (%) |
|---|---|---|---|
| Primary efficacy endpoint | 0.0% | 4.3% | 4.7% |
| Death (VTE related) | 0.0% | 0.0% | 0.0% |
| Pulmonary embolism | 0.0% | 0.0% | 0.0% |
| DVT, proximal | 0.0% | 4.3% | 4.7% |
| Post-operative major bleeding | 6.5% | 10.8% | 0.0% |
| Sum[a] | 6.5% | 15.1% | 4.7% |

a The sum is calculated by adding the incidence rate of major VTE and the incidence rate of post-operative major bleeding.
Source: Table 14.2/2.1.1 and Table 14.3.1/11.1

144. The report indicated a **S**um of the two (2) incidence rates [VTE%+ Post-op Major Bleeding%= SUM] to develop a "net clinical benefit".  A methodology also used for warfarin studies.  The lower the sum, the more favorable the product for anticoagulation. Enoxaparin has a Sum (net clinical benefit) of 4.7%. None of the doses had a Sum lower than 4.7%.  The best options were 10mg BID, 30mg OD and 20mg BID (a 15mg BID would have also potentially worked).

145. Figure 12-2 (below), "Dose-Response relationship," displays the relationship between VTE rates and post-operative bleeding rates.  It also showed a wide range of optimal doses available from 20mg to 40mg total daily dose (TDD) (given twice a day) with regard to safety (post-operative major bleeding) and efficacy (VTE prevention) (exposure- response relationship) .[150]

---

[149] XARELTO_BHCP_00004220 at p. 107
[150] XARELTO_BHCP_00004220 at p. 108

146. Figure 12-2 depicts the "Net Clinical benefit" for "incidence" (X-axis), which is the combined Sum of risk and benefits.  [SUM= VTE incidence + incidence of major bleeding].  The investigators indicate that using the SUM for 30 mg OD (nadir) supports that the best net benefit for VTE-P is 30mg OD.  Note the increasing post-operative major bleeding by dose ranging from 0% (2.5mg BID) to 2.5% (5mg BID) to 10.8% 30mg BID, with enoxaparin 0% post-operative bleeding, only 2.5mg BID dose not exceed enoxaparin bleeding risk.  For efficacy VTE - 2.5 mg BID 11.1% VTE- 20mg BID 0% VTE, 30mg BID 4.3% VTE, versus enoxaparin 4.7% VTE. Only 10mg BID, 30mg OD, and 20mg BID have a VTE rate less than enoxaparin, with the risk paradoxically increased for 30mg BID to 4.3%.  So in this representation the net clinical benefit is the lowest "incidence" (There is a bar chart version of this for Study 11527 for OD dosing as Figure 12.2 (see below)).



Figure 12-2: Dose-response relationship of BAY 59-7939 with respect to the sum of the incidence rate of major VTE (PP population) and the incidence rate of post-operative major bleeding (safety population)

Dots represent the sum of the two incidence rates considered here. The solid line represents the dose-response curve of BAY 59-7939 estimated by simple quadratic regression.
Source: Table 14.2/2.1 and Table 14.3.1/11.1.

The net clinical benefit of the individual treatments is assessed by the sum of the incidence rates of major VTE and post-operative major bleeding. The data presented in Figure 12-2 indicate that the net clinical benefit is optimal around a total daily dose of 30 mg and still close to its nadir in the range from 20 to 40 mg. The BAY 59-7939 30 mg od dose fits well into the pattern and indicates that BAY 59-7939 may also work when administered once daily.

151

147. The conclusion was that higher BAY 59-7939 doses than 30mg BID (60mg TDD) (see Figure 12-2) (above) were not recommended because the net clinical benefit (sum of the incidence rates of major VTE and post-oprative major bleeding) would disappear. A TDD of 30mg was the optimal net clinical benefit,  which could have been administered as '15mg BID' (a dose not investigated in Study 10942) or the 30mg OD (which was investigated).   The 20mg TDD and 40mg TDD remain near the nadir and provide other

---

151 XARELTO_BHCP_00004220 at p. 108

options including 10mg BID (or 20mg OD), and 20mg BID (or 40mg OD) to investigate. The 30mg OD at the nadir suggested to Defendants that it fit well and an OD dose may 'work' rather than a BID dosing regimen.

- **Study 10944-ODIXa-HIP II**

148. The study dates were from January 12, 2004 (first patient in – visit of last patient) through September 16, 2004, with the final report signed on August 20, 2007 by A. Migge, W. Mueck, T. Westermeir, E. Muehlhofer and M. Kubin.  For Study 10944 (aka MRR-00135 Amendment A), 418 orthopedic hip replacement surgical patients enrolled in Defendants'BID dose-ranging VTE-P study (1.25mg, 5-mg, 10mg. 20mg or 30 mg arms  given BID) versus 40mg enoxaparin OD.  As of August 22, 2003, there were 64 serious adverse events reported, with 46 SAEs for BAY 59-7939 versus 15 SAEs for enoxaparin and three (3) patients who did not receive study drug.  The SAEs for patients treated with BAY 59-7939 (all doses) were: DVT, bleeding events or anemia, mechanical complications of hip prostheses, bacteremia with renal failure, wound infection, ileus, abnormal ECG, liver enzyme increase, and exacerbation of chronic bronchitis.  The 30mg BID dose, which was the highest dose of rivaroxaban used in Bayer's Study 10944 protocol, was officially not accepted by the French Health Authority.  The 30 mg BID had been used in a number of Bayer studies, including Study 10942, and was the maximum dose used in the Rivaroxaban clinical studies.

149. Based on positive results, Study Protocol 10944 was amended to add the 1 .25mg BID dose to the design.[152]  The design of Study 10944 was a Phase IIb VTE-P HIP 'BID' dosing regimen (in contrast to Phase IIb Study 11527, same patient population for VTE-P, except for the "OD" study).

150. The following chronology comes from "*Defendants' PTE Appendix of Significant Regulatory Activities.*"[153] On May 26, 2004 Bayer informed FDA by letter to IND #64,892 that in Study 10944, which was a Controlled, Double-Blind, Randomized, Dose-Ranging Study for the Prevention of VTE in Patients Undergoing Elective Total Hip Replacement-ODIXaHip IIb Study, which was conducted outside the United States, the use of the 30mgBID dose arm had not been <u>accepted</u> by the French Authority.[154]

151. FDA was told that the decision to stop the 30mg BID dose arm in Study 10944 was to keep the study protocol consistent across centers. According to Bayer and its Data Monitoring Review Board (DMRB), FDA was informed that the change was made but not made for any medical or safety reason. The Steering Committee (SC) reportedly decided to suspend the 30 mg BID dose arm to retain consistency.

---

[152] XARELTO_BHCP_00000548
[153] XARELTO_JANSSEN_06628658
[154] See discussion below of Study 11527 phase IIb – and OD study; Study 10942- the hip phase II a dosing study with 30mg bid (60mg TDD) with increased VTE risk (17%) compared to 20mg bid (10%) and Study 10945- knee study.

152. The blood sampling was on the first operative day (Study day 3) after morning administration at 1 h, at 3h, at 6 hr postdosing, and in the time interval between 8h postdosing and before the next dose was given.  Sampling was also taken during steady state conditions of Rivaroxaban (on study days 6 or 7) after morning administration at 1, at 3h, at 6h postdosing and in the time interval between 8 h postdosing and before the next dose was given.[155]

- **Study 10945**

153. Study 10945 is a Phase IIb Controlled, Double-Blind, Randomized, Dose-ranging Study for the Prevention of VTE in patients Undergoing Elective Total Knee Replacement, also 'ODIXa-Knee IIa' study, which was conducted totally outside the United States.  It is a safety and efficacy tolerability study.  The doses are 2.5mg BID, 5.0mg BID, 10mg BID, 20 mg BID, and 30mg BID with comparison to enoxaparin 30mg BID SC. There were to be 621 randomized, with treatment 8±2 days. The principal coordinating investigator is Dr. Alexander Turpie, Hamilton Health Sciences.  The date of the report is June 3, 2005. It is signed by Min Irwin, Miranda Murray, Ph.D. and Andrea Nadel Ph.D.

154. The primary objective is to assess the composite endpoint of any deep veing thrombosis (DVT), nonfatal PE and death from all causes on Days 5 to 10.  Population pharmacokinetics and PD (Factor X activity, PT, aPTT, Heptest and Intervational Normalized [PT INR]) were also assessed.

155. There were 709 subjects enrolled, 621 randomized, 613 were treatated with either Bay 59-7939, with 570 completing the entire treatment period.[156] Duration of the study is 6 to 10 days.[157]

- **Study 11572**

156. Study 11527 was titled: "Controlled, Double-Blind, Randomized, Dose-ranging Study of once-daily regimen of BAY 59-7939 in the Prevention of VTE in Patients Undergoing Elective Total Hip Replacement-ODIXa-OD.HIP Study".[158]  It was conducted from November 12, 2004, through July 25, 2005 (last patient visit).  The primary investigator was Dr. Bengt Eriksson Gothenburg, Sweden. The date of the final report was January 10, 2006. The Study Manager was A. Migge, Medical Expert E. Muehlhofer and Statistician C. Dierig.  There were 48 study centers: Germany (8), Poland (6), Israel (5), Italy (5), Austria (4), Denmark (4), Sweden (4), Belgium (3), the Netherlands (3), Norway (3) and Spain (3).  It was a Phase II b study.  The objective was the assessment of safety and efficacy of BAY 59-7939 5mg-40mg (8-fold range) administered once daily for the prevention of VTE in men aged 18 years or above and in postmenopausal women undergoing elective primary total hip replacement.  The assessment of population

---

[155] XARELTO_BHCP_00004205
[156] XARELTO_BHCP_00004442 at p. 57
[157] XARELTO_ BHCP_00004442 at p. 3
[158] XARELTO_BHCP_00006068 at p. 1

pharmacokinetics and pharmacodynamics included Factor Xa activity, PT, PT INR, aPTT and Heptest.[159]

157. Blood samples were to be taken for pharmacokinetic and coagulation measurements from all patients.  For the investigation of pharmacokinetics, the concentration of BAY 59-7939 in plasma was determined. The blood sampling schedule was:

   o *On day of surgery (Study day 2):2-4 hours after the administration of the first dose*

   o *On study day 3-4 one blood sample should be drawn in the time interval of 4 to 0.5 hours before the evening administration of Riva and at 1 h, 3h, and 12 hour post-dosing.*

   o *On study day 5/6/7: one blood sample should be drawn at time interval of 4 to 0.5 hous before the evening administration of Riva and at 3h post-dosing*

   o *On study day 10±2 hr after the last dose of riva[160]*

158. For the investigation of pharmacodynamics, Factor Xa activity, prothrombin time (PT), prothrombin time ratio (PTINR), Heptest and aPTT were determined.  In Section 11.4.4 "Drug Dose, Drug Concentration and Relationship to Response", the Defendants indicate the analyses of the PK results will be reported separately.[161]  PK 000131 is Defendants' report of popPK data combined from Studies 11527 and 10944.

159. The number of patients enrolled were 877 subjects, 873 randomized, 852 treated with study medication, 845 valid for safety assessment, 650 valid for ITT, and 618 valid for PP (per-protocol) analysis. The treatment arm and placebo tablets were all to be taken with water and food.  The treatment arms were: 5mg OD, 10mg OD, 20mg OD, 30mg OD, and 2x 20 mg OD (40mg TDD), versus placebo tablets and standard of care (SOC). Intake of active or placebo drug started on the day of surgery 6 to 8h after wound closure. The duration of treatment was 9±2 days.  Enoxaparin was administered 40 mg OD sub q. to patients. Either Enoxaparin or placebo were given the evening prior to surgery according to hospital routine. Subsequently enoxaparin or placebo was administered on the day of surgery 6 to 8 h after wound closure and in the evenings of the following days.[162]

160. Efficacy was a composite endpoint of: any deep vein thrombosis (DVT) (proximal or distal); non-fatal pulmonary embolism (PE); and death from all causes.  The primary endpoint was evaluated 6-10 days after surgery.  The analysis of primary efficacy endpoint was solely based on the assessments made by the Venography and VTE Adjudication committee.  Secondary endpoints were: incidence of DVT (total, proximal, distal); incidence of symptomatic VTE; Incidence of major VTE (proximal DVT, PE or VTE-related death); the composite endpoint that results from the primary endpoint by

---

[159] XARELTO_BHCP_00006068 at p. 2
[160] XARELTO_BHCP_00004205 at p. 19
[161] XARELTO_BHCP_00006068 at p. 95
[162] XARELTO_BHCP_00006068

substituting VTE-related deaths for all deaths; incidence of symptomatic VTE (total, PE, DVT) within 30 days of stop of treatment with the study drug.  The analyses of the secondary efficacy endpoints related to VTE were solely based on the assessments made by the Venography and VTE Adjudication Committee.[163]

161.  The main safety endpoint was the incidence of major bleeding observed after the first post-operative intake of study drug and not later than 2 days after the last intake of study drug.  Major bleeding observed before and after this period was assessed separately. The safety analysis was performed in the population of patients valid for safety analysis. Incidence rates of post-operative major bleeding were analyzed by a "logistic regression model." Unlike 10942, there was no planned interim analysis.[164]

162.  For BAY 59-7939, using an 8-fold dose range (5mg to 40mg OD) was effective in preventing VTE in adult subjects undergoing elective hip replacement compared to enoxaparin.  "All treatment groups" (5-40mg OD) receiving BAY 59-7939 had substantially lower VTE incidence rates than enoxaparin.  The study failed to detect a trend for BAY 59-7939 in the dose-response relationship regarding primary efficacy (P=0.0852).  This was reportedly caused by the 'good efficacy' seen with the lower dose groups, in which the incidence rates for VTE were lower than anticipated.  In the PP population, the VTE incidence rates declined from 14.9% (BAY 59-7939 5mg OD) to 6.4% (BAY 59-7939 40mg OD) compared to the 25.2% in the enoxaparin group. However, the incidence rate of 13.5% seen in the *30mg OD dose* group was "not in line with a monotonous dose response relationship, but was thought to be likely caused by random variation."[165] All doses of BAY 59-7939 except for the 5mg dose had lower incidence rates of *major* VTE than enoxaparin (0.9-2.7% vs 2.8%).  Major VTE incidence rates were lowest at doses of 20 and 40mg OD (0.9 and 1.1%), the incidence rate for 5mg was 8.5%.  "As expected, dose-dependent decreases in factor Xa activity and prolongation of PT and PT INR were observed with increasing doses of BAY 59-7939." As in Study 10942,the PP population by dose was as follows: N=94 5mg OD; N=113 10mg OD; N=106 20mg OD; N=104 30mg OD; N=94 40mg OD; Enoxaparin N=107.[166]

163.  Summary of Safety stated: "*The percentages of major post-operative bleeding events increased with increasing BAY59-7939 doses indicating a clear dose-response.*"Percentages of *major* bleedings were similar for BAY 59-7939 at doses of 5mg OD and 10mg OD and enoxaparin, which also was the case for any post-operative bleeding events. The investigators' report included that the increased post-operative bleeding was considered clinically acceptable.  The report had the following qualifier for acceptability of  post-operative bleeding (increased compared to enoxaparin): "*It is important to note that there were neither fatal bleeding or bleedings in critical organs, nor clinically significant bleedings that could not be treated.*"  All bleedings adjudicated as major were related to the surgical site.[167]

---

[163] XARELTO_BHCP_00006068
[164] XARELTO_BHCP_00006068
[165] XARELTO_BHCP_00006068
[166] XARELTO_BHCP_00006068
[167] XARELTO_BHCP_00006068

164. With increasing doses of BAY 59-7939, the bleeding events tended to increase as well. The incidence rates of bleeding events with 5mg OD was 8% and 10mg OD was 6%, with enoxaparin 9%. The 20mg OD to 40 mg OD bleeding ranged from 10% to 19%.[168]

165. The number of postoperative bleeding events with increasing BAY 59-7939 doses indicated a "clear dose-response". No statistical difference was seen between enoxaparin and any of the BAY 59-7939 dose groups with regard to the number of post-operative major bleeding events. About 65% of post-operative bleeding events occurred on the day of surgery or within 3 days after surgery, and 7% of first post-operative bleeding events occurred on day 6 or 7 after surgery.[169]

166. The "net clinical benefit" of the individual treatment was assessed based on a summation of the 'composite endpoint of major VTE + post-operative major bleeding events'. Low incidence of the composite endpoint indicate a high net clinical benefit. The lowest 'net incidence rate' of 3.5% and highest clinical benefit was for the 10 mg OD group. The incidence rate for the 20 mg dose was 6.1%, still comparable to the incidence rate for enoxaparin. The study supported the use of the 10mg OD dose for VTE-P.[170]

167. The overall incidence of treatment-emergent adverse events for 11527 ranged from 70% (BAY 59-7939 10mg OD group) to 80% (BAY 59-7939 40mg OD group and enoxaparin). Adverse events related to the gastrointestinal tract (26%-35%) and investigations (15%-31%) were the most frequent; however, the incidence rates were not dose-dependent for GI events. The occurrence of treatment emergent adverse events (TEAES) assessed by investigators to be drug-related the incidence rates ranged from 21% to 35%.[171]

---

[168] XARELTO_BHCP_00006068
[169] XARELTO_BHCP_00006068
[170] XARELTO_BHCP_00006068
[171] XARELTO_BHCP_00006068



Figure 12-1: Dose relationship of BAY 59-7939 with respect to post-operative major bleeding events (subjects valid for safety analysis)[a]

a The solid line represents the dose-response curve estimated by logistic regression. The dotted and dashed lines represent the point wise lower and upper 95% confidence limits. Dots represent observed frequencies. The applied logistic regression model includes dosage as a covariate.
Source: Figure 14.3.1/11.3

[172]

168. Figure 12-1(above): Dose Relationship with respect to post-operative bleeding.  All the rivaroxaban in Study 11527 is administered as OD. The solid line is the dose-response curve that is estimated by logistic regressions for post-operative major bleeding events based on dose.  The dotted lines are the 95% confidence intervals.  There is a clear tendency for higher post-operative major bleeding events with increasing dose.  The existence of the dose-response relationship of BAY 59-7939 was confirmed by the Defendants' trend test that achieved a P value of P=0.0391.[173] The incidence of post-operative major bleeding events was similar for 5mg and 10mg OD groups and enoxaparin group (1-2%).

169. On Table 12-11 (below) is the incidence of major bleeding events by dose.[174] The postoperative incidence (risk) of major bleeding for 10mg OD was 0.7% versus the post-operative risk of bleeding for 20mg OD which was 4.3%.   For a doubling of OD dose there was a 4-fold increased risk of bleeding.  This would be pointed out by FDA to Defendants as a serious safety concern about dose and risk for major bleeding. Each OD dose of XARELTO produced a greater post-operative bleeding risk than enoxaparin.

---

[172] XARELTO_BHCP_00006068 at p. 116
[173] XARELTO_BHCP_00006068
[174] XARELTO_BHCP_00006068

FDA used this study to justify the need for a 5mg tablet alterarnative for titration of patients at increased risk.

170. Internally, to look at the potential risk factors of bleeding in Study 11527, Defendants conducted an applied logistic regression model applying a stepwise variable selection process at an entry level of 5% focusing on the BAY 59-7939 treatment groups. The process included the selection of a country's results, as well as age, weight, body mass index, and time from end of surgery to first post-operative tablet intake. The latter achieved a P value of P=0.0003 indicating a dose "trend" in the incidence of post-operative bleeding. For the 'country' effect a P value of P<0.0001 was calculated. No odds ratio estimation was performed for the comparison country of 'Poland' with the other (pooled) countries, because "no post-operative bleeding events were reported for *Poland*."[175]

171. Applying the same approach for post-operative major bleeding resulted in the selection of a total daily dosage (P=0.0211) and categorized body mass index (P=0.0947), where increasing dosage of BAY 59-7939 is associated with increased risk of post-operative major bleeding events. In Defendants' simulation model, an increased risk was detected in subjects with a [BMI < 18.5kg/m$^2$]. "However, as this result was based on major bleeding seen in 1 out of 3 subjects with a BMI <18.5 kg/m$^2$, this finding was considered to be most likely an artifact."[176]

- **Bleeding Risk**

An additional analysis was done for major bleeding events stratified by surgical-site and extra-surgical-site bleedings and time of occurrence (Table 12-11).

Table 12-11: Incidence rates of major bleeding events by surgical-site and extra-surgical-site bleedings (safety population)

| Site and time of major bleeding | BAY 59-7939 5 mg od (N=128) n (%) | BAY 59-7939 10 mg od (N=142) n (%) | BAY 59-7939 20 mg od (N=139) n (%) |
|---|---|---|---|
| Surgical-site bleedings | | | |
| Post-operative[a] | 3 ( 2.3%) | 1 ( 0.7%) | 6 ( 4.3%) |
| Late post-operative[b] | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) |
| Extra-surgical-site bleedings | | | |
| Post-operative[a] | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) |
| Late post-operative[b] | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) |

| Site and time of major bleeding | BAY 59-7939 30 mg od (N=142) n (%) | BAY 59-7939 40 mg od (N=137) n (%) | Enoxaparin 40 mg od (N=157) n (%) |
|---|---|---|---|
| Surgical-site bleedings | | | |
| Post-operative[a] | 7 ( 4.9%) | 7 ( 5.1%) | 3 ( 1.9%) |
| Late post-operative[b] | 1 ( 0.7%) | 0 ( 0.0%) | 0 ( 0.0%) |
| Extra-surgical-site bleedings | | | |
| Post-operative[a] | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) |
| Late post-operative[b] | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) |

a ≤2 days after last intake of study medication
b >2 days after last intake of study medication
Source: Table 14.3.1/11.4 and Table 14.3.1/11.5

---

[175] XARELTO_BHCP_00006068
[176] XARELTO_BHCP_00006068 at p. 118

177

172. As stated, Table 12-11(above) contained information which would create a major "safety concern" for the FDA and relates back to Defendant's Pushback discussion (see discussion above) in its pre-planning for a teleconference with FDA. The bleeding risk in Study 11527, based on dose, directly related to Dr. Mueck's comments in a February 2009 email as the XARELTO Team prepared for a teleconference with FDA. FDA replied to Defendant's response for the agency to receive additional information:

> *Table 1 in your response to FDA reports a greater than 4 fold increase in major bleeding (0.7% vs 4.3%) when exposure is increased two fold from the proposed dose. This suggests that even a 1.5 fold increase in exposure may double the risk major bleeding. This is an important safety concern.*[178]

173. To help the Rivaroxaban team prepare for FDA's TC meeting, Dr. Mueck sent out a February 6, 2009 email to Dr. Berkowitz, Mr. Jolata, and others. Dr. Mueck told the team it needed to "*push back*" on FDA because if FDA's hypothesis is correct, XARELTO is a "*really dangerous drug*".[179]

174. That email also includes Table 1, which shows that "even a 1.5 fold increase in exposure may double the risk of major [bleeds] – this is an important safety concern."[180]

175. Dr. Mueck then wrote:

> *This has to be pushed back otherwise we accept that our drug s really dangerous...because with our moderate (=good!) inter-patient variability...large proportions of our patients may then be at considerable risk!!!*[181]

176. Dr. Gary Peters, VP at Janssen and one of Janssen's lead presenters at the FDA's Cardiovascular and Renal Drug Products Advisory Committee on March 19, 2009 requesting consideration for approval of the NDA 22-406 for VTE-P,[182] (see discussion of FDA March 2009 AdCom meeting for VTE-P below) addressed the increased bleeding risk seen in Study 11527 and the differences in presentation of bleeding risk by FDA and Defendants:

> *Differing views of the relationship of rivaroxaban doses to bleeding events are presented in the two briefing books which you received. I will try to clarify this situation using the post-operative major bleeding event data from the once daily dosing study 11527...The greater than four-fold increase in major bleeding events with a doubling of rivaroxaban dose stated in the FDA briefing book is based on these individual group event rates.*

---

[177] XARELTO_BHCP_00006068 at p. 118
[178] XARELTO_BHCP_00015504
[179] Mueck Exhibit 27
[180] XARELTO_BPAG_01472646
[181] XARELTO_BPAG_01472646
[182] XARELTO_JANSSEN_00909631 at pp. 35-36

> *Looking at the dose response curve, the estimated rate for the 10-milligram dose group is 2.2% and for the 20-milligram group is 3.1 percent, an increase of about 50 percent.*
>
> *Based on this data, rivaroxaban exposure of less than two-fold are considered to be acceptable, while exposures greater than two-fold increase may need to be avoided. We are committed to working with the agency to agree [sic] this threshold and elucidate it in our label.[183]*

177. At the same March 2009 AdCom meeting, Dr. Peters gave the following statement regarding dose and increased bleeding risk:

> *...there's no disagreement that bleeding increases with dose. I mean, that is definitely true. [184]*

178. There is an internal email from Carrie Ku ( Bayer) to Andrea Derix et al "RE: XARELTO Response" with an Attachment: "*Draft Response to Health Canada's Information Request dated May 2, 2008*" for Pivotal Trial Study 353 (RECORD 1-Hip replacement).[185]

179. From the response, Health Canada was concerned about the increased risk of bleeding seen in Study 11527.  Health Canada wrote to Defendants that it would not accept a superiority claim based on the magnitude of the anticoagulant effect for rivaroxaban compared to enoxaparin:

> *We are willing to consider a non-inferiority claim but not a superiority claim. The reasons are that the magnitude of the anticoagulant effect for rivaroxaban is greater than that for enoxaparin, as shown by the higher incidence of bleeding for rivaroxaban versus enoxaparin.*

180. Health Canada requested that the sponsor consider Therapeutic Drug Monitoring (TDM) for XARELTO to help reduce the risk of bleeding in Study 11527:

> *Please discuss the potential benefit to the patient if laboratory coagulation activity tests were to be introduced to monitor the pharmacodynamic effect of rivaroxaban.*
>
> *In conclusion, the additional analyses of Study 11527 did not identify a threshold for pharmacodynamic parameters indicating an increased bleeding risk.  The bleeding risk increases with dose. [186]*

181. Bayers' Simplified Investigational Medicinal Product Dossier, dated July 29, 2013, stated:

> *Study 11527*

---

[183] XARELTO_JANSSEN_00909631 at pp. 35-36
[184] XARELTO_JANSSEN_00909631 at p. 144
[185] XARELTO_BPAG_00825902
[186] XARELTO_BPAG_00825903 at p. 55, 57

*The number of postoperative bleeding events increased with increased with increasing rivaroxaban doses indicating a clear dose-response, when ignoring the 10mg OD treatment arm. The percentages of major bleeding events increased with increasing rivaroxaban doses indicating a clear dose –response.*[187]

182. There is an internal chain of emails between Claudia Henn and Weber, Kubitza, Stampfuss Berkowitz, and Spiro et al "RE: XARELTO PT-bleeding-reactive statement draft," dated April 18, 2014.[188] Ms. Henn is circulating a draft version of a reactive statement about XARELTO in response to a "Spiegel" article and to address the EMEA's questions about correlation of PT, plasma concentration, bleeding events and TDM in a Periodic Benefit Risk Evalaution Reports (PBRER) Statement. Ms. Henn wrote:

> *I have based this text mainly on regulatory documents addressing this specific question i.e. EMEA-responses 18, question 65 and Response- additional questions Mar 2104 which are focused on ROCKET AF and the ODIXa-OD.HIP(\*Study 11527) study.*

> *With the Spiegel[189] article having been published recently it is very important to have an approved standard answer in place in order to be able to adequately address any questions that arise around this topic.*[190]

183. Rainer Spiegel (2012) wrote a Letter to the Editor of *Circulation* about atrial fibrillation and use of rivaroxaban in that population. The authors wrote about the difficulty of physicians treating AF patients to determine if they had valvular or nonvalvular AF. The authors were aware of evidence that rivaroxaban was found noninferior to warfarin for nonvalvular AF (per ROCKET results),[191] with the approved label containing the statement: "There is, however, no evidence in terms of applying rivaroxaban in valvular AF."[192] Based on Freiberg (2012)[193] and the Swedish Atrial Fibrillation Cohort Study: "If there is no valvular dysfunction or replacement, we can administer rivaroxaban safely. If there is at least minor valvular dysfunction and the CHADS2DS2-VASc[194] score is >0 (which is the case of an overwhelming majority of our patients), we can administer warfarin safely."[195]

---

[187] XARELTO_BPAG_00424827 at p. 338

[188] XARELTO_BPAG_00004554

[189] Rainer Spiegel et al. Letter by Spiegel et al. Regarding Article, *Net Clinical Benefit of Warfarin in Patients with Atrial Fibrilaltion: A Report from the Swedish Atrial Fibrillation Cohort Study*. Circulation (2012): 126:e322.

[190] XARELTO_BPAG_00004554

[191] Patel MR, Mahaffey KW, Garg J, Pan et al. and Rocket AF Steering Committee. *Rivaroxaban versus warfarin in nonvalvular atrial fibrillation.* NEJM (2011); 365:883-891.

[192] Rainer Spiegel et al. Letter by Spiegel et al. Regarding Article, *Net Clinical Benefit of Warfarin in Patients with Atrial Fibrilaltion: A Report from the Swedish Atrial Fibrillation Cohort Study*. Circulation (2012): 126:e322.

[193] Friberg L, Rosenqvist M, Lip GYH. *Net Clinical Benefit of Warfarin in Patients with Atrial Fibrillation. A Report from the Swedish Atrial Fibrillation Cohort Study*. Ciculation (2012): 125:2298-2307.

[194] CHADS2DS2- VASc stands for: C, Congestive Heart Failure, H, hypertension, A, Age ≥75 years 2 points; D, diabetes mellitus, S, stroke or previous thromboembolic event 2 points; V, Vascular Diseaes, A, Age 65-74 years, and Sc, Sex category female. If the CHADS2DS2-VASc score equals 0 (ie patient very low risk of thromboembolic events), oral anticoagulation may not be needed (depending on other risk factors)

[195] Rainer Spiegel et al. Letter by Spiegel et al. Regarding Article, *Net Clinical Benefit of Warfarin in Patients with Atrial Fibrilaltion: A Report from the Swedish Atrial Fibrillation Cohort Study*. Circulation (2012): 126:e322.

184. Dr. Kubitza provided her comments to the reactive statement proposed by Ms. Henn and Jan Stampfuss:

> *Draft Reactive Statement- XARELTO and correlation between PK and PT parameters and bleeding events.*[196]
>
> *No correlation between pharmacokinetic parameters (e.g. maximum plasma concentration, Cmax) and bleeding or efficacy events has been performed in the clinical development program of XARELTO with the exception of one phase II clinical study, since the number of subjects with pharmacokinetic samples was small and only intended for population pharmacokinetic evaluations.*[197]

185. A red-lined comment by J Stampfuss stated:

> *1. I suggest to delete the text in italic letters. The justification is inaccurate (also with sparse sampling and pop PK approach you get estimates for a full PK profile, i.e. you can estimate Cmax, AUC, Ctrough). The fact is that we only performed this analysis for study 11527; in the other programs PT vs. bleeding was analyzed, because PT Neoplastin measured centrally was considered a reliable exposure estimate.*
>
> *2. The result of the PK-bleeding event analysis is missing, i.e. Within the individual rivaroxaban dose groups of up to 20 mg od there is no relevant difference in Cmax distribution with respect to the occurrence of bleeding events. Although Cmax increases with rivaroxaban dose, the data from Study 11527 do not indicate that subjects with bleeding events exhibit higher Cmax values compared to subjects without bleeding events…*[198]

186. There is a May 2, 2014 email regarding Defendants' PBRER Statement for the EMA on PK/PD and Therapeutic Drug Monitoring (TDM), prepared by Dr. Spiro along with Drs Dyszynski, Berkowitz, Hommering, Stampfuss and with Ms. Claudia Henn.[199] Specifically, Dr. Spiro proposed to delete the reference to Study 11527 since he was unable to find any PK correlations with efficacy and safety in any of the reports he had reviewed. (*see* discussion of EMA PBRER below.)

187. Dr. Spiro replied as follows:

> *What is missing is the correlation of safety and efficacy outcomes events with actual individual plasma concentrations measured.  Such analyses have been performed for the prothrombin time results but not as far as I can determine for rivaroxaban concentrations with the exception of the results from studies 14392 J-THR and*

---

[196] XARELTO_BPAG_00004554; XARELTO_BPAG_00004558
[197] XARELTO_BPAG_00004558
[198] XARELTO_BPAG_00004558
[199] Dyszynski Exhibit 29

*14398 J-TKR[200] which are reported in PH-3700, Section 11.3.3…Although the number of data are limited…It could be concluded that there is no clear relationship between any exposures or PT and efficacy of safety events.[201]*

188. Ms. Henn reminded him that Defendants had already discussed 11527 with authorities so it could not be omitted from the response; also 11527 could not be removed from the reactive statement she was currently amending (see above).  Henn's response was as follows:

> *Apologies, but I am confused. It is stated with the response to question 65 that analysis of PK parameters have also been done within the individual dose groups with regard to the occurrence of bleeding events…These exposure-response curves show increases of bleeding risk with higher PK values, but the risk increases in the PK parameter range typical for rivaroxaban doses of 5-20mg OD are small and comparable to enoxaparin rate……[202]*

189. Spiro agreed to leave the 11527 sentence in the PBRER Statement being drafted for the EMA. Dr. Homering, a Bayer statistican later wrote about the wording, which could be used in Defendants' PBRER submission to the EMA regarding the relationship of PT and bleeding:

> *Since we cannot rule out that bleeds increase with PT, could we state instead of "no correlation between PT and bleeding events was observed" something like "no obvious correlation between PT and bleeding events was seen? [203]*

190. Dr. Berkowitz ended the PBRER email chain as follows:

> *Thank you for bringing in the point that the distributions in those with and without bleeding are largely similar, but there is a small tendency that bleeding increase with PT…[204]*

191. Then in October 11, 2015, Defendants prepared a draft PowerPoint presentation intended for public presentation at EMA's Workshop for DOACS for November 23, 2015 in London, UK.  The Workshop was titled: "The role of pharmacokinetic and pharmacodynamic measurements in the use of direct oral anticoagulants programme." Session 4 of the Workshop was to be a "Discussion of Gaps in Knowledge about DOACs and PK/PD Measurements."  Defendants' first draft included a reference to Slide 5b (culled from Study 11527), also known as the "Wolfgang Mueck slide" (bolding added for emphasis):

> o  *PK curve over time "wolfgang slide" + "Portola" slides DVT/ACS*

---

[200] 14392 J-THR and 14398 J THK are clinical trials in Japan for VTE-P studies for surgical patients for total hip and knee replacements.
[201] Dyszynski Exhibit 29
[202] Dyszynski Exhibit 29
[203] Dyszynski Exhibit 29
[204] Dyszynski Exhibit 29

o ***Exposure/response analyses were to indicate that substantial numbers of patients fall outside the exposure range that delivers the optimal benefit*** *(Wolfgang Mueck slides)*

o *Variability in PK/PD we see in our program.*[205]

- **Dose-Response Relationship**



Figure 11-2: Dose-response relationship between BAY 59-7939 doses and major VTE (proximal DVT, PE, and VTE-related death) (PP analysis) [a]

a  The solid line represents the dose-response curve estimated by logistic regression, the dotted lines present the point wise lower and upper 95% confidence limits. Dots represent the observed frequencies. The applied logistic regression model includes dosage as a covariate.
Source: Figure 14.2/2.5.1

[206]

192. Figure 11-2 (above) depicts the dose-response relationship and major VTE estimated by logistic regression PP analysis.  The 25.2% VTE incidence rate for enoxaparin was considered high by FDA when compared to the published literature for patients undergoing total hip replacement (9.4% and 19.4%).  The incidence rate of 2.8% with enoxaparin for proximal DVT was similar to the anticipated published rate in the literature (2.9%).[207]

193. Figure 11-4 (below) depicts the dose-response relationship with respect to the primary efficacy endpoint also estimated by logistic regression ITT analysis. As shown in Figure 11-3,there was a "monotonous dose-response relationship to BAY 59-7939 with regard to the incidence rate of the primary efficacy point." However, Defendants reportedly could not confirm a statistical trend.  All doses except for the 5mg OD dose had lower

---

[205] Kubitza Exhibit 47
[206] XARELTO_BHCP_00006068
[207] XARELTO_BHCP_00006068

incidence rate for major VTE than enoxaparin.  Major VTE incidence rates were lowest for doses of 20mg and 40mg OD (0.9 and 1.1%).  All rivaroxaban doses (5-40mg) were effective for reduction of VTE and had an incidence rate less than 25% of that developed for enoxaparin in this study.   However, FDA expressed concern that the incidence rate for VTE was that high for enoxaparin in this study.



Figure 11-4: Dose-response relationship of BAY 59-7939 with respect to the primary efficacy endpoint (subjects valid for ITT analysis) [a]

a  The solid line represents the dose-response curve estimated by logistic regression. The dotted and dashed lines represent the point wise lower and upper 95% confidence limits. Dots represent observed frequencies. The applied logistic regression model includes total daily dosage as a covariate.
Source: Figure 14.2/2.3.2

208

- **Net Clinical Benefit**

194. Figure 12-2 (below) depicts the dose-response relationship with respect to incidence rate of major VTE and post-operative major bleeding events (subjects valid for net clinical benefits assessment)The following is a bar graph presentation of the "SUMS" information of net clinical benefit [incidence of VTE+ incidence of Major bleeding.]  The lower the bar (sum), the better the net clinical benefit.  The use of net clinical benefit is a concept used with warfarin, avalue that is a balance of benefit (prevention) andrisk (bleeding).   Study 10942 had a net clinical benefit as a calculated U-shaped curve with the optimal net clinical benefit of 30mg OD. (See Figure 12.2 Study 10942 above),

---

[208] XARELTO_BHCP_00006068



Figure 12-2: Dose-response relationship of BAY 59-7939 with respect to the incidence rate of major VTE and post-operative major bleeding events (subjects valid for net clinical benefit assessment)

209

195. Defendants calculated a 'net clinical benefit' with the lowest sum, or shortest graph bar, being the optimal net clinical benefit. Here the 10mg OD with an incidence of 3.5% according to Defendants would have the best net clinical benefit. Using that same method, enoxaparin with 5.2% would have the second best optimal net clinical benefit followed by 20mg OD with 6.1%. Defendants maintained that the net cinical benefit for the 20mg OD (6.1%) and enoxaparin (5.2%) are roughly equivalent.

---

209 XARELTO_BHCP_00006068 at p. 122



Figure 12-3: Dose-response relationship of BAY 59-7939 with respect to the primary efficacy endpoint (PP population) and post-operative major bleeding events (safety population)[a]

a Dots represent the incidence of VTE, squares the incidence of post-operative major bleeding. The solid lines represent the dose-response curve of BAY 59-7939 estimated by logistic regression for VTE and post-operative major bleeding, respectively. The dotted and dashed lines represent the point wise lower and upper 95% confidence limits. The applied logistic regression model includes dosage as a covariate.
Source: Figure 14.2/2.3.1 and Figure 14.3.1/11.3.

210

196. Figure 12-3 depicts a dose-response relationship with respect to primary efficacy endpoint and post-operative bleeding events, retaining the upper and lower 95% confidence interval dotted lines. This is an applied logistic regression model which generated the solid curves.  There is no discussion of this figure by Defendants in Study 11527.  It does show the relationship of both VTE and major bleeding to dose with a potential for selection of a dose for efficacy and safety.[211]  The combination table does not use PT (a measure of the underlying anticoagulant effect), but rather only data from patients with active bleeding.

---

[210] XARELTO_BHCP_00006068 at p. 123
[211] XARELTO_BHCP_00006068

- **Coagulation Parameters for 11527**

Table 11-22: Factor Xa activity - percent change from baseline (mean ± SD; PP population) [a]

| Visit | BAY 59-7939 5 mg od | BAY 59-7939 10 mg od | BAY 59-7939 20 mg od |
|---|---|---|---|
| Day 2 (peak) | -26.9 ± 21.0 (n=81) | -26.2 ± 38.0  (n=95) | -31.1 ± 17.3  (n=96) |
| Day 3/4 (trough) | -22.9 ± 27.2 (n=73) | -22.1 ± 23.5  (n=87) | -26.8 ± 16.8  (n=85) |
| Day 3/4 (peak) | -26.3 ± 26.8 (n=87) | -31.4 ± 21.9 (n=109) | -39.4 ± 19.1 (n=101) |
| Day 5-7 (trough) | -5.9 ± 40.5 (n=83) | -0.1 ± 48.0 (n=103) | -9.3 ± 30.6  (n=92) |
| Day 5-7 (peak) | -14.3 ± 37.5 (n=85) | -18.4 ± 23.6 (n=110) | -28.9 ± 21.7  (n=98) |

| Visit | BAY 59-7939 30 mg od | BAY 59-7939 40 mg od | Enoxaparin 40 mg od |
|---|---|---|---|
| Day 2 (peak) | -29.9 ± 21.4 (n=91) | -30.5 ± 22.1 (n=81) | -25.4 ± 19.5  (n=96) |
| Day 3/4 (trough) | -30.5 ± 21.9 (n=82) | -27.3 ± 34.9 (n=80) | -21.7 ± 18.2  (n=84) |
| Day 3/4 (peak) | -42.0 ± 19.5 (n=99) | -43.6 ± 21.2 (n=88) | -22.7 ± 21.4  (n=96) |
| Day 5-7 (trough) | -9.6 ± 32.2 (n=87) | -6.5 ± 39.9 (n=82) | -2.0 ± 25.1  (n=95) |
| Day 5-7 (peak) | -31.0 ± 25.7 (n=98) | -33.7 ± 30.8 (n=83) | -3.5 ± 23.7 (n=103) |

a  Only subjects measurements taken at peak 2 to 4 h after tablet intake and at trough 20 to 26 h after drug intake were considered.
Source: Table 14.2/7.1.1

212

197. Unlike with Study 10942, Defendants did not obtain a Factor Xa trough value at Day 9 in Study 11572.  All doses, 5mg OD-40mg OD, show that rivaroxaban can inhibit Factor Xa and that the effect is present at Days 5-7 (trough) and the inhibition is proportional to dose at Days 5-8 (peak).  Enoxaparin also shows inhibition of Factor Xa from Day 2 peak through Days 5-7 peak and trough.   In terms of Days 5-7 trough values, 10mg OD had the lowest Factor X inhibition at baseline, even lower than 5mg OD and 20mg OD, with the 30mg OD having higher inhibition than 40mg OD.  40 mg OD also had a lower Days 3-4 trough.  The data doesn't support calling the 5-7 day trough dose dependent.  The peaks were all related to dose, the higher the starting OD dose the greater the Factor Xa inhibition.  Defendants, however, called the peak and trough levels 'a monotonous dose-response relationship.'[213]  For 5 mg OD and 10 mg OD, Factor Xa inhibition results were as follows: Day 2 (peak) >Days 3-4 (peak)> Days 5-7 (peak).  Days 3-4 (peak) > Days 5-7 was greatest for all doses 5mg-40mg OD.  There was retained Factor Xa inhibition detected at Days 5-7 (trough).[214]

---

[212] XARELTO_BHCP_00006068 at p. 90
[213] XARELTO_BHCP_00004220 at p. 75
[214] XARELTO_BHCP_00006068

Table 11-23: Prothrombin time (PT) – percent change from baseline (mean ± SD); PP population) [a]

| Visit | BAY 59-7939 5 mg od | BAY 59-7939 10 mg od | BAY 59-7939 20 mg od |
|---|---|---|---|
| Day 2 (peak) | 22.1 ± 71.5 (n=80) | 28.6 ± 93.4 (n=93) | 37.8 ± 86.7 (n=95) |
| Day 3/4 (trough) | 12.1 ± 22.5 (n=72) | 12.6 ± 20.9 (n=84) | 17.7 ± 21.9 (n=85) |
| Day 3/4 (peak) | 20.2 ± 43.6 (n=87) | 24.0 ± 30.3 (n=108) | 44.7 ± 45.5 (n=100) |
| Day 5-7 (trough) | 1.3 ± 28.0 (n=83) | 3.1 ± 47.9 (n=102) | 2.5 ± 12.0 (n=91) |
| Day 5-7 (peak) | 10.1 ± 30.3 (n=85) | 9.3 ± 14.2 (n=109) | 23.5 ± 22.0 (n=97) |

| Visit | BAY 59-7939 30 mg od | BAY 59-7939 40 mg od | Enoxaparin 40 mg od |
|---|---|---|---|
| Day 2 (peak) | 19.3 ± 18.1 (n=90) | 32.8 ± 55.9 (n=81) | 14.8 ± 20.6 (n=95) |
| Day 3/4 (trough) | 27.6 ± 28.9 (n=82) | 34.1 ± 87.2 (n=80) | 8.8 ± 19.3 (n=84) |
| Day 3/4 (peak) | 52.0 ± 53.0 (n=98) | 55.6 ± 44.8 (n=88) | 14.5 ± 31.6 (n=95) |
| Day 5-7 (trough) | 7.8 ± 35.0 (n=86) | 1.1 ± 14.7 (n=82) | -4.8 ± 9.4 (n=95) |
| Day 5-7 (peak) | 29.8 ± 33.3 (n=96) | 32.4 ± 27.7 (n=83) | -3.1 ± 9.9 (n=103) |

a  Only subjects measurements taken at peak 2 to 4 h after tablet intake and at trough 20 to 26 h after drug intake were considered.

Source: Table 14.2/7.2.1

[215]

198.  Table 11-23 shows that prothrombin time (PT) was dose dependent, except for 40mg OD Day 5-7 (trough). [216] The lowest PT prolongation (anticoagulation effects) was at Day 5-7 (trough) for 5mg OD and 40mg OD.  The lowest Day 2 (peak) occurred with 5mg OD and 30mg OD.

---

[215] XARELTO_BHCP_00006068 at p. 91
[216] XARELTO_BHCP_00006068 at p. 91

BAY 59-7939  /011527                    1 - 92
10 January 2006

**Table 11-24: PT INR – percent change from baseline (mean ± SD; PP population)[a]**

| Visit | BAY 59-7939 5 mg od | BAY 59-7939 10 mg od | BAY 59-7939 20 mg od |
|---|---|---|---|
| Day 2 (peak) | 23.3 ± 79.4 (n=80) | 29.4 ± 99.0  (n=93) | 39.2 ± 91.5  (n=95) |
| Day 3/4 (trough) | 12.1 ± 24.2 (n=72) | 12.5 ± 22.5  (n=84) | 17.8 ± 22.3  (n=85) |
| Day 3/4 (peak) | 21.5 ± 48.6 (n=87) | 24.9 ± 32.9 (n=108) | 44.8 ± 45.6 (n=100) |
| Day 5-7 (trough) | 1.3 ± 28.9 (n=83) | 3.8 ± 51.8 (n=102) | 2.0 ± 12.2  (n=91) |
| Day 5-7 (peak) | 10.1 ± 31.1 (n=85) | 9.2 ± 15.1 (n=109) | 23.7 ± 21.7  (n=97) |

| Visit | BAY 59-7939 30 mg od | BAY 59-7939 40 mg od | Enoxaparin 40 mg od |
|---|---|---|---|
| Day 2 (peak) | 19.1 ± 18.3 (n=90) | 33.9 ± 57.6 (n=81) | 14.6 ± 21.2  (n=95) |
| Day 3/4 (trough) | 27.5 ± 30.5 (n=82) | 35.1 ± 88.4 (n=80) | 8.2 ± 19.7  (n=84) |
| Day 3/4 (peak) | 51.5 ± 50.5 (n=98) | 56.1 ± 45.6 (n=88) | 14.4 ± 32.7  (n=95) |
| Day 5-7 (trough) | 7.5 ± 35.3 (n=86) | 1.3 ± 15.1 (n=82) | -6.0 ± 11.0  (n=95) |
| Day 5-7 (peak) | 29.2 ± 33.9 (n=96) | 32.5 ± 28.6 (n=83) | -3.8 ± 11.1 (n=103) |

a  Only subjects measurements taken at peak 2 to 4 h after tablet intake and at trough 20 to 26 h
   after drug intake were considered.
Source: Table 14.2/7.3.1

There was a monotonous trend in the prolongation of PT and PT INR with
increasing dosage of BAY 59-7939 at peak on Day 3/4 and Day 5-7 as well as at
trough levels on Day 3/4. PT and PT INR changes in the enoxaparin group were
not clinically relevant.

**Table 11-25: aPTT – percent change from baseline (mean ± SD; PP population)[a]**

| Visit | BAY 59-7939 5 mg od | BAY 59-7939 10 mg od | BAY 59-7939 20 mg od |
|---|---|---|---|
| Day 2 (peak) | 19.8 ± 69.6 (n=79) | 21.5 ± 38.9  (n=93) | 25.5 ± 46.5 (n=92) |
| Day 3/4 (trough) | 24.3 ± 58.3 (n=72) | 25.7 ± 34.6  (n=86) | 38.7 ± 62.1 (n=84) |
| Day 3/4 (peak) | 38.2 ± 63.0 (n=85) | 39.0 ± 40.7 (n=109) | 58.7 ± 39.2 (n=96) |
| Day 5-7 (trough) | 22.9 ± 70.1 (n=83) | 16.2 ± 62.4 (n=103) | 23.8 ± 36.1 (n=90) |
| Day 5-7 (peak) | 39.7 ± 61.3 (n=84) | 37.4 ± 43.7 (n=110) | 58.6 ± 53.0 (n=97) |

| Visit | BAY 59-7939 30 mg od | BAY 59-7939 40 mg od | Enoxaparin 40 mg od |
|---|---|---|---|
| Day 2 (peak) | 13.5 ± 29.0 (n=89) | 28.7 ± 78.7 (n=78) | 19.8 ± 46.5  (n=94) |
| Day 3/4 (trough) | 49.0 ± 61.6 (n=80) | 55.3 ± 92.5 (n=78) | 23.2 ± 44.6  (n=84) |
| Day 3/4 (peak) | 71.6 ± 69.3 (n=95) | 81.8 ± 70.3 (n=82) | 39.6 ± 63.2  (n=94) |
| Day 5-7 (trough) | 31.8 ± 45.0 (n=86) | 24.3 ± 37.0 (n=82) | 12.3 ± 38.2  (n=95) |
| Day 5-7 (peak) | 69.0 ± 60.7 (n=94) | 72.4 ± 59.8 (n=80) | 18.3 ± 28.4 (n=102) |

a  Only subjects measurements taken at peak 2 to 4 h after tablet intake and at trough 20 to 26 h

217

199. Table 11-24 depicts PT INR, and also shows a difference in the pattern for 40mg OD at
Day 5-7 trough and reduction of the Day 2 peak for 30mg OD. Otherwise all the values
are in proportional to dose.

200. Table 11-25 depicts aPTT. Days 5-7 trough is again reduced for the 10mg OD and 40mg
OD, and Day 2 peak is lower for 30mg OD. Defendants refer to these findings as a
monotonous trend in prolongation of aPTT with increasing dosage at peak on Days 5-7
and up to 20mg OD on Day 2. aPTT increased also dose dependently at trough on Days
3-4 but was less pronounced on Days 5-7.

---

217 XARELTO_BHCP_00006068 at p. 92

201. According to Defendants, dose-dependent decreases in Factor Xa activity and increases in PT, PT INR, aPTT were observed with increasing doses of BAY 59-7939.[218]

e. **PK000131: DEFENDANTS' POPULATION PK, PD AND PK/PD ANALYSIS**

202. PK000131 was intended to define PK and PK/PD models for Defendants using data from two Phase IIb oral VTE-P dose ranging studies using plasma concentrations for PK and coagulation parameters for PD. PD activity would be measured with Xa activity, PT, aPTT, PT IND and Hep test. [219] A goal of the analysis was to characterize the inter- and intra-individual variability in the derived PK and PD parameters for this orthopedic surgery hip replacement population. The secondary objective was to evaluate possible covariaties influencing PK/PD. There were 666 patients from Study 11527 supplying a total of 5,049 valid rivaroxaban plasma concentrations and 5,618 PT data points, with combined Studies 11527 +10944 providing PK analysis for 758 patients, supplying 5,743 valid rivaroxaban plasma concentrations.

203. Rivaroxaban plasma concentration was measured by validated and selective chromatographic assay with mass spectrometric detection (L-MS/MS). The bioanalytics group was not blinded as to treatment groups. The analysis was under the supervision of G. Rohde, Ph.D. Insitute of Pharmacokinetics, Dep of Bioanalytics, Wuppertal, Germany.

204. Defendants' PK000131 final report was originally dated April 18, 2007, with an Amendment A dated February 19, 2008. [220] It was titled "Population PK/PD analysis using data from two phase IIb dose-ranging studies for the prevention of VTE in patients undergoing total hip replacement." The two combined studies were Study 10944-(ODIXa-HIPII) and Study 11527(ODIXa-HIP OD) (see above discussions of two studies). It was also called Medical Research Report PH-34298 Version 2 under the signature of Dr. Mueck "PK/PD scientist responsible for PK, PD evaluation and Bay 59-7939" originally dated April 24, 2007, and on Amendment A on February 26, 2008.[221]

205. The stated rationale for Amendment A, made almost one year after the initial report, was to provide additional details to Section 16 .2 Evaluation PK000131, and Section 16.2.1 Model history with essential development steps for the final models. Interestingly, Section 16.2 (page 2152) follows Section 13 in the Appendices (page 2149). The following changes were also made: original Section 16.1.2 (now Section 16.3.1.1), original Section 16.1.5 (now Section16.3.1.2), original Section.16.1.7 (now Section16.3.1.3), original Section.16.2.2 (now Section16.3.2.1), original Section 16.2.5 (now Section16.3.2.2) and original Section 16.2.7(now Section16.3.2.3). As an example of Amendment A made in 2008, there was an amendment to original Section 16.1: "Exploratory evaluation PPK 04-011" to "Section 16.3.1.1: NONMEM control streams and result files of the base (structural) and full (Covariate) PK/PD models, amendment to

---

[218] FDA Pharmacology Review NDA 22406, 2009 Review
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[219] XARELTO_BHCP_00004205
[220] XARELTO_BHCP_00004205
[221] XARELTO_BHCP_00004205

original section 16.1.2" (page 2765); and "Section 16.2.7 'Individual 90% prediction intervals vs observations for the validation set'" was called "not applicable." Amendment A is the new Section 16.3.2.3 "Valdiation of the final PK model; visual predictive check and bootstrap Amendment to the original Section 16.2.7." [222]

206.   Therefore, Amendment A added additional patient plasma concentration observation data based on the same dose over time to the finalized 2007 PK000131 report's Section 16. That new information added Visual Predictive Check of CP showing the observed patient values for plasma concentration at a specific dose over time and the 90% prediction interval.  The Visual Predictive Check of CP with observed values show the 'outlier' values of rivaroxaban plasma concentration (high and low) for the same administered dose and time, namely the inter-individual variation.  The Visual Predictive CP shows the inter-individual variability with rivaroxaban in the PK data from Defendants' two Phase IIb dose ranging populations.  The Visual Predictive Check of CP are for Study 10944 and 11527, along with the added information in 2008.  The Visual Predictive CP graphic, followed by the data, began on page 2920 of a 2940 page document.  The Visual also shows the change in observed rivaroxaban plasma concentration (high and low) and the trend at 12 hours after dose (Study 10944) and at 24 hours after dose (Study 11527). During ROCKET, the limited PK samples taken were at 12-24 hours after dose (at evening with food) and referred to as the "pre-treatment dose" since it did provide Cpeak or C trough.  The Visual Predictive Checks measure plasma concentration and does not use PT (a measure of anticoagulation effect). The first Visual Predictive Check for CP are from Study 10944:



---





79

Table 7-1: Summary of data valid for PK/PD analyses in study #11527

| Dose | PK number of subjects | PK number of samples | PD number of subjects | FXa number of samples | PT number of samples | PTT number of samples | HepTest number of samples |
|------|------|------|------|------|------|------|------|
| 5 mg qd | 124 | 928 | 124 | 1039 | 1034 | 1022 | 1008 |
| 10 mg qd | 140 | 1069 | 140 | 1196 | 1190 | 1183 | 1172 |
| 20 mg qd | 132 | 1005 | 132 | 1119 | 1118 | 1099 | 1104 |
| 30 mg qd | 136 | 1040 | 135 | 1156 | 1151 | 1128 | 1138 |
| 40 mg qd | 134 | 1007 | 134 | 1127 | 1125 | 1107 | 1115 |
| total | 666 | 5049 | 665 | 5637 | 5618 | 5539 | 5537 |

For the across-study PK analysis #11527/#10944 the data sets individually prepared for both studies were combined.



BAY 59-7939/PK000131
Visual predictive check of CP (based on O2/run207), simulated IPRED (N=200)
Study 10944, 10mg bid

2929

80



81



207. The PK000131 data for plasma concentration observations is further divided into fast absorbtion and slow absorption. For Study 11527 the frequency of fast and slow absorption individuals in the study is described in Table 12-2 (below):

Table 12-2: Frequency of ka mixture populations per dose group (slow absorption/ fast absorption) as integrated in the model of the #11527 analysis

| ka: MIX visit 2 | slow absorption | | fast absorption | |
|---|---|---|---|---|
| | n | [%] | n | [%] |
| all dose | 325 | 48.80 | 341 | 51.20 |
| 5 mg od | 55 | 8.26 | 69 | 10.36 |
| 10 mg od | 62 | 9.31 | 78 | 11.71 |
| 20 mg od | 63 | 9.46 | 69 | 10.36 |
| 30 mg od | 82 | 12.31 | 54 | 8.11 |
| 40 mg od | 63 | 9.46 | 71 | 10.66 |

208. For the 666 patients in Study 11527 with PK data,[224] 325 (48.80%) were referred to as having 'slow absortion', and 51.20% were referred to as having 'fast absorption'.[225] Looking at the 30mg OD dose, there were 136 patients receiving that dose, with 82 (60%) referred to as having slow absorption vs 40% referred to as having fast absorption. When looking at the patient population of 666, the 30mg OD had 12.31% of the slow

---

[223] XARELTO_BHCP_00004205
[224] XARELTO_BHCP_00004205
[225] XARELTO_BHCP_00004205

absorbers and 8.11% of the fast absorbers.  For the 20mg OD dose, 132 patients in the arm, 48% were slow absorption and 52% fast absorption, for the total population. 9.46 slow absorbers vs 10.36% for fast absorbers.  For the 5mg OD dose, out of 124 patients, 44% were referred to as having slow absorption and 56% were referred to as having fast absorption.  The 30mg OD arm had a preponderance of slow absortion when compared to the other OD doses.

Table 12-4: Frequency of ka mixture populations per dose group (slow absorption/ fast absorption) as integrated in the model of the combined #11527/#10944 analysis

| ka: MIX day 2+3+4 | slow absorption | | fast absorption | |
|---|---|---|---|---|
| | n | [%] | n | [%] |
| all dose | 399 | 52.64 | 359 | 47.36 |
| 2.5 | 67 | 8.84 | 55 | 7.26 |
| 5 mg | 125 | 16.49 | 121 | 15.96 |
| 10 mg | 147 | 19.39 | 111 | 14.64 |
| 20 mg | 60 | 7.92 | 72 | 9.50 |

[226]

209.  Defendants' pooled Studies 11527 + 10944 looked at the ka[227] mixture population day 2+3+4 per dose group (slow absorption/fast absorption). The total population is 758 subjects (dose 2.5mg TDD to 20mg TDD), with 399 (52.64%) referred to as having slow absorption and 359 (47.36%) referred to as having fast absorption.The 10mg dose had the highest (19.39%) slow absorption, while the 5mg dose had the highest (15.96%) fast absorption.  Defendants wrote:

> *it has to be kept in mind, however, that this modelling approach does not automatically imply that there are two separate patient groups exhibiting different absorption characteristics.[228]*

210.  Gary Peters sent an email to Peter DiBattiste, Christopehr Nesselon October 17, 2007. He sent the group some slides looking at PT and INR with warfarin and rivaroxaban suggesting that an INR of 10 would be difficult, ifnot impossible, to achieve with rivaroxaban as the plasma concentration tested was 1000ng/ml with the highest INR approaching 10. He also included that the average levels of rivaroxaban with 10mg dose in OS were about 125ng/ml.  The 20 mg dose is double and would be about 250ng/ml in ROCKET, although this average could get some individuals approaching 1000 at peak.[229]

211.  In that same October 18, 2007 email series, Dr. Byra added "when the IB has Cmax for Caucasians receiving 20mg at a mean of 318 ug/L or 0.3."[230]

---

[226] XARELTO_BHCP_00004205 at p. 38
[227] Ka= the **absorption rate constant** for a drug administered by a route other than intravenous.  The half time for absorption is computed as 0.693/ka.
[228] XARELTO_BHCP_00004205 at p. 42
[229] Nessel Exhibit 19
[230] Nessel Exhibit 19

212. PK 000131 contained actual patient PK data taken at pre-specified times and organized in groups by dose. For example, Patient# 1509 in Study 11527 study, within the 5mg OD arm, was identified as a "*slow absorber*". The following examples were selected as examples of high plasma concentration outliers to support inter-individual variability, demonstrated in Study 11527.

Patient #1509 had a measured plasma concentration greater than250ng/mL, as Dr. Peters predicted for a 20mg dose.

| Time | CMax |
|---|---|
|  | 192.170 |
| Day 3-4 | 281.970 |
|  | 293.630 |
|  | 304.400 |
| 5-6-7 days | 295.800 |
|  | 277.130 |

Patient #1552 (slow absorption 20 mg OD) had a measured plasma concentration greater than the 250ng/mL predicted by Dr. Peters, or the Cmax mean of 318 ug/L predicted by Dr. Byra (for a Caucasian).

| Time | CMax |
|---|---|
|  | 340.160 |
| Day 3-4 | 330.860 |
|  | 331.540 |
|  | 345.380 |
| 5-6-7 days | 343.630 |
|  |  |

Patient #1644 (fast absorption 20 mg OD) had a measured plasma concentration greater than the 250ng/mL predicted by Dr. Peters, or the mCmax mean of 318ug/L predicted by Dr. Byra.

84

| Time | CMax |
|---|---|
| | 181.420 |
| Day 3-4 | 412.990 |
| | 322.810 |
| | 452.360 |
| 5-6-7 days | 420.240 |
| | 431.290 |
| | 432.940 |
| | 433.180 |

[231]

## f.  FDA'S 2009 CLINICAL PHARMACOLOGY REVIEW[232]

213.  The April 9, 2009 FDA Clinical Pharmacology Review (regarding the July 28, 2008 submission of NDA 22406 for the prophylaxis of DVT and PE in patients undergoing hip replacement surgery or knee replacement surgery), with lead reviewer Joseph Grillo, Pharm.D, Team Leader Young Moon Choi, Ph.D. OCP contained an executive summary with no specific mention of Study 11527, but relied primarily on RECORD (this was prior to the audits of RECORD sites and FDA's conclusion that RECORD 4 data was unreliable). As early as 2008, FDA requested that Defendants develop a 5mg dosing form for dose titration.  There is a discussion of healthy, elderly subjects (65-80 years), who had a higher rivoraxaban exposure with terminal half-lives between 11 and 13 hours. There were no clinically relevant differences in rivaroxaban exposure in studies evaluating the effects of body weight or sex on pharmacokinetics.  However, increased bleeding risk was noted in subjects in Phase 3 trials: "Japanese subjects were found to have an apparent higher dose-normalized rivaroxaban exposure compare to other ethnic groups. The reason for this difference requires further exploration by the applicant."

214.  According to the FDA's published OCP review, the VTE-P NDA was supported by 44 human clinical studies, 8 population PK (PopPK) studies, 13 in vitro studies and 16 biopharmaceutical studies.   In particular, there were the following Phase 2 studies comparing efficacy and safety of rivaroxaban with enoxaparin in VTE-P for hip replacement: Study 10942, 10944 and 11527; and for knee replacement Study 10945. The

[231] XARELTO_BHCP_00004205
[232] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

total daily dose of rivaroxaban administered in each of the Phase 2 studies was similar; however, BID dosing was used in Studies 10942, 10944, and 10945 (TDD 5- 60mg). Study 11527 was an OD study (TDD 5-40 mg). Duration of dosing was shorter than for the Phase III RECORD studies. The dosing was for 8-9 days. For the investigation of pharmacodynamics in Phase 1 and 2 studies, Factor Xa activity, PT, prothrombin time ratio (PTR), HepTest and activated prothrombin time (aPTT) were determined. Dose-dependent inhibition of factor Xa activity and prolongation of PT, aPTT and HepTest were observed in humans.

215. The pattern for dosing and steady state (SS) was determined from Study 11527.[233] Several special populations had greater than 2-fold increases in drug exposure. The increased exposure resulted in approximately a 2-fold increase in Factor Xa inhibition and prothrombin time (PT) for moderate –severe renal impairment and 2.6 fold and 2.1 fold increase in Factor Xa inhibition and PT time, respectively for Child Pugh B (CPB) hepatic impaired patients. Defendants proposed a VTE-P with only a single unscored 10mg tablet, with potential for clinically relevant increases in drug exposure and related pharmacodynamics. Information submitted by the applicant in its Phase II dose ranging study indicated an almost 5-fold increase in major bleeding (0.7% vs 4.3%) when exposure increased two-fold from the proposed dose. This suggests to the OCP reviewer that theoretically even a 1.5fold increase in exposure may double the risk of major bleeding.

216. Therefore, without the ability for downward dose adjustment, a part of the target population will not be able to utilize this drug (or it will be inappropriately used) at the current strength in these special populations. This could pose additional risk for a medication error. Since there is very little accumulation of the 10mg dose, it is not possible to shift these patients to every other day to help lower the risk of bleeding.

217. Figure 11 (below) depicts the rivaroxaban plasma concentration vs time until steady state. The 5th OD dose is the start of steady state. This is based on the 10mg qd dosing regimen in a population based PK analysis of combined VTE prevention Phase 2 studies 11527 and 10944 (PK000131).

---

[233] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)



**Figure 11:** Rivaroxaban plasma-concentration vs time profile for the 10 mg qd dosing regimen used in OdIXa-HIP OD trial [geometric mean/SD of individually posthoc estimated plasma concentration/time curves; n=131-140] (Study PK000131).
*Source: Sponsor's Figure 3.7 in clinical pharmacology summary on pages 187.*

234



**Figure 10:** (Left) Total venous thrombotic events odds ratio curve vs enoxaparin and (Right) post-operative major bleeding odds ratio curve vs enoxaparin with total daily dose (2.5-30 mg bid) for studies 10942, 10944, and 10945-safety population.

*Source: Sponsor's Figure 4.3 and 5.1 in clinical overview on pages 41 and 64.*

235

218. For Figure 10, the Y axis is total daily dose from 0-60 mg TDD.  The X axis is "Odds-Ratio" vs Enoxaparin.[236] The table is based on an applied **logistic regression analysis** of pooled data from Phase II studies 010942, 019044, and 010945, which suggested a

---

[234] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[235] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[236] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

similar shallow dose response relationship relative to enopxaparin. "A similar pattern was observed in the OD dosing Study 011527." A shallow response means that as the BID dose is increased, there is not a significant corresponding gain in 'efficacy' for VTE prevention in terms of potential risk for bleeding.  The 5mg and 10mg (TDD) both showed efficacy for VTE-P compared to enoxaparin.  FDA wrote that the entire dose range tested (5mg-40mg OD) was found to be efficacious compared to enoxaparin, analyses of the *incidence of total and major VTE failed to show a statistically significant trend* with total daily dose of rivaroxaban within the studied dose range (Figure 10 left). In contrast, there is a clear trend with increasing total daily dose of rivaroxaban for post-operative major bleeding events (Figure 10 right)

219. FDA discussed the characteristics of the "Exposure-Response relationship (dose-response, concentration –response) for Safety."

220. FDA wrote there was a steep increase in the risk of major bleeding from 0.7% for 10mg qd (proposed therapeutic dose) to 6.1% for 40mg QD (for example as in Figure 10), and as observed in the dose ranging study 11527, whereas only 1.9% receiving the active comparator enaoxaparin 40 mg experienced a major bleeding event.  The proposed 10mg OD seemed an adequate does from a safety point of view (see Figures 6 and 7 below).



**Figure 6:** Risk of major bleeding and associated 95% CI vs. dose in dose-ranging study 11527 receiving 5-40 mg qd rivaroxaban (black) and enoxaparin 40 mg (red) (safety population).

The risk of major bleeding was found to increase with increasing exposure (AUCss,0-24 or Cmax,ss) (Figure 7). The mean exposure percentile following 10 mg qd is associated with a 2.5% risk of major bleeding while a 2-fold increase in exposure due to intrinsic and extrinsic factors (Table 3) will increase the risk of major bleeding by 50%.

 

**Figure 7:** Risk of major bleeding vs. median quartile steady-state (Left) $AUC_{0-24}$ and (Right) $C_{max}$. The horizontal black bar shows the steady-state $AUC_{0-24}$ quartiles and the colored bars illustrate the predicted $10\text{-}90^{th}$ AUC and $C_{max}$ percentiles following different dose regimens.

A steep increase in the risk of major bleeding with increasing total daily dose was observed in the dose-ranging studies 10944 and 10945 for prevention of VTE in patients undergoing elective total hip and knee surgery where doses from 2.5 to 30 mg bid were administered (Figure 8). A similar pattern was observed in the once daily dosing study 011527.

237

221. The data from 11527 (Figure 6) shows that the major bleeding risk for 10 mg OD is (0.7%) less than enoxaparin. The major bleeding risk for 5mg is 2.4%, 20 mg OD is 5.3%, 30mg OD 5.2%, and 40mg 6.1%. The data was disconcerting to FDA since Figure 5 showed a doubling of dose results in a fourfold increase in major bleeding (0.7% to 4.3%) (increased bleeding from 10mg TDD to 20mg TDD) with that four-fold risk maintained as the doses increased. Figure 7 is a composite from Studies 10944 and 10945 reportedly showing a similar pattern as Study 11527 with a steep increase in the risk of major bleeding with increasing dose.

222. Safety data for Study 11527 report a dose related increase in "all adverse events", "serious adverse events" and "prolonged hospitalization" at rivaroxaban exposures greater than 10mg QD.

223. FDA expressed concern to the Defendants based on the dose ranging studies, Studies 10942, 10944, 10945 and 11527, that it was intending to market only a single 10mg tablet. Several special populations (*i.e.,* patients with severe renal impairment, moderate-to-severe hepatic impairment and strong CYP3A4 or Pgp inhibotirs) have greater than two-fold increases in drug exposure. The increases in exposure resulted in an approximately two-fold increase in Factor Xa inhibition (2.6 fold) and PT prolongation (2.1) for patients with moderate-to-severe renal impairment.[238]

224. An exploratory pop-PK analysis (PK000131) was performed by Defendants using the combined PK/PD data information available from two Phase 2 studies (11527 and 10944), as discussed above.

225. Population models of the PK of rivaroxaban suggested it could best be described as oral, two compartment model with elimination from the central compartment. It appears to have a linear PK up to 15 mg with no evidence of significant accumulation upon repeat

---

[237] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[238] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

dosing. It is characterized in vitro as a **substrate of both P-glycoprotein (Pgp) and** the active transport protein "breast cancer resistance protein" (BCRP). These transporters (Pgp and BRCP) were thought by FDA to possibly play a role in active secretion of rivaroxaban in the kidney.

226.   Approximately 50% of an orally administered dose undergoes **metabolic degradation via cytochrome 50 (CYP3A4/3A5, CYP2J2** and hydrolytic cleavage). The remainder is excreted unchanged via 'Pgp/BCRP mediated active renal secretion' and in the feces. The terminal half-life is approximately 5-9 hours in healthy subjects and 11-13 hours in the healthy elderly.[239]

227.   In the [14C]rivaroxaban mass balance (Study 10991), about 94% of the radioactive dose administered is recovered in the excreta within 7 days following administration.  The urinary excretion pathway (kidney) appears to be more pronounced in humans than animals following oral administration, with 66% of the administered dose excreted by the kidneys in humans and 28% excreted via the fecal/biliary route.[240]

228.   The FDA's reviewers were concerned in 2008 about issues with metabolism and ethnicity, especially in Japanese patients.  The sponsor had placed Japanese patients under the heading "Asians" in its PK analysis.  But there were a total of 7 Asians in its population PK analysis and not all were Japanese.[241] The Sponsor indicated to FDA the increased plasma concentration was related to low body weight.  This did not seem correct to FDA OCP reviewers since Chinese patients of the same weight did not show increased plasma concentrations of rivaroxaban of 40%.

229.   Because of the FDA's concerns about the ethnicity issues especially with Japanese patients the Office of Clinical Pharmacology obtained an additional Genomics Consult Review from Rosane Charlab Orbach, Ph.D.  She wrote that Inter-ethnicity differences were found to influence rivaroxaban pharmacokinetics or pharmacodynamics outcomes as reported by the Clinical Pharmacology and Pharmacometrics reviewers of the submission.  The genomic review addressed the potential for a pharmcogenetic basis underlying these ethnic differences.[242]

230.   Pharmacogenetics analyses revealed that Japanese individuals do have significantly higher exposure to rivaroxaban (AUC, Cmax) than other tested groups including Caucasians, Hispanic, African-Americans and Chinese following a single oral dose of

---

[239] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[240] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[241] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[242] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

rivaroxaban.  The differences did not correct after taking into account potential differences in several anthropometric variables, for example body weight differences. [243]

231.   It was plausible that the pharmacokinetics (PK) differences detected in the Japanese population may be explained, at least in part, by genetic differences in any and all of the genes involved in rivaroxaban pharmacokinetics.  FDA suggested that the applicant could consider analysis of candidate SNPs or haplotypes in order to rule out genetics as a cause of variability.  The FDA's Genomic reviewer recommended that the rivaroxaban label indicate that healthy Japanese subjects were found to have higher exposure compared to Caucasians, African-Americans, Chinese and Hispanics.[244]  Figure 14 (below) is the difference between population and individual predicted clearance vs ethnicities in Studies 10944 and 10945.



**Figure 14:** Difference between population and individual predicted clearance vs. ethnicities in studies 10944 and 10945.

[245]

---

[243] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[244] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[245] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

232. During a midcycle meeting held on December 2, 2008, the Office of Clinical Pharmacology (OCP) reported on its review related to clinically relevant increases in drug exposure requiring dose adjustment in patients with renal impairment, hepatic impairment and/or concurrent use of a moderate or strong CYP3A4 inhibitor.  OCP expressed its concerns that a method for dose adjustment in these populations was not available.  The Sponsor was proposing to market only a single strength unscored 10mg tablet in the United States as its marketed formulation.  Without the ability of a physician to downward dose adjustment, a significant part of the target population would not be able to safely utilize rivaroxaban.  The availability of only a 10mg tablet and no titration isntructions could result in the inappropriate use of the current strength in at increased risk populations, which could pose a risk to public health and unnecessary injuries and death. A preliminary pharmacometric analysis revealed that extending the dosing interval to every other day was not a viable option for patients to help lower the daily dose exposure and risk.[246]

233. OCP also reported that plasma concentration is approximately 40% higher exposure in Japanese subjects compared to other ethnic groups including Chinese. Defendants suggested to FDA that the increase was due to body weight.  The OCP pharmacometrics preliminary analysis did not suggest that weight difference was the case since Chinese subjects were found to have 40% lower exposure when compared to Japanese of similar body weight.[247]

234. FDA contacted the sponsor directly on December 5, 2008 to inform them of the need to develop a lower strength tablet or a scored 10mg tablet.  The sponsor reposnded that based on the "totality of the clinical data": 1) a once daily dose of 10mg is an effective treatment that is considered safe in a wide variety of patients, including those with mild or moderate renal impairment, mild hepatic disease and following co-adminsitration of CYP3A4 inhibitors (except for co-administration with strong inhibitors of both CYP3A4 and P-gp); and 2) the clinically acceptable limits for exposure increases are proposed as a doubling, and the proposed Product label address the appropriate use in each of these special populations.  Based on this rationale, "the sponsor does not believe dose adjustment or a lower strength tablet was necessary in the populations highlighted by FDA."[248]

235. In December 2008, Defendant wrote that it did not agree with the FDA's OCP reviewers on the need for marketing a lower 5mg dose of XARELTO for dose adjustment.[249]

236. FDA indicated it reviewed Defendants' response to FDA's Question #3, including the supporting data provided.  FDA wrote that it "is not persuaded by your argument."

[246] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[247] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[248] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[249] FDA Clinical Pharmacology Review NDA 22406 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

Compared to enoxaparin, rivaroxaban has a steep dose response relationship for the risk of major bleeding.  The FDA then provided the "pushback statement" that would be the subject of a later teleconference with Defendants in Febraruy 2009.  FDA wrote to Defendants' about the findings:

> *"...table 1 in your response reports a greater than 4 fold increase in major bleeding (0.7% vs 4.3%) when exposure is increased two fold from the proposed dose...*[250]

237.  Without the ability to downward titrate the dose for the following populations FDA called the following groups at increased risk of major bleeding based on the exposure and PD inforamtion: 1) moderate to severe renal impairment, 2) mild to severe renal impairment when used with a CYP3A4 inhibitor, 3) moderate to severe hepatic impairment, and 4) concurrent use with moderate or strong CYP3A4 inhiibitor plus a moderate of strong P-gp inhibitor.  Further, the potential increase in exposure with renal impairment combined with CYP3A4 is of concern to FDA since it has not been studied and could be significant given major elimination pathways are blocked.

> *We again strongly recommend you to develop a lower strength tablet of a scored 10mg tablet of rivaraoxaban and provide adequate data to support bioequivalence between the current formulation and the lower strength or scored tablet.  We encourage you to promptly obtain this information and submit it as an amendment to your application.  We suggest having a teleconference with you prior to submitting your next response.*[251]

## g.  2010 FDA'S CLINICAL PHARMACOLOGY REVIEW

238.  There had been an earlier April 6, 2009 Review conducted by FDA's Clinical Pharmacology and Biopharmaceutics Review which contributed to the May 27, 2009 Complete Response (CR) Letter to Defendants, primarily addressing Clinical and Quality related issues.  Published on the FDA's website for NDA 22-406 is the "Office of Clinical Pharmacology Addendum to the April 6, 2009 Review" which involved Defendants' December 30, 2010 resubmission for marketing a 10mg immediate release XARELTO tablet for VTE-P.  The relevant IDE was #64,892.  FDA's OCP wrote in the Executive Summary:

> *Although there were no clinical pharmacology related deficiencies, the agency did proactively communicate potential a postmarketing related issue regarding the need to develop a lower strength tablet for patients with Child Pugh class B hepatic impairment without coagulopathy, concurrently taking rivaroxaban with a P-gp and strong CYP3A4 inhibitor, and concurrently taking rivaroxaban with a P-gp and mild or moderate CYP3A4 inhibitor with mild-moderate renal impairment.*[252]

---

[250] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[251] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[252] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

239. According to the Executive Summary, in Defendants formal response to FDA the Defendants stated that it did not agree with FDA that a lower dose was needed for patients with hepatic impairment ('exposure matching') or that it was appropriate to have exposure matching based on Defendants' predictive "simulation" model analysis in Study 11527 with calculation of "expected plasma concentrations'.   FDA was also told by Defendants that according to its 11527 simulation modelling, an increased baseline PT (lengthed clotting time) somehow suggested a greater "*sensitivity*" of patients to rivaroxaban plasma concentrations.  Sensitivity was derived from the slope of the exposure response plot of PT versus rivaroxaban concentration (Study 11527). However, the clinical significance of 'greater sensitivity to rivaroxaban' was not clear to the FDA's OCP reviewers.  To further argue against the need for dose matching (dose titration), Defendants said there was "no relationship observed between PT levels and major bleeding" based on its simulation in Study 11527 and Phase III RECORD studies.  Using the plasma concentration from Study 11527 simulations in patients with hepatic impairment, Defendants maintained these patients should be within the same plasma concentration range seen in the phase 3 RECORD studies.  In addition, Defendant's own analysis of the RECORD studies for PT and PTR were that both were reportedly 'poorly predictive values' for bleeding risk. After reading this response from Defendant, FDA answered it "is not persuaded by the applicant's argument against exposure matching in this population."[253]

240. FDA went on to describe what it considered to be flaws in Defendants' model simulations which showed increased risks from taking a lower 5mg OD in a patient taking a combination of strong CYP3A4 and P-gp inhibitors.  Defendants' simulations suggested that a 5mg OD dose would result in a steady state, trough concentration (Ctrough) estimated to be 6-times higher than for patients taking a 10mg QD alone.

241. FDA wrote in its OCP 2010 review that Defendants' simulation was limited by its holding the volume of distribution (Vd/F) constant in its model while decreasing clearance (CL/F) in order to drive change in drug exposure by a prolonged elimination half-life and higher trough.  However, FDA did not consider the model consistent with the reduction seen in both Vd/F and CL/F for half-life interaction studies with use of the combined inhibitors.[254]

242. FDA's Clinical Pharmacology reviewers conducted their own simulations using the same methodology as Defendants but this time reducing both CL/F and Vd/F (as occurred in the applicant's drug interaction studies).  The FDA's simulation did not support Defendants' claim that the 5mg OD dose produced a 6-fold change in steady state and Ctrough concentrations.  Therefore, FDA once again wrote that it "is not persuaded by the applicant's argument against exposure matching in this population."[255]

[253] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[254] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[255] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

243. As a result of FDA's own concerns about Defendants simulations (Study 11527) and Defendants' statements against exposure matching, including phase using RECORD PT/PTR, FDA continued to recommend that there should be a lower dose strength of rivaroxaban available as the "best option to allow a larger patient population to review this treatment and this issue still should be considered as a post market commitment." FDA continued, "Until a lower dose formulation is developed FDA supports avoidance language in the labeling for these populations."[256]

244. The origin of the FDA's recommendation for a postmarketing commitment from Defendants to devlop a 5mg dose and recommendations for titration for its label for the United States comes from the 2010 interaction with Defendants:

> *1.1 RECOMMENDATION:*
>
> *From a clinical pharmacology perspective, this resubmission of the original application is ACCEPTABLE provided the applicant and the Agency come to a mutually satisfactory agreement regarding the language in the package insert and the applicant commits to the following post marketing commitments addressing clinical pharmacology related safety concerns with rivaroxaban treatment.*
>
> *1.2 Post marketing Requirements:*
>
> *None*
>
> *1.3 Post marketing Commitments:*
>
> *Develop and propose a 5mg dosing form ...to allow for proper dose titration when rivaroxaban needs to be co-administered in patients at risk for clinically relevant changes in rivaroxaban exposure.*
>
> *Protocol submission Date: 45 days from data of action*
>
> *Submission Date: 6 months after FDA agreement to submitted protocol*
>
> *1.4 Comments to the Applicant*
>
> *1.4.1 The FDA suggests that the applicant evaluate the effect of P-gp inhibitor with limited CYP3A4 inhibitory activity (e.g. quinidine) on the pharmacokinetics, pharmacodynamics and safety of rivaroxaban in healthy subjects. This study will explore the involvement of P-gp in rivoaroxaban elimination so that appropriate dosing recommendations can be created following the development of a 5mg tablet formation.[257]*

---

[256] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[257] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

245. In Section "1.5 Summary of Important Clinical Pharmacology and Biopharmaceutics Findings" of FDA's Clinical Pharmacology Review dated April 6, 2009, it found the original application acceptable <u>provided</u> post-marketing related issues were addressed. Defendants' formal response to FDA stated that it did not consider using a lower dose for treatment of Child Pugh class B patients without coagulopathy '*appropriate*' because its analysis of PD response from a dedicated hepatic impairment study suggests '*greater sensitivity to rivaroxaban plasma concentrations*' and 'prothrombin time' (PT) in this population. Defendants stated that "[s]ensitivity was derived from the slope of the exposure-response plot of PT versus rivaroxaban concentration."[258]

246. FDA did its own internal evaluation of applicant's data and PT analysis, and also did its own analysis with focus on 'sensitivity' rather than on baseline differences. FDA found that the baseline PT was prolonged in subjects with Child Pugh class B patients (16.2 seconds) compared to healthy subjects (13.0 seconds) (Study 11003). In addition, relationships between PT and major bleeding were explored by FDA using the data provided from Defendants from Study 11527 and RECORD.[259]

247. In terms of 'exposure matching' (dose-titration) for hepatic impairment patients, FDA, using the expected plasma concentration from Study 11527, proposed a clinical dose for use in a patients with Child Pugh class B that was half of the dose of healthy subjects (*i.e.,* 5mg OD). FDA estimated the expected PTR for each group from the linear equation for this relationship. The expected median PTR was ~1.61 in the C-P class B patients compared to ~1.34 in healthy subjects. This PTR range of exposure matched C-P class B patients within the range reported by the applicant for the PTR seen in the combined analysis of the RECORD study. Unlike Defendants, the FDA's analysis further supported the "development of the 5mg OD dose" for use in patients with liver impairment.[260]

248. FDA derived the 'expected PTR', based on a linear equation from the exposure response analysis of study 11003, using exposure data (*i.e.,* $C_{max}$) from the phase 2b study #11527 where 135 patients received a **10mg OD dose** of XARELTO. For a C-P class B patient given the 5mg OD dose (half the dose of healthy subjects), the expected median PTR (25th, 75th) would be approximately 1.16 (1.55, 1.75) compared to approximately 1.34 (1.31, 1.41) in healthy subjects. "This difference is not likely to affect bleeding risk since the applicant's integrated safety summary reports found no relationship between PT or PTR and relevant bleeding."[261] Plotting the major bleeding episodes versus the *quartiles for PT* (Figure 1) from Study 11527 study and RECORD did not change this conclusion.The PTR range for exposure matched CPclass B is within the range reported

---

[258] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[259] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[260] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[261] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

for the applicant for the PTR seen in RECORD studies and submitted by Defendants in support of proposed safety for the drug.

249. Figure 1 (below) depicts the relationship between PT and major bleeding for Study 11527 (left) and the combined analysis of RECORD studies (right).[262]



*The vertical black bars represent the mean with 95% confidence interval. Proportion of patients with major bleeding are demonstrated as black circles at the median PT of each quartile. The numbers against each quartile are the number of patients with major bleeding/total number of patients. The horizontal dashed red line represents the proportion of patients with major bleeding in the placebo arm (enoxaparin).*

phase 2b study #11527 where 135 patients received Xarelto dosed at 10 mg daily. The results of this analysis are presented in Table 2.

**Table 2:** Estimated PTR for hepatic impairment patients and healthy subjects using phase 2 $C_{max}$ estimates from study 11527[#] and the linear relation between PTR and rivaroxaban concentration from study 11003

| Parameter | Concentration (µg/L) | Prothrombin time ratio (PTR) | | |
|---|---|---|---|---|
| | | CPA | CPB | Healthy |
| **Study 11527 dosed 10 mg qd (n=135)** | | | | |
| 5th Percentile | 125 | 1.28 | 1.45 | 1.26 |
| 25th Percentile | 111 | 1.34 | 1.55 | 1.31 |
| Median | 154 | 1.38 | 1.61 | 1.34 |
| 75th Percentile | 91.4 | 1.46 | 1.75 | 1.41 |
| 95th Percentile | 196 | 1.58 | 1.96 | 1.52 |

*Applicant's pop-PK report PK000131 for 135 patients receiving a Xarelto dose of 10 mg daily

[263]

250. FDA said Defendants told them there was no relationship observed between the steady state PT levels and the proportion of patients with major bleeding in Study 11527 and RECORD studies. Defendants' integrated safety summary reports also found no relationship between PT or PTR and relevant bleeding risk.  Based on the FDA's analysis of the data, FDA wrote "it still was not persuaded against exposure matching, with the justification for the doubt." FDA further commented, "Based on this analysis and the

---

[262] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[263] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf) at p. 8

limitations of the applicant's approach, FDA is not persuaded by the applicant's argument against exposure matching." [264]

251. Nitin Mehrotra, Ph.D as an FDA OCP primary reviewer and Chrisine Garnett, Pharm.D as the FDA Pharmacometrics Team leader, created the published 2010 FDA's Pharmacometric Review in the Office of Clincial Pharmacology Review for NDA 22-406. The Key Review Question set out two objectives for the review: 1) repeat sponsor's simulations with correct assumptions (decrease in both apparent clearance and volume of distribution); and 2) explore PT-major bleeding relationship for the dose ranging study (Study 11527 (5-40mg QD dose)) and safety data in Phase 3 trials (RECORD 1, 2, 3, and 4). The first Key Question was as follows:

> ### 1.1.1 Is the sponsor's rationale for not recommending 5mg QD dose of rivaroxaban in patients taking concomitant CYP3A4 and PgP inibitors (e.g. ketoconazole, ritonavir, etd.) appropriate? [265]

252. The FDA reviewers' response to this question was "No".[266] The FDA continued to recommend the availability of a lower dose of 5mg: "a significant exposure-major bleeding relationship was established with increased risk of major bleeding with increasing exposures." (For details refer to the clinical pharmacology review in DAARTs by Dr. Grillo and Tornoe dated 4/2/2009).

253. The mean AUC (exposure) in normal patients receiving 10mg was approximately 1300 ug*h/ml (1.3mg*hr/ml) with a risk of major bleeding of 2.5%. A patient taking a concomitant strong CYP3A4 and P-gp inhibitor will have a 2.6 –fold increase in exposure and the risk of major bleeding increases to 4.5%. By administering 5 mg (i.e., downward dose titration) to a patient taking concomitant strong CYP3A4 and P-gp inhibitor, the exposure will remain similar (slightly higher) to the exposure of a normal patient taking 10mg OD, and the risk of major bleeding will be reduced to 2.8% (Figure 3). [267]

254. FDA's second Key Question was as follows:

> ### 1.1.2 Is the sponsor's rationale for not recommending 5mg QD dose of rivaroxaban in patients with moderate hepatic impairment (Child Pugh class B) appropriate?[268]

---

[264] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[265] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[266] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[267] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[268] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

255. The FDA's response was "No". Defendants presented an argument that moderate hepatic impairment have higher baseline PT times (approximately 3 seconds higher) and a steeper concentration-PT relationship (1.7 fold higher slope) compared to patients with normal hepatic function. However, the clinical relevance of this was not clear to FDA's reviewer. FDA wrote: "PT-major bleeding relationship was explored for dose ranging study 11527 (5-40mg QD) and for the four pivotal registration trials (combined analysis of RECORD 1,2,3 and 4 at 10mg QD level). There was no relationship observed between steady state trough PT levels and proportion of patients with major bleeding across the PT range observed in 11527 and RECORD. The 5th and 95th percentiles of steady state trough PT in 11527 and RECORD studies were 9.6, 14.5 second (11527) and 10.3, 14.4 sec (RECORD)."[269]

256. FDA would continue to recommend a lower dose of 5mg QD in moderate hepatic impairment in order to match exposures with the risk of major bleeding (Figure 5, below).[270]



**Figure 5:** Risk of major bleeding vs. steady state AUC. The figure is taken from the FDA's presentation at the CRD advisory committee meeting (March 19, 2009).

[271]

[269] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)
[270] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf) at p. 23
[271] FDA Clinical Pharmacology Review NDA 22406
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000ClinPharmR.pdf)

**h.  XARELTO VTE-P FDA ADVISORY COMMITTEE MEETING MARCH 19, 2009**

257.  The FDA's review of  RECORD and the NDA for VTE-P was assigned to CDER's Office of Drug Evalaution, Division of Hematology Drug Products.  The external public review was held at FDA's Advisory Committee of the Cardiovascular and Renal Drug Products.  Janssen's presenters were Peter DiBattiste, MD, Cardivoascular Therapeutic Area Head, and Dr. Gary Peters, VP, Johnson & Johnson Pharmaceutical R&D, accompanied by Richard Friedman, MD, Charleston Orthopedic Associates and Paul B. Watkins, MD, Director, Hamner Center for Drug Safety Sciences, University of North Carolina.  FDA's presenters were Kathy Robie-Suh, MD, Min Lu, MD, MPH, and Qing Xu, Ph.D.MD, FACP.  FDA's post-market hepatotoxicity concerns were presented by Kate Gelperin, MD, MPH (OSE) and a discussion of "**Dose Adjustment Consideration**" by Christoffer Tornoe, Ph.D. Office of Clinical Pharmacology.

258.  Dr. Tornoe, Ph.D. CDER's Office of Clinical Pharmacology's PowerPoint slides at the AdCom meeting, Slide #2:

> *Bottom Line Up Front*
>
> *Is there evidence of Dose/Exposure-Response for Effectiveness and Safety*
>
> > *– Shallow dose-response*
> >
> > > -   *Increased bleeding risk with increasing rivaroxaban dose/exposure*
>
> *Which Special Populations are at Risk for Clinically Relevant increases in Exposure*
>
> > -   *Moderate-severe hepatic patients*
> >
> > -   *Use of Strong CYP3A4/P-gp inhibitors*
> >
> > -   *Mild-moderate renal impairment + moderate CYP3A4/P-gp inhibitors*
>
> *What are the Strategies to Address Increased Exposure and Risk of Bleeding in Special populations?*
>
> > -   *Lower dose strengths is the best option and will allow a larger patient population to receive this treatment.*

## Shallow Dose-Response Relationship for Composite Efficacy Endpoint



*The error bars represent the 95% confidence interval of the mean proportions

## Increasing Risk of Major Bleeding with Increasing Dose and Exposure



*The error bars represent the 95% confidence interval of the mean proportions

101



**Moderate Hepatic Impairment and Strong CYP3A4/ P-gp Inhibitors have >2-fold Increase in Exposure**

272

259. The Medical Officer Presentation at the AdCom panel used the Phase III pivotal data from RECORD and ongoing XARELTO'S other clinical studies was given by Min Lu, MD, MPH:

- ***Do the data show efficacy?***
  - *Yes, based on "Total VTE"*

- ***Does Rivaroxaban increase bleeding?***
  - *Yes*

- ***Dose Rivaroxaban increase the risk for hepatotoxicity?***
  - *Cannot exclude possibility*

- ***Increased thrombotic CV risk after rivaroxaban discontinuation?***
  - *Cannot exclude possibility[273]*

260. A Janssen slide at the AdCom indicated that for Phase 2 VTE prophylaxis in THR/TKR N=2,787 and in RECORD 1-4 VTE prophylaxis in THR/THK N=12,383. Other Studies

---

[272]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143665.pdf

[273]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143657.pdf

included: ATLAS ACS Phase 2 N=3491; ATLAS 2 ACS Phase 3- ongoing; MAGELLAN (VTE)- ongoing; EINSTEIN (VTE) - ongoing; and ROCKET AF (SPAF) - ongoing.[274] VTE prophylaxis in THR/THK - Phase 1-clinical pharmacology consisted of 52 studies (N=1129 riva); Phase 2 –THR/THK dose finding consisted of four (4) studies (2232 riva); Phase 3 RECORD studies (41 countries) consisted of 4 studies N=6183 riva.[275] Total daily doses of 5mg to 60mg were tested. Janssen also told the AdCom panel in 2009 some statements that were not consistent with the company's internal documents, particularly the lack of difference between a BID versus OD dosing in terms of safety: Once and twice daily dosing regimens with no clear efficacy or safety differences.

> *Efficacy not strongly related to dose but reduced proximal DVT with increasing dose Bleeding dose related but similar to enoxaparin for total daily doses of 20mg or less 10mg once daily dose selected for Phase 3 evaluation[276]*

261. Defendants' Safety Population in Study 11527: treatment emergent Major Bleeding Events Safety Population RECORD 1Riva vs Enox Hazard ratio (HR) = 3.01 (0.61, 14.92); RECORD 2 not calculated <5 events; RECORD 3 HR=1.17 (0.39, 3.49); RECORD 4 HR= 2.47 (0.77, 7.87) 277 Treatment Emergent Bleeding Events Pooled RECORD 1-4 Safety Population Major Bleeding Event riva vs Enos 1.84 (0.94, 3.62) p=0.076. Janssen safety information referred to data from RECORD liver safety database and the ATLAS liver safety database.

262. Janssen slide CC-50, Consideration for Populations with Higher Exposure, promised that information "will be addressed" in the labeling and education materials as to how to deal with patients with a "2- fold" increase in exposure to rivaroxaban (*i.e.,* special populations):

- *RECORD program shows subgroups with known increases in exposures (fragile, age, moderate renal impairment) have documented efficacy benefit and bleeding risk similar to overall*

- *Situations with expected exposures over a 2-fold increase are limited in occurrence, and will be addressed with labeling and education.[278]*

263. Janssen also provided a Figure 3-14 Distribution of PT versus Bleeding Events (Pooled Phase 3 Record Study 54 BF-19).

---

[274]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143666.pdf
[275]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143666.pdf
[276]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143666.pdf
[277]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143666.pdf
[278]www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drug/CardiovascularandTenalDrugsAdvisory Committee/UCM143666.pdf



**Figure 3-10:** Correlation Between Rivaroxaban Plasma Concentrations and Factor Xa Inhibition (top) or PT (bottom) in Healthy Subjects Following Multiple Dosing (Phase 1)



r values of 0.97 for inhibition of Factor Xa activity, 0.98 for PT, when the Neoplastin® assay was used. The median steady-state peak plasma concentration of rivaroxaban in patients is estimated to be 125 µg/L (with maximum $C_{max}$ of 196 µg/L).[279]



**Figure 3-14:** Distrubution of PT vs. Bleeding Events (Pooled Phase 3 RECORD Studies)[280]

---

[279] XARELTO_JANSSEN_00909017
[280] XARELTO_JANSSEN_00909017

264. According to the FDA's Summary Minutes of the 2009 meeting, written by FDA's Elaine Ferguson MS, R.Ph. (with sign-off by A. Michael Lincoff, MD, Committee Acting Chair), the primary endpoint in the RECORD studies was a comparison of the occurrence of Bayer's composite endpoint, which consisted of venographic evidence of DVT, non-fatal DVT, non-fatal PE or death.  Statistical success was reportedly demonstrated in each of the four RECORD studies.  The main safety finding in the RECORD studies was increased bleeding among patients who receive rivaroxaban compared to patients receiving enoxaparin.  Major bleeding occurred at a rate of 0.4% within the rivaroxaban group and 0.2% within the enoxaparin group (a doubling).  The only bleeding-related death occurred in a patient who received rivaroxaban.  Safety findings also noted an increased occurrence in significant changes in liver function, greater in the rivaroxaban patients than enoxaparin.   Two of the Advisory Committee members said that the RECORD data available at the AdCom precluded supporting NDA approval. [281]

265. The FDA's AdCom panel members recommended that there needed to be longer term studies available for patient populations "*particularly given the likelihood that this agent will be used in some patients in clinical practice for periods longer than 35 days.*"[282]  The vote regarding a favorable risk-benefit profile for this population was: Yes 15, No 2, Abstain 0.[283]

266. The two committee members voting **'No'** questioned the validity of Defendants' choice of a composite endpoint to be a valid surrogate for clinical practice.  Committee members also expressed concerns about rivaroxaban used in subgroups of patients with liver disease, with risk for bleeding, risk for bleeding with re-operation, and in patients undergoing neurosurgery.[284]

267. Regarding the FDA's insistence that Defendants needed to develop a lower dose for specific groups of patients, FDA's Question #4 for the AdCom panel members requested a VOTE.  FDA received a mixed discussion and a spread-out vote with 3 members abstaining:

> **"4. (VOTE): Question**: *Rivaroxaban clinical pharmacology data indicate that, based on systemic exposure, a lower dose would optimize benefit-risk in patients with renal and/or hepatic dysfunction and/or CYP3A4, P-gp inhibitors. In addition to the proposed 10 mg dose of rivaroxaban, should a lower dose be available to treat this population?*

---

[281] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

[282] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

[283] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

[284] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

*VOTE: Yes 5 No 9 Abstain 3* [285]

*Many committee members expressed that there was not enough data.  While some were persuaded that there might be a loss of efficacy, other expressed concerns for safety in these specific populations.* [286]

### i.  DEFENDANTS INTERNALLY PROPOSE TO DRAFT A LABORATORY TESTS SECTION FOR THE XARELTO LABEL, BUT ONLY AS A "*CONTINGENCY*"

268.  As of March 31, 2009, Defendants were fairly confident about being on track for obtaining NDA approval for XARELTO by the PDUFA Goal date of May 2009.  Defendants were putting together their position regarding the labeling negotiations with the FDA for completion of NDA approval.  Judy Kinaszczuk circulated a "Contingency Planning Document" to the regulatory, clinical and commercial groups that was limited to addressing the positions they planned to take with FDA on the "DOSAGE ADMINISTRATION" section of the XARELTO launch label. [287]

269.  FDA's Medical Officer, Dr. Rafel (Dwaine) Rieves informed Defendants that as to the 10mg dose, they could reflect that in the label, provided they stated that it is "not recommended for use in the following populations…" and that post market expectations of Defendants would be contingent on that labeling. [288]  Additionally, FDA would not agree to Defendants' use of a statement of a 2-fold exposure limit for the general population in the label due to FDA's concerns about individual bleeding risk and the need to match dose exposure. [289]

270.  Defendant submitted a draft XARELTO label for VTE-P in July 2008 which included a proposed paragraph in **Section 12.2 PHARMACODYNAMICS.**  Defendants did not propose to put similar drug monitoring information in "DOSAGE AND ADMINISTRATION" or to add a Section 5.4 LABORATORY Test section like Section 5.9 Laboratory Tests for Lovenox (enoxaparin) where the information would likely be seen by a health care provider considering prescription and monitoring of XARELTO in a patient.  An internal April 23, 2009 document entitled "The XARELTO USPI Labeling Contingency Document," asked "Will we need to add a new 5.4 laboratory test section like Lovenox?" The document then indicated that the company would include such language "only if section is requested…" [290]

271.   Below are excerpts from the Lovenox label approved in 2007.  As indicated in the Label Contingency Document, Defendants were already aware of the Lovenox USPI label as

---

[285] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

[286] Summary Minutes of the Cardiovascular and Renal Drugs Advisory Committee March 19, 2009 NDA 022-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm125999.htm)

[287] XARELTO_JANSSEN_03696403

[288] XARELTO_JANSSEN_04187420

[289] XARELTO_JANSSEN_04187420

[290] XARELTO_JANSSEN_05911809

Defendants were drafting its XARELTO label for consideration by FDA. The sponsor of Lovenox, Sanofi, in its USPI recommended monitoring special patients at increased risk with anti-factor Xa (peak and trough) for signs of clinical bleeding and blood loss (i.e., periodic blood counts, platelets, occult blood in stool). With Lovenox the physician was able to adjust the dose as needed for a patient. Lovenox (enoxaparin sodium injection) is a factor Xa inhibitor given by subcutaneous (SC) or intravenous (IV) injection and not a pill like XARELTO.

272. In 2007, Lovenox was approved for prophylaxis of DVT in abdominal surgery; hip and knee replacement; medical patients with severely restricted mobility during acute illness; inpatient or outpatient treatment of acute DVT without PE; prophylaxis of ischemic complications of unstable angina and non-Q-wave myocardial infarction [MI] and treatment of acute ST-segment elevation myocardial infarction [STEMI] managed medically or with subsequent percutaneous coronary intervention [PCI]. The Lovenox USPI 2007 DOSAGE and ADMINISTRATION is approved without any recommendation for routine monitoring of coagulation parameters but provides information about monitoring special subgroups of patients at increased risk of bleeding, much like FDA was requesting of Defendants for XARELTO's marketing in the USA.

### Lovenox (enoxaparin) USPI –NDA Approved Parenteral Factor Xa Inhibitor

**Section 8.5 Geratric Use** .Lovenox should be used with care in geriatric patients who may show delayed elimination of enoxaparin. Monitoring of geriatric patients with low body weight (<45 kg) and those predisposed to decreased renal function should be considered.

**Section 8.9 Low-Weight Patients**
An increase in exposure of enoxaparin sodium with prophylactic disease (non-weight adjusted) has been observed in low-weight women (<45kg) and low-weight men (<75kg) All such patients should be observed carefully for signs and symptoms of bleeding…

**Section 5.9 Laboratory Tests**

Periodic complete blood counts, including platelet count, and stool occult blood tests are recommended during the course of treatment with Lovenox. When administered at recommended prophylaxis doses, routine coagulation tests such as Prothombin Time (PT) and Activated Partial Thromboplastin Time (aPTT) are relatively insensitive measures of Lovenox activity and therefore, unsuitable for monitoring. Anti-Factor Xa may be used to monitor the anticoagulant effect of Lovenox in patients with significant renal impairment. If during Lovenox therapy abnormal coagulation parameters should occur, anti-factor Xa levels may be used to monitor the anticoagulant effect of Lovenox. [see Clinical Pharmacology (12.3)]

**12.2 Pharmacodynamics**

In humans, enoxaparin given at a dose of 1.5mg/kg subcutaneously (SC) is characterized by a higher ratio of anti-factor Xa to anti-factor IIa activity (mean

107

*±SD, 14.0±3.1) (based on areas under anti-Factor activity versus time curves) compared to the ratios observed for heparin (mean ±SD, 1.22±0.13). Increases of up to 1.8 times the control values were seen in the thrombin time (TT) and the activated partial thromboplastin time (aPTT). Enoxaparin at a 1 mg/kg dose (100 mg/mL concentration), administered SC every 12 hours to patients in a large clinical trial resulted in aPTT values of 45 seconds or less in the majority of patients (n=1607). A 30mg-IV bolus immediately followed by a 1mg/kg SC administration resulted in aPTT post injection values of 50 seconds. The average aPTT prolongation value on Day 1 was about 16% higher than on Day 4.*

273. Within the Xarelto label, there is no **Section 5.2 Laboratory Tests** informing the physician to periodically check for bleeding in a patient by common tests such as periodic complete blood counts, platelets, stool occult blood tests (i.e., GI bleeding) and physical observation.  FDA subsequently re-drafted Defendants' proposed "Geriatric section" (June 13, 2011).  There is no proposed section warning for special groups like low-weight patients.  Defendants' reference to laboratory tests was included in its discussion in "**Section 12.2 Pharmacodynamic**":

> **Section 12.2 Pharmacodynamic**
>
> *Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose dependently. The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended. The Neoplastin® PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) ranged from 13 to 26 seconds. The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamic effect.[291]*

274. Throughout RECORD, Defendants used the Neoplastin PT assay (K922040; K922565), a 510(k) cleared commercial diagnostic laboratory device marketed in the United States since 1992.  Defendants referenced "aPTT," a standard and commonly used laboratory coagulation test (*FDA listed 30 aPTT kits cleared before 2008 with clearance beginning in 1979 to pre-1976 (pre-Amendment) devices).  The proposed label also listed the HepTest ("HepTest-A Quantitative Heparin in Plasma Assay" (K853239) and available commercially in the United States since 1985).  So all three laboratory tests described by Defendants in its 12.2 Pharmacodynamics were commonly available Laboratory Tests for coagulation monitoring.  As shown in Lovenox, 12.2 Pharmacodynamic as drafted by Defendants was not the site in a USPI where physicians would look at Laboratory tests.

---

[291] XARELTO_JANSSEN_00047659; Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption dated 8/12/2016 at p. 8.

275. In April 2009, shortly after the March 19, 2009 AdCom meeting, Defendants' US Label Contingency Document proposed proactively creating a "5.4 Laboratory Tests Section" in its draft label, and indicated that there was statistical significance in the RECORD XARELTO data when compared to enoxaparin rather than add 'p' values to Table 2:

- *"Draft 5.4 Laboratory Test: LWG has been asked to proactively provide a section that provides some guidance to the physician about correlation (or lack) of PT measurements with bleeding risks and dosing;*

- *5 ADRs, Table 2 we will proactively request an addition of a footnote to state statistical significance rather than add p-values to the entire table."[292]*

276. On April 23, 2009, before the FDA's Complete Response Letter denying approval of the NDA for XARELTO (see below), Defendants were already "proactively" creating a "Section 5.4 Laboratory Test" to be available for the XARELTO label like Lovenox, but "only if section is requested" by the FDA.[293] So Defendants were able to provide physicians some guidance about laboratory measurements like PT, bleeding risks, and dosing in 2009, as had already been done for the Lovenox label, but only as a "contingency" for Defendants to have available during negotiations with FDA of the final launch label for NDA approval. The Defendants did not intend to include the information in its draft label for FDA because it was its duty to provide an adequate and safe label, with adequate instructions for use and would increase the safety of XARELTO for the public. (21 USC 352(a)(f)(1)(2); 21 CFR 201.57; 21 USC 331(a)(b)).

277. Apparently the proposed laboratory correlation of PT measurements with bleeding risk and dosing for the United States PI, even as part of contingency planning was not to be even as "*specific as the Canadian label*". An email from Judy Kinaszczuk to Paul Burton and Mehul Desai of Janssen on April 23, 2009 entitled "Subject FW: MTG: XARELTO USPI LWG Labeling Negotiation Contingencies 24-Apr-09; Post LRC actions" and described the proposed changes for the XARELTO label:

*The second thing we needed to do, was to offer more pointed guidance to the physician about correlation (or lack) of PT measurement with bleeding risks and dosing. But, we were not to be as specific as the Canadian label. I have a draft suggestion, but obviously need your edits on the topic as well.[294]*

## j. RECORD INVESTIGATOR COMPLAINTS TRIGGER FDA'S INSPECTION AND IDENTIFICATION OF '*UNRELIABILITY*' OF BAYER'S RECORD STUDIES

278. The RECORD studies would prove to be another stumbling block for the 'horse' XARELTO, and its trip to the United States market. According to the FDA's Medical Officer Compliance Review of the XARELTO NDA, during the conduct of the international RECORD clinical studies, FDA received complaints regarding two

---

[292] Burton Exhibit 50
[293] XARELTO_JANSSEN_05911809.
[294] Burton Exhibit 50

investigators enrolling subjects in RECORD, Dr. Arturo Corces[295] in RECORD 2 and Dr. David Loucks in RECORD 4.[296]  On July 28, 2008, Janssen submitted the data from the RECORD 1, 2, 3 and 4 studies to FDA to support approval of NDA 22-406, and FDA issued a standard request for inspection of RECORD investigational sites cited in the NDA by Division of Scientific Investigations ("DSI"). DSI conducted eight (8) validation inspections of clinical investigators enrolling subjects in the four (4) RECORD studies. The results of the DSI inspections were disconcerting and resulted in additional questions with FDA identifying multiple regulatory violations for many of these sites, thus raising concerns about the overall quality and integrity of the data submitted to FDA by Janssen in its NDA.[297]

279. A major issue DSI identified <u>after</u> the FDA AdCom meeting for the RECORD 4 study sites was randomization of subjects after surgery, rather than the approved randomization prior to surgery.[298] Bayer Healthcare was inspected as the sponsor and monitor of the four RECORD studies cited in the NDA, and significant issues were identified.  Some of the items cited in FDA's letters to the individual investigators were also not identified by Bayer, as the monitor of the studies.

280. FDA's internal DSI review team indicated to CDER that after its inspection of 11 clinical investigation sites and Bayer (as the monitor of the 4 RECORD trials), it concluded the data from the RECORD trials 1, 2 and 3 could be made reliable.  However, DSI concluded that all the data from RECORD 4 was <u>not</u> reliable and could <u>not</u> be made reliable.

281. DSI's inspection found the percentage of post-surgical randomization in RECORD 1, 2 and 3 was less than 1%; however, in RECORD 4 the percentage was 39%.  All four RECORD trials were identified to have unreported adverse events (AEs).

282. DSI's inspection of Bayer uncovered significant problems for the sponsor with its monitoring of the 4 RECORD trials. An inspection of Johnson & Johnson (Janssen) did not uncover similar problems.  Bayer's monitoring of RECORD had failed to identify major violations at investigation sites.  Bayer acknowledged to FDA that it had problems with the monitoring of RECORD trials.

**k.  REVIEW OF XARELTO VTE-P NDA HALTED BY MULTIPLE ISSUES, INCLUDING RECORD UNRELIABILITY, MANUFACTURING QUALITY ISSUES, LIVER TOXICITY AND CONCERNS ABOUT DOSE**

283. On April 29, 2009, Defendants received a follow-up call from FDA regarding the FDA's CMC Inspection regarding Scheduling an inspection of Wupertal (Bayer).  On May 1, 2009, Defendants received a letter from FDA providing: "CMC section of the drug

---

[295] Arturo Corces, MD, Miami, FL at Miami Institute for Medical Research, received a Clinical Investigator Warning Letter dated May 28, 2008 from FDA's DSI for violative actions with VTE-P and VTE- Extended Prevention INDs. He had been inspected March 20 and April 26, 2007.
[296] Burton Exhibit 10
[297] Burton Exhibit 10
[298] Burton Exhibit 10

master files (DMF) 21580, 21581 and 21592 were "Inadequate to Support the NDA." Therefore, FDA had serious concerns about the adequacy of the Good Manufacturing Practices and quality controls used by Bayer to manufacture XARELTO.  (21§ CFR 210, 211).  Shortly before the FDA's denial of the NDA based on DSI concerns of unreliability of RECORD trials, particularly RECORD 4, Defendants' had facilitated publication of RECORD 4 in The Lancet on May 5, 2009 with Turpie et al.[299] Andrea Kollath would later testify that she did not know whether Janssen or Bayer ever informed The *Lancet* that FDA deemed the RECORD 4 data unreliable.[300]

284. Turpie (2009) described the success of the RECORD 4 study for total knee replacement surgery patients for VTE-P when compared to enoxaparin, including XARELTO's superiority and reduced risk: "Head-to-Head study shows once-daily XARELTO is the only oral anticoagulant to significantly reduce VTE event rates compared to twice-daily injectable enoxaparin, whilst maintaining a similar low rate of major bleeding." [301] The FDA's subsequent finding of 'unreliability' of RECORD 4, as a result of DSI auditing the investigation sites and Bayer, would have significantly impacted the clinical value of the publication for physicians, as well as impede the ability of Janssen sales force to distribute this reprint (and a later 2013 updated reprint) to physicians to market Xarelto in the United States. It would also have informed other regulatory agencies, including the EMA, that FDA's inspection of the RECORD 4 sites and Bayer confirmed the RECORD 4 data to be unreliable.

285. There is a May 6, 2013 email from Charles Seife, a journalism professor at NYU and journalist writing for ProPublica, who contacted Dr. Fisher with questions regarding RECORD 4. The email provided: "As you might know, according to US FDA records, there were a number of audits of the study… I also have little doubt that you as scientists have fairly strong opinions about FDA's decision to declare the RECORD 4 study unreliable…" [302] Dr. Fisher forwarded the email to Turpie, who then wrote a follow-up email to Scott Berkowitz on May 6, 2013 providing: "There seems to be some serious allegations regarding the conduct of the trial that neither I or the Steering Committee were aware of. Please let me know how we should proceed." On May 9, 2013, Berkowitz forwarded the email to Sigmond Johnson and Troy Sarich "For our call tomorrow AM".[303]

286. Despite the *Lancet* publication in 2009, the FDA in the United States eliminated RECORD 4 from its consideration for approval of the XARELTO VTE-P NDA regarding post-hip and knee replacement surgery. FDA also required that any mention of RECORD 4 be deleted from the XARELTO label.

287. On May 11, 2009, the PDUFA goal date was updated.  On May 20, 2009, Defendants responded to FDA's Request for Information about DMF 21592, DMF 21580, DMF

---

[299] Kollath depo 3/30/16 p. 273: L 18 – p. 276: L 12; Kollath Exhibit 21; Burton Exhibit 17; Derix 52
[300] Kollath depo 3/30/16 p. 272: L 23 – p. 273: L 6; Kollath Exhibit 21; Burton 17; Derix 52
[301] Derix Exhibit 52; Burton 17; Kollath 21
[302] Derix Exhibit 53
[303] Derix Exhibit 53

21581, and a CMC amendment was submitted to FDA for the trade blister packs (containers) for the Xarelto tablets.

288. On May 27, 2009, FDA issued its NDA "Complete Response" (CR) Letter to Janssen stating that XARELTO could not be approved due to numerous concerns following FDA's DSI audit of RECORD 1, 2, 3 and 4.[304]  Also, FDA had remaining manufacturing issues about XARELTO.  FDA informed Defendant of all the remaining issues for the NDA, stopped review, and required the Sponsor to address the issues.

289. Regarding the clinical studies, FDA requested Janssen provide additional information pertaining to future plans for an audit program for RECORD.  Janssen submitted a response to FDA after a June 19, 2009 meeting.  It was decided that an independent third party would audit a representative number (*not all) of RECORD study sites. Bayer, not Janssen, had overseen the RECORD sites and data. Janssen would pay for the Falcon audit of the data and sites (see Falcon Audit below).

290. On July 8, 2009, Janssen submitted a proposed audit plan regarding an audit of 30 clinical sites across the entire RECORD program. The audit was to include all of the 18 higher enrolling sites ($\geq$ 60 randomized subjects), and 12 moderate enrolling sites (15-59 randomized subjects).  The 12 moderate sites (3 per study) were to be randomly selected by Janssen's statistics group from a common pool of sites.  None of the sites selected were previously inspected by DSI for the NDA.  The resulting sample size would represent 31% to 58% sampling (35 to 43 subjects) of sites, which enrolled more than 35 subjects.  The audit of 30 sites resulted in a total of 950 subjects with data audited out of 12,729 subjects, which constituted 7.5% of all subjects in the RECORD program database had data audited.[305]

291. Janssen attempted to salvage the RECORD 4 data, and proposed the entire RECORD 4 study data be re-analyzed and verified by Contract Research Organization (CRO) PAREXEL International (not Falcon Consulting, Inc.).  During the auditing process, a large number of previously unreported adverse events were identified for RECORD.[306]

292. On November 17, 2009, shortly after the FDA Complete Response Letter was received, Defendants circulated vi a email a Complete Response Scenario (strategy) to be considered by an ad hoc "CDT" meeting as to recommendations as to how the Defendants could best address the items in FDA's Complete Response Letter. One of the responses to address FDA's concerns was to develop and test a lower dose tablet based not on a requirement to conduct a clinical trial showing VTE-P efficacy in THR/THK patients, but through bioequivalence (BE) of a 2.5mg dose rivaroxaban tablet to the 10mg tablet based on (PK/PD) studies in normal volunteers.

293. The FDA's Complete Response Letter, besides having concerns about RECORD reliability, had referenced other issues for XARELTO which still needed to be addressed

---

[304] XARELTO_JANSSEN_02322190; Kollath Exhibit 11
[305] Burton Exhibit 10
[306] XARELTO_JANSSEN_02322190

by Janssen. Those issues involved quality control, drug manufacturing, chemistry, stability, and packaging. Another remaining issue was liver toxicity as part of updated safety information. FDA also wanted a lower dose tablet and information for special populations. The Defendant's Complete Response Scenario was designed with six basic components: 1) quality assurance through additional audits; 2) addressing potential risk of serious liver toxicity through expanded analysis of ongoing studies; 3) addressing product quality issues through chemistry manufacturing and control (CMC) measures; 4) providing plans to develop a lower dose formulation for use in special populations of patients; 5) revising draft labeling; and 6) providing FDA with a safety update[307].

294. For Defendants' additional testing in terms of XARELTO use in special populations, Defendants planned to conduct drug-drug interference (DDI) studies with strong Pgp in healthy volunteers; and combined CYP/Pgp inhibitors studies in patients with renal impairment.

295. In contrast to Defendants' contingency discussion in 2009, proactively drafting "Section 5.4 Laboratory Tests" to be prepared for label negotiation with FDA, (and which has never appeared in a XARELTO label through 2016), in a March 29, 2010 internal email from Anja Alpers, Bayer, to Young-Ling Liu, Janssen, with copies sent to members of both Bayer and Janssen, titled: "Subject "Antwort: A-GEST review-Assays for rivaroxaban (GDR34)," and an attached March 23, 2010 email on Assays for Rivaroxaban, Young-Ling Liu was told:

> *In genera we should avoid to talk too much about "monitoring of rivaroxaban" the underlying message that "no monitoring of rivaroxaban is required" needs to be kept. The lab tests which are described could be of assistance in specific clinical circumstances, but sometimes it reads that they should be used to monitor rivaroxaban. [308]*

296. Janssen proposed adding under Table 2 a statement that comparisons of Treatment Emergent Bleeding Event Rates were statistically significant between XARELTO and enoxaparin.[309] However, in terms of the reliability of this finding of superiority for data generated in RECORD, the "Audit Topline Results: 13/30 (43%) sites with 19 critical findings, 30/30 (97%) sites with 121 major findings (mean 4.0 per site); 293/945 (31%) of audited subjects with 578 possible missing AEs, monitoring assessment: 13/30 adequate (43%), 6/30 concern (20%); 11/39 inadequate (37%).[310]

297. There were multiple scenarios discussed and considered by Defendants for proceeding with obtaining NDA approval for XARELTO. One possible scenario for Defendants to address FDA's safety concerns and flaws of RECORD was to consider a new role for the ROCKET data for SPAF. The question was asked, "Do additional data from ROCKET justify waiting for completion of trial?"[311] Another major consideration by Defendants

---

[307] Burton Exhibit 42
[308] Burton Exhibit 52
[309] XARELTO_JANSSEN_05911803; XARELTO_JANSSEN_05911804
[310] Burton Exhibit 42 at slide 11
[311] Burton Exhibit 42 at slide 12

was ultimately the global interests of Bayer: "Which approach aligns best with global interests/interests of our partners?"  Of the potential submission scenarios open to Janssen, one also included just abandoning the VTE-P indication in the US and proceeding to other indications.  Another approach was to file defending the RECORD 1-4 data quality, but being willing to abandon RECORD 4 data if FDA raised a concern.[312]  Of the scenarios proposed after May 2009, the quickest route to the US market for Janssen appeared to be to proceed with submitting its response and not waiting for ROCKET data to be available.  This projected NDA re-filing of the VTE-P NDA in 2009.  If Janssen waited to have ROCKET data available before filing, this delayed the filing date to at least 2010.[313]

298.    According to Janssen's "Scenario Summary" to file an NDA with FDA using the current available RECORD data ('Pre-ROCKET') would cost Janssen no additional cost, with filing and approval in 4Q2009, but carried only a 20% chance of success.  For Defendants to wait until the 'Post- ROCKET data' was available also cost Janssen nothing, but the NDA filing would be delayed until 4Q2010; however, it had a 40% chance of success.  The highest positive chance for obtaining an NDA approval for VTE-P (80 %) would be Janssen conducting a new pivotal study, but at a cost of $66 million and delayed filing until 2 Q12.  Another highly positive scenario (70%) was to re-monitor all RECORD sites at a cost of $22.5 million with filing and approval still delayed until 1Q12.  The final alternative scenario was simply to abandon the VTE-P indication which would be a loss of sales, an option not accepted by Janssen.[314]

299.    Janssen submitted its official response to FDA's May 2009 NDA Complete Response Letter on December 23, 2010. Over that period working on an acceptable response for FDA, Janssen's Judy Kinaszczuk, Andrea Kollath and Sanjay Jolata continued to work on the 'Labeling Contingency Document' for discussions between Bayer and FDA when XARELTO was NDA approved for VTE-P in hip and knee replacement surgical patients in the United States.[315]

- **Defendants Hired Falcon Consulting to Audit 30 Selected RECORD Sites and Parexel to Audit RECORD 4**

300.    Following Janssen's May 27, 2009 Complete Response Letter, FDA and Janssen reached an agreement that an 'independent' audit program of RECORD should be conducted to verify the data.  Janssen hired the Falcon Consulting Group.[316]  According to Andrea Kollath, Janssen RA, Janssen paid for the Falcon audit.  Although it was called "independent" Janssen was able to review, comment and generate amendments to the final Falcon report submitted to FDA.[317]

---

[312] Burton Exhibit 42
[313] Burton Exhibit 42
[314] Burton Exhibit 42
[315] XARELTO_JANSSEN_05911803; XARELTO_JANSSEN_05911804; XARELTO_JANSSEN_05911809.
[316] Kollath depo 3/30/16, p. 218, L 10-15.
[317] Kollath depo 3/31/16, p. 459: L 5 – p. 465: L 24.

301. Falcon Consulting was selected by Janssen to audit the RECORD sites since it had no previous association with the rivaroxaban development program and no current contracts with either Janssen or Bayer.[318] On August 5, 2009, DSI indicated it would accept the number of sites and number of subjects to be audited at each site. On March 5, 2010, Janssen submitted Meeting Background Information (Briefing Document) in for a face-to-face meeting with FDA on April 7, 2010.[319] The document was addressed to R. Dwaine Rieves, MD, Director, Division of Medical Imaging and Hematology Drug Products, CDER for a Type C meeting on April 7, 2010. The cover letter also references an earlier Type A meeting on January 18, 2010 held to discuss the results of the independent audit by Falcon Consulting Group and proposed verification activities.[320]

302. Defendants received the FDA's preliminary responses to the submitted Briefing Document on March 31, 2010. The FDA's comments were widely emailed throughout both Bayer and Janssen.[321] The response from the FDA appeared to be encouraging and as a result, Defendants continued to plan to participate in the meeting with FDA.

303. Janssen's briefing document provided FDA with only a summary of Falcon's audit findings. It did not provide FDA with the complete Falcon Audit Report. As a result, the FDA's minutes of the April 7, 2010 Type C meeting, and FDA's comments sent to Janssen before the meeting, indicated that the FDA would not agree with Janssen's conclusions that Falcon's audit supported the integrity of the RECORD data without access to the full data.

304. Janssen proposed conducting additional data verification and sensitivity analyses of RECORD 4.[322] FDA's position was that without the agency (DSI) having access to the full Falcon Audit Reports, no determination would be made about the reliability of the RECORD studies in terms of supporting (or not supporting) NDA approval.[323] FDA indicated it was unable to answer Janssen if additional analyses and auditing would be necessary and/or beneficial[324]. FDA asked Janssen to explain how Parexel was chosen to conduct additional auditing of RECORD 4, and to explain to FDA how the proposed methodology to be used by Parexel was validated and characterize what Janssen would consider an "acceptable outcome of these additional studies."[325]

305. Janssen submitted the Falcon audit reports to FDA on April 19, 2010 as well as copies of Bayer's internal company audits. As stated above, the Complete Response letter from Janssen was submitted on December 23, 2010.[326] The Falcon Audit data was reviewed by FDA's Susan D. Thompson, MD, Medical Officer, Good Clinical Practice Branch II, Division of Scientific Investigations, on May 24, 2011. Her review was forwarded to

---

[318] Burton Exhibit 10
[319] Burton Exhibit 10
[320] Kollath Exhibit 13
[321] Derix Exhibit 43
[322] Derix Exhibit 44; Derix Exhibit 46
[323] Derix Exhibit 44
[324] Derix Exhibit 44
[325] Derix Exhibit 44
[326] Burton Exhibit 10

Tyree Newman, Regulatory Project Manager, Min Lu, MD, Medical Officer, Division of Hematology Products.[327]

306. Bayer's Good Clinical Practice (GCP) Study Audit Management for the RECORD 1-4 studies classified 69 reports as routine. Review of Bayer's audit reports for the clinical investigator sites (which both Falcon and/or DSI considered data unreliable) (when available) in RECORD showed that the majority of time violations considered significant by DSI or Falcon were not reported in Bayer's audit report. Significant deficiencies at the investigation sites of Drs. Lenart (RECORD 1), Porvaneckas (RECORD 1), Nararrete (RECORD 2) and Buettner (RECORD 4), described in Falcon's audit reports were not mentioned in Bayer's audit reports.[328] Based on DSI's review of Falcon audit reports, Falcon auditors stated that overall study monitoring was deficient at one (1) of 11 (9%) sites in RECORD 1, two (2) of seven (7) (29%) sites audited in RECORD 2, one (1) of three (3) (33%) sites audited in RECORD 3, and four (4) of nine (9) (44%) sites audited in RECORD 4.[329] FDA concluded that "Overall, monitoring deficiencies were noted for all 4 RECORD studies; however, in comparison to RECORD 1-3, the extent and scope of monitoring deficiencies noted for RECORD 4 are considered more significant and raise concerns regarding pervasiveness of monitoring deficiencies for other sites not inspected or audited…"[330]

307. For Adverse Event (AEs) Reporting, the Falcon audit found only two (2) of the 30 audited sites had no unreported adverse events identified during the audits. The number of unreported AEs ranged from one (1) to 54 per site. Eight unreported serious AEs (SAEs) were identified at the RECORD 4 site. The total number of unreported AEs for each RECORD study with "Significant" findings as defined by DSI were: RECORD 1 - 110, 16 significant; RECORD 2 – 131, 24 significant; RECORD 3 – 37, two (2)+ significant; RECORD 4 – 265, 61 significant; Total RECORD studies 543, 103+ significant. There were a total of 603 unreported AEs identified for sites in all four (4) RECORD studies.[331]

308. According to Defendants' "XARELTO PTE Appendix of Significant Regulatory Activities_44250621(1) (2) AK Comments.DOC", on April 27, 2010, an FDA Warning Letter was sent to Craig Buettner regarding conduct of a Study. On April 30, 2010 FDA issued a letter titled "Notice of Initiation of Disqualification Proceeding and Opportunity to Explain" sent to Dr. David Craig Loucks.[332]

- **Defendants Address Liver Toxicity by Unblinding and Pooling XARELTO Clinical Studies**

---

[327] Burton Exhibit 10
[328] Burton Exhibit 10
[329] Burton Exhibit 10
[330] Burton Exhibit 10
[331] Kollath Exhibit 14
[332] XARELTO_JANSSEN_06628658

309. On July 14, 2009, FDA recommended a new Liver Adjudication Panel (NDA 22-406 Complete Response Clarification Meeting Minutes- June 19, 2009).[333] In terms of FDA's concerns about the post-market long-term risk of liver toxicity with rivaroxaban, on October 13, 2009 Defendants received FDA's comments on the proposed liver adjudication Panel Procedural Charter (NDA 22.406 Complete Response Clarification Meeting Minutes).[334] FDA held a November 13, 2009 meeting with Defendants and requested "unblinded liver cases of interest" in the clinical trials. FDA said that it must see unblinded liver data from the rivaroxaban clinical studies in order to be able to complete its review and approval of the NDA for VTE-P. FDA indicated that VTE-P in total hip replacement (THR)/total knee replacement (THK) is an unusual approval request for FDA because Defendants were requesting approval of only a short-term orthopedic claim. However, the drug may be prescribed for longer periods. Therefore, in terms of showing potential 'safety' of rivaroxaban for the liver, FDA needed to have access to data longer than provided by RECORD. FDA proposed that liver toxicity risk information could be obtained from Defendants' other ongoing longer term studies.[335]

310.  At the time of FDA's review of liver data in November 2009, Janssen's clinical trials had received reports of 72 cases in which the patient had evidence of liver impairment and adjudicated: J-ROCKET - six (6) cases; ROCKET-AF - 39 cases; ATLAS ACS 2 TIMI 51- five (5) cases; MAGELLAN - 15 cases; and EINSTEIN – seven (7) cases. Defendants also had one case of ALT>8x from its EINSTEIN Extension study. All these liver cases with rivaroxaban had been reviewed by three reviewers, with 28/73 (38%) considered possible or probably related by at least one reviewer to rivaroxaban.[336]

311. On January 13, 2011, Defendants submitted Liver Related Safety Information from the following studies: ROCKET AF 11630, J-ROCKET 12620, EINSTEIN 11702, EINSTEIN Extension 11899 and EINSTEIN PE 11702.[337]

312. On May 3, 2011, FDA requested Bayer pool Adverse Events Analysis Dataset for EINSTEIN DVT-11702, Extension-11899, and EINSTEIN PE-11702. The Cutoff date was December 31, 2010.[338] This response was on May 6, 2011, as a result of FDA's Information Request of April 27, 2011. Bayer did submit pooled Adverse Events for EINSTEIN DVT Extension (11899) and EINSTEIN PE (11702).[339]

313. On May 17 and May 19, 2011, FDA had information requests for tables for SAEs, AEs, Bleeding Events and Drug-Related AEs based on an integrated safety analysis of RECORD 1-3, excluding RECORD 4. The response was May 25, 2011.[340]

---

[333] XARELTO_JANSSEN_06628658
[334] XARELTO_JANSSEN_06628658
[335] Burton Exhibit 42
[336] Burton Exhibit 42
[337] XARELTO_JANSSEN_06628658
[338] XARELTO_JANSSEN_06628658
[339] XARELTO_JANSSEN_06628658
[340] XARELTO_JANSSEN_06628658

- **FDA's Meeting Held to Remind Defendants to Avoid Data Credibility Issues in ROCKET-AF Studies**

314. A meeting was requested by FDA with Defendants which was held September 29, 2009.[341]  The FDA wanted to attempt to prevent the same types of credibility problems being identified with Bayer's RECORD studies from occurring in Janssen's ROCKET study (for prevention of stroke and systemic embolic in patients with non-mechanical atrial fibrillation (SPAF).  The FDA held its meeting with Defendants to reinforce to Janssen that it needed to ensure the conduct and monitoring of the global ROCKET-AF trial would be adequate enough to support NDA approval.  As a result, the ROCKET-AF study had a "Plan for Additional Monitoring of High-Risk Sites" dated February 19, 2010.[342]  ROCKET was intended as an international clinical investigation that would be conducted and monitored by Janssen.  Janssen approved the use of additional monitoring visits for each of its high risk sites for ROCKET.  The Contract Research Organization (CRO) was with Parexel.  Parexel would maintain the patient reports and data for ROCKET.[343]

- **Defendants Requested to Provide Foreign XARELTO Data to FDA**

315. FDA requested to receive a copy of the European label on August 7, 2008, with a European Final Summary of Product Characteristics (SPC) on August 11, 2008.  On November 9, 2010 the FDA still was asking Defendants Foreign Labeling Questions.[344]

- **Defendants Plan to Request a Future Meeting with FDA to Obtain Guidance and Concurrence on Potential Dose Reduction in Special Populations**

316. The Defendants "XARELTO PTE Appendix of Significant Regulatory Activities _4425062(1)(2) AK comments"[345] has a September 2, 2010 entry:

> *Type C meeting Request to obtain guidance and concurrence from the Agency regarding the rivaroxaban exposures in special populations of interest and potential dose reduction.[346]*

317. It does not appear that this meeting was requested and/or occurred since a Type C meeting with this title is not listed on Defendants' chronology of significant regulatory activities.

- **Defendants Participate in CardioRenal "Drug-to-Drug Interference" Meeting**

---

[341] Kolalth Exhibit 23
[342] Kollath Exhibit 24
[343] Kollath depo 3/30/16 p. 299: L 20 – p. 306: L 18
[344] XARELTO_JANSSEN_06628658
[345] XARELTO_JANSSEN_06628658
[346] XARELTO_JANSSEN_06628658

318. On September 13, 2010, a CR Renal DDI Study Meeting Request (telecom) – with an FDA meeting Granted letter Attached – resulted in a Type C meeting Teleconference Scheduled for October 14.  On October 14, 2010 there was a Summary of FDA teleconference on Renal DDI Studies Meeting.

## VI.   DEFENDANTS SUBMITTED 'COMPLETE RESPONSE' AND DRAFT XARELTO VTE-P LABEL TO FDA ON DECEMBER 27, 2010

319. Defendants' December 27, 2010[347] Complete Response included its latest proposed draft label in its Module 1.14.1.  The label proposed deletion of the Black Box Warning regarding Spinal and Epidural Hematoma, which Defendant referred to as outdated.  There was no **Section 5.4 Laboratory Tests.** Defendant also modified **Section 12.2 Pharmacodynamics as follows** (underlining indicates new wording):

> *Routine monitoring of coagulation parameters is not required with XARELTO use. Dose-dependent inhibition of factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently.  Anti-factor Xa activity is also influenced by rivaroxaban. The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated.  If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended.  The Neoplastin PT assay was measured in the RECORD program and the median (with 5/95 percentiles) for PT (Neoplastin) 2 to 4 hours after tablet intake (i.e. at the time of maximum effect) was 18 (13 to 26) seconds.  The International Normalized Ration (INR) should not be used for measuring rivaroxaban pharmacodynamics effect.[348]*
>
> *Cardiac Electrophysiology: In a thorough QT study in healthy men and women aged 50 years and older, no QTc prolonging effects were observed for XARELTO (15 mg and 45 mg, single dose)[349]*

## a.   DEFENDANTS RECEIVE FDA'S LABEL COMMENTS ON JUNE 13, 2011

320. On June 13, 2011, FDA's Tyree Newman sent Andrea Kollath, Janssen Regulatory Affairs, the Agency's proposed redlined version (revisions) for Janssen's draft XARELTO label.  The FDA requested to receive Janssen's comments by close of business (COB) on June 16.[350]  Janssen could have opted to make all of the FDA's requested label changes immediately with no further discussion.  However, it chose to continue to negotiate a more favorable label.  Defendants also could have opted to voluntarily include the Section 5.4 Laboratory Tests, which was earmarked as a contingency *if requested by FDA*. Defendants have the responsibility to ensure the adequacy of its own commercial label, not the FDA.  The FDA attempts to negotiate the best label in terms of public health and to ensure that the label accurately reflects the

---

[347] XARELTO_JANSSEN_00054178
[348] XARELTO_JANSSEN_00054184
[349] XARELTO_JANSSEN_00054184
[350] XARELTO_JANSSEN_05852122; XARELTO_JANSSEN_01252499; XARELTO_JANSSEN_01252500

information considered for NDA approval.  The FDA (unlike the NDA sponsor) negotiates a new label under the time constraints of attempting to meet the PDUFA Goal deadline for approval of the NDA. XARELTO for VTE-P had a PDUFA Goal of July 3, 2011 (a Sunday), with July 4, 2011 being a holiday falling on Monday.  Therefore, XARELTO's NDA approval letter was sent out by FDA on the Friday before a three-day weekend and government holiday.  Thus, there was additional urgency for the FDA to be efficient in its negotiations and get the label completed before the holiday and PDUFA goal.

321. As of June 13, 2011, the FDA returned the Black Boxed WARNING: SPINAL/EPIDURAL HEMATOMA to the draft label.  In DOSAGE and ADMINISTRATION, FDA added a new paragraph about administration of XARELTO via GI feeding tube and a new **Section 2.1 "Use with P-gp and strong CYP 3A4 inducers**"; and to **CONTRAINDICATIONS**, FDA added "hypersensitivity to XARELTO" and "active major bleeding hepatic disease associated with coagulopathy leading to bleeding risk."  Under the heading "**Section 5.2 Risk of Bleeding,**" FDA added the following statements:

> *Major hemorrhages including intracranial, epidural hematoma, gastrointestinal, retinal, and adrenal bleeding have been reported.  Use XARELTO with extreme caution in conditions with increased risk of hemorrhage, such as congenital or acquired bleeding disorders, active ulcerative gastrointestinal disease, uncontrolled hypertension, recent hemorrhagic stroke, or recent brain, spinal, ophthalmological surgery, or labor and delivery.*

> *Concomitant use of drugs affecting hemostasis increases the risk of bleeding, these include such as platelet aggregation inhibitors, other antithrombotic agents, fibrinolytic therapy, thienopyridines and chronic use of non-steroidal anti-inflammatory drugs [NSAIDS][351]*
> *...*
> *See Drug Interactions (7.4), (7.5), (7.6)] Bleeding can occur at any site during therapy with XARELTO. An unexplained fall in hematocrit or blood pressure should lead to a search for a bleeding site....[352]*

322. FDA added a new **Section 5.3 Risk of pregnancy related to hemorrhage**, **Section 5.4 Renal Impairment,** and **Section 5.5 Hepatic Impairment with Laboratory Abnormalitie**s.  Specifically, FDA recommended laboratory tests for patient monitoring of coagulation abnormalities, liver function and thrombocytopenia, which is done with the use of routine laboratory tests:

> *Patients who develop increased transaminase levels should be monitored until the abnormalities resolve.  Should an increase in ALT or AST of >3 times ULN persist or symptoms develop, discontinuation of XARELTO is recommended.  XARELTO should be used with caution in patients who have a history of liver disease [see Laboratory Abnormalities (5.1)]*

---

[351] XARELTO_JANSSEN_05852123
[352] XARELTO_JANSSEN_05852123

*Patients who develop thrombocytopenia of any degree should be monitored closely [see Laboratory Abnormalities (5.1)][353]*

323. Under **Section 6. ADVERSE REACTIONS**, FDA added **Section 6.1 Adverse reactions in clinical trials**, including the statement:

*Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in clinical practice.*

**Hemorrhage**

*The most common adverse reactions with XARELTO were bleeding complications [see WARNINGS AND PRECAUTIONS (5.1)]. The rates of major bleeding events, major bleeding events combined with non-major bleeding events and any bleeding events observed in patients in clinical trials are/is shown in Table 1.*

*Table 1. "Treatment Emergent Bleeding Events in Patients Undergoing Hip or Knee Replacement Surgeries Rates"*

**FDA Comment [A5]:** *Sponsor define bleeding events;*

**Comment [A6]:** *Sponsor: add minor bleeding numbers [so Table 1]*

324. FDA added:

*Following XARELTO treatment, the majority of major bleeding complications (>60%) occurred during the first week of surgery[354]*

325. FDA inserted into this section a discussion of clinical conditions associated with characteristic 'laboratory parameters' and 'liver and clotting function monitoring' for patients taking XARELTO:

**Elevations of Serum Aminotransferases…**

*Patients who develop increased transaminase level should be monitored until the abnormalities resolve. Should an increase in ALT or AST of >3 times ULN persist of symptoms develop withdrawal of XARELTO is recommended. XARELTO should be used with caution in patients who have a history of liver disease.*

**Thrombocytopenia**

*Platelet counts < 100,000/mm³ or a decrease 50% from baseline occurred at a rate of 2.5% in patients given XARELTO and 2.6% in patients given enoxaparin in the clinical trials. Platelet counts less than 50,000/mm³ occurred at a rate of 0.1% in patients given XARELTO and 0.1% in patients given enoxaparin. There were 10*

---

[353] XARELTO_JANSSEN_05852123

[354] NDA eCTD Module 5.3.5.3.8 Integrated Summary of Safety at Section 1.5.1.6.1.2 (XARELTO_BHCP_00006185); XARELTO_JANSSEN_05852123

*(0.2%) and 9 (0.2%) cases of reported thrombocytopenia events on rivaroxaban and enoxaparin, respectively and 7 (0.1%) and 7 (0.1%) cases of reported platelet count decreased events on rivaroxaban and enoxaparin, respectively*

*Thrombocytopenia of any degree should be monitored closely.*[355]

326. FDA added a recommendation for monitoring of patients on XARELTO even for the short-term use for VTE-P.  FDA continued its changes to the draft label based on Defendants NDA Integrated Summary of Safety:

> **Other Adverse Reactions**
>
> *The other most common ADRs (reported by ≥5% of patients receiving XARELTO in the clinical studies were nausea (12.7%), vomiting (9.8%), post-procedural hemorrhage (8.1%) and anemia (6.6%)*[356]

327. FDA added the following adverse drug reactions (ADRs) that occurred in <1% of XARELTO-treated patients in the clinical RECORD studies pooled safety data. Blood and lymphatic system disorders: hemorrhagic anemia, thrombocytopenia, etc.  There was also a table of **Laboratory Abnormalities in Clinical Studies**. In **Postmarketing Experience,** FDA added a list of organ system areas with reports secondary to use of XARELTO.  FDA revised the **Drug interactions descriptions**.[357]

328. FDA requested XARELTO be a Pregnancy Category C drug, while Defendants had originally proposed it as Pregnancy Category B.  FDA re-wrote Defendants' proposed Section 8.2 Labor and Delivery to add new warnings for 8.2 Labor and Delivery, 8.3 Nursing Mothers, and to 8.4 Pediatric Use. FDA added: "Safety and effectiveness in pediatric patients have not been established".[358]

329. For **Geriatric Use**, FDA's **Comment [A8]** stated as follows: "Note to sponsor: Format this section per CFR 201.57(H)(v)."  FDA added the sentence, "In clinical trials the efficacy of XARELTO in the elderly (65 years or older) was similar to that seen in patients younger than 65 years", but then completely re-wrote the section's two paragraphs, removing any reference to RECORD.[359] FDA recommended assessment of renal function before starting XARELTO in **all** patients 65 years of age and older, and that they should be **followed closely during** XARELTO treatment and "**promptly evaluate** any signs or symptoms of blood loss."  These are instructions from FDA for monitoring patients >65 years of age :

---

[355] XARELTO_JANSSEN_05852123
[356] NDA eCTD Module 5.3.5.3.8 Integrated Summary of Safety at Section 5.1.1.10 (XARELTO_BHCP_00006185); XARELTO_JANSSEN_05852123
[357] XARELTO_JANSSEN_05852123
[358] XARELTO_JANSSEN_05852123
[359] XARELTO_JANSSEN_05852123

*Of the total number of patients in the clinical studies of XARELTO, about 53% were 65 years and over, while about 15% were 75 years and older.[360]As would be expected, both thrombotic and bleeding event rates were higher in these older patients as compared to younger patients, but the efficacy and safety results versus enoxaparin were similar to those observed in younger patients.  Exercise caution when using XARETLO in elderly patients, paying particular attention to concomitant medications (especially anti-platelet medication).[see Clinical Pharmacology (12.3) and Clinical Studies (14)]*

*Elderly subjects exhibited an increase in exposure that may be caused by age related changes in renal function.  All patients 65 years of age and older should have an assessment of renal function prior to starting therapy with XARELTO and should be followed closely during treatment.  Promptly evaluate any signs or symptoms of blood loss (e.g. a drop in hemoglobin and/or hematocrit or hypotension) [see Clinical Pharmacology (12.3)] ...[361]*

330. FDA also re-wrote Defendants' proposed draft **Section 8.6 Females of Reproductive Potential**, **Section 8.7 Renal Impairment**, adding:

*Compared to healthy subjects with normal creatinine clearance, rivaroxaban exposure increased in patients with renal impairment. Increases in pharmacodynamics effects were also observed.[362]*

331. FDA continued to notify health care providers to "**observe closely" (i.e., monitor) and "promptly evaluate any signs or symptoms of blood loss**" including a drop in hematocrit/hemoglobin (i.e. laboratory tests) as well as the risk for "increased exposure" to XARELTO in certain patients:

*Patients with any degree of renal impairment with concurrent use of P-gp and weak to moderate CYP 3A4 inhibitors may have increases in exposure which may increase bleeding risk*

*The combined analysis of the RECORD studies did not show an increase in bleeding risk for subjects with moderate renal impairment and reported a possible increase in total VTE in this population.  Observe closely and promptly evaluate any signs or symptoms of blood low (e.g. a drop in hemoglobin and/or hematocrit or hypotension) in patients with moderate renal impairment (CrLcCRL 30-50 mL/min [   ]. Avoid the use of XARELTO in in given patients with severe renal impairment (CLrcCrl<30mL/min [ ]).*

*XARELTO should be used in caution in patients with moderate renal impairment (CrCL 30 to <50 mL/min) who are also receiving certain specific concomitant*

---

[360] NDA eCTD Module 5.3.5.3.8 Integrated Summary of Safety at Section 1.4 (XARELTO_BHCP_00006185); XARELTO_JANSSEN_05852123
[361] XARELTO_JANSSEN_05852123
[362] XARELTO_JANSSEN_05852123

*medications (e.g. strong CYP3A4 inhibitors) since the combination may lead to clinically relevant increased rivaroxaban concentrations[363]*

332. **Section 8.8 Hepatic Impairment** was also re-written by FDA, with the following statements, including reference to "*coagulopathy*." The diagnosis of coagulopathy can be considered based on symptoms, but a coagulopathy and the type of coagulopathy is clinically characterized and confirmed only by use of blood work with diagnostic coagulation laboratory work. The work-up included looking at liver function, patients' clotting cascade (external, intrinsic and common) and coagulation factors, and platelet function - i.e., laboratory monitoring.

> *Compared to healthy subjects with normal liver function, significant increases in rivaroxaban exposure were observed in subjects with hepatic impairment. Increases in pharmacodynamics effects were also observed. [364]*

> *…In addition, avoid the use of XARELTO should be avoided in any degree of hepatic disease associated with coagulopathy [see WARNINGS and PRECAUTIONS (5.2, 5.3)[365]*

333. For **Section 10 OVERDOSAGE** FDA added and commented on the section as initially proposed by Defendants:

> *Overdose of XARELTO may lead to hemorrhagic complications. A specific antidote of rivaroxaban is not available. Discontinue XARELTO treatment and initiate appropriate therapy if bleeding complications associated with overdosage occur. The use of activated charcoal to reduce absorption in case of XARELTO overdose may be considered. Due to high plasma protein binding rivaroxaban is not expected to be dialyzable.*

> *[FDA] Comment [A9]: Sponsor: What data exists for treatment of an overdose?*

> *[FDA] Comment [A10] Sponsor: What do you do for cases regarding an overdose?[366]*

334. The statement in the FDA's proposed label for **Section 12.2 Pharmacodynamics**, added only a single sentence to the draft section. FDA made no request that the information proposed be removed. FDA made no comments. Therefore, based on this draft document received from FDA, as the Pharmacodynamics section was originally drafted by Defendants in 2008, then 2009, and again in 2011, the contents were acceptable to FDA even with the reference to RECORD. The only later change leading to launch was to improve the format (structure), not change the underlying content. As proposed by the FDA in June 13, 2011, Defendants added the underlined statement about lack of adequate study by Defendants:

> *Routine monitoring of coagulation parameters is not required with XARELTO use.*

---

[363] XARELTO_JANSSEN_05852123
[364] XARELTO_JANSSEN_05852123
[365] XARELTO_JANSSEN_05852123
[366] XARELTO_JANSSEN_05852123

*Dose-dependent inhibition of factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently.  Anti-factor Xa activity is also influenced by rivaroxban. The relationship between PT and rivaroxaban plasma concentration is linear and closely related.  If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT(measured in seconds) is recommended.  The Neoplastin PT assay was measured in the RECORD program and the median (with 5/95 percentiles) for PT (Neoplastin) 2 to 4 hours after tablet intake (i.e. at the time of maximum effect) was 18 (13 to 26) seconds.  The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect. The predictive value of these coagulation parameters for relevant bleeding risk or efficacy has not been adequately studied.*

*Cardiac Electrophysiology: In a thorough QT study in healthy men and women aged 50 years and older, no QTc prolonging effects were observed for XARELTO (15 mg and 45 mg, single dose).[367]*

335. In **Section 12.3 Pharmacokinetics**, FDA made changes to **Absorption** describing what Defendants referred to as "*flip flop*" or paradoxical pharmacokinetics (PK) based on the location of a patient's absorption of XARELTO in the GI tract:

> *…. Absorption of rivaroxaban is dependent on the site of drug release in the GI tract. A 29% and 56% decrease in AUC and $C_{Max}$ compared to tablet was reported when rivaroxaban granulate is released in the proximal small intestine.  Exposure is further reduced when drug is released in the distal small intestine, or ascending colon.  Therefore, avoid administration of rivaroxaban via a method that could deposit drug directly into the proximal small intestine (e.g. feeding tube) which can result in reduce absorption and related drug exposure and should be avoided [see Dosage and Administration (2.1)][368]*

336. For **Special Populations**, Defendants had written for '**Gender and Race**' that there was no clinically relevant effect on pharmacokinetics or pharmacodynamics. [369] FDA wrote there was a difference for "Race" in terms of the Japanese handling of XARELTO as well as age in elderly patients based on renal impairment:

*Race*

*Healthy Japanese subjects were found to have 50% higher exposure compared to other ethnicities including Chinese.*

*Elderly*

*In clinical studies, elderly subjects exhibited higher rivaroxaban plasma concentrations than younger subjects with mean AUC values being approximately 1.5/50%-fold higher, mainly due to reduced (apparent) total body and renal*

---

[367] XARELTO_JANSSEN_05852123
[368] XARELTO_JANSSEN_05852123
[369] XARELTO_JANSSEN_05852123

> *clearance. Age related changes in renal function may play a role in this age effect. The terminal elimination half-life is 11 to 13 hours in the elderly.*
>
> *Therefore, all patients greater than 65 years of age should have an assessment of renal function prior to starting therapy with XARELTO and should be observed closely. Promptly evaluate any signs or symptoms of blood loss (e.g. a drop in hemoglobin and/or hematocrit or hypotension) ...[370]*

337. FDA's **Comment [A11]** to **Section 14 Clinical Studies** regarding the removal of RECORD 4 and unreliable sites in RECORD 1-3 as follows:

> *Note to Sponsor: the Office of Scientific Investigation has determined that the results from RECORD 4 are unreliable. Please remove all references to RECORD 4 trial in Section 14. The Office of Scientific Investigations has also determined several clinical sites from RECORD 1-3 studies are unreliable. Please remove the results from the unreliable sites in RECORD 1-3 studies from Section 14.*

> *Table 5- **Comment [A12]:** Note to Sponsor. Define major VTE*

> *Table 6 \*\* Note to Sponsor include the definition of major VTE[371]*

**b. DEFENDANTS' JUNE 16, 2011 RESPONSE PROPOSED SIGNIFICANT CHANGES TO COUNTER FDA LABEL CHANGES, TO WHICH FDA PROVIDED FEEDBACK ON JUNE 24, 2011**

338. On June 16, 2011, Defendants' Labeling Working Group (LWG) and the Product Expert Team (PET) members discussed the FDA's June 13, 2011 tracked changes for the draft label Janssen had submitted. [372] On the same day, Janssen, via Andrea Kollath, Director of Regulatory Affairs, responded to Tyree Newman at FDA to provide her with Janssen's initial label revisions. The changes included changing the Sponsor's name on the label from "Ortho-McNeil-Janssen Pharmaceuticals" (OMPJA) to "Janssen Pharmaceuticals" effective June 22, 2011. Janssen provided FDA with its June 6, 2011 RECORD 1-4 justification.pdf[373] to provide support to retain RECORD 4 and selected portions of RECORD 1, 2 and 3 in the label. There is a June 16, 2011 email from Andrea Kollath to Tyree Newman "Subject RE: NDA 22 406 FDA label review," which was sent widely by Ms. Kollath throughout Bayer and Janssen on June 17, 2011, Subject FW: NDA 22406 FDA label review, attachments RECORD 1-4 justification. Pdf; 6-16-2011 J&J Sponsor response to FDA NDA 22406 label comments_6 13 11.doc.[374]

339. Defendants agreed to FDA's request to make XARELTO Pregnancy Category C.[375] Subsequent to the Complete Response to the FDA Action Letter, the Sponsor requested input from two (2) external experts on pregnancy text submitted in the December 2010

---

[370] XARELTO_JANSSEN_05852123
[371] XARELTO_JANSSEN_05852123
[372] XARELTO_JANSSEN_05852123
[373] XARELTO_JANSSEN_00047239
[374] XARELTO_JANSSEN_01231195
[375] XARELTO_JANSSEN_01231199

USPI.  Attached were assessments from the two (2) external experts.  The sponsors also indicated acceptance of FDA's comments on the container carton and the blister pack labels which were to be submitted as proofs to the NDA the following week.  The Sponsor proposed to address the label's Highlights section once the Full Prescribing Information was more stable.  FDA was asked to look at the RECORD 1-4 Justification. [376]

340. Ms. Kollath, Janssen's Director of RA, and a Doctor of Veterinary Medicine, did not mention to FDA in its December 2010 response of the interaction for the label in June 2011 that the results of Defendants' RECORD 1 study were already published in the *NEJM* on June 26, 2008.  She testified that she was unaware if Janssen or Bayer ever told the NEJM or physicians that RECORD 1 had unreliable data.[377] The Defendants' Appendix of Significant Regulatory Activities containing the unreliable results of RECORD 4 had been published in May 5, 2009 by Turpie et al in Lancet.[378] Kollath testified that she does not know whether Janssen or Bayer ever informed the Lancet that FDA deemed the RECORD 4 data unreliable.[379] Janssen's Marketing Department was planning to provide the RECORD reprints to United States physicians to help support the "superiority" of XARELTO to enoxaparin for VTE-P despite a lack of 'superiority' in the flawed Bayer RECORD studies.[380] Such information about the inaccurate and misleading publications already being circulated for XARELTO could have permitted FDA the opportunity to request as a condition of NDA approval that Janssen and Bayer issue an official correction in both journals (NEJM and Lancet) in order to inform the editors and physicians that the data from RECORD was considered "unreliable" by the FDA, particularly RECORD 4.

341. Such an official correction of the official record for RECORD would also have alerted the EMEA and physicians (both in the United States and out) of the unreliability of the RECORD data.  When Defendants interacted with the EMA and other regulatory agencies, they continued to use the flawed and unreliable RECORD data as support for safety and efficacy of XARELTO, despite knowing of the flaws in the studies conducted by Bayer.

342. When Ms. Kollath was shown internal Janssen emails showing that employees were encouraged to use the published RECORD studies to promote XARELTO, she testified that, "A drug company should not promote using information that is inconsistent with the product label." [381] She also testified that if Janssen came to her today and proposed to use RECORD 4 to promote XARELTO, she would probably advise then not to, and agreed that it would be a violation.[382]

[376] XARELTO_JANSSEN_01231195
[377] Kollath depo 3/30/16 p. 259: L3 – p. 265: L11; Kollath Exhibit 18
[378] Kollath Exhibit 21; Burton Exhibit 17
[379] Kollath depo 3/30/16, p. 276: L1-12
[380] XARELTO_JANSSEN_05852123
[381] Kollath depo 3/31/16, p 509: L2 – p. 513: L10; p. 518: L16 – p. 526: L6
[382] Kollath depo 3/31/16, p. 595: L19 – p. 596: L11

343. According to Ms. Kollath, all data relating to RECORD 4 and the unreliable sites in RECORD 1-3 were removed from the XARELTO label at the insistence of the FDA and over Janssen's objections.[383]

344. Janssen proposed in its June 16, 2011 response to the FDA's June 13 comments substitution of "not recommended" instead of "avoid" throughout the label. Janssen also continued to propose removing the re-added "Black Boxed Warning re: spinal hematoma" as outdated.[384]  The Sponsor's response dated 6-15-11 states:

> *The boxed warning proposed by the Agency was applied to anticoagulants developed some time ago, when spinal or epidural anesthesia was less commonly practiced. This is no longer the case, and physicians are more aware of this potential complication in patients receiving, or having received anticoagulants. This is exemplified by the lack of a boxed warning for a recently approved direct thrombin inhibitor anticoagulant. As such, the Sponsor would propose to remove the boxed warning.[385]*

345. Janssen had indicated it did not propose to review the Highlights at that time. FDA's Comment [A2] in response was for the Sponsor to please revise to include relevant changes to section (Highlights)[386], and noted that the Sponsor proposed to address the Highlights section once Full Prescribing Information was more stable.[387] FDA's response also stated that "all revisions will need to be added to the Sponsor's USPI template before finalization." FDA's response on June 24, 2011, continued not to agree with the removal of the Black Boxed Warning.

346. Under the FDA's comment regarding Administration via GI feeding tube, it was noted that the Sponsor had responded:

> *Propose to accept as additions are based on extrapolated absorption data, but revised to state:*
> *Administration via ~~GI feeding~~ gastric tube [388]*

347. For Section 2.1 Use with P-gp and Strong CYP3A4 inducers, FDA suggested dose titration of 10 mg BID. J&J deleted FDA's statement and proposed its own: " ~~a XARELTO dose increase to 20 mg (i.e. 10mg tablets) should be considered  with the change~~ A XARELTO dose increase to 20 mg (i.e. two 10mg tablets should be considered if these drugs must be co-administered." It also proposed adding the statement "The 20mg should be taken with food."

---

[383] Kollath depo 3/30/16 p 251: L17 – p. 257: L1
[384] XARELTO_JANSSEN_00047238; XARELTO_JANSSEN_00047240
[385] XARELTO_JANSSEN_01231199
[386] XARELTO_JANSSEN_ 01231199
[387] XARELTO_JANSSEN_ 01231199
[388] XARELTO_JANSSEN_ 01231199

348. Defendants' Rationale for <u>10mg BID dosing</u> rather than <u>once a day dosing for this population group</u> was as follows:

> *Modeling data shows that twice daily rivaroxaban dosing for concomitant use with strong CYP3A4 inducers is more appropriate than once daily dosing to approximate equivalent exposure over the dosing interval and is being studied in the EINSTEIN CYP inducer study for confirmation.* [389]

349. FDA had requested that "hypersensitivity to XARELTO" be a CONTRAINDICATION for use.  Defendants responded on June 14, 2011:

> *During preparation of the initial NDA and the Complete Response to the FDA Action Letter, the sponsor reviewed all rivaroxaban cases of anaphylaxis and other serious hypersensitivity reactions.  Since there did not appear to be sufficient evidence to consider any of them causally related to rivaroxaban, no contraindication was proposed.  Can the agency clarify the basis for requesting this contraindication (e.g. which specific cases does the agency consider causally related to rivaroxaban)?*

> *Hepatic disease associated with coagulopathy: "Can the Agency clarify the basis for deleting this contraindication (e.g. was removal based on lack of actual data showing harm exceeds benefit for this situation)?"* [390]

350. For specific label changes, FDA had proposed on June 13, 2011 to add to **Section 5.2 Risk of Bleeding** types of major hemorrhages and the statement to "*Use XARELTO with extreme care.*"  Janssen now proposed to omit the references to types of medical conditions that increase the risk of bleeding based on it being common knowledge.  Instead Janssen wanted to include the risk factors for bleeding events.  The sponsor also proposed to omit the following from the statement: "Promptly evaluate any signs or symptoms of blood loss (~~e.g. a drop in hemoglobin and/or hematocrit or hypotension~~).  FDA agreed to the proposed change.

351. On June 15, 2011, the Sponsor responded:

> *Propose to retain the streamlined December 2010 submission format which does not list medical conditions which increase the risk of bleeding, as this is general medical knowledge* [391]

352. On June 14, 2011, the Sponsor responded: "Accept, but propose to delete the parenthetical test in the last sentence, as it is redundant to the preceding sentence, to state":

> *Promptly reevaluate any signs or symptoms of blood loss (~~e.g. a drop in hemoglobin and or hematocrit or hypotension~~).* [392]

---

[389] XARELTO_JANSSEN_ 01231199
[390] XARELTO_JANSSEN_ 01231199
[391] XARELTO_JANSSEN_01231199
[392] XARELTO_JANSSEN_01231199

353. For **Section 5.3 Risk of pregnancy related hemorrhage**, Janssen wanted to revise the section written by FDA to indicate that XARELTO should be used with caution in pregnant women and add: <u>only if the potential benefit justifies the potential risk to the mother and fetus….</u>

354. For **Section 5.5 Hepatic Impairment**, as written by FDA, the Sponsor response on June 15, 2011 was to accept as written but revise to add the conditions Child-Pugh B and C to state: "XARELTO is not recommended in patients with moderate (<u>Child-Pugh B</u>) or Severe- (<u>Child-Pugh C</u>) hepatic impairment…"[393]

355. Under **Section 6 Adverse Reactions**, Janssen requested further discussion with FDA on the exclusion of RECORD 4 data from the USPI and selected RECORD 1, 2, 3 site information deemed unreliable by OSI. In support of its position, Janssen provided the FDA with its "RECORD 1-4 Justification."  The FDA's June 24th response was that FDA accepted J&J's request to maintain a reference to the RECORD study in this section.  However, FDA did not accept inclusion of the data deemed unreliable by OSI.[394]

356. For **Section 6.1 Adverse Reactions in Clinical Trial**, the Sponsor proposed to add to the statement Ii randomized, controlled clinical trials (RECORD 1-4).  FDA's June 24th response accepted Janssen's request to maintain a reference to the RECORD study. The rationale from the Sponsor was that the Sponsor would be submitting for additional indications and wished to retain the name RECORD in order to differentiate from the studies used for other indications. These studies are referred in publications under the name RECORD, so retaining this name provided consistency with the literature.  Since the incidence of adverse reactions leading to permanent discontinuation of study drug is an important safety consideration, the Sponsor proposed to retain the following text at the beginning of section 6 and add as paragraph #3:

    ### *Drug Discontiuation in RECORD 1-2*

    *The overall incidence rates of adverse reactions leading to permanent discontinuation were lower for XARELTO (3.7%) than for enoxaparin (4.7%) primarily due to lower frequencies of DVT (0.3% vs 0.6%) and PE (0.2% vs 0.4%), respectively. Bleeding events were the most frequent adverse reactions leading to discontinuation of XARELTO and were similar to enoxaparin (0.8% vs. 0.6%), respectively.*"[395]

357. For **Section 6.1 Hemorrhage**, FDA's June 13, 2011 response edited Table 1, with FDA proposing the following categories: major bleeding event, non-major bleeding event, and any bleeding event.  Janssen was asked by FDA for Table 1 to "define bleeding events." FDA deleted all reference to hazard ratios (HR) and confidence intervals (CI) (statistical information) for rivaroxaban comparison with enoxaparin from Table.  The Sponsor responded on June 15, 2011:

---

[393] XARELTO_JANSSEN_01231199
[394] XARELTO_JANSSEN_01231199
[395] XARELTO_JANSSEN_01231199

*Accept, but modify the above last sentence to read: "The most common adverse reactions with XARELTO were bleeding complications [see Warnings and Precautions (5.1)]. The rates of major bleeding events, ~~major bleeding events combined with~~ non-major bleeding events, and any bleeding events observed in patients in clinical trials are ~~is~~ shown in Table 1.*[396]

358. Under Table 1, the Sponsor wrote on June 15, 2011:

*In the RECORD studies there was no categorization of bleeding events as minor. Bleeding events were categorized as major or no-major (with subcategories of clinically relevant non-major and any other non-major). If the sponsor understands the FDA proposal correctly the following categories of bleeding events will be included in Table 1:*

*Major bleeding event (with 4 subcategories)*

*Non-major bleeding event (with no subcategories)*

*Any bleeding event*

*Since the hazard ratios and confidence intervals for the rivaroxaban comparison with enoxaparin have been deleted from Table 1 the Sponsor proposes to add the following statement as a footnote to the table "No comparisons between XARELTO and enoxaparin were statistically significant (i.e. p<0.05).*

*Also, the footnote with the definition of major bleeding events appears mostly redundant with the subcategories in the table, so deletion is proposed.*[397]

*Following XARELTO treatment, the majority of major bleeding complications (≥ 60%) occurred during the first week after surgery.*[398]

359. There was a June 21, 2011 Teleconference with FDA with a summary written by FDA's Tyree Newman. The Action Items were that the "Sponsor requested a separate teleconference with the Clinical and Clinical Pharmacology reviewers to discuss concerns regarding comments noted in the label." She continued that "The Sponsor also requested a separate teleconference with DSI and Clinical Reviewers to discuss the RECORD 1-4 data." During the meeting the following was agreed:

*Only "Major Bleeding" and "Any Bleeding" will be addressed in Table 1 of the label and "Any Bleeding" will be defined by the Sponsor in a foot note. The agency will remove the comment, "Add minor bleeding numbers" from the label.*[399]

---

[396] XARELTO_JANSSEN_01231199
[397] XARELTO_JANSSEN_01231199
[398] XARELTO_JANSSEN_01231199
[399] XARELTO_JANSSEN_11169733

360. This summary was emailed, Subject: FDA Meeting Minutes NDA 22-406 Attachments Minutes FDA telecom June 21, 2011, to members of Bayer and Janssen by Andrea Kollath.[400]

## c.  DEFENDANTS PARTICIPATE IN A REQUESTED JUNE 23, 2011 TELECONFERENCE WITH THE CLINICAL PHARMACOLOGY GROUP ON JUNE 23, 2011 (SECTIONS 7 AND 12 OF USPI)

361. According to the Summary of Minutes of the teleconference held on June 23, 2011 regarding the "Clinical Pharmacology Section" of the USPI, requested by the Defendants on June 21, 2011, the discussion of the meeting was the Clinical Pharmacology in the USPI and specifically **Section 7** and **Section 12.**   There is no statement in Defendants' Minutes that FDA expressed any concerns or restrictions about the information in **Section 12.2 PHARMACODYNAMICS.** In fact, Defendants recorded that FDA informed them they were still free to propose language for the draft labeling of this section.  It was also indicated that the Cardio-Renal Division (handling the ROCKET and SPAF indication) had been involved in FDA's current label review and was providing input:[401]

- *The Division clarified its rationale for including all the in vivo drug interaction information in Section 7 of the draft labeling rather than splitting it between Section 7 and 12. "The sponsor was concerned that there may be changes as there working with the Cardio-Renal Division on the label.  The Division confirmed that the Cardio-Renal Division has been involved in the current labeling review.*

- *The Division clarified its rational for omitting PgP potency claims…*

- *The Division provided clarification regarding its rationale for including Section 7.2 by stating simulations from both the sponsor and FDA reported the potential for a significant increase in rivaroxaban exposure that the team felt required further assessment as a PMR, …*

- *The Division provided clarification regarding its rationale for removing "clinical relevant" throughout the draft.*

- *The Division stated that the sponsor is free to propose revised wording for the introductory paragraph for Section 7.1…*

- *The Division stated that the Sponsor may propose changes regarding the use of term(s) "avoid" or Not recommended" or "Use with caution" as long as they are using the "active voice".*

- *The Division stressed that the sponsor is free to submit proposed language for the draft labeling.  The proposals would be carefully reviewed, but it should not be assumed they are acceptable to the Agency.*

---

[400] XARELTO_JANSSEN_11169732
[401] XARELTO_JANSSEN_01231155

132

> • *The Division has completed the review of the label based on the data received in response to the CR. The Division will not be able to review any new data for this submission.*[402]

362. Andrea Kollath then sent an email, "Subject: NDA 22-406 Minutes of FDA telecon ClinPharm June 23, 2011," attaching "NDA 22406 06 23 2011 clinpharma.doc, on June 24, 2011 throughout Bayer and Janssen.[403]

363. In FDA's June 24, 2011 response, the agency "disagreed with J&J's proposed footnote for Table 1."

364. For **Section 6.4 Postmarketing Experience** FDA had originally proposed the addition of bleeding and non-bleeding terms to this section reported in the postmarket experience. Janssen countered that it did not agree with FDA's request, indicating it felt that the use of non-bleeding terms had not been determined as ADRs associated with XARELTO and proposed to delete them from the USPI. Janssen proposed to delete the following from the FDA's list of Postmarketing Experience:

> <u>Nervous System disorders</u>: cerebral ~~Additional adverse reactions identified from post marketing experience in other countries include intracranial~~ hemorrhages, subdural hematoma…
>
> <u>Skin and subcutaneous tissue disorders</u>: ~~jaundice, cholestasis, cytolitic hepatitis, hypersensitivity, anaphylactic reaction, anaphylactic shock, agranulocytosis, and Stevens-Johnson syndrome.~~[404]

365. On June 15, 2011 the Sponsor responded:

> *The bleeding terms listed in section 6.4 do not add significantly to the information presented in section 5.2 XARELTO increases the risk of bleeding and can cause serious and fatal bleeding. Major hemorrhages including intracranial, epidural hematoma, gastrointestinal, retinal and adrenal bleeding have been reported.*
>
> *The non-bleeding terms listed in section 6.4 represent adverse events that have been assessed by the Sponsor and have not been determined to be ADRs. If the Agency has determined that these event terms do represent ADRs, we would appreciate if you would share the rationale for the ADR determination. If these events do not represent ADRs, the sponsor proposes to delete them from the proposed USPI.*[405]

366. On June 24, 2011 FDA wrote that it disagreed with Janssen's proposal.

367. Janssen deleted all of FDA's **Section 6.2 Commonly Observed Adverse Drug Reactions in Double Blind Controlled Clinical Studies** and **Section 7 Other Adverse Drug Reactions Observed During the Premarketing Evaluation of XARELTO**

---

[402] XARELTO_JANSSEN_01231155
[403] XARELTO_JANSSEN_01231154
[404] XARELTO_JANSSEN_01231199
[405] XARELTO_JANSSEN_01231199

368. Section Drug Interactions, the June 15, 2011 Sponsor Response proposed to retain the 12/10 CR submission Section 7 format and text which has all the drug interactions included in one section rather than split between section 7 and 12.  The sponsor did not agree with the approach proposed by FDA for the description of the potential risks of rivaroxaban for either drug-drug interactions or drug-disease interactions.

369. In **Section 7.1 Drug Instruction**, on June 13, 2011 FDA proposed to add many paragraphs but included the following statement: "*Increases in rivaroxaban may increase bleeding risk.*" J&J disagreed with FDA's addition and re-wrote the language to include parameters to identify what it would consider as "*clinically relevant*" bleeding versus just bleeding.

370. The basis for defining the clinically relevant exposure threshold was multifactorial and included the following observations:

> *1. There was not a strong relationship between rivaroxaban 10 mg dose exposure (measured by PT values) and bleeding risk in the RECORD program (i.e. the distribution of PT values was similar for subjects with and without bleeding events) despite the expected variations in exposure by subgroups (e.g. older age or lower renal function was associated with a modest increase in rivaroxaban exposure)*

> *2. An overall favorable benefit (total VTE prevention) to bleeding risk profile in all subgroups of patients including those with modest increases in exposure like the elderly or moderate renal impairment.*

> *3. In the Phase 2 total hip and knee replacement studies total daily rivaroxaban dose of up to 60 mg were studied (i.e. 6 fold average increase exposure compared with the 10mg dose).  Although a clear relationship of rivaroxaban dose with bleeding risk was observed in these studies no doses were discontinued prematurely by the safety committees monitoring these studies and the increase observed with the 20mg dose compared with enoxaparin was considered clinically acceptable (in the context of preventing more VTE events)*

> *Since the submission of NDA 22,406 further data has become available from the ROCKET AF study (NDA 202,439) which further supports this position.  In this study rivaroxaban doses of 20 mg (CrCL>50 ml/min) and 15 mg (-CrCL 30-49 ml/min) showed a similar bleeding profile compared with warfarin using the same INR range (2.0-3.0) that is used for DVT prophylaxis after total hip or knee replacement surgery.*[406]

371.  On June 24, 2011 FDA responded that it disagreed with Janssen's proposed modification and thought the use of the term "*clinically relevant*" was vague and not appropriate for labeling.

---

[406] XARELTO_JANSSEN_01231199

372. For **Section 7 Drug Interactions**, Defendants proposed a total re-write of the section and proposed to return to its 12-10 CR submission draft label.[407]

373. In response to FDA's re-written **Section 7.2 Complex Drug Disease Interactions with Drugs that inhibit Cytochrome P450 3A4 Enzymes and Drug Transport Systems**, Defendants proposed to return to its 12/10 CR submission.  The sponsor did not agree with the approach proposed by the FDA for the description of potential risks with rivaroxaban for either drug-drug interactions or drug-disease interactions.  Janssen wrote:

> **Section 7.2** *provides instructions to avoid the use of rivaroxaban in patients with renal impairment also receiving weak to moderate P-gp/CYP3A4 inhibitors. The basis for this recommendation is stated to be simulated data.  The sponsor objects to this section and recommends its deletion based on the following reasons.*[408]
> *And the Sponsor goes on to reference RECORD and ROCKET-AF as support of safety.*[409]

374. For **Section 8.5 Geriatric Use**, FDA had proposed a statement that all patients 65 years of age or older should have assessment of renal function prior to starting XARELTO and should be followed closely during treatment.  Janssen disagreed with FDA's proposal and wanted to delete the '*restriction/monitoring sentence'* added by FDA. Janssen proposed a revised statement: "*Elderly subjects exhibit an increase in exposure that may be caused by age related changes in renal function.  Promptly evaluate any signs or symptoms of blood loss (e.g. a drop in hemoglobin and/or hematocrit or hypotension).*"  On June 23, 2011, Janssen proposed a modification to its earlier statement, "*For patients ≥ 65 years and older consideration should be given to assessment of renal function prior to starting therapy with XARELTO.*"  However, on June 24, FDA disagreed with all of Janssen's proposed changes: "*Elderly patients are frequently on more than 1 medication and have some evidence of impairment*".[410]

375. For **Section 8.7 Renal Impairment**, FDA proposed adding a new "*Table X: Percent increase of rivaroxaban PK and PD Parameters from normal in patients with renal insufficiency from a dedicated renal impairment study*."  FDA recommended adding a statement about how renal impairment and use of P-gp and weak to moderate CYP 3A4 inhibitors can increase exposure, which may increase bleeding risk.  The FDA also proposed adding the following statement: "*Avoid the use of XARELTO in patients with severe renal impairment...*".  To all suggestions, Janssen indicated it disagreed. It proposed deleting FDA's proposed Table X as confusing for prescribers.  Janssen also proposed deleting the sentence about patients with any degree of renal impairment as too broad and not reflective of its own PK exposure data.  In response to FDA's proposal to add "*Avoid the use of XARELTO…*", Janssen proposed to change the words to  "*not recommended.*"  The FDA's reply on June 24th was to disagree with Janssen on two of

---

[407] XARELTO_JANSSEN_01231199
[408] XARELTO_JANSSEN_01231199
[409] XARELTO_JANSSEN_01496506
[410] XARELTO_JANSSEN_01496506

the three points.  FDA wanted to keep *Table X,* FDA did not agree with deleting the sentence "*Patients with any degree of renal impairment*…." , but FDA accepted Janssen's proposal to change the word avoid to "not recommended" .[411]

376.  In **Section 10 Overdosage**, FDA deleted Janssen's proposed statement "*due to limited absorption, no further increase in average plasma exposure is expected at supratherapeutic doses of $\geq$ 50mg rivaroxaban.*"  Janssen disagreed with the FDA's deletion. Janssen requested to add the information taken from the Pradaxa USPI label regarding overdosage and evidence supporting the role of activated prothrombin complex concentrates (e.g. FEIBA), or recombinant Factor Va or concentrates of coagulation factors II, IX, or X adding, "however their usefulness in clinical setting has not been established" and re-add the deleted statement about absorption and supratherapeutic doses >50 mg.  FDA disagreed regarding adding Pradaxa's statements for activated prothrombin and clotting factors for the XARELTO label. The FDA's June 24th rationale for not accepting the PRADAXA-like overdosage statement was based on Janssen's own studies in rats and baboons which showed only partially reversed bleeding time for rivaroxaban in some animals, while in other animals, riva was not reversed.  FDA also requested that Janssen provide any data that it had about treatment of overdosage to FDA.[412]

377.  The FDA's proposed **Section 12.2 Pharmacodynamics**

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. ~~The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect.~~ The predictive value of these coagulation parameters for bleeding risk or efficacy has not been <u>adequately studied.</u>*

> *6-15-11 Sponsor Response: Accept, but retain important INR information:*

> <u>*The predictive value of these coagulation parameters for bleeding risk or efficacy has not been*</u> ~~adequately studied~~ <u>*established.  The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect.*</u>[413]

378.  The FDA did accept the components proposed by Janssen, including return of the deleted sentence about INR, based on Defendants calling the information "important."  FDA indicated no objections or limitations to Defendants' continued references to PT, aPTT and HepTest or that anti-factor Xa is also influenced by rivaroxaban in the label.

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by*

---

[411] XARELTO_JANSSEN_01231199
[412] XARELTO_JANSSEN_01231199
[413] XARELTO_JANSSEN_01231199

*rivaroxaban. There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established. (XARELTO VTE-P label July 1, 2011)*

379. For **Section 12.3 Pharmacokinetics – RACE**, as FDA had proposed, "Healthy Japanese subjects were found to have 50% higher exposure compared to other ethnicities including Chinese." Janssen disagreed with the request. Janssen proposed deletion of the statement based on its claim that "*these differences in exposure are minimized when values are corrected for body weight*." Janssen proposed the following counter statement for **Gender and Race**: "*There were no clinically relevant effects of gender or race of pharmacokinetics or pharmacodynamics of XARELTO*" (as it had first proposed in the draft label 12/10).[414]

380. On June 24th, the FDA did not agree with either of Janssen's changes or the rationale and stated: "*There is more than weight that is driving this exposure difference*"[415]

381. For **Section 14 Clinical Studies**, FDA made a note to the Sponsor in the margin of the original comments to the label and continued to state its official position about RECORD:

> *The Office of Scientific Investigation has determined that the results of RECORD 4 are unreliable. Please remove all references to RECORD 4 trial in Section 14…[OSI] has also determined several clinical sites from RECORD 1-3 studies are unreliable. Please remove the results from the unreliable sites in RECORD 1-3 studies (see above)*[416]

382. Janssen's response was to propose to retain mention of all of its RECORD study description for "ease of publication identification: and to retain RECORD 4 info."[417] Janssen requested further discussion with FDA on this topic and referred to its attached RECORD 1-4 justification.[418] FDA's June 24 response repeated its earlier statements of June 13, 2011 originally written in the label margin about removal of RECORD 1-3's unreliable data and sites and total deletion of any reference to RECORD 4.[419]

383. On June 24, 2011, Judy Kinaszczuk circulated another working draft label with the FDA's June 13, 2011 reply to Janssen's responses submitted June 16, 2011 to the PET/LWG team in preparation for the XARELTO ORS USPI meeting.[420]

384. After the Defendants received the FDA's June 24, 2011 comments, Scott Berkowitz, Bayer, by email made the following comment to **Section 12.2 Mechanism of Action**: "Also, in regard to our justification (Comment A19), I have re-worded this as well …[I

---

[414] XARELTO_JANSSEN_01231199
[415] XARELTO_JANSSEN_01496504
[416] XARELTO_JANSSEN_05852123
[417] XARELTO_JANSSEN_01231199
[418] XARELTO_JANSSEN_00047239
[419] XARELTO_JANSSEN_01496504
[420] XARELTO_JANSSEN_01496504

have] focused on how the INR is valid only for patients on VKAs and our PD studies with rivaroxaban used PT in seconds." His revision proposed to add: "*the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamic effect" (although Sponsor does not recommend it due to the short half-life and fact that the effect varies with the various available thromboplastin/tissue factor reagents.)*"[421].  Attached to this email, were draft labels with Janssen's responses to the FDA's June 24, 2011 response.[422] There is no documentation to support that the statement from Dr. Berkowitz about the role of PT was requested for the final label.

385.  On June 25, 2011, a revised label prepared by the XARELTO LING/PET rapid response team members was prepared in response to the second round of FDA feedback on the XARELTO ORS USPI. [423] However, the team decided to only send their proposed revisions to **Section 7 DRUG INTERACTIONS** (not Section 12 - see Dr. Berkowitz's comment above) to the FDA because they (FDA and Defendants) were mutually aligned on that section.[424]

386.  On June 27, 2011 Andrea Kollath informed the team that "despite several alternative proposals presented by the team, the final decision by FDA was that the RECORD 4 study data cannot be included in the USPI. [425]

387.  Also on June 27, 2011, Judy Kinaszcuk circulated a draft USPI which Janssen would submit to FDA on June 28, 2011.  She noted the deletion of all of RECORD 4, the inclusion of RECORD 1-3, but specific sites and data considered unreliable by FDA had been excluded; all of Section 6, 8.5 and 14 had been regenerated and reassessed for inclusion by Defendants' Biostatisticians with guidance from Janssen's Dr. Gary Peters.[426]  There is a red-lined comment that stated the Sponsor would appreciate further discussion on the exclusion of RECORD 4 from the USPI and selected RECORD 1, 2, 3 sites which were deemed unreliable by OSI.  Janssen's final label changes were submitted to FDA on June 28, 2011.[427]

388.  Noteworthy comments from Janssen in the draft label included:

> *Section 10 OVERDOSAGE- J&J responds to FDA's previously request for data that exists for treatment of overdosage, J&J admits that there is no human data available; however, experimental animal data suggest charcoal will reduce absorption.*
>
> *Section 12.2 PHARMACODYNAMICS- J&J comments on the FDA's request to remove the statement "the International Normalized ration (INR) should not be used for measuring rivaoxaban pharmacodynamics effect." J&J provides the response as*

---

[421] XARELTO_JANSSEN_01496729
[422] XARELTO_JANSSEN_01496733; XARELTO_JANSSEN_01496784
[423] XARELTO_JANSSEN_01496886
[424] XARELTO_JANSSEN_01167376
[425] XARELTO_JANSSEN_06557495; XARELTO_JANSSEN_01252694
[426] XARELTO_JANSSEN_01167380; XARELTO_JANSSEN_01167381.
[427] XARELTO_JANSSEN_06557497

*to why this sentence is important and should not be removed.*  Additionally, J&J *proposes to add "the Prothrombin time could be used for estimating rivaroxaban pharmacodynamics effect" (although Sponsor does not recommend it due to the short half-life and fact that the effect varies with the various available thromboplastin/tissue factor reagents.)"*

**Section 12.3 Pharmacokinetics/Race**- *J&J changed the statement to Healthy Japanese subjects were found to have 50% higher exposures…" to Healthy Japanese subjects were found to have 20% to 40% on average.  With J&J adding: "However, these differences in exposure are reduced when values are corrected by body weight." [428]*

389.   In **Section 14 Clinical Studies** Janssen proposed to add a simplified Table 7.[429]

390.   Defendants proposed on June 28, 2011 to include Dr. Berkowitz's proposed statement about PT in the label but immediately followed by a disclaimer that it is not recommended by the Sponsor and can have various effects based on the "various available thromboplastin/tissue factor reagents."  Defendant did maintain that the INR reference was "important" to the label, and FDA permitted it to be returned to the section. Consistent with Dr. Berkowitz's suggested terminology about unknown predictive value, FDA permitted the statement: "the predictive values of these coagulation parameters for bleeding risk or efficacy has not been established."

391.   On June 29, 2011, FDA's Tyree Newman sent several of FDA's label changes to Andrea Kollath via email.  Those changes included a Table 2 footnote, Section 12.3 "Race," requesting the removal of Janssen explanatory statement about weight adjustment.[430] There is no mention of changes to 12.2 by the FDA.

392.   The FDA also provided a full version of the final USPI to Janssen on June 29, 2011. Additional changes had been made by FDA to Section 14-Clincial Trial.  FDA's clinical reviewer sought to delete "*Table 6: Summary of Key Efficacy*" stating it was not appropriate to include results of integrated analysis of symptomatic VTE or All cause death, including that the control of a false positive rate was not built into the plan for confirmatory analysis. [431]

393.   XARELTO 10mg would be approved on July 1, 2011as a once a day dose for VTE-P without a requirement for monitoring following orthopedic total hip or knee replacement surgery.

---

[428] XARELTO_JANSSEN_06557497
[429] XARELTO_JANSSEN_06557497
[430] XARELTO_JANSSEN_01196281
[431] XARELTO_JANSSEN_11033579

VII.  **FDA'S SUMMARY REVIEW AND NDA APPROVAL OF XARELTO VTE-P
SUPPORTS DEFENDANTS' USE OF NEOPLASTIN PT, APTT, AND HEPTEST
FOR MONITORING XARELTO'S ACTIVITY**

394.  The FDA's Summary Review for Regulatory Actions[432] was from Ann T Farrell, MD,
Acting Division Director.  The NDA was submitted January 4, 2011 and approved July 3,
2011.The Medical Officers were Min Lu, M.D. and Kathy Robie-Suh, MD, Ph.D.  The
Phase 3 Studies submitted were RECORD 1-4. (see discussion of RECORD below)

395.  Dr. Farrell wrote as follows in the "INTRODUCTION":

> *XARELTO is an oral Factor Xa inhibitor. Johnson & Johnson Pharmaceutical
> Research and Development LLC initially submitted this NDA on July 22, 2008 for
> the prophylaxis f deep vein thrombosis and pulmonary embolism in patients
> undergoing hip replacement surgery and/or knee replacement surgery.  However,
> the application could not be approved during the first cycle due to a need to clarify
> the chemistry, manufacturing and control issues, need for additional understanding
> of potential safety issues and need for additional clarification of data integrity
> issues.  The applicant was sent a complete response letter on May 27, 2009. The
> applicant responded to the complete response letter on January 4, 2011.
> XARELTO has been approved by the European Medicines Agency since May 9,
> 2009.*

396.  She then provided in the **BACKGROUND** the information requested by FDA in its May
27, 2009 Complete Response letter. The FDA held an FDA Advisory Committee meeting
on the NDA on March 19, 2009.  Defendants responded to FDA on January 4, 2011,
which once again restarted the FDA's PDUFA review clock for the XARELTO NDA.

397.  FDA's NDA Summary clearly shows that FDA knew, and accepted, that dose-dependent
inhibition of factor Xa activity was observed in humans, and that Neoplastin prothrombin
time (PT), activated partial thromboplastin time (aPTT), and HepTest were prolonged
dose-dependently. Anti-factor Xa activity was also influenced by rivaroxaban.

398.  The FDA's Summary continued to support the use of PT, aPTT, HepTest and linearity
information in the label for bleeding based on the data indicating that a "dose dependent
inhibition of Factor Xa was observed in clinical trials." (Underlining added for emphasis)

> *The FDA has approved four drugs for use in prevention of venous thromboembolism
> (VTE) in hip and/or knee replacement. All these drugs are administered parenterally.
> Warfarin is the only FDA-approved oral anticoagulant approved for prophylaxis of
> venous thrombosis…*
>
> *…rivaroxaban does prolong the partial thromboplastin time (PT) and partial
> thromboplastin time (PTT). Additionally there is a linear relationship between*

---

[432] FDA Summary Review, Regulatory Actions,
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/022406Orig1s000SumR.pdf)

*exposure and PT prolongation. Dose dependent inhibition of Factor Xa was observed in clinical pharmacology trials.*

*A single dose of 10mg daily is recommended for all patients.  However, the clinical pharmacology review team recommended and continues to recommend the development of a lower strength formulation for dose modification to be used in certain populations of patients who may be more sensitive to rivaroxaban.*

*The original submission had four major trials submitted (RECORD 1, 2, 3 and 4[433]) in support of the application,…during the first review cycle a number of deficiencies were identified in the areas of chemistry, manufacturing and control, clinical safety , and data integrity issues….*

**Sponsor Inspection**

*Inspection of Bayer Pharmaceuticals as the sponsor of the four RECORD 4 studies revealed that the sponsor failed to 1) ensure proper monitoring of the study, 2) to ensure the study was conducted in accordance with the protocol and/or investigational plan, and 3) to ensure that FDA and all investigators were promptly informed of significant new adverse effects or risks…*

399.   The following part of the Summary demonstrated that Defendants were bridging data from other Phase 2 and pPhase 3 studies with rivaroxaban for the initial approval of XARELTO (as also described above). Defendants, as the expert in rivaoxaban, had knowledge about XARELTO, including its clinical use outside the United States and the ROCKET-AF trial for SPAF.  The history of use of XARELTO as a NOAC outside the United States was apparently available to Defendants since at least 2008, but had not been provided to FDA in the original NDA until FDA specifically requested such information in its 2009 Information Request.

400.   FDA considered Janssen the NDA sponsor.  As discussed above, Bayer had developed XARELTO and was the entity responsible for conducting and monitoring the quality of the clinical studies and data submitted to FDA in the INDs, and later the NDAs.  A summary of all patient experience with XARELTO use outside the United States

---

[433] The RECORD 1 trial & RECORD 2 trial were for hip replacement; RECORD 3 trial & RECORD 4 trial were for knee replacement.  All four trials were international, randomized, double-blind, double-dummy, active control (enoxaparin), parallel group design enrolling patients undergoing elective surgery for hip replacement or knee replacement. (NDA Summary Review- Ann Farrell, MD, NDA Approval 22406 (http://www.fda.gov). RECORD 2 had the longer duration of rivaroxaban than enoxaparin (rivaroxaban 35 days versus enoxaparin 13 days).  The dose regimen for enoxaparin (40mg once daily) control in RECORD 3 study is not a recommended dose for enoxaparin prophylaxis of DVT in patients undergoing knee replacement in the United States.  The RECORD trials combined had a total of 12,729 patients (N=6,356 rivaroxaban versus 6,373 in enoxaparin were randomized in 4 RECORD studies and 8,512 (67%) (N-4,248 rivoraoxaban and N=4,264 enoxaparin group) were included in the Modified Intent to Treat (MITT) population for the primary efficacy analysis.  About 30-39% of randomized RECORD patients were excluded from the MITT population due to no adequate assessment of DVT.  In terms of the statistical analysis, FDA went and re-analyzed the data removing the problematic sites and investigators and still found the data supporting of efficacy.  "However, the Agency had additional concerns regarding the study conduct and data collected in RECORD 4. FDA generated data: The greatest absolute risk reduction (ARR) was seen at RECORD 3 (9.1%, p<0.0001, followed by RECORD 2 6.3%, p<.0001, RECORD 1 the largest number of patients ARR 2.8% , p<.0001   RECORD 4 ARR 3.7% , p=0.0174.

apparently had not been provided by Bayer until requested by the FDA as it considered final approval.  Also, according to Dr. Farrell, Defendants had described an observational postmarketing study conducted outside the United Sates with XARELTO to the FDA's Advisory Committee meeting (March 2009) which Defendants had not provided to FDA as of May. Dr. Farrell Summary continued:

> The supplied clinical data are insufficient to fully characterize a potential risk for serious liver toxicity. We request the following information:
>
> > a)  report that assesses the potential signal for severe liver toxicity in your major on-going clinical studies of patients with atrial fibrillation (the ROCKET studies.)...
> >
> > b)  report of the safety findings from the rivaroxaban post-marketing experience outside the United States....
> >
> > c)  a report that provides a summary of post-marketing studies initiated outside the United States, to include a description of the study designs, a status update, as well as a summary of adverse events detected in these studies.  Additionally, provide a copy of the protocol for the "observational" postmarketing study you cited at the March 19, 2009, Advisory Committee.
> >
> > d)  provide a final report for the ATLAS ACS TIMI 46" study...

401. Dr. Farrell then discussed specific areas of the NDA in terms of the review team. Defendants' post-marketing commitments in the NDA Approval Letter (and repeated in the NDA 20-2439 letter of November 2011) for a **5mg dose and dose titration** for increased risk patients came directly from the FDA's Clinical Pharmacology Biopharmaceutics Review team:

> **Clinical Pharmacoloy/Biopharmaceutics**
>
> The recommended dose is 10 mg per day with or without food.  Dose modification s suggested for those who will take rivaroxaban with a strong PgP and CYP 3A4 inducer.
>
> From the first cycle review:
>
> <u>Dose-dependent inhibition of FXa activity and prolongation of the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest were observed in humans.</u>  The offset of the pharmacodynamics effect (24-48 hours) parallels the pharmacokinetic half-life.  <u>The relationship between exposure and PT prolongation appears linear.</u>
>
> These are not issues which would preclude approval of rivaroxaban based on the clinical pharmacology reviews.  However, the clinical pharmacology review team recommends the following post-marketing commitment and requirement from their second cycle review:

1) *Develop a propose a 5 mg dosing form (tablet) or scored 10mg tablet to allow for proper dose titration when rivaroxaban needs to be co-administered in patients at risk for clinically relevant changes in rivaroxaban exposure…Full chemistry, manufacturing and controls (CMC) information for the 5mg dosage form including the batch data and stability data, labels, updated labeling, and updated environmental assessment section is required in a prior approval supplement.*

402. Dr. Farrell's summary included **Safety, *with rivaroxaban patients appearing to have an increased risk of major bleeding events*.** She also included that FDA's reviewers had identified certain patient subgroups from Defendants' data at increased major bleeding risk: Asians (ethnicity), weight ≤ 50kg and patients ≥ 110kg. She wrote:

*Safety*
**Bleeding Events:**

*Review of the bleeding events revealed an increase in major bleeding events for the rivaroxaban treated patients; however, the difference was not statistically significant. In subgroup analyses, for Asian subjects and those with body weight ≤ 50mg or ≥ 110 kg the bleeding risk appeared to be higher for those subjects with rivaroxaban treatment*

*Dr. Lu concluded in the second cycle review the following:*

*…Other significant adverse events reported associated with rivaroxaban treatment in post-marketing spontaneous reports were <u>cerebral hemorrhage, epidural hematoma, hypersensitivity reactions including anaphylactic shock, agranulocytosis and Steven-Johnson Syndrome.</u>*

403. Dr. Farrell concluded the Section "Safety" expressing her concerns about rivaroxaban and the FDA's rationale as to why Defendants post-operatively were to be required to amass "cases of major bleeding" to collect dosing information, treatment of major bleeding, and outcome data. This would then reflect the section 505(o) request for "Enhanced Pharmacovigilance Plan" and post-approval active study by Defendants to address major bleeding with XARELTO.

*One of the safety issues associated with rivaroxaban use is the lack of knowledge about a method to reverse anticoagulation (including excessive anticoagulation). This information would be crucial for practicing physicians to have. The division will request from the sponsor a method to amass cases of major bleeding seen post-approval, collect information on rivaroxaban dosing, outcome of major bleeding, and any treatment for the major bleeding.*

404. Dr. Farrell indicated that the FDA's Cardiovascular and Renal Advisory Committee met on March 19, 2009. The committee voted 15 (yes) to 2 (no) that the available data demonstrated a favorable risk-benefit profile for rivaroxaban for the VTE-P indication.

143

## VIII.   NDA 022406 XARELTO VTE-P WAS CONDITIONALLY APPROVED

405.   The first NDA for any marketing of XARELTO in the United States was approved on July 1, 2011 as NDA 022406.[434]   It approved the requested single 10 mg immediate release tablet for VTE-P.   The approval was conditioned on FDA receiving commitments from Defendants to conduct post-marketing studies and develop a lower dose tablet. FDA's approval letter referenced the Required Pediatric Assessments under the Pediatric Research Equity Act ("PREA") (21 USC 355c), which FDA elected to waive at the time on the basis that it was "highly impracticable and because there are too few children with disease/condition to study (i.e., VTE-P)."

406.   As memorialized by the FDA in the initial NDA approval letter, "**POSTMARKETING REQUIREMENTS UNDER 505(o),**" FDA indicated it had determined that an analysis of spontaneous postmarketing adverse events reported under subsection 505(k)(1) of the FDCA would not be sufficient to assess the serious risks of major bleeding and renal impairment.   The new (future) pharmacovigilance system that FDA was required to establish under section 505(k)(3) of the Act also would not be sufficient to assess serious risks.   Therefore, FDA continued, that 'based on appropriate scientific data', FDA had determined and obtained a commitment from Defendants that it would establish an "Enhanced Pharmacovigilance Plan" with any regulatory implications including "label changes".   Prior to NDA approval, Defendants had agreed to provide performance data of XARELTO in terms of 'major risk of bleeding' with monitoring and analysis actions which exceeded the traditional pharmacovigilance of 21 CFR §314.80 and 21 CFR §314.81.

407.   Since 2007, Section 505(o) of the FDA Administration Act (FDAAA) gives the FDA authority to make and require post-market study and reporting requests in order to protect patient safety.   Section 505(o)(3)(E )(ii) of the FDCA requires Defendants to report periodically on the status of any study or clinical trial required by this section.   "*This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise undertaken to investigate a safety issue*."   Section 506B of the FDCA, as well as 21 CFR 314.81(b)(2)(vii), requires Defendants to report annually on the status of any postmarketing commitments or required studies or clinical trials.   FDA indicated that it would consider submission of the annual report under section 506B and 21 CFR 314.81 (b)(2)(vii) to satisfy the periodic reporting requirements under section 505(o)(3)(E )(ii) provided that Defendants include the elements for  both section 505(o) and 21 CFR 314.81 (b)(2)(vii).   To comply with section 505(o) requirement, the Defendants' annual report was also to include a report of the status of <u>any study or clinical trial otherwise undertaken to investigate a safety issue.</u>   Failure of Defendants to submit an annual report for studies or clinical trials required under 505(o) on the date

---

[434] July 1, 2011 FDA Approval Letter re NDA 022406
(https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apph
ist)

required would be considered by FDA a violation of FDCA section 505(o)(3)(E )(ii) and could result in enforcement action.[435]

### a.  COMMITMENT TO "*ENHANCED PHARMACOVIGILANCE PLAN*" TO STUDY RISKS OF MAJOR BLEEDING AND UPDATE LABEL

408.  FDA's NDA Approval Letter[436] stated that "*you*" are required to conduct the following:

> **PMR 1797-1** *A postmarketing pharmacovigilance study of the risk factors, clinical management, and outcome of cases of major bleeding in association with XARELTO (rivaroxaban) use.*

409.  FDA indicated, "***You*** agree to conduct an "*Enhanced Pharmacoviglance Plan*" that will consist of the collect, analysis and reporting of events termed "major bleeding" to consist of <u>active solicitation</u> of the events and associated risk factors, subsequent therapy, and outcomes."  Therefore, Defendants had agreed with FDA, prior to NDA approval and any start of commercial marketing of XARELTO in the United States for any indication, to create a plan to actively solicit information about major bleeding in patients taking XARELTO.

410.  FDA continued in the NDA Approval Letter: "You agree to provide reports quarterly for the first three years following drug approval, then annually." The Final Protocol plan for the Enhanced Pharmacovigilance Plan was to be submitted by November 30, 2011.  The complete "*study*" was to be completed by Defendants on June 30, 2016 and the Final Report Submission on December 30, 2018.  Defendants were to submit a summary (total cases and summary of key facts in those cases, with pertinent expert analysis of clinically relevant information from the case series and any potential regulatory implications such as label changes) quarterly for 3 years, then annually.  FDA had successfully leveraged the authority of Section 505(o) of the Act based on its concerns for Major Bleeding risk posed to the public with XARELTO in order to obtain a commitment from Defendants to obtain additional safety data.

### b.  PERFORM REQUIRED STUDIES FOR DOSING AND DOSING RECOMMENDATIONS

411.  In terms of the effects of XARELTO on renal impairment (i.e., mild, moderate and severe) plus the concurrent use of P-gp and moderate inhibitors of CYP3A4 on pharmacokinetics, pharmacodynamics and safety of rivaroxaban in volunteers, FDA had determined Defendants were required to conduct **PMR 1797-2** "so that appropriate dosing recommendation can be developed in these populations." Despite the lack of dosing titration in VTE-P, FDA wanted Defendants to pursue dosing recommendations

---

[435] July 1, 2011 FDA Approval Letter re NDA 022406
(https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apph ist)
[436] July 1, 2011 FDA Approval Letter re NDA 022406
(https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apph ist)

for specific population. These dosing actions were to be completed by Defendants by June 30, 2012. Therefore, FDA anticipated in 2011 that there would be dosing recommendations for certain specific subpopulations available by June 30, 2012.

### c.  DEVELOP A 5MG DOSE TABLET FOR 'PROPER DOSE TITRATION'.

412.  FDA's letter also discussed "**POSTMARKETING COMMITMENT NOT SUBJECT TO THE REPORTING REQUIREMENTS UNDER SECTION 506B**": "We remind you of your postmarketing commitment" **PMC 1797-3**. The Defendants' 'commitment' with FDA prior to XARELTO NDA approval, to develop and be able to manufacturer a commercial 5mg strength tablet (or new scored 10mg tablet) to "allow for proper dose titration when rivaroxaban needs to be co-administered in patients at risk for clinically relevant changes in rivaroxaban exposure." This task was to be completed by April 2012.

413.  These same post-approval commitments for Defendants, including the development of the 5mg dose and titration recommendations, were repeated in the NDA approval letter for SPAF issued November 2011 by the FDA's Division of Cardiovascular and Renal Drug Products.

### d.  DEFENDANT REQUESTED FDA CLARIFY WHAT WAS MEANT BY "ENHANCED PHARMAOVIGILANCE"

414.  Defendants' Andrea Kollath sent out an email dated June 24, 2011 which she forwarded throughout Janssen and Bayer, "Subject RE: Clarification on the Postmarketing Requirement."  She attached an email from FDA's Tyree Newman Responding to Defendants' two requests for clarification.  Defendants' Request #1 was for clarification from FDA that the term "post-market study" referred to in the first paragraph applies to the "pharmacovigilance plan" referred to in the second paragraph.  FDA's response:

> *Correct. The "enhanced pharmacovigilance" would include a plan for collection, follow-up, and analysis of post-marketing safety data pertaining to major bleeding, and for periodic reporting on risk factors, clinical management and outcome of relevant cases.*[437]

415.  Defendants also requested clarification on how FDA defined the "solicitation of reports of bleeding events." FDA's response was as follows:

> *You will promote the reporting of events to you.  You will query major sites of drug use, etc.  We ask for your ideas also (communications, etc.)*[438]

### e.  DEFENDANTS' "ENHANCED PHARMACOVIGILANCE PLAN" INCLUDED DEVELOPMENT OF BLEEDING QUESTIONNAIRES TO OBTAIN COAGULATION AND DOSING INFORMATION

416.  FDA required a commitment for enhanced pharmacovigilance for XARELTO, including more aggressive collection and reporting of events.  Defendants developed bleeding

---

[437] XARELTO_JANSSEN_01231151
[438] Xarelto_Janssen_01231152

questionnaires as part of the enhanced pharmacovigilance plan. [439] However, Dr. Kollath did not recall the specifics of what was in the questionnaires.  If PT was included to determine the level of rivaroxaban, that would be "useful information."[440]  When discussing Samama's[441] assay article, Kollath stated that PT/PTT results relay useful information about a patient and it makes sense that the information is included in the questionnaires.[442]

## f.  FDA HAS NOT TAKEN ACTION TO PREVENT/RESTRICT/HINDER DEFENDANTS ADDING "PRIMARY PT LANGUAGE" TO ITS LABEL

417. It is clear from FDA's Summary (above) that FDA at the time of NDA approval for VTE-P (and later SPAF) expressed no issues or concerns, provided <u>no evidence of</u> "*impossibility*" for Defendants providing the majority of its proposed PT language, including prolongation of PT (Neoplastin) and partial thromboplastin time (aPTT), HepTest, or describing in the Pharmacodynamics section the linear relationship between rivaroxaban exposure and PT prolongation.  In fact, it was FDA that has consistently requested Defendants to develop instructions for physicians to down titrate dose, providing a lower 5mg option for physicians to reduce risk of bleeding.

418.  The Defendants proposed **Section 12. 2 Pharmacodynamics** included and still contains references to PT (Neoplastin), aPTT, and HepTest as prolonged dose-dependently as well as a continued statement about dose-dependent inhibition of factor Xa.  FDA at no time has objected to or commented against the inclusion of this laboratory information in this section. On June 28, 2011 Defendants asked for the return of the FDA's deleted INR information to this section of the label as 'important' and FDA agreed.

419.  Defendants proposed on **June 28, 2011** to include Dr. Berkowitz's statement about PT in the label, which he immediately qualified with a disclaimer that it is not recommended by the Sponsor and can have various effects based on the "various available thromboplastin/tissue factor reagents."  Therefore, what Defendants proposed at the last stages of negotiation for the VTE-P label additions to **Section 12.2 Pharmacodynamic** section, when referred to as 'important,' was returned to this section: "There are no data on the use of the International Normalized Ratio (INR)."  Followed by the statement, "predictive value of these coagulation parameters for bleeding risk and efficacy has not been established" since the coagulation parameters have not been established by Defendants for both bleeding risk and VTE prevention (efficacy).

> *Section 12.2 PHARMACODYNAMICS- J&J comments on the FDA's request to remove the statement "the International Normalized ratio (INR) should not be used for measuring rivaoxaban pharmacodynamics effect."  <u>J&J provides the response as to why this sentence is important and should not be removed.</u>  Additionally, J&J proposes to add "the Prothrombin time could be used for estimating rivaroxaban*

---

[439] Kollath depo 3/31/16, p. 438: L 16-20
[440] Kollath depo 3/31/16, p. 442: L 8-14
[441] Moore Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; Exhibit 24
[442] Kollath depo 3/31/16, p. 443: L 13 – p. 444: L 10

*pharmacodynamics effect" (although Sponsor does not recommend it due to the short half-life and fact that the effect varies with the various available thromboplastin/tissue factor reagents.)"*[443]

420. FDA allowed Janssen to make the changes to its label for approval of July 1, 2011 (XARELTO VTE-P), specifically **Section 12.2 Pharmacodynamics**:

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established (July 1, 2011 Label).*

421. Janssen's Alla Rhoge sent an email to the "XARELTO LWG and LRC," "Subject: URGENT Updated Label November 4-9:00AM- Submission needed within 1 hour." On November 4, 2011 FDA sent Defendants its final proposal for the XARELTO SPAF label (underlining for emphasis):

> *Sanjay spoke with Alison this morning and the Division just sent us the enclosed new revised label.*

> *After speaking with team this morning and last night, we decided to make a couple more changes to the label. These changes were to **section 8.7** (to provide clarity) and to **section 12.2** (last two sentences regarding INR were deleted based on the data from ROCKET-AF). I made another editorial change, but everything appears in track changes.* [444]

422. FDA had proposed to delete the statement "There are no data on the use of the International Normalized Ratio (INR)" from the VTE-P label in June 2011, but allowed it to be returned to the section when Defendants deemed it "important" after June 28, 2011. (See July 1, 2010 label).

423. As Alla Rhoge wrote in the November 4, 2011 email to the Defendants' label team: "we decided to make a couple changes." He continued, "section 12.2 (last two sentences regarding INR were deleted based on the data from ROCKET AF)." Defendants were able to modify the label as proposed on November 4, 2011 for the approved SPAF label (November 5, 2011).

424. Therefore, it is simply inaccurate and misleading to imply or misrepresent that FDA made specific demands of the Defendants for its USPI labeling for Section 12.2 designed to force Defendants to remove the "majority of the PT language" and not provide additional PT language.[445] The FDA requested removal of the "International Normalized Ratio (INR)" prior to approval. When called 'important' for the Defendants' label, the

---

[443] XARELTO_JANSSEN_06557497
[444] XARELTO_JANSSEN_01499448
[445] Defendant Janssen Research & Development, LLC's responses to Plaintiff's Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption MDL No. 2592 Section L, dated Aug. 12, 2016.

entry was returned to the label, and appears in the approved July 1, 2011 label as Section 12.2 Pharmacodynamic.  The INR has no data for use and the fact that predictive value of coagulation parameters (for bleeding and stroke prevention with AFib) have not been established are both in the label.  When Defendants (not the FDA) requested the information be deleted for the SPAF label in Section 12.2 for ROCKET on November 4, 2011, it was subsequently deleted and does not appear in the November 5, 2011 approved label.

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose dependently. Anti-factor Xa activity is also influenced by rivaroxaban. [446] (Label approved November 5, 2011)*

425.  The Defendants, not the FDA, are the ones responsible under the Federal Food, Drug and Cosmetic Act to provide an accurate and adequate label, and sell a safe and effective product.  Defendants have agreed to develop a lower dose and proper dosing information as to the therapeutic range for safety and efficacy post-approval.  As of 2016, this has still not been done.

426.  The final approved "**Section 12.2**" of the USPI language shows the XARELTO label continues to retain all the "*primary PT language*"[447] proposed by Defendants (PT (Neoplastin), aPTT, HepTest and the same significant linearity language to dose).  Comparing the elements of the Defendants' requested language and the final format of the approved label of November 5, 2011, the changes to the label by FDA have been more stylistic and render the label more useable (i.e., from a regulatory perspective, an improved entry than proposed by Defendants).  Section 12.2 is but one of many examples in the history of the XARELTO label, both for VTE-P and SPAF, where the FDA's offered recommendations and comments significantly improved the usability of the information in the label's section compared to the label initially drafted by Defendants.

427.   In discussion of Section 12.2 it is important not to confuse Section 12.2 Pharmacodynamics with Defendants attempting to provide valid and adequate 'Section 5.4 Laboratory Tests' or dosing information in its label, including the dosing recommendations it is committed to develop for a 5mg dose (see the Lovenox label example provided above).  Development of a 5mg dose and instructions for dosing were conditions for NDA approval of XARELTO which still have yet to be fulfilled by Defendants.  At the time of July 1, 2011 and then November 5, 2011 label and subsequent NDA approvals, based on representations from Defendants in 2011, FDA would have had reason to assume a 5mg dose and label recommendations for proper dose titration would be available by 2012.

428.  The final approved **Section 12. 2 Pharmacodynamics** from the NDA (November 5, 2011 through 2016) contains the pharmacodynamics information provided by Defendants to FDA in its rivaroxaban NDA.  Without information like that in the Lovenox label,

---

[446] Jalota Exhibit 55
[447] Jalota Exhibit 55

particularly in Section 5.4, the XARELTO label, based on the knowledge and actions of Defendants with its NDA, still does not provide physicians with adequate and accurate information/instructions for use when viewed in terms of Defendants internal documents and its knowledge of the increased risk of bleeding and relationship to PT (21 USC 352(a)(f)(1)(2)).

429. As discussed in other areas for the XARELTO label 'Section 5.4' was only viewed as a '*contingency*' by Defendants for inclusion in its "Label Contingency plan" in April 2009. Defendants knew the type of laboratory information detailed in the Lovenox label in 2007.  Defendants have indicated internally that such information could be placed in the label, but only if requested by FDA.[448]

430. In this litigation, the Defendants' Response to Interrogatory No. 2 was as follows:

> *Has FDA ever required a warning or instruction in the Prescribing Information and Medication Guide for XARELTO pertaining the use of biomarkers in evaluating the effect of XARELTO in patients, including, but not limited to biomarkers such as prothrombin time and thrombin generation inhibitors.*

> **RESPONSE**: *No.*[449]

431. Defendants' Response to Interrogatory No. 3 stated:

> *Has the FDA ever refused to add, remove, or modify language you proposed in the Prescribing Information and Medication Guide for XARELTO pertaining to the use of biomarkers in evaluating the effect of XARELTO in patients, including, but not limited to biomarkers such as prothrombin time and thrombin generation inhibition?*

> **RESPONSE**: *See response to Interrogatory No. 1.*[450]

432.  Defendants' Response No. 1 has already been discussed and refers to the June 28th, 2011 request by FDA to remove INR and the November 2011[451] SPAF indication label. After June 28, 2011, FDA permitted Defendants to return its own INR language back to the July 1, 2011 label.  In November 4, 2011, Defendants, according to Alla Rhoge's email, elected to delete the same INR language (last two lines) based on ROCKET AF.  FDA at no time prevented the Defendants from including in its label information regarding pertinent biomarkers PT, aPTT, and HepTest (the same biomarkers used by Defendants throughout all the XARELTO clinical trials and which were relied upon by FDA in review of the NDA, described in FDA's Summary Review, and as markers of bioactivity of XARELTO).

---

[448] XARELTO_JANSSEN_05911809

[449] Defendant Janssen Research & Development, LLC's responses to Plaintiff's Interogatories Pertaining to Defendants Affirmative Defense of Federal Preemption MDL No. 2592 Section L, dated Aug. 12, 2016.

[450] Defendant Janssen Research & Development, LLC's responses to Plaintiff's Interogatories Pertaining to Defendants Affirmative Defense of Federal Preemption MDL No. 2592 Section L, dated Aug. 12, 2016.

[451] XARELTO_JANSSEN_08646664; XARELTO_JANSSEN_0149948; XARELTO_JANSSEN_23524564

433. INR was not used by Defendants in the pharmacodynamic evaluation of XARELTO. Though the predictive value of coagulation parameters have not been established for both bleeding risk and Stroke prevention efficacy in ROCKET, they have been linked to increased risk of bleeding.  I have seen no document to support that FDA ever requested that PT (Neoplastin), aPTT or HepTest and linearity of dose be removed or excluded from Defendant's Section 12.2 Pharmacodynamics.  FDA has permitted Defendants throughout the label negotiation processes to update the contents of Section 12.2 Pharmacodynamics to be consistent with the information in its two NDAs.

434. It has always been Defendants' decision not to voluntarily include a **Section 5.4 Laboratory Tests** or similar dosing recommendations in its XARELTO label.   FDA had no role in the lack of dosing/monitoring coagulation information for bleeding and efficacy. Defendants' goal for BAY 59-7939 since 2002 has been to sell it as a single fixed dose anticoagulant requiring no laboratory monitoring.  It has been Defendants, and not FDA, which subsequently failed to fulfill its post-approval commitment to FDA as a condition of NDA approval in 2011 to voluntarily develop a lower 5mg dose and label recommendations for titration of certain patient populations at increased bleeding risk.

> *Section 12.2 Pharmacodynamics*
>
> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established (Label approved **July 1, 2011**)*
>
> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose dependently. Anti-factor Xa activity is also influenced by rivaroxaban.* [452] *(Label approved **November 5, 2011**)*
>
> *Dose-dependent inhibition of FXa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose dependently. Anti-factor Xa activity is also influenced by rivaroxaban.* [453] *(Label approved September 2015)*

## IX.   NDA 022406 SUPPLEMENTS

### a.   EINSTEIN- TREATMENT OF DVT/ PE (STUDY 11702)

435. EINSTEIN Deep Vein Thrombosis (DVT) and EINSTEIN Pulmonary Embolism (PE) Studies investigated XARELTO for the treatment of DVT and/or PE and for the reduction in the risk of recurrence of DVT and or PE.  EINSTEIN DVT and EINSTEIN PE, were multi-national, open-label non-inferiority studies comparing XARELTO (at an

---

[452] Jalota Exhibit 55
[453] Jalota Exhibit 55

initial dose of 15mg twice a day with food for the first three weeks, followed by XARELTO 20 mg once daily with food) to enoxaparin 1mg/kg twice daily for at least five days with VKA (warfarin) and then continued VKA only after a target INR (2.0-3.0) was reached. Patients who required thrombectomy, insertion of a caval filter, or use of a fibrinolytic agent and patients with CrCL<30mL/min, significant liver disease, or active bleeding were excluded from the studies. The intended duration was three (3), six (6), or 12 months based on the investigator's assessment prior to randomization.

436. A total of 8281 patients (3449 in EINSTEIN DVT and 4832 in EINSTEIN PE) were randomized and followed on study treatment for a mean of 208 days in the XARELTO group and 204 days in the enoxaparin/VKA group. The mean age was 57 years. The population was 55% male, 70% Caucasian, 9% Asian and about 3% Black. Patients randomized to VKA had an unadjusted mean percentage of time in the INR target range of 2-3.0 of 58% in EINSTEIN DVT study and 60% in EINSTEIN PE study with the lower values occurring in the first month of the study.

437. In the EINSTEIN DVT and EINSTEIN PE studies, 49% of patients had an idiopathic DVT/PE at baseline. Other risks included previous episode of DVT/PE (19%), recent surgery or trauma (18%), immobilization (16%), use of estrogen-containing drug (8%), known thrombophilic conditions (6%) and active cancer (5%).

438. In the EINSTEIN DVT and EINSTEIN PE studies, XARELTO demonstrated to be non-inferior to enoxaparin/VKA for the primary composite endpoint of time to first occurrence of recurrent DVT or non-fatal or fatal PE [EINSTEIN DVT HR (95% CI):**0.68** (0.44, 1.04); EINSTEIN PE HR (95% CI): **1.12** (0.75, 1.68)]. Non-inferiority was based on an upper limit of 95% CI and for the HR <2.0.

439. There is a June 24, 2012 email from Janssen's Sigmond Johnson to Vicki Brennan, "Subject RE: PR treatment-Preliminary Assessment Report," which forwarded a June 24, 2012 email from Corrina Weidt to Huy Q Truong, Sanjay Jalota et al., "Subject: WG: PE Treatment-Preliminary Assessment Report."[454] The preliminary assessment report had been received from the rapporteur (Sweden) for the EINSTEIN PE trial. There were two major objections and a total of 10 clinical questions. The team was to develop a response strategy. The first major objection to the EINSTEIN-PE findings was the higher risk (70%) for recurrences of PE in the XARELTO arm compared to conventional treatment:

> *The numerically higher incidence of VTE recurrences in the rivaroxaban arm and with a CI indicating a possibly 70% relative increase as compared to conventional treatment of such events is a major concern. VTE recurrences can be life-threatening and otherwise have major clinical consequences for the patients with a need for long-term anticoagulant treatment and risks of post-thrombotic syndromes, chronic pulmonary hypertension and/or chronic pulmonary embolism. These potentially increased risks should be further addressed by the MAH and included in an over-all benefit risk discussion for the proposed regimen.[455]*

---

[454] XARELTO_JANSSEN_01116317
[455] XARELTO_JANSSEN_01116317

440. Defendants' preliminary response was that the increase in recurrence of VTE for
XARELTO was acceptable when compared to the risk for major bleeding in the
comparison enox/VKA arm (median TTR= 60%).  However, Defendants are not
addressing the issue that the major bleeding seen in the enox/VKA arm could also be a
factor of the adequacy of the enox/VKA control, with a risk for higher INR and increased
bleeding with warfarin:

> *The overall incidence rates in both the enox/VKA and rivaroxaban groups in
> comparison to contemporaneous studies and to what was a priori expected in the
> protocol was very low in the trial.  ...*

> *The statistically non-significant absolute risk increase for recurrence of only 0.24%
> cannot be seen in isolation and needs to be counter balanced by the statistically
> significant absolute increase in major bleeding in the enox/VKA group.  Importantly,
> the incidence rate of major bleeding was consistently lower in the rivaroxaban group
> for the categories of fatal, non-fatal, critical organ, and non-fatal critical organ
> bleeding.  ....*

> *Considering that the case fatality rate, co-morbidity, long term complications, and
> need for emergency intervention is similar for recurrent thrombotic events and major
> bleeding, one can state that the 0.24% risk for recurrent VTE in favor of enox/VKA is
> is offset by an increase in major bleeding with enox/VKA.*[456]

441. The Rapporteur asked about the maintenance dose recommendation in patients with
moderate to severe renal impairment for PE treatment and prevention of recurrent DVT
and PE compared to Defendants' approved VTE indications.  Among the other questions
for Defendants from the Rapporteur was #4 in regards to Pharmacokinetics:

> *The applicant should provide a justification for the different maintenance dose
> recommendations in patients with moderate and severe renal impairment for the new
> indication treatment of PE and prevention of recurrent DVT and PE compared to the
> previously approved indication for treatment of DVT and prevention of recurrent
> DVT and PE.*[457]

442. For Efficacy the Rapporteur requested in #5 and #6 to receive information about the
mean INR target range for centers divided by >70%, 60-70%, and >60% as well as the
initial effect of rivaroxaban alone without prior treatment with enoxaparin and VKA in
the first 36 hours:

> *The incidence of the primary efficacy endpoints in the pivotal study should be given
> separately for centers with mean INR within target interval for more than 70%,
> between 60 and 70%, and below 60% from month 1 of treatment and forward.*

> *#6 Pre-randomization treatment with parenteral anticoagulants and VKA were
> allowed for up to 36 hours.  It should be further substantiated that treatment with*

---

[456] XARELTO_JANSSEN_01116317
[457] XARELTO_JANSSEN_01116317

*rivaroxaban alone when initiating anticoagulant treatment for acute PE is sufficiently effective in this critical clinical setting. [458]*

443. For Safety the Rapporteur requested in #8 information on patient changes in hemoglobin and hematocrit over time to look for occurrence of clinically silent GI bleeding:

*Haemoglobin or haematocrit levels do not seem to have been routinely monitored during the studies. Thus the possibilities to detect clinically silent GI bleedings were limited.  Available data on such assay results by end of treatment should be provided and compared between treatment groups.[459]*

444. April 2008 JSC Meeting Minutes discuss the "VTE-T: Separate small PK/PD trial for CYP3A4 inducers."  Defendants indicated that Strong CYP3A4 inducers are used in approximately 2% of patients with acute DVT/PE.  This medication "will have a profound effect on Rivaroxaban AUC, t½, Cmax and Ctrough."  PK/PD modeling was performed pointing to a required dose doubling.  The GDC recommends conducting a small extra study to generate data in patients with CYP3A4 inducers to "strengthen our profile beyond VTE treatment" (*see Defendants' PBRER statement discussion of 2014 for discussion of this small VTE-T study).  Regarding the cost of the small study, "it is believed that the extra development costs € 4m (up to 120 patients) are more than compensated for by additional sales generated in 2% of VTE treatment population."[460]

445. Under the same heading, "Competitive Intelligence" indicates that BMS works on development of an antidote for Apixaban.  The JSC briefly discussed the commercial benefit.  Marketing was asked to discuss and come up with a common position (AP 87: Evaluate pros and cons to develop an antidote; I Talmage, B. Lis, May 2008).[461]

446. On April 27, 2016 Claudia Henn emailed Ton Lensing to obtain an answer for an Australian TL on the EINSTEIN studies.  She wanted to know the name of the exact devices used in the EINSTEIN studies for INR monitoring and if it was a Point of Care monitoring or laboratory measurement.  The CSR did not specify, and in the chapter about treatment compliance it is stated that INR values were "obtained directly from the patient file or transmitted by the physician or the laboratory monitoring INR."

447. Ton Lensing replied that "lab based measurements were used."[462] However, he still did not specify the name of the device used in the laboratory measurements for INR.

448. Edmond Chen, MD, Senior Director, Global Clinical Leader, Thrombosis Group, Cardiovascular Therapeutic Area, Bayer sent an email to Dr. Berkowitz on March 4, 2016:

---

[458] XARELTO_JANSSEN_01116317
[459] XARELTO_JANSSEN_01116317
[460] Burton Exhibit 31
[461] Burton Exhibit 31
[462] XARELTO_BPAG_38502241

> *I was asked a question by Rupert ….He was asked by someone whether the point of care device used in EINSTEIN was the same as ROCKET and involved in the recall.*

449. Dr. Berkowitz replied, "Subject RE: Question from Rupert," on March 4, 2016:

> *The EINSTEIN trials (DVT and PE) were unblinded, PROBE designed trials, while EINSTEIN EXT was vs placebo.  We did not use any POC devices in those trials (although we cannot rule out that an investigative site used one on their own.)  The Alere device was only used in ROCKET AF, and not in any other Rivaroxaban clinical development or Med affairs trials.[463]*

## b.  EINSTEIN EXTENSION AND THE REDUCTION IN THE RISK OF RECURRENCE OF DVT AND PE COMPARED TO PLACEBO

450. The <u>EINSTEIN Extension Study</u> was conducted to support reduction in the risk of recurrence of DVT and PE.  The extension compared XARELTO (20mg OD with food) to placebo in patients who completed six (6) to 14 months of treatment for DVT and/or PE following an acute event.  The intended treatment was for six (6) or 12 months based on the investigator's assessment prior to randomization.

451. A total of 1196 patients were randomized and followed to study treatment for a mean of 190 days for both XARELTO and placebo treatment groups.  The mean age was approximately 58 years.  Aspirin was taken as on-treatment concomitant antithrombotic medication by approximately 12% of patients in both treatment groups.  In the EINSTEIN Extension study about 60% of patients had a history of proximal index DVT without event and 29% of patients had a PE without symptomatic DVT.  About 59% of patients had idiopathic DVT/PR.  In the EINSTEIN Extension study XARELTO was demonstrated to be superior to placebo for the primary composite endpoint of time to first occurrence of recurrent DVT or non-fatal or fatal PE [HR (95%CI):0.18 (0.09, 0.39).

## X.  NDA SUPPLEMENTS S-001, S-002, and S-003-[EINSTEIN STUDIES]

452.  FDA approved three NDA supplements (**S-001, S-002, and S-003**) further expanding XARELTO indications from initial VTE-P prevention to include '*treatment*' of DVT, PE (VTE-T) and then '*reduction*' in risk of DVT and PE using 15mg twice a day (BID) for 21 days.

453. The approved labeling change was to add the following information: "<u>Treatment of DVT, PE ad Reduction in the Risk of Recurrence of DVT and of PE: 15 mg orally twice daily with food for the first 21</u> days." FDA then obtained a series of commitments from Defendants (per requirements of Pediatric Research Equity Act (PREA) (21 USC §355c) to conduct pediatric post-marketing studies - single and multiple PK/PD and dose-exploration trials in pediatric patients (17 years to >6months) with VTE.(PMR 1966  1-6). The three NDA supplements were approved by Ann T. Farrell, MD Director Division

---

[463] XARELTO_BHCP_11844533

of Hematology Products, Office of Hematology and Oncology Products CDER, on November 2, 2012.[464]

## a.  NDA SUPPLEMENT S-004

454.  **NDA S-004** was approved on March 1, 2013 with an assessment of the relative bioavailability of rivaroxaban when administered under various conditions, and a food effect study, with the FDA's NDA approval letter signed by Edvardas Kaminskas, MD, Deputy Director, Division of Hematology Products, OHOP.

## b.  NDA SUPPLEMENT S-007

455.  **NDA  S-007** was signed by Ann Farrell, MD Division Director on  January 7, 2014 for label updates including: prothrombin complex concentrate (PCC)  and data from the completed PCC clinical pharmacology study (Phase 1, RIVAROXABAN P1003) in Section 5.2 (Risk of Bleeding) and Section 12.2 (Pharmacodynamics); updated on tranexamic acid (TXA) experience based on recent review of published literature (Section 5.2); inclusion of a new Section (5.8) under Section 5 (Warnings and Precautions) to add a warning and precaution statement for "**acute PE**" occurring in hemodynamically unstable patients or in patients who require thrombolysis or pulmonary embolectomy; and finally an updated description of Factor Xa (FXa) inhibitor mechanism of action to be more specific in **Section 12.1** (Mechanism of Action).

## c.  NDA SUPPLEMNT S-009

456.  **NDA S-009** approval letter was signed by Robert Kane, MD, Deputy Division Director of Safety, Division of Hematology Products on March 6, 2014 for revising the label to add the risk of the 10mg tablets and neuroaxial hematoma.

## d.  NDA SUPPLEMENT S-010

457.  **NDA S-010** approval letter was signed by Robert Kane, MD, Deputy Division Director of Safety, Division of Hematology Products on February 13, 2014 to include the final interference and Phase I safety study report entitled: "An Open-Label Study to Estimate the Effect of Multiple Doses of Erythromycin on the PK and PD and Safety of a Single Dose of Rivaroxaban in Subjects with Renal Impairment and Normal Function" (*which fulfilled the "**PMR 1979-2"commitment**).

458.  **NDA S-011** (9/15/2014**), S-013** (2/16/2015), **S-014** (5/5/2015), and **S-016** (10/26/2015) were all approved as Manufacturing Changes.

---

[464] EINSTEIN/EINSTEIN Extension Label negotiations: 118191-4-13-12; 120937-10-17-12,140274 10-16-12, 141431-Xarelto USPI, 143059-2-16-12, 217288-10-18-12, 253889-Xarelto USPI, 319230-10-1—12, 322490-10-18-12, 322497-10-18-12, 322498-10-18-12, 796741-4-27-12, Derix 62, Derix 64, Deric 65

### e.   NDA SUPPLEMENT S-012

459. **NDA S-012** was approved on January 15, 2015 by Dr. Ann T. Farrell, Director, Division of Hematology Products revising the Prescribing Information Section 2.8 Administration Options to include rivaroxaban 10 mg crushed tablets.

### f.   NDA SUPPLEMENT S-105 CHANGES BEING EFFECTED (CBE)

460. **NDA S-015** was approved by Dr. Kane on December 19, 2014 as a '**CBE**' supplement (21 CFR 314.70) adding "*thrombocytopenia*" as an adverse reaction and replacing the adverse reaction term "*cytolytic hepatitis*" with "*hepatitis (including hepatocellular injury)*" in Section 6.2 Postmarketing Experience.

461. That is all the NDA supplements for NDA 022406 published on FDA's website as of August 27, 2016. There continues to be no 5mg tablet or change in dosing recommendations with a 5mg tablet.

## XI.   FDA AND NDA 20-2439- XARELTO 'SPAF' INDICATION

### a.   DEFENDANTS MET WITH FDA TO DISCUSS THE DESIGN OF THE ROCKET AF CLINICAL STUDY FOR APPROVAL OF A SPAF INDICATION

462. On September 13, 2006 FDA and the Defendants held an End of Phase II (EOP2) meeting with FDA's Division of Cardio Renal Products to discuss development of rivaroxaban and testing for an indication for Stroke Prevention in Afib patients.  There is a Summary of the Meeting authored by Janssen's Sanjay Jalota.[465] Defendants submitted a Background Package on August 23, 2006, with FDA having already provided Defendants with its draft responses to the questions asked in the package materials.  For conducting a non-inferiority test, FDA proposed a margin of 1.378 (1.38), with a range of higher than 1.38 or below 1.46 qualified as a review issue for FDA.  Regarding the 'patient population' requested, FDA expressed its concerns that Defendants proposed "enriching" of the study population with subjects with a CHADS2 score of greater than 2 (higher risk for SPAF) would "potentially violate the constancy" outcome anticipated for well-controlled warfarin management for SPAF "needed in a non-inferiority trial."[466]  The FDA expressed concerns that the benefits of the warfarin treatment for SPAF in this enriched population (hypertension and diabetes) might prove to be minimal, as these risk factors could increase the proportion of noncardioembolic events (i.e., skew or reduce the anticipated benefit for warfarin for SPAF).  Defendants provided counterarguments, but, according to Mr. Jalota's minutes this "did not appear to allay the FDA concerns."

463. FDA reportedly agreed to Defendants' plan to conduct a single pivotal study with a p value of 0.05 and meeting an NI margin of 1.378 or less as sufficient for NDA approval.  "FDA acknowledged this study should support the proposed indication without requiring data

---

[465] XARELTO_JANSSEN_00084945, Burton Exhibit 32
[466] XARELTO_JANSSEN_00084945, Burton Exhibit 32

from other studies, but would not necessarily provide any claim comparing the effect to warfarin."[467]

464. FDA indicated the testing for non-inferiority followed by superiority could be performed as a single test using the primary endpoint. In terms of "Dose Selection," Mr. Jalota wrote that FDA expressed preference for a BID dosing regimen based on efficacy considerations (in PK/PD and clinical trial data already reviewed by FDA for rivaroxaban) but did not object to Defendants' use of OD dosing. [468] The FDA reportedly stated in 2006 on "multiple occasions that it was more concerned with incidence of strokes than bleeding but agreed that no definitive conclusions on dosing frequency can be made from the current rivaroxaban data based on the low number events."[469]

465. However, these minutes are for a meeting with FDA in 2006, which was prior to the October 2010 NDA approval of a NOAC PRADAXA (dabigatran) for a SPAF indication (fixed dosing, no monitoring and no dietary restrictions) as an alternative to variable-dosing warfarin. In 2004 FDA denied approval of AstraZenaca's ximelagatran (Exanta) (a direct oral thrombin inhibitor) (intended for DVT-P, prevention of secondary thromboembolism and complications of AFib) despite its non-inferiority SPORTIF V clinical trial with a mean TTR of 68%. Also in 2006, Sponsor AstraZeneca withdrew all marketing applications and stopped marketing of ximelgatran based on hepatotoxicity.

466. On December 5, 2006 Defendants began a discussion with FDA on using a "rolling" NDA submission.[470] A rolling NDA review submission is one mechanism created by the FDA to help accelerate the US Regulatory Approval process for drugs intended to treat serious diseases. It means that a Sponsor is asking to submit completed sections of its NDA (Modules) for early review by FDA, rather than waiting until every section of the NDA application is completed before submitting the entire NDA application to the Division for review. Rolling reviews are often permitted for NDAs, but there must be agreement by the reviewing Division to accept the Modules before the NDA. There are certain time advantages for a Division to review modules and then not having to re-review a closed/completed module when the final NDA is submitted. However, the decision about rolling review also depends on the current work-load of the Division and its reviewers. [There are three official mechanisms created by CDER to speed up its review of new drugs to treat serious conditions: Fast Track, Accelerated Review, PriorityReview.[471]] FDA denied designating XARELTO as a Priority Review for SPAF.

467. The Defendants Phase 3 pivotal study which would support FDA's approval of NDA 20-2439 for XARELTO for SPAF had the title: **R**ivaroxaban **O**nce Daily Oral Direct Factor

---

[467] XARELTO_JANSSEN_00084945, Burton Exhibit 32
[468] XARELTO_JANSSEN_00084945, Burton Exhibit 32
[469] XARELTO_JANSSEN_00084945, Burton Exhibit 32
[470] XARELTO_JANSSEN_06628658
[471] **Accelerated Review**-1992 Rule 21 CFR 314; in 1997, FFDCA 506(b)(Adjusted trial requirements-studies to extend results from surrogate to clinical markers); **Fast Track Designation**- 1997 Statute FFDCA 506(a) (Rolling Review); **Priority Review**- 1996 Agency Procedure (Expedited Review 4-6 months); CDER MAPP 6020.3. A key to Accelerated Review and Fast Track – 'serious or life-threatening' and to 'address an unmet medical need'. For **Priority Review**- "major advance in treatment or treatment where no adequate therapy exists".

Xa Inhibition **C**ompared with Vitamin **K** Antagonism for Prevention of Stroke and **E**mbolism **T**rial in Atrial Fibrillation ("ROCKET AF"). As with VTE-P FDA's reviewers voiced concerns to Defendants that the selected 20mg/15mg 'one dose for all patients' and no monitoring selected by Defendants was too high for all patients and placed certain patients at increased risk for bleeding.

## b.  AS EARLY AS 2006, FLAWS ARE APPARENT IN ROCKET AF DESIGN CONTRIBUTING TO 'SUBOPTIMAL PERFORMANCE OF WARFARIN'

468.  With regard to the ROCKET clinical trial's design and outcomes, along with its many flaws, I will defer to the greater discussion in the Expert Reports of: Dr. Henry Bussey, Dr. Bud Gerstman and Dr. Henry Rinder. The ROCKET trial submitted to FDA as presented by Defendants was sufficient to support XARELTO efficacy as '*non-inferior*' to warfarin (not superior) by the statistical criteria pre-specified by Defendants to FDA for prevention of stroke and systemic embolism (SSE) in patients with non-valvular atrial fibrillation (AFib). In terms of support of safety, Defendants' data supported there were similar rates of major and non-clinically significant major bleeding between the two groups. However, internal documents showdiscussions as early as 2006 with the FDA about the concerns for the ROCKET design and potential to introduce suboptimal warfarin management by investigators.

- **Defendants Enriched the ROCKET Population by Adding Patients with Hypertension and Diabetes**

469.  According to the summary minutes by Sanjay Jolata for the 2006 End of Phase II (EOP2) meeting with Defendants, following FDA's review of a Background package, regarding the design of ROCKET AF, FDA raised concerns about the Defendants proposal to use an enriched patient population in the study for comparison of XARELTO to warfarin as the active control in a non-inferiority study. FDA indicated that Defendants' planned use of patients with a CHADS2[472] score above 2, and the inclusion of patients with hypertension and diabetes mellitus, which are also conditions placing patients at increased risk for thromboembolic events, could potentially skew the data. Specifically, this type of population mix could help reduce the constancy of the effect for SPAF seen in the warfarin active treatment arm (active control). Thus, the data could be skewed against efficacy with warfarin. In short, the ROCKET design would compare Rivaroxaban to a potentially poorer performing warfarin treatment arm (*i.e.* poor control).

- **HemoSense POC INRatio and Concern For Acceptabilty for Use in ROCKET**

---

[472] CHADS2 score used for Atrial Fibrillation patient to assess stroke risk = C, Congestive Heart Failure, H, Hypertension, A, Age ≥75 years, D, Diabetes Mellitus, S2, Prior Stroke, TIA or Thromboembolism. CHADS2 ≥0 **1.9%** stroke risk (95% CI 1.2, 3.0); CHADS2≥ 2 is **4%** risk of stroke (95% CI 3.1, 5.1), CHADS2≥3 **5.9%** risk of stroke (95% CI 4.6, 7.3); CHADS2 ≥4 **8.5%** risk of stroke (95% CI 6.3, 11.1); CHADS2≥5 **12.5%** (95% CI 8.2, 17.5), and CHADS2≥6 **18.2%** stroke (risk 95% CI 10.5, 27.4) CHADS2 score [1.9%-18.2%]

470. The first patient was enrolled in ROCKET on December 18, 2006.  Before there was any patient enrollment, Defendants consulted Dr. Markku Kaste, a professor of neurology in Finland.

471. Scott Berkowitz sent an email to Christopher Nessel et al, Subject "Summary of Teleconf with Prof Kaste of Finland November 16, 2006." Dr. Kaste, a professor of neurology in Finland, had concerns about the SPAF protocol and expressed that he might not be able to participate in the Phase III study. One of his major concerns was the risk of bleeding posed to patients, especially intracranial hemorrhage (ICH). Berkowitz provided: "Prof Kaste also raised the issue of variations in point of care PT monitor measurements and the discrepancy that may exist between INR values from these machines and those done in hospital labs.  He would like us to ensure that a few central PT measurements are made at least early in the patients' enrollment to know that there is a reasonable match between the POC and central/hospital 'wet' lab PT INRs…."[473]  Defendants did not act on Dr. Kaste's recommendations for the HemoSense device to ensure adequate performance.

472. Dr. Kaste also suggestedthat a "blood test of every patient be sent to a central laboratory in the beginning of their participation in the trial to find out if the patient is one of these peculiar patients" (*i.e.,* in whom the point of care device shows a higher or lower value than the true INR). [474]

473. On November 29, 2006, Dr. Nessel sends an email to Dr. Berkowitz attaching a document entitled "Responses to Markku Kaste".[475] According to Dr. Nessel, the statements were made to Dr. Kaste on behalf of the ROCKET-AF EC, including the following:[476],[477]

> *1…It is believed that randomization and administration of rivaroxaban to this patient population will be safe and efficacious…*
> *The trial leadership has supreme confidence in the performance and reliability and validity of the Hemosense device.  …the device has exceptionally low and quite acceptable intra-and inter-individual variability as well as remarkable congruence with a plasma-based assay.[478]*

474. Dr. Nessel testified thatwhat he believed about the HemoSense device in 2006 was based on "their diligence, the FDA 510(k) approval, the CE Mark, that was my belief about the HemoSense device."[479]  Dr. Nessel was asked about Dr. Kaste's recommendation for validation of HemoSense in 2016:

> *Q. Now, Dr. Kaste had recommended that you validate this device prior to utilizing it in ROCKET, correct?*

---

[473] Nessel Exhibit 5
[474] Nessel Exhibit 5
[475] Nessel Exhibit 6
[476] Dr. Califf was a member of the EC at the time of the statement to Dr. Kaste.
[477] Nessel depo 2/16/16, p. 60: L 12 – p. 67: L 11
[478] Nessel Exhibit 7
[479] Nessel depo 2/16/16, p. 62: L23 – p. 63: L2

*A Dr. Kaste proposed a hypothetical situation and suggested a validation, Yes, that's my understanding.*

*Q. And it's fair to say that you did not take him up on that suggestion and you did not validate this device prior to enrolling patients in ROCKET?*

*A. So this matter was discussed both at the –at the sponsor and at the level of the executive committee, and we went so far as to query Drs. Jonathan Haleprin and Dr. Jay Horrow about what was done in the SPORTIF V trial.  ...*

*And Dr. Horrow informed me, and Dr. Halperin confirmed, that no such validation was performed in the SPORTIF V trial.*

*So after discussing it at the level of the executive committee, while we appreciated Dr. Kaste's comments, we decided not to perform the validation.*[480]

*Q....Today, sir, today, do you have supreme confidence in the performance, reliability and the validity of the Hemosense device that was used in ROCKET?*

*A. That was used in ROCKET?*

*Q. Today you still do?*

*A. Yes.*[481]

475. Dr. Nessel testified that he was involved in the decision of selecting the HemoSense INRatio device.[482]  He confirmed that it was "wholly [his] responsibility to ensure the validity of the Hemosense device."[483] He had been in contact with David Phillips at HemoSense, and testified that he was unaware that J&J's company LIFESCAN also made a Point-Of-Care (POC) INR Monitoring System.[484] Defendants could have selected a laboratory-based platform for measuring INR as it has used in other studies with Rivaroxaban, but selected a point-of-care device (POC) intended for either a provider (or patient for self-monitoring) of warfarin anticoagulation (INR).[485]   Dr. Nessel would later write an email to Dr. Karuppan, dated December 19, 2012, "Subject Hemosense Device," to respond to the question: "Why the HemoSense device was chosen over other devices?"

*The device was chosen for several reasons.  The executive committee was comfortable with the results of the assay in that they closely approximated that which would have been rendered by a standard laboratory platform.  Moreover, the device could print the results.  This was particularly important during the conduct of a registration-enabling clinical trial.*[486]

---

[480] Nessel depo 2/16/16, p. 60: L12 – p. 67: L11
[481] Nessel depo 2/16/16, p. 60: L12 – p. 67: L11
[482] Nessel depo 2/16/16, p. 30: L12-15
[483] Nessel Exhibit 2
[484] Nessel depo p. 30: L16 – p. 31: L5
[485] Nessel depo p.33: L7-13
[486] Nessel Exhibit 1

476. The INRatio PT/INR device obtained from HemoSense had its software significantly altered to generate not an INR value but a new code.  The code would then be plugged into the telephone IVRS system or web-based portal.  In the event that a patient had been randomized to warfarin, the device would tell the investigator the warfarin patient's true INR (based on the HemoSense INRatio PT/INR value).  If the patient was randomized to rivaroxaban, the 7-digit code would generate a sham value to mimic what a warfarin's INR would look like based on the last three warfarin doses available.  Therefore, the HemoSense INRatio PT/INR was not the same device as the commercial device, it was an "investigational device."  Patient treatment should not have relied on the accuracy of the investigational HemoSense INRatio Pt/INR device, investigators should have been informed that there needed to be a reference back-up measure to ensure the safety of the warfarin arm patients as well as an opportunity for adequate informed consent. (21 CFR 812). No such safeguard or protection appears included in the ROCKET protocol by Defendants for the HemoSense device.

477.  When asked why he chose HemoSense, he said "we choose devices that would deliver an accurate result to the treating physician or to the patient."[487]

478. Dr. Nessel testified: "I'm no device expert."[488] Further, he testified that for ROCKET, the Executive Committee (EC) wanted a device that could be used worldwide for a study in at least 40 countries.  The Hemosense device had 510(k) clearance and CE Mark.  Dr. Nessel further testified that, "Moreover, others on the Executive Committee, Dr. Richard Becker, for example, knew that the device was being used in -- in clinics… And it was his opinion, as both a fully trained hematologist and cardiologist, that device –the device was being used successfully and satisfactorily."[489]

> *Q. Aside from the 510(k) clearance, the CE Mark, and Dr. Becker's personal experience with the device, what, if anything, did you do to reach the conclusion that you did of supreme confidence in the accuracy and reliability of the hemoSense device?*
>
> *A. …one of the first things we did, and this is kind of taking a step back before we reach the ultimate decision about the HemoSense device, is the study team—a study team was assembled.  And we performed what are called capibilities presentations, or we invited in sponsors, International Technidyne Corporation- they might have been out of Piscataway, New Jersey, at the time—and HemoSense in San Jose.*
>
> *And it was our opinion at the time, meaning both sponsors and the executive committee, that for the conduct of ROCKET—and we can—I can give you further details if you want.*
>
> *But we had excluded or precluded the use of a central lab or local labs. So now we were down to the use of point-of-care device for the ROCKET AF study.*

---

[487] Nessel depo 2/16/16, p. 32: L1-7
[488] Nessel depo 2/16/16, p. 69: L6-7
[489] Nessel depo 2/16/16, p. 68: L10 – p. 70: L20

*In looking at devices that could be used around the wold, we came upon three that were CE-Marked and 501(k) approved.  They were the HemoSense device, as we described, and two devices from ITC Med, the ProTime Jr and the HEMOCHRON.*

*We then brought in those companies, ITC and Hemosense, respectively, for capabilities presentations.  The team that was assembled to review those capabilities included functions for statistics, regulatory, what we call RTMS, randomization and trial management, clinical quality assurance, operations and clinical*

*And each-each supplier was brought in for a full-day presentation…*

*And both Horrow and Halperin concurred and recommended the use of the HemoSense device.*

*Q.  …but the other clinical trial didn't use the HemoSense device, did it?*

*A. No, it didn't*

*Q…So do you have any reason to believe that Dr. Horrow or Dr. Halperin had any personal experience or any personal knowledge abut the validity and accuracy and reliability of the HemoSense device?*

*A.…they had very specific knowledge of the HEMOCHRON device, which was used in the SPORTIF V trial…But they were not—I don't think they were largely satisfied with the HEMOCHRON device in Sportif V.*

*…It was there opinion that we should consider a different device.* [490]

479. Dr. Nessel sent an email, "Subject: Questions about Hemosense," to Dr. Mahaffey on February 10, 2007, saying that he recalled Dr. Mahaffey at a meeting in Vienna expressing concerns about the HemoSense device, but he could not recall what the concerns were about. Dr. Mahaffey responded on Febraury 11, 2007, to Dr. Nessel that "there are three things that are needed.

*1. A scientific summary of the published literature on the device for the Exec and Steering committee, with him provided a list of publications and a copy of the key 2-4 papers.*

*2. A summary of the device for the site coordinators and the PIs. We could provide the reference list and only the papers if requested. This needs to be wrapped in with a summary for the sites about the effect of riavoarxaban on the INR and the critical need not to get a local INR and if one is done that the result of the INR does not allow one to 'guess' which study arm patient is in. Here is a list of things to consider for this summary….*

- *Rivaroxaban can affect the INR…*

- *Patient safety is crucial so if unblinding is needed please call the helpline to review with a study physician so this can be done and appropriate therapy instigated.*

---

[490] Nessel depo 2/16/16, p. 73: L12 – p. 76: L6

- *The protocol stipulates that you should not get local INR*

- *We need to maintain integrity of the blinding procedures to perseve the scientific methodology.*

> *3. A consensus agreement from the Exec Comm about how to address the concern about the accuracy of the hemosense device in the higher ranges of INR. Rick Becker has looked into this and agrees. A couple of sites talked to me about this in both atlanta and Vienna. I also agree there is i(sic) higher level of discordance in higher ranges but I don't think this impacts clinical care because you simply recheck INR with device a day or two earlier than you normally would so that INR does not fall from too high through the therapeutic window to a level that is 'under-anticoagulated.'*[491]

480. Dr. Nessel responded to Dr. Mahaffey on February 12, 2007 that "this helps immensely and it is wholly my responsibility to reassure the EC and the sites about the validity and realiability of the device."[492]

481. Dr. Nessel testified in 2016 that he was aware that HemoSense had been sent two FDA Warning Letters for inadequate investigations and follow-up of reported instances of the INRatio device malfunctioning. But he could not recall if he had shared the information with the Executive Committee.[493] He did not recall when he became aware of the Warning Letters. He was shown a January 22, 2007 email from Bill Byra with the Subject line "Other warning letter to hemosense."[494] The letter attached was an October 4, 2005 Warning Letter to HemoSense. Dr. Nessel testified that he cannot opine as to the significance of an FDA Warning Letter despite having worked in the pharmaceutical industry for 10 years.[495]He also did not dispute he was in possession of the 2005 Warning Letter in January 2007. He also testified that he was aware that the FDA had raised concerns about the INRatio device generating clinically significant erroneous values.[496] He also agreed that the issue should have been investigated before having a conversation with the EC.

482. Regarding the 2005 Warning Letter, Dr. Nessel testified that an investigation was done in order to understand the nature of the letter and the remediation steps put into place by the manufacturer. This investigation was conducted by an assembled study team with members from regulatory and clinical quality assurance, RT, MS, clinical and operations. A meeting was also held between Hemosense and Defendants.[497] Bernadette O'Brien led the investigation as the representative from clinical quality assurance. He testified:

---

[491] Nessel Exhibit 2
[492] Nessel Exhibit 2
[493] Nessel depo 2/16/16, p. 77: L16 – p. 78: L8
[494] Nessel Exhibit 8, Nessel Exhibit 9
[495] Nessel depo 2/26/16, p. 82: L2-18
[496] Nessel depo 2/16/16, p. 81: L6 – p. 86: L18
[497] Nessel depo 2/16/16, p. 86: L20 –p. 87: L9

> *...nowhere in this letter does it say that the devices cannot be used or should not be used or were being pulled from the market.*
> *At no time was the sponsor advised by the FDA that the devices were being pulled from the market or, in fact, that they should not be used during the conduct of the clinical study. [498]*

483. Ms. O'Brien interacted with Hemosense and it was her opinion the remediation actions were appropriate. Dr. Nessel could not confirm whether he had seen any aspect of this investigation written down.[499]

484. He received a second email from Sanjay Jalota on January 11, 2007, "Subject Confidential regarding FDA Warning Letter," attaching a November 29, 2006 Warning Letter. Dr. Nessel's receipt of the two Warning Letters from FDA confirms they were both received prior to the start of ROCKET.[500]

485. Dr. Nessel was asked if the Defendants did anything beyond relying on the 510(k), CE Mark, and representations of both the Hemosense manufacturer and Dr. Becker to substantiate what he described as a "supreme confidence in Hemosense." He responded as follows:

> *A....As a matter of fact, early during the conduct of the ROCKET study, we had a personal conversation with Dr. Steve Gutman of CDRH, who is, in part, responsible for the approval of such devices. And it was Dr. Gutman's opinion that the device— and he knew we were using it in the ROCKET study, and he had no concerns about the use of the device in the ongoing study. [501]*

486. Without a written document of the opinion requested by Defendants about HemoSense and then a written opinion from FDA, including Dr. Gutman, the Director of the OVID, it cannot be determined what Dr. Gutman was asked or told and if he was made fully aware that the INRatio software had been significantly altered for ROCKET and was not the device that was 510(k) cleared, the context of the discussion, or that he was informed that the Hemosense device was being relied on as the only test for patients management without any backup laboratory testing , it is difficult to comment on what Dr. Gutman may or may not have known or said to Defendants about the HemoSense. The generation of two Warning Letters (2005 and 2006) may or may not have involved members of CDRH's premarket ODE's Office of In Vitro Devices (OVID). So he may not have had any or very limited information about the Warning letter, Hemosense and the INRatio recall. Official FDA opinions are made in writing to FDA and responded to by a member of FDA with designated authority and in writing. [502].

> *Q. Did you ever actually look at any data that compared the INRatio device with a central lab to see if it was, in fact, accurate and reliable?*

---

[498] Nessel depo 2/16/16, p. 88: L17 – p. 89: L23
[499] Nessel depo 2/16/16, p. 90: L1-19
[500] Nessel exhibit 12
[501] Nessel depo 2/16/16, p. 104: L4 – p. 105: L10; Nessel Exhibit 12
[502] 21 CFR§ 10.85

*A. We did not.*

*Prior to the conduct of the ROCKET AF study, we did not draw blood samples from patients and compare the point of care device to a central labe.*

*We did not draw paired blood samples; that is correct.*[503]

487. Dr. Nessel was asked if he had seen the article by Taborski et al. entitled, "Analytical Performance of the New Coagulation Monitoring System INRatio for the Determination of INR Compared with the Coagulation Monitor Coaguchek S and an Established Laboratory Method"[504] from 2004.  He believed he had seen it in 2006 or 2007. Figure 2 within the article depicted a comparison of results generated by the INRatio device versus a reference lab value, and showed that the INRatio device inappropriately identified 38% of the patients as being within range when the lab INR value was above range. Dr. Nessel testified that he was aware of this information at the time the device was chosen for ROCKET in 2006. [505]

488. There is an internal series of emails in October 2007, started by Dr. Peter DiBattiste to Gary Peters and Christopher Nessel, regarding a ROCKET patient in Canada who had a POC INR of 2.9, and four hours later, during a hospitalization forepistaxis, had a lab INR of 10.  Dr. DiBattiste stated that "questions have thus arisen about the device and the accuracy of the readouts, both for this particular device and for the devices in general… if the subject was on warfarin, then do we have an issue with the accuracy of this device?[506]

489. Dr. Peters responded, "*I think it is recognized that these machines do not perform as well at extremes of INR but would need to confirm this.*"[507]

490. Dr. Nessel followed up by email on October 18, 2007: "Based on some in-depth discussion with Rick Becker, both the POC and plasma-based assay demonstrate a decrement in validity once the INR exceeds 5.5-6. However, even if the margin of error in excess of 2 (absolute), the concern remains about the patient and the devices' performance."[508]

491. Dr. Dibattiste then responded on October 18, 2007, stating: "We should consider some method/effort to periodically validate the devices… trial wide. The successful execution of this study depends on the devices and investigator confidence in them."He further stated: "This is not the first time we have had potential concerns with INRs and Hemosense."[509]

---

[503] Nessel depo 2/16/16, p. 105: L12 – p. 106: L16
[504] Nessel Exhibit 13
[505] Nessel depo 2/16/16, p. 113: L2 - p. 114: L23.
[506] Nessel Exhibit 19
[507] Nessel Exhibit 19
[508] Nessel Exhibit 19
[509] Nessel Exhibit 19

492. Then on April 2, 2008, Dr. Nessel sent an email to Peter DiBattiste and Gary Peters, "Subject ROCKET AF INR data", writing: "You will recall the comment of Dr. Marciniak at the end –of-phase II meeting about the performance of warfarin in ROCKET AF.  He noted that 'it had better look good' or something similar. The target INR can be analyzed in numerous ways (i.e. raw percent, proportion, etc.). I was about to request a report on INR performance. I recognize all of the caveats, this is a blinded trial and that we cannot unduly influence patient management. However, I am concerned that if we "don't look", we may arrive at database lock to find that warfarin was so poorly regulated the trial is invalid. Foir example, the literature rate is 65% and we present 40%. To date, there have been over 32,000 individual INRs performed."[510]

493. As discussed above, Dr. Nessel confirmed it was "wholly [his] responsibility" to ensure the validity of the HemoSense device used in ROCKET.  Thus, when questions were raised by the Executive Committee, he was tasked with contacting David Phillips, his direct contact at HemoSense.

494. Dr. Nessel was contacted pursuant to a very specific recall of the INRatio device that was issued in December 2014. Regarding the recall, he testified:

> *Q. Would it be fair to say that you personaly were unaware of nay potential malfunction of the INRatio device in the ROCKET clinical trial until you were contacted by a reporter with the British medical journal in September of last year?*
>
> *A. Yes.*
>
> *Q...I want to known when did you first learn that the device called the INRatio may have malfunctioned during the ROCKET clinical trial?*
> *A. In September 2015.[511]*

495. Dr. Nessel testified that he agreed with Dr. DiBattiste's statement about the importance of the HemoSense device for ROCKET and confidence of investigators in the performance of the device.[512]

- **Poor Warfarin Management without Adequate Management Instructions for Investigators**

496. There is a discussion of the flaws that contributed to the poor warfarin outcome in the November 4, 2011 FDA NDA 20-2439 Summary Review by Stephen Grant, MD, Deputy Division Director FDA.  He wrote the Decision Memo and summary after the FDA's September 2011 Advisory Committee Meeting (see below).  In the summary, Dr. Grant called ROCKET an attempt at a "real world" trial in which dosing of warfarin was left to the discretion of the individual investigators.  There was no adjustment of warfarin centrally based on a specific algorithm.   Seeing the results of ROCKET, Dr. Grant wrote that FDA had actually considered the possibility that Defendants deliberately selected investigators for ROCKET who were "unfamiliar or unskilled in managing warfarin".

---

[510] Nessel Exhibit 4
[511] Nessel depo 2/16/16, p. 122: L10 – p. 124: L3
[512] Nessel depo 2/16/16, p. 199: L 3-22

He said this would be unethical and would place warfarin patients at increased risk.  He indicated that as of 2011, FDA was unaware of any 'evidence' that the Sponsor deliberately chose investigators unable to manage patient warfarin:

> *If the applicant had deliberately attempted to choose investigators that were unfamiliar or unskillful in managing warfarin there would have been an ethical problem because then patients would have received suboptimal care as a result of enrolling in the trial.  Although OSI inspections revealed investigators who did not follow US standards for managing warfarin dose, the Division is unaware of any evidence that the applicant deliberately chose investigators because they would not be skillful in managing warfarin dosing.*[513]

497. Dr. S. Nissen, a voting member of FDA's XARELTO SPAF Advisory Committee Meeting on September 8, 2011, and who voted against approval of XARELTO for SPAF, expressed his concerns that the physician investigators in ROCKET were not provided adequate instructions on warfarin management for ROCKET.  He called this a failure of Defendants in the ROCKET study design.  He also said that "if you were cynical" you would say the ROCKET trial was designed not to have warfarin particularly well controlled:

> *...could the TTR have been better? And my conclusion is that it could have been, that there is a fatal flaw in the study design, in that there were not instructions given. And so, if you were cynical, you'd say that warfarin was designed to not be given particularly well in the trial.  And I think it was an oversight, not necessarily an intent, but the other trials in this field used algorithms for treatment that allowed them to get the TTR up into the mid-60s.*
>
> *That wasn't done here, and it left me with a sense of doubt that using the ITT analysis and then further deflating evidence of non-inferiority because of uncertainty about the TTR, now, you get to the point where I worry.* [514]

## XII.    DEFENDANTS' ROCKET AF STUDY FOR SPAF INDICATION

498. The Defendants' next XARELTO NDA approval was for NDA 20-2439 for prevention of stroke and systemic emboli in non-valvular atrial fibrillation patients (SPAF).  Defendants, as planned, were able to rely on the FDA's July 1, 2011 approval for VTE-P and its prior phase II safety studies (Study 10942, 10944, 10944, 11527), as well as all of Defendants' other clinical studies with no distinction made by FDA for differing indications, patient populations or potential drug exposures: EINSTEIN, EINSTEIN Extension, RECORD, ATLAS, MAGELLAN, and J-ROCKET.  As planned, Defendants were able to use the same pharmacokinetic and pharmacodynamics testing conducted in

---

[513] Burton Exhibit 41

[514] September 8, 2011 FDA Cardiovascular and Renal Drug Products Advisory Committee Meeting,  Dr. Nissen, transcript p. 395: L6 – p. 398: L15

orthopedic surgery VTE patients to support XARELTO for SPAF.  The Rivaroxaban IND was # 75,238.[515]

499. The submission date for the SPAF NDA was January 4, 2011. The PDUFA completion Goal Date for FDA was November 5, 2011, with  FDA's final NDA Approval on November 5, 2011. The Medical Officer Reviews and Clinical Pharmacology Reviews were completed on August 10, 2011, prior to the FDA's September 2011 Cardiovascular and Renal Drug Products Advisory Committee meeting.

500. ROCKET-AF was a Phase 3 single pivotal international study used to support approval of XARELTO for the SPAF indication. There were a total of 14,269 patients randomized to receive either rivoraxaban (20mg OD or 15 mg OD if CrCl is 30-49 ml/min) or dose adjusted warfarin (INR target range of 2-3).  Patients enrolled were to have nonvalvular atrial fibrillation with at least two risk factors for stroke, such as congestive heart failure (CHF), hypertension, age ≥75 years and diabetes or a prior history of stroke, TIA or systemic embolus events (CHADS2 >2).  The populations were considered well balanced by FDA and 37-38% subjects were vitamin K antagonist (warfarin) naïve patients in the safety population.

501. Unlike RECORD (VTE-P) (with a direct comparison of XARELTO to enoxaparin), ROCKET AF (or ROCKET GLOBAL) was a non-inferiority study ("NI") study.).[516] The protocol proposed to double the daily dose of rivaroxaban from 10mg of VTE-P to 20mg OD for SPAF to be taken by a patient for the rest of the patient's life.  Unlike VTE, the AF patients were a more fragile population of patients with atrial fibrillation (AF) as well as other major systemic health conditions.  This doubling of dose for all patients for SPAF had originally triggered FDA's concerns for VTE and short term use. The Phase II studies had shown a four-fold increased risk of bleeding with a doubling of dose for VTE prevention at 8 weeks of use compared to enoxaparin.

502. Defendants selected the 20 mg dose to be given once a day (QD/OD) (or 15 mg QD in patients with creatinine clearance (CrCl) 30-50) along with food.  The protocol was that 20mg OD could be taken for SPAF chronically without any need for additional patient monitoring or dose titration. There was an add-on Phase III study conducted in Japan called J-ROCKET AF, which used a 15mg OD dose (10mg if creatinine clearance was 30-49 mL/min) and Japanese guidelines for warfarin and INR maintenance. As already discussed, Japanese patients are known to have a 40% higher serum concentration for rivaroxaban.

503. The protocol made no attempt to collect prospective data on risks, benefits, and/or plasma concentration to develop additional drug outcomes-correlation information (benefits/risk) or make recommendations for patient monitoring and/or drug titration.  As a non-inferiority study, XARELTO could be FDA approved for SPAF if ROCKET data showed

---

[515] Rhoge Exhibit 6
[516] FDA Draft Guidance For Industry Non-Inferiority Clinical Trials March 2010
(http://webcache.googleusercontent.com/search?q=cache:SPDO2MpyhMoJ:www.fda.gov/downloads/Drugs/.../Guidances/UCM202140.pdf+&cd=1&hl=en&ct=clnk&gl=us)

that a once a day dose fits all patients and was not significantly worse than managed warfarin for SPAF.  The non-inferiority margin was 1.46 but later changed to 1.38 for hazard ratio.

504. ROCKET was never intended or required to be a head-to-head comparison of XARELTO to other approved DOAC/NOAC drugs, like Pradaxa..[517]  However, head-to-head testing and scientific data would be required to support marketing claims of comparative efficacy and safety.

505. Non inferiority of rivaroxaban to warfarin was demonstrated for the primary safety endpoint with a pre-specifed margin of 2. Safety was assessed by the composite of major and non-major clinically relevant bleeding events comparing rivaroxaban to warfarin. The Rivaroxaban group had numerically lower event rates for the primary efficacy endpoint, which was a composite of adjudicated stroke and non-CNS systemic embolism, compared with warfarin in the per-protocol (PP), on treatment population (Event rate: 1.26 vs 2.16/100 pt-years, respectively).

506. It was a double-blinded study, meaning that both patients and physicians were intended to be blinded as to whether a patient was assigned to take XARELTO or warfarin.  The maintenance of ROCKET's blinding was facilaited by Defendants' use in the ROCKET protocol of a modified Point of Care (POC) HemoSense INRatio PT/INR Monitoring System.  The commercial HemoSense device is 510(k) cleared as intended to be used by providers or patients to self-monitor (or providers to monitor) INR values for warfarin maintenance.  The INR values from the POC device are to provide a quick, reliable and easy method for helping with warfarin adjustment.  However, the Hemosense device in ROCKET differed from a commercial POC device.  The software for the read-out had been significantly modified.  The machine did not provide an INR value, but insteadprovided a coded value. The coded HemoSense value obtained in ROCKET needed to be decoded by a physician and used to manage either the patient's warfarin or XARELTO.  A commercial POC device for monitoring warfarin in an anticoagulated patient is intended to add convenience and reliability, and improved medical outcome which would translate into reduced medical costs.  For example, a patient can use the system to obtain the INR for warfarin and call the value into a source where it can be given to a physican for prescription of warfarin.   HemoSense was one of many manufacturers with 510(k) cleared coagulation devices sold in the United States.  The HemoSense INRatio PT/INR, unlike the commercial device, when modified and used in the ROCKET Study was an 'investigational' device (21 CFR 812).  An investigational device is a device that has not been shown to be safe and effective, and has not been cleared by FDA for commercial marketing.  There are certain ethical and reporting controls and restrictions placed on the Sponsor of an investigational device like INRatio that has not been cleared or

---

[517] On October 19, 2010, the FDA approved PRADAXA (Boehringer Ingelheim) for SPAF. The EMA issued a marketing authorization on March 18, 2008. Canadian health authorities approved Pradaxa on June 10, 2008. On May 13, 2014, the FDA issued a Safety Alert entitled "FDA Study of Medicare patients finds risk lower for stroke and death but higher for gastrointestinal bleeding with Pradaxa (dabigatran) compared to warfarin." On October 29, 2014, FDA issued another Safety Alert entitled "Pradaxa should not be used in patients with mechanical prosthetic heart valves." *See* BMJ Cohen D. *Dabigatran: how the drug company withheld important analyses.* BMJ (2014); 349; Moore TJ, Cohen MR, Mattison DR. *Dabigatran, bleeding, and the regulators*. BMJ (July 2014) 349:g4517.

approved for marketing in the United States.  The IND (IDE) process (21 CFR 312 (as a drug) /21 CFR 812(as a device)) was designed by Congress to provide an exemption so that an investigational new device could be 'investigated' in United States patients in clinical studies.  The use of an investigational device in a clinical protocol must be described in the Informed Consent for the patients (21 CFR part 50).  An investigational device, even an in vitro diagnostic device, unlike a commercial device, is not intended to be solely relied upon (without a backup method) for determination of patient medical care, including management of warfarin.

507.  The primary endpoint for ROCKET was a comparison between both arms of 'time of event.'  Defendants' 'time in therapeutic range' (TTR) for the ROCKET warfarin arm showed poor therapeutic control (low) in the world's AF patients (TTR 55%).  This TTR for warfarin management at the end of ROCKET fell below that of prior warfarin studies.

508.  The median exposure in ROCKET-AF of patients was about 19 months.  Defendants' enrollment of subjects in ROCKET began with the first enrolled patient on December 18, 2006 and extended through 2009.  Based on ROCKET's results as submitted to FDA in the NDA, the hazard ratio HR for rivaroxaban vs warfarin for safety in the "*on treatment*" population had a **1.04** (0.90, 1.20) risk for **"Major"** hemorrhage.  Defendants supported the claim that XARELTO was 'not inferior' to warfarin when viewed in terms of the benefits of lifestyle and support with ROCKET of an acceptable increased risk in major bleeding compared to bleeding with warfarin.  However, the significant negative issue for ROCKET as NI was the 55% TTR for the warfarin population, which was lower than any of the other NOAC studies.  To FDA's medical reviewers the low TTR potentially compromised the value of the ROCKET data as a NI study to support approval of the NDA for SPAF.

a.  **DEFENDANTS CHOSE TO INVESTIGATE A SINGLE 20 MG ONCE A DAY DOSE WITH NO DRUG MONITORING OR TITRATION**

509.  Defendants (not the FDA) selected to investigate only a 20mg OD dose (or 15 mg OD dose in patients with renal impairment).  Even the outside experts at the meeting held by Bayer in 2003 recommended investigation of two doses, with a final switch to the best dose.  As the FDA's Medical Officer reviewer of efficacy wrote in FDA's published review for NDA 20-439, in terms of the dose selected and the response detected in all Defendants Phase 2 and Phase 3 clinical studies, data available before NDA approval and commercial launch, and which also should have been known to both Defendants as experts in XARELTO:

> *...the sponsor's rationale for evaluating only once daily dosing in Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials in the Sponsor's ACS and VTE programs (including a direct comparison in VTE Study 11223 of once daily vs. twice daily dosing at the same total dose that favored the latter in terms of VTE treatment, and another direct comparison favoring twice daily dosing at the same total daily dose in the overall results of ATLAS ACS TIMI 46.) There is also information from clinical pharmacology studies suggesting that twice*

> *daily dosing would produce substantially lower peak blood levels and substantially higher trough blood levels of rivaroxaban than once daily dosing, which might have been associated with a better safety profile.  It might also be associated with improved efficacy, such as lower primary efficacy endpoint rate in patients with a prior history of stroke, a high-risk group that might benefit from better round-the-clock anticoagulation.  There is also information from the DVT program suggesting that a lower total daily dose might have been as effective as 20mg…This reviewer recommends that the sponsor must perform a clinical study to evaluate the efficacy and safety of a lower dose and/or additional dosing regimens, including at least one BID regimen, before this product is approved.[518]*

510. The Summary Review (NDA 20-2439), dated November 4, 2011, by Stephen Grant, MD, Deputy Division Director FDA, provides a  discussion of the flaws that contributed to the poor warfarin outcome in the ROCKET trial.  He wrote the Decision Memo and Summary after the FDA's September 2011 Advisory Committee Meeting. Dr. Grant wrote that despite the concerns of the FDA about the selection of the 20mg dose by Defendants, it "did not have the authority to place the trial on hold for inadequate dose selection".[519] (underlining added for emphasis):

> *The Division concurs with all reviewers of this NDA that <u>data adequate to select a dose to be tested in ROCKET were not available when the trial was designed</u>. The applicant chose the dose to be tested in ROCKET based on two small dose-ranging studies…*
>
> *Nonetheless, the Division allowed ROCKET to proceed.  <u>We did so because we lack authority to put trials on clinical hold for inadequate dose selection</u>.[520]*

511. At the FDA Advisory Committee Meeting of September 8, 2011, Dr. Dunnmon, one of FDA's Clinical Reviewers of NDA 202439, gave FDA's PowerPoint presentation titled "Dose Selection for ROCKET," which was based on PK-PD Profile, VTE Treatment Studies, ATLAS ACS 1 TIMI 46 and ROCKET PK-PD Outcomes.  Prothrombin time (PT) was used by Defendant as a '*surrogate*' for rivaroxaban 'exposure'.'  His slides indicated there were "*no dose ranging studies in atrial fibrillation patients,*" and "*ROCKET dose based on two small Phase 2 VTE treatment studies- 20mg/day lowest total daily dose given in either study*".  One slide was titled "*BID Regimen has lower PT fluctuation compared to QD regimen*" with the comment that in normal volunteers the half-life  (t ½) was 5-9 hours and in elderly 11-13 hours and a "*Minimal PT effect in the 2nd half of the inter-dosing interval with QD dosing.*"[521]

---

[518] NDA 202439 FDA Medical Review 2011 at p. 17
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[519] Misselwitz Exhibit 4; NDA 202439 FDA Summary Review
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[520] Misselwitz Exhibit 4; NDA 202439 FDA Summary Review
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[521] NDA 202439 FDA Slides for Advisory Committee Meeting, September 8, 2011, at slide 3
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm) [Study 10942- BID dosing when compared to Study 11527 OD dosing had shown less bleeding with BID dosing.]

512. According to Dr. Dunnmon, Defendants' VTE Study 11223 "*tested total daily dose given QD and BID,*" and showed "*Better efficacy with BID dosing*" and "*Numerically fewer non-major bleeding events with BID dosing.*" [522] In terms of bleeding for DVT, the BID dosing as well as lower total dose (10mg to 30mg BID) versus 40mg QD, the BID dosing showed reduced risk of bleeding in Study 11223. The other study relied upon by Defendants was Phase II "ATLAS ACS 1 TIMI 46 Bleeding Events," which examined a dose range of 5mg-20mg as QD versus BID dosing (including 2.5 mg BID). For the lowest dose (a total of 5mg per day), the 2.5mg BID dosing had the lowest hazard ratio (HR) for bleeding events (0.81 (95% CI 0.09-7.23) compared to 5mg QD with HR 1.67 (95% CI 0.31-9.14). The studies used prothrombin (PT) to measure the anticoagulant effect as a surrogate marker for plasma concentration. In Dr. Dunnmon's slide titled "*Effect on PT is Concentration Dependent,*" he wrote:

> *The established close-to-linear PT/rivaroxaban plasma concentration relationship in Phase 2 supported the use of PT exposure-driven safety and efficacy analyses for the Phase 3 trials.*[523]

513. Regarding ROCKET, Dr. Dunnmon's slide entitled "*ROCKET Rivaroxaban- PT dependent increased risk for major bleeding but no relationship for ischemic stroke,*" contained a figure showing that the risk of major bleeding with rivaroxaban directly increased with the prolongation of the last observed PT (second).[524]

514. His "CONCLUSIONS" for the QD ROCKET STUDY dosing were as follows:

- *Clinical pharmacology attributes suggest BID dosing of Rivaroxaban*

- *VTE studies do not provide a firm basis for the dose and regimen studied in ROCKET*

- *20 mg QD dose of Rivaroxaban in ROCKET*
  *-Twice the approved VTE prevention dose (10 mgQD)*
  *-Lower and split dosing incorporated into ATLAS ACS-2*
  - *2.5mg BID*
  - *5.0mg BID*[525]

---

[522] NDA 202439 FDA Slides for Advisory Committee Meeting, September 8, 2011,
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[523] NDA 203439 FDA Slides for Advisory Committee Meeting, September 8, 2011, at slide 8
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[524] NDA 202439 FDA Slides for Advisory Committee Meeting, September 8, 2011, at slide 10
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[525] NDA 202439 FDA Slides for Advisory Committee Meeting, September 8, 2011, at slide 11
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

- *Ischemic Stroke and Major bleeding in ROCKET*
  - *Warfarin: increasing INR associated with decreasing ischemic stroke and increasing major bleeds*

  - *Rivaroxaban: flat PT/ischemic stroke relationship, but increasing PT associated with increasing major bleeds.*[526]

515. The Advisory Panel, on September 8, 2011, was asked to comment on whether it was reasonable for Defendants to test a single dosing regimen in ROCKET-AF given the short half-life and nonlinear kinetics of rivaroxaban.[527]

516. At the end of 2015, both the EMA and FDA held public meetings and workshops to discuss the need to measure blood levels (Therapeutic Drug Monitoring) of direct oral anticoagulants (DOAC) and adjust the dose accordingly to maximize benefit and minimize harm (bleeding) (see discussion of three Public Meeting in 2015 below). Defendants, unlike FDA, EMA, physicians and academia at those public forums, continue to indicate that monitoring and titration of XARELTO is not necessary or appropriate.[528]

517. A February 12, 2015 presentation by FDA's Robert Temple, Deputy Director for Clinical Science CDER, suggested that the FDA believes there is a scientific argument for measuring the blood levels of these drugs and adjusting the dose.[529]

> *Being too low leads to a stroke, a very bad outcome, and being too high leads to major bleeds, also bad, so that early optimization [of the dose] seems worthwhile … the NOACs are very good, but could probably be better.*[530]

518. The Clinical Pharmacology Review for CDER asked, "3.2 Is the proposed dose and dosing regimen justified?" The dose selection in ROCKET was based on the results of Study 11223 ODIXa-DVT and Study 11528 EINSTEIN-DVT. To date, studies have not been conducted to specifically look at the difference between once daily and twice daily dosing regimens for the same total daily dose within a single study. Cross-study comparisons were inconclusive.

519. Defendants' ATLAS TIMI ACS 46 was a phase II dose selection study conducted in ACS patients. It covered a total daily dose range of 5mg to 20mg either OD or BID and

[526] NDA 202439 FDA Slides for Advisory Committee Meeting, September 8, 2011, at slide 12 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[527] NDA 202439 FDA Advisory Committee Meeting Transcript, September 8, 2011 at p. 286 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)
[528] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352
[529] Feb. 12, 2015 Presentation by Robert Temple, MD (CSRC), NOAC Dosing: Evolution  Regulatory Considerations – *Evolution of Clinical Trial Designs* (http://webcache.googleusercontent.com/search?q=cache:vdgOUo9P81UJ:www.asq509.org/ht/a/GetDocumentAction/i/101158+&cd=1&hl=en&ct=clnk&gl=us)
[530] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352

showed a numerical advantage for safety and efficacy for the BID regimen.  As a result of this pahse II study, the sponsor selected a BID regimen for its phase III ACS program using ACS TIMI 51.

## b.  CALCULATION OF MEDIAN TIME IN THERAPEUTIC RANGE (TTR)

520.  In April 2011, Dr. Rose and the EMA Reviewer questioned how the Defendants calculated median TTR for the warfarin arm for ROCKET AF.

521.  Not specifically addressed by Dr. Rose was that ROCKET AF and EINSTEIN-DVT both had warfarin median TTRs calculated in the 50s, which was below the TTR for other non-inferior trials with warfarin.  The EINSTEIN-PE study had a median TTR of 60%.[531]

522.  In an email dated March 26, 2009, Dr. Nessel wrote: "clincians are exhorted to keep the INR at 2.5".  He stated that TTR was never calculated during the conduct of the ROCKET study. He did confirm that in terms of evaluating performance of the warfarin arm that you look at the amount of time in therapeutic range, however, the EC debated whether or not to calculate the TTR during the conduct of the study and this was unanimously rejected.[532]

523.  Dr. Singer (investigator) prepared a 2-page memo summarizing his thought on the "challenging matter" (*i.e.,* the primary criticism of ROCKET AF being that rivaroxaban was compared to "mediocre quality warfarin anticoagulation") noting the concern that the TTR in ROCKET was "substantially lower than in RE-LY and SPORTIF" (about 64%). Singer discussed the difference between the center TTR analysis and the individual TTR analysis, stating, "We are all uncomfortable with the individual TTR analysis." He also studied the dabigatran briefing book submitted to the FDA to assess the FDA's views. Singer noted that he was interested in the individual level analysis of rivaroxaban vs warfarin, but there are "scientific and strategy" reasons for not doing the analysis. He summarized two analytical approaches: (1) Duke's approach - develop a model that would provide the estimate of HR at any level of TTR that would include the terms for therapy of rivaroxaban vs warfarin, which Singer stated could directly answer the question of whether rivroxaban is as good as warfarin at TTR=65%; (2) J&J's approach - a propensity score for TTR would be developed, where patients would be assigned a score from the model and grouped by deciles, which would not directly answer the question.[533]

## c.  ROCKET DID NOT INVESTIGATE COMBINED P-GP CYP3A4- PGP INHIBITORS AND INDUCERS, OR PROVIDE MEANS FOR ADEQUATE DRUG TITRATION TO REDUCE PATIENT RISKS AS REQUESTED BY FDA

---

[531] NDA 22-406 Supplements S-001, S-002, and S-003 were approved by the Division of Hematology on November 2, 2012, to expand the DVT and PE indications and length of use of XARELTO for marketing in the United States.
[532] Nessel Exhibit 3
[533] XARELTO_JANSSEN_06768554

175

524. In an email dated Febaruary 6, 2009, Dr. Mueck discussed FDA's concerns about increased risk of bleeding and conceded that FDA's point about "*undesired overdose effect*" (increased plasma concentration) with CYP3A4/P-gp was "scientifically valid". Nevertheless, his message was to "*push back*" on FDA.[534]

525. FDA's OCP reviewers characterized rivaroxaban as a **substrate of both P-glycoprotein (Pgp) and an active transport "breast cancer resistance protein" (BCRP).** Both of **t**hese transporter mechanisms (Pgp and BRCP) are thought to play a role in active secretion (and clearance) of rivaroxaban from the body by the kidney.

526. When new drugs are developed, the FDA requires they be tested for drug interactions with a small number of medications well characterized for significant interactions. This is usually done in the laboratory, as well as in animal models and cell cultures. The DOACS (rivaroxaban (Xarelto), apixaban (Eliquis), dabigatran (Pradaxa), edoxaban (Savaysa)) are all known to be P-gp substrates transported for elimination by the body by P-glycoprotein (P-gp).

527. P-glycoprotein (P-gp) are proteins located in the cell membrane throughout the body and can transport (carry) drugs (substrates) through the body for elimination by the kidney, liver, intestines, and blood-brain barrier. P-gp is coded for by ABCB1 (also called Multidrug Resistance Protein (MDR1). There are different genetic variants for P-gp transporters with some produced in individuals that are less effective for elimination of drugs. The ABCB1 genetic makeup of an individual can alter how that individual is able to transport and eliminate a drug. Different drugs which are substrates requiring transport by P-gp when taken together can compete for P-gp, and have the ability to alter blood levels of one or both drugs. **P-gp substrates** besides rivaroxaban are prescribed for GI and cardiac symptoms, as antibiotics, for pain control, to lower lipids like statins, as antiseizure medications, and as hormones and chemotherapy agents. The names of P-gp substrates include the following: cimetidine (Tagamet), digoxin (Lanoxin), diltiazem (Cardiozem), Domperidone, Doxuribicin (Adriamycin), Atorvastatin (Lipitor), Bromocriptine (Cycloset), Carbamazepine (Tegretol), Erythromycin, Estradiol, Lovastatin (Mevacor), Morphine, Phenytoin (Dilantin), Quinidine, Ranitidine (Zantac), Sirolimus (Rapamune), tetracycline, Vinblastine.

528. There are also common drugs called '**P-gp inhibitors'** which essentially inhibit P-gp transport (slow P-gp down).[535] P-gp inhibitors also include heart drugs, pain medicines, antifungals, statins, antihypertensives, hormones, and chemotherapy drugs with names like Amiodarone (Cordarone), Captoril (Capoten), Ketoconazole (Nizoral), Meperidine (Demerol), Progesterone, Methadone, Tamoxifen.

---

[534] Mueck Exhibit 27

[535] If Drug A, a substrate like rivaroxaban, is taken along with a drug that is a P-gp inhibitor then the blood levels of Drug A (rivaroxaban) may be increased since Drug A will not be transported as quickly by P-gp for elimination.

529. There are drugs and products known as **P-gp inducers**.[536]  Example of P-gp drug inducers are: Carbamzepine (Tegretol), Morphine (MS Contin), phenobarbital, phenytoin (Dilantin), Retinoic Acid, Spironolactone (Aldactone), St. John's Wort (dietary supplement), and Rifampin.  Some drugs are both inducers and substrates, some are considered strong inhibitors or inducers, while others are considered weak inhibitors or inducers.

530. According to an example on the website, Straight Healthcare, when people are taking three or more drugs, the potential for compounded interactions exist.  For example, if Drug A is metabolized by CYP2D6 (cytochrome P450 enzyme) and it is transported by P-gp, Drug B may inhibit cytochrome CYP2D6 while Drug C inhibits P-gp.  When Drug A is taken with Drug B, its elimination is partially decreased, but not significantly decreased.  When Drug A is taken with Drug B and Drug C, its elimination is decreased substantially and the interactions between the three drugs become significant.[537]

531. According to the FDA OCP reviewer, Rivaroxaban is also transported by Breast Cancer Resistance Protein (BCRP) which is also called "ATP-binding cassette sub-family G member 2" (ABCG2).  It is also a membrane associated protein coded for by a gene included in a superfamily of ATP-binding cassette (ABC) transporters. BCRP protein functions as a foreing compound transporter by the body and which can paly a role in multi-drug resistance to chemotherapeutic agent.  BCRP/ABCG2 has a role in the apical membrane of the intestine, where it blocks absorption of foreign substances by the intestine.  In the membrane of the kidney and liver it enhances excretion of foreign chemical substances (elimination).  Both the P-gp and BCRP are thought to actively help transport rivaroxaban to the kidneys, liver, bile and gastrointestinal tract for elimination.

532.  FDA also wrote in its OCP revew that approximately 50% of an orally administered dose undergoes **metabolic degradation via (CYP3A4/3A5, CYP2J2** and hydrolytic cleavage). The remainer is excreted unchanged via **Pgp/BCRP mediated active renal secretion** and in the feces.

533. Approximately 50% of the dose of rivaroxaban must undergo metabolic breakdown by the body's Cytochrome 450 systems- particularly CYP3A4, CYP3A5 and CYP 2J2.

534. By listing "CYP3A4/3A5, CYP2J2," the FDA's OCP reviewer is identifying the Cytochrome P450 enzymes, a variety of small and large molecules, subtrates in enzymatic reactions, that are also membrane-associated proteins and are considered major enzymes for drug metabolism.  Most drugs undergo deactivation by CYPs for elimination or are bioactivated by CYPs to form drug active compounds.   CYP3A4/3A5 and CYP2J2 are the Cytochrome P 450 enzymes necessary for the metabolism (breaking down) of rivaroxaban.  There are over 50 enzymes in the Cytochrome P450 class of enzymes but only six of them are responsible for metabolizing about 90% of drugs.  The two most commonly involved are CYP3A4 and CYP2D6.  CYP 3A4/ CYP3A5 are both

---

[536] If Drug A is rivaroxaban and taken along with Drug B a P-gp inducer, the blood levels of Drug  A will be decreased because of the induction of more rapid P-gp transport for elimination of Drug A.
[537] www.straighthealthcare.com/p-glycoprotein.html

in the family 'CYP3' and metabolize drugs and steroids, with 4 genes invovled.  CYP2J2 is in the'CYP2' family and also metabolize drugs and steroids, with 16 genes involved.[538]

535.  If there is a breakdown or a conflict or abnormalties of these elimination systems of rivaroxaban (P-gp/BCRP/CYP3A4/CYP2J2) or impaired renal or liver function then the rivaroxaban will not be broken down and eliminated by the kidney and gut and the plasma concentration will increase with the risk of increased anticoagulant effects, literally an overdose.  Also if the kidney function or liver function has been impaired, then the normal methods for elimination of rivaroxaban will be blocked.  The net result with reduced elimination processes will result in what Dr. Mueck in 2009 called "undesired overdose effects".

536.  The 2011 XARELTO Label in Section 7 "Drug Interactions" supports the need for dose titration in groups that FDA has repeatedly stated are at high risk for bleeding from too high a dose.[539]  The label also includes patients with too low plasma concentrations and a risk of loss of efficacy. There is no information about dose titration for the increased risk patients (bolding added for emphasis).

> *Rivaroxaban is a substrate of CYP3A4, CYP2j2, and the P-gp and ATP-binding G2 (ABCG2) transporters.  Inhibitors and inducers of these CYP450 enzymes and transporters (e.g. P-gp) may result in **changes in rivaroxaban exposure**.*
>
> ### *7.1 Drugs that Inhibit Cytochrome P450 3A4 Enzymes and Transport Systems*
>
> *In drug interaction studies, conducted ins ubjects with normal renal function, evaluating the concomitant use with drugs that are combined P-gp and CYP3A4 inhibitors (ketoconazole, ritonavir, clarithromycin and erythromycin) or a moderate CYP3A4 inhbitor (fluconazole) increases the rivaroxaban exposure and pharamcodynamic effects (i.e. factor Xa inhibition and PT prolongation ere observed.  The increases in exposure ranged from 30% to 160%. **Significant increases in rivaroxaban exposure may increase bleeding risk.***
>
> *When data suggest a change in exposure is unlikely to affect bleeding risk (e.g. clarithromycin, erythromycin), no precautions are necessary during coadminsitration with drugs that are combined P-gp and CYP3A4 inhibitors*
>
> *Avoid concomitant administration of XARELTO with combined P-gp and strong CYP3A4 inhibitors.*
>
> ### *7.2 Drugs that Induce Cytochorme P450 3A4 Enzymes and Transport Systems*
>
> *Results from drug interaction studies and population PK analyses from clinical studies indicate coadministration of XARELTO with a combined P-gp and strong*

---

[538] NDA 202439 Clinical Pharmacology Biopharaceutics Review (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[539] Xarelto 2011 Approval Label (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist); Burton Exhibit 56

*CYP3A4 inducer (e.g. rifampin, phenytoin) decreased rivaroxaban exposure by up to 50%...these **decreases in exposure to rivaroxaban may decrease efficacy**...*

**7.4 Drug-diease Interactions with Drugs that Inhibit Cytochrome P450 3A4 Enzymes and Drug Transport**

*Results from pharmacokinetic trial with erythromycin indicated that patients with renal impairment coadministered XARELTO with drugs classified as combined P-gp and moderate CYP3A4 inhibitors (e.g. diltiazem, verapamil, dronedarone, and erythromycin) have increased exposure compared with patients with normal renal function and no inhibitor use. **Significant increases in rivaroxaban exposure may increase bleeding risk.***

*...ROCKET AF trial, which allowed concomitant use with combined P-gp and either weak (e.g amiodarone) or moderate CYP3A4 inhibitors (e.g. diltiazem, verapamil, and erythromycin), did not show an increase in bleeding in patients with CrCl 30to<50 mL/min [Hazard ratio (95% CI):1.05 (0.77, 1.42)]*

*XARELTO should not be used in patients with CrCl 15 to <80 mL/min who are receiving concomitant combined P-gp and moderate CYP3A4 inhibitors...unless the potential benefit justifies the potential risk...[540]*

537.  At a June 6, 2011 meeting with FDA, the FDA's reviewers indicated concerns about the ROCKET 20mg OD dose being too high.  They requested that Defendants consider decreasing the dose, including changing to10mg BID for SPAF based on the potential for reduced bleeding risk (see discussion of June 6, 2011 meeting with FDA below).[541]

### d. CONCERNS ABOUT PREMATURE UNBLINDING AND SUBSEQUENT PROTOCOL CHANGES IN ROCKET

538.  Dr. Martin Rose, MD, JD, Medical Officer, Division of Cardio Renal Products (DCRP), was assigned responsibility for conducting the ROCKET Efficacy review. In his review of the ROCKET AF study supporting the NDA's efficacy, he questioned Defendants on the SOP permitting premature unblinding and unspecified interim analysis with data given to Duke Clinical Research Institute (DCRI) and Independent Data Monitoring Comittee (IDMC) members.  He was concerned that premature unblinding of the IDMC members was followed by protocol changes which could have been made to address issues seen with the interim safety and efficacy review.  Dr. Rose had questions about the ITT population and the on-treatment safety population used by Defendants.

539.  Janssen's Alla Rhoge received an email from FDA's Alison Blaus, DCRP on April 4, 2011, "Subject: NDA 202436-Clinical IR)."[542] FDA requested additional information about ROCKET. In particular, Dr. Rose gave Ms. Blaus two questions to convey to Janssen.  One of the questions was about ROCKET's blinding and the IDMC charter

---

[540] Burton Exhibit 56
[541] XARELTO_JANSSEN_00200043
[542] XARELTO_JANSSEN_01228564

which indicated that unblinded datasets, tables, graphics, and ad listings (including information related to efficacy and safety) were prepared within Janssen by a "designated independent statistical programmer" and sent to DCRI in preparation for the IDMC periodic closed meetings.  In addition, there was a planned interim analysis (which included an analysis of efficacy and safety data) when half of the planned primary endpoint events occurred.  Dr. Rose noted that several changes occurred to the protocol and statistical plan during the study; some of the changes occurred after meetings of the IDMC with premature unblinding and some occurred after an interim analysis review.

540. As a result of these concerns about ROCKET, Dr. Rose wanted Defendants to provide the names' titles, the reporting relationship within Janssen involved in generating the unblinded data, and the identification of the designated statistical programmer.  He also wanted the name of individuals who had access to such data or information prior to the time of the final study.  He wanted the standard operating procedures (SOPs), internal memoranda, or other documents related to Janssen's procedures in place prior to the first unblinded analysis of the ROCKET data and restrictions for distribution of unblinded study data.  For ROCKET, he wanted a rationale for the preparation of unblinded data within Janssen rather than sending blinded data to DCRI, or some other independent entity for the preparation of unblinded information to be reviewed by the IDMC.  Finally, he wanted Defendants to explain why the benefits of internal analysis of unblinded ROCKET data outweighed the risks to the quality of the protocol and data.

541. Alla Rhoge responded via email on April 11, 2011, saying the answer to Dr. Rose's question should be available in about a week.

542. Dr. Rose also asked a question regarding the method for calculation of the time in therapeutic range for INR (TTR) results in ROCKET.  According to Dr. Rose, the ROCKET study report did not provide details on the method used to calculate TTR.  In the second amended statistical plan, there was a section on the methodology for calculation of TTR. He asked if that was the same methodology used for all TTR results in the study report, and if not, then he asked that the details on the methodology used to calculate TTR be provided.[543]

543. Alla Roge sent an internal email on April 12, 2011, titled "Subject RE: NDA 202439 Clinical IR-follow-up and NEW request," indicating that the attached FDA inquiry contains: 1) a follow-up to the response provided yesterday; and (2) new information request asking whether the TTR methods outlined in the second amendment SAP were applied to all CSR analyses. He then thanked the Stats and Programming groups on April 15, 2011 for generating a response for FDA.[544]

544. Dr. Nessel sent an email, ("Subject ROCKET AR INR data") to Peter DiBattiste and Gary Peters on April 2, 2008.  He indicated that despite ROCKET being on-going and a blinded trial, and "that we cannot unduly influence patient management," he wanted to prematurely review the INR data before the study was completed.  He was concerned that

---

[543] XARELTO_JANSSEN_01228564
[544] XARELTO_JANSSEN_04934695

if they "don't look," they may arrive at database lock to find that warfarin was so poorly regulated so that the trial is invalid.  To date, 32,000 individual INRs were performed in ROCKET.[545]

545. Dr. DiBattiste replied on April 7, 2008, "Have you in fact, reviewed performance? Is it possible to do so in a blinded fashion? (I guess not)."[546]

546. An October 17, 2007 email series from Dr. Byra proposed premature unblinding of additional people at Janssen to know what drug was assigned in ROCKET to a patient. This would permit Janssen to be able to deal directly with the people at HemoSense to request changes to the device.  He stated: "The problem is that Bud [Chalecki, the unblinded INR monitor] may know what the issue is, as does the DCRI unblinded physician, but they can't go to HemoSense and order changes or equipment evaluation as they are not paying HemoSense- we are."[547]

547. Dr. DiBattiste responded that he was not in favor of unblinding any internal people and perhaps not anyone at all: "If we agree, after review of additional patient information, that we need someone unblinded, I propose we re-engage Jau Horrow and aks him to work with Bud."  He further stated that if people are unblinded they "*shouldn't*" be PRD [Janssen] people."[548]

**e.  ROCKET AF Utilized Non-Inferiority Study Design**

- **FDA's Non-Inferiority Guidance and Published Warfarin Studies in SPAF Patients**

548. The FDA's draft 2010 Guidance provided a "Table 1: Placebo-Controlled Trials of Warfarin in Non-Valvular Atrial Fibrillation -six placebo-controlled studies" (AFASAK, BAATAF, EAFT, CAFA, SPAF I and SPINAF), which were all performed and published from 1989 and 1993.[549]  From the six published warfarin vs placebo studies, the "Events/Patient Years" for warfarin ranged from [0.62% to 4.14%] (N=2393) versus placebo [2.99%-13.3%] (n=2206).[550] As a point of reference, FDA indicated that based on the six published studies, the warfarin effect M1 was estimated from the historical placebo studies to be a 47% risk reduction of AFib. The data supported a positive warfarin effect, and it was anticipated that similar studies using warfarin in an AFib population would show the same positive effect (*i.e.*, benefit) (constancy assumption); however, the study design and patient characteristics also must be considered. For example, the EAFT study was the only study of the six which included subjects with a

---

[545] XARELTO_JANSSEN_11458758
[546] XARELTO_JANSSEN_11458758
[547] Nessel Exhibit 19
[548] Nessel Exhibit 19
[549] FDA Draft Guidance For Industry Non-Inferiority Clinical Trials March 2010 at p. 41 (http://webcache.googleusercontent.com/search?q=cache:SPDO2MpyhMoJ:www.fda.gov/downloads/Drugs/.../Guidances/UCM202140.pdf+&cd=1&hl=en&ct=clnk&gl=us)
[550] FDA Draft Guidance For Industry Non-Inferiority Clinical Trials March 2010 at p. 41 (http://webcache.googleusercontent.com/search?q=cache:SPDO2MpyhMoJ:www.fda.gov/downloads/Drugs/.../Guidances/UCM202140.pdf+&cd=1&hl=en&ct=clnk&gl=us)

prior history of stroke or TIA, as a result, EAFT subjects were considered at higher risk than AFib subjects in the other five published studies. This difference in inclusion criteria or subjects was thought to presumably contribute to a higher event rate in both the warfarin and placebo arms.

- **A GAO Report Calls Non-Inferiority Studies a Clinical Trial of "Last Resort" for New Drug Approval**

549. The Government Accounting Office (GAO), in a Report to Congressional Requester on July 2010, provided a report titled NEW DRUG APPROVAL, FDA's Consideration of Evidence from Certain Clinical Trials.

> *Evidence from non-inferiority trials was included in about one-quarter, or 43, of the 175 NDAs for new molecular entities that were submitted to FDA for review from fiscal years 2002 through 2009. Many of these applications were for antimicrobial drugs…As of December 31, 2009, FDA approved 18 of the 43 NDAs on the basis of evidence from non-inferiority trials. Of the remaining 25 NDAs, FDA approved 11 based on other evidence, such as proof that the new drug was more effective than a placebo (no treatment), and decided not to approve 14.[551]*

550. The GAO report continued with its review of experts about FDA's March 2010 Draft Guidance, including the use of surrogate endpoints in a NI trial and that the NI trial should be reserved as the trial of "*last resort*" for drug approval:

> *While experts we interviewed who reviewed FDA's March 2010 guidance noted that it addressed key principles, most identified additional technical issues that they would have liked this guidance to address. For example, the March 2010 guidance does not address how the use of a surrogate endpoint impacts the design and interpretation of non-inferiority trial….Finally, some experts who reviewed FDA's March 2010 guidance told us that they wished the guidance more emphatically stated that non-inferiority trials should only be used as a last resort when seeking drug approval.[552]*

551. FDA's regulations about design and conductance of NI trials have remained unchanged since 1985. FDA has addressed the critical need to know, for an NI trial to be interpretable, that the active control had its expected effect in the trial (21 CFR 314.126(a)(2)(iv)). This would be true for a warfarin arm for AFib patients.

552. The endpoint for ROCKET was a definition of acceptable "non-inferiority" margin (i.e., delta or $\Delta$[553]) (*i.e.*, not worse) pre-specified by the Defendants in its IND protocol plan. The efficacy of ROCKET was based on obtaining constancy of the warfarin response in the warfarin active control arm.

---

[551] GAO's Report to Congressional Requesters - FDA's Consideration of Evidence from Certain Clinical Trials – GAO-10-798, (July, 30, 2010) at p. 25 (http://www.gao.gov/products/GAO-10-798).
[552] GAO's Report to Congressional Requesters - FDA's Consideration of Evidence from Certain Clinical Trials – GAO-10-798, (July, 30, 2010) at p. 25 (http://www.gao.gov/products/GAO-10-798).
[553] delta

- **FDA'S Dr. Temple Addressed Shortcomings of Non-Inferiority Studies**

553. Dr. Robert Temple, FDA CDER's Associate Director for Medical Policy, presented a January 18, 2008 PowerPoint at an FDA Workshop on CAP titled, "FDA Experience and Perspective on Non-Interiority Trials." Dr. Temple's INTRODUCTION slide indicated that NI trials "*pose inferential problems, but you use them when you have no choice, i.e. when you simply cannot leave patients untreated (placebo-treated) and must use active treatment as the control.*" He continued, "*But the <u>need</u> to use an active control dose not always mean this design will be a valid test of effectiveness.*"[554]

554. According to Dr. Temple, the NI Study seeks to show that the new drug is not inferior to the standard by too large an amount; that amount being the non-inferiority margin, M or delta. Because the degree of inferiority shown must not be clinically unacceptable, the NI included clinical issues, not just statistical judgment. The largest clinically acceptable difference is called 'M2' and it must not be > than M1. For assay sensitivity, the active control must be at least equivalent to M1. If the active control does not show M1 (i.e., non-inferiority or warfarin active control), the anticipated clinical data outcome (*i.e.*, as in ROCKET) the data generated for the test method will not be able to tell you if a "test drug has any effect" since the data generated will be "meaningless" with respect to effectiveness.[555]

555. For NI studies, there is an assumption made that the active control is effective based on past experience. For ROCKET, there was an assumption that warfarin treatment is effective for SPAF and will be just as effective as seen in prior studies. If that assumption is wrong, and the active control is not effective in the study, as Dr. Temple stated: "you could conclude that an ineffective treatment works." This has long been recognized by some clinical trialists and by FDA. It also contributes to the uncertainty about the actually meaning (reliability) of the NI trial.[556]

556. Dr. Temple referred to a 1979 Expert Clinical Report by L. Lasagna that if the drug is inferior, or even 'indistinguishable' from a standard remedy, the results may not be readily interpretable. In the absence of a 'placebo control' (non treatment arm), "one does not know if the "inferior" new medicine has any efficacy at all…"[557] Dr. Temple stated that "NI studies can be called really a "not too much inferiority" study".[558]

---

[554] Dr. Temple's PowerPoint Presentation, January 18, 2008 FDA Workshop CAP at slide 2
(http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM187447.pdf)
[555] Dr. Temple's PowerPoint Presentation, January 18, 2008 FDA Workshop CAP at slide 4
(http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM187447.pdf)
[556] Dr. Temple's PowerPoint Presentation, January 18, 2008 FDA Workshop CAP at slide 5
(http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM187447.pdf)
[557] Dr. Temple's PowerPoint Presentation, January 18, 2008 FDA Workshop CAP at slides 6-7
(http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM187447.pdf)
[558] Dr. Temple's PowerPoint Presentation, January 18, 2008 FDA Workshop CAP at slide 10
(http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM187447.pdf)

**f.  MARCH 14, 2011 FDA REQUESTED CLINICAL INFORMATION ABOUT INR POC FOR ROCKET**

557. On March 14, 2011 the FDA requested additional information from Defendants on the Clinical Endpoint Committee (CEC) and the INR point of care (POC) device used in ROCKET.[559]  The specific questions were Item #1 CEC membership and Item #2 INR Instructions.  Regarding HemoSense, FDA asked Defendants to answer whether the same device was used in ROCKET as J-ROCKET.  The request had been emailed to Defendants by Alison Blaus on March 14, 2011. The Defendants' formal response was submitted on March 17, 2011[560].

558. Defendants' response was that the same HemoSense device was used in both studies, but the device was slightly modified in that it did not report a numerical INR (instead the device reported a 7-digit code). This code was decrypted by the investigator using an interactive voice recognition system (IVRS).  This was described in the ROCKET clinical study report in Section 3.9.7.3.2[561]

559. FDA asked for the labeling for the device and Defendants response was that "because the INRatio would only display a code number and not an INR, an additional label was added by Janssen which sated "*Not for diagnostic use. Investigational user only*."  Therefore, Defendants in 2011 were aware that the 'modified HemoSense device' was an "investigational device" (21 CFR 812/21 CFR 312) and being used in a drug IND.  As an investigational device, it is not considered as safe and effective as the 510(k) cleared commercial device and should not be relied upon for patient treatment. However, Defendants did rely on the investigational modified INRatio device for warfarin patient treatment.

560.  Defendants continued that the INR read-out for the device is 0.7 to 7.5.  For the study, the 7-digit code was limited to 1.0 through 6.0. Any INR less than 1.0 would be reported as less than 1.0 and any INR greater than 6.0 would be reported as greater than 6.0.  The highest values for sham vales would be 4.0, while the highest for warfarin would be 6.0. The investigators were not told the difference between the sham and the actual INR.  This chage in read-out limits further changes the ROCKET device from the commercial device.

561. FDA requested the available information on the performance characteristics beyond the information found in the labeling.  Defendants responded by referring the FDA to the Professional User Guide available on the HemoSense website.  Defendants failed to inform FDA that they did not independently develop any performance data for the POC for ROCKET, and had not performed validity, precision or accuracy testing for the

---

[559] Nessel Exhibit 37, Nessel Exhibit 39
[560] Nessel Exhibit 39
[561] Nessel Exhibit 37,38, 39

modified INRatio device (as modified and intended to be used by investigators worldwide for ROCKET with no back up testing method).[562]

## g. DURING THE JUNE 6, 2011 MEETING, FDA DISCUSSES CONCERNS ABOUT DOSE, TTR, HYPERCOAGUABILITY REBOUND AT SWITCHING, AND LACK OF SUPERIORITY TO WARFARIN

562. Janssen summarized a meeting held with FDA on June 6, 2011.[563]  Janssen attendees were Sanjay Jalota, Dr. Christopher Nessel, James Pan, Dr. Gary Peters, Alla Rhoge.  FDA attendees were Alison Blaus, Dr. Steven Grant, Dr. Nordic Stockbridge and Dr. Aliza Thompson.  Reportedly, the three key issues remaining for the FDA with ROCKET and approval of SPAF were 1) Qaulity of INR control, 2) Hypercoagulability observation (Rebound/Transition to VKA), and 3) Determing the strategy for administration of rivaroxaban (choice of daily dose and dosing frequency).

563. For TTR, the FDA stated that the quality of the INR control early on may influence the NI and superiority assessment.  Since the ROCKT TTR of 55% is "far lower" than that seen in contemporary studies, the Agency intended to seek advice from the Advisory Committee on the influence of the observed TTR on the non-inferiority assessment.

564. For non-inferiority vs. superiority, the Agency indicated it understood the primary endpoint and that the case could be made for either a PP or ITT population for NI testing.  However, the FDA firmly and clearly stated that ITT is required in support of a superiority claim.  The FDA indicated that this is not a consideration in the background of sub-optimally managed positive control (warfarin).

565. In terms of hypercoagulability the Division observed that stroke rates seem to increase after people are discontinued on rivaroxaban therapy.  The reviewers commented that it was not comforting that this was seen in two of Janssen's studies, and Janssen did not have a workable strategy to address the risk and transition to VKA.  Janssen indicated that the results of the switching study would likely be completed post-PDUFA data.

566. The FDA also questioned the rationale of choosing the 20mg dose for SPAF.  It commented that Janssen had a limited range of drug exposures (since only using the one dose), and therefore had limited opportunity to assess effects at extremes (*i.e.*, not much information to formulate an opinion on which patients need to be dosed up or down, or determine how patients at either end of exposure differ with respect to bleeding risk or stroke prevention). The FDA's reviewers suggested that "[t]he peak/valley dosing needs to be smoothed out" and hypothesized whether 10mg BID would be more optimal (or if the entire dose needs to be shifted up or down).  This question still related to Question 3 and 4 of the day 74 letter.  The FDA did not give a clear answer to the progress on Question 5 (routine measurement of coagulation parameters).

---

[562] Nessel Exhibit 37, 38, 39
[563] XARELTO_JANSSEN_00200043

The next day, June 8, 2011, Dr. Peters gave his assessment of the meeting with FDA, stating that "the topics of greatest concern to FDA are: TTR ("far lower" than other trials. 2) Events during transition 3. Dose selection and regimen."[564]

## h. FDA REFERRED TO XARELTO DATA AS <u>NOT</u> ESTABLISHING A '*WIDE THERAPEUTIC INDEX*'

567. Dr. Frank Misselwitz, a Board Certified Physician, has been at Bayer since 2002 working on XARELTO. He is a member of the Joint Steering Committee (JSC) with Janssen and Head of Therapeutic Area Cardiovascular, Pulmonary and Thrombosis, Corporate Vice President Global Clinical Development. At his deposition in 2016, he was shown notes from a June 6, 2011 FDA Mid-Cycle meeting made by Dr. Berkowitz. FDA reportedly indicated to the Defendants that they wanted to be transparent and wanted the FDA's Advisory Committee to have adequate information in order to make a decision. FDA had no plans to obtain an OSC consult or to present liver toxicity issues at the SPAF meeting. The issues to be discussed by FDA at the meeting were as follows:

> 1) Warfarin Arm Quality of INR- 55% far lower than contemporary trials FDA would seek advice of AdCom, Lower than in real world and recent studies. FDA had no plans to discuss superiority at AdCom.
> 2) Hypercoaguability- transition of patients from rivaroxaban to warfarin. Bayer was to submit a protocol for switching. FDA believed there was an issue with rebound when patients stopped rivaroxaban with "hypercoagulability."
> 3) Determine strategy of administration for riva- Dose determination- single dose; rationale for choice of dose was not clear. Not reasonably wide exposure range in dose". FDA indicated it did not "know if one pt needs titration down or more riva…could BID be optimal".[565]

568. Defendants had selected to investigate only a long-term 20mg oral dose for SPAF. For the VTE-P indication, FDA had expressed concerns about the use of the 10mg dose. During the Bayer IND review, FDA asked Defendants to discontinue a higher dose. Now, for SPAF, Defendants had elected to investigate only the doubled 20 mg QD dose, even though they were aware of the increased risk for major bleeding. Defendants maintained to FDA that the 20mg dose was adequate based on Phase 2 and/or information in other trials, and/or pooled PK/PD data focused on the lower extremes showing that those with "low exposure" still maintained benefit. According to Dr. Berkowitz's note, FDA told the Defendants:

> *Therapeutic range is not wide- have not established a wide therapeutic range.*[566]

569. A "narrow therapeutic index" (NTI) is a pharmacological principle for drugs usually applicable to generic drugs. FDA will publish a list of reference drugs considered by FDA to have a narrow therapeutic index (or window). XARELTO is an example of a

---

[564] XARELTO_JANSSEN_00200043
[565] Misselwitz Exhibit 2
[566] Misselwitz Exhibit 2

drug with a narrow window of therapeutic efficacy and risk. In Defendants' own NDA, too high a dose for some patients was associated with major bleeding and too low a dose for some patients was associated with the complication of lack of efficacy. For example, Bayer had identified that in the RECORD tables in 2009, at a 10mg dose, the patients in the highest quartile shared a prolonged PT > 50 seconds and had increased risk of bleeding, while patients in the lower quartiles all shared a PT of 11 seconds and lower risk of bleeding.[567] Bayer had not attempted to establish the range (window) for patient subgroups of XARELTO to ensure efficacy in terms of VTE-prevention and reduce risk of major bleeding.

570. As mentioned above, the idea of a narrow window of therapeutic index or efficacy is a concept most often applied to generic drug sponsors attempting to show bioequivalence (BE) for approval of an ANDA. Warfarin is an example of a drug with known narrow therapeutic index. Generic drug manufacturers wanting to obtain FDA approval of an ANDA for marketing warfarin must be aware it is listed by FDA as an NTI drug. The Generic Drug User Fee Amendments (GDUFA) of 2012 addressed 'Narrow Therapeutic Index Drugs.' FDA's office of Generic Drugs wrote on its website about 'Narrow Therapeutic Index Drugs':

> *Narrow therapeutic index drugs are drugs where small differences in dose or blood concentration may lead to serious therapeutic failures and/or adverse drug reactions that are life-threatening or result in persistent or significant disability on incapacity. FDA recommends tighter quality and BE standards to ensure the safety and efficacy of generic NTI drugs. However, broad implementation of tighter standards for NTI drugs is challenging, because most potential NTI drugs lack NTI classification, which is partly due to the difficulty in characterizing the therapeutic index. Additionally, no well-controlled clinical study exists to evaluate the within-subject variability of the clinical response of NTI drugs, which complicates the assessment of the perceived therapeutic inequivalence concerns of generic NTI drugs.[568]*

571. Each patient has an "individual therapeutic range" which can be defined as the range of concentrations at which an individual patient has been found, empirically, to exhibit a good response. This can be identified by measuring the serum drug concentration at a dosage that has been found to produce the desired effect without increased adverse effects. Clinicians usually attempt to select the appropriate individual therapeutic range based on the desired clinical response and reduced adverse effects. However, in the XARELTO studies, certain subpopulations were identified as having an increased risk of major bleeding based on increased effect (prolongation of bleeding >50 seconds). Defendants, however, chose to continue to only investigate a single once a day dose without providing clinicians with the ability to down-titrate or change to BID dosing in certain patients found at the high or low end of the individual therapeutic range.

---

[567] Mueck depo 2/24/16 p.296: L20 – p. 298: L22; Mueck Exhibit 28
[568] FDA – Narrow Therapeutic Index Drugs
(http://www.fda.gov/ForIndustry/UserFees/GenericDrugUserFees/ucm500577.htm)

572. In his deposition, Dr. Misselwitz testified in 2016 that a drug may require therapeutic drug monitoring (TDM) when it has a "narrow therapeutic window/index." He defined a narrow therapeutic window as when "the desired beneficial effect, so the pharmacological action that you would desire to have, is very close in terms of plasma concentrations to undesired toxic effects of that particular drug."[569]  He continued:

> *Therapeutic drug monitoring would be potentially beneficial for drugs that have a very narrow therapeutic window, which is not the case for XARELTO, and it would in addition to that require very precise lab tests to measure the plasma concentration, and again, clot-based tests or coagulation measurements have typically a very wide variability.*
>
> *Q. Okay. So if XARELTO had a narrow therapeutic index, then you might be open to the idea of therapeutic drug monitoring improving patient safety?*
>
> *A. That's a very speculative question…*
>
> *Q. But sir, you're aware that the FDA is of the opinion that XARELTO has a narrow therapeutic index, aren't you?*
>
> *A. Individuals within the FDA use that wording, to which I respectfully disagree.*
>
> *Q. Did Dr. Berkowitz tell you that he attended a meeting with the FDA when they told him and he made notes that the FDA is of the opinion that XARELTO does not have a wide therapeutic range?*
>
> *A. I don't recall any specific meeting you may refer to, but in general we—I'm aware of that debate.[570]*

573. There is a September 22, 2006 email from Sanjay Jalota to Larry Winick, Christopher Nessel, Dagmar Kubitza, Frank Misselwitz and, Gary Peters, Rene Kluensch, Scott Perkowitz, Wolfgang Mueck, "Subject RE: Antwort: Teleconference; FDA: Summary," regarding a discussion on the label dosing section for the Acute Coronary Syndrome (ACS) indication. In this email, Mr. Jalota stated:

> *We have to avoid FDA thinking rivaroxaban has a narrow therapeutic window and there is potential safety concerns with taking rivaroxaban on an empty stomach.[571]*

## i.   THE SEPTEMBER 8, 2011 FDA CARDIORENAL PRODUCTS ADVISORY COMMITTEE FOR XARELTO FOR SPAF INDICATION

574. To prepare for the Advisory Committee meeting in September, Defendants held several mock practice sessions.[572] On the same day of the FDA's AdCom meeting, the ROCKET AF trial was published in the NEJM. According to the published results, XARELTO was

---

[569] Misselwitz depo 7/13/16, p. 10: L14 – p. 11: L7
[570] Misselwitz depo 7/13/16, p. 17: L12 – p. 18: L19
[571] Misselwitz Exhibit 3
[572] XARELTO_BHCP_00217031

non-inferior (no worse than warfarin) with respect to safety (major bleeds) and efficacy (stokes).[573]

575. At the FDA Advisory Committee meeting on September 8, 2011, Defendants' Gary Peters, MD VP, Cardiovascular Development, gave the introduction. The "Medical Landscape and ROCKET AF Study Design" was presented by Kenneth Mahaffey, MD, Co-Director, DCRI CV Research, Director DCRI CEC Group. "ROCKET AF EFFICACY and Benefit Risk Balance, Key Issues and Conclusions" was presented by Robert Califf, MD Vice Chancellor Clinical Research, Duke University Medical Center, Director, Duke Translational Medicine Institute. Christopher C. Nessel, MD Senior Director, Clinical Research, presented ROCKET AF Safety. There were no presentations given by members of Bayer. According to Dr. Peters introductory presentation, titled "Basis for Rivaroxaban Approval: ROCKET AF," the ROCKET AF trial was a well-designed and executed double-blind study, with robust non-inferiority on efficacy, superior efficacy for the on-treatment set, and similar safety to warfarin.[574]

576. Dr. Robert Califf's first presentation was entitled "ROCKET AF: Efficacy."[575] Enrollment in the trial was 14,264 participants from 1,187 sites in 45 countries (North America, Latin America, West Europe, East Europe and Asa Pacific). The United States had 1,931 participants, and Canada had 750 participants. In terms of the ITT population, the warfarin population had a higher % of prior MI compared to rivaroxaban (18% verse 16.6%), with similar distribution of Congestive Heart Failure, hypertension age≥75 years (43%), diabetes, prior stroke/TIA/Non-CNS embolism.[576] Of the enrolled participants, 43.6% had a CHAD2 Score of 3, and 28.7% had a Chads2 Score of 4. Dr. Califf made no mention of dose selection for ROCKET in his presentation.

577. In his second and final presentation, titled "Benefit Risk Balance, Key Issues and Conclusions," he indicated that rivaroxaban could be given once a day or twice a day. He claimed that the TTR in ROCKET was similar to recent trials, "considering higher risk population" and considering "regional distribution" of patients enrolled. He even referred to the TTR in ROCKET as "better than global practice," similar to standard US practice for the trial overall, and better than US practice for the North American subset. In terms of cultural effect, he stated:

- *There is variation by region in timing between out of range value and new INR, but most dose adjustments are appropriate*

---

[573] Patel M, Mahaffey KW, Garg J, Pan G, Singer DE, Hacke W, et al. *ROCKET AF Investigators Rivoaxaban versus warfarin in Nonvalvular Atrial Fibrillation*. NEJM. (September 8, 2011). 365: 883-91.
[574] Janssen's Slides for Advisory Committee Meeting on 9/8/2011 at p. cc-6 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[575] Janssen's Slides for Advisory Committee Meeting on 9/8/2011 at p. cc-33 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[576] Janssen's Slides for Advisory Committee Meeting on 9/8/2011 at p. cc-37 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

189

- *This induces an "artificial" lowering of TTR in areas with longer delay to INR measurement*
- *Evidence of modest under-dosing in Eastern Europe and Asia.[577]*

578. Janssen presenters told the FDA and AdCom members:

- *TTR is not a valid surrogate for anticoagulatnt benefit risk balance (but can be useful)*
- *Inherent uncertainty in the TTR measurement*
- *Stroke has multiple causes and risk factors-atheroscloeris and hemorrhage, etc.*
- *Presented data that the average TTR in US was only 51%*

- *Overall, there is no evidence that TTR affected the benefit risk balance of rivaroxaban compared to warfarin[578]*

579. Dr. Califf discussed the individual sites and Defendants' lack of feedback to centers about warfarin control in order to prevent inadvertent unblinding:
    ### *ROCKET: Feedback to Sites on the Importance of INR Control*

- *In an effort to prevent inadvertent un-blinding, no information on INR control in warfarin subjects was shared with the site.*
- *By design, individual sites were not advised on specific dosing or management of the subject on warfarin*
- *The only time that an individual site was contacted was if that site was clearly not adjusting. This occurred at only 3 sites. The critical importance of improving INR control was reiterated to the investigators by telephone or my letter.*
- *No site was closed specifically because of poor INR control subjects. [579]*

580. Janssen's Dr. Nessel told the Panel members that in ROCKET, *"all bleeding events in the principal safety endpoint were adjudicated by an independent committee blinded to treatment assignment, which was comprised of physicians at the Duke Clinical Research Institute."[580]*

---

[577] FDA Ad Com Mtg transcript 9/8/2011
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm); Janssen's Slides for Advisory Committee Meeting on 9/8/2011 at p. cc 117
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[578] Janssen's Slides for Advisory Committee Meeting on 9/8/2011 at p. cc-88
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[579] Janssen's Slides for FDA Advisory Committee Meeting on 9/8/2011 at p. IN-697
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[580] September 8, 2011 FDA Advisory Committee Meeting transcript at p. 58
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

- **FDA's Advisory Panel Members Ask Questions Regarding ROCKET and Poor Warfarin Control**

585. Dr. Sanjay Kaul, Director, Cardiovascular Diseases Fellowship Training, Cedars-Sinai Heart Institute, and a voting member of the advisory panel, asked Dr. Peters about the inclusion of ischemic stroke, and hemorrhagic stroke in efficacy measurements. He expressed concern that warfarin is known to reduce ischemic strokes, so that rivaroxaban should be measured in terms of efficacy of reduction of "ischemic strokes" and not Defendants' reliance on lumping together "all strokes." He was concerned that Defendants were pooling all strokes (hemorrhagic and ischemic) as support of efficacy and safety. Dr. Nessel indicated that it was prespecified in the protocol that both hemorrhagic and ischemic strokes would be included as a composite primary safety endpoint (underlining added for emphasis).

> *Dr. Kaul: So the question I have is, does warfarin reduce ischemic stroke or hemorrhagic stroke?*
> *Dr. Peters: It reduces ischemic stroke.*
>
> *Dr. Kaul: So why are we adding hemorrhagic stroke in the assessment of efficacy?*
>
> *Dr. Califf: This is a good point of discussion and consideration. You're well aware that many people die from stroke, and no one ever knows whether it is ischemic or hemorrhagic. We're in an era where, if one does an MRI, for example, the classification itself has significant bias.*
>
> *So we thought the best thing to do, and what is the standard in the field, for better or worse…*
>
> *Dr. Kaul: So the follow-up question is that if you're count of hemorrhagic stroke towards an efficacy assessment, is it fair to also count that towards a safety assessment?*
>
> *Dr. Califf: Fair? Some quotes come to mind about fair…*
>
> *Dr. Kaul: Do you have data where you don't count the hemorrhagic stroke as a bleeding endpoint? And so are the differences in bleeding that don't count hemorrhagic stroke statistically persuasive, in favor of rivaroxaban?*
>
> *I mean, I like the data you showed, the graph that you showed, slide 72. But what I would like to see there is also data for disabling stroke that excludes hemorrhage.*
>
> *Dr. Califf… …We don't have that? Anything that you ask for, we can get before the end of the day, and we certainly will.*
>
> *Dr. Nessel: Just a comment to the committee. Since hemorrhagic stroke was a prespecified composite, or part of the composite primary safety endpoint, it is included.*

> *Dr. Peters: The hemorrhagic stroke of the intracranial hemorrhages—hemorrhagic stroke was the largest component of the intracranial hemorrhages, but also subdural hemorrhages, and there were a few subarachnoid hemorrhages, were also numerically fewer with rivaroxaban compared with warfarin, but in the intracranial hemorrhage endpoint….*

> *Dr. Califf: Is that what you wanted to see?*

> *Dr. Kaul: No. I wanted to see the disabling stroke data, excluding hemorrhage…*[581].

586. Dr. Kaul then asked if there were any investigation sites that participated in both RE-LY and ROCKET, and the TTR from those sites:

> *Dr. Kaul: In terms of TTR, asked if there were centers that participated in both ROCKET and RE-LY. And based on the differences in protocol design- one centralized through protocol algorithm (RE-LY) and the other based on the local standard practice (ROCKET), did that impact anticoagulation management.* [582]

587. Dr. Nessel responded that it was a "*superb question*," but he did not have an answer. According to Dr. Nessel, the Defendants had not collected information on the other clinical trials in which centers were participating.[583]

588. Dr. Califf later clarified for Dr. Kaul that he did not want the panel to think that the only difference between ROCKET (double-blind, double dummy study) and RE-LY (unblinded) was an algorithm for INR.  He described the differences as important, but then did not indicate the significance of the differences to the panel members other than "big differences" and "logistics."  Dr. Califf said:

> *Doing a blinded, double-dummy trial is very different than an unblinded trial.  In an unblinded trial, everyone knows the INR, the treating physician, the patient and the study center.  It's a whole different set of logistics that one has to go through in a double-blind, double-dummy study, which is the reason why I sort of favor having one of each, if you could possibly do it, because I think there are big differences in trial logistics in those circumstances.* [584]

589. Dr. Kaul next asked how many of the subjects with major bleeds either resumed treatment or had no treatment interruption; and of those who resumed treatment, the

---

[581] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 118 -122 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

[582] September 8, 2011 FDA Advisory Committee Meeting transcript at p. 145 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

[583] September 8, 2011 FDA Advisory Committee Meeting transcript at p. 145 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

[584] September 8, 2011 FDA Advisory Committee Meeting transcript at p. 148 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

percentage with another recurrent major bleed. Dr. Peters asked Dr. Nessel to respond, while pulling up a slide with data for multiple bleeds. Dr. Nessel indicated that whether a patient was removed from XARELTO after major bleeding was left to physician discretion (underlining added for emphasis).

> **Dr. Nessel**: *Other than the event of intracranial hemorrhage, the protocol did not <u>require that patients come off study medication for a major bleeding event</u>, or even for a myocardial infarction, for that matter. So it was, of course, <u>at the treating physician's discretion</u>, but they could be kept on study medication for after a major bleeding event.*

> **Dr. Nessel**: *So Dr. Kaul, in this slide, you will see the total number of subjects with one, two, or three major bleeding events. And, of course, since this is the safety on-treatment populations, all these patients remained on study medication for each subsequent major bleeding event.*

> *I'll further remind you that the <u>major bleeding component was hemoglobin drop requirement for a transfusion of two or more units, leading into a critical organ or site, or a fatal.</u> Obviously, they wouldn't be counted here it they don't bleed.[585]*

590. Dr. Temple, FDA CDER, followed up on the ischemic and hemorrhagic stroke questions raised by Dr. Kaul, as well as Dr. Steve Nissen (see below), and the relationship to TTR. He acknowledged that FDA permitted the protocol to include both hemorrhagic and ischemic stroke together but then raised the implications of TTR for stroke. (Underlining added for emphasis).

> **Dr. Temple**: *The primary endpoint-and we don't disagree with this- was both kinds of stroke together, so I have a couple of questions related to that.*

> *Are you reasonably convinced you can tell the difference, with available approaches, between hemorrhagic and thrombotic strokes? That's one question.*

> *Second, there's been not that much attention to the implications of, for example, time in therapeutic range on the two kinds of strokes. <u>If you were too low, if you had a low INR, that might affect the comparison for thrombotic strokes</u>. You wouldn't expect it to advantage rivaroxaban for hemorrhagic strokes. And yet, <u>almost all of the effect on stroke is on hemorrhagic stroke.</u>*

> *<u>Steve pointed out that when you add the people after withdrawal, the effect goes slightly the wrong way</u>, but it was never very strong in the first place. The hazard ratio is only .95 for thrombotic strokes, which is not very impressive.*

> *In other situations, for example in dabi, <u>dabi had an effect on both thrombotic and hemorrhagic strokes.</u> But even though hemorrhagic strokes were less frequent, half of the effect of that drug was on the hemorrhagic strokes. And the lower dose, which*

---

[585] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 146-147 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

*many people in our committee thought should be approved, actually didn't have any effect on thrombotic strokes at all. It went the wrong way. So all of the effect of the low dose was on that.*

*I also glanced briefly at the apixaban data. We haven't reviewed it, <u>but most of that effect is on hemorrhagic strokes also. So the considerations of time and range, that all seems to be very important part of all of this</u>. I don't know if any of the differences are real, but it's not being discussed enough in my opinion. I just want a preliminary view on that.*[586]

591. Dr. Mahaffey was asked by Dr. Peters to respond to Dr. Temple, but failed to address TTR and differences in ischemic and hemorrhagic strokes for ROCKET. Dr. Mahaffey then reinforced the adequate conduct of investigators in ROCKET. There were subsequent additional responses and slides provided by both Dr. Califf and then Dr. Peters in response to Dr. Temple.

592. Dr. Califf indicated that the best sites for TTR management paradoxically had the highest risks for "*intracranial hemorrhage*" in ROCKET so that the sites with best patient control (TTR) which he called "*pounding the patient*" had "*a few more*" intracranial bleeds relative to once-a-day dosing with XARELTO (underlining added for emphasis):

**Dr. Mahaffey**: *Dr. Temple, obviously, an important issue across a variety of different endpoints and adjudication efforts and different disease stated in patient populations. We did go to <u>rigorous lengths to collect both clinical information</u> about stroke events, but also radiographic imaging information about the strokes as well. And I think we did a fairly good job, and we did a very rigorous job in this trial. All of the strokes were looked at by a <u>neurologist who had experience in event adjudication,</u> as well as understanding CEC issues and anticoagulant therapy in patients with atrial fibrillation….*

**Dr. Peters** *…we did do some analyses looking at, by quartiles, hemorrhagic events above INR, above time, above 3, and for ischemic stroke, INR below 2.*

*…In the primary endpoint safety on-treatment, there were only 18 events that the CEC didn't assign to either ischemic or hemorrhagic.*

**Dr. Califf**: *…One might suppose that if you pushed anticoagulation, that you would cause more intracranial bleeds.*

*What we show in this slide, just to review it again, <u>for intracranial hemorrhage, is that trying to achieve a time in therapeutic range, our best sites are the ones that look the worst in the comparison of rivaroxaban.</u>*

*So your point that this is complication I think is quite good. And understanding what the implications are, as with many other drugs, of trying to hit an intermediate*

---

[586] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 152-154 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

194

*biomarker by <u>pounding the patient</u>, perhaps in circumstances where it may not be beneficial, can be complicated.*

*So the overall impact on the patient may be a <u>few more intracranial hemorrhages, relative to what a once-a-day drug can do.</u>*

***Dr. Peters****: So this slide shows—and if we could have the hemorrhagic stroke equivalent slide on.  So this is a quartile analysis of <u>ischemic strokes</u>, as <u>diagnosed by CEC</u>, by quartile time below the range of 2.  You can see, the <u>ischemic stroke</u> in the overall was pretty close to the line of 1, and it's pretty close to the line of 1 here.*

*The most time below 2 is the bottom, so the event rate is higher, 1.7, and it's a bit lower. But you can see <u>rivaroxaban versus warfarin, not much difference</u>.  Then the next slide is a little bit different for format, but the same similar analysis, where you can see in the gray.  And this is now <u>hemorrhagic stroke</u> by quartile <u>time above 3</u>, so above 3.0. And the <u>warfarin rate</u> is not strikingly different. And <u>actually may be even a little bit lower</u> with the quartile that had the most time above 3. And the rivaroxaban rates low and comparable.*

*But these analyses, we did not look at some of these and didn't do a lot of because there's relatively little time at the two extremes.  So I actually think, as in the literature, <u>the time in the range, 2 to 3</u>, is probably the most reliable for looking at how things spread out by TTR.*[587]

593. Dr. Kaul expressed his confusion over the FDA's 2010 non-inferiority guidance document, which reflected  FDA's policy statements, and the comparison of XARELTO to warfarin and not dabigatran.  For example, when a new population and new therapy is a concern, the non-inferiority assessment uses warfarin to compare the new drug to a treatment population in older, historical trials.  Yet, he had some concners regarding the ROCKET data when compared to dabigatran's RE-LY data. He asked FDA to clarify.

594. Dr. Temple, on behalf of the FDA, responded to Dr. Kaul indicating that after the approval of dabigatran as an alternative to "*difficult to use*" warfarin, he thought the FDA's standard for support of effectiveness of a new NOAC for SPAF had shifted and the data comparing it to warfarin should be more convincing than dabigatran, but that the NOAC did not need to be compared to dabigatra. (underlining for emphasis)

***Dr. Temple****: I mean there is an interesting and provocative issue here that I'm not going to try to address our policy on.  But suppose, in the course of the study, something new and really hot comes along? Do we ever say, <u>I'm sorry you compared it to a dog, we have something better now?</u>  We don't usually do that, but I wouldn't rule out the possibility. And that is a little bit about the possibility, but I don't think we really meant to get too much into the discussion.*

---

[587] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 154-159 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

*I mean, its's the big dog; in the range, there's this other drug that does something. But I don't think—as many people have said repeatedly, I don't think a cross-study comparison here is plausible. It's a different population, and <u>I don't know whether this study tells you anything about how the drug compares to dabigatran.  I'm not sure it does at all.</u>*

*So I think it reflects the fact that <u>it's in the air</u>.  We know it's there.  It's hard to ignore it, but I'm not sure this is the most important question.  The comparison that we focused on when we discussed the trial with the company and that we're focusing on now, really, is with warfarin and not with dabi.*

*As I said at the opening, what dabi does makes me, at least, more interested in being sure that the <u>comparison with warfarin is really solid</u>; whereas, before there was any alternative, just having an alternative to the difficult-to-use Coumadin would have seemed like a very good deal, and any evidence of effectiveness might have been okay.  But I don't think that's true anymore, because <u>you have alternatives that are really solid.</u>  But I don't think it makes dabi the comparator.*[588]

595. Mr. Allan Coukell, B.Sc., Pharm.D, Consumer Representative, Director, the PEW Prescription Project, and a voting member of the Panel, asked a question pertaining to the FDA's instruction to the panel to consider XARELTO approval for SPAF in terms of the commercial availability of Pradaxa (dabigatran) as a direct NOAC for the same indication and patient population.  The FDA wanted the Panel to consider XARELTO approval in terms of being an '*alternative*' to both Pradaxa and warfarin for SPAF.  Mr. Coukell asked Defendants if there were any potential unique benefits for XARELTO when compared to Pradaxa for SPAF patients.  He also asked why Defendants were seeking a general SPAF patient indication when it had elected to only study high risk SPAF patients in ROCKET.  Dr. Califf's response was that XARELTO could be used in the patient unable to tolerate Pradaxa, and also Pradaxa had a "significant rate" of GI bleeding.  Thus, Dr. Califf stated that XARELTO was to be used in a subgroup of the current Pradaxa population, particularly in patients at high risk of significant GI bleeding.  Dr. Califf's comments implied to the panel that XARELTO would be marketed as a "second –line" NOAC, an alternative to Pradaxa.  However, Dr. Califf   provided no specific subgroup of patients that would otherwise benefit from availability of XARELTO.  Defendants made no formal comparison between XARELTO and Pradaxa because the Defendants had been "opposed" to cross-study or indirect comparison.  Therefore, the Defendants would not be able to make claims of superiority of XARELTO over Pradaxa.

596. Dr. Califf responded to the second question from Mr. Coukell.  Defendants had excluded both CHADS1 and CHADS2 patients.  He boasted that Defendants had not performed research on any "*namby-pamby population at low risk*,", but instead on a high risk population.  Without any supporting data, he speculated that there would be potential

---

[588] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 363-366 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

"overlap" between the low risk and the high-risk Afib populations when treated with XARELTO (underlining added for emphasis):

> **Mr. Coukell**: *So the FDA has asked us to think about rivaroxaban in the context of having dabigatran on the market. We haven't finished or maybe even started that discussion yet, but is that any data that suggests there's a subpopulation, pharmacodynamics or clinical data, that would respond better to this drug than the other, for which this drug might be particularly suited?*
> *My second question is, in ROCKET, you've deliberately selected a higher-risk population, where, presumably, the effect of both drugs would be greater. As I understand it, the indication you're seeking is in the general afib population. And what's the basis for that?*
>
> **Dr. Califf**: *…The first question, as I've said, we are fundamentally opposed to cross-trial, indirect comparisons, but there is one circumstance that's relatively obvious I think to everyone. And that is someone who can't tolerate dabigatran, can't take it, and so we have an alternative non-warfarin opportunity for those people.*
>
> *There's a significant rate of GI side effects, for example, with dabigatran. And that's a minority of the population, but it's an obvious group where, if you can't take a drug, having an alternative, in our view, could be important.*
>
> **Dr. Califf**: *…Two key points here I think that the committee should think about. The first is that while the two populations—one is high risk and the others are more general—there is a lot of overlap in those.*
>
> *Remember that per CHADS1, the patient that we excluded right now, either anticoagulation or aspirin is in the guidelines. That may change in the near future, but that's the current recommendation. So all the trials are dealing pretty much with CHADS2 and above as the primary population. <u>We just excluded many of the CHADS2 people on purpose to get this higher-risk population.</u>*
>
> *So we think there's enough overlap that the general indication holds, and there is no heterogeneity in treatment effect across any of the major subgroups that we looked at. So we think the result is generalizable.*
> *Second point, just in terms of policy, we routinely do trials in namby-pamby populations of low-risk patients for a lot of reasons. It's easier to do the studies. And then we extrapolate to the 80-year-old person on 15 other medications. We think it's time to begin to think about doing trials in the more sick people and having enough overlap that we can talk about the general population. We're somewhat responding to what practitioners are saying, which is, you're doing these trials. They're not relevant to the patient that are of biggest concern to us.[589]*

597. Mr. Coukell, who later voted for approval of rivaroxaban (see Question 7, Summary Meeting Minutes below), described his concerns about the aggressive marketing of

---

[589] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 148-151 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

XARELTO as a '*first-line*' drug when compared to dabigatran with no additional support of a patient subgroup that benefited from availability of XARELTO, evidence of superiority to warfarin, or a direct comparison of rivaroxaban versus dabigatran . (underlining added for emphasis):

> **Mr. Coukell**, – *I am convinced that rivaroxaban is <u>superior to placebo</u>. I think clearly, the underlying question in the Reinventing Government policy is would <u>patients be harmed if they were started on a new therapy that was approved through this process?</u>*
> *Had there been a third arm to the ROCKET trial that was a dabigatran arm that clearly demonstrated superiority, I think the answer would be quite clear. We don't have that. <u>And I thing we don't have the evidence to make a comparative conclusion</u>.*
>
> *At the same time, the questions that we've discussed about TTR and the transition issues remain real, and <u>I've heard nothing that convinces me that rivaroxaban should be a firstline therapy for any patient or any subgroup of patients</u>. And so while I voted yes, my lingering concern is that once this drug is on the market, it'll be aggressively promoted on the basis of once-daily dosing or <u>some other purported advantage and will displace a drug that has a superiority indication</u>….[590]*

598. Dr. Steven Nissen, Chair, Department of Cardiovascular Medicine, Cleveland Clinical Foundation, and a temporary voting member of the Panel questioned, based on Defendants slides, the adequacy of the ROCKET protocol for ensuring adequate monitoring of warfarin. Dr. Nissen was then chastised by Dr. Califf for his "*American-exceptional tone*" regarding low TTR at third-world sites, that warfarin is a "hard drug to use" in "socioeconomic personality characteristic circumstances" (underlining added for emphasis):

> **Dr. Nissen**: *I have two quick questions, one for Dr. Mahaffey. You made the case that doctors don't use warfarin very well, and particularly, I think in some of the third-world countries. But I was puzzled by what you said, is that not (sic) education of sites on INR management was performed, nor was there any protocol-mandated approach to this.*
> *So my concern is whether you, in fact, made an effort to get the sites to use warfarin as well as they might. Now, maybe I misunderstood what you said.*
>
> **Dr. Mahaffety**: *Thanks, Dr. Nissen. Sorry if I wasn't clear. We did comprehensively educate all sites across the world in multiple investigator meetings about the importance of INR management and how to get to a target INR of 2.0 to 3.0. What we did not do, as some other investigators have done, was to <u>provide a cookbook algorithm for the sites about what to do with a specific INR in terms of dose change</u>. That, we decided as an investigative group, we weren't going to do, but we did educate people at the beginning of the trial and then…*

---

[590] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 403-404 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

**Dr. Nissen**: Right. But given the fact that I think you guys knew that the TTR was going to be a critical factor in the approvability of the drug, I'm just puzzled as to <u>why you didn't make an effort to give sites, particularly third-world sites, some guidance about what to do.</u>  I mean, basically, you sort of left then on their own, and my concern is that that's why you got such a low TTR. [591]

**Dr. Califf**: So, Dr. Nissen, I'm sure you didn't mean to use the term third world, because I don't think that's an appropriate term anymore.  And, in fact, if you look at the news today, you would find what you're calling third world actually owns most of our national debt.

So I think investigators around the world would be highly offended by this sort of <u>American-exceptional tone</u> of some of the discussion, not you personally, but it's part of the background here we need to acknowledge.

**Dr. Nissen**: Robert, <u>you showed us that those sites in those countries didn't do a very good job of managing warfarin.</u>

**Dr. Califf**: Yes, That's where I want to go.

**Dr. Nissen**: That's where this all comes from.

**Dr. Califf**: But these two concepts are related.  I don't think we need to show a slide here, because I think the critical point is—and I think <u>Dr. Mahaffey misspoke slightly. It's not that doctors do a lousy job</u>.  This is a really <u>hard drug to use</u>, and it's especially really hard to use in various <u>socioeconomic personality characteristic circumstances</u>…

**…**Now one could argue that one should spend a fortune sending a limousine out to pick up patients in countries that need anticoagulation and artificially make the TTR come out better.  We chose to really focus on the highest quality care that we could get at these sites in a global trial.

**Dr. Nissen:** But you could have told them that if the INR was less than 1.5, that the patient should be brought back quickly. You could have instructed them to do that.

**Dr. Califf**: We did instruct then to make every effort to get the patient back…but there are limitations on what a site can do in practice in many places.

But, again I want to emphasize, the TTR is a somewhat artificial measure if you've already adjusted the dose but you measured 30 days later. [592]

---

[591] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 124-127 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

[592] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 124-128 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

599. Dr. Nissen then asked for Defendants to put up slide CC-47, returning to the issue of ischemic stroke and TTR with XARELTO (Dr. Temple (above) had referred to Dr. Nissen's questions about ischemic and hemorrhagic stroke):

> *Dr. Nissen: the reason I wanted to see this is I wanted to see whether, in fact, there were actually more ischemic strokes in the rivaroxaban arm than the warfarin arm with the full analysis set through the end of the trial. And there are slightly more, 226 versus 220. So the point estimate, in fact, is above 1 for rivaroxaban, if you look through the end of the trial.*

> *Dr. Califf: That's true, but I don't think, in practice, there would be the entire population taken off a treatment and making a transition, so it's somewhat artificial last month. But, again, we looked. The comparable data that are being discussed today, nobody looked.*

> *Dr. Peters: So, the other point, so this analysis with this primary ischemic hazard ratio of 1.03, the upper bound of 1.24, which is still well below the non-inferiority margin. And this does include the ischemic strokes in the post-treatment period, where you saw there was clearly inadequate anticoagulation in those who were on rivaroxaban compared to those who were on warfarin. So even with that included, the hazard ratio was very close to 1.*

> *Dr. Nissen: ...later, I'd like to see this, then, in the patients in whom the TTR was in the upper range, up in the mid- and higher 60s. In other words, how does that, a point estimate, drift—if you use the full ITT analysis—and I'd be interested in the later hearing from Dr. Fleming who's, I think , been an advocate of that sort of an approach—if you looked at the patients where the TTR was up in the mid-to upper 60s.*

> *Dr. Sager: ...did the executive committee have a target TTR for this study? I mean, was there a number that you would have liked to have seen, actually, when you started the study, that you thought was appropriate?*

> *Dr. Califf: Well, of course, we'd like to see as high a TTR as possible, and so shooting for around 60 would be—but at that time the study was designed, we didn't have all these data about regional differences and severity-of-illness differences.*

> *Dr. Peters: I would say that SPORTIF III and V were kind of the trials that these were being designed, following on, an ACTIVE W a little bit just before we started. So we were looking at mid 60s, but we didn't set a specific target that I'm aware of for the trial.[593]*

600. Thomas Fleming, Ph.D., Professor, Department of Biostatistics, University of Washington, followed up on Dr. Nissen's reference to ITT, TTR and stroke (underlining and bold added for emphasis):

---

[593] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 128-133 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

**Dr. Fleming**: On slide CC-50, you provide results, again, for the safety on-treatment. Dr. Nissen has saved me some time here because I had the same question he did about CC-47, which is to look at the results in stroke, not only by on-treatment per protocol, but ITT.

My understanding here, when we're looking at _all-cause mortality_, is there were 458 events. When I look at your briefing document, on page 94, in terms of deaths, there are almost triple that number of death. So it's perplexing to me. There are about 25 percent—from Dr. Nissen's answer, _about 25% more strokes when you look at ITT_. _There are 200% more deaths_. I'm perplexed about why there are so many more deaths. And then the actual additional evidence that I want to get is, can you give us the ITT results for MI? And then I want to come to the last part of the questions, which is I'd like to see those results by U.S. only.

So there's really probably three parts to the question. Why are there triple the number of deaths when you look at ITT? Secondly, what is the MI ITT? And thirdly, what are death and MI in the U.S. sites?

**Dr. Califf**: That's a trifecta, as we say in basketball. But if we can put up the first slide that's up here, I think the main point to make is, in a sick population, we have _non-fatal events as a primary endpoint_. A lot of non-fatal events occur. Let's take stroke as a good example. _If you don't die from stroke, there's a good chance you're_ **_going to come off study drug_**, not necessarily because anybody wants to do it, but you may no longer be a candidate for anticoagulation. You may be in a rehab center that can't manage the trial. There are multiple reasons.

So what we had was a lot of deaths that occurred either as subsequent events to the primary event of the trial. Or, remember, these were people on nine medications, on average, with multiple other disease who died from a variety of causes.

**Dr. Fleming**: So what percentage of person years were occurring in ITT? So what you referred to in the briefing document as the ITT analysis used for efficacy, _the ITT population used for efficacy analysis, that has three times the number of deaths than the number of deaths that are on treatment, per protocol._ What's the difference in the person years of follow-up, in total, for the ITT versus for the per protocol?

**Dr. Califf**: We'd have to calculate that. That's an interesting question....

**Dr. Fleming**: ...So, specifically, for MIs what is the MI distribution by treatment arm for the ITT for efficacy analysis population?

**Dr. Califf**:...here you see the results for myocardial infarction. Hazard ratio is 0.89; upper confidence interval 1.13.

**Dr. Fleming**: And then the last question that I had was, when you look at your on-study per protocol, _within the U.S._, the mortality differences that you see at .85 shrink to .97. The MI from .81 shrinks to .95 when you look within the U.S. by the on-study.

201

*What are the ITT results for the U.S. for survival and for MI?*

**Dr. Califf**: *We're going to put the slide up…<u>When you're asking for ITT to end of study plus 30 days</u>, you're asking for something different than any other trial has included in this field.  <u>So we have an artificial additional 30 days</u>, but we do have the data, and go ahead and put it up.*

*So you can see that –and this is for North America, not the U.S….*

**Dr. Fleming**: *So in the U.S., MI is in the wrong direction, actually.  That's 41—that's excess, more on rivaroxaban, <u>41 and 36.</u>*

**Dr. Califf**: *Yes.  It's 41 versus 36.  If we could, put up the slide that's up now.  So this would be the data, as other trials have looked at it, which you can see here.  The MI is now 30 versus 29, not counting those additional 30 days after discontinuing.*

**Dr. Fleming**: *But even as this analysis says, in the U.S., MI and all-cause mortality are neutral.*

**Dr. Califf**: *Yes*

**Dr. Peters**: *But, again, this is a subgroup.  About a thousand patients in each group were from the U.S.  So compared to the overall trials, it's much smaller numbers.[594]*

601. Dr. Nissen's also commented on outstanding issues at the conclusion of the meeting (underlining added for emphasis):

*I would really like to see this drug tested in this <u>atrial fibrillation population BID</u>, <u>because it make a lot more sense from a pharmacokinetic, pharmacodynamic</u> point of view.  And maybe this drug will have more –at point estimates and confidence intervals and look more like dabigatran if it's studied in a more optimal dosage regimen,*

*Actually, we're all sitting here saying yes, maybe it's better than warfarin, maybe it's not; it's certainly better than placebo.  But that kind of robustness that Tom has been looking for here, you might just find if you give the drug in a more optimal way.  And if you do such a study, please, <u>get a TTR up in the mid-60s</u>. [595]*

602. Dr. Temple commented on behalf of the FDA at the conclusion of the meeting:

---

[594] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 171-176
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)
[595] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 415-416
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

> *Dr. Temple:  We don't care about votes either, but we thought the discussion as extremely good, sophisticated, and well informed, and we are grateful for the discussion. We really do care about votes a little. I was just kidding.[596]*

- **FDA's Reviewers Presented Conclusions Regarding ROCKET and XARELTO for SPAF**

603. At the September 8, 2011 meeting, Dr. Rose, the Medical Officer responsible for XARELTO's efficacy review, presented his summary of the ROCKET data. He stated that a major problem with the ROCKET data was the overall TTR of 55% for the warfarin arm:

   ***Overall Efficacy Findings***

   *In ROCKET-*

   - *None of the ITT[597] analyses support superiority of rivaroxaban to warfarin*

   - *As-treated and ITT analyses support non-inferiority of rivaroxaban to warfarin <u>as it was used in ROCKET</u>*

   - *These analyses do not consider how the quality of warfarin administration might have affected the outcomes.[598]*

604. The ROCKET clinical protocol did not stipulate an algorithm for physicians managing warfarin:

   ***Management of INR in ROCKET***

   - *Protocol specified a procedure for starting study drug in patients on VKA (vitamin K antagonist, e.g. warfarin) at baseline, but-*

   - *Did not stipulate any algorithm for managing VKA dose[599]*

   ***Adequacy of Anticoagulation-Summary***

   - *INR control in ROCKET was worse than in other recent trials, potentially biasing the overall results in favor of rivaroxaban.*

---

[596] September 8, 2011 FDA Advisory Committee Meeting transcript at p. 417 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

[597] ITT= Intent to Treat

[598] FDA Backup Slides for 9/8/11 Advisory Committee Meeting at slide 8 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

[599] FDA Backup Slides for 9/8/11 Advisory Committee Meeting at slide 12 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

- *Few patients were enrolled at sites where warfarin was used skillfully, resulting in insufficient data to assess the efficacy of rivaroxaban compared to warfarin when the latter is used well.[600]*

**Comments on Proposed Transition Regimen**

- *Starting rivaroxaban in patients taking warfarin is not comparable to starting warfarin in patients taking rivaroxaban*

- *Rivaroxaban may increase INR; discontinuing it at INR≥ 2 may lead to under-anticoagulation*

- *The onset of the effect of warfarin is slow*

- *The time to therapeutic range is not predictable*

- *INR can fluctuate in and out of the therapeutic range during initiation of therapy*

- *Concentrations of anti-thrombotic protein C decrease faster than pro-coagulant factors[601]*

605. Dr. Rose provided a slide with a "**Summary of the Post Treatment Events**" including increased risk of stroke in the rivaroxaban patients after discontinuation of the treatment drug:

- *Completing patients in the rivaroxaban arm in ROCKET had a 28 day post treatment stroke rate about 4X that of warfarin arm patients; J ROCKET data are directionally consistent*

- *The rivaroxaban arm stroke rate was not inconsistent with the observed poor warfarin control in this period, however the data are also not inconsistent with rebound hypercoagulability[602]*

606. Dr. Dunnmon, the Clinical Reviewer responsible for FDA's Safety review, presented on "**Dose Selection**".

*Dose Selection for ROCKET*

- *Pk-Pd Profile*

---

[600] FDA Backup Slides for 9/8/11 Advisory Committee Meeting at slide 30
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[601] FDA Backup Slides for 9/8/11 Advisory Committee Meeting at slide 38
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[602] FDA Backup Slides for 9/8/11 Advisory Committee Meeting at slide 39
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

- *VTE Treatment Studies*

- *ATLAS ACS 1 TIMI 46*

- *ROCKET PK-PD Outcomes*

    - *PT as a surrogate for exposure*

    - *Exposure driven efficacy and safety analyses.*[603]

607. This slide was followed by the statement: "BID regimen has lower PT fluctuation compared to QD regimen."[604]

  ***Phase II VTE Studies-***

- ***No dose ranging studies in atrial fibrillation patients***.

- ***ROCKET dose based on two small Phase 2 VTE treatment studies***

    - *20 mg/day lowest total daily dose given in either study*

    - *Small number of outcome events*

    - *Neither study demonstrated efficacy dose response*

    - *Only 11223 tested same total daily dose given QD and BID*

        o *Better efficacy with BID dosing*

        o *Numerically fewer non-major bleeding events with BID dosing.*[605]

- ***Effect on PT is Concentration Dependent***

  *"The established close-to-linear PT/rivaroxaban plasma concentration relationship in Phase 2 supported the use of PT exposure-driven safety and efficacy analyses for the Phase 2 trials."*[606]

- ***ROCKET Rivaroxaban-PT dependent increased Risk for Major Bleeding but no relationship for Ischemic stroke***[607]

---

[603] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 2 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

[604] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 3 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

[605] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 4 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

[606] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 8 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)

*Conclusions*

- *Clinical pharmacology attributes suggest BID dosing of Rivaroxaban*
- *VTE studies do not provide a firm basis for the dose and regimen studied in ROCKET*
- *20 mg QD dose of Rivaroxaban in ROCKET*
  - *Twice the approved VTE prevention dose (10mg QD)*
  - *Lower and split dosing incorporated into ATLAS ACS-2*
    - *2.5 mg BID*
    - *5.0 mg BID[608]*

- *Ischemic Stroke and Major Bleeding in ROCKET*

  - *Warfarin: increasing INR associated with decreasing bleeding stroke and increasing major bleed*
  - *Rivaroxaban: flat PT/ischemic stroke relationship, but increasing PT associated with increasing major bleeds.[609]*

- **FDA's Summary Minutes of the Advisory Committee Meeting on September 8, 2011**

608. FDA's final questions for the Advisory Committee, chaired by A. Michael Lincoff, M.D., Director, C5Research Cleveland Clinic (designated as a Special Government Employee Consultant, Acting Chair and Temporary Voting Member), requested that the members of the panel discuss the adequacy of Defendants' XARELTO NDA and the ROCKET-AF non-inferiority study. Defendant's ROCKET NI had a TTR of 55% which was below the TTR for similar NOAC studies, with TTRs that ranged from 62%-68%. The discussion, and one subsequent voting question, occurred at the public meeting and was published by FDA in its Summary Minutes of the Meeting dated October 28, 2011. Defendants, besides participating at the Ad Com meeting, had complete access to the full meeting transcript and Summary Meeting Minutes and follow-up by FDA. The following FDA final questions and Summary Meeting Minutes were published by the FDA, with voting occurring for Question #7 (underlining added for emphasis).[610]

*1) DISCUSSION: Please comment on the adequacy of the design of ROCKET-AF*
*   a. Was the planned warfarin management strategy reasonable?*

---

[607] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 10
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[608] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 11
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[609] FDA Core Slides for 9/8/11 Advisory Committee Meeting at slide 12
(http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm271999.htm)
[610] FDA Summary Minutes for 9/8/11 Advisory Committee Meeting
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

*Some members thought the planned warfarin management strategy was not reasonable. There was not a standardized algorithm for warfarin maintenance dose adjustment, which other studies have utilized with subsequent higher TTR.  A protocol how to manage out of range INRs may have overcome mediocre time in therapeutic range TTR.  Other members thought the strategy was reasonable as the intent was to reflect the way heparin (sic) is actually used in the real world setting and not provide an artificial warfarin dosing strategy.*

**b. Was it reasonable to test a single regimen or rivaroxaban in ROCKET-AF? Was the specific choice of regimen reasonable, given the short half-life and nonlinear kinetics of rivaroxaban?**

*Some members thought it was reasonable to test a single once-daily regimen of rivaroxaban as the pharmacokinetic data did not show large differences between once-daily and twice-daily dosing and there did not seem to be large difference in the available clinical trial data.  Once-daily dosing was also thought to be beneficial from a patient compliance standpoint.  Other members thought that studying twice-daily dosing would have been beneficial. There were concerns that not having twice-daily dosing could lead to increased risk of bleeding or reduced efficacy. Additionally, since rivaroxaban has a shorter half-life than dabigatran, which is dosed twice daily, <u>rivaroxaban should have been studied twice-daily.  Members questioned why the study couldn't prove superiority over warfarin, considering the warfarin therapy was not optimal.</u>*

**c. The primary analysis included events that occurred within 2 days of discontinuing study drug. For how many days should end point events that occurred after discontinuation of study drug- during the study or at its end—be counted?**

*Some members said they were not able to say how many days to count as ITT has to consider events that occur after stopping the drug may be related to the study drug.  Some felt that the 2 days used in the trial was reasonable, given the pharmacokinetics of the drug, and that events occurring after 2 days reflect inadequate bridging but not the effect of the drug therapy.  Others felt that it is best for ITT duration to follow-up to a target number of events or until everyone is followed for a certain number of months from randomization. <u>Many members believed that two days following study drug discontinuation was too short</u>.  <u>Some members thought it would be best to follow-up 7-14 days in order to rule out hypercoaguability.</u> Some members though follow-up should be <u>conducted for 30 days</u> from on-treatment, as this seemed to capture where events were happening off study drug and that 30 days is commonly used in clinical trials.*

**d. Are there other aspects of study design that importantly affect interpretation of the study?**

*Members identified many aspects that included TTR percentages, handling of transition off of the study drug, missing data, and double counting of safety events toward efficacy. Members expressed concerns about the exclusion of patients scheduled for cardioversion, since that is often used in the real world. Additionally, members would like to have known how rivaroxaban performed against dabigatran. Furthermore, there was concern among some members that efficacy should only be reflected in ischemic events but others disagreed, as what is important to the patient is having a stroke. The agency stated that distinguishing between the two different types of strokes may help to determine if different doses are better for the different types of strokes.*

**6) DISCUSSION: Are there adequate instructions for use with regard to…**

    a) ***...what regimen to use in most patients? If not, does this matter?***

    b) ***…what dose adjustments are needed in patients at extremes of exposure or risk?  If not, does this matter?***

    c) ***…transitioning between rivaroxaban and other anticoagulant therapy? If not, does this matter?***

    d) ***…actions to take in the event of serious bleeding. If not, does this matter?***

*Questions 6a through 6d were discussed together. The committee was concerned that there was no data on how to address discontinuation and/or transitioning between rivaroxaban and other anticoagulant therapies. The blinded design of ROCKET made it difficult to address discontinuation. It was stated that it is not known how to bridge most anticoagulant therapies, but physicians will do what they feel is best. Members thought that a properly performed clinical trial examining INR's, which would not need to be large, would be informative to address the medical needs of discontinuation or rivaroxaban and provide needed information to healthcare providers.*

**7.) VOTING: Should rivaroxaban be approved for the reduction of stroke and non-CNS systemic embolism in patients with non-valvular atrial fibrillation?**

***Yes: 9  No: 2 Abstain : 1.***

*The members who voted yes felt that rivaroxaban was non-inferior to warfarin. Many members felt it was beneficial to as an additional option for oral anticoagulation. The members were pleased with the patient population used in ROCKET. There was concern about the once-daily dosing being used as a marketing ploy and about the lack of data informing the transition to warfarin.*

*The members who voted no were worried that based on the half-life of the drug, it should be administered twice daily. There were also concerns regarding the TTR and the lack of dosing scheme for warfarin in ROCKET. The members felt the lack of a plan for bridging was an approvability issue and that rivaroxaban may be a step back instead of a step forward when thinking about dabigatran.*

*The member who abstained felt that rivaroxaban was <u>superior to placebo, but felt it could not be concluded that it is superior to warfarin, and that it may be possible to justify non-inferiority to warfarin.</u>  There was concern regarding TTR levels, events occurring at transition, <u>deaths two days post study drug, and missing data</u>.*

***8.) DISCUSSION: If you voted to approve rivaroxaban to prevent strokes in patients with atrial fibrillation, does it merit…***

   a)  *…a superiority claim to warfarin?*

   b)  *…a claim as an effective alternative to warfarin?*

   c)  *…a claim as effective?*

   d)  *…a claim for patients failing other anticoagulant therapy? If so, what constitutes failure?*

*Questions 8a and 8d were discussed together. <u>The committee felt that rivaroxaban was not superior to warfarin.</u>  Most, although not all members, felt that rivaroxaban met criteria as an <u>effective alternative to warfarin</u>.  Members felt it was <u>effective vs. placebo</u> and some viewed it as effective.  <u>Rivaroxaban was considered to merit a claim for patients failing other anticoagulant therapies</u>.  Failure of other anticoagulant therapies was defined as issues such as <u>difficulty using warfarin, inability to maintain appropriate INR, warfarin-induced skin necrosis or gastrointestinal upset with dabigatran.</u>*

***9) DISCUSSION: If rivaroxaban were to be approved for stroke prevention in patients with atrial fibrillation…***

   a)  *…are there constraints you would place on the population in whom it would be indicated?*

   b)  *…are there any issues you would want to resolve post-marketing?*

*Questions 9a and 9b were discussed together.  Members preferred constants on the indicated population for patients with <u>end stage renal disease, end stage liver disease, those well-controlled on warfarin without reasons to switch, and those with low body weight.</u>  Members also preferred for studies to be <u>conducted to exclude hypercoaguability</u> and to test different bridging regimens.  Many members wanted the <u>bridging studies to be conducted premarketing</u>.[611]*

- **FDA Advisory Committee Members Who Voted Against NDA Approval for the SPAF Indication**

609.  According to the meeting transcript, Dr. Thomas Fleming abstained from voting. His rationale included the influence of TTR levels, the per-protocol on-therapy versus ITT,

---

[611] FDA Summary Minutes for 9/8/11 Advisory Committee Meeting
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

particularly in the context of the increasing events occurring at transition, the overall total excess events in the wrong direction, and the large fraction of events, particularly deaths, that occurred after two (2) days post-therapy, and the missing data.  He also stated that he was perplexed about the proper way to address the dabigatran results.  If dabigatran is superior to warfarin, he stated that he was uncertain how to interpret the adequacy of showing non-inferiority to warfarin.  He chose to abstain from the voting, saying it was difficult for him to answer yes/no because the issues were still uncertain in his mind for both sides. [612]

610.   Dr. Nissen voted "No," recommending against FDA's approval of the SPAF indication for XARELTO based on the limited information available and the unfavorable precedent it would set for future drug approval.  He then provided a summary of his thoughts:

> *First I am worried that we may have the* <u>*wrong dose*</u> *administration schedule for the drug, that a drug with a relatively short half-life was developed as a once-a-day drug and that there may be a better way to give this drug.  And we're not likely to find that out at this point, if we approve the drug with the current data.*
>
> *But more importantly, if you look at the evidence for non-inferiority, it is strongest in the per-protocol population, but when you start to look at the different censoring rules, particularly if you go out—we don't have the intermediate values of say going on a couple of weeks as Dr. Kaul suggested.  Basically, you end up with point estimates that start to get pretty close to 1. ..*
>
> *If you then factor into that the fact that the* <u>*TTR was well below other studies*</u> *that we looked at—I mean, again they were all pretty much in the mid- to high 60s- now you introduce a level of uncertainty as to the efficacy of the drug that is substantial.*
>
> *...*<u>*could the TTR have been better?*</u> *And my conclusion is that it could have been, that there is a fatal flaw in the study* <u>*design,*</u> *in that there were not instructions given.* <u>*And so, if you were cynical, you'd say that warfarin was designed to not be given particularly well in the trial*</u>.  *And I think it was an oversight, not necessarily an intent, but the other trials in this field used algorithms for treatment that allowed them to get the TTR up into the mid-60s.*
>
> *That wasn't done here, and it left me with a sense of doubt that using the ITT analysis and then further deflating evidence of non-inferiority because of uncertainty about the TTR, now, you get to the point where I worry.*
>
> *Again, as I said earlier, I worry about* <u>*creeping non-inferiority*</u>. *This has happened in other fields, where a trial comes along and the comparator is not used as well as it was used previously.  Now, I worry someone's going to come along and have a TTR of 50 percent, not 55, and they're going to argue, well, we're pretty close to what they did in ROCKET, so maybe we're okay, too.*

---

[612] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 392-393 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

*When you deal with a morbid, mortal complication like this, <u>we owe patients the best therapy that we can get.</u> Now, if we didn't have another agent, if we didn't have another oral agent like dabigatran, maybe I might view it differently. But it dose change my thinking, and it made me concerned that <u>this may be a step back, not a step forward,</u> and that <u>we will come to regret approving a drug without having the right pharmacokinetic, pharmacodynamics properties studied.</u>*

*Then, finally, the issue of <u>what to do when therapy is stopped or interrupted</u> is a huge approvability issue, from my perspective. I'm concerned that it hasn't been studied. It could have been studied in parallel. It didn't have to be studied in ROCKET. <u>It could have been studied in another small trial,</u> as has been suggested. And <u>I still think that the agency should not approve this drug without having the data on what to do when you stop the drug.</u>*

*We have to stop anticoagulation frequently in patients for a variety of reasons, and when we do, <u>we need to have at least some information on what we should do</u> in those patients, particularly when we have evidence that when we stop the drug, there is a rather significant excess of morbid, mortal events. So those are my reasons for voting no.[613]*

The other No vote came from Scott Emerson, MD, Ph.D, Professor of Biostatistics, Department of Biostatistics, University of Washington, Seattle, WA. He classified his opinion as lying somewhere between that of Drs. Fleming and Nissen.[614]

## j. FDA RECOMMENDS 'CONDITIONAL' APPROVAL OF XARELTO SPAF WITH SAME POST-APPROVAL COMMITMENTS AS XARELTO FOR VTE-P

611. In terms of the NDA approval of XARELTO for SPAF, the FDA's Summary Review of the NDA by Deputy Director Grant and the two primary Medical Officer Reviews would provide discussion by FDA of the NDA's documentation and the agency's considerations regarding approval of XARELTO. The FDA documents include FDA's medical reviewers' evaluations of Dr. Rose and Dr. Dunnmon, recommending against NDA approval based on ROCKET. It was FDA's Cross-Discipline Team Leader, Dr. Thompson, which would support approval of the NDA.

612. Dr. Rose, the clinical efficacy reviewer, concluded that "if" a new NOAC drug was medically needed as an alternative to warfarin or dabigatran, XARELTO could be approved, but based on the ROCKET data as well as other rivaroxaban clinical studies submitted to FDA, it should be reserved only as a third-line drug option for anticoagulation of AFib patients. He based this recommendation, for reduced prescribing of XARELTO, on the weaknesses he saw in the ROCKET data submitted to FDA as well

---

[613] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 395-398 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)
[614] September 8, 2011 FDA Advisory Committee Meeting transcript at pp. 405-406 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm250287.htm)

as other Phase 2 and Phase 3 rivaroxaban trials.  For ROCKET, he saw that Defendants' support of non-inferiority was based on the 'poor management' (low time in therapeutic range of TTR) of the comparator warfarin in the warfarin arm patients. At best, ROCKET exhibited the benefit of XARELTO in situations of poor warfarin control.  The data about warfarin skewed the results of a non-inferiority study in favor of XARELTO, but reduced the overall quality and reliability of the data available to support the benefit of XARELTO for SPAF.  At the time of consideration of SPAF approval by the three medical officers and FDA, the deficiencies in the INR monitoring medical device provided to the warfarin patients, and the introduction of bias against warfarin treatment arm subjects in favor of XARELTO, had not been disclosed to the FDA's reviewers. Unlike VTE-P there were two new doses of XARELTO approved for SPAF: 20mg QD for patients with CrCl of >50 mL/min, and 15mg QD for patients with CrCL of 15-50 mL/min.  So, unlike the VTE-P approved label as a 10mg OD with short-term use, the FDA's draft label comments for the Defendants' VTE-P approved label would include a recommendation to consider dose adjustment in certain patient population as well as discussion of the increased concentration of XARELTO, pharmacodynamics and increased risk for bleeding.

613. There is an internal document titled "Coordination of Analyses of INR" dated April 5, 2011. Comments from regulatory agencies (April 5, 2011)[615]:

> **FDA**: *We are concerned that the administration of warfarin in ROCKET was inadequate to be a proper comparator for evaluating the efficacy of rivaroxaban.[616]*

> **EMA: Assessor's Comment**: *Table E-7 Percentage of INR Values for Warfarin: <u>It is not totally clear for the assessor how the TTR has been calculated.</u> Is it just the mean of the total number of values within the specific INR ranges or has consideration been made to the time between the measurements?  The mean TTR in the warfarin group must be considered as low and lower than what has been seen in recent trials within this area.  Thus, the external validity of the study results for centers with better INR control must be further clarified…*

> *Time in therapeutic range also appears to have been influenced by patient risk. The TTR for patients without CHF (mean 59.6, median 61.8) was higher than with congestive heart failure (mean 52.9, median 55.6). Given the high representation of heart failure in the study (approximately 62%), this population contributed substantially to the overall TTR for the study.*

> *…the mean TTR was lower in VKA-naïve subjects (47.4%) than in those with prior VKA use (59.8%).*

---

[615] XARELTO_JANSSEN_03888342
[616] XARELTO_JANSSEN_03888342

> *Assessor comment: These results could be biased as regions with poorer INR control also seem to have had patients with higher incidences of CHF and high CHADS2 scores.[617]*

614. Defendants' "List of INR-Related Analyses" was as follows:
    o Determine predictors of TTR- DCRI proposal, target April; Zhong – proposal attached;
    o Zhong was to perform a TTR in ROCKET compared to other trials (RE-LY, SPORTIF);
    o DCRI was to evaluate the association between TTR, treatment and outcomes with a tentative date of April;
    o The study already completed was a "Pre-Planned and Post-hoc analyses of INR in ROCKET/J-ROCKET"; and
    o "INR-related analyses by AdCom" sub-team (INR, efficacy, safety) ongoing. [618]

## k.  FDA AND DEFENDANTS NEGOTIATE A LAUNCH LABEL FOR THE SPAF INDICATION

- **Defendants' Proposed XARELTO SPAF Label**

615. On July 12, 2011, Sanjay Jalota and Alla Rhoge (Janssen) had a call with Alison Blaus (FDA Project Manager) to obtain feedback from the FDA's internal meeting held on July 12, 2011.  During this call, 'Alison mentioned that NDA 22-406 approved label should be used as the basis for the updated label and the AFib specific information added to it.'[619]

616. On August 10, 2011, the FDA's Clinical Pharmacology reviewers stated, "Major bleeding events increased with an increase in pre-dose PT [trough] over the observed range (per-protocol, on treatment analysis set).  Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year."[620]

617. On September 16, 2011, Judy Kinaszczuk sent an internal email to members of Janssen, "Subject: LWG Mtg: XARELTO Afib USPI contingency planning," regarding the contingency plan for the XARELTO SPAF in September 2011.  Some of the proposals came from the direction of the AdComm discussions. For **Section 5.1 Risk of Bleeding**, the contingency or change was "*addition of pulmonary bleeding*".[621]  Regarding the questions Dr. Rose was asking Defendants about in April 2011, including ITT on treatment and the safety on treatment analyses, there is Section 14 (Clinical Studies) Table 10: (i) ITT data was added but pre-specified safety on-treatment analyses was kept; (ii) ITT data was added and pre-specified safety on treatment analyses were deleted, but

---

[617] XARELTO_JANSSEN_03888342
[618] XARELTO_JANSSEN_03888342
[619] XARELTO_JANSSEN_00000200
[620] FDA's Clinical Pharmacology Biopharmaceutics Review of NDA 202439 at p. 28 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[621] XARELTO_JANSSEN_01164624

Figure 1 remained.[622] For dosage and administration, there is reference to the fact that "10mg BID was not supported by the data of ROCKET."[623]



**Figure 4**    Major bleeding events increased with an increase in pre-dose PT over the observed range (per-protocol, on treatment analysis set). Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year. The PT measurements made either at week 12 or week 24, whichever was closer to the reported major bleeding event was used for the analysis. Majority of the PT measurements were made during 12-24 hours after the previous dose and is referred to as pre-dose PT.

[624]

618. A September 29, 2011 Bayer Contact Report by Alla Rhoge (Janssen) regarded a discussion with FDA's Alison Blaus. The CardioRenal Division Medical Reviewer, Dr. Dunnmon (Safety), called to discuss proposed Agency revisions to Table 3 of the Draft Label.  Earlier in the day, he had informed Ms. Blaus of a positive CHMP Opinion for Rivaroxaban in Europe.  Ms. Blaus responded that the Division had already received the documents from the EMA that week.  He speculated that, "It is likely that the CHMP/EMA also provided the final SPC to the Division."[625]

619. Dr. Dunnmon had called to discuss "Table 3: Bleeding Events (per 100 Patient-years) in ROCKET AF".  Based on the comments expressed at the FDA's September 8, 2011 Advisory Committee meeting concerning Defendants' double counting of hemorrhagic strokes as both efficacy and safety endpoints, Dr. Dunnmon was considering either replacing or appending values for Principal Safety Outcome and Major Bleeds with those excluding hemorrhagic stroke.  Dr. Dunnmon had received the numerical values to make the changes as part of the Defendant's response to FDA's Information Request of September 23, 2011 (Seq 0107).[626]

---

[622] XARELTO_JANSSEN_01164624
[623] XARELTO_JANSSEN_01164624
[624] FDA's Clinical Pharmacology Biopharmaceutics Review of NDA 202439 at p. 28
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[625] XARELTO_BHCP_00015717
[626] XARELTO_BHCP_00015717
[626] XARELTO_BHCP_00015717

- **Defendants Received FDA's Comments on the Label on October 11, 2011**

620. On October 11, 2011, a Bayer contact report was received from Janssen's Alla Rhoge, "Subject: IMPORTANT: NDA 202439 Rivaroxaban FDA-Proposed DRAFT label." [627] The CardioRenal Division had sent Defendants a draft mark-up Rivaroxaban AFib label with FDA's changes and comments.  "In line with LWG process, Judy Kinaszczuk would organize the meeting between Bayer and J&J to review the agency's proposal.  The high level Agency requests/comments for this round of review: Changes were not needed to Highlights, TOC, Section 17 and the MedGuide."  The same labeling was also sent by the Division to FDA's Office of Surveillance and Epidemiology (OSE).  The label before the completion of the negotiation process and NDA approval would be sent to Division of Drug Marketing, Advertising and Communications (DDMAC) to review the patient information and the Medication Guide.  Defendants would have a call with FDA on October 12, with the goal for Defendants to provide comments on the FDA's changes by October 14.

621. FDA's proposed changes to the XARELTO label were to add the indication for SPAF and information regarding ROCKET AF. There was a new addition to the Black Box Warning: WARNINGS: DISCONTINUING XARELTO IN PATIENTS WITH ATRIAL FIBRILLATION INCREASES RISK OF STROKE AND SURGICAL SETTING-SPINAL /EPIDURAL HEMATOMA. "Discontinuing XARELTO places patients at an increased risk of thrombotic events (5.2)." The new label, based on increased risk for discontinuation of XARELTO in ROCKET, had reinforcing language for the physician regarding not discontinuing XARELTO in a patient due to increased thrombotic risk. This Warning and Precaution to keep patients on XARELTO appears to have been acceptable to Defendants.

622. The FDA added new statements about Special Populations throughout the label for patients with renal impairment and the potential for increased exposure, and the need to "*adjust therapy accordingly.*"  Despite the VTE-P label being the approved label and basis for the AFib label, FDA updated the information for "Prophylaxis of Deep Vein Thrombosis" while adding "Atrial Fibrillation". As indicated in Dr. Grant's November 4, 2011 Summary Review[628], FDA also added a qualifier statement that the relative effectiveness of XARELTO and warfarin in reducing SPAF had not been characterized when warfarin was well managed.  FDA addressed and tightened the format of the switching information in terms of the lengthy and confusing discussion proposed initially by Defendants:

*1. INDICATIONS AND USAGE*
   *1.1. <u>Reduction of Risk of Stroke and Systemic Embolism in Atrial Fibrillation</u>*

   *XARELTO (rivaroxaban) is indicated to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation*

---

[627] XARELTO_BHCP_00015723
[628] Burton Exhibit 41

***The relative effectiveness of XARELTO and warfarin in reducing the risk of stroke and systemic embolism has not been characterized when warfarin is well managed (e.g., patients INR in the target range more than 70% of the time) [see Clinical Studies (14.1)[629]***

### *12.2   Prophylaxis of Deep Vein Thrombosis*

*DOSAGE AND ADMINISTRATION*
*General Considerations*

*Use with P-gp and Strong CYP3A4 Inducers---should be avoided*

*Missed Dose: If a dose of XARELTO is not taken at the scheduled time, administer the dose as soon as possible on the same day. Do not administer two doses on the same day.*

### *2.1   Atrial Fibrillation*

*Surgery and Intervention*

*Converting from or to Warfarin-…No clinical trial data are available to guide converting patients from XARELTO to warfarin…*

*Converting from or to Anticoagulant Other than Warfarin[630]*

623. FDA deleted Defendants' lengthy discussion of the lack of clinical trial data available to guide conversion of patients.  FDA also deleted Defendants' references to other products, such as low molecular weight heparin, non-warfarin oral anticoagulants, unfractionated heparin continuous infusion, etc. FDA's re-write was more concise.

### *2.2 Prophylaxis of Deep Vein Thrombosis*

### *3. DOSAGE FORMS AND STRENGTHS*

- *10 mg tablets…*

- *15mg tablets…*

- *20 mg tablets…*

### *4. CONTRAINDICATIONS*

- *Active pathological bleeding*

- *Hypersensitivity to XARELTO*

---

[629] XARELTO_BHCP_00015723
[630] XARELTO_BHCP_00015723

624. FDA re-wrote Section 5 (WARNINGS and PRECAUTIONS), in order to update since the initial approval for Prophylaxis of DVT, in which Defendants had maintained to FDA there was no need for dose adjustment of the 10mg dose based on renal function.

*5.1 Risk of Bleeding*

*5.2 Increased Risk of Stroke After Discontinuation in Atrial Fibrillation*

*5.3 Renal Impairment*

*Atrial Fibrillation*

*Avoid the use of XARELTO in patients with creatinine clearance < 15mL/min. Monitor renal function and adjust therapy accordingly. [see Use in Specific Populations (8.7)]*

*Prophylaxis of Deep Vein Thrombosis*

*Avoid the use of XARELTO in patients with severe renal impairment (creatine clearance <30mL/min) due to expected increase in rivaroxaban exposure and pharmacodynamics effects in this patient population. Observe closely and promptly evaluate any signs or symptoms of blood loss in patients with moderate renal impairment (CrCl 30 to <50mL/min). Patients who develop renal failure while on XARELTO should discontinue the treatment [see Use in Specific Population (8.7)]*

*5.4 Hepatic Impairment*

*All Indications*

*No clinical data are available for patients with severe hepatic impairment. Avoid use of XARELTO in patients with severe (Child-Pugh C) hepatic impairment or any hepatic disease associated with coagulopathy…*

*Prophylaxis of Deep Vein Thrombosis*

*Clinical data in patients with moderate hepatic impairment (Child-Pugh B) indicate a significant increase in rivaroxaban exposure and pharmacodynamic effects.  Avoid use of XARELTO in patients with moderate (Child-Pugh B) hepatic impairment…* [631]

625. FDA deleted Defendants' "Patients Undergoing Direct Current Cardioversion" section, removing information regarding ROCKET AF, MAZE procedure, and Table X Strokes and Non-CNS emboli following DCC from ROCKET (to Day 30 follow-up), and moved it to Section 5.7 as a single statement about the lack of study.

*5.6 Risk of Pregnancy Related Hemorrhage*

*XARELTO should be used with caution in pregnant women and only if the potential benefit justifies the potential risk to the mother and fetus. XARELTO dosing in pregnancy has not been studied. The anticoagulant effect of XAERLTO cannot be*

---

[631] XARELTO_BHCP_00015723

*monitored with standard laboratory testing nor readily reversed. Promptly evaluate*
*any signs or symptoms suggesting blood loss (e.g. a drop in hemoglobin and/or*
*hematocrit, hypotension, or fetal distress)…*

**5.7 Use with Cardioversion**
*There is little experience with XARELTO in patients undergoing DC cardioversion*
*for atrial fibrillation.[632]*

626.  In Section 6 **ADVERSE REACTIONS**, 6.1 **Clinical Trial Experience**, FDA again
simplified the Defendants' proposed ROCKET AF and RECORD adverse reactions
information in the clinical trials:

*…these included 7111 patients who received XARELTO 15 mg or 20 mg orally once*
*daily for a mean of 19 months for prevention of stroke and systemic embolism in*
*non-valvular atrial fibrillation (ROCKET AF) and…*

*In the ROCKET AF trial, the overall incidence rates of adverse reactions leading to*
*permanent treatment discontinuation were 4.6% for XARELTO and 4.0% for*
*warfarin. The most frequent adverse reactions leading to discontinuation of*
*XARELTO compared to warfarin were bleeding events (4.3% vs. 3.1%, respectively).*
*In the RECORD clinical trials, the overall incidence rate of adverse reactions*
*leading to permanent treatment discontinuation was 3.7% with XARELTO. [633]*

627.  FDA included Table 1 Major Bleeding Events (per 100 patient-years) in ROCKET AF*.
In follow-up to the Advisory Committee meeting and Dr. Dunnmon's statements, the
table indicated that "Hemorrhagic strokes were not included as All Major bleeds".
Critical Organ bleeds were listed as intracranial, intraspinal, intraocular, pericardial,
intraarticular, intramuscular with compartment syndrome or retroperitoneal. FDA
retained, as unchanged from the July 1, 2011 approval, "Table 2: Bleeding Events in
Patients Undergoing Hip or Knee Replacement Surgeries (RECORD 1-2)". FDA deleted
Defendants' "Table 3 number of patients experiencing adjudicated major bleeding events
endpoints during the treatment period in the ROCKET AF study with bleeding rate per
100 patient-years (100%)." FDA also deleted "Reduction of Risk of Stroke and Systemic
Embolism in Atrial Fibrillation." It continued to the heading "Prophylaxis of Deep Vein
Thrombosis," and renumbered the Table from the July 1, 2011 for VTE-P to "Table 3
Other Adverse Drug Reactions reported by ≥ 1% of XARELTO-Treated Patients in
RECORD 1-3 Studies."

628.  FDA deleted Defendants' "In the ROCKET AF trial, non-hemorrhagic ADRs (reported
by ≥1% of patients receiving XARELTO compared to warfarin." FDA also deleted
RECORD data: "Less Common ADRs, Renal and Urinary Disorders: dysuria." FDA
then deleted Defendants' July 1, 2011 "TABLE 5: Laboratory Abnormalities in
RECORD 1-3 Clinical Studies" and instead listed the laboratory abnormalities from
RECORD 1-3 clinical studies in Table 35.

---

[632] XARELTO_BHCP_00015723
[633] XARELTO_BHCP_00015723

629. In **Section 6.2 Postmarketing Experience**, FDA added to the approved label: <u>Pulmonary system disorders: pulmonary hemorrhage, pulmonary hemorrhage with bronchiectasis.</u>[634]

630. In **Section 8.5 Geriatric Use**, FDA added the following information about the geriatric population in ROCKET: "In ROCKET AF, approximately 77% were 65 years and over and about 38% were > 75 years."[635]

631. In **Section 8.6 Females of Reproductive Potential**, FDA deleted a statement about elderly subjects exhibiting an increase in exposure that may be caused by age-related changes in renal function.[636]

632. **Section 8.7 Renal Impairment** remained unchanged, but the table was renumbered to Table 4. FDA deleted Defendants' discussion of patients with severe renal impairment and taking a 15 mg dose with an evening meal and pharmacodynamics. FDA instead added a re-written section titled "Atrial Fibrillation" based on ROCKET and patients with severe renal impairment.

   *Atrial Fibrillation*

   *<u>For patients with CrCl 15 to 50mL/min, reduce the dose of XARELTO to 15mg once daily with the evening meal. [see Dosage and Adminisitration (2.1)]. There is no clinical experience with this dosing regimen for XARELTO in patients with CrCl< 15ml/min. [see Warnings and Precautions (5.5)]</u>[637]*

633. Under **Section 8.8 Hepatic Impairment**, FDA added a new section "**Atrial Fibrillation,"** which indicated the lack of any dosing recommendations for use in patients with moderate hepatic impairment. XARELTO was to be avoided in patients with severe hepatic impairment or with any hepatic disease associated with coagulopathy.[638]

634. In **Section 10 Overdosage**, FDA added one qualifier to earlier approved label changing "lead to hemorrhage" to "Overdose of XARELTO may <u>result in fatal bleeding</u>."[639]

635. FDA made no changes to **Section 12 CLINICAL Pharmacology,** Section 12.1 Mechanism of Action, and Section 12.2 Pharmacodynamics.[640]

636. In **Section 12.3 Pharmacokinetics**, FDA deleted and re-wrote the information proposed by Defendants (underling shows the words added by FDA):

   *Absorption*

---

[634] XARELTO_BHCP_00015723
[635] XARELTO_BHCP_00015723
[636] XARELTO_BHCP_00015723
[637] XARELTO_BHCP_00015723
[638] XARELTO_BHCP_00015723
[639] XARELTO_BHCP_00015723
[640] XARELTO_BHCP_00015723

*The absolute bioavailability of rivaroxaban is <u>dose-dependent.</u>  For the 10mg dose, it is <u>estimated to</u> be 80% to 100% <u>and is not affected by food</u>…*

<u>*The absolute bioavailability of rivaroxaban at a dose of 20mg in the fasted state is estimated to be approximately 66%. Coadministration of XARELTO with food increases the bioavailability of the 20mg dose with mean AUC and $C_{max}$ increasing by 39% and 76% respectively. XARELTO 15 mg and 20mg tablets should be taken with the evening meal. [see Dosage and Administration (2.1)]*</u>

*The maximum concentration ($C_{max}$) of rivaroxaban appear 2 to 4 hours after tablet intake….[641]*

637. Under <u>Specific Population</u>s, FDA added the qualifier statement requested by Defendants during the initial VTE-P approval about Japanese volunteers:

> *Specific Populations*
> *Race*
> *Health Japanese subjects were found to have <u>20 to 40%</u> on average higher exposures compared to other ethnicities including Chinese.  <u>However, these differences in exposure are reduced when values are corrected for body weight.</u>*
>
> *Body Weight*
> *Extremes in body weight (<50kg or >120kg) did not influence <u>(less than 25%)</u> rivaroxaban exposure.[642]*

638. **Section 14 CLINICAL STUDIES** was deleted from Defendants' proposed statement and ROCKET's description and findings were re-written by the FDA.  The Table for ROCKET "Efficacy" had a breakdown by stroke types, keeping hemorrhagic stroke in efficacy.

***14.1 Stroke Prevention in Atrial Fibrillation***

<u>*The clinical evidence for the efficacy of XARELTO was derived from ROCKET AF, a multi-national, double-blind study comparing XARELTO (20 mg once daily with the evening meal) with warfarin (titrated to INR 2-3) in the prevention of stroke and non-central nervous system (CNS) systemic embolism in patients with non-valvular atrial fibrillation (AF). Patient also had to have one or more of the following additional risk factors for stroke:*</u>

- <u>*A prior stroke (ischemic or unknown type), transient ischemic attack (TIA) or non-CNS systemic embolism*</u>

- <u>*2 or more of the following risk factors:*</u>

  - <u>*age>75 years*</u>
  - <u>*hypertension*</u>

---

[641] XARELTO_BHCP_00015723
[642] XARELTO_BHCP_00015723

> o *heart failure or left ventricular ejection fraction ≤35%, or diabetes*
> *mellitus.*
>
> *This was a non-inferiority study designed to demonstrate that XARELTO preserved*
> *more than 50% of warfarin's effect as established by previous placebo-controlled*
> *trials of warfarin in AF.*
> *A total of 14,264 patients were randomized and followed for a median of 590 days.*
> *The mean age was 71 years. The population was 60% male, 83% Caucasian, 13%*
> *Asian and 1.3% Black.  There was a history of stroke, TIA or non-CNS systemic*
> *embolism in 55% of patients, and 38% of patients had not taken a vitamin K*
> *antagonist (VKS) within 6 weeks at time of screening.  Concomitant disease of*
> *patients in these trials included hypertension 91%, diabetes 40%, congestive heart*
> *failure 63%, and prior myocardial infarction 17%. At baseline, 37% of patients were*
> *on chronic aspirin and 2.0% on anticoagulants other than VKAs.[643]*

639. Table 6 displays the overall results for the primary composite endpoint and its
components. Table 6 under Stroke had hemorrhagic stroke, ischemic stroke and unknown
stroke type.  The primary composite endpoint was the time to first occurrence of stroke
(any type) or non-CNS systemic embolism.

640. On Table 6, in terms of stroke XARELTO (253) vs Warfarin (306), the event rate (100
Pt-yrs) was (2.1) for XARELTO and (2.4) for warfarin, with Hazard Ratio of 0.88 (0.74-
1.03). However when looking specifically at the breakdown of stroke types, for
hemorrhagic stroke – which the Advisory Committee called both an efficacy and safety
issue – the XARELTO (33) event rate was 0.3 compared to warfarin's (57) event rate of
0.4.  Looking at ROCKET, even in a poorly managed warfarin arm, there was the same
event rate for XARELTO and warfarin for ischemic stroke = (1.6).  For the category
"unknown stroke" there were 19 for XARELTO, event rate of (0.2), and there were 18
for warfarin, event rate of (0.1).  For Non-CNS Systemic embolism, the event rate was
the same (0.2).  Therefore, the primary advantage for XARELTO versus a poorly
controlled warfarin population was a slight decrease in "hemorrhagic" stroke (actually a
safety issue for anticoagulation) and not ischemic stroke (efficacy of anticoagulation for
SPAF).  XARELTO did support non-inferiority (not superiority) with this data, but with
the caveat that XARELTO was non-inferior to poorly controlled warfarin.

641. FDA wrote about ROCKET:

> *For the primary composite endpoint of stroke and systemic embolism XARELTO was*
> *non inferior to warfarin.  Superiority to warfarin was not demonstrated.  The*
> *efficacy of XARELTO was generally consistent across major subgroups (\**This
> sentence moved by FDA from where proposed by Defendants under Figure 1*)*
>
> *Figure 1 is a plot of time from randomization to the occurrence of the first primary*
> *endpoint vent in the two treatment arms.*

---

[643] XARELTO_BHCP_00015723

*Figure 1 Kaplan-Meier Curves of Adjudicated Primary Composite Endpoints of Stroke and Non-CNS Systemic Embolism by Treatment Group (All randomized patients followed to site notification)*

*Patients randomized to warfarin had INR in the target range of 2-3 only 55% of the time, worse during the first few months of the study. There is insufficient experience with INR control more typical of US practice to say how XARELTO and warfarin compare in this setting.[644]*

642. FDA began with the same **12.2 Pharmacodynamics** section, as approved for VTE-P,[645] with INR information requested by Defendants returned because it was important. From November 5, 2011 until May 2016, **Section 12.2 Pharmacodynamics** had sentences removed that were not supported by ROCKET AF:

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. There are no data on the use of INR. The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established.* [646](Label approved July 1, 2011)

643. FDA's proposal for **Section 12.2** for SPAF was based on the July 1, 2011 approved label:

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. There are no data on the use of INR. The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established* (Label proposed by FDA October 21, 2011)[647]

644. Defendants had the ability to simply accept all of FDA's requested changes, and discontinue any further negotiations with FDA about the XARELTO SPAF label. Defendants also had the ability to continue negotiations with FDA to obtain approval of a more acceptable commercial XARELTO SPAF label. There were no significant changes requested by Defendants or FDA for "**Section 12.2 Pharmacodynamics**".

- **Defendants Sent Proposed Label Changes to FDA on October 14 and 24, 2011**

---

[644] XARELTO_BHCP_00015723
[645] XARELTO_JANSSEN_08646664
[646] XARELTO_JANSSEN_23524564; XARELTO_BHCP_00015728
[647] XARELTO_BHCP_00015723

645. Defendants sent the FDA its proposed changes/comments to the FDA Draft label on October 14, 2011.[648] There was discussion with FDA's CardioRenal Division on October 19, 2011, as summarized by Alla Rhoge (Janssen) for the Rivaroxaban AFib Labeling Working Group (LWG):

> *The Division confirmed they had reviewed our comment/responses thoroughly but their position/text in the sections certain discussed remain largely unchanged from the initial version of the label that was sent to use*
> *During the review the Division has also requested an updated version of Figure 1 that would depict: 1) greater graphical resolution and 2) observation period cut-off at 2.5 years. The updated variations of Figure 1. have been created and sent to the Division for inclusion in the text draft of the label.[649]*

646. As a result, Defendants sent the next draft of the label on October 24, 2011.

- **Defendants Received FDA's Updated Label on November 1, 2011**

647. On November 1, 2011, Alison Blaus sent Sanjay Jalota (Janssen) FDA's Updated Label. Blaus wrote to Jalota:

> *Please find the updated rivaroxaban label.  We consider this label final, but if you disagree with any f these changes, please let me know as soon as possible.  If not, please accept all changes and delete comments and submit to the NDA as soon as possible. ... As you can see, we have retained the "hypersensitivity" contraindication so no further changes to the MG or REMS are needed.[650]*

648. FDA had modified the CONTRAINDICATIONS from hypersensitivity to "severe hypersensitivity reactions to XARELTO".  FDA added a new **Section 5.5 Severe Hypersensitivity Reactions**: "There were post-marketing cases of anaphylaxis in patients treated with XARELTO to reduce the risk of DVT. Patients who have a history of severe hypersensitivity reaction to XARELTO should not receive XARELTO."

649. The FDA's November 1, 2011 label no longer had FDA's earlier addition to 6.2 Postmarketing Experience, "*Pulmonary Systems*" *and risk of pulmonary hemorrhage and bronchietasis.*  In **Section 10 Overdosage**, the FDA's previous addition of "lead to fatal hemorrhage" had been returned as previously stated - "lead to hemorrhage".  **Section 12.2 Pharmacodynamics** remained unchanged from approval on July 1, 2011.

650. By November 1, 2011, **Section 2. DOSAGE AND ADMINISTRATION** had been modified to clarify that the NDA approved indication was only for "**Nonvalvular AF,**" not forms of AFib associated with a heart valve.  The disclaimer referenced by Dr. Grant in his Decisional Memo for the Division to inform physicians about the poor warfarin control in ROCKET had been negotiated and revised to no longer include a definition of

---

[648] XARELTO_BHCP_00015725
[649] XARELTO_BHCP_00015726
[650] XARELTO_BHCP_00015728

well controlled warfarin (i.e., in therapeutic range 70%). So the label had evolved, as it neared NDA approval, with the weaknesses of ROCKET and TTR for the warfarin arm less apparent to a physician. In fact, the way the warning was written, the strength of warfarin for reduction of stroke and systemic embolism appeared reduced.

*1. INDICATIONS AND USAGE*

*1.1. Reduction of Risk of Stroke and Systemic Embolism in Atrial Fibrillation*

*XARELTO (rivaroxaban) is indicated to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation.*

*November 1, 2011 FDA Proposed label:*

*There are limited data on the relative effectiveness of XARELTO and warfarin in reducing the risk of stroke and systemic embolism when warfarin therapy is well-controlled [see Clinical Studies (14.1)][651]*

*October 12, 2011 FDA Proposed label:*

*The relative effectiveness of XARELTO and warfarin in reducing the risk of stroke and systemic embolism has not been characterized when warfarin is well managed (e.g. patient INR in the target range more than 70% of the time) [see Clinical Studies (14.1)][652]*

*2. DOSAGE AND ADMINISTRATION*

*2.1 Nonvalvular Atrial Fibrillation followed by "switching "recommendations Switching to warfarin*

*Switching from or to Anticoagulants other than Warfarin*

*2.2 Prophylaxis of Deep Vein Thrombosis*

651. The November 1, 2011 label included a new "**Section 2.3 General Dosing Instructions**" which contained information formerly in "**Section 2 Dosage and Administration**"

*General Dosing*

*Hepatic Impairment*

*No clinical data are available for patients with severe hepatic impairment. Avoid use of XARELTO in patients with moderate (Child-Pugh B) and severe (Child-Pugh C) hepatic impairment or with any hepatic disease associated coagulopathy.*

*Renal Impairment*

*Nonvalvular Atrial Fibrillation*

---

[651] XARELTO_BHCP_00015728
[652] XARELTO_BHCP_00015723

*Avoid the use of XARELTO in patients with CrCl <15ml/min. Periodically access renal function as clinically indicated (i.e. more frequently in situations in which renal function may decline) and adjust therapy accordingly.  Discontinue XARELTO in patients who develop acute renal failure while on XARELTO…*

### *Prophylaxis of Deep Vein Thrombosis*

*Avoid the use of XARELTO in patients with severe renal impairment (CrCl<30 mL/min) due to an expected increase in rivaroxaban exposure and pharmacodynamics effects in this patient population.  Observe closely and promptly evaluate signs or symptoms of blood loss in patients with moderate renal impairment (CrCl 30 to 50mL/min). Patients who develop acute renal failure while on XARELTO should discontinue treatment…*

### *Surgery and Intervention-*

*If anticoagulation must be discontinued to reduce risk of bleeding with surgical or other procedures, then XARELTO should be stopped at least 24 hours…*

### *Missed Dose*

### *Use with P-gp and Strng CYP3A4 Inhibtors or Inducers*

652. For the following warnings, the order had been altered since October 2011, with Risk of Discontinuation now listed as #1 before the Risk of Bleeding:

### *5 WARNINGS AND PRECAUTIONS*

### *5.1 Increased Risk of Stroke After Discontinuation in Nonvalvular Atrial Fibrillation*

*Discontinuing XARELTO in the absence of adequate alternative anticoagulation increases the risk of thrombotic events.  ….*

### *5.2 Risk of Bleeding*

### *5.3 Spinal/Epidural Anesthesia or Puncture*

### *5.4 Risk of Pregnancy Related Hemorrhage*

### *5.5 Severe Hypersensitivity Reactions [653]*

653. The November 1, 2011 "**Table 1: Bleeding Events in ROCKET AF**" had been retitled from the October **Table 1: Major bleeding Events (per 100 patient-Years) in ROCKET AF.**  Table 2 was from RECORD 1-3 as approved in July 2011 and titled "Bleeding Events in Patients Undergoing Hip of Knee Replacement Surgeries (RECORD

---

[653] FDA in October 12, 2011 proposed for **Section 5. WARNINGS and PRECAUTIONS** the following order of headings:  5.1 Risk of Bleeding; 5.2 Increased Risk of Stroke after Discontinuation in Atrial Fibrillation; 5.3 Renal Impairment- Atrial Fibrillation, Prophylaxis of Deep Vein Thrombosis; 5.4 Hepatic Impairment- All Indications, Prophylaxis of DVT; 5.5 Spinal/Epidural Anesthesia or Puncture; 5.6 Risk of Pregnancy Related Hemorrhage; 5.7 Use with Cardioversion.  This would differ from the order for Section 5 in November 1, 2011.

1-3)"; Table 3 was titled "Other Adverse Drug Reaction Reported by ≥1% of XARELTO Treated patients in RECORD 1-3 Studies."

654.   In **Section 6.2 Postmarketing Experience,** the FDA's entry of October 12, 2011 regarding "Pulmonary system disorders: pulmonary hemorrhage, pulmonary hemorrhage with bronchiectasis" was deleted by November 1, 2011.

655.   Table 4 was now in **Section 8.7 Renal Impairment,** followed by Nonvalvular Atrial Fibrillation (ROCKET AF) and the Prophylaxis of Deep Vein Thrombosis (RECORD 1-3).

656.   **Section 8.8 Hepatic Impairment** and"Table 5: Percent Increase in Rivaroxaban PK and PD Parameters form Normal in Subjects with Hepatic Insufficiency from a Dedicated Hepatic Impairment Study" were unchanged.

657.   **Section 10 Overdosage** was changed from "result in fatal bleeding" back to Overdose of XARELTO may "lead to hemorrhage" by November 1, 2011.

658.   **Section 14.1 Stroke Prevention in NonValvular Atrial Fibrillation,** "Table 6 "Primary Composite Endpoint Results in ROCKET AF Study," remained as described in October 12, 2011.  However, FDA had asked in October 12, 2011 that the <u>following</u> paragraph be located after Table 6: "For the primary composite endpoint of stroke and systemic embolism, XARELTO was non-inferior to warfarin.  Superiority to warfarin was not demonstrated. The efficacy of XARELTO was generally consistent across major subgroups."[654]

659.   By November 1, 2011, a <u>similar</u> but less clear discussion came before Table 6:

> *In ROCKET AF, XARELTO was demonstrated non-inferior to the primary composite endpoint of time to first occurrence of stroke (any type) or non-CNS systemic embolism [HR (95% CI):0.88 (0.74, 1.03)], but superiority to warfarin was not demonstrated.  There is insufficient experience to determine how XARELTO and warfarin compare when warfarin therapy is well-controlled.* [655]

660.   The October 12, 2011 label contained "*Figure 1: Kaplan-Meier Curves of Adjudicated Primary Composite Endpoints of Stroke and Non-CNS Systemic Embolism by Treatment Group (All randomized patients followed to site notification).*"[656]

---

[654] XARELTO_BHCP_00015723
[655] XARELTO_BHCP_00015728
[656] XARELTO_BHCP_00015723



661. The November 1, 2011 label contained "Figure 1 "Time to First occurrence of Stroke (Any type) of Non-CNS Systematic Embolism by Treatment Group"

---

657 XARELTO_BHCP_00015723



Figure 1:  Time to First Occurrence of Stroke (any type) or Non-CNS Systemic Embolism by Treatment Group

658

662. The line -- "the efficacy of XARELTO was generally consistent across major subgroups" – was moved above Figure 1 by the FDA in October, but was moved under Figure 1 in November.  There was also a new paragraph about the data from the 30 day period post ROCKET:

> *The protocol ROCKET AF did not stipulate anticoagulation after study drug discontinuation, but warfarin patients who completed the study were generally maintained on warfarin.  XARELTO patients were generally switched to warfarin without a period of co-administration of warfarin and XARELTO, so that there were not adequately anticoagulated after stopping XARELTO until attaining a therapeutic INR. During the 28 days following the end of the study, there were 22 strokes in the 4637 patients taking XARELTO vs 6 in the 4691 patients taking warfarin.[659]*

663. The Defendants' LWG for AFib were set to meet on November 1, 2011 to send comments to the Division.

• **Defendants Request Changes to FDA's Proposed Label of November 4, 2011**

664. Alla Rhoge (Janssen) sent an email to the XARELTO LWG and LRC "Subject: URGENT Updated Label November 4-9:00AM- Submission needed within 1 hour":

---

[658] XARELTO_BHCP_00015728
[659] XARELTO_BHCP_00015728

*Sanjay spoke with Alison this morning and the Division just sent us the enclosed new revised label*
*After speaking with team this morning and last night, we decided to make a couple more changes to the label.  These changes were to section 8.7 (to provide clarity) and to* <u>*section 12.2 (last two sentences regarding INR were deleted based on the data from ROCKET-AF )*</u>*. I made another editorial change, but everything appears in track changes.* [660]

665.   For Section 12.2, FDA proposed to delete the INR information. As Alla Rhoge stated the last two lines were deleted by FDA based on the <u>ROCKET data</u>:

> *Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose dependently. Anti-factor Xa activity is also influenced by rivaroxaban.* [661] *(November 5, 2011 approved label)*

666.   Defendants' United States label for Xarelto (SPAF indication) was approved on November 5, 2011. Section 12.2 (Pharmacodynamics) read as follows:

> *Section 12.2 Pharmacodynamics*
> *Dose-dependent inhibition of factor Xa was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. (November 2011 approved label)*

- **NDA SUPPLEMENT S-008 FDA Requested Label Change**

667.   Defendant's first labeling NDA supplement for SPAF (NDA 202439) was S-008, approved on August 7, 2013 and signed by Mary R. Southworth, PharmD, Deputy Director for Safety, Division of Cardiovascular and Renal Products. [662]  FDA had initiated the labeling changes in a January 17, 2013 letter sent to Janssen requesting it update the XARELTO labeling to provide risk of thrombotic events upon premature discontinuation of drug and a new warning against use in patients with prosthetic heart valves. The mutually agreed upon labeling revisions of S-008 included changes to the boxed warning against premature discontinuation of XARELTO and increased risk of thrombotic events. Warning 5.1 "Increased Risk of Thrombotic Events after Premature Discontinuation" was amended to reflect the revisions of the boxed warning.  A new warning was added to Section 5, WARNINGS and PRECAUTIONS with the heading "Patients with Prosthetic Heart Valves" to indicate: "The safety and efficacy of XARELTO have not been studies in patients with prosthetic heart valves. Therefore, use of XARELTO is not recommended."  S-008 included the Risk Evaluation and Mitigation Strategy (REMS) Requirements, originally approved on November 4, 2011 (Original SPAF approval),

---

[660] XARELTO_JANSSEN_01499448
[661] Jalota Exhibit 55
[662] 8/7/2013 Letter from FDA to Janssen, NDA 202439/S-008 – Supplement Approval (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist)

modified and approved on July 12, 2012.  The current proposed modification of REMS in S-008 updated the boxed warning, was consistent with the revised package insert, and Dear Professional Organization and Dear Healthcare Professional Letters.  The modified REMS was submitted to FDA on July 10, 2013 and approved. The Defendants' REMS assessment plan and deadlines for submission to FDA remained the same as approved on July 12, for NDA S-012 (and S005) was approved by Mary Southworth, PharmD on February 12, 2014 to discontinue the REMS "…Because the communication plan has been completed and the most recent assessment demonstrated that the communication plan has met its goals, we have determined that it is no longer necessary to include it as an element of the approved REMS to ensure that the benefits of the drug outweigh the risks."[663]

- **NDA SUPPLEMENT S-015 Label Changes Requested by FDA**

668.  NDA 202439 S-015 was signed by Mary R Southworth, Pharm.D on September 10, 2015, and contained approval of label changes intended to harmonize the presentation of the safety and efficacy data in the labels of recently approved "non-vitamin K-dependent oral anticoagulants" ("NOACs"). The changes included the graphic discussion of the Defendants' ROCKET data, which was based on the flawed medical device for INR in the warfarin population, as well as the poorly controlled warfarin population.  In **Section 6. Adverse Reactions** the presentation of bleeding events was amended – "to eliminate redundancy, some information that once appeared prior to the bleeding table (and in Table 1) was deleted."  A forest plot was added to Section 6.  The population used was On-Treatment plus two (2) days: Figure 1 "Risk of Major Bleeding Events by Baseline Characteristics in ROCKET AF-On Treatment Plus 2 Days." According to FDA's letter the following standard cautionary paragraph was included at the bottom of the forest plot:

> *Note: The figure above presents effects in various subgroups all of which are baseline characteristics and all of which were pre-specified (diabetic status was not pre-specified in the subgroup, but was a criterion for the CHADS2 score). The 95% confidence limits that are shown do not take into account how many comparisons were made, nor do they reflect the effect of a particular factor after adjustment for all other factors.  Apparent homogeneity or heterogeneity among groups should not be over-interpreted.*

> *4. In Section 14, **CLINICAL STUDIES**, the forest plot was amended to include the same subgroups as the plot in Section 6 and also to present the data in an identical way as Section 6.  The population used to generate the forest plot, however, is different than that in Section 6. The population used in Section 14 was Intent –to-Treat (ITT).*

---

[663] 2/12/2014 Letter from FDA to Janssen, NDA 202439/S-012 – Supplement Approval, Release REMS Requirement (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist)

> *5. In Section 12.3, **CLINICAL PHARMACOLOGY**, Pharmacokinetics, the effect of certain drugs on the pharmacokinetics of a NOAC were depicted in a plot rather than describing the study data in paragraph form.  To eliminate redundancy, the descriptions of the studies included in the plot were removed.[664]*

- **NDA SUPPLEMENT S-017 LABEL CHANGE FOR POST-MARKET COMMITMENT TO STUDY RENAL IMPAIRMENT**

669. The final label change and NDA supplement approval on the FDA's website as of August 2016 is S-017.  The NDA approval was sent by Norman Stockbridge, MD, Ph.D., Division Director, Division of Cardiovascular and Renal Products on May 6, 2016.  The submission was to provide clinical data for patients with End-Stage Renal Disease and to revise the product insert, namely Section 5 Warnings and Precautions (section 5.2 Risk of Bleeding and 5.4 Use in patients with Renal Impairment); Section 8 Use in Specific Populations (Section 8.7 Renal Impairment) and Section 12 Clinical Pharmacology (sections 12.2 Pharmacodynamics and 12.3 Pharmacokinetics) The Medication Guide was also updated in accordance with revisions to Section 5.2.[665]

- **DEFENDANTS 'ARGUE' PUBLICLY IN THE UNITED STATES THEIR FAILURE TO PROVIDE MONITORING RECOMMENDATIONS DESPITE THE REQUIREMENT FOR THEM IN EUROPE**

670.  Dr. Grant described the purpose of his Decisional Memo and the conflicts in FDA that had occurred regarding approval of XARELTO:

> *Dr. Thompson's CDTL memo ably reviews the background for important issues presented by this application and can therefore serve as the summary basis of approval.  In this memo, I am not going to summarize systematically the medical background or the design and outcomes of the principal clinical trial ROCKET AF (ROCKET). Rather I intend to review the salient issues germane to the decision to approve because while the CDTL, Dr. Thompson recommends approval, the primary clinical reviewers of this application, Dr. Rose and Dunnmon do not.  There appears to be no fundamental disagreement among the reviewers of this application about the data generated in ROCKET but rather about the implications of these data.  At the dose administered, ROCKET demonstrated robust statistical noninferiority (NI) to warfarin using the agreed upon NI margin of 1.38.*
> *The primary basis for recommending that this NDA not be approved relates to the adequacy of international normalized ration (INR) control among subjects randomized to warfarin in ROCKET.*

---

[664] 9/9/2015 Letter from FDA to Jannsen, NDA 202439-S015 – Supplement Approval (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist)
[665] 5/6/2016 Letter from FDA to Janssen, NDA 202439-S017 – Supplement Approval (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist)

*...Both stroke and bleeding outcomes in patients administered warfarin are directly correlated with the TTR. Because there were few subjects whose mean TTR was in the range attained in other contemporary trails (and can be attained in some clinical practices in the USA), ROCKET provides inadequate information to assess the relative safety and efficacy of XARELTO in patients whose warfarin administration can be well-controlled….*

*...The FDA has a policy enunciated in a 1995 Federal Register (FR) notice signed by William Schultz stating that we will not approve a drug intended to prevent mortality or serious irreversible morbidity if it is inferior to other available therapy...*

*If XARELTO were inferior to warfarin in patients in whom warfarin administration can be well-controlled then approval could result in American patients having worse outcomes than if not approved.*[666]

671.  Dr. Grant continued that 30 days after the end of the ROCKET study, the XARELTO arm subjects in ROCKET had 22 strokes whereas the warfarin subjects had 6 strokes (i.e., XARELTO subjects had nearly four times more strokes.)  "Some of the review team as well as several members of the FDA's Advisory Committee suggested that if XARELTO were approved that it be restricted to only a "second line therapy."  The Division did not adopt the recommendation because it could not identify any specific clinical scenario that would prompt a health care provider to switch a patient from warfarin or PRADAXA to XARELTO.  In fact, some of the problems seen with PRADAXA and warfarin for a patient should actually prompt a physician not to switch the patient to XARELTO since it may not decrease the patient's risk of bleeding.

672.  Although the Division chose not to label XARELTO as second line therapy, it did require the Sponsors' label to include, in "Section 1 INDICATIONS AND USAGE," a statement that the relative effectiveness of XARELTO and warfarin is unknown when a patients' INR can be "well-controlled."   This statement was added because the ROCKET study did not demonstrate good control of warfarin.  So FDA's medical reviewers did not know how XARELTO would compare to adequately controlled warfarin, only poorly controlled warfarin.  XARELTO had shown non-inferiority to poorly controlled warfarin.  On page 8, under the heading "Dose of XARELTO Administered in ROCKET," Dr. Grant wrote that despite the concerns of the FDA about the selection of the 20mg dose by Defendants, it "did not have the authority to place the trial on hold for inadequate dose selection" (underlining added for emphasis):

*<u>Anticoagulants are intrinsically narrow therapeutic range drugs</u> because their principal toxicity, bleeding, is a result of their intended pharmacodynamic activity; too low a dose results in inadequate prevention of pathological thrombosis and consequent serious clinical events and too high a dose results in excessive inhibition of physiologic clotting and excessive bleeding.  Therefore, prudent drug development of anticoagulants should include robust investigation of the relationship between*

---

[666] Burton Exhibit 41

*dose and outcomes in order to choose reasonable doses(s) for administration to patients."*

*The Division concurs with all reviewers of this NDA that <u>data adequate to select a dose to be tested in ROCKET were not available when the trial was designed</u>. The applicant chose the dose to be tested in ROCKET based on two small dose-ranging studies…*

*Nonetheless, the Division allowed ROCKET to proceed.  <u>We did so because we lack authority to put trials on clinical hold for inadequate dose selection</u>.[667]*

### *Additional Issues*

### *Desirability of Monitoring for Adjustment of XARELTO Dose*

*The clinical pharmacology and clinical reviewers demonstrated that there is a linear correlation between rivaroxaban levels and prothrombin time (PT). They also demonstrated that there is also a correlation between PT and risk of bleeding.  This applicant has not chosen to utilize this information….. However, <u>infrequent monitoring (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding may improve outcomes and be acceptable to patients</u>.[668]*

673. In his deposition, Dr. Misselwitz was asked about Dr. Grant's Summary for the NDA and reference to narrow therapeutic range – "because their principal toxicity is bleeding" – and the benefits of monitoring for adjustment of XARELTO dose.

> *Q. And is this the voice you referenced a few minutes ago with respect to people within the FDA having the opinion that XARELTO has a narrow therapeutic index?*
>
> *A. Well, Stephen Grant in his summary review as a deputy division director has written that sentence, yes.[669]*
>
> *Q. I believe you testified that you, sir, would be of the opinion that therapeutic drug monitoring would make sense for XARELTO if XARELTO had a narrow therapeutic index. Did I hear you correctly?*
>
> *A. Therapeutic drug monitoring would make sense scientifically for a drug that has a narrow therapeutic index, and for a lab test that would be able to measure the drug levels' precision and low variability. [670]*

674. In contrast, Janssen's Todd Moore[671] stated in an August 19, 2011 Clinical Pharmacology Core Part 1.ppt:[672]

---

[667] Misselwitz Exhibit 4; Burton Exhibit 41
[668] Misselwitx Exhibit 4; Burton Exhibit 41
[669] Misselwitz depo 7/13/16, p. 25: L8 – p. 28: L7
[670] Misselwitz depo 7/13/16, p. 83: L6-15



673

675. This slide (CP-027) was originally prepared to be used in submission or presentations to the FDA and Advisory Committee (without the highlighting/handwriting). According to the 2016 deposition testimony of Mr. Moore, for 14,000+ people in ROCKET, there were 62 (principal safety endpoint event) + 252 (no bleeding event) = 314 peak PT measurements.  Mr. Moore acknowledged that one of the criticisms of the FDA reviewing the data was that most people did not get a PT sample drawn until sometime between 12 and 24 hours after an evening meal.[674]

676.  FDA's Clinical Pharmacology Review January 5, 2011 for NDA 202-439 indicated that based on the data provided to FDA by the Defendants, there was **complete PK-PD data available for only 161 subjects in ROCKET AF (2% protocol analysis set, a total of 786 time match PK-PD specimens)[675]**, FDA was unable to independently calculate the clinical benefit of the difference in the peak to trough ratio and higher trough PT levels in a twice daily regimen.  The ROCKET AF dose of 20mg OD was derived from two short-term DVT studies (Number 11223 ODIXa-DVT and 11528 EINSTEIN-DVT). According

---

[671] In March 2015, Moore became the Scientific Director of Cardiovascular Disease with responsibility for XARELTO, but from 2006 had been Clinical Pharmacology Leader.  He took on responsibility for XARELTO in 2011. Before Janssen, he had worked at Bristol-Myers Squibb on apixaban
[672] Moore Exhibit 62
[673] Moore Exhibit 62
[674] Moore depo 7/13/16, p. 773: L2 – p. 774: L19
[675] The EMA CHMP Variation Assessment Report of 2011 for authorization of the SPAF indication, noted that the matched PK and PD blood samples were collected from 161 patients, with n= 25 randomized to 15 mg due to moderate renal failure. So of the 161 matched samples, only 136 matched samples are from patients randomized to 20 mg dose for SPAF (84%), and 16% of patients were randomized to the lower 15mg dose.[Source = Derix Exhibit 72]

to FDA's Clinical Medical Officer Reviewer Dr. Dunnmon, Study 11223 outcome supported the use of twice a day dosing over once a day dosing as used in ROCKET AF:

> *The dose selection in ROCKET-AF study was based on the results from two DVT studies (Study Number 11223 ODIXa-DVT and 11528 EINSTEIN –DVT) and the sponsor concluded that a 20 mg once daily dose has desired safety and efficacy profile for studies supporting the SPAF difference. However, the difference between the once daily and twice daily regimens for the same total daily dose was not studied within a single study and the cross-study comparisons were inconclusive. Further, a recently concluded TIMI-ACS 46, a dose selection study conducted in patients with acute coronary syndrome (ACS) covering a total daily range of 5mg to 20mg, as once or twice daily regimen, showed numerical advantage for safety and efficacy for the twice daily regimen ….The pharmacokinetic and pharmacodynamic characteristics suggest that a twice daily regimen might offer lower peak to trough ratio in PT levels within a dosing interval compared to the once daily regimen. (See Figure 1). The clinical benefit of the difference in the peak to trough ratio and higher trough PT levels at twice daily regimen cannot be derived from the existing data. [676]*

677. As can be seen in Defendants' Table 1 (below) there is not a statistically significant difference between Xarelto and poorly controlled warfarin. Efficacy is supported by the difference in event rate between Xarelto and Warfarin but without support for the adequacy of the 20mg dose selected for XARELTO for prevention of ischemic stroke. Well controlled and adjusted warfarin has been supported to be effective for prevention of ischemic stroke, unlike Xarelto 20mg. Using simulation, there is not the same PT highs and lows seen in 10mg twice a day dosing when compared to 20 mg OD.



**Figure 1** Simulated PT-time course for the PK-PD subset in ROCKET-AF for a total daily dose of 20 mg rivaroxaban, given as once daily (red-dashed line) or as twice daily (blue-solid line). The simulations were based on rivaroxaban PK model and rivaroxaban PK-PT relationship presented in Figure 2.

677

---

[676] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011 at p. 25 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[677] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011 at p. 25 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)

**Table 1** Top-line efficacy and safety analysis results from ROCKET-AF

| Endpoint | Rivaroxaban | | Warfarin | | Rivaroxaban Vs. Warfarin | |
| --- | --- | --- | --- | --- | --- | --- |
| | n/N | Event rate (100 pt-yr) | n/N | Event rate (100 pt-yr) | HR (95 % CI) | *p* value |
| Primary efficacy endpoint* | 188/6958 | 1.71 | 241/7004 | 2.16 | 0.79 (0.66-0.96) | <0.001 |
| Principal safety endpoint** | 1475/7111 | 14.91 | 1449/7125 | 14.52 | 1.03 (0.96-1.11) | 0.44 |

*Non-inferiority on primary efficacy endpoint based on treatment data from the per-protocol population
**Superiority on principle safety endpoint on treatment data from the safety population

678

678. FDA described the sampling of the PT measurements in the NDA ROCKET AF data as 12-14 hours after dosing, (when traditional peak blood levels should have been obtained 2-4 hours after dosing. FDA gave this 12-14 hour sampling the name "pre-dose PT" to distinguish it from peaks and troughs, and when ROCKET AF had no meaningful dose ranging studies conducted regarding efficacy (only "non-inferiority" to poorly controlled warfarin). Warfarin was being managed by physicians using the HemoSense POC device (*see Discussion of defective HemoSense POC device below):

> *The PT measurements made either at week 12 or week 24, whichever was closer to the reported event was used for the analysis. Majority of the PT measurements were made during 12-24 hours after the previous dose and is referred to as a pre-dose PT.*

> *There are no meaningful dose-ranging studies in the target population of patients with atrial fibrillation. Hence it is not clear whether the 20 mg once daily dose selected in ROCKET-AF is optimal for the proposed indication. Nevertheless, the results from the ROCKET-AF study showed rivaroxaban 20 mg once daily to be non-inferior to dose-adjusted warfarin.* [679]

---

[678] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[679]FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)

A total of 786 time-matched pharmacokinetic-pharmacodynamic (PK-PD) samples were collected from a subset of 161 subjects (2% of per-protocol analysis set) and PD samples were collected during week 12 and 24 visits from all eligible subjects. The PD measures included prothrombin time (PT), factor Xa activity (FXa) and prothrombinase induced clotting time (PiCT). INR values from point-of-care Hemosense INRatio® Device and PT-INR derived directly from the measured PT were also provided by the sponsor.  See Table 2 for PK-PD sampling schedule followed in ROCKET-AF study.

Table 2 PK-PD sampling schedule in ROCKET-AF. Source: Sponsor's submission Page 61, Table 5: \\cdsesub1\EVSPROD\NDA202439\0000\m5\53-clin-stud-rep\535-rep-effic-safety-stud\afib\5351-stud-rep-contr\39039039afl3001

| | Day 1 | Between Week 2 and the End-of-Study Visit | | | Week 12[+] | Week 24[+] | At Least 1 Month, Preferably at Least 6 to 12 Months, After the First Matched PK/PD Sample[b] | |
| | Hours Predose | Hours Predose | Hours Postdose[c] | | | | Hours Predose | Hours Postdose 1-3 |
| | | | 1-3 | 3-16 | | | | |
| PD sampling only (ALL subjects) | X[d] | | | | X | X | | |
| Matched[e] PK & PD blood sampling (select sites and subjects)[f] | | X | X | X | | | X | X[g] |

PD=pharmacodynamic; PK=pharmacokinetic; PT= prothrombin time; FXa= factor Xa; PiCT= Prothrombinase-induced clotting time;

[+] PD sampling was to be taken as either a predose or postdose sampling for the Weeks 12 and 24. Predose or postdose sampling had to be documented.

[b] As close to the end-of-study visit as possible.

[c] Postdose samples were taken after supervised study drug administration; study drug was to be administered in the evening.

[d] Only subjects enrolled at sites participating in the matched PK/PD substudy had a baseline PD sample collected. The baseline sample was to be drawn either at screening or on Day 1 (before dosing).

[e] Matched samples = PD blood samples to determine coagulation characteristics (PT, FXa activity, PiCT) taken at the same time points as PK blood samples.

[f] On days of matched PK/PD sample collections, subjects may have been confined to the study site.

[g] If agreed to by the subject.

680

679. In ROCKET AF, FDA described that complete matching pharmacokinetic-pharmacodynamic (PK-PD) samples were collected by Defendants only for a subset of **161 patients in ROCKET AF**. The sponsor did not elect to collect PK data in all subjects or a larger population of subjects, however, the PD samples were to be collected during visits at weeks 12 and 24 for all eligible patients.  Most of these PD measurements (~78%) were made during 12-24 hours (pre-dose PT) after the rivaroxaban dose.[681] Therefore, the Defendants PD measurements included PT, FXa, and PiCT were described by the term 'pre-dose' in subsequent sections (to distinguish them from peak) and only for 161 selected subjects. All the PD measurements were found to be dependent on rivaroxaban concentration in subjects with matching PK and PD samples:

> *Factor Xa activity, PT (figure 2) and PiCT were found to be dependent on*
> *rivaroxaban concentration in the patients with matching PK-PD samples.  This is in*

[680] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)

[681] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011 (http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)

> *agreement with observations from the dedicated rivaroxaban PK and PD studies in*
> *healthy volunteers (NDA 022-406, DARRTS dates 4/6/2009, 6/3/2011 by Dr. Joseph*
> *Grillo). Based on this observation, the PD measurements (such as PT) can be used*
> *as surrogates for PK measurements in the PD-Outcome analyses.*[682]

680.   FDA concluded that PT measurements, measured at week 12 and 24 whichever was
closer to an event (efficacy/safety) could be used as a surrogate for PK.  The PD-
Outcome analyses were conducted for rivaroxaban using PT as the primary PD measure
for Xarelto.

> The probability of ischemic stroke, a major component of the primary efficacy endpoint,
> was independent of the pre-dose PT measures over the observed range for rivaroxaban
> (Figure 3).



683

681.   The Defendants' samples were not obtained during an acute ischemic event.  Samples
were drawn at week 12 or week 24, (remote from the event) whichever was closer to a
reported ischemic event.  Of the 161 samples with PK-PD information, the samples were
obtained as a "pre-dose PT" (not as peak).  For ROCKET AF, Defendants had not shown
the dose of 20mg OD was necessary for efficacy, despite the use of the 20mg dose in
ROCKET AF. Defendant showed non-inferiority to adjusted warfarin based on the use of
the flawed Hemosense POC device (i.e. poorly managed warfarin).

682.   But when it came to major bleeding events there was a direct correlation to an increase in
major bleeding (safety) with an increase in pre-dose PT (12 to 24 hours post dose) over
the observed range of 12 to 24 weeks nearest to the reported major bleeding event.  FDA
did not have a PT from 2-4 hours post dose.

---

[682] FDA's NDA 202-439 Clinical Pharmacology Review January 5, 2011 Team Leader R. Madabushi, Ph.D., p 9-10
(FOIA 12312014 – 0002026)
[683] FDA's NDA 202-439 Clinical Pharmacology Review January 5, 2011 Team Leader R. Madabushi, Ph.D., p 9-10
(FOIA 12312014 - 0002026)

The probability for major bleeding event, the primary safety endpoint as defined as clinically overt bleeding associated with a decrease in hemoglobin $\geq$ 2g/dl, or a transfusion of $\geq$ 2 units of packed red blood cells or whole blood, or bleeding at critical sites, or a fatal outcome, increased with an increase in pre-dose PT as shown in Figure 4. See Appendix 1 for details on PD-Outcome analysis.



**Figure 4**    Major bleeding events increased with an increase in pre-dose PT over the observed range (per-protocol, on treatment analysis set). Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year. The PT measurements made either at week 12 or week 24, whichever was closer to the reported major bleeding event was used for the analysis. Majority of the PT measurements were
[684]

683. FDA then wrote about INR (at that time unaware of the flawed HemoSense device used for determination of INR). FDA reviewers were looking at the following data as if it had been obtained from a reliable source for INR in the warfarin population. The INR was being obtained, unlike Xarelto, at the time of an event and included the use of the HemoSense INRatio POC device:

> *The risk for both safety (major bleeding) and efficacy (ischemic stroke) endpoints for warfarin in ROCKET AF were dependent on the last observed INR consistent with the expected warfarin INR-Outcome relationship.*

684. According to FDA the focus on PT as a surrogate was because PT could be converted to INR for comparison to warfarin. INR is the most widely used PD marker for warfarin. However, the warfarin data for ROCKET AF were obtained by HemoSense INRatio POC device.

---

[684] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)



**Figure 5** Probability of major bleeding and ischemic stroke by the last observed INR (before or at an event) for warfarin (per-protocol, on treatment analysis set). (A) Linear logistic regression model and (B) Cox regression model with a plot indicating probability of an event within 1 year.

685

685. See the discussion below of Claudia Henn, Bayer Global Medical Affairs and an email to Drs. Spiro and Dyszynski on May 2, 2014 "Subject: AW: PBRER[686] Statement". [687]

686. Dr. Spiro commented that the correct type of study to correlate safety and efficacy with actual individual plasma concentrations and rivaroxaban had not been performed by Defendants.

687. The dose for ROCKET AF was specified to be taken after the evening meal per the design of the study. Typically, if a person did not get a PT measured as part of the pre-specified visits at Week 12 or Week 24, a sample for PT peak was not drawn until sometime after 12 to 24 hours post dose. So, based on the time delay, the peak PT would

---

[685] FDA's NDA 202439 Clinical Pharmacology Review, January 5, 2011
(http://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/202439toc.cfm)
[686] PBRER= Periodic Benefit-Risk Evaluation Report- specified by ICH Guidelines E2C (R2)
[687] Dyszynski Exhibit 29; XARELTO_BHCP_00267737

not represent a PT at true peak.  "For a 20-mg dose with food, I would say it's more like two or four is what peak measurements are."[688]  For the trough, there are somewhere around 3385 measurements for trough.  Post dose there were 7337.

> *Q. So most of the data, you would agree, for PT measurements in the sparse sampling of ROCKET population came from doses that were not peak and were in this defined post dose period; is that right?*
>
> *A. Based in what's represented here, yes.*
>
> *Q. Okay. Now, one of the fundamental- this analysis is basically flawed, right?*
>
> *A. I disagree*
>
> *Q. The FDA did not accept this analysis, correct?*
>
> *A. The FDA performed their own analysis.*
>
> *...*
>
> *Q. Because, as you have said in some documents that we've seen, that in order for there to bleed, you need some type of an event to bleed, right?*
>
> *A. Some sort of physiological event that would lead to bleeding ...*
>
> *Q. ...in the 12 hours post dose, when you sample patients, over 7,000 patients that got those samples taken post dose, you had PTs that ranged from somewhere down around - a little above zero all the way to nearly 125.  That a pretty big variability in PT, isn't it?*
>
> *A. It is a variability in PT. The significance of that, I can't tell you.*
>
> *...*
>
> *Q. ...The trough PT values range from somewhere around between zero and 25 all the way to nearly 100 trough PT values for some patients. That's a huge variability in trough PT, isn't it?*
>
> *A. Not necessarily...*
>
> *Q. In fact, of the over 14,000 patients in the study, you only had sample data from 3,300, right?*
>
> *Q. It was not up to what the protocol called for, was it?*
>
> *A. Again, I can't speak to the way the protocol was designed....*
>
> *Q. You guys amended the protocol to call for pre-dose sample right?*
>
> *A. That was before my time on the study.*

---

[688] Moore depo 7/13/2016 p. 776, L. 16-22

...

*Q. The other thing that this analysis didn't do was take the people that had bleeding events and break them up by PT quartiles, right?*

*A. We did not do a quartile analysis.*

*Q. For ROCKET, the company didn't do any type of analysis, right?*

*A. We did not do a quartile analysis. These were the types of analysis we did.[689]*

688.   On November 4, 2011, FDA's Stephen M. Grant, Deputy Division Director, Division of Cardiovascular and Renal Products, the Clinical Pharmacology and Clinical Reviewers demonstrated "that there is also a correlation between PT and risk of bleeding."[690] The FDA's Clinical Pharmacology Review dated January 5, 2011,Team Leader R. Madabushi, Ph.D. the discussion of PT and risk of bleeding was  based on a PK-PD sampling of 161 patients, and relied on the  warfarin arm INR information from the flawed Hemosense Point of Care device and the flawed ACS phase 2 data. (An NDA supplement rejected twice by the FDA Advisory Committee members and FDA as seriously flawed). According to the EMA submission for SPAF, but not stated in the FDA's review of the 161 patients with matched PK-PD samples, N=25 were randomized to receive the 15mg dose based on moderate renal failure.  Therefore, there was data on 136 matched PD/PK sample pairs for the 20mg dose (84%) and 25 for the 15mg dose with moderate renal failure (16%)  These samples were drawn not at 2-4 hour post dose (peak) but at 12-24 hours after the evening dose.[691]

689.   In a July 12, 2012 email from Todd Moore to Christopher Nessel, "Subject 7/12/12 Mock Ad Com VTE-Tx," Mr. Moore indicated that Dr. Nessel had done a "Great Job today!!" at the Mock Advisory Committee meeting.  In his deposition, Mr. Moore confirmed that there was no FDA AdCom for VTE Treatment.[692]  However, at the time of the Mock AdCom[693], he sent Dr. Nessel a quick email while the information was "fresh" in his mind regarding questions raised by the panel and approaches to answer them. Mr. Moore testified that he had an understanding that Bayer had worked with Samama[694] to look at the use of anti-Factor Xa assay versus PT in measuring rivaroxaban levels.[695]

*Therapeutic Monitoring- I believe there is preference to use anti-FXa (chromogenic assay with specific rivaroxaban calibrators and controls) vs. PT, based on the work done by Bayer and Samama, et al.  Now, I believe this assay is available in the EU (and we are trying to develop this assay in the US). If PT is used, then recommend using the PT assay with Neoplastin + reagent (as that was the reagent used throughout rivaroxaban development) (Slide CP-032)*

[689] Moore depo 7/13/2016, p.771: L21 – p. 794: L11
[690] FDA Summary Review, p. 9.
[691] Derix Exhibit 72
[692] Moore depo 7/12/16, p.386: L17 – p. 387: L16
[693] Burton Exhibit 47
[694] Moore Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; Exhibit 24
[695] Moore depo 7/12/16, p. 392: L2-9

*3) Fragile population- Simulations by Bayer based on Phase 2 DVT data-the categories in this figure, probably doesn't match the definition of fragile for your safety and efficacy slides…can you provide the definition of fragile for Clinical Studies (Slide CP-011)*

*6) Effects of extreme weights (>400 kg) granted, I doubt we have any data on these types of extreme weights, we at least have some data from DVT patients from the phase 2 program we could simulate (C-007)[696]*

690. As part of the Janssen Pediatrics team, Mr. Moore received an April 17, 2014 email from Roger Mills, "Subject: Riva dose and coagulation labels," for members of the Pedi-team to review a document summarizing rivaroxaban dosing and clinical laboratory tests of coagulation. His response was sent to Roger Mills as well as the rest of the Pedi-team members:

*However, I'm a little confused…it seems you are suggesting that we don't use the anti-FXa assay (with rivaroxaban specific calibrators and controls) to indirectly measure rivaroxaban concentration for potential dose adjustment…Perhaps I misunderstood the paper, but that is indeed what we want to do. The idea is to use this assay (with specific riva calibrators)…obtain the indirect estimate of the riva plasma level…then adjust the dose if the value is above the PBPK model exposure matched range for a 20mg QD dose.[697]*

691. The attachment that the Pedi-Team was meant to review was a draft document titled "Anti-Xa Levels and Rivaroxaban."[698]

692. On May 7, 2014, Dr. Moore emailed Christopher Nessel, "Subject RE: Dose for CHD," discussing the resistance of "colleagues at Bayer" to come on board with "anti-FXA assay to indirectly monitor rivaroxaban plasma concentrations":

*…I assume we will still try to exposure- match to the 20mg qd dose used for prevention in adults…correct? I think the utility of monitoring after the initial dose still needs to be worked out. Being respectful of our Bayer colleagues opinions, they are not completely on board with the idea of using the anti-FXa assay to indirectly monitor riva plasma concentrations, not that the science is in question, but more around the utility and acceptance of using specific calibrators and controls by the actual centers participating in the trials.'*
*I still think it is of value to engage in a conversation with Stago on the use of this assay in this scenario and their experience to date in Europe, before we make any steadfast plans…[699]*

693. Claudia Henn, Bayer Global Medical Affairs, sent an email to Drs. Spiro and Dyszynski on May 2, 2014 "Subject: AW: PBRER[700] Statement". [701] It was her understanding that if

---

[696] Moore Exhibit 25
[697] Moore Exhibit 28
[698] Moore Exhibit 29
[699] Moore Exhibit 30

243

the attached document had been sent to authorities, it could not be omitted from the statement.  She copied Jürgen Weber, and Dr. Spiro responded:

> *We see analysis of analysis of trends for events versus dose regimens tested, including both efficacy and safety event outcomes in all of the phase 2 study reports.  <u>What is missing is the correlation of safety and efficacy outcome events with actual individual plasma concentrations measured.</u>  Such analyses have been performed for the prothrombin time results but not as far as I can determine for rivaroxaban concentration with the exception of the results from studies 14397 J-THR and 14398 J-THR which are reported in PH-37000, Section 11.3.3. [702]*

694. Dr. Spiro commented that the correct type of study to correlate safety and efficacy with actual individual plasma concentrations and rivaroxaban had not been performed.  The studies that were performed correlated with PT and concentration in two (2) short-term Phase 2 VTE-P studies (hip/knee).  Those two studies were reported in Defendants' PH-3700 Section 11.3.3, and were used repeatedly by Defendants to support the opinion against drug monitoring and lack of correlation between PT and plasma concentration.

695. On September 22, 2014, Todd Moore sent an email to Anita Knapp-Ryseck "Subject: RE:Stago":

> *"within the exploratory objectives section, we should probably change the text to read…"1. To indirectly measure rivaroxaban concentrations through the Stago-assay at selected sites." (I would remove any mention of the word "monitoring")*
>
> *2. Stago Assay: This assay is for experimental use only in the US only and will allow for provide the indirect monitoring measurement of rivaroxaban plasma concentrations using an anti-factor Xa assay with rivaroxaban calibrators and controls on Day 1 and Day 4 at selected sites. (again…staying away from the term "monitoring").[703]*

696. Catherine Vanden Boom replied to Todd Moore et al. on September 22, 2014:

> *I like the text.  Do we need to mention somewhere (outline or BB) that this is for the 510(k) application for Stago in the US?*

697. On September 22, 2014, Liza Pina sent an email to Todd Moore and Anita Knapp-Ryseck, et al. "Subject Stago":

> *Your suggestions sound good.  The word "monitoring" raises an unwanted flag….[704]*

698. Mr. Moore was then asked about the reference to Stago:

---

[700] PBRER= Periodic Benefit-Risk Evaluation Report- specified by ICH Guidelines E2C (R2)
[701] Dyszynski Exhibit 29; Xarelto_BHCP_00267737
[702] Dyszynski Exhibit 29
[703] Moore Exhibit 31
[704] Moore Exhibit 31

> *Q. And Bayer and Janssen worked with Stago in the development of an anti-factor Xa assay with rivaroxaban calibrators and controls; is that right?*
>
> *A. I believe we supported Stago in their efforts, yes.*
>
> ...
>
> *Q. Is it fair statement that you believe that the anti-factor Xa assays with specific rivaroxaban calibrators and controls could be used for therapeutic monitoring of Xarelto?*
>
> *A. I believe it could be used to, again, indirectly measure rivaroxaban concentration within the plasma.*
>
> *Q. ...if a physician wanted to use PT to measure rivaroxaban levels, you believe that the right agent to use would be the Neoplastin Plus reagent; is that right?*
>
> *A. If a physician wanted to indirectly measure rivaroxaban concentration in plasma, they can use PT with Neoplastin plus reagent, yes.[705]*

699. Mr. Moore was also asked about the PT Neoplastin Assay, as used in the clinical study program:

> *Q. ...did you have a recollection as to why PT Neoplastin had been chosen as a reagent that was used in the clinical study program?*
>
> *A. I believe the data collected to date by the time the project came to me showed that Neoplastin was more sensitive to the effects or rivaroxaban than some of the other reagents that were used.*
>
> *Q. And there had been some PK/PD analysis that had indicated there was a closer or more linear relationship between PT using Neoplastin and drug concentration; is that right?*
>
> *A. So there is a close to linear relationship between PT and plasma concentration of rivaroxaban. [706]*

700. On December 4 and 5, 2014, Dr. Temple gave a presentation entitled "Dose-Response – Anticoagulants," which stated:

> *...It is possible that if blood levels were not too variable a single dose could get most people into proper range. We know that is not true for dabigatran and edoxaban, and we also know that apixaban and rivaroxaban did not reduce thromboembolic strokes compared to warfarin although they caused less bleeding.*
>
> *Coagulation measures might do as well as, or better than, blood levels.*

---

[705] Moore depo 7/12/16, p. 384: L17 – p. 385: L1
[706] Moore depo 7/12/16, p. 50: L24 – p. 51: L20

245

> *All of this is under active consideration. With steep D/R for both benefit and risk, optimizing dose or blood levels seems like a very good idea.*[707]

701. On February 3, 2015, Dr. Temple stated in a presentation:

> *Not having the optimal dose at initial dosing is tolerable for many drugs. You can adjust up or down according to response. But here being too low leads to a stroke, a very bad outcome, and being too high leads to major bleeds, also bad, so that early optimization seems worthwhile…So, the NOACs are very good, but could probably be better.*[708]

702. On October 26, 2015, Drs. Jeffry Florian and Martin Rose of FDA, gave a presentation entitled "*Correlation of Drug Levels and Outcomes in Phase III New Oral Anticoagulant (NOAC) Trials,*" stating: "Relationships identified between drug exposure/coagulation markers and major bleeding rate."[709]

703. On December 3, 2015, at the Cardiac Research Safety Consortium (CRSC) meeting, FDA's Dr. Jeffry Florian, Team Leader, Division of Pharmacometrics CDER/OTS/Office of Clinical Pharmacology, in a presentation entitled "Observations from Novel Oral Anticoagulation (NOAC) Trails for Stroke Prevention in Atrial Fibrillation (SPAF)," presented Figure 4(A) Logistic Regression model, which demonstrated an increased bleed risk with prolongation of PT as found at page 12 of the Clinical Pharmacology Review, dated August 10, 2011.[710]

704. However, Defendants, just like Dr. Misselwitz, continue to maintain publicly that a PK based dosing strategy is impractical and may not add value for XARELTO. As a follow-up to the CRSC meeting on December 3, 2015, there was an organized debate between FDA's Dr. Temple and Bayer's Dr. Berkowitz. Dr. Berkowitz's presentation was titled "CounterPoint: PK based dosing strategy is impractical and may not add value," and he stated:

> *Clinical value of a PK/PD measurement for NOAC dosing not proven nor as straightforward as with PT/INR for VKAs.*
>
> …

---

[707] EMA EFPIA Workshop, Slides 4, 6, and 11.
(http://www.ema.europa.eu/docs/en_GB/document_library/Presentation/2015/01/WC500179814.pdf)
[708] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352; Temple, R, M.D. "NOAC Dosing: Pharmacometric Guidance Regulatory Considerations." CSRC, Feb. 3, 2015
[709] Florian, Jeffry, Ph.D. (CDER/OTS/OCP/DPM) & Rose, Martin, M.D. (CDER/OND/ODE1/DCRP). "*Correlation of Drug Levels and Outcomes in Phase III New Oral Anticoagulant (NOAC) Trials.*" Oct. 26, 2015, Slide 13. (http://webcache.googleusercontent.com/search?q=cache:OxkAkgRrLAwJ:www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473317.pdf+&cd=1&hl=en&ct=clnk&gl=us)
[710] Florian, Jeffry, Ph.D. "*Observations from Novel Oral Anticoagulant (NOAC) Trials for Stroke Prevention in Atrial Fibrillation (SPAF).*" CSRC NOAC Dosing Workshop, Dec. 3, 2015, Slide 10. (http://webcache.googleusercontent.com/search?q=cache:TpiaDOb2qM4J:cardiac-safety.org/wp-content/uploads/2015/12/S1_5_Florian.pdf+&cd=1&hl=en&ct=clnk&gl=us)

> *Value added (for the patient) by taking a measurement not clear…A drug plasma concentration level does not provide information about the overall status of hemostasis in the patient in conjunction with that level*[711]

705. Dr. Temple, in alignment with Dr. Florian and Dr. Rose's presentation in October 26, 2015, gave a counter presentation to Dr. Berkowitz and stated that it would be worthwhile to get one NOAC bleed level to predict outcomes for NOAC patients:

> *So, for the previous of standard of care, warfarin, we do not use a fixed dose but always use a dose titrated to anticoagulant effect. Why are NOACs different? Maybe they shouldn't be.*
>
> *…*
>
> *Blood Levels Can Help…How hard would it be to get one NOAC blood level (when monthly or greater levels are SOC for warfarin) if blood levels predicted outcome (which they appear to do)? It seems self-evidently worth it.*[712]

706. In 2016, a published report[713] on the discussions at the CSRC think tank meeting in February 2015 stated:

> *The NOACs have reasonably predictable pharmacologic profiles, with well-defined relationships between plasma concentrations and anticoagulant effects and generally predictable blood levels based upon administered dose. As such, routine monitoring of coagulation tests has not been a requirement for therapy. Moreover, even without such monitoring, the NOACs performed well versus monitored warfarin in their pivotal trials, including reduced fatal and intracranial bleeding and, at least in AF trials, a 10% reduction in all-cause mortality.* **Nonetheless, it is possible that they might have performed even better regarding thrombotic or bleeding events and stroke reduction if PK or PD monitoring were available.**[714]

---

[711] Berkowitz, S., M.D. "Counterpoint: PK based dosing strategy is impractical and may not add value." 3 Dec. 2015, Slides 3 and 5. (http://webcache.googleusercontent.com/search?q=cache:inWSqfA3beUJ:cardiac-safety.org/wp-content/uploads/2015/12/S2_1b_Berkowitz.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[712] NOAC Dosing Precision Dosing – YES!, Robert Temple, MD, CSRC Meeting, Dec. 3, 2015, Slides 5 and 12 (http://webcache.googleusercontent.com/search?q=cache:OjW9hq76hFsJ:cardiac-safety.org/wp-content/uploads/2015/12/S2_1a_Temple.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[713] One of the authors of this report, Dr. Evardas Kaminskas, is an employee at the FDA Division of Hematology Products, CDER.

[714] Reiffel, et al. *NOAC monitoring, reversal agents, and post-approval safety and effectiveness evaluation: A cardiac safety research consortium think tank.* Am. Heart J (2016);177:74-86, (*emphasis added, internal citations omitted*).

l. **DEFENDANTS ENCOURAGE USE OF XARELTO IN PATIENTS WITH CONGESTIVE HEART FAIULE DESPITE KNOWING THEY DO NOT HAVE AN APPROVED INDICATION**

707. In the April 2008, Minutes of JSC held in Berlin, Germany, there is a Congestive Heart Failure (CHF) study. As of 2008, there had been 736 patients entering the Phase 2 trial, with LPFT (pulmonary function testing) planned for the end of July 2008.[715]

708. Despite not having any approved indication for congestive heart failure, in 2013 Defendants published in *Circ Heart Failure* "Efficacy and Safety of Rivaroxaban in Patients with Heart Failure and Nonvalvular Atrial Fibrillation- Insights from ROCKET AF."[716] The authors were members of DCRI, including Robert Califf, Manesh Patel, Kenneth Mahaffey, as well as Defendants' Christopher Nessel, MD, Scott Berkowitz, MD, and Keith A.A. Fox. A total of 9033 (63.7%) patients in ROCKET had HF.

> *Conclusion:*
>
> *Treatment-related outcomes were similar in patients with and without HF and across HF groups. These findings support the use of rivaroxaban as an alternative to warfarin in patients with atrial fibrillation and HF (Clinical trial registration NCT00403767)*

709. Defendants PK/PD study in CHF patients was study 12980, R-8560, with a dose of 10mg in 18 patients exposed to rivaroxaban and 8 to placebo.[717]

710. Defendants are proposing the investigational use of XARELTO in patients with known underlying chronic disease of their pulmonary system and lungs. For the NDA approval of XARELTO for SPAF, FDA in October 2011 had included a statement about risk for pulmonary systems in Defendants' proposed draft XARELTO label for SPAF to warn about the postmarket reports of bleeding into the lungs. FDA proposed for the XARELTO label:

> *Section 6.2 Postmarketing Experience:*
> *Pulmonary system disorders: pulmonary hemorrhage, pulmonary hemorrhage with bronchiectasis.[718]*

711. However,the FDA's request for this addition about the lungs was not acceptable to Defendants. The statement about pulmonary system adverse event reports including hemorrhage was subsequently deleted from Section 6.2 Postmarketing experience and did not occur in XARELTO's November 2011 approved launch label for SPAF based on ROCKET.

---

[715] Burton Exhibit 31

[716] Diepen S van, Hellkamp AS, Manesh, P, Becker RC, Breithardt G, et al. *Efficacy and Safety of Rivaroxaban in Patients with Heart Failure and Nonvalvular Atrial Fibrillation- Insights from ROCKET AF*. Circ Heart fail. (2013); 6:740-747.

[717] Derix Exhibit 71

[718] XARELTO_BHCP_00015723

712. In the Defendant's EMA PBRER of May 2014[719], Defendants list under current studies Study BAY59-7939/16302 (COMMANDER HF).  It is a randomized Double-blind, Event-driven, Multicenter Study Comparing the Efficacy and Safety of Oral Rivaroxaban with Placebo for Reducing the Risk of Death, Myocardial Infarction or Stroke in Subjects with Chronic Heart Failure and Significant Coronary Artery Disease Following a Hospitalization for Exacerbation of Heart Failure: "COMMANDER HF Study" (NCT01877915) In May 2014 it was still recruiting subjects.  The actual start date was August 30, 2013, and projected completion date October 1, 2016.  Like ROCKET AF, it is to be an International study primarily conducted outside the United States, with 294 patients enrolled in the trial. The United States will have (5) subjects. In terms of the other countries:  Ukraine (122), Russia (108), Spain (30), Poland (14), Bulgaria (9), Germany (3), Czech Republic (2), and the Netherlands (1).  The DSMB was not to meet until March 30, 2014.  The primary endpoint was to demonstrate rivaroxaban is superior to placebo in subjects with chronic heart failure and significant coronary artery disease (CAD), who received standard of care following a recent hospitalization for exacerbation of heart failure.  There is no mention of the dose that will be studied in the PBRER.

713. An internet search of "COMMANDER HF Study" in September 2016 produces many hits for "COMMANDER –HF Phase III Clinical Trial".  The NIH's 'Clinicaltrials.gov' website has the last data received for this study as September 2016.  The sponsor is Janssen R&D with collaborator Bayer and the completion date is May 2018.  The dose is 2.5mg BID + single or dual antiplatelet therapy. Patient eligibility is 18 years to 95 years. There are 883 study locations listed including sites in every state in the United States, with the majority listed as withdrawn or completed, and a few sites still recruiting. The Health Authorities listed as participating are as follows: Australia, Bulgaria, Germany, Great Britain, Hungary, Netherlands, Ukraine, and United States (FDA).  The EMA is not listed.  The estimated enrollment is 5000 patients and as of September 2016 no study results have been posted.

714. On Bayer's Letterhead, the 'Multivu.com' website for COMMANDER HF references the ACS 2-TIMI 51 study (rejected twice by the FDA's Advisory Members and FDA as unacceptable for support of ACS indication based on missing data and unacceptable increased bleeding risk without efficacy).  In 2014 when represented to the FDA AdCom panel, it was still rejected and the pattern of prior loss of patient follow-up suggested 'information censoring' to the AdCom members.  However, Defendants reference the same study to support to physicians some sort of efficacy of XARELTO for COMMANDER HF and that XARELTO has a role for patients with chronic heart failure (CHF). There is no mention to physicians that the ACS indication (and use for HF) and use of a 2.5 mg tablet for any indication are still not FDA approved in the United States:

**Phase III COMMANDER HF Will Provide Insights on How Best to Protect Patients with Chronic Heart Failure and Coronary Artery Disease (CAD) Against Long-term Clot formation**

---

[719] Dyszynski Exhibit 27

*Antiplatelets and rivaroxaban have complementary mechanisms of action that together address the dual pathway of clot formation. In a sub-group of acute coronary syndrome (ACS) patients with HF in the ATLAS ACS 2-TIMI 51 Study, treatment with rivaroxaban 2.5 mg twice daily plus antiplatelet therapy demonstrated decreased rates of cardiovascular (CV) events and death compared with antiplatelet therapy alone.[720]In a similar way, COMMANDER HF will evaluate the potential of this combination to provide more complete protection against long-term clot formation compared to each therapy alone.*

***The extensive evaluation of rivaroxaban to protect different patient populations at risk of venous and arterial thromboembolism (VAT), makes it the most studied novel OAC in the world. Rivaroxaban (Xarelto) is already approved for five indication in seven areas of use and its investigation-both completed and ongoing-will include more than 275,000 patients in clinical trials and real world setting.[721]***

715. At the bottom of the page in a footer, there is a small statement: "Media Backgrounder for Ex-US and Ex-UK Use Only". This is not a sufficient warning for a United States healthcare provider reading this document on Bayer's Letterhead to warn them that XARELTO for HF is an "investigational use" and is required to be done under the safeguards of an FDA approved IND (21 CFR 312). This Bayer online document is describing an "off-label use" (Investigational) for XARELTO for chronic lung disease and fails to adequately warn about the known increased risk of bleeding with XARELTO for the ACS patient population. The United States is not the only regulatory agency in the world to have refused (rejected/withdrawn) approval of the ACS indication. It was conditionally authorized for use in Europe by the EMA for ACS based on Defendants' follow-up methods (FUM) requirement for it to conduct a Company Sponsored Post-authorization Safety Studies (PASS).[722]

716. Zannad (2015) published on the COMMANDER HF study in "European Journal of Heart Failure". The conclusion:

*COMMANDER HF is the first prospective study of a target-specific oral antithrombotic agent in HF. It will provide important information regarding rivaroxaban use following an HF event in an HF-rEF patient population with coronary artery disease.[723]*

717. Gheorghiade M (2013) along with Zannad published in Heart Failure Review "Anticoagulation in Heart Failure: Current Status and Future Direction," with inclusion

---

[720] Mega JL, Braunweld E, Wiviott SD et al. *Rivaroxaban in Patients with Recent Acute Coronary Syndrome*. NEJM (2012); 366:9-19
[721]http://webcache.googleusercontent.com/search?q=cache:SlgsisrOi3QJ:www.multivu.com/players/English/7425851-navigate-esus-study-bayer-xarelto/links/7425851-
The%2520COMMANDER%2520HF%2520Study.pdf+&cd=1&hl=en&ct=clnk&gl=us
[722] Dyszynski Exhibit 27
[723] Zannad F, Greenberg BM, Cleland JG, Gheorghiade M, …Fu M(Janssen R&D): *Rationale and design of a randomized, double-blind, event-driven, multicentre study comparing the efficacy and safety of oral rivaroxaban with placebo for reducing the risk of death, myocardial infarction or stroke in subjects with heart failure and significant coronary artery disease following an exacerbation of heart failure: the COMMANDER HF trial*. Eur J Heart Fail (July 2015); 17(7):735-42.

of Defendants' ROCKET AF and ACS trial (ATLAS ACS 2-TIMI 51) supporting the use of rivaroxaban for HF. The authors speculate that HF patients "may" have increased morbidity and mortality based on a not "frequently clinically unrecognized hypercoagulable state" that could possibly respond to an oral anticoagulant like rivaroxaban. The authors maintained that "Because data are largely derived from observational studies or trials of modest size, guideline recommendations on anticoagulation for HF vary between organizations." The authors then indicate that SPAF studies (including Defendants' ROCKET AF for Xarelto) somehow supported a unique 'benefit' for patients with HF. This HF benefit claim and indication was not supported for Xarelto in SPAF when approved by FDA. The authors write that all the three approved NOACS have shown benefits for HF and then describes the supported benefit of rivaroxaban in the flawed ATLAS (ACS) clinical trial (rejected for approval, by FDA the first time in 2012 before this article was published):

> *Newer oral anticoagulants dabigatran, apixaban and rivaroxaban have successfully completed trials for prevention of stroke in patients with AF and have shown benefits in the subpopulation with concomitant HF. Evidence suggests a hypercoagulable state is present in patients with HF. Although thromboembolism as a direct consequence of HF is not frequently clinically recognized, it may contribute to mortality and morbidity. Positive results of the Anti-Xa therapy for Lower Cardiovascular Events in Addition to Standard Therapy in Subjects with Acute Coronary Syndrome- Thrombolysis in Myocardial Infarction 51 (ATLAS ACS 2-TIMI 51) trial of rivaroxaban in ACS are also encouraging. These data suggest there is a need to assess the potential role of these newer agents in the management of patients hospitalized for HF who continue to have a high post-discharge rate despite available therapies.[724]*

718. There is no currently FDA approved indication for XARELTO for any indication for CHF, AF patients with HF, or use in the lungs. These Janssen R&D articles are describing an off-label and investigational use of XARELTO for patients with chronic lung conditions such as CHF. There is nothing informing physicians of the potential for XARELTO to cause hemorrhage/bleeding in the lungs. Studies for XARELTO and HF are investigational and must be conducted legally in United States patients under the safeguards of an IND. There had been an IND for CHF at the FDA for Xarelto, as well as an IND for ROCKET. However, an NDA has not been approved for Defendants to promote/encourage/imply or market XARELTO for use for patients with CHF, CHF and Atrial Fibrillation, chronic lung conditions. Therefore, Defendants are prevented by the FDCA from promoting or encouraging the use of XARELTO by distribution or discussion of Janssen R&D and sales to treat patients with heart failure in the United States. Defendants are also required to warn of the potential risks for bleeding into the lungs, the FDA's postmarket risk that Defendants did not accept for inclusion in its XARELTO SPAF label.

719. The Defendants May 2014 PBRER had an entry entitled "Proper Use Letter/Japan."

---

[724] Gheorghiade M, et al. *Anticoagulation in Heart Failure: Current Status and Future Direction*. Heart Fail Rev. (Nov 2013); 18(6):797-813.

720. Defendants indicated that following discussions and interactions with the Japanese Health Authority (PMDA) regarding 'interstitial pneumonia/interstitial lung disease,' Bayer prepared and issued a 'White Letter' (Proper use Letter) which was distributed to all doctors in Japan on January 30, 2014.  The White Letter served as information to healthcare professionals for the use of the product and warned of the risk for the lungs. Bayer wrote to the EMA: "It is common practice in many countries, including Japan, to update physicians and pharmacists on product information as a supportive tool for their prescribing practice."   An English copy of the White Letter was provided to the EMA Rapporteur in the PSUR for the interval 16March 2013 to 15 September 2013 with the date of the report 10 February 2014.  A request for supplementary information (RSI) was issued to the MAH to present a comprehensive and cumulative review of all cases of interstitial pneumonia/interstitial lung disease, including literature, post-marketing and clinical trials data and consider updating the contents of its SmPC.[725]

## m. DEFENDANTS ENCOURAGE XARELTO USE IN HOSPITALIZED MEDICALLY ILL PATIENTS DESPITE LACK OF AN FDA APPROVED INDICATION

721. MAGELLAN is Defendants' "**M**uticenter r**A**adomized parallel **G**roup **E**fficacy superiority study in hospitalized medically i**LL** patients comparing rivaroxab**AN** with enoxaparin."  It was conducted under Protocol BAY 59-7939/12839 within ROC VTE IND 64,892.[726] MAGELLAN was a study run by Bayer.

722. According to Minutes of the JSC on April 10, 2008, the MAGELLAN Phase 3 trial in medically ill patients had an amendment to introduce an additional 10±4 day ultrasound.[727] In April 2008, MAGELLAN had 21 patients enrolled, and 21 CTAs approved.  There had been EMA input with a final MAGELLAN protocol amendment. The amendment, according to Defendants, had been to respond to both the EMA and FDA criticisms of the global MAGELLAN study.

723. The changes included a new day 10±4 non-inferiority primary endpoint added; inclusion criteria (i.e., risk factors, immobilization, etc.) amendment; and "all-cause mortality would not be a primary endpoint, but remain a secondary criteria."  It was emphasized that the outcome of the added endpoint of a day 10±4 (non-inferiority) lower extremity ultrasonography would be linked to the study on day 35±4 (superiority).  Janssen proposed to take over the operational conduct of the MAGELLAN study in the United States, which would be discussed with Bayer Clinical Operations.[728]

724. A September 10, 2009 email indicated that FDA was notified that the investigational site of Dr. John Simmons, MAGELLAN Study, was closed for Good Clinical Practice (GCP) non-compliance issues.  There was a letter to FDA R. Dwaine Rieves, MD, Director,

---

[725] Dyszynski Exhibit 27
[726] Derix Exhibit 69
[727] Burton Exhibit 31
[728] Burton Exhibit 31

Division of Medical Imaging and Hematology Drug Products, on September 10, 2009 for IND 64,892 Serial No. 1665, General Correspondence for Site closure.[729]

725. The investigation site being closed was in Geneva, Alabama (Trial Site #14036). According to the letter to FDA, the site had a total of 31 patients enrolled, with 19 patients having completed the required follow-up visit. 3 patients died during the study, 3 patients withdrew consent and 6 patients were lost to follow-up. Therefore, there were no on-going patients at the site. The letter did not indicate the treatment of the patients that died, withdrew or were lost to follow-up. [730] The letter did not address the current enrollment status of Defendants' MAGELLAN study in 2009.

726. Defendants had reportedly identified at the site protocol violations which included enrolling patients that did not meet the inclusion/exclusion criteria, failure to perform all necessary screening assessments (INR and creatinine clearance). Failure to follow the study dosing regimen and conduct the study assessment within the required timeframe. SAEs and bleeding events were not identified and reported promptly by the investigator. The informed consent was not properly managed at the site. Investigator failed to sign the ICFs. The CRFs completed on site consistently failed to capture the necessary data and out of range laboratory results were not adequately assessed.[731]

727. The MAGELLAN indication has not been approved for use in the United States. Therefore, there cannot be marketing or encouragement by Defendants of 10mg OD for hospitalized medically ill patients. The article does not indicate that this represents a still "Investigational Use" of XARELTO, which has not been approved by the FDA, and must be investigated in United States patients only under the restrictions of an approved IND. All patients enrolled must receive adequate informed consent, investigation monitoring, and reporting to FDA. The safety and the efficacy of this proposed use in MAGELLAN has not been approved by the FDA. Reportedly the steering committee for MAGELLAN "made the decision to submit the manuscript for publication."[732]

728. The MAGELLAN Study was published by Cohen (2013)[733] in the *NEJM* by Bayer and on behalf of the MAGELLAN Investigators. According to the published study, from December 2007 through July 2010 the study was conducted as a multicenter, randomized, double-blind trail, the MAGELLAN investigators evaluated the efficacy and safety of oral rivaroxaban administered for an extended period, compared with subcutaneous enoxaparin administered for the standard time, followed by placebo. Patients 40 years of age or older who were hospitalized for an acute medical illness were randomized to receive SQ enoxaparin, 40mg once daily for 10±4 days and oral placebo for 35±4 days or to receive SQ placebo for 10±4 days and oral rivaroxaban, 10mg once daily, for 35±4 days. The primary efficacy outcomes were composite of asymptomatic proximal or

---

[729] Derix Exhibit 69
[730] Derix Exhibit 69
[731] Derix Exhibit 69
[732] Cohen, AT, Spiro, T, Buller HR, Haskell, L et al. *Rivaroxaban for Thromboprophylaxis in Acutely Ill Medical patients*. NEJM (February 7, 2013), pp 513-23.
[733] Cohen, AT, Spiro, T, Buller HR, Haskell, L et al. *Rivaroxaban for Thromboprophylaxis in Acutely Ill Medical patients*. NEJM (February 7, 2013), pp 513-23

symptomatic venous thromboembolism (VTE) up to 10 days (non inferiority test) and up to day 35 (superiority test).  The principal safety outcome was the composite of major or clinically relevant nonmajor bleeding.  a total of 8101 patients were randomized, a primary efficacy outcome occurred in 78 of 2938 patients (2.7%) receiving rivaroxaban and 82 of 2993 patients (2.7%) receiving enoxaparin at day 10 and in 131 of 2967 (4.4%) who received rivaroxaban and 175 of 3057 (5.7%) who received enoxaparin followed by placebo at day 35 (RR 0.77 (95% CL 0.62 to 0.96, p=.02).  A principal safety outcome event occurred in 111 of 3997 patients (2.8%) in the rivaroxaban group and 49 of 4001 patients (1.2%) in the enoxaparin group at 10 day (p<0.001) and in 164 patients (4.1%) and 67 patients (1.7%) in the respective groups at day 35 (p<.001)

729.    The conclusion of the MAGELLAN investigators and members of Bayer and Janssen was as follows:

> *In acutely ill medical patients, rivaroxaban was non inferior to enoxaparin for standard-duration thromboprophylaxis. Extended-duration rivaroxaban reduced the risk of VTE. Rivaroxaban was associated with increased risk of bleeding. (Funded by Bayer Healthcare Pharmaceuticals and Janssen Research Development; MAGELLAN Clinical trial.gov number NCT00571649)*

730.    Defendants' published MAGELLAN study proposed the use of XARELTO in patients with active cancer, stroke, myocardial infarction or acute exacerbations of a variety of medical conditions at increased risk for VTE as well as prolonged immobilization and risk factors such as an age older than 75 years, chronic heart failure, history of VTE and obesity.

731.    Though not in the Conclusion of the abstract, but in the text under the heading " Safety Outcomes", between day 1 and 10, an episode of clinically relevant bleeding occurred in 111 of 3,997 patients (2.8%) who were receiving rivaroxaban as compared to 49 of 4001 patients (1.2%) who received enoxaparin (**RR= 2.3**, 95% CI, 1.63, 3.17; P<0.001), and fatal bleeding occurred in 5 patients of 3,997 in the rivaroxaban group and 1 patient of 4,001 in the enoxaparin group.  Between day 1 and day 35, an episode of clinically relevant bleeding occurred in 164 of 3,997 (4.1%) who received extended-duration rivaroxaban as compared to 67 of 4,001 patients (1.7%) in the group who received enoxaparin followed by placebo (**RR=2.5**, 95% CI 1.85, 3.25; p<0.0010. Fatal bleeding occurred in **7** patients in the group that received extended-duration rivaroxaban and in **1** in the patient with enoxaparin followed by placebo.  The seven fatal bleedings involved pulmonary bleeding (in 3 patients), intracranial bleeding (2 patients) and retroperitoneal and gastrointestinal bleeding (each in 1 patient).  In the enoxaparin group there was 1 death due to tracheal bleeding.  The authors concluded that the "adverse-event profiles and the incidence of cardiovascular event were similar up to day 35 in the group that received extended-duration rivaroxaban and the group that received enoxaparin followed by placebo." "The incidence of death from any cause over the entire study period was similar in the two groups."

732.    Under "Net Clinical Benefit or Harm", by day 10, an event of the primary efficacy outcome or major or clinically relevant **nonmajor** bleeding (the measure of net clinical

benefit or harm) had occurred in 216 of 3,266 patients (6.6%) in the rivaroxaban group, compared with 151 of 3,291 patients (4.6%0 in the enoxaparin group (RR= 1.44, 95% CI 1.18, 1.77; P<0.001). By day 35, an event of this composite outcome occurred in 286 of 3042 patients (9.4%) in the group that received extended-duration rivaroxaban as compared to 240 of 3,082 patients (7.8%) in the group that receive enoxaparin followed by placebo (RR=1.21; 95% CI, 1.03,1.43;P=0.02).

733. The authors concluded that rivaroxaban at a dose of 10mg for 35 days was similar to standard therapy of 40 mg once daily [* not stated (i.e. for 10 ±4 days)] enoxaparin for hospitalized patients with acute illness and extended duration rivaroxaban was superior to enoxaparin [ not stated followed by placebo]. The authors did state: "However, rivaroxaban was associated with an increased risk of clinically relevant bleeding." [*No mention of the significantly increased RR risk for bleeding **RR= 2.3**, 95% CI, 1.63, 3.17; P<0.001; **RR=2.5**, 95% CI 1.85, 3.25; p<0.0010) for rivaroxaban compared to enoxaparin or enoxaparin followed by placebo or the increase in fatal bleeding 5:1 and 7:1 for rivaroxabarin compared to standard enoxaparin or enoxaparin followed by placebo.] There is also no mention that FDA has not concluded the same as the MAGELLAN investigators and that the MAGELLAN data has been able to support approval of the indication for use in medically ill patients.

## XIII.   POINT-OF-CARE INR MONITORING FOR ROCKET AF

### a. BACKGROUND HEMOSENSE/ALERE

734. HemoSense, a biotechnology firm based in San Jose, CA, developed the INRatio PT/INR monitor system. HemoSense originally was named CardioSense, Inc. when it incorporated in March 1997, but took the name HemoSense in January 1998. The development of the INRatio PT/INR monitor was the core of HemoSense's business plan. The corporate mission was the development, manufacturing and sale of an "easy to use home monitoring system" for patients prescribed warfarin.[734]

735. In September 1999, HemoSense filed a trademark application for the name "INRatio" with the United States Patent and Trademark Office. The FDA approved the INRatio monitor system for home use in October 2002, and commercial sales began in March 2003.

736. By 2004, sales of the INRatio monitor were brisk, totaling $3.25 million, in 2005 $8.77 million and 2006 $16.26 million. HemoSense received an FDA Warning Letter in 2005 with identification of a failure to investigate and file required MDRs with FDA for reports of erroneous values for patients using the INRatio monitor systems.

737. In August 2007, Hemosense was purchased by Inverness Medical Innovations, Inc. (IMT). IMT was renamed in 2010 'Alere, Inc.' Beginning in 2008, HemoSense had its

---

[734] Article by The Cochran Firm, *The corporate history behind the INRatio: how Alere ended up owning the faulty PT/INR monitor*, February 9, 2015. (Inratiorecall.com/corporate-history-behind-inratio-alere-ended-owning-faulty-ptinr-monitor/)

operations transferred to Alere's manufacturing facility in San Diego, CA.  By 2013, HemoSense's San Diego operations had been merged with Cholestech Corporation, Inverness Medical-Biostar Inc. and Ischemia Technologies, Inc. all under Alere San Diego, Inc. corporate entity, a wholly owned subsidiary of Alere, Inc.  Therefore, HemoSense continues to exist within the structure of Alere, Inc.

738.   The origins of Alere Inc. and Alere San Diego, Inc. stem from a company initially set up in 1991 named SelfCare in Waltham, MA.  SelfCare changed its name next to 'Inverness Medical Technology' (IMT) in 2000 (the entity purchasing HemoSense in 2007) and then officially changed its name once again to' Alere Inc.' in 2010.  Alere Inc. is a global diagnostic device and service provider, with revenue in 2013 of $3.03 billion, and headquarters in Waltham, MA.  In 2001, IMT sold off it diabetes business to Johnson & Johnson.  The company since 2003 has expanded by buying up consumer and professional-grade diagnostic product lines and entire companies to establish adominance in the diagnostics device market.  Acquisitions brought in diagnostics for home use, point-of-care tests, drug and parasite screening products, cholesterol and cancer diagnostics.  In 2007, IMT/ Alere entered into a joint venture, named 'Swiss Precision Diagnostics', with Proctor and Gamble for sales and marketing of consumer diagnostic products including First Check drug tests available in drug stores.  The US accounts for more than half of Alere's sales.

739. Alere, Inc. is currently organized into three segments: Professional Diagnostics, Patient Self-Testing, and Consumer Diagnostics.  The largest share belongs to its Professional Diagnostics segment.  Patient Self-Testing (formerly Health Information Solutions) consists primarily of Alere's Home Monitoring products for anti-coagulation management to help prevent stroke and clotting disorders (i.e. HemoSense's Alere,Inc. INRatio PT/INR and INRatio 2 PT/INR Monitoring Systems).

740. Alere maintains primary manufacturing sites in China, Japan, Norway, South Korea, and the US.  It has secondary manufacturing facilities in parts of Europe, Australia, India, Israel and South Africa.  Alere conducts its main research and development activities in Germany, the UK and the US.

## b.  DEFENDANTS RECEIVE TWO FDA HEMOSENSE WARNING LETTERS DESCRIBING DEFECTIVE INRATIO DEVICE

741. According to a December 20, 2005 email, David Phillips contacted Kimberly Schwabe (now Kimberly Nessel) to discuss HemoSense receiving an FDA Warning Letter.  He apparently did not attach the Warning Letter to the email.  He wrote: "Just to reiterate, this is concerning our internal processes and not a product issue."  He understated the significance of the content of the FDA Warning Letter in that it indicated that the INRatio device was made not in compliance with quality regulations and would be considered adulterated and misbranded, and FDA findings of deviations can represent much bigger systemic issues which need to be addressed by HemoSense management.  Hemosense had received a similar Warning Letter in 2005, so there was a continuing manufacturing issue which had not been addressed by Hemosense management and directly impacted all

256

devices used in ROCKET, particularly since it was a modified investigational device and not even the commercial device discussed in the Warning Letter.[735]

742. Ms. Schwabe sent an email to members of J&J about the recall and her discussion with David Phillips: "He has assured me this does not have anything to do with their devices, test strips, or manufacturing processes and does not effect our study in anyway." He then told her the letter would be posted on the FDA's website.[736] However, he had provided her with the "Letter to Alere Patients,"[737] rather than a copy of the Warning Letter recived by HemoSense.

743. On January 11, 2007, Sanjay Jalota of Regulatory Affairs sent Kimberly Schwabe, Bernadettee O'Brien, Christopher Nessel, William Byra et al. an email and attachment, "Subject: Confidential-RE: FDA Warning Letter". Attached to the email was the HemoSense FDA Warning Letter of 2006. The letter had been posted on the FDA website.[738]

744. Janssen's Drs. Byra and Nessel testified that they were aware of two FDA Warning Letters[739] issued to HemoSense before commencement of the ROCKET study (October 2005, November 2006). The two Warning Letters from FDA cited HemoSense for significant failures of quality systems and MDR (21 CFR§ 820, 21 CFR§ 803) reporting with the HemoSense INRatio device, when used as an INR monitoring system. The Warning Letters are serious and directly reflect on the quality of the commercial HemoSense device and the poor manufacturing conditions at the company when inspected by FDA. Yet, this technology platform and company was the INR monitoring device selected by the Defendants for ROCKET.

745. Defendants' Dr. Byra, Senior Director of International Medicine at Janssen since 2006, was unable to explain during his deposition in 2016 why he waited until 2007 to circulate either of the two HemoSense Warning Letters (1) October 14, 2005; and 2) November 29, 2006) despite the obvious importance to ROCKET since it was Defendants' pivotal study and for ensuring warfarin arm patient safety.[740] There is a January 22, 2007 email "Subject : Other warning letter to Hemosense" sent by Dr. Byra to Vicki Brennae et al.[741] The two Warning Letters from FDA's CDRH described 'significant management failings' in ensuring adequate device quality assurance including the devices reporting erroneous values for the INRatio PT/INR. FDA's CDRH wrote to HemoSense on October 14, 2005 (Pre-ROCKET):

---

[735] Nessel Exhibit 15
[736] Nessel Exhibit 15; XARELTO_JANSSEN_21443473
[737] Nessel Exhibit 11
[738] Nessel Exhibit 15, Nessel Exhibit 11
[739] FDA Warning Letter October 4, 2005
(http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2005/ucm075594.htm); FDA Warning Letter November 29, 2006 (http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm076188.htm)
[740] See Byra Exhibit 1; Byra Exhibit 2; Byra Exhibit 3; Byra Exhibit 5
[741] Byra Exhibit 1

*Our review indicates that your firm had information indicating that INRatio devices were generating clinically significant erroneous values. INR values are used to adjust anticoagulant medication dosages and must be accurate in order to permit appropriate use of these drugs. If the INR is too low, a patient will be prone to form bloods clots or stroke.  If the INR is too high, a patient will be prone to excessive bleeding. Therefore, both high and low test results have the potential to cause or contribute to a death or serious injury, because they may result in erroneous dosing and thus improper control of coagulation.[742]*

746. The FDA's next November 29, 2006 Warning Letter to HemoSense indicated that HemoSense's conduct with the INRatio PT/INR System remained in violation, stating if the device were to malfunction, it would result in serious injury or death.  The letter provided: "These violations include, but are not limited to, the following: failure of management with executive responsibility of ensuring that quality system requirements are effectively established and effectively maintained as required by 21 CFR 820.20 (b)(3)(i).  For example…devices not meeting performance specifications are not being investigated."[743]

747. On December 20, 2006, HemoSense sent out a letter to HemoSense Users ("Dear Hemosense User" Letter) describing FDA findings of serious deviations in Good Manufacturing Practices of the Quality Systems at HemoSense (21 CFR 820).  The description of the findings are significant, and despite the tone of the letter from HemoSense (or perhaps lack of understanding of Hemosense management), these findings all directly impact quality of devices it is making and releasing and selling and supports commercial HemoSense devices are not safe and effective devices. [744]

748. HemoSense said in its letter that, specifically, the FDA provided HemoSense with a set of directives and instructions for improvements in our processes following their inspection. The Warning Letter clearly indicates, among other things, that the FDA found HemoSense's response to be insufficient because it did not include analyses of root cause, and because the Company's corrective and preventive actions to address the specific observations had not yet been completed.

749. Despite the description of the FDA's findings, Hemosense then says: "It is absolutely critical to note that the FDA's concerns do not involve the quality, design or use of HemoSense INRatio meters of test strips, and do not raise any questions concerning our manufacturing process or our commitment to quality." That statement is totally inconsistent with the FDA's description of findings, which do directly impact Quality Systems and product released by HemoSense.

750. The HemoSense Letter continues that in fact "we recently received "ISO 13485: 2003" certification, which testifies to the quality of our production process and facilities." That has nothing to do with compliance with FDA's 21 CFR 820, which is a requirement for

---

[742] Byra Exhibit 2
[743] Byra Exhibit 5
[744] Byra Exhibit 4

products sold in the United States.  ISO 13485:2003 is often seen as the first step to achieving compliance with EU requirements.  It is not compliance with regulatory requirements such as the Quality System regulation for medical devices.

751. The two FDA Warning Letters, received before the start of ROCKET, should have made a reasonable manufacture seek to at least validate and monitor the performance of the INR devices in ROCKET before starting a worldwide non-inferiority study.

752. The FDA's November 29, 2006 letter goes on to describe pages of serious observations about the poor performance and quality of the INRatio devices and HemoSense management's lack of commitment to ensuring quality. [745]

753. Dr. Byra at his deposition in 2016 testified that he had no explanation why the two FDA CDRH HemoSense Warning Letter(s) were not circulated.[746]

## c.  OTHER HEMOSENSE INC. (ALERE) RECALLS

- **November 2005 Class 2 Recall**

754. The INRatio PT/INR System began commercial launch in March 2003.  There was a HemoSense Voluntary Class 2 Recall conducted in November 15, 2005, before of the start of ROCKET. The recall was related to 'software problems' occurring with Hemosense's INRatio meter.  There was the risk that it would incorrectly display an INR>7.5 under certain conditions (i.e. very high warfarin level).  FDA reportedly cited HemoSense for failing to investigate reports of "clinically significant erroneous" high and low INR results generated by the point of care device and the failure of HemoSense to investigate and file required Medical Device Reports (MDRs) with FDA (21 CFR 803). This class II recall information was on the FDA's website and was easy to obtain and examine during any type of due diligence review or consideration of HemoSense by Janssen.  Therefore, the same type of erroneous values with INRatio for INR had been identified in 2005.

> *Both high and low [INR] test results have the potential to cause or contribute to a death or serious injury, because: they may result in erroneous dosing and thus improper control of coagulation.[747]*

- **May 22, 2009 Class 3 Recall-HemoSense/Alere**

755. The FDA's published *Enforcement Report* had the HemoSense device listed as part of a Class 3 Recall. The action was officially announced by FDA on May 22, 2009, and terminated two years later on March 25, 2011 for 510(k) K072727 (INRatio 2 PT/INR Professional Monitoring System cleared October 26, 2007).  HemoSense sent out a letter titled "*Urgent Medical Device Recall Notice*" on December 19, 2008 (during the time

---

[745] Byra Exhibit 5
[746] Byra depo 4/5/16, p. 98: L7 – p. 99: L2
[747] Byra Exhibit 2

<u>that the ROCKET trial was ongoing).</u>  At this time, FDA classified the HemoSense notification of customers as a Class 3 Recall.

756.   The 2008 HemoSense letter explained to customers a problem with the new INR 2 PT/INR device, and instructed known users to discontinue use of the device, complete the provided reply form, and return the defective device back to HemoSense at 'Inverness Medical' (IMT).  Distributors were instructed to contact customers and provide the recall information.  The recall involved 921 units worldwide.

757.   There was no "Dear Health Care Professional Letter" sent out by HemoSense directly notifying/warning physicians caring for patients monitoring warfarin therapy at home that the HemoSense new INRatio 2 PT/INR System could give inaccurate values for warfarin monitoring.  An adequate notification should have included all physicians and other health care providers caring for patients taking warfarin including emergency room physicians.  This recall action was prolonged and extended from December 2008 through March 25, 2011, almost three years.

758.   According to the FDA, these recalled devices were manufactured with a specific EEPROM memory chip[748] failure which occurred during use.  The monitors would report an error code and not provide the patient a test result.  The INRatio 2 PT/INR Monitor System had been designed to be smaller than the prior INRatio PT/INR Systems, have a smaller display, and greater memory storage, with software accessible from multiple sites compared to only the menu with the prior device.  (See K092987 (above) submitted April 2010 and cleared June 11, 2010 for Biosite, Inc. for INRatio/INratio 2 Test Strips).

- **May 2014 Alere Inc. Conducts a Voluntary Class I Recall**

759.   Alere conducted a voluntary recall classified as Class I by FDA for Alere INRatio 2 PT/INR Professional Test Strips, Model # 99008G2.  The test strips were packaged from August 22, 2013 through March 28, 2014. The recalled test strips were cleared by K092987 for Biosite Inc on June 11, 2010.[749] The recall was Z-1546-2014.

760.   Alere San Diego, Inc. sent out a letter titled "*Urgent: Medical Device Recall*" dated April 16, 2014 via fax, email or direct mail.  The letter was sent to Alere customers to identify the affected product and describe the problem and actions, which should be taken.  Alere customers were instructed to discontinue use, return remaining inventory to Alere, and complete the verification form to acknowledge receipt of the recall.

761.   According to the FDA's website, on May 6, 2014 Alere Inc. issued a press release announcing a Class I recall made to the consumer/public level.  The press release announced Alere Inc.'s voluntary Class I Recall for its product sold in the United States -

---

[748] EEPROM= Electrically Erasable Programmable Read-Only Memory. A type of memory used in computers and other electronic devices to store relatively small amounts of data but allowing individual bytes to be erased and reprogrammed.  EEPROMS are arranged as arrays of floating-gate transistors.
[749] May 8, 2014, Class I Recall Z-1546-2014
(https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?id=126845)

Alere INRatio2 PT/INR Professional Test Strips (PN 99008G2) (K092987 cleared June 11, 2010).  The press release provided the reason for the recall, adverse event reports, reason for adverse event reports and that the Alere root cause analyses had not determined the cause. The press release was intended to notify customers to immediately STOP using the product.  It also was intended to provide a product description with codes, contact information, FDA MedWatch information and information about the Alere INRatio 2 PT/INR Professional Monitoring System (K072727).  The estimated quantity in commerce- 99,795 Total units.

762.   The reason for the Class I Recall according to Alere:

> *Test Strips may report an inaccurately low INR result. Several patients had a therapeutic or near-therapeutic INR with the Alere INRatio 2 PT/INR Professional Test Strip but a significantly higher INR (outside the therapeutic range) when performed by a central laboratory.*[750]

- **January 2015 Alere Conducts a Voluntary Class I Recall**

763.   On December 5, 2014, Alere initiated a field action for the INR PT/INR Systems that could deliver results that were "clinically significantly lower" than a reference laboratory method.  Alere sent out an Urgent Medical Device Correction letter dated December 5, 2014. Alere was recalling all monitor systems and INRatio Test Strips manufactured and distributed April 1, 2008 to December 4, 2014. The Class I Recall had received 18,924 complaints about the INRatio Test Strips from 2013-2014; however, not all were related to the recall.  There were reports of malfunctions, including 14 serious injuries.  The FDA upgraded the action to a Class I recall.  According to the FDA, "*use of the affected devices may delay treatment and cause severe or life-threatening injuries, including death*"'. The recall affected Alere INRatio and INRatio 2 Monitor Systems manufactured and distributed between April 2008 and December 2014.

764.   However, according to the *British Medical Journal* (BMJ) (below), "The company confirmed to *The BMJ* that the fault went back to 2002, before the ROCKET-AF trial started."[751]

765.   A falsely low INR reading could mean that a patient's warfarin dose would be unnecessarily increased, leading to a greater risk of bleeding. In terms of ROCKET, the falsely low INR values in the warfarin arm could contribute to a seemingly lesser risk of bleeding with rivaroxaban.  The flaws with the Alere Device and its Class I Recall casts doubt on the quality of the non inferiority clinical data and warfarin active control used to obtain FDA approval of Xarelto.[752]

---

[750] May 8, 2014, Class I Recall Z-1546-2014
(https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?id=126845)
[751] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.
[752] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

766. According to a January 28, 2015 Press Release,[753] after issuing a voluntary correction of the Alere INRatio and INRatio 2 PT/INR Monitor System in December, the FDA announced a Class I Recall after receiving 18,924 complaints of all types. Of the almost 19,000 complaints of malfunctions with the monitoring system, there were 14 with serious injury, including three reports of patient deaths and six reports of serious bleeding injuries.

767. As previously reported by 'Managed Health Care Connect', the voluntary correction in December informed patients in the United States that the device should not be used by patients with certain medical conditions. The patient conditions highlighted in the correction included patients with anemia or any type of a hematocrit less than 30%, any condition associated with elevated fibrinogen levels (*e.g.*, acute inflammatory conditions, chronic inflammatory conditions) and any bleeding or unusual bruising. "Further, the company recommended that individuals periodically verify their INR levels using a laboratory INR method."[754]

768. After the earlier May 2014 Alere-initiated voluntary Class I recall of the Alere INRatio 2 PT/INR Professional Test Strips (see above), the company announced its plan to transition customers away from the current Alere INRatio 2 PT/INR Professional Test Strips back to the Alere INRatio PT/INR Test Strip (PN 100139)[755]

*A Class I recall is "a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death" according to the FDA website.[756]*

### d. BRITISH MEDICAL JOURNAL (BMJ) UNCOVERS RECALLED INRATIO AS POC DEVICE USED IN ROCKET FOR APPROVAL OF XARELTO

769. The BMJ identified that the POC Alere device used to measure INR in patients taking warfarin as the active treatment arm in AFib patients in ROCKET-AF was recalled in December 2014. The BMJ became aware that the problematic device was used in the ROCKET-AF trial only after it reviewed European regulatory documents in April of 2015. The medical device used in ROCKET had not been identified in the published Phase III trials.[757]

---

[753] White ME. *Nearly 19,000 Complaints Prompt Class I Recall of INR Testing System*, Managed Healthcare Connect (January 28, 2016) (www.managedhealthcareconnect.com/articles/nearly-1900-complaints-prompt-clas-i-recall-inr-testing-system)
[754] White ME. *Nearly 19,000 Complaints Prompt Class I Recall of INR Testing System*, Managed Healthcare Connect (January 28, 2016) (www.managedhealthcareconnect.com/articles/nearly-1900-complaints-prompt-clas-i-recall-inr-testing-system)
[755] White ME. *Nearly 19,000 Complaints Prompt Class I Recall of INR Testing System*, Managed Healthcare Connect (January 28, 2016) (www.managedhealthcareconnect.com/articles/nearly-1900-complaints-prompt-clas-i-recall-inr-testing-system)
[756] White ME. *Nearly 19,000 Complaints Prompt Class I Recall of INR Testing System*, Managed Healthcare Connect (January 28, 2016) (www.managedhealthcareconnect.com/articles/nearly-1900-complaints-prompt-clas-i-recall-inr-testing-system)
[757] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

770. There is a September 4, 2015 email from Deborah Cohen, Investigations Editor, BMJ to Dr. Christopher Nessel, "Subject BMJ Inquiry about INRatio Device." She wrote that she was looking at devices used in clinical trials and noted that the ROCKET trial used the HemoSense INRatio POC. She also asked, "Are you aware of this recall notice relating to Alere's INRatio POC?"[758]

771.  In September 2015, the BMJ asked the investigators of the *NEJM* published ROCKET-AF study about the Alere recall.  The researchers were from Bayer, Janssen and Johnson & Johnson as well as at the Duke Clinical Research Institute (DCRI).  The Duke Clinical Research Institute had carried out the trial on behalf of the drug companies.

772. The BMJ asked Defendants and DCRI if investigators had complained to them about mismatches of POC results with laboratory INR readings when a patient had a bleed in the trial.  The BMJ also asked if Defendants had validated the performance of the device at any point before or during the trial.[759]

773. According to Ms. Cohen, none of the authors[760] of the published *NEJM* 2011 study for Xarelto involved in ROCKET responded. A spokesperson for Janssen later contacted the *BMJ* to say that "they were unaware of this recall" and that they took the journal's concerns "seriously". [761]

774. The BMJ contacted the European Medicines Agency (EMA) in April 2015, and subsequently the FDA.  Both told the *BMJ* they did not know that the Alere recalled device had been used in ROCKET-AF.[762]  In November, the EMA told BMJ it was investigating the issue, and the agency subsequently told the BMJ: "*Due to the defect it is now thought that the INR device may have impacted the clotting results in some patients in the warfarin group.*"[763] The executive director of EMA, Guido Rasi, called for further independent investigation into direct oral anticoagulants: "*It would be nice to have some independent study carried out to give confidence in the use of this medicine.*"[764]

775. The FDA reportedly told the *BMJ* it was "*aware of concerns regarding the INR device and its use in the ROCKET-AF trial and is reviewing relevant data.*" [765]  It subsequently announced  it would hold a public workshop[766] about the safety and effectiveness of point

---

[758] XARELTO_JANSSEN_15527978

[759] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[760] Patel MR, Mahaffey KW, Garg J. et al. Rivaroxaban versus warfarin in nonvalvular atrial fibrillation. NEJM 2011; 365:883-91

[761] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[762] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[763] Burger I. *Trial for Bayer drug Xarelto under scrutiny over defective device*. Reuters (December 9, 2015) (http://www.reuters.com/article/us-bayer-xarelto-idUSKBN0TR2DU20151209)

[764] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[765] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[766] FDA held a Public Workshop-Point of Care Prothrombin time/International Normalized ratio Devices for Monitoring Warfarin March 18, 2016 (http://webcache.googleusercontent.com/search?q=cache:4zpzRc_4TPkJ:www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM491546.pdf+&cd=2&hl=en&ct=clnk&gl=us)

of care INR devices "*to seek and identify potential solutions*" to what it called as "*scientific and regulatory challenges.*"[767]

### e.   DEFENDANTS' ROCKET AF TASK FORCE

776.  Defendants held a ROCKET AF Task Force on September 21, 2015. In an email sent to the Task force Members, the agenda included a discussion regarding a flaw in the INRatio device's algorithm which "led to fatal bleeding event in some" patients.

- *3400 devices of ROCKET included in recall*
- *Flaw in algorithm- mostly→ incorrect reading on low side*
- *9AEs that are basis of recognition*
- *3.1-12.2 INR units below traditional lab meas→omveranticoag pts, and led to fatal bleeding event in some.*
- *We did 12 and 24 wk sparse→we got hi% (5800 pts on warfarin in ROCKET), vast majority on same day*
- *Janssen- Some correlation mod strength .69 and .67 R value- Eun Young*
- *Lab Within 0.5 of device value~68% of time*
- *Workstreams*
  - *biostats-Eun Young/Len/James/CN*
  - *supportive-Purve/Shujan/MVE*
    - *Other trials and databases*
    - *Einstein*
  - *Competitive-Tina*
  - *Device stds-Purve-Dxstics*
  - *Communic with Reg and Journal- Christina Chan, CN-EC for ROCKET, Purve, JW*
- *Plan*[768]

### f.   GROWING CONCERN AMONGST PHYSICIANS ABOUT FAULTY DEVICE USED IN ROCKET

777.  An article published in Medpage Today on December 1, 2015 reported:

"*disturbing questions are being raised about the integrity and reliability of crucial data in the ROCKET AF trial, with important implications on several fronts…the trial co-chairman, Robert Califf, MD, has been nominated by President Obama to be the next FDA Commissioner…*

*The new questions go beyond the FDA reviewers original concerns and address the fact that the portable device used to monitor and calibrate warfarin usage in the trial appears to have been seriously defective…*[769].

778.  A December 3, 2015 article in BMJ provided:

---

[767] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.
[768] Nessel Exhibit 40
[769] Byra Exhibit 38

> *Data from the key phase III trial that allowed the oral anticoagulant rivaroxaban on the market for the prevention of ischemic stroke in non-valvualr atrial fibrillation is being reanalyzed because of the use of a faulty device…*[770]

779. A December 15, 2015 article in Handelsblatt reported that "A defective testing device was apparently used in clinical trials that led to the approval of Bayer's blockbuster anticoagulant drug, XARELTO. European drug safety authorities are now investigating… [and] Bayer shares dropped as much as 4.6 percent."[771]

780. A Febraury 22, 2016 article in *The New York Times* reported that "[t]he Food and Drug Adminsitration is investigating whether a faulty blood-testing device may have compromised the results of a clinical trial that led to the approval of Xarelto, a blockbuster anticlotting drug that has been prescribed to millions of Americans since it arrived on the market in 2011…"[772]

## g. FDA's JANUARY 2016 LETTER AND DEFENDANTS' FEBRUARY RESPONSE REGARDING USE OF THE INRATIO DEVICE IN ROCKET

781. FDA's January 12, 2016 letter referred to Defendants' admendents dated September 29, October 15, November 16 and December 14, 2015: "These submissions contained information related to the potential impact of the recall of the Alere INRatio Monitor Systems, which was the POC device utilized to measure INR in the phase 3 ROCKET-AF study. The submissions also contained various sensitivity analyses conducted by you as well as those requested by the EMA."  As a result of the FDA's review, the agency posed the following seven questions to Defendants:

> *Question #1: Please provide reports of any serious adverse event reports mentioning the INRatio device in ROCKET-AF*
> *Question # 2: Please provide your rationale for choosing the INRatio device, rather than a lab-based PT/INR tests or other POC PT/INR devices.*
>
> *Question #3: Please provide the models and serial numbers of PT/INR meters/instruments as well as the types and lot numbers for all device test strips during the trial…*
>
> *Question # 4: Please provide detailed information on the device modification, description of the modification, how the modification was implanted, whether/how the modification affects the performance of the device, etc.*
>
> *Question # 5: Please provide a summay report of information collected by the unblinded physician, if available and elaborate on the role and responsibilities of the unblinded physician that monitored the warfarin patients.  Please explain whether the unblinded physician had access to the laboratory-based INR determinations performed as part of the PK-PD substudy of ROCKET –AF and when.*

---

[770] Byra Exhibit 37
[771] Byra Exhibit 34
[772] Byra Exhibit 36

*Question # 6: Please provide details regarding the training of site personnel in the use of the POC device*

*Question # 7: Please clarify when the plasma samples, obtained for the PK/PD substudy, were analysed by the central labl for PTINR...[773]*

782. FDA's request to Defendants was to identify the potential malfunction of the INRatio device for the public, as well as in the ROCKET trial. Defendants' response was received February 5, 2016.[774] To answere FDA's first question, Defendants provided reports of serious adverse event reports mentioning the INRatio device in ROCKET-AF. Defendants conducted a search of Bayer's global pharmacovigilance database using the following search terms: HemoSense, INRatio, point-of-care, POC or device. Despite the FDA wanting to receive any and all reports related to HemoSense malfunction in ROCKET AF, Defendant's search was limited to only the specific search terms. If one of the search terms was not present in the SAE report, the SAE would not be identified.

*Q...my question was simply do you agree that this response was meant to be a full and accurate and complete description of any evidence in the possession of Janssen that would indicate a potential malfunction of the INRatio device in the ROCKET clinical trial...*

*A. What this is trying to communicate is a direct response to FDA Request Number 1.*

*Q. ...Do you believe Attachment 3 is a – is a complete description of the information available to Janssen that indicated the device malfunctioning in the trial?*

*A. First of all, there's -- we have no direct evidence that the device malfunctioned in the trial...[775]*

783. That statement by Dr. Nessel is directly refuted by internal documents and reports which show evidence of INRatio malfunctioning. As the individual reportedly most responsible for the conduct of ROCKET and adequate performance of the INRatio, his statements in 2016 are not consistent with the internal records showing evidence of known or knowable malfunction of INRatio in ROCKET.[776]

784. As an example, Dr. William Byra, Senior Director, Medical Leader, Internal Medicine, J&J Pharmaceutical R&D, sent an email to Sharon Kelly with copy to Bernard Chalecki and Christopher Nessel dated September 24, 2007 (still early in ROCKET), "Subject: Replace HemoSense Devices at site" . He asked, "please have someone contract SITE #049008" and have the HemoSense devices and test strips replaced. He continued:

---

[773] XARELTO_BHCP_07995641
[774] Nessel Exhibit 15
[775] Nessel depo 2/16/16, p. 147: L10 – p. 148: L23
[776] See Nessel Exhibit 16 through Nessel Exhibit 39.

> *Bud has spoken wih me and told me that there have been unusally high INRs for both warfarin and rivaroxaban subjects where out of character for the dose the subjects are receiving.  He continued*
>
> *I would simply inform the site that based upon INR values seen by our unblinded monitor, the machine may not be functioning properly.[777]*

785. Sharon Kelly, Clinical Study Manager, PAREXEL International Subject, responded on September 25, 2007, stating that it had been determined the site was not applying blood directly to the test strip from the finger, but from a blood sampling tube despite their training, whichproduced an INR value of 5 or 6. She did not provide any information on patient outcomes or safety.[778]

786. Dr Byra's response email: "They are slowly killing me".[779]

787.  Dr. Nessel subsequently confirmed that there is no reference to this site and malfunction in Defendants' response to FDA.[780]

788. Another example of clear notification of malfunctioning of the INRatio device for a warfarin patient (and medical action taken to preclude serious patient injury) is captured in a series of emails in October 17, 2007 by Jonathan Piccini, MD Division of Cardiology, DCRI which he sent directly to Dr. Nessel, Dr. Byra and K Schwabe, and copy to Dr. Mahaffey, "Subject: POC/SAE". Dr. Piccini had received a number of helpline calls that morning for a ROCKET patient at site #11008 (PI Luten, SC Shannon Douglas). The patient was warfarin naïve and was being titrated with study drug.  He presented to the office with hematuria, with a POC in the office of 2.9.  Four hours later, he developed severe epistaxis which required hospitalization, transfusion of 4 units of FFP and IV vitamin K.  He had an "unblinded" INR>10.  Dr. Piccini had spoken with the ENT team and told them not to unblind the physician and keep the INR quiet (to themselves), but the study MD had already tracked down the information. Dr. Piccini wrote: "the study PI, study coordinator, and family are very upset."  He continued that the PI has concern that the POC is "defective", since there was a 7 unit difference in the INR between the POC and serum assay within 4 hours.  Apparently, they had a previous episode of what they considered "bad POC data"…

> *I shared with them the differences between the POC and serum based assays, and reassured them that supratherapeutic INRs are picked up by the POC device (as has happended several times in this trial).  I did recommend that they should have the POC device checked/recalibrated and to notify their monitor.[781]*

789. This is patient was assigned to the warfarin arm (Patient #10997). In his deposition, Dr. Nessel contended that the reports were due to user error.  However, Dr. Nessel did admit

---

[777] Nessel Exhibit 17
[778] Nessel Exhibit 17
[779] Nessel Exhibit 17
[780] Nessel depo 2/16/16 p. 185: L13 – p. 186: L2
[781] Nessel Exhibit 18

that a new device was an option, which suggests that 'device malfunction' was a possible explanation for a patient event as described by Dr. Piccini.[782]

790. Dr. Nessel was asked if the patient incident described in the email "**Subject: POC/SAE**" was sent to the FDA to answer its response for SAEs (Request #1). Dr. Nessel was also asked why there was no reference to Patient #10997 in the Defendant's response to FDA and reports of SAEs. (see Defendants' Response to FDA February 5, 2016).[783]

791. Dr. Nessel could not confirm whether the event was reported to the FDA or whether it was even entered in the ROCKET complaint database.The lack of identification of this POC SAE in the ROCKET database raises serious concerns about the maintaining of an accurate safety database by Defendants, as well as the monitoring by Parexel.  Thefaulty adverse event handling and reporting for its clinical studies was already shown with RECORD:

> *As you can see from the search strategy on Page—beginning on page 3 and to  page 4, one of those five search terms would have had to appear somewhere in the SAE in order for it to have been caught in the search.* [784]

792. There is a PowerPoint provided to the FDA entitled "Hemosense Helpline_ROCKET_AHA07."  Slide 6 reads "Routine and prompt quality control is part of the ROCKE-AF point of care testing," which is an inaccurate statement.  However, in the final version of the PowerPoint submitted to FDA, this text is covered up by a box.[785]

## h.  DEFENDANTS DOWNPLAY THE SIGNIFICANCE OF THE FLAWS IN ROCKET TO PHYSICIANS

793. Defendants issued the following identical statements in December 2015: "We have conducted a number of sensitivity analyses. These sensitivity analyses confirm the results of the ROCKET-AF study and the positive benefit-risk profile of Xarelto (rivaroxaban) in patients with non valvular atrial fibrillation."[786]

794. In December 2015, lead investigator Dr. Manesh R Patel (DCRI) and other executive committee members[787] issued a "*Research Letter*" to the *NEJM*, for ROCKET AF and press release reaffirming the findings of ROCKET and non-inferiority of Xarelto to warfarin. This re-analysis reportedly occurred following notification of the recall in the Fall and was completed by December 2015.  It also occurred prior to completion of FDA's investigations of the issue including poor performance of the Alere device in the ROCKET study, identification of Alere's inadequate software changes and fixes to the commercial device and prior to FDA's June 2016 official request from Dr. Maisel that

---

[782] Nessel depo 2/16/16, p. 186: L5 – p. 191: L21
[783] Nessel Exhibit 15
[784] Nessel depo 2/16/16, p. 193: L16 - 23
[785] Byra Exhibit 31; XARELTO_JANSSEN_16397478
[786] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.
[787] Patel MR, Hellkamp AS, Fox KAA. *Point-of-care warfarin monitoring in the ROCKET AF trial*. NEJM (2015).

268

Alere voluntary withdrawal all Alere Devices from the United States market based on unacceptable risk for patients.

795. The ROCKET Executive Committee members by December 2015 were able to provide the results of a "secondary analysis of the trial findings" conducted based on the December 2014 statements in Alere's December 2014 Field Action which FDA subsequently classified, based on patient risk, as a Class I recall. The investigators continued to maintain the validity of the ROCKET date based on its own post-hoc review of the data:

> *The findings from the analysis are consistent with the results from the original trial and do not alter the conclusions of ROCKET-AF-rivaroxaban is a reasonable alternative to warfarin and is non-inferior for the prevention of stroke and systemic embolism with less intracranial hemorrhage and fatal bleeding.* [788]

796. According to a *Medscape* February 2016 article[789], the investigators pointed out in December 2015 that the statements in the "FDA's recall", the Alere voluntary Class I recall, and Alere's Medical Device Correction Notification indicated INR readings may be lower in patients with "*certain specific medical conditions,*"[790] including abnormal hematocrit levels, bleeding or unusual bruising, or conditions linked to higher fibrinogen levels. So the new analyses of ROCKET retrospectively identified study participants with any of the listed "clinical conditions" and compared outcomes in the treatment subgroups. A total of 37% of the patient population in ROCKET had a least one of the recall conditions distributed equally in each treatment group. When they looked at the entire patient population (primary results), those with none of the identified recall conditions versus those with any recall condition, they found no differences in rates of "stroke or embolism."

797. The subgroup in ROCKET-AF with none of the recall conditions identified by investigators appeared to have safety endpoints consistent with the primary results, with similar rates of overall bleeding and lower rates of fatal and intracranial bleeding seen among patients treated with rivaroxaban, but the analyses also found a higher rate of **gastrointestinal bleeding** for patients with rivaroxaban (hazard ratio [HR] 1.47 (95% CI 1.04-2.06). Bleeding rates were higher in both treatment arms for those with any recall condition, according to Dr. Patel, but "*with a trend toward a higher relative risk of major bleeding with rivaroxaban than with warfarin*" (*5.53 vs 4.79 events per 100 person-years, respectively*) - something not seen in those patients without any recall condition (*2.34 vs 2.68 events, respectively*). As not addressed by Dr. Patel and the Executive Committee, the re-analyses had shown 'subgroups of AFib patients' taking 20mg

---

[788] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.
[789] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)
[790] Alere conducted a Field Action (recall/notification) (Medical Device Correction Notification on December 2014 (Recall # Z-0880-2015) classified as a Class I recall by FDA (http://www.inr-care.com/ww/index/previous-recall-information.html). Alere notified health care providers that in patients with certain blood samples attributes (i.e. low hematocrit or elevated fibrinogen) the INRatio System may provide a discrepant low value. On April 16, 2014 Alere had a Class I recall for the Alere INRatio2/INR Professional Test Strips distributed August 26, 2013 through April 2, 2014.

rivaroxaban OD with an increased risk of 'major bleeding,' as well as increased HR of gastrointestinal bleeding on rivaroxaban compared to warfarin than initially identified in ROCKET.

798.   There was no mention by Dr. Patel of any future plans by Defendants to update its United States product insert or EMA product labeling, or to send a Dear Healthcare Letter regarding this bleeding risk information.Instead, Dr. Patel's conclusion from the retrospective analyses to Heartwire at Medscape in February 2016 were as follows:

> *This result runs counter to the concern that a potentially malfunctioning INR device in patients with relevant conditions would have led to incorrect low reading and inappropriate increase in warfarin dose, resulting in a higher warfarin bleeding risk in these patients.*

> *Given the totality of the findings, we concluded that we do not find a statistically significant interaction between the device in patients who may have had a condition and the outcomes of those patients. Therefore, we think the original trial conclusions are still held.* [791]

799.   Despite the re-analysis conclusions by investigators, Dr. Patel reported to Heartwire at Medscape in 2016: "*We recognize that there are people who may have concerns with these findings. We hope that the diligent, thorough analysis we've done will answer a lot of those concerns.*"[792]

800.   Alere and the FDA issued a Class I recall notice (highest risk) in December 2014 for the defective Alere INRatio Monitor System.  It was announced that the manufacturer had received 924 reports of device malfunctions.  But, according to Dr. Patel, the ROCKET AF Executive Committee were not notified that the device used in the warfarin arm was part of the recall until the Fall of 2015.[793]

801.   Dr. Harlan Krumholz (Yale University, New Haven, CT-) told BMJ that the *NEJM* should place "*an immediate expression of concern*" on the original 2011 ROCKET AF paper.  He thought the study "*should be considered of uncertain validity until a more thorough review can be done.*"[794]

802.   Following the release of the new data by Patel et al, Dr. Krumholz stated that the new data did not alleviate his worries.  Although he noted DCRI provided a "nice analysis to

---

[791] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[792] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[793] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[794] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

270

prove their trial valid," he wished they had done further analyses; he stressed that "*all*" data should be made public: "Why not share the data and let other take a look?"[795]

803. Dr. Krumholtz noted that further investigation into the trial is needed "*by an independent group of experts to quickly determine whether there are grounds for retraction.*" He continued, "*These questions cannot be easily answered by a single analysis. And there should be a public dialogue as to whether the findings are truly valid.*"[796] He reiterated his call for release of more data, noting that Defendants told him it would allow access to all trial information. However, Defendants reportedly refused to release the original data for review. The *BMJ* reported that a spokesperson said the company shares data only on studies for new medications approved after January 2014.[797]

804. In a letter submitted to the *NEJM* and shown before publication to the *BMJ*, a former FDA Cardiovascular and Renal Drug reviewer and Medical Officer for Xarelto, Dr. Thomas Marciniak, wrote: "The care for the warfarin control arm [in ROCKET-AF] appears to have been compromised."[798] He also stated that none of the publications in the *NEJM* for three direct oral anticoagulants included the names of the medical devices used in the clinical trials for warfarin monitoring. He thought that should be rectified and wrote to the *NEJM*: "You should require that the devices used in trials are clearly and specifically identified in your publications."[799]

805. According to the *BMJ*, Dr. Marciniak indicated that he would not rely on any re-analyses done by Duke, Defendants or FDA. His rationale was as follows:

> *Because they already missed the problems both in the trial and with the public marketing, I would not trust them to publish anything that is accurate-or that provides any details.*

> *He reportedly added that the datasets need to be released as "the only solution that would lead to unbiased analyses.*[800]

806. In February 2016, the EMA issued a statement based on Defendants' response to it that the issue with INR monitoring device in ROCKET-AF "does not change its conclusions on the overall safety or benefit-risk balance" of rivaroxaban in the trial. "This means that Xarelto can continue to be used as before, in line with current prescribing information."[801]

---

[795] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[796] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[797] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.; Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435)

[798] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[799] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[800] Cohen D. *Rivaroxaban: can we trust the evidence?* The BMJ (2016); 352:i575.

[801] Brauser D. *Validity of Pivotal ROCKET AF Rivaroxaban Trial Questioned*, Medscape (February 5, 2016) (http://www.medscape.com/viewarticle/858435); EMA. EMA concludes defective device in ROCKET study does

807. In response to the growing controversy over the reliability of the ROCKET AF results due to concerns over the use of a defective point-of-care (POC) INR device, the FDA published their ROCKET AF Reanalysis Reviews on September 26, 2016, stating that "Janssen and FDA independently formed a variety of analyses intended to characterize the impact of use of the INRatio device on the safety and efficacy results of ROCKET."[802]

808. The FDA further stated that they "used two mathematical modeling approaches to estimate the clinical outcomes results that might have occurred in ROCKET if a more accurate INR assay had been used to guide warfarin dosing…. Each of these analyses predicted a small decrease in the expected rate of major bleeding in the warfarin arm compared to the observed rate of 3.45 events per 100 patient years in ROCKET (reductions in the 3 models ranged from 7-10% of the observed rate)."[803]

809. The FDA ultimately concluded that:

*The information summarized above indicates that it is quite likely that patients in the warfarin arm of ROCKET unintentionally received higher doses of warfarin than they would have received if the INRatio device had provided results similar to those provided by the laboratory-based device at Duke. However, the effects of this increased intensity of anticoagulation on clinical outcomes were likely to have been quite modest. It seems very unlikely that if the device had performed similarly to the INR assessment device at Duke, the benefit/risk profile of rivaroxaban compared to warfarin would have been notably different from the profile based on the observed results of ROCKET. Accordingly, the conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.[804]*

810. As a result of this conclusion, the FDA Reviewers recommended "no changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory actions should be taken with respect to rivaroxaban. Our conclusions regarding the issues addressed by this review should be communicated to the public in a suitable manner, but not through any changes in labeling."[805]

811. In the body of their Review, the FDA Reviewers provided additional rationale as to this recommendation:

not impact Xarelto's safety [press release]. February 5, 2016 (http://www.ema.europa.eu/ema/index.jsp?curl=pages/news_and_events/news/2016/02/news_detail_002465.jsp&mid=WC0b01ac058004d5c1)

[802] FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at 1.
[803] FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at 2.
[804] FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at 3.
[805] FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at 3.

*Accordingly, the reviewers see no need for regulatory action at this time. We think that a labeling change to describe the modeling results would very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted. FDA might make a brief announcement regarding our conclusions and make this review or a summary of it available to the public online. A publication of our analyses in a journal might be desirable. If others think it is important to change labeling, we might add a simple statement that FDA has reviewed the INR and outcomes information in ROCKET and determined that the effect of use of the INRatio device on outcomes in ROCKET was too small to affect our prior conclusion that the benefits of rivaroxaban outweigh its risks relative to warfarin.*[806]

## XIV.  REGULATORY ACTIONS REGARDING POC DEVICES FOR MONITORING WARFARIN

### a.  FDA 510(k) CLEARANCE OF HEMOSENSE ALERE INRATIO DEVICE

812.  The HemoSense INRatio Prothrombin Time Monitoring System, 510(k) was cleared for marketing in the United States in 2002 by K020679 and K021923. HemoSense (later Alere) has a total of three cleared 510(k)s for all of its INRatio technology.

- **K020679- INRatio PT/INR Monitor**

813.  K020679 was submitted March 4, 2002 and cleared on **May 6, 2002** as "GJS" 21 CFR 864.7750 as a Prothrombin Time Test (PTT) based on claims of support for substantial equivalence to the predicate "Roche CoaguChek S System".   This is the only 510(k) cleared for HemoSense INRatio PT/INR System making a comparison to a "non-HemoSense predicate" (*i.e.,* the marketed Roche CoaguChek S System).

814.  In terms of the performance data provided to the FDA for HemoSense, the accuracy of the INRatio was reportedly compared by HemoSense to the CoaguChek S System (predicate) and a reference method in field studies (laboratory test samples) and found to be equivalent (r>0.90). Precision and linearity evaluations were performed by the Sponsor on the INRatio and the results were found to be acceptable.  Additional testing on interfering substances, and effects of patient <u>hematocrit</u> were performed and the results reflected in the labeling.  In terms of the comparison to the predicate device for FDA (CoaguChek S), the sponsor called the two devices substantially equivalent based on intended use and same userprofessional and point-of-care market.  FDA does no independent examination of the products (old and new) to ensure adequate performance

815.  Predicates and the new device do not have to have the same technology, only the same intended use without new issues of safety and efficacy.  The two products (HemoSense and CoaguCheck S) differed in clot detection methods. The CoaguChek S measures

---

[806] FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at 42.

*fibrin formation* via detection of *motion of magnetic particles.* The HemoSense INRatio measures (fibrin formation) via a *change in the measured electrical impedance of the sample.* There was no further discussion of clinical factors which may be able to alter or interfere with the final measurements (results) of the HemoSense INRatio device compared to the Roche CoaguChek S based on the change in measurement in the sample (i.e. there are no new issues of safety and effectiveness based on this change in detection method). Unlike HemoSense, which relied on control built into the paper test strip, the Roche CoaguChek predicate utilized external liquid controls.

- **K962571 CoaguChek PST System – Predicate for HemoSense INRatio PT/INR System**

816. K962571 is the clearance for the Boehringer Mannheim Corp CoaguChek PST System product code GJS. The 510(k) was submitted to FDA on July 1996 and cleared April 22, 1997. "This study shows that trained patients are able to obtain results that are as accurate as those obtained by health care professionals trained in the use of the CoaguChek System." The predicate for the CoaguChek PST was Boehringer Mannheim's K930454 CoaguChek, which was 510(k) cleared as SE to "Boehringer Mannheim's CoaguChek Plus System and a laboratory system called the MLA 700 Analyzer" for PT/INR determination.

817. Intended Use: "For quantitative prothrombin time (PT) testing in fresh capillary blood with the CoaguChek System by properly selected and suitably trained patients (or their care givers) on the prescription of the treating doctor." The 510(k) clearance provided draft labeling intended for health care professional.

- **Published Comparison of CoaguChek S (Predicate) to HemoSense INRatio**

818. There is a Taborski (2004)[807] published comparison of the CoaguChek S (predicate POC device), HemoSense INRatio (new device) and an established laboratory method for INR determinations. The authors thanked HemoSense for supporting this study. The HemoSense is a self-contained small meter and disposable test strips. The meter measures the change in impedance of the blood-reagent mixture during the process of coagulation and determines the Prothrombin time (PT) using a programmed algorithm. The INR is calculated using a standard formula INR = $(PT/Mean\ Normal\ PT)^{ISI}$. A 15µl drop of capillary blood is applied to the patient test strip. The test strip also contains two quality control channels which contain reagents (controls) designed to clot at a predetermined time regardless of the INR of the patient's sample. The on-board strip controls have been designed to fail if the test strips are not of acceptable quality and have been exposed to conditions of high temperature or humidity verifying the integrity of the test strips. As written by the authors, "*these on-board controls are a new feature of those*

---

[807] Taborski U, Braun SL, Voller H. *Analytical Performance of the New Coagulation Monitoring System INRatio for the Determination of INR Compared with the Coagulation Monitor and an Established Laboratory Method.* Journ of Thromb and Thrombly (2004) 18(2):1003-107.

274

*kinds of systems.*"[808]  After about two minutes, the result is shown on the display, and stored with the time and date in the memory of the meter.

819.   Reference testing was to be performed using patient citrated plasma samples of drawn blood performed on a STA Compact coagulation analyzer.  The other self testing device reviewed was the CoaguChek S (cleared in 1996).  The authors describe the CoaguChek S (the predicate cited by HemoSense in its 510(k)) as a meter with a digital display and disposable test strips. The meter incorporates a detector that recognizes iron oxide particles which move in an oscillating magnetic field, and cease movement when the clotting has finished. To start the reaction, approximately 10 µl of capillary or venous blood is placed on the application test strip. After 1-2 minutes, the INR result is displayed. Quality control unlike the HemoSense is performed using external liquid control solutions on separate strips.

820.   The systems were evaluated at two different centers in Germany. Center 1 had 63 orally anticoagulated subjects tested. Center 2 had 14 anticoagulated subjects and 5 healthy subjects.  All patients enrolled were familiar with self testing at home and used Biotrack 512, CoaguChek or CoaguChek S devices.  They were asked to compare the new HemoSense device to their (home) device(s). The samples were measured in terms of precision, accuracy, concordance and patient observations.  The negative comments from patients for HemoSense was that it required a larger drop of blood (15 µl vs 10µl ), took longer time for a result, and the PT% display was missing.  All patients noted the larger drop of blood required to fill the three chamber paper HemoSense strip.

821.   The INRatio and the CoaguChek S were compared with an established laboratory method.  The correlation coefficient of the comparison with the laboratory method was r=0.954 for INRatio and r=0.937 for CoaguChek S. The mean relative deviation from the laboratory method calculated according to Hill was **6.87%** for INRatio, rated "very good" and **9.72%** for CoaguChek S (good).

822.   The imprecision in the normal range (INR=1.1) showed a coefficient of variation (CV) of 7.8% (SD 0.09). In the therapeutic range (INR=3.9) the CV was 5.4% (SD 0.21) and **above therapeutic range (INR=5.3) the CV was 8.4%** (SD 0.44) rated satisfactory. The concordance of the CoaguCheck and the INRatio with the routine testing were 81% INRatio and 79% for CoaguChek which is considered state of the art.  In the hands of professionals the INRatio demonstrated very good accuracy and precision and an excellent technical reliability.

### b.  FDA CONVENED A PUBLIC DOAC DIAGNOSTIC TESTING WORKSHOP OCTOBER 2015

823.   The issues raised by the Alere InRatio device and inaccuracy in ROCKET triggered FDA's review of the larger public safety issue for POC devices. FDA convened a

---

[808] Taborski U, Braun SL, Voller H. *Analytical Performance of the New Coagulation Monitoring System INRatio for the Determination of INR Compared with the Coagulation Monitor and an Established Laboratory Method*. Journ of Thromb and Thrombly (2004) 18(2):1003-107.

workshop for diagnostic testing of DOAC drugs to determine when a patient's anticoagulant drug level was above or below "therapeutic range," putting them at risk for bleeding or thrombosis, to look for residual events prior to major surgery and to check for patient compliance.  According to the presentation by Stephan Moll, MD, University of North Carolina, in a PowerPoint titled: "When is Testing Needed? How to Interpret Tests?" the underlined range for rivaroxaban for the approved 20mg QD dose was in Francart et al *Thrombosis and Haemostasis* 2014.  The peak values on the table were 103-660 ng/ml and the trough values 8.9-92 mg/mL.[809]  The slide had a patient specimen slip performed by Laboratory Corporation of American, Burlington, NC:

> *Peak levels should be drawn 3 hours after oral dosing, Trough levels are drawn 24 hours after oral dosing.  Steady state is attained after 4 to 6 days of once daily treatment.  The peak and trough ranges were obtained from the following study and represent the median (5th to 95th percentiles). The 10mg dose study includes 135 patients and the 20mg dose study 131 patients.*

> *Mueck W, Borris LC, Dahl OE et al. Population pharmacokinetics and pharmacodynamics of once-and twice-daily rivaroxaban for the prevention of venous thromboembolism in patients undergoing total hip replacement. Thromb Haemost, 2008 Sep; 100(3):453-461[810]*

824. The Laboratory Corporation of American patient results for 20mg varied from the published table and were peak 159.6-359.8ng/mL and the trough 4.3-95.7ng/mL.  The data was to reflect "inter-individual variability".

825. In terms of the inter-individual variability, Dr. Moll proposed testing for obese patients (BMI>40kg/m2, weight >140kg); underweight; interfering medications; fragile elderly; borderline renal function; recurrent thrombosis on DOAC; major bleeding on DOAC; assessing disappearance of DOAC prior to surgery; dosing reversal agents; and to check drug compliance.  The UNC Experience was to identify all NOAC levels ordered at UNC from 6-2012 to 7-2015 (3 years).  There were 28 patients with 48 levels sent.  In terms of DOAC prescribing at UNC: Rivaroxaban 12,164; apixaban 7,700; dabigatran 3,128.  The majority of all patients receiving NOAC prescriptions at UNC received rivaroxaban (6/2012-7/2015).

826. The next PowerPoint presentation published on FDA's website from its DOAC Public Workshop was given by Bob Gosselin, CLS, UC, Davis Health System.  The hospital performed DOAC Assessments.  For rivaroxaban, the lab used Techniclone and Hyphen

---

[809] Francart S., et al. *Performance of coagulation tests in patients on therapeutic doses of rivaroxaban: A cross-sectional pharmacodynamics study based on peak and trough plasma levels.* Thromb Haemost (2014); 111:1133-1140.

[810] FDA Public Work Shop, October 26, 2015, Dr. Stephan Moll Presentation, *When is Testing Needed? How to Interpret Tests?* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)

Biomedical calibrators and controls.[811]   A slide was titled "The FXa DOAC Test verification of performance":

- *Rivaroxaban*

  - *Collaborative study with UNC-patient samples*
  - *LC-MS/MS provided by Lab Corp*
  - *Drug obtained from Janssen Pharmaceutical Inc.*
    - Enriched plasma studies.[812]

827. The Gosselin slide "*Comment with each result*" had the following comments about monitoring and adjustment for rivaroxaban and variability of results and reference to EINSTEIN-DVT published in 2008 for continued DVT treatment and the PK and PD data and **median drug trough levels of 32ng/mL (19-60ng/mL):**

> ***Rivaroxaban:***
>
> *Routine monitoring of Rivaroxaban (Xarelto) serum levels is not currently recommended with only limited data available for use patients receiving this drug. Results can vary depending on selected factors such as indication, renal function, daily dose and frequency of administration, with or without food etc.  In the EINSTEIN-DVT-Dose-Ranging Study (Blood 2008; 112:2242-2247), patients receiving 20mg rivaroxaban once daily for continued DVT treatment had median trough drug levels of 32ng/mL (19-60ng/mL interquartile range).  For further assistance regarding Rivaroxaban plasma levels please contact anticoagulation pharmacists.[813]*

828. Gosselin went on to recommend the collection of DOAC "trough" levels.  Since 2013, his facility had performed ~60 rivaroxaban levels. There was already a CAP (College of American pathologist) laboratory proficiency testing program for DABI and RIVA.  The DOAC assessment at UCDHS was as follows:

> ***DOAC- Is it still there?***
>
> - *Factor XA DOACS (FXa DOACS)*
>   - *Rivaroxaban, apixaban*
>   - *Drug calibrated anti-Xa*
>     - *LLQ is ~10ng/mL*
>
> ***DOAC-How much is there?***
>
> - *Factor Xa DOAC*
>   - *Drug calibrated anti-Xa*

---

[811] FDA Public Work Shop, October 26, 2015, Bob Gosselin Presentation, *DOAC Assessment at UCDHS: What's Important.* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)

[812] FDA Public Work Shop, October 26, 2015, Bob Gosselin Presentation, *DOAC Assessment at UCDHS: What's Important.* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)

[813] FDA Public Work Shop, October 26, 2015, Bob Gosselin Presentation, *DOAC Assessment at UCDHS: What's Important.* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)

- *Calibrators and Controls*
  - *Diagnostica Stago*
  - *Techniclone*
  - *Hyphen Biomedical*
  - *Similar raw data values with rivaroxaban and apixaban*

**DOAC Assessment in the US**
- *Based on recent College of American Pathologists proficiency survey:*
  - *~4,500 laboratories report PT and APTT*
  - *~ 400 laboratories report Anti-Xa measurments*
    - *UFH, LMWH, Hybrid*
  - *~ 20 laboratories report measurement of DOAC*
    - *21 anti-Xa*
  - *Only rivaroxaban?[814]*

829.  There are several slides showing in-vitro enrichment (NPP enriched) versus the use of commercial calibrators (Hyphen calibrators) versus patient samples. A slide titled "Different PT reagent response to rivaroxaban" depicted a linear relationship between rivaroxaban and PT when using Neoplastine CL+, R2G, Innovin, and Thromborel S.[815]

## c.  FDA OFFICIALLY CALLED FOR VOLUNTARY REMOVAL OF ALERE'S INRATIO SYSTEMS FROM THE UNITED STATES MARKET

830.  On March 31, 2016, a member of Alere gave a presentation to the FDA after Alere had been informed that FDA could initiate a mandatory recall and/or negative external public communications regarding INRatio. FDA requested that Alere consider product withdrawal. FDA was also concerned about the "randomness of data" in ROCKET-AF. FDA indicated that Alere did not understand the issues with its devices; 50% of lots were currently being rejected. The MDR analysis suggests that the "limited patient population" was still utilizing the INRatio device following the 2014 Class I Recall. FDA agreed there was no unfavorable trend; however, "the current number of serious adverse events is of significant concern."   The FDA Position was as follows:

- *Rocket AF trial data is startling, however FDA concedes this data may not reflect the currently marketed device*
- *MDR data in 2015 continues to raise significant concerns*
- *While lot release specifications may improve released lots there is no data to support this claim*
- *Software v.1.12 might improve the performance of the device, however, there is no data set to demonstrate real-world performance*

---

[814]  FDA Public Work Shop, October 26, 2015, Bob Gosselin Presentation, *DOAC Assessment at UCDHS: What's Important.* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)
[815] FDA Public Work Shop, October 26, 2015, Bob Gosselin Presentation, *DOAC Assessment at UCDHS: What's Important.* (http://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm459448.htm#webcast)

- *FDA continues to believe that compliance action is required for the currently marketed INRatio device.*
- *If Alere is unwilling to voluntarily recall the INRatio and INRatio2 devices the FDA will pursue an alternative action.*[816]

831.  FDA Center for Devices and Radiological Health (CDRH) sent a letter to Ms. Melissa D. Guerdan, Sr. VP, Global Quality & Regulatory Alere Inc., on June 14, 2016 (signed by William Maisel, MD, Ph.D. Deputy Director for Science and Chief Scientist, CDRH).[817] According to Dr. Maisel, he had received a May 23, 2016 email and a letter of June 1, 2016 from Alere, Inc. requesting he review the Office of In Vitro Diagnostics and Radiological Health (OIR) decision that Alere should conduct a voluntary recall of the Alere INRatio PT/INR Monitoring System "due to product performance concerns." The June 14, 2016 letter was his official response to that request.

832.  According to Dr. Maisel, the FDA (OIR) had expressed concerns about the acceptability of the performance of the 510(k) cleared INRatio System. Both Alere and OIR were in agreement there is a risk of discrepant (erroneous) low results with occurrence of therapeutic or subtherapeutic INR results with the System and with significantly higher INR results obtained when compared to the reference INR values obtained at a central laboratory. He listed the series of steps he knew had been taken by Alere to reduce the risk of a low value. His list included Alere's conductance of a CAPA investigation (CAPA-14-005) which identified that the software embedded in the meter could generate discrepant low results. Alere had conducted a Field Action (recall/notification) starting December 2014 (Recall # Z-0880-2015) notifying patients and health care providers that in patients with certain blood samples attributes (i.e. low hematocrit or elevated fibrinogen) the INRatio System may provide a discrepant low value. Alere had submitted a new 510(k) (K153774) in December 2015 to seek clearance to market a device with software modifications made to address the low results, particularly those of large magnitude (>4 INR units difference). Alere had also conducted studies to assess the proposed software modifications intended to support the performance of the "currently marketed product." Alere had also made a formal presentation to FDA on theINRatio/INRation2PT/INR Professional Monitoring System at the June 3, 2016 meeting.

833.  His decision after reviewing the information and administrative file, and after a meeting with Alere on June 3, 2016, was that there is a "*reasonable probability that the use of, or exposure to, the Alere INRatio System will cause serious adverse health consequences or death.*" He agreed with the OIR review team and management that actions taken and proposed by Alere were not adequate. He advised Alere to initiate a voluntary product recall that "*includes removal of the product from the market.*" He continued, "*Because this is a serious public health matter, CDRH may pursue additional actions, as necessary, to protect the public health.*" Dr. Maisel then provided the bases for his official decision about unacceptable risk and need for device withdrawal. His point #1: that FDA had already received more than 100 Medical Device reports (MDRs) from

---

[816] ALRX_00001679
[817] ALRX_00002509

January 2015 to April 2016 related to the INRatio System including reports of serious injuries and one death.  Included in the reports were dozens of cases of discrepant INRs where the INRatio INR value differed substantially from a contemporaneous reference INR. [818]

834. His point #2: Alere's INRatio (POC) device performed "*poorly*" in ROCKET-AF.  Dr. Maisel wrote:

> *INRatio performed poorly in ROCKET-AF. Although Alere contends that continuous improvements have been made to the INRatio System rendering ROCKET-AF performance "irrelevant" to the currently marketed system, Alere has not submitted performance data that validates the claim that the currently released and marketed device (or the device with software version 1.12) has sufficiently mitigated the risk of discrepant low values.*[819]

835. His point #3: Alere was underestimating the potential risk to the public. Alere maintained that "approximately 0.06% of the patient population was at risk of discrepant low (>-4 INR units from reference value) results and that 99.94% were unaffected." He indicated that the numbers significantly underestimated the rate of clinically meaningful discrepant low INR values in clinical use and the number of patients that could be impacted.[820]

836. Dr. Maisel's point #4:the MAPLE data provided by Alere to support the accuracy of the current on-market product and updated software (version 1.12) had significant shortcomings which limited utility in assessing the system's INR performance in terms of the intended use.  He raised issues about sample collection as well as the results, which demonstrated that the discrepant low error coding is inconsistent, even within the multiple replicates from a single patient on a single day.  There are differences in the system reading and the lab INR values that are clinically meaningful and could impact patient care decisions.  According to Dr. Maisel, the data from additional recently completed or ongoing studies (ELM, PINE and BIRCH) did not provide supportive evidence for performance.  The interim results of the PINE and BIRCH studies in patients with comorbid conditions and/or high clinical acuity (ER, ICU) associated with elevated fibrinogen and other actue phase proteins demonstrate a high frequency of INRatio Systems discrepant results with software version 1.10 and a high frequency of "enhanced effort coding" and discrepant results with software version 1.12.[821]

837. Dr. Maisel indicated he agreed with the recommendation of OIR for product removal from the market.  He also concluded that the software modifications proposed in version 1.12 do not provide a basis for leaving the product on the market.  A plan for withdrawal was to be provided to OIR by June 21, 2016.  He concluded that the "decision reflects the conclusion of my Center level review of your request."[822]

---

[818] ALRX_00002510
[819] ALRX_00002510
[820] ALRX_00002510
[821] ALRX_00002510
[822] ALRX_00002510

838. On July 11, 2016, FDA published a statement:  "**Alere to Initiate Voluntary Withdrawal of the Alere INRatio and INRatio2 PT/INR Monitor System**" on the FDA's website.  The FDA also indicated that "**FDA does not endorse either the product or the company**" just by publishing the communication on the FDA's website. The notice as written by Alere was as follows:

> *Following a collaborative process with the U.S. Food and Drug Administration (FDA) Alere Inc. will be initiating a voluntary withdrawal of the Alere INRatio and INRatio 2 PT/INR Monitoring System. Alere is working with FDA to determine the most appropriate timing for product discontinuation and will provide guidance on transitioning patients to an alternate solution to allow them to continue anti-coagulation monitoring in the least disruptive manner possible….*
> *In December 2014, Alere initiated a voluntary correction to inform users of the INRatio and INRatio2 PT/INR Monitoring System that patients with certain medical conditions should not be tested with the system….*
>
> *Over the course of the past two years, Alere invested in the research and development of software enhancements to address the potential, in certain cases, of the system to deliver a result that differs from that of another measurement method.*
>
> *Although Alere is confident that the software enhancements it developed and submitted to the FDA at the end of 2015 effectively address this issue, the FDA notified the company it believes the company's studies do not adequately demonstrate the effectiveness of the software modification and advised Alere to submit a proposed plan to voluntarily remove the INRatio device from the market.*[823]

839. On July 26, 2016, Alere San Diego sent out a Dear Healthcare Professional Letter titled "***URGENT: MEDICAL DEVICE RECALL Alere INRatio/INRatio2 PT/INR Monitoring System***".[824] The letter downplays (minimizes) the risk of the unit to the healthcare provider and the potential unacceptable risk for patients and changes in clinical management based on the erroneous data for INR. It does not instruct physicians to verify the INR reports of patients on the monitors and to check patients with questionable INR values that do not appear to correlate with the Alere readings.  Alere also does not reference that FDA has received over 100 MDRs, including the report of a patient death, nor does it indicate or address that an earlier device had performed poorly in ROCKET.

840. Instead the health care providers are told that this is a "*notification*" to inform them that Alere San Diego, Inc. is initiating the voluntary removal of the INR Monitoring System including the Alere INRatio Test Strips as well as the systems.  Physicians are not told to

---

[823] On July 11, 2016 FDA Published Alere's Voluntary Withdrawal on its website: http://www.fda.gov/Safety/Recalls/ucm510746.htm. Alere to Initiate Voluntary Withdrawal of the Alere INRatio and INRatio2 PT/INR Monitor System.
[824] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

<u>stop using the device immediately in patients</u> and to correlate any questionable results with alternative methods including laboratory INR.  The letter was not widely distributed (to ERs or urgent care clinics or hematologists, nurses caring for patients on warfarin that may have been using the flawed Alere System), but sent to  specific healthcare providers (customers) who have purchased an Alere System:

> *Our records indicate that you have received at least one Alere INRatio or Alere INRATIO2 PT/INR Monitoring System manufactured by Alere San Diego.[825]*

841.  The letter is inadequate and misleading in that there is no immediate mention about the risk for the systems to provide significantly discrepant values for patients, which could seriously impact a patient's warfarin management and safety.  Healthcare providers are not told that the performance of the Alere System for INR 'self-monitoring' is unreliable and that is why Alere was requested by FDA to withdraw it from the market.  There is also no mention about issues with design and software and that Alere's proposed software fix, according to FDA's Dr. Maisel, did not correct the problem.

842.  The reason for the recall, according to Alere, is that "*patients with certain medical conditions should not be tested with the system.*"[826] Alere reportedly identified this issue (*i.e.*, patient-related issues- not device issues) through its own internal investigations associated with the earlier recall of the Alere INRatio 2 PT/INR Professional Test Strips in **April 2014**. That recall was initiated based on the potential, "<u>in certain cases</u>", of the Alere INRatio System providing an INR result that was significantly lower than a result obtained using a laboratory INR system. The letter stated: "*As part of its commitment to ensuring the safety of patients, <u>Alere proactively reported</u> these device concerns to the U.S. Food and Drug Administration (the "FDA") and began conducting a thorough investigation of these events.*"  The letter continued: "*Any patient having significant discrepant low results on the Alere INRatio/INRatio 2 System as compared to the plasma-based laboratory INR method should immediately be transitioned to an alternate method for monitoring their INR.*"[827]  However, it implies again that it is only certain patients that will have problems and not the defective System, which understates risk: "*For example, discrepancies in which the laboratory INR value is 6 or greater and the Alere INRatio INR value is 3 or less are of particular concern.*"[828]  In the lower part of the letter, Alere describes a patient with significant risk of major bleeding at INR 6 but which would have only an INR of 3 by the Alere System. The Alere reading of 3 would have delayed identification of the bleeding risk for the patient.

---

[825] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

[826] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

[827] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

[828] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

843. Instead of conveying to physicians at the beginning of the letter to remove patients from the Alere System, it tells providers to continue patients on the Alere System "*as long as you ensure that you and your patients…adhere to the precautions and recommendations found in the Medical Device Correction Notification of December 2014 and current product insert labeling.*"[829]  There is nothing either the patient or healthcare provider has done to contribute to the risk for this device.  As Dr. Maisel said there can be variation in the results for a single patient on a single day.

844. At the end of the letter under the heading "CUSTOMER REQUIRED ACTION," customers who currently have one or more Alere INRatio/INRatio 2 PT/INR Monitoring Systems are told to "*transition as soon as possible to an alternate method to preform PT/INR testing, such as a plasma-based laboratory INR method or a point-of-care monitoring system from a different manufacturer.*"[830] This safety information should have been at the top of the letter.

845. FDA's MedSun Bulletin August 2016, Vol 16, Issue 8- Recalls and Safety Alerts states as follows:

> *INRatio and INRatio2 PT/INR Monitor Systems by Alere: Recall*
> *Although Alere is confident that the software enhancements it developed and submitted to the FDA at the end of 2015 effectively address this issue, the FDA notified the company that it believes the company's studies do not adequately demonstrate the effectiveness of the software modification and advised Alere to submit a proposed plan to voluntarily remove the INRatio device from the market.[831]*

**d.  FDA HARMONIZES NOAC LABELS**

846. NDA 202439 **S-015** signed by Mary R Southworth, Pharm.D on September 10, 2015, approved label changes intended to harmonize the presentation of the safety and efficacy data in the labels of recently approved "*non-vitamin K-dependent oral anticoagulants*" ("NOACs"). The changes included the graphic discussion of Defendants' ROCKET data which had been based on the flawed medical device for INR in the warfarin population as well as the poorly controlled warfarin population.  In Section 6, **Adverse Reactions** the presentation of bleeding events was amended – "*to eliminate redundancy, some information that once appeared prior to the bleeding table (and in Table 1) was deleted*". A forest plot was added to Section 6. The population used was On-Treatment plus 2 days:

---

[829] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

[830] July 26, 2016 Alere Dear Healthcare Professional Letter titled, "URGENT: MEDICAL DEVICE RECALL" (https://webcache.googleusercontent.com/search?q=cache:Rb88AlBw2SMJ:https://ensur.invmed.com/ensur/broker/ensurbroker.aspx%3Fcode%3D10002976E%26cs%3D25638327+&cd=1&hl=en&ct=clnk&gl=us)

[831] FDA MedSun Medical Product Safety Network Volume 16, No. 8 August 2016. (http://webcache.googleusercontent.com/search?q=cache:Wl-3hqwBYTAJ:www.fda.gov/downloads/MedicalDevices/Safety/MedSunMedicalProductSafetyNetwork/Newsletters/UCM516189.pdf+&cd=1&hl=en&ct=clnk&gl=us)

Figure 1 "*Risk of major Bleeding Events by Baseline Characteristics in ROCKET AF-On Treatment Plus 2 Days.*"  According to FDA's letter the following standard cautionary paragraph was included at the bottom of the forest plot:

> *Note: The figure above presents effects in various subgroups all of which are baseline characteristics and all of which were pre-specified (diabetic status was not pre-specified in the subgroup, but was a criterion for the CHADS2 score). The 95% confidence limits that are shown do not take into account how many comparisons were made, nor do they reflect the effect of a particular factor after adjustment for all other factors.  Apparent homogeneity or heterogeneity among groups should not be over-interpreted.*

> *4. In Section 14 **CLINICAL STUDIES**, the forest plot was amended to include the same subgroups as the plot in Section 6 and also to present the data in an identical way as Section 6.  The population used to generate the forest plot, however, is different than that in Section 6. The population used in Section 14 was Intent –to-Treat (ITT).*

> *5. In Section 12.3, **CLINICAL PHARMACOLOGY**, Pharmacokinetics, the effect of certain drugs on the pharmacokinetics of a NOAC were depicted in a plot rather than describing the study data in paragraph form.  To eliminate redundancy, the descriptions of the studies included in the plot were removed.[832]*

## e.  EMA AND ALERE

847.  On September 23, 2015, Defendants sent a letter to EMA regarding the issues with the INRatio device. Specifically, that the manufacture of the POC INR device had identified that the device in certain clinical conditions gave inapprorpaitely low INR values.  Upon receipt of the information a specific regulatory procedure (LEG) was initiated. The CHMP discussion was held in January 2016, and the Assessement Report was published on February 5, 2016, which contained multiple requests for Defendants.[833]

848.  Request #1: Clarification on the reasons for the delay in informing the EMA, considering that more than 9 months elapsed since the US alert and recall. Clarification on either the alerts or recalls that have taken place any other countries, including EU.

849.  Request #2: The MAH's view on the impact on the results reported in the ROCKET trials. The Company proposal for sensitivity analyses submitted by October 15, 2015 are supported.

---

[832] 9/9/2015 Letter from FDA to Jannsen, NDA 202439-S015 – Supplement Approval (https://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist)
[833] EMA Assessment Report dated February 5, 2016 (http://webcache.googleusercontent.com/search?q=cache:HshFz-ahIzQJ:www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Assessment_Report_-_Variation/human/000944/WC500201726.pdf+&cd=1&hl=en&ct=clnk&gl=us)

850. Request #3: Clarification whether the recalled device was used in other trials performed with Xarelto or any other development programmes, and submitted or intended for submission.

851. Request #4: Information whether other Regulatory authorities have been informed and subsequent actions were taken in any territory.

852. The draft response to to the EMA LEG 037 Request # 2 was as follows: [834]

> *The MAH's view on the impact of the results reported in the ROCKET trials- initial thoughts ahead of availability of sensitivity analyses*
>
> - *B/R (efficacy & safety) of Xarelto not altered (Results pending)*
>
> - *Issues related to the POC device/test strip leading to potentially discrepant INRs*
>
> - *Efficacy of rivaroxaban in relation to warfarin not anticipated to be affected, and was not observed to be changed (Results pending)*
>
> - *Safety comparison of rivaroxaban to warfarin not found to be alterd (Results pending)*
>
> - *Whatever effect device fault may have had on INR readings and possible dose adjustments based on them did not appear to affect results in ROCKET AF (results pending)[835]*

853. According to the CHMP Assessment Report dated Febraury 5, 2016, for ROCKET, Janssen purchased 3,000 INRatio devices from HemoSense, Inc. and Inverness Medical Inc. between 2006 and 2009. Alere informed JRD that the Urgent Medical Device Correction notification did contain information applicable to the PT/INR Monitor System PN 200361 in a formal letter on September 24, 2015.  The MAH (Bayer) was neither the manufacturer nor a distributor of the INRatio and INRatio 2Pt/INR Monitor System and the device was not chosen to monitor INR in any other development program other than the ROCKET AF trial program. The EMA request for more information on the device was forwarded to Alere. The EMA determined that Bayer was not aware of deficiencies of the INR device system in the ROCKET studies until September 9, 2015.  These clarifications were accepted by the CHMP.

854. EMA emphasized that it is the responsibility of Bayer, as MAH, to ensure that it maintains oversight of the safety profile and is kept informed on major issues, including the use of devices used during trials.  In addition, appropriate traceability of data generated by devices used during a study should be ensured by the sponsor and retained even after the study has been finalized.

---

[834] Derix Exhibit 10
[835] Derix Exhibit 10

855. The INRatio device was modified by the manufacturer (HemoSense) with a software program to encrypt the INR reading and maintain blinding. The read-out on the screen was seven-digit code that corresponded to the actual or sham INR value.

856. The INR shamming program developed for the IVRS was derived from a proprietary algorithm developed from literature and actual patient data from anticoagulation clinics in Sweden which included patients with AF receiving anticoagulation. A monitor unblinded to the study data was employed to review INR data and ascertain if subjects were frequently out of range. This monitor could consult with a physician unblinded to study data at DCRI to discuss specific cases.

857. CHMP's discussion did not mention being informed of any actions involving the FDA for investigation of this same issue. CHMP indicated, from a safety perspective, the major concern would be a potential for higher bleeding rates in the warfarin arms than would be expected in well manged warfarin therapy. This would mean that the initial conclusions reached by the CHMP when approving the NVAF indication, based on comparisons between the treatment arms, would potentially underestimate the bleeding tendency induced by rivaroxaban as compared to warfarin.

858. The CHMP had 6 more questions for the MAH to respond to for the calculation of INR values. The MAH provided an integrated response to CHMP questions 1-3.

859. Regarding the MAH's responses to Questions 1-3, the CHMP stated that "it must be emphasized that the provided INR laboratory data only reflects the INR results at two specific time points (week 12 and week 24) and that clinical decisions on dosing should not be based on a single INR measurement." It is concluded that the originally performed sensitivity analyses provided in October 2105 do not seem to capture the discrepancies observed at week 12 and 24. These analyses are based on retrospective identification of patients with clinical or laboratory conditions where the device estimated INR would be unreliable according to the Alere recall notice information. With the criteria set up in the 2007 ISO 17593 standards, the majority of samples were found to be concordant. These criteria are somewhat arbitrary and cannot easily be interpreted in terms of relevance to clinical decisions on dosing.

860. The CHMP acknowledges that there are also limitations related to the above analyses as they only represent two specific time points during treatment, approximately 11,000 out of 160,000 INR measurements, which were performed during the study.

861. As described in a later submission to the EMA for LEG 037, it was identified that the clinical team during development of the LEG response had not thought to include the data in the "INR Unscheduled Vists Process" (i.e. "Covance Recheck") at Covance, which were not in the sponsor's possession and were "outside the ROCKET AF clinical trial database."

862. The LEG 037.3 of July 2016 described the EMA becoming aware of an investigation occurring with the FDA. On June 30, 2016, the EMA received additional documentation

in relation to the 'signal' regarding the device used for INR testing in the ROCKET AF trial.  The information provided was requested by the CHMP at the time of its June meeting.  The request was worded as follows (and focused on actions of the FDA):

1.  *The MAH has informed the EMA of additional analyses being conducted in relation to the "attributable risk analysis" upon request from FDA. The MAH is asked to provide this information for further assessment.*

2.   *Considering the additional information received from Bayer in relation to the INR device issue, the CHMP requests the company clarify why these data/information were not provided in the framework of the initial assessment of the INR device.  Bayer is also asked to clarify what mechanisms are put in place in order to ensure that the company will in future comply with its legal obligations set out in Article 16(2) of Reguatlion (EC) 726/2004.*

863.  The EMA Rapporteur continued to discuss the responsibilities to the MAH:

> *There is no obvious reason to suspect that the MAH deliberately has withheld data or that there is a systematic failure in data handling.*
> *Nevertheless it may be argued that the MAH could have acted more proactively when they became aware of the uncertainties related to the point of care estimations of INR.  For completeness the MAH could spontaneously have requested the Covance data as soon as they became aware of the uncertainties related to the Alere device INR estimations. Furthermore, in the situation that emerged it cannot be regarded as far-fetched to analyse the consistency between the INR estimations provided by the device and by the analyses at Duke, respectively.  According to the Rapporteurs's understanding, this was done only after a specific request from the CHMP.*

864.  The EMA added that the MAH is reminded of its obligation to proactively and vigorously investigate and report any potentially important concerns that may affect the understanding of the safety profile or the benefit/risk balance of their products.[836]

## XV.  DEFENDANTS ENCOURAGE XARELTO FOR ACUTE CORONARY SYNDROME (ACS) DESPITE THE INCREASED RISK OF BLEEDING AND FDA'S REFUSAL TO APPROVE THE INDICATION (TWICE)

865.  There was an internal presentation on April 10, 2008 made to the Joint Steering Committee according to Draft Meeting Minutes.[837]  One of the studies presented was an ACS study, which would be conducted for the planned ACS indication. It would be filed as NDA 202-439 Supplement S-002 with FDA for marketing approval, but the ACS indication was denied for approval twice by FDA. The ATLAS ACS study was conducted from November 2008 through September 2011, at 766 sites in 44 countries. The mean duration of treatment with a study drug was 13.1 months.

---

[836] XARELTO_BPAG_39519273
[837] Burton Exhibit 31

866. The JSC approved a plan to approach Health Authorities with a Phase 3 study proposal based on a three arm study design, two active rivaroxaban dosages 2.5mg BID, and 5.0mg BID will be proposed and a study size of 12,500 patients.

867. Under the heading: "ACS: Second interim look at Phase 2 data (all 3,500 patients for 30 days)," Defendants indicated that "*enriching for higher risk patients increases the placebo event rate and preserves the Rivaroxaban effect.*" Under the discussion of the main results in terms of safety, in 2008 in the phase 2 studies there is an "identifiable dose-dependent increases in major, minor and clinically significant bleeding for Rivaroxaban" and the "BID dosing regimen outperforms the OD regimen" with the "risk of bleeding higher for OD versus BID." Defendants chose to use the 2.5mg BID and 5mg BID based on the risk of bleeding for the 5mg OD and 10mg OD in the Phase 3 trial:

> *Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding, and clinically significant bleeding; the risk of bleeding appears to be higher for OD versus BID dosing regimens for any given total daily dose (TDD) or strata; Rivaroxaban TDD of 5mg and 10mg appear to be the most suitable for study in Phase III, based on the bleeding data. Main efficacy data show that: "Considering the 5mg TDD and 10mg TDD panels, the BID dosing regimen continues to outperform OD dosing-this is true of both strata (aspirin only and aspirin plus thienopyridine); enriching for higher-risk patients increases the placebo event rate, and preserves Rivaroxaban's effect; both 2.5mg BID and 5mg BID dosing regimens present a positive net clinical benefit whereas the 10mg OD particularly on background treatment with aspirin and thienopyridine did not provide a positive net clinical benefit.*[838]

868. The JSC minutes continued to "*ACS: Phase III design to be proposed to Health Authorities (incl AP 76).*" The proposed Phase 3 study design had been reviewed and approved by J&J and BSP and academic partners and endorsed by the JSC. Enrollment is estimated for 18 months and total study duration will be 24 months. Both EPO2 EMA (July 2008) and FDA (July 2008) meetings for review of the Phase 2 data and Phase 3 study plans are scheduled. In addition, there are to be meetings with Health Canada (HC) and PMDA planned before start of the global Phase 3. The EMEA Scientific Advice Formal request was sent in March 2008. Briefing package preparation is ongoing for April 14, 2008. Both FDA and HC meetings will be held June/July 2008. Implementation of feedback into final protocol in July/August 2008 with FPFV in November 2008. In terms of the countries included in the ACS trial, a key success factor for the study is acceptance of the placebo (aspirin-only) arm by the local medical community and low logistics complexity. Faster recruiting/performing countries should have priority.[839]

---

[838] Burton Exhibit 31
[839] Burton Exhibit 31

869. Defendants published the ATLAS ACS 2-TIMI 51 study in the *New England Journal of Medicine* on January 5, 2012.[840]  The authors' conclusion:

> *In patients with a recent acute coronary syndrome, rivaroxaban reduced the risk of the composite endpoint of death from cardiovascular causes, myocardial infarction, or stroke.  Rivaroxaban increased the risk of major bleeding and intracranial hemorrhage but not the risk of fata bleeding.  (Funded by Johnson & Johnson and Bayer Healthcare; ATLAS ACS 2-TIMI 51 Clinical trials.gov number, NCT00809965)*

870. There is no subsequent disclaimer in the *NEJM* that the FDA has denied approval of this ACS indication twice based on the significant flaws including loss of patient follow-up called "informative censoring" by the FDA's CardioRenal Advisory Panel members. Other non-USA countries have denied approval of an ACS indication or XARELTO. At the FDA's 2014t Advisory Committee Meeting, there was an almost unanimous recommendation (10 votes against approval; 0 votes for approval; 1 abstained from voting) to not approve XARELTO for the ACS indication based on the increased risk of bleeding with lack of support of efficacy. There is also nothing to inform United States' physicians that XARELTO for ACS is an investigational indication that must be done within an approved IND in the United States.

871. According to Defendants' subsequent Briefing Document for the May 23, 2012 FDA Advisory Committee, Defendants requested approval of the indication for XARELTO to reduce the risk of thrombotic cardiovascular events in patients with acute coronary syndrome (ACS) [ST elevation myocardial infarction (STEMI), non-ST elevation myocardial infarction (NSTEMI), or unstable angina (UA)] in combination with aspirin alone or with aspirin plus clopidogrel or ticlopidine.  The Advisory Committee was asked to opine on the approvability of Rivaroxaban (2.5 mg BID) (TDD 5mg) for ACS.

872. The IND at FDA for the global Phase 3 study was IND #75,931. The support for this claim was two studies "ATLAS" Phase 2 and Phase 3:

> 1) **RIVAROXACS3001-** A Randomized, Double-Blind, Placebo Controlled, Event-Driven Multicenter Study to Evaluate the Efficacy and Safety of Rivaroxaban in Subjects with a Recent Acute Coronary Syndrome" (The **ATLAS ACS 2 TIMI 51 Trial** (The second trial of **A**nti-Xa/**T**herapy to **L**ower cardiovascular events in **A**ddition to standard therapy in **S**ubjects with **A**cute **C**oronary **S**yndrome) (Phase 3 trial in 15,526 subjects); (44 countries and 766 centers); and

> 2) **RIVAROXACS2001**, A Randomized, Double-Blind, Placebo-Controlled, Multicenter, Dose-Escalation and Dose-Confirmation Study to Evaluate the Safety and Efficacy of Rivaroxaban in Combination with Aspirin Alone or with

---

[840] Mega JL, Braunwald E, Wiviott SD, et al. *Rivaroxaban in Patients with a Recent Acute Coronary Syndrome*. NEJM (Jan 5, 2012), Vol 366 (No.1): 9-19.  [This article was first published online at NEJM.org on November 13, 2011]

Aspirin and a Thienopyridine in Subjects with Acute Coronary Syndromes (The **ATLAS ACS TIMI 46 Trial** (**A**nti-Xa **T**herapy to **L**ower Cardiovascular events in **A**ddition to aspirin with or without thienopyridine therapy in **S**ubjects with **A**cute **C**oronary **S**yndrome (Phase 2 trial in 3491 subjects).(27 countries, 297 centers)

873. The FDA's Cardio Renal Products Advisory Committee Panel members were specifically asked by FDA to comment on the substantial missing data, poor follow-up, predominantly attributed to withdrawal of consent for ATLAS.  In terms of effectiveness, FDA requested guidance as to how it should handle the data quality issues in ATLAS, including the 1,294 subjects who discontinued prematurely from the study, incomplete follow-up, missing vital status, and uncounted deaths.  The efficacy results appeared to be inconsistent with Rivaroxaban 2.5 mg BID (TDD 5mg) primarily reducing CV deaths and Rivaroxaban 5mg BID (TDD 10mg) primarily reducing MI.  In the small stratum for aspirin use with a thienopyridine, Rivaroxaban 2.5mg BID primarily reduced MI while increasing CV deaths and Rivaroxaban 5mg BID reduced both CV deaths and MI.

874. The FDA's Medical Officer Reviewer from The Division of Cardio Renal Products was Karen Hicks, MD.  Her review was completed April 30, 2012.  The NDA supplement (S-002) was submitted on December 29, 2011.  Dr. Hicks recommended approval after consideration of items other than the NDA data, including responses of both the Sponsor and the IDMC and medical need, despite the many issues with ATLAS ACS 2 TIMI 51 trial.  She indicated that she thought the 2.5 mg BID dose had been shown to reduce the rate for combined endpoint of cardiovascular (CV) death, nonfatal MI or nonfatal stroke, (non-inferiority) compared to placebo when administered in addition to standard care consisting of the stratum of (aspirin plus either clopidrogel to ticlopidine).  The difference between the treatment outcomes was driven predominantly by cardiovascular death, with little difference shown for myocardial infarction and no difference shown for ischemic stroke.

875. Dr. Hicks continued that compared to the 2.5mg BID (5TDD), Rivaroxaban 5 mg BID (10mg TDD) increased all bleeding events without providing any evidence of added efficacy.  Further, Rivaroxaban 5mg BID improved MI, but not CV death, which Dr. Hicks called "somewhat unexpected."

876. With respect to reducing 'all-cause mortality' for this population, a claim sought by the Sponsor, Rivaroxaban 2.5mg BID was shown to be only nominally statistically significant.  However, Rivaroxaban 5 mg BID (10mg TDD) was not supported as effective for ACS, and both combined Rivaroxaban doses (2.5 mg BID and 5mg BID) did not demonstrate  sufficient  statistical power for  reducing all-cause mortality.  Given the inconsistent results shown between Rivaroxaban 2.5mg BID and Rivaroxaban 5mg BID with respect to CV death and all-cause mortality, Dr. Hicks indicated she would not recommend that the Sponsor could not market XARELTO for an improved mortality claim for ACS.  Dr. Hicks also wrote that she considered that in all Strata, a total of 2,402 (15.5%) subjects discontinued from the study prematurely, including 1,294 (8%) subjects who "withdrew consent".  There were over 1,000 subjects remaining at the end of the trial

290

with unknown vital status. Additionally, there was incomplete follow-up and uncounted for deaths.  She indicated that the quantity of missing data in ATLAS Phase III could affect the overall interpretability of the trial.

877. The FDA's first Advisory Committee meeting for ACS was held on May 23, 2012.  The panel members were to consider approval of a 2.5mg BID (5TDD) and 5.0mg BID (10mg TDD) dose for ACS.  Representing Janssen for the approval of the NDA supplement, were Paul Burton, MD, Ph.D. (Janssen), Jessica Mega MD, MPH (Thrombolysis in Myocardial Infarction ("TIMI") Study Group), C. Michael Gibson, MD (TIMI Study Group), and Eugene Branwald, MD (TIMI Study Group).

878. There were FDA presentations from Karen Hicks, MD Clinical Reviewer and Thomas Marciniak, MD, Clinical Team Leader, both of CDER's Division of Cardiovascular and Renal Products.

879. Dr. Marciniak's PowerPoint presentation was titled: "*NDA 202-439 Rivaroxaban for Acute Coronary Syndromes*".  The first slide was titled: "ATLAS Challenge: Missing Data & Questionable Quality is it: Atlas Shrugged? Or the weight of the world is too great today?"  His presentation addressed the significant flaws of the ATLAS data and study, and unlike Dr. Hicks' recommendation, he did not support approval of ACS based on ATLAS:

> *Q. Why push for on treatment analysis?*
>
> *A. Rivaroxaban causes more bleeding & bleeding leads to more CV events & death.*
>
> - *ATLAS bleeding rates were higher with incomplete follow-up*
> - *ATLAS death & MACE rates were higher with bleeding*
>
> **Clinical Status Review Problems**
>
> - *309 "office" visit for "death" since last visit*
>   - *46 were patients otherwise reported alive*
> - *61 patients counted as living had at least one CSR reporting 'death'*
> - *Imbalanced by arm:*
>   - *11 in placebo arm*
>   - *23 in 2.5 mg arm*
>   - *27 in 5 mg arm*
>
> **ATLAS Conclusion**
>
> *ATLAS failed, not shrugged*
>
> *The missing data and quality problems preclude ATLAS from providing substantial evidence of effectiveness.*[841]

---

[841] FDA presentation for May 23, 2012 Advisory Committee Meeting at slide 25 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm305920.htm)

880. According to Dr. Hick's presentation, administration of rivaroxaban at either dose increased the risk of Non-CABG-Related TIMI Major Bleeding in all subgroups except those with a history of CHF in Stratum 2 receiving Rivaroxaban 2.5 mg BID. Those ACS populations showing a higher risk of bleeding with even the 2.5mg BID (5TDD) dose were identified as:

- *Subjects ≥75 years of age*
- *Subjects weighing <60 kg or ≥90kg*
- *Subjects with moderate renal impairment*
- *women*[842]

881. When the FDA's AdCom Panel was asked to vote as to whether or not Rivaroxaban should be approved by the FDA intended for ACS based on the ATLAS data, the vote was "Yes: 4, No:6, Abstain 1". The committee members voting "No" indicated that they could not rely on the evidence presented at the meeting for supporting use of XARELTO for ACS. There was a major concern expressed about the unacceptable bleeding risk and the need to counterbalance cardiovascular death (as a benefit) versus life threatening bleeds (a risk). There were concerns by the panel members about Defendants' loss of patient data and follow-up. The Panel members stated that one had to weigh whatmatter for patients (i.e. benefit) against the concerns (risk) and missing data. The panel members indicated they were not able to adequately judge the endpoint because of the missing data. The AdCom members stated that XARELTO may be potentially approvable if Defendant were to conduct a 2nd new trial, preferably using only the lower 2.5 mg BID dose (5mg TDD).[843]

882. The FDA subsequently denied approval of the NDA 202-439 S-002, still not permitting XARELTO to be marketed for ACS in the United States.

883. The FDA held a second AdCom Cardiovascular Renal Products Panel for XARELTO and ACS on January 16, 2014. Defendants had not conducted a new ACS trial as suggested by the AdCom members, but had performed a "re-analysis" of the original Phase III ATLAS data to support a second consideration for FDA approval of a new ACS indication. This time, the Defendants requested approval of the 2.5 mg BID dose. Defendants obtained additional missing data for patients in the study. On behalf of the Defendants at the FDA's AdCom meeting was Paul Burton, MD, Ph.D. (Janssen). He was joined by C. Michael Gibson, MD, MS (Coordinating Principal Investigator ATLAS ACS 2 TIMI 51). Others on behalf of Defendants were Roderick A. Little Ph.D., Jay Siegel, MD, and Marvin Konstam, MD. Presenting on behalf of the FDA were FDA's Clinical Reviewers Stephen Grant, MD and Thomas Marciniak, MD.

---

[842] FDA presentation for May 23, 2012 Advisory Committee Meeting at slide 36 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm305920.htm)
[843] FDA Summary Minutes of FDA May 23, 2012 Advisory Committee Meeting UCM310093 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm305920.htm)

884. The data for ATLAS was re-examined once again but now only in terms of the period of time prior to a significant patient loss to follow-up (or discontinuation) orr interference with Plavix.  Although not a concern described in the earlier AdCom summary of actions, the risk of bleeding appeared to be reduced if the time of exposure to XARELTO was reduced in the analysis.  Defendants requested to add a new supplemental claim to its request for FDA approval.  Defendants wanted to indicate that XARELTO reduces the risk of cardiovascular stent thrombosis.  The claim, according to Defendants, had been supported by its re-analysis of the original ATLAS-ACS data. Since the prior FDA AdCom meeting, the Defendants had obtained additional patient information about vital status to fill-in the missing patient data.

885. According to the FDA's Published Summary Minutes of the 2014 Advisory Committee Meeting, panel members stated that Defendants' having obtained the additional data on vital status actually "weakened" the original findings for supporting all-cause mortality. It was noted by the panel members that the new data obtained (and its weakening of the original results) suggested a "small degree of informative censoring" by Defendants. The FDA Summary Minutes further provide that despite the efforts to obtain missing data: "The Committee also stated that although tremendous efforts had been taken to obtain the additional data for ATLAS, the data did not have a large impact on the trial's statistical interpretation of the primary endpoint."

886. In terms of the FDA's requested vote by the panel, "Should rivaroxaban be approved for use in ACS?" The Panel voted almost unanimously against FDA approval (one abstention) – Vote: Yes 0, No 10 and Abstain 1.  The Panel members indicated that they felt the risk of Rivaroxaban at 2.5mg BID versus placebo (aspirin-only) did not justify a benefit for XARELTO for ACS and continued to raise "concerns" about "informative censoring in loss to follow-up".

887. According to the FDA' Summary Minutes, Question #6, the panel's vote for FDA approval of 2.5mg BID for ACS:

> **Committee Discussion**: *The majority of the committee agreed that rivaroxaban should not be approved for use in ACS. The committee members who voted "No" stated that there were concerns regarding the increased risk of bleeding. It was noted that study imperfections such as missing data and a high likelihood of informative censoring in loss to follow-up were also concerns.  Also, it was stated that a lack of confirmatory evidence made the p value of 0.03 insufficient to support a single trial, and that there are concerns that mITT and ITT are not robust enough to reliably establish benefit.  It was also stated that the magnitude and statistical significance of the risk associated with rivaroxaban greatly outweighed the magnitude and statistical significance of the benefit of rivaroxaban.* [844]

888. Subsequently, FDA once again denied approval of the NDA 202-439 S-002.  FDA held two FDA Cardio Renal Advisory Committee meetings for ACS. Both were not supportive of NDA Supplement S-002approval based on significant issues with the

---

[844] Derix Exhibit 61

ATLAS trial data.  The re-analysis with additional data raised concerns of "information censoring" by the Sponsors and resulted in an almost unanimous vote to deny approval based on unacceptable risk of bleeding without sufficient evidence of commensurate efficacy for this ACS population.

889.  FDA, unlike Defendants, will not disclose the existence of a marketing application at FDA before an approval letter is sent to the applicant.  This prevents FDA from disclosing publicly marketing applications for drug products that are not approved. (21 CFR 314.430 (b)) FDA has repeatedly denied NDA S-002 at 5mg BID (10mg TDD) and then at 2.5mg BID (5mg TDD) for ACS.  As an NDA denial, members of FDA would not be able to openly discuss the reason for denying ACS approval.  Defendants, unlike the FDA, are not prevented from discussing in the medical literature and with United States physicians the reasons why  XARELTO was denied FDA approval for ACS based on a lack of effaicy and  unacceptable bleeding at a 2.5mg BID (5mg TDD) dose.  Defendants would be prevented from implying or representing to US physicians that XARELTO has been approved or found effective for ACS.

890.  The results of ATLAS at the 2.5mg BID dose (5TDD), the excessive bleeding noted within the trial, and FDA's denials of NDA approval further support the need for therapeutic drug monitoring (even for a 5mg TDD dose) for protection of patients prescribed XARELTO, particularly in patients at  highest risk for bleeding.  As pointed out by the FDA at the public  2012 AdCom meeting, patients at increased risk for bleeding in ATLAS were:

- *Subjects ≥75 years of age*
- *Subjects weighing <60 kg or ≥90kg*
- *Subjects with moderate renal impairment*
- *women*[845]

891.  Unlike the United States, the EMA does market a 2.5 mg BID dose of XARELTO since authorization on May 22, 2013. However, the EMA required, as a post-authorization condition for marketing XARELTO in Europe for ACS, that Defendants perform 'Post-Authorization Safety Studies' (PASS).  Defendants' proposed ACS PASS protocol was submitted to the EMA PRAC on June 20, 2013. In a pre-submission meeting with the PRAC Rapporteur on February 18, 2014, a path forward was proposed to help address the PRAC's objections.  However, the EMA's Pharmacovigilance Risk Assessment Committee (PRAC) objected to Defendants' proposed ACS PASS protocol on December 5, 2014.  It was agreed that Defendants would expand their current epidemiological PASS programs for XARELTO to address safety concerns of the CMHP during its ACS review procedure as an alternative approach to Defendants conducting a PASS. Defendants updated the protocols for its existing epidemiologic programs, as well as

---

[845] FDA presentation for May 23, 2012 Advisory Committee Meeting at slide 36 (http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/ucm305920.htm)

added a new protocol to conduct an additional database study in Sweden. These proposals were all to be submitted by Defendants to the EMA as of May 2014. [846]

892.   Defendants were also required to add a new warnings statement to their Company Core Data Sheet (CCDS) regardingconcomitant use of 2.5 mg XARELTO with ticagrelor/prasugrel for the ACS indication.

893.   Currently the only authorized indication to sell  XARELTO 2.5 mg tablet is ACS.  The first approval of XARELTO for an ACS indication was November 8, 2012 in the Ukraine.  In the Defendants' 2014 PBRER, there is also a listing of a voluntary withdrawal of a request for marketing authorization for ACS (the 2.5 mg BID tablet) in Canada on December 12, 2013.  Defendants indicated to the EU in 2014 the voluntary withdrawal was the result of Health Canada's requesting additional data.  The company chose to withdraw its application. As of the 2014 PBRER, sale of the 2.5 mg tablet is authorized for a total of 41 countries, however, is only marketed by Defendants in 8 countries.[847]  As of February 28, 2014 for sale of the 2.5 mg tablet, a total of 654,060 tablets (total 869,660,925) have been sold worldwide, accounting for less than 1% of XARELTO sales.[848]

894.   Defendants PSUR for the period March 16, 2013 to September 15, 2013, as submitted to the EMA on November 20, 2013, further provides an "Overview" of regulatory activities for Defendants' ACS application.  On November 11, 2012, the Ministry of Public Health in Russia rejected the ACS application, but it was resubmitted by Defendants on June 11, 2013.  The Ministry of Health in Chile triggered a withdrawal of the ACS application by Defendants with resubmission on July 30, 2013.  The Ministry of Health in Brazil, rejected the ACS application, but it was resubmitted by Defendants on April 27, 2013.  On May 30, 2013, the Therapeutic Goods Administration/Australia withdrew the ACS submission by the Defendants without any resubmission.  On July 31, 2013, the Swissmedic/Switzerland rejected the ACS application.  On August 15, 2013, the Department of Health/Taiwan rejected the ACS application.[849]

## XVI.   EUROPEAN MEDICINES AGENCY (EMA) AND DEFENDANTS' ACTIONS WITH XARELTO

### a.   IN 2008, EMA REQUIRED DEFENDANTS TO DEVELOP AND VALIDATE COMMERCIAL LABORATORY METHODS FOR MONITORING XARELTO

895.   In the Rapporteur's Joint Response Assessment Report"CLINICAL" Assessment of the response to the CHMP Day 180 List of Outstanding Issues, issued on July 10, 2008, there is evidence of cooperation and willingness on Defendants' part to develop a method for

---

[846] Dyszynski Exhibit 27
[847] Dyszynski Exhibit 27
[848] Dyszynski Exhibit 27
[849] Dyszynski Exhibit 26

laboratory monitoring for patients at increased risk of bleeding prior to receipt of marketing authorization.[850] The EMA's Question #20 and Defendants' response:

> *The applicant is requested to further investigate the possibility to develop a laboratory test (e.g. an adapted anti-Factor Xa test) for monitoring of patients at increased risk of bleeding.*
> ***Response:***
>
> *There are a variety of laboratory assays for monitoring available, some of which may be adapted for the monitoring of rivaroxaban in a clinical routine.*
>
> *The most promising assays are prolongation of prothrombin time (PT) and inhibition of factor Xa (FXa) activity. Plasma concentrations of rivaroxaban correlate well with both principles in clinical pharmacology studies. Based on this information the commercially available PT assays and FXa assay(s) will be validated in cooperation with laboratories and distributors. The first steps in preclinical investigations have been initiated...*
>
> > *1. Different thromboplastin reagents used for PT vary in their sensitivity to anticoagulant drugs that directly inhibit FXa. ...Therefore, calibration standards with Rivaroxaban are required. Evaluation of standards with rivaroxaban for calibration of different PT assay in different laboratories was initiated. Preliminary results show that in reference plasmas spiked with rivaroxaban and frozen at $-30^0C$ up to 60 days PT values did not change during storage...*
> >
> > *2. Anti-Factor Xa activity is influenced by rivaroxaban; however, again no standard calibration is available. Therefore, validation of the Coamatic® Heparin assay for measuring rivaroxaban in human plasma for clinical diagnostics has been initiated with a local distributor (Haemochrom Diagnostica GmbH in Germany). This assay is a chromogenic kit for the determination for unfractionated heparin and low molecular weight (LMW) heparin in human plasma. This one-stage assay is optimized for LMWHs and Fondaparinux and can be used on a wide range of laboratory device...*
> >
> > *3. Another option may be the PiCT assay, which has to be modified to be sensitive for rivaroxaban[851]... The sensitivity increases in a modified assay (one-step approach)...this test is not yet validated. Activities to evaluate this approach are ongoing and introduced in the clinical trial program for Rivaroxaban (Treatment of VTE, Prevention of VTE in medically isll patients)*
> >
> > *4. Other assays such as diluted Russell' Venom Test or Hep Test may be taken into consideration.*

---

[850] Burton Exhibit 43
[851] Samama MM, LeFlem L, Guinet CD, et al. *Comparative responses of some clotting assays to fondaparinux, dabigatran and rivaroxaban*, Pathophysiology of Haemostasis and Thrombosis (2007); 36(Suppl1).

> *Future work will be directed to validate modified commercially available tests. The most promising are PT, PiCT (one-step procedure) and anti-factor Xa tests. Activities are ongoing to provide a stable and validated set of rivaroxaban calibrators (spiked plasma samples)*[852]

896. The EMA's Rapporteurs, Dr. Ljungberg and Dr. Broich, wrote that calibration standards with rivaroxaban may be a solution, but continued that Defendants' data variability with peak PT values may have come from its "sparse sampling" of patients in its clinical trials at 2-4 hours after dose of rivaroxaban (*i.e.*, during peak plasma concentration levels). The Rapporteurs also expressed expectation that additional laboratory methods would be forthcoming from Defendants and that those methods would be added to Section 5.1 of the label for patient monitoring and dose adjustment:

> *However, as was shown in the Neoplastin PT measurements of phase III studies, the difference between the baseline and maximum activity is low given the shallow rivaroxaban concentration/PT relationship and the variability is high with median PT and 90% prediction interval at baseline of 13 (12-15) sec and 18 (13-25) secs at peak 2-4 hours after dose. It should be noted that part of the large variability in the observed peak PT may be due to the sparse sampling with a sampling window of 2-4 h. The "true" maximum PT may thus be higher than 18 ms and the variability lower than observed.*

> *…It would however, be useful with a laboratory test that can be used to estimate the rivaroxaban concentration or factor Xa activity. Although it may not be possible to identify a cut-off predictive of bleedings, some information on expected normal range of this variable could potentially be used in monitoring risk patients, and be used in dose adaption, if needed.*

> *Information regarding range of PT (Neoplastin) at 2-4 h after dose at steady state (5th/95th percentiles ranged from 13 to 25 sec) is included in section 5.1 of the SPC, and can serve as a guide until a better laboratory test is available. Hence, the development of a new laboratory method can therefore be made as a follow up measure.*[853]

897. The Rapporteurs concluded that the issue of laboratory tests and monitoring of XARELTO would be subsequently addressed by Defendants' follow-up measure for authorization by the EMA (FUM):

> *Issue resolved with follow up measure.*[854]

898. When the EMA authorized marketing of XARELTO as a 10mg tablet for VTE-P on September 30, 2008, as discussed (above), one of the 'follow up measures' (FUM) in the Letter of Undertaking sent to Defendants as the Marketing Authorization Holder (MAH – BAYER) specified that Defendants would validate modified commercial methods and include the recommendation in its Summary of Product Characteristics (SPC):

---

[852] Burton Exhibit 43 at p. 19
[853] Burton Exhibit 43 at pp. 19-20
[854] Burton Exhibit 43 at p. 20

*...continue his work to validate modified commercially available tests for estimations of the pharmacodynamics activity of rivaroxaban (or rivaroxaban plasma concentration) that could be used in routine clinical setting.  After development of an appropriate validated method, the applicant should explore options to include recommendations in the Summary of Product Characteristics (SPC) including methodology for monitoring of pharmacokinetics (PK).  Progress to be reported regularly to the Committee for Medicinal Products for Human Use (CHMP) with the first report within 6 months and thereafter together with Periodic Safety Update Report (PSUR) updates (FUM 014)[855]*

899.   The Rapporteur continued in the 'Background Section' discussion to describe that before marketing authorization, Defendants had already begun working with several laboratory instrument manufacturers to help develop laboratory test methods, including rivaroxaban calibrators and control materials and for the adaption of established anti-factor Xa assay methods.  The laboratory testing was to be validated on multiple automated laboratory instruments to ensure precision and accuracy.  The testing was intended to be used by EU physicians to help with management and monitoring of patients' rivaroxaban plasma concentration when clinically indicated and with the goal to reduce bleeding risk and improve anticoagulation efficacy.  The Rapporteur set the acceptable rivaroxaban plasma concentration range: [20 ng/mL (low) - 500 ng/mL (high)].  This laboratory information was also to be included in XARELTO's label (SmPC):

*In order to fulfill the FUM, after approval of XARELTO 10mg the MAH has started collaborations with several manufacturers and suppliers of laboratory instruments and reagents that are managing IVDs.  The efforts were focused on the development of rivaroxaban calibrators and controls and the adaptation of established anti-factor Xa assay methods which in combination were to be validated on multiple automated laboratory instruments.  The objective of this approach was to allow individual laboratories to measure rivaroxaban plasma concentrations over a broad range including low concentration (e.g. 20 ng/mL) and high rivaroxaban concentrations (e.g. 500ng/mL) with well-defined precision and accuracy.  The availability of CE marked IVD assays to clinical laboratories in the EU was reported in the 5th Rivaroxaban Laboratory Test Update Report submitted November 10, 2011 with the response to FU2 14.4 together with PSU-005, Version 6 to fulfill the first part of the FUM.  With Type II variation EMEA/H/C/000944/II/016/G the availability of these tests was implemented in the European Product Information section 4.4 and 5.1.*

**Section 5.1 Pharmacodynamics**
*….*
*There is no need for monitoring of coagulation parameters during treatment with rivaroxaban in clinical routine.  However, if clinically indicated, rivaroxaban levels can be measured by calibrated quantitative antifactor-Xa tests (see section 5.2)[856]*

---

[855] Derix Exhibit 36 at p. 12
[856] Derix Exhibit 36

900. Later included in the CHMP's Assessment Report of April 19, 2012 was the following paragraph about the commercially available test for the measurement of rivaroxaban – activity/concentration (EMA/CHMP/83776/2012):

> ### 2.2.3 Update of sections 4.4, 5.1, 5.2 to address the post authorization commitment FU2-14.4¶
>
> *The introduction of a commercially available test for the measurement of the rivaroxaban activity/concentration has been evaluated in FUMs-14 and 18. An assessment of these FUMS has been distributed to the CHMP January 20, 2012 describing the anti-factor-Xa assay method introduced. In summary the following commercially available laboratory assays were investigated.[857]*

901. The following table provided a list of laboratory instrument manufacturers with suitable laboratory measurement devices sold in the EU in 2012 intended for determining patient rivaroxaban plasma concentrations.

**2.2.3. Update of sections 4.4, 5.1, 5.2 to address the post authorisation commitment FU2-14.4¶**

The introduction of a commercially available test for the measurement of the rivaroxaban activity/concentration has been evaluated in FUMs-14 and 18. An assessment of these FUMs has been distributed to the CHMP January 20, 2012 describing the anti-factor-Xa assay method introduced. In summary the following commercially available laboratory assays were investigated:¶

| Assay | Manufacturer | CE-Mark |
|---|---|---|
| STA-Rotachrom® Heparin Assay | Diagnostica Stago | Yes |
| STA®-Liquid anti Xa Assay | Diagnostica Stago | Yes |
| Coamatic® Heparin assay | Chromogenix* | Yes |
| Biophen Heparin 6® Assay | Hyphen BioMed | Yes |
| Biophen DiXaI Assay | Hyphen BioMed† | Yes |
| Technoclrom anti-Xa Assay | Technoclone | Yes |

\* Distributer – Haemochrom Diagnostica
† Based on information from the manufacturer CE mark certification has been achieved (not yet published on manufacturer's website)

¶

When calibration was performed with rivaroxaban in plasma, these tests allowed for detection of rivaroxaban plasma concentrations with acceptable precision from 20 ng/mL up to 500 ng/mL.¶

858

902. The EMA's Assessors commented in 2012: "The efforts taken by the MAH to provide recommendations for laboratory estimations of rivaroxaban activity/concentrations are recognised and they have been evaluated in previous procedures as described by the

---

[857] Derix Exhibit 36 at p. 13
[858] Derix Exhibit 36 at p. 13

MAH.  The strategy to focus on anti-Xa tests is supported by the available PK/PD data. In addition, some information on PT tests is also included in the SPCs." [859]

903.  The 2013 European label Summary of Product Characteristics (SmPC) for XARELTO provided:

> ### Section 4.5.5 Interactions with laboratory parameters
> *Clotting parameter tests (PT, aPTT, HepTest) are affected as expected by the mode of action of XARELTO.[860]*

904.  **Section 5.1 Pharmacodynamics** in the label was based on the EMA's follow up requirements for Defendants to work with the diagnostics laboratory industry:

> ### Section 5.1 Pharmacodynamics
>
> *Dose dependent inhibition of factor Xa activity was observed in humans. Prothrombin time (PT) is influenced by rivaroxaban in a dose dependent way with a close correlation or plasma concentrations (r value equals 0.98) if Neoplastin is used for assay. Other reagents would provide different results.  The readout for PT is to be done in seconds, because the INR (International Normalised Ratio) is only calibrated and validated for coumarins and cannot be used for any other anticoagulant...*
>
> *The 3-factor PCC reduced mean Neoplastin PT values by approximately 1.0 second within 30 seconds, compared to reductions of approximately 1.0 second within 30 minutes, compared to reductions of approximately 3.5 seconds with the 4-factor PCC. In contrast, the 3-factor PCC had a greater and more rapid overall effect on reversing changes in endogenous thrombin generation than the 4-factor PCC (see section 4.9)[861]*
>
> *The activated partial thromboplastin time (aPTT) and HepTest are also prolonged dose-dependently; however, they are not recommended to assess the pharmacodynamic effect of rivaroxaban.  There is no need for monitoring of coagulation parameters during treatment with rivaroxaban in clinical routine. However, if clinically indicated, rivaroxaban levels can be measured by calibrated quantitative anti-factor-Xa tests (see section 5.2)[862]*
>
> ### Section 5.2 Pharmacokinetics
>
> #### Pharmacokinetic/Pharmacodynamic relationship
>
> *The pharmacokinetic/pharmacodynamics (PK/PD) relationship between rivaroxaban plasma concentration and several PD endpoints (factor-Xa inhibition, PT, aPTT,*

---

[859] Derix Exhibit 36 at p. 15
[860] Xarelto_BPAG_25596407
[861] EU Product Information for Xarelto (June 2016) (www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000944/WC50005710.pdf)
[862] Derix Exhibit 36

*HepTest) have been evaluated after administration of a wide range of doses (5-30mg twice a day). The relationship between rivaroxaban concentration and factor-Xa activity was best described by the $E_{Max}$ Model[863]. For PT, the linear intercept model generally described the data better.  When Neoplastin PT was used, baseline PT was about 13s and the slope was around 3 to 4 s/(100µg/l). The results of the PK/PD analyses in Phase II and III were consistent with data established in healthy subjects.[864]*

## b. DEFENDANTS WERE REQUIRED TO RESPOND TO EMA'S REQUESTS FOR XARELTO SAFETY AND EFFICACY INFORMATION

- **2008 EMA's Rapporteur 'Encouraged' Defendants to Develop PK/PD Modelling and Therapeutic Concentration Guidance**

905. In the Rapporteur's Joint Response Assessment Report of July 10, 2008, prior to the first marketing authorization of Defendants' 10mg XARELTO for VTE-P in the EU, the comments for Question #20 has the Rapporteur encouraging Defendants to develop its PK/PD information in terms of future indications for XARELTO and to be able to correlate plasma concentration (Factor Xa activity) bleeding risk and efficacy:

> *The applicant is also encouraged to continue measuring rivaroxaban concentration and different coagulation parameters in phase II and III studies for future indications. This is important for evaluating the PK/PD, PK/efficacy, PK/bleeding and PD/bleeding relationships which may differ between different patient populations and different indications.[865]*

906. The Rapporteurs wrote about Defendants' development of PK/PD modelling for Rivaroxaban marketing in the 2008 review and the role of both PT and anti-factor Xa assay for determination of a therapeutic concentration range for rivaroxaban:

> *The PK/PD modelling showed an $E_{max}$ relationship between rivaroxaban concentration and Factor XA activity.  However, $EC_{50}$ was about twice as high as $C_{max}$ at 10mg qd suggesting a roughly linear relationship in the therapeutic concentration range.  The concentration/Factor Xa activity relationship seems to be steeper than for PT.  Hence, an anti-Factor Xa assay might be a better option than a PT assay at least for this indication with the dose of 10 mg qd.[866]*

- **2011 Defendants Provide EMA with PK/PD Information from Two DVT Phase II Dosing-Studies with Efficacy Identified at Plasma Concentration at Ctrough and Bleeding Risk at CMax**

---

[863] Derix Exhibit 36
[864] EU Product Information for Xarelto (June 2016) (www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000944/WC50005710.pdf)
[865] Burton Exhibit 43 at p. 20
[866] Burton Exhibit 43 at p. 19

907.  In the EMA September 22, 2011 Assessment Report, the assessor wrote about reviewing the initial marketing authorization application.  The pharmacokinetics (PK) of XARELTO was studied both for fasted and fed states and in Japanese and Chinese volunteers.  For AUC the non-linearity proportional to dose became "most marked" in fasted volunteers starting at a rivaroxaban dose > 15mg.  In contrast, giving rivaroxaban in the fed state the AUC remained proportional to dose up until 30mg in Caucasian volunteers and 20 mg in Japanese and Chinese volunteers, at which time the non-linearity became pronounced.  There was also an upper ceiling effect reached at 50mg in volunteers when there was no additional increase in rivaroxaban exposure detected:

> *The assessment of the initial marketing authorization application concluded that rivaroxaban displays dose dependent pharmacokinetics with less than proportional increase in AUC as the dose is increased.  The non-linearity is most marked in the fasting state, where the non-linearity starts at doses above 15mg. However, in fed state the pharmacokinetics seemed to be fairly proportional up to 30mg in Caucasian volunteers and to 20 mg in Japanese and Chinese volunteers.  A ceiling effect with no additional increase in exposure with increased dose is reached at doses of about 50mg.[867]*

908.  The Defendants' population PK and PK/PD analysis for XARELTO in 2011 was for expanded DVT/PE indications.[868] According to the Assessor, it consisted of a total of 870 patients derived from its Phase II Study 11223 (**ODIXa-DVT**)[869]  and Phase II Study 11528 (**EINSTEIN-DVT**)[870] studies for treatment of acute symptomatic DVT. [871] According to the CHMP Assessment Report, for rivaroxaban clearance, there was inter-individual variability of 39.9%, for volume of distribution inter-individual variability of 28.8%.  In addition, Study 12362 demonstrated a dose proportional increase in AUC and $C_{max}$ with increased dose in the dose range of 10 to 20mg when taken in the fed state.  There is a tendency for less than proportional increase in $C_{max}$ with dose and slightly longer $t_{\frac{1}{2}}$ at the 20mg dose, reflecting a slightly slower absorption with increased dose and absorption rate limited by elimination.[872]  There is no mention of Study 11527 or Study 1044 with PK/PD data or PK000131 that was given to the FDA.

909.  Study 11223 is titled "Oral Factor Xa Inhibitor BAY 59-7939 in Patients With Acute Symptomatic Proximal Deep Vein Thrombosis ODIXa-DVT Study."  It was a prospective randomizd, multinational, multicenter, partially blinded, parallel-group, open-label active comparator controlled phase II dose finding and proof of principle trial.  It was conducted from March 24, 2004, to October 5, 2005.  The date of the Final report was Augsut 3, 2006 with sign-off by E. Muehlhofer and H. Beckmann, It was conducted by Bayer Healthcare AG and medical research number MRR-00150.  Yhe coordinating investigator was Prof G Agnelli.  636 patients were enrolled at 107 active sites in 19

---

[867] Derix Exhibit 71
[868] Derix Exhibit 71
[869] Derix Exhibit 71
[870] Derix Exhibit 71
[871] Note that for the FDA they referenced two phase IIb dosing studies for VTE-P, Study 11527 and Study 10944, combined in PK000131.  The earlier study used for FDA was Study 10942.
[872] Derix Exhibit 71

countries, but no centers listed in the United States.  604 subjects were valid for safety analysis, 543 for ITT, and 528 for PP analysis.  Rivaroxan was supplied as 10mg, 20mg and 30 mg tablets for BID, and given 40mg OD patients (2 x 20mg).  The planned treatment was 84 days with a follow-up of 1 month.  The comparison was to enoxaparin for 5-7 days, and each country chose the vitamin K antagonist to use as SOC.[873]

910.   In Study 11223, VTE events and major bleeds were rare in each treatment group.  At Day 21, the response rate within BAY 59-7939 ranged from 44% (40mg OD) and 59% (20mg BID), with response rate comparator 46%. Based on the trend calculation, a dose-response relationship could not be established.  No statistically significant differences were observed between the BAY 59-7939 response rate and comparator.  A total of 14 subjects died during the study.  Most died from malignancies, the death of four was associated with either a PE (3) or bleeding (1).[874]

In Study 11223, all major bleeding occurred in the rivaroxaban groups, with the greatest bleeding in 30 mg BID.  Major bleeding 10mg BID-2(1.7%); 20mgBID 2 (1.7%), 30mg BID 4(3.3%) and 40mg OD 2 (1.7%), enoxaparin 0. Non-Major bleeding 10mg BID-4(3.4%); 20mg BID 9 (7.7%), 30mg BID 11(9.1%) and 40mgOD 12 (9.9%), enoxaparin 8(6.3%).  There were more TEAEs related to gastrointestinal disorders on treatment with BAY 59-7939 than on VKA/enoxaparin.   The EMA is told that "due to the low number ofpatients with full profile data no separate PK/PD and subseqnet statistical evaluations were performed for this cohort.  Instead, the data were completely added to the data set for the PK/PD modeling evaluations.[875]

911.   According to the CHMP Assessment Report, bioavailablity (BA) of the 20mg strength dose in the fasting state was 66% (Study 11938, PH-35231) in 23 patients.[876]  A high-calorie high-fat breakfast (fed state) increased rivaroxaban AUC by 39% and $C_{max}$ by 76%.  Absorption was delayed in the fed state showing a lag-time of approximately 1.5 hours and a delay in median $T_{max}$ of about 1.25h.  The food effect on the 15mg strength dose was not evaluated in a specific study. However, cross-study comparison suggested an 18% increase in AUC and 86% increase in $C_{max}$ with food.[877]

912.   The CHMP Assessment Report contained "Primary and Secondary Pharmacology" for VTE-T, with phase I dose escalation studies in normal volunteers showing Factor Xa inhibited in a 'dose-dependent way' over the complete dose range closely following the pharmacokinetics of rivaroxaban.  The other global clotting tests PT, aPTT and Heptest were also affected in a dose-dependent way.[878]

913.   The 10mg dose resulted in maximal reduction of Factor Xa activity by 33% (SD 5.1%), and a maximal prolongation of PT of 38%.  The 20mg dose resulted in a maximal

---

[873] XARELTO_BHCP_00006198
[874] XARELTO_BHCP_00006198
[875] XARELTO_BHCP_00006198
[876] Derix Exhibit 71 at p. 16
[877] Derix Exhibit 71 at p. 16
[878] Derix Exhibit 71

reduction of Factor Xa activity by 55%, and a maximal prolongation of PT of 98%. According to the CHMP Assessment report: "*All pharmacodynamic parameters investigated in phase I trials correlated closely with the plasma concentrations.*" [879]

914. The Assessment Report continued to describe the assessor's understanding of the relationship between plasma concentration and effects on PT, FXa activity, based on Defendants' use of Phase I studies in normal volunteers and PK/PD simulation (using observed rivaroxaban concentrations, PT and HepTest results) to estimate $E_{max}$, $EC_{50}$[880] for its 2011 submission requesting VTE-T authorization. The EMA was told that Defendants had determined that PT directly correlated (linear) with rivaroxaban plasma concentration up to 700 ug/L, with baseline PT at steady state =12.5 seconds, and rivaroxaban $EC_{50}$= 376 ug/L, and **FXa activity ranged between 0.9 and 1.1 U/mL.**[881](bolding added for emphasis)

> *The relationship between plasma concentration and effect was evaluated in the population PK/PD analysis of data from the two phase 2b dose-ranging studies. A linear intercept model for PT, and $E_{max}$ model for factor Xa activity, and a combined linear-$E_{max}$ model for the HepTest were used. Observed rivaroxaban concentrations were used as input in the PK/PD models. Rivaroxaban concentrations* **up to 700 ug/L correlated with PT in an almost linear fashion***. At* **steady state, baseline PT was estimated to be 12.5 seconds** *and the slope of correlation was 3.3 seconds/100ug/L. For FXa the baseline FXa activity value differed somewhat between studies and study days and ranged between* **0.9 and 1.1 U/mL** *and the* **$EC_{50}$** *of rivaroxaban was 376 ug/L and* **$E_{max}$ 98.4%***. The PK/PD parameter estimates of PT were very similar in the above analyses and those previously obtained when using* **Neoplastin** *in surgery patients. The $EC_{50}$ for FXa was somewhat higher than that estimated in surgery patients (376 compared to 296 ug/l).*

915. Defendants provided the EMA reviewer with its two Phase II dosing studies as adjudicated to show the correlation in terms of bleeding risk and/or efficacy in the dose-ranging studies proposed for VTE-T. The Assessor provided a brief discussion of the two studies received from Defendants as adjudicated efficacy and bleeding events: Studies 11223 (ODIXa-DVT) and 11528(EINSTEIN-DVT) (PH-34764). According to the Assessor, Defendants found that rivaroxaban efficacy was best correlated with plasma concentration at "$C_{trough}$". The plasma concentration values for bleeding risk were best correlated with Cmax values. The data also showed that a gain in efficacy of a higher dose would be marginal in terms of the increased bleeding risk of higher drug exposure.[882]

> *A post-hoc, exploratory analysis of the relationship between estimated steady state $AUC_{0-24hr}$, $C_{max}$ and $C_{trough}$ and adjudicated efficacy and bleeding events was*

---

[879] Derix Exhibit 71 at p. 18
[880] EC50= half maximal effective concentration refers to the concentration of drug which induces a response halfway between the baseline and the maximum after a specified exposure time. Used to measure a drug's potency.
[881] Derix Exhibit 71 at p. 18
[882] As detailed above, the Assessor indicated that Defendants had already identified that PT had a direct linear correlation with plasma concentration up through 700 ug/mL.

*evaluated in rivaroxaban treated subjects from **Studies 11223 and 11528** (PH-34764)...The analysis suggested that the decrease in incidence of a VTE deterioration until week 12 was best correlated to $C_{trough}$ values, while any/clinically relevant bleeding events tend to show the most pronounced increase with higher values of $C_{max.}$ To some extent this evaluation supports the selected dose.  The obtained exposure response relationships suggest that the gain in efficacy with a higher dose than the proposed would be marginal while there is an increased bleeding risk at higher exposure.*[883]

916.   The CHMP Assessment Report addresses two Phase 2 studies labeled as "Supportive Phase II trials".  They are provided here since they will be referenced by Defendants in response to the EMA's request for PK/PD data and addressing a relationship of rivaroxaban plasma concentration to exposure response outcome.  For both studies, the Assessor indicated that assessment of all efficacy and safety outcomes had been done by central and independent adjudication committees, which were unaware of treatment allocation.  The Assessor provided the following description and tables:

**Study 11223(ODIXa-DVT)** - Acute symptomatic DVT (treatment) without symptomatic PE.  (Secondary prevention of VTE after initial DVT) It is a randomized, partially blinded (double-blind for rivaroxaban and open-label for the comparator) parallel group.  The rivaroxaban regimen is 10mg BID, 20mg BID, 30mg BID and 40 mg OD for 12 weeks.  The comparator treatment is Enoxaparin BID overlapping with followed by VKA for a total of 12 weeks. The number of subjects randomized to rivaroxaban 487 (R), 478(VFS) 433 (ITT) and 419 (PP).

Between Table E-1 and E-2, the greatest loss of patients occurred in the 20mg BID (40mg TDD) group with 17 lost, followed by the 10mg BID (20TDD) with 13 lost, the 30mg BID (60mg TDD) with 10 lost and finally 7 from the 40mg OD (40TDD)group.  Study 11223 is called a 'proof-of-principle' and dose-ranging study in subjects with confirmed acute proximal DVT.  The safety population for Table E-2 is 478 patients exposed to rivaroxaban. There were three Thromboembolic Events (TE) in the ITT rivaroxaban treatment population- 1 proximal DVT in the 10mg BID treatment, 1 in the 20mg BID treatment group.  There was 1 non-fatal PE in the 30mg BID treatment group. (See Table E-2 Study 11223 from CHMP Assessment Report below).[884]

---

[883] Derix Exhibit 71 at pp. 18-19
[884] Study 11223 (ODIXa-DVT) as a dose-ranging study was also used to determine the 20mg OD dose for Defendants' ROCKET AF study for SPAF.

**Table E-2      Response to treatment based on CUS thrombus score and confirmed VTE events at visit Day 21 (Study 11223)**

| Cut Off Score | | Rivaroxaban 10 mg b.i.d. | Rivaroxaban 20 mg b.i.d. | Rivaroxaban 40 mg o.d. | Rivaroxaban 30 mg b.i.d. | VKA / enoxaparin |
|---|---|---|---|---|---|---|
| **ITT population** | | | | | | |
| | | (N=106) | (N=100) | (N=114) | (N=111) | (N=112) |
| 4 points [b] | | | | | | |
| | Unchanged | 48 (45.3%) | 40 (40.0%) | 65 (57.0%) | 47 (42.3%) | 60 (53.6%) |
| | Improved | 57 (53.8%) | 59 (59.0%) | 49 (43.0%) | 63 (56.8%) | 52 (46.4%) |
| | Deteriorated | 1 ( 0.9%) | 1 ( 1.0%) | 0 ( 0.0%) | 1 ( 0.9%) | 0 ( 0.0%) |
| 30% change | | | | | | |
| | Unchanged | 48 (45.3%) | 51 (51.0%) | 69 (60.5%) | 52 (46.8%) | 67 (59.8%) |
| | Improved | 56 (52.8%) | 48 (48.0%) | 43 (37.7%) | 58 (52.3%) | 45 (40.2%) |
| | Deteriorated | 2 ( 1.9%) | 1 ( 1.0%) | 2 ( 1.8%) | 1 ( 0.9%) | 0 ( 0.0%) |

**Table E-3 Incidence rates of all bleeding events (safety population) (Study 11223)**

| Bleeding event | BAY 59-7939 10 mg bid (N=119) n (%) | BAY 59-7939 20 mg bid (N=117) n (%) | BAY 59-7939 40 mg od (N=121) n (%) | BAY 59-7939 30 mg bid (N=121) n (%) | VKA / enoxaparin (N=126) n (%) |
|---|---|---|---|---|---|
| Any event | 6 (5.0%) | 11 (9.4%) | 14 (11.6%) | 13 (10.7%) | 8 (6.3%) |
| Major bleeding | 2 (1.7%) | 2 ( 1.7%) | 4 ( 3.3%) | 0 (0.0%) | 0 (0.0%) |
| Fatal bleeding | 0 (0.0%) | 0 ( 0.0%) | 0 ( 0.0%) | 0 ( 0.0%) | 0 (0.0%) |
| Clin overt bleeding [b] | 2 (1.7%) | 2 (1.7%) | 2 ( 1.7%) | 2 ( 1.7%) | 0 (0.0%) |
| Clin overt bleeding [c] | 2 (1.7%) | 0 (0.0%) | 1 ( 0.8%) | 2 ( 1.7%) | 0 (0.0%) |
| Clin overt bleeding [d] | 1 (0.8%) | 2 (1.7%) | 1 ( 0.8%) | 3 ( 2.5%) | 0 (0.0%) |
| Non-major bleeding | 4 (3.4%) | 9 (7.7%) | 12 ( 9.9%) | 11 ( 9.1%) | 8 (6.3%) |

a   Bleeding events starting more than 2 days after last study medication intake were not considered.
b   Associated with a fall in Hb of ≥2 g/dL.
c   Leading to transfusion of ≥2 units blood.
d   Warranting treatment cessation.

885

917. In the Phase II Study 11223 dose-finding study, the conclusion was there was "no clear dose relationship or clear efficacy advantage observed for BID dosing compared with OD dosing over the range of rivaroxaban doses tested, and no definite difference between the BID and OD regimens in bleeding compared to LMWH-VKA except at 40mg TDD or higher." The only once a day dose was 40mg OD, the rest were all BID. There was no information on the matched sample for matched PK/PD determination for this study population. The ITT population for ODIXa-DVT was 325 subjects treated with rivaroxaban for 12 weeks in 4 different dosing groups. (bold added for emphasis)

> *The o.d. dosing was considered advantageous from patient convenience and compliance perspective. However, b.i.d. dosing had some advantages; steady state was attained earlier, higher trough levels were reached, an improved duration of anticoagulation was noted, and a better (but non- significant) improvement in thrombus score was obtained with **twice daily dosing**...Also, based on the clinical observations from the phase II dose –finding trials, it was concluded that the lowest **once-daily dose studied (20 mg) should be selected as the dose**....[886]*

---

885 Derix Exhibit 71
886 Derix Exhibit 71 at p. 22

918.  The Assessor next described Study 11528:

> **Study 11528 (EINSTEIN-DVT) (**Secondary prevention after initial DVT)  was an
> acute symptomatic DVT (treatment) without symptomatic PE.  It was also a dose
> ranging study in subjects with proximal or extensive calf-vein thrombosis (i.e.
> involving at least the upper third part of the calf veins.  Subjects received 20mg,
> 30mg and 40mg OD for 12 weeks.  The comparator was enoxaparin (LMWH)
> overlapping with VKA for 12 weeks.  Number of subjects receiving rivaroxaban
> were 406(R), 405 (VFS) 368 (ITT) and 348 (PP).  For Enoxaparin the subjects were
> 137(R), 137 (VFS), 126 (ITT) and 101 (PP).[887]

919.  The lowest rivaroxaban dose in Study 11528 was 20mg OD. Based on Table E-4 VTE on
Day 84 (Study 11528), the ITT population was 20mg OD (N=123), 30mg OD (N=119),
40mg OD (N=126) and LMWH/VKA ( N=119). There are a total of 368 (ITT) subjects
with exposure to three different doses of once-a-day rivaroxaban for 12 weeks.  The
subsequent safety table (Table E-5) does not use the ITT "N" values but a larger safety
population of 405 subjects.  The greatest loss of patients occurred in the 30mg OD group
(134-119 = 15 patients) compared to 20mg OD (12 patients lost) and 40mg OD (10
patients lost). The greatest trend for major bleeding and clinically overt bleeding in the
study occurred for the 30mg OD population.  The 20mg OD showed the highest reporting
for "any clinically relevant non-major bleeding event" (5.2%).  Again there is no
information on the sampling of PK/PD information for this study. The Assessor makes no
comment on the   40mg OD (the highest dose) appearing to have the lowest risk (best
safety) in terms of bleeding compared to the lower 20mg and 30mg OD or LMW
Heparin/VKA arm.  The safety findings for 40mg OD do not correlate with the safety
findings of 40mg OD in Study 11223.[888]

---

[887] Derix Exhibit 71 at p. 20
[888] Derix Exhibit 71

| Overall response | Rivaroxaban 20 mg o.d. | Rivaroxaban 30 mg o.d. | Rivaroxaban 40 mg o.d. | (LMW) VKA | heparin/ |
|---|---|---|---|---|---|
| Improved | 95 (77%) | 98 (82%) | 93 (74%) | 82 (69%) | |
| Unchanged | 19 (15%) | 14 (12%) | 25 (20%) | 26 (22%) | |
| Deteriorated | 9 ( 7%) | 7 ( 6%) | 8 ( 6%) | 11 ( 9%) | |

The number of events for recurrent DVT or PE or death of any cause up to day 98 was 3, 5, 2 and 8 in the 20 mg o.d., 30 mg o.d., 40 mg o.d. and the LMWH/VKA groups respectively.

**Table E5 Incidence rates of clinically relevant bleeding events (major or clinically relevant non-major bleedings)**

| Bleeding event | BAY 59-7939 20 mg od (N=135) | BAY 59-7939 30 mg od (N=134) | BAY 59-7939 40 mg od (N=136) | (LMW) heparin/ VKA (N=137) |
|---|---|---|---|---|
| Any event | 31 (23.0%) | 29 (21.6%) | 29 (21.3%) | 38 (27.7%) |
| Major bleeding | 1 (0.7%) | 2 (1.5%) | 0 (0.0%) | 2 (1.5%) |
| Fatal bleeding | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.7%) |
| Critical bleeding | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (1.5%) |
| Intracranial | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.7%) |
| Rectal | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.7%) |
| Clinically overt bleeding associated with a fall in hemoglobin ≥2 mg/dL | 1 (0.7%) | 1 (0.7%) | 0 (0.0%) | 1 (0.7%) |
| Clinically overt bleeding leading to blood transfusion ≥2 units of blood | 1 (0.7%) | 2 (1.5%) | 0 (0.0%) | 1 (0.7%) |
| Non-major bleeding | 30 (22.2%) | 27 (20.1%) | 29 (21.3%) | 36 (26.3%) |
| Any clinically relevant non-major bleeding | 7 (5.2%) | 6 (4.5%) | 3 (2.2%) | 10 (7.3%) |

889

920. In terms of the Assessor's appreciation of pharmacodynamics (PD), Defendants told the CHMP Assessor that when switching from warfarin to rivaroxaban there were laboratory tests available for monitoring the patient to determine the onset of rivaroxaban effects compared to warfarin effects:

> *Anti-factor Xa, HepTest and PiCT were not affected by warfarin. Tests of anti-factor Xa, HepTest and PiCT were capable of detecting rivaroxaban effects independently from warfarin effects.*[890]

921. The Pivotal Phase III trials for VTE-T were: 1) Study 11702- Acute Symptomatic Proximal DVT without Symptomatic PE (EINSTEIN-DVT), 15mg BID for three weeks followed by 20mg OD for 3, 6, or 12 months versus enoxaparin BID overlapping with and followed by VKA for 3, 6 or 12 months. 1731 patients randomized to rivaroxaban vs 1718 for enoxaparin; and 2) Study 11899 continued treatment of VTE after 6 to 14 months of anticoagulant treatment, which was 20mg OD for 6 or 12 months versus placebo for 6 or 12 months (EINSTEIN-EXTENDED). For Rivaroxaban 602 randomised and placebo 595. Twenty--six (26%) of the patients did not complete the planned treatment duration as the Sponsor terminated the study when a pre-planned

---

[889] Derix Exhibit 71 at p. 22
[890] Derix Exhibit 71 at p. 19

number of events was reached.  Another 14% had shorter treatment duration for other reasons or due to primary end-point reached or for other reasons. [891]

922. As the Assessor pointed out in the report, "the lack of experience of treatment beyond one year needs to be appropriately addressed."[892]

- **In 2014, EMA Required Defendants to Provide PK/PD, Bleeding Risk, and Guidance for Use of Anti-Factor Xa Assay in Next Submission**

923. There is an EMA/PRAC/20333/2014 PRAC PSUR[893] Assessment Report of the PRAC Rapporteur's review of Defendants' 10th PSUR. The PSUR was submitted by Defendants on November 2013 to cover the reporting period of March 16, 2013 through September 15, 2013.  The "Final Assessment and conclusions and actions" and "Final Recommendations" included a request that Defendants address the following issues in its next PSUR:

- *Provide a review on the relationship between PK and PD regarding increase in bleeding risk and relationship with dose.*
- *Provide a thorough analysis of case reports with serious bleeding in patient groups who may be at particular risk and who are not contraindicated.* [894]

924. The PRAC PSUR adopted on April 10, 2014 also had a request for Defendants to provide supplementary information to address the comments of the Member States (MS):

*It is the MS opinion that the MAH should provide all available PK data (available arithmetic means and geometric means of peak/trough concentration of ROCKET AF) for this purpose, and highlight the interval of haemorrhagic/thrombotic risk to take into consideration as well as the recommendation of action to take in these situations.*

*Moreover, the absence of clear recommendation in the SmPC on the topic may lead to inappropriate decisions of actions to take and potentially harmful consequences.*

*The issue is particularly important for the SPAF indication, for which no guidance for interpretation of anti-Xa tests is available in the SmPC.*[895]

925. The PRAC Rapporteur stressed the need for Defendants to gather sufficient data for clinicians to be able to interpret the calibrated anti-Xa test for prescribing to patients since the test is now available in "many hospitals" and "emergency departments".

*Regarding the measurement of anticoagulant activity of rivaroxaban in specific situations…it is necessary to gather available data that may allow the interpretation*

---

[891] Derix Exhibit 71
[892] Derix Exhibit 71 at p. 33
[893] PSUR= Periodic Safety Update Report
[894] Dyszynski Exhibit 26 at p. 4
[895] Dyszynski Exhibit 26 at p. 23

*of calibrated anti-Xa test, since it is now available in many hospitals and emergency departments.*[896]

- **In 2014, Defendants Attempted to Expand "*Little PD Data*" in the PBRER[897] Statement to Respond to EMA's "Dose Bleeding Questions"**

926. In the EMA's PRAC PSUR Assessment Report, adopted April 10, 2014, the EMA requested that Defendants in its next submission provide a review of the relationship between PK and PD regarding increase bleeding risk and relationship with dose. To respond to the Member States (MS), Defendants was to provide guidance for interpretation of anti-Xa tests in the SmPC.  This was considered important information for physicians to have treating patients with XARELTO for a chronic indication like SPAF.[898]

927. On May 5, 2014, Bayer's Tomasz Dyszynski sent an email to Theodore Spiro, "Subject RE: PBRER Statement," regarding the EMA's request and Defendants response to PK/PD regarding increase in bleeding risk and relationship to dose:

> *Relationship between PK and PD regarding increase in bleeding risk and relationship with dose*
>
> *As requested by the PRAC Rapporteur in the Assessment Report of previous PBRER, company's assessment of relationship between PK and PD regarding increase in bleeding risk and relationship with dose should be provided.*[899]

928. To develop a PBRER response for the EMA, Dr. Sabine Dittmar, Head Therapeutic Area CV/Hem, Global Pharmacovigilance Risk Management (Bayer) sent an internal April 17, 2014, email, "Subject: URGENT: Xarelto PBRER: PK-PD, dose bleeding questions," to Tomasz Dyszynski, Juergen Weber, Dagmar Kubitza, Jan Stampfuss, and Scott Berkowitz.  Dr. Dittmar was putting together a draft Bayer PBRER submission package for the EMA.

929. Dr. Berkowitz replied by email to the same group on April 17, 2014 that Defendants had not designed its "*phase III studies to obtain sufficient PD data to be able to make a connection or develop a relationship between efficacy and bleeding events (risk/benefit)*".[900] Spiro was on the project to develop PK/PD data for the PBRER response. At one time, Dr. Berkowitz thought the PBRER might need to have a general statement of a few sentences reflecting the fact "*that we do not have the data from our program*".  He wrote:

> *Theo is working through the documents mentioned in prior emails but so far he has noted that with what little PD data there is no valid connection to clinical events is*

---

[896] Dyszynski Exhibit 26
[897] PBRER= Periodic Benefit Risk Evaluation Report
[898] Dyszynski Exhibit 26
[899] Dyszynski Exhibit 29
[900] Dyszynski Exhibit 28

*present.  As we know, it was not planned to do this and was not built into the Phase III clinical program.  It is likely that all we will be able to provide is a general statement of a few sentences that reflects the fact that we do not have the data from our program to make statements about the relationship of PD parameters to efficacy and bleeding events.* [901]

930.  In his May 2, 2014 response, Dr. Spiro suggested to Tomasz Dyszynski and Claudia Henn to delete a reference in the PBRER regarding phase 2 MOSILL **Study 11527** (ODIXa-OD.HIP- prevention of VTE after elective hip surgery)[902] as he currently was unable to find any PK correlations with efficacy or safety in any of the reports he reviewed. "If any others have identified these analyses please let me so know and we can re-insert the statement."[903]

931.  Claudia Henn, Bayer Global Medical Affairs, sent an email to Theodore Spiro and Tomasz Dyszynski on May 2, 2014, "Subject: AW: PBRER Statement."[904] She indicated that if a document like Study 11527 had already been given to authorities, it still needed to be included in the 2014 response. She copied Jürgen Weber. Theodore Spiro, MD, Senior Director, Thrombosis Group, Cardiovascular and Coagulation Therapeutic Area, Global Clinical Development, Bayer at Whippany, NJ,

932.  Dr. Spiro replied on May 2, 2014 that what was missing from the clinical trial data was "correlation of safety and efficacy outcome events with actual individual plasma concentration measures".  He had identified two short-term Phase III studies conducted in Japan ("J" studies) with rivaroxaban for DVT that had plasma concentration information, which could be included in the PBRER response:

*We see analysis of trends for events versus dose regimens tested, including both efficacy and safety event outcomes in all of the phase 2 study reports.  <u>What is missing is the correlation of safety and efficacy outcome events with actual individual plasma concentrations measures.</u>  Such analyses have been performed for the prothrombin time results but not as far as I can determine for rivaroxaban concentrations with the exception of the results from studies **14397 J-THR** and **14398 J-TKR** which are reported in **PH-37000**, Section 11.3.3.* [905]

933.  Dr. Spiro then wrote the following draft PBRER Statement:

---

[901] Dyszynski Exhibit 28
[902] Study 11527 was the Safety Population for Record phase II (ODIXa.HIP).  This is the safety population which FDA cited as raising concerns about major bleeding- "Table 1 showed a 4-fold increase of major bleeding 0.7 vs 4.3% suggesting even a 1.5 fold increase in exposure may double the risk of major bleeding".  This is the same study that Dr.Mueck said the Defendants needed to 'push back' against FDA- since the FDA was claiming XARELTO was a dangerous drug.(February 6, 2009 Mueck Exhibit 27). Dr. Spiro at first porposed to deleted from PBRER. It is also the topic for the "wolfgang" slide, considered for use with the EMA Workshop for LEG 036 response for Exposure Response.
[903] Dyszynski Exhibit 29
[904] Dyszynski Exhibit 29
[905] Dyszynski Exhibit 29

***Section 11.3.3 Exposures/PT vs efficacy or safety event***

*Relationship between estimated individual exposures ($C_{max, ss}$, $C_{trough, ss}$ and $AUC_{0-24, ss}$) an PT ($PT_{max, ss}$ and $PT_{trough, ss}$) and efficacy or safety events are plotted in Figure 11-14 to Figure 11-28. The definitions of efficacy and safety were accorded to the clinical protocol. Efficacy events were defined as a composite endpoint of any DVT (proximal and/or distal), non-fatal PE and death from all causes up to Day 9 (±2 days) and Day 13 (±2 days) in Study 14397 and Study 14398, respectively. Safety events were defined as bleeding events, which consisted of 'non-major clinically relevant bleeding' because <u>'treatment-emergent major bleeding' was never seen in either of the studies though it was a primary safety variable in these studies.</u>*

*<u>The exposure levels of Cmax, ss and AUC $_{0-24}$, ss in the patients with moderate renal impairment (CrCL<50) and with efficacy event or safety event were lower than those in patients without efficacy event or safety event (Figure 11-14 and Figure 11-20).</u> Theoretically, <u>it is impossible to cause both efficacy and safety event by low rivaroxaban exposures</u>, and the number of patients with moderate renal impairment and with efficacy or safety event was <u>too low</u> (with efficacy: N=8; with safety: N=3). Therefore, there seemed to be no correlation between exposure levels of $C_{max}$, ss and AUC $_{0-24}$, ss and efficacy and safety events in patients with moderate renal impairment (CrCl<50).*

*Although the number of data were limited since exposure and PT could be estimated only for subjects who have provided PK samples, it could be concluded that there is no clear relationship between any exposures or PT and efficacy or safety events.* [906]

934.  Claudia Henn sent an email to Spiro and Bayer's statistician Martin Homering, stating: "It is stated within the response to question 65 that analysis of PK parameters has also been done within the individual dose groups with regard to the occurrence of bleeding events."[907] She continued that Study 11527 had shown bleeding risk increased with higher PK values with the typical range of rivaroxaban doses of 5-20mg OD but with no support for increased bleeding at higher Cmax values when compared to subjects without bleeding:

> *Exposure-response curves derived from logistic regression models with the PK parameters, Cmax, Ctrough and AUC (derived from the population PK analysis) as covariate were assessed with regard to the adjudicated bleeding events. These exposure-response curves show increases of bleeding risk with higher PK values, but the risk increases in the PK parameter range typical of rivaroxaban doses of 5 – 20 mg od are small and comparable to the enoxaparin rate. Although Cmax increases with rivaroxaban dose, the data from Study 11527 do not indicate that subjects with bleeding events exhibit higher Cmax values compared to subjects without bleeding events. Similar conclusions are derived from analyses of AUC and Ctrough.*

---

[906] Dyszynski Exhibit 29
[907] Dyszynski Exhibit 29

*How is this then to be interpreted?* [908]

935. Martin Homering, Ph.D., Bayer's statistician, responded to Ms. Henn's email about the proposal to delete Study 11527 from PBRER:

> *Yes, I have seen the report you are referring to, which is also referenced here. But again it seems to be a purely technical report where no interpretation or conclusions are provided.*

936. Theo Spiro responded to Ms. Henn to leave the sentence in the PBRER report. He then sent a May 3, 2014, email to Tomasz Dyszynski indicating he found the reference to PK (lack of) correlation with bleeds in a Study 12620[909] population PK/PD report PH-35436. Accordingly, Dr. Dyszynski said he would adjust the PBRER statement to state that PK correlations had been identified in three Phase 3 studies (rather than two).

937. Martin Homering then sent a follow-up email on May 4, 2014, to Tomasz Dyszynski and Dr. Spiro:

> <u>*Since we cannot rule out that bleeds increase with PT*</u>*, could we state instead of "no correlation between PT and bleeding events was observed" something like"* <u>*no obvious correlation between PT and bleeding event was seen?"*</u>

938. Martin Homering then pooled Defendants' XARELTO Phase III clinical studies together to create a single list of studies followed by a statement that "no obvious correlation between PT and bleeding events was seen". However, he failed to include that Defendants' Phase III studies had not been designed to correlate PT and bleeding events. He also failed to include, for the benefit of the EMA PBRER, a statement that FDA (beginning three years earlier) had concluded that some of the RECORD 1-3 data, and all of RECORD 4 data, was unreliable. So the PBRER statement as proposed by Dr. Homering and Defendants for the EMA was potentially misleading.

> **New Suggested text:**
>
> *No obvious correlation between PT and bleeding events was seen in the **RE**gulation of **C**oagulation in **Or**thopedic Surgery to prevent DVT and PE(RECORD) program, including studies: BAY 59-7939/11354, BAY 59-7939/11354, BAY 59-7939/11356; BAY 59-7939/11357:PH-34508; in the treatment and secondary prevention of venous thromboembolic disease (EINSTEIN DVT and PE) program (V11702:PH-36329); in the stroke prevention in atrial fibrillation ROCKET AF (BAY 59-7939/11630, 39039039AFL3001: R-8593) and in the J-ROCKET AF study (BAY 59-7939/12620:PH-36436).* [910]

939. Dyszynski responded to Dr. Homering and Dr. Spiro, et al., on May 4, 2012 (bold added for emphasis):

---

[908] Dyszynski Exhibit 29
[909] Study 12620 is a Japanese (J-ROCKET AF) study 15mg /10mg OD
[910] Dyszynski Exhibit 29

313

> *...I like your proposal to refer to all studies together rather than repeat the statement four times. And since I do not think **our intention is to say that there is no association at all between PT and bleeding,** weaker statement seems ok with me. I wonder if "correlation" is technically the right expression and if more general "association" could be substituted...[911]*

940. Dr. Berkowitz sent an email about the working draft of the PBRER statement to Tomasz Dyszynski, Martin Homering and Theodore Spiro, et al., on May 4, 2014.  Despite knowledge that there is an increased tendency for bleeding with increasing PT, he wordsmiths to reduce the potential risk for the PBRER statement (bold added for emphasis):

> *Dear Martin*
>
> *Thank you for bringing in the point that the distribution in those with and without bleeding are largely similar, **but there is a tendency that bleeds increase with PT** and for suggesting some alternative wording.*
>
> *Dear Tomasz and Theo,*
>
> *...I also agree that it would be better to refer to all the studies together as Martin's wording suggests.  However, because this basis of our decision on the overlap of distributions, I think it is fine to use "**correlation**" and am hesitant to further weaken our conclusion by using the word "**association**".  In addition, I suggest substituting the word "**obvious**" with "**clear**" ("No clear correlation between PT and bleeding events was seen in the Regulation...)[912]*

941. Tomasz Dyszynski replied to Dr. Berkowitz: "*I am fine with amending to "no clear correlation" if nobody objects to this.*"[913]

942. Dr. Spiro followed up by email with a comment and the updated PBRER Statement.  In terms of studies with plasma concentration, the statement uses: Japanese Study 12620- J-Rocket AF; Study 11527 DVT-P Hip; and 2 Japanese Studies 14397 and 14398 (3 phase 3 studies from Japan), with PT used in other phase 3 studies RECORD (1-4), and ATLAS 2 TIMI 51.  The PT (Neoplastin) correlation is linear for plasma concentration $\leq 700$ ug/L "confirming that PT Neoplastin would be suitable for estimating rivaroxaban concentration."  However, the EMA is also told that Defendants have not yet identified a PT threshold predictive of bleeding. The EMA is also told that postmarket surveillance and case reports are not suitable to develop exposure event relationship information (with or without bleeding) since there is not enough information in case report forms about coagulation, sample collection and dosing times.  Therefore, with all these limitations, using plasma concentrations and PT, the Defendants were informing the EMA that it was unable to determine a relationship between PK and PD regarding increase in bleeding risk and relationship with dose:

---

[911] Dyszynski Exhibit 29
[912] Dyszynski Exhibit 29
[913] Dyszynski Exhibit 29

*The wording in the PK paragraph was taken directly from the reports themselves. So long as we do not change the general tone of the language used by the teams that prepared the reports, we should be fine.[914]*

*Here is the PBRER subsection in its current shape*

**Relationship between PK and PD regarding increase in bleeding risk and relationship with dose***.*

*As requested by the PRAC Rapporteur in the Assessment Report of previous PBRER, company's assessment of relationship between PK and PD <u>regarding increase in bleeding risk and relationship with dose should be provided.</u>*

*A pharmacokinetic (PK) bleeding event analysis has been performed in one phase 2 study (BAY 59-7939/**11527**) (for subjects treated for VTE prevention after elective hip replacement surgery) and in three phase 3 studies conducted in Japan in subjects with non-valvular atrial fibrillation (BAY 59-7939/**12620**) and in subjects undergoing hip (BAY 59-7939/**14397**) and knee (BAY 5907939/**14398**) replacement surgery. In the phase 2 study BAY 59-7939/**11527**, exposure-response curves derived from logistic regression models with the PK parameters, Cmax, Ctrough and AUC (derived from the population PK analysis) as covariate were assessed with regard to the adjudicated bleeding events. These exposure-response curves show increases of bleeding risk with higher PK values, but the risk increases in the PK parameter range typical for rivaroxaban doses of 5-20mg OD are small and comparable to the enoxaparin rate PH-35339).  In the phase 3 study conducted in Japan in subjects with non-valvular atrial fibrillation, there was no clear relationship between any exposures and PTmax, ss and bleeding events (PH-36436).  In the phase 3 studies conducted in Japan in subjects undergoing elective hip and knee replacement surgery, patients with bleeding events did not have higher area under the curve (AUC), Cmax or Ctrough values compared to patients without bleeding events (PH-37000).*

*In the other clinical development phase 3 programs, pharmacodynamics (PD) bleeding event analysis was performed.  Bleeding events were analyzed with regards to correlation to the pharmacodynamics marker prothrombin time (PT), because PT is a reliable exposure biomarker for rivaroxaban when a sensitive assay is used (i.e. Neoplastin Plus). No obvious correlation between PT and bleeding events was seen in the REgulation of Coagulation in ORthopedic Surgery to prevent DVT and PE (RECORD) program…<u>No threshold for PT that would be predictive of bleeding could be identified.</u>  In the prevention of major acute cardiovascular events after acute coronary syndromes program (ATLAS 2 TIMI 51 BAY 59-7939/13194), <u>PT measurements were not performed.</u>  PK or PD event analysis for ACS was **<u>confounded by the co-medication</u>** of two or at least one antiplatelet agent which would impact the outcome. Hence the scope of such an investigation would be different from analysis which just looks at rivaroxaban.  <u>The MAH has not collected</u>*

---

[914] Dyszynski Exhibit 29

*any new data that would allow correlation of PK parameter with bleeding or efficacy in the target patient populations….*

*PT correlated in an almost linear fashion with rivaroxaban concentrations ≤700 ug/L, confirming that PT Neoplastin would be suitable for estimating rivaroxaban exposure, if necessary.  However, no threshold for PT that would be predictive of bleeding could be identified.*

*This limitation of PT as weak biomarker of bleeding risk is not unique.  The prothrombin time INR, which is used as a monitoring parameter for patients treated with VKAs does not sufficiently predict major bleedings…*

*Analysis of data received for post marketing surveillance cases, with or without bleeding events, is hampered by the fact that case reports do not contain information on coagulation tests, type of tests onset of bleeding and blood collection times. In summary, post marketing cases did not provide any further significant insight beyond the already existing information and established rivaroxaban drug profile.*

*In conclusion, no threshold for PT predictive of bleeding could be identified.  Thus, the data do not support the use of PT as indicator of bleeding risk.  As addressed in the SmPC for hemorrhagic risk, for doses above 20 mg OD or in conditions which lead to exposure equivalent to doses above rivaroxaban 20mg OD, subjects warrant surveillance for signs of bleeding complications after initiation of treatment.  This may be done by regular physician examination of the subject, close observation of the surgical wound drainage and periodic measurements of hemoglobin.[915]*

943. On May 5, 2014, Dr. Spiro sent an email attaching a document titled "Relationship between PK and PD_Final_ts.docx."

   *If not too late, see attached update incorporating references to two additional technical reports describing PD from the EINSTEIN program.[916]*

944. Although it was not directly communicated to the EMA by the PBRER Statement, but was stated by Dr. Berkowitz to members of Bayer: "*there was a tendency for bleeding to increase with PT*" (and PT correlated directly with plasma concentration ≤700ug/L) and its Phase III studies, despite the PBRER Statement, had not been designed *"to obtain sufficient PD data to be able to make a connection or develop a relationship between efficacy and bleeding events (risk/benefit)*".[917]

- **June 2014 EMA PRAC Meeting: Defendants Were to Provide a Review of PK/PD for Bleeding Risk, Relation to Dose and Those Patients at Increased Bleeding Risk**

945. On June 5, 2014, Weber sent an email to Tomasz Dyszynski and Andrea Horvat-Broecker, "Subject: Forward of the Meeting minutes of a PRAC meeting 7-10 April 2014," attaching the outcome of the last PBRER assessment publicly available.  The

---

[915] Dyszynski Exhibit 29
[916] Dyszynski Exhibit 29
[917] Dyszynski Exhibit 29

information was published on the EMA's website. Under "6.1.14 Rivaroxaban-XARELTO" was a "summary of recommendations and conclusions". Defendants were to provide in its next PSUR a review of the relationship between PK and PD regarding the increase in bleeding risk and the relationship with dose. Defendants were to provide a revised analysis of the risk of bleeding in patients who may be at particular risk, such as those with impaired hepatic function or renal patients taking concomitant potent CYP3A4 inhibitors. Finally, Defendants were to provide a detailed analysis of cases of serious bleeding in patients who may be at a particular risk but who are not contraindicated.[918]

- **LEG[919] 036 EMA CHMP Assessment Report for Post-Authorization Measures: Defendants to Take Whatever Steps Necessary to Develop TDM for XARELTO for Each Licensed Indication[920]**

946. An EMA CHMP Assessment Report for Post-Authorization Measure LEG 036 (Procedure No. EMEA/H/C/944) was issued to Market Authorization Holder (MAH) Bayer following up on a CHMP meeting discussion held in March 2015 and June 2015. The Rapporteur was Kristina Dunder and Lisa Landberg of Sweden. The Rapporteur's assessors were Britt-Marie Emanuelsson and Bengt Ljungberg, of Sweden.[921] The CHMP clearly indicated to Defendants in June 2015, despite Defendants' objections, that the health regulatory agency planned for Bayer to obtain sufficient data and recommendations for XARELTO to provide recommendations for therapeutic drug monitoring (TDM). To that end, the EMA would require Defendants conduct a prospective clinical trial for each of the licensed indications and doses (10mg VTE-P; 20mg/15mg SPAF, VTE-T, VTE-P, and prevention of recurrent DVT/PE, and 2.5 mg ACS) to obtain the necessary exposure-risk/benefit information to provide recommendations for TDM to physicians and in its SmPC.

947. For this process, the submission date was April 20, 2015. The start of the CHMP Assessment Procedure was April 26, 2015. A preliminary Assessment Report was issued May 29, 2015 with comments received on June 10, 2015 and issuance of an updated report June 25, 2015. The CHMP held a discussion about rivaroxaban in June 2015.

948. In the Introduction, the MAH was requested to discuss how the benefit-risk balance based on available data could be enhanced by implementing therapeutic drug monitoring (TDM). The response was to address both the overall target population, as defined by the licensed indications and subgroups at particular risk of over-of-undertreatment. As anti-Xa activity is well correlated to exposure of rivaroxaban, the applicant was requested to provide a plan to explore the suitability of developing a validated anti-Xa test. The MAH was also to discuss the design and feasibility of a future propsoective clinical trial which

---

[918] Dyszynski Exhibit 24
[919] LEG= Legally Binding Measure, Category of a Post-Authorization Measure (PAM) directly requested by the CHMP
[920] Derix Exhibit 36
[921] Derix Exhibit 36

could potentially support recommendations on TDM in case further data may be helpful.[922]

949. Section 2 of the CHMP Report was titled, "Assessment of the post-authorization measure LEG 036". The CHMP provided a brief discussion of rationale for use of therapeutic drug monitoring (TDM) for XARELTO:

> *... is to improve patient care by individually adjusting the dose of difficult-to-manage drugs for which clinical experience or clinical trials have shown it improved outcome in the general or special populations. It is unnecessary to employ TDM for the majority of medications, and is primarily used for monitoring drugs with narrow therapeutic ranges, drugs with marked pharmacokinetic variability, and medications for which target concentrations are difficult to monitor, or in the case of compliance issues. Examples of drugs whose use in clinical practice is benefited by TDM include…unfractionated heparin and Vitamin K antagonists (VKAs).* [923]

950. Regarding Request 1, Defendants provided a summary of the response:

> **Request 1:** *The MAH is requested to discuss if the benefit-risk balance based on available data could be enhanced by implementing therapeutic drug monitoring (TDM). The response should address both the overall target population as defined by the licensed indications and subgroups at particular risk of over-or undertreatment.*[924]

951. The Response indicated that in identifying an effective and safe dose of rivaroxaban to be investigated in the Phase III clinical development program "the relationship between PK parameters and bleeding events was analyzed in a limited number of phase II studies: 1) ODIXa-OD.HIP/SN 11527; 2) ODIXa-DVT/SN 11223, and 3) EINSTEIN-DVT/SN 11528. One other study was performed exclusively in Japanese Patients for stroke prevention 4) J-Rocket AF/SN 12620."

952. The Assessor continued that PT had been used in lieu of pharmacodynamics markers (PD) and Defendant had obtained only "sparse blood samples for PD evaluations". Blood samples were collected at pre-specified time points, but not obtained at time of bleeding or efficacy event since the sponsor had not "aimed at establishing routine coagulation monitoring":

> *As prolongations of the pharmacodynamics (PD) marker prothrombin time (PT) have been shown in phase I and Phase II clinical studies to correlate with rivaroxaban plasma concentrations when the assay is performed with a sensitive thromboplastin reagent (Neoplastin® Plus), PT had been used as exposure marker instead of PK parameters throughout the phase III clinical development program. Sparse blood samples were collected for PD evaluations from the majority of randomized subjects at pre-specified time points, but not specifically at the time of a*

---

[922] Derix Exhibit 36
[923] Derix Exhibit 36
[924] Derix Exhibit 36

*bleeding or efficacy event as these analyses were not aimed at establishing routine coagulation monitoring.[925]*

953. In terms of the interpretation of clotting tests such as PT, the PK profile of rivaroxaban has to be taken into account:

*As expected results of the PT are dependent on plasma concentration which are driven by rivaroxaban dose, the timing of measurement relative to the drug intake (i.e. peak vs trough) and patient characteristics (e.g. renal function, hepatic function, age, intake of certain co-medications).[926]*

954. Defendants provided PT information for its Phase III studies: RECORD 1-4 (SN 11354, SN 11356, SN 11355), EINSTEIN DVT and PE studies (SN 11702), ROCKET AF (SN 11630), J-ROCKET AF (SN 12620). The PT was measured at baseline and post-baseline, and/or at peak and/or trough. Defendants indicated in the  summary that thisdata   showed no obvious relationship between PT and bleeding events. However, Defendants failed to highlight that in the United States some of the information in RECORD 1-3 was deemed unreliable, and FDA did not accept any of RECORD 4 data in support of XARELTO approval in 2011 for DVT-P. According to the Assessor, the overall weakness of Defendants' method for capturing and grouping different severities of events in its Phase III studies (above) did not allow a determination of a threshold PT (surrogate for plasma concentration) to identify patients at higher risk of bleeding:

*There were wide overlaps of the distribution of PT values between patients with bleeding events of different severities and patients without bleeding events observed within the box plots which did not allow the determination of a threshold of PT to identify patients at higher risk of bleeding for any of these studies.[927]*

955. ATLAS 2 TIMI 51 SN 13194 did not capture PT measurements. PK and PD event analysis for ACS was confounded by co-medication of two or at least one antiplatelet agent.  Analyses of bleeding events were also performed by subjects grouped into quartiles (postbaseline) PT at peak and trough.  Patients in the upper quartile had higher rates of bleeding compared to lower quartiles.  However, in RECORD 1-3 studies, the upper quartile was comprised of elderly subjects, more women, subjects with slightly decreased creatinine clearance, and more normal weighted subjects than the lower 3 quartiles (PT may differ with respect to bleeding risk factors).

956. In the Final PRAC Assessment Report of the PSUR No. 10, Defendants were requested to assess the relationship between PK and PD regarding increase in bleeding risk and relationship with rivaroxaban dose.  The topic was addressed in the PSUR No. 11 (covering the period from 16 Sep 2013 to 15 Mar 2014).  Defendants indicated to the EMA Assessor that post market cases did not provide any further significant insight.

---

[925] Derix Exhibit 36
[926] Derix Exhibit36
[927] Derix Exhibit 36

957. Regarding TDM, in Phase III clinical trials (RECORD 1-4, EINSTEIN studies, ROCKET-AF and J-ROCKET AF): "*sparse blood samples were collected for PT evaluations from the majority of randomized subjects at pre-specified time points, but not specifically at time of a bleeding or efficacy event*".   "*...the purpose of these analyses was not aimed at establishing routine coagulation monitoring.*"[928]

958. There are no definitive data in the rivaroxaban clinical trial program to correlate an outcome with plasma concentrations: peak and trough levels for rivaroxaban have not been temporally correlated with efficacy or bleeding/safety outcomes. Post marketing surveillance cases to date, with or without bleeding events, have not provided more insight; the data is hampered by the fact that case reports often do not contain information on coagulation tests, type of test, onset of bleeding and blood collection times (steady-state 'peak', 'trough' and time 'postdose' when treated with either 5mg, 10mg, 15mg, 20mg or 30 mg TDD Xarelto.

> *In summary, despite substantial efforts, a threshold of exposure that would identify patients at an increased risk of bleeding in the overall population of subgroups of patients categorized by age, weight, or renal function could not be identified. Therefore, the MAH has not obtained data that suggests routine coagulation monitoring or TDM would optimize the benefit/risk profile of rivaroxaban.*[929]

959. Despite Defendants' lack of acquisition of data for coagulation monitoring and TDM, the Assessor describes situations where assessment of rivaroxaban effect may be appropriate:

> *Although there is no need to monitor the anticoagulant effect of rivaroxaban during routine clinical practice, in certain infrequent situations like overdosage, acute bleeding, urgent surgery, or suspected noncompliance, assessment of the anticoagulant effect of rivaroxaban may be appropriate. Accordingly, measuring PT using a sensitive thromboplastin reagent such as Neoplastin Plus, or a commercially available Factor –Xa assay using rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.* [930]

960. Defendants maintained that TDM was not necessary for rivaroxaban: "The MAH find no persuasive evidence that implementing TDM would further enhance the benefit/risk of rivaroxaban over and above what the clinical trials and post-marketing surveillance have provided."[931]

961. Assessor's comments: "It is recognized that all the phase III studies supportive of the approved indications were performed without TDM guided dose adjustments."[932] The Assessor further commented:

---

[928] Derix Exhibit 36
[929] Derix Exhibit 36
[930] Derix Exhibit 36
[931] Derix Exhibit 36
[932] Derix Exhibit 36

*The purpose with CHMP initiative is rather to discuss whether further improvement of the B/R balance can be achieved by recommendations for some form of TDM.*[933]

*Nevertheless, in the Rapporteur's opinion, the compiled preclinical and clinical experience strongly indicates that plasma exposure is of importance for the bleeding risk and one factor among several worth to take into account in attempts to clinically estimate the bleeding risk in an individual. This correlation between exposure and bleeding risk is more apparent in the clinical study results for more susceptible patient groups, e.g. ACS patients where a combination with intense platelet inhibition resulted in a relatively high bleeding incidence.* [934]

*The SPC's for different strengths already include some general guidance for laboratory evaluation of drug exposure…but there may be room for more specific guidance and refined recommendations.*

962. The Assessor requested the following actions of the Defendants in response to Request #1::

> *In order to bring the discussion forward the MAH is requested*
>
> - *to perform a post-hoc overall population pharmacokinetic (PPK) analysis using all available PK data in all taget populations. The model should be fully reported.*
>
> - *to simulate/predict Cmax, C trough and AUC at steady state following current dose recommendations in all approved indications. Exposure predictions in identified sub-groups i.e. renal impairment, elderly, hepatic impairment should also be presented.*
>
> - *to perform a post-hoc overall PKPD analysis using all available data including all target populations, on PT and Xa as PD variables. The model should be fully reported.*
>
> - *to perform a post-hoc PKPD analysis on bleeding events and thromboembolism using Cmax, Ctrough and AUC as exposure variable, using all available data in all different target populations and identifying covariates including among others renal impairment, elderly, hepatic impairment, co-treatment with antihaemostatic drugs. The model should be fully reported.*
>
> - *to clarify/comment on the uncertainty of a determined plasma concentration value bearing in mind variability in the bioanalytical assay and intra-individual variability. The MAH should also comment on/discuss how soon after a dose adjustment a blood sample could be taken to correctly mirror the new systemic exposure.*

---

[933] Derix Exhibit 36
[934] Derix Exhibit 36

*To possible to provide more detailed advice in the SPCs in relation to the reported predicted/achieved plasma concentrations… The MAH should also include information on intra-individual variability on the important variables for safety monitoring.*[935]

963. The CHMP Assessor's Request #2 was as follows: "As anti-Xa activity is well correlated to exposure to rivaroxaban, the applicant is requested to provide a plan to explore the suitability of developing a validated anti-Xa test."  For " pharmacokinetic data in patients," the following text proposal was implemented in currently approved SmPCs of the 15 and 20mg strengths:

*In patients receiving rivaroxaban for treatment of acute DVT 20 mg once daily the geometric mean concentration (90% prediction interval) 2-4 h and about 24 h after dose (roughly representing maximum and minimum concentrations during the dose interval) was 215(22-535) and 32(6-239) ug/l, respectively.*[936]

964. Regarding the 10mg tablet:

*In patients receiving rivaroxaban for prevention of VTE 10 mg once daily the geometric mean concentration (90% prediction interval) 2-4 h and about 24 h after dose (roughly representing maximum and minimum concentrations during the dose interval) was 101(7-273) and 14(4-51) ug/l, respectively.*[937]

965. Regarding the 2.5 mg tablet:

*In patients receiving rivaroxaban 2.5 mg twice daily for the prevention of atherothrombotic events in patients with ACS the geometric mean concentration (90% prediction interval) 2-4 h and about 24 h after dose (roughly representing maximum and minimum concentrations during the dose interval) was 47(13-123) and 9.2(4.4-18) ug/l, respectively.*[938]

966. The Assessor discussed that the SmPC for atrial fibrillation provided no information on the plasma concentrations achieved in the clinical studies.  In terms of the current procedure and requests, the Assessor indicated that an explanation for this apparent inconsistency should be provided.[939]

967. The Rapporteur then provided general information for the SmPC for the different rivaroxaban strengths:

---

[935] Derix Exhibit 36
[936] Derix Exhibit 36
[937] Derix Exhibit 36
[938] Derix Exhibit 36
[939] Derix Exhibit 36

*Section 5.1*

*Dose-dependent inhibition of factor Xa activity was observed in humans. Prothrombin time (PT) is influenced by rivaroxaban in a dose dependent way with a close correlation to plasma concentrations (r value equals 0.98) if Neoplastin is used for the assay. Other reagents would provide different results. The readout for PT is to be done in seconds, because the INR (International Normalised Ratio) is only calibrated and validated for coumarins and cannot be used for any other anticoagulant.*

*Section 5.2*

*The activated partial thromboplastin time (aPTT) and HepTest are also prolonged dose-dependently; however, they are not recommended to assess the pharmacodynamic effect of rivaroxaban. There is no need for monitoring of coagulation parameters during treatment with rivaroxaban in clinical routine. However, if clinically indicated, rivaroxaban levels can be measured by calibrated quantitative antifactor- Xa tests (see section 5.2).*

In the SPC for the15 and 20 mg tablets following additional information is provided

*Section 5.1*

*In patients receiving rivaroxaban for treatment of DVT and PE and prevention of recurrence, the 5/95 percentiles for PT (Neoplastin) 2 - 4 hours after tablet intake (i.e. at the time of maximum effect) for 15 mg rivaroxaban twice daily ranged from 17 to 32 s and for 20 mg rivaroxaban once daily from 15 to 30 s. At trough (8 - 16 h after tablet intake) the 5/95 percentiles for 15 mg twice daily ranged from 14 to 24 s and for 20 mg once daily (18 - 30 h after tablet intake) from 13 to 20 s. In patients with non-valvular atrial fibrillation receiving rivaroxaban for the prevention of stroke and systemic embolism, the 5/95 percentiles for PT (Neoplastin) 1 - 4 hours after tablet intake (i.e. at the time of maximum effect) in patients treated with 20 mg once daily ranged from 14 to 40 s and in patients with moderate renal impairment treated with 15 mg once daily from 10 to 50 s. At trough (16 - 36 h after tablet intake) the 5/95 percentiles in patients treated with 20 mg once daily ranged from 12 to 26 s and in patients with moderate renal impairment treated with 15 mg once daily from 12 to 26 s.*

968. Request #3 was as follows: The MAH should also discuss the design and feasibility of a future prospective clinical trial which could potentially support recommendations on TDM in case further data may be helpful.[940]

969. In the response, Defendants explained why they did not agree with such a recommendation to conduct clinical studies to develop TDM. The Assessor's comments focused on the information needing to be obtained, steps to acquiring that information for TDM, beginning with improvement of the recommendations for laboratory estimates of rivaroxaban concentration in the label (SPC), and recommendations for each of the indications since the size of the therapeutic index can be assumed to vary between indications:

> *It is agreed that with current knowledge it is not realistic to define a certain target range to titrate all treated patients towards. Nevertheless and as discussed in Request 1 the exposure to rivaroxaban is an important factor to take into account for clinical decisions in some situations. Thus, minimum requirements would be to provide information on what the predicted/estimated plasma concentrations were in the pivotal trials together with recommendations for how the concentrations can be estimated in clinical routine when this is considered needed in specific clinical situations. For the time being it appears reasonable to discuss the recommendations*

---

[940] Derix Exhibit 36

323

*provided in the SPC can be improved and to what extent appropriate tools for laboratory estimations of concentrations are widely available (Request 2)*

*It is agreed with the MAH that clinical studies of a generally applied TDM guided dosing compared with currently approved non-monitored standard doses focusing on efficacy/safety outcomes would be an extensive undertaking. The low incidence rates together with realistic expectations of the potential differences in efficacy/safety outcomes would require huge studies. It would probably be necessary to make such comparisons in each of the approved indications as the size of the therapeutic index can be assumed to vary between them.*

*An alternative simpler approach could be that in a first step to perform simulations/modelling on the relationships between exposure on one hand and bleeding and thromboembolism on the other as discussed in Request 1. This could potentially result in more narrow target ranges than the currently pure descriptive ranges derived from standard dosing that now are provided in the SPCs. In a second step it could be investigated in clinical studies if TDM guided dosing would result in fewer outliers where increased risk of loss of efficacy/bleedings could be assumed. If such an exercise would be successful a TDM guided dosing could be recommended as an alternative e.g. in patients for clinical reasons are judged to be susceptible.[941]*

970. After the plenary discussion during the June 2015 CHMP meeting, the CHMP reviewed and discussed each of the four NOAC assessment reports.The CHMP concluded that a general approach to the issue of potential TDM with centrally approved NOACS (Xarelto, Lixiana, Pradaxa, Eliquis) was necessary. The CHMP was planning several initiatives to shed further light on the utility of implementing limited or targeted PK or PD measurements in the clinical use of new oral anticoagulants for more individualized dosing.

971. As a basis for further discussion, the CHMP posed the following questions to Defendants:

- *Population pharmacokinetic analysis*

- *Prediction of exposure ($C_{trough}$, $C_{max}$ and AUC) at steady state following recommended doses, including exposure predictions in subgroups of particular interest (e.g. elderly, patients with renal impairment, concomitant medication influencing exposure)*

- *Pharmacokinetic-Pharmacodynamic analysis*

   o *$C_{trough}$ $C_{max}$ AUC should be included as exposure variables*

   o *PT and factor Xa activity should be included I as pharmacodynamic variables*

---

[941] Derix Exhibit 36

      o   *Important clinical outcomes such as thromboembolic events and major bleeding events should also be include in the analysis*

      o   *Covaraites (e.g. age, renal function, concomitant medication) influencing the analysis should be identified and discussed*

    •  *The MAH is also requested to provide a summary of the calibrated quantitative anti-factor XA assay in terms of variability of the bioanalytical assay, including intra-subject variability*

*The MAH should provide time lines in writing by July 15th as to when these analyses can be made available.[942]*

- **Defendants Update the Joint Steering Committee on EMA's LEG 036 Requests and Plan for Creation of a Simulation Model**

972. Andrea Derix and Jürgen Weber (Joint XARELTO Team) provided a September 9, 2015 internal slide presentation to the Joint Steering Committee which was titled: "Model-Based Exposure-Response Analysis on Rivaroxaban Data- EMA Request LEG 036".[943] The purpose of their presentation was to update the JSC about the Joint Xarelto Team's current planned "analyses of data available from Defendants' Rivaroxaban clinical development program data to develop an acceptable LEG 036 response for the EMA." This same information could then be presented at public meetings to the EMA and FDA scheduled for Q4/2015.

973. According to the slide titled Regulatory History of the EMA LEG 036 request, there was a 2014 EMA/ CHMP/PRAC meeting on dabigatran regarding whether routine monitoring of dabigatran concentrations may provide increased benefits and lower risks for patients. Following that 2014 EMA/PRAC meeting, requests were sent out to all NOAC MAHS about benefits of TDM.  The JSC was told that Defendants had not received an initial request from EMA on "potential need to measure plasma concentrations or pharmacodynamics markers of anticoagulant activity of the new oral anticoagulants" until March 2015, with Bayer's first response on April 2015.  However, this is not an accurate representation to the JSC of the actions and concerns of the CHMP/PRAC for XARELTO with MAH.  Since the EMA/PRAC had been actively requesting and requiring Defendants to develop and provide PK/PD recommendations, correlation with plasma concentrations and pharmacodynamics biomarkers for monitoring anticoagulant activity in high bleeding risk patients, including as a FUM the validation of a commercial anti-Xa assay for measuring rivaroxaban plasma concentration and recommendations for labels (SmPC) for each dose and indication.

974. Although not stated during the presentation to the JSC, the EMA began actively requesting the development of this information as a FUM before initial licensing in 2008. The EMA/PRAC repeatedly requested that Defendants provide periodic submissions (PSUR/PBRER) containing PK/PD risk-benefit plasma correlation information for the

---

[942] Derix Exhibit 36
[943] Derix Exhibit 28

EMA Assessors in 2011 and 2014. However, Defendants elected not to design its clinical trials to obtain PK/PD biomarkers, but used PT (Neoplastin Plus) as a surrogate biomarker for plasma concentration ≤ 700ug/L. Defendants obtained scant pre-specified blood samples in its Phase III clinical trials and failed to obtain samples at time of bleeding or efficacy events. Defendants, as stated by Dr. Theodore Spiro, elected not to obtain correlation of plasma concentration with safety and efficacy of XARELTO in its phase III clinical trial designs and designed trials not intended to pursue coagulation and TDM recommendations. (see discussions above)

975. The JSC was further not told that Defendants failed to adequately respond to the prior EMA/PRAC requests to develop PK/PD information in its ongoing clinical trials after 2008. The slide presentation also fails to mention that in the United States, XARELTO was approved by the FDA with a condition of approval -- an "Enhanced Pharmacovigilance" commitment to actively investigate bleeding risk for VTE-P and SPAF post-approval and included the use of a bleeding questionnaire for reports of adverse events to capture coagulation and dosing information.

976. The JSC is rather told by the XARELTO Team Members that in July 2015, there suddenly was a "detailed LEG 036 request for EMA" with "concrete proposals for PopPK analyses, exposure predictions and PK/PD analyses including clinical outcomes." This information for TDM, which had been repeatedly requested and required by the EMA Assessors, had not been developed by Defendants as supported by its PBRER and PSUR submissions and the EMA Assessor comments.

977. According to the presentation to the JSC,[944] only two events (both for dabigatran) triggered all the sudden interest of the EMA in TDM for NOACs. The first event was an "FDA analysis of Dabigatran" presented at an FDA Advisory Committee Meeting on September 20, 2010. No explanation was given as to why the FDA suddenly became involved in looking at dabigatran for TDM and held an FDA AdCom meeting regarding same. The second event of interest to the XARELTO Team was the publication of the Reilly paper (J Am Coll Cardiol, 2014) on dabigatran. These two events, the XARELTO Team told the JSC, were sufficient to trigger all the discussion by both academia and regulatory health authorities regarding a role for NOAC plasma monitoring and safety (TDM). The JSC was told that the questions asked by EMA and NOAC manufacturers as a result of these two events in 2014 were: "Can you improve the benefit-risk by individual dosing based on biomarkers? What are the challenges?" Again this slide failed to accurately capture for the JSC the true history of the Defendants' interactions regarding XARELTO both with the EMA and the FDA. Both agencies have expressed concerns for years to Defendants over XARELTO's bleeding risks and the need for Defendants to provide recommendation for physicians for patients at increased risk of bleeding. Based on the risk of bleeding, the FDA had requested the development of a 5mg dose with product titration recommendations as a condition of NDA approval in 2011.

---

[944] Derix Exhibit 28

978. The JSC presentation[945] also failed to address that, in 2011, there were already plans at Janssen to conduct a Phase III protocol called ROCKET II (or ROCKET BOOSTER). The need for the ROCKET II protocol was driven by outside consultant Dr. Califf in order to address concerns that the SPAF 20mg OD dose was too high and create dosing recommendations to reduce the risk of bleeding in this population.[946] The secondary effect of ROCKET II was to improve efficacy to enable a direct comparison between XARELTO and ELIQUIS.[947] That ROCKET II protocol was to address finding the correct dose, reducing bleeding risk, improving patient safety and efficacy. However, ROCKET II was not done. Development on ROCKET II was halted shortly after a recommendation was received from Defendants' Patricia Torr, Vice President of Marketing to physicians at Janssen considering ROCKET II planning. In a January 10, 2012 email, she wrote "not to support doing Rocket 2 study and unwinding everything we invested and are actively selling today…would kill us in the market today."[948]

979. So the issues of Pop PK, PK/PD and TDM for regulatory agencies (EMA and FDA) relating to XARELTO had in fact began years before the two events regarding dabigatran referenced by Defendants, and at least seven years before LEG 036.

980. Defendants' position for its response planning for the EMA, as presented to the JSC, remained unchanged since the time XARELTO was developed, licensed and marketed. TDM was "deemed scientifically inappropriate" based on "positive" post-market surveillance with "no need in routine clinical practice".[949] In the EU, but not in the USA, under certain "exceptional" situations there was information provided to physicians in its label about calibrated quantitative anti-factor Xa assay or PT (Neoplastin® Plus) as a result of the EMA's FUM requirements of 2008. The Bayer position was that, despite the concerns of the EMA Rapporteurs and Assessors as well as the FDA's reviewers about plasma concentration, increased bleeding risks in its clinical trials including ATLAS, therapeutic range, TDM, Defendants protocols which did not attempt to correlate drug exposure to risk, and used pre-specified sampling for PK and scant sampling for PD using PT, XARELTO in 2015 would continue to be described as not having a narrow therapeutic range, not showing pharmacokinetic variability in any patient groups and not requiring any recommendations for TDM. The XARELTO Team slide for the JSC titled: "Bayer's position in initial response to EMA":

- *In routine clinical practice, no need to monitor the anticoagulant effect of rivaroxaban.*

- *In certain exceptional situations, rivaroxaban levels measures with a calibrated quantitative anti-factor Xa assay may be useful (e.g. overdose, emergency surgery)*

---

[945] Derix Exhibit 28
[946] Dr. Califf, on multiple occasions, expressed concern regarding the 20 mg dose. (*e.g.*, XARELTO_JANSSEN_08583165; XARELTO_JANSSEN_03927493; DCRI0005328). In fact, in an August 26, 2012 email, Dr. Califf stated, "don't put my mom on 20 mg!" (DCRI0002794)
[947] Derix Exhibit 28
[948] Burton Exhibit 39
[949] Derix Exhibit 28

- - *PT (Neoplastin Plus) and anti-Factor Xa (CE marked) available in EU*

- *Attempting to incorporate post hoc dose adjustments for a drug that-*

    - *does not have a narrow therapeutic range,*
    - *does not have marked pharmacokinetic variability,*
    - *has proven its efficacy and safety in large clinical outcome trials,*
    - *has consistently shown a positive benefit/risk balance also in post marketing surveillance.*

*is deemed scientifically inappropriate.* [950]

981. The JSC was told the future potential outcomes for Defendants' LEG036 response for TDM issues may include: #1) EMA may follow Defendant's position (i.e. no TDM); #2) EMA may request Defendants to perform a "prospective clinical trial which could potentially support recommendations on therapeutic drug monitoring (TDM); #3) EMA may request a label change regarding TDM for all NOACS; and #4) EMA may decide on a "wider communication to Health Care Professionals" for all NOACS.[951]

982. Despite the EMA's LEG 036 Request 1, for TDM to be developed for each individual indication and dose and population PK/PD for bleeding risk, Defendants' XARELTO Team proposed, as its response to Request 1, to create an 'Exposure Prediction-Integrated Model' with PK/PD data that was available and could be estimated. Defendants' Step 1 for its proposal was to create a simulation model of integrated population PK using established model structure and covariates. The source of PK/PD information for the PopPK Model would come from the Phase II/III studies available with pre-specified PK data and PD data ('PT'). The Phase III clinical studies database would then be used to help provide "Individual PK estimates" based on PD data and pre-specified PT testing available.

983. The model proposed that individual PK estimates could be made based on adjusted PT. There was no plan with the model to correlate bleeding events with PT or plasma concentration in the virtual population (PopPK) or develop TDM recommendations.[952] (below is Defendants' slide of the "Rivaroxaban Exposure Prediction Model" plan)

984. Defendants' EXPOSURE-RESPONSE Analyses would provide individual PK estimates for all Phase III patients (AUC, Cmax, Ctrough) for each licensed indication to respond to the 'EU'. However, it was assumed for the prediction model, based on the pooling, that there was no difference in PK/PD estimates based on the indications, underlying patient populations, and length of exposure and dose. The studies to be used for PK/PD modeling prediction to respond to the EMA's LEG 036 response "Exposure-Prediction Integrated Model for PK/PD data using adjusted PT" Phase III clinical studies were as follows: VTE-P- RECORD 1-4 (10mg OD, 2wks (TKR) or 5wk (THR) N=6097); VTE-T

---

[950] Derix Exhibit 28
[951] Derix Exhibit 28
[952] Derix Exhibit 28

EINSTEIN DVT/PE (15mg BID 3 weeks and 20mg OD (3, 6, or 12 months)N=4130); SPAF ROCKET AF (20mg OD/15mg OD if CrCl<50)(mean 570 days)N=7111; J-ROCKET(15mg OD/10mg OD if CrCl<50ml/min)(mean 499 days)N=639, and ACS ATLAS ACS2 TIMI 51 phase 3 (2.5 and 5 mg BID)(mean 390 days)(N=10225) (Total N= 28,202 subjects), with 36% of the simulation phase III populations from ATLAS ACS TIMI 51.   The only Phase II clinical study listed for the model was: ATLAS ACS TIMI 46 phase 2 (5, 10, 15, and 20mg as OD or BID)(6 months) N=2309. [953]   According to Defendants, all studies pooled, 5599 subjects, had 56,741 observations (~ 1 observation per patient).  A total of 40% of the proposed simulation database population came from ATLAS studies (2251/5599).   A flaw of the model for determination of correlation of plasma concentration to risk and benefit was that blood sampling was not obtained at the time of bleeding or efficacy event but at pre-specified time and samples were not obtained at true trough or peak.  Since dosing was at the evening meal, there was a delay in obtaining blood samples at the pre-specified 12 or 24 weeks until 12-24 hours from dosing.

---

**Company position:**

An integrated analysis on rivaroxaban exposure through pooled population PK analyses is provided. The analysis was performed across four patient populations (SPAF, DVT treatment, VTE prevention, and ACS), and is based on pooled data from eight phase II and III studies:

• AF: ROCKET AFL3001 / 11630 [R-8570, Module 5.3.5.1]
• J-ROCKET: Rivaroxaban AF Japan, (SN 12620)
• ACS: Rivaroxaban ACS, #2001 [Study 11898, A51733 in Module 5.3.5.1 ACS]]
• VTE prevention: ODIXa HIP II, (Study 10944, [MRR-00135 in Module 5.3.5.1]
• VTE prevention: ODIXa-OD.HIP (SN 11527)
• VTE prevention: ODIXa Knee, Study 10945 [MRR-00161 in Module 5.3.5.1].
• DVT treatment: ODIXa DVT, (SN 11223, MRR-00150, Module 5.3.5.1))
• DVT treatment: EINSTEIN, (SN 11528, MRR-00223, Module 5.3.5.1)

In total, the population PK dataset consists of 5599 subjects with 56741 observations, who received rivaroxaban treatment as once or twice daily dosing in the range of 2.5 to 40 mg. In the pooled dataset, the most commonly studied dose was the 10 mg (1415/5599 25%) and the largest proportion of subjects were from the phase 2 ACS study # 2001 (2251/5599 40%).

[954]

---

985. The primary dose (tablet) that would be studied in the XARELTO Team's "Exposure-Predication Integrated Model for PK/PD data using adjusted PT" as well as bioavailability would be the 10mg dose. The 10mg dose was approved for chronic use in Japanese SPAF patients with renal impairment and approved for "VTE-P in patients undergoing major orthopedic surgery of the lower limbs."  The 10mg OD tablet was to be taken with or without food.

986. The XARELTO 20mg/15 mg tablet is sold in the EU and the United States for prevention of stroke and systemic embolism in patients with non-valvular atrial fibrillation (SPAF); prevention of recurrent DVT and PE; Treatment of DVT, PE, reduction in the Risk of Recurrence of DVT and PE (initially 15mg BID and switched to 20mg OD) . The 15mg

---

[953] Derix Exhibit 28
[954] XARELTO_JANSSEN_15372631

OD is approved for SPAF in patients with renal impairment and in Japan the 15mg OD is approved for SPAF.  The 20mg and 15mg tablets are both only to be taken with food.

987.   In Defendants' PBRER May 6, 2014, the cumulative worldwide post-marketing exposure of XARELTO from launch to February 28, 2014 totaled 869,660,926 tablets sold, of which 654,060 were 2.5mg (>1%);  184,893,447 were 10mg (21%);  232,400,075 were 15 mg (27%) and 451,713,343 were 20mg (52%).  The most commonly sold XARELTO Tablet worldwide was the 20mg OD tablet.  In the United States the post-marketing exposure of XARELTO from launch to February 28, 2014, totaled 85,535,730 tablets sold, 6,689,930 were 10mg (8%);  21,556,580 were 15 mg (25%); and 67,289,220 were 20mg (79%).[955]  The United States used a greater percentage of 20mg tablets based on tablet sales than the rest of the world (ROW) -- 79% versus 52%.  However, Defendants proposed to conduct its bioavailability and modelling based on the plasma concentration of the 10mg tablet, which would underestimate the effects and plasma concentration.

988.   Defendants proposed to use the VTE-P studies (RECORD 1-4).  Outside the EU, FDA had not accepted all the RECORD 1-3 study data to be reliable, and in fact had deemed the entire RECORD 4 Study as unreliable and rejected its use for approval of the VTE-P indication.  For the ACS study, FDA had not accepted the Phase III ATLAS study as supportive of NDA approval for ACS in 2012, and again rejected NDA approval in 2014 with a re-analysis of the 2.5 mg BID data.  In particular, NDA approval was denied on the basis of the flaws of the ALTAS study showing increased risk of bleeding, unacceptable loss to follow up, and lack of support for efficacy for the indication at 5mg BID and 2.5mg BID dose.  The Phase 2 ATLAS study had exposure for 6 months, while the Phase 3 study ~1 year.  Further, the FDA Advisory Committee suggested in 2014 that with retrieval of the missing data, there appeared to be 'information censoring' by Defendants.  The Advisory Committee Panel voted almost unanimously against approval of the 2.5 mg BID dose for ACS in 2014.[956]

989.   In 2015, it was identified that Defendants' use of the HemoSense POC device in the warfarin arm in its ROCKET AF study, as a commercial device, was unreliable for INR and warfarin monitoring and voluntarily withdrawn from the United States market. Both the FDA and EMA reviewers had raised questions about premature unblinding of results with changes in the protocol.  Thus, the POC device potentially ntroduced significant bias into the ROCKET clinical trial and skewed the data.  The EINSTEIN DVT/PE EXTENSION study provided exposure to rivaroxaban at a maximum of 12 months, while the VTE-P RECORD studies had exposure to rivaroxaban to a maximum of 5 weeks.

990.   Defendants' modelling proposed pooling all XARELTO clinical trial data, despite the study protocols varying significantly in rivaroxaban exposure times, indications, doses

[955] Dyszynski Exhibit 27
[956] Summary Minutes of the FDA Cardiovascular and Renal Drugs Advisory Committee Meeting, January 16, 2014 (Proposed ACS Indication)
(http://webcache.googleusercontent.com/search?q=cache:P7tzErnzp4wJ:www.fda.gov/downloads/AdvisoryCommitt ees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/UCM396034.pdf+&cd =1&hl=en&ct=clnk&gl=us)

and underlying patient populations.   PT values that had been obtained at pre-specified periods (*not at bleeding events, Cmax or Ctrough, PT trough or PT max) were not being proposed to be adjusted to estimate rivaroxaban plasma concentration in the patients with blood samples. There was scarce sampling of blood at times of adverse events.

991.  The JSC was told that the Rapporteur and the Co-Rapporteur "*agreed to the approach*" and offered further advice /interactions after finalization of the exposure prediction. The PowerPoint does not actually indicate that the Rapporteurs specifically agreed to the design of the XARELTO Team's proposed simulation and modelling analysis plan as presented to the JSC.[957] The LEG 036 Assessor comments had mentioned use of simulation modeling as a cost effective alternative method for Defendants to consider to perhaps prevent having to use a prospective clinical trial to obtain PK/PD data for developing TDM recommendations.  It was proposed as a potential Step 1, before moving on to a Step 2, actual prospective clinical trials for development PK/PD information for TDM recommendations.

992.  The CHMP LEG 036 Assessment Report contained the Assessor Comments in response to Defendants' claims that its clinical trial designs and post market safety information was not acceptable for PK/PD and TDM, and its unwillingness to conduct additional trials. It was proposed that Defendants, as an alternative, could start the TDM development process as a "First Step" by performing simulations/modelling of the relationships between exposure on one hand and bleeding and thrombobemolism on the other hand as discussed in relation to CHMP's Request 1.[958]

993.  Defendants' current proposal of a model for the JSC did not include Defendants acquiring real time data to look at coagulation parameters of bleeding and thromboembolic events (Safety/efficacy).  The Assessor commented that modeling could potentially result in narrow target ranges for plasma concentration in comparison to the currently pure descriptive ranges derived from standard dosing provided in the XARELTO SPCs.

994.  The Assessor proposed that in Defendants' "Second Step" towards TDM for the SPmMC, clinical studies could be used for TDM guided dosing, if necessary, to result in fewer outliers where increased risks for loss of efficacy/bleedings could be assumed. None of these Assessor comments as to a mechanism to develop TDM and therapeutic ranges to reduce outliers were relayed to the JSC by the XARELTO Team's presentation.

995.  The Team's PowerPoint presentation to the JSC continued:

> *The team's proposal regarding timelines for completion of the LEG 036 response (finalization of analysis in Q2 2015) was challenged by the EMA.   Defendants indicated to the EMA CHMP that the first information proposal (PopPK) to respond to request 1 for the LEG 036 would be available in October 2015.*[959]

---

[957] Derix Exhibit 28
[958] Homering Exhibit 42
[959] Derix Exhibit 28

996. Defendants informed the JSC of three upcoming general public meetings, none of which were specific for XARELTO.  The three meetings listed were regarding TDM for the class of NOACs/DOACs, reinforcing that the current activity was class related.  The first was an FDA Public Workshop to be held on October 26, 2015 at the FDA Campus in White Oak (and also available as a webcast) titled "In Vitro Diagnostic Testing for Direct Oral Anticoagulants." a  As FDA had identified a need for medical devices for testing of DOACs, the workshop was to focus on medical device manufacturers of potential in vitro diagnostics for NOAC TDM to get regulatory clearance for marketing.

997. The next workshop was an EMAPublic Workshop titled "The role of pharmacokinetic and pharmacodynamics measurements in the use of direct oral anticoagulants (DOACs)," to be held on November 23, 2015 in London, UK. During the workshop, the EMA was to address PK/PD measurements for all DOACs, TDM, and patient safety.

998. The final meeting was the Cardiac Safety Research Consortium Think Tank (CRSC) titled "Is there a Role for Pharmacokinetic/Pharmacodynamics Guided Dosing for Novel Anticoagulants?", to be held on December 3, 2015 in Washington, DC. The purpose of the meeting was to discuss the role of PK/PD for NOACs TDM. After the meeting, though not mentioned to the JSC, there was a debate between FDA's Dr. Temple (pro TDM for NOACs) and Bayer's Dr. Scott Berkowitz (con TDM for NOACs).

999. Keeping with Dr. Berkowitz's position against TDM, Janssen's DRAFT Company Core Position Statement did not support TDM as of 4Q15.[960]  The Janssen draft CDT position statement placed the burden for development of TDM on the shoulders of the FDA to develop a "robust assay" to estimate rivaroxaban exposure and optimal benefit/risk.  The Janssen Position Statement was that the clinical development program, which was not designed to look at plasma concentration and PK/PD and outliers, and postmarketing experience did not support a need for TDM.  The CDT did not recommend TDM.  In marketing XARELTO in the United States, Janssen does not mention commercial rivaroxaban laboratory assays (anti-factor Xa assay). However, Bayer's SmPC, used in marketing Xarelto in Europe and outside the United States, provides as follows:

- *Based on currently available data from extensive clinical development program and postmarketing experience using fixed rivaroxaban doses without TDM, the CDT does not recommend TDM for rivaroxaban*

- *We would consider TDM if the following conditions are met:*

    - *A robust assay was approved by FDA and available in the US to estimate rivaroxaban exposure*

    - *Exposure/response analyses were to indicate that substantial numbers of patients fall outside the exposure range that delivers the optimal benefit risk*

---

[960] Derix Exhibit 31

- *The clinical impact of falling outside of the desired exposure/response range is considered important and*

- *Verify that performing TDM will improve upon the number of patients that fall within the exposure range that delivers the optimal benefit risk[961]*

- **Defendants Develop a "One Size Fits All" Approach for Rivaroxaban PK/PD Modelling For Their October 2015 EMA LEG 036 Response**

  Dr. Dagmar Kubitza (Bayer) was a member of Defendants' XARELTO Joint Team tasked with compiling Defendants' October 2015 response to Request 1 for the EMA. She recalled that the other Team members were Stefan, Lipping, Berkowitz, Peters, Mueck, and Homering.[962]  During the JSC meeting (as discussed above), the Xarelto Joint Team considered using a simulation with pooled population data  for its integrated analysis model.  The Team considered it acceptable to pool all the PK/PT data for all indications and patient populations as an advantage over developing a single PopPK approach for each licensed indication and population.

1000. Dr. Kubitza confirmed that the most commonly studied dose for Defendants' integrated "PopPK simulation" would be the 10mg dose, a dose not approved for XARELTO use for SPAF in the United States.[963] Of the eight studies used by Defendants for its model, only 2 included SPAF patients. The largest study population with PK data available for simulation was Defendants' Phase II ACS study (see discussion of ACS above), for an indication not approved in the United States.  ACS was licensed in the EU based on Defendants' commitment to follow-up measure (FUM) to obtain additional safety data.

1001. Dr. Kubitza testified[964] that she did not remember anyone on the Team expressing concern about the pooling approach selected "diluting the results".  For example in SPAF, patients taking 20mg OD were older and often sicker than orthopedic surgery patients, and pooling could "mask the potential cause and effect between exposure and bleeds/strokes" (*i.e.,* Risk/Benefit). She further testified, "I'm not familiar with all the details of the model so I cannot tell you where exactly the limitations of the model are." She indicated that Dr. Girgis should be the one asked about the model. She confirmed that in 2016 she was not aware of anyone with Defendants still working on completing the PopPK TDM LEG 036 response simualtion: "The basic model has been developed, but the next step is the predication." [965]

1002. In its proposed data pooling and simulation modelling approach, Defendants had assumed that PK/PD/PT parameters for XARELTO would remain consistent across different indications, patient groups, doses and exposure times. Defendants anticipated its simulation, based on the bioavailability of a 10mg tablet as the reference dose, would provide plasma concentration estimates applicable to all patients taking Xarelto whatever

---

[961] Derix Exhibit 31
[962] Kubitza depo 2/29/16, p. 120: L8 – p. 121: L16
[963] Kubitza depo 2/29/16, p. 87: L23 – p. 88: L9
[964] Kubitza depo 2/29/16, p. 138: L14-22; Kubitza Exhibit 11
[965] Kubitza depo 2/29/16, p. 89: L21 – p. 91: L21

the indication (*e.g.*, SPAF or VTE-P) or the lengths of times and the doses (10mg, 20mg, 15 mg) (underlining added for emphasis):

> *Population PK models were developed previously to describe PK of rivaroxaban in patients with AF, ACS, and in need for DVT treatment or VTE prevention. Collectively, these studies (Girgis 2014, Mueck 2007, Mueck 2008a, Mueck 2011, Xu 2012) suggested that the PK parameters were consistent across different indications.*

> *Predefined covariates that were biologically meaningful and have been identified from previous population analyses were included in the integrated model as well. Both age and renal function have been found to be significant factors of rivaroxaban PK in healthy subjects and patients (Girgis 2014, Mueck 2007, Mueck 2008a, Mueck 2011, Xu 2012). Similarly, significant effects of age and bodyweight on volume of distribution have also been reported in healthy subjects and patient populations….In addition, bioavailability of rivaroxaban has been shown to be dose dependent in DVT treatment, VTE prevention and ACS patients populations…Therefore, the covariates included in the integrated PK model were as follows: age and renal function…body weight and age. Dose dependence was estimated on relative bioavailability using a 1 mg rivaroxaban reference dose.  …*

> *The integrated population PK model is expected to achieve a robust and harmonized description of rivaroxaban exposure in <u>all approved patient populations irrespective of dosing regimen, dose strengths, trial specifications</u>.  In addition, this model would also assess the impact of patient populations, co-administered medications and geographic factors (Japan vs rest of world) on rivaroxaban exposure, that were not available in previous analyses. [966]*

1003.  Dr. Kubitza confirmed that PopPK models for other indications had already been done by Defendants.  When asked why Defendants did not perform a single PopPK analyses for each indication, and subsequently perform an integrated analysis, she responded: "I'm not aware of any reason."[967]

1004.  Defendants' conclusions, using its integrated PK (PT) simulation model was that "the population PK analysis did not suggest differences in rivaroxaban exposure across the four evaluated patient populations and geographic regions (Japan vs rest of world)."[968] Even before modeling was completed, Defendants' anticipated that the simulation model would show no differences, thereby showing predictability of therapeutic effect using integrated PK simulation model, which would  support the lack of a need for TDM to the EMA.

---

[966] Kubitza Exhibit 11
[967] Kubitza depo 2/29/16, p. 140: L7-14
[968] Kubitza Exhibit 12

## XVII.    THREE PUBLIC MEETINGS FOR DOACS AND TDM

### a.  PUBLIC MEETING #1: FDA WORKSHOP REGARDING IN VITRO DIAGNOSTIC TESTING FOR DOACS

1005. As discussed above, the FDA workship on October 26, 2015 was intended to be a medical device meeting, presented by FDA's CDRH, aimed at medical device manufacturers to discuss methods for obtaining the need for DOAC in vitro devices, and the FDA's clearance process for in vitro diagnostic devices intended for NOAC TDM sold in the United States.  The FDA's meeting began with a brief "Overview of DOACS and Their Clinical Indications" given by Dr. Robert Califf, now Commissioner of the FDA.  Another topic included "Emergency Department Cases Where NOAC Testing Would Have Been useful" with discussion of 6 scenarios that necessitated NOAC testing for physicians and patient management: stroke, trauma, evaluating VTE, spontaneous hemorrhages, emergent procedures and intentional and unintentional overdose.  The next presentation was titled: "Measurement of the DOACS: Basic Principles and Attributes of an Ideal Assay.  This was a PowerPoint presentation by Dr. Cuker, Perelman School of Medicine, University of PA.  His slide titled, "Plasma drug levels" provided drug levels for 4 approved DOACS including rivaroxaban. For a patient on 20mg OD of rivaroxaban he listed the median trough plasma as **26 ng/mL**; (5th-95th % **6- 87 ng/mL**) and peak plasma median as **270 ng/mL** (range **189-419 ng/mL**).[969],[970]  Dr. Cuker presented the following slides:

---

[969] Mueck W, et al. *Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban*. Clin Pharmacokinet (2014) 53:1-16.
[970] FDA CRDH Public Workshop October 26, 2016, *Measurement of the DOACs: Basic Principles and Attributes of an Ideal Assay* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473311.pdf)



[971] FDA CRDH Public Workshop October 26, 2016, *Measurement of the DOACs: Basic Principles and Attributes of an Ideal Assay* at slide 7
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473311.pdf)

10

# Take-home points

- There is substantial intra- and inter-individual variation in DOAC levels.

- Therapeutic ranges have not been defined.

- On-therapy range = 5% trough to 95% peak

- Laboratory measurement may be desirable in special circumstances.

- The ideal assay should:
  - Show good linear correlation with drug levels, as measured by LC-MS/MS
  - Across a broad range of clinically relevant concentrations
  - Be sufficiently sensitive to the smallest clinically relevant concentrations
  - Be specific
  - Be available 24/7 with an acceptable TAT

1006. The next FDA invited presenter was Dorothy Adcock, M.D. Colorado Coagulation Laboratory, with a presentation entitled "Methods for Measuring Direct Oral Anticoagulants," which contained the following slides:[972]

---

[972] FDA CRDH Public Workshop October 26, 2016, *Measurement of the DOACs: Basic Principles and Attributes of an Ideal Assay* at slide 10
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473311.pdf)

337



## Rivaroxaban (DXa) Effect on PT and APTT

Amount of rivaroxaban needed to double the PT varies from 66ng/mL to 700ng/mL depending on the reagent, with no correlation to ISI
*Samama MM, et al. Thromb Haemost.*2010;103:815-25

———— On therapy range          ———— Upper limit normal range

Francart S,… Adcock D, Gosselin R, Moll S. *Thromb Haemost* 2014;116:1133-40

973

---

973 FDA CDRH Public Workshop October, 26, 2015, Presentation by Dorothy Adcock, *Methods for Measuring Direct Oral Anticoagulants,* at slide 9.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473312.pdf)

## Anti-Xa Assays for DXa Inhibitors



### Anti-Xa Assay Principal

Patient sample (DXa) + FXa (in excess)

Residual Xa = [1/DXa]

Measured with a chromogenic substrate

*The assay is calibrated with the specific DXa (rivaroxaban), results are reported in ng/mL*

- AT-supplemented reagents are not recommended
- Human Xa vs bovine Xa

Francart S, …Adcock D, Gosselin R, Moll S. *Thromb Haemost 2014;116:1133-40.*
974

1007. The next invited speaker was Bob Gosselin, CLS, Sr. Specialist, Special Coagulation Section at Department of Pathology, University of California, Davis Health Systems. He gave a presentation entitled "DOAC Assessment at UCDHS: What's Important," For DOAC Assessment at UCDHS, he "implemented drug calibrated anti-Xa in 2013-Techniclone and Hyphen Biomedical calibrators and controls."[975]  A slide titled "FXa DOAC test verification of performance" indicated as follows:

- *Rivaroxaban*
    - *Collaborative study with UNC-patients samples*
    - *LC-MS/MS provided by Lab Corp*
    - *Drug obtained from Janssen Pharmaceutical Inc.*

---

[974] FDA CDRH Public Workshop October, 26, 2015, Presentation by Dorothy Adcock, *Methods for Measuring Direct Oral Anticoagulants,* at slide 22.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473312.pdf)
[975] FDA CDRH Publich Workshop October 26, 2015, Presentation by Bob Gosselin, *DOAC Assessment at UCDHS: What's Important,* at slide 5.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473313.pdf)

- *Enriched plasma studies.*[976]

1008. Mr. Gosselin provided that Factor Xa DOAC-Drug calibrated anti-Xa- calibrators and controls could be obtained from Diagnostica Stago, Techniclone, and Hyphen Biomedical.

1009. Mr. Gosselin provided slides regarding DOAC Assessment in the United States.  He also identified that Defendants directly provided rivaroxaban and patient samples for his studies with UNC.





977

---

[976]  FDA CDRH Publich Workshop October 26, 2015, Presentation by Bob Gosselin, *DOAC Assessment at UCDHS: What's Important,* at slide 12.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473313.pdf)
[977] FDA CDRH Publich Workshop October 26, 2015, Presentation by Bob Gosselin, *DOAC Assessment at UCDHS: What's Important,* at slide 14.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473313.pdf)

# Comment with each result:

### Rivaroxaban:

*Routine monitoring of Rivaroxaban (Xarelto) serum levels is not currently recommended with only limited data available for use patients receiving this drug.  Results can vary depending on selected factors such as   indication, renal function, daily dose and frequency of administration, with or without food etc. In the Einstein-DVT-Dose-Ranging Study (Blood   2008;112:2242-2247), patients receiving 20mg rivaroxaban once daily for continued DVT treatment had median trough drug levels of 32ng/mL (19-60ng/Ml interquartile range) .  For further assistance regarding Rivaroxaban plasma levels please contact anticoagulation pharmacists*

978

---

[978] FDA CDRH Publich Workshop October 26, 2015, Presentation by Bob Gosselin, *DOAC Assessment at UCDHS: What's Important,* at slide 5.
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473313.pdf)

# DOAC Assessment in the US

- Based on recent College of American Pathologists proficiency survey:
  - ~4,500 laboratories report PT and APTT
  - ~400 laboratories report Anti-Xa measurements
    - UFH, LMWH, Hybrid
  - ~ 20 laboratories report measurement of DOAC
    - 19 Anti-IIa
    - 21 Anti-Xa
      - Only rivaroxaban?

342



1010. The next presentation during the FDA Workshop was made by Stephan Moll, MD, University of North Carolina, Chapel Hill, NC. His PowerPoint entitled," When is testing needed? How to Interpret Tests?" contained a slide titled "DOACS: Expected levels- Inter-individual differences" depicting Table 1: Published Ranges of DOAC Peak and Trough: Rivaroxaban: 20mg QD, peak values 103-660ng/mL, trough values 8.9-92ng/mL.[980]  His next slide, "DOACS: Expected Levels" contained an actual patient laboratory sheet from LABORATORY CORPORATION OF AMERICA with patient value of Rivaroxaban =459.8 ng/mL.  For 10mg QD the mean peak was 124.6 ng/mL (range 91.4-195.5ng/mL); trough median 9.1 (range 1.3-37.6 ng/mL); 20mg QD peak 222.6 ng/mL (159.6-359.8 ng/mL); and trough 22.3ng/mL (4.3-95.7ng/mL).  The sampling instructions were that "peak levels should be drawn 3 hours after oral dosing." Trough levels were drawn 24 hours after oral dosing. Steady state was obtained after 4 to

---

[979] FDA CDRH Publich Workshop October 26, 2015, Presentation by Bob Gosselin, *DOAC Assessment at UCDHS: What's Important*

(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473313.pdf)
[980] Francart S., et al. *Performance of coagulation tests in patients on therapeutic doses of rivaroxaban: A cross-sectional pharmacodynamics study based on peak and trough plasma levels.* Thromb Haemost (2014); 111:1133-1140.

6 days of once daily treatment. The peak and trough ranges were obtained from the following study and represent the median (5th and 95th percentiles): A 10mg dose study including 135 patients and a 20mg dose with 131 patients. The source of this PK information for rivaroxaban was "Mueck (2008)."[981]  In conclusion, he observed big differences between patients, day-to-day fluctuations in a given patient, and limited knowledge of correlation of drug-level with efficacy and safety.

1011. Dr. Moll's recommendations for the type of patient for whom testing should be considered were as follows: obese (BMI >40kg/m$^2$; weight >140kg); underweight; interfering medications;fragile elderly; borderline renal function; recurrent thrombosis on DOAC; major bleeding on DOAC; assessing disappearance of DOAC prior to surgery; check for compliance with drug; dosing of reversal agents; and DOAC interactions with chemotherapy.

1012. His case series at UNC identified all dabigatran, rivaroxaban, and apixaban levels ordered at UNC from June 2012 to July 2015.  Results were for 28 patients (48 levels).

1013. In the afternoon session, Dr. Cuker gave another presentation titled "Measurement of the DOACS: Suggestions and Guidance Statements".  He provided his published suggestion for measurement of FXa inhibitors based on PT if specialized assays were not available[982]:



| 9 | **Suggestions for measurement of FXa inhibitors if specialized assays are not available** | | | |
|---|---|---|---|---|
| | **Exclude on-therapy drug levels** | | **Determine whether above on-therapy levels are present** | |
| Rivaroxaban Edoxaban | None | Normal PT and APTT do not exclude clinically relevant levels | PT | • Prolonged PT suggests that on-therapy or above on-therapy levels are present. • Normal PT likely excludes above on-therapy levels. • Normal PT may not exclude on-therapy levels. |

983

981 Mueck W, Borris KC, Dahl OE, et al. *Population pharmacokinetics and pharmacodynamics of once-and twice-daily rivaroxaban for the prevention of venous thromboembolism in patients undergoing total hip replacement.* Thromb Haemost. (2008): 100(3):453-461
982 FDA CDRH Workshop, October 26, 2015, presentation by Adam Cuker, *Measurement of the DOACs: Suggestions amd Guidance Statements* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473316.pdf)
983 FDA CDRH Workshop, October 26, 2015, presentation by Adam Cuker, *Measurement of the DOACs: Suggestions amd Guidance Statements* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473316.pdf)

1014. Abraham Tzou, FDA/CDRH/OIR/DMGP, gave a presentation on behalf of the FDA regarding regulatory considerations.  A slide titled "Routine Therapeutic Monitoring," discussed repeated testing in individual patients, that therapeutic range translates into clinical outcomes, and that changes in test resultsare sufficient to prompt clinical action (e.g. dose adjustment).[984] For the "Premarket" development of commercial in vitro diagnostic tests for therapeutic monitoring of DOACS, he provided:

- *Evaluate patients undergoing monitoring*
- *Accuracy and consistency at key medical decision levels (e.g. subtherapeutic, therapeutic, supratherapeutic)*
- *Well-established comparator method*
- *Calibrators and controls, as applicable*
- *Support for use in monitoring[985]*

1015. FDA's Marina Kondratovich, Ph.D (FDA/CDRH/OIR) presented the options for the in vitro industry for development of DOAC therapeutic testing.  She provided a discussion of the types of in vitro diagnostic tests for DOACS. The first type,qualitative tests,are basically a test to determine whether a drug is detected..  The development of these tests requires the sponsor to determine the threshold for detection and limit of blank (LoB) (threshold with low probability α=5%), and limit of detection (LoD) (detected 95% of the time under different testing conditions).  For these tests, FDA was concerned about 'within-subject biological variability' for the intended patient popualtion. The second type of test, quantitative tests, provide numerical values, which should have favorable properties (for example linearity).  Linearity is related to device calibration – a process that establishes the relationship between an assigned value (result) based on device calibrators and correlation with detection of an instrument signal. The device calibrators establish the calibration curve which serves to relate the mean of the measured signal (result) to an assigned concentration value.  For quantitative tests, the Limit of Quantitation (LoQ) is important (showing precision and bias are acceptable). The third type of test, semi-quantitative tests, provide results such as 'not detected,' low', 'on therapy range' and 'high'.   They do not provide values.  The advantage of this type of device is the assay can be less precise than a quantitative assay, and there are no requirements for linearity (*i.e.,* calibration) and the values are easy to interpret.  The disadvantage of this type of in vitro device for a DOAC is that this test does not provide numerical information about how close the patient result falls to the test's cutoff values.[986]

---

[984] FDA CDRH Workshop, October 26, 2015, Presentation by Abraham Tzou, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants – Regulatory Considerations*
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473324.pdf)
[985] FDA CDRH Workshop, October 26, 2015, Presentation by Abraham Tzou, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants – Regulatory Considerations*
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473324.pdf)
[986] FDA CDRH Workshop, October 26, 2015, Presentation by Marina Kondratovich, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants – Test Outputs and Interpretations*
*(*www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473323.pdf)

1016. F. Depasse, D. Kaczor, Stago, gave a presentation from the industry perspective titled: "Testing for Direct Oral Anticoagulants and IVD Perspective". The presentation discussed Stago's experience with DOAC assays in Europe. He discussed that Stago has been working on 1) Specific Quantitative assays with dedicated calibrators and controls; 2) Chromogenic assays for anti-XA: same reagent as for heparin (K111822-Heparin Only); 3) Fully automated (turn around time of 6 minutes); 4) Wide measuring ranges (20 to 500ng/mL), based on observations from PK studies; and 5) Traceable to LCMS[987] reference methods used during drug development.[988]

1017. Stago provided the CE marking experience with rivaroxaban based on EPO9-A2 guidelines, reference method LCMS. Stago also indicated it was up to each DOAC manufacturer to include the recommendation for the assay values in the DOAC label and to define the levels in its pivotal trials. Stago maintained it was beyond the role of the IVD company to determine this therapeutic information for clinicians. Stago developed the IVD tests, not the drug.[989]

- ▪ *Intended use:*
  - *<u>**quanititive determination**</u> in plasma of [DOAC] by **<u>measuring its direct [anti-Xa] activity</u>** in a competitive assay using a synthetic chromogenic substrate on [Stago isntruments].*
  - *"This concentration is helpful for clinicians to assess the extent of anticoagulation in situations requiring further characterization of the clinical literature"*
    - ○ *Supported by literature…*
  - *No thresholds for result interpretion is provided*

- ▪ *Determination of adverse event/clinical decision in relation with threshold is not feasible if there are no recommendations in DOAC labeling; not defined in the pivotal studies. This would be beyond the sole capability of an IVD company.[990]*

1018. According to Stago, there are several guidances recommending DOAC measurement in specific situations, but only one reference comments on thresholds related to clinical decisions.[991, 992, 993, 994]

---

[987] LCMS= Liquid chromatography-Mass spectrometry

[988] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[989] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[990] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[991] Pernod G, et al. *Management of major bleeding complications and emergency surgery in patients on long-term treatment with direct oral anticoagulants, thrombin or factor-Xa inhibitors: Proposals of the Working Group on Perioperative Haemostasis (GIHP) – March 2013.* Arch Cardiovascular Disease (2013); 106:382-93.

346

1019. The first Stago kits for rivaroxaban were CE marked in 2012 (calibrators and controls), followed by kits for dabigatran and apixaban in 2015.  Stago DOAC kits are marketed in more than 40 countries world wide, including in Europe, Latin America, Middle East, Asia Pacific, Ocenia.  For example, 50% of University hospitals in France use Stago assays.  The demand is growing each year, with rivaroxaban in volumes of quality controls sold increased by180% in 2014 vs 2013.  There are other companies with DOAC assays with CE market.  The most frequent use is for bleeding investigation.  The feedback from the field is that the tool is useful for clinicians and aids in clinical decisions, and is readily available in routine settings.  Moreover, scientific studies support the accuracy of performance of the Stago assays.[995,996]

1020. In terms of "US DOAC Prescriptions," DOACs are now important players in the US market, [997] with the SPAF population having the largest potential for DOAC measurements. [998]

---

[992] Heidbuchel H. et al. *Updated European Heart Rhythm Association Practical Guide on the use of non-vitamin K antagonist anticoagulants in patients with non-valvular atrial fibrillation.* Europace (2015, Aug 31) (Epub ahead of print)

[993] Camm AJ, et al. *2012 focused update of the ESC Guidelines for the management of atrial fibrillation.* European Heart Journal (2012): 33, 2719-2747.

[994] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[995] Gouin-Thibault I, et al. *Assessment of apixaban plasma levels by laboratory tests: suitability of three anti-Xa assays. A multicenter French GEHT study.* Thromb Haemos (2014 Feb) 111(2):240-8; Rathbun S, et al. *Comparison of Methods to Determine Rivaroxaban anti-factor Xa activity.* Thromb Res. (2015 Feb) 135(2):394-7.

[996] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[997] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

[998] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

## US DOAC measuring potential

- **Several specific situations in which DOAC measurements can be helpful**
- **Stroke Prevention in Atrial Fibrillation (SPAF) = largest potential for DOAC measurements**
  - ~3 000 000 patients with AF in the US[1]

| Treatment for SPAF | % of Patients | Nb of Patients | IVD Testing | Patients that may benefit from testing / year | Tests / Patient / Year | Potential nb of tests / year |
|---|---|---|---|---|---|---|
| No treatment | ~50% | 1 500 000 | 0% | / | / | / |
| VKA | ~25%[2] | 750 000 | 100% | 750 000 | > 12 | ~ 9 millions |
| DOAC | ~25%[2] | 750 000 | 10 -20%[3] | 75 000 to 150 000 (if tests available) | < 3 | ~ 450 000 |

→ Significant number of patients may benefit from DOAC measurements

BUT…

→ DOAC testing potential market is limited compared to VKA monitoring

1- Adcock DM, Gosselin R. Thromb Res 2015 Jul;136(1):7-12
2- IMS Health National Prescription Audit, Data through 2/6/15
3- Pernod G *et al.* Arch Cardiovasc Dis 2013; 106: 382-93



12

999

---

999 FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* at slide 12 (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

## How to access the US market ?

- **Stago objective is to have DOAC assays marketed worldwide to contribute to improve patient outcomes**
  - ◆ US is targeted as a high priority

- **FDA least burdensome pathway**
  - ◆ Most efficient pathway for clearance
    - · Balance investments/burden
    - · Small portion of patients on DOAC will need testing

13

Stago

1000

---

[1000] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* at slide 13
(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

1001

1021. Marck Triscott, Ph.D, of Instrumentation Laboratory (IL), gave a presentation titled "Development of Assays for the Testing of Direct Oral Anticoagulants (DOACS)," which included Material Transfer Agreements in place with Bayer.  IL currently markets testing solutions for Rivaroxaban in EU (CE marked) as "Complete Solutions": calibrators/controls, reagent test kits and validated test methods on IL instrumentation.

1001 FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* at slide 14 (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

# Development Collaborations

- For DOAC-related projects, IL has collaborated closely with drug manufacturers to ensure:
  - Direct access to each DOAC for the manufacture of calibrators / controls
  - Traceability of materials to manufacturers' product mass measurements using methods used by pharmaceutical companies (e.g HPLC/MS/MS*).
  - Consensus on best approach to providing solutions to our mutual customers
- Material Transfer Agreements in place with drug manufacturers, *for example*:
  - Bayer
  - Bristol Myers Squibb
  - Boehringer Ingelheim
- Engagement throughout development process.

\* High Pressure Liquid Chromatography and Tandem Mass Spectroscopy

© Instrumentation Laboratory. All rights reserved. Confidential. For internal use only.

Our Passion.
  Your Results.

Instrumentation Laboratory

1002

---

[1002] FDA CDRH Workshop, October 26, 2015, Presentation by Mark Triscott Ph.D., *Development of Assays for the Testing of Direct Oral Anticoagulants (DOACs)* at slide 7 *(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473319.pdf)*

## HemosIL Rivaroxaban Testing Solution

- Chromogenic Anti-Xa method
  - HemosIL Liquid Anti-Xa technology adapted for Rivaroxaban
- Rivaroxaban Calibrators / Controls
  - Traceable to LC MS/MS
- Validated test method for ACL TOP family instruments
- Linearity from 20 – 1,000 ng/mL
- Limit of detection 10 ng/mL
- Total and within run precision (CV < 5%)
- Instrument-specific on-board stability claims (ACL TOP Family)
  - Extended refrigerated claims



Our Passion.
    Your Results.

Instrumentation Laboratory

12

1003

1022. Defendants were aware of the FDA public meeting, andwould have had access to all the presentations and the workshop transcript. Webcasts of the sessions are also available on the FDA's website.

1023. In summary, Janssen was credited with providing rivaroxaban for studies conducted at UCDHS. Bayer is mentioned as having a Material Transfer Agreement with IL. Therefore, Defendants are clearly engaged with manufacturers pursuing diagnostic devices for therapeutic drug monitoring, both inside and outside of the United States. Physicians have presented on the clinical role and need for such information for TDM. The device manufacturers rely on the drug manufacturer, Defendants, to provide the relevant clinical information and instructions for use of TDM for patients.  As Stago's presentation indicated, that information should have been obtained in the pivotal studies. That is the same information which the EMA LEG 036, FDA and physicians have been attempting to obtain from Defendants for XARELTO since 2008.

---

[1003] CDRH Workshop, October 26, 2015, Presentation by Mark Triscott Ph.D., *Development of Assays for the Testing of Direct Oral Anticoagulants (DOACs)* at slide 12 *(www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473319.pdf)*

**b. PUBLIC MEETING #2: EMA WORKSHOP ON THE ROLE OF PK/PD
MEASUREMENTS AND DOACS**

- **Preparation for EMA Workshop**

1024. An October 11, 2015 draft PowerPoint presentation intended for Session 4 of EMA's
Workshop on November 23, 2015,  Discussion of Gaps in Knowledge about DOACs and
PK/PD Measurements,  Provided as follows: (bolding added for emphasis)

- *PK curve over time "wolfgang slide" + "Portola" slides DVT/ACS*
- ***Exposure/response analyses were to indicate that substantial numbers of
patients fall outside the exposure range that delivers the optimal benefit
risk*** *(Wolfgang Mueck slides)*
- *Variability in PK/PD we see in our program.[1004]*

1025. Dr. Kubitza testified[1005] that the referenced "wolfgang" slide came from "Exposures
versus Outcomes" section from Study 11527, thePhase IIb study (ODIXa-OD.HIP), with
information obtained about bleeding/thrombotic events.[1006] The slide stated the
information is "From WM, 11615."  The slide was originally made in October 2005 for
use at an internal ODIXa-OD.HIP steering committee meeting (for Study 111527 Phase
IIb) held in London regarding the ongoing evaluation of data. The "wolfgang slide" was
now being proposed as a potential response to the EMA's LEG 036 request for 'Exposure
versus Outcome' analysis.  The analysis performed included "pooling" of available data.

1026. Study 11527 had been referenced (as discussed above) for the EMA in Defendants' 2014
PBRER Statement, as prepared by Dr. Spiro, Dr. Dyszinski, Dr. Homering and Dr.
Berkowitz in 2014.  Ms. Claudia Henn had asked Dr. Spiro about retaining Study 11527
in the 2014 PBRER statement after he had deleted it.  She continued that Study 11527
had shown bleeding risk increased with higher PK values with the typical range of
rivaroxaban doses of 5-20mg OD but with no support for increased bleeding at higher
Cmax values when compared to subjects without bleeding.[1007]

1027. But as discussed in the proposal to use the "wolfgang slide," though not stated in the
PBRER, the exposure/response analysis in Study 11527 showed that a substantial number
of patients fell outside the exposure range considered for optimal benefit.  This
information was not provided by Dr. Berkowitz at the EMA Workshop presentation or by
anyone from Bayer/Janssen.  The slide and information was not based on measured
plasma concentration but rather on predicted individual plasma time curves. When asked
about the "wolfgang slide" in 2016, Dr. Kubitza testified:

> *Q. It has never been shown elsewhere, been formally reported to my knowledge. But
> I assume it could be easily reproduced based on the available PopPK data from*

---

[1004] Kubitza Exhibit 47 at slide 9
[1005] Kubitza depo 3/1/16, p. 528: L28 – p. 531: L18
[1006] Dyszynski Exhibit 29; Mueck Exhibit 27.
[1007] Dyszynski Exhibit 29

*ODIXa-HIP (archived) and the reported bleeding/thrombotic event results in that study (in archived clinical database or stats files) Did I read that correctly?*

*A. Yes.*

*Q. When this slide was added to the slide deck, was there some discussion in the company as to why, perhaps, it should not be used? Do you recall that?*

*A. No.  It was just—I mean , the caveats that these were obviously not produced in an official—I mean, they were not part of a report, and so this is—I'm not sure when the work was done.*

*Q ...And this is the exposure versus-outcome analysis that EMA was asking Bayer to perform with respect to the AFib indication through an integrated model process that Bayer was suggesting, correct?*

*A. EMA is requesting an exposure outcome analysis.*

*Q...so if we look at the right side of the slide it says, Individual Predicted Plasma Concentration Time Curves Total. Do you see that?*

*A. Yes*

*Q. So in this particular slide, Bayer had made individual predictions of plasma concentrations for the patients in Study 11527 ODIXa Study, correct?*

*A. That's what's written here.*

*Q...on the left side of the slide, it's measuring actual exposure to the drug, correct?*

*A. It's not measured; it's predicted.*

*Q.  ...there are basically three plotted lines drawn from different outcomes, the black—gray line being no event correct?*

*A. That's what the legend says*

*Q...the bright red lines being major bleeding events*

*A. Major and clinically relevant, non-major, yes. Combined.*

*Q...the dashed red lines at the clinically relevant bleeds, correct?  ...*

*A. Yeah, that's what is said here.*

*Q...On the left side of the slide is demonstrating the predicted plasma concentration of the drug across individuals based on PopPk modeling for the 11527 study, right?*

*A Yes*

*Q.  ...each of these lines on this chart represent an individual patient that has been modeled based on PopPK modeling for plasma concentration of the drug and*

*whether they were a patient that had a bleed, a major bleed, or clinically relevant bleed…*

*A. Yes.*

*Q. And that is the same thing that the EMA, ten years later from when Dr. Mueck produced the slide, is asking Bayer to do for the AFib population and the people included in the ROCKET study, correct?*

*A. EMA is asking us for an exposure response analysis on all trials—on all indications.[1008]*

1028. Dr. Kubitza was copied on an email sent from Dr. Mueck on March 30, 2004 to Christoph Dierig, Subject BAY59-7939/10492, regarding a modeling evaluation plan using PT in the DVT-P hip study. Dr. Kubitza responded: "one can model on the basis of PT---interesting".[1009, 1010]

- **EMA Meeting**

1029. The objective of the EMA Workshop was to bring experts and stakeholders together to discuss the utility of PK and PD measurements in the clinical use of DOACS. Dr. Berkowitz presented the industry prospective for Bayer/Janssen. FDA was also present at the meeting with the final panel discussion led by FDA's Dr. Mary Ross Southwell.

1030. Menno Huisman, Department of Thrombosis and Hemostasis LUMC Leiden, The Netherlands, presented the clinical perspective of "Challenging Patients on DOACS and Need for Monitoring."[1011]

1031. Dr. Huisman presented a table titled "Sensitivity of PT for rivaroxaban" (see below). The central lightly shaded portion of the graph represents the 5th-95% percentile interval in a simulated AF population at 'Cmax'. The dark shaded area nearest the X-axis represents the 5th-95% percentile in a simulated AF population at Ctrough. The Y axis provides the rivoraxaban plasma concentration. Note, not all predicted values for the AF population fall within the 95% percentile at Cmax or C trough.

---

[1008] Kubitza depo 3/1/16, p. 530: L5 – p. 535: L20
[1009] Kubitza Exhibit 23; p. 279: L18 – p. 283: L2
[1010] Kubitza Exhibit 24
[1011] Presentation by Menno Huisman, *Challenging patients on DOACS and need for monitoring* (http://webcache.googleusercontent.com/search?q=cache:ay69q99fuBwJ:www.ema.europa.eu/docs/en_GB/document_library/Presentation/2016/01/WC500199522.pdf+&cd=1&hl=en&ct=clnk&gl=us)





1012

1032. Steve Kitchen, Clinical Scientist, Sheffield Haemophilia and Thrombosis Center & Scientific Director UK NEQAS Blood Coagulation, gave a presentation at the EMA Workshop titled: "Measuring concentrations of Rivaroxaban, Apixaban, Edoxaban Methods and Challenges."  A slide titled "Rivaroxaban/Xarelto SPC" contained information  currently in the European Xarelto label (SPC):

---

[1012] Presentation by Menno Huisman, *Challenging patients on DOACS and need for monitoring* at slide 12 (http://webcache.googleusercontent.com/search?q=cache:ay69q99fuBwJ:www.ema.europa.eu/docs/en_GB/docume nt_library/Presentation/2016/01/WC500199522.pdf+&cd=1&hl=en&ct=clnk&gl=us)

**Rivaroxaban/Xarelto SPC**

- PT APTT Heptest are affected by rivaroxaban

- Dose dependent effect on PT with Neoplastin. Other reagents provide different results.  PT done in seconds not INR.

- Conversion between warfarin and Riva - anti Xa PiCT Heptest can be used to test for effects of Riva as these are not affected by warfarin

- Calibrated quantitative anti Xa assay may be useful in exceptional circumstances

- 20 mg dose - Geometric mean (90% prediction interval) 2-4 hr post dose 215 µg/ml (22-535) and 24 hr post dose- 32 µg/ml ( 6-239)

1013

1033. He then commented on the next slide addressing "What is needed" for the SPC:

- *More information/data/references to PT and APTT and Anti Xa results with different reagents.*

- *Anti Xa levels in more detail where lacking*

- *Statements that normal PT and/or APTT don't exclude presence of therapeutic levels.*[1014]

1034. Dr. Berkowitz then gave a presentation in contrast to the presentations already made encouraging the development of PK/PD information and the utility of therapeutic levels

---

[1013] Presentation by Steve Kitchen, *Measuring concentrations of Rivaroxaban, Apirxaban Edoxaban – Methods and Challenges* at slide 20
(www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199526.pdf)
[1014] Presentation by Steve Kitchen, *Measuring concentrations of Rivaroxaban, Apirxaban Edoxaban – Methods and Challenges* at slide 21
(www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199526.pdf)

for DOACs.[1015] He indicated that development of rivaroxaban was to provide reliable anticoagulation without the need to monitor for dose adjustment because of a "highly predictable PK/PD response". He said the SPC summarized the most relevant information for clinicians in Section 4.2 Posology/Administration, Section 5.1 Pharmacodynamic properties, and Section 5.2 Pharmacokinetic properties.  He called plasma levels sensitive to both time of sampling and time of last dose taken as recalled by patient. He had a slide showing a list of CE Marked anti-factor XA chromogenic assays already available in the EU to measure rivaroxaban plasma concentrations: 1) Diagostica Stago- STA- Liquid anti-Xa; 2) Hyphen Biomed- Biophen DiXal; 3) Instrumentation Laboratories Hemosil Liquid anti-Xa; and 4) Technoclone Technochrome anti-Xa.  He provided no recommendations as to how the kits or information would be used by a clinician caring for a patient prescribed rivaroxaban.[1016]  He did not indicate or address that the EMA LEG 036 had specifically requested Bayer provide a "summary of the calibrated quantitative anti-factor Xa assay in terms of variability of the bioanalytical assay, including intra-subject variability."[1017]

1035. Next, Dr. Berkowitz provided a series of slides showing that PK/PD was developed by Defendants from the phase I, II and III trials.  Dedicated phase I studies identified PK covariates (AUC and Cmax). Phase II population PK data confirmed the identified co-variates in patients  with "predicted" (*not measured)  rivaroxaban plasma concentration, time profiles for "extremes" in age, renal function and body weight in patients and no correlation with safety or efficacy.[1018] In Phase III studies, patient characteristics determined the safety and efficacy profile.[1019, 1020]  There is no mention or use by Dr. Berkowitz of the "wolfgang slide" (see discussion above) discussing:

- *Exposure/response analyses were to indicate that substantial number of patients fall outside the exposure range that delivers the optimal benefit (Wolfgang Mueck slides)*

- *Variability in PK/PD we see in our program.*[1021]

1036. Dr. Berkowitz provided the "Rivaroxaban Exposure Prediction Model,"as shown by the Xarelto Team to the JSC.  He once again made no mention that this simulation model

---

[1015] Presentation by Scott Berkowitz, *Workshop: The role of pharmacokinetic and pharmacodynamics measurements in the use of direct oral anticoagulants* dated November 23, 2015
(www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199519.pdf)
[1016] Presentation by Scott Berkowitz, *Workshop: The role of pharmacokinetic and pharmacodynamics measurements in the use of direct oral anticoagulants* dated November 23, 2015
(www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199519.pdf)
[1017] Homering Exhibit 42
[1018] Mueck et al. *Population Pharmacokinetic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention,* Clin Pharmacokinetic (2011); 50:675-686
[1019] Bauersachs R, et al. *Rivaroxaban versus enoxaparin/vitamin K antagonist therapy in patients with venous thromboembolism and renal impairment.* Thromb J (2014), 12:25.
[1020] Prins MH, et al. *Oral rivaroxaban versus standard therapy for the treatment of symptomatic venous thromboembolism: a pooled analysis of the EINSTEIN-DVT and PE randomized studies.* Thromb J (2013),11:21
[1021] Kubitza Exhibit 47 at slide 9

was created to respond to the EMA's LEG 036 Request 1.Despite the EMA Assessor's conclusions in the LEG 036 Assessment Report describing deficiencies of Defendants previous obtaining of PK/PD in its clinical trials, the slide inaccurately suggests Bayer has been actively engaged in analyses of rivaroxaban PK/PD and plasma concentration in its clinical trials.[1022]

1037.Prof Hugo ten Cate, Maastrict, The Netherlands, gave a presentation titled "NOAC: Future perspectives: academic perspective."[1023]   For stroke or systemic embolism, rivaroxaban is listed as his fourth entry and the closest to being on the midline for the NOACS.

---

[1022] Presentation by Scott Berkowitz, *Workshop: The role of pharmacokinetic and pharmacodynamics measurements in the use of direct oral anticoagulants* dated November 23, 2015 (www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199519.pdf)

[1023] Presentation by Prof. Hugo ten Cate, *NOAC: Future perspectives: academic perspective* (www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199517.pdf)



1038. For major bleeding, rivaroxaban is the only NOAC with a HR >1.0 (1.03) (0.89, 1.19). Dr. ten Cate concluded his presentation by stating that NOAC (and VKA) treatment should be improved,that drug and dose selection should be optimized based on individual criteria (also including PK), and that long-term follow-up for NOACS should be optimized.[1024]

## c. PUBLIC MEETING #3: CARDIAC SAFETY RESEARCH CONSORTIUM (CRSC) THINK TANK ON DECEMBER 3, 2015

1039. The CRSC meeting was a joint meeting with the CRSC and participation by the FDA held in Washington, DC.

---

[1024] Presentation by Prof. Hugo ten Cate, *NOAC: Future perspectives: academic perspective* (www.ema.europa.eu/doc/en_GB/document_library/Presentation/2016/01/WC500199517.pdf)

1040. Dr. Kubitza testified that she presented Defendants' simulation plan for the PopPK data to the FDA. Her presentation did not mention that EMA issued an official LEG 036 request requiring Defendants to provide PopPK information for XARELTO in June 2015.[1025]

- **Preparation for the meeting**

1041. Defendants prepared a draft PowerPoint file titled "FDA Thinktank Bayer_Janssen Presentation_Draft 3_November 26, 2015".[1026] The presentation was titled: "*Session 1: What evidence is there that variable clinical responses to PK parameters exist for NOACS? What conclusions can be drawn from these data?*"

1042. The draft PowerPoint included a slide showing data from healthy volunteers (phase 1) (with a linear relationship between maximum rivaroxaban plasma concentrations of 500 ug/L and PT (Neoplastin Plus) (40 secs).[1027] For VTE patients, the chart widens the model and changes the Y axis component.  Plasma concentrations of rivaroxaban in phase III VTE patients measured up to 1400 ug/L (with PT at 40 seconds) and an observed PT of 50 seconds (with plasma concentration 400 ug/L).[1028]



---

[1025] Kubitza depo 2/29/16, p. 148: L16 – p. 149: L9
[1026] Kubitza Exhibit 13
[1027] Kubitza Exhibit 13; Kubitza, et al. *Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 – an oral, direct Factor Xa inhibitor – after multiple dosing in healthy male subjects*, Eur J Clin Pharmacol (2005) 61: 873-880.
[1028] Mueck et al. *Population Pharmacokinetic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention,* Clin Pharmacokinetic (2011) 50:675-686

1043. A slide titled, "Detailed understanding of the pharmacokinetic properties of Rivaroxaban," indicated that bioavailability was high (80 to 100% for the 10mg dose); pharmacokinetics remained linear when administered with food at doses above 15mg[1029]; inter-individual variability was moderate (30-40%);[1030] andintra-individual variability AUC-14%, Cmax-19%[1031]. As a result, the 20mg and 15 mg tablets are both labeled to only be taken with food (to improve bioavailability), while the 10mg tablet is labeled to be taken with or without food.[1032]

1044. Another slide entitled "Safety/Efficacy Profile: Fragile" defined 'fragile' rivaroxaban patients as: "age >75 years, CrCl <50ml/min or body weight 50kg".

1045. Dr. Kubitza was asked if the data developed in response to the EMA LEG 036 Request 1 was provided at the CRSC Think Tank Meeting in December 2015:

> Q ...But are you suggesting that at the FDA meeting in—on December 3rd, the fact that the EMA had requested this analysis was communicated to the folks in the room?
>
> A. What was communicated is actually the plans of the analysis and that we are currently doing it. So this was disclosed.
>
> Q. Who specifically disclosed that there was an exposure outcomes analysis being conducted using a PK pop model?
>
> A. I did that in my presentation.[1033]
>
> A. I did not say that the EMA made this request...[1034]
>
> Q. Do you know why every person's PowerPoint presentation was made available in the FDA website except yours?
>
> A. I don't know.[1035]

1046. Defendants' December 3, 2015 CRSC presentation described the same proposed simulation Exposure-Prediction Model presented by the XARELTO Team to the JSC. It also described the existence of an anti-Factor Xa assay method to obtain patient serum concentration of rivaroxaban. There is a note on the slide that the laboratory method is

---

[1029] Stampfuss et al. *The effect of food on the absorption and pharmacokinetics of rivaroxaban.* Int J Clin Pharmacology (2013), 51: 549-61

[1030] 2008 CHMP assessment report for XARELTO Procedure No. EMEA/H/C/000944 (http://webcache.googleusercontent.com/search?q=cache:_Px6ocEFtCAJ:www.ema.europa.eu/docs/en_GB/docume nt_library/EPAR_-_Public_assessment_report/human/000944/WC500057122.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[1031] 2008 CHMP assessment report for XARELTO Procedure No. EMEA/H/C/000944 (http://webcache.googleusercontent.com/search?q=cache:_Px6ocEFtCAJ:www.ema.europa.eu/docs/en_GB/docume nt_library/EPAR_-_Public_assessment_report/human/000944/WC500057122.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[1032] Kubitza Exhibit 13

[1033] Kubitza depo 2/29/16, p. 148-149  L16-9

[1034] Kubitza depo 2/29/16, p. 150: L 5-6

[1035] Kubitza depo 2/29/16, p. 151: L23 – p. 152: L2

available in the United States as '*Research*'.  It is commercially available in the EU and described in the XARELTO label (SPC).[1036]

- **The CRSC Meeting**

1047. FDA's Dr. Robert Temple, Deputy Director for Clinical Science CDER, gave a presentation at the CRSC Think Tank meeting titled "*NOAC Dosing Precision Dosing-YES!*"[1037]  He stated that dose is critical when the dose response (D/R) curve is steep for both effectiveness and toxicity (*i.e.,* narrow therapeutic window).

> *Dr. Temple expressed that there are good reasons to consider NOACS (as well as warfarin) to be in this category, and that there are major costs of being too low or too high and the C/R curves are steep in some places.*[1038]

1048. On a slide titled "Blood Levels Can Help", Dr. Temple asks in the context of Dabigatran, "How hard would it be to get one NOAC blood level (when monthly or greater levels are the SOC for warfarin) if blood levels predicted outcome (which they appear to do)? It seems self-evidently worth it."  He continued, "These events matter, especially when you can reduce them with little extra bleeding risk…but it may be possible to adjust NOAC dose in accordance with the factor that is most critical to the blood level attained, renal function."[1039]

1049. Also presenting at the meeting was Francois Depasse for Stago. His presentation, titled "What is the pathway for approval of tests for measuring the specific anticoagulant activity of NOAC?"[1040] was similar to the presentation at the FDA's October 2015 "Workshop for In Vitro Diagnostics for DOACs."[1041]

1050. Dr. Berkowitz also presented at the CRSC meeting during Session II. His presentation, titled "*Counterpoint: PK based dosing strategy is impractical and may not add value,*" stated that: "Clinical vaue of a PK/PD measurements for NOAC dosing not proven nor as straightforward as with PT/INR for VKAs."  He indicated that NOAC plasma concentrations can change rapidly over the dosing interval, and therefore "a drug plasma

---

[1036] Kubitza Exhibit 13

[1037] NOAC Dosing Precision Dosing – YES!, Robert Temple, MD, CSRC Meeting, Dec. 3, 2015, Slides 5 and 12 (http://webcache.googleusercontent.com/search?q=cache:OjW9hq76hFsJ:cardiac-safety.org/wp-content/uploads/2015/12/S2_1a_Temple.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[1038] NOAC Dosing Precision Dosing – YES!, Robert Temple, MD, CSRC Meeting, Dec. 3, 2015, Slides 5 and 12 (http://webcache.googleusercontent.com/search?q=cache:OjW9hq76hFsJ:cardiac-safety.org/wp-content/uploads/2015/12/S2_1a_Temple.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[1039] Presentation by Robert Temple, MD, CSRC Meeting, Dec. 3, 2015, *NOAC Dosing Precision Dosing – YES!,* Slides 5 and 12 (http://webcache.googleusercontent.com/search?q=cache:OjW9hq76hFsJ:cardiac-safety.org/wp-content/uploads/2015/12/S2_1a_Temple.pdf+&cd=1&hl=en&ct=clnk&gl=us)

[1040] Presentation by Francois Depasse (Stago), CSRC Meeting, Dec. 3, 2015. *What is the pathway for approval of tests for measuring the specific anticoagulant activity of NOAC?*  (http://cardiac-safety.org/is-there-a-role-for-pharmacokineticpharmacodynamics-guided-dosing-for-novel-anticoagulants/)

[1041] FDA CDRH Workshop, October 26, 2015, Presentation by F. Depasse and D. Kaczor (Stago), *Testing for Direct Oral Anticoagulants – An IVD perspective* (www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM473322.pdf)

concentration level does not provide information about the overall status of hemostasis in the patient in conjunction with that level."  A slide titled "Hemostasis is dynamic," indicated that "a plasma drug concentration level (PK) or laboratory coagulation test (PD) cannot capture the dynamics of hemostasis over time."  Further, a slide titled "*When it is not valuable to monitor (or measure)*" provided:

- *No evidence to date for NOACS that dose adjustment based on PK or PD measurements results in improved outcomes*

- *Obtaining a level and taking a dose adjustment decision without clinical outcomes correlation is not evidence-based; risks harming patients and negating the proven benefit.*[1042]

1051. However, Dr. Berkowitz did not indicate to the attendees of the CRSC in his presentation that the lack of clinical outcomes correlation was based directly on the actions of Defendants, design of its Phase III protocols, and failure to obtain blood specimens to obtain PK/PD information for therapeutic recommendations from its clinical trials.  This is the same issue which had triggered the LEG 036 from the EMA CHMP in June 2015.[1043,1044]

## XVII.   HIGHLIGHTS OF ISSUES IN DEFENDANTS' MANAGEMENT OF CLINICAL TRIALS

### a.  BAYER'S SLOPPINESS WITH RECORD 4 REPORTEDLY CREATED HUGE FINANCIAL LOSSES FOR JANSSEN AND TRIGGERED RE-NEGOTIATION OF THE COLLABORATION AGREEMENT WITH BAYER

1052. Greg Ruppersberger, Group Product Director, Cardiovascular for Janssen, testified that his analytics team, directed by Paul Mullen and included Patty Torr and Nauman Shah, calculated a financial loss for Janssen created by the 25 month delay in obtaining FDA approval of XARELTO and launching in the United States for an orthopedic indication.[1045]  Apparently the quality concerns were attributed by Janssen to Bayer's decision to outsource the RECORD 4 clinical trial:  "*Most significant quality concerns were in RECORD 4, a US requirement for filing which Bayer chose to outsource.*"[1046]

1053. The delay in obtaining United States approval resulted in XARELTO moving from 1st to 2nd in the US market following the PRADAXA launch expected Q4/10. There were a set of internal slides circulated titled: "XARELTO Update, February 13, 2012".[1047]  J&J R&D's investment of $1B in program by year end 2010 had resulted in no product on the market. It was calculated that based on the delay, J&J lost its commercial expenses of

---

[1042] Presentation by Scott Berkowitz, CSRC Meeting, Dec. 3, 2015, *Counterpoint: PK based dosing strategy is impractical and may not add value* (http://cardiac-safety.org/is-there-a-role-for-pharmacokineticpharmacodynamics-guided-dosing-for-novel-anticoagulants/)
[1043] Dyszynski Exhibit 29
[1044] Kubitza Exhibit 47
[1045] Ruppersberger Exhibit 4
[1046] Ruppersberger Exhibit 4 at slide 27
[1047] Rupeprsberger Exhibit 4

~$56 MM in preparation for launch that did not occur.  J&J had to have restructuring costs, layoffs, and significant organizational impact in 2009/2010 due to XARELTO launch delay. [1048]

1054.Mr. Ruppersberger agreed that because of Bayer's sloppiness in conducting the RECORD trials, Janssen lost $56 million in launch costs, and between $891 million and $3 billion in net trade sales through 2023.  As a result of that loss, Bayer and Janssen re-negotiated their joint collaboration agreement, and  Bayer's royalties to compensate Janssen for the losses in sales.[1049]

## b.  AS EARLY AS 2008, DEFENDANTS WERE AWARE THE ROCKET 20 MG OD DOSE WAS "TOO HIGH"

1055.By 2008, when ROCKET AF was still ongoing, XARELTO had not been approved for any indication, including SPAF.  Yet, physician members of Janssen, including Drs. DiBattiste, Gary Peters, and Paul Burton, were in "Consensus" that the 20mg OD used in ROCKET-AF was too high a dose and was associated with too high a risk of bleeding. Dr. Robert Califf, a primary clinical investigator in ROCKET and at DCRI was also aware, looking at the ROCKET data, the dose was too high.  Nevertheless, Defendants continued on planning to have ROCKET approved with 20mg OD and still without any patient monitoring or determination of plasma concentrations at time of bleeding. The same members in consensus would attend the  the FDA's Advisory Committee Meeting in September 2011 and recommend the approval of ROCKET for SPAF with a 20mg OD dose and no monitoring.  The same physician members of Janssen joined by Dr. Califf would later plan to perform a ROCKET 2 (or ROCKET BOOSTER) dosing study with a lower BID dose.

1056.There was an internal email chain beginning February 22, 2008 about the dose of XARELTO used in the ROCKET II study.  Paul Burton sent an email to Gary Peters, Peter DiBattiste, Lloyd Haskell, Robert Kale, "Subject Consensus???"  Dr. Burton began with reference to a monitoring plan for ROCKET:

> *So, best case 3 arm, 22.5% RRR.n~12500. I will work with MEI to finalize this and maybe she could present the numbers at CDT? We need to do the "Chevy, plus white wall, plus radio" approach to the options.  Get consensus on monitoring at the SOC in March...the monitoring plan we are proposing is actually fairly comprehensive.[1050]*

1057.Dr. DiBattiste replied on February 22, 2008 "Subject RE: Consensus???"

> *Yes. I think we are indeed getting there. I'm still a little nervous about 8%, but if we truly believe that we can enrich the population to achieve this, then we are probably OK.*

---

[1048] Ruppersberger Exhibit 4
[1049] Ruppersberger Exhibit 4
[1050] Burton Exhibit 55

*One additional point: the commercial team is very concerned about the absence of a qd dosing regimen. They are projecting a 15-20% hit on the forecast and are concerned that this will not be embraced by their management. My push back was that our decisions need to be data driven…*[1051]

1058.Gary Peters replied to Dr. DiBattiste, et al.:

*One point related to this that I have been meaning to mention- if it is true that the BD vs the OD difference is most pronounced at lower doses (with lower trough levels) then since our next look at the data will have more 15 and 20mg exposures the difference may not be as pronounced as it appears now—still believe BD(sic) is the way to go but it may be a bit harder to defend this.* [1052]

1059.Paul Burton responded on February 28, 2008:

*It seems though that for OD to be effective, we need doses >10mg, and then the increased bleeding risk takes them off the table, right?*

*I have been given a lot of questions from Bayer management to answer, which I will finish today, and the "why not od" question comes up.*[1053]

1060.Gary Peters next replied:

*Agreed- I think 20 od probably is an effective dose but bleeding risk is to high in this setting- if go to 5 or 10 mg od I think the trough is too low to be fully effective…*[1054]

1061.Robert Califf, at that time Vice Chancellor for Clinical Research, Duke University, sent an email to Peter DiBatiste "Subject: Confidential" on June 24, 2008. Dr. Califf raised his concern during the timeROCKET-AF was still enrolling new patients, and the concern was also shared by FDA's Clinical Pharmacology Reviewers, that the single dose of XARELTO selected by Defendants for investigation in ROCKET-AF is too high.

*Overall the riva review was very positive. My main concern after seeing the rest of the data is that our dose is too high. I don't want to upset people, but feel that we need more contingency planning.*
*Please don't forward this as the team is sensitive about my going "over their heads"…*[1055]

1062.Yet, all these physicians working for Janssen and representing Janssen at the FDA Advisory Panel, and Dr. Robert Califf, at theSeptember 8, 2011 AdCom Meeting, made no mention of an internal "consensus" of concern that the 20mg OD dose in ROCKET-AF was known to be 'too high', with an increased risk of bleeding.

---

[1051] Burton Exhibit 55
[1052] Burton Exhibit 55
[1053] Burton Exhibit 55
[1054] Burton Exhibit 55
[1055] Burton Exhibit 33

### c.  DEFENDANTS DID NOT USE A LIFESCAN J&J POC INR DEVICE IN THE ROCKET CLINICAL TRIAL

1063. Before starting the ROCKET study, Janssen had access to its own 510(k) cleared Point of Care (POC) INR monitoring devices.  There was the Rubicon Prothrombin Time Monitoring System (K001699), cleared on May 15, 2001, and Harmony INR Monitoring System (K022922) cleared on September 30, 2002.[1056]  These devices were 510(k) cleared for LIFESCAN, Inc., a subsidiary of J&J since 1986.[1057] Lifescan is a worldwide company originally based in Milipitas, CA (the same location as HemoSense, Inc.) and now headquartered in Chesterbrook, PA. Lifescan has manufacturing facilities in Puerto Rico and Scotland, and is considered a leader in Glucose Monitoring Systems intended for both professional and patient use.   The 510(k) description of the LIFESCAN Harmony INR Monitoring System (K022922- submitted September 4, 2002 and cleared September 30, 2002) included an indication for POC home monitoring of PT/INR very similar to the description of the HemoSense monitor:

> *The Harmony System consists of a meter and test strip.  When a drop of blood is placed on the test strip, the blood is drawn into the reaction cells and mixed with reagents that cause blood clotting to begin.  The meter monitors the blood clotting ...the prothrombin time is displayed in International Normalized ratio (INR) units.* **Intended Use:**
>
> *For the quantitative determination of prothrombin time (PT) in capillary whole blood by properly selected and trained patients or their caregivers, or in capillary or venous whole blood by health care professionals, as an aid in monitoring oral anticoagulation therapy.[1058]*

1064. In terms of the FDA's published "Total Product Lifecycle" (TPLC) website for these types of PT/INR monitoring systems, the top device problems reported to FDA in the Medical Device Reports (MDRs) are related to "incorrect or inadequate results".  Therefore, Janssen, in selling its own GJS devices for INR monitoring, should have been well aware of the risk of POC devices producing incorrect and inadequate results for INR and warfarin management before it even engaged in ROCKET (2006-2009).

### d.  THE CONVANCE RECHECK PROGRAM IN ROCKET

1065. For ROCKET, the unblinded INR monitor was Bernard "Bud" Chelecki[1059] and the unblinded INR physician was Stephanie Perry.  The ROCKET investigators would receive a seven digit code from the HemoSense INRatio INR device.  The code would then be decoded by the IVRS to either the true INR for subjects on warfarin, or a sham

---

[1056] The group of medical devices is called a - "Prothrombin Time Test".  FDA assigned a three-letter product code "GJS" to the class.  The PT Time Test is described by FDA under 21 CFR 864.7750.  Based on risk it is classified by FDA as a Class 2 device first requiring 510(k) clearance for marketing in the United States.

[1057] LIFESCAN part of the Johnson & Johnson Companies (http://www.lifescan.com/about-us)

[1058] Harmony INR Monitoring System – K022922, Lifescan, Inc. (https://510k.directory/clearances/K022922)

[1059] Bernand Chalecki was an unblinded INR monitor in Sportif V trial.  His primary role in ROCKET was to monitor trends among POC device INR values and to identify any overt aberrations, for example, persistently high INRs

367

INR for for subjects on randomized warfarin placebo.  Mr. Chalecki would see the actual INR and sham INR where appropriate, plus the treatment group to which the particular patient was assigned.

1066. In late October 2007, Janssen began discussions to explore ROCKET Proposal for QC checks of the HemoSense Device.  Dr. DiBattiste testified that Rick Becker, of DCRI at the time and serving on the EC, stated that "such QC checks are standard and expected."[1060]

1067. On October 26, 2007, a meeting was held to discuss the Covance INR QC Check-Hemosense Device.[1061] The agenda for the meeting regarding the Hemosense device was the Covance INR QC Check Draft Proposal: Convance to perform QC checks of the Hemosense device (*i.e.,* concurrent INR testing).[1062]  However, this process never occurred.

1068. Instead, nearly 4 months later, and prompted by the concern of an investigator regarding the accuracy of the INRatio device, Defendants developed the Covance Recheck Program. On Febraury 21, 2008, a letter was sent to the ROCKET-AF investigators regarding the Covance Recheck Program.[1063] The letter provided: "You will be receiving or have recently received a special kit for collecting single samples of a SPECIAL BLINDED INR which is to be drawn only after discussion with one of the medical monitors or with the Parexel of DCRI helpline."[1064] Mr. Chalecki would receive the results of this sampling, as the unblinded monitor.

1069. This process, later referred to as the Convance Recheck Program, consisted of split samples taken from patients whereby one measurement was from the POC device and the other measurement was sent to a central lab.  It is not only clear from numerous internal emails discussing instances of device malfunction,[1065, 1066] but with the introduction of this recheck mechanism, there was evidence of device malfunctioning during ROCKET.

1070. A recheck was requested by the investigators 142 times per the Covance Recheck spreadsheet prepared and maintained by Dr. Byra.[1067] Of those requests, 16 involved inconsistency between the POC and lab INR values.[1068]

1071. On January 12, 2016, FDA sent an Information Request to Janssen.[1069] FDA's Question #5 asked Defendants to exlain whether the unblinded physician had access to the laboratory-based INR determinations performed as part of the PK-PD study in ROCKET

---

[1060] Byra Exhibit 12; Byra Exhibit 13
[1061] Byra Exhibit 18
[1062] Byra Exhibit 18
[1063] Byra Exhibit 22; Byra Exhibit 23
[1064] Byra Exhibit 23
[1065] Byra Exhibit 21
[1066] Byra Exhibit 8
[1067] Byra Exhibits 18, 22, 23
[1068] Byra Exhibits 18, 22, 23
[1069] XARELTO_JANSSEN_18501728

and when, and "elaborate on the role and responsibilities of the unblended physician that monitored the warfarin patients." However, in Defendants' response to this request, Defendants failed to provide any information regarding the Covance Recheck Program.[1070]

1072. Dr. Nessel agreed that the Covance Recheck Program was part of Mr. Chalecki's role and responsibilities as the unblinded INR monitor,[1071]

1073. Dr. DiBatiste was asked if the CoVance ReCheck spreadsheet, or information regarding same, was ever communicated to the FDA. His response was that it had not been formally transferred to Janssen, so it has not been given to FDA.[1072]

## e. DEFENDANTS' PLANNED 'ROCKET II STUDY' TO FIND A SAFER DOSE NEVER OCCURRED

1074. Dr. Califf sent an email to Peter DiBattiste on September 26, 2011, only days after the FDA AdCom meeting, "Subject: the dust has settled". Dr. Califf indicated to Dr. DiBattiste that at some distant point Janssen would need to conduct a head to head comparison of rivaroxaban and apixaban. But before that could occur, and be successful for Janssen, Dr. Califf recommended Janssen conduct a new SPAF dosing study called ROCKET II.

> *Now that we have gotten through one hurdle. I hope you will:*
>
> *1. Keep me informed about your FDA dealings*
>
> *2. Push hard for a very simple head to head. This could start with 2 doses of riva and morph to a comparative trial when the best dose emerges as a winner.*[1073]

1075. On September 27, 2011, Dr.DiBattiste responded to Dr. Califf: "Yes the dust is finally settling. As I look back at what we did it is pretty gratifying."[1074] He continued that Janssen had a few discussions with FDA:

> *They have reiterated that they don't see any value in a PD or other study evaluating the post-discontinuation transition. The only thing of value to them would be outcomes, and they don't see a practical path forward.*[1075]

1076. Dr. Califf replied to Dr. DiBattiste on October 1, 2011:

> *Would it be worthwhile talking? I really think you're going to need some strong follow-on studies to assure prescribers relative to apixaba, which looks darn good at their dose regimen.*
> *Why not do something relatively inexpensive that clears the air?*[1076]

---

[1070] XARELTO_JANSSEN_16397478
[1071] Christopher Nessel dep, 2/16/2016 p.173:L18-22.
[1072] Dibattiste depo 4/12/16 p. 157: L21 – p. 158: L5
[1073] DiBattiste Exhibit 27
[1074] DiBattiste Exhibit 27
[1075] DiBattiste Exhibit 27

1077. On October 31, 2011, Paul Burton sent an email to Dr. Nessel, "Subject ROCKET 2":

> *Apparently there is continued interest in having a backup plan for R2…"we need to be prepared in case the competition announces such a study."*

> *Would you have the time, perhaps with James, to put together a short synopsis…Apparently the early December JSC wants an overview of LCM![1077]*

1078. On January 3, 2012, Janssen's Gary Peters sent an email to Drs. Nessel, Burton, and Sarich, "Subject ROCKET2" with attachments: Second stage Final November 30, 2011.[1078]  He agreed with Dr. Califf that "we're not ready to go head-to-head with apixaban (or dabigatran) yet until we have explored other rivaroxaban doses."  Dr. Peters indicated that if Janssen wanted to do a dose finding study, the regimens of interest to him were: 20/15 QD, 10/7.5 QD, 5BID, 2.5 BID.[1079]  He continued:

> *The trick is to design an adaptive rule based on both efficacy and safety that allows reasonable confidence that one of these would be better than the standard (all should be better for bleeding since lower dose so really comes down to an efficacy or benefit/risk tradeoff..)…depending on how strict the rule is the sample size might not be too bad.*

1079. According to Dr. Peters, this study could address the following issues:

> 1)  *Once daily vs twice daily question once and for all*
> 2)  *Some of the concerns about ACS/AF ( e.g.if 2.5mg bid fully suppresses D-dimer[1080] there would be reasonable likelihood that it would be effective on stroke outcomes also)*
>
> 3)  *Set the stage for medically ill[1081]*
>
> 4)  *Set the stage for comparison with apixaban (dabigatran)[1082]*

1080. Dr. Nessel responded to Dr. Peters on January 3, 2012:

> *I designed the ROCKET 2 trial for the comparison with apixaban but fully support the concept of a dose-finding study in advance.  I agree that the bleeding should be lower compared to the 20/15 regimen but therein lies the challenge…  If conducted in series rather than parallel, the time required to enroll the patients, wait for events, collect the data (presumably adjudicated) and get committee agreement before moving on the next dose might be prohibitive….  I am less worried about the oft-*

---

[1076] DiBattiste Exhibit 27
[1077] Burton Exhibit 38
[1078] Burton Exhibit 53
[1079] Burton Exhibit 53
[1080] D-Dimer- is a fibrin degradation product, a small protein fragment present in the blood after a blood clot is degraded by fibrinolysis.  It gets its name because it is two crosslinked D-fragments (dimers) of fibrin protein. (crosslinking is done by Factor III). It is a common coagulation laboratory test and is used to help rule of DVT and PE- conditions of clotting.
[1081] MAGELLAN Study
[1082] Burton Exhibit 53

> *quoted 3-page CRF and even patient recruitment since this would be closer to a registry than a clinical trial…[1083]*

1081. Sigmond Johnson sent an email on January 3, 2012 to inform Janssen there would be a LCM-J&J pre-meeting on January 12-14, 2012. He sent another email on January 8, 2012 regarding "our agreed to position going into the meeting later this week."  On January 10, 2012, Gary Peters sent out a follow-up email regarding the LCM-J&J pre-meeting.  He provided a few thoughts about the meeting.  He was curious why the medically ill[1084] indication is not the top priority: "Just because we didn't have completesuccess in this indication first time around doesn't mean we shouldn't try again."  Regarding AF, he wrote:

> *In my view it's really about what dose is needed in AF patients to fully protect against thromboembolic stroke (either with or without ACS) so it's more like an AF dose finding study than anything else.  Rob Califf is supposed to be sending us a proposal for such a study---basis for this is that he says that comparative studies vs apixaban will be done and since likely we will not fare optimally with our current dosing regimen we need to explore others…I fully agree with this and would like to see ROCKET 2 discussed again in this context. [1085]*

1082. Paul Chang, MD Medical Affairs, responded to the group on January 10, 2012:

> *Thanks Gary. Agree with your thoughts on the medical affairs studies*
>
> *Also agree with the AF/ACS question. The range of possibilities are :*
>
> *1. Small safety study (<2000 pts total) to show 2.5 BID and/or another dose on top of ASA/thienopyridine do not cause major disadvantage versus standard of care in terms of stroke or bleeding*
>
> *2. Large program to definitively find and prove a safe and effective dose of AF in patients taking ASA and thienopyridine…*
>
> *3. Somewhere in between (probably no one will like)*
>
> *Realistically only option 1 is within stretch of medical affairs. Anything beyond really requires R&D to drive.[1086]*

1083. There is a final January 10, 2012 email from Patricia Torr, Vice President of Marketing, to members of Janssen, "Subject RE: LCM-J&J Pre-meeting", her focus appears to be on the stalled medically ill clinical trial with rivaoxaban (MAGELLAN) for Janssen.  She also did not support performing ROCKET 2 due to the harm it would do to sales. (underlining added for emphasis):

---

[1083] Burton Exhibit 46
[1084] MAGELLAN
[1085] Burton Exhibit 39
[1086] Burton Exhibit 39

*The most important items on the list for me is the AF/PCI safety study and the antidote/PCC strategy…The two most pressing issues we are facing NOW.*

*I would also support the strategic importance of making <u>med ill a level 1 priority</u>[1087]despite that we know Bayer is less interested…indication differentiation against the competition will be one of our main selling points.*

<u>*Would not support doing a Rocket 2 study and unwinding everything we invested and are actively selling today.  It would say to the market, the competition is right, we are a BID drug…would kill us in the market today. By the time the study was done, the market would have moved on.*</u>

*With BMS/Pfizer doing Appraise 3, we need to think how to keep ahead of them in the ACS space.*

*Hard to see support of CARDIAC (too expensive, too risky, do not feel we need)…*[1088]

1084. Gary Peters sent an email to Drs. DiBatiste, Sarich, Burton and Nesselon February 2, 2012, "Subject Canadian SPAF Review and Rob Califf."[1089]   Dr. Califf had sent him a draft review from Canada comparing dabigatran, apixaban, and rivaroxaban with warfarin for SPAF. Dr. Peters stated that Dr. Califf's interpretation was that "rivaroxaban appears to be the least favored option…"[1090]  Dr. Peters further stated that Dr. Califf "promised to send 2 page ROCKET2 outline this weekend."[1091]

1085. Dr. Peters sent an  email to Troy Sarich, Sigmond Johnson, and Paul Burton, "Subject: ROCKET 2", on February 21, 2012:

*Just finished speaking with Pete and if commercial numbers continue below projections he wants to be ready with a ROCKET2 study proposal…*

*I think we probably all agree not ready for head to head with apixaban without some rivaroxaban dose finding first so I would envision a two stage protocol with first part having a range of doses and second part the actual definitive comparison*

*…I have a call with Rob Califf on another topic tomorrow morning so I'll inquire about his missing proposal.*[1092]

---

[1087] MAGELLAN
[1088] Burton Exhibit 39
[1089] Dr. Robert Califf, a Cardiologist, formerly at Duke Clinical Research Institute (DCRI) was a principal clinical investigator for ROCKET AF and presented ROCKET on behalf of Janssen at the Xarelto SPAF FDA Advisory Committee Meeting in September 8, 2011.  There is no mention in the transcript of concerns about the 20mg OD dose for SPAF. Dr. Robert Califf was the Deputy Commissioner of the FDA's Office of Medical Products and Tobacco since January 2015, and February 24, 2016 obtained Senate Confirmation (89 to 4) to by Commissioner of the FDA. His nomination and appointment had been blocked by a handful of lawmakers over the FDA's poor regulation of prescription painkillers.
[1090] DiBattiste Exhibit 31
[1091] DiBattiste Exhibit 31
[1092] DiBattiste Exhibit 30

1086. Dr. Califf sent the Duke investigators an email, "Subject first draft of Rocket booster idea," on February 24, 2012:

> *What I'm not saying is that this would help their marketing while also defending against prospective CER trials while they find the best dose. That is not our motivation, but it's the only way they will be able to sell it internally. I believe they will lose out if they don't do this!*[1093]

1087. On February 26, 2012, Jonathan Piccini, MD at Duke University, sent an email to Robert Califf, with copy to Kenneth Mahaffey, MD and Manesh Pael, MD at Duke " Subject RE: first draft of ROCKET booster idea".

> *I like the idea of a pragmatic clinical trial. Comments included in the attached draft.*
>
> *My principle concerns are primary endpoint, the sample size, and the 4 dose selections. Divorcing hemorrhagic stroke from the primary endpoint carries risk...Finally, how do we know the 20mg once daily is the upper limit for the ideal dose?*
> *The launch of this study will force the sponsor to admit they don't have the right dose. This will certainly have implications for a critical period of their product launch, particularly with apixaban and edoxaban joining the scene....*
>
> *From a JNJ perspective, it will be interesting to see how they prioritize their investments with this compound (e.g Valve trial, more ACS data, AF dosing, AF registry [ORBIT 2], ACS registry, etc.)* [1094]

1088. On February 27, 2012, Dr. Califf sent an email to Drs. DiBattiste and Peters attaching a "simple 2 pager." He had two premises: "it's the right thing to do for a drug that has a long life and can make a huge difference"; "CADTH is just the beginning of the comparative effectiveness issues and the dosing of riva will be key."[1095]

1089. Dr. Peters sent an email to Drs. Sarich, Burton, Nessel, and DiBattiste on February 28, 2012, "Subject: ROCKET Booster proposal from Rob Califf". Dr. DiBattiste answered that he was sending them the proposal he received from Dr. Califf: "In general I like the approach but the devil will be in the details as Len likes to say." Gary Peters asked if they should work on some of the details or hold until there is further clarity on need/desire to undertake such an exercise.[1096]

1090. There is a Janssen document titled: "Rivaroxaban and Atrial Fibrillation: the Need for ROCKET AF Booster":

> *...At the time ROCKET AF was designed there was no substitute for warfarin, but in the interim RE-LY established dabigatran as a viable alternative with a superior profile to*

[1093] Burton Exhibit 36
[1094] Burton Exhibit 36; DiBattiste Exhibit 35
[1095] Burton Exhibit 54
[1096] Burton Exhibit 34

*warfarin for efficacy in and a reduction intracranial hemorrhage, although the trial was open label.  Shortly after ROCKET AF was reported, ARISTOTLE established apixaban as superior to warfarin with a reduction in both the intracranial and systemic bleeding…[t]he sudden availability of 3 alternatives to warfarin has initiated a major interest in comparative effectiveness, as evidence by the recent CADTH network meta-analysis from the Canadian government.*

*The major comparative advantage of rivaroxaban is its once a day dosing, but the failure of ROCKET AF to prove superiority, even in the face of lower than expected TTR in the trial, has raised major questions about whether the ROCKET AF dosing regimen is indeed the best dose. When ROCKET AF was designed…lead to simulations to estimate the best dose and a decision was made that a 3 arm Phase 3 trial would be too costly…*

*The comparison of apixaban and rivaroxaban development leads to another element of conventional wisdom; rivaroxaban may have found the right dose in ACS while apixaban found the right dose in AF…*

<u>*Design*</u>

*The trial would be initiated with 4 possible dosing regimens in the broad AF population…The adaptive randomization would gravitate toward the best dosing regimen over time….*

*Sample size: Adaptive with a goal of entering up to 40,000 participants until the best dose is found.*

*Potential doses:*

    *A.  ROCKET AF dose: 20 mg daily/15 mg daily for renal impairment*
    *B.  10 mg BID/5 mg BID for renal impairment*
    *C.  15 mg per day/10 mg per day for renal impairment*
    *D.  7.5 mg BID/5 mg BID for renal impairment[1097]*

1091. Ms. Susan Geiger, Marketing & Sales at Janssen since 1998 and the individual assigned responsibility for launch and marketing of XARELTO to United States physicians, including Sales' use of making unsupported claims that XARELTO was 'superior' to warfarin and with comparative safety, testified that she was not informed by her marketing superiors about Janssen's internal planning to conduct a ROCKET II dosing study for SPAF.  She was not informed that there had been 'Consensus' in 2008, before the SPAF indication or XARELTO were approved among Janssen's clinical staff and an outside expert consultant, Dr. Califf, that the dose for XARELTO of 20mg OD was too high, Janssen needed to conduct a new study, ROCKET II (or ROCKET BOOSTER) to identify a lower dosing regimen, potentially BID, to reduce the risk of bleeding for AF

_____

[1097] Burton Exhibit 35

patients. She testified in her deposition in 2016 that this was the first time she had ever seen documents related to the reason and plans for ROCKET 2.[1098]

## XVIII.   DEFENDANTS' MARKETING OVERSTATED BENEFITS AND DOWNPLAYED RISKS

### a.   DEFENDANTS DISTRIBUTED FLAWED AND UNRELIABLE STUDIES TO EXPAND MARKETING CLAIMS AND SUPPORT XARELTO'S 'SUPERIORITY'

1092. Ms. Geiger was part of the XARELTO Team from 2008 and Product Director for the United States launch. Before she joined the XARELTO Team,[1099] Janssen's 2005 Business plan aimed to tap into the anticoagulation market in the United States, which was already generating approximately $7.9 billion and was expected to keep expanding through year 2012.[1100]

1093. From May 2013 until October 2015, she was Janssen's National Sales Director and Director of Marketing for the 'Strategic Customer Group'.  Her direct involvement with XARELTO marketing stopped in 2015.  Ms. Geiger agreed that, based on her own experience and work with XARELTO, the "anticoagulation market is a multi-billion-dollar market."[1101]  From 2008 to 2010, before XARELTO was approved (pre-launch) for any indication in the United States, she took the lead role in preparation activities for "managed markets access strategies".  She met with hospitals and insurance companies to ensure that once approved, XARELTO would be placed on drug formularies for reimbursement. As part of the XARELTO Janssen Business Plan for 2009,[1102] and as testified by Ms. Geiger at her deposition, five separate key customer groups were identified to help ensure success of XARELTO's launch for its first approved indication (the post-hip and knee replacement surgery indication). The 5 groups to be targeted by Janssen for XARELTO use and reimbursement were as follows: 1) orthopedic surgeons; 2) hospital administration and purchasers; 3) skilled nursing and facilities and long term care (LTC); 4) managed care organizations and Medicare; and finally 5) third party advocacy groups/key opinion leaders (KOL).[1103]

1094. On June 26, 2008, the RECORD 1 study was published in the *NEJM*: "Rivaroxaban Versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty".[1104]  In the original Janssen plan, the publication would have corresponded to the anticipated time for NDA approval and XARELTO launch in the United States by VTE-P approval. However, Mr. Greg Ruppersberger, Group Product Director, Cardiovascular for Janssen, testified that his analytics team calculated a significant financial loss caused by the unanticipated delay in obtaining FDA approval of XARELTO, which they blamed on the sloppiness of

---

[1098] Geiger Exhibit 20; Geiger depo 4/25/16, p. 407: L12 - 17
[1099] Geiger Exhibit 5
[1100] Geiger Exhibit 5
[1101] Geiger depo 4/25/16, p. 93: L23 – p. 94: L3
[1102] Geiger Exhibit 7
[1103] Geiger depo 4/25/16, p. 119: L24 – p. 120: L20
[1104] Geiger Exhibit 6

Bayer. Despite the publication of RECORD, Janssen had failed to be the first NOAC approved and launched in the United States.[1105]  However, as published in 2008 (with some of the authors being from Janssen), the RECORD 1 study did not reflect how the data was utilized and interpreted in the final NDA approval and label by FDA. Moreover, Defendants never updated the *NEJM* regarding the RECORD 1 published study based on unreliability of data following FDA's review.

1095. Dr. Kollath, Janssen Regulatory Affairs, testified in 2016 that the *NEJM* would be interested to learn that the Defendants' 2008 published RECORD 1 study contained unreliable data from investigational sites , including issues with adverse event reporting, which resulted in thedownplaying of serious adverse events (SAEs).  She was unaware whether or not Defendants ever informed physicians or the *NEJM* that FDA considered some of the data for RECORD 1 to be unreliable as early as 2009.

1096. Slightly prior to receipt of the FDA's Complete Response Letter[1106] and listing of remaining deficiencies including concerns about the  RECORD studies, Defendants published "Rivaroxaban versus Enoxparin for Thromboprophylaxis after Total Knee Arthroplasty: A Randomized Trial" in the Lancet on May 5, 2009 in *The Lancet*.  The publication discussed data from the RECORD 4 study.[1107]  As with the *NEJM* for RECORD1, Dr. Kollath was not aware if Defendants ever informed the editors of *The Lancet* that the FDA had deemed all data in RECORD 4 ***unreliable*** and would not accept RECORD 4 as a basis for approval of the post-hip and knee replacement surgery indication.  RECORD 4 does not appear in the FDA's approved label for XARELTO, and in fact, all data from RECORD 4 and from unreliable sites in RECORD 1-3 were deleted from inclusion in the XARELTO label at the insistence of FDA despite Defendants' objections.[1108]

1097. Mr. Jalota testified that Bayer (not Janssen) was the entity responsible for the conductance and monitoring of the RECORD trials.[1109]  He testified that FDA did not accept any of RECORD 4 data for NDA approval because it was all considered "unreliable".[1110]

1098. There is no evidence indicating that regulatory authorities in Europe, including the EMA which approved XARELTO for VTE-P in 2008, were ever officially notified by Defendants that FDA, after direct inspection, took the following actions: sent clinical investigators Warning Letters; identified issues at clinical investigator sites; ; determined unreliability of components of the data for RECORD 1-3 studies, including the failure to report adverse events; and re-analyzed the data; and discounted all data from RECORD 4 as unreliable.  Such notification would have provided the EMA with at least an opportunity to consider Defendants continued reliance on RECORD 1-4 data in its

---

[1105] Ruppersberger Exhibit 4
[1106] Geiger Exhibit 8
[1107] Geiger Exhibit 10
[1108] Kollath depo 3/30/16, p. 251: L17 – p. 257: L1
[1109] Jalota depo 3/3/16, p. 81: L1-24
[1110] Jalota depo 3/4/16 p.682: L8-18

376

proposed simulation Exposure Response Modeling to respond to LEG 036, and would have impacted the reference to Study 11527 (ODIXa.HIP) in Defendants' PBRER.

1099. Dr. Kollath was also unaware that Defendants' sales force provided physicians with the published RECORD 1 and RECORD 4 studies as part of Defendants' sales and marketing plans, despite the information not being permitted in the FDA approved label. The RECORD studies were provided as reprints to supplement (expand) the limited claims of the FDA's approved label. Defendants even provided an updated Lancet RECORD 4 reprint in 2013 for its sales force despite Dr. Kollath admitting that "a drug company should not promote using information that is inconsistent with the product label."[1111]

1100. Ms. Geiger testified that in her discussion with key customer groups identified in Janssen's 2009 Business Plan, she did not recall discussing that FDA had conducted an audit of the RECORD 4 trial. Her rationale as to why the information would not be shared by sales representatives with physicians was as follows: "Those discussions between R&D and the FDA. I don't know what's privileged and confidential and what isn't, so I wouldn't have been in a position to decide or to share any kind –of information related to that. A clinical person would have been, you know, part of that decision making."[1112]

1101. Janssen's 2009 Business Plan projected that XARELTO was on course to be approved by May 2008 and Janssen was building "marketing anticipation".[1113] The projected indications for XARELTO were as follows: high-risk orthopedic patients (1.5MM)*[1114]; general surgery (23.6 MM); treatment of medically ill (11.7MM); treatment of DVT/PE (0.5 MM); Atrial Fibrillation [prevalence] 2.8MM and Acute Coronary Syndrome (1.4MM)- an incidence of 41.5MM patients. The largest groups were General Surgery and Treatment of Medically Ill.[1115]   In a SWOT analysis, the following "weaknesses" were identified: "No antidote; cost premium; first in class may take longer to establish reimbursement across private and public payer; Incidence of major bleeds are not lower. RECORD 4 was higher (not statistically significant) than current SOP; Adverse events similar to current SOC." Further, the following "threats" were identified: March 2008 study review shows anticoagulants increase mortality after hip/knee surgery calls for revision to ACCP guidelines.[1116] Finally, the "vision for Xarelto" was to "revolutionize the prevention and treatment of thromboembolic disorders, protecting millions from life limiting & threatening events."[1117]

1102. Ensuring "access" (and reimbursement) for XARELTO through sources like hospitals, insurance, Medicare and placement on formularies was critical to Janssen's strategy for

---

[1111] Kollath depo 3/31/16, p. 509: L2 – p. 513: L10 and p. 518: L16 - P. 525: l19
[1112] Geiger depo 4/25/16, p. 178: L8 – p. 179: L38
[1113] Geiger Exhibit 7
[1114] * Incidence in the United States population
[1115] Geiger Exhibit 7
[1116] Geiger Exhibit 2 at slide 9
[1117] Geiger Exhibit 7 at slide 12

generating prescriptions of XARELTO.[1118] It was touted that "XARELTO offers Outstanding Profile: Superior efficacy; low incidence of bleeding; excellent safety profile; ultimate convenience allows continuity of use in and outside hospital."[1119] Defendants' "Strategy for VTE Prevention Launch" was to: "partner with advocacy groups- AAOS, ACCP to establish improved guidelines for VTE prevention & ideal therapies;" "Garner strong national & regional support among KOLs who influence preventive strategies for VTE in orthopedic surgery;" "Aggressively secure formulary positions with high volume hospitals & payers prior to the introduction of competitive therapies;" "Utilize data mining activities of phase III database to identify additional measures of relevance to key stakeholders;" and "Execute robust Phase IV plan that strengthen the XARELTO profile & addresses data gaps (wound appearance, timing of dosing)".[1120]

1103. The perceived "risks" were as follows: "Perception of increased bleeding risk with XARELTO." The "Mitigation Strategies" were: "Effectively convey better overall benefit/risk profile; dose flex study to assess bleeding with later administration (12-24 hrs) after surgery; and ensure representatives well trained about bleeding data, without losing focus on core message."[1121]

1104. The following three slides are from Geiger Exhibit 7:



---

[1118] Geiger depo 4/25/16, p. 113: L12-18
[1119] Geiger Exhibit 7 at slide 14
[1120] Geiger Exhibit 7 at slide 19
[1121] Geiger Exhibit 7 at slide 20

378



## Overview of Tactical Plan

| Reinvigorate VTE prevention market by establishing DVTs & PEs as unacceptable outcomes & highlighting need for better therapies | Establish XARELTO as the ideal choice for VTE prevention following knee & hip replacement surgery | Secure wide access & reimbursement based on a strong value proposition | Strengthen the value of XARELTO over time |
|---|---|---|---|
| Pre-approval VTE prevention campaign | Sales promotion | Pre-approval VTE prevention campaign | Strong publication plan |
| Partnerships with key advocacy groups | Online promotion & media | Meta-analysis publication | Dose timing study |
| Non-branded website & AAOS site sponsorship | Promo Medical education & Congress | Cost effectiveness model for each channel | Data mining & pooled analyses of RECORD trials |
| Promotion efforts for discharge planners | Journal media | Dossier & value tool kit, formulary kit | |

## Launch Plan Overview

- 4 mos  - 3 mos  - 2 mos  - 1 mos   Approval   +1 mos  +2 mos  +3 mos  +4 mos

| VTE Prevention Campaign | Initial Launch | Full Launch |
|---|---|---|
| • Regional training mtgs<br>• Orthopedic Surgery journal advertorials<br>• Representatives initiate profiling & educational efforts<br>• Initiate discussions with hospital admin, SNF/LTC, payors<br>• PR activities<br>• Non-branded website | • Regional launch mtgs<br>• Initiate physician promotion with "safe materials" & reprints<br>• Public relation efforts<br>• Branded "safe" website<br>• Now available ads | • Full launch meeting<br>• Ramp up promotional materials utilizing DDMAC comments<br>• Branded journal advertising<br>• Phase 2 website<br>• Initiate speaker programs |

Xarelto® rivaroxaban

1122

---
[1122] Geiger Exhibit 7

1105.A slide entitled "**XARELTO LAUNCH**" reads as follows:

- *Background:*
  - *J&J has several key products going off patient in 2008-2010*
  - *Product has potential to be next blockbuster for J&J, producing fiscal stability for Pharma sector*
  - *J&J senior leadership watching this product launch closely*
  - *Mx Approach fully integrated into this launch plan*

- *Strategic Objective:*
  - *Flawless launch of Rivaroxaban as first in class Factor Xa Inhibitor*
  - *Exceed forecast goals for launch*
  - *Create multiple barriers to entry for competitor[1123]*

- **Defendants Market XARELTO Off-Label using MAGELLAN for Medically Ill Patients Despite Lack of FDA Approval To Expand Label**

1106.(See above discussion of MAGELLAN[1124])

- **Defendants Market XARELTO Off-Label using ATLAS ACS 2-TIMI 51 Despite Two FDA Approval Denials Based on Missing Patient Data, Increased Risk of Bleeding and Lack of Support for Efficacy to Expand Label**

1107.(See above discussion of ACS)[1125]

- **Defendants Market XARELTO Off-Label using ROCKET and 20mg OD for Congestive Heart Failure To Expand Label**

1108.(See above discussion of Congestive Heart Failure)[1126]

- **Defendants Announced the Benefits of Xarelto for EINSTEIN-Extended Use in 2009 at the American Society of Hematology**

1109.Janssen notified its sales force regarding receipt of the FDA Complete Response for rivaroxaban, which would delay approval past the May 2009 date.[1127]

1110.Before the approval of XARELTO for any marketing in the United States, Defendants highlighted for its sales force via North America Communications that the 51st Annual

---

[1123] Geiger Exhibit 2

[1124] Cohen, AT, et al. *Rivaroxaban for Thromboprophylaxis in Acutely Ill Medical patients.* NEJM (February 7, 2013), pp 513-23.

[1125] Mega JL, Braunwald E, Wiviott SD, et al. *Rivaroxaban in Patients with a Recent Acute Coronary Syndrome.* NEJM (Jan 5, 2012), Vol 366 (No.1): 9-19.

[1126] Diepen S van, Hellkamp AS, Manesh, P, Becker RC, Breithardt G, et al. *Efficacy and Safety of Rivaroxaban in Patients with Heart Failure and Nonvalvular Atrial Fibrillation- Insights from ROCKET AF.* Circ Heart Fail. (2013); 6:740-747.

[1127] Geiger depo 4/25/16, p. 146: L5 - 12

meeting of the American Society of Hematology Congress (ASH) was to have data from the EINSTEIN Extension Study presented as part of the "Late Breaking Abstract Session." Reportedly, EINSTEIN-Extension showed the benefit of extending anticoagulant therapy by six to 12 months beyond the currently accepted clinical practice, in order to significantly reduce a patient's risk of a recurrent symptomatic VTE. Janssen provided: "It is worth noting this is the fifth Phase 3 study of rivaroxaban to show significant benefit of reducing the risk of clot-mediated events in patients."[1128]

## b. DEFENDANTS MARKETED ROCKET AF TO CAPTURE A BILLION DOLLAR MARKET WITH CLAIMS OF "SUPERIOR PROTECTION", ONCE-A-DAY FIXED DOSE, NO MONITORING AND CONVENIENCE

- **Defendants Launch a Large United States Marketing Campaign for XARELTO**

1111. In an internal PowerPoint, Defendants indicated that the anticoagulant market was very large; new healthcare reforms and CMS payments could result in additional market growth; and that cost will be a major consideration for adoption due to the overall US healthcare environment and availability of effective generic options (*e.g.*, heparin, warfarin).[1129] The current Rivaroxaban messages were as follows:

- *Most Studied, oral, direct Factor Xa inhibitor in world;*
- *Convenience of oral, fixed once-daily dosing;*
- *Eliminates need for blood-clotting monitoring & dose adjustments;*
- *Consistency in treatment- in hospital and outside.* [1130]

1112. Ms. Geiger helped coordinate one of the largest launch meetings in the history of Janssen and helped develop sales messages that would be delivered by approximately 2,500 sales representatives about the benefits of XARELTO to physicians. Defendants' management placed great emphasis on ensuring the success of XARELTO. Janssen contracted with third party marketing agencies, consultants, and marketing companies to assist with identification of the right messages for physicians ("doctor segmentation") to get them to prescribe XARELTO rather than warfarin for stroke prevention in AFib patients.[1131] At the time of XARELTO's launch, Janssen sales force did not have much selling experience in cardiovascular drug products.

1113. Because Janssen had not previously engaged in the cardiovascular market, Greg Ruppersberger and his analytics team determined which doctors/hospitals/practices they needed to detail, where they were, and how many sales reps were needed to detail them. A target list was developed mainly from analyzing prescription data Janssen purchased to determine which MDs were prescribing anticoagulants. This lack of experience was in

---

[1128] Geiger Exhibit 9
[1129] Geiger Exhibit 2
[1130] Geiger Exhibit 2
[1131] Geiger depo 4/25/16, p. 200: L6 – p. 202: L23

direct contrast to the Sponsors of two competing NOACS: PRADAXA (dabigatran) and ELIQUIS (apixaban).[1132]

1114. AFib is the largest, most profitable indication for XARELTO, since it is a chronic condition.

## c. DEFENDANTS USE ITS ROCKET STUDY AND INVESTIGATORS TO TELL PHYSICIANS THAT XARELTO IS 'SUPERIOR' TO WARFARIN BEFORE OBTAINING FDA APPROVAL

1115. Ms. Geiger testified that she knew Janssen requested that FDA include in the XARELTO label language that XARELTO was superior to warfarin based on the on-treatment analysis, but the FDA rejected it.[1133] She also knew it would not be accurate for Janssen's marketing team to promote XARELTO to physicians as superior to warfarin.[1134] In fact, Janssen's market research identified the lack of superiority claim compared to warfarin as a barrier to physicians' decision to prescribe XARELTO.

1116. During the pre-launch phase, Janssen developed a "best case scenario" message of 'superiority' over warfarin in AFib strokereject prevention. It delivered that message publicly at the American Heart Association (AHA) Congress in Chicago, IL on November 14th to 16th 2010 with a presentation by physicians in the ROCKET Investigation Team from Duke University, including Robert Califf.[1135] This conference took place one year before XARELTO was approved for SPAF, and FDA had specifically told Janssen not to market XARLETO as superior to warfarin.

1117. The press release for this conference presentation was titled: "Rivaroxaban significantly reduces risk of stroke in patients with atrial fibrillation with comparative safety versus warfarin in pivotal Phase III study". The press release continued that once daily XARELTO was superior in reducing the risk of stroke and non-CNS systemic embolism in patients with atrial fibrillation with comparable safety versus warfarin, the most commonly used medicine for prevention of stroke in AF patients.[1136] Ms. Geiger was asked about the AHA meeting and press release in her deposition in 2016:

> Q. But one year before, when you got the study results, you promoted your drug as superior to warfarin through a press release and at a conference with doctors.
>
> A. No that is not accurate. A very—a different division. Our R&D group reported the results of the pivotal trial at a conference, which is standard practice.
>
> Q. Where they reported the results as being superior to warfarin, right?

---

[1132] Geiger Exhibit 25, Exhibit 26
[1133] Geiger depo 4/26/16, p. 798: L18 – p. 799: L8; Geiger Exhibit 60; FDA Briefing Document 9/8/2011 (http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/UCM270796.pdf)
[1134] Geiger depo 4/26/16, p. 712: L13-19
[1135] Geiger Exhibit 49
[1136] Geiger Exhibit 49; Geiger Exhibit 50

382

*A. The primary investigator was technically the report of all reports and we are the vehicle.  So yes.*

*A. That's what was reported. This is very standard, yes.*

*Q. ---this is—this is a Janssen press release, correct?*

*A. It's a Johnson & Johnson R&D.*

*Q. Okay.  And this is –goes out to the American Press, correct?*

*A. Yes*

*Q And the hope is, is that the press will pick up the press release, and what you are doing here is you're positioning your product as superior to warfarin, correct?*

*A. This isn't positioning. This is a report of a trial that we funded with a primary investigator, whoever it was. It looks like Bob Califf*

*Q. Bob Califf, right. So you're not positioning the product in the press?*

*A. No. This is R&D*

*…We're not permitted to speak about the product until—as Janssen, until it's approved by the FDA. [1137]*

1118. The message about XARELTO and ROCKET at the AHA meeting was further reinforced by similar press releases sent out by Bayer and Duke University physicians.  The AHA however did not issue a similar statement about benefits of XARELTO for AFib patients.

## d.  DEFENDANTS' STRATEGIC PLATFORM FOR LAUNCH[1138] WAS BASED ON CLAIMS OF SUPERIOR EFFICACY/SUPERIOR PROTECTION OF XARELTO COMPARED TO WARFARIN

1119. In an August 2, 2011 (Pre-Launch) internal email from Fabiola Storz, Product Director, Rivaroxaban, Ortho McNeil, Cardiovascular, to Paul Herman, Rajul Saraiya, and Susan Geiger, "Subject XARELTO'S Strategic Platform Session- ACTION Item- Please review,"  Storz thanked the named members for attending a Wednesday session of XARELTO's Strategic Platform. The attached XARELTO Strategic Platform slide deck was dated July 2011 (pre-launch of SPAF):[1139]

> *Our objective is to ensure all tactics are aligned to our current unmet needs and XARELTO's Strategic Platform of "Superior Efficacy"*
> ***ACTION ITEM***

---

[1137] Geiger Exhibit 49; Geiger Exhibit 50; Geiger depo 4/26/16 p. 703: L19 – p. 714: L18
[1138] XARELTO's Virtual launch included a live broadcast/webcast event with a panel of KOLs and key team members to generate excitement and build anticipation (Geiger Exhibit 14).
[1139] Geiger Exhibit 12; Geiger Exhibit 11

> *As you know, we are having the SPAF Deep Dive session on Wed, Aug 10 to review the 2011 tactics in detail…During the SPAF Deep Dive discussion, please ensure that you communicate how your team is incorporating the current unmet needs and/or 'Superior Protection' strategic platform in each of (or some) of your tactics.[1140]*

1120. The Strategic Platform was designed to help shape the market to focus on the unmet medical need for "Better Protection for Patients at Risk of Stroke." It described as follows: "*Current unmet needs require a more Efficacious, Predictable and Convenient option*" **1)** Need for improved compliance and adherence, improved tolerability- no monitoring required, limited drug or food interactions, improved stability improved tolerability = More patient-friendly options. 2) Lack of patients compliance, lack of optimal patient management= heightened awareness of preventable risk 3) Improved protection, faster onset of action vs warfarin, adequate duration of treatment, appropriate for a wide range of patients = Improved Efficacy and Net Clinical Benefit (NCB). 4) Lower incidence of stroke without increase in CV related MIs, No requirements for INR monitoring, reduced rate of medical errors and reduce re-admission to hospitals= Lower Cost and Burden.[1141] It added regarding "Superior Protection":

> *XARELTO delivers superior protection resulting from a significant reduction in stroke and ICH compared with warfarin, once-daily dosing & favorable tolerability that brings a new level of simplicity & patient friendliness.[1142]*

e. **DEFENDANTS' MARKETING DOWNPLAYS THE INCREASED RISK FOR BLEEDING WITH XARELTO**

1121. A July 26, 2011 SPAF Tactical Plan PowerPoint titled, "XARELTO Faces Fierce Competition but Profile Offers Key Advantages & Meets TPP,"discussed Xarelto in light of competitors, namely dabigatran and apixaban. XARELTO, unlike its competitors, produced "significantly higher transfusion & hemoglobin drops" (i.e. increased risk of bleeding) as compared to warfarin.[1143]

1122. As an analytics expert for Janssen, Greg Ruppersberger agreed that the data from ROCKET showed the risk of major bleeding was higher with XARELTO than with warfarin.[1144]

1123. Sales representatives were provided iPods to display data to physicians.  Sales reps would show the non-inferiority data from ROCKET and then go straight to the superiority data of EINSTEIN to "leverage the bleeding data of the compound." [1145] Therefore, they used the DVT/PE safety data to help convince the physician that Xarelto was safer than warfarin for NVAF as well.

---

[1140] Geiger Exhibit 11
[1141] Geiger Exhibit 12
[1142] Geiger Exhibit 12
[1143] Geiger Exhibit 14
[1144] Ruppersberger depo 6/6/16, p. 309: L6 - 12
[1145] Ruppersberger Exhibit 14; Ruppersberger depo 6/7/16, p. 455: L19 – p. 463: L13

1124. Defendants' CVI Fast Start broadcast script and slides instructed sales representatives to utilize reprints to "even out the clinical playing field." The slides also instructed the sales representatives to insinuate to physicians that the ROCKET trial involved sicker patients than the corresponding trials for Eliquis or Pradaxa.  Moreover, sales representatives were provided with  unbranded materials  to leave with physicians regarding the difficulty in managing warfarin for AFib patients, as well as information touting adherence rates for once daily medications. [1146]

## f.  DEFENDANTS TARGET SPECIFIC PHYSICIAN GROUPS AND ATTEMPT TO OVERCOME BARRIERS FOR XARELTO PRESCRIBING

1125. In the July 26, 2011 SPAF Tactical Plan, there were approximately 120,000 physicians listed in the XARELTO iQMap, including 16,000 cardiologists and 16,000 PCPs (primary care physicians). It was calculated that, by targeting 23% of the audience, the message would actually reach the remaining 77%.  Defendants selected 3,600 physicians to target. These physicians are found within the top 10 influencer networks, with nearly 50% being physicians in the top 2 deciles for outbound influence; 3,300 out of 3,600 being part of a group practice; and 1,600 having written PRADAXA scripts through 2010. [1147] Another slide depicted the make-up of targeted physicians:

---

[1146] Ruppersberger Exhibit 15
[1147] Geiger Exhibit 14



1148

1126.Ms. Geiger wrote about the 2013 plans for ROCKET publications for "optimal field distribution":

> *...this is the list of ROCKET AF sub analysis being developed in 2013.  We'd like to select the most strategically important and differentiating reprints to push through PRC and discuss optimal field distribution...This will be a brand approach to identify reprints, talk to select PRC members (there are 2 different teams supporting XARELTO) and develop a plan for 2013.*
>
> *I am attaching the ROCKET reprint and appendix for your reference.*
> *In addition, at some point in the next few months you'll want to read RECORD 1-4 (though 4 did not make it into the label) as well as the EINSTEIN reprints and ATLAS (these are the pivotal studies for our indications).[1149]*

1127.At launch, Defendants provided sales representatives with the October 2011 *NEJM* publication of ROCKET, which contained an analysis and reference to XARELTO superiority to warfarin, *a claim specifically not approved by the FDA*.  The representatives were told to use the ROCKET reprint as a selling tool with physicians. In the event that a physician asked about the finding of superiority, the representatives were

---

1148 Geiger Exhibit 15
1149 Geiger Exhibit 4

to direct the physician to read the ROCKET reprint if they had further questions.  If the physician wanted additional information not in the reprint, the representatives were instructed to tell the physician to submit a written Medical Information Request form to Janssen. Notably, sales representatives were not provided the FDA's Summary Review, which details the reasons FDA did not approve the superiority claim.

1128. Defendants modified the published 2011 ROCKET reprint in 2013 (after Eliquis was on the market) to address Eliquis and reinforce superiority to warfarin.[1150] The revised reprint was provided to sales representatives with instructions to use the reprint to directly claim "superiority" of rivaroxaban.[1151]

1129. The 2012 SPAF Professional Education Objective/Tactics describes tactics for getting ROCKET SPAF message to prescribers:[1152]



1153

1130. In 2012, Janssen conducted marketing research on physicians' views about XARELTO and the anticoagulation market. The report presentation lists 11 barriers to prescribing XARELTO identified as important to physicians.  The top 3 barriers were cost, heightened bleeding concerns, and entrenchment of warfarin in prescribing practices.[1154] The presentation continued as follows:

---

[1150] Geiger Exhibit 77
[1151] Geiger Exhibit 77
[1152] Geiger Exhibit 14
[1153] Geiger Exhibit 14 at slide 18
[1154] Geiger Exhibit 19

*Cardiologists: Efficacy and safety not convincing- 70% costs, insurance formulary; 32% new/lack of experience; 16% efficacy not convincing, lack of Superior efficacy; 14% safety data not convincing, side effects, black box warning; 7% no reversal agent; 2% Pradaxa on market; 1% Question QD dosing- half life more consistent with BID dosing*

*PCPs: Waiting for feedback from colleagues/cards- 77% costs, insurance formulary; 32% new/lack of experience; 39% waiting for feedback from colleagues, lack of cardiologist recommendations; 6% safety, side effect, black box warning, long-term safety; 3% no reversal agent[1155]*

***How Does XARELTO overcome these barriers****? "Shifting MD Perception: Shifting MD Perception of barriers in his/her practice could shift drug selection. Comparing Safety: Perceptions are influenced by experience and mortality claims*

***Priority of Safety:*** *MDs placed a high priority on safety, with many citing safety concerns as a reason not yet fully adopting PRADAXA or XARELTO- Experience; Mortality Data*

*Cards & PCPs have Similar Stated Importance (Top 3) Stroke Reduction, Low ICH, Low Major Bleeding*

***Cards:*** *Is easy for patient to comply with (#4)(#8 for PCP)- Warfarin owns comforts and familiarity; Xarelto owns convenience; Pradaxa – brand requested by name by patients*

***PCP****: Is affordable to patient (#5) (#8 for Cards)*

*Among PCPs: XARELTO performs worse vs warfarin and Pradaxa on reduction of stroke (#1) and Worse vs Pradaxa on low major bleeding (#2) Favorable SE/Tolerability Profile and Easy for Patients to Comply*

*Among PCPs XARELTO performs: Worse vs warfarin and Pradaxa on High Comfort and Familiarity. Better than warfarin on convenience, lack of monitoring and fast onset of action. No clear advantage over Pradaxa.[1156]*

*BOTH: Lack of monitoring requirements(Cards #9, PCP #12) not that high for either group[1157]*

### g.  DEFENDANTS TARGET STABLE WARFARIN PATIENTS USING FEAR OF BLEEDING, NEED FOR CONSISTENT PROTECTION, AND CONVENIENCE

1131. A draft message intended for the Cardiology Team was sent by Judy Wicklum to Susan Geiger on December 15, 2011, "Subject: Hello Cardiology Team- Year End

---

[1155] Geiger Exhibit 19
[1156] Geiger Exhibit 19
[1157] Geiger Exhibit 19

message".[1158] There were only 10 selling days left in 2011 and XARELTO was in its fifth week of launch. The letter reinforced that sales was positioning XARELTO for a broad set of patients. The targeted patients for XARELTO included: newly diagnosed patients, unstable warfarin patients, unsatisfied Pradaxa patients and stable warfarin patients who want another option.[1159]

1132. Nauman Shah, Ms. Geiger's superior, sent her an email on January 8, 2012 "Subject: Patient Profile."[1160] He asked if Janssen sales could create a new patient profile for patients who may be doing fine (stable) on warfarin but want something easier and potentially with less worry about ICH, critical organ bleed or drug interactions. He stated: "*we are limiting ourselves too much by only focusing on new pts and the field is now also focusing on these pts, as there simply aren't enough existing patients who are not doing well or new pts.*"[1161] Targeting stable warfarin patients could expand the population.

1133. Susan Geiger sent a follow-up email on January 10, 2012 to Nauman Shah, stating: "your point is well taken on the "stable" warfarin patient. We chose not to start with that patient type for two reasons":

> 1. *if the HCP perceives the patient is well managed and well adjusted to their warfarin therapy, this could be a longer selling cycle to convert that patient...ensuring the initial profiles prioritize the 3 "lowest hanging fruit."*
> 2. *with our patient who fits the "successful health teams" segment, we paint the picture of someone frequently out of range but we could also use this to open the discussion with HCPs as to whether there is such a thing as a "stable" patient...can he/she be confident that the patient is consistently protected.*

> *We should actively pursue those patients who are stable and will work with the team evolving and adding such patient profiles but I wanted to make sure you didn't think we'd only focus on new AF diagnosis.*[1162]

## h. DEFENDANTS SPECIFICALLY TARGETED ELIQUIS PATIENTS

1134. A January 27, 2012 email from Fabiola Storz to Nauman Shah, Susan Geiger, et al., "Subject: XARELTO vs ELIQUIS-COMPETITIVE SIMULATION_PLEASE REVIEW ACTION ITEMS" attached a "XARELTO vs ELIQUIS Final Report."[1163]

1135. In a Competitive Simulation Workshop on January 24, 2012, Defendants assessed the strengths of Eliquis and weaknesses of XARELTO. The report was made in anticipation of the launch of Eliquis. A group of 30 professionals spent 8 hours (January 19, 2012) on exercises designed to address the launch and marketing of XARELTO. The following

---

[1158] Geiger Exhibit 16
[1159] Geiger Exhibit 17
[1160] Geiger Exhibit 18
[1161] Geiger Exhibit 18
[1162] Geiger Exhibit 18
[1163] Geiger Exhibit 25; Geiger Exhibit 26

strengths were identified for Xarelto:  once a day dosing; broad indications; and comorbidities in ROCKET population.[1164]  In contrast, the following weaknesses were identified for Xarelto: Lack of superiority claim in efficacy; safety/bleeding; absence of a mortality benefit; and black box. The following competitive messages were developed: 1) the patient population studied in ROCKET; 2) once a day advantages for compliance; and 3) real-world experience, other indications (current and pending) and formulary access represent a third major argument. [1165]

1136. A specific challenge for XARELTO when compared to BID Eliquis was "*consistent blood levels with qd dosing and resulting implication for coverage and protection.*"[1166]

## i.   DEFENDANTS IMPLEMENTED AN AGGRESSIVE DCT MARKETING CAMPAIGN TO COMPETE WITH ELIQUIS

1137. After implementing a DTC marketing campaign, a March 31, 2014 "X2K Initiative-Retail RBD Review PowerPoint" presentation indicated that "2K high Eliquis NRx targets resulted in Eliquis NBRx share decrease of ~13 points." On May 3, 2013, Defendants also broke the "warfarin wall," in that, for the first time Xarelto was prescribed more than warfarin.

## j.   DEFENDANTS PLAN TO SPECIFICALLY TARGET 2,400 ELIQUIS HIGH PRESCRIBERS

1138. Through focused field force efforts, resources, programs, broadcasts and DTC regionally in 115 territories, Eliquis NBRx share decreased by ~13 points while XARELTO increased by ~ 7 Points.[1167]

1139. However, Xarelto NBRx trend was flat in cardiology while Eliquis continued to increase. As of data through January 31, 2014, Xarelto had 4 week share of 37.7%, with Warfarin 29.3%, Pradaxa 8.7% and Eliquis 24.3%.[1168]  Physicians' perception of Eliquis was improving and driving an increase in penetration and productivity. Defendants' strategy was to deploy a sound approach to Eliquis high prescribers to flatten Eliquis NBRx while growing XARELTO NBRX. There were currently 4,900 prescribers that contribute to 80% of Eliquis NRx in Cardiology.  Defendants plan was to hyper focus on 2,400 prescribers that were driving the Eliquis NBRx volume with increased call frequency and strategic messaging:  "Reinforce XARELTOS market leadership through real world experience and depth of data across patient types.  Build field force confidence through training and resource utilization to address objections.  Execute multi-channel approach to target X2K prescribers and reinforce field force efforts."[1169]

---

[1164] Geiger Exhibit 26
[1165] Geiger Exhibit 26
[1166] Geiger Exhibit 26
[1167] Geiger Exhibit 28; Geiger Exhibit 29
[1168] Geiger Exhibit 29
[1169] Geiger Exhibit 29

## XIX.   DIRECT TO CONSUMER (DTC) MARKETING

### a.  DEFENDANTS TARGET STABLE WARFARIN PATIENTS

1140.Paul Herman, who is media trained, transferred to Janssen in 2011 to work on Xarelto as
Product Director.  His primary responsibility was direct-to-consumer marketing (DTC)
under the supervision of Nauman Shah.  Mr. Herman helped Janssen develop a plan to
market XARELTO directly to patients with nonvalvular atrial fibrillation (NVAF).  He
testified that he researched the market to understand patients' thoughts, feelings, and
experiences relative to atrial fibrillation and how Janssen could use that information to
market XARELTO.[1170]  "Scoping the Insight opportunity" or "SCIOP" is a tool used by
Janssen marketers to develop insight about customers.[1171]  SCIOP was a "very important
element in helping the XARELTO brand team come up with insights that were ultimately
used to inform all of the DTC advertising…it helped [Janssen] focus on the foundation,
discovery, and ultimately finding our insight."[1172]

1141.As part of the SCIOP initiative, Janssen conducted a segmentation analysis to better
understand how to advertise to particular segments of customers.[1173]  Segment 1 (S1) and
Segment 2 (S2) were the population most aggressively analyzed by Janssen because they
were current groups that indicated they were <u>satisfied with warfarin</u>.[1174]

1142. S1 were AFib patients who felt like their AFib was under control based on their
medication.  Janssen described them internally as "unconcerned about AFib, trust
Coumadin. Don't mind blood monitoring tests. Smart, informed and proactive. Want to
think/feel that they are doing their best for their health, including AFib."[1175]

1143.S2 were described as "independent loyalists, and are usually single.  They have a strong
relationship with their doctor and trust the doctor's opinion as to how to manage their
condition and which product to take to reduce their risk of stroke caused by NVAF.
Janssen describes this segment 2 as unconcerned about AFib because they've got it under
control. Very satisfied with Coumadin."[1176]

1144.Despite S1 and S2's positive experiences with warfarin, and satisfaction with warfarin
control, Janssen specifically targeted these two warfarin-stable patient populations with
its DTC campaign.  Janssen determined that when presented with different options, this
group became interested in replacing warfarin although they previously "thought they
were satisfied with."[1177]  Mr. Herman would later call the "SCIOP Tools PowerPoint"
dated April 6, 2011, which describes S1 and S2 as satisfied with warfarin, only a draft
and testified that it was later updated with additional information that S1 and S2 segments

---

[1170] Herman depo 4/18/16, p. 73: L21 – p. 75: L10
[1171] Herman depo 4/18/16, p. 160: L9 – p. 161: L10
[1172] Herman depo 4/18/16, p. 178: L14 – p. 179: L6
[1173] Herman depo 4/18/16, p. 180: L11 – p. 181: L13
[1174] Herman Exhibit 7
[1175] Herman depo 4/18/16, p. 209: Ll8 – P. 210: L13; Herman Exhibit 7
[1176] Herman depo 4/18/16, p. 189: L12 – p. 190: L15; Herman Exhibit 7
[1177] Herman depo 4/18/16  p 283, L. 9-24; Herman Exhibit 7

were "dissatisfied" with warfarin. However, when Mr. Herman was shown an email from Herman to Janine Osborn on October 16, 2014, with the same PowerPoint attached, Mr. Herman stated that he did not know if the SCIOP Tools PowerPoint was later updated with different views about the status of the S1 and S2 segments.[1178]

1145. The SCIOP and segmentation analysis resulted in Janssen creating a statement for DTC use: "*I reached a point where all I wanted to do was enjoy my life my way.  I get tired of adapting it to fit my bleed thinner.*"  This statement ultimately drove Janssen's DTC marketing to AFIb S1 and S2 patients and helped crystallize the intended customer, and their thoughts, feelings and experiences.[1179]  Janssen also hired psychiatrists and psychologists to evaluate the best phrases to use in furthering the insight statement and to moderate discussions with AFib patients to determine their opinions and concerns.[1180]

1146. This information was used to create an effective DTC advertising campaign to capture the S1 and S2 groups and to facilitate consumer interest in XARELTO.[1181]

1147. Herman also testified that Janssen used a disease awareness campaign to raise interest in the marketplace as to what AFib was and its link to stroke.[1182]  He also testified there was a self-serving interest as well: the more people are educated about the condition and the need for anticoagulation, the more likely they would be interested in XARELTO.[1183]  An AFib Disease Awareness website had a place for a consumer to check a box to be sent information specific to XARELTO.[1184]  Janssen intended to use this strategy to "capture prospects' names".[1185]  He testified that he was unaware of any Disease Awareness sight that was not linked to a product that a company was already selling or was trying to get on the market.[1186]  He testified that the purpose of the Disease Awareness campaign for XARELTO was to "motivate consumer prospects/caregivers to ask their doctors about XARELTO."[1187]

1148. Mr. Herman helped develop the CarePath website, which "was intended to help patients follow their doctor's prescriptions for XARELTO and also to help inform patients to better understand their condition and why anticoagulation was important to reduce the risk of stroke."  It was also used to help them stay on XARELTO.[1188]  Part of the CarePath website was a "doctor discussion guide" under the "coaching and tools" section, intended to arm patients with specific reasons to tell their doctors why they wanted to be prescribed XARELTO.[1189]  The Janssen goal was to have the patient make a

---

[1178] Herman depo 4/18/16, p. 220: L8 – p. 222: L7; Herman Exhibit 8
[1179] Herman depo 4/18/16, p. 179: L9-17 and p. 198: L1-14 and p. 192: L18 – p. 193: L19
[1180] Herman depo 4/18/16, p. 193: L20 – p. 195: L3
[1181] Herman depo 4/18/16, p. 195: L8-23
[1182] Herman depo 4/18/16, p. 251: L16 – p. 252: L12
[1183] Herman depo 4/18/16, p. 252: L3 – p. 253: L14
[1184] Herman depo 4/18/16, p. 254: L23 – p. 255: L12
[1185] Herman depo 4/18/16, p. 298: L4-23
[1186] Herman depo 4/18/16, p. 256: L21 – p. 259: L15
[1187] Herman depo 4/18/16, p. 290: L15 – p. 291: L6
[1188] Herman depo 4/18/16, p. 261: L10 – p. 262: L4
[1189] Herman depo 4/18/16, p. 316: L10 – p. 318: L21

"strong request" to the doctor for prescription of XARELTO.[1190] Janssen recognized that doctors are hesitant to switch stable warfarin patients unless asked: "Some doctors may not actively encourage their appropriate patients to switch, but they will accommodate a request if the patient comes in and makes the request to switch."[1191]  As a result, Janssen aimed to convince satisfied and stable warfarin patients to ask their doctor for XARELTO by name. [1192] Janssen began to target the stable warfarin patients win the Disease Awareness AFib campaign when FDA approval was in sight.[1193]

1149. After raising awareness of AFib, Janssen initiated a point-of-care marketing inside the physician's office through "Coffee Cup Lady", "Bob's Story" and "Jim on the Road" campaigns.[1194]  Janssen partnered with CNN, Accent Health, Health Advisory Network, and EURO to increase its brand presence at the "higher-decile offices" across the country.  Janssen wanted to be sure that ads were placed in locations where the most individuals with AFib sought care from physicians.[1195] "More than 3,400 offices had XARELTO advertising on wallboards, brochures, in-office TVs, increasing awareness and supporting sales efforts.[1196] Patient education resource kits (PERK) were provided to sales representatives to give to doctors for appropriate patients.[1197] Ads were also placed in magazines well-known in physicians' offices.[1198]

1150. Janssen also paid Catalina to attach information about XARELTO to the prescription packages for stable warfarin users.[1199] Janssen did not inform well-controlled warfarin patients that XARELTO may not protect them as well as their well-controlled warfarin. However, only in television ads, Janssen was required by FDA to add a statement that there was limited information comparing XARELTO to well-controlled warfarin.[1200] It did not include that same disclaimer and warnings in Janssen's other DTC products intended to stimulate the consumer's request to a physician to prescribe XARELTO and switch from warfarin.

1151. Janssen had three marketing messages for consumers: 1. Once a day dosing; 2. No blood monitoring; and 3. No dietary restrictions. Janssen separated XARELTO from PRADAXA by once a day dosing. Convenience themes were present in all of XARELTO's ads.  In 2012, XARELTO reached the 1 million prescriptions mark.[1201] The claims of no blood monitoring and no dietary restrictions were intended to target warfarin users.[1202]

---

[1190] Herman depo 4/18/16, p. 266: L3 – p. 267: L15
[1191] Herman depo 4/18/16, p. 322: L15 – p. 322: L20
[1192] Herman depo 4/18/16, p. 265: L22 – p. 267: L1 and p. 152: L11-24
[1193] Herman depo 4/19/16, p. 568: L10 – p. 569: L3
[1194] Herman depo 4/19/16, p. 546: L22 – p. 547: L10
[1195] Herman depo 4/19/16, p. 574: L14 – p. 575: L8; Herman Exhibit 40
[1196] Herman depo 4/19/16, p. 577: L9-15
[1197] Herman depo 4/19/16, p. 584: L2-9
[1198] Herman depo 4/19/16, p. 599: L17 – p. 600: L1
[1199] Herman depo 4/18/16, p. 346: L1 – p. 358: L5; Herman Exhibit 15; Herman Exhibit 16
[1200] Herman depo 4/18/16, p. 155: L20 – p. 156: L20
[1201] Herman depo 4/19/16, p. 688: L6-24
[1202] Herman Exhibit 52; Herman Exhibit 72

1152. In terms of the lack of safety information and warnings in the DTC marketing, there is no mention of the lack of an antidote for XARELTO in its advertisements.[1203] Janssen diminishes safety risks while openly encouraging consumers to switch from warfarin to XARELTO based on convenience, not evidence of improved safety.[1204]

1153. Janssen employed outside entities to assist in consumer and healthcare provider marketing plans for XARELTO.  The vendors included: Galileo/Galileo Analytics to gather market research insights[1205]; Bernard & Associates- strategic preparations to understand the future marketplace, ran simulations and work with healthcare providers promotions;[1206] and Catalina- stable warfarin patients provided with XARELTO information when they picked up a warfarin prescription[1207] (Catalina also tracked the number of switches from warfarin, Pradaxa and others to XARELTO per week and sent reports to Janssen[1208]); M3 health  patient directed videos; Edelman Health- public relations; InfoMedics – patient could provide their experience with Xarelto, and created the "silent generation"[1209] ; Razorfish health- search engine for marketing;[1210] Blue Diesel- services to healthcare providers marketers, promotional iPad presentation development that sales resps would use with a healthcare provider when promoting XARELTO; J3-planning of consumer media, make recommendations on which media Janssen should purchase; IPSOS- market research company hired by Janssen to track the impact of ads based on the number of large competitive companies in the marketplace;[1211] and Millward Brown- conducted research prior to "Jim on the Road," and compared "Jim on the Road" to "Tom Old Photo".[1212]

## b.  THE USE OF CELEBRITY ENDORSEMENTS

1154. Kristina Chang was involved in the use of sports figures in XARELTO ads in November 2013.[1213]  These campaigns were as follows: "Movements 1," a DTC unbranded campaign with Brian Vickers sponsored by "treatmyclot.com300 race;" "Movements 2," an unbranded campaign during AFib awareness months using Michael Waltrip; and "Movements 3," an unbranded campaign with Kevin Nealon and Arnold Palmer.  These Movements campaigns were design to lay the foundation for the next DTC adsCelebrities, like Palmer, elicit certain emotions in consumers: trust; confidence; and integrity in the brand. In fact, the Return on Investment for the celebrity ads was 2:1. Janssen paid NASCAR $500,000 in 2015 to be the "Official Blood Thinner of NASCAR," and paid $250,000 to have XARELTO on Vickers' No. 55 car. Vickers was

---

[1203] Herman depo 4/19/16, p. 858: L11-24 and p. 754: L10-15; Herman Exhibit 74
[1204] Herman depo 4/19/16, p. 673: L12 – p. 675: L1
[1205] Herman depo 4/19/16, p. 834: L5 – p. 835: L1
[1206] Herman depo 4/18/16, p. 450: L3-15
[1207] Herman depo 4/18/16, p. 452: L5 – p. 454: L5
[1208] Herman depo 4/19/16, p. 699: L15-24; Herman Exhibit 53
[1209] Herman depo 4/18/16, p. 456: L10 – p. 457: L5
[1210] Herman depo 4/18/16, p. 457: L18 – p. 458: L1
[1211] Herman depo 4/19/16, p.703: L24 – p. 708: L21
[1212] Herman depo 4/19/16, p. 723: L16 – p. 724: L17; See also Herman Exhibit 4; Herman Exhibit 12; Herman Exhibit 13; Herman Exhibit 16; Herman Exhibit 21; Herman Exhibit 22;Herman Exhibit 32; Herman Exhibit 34; Herman Exhibit 35; Herman Exhibit 75
[1213] Ruppersberger Exhibit 4; Ruppersberger Exhibit 7; Ruppersberger Exhibit 8

paid $1.65 MM, Palmer was paid $1.4 MM, Nealon was paid $1.9 MM, and, for the most recent ad, Chris Bosh was paid over $1MM.   Unbranded ad campaigns also included Jerry West and Billie Jean King.

## c.  FDA IDENTIFIES MISLEADING CLAIMS IN DTC ADVERTISING

1155. On June 6, 2013, FDA issued an "Untitled Letter" to Defendants for misbranding XARELTO with claims of "*no dosage adjustments….*"[1214]

1156. FDA's Office of Prescription Drug Promotion (OPDP) had reviewed a direct-to-consumer (DTC) print advertisement for XARELTO tablets submitted to FDA under cover of Form FDA 2253 and "observed during routine surveillance in the January/February 2013 issue of WebMD magazine."  FDA called the print ad "*false and misleading*" because it "*minimizes the risks associated with XARELTO and makes a misleading claim.*"  FDA continued that the PrintAd "*misbrands XARELTO in violation of the Federal Food, Drug and Cosmetic Act, 21 USC 352(n) and FDA implementing regulations 21 CFR 202.1(e )(5)(i); ( e) (&)(viii), (ix).*"[1215]

1157. FDA classified the following a "Misleading Claim": "And there are no dosage adjustments…"  FDA pointed out the need to adjust patient's dose with reduced renal function:

> *The above claim misleadingly suggests that dosage adjustments are not necessary with XARELTO.  However, according to the DOSAGE AND ADMINISTRATION section of the PI, the dose should be lowered to 15mg once daily for patients with renal impairment who may have a CrCl of 15 to 50 mL/min.  In addition, the WARNINGS AND PRECAUTIONS section of the PI states…"Periodically assess renal function as clinically needed…and adjust therapy accordingly…" Thus, patients with renal impairment may need to have their dosage adjusted while on XARELTO therapy.[1216]*

---

[1214] FDA "Untitled Letter" Office of Prescription Drug Promotion dated June 6, 2013. Signed by  Zarna Patel, Pharm.D, and Amy Toscano, Pharm. D, RAC, CPA (http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm339597.htm)

[1215] FDA "Untitled Letter" Office of Prescription Drug Promotion dated June 6, 2013. Signed by  Zarna Patel, Pharm.D, and Amy Toscano, Pharm. D, RAC, CPA (http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm339597.htm)

[1216] FDA "Untitled Letter" Office of Prescription Drug Promotion dated June 6, 2013. Signed by  Zarna Patel, Pharm.D, and Amy Toscano, Pharm. D, RAC, CPA (http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm339597.htm)