# EXHIBIT O

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1                UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF LOUISIANA

2

3

     IN RE:  XARELTO          )   MDL No.:  2592

4    (RIVAROXABAN) PRODUCTS   )   Section:   L

     LIABILITY LITIGATION     )   Judge Eldon E. Fallon

5                             )   Mag. Judge North

                              )

6                             )

                              )

7    JOSEPH J. BOUDREAUX,     )   Case No.:

     JR.                      )   2:14-CV-0270

8    and LORETTA BOUDREAUX    )

9

10

11   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14      Videotaped deposition of JAMES WAYNE SMITH,

15   M.D., taken on Wednesday, December 14, 2016, in

16   the office of Irwin, Fritchie, Urquhart & Moore,

17   L.L.C., 400 Poydras Street, Suite 2700, New

18   Orleans, Louisiana 70130, commencing at 12:57 p.m.

19

20

21

22

23

     Reported by:

24   AURORA M. PERRIEN

     CERTIFIED COURT REPORTER

25   REGISTERED PROFESSIONAL REPORTER

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1                         I N D E X
                                              Page
2
           Caption...........................1
3
           Appearances.......................4
4
           Agreement of Counsel..............6
5
           Witness' Certificate............192
6
           Reporter's Certificate..........193
7
8
                    E X A M I N A T I O N
9
           MR. GOZA..........................8
10
11
12               E X H I B I T S
13         Exhibit No. 1.....................11
           Plaintiffs' Notice with Subpoena Duces
14         Tecum of Oral Videotaped Deposition of
           James W. Smith, MD
15
           Exhibit No. 2.....................15
16         Expert Report of James William Smith,
           M.D.
17
           Exhibit No. 3.....................34
18         "Risk of gastrointestinal bleeding
           associated with oral anticoagulants:
19         population based retrospective cohort
           study"
20
           Exhibit No. 4.....................34
21         (Fee schedule and time sheets)
22         Exhibit No. 5.....................34
           (Xarelto) Highlights of Prescribing
23         Information
24         Exhibit No. 7....................148
           (Excerpt from Edward S. Peters' report
25         dated 10/12/16, Pages 10 - 13)

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1           Exhibit No. 8......................154

            "Bleeding with Direct Oral Anticoagulants

2           vs Warfarin:  Clinical Experience"

3           Exhibit No. 9......................167

            "Comparative risk of gastrointestinal

4           bleeding with dabigatran, rivaroxaban,

            and warfarin:  population based cohort

5           Study"

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **Reporter's Note:  There is no Exhibit No. 6.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              A P P E A R A N C E S
 2   REPRESENTING JOSEPH J. BOUDREAUX, JR. AND
     LORETTA BOUDREAUX:
 3
          BEASLEY, ALLEN, CROW, METHVIN,
 4        PORTIS & MILES, P.C.
          BY:  DAVID B. BYRNE, ESQ.
 5        218 Commerce Street
          Montgomery, Alabama 36104
 6        334.269.2343
          David.byrne@beasleyallen.com
 7
          BARRIOS, KINGSDORF & CASTEIX, L.L.P.
 8        BY:  EMMA E. KINGSDORF, ESQ.
          701 Poydras Street, Suite 3650
 9        New Orleans, Louisiana 70139-3650
          504.524.3300
10        Ekingsdorf@bkc-law.com
11        GOZA & HONNOLD, L.L.C.
          BY:  KIRK J. GOZA, ESQ.
12        11181 Overbrook Road, Suite 200
          Leawood, Kansas 66211-2241
13        913.451.3433
          Kgoza@gohonlaw.com
14
15
16   REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
     JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
17   ORTHO, L.L.C.:
18        KAY SCHOLER, L.L.P.
          BY:  BERT L. SLONIM, ESQ.
19        250 West 55th Street
          New York, New York 10019-9710
20        212.836.8897
          Bert.slonim@kayescholer.com
21
22
23
24
25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1     REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
       INC., and BAYER PHARMA AG:
 2

