**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen, et al.* | * | |
| *Case No. 2:14-cv-02720* | * | MAG. JUDGE NORTH |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT
MOTION FOR PARTIALSUMMARY JUDGMENT BASED ON THE
LEARNED-INTERMEDIARY DOCTRINE [REC. DOC. 5118]**

---

# FILED UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

LEGAL ARGUMENT & AUTHORITIES ........................................................................5

I.      Legal Standard ........................................................................................................5

II.     More Than Sufficient Evidence Exists to Preclude Summary Judgment Under
        the Learned Intermediary Doctrine ........................................................................6

        A.      Plaintiffs Meets the First Prong of the Learned Intermediary Test by
                Showing the Inadequacy of Defendants' Instructions ...........................7

                1.      Defendants Misapply the First Prong of the Learned
                        Intermediary Test .......................................................................8

                2.      Defendants Failed to Adequately Instruct Physicians on
                        Available Laboratory Tests for Assessing a Patient's Exposure
                        to Xarelto ....................................................................................9

        B.      Plaintiff Meets the Second Prong of the Learned Intermediary Test by
                Showing that Defendants' Inadequate Instructions Caused Mr.
                Boudreaux to Not be Identified as a High Responder Until After
                His GI Bleed ...........................................................................................12

                1.      Defendants Narrow Interpretation of Causation Does Not Align
                        with Precedent Concerning the Learned Intermediary Doctrine ..............14

                2.      Had Defendants Adequately Instructed Dr. Wong, Mr. Boudreaux
                        Would Have Been Identified as Being at a High Risk of Bleeding
                        Early On and Would Have More Likely Than Not Been Taken
                        Off of Xarelto ...........................................................................15

CONCLUSION..................................................................................................................19

## TABLE OF AUTHORITIES

<u>Cases</u>

*Allgood v. GlaxoSmithKline PLC,* Civ. No. 06-3506,
    2008 WL 483574, *6 (E.D. La., Feb. 20, 2008). ............................................................ 19
*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).............................................................................................................. 6
*Bloxom v. Bloxom,*
    512 So.2d 839 (La. 1987) ................................................................................................... 13
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................................. 6
*Dediol v. Best Chevrolet, Inc.,*
    655 F. 3d, 435 (5th Cir. 2011) ............................................................................................. 6
*Devon Enterprises, LLC v. Arlington Independent School Dist.*,
    541 Fed. Appx. 439 (5th Cir. 2013).................................................................................... 6
*ExxonMobil Wagoner v. Exxon Mobil Corp.*,
    813 F.Supp.2d 771 (E.D. La., Aug. 24, 2011) ................................................................. 13
*Frischertz v. SmithKline Beecham Corp.*,
    No. 10-2125, 2012 WL 2952427 (E.D. La., July 19, 2012) ...................................... 14, 19
*Georges v. Novartis Pharm. Corp.*,
    No. CV 06-05207, 2013 WL 5217198 (C.D. Cal., Apr. 4, 2013) ................................... 15
*Harris v. Merck & Co., Inc.*,
    No. 12-1446, 2012 WL 5384720 (W.D. La., Nov. 1, 2012)............................................ 14
*In Re: Vioxx Products Liabilty Litigation,* MDL 1657,
    2015 WL 1909859 (E.D. La., April 21, 2015)................................................................. 19
*Jenkins v. Bristol-Myers Squibb, et al.*,
    No. 14-2499, 2015 WL 501230 (E.D. La., Aug. 21, 2015) ............................................ 12
*Johnson v. World All. Fin. Corp.*,
    830 F.3d 192 (5th Cir. 2016) ............................................................................................... 6
*Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*,
    835 F. Supp. 2d 299 (W.D. Ky. 2011)............................................................................. 15
*McEwen v. Ortho Pharm. Corp.*,
    270 Ore. 375, 528 P.2d 522 (Ore. 1974)......................................................................... 15
*Patrick v. Tractor Supply Co.*,
    No. CV 16-10755, 2017 WL 396301 (E.D. La., Jan. 30, 2017) ...................................... 12
*Stahl v. Novartis Pharm. Corp.,*
    283 F.3d 254 (5th Cir. 2002) ..................................................................................... passim
*Stevens v. Novartis Pharm. Corp.*,
    358 Mont. 474, 247 P.3d 244 (2010) ............................................................................... 15

<u>Rules</u>

Fed. R. Civ. P. 56.......................................................................................................................... 6

**Statutes**

La. R.S. § 9:2800.53 ................................................................................................................... 2, 7

**Other Authorities**

Restatement (Third) of Torts: Product Liability § 6(d) (1997)...................................................... 15

## TABLE OF EXHIBITS

Exhibit 1     Xarelto Label (January 2015).

Exhibit 2     (Rec. # 3037298) (XARELTO_JANSSEN_15141631) FDA Summary Review (November 4, 2011).

Exhibit 3     Canadian Xarelto Product Monograph Label.

Exhibit 4     New Zealand Xarelto Label.

Exhibit 5     Deposition of Joseph Boudreaux.

Exhibit 6     Deposition of Loretta Boudreaux.

Exhibit 7     Deposition of Najy Masri, M.D.

Exhibit 8     Deposition of Kenneth Wong, M.D.

Exhibit 9     Deposition of Virenda Joshi, M.D.

Exhibit 10    Deposition of Peter Fail, M.D.

Exhibit 11    Kubitza, D., et al. *Safety, pharmacodynamics, and pharmacokinetics of single doses of BAY 59-7939, an oral, direct factor Xa inhibitor*. 78 Clinical Pharmacology & Therapeutics 412 (2005).

