# EXHIBIT-10

# FILED UNDER SEAL

Protected - Subject To Further Protective Review

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  XARELTO (RIVAROXABAN)  MDL No. 2592
     PRODUCTS LIABILITY LITIGATION

5                                   SECTION L

6    _____  JUDGE FALLON

7    THIS DOCUMENT RELATES TO:    MAG. JUDGE NORTH

8    BOUDREAUX VS. JANSSEN RESEARCH
     & DEVELOPMENT, ET AL.

9

     Civil Case No. 2:14-cv-02720

10

11

12     PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

13

14                   SEPTEMBER 22, 2016

15

16

17                      - - -

18          Videotaped deposition of PETER S. FAIL,
     M.D., held at the Cardiovascular Institute of the

19   South, 225 Dunn Street, Houma, Louisiana, commencing
     at 5:13 p.m., on the above date, before Leslie B.

20   Doyle, Certified Court Reporter (#93096), Registered
     Professional Reporter, Certified Realtime Reporter.

21

22                      - - -

23            GOLKOW TECHNOLOGIES, INC.

24        877.370.3377 ph|917.591.5672 fax

25               deps@golkow.com

Protected - Subject To Further Protective Review

Page 2

1  A P P E A R A N C E S:
2
3  COUNSEL FOR THE PLAINTIFF:
4      KIRK J. GOZA, ESQ.
          Email: Kgoza@gohonlaw.com
5      Phone: (913) 451-3433
       GOZA & HONNOLD, LLC
6      11181 OVERBROOK ROAD, SUITE 200
       LEAWOOD, KANSAS 66211
7
8  COUNSEL FOR PETER S. FAIL, M.D.:
9      CHARLES J. BOUDREAUX, ESQ.
          Email: Cboudreaux@joneswalker.com
10     Phone: (337) 593-7764
       JONES WALKER, LLP
11     600 JEFFERSON STREET, SUITE 1600
       LAFAYETTE, LOUISIANA 70501
12
13 COUNSEL FOR THE JANSSEN DEFENDANTS:
14     JOHN A. MCCAULEY, ESQ.
          Email: Jmccauley@venable.com
15     Phone: (410) 244-7655
       VENABLE LLP
16     750 E. PRATT STREET, SUITE 900
       BALTIMORE, MARYLAND 21202
17
18 COUNSEL FOR THE BAYER DEFENDANTS:
19     BERT L. SLONIM, ESQ.
          Email: Bert.slonim@kayescholer.com
20     Phone: (212) 836-8897
       KAYE SCHOLER, LLP
21     250 WEST 55TH STREET
       NEW YORK, NEW YORK 10019-9710
22
23 ALSO PRESENT:
24     MARK ANCALADE, VIDEOGRAPHER
25     MELISSA BARDWELL, VIDEOGRAPHER

Page 3

1          INDEX OF EXAMINATIONS
2  EXAMINATION
3      BY MR. SLONIM......................6, 104
4      BY MR. GOZA..................88, 113, 119
5      BY MR. MCCAULEY..................115, 121
6  CERTIFICATE........................123 - 124
7
8              * * *
9
10         INDEX OF EXHIBITS
11 EXHIBIT #1.................................10
12    CROSS NOTICE OF DEPOSITION OF PETER
13    FAIL, M.D.
14 EXHIBIT #2.................................10
15    CURRICULUM VITAE
16 EXHIBIT #3.................................11
17    MEDICAL RECORDS
18 EXHIBIT #4.................................12
19    4/2/15 HISTORY & PHYSICAL
20    (JBoudreaux-PPR-002624- 2626)
21 EXHIBIT #5.................................16
22    4/27/15 HISTORY & PHYSICAL
23    (JBoudreaux-PPR-002510 - 2513)
24
25

Page 4

1  EXHIBITS (CONTINUED):
2
3  EXHIBIT #6.................................20
4     ARTICLE FROM THE DAILY COMET: HOUMA
5     DOCTOR AMONG FIRST IN LA TO PERFORM
6     PROCEDURE
7  EXHIBIT #7.................................23
8     AGENDA - NCVH LAFAYETTE
9  EXHIBIT #8.................................23
10    "OTHER STRUCTURAL HEART INTERVENTIONS"
11 EXHIBIT #9.................................36
12    COMMENT REGARDING PERCUTANEOUS LEFT
13    ATRIAL APPENDAGE (LAA) CLOSURE THERAPY
14 EXHIBIT #10................................48
15    CONSENT FOR SURGERY OR TREATMENT AND
16    ACKNOWLEDGEMENT OF RECEIPT OF MEDICAL
17    INFORMATION
18    (JBoudreaux-TGMC-MD-000115 - 0121)
19 EXHIBIT #11................................51
20    5/11/15 OPERATIVE REPORT
21    (JBoudreaux-PPR-001501 - 1502)
22 EXHIBIT #12................................54
23    9/16/15 PROGRESS NOTE
24    (JBoudreaux-PPR-002714 - 2718)
25

Page 5

1  EXHIBITS (CONTINUED):
2
3  EXHIBIT #13................................57
4     HOSPITAL ADMIT/HISTORY AND PHYSICAL/
5     CONSULT
6     (JBoudreaux-PPR-002701 - 2705)
7  EXHIBIT #14................................58
8     3/24/16 PROGRESS NOTE
9     (JBoudreaux-CIS-H-000355 - 0359)
10 EXHIBIT #15................................59
11    4/26/16 PROGRESS NOTE
12    (JBoudreaux-CIS-H-000360 - 0364)
13 EXHIBIT #16................................62
14    CONSENT FOR SURGERY OF TREATMENT AND
15    ACKNOWLEDGEMENT OF RECEIPT OF MEDICAL
16    INFORMATION
17    (JBoudreaux-PPR-005279 - 5280)
18 EXHIBIT #17................................64
19    DISCHARGE SUMMARY
20    (JBoudreaux-PPR-005124 - 5125)
21 EXHIBIT #18................................67
22    PROGRESS NOTE
23    (JBoudreaux-PPR-005254 - 5257)
24
25

Page 6

1  EXHIBITS (CONTINUED):
2
3  EXHIBIT #19...............................72
4    FLASH DRIVE
5  EXHIBIT #20...............................90
6    PROGRESS NOTES
7    (JBoudreaux-OMC-K-MD-000017 - 0023)
8
9           - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1           PROCEEDINGS
2        THE VIDEOGRAPHER:  My name is Mark
3   Ancalade, the videographer.  Also with me
4   is Melissa Bardwell.  We're with Golkow
5   Technologies.
6        Today's date is September the 27th --
7   22nd, 2016, at the time indicated on the
8   video screen, which is 5:13.  Today's
9   deposition is being held at 225 Dunn
10  Street in Houma, Louisiana, taken in the
11  matter of In Re:  Xarelto (Rivaroxaban)
12  Products Liability Litigation, being heard
13  before the United States District Court,
14  Eastern District of Louisiana.
15       Today's deponent is Dr. Peter S. Fail.
16  The court reporter is Ms. Leslie Doyle.
17       I would ask that counsel state their
18  names for the record, which, thereafter,
19  would the court reporter please swear the
20  witness.
21       MR. GOZA:  Kirk Goza on behalf of
22  plaintiff, Joseph Boudreaux.
23       MR. BOUDREAUX:  Chuck Boudreaux on
24  behalf of Dr. Fail.
25       MR. SLONIM:  Bert Slonim on behalf of

Page 8

1   defendant, Bayer.
2        MR. MCCAULEY:  John McCauley on behalf
3   of the Janssen defendants.
4           * * *
5        PETER S. FAIL, M.D.,
6   having been first duly sworn, was examined
7        and testified as follows:
8        MR. GOZA:  At this point, we want to
9   state one thing for the record, that
10  Mr. Boudreaux, seated here to my left, is
11  the lawyer for Dr. Fail, but is not
12  related to my client, Mr. Joseph
13  Boudreaux.
14       MR. SLONIM:  Thank you.
15           EXAMINATION
16  BY MR. SLONIM:
17   Q.  Dr. Fail, good evening.
18   A.  How are you?
19   Q.  My name is Bert Slonim.  As you know, I
20  represent the defendant, Bayer Corporation, in this
21  matter.  My colleague, Mr. McCauley, represents
22  Janssen.
23       You understand, Dr. Fail, that you're
24  being asked to give a deposition in this matter
25  because there's been a lawsuit instituted by

Page 9

1   Mr. Joseph Boudreaux, who is a patient of yours,
2   against our clients?
3    A.  I do.
4    Q.  And you understand that you are not a
5   defendant in the lawsuit; your practice group is not
6   a defendant in the lawsuit; the plaintiff,
7   Mr. Boudreaux, does not assert that you did anything
8   wrong, or that your practice group did anything
9   wrong, and I want to represent on the record that
10  neither of the defendants assert that you or your
11  practice group did anything wrong.  Do you
12  understand that?
13   A.  I do.
14   Q.  For the record, would you state your full
15  name and your business address, please?
16   A.  Peter Stevens Fail, 225 Dunn Street,
17  Houma, Louisiana.
18   Q.  And I understand that you're a medical
19  doctor, more specifically that you're a
20  cardiologist; is that correct?
21   A.  Correct.
22   Q.  And, of course, you're board certified; is
23  that right?
24   A.  Yes, sir.
25   Q.  In what disciplines are you board

Protected - Subject To Further Protective Review

Page 10

1  certified?
2      A.  Board certified in cardiology and
3  interventional cardiology.
4      Q.  Let's mark as Deposition Exhibit #1 -- I
5  think the court reporter handed it to you -- the
6  Notice of Deposition.
7          (Deposition Exhibit #1 was marked for
8              identification.)
9      Do you have that?
10     A.  Yes, sir.
11     Q.  And the Notice of Deposition asked you to
12  bring certain documents with you?
13     A.  Yes, sir.
14     Q.  Are you aware of that?
15     A.  Yes, sir.
16     Q.  And did you bring some documents with you?
17     A.  Yes, sir.
18     Q.  One of the things that you were asked to
19  bring was a CV; is that correct?
20     A.  That is correct, sir.
21     Q.  Let's mark that as Deposition Exhibit #2.
22         (Deposition Exhibit #2 was marked for
23             identification.)
24     We'll come back to that in a minute.  What
25  else did you bring with you?

Page 11

1      A.  I believe these are the patient's records.
2      Q.  Okay.  Let's mark that as -- court
3  reporter mark that as Deposition Exhibit #3.
4          (Deposition Exhibit #3 was marked for
5              identification.)
6      Dr. Fail, is it your understanding that
7  that's a full set of Mr. Boudreaux's records for all
8  his care and treatment by the Cardiovascular
9  Institute of the South?
10     A.  It is.
11     Q.  So that would encompass more than your own
12  personal treatment of Mr. Boudreaux?
13     A.  Yes, sir, it should.
14     Q.  Okay.  Did you bring any other materials
15  with you?
16     A.  No, sir.
17     Q.  Very good.
18     Dr. Fail, your medical practice is located
19  in Houma, Louisiana; is that correct?
20     A.  That's correct.
21     Q.  The CV that we've marked as Deposition
22  Exhibit #2, is that an accurate description of your
23  education, your medical training, your publications,
24  and your research interests?
25     A.  I believe it is.

Page 12

1      Q.  Now, the case, as I mentioned, concerns a
2  patient that you treated, Mr. Joseph Boudreaux.  As
3  you sit here today, do you have an independent
4  recollection of Mr. Boudreaux, apart from what you
5  see in his medical records?
6      A.  No, sir, I do not.
7          (Deposition Exhibit #4 was marked for
8              identification.)
9      Q.  We've marked as Deposition Exhibit #3 --
10  I'm sorry -- #4 --
11     A.  #4, yes, sir.
12     Q.  I'm going to adjust this on the Elmo -- a
13  medical record dated April 2nd, 2015.  I projected
14  that on the Elmo and handed you a copy.
15     A.  Yes, sir.
16     Q.  Is this your medical record?
17     A.  Yes, it is.
18     Q.  And do you notice that the -- there's a
19  red box around the date of April 2nd, 2015?
20     A.  Uh-huh.
21     Q.  Do you see that?
22     A.  Yes, sir.
23     Q.  Is it correct that you first saw
24  Mr. Boudreaux on that date, April 2nd, 2015, and
25  that these are your notes of the -- that visit?

Page 13

1      A.  Yes, sir.
2      Q.  The section of the medical record that I
3  put in a red box, and it's labeled Chief Complaint
4  and then Present Illness.  Do you see that?
5      A.  Yes, sir.
6      Q.  That section of the medical record
7  indicates that Mr. Boudreaux had been referred to
8  you by a Dr. Al Timothy; is that correct?
9      A.  Yes, sir.
10     Q.  And the purpose of that referral was for
11  you to consider whether Mr. Boudreaux was a
12  candidate for a cardiac procedure called the LARIAT
13  procedure; is that correct?
14     A.  That is correct.
15     Q.  And the LARIAT procedure is an
16  interventional cardiology procedure that's used to
17  treat atrial fibrillation, correct?
18     A.  It's utilized to treat patients who have
19  atrial fibrillation who cannot take anticoagulation.
20     Q.  Okay.  And Dr. Al Timothy is a
21  cardiologist who works in your medical practice
22  group; is that correct?
23     A.  That is correct.
24     Q.  Is Dr. Timothy -- as a cardiologist, is he
25  experienced in treating patients with atrial

Protected - Subject To Further Protective Review

Page 14

1 fibrillation?

2    A.  I believe so.

3    Q.  Has Dr. Timothy referred other patients to

4 you for consideration of the LARIAT procedure?

5    A.  He has.

6    Q.  And is that both before and after

7 Mr. Boudreaux?

8    A.  That is correct.

9    Q.  Now, your note in this medical record, the

10 handwritten part under Present Illness, indicates

11 that Mr. Boudreaux had a history of GI bleeding with

12 anticoagulation therapy; is that correct?

13    A.  Correct.

14    Q.  And even though Mr. Boudreaux was at a

15 high risk of stroke from atrial fibrillation, at the

16 time that you saw him in April 2015, he had been off

17 anticoagulants for more than a year; is that

18 correct?

19    A.  That is correct.

20    Q.  If I understood your note in the lower

21 right-hand corner of the portion that's in the red

22 box, it looks like it indicated three years; is that

23 correct?

24    A.  That's what it looks like.

25    Q.  But you're aware, and based on the

Page 15

1 reviewing the records more recently, that it was a

2 little over a year that he actually had been off

3 anticoagulation?

4    A.  Yeah.  And I'm not sure if that's years or

5 units.  Oh, he may have got transfused.  I'm looking

6 at that now in bad handwriting, so I'm not sure that

7 was -- if I put off transfusion or if I put three

8 units or three years.  I wonder if that's units.

9    Q.  All right.  I see.  It's not clear to you

10 looking at --

11    A.  No, it's not.

12    Q.  -- looking at that note, whether that's --

13    A.  Right.

14    Q.  -- that's referring to the transfusion

15 note about --

16    A.  That's what I believe it -- yeah.

17    Q.  -- or the off anticoagulation to the left?

18    A.  No, that's what I think it -- I think it's

19 referring to the transfusion, yes, sir.

20    Q.  Okay.  But you do know that, at this time

21 as of April 2015, that Mr. Boudreaux had been off

22 anticoagulation for more than a year, right?

23    A.  I understand that, yes, sir.

24    Q.  And your plan was to conduct imaging

25 studies to assess whether Mr. Boudreaux was suitable

Page 16

1 for the LARIAT procedure; is that correct?

2    A.  That is correct, yes, sir.

3    Q.  It's bleeding through a little bit.  Let's

4 see.  Dr. Fail, give us a second to adjust the

5 brightness of the projection.