            SCHWABE, WILLIAMSON & WYATT, P.C.
 3          BY:  MARGARET HOFFMANN, ESQ.
            1211 South West Fifth Avenue, Suite 1900
 4          Portland, Oregon 97204
            503.796.2868
 5          Mhoffmann@schwabe.com
 6          BARRASSO, USDIN, KUPPERMAN, FREEMAN &
            SARVER, L.L.C.
 7          BY:  SHAUN P. McFALL, ESQ.
            909 Poydras Street, 24th Floor
 8          New Orleans, Louisiana 70112
            504.589.9764
 9          Smcfall@barrassousdin.com
10
11

       ALSO PRESENT:
12

            MARK ANCALADE, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              S T I P U L A T I O N

 2       It is stipulated by and among Counsel that

 3   the videotaped deposition of JAMES WAYNE SMITH,

 4   M.D., is being taken under the Federal Rules of

 5   Civil Procedure for all purposes permitted under

 6   the law.

 7       The formalities of reading and signing are

 8   not waived.

 9       The formalities of sealing, certification

10   and filing are not hereby waived.  The party

11   responsible for services of the discovery material

12   shall retain the original.

13       All objections, except those as to the

14   form of the questions and/or the responsiveness of

15   the answers, are reserved until the time of the

16   trial of this cause.

17                  *   *   *   *   *

18           Aurora M. Perrien, Certified Court

19   Reporter, Registered Professional Reporter, in and

20   for the State of Louisiana, officiated in

21   administering the oath to the witness.

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                 P R O C E E D I N G S

 2          THE VIDEOGRAPHER:

 3              We're now on the record.  My name is

 4          Mark Ancalade, the videographer with

 5          Golkow Technologies.  Today's date is

 6          December the 14th, 2016, at the time

 7          indicated on the video screen, which is

 8          12:57.  Today's deposition is being held

 9          at 400 Poydras Street, Suite 2700,

10          New Orleans, Louisiana, taken in the

11          matter of -- in reference:  Xarelto

12          (rivaroxaban) Products Liability

13          Litigation, being heard before the

14          United States District Court, Eastern

15          District of Louisiana.  Today's deponent

16          is Dr. James W. Smith.  Today's court

17          reporter is Miss Aurora Gonzales [sic].

18              I would ask that counsel please state

19          their names for the record, which

20          thereafter would the court reporter please

21          swear in the witness.

22          MR. GOZA:

23              Kirk Goza on behalf of the plaintiffs.

24          MR. BYRNE:

25              David Byrne on behalf of plaintiffs.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1        MS. KINGSDORF:

2            Emma Kingsdorf on behalf of the

3        plaintiffs.

4        MS. HOFFMANN:

5            Margaret Hoffmann on behalf of

6        defendant Janssen.

7        MR. SLONIM:

8            Bert Slonim on behalf of the Bayer

9        defendant.

10       MR. McFALL:

11           Shaun McFall on behalf of Janssen.

12       (The court reporter swore in the witness.)

13                E X A M I N A T I O N

14   BY MR. GOZA:

15       Q.   Doctor, if you would, please state your

16   full name for the record.

17       A.   James Wayne Smith.

18       Q.   And Doctor, my name is Kirk Goza.  You and

19   I had an opportunity to meet just before the start

20   of this deposition?

21       A.   Yes.

22       Q.   Have you given deposition testimony

23   before?

24       A.   I think I've only given one deposition

25   before.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1       A.   Well --

2       Q.   -- seems to be --

3       A.   And -- and Acosta is too.  I mean,

4   that's -- that -- that -- Acosta wrote for

5   gastrointestinal endoscopy, the --

6       Q.   Okay.  Is -- sorry.  Go ahead.

7       A.   So the -- the -- I consider that a key

8   article as far as both NOACs and Coumadin.

9       Q.   Did it have any discussion about the

10  relative risk factors associated with the

11  different NOACs?

12      A.   No.  It did not --

13      Q.   Okay.  It doesn't have anything -- and --

14  and part of what I'm -- what I really want to

15  understand now -- you offered some opinions here

16  about the relative risks of bleeding associated

17  with NOACs.  And I want to understand the basis

18  for which you're operating.