Exhibit 12    Mueck, W., et al. *Rivaroxaban Population Pharmacokinetic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention*. 50(10) Clin Pharmacokinetics 675 (2011).

Exhibit 13    Lippi G., et al. *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation: a tentative approach based on routine laboratory tests.* DOI 10.1007 Journal of Thrombosis and Thrombolysis 11239-014-1082-5 (2014).

Exhibit 14    Zhang, Y., et al. *Laboratory monitoring of rivaroxaban and assessment of its bleeding risk.* 73:3 British Journal of Biomedical Science 134 (2016).

Exhibit 15    Baglin, T., et al. *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific and Standardization Committee of the International Society on Thrombosis and Haemostasis.* 11 Journal of Thrombosis and Haemostasis 756 (2013).

Exhibit 16    Patel M., Peacock, Eikelboom, J., *Continuing Medical Education: Emergency Management of Bleeding With NOACs: Do We Need a Reversal Agent?.*

Exhibit 17    (Rec # 399453) May 3, 2011 Email of Kemal Malik; (Rec # 551816) March 29, 2010 Email of Anja Alpers.

Exhibit 18    Deposition of Kenneth Todd Moore.

Exhibit 19    Deposition of Andrea Derix, Ph.D.

Exhibit 20    Expert Report of Laura M. Plunkett, Ph.D., D.A.B.T.

Exhibit 21    Expert Report of Suzanne Parisian, M.D.

Exhibit 22    Expert Report of Robert Charles Gosselin.

Exhibit 23    Deposition of Nathanial Winstead, M.D.

Exhibit 24    Deposition of Henry Michael Rinder, M.D.

Exhibit 25    Expert Report of Henry Michael Rinder, M.D.

Exhibit 26    (Rec. # 5486139) Xarelto Coagulation Monitoring Parameters (May 11, 2016).

## INTRODUCTION

Defendants' joint motion for partial summary judgment based on the learned intermediary doctrine addresses a case that Plaintiff Joseph Boudreaux has not brought. Defendants have misstated the allegations set out by Plaintiff to try to fit a set of facts that would allow for summary judgment. Defendants do this by trying to convert the Plaintiff's case into a case about a failure to warn about the risk of bleeding and whether Mr. Boudreaux's treating physician – Dr. Wong – would have still prescribed Xarelto had an appropriate bleed risk warning been provided. That simply is not the Plaintiff's case before the Court.

To clear the record for the Court and plainly state Plaintiff's case, Joseph Boudreaux is not alleging Defendants failed to warn about the risk of bleeding due to Xarelto.[1] The Xarelto label informs doctors, albeit not completely, about the risk of bleeding. This is not at issue here—the Xarelto label plainly states that Xarelto *causes* bleeding.[2] As an anticoagulant, it is understood by virtually the entire medical profession that there is a risk of bleeding associated with anticoagulant use. As such, a case based purely on the failure to warn about bleeding risk would be clearly problematic.

Plaintiffs' failure to warn claim, unlike as stated by Defendants, is based on the inadequate instructions provided by Defendants that fail to inform physicians as to available laboratory tests for clinically evaluating a patient's exposure to Xarelto. Louisiana law provides that a failure to warn case is about more than simply providing a warning about the risk of a specific injury. Louisiana law requires that an adequate warning must also instruct the users of a product – in this

---

[1] As will be set out below, Defendants bleed risk warnings at the time Mr. Boudreaux ingested Xarelto did not provide complete information as the label did not inform doctors that Xarelto proved to be inferior to warfarin in the United States subgroup of ROCKET when the warfarin patients' time in therapeutic range ("TTR") was up to the standard of most clinical trials. This data was only added to the warning in September of 2015 and informed doctors that there was a 50% increase in the risk of bleeding as compared to Xarelto in the United States subgroup.

[2] Exhibit # 1, § 5.2 ("XARELTO … can **cause** serious or fatal bleeding.") (emphasis added).

1

case Mr. Boudreaux's doctors – how to safely use the product.[3]  Defendants' motion ignores this aspect of Louisiana law.

Defendants failed to instruct physicians, like Dr. Wong, as to the available laboratory tests for clinically evaluating a Xarelto patient's bleed risk.  The record evidence demonstrates that Defendants failed to include any such instructions to doctors and went so far as to directly contradict its own internal documents[4], the statements of the FDA[5], the instructions used for Xarelto in countries outside of the United States[6] and in the published literature[7] by telling doctors no such testing was even possible.[8]  The record also establishes that Defendants failed to include language as to the availability of these necessary laboratory tests in order to avoid undercutting the all-important "no-testing-required" marketing message they used to gain a substantial portion of warfarin's market share and maintain Xarelto's status as the number one selling drug in the NOAC class.[9]

The product label fails to provide instructions on how to avoid a high bleed risk.  This failure forms the basis of the Plaintiff's claim.  Since none of the treating physicians received this instruction, the label cannot be considered adequate as a matter of law.  Statements pertaining to these laboratory tests are provided nowhere in the label.  Further, pursuant to Louisiana's application of the heeding presumption in products liability cases, it is presumed that Dr. Wong

---

[3]  *See* La. R.S. 9:2800.53(9)("'Adequate warning' means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.").

[4] *See* Exhibit # 26.

[5] Exhibit # 2.

[6] Exhibit # 3; Exhibit # 4.

[7] See Exhibits # 11 - 16.