6       (Deposition Exhibit #5 was marked for

7           identification.)

8       Dr. Fail, we've marked as Deposition

9 Exhibit #5 a medical record dated April 27th, 2015,

10 regarding Mr. Boudreaux.  Do you see the date as

11 indicated in the upper left-hand corner in the red

12 box?

13    A.  Yes, sir.

14    Q.  And this is your medical record, correct?

15    A.  That's correct.

16    Q.  So this is dated approximately three

17 weeks -- a little more than three weeks after you

18 had first seen Mr. Boudreaux for consideration of

19 the LARIAT, correct?

20    A.  That's correct.

21    Q.  Can you please read aloud the chief

22 complaint?

23    A.  Referred for evaluation of atrial

24 fibrillation and consideration for LARIAT.

25    Q.  And then would you keep on reading the --

Page 17

1    A.  73-year-old male referred by Dr. Timothy

2 for atrial fibrillation consideration and for LARIAT

3 procedure.

4    Q.  Dr. Fail?

5    A.  I'm sorry.

6    Q.  Could I ask you to slow down --

7    A.  Yes.

8    Q.  -- just a little bit so the court reporter

9 can catch up with you?

10    A.  The patient was diagnosed with new onset

11 atrial fibrillation in January of 2014, duration

12 unknown and associated with some diastolic heart

13 failure.  The patient was started on Xarelto.  The

14 plans for future cardioversion were discussed.  He

15 was unable to tolerate the anticoagulation due to

16 recurrent GI bleeds.  Outpatient workup also

17 revealed non-ischemic cardiomyopathy and ejection

18 fraction of 35 percent.

19    Q.  Is this accurate, that Mr. Boudreaux had

20 been diagnosed with new onset, meaning first time,

21 atrial fibrillation in January of 2014?

22    A.  That is my understanding, yes, sir.

23    Q.  And so he was -- he had come to see you in

24 April of 2015; that's more than a year later?

25    A.  Correct.

Page 18

1    Q.   And he had been off anticoagulation for
2  much of that year, more than a year-long period,
3  correct?
4    A.   That is correct, yes, sir.
5    Q.   At the time -- it indicates that at the
6  time, he was -- of the diagnosis, he was started on
7  Xarelto?
8    A.   Yes, sir.
9    Q.   Do you know that he was started on Xarelto
10  by a treating cardiologist, Dr. Kenneth Wong?
11    A.   That's my understanding, yes, sir.
12    Q.   And you know Dr. Wong, of course?
13    A.   I do.
14    Q.   Dr. Wong is a cardiologist that practices
15  with your medical practice group, correct?
16    A.   That is correct.
17    Q.   And is Dr. Wong also experienced in
18  treating atrial fibrillation?
19    A.   I believe he is.
20    Q.   Now, Dr. Fail, you personally never
21  prescribed Xarelto to Mr. Boudreaux; is that
22  correct?
23    A.   That is correct.
24    Q.   We're going to move on to another
25  document, then we're going to return to this

Page 19

1  document, though.
2    A.   Okay.
3    Q.   One question before we move on.  The
4  note -- there is a note.  The note indicates that
5  the patient was started on Xarelto, and there were
6  plans for future cardioversion.
7    A.   Yes, sir.
8    Q.   Do you know why the cardioversion was not
9  done during this more than year period of time since
10  the diagnosis of atrial fibrillation and the time he
11  came to see you in April of 2015?
12    A.   My suspicion is that he was started on
13  Xarelto with a plan of using anticoagulation for
14  approximately four weeks before the cardioversion,
15  because his AFib was unknown duration, and then
16  bring him in and do the cardioversion at that time.
17  He developed a GI bleed.  It was stopped on his
18  anticoagulation and, therefore, was not being able
19  to be cardioverted without having -- having --
20  convinced that he was anticoagulated.
21    Q.   Is it a requirement for cardioversion that
22  a patient be anticoagulated?
23    A.   It's -- yes, sir.
24    Q.   And that's because there's a risk -- too
25  much of a risk of clots if the patient is not

Page 20

1  anticoagulated?
2    A.   Correct.  Correct.
3    (Deposition Exhibit #6 was marked for
4      identification.)
5    Q.   I've marked as Deposition Exhibit #6 a
6  newspaper article dated December 13, 2013.  Do you
7  have that in front of you, Dr. Fail?
8    A.   I do.
9    Q.   The newspaper is The Daily Comet.  That's
10  a newspaper that covers events in Houma, Louisiana,
11  and the surrounding area; is that correct?
12    A.   I believe so.
13    Q.   And the -- Dr. Fail, the title of the
14  article, and the second paragraph which I have
15  yellow-highlighted, indicates that you were one of
16  the first cardiologists in Louisiana to use the
17  LARIAT procedure to treat atrial fibrillation in
18  patients who could not tolerate anticoagulation
19  medications.  That's correct?
20    A.   That's what it says.  I was not aware of
21  that, but that's what it says.
22    Q.   Well, actually, I asked -- I asked a poor
23  question, and thank you for picking up on that.
24      The article says that?
25    A.   Yeah.

Page 21

1    Q.   Do you know if that's the case?
2    A.   I assume that's true.  Not very many
3  people do that.  You're right.
4    Q.   You were an early adopter --
5    A.   Yes, sir.
6    Q.   -- of the LARIAT technique?
7    A.   Yes, sir.
8    Q.   And according to this article, you first
9  performed the LARIAT procedure in December of 2013.
10  That's about a year and a half before you saw
11  Mr. Boudreaux, correct?
12    A.   That seems about right, yes, sir.
13    Q.   And is that date correct, that you -- your
14  first LARIAT patient was in December of 2013?
15    A.   I would assume so.
16    Q.   You don't have any reason to doubt that?
17    A.   I don't, no, sir.
18    Q.   The two paragraphs that are
19  yellow-highlighted towards the bottom, not the last
20  paragraph, but the next two that are highlighted --
21      MR. MCCAULEY:  Move it up a little
22    bit.
23      MR. SLONIM:  Oh, I'm sorry.
24  BY MR. SLONIM:
25    Q.   These describe the LARIAT procedure.

Protected - Subject To Further Protective Review

Page 22

1  Could I ask you to read those aloud?
2      A.  The LARIAT procedure itself?
3      Q.  Yes.
4      A.  The LARIAT procedure is performed in the
5  cardiac catheterization lab under general
6  anesthesia.  One catheter inserted under the
7  patient's rib cage, another guides the device to
8  part of the heart called the left atrial appendage.
9      Q.  Read the next paragraph.
10     A.  The LARIAT device places and tightens a
11 loop stitch around the base of the appendage,
12 sealing it off from the rest of the heart,
13 decreasing the risk of blood clots traveling to the
14 brain and causing a stroke.
15     Q.  Is that an accurate summary of the
16 procedure that you performed on Mr. Boudreaux?
17     A.  Yes, sir.
18     Q.  Can you read aloud the last paragraph of
19 the article?
20     A.  This procedure offers those patients, who
21 in the past had to worry about a -- had to worry
22 about stroke because they were not able to tolerate
23 anticoagulation medication, an option to
24 significantly reduce the risk associated with atrial
25 fibrillation.

Page 23

1      Q.  So is that an accurate reflection of a
2  quote that you gave to the reporter who wrote this
3  article?
4      A.  I believe so, yes, sir.
5      Q.  And, Dr. Fail, is it correct that there
6  are many atrial fibrillation patients, like
7  Mr. Boudreaux and like the patient on whom you
8  performed the LARIAT procedure in December 2013, who
9  cannot tolerate any anticoagulation therapy, and
10 that the LARIAT procedure is an option that can
11 reduce the risk of stroke for those patients?
12     A.  I believe so, yes, sir.
13     Q.  Dr. Fail, we've marked as Deposition
14 Exhibit #7 --
15     A.  Uh-huh.
16     Q.  -- an agenda from a scientific meeting
17 organized by New Cardiovascular Horizons on August
18 6th, 2016.
19     (Deposition Exhibit #7 was marked for
20         identification.)
21     And we've also marked as Deposition
22 Exhibit #8 a slide deck that was presented at that
23 meeting with the slide deck that's entitled, "Other
24 Structural Heart Interventions."
25     (Deposition Exhibit #8 was marked for

Page 24

1         identification.)
2      Do you have those in front of you?
3      A.  I do.
4      Q.  Now, Dr. Fail, you have taught and
5  lectured other cardiologists about the LARIAT
6  procedure, correct?
7      A.  I have.
8      Q.  And Exhibit #7, the agenda for the
9  scientific meeting, if you turn to page 5 of 7.
10     A.  I have it.
11     Q.  Okay.  That indicates that you were a
12 speaker at this program on August 16th, and you gave
13 a talk, a presentation, entitled, "Update in
14 Structural Heart Disease Management," correct?
15     A.  Correct.
16     Q.  You are listed as the speaker there.  And
17 do you see that there's a link to the PDF file that
18 contains the slides that you presented at that
19 meeting?
20     A.  Yes, sir.
21     Q.  Okay.  And Exhibit #8, this is the slide
22 deck that you actually presented at this August 6th,
23 2016, meeting, correct?
24     A.  That's correct.
25     Q.  Okay.  Let's put that on the screen, zoom

Page 25

1  that in.
2      Do you recall giving this talk?
3      A.  I do.
4      Q.  Would you turn, please, to slide 33?
5      A.  I have it.
6      Q.  Let me get it on the screen.
7      This is the portion of your talk where you
8  began discussing atrial fibrillation with your
9  fellow cardiologists, correct?
10     A.  That is correct.
11     Q.  And atrial fibrillation, that's the
12 condition for which Mr. Boudreaux was treated,
13 correct?
14     A.  Correct.
15     Q.  Let's turn, please, to slide 34.  Can you
16 explain this slide?  Maybe read it to us and explain
17 it to us.
18     A.  This is basically the scope of the problem
19 of those patients with atrial fibrillation.  Bullet
20 point 1, affects more than 2.3 million people in the
21 United States alone.  Bullet point 2, projected to
22 increase between 5.6 and 12.1 million by 2050.
23 Bullet point 3, patients with atrial fibrillation
24 have four- to five-fold higher increase -- or higher
25 risk of stroke than a patient without atrial

Page 26

1  fibrillation. And Bullet Point 4 is, the
2  cornerstone for stroke prevention is oral
3  anticoagulation.
4      Q.  So let's talk about that, each one of
5  these for a minute. Based on available reliable
6  statistics, it's your understanding that as of 2016,
7  there are more than 2.3 million people in the U.S.
8  that have this condition that Mr. Boudreaux had,
9  this atrial fibrillation?
10     A.  Correct.
11     Q.  And for various reasons, it's a condition
12  that, as the population ages, the prevalence of that
13  disease is expected to rise --
14     A.  That's correct.
15     Q.  -- significantly over the coming decades,
16  correct?
17     A.  Yes, sir.
18     Q.  The next bullet points says that patients
19  with atrial fibrillation have a four- to five-fold
20  higher risk of stroke than patients without atrial
21  fibrillation. Is that based on reliable data?
22     A.  Yes, sir.
23     Q.  And is that applicable to Mr. Boudreaux?
24  Was Mr. Boudreaux at a four- to five-fold risk --
25  increased risk of stroke because of his atrial

Page 27

1  fibrillation?
2      A.  I believe he is, yes, sir.
3      Q.  The next bullet point has a red box around
4  it. That was in your original slides, correct?
5      A.  That is correct.
6      Q.  And it says that the cornerstone of stroke
7  prevention is oral anticoagulation; is that right?
8      A.  Correct.
9      Q.  Why did you put a red box around that?
10     A.  The point of this talk was to show those
11  patients that cannot take anticoagulation, and what
12  I did not want to do was to promote the procedure
13  over what was still a cornerstone, that would be
14  oral anticoagulation.
15     Q.  So, in other words, if there's any
16  possibility that the patient can tolerate an oral
17  anticoagulation -- an oral anticoagulant medication,
18  that would be the first and most -- and primary
19  therapy for the patient, correct?
20     A.  That is correct.
21     Q.  And the reason that you want to
22  anticoagulate them is to cut this four- to five-fold
23  risk and bring it back as close to baseline as
24  possible, correct?
25     A.  That is correct.

Page 28

1      Q.  And, historically, the way that was done
2  was by prescribing an oral anticoagulant; is that
3  right?
4      A.  Correct.
5      Q.  But the problem that you are describing to
6  this audience is that there are some patients, like
7  the patient you operated on in December of 2013, and
8  like Mr. Boudreaux, who are unable to tolerate the
9  oral anticoagulants, correct?
10         MR. GOZA:  Object to the form. It's
11     vague, ambiguous as to all.
12     A.  That is correct.
13  BY MR. SLONIM:
14     Q.  Let's turn to the next slide, please. The
15  title of this slide is "Anticoagulation Intolerant
16  Population by Age"; is that correct?
17     A.  Yes, sir.
18     Q.  So this is a complicated slide with a
19  graph in it. Can you walk us through this slide and
20  explain it to us, please?
21     A.  This basically was showing that, as the
22  population ages on Coumadin, they seem to take less,
23  and there were several anecdotes, one of them on the
24  left-hand side. Older patients, fear of falling,
25  leading to hemorrhage, and "You bump your head,

Page 29

1  you're dead" is an adage that is used in medicine
2  very often. And that's why, when we see
3  80-plus-year-old patients with atrial fibrillation,
4  there's always this fear of anticoagulating them.
5         The younger patients want to remain
6  physically active, and, therefore, their fear of
7  falling and causing hemorrhaging and stuff like
8  that. And then all patients, we basically said,
9  side effects from drug-to-drug interaction. This is
10 specifically directly focused towards Coumadin,
11 which was the cornerstone at the time of these --
12 this study was done.
13     Q.  So there are a variety of reasons why
14 patients may be intolerant to oral anticoagulants,
15 Coumadin and other oral anticoagulants, correct?
16     A.  That is correct.
17     Q.  One of the reasons that they may be
18 intolerant of anticoagulation is they may be fearful
19 of trauma or injury, like a fall?
20         MR. GOZA:  Excuse me. Are you done?
21     I'm sorry. I'm just going to object to
22     the form, that intolerant equates with
23     that, so...
24         MR. SLONIM:  Objection noted.
25 BY MR. SLONIM:

Page 30

1    Q.  One of the -- Dr. Fail, one of the reasons
2  that you note in your slide that patients may be
3  intolerant of anticoagulation is because they have a
4  concern that they might have a hemorrhage,
5  particularly a brain hemorrhage; is that correct?
6        MR. GOZA:  Same objection.
7    A.  Yes, sir.
8  BY MR. SLONIM:
9    Q.  And patients may be intolerant to
10  anticoagulation because of side effects, meaning
11  they might be -- have a propensity to bleed,
12  correct?
13    A.  Yes, sir.
14    Q.  And then there may be problems attendant
15  to taking medication, like in the case of Coumadin,
16  perhaps watching their diet, and other medications,
17  correct?
18    A.  That is correct.
19    Q.  I wanted to ask you about the bar graph on
20  the right-hand side.
21    A.  Yes, sir.
22    Q.  So Mr. Boudreaux was 73 years old when you
23  first saw him in April 2015; is that correct?
24    A.  I believe that's true, yes, sir.
25    Q.  So that would put him in the bar that

Page 31

1  has -- that reads 60.7 percent, correct?
2    A.  Yes, sir.
3    Q.  So how common is it for a 73-year-old
4  patient like Mr. Boudreaux to be intolerant to any
5  type of anticoagulant therapy?
6    A.  In this bar graph here, it would say
7  somewhere of 40 percent.
8    Q.  So out of every ten patients in that age
9  range who have atrial fibrillation and you would
10  like to prescribe them oral anticoagulants, for one
11  reason or another, four out of ten of those patients
12  you find are intolerant to anticoagulation; is that
13  right?
14    A.  I'm not sure that's what the study
15  actually showed.  I mean, I think -- I think those
16  are the patients who are truly on anticoagulation.
17  The other flip side of that is there are patients
18  who have AFib are never prescribed it, irrespective
19  of -- irrespective of intolerance.  And so I think
20  that's what that shows is that there is a large
21  group of patients that are not anticoagulated, not
22  necessarily intolerant, but a large group that are
23  not taking it.
24    Q.  Do you know what group of the 73-year-old
25  patients would be intolerant?