19           And so the -- the first article that might

20  have something relevant to that would be the

21  Abraham article, the first one you list; correct?

22      A.   Correct.

23      Q.   The second article would be the other

24  Abraham article that's No. 2 on your list?

25      A.   Correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1        Q.   The next article would be Ashburner, the

2   No. 4 on your list?

3        A.   Yes.

4        Q.   I think we then go down to No. 7, Chang,

5   that article from 2015 from the British -- British

6   Medical Journal; correct?

7        A.   Correct.

8        Q.   And then we have the Desai article, which

9   is out of the Journal of Gastroenterology from

10  2016?

11       A.   Correct.

12       Q.   And then we have Guttermann, the top

13  article on the second page, related to GI

14  bleeding?

15       A.   Right.

16       Q.   Have I covered the articles that you

17  believe relate to the relative risk factors

18  associated with the use of anticoagulants and

19  bleeding?

20       A.   Well, I think -- I think Radaelli and

21  Rockey both have important articles in it as well.

22       Q.   Okay.  Do either one of those attempt to

23  discern the relative safety factors or risk

24  factors associated with the relative NOACs?

25       A.   I don't think they compare the NOACs, if

1    that's what you're asking.

2        Q.  That is what I'm asking.

3        A.  No.

4        Q.  Do they -- okay.

5        A.  To -- to my knowledge, they do not.

6        Q.  You cite those for very specific things in

7    your report, those two articles for very specific

8    things in your report; correct?

9        A.  Correct.

10        Q.  And neither of those were cited as it

11    pertains to the relative risk factors of

12    gastrointestinal bleeding associated with the

13    NOACs; correct?

14        A.  Well, I -- I still think they were

15    important articles as far as the assessment of GI

16    bleeding in patients on NOACs.

17        Q.  Sure.  And I'm not talking about the

18    assessment --

19        A.  Okay.

20        Q.  -- of patients.

21            You -- you cite them for symptoms and

22    issues associated with patients that have bleeds

23    on NOACs; correct?

24        A.  Yes.  I --

25        Q.  And -- and what I'm trying to discern, in

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1    this world of documents that --
 2        A.   Yeah.
 3        Q.   -- you have in front of you, the number of
 4    articles that you looked at that talk about the
 5    relative risk factors of bleeding in the NOACs.
 6    And I think we've --
 7        A.   Okay.
 8        Q.   -- identified the six that do that.
 9        A.   Okay.
10        Q.   Is that true?
11        A.   Yes.   Yes.
12        Q.   And is it fair to say that those -- or
13    strike that.
14             Obviously not all six of those articles
15    were written by --
16        A.   Neena Abra- --
17        Q.   -- Neena Abraham --
18        A.   Right.
19        Q.   -- correct?
20        A.   Yes.  It would --
21        Q.   How did you come about the other articles?
22        A.   Well, I think that after I -- fortunately
23    the timing of this was that the American Journal
24    of Gastroenterology came out with this -- really
25    this collection of several articles all at once.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  You know, one was by Rockey, Don Rockey, someone I

2  respect quite a bit.  Desai was well-written.

3  I -- I Desai had a table of different rivaroxaban

4  trials, and he specifically quoted the Chang.  So

5  I got Chang from reading the Desai article.  I

6  don't know how I got the others other than

7  probably looking at the articles, seeing which

8  study they quoted, and -- and -- and trying to

9  pull that article.

10      Q.  Okay.  You're not trying to represent to

11  either the court or the jury that this is an

12  exhaustive search of the literature on the various

13  risk factors associated with the different NOACs,

14  are you, sir?

15      A.  No.

16      Q.  If one were to do an epidemiologic review

17  in order to try to make a determination about the

18  risk factors associated with each of the NOACs or

19  even as they compare to one another or as they

20  compare to warfarin, one would want to have as

21  many articles available to them as they could.

22  True?

23          MS. HOFFMANN:

24              Objection.

25          MR. SLONIM:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   Yeah.

2      Q.   Struggling with it.  Sorry.  Thank you.

3 And the fourth a -- Savasa [sic].  Okay.

4           Am I correct that you yourself have never

5 prescribed Xarelto?

6      A.   That's correct.

7      Q.   You have never prescribed any NOAC.  True?

8      A.   Correct.

9      Q.   And you've never prescribed a NOAC.  So

10 you yourself have never sat down and done the

11 risk-benefit analysis of weighing the use of a

12 NOAC versus the -- the benefits of -- of a NOAC in

13 a -- in a patient?