[8] *See* Exhibit # 1 § (pregnancy, ability to test)

[9] See Exhibit # 17.

would have followed such an instruction to conduct laboratory tests to assess bleeding risk. Defendants, through their motion, have provided no evidence to rebut such a presumption.  In fact, the record testimony of Dr. Wong establishes that he would have followed such an instruction to conduct laboratory testing and that he would have withdrawn Mr. Boudreaux from Xarelto therapy as an individual at excessively high bleed risk.  In other words, had these instructions been provided, Mr. Boudreaux's physician would have discontinued his Xarelto use well before his GI bleed.

## BACKGROUND

Joseph Boudreaux suffered a gastrointestinal bleed ("GI bleed") on Monday, February 3, 2014, after taking Xarelto for less than a month for treatment of his atrial fibrillation.[10] Symptoms of Mr. Boudreaux's GI bleed began to manifest a few days before he presented to the hospital.[11] These symptoms, which began at work, initially included weakness, but later escalated to constipation and bloody stools.[12] The Friday before Mr. Boudreaux presented to the hospital, Mr. Boudreaux was at work and felt extremely weak.[13] Knowing he had a follow-up appointment with his cardiologist on Monday, Mr. Boudreaux decided to address his condition at that time if his symptoms were still present.[14] At the time, Mr. Boudreaux was unaware that his weakness was because of a GI bleed or that it was associated with his Xarelto use.[15]

The morning of February 3rd, Mr. Boudreaux was so weak that his wife called Dr. Kenneth

---

[10] Exhibit # 5 at 129:3-130:3, 149:1-150:18.

[11] *Id*. at 142:2-10.

[12] *Id*. at 145:6-21.

[13] *Id*. at 142:9-143:10.

[14] *Id*. at 142:9-18.

[15] *Id*. at 201:18-202:16.

Wong, Mr. Boudreaux's cardiologist, to see if he could come in earlier.[16] The nurse advised Mr. Boudreaux to not take any medications, drink lots of fluid, and informed him that he could come into the clinic.[17] Dr. Wong's evaluation notes from the appointment indicate: his stool is 'very black.' Constipation x3-4 days. Weak 2 days ago.[18] Blood was drawn and when the results returned, Mr.  Boudreaux was instructed to go to the hospital as soon as possible.[19] Mr. Boudreaux's labs showed his hemoglobin to be 6.7 and hematocrit to be 21.2, both below normal range and indications of anemia.[20] Mr. Boudreaux presented to Ochsner St. Anne Hospital Emergency Room and labs taken as the hospital showed his PT was 13.6 and INR was 1.4, both above the normal reference ranges.[21] At the hospital, his hemoglobin dropped to 6.6 and hematocrit to 20.9.[22] He was diagnosed with anemia and a GI bleed.[23] He was transferred to Ochsner Kenner Medical Center ICU for a GI evaluation and treatment as the St. Anne facility did not have adequate resources.[24] He reported having weakness, dizziness, and abdominal cramps over the last couple days, and one episode of nausea and vomiting prior to admission.[25] All anticoagulant medications (including Xarelto) were discontinued.[26]

       Mr. Boudreaux received a total of 4 units of blood while hospitalized at Ochsner Kenner

---

[16] *Id*. at 143:21-146:8.

[17] Exhibit # 6 at 270:18-271:17.

[18] Exhibit # 5 at 145:6-9.

[19] *Id*. at 149:5-18; Exhibit # 7 at 85:5-18.

[20] Exhibit # 7 at 85:5-18.

[21] Exhibit # 8 at 147:19-148:2.

[22] Exhibit # 9 at 127:22-128:13.

[23] Exhibit # 7 at 118:4-5.

[24] Exhibit # 5 at 151:3-7.

[25] Exhibit # 7 at 88:6-89:23.

[26] *Id*. at 116:7-11.

Medical Center.[27] His treating physician, Dr. Najy Masri indicated that Mr. Boudreaux was suffering from a GI bleed related to recent Xarelto initiation.[28] While hospitalized, he underwent a colonoscopy and EGD, but no source of internal bleeding was identified.[29] Mr. Boudreaux was eventually discharged from the hospital on February 8, 2014.[30] He subsequently underwent a video capsule endoscopy that did not reveal the source of his internal bleeding.[31]

Since Mr. Boudreaux's bleed in February 2014, he is no longer a candidate for any anticoagulant specifically because of his high risk for bleeding that was established at the time of his injury.[32] Accordingly, in May 2015, he underwent a serious surgical procedure, known as a LARIAT procedure, to decrease his risk for blood clots from his A-fib.[33] Although the LARIAT procedure was successful, he developed pericardial effusion and, in September of 2015, had to undergo another invasive procedure, pericardiocentesis, to drain the fluid around his heart.[34]

## LEGAL ARGUMENTS AND AUTHORITIES

### I.    Legal Standard

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the non-moving party who must go beyond mere allegations and offer specific facts

---

[27] Exhibit # 7 at 177:12-25.

[28] *Id*. 128:22-129:11, 169:5-8.

[29] *Id*. at 73:19-24.

[30] Exhibit # 5 at 154:14-16.

[31] Exhibit # 7 at 149:20-150:11.

[32] Exhibit # 5 at 160:5-14.

[33] Exhibit # 5 at 159:8-160:4; Exhibit # 10 at 46:22-47:6.

[34] Exhibit # 10 at 54:4-55:9.

showing that there is a genuine issue of fact for trial.[35] In determining whether a genuine issue of fact exists, the Court must review the evidence and draw all reasonable inferences in favor of the party opposing the motion.[36] In deciding a motion for summary judgment, a genuine issue of material fact exists when the evidence is such that, viewing the record as a whole, a rational trier of fact could return a verdict for the non-moving party.[37] However, the Court must "refrain from making credibility determinations or weighing the evidence."[38] Ultimately, this Court's concern is to ascertain "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[39]

## II.  More Than Sufficient Evidence Exists to Preclude Summary Judgment Under the Learned Intermediary Doctrine.

In products liability claims involving prescription drugs, Louisiana applies the "learned intermediary doctrine," which permits a drug manufacturer to discharge its duty to warn consumers by adequately warning physicians.  "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the **treating physician**."[40] Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[41]

---

[35] Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[36] *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 255 (1986); *Johnson v. World All. Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016).