Page 32

1    A.  Intolerant?
2    Q.  Yeah.
3    A.  I would -- my -- my guess would be 15 to
4  20 percent, maybe.
5        MR. GOZA:  Just move to strike if it's
6    a guess.
7    A.  Yeah, guess.
8  BY MR. SLONIM:
9    Q.  Is it based on -- is it based on your
10  practice and experience?
11    A.  Yes, sir.
12    Q.  Let's move to the next slide.  It's 36.
13  This slide is entitled, "Rationale for LAA Closure."
14  LAA refers to left atrial appendage, correct?
15    A.  That is correct.
16    Q.  Can you explain this slide, please?
17    A.  So this just has a picture of two
18  different types of left atrial appendages showing
19  sort of the nooks and crannies where blood clots can
20  start, if you will.  And then it says 91 percent of
21  patients with thrombus who have non-rheumatic atrial
22  fibrillation, it originates from the left atrial
23  appendage, and 57 of those patients who have
24  rheumatic atrial fibrillation, it originates from
25  it.  So it just shows a high prevalence from the

Page 33

1  left atrial appendage.
2    Q.  Now, Mr. Boudreaux's atrial fibrillation
3  was not associated with rheumatic heart disease,
4  correct?
5    A.  I believe that's true, yes, sir.
6    Q.  So he would fall into the first group of
7  patients, correct?
8    A.  That is correct.
9    Q.  And just so it's 100 percent clear, in
10  other words, for atrial fibrillation patients like
11  Mr. Boudreaux who develop a blood clot, 91 percent
12  of the time, the clot originates in a portion of the
13  heart that's known as the left atrial appendage,
14  correct?
15    A.  That is correct.
16    Q.  And can you tell us what the left atrial
17  appendage is anatomically?
18    A.  It is an outpouching that arises from the
19  left atrium.  Its function is not really clear why
20  it's there.  It's probably a vestigial organ.
21    Q.  Let's turn, please, to the next slide --
22  turn to slide 50.
23    A.  50?
24    Q.  Yeah.  Can you please read that slide out
25  loud?

Protected - Subject To Further Protective Review

Page 34

1     A.  Currently, there is no FDA approved
2   interventional procedure for left atrial appendage
3   exclusion in those patients who cannot take or
4   tolerate anticoagulation.
5     Q.  So if I understand this slide correctly,
6   the LARIAT procedure has not been approved by the
7   FDA for treatment of atrial fibrillation; is that
8   correct?
9     A.  It's been not approved for left atrial
10  appendage exclusion in those patients with atrial --
11  that's correct.
12    Q.  But it has been tested on atrial
13  fibrillation patients, and those results have been
14  published, correct?
15    A.  That is correct.
16    Q.  And even though the LARIAT procedure has
17  not been approved by the FDA for left atrial
18  appendage occlusion in atrial fibrillation patients,
19  there's no prohibition that prevents a doctor from
20  using the procedure, correct?
21    A.  That is correct.
22    Q.  And for patients like Mr. Boudreaux, who
23  cannot tolerate oral anticoagulants, the LARIAT
24  procedure might be the best therapy available to
25  prevent strokes; is that right?

Page 35

1     A.  In my --
2       MR. GOZA:  Object to form.
3     A.  In my opinion, yes, sir.
4   BY MR. SLONIM:
5     Q.  Would you turn, please, to slide 51 and
6   explain that slide to us?
7     A.  So the blackened corner is actually a
8   video of -- an animation video of the procedure
9   itself, and then what you see is actually the left
10  atrial appendage balloon -- that's the big dark
11  circle in the middle -- being inflated, and then in
12  the far right, you can actually make out the LARIAT
13  that's across the left atrial appendage.
14    Q.  And I have a copy of the animation, and we
15  will get to that in due course.
16    A.  Okay.
17    Q.  Turn, please, to slide 52.  Please tell us
18  what that slide shows.
19    A.  I'm sorry?
20    Q.  Can you explain slide 52?
21    A.  Oh, yeah.  So this is just a continuation
22  and showing the LARIAT that is going over -- so on
23  the far left, you see the two magnet wires are
24  linked together and the LARIAT coming from left to
25  right going over the atrial appendage, and then on

Page 36

1   the right-hand panel, you actually can see that the
2   snare has been closed.
3     Q.  And these images were taken from a patient
4   like Mr. Boudreaux as he or she was undergoing the
5   procedure; is that right?
6     A.  That is correct.
7     Q.  And, finally, would you turn to slide 53,
8   please?  Can you explain this slide to us?
9     A.  So this is just going through the sort of
10  three devices that are available for those patients
11  for left atrial appendage exclusion, the LARIAT, the
12  Watchman and the Amplatz, and goes through some of
13  their pertinent data.
14    Q.  Thank you.  I'm going to move to another
15  document, if I can find it in my collection.
16      MR. GOZA:  This is #9?
17      MR. SLONIM:  Yeah.
18    (Deposition Exhibit #9 was marked for
19        identification.)
20  BY MR. SLONIM:
21    Q.  We've marked as Deposition Exhibit #9 a
22  comment that you submitted to the Center for
23  Medicare on June 15th, 2015.
24    A.  Okay.
25    Q.  Do you have that in front of you?

Page 37

1     A.  I do.
2     Q.  And do you see that it's -- there's yellow
3   highlighting under the -- underneath Commenter, and
4   that's your name, correct?
5     A.  Yes, sir.
6     Q.  And the date is indicated as June 6th,
7   2015 -- June 16th?
8     A.  June 16, yes, sir.
9     Q.  June 16, 2015.  And it's correct that this
10  is an accurate copy of a comment that you submitted
11  to the Centers for Medicare, correct?
12    A.  Yes, sir.
13    Q.  This was submitted just a few weeks after
14  you had evaluated Mr. Boudreaux for the LARIAT
15  procedure, correct?
16    A.  I believe that's correct, yes, sir.
17    Q.  And you evaluated him on -- in April of
18  2015, and this is just two months later?
19    A.  Yes, sir.
20    Q.  Why did you write to Medicare?
21    A.  This was a forum that was put forward by
22  SentreHeart, which was the company that produces the
23  LARIAT device, and asking those physicians who
24  performed the procedure to comment on the coverage
25  decision for the Medicare patients.

Page 38

1    Q.  In other words, you were writing to urge
2  the Centers for Medicare to reimburse patients or
3  cover -- provide insurance coverage for patients
4  that needed this type of procedure; is that correct?
5    A.  That's correct, sir.
6    Q.  I yellow-highlighted the first couple of
7  sentences.  Could you read those aloud, please?
8    A.  As a practicing interventional
9  cardiologist, I am writing in support of the
10  national coverage decision being applicable to both
11  the Watchman and the LARIAT.  LAA closure, LAAC, is
12  an important option for patients that may be
13  noncompliant or -- but eligible with Coumadin
14  therapy in the Watchman and, more importantly,
15  contraindicated to anticoagulation and left with no
16  other option, the LARIAT.
17    Q.  So the Watchman would be a procedure that
18  closes or blocks the left atrial appendage, but the
19  Watchman still requires that patients be able to
20  take anticoagulation therapy; is that right?
21    A.  So the trial was designed that the
22  patient, after they had the Watchman placed, they
23  went back on anticoagulation therapy.  So the
24  indication is for those patients who choose not to
25  be anticoagulated and can go under Watchman.  Those

Page 39

1  patients who cannot be anticoagulated, the Watchman
2  is not applicable.
3    Q.  Is not applicable.
4        So for the patients that cannot be
5  anticoagulated, the Watchman is not an option, and
6  the only option for those patients would be the
7  LARIAT procedure?
8    A.  The Watchman could be used in an off
9  label, just like the LARIAT is.  So it's not
10  indicated.  So you could use the Watchman in a
11  different manner, as -- the same as the LARIAT.  So
12  both could be done, just I think the LARIAT probably
13  offers you a little bit better closure.
14    Q.  Now, is Mr. Boudreaux one of the patients
15  that you had in mind when you write to the Centers
16  for Medicare about patients for whom anticoagulation
17  is contraindicated, and they are, your words, quote,
18  left with no other option other than the LARIAT
19  procedure?
20    A.  Not him specifically, but, yes, patients
21  like him.
22    Q.  Patients that have his type of condition?
23    A.  Yes, sir.
24    Q.  And, Dr. Fail, because Mr. Boudreaux could
25  not tolerate any type of oral anticoagulant

Page 40

1  medication, his only option to prevent strokes was
2  the LARIAT procedure, even though that procedure had
3  certain risks and was not approved by the FDA for
4  that purpose?
5    A.  I believe --
6        MR. GOZA:  Object to form.
7    A.  I believe so, yes, sir.
8  BY MR. SLONIM:
9    Q.  Let's go back to that exhibit that we had
10  looked at on April 27th.  That is Exhibit #5.  Yeah.
11        So, Dr. Fail, I put up on the screen, and
12  you should have in front of you, Exhibit #5.
13    A.  Yes, sir.
14    Q.  So this is your note again of April 27,
15  2015, when you saw Mr. Boudreaux.  Your note states
16  that Mr. Boudreaux was, and I quote, unable to
17  tolerate anticoagulation due to recurrent GI bleeds.
18        At the time that you saw Mr. Boudreaux on
19  April 27th, 2015, had he fully recovered from his GI
20  bleed that he had experienced more than a year
21  earlier?
22    A.  It is my assumption, yes, sir.
23    Q.  In other words, he did not have any
24  lingering or permanent damage to his GI tract from
25  his bleed; is that correct?

Page 41

1    A.  Not that I'm aware of, no, sir.
2    Q.  And, more specifically, Xarelto did not
3  cause, in your opinion, Mr. Boudreaux to sustain any
4  lingering or permanent damage to his GI tract?
5        MR. GOZA:  Object to foundation.
6  BY MR. SLONIM:
7    Q.  Is that correct?
8    A.  None that I'm aware of.
9    Q.  And Xarelto did not make Mr. Boudreaux
10  allergic or sensitive to other types of oral
11  anticoagulants, correct?
12    A.  None that I'm aware of.
13    Q.  Xarelto did not make Mr. Boudreaux extra
14  sensitive or extra susceptible to GI bleeding in the
15  future, did it?
16    A.  Not that I'm aware of, no, sir.
17    Q.  In other words, insofar as Mr. Boudreaux
18  had an underlying propensity to GI bleeding when
19  administered an anticoagulant, he had that as a
20  baseline risk, but Xarelto did not do anything to
21  exacerbate or intensify that baseline risk, correct?
22        MR. GOZA:  Object to form and
23        foundation.
24    A.  I don't think Xarelto changed his risk, if
25  I got that question right.

Page 42

BY MR. SLONIM:
1  BY MR. SLONIM:
2      Q.  Yes.  At the time that you and Dr. Timothy
3  were seeing Mr. Boudreaux in 2014 and 2015, there
4  were several types of anticoagulants on the market.
5  That would include Pradaxa, Eliquis and warfarin,
6  which is also known as Coumadin, correct?
7      A.  Correct.
8      Q.  But your concern and Dr. Timothy's concern
9  was that Mr. Boudreaux could not tolerate any of
10  those available oral anticoagulants; is that
11  correct?
12          MR. GOZA:  Object to form.
13      A.  I can't speak to Dr. Timothy's concern.
14  BY MR. SLONIM:
15      Q.  Fair to say that your --
16      A.  He was -- he was -- so he was referred to
17  me after the GI bleed specifically for this
18  procedure, and, therefore, my assumption was that
19  Dr. Timothy did have a concern about putting him on
20  other anticoagulations.
21      Q.  And you know that Mr. Boudreaux, in fact,
22  had been not protected by anticoagulation therapy
23  for more than a year --
24      A.  That's correct.
25      Q.  -- even though he was in atrial

Page 43

1  fibrillation and at a substantially increased risk
2  of stroke during that period of time, correct?
3          MR. GOZA:  Object to the form.
4      A.  That is correct.
5  BY MR. SLONIM:
6      Q.  And, Dr. Fail, your own personal concern
7  in April of 2015, at the time you were assessing
8  Mr. Boudreaux for the LARIAT procedure, was that he
9  would be unable to tolerate a medication like
10  Pradaxa or Eliquis or warfarin; is that right?
11      A.  I'm not sure that we discussed other
12  alternatives, specifically medication.  It was my
13  belief that his primary care cardiologist had
14  already done that and had gone down that road, and
15  that's why he was being referred to me.
16      Q.  Because Mr. Boudreaux was not able to take
17  any type of anticoagulant, and because he was at a
18  high risk of stroke, and based on his imaging
19  studies, Dr. Fail, you felt that the LARIAT
20  procedure would be a good option; is that correct?
21      A.  That is --
22          MR. GOZA:  Object to form.
23      A.  That is correct.
24  BY MR. SLONIM:
25      Q.  Would you turn, please, to the last page

Page 44

1  of Exhibit #5.  Let me put that on the screen, as
2  well.  These are your notes regarding his admission,
3  diagnosis and your plan for treatment; is that
4  correct?
5      A.  That is correct.
6      Q.  Would you please read your plan for
7  treatment?  So I put it in the red box, and it would
8  be the second portion of it.
9      A.  I see.  So arrange for a TEE on May 6th,
10  2015, with Dr. Engeron and then LARIAT on -- that
11  probably should be the 11th.  Should be May,
12  probably 11/15.  Risks versus benefits discussed in
13  detail.  Patient verbalizes understanding and agrees
14  to proceed.
15      Q.  Now, the TEE, that refers to a
16  transesophageal echocardiogram?
17      A.  That is correct.
18      Q.  And that's an imaging technique that
19  enables you to visualize the cardiac anatomy,
20  correct?
21      A.  That is correct.
22      Q.  And that's one of the techniques that you
23  use to assess whether or not Mr. Boudreaux
24  anatomically would be a suitable patient for the
25  LARIAT procedure?

Page 45

1      A.  In this case, it was designed to see if
2  Mr. Boudreaux had a clot in his left atrial
3  appendage would prohibit us from doing anything.
4      Q.  Okay.  And based on the examination and
5  imaging studies, you determined that Mr. Boudreaux
6  would be a suitable candidate; is that correct?
7      A.  That is correct.
8      Q.  And the sentence that's in the middle
9  indicates that you had a discussion with the --
10  about the risks and benefits in detail with
11  Mr. Boudreaux; is that correct?
12      A.  That is correct.
13      Q.  Did you tell him that medication was not a
14  good option because he was not able to tolerate
15  anticoagulation?
16      A.  I'm not sure I had that exact terminology.
17  I think that was an assumed that he had already gone
18  through that.
19      Q.  Did you tell him that he needed treatment,
20  something to treat his atrial fibrillation, because
21  without treatment, he was at a very high risk of
22  stroke?
23      A.  I think we discussed the risk of doing
24  nothing versus the risk of doing something, yes,
25  sir.