14     A.   Correct.

15     Q.   And am -- and prior to this litigation,

16 you've never sat down and read specific articles

17 with respect to NOACs.  True?

18     A.   Right.

19     Q.   Fair to say you don't consider yourself an

20 expert on NOACs?

21     A.   I -- I treat patients almost on a weekly

22 basis that are on NOACs, so I have a great deal of

23 experience.  And -- and certainly I have

24 consultations with cardiologists frequently after

25 I take care of the patient, maybe interrupt the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

 1    NOAC for a procedure or take care of them in the

 2    hospital with bleeding.  So I -- I -- I have

 3    experience with that, but only in that capacity.

 4        Q.  And that's what I -- I want to make sure I

 5    understand.

 6        A.  Yeah.

 7        Q.  So your -- the -- there's a difference

 8    between having experience with a drug and being an

 9    expert on it.  True?

10        A.  Correct.

11            MS. HOFFMANN:

12                Objection.

13    BY MR. GOZA:

14        Q.  In terms of being an expert on the use of

15    the drug, when it's used, making that risk-benefit

16    analysis, that's not something you do; correct?

17            MS. HOFFMANN:

18                Objection.

19            THE WITNESS:

20                That's not something I do.

21    BY MR. GOZA:

22        Q.  Okay.  What you might do is -- if somebody

23    has a bleed on an anticoagulant or a bleed caused

24    by an anticoagulant, you would see them in your

25    practice?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   You're not offering an opinion to a

2    reasonable degree of medical certainty that

3    Mr. Boudreaux has acute ongoing occult bleeding?

4    A.   Actually I think it's highly likely that

5    he's having chronic -- chronic ongoing slight

6    bleeding.

7    Q.   And tell me the things that you base that

8    on.

9    A.   Well, his hemoglobin was 10.6 in the

10   summer of 2016.  There'd be no reason why his

11   blood count wouldn't have -- be -- be normal at

12   that point.

13   Q.   Do you rule out the possibility that he

14   has some underlying hematologic issue?

15   A.   What I would say is that that has not been

16   explored.  I'm asked to see patients that are

17   anemic all the time.  I'm not a hematologist, but

18   I get referrals for anemia all the time.  And I

19   feel very comfortable in the initiation -- in the

20   initial evaluation and -- and assessment of those

21   patients.  I think that if you have a patient with

22   -- with a low hemoglobin, normal MCV, but there's

23   this question in the past of B12 deficiency, I

24   think there's a very -- probability that they also

25   -- the smaller cells that would go along with an

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    iron deficiency too.

2        Q.  And when you talk about the smaller cells,

3    you're talking about -- and you saw

4    Dr. Leissinger's explanation of why there might be

5    smaller cells?

6        A.  I don't remember that in Dr. Leissinger's.

7    No.

8        Q.  With respect to the differentiation

9    between -- and that's what -- when you're talking

10   about -- tell me the test again.

11       A.  The RDW or the --

12       Q.  The RDW.

13       A.  -- MCV?

14       Q.  We're --

15       A.  Yeah.

16       Q.  -- talking about an actual -- is it a

17   qualitative description of the cells themselves?

18       A.  It's -- it's the variation in the size of

19   the cells.

20       Q.  Right.

21       A.  So if it's elevated, that means that

22   there's a population of -- of more diverse cells,

23   large cells and small cells.

24       Q.  And did she -- did you have a chance or an

25   opportunity to read what her explanation of that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  evaluate that?

2      MS. HOFFMANN:

3          Objection.  Form.

4      THE WITNESS:

5          There -- there are different tests

6          that can be done to -- to help it.

7  BY MR. GOZA:

8      Q.  What would those tests be?

9      A.  Well, you could go on a very basic and

10  crude level and do stools for occult blood.  If

11  it's negative, it doesn't mean he's not

12  intermittently bleeding.  If it's positive,

13  there's some false positive.  But that's a --

14  that's a inexpensive and easy test that could be

15  done.

16     Q.  What else?

17     A.  One could -- one could do the -- the --

18  repeat some of the iron studies, the iron in TIBC,

19  which were indicative of a iron deficiency when

20  they were first done on February 5th.  But they

21  weren't repeated afterwards.