[37] *Dediol v. Best Chevrolet, Inc.,* 655 F. 3d, 435, 439 (5th Cir. 2011).

[38] *Devon Enterprises, LLC v. Arlington Independent School Dist.*, 541 Fed. Appx. 439, 441(5th Cir. 2013), *quoting Equal Employment Opportunity Comm'n  v. WC&M Enters.*, 496 F. 3d 393, 398 (5th Cir. 2007)).

[39] *Anderson*, 477 U.S. at 250.

[40] *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 268 (5th Cir. 2002) (emphasis in original).

[41] *Id*. at 267, *quoting McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 41, 413 (E.D. La. 1999)).

Under the learned intermediary doctrine, a failure-to-warn claim requires that the plaintiff meet a two-pronged test:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician. Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.[42]

Here, Defendants claim that Plaintiff has failed to raise any question of material fact as to both prongs. In doing so, Defendants ignore that, under the LPLA, the duty to warn encompasses a duty to provide adequate instruction for the safe use of a product.[43] In the context of the learned intermediary doctrine, this duty extends to any healthcare provider in the position to make the use of the product safer. As described below, the evidence demonstrates that Defendants failed to provide Mr. Boudreaux's physicians with adequate instructions for evaluating a patient's exposure to Xarelto. As a result, Mr. Boudreaux was not identified as being at excessively high bleed risk until the day he presented to the hospital with a GI bleed, and by that time it was too late. Had adequate instructions been provided, Mr. Boudreaux would not have suffered his injuries.

### A.  Plaintiffs Meets the First Prong of the Learned Intermediary Test by Showing the Inadequacy of Defendants' Instructions.

"[I]t is an accepted tenet in Louisiana products liability law that a manufacturer's duty to warn includes a duty to provide adequate instructions for safe use of a product."[44] Indeed, the LPLA definition of an "adequate warning" encompasses "instructions" as well as "warnings."

> "Adequate warning" means a warning or **instruction** that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, **to use or handle the product in such a manner as to avoid the damage**

---

[42] *Id.* at 265-66.

[43] La. R.S. 9:2800.53.

[44] *Id.* at 269-70.

**for which the claim is made**.[45]

In the case at bar, Defendants attempt to redefine Plaintiffs' claim as a failure to warn of the risk of bleeding. Plaintiff, however, does not contest that Xarelto *causes* bleeding as it is unquestionably stated in the Xarelto label.[46]  Rather, Plaintiff alleges that Defendants failed to adequately instruct Mr. Boudreaux's physicians on the safe use of Xarelto—namely, as to available laboratory tests for evaluating a patient's bleed risk.  By improperly characterizing Plaintiffs' claim as a failure to warn of bleeding risk, Defendants apply the wrong legal analysis and do not meet their summary judgment burden with respect to the failure to warn claim actually alleged by Plaintiffs, i.e. the inadequacy of the instructions provided to physicians in the Xarelto label.

> ### 1.     Defendants Misapply the First Prong of the Learned Intermediary Test.

In a warnings claim based on failure to adequately instruct, the focus is whether the label provides sufficient instruction so as to allow for the safe use of the drug—not whether the label discloses a risk of injury.[47]  The distinction between a warnings claim based on an inadequate instruction versus an inadequate warning of risk is significant as it impacts the type of analysis required under the first prong of the learned intermediary test.  Defendants' motion ignores this distinction, applying the incorrect analysis to Plaintiff's warnings claim.

The analysis applied by Defendants pertains to a claim based on a failure to warn of injury risk, which looks at whether the label unambiguously warned of the risk of the plaintiff's injury and whether the prescribing physician unequivocally understood the risk in prescribing the drug

---

[45] La. R.S. 9:2800.53 (emphasis added).

[46] Exhibit # 1 at § 5.2 ("XARELTO … can **cause** serious or fatal bleeding.") (emphasis added).

[47] *Stahl*, 283 F.3d at 270  ("There appears to be no compelling reason to exempt recommended medical monitoring schemes—which are, in essence, instructions for safe use of prescription drugs—from a drug manufacturer's duty to warn.").

to the plaintiff.[48]  In a failure to adequately instruct claim, which is the claim brought by Plaintiff Boudreaux, the analysis is different, focusing on whether the instruction permitted for the safe use of the drug.  The Fifth Circuit explored the difference in *Stahl*, evaluating both claims in a product liability case involving a prescription drug.[49] Recognizing that inadequate instruction claims are governed by a different standard, the Fifth Circuit explained that an adequate instruction must provide sufficient information to allow for the safe use of the drug.[50]

Consequently, the basis for Defendants' conclusion that the Xarelto label is adequate as a matter of law is flawed because Defendants limited their analysis to whether the Xarelto label warns of a bleeding risk.  As described below, the evidence demonstrates that the Xarelto label lacked an adequate instruction as to the availability of a laboratory test for purposes of evaluating a patient's bleed risk on Xarelto.  This instruction would have allowed for safe use of Xarelto.

### 2.  Defendants Failed to Adequately Instruct Physicians on Available Laboratory Tests for Assessing a Patient's Exposure to Xarelto.