Protected - Subject To Further Protective Review

Page 46

1    Q.   Did Mr. Boudreaux tell you that he
2  understood the risks and the benefits of the
3  procedure and that he would agree to proceed with
4  the LARIAT?
5    A.   I believe he did, yes, sir.
6    Q.   Did Mr. Boudreaux express any aversion to
7  taking oral anticoagulant medications?
8    A.   Not specifically, no, sir.
9    Q.   Was it part of your plan at this time, in
10  April of 2015, to cardiovert Mr. Boudreaux?
11    A.   It was not.
12    Q.   And can you tell us why?  Because the
13  LARIAT procedure does not correct the underlying
14  atrial disturbance in the rhythm, correct?
15    A.   That is correct.  That is correct.  Our
16  plan was to exclude the left atrial appendage,
17  reevaluate him to make sure that it was completely
18  excluded at six months, and then come back and
19  possibly cardiovert him at that point.
20    Q.   So cardioversion remained an option?
21    A.   That is correct.
22    Q.   And so, if I understood correctly,
23  cardioversion requires either anticoagulation or the
24  equivalent in this case, the LARIAT, because the
25  cardioversion procedure would run a risk of a

Page 47

1  patient throwing a clot?
2    A.   Yes, sir.
3    Q.   And so Mr. Boudreaux could not tolerate
4  oral anticoagulants, so cardioverting him would be a
5  problem absent the LARIAT; is that right?
6    A.   Before the LARIAT.
7    Q.   Before the LARIAT.
8    A.   Yes, sir.
9    Q.   But if the LARIAT procedure were
10  successful and you occluded the left atrial
11  appendage, then you felt that you would have at
12  least the option of cardioverting without the need
13  for oral anticoagulation because the risk of a clot
14  would be largely eliminated because of the blockage
15  of the left atrial appendage?
16    A.   That is correct.
17    Q.   That's the idea, right?
18    A.   Yes, sir.
19    Q.   Rather than the LARIAT procedure and
20  rather than oral anticoagulants, could you have done
21  something like increased his dosage of aspirin or
22  prescribed an anti-platelet agent, like Plavix, to
23  protect Mr. Boudreaux from strokes?
24    A.   It's not been shown to be effective.
25    Q.   So, in other words, aspirin and Plavix are

Page 48

1  prescribed to treat some forms of cardiovascular
2  disease, ischemic cardiovascular disease, but they
3  have not shown -- been shown to be effective in
4  preventing strokes in patients like Mr. Boudreaux
5  with atrial fibrillation; is that --
6    A.   That's correct.
7    Q.   Another question I have for you about
8  Mr. Boudreaux.  Based on his EKGs, did he have a
9  history of prior heart attack, prior MI?
10    A.   I don't -- I don't recollect.
11      (Deposition Exhibit #10 was marked for
12       identification.)
13    Q.   I've marked as Deposition Exhibit No. 10
14  the informed consent.  If you turn to page 2, it
15  indicates it was dated on April 27th, 2015?
16    A.   That is correct.
17    Q.   See that?
18    A.   Yes, sir.
19    Q.   Can I ask you to -- she's getting that in
20  focus.
21    A.   Uh-huh.
22    Q.   I put a red box around the top of the
23  informed consent.
24    A.   Yes, sir.
25    Q.   And could I ask you to read that aloud,

Page 49

1  the contents inside the red box, please?
2    A.   Consent for surgery or treatment and
3  acknowledgment of receipt of medical information.  I
4  hereby authorize Peter Fail, M.D. and/or assistants
5  as may be selected by said physician to treat the
6  following conditions:  Atrial fibrillation.  The
7  procedures planned for treatment of my condition
8  have been explained to me by my physician and are
9  listed below.  Left atrial appendage ligation, a
10  procedure that places a suture around the bottom
11  pouch of the appendage.  The purpose is to cut off
12  blood flow to the appendage and prevent blood clots
13  from forming inside the appendage.
14    Q.   Does this informed consent, and
15  specifically the language that you read, accurately
16  describe the LARIAT procedure, the purpose of the
17  procedure, and the risks associated with the
18  procedure?  I guess the risks associated with the
19  procedure below, so --
20    A.   Yes, sir.
21    Q.   Let me rephrase that question.
22      Does the informed consent document and the
23  portion that you read accurately describe the LARIAT
24  procedure, the purpose of -- and the purpose of the
25  procedure?

Protected - Subject To Further Protective Review

Page 50

1    A.  It does.
2    Q.  And the bottom of the document -- and let
3  me pull that up on the screen -- that goes on to
4  describe in detail the risks that are associated
5  with the procedure, correct?
6    A.  That's correct.
7    Q.  And are those risks accurately described?
8    A.  Yes, sir.  There's more of a generic that
9  happens in all interventional procedures.
10    Q.  But the risks of the LARIAT procedure
11  would include a risk of death; is that right?
12    A.  That is true.
13    Q.  A risk of brain damage?
14    A.  Yes, sir.
15    Q.  Stroke?
16    A.  Yes, sir.
17    Q.  And numerous other serious risks?
18    A.  Yes, sir.
19    Q.  Okay.  Let's turn, please, to page 2 of
20  the informed consent.
21       Would you please read the bottom that's
22  put in the red box?  Read that aloud, please.
23    A.  Alternative therapy:  Medical therapy with
24  only medication or treatment -- or no treatment
25  could contribute to the worsening of the heart

Page 51

1  condition and possible bypass surgery.  Future risks
2  identified by my physician to me because of
3  complicating medical conditions are.  I certify that
4  these three pages forms have been explained to me
5  and that I have read them and I have had -- or I
6  have had it read to me, and I understand its
7  consent.
8    Q.  Now, did Mr. -- and then it's signed and
9  witnessed; is that correct?
10    A.  That is correct.
11    Q.  Did Mr. Boudreaux affirmatively state, as
12  evidenced by his signature, that he received and
13  understood the information set forth in the informed
14  consent?
15    A.  That is my understanding, yes, sir.
16    Q.  And Mr. Boudreaux signed this informed
17  consent on April 27th, 2015, at 3:20 p.m.?
18    A.  I believe that's his signature, yes, sir.
19    Q.  And that's the date and time stamped?
20    A.  Yes, sir.
21    (Deposition Exhibit #11 was marked for
22       identification.)
23    Q.  I've marked as Deposition Exhibit #11 the
24  operative report dated May 11th, 2015.  Do you have
25  that in front of you?

Page 52

1    A.  I do.
2    Q.  Is this your operative report concerning
3  the LARIAT procedure that you performed on
4  Mr. Boudreaux?
5    A.  Yes, sir, it is.
6    Q.  And I yellow-high -- I highlighted in red
7  boxes some of the sections I want to talk about.
8  But going down about halfway on the first page,
9  there's a section entitled, "Procedure in Detail."
10  Do you see that?
11    A.  I do.
12    Q.  Does that describe pretty much step by
13  step the actual LARIAT procedure that you performed
14  on May 11th on Mr. Boudreaux?
15    A.  Yes, sir.
16    Q.  Now, going up to the section that's
17  entitled, "History," that's the second red box; do
18  you see that?
19    A.  Yes, sir.
20    Q.  That indicates that Mr. Boudreaux had
21  something called a CHADs-VASc score of 4, correct?
22    A.  That's correct.
23    Q.  CHADS-VASc is a numerical scoring system
24  that quantifies a patient's risk of stroke if
25  they're not treated with oral anticoagulants or some

Page 53

1  other means of preventing stroke; is that correct?
2    A.  That is correct.
3    Q.  And the CHADS-VASc score of 4 is based on
4  Mr. Boudreaux's age -- that counts as one -- his
5  congestive heart failure, his diabetes and his
6  hypertension, correct?
7    A.  Yes, sir.
8    Q.  And that adds to the score of 4?
9    A.  Yes, sir.
10    Q.  And that means that if he were untreated,
11  he was at a high risk of having a stroke, correct?
12    A.  Correct.
13       MR. GOZA:  Object to the form.
14  BY MR. SLONIM:
15    Q.  The note also indicates that Mr. Boudreaux
16  had a history of GI bleeding and was a poor
17  candidate for oral anticoagulation because he had a
18  problem tolerating that type of therapy, correct?
19    A.  That is my assumption, yes.  Yes, sir.
20    Q.  Well, and that's --
21    A.  That's what we say, yes, sir.
22    Q.  Yes.  And I quote, he was felt to be a
23  poor candidate for long-term anticoagulation
24  therapy, correct?
25    A.  Correct.

Protected - Subject To Further Protective Review

Page 54

1    Q.   And before that, it notes that he had a
2    history of GI bleed, correct?
3    A.   Yes, sir.
4    Q.   The LARIAT procedure was successful,
5    correct?
6    A.   That's true, yes, sir.
7    Q.   And Mr. Boudreaux initially did well, but
8    several months later did develop some pericardial
9    effusions -- that's fluid around the heart -- that
10   needed treatment, correct?
11   A.   That is correct.
12   Q.   This is a medical record dated September
13   16th, 2015, that we've marked as Deposition Exhibit
14   #12.
15       (Deposition Exhibit #12 was marked for
16           identification.)
17       Do you have that in front of you?
18   A.   I do.
19   Q.   And this indicates that it's a follow-up
20   note for Mr. Boudreaux, correct?
21   A.   That is correct.
22   Q.   And this indicates that he underwent the
23   procedure, the LARIAT procedure, did well initially,
24   but then had some symptoms that indicated that he
25   had a pericardial effusion, correct?

Page 55

1    A.   Yes, sir.
2    Q.   Do you know what caused the pericardial
3    effusion?
4    A.   Usually, irritation of the pericardium
5    secondary to the procedure itself.
6    Q.   So, in other words, the procedure itself
7    can cause an irritation, and that irritation can
8    cause the buildup of fluid around the heart?
9    A.   That is correct.
10   Q.   He was treated for that; is that correct?
11   A.   Yes, sir.
12   Q.   Was the treatment for the pericardial
13   effusion effective?
14   A.   Yes, sir.
15   Q.   One of the things that I noted in this
16   record -- I think it's on the -- towards the end,
17   page 5 of 6.
18   A.   I have it.
19   Q.   Yeah.  Indicates that you started him on a
20   drug called Aldactone, 12.5 milligrams daily; is
21   that correct?
22   A.   That is correct, sir.
23   Q.   What was the reason that you started
24   Mr. Boudreaux on Aldactone?
25   A.   Heart failure.

Page 56

1    Q.   Now, he had previously been on a higher
2    dose of Aldactone prior to the LARIAT procedure; is
3    that correct?
4    A.   I believe that's true, yes, sir.
5    Q.   Can you tell us what your thinking was in
6    regard to prescribing him the lower dose of
7    12-and-a-half milligram?
8    A.   I'm not sure why he was stopped
9    originally, why he was stopped at all, and then I
10   think on him, with a blood pressure of 122, just to
11   get him back on his Aldactone.
12   Q.   So Aldactone was designed to help treat
13   the congestive heart failure symptoms that he was
14   experiencing?
15   A.   Yes, sir.
16   Q.   So, in other words, it's fair to say that
17   Mr. Boudreaux had other cardiac disease and symptoms
18   besides the atrial fibrillation, correct?
19   A.   That is true, yes, sir.
20   Q.   And he had hypertension, correct?
21   A.   Yes, sir.
22   Q.   He had congestive heart failure, correct?
23   A.   Yes, sir.
24   Q.   That's when the heart is not pumping
25   efficiently?

Page 57

1    A.   Yes, sir.
2    Q.   He had some ischemic heart disease; is
3    that right?
4    A.   I believe it was non-ischemic.
5    Q.   Non-ischemic?
6    A.   I believe it was non-ischemic.
7    Q.   Did he have cardio -- did he have
8    cardiomyopathy?
9    A.   He had cardiomyopathy, yes, sir.
10   Q.   And cardiomyopathy is when the muscle is
11   damaged?
12   A.   Yes, sir.
13   Q.   Could the pericardial effusion have been
14   related to the congestive heart failure?
15   A.   Unlikely, but possible.
16   Q.   One of the consequences and symptoms of
17   congestive heart failure can be a buildup of fluid
18   around the heart; is that correct?
19   A.   That is true.
20       (Deposition Exhibit #13 was marked for
21           identification.)
22   Q.   We've marked as Deposition Exhibit #13 a
23   medical record dated November 10th, 2015.  Do you
24   have that in front of you?
25   A.   I do.

Protected - Subject To Further Protective Review

Page 58

1    Q.   So this is now about six months after the
2  LARIAT procedure; is that right?
3    A.   That is correct.
4    Q.   And it's about two months after the record
5  that noted that he was -- had -- was being treated
6  for and had recovered from the pericardial
7  effusions, correct?
8    A.   That is correct.
9    Q.   And according to the record, and I put a
10 red box around it, Mr. Boudreaux was doing well at
11 this time; is that correct?
12   A.   Yes, sir.
13   Q.   That was your assessment based on a
14 physical --
15   A.   Yes, sir.
16   Q.   -- exam?
17   A.   Yes, sir.
18   Q.   In your opinion, had he recovered from his
19 pericardial effusion at this time?
20   A.   Yes, sir.
21      (Deposition Exhibit #14 was marked for
22          identification.)
23   Q.   We've marked as Deposition Exhibit #14 a
24 medical record dated March 24th, 2016.  Do you have
25 that in front of you?

Page 59

1    A.   I do.
2    Q.   And this is another visit, a progress note
3  for Mr. Boudreaux, correct?
4    A.   Yes, sir.
5    Q.   And this represents a new complaint, new
6  symptoms; is that right?
7    A.   Yes, sir.
8    Q.   According to the record, Mr. Boudreaux
9  came to your office complaining of sudden onset of
10 chest pain and shortness of breath when exercising;
11 is that correct?
12   A.   Yes, sir.
13   Q.   Did you diagnose a cause for that
14 condition?
15   A.   I believe we did an echo at that point, an
16 EKG, and did some lab work.
17      (Deposition Exhibit #15 was marked for
18          identification.)
19   Q.   We've marked as Deposition Exhibit #15 a
20 follow-up note to that visit a few weeks earlier.
21 This one is dated April 26th, 2016.  Do you have
22 that in front of you?
23   A.   I do.
24   Q.   This indicates that Mr. Boudreaux had a
25 low ejection fraction noted at 20 percent; is that

Page 60

1  correct?
2    A.   Yes, sir.
3    Q.   Does that indicate that the heart --
4  Mr. Boudreaux's heart was not working efficiently?
5    A.   Yes, sir.
6    Q.   What was the cause of the low ejection
7  fraction?
8    A.   I believe it was non-ischemic
9  cardiomyopathy.
10   Q.   Does atrial fibrillation contribute to
11 that?
12   A.   That was the assumption in this note, yes,
13 sir.
14   Q.   And the problem with -- one of the
15 problems or consequences of atrial fibrillation is
16 that the rhythm of the heart is disturbed so the
17 pump is not as efficient as a heart that's in normal
18 sinus rhythm, correct?
19   A.   That is the thought, yes, sir.
20   Q.   And so -- and one of the consequences can
21 be is that when the heart is pumping efficiently, a
22 lot of blood gets pumped through the aorta into the
23 body, correct?
24   A.   Yes, sir.
25   Q.   But when you have atrial fibrillation,

Page 61

1  only a small fraction of that blood may get pumped
2  into the body, correct?
3    A.   Yes, sir.
4    Q.   And that can result in a patient
5  experiencing physical symptoms apart from the risk
6  of clots, correct?
7    A.   That is correct.
8    Q.   So even though the LARIAT procedure was
9  successful in closing the left atrial appendage and
10 reducing the risk of stroke, Mr. Boudreaux still had
11 persistent heart problems because of his atrial
12 fibrillation and his other underlying cardiac
13 diseases, correct?
14   A.   That is the assumption, yes, sir.
15   Q.   At this time, your plan was to give him a
16 drug called amiodarone, correct?
17   A.   Yes, sir.
18   Q.   And amiodarone is a medication that can
19 help improve the heart rhythm, correct?
20   A.   Yes, sir.
21   Q.   And your plan was further to schedule him
22 for a procedure called a cardioversion; is that
23 right?
24   A.   Yes, sir.
25   Q.   And we've talked a little bit about that,

Protected - Subject To Further Protective Review

Page 62

1 but can you tell us what a cardioversion is?