22     Q.  Okay.

23     A.  You could do another complete GI workup.

24     Q.  Okay.  Have we -- I want to just make sure

25  I got an exhaustive list.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    a follow-up was 13.0.

2        Q.  Right.  In fact, that's why he got the

3    additional two --

4        A.  Uh-uh.  No.  I'm talking about January.

5        Q.  Right.

6        A.  I'm talking about January, the hemoglobin

7    of 13.0.

8            COURT REPORTER:

9                I can only have one at a time.  I'm

10           sorry.

11           THE WITNESS:

12               Oh, I'm sorry.

13           MR. GOZA:

14               No.  That's okay.  We'll try to do

15           better.

16           MS. HOFFMANN:

17               And, Counsel, if you will just let

18           Dr. Smith really finish his answer.  I

19           think he speaks a little bit slower than

20           perhaps you do.  And he has a cold today,

21           which may be causing him to speak even a

22           little bit slower.  So maybe just give him

23           a minute.

24    BY MR. GOZA:

25        Q.  With respect to at least the acute nature

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   of his bleed -- and -- and strike that.

2          Are you saying possibilities -- is it your

3   intent to offer some medical opinion to

4   probability about that issue, or are you saying

5   that's simply a possibility?

6      A.   I think that at the time, at that initial

7   encounter in January or in February, I would have

8   not thought that that's very significant.  13.0's

9   not that low.  However, in retrospect, when one

10  looks at the course of events for two years after

11  the Xarelto has been stopped and how he's still

12  anemic, I think with -- I think with probability

13  he was having occult bleeding before.  And I think

14  he continued to have occult bleeding in the years

15  to come, most likely from a arteriovascular

16  malformation, a AVM, of the GI tract.

17     Q.   And can you tell me what evidence that you

18  have that he has an AVM of his gastrointestinal

19  tract?