For over a decade, Defendants have known that laboratory tests measuring prothrombin time ("PT") or anti-Factor Xa activity are capable of assessing a Xarelto patient's bleed risk.  In clinical trials used to obtain regulatory approval of Xarelto, scientists employed by Defendants found that the anticoagulant effect of Xarelto could be evaluated using PT or anti-Factor Xa testing.[51]   Additional clinical studies and analysis published in peer-reviewed articles have

---

[48] *Stahl,* 283 F.3d at 268.

[49] *Id.* 283 F.3d at 264-72.

[50] *Id.* at 271 ("[T]he warning must both lead the ordinary user or handler to contemplate the danger in using the product (the warning component) and to either use it safely (the instruction component) or decline to use it."), *quoting* Thomas C. Galligan, Jr., *The Louisiana Products Liability Act: Making Sense of it All*, 49 La. L. Rev. 629, 677 (1989)).

[51] *See, e.g.*, Exhibit # 11. "The availability of both pharmacodynamic and pharmacokinetic data for such a large number of patients enabled us to show a good correlation between these parameters, particularly between BAY 59-7939 concentrations and PT and factor Xa tests. Therefore tests such as PT may be used in future trials for monitoring, if necessary." *Id.* at 420; Exhibit # 12 ("The slope of the plasma concentration-PT correlation graph reflected the sensitivity of the PT to increases in rivaroxaban exposure. The PT correlated in an almost linear fashion with rivaroxaban concentrations $\leq$ 500 mg/L, confirming that the PT could be used to assess exposure.").

similarly confirmed that such testing can be used to screen for Xarelto exposure.[52] As such, medical organizations recommend PT or anti-Factor Xa testing of patients taking Xarelto in special circumstances, such as acute surgery, overdosage, and cases of suspected non-compliance.[53]

Indeed, Defendants have recommended using PT testing in clinical practice outside the context of litigation. For example, in a webinar sponsored by Bayer and provided to physicians for continuing medical education ("CME") credit through November 2016, a Janssen thought leader and defense expert in this litigation, William Peacock IV, MD, instructed physicians on using PT testing to assess a patient's level of Xarelto exposure for purposes of urgent medical care.[54]  This instruction aligns with Xarelto product information disseminated by Janssen to an unknown number of healthcare providers, which states that "[i]f assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test."[55]  In addition, Defendants expressly inform doctors in Canada, in the warning section of the label, about the value of testing PT to identify bleeding risk.

Even in the context of litigation, there is agreement among certain employees of Defendants that information on PT testing would be beneficial to physicians.  For example, the

---

[52] *See* Exhibit #13. "[W]e have hence developed an algorithm based on first-line tests for urgent **screening of the anticoagulant effect of direct oral anticoagulants**, which entails activated partial thromboplastin time (aPTT) for dabigatran and **prothrombin time (PT) for rivaroxaban**… this strategy appears **suitable to reliably define** the thrombotic or **bleeding risk** in an urgent setting, contextually saving precious laboratory resources." *Id.* at 2. (emphasis added); Exhibit #14 ("The PT reagent (Thrombosis S) could be considered as a rough method to monitor the anticoagulation activity of rivaroxaban and evaluate bleeding risk caused by rivaroxaban.")

[53] *See, e.g.*, Exhibit # 3, *available at* http://omr.bayer.ca/omr/online/xarelto-pm-en.pdf.

> [I]n certain infrequent situations such as overdosage, acute bleeding, urgent surgery, in cases of suspected non-compliance, or in other unusual circumstances, assessment of the anticoagulant effect of rivaroxaban may be appropriate. Accordingly, measuring PT using the Neoplastin reagent, or Factor-Xa assay using rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.

*Id.* at 10; *see also* Exhibit #15 ("A PT assay with a plain thromboplastin can be used to determine the relative intensity of anticoagulation caused by rivaroxaban, e.g. in an emergency or urgent clinical scenario.")

[54] Exhibit # 16.

[55] Exhibit # 17.

Scientific Director of Cardiovascular Disease for Janssen Pharmaceuticals, Inc., Kenneth Todd

Moore, testified that using PT to evaluate exposure to Xarelto would be beneficial for patients

requiring emergency surgery:

> Q.   And that fact, that PT using the Neoplastin reagent, could be used as an indirect measurement of plasma concentrations of Xarelto, that was an important fact for the company to tell the FDA with respect to getting the drug approved, correct?
>
> A:   I don't know how important of a fact it was. It was just part of the profile of the drug itself.
>       …
> Q.   It was certainly important for the company to be able to say that there was a method to -- that could be used clinically to evaluate the amount of drug in someone's system.
>
> A.   I believe in those rare circumstances where you would have a desire to understand if there is drug in your system, for example for compliance, if there is a patient that goes in for emergency surgery, it would be a benefit to have that information, yes.[56]

Similarly, the Xarelto Global Program Team Leader for Bayer Research & Development, Andrea

Derix, Ph.D., testified that PT testing would be useful in certain circumstances:

> Q.   And it's Bayer's position that in routine clinical practice, there is no need to monitor the anticoagulant effect of rivaroxaban.  But you say in certain exceptional circumstances, rivaroxaban levels with a calibrated assay may be useful, such as overdosage or emergency situations, correct?
>
> A.   That's correct.
>
> Q.   And you've suggested PT with a Neoplastin reagent or an anti-factor Xa assay, which is a way to indirectly measure drug concentration, correct?
>
> A.   These are given here as examples, yes.[57]

Despite this, Defendants chose not to include any instruction in the United States label for

Xarelto regarding the capability of PT or anti-Factor Xa testing to evaluate the anticoagulant effect

of Xarelto in patients.  This instruction would make Xarelto a safe product to use as demonstrated

---

[56] Exhibit # 18 at 66:16-67:11; 68:1-12.