2 A. It's basically giving him an electrical

3 shock in order to try to reset the entire rhythm.

4 Q. So the idea is you give the heart a jolt?

5 A. Yes, sir.

6 Q. With electrical paddles?

7 A. Yes, sir.

8 Q. And that may cause the heart to

9 spontaneously re --

10 A. Reset.

11 Q. -- restore, reset itself back to a more

12 normal sinus rhythm?

13 A. That is correct.

14 (Deposition Exhibit #16 was marked for

15 identification.)

16 Q. We've marked as Deposition Exhibit #16 the

17 informed consent for the cardioversion procedure,

18 and this is dated on the bottom June 6th, 2016; is

19 that correct?

20 A. That is correct.

21 Q. Does this informed consent document

22 accurately describe the cardioversion procedure, the

23 purpose of the procedure and the risks that are

24 associated with the procedure?

25 A. I believe it does, yes, sir.

Page 63

1 Q. And the risks that are listed on this

2 document sort of in the middle of the page, these

3 would include the risk of death, brain damage,

4 stroke and other serious risks; is that correct?

5 A. Yes, sir.

6 Q. And then on the bottom -- bottom of the

7 page, did Mr. Boudreaux affirmatively state that he

8 understood the information set forth in the informed

9 consent and that he agreed to proceed with the

10 cardioversion?

11 A. It is my assumption, yes, sir.

12 Q. Well, you recognize his signature --

13 A. I do.

14 Q. -- on the bottom of the document, correct?

15 A. Yes, sir.

16 Q. And does that indicate that Mr. Boudreaux

17 signed the informed consent on June 6th, 2016, at

18 9:45 in the morning?

19 A. It does, yes, sir.

20 Q. And by the way, the informed consent,

21 specifically, the authorization is to you

22 personally, correct?

23 A. Yes, sir.

24 Q. I hereby authorize Dr. Fail?

25 A. Yes, sir.

Page 64

1 (Deposition Exhibit #17 was marked for

2 identification.)

3 Q. Let's see if I can blow this up a little

4 bit.

5 Dr. Fail, we've marked as Deposition

6 Exhibit #17 -- I'm going to try to get this better

7 on the screen -- a medical record dated June 7th,

8 2016. Do you have that in front of you?

9 A. I do.

10 Q. And under the discharge summary, there's a

11 section that's in a red box entitled, "Summary."

12 Could you please read that aloud to us?

13 A. 74-year-old white male with a past medical

14 history of permanent atrial fibrillation status post

15 LARIAT secondary --

16 Q. Dr. Fail, the court reporter has to get it

17 down and --

18 A. I apologize.

19 Q. -- most of us are not doctors, so --

20 A. 74-year-old white male with a past medical

21 history of permanent atrial fib status post LARIAT

22 secondary to recurrent GI bleed on anticoagulation.

23 Hypertension, non-ischemic cardiomyopathy, chronic

24 systolic heart failure/left ventricular systolic

25 dysfunction, ejection fraction 20 percent. Post

Page 65

1 LARIAT he developed pericardial effusion requiring

2 pericardialcentesis. An echocardiogram was repeated

3 post pericardialcentesis to assess for recurrent

4 pericardial effusion. Ejection fraction 20 percent

5 without pericardial effusion. EF decreased likely

6 secondary to AFib. Amiodarone started for Afib with

7 plans of future cardioversion. The patient is

8 tolerating amiodarone, ready for cardioversion.

9 Status post successful cardioversion. Family at

10 bedside. Patient awake and alert.

11 Q. So that is a very technical and succinct

12 summary of Mr. Boudreaux's medical course up to and

13 immediately after the cardioversion, correct?

14 A. That is correct.

15 Q. And some of the pertinent facts are that

16 Mr. Boudreaux underwent the LARIAT procedure because

17 he was unable to be treated with anticoagulants

18 because of GI bleeding problems, correct?

19 A. That is correct.

20 Q. After that, he did develop these

21 pericardial effusions, but those were treated

22 successfully; the fluid was just drained, and those

23 problems resolved, correct?

24 A. Yes, sir.

25 Q. But then he had a problem with his

Page 66

1  ejection fraction. His heart was not pumping
2  efficiently. It was only pumping 20 percent of the
3  blood out of his left ventricle, correct?
4      A.  That is correct.
5      Q.  And that's a problem because you need more
6  blood, correct?
7      A.  Yes, sir.
8      Q.  And you felt that the left ejection
9  fraction was -- that the ejection fraction was
10  decreased because of that persistent atrial
11  fibrillation, correct?
12      A.  That was my assumption, yes, sir.
13      Q.  So even though the LARIAT had
14  successfully, hopefully, reduced the risk of stroke,
15  he still had this underlying problem with his
16  cardiac rhythm that was causing this reduced
17  ejection fraction, and so you wanted to do the
18  cardioversion procedure to try to improve that,
19  correct?
20      A.  That is correct.
21      Q.  And you performed the cardioversion
22  procedure on June 6th, 2016, and the following day
23  you assessed that it was a successful procedure,
24  correct?
25      A.  That is correct.

Page 67

1      Q.  So, in other words, it corrected the
2  cardiac rhythm disorder, the atrial fibrillation, at
3  its root, correct?
4      A.  Yes, sir.
5      Q.  And it made Mr. Boudreaux's heart pump
6  more efficiently, correct?
7      A.  That is my assumption, yes, sir.
8      (Deposition Exhibit #18 was marked for
9          identification.)
10      Q.  We've marked as Deposition Exhibit #18 a
11  medical record a couple of weeks later. It's dated
12  June 22nd, 2016. Do you have that in front of you?
13      A.  I do.
14      Q.  So this is a follow-up visit that occurs
15  about two weeks after the cardioversion, correct?
16      A.  That is correct.
17      Q.  And according to this record,
18  Mr. Boudreaux was doing well, and his heart was
19  working better; is that right?
20      A.  That is my assumption, yes, sir.
21          MR. SLONIM: The videographer tells me
22      that we've only got a couple of minutes
23      left on the tape, so let's use this as a
24      short break, and we're almost done.
25          THE VIDEOGRAPHER: This is the end of

Page 68

1          Tape 1. We're now off the record at 6:29.
2  (Recess.)
3          THE VIDEOGRAPHER: We're now back on
4      the record at 6:38. Wait. We need to go
5      off, 6:38.
6          We're now back on the record at 6:38.
7  BY MR. SLONIM:
8      Q.  Dr. Fail, when we just broke, we were
9  discussing a medical record following up on the
10  cardioversion procedure. The last record, I
11  believe, that we have from your files concerning
12  Mr. Boudreaux date from June 2016, so that's about
13  three months ago. Do you still continue to see and
14  treat Mr. Boudreaux?
15      A.  Yes, sir.
16      Q.  When was the last time you saw him?
17      A.  I believe this is it here, sir.
18      Q.  Okay. So this is the most recent record?
19      A.  Yes, sir.
20      Q.  Based on that record and your assessment
21  of his status, can you tell us what his current
22  cardiac status is? How would you describe him?
23      A.  Based on this, I believe he was improving
24  after the cardioversion.
25      Q.  Is it fair to say that he actually was in

Page 69

1  a better state than he was in January of 2014, at
2  the time he was first diagnosed with atrial
3  fibrillation?
4      A.  My assumption would be yes, sir.
5      Q.  And that's because the risk of blood clot
6  had been minimized to prevent it with the LARIAT
7  procedure and because the cardioversion was
8  successful in restoring him back to normal sinus
9  rhythm?
10      A.  Correct.
11      Q.  And because his ejection fraction had
12  improved, and that helped relieve some of the
13  congestive heart failure symptoms?
14      A.  That, we're not aware of. He was supposed
15  to come back for a repeat echo, so we're not aware
16  that his ejection -- that was -- the note here would
17  say, repeat echo in three months after the
18  cardioversion.
19      Q.  Okay. So he's due in imminently, then?
20      A.  Yes, sir.
21      Q.  Do you know if he's scheduled that
22  appointment?
23      A.  That, I do not know.
24      Q.  Insofar as Mr. Boudreaux had GI bleeding
25  prior to the time that you first saw him in April

Protected - Subject To Further Protective Review

Page 70

1 2015, he has fully recovered from that bleeding
2 event, correct?
3     A.  As far as I know, yes, sir.
4     Q.  And, medically, he does not have any
5 lingering effects or limitations that are
6 attributable to his GI bleed that occurred prior to
7 the LARIAT procedure; is that correct?
8          MR. GOZA:  Object; foundation.
9     A.  None that I'm aware of, sir.
10 BY MR. SLONIM:
11     Q.  And to the extent that Mr. Boudreaux
12 currently today has health issues, are they
13 attributable to his underlying medical conditions
14 rather than to the GI bleed that he had prior to
15 20 -- to April 2015?
16          MR. GOZA:  Object to form.
17     A.  That is my assumption, yes, sir.
18 BY MR. SLONIM:
19     Q.  Dr. Fail, I want to go back to Deposition
20 Exhibit #8.  It's slide 51.  I'll show it to you.
21 You don't need to -- I don't think we need to pull
22 them out.  I can put it on the --
23     A.  Yes, sir.
24     Q.  So this is a PDF file, so it's a -- just a
25 still image of a presentation that you gave to an

Page 71

1 audience of fellow cardiologists to, in part, teach
2 them about the LARIAT procedure, correct?
3     A.  Yes, sir.
4     Q.  And the two images on the lower right,
5 those are actually radiographic images of the
6 LARIAT, correct?
7     A.  That is correct.
8     Q.  And the box that -- in the lower left
9 that's opaque, it's black in this particular slide,
10 that you told us was actually a computer animation
11 that showed and illustrated the LARIAT procedure; is
12 that correct?
13     A.  That is correct.
14     Q.  I've marked as Deposition Exhibit #18 a
15 computer animation that I've handed to Mr. Goza, and
16 I am going to put it on the screen and show it to
17 you, and I'm going to let the animation run in its
18 entirety.  It runs 1 minute and 15 seconds.  And I'd
19 like you to watch that video and tell us if it is
20 the animation that you presented.
21     A.  Okay.
22     Q.  I was just advised I misdesignated the
23 exhibit number.  This -- the animation is Exhibit --
24     A.  19.
25     Q.  -- #19.

Page 72

1     A.  Yes, sir.
2 (Deposition Exhibit #19 was marked for
3          identification.)
4     Q.  I handed Mr. Goza a flash drive with the
5 animation, and we're going to project it on the
6 screen, and the first thing I just want you to do is
7 watch the animation in its entirety and tell us if
8 this is the animation that you presented.
9          MR. GOZA:  I just object to
10 foundation.
11     (Animation played.)
12 BY MR. SLONIM:
13     Q.  So, Dr. Fail, the question is, is that the
14 video that you presented?
15     A.  I believe it is, yes, sir.
16     Q.  And, Dr. Fail, can you tell us, is that
17 computer animation which you presented to
18 cardiologists in August of this year, 2016, is that
19 a fair and accurate depiction of the LARIAT
20 procedure that you performed on Mr. Boudreaux on --
21 in April of 2015 -- May of 2015?
22     A.  Yes, sir, it is.
23     Q.  And that's the procedure that's described
24 more fully in detail in your operative report that
25 we had previously marked as an exhibit?

Page 73

1     A.  Yes, sir, it is.
2     Q.  What I'd like to do is go back and replay
3 this animation, and we'll stop it from time to time,
4 and I'll ask you to describe what's being depicted.
5     A.  Yes, sir.
6     Q.  So let's stop right here.  Can you tell us
7 what's being shown on the still?
8     A.  So you have a animation of a heart, and on
9 your lower right-hand -- lower right-hand portion,
10 you have a catheter that is in the intrapericardial
11 space.
12     Q.  And that is the blue --
13     A.  Yes, sir.
14     Q.  -- right over there?
15     A.  Yes, sir.
16     Q.  Now, you've described a left atrial
17 appendage.  Is that visualized on this --
18     A.  Yes, sir.  That is up about midway right
19 there.  Yes, sir.
20     Q.  Okay.  So the area that's being circled by
21 the cursor --
22     A.  That is correct, sir.
23     Q.  -- that's the left atrial appendage?
24     A.  Yes, sir.
25     Q.  This is the catheter that's being

Page 74

1 introduced into the heart, correct?
2 A. It is on top of the heart,
3 intrapericardial.
4 Q. Okay. So this is on the -- this is on the
5 exterior of the heart?
6 A. That is correct.
7 Q. Inside the sac?
8 A. That is correct.
9 Q. And there are actually two catheters that
10 have been used in this procedure?
11 A. Yes, sir.
12 Q. One that gets introduced into the heart
13 and the other that approaches the heart from the
14 exterior?
15 A. That is correct.
16 Q. And the catheter we're seeing now is the
17 catheter that's introduced to the heart from the
18 exterior?
19 A. That is correct.
20 Q. And when the animation runs, we're seeing
21 the heart beating, correct?
22 A. That is correct.
23 Q. And, again, that's the left atrial
24 appendage, and that's the catheter that was --
25 that's the catheter that's being introduced from the

Page 75

1 exterior?
2 A. That is correct.
3 Q. Can you describe this cut-away section of
4 the heart?
5 A. So this is basically the heart in a
6 cut-away section. On the far left-hand side, you
7 have the right atrium.
8 Q. This is the right atrium right over here?
9 A. Yes, sir. And then you have the tricuspid
10 valve below that. You have the -- on the right --
11 excuse me -- on the right-hand side, you have the
12 left atrium, the left atrial appendage and the
13 mitral valve.
14 Q. Okay. So when we saw the
15 three-dimensional heart before, this is a cut-away
16 section; it's as if the heart was sliced laterally
17 and opened up?
18 A. That is correct, yes, sir.
19 Q. That's what we're seeing. And just so
20 it's clear, the heart is divided into chambers, and
21 this is the -- this would be the right chamber, and
22 that would be the right atrium, correct?
23 A. Yes, sir.
24 Q. And this is the left chamber, and this is
25 the upper left chamber; it's the left atrium,

Page 76

1 correct?
2 A. That is correct. Yes, sir.
3 Q. That's the mitral valve down there?
4 A. Yes, sir.
5 Q. And this pouch-like structure off -- right
6 over here, that is what's called the left atrial
7 appendage, correct?
8 A. That is correct.
9 Q. And we're seeing the catheter approach
10 that from the outside of the heart, correct?
11 A. Correct.
12 Q. I'm going to continue with the animation.
13 Okay. Now, can you tell us what's happening on the
14 left side of the heart?
15 A. So this is a transseptal puncture going
16 from the right to the left with a catheter. The
17 catheter now exits the right, goes into the left.
18 Q. Okay. So you've introduced a catheter
19 internally through a blood vessel -- through a blood
20 vessel in the leg into the heart; is that correct?
21 A. That's correct.
22 Q. And then you've threaded that blood vessel
23 all the way up from the leg into the right-hand side
24 of the heart; is that correct?
25 A. That is correct.