20     A.   That would -- that would be the most

21  likely cause of the GI bleeding in the -- of this

22  nature.  It'd be -- it's the easiest thing to be

23  missed on a first evaluation, and that it would

24  not be uncommon at all for that to be missed by

25  upper scope, lower scope, or a video capsule.

```
 1              And --

 2         MS. HOFFMANN:

 3              -- about that.  Okay.

 4         MR. GOZA:

 5              No.  We haven't talked about this

 6         part, but that's okay.

 7    BY MR. GOZA:

 8      Q.  "Mr. Boudreaux most likely would have had

 9    a GI bleed with any anticoagulant, including

10    Coumadin or any of the other DOACs"; correct?

11      A.  Correct.

12      Q.  I want you to tell me first all of the

13    bases that you have that -- upon which you base

14    your opinion.

15      A.  Well, any anticoagulant has a risk of GI

16    bleeding.  That's its main side effect.  That --

17    and if you look at Neena Abraham's work on the

18    comparative, where she looks at both Pradaxa to

19    Coumadin, as well as Xarelto to Coumadin, they

20    both have approximately the same amount of GI

21    bleeding as Coumadin.  There's some variations.

22    You know, I think that -- you know, and she -- for

23    Pradaxa maybe there was a little bit less bleeding

24    for a-fib and a little bit more bleeding

25    non-a-fib.  But the bottom line is that the risk
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    is just about the same for the NOACs and Coumadin.

2        Q.  So -- I -- I just want to make sure I -- I

3    get this.

4            The reason that you feel you are able to

5    make this statement is because of your opinion or

6    belief that the risk of gastrointestinal bleeding

7    is the same with all NOACs and with Coumadin?

8            MS. HOFFMANN:

9                Objection.

10           THE WITNESS:

11               I do believe that it's just about the

12               same.  I think there's some variation

13               between one study and the next, but I

14               think it's -- it's about the same risk.

15   BY MR. GOZA:

16       Q.  Now, I want to know everything that you

17   have done to formulate that opinion.  Because, I

18   mean, it was inherent in what you were saying,

19   I'm -- I'm -- I was assuming.  So now I want to

20   understand that -- that -- what you've done to

21   formulate that opinion.

22       A.  All right.  Well, one, based on my

23   experience taking care of lots of GI bleeding

24   patients, there doesn't seem to be any one that

25   causes more bleeding than the others.  I see it as

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    a equal opportunity complication for all of them.

2    As far as the literature there, it seems like that

3    there may be some variation from one study to the

4    next.  But the overall aggregate is that they all

5    cause GI bleeding in about the same percentage of

6    cases.

7        Q.  And the literature specifically that

8    you're pointing to are the six articles that exist

9    in your reliance list?

10       A.  Yes.  And the ROCKET AF study that I added

11   to that.

12       Q.  Okay.  Now, let's go back.

13           In terms of your practice, do you keep

14   records of how many bleeds you get on what

15   patients?

16       A.  It's -- it's funny you ask that.  Because

17   when I -- when I did -- my paper said that I've

18   taken care of at least 5,000 bleeds.  I can tell

19   you how I base that, and I can -- and how it's --

20   that's really a very low estimate.

21           How I base that was -- about two years ago

22   I was asked to give a lecture at a local

23   hospitalist course on GI bleeding.  I hadn't given

24   that lecture in a while, so I decided to update my

25   slides.  So -- so I kept track of all the bleeds I

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    cases and -- but that would have been predating

2    the NOACs.  But of course for those patients we

3    kept track of the medications they were on.

4    There's -- if that's what you mean.

5        Q.   Sure.

6            And to the extent those patients were on

7    medications preceding the NOACs, more likely than

8    not they were on Coumadin?

9        A.   Correct.

10       Q.   Okay.  So we -- the -- I'm trying to

11   understand now as we sit here and talk about your

12   own personal practice, whether that gives you any

13   basis to say that in fact each of the NOACs are

14   equal.

15           And so what I'm trying to understand:

16   Have you undertaken some kind of study or by

17   tallying how many per week or -- or taking Pradaxa

18   and how many per week have bleeds on Pradaxa and

19   how many per week have bleeds on Xarelto, if

20   you've done that?

21       A.   No.  I have not done that.

22       Q.   So really the -- the -- the basis upon

23   which you are saying that in your opinion the

24   NOACs and Coumadin have an equivalent rate of

25   gastrointestinal bleeding are the six articles

1    that we have talked about that you placed on your

2    reliance list?

3            MS. HOFFMANN:

4                Objection.  That's not what he's

5            testified to.

6            THE WITNESS:

7                The -- I've -- I've cited those

8            articles in addition to the ROCKET AF

9            study and my just -- my general knowledge

10           that I've acquired as far as taking care

11           of these patients.

12   BY MR. GOZA:

13       Q.  Okay.  And the --

14       A.  That -- that's all.

15       Q.  Okay.  And the -- and I just -- that's why

16   I want to make sure.

17           Now, when --

18       A.  All right.

19       Q.  -- you say the general knowledge that

20   you've acquired, again that general knowledge just

21   relates to taking care of patients who have

22   bleeds?

23       A.  Well -- and going to meetings and hearing

24   lectures and -- and -- and just -- again, the

25   articles I included are not all the articles that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              C E R T I F I C A T E
 2       This certification is valid only for
 3   a transcript accompanied by my original signature
 4   and original seal on this page.
 5       I, AURORA M. PERRIEN, Registered Professional
 6   Reporter, Certified Court Reporter, in and for the
 7   State of Louisiana, as the officer before whom
 8   this testimony was taken, do hereby certify that
 9   JAMES WAYNE SMITH, M.D., after having been duly
10   sworn by me upon the authority of R.S. 37:2554,
11   did testify as hereinbefore set forth in the
12   foregoing 192 pages; that this testimony was
13   reported by me in the stenotype reporting method,
14   was prepared and transcribed by me or under my
15   personal direction and supervision, and is a true
16   and correct transcript to the best of my ability
17   and understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1    Civil Procedure Article 1434 and in rules and

 2    advisory opinions of the board; that I have no

 3    actual knowledge of any prohibited employment or

 4    contractual relationship, direct or indirect,

 5    between a court reporting firm and any party

 6    litigant in this matter nor is there any such

 7    relationship between myself and a party litigant

 8    in this matter.  I am not related to counsel or to

 9    the parties herein, nor am I otherwise interested

10    in the outcome of this matter.

11

12

13

14

15                  AURORA M. PERRIEN, CCR, RPR

16

17

18

19

20

21

22

23

24

25
```