[57] Exhibit # 19 at 289:19-290:09.

by the evidence described above and as confirmed by Plaintiffs' experts.[58] The Defendants decision not to include such a warning was driven not by a desire to protect patients but rather a desire to protect the marketability of Xarelto.

As such, Defendants fail to meet the summary judgment burden to show there is no genuine issue of material fact as to the adequacy of their instructions.[59]  More than sufficient evidence exists to raise a question of material fact as to the inadequacy of Defendants' instructions to physicians concerning the utility of laboratory testing for evaluating the anticoagulant effect of Xarelto.

> **B.     Plaintiff Meets the Second Prong of the Learned Intermediary Test by Showing that Defendants' Inadequate Instructions Caused Mr. Boudreaux to Not be Identified as a High Responder Until After His GI Bleed.**

Under the second prong of the learned intermediary test, the plaintiff must show that the defendant's failure to warn was the cause in fact and proximate cause of the plaintiff's injury.[60] Defendants incorrectly assume that the only way to establish causation is through evidence that a plaintiff's prescribing physician would have refused to prescribe the drug had the physician received a stronger warning.  While this is certainly one way to establish causation, it is hardly the **only** way of doing so.

As explained below, causation can also be established by showing that, if properly instructed, the plaintiff's treating physician would have acted differently such that the injury alleged by the plaintiff could be avoided.  In other words, Plaintiff's physician, Dr. Wong, would

---

[58] *See, e.g.*, Exhibit # 20 at 7-8; Exhibit # 21 at 13; Exhibit # 22 at 31-33.

[59] *Patrick v. Tractor Supply Co.*, 2017 WL 396301, at *2 (E.D. La. Jan. 30, 2017) ("A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.").

[60] *Jenkins v. Bristol-Myers Squibb, et al.*, 2015 WL 501230, at *3 (E.D. La. Aug. 21, 2015), *quoting Stahl*, 283 F.3d at 266.

have taken Mr. Boudreaux off of Xarelto because of an assessment that the bleed risk was too high.  In this regard, Louisiana recognizes the "heeding presumption." This presumption assumes that if an adequate warning had been provided, that warning would have been followed and the plaintiff would not have been injured.[61]  The application of the presumption in pharmaceutical cases makes sense as it is appropriate to assume, unless record evidence rebuts the assumption, that a licensed physician practicing in the State of Louisiana would follow the instructions for safe use of a pharmaceutical drug in the treatment of his patients. This presumption may be rebutted though with evidence showing that an adequate warning or instruction would have been futile under the circumstances.[62]

In the instant case, the failure to inform physicians as to available laboratory tests for clinically evaluating a patient's exposure to Xarelto gives rise to a presumption that Mr. Boudreaux's treating physician would have heeded such an instruction had it been provided in the label. Dr. Wong testified that he reviewed the product label at the time Xarelto became available, which stated that Xarelto could not be monitored with standard laboratory testing.[63] Defendants have not come forward with specific, affirmative evidence showing that Dr. Wong would not have heeded a warning or instruction had it been given.   Under these circumstances, the presumption holds that Dr. Wong would have used a laboratory test to assess Mr. Boudreaux's Xarelto exposure had he known such a test existed, and summary judgment on the grounds urged by Defendants is not appropriate.

Regardless of the presumption, Dr. Wong's direct testimony affirms that he would have

---

[61] *Bloxom v. Bloxom*, 512 So.2d 839, 850 (La. 1987); *ExxonMobil Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 797 (E.D. La. Aug. 24, 2011).

[62] *Id.* at 850.

[63] Exhibit # 8 at 37:12-38-9.

heeded an instruction to test Mr. Boudreaux to determine his specific bleed risk had such an instruction been provided.  Dr. Wong was specifically asked whether he would use a one-time blood test if it were available:

> Q.    If such a one-time blood test were available, would you use it for patients that you were putting on Xarelto?
> A.    So if there is a test that would tell you that some people are high responders, is that what you said?
> Q.    Yes.
> A.    Like they are very sensitive to it?
> Q.    Yes.
> A.    That they would be at risk for bleeding?
> Q.    Yes.
> A.    Or proven bleeding, that they are clearly at higher risk?  Yes, of course, I would want to know that.[64]

The only way for Dr. Wong to "know that" is to conduct the PT Neoplastin test.  Dr. Wong unequivocally testified he would have used a one-time blood test were it called for in the label and made available to him.  Given this testimony, Plaintiff has unquestionably met his burden and established causation.

### 1.    Defendants Narrow Interpretation of Causation Does Not Align with Precedent Concerning the Learned Intermediary Doctrine

Defendants claim that Plaintiffs must demonstrate causation through evidence that Mr. Boudreaux's prescribing physician would have declined to use Xarelto had he received a stronger warning.  Louisiana federal courts, however, are not so inflexible in their analysis of causation; instead, courts examine whether the plaintiff's physician would have acted differently in response to an adequate warning such as to avoid the plaintiff's injuries.[65]

---

[64] Exhibit # 8 at 45:9 - 46:4.

[65] *See Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012) (denying summary judgment where the prescriber testified that, although he still prescribed the drug, he would have disclosed the stronger warning to his patients and deferred to the patient's wishes on whether to take the drug); *Harris v. Merck & Co., Inc.*, 2012 WL 5384720, at *6 (W.D. La. Nov. 1, 2012) (denying a dismissal under Fed. R. Civ. P. 12(b)(6) based on allegations that the prescribing physician would have been deterred from prescribing an 80 milligram dose had an adequate warning of the dangers associated with that dose been provided).