Page 77

1 Q. Into the -- into the right atrium?
2 A. Right, correct.
3 Q. And then what you've got to do because
4 there's a septum, there's a muscular wall that
5 separates the right and left side of the heart, you
6 have to take the catheter and punch through that
7 septum, correct?
8 A. You take a needle and do that, yes, sir.
9 Q. And then you -- and then you introduce the
10 catheter into the left atrium?
11 A. Correct.
12 Q. Let's continue. Okay. Can you tell us
13 what's happening here?
14 A. So this is a magnetic wire that goes from
15 that catheter into the furthest part of the left
16 atrial appendage itself.
17 Q. So you get the catheter -- the main
18 catheter part way into the left atrium, and then you
19 extrude a magnetic wire that goes all the way across
20 the left atrium into the left atrial appendage; is
21 that --
22 A. Correct.
23 Q. And this tip at the end is magnetic,
24 correct?
25 A. That is correct.

Page 78

1    Q.   And the idea of having a magnet is because
2  that has a -- will have an attractive force
3  that will enable it to -- made up with this other
4  catheter that's being introduced from the exterior
5  of the heart, correct?
6    A.   There's a magnetic wire on the other side.
7  Yes, sir.
8    Q.   Good.  Let's continue on.  Now, can you
9  tell us what's being extruded now?
10   A.   So this is a balloon catheter that we use
11 as a marker to give us an idea where the ostium of
12 the left atrial appendage is when we do this under
13 TEE, because it's not clearly defined.  So the best
14 way for us to do that is actually blow up a balloon
15 that has some contrast, and you'll see the balloon
16 dilate in a second.  That lets us know if we're too
17 deep or not deep enough.
18   Q.   So the patient at this point is in the
19 cardio catheterization laboratory -- lab, correct?
20   A.   Yes, sir; yes, sir.
21   Q.   The patient, of course, is under
22 anesthesia?
23   A.   Yes, sir.
24   Q.   But the heart is beating, correct?
25   A.   Correct.

Page 79

1    Q.   And the chest cavity is closed; this is
2  not a -- like, an open procedure?
3    A.   No, sir.
4    Q.   There is just very small openings that are
5  made to insert these instruments, these catheters,
6  correct?
7    A.   Yes, sir.
8    Q.   And you, at the same time, to sort of see
9  where you're being positioned, you have different
10 kinds of imaging tools available, correct?
11   A.   That is correct.
12   Q.   So you sort of know where the catheters
13 are at different points in the procedure; is that
14 right?
15   A.   Correct.
16   Q.   Now, you mentioned the balloon.
17   A.   Right there.
18   Q.   Can you tell -- so this is the balloon?
19   A.   Yes, sir.
20   Q.   So you introduce -- so you first run the
21 wire, and then you run this other portion of the
22 catheter that has a balloon, and when the balloon
23 gets positioned, it's inflated?
24   A.   Yes, sir.
25   Q.   And can you remind us again, what is the

Page 80

1  purpose of inflating the balloon at this point?
2    A.   So this is -- what we're doing is looking
3  under TEE to see where the ostium of the left atrial
4  appendage is compared to where we're going to use as
5  a target when we do our LARIAT.
6    Q.   The ostium is this point --
7    A.   That is -- yes, sir.
8    Q.   -- right over here?
9    A.   Yes, sir.
10   Q.   What you want to do is be able to get a
11 marker that enables you to define precisely where
12 you want to put a suture to close this off, correct?
13   A.   Correct.
14   Q.   And by inflating the balloon and then
15 using the transesophageal echocardiogram, you get a
16 good -- you're able to visualize well where you need
17 to put that suture, correct?
18   A.   Correct.  We use that and fluoro together.
19   Q.   Now the balloon is deflated; is that
20 right?
21   A.   Yes, sir.
22   Q.   Because you've got your mark?
23   A.   We have -- yes, sir.
24   Q.   Now, what's going on with this catheter on
25 the right?

Page 81

1    A.   So this is -- this is another magnetic
2  wire that's coming up from the pericardial sac
3  that's being introduced through the pericardial
4  catheter, and the object is to get these two magnets
5  to meet.
6    Q.   So now what -- so the -- now you've got
7  your mark from the balloon?
8    A.   Correct.
9    Q.   And now what you're doing is moving this
10 catheter around so that you're going to be
11 eventually able to manipulate a surgical instrument
12 around the exterior of the left atrial appendage,
13 correct?
14   A.   Correct.  Makes a -- what we call a rail,
15 so that we have some way to make sure that it's
16 guided, if you will.
17   Q.   Can you describe what's happening here?
18   A.   So this is actually the LARIAT device
19 itself.  It goes in closed, and as it exits the
20 catheter, it opens.  It has to be in a certain
21 position to make sure that as you come across this
22 rail, that it will actually lay across the left
23 atrial appendage appropriately.
24   Q.   So the idea is you want this device to
25 entire -- to come around and entirely encircle the

Protected - Subject To Further Protective Review

Page 82

1 left --
2     A.   Correct.
3     Q.   -- atrial appendage --
4     A.   That is correct.
5     Q.   -- as you move it into position, as you
6 move it around this exterior of the heart around the
7 left atrial appendage, correct?
8     A.   That is correct.
9     Q.   Can you tell us what we just visualized?
10     A.   So we watched the LARIAT basically being
11 slid over the left atrial appendage.
12     Q.   And the idea is to position it at your
13 mark --
14     A.   Where that balloon was.
15     Q.   -- where the balloon was?
16     A.   Yes, sir.
17     Q.   Okay.  Can you tell us what happens here?
18     A.   You're just reconfirming that in all the
19 manipulation that you were doing, that that mark
20 that you used originally has not moved.  You're just
21 reassessing.
22     Q.   So you first mark it to note -- to get the
23 exact spot you want to hit; then you manipulate the
24 LARIAT to that spot; then you reinflate the balloon
25 as a double-check to make sure you're exactly

Page 83

1 anatomically where you want to be in the patient's
2 heart?
3     A.   That is correct.
4     Q.   Tell us what's happening there.
5     A.   So there's a slide mechanism on the end of
6 the wire that you basically pull back, and it
7 basically creates a noose and tightens.
8     Q.   So the idea is you've now -- you've now
9 constricted but not fully closed off the left atrial
10 appendage, correct?
11     A.   Correct.
12     Q.   The balloon is still inflated?
13     A.   Right.
14     Q.   So you know you're at the right spot?
15     A.   Yes, sir.
16     Q.   Tell us what's happening here.
17     A.   We're separating the magnets and pulling
18 out of the left atrial appendage.
19     Q.   So you deflate the balloon, and now you
20 start to withdraw the magnetic -- first the magnetic
21 wire and then the catheter itself, correct?
22     A.   That is correct.
23     Q.   So now we're seeing the catheter that was
24 in the left atrial appendage being fully withdrawn,
25 correct?

Page 84

1     A.   Yes, sir.  It's the left atrium now.
2     Q.   Okay.  And the -- meantime, the LARIAT has
3 still encircled but not fully closed off the left
4 atrial appendage, correct?
5     A.   That is correct.
6     Q.   Tell us what happens there.
7     A.   We actually tighten the knot to completely
8 exclude the left atrial appendage.
9     Q.   So once you've withdrawn the catheter that
10 had gone from the right atrium into the left atrium,
11 once you've fully withdrawn that, now you can fully
12 tighten down the suture that was around the left
13 atrial appendage, correct?
14     A.   That is correct.
15     Q.   And then you have to -- you'll have to cut
16 that off -- clip that off --
17     A.   Yes, sir.
18     Q.   -- and then withdraw that?
19     A.   Yes, sir.
20     Q.   And the video kind of jumped at that
21 point, but that's what happened?
22     A.   Yes, sir.  Yeah, there is a mechanism to
23 cut that suture.
24     Q.   Great.  Thank you.
25          MR. SLONIM:  Cut the video.

Page 85

1 BY MR. SLONIM:
2     Q.   Is that a fair and accurate depiction of
3 the procedure that you performed on Mr. Boudreaux in
4 May of 2015?
5     A.   Yes, sir.
6     Q.   And it's more fully described in your
7 operative report that we marked as an exhibit,
8 correct?
9     A.   Yes, sir.
10     Q.   And it was a successful procedure,
11 correct?
12     A.   Yes, sir.
13     Q.   And the consequence of the procedure is
14 that it reduced or eliminated the risk of stroke
15 emanating from the left atrial appendage as a
16 consequence of the atrial fibrillation, correct?
17     A.   That's the assumption, yes, sir.
18          MR. SLONIM:  Let me consult with my
19     colleague and see if we have any further
20     questions.
21          THE VIDEOGRAPHER:  We're now off the
22     record at 6:57.
23 (Recess.)
24          THE VIDEOGRAPHER:  We're now back on
25     the record.  The time is 7:01.

Protected - Subject To Further Protective Review

Page 86

BY MR. SLONIM:

1  BY MR. SLONIM:
2      Q.  Dr. Fail, just a couple of clarifying and
3  final questions.
4      So if I understood correctly from your
5  slide deck that you had presented, for patients that
6  have atrial fibrillation not associated with
7  rheumatic heart disease, like Mr. Boudreaux, for
8  those patients that have clots that form in over 90
9  percent of the cases, the origin of the clot is the
10  portion of the heart called the left atrial
11  appendage; is that right?
12      A.  That is correct.
13      Q.  And by using this LARIAT procedure for
14  Mr. Boudreaux, what you successfully managed to do
15  was totally exclude the left atrial appendage from
16  the cardiac circulation, correct?
17      A.  That is correct.
18      Q.  And in that respect, what you have done
19  successfully is taken 90 percent of the risk of clot
20  formation associated with atrial fibrillation and
21  hopefully and presumably removed that as a risk for
22  Mr. Boudreaux, correct?
23      A.  That is the assumption, yes, sir.
24      Q.  And looking at it and considering the
25  medical technology that's involved, is it fair to

Page 87

1  say that Mr. Boudreaux has received state of the art
2  medical care for atrial fibrillation?
3      A.  I don't know.  Is that self -- is that
4  patting myself on the back?
5      Q.  No.  I'm just asking you.
6      A.  Yes.  I do believe it is, sir.  Yes, sir.
7      Q.  Dr. Fail, I'm not asking you to pat
8  yourself on the back.
9      A.  I do believe it is, yes, sir.
10      Q.  In other words, Dr. Fail, you're board
11  certified in multiple medical disciplines, including
12  interventional cardiology, correct?
13      A.  Yes, sir.
14      Q.  The procedure that we just saw on this
15  animation, which is the procedure that you performed
16  on Mr. Boudreaux, that is one of the most cutting
17  edge, sophisticated examples of interventional
18  cardiology, correct?
19      A.  I believe it is, yes, sir.
20      Q.  And you, Dr. Boudreaux, without being
21  falsely modest --
22      MR. MCCAULEY:  You said Boudreaux.
23      MR. BOUDREAUX:  Dr. Fail.
24  BY MR. SLONIM:
25      Q.  Dr. Fail -- were one of the first

Page 88

1  cardiologists to perform this procedure in the State
2  of Louisiana, correct?
3      A.  Yes, sir.
4      Q.  And the consequence of your treatment of
5  Mr. Boudreaux between the left atrial appendage
6  occlusion that was successful via the LARIAT and via
7  the cardioversion that you subsequently performed is
8  that his cardiac status is now better than it was in
9  April or even January of 2014, when he was first
10  diagnosed with new onset atrial fibrillation?
11      A.  I believe that's correct, yes, sir.
12      MR. SLONIM:  I pass the witness.
13      THE VIDEOGRAPHER:  We're now off the
14      record at 7:04.
15  (Recess.)
16      THE VIDEOGRAPHER:  We're now back on
17      the record.  The time is 7:15.
18      EXAMINATION
19  BY MR. GOZA:
20      Q.  Doctor, are you ready to continue?
21      A.  I am.
22      Q.  Good evening.  My name is Kirk Goza, and
23  you understand that I represent Mr. Boudreaux in
24  this lawsuit?
25      A.  I do.

Page 89

1      Q.  First, as I understand it, you first
2  became involved in Mr. Boudreaux's care in April of
3  2015; is that correct?
4      A.  I believe that's correct, yes, sir.
5      Q.  You did, though, have information by way
6  of history concerning the background of
7  Mr. Boudreaux, true?
8      A.  Yes, sir.
9      Q.  To your understanding, he was diagnosed
10  with new onset atrial fibrillation, I believe it was
11  January 7th of 2014?
12      A.  That is correct.
13      Q.  And as a result of being diagnosed with
14  atrial fibrillation, he was placed on a medication
15  called Xarelto beginning on January 8th of 2014?
16      A.  I believe that's correct, yes, sir.
17      Q.  And was it your understanding that in
18  early February, and I believe the date is February
19  3rd of 2014, Mr. Boudreaux ultimately, through going
20  through a couple of health care providers, was
21  transported by ambulance to the Ochsner Medical
22  Center emergency room and then ultimately admitted
23  to ICU?
24      A.  I believe that's correct, yes, sir.
25      Q.  And he was diagnosed with a

Page 90

1 gastrointestinal bleed?

2     A. Yes, sir.

3     Q. And would it be correct that it was your

4 understanding, prior to January of 2014 and being

5 placed on Xarelto, there was no reported bleeding

6 history in Mr. Boudreaux, correct?

7     A. None that I'm aware of.

8     Q. And he had never had a stroke before,

9 correct?

10     A. None that I'm aware of, no, sir.

11     Q. In fact, to your knowledge, he's never had

12 a stroke?

13     A. No, sir.

14       COURT REPORTER: I'm sorry. What was

15       your answer?

16     A. I agree, yes.

17 (Deposition Exhibit #20 was marked for

18       identification.)

19 BY MR. GOZA:

20     Q. And the -- I'll show you -- let me hand

21 you what has been marked as Exhibit #20, and that is

22 simply a note from the Ochsner Medical Center, and I

23 think that the diagnosis at that time was that he

24 had a GI bleed related to his recent Xarelto

25 initiation. Did I read that correctly?

Page 91

1     A. Yes, sir.

2     Q. And was that your understanding, as well,

3 by history?

4     A. By history, yes, sir.

5     Q. In other words, Xarelto had caused him to

6 have a GI bleed?

7       MR. SLONIM: Objection.

8       MR. MCCAULEY: Object to form.

9     A. That was the assumption, yes, sir.

10 BY MR. GOZA:

11     Q. And am I correct, as well, that there was

12 a gastroenterologist that was brought in?

13     A. I believe so.

14     Q. And, ultimately, there was a colonoscopy

15 done which showed no anatomic explanation for the

16 bleed?

17     A. That is correct.

18     Q. And when you took over the care, much of

19 your care was based on the premise that

20 Mr. Boudreaux's bleed was the result of the use of

21 the anticoagulant Xarelto?

22     A. Correct.

23     Q. And am I correct that -- or strike that.

24       I believe the plan, and I think you

25 articulated it, that Mr. Boudreaux initially was

Page 92

1 going to be placed on Xarelto for four weeks with

2 the plan of initiating cardioversion, and I believe

3 a date was actually set for February 5th of 2014.

4 Would that be correct with your understanding of the

5 history?

6     A. I believe that's correct.

7     Q. And as a result of the Xarelto bleed,

8 Mr. Boudreaux was unable to be cardioverted on

9 February 5th of 2014, correct?

10     A. Correct.

11       MR. MCCAULEY: I object.

12 BY MR. GOZA:

13     Q. And the reason that he was unable to be

14 cardioverted at that time is one needs to be able to

15 take an anticoagulant, and, obviously, he was still

16 in the process of being treated for his bleed at

17 that point, true?

18     A. Correct.

19     Q. And as Mr. Slonim pointed out, in the next

20 year and three months, Mr. Boudreaux was not on

21 anticoagulants, true?