The Fifth Circuit confirmed this less-rigid approach to causation in *Stahl*, holding that "to prevail on an inadequate instruction claim for a prescription drug, a plaintiff must demonstrate that the instructions provided did not enable the treating physician to 'use or handle the [drug] … in such a manner as to avoid the damage for which the claim is made.'"[66] In this context, a "treating physician" is not limited to the plaintiff's prescribing physician, but extends to non-prescribing healthcare providers "who are in positions to act on such information so as to reduce or prevent injuries to patients."[67]

Applying this analysis to the matter at bar, Defendants' duty to provide adequate instructions extended to Dr. Wong in his capacity as Mr. Boudreaux's treating physician. Between the time Mr. Boudreaux was placed on Xarelto and the date he presented to the hospital for his GI bleed, he had three follow-up visits with Dr. Wong. Mr. Boudreaux's GI bleed and prolonged hospital stay could have been avoided if Defendants had provided an instruction on PT testing.

      **2.**      **Had Defendants Adequately Instructed Dr. Wong, Mr. Boudreaux Would Have Been Identified as Being at a High Risk of Bleeding Early On and Would Have More Likely Than Not Been Taken Off of Xarelto**

When questioned about a one-time blood test to use on patients he was putting on Xarelto to determine whether that patient was a high responder and at a higher risk for bleeds, Dr. Wong

---

[66] *Id*. at 271, *quoting* La. R.S. 9:2800.53(9).

[67] Restatement (Third) of Torts: Product Liability § 6(d) (1997). *See also Stahl*, 283 F.3d at 267, 269-70, *citing* Restatement (Third) of Tort §§ 6(b), 6(d) in applying the learned intermediary doctrine); *Georges v. Novartis Pharm. Corp.*, No. CV 06-05207, 2013 WL 5217198, at *9 (C.D. Cal. Apr. 4, 2013) (finding that dentist "may be in the class of learned intermediaries 'in a position to reduce the risks of harm' to whom Defendant owed a duty to warn"); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 307-308 (W.D. Ky. 2011) (extending learned intermediary status to plaintiff's non-prescribing physicians noting that "[i]t is impossible to read the learned intermediary rule through [defendant's] proposed lens given the interplay between multiple physicians, numerous procedures, and countless drugs to which cancer patients are subjected."); *Stevens v. Novartis Pharm. Corp.*, 247 P.3d 244, 260 (Mont. 2010) (describing scope of learned intermediary doctrine as applying to any healthcare professional responsible for making decisions regarding the patient's case); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Ore. 1974) ("Although the ethical drug manufacturer's duty to warn has been discussed most often with reference to the prescribing physician, the [doctrine's] reasoning applies with equal force to the treating physician … [who] may be more likely to observe the actual symptoms of the drug's untoward consequences.").

answered "Yes, of course, I would want to know that."[68] And if Defendants were aware of a way to effectively measure the anticoagulant effect of Xarelto and failed to share that with doctors in the United States, Dr. Wong would find that "troubling" if it had an impact on patient management and it was something that clearly impacted patient safety.[69]

Mr. Boudreaux had a **normal** PT of 11.4 with a reference range of 9.0 to 12.5 on January 7, 2014, the day he was diagnosed with atrial fibrillation and **before he was placed on Xarelto**. This PT is within normal limits.[70] On the day Mr. Boudreaux presented to the hospital for his GI bleed, February 3, 2014, he had a PT of 13.6[71] with a reference range of 9.0 to 12.5. This PT is **abnormal and outside of the normal limits**.[72] Nearly fifteen months later, **after the withdrawal of Xarelto**, on May 11, 2015, Mr. Boudreaux had a **normal** PT of 13.2[73] with a reference range of 11.5 to 14.0. This PT is within the normal limits.[74] The only abnormal PT in Mr. Boudreaux's records is while he was on Xarelto. Considering Mr. Boudreaux was, in fact, a high responder and administering a PT test with a Neoplastin reagent during his anticoagulant treatment on Xarelto would have lowered or eliminated the risks of Mr. Boudreaux's gastrointestinal bleed, this clear impact on Mr. Boudreaux's safety would have altered Dr. Wong's treatment of Mr. Boudreaux.[75]

Plaintiffs have presented expert testimony that establishes that had Mr. Boudreaux been tested in a manner consistent with the instructions that Defendants failed to provide to Dr. Wong,

---

[68] Exhibit # 8 at 45:9-46:4.

[69] *Id*. at 175:8-18.

[70] Exhibit # 23 at 202:8-13.

[71] While this PT was done with the assay Innovin, which reacts differently than Neoplastin, Dr. Rinder testified that an Innovin PT of 13.6 corresponds to a Neoplastin PT between 21 and 25. Exhibit # 24 at 159:15-160:7.

[72] *Id*. at 202:20-203:1.

[73] This PT was done at a different hospital using a different assay than his prior PT tests and not Neoplastin.

[74] *Id*. at 164:3-6, 203:3-18.

[75] *See* Exhibit # 24 at 173:8-175:16.