22     A. Correct.

23     Q. He was not receiving Xarelto?

24     A. Correct.

25     Q. He ultimately -- he did not have a stroke

Page 93

1 during that period of time, to your knowledge,

2 correct?

3     A. Not that I'm aware of, yes, sir.

4     Q. And, to your knowledge, Mr. Boudreaux has

5 not had a bleed since he was on Xarelto, true?

6     A. Correct.

7     Q. Now, ultimately, you did the LARIAT

8 procedure in May of 2015, correct?

9     A. Correct.

10     Q. And that procedure was appropriate because

11 Mr. Boudreaux had a Xarelto bleed, true?

12       MR. SLONIM: Objection.

13       MR. MCCAULEY: I object.

14     A. That was my assumption, yes, sir.

15 BY MR. GOZA:

16     Q. And so Mr. Slonim went through a video of

17 all that was involved in doing the procedure on

18 Mr. Boudreaux, and that was marked as Exhibit #19.

19 Do you recall that?

20     A. Yes, sir.

21     Q. And so Mr. Boudreaux -- and strike that.

22       So I want to just talk for a minute about

23 the results of the bleed. And I apologize. Let me

24 start this over.

25       First, it was your understanding that

Protected - Subject To Further Protective Review

Page 94

1 Mr. Boudreaux, as a result of his Xarelto bleed, had
2 to be hospitalized for a period of five days?
3     A.  I believe that's correct, yes, sir.
4     Q.  And you noted in your records that he
5 had -- and I think the actual hospital records show
6 four units of transfused blood, but you at least
7 have at least three --
8     A.  Maybe three.  Okay.
9     Q.  -- units of transfused blood, correct?
10    A.  I think that was by a conversation, yes,
11 sir.
12    Q.  And his hemoglobin when he went into the
13 hospital was 6.6, which is extremely low?
14    A.  Yes, sir.
15    Q.  And he -- so he had a significant bleed at
16 that time, true?
17    A.  Yes, sir.
18    Q.  Which required treatment in the ICU,
19 correct?
20    A.  Correct.
21    Q.  The next thing that flowed from his
22 Xarelto bleed is that he was unable to be
23 cardioverted for a period of time, true?
24    A.  Correct.
25    Q.  The next thing that flowed from his

Page 95

1 Xarelto bleed was that he had to have the LARIAT
2 procedure performed that you have described in such
3 eloquent detail here today, true?
4         MR. SLONIM:  Objection.
5     A.  Correct.
6 BY MR. GOZA:
7     Q.  And part of what I think you indicated in
8 Exhibit #10 -- you listed a whole kind of litany
9 of -- hold on just a minute.  We had a technical
10 difficulty here.  You had a whole list of risks that
11 Mr. Boudreaux accepted as part of the LARIAT
12 procedure which was necessitated by his Xarelto
13 bleed, true?
14        MR. MCCAULEY:  I object to form.
15    A.  Yes, sir.
16 BY MR. GOZA:
17    Q.  One of the things that -- or strike that.
18        As a result of the LARIAT procedure, there
19 was a complication, correct?
20    A.  Side effect, yes, sir.
21    Q.  Side effect.  Mr. Boudreaux suffered a
22 condition of pericardial effusion, true?
23    A.  Yes, sir; correct.
24    Q.  And it was your opinion to a reasonable
25 degree of medical certainty that that was most

Page 96

1 likely the result of irritation caused by the LARIAT
2 procedure?
3     A.  Correct.
4     Q.  Again, the LARIAT procedure that was
5 necessitated by the fact that Mr. Boudreaux had a
6 Xarelto bleed, true?
7        MR. SLONIM:  Objection.
8        MR. MCCAULEY:  Same objection.
9     A.  Yes, sir.
10 BY MR. GOZA:
11    Q.  The LARIAT procedure that you performed on
12 Mr. Boudreaux, in addition to involving all of the
13 risks that you set out in Exhibit #10, as we went
14 through the visual that you -- the animation,
15 Exhibit #19 --
16    A.  Uh-huh.
17    Q.  -- showed that, first, he has to be placed
18 under a general anesthetic for that procedure, true?
19    A.  Correct.
20    Q.  And then there has to be incision sites in
21 his chest, true?
22    A.  Needle sticks.
23    Q.  Needle sticks?
24    A.  Yes, sir.
25    Q.  And then I think at some point you had to

Page 97

1 stick a needle through his left atrium --
2     A.  Yes, sir.
3     Q.  -- correct?
4        And so all of those things were, again,
5 necessitated as a result of the Xarelto bleed and
6 him needing the LARIAT procedure?
7        MR. SLONIM:  Objection.
8        MR. MCCAULEY:  I object.  Can we
9     just -- just one second.  Can we just
10    agree that if one of us objects --
11        MR. GOZA:  Sure, yeah.
12        MR. MCCAULEY:  -- the objection
13    preserves for both?
14        MR. GOZA:  Absolutely.
15        MR. MCCAULEY:  Thank you.  That way, I
16    won't have to chime in.
17        MR. GOZA:  No problem.
18    A.  I agree.
19 BY MR. GOZA:
20    Q.  I'm correct that you have actually treated
21 patients -- first of all, let me do it this way:
22 You've used warfarin or Coumadin for many years for
23 treating patients with atrial fibrillation, correct?
24    A.  Correct.
25    Q.  Mr. Slonim asked you were there other

Page 98

1 kinds of anticoagulants now on the market, and there
2 are obviously several different kinds on the market,
3 true?
4    A.  Correct.
5    Q.  And the -- if you looked at the whole host
6 of anticoagulants, many of them work in different
7 ways, correct?
8    A.  Correct.
9    Q.  And you have seen patients that have had a
10 bleed on one anticoagulant be placed on another
11 anticoagulant and be able to tolerate that, true?
12    A.  That is true.
13    Q.  So simply because you have a bleed on one
14 anticoagulant doesn't mean you're going to bleed on
15 every anticoagulant, true?
16    A.  That seems to be the case, yes, sir.
17    Q.  We know ultimately that Mr. Boudreaux was
18 cardioverted in June of 2016, I believe the last
19 time that you saw him; is that correct?
20    A.  I believe somewhere in that time.  Maybe a
21 little bit earlier, but, yes, sir, in that
22 timeframe.
23    Q.  You're right.  I think --
24    A.  It was April.
25    Q.  Yeah.  Okay.  I appreciate that.  I see

Page 99

1 what you're saying.
2    A.  The last time we saw him was in June.
3    Q.  The last time you saw him was in June.  I
4 see.  You actually cardioverted him sometime in
5 April, and that cardioversion was successful?
6    A.  Yes, sir.
7    Q.  And is there any reason to believe that
8 had he been able to be cardioverted in February of
9 2014, but for his bleed, if he'd have been -- if the
10 cardioversion would have occurred then, any reason
11 to believe it wouldn't have been successful then?
12    A.  No reason to believe it, no, sir.
13    Q.  In fact, the end result, the fact that he was able
14 to be cardioverted, would point to the fact he would
15 have been able to successfully --
16    A.  Correct.
17    Q.  -- sustain the cardioversion?
18    A.  You would assume so, yes, sir.
19    Q.  Let me go through my notes for just a
20 second.
21       It is true from a HAS-BLED score --
22 HAS-BLED score is something that physicians look to
23 in generalities just to make an assessment about the
24 risk of future bleeding for a patient?
25    A.  Based on Coum -- yes, sir.

Page 100

1       COURT REPORTER:  I'm sorry.  Based on?
2    A.  Coumadin.  Yes, sir.
3 BY MR. GOZA:
4    Q.  And one of the factors that weighs in on
5 the HAS-BLED score is the history of a prior bleed,
6 true?
7    A.  Correct.
8    Q.  And so the simple fact of a prior bleed on
9 Xarelto would weigh in your judgment about whether
10 to place a patient on another anticoagulant during
11 an interim period of time?
12    A.  Correct.
13       MR. MCCAULEY:  I object.
14 BY MR. GOZA:
15    Q.  And --
16    A.  Correct.
17       MR. MCCAULEY:  Can I hear that
18       question back?  I'm not sure I heard --
19       that's part of my objection.  I just
20       didn't hear the question.  I'm sorry.
21       COURT REPORTER:  "And so the simple
22       fact of a prior bleed on Xarelto would
23       weigh in your judgment about whether to
24       place a patient on another anticoagulant
25       during an interim period of time?"

Page 101

1       MR. MCCAULEY:  I maintain my
2       objection.
3       MR. GOZA:  Okay.  Let me ask it --
4       I'll restate it.
5 BY MR. GOZA:
6    Q.  The simple fact that Mr. Boudreaux had a
7 bleed on Xarelto would weigh in your judgment as to
8 whether to use another anticoagulant on him, true?
9    A.  Correct.
10    Q.  And, in fact, in this case, it was
11 ultimately your judgment that rather -- because of
12 his prior history of bleed on Xarelto, it would --
13 the better option would be to do the LARIAT
14 procedure?
15    A.  That is correct.
16    Q.  On Exhibit #4, if you look at that real
17 quick, I just want to clean up a few things.  Are
18 you able to dig that out?
19    A.  Yeah.  Let's see.  8, 1, 2, 3, 4.  Okay.
20 I have it.
21    Q.  When it says, GI bleed with
22 anticoagulation, and then it says, no etiology noted
23 dash transfer, do you see that?
24    A.  Transfused, yes, sir.
25    Q.  Transfused.  When we're talking about the

Protected - Subject To Further Protective Review

Page 102

1 no etiology noted, that's what -- we're referring to
2 the gastroenterology report that there was no
3 anatomic explanation for the bleed?
4     A.  None that could be found, that's correct.
5     Q.  Again, supporting your assumption or
6 belief or opinion -- strike that.
7         Let me ask it this way:  Again, that was
8 supporting your opinion that, in fact, the bleed was
9 due to his anticoagulation with Xarelto?
10        MR. SLONIM:  Objection.
11        MR. MCCAULEY:  I object.
12    A.  My belief was that there was no
13 anatomical -- that was found in probably more of a
14 small intestine thing.  No fixable GI etiology.
15 That's probably a better answer.
16 BY MR. GOZA:
17    Q.  I understand.  No fixable GI etiology, but
18 it stemmed from the anticoagulation Xarelto?
19    A.  Correct.
20        MR. SLONIM:  Objection.
21        MR. MCCAULEY:  Same objection.
22 BY MR. GOZA:
23    Q.  Did I get that correctly?
24    A.  That's correct, yes, sir.
25    Q.  And, in fact, as we sit here today, your

Page 103

1 opinion to a reasonable degree of medical certainty
2 is that Xarelto caused his gastrointestinal bleed
3 back in February of 2014?
4        MR. SLONIM:  Objection.
5        MR. MCCAULEY:  I object.
6    A.  I believe it was a mitigating -- yes, sir.
7 BY MR. GOZA:
8    Q.  Caused or contributed to cause his bleed?
9    A.  Yes, sir; yes.
10        MR. MCCAULEY:  I object.
11 BY MR. GOZA:
12    Q.  Just to get a clear answer and clear
13 question --
14    A.  Yes.
15    Q.  -- it's your opinion --
16    A.  Caused.
17    Q.  There you go.  It's your opinion to a
18 reasonable degree of medical certainty that Xarelto
19 directly caused or contributed to cause his bleed?
20    A.  That is correct.
21        MR. SLONIM:  Objection.
22 BY MR. GOZA:
23    Q.  And generally speaking, in using that
24 HAS-BLED score system, Mr. Boudreaux would have had
25 a 1 for hypertension and a 1 for age, as I recall

Page 104

1 the chart.  Would that be consistent with your
2 understanding?
3    A.  Correct.
4    Q.  Therefore, his risk of bleed would be --
5 if he was on Coumadin with appropriate INRs, his
6 risk of bleed would be less than 5 percent, more
7 like 2 percent?
8    A.  That, I'm not -- but, yes, it would be
9 relatively low.  Yes, sir.
10    Q.  It would be very low?
11    A.  Yeah, a 2.
12    Q.  In other words, if you're able to maintain
13 Mr. Boudreaux with his INRs at a -- between 2 and 3,
14 his risk based on a HAS-BLED score, much more
15 probable than not that he would not have a bleed,
16 true?
17        MR. SLONIM:  Objection.
18    A.  That would be the assumption based on the
19 HAS-BLED, yes, sir.
20        MR. GOZA:  I don't have any other
21        questions at this time.
22        FURTHER EXAMINATION
23 BY MR. SLONIM:
24    Q.  So, Dr. Fail, a few questions.
25        So it's correct that every anticoagulant

Page 105

1 medication that's available today is associated with
2 a risk of bleed, correct?
3    A.  That is correct.
4    Q.  And, in particular, it's associated with
5 an increased risk of bleed in the gastrointestinal
6 tract, correct?
7    A.  That is correct.
8    Q.  But a patient who is on anticoagulation
9 therapy, even if they're over anticoagulated, will
10 not spontaneously bleed unless there is some
11 pathology in the GI tract, in the vasculature,
12 correct?
13    A.  That is the assumption, yes, sir.
14    Q.  Even if the blood is very thin, it will
15 not spontaneously erupt out of the GI tract unless
16 there is some kind of an ulceration or an erosion or
17 some underlying pathological condition in the GI
18 tract, correct?
19    A.  That is the assumption, yes, sir.
20    Q.  So when a patient has a GI bleed,
21 regardless of whether they're anticoagulated or even
22 if they're over anticoagulated, the reason for the
23 GI bleed, the reason for the emission of blood from
24 the tract is because there is some underlying
25 pathology somewhere, correct?