Plaintiff would have been identified as a high-risk bleeder.  Pursuant to the expert opinion of Plaintiff's expert hematologist, Dr. Rinder, had Plaintiff been tested with PT Neoplastin at the outset of his Xarelto use, Mr. Boudreaux would have been identified as having excessive exposure to Xarelto and thus at an excessively high risk for bleeding when compared to the benefits.[76]  The course of treatment of Mr. Boudreaux shows that, had his doctors known he was at high risk for bleeding, they would have taken him off of Xarelto.  Following Mr. Boudreaux gastrointestinal bleed, he was taken off Xarelto and determined to be at high risk for major bleeding.  Because of this high risk, the decision was made that Mr. Boudreaux's risk of major bleeding exceeded the benefit of stroke protection provided by anticoagulation.  Had Defendants properly instructed Plaintiff's physicians, he would have been identified at initiation of therapy and would not have suffered a bleed due to Xarelto as he would have been removed from Xarelto therapy.

Dr. Wong's testimony is further buttressed by his testimony related to the failure to inform doctors about the high bleed risk identified in the ROCKET trial.  At the conclusion of the ROCKET study, significant concerns were raised pertaining to the quality of warfarin control in the study.  This is an important issue when determining the safety and benefits of Xarelto as the safety events and efficacy events for study patients taking Xarelto were compared to a matched pool of study participants taking warfarin.  In the context of warfarin use, the Time in Therapeutic Range ("TTR") is important as it has been established that patients with poor warfarin control have higher number of bleeds and higher numbers of strokes.  Thus, by conducting a study with poor warfarin control, a TTR of 55%, participants in the Xarelto arm were able to suffer more bleeds and more strokes thus tilting the balance of the comparison against poorly controlled warfarin and making it appear that Xarelto performed better than it actually did.

---

[76] *See* Exhibit # 25 at 2, ¶ 4; Exhibit # 24 at 173:8-174:20.

Despite the poor warfarin control globally in the trial, warfarin control in the United States was acceptable in comparison to other clinical studies as TTR was 64%.  When the United States subgroup data was analyzed, Xarelto was shown to be inferior to warfarin when comparing major bleeds at a statistically significant level.  The risk of a major bleed in the Xarelto United States subgroup was 50% higher than comparable study participants in the United States warfarin arm.  This information was not provided in the label until September 2015, long after Mr. Boudreaux suffered his bleeding injury and was taken off Xarelto.

Given that Mr. Boudreaux would have been identified as a patient at high risk of bleeding if PT screening test had been conducted, the failure to include the US data in the label at the time of Mr. Boudreaux's ingestion would have further caused Dr. Wong to remove Mr. Boudreaux from Xarelto therapy.  Dr. Wong testified:

Q.     Let's say if there were a 50 percent difference in the risk of major bleeds, would that be significant in your mind?
A.     I would definitely go with the one with less risk, yes.
Q.     If there were two drugs that were equally effective in reducing the risk of stroke but one had a 50 percent greater risk of bleeds –
A.     Then I would try not to use that one, yes.[77]

 Dr. Wong's testimony makes clear that he valued and would consider bleed risk data:

Q.     If there is a 50 percent increase in risk for major bleeds on Xarelto versus warfarin, would that be important information for you to consider in prescribing Xarelto?
A.     Yes.[78]

In fact, had Dr. Wong known of this data, more likely than not he would have avoided Xarelto use altogether.  At the very least, Dr. Wong would have taken Mr. Boudreaux off of Xarelto at the point it was known he was at high risk for bleeding.

---

[77] Exhibit # 8 at 32:19-33:10.

[78] *Id.* at 182:13-182:20.

To raise a question of material fact as to causation, this Court recently noted that subjective testimony from the treating physician may be "supplement[ed] … with objective evidence of how a reasonable physician would have a responded to an adequate warning."[79]  If adequately warned of the risk of bleeding and inter-patient variability in the Xarelto label, a reasonable physician would follow labeling instructions recommending that a patient's PT be evaluated to determine the pharmacodynamic effects of the drug. Defendants marketed Xarelto as a drug which required no blood tests prior to or during usage.  Yet, blood tests would have determined which patients were at high risk for serious adverse events and doctors should have been warned of those risks and instructed on how to identify those at high risk of a bleed. Therefore, a reasonable doctor would not have continued a high risk patient, like Mr. Boudreaux, on Xarelto had he been adequately warned of the risks.[80]

Plaintiffs have unquestionably presented issues of material fact as to whether an adequate warning would have altered Dr. Wong's, or a reasonable physician's, decision to prescribe or continue to prescribe Xarelto to Mr. Boudreaux. Accordingly, the existence of these unresolved issues of material fact precludes the entry of the summary judgment under the learned-intermediary doctrine.[81]

## CONCLUSION

Defendants fail to meet their burden in seeking partial summary judgment based on the learned intermediary doctrine in the Joseph Boudreaux matter.  As detailed above, Plaintiffs have put forth evidence demonstrating the inadequacy of Defendants' instructions to physicians

---

[79] *Allgood v. GlaxoSmithKline PLC,* Civ. No. 06-3506, 2008 WL 483574, *6 (E.D. La. Feb. 20, 2008).

[80] *See* Exhibit # 26 at 20; Exhibit # 24 at 422:2-423:2, 425:9-24, 431:7-433:10

[81] *In Re: Vioxx Products Liabilty Litigation, MDL 1657,* 2015 WL 1909859, *9 (E.D. La. April 21, 2015); *Frischhertz*, 2012 WL 2952427 at *3.

regarding available laboratory tests for evaluating a patient's exposure to Xarelto.  Plaintiffs have likewise shown that Mr. Boudreaux would not have suffered a GI bleed had his physicians been provided with adequate instructions.  As such, genuine issues of material fact remain as to both prongs of the learned intermediary test and summary judgment is therefore precluded.

Respectfully submitted,

Dated:  February 27, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH: (504) 522-2304
FAX: (504) 528-99\73
Email:  gmeunier@gainsben.com

**Plaintiffs' Liaison Counsel**

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**