Page 106

1    A.   That is correct.
2    Q.   And what the gastroenterologists do is use
3  imaging techniques; they use scopes that go -- that
4  can image the upper tract, and they can use scopes
5  that image the lower tract in an effort to try to
6  see and identify the situs of the pathology,
7  correct?
8    A.   Correct.
9    Q.   But it is well-known in medicine that
10 those imaging techniques, although good, are not
11 perfect, correct?
12   A.   Correct.
13   Q.   It is not uncommon at all to have a
14 patient that presents with a GI bleed on any
15 anticoagulant and that the GI workup, the endoscopic
16 workup is negative, meaning they're unable to find
17 the source of the bleed, correct?
18   A.   Correct.
19   Q.   But, nevertheless, you know that there is
20 some underlying pathology because the bleed does not
21 happen spontaneously, correct?
22   A.   That is correct.
23   Q.   And, in fact, there are certain parts of
24 the GI tract that are not particularly amenable to
25 imaging, regardless of how good the scoping

Page 107

1  technology is, correct?
2    A.   Correct.
3    Q.   Particular portions of the intestinal
4  tract that it affect are obscure, correct?
5    A.   Correct.
6    Q.   So the fact that a source of bleed is not
7  found in no way negates the fact that there is some
8  underlying pathological condition in Mr. Boudreaux's
9  case that was the situs of the bleed, correct?
10   A.   Yes, sir.
11   Q.   And the fact that the doctors who did the
12 best effort to scope him and find the source of the
13 bleed failed to do so doesn't mean that the
14 pathology wasn't there; it just meant that it was
15 not amenable to observation on the imaging
16 techniques that were used, correct?
17   A.   That is correct.
18   Q.   Now, if a patient has such an underlying
19 pathology that was not identified, they can have a
20 propensity, a predisposition, to bleed regardless of
21 the anticoagulant that's used, correct?
22   A.   That is correct.
23   Q.   Now, you were asked a question about the
24 fact that sometimes a patient that has a GI bleed on
25 one anticoagulant may not have a GI bleed on another

Page 108

1  anticoagulant, correct?
2    A.   Correct.
3    Q.   And that could be due to a variety of
4  reasons; I mean, one reason may be is that the
5  underlying pathology has spontaneously resolved,
6  spontaneously healed, correct?
7    A.   Correct.
8    Q.   And that happens all the time?
9    A.   I believe so, yes, sir.
10   Q.   So one possibility that could have
11 happened for Mr. Boudreaux would have been the fact
12 that he had a GI bleed on Xarelto, the source was
13 not identified, but it had fully resolved with
14 treatment, the blood tranfusions and the treatment,
15 is he could have been -- he could have been started
16 on another anticoagulant, warfarin or Eliquis or
17 Pradaxa, in an effort to see if he could -- if he
18 could accept one of those therapies, correct; that
19 would have been a possible medical alternative?
20   A.   Correct.
21   Q.   But the decision was made not to use one
22 of those other therapies, correct?
23   A.   Correct.
24   Q.   And that was because there was an
25 underlying concern that Mr. Boudreaux's

Page 109

1  predisposition -- underlying predisposition to
2  sustain a GI bleed regardless of the anticoagulant
3  therapy was too great to subject him to that risk,
4  correct?
5        MR. GOZA:  Object to form.
6    A.   Yes, sir.
7  BY MR. SLONIM:
8    Q.   And you agreed with that decision,
9  correct?
10   A.   I did.
11   Q.   And that is the whole reason that the
12 LARIAT procedure had to be considered; as a non-FDA
13 approved procedure, it is still appropriate for a
14 patient that cannot tolerate anticoagulant, like
15 Mr. Boudreaux, correct?
16   A.   Correct.
17   Q.   The fact that Mr. Boudreaux could not
18 tolerate any anticoagulant had nothing to do with
19 the fact that he had a GI bleed on Xarelto; it had
20 to do with the fact that he had an underlying
21 propensity to have a GI bleed on anticoagulation,
22 correct?
23       MR. GOZA:  Object to form.
24   A.   That is the assumption, yes, sir.
25 BY MR. SLONIM:

Protected - Subject To Further Protective Review

Page 110

1    Q.  Now, you were asked the question -- some
2  questions in regard to the cardioversion procedure
3  that had been planned for February -- February of
4  2014.
5    A.  '14; yes, sir.
6    Q.  And I just want to make sure I understand
7  this.  When you have a patient --
8      Dr. Fail, let me restart the question
9  because the mic came off.
10      When a patient has atrial fibrillation and
11  undergoes a cardioversion procedure, and even if
12  that cardioversion is successful, the standard
13  practice is to continue the patient on anticoagulant
14  therapy because of a concern that the atrial
15  fibrillation could recur; isn't that right?
16    A.  Correct.
17    Q.  So although Mr. -- so even assuming that
18  in February 2014, Mr. Boudreaux's cardioversion
19  needed to be deferred for some period of time while
20  the GI bleed had resolved, it would be an in -- it
21  would be an incorrect assumption to think, oh, gee,
22  if he had a successful cardioversion at that time,
23  he would not need to be anticoagulated, correct?
24    A.  Correct.
25    Q.  In other words, he could have had the

Page 111

1  card -- if he had had the cardioversion in February
2  of 2014, and even if it was -- even if it were
3  successful, he would still need to be placed on
4  anticoagulant therapy, something, correct?
5    A.  That's correct.
6    Q.  And he would be at a risk of having a GI
7  bleed because he was on anticoagulant therapy,
8  correct?
9      MR. GOZA:  Object to form.
10    A.  Correct.
11  BY MR. SLONIM:
12    Q.  And now we know, because of the event that
13  had happened in January 2014, that Mr. Boudreaux had
14  some kind of an underlying pathology that
15  predisposed him to GI bleeding if subjected to
16  anticoagulation, correct?
17    A.  That's the assumption, yes, sir.
18    Q.  And, in part, that risk may have been
19  exacerbated by the fact that Mr. Boudreaux needed to
20  be on aspirin therapy, correct?
21    A.  Potentially, yes, sir.
22    Q.  Okay.  And let's just talk about that for
23  a minute, because I think we may have overlooked it.
24      So Mr. Boudreaux was a long-term user of
25  low dose Ecotrin, correct?

Page 112

1    A.  Correct.
2    Q.  So that's an enteric-coated form of
3  aspirin, correct?
4    A.  Correct.
5    Q.  But even with enteric coating, aspirin
6  attacks the GI tract, not just the stomach, but
7  other portions of the GI tract, as well, correct?
8    A.  Correct.
9    Q.  And when I say "attack," what I mean is it
10  can cause erosions or ulcerations, right?
11    A.  That is correct.
12    Q.  And those could be quite minute, quite
13  microscopic, correct?
14    A.  Potentially, yes, sir.
15    Q.  And they could actually be subclinical,
16  correct, meaning they don't have an obvious
17  manifestation; microscopic, almost imperceptible
18  amounts of blood can be leaking out, but you might
19  not notice it, correct?
20    A.  Correct.
21    Q.  And now if you took a patient in that
22  state, where the GI tract had some microscopic
23  erosions, virtually undetectable erosions, and you
24  put that patient on an anticoagulant, any
25  anticoagulant, those erosions can bleed, correct?

Page 113

1    A.  That would be the assumption, yes, sir.
2    Q.  And they actually could cause quite a loss
3  of blood, correct?
4    A.  Correct; yes, sir.
5    Q.  But they can also spontaneously heal,
6  correct?
7    A.  Potentially, yes, sir.
8    Q.  And they are the kind of damage to the GI
9  tract that might be missed, not because the
10  endoscopic examiner is not qualified or made a
11  mistake, but just because they're in a portion of
12  the bowel that is -- or the GI tract that is not
13  easily observed by endoscopy, correct?
14    A.  That is correct.
15    Q.  It's fair to say that Mr. Boudreaux could
16  have had exactly the same bleed that he had with
17  exactly the same outcome had he been given any
18  anticoagulant, correct?
19      MR. GOZA:  Object; speculation.
20    A.  That would be an assumption, yes, sir.
21      MR. SLONIM:  I have no further
22    questions.  Thank you.
23      FURTHER EXAMINATION
24  BY MR. GOZA:
25    Q.  I do have a few questions for you.

Protected - Subject To Further Protective Review

Page 114

1 And I think I understand better your
2 qualifications on an answer, but I want to make
3 sure. So Mr. Boudreaux may have had some underlying
4 condition in his GI tract that made him more
5 susceptible to a bleed, correct?
6 A. That is correct.
7 Q. He had never had a bleed before, though,
8 that you're aware of, true?
9 A. None that I'm aware of, that's correct.
10 Q. And he had been on Ecotrin, aspirin
11 therapy, for a long time, true?
12 A. I believe that's correct, yes, sir.
13 Q. And since his bleed, he has continued to
14 be on Ecotrin aspirin therapy, true?
15 A. Correct.
16 Q. And he still has never had another bleed,
17 true?
18 A. None that I'm aware of.
19 Q. The only time he's had a bleed is when he
20 was on Xarelto, true?
21 A. Correct.
22 Q. I have something else I wanted to ask.
23 Give me just one second.
24 And while we can talk about a lot of
25 possibilities, the one thing you know as you sit

Page 115

1 here or have an opinion to a reasonable degree of
2 medical certainty about is that Xarelto directly
3 caused or contributed to cause Mr. Boudreaux's
4 bleeding event back in February of 2014, true?
5 A. That's my assumption, yes, sir.
6 MR. GOZA: I have no further
7 questions.
8 MR. MCCAULEY: I've got a couple.
9 EXAMINATION
10 BY MR. MCCAULEY:
11 Q. Doctor, that opinion you just offered --
12 MR. GOZA: I just object to being able
13 to ask questions at this point, but go
14 ahead.
15 MR. MCCAULEY: Okay.
16 BY MR. MCCAULEY:
17 Q. Doctor, the opinion you just offered, that
18 opinion is predicated on your understanding that the
19 patient was taking Xarelto tablets for three or four
20 weeks prior to the onset of his GI bleed; is that
21 right?
22 A. Yes, sir.
23 Q. And your opinion might change if you
24 learned that he, in fact, was not taking Xarelto
25 tablets during that period of time?

Page 116

1 A. Yes, sir.
2 Q. It would have to change, I would assume.
3 A. Yes, sir.
4 Q. All right. Doctor, we heard a lot of
5 questions that contained a phrase "Xarelto bleed,"
6 so I want to -- I just want to ask a couple
7 questions on that.
8 I think you answered in response to
9 Mr. Slonim that, in order to have a bleed, there has
10 to be some underlying erosion or ulceration of the
11 GI tract somewhere, correct?
12 A. That's the assumption, yes, sir.
13 Q. And the assumption is that, in the absence
14 of such a thing, there's not going to be a bleed,
15 whether it's Xarelto or Eliquis or Coumadin or any
16 of the other anticoagulants, right?
17 A. Correct.
18 Q. You need to have that ulceration or
19 erosion, right?
20 A. That's correct, yes, sir.
21 Q. And when you're counseling patients who
22 you're putting on drugs, like anticoagulants, do you
23 sometimes tell them, if they nick themselves
24 shaving, that they might bleed longer than they
25 ordinarily would as a result of being on blood

Page 117

1 thinners?
2 A. Correct.
3 Q. And in a very real sense, that nick they
4 make when they shave is kind of the analogue to the
5 gastrointestinal erosion or ulceration; it's a place
6 where blood can come out and will come out more
7 profusely if their blood is thinner or
8 anticoagulated --
9 A. Correct.
10 Q. -- fair?
11 So in a sense, you wouldn't -- the direct
12 cause of that bleed, if let's say he's using a
13 Gillette razor, would be the Gillette razor caused
14 that nick?
15 A. With that analogy, yes, sir.
16 Q. And the -- and the bleeding that results
17 from that was not caused, but, rather, the thinning
18 of the blood allowed the blood to come out, but it
19 was the nick of the razor that caused the bleed?
20 MR. GOZA: Object to the form of the
21 question.
22 BY MR. MCCAULEY:
23 Q. Isn't that right?
24 A. Correct.
25 Q. It could be more fairly called a Gillette

Protected - Subject To Further Protective Review

Page 118

1 bleed if we wanted to name them with proper nouns,
2 right?
3     A.  Correct.
4     Q.  And, Doctor, if you -- if you analogize
5 that, then the gastrointestinal bleed really, if
6 it's properly denominated as to what it is, it's
7 some gastrointestinal, erosional bleed facilitated
8 by use of an anticoagulant; isn't that fair?
9         MR. GOZA:  Object to form.
10    A.  Correct.
11 BY MR. MCCAULEY:
12    Q.  And I think, as we went through your
13 medical records, there was never an occasion where
14 you and any other doctor said he had a, quote,
15 Xarelto bleed, was there?
16    A.  No, sir.
17    Q.  In fact, what you said was that, because
18 he had a bleed on one anticoagulant, we're going to
19 be very cautious -- I'm sort of paraphrasing -- very
20 cautious about ever giving him another
21 anticoagulant?
22    A.  That is correct.
23    Q.  If he had -- I don't know whether if he
24 had a bleed on Eliquis or Pradaxa, but when Mr. Goza
25 would be calling it a Pradaxa bleed or a Coumadin

Page 119

1 bleed or some such, but you would refer to it as a
2 bleed resulting from thin blood as a result of
3 anticoagulation due to some underlying pathology
4 that existed before that anticoagulant was
5 introduced, right?
6         MR. GOZA:  Object to form.
7     A.  That's correct.
8         MR. MCCAULEY:  All right.  I don't
9     have any further questions.  Thank you,
10    Doctor.
11        FURTHER EXAMINATION
12 BY MR. GOZA:
13    Q.  And, Doctor, just so we're clear, because
14 I started off --
15        MR. GOZA:  What do I have to press to
16    make this work?
17        MS. BARDWELL:  Oh, I'm so sorry.  The
18    projector turned off.  It might take a
19    minute because the projector turned off.
20    I'm so sorry.  It's going to take a
21    second.
22        MR. GOZA:  How long is this going to
23    take?
24        MS. BARDWELL:  It's going to take a
25    second because we paused too long.

Page 120

1 BY MR. GOZA:
2     Q.  Okay.  Let's -- let me go ahead and
3 continue.  When it comes on, I'll ask it.
4         First of all, with respect to the
5 questions that Mr. --
6         MR. MCCAULEY:  McCauley.
7 BY MR. GOZA:
8     Q.  -- McCauley asked, he asked whether your
9 opinions were premised on the fact that Xarelto had
10 been taken for three or four weeks, but the reality
11 of it is that Xarelto, in terms of reaching its
12 maximum thinning of the blood, so to speak, works
13 very quickly, true?
14    A.  That's correct.
15    Q.  In fact, you could take it a day or two
16 days and have the maximum effect of the drug, true?
17    A.  That's my assumption, yes, sir.
18    Q.  So your assumption in formulating these
19 opinions is not that Mr. Boudreaux took it three or
20 four weeks, but that he at least took the
21 medication, was on the medication at the time of his
22 bleed, true?
23    A.  That would be the assumption, yes, sir.
24    Q.  Second, he said that no one had talked
25 about this -- the GI bleed being related to recent

Page 121

1 Xarelto -- use of Xarelto.  In fact, that was the
2 specific diagnosis that Mr. Boudreaux left the
3 hospital with, was GI bleed related to recent
4 Xarelto initiation; is that true?
5     A.  That's from the hospital in Kenner, yes,
6 sir.
7         MR. GOZA:  I don't have any other
8     questions.
9         FURTHER EXAMINATION
10 BY MR. MCCAULEY:
11    Q.  So let me just ask one follow-up to that.
12        If someone took a tablet of Xarelto and
13 then stopped taking Xarelto, the effect would wear
14 off within 24 to 36 hours?
15    A.  Correct.
16    Q.  And so if someone took Xarelto for four
17 days and then decided to stop, by the -- by three or
18 four weeks from then, you wouldn't expect to be
19 seeing any anticoagulation effect of Xarelto going
20 on?
21    A.  You would not.
22        MR. MCCAULEY:  All right.  Thank you.
23    I don't have any further questions.
24        MR. GOZA:  No other questions.
25        THE VIDEOGRAPHER:  Today's deposition

Protected - Subject To Further Protective Review

Page 122

1  consists of two tapes.  This is the end of
2  Tape 2.  We're now off the record at 7:53.
3        (DEPOSITION CONCLUDED.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1  Signed this ___ day of _____, 2016.
2
3
4  _____
5  LESLIE B. DOYLE, RPR, RMR, RDR
   Certified Court Reporter
6  LA Certificate #93096
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1     R E P O R T E R ' S   C E R T I F I C A T E
2        This transcript is valid only for a
3  transcript accompanied by my original signature and
4  original required seal on this page.
5        I, Leslie B. Doyle, Certified Court
6  Reporter (LA Certificate #93096), in and for the
7  State of Louisiana, as the officer before whom this
8  testimony was taken, do hereby certify that PETER S.
9  FAIL, M.D., after having been duly sworn by me upon
10  authority of R.S. 37:2554, did testify as herein
11  before set forth in the foregoing 122 pages; that
12  this testimony was reported by me in the stenotype
13  reporting method, was prepared and transcribed by me
14  or under my personal direction and supervision, and
15  is a true and correct transcript to the best of my
16  ability and understanding; that the transcript has
17  been prepared in compliance with transcript format
18  guidelines required by statute or by rules of the
19  board, that I have acted in compliance with the
20  prohibition on contractual relationships, as defined
21  by Louisiana Code of Civil Procedure Article 1434
22  and in rules and advisory opinions of the board.
23        I further certify that I am not related to
24  counsel or to the parties herein, nor am I otherwise
25  interested in the outcome of this matter.