# EXHIBIT-18

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF LOUISIANA
 3                    -  -  -
 4

        IN RE:  XARELTO       :   MDL NO. 2592
 5      (RIVAROXABAN) PRODUCTS :
        LITIGATION            :   SECTION L
 6                           :

        THIS DOCUMENT RELATES  :   JUDGE ELDON
 7      TO ALL CASES          :   E. FALLON
                             :
 8                           :
                             :   MAG. JUDGE
 9                           :   NORTH
10                 VOLUME I
11                    -  -  -
12              July 12, 2016
13                    -  -  -
14               - PROTECTED -
15    - SUBJECT TO FURTHER PROTECTIVE REVIEW -
16            Videotaped deposition of
       KENNETH TODD MOORE, taken pursuant to
17     notice, was held at the law offices of
       Drinker Biddle & Reath, 105 College Road
18     East, Princeton, New Jersey, beginning at
       9:21 a.m., on the above date, before
19     Michelle L. Gray, a Registered
       Professional Reporter, Certified
20     Shorthand Reporter and Notary Public.
21                    -  -  -
22           GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph| 917.951.5672
23              deps@golkow.com
24
```

Protected - Subject to Further Protective Review

```
 1    APPEARANCES:

 2

 3        AYLSTOCK, WITKIN, KREIS &
          OVERHOLTZ, PLLC
 4        BY:  NEIL D. OVERHOLTZ, ESQ.
          E. SAMUEL GEISLER, ESQ.
 5        17 East Main Street, Suite 200
          Pensacola, Florida 32502
 6        (850) 202-1010
          noverholtz@awkolaw.com
 7        sgeisler@awkolaw.com
 8           - and -
 9        LEVIN, FISHBEIN, SEDRAN & BERMAN
          BY: MICHAEL M. WEINKOWITZ, ESQ.
10        (Via telephone)
          510 Walnut Street, Suite 500
11        Philadelphia, Pennsylvania 19106
          (215) 592-1500
12        mweinkowitz@lfsblaw.com
          Representing the Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24
```

Protected - Subject to Further Protective Review

```
 1      APPEARANCES:  (Cont'd.)
 2

        TUCKER ELLIS, LLP
 3      BY:  MICHAEL C. ZELLERS, ESQ.
        515 South Flower Street, 42nd Floor
 4      Los Angeles, California 90071
        (213) 430-3301
 5      Michael.zellers@tuckerellis.com
 6          - and -
 7      DRINKER, BIDDLE & REATH, LLP
        BY:  SEAN KENNEDY, ESQ.
 8      500 Campus Drive
        Florham Park, New Jersey 07932
 9      (973) 549-7000
        sean.kennedy@dbr.com
10      Representing Janssen entities and
        the Witness
11

12      BRADLEY ARANT BOULT CUMMINGS, LLP
        BY:  JOSEPH J. STROBLE, ESQ.
13      One Jackson Place
        188 East Capitol Street, Suite 400
14      Jackson, Mississippi 39201
        (601) 592-9902
15      jstroble@bradley.com
        Representing Bayer Pharmaceuticals
16

17      VIDEOTAPE TECHNICIANS:
18         Henry Marte
           Daniel Ortega
19

20      LITIGATION TECHNICIAN:
21         Sean Sullivan
22

        ALSO PRESENT:
23

                   Luke Bosso (Intern)
24                 (Aylstock, PLLC)
```

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4

     Testimony of:

 5
                          KENNETH  TODD  MOORE
 6
     By Mr. Overholtz                        13
 7

 8

 9

10                    -   -   -
11                E X H I B I T S
12                    -   -   -
13

14   NO.              DESCRIPTION            PAGE
15   Moore-1          E-mail, 1/22/10         29
     (1389694)        Subject, Rivaroxaban
16                    Program overview
                      XARELTO_JANSSEN_
17                    08450536
18   Moore-2          Riva Overview           30
     (1389695)        PowerPoint
19                    XARELTO_JANSSEN_
                      08450537
20
     Moore-3          E-mail Thread          100
21   (1389139)        3/2/10
                      Subject, Protocol
22                    Phase I Omeprazole
                      XARELTO_JANSSEN_
23                    08447760-62
24
```

Protected - Subject to Further Protective Review

```
1                        -   -   -
2              E X H I B I T S  (Cont'd.)
3                        -   -   -
4
5    NO.              DESCRIPTION              PAGE
6    Moore-4          E-mail Thread            106
     (1259514)        2/25/10
7                     Subject Rivaroxaban
                      Joint Bayer/J&J
8                     Meeting Agenda
                      March 1, 2010
9                     XARELTO_BPAG_
                      03244488
10
     Moore-5          Afib/VTE Kickoff         112
11   (1259515)        Post-Meeting Notes
                      January 20-21, 2010
12                    XARELTO_BPAG_
                      03244491-98
13
     Moore-6          Rivaroxaban Bayer        127
14   (1259516)        J&J Joint Submission
                      Meeting Roster
15                    XARELTO_BPAG_
                      03244499
16
     Moore-7          E-mail Thread            131
17   (1389129)        3/2/10
                      Subject, Rivaroxaban
18                    ClinPharm
                      F-2-F Meeting Minutes
19                    XARELTO_JANSSEN_
                      08447745-46
20
     Moore-8          Meeting Minutes          138
21   (1389130)        Face-to-Face Meeting
                      September 17-18, 2009
22                    Beerse
                      XARELTO_JANSSEN_
23                    08447747
24
```

Protected - Subject to Further Protective Review

```
 1                    -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Moore-9          E-mail Thread            163
     (1363794)        2/25/10
 7                    Subject, Rivaroxaban
                      ClinPharm PreClin
 8                    Cross Company TC
                      XARELTO_JANSSEN_
 9                    08127104
10   Moore-10         E-mail Thread            179
     (246317)         2/25/10
11                    Subject, Riva
                      Extended Release
12                    XARELTO_JANSSEN_
                      01109178
13
     Moore-11         E-mail Thread            194
14   (1389727)        1/20/10
                      Subject, Rivaroxaban
15                    Afib PK/PD Substudy
                      XARELTO_JANSSEN_
16                    08450653-60
17   Moore-12         Matched PK/PD            217
     (1389728)        CoVance Tracker
18                    Excel Spreadsheet
                      XARELTO_JANSSEN_
19                    08450661-728
20   Moore-13         E-mail Thread            223
     (1389771)        2/8/10
21                    Subject, Rivaroxaban
                      Phase III ROCKET Trial
22                    PK/PD Substudy
                      XARELTO_JANSSEN_
23                    08450846-47
24
```

Protected - Subject to Further Protective Review

```
 1                      -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Moore-14         E-mail Thread            239
      (1362548)        1/29/10
 7                     Subject, Rivaroxaban
                       Afib PD Sample Analysis
 8                     XARELTO_JANSSEN_
                       08117211-15
 9
      Moore-15         E-mail, 2/19/10          259
10    (1001070)        Subject, Acceleration
                       To Value and CDT Meeting
11                     XARELTO_JANSSEN_
                       06309682
12
      Moore-16         E-mail Thread            268
13    (632339)         2/24/10
                       Subject, Final Slide
14                     Deck for Rivaroxaban
                       Acceleration to
15                     Value Meeting
                       XARELTO_JANSSEN_
16                     03749812
17    Moore-17         Acceleration to          271
      (632340)         Value PowerPoint
18                     XARELTO_JANSSEN_
                       03749813
19
      Moore-18         Movie Clip               303
20    (235-9203)       XARELTO_JANSSEN_
                       11047871
21
22
23
24
```

Protected - Subject to Further Protective Review

```
 1                     -   -   -
 2            E X H I B I T S   (Cont'd.)
 3                     -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Moore-19         E-mail Thread            318
     (1363457)        11/18/10
 7                    Subject, Xarelto
                      Afib CCDS Questions
 8                    (235-9203)
                      XARELTO_JANSSEN_
 9                    08125121
10   Moore-20         E-mail Thread            335
     (880160)         6/9/10
11                    Subject, Preparation
                      For Afib Submission
12                    Paper Samama on
                      Clotting Assays
13                    XARELTO_BPAG_
                      01560271-73
14
     Moore-21         E-mail Thread            339
15   (255699)         6/15/10
                      Subject, Inclusion
16                    In VTEPr/Afib
                      Submission Attempts
17                    To Find Assay
                      XARELTO_JANSSEN_
18                    01182363
19   Moore-22         Clotting Assays          339
     (255700)         Samama, PDF
20                    XARELTO_JANSSEN_
                      01182364
21
22
23
24
```

Protected - Subject to Further Protective Review

```
 1                    -   -   -
 2             E X H I B I T S   (Cont'd.)
 3                    -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Moore-23         E-mail Thread            366
      (1023223)        6/15/10
 7                     Subject, Inclusion
                       To VTEPr/Afib
 8                     Submission
                       XARELTO_JANSSEN_
 9                     06608858-59
10    Moore-24         E-mail Thread            375
      (255705)         6/16/10
11                     Subject, Inclusion in
                       VTEPr/Afib
12                     Submission
                       XARELTO_JANSSEN_
13                     01182389-91
14    Moore-25         E-mail Thread            385
      (318386)         7/12/12
15                     Subject, Mock AdCom
                       VTE-Tx
16                     XARELTO_JANSSEN_
                       01479607-08
17
18
19
20
21
22
23
24
```

Protected - Subject to Further Protective Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      None.

16

17

18

19

20

21

22

23

24
```

Protected - Subject to Further Protective Review

1                    -  -  -

2              THE VIDEOGRAPHER:  We are

3       now on the record.

4              My name is Henry Marte.  I'm

5       a videographer for Golkow

6       Technologies.

7              Today's date is July 12,

8       2016.  The time is 9:21 a.m.

9              This videotaped deposition

10      is being held in Princeton, New

11      Jersey, taken in the matter of In

12      Re Xarelto Products Liability

13      Litigation, filed in the United

14      States District Court, Eastern

15      District of Louisiana.

16              The deponent today is

17      Mr. Todd Moore.

18              Counsel will be noted on the

19      stenographic record.

20              The court reporter is

21      Michelle Gray and will now

22      administer the oath.

23

24                    -  -  -

Protected - Subject to Further Protective Review

1              ... KENNETH TODD MOORE,

2        having been first duly sworn, was

3        examined and testified as follows:

4                  -   -   -

5        MR. ZELLERS:  Before we

6        start the deposition, I just want

7        to note that the deposition has

8        been noticed in the MDL In Re

9        Xarelto/Rivaroxaban Product

10       Liability Litigation, MDL Number

11       2592, which is overseen by Judge

12       Fallon in the Eastern District of

13       Louisiana and has been

14       cross-noticed by plaintiffs in

15       Pennsylvania and Delaware.

16       The deposition shall be

17       conducted in accord with the MDL

18       court's order, including the

19       governing protective orders, and

20       anyone attending the deposition

21       must agree to be bound by the

22       protective orders.  Thank you.

23                  -   -   -

24                EXAMINATION

Protected - Subject to Further Protective Review

1                        -   -   -

2    BY MR. OVERHOLTZ:

3            Q.    Good morning, Mr. Moore.

4    How are you doing?

5            A.    Good morning.  Good.

6            Q.    Good.  Why don't you state

7    your full name for the record.

8            A.    Kenneth Todd Moore.

9            Q.    Mr. Moore, my name is Neil

10   Overholtz.  I'm going to be asking you

11   questions today about your work on

12   Xarelto.

13               Why don't you tell us where

14   you're currently employed.

15           A.    I'm currently employed for

16   Janssen Pharmaceuticals.

17           Q.    Okay.  And what's your

18   current position there at Janssen?

19           A.    I hold the position of

20   scientific director of cardiovascular

21   disease.

22           Q.    Okay.  And when you say

23   Janssen Pharmaceuticals, Janssen is a

24   division of Johnson & Johnson?

Protected - Subject to Further Protective Review

1    A.    Subsidiary of it, yeah,

2  something to that effect, yeah.

3    Q.    Okay.  And in your position

4  as -- I think you said you're scientific

5  director of cardiovascular disease.  Do

6  you still have continuing responsibility

7  on Xarelto?

8    A.    I do, yes.

9    Q.    When did you first start

10  your position as scientific director of

11  cardiovascular disease?

12    A.    That was around March of

13  2015.

14    Q.    Okay.  So we'll probably

15  come back to kind of your work once you

16  transitioned to that job.  And let's just

17  go back and see what you were doing

18  before then.

19    A.    Certainly.

20    Q.    Before you took your

21  position as the scientific director for

22  CV, you were working in clinical

23  pharmacology at Janssen; is that right?

24    A.    That's correct.

Protected - Subject to Further Protective Review

1     Q.    Okay.  And what was your

2  position as far as that goes?

3     A.    My title was clinical

4  pharmacology leader.

5     Q.    Okay.  And according to the

6  resumé that was provided to us prior to

7  the deposition, you held that job for

8  three and a half years, almost four

9  years, something like that?

10     A.    From 2006 to 2015.  Yeah.

11     Q.    Okay.  And I -- yeah, I

12  think I should have probably been

13  specific about Xarelto.  You had the

14  clinical pharmacology lead job for

15  Xarelto for about three and a half years,

16  according to this, September of 2011 to

17  March of 2015, does that sound right?

18     A.    Yeah, I -- I took on the

19  responsibilities for Xarelto and clinical

20  pharmacology in around, I guess it was,

21  yeah, late 2011.

22     Q.    Okay.  And who did you take

23  those over from?

24     A.    My colleagues over in

Protected - Subject to Further Protective Review

1   Beerse, Erik Mannaert and another

2   scientist that was there.  Her name --

3   her name --

4          Q.    Was it An Thyssen?

5          A.    Yes, An Thyssen.

6          Q.    And before that, when you

7   were the clinical pharmacology lead on

8   Xarelto, according to what I've seen in

9   the documents and your resumé, it looks

10  like you were called the PK/PD or

11  pharmacokinetic/pharmacodynamic leader

12  for Xarelto?

13         A.    Yeah.  The -- the titles

14  have changed and obviously within the

15  department your responsibilities change,

16  so I came in as a scientist and came is

17  as associate director and so forth.

18         Q.    So when did you first start

19  working for Janssen?

20         A.    2006.

21         Q.    And according to what I've

22  seen so far, it looks like your Xarelto

23  responsibilities didn't start until some

24  time after that; is that right?

Protected - Subject to Further Protective Review

1        A.      Correct.

2        Q.      Okay.  So prior to starting

3   working on Xarelto, what was your main

4   types of drug responsibility?

5        A.      I acted as both scientist

6   and leader on different compounds.  Some

7   of them were pain products like Duragesic

8   and Jurnista.  Other compounds that never

9   made it to market, so on and so forth.

10  So, it's in the -- within the pain and --

11  yeah, mostly within the pain program.

12       Q.      Okay.  And then it looks

13  like the -- that first responsibility

14  with Xarelto occurred about when?

15       A.      Again, I think it was

16  towards the end of 2011.

17       Q.      Okay.  And I think I have

18  some documents to indicate maybe there

19  was a -- at least a transition from An

20  Thyssen to you sometime in early 2010.

21  Does that make sense?

22       A.      I would have to go back and

23  see it.  Yeah, it's -- it was a short

24  transition, because she was changing

Protected - Subject to Further Protective Review

1    roles so it was -- looking -- there

2    was -- yeah, there was a transition onto

3    me.  I just don't recall the exact dates

4    of that.

5            Q.    That's fine.  We'll take a

6    look at some documents and kind of figure

7    it out.

8                 Now, prior to working at

9    Janssen, you were working at

10   Bristol-Myers Squibb; is that right?

11           A.    Yes.

12           Q.    Okay.  And what led to your

13   switch over to Janssen?

14           A.    Opportunity to continue

15   doing the type of work that I enjoy

16   doing.

17           Q.    And one of the drugs that

18   you had responsibility for over at

19   Bristol-Myers Squibb, BMS, was -- was

20   that apixaban?

21               MR. ZELLERS:  Object to

22           form.

23               THE WITNESS:  I --

24               MR. ZELLERS:  Mr. Moore, as

1    we go along, I occasionally may

2    make an objection.  It's just for

3    the record.  You know, once I'm

4    finished, you go right ahead and

5    respond if you're able to.

6             THE WITNESS:  Certainly.

7             Yes, I did work on apixaban,

8    but I wasn't the leader of that

9    program.

10   BY MR. OVERHOLTZ:

11        Q.    What was your role on

12   apixaban which I think the brand name is

13   on the market now is Eliquis, right?

14        A.    That's correct.

15        Q.    What was your responsibility

16   for apixaban or your job title?

17        A.    I acted as a pharmacokinetic

18   dynamic -- well, it was -- the actual

19   title was clinical scientist for that --

20   for that role.  But I worked within the

21   clinical pharmacology department.

22        Q.    Okay.  And did you do any

23   PK/PD analyses or studies on apixaban or

24   Eliquis?

1          A.     Yeah.  I did both study

2    design, some -- some of the PK/PD

3    analyses, writing study reports,

4    monitoring the trials.  My

5    responsibilities were a lot broader back

6    then.  There were other

7    pharmacokineticists that may have been

8    assigned to the actual studies themselves

9    to do the analyses.  I do a lot of the --

10   as I mentioned, a lot of monitoring, the

11   writing the summary of the results,

12   coordinating publications and so forth.

13          Q.     Okay.  In fact, one of the

14   things, I don't know if it was on your CV

15   or not.  It looked like there had been

16   like some recent publications on

17   apixaban.  Yeah, here it is.  The

18   Frost -- a couple of the Frost studies

19   that just got published on apixaban that

20   you were a co-author for.

21          A.     Yeah.  They -- they took the

22   time in publishing their data.  So

23   it's -- kindly enough they don't have to

24   put me as an author, but since I had the

Protected - Subject to Further Protective Review

¹ responsibilities at that time, I thought

² it was prudent to keep me as a co-author.

³     Q.    Okay.  So you had done some

⁴ of the PK/PD work for those publications

⁵ that came out in the last couple years?

⁶     A.    Yeah, a few of the studies,

⁷ yeah.

⁸     Q.    Okay.  Did you have an

⁹ opportunity to review those articles

¹⁰ before they were published?

¹¹     A.    Yeah.  I was -- I was asked

¹² to review them as part of the co-author

¹³ process.

¹⁴     Q.    Janssen was good with you

¹⁵ showing up on the Eliquis publications?

¹⁶         MR. ZELLERS:  Object to

¹⁷     form.  Go ahead.

¹⁸         THE WITNESS:  I think they

¹⁹     were fine, because they were --

²⁰     again, it's just scientific

²¹     knowledge that needs to be kind of

²²     presented.

²³ BY MR. OVERHOLTZ:

²⁴     Q.    So, let's see.  Before

1   Bristol-Myers Squibb you worked for a

2   company called Clinical Data Management;

3   is that right?

4          A.    Well, the company was

5   actually Schering-Plough.

6          Q.    Oh, okay.

7          A.    The responsibility was data

8   management.

9          Q.    Just to clear something up,

10  I was looking -- you had gone to work for

11  Schering-Plough.  Afterward you had

12  worked for a company called Merit

13  Behavioral Care.

14         A.    Right.

15         Q.    You ended that job at Merit

16  Behavioral in April of '98.  I assume you

17  started with Schering-Plough like around

18  the same time?

19         A.    Correct.

20         Q.    Okay.  Your resumé says

21  April '89?

22         A.    '89.

23         Q.    Yeah --

24         A.    Yeah, that's definitely a

Protected - Subject to Further Protective Review

1  typo.  Yeah.  I was still in high school

2  at that time.  Thank you.  I didn't pick

3  that up when we --

4        Q.    Wow, he started working at

5  Schering-Plough in high school?

6        A.    Junior in high school.  It

7  was great.

8        Q.    Okay.  So let's just talk

9  about your education for a minute --

10        A.    Sure.

11        Q.    -- so we have a background

12  of what we're doing.

13              You got a bachelors degree

14  in biology from University of Delaware;

15  is that right?

16        A.    That's correct.

17        Q.    Okay.  And it looks like you

18  got a masters in biology as well with a

19  minor in pharmaceutical business

20  management from Fairleigh Dickinson; is

21  that right?

22        A.    That's correct.

23        Q.    Okay.  And you don't have a

24  Ph.D.; is that right?

Protected - Subject to Further Protective Review

1    A.    No, I do not.

2    Q.    Okay.  And you don't have an

3    M.D., a medical doctor degree?

4    A.    No, I do not.

5    Q.    It's okay for me to call you

6    Mr. Moore instead of Dr. Moore?

7    A.    I appreciate that.

8    Q.    I may accidentally call you

9    Dr. Moore because we've taken so many of

10   these doctor depositions.

11   A.    That's fine.

12   Q.    Okay.  I'll try to stick to

13   Mr. Moore.

14         Now, when you worked on

15   apixaban, Eliquis, over at Bristol-Myers

16   Squibb, that drug, it was dosed -- had a

17   dosing regimen of twice-daily dosing when

18   it came to market, correct?

19         MR. ZELLERS:  Object to

20         form.

21         THE WITNESS:  That's

22         correct.

23   BY MR. OVERHOLTZ:

24   Q.    Okay.  And, of course, as

Protected - Subject to Further Protective Review

1   you know, we'll probably talk today about

2   Xarelto.  Xarelto is marketed with

3   respect to the Afib indication and

4   besides a short period in a couple of the

5   other indications as a once-daily drug;

6   is that right?

7           A.    That's correct.

8           Q.    Okay.  In the Phase III

9   trial for apixaban or Eliquis, how many

10  doses were studied?

11          A.    I would have to take a look

12  at the manuscript to --

13          Q.    Okay.  And we'll take a look

14  at it, a comparison document, a little

15  bit later and we can look at that.

16          Did you ever do any PK/PD

17  analyses that looked at differences in PK

18  or PD for apixaban comparing BID or

19  twice-daily dosing to QD or once-daily

20  dosing?

21          A.    Within apixaban?

22          Q.    Yes.

23          A.    No, I did not.

24          Q.    Okay.  All right.

1    Well, you mentioned that you

2  kind of transitioned also from Erik

3  Mannaert's position.  What was his

4  position at the company?

5       A.    At the time I believe he was

6  a senior manager.  He was I believe

7  overseeing a lot of the work that was

8  being done in Beerse, Xarelto, when was

9  first -- when the -- I guess when the

10  agreement between Janssen and Bayer first

11  occurred, and there was work to be done

12  at Janssen, that original work was

13  positioned within our Belgium office,

14  Erik, again as I said, was a -- I believe

15  a senior manager at that time point and

16  also worked with them.  And I believe we

17  both had responsibilities for Xarelto.

18       Q.    Okay.  And whenever you kind

19  of transitioned into having Xarelto

20  responsibilities, did you undertake some

21  efforts to try to kind of bring yourself

22  up to speed on the project?

23       A.    Of course, yes.

24       Q.    Okay.  And generally, can

Protected - Subject to Further Protective Review

1   you tell me kind of what the things you

2   would have done to bring yourself up to

3   speed on Xarelto?

4        A.     I would have met, or via

5   teleconference, most likely because of

6   the -- the distance between the two

7   groups, with An and/or Erik.  I remember

8   speaking with An much more in regards to

9   the transition.  It was primarily kind of

10  in order of importance.  The projects

11  that were currently ongoing that needed

12  my attention.  Preparing for the possible

13  AdCom that would occur for the Afib

14  indication.  At the time the Afib study

15  was already undergoing and, of course, to

16  end by the time I came onto the team.  So

17  it was more trying to start pulling the

18  documents ready for the filing itself.

19  Documents specifically that would be

20  given to the FDA just for the filing.

21       Q.     Okay.  And so when it comes

22  to timing coming on, obviously this was

23  before the NDA had been filed for Xarelto

24  for either VTE treatment, Afib, or VTE

Protected - Subject to Further Protective Review

```
 1   prevention; is that right?

 2              MR. ZELLERS:  Object to

 3         form.

 4              THE WITNESS:  I came in

 5         after they had filed the ROCKET

 6         indication -- I mean -- I'm sorry.

 7         Excuse me -- the RECORD

 8         indication.  That was the first

 9         one.

10   BY MR. OVERHOLTZ:

11         Q.    The RECORD.  VTE prevention?

12         A.    VTE prevention for hip and

13   knee.  So that was already completed by

14   the time I came onto the team.  Again,

15   the ROCKET study was near -- towards the

16   end of its completion when I came on.

17         Q.    And do you recall which NDA

18   was filed first, the VTE treatment or

19   Afib?

20         A.    It was -- Afib was filed

21   first, then the EINSTEIN VTE treatment

22   was filed after that.

23              (Document marked for

24         identification as Exhibit
```

Protected - Subject to Further Protective Review

1          Moore-1.)

2    BY MR. OVERHOLTZ:

3          Q.    Let me show you what we'll

4    mark as Exhibit Number 1, Bates Number

5    Xarelto Janssen 08450536, and it's

6    1389694 Record Number.  I have a couple

7    copies here for you.

8               You'll just keep the ones

9    with the yellow stickers on them.  You'll

10   see this is an e-mail from An Thyssen to

11   you January 22, 2010, regarding the

12   rivaroxaban program review.

13               Do you see that?

14         A.    Right.

15         Q.    It says rivaroxaban.  I

16   don't know when this might be played for

17   a jury one day, so -- whether the end or

18   the beginning or something like that.

19   But for rivaroxaban, we're talking about

20   Xarelto?

21         A.    Correct.

22         Q.    And according to this, it

23   says, "Dear all, in order to facilitate

24   the transition of rivaroxaban to Todd,

Protected - Subject to Further Protective Review

1    please find attached a PowerPoint

2    presentation highlighting the different

3    aspects of the rivaroxaban program.  I

4    hope this will be of help for you."  And

5    of course, she says, "Best regards, An."

6                 When it says to Todd, that's

7    talking about you, right?

8           A.    Yes.

9           Q.    And that's what you go by at

10   work?

11          A.    Yes.

12          Q.    And so we'll just look and

13   see if we can refresh your recollection

14   of kind of the type of information she

15   would have given you, which is the

16   attachment, the PowerPoint that she gave

17   you.

18                (Document marked for

19          identification as Exhibit

20          Moore-2.)

21   BY MR. OVERHOLTZ:

22          Q.    So this is a PowerPoint that

23   was produced to us.  And you can see the

24   title of it is, "Rivaroxaban Overview of

Protected - Subject to Further Protective Review

1   the Project."  And I'll give you a second

2   to take a look at it, and then just a

3   couple questions about it.  There's not

4   really anything in depth that we want to

5   go to in here.

6           This was titled "Overview of

7   the Project" that you got from An Thyssen

8   in January 2010.  Do you recall seeing

9   this PowerPoint?  I know it's several

10  years ago.

11          A.    It's been several years ago.

12  I don't recall the specifics of when I

13  received it or -- but I'm sure I reviewed

14  it when I did.

15          Q.    Right.  You would have

16  received this e-mail --

17          A.    Yeah.

18          Q.    -- from An Thyssen in your

19  normal course of work at Janssen?

20          A.    That's correct.

21          Q.    Okay.  And so if we look

22  at -- I think it's Page 3.

23          A.    Yes.

24          Q.    The one that's titled

Protected - Subject to Further Protective Review

1    "Phase I Studies Plan for 2010."

2         A.    Correct.

3         Q.    Okay.  So we look at Page 3.

4    I just want to ask you about a couple of

5    these.

6              There's a list of a couple

7    of ClinPharm studies and then a pediatric

8    development study.  Did you work on any

9    of those studies?

10        A.    I completed the study titled

11   R-I-V-A-R-O-X-A-F-L 1001 or RIVAROXAFL

12   1001, the omeprazole interaction study.

13        Q.    Okay.

14        A.    That was a study that was in

15   concept originally designed by An that I

16   came in, completed the concept, wrote the

17   protocol, and ran the study, and

18   published on that.

19              There was the -- there's a

20   study here that says XXXX renal

21   impairment.  That ended up being the

22   renal DDI study --

23        Q.    Okay.

24        A.    -- which I also -- that was

Protected - Subject to Further Protective Review

1   after the Afib filing.  And that was part

2   of the postmarketing request that was --

3   came from the FDA.  I designed the study,

4   ran that study.

5           Pediatrics, no, I was not

6   involved in this pediatric study.  This

7   was conducted -- designed and conducted

8   by -- by Bayer.

9       Q.    You worked on later

10  pediatric studies?

11      A.    I worked on the design of

12  some of the pediatric work that was

13  required, again, from the FDA that we

14  conducted.

15      Q.    Okay.  So if that omeprazole

16  study -- omeprazole, that's a proton pump

17  inhibitor drug?

18      A.    That's correct.

19      Q.    Okay.  Used to treat GERD?

20      A.    Correct.

21      Q.    Is that Prilosec?

22      A.    I believe so.

23      Q.    And there -- this was a drug

24  interaction study that you were working

Protected - Subject to Further Protective Review

1   on?

2          A.     That is correct.

3          Q.     And how the -- how the

4   interaction of taking Xarelto with

5   another drug might affect its

6   pharmacokinetics, PK, or its PD,

7   pharmacodynamics; is that right?

8          A.     That would be correct, yes.

9          Q.     Okay.  By this time, I think

10  the jury and the court will probably have

11  already been educated on PK and PD.  But

12  generally, can you just tell me what is

13  pharmacokinetics studying?

14         A.     Sure.  Pharmacokinetics is

15  the study of how the body handles the

16  drug or the medication itself.  So when

17  you take a medication, you think about

18  things about how the medication is

19  absorbed, how it is distributed through

20  your body, how it's metabolized and then

21  eventually excreted out through your

22  system.  And the term that they use to

23  describe that is pharmacokinetics.

24         Q.     Okay.  And then a different

Protected - Subject to Further Protective Review

1  term that we see in a lot of these

2  documents, and we'll see about, is

3  pharmacodynamics or PD.

4          A.    Yes.

5          Q.    How is that study different

6  than pharmacokinetics?

7          A.    Sure.  So where -- in

8  contrast, where pharmacokinetics you

9  assess how the drug is handled by the

10  body, now, pharmacodynamics you're

11  assessing how the body is affected by the

12  drug.  And there's various ways to assess

13  that.

14          Q.    It's what happens to the

15  body when you take the drug, correct?

16          A.    It's more how the body

17  responds to the drug.

18          Q.    Okay.  That's fair enough.

19  When y'all did this omeprazole

20  interaction study, you guys didn't know

21  back then that PPIs had been associated

22  with causing chronic kidney disease,

23  right?

24                  MR. ZELLERS:  Object to

Protected - Subject to Further Protective Review

1    form.

2           THE WITNESS:  I am not aware

3    of PPIs.  I haven't looked into

4    that research.  So that would be

5    something I would need to educate

6    myself on.

7  BY MR. OVERHOLTZ:

8       Q.    That's some new stuff.  You

9  ought to take a look at that.

10          MR. ZELLERS:  There's no

11    question pending.

12 BY MR. OVERHOLTZ:

13      Q.    No question.  That's just me

14 commenting.  That's all new stuff.

15      A.    Sure.

16      Q.    Let me ask you -- let's turn

17 over to the next page.  This is actually

18 a helpful page for us, I think, as we go

19 forward today because it has some

20 abbreviations.  And for whatever reason,

21 pharmaceutical companies like

22 abbreviations and acronyms.

23          One of the things that it

24 talks about here is ACS WG.  ACS is

Protected - Subject to Further Protective Review

1    talking about acute coronary syndrome; is

2    that right?

3           A.     Yes.

4           Q.     Okay.  And that's another

5    indication that Janssen was pursuing

6    along with Bayer for Xarelto in patients

7    that have acute coronary syndrome?

8           A.     That's correct.

9           Q.     Okay.  And when it says WG,

10   is that working group?

11          A.     That's correct.

12          Q.     Okay.  And then if we look

13   down at the bottom, there is a -- it

14   looks, "CDT always invited."

15          A.     Correct.

16          Q.     CDT, do you know what it

17   stands for?

18          A.     Clinical development team.

19          Q.     Okay.  Clinical development

20   team?

21          A.     Or compound -- I'm sorry.

22   Excuse me.  Compound development team.

23          Q.     Compound development team.

24   Okay.  And then there's the GDC, and

Protected - Subject to Further Protective Review

1  that's listed for us there as the global

2  development committee.  And who is that

3  at Janssen -- is that a Janssen

4  organization?

5       A.    No.  I think as -- when it

6  says "global," it refers to a partnership

7  between both Bayer and Janssen.

8       Q.    And then the JSC, is that

9  also a -- joint steering committee,

10 that's a Bayer and Janssen collaboration?

11      A.    Yes.

12      Q.    Okay.  It says, "ClinPharm

13 never invited to the JSC."  Was that your

14 recollection that ClinPharm wasn't

15 invited to the JSC?

16      A.    I think the -- from a

17 strategic standpoint, if there's

18 questions in regard to the clinical

19 pharmacology, the kinetics, dynamics, we

20 are certainly invited.  I believe, if I

21 remember correctly, when I finished my

22 studies, if there were important results

23 to display to both companies, I would be

24 invited to the JSC to present them.

Protected - Subject to Further Protective Review

1      Q.    Yeah, I think I've seen some

2  of the JSC meeting minutes where people

3  from ClinPharm have been invited to

4  present information to the JSC.

5      A.    Right.  Correct.

6      Q.    The JSC is kind of a higher

7  level committee as far as making strategy

8  and management decisions; is that a fair

9  statement?

10          MR. ZELLERS:  Object to

11      form.

12          THE WITNESS:  It appears to

13      be, yes.

14  BY MR. OVERHOLTZ:

15      Q.    Let's turn over to the next

16  page which is Page 5.  And this kind of

17  talks about some of the different

18  indications.

19          And as you said earlier,

20  about January 2010, the VTE prevention

21  indication had been filed and responses.

22  And that was J&J's responsibility with

23  the FDA, correct?

24      A.    Yes.

Protected - Subject to Further Protective Review

1    Q.    Okay.  ACS, there's an arrow

2    pointing to J&J.  ACS was a J&J

3    responsibility?

4    A.    Correct.

5    Q.    Okay.

6         MR. ZELLERS:  And let me

7    just interpose an objection to

8    form.  I understand the document

9    states J&J.  I think we've

10   established it's Janssen who is

11   actually doing the filings.  So if

12   I could just have a continuing

13   objection to --

14        MR. OVERHOLTZ:  You can.

15        MR. ZELLERS:  -- form on

16   that.

17        MR. OVERHOLTZ:  You can have

18   an objection to that.

19        MR. ZELLERS:  Thank you.

20        MR. OVERHOLTZ:  I don't know

21   that it's effective, but you can

22   have it.

23 BY MR. OVERHOLTZ:

24   Q.    You guys -- sometimes,

Protected - Subject to Further Protective Review

1  according to when I look at these

2  documents, it says J&J.  When it comes to

3  Xarelto, that's talking about Janssen; is

4  that right?

5       A.    Janssen, yes.

6       Q.    Yeah.

7             Afib, there's an arrow

8  pointing to J&J as well -- as well,

9  correct?

10      A.    Pointed, yes.

11      Q.    Okay.  And J&J led the

12 development and approval for the Afib

13 indication?

14            MR. ZELLERS:  Object to

15      form.

16            THE WITNESS:  Janssen.

17 BY MR. OVERHOLTZ:

18      Q.    "VTE treatment plus PE."  It

19 says, "Bayer."  And then, "Medically

20 ill," it says "Bayer" as well.

21            Did that continue, did Bayer

22 continue to have responsibility for the

23 medically ill indication?

24      A.    During the -- what this is

Protected - Subject to Further Protective Review

1    saying, yes, that the original medically

2    ill study was conducted by Bayer.

3         Q.    Okay.  And the medical --

4    the first medically ill study, was

5    that -- was that MAGELLAN?

6         A.    Yes, I believe it was.

7         Q.    Okay.  And there were some

8    planned indications.  CHF, congestive

9    heart failure; is that right?

10        A.    That's correct.

11        Q.    Okay.  And that has never

12   been approved for Xarelto, correct?

13        A.    Not to date.

14             MR. ZELLERS:  Object to

15        form.

16   BY MR. OVERHOLTZ:

17        Q.    And when I say "approved,"

18   in the United States -- it hasn't been

19   approved in the United States for

20   congestive heart failure?

21        A.    That is correct.

22        Q.    Or globally?

23        A.    That is correct.

24        Q.    Okay.  There is a list of

Protected - Subject to Further Protective Review

1  surgery and cancer.  And there's no

2  approval for those indications at this

3  time either in the United States,

4  correct?

5        A.    Not for those indications,

6  no.

7        Q.    Okay.  If we can turn to the

8  next page, 6.  This is the VTE prevention

9  indication slide.  And it talks about the

10 fact that there was a complete response

11 letter received by the FDA in May of

12 2009.  And it says, "ClinPharm related

13 request for plans of development lower

14 dose for certain subpopulations."

15        Do you see that?

16        A.    Yes, I do.

17        Q.    Okay.  Did you work on this

18 request related to a lower dose

19 development for VTE prevention?

20        A.    No, I did not.

21        Q.    Okay.  Did you work at all

22 on the VTE prevention indication?

23        A.    No, I did not.

24        Q.    Okay.  Who would have had

Protected - Subject to Further Protective Review

```
1   primary responsibility from a clinical

2   pharmacology standpoint for the VTE

3   prevention issues?

4        A.    Well, at that time it would

5   have been An.

6        Q.    Okay.  And do you know if

7   anyone else from -- like took over for An

8   when she transitioned?

9        A.    No.  That would have come to

10  me.

11       Q.    Okay.

12       A.    If this was still a topic,

13  yeah, that would have come to me.

14       Q.    Okay.  Now, the third bullet

15  point says, "F-2-F," that's face-to-face,

16  "FDA meeting to take place on March 5th

17  to discuss monitoring."

18            Do you see that?

19       A.    Yes, I do.

20       Q.    Okay.  Now, when it talks

21  about monitoring -- I think you probably

22  know that you and I are going to talk a

23  little bit about monitoring today.

24       A.    Certainly.
```

Protected - Subject to Further Protective Review

1    Q.   But when it talks about

2    monitoring, it's not talking about

3    routine clinical monitoring of like

4    something like PD or PK/PD parameters,

5    or -- or do you know?

6    A.   I -- in this context, I do

7    not know specifically.

8    Q.   Do you recall that there

9    were some issues that had been raised

10   regarding the conduct of the RECORD

11   studies and the need to monitor those

12   trials more closely?

13           MR. ZELLERS:  Object to

14        form.

15           THE WITNESS:  Again, it

16        would be speculating.  I wasn't

17        involved in the RECORD trials.

18   BY MR. OVERHOLTZ:

19        Q.   That's fine.

20           Now, it does say that "there

21   was a separate FDA meeting, I would

22   suggest face-to-face, to take place after

23   the monitoring meeting to discuss

24   development, lower dose, and design a

1    renal DDI study."

2                    Do you see that?

3         A.    I do.

4         Q.    Okay.  Now, when it says

5    "DDI," what does that mean?

6         A.    Drug-drug interaction.

7         Q.    And -- and that was

8    something that you ended up having some

9    role in supporting; is that right?

10        A.    Yes.

11        Q.    Okay.  Is there a separate

12   renal dose for Xarelto in the VTE

13   prevention indication?

14        A.    Not for VTE prevention, no.

15        Q.    There is a lower renal dose

16   for Afib indication; is that right?

17        A.    That is correct.

18        Q.    VTE treatment as well?

19        A.    No.  There's only a lower

20   dose for the Afib indication.

21        Q.    So only a lower dose for the

22   Afib indication?

23        A.    That is correct.

24        Q.    Okay.  So let's -- let's

Protected - Subject to Further Protective Review

1  look at Slide 8 which deals with the ACS

2  indication.  And ACS, the -- there was a

3  Phase II study called the ATLAS TIMI 46

4  study, right?

5       A.    Correct.

6       Q.    Okay.  And had that been

7  completed by the time that you kind of

8  took over responsibility for Xarelto?

9       A.    Yes.

10      Q.    Okay.  And there was also --

11 if you can flip over to the next slide if

12 you want to, quickly.  And there was a

13 Phase III study called the ATLAS2 TIMI 51

14 study.  Was that a study that had been

15 completed by the time you took over

16 responsibility or was that a study that

17 was ongoing at the time?

18      A.     It was a study that was

19 ongoing at the time.

20      Q.    Okay.  And you can see --

21 just so we don't have to flip back to it.

22      A.    Sure.

23      Q.    -- the TIMI 51 study looked

24 at two doses, a 2.5-milligram dose and

Protected - Subject to Further Protective Review

1    5-milligram dose that were dosed BID or

2    twice daily, right?

3         A.    Correct.

4         Q.    Okay.  And when it talks

5    about a Phase III study, Phase III study

6    is the study -- the last study that you

7    do before you seek approval of the drug,

8    right, pivotal study?

9         A.    Considered a pivotal study.

10        Q.    Okay.  And so ATLAS2 TIMI 51

11   is a Phase III study.  The ROCKET study,

12   who the jury and -- and the Court are

13   going to hear a lot about, that's a Phase

14   III study as well, right?

15        A.    That's correct.

16        Q.    Okay.  Now, it says here for

17   the ATLAS2 TIMI 51 study, that there was

18   no PK or PD.

19             Do you see that?

20        A.    Yes, I do.

21        Q.    Okay.  But if we look back

22   at ATLAS TIMI 46, which was a Phase II

23   study, at the very -- the top bullet

24   point it says, "Sparse PK and PD for all

Protected - Subject to Further Protective Review

1    patients."

2              Do you see that?

3         A.    I do, yes.

4         Q.    All right.  Now, are you

5    familiar with the PK/PD analysis that was

6    done for the ATLAS TIMI 46 study?

7         A.    I am.  It's been a while

8    since I looked at it.

9         Q.    Okay.  It was something you

10   would have looked at as part of your job

11   as clinical pharmacology leader?

12        A.    Sure.

13        Q.    Okay.  Now, if you can look

14   with me -- one, two, three, four -- the

15   fourth bullet point down.  It says,

16   "Comment with respect to PD sample

17   analysis.  Three different PT assays were

18   used throughout the course of the PD

19   sample analysis."

20              Now, PT, that's prothrombin

21   time; is that right?

22        A.    Correct.

23        Q.    Okay.  And PT is a

24   measurement of a pharmacodynamic or PD

Protected - Subject to Further Protective Review

1   effect; is that right?

2        A.    It can be, yes.

3        Q.    Okay.  Now, it says in kind

4   of parentheses at the end of that bullet

5   point, "The Neoplastin assay used for all

6   samples."

7             Do you see that?

8        A.    Yes.

9        Q.    Neoplastin is one of the PT

10  reagents that are used when testing PT?

11       A.    That is correct.

12       Q.    Okay.  And in -- when the

13  company -- when -- let's just stick with

14  Janssen for a minute.  In the studies

15  that Janssen were involved with, when the

16  PT was measured in patients, was the --

17  in the clinical studies, was PT

18  Neoplastin the test that was used in the

19  clinical studies that you were familiar

20  with?

21       A.    As far as I know, the -- the

22  entire program attempted to use the

23  Neoplastin as -- as the reagent for PT.

24       Q.    Okay.  And did you have a

1   recollection as to why PT Neoplastin had

2   been chosen as a reagent that was used in

3   the clinical study program?

4        A.    I believe the data collected

5   to date by the time the project came over

6   to me showed that Neoplastin was more

7   sensitive to the effects of rivaroxaban

8   than some of the other reagents that were

9   used.

10        Q.    And there had been some

11  PK/PD analysis that had indicated there

12  was a closer or more linear relationship

13  between PT using Neoplastin and drug

14  concentration; is that right?

15             MR. ZELLERS:  Object to

16        form.

17             THE WITNESS:  So there is a

18        close to linear relationship

19        between PT and plasma

20        concentration of rivaroxaban.

21  BY MR. OVERHOLTZ:

22        Q.    And if we look at some of

23  the work that Dr. Mueck did over at

24  Bayer, we see that statement a lot, "a

Protected - Subject to Further Protective Review

1  close to linear relationship between PT,

2  Neoplastin and the drug concentration,"

3  right?

4       A.    Plasma concentration, right.

5       Q.    Yeah, you kind of corrected

6  me when I said drug concentration to be

7  more specific regarding plasma

8  concentration.  Plasma concentration is a

9  measurement of -- a type of measurement

10  of drug concentration levels?

11       A.    It is a measurement of drug

12  concentration levels.

13       Q.    In the blood plasma?

14       A.    In the blood plasma.

15       Q.    Okay.  Now it says,

16  "Outstanding analysis and report

17  containing POP PK population, PD

18  population, PK/PD analysis, Stephen Xu."

19            Do you see that?

20       A.    Yes, I do.

21       Q.    Do you know what Steven's

22  position was at the company?

23       A.    Stephen Xu was the modeling

24  and simulation expert.

Protected - Subject to Further Protective Review

1    Q.    And that's pronounced Xu?

2    A.    I believe so.

3    Q.    Okay.  So he was one of the

4    modeling guys?

5    A.    He was responsible for that,

6    those analyses.

7    Q.    Okay.  Now, the second

8    bullet point is "A PK or PD versus

9    response efficacy safety analysis by

10   Adriane Dune."

11          Do you see that?

12   A.    I do.

13   Q.    That's looking at comparing

14   either PK parameters, pharmacokinetic; or

15   PD, pharmacodynamic parameters, to either

16   safety endpoints from the study or

17   efficacy endpoints in a study.  Is that

18   what that is?

19   A.    From my understanding of

20   this slide, yes.

21   Q.    Okay.  Sometimes I think we

22   see it referred to as an exposure

23   response analysis sometimes?

24          MR. ZELLERS:  Object to

Protected - Subject to Further Protective Review

1            form.

2                    THE WITNESS:  I guess so.

3    BY MR. OVERHOLTZ:

4            Q.    If you're looking at PK

5    compared to responses, sometimes I've

6    seen things -- especially more recently

7    with the European request, that they want

8    some type of exposure response analysis

9    to be conducted.

10                   MR. ZELLERS:  Same

11           objection.

12                   THE WITNESS:  I'm unfamiliar

13           with the current request.

14   BY MR. OVERHOLTZ:

15           Q.    Okay.  You are familiar with

16   the current request from the EMA, are you

17   not?

18           A.    I'm not involved in it.

19           Q.    Okay.  I didn't know.  I'm

20   sorry.  Are you aware of the EMA's

21   request related to an exposure response

22   analysis and looking at whether or not

23   TDM or therapeutic drug monitoring would

24   be beneficial to patients?

Protected - Subject to Further Protective Review

1    A.    I had heard that there was a
2  request that came in.  But that was --
3  that's the extent of it.
4    Q.    Had you been asked based on
5  your formal role as clinical pharmacology
6  lead to provide any support to that EMA
7  TDM request?
8    A.    No, I have not.
9    Q.    When you shifted over to
10  scientific affairs and became scientific
11  director on CV, what would have happened
12  to your information, your files on the --
13  from your clinical pharmacology lead job?
14    A.    Right.  I would have
15  transitioned all that information on to
16  the next scientist that was assigned.
17    Q.    Okay.  And who would that
18  have been?
19    A.    That would have been Clapton
20  Dias.
21    Q.    Clapton just like Eric
22  Clapton?
23    A.    Just like Erik Clapton.
24    Q.    D-I-A-Z?

Protected - Subject to Further Protective Review

1    A.    D-I-A-S.

2    Q.    D-I-A-S.  Okay.  And do you

3  know if Mr. Dias still has that role?

4    A.    No.  He has left the company

5  since then.

6    Q.    Okay.  And do you know if

7  anyone else has transitioned?

8    A.    I believe the transition

9  went from Clapton Dias to Liping Zhang.

10    Q.    Would this have been a

11  situation where you would have moved

12  offices when you took your new job to a

13  different floor, different hallway, or

14  something like that?

15    A.    I changed campuses.

16    Q.    You changed campuses.  Okay.

17  And someone would have taken over your

18  space; is that right?

19    A.    Not necessarily my space,

20  but would have taken over my

21  responsibilities.

22    Q.    Okay.  But you had physical

23  files on your work on the drug?

24    A.    Yes.  I had few physical

Protected - Subject to Further Protective Review

1   files, yeah.

2          Q.     And you would have left them

3   for Mr. Dias at the time?

4          A.      Absolutely.

5          Q.     Okay.  Did you prepare any

6   documents or any -- that would have kind

7   of given Mr. Dias a guide to where he

8   could find things related to the clinical

9   pharmacology work by Janssen on Xarelto?

10         A.      As I remember, I sent him a

11  series of e-mails which -- which outlined

12  and documented what the current

13  responsibilities he would have to take on

14  as the clinical pharmacology leader for

15  Xarelto.

16               In addition I had pointed

17  out where he would be able to find all

18  the electronic documents that I had saved

19  over the years of working on Xarelto

20  within the common drive, pharmacokinetic,

21  pharmacodynamic, or clinical pharmacology

22  common drive, which he could have access

23  to to obtain all those documents.

24         Q.     Okay.  Another study that I

Protected - Subject to Further Protective Review

1  think that we'll talk about today that

2  you may have worked on is on Slide 10.

3            If I lose track of time, by

4  the way -- you're doing fine?

5        A.    I'm doing fine.

6        Q.    Okay.  So if we look at

7  Slide 10, this is talking about Phase III

8  Afib.  And of course the ROCKET study is

9  mentioned.  And that was the main pivotal

10  Phase III trial for ROCKET, correct?

11        A.    Correct.

12        Q.    Okay.  That study tested a

13  once daily dose in the patients that

14  suffered from nonvalvular atrial

15  fibrillation, correct?

16        A.    Yes, that's correct.

17        Q.    And that dose was either

18  20 milligrams for a majority of the

19  patients and 15 milligrams for patients

20  that suffered from moderate renal

21  insufficiency?

22        A.    Correct.

23        Q.    And moderate renal

24  insufficiency in ROCKET was defined as

Protected - Subject to Further Protective Review

1    those with a creatinine clearance of 30

2    to 50 milliliters a minute; is that

3    right?

4                    MR. ZELLERS:  Object to

5           form.

6                    THE WITNESS:  I believe so.

7           I believe that is the --

8    BY MR. OVERHOLTZ:

9           Q.    Okay.  Yeah, I'm not testing

10   every number, though I think you do know

11   more than most.

12                    There was definitely a

13   definition for moderate renal

14   insufficiency that was applied to

15   patients during the ROCKET study?

16          A.    That's correct.

17          Q.    And of course, it says that

18   all subjects had two PD samples, one at

19   Week 12 and one at Week 24 in the study.

20   And that comports with your recollection

21   of how ROCKET was performed?

22          A.    Yes.

23          Q.    Okay.  Now, at some point

24   there was a -- I believe, a regulatory

Protected - Subject to Further Protective Review

1   request and then compliance to do some

2   type of a substudy that had a little more

3   PK/PD analysis component; is that right?

4           MR. ZELLERS:  Object to

5       form.

6           THE WITNESS:  I'm not aware

7       of a specific request, because the

8       study was already designed by the

9       time I had it.  But obviously, the

10      ROCKET study had a small subgroup

11      of patients that had both PK and

12      PD collected.

13  BY MR. OVERHOLTZ:

14      Q.    So by the time that you took

15  responsibility, there was a small

16  substudy going on that was looking at

17  matched PK/PD parameters in patients?

18      A.    That is correct.

19      Q.    And when we talk about the

20  idea of matched PK/PD, can you just

21  explain that concept, simply as what

22  you're trying to do as far as matching

23  the values taking in patients --

24      A.    Sure.

Protected - Subject to Further Protective Review

1    Q.    -- and why it's called a

2  matched PK/PD analysis?

3    A.    The term "matched" only

4  refers to the fact that a sample was

5  taken for both pharmacokinetics and

6  pharmacodynamics at the same time point.

7    Q.    So if you're going to

8  measure drug plasma concentrations and

9  then try to determine if there is a

10  relationship with a PD measurement, you

11  need to take those samples at the same

12  time?

13    A.    That's correct.

14    Q.    Okay.  Now, it says,

15  "Original rich sampling, but enrollment

16  not good.  Only six to eight patients.

17  Substudy amended with sparser sampling."

18         Had that already happened by

19  the time you took over responsibility?

20    A.    That's correct.

21    Q.    Okay.  It says, "Projected

22  enrollment 200 patients with about 15

23  percent moderate renal.  Actual

24  enrollment 281 patients, including 41

Protected - Subject to Further Protective Review

1    moderate renal patients."

2              Do you see that?

3         A.    I do.

4         Q.    Okay.  Did you do work on

5    the analysis of the small PK/PD substudy

6    for ROCKET?

7         A.    The primary work was done by

8    the modeling and simulation expert Ihab

9    Girgis.

10        Q.    Okay.  From an employment

11   perspective, how did Mr. Girgis's

12   position relate to your position at

13   Janssen.  Did he report to you?

14        A.    No.  We were -- we were part

15   of a team.  So his responsibility was

16   more, again, for the modeling and

17   simulation of the results.  He was

18   responsible for analyzing and reporting

19   the results from both the small

20   pharmacokinetic/pharmacodynamic subset

21   study as you've defined, but also the

22   large pharmacodynamic analysis that

23   occurred.

24        Q.    And -- but you did have with

Protected - Subject to Further Protective Review

1  respect to this PK -- matched PK/PD

2  substudy in ROCKET, you had interactions

3  with Mr. Girgis and worked with him on

4  his work on this study; is that right?

5       A.   I would have interactions

6  with him, yes.

7       Q.   Now, of the -- of the 281

8  patient that were enrolled in this PK/PD

9  matched substudy, do you know how many of

10 those patients were from the United

11 States?

12      A.   Not off the top of my head.

13      Q.   ROCKET was a study that was

14 conducted both in Europe as well as in

15 the United States and North America; is

16 that right?

17      A.   That's correct.

18      Q.   Okay.  Do you know what the

19 breakdown was between Europe and North

20 America?

21           MR. ZELLERS:  Object to

22      form.

23           THE WITNESS:  I do not know.

24 BY MR. OVERHOLTZ:

Protected - Subject to Further Protective Review

1          Q.   Okay.  Do you think it's

2  fair to say that more of the patients

3  were enrolled in European centers

4  compared to the United States?

5             MR. ZELLERS:  Same

6        objection.

7             THE WITNESS:  I would have

8        to look at the document to be able

9        to comment on that.

10  BY MR. OVERHOLTZ:

11          Q.   I'm sure we'll have one --

12          A.   Sure.

13          Q.   -- that will give us some

14  details.

15            The next bullet point talks

16  about the fact that PD sample analysis

17  done by DCRI, PK sample analysis done by

18  Bayer.

19            Do you see that?

20          A.   I do.

21          Q.   And DCRI, that was who?

22          A.   DCRI is an acronym for Duke

23  Clinical Research Institute.

24          Q.   Okay.  And they are the

Protected - Subject to Further Protective Review

1   group that was brought in by Janssen to

2   run the ROCKET study; is that right?

3          A.    That's correct.

4          Q.    Okay.  That was Dr. Califf's

5   group at Duke; is that right?

6          A.    I believe he was part of

7   that group, yeah.

8          Q.    And that's the same

9   Dr. Califf that's now the FDA

10  commissioner; is that right?

11         A.    I believe that's his current

12  role.

13         Q.    Okay.  Do you know what led

14  to the PD sample analysis being done by

15  DCRI?

16         A.    I'm not sure how the

17  division of work was set up at the time

18  that the study was created.  So, no, I

19  don't think I can comment on that.

20         Q.    We're looking on this

21  PowerPoint that An Thyssen sent to you in

22  January 2010.  And this is prior to the

23  FDA approving Xarelto for treatment of

24  patients with atrial fibrillation, right?

Protected - Subject to Further Protective Review

1    A.    That is correct.

2    Q.    Okay.  Now at this time

3  period, it was Janssen's position that PT

4  could be a good tool for -- as a

5  surrogate measurement tool for the plasma

6  concentrations for Xarelto, right?

7            MR. ZELLERS:  Object to

8       form.

9            THE WITNESS:  I believe at

10      the time, which is still a thought

11      today, if you use Neoplastin plus

12      as the reagent for PT, you can

13      indirectly measure plasma

14      concentrations of Xarelto.

15  BY MR. OVERHOLTZ:

16    Q.    And that fact, that PT using

17  the Neoplastin reagent, could be used as

18  an indirect measurement of plasma

19  concentrations of Xarelto, that was an

20  important fact for the company to tell

21  the FDA with respect to getting the drug

22  approved, correct?

23            MR. ZELLERS:  Object to

24       form.

Protected - Subject to Further Protective Review

1           THE WITNESS:  I don't know

2      how important of a fact it was.

3      It was just part of the profile of

4      the drug itself.

5  BY MR. OVERHOLTZ:

6      Q.    That fact was certainly part

7  of the information that was submitted to

8  the FDA seeking approval for the Afib

9  indication, correct?

10     A.    It was part of the

11 information, sure.

12     Q.    It's certainly important for

13 a company to be able to say that there is

14 a way to know how much drug is being,

15 from a PK perspective, taken in by a

16 patient.  Is that a fair statement?

17          MR. ZELLERS:  Object to

18      form.

19          THE WITNESS:  Can I ask you

20      to rephrase that?

21 BY MR. OVERHOLTZ:

22     Q.    Yeah.  That was a bad

23 question.

24     A.    Sorry.

Protected - Subject to Further Protective Review

1       Q.    It was certainly important

2    for the company to be able to say that

3    there was a method to -- that could be

4    used clinically to evaluate the amount of

5    drug in someone's system.

6       A.    I believe in those rare

7    circumstances where you would have a

8    desire to understand if there is drug in

9    your system, for example for compliance,

10   if there is a patient that goes in for

11   emergency surgery, it would be a benefit

12   to have that information, yes.

13      Q.    Certainly, in a situation

14   where you need to know is the drug -- and

15   I've seen the term used -- is the drug on

16   board, having that ability was something

17   that was considered important by the

18   company?

19          MR. ZELLERS:  Object to

20      form.

21          THE WITNESS:  Again, I can't

22      speak to the importance of that.

23      But it was just -- it was part of

24      the profile of the drug.

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2         Q.    If there was difficulty in

3    determining whether the drug was on

4    board, that would not lead to a favorable

5    view of the drug as far as being able to

6    safely use the drug.  Is that a fair

7    statement?

8              MR. ZELLERS:  Object to

9         form.

10             THE WITNESS:  Would you mind

11        rephrasing that?

12   BY MR. OVERHOLTZ:

13        Q.    Yeah, sure.  If you're going

14   to evaluate the safety of this drug,

15   certainly being able to determine whether

16   or not the drug is on board and how much

17   would be important to that safety

18   analysis?

19             MR. ZELLERS:  Same

20        objection.

21             THE WITNESS:  Again,

22        probably when -- when it comes to

23        concerns of safety, I'm not a

24        physician, so I would have to

1          defer back to my clinical

2          colleagues to be able to properly

3          answer that question.

4    BY MR. OVERHOLTZ:

5          Q.    As the ClinPharm lead, was

6    that something that was communicated to

7    you, that, we believe it's important that

8    we be able to determine whether and how

9    much drug is on board in a patient?

10             MR. ZELLERS:  Object to

11         form.

12             THE WITNESS:  I believe the

13         only thing that was communicated

14         to a ClinPharm, as a clinical

15         pharmacology lead, was that PT,

16         again using the proper reagent,

17         could be used as an indirect

18         measure of drug concentration.

19         The importance of that is a

20         clinical determination.

21   BY MR. OVERHOLTZ:

22         Q.    So one of the things -- and

23   you and I already talked about this --

24   that was being told in the information

Protected - Subject to Further Protective Review

1  submitted to the FDA was that PT had this

2  close to linear relationship with plasma

3  concentrations when you used the

4  Neoplastin reagent; is that right?

5          A.    That's correct.

6          Q.    Okay.  Let's look at Slide

7  Number 11 here.  And so in this 2010

8  PowerPoint by An Thyssen sent to you,

9  she's talking about Afib Phase III.  And

10  the second bullet point says that the

11  PK/PD analysis is going to be done by

12  Ihab Girgis.

13             Do you see that?

14          A.    I do.

15          Q.    Okay.  And I think you told

16  me that Mr. Girgis was in the modeling

17  department; is that right?

18          A.    I believe it was the

19  modeling and simulation group, yeah.

20          Q.    And is he still with the

21  company?

22          A.    No, he is not.

23          Q.    Okay.  When did he leave?

24          A.    I don't know the exact date,

Protected - Subject to Further Protective Review

1  but I believe it was in 2015.

2          Q.     And do you know why he left

3  the company?

4          A.     I do not know.

5          Q.     Did you have any

6  conversations with him about why he was

7  leaving the company?

8          A.     No, I did not.

9          Q.     He resigned, correct?

10         A.     I don't know the specifics

11  to it, but I assume it.

12         Q.     Okay.  If you can look with

13  me at the fourth bullet point, it says,

14  "PK and PD analysis.  Confirm lin" --

15  linear -- "relationship between PK and

16  PD.  Confirm PT can be used as a

17  surrogate marker of exposure."

18             Did I read that correctly?

19         A.     According to this, what I'm

20  seeing, yes.

21         Q.     Okay.  So it's January 2010.

22  There looks to be associated with the

23  Afib indication a goal to confirm that PT

24  could be used as a surrogate marker of

Protected - Subject to Further Protective Review

1    exposure for Xarelto, right?

2         A.    Surrogate marker or an

3    indirect, yeah.

4         Q.    Okay.  Now, the next one,

5    bullet point, is, "PD versus covariates,

6    bleeding, analysis, details to be worked

7    out ASAP.  Check with Christopher Nessel,

8    and Gary Peters and Bayer."

9              Now -- I read that

10   correctly?

11        A.    I believe so, yes.

12        Q.    Okay.  This is talking about

13   doing an analysis where you compare PD

14   measurements, like we've talked about PT

15   can be one of those --

16        A.    Mm-hmm.

17        Q.    -- versus, the first one is

18   covariates.  What are covariates?

19        A.    So within that type of

20   analysis covariates would account for

21   those intrinsic factors within a person.

22   So when I say "intrinsic factors," that

23   would be things like age, renal function,

24   body weight, gender, all of those things

Protected - Subject to Further Protective Review

1   that may potentially affect the -- the

2   plasma concentration of any drug within

3   your system.

4        Q.    Okay.  So we're trying to

5   see if there's any particular patient

6   characteristics that might be affecting

7   how -- how the body responds to the drug?

8        A.    Again, it's intrinsic

9   factors.

10        Q.    Would that include things

11   like renal impairment or liver disease,

12   things like that?

13        A.    It would -- it would include

14   things like renal impairment and liver

15   dysfunction.

16        Q.    Okay.  What about drug-drug

17   interaction, would that be considered a

18   covariate as well?

19        A.    It wouldn't be considered an

20   intrinsic factor.  It would be considered

21   an extrinsic factor.

22        Q.    Okay.  The next one that was

23   listed was bleeding.  And that's more of

24   a safety response or safety endpoint,

Protected - Subject to Further Protective Review

1  correct?

2        A.    That is, yes.

3        Q.    So do you know if Janssen

4  conducted this analysis that evaluated

5  the association between PD measurements

6  in patients taking Xarelto and bleeding?

7        A.    We assessed a lot of the PD

8  values collected through the study to see

9  if there was any -- any relationship

10  between the PD data collected from the

11  study and whether or not it could lead to

12  a potential bleeding event.

13        Q.    And the FDA did their own PD

14  versus bleeding analysis as well,

15  correct?

16        A.    I believe so.

17        Q.    Okay.  They did it a

18  different way than Janssen did it,

19  correct?

20        A.    That is correct.

21        Q.    Okay.  Janssen said, well,

22  let's look at -- let's look at people

23  that didn't bleed and see what their

24  range of PT values are and compare that

Protected - Subject to Further Protective Review

1  range to the people who did have bleeds,

2  right?

3         A.    That was one way.

4         Q.    That way doesn't make a lot

5  of sense though, does it?

6               MR. ZELLERS:  Object to

7         form.

8               THE WITNESS:  I disagree.

9  BY MR. OVERHOLTZ:

10        Q.    Because, just because you

11 have a high PT doesn't mean you're going

12 to have a bleed, right?

13        A.    That is correct.

14        Q.    I mean, you can walk around

15 with high PTs and not have a bleed at

16 all, right?

17        A.    As far as I understand.

18        Q.    Okay.  PT, a higher PT is

19 really an indication of a higher bleeding

20 risk, correct?

21               MR. ZELLERS:  Object to

22        form.

23               Go ahead.

24               THE WITNESS:  I don't know

Protected - Subject to Further Protective Review

1              if I can answer the specific risk

2              in regards to whether or not you

3              have the high -- higher PT leading

4              to risk.  That is what the -- the

5              FDA assumes to say.

6     BY MR. OVERHOLTZ:

7              Q.    And that was something that

8     you agreed with that -- well, let's break

9     it down.  I don't want to -- let's break

10    it down into two different parts.

11              PT -- strike that.  Let me

12    start over.

13              Do you agree that PT or an

14    increased PT --

15              MR. ZELLERS:  Mr. Overholtz,

16         as we go through, can we just

17         assume that when -- unless you

18         state otherwise, that when you use

19         the term "PT" you mean with

20         Neoplastin plus reagent?

21              MR. OVERHOLTZ:  Yeah, unless

22         we get --

23              MR. ZELLERS:  Okay.

24              MR. OVERHOLTZ:  -- we'll

Protected - Subject to Further Protective Review

1   obviously talk about -- we're

2   going to talk about some variants

3   later and --

4           MR. ZELLERS:  And -- and if

5   we do, if you'll make that --

6           MR. OVERHOLTZ:  Make it

7   clear.

8           MR. ZELLERS:  Make it clear.

9   But I just don't want to have

10  either you or the witness have to

11  include that every time.

12          MR. OVERHOLTZ:  Every time.

13  I agree.  That's fine.

14  BY MR. OVERHOLTZ:

15      Q.   That's fine.  If I need you

16  to talk about differences in PT tests,

17  we'll talk about that.

18          MR. ZELLERS:  Thank you.

19  Sorry.

20  BY MR. OVERHOLTZ:

21      Q.   Do you agree with the

22  statement that PT -- increased PT, does

23  not cause someone to bleed?

24          MR. ZELLERS:  Object to

Protected - Subject to Further Protective Review

 1          form.

 2              THE WITNESS:  Could you

 3          repeat the question, please?

 4      BY MR. OVERHOLTZ:

 5          Q.    Yeah.  In and of itself does

 6      an increased PT cause bleeding in a

 7      patient?

 8          A.    I'm not a clinician.  I

 9      won't be able to answer specifically if

10      that's going to cause a bleed or not.

11          Q.    Let me -- let me just go

12      back and say that -- I'll just restate

13      the question because I'm just going to

14      ask you from your understanding in your

15      role as a ClinPharm lead with the

16      company.

17              In your role with the

18      company as a clinical pharmacology lead,

19      and not one of the clinicians of the

20      company, did you have an understanding,

21      though, that simply having an increased

22      PT does not necessarily cause a patient

23      to bleed?

24          A.    Again, as part of my role as

Protected - Subject to Further Protective Review

1  clinical pharmacology lead, not a

2  clinician, it was my understanding that

3  you can have a high PT value and not

4  bleed.

5       Q.    Okay.  Do you also agree

6  that increased PT, in your role as

7  clinical pharmacology lead and your

8  understanding, is a better measurement of

9  bleeding risk?

10            MR. ZELLERS:  Object to

11       form.  Better than?

12  BY MR. OVERHOLTZ:

13       Q.    Better than determining

14  whether someone is going to bleed or not.

15            MR. ZELLERS:  Object to

16       form.

17            THE WITNESS:  I don't --

18       could you possibly reword that

19       question.

20  BY MR. OVERHOLTZ:

21       Q.    Yeah, sure.  Yeah, I don't

22  want to make you answer a question that

23  you don't understand.  And it's probably

24  my fault.

Protected - Subject to Further Protective Review

1        A.     That's all right.

2        Q.     We'll redo it.

3               I didn't want to ask a big,

4    long question.

5        A.     Sure.

6        Q.     I was trying to break it

7    down, but sometimes that makes it even

8    more confusing.

9               Do you agree with the

10   statement that having a high PT in and of

11   itself does not mean that a patient is

12   going to bleed, but instead that PT is

13   more of an indication of their bleeding

14   risk?

15       A.     I would agree with the first

16   part of your statement that having a high

17   PT does not mean that the patient is

18   going to bleed.

19              I don't know if I can agree

20   with the statement in regards to having a

21   high PT leading to a higher risk.

22       Q.     Okay.  The -- let's talk

23   about the first part of the statement for

24   a second.

Protected - Subject to Further Protective Review

1          A.     Okay.

2          Q.     For a bleed to happen, from

3     your understanding as clinical

4     pharmacology lead, there needs to be some

5     type of injury or insult to the body.  Is

6     that a fair statement?

7          A.     From my limited

8     understanding, sure.

9          Q.     It could be a cut.

10          A.     Absolutely.

11          Q.     It could be -- it could be a

12     gastric ulcer.

13          A.     Sure.

14          Q.     Some type of insult, injury,

15     pathology to the body that is a potential

16     bleeding site.  Is that a fair statement?

17          A.     I believe that's a fair

18     statement.

19          Q.     Okay.  And now, if you have

20     two patients, two people, and with -- one

21     with a normal PT and one with let's call

22     it a significantly elevated PT --

23          A.     Okay.

24          Q.     -- and they each get a cut

Protected - Subject to Further Protective Review

1  on their arm, the one with the higher PT,

2  that bleed is going to take longer to

3  stop bleeding.  Was that your

4  understanding?

5          MR. ZELLERS:  Object to

6      form.

7          THE WITNESS:  I'm not,

8      again, an expert in the

9      physiological response of

10      increased PT, so I don't know if I

11      can adequately answer your

12      question in regards to that.

13  BY MR. OVERHOLTZ:

14      Q.    Okay.  Well, let's talk

15  about it from kind of a PK/PD

16  perspective.

17      A.    Okay.

18      Q.    PT tells you more about

19  what's going to happen with that bleed,

20  if there is a reason for you to bleed.

21          MR. ZELLERS:  Object to

22      form.  Go ahead.

23          THE WITNESS:  So from my

24      understanding, PT is a measure of

Protected - Subject to Further Protective Review

1        your body's ability to

2        anticoagulate -- or coagulate.

3        Sorry.

4   BY MR. OVERHOLTZ:

5        Q.    PT is a measurement of your

6   body's ability to coagulate or to stop a

7   bleed; is that right?

8        A.    Well, that's partially

9   correct, yes.  I think there's other much

10  broader physiological processes that are

11  involved.  So I couldn't say that PT

12  alone would be responsible for that.

13       Q.    Right.  I'm trying to keep

14  it at a certain level of simplicity

15  without getting too much into the weeds.

16       A.    It's a complex -- it's a

17  complex issue, so...

18       Q.    Maybe to get a little deeper

19  into it, one of the things that your body

20  does is generate thrombin to reduce or

21  I'll say coagulate the blood so that a

22  bleed would stop.  Is that a fair

23  statement?

24       A.    That's one of the processes.

Protected - Subject to Further Protective Review

1    Q.    And, in fact, one of the

2    things that Xarelto does is actually

3    inhibit the generation of that thrombin;

4    is that right?

5    A.    Yes.  Inhibition of that.

6    Q.    It inhibits something called

7    Factor Xa?

8    A.    Yes.

9    Q.    And somehow that inhibits

10   the generation of thrombin?

11   A.    It's a downstream effect of

12   inhibiting the Factor Xa, yes.

13   Q.    So if -- and, in fact, PT is

14   often expressed in terms of a unit of

15   measurement in seconds; is that right?

16   A.    I believe so, yes.

17   Q.    So it's actually a

18   measurement of the time it takes for

19   certain clotting parameters to be seen in

20   the blood when they conduct that

21   laboratory test?

22   A.    Specifically to PT, yes.

23   Q.    Specific to PT.

24   A.    Yes.

Protected - Subject to Further Protective Review

1          Q.    So PT can be a measurement

2    of -- strike that.  That's not a good way

3    of putting that.  I'm trying to keep it

4    simple.

5          A.    That's all right.

6          Q.    I apologize for my

7    struggles.

8          A.    No worries.

9          Q.    We don't want to get too

10   deep into the weeds.  We may have to a

11   little bit later, but we'll keep that

12   very short and as brief as possible.

13              And maybe you answered this,

14   but let me ask you again.  Do you agree

15   that PT, from a pharmacodynamic

16   evaluation standpoint, is a measurement

17   of what happens with a patient's blood if

18   they have a bleed?

19              MR. ZELLERS:  Object to

20        form.

21              THE WITNESS:  I don't know

22        if I can answer that specifically,

23        that PT -- again, I'm sorry.

24        Maybe I'm misunderstanding the

Protected - Subject to Further Protective Review

1      question because --

2  BY MR. OVERHOLTZ:

3      Q.    Yeah.  Let me put it a

4  different way maybe.

5      A.    Okay.

6      Q.    Because it kind of occurred

7  to me as I was asking the question.

8          Is PT a -- from a

9  pharmacodynamic measurement perspective,

10 is PT a predictor of what would happen to

11 a patient's blood if they had a bleed?

12          MR. ZELLERS:  Object to

13      form.

14          THE WITNESS:  What do you

15      mean by "predictor"?

16 BY MR. OVERHOLTZ:

17     Q.    In other words, how long it

18 would take their bleed to coagulate and

19 stop.

20     A.    I believe PT is a measure of

21 the -- again, the body's ability to

22 coagulate.  How that relates to the

23 downstream effects of blood cessation or

24 stopping the bleed, I don't know enough

Protected - Subject to Further Protective Review

1    about that to be able to adequately

2    answer your question.

3          Q.    Let me take it back to a few

4    minutes ago when we were talking about

5    the way that you would analyze it.  We

6    talked about one of the things that

7    Janssen and Bayer worked on was comparing

8    the range of PTs in the patients that

9    didn't have bleeds to the range of PTs in

10   the people that did have bleeds.

11         A.    That's correct.

12         Q.    And I've seen it expressed

13   lots of different ways with graphs and

14   with box of whiskers plots.  But that was

15   an analysis that was performed?

16         A.    That was an analysis.

17         Q.    Okay.  Another analysis that

18   could be done is to actually look at the

19   people that had bleeds and then determine

20   whether the people that have had bleeds,

21   did the people with higher PTs have a

22   higher proportion of those bleeds?

23              MR. ZELLERS:  Object to

24         form.

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2         Q.     Is that another analysis

3    that could be done?

4         A.     There's probably many ways

5    to analyze it.  That could be one.

6         Q.     And one of the ways in which

7    those analysis had been done that I've

8    seen is where you could take the patients

9    that had bleeds and break them up into

10   something like quartiles or terciles

11   based on their PT levels and see how that

12   corresponded to the number of bleeding

13   events.

14        A.     Your question being?

15        Q.     Is that the type of analysis

16   that you're familiar with that can be

17   done?

18        A.     I believe that can be done.

19        Q.     Okay.  And have you actually

20   seen the analysis that was done with

21   respect to the EINSTEIN Phase II study

22   and the apixa DVT treatment study with

23   that regard, doing it that way?

24        A.     So those Phase II studies I

Protected - Subject to Further Protective Review

1    was not involved with.  And I would have

2    to go back and take a look at those

3    documents.

4         Q.    Okay.  Now, you and I talked

5    about the fact that one of the things

6    that was going on at the time and

7    believed by the companies was that there

8    was a close to linear relationship

9    between PT measured by Neoplastin and

10   plasma concentrations; is that right?

11        A.    That's correct.

12        Q.    Okay.  Have you seen in the

13   ACS indication the analysis that Janssen

14   performed that looked at the different

15   quartiles of plasma concentrations for

16   the patients and compared those to

17   bleeding events?

18        A.    No.  I'm -- no, not -- not

19   that analysis.  I'm sorry.

20        Q.    Do you know why the company

21   didn't do that type of analysis where you

22   would either look at PT -- or let's

23   just -- let's not make it complicated.

24   Let's make it simple PT.

Protected - Subject to Further Protective Review

1             Why the company didn't do an

2    analysis where they broke the people in

3    the ROCKET study that had bleeds and

4    looked at their PT information divided by

5    either quartiles or terciles to determine

6    whether people with the highest PT

7    numbers had a higher proportion of

8    bleeds?

9         A.    I can't speak to the reasons

10   why the modeling and simulation group may

11   not have looked at it in that format.

12   But we did do a substantial investigation

13   of PT and its potential relationship to

14   bleeding.

15             Would it be okay in the next

16   five minutes or so to take a break?

17        Q.    Absolutely.  Just give me

18   one second.

19        A.    Sure.

20        Q.    I just want to see if I have

21   to ask you about this or not, or if we

22   can skip it based on the discussion that

23   we just had.

24        A.    Sure.

Protected - Subject to Further Protective Review

1        Q.    Okay.  Just let me ask you a

2   couple questions, and we'll wrap up and

3   take a break.

4        A.    Okay.

5        Q.    I want to ask you a couple

6   questions about this same slide we were

7   looking at.  This is more of my trying to

8   learn some information.

9        A.    Sure.

10        Q.    It says, "PK and PD results

11   will not be part of the CSR."  That's

12   clinical study report?

13        A.    It is clinical study report.

14        Q.    Okay.  And that's kind of

15   like the internal clinical study report

16   developed by the company, correct?

17        A.    It is a report developed by

18   the company submitted to the agencies.

19        Q.    Typically to be submitted to

20   a regulatory agency?

21        A.    Typically, yes.

22        Q.    Okay.  It's not the

23   published manuscript that we see in a

24   journal like when ROCKET was published,

Protected - Subject to Further Protective Review

1  correct?

2      A.    No.  Generally that -- that

3  type of manuscript is based on the CSR.

4      Q.    There was something I wanted

5  to ask you about on Page 16.  It talks

6  about the Afib filing on Page 16.

7          And it says, "Not discussed

8  at face-to-face meeting.  In case Afib

9  and VTE treatment submissions would

10 happen at different times in U.S. and new

11 Phase I data would become available in

12 the meantime, who to update the relevant

13 ClinPharm submission docs."

14          So seeing that, do you

15 recall what the discussion was with

16 respect to why or why not Afib and VTE

17 treatment would not have been submitted

18 at the same time?

19     A.    That's -- I don't.  That

20 would be a regulatory-type question in

21 regards to when the studies had completed

22 and -- and the data was available for

23 submission.

24     Q.    Okay.  Let's look at Page 18

Protected - Subject to Further Protective Review

1    real quick.  Let me ask you this.  Did --

2    do you have a recollection that the VTE

3    and Afib were submitted together in

4    Europe, to the European regulatory

5    authorities?

6                  I think it says it there on

7    the --

8         A.    Yeah, I believe it was.  I

9    believe it was.

10        Q.    Again, I'm -- I'm not

11   testing your memory --

12        A.    It was six years ago.  I'm

13   trying to think.  But, yes, I believe

14   that was the case, yeah.

15        Q.    Okay.  And then if you look

16   with me on the third bullet point, it

17   says, "U.S. not clear whether this will

18   be filed together with Afib, will depend

19   on results from PE.  If superiority would

20   be shown, arrow, file together with Afib,

21   otherwise would be 1 quarter 2011."

22                  Do you see that?

23        A.    I do see that.

24        Q.    Okay.  And when we talk

Protected - Subject to Further Protective Review

1   about a VTE treatment indication, we're

2   talking actually about trying to either

3   reduce the size of a clot or prevent a

4   clot from getting bigger in someone who

5   actually has venous thromboembolus; is

6   that right?

7            A.    DVT or PE.

8            Q.    Okay.  And that could either

9   be a DVT, a deep vein thrombosis; or a

10  PE, a pulmonary embolism.

11           A.    My understanding, yes.

12           Q.    And in the EINSTEIN study

13  itself, was -- was there separate

14  analysis looking at PE compared to DVT?

15           A.    Again, I would have to refer

16  back to one of my clinical colleagues in

17  regards to that.

18           Q.    Okay.  That's something you

19  don't really recall how the EINSTEIN was

20  conducted and performed?

21           A.    I wasn't involved in the

22  EINSTEIN program.  I mean, given the

23  manuscripts I can answer your question,

24  but off the top -- I couldn't -- off the

Protected - Subject to Further Protective Review

1   top of my head, I don't think I could

2   adequately answer your question.

3           Q.    Okay.  But when it talks

4   about whether they are going to be filed

5   together with Afib or not, depending on

6   the results from PE, it's your

7   understanding that's referring to the

8   EINSTEIN study and the results that it

9   would show in treating people with

10  pulmonary embolism?

11          A.    Right.  I know the EINSTEIN

12  was broken up with assessment of DVT and

13  PE separately.  Again, that's my -- that

14  was my understanding obviously of how the

15  trial was designed and performed.

16               Regarding the timing of its

17  filing, again that's -- that was more of

18  a regulatory decision than anything.

19          Q.    Okay.  Are you familiar with

20  the J-ROCKET study?

21          A.    Part of it, yes.  I wasn't

22  involved in it.

23          Q.    Okay.  You were not involved

24  in J-ROCKET?

Protected - Subject to Further Protective Review

1        A.    No.

2        Q.    That was a study of -- kind

3   of a ROCKET-style study in Japanese

4   patients?

5        A.    From my understanding, yes.

6        Q.    Okay.  They used lower doses

7   because of Japanese requirements in --

8   on -- on their anticoagulation

9   parameters?

10           MR. ZELLERS:  Object to

11       form.

12   BY MR. OVERHOLTZ:

13       Q.    If you know?

14       A.    I am vaguely familiar with

15   the fact that Japanese government tends

16   to look at lower doses for their studies.

17       Q.    Okay.  Did you have an

18   opportunity when you were either the

19   PK/PD lead or the ClinPharm lead to look

20   at the PK/PD data from J-ROCKET?

21       A.    Only if it was put in top

22   level, you know, like highlighted form

23   from Bayer to inform me that that's what

24   the results were.

Protected - Subject to Further Protective Review

1    Q.    Do you know whether or not

2    that was -- the PK/PD data from J-ROCKET

3    was submitted to the FDA when the company

4    sought the -- the Afib indication?

5    A.    I can't -- I know it was

6    eventually submitted.  I just don't know

7    when it was.

8    Q.    Okay.  If you want to -- do

9    you -- you think it was submitted

10   eventually?

11   A.    I believe so.

12   Q.    Okay.  If you look with me

13   on Slide 15.  And then we'll take our

14   break.

15   A.    Sure.

16   Q.    It says, "Afib filing," at

17   the top.

18        Do you see that?

19   A.    Yes.

20   Q.    Okay.  So on Slide 15, Afib

21   filing.  It says, "PK and PD data from

22   J-ROCKET will not be included in the

23   submission."

24        Do you see that?

Protected - Subject to Further Protective Review

1        A.      Right.  I do.

2        Q.      Okay.  Do you think

3    eventually at some point it was provided

4    to the FDA?

5        A.      I believe it was eventually.

6              MR. OVERHOLTZ:  All right.

7        I think that's all I have for now,

8        so why don't we take our break.

9              THE WITNESS:  Thank you.

10             THE VIDEOGRAPHER:  The time

11       is 10:44 a.m.  This completes Tape

12       Number 1.  We are going off the

13       record.

14             (Short break.)

15             THE VIDEOGRAPHER:  This

16       marks the beginning of Videotape

17       Number 2.  The time is 11:01 a.m.

18       Back on the record.

19   BY MR. OVERHOLTZ:

20       Q.      Okay.  Mr. Moore, let's talk

21   a little bit more about your time when

22   you first kind of transitioned into

23   Xarelto.

24       A.      Okay.

Protected - Subject to Further Protective Review

1          (Document marked for

2          identification as Exhibit

3          Moore-3.)

4    BY MR. OVERHOLTZ:

5          Q.    I'm going to show you what

6    we'll go ahead and mark as Exhibit Number

7    2 -- 3.  Sorry.  That's right.  There was

8    an attachment, which is Janssen 0844760.

9    It's 1389139, Record Number.

10              It's an e-mail that includes

11   yourself as well as a Vicki Brennan and

12   Sanjay Jalota from March of 2010 and

13   responding to some earlier e-mails in the

14   chain involving yourself and some others.

15   And take a look at it.  I just have a

16   couple of questions about it.

17              I really want to direct your

18   attention to the first e-mail in the

19   chain, which is kind of like the -- I

20   guess it's the last page, kind of the

21   first e-mail from February 2010 from

22   Chris Nessel -- well, from Sabine Dittmar

23   to Chris Nessel.

24              A.    I see Thursday,

1    February 4th.

2         Q.    Yeah, that's it.  If you

3    look there with me, it looks like Sabine

4    Dittmar at Bayer sends an e-mail to Chris

5    Nessel at Janssen, as well as Dagmar

6    Kubitza at Bayer.

7              Do you see that?

8         A.    Yeah.

9         Q.    And Dagmar Kubitza, she was

10   the clinical pharmacology lead for

11   Xarelto for Bayer, correct?

12        A.    That's correct.

13        Q.    And Dr. Kubitza was a

14   medical doctor?

15        A.    I believe she has her

16   medical degree.

17        Q.    The subject of this e-mail

18   was "Protocol Phase I omeprazole."

19   That's that drug interaction study that

20   we were talking about earlier, correct?

21        A.    That's correct.

22        Q.    Okay.  And it looks like

23   that Sabine Dittmar was looking for

24   somebody from GPV -- I think that stands

1    for global pharmacovigilance -- who had

2    reviewed the patient informed consent.

3              Do you see that?

4         A.    I do.

5         Q.    Okay.  And it says, "Is the

6    reporting process for SAEs clear?"

7              Do you see that?

8         A.    I do.

9         Q.    And SAEs, do you understand

10   what that stood for?

11        A.    I do.

12        Q.    Okay.  Is it serious adverse

13   events?

14        A.    That's my understanding,

15   yes.

16        Q.    Sometimes I see it as

17   suspected adverse events.

18        A.    From my understanding, it's

19   serious adverse events.

20        Q.    Okay.  And so it looks like

21   at some point you kind of get brought

22   into this discussion about whether or not

23   this patient consent form -- I think they

24   refer to it as the ICF in the e-mail --

Protected - Subject to Further Protective Review

1  has been reviewed.  Do you see that on

2  the second page, kind of the bottom, and

3  you kind of introduce yourself to Sabine

4  Dittmar?

5          A.    Mm-hmm.  Yes.  Sorry.

6          Q.    This is in -- I think you

7  send your e-mail on March -- on

8  February 24th of 2010.  And you say, "Hi

9  Sabine.  My name is Todd Moore.  I'm the

10  new clinical pharmacology leader at J&J

11  for the rivaroxaban project."

12              Do you see that?

13          A.    For the rivaroxaban project,

14  yes.

15          Q.    And you -- and you

16  specifically use the term "J&J" when

17  you're referring to your position,

18  correct?

19          A.    In this e-mail, yes.

20          Q.    "I just wanted to follow-up

21  on your e-mail and ask if you received an

22  answer."

23              That's what you asked Sabine

24  Dittmar, right?

Protected - Subject to Further Protective Review

1    A.    That's what's stated here,

2    yes.

3    Q.    Now, if you look with me at

4    the top of the first page, you get an

5    e-mail from a Vicki Brennan.  And she

6    copies kind of the transition person you

7    were transitioning from as well as Sanjay

8    Jalota.  Sanjay Jalota, was that a

9    regulatory person at Janssen?

10    A.    Yes, I believe that was his

11    role.

12    Q.    Okay.  And how about Vicki

13    Brennan?  Who was that?

14    A.    I believe she had a clinical

15    scientist role within the clinical group.

16    Q.    It says, "Todd, we need to

17    ask An if you consulted any Bayer

18    colleagues on this.  This is also a J&J

19    sponsored.  So I'm not really sure if

20    Bayer needs to review or just receive a

21    courtesy copy.  Sanjay, can you please

22    respond to this?  Once I hear back from

23    An and Sanjay, I will respond to Sabine.

24    Thanks, Vicki."

Protected - Subject to Further Protective Review

1          Do you see that?

2     A.    Yes, I do.

3     Q.    And then you say back to

4 Vicki, you say, "Just trying to play nice

5 in the sandbox."

6          Do you see that?

7     A.    I do.

8     Q.    So this is kind of your new

9 role in the company?

10    A.    I've just come into it,

11 yeah.

12    Q.    And -- but one of the things

13 that you've learned is that you have this

14 collaboration agreement on Xarelto with

15 Bayer, right?

16    A.    That's correct.

17    Q.    And Janssen had taken on

18 certain responsibilities with respect to

19 the drug, and Bayer had other

20 responsibilities, correct?

21    A.    That's correct.

22    Q.    Okay.  And was there

23 anything particular that you had to do to

24 try to educate yourself with respect to

Protected - Subject to Further Protective Review

1  kind of how the rules were between

2  Janssen and Bayer with respect to this

3  joint development agreement on Xarelto?

4         A.    At that time, as I remember,

5  I first consulted with those members

6  within my team, the already developed

7  clinical team for rivaroxaban, to see how

8  the working relationship was.

9             Then once determining how I

10  should proceed forward as a team, I would

11  contact my counterparts over at Bayer,

12  specifically Dagmar and Wolfgang, to

13  again continue with collaboration and

14  further gain understanding on the work

15  that they've done and the work that still

16  needs to be done.

17         Q.    Okay.  Of course one of the

18  things that you came to understand is

19  that this -- Xarelto, was a joint Bayer

20  and Janssen project, correct?

21         A.    That's correct.

22             (Document marked for

23         identification as Exhibit

24         Moore-4.)

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2        Q.    So if I can show you what

3    we'll mark as Exhibit Number 4.  It's

4    Bates Number BPAG 03244488, and the

5    Record Number is 1259514.

6            And it's an e-mail chain

7    from Dagmar Kubitza at the very top.  But

8    it also includes down below the exchange

9    of information from several people at

10   Janssen, including yourself, related to

11   what's described in the subject as

12   "Rivaroxaban joint Bayer J&J meeting

13   agenda, March 1st, 2010."

14           I'll give you a second to

15   take a look at it.

16           MR. KENNEDY:  This is a

17       Bayer document, correct?

18           MR. OVERHOLTZ:  It's a Bayer

19       document.

20           MR. KENNEDY:  Okay.  Thank

21       you.

22           THE WITNESS:  Okay.

23   BY MR. OVERHOLTZ:

24       Q.    So just to kind of clear

Protected - Subject to Further Protective Review

1   what's happening here, if you look at the

2   second e-mail in the chain kind of the

3   bottom of the first page, it's from a

4   Kelly Kurtz at KKurtz@ITS.jnj.com.

5            Do you see that?

6       A.    That's correct.

7       Q.    Okay.  And J&J, of course,

8   is for Johnson & Johnson's e-mail, right?

9       A.    Yes, that's correct.

10      Q.    Do you know what the ITS

11  stood for?

12      A.    No, I do not.

13      Q.    Okay.  So she sends an

14  e-mail -- I'm assuming Kelly's a female.

15            Kelly Kurtz, do you know who

16  that person is?

17      A.    It's been a while, but,

18  yeah, she is a female.

19      Q.    Okay.  Do you know what role

20  she had with the company as far as

21  department or anything --

22      A.    I'm sorry.  I can't

23  remember.

24      Q.    That's okay.  It says --

Protected - Subject to Further Protective Review

1   Kelly Kurtz sends an e-mail on

2   February 24th of 2010.  And she sends it

3   to several people, Maria Cleveland, Alla

4   Rhoge, Andrea Kollath.  And then about

5   six down you see that you are listed,

6   T. Moore17.

7              Do you see that?

8        A.    Yes, I do.

9        Q.    And that would have been

10  you?

11       A.    That's correct.

12       Q.    Okay.  And it looks like

13  back then your e-mail was

14  Tmoore17@ITS.jnj.com; right?

15       A.    That's correct.

16       Q.    Okay.  And what she says --

17  of course, the subject, of course, is

18  this rivaroxaban joint Bayer/J&J meeting.

19  I'm not quite sure why it cuts off like

20  half the e-mail addresses on the right

21  side of the screen.  That's just how it

22  was produced to us.

23              But if you look with me on

24  the second page, it looks like, "On

Protected - Subject to Further Protective Review

¹ Monday, March 1st, we will have our first

² rivaroxaban joint submission team meeting

³ between Bayer and J&J.  Agenda for the

⁴ hour is as follows."

⁵          Do you see that?

⁶     A.    I do.

⁷     Q.    Okay.  And was it -- and --

⁸ so when it came to submitting for

⁹ approval with the FDA for Xarelto related

¹⁰ to the Afib indication, that this was a

¹¹ joint work between Bayer and J&J; is that

¹² right?

¹³          MR. ZELLERS:  Object to

¹⁴     form.

¹⁵          THE WITNESS:  I'm not sure

¹⁶     how it relates -- I mean, it was

¹⁷     all the work that was being done

¹⁸     between the two companies.

¹⁹ BY MR. OVERHOLTZ:

²⁰     Q.    All the work that was being

²¹ done for Xarelto was a joint work between

²² Bayer and J&J?

²³     A.    Each of the partners had

²⁴ individual responsibilities, but

Protected - Subject to Further Protective Review

1  generally, yes, there was a collaboration

2  between both Bayer and -- and Janssen in

3  regards to what those were.

4       Q.   And, of course, for certain

5  things there were even joint committees

6  or joint teams created, correct?

7       A.   Yeah.  Depending on the

8  individual project to be determined, yes.

9       Q.   Okay.  And so when it refers

10 to the rivaroxaban joint submission team,

11 they are talking about the submission to

12 the FDA for approval of the drug, right?

13            MR. ZELLERS:  Object to the

14       form.

15            THE WITNESS:  It's hard for

16       me to say whether or not it's

17       specific to the FDA.  But I have

18       to assume that it is a regulatory

19       agency.

20 BY MR. OVERHOLTZ:

21       Q.   Okay.  So was it -- is it

22 your understanding that when they refer

23 to the joint submission team for

24 rivaroxaban, they are talking about

Protected - Subject to Further Protective Review

1   submission for approval to a regulatory

2   agency?

3           A.    To a regulatory agency.

4           Q.    Okay.  Now, if you look with

5   me a little bit down.  It says, "Please

6   review attachment of our action items

7   from our January kickoff meeting."

8               Do you see that?

9           A.    I do.

10          Q.    Okay.  And do you know if

11  you went to the January kickoff meeting?

12          A.    I -- I might have.  It's

13  been some time.  I -- I would have to

14  look at the meeting minutes or something

15  from the meeting to refer me.

16          Q.    Okay.

17              (Document marked for

18          identification as Exhibit

19          Moore-5.)

20  BY MR. OVERHOLTZ:

21          Q.    Let me show you what we'll

22  mark as Exhibit Number 5.

23              This is the attachment to

24  that e-mail we just looked at that was

Protected - Subject to Further Protective Review

1    sent --

2              MR. ZELLERS:  Excuse me one

3         second.  I think we have too many.

4              MR. OVERHOLTZ:  You have too

5         many?

6              MR. ZELLERS:  Here.  Let me

7         have them back.

8              MR. OVERHOLTZ:  Oh, the same

9         at least?

10             MR. ZELLERS:  No.  So it

11        appears -- is this the exhibit?

12             MR. OVERHOLTZ:  Some may

13        have been printed landscape; some

14        may have been printed --

15             MR. ZELLERS:  Is this the

16        exhibit?

17             MR. OVERHOLTZ:  Yes.

18             MR. ZELLERS:  Okay.  I -- I

19        don't know what these are.  But

20        maybe they are the next exhibit.

21             MR. OVERHOLTZ:  I think they

22        are the same thing --

23             MR. ZELLERS:  Do we need

24        them both or -- if we do, I'm glad

Protected - Subject to Further Protective Review

1       to take them, I just...

2              MR. OVERHOLTZ:  It's the

3       same exhibit, same Bates number.

4       Because it's printed -- you can

5       see --

6              MR. ZELLERS:  And do you

7       think it may be helpful for the

8       witness to have the other?  Could

9       we mark the other one as 5A?

10             MR. OVERHOLTZ:  We'll just

11      mark it as 5.  We'll mark the wide

12      one as 5.

13             MR. ZELLERS:  Very good.

14             MR. OVERHOLTZ:  Thank you.

15             MR. ZELLERS:  Sorry to

16      interrupt.

17             MR. OVERHOLTZ:  If you want

18      to follow along.  If you want to

19      follow along.  You can have the

20      thin version.  Thank you, guys.

21  BY MR. OVERHOLTZ:

22      Q.    So Exhibit 5, we're looking

23  at Bates Number BPAG 03244491, and this

24  was attached to -- this was the kickoff

Protected - Subject to Further Protective Review

1    post-meeting notes from the

2    January 20-21, 2010, that was produced

3    along with this e-mail that we just

4    looked at in Exhibit 4.  And if you can

5    give me a second to take a look at that.

6    And I'm just going to draw your attention

7    to a couple of things, the third and

8    fourth pages primarily.

9              And let's look at the first

10   page for a minute just so we kind of have

11   a better idea what we are talking about.

12   It refers to the Afib VTE kickoff

13   post-meeting notes from January 20th to

14   21st, 2010.

15             Do you see that?

16        A.    I do.

17        Q.    Okay.  And then if we can

18   look over at Page 3, about -- there is

19   a -- boxes on the left side under

20   "Topics."  And the third one down is,

21   "Planning for NDA."

22             Do you see that?

23        A.    I do.

24        Q.    Okay.  And it says,

Protected - Subject to Further Protective Review

1    "Planning for NDA, MAA review questions."

2              Do you see that?

3         A.    I do.

4         Q.    Okay.  Now, NDA would be the

5    new drug application that would be filed

6    with the FDA, correct?

7         A.    That's correct.

8         Q.    Okay.  And the MAA review

9    questions, what would MAA be, do you

10   know?

11        A.    That's the -- it's an

12   acronym for a similar filing to the EMEA.

13        Q.    Okay.  And it says,

14   "Establish a joint Bayer/J&J working

15   group."

16             Do you see that?

17        A.    I do.

18        Q.    Okay.  Now, if we can turn

19   over to Page 4.  This is a page that

20   looks to deal with the topic in bold, the

21   VTE treatment indication.

22             Do you see that?

23        A.    I do.

24        Q.    And it says, the first point

Protected - Subject to Further Protective Review

1    under "Action Items" says, "Dose

2    justification, 15 milligrams."

3                    Do you see that?

4         A.    I do.

5         Q.    And it says, "Prepare dose

6    justification for Afib and VTE Tx" --

7    that stands for treatment, right?

8         A.    From my understanding, yes.

9         Q.    Okay.  "Prepare dose

10   justification for Afib and VTE treatment,

11   prepared sooner rather than later."

12                    Okay.  Now, let me ask you a

13   question about that.

14                    Did you have an

15   understanding that in determining the

16   dose to be used in the ROCKET trial, that

17   was based upon the Phase II studies that

18   had been done in VTE treatment

19   indication, and there wasn't a separate

20   dose finding study for Afib patients?

21        A.    I am familiar with the fact

22   that there wasn't a separate dose finding

23   study for the Afib indication.

24                    Q.    Okay.  And you -- did you

Protected - Subject to Further Protective Review

1  understand that the VTE treatment Phase

2  II study information was used and

3  evaluated to select the dose to take into

4  the Phase III ROCKET program?

5       A.    I wasn't part of the dose

6  selection for the ROCKET program, so...

7       Q.    Did you ever come to learn

8  that, that the VT -- VTE treatment dose

9  information was relevant to the selection

10  of the dose in ROCKET?

11       A.    I'm familiar with the

12  modeling and simulation publication that

13  Wolfgang had presented --

14       Q.    Okay.

15       A.    -- or published.

16       Q.    Okay.  If you look with me

17  at Point Number 3, it says, "Antidote,

18  need for monitoring."

19            Do you see that?

20       A.    I do.

21       Q.    Okay.  And it says, "Outline

22  strategy for MAA."

23            Do you see that?

24       A.    Yes.

Protected - Subject to Further Protective Review

1      Q.    Okay.  And then it says,

2   "Not needed for NDA."

3            Do you see that?

4      A.    I do.

5      Q.    Do you know what that meant

6   by, "Outline the strategy related to

7   antidote need for monitoring for the MAA,

8   but not needed for the NDA"?

9      A.    I do not.

10     Q.    Okay.  And the MAA, does

11  that stand for marketing authorization

12  application?

13     A.    I can't say with certainty.

14  I -- I believe so.

15     Q.    Okay.  It's the way that you

16  apply to get approval in the EMEA in

17  Europe?

18     A.    As I mentioned before, it's

19  similar to.

20     Q.    Okay.  Do you know why, for

21  Xarelto, you would have a strategy to

22  deal with an antidote and need for

23  monitoring back in January of 2010 for

24  Europe, but not need to do that for how

1    you apply to sell the drug with the FDA

2    in the United States?

3                  MR. ZELLERS:  Object to

4          form.

5                  THE WITNESS:  I really can't

6          comment on that.  I -- I do not

7          know.

8    BY MR. OVERHOLTZ:

9          Q.    When you saw this, these

10   kickoff notes that had been sent to you

11   in February of 2010, did you say, hey,

12   how come we are not providing this

13   information to the FDA as well?

14                 MR. ZELLERS:  Object to

15         form.

16                 THE WITNESS:  That was from

17         2010.  It would be hard for me to

18         recollect exactly my response to

19         that.

20   BY MR. OVERHOLTZ:

21         Q.    Okay.  Did you ever come to

22   understand that the EMEA had actually

23   requested that the company look at

24   information related to monitoring of the

Protected - Subject to Further Protective Review

1    drug, an antidote, with respect to their

2    application?

3            A.    I would have to defer back

4    to my regulatory colleagues in regards to

5    that.

6            Q.    Okay.  Did you -- you became

7    a part of this joint submission team

8    though, with respect to Afib and VTE,

9    correct?

10           A.    I believe so, yes.

11           Q.    You actually participated in

12   mock AdComs, or advisory committee

13   meetings, preparing for the advisory

14   committee meetings with the FDA; is that

15   right?

16               MR. ZELLERS:  Object to

17           form.  Are you including both Afib

18           and VTE?

19               MR. OVERHOLTZ:  Yes.  Good

20           question.

21               THE WITNESS:  So I only

22           participated in the training

23           sessions for the Afib filing.  So

24           the Afib advisory committee

Protected - Subject to Further Protective Review

1      meeting.

2  BY MR. OVERHOLTZ:

3      Q.    So you actually participated

4  in the -- you called them training

5  sessions.  Sometimes I see them referred

6  to as mock advisory committee meetings

7  for the Afib indication; is that right?

8      A.    Specifically for Afib, yes.

9      Q.    When we talk about -- when I

10 use the term advisory committee meetings,

11 you know what I'm talking about?

12     A.    I do.

13     Q.    And the advisory committee

14 is a group of advisors that make a

15 recommendation to the FDA as to whether

16 or not a drug should be approved or not.

17 Is that a fair statement?

18     A.    It's a fair statement.

19     Q.    So in having these training

20 sessions or mock advisory committee,

21 Janssen and Bayer would actually get a

22 group of people that they believed could

23 serve as mock advisory committee members,

24 experts in the field, and kind of

Protected - Subject to Further Protective Review

1   practice what's going to be said to the

2   FDA advisory committee; is that right?

3          A.    If I remember correctly, for

4   the preparation for the AdCom, you would

5   pull in outside experts to peruse your

6   data to ask questions in regard to the

7   medicine and science in regard to the

8   results that you obtained, as part of

9   preparation for the -- for the actual

10  meeting itself.

11         Q.    Now, I know you have already

12  told me that you participated in those

13  for Afib.

14         A.    That's correct.

15         Q.    You weren't actively

16  involved with those for the VTE treatment

17  AdCom?

18         A.    I don't believe there was an

19  AdCom for the VTE treatment.

20         Q.    Okay.  How about for the

21  mock AdComs for VTE treatment?  Well, let

22  me go back a step just so we can lay a

23  foundation.

24         A.    Yeah.  Yeah.

Protected - Subject to Further Protective Review

1    Q.    Do you know if there was a

2    separate mock or training session AdCom

3    for VTE treatment?

4         A.    I believe they were -- they

5    were setting up meetings in the

6    possibility that there may be -- may have

7    been an AdCom.  But since one didn't

8    occur -- I don't recall the -- there

9    might have been one or two meetings where

10   we got together to discuss it.  But I

11   don't recall the specifics of that.

12        Q.    Okay.

13        A.    It was not -- not to the

14   extent that we had for the others.

15        Q.    I've seen some references to

16   the VTE mock AdCom.

17        A.    Okay.

18        Q.    So maybe we'll look at that

19   and try to figure out --

20        A.    Sure.

21        Q.    -- if there actually was one

22   or wasn't one or whether it was just a

23   discussion.

24             Did you actually attend the

Protected - Subject to Further Protective Review

1    actual advisory committee meeting for the

2    Afib indication?

3            A.    I did.

4            Q.    Did you present at that

5    advisory committee?

6            A.    I did not.

7            Q.    Who presented on the

8    clinical pharmacology information at that

9    advisory committee meeting?

10            A.    That would have been Gary

11    Peters.

12            Q.    And if you look with me down

13    under "VTE Treatment" about -- one, two,

14    three, four, five -- you see a section

15    called Afib?  Do you see that?  It's

16    about six down.

17            A.    Yes.

18            Q.    Okay.  Down under "Afib," it

19    says, "Clarify if the datasets are

20    needed.  Datasets on integrated pool of

21    Japanese Phase II Afib study has been

22    submitted."

23                  Do you see that?

24            A.    I do.

Protected - Subject to Further Protective Review

1    Q.    And the topic is the

2  J-ROCKET Phase II studies.  Do you see

3  that?

4    A.    J-ROCKET Phase II studies,

5  yes.

6    Q.    And that's the Japanese

7  study that we talked about before?

8    A.    My understanding, yes.

9    Q.    The next one says, "EMEA,

10  commitment to analyze 15 and 20-milligram

11  dose."  And the action item says,

12  "Afib/defend the dose selection."

13        Do you see that?

14    A.    I do.

15    Q.    Did you perform any work

16  from the PK/PD and clinical pharmacology

17  perspective to help the companies defend

18  the dose selection for the Afib

19  indication?

20        MR. ZELLERS:  Object to

21        form.

22        THE WITNESS:  Again, I

23        wasn't part of the doses selected

24        for the ROCKET trial.  Obviously,

Protected - Subject to Further Protective Review

1        I was part of the analysis of the

2        PK and PD data that came from the

3        trial.

4   BY MR. OVERHOLTZ:

5        Q.    I got my pages mixed up

6   here.

7             And then if I can have you

8   look at Exhibit Number 6.

9             (Document marked for

10        identification as Exhibit

11        Moore-6.)

12   BY MR. OVERHOLTZ:

13        Q.    This is Bates Number BPAG

14   03244499.  It's 1259516.  You see it's a

15   roster document related to the

16   rivaroxaban or Xarelto Bayer/J&J joint

17   submission meeting roster.

18             Do you see that?

19        A.    I do.

20        Q.    So -- and we got this out of

21   Bayer's files, Dr. Kubitza's file.  And

22   certainly at a time that these were going

23   on, everyone believed that this was a

24   joint project between Bayer and J&J,

Protected - Subject to Further Protective Review

1  right?

2           MR. ZELLERS:  Object to

3      form.

4           THE WITNESS:  What do you

5      mean by "this is a joint project"?

6  BY MR. OVERHOLTZ:

7      Q.    Well, Xarelto obviously is a

8  joint project.  You agree with that?

9      A.    Yes.

10     Q.    Okay.  But there's no

11 distinguishing in these documents or in

12 the company between J&J or Janssen,

13 right?

14          MR. ZELLERS:  Object to

15     form.

16          THE WITNESS:  Would you mind

17     rephrasing that question?

18 BY MR. OVERHOLTZ:

19     Q.    I mean, this document at the

20 top says Bayer/J&J, right?

21     A.    Correct.

22     Q.    You knew that was talking

23 about your company's work on Xarelto when

24 it says Bayer/J&J, right?

1          A.      Bayer/J&J.

2          Q.      So when it says J&J, you

3  knew that they were talking about

4  Janssen?

5          A.      Yes.

6          Q.      Okay.  Now, if you can look

7  with me down at -- the third item is a

8  clinical PK, right?

9          A.      Correct.

10         Q.      And there's three people

11  listed.  And there's Dr. Kubitza at

12  Bayer, correct?

13         A.      Correct.

14         Q.      Okay.  And then we have

15  Dr. Mueck.  He's also at Bayer, correct?

16         A.      That's correct.

17         Q.      Both work over in Germany,

18  correct?

19         A.      Correct.

20         Q.      Okay.  And then you're

21  listed as well under clinical PK for this

22  joint submission meeting with those two,

23  correct?

24         A.      That's correct.

1    Q.    Okay.  Have you ever

2    traveled to Germany to visit with either

3    Dr. Kubitza or Dr. Mueck?

4    A.    Yes, I have.

5    Q.    Okay.  When did you make

6    those trips?

7    A.    I would have to go back and

8    look, but it was in and around the times

9    of the filing.

10    Q.    Okay.  Around the times of

11    filing for approval in the United States?

12    A.    Yes, that's correct.

13    Q.    Okay.  Was it one or two

14    meetings?  A few meetings?  Do you know?

15    A.    It had to be two or three

16    meetings as things progressed, yeah.  So

17    there was a meeting prior to the Afib

18    filing.  There was also, I believe, a

19    meeting prior to the ACS filing, and

20    probably another meeting in between.

21    Q.    Okay.  Do you know, what was

22    the purpose of your meeting with them?

23    A.    The purpose of the meeting

24    at the time, again, was to look at the

1    overall clinical pharmacology, the

2    product, the portfolio that we've

3    developed, and to ensure that was

4    properly suited for filing.

5                    (Document marked for

6            identification as Exhibit

7            Moore-7.)

8    BY MR. OVERHOLTZ:

9            Q.    Let me show you what we'll

10   mark as Number 7.  This is Bates

11   Xarelto_Janssen 08447745, Record Number

12   1389129.

13                   It's an e-mail chain from

14   March of 2010 between yourself and An

15   Thyssen, as well as some earlier e-mails

16   between yourself and Dr. Mueck and

17   Dr. Kubitza --

18                   MR. ZELLERS:  I'm sorry.

19           One question.

20   BY MR. OVERHOLTZ:

21           Q.    -- and some other folks at

22   J&J as well.

23                   MR. OVERHOLTZ:  Did I say

24           something wrong?

1           MR. ZELLERS:  No.  We have

2      an issue because the document

3      doesn't say protected information

4      resulting from protective order.

5           MR. OVERHOLTZ:  I was

6      wondering why you didn't do that.

7      Do you want to do that now?

8           MR. ZELLERS:  Well, we'll do

9      that orally on the record.

10           MR. OVERHOLTZ:  Sure.

11           MR. ZELLERS:  But if we can

12      have an agreement that we can

13      substitute a document for the

14      exhibit with the court reporter as

15      part of the official record.

16           MR. OVERHOLTZ:  Sure.

17      Assuming that's appropriate under

18      the rules or under the order or

19      whatever that we have to comply

20      with.

21           MR. ZELLERS:  Yes.  Our

22      objection would be to the use of

23      the document without the protected

24      information language.  We'll work

Protected - Subject to Further Protective Review

1    with you to protect the record as

2    needed.

3            MR. OVERHOLTZ:  This is how

4    it's produced to us, I think.

5            MR. ZELLERS:  Neither of us

6    are in -- at least I am not in a

7    position to agree or disagree with

8    that.  I do believe that it is a

9    document that should be stamped

10   "Protected information subject to

11   protective order."  So we've noted

12   our objection.  And I do not have

13   an objection --

14           MR. OVERHOLTZ:  I understand

15   what you're objecting to.

16           MR. ZELLERS:  Right.  And we

17   will work --

18           MR. OVERHOLTZ:  I want to be

19   able to ask the witness questions

20   about the document.

21           MR. ZELLERS:  And I will

22   permit that.

23           MR. OVERHOLTZ:  Okay.

24   That's fine.  And if we determine

Protected - Subject to Further Protective Review

1    that this document is the one that

2    should have subject to protective

3    order, confidential, then we'll

4    substitute it.  But the fact that

5    you produced it without it, won't

6    be held against me as far as my

7    use with the witness.

8         MR. ZELLERS:  As I have

9    said, I -- I can't comment on how

10   it was produced.  All I can

11   comment is what it looks like now.

12        I can certainly state for

13   the record that it should have

14   been produced, if it was not, with

15   the caption "Protected Information

16   Subject to Protective Order."

17        MR. OVERHOLTZ:  It was not.

18   I'll verify for you it was not

19   produced that way.

20        MR. ZELLERS:  In terms of

21   proceeding, you may ask the

22   witness questions.

23        MR. OVERHOLTZ:  All right.

24   Great.  If we need to substitute

Protected - Subject to Further Protective Review

1       it, we will.  Maybe let's -- just

2       for the purposes of the video,

3       let's just kind of cut off the

4       bottom of the document just so it

5       doesn't -- you know, where the

6       stamp would be above the Bates

7       number.  Let's get the actual text

8       of the document on the screen.

9       Let's do it just like that.

10      That's perfect.  That way we don't

11      have to worry about it not being

12      on the video as well.

13  BY MR. OVERHOLTZ:

14      Q.    Okay.  So let me kind of

15  start over here, and I'm going to ask you

16  about Exhibit Number 7, Mr. Moore, which

17  is this e-mail chain with Bayer's --

18  Janssen's Bates Number 08447455.  And if

19  you can look with me at the bottom of the

20  page.  It looks like that An Thyssen, who

21  was your predecessor in the -- that

22  clinical pharmacology role, lead role,

23  she sends an e-mail to Dagmar Kubitza,

24  Wolfgang Mueck, An Vermeulen, Erik

Protected - Subject to Further Protective Review

1  Mannaert who also worked with you at J&J,

2  and a Rolf Burghaus.  And it says that

3  this was the rivaroxaban ClinPharm

4  face-to-face meeting minutes.

5          Do you see that?

6      A.    I do.

7      Q.    And then up above it looks

8  like she -- I assume after finding out

9  that you're kind of the new clinical

10 pharm lead at J&J, she says -- she

11 forwards the information to you and says,

12 "Hi Todd.  Please find enclosed what we

13 have agreed with An in terms of sharing

14 the work for the submission.  I suggest

15 that we use this as a basis for our

16 discussion on Friday."

17          Do you see that?

18          MR. ZELLERS:  Object to

19      form.  I'm just objecting to your

20      use of the -- the term "J&J."  I

21      understand the documents do say

22      J&J.  So that -- that's what my

23      objection goes to.

24          MR. OVERHOLTZ:  I

Protected - Subject to Further Protective Review

1    understand.

2            MR. ZELLERS:  Go ahead,

3        Mr. Moore, you can answer if you

4        can.

5            THE WITNESS:  Could -- since

6        that just happened, I forgot what

7        you asked.  Ask it again.

8            MR. OVERHOLTZ:  Sorry.  I'm

9        going to grant your objection on

10       the J&J term.  You know I'm going

11       to use it.  Standing objection on

12       that.

13           MR. ZELLERS:  Thank you.

14   BY MR. OVERHOLTZ:

15       Q.    Dr. Kubitza, Mr. Moore,

16   forwards you an e-mail on March 2, 2010,

17   from the e-mail that An Thyssen says

18   below, when she says, "Hi Todd.  Please

19   find enclosed what we have agreed with An

20   in terms of sharing the work for the

21   submission."

22           Do you see that?

23       A.    I do.

24       Q.    Okay.  And she says, "I

Protected - Subject to Further Protective Review

1    suggest that we use this as a basis for

2    our discussion on Friday."

3              Correct?

4         A.    That's correct.

5         Q.    Okay.  And you forward that

6    e-mail onto An Thyssen as well and say,

7    "FYI, I just received it from Dagmar,"

8    right?

9         A.    That's correct.

10        Q.    Okay.

11              (Document marked for

12              identification as Exhibit

13              Moore-8.)

14    BY MR. OVERHOLTZ:

15        Q.    Now, if we can take a look

16    at Exhibit Number 8, which is going to be

17    the attachment to the e-mail string.  So

18    your -- the attachment is marked with,

19    "Confidential Protective Order, Highly

20    Protected Information."  It's Bates

21    Number Janssen 0844747.

22              And it says, "Meeting" --

23    oh, it's Record Number 1389130.  And it

24    says, "Meeting minutes, face-to-face

Protected - Subject to Further Protective Review

1   meeting, September 17-18, 2009."

2           So this looks like a meeting

3   that happened in Beerse back in September

4   of 2009 before you kind of stepped into

5   the role.

6           Do you see that?

7       A.   I do, yes.

8       Q.   And when it says Beerse,

9   what's it talking about there?

10      A.   Beerse is the location of

11  our -- of Janssen's or one of Janssen's

12  sites.

13      Q.   Okay.  And there is a

14  section at the top for Afib, right?

15      A.   Yes.

16      Q.   Okay.  And it talks about

17  various updates to different modules for

18  the filing documents.  Do you see that?

19      A.   I do.

20      Q.   If you look right down below

21  that there's a POP PK/PD analysis, see

22  slide deck eRoom.

23           Do you see that?

24      A.   I do.

Protected - Subject to Further Protective Review

1    Q.    And when it talks about a

2    slide deck eRoom, what is that?

3    A.    I believe they are referring

4    to a shared -- a shared document room,

5    electronic document room, that both Bayer

6    and Janssen used to transfer documents.

7    Q.    Okay.  So this is an -- an

8    electronic site like a website or web

9    room where both companies can look at the

10   documents?

11   A.    Like a repository, yes.

12   Q.    Okay.  If you look with me,

13   the first bullet point refers to PK.  It

14   says, "Use available POP PK model (from

15   VTE treatment) to predict plasma

16   exposure.  Overlay predicted exposure

17   with observed exposure."

18         Do you see that?

19   A.    I do.

20   Q.    And that was work that I

21   think we talked about before that

22   Dr. Mueck did to say, let's look at the

23   VTE information, model information we

24   have, and we can kind of predict that for

Protected - Subject to Further Protective Review

1    the Afib population, because the Afib

2    population is different than the VTE

3    treatment population.

4              Is that your understanding?

5        A.    Would you mind rephrasing

6    that?

7        Q.    Yeah, sure.  We'll break it

8    down a little bit.

9        A.    Sure.

10       Q.    You had an understanding

11   that there was a POP PK model done for

12   the VTE treatment population of patients?

13       A.    I do.

14       Q.    Okay.  And did you also have

15   an understanding that the companies

16   recognized that there was a difference

17   between the VTE treatment population and

18   the presumed to be Afib population?

19       A.    I understand there's

20   differences between the populations.

21       Q.    Right.  And, I mean, the

22   companies obviously by this time already

23   significantly conducted Phase III studies

24   in both population groups, right?

Protected - Subject to Further Protective Review

1        A.     At this time?

2        Q.     Yeah.  During the middle of

3    it.

4        A.     At least started, yes.

5        Q.     Okay.  And the -- generally

6    it was understood that the AFib

7    population was going to be an older

8    population, right?

9        A.     To my understanding, yes.

10       Q.     Okay.  And it -- it was also

11   a population that might have other

12   comorbidities different than those in the

13   VTE population?

14       A.     Again, to my understanding.

15       Q.     More patients with renal

16   impairment was one of the things that was

17   expected for the Afib population.  Did

18   you have an understanding of that?

19       A.     A general understanding,

20   yes.

21       Q.     And so did you understand

22   that there was work done to take that POP

23   PK model from the VTE treatment and

24   predict what the exposures, the plasma

1    exposure levels of the drug would be, in

2    an Afib population, taking into account

3    those population differences?

4         A.    I believe there was work

5    done by Wolfgang Mueck to assess that.

6         Q.    Now, it says "PD."  No POP

7    PD analysis, rather more descriptive

8    stats with plots as done for VTE

9    prevention.  Conduct same analysis as for

10   VTE treatment, stats group Bayer-J&J to

11   interact to discuss SAP drafted by Martin

12   Homering."

13            Do you see that?

14        A.    I do.

15        Q.    Did you know Mr. Homering?

16        A.    Not directly, no.

17        Q.    He was a biostats guy over

18   at Bayer that did statistical analysis.

19            Do you know why there wasn't

20   a POP PD analysis done for the Afib

21   indication?

22        A.    There was a PD analysis done

23   for the Afib population based on the

24   RECORD -- ROCKET program.  Excuse me.

Protected - Subject to Further Protective Review

1   That was -- and the report was generated

2   by Ihab Girgis.  I can't speak to

3   specifically at this time what type of

4   analysis that was, whether that was --

5   but in general that was -- I think that

6   would be considered a population PD

7   analysis.

8          Q.   Okay.  We'll take a look at

9   it maybe and see if there was a

10  difference a little bit later.

11         A.   Sure.

12         Q.   Just so we are all talking

13  about the same thing.  When we talk about

14  a population PK analysis, this is

15  about -- I said PK.

16              Population PK analysis.  We

17  are talking about using modeling to

18  predict PK parameters for the population

19  in a clinical study, for example, that's

20  going to be exposed to the drug; is that

21  right?

22         A.   In general, yeah.

23         Q.   We're not talking about

24  actually measuring, using some type of

Protected - Subject to Further Protective Review

1    laboratory tool to measure the PK

2    parameters; we're talking about using a

3    model to predict them?

4         A.    Well, based on the modeling,

5    you need some sort of concentration or

6    pharmacokinetic or photodynamic

7    information in order to generate the

8    model.

9         Q.    You have to -- to -- from

10   the data that you have from a PK/PD

11   perspective, you put that into the model

12   and then you use the model to predict the

13   amounts for all the patients in a

14   clinical study population --

15              MR. ZELLERS:  Hold it.

16        Object to form.

17              Go ahead.

18              THE WITNESS:  You know, I'm

19        not an expert in modeling

20        simulation.  I wouldn't be the

21        proper person to answer that

22        specifically.

23   BY MR. OVERHOLTZ:

24        Q.    Okay.  Is that generally

Protected - Subject to Further Protective Review

1  your understanding is that you -- I think

2  you just testified that you use -- you

3  put PK and PD data into a model so that

4  you can then do a full population PK/PD

5  analysis with the model; is that right?

6       A.    You put relevant PK and PD

7  data into the model to help better

8  understand the -- the kinetics and

9  dynamics of that population.

10       Q.    Okay.  But then the actual

11  population PK/PD analysis makes

12  predictions as to the exposures of the PK

13  measurements or the PD measurements for

14  the clinical study population?

15       A.    Again, I'm not an expert in

16  modeling simulation, but that would be my

17  understanding.

18       Q.    Okay.  As opposed to

19  actually taking those measurements from

20  every single patient over the entire

21  course of the study.

22              MR. ZELLERS:  Object to

23       form.

24  BY MR. OVERHOLTZ:

Protected - Subject to Further Protective Review

1    Q.    Is that right?

2    A.    Again, I -- I'm not a PK/PD

3  modeling expert.  But the general premise

4  is that you would be able to take

5  pharmacokinetic and pharmacodynamic from

6  a subset of your population to be able to

7  predict how it would handle in the entire

8  population.

9    Q.    And then we talked about, if

10  we talked about Bullet Point Number 3, it

11  says, "PK/PD.  For the approximately 100

12  riva-treated patients in matched PK and

13  PD data show that the PK/PD relationship

14  to PT only is not changed in order to

15  claim that PT can continue to be used as

16  a surrogate marker of exposure."

17          Do you see that?

18    A.    I do.

19    Q.    So like we discussed

20  earlier, it seems like the reason to do

21  this matched PK/PD study at this time was

22  so that the companies can continue to

23  claim that PT could be a surrogate marker

24  of exposure back in 2009, 2010, prior to

Protected - Subject to Further Protective Review

1  the drug getting approved, right?

2          A.    I don't agree.  I think the

3  purpose of the population PK/PD analyses

4  that were done in ROCKET was more broad

5  than that.  It was to assess the effects

6  of both the 20-milligram and 15-milligram

7  dose in that population, assess what the

8  pharmacodynamic parameters looked like in

9  that population.  It was to assess the

10 other covariates as we discussed

11 previously and how that would affect the

12 pharmacokinetics and dynamics in that

13 population.

14          So to say it was strictly to

15 look at PT in that -- that constraint, I

16 think is incorrect.

17          Q.    So the PK/PD matched study

18 in ROCKET had many different purposes, is

19 what you're saying, correct?

20          A.    That is correct.

21          Q.    But according to these

22 meeting minutes from September 17-18,

23 2009 meeting in Beerse, it says that the

24 analysis with the matched PK/PD data show

Protected - Subject to Further Protective Review

1  that the PK/PD relationship, PD only is

2  not changed in order to claim that PT can

3  continue to be used as a surrogate marker

4  of exposure," right?

5      A.    Again, that's what this

6  document says.

7      Q.    Okay.  When it talks about

8  claiming that PT can continue to be used

9  as a surrogate marker of exposure, that's

10  talking about the company is claiming

11  that in their submissions to the

12  regulatory agencies for Xarelto, right?

13          MR. ZELLERS:  Object to the

14      form.

15          THE WITNESS:  Could you ask

16      the question again?

17  BY MR. OVERHOLTZ:

18      Q.    Sure.  When it talks about

19  making this claim that PT could be used

20  as a surrogate marker of exposure,

21  they're talking about making that claim

22  in the submission documents to regulatory

23  agencies, right?

24          MR. ZELLERS:  Same

Protected - Subject to Further Protective Review

1    objection.

2           THE WITNESS:  It's hard for

3    me to speculate exactly what they

4    mean from this particular meeting

5    that I wasn't involved with.

6    BY MR. OVERHOLTZ:

7           Q.    You were provided a copy of

8    these meeting minutes though, correct?

9           A.    I was, yes.

10          Q.    Okay.  If you can turn over

11   to the second page for a minute.  If you

12   look at the top of the page, it says --

13   this is under the section -- I should

14   have been more clear -- on the bottom of

15   the first page, under VTE treatment

16   section, if we look at the top of the

17   second page.

18          Do you agree?

19          A.    At the top -- yes.

20          Q.    Okay.  It's under the VTE

21   treatment section, right?

22          A.    That's correct.

23          Q.    Okay.  So at the top it

24   says, "Filing:  ClinPharm submission

Protected - Subject to Further Protective Review

1   package VTE treatment equals submission

2   package Afib, with exception for U.S.

3   submission as VTE treatment and Afib will

4   not be filed together in U.S.  This has

5   impact on Mod 272 and its Phase III PD

6   analysis."

7           Do you see that?

8       A.    I do, yes.

9       Q.    Okay.  So sometime between

10  some of the documents that we looked at

11  earlier, but it looks like by

12  September 2009, the idea was not to file

13  the VTE treatment and Afib together; is

14  that right?

15          MR. ZELLERS:  Object to the

16      form.

17  BY MR. OVERHOLTZ:

18      Q.    And I don't mean to test you

19  with the regulatory history, but I'm

20  trying to figure out if you had an

21  understanding as to when the decision was

22  made whether to file them together or

23  not.

24      A.    I don't -- I don't have an

Protected - Subject to Further Protective Review

1   understanding of when that decision was

2   made.  Obviously, I have an understanding

3   that that particular decision was made.

4          Q.    Okay.  So that's

5   consistent -- what's stated in this

6   document is consistent with the decision

7   that you understood was made to not file

8   together in the United States?

9          A.    Again, it's consistent with

10  the fact that I know that they weren't

11  filed together.

12         Q.    Okay.  If you look with me

13  in the next section, it's ACS PK/PD

14  analysis.

15               Do you see that?

16         A.    I do.

17         Q.    It says, "PK and PD data

18  only collected in Phase II."  We looked

19  at a document before that indicated that,

20  that in the TIMI 46 study, PK/PD data was

21  collected in Phase II but it wasn't done

22  for Phase III.

23               Do you recall that?

24         A.    I do, yes.

1    Q.    Okay.  Do you know why you

2  wouldn't do PK/PD data collection in a

3  Phase III study?

4    A.    Again, I would be

5  speculating since I wasn't involved in

6  the design of the Phase III trial, the

7  reason why the mutual companies decided

8  not to assess it.

9    Q.    Usually Phase III studies

10  are larger than Phase II studies?

11    A.    Generally, yes.

12    Q.    Okay.  Usually they're

13  significantly larger?

14    A.    Can you define

15  "significantly"?

16    Q.    Sure.  I had a feeling you

17  would say that.  Do you know in ACS

18  particularly whether the TIMI 51 study

19  was larger than the TIMI 46 Phase II

20  study?

21    A.    I would have to look back at

22  the documents, but I assume it was.

23    Q.    If you look at the bottom,

24  and this is under ACS.  It's the -- one,

Protected - Subject to Further Protective Review

1    two, three, four -- fifth point, "Relate

2    PK/PT."

3              Do you see that?

4        A.    Okay.

5        Q.    It says, "Relate PK/PT to

6    bleeding and efficacy info."

7              Do you see that?

8        A.    I do.

9        Q.    So in 2009, according to

10   these meeting minutes, there was an idea

11   of the importance of relating PK and PT

12   information to bleeding information,

13   correct?

14       A.    It says bleeding and

15   efficacy.

16       Q.    Okay.  In 2009, according to

17   these meeting minutes, there was a belief

18   that the PK/PT information should be

19   related to bleeding and efficacy,

20   correct?

21              MR. ZELLERS:  Object to

22         form.

23   BY MR. OVERHOLTZ:

24       Q.    For the ACS indication?

Protected - Subject to Further Protective Review

1         A.     Again, that's what the

2    document states.

3         Q.     Okay.  So this idea that the

4    EMA has now requested that this type of

5    analysis be done, an exposure response

6    analysis, and correlated to bleeding and

7    efficacy information, that's not

8    something new; that's been something

9    that's been in the company's mind going

10   all the way back to even preapproval of

11   the Afib indication, right?

12             MR. ZELLERS:  Object to the

13        form.

14             THE WITNESS:  I would be

15        speculating.  I'm not part of the

16        exposure response analyses.

17   BY MR. OVERHOLTZ:

18        Q.     I'm just asking you,

19   generally as a scientist, is the idea of

20   taking PK and PD information and

21   determining whether it could be

22   correlated to responses, either from an

23   efficacy standpoint or a safety

24   standpoint, like bleeding, that's not a

Protected - Subject to Further Protective Review

1    new concept that's just come up in 2015

2    and 2016 by the EMA; the companies had

3    that idea back prior to even seeking

4    approval for Afib, right?

5          A.    The concept is there, yes.

6          Q.    I'm going to shift topics

7    for just a second on you.

8          A.    Sure.

9          Q.    Xarelto was sold -- the

10   doses on the market today, it's a

11   once-daily dose, correct?

12         A.    That's correct.

13         Q.    And --

14         A.    For Afib, excuse me.

15         Q.    For Afib.  Once daily for

16   Afib, correct?

17         A.    Mm-hmm.

18         Q.    Okay.  And the drug, when we

19   talk about PK measurements for plasma

20   exposure of the drug, some of the

21   measurements that we see often in the

22   documents we reviewed and submission

23   documents involve both looking at CMAX or

24   peak levels, CMIN or trough levels, or

1  areas under the curve.  Those are all PK

2  parameters, correct?

3         A.    Those are three of the PK

4  parameters you can calculate.

5         Q.    Okay.  And CMAX or peak when

6  it comes to plasma exposure of Xarelto,

7  what does that mean?

8         A.    It's generally a measure of

9  when you take a look at the time

10 concentration curve, it is the top of

11 that curve, in which case it represents

12 the maximum level of medication in your

13 system.

14        Q.    Okay.  And for Xarelto,

15 based on the analyses that were done by

16 the company, the peak levels for most

17 patients happen somewhere between, like,

18 one to two hours after exposure; is that

19 right?

20        A.    Generally between two and

21 four hours.

22        Q.    Okay.  Two and four hours --

23        A.    Yes.

24        Q.    -- is when you get these

Protected - Subject to Further Protective Review

1    CMAX or peak levels of plasma exposure of

2    the drug?

3          A.    Yes.  That's generally

4    between those time frames.

5          Q.    And because it's once daily,

6    over time those levels drop throughout

7    the day until you take your next dose,

8    according to the analysis that have been

9    done by the company; is that right?

10         A.    Regardless of whatever your

11   regimen is, after you reach the peak

12   concentrations, it starts to eliminate.

13         Q.    Okay.  And when it gets down

14   to the bottom before -- before you take

15   your next dose, is that where the

16   so-called CMIN or trough levels come into

17   play?

18         A.    Prior to taking your next

19   dose of a medication, that is where it is

20   considered your trough level.

21         Q.    And then -- and so I think

22   you kind of described a curve.  Maybe

23   we'll look at one later.  But basically

24   it goes up, and then it comes down.  And

1   then there's this area under that curve.

2   We see that a lot of time expressed as

3   AUC, right?

4        A.    Generally, yes.

5        Q.    And AUC generally represents

6   the amount of plasma concentration of the

7   drug over the full time between dose and

8   next dose.  Is that a fair statement?

9        A.    They usually -- usually the

10  term overall systemic exposure.

11       Q.    The overall systemic

12  exposure?

13       A.    Yes.

14       Q.    Now, Xarelto was not given

15  as an extended or release version,

16  correct?

17       A.    That is correct.

18       Q.    Okay.  Now, what is the

19  difference between a drug like we talked

20  about with Xarelto that is not given

21  extended-release, as opposed to an

22  extended-release version when it comes to

23  something like the CMAX to trough curve

24  and what it would look like?

Protected - Subject to Further Protective Review

1          MR. ZELLERS:  Object to

2      form.

3          THE WITNESS:  Are you

4      talking about in general?

5   BY MR. OVERHOLTZ:

6      Q.    In general.  In general from

7   a PK perspective.

8      A.    From a PK perspective, in

9   general, when you have an

10  extended-release formulation, you have

11  prolonged absorption of the drug for a

12  great amount of time.  Therefore, it

13  is -- its elimination is -- is less steep

14  than what it would be for a QD or a once

15  daily dose.

16     Q.    So if we had a curve that

17  went up to the peak level when you first

18  take a non extended-release version and

19  then that level goes down over the course

20  of time until the next dose, an

21  extended-release version, the level it

22  goes down would be less steep; is that

23  right?

24          MR. ZELLERS:  Object to

Protected - Subject to Further Protective Review

1          form.

2                    THE WITNESS:  Again, for a

3          general drug, it would depend on

4          the drug itself.  But that --

5          that's the general idea.

6   BY MR. OVERHOLTZ:

7          Q.    Is the idea to have less

8   extremes between the -- the peak exposure

9   and the trough exposure?

10                   MR. ZELLERS:  Object to

11         form.

12                   THE WITNESS:  Would you mind

13         asking that again?

14  BY MR. OVERHOLTZ:

15         Q.    Sure.  Does an

16  extended-release version provide you with

17  a more steady systemic exposure of the

18  drug over the time of dosing?

19                   MR. ZELLERS:  Object to

20         form.

21                   THE WITNESS:  In -- in

22         general with any drug, if you're

23         given an extended-release, from my

24         understanding, that if you prolong

Protected - Subject to Further Protective Review

1          the absorption of the drug

2          throughout the GI tract, you will

3          end up seeing -- it's just a

4          different pharmacokinetic profile

5          than what you would if you had

6          taken it once daily.

7     BY MR. OVERHOLTZ:

8          Q.     And when you became the

9     clinical pharm lead for Xarelto, did you

10    have the opportunity to learn about

11    whether or not there had been any

12    extended-release development work for

13    Xarelto?

14         A.     I was aware that Bayer had

15    looked into some development of an

16    extended-release formulation.

17         Q.     Okay.  And what did you

18    learn about that?  What had been done for

19    the extended-release development?

20         A.     Nothing specific.  Nothing

21    specific that I can recall as of now.

22    That work -- they ran a couple studies to

23    look at different formulations.

24         Q.     Okay.  Do you know, is there

Protected - Subject to Further Protective Review

1  currently any ongoing work to develop an

2  extended-release version of Xarelto?

3        A.   I'm not aware of any further

4  work in regards to that.

5              (Document marked for

6         identification as Exhibit

7         Moore-9.)

8  BY MR. OVERHOLTZ:

9        Q.   Let me show you what we'll

10  mark as Exhibit Number 9 which is Bates

11  Janssen 0812704, Record Number 136794.

12              This is an e-mail from

13  February 2010.  A couple of e-mails.  The

14  first starting on February 3rd and then a

15  follow-up on February 25th.  I'll give

16  you a second to look at it and I have a

17  couple questions about it.

18        A.   Sure.

19        Q.   So if I can ask you about

20  the e-mail down at the bottom first which

21  is the one from An Thyssen.

22        A.   Yeah.  Just one second.

23        Q.   Oh, sure.  Not a problem.

24        A.   Okay.  Thank you.  Sorry.

Protected - Subject to Further Protective Review

1       Q.    So An Thyssen, your

2  predecessor on that ClinPharm lead role,

3  sends an e-mail on February 3, 2010, to

4  several people, including yourself, Todd

5  Moore.

6             You see that?

7       A.    Mm-hmm.  Yep.

8       Q.    Okay.  And then there is

9  also a Nini Bode.  Do you know, who was

10  that?

11      A.    I believe Nini was

12  responsible for some of the preclinical

13  work --

14      Q.    Okay.

15      A.    -- at -- at Janssen.

16      Q.    Okay.  Now, when we talk

17  about preclinical as opposed to clinical

18  work, preclinical work is work that's not

19  done in human subjects.  Is that a fair

20  statement?

21      A.    That's very general, but a

22  fair statement.

23      Q.    Okay.  It could either be

24  done in a laboratory, in vitro testing,

Protected - Subject to Further Protective Review

1    or it could be -- also could include

2    animal testing, right?

3          A.    It's just part of it, yes.

4          Q.    Okay.  And if you look with

5    me, the subject of this e-mail is

6    "Rivaroxaban ClinPharm-preclin cross

7    company TC" -- teleconference.

8                Do you see that?

9          A.    I do.

10         Q.    Okay.  And it looks like

11   there's a teleconference being scheduled

12   for February 25th of 2010.  It looks

13   like, I guess, the callers are going to

14   be in several different locations, from

15   Brussels, Copenhagen, Madrid to Paris.

16               Do you see that?

17         A.    I do, yes.

18         Q.    Okay.  And it says -- now

19   did some of these employees of Janssen

20   work in Belgium that are on this e-mail

21   string?

22         A.    So from the below string it

23   looks like An, Nini.

24         Q.    Mm-hmm.

Protected - Subject to Further Protective Review

1        A.     An and Nini Bode seem to be

2   the two that --

3        Q.     Yeah.

4        A.     -- respectively from Janssen

5   that worked at the Beerse location.

6        Q.     And then there were some

7   Bayer employees included as well, which

8   was Geiss Volker, Wolfgang Mueck, and

9   Dr. Kubitza.

10              Do you see that?

11       A.     I do.

12       Q.     Now, there's an agenda, and

13  one is ClinPharm only, who is who.  I

14  assume that had to do with there being

15  some transition there, right?

16       A.     That's correct.

17       Q.     Okay.  And then the second

18  section is ClinPharm and preclinical.

19              Do you see that?

20       A.     I do.

21       Q.     And it -- and it says, "ER

22  development."  That would stand for

23  extended-release development; is that

24  right?

Protected - Subject to Further Protective Review

1          A.     Yes, I believe that's

2     correct.

3          Q.     So now if we turn our

4     attention to the -- this -- the e-mail

5     that comes after this.  And it's a --

6     several -- 22 days later on the same day

7     that the teleconference was called.  It's

8     an e-mail from Nini Bode to An Thyssen

9     and yourself.

10               Do you see that?

11          A.     I do.

12          Q.     Okay.  And Nini says, "Dear

13     Todd.  Sorry if it did sound like I was

14     making fun of you when I proposed you

15     would ask at CDT for the business case

16     for ER development.  In reality I was

17     very serious."

18               Do you see that?

19          A.     I do.

20          Q.     Okay.

21               "It's that I've tried.  An

22     did.  And Donald Doyle/Chem pharm also

23     brought it up, so at least I have the

24     feeling we're running into a wall."

Protected - Subject to Further Protective Review

1          Do you see that?

2     A.    I do.

3     Q.    So did that become your

4  understanding when you took over as

5  ClinPharm lead that for whatever reason a

6  wall had been put up with respect to the

7  development of an extended-release

8  version of Xarelto back in early 2010?

9          MR. ZELLERS:  Object to the

10         form.

11         THE WITNESS:  I can't speak

12         to what Nini meant by a wall.  I

13         do know that Bayer had run a

14         significant number of studies to

15         look at a ER formulation.

16         MR. ZELLERS:  ER is what?

17         THE WITNESS:  I'm sorry.  ER

18         is extended-release formulation.

19  BY MR. OVERHOLTZ:

20    Q.    Now, when it comes to

21  development of -- of drugs, sometimes the

22  development of an extended-release

23  version is undertaken because it can

24  result in the safer administration of the

1  drug; is that correct?

2           MR. ZELLERS:  Object to the

3        form.

4           THE WITNESS:  Again, I can't

5        comment on the safety of the ER

6        formulation.

7  BY MR. OVERHOLTZ:

8        Q.    An ER, extended-release

9  formulation, can result in smaller peaks

10 and higher trough levels of a drug.

11           Is that a fair statement?

12        A.    It is a different

13 pharmacokinetic profile than what you

14 would see with a once-daily.

15        Q.    And one of those differences

16 is smaller peaks and higher troughs than

17 you would see with a nonextended-release

18 version of the drug?

19        A.    It would really depend on

20 the drug itself.

21        Q.    When it comes to an

22 anticoagulant and an anticoagulant

23 effect, was there a belief that if you

24 could have lower peaks and higher

Protected - Subject to Further Protective Review

1  troughs, that the drug could be safer?

2          MR. ZELLERS:  Object to the

3      form.

4          THE WITNESS:  Again, I can't

5      comment on whether or not it was

6      considered safe or not.

7  BY MR. OVERHOLTZ:

8      Q.   At the end of the day when

9  it comes to development of an

10 anticoagulant drug like Xarelto, the --

11 the entire goal of the drug is to make it

12 safer, correct, both from a prevention of

13 the clot that you're trying to prevent

14 and the avoidance of bleeds that could

15 harm the patient, correct?

16          MR. ZELLERS:  Object to

17     form.

18          THE WITNESS:  Would you mind

19     rephrasing that question again?

20 BY MR. OVERHOLTZ:

21     Q.   Just when it comes to an

22 anticoagulant --

23     A.   Mm-hmm.

24     Q.   -- drug used in let's say

Protected - Subject to Further Protective Review

1  patients with Afib to prevent strokes,

2  the whole point of the drug is to provide

3  safety to that patient, both by having

4  enough drug to prevent the clot that

5  would form that would cause a stroke,

6  or -- and -- but not so much drug that

7  that patient would be at an increased

8  risk of a serious bleed.  Do you agree?

9       A.    I would agree that there has

10  to be a balance between safety and

11  efficacy for any drug.

12       Q.    And for an anticoagulant

13  like Xarelto, that balance is between

14  enough drug to prevent the clot in an

15  Afib, prevent a stroke, and not so much

16  drug that you have significant bleeding

17  in the patients that take the drug?

18            MR. ZELLERS:  Object to

19       form.

20  BY MR. OVERHOLTZ:

21       Q.    Right?

22       A.    Again, that's more of a

23  clinical question.  I -- I would have to

24  defer to my clinical colleagues.

Protected - Subject to Further Protective Review

1    Q.    But in determining, you

2  agree that in ROCKET for example, the

3  primary efficacy endpoint was prevention

4  of strokes, correct?

5    A.    I believe that was the

6  primary endpoint, yes.

7    Q.    Okay.  The primary safety

8  endpoint was the bleeding endpoint,

9  correct?

10    A.    It was a specific bleeding

11  endpoint.  I don't recall the specifics

12  of that.

13    Q.    Was it -- do you have an

14  understanding that major bleeds was the

15  primary significant endpoint?

16    A.    That's my memory.  I can't

17  remember if that was specifically the

18  primary endpoint.

19    Q.    Well, you agree that it was

20  a bleeding endpoint as defined by the

21  study?

22    A.    I would agree that it was a

23  bleeding endpoint.

24    Q.    Okay.  Now, the comparator

1   drug in ROCKET was warfarin, correct?

2          A.     Correct.

3          Q.     Now, warfarin, you're

4   familiar with the PK/PD characteristics

5   of warfarin when given to patients for

6   Afib?

7          A.     In general.

8          Q.     Okay.  For warfarin, you can

9   take -- let me step back.

10             For Xarelto, let's start

11  with PD.  The PD measurement that you

12  would take can be different depending on

13  the time of day that you take it,

14  correct?

15         A.     The PD -- the PD measurement

16  will change as the concentration of the

17  drug -- of the medication in the body

18  changes.

19         Q.     Right.  You would expect a

20  higher PT if you took a PT measurement

21  using Neoplastin two hours after drug

22  administration than you would at 23 hours

23  after administration?

24         A.     I believe that would be --

Protected - Subject to Further Protective Review

1    that would be the case, yes.

2           Q.    Okay.  Now -- and when it

3    comes to measuring drug concentration,

4    either through direct measurements or

5    through a surrogate or indirect measure

6    of like using PT Neoplastin, the drug

7    exposure would be different if you took

8    it between two and four hours after

9    administration and 23 hours after

10   administration, right?

11          A.    The plasma concentration of

12   the drug would be different between two

13   and four hours after administration

14   compared to 23 hours after

15   administration.

16          Q.    So when you're evaluating

17   the PK/PD for a drug like Xarelto that is

18   given once daily and is not

19   extended-release, it's important to know

20   the time in which those samples were

21   taken, correct?

22          A.    I'm not sure I understand.

23   Can you --

24          Q.    In other words, if you're

1   going to do an evaluation of PK/PD

2   parameters for a drug like Xarelto --

3           A.    Correct.

4           Q.    -- it's important that you

5   know the time in which the samples were

6   taken, whether they were closer to the

7   expected peak level or closer to the

8   expected trough level?

9           A.    If you were doing a

10  pharmacokinetic and pharmacodynamic

11  analysis of the drug, it would be a

12  benefit to know when the samples were

13  taken in relation to when the dose was

14  taken.

15          Q.    But for a drug like

16  warfarin, when doctors treat patients

17  with warfarin, they can pull a PT/INR at

18  any time during the day, correct?

19          A.    Once warfarin is at a steady

20  state, I believe that's correct.

21          Q.    Okay.  When you start taking

22  warfarin, once it becomes at a steady

23  state in your system, you don't have

24  these changes in peak and trough when it

Protected - Subject to Further Protective Review

1   comes to -- let me take a step back.

2          With warfarin, you don't see

3   these changes in PD parameters like PT

4   from time immediately following your dose

5   until the next dose is due?

6          MR. ZELLERS:  Object to

7       form.

8          Go ahead.

9          THE WITNESS:  Again, I'm not

10      an expert on warfarin.  I would

11      have to have some documentation to

12      be able to answer your question.

13  BY MR. OVERHOLTZ:

14      Q.   But we agree that warfarin

15  reaches a steady-state in patients when

16  they are taking a dose, and that those PT

17  measurements can be taken any time of the

18  day, right?

19      A.   When they are taken, I would

20  refer back to my clinical colleagues as

21  far as when the best time to take an INR

22  would be.

23          That's about the best I can

24  answer.

Protected - Subject to Further Protective Review

1    Q.    And in the ROCKET trial,

2    there was actually an INR goal that was

3    set for the warfarin patients, right?

4    A.    I believe the goal, yes.

5    Q.    And that was a PT/INR

6    between 2 and 3; is that right?

7    A.    2.0 and 3.0, I believe, was

8    the goal.

9    Q.    And the goal was to keep it

10   within that 2 to 3 range, right?

11   A.    Again, going back to the

12   design -- the design of the trial, I

13   believe that's what the design was, but I

14   wasn't part of the design of the trial.

15   Q.    Was there any goals set up

16   with respect to peak and trough PT levels

17   for Xarelto in the ROCKET trial?

18   A.    No, I don't believe there

19   was.

20   Q.    Okay.  Let's go back to

21   Exhibit 9, see what Nini Bode said next

22   to you.  First she said, "It's that I

23   tried.  An did.  Donald Doyle/ChemPharm

24   also brought it up.  So at least I have

Protected - Subject to Further Protective Review

1   the feeling that we're running into a

2   wall.  So perhaps if you would try, new

3   on the job, and you would also come up

4   with the same message again" -- in

5   italics -- "people will get it."

6                Do you see that?

7        A.    I do.

8        Q.    Now, one of the things that

9   was mentioned earlier in the e-mail is

10  that Nini says she proposed that you,

11  being Todd Moore, would ask at the

12  compound development team meeting for a

13  business case for ER development.

14               Do you see that?

15       A.    Yes, I do.

16       Q.    Okay.  Now, when it talks

17  about a business to case -- business

18  case, you're talking about the ability to

19  market the drug more effectively; is that

20  right?

21               MR. ZELLERS:  Object to

22        form.

23               THE WITNESS:  I can't answer

24        that.  I can't tell you what Nini

1       was emphasizing when she was

2       writing this e-mail.

3  BY MR. OVERHOLTZ:

4       Q.    Let's look at Exhibit Number

5  10.  And then we'll take a break, if you

6  don't mind.

7       A.    Sure.

8            (Document marked for

9       identification as Exhibit

10      Moore-10.)

11           MR. OVERHOLTZ:  It might be

12      about lunchtime.

13           MR. ZELLERS:  Good.

14      Hopefully I have lunch.

15           (Whereupon, a discussion was

16      held off the record.)

17  BY MR. OVERHOLTZ:

18      Q.    Mr. Moore, I'm showing you

19  what is Exhibit Number 10, which is

20  Xarelto_Janssen 01109178, which is Record

21  Number 246317.

22           And it's an e-mail the same

23  day about 30 minutes later or so that you

24  sent to Sigmond Johnson and Ken Turner.

Protected - Subject to Further Protective Review

1          Do you see that?

2     A.     Yes.

3     Q.     If you need, I'll let you

4  finish reading it.

5     A.     If you wouldn't mind.  Okay.

6     Q.     Okay.  So you send this

7  e-mail on February 25th at 4:56, about

8  30 minutes after you got that e-mail from

9  Nini Bode regarding the rivaroxaban

10 ClinPharm pre-clin cross-company

11 teleconference, correct?

12    A.     That's correct.

13    Q.     And you sent it to Sigmond

14 Johnson and Ken Turner, right?

15    A.     Correct.

16    Q.     And Sig Johnson was who at

17 Janssen?

18    A.     I believe he was the project

19 manager for Xarelto.

20    Q.     Okay.  And Ken Turner, was

21 he one of your colleagues in clinical

22 pharmacology?

23    A.     He was the director I

24 reported to.

Protected - Subject to Further Protective Review

1        Q.    Okay.  And the subject of

2   your e-mail is "Riva extended-release,"

3   right?

4        A.    That's correct.

5        Q.    You say, "Hi Sig.  I just

6   finished a call with our ClinPharm

7   colleagues at Bayer.  The general agenda

8   of this call that An had set up as an

9   ad hoc-type meeting, was general

10  ClinPharm issues that stretch across our

11  two companies.  One of the issues brought

12  up was the development of an

13  extended-release formulation.  Nini Bode,

14  who was also in attendance at this

15  meeting, informed me that the ER

16  development was on the G&O list for both

17  the CDT and GDC."

18            Do you see that?

19        A.    I do.

20        Q.    When it talks about a G&O

21  list, what is that?

22        A.    I believe G&O stands for

23  goals and objectives.

24        Q.    And we've already --

Protected - Subject to Further Protective Review

1    compound development team is our CDT,

2    right?

3           A.    Right.  Mm-hmm.

4           Q.    GDC is the global

5    development committee?

6           A.    My understanding, yes.

7           Q.    You say, "A common question

8    was raised across the groups,

9    specifically, was there a business case

10   developed for this development work?"

11          Do you see that?

12          A.    Yes.

13          Q.    So when you asked was there

14   a -- when you talked about in this e-mail

15   that this common question had been

16   raised, was there a business case

17   developed for this development, what did

18   you mean by business case?

19          A.    I believe I was just

20   following on with what Nini Bode had

21   indicated about the need for a business

22   case.

23          Q.    Now, sometimes companies can

24   start selling a drug and then later they

Protected - Subject to Further Protective Review

1    can extend their patent protection for

2    that drug by coming out with an

3    extended-release version later; is that

4    right?

5              MR. ZELLERS:  Object to

6         form.

7              THE WITNESS:  I would have

8         to defer to my regulatory

9         colleagues in regards to that.

10   BY MR. OVERHOLTZ:

11        Q.    You've worked at

12   pharmaceutical companies that have sold

13   extended-release versions of drugs,

14   right?

15        A.    I have, yes.

16        Q.    Have you ever worked on

17   extended-release versions of drugs?

18        A.    Yes, I believe I have.

19        Q.    Have you ever worked on a

20   drug that originally came out as a

21   nonextended-release version and then

22   later was marketed as an extended-release

23   version?

24        A.    No, I have not.

1      Q.    Okay.  You've heard of

2    drugs -- that happening in drug

3    situations, correct?

4      A.    I understand that can

5    happen, yes.

6      Q.    You say, "I realize this may

7    have been a topic in previous CDTs, so I

8    certainly appreciate any background

9    updates you can provide."

10          Do you see that?

11    A.    Yes, I do.

12    Q.    Okay.  Now, did you get any

13    answers from either Sig Johnson or Ken

14    Turner about what the background was as

15    to why the extended-release version

16    development had not been continued or

17    completed?

18    A.    It's been a while since 2010

19    what exactly Sig may have indicated.  I

20    understand that Bayer -- Bayer did not

21    finish up with the extended-release

22    program.

23    Q.    Okay.  We know that -- would

24    it be fair to say that an

Protected - Subject to Further Protective Review

1  extended-release version of one of the

2  NOACs -- when I say NOAC, you know what I

3  mean?

4          A.    Novel oral anticoagulants.

5          Q.    Right.  That's like Xarelto

6  and Eliquis, and edoxaban, whatever

7  that's called, Savaysa, right?

8          A.    Yes.

9          Q.    Okay.  Would it be a fair

10  statement that when it comes to NOACs,

11  that extended-release versions of those

12  drugs would act more closely in their

13  pharmacology to warfarin if they were

14  given extended-release versions?

15          MR. ZELLERS:  Object to

16      form.

17          THE WITNESS:  I don't know

18      that for sure, no.

19  BY MR. OVERHOLTZ:

20          Q.    Do you know if that has been

21  evaluated by any of the companies that

22  developed NOACs, as to whether

23  extended-release versions would be more

24  likely to behave from a pharmacology

1  perspective more similarly to warfarin

2  when it comes to the PK and PD responses

3  to the drug?

4          MR. ZELLERS:  Object to

5      form.

6          THE WITNESS:  Again, I'm not

7      aware of that specific goal.

8  BY MR. OVERHOLTZ:

9      Q.    Now, are you aware, are

10 there any of the NOACs that have been

11 developed that are extended-release

12 versions?

13     A.    I am not aware of any of the

14 NOACs having an extended-release

15 formulation.

16     Q.    What about batroxobin?  Have

17 you worked on batroxobin?

18     A.    I have not.

19     Q.    Are you familiar with

20 batroxobin?

21     A.    No, I am not.

22     Q.    Are you familiar with

23 Portola Pharmaceuticals?

24     A.    I am familiar with the

Protected - Subject to Further Protective Review

1    company, yes.

2         Q.    Portola was the company that

3    Janssen worked with with respect to the

4    development of a reversal agent or

5    antidote for Xarelto, correct?

6         A.    I'm familiar with the work

7    that they did with andexanet.

8         Q.    Okay.  Andexanet alpha?

9         A.    Yes.

10         Q.    And is there andexanet now

11    available in the market in the United

12    States?

13         A.    It is not.

14         Q.    Okay.  For any of the

15    anticoagulants?

16         A.    I believe dabigatran has a

17    reversal agent now available.

18         Q.    Okay.  But not Xarelto?

19         A.    Xarelto does not.

20         Q.    Do you know if the NDA has

21    been filed by Portola for use of

22    andexanet with Xarelto?

23         A.    I believe they have filed an

24    NDA for that.

Protected - Subject to Further Protective Review

1    Q.    Have you worked with Portola

2    at all in providing PK and PD

3    information, clinical pharmacology

4    information, to support their ND app --

5    NDA application for their reversal agent

6    for Xarelto?

7    A.    I supported Portola from a

8    sponsor standpoint, providing them with

9    insight to the

10   pharmacokinetic/pharmacodynamic

11   properties of rivaroxaban as they were

12   going through their development program.

13   Q.    Okay.  And in doing that

14   work with Portola, did you also have an

15   understanding that they were working on

16   their own novel oral anticoagulant?

17   A.    I believe they had a

18   compound in development, but it was not

19   something that I paid attention to.

20   Q.    All right.  Are you aware of

21   any other -- you may have already

22   answered this, but we'll ask this and

23   we'll take our break.

24            Are you aware of any other

Protected - Subject to Further Protective Review

1    novel oral anticoagulants that are in

2    development now as extended-release

3    versions, whether approved or not

4    approved?

5        A.   No, I'm not aware of any

6    other novel oral anticoagulants that --

7    that are an extended-release formulation.

8        Q.   And -- and you haven't been

9    involved in doing any type of clinical

10   pharmacology studies, PK/PD studies, or

11   analyses of an extended-release version

12   of Xarelto?

13       A.   I have not been involved in

14   any studies that assessed -- assessed

15   that.

16       Q.   Do you know what came of

17   this e-mail that you sent to Sig Johnson

18   and Ken Turner in February 2010 about

19   this business case development?

20       A.   No, I -- I can't recall what

21   happened after this e-mail.

22       Q.   Just kind of dried up?

23            MR. ZELLERS:  Object to

24       form.

Protected - Subject to Further Protective Review

1              THE WITNESS:  I understand

2         that Bayer had run several studies

3         looking at different

4         extended-release formulations.  I

5         also understand that they were not

6         successful in -- in generating

7         one, but that's it.

8    BY MR. OVERHOLTZ:

9         Q.    Did you have an

10   understanding of when they had run those

11   studies, done those studies?

12        A.    It was prior to my

13   involvement.

14              MR. OVERHOLTZ:  Okay.  Let's

15        take our lunch break now.

16              THE VIDEOGRAPHER:  This

17        marks the end of Videotape

18        Number 2.  The time is 12:28 p.m.

19        We are going off the record.

20                   -  -  -

21              (Whereupon a luncheon recess

22        was taken at 12:28 p.m. until 1:50

23        p.m.)

24                   -  -  -

Protected - Subject to Further Protective Review

1           A F T E R N O O N   S E S S I O N

2                        -   -   -

3              THE VIDEOGRAPHER:  This

4        marks the beginning of Videotape

5        Number 3.  The time is 1:50 p.m.

6        Back on the record.

7                        -   -   -

8                     EXAMINATION

9                        -   -   -

10   BY MR. OVERHOLTZ:

11           Q.    Okay.  Mr. Moore, one of the

12   things that we talked about is that when

13   you took over as the clinical pharm lead

14   from An Thyssen back in 2010, one of the

15   things that you had to bring yourself up

16   to speed on was the matched PK/PD

17   substudy in ROCKET.  Do you recall that?

18           A.    Yes.

19           Q.    Okay.  And that was the

20   substudy that involved a couple hundred

21   people -- I think it ended up being 281

22   folks -- enrolled in the ROCKET study in

23   which some more PK/PD sampling and

24   analysis were done than in the overall

Protected - Subject to Further Protective Review

1    larger ROCKET study, right?

2         A.    That was the only part of

3    the study that collected pharmacokinetic

4    and pharmacodynamic samples together.

5         Q.    And that's what we talked

6    about as far as matching.  You take the

7    PK sample and the PD sample at the same

8    time so they can be evaluated?

9         A.    That's correct.

10        Q.    Okay.  Now, ROCKET, we

11   talked about, was a study that was a

12   global study that Janssen sponsored that

13   was run by the folks down at Duke at

14   DCRI, right?

15             MR. ZELLERS:  Object to

16        form.

17             THE WITNESS:  To my

18        understanding, yes.

19   BY MR. OVERHOLTZ:

20        Q.    And Janssen had primary

21   responsibility as between Bayer and

22   Janssen on the ROCKET study; is that

23   right?

24        A.    To my understanding, yes.

Protected - Subject to Further Protective Review

1    Q.    And it was a global study,

2  meaning that there was investigator sites

3  both for North America as well as in

4  Europe; is that right?

5    A.    That's correct.

6    Q.    Now -- and I think you told

7  me that you're not aware, as far as in

8  the matched -- well, let me ask you this.

9        In the overall ROCKET study,

10  do you know what the percentage was of

11  patients from the United States versus

12  those patients in Europe?

13        MR. ZELLERS:  Object to

14        form.  Only that I think it was

15        more than Europe in terms of where

16        patients were in ROCKET, but ask

17        your questions however you want,

18        if that becomes important.

19        MR. OVERHOLTZ:  I

20        understand.

21  BY MR. OVERHOLTZ:

22    Q.    As far as the comparison

23  between patients that were enrolled in

24  the European part of the ROCKET study and

Protected - Subject to Further Protective Review

1   patients compared in the United States or

2   North America part of the study, do you

3   have an understanding of how that broke

4   down as far as percentages?

5       A.   I wouldn't be able to say

6   what percentage is what without actually

7   looking at the trial report.  Obviously,

8   there was a difference, but I don't know

9   what that is.

10      Q.   Okay.  Now, for the matched

11  PK/PD study that looked at

12  pharmacokinetic and pharmacodynamic

13  matched samples for the ROCKET substudy,

14  were you aware of how many of those

15  patients that enrolled in that study were

16  from the United States?

17      A.   No, I am not aware.

18      Q.   Okay.  Let's look at what

19  we'll mark as Exhibit Number 11.

20          (Document marked for

21          identification as Exhibit

22          Moore-11.)

23  BY MR. OVERHOLTZ:

24      Q.   And this is Bates Janssen

Protected - Subject to Further Protective Review

1    08450655, Record Number 1389727.

2    1389727.

3              And it's an e-mail chain

4    from early January of 2010, the last

5    e-mail forward from An Thyssen to

6    yourself.  And it has several e-mails in

7    this chain stretching back to sometime in

8    December of 2009.  I'll give you a chance

9    to take a look at it.

10             I think actually the first

11   e-mail on the page -- the first e-mail in

12   the chain started back in November of

13   2009 and kind of ran forward.

14        A.    Okay.  Sorry.  Almost done.

15        Q.    That's okay.

16        A.    Okay.

17        Q.    Okay.  So we see that the

18   first e-mail in this chain was from

19   Estelle Besson to several people at Bayer

20   Healthcare, as well as folks at Janssen,

21   including Alla Rhoge and An Thyssen back

22   in November 2009.  The subject was the

23   ROCKET-AF 244 patients, 23 renal

24   impaired, enrolled in matched PK/PD

1   substudy, correct?

2          A.     That's correct.

3          Q.     And this e-mail chain was

4   forwarded to you, if we look at the top

5   of the first page, by An Thyssen to

6   yourself on January 20th of 2010; is that

7   right?

8          A.     That is correct.

9          Q.     And it says, "Info/update on

10   the Afib PK/PD substudy," correct?

11          A.     Correct.

12          Q.     And this would have been

13   sent to you just in the course of her and

14   the transition of you taking over the

15   role as clinical pharm lead in your job

16   at Janssen, right?

17          A.     I think that's fair to say,

18   yes.

19          Q.     Okay.  And so if we go back

20   to the last e-mail in the chain, the

21   November 2009 chain.  The first part of

22   the e-mail indicates that a letter had

23   gone out to all participating sites last

24   week, that we stopped the enrollment of

Protected - Subject to Further Protective Review

1  normal patients in the matched PK/PD

2  substudy, right?

3          A.     That's what it says here.

4          Q.     One of the goals in the

5  PK/PD substudy was to evaluate both

6  normal patients as far as renal function

7  goes, as well as people with renal

8  impairment; is that right?

9          A.     You wanted some

10 representation from both of those, yes.

11         Q.     And it says, "With the

12 request to enroll only patients with

13 renal impairment," right?

14         A.     Yes, that's what it says

15 here.

16         Q.     We can -- we can flip over

17 to the next e-mail in the chain which I

18 think is about a week later, on

19 November 24, 2009.

20                First of all, let me ask you

21 this.  Did you know who Estelle Besson

22 was?

23         A.     No.  I'm afraid I don't.

24         Q.     Okay.  According to her

Protected - Subject to Further Protective Review

1   e-mail signature block, she was the

2   clinical lead for Parexel Paris office.

3   Parexel, do you know that company?

4           A.      Parexel, yes.

5           Q.      Yeah.  They are a company,

6   contract resource organization --

7           A.      CRO.

8           Q.      -- CRO.  And they help run

9   clinical study sites; is that right?

10          A.      From my understanding, yes.

11          Q.      Okay.  Are they a fringe

12  company?

13          A.      Parexel?  I don't know the

14  origin of the company itself.

15          Q.      And so she says in this

16  e-mail November 24th that, "We continue

17  to motivate sites to enroll renal

18  impaired patients in the substudy and we

19  have not yet exhausted all possibilities.

20  As of today 255 patients enrolled, among

21  them 24 with renal impaired."

22                  Do you see that?

23          A.      I do, yes.

24          Q.      Okay.  Now, if you look with

Protected - Subject to Further Protective Review

1   me in the next e-mail that starts on

2   December 1st, 2009, and it's at the

3   bottom of the next page going forward.

4   It says, "Dear all.  Today's CoVance

5   tracker does not show additional renal

6   impaired patients."

7           Do you see that?

8       A.   I do, yes.

9       Q.   And then at the top of the

10  next page it says, "But during our direct

11  contact with sites" -- and I'm looking at

12  the page that ends in Bates 659 at the

13  very bottom right corner.

14      A.   Right.

15      Q.   It says, "During our direct

16  contact with site staff, we identified 19

17  more patients approached for

18  participation and who agreed."

19          Do you see that?

20      A.   Yes.

21      Q.   Okay.  So it seems that what

22  was going on here was the CRO, Parexel,

23  was approaching patients enrolled in the

24  ROCKET study who had renal impairment and

Protected - Subject to Further Protective Review

1    asking them to participate in this

2    matched PK/PD substudy.

3              Is that what your

4    understanding was?

5         A.    Based on the document that

6    you've provided here, I -- I would think

7    that's a fair assumption.

8         Q.    Okay.  And do you know what

9    the parameters were for Parexel to

10   approach these patients and ask for their

11   involvement in the substudy?

12        A.    No.  I'm sorry.  That was

13   before my time.

14        Q.    Okay.  And generally the

15   matched PK/PD substudy required what

16   additional of these patients that decided

17   to enroll in the study as far as going in

18   and getting their blood tested, and that

19   type of thing?

20        A.    Well, from what I

21   understand, and again I didn't design the

22   substudy, nor did I design the ROCKET

23   trial itself, but from my understanding,

24   that the patients needed to pass all the

Protected - Subject to Further Protective Review

1    inclusion/exclusion criteria defined by

2    the trial, be willing to come in and

3    participate in this aspect of the trial

4    itself, therefore, be willing to give

5    additional blood draws for

6    pharmacokinetic/pharmacodynamic analyses.

7        Q.    Okay.  So there were

8    additional blood draws required for these

9    patients?

10       A.    For the -- the ones enrolled

11   into the substudy, yes.

12       Q.    Okay.  And were those --

13   were the times of those additional blood

14   draws designated in the matched PK/PD

15   substudy?

16       A.    The times were defined in

17   the protocol as far as when they would

18   need to come in and provide those

19   samples.

20       Q.    Do you know when those times

21   were?

22       A.    Not off the top of my head.

23   I would have to go back and take a look.

24   It's been quite some time.

Protected - Subject to Further Protective Review

1    Q.    In the ROCKET study itself

2  was the instructions to the patients to

3  take their dose with the evening meal?

4  Is that right?

5    A.    That's correct, yes.

6    Q.    Okay.  Do you know whether

7  in the ROCKET PK/PD substudy, whether

8  samples were taken from those enrolled

9  patients at night?

10    A.    Again, I don't know the

11  exact times of when the samples were

12  taken.  I recollect that there was a

13  sample taken prior to the dose and then a

14  sample take -- samples taken after the

15  dose.  So if -- assuming that the -- the

16  subjects were following the protocol

17  properly, then the sampling would have

18  occurred at night following the evening

19  meal.

20    Q.    So it's your understanding

21  that the sample would have occurred that

22  night following the evening meal?

23    A.    Again, yes, that would be my

24  understanding.

Protected - Subject to Further Protective Review

1      Q.    With the idea to take a

2  sample under what would be believed to be

3  a peak time?

4      A.    Again, I would have to see

5  the -- the exact time points.

6      Q.    Okay.  And do you know

7  which -- how -- how the patients that

8  were approached to enter into the study

9  were selected?

10      A.    No.  Again, I'm sorry.

11  That -- that was before my time coming

12  into the study.

13      Q.    Are you familiar with the

14  term "selection bias" when it comes to

15  clinical studies?

16      A.    I'm vaguely familiar with

17  the term.

18      Q.    Okay.  So in the matched

19  PK/PD substudy of ROCKET, patients had to

20  be willing to undergo additional blood

21  draws; is that right?

22      A.    That was one of the aspects

23  of their involvement.

24      Q.    Okay.  And did you have an

Protected - Subject to Further Protective Review

1   understanding that there were patients

2   with various levels of different

3   comorbidities or -- within the ROCKET

4   study itself?

5        A.    Within the total population?

6        Q.    Yes.

7        A.    Yes.

8        Q.    Do you know whether or not

9   the -- of the patients that chose to

10  enter into the ROCKET PK/PD substudy,

11  whether or not healthier patients chose

12  to participate in the PK/PD substudy in

13  relation to the overall population in

14  ROCKET?

15       A.    No, I'm not aware of that

16  difference.  Again, I would have to

17  probably go back to the final study

18  report that Ihab Girgis produced to be

19  able to assess that.

20       Q.    Now, if we can look back to

21  the page that ends in Bates Number 656.

22  I think it's -- one, two, three, four --

23  it's the fourth page of the e-mail.  And

24  it's another follow -- it's another

Protected - Subject to Further Protective Review

1    informational e-mail from Estelle Besson

2    to several people at Bayer and Janssen,

3    including An Thyssen.

4                    Do you see that?

5         A.     Could you read the subject

6    line?

7         Q.     Yes.  December 15, 2009, at

8    15:44, "ROCKET-AF.  Question stop

9    recruitment on matched PK/PD substudy???

10   274 patients, 40 or 42 renal impaired."

11                   Do you see that?

12        A.     I do now, yes.  Thank you.

13        Q.     Okay.  So on December 15th

14   Ms. Besson reports to the folks at Bayer

15   and Janssen that, "I am delighted to

16   inform you that as of today we have a

17   total of 274 patients enrolled in the

18   matched PK/PD substudy.  Among them, 34

19   samples from renal impaired patients are

20   received at CoVance plus 6 patients have

21   been sampled but tube has not been sent

22   yet, which will make a total of 40 renal

23   impaired patients."

24                   Do you see that?

Protected - Subject to Further Protective Review

1    A.    I do, yes.

2    Q.    Okay.  Couple questions.

3  One is CoVance.  CoVance was another CRO

4  lab company that was used in the ROCKET

5  study to collect these PK/PD samples?

6              MR. ZELLERS:  Object to

7         form.

8              THE WITNESS:  From my

9         understanding, CoVance was a lab

10         that we contracted with to hub all

11         the samples together.

12  BY MR. OVERHOLTZ:

13    Q.    And so CoVance was a lab to

14  basically take in all the samples and

15  keep them together?

16    A.    That's my understanding,

17  yes.

18    Q.    And -- now, this talks about

19  a fact of 274 patients being enrolled in

20  the PK/PD substudy.  There were about

21  15,000 patients enrolled in the ROCKET

22  study; is that right?

23              MR. ZELLERS:  Object to

24         form.

Protected - Subject to Further Protective Review

1           THE WITNESS:  It was less

2       than 15,000, but around there,

3       yes.

4   BY MR. OVERHOLTZ:

5       Q.    Okay.  It was 14,000 and

6   something?

7       A.    I believe so, yeah.

8       Q.    And -- but only 274 patients

9   as of this time.  And I think it ended up

10  being 281 were enrolled in the matched

11  PK/PD substudy; is that right?

12      A.    The exact number, again,

13  escapes me.  But, yes, I think that's

14  generally correct.

15      Q.    Okay.  Says -- she asks

16  whether or not the companies could

17  confirm that we should stop recruitment

18  15 days before the end of the year,

19  right?

20      A.    Yes.

21      Q.    Okay.  Then she says,

22  "Anyway we have only three remaining

23  subjects who have not been approached or

24  have not made a decision yet," right?

Protected - Subject to Further Protective Review

1        A.    That's what it states.

2        Q.    Okay.  And then it says,

3   "Below the breakdown by country FYI."

4              Do you see that?

5        A.    I do, yes.

6        Q.    Now, if we look at this,

7   there's a list of countries on the next

8   page as well as -- and -- and under each

9   country is a number.  The first number

10  was corresponding to patients who

11  received the riva 15-milligram dose, and

12  then the second number corresponding to

13  people that received the riva

14  20-milligram dose, right?

15       A.    That would be my

16  understanding based on the format of the

17  e-mail.

18       Q.    Okay.  And so when we look

19  at the countries there, we see Belgium,

20  that they have two and one for a total of

21  three patients, right?

22       A.    That's correct.

23       Q.    Czech Republic has two and

24  five, which is a total of seven, right?

Protected - Subject to Further Protective Review

1    A.    That's correct.

2    Q.    Denmark had ten, looks like

3  they were all the 20-milligram dose

4  people, right?

5    A.    Yeah, I'm making an

6  assumption again based on the format.

7    Q.    Okay.  Germany, 12 patients,

8  right?

9    A.    Mm-hmm.

10    Q.    Poland, 11 patients, right?

11    A.    Poland, 11 patients,

12  correct.

13    Q.    Okay.  And Russia, we have

14  125 patients with 116 getting the

15  20-milligram dose, correct?

16    A.    According to this, yes.

17    Q.    Singapore is 20 patients,

18  right?

19    A.    Correct.

20    Q.    Spain is one patient?

21    A.    Correct.

22    Q.    And Ukraine has 85 patients,

23  and 78 who got the 20-milligram dose and

24  seven they got the renal 15-milligram

Protected - Subject to Further Protective Review

1    dose, correct?

2         A.    Correct.

3         Q.    And then -- so then I think

4    the total is 34 and 240, which gave us

5    the 274 number that she was at at that

6    time, right?

7         A.    That looks to be correct.

8         Q.    Okay.  Now, so of these 274

9    patients at the time, if we look at

10   Russia and Ukraine, they make up 210 of

11   the 274 patients represented in the

12   matched PK/PD study; is that right?

13        A.    My mental math probably

14   isn't that fast.  But assuming that

15   you're adding up the totals from those

16   two countries, yes.

17        Q.    Thanks for the confidence in

18   my math.  I've got it by saying 125 for

19   Russia, 116 plus 9, and 85 for Ukraine,

20   78 and 7.  And that got me to 210.

21        A.    That seems fair, yes.

22        Q.    Now, that's a pretty big

23   percentage of the patients who either

24   come from Russia and Ukraine in the

Protected - Subject to Further Protective Review

1    matched PK/PD study.  Do you agree?

2              MR. ZELLERS:  Object to

3         form.

4              THE WITNESS:  If you're

5         looking at it percentage-wise in

6         total for each of the countries,

7         yes, I would say that Russia and

8         Ukraine had -- seemed to be the

9         majority of the patients enrolled.

10   BY MR. OVERHOLTZ:

11        Q.    That doesn't match with your

12   understanding of how the number of

13   patients were divided generally in the

14   overall large ROCKET study, correct?

15             MR. ZELLERS:  Object to

16        form.

17             THE WITNESS:  Again, I would

18        have to go back to the actual

19        ROCKET report or the publication

20        to get a better understanding of

21        how the patients were distributed

22        throughout the countries.

23   BY MR. OVERHOLTZ:

24        Q.    Did you ever recall any

Protected - Subject to Further Protective Review

1  discussions about why they were able to

2  enroll 210 out of 274 patients in the

3  matched PK/PD study from either Russia or

4  the Ukraine?

5      A.    As this was done prior to my

6  involvement with rivaroxaban, I'm not

7  aware of that.  And I don't recall any

8  specific discussions that we had after

9  the completion of the substudy about the

10  distribution of the patients from the

11  different countries.

12      Q.    But you don't recall there

13  being any discussions internally about

14  what seems to be an imbalance in the

15  distribution of participants by country?

16          MR. ZELLERS:  Object to

17      form.

18          THE WITNESS:  Could you

19      define what imbalance is?

20  BY MR. OVERHOLTZ:

21      Q.    Sure.  Just the fact that

22  there seems to be a higher proportion of

23  patients from Russia and Ukraine to the

24  other countries as compared to the

Protected - Subject to Further Protective Review

1    distribution among countries in the

2    overall ROCKET study.

3         A.    In that particular case,

4    then, yes, I would agree that there seems

5    to be a greater percentage of patients,

6    again, from the Ukraine and Russia.

7         Q.    But you don't recall there

8    being any subsequent discussions about

9    that difference in distribution

10   proportions?

11        A.    No, I don't recall any

12   discussions.  It's been quite some time,

13   but I don't recall any discussions in

14   regards to, again, the different

15   proportions of the subjects that were

16   enrolled per country as part of the

17   analysis.

18        Q.    You don't recall whether or

19   not the companies did any type of

20   investigation as to whether or not that

21   difference in proportion impacted the

22   results in one way or the other?

23        A.    The difference in proportion

24   specific to the substudy that we're

Protected - Subject to Further Protective Review

1    referencing?

2            Q.    Correct.

3            A.    No, I'm not aware.

4            Q.    If you can look with me on

5    the front page now.  Estelle Besson, kind

6    of in the middle of the page, on Friday,

7    January 15th of 2010 sends an updated

8    information on this same e-mail chain

9    that she says, "Sorry for my late reply,"

10   to An.  "Attached the CoVance tracker as

11   of today."

12            Do you follow me?

13            A.    I do, yes.

14            Q.    Okay.  And it says, "281

15   patients with samples received."  So now

16   we're up to our final number of 281,

17   right?

18            A.    Okay.

19            Q.    It says 41 with renal

20   impairment, right?

21            A.    Yes, it does.

22            Q.    Okay.  It says, "118

23   patients have already their Timepoint 2

24   received at CoVance."

Protected - Subject to Further Protective Review

1          That means that CoVance has

2     received their sample that was taken at

3     what was defined as the Timepoint 2,

4     right?

5          A.    I believe that's correct

6     based on the e-mail.

7          Q.    So -- and just so I'm -- to

8     provide a little bit of information, the

9     ROCKET PK/PD substudy involved taking

10    samples at two time points; is that

11    right?

12         A.    Again, I have to go back and

13    actually take a look at the design of the

14    substudy.  There were multiple time

15    points that were collected.

16         Q.    It says, "As previously

17    discussed, CoVance is not querying any

18    discrepancy or missing data."

19              Do you see that?

20         A.    I do, yes.

21         Q.    Do you recall what issues

22    there were with either discrepancies or

23    missing data from the PK/PD matched

24    substudy in ROCKET?

Protected - Subject to Further Protective Review

1     MR. ZELLERS:  Object to

2        form.

3           THE WITNESS:  I am not aware

4        of any discrepancy or missing data

5        regarding the substudy.

6  BY MR. OVERHOLTZ:

7        Q.    And then this is -- and then

8  of course at the top, we already went

9  over, the -- An Thyssen forwarded to you

10  in your new role as the ClinPharm lead,

11  correct?

12        A.    That's correct.

13        Q.    And if you see with me in

14  her e-mail, she says, "Do you plan" --

15  kind of the third line, fourth line down.

16  It says, "Do you plan to do a review of

17  the attached tracker" -- that's the

18  Estelle Besson e-mail.

19        A.    Okay.  Yes.

20        Q.    It says, "Do you plan to do

21  a review of the attached tracker in case

22  there are missing or inconsistent data

23  you would like to be queried to the site

24  staff?  I see several N/A in this

Protected - Subject to Further Protective Review

1   tracker."  Right?

2          A.    That's what it states, yes.

3                (Document marked for

4          identification as Exhibit

5          Moore-12.)

6   BY MR. OVERHOLTZ:

7          Q.    Okay.  Let me show you what

8   we'll mark as Exhibit 12, which is Record

9   Number 13987 -- 1389728.  1389728.

10  Janssen 08450661.  This is the attachment

11  to the e-mail that An Thyssen forwarded.

12                You can see the name of this

13  file as produced to us was the "Matched

14  PK/PD tracker Sub 3, 10/01/15.xls."  I'm

15  not going to try to ask you to go through

16  this and memorize it.  I just want to

17  direct your attention that these seem to

18  be the patient information regarding

19  their sampling from the PK/PD substudy.

20  And they list which country they're from,

21  the investigator site number, the subject

22  number, their creatinine clearance

23  information, and what visit we're talking

24  about, right?

Protected - Subject to Further Protective Review

 1          A.    Yeah.   Some of the headers

 2    are cut off.  But it seems to be, that's

 3    correct.

 4          Q.    If we look over at like

 5    Page -- one, two -- the third page.

 6                MR. ZELLERS:  Can you give

 7          us a Bates number.

 8                MR. OVERHOLTZ:  Yeah.

 9          That's probably easier if I can

10          figure it out.  661 -- 663.

11                MR. ZELLERS:  So you're

12          looking at Bates Number that ends

13          in 663?

14                MR. OVERHOLTZ:  Right.

15                I think it's the next page.

16                THE WITNESS:  Is it up here

17          then?

18                MR. ZELLERS:  No, I think

19          he's looking at -- well --

20                THE WITNESS:  I only see one

21          Bates number.

22    BY MR. OVERHOLTZ:

23          Q.    If you look with me on the

24    left side of the page, it goes Russian

Protected - Subject to Further Protective Review

1   Federation down the left and switches to

2   Singapore.

3           A.    Does the top of the page

4   have a number that says 1389728?

5           Q.    One, two three, four, five.

6   Fifth page.  It's the fifth.

7           A.    Yeah, it's hard to tell

8   because it seems like it's two pages on

9   one.  One, two, three, four, five.

10          Q.    You got it.

11          A.    Can you confirm the top

12  number of the page is 1389728?

13          Q.    Yeah.  That's what it says

14  on the top left there.  The first date on

15  the top right of this first patient

16  listed is 16/9, September '09.  So we're

17  looking at the same thing.

18                MR. ZELLERS:  Counsel, while

19          you are orienting everyone, I just

20          object in that there is a Bates

21          number on the first page of this

22          exhibit.  It doesn't look like any

23          of the other pages are stamped.

24                MR. OVERHOLTZ:  I think this

Protected - Subject to Further Protective Review

1      is one of those Excels that you

2      guys produced to us natively and

3      did not give us a TIFF page or

4      Bates number on it.  The overall

5      document has a Bates 663084506.

6  BY MR. OVERHOLTZ:

7      Q.    So if we look at that fifth

8  page in order.  I want to just bring your

9  attention down to -- if you look at

10  Singapore group of patients kind of at

11  the bottom of the page?

12      A.    Yes.

13      Q.    You can see there's, like, a

14  whole section there that says for several

15  patients, not done, not done, not done.

16      Do you see that?

17      A.    Yes.

18      Q.    Not done.  And then if we

19  look over to six -- it is hard to count

20  these pages, isn't it?  Six, seven,

21  eight -- ten.

22      A.    May I ask a question?

23      Q.    Sure.

24      A.    Just so I can properly

Protected - Subject to Further Protective Review

1    answer your queries?

2         Q.    Yeah, absolutely.

3         A.    I guess the problem I have

4    is that the header across the top, I

5    can't fully read what the header is for

6    that particular date.  Is that "Results"

7    (CRI/COL)?  I'm not -- I'm not entirely

8    sure what that stands for.

9         Q.    Okay.  That's a good

10   question.  It says "result," and there is

11   a date listed under that column, right?

12   That's the one that you're talking about.

13   But the CON is cut off or something like

14   that, right?

15        A.    Because it doesn't appear

16   that this is a result, but just a date.

17             MR. ZELLERS:  And, Counsel,

18        can someone show me where it says

19        "not done" in the document?

20             MR. OVERHOLTZ:  Yeah.  It's

21        on Page 5.

22             THE WITNESS:  Underneath the

23        date.  So is it that -- you

24        understand my confusion?

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2           Q.    I do.

3           A.    If I see a column that says

4    "result," then I would expect a result,

5    not a date.

6                 Now, if the date -- it could

7    be that a date wasn't collected but a

8    result is available.

9           Q.    Okay.  I understand.

10          A.    Okay.

11          Q.    All right.  Got it.

12          A.    Thank you.

13          Q.    Maybe we'll see if we can't

14   get a better copy of this and move back

15   to it so you can have an answer to that

16   question.

17          A.    Sure.

18          Q.    It's valid.  We'll figure it

19   out.  I think it's talking about the date

20   the result was taken, but we'll see if we

21   can get a better copy of it.

22          A.    Yeah.

23          Q.    Let's look at what we'll

24   mark as Exhibit Number 13, which is

Protected - Subject to Further Protective Review

1   Janssen 08450846, Record Number 1389771.

2                (Document marked for

3        identification as Exhibit

4        Moore-13.)

5   BY MR. OVERHOLTZ:

6        Q.    I'll let you take a look at

7   that for a minute.

8        A.    Okay.

9        Q.    Sometimes these

10  spreadsheets, when they get printed they

11  come out in a weird format.

12       A.    It compacts everything,

13  so...

14             Okay.  I think I got the

15  general idea.

16       Q.    Okay.  So this is Ihab

17  Girgis who you told me worked in the

18  modeling and simulation and worked on the

19  population, the PK/PD substudy analysis,

20  correct?

21       A.    That's correct.

22       Q.    Okay.  And he's e-mailing

23  you and An Thyssen and several other

24  people at Janssen about what he describes

Protected - Subject to Further Protective Review

1    in the subject line as rivaroxaban Phase

2    III pocket trial PK/PD substudy.

3              Do you see that?

4         A.    It's obviously a typo, yes.

5         Q.    Yeah, I think he meant the

6    ROCKET trial.

7         A.    I believe so, yeah.

8         Q.    Okay.  And February 8, 2010,

9    is when he wrote this e-mail, correct?

10        A.    According to this date, yes.

11        Q.    Okay.  And he says,

12   "Building up on An Thyssen's e-mail last

13   year and some comments from Rachel,

14   please find some points that we might

15   want to discuss in our meeting tomorrow."

16             And his first section is for

17   the matched PK/PD substudy.  Do you see

18   that?

19        A.    Yes.

20        Q.    It says, "Date and time of

21   the last drug administration prior to

22   PK/PD samplings are needed."

23             Do you see that?

24        A.    I do, yes.

Protected - Subject to Further Protective Review

1    Q.   Okay.  And I think I asked

2    you earlier about that -- that is

3    important information to have if you're

4    going to do a PK/PD analysis of a drug

5    and samples have been taken, you want to

6    know what -- what relation they have to

7    the time when the drug was actually

8    taken, correct?

9    A.   Yes, that's -- that's

10   important.

11   Q.   Okay.  And the next thing he

12   says is, "Please make sure that the last

13   drug recorded is indeed the riva placebo

14   but not warfarin" -- "warfarin placebo.

15   We are concerned about this because in

16   the past study, e.g., ACS 2001, we

17   encountered confusion related to this."

18        Do you see that?

19   A.   I do, yes.

20   Q.   Okay.  So in the PK/PD

21   substudy, did all of -- were all of the

22   patients supposed to have been the ones

23   that were randomized to taking Xarelto,

24   rivaroxaban, or were there some of the

Protected - Subject to Further Protective Review

```
 1   patients that were patients that got the

 2   warfarin control drug?

 3        A.    As it was a blinded trial, I

 4   believe that those patients would have --

 5   would have received either riva or

 6   warfarin.

 7        Q.    Okay.  And so -- they did

 8   this double-dummy concept where each

 9   patient would take two pills.  They would

10   take riva plus a placebo or warfarin plus

11   a placebo, so the blind could be

12   maintained.  Was that your take?

13        A.    That was my general

14   understanding, yes.

15        Q.    He then asks questions about

16   whether or not the riva placebo and

17   warfarin placebo are taken separately or

18   together.

19              Do you see that?

20        A.    I do, yes.

21        Q.    Okay.  Do you -- do you

22   recall whether or not in the ROCKET

23   studies that the drugs were -- that

24   everyone was supposed to take their drugs
```

Protected - Subject to Further Protective Review

1    at the same time?

2         A.    I know that everybody was

3    supposed to take their drugs with the

4    evening meal.

5         Q.    And that's whether they were

6    all in the -- randomized to the riva or

7    randomized to warfarin, because they

8    didn't know?

9         A.    My understanding, yes.  As

10   long as the drug was taken with the

11   evening meal.

12        Q.    Okay.  Point B he says,

13   "Date and time of PK sampling and PD

14   sampling are needed."  He talks about

15   that's important information if you're

16   going to do the analysis because we want

17   to make sure that the matched samples are

18   the same.  And that's what Ihab Girgis

19   says here, right?

20        A.    That's correct.

21        Q.    Okay.  Now, if I could bring

22   you down, Point Number 2 there under C,

23   C2.  "For riva subjects."

24             Do you see that line?

1        A.      Yes, I do.

2        Q.      Okay.  "For riva subjects,

3   the dosage is decided on a subject level.

4   Subject either took 20 milligrams or

5   15 milligrams all the way through the

6   study.  In which dataset is this subject

7   level information recorded?"

8            Do you follow me there?

9        A.      That's what it states there.

10       Q.      And it looks like here he's

11  just trying to look at where do I find

12  this data so I can use it in my analysis,

13  right?

14       A.      That appears that's what

15  he's doing.

16       Q.      Now, the statement about 20

17  and 15 milligrams.  In the ROCKET study

18  for patients that were enrolled in the

19  study, if they were -- came into the

20  study and they were randomized to the

21  20-milligram dose because they didn't

22  meet the moderate renal insufficiency

23  requirement or definition, they continued

24  to take 20 milligrams throughout the

Protected - Subject to Further Protective Review

1    entire study; is that right?

2         A.    My understanding -- that's

3    to my understanding, yes.

4         Q.    Okay.  And if someone came

5    into the study and they were put on the

6    15-milligram dose, they stayed on the

7    15-milligram dose throughout the study?

8         A.    Yes.  As long as their renal

9    function dictated that, yes.

10        Q.    Okay.  And -- now, if

11   someone's renal function changed in the

12   middle of the study because it was a

13   double-blinded trial, placebo-controlled

14   trial, their dose of riva would not

15   change, correct?

16             MR. ZELLERS:  Object to

17        form.

18             THE WITNESS:  It is my

19        understanding that that's how the

20        drug was designed, yes.

21   BY MR. OVERHOLTZ:

22        Q.    So you came in at 20.

23   Halfway through the study you developed

24   renal insufficiency.  You would still

Protected - Subject to Further Protective Review

¹ continue to get that 20-milligram pill of

² riva as the study went forward?

³      A.     Again, to my understanding,

⁴ I believe that's correct.

⁵      Q.     The next point under 1 is D,

⁶ "Is the meal information provided

⁷ needed?"

⁸             Do you see that?

⁹      A.     I do, yes.

¹⁰      Q.     Okay.  Do you know what he's

¹¹ referring to there by when he says, "Is

¹² the meal information provided or needed"?

¹³      A.     I believe he's referring to

¹⁴ the question of whether or not there's

¹⁵ some confirmation that the subject took

¹⁶ their dose, be it 15 or 20 milligrams,

¹⁷ with the meal.

¹⁸      Q.     There was an idea that

¹⁹ whether or not they took it with the meal

²⁰ or not could make a difference in the

²¹ PK/PD analysis?

²²      A.     The 15 and 20-milligram dose

²³ due to its properties, to get full

²⁴ exposure, you need to take it with a

Protected - Subject to Further Protective Review

1  meal.

2         Q.    And do you know if that

3  information was included in the PK/PD

4  analysis, the matched PK/PD analysis

5  substudy for Xarelto?

6         A.    I don't know the specifics

7  of it.  I'd have to defer back to my

8  colleague Ihab --

9         Q.    Mm-hmm.

10         A.    -- to be able to properly

11  answer that.  Just for the fact that I

12  haven't reviewed those datasets.

13         Q.    Okay.  Now, if you can look

14  with me at number E, he lists several

15  checks that need to be done to make sure

16  of that.

17              Do you see that?

18         A.    Yes, I do.

19         Q.    Okay.  Number 2 he says is,

20  "Check the scheduled versus actual date

21  and time of dosing and sampling," right?

22         A.    That is correct.

23         Q.    Because in -- in doing the

24  analysis, you'd want to know the actual

Protected - Subject to Further Protective Review

1   date and time the sample was taken and

2   the dose as opposed to just what was

3   scheduled.  Is that a fair statement?

4          A.    That's a fair statement,

5   yes.

6          Q.    Now, the next thing he says,

7   "Are pre-dose samples taken pre-dose

8   (likewise for post-dose samples, is it

9   within the windows?)"

10          Do you see that?

11          A.    I do see that, yes.

12          Q.    Okay.  And just so -- so --

13   I'm not asking you to guess.  If we look

14   down at Point Number 6, Roman numeral VI,

15   the gap between last dosing and PK sample

16   date/time.

17          Do you see that?

18          A.    Okay.

19          Q.    "So gap between last dosing

20   and PK sample date/time is reasonable,

21   e.g., close to 1 to 3, 3 to 16 hours

22   accordingly, and not bigger than

23   24 hours."

24          Do you see that?

Protected - Subject to Further Protective Review

1      A.     I do, yes.

2      Q.     Okay.  So in this study, if

3  we're going to do sampling, do -- does

4  this refresh your recollection at all

5  that you would take a pre-dose sample

6  which would be a sample you'd take just

7  before you take your -- your pill,

8  correct?

9      A.     That's correct.

10      Q.     And then that there were two

11  other windows for the sampling, one being

12  in that 1 to 3-hour time frame and

13  another that's somewhere between 3 and

14  16 hours.

15      A.     That would be my

16  understanding, yes.

17      Q.     And just so we can kind of

18  go back over our PK education, the -- the

19  pre-dose sample would kind of give you a

20  level that's found at what would be

21  considered from a drug concentration

22  perspective trough level; is that right?

23      A.     That's generally the

24  terminology that's used.

Protected - Subject to Further Protective Review

1    Q.    Right.  And this 1 to 3-hour

2    window would be the time closer to peak;

3    is that right?

4    A.    That would be correct, yes.

5    Q.    Okay.  And 3 to 16 would be

6    sometime after peak but before you start

7    getting to the trough levels?

8    A.    During the elimination

9    phase, yes.

10    Q.    Okay.  Now, if you look with

11    me at Number 2, there's a description of

12    a sparse PD study.  Do you see that?

13    A.    I do yes.

14    Q.    Now, the sparse PD study,

15    substudy -- I shouldn't use that term.

16    For the sparse PD study, was that part of

17    the PK/PD substudy or is that a different

18    study?

19    A.    That's a different

20    assessment.

21    Q.    Okay.  And what was the

22    sparse PD study?

23    A.    That was the process in

24    which sparse pharmacodynamic sampling was

Protected - Subject to Further Protective Review

1   taken throughout the entire study for a

2   majority of the patients that were

3   enrolled.

4           Q.     Was that the Week 12 and

5   Week 24?

6           A.     I believe so, yes.

7           Q.     Okay.  I just want to make

8   sure that what Mr. Girgis talked about

9   was -- that we had an idea of what he was

10  talking about.  That's taking the

11  majority of the ROCKET patients at a 12

12  and 24-week sample of their PD

13  measurements taken, correct?

14          A.     That's my understanding,

15  yes.

16          Q.     Now, they also had, during

17  the course of the study, every month,

18  they had a level taken, PD level taken

19  with a point-of-care device that took a

20  blood sample and measured it using a

21  PT -- PT and INR measurement?

22          A.     I believe a device was used

23  to check a sham INR of some sort.

24          Q.     Okay.  That was part of the

Protected - Subject to Further Protective Review

1    system that was created to make sure that

2    the warfarin patients' doses was adjusted

3    correctly and also to prevent the blind

4    from being broken because a sham INR

5    would even get reported for the patients

6    that were randomized to take Xarelto.

7          A.    Yes, that's my general

8    understanding of the study design.

9          Q.    Okay.  That PD data, when

10   the point-of-care device would take the

11   blood information and calculate a PT and

12   then of course convert it to an INR

13   measurement or either a sham INR

14   measurement, do you know what happened to

15   that data?

16         A.    No, I do not.

17         Q.    Okay.  Did you, as part of

18   your work in the PK/PD in clinical

19   pharmacology, did you ever ask to look at

20   the data that had been gathered by the

21   point-of-care devices on a monthly basis

22   throughout that time period for either

23   the Xarelto patients or the Xarelto and

24   warfarin patients?

1          A.     No, I don't believe we have,

2    just because that's a clinical -- that

3    was a clinical construct of the study

4    itself, not a strict pharmacodynamic or

5    kinetic parameter that we would

6    necessarily want to follow.

7          Q.     Do you know whether or not

8    the data that was collected through those

9    point-of-care devices and then was

10   reported to the company that would spit

11   back out either the true INR or the sham

12   INR, whether that was saved and

13   available?

14              MR. ZELLERS:  Object to

15         form.

16              THE WITNESS:  Again, it goes

17         beyond what we in clinical

18         pharmacology had any control or

19         influence over.

20   BY MR. OVERHOLTZ:

21         Q.     You were aware that that

22   data had been collected, though, in the

23   study, because it was part of the

24   protocol?

Protected - Subject to Further Protective Review

1         MR. ZELLERS:  Object to

2     form.

3         THE WITNESS:  Again,

4     assuming it was part of the

5     protocol, I would assume that it

6     was, yes.

7  BY MR. OVERHOLTZ:

8     Q.    Okay.  But no one in the

9  ClinPharm department ever said, "Hey, can

10  we look at the PK/PD data that had been

11  collected" -- well, let me start back.

12         No one at ClinPharm, PK/PD,

13  ever said, "Can we look at this data

14  that's been collected on PT measurements

15  taken on a monthly basis in the ROCKET

16  patients using the point-of-care device?"

17     A.    I don't recall specifically

18  if that was ever requested by members of

19  my team within clinical pharmacology or

20  within the modeling and simulation group.

21  It was not anything that we, as I

22  remember, were interested in looking at

23  at that time, because it wasn't a kinetic

24  or dynamic parameter that we would be

Protected - Subject to Further Protective Review

1    handling.

2        Q.    Did you have any questions

3    regarding the reliability of the PD

4    measurements that were taken by the

5    point-of-care device?

6        A.    No.  Again, it fell outside

7    any of the clinical pharmacology

8    responsibilities for the trial.

9        Q.    I want to ask you some

10   questions about another e-mail that An

11   Thyssen sent you in 2010, early on when

12   you took over the role from her on

13   ClinPharm lead.  It's going to be Exhibit

14   Number 14.

15            (Document marked for

16            identification as Exhibit

17            Moore-14.)

18            MR. OVERHOLTZ:  It's Bates

19            Janssen 08117211, Record Number

20            1362548.

21            THE WITNESS:  I'm sorry.

22            It's a long e-mail.

23   BY MR. OVERHOLTZ:

24       Q.    That's okay.  That's why I'm

Protected - Subject to Further Protective Review

1 not going to ask you about everything.

2 But I know you probably want to read it

3 first so you understand, you have some

4 context.

5          MR. OVERHOLTZ:  I don't know

6      how long we've been going.  But I

7      think we need to take a break

8      soon.

9          MR. ZELLERS:  Whatever you

10      need.

11          (Whereupon, a discussion was

12      held off the record.)

13          MR. ZELLERS:  Mr. Moore, you

14      will have a chance, if he would

15      ask you a question that you think

16      you need to look at it in greater

17      detail, you can, so...  this is

18      not your only opportunity to

19      review it if need be.

20          THE WITNESS:  Sure.  Just

21      give me one more second.

22          I think I have a general

23      context.

24 BY MR. OVERHOLTZ:

Protected - Subject to Further Protective Review

1        Q.     Okay.  Let me -- I'm going

2   to ask you a couple questions about a

3   couple of these e-mails.  This is

4   obviously -- let's see if we can agree on

5   a couple of things so we don't have to go

6   through e-mail by e-mail.  This is an

7   e-mail chain back and forth between

8   Janssen and some folks at Duke, DCRI,

9   regarding the samples related to the

10  ROCKET study; is that right?

11       A.     That's what it appears to

12  be, yes, from this e-mail.

13       Q.     And the first e-mail in the

14  chain is an e-mail from a Stephen

15  Haneline from Duke to An Thyssen, your

16  predecessor, in early January 2010, the

17  21st to be precise; is that right?

18       A.     According to this, yes.

19       Q.     Okay.  According to this

20  e-mail from Stephen Haneline, he's

21  following up on some issues from a

22  telephone conference that was held

23  between Duke and Janssen; is that right?

24       A.     I don't know what the

1   specifics of the telephone conference

2   was, but it appears to be that members

3   were from Duke and members were from

4   Janssen.

5        Q.   Okay.  So if we can turn

6   over to the next-to-the-last page,

7   there's a section called, at the very

8   top, "Matched PK/PD test design."

9             Do you see that?

10       A.   Yes, I do.

11       Q.   And he just talks about

12  whether or not the -- there was an

13  updated list of the PK/PD substudy list

14  of subjects, right?

15       A.   It appears that's what they

16  are asking.

17       Q.   Okay.  The next says,

18  "Sample quality issue and implications."

19            Do you see that?

20       A.   Yes, I do.

21       Q.   Okay.  And he says, "I want

22  to apologize for my delay in sending you

23  a list.  Part of the delay has been in my

24  attempt to get you a complete list.

Protected - Subject to Further Protective Review

1    Thank you for this list.  This is very

2    helpful."

3              Seems like maybe An Thyssen

4    provided some comments to his e-mail; is

5    that right?

6         A.    So based on the context of

7    what I'm reading, that appears to be the

8    case.

9         Q.    Okay.  It says, "Please let

10   me elaborate.  The laboratory normally

11   comments on a sample's quality at the

12   time of testing.  The Ortel laboratory

13   will be doing this as standard practice."

14             Now, do you know who the

15   Ortel laboratory was?

16        A.    No, I'm afraid I don't.

17        Q.    Okay.  "After we realized

18   that the sample quality may be an issue,

19   we added an additional commenting at the

20   time the samples were accessioned into

21   the laboratory's freezer system.

22   Unfortunately, due to its program

23   constraints we cannot go back and add

24   comments on the first shipment.  As a

Protected - Subject to Further Protective Review

1   standard practice, we will eventually

2   receive sample quality comments for these

3   samples with the data transfer."

4           Do you recall there being an

5   issue with sample quality associated with

6   the PK/PD study?

7       A.    I don't recall there being

8   any specific issue.  But it's always a

9   question when you run clinical trials,

10  especially when you're housing samples

11  for a long duration of time, whether or

12  not there -- you have enough evidence

13  that sample stability is still there.

14  You do that with both pharmacokinetic and

15  pharmacodynamic samples.  So I do recall

16  though the specifics -- it's been some

17  time.  But these were general questions

18  that we would have asked the lab to

19  ensure that there was still sample

20  stability for the pharmacodynamic samples

21  collected.

22      Q.    Okay.  There's a next

23  section called, "Sample flow to

24  laboratory."

Protected - Subject to Further Protective Review

1           Do you see that?

2      A.    I do, yes.

3      Q.    Okay.  "We are still

4  experiencing some issues with sample flow

5  from CoVance to Esoterix.  I have written

6  Sharon and she has responded.  Thanks for

7  this feedback.  Stephen."

8           Who -- do you know who

9  Esoterix was?

10     A.    I believe Esoterix is

11  another lab.  I don't recall specifically

12  what type of analyses they may have done

13  regarding the samples.  So there were

14  several pharmacodynamic parameters that

15  were assessed, PT, PK, Factor Xa.  I

16  just -- from my recollection, Esoterix

17  was a lab that was working with DCRI and

18  CoVance in that regards.

19     Q.    Now, if you can look with

20  me, An Thyssen kind of responds to

21  Mr. Haneline on Page 202 on the bottom.

22  She sends an e-mail January 22, 2010?

23     A.    Yes.

24     Q.    And she copies you on this

Protected - Subject to Further Protective Review

1   response.  Do you see that?  Bottom of

2   the page?

3          A.    Yes, I see that.

4          Q.    And she says, "Thanks for

5   your message.  Please see below for some

6   of my responses.  CoVance will be

7   shipping the PD samples collected from

8   the subject in the matched PK/PD substudy

9   to you, Esoterix, most likely end of

10  March.  You will be informed more about

11  exact timing for this."

12              Esoterix, was that a lab

13  that Duke was using for their part of

14  this PD analysis for the substudy?

15         A.    I can't say with certainty

16  what the relationship was between DCRI

17  and Esoterix.  I know Esoterix is a

18  laboratory that does analyses.

19         Q.    And then she has a note, "On

20  a personal note I would like to inform

21  you that I will be transitioning off the

22  rivaroxaban team.  Todd Moore will be

23  taking up the responsibilities of

24  clinical pharmacology leader for riva at

Protected - Subject to Further Protective Review

1   J&J."  Right?

2           A.    That's what it says.

3           Q.    We already established that

4   was what was happening between you and An

5   Thyssen back in early 2010, correct?

6           A.    That's correct.

7           Q.    Okay.  So then An Thyssen

8   sends an e-mail to you -- you and several

9   others at Janssen leaving off the Duke

10  team, on the bottom of the first page, on

11  January 22nd at 3:56.

12              Do you see that?

13          A.    I do, yes.

14          Q.    Okay.  And she says again

15  that Todd will be taking her place.  Do

16  you see that?

17              "I will no longer be

18  involved in discussions with DCRI.  Todd

19  will take my place.

20              "I've also copied Ihab who

21  will be doing the PD stats analysis."

22              Do you see that?

23          A.    I do, yes.

24          Q.    Okay.  And then if you look

Protected - Subject to Further Protective Review

 1   just above that e-mail, you respond to An

 2   and you say, "Hi An.  Just some quick

 3   questions concerning your e-mail below.

 4   Please see red text."

 5              Do you see that?

 6        A.    I do, yes.

 7        Q.    Okay.  And I don't have a

 8   version that has red text, but I think we

 9   can tell where you make a comment,

10   because it kind of has your name with a

11   colon beside it.

12        A.    That's typically how I'd

13   respond.

14        Q.    Okay.  And so -- so if -- if

15   you look with me on the second line, at

16   the end, it says, "Todd:  Sorry.  As part

17   of the" -- I'm sorry.

18              "Sorry, I believe you

19   mentioned this earlier, but does DCRI

20   clean/QC their PD data?  I assume they do

21   as part of the contract."

22              Do you see that?

23        A.    I do, yes.

24        Q.    Okay.  And then it looks

1    like An Thyssen responds and says, "Good

2    question.  I don't have the contract in

3    front of me."

4              Do you see that?

5         A.    I do, yes.

6         Q.    Okay.  And there's a comment

7    by Barbara.  Is that Barbara Wittreich?

8         A.    Wittreich.  I believe in

9    this context it would be, yes.

10         Q.    Okay.  And who is she?

11         A.    She was involved with the

12    general management of the ROCKET trial.

13         Q.    Okay.

14         A.    She is from the clinical

15    side.

16         Q.    Okay.  It says, "What

17    does" -- let's see.  "What does the

18    contract say?  At least some cleaning/QC

19    will need to be done on their end.  At

20    least they should generate the quality of

21    their PD sample analysis and the transfer

22    of the results in a data file.

23              "Also because of the

24    following:  When the samples are sent

Protected - Subject to Further Protective Review

1    from CoVance to Esoterix, the samples are

2    re-coded so that the blind is maintained

3    when DCRI" -- "when DCRI runs the PD

4    sample analysis.  DCRI is also involved

5    in other parts of the study and hence it

6    was important that they remain blinded.

7    This means that in order for us to link

8    the PD sample analysis results to the

9    subject ID codes, this re-coding list

10   needs to be provided."

11            Do you see that?

12       A.    I do, yes.

13       Q.    Okay.  And so the point here

14   is that with -- with moving all these

15   samples back and forth between companies

16   for the analysis and different labs,

17   because Duke is charged with overall

18   running this blinded study, they couldn't

19   know whether the sample came from someone

20   who had taken Xarelto or someone who had

21   taken warfarin?

22       A.    It is my understanding that

23   the blinding would be maintained.

24       Q.    If you look with me in the

Protected - Subject to Further Protective Review

1   next section, there's a note about, "I'm

2   somewhat concerned about DCRI being able

3   to provide us with the PD results by DB

4   lock."  That's database lock?

5       A.    Okay.

6       Q.    "Barbara, could you continue

7   to follow this up with them?"

8           Then you have a comment.  Do

9   you see that?

10      A.    Yes.

11      Q.    Okay.  It says, "Todd:  As

12  mentioned previously, I guess the best

13  person to influence this would be the one

14  responsible for contracting with DCRI.

15  We should confirm what the contract

16  stipulates and if there are any penalties

17  if the contract is not adhered."

18          And then An Thyssen says, "I

19  agree, although they might be pointing to

20  the fact that the PD samples were not

21  shipped to them in a timely fashion,

22  i.e., the discussion with respect to

23  CoVance on the sample shipments to DCRI."

24          Do you see that?

Protected - Subject to Further Protective Review

1      A.    I do, yes.

2      Q.    Do you know what the issue

3  was with the samples not being shipped

4  from CoVance to Duke in a timely fashion?

5           MR. ZELLERS:  Object to

6      form.

7           THE WITNESS:  From a general

8      standpoint I think there were

9      questions in regards to the time

10     frame in which case DCRI was

11     receiving the samples they needed

12     for analysis.

13          CoVance -- again, I don't

14     know the specifics of it.  But

15     CoVance was -- the company that

16     was hubbing those samples were

17     responsible for hubbing them and

18     sending them in batches to DCRI to

19     run their analysis, if I remember

20     correctly.  I can't speak to the

21     specific issues.  Again, it's been

22     some time that this was -- this is

23     referring to.

24          But at the end of the day,

Protected - Subject to Further Protective Review

1    DCRI received the -- the samples

2    and were able to run their

3    analyses and so forth, so I assume

4    it was resolved, whatever it was.

5    BY MR. OVERHOLTZ:

6    Q.    Okay.  If we look at the

7    next paragraph.  It says, "As raised at

8    the TC with DCRI, further details need to

9    be worked out on the PD 'stacks' analysis

10   DCRI will be doing for us.  Remember that

11   DCRI mentioned last year that they are

12   not a 'service institute,' and as such,

13   want to be involved in the scientific

14   aspects as well.  It was 'agreed' that

15   after the PD sample results would be sent

16   to J&J, J&J would then do their own

17   analysis which will be part of the

18   submission and that DCRI would also

19   receive a data file for" -- "for their

20   'own' analysis, over which the results

21   does not necessarily need to be part of

22   the submission."

23          Do you see that?

24   A.    I do, yes.

Protected - Subject to Further Protective Review

1    Q.    Okay.  "We,

2  ClinPharm-AM&S" -- that's the advanced

3  modeling and statistics -- I mean

4  simulation?

5    A.    Advanced modeling and

6  simulation, right.

7    Q.    That's Ihab Girgis's group?

8    A.    That's correct.

9    Q.    Okay.  "We at ClinPharm-AM&S

10  will have to start thinking about which

11  analysis could be done by DCRI.  After

12  internal discussion a PD stats meeting

13  with DCRI to discuss this further could

14  be of help."

15         And then there's a comment

16  by you.  Do you see that?

17    A.    Yes.

18    Q.    You say, "This time -- "This

19  seems odd that the 'type' of PD analysis

20  they plan to perform was not previously

21  outlined and approved by Bayer and J&J...

22  Isn't this risky?  Or is it up to us to

23  give them a PD analysis to perform so

24  they don't 'feel' like a service

Protected - Subject to Further Protective Review

1    institute?  Please clarify."

2              Do you see that?

3         A.    I do, yes.

4         Q.    Now, what did you think

5    would be risky about the Duke Clinical

6    Research doing their own PD analysis on

7    the samples?

8         A.    It is not so much worried

9    about the riskiness.  It is that I wanted

10   to make sure that any work that DCRI did

11   was in collaboration with Bayer and

12   Janssen.  So I didn't want a situation

13   where they would go off running ad hoc

14   analyses without including us and letting

15   us know what they were doing.

16              I didn't see any document

17   that outlined a priori what they intended

18   to do.  So of course, if you don't know

19   what your partner is doing, it puts you

20   at some disadvantage, for example.  So I

21   just wanted to ensure that Janssen and

22   Bayer and DCRI were all in align in terms

23   of what analysis were appropriate with

24   this data.

Protected - Subject to Further Protective Review

1    Q.    And that seemed appropriate

2  to you that he would have alignment with

3  your research partner in this ROCKET

4  matched PK/PD study at DCRI?

5    A.    So I voiced that to Ihab

6  Girgis, who is responsible for the

7  modeling and simulation of the data and

8  to ensure that he was now in alignment

9  with DCRI and what was being done in

10  addition to Bayer.

11    Q.    If you keep going, there's

12  An Thyssen in brackets.  It says, "What

13  exactly DCRI will be doing with respect

14  to PD stat analysis has not been

15  discussed yet between DCRI and J&J.

16         "Also, internally, we

17  haven't defined yet what would be needed

18  for the filing.  Although J&J and Bayer

19  stats have started discussions last week,

20  but I wasn't present at that part of the

21  meeting.

22         "And what DCRI could do,

23  perhaps something more on an exploratory

24  basis that does not need to be part of

Protected - Subject to Further Protective Review

1    the filing.  I would say it is up to us

2    to outline the type of PD stats analysis

3    that should be done."

4              Do you see that?

5         A.    I do, yes.

6         Q.    Okay.  Now, if you can look

7    with me, there's two points under that

8    last sentence.  One is that time was

9    critical for the information.  And the

10   second one, "What is nice to have."

11             Do you see that?

12        A.    I do, yes.

13        Q.    It says, "What is nice to

14   have.  Something that would also be

15   useful but perhaps less critical for the

16   filing and that could be done by DCRI,

17   indeed so they don't feel like a service

18   institute.  This F.E could be another

19   type of PD bleeding analysis that we

20   would be thinking of doing ourselves."

21             When it says "F.E," do you

22   know what that stands for there?

23        A.    I would be speculating.  I

24   can't really.

Protected - Subject to Further Protective Review

1    Q.    "Or DCRI may think of

2    totally other types of analysis that we

3    have in mind.  Obviously, what we come up

4    with needs to be discussed with DCRI.

5    Best regards, An."

6                Do you see that?

7    A.    I do, yes.

8    Q.    And we can tell we are kind

9    of looking at a back-and-forth group of

10   comments because the first e-mail on the

11   chain at the top of the page on

12   January 29, 2010, from An Thyssen to

13   yourself and Ihab Girgis and Ken Turner

14   and Barbara Wittreich, it says, "Please

15   see my thoughts (black text)."

16                Do you see that?

17   A.    Yes.

18                MR. ZELLERS:  Are you okay?

19                MR. OVERHOLTZ:  This seems

20          like a long PowerPoint.  Let's go

21          ahead and take a break.

22                THE VIDEOGRAPHER:  The time

23          is 3:03 p.m.  This completes Tape

24          Number 3.  Going off the record.

Protected - Subject to Further Protective Review

1          (Short break.)

2          THE VIDEOGRAPHER:  This

3     marks the beginning of Videotape

4     Number 4.  The time is 3:28 p.m.

5          Back on the record.

6  BY MR. OVERHOLTZ:

7          Q.    Mr. Moore, do you know what

8  acceleration to value is?

9          A.    I'm not -- I'm not -- I'm

10  not familiar with the specific meaning of

11  it, no.

12          Q.    Okay.  Is it a -- something

13  that Janssen does as far as evaluating

14  their drug development projects?

15          A.    Again, I would be hard

16  pressed to give you a -- a specific

17  definition of what that is.

18          (Document marked for

19     identification as Exhibit

20     Moore-15.)

21  BY MR. OVERHOLTZ:

22          Q.    Let me show you what we'll

23  mark as Exhibit Number 15.  Bates Number

24  Janssen 06309682, Record Number 11070,

Protected - Subject to Further Protective Review

1   which is an e-mail from February 2010.

2   Soon after you took responsibility of

3   Xarelto as clinical pharmacology leader.

4   And you can see this is an e-mail from

5   Sigmond Johnson to several people at

6   Janssen, including yourself as listed on

7   the last line of the "To" line there.

8        A.    Mm-hmm.

9        Q.    Okay.  And there's several

10  other people listed on here, including

11  Nini Bode, who we talked about before.

12  Gary Peters, correct?  I see Chris Nessel

13  is someone that we've seen in some of the

14  documents.  Sanjay Jalota I think was

15  regulatory, right?

16       A.    Correct.

17       Q.    Okay.  Nauman Shah.  Who was

18  Nauman Shah?

19       A.    I believe Dr. Shah was from

20  the biostats group, but I'm not

21  100 percent sure.

22       Q.    Okay.  We also see just

23  above your name, Peter DiBattiste is

24  listed as well.

Protected - Subject to Further Protective Review

1                    Do you see that?

2          A.    Yes, I do.

3          Q.    You see that Barbara

4    Wittreich, who we talked about before,

5    correct?

6          A.    Correct.

7          Q.    Okay.  And this e-mail on

8    February 2010 talks about, in the subject

9    line, acceleration to value and CDT

10   meeting, right?

11         A.    Okay.

12         Q.    And CDT was the compound

13   development team, right?

14         A.    That's correct.

15         Q.    Okay.  Now, some of the

16   people -- like if we look at your e-mail,

17   yours is PRDUS, right?  The little

18   initials beside your e-mail?

19         A.    Yes.

20         Q.    Okay.  That's an indication

21   that you worked in research and

22   development side of the company; is that

23   right?

24         A.    That is correct.

Protected - Subject to Further Protective Review

1       Q.    Okay.  Now, some of the

2   people have this OMPUS.

3             Do you see that?

4       A.    I do, yes.

5       Q.    You see that -- is that kind

6   of the management side of the company?

7             MR. ZELLERS:  Object to

8        form.

9             THE WITNESS:  I can't say

10       for sure.

11  BY MR. OVERHOLTZ:

12       Q.    Like when you see Catherine

13  Cotagno with OMPUS after her name, do you

14  know whether she was on the business side

15  of the company or not?

16            MR. ZELLERS:  Same

17       objection.

18            THE WITNESS:  Again, I'm

19       sorry.  I'm not familiar with who

20       Catherine is or even Martine

21       Thurin.  Yeah.  Sorry.

22  BY MR. OVERHOLTZ:

23       Q.    Okay.  So Sig Johnson you

24  told me was project manager on Xarelto,

Protected - Subject to Further Protective Review

 1   right?

 2         A.    Yeah.  He oversaw the

 3   project.

 4         Q.    Okay.  And he writes an

 5   e-mail to all of these people that we've

 6   gone through.  It says, "All, Lloyd and I

 7   participated in a prep meeting this

 8   morning to discuss the focus of the

 9   Thursday acceleration to value meeting.

10   Martin made it clear that he would like

11   the meeting to be mostly about unresolved

12   operational risk to timelines."

13               Do you see that?

14         A.    I do, yes.

15         Q.    "Quality and value."  Do you

16   see that?

17         A.    "Operational risk to

18   timelines, quality and value."

19         Q.    Okay.  And there is, of

20   course, a risk if the quality of the data

21   of the studies is called into question,

22   correct?

23               MR. ZELLERS:  Object to

24         form.

Protected - Subject to Further Protective Review

1          THE WITNESS:  Could you be a

2      little bit more specific in

3      regards to the quality of data?

4  BY MR. OVERHOLTZ:

5      Q.    Yeah, sure.  So this e-mail

6  that Sig Johnson is sending to you guys

7  in February of 2010, he's talking about

8  operational risk, right?

9      A.    That's what he states in the

10  e-mail, yeah.

11      Q.    And then one of the items

12  that he talks about is quality, right?

13      A.    Yes.

14      Q.    Okay.  He was talking about

15  the quality of the work that was being

16  done on the Xarelto project, right?

17          MR. ZELLERS:  Object to

18      form.

19          THE WITNESS:  Based on my

20      interpretation of his e-mail, that

21      seems to be correct.

22  BY MR. OVERHOLTZ:

23      Q.    And is that how you would

24  have interpreted it back in February of

Protected - Subject to Further Protective Review

1   2010 when you received it?

2         A.    That's most likely how I

3   would have interpreted it back at that

4   time.

5         Q.    Okay.  And he also talks

6   about operational risk to timelines.  Do

7   you see that?

8         A.    I do.  Yes.

9         Q.    When it comes to

10  pharmaceutical development, are there

11  risks if companies cannot meet their

12  expected timelines for completing studies

13  and getting approval of the drug?

14             MR. ZELLERS:  Object to

15             form.

16             THE WITNESS:  In regards to

17             those specific risks, I would have

18             to defer to my marketing

19             colleagues or somebody with the

20             business end of the company.

21  BY MR. OVERHOLTZ:

22        Q.    But based on your position

23  as the ClinPharm lead, and being part of

24  these acceleration to value e-mails, did

Protected - Subject to Further Protective Review

1  you have an understanding that there were

2  risks if certain timelines weren't met

3  from an operational perspective that

4  could cost the company money if those

5  timelines were not met?

6                    MR. ZELLERS:  Object to

7          form.

8                    THE WITNESS:  Again, I -- I

9          couldn't speak to the exact

10         definition of risk the way it is

11         outlined here.  If you are talking

12         about financial risk, again I'd

13         have to defer back to my marketing

14         and business colleagues from the

15         company.

16  BY MR. OVERHOLTZ:

17         Q.    It says, "We will spend the

18  entire upcoming CDT team meeting going

19  over a few slides and prioritizing issues

20  that put the timeline, value, or quality

21  at risk for each indication."

22                    Do you see that?

23         A.    I do, yes.

24         Q.    "Greater emphasis will be

Protected - Subject to Further Protective Review

1    placed on areas the TA can help as

2    opposed to risks the team can resolve

3    internally."

4             Do you see that?

5        A.   I do, yes.

6        Q.   It says, "To be an effective

7    meeting, I will need each of you to

8    provide an answer to the question below

9    no later than midday Monday.  Piecemeal

10   in any format is fine."

11            Do you see that?

12       A.   I do.

13       Q.   And if you look with me, the

14   question that's asked below says, "What

15   program issues keep you awake at night?"

16            Do you see that?

17       A.   Yes, I do.

18       Q.   Now, do you recall being

19   asked to answer that question with

20   respect to Xarelto in the acceleration to

21   value meeting?

22       A.   I don't -- I mean, I don't

23   recall specifically the answer that I

24   gave, if I gave an answer to this

1    particular request.

2          Q.    Okay.   If we can look at

3    what we'll mark as Exhibit Number 16.

4              (Document marked for

5              identification as Exhibit

6              Moore-16.)

7    BY MR. OVERHOLTZ:

8          Q.    It's Record -- Bates Number

9    Janssen 03749812, Record 632339.  This is

10   a follow-up e-mail a couple days later --

11   five days later from Sig Johnson to

12   yourself as well as others at Janssen.

13              And the subject is "The

14   final slide deck for the rivaroxaban

15   acceleration to value meeting."

16              Do you see that?

17         A.    I do, yes.

18         Q.    And there's a PowerPoint

19   attached.

20              Do you see that?

21         A.    I see the attachment listed,

22   yes.

23         Q.    Okay.  And the where is --

24   if you look down below, there's an

Protected - Subject to Further Protective Review

1    appointment from Lloyd Haskell.

2                 Do you see that?

3         A.    Yes, I do.

4         Q.    The appointment is PRD court

5    reporter 1808.

6                 Do you see that?

7         A.    Yes, I do.

8         Q.    It says live meeting, right?

9         A.    Right.

10        Q.    Is PRD court reporter 1808 a

11   room at Janssen?

12        A.    I believe it is, yes.

13        Q.    Okay.  And you're one of

14   the -- obviously the invitees to this

15   meeting, right?

16        A.    It appears that --

17        Q.    Second line.

18        A.    I'm sorry.  Yes, I see it

19   there.

20        Q.    And there's a gentleman

21   besides you named Peter Wildgoose.  Do

22   you see that?

23        A.    I do, yes.

24        Q.    Do you know who Peter

Protected - Subject to Further Protective Review

1   Wildgoose is?

2       A.    Yes.  Peter is a scientific

3   director within medical affairs.

4       Q.    Okay.  Do you know what his

5   responsibilities were with respect to

6   Xarelto?

7           MR. ZELLERS:  At what point

8       in time?  Objection.

9   BY MR. OVERHOLTZ:

10      Q.    At any point in time.

11      A.    I could speak with more

12  confidence in regards to now, since he's

13  a colleague of mine within medical

14  affairs.

15      Q.    Okay.

16      A.    So Peter, along with myself,

17  deals with clinical trials being

18  conducted in late-stage development,

19  along with clinical trials that are being

20  projected or positioned by outside key

21  opinion leaders or investigators that

22  would like to run trials with Janssen.

23      Q.    Like investigator-initiated

24  studies?

1      A.    That's exactly it,

2   investigator-initiated studies.

3      Q.    All right.  Then if we can

4   look at Exhibit Number 17, which is the

5   PowerPoint that was attached to this

6   e-mail.

7           (Document marked for

8           identification as Exhibit

9           Moore-17.)

10  BY MR. OVERHOLTZ:

11     Q.    It's going to have a Bates

12  Number of Janssen 03749813.  Record

13  Number 632340.  It's the acceleration to

14  value 25 February '10, final.ppt.

15     A.    Okay.  Can I have a

16  question?  Would you like me to look

17  through this entirely first before we

18  continue?

19     Q.    Yeah, you can look through

20  it if you want to.  I'll ask some

21  specific questions about some specific

22  pages.  But if you want to familiarize

23  yourself with it generally.

24     A.    I'll do it quickly.

Protected - Subject to Further Protective Review

1       Q.    If you don't mind, why don't

2   we take a shot and look at a couple of

3   pages --

4       A.    Yeah, I'm sorry.

5       Q.    -- and if you need to review

6   that more --

7       A.    Sure.

8       Q.    -- you just let me know.

9       A.    Absolutely.

10      Q.    Okay.  So if we look at the

11  third page of the slide -- slide deck.

12  And when I say "third," it's one of those

13  things that prints two to a page.  It's

14  right after the program introduction,

15  history of project and key decisions

16  page.

17      A.    Yes.

18      Q.    It's got a little -- it's

19  actually the -- it's page number -- it's

20  got a page number down at the bottom

21  right that says 2.

22      A.    Yes.  Yes.

23      Q.    And title is "History of

24  Project and Key Decisions."

Protected - Subject to Further Protective Review

1       Do you see that?

2       A.    I do yes.

3       Q.    This provides a little bit

4    of context.  One is, "October 2005, J&J

5    and Bayer HC signed a development

6    worldwide and co-promotion U.S. only

7    agreement."

8             That was your understanding

9    as well?

10      A.    It is, yes.

11      Q.    All right.  "J&J has

12   commercial rights in U.S., Bayer rest of

13   world," correct?

14      A.    That is correct.

15      Q.    The fourth bullet point

16   says, "J&J is responsible to lead

17   development of atrial fibrillation, Afib,

18   and acute coronary syndrome indications,"

19   right?

20      A.    That's what it states.

21      Q.    Okay.  Above that was,

22   "Bayer Healthcare is responsible for VTE

23   treatment and medically ill indications,"

24   right?

Protected - Subject to Further Protective Review

1        A.     That's what it states, yes.

2        Q.     And, "Bayer was responsible

3   for the IND preparation and filing for

4   the initial indication, venous

5   thromboembolism, VTE prophylaxis."

6               That's the VTE prevention or

7   RECORD study program?

8        A.     That's what it states, yes.

9        Q.     And then I guess there was a

10  change to the agreement so that the IND

11  was transferred to J&J prior to filing

12  the VTE prophylaxis in the United States,

13  right?

14       A.     Is that where you're saying

15  it says, "Upon the first commercial sale

16  in the U.S."?

17       Q.     Yeah.  It says, "Upon the

18  first commercial sale in the U.S., Bayer

19  was to transfer the IND/NDA to J&J,

20  subsequently amended, and IND was

21  transferred to J&J prior to filing VTE

22  prophylaxis in the U.S."

23       A.     That's what it states, yes.

24       Q.     If we can turn over to the

Protected - Subject to Further Protective Review

1    slide that's marked Page 7 at the bottom.

2          A.    Sadly, not all the slides

3    are marked.

4          Q.    This one has a 7 though.  I

5    guess it's five slides over.

6          A.    Can you give me the title?

7          Q.    Yeah.  It says "Heightened

8    Scrutiny of Data Quality" at the top.

9          A.    Oh, I see it.  Thank you.

10         Q.    And if you look with me at

11   the slide, it says, "Issue, heightened

12   scrutiny of data quality.  Complete

13   response highlighted FDA concerns about

14   adequate sponsor oversight in the RECORD

15   program."

16               I think you told me that you

17   didn't really -- you weren't really

18   responsible or have any work on that?

19         A.    That was before my time into

20   the project.

21         Q.    Okay.  The next one is, "FDA

22   meeting held on 29 September '09, to

23   discuss monitoring of ROCKET-AF.

24   Emphasize this point."

Protected - Subject to Further Protective Review

1          Do you see that?

2     A.    I do, yes.

3     Q.    Do you recall that -- you

4  remember that we had looked at one of

5  those early documents that had been

6  forwarded to you by Dr. Kubitza of the

7  face-to-face meeting with the FDA, and it

8  talked about monitoring.  Is that kind of

9  consistent with you -- about monitoring

10 of the actual trial as opposed to routine

11 monitoring?

12    A.    Yeah.  I don't know the

13 specifics in regards to monitoring, but

14 based on our past discussion, that's what

15 this appears to be referencing.

16    Q.    Okay.  Then it says, "J&J

17 recently received a warning letter for

18 another program."

19         Do you see that?

20    A.    I do.

21    Q.    Do you know if that was

22 talking about a Xarelto program or a

23 different drug?

24    A.    I really don't know.  I have

Protected - Subject to Further Protective Review

1   no idea.

2         Q.    So I talked to you a little

3   bit about whether or not there was risk

4   with respect to -- financial risk

5   associated with delays in filing of NDAs

6   and getting approval of a drug.  If you

7   can turn with me over to Page 18.  I want

8   to ask you about that.  Slide 18, I guess

9   I should call it.

10        A.    Okay.

11        Q.    You see this is a summary of

12  findings for a one-month delay, 2009

13  strat plan.

14              Do you see that?

15        A.    I do.

16        Q.    It says, Greatest potential

17  impact occurs in Afib with a loss of over

18  $37 million for each month delayed.

19  Converting this lost revenue into present

20  day terms is equal to 22 million per

21  month or $7 million per day.

22              Do you see that?

23        A.    I see .7 million per day.

24        Q.    $.7 million per day.  Right.

Protected - Subject to Further Protective Review

1    Or $22 million per month.

2           A.     That's what it states here,

3    yes.

4           Q.     It then says, "The impact of

5    delay for VTE prevention or VTE treatment

6    are relatively small when compared to

7    Afib."

8                  Do you see that?

9           A.     I do, yes.

10          Q.     Okay.  And do you have an

11   understanding that the Afib indication

12   was a much bigger indication than the VTE

13   indications?

14                 MR. ZELLERS:  Object to

15          form.

16                 THE WITNESS:  Again, in

17          regards to the size or scope of

18          importance, I'd have to refer you

19          back to my marketing or business

20          colleagues.

21   BY MR. OVERHOLTZ:

22          Q.     But you knew that as being

23   the clinical pharmacology lead, that Afib

24   was the big indication as far as expected

Protected - Subject to Further Protective Review

1    sales for this drug?

2              MR. ZELLERS:  Same

3         objection.

4              THE WITNESS:  Again, I can't

5         speak to the sales.  I know Afib

6         was an important indication that

7         was a large population.

8    BY MR. OVERHOLTZ:

9         Q.    And this is indicating that

10   a -- that the company stood to lose

11   $700,000 a day for delays in getting this

12   drug approved and being sold on the

13   market for the Afib indication, right?

14              MR. ZELLERS:  Object to

15         form.

16              THE WITNESS:  According to

17         the statement in the first bullet

18         here, that would be the

19         interpretation of that.

20   BY MR. OVERHOLTZ:

21         Q.    So if there was any concern

22   that the company needed to go back and

23   maybe do a second study to look at a

24   lower dose before seeking approval, the

Protected - Subject to Further Protective Review

1    company stood to lose a lot of money,

2    right?

3                    MR. ZELLERS:   Object to

4          form.

5                    THE WITNESS:   Again, I'm

6          sorry.   I have to refer you back

7          to my business and marketing

8          colleagues to respond to that.

9    BY MR. OVERHOLTZ:

10         Q.     But you do agree that you

11   received this e-mail and you went to this

12   acceleration to value meeting.   You were

13   one of the people that they invited to

14   this meeting back in February of 2010,

15   right?

16         A.     I was invited to the

17   meeting, it appears, yes.

18         Q.     There's only a dozen or so

19   people that even were allowed to come to

20   this meeting that looked at the potential

21   value of this drug and risk for the

22   company, right?

23                    MR. ZELLERS:   Object to

24          form.

Protected - Subject to Further Protective Review

1    THE WITNESS:  I -- again

2    going back to the invitational,

3    there were people that were

4    involved.  I don't -- I can't even

5    tell you whether or not I actually

6    attended the meeting.

7  BY MR. OVERHOLTZ:

8    Q.    You were invited though,

9  right?  We saw that in the e-mail?

10    A.    I was invited, yes.  But

11  whether or not I attended is -- I can't

12  speak to that specifically.

13    Q.    Thirty-one people were

14  invited to this meeting, just based on

15  this Outlook or Lotus note.  It looks

16  like Outlook invite from February of

17  2010.  How many people work for Janssen?

18    A.    I don't know the exact

19  number.

20    Q.    Thousands?

21    A.    I would say thousands, yes.

22    Q.    So you are one of 31 people

23  invited to this acceleration to value

24  meeting for Xarelto back in 2010.  You at

Protected - Subject to Further Protective Review

1    least understood that Xarelto was an

2    important product for Janssen?

3         A.    Yes.

4         Q.    Okay.  So let me have you

5    turn your attention over to Slide 27.

6    And this says, "SPAF TPP contingencies."

7              Do you see that?

8         A.    I do, yes.

9         Q.    Okay.  And SPAF is stroke

10   prevention and Afib.  That's what that

11   stood for?

12        A.    That's the acronym, yes.

13        Q.    So we are talking about the

14   Afib indication for Xarelto, right?

15        A.    It seems to be, yes.

16        Q.    Now, there's three kind of

17   boxes at the top, "Safety/Tolerability,

18   Scenarios and Plan."

19             Do you see that?

20        A.    Yes.

21             MR. ZELLERS:  Counsel, I'm

22        sorry.  I thought you were

23        referring to Slide 28.

24             MR. OVERHOLTZ:  27.

Protected - Subject to Further Protective Review

1          MR. ZELLERS:  27?  Okay.

2      Thank you.

3          MR. OVERHOLTZ:  27.  Sorry.

4          THE WITNESS:  I see the

5      three headers above.

6  BY MR. OVERHOLTZ:

7      Q.    Okay.  So under

8  "Safety/Tolerability," it says, "NI

9  bleeding to warfarin."

10          Do you see that?

11      A.    I do, yes.

12      Q.    Okay.  And NI, does it make

13  sense that stood for non-inferiority?

14      A.    I believe that's the acronym

15  that's typically used.

16      Q.    Okay.  And the ROCKET trial

17  was a non-inferiority trial comparing

18  Xarelto to warfarin treatment, correct?

19      A.    ROCKET shared

20  non-inferiority to warfarin in regard to

21  its primary outcome -- outcomes.

22      Q.    That was the -- the

23  non-inferiority component of the study

24  was what the goal of the study was to

Protected - Subject to Further Protective Review

1   show?

2       A.    It was designed to show

3   non-inferiority, yes.

4       Q.    Okay.  So it wasn't shown --

5   it wasn't designed to show superiority or

6   that the drug was better than warfarin,

7   just to show that it's no worse than

8   warfarin?

9           MR. ZELLERS:  Object to

10      form.

11          THE WITNESS:  Again, all I

12      can say is it was designed as a

13      non-inferior study.

14  BY MR. OVERHOLTZ:

15      Q.    Okay.  Did you understand

16  that non-inferior meant that it just

17  wasn't worse than warfarin?

18          MR. ZELLERS:  Same

19      objection.

20          THE WITNESS:  In general,

21      yes.

22  BY MR. OVERHOLTZ:

23      Q.    Okay.  Now, why did you guys

24  at Janssen and Bayer have such lofty

Protected - Subject to Further Protective Review

1    goals to try to get a drug on the market

2    that just wasn't any worse than warfarin?

3                    MR. ZELLERS:  Object to

4          form.

5                    THE WITNESS:  Again, I

6          wasn't part of the design of the

7          ROCKET trial.  I came in after the

8          trial was -- had already started

9          and was well underway, so I can't

10         speak to why the company or mutual

11         companies together designed the

12         trial as a non-inferiority trial.

13   BY MR. OVERHOLTZ:

14         Q.    Okay.  So then there's a

15   scenarios column.  And the column says,

16   "Greater bleeding under scenarios when it

17   comes over from non-inferior bleeding."

18                    Do you see that?

19         A.    Yes, I do.

20         Q.    So this is basically saying

21   if Xarelto has greater bleed -- bleeding,

22   the plan would be to do a lower dose

23   trial.

24                    Do you see that?

Protected - Subject to Further Protective Review

1          A.    Outlined on this figure

2     itself, that is what it implies, yes.

3          Q.    Okay.  Now, did you come to

4     learn at some point that when you looked

5     at the data for the patients in the

6     ROCKET study in the United States, that

7     Xarelto actually showed a greater

8     bleeding risk than warfarin in the

9     patients in the ROCKET trial that were

10    from the United States of America as

11    compared to the other worldwide patients

12    in ROCKET?

13               MR. ZELLERS:  Object to

14          form.

15               THE WITNESS:  So from a

16          clinical pharmacology standpoint

17          we didn't assess bleeding or

18          efficacy.  That would have been a

19          clinical marker, and I would have

20          to defer you back to my clinical

21          colleagues to properly answer

22          that.

23    BY MR. OVERHOLTZ:

24          Q.    Okay.  And I understand your

Protected - Subject to Further Protective Review

1    answer, but what I'm asking is, did you

2    come to have that understanding that in

3    the subgroup of patients that were

4    treated with Xarelto in the United States

5    and -- and compared to the warfarin

6    patients that were treated in the United

7    States, that the Xarelto patients showed

8    a greater risk of bleeding than the

9    warfarin patients in the ROCKET trial in

10   the United States?

11        A.    Again, I would have to take

12   a look at the data again to be able to

13   properly answer that.  It wasn't a

14   clinical pharmacology output that we

15   were -- that I would normally be

16   participating in.  That would be

17   completely a clinical -- a clinical

18   analysis.

19        Q.    Okay.  Did anyone come to

20   you from clinical after finding out that,

21   in the United States, in the ROCKET

22   trial, that the Xarelto patients had a

23   greater risk of bleeding than the

24   warfarin patients, that maybe we need to

Protected - Subject to Further Protective Review

1   come and -- and work on preparing to do a

2   lower dose trial for Xarelto?

3               MR. ZELLERS:  Object to

4          form.

5               THE WITNESS:  I'm not

6          familiar with any plans to look at

7          a lower dose trial based on the

8          ROCKET study.  At least I wasn't

9          involved in any discussions that

10         would -- that occurred in regards

11         to looking at a trial.

12  BY MR. OVERHOLTZ:

13         Q.    I'm sorry.  I'm trying to

14  read to see if I can even read this.  I

15  don't know if I can.  Some of them are

16  pretty small.  We are done with that one,

17  but let's make sure.

18               If you can turn with me a

19  little bit further in the presentation.

20  I want to make sure we are all set.  I

21  want to make sure you have the right

22  context.  I want to give you the right

23  slide number.  If you could look with me

24  at Slide 64.

Protected - Subject to Further Protective Review

1          MR. ZELLERS:  60 -- 64?

2          MR. OVERHOLTZ:  Yeah, back a

3      couple.  Yeah, there you go.

4  BY MR. OVERHOLTZ:

5          Q.    The one that says, "ATLAS2

6  ACS TIMI 51"?

7          A.    Yes.

8          Q.    It says, "J&J lead trial,"

9  correct?

10         A.    That's correct.

11         Q.    Okay.  And this was the

12 Phase III trial for the acute coronary

13 syndrome indication that J&J was

14 responsible for, correct?

15         A.    TIMI 51 was the Phase III

16 trial, yes.

17         Q.    Okay.  So if we can flip the

18 page to Slide 65.  And it says at the

19 top, "ATLAS TIMI 46, selection of doses

20 for Phase III."

21              Do you see that?

22         A.    I do, yes.

23         Q.    Okay.  And it says, "Based

24 upon efficacy at lower doses of

Protected - Subject to Further Protective Review

1    rivaroxaban."

2              Do you see that?

3         A.    I do, yes.

4         Q.    "Graded increase in bleeding

5    at higher doses of rivaroxaban."

6              Do you see that?

7         A.    I do, yes.

8         Q.    Okay.  When it talks about a

9    graded increase in bleeding at higher

10   doses, that's talking about the -- as the

11   doses get higher, the rates of bleeding

12   get higher, correct?

13        A.    I believe that means as

14   doses -- as you increase the dose of

15   rivaroxaban, your risk of bleeding

16   increases.

17        Q.    And then Number 3 says --

18   well, let me ask you this so we

19   understand what Number 3 means.

20              In ATLAS TIMI 46, that was

21   the Phase II dose selection trial, right?

22        A.    That's correct.

23        Q.    They tested multiple doses

24   in that trial?

Protected - Subject to Further Protective Review

1    A.    They did, yes.

2    Q.    And they tested doses that

3    were given both in a BID, or twice-daily,

4    regimen as well as QD, once-daily,

5    regimen?

6    A.    From my understanding, yes.

7    Q.    Okay.  They even tested the

8    20-milligram total daily dose that was

9    tested in ROCKET, correct?

10    A.    I would have to go back and

11    confirm that, but it sounds right.

12    Q.    Okay.  So then it's -- if

13    you look at Point Number 3 it says, "A

14    trend for BID doses of rivaroxaban to be

15    safer and more efficacious than QD dosing

16    of rivaroxaban in ACS."

17    Do you see that?

18    A.    Yes, I do.

19    Q.    So you're just starting, and

20    your job is the clinical pharmacology

21    lead.  And the fact that you learned in

22    2010 that in the ACS study for dose

23    selection, that there was a trend for the

24    BID doses to be safer and more

Protected - Subject to Further Protective Review

1  efficacious than once-daily dosing in the

2  ACS patients, did that make you question

3  whether or not the company should look at

4  a twice-daily dose for the Afib

5  indication?

6         A.    From what I understand, that

7  ACS has a different pathophysiology than

8  what Afib does, and where the BID dosing

9  regimen in ACS seemed to be appropriate

10  and justified, the past work that was

11  done to look at both the QD and BID dose

12  in Afib showed that one or the other

13  was -- was perfectly fine, that -- that

14  QD dosing was certainly appropriate and

15  ended up working quite well within the

16  ROCKET trial.

17         Q.    Do you agree that on the

18  work that had been done to select the

19  once-daily dosing regimen in ROCKET for

20  Afib, that the past work did not show

21  that once daily was better or safer than

22  twice daily?

23              MR. ZELLERS:  Object to

24        form.

Protected - Subject to Further Protective Review

1           THE WITNESS:  Again, with

2       the caveat I did none of that

3       work.  That work was done by my

4       colleagues at Bayer.  From my

5       understanding was that the QD dose

6       showed that it was just as good as

7       the BID dose in the Phase II

8       setting, and that justified the

9       dose -- the QD dosing regimen to

10      be tested, again only to be tested

11      within the ROCKET trial.

12  BY MR. OVERHOLTZ:

13      Q.    Did you agree that that work

14  that had been done did not show that a

15  twice-daily dose wouldn't necessarily be

16  safer and more efficacious --

17          MR. ZELLERS:  Objection --

18  BY MR. OVERHOLTZ:

19      Q.    -- if tested in a large

20  Phase III trial?

21          MR. ZELLERS:  Object to

22      form.

23          THE WITNESS:  I'm sorry.

24      Could you repeat that question,

Protected - Subject to Further Protective Review

1          please?

2    BY MR. OVERHOLTZ:

3          Q.    Do you agree that the work

4    that had been done leading up to the

5    once-daily dose selection for ROCKET had

6    not demonstrated that a twice-daily

7    dosing regimen might actually be safer

8    and more efficacious when conducted

9    either in a large Phase III trial or in

10   the real world?

11              MR. ZELLERS:  Object to

12        form.

13              THE WITNESS:  I would have

14        to go back and take a look again

15        at the Phase II data and what was

16        actually the conclusions of that

17        work being done.

18              From what I remember, the

19        assessment of what the QD regimen

20        and BID regimen showed that QD

21        would perform just as well as what

22        a BID regimen would in that

23        setting.  And that seemed to

24        justify again assessing a QD dose

Protected - Subject to Further Protective Review

1      within the Phase III trial.

2           I can't speak to whether or

3      not a BID would be better or worse

4      within that setting.

5  BY MR. OVERHOLTZ:

6      Q.    Okay.  So in this ACS

7  section of this acceleration to value

8  PowerPoint, it describes that the -- what

9  happened from TIMI 46 to go into the

10  Phase III trial was that two low doses,

11  2.5 milligrams BID and 5 milligrams BID,

12  have been selected for the Phase III

13  trial.

14           Do you see that?

15      A.    That's what it states on the

16  PowerPoint presentation, yes.

17      Q.    Now, are you aware of

18  whether or not the FDA approved Xarelto

19  in treatment with ACS patients after the

20  ATLAS TIMI 51 Phase III study?

21      A.    It was not approved.

22      Q.    Do you know one of the basis

23  for nonapproval was the increased

24  bleeding that was shown in the

Protected - Subject to Further Protective Review

1    5-milligram twice daily dose of the drug?

2         A.    I can't speak to the

3    specifics of the FDA's response.  I would

4    want to take a look at the letter that

5    they had sent us.  I know that was a

6    topic of discussion during the AdCom.

7              MR. OVERHOLTZ:  Let's --

8         it's 4 o'clock.

9    BY MR. OVERHOLTZ:

10        Q.    Let's switch gears a little

11   bit here.  I want to talk a little bit

12   about some of the aspects of the drug

13   that might impact on what the company

14   stated about the drug and how that may

15   have impacted the clinical pharmacology.

16   Okay?

17        A.    Okay.

18        Q.    I can flip over here to the

19   Elmo here for a minute.  There we go.

20              So your understanding of the

21   drug as it's marketed for Afib patients

22   is that the drug does not require any

23   form of routine clinical monitoring,

24   right?

Protected - Subject to Further Protective Review

1              MR. ZELLERS:  Counsel, can

2         you reposition that so we can see.

3              MR. OVERHOLTZ:  I'm trying

4         to get this to slide over a little

5         bit.

6    BY MR. OVERHOLTZ:

7         Q.    That's one of the positions

8    for the drug when it's being sold to

9    doctors and patients today, is that the

10   drug does not require routine clinical

11   monitoring in the Afib population; is

12   that right?

13        A.    That was one of the

14   positions of the drug that was accepted

15   by the FDA, yes.

16        Q.    And that's also true for the

17   VTE prevention indication?

18        A.    Yes, that is correct.

19        Q.    And the VTE treatment

20   indication, correct?

21        A.    That is correct.

22        Q.    Number 2, the drug -- when

23   it comes to Afib, so for Afib, can be

24   taken once daily, right?

Protected - Subject to Further Protective Review

1        A.      That's correct.

2        Q.      Okay.  That's either

3   sometimes referred to as QD or OD when we

4   look at some of these documents, right?

5        A.      That's correct.  Can I --

6   can I also clarify that is once daily

7   with a meal or the evening meal.

8        Q.      That was going to be my next

9   point.

10              MR. ZELLERS:  And, Counsel,

11          this may not be meaningful and I

12          don't know if you intend to mark

13          this or not.  But if you do mark

14          it, Number 1 as you've written it

15          is inconsistent with his

16          testimony.

17              I understand his testimony

18          is his testimony.  I don't know if

19          you intend to mark this.  But if

20          you are going to mark this, then I

21          think it should reflect his

22          testimony.

23              THE WITNESS:  I said no

24          routine clinical monitoring.

1           MR. OVERHOLTZ:  So let's

2     mark "no" here beside it.

3           MR. ZELLERS:  Perfect.

4  BY MR. OVERHOLTZ:

5     Q.    So you agree that as the

6  drug is sold, doctors and patients are

7  told that Xarelto in any indication does

8  not require routine clinical monitoring?

9     A.    Does not require routine

10  clinical monitoring.

11     Q.    Does not require.

12           MR. ZELLERS:  Thank you.

13  BY MR. OVERHOLTZ:

14     Q.    For Afib, the drug is given

15  once daily, QD or OD, at either

16  20 milligrams or 15 milligrams, right?

17     A.    That's correct.

18     Q.    And the 15 milligram is for

19  moderate renal; is that right?

20     A.    Moderate renal impairment,

21  yes.

22     Q.    Moderate renal impairment.

23  Okay.

24           And for Afib, the

Protected - Subject to Further Protective Review

1   instruction is that it's taken with

2   evening meal, right?

3          A.    That is correct.

4          Q.    Okay.  And that has to do

5   with the 20-milligram and 15-milligram

6   dose, correct?

7          A.    It's required to take with

8   the evening meal, yes.

9          Q.    Okay.  Now, for VTE either

10  prevention -- there's no -- no

11  instruction for an evening meal; is that

12  right?

13         A.    So for VTE prevention, hip

14  or knee, which a 10-milligram dose is

15  utilized --

16         Q.    Right?

17         A.    -- you do not need to take

18  it with a meal.  You can take it with or

19  without a meal.

20         Q.    Okay.  No need to take with

21  meal; is that right?

22         A.    That is correct.

23         Q.    But you can take with meal?

24         A.    If you choose to, yes.

Protected - Subject to Further Protective Review

1      Q.    I'm going to make this --

2    from Point Number 2, I'm going to make

3    that one 2A, and I'm going to make that

4    one a B.  Okay?

5      A.    Okay.

6      Q.    Okay.  And for C, VTE

7    treatment, you start out with a

8    15-milligram BID dose for three weeks,

9    right?

10      A.    I believe that's the

11    regimen, yes.

12      Q.    So it's 15 milligrams BID

13    for 21 days, and then you go to

14    20 milligrams once daily, right?

15      A.    That's my understanding,

16    yes.

17      Q.    Do you need to take this

18    with -- is there any instruction to take

19    that dose with the meal, either one of

20    those doses?

21      A.    Yes, you're instructed to

22    take it with a meal.

23      Q.    With a meal?

24      A.    Yes.

Protected - Subject to Further Protective Review

1    Q.    Is that different than the
2  instruction for the Afib to take with an
3  evening meal?
4    A.    It is different in regards
5  to the instruction of evening meal.
6    Q.    All right.  Now, another
7  point that is raised, if I could slide up
8  here, for the drug as it's sold to
9  doctors and patients today, is that there
10  is no food restrictions, right?
11    A.    That is correct.
12    Q.    That's different than --
13  that differentiates the drug from
14  warfarin, in which there can be food
15  interactions with the way warfarin reacts
16  with the body; is that right?
17    A.    Sure.  So warfarin has some
18  possible interaction with high vitamin K
19  content foods.
20    Q.    And taking warfarin with
21  something like green leafy vegetables
22  that have high vitamin K content can
23  change the PD parameters that the body
24  has when they take warfarin, right?

Protected - Subject to Further Protective Review

1       A.    Yes, it affects the overall

2   pharmacology of warfarin.

3       Q.    All right.  And so let's, if

4   we can -- and I don't know if I need to

5   go back to your computer, if we can watch

6   the video.

7            I'm going to show you one of

8   the commercials for Xarelto with Brian

9   Vickers.  We'll mark this as Exhibit

10  Number 18 in the deposition.

11            (Document marked for

12            identification as Exhibit

13            Moore-18.)

14            MR. KENNEDY:  Is there Bates

15            number?

16            MR. OVERHOLTZ:  There is not

17            a Bates number.  I don't know if

18            they Bates -- do they Bates the

19            videos?  This one does not have a

20            Bates number.  I think this one is

21            generally widely available on the

22            internet.

23            (Video playback.)

24            BRIAN VICKERS:  I'm Brian

1       Vickers, NASCAR driver.

2              KEVIN NEALON:  I'm Kevin

3       Nealon, comedian.

4              ARNOLD PALMER:  And I'm

5       Arnold Palmer, professional

6       golfer.  Know what we have in

7       common?

8              BRIAN VICKERS:  We talked to

9       our doctors about treatment with

10      Xarelto.

11             Me, I had a blood clot in my

12      leg that could travel to my lungs.

13             ARNOLD PALMER:  That's why I

14      took Xarelto too.

15             BRIAN VICKERS:  Xarelto is

16      proven to treat and help reduce

17      the risk of DVT and PE blood

18      clots.

19             KEVIN NEALON:  I took

20      Xarelto for Afib, an irregular

21      heartbeat that can lead to a

22      stroke from a blood clot.

23             Xarelto is proven to reduce

24      the risk of stroke in people with

Protected - Subject to Further Protective Review

1    Afib not caused by a heart valve

2    problem.

3         ARNOLD PALMER:  Hey, well,

4    I'm glad we got together.

5         THE NARRATOR:  For people

6    with Afib currently well-managed

7    on warfarin, there is limited

8    information on how Xarelto and

9    warfarin compare in reducing the

10   risk of stroke.

11        BRIAN VICKERS:  I tried

12   warfarin before, but the blood

13   testing routine and dietary

14   restrictions had me off my game.

15        KEVIN NEALON:  Tell me about

16   it.  Let's see, golf clinic or

17   blood clinic?  Ooh, that's a tough

18   one.

19        ARNOLD PALMER:  Not this

20   time.

21        BRIAN VICKERS:  Not with

22   Xarelto.

23        FEMALE SPEAKER:  Anything

24   else?

Protected - Subject to Further Protective Review

1          ARNOLD PALMER:  I'll have
2     another Arnold Palmer.
3          FEMALE SPEAKER:  Okay.
4          KEVIN NEALON:  Make mine a
5     Kevin Nealon.
6          Really, Brian?
7          BRIAN VICKERS:  Hey, safety
8     first.
9          THE NARRATOR:  Like all
10    blood thinners, don't stop taking
11    Xarelto without talking to your
12    doctor, as this may increase your
13    risk of a blood clot or stroke.
14         While taking Xarelto, you
15    may bruise more easily and it may
16    take longer for bleeding to stop.
17         Xarelto may increase your
18    risk of bleeding if you take
19    certain medicines.  Xarelto can
20    cause serious bleeding, and in
21    rare cases, may be fatal.
22         Get help right away if you
23    develop unexpected bleeding,
24    unusual bruising, or tingling.

1    If you have had spinal

2    anesthesia while on Xarelto, watch

3    for back pain or any nerve or

4    muscle-related signs or symptoms.

5    Do not take Xarelto if you

6    have an artificial heart valve or

7    abnormal bleeding.

8    Tell your doctor before all

9    planned medical or dental

10    procedures.

11    Before starting Xarelto,

12    tell your doctor about any

13    conditions, such as kidney, liver,

14    or bleeding problems.

15    BRIAN VICKERS:  Xarelto has

16    been prescribed more than 11

17    million times in the U.S.

18    KEVIN NEALON:  And that

19    number is growing.

20    ARNOLD PALMER:  Like your

21    guys' scores.

22    THE NARRATOR:  With Xarelto

23    there is no regular blood

24    monitoring and no known dietary

Protected - Subject to Further Protective Review

1          restrictions.

2                  ARNOLD PALMER:  Treatment

3          with Xarelto was the right move

4          for us.

5                  THE NARRATOR:  Ask your

6          doctor about Xarelto.  You may be

7          able to get up to 12 months at no

8          cost.

9                  (End video playback.)

10                 MR. OVERHOLTZ:  I think it

11         goes on repeat.

12    BY MR. OVERHOLTZ:

13         Q.    Okay.  So as we saw, did you

14    know that Janssen won awards for this

15    Xarelto ad?

16         A.    No, I really didn't realize

17    that, no.

18         Q.    Okay.  I don't know if they

19    announced that at one of the company

20    meetings or something?

21         A.    They might have.  I don't

22    know that I retained that information.

23         Q.    Based on what you saw,

24    wouldn't you agree -- let me go back to

Protected - Subject to Further Protective Review

1   my Elmo here for a minute.

2               There we go.

3               Again, the ad promised no

4   need for routine clinical monitoring,

5   correct?

6        A.    Correct.

7        Q.    Okay.  And then no food

8   restrictions, I think they used the term

9   "no dietary restrictions," right?  That

10  was from the commercial?

11       A.    Right, I guess they said

12  that, yeah.

13       Q.    Seemed like they made some

14  joke about not being able to eat

15  something during the commercial --

16       A.    I did.

17               MR. ZELLERS:  That wasn't a

18       question.  That was a comment.

19  BY MR. OVERHOLTZ:

20       Q.    You heard the little jokes

21  that they made about not being able to

22  eat something.  But Arnold Palmer said,

23  "Well, not today"?

24       A.    Yes, I heard the joke.

Protected - Subject to Further Protective Review

1    Q.    Okay.  So I want to kind of

2    talk about some of these points.  One of

3    the first things I want to talk about is

4    kind of the -- the routine clinical

5    monitoring.  And then I think maybe

6    tomorrow we'll talk a little bit more

7    about a couple of the other -- a couple

8    of the other things as far as the drug

9    and the once daily versus twice daily

10   that I told you we'll talk about later.

11        A.    Sure.

12        Q.    But let me ask you a couple

13   of things.  One is, when we saw that ad,

14   there was a time when he started talking

15   about -- so you had the actors talking,

16   right?

17             Let me ask you this.

18   Working for Janssen and pharmaceutical

19   companies for a pretty long time, you are

20   familiar with the term that the marketing

21   information for a drug should be fair and

22   balanced?

23             MR. ZELLERS:  Object to

24        form.

Protected - Subject to Further Protective Review

1           Go ahead.

2           THE WITNESS:  I understand

3       that -- very roughly that there is

4       a fair and balance in our

5       marketing, yes.

6   BY MR. OVERHOLTZ:

7       Q.    Generally what does that

8   mean to you in the company as far as fair

9   and balanced, as far as talking about

10  benefits and risks?

11      A.    I haven't thought about it

12  to properly answer that.  I would almost

13  defer you to my marketing colleagues to

14  talk to you about that.

15      Q.    Okay.  Maybe we'll talk to a

16  couple of those guys.  Let me just ask

17  you a couple questions quickly to -- when

18  the guy starts talking about the risk of

19  bleeding associated with taking an

20  anticoagulant like Xarelto, why is his

21  voice so different than the rest of the

22  talking during the commercial?

23          MR. ZELLERS:  Object to

24      form.

Protected - Subject to Further Protective Review

1          THE WITNESS:  Again, I'm

2     sorry.  That's -- that would be --

3     that would be a question better

4     placed to my marketing colleagues.

5  BY MR. OVERHOLTZ:

6          Q.    Have you ever seen that -- a

7  Xarelto commercial run on TV?

8          A.    I have, yes.

9          Q.    Yeah.  Sometimes you see

10  them and right after that you see a

11  lawyer's ad for Xarelto on TV?

12          A.    I've seen those, yeah.

13          Q.    Or you see it the other way

14  around, the lawyer ad and then the --

15          A.    Certainly.  I'm sure the

16  combination has occurred, yeah.

17          Q.    And then when the guy --

18  when the guy was talking about the

19  bleeding risk associated with the drug

20  and coming off the drug, be careful

21  because you could increase your risk for

22  a stroke and all the risk information, do

23  you know why they didn't have pictures or

24  videos of people in the hospital getting

Protected - Subject to Further Protective Review

1    blood transfusions during that part of

2    the commercial?

3              MR. ZELLERS:  Object to

4         form.

5              THE WITNESS:  Again, I'm

6         sorry.  I wasn't part of the

7         generation of the commercial or

8         the marketing team at that time,

9         so I -- it's hard for me -- I

10        would be speculating at best.

11   BY MR. OVERHOLTZ:

12        Q.   Did you ever go back to the

13   company and call somebody either in the

14   business side or the marketing side and

15   say, guys, when we are talking about the

16   risk of our drug in our commercials, we

17   have people hitting golf clubs and eating

18   salads as opposed to -- as opposed to

19   showing that risk information on the

20   screen?

21        A.   No, I -- I never approached

22   anybody in my company in regards to that.

23        Q.   So it really wasn't your job

24   to determine what the marketing was

1  doing; is that right?

2      A.    No, it was not.

3      Q.    You were the clinical

4  pharmacology lead?

5      A.    That's correct.

6      Q.    Not the marketing lead?

7      A.    That's correct.

8      Q.    You dealt with how the

9  body -- either how the body reacts to the

10  drug or what happens to the drug in the

11  body, right?

12      A.    I dealt with the science of

13  the drug, yeah.  Kinetic and dynamic.

14      Q.    We talked about PK/PD

15  earlier?

16      A.    Yes, sir.

17      Q.    That was your job?

18      A.    Yes, sir.

19      Q.    Okay.  Let me -- let's talk

20  about monitoring for a minute.  We'll

21  kind of go back in order.  And --

22          MR. ZELLERS:  Look more that

23      way.

24          THE WITNESS:  I'm sorry.

Protected - Subject to Further Protective Review

1  BY MR. OVERHOLTZ:

2      Q.    One of the things we talked

3  about is that there actually is a

4  different dose that was tested as well as

5  marketed for patients that take it for

6  Afib with respect to whether or not they

7  have moderate renal insufficiency or not,

8  right?

9      A.    I'm not sure I understand.

10     Q.    Did I say it right?

11     A.    You said a different dose

12 that was tested than what was actually

13 marketed?

14     Q.    No.  I think I may have

15 misspoke.

16     A.    Okay.

17     Q.    Maybe that would have been a

18 good idea.

19          MR. ZELLERS:  Move to strike

20     the comment of counsel.

21 BY MR. OVERHOLTZ:

22     Q.    Okay.  In the ROCKET trial

23 study of the drug, as well as in the way

24 it's marketed in the Afib indication

1  today, there is a lower dose for the

2  patients with moderate renal impairment,

3  right?

4       A.    A 15-milligram dose, yes.

5       Q.    Now, you, being a scientist,

6  involved in study design, you understand

7  that there are patients who begin taking

8  Xarelto and after they start taking

9  Xarelto, their renal function can change

10  over time, correct?

11       A.    There's always that chance,

12  yes.

13       Q.    Okay.  Just like their renal

14  function may change over time, they also

15  may start taking a new drug that might

16  have a drug-drug interaction with

17  Xarelto?

18       A.    There is always that

19  possibility, yes.

20       Q.    Okay.  Does the labeling for

21  the drug, as you understand it, tell

22  doctors that they should monitor

23  patients' renal function when they are

24  taking Xarelto?

Protected - Subject to Further Protective Review

1           MR. ZELLERS:  Object to

2       form.

3           THE WITNESS:  I believe the

4       statement within the label

5       indicates that renal function

6       should be assessed.

7    BY MR. OVERHOLTZ:

8       Q.   Do you know if there is

9    any -- remember we looked at on the Elmo

10   it talks about routine clinical

11   monitoring, does not require no routine

12   clinical monitoring.

13           Is there any recommendation

14   in the labeling of the product for

15   doctors that there needs to be routine

16   renal assessment?

17           MR. ZELLERS:  Object to

18       form.

19           Go ahead.

20           THE WITNESS:  I would have

21       to take a look at the label again

22       specifically.  I know renal

23       function is recommended to be

24       assessed.  I can't speak to

Protected - Subject to Further Protective Review

1    whether or not it's routine

2    assessments.

3    BY MR. OVERHOLTZ:

4        Q.    You agree that the

5    commercial that we saw said that there is

6    no routine clinical monitoring required,

7    correct?

8        A.    I believe that's what was in

9    the commercial.

10        Q.    So let me show you what

11    we'll mark as Exhibit Number 19.

12            (Document marked for

13        identification as Exhibit

14        Moore-19.)

15            MR. ZELLERS:  You've got

16        some yellow sticky up there.

17            MR. OVERHOLTZ:  I know what

18        it says.  I'll take it down.

19            MR. ZELLERS:  I've got some

20        extras.

21            MR. OVERHOLTZ:  I need to

22        hit the button.

23    BY MR. OVERHOLTZ:

24        Q.    This is Bates Janssen

Protected - Subject to Further Protective Review

1    08125121, and Record Number 1363457.

2                This is an e-mail chain in

3    which Troy Sarich forwards to you on

4    November 18, 2010, dealing with the

5    Xarelto Afib CCDS questions.

6                Do you see that?

7         A.    I do, yes.

8         Q.    Okay.  And when Troy Sarich

9    e-mailed you this in November of 2010,

10   you knew what the CCDS was?

11        A.    Core company data sheet,

12   yes.

13        Q.    And that's something that is

14   kept as part of the European regulatory

15   requirements, to keep a company core data

16   sheet on the drug, correct?

17        A.    I believe so, yes.

18        Q.    It's basically a compilation

19   of everything everyone knows about the

20   drug?

21                MR. ZELLERS:  Object to

22        form.

23                THE WITNESS:  I think it's

24        the -- the highlights of the

Protected - Subject to Further Protective Review

1       important information.
2   BY MR. OVERHOLTZ:
3       Q.    Okay.  And if there is
4   differences in product labeling between
5   countries, the company core data sheet
6   will have that information in it?
7           MR. ZELLERS:  Object to
8           form.
9           THE WITNESS:  I probably
10          would have to refer you to my
11          regulatory colleagues specifically
12          in regards to how that deviates
13          from the company core data sheet.
14  BY MR. OVERHOLTZ:
15      Q.    Okay.  So Troy e-mails
16  this -- forwards this e-mail chain to you
17  regarding the CCDS questions.  Says,
18  "FYI."
19          Now, who was Troy Sarich?
20      A.    Troy Sarich was the compound
21  development team leader for Xarelto.
22      Q.    And he had received an
23  e-mail from Judy Kinaszczuk to Chris
24  Nessel, and in which he had been copied,

Protected - Subject to Further Protective Review

1    along with Sanjay Jalota, Alla Rhoge, and

2    Lloyd Haskell.

3              Do you see that?

4         A.    I do see that, yes.

5         Q.    And if you can look with me,

6    Judy says, "Hi Christopher.  I received

7    several questions from Bayer below.  For

8    tomorrow would you be able to address the

9    following please?"

10             Do you see that?

11        A.    I do, yes.

12        Q.    Okay.  It says, "For

13   patients with renal impairment labeling

14   questions are:

15             "Are we confirming the

16   approach to go with the 15-milligram dose

17   for patients with moderate renal

18   impairment (efficacy and safety

19   comparable to 20-milligram healthy or

20   mild renal impairment?)"

21             Do you see that?

22        A.    I do, yes.

23        Q.    Okay.  "The next question

24   is:  What do these data tell with respect

Protected - Subject to Further Protective Review

1    to efficacy and safety when patients went

2    to moderate renal impairment during the

3    trial but still received the 20-milligram

4    dose?"

5              Do you see that?

6         A.    I do, yes.

7         Q.    Okay.  And did you become

8    aware that during the trial there were

9    patients in ROCKET that actually would

10   develop moderate renal impairment but

11   then continue on the 20-milligram dose?

12        A.    Again, it's related to the

13   design of the trial.  It -- that's what I

14   assumed.

15        Q.    From a clinical pharmacology

16   perspective, your department, was there

17   any analysis done by Janssen as to the PK

18   or PD parameters for those patients that

19   were identified that developed moderate

20   renal impairment during the trial but

21   continued to receive the 20-milligram

22   dose?

23        A.    I know it was a question

24   that came up during the time.  But I

Protected - Subject to Further Protective Review

1    don't believe that there were any

2    subjects within the substudy, the PK/PD

3    substudy that fell into that category, or

4    at least enough subjects that you would

5    be able to make a determination.

6           Q.   Okay.  All right.  So

7    none -- none of the patients that fell

8    into that category are part of the

9    substudy.  We agree with that?

10          A.    As far as I recollect.  I

11   mean, I would have to go back again and

12   take a look at the data.  But I do

13   remember that question being raised, but

14   I don't believe -- I don't believe we had

15   enough data within the substudy to make

16   any conclusions or even analyze.

17          Q.   Okay.  So if we put the

18   substudy aside for a second, was there

19   any effort to go back and just look at

20   what information was available from a PK

21   or PD perspective in those patients in

22   the ROCKET trial that developed moderate

23   renal impairment during the trial but

24   still continued to receive the

1  20-milligram dose?

2      A.    So could you clarify your

3  question?  Are you asking, outside of the

4  substudy, all the patients that we didn't

5  have PK data on, you want to know if we

6  assessed the PK?

7      Q.    If you had -- that's what

8  I'm asking about, but I want to make sure

9  we are clear, we're talking about the

10 same thing.

11         We agree that for the

12 patients that weren't in the substudy,

13 there was PK/PD information available for

14 those patients.

15     A.    No.  There was only PD

16 information available for those patients.

17     Q.    Okay.  There was PD

18 information from the sampling that was

19 done at Week 12 and Week 24?

20     A.    That would be the sparse PD

21 sampling, yes.

22     Q.    And then -- and then we

23 talked about there might have been data

24 collected as part of the point-of-care,

Protected - Subject to Further Protective Review

1   but that was not part of the clinical

2   pharmacology program?

3        A.    That was not part of the

4   clinical pharmacology program.

5        Q.    So there was sparse PD

6   sampling information for the patients in

7   ROCKET from Week 12 and Week 24, right?

8        A.    That's correct.

9        Q.    Okay.  Was there any effort

10  by clinical pharmacology to go back and

11  look at that information from a PD

12  perspective for those patients that

13  continued to receive the 20-milligram

14  dose even though they developed moderate

15  renal impairment during the trial?

16       A.    I mean, it might have.  I

17  would have to go back to Ihab Girgis and

18  ask, you know, exactly what type of

19  subanalysis he performed, if that was

20  part of it.  I can't recollect -- nothing

21  comes to mind as anything specific that

22  was done.

23       Q.    Okay.  Did the issue -- if

24  you know, did the issue that there were

Protected - Subject to Further Protective Review

1  patients in the trial that had developed

2  moderate renal impairment during the

3  trial come up while the trial was

4  ongoing?

5          MR. ZELLERS:  Object to

6      form.

7          THE WITNESS:  While the

8      trial was ongoing?

9  BY MR. OVERHOLTZ:

10     Q.    Right.

11     A.    I don't recall while the

12 trial was ongoing.  And then again, I

13 came into the trial quite late, towards

14 the very end.  I do remember it was a

15 discussion point after the trial in

16 regards to whether or not data may have

17 existed.  But I don't recall during the

18 trial being involved in any discussions.

19     Q.    What about for those

20 patient -- the group of patients that we

21 are talking about that go from

22 20-milligram -- they start at the

23 20 milligrams and they develop moderate

24 renal insufficiency during the trial?

Protected - Subject to Further Protective Review

1    Are you aware if there was ever any

2    analysis to look at bleeding incidence

3    rates in those groups of patients?

4         A.    Again, I'd have to defer you

5    to my clinical colleagues that would most

6    likely run any sort of analysis like

7    that.

8         Q.    Were you aware as clinical

9    pharmacology lead that patients enrolled

10   in the ROCKET trial would occasionally

11   have PD parameters taken as part of their

12   normal medical care while they were part

13   of the ROCKET trial?

14        A.    Are you referring to safety

15   samples taken outside of the protocol?

16        Q.    Yes, PD samples taken

17   outside of the protocol of the study.

18        A.    Again, then there would be

19   clinical assessments versus actual

20   clinical pharmacology assessments.

21             If the physician -- in most

22   cases in trials, if a physician had a

23   desire to take an additional PT value or

24   otherwise -- again, I'm not sure if the

Protected - Subject to Further Protective Review

1  protocol states on that.  But if one is

2  taken, that would be a clinical marker

3  and not so much a pharmacodynamic marker.

4        Q.    And sometimes that might

5  happen if someone had an adverse event in

6  the trial.  Maybe they went to the

7  emergency room and a doctor ran a PT or

8  something like that.  That information

9  wouldn't have been shifted to clinical

10 pharmacology?

11       A.    No, it would not.

12       Q.    Do you know who was

13 responsible for evaluating that

14 information?

15       A.    It would have been members

16 of my clinical team.

17       Q.    Okay.  What about the

18 pharmacovigilance people?  Would the

19 pharmacovigilance people have been

20 responsible for that as well?

21       A.    They may be involved in that

22 as well, yeah.

23       Q.    Were there some -- when I

24 say "pharmacovigilance," now it's called

Protected - Subject to Further Protective Review

1  drug safety.  Was there pharmacovigilance

2  requirements as part of running the

3  ROCKET trial?

4        A.    I can't speak to the

5  specifics.  I'm sure there was.

6        Q.    Okay.  Let's look at the

7  next bullet point.  It says -- the third

8  bullet point.

9              "We would probably like to

10  avoid monitoring for CrCl."

11              Do you see that?

12        A.    I do, yes.

13        Q.    "For how long would we allow

14  patients to stay on 20 milligrams if

15  renal function drops while on treatment?

16  How did we handle this during the study?

17  Is there a threshold with respect to time

18  or CrCl to go into the label?"

19              Do you see that?

20        A.    I see what's written there.

21        Q.    Okay.  Now, when it talks

22  about CrCl, we're talking about

23  creatinine clearance, correct?

24        A.    That's the acronym for

Protected - Subject to Further Protective Review

1    creatinine clearance.

2         Q.    Okay.  Do you know why the

3    discussion was here in November of 2010

4    that they wanted to avoid monitoring for

5    creatinine clearance?  Wouldn't that be a

6    good idea for patients?

7              MR. ZELLERS:  Object to

8         form.

9              THE WITNESS:  I can't speak

10        to what Judy was implying

11        within -- within this document,

12        this e-mail.

13   BY MR. OVERHOLTZ:

14        Q.    And whenever you read that

15   back in November of 2010, when Mr. Sarich

16   e-mailed you, did you think or have a

17   position one way or the other as to

18   whether it was a good idea to avoid

19   monitoring for creatinine clearance for

20   patients?

21        A.    Considering that is asking

22   about creatinine clearance and the

23   monitoring of it, that would have been a

24   more clinical decision, not a

Protected - Subject to Further Protective Review

1    pharmacokinetic, pharmacodynamic, or

2    clinical pharmacology decision or aspect.

3              So I would have left that up

4    to our clinical colleagues to determine

5    whether or not that was appropriate.

6         Q.    You did understand that

7    there was a recommendation that patients

8    with moderate renal impairment would

9    receive a lower dose for Xarelto, right?

10        A.    Of course, yes.

11        Q.    And the basis for that was

12   to ensure that those patients with

13   moderate renal impairment have an

14   exposure of the drug that is something

15   close to the exposure that the patients

16   who don't have moderate renal impairment,

17   right?

18             MR. ZELLERS:  Object to

19        form.

20             THE WITNESS:  So the use of

21        the 15-milligram dose and the

22        20-milligram dose within the

23        ROCKET trial, we were able to

24        assess whether or not the

Protected - Subject to Further Protective Review

1          pharmacokinetics of a 15-milligram

2          dose resembled that of a

3          20-milligram dose in those that

4          had moderate renal impairment.

5              So you would have similar,

6          as you said, exposures.

7     BY MR. OVERHOLTZ:

8          Q.   Do you know which dose was

9     closer for the moderate renal impairment

10    patients to being similar to the

11    20-milligram dose in other patients, the

12    15-milligram or the 10-milligram?

13         A.   Within the context of the

14    RECORD -- the ROCKET trial?

15         Q.   Well, as far as the work

16    that was done prior to selecting the

17    15-milligram dose before ROCKET.

18         A.   Again, I can't speak to the

19    work of dose selection for the ROCKET

20    program.  I realize that Wolfgang Mueck

21    had done a lot of work in modeling and

22    simulation to test whether or not the

23    15-milligram dose would have behaved in,

24    again, a similar manner as a 20-milligram

Protected - Subject to Further Protective Review

1  dose in the Afib population.  And that's

2  ultimately what we showed in the ROCKET

3  trial itself.

4          Q.    Now, as a scientist at

5  Janssen, did you believe that if

6  information about the safe use of a drug

7  was going to be provided to the European

8  regulatory authorities and European

9  doctors, that that same information

10  should be given to the FDA and United

11  States doctors?

12              MR. ZELLERS:  Object to

13        form.

14              THE WITNESS:  I'm sorry.

15        Would you mind rephrasing that or

16        stating that again?

17  BY MR. OVERHOLTZ:

18          Q.    No.  In your perspective as

19  a scientist at Janssen --

20          A.    Yes.

21          Q.    -- do you believe that

22  information about the safe use of a drug

23  should be provided to -- strike that.

24  Let me say it again.

Protected - Subject to Further Protective Review

1            As a scientist at Janssen,

2    from your perspective, did you believe

3    that if information about the safe use of

4    the drug was going to be given to

5    European regulatory authorities, that

6    that same information should be provided

7    to the FDA here in the United States?

8            MR. ZELLERS:  Object to

9        form.

10           THE WITNESS:  As a clinical

11       pharmacologist at Janssen, I would

12       expect that the same information

13       provided in regards to the

14       clinical pharmacology of the drug

15       that was submitted to the EMEA

16       should be submitted to the FDA.

17   BY MR. OVERHOLTZ:

18       Q.    Do you know why anyone at

19   Janssen would ever think differently than

20   that?

21           MR. ZELLERS:  Object to

22       form.

23           THE WITNESS:  Are you asking

24       do I know if anybody at Janssen

Protected - Subject to Further Protective Review

1          would not want the same clinical

2          pharmacology information submitted

3          to the EMEA to the FDA?

4     BY MR. OVERHOLTZ:

5          Q.     Right.

6          A.     I'm not aware of that.

7          Q.     Let me show you what we'll

8     mark as Exhibit Number 20.

9               (Document marked for

10          identification as Exhibit

11          Moore-20.)

12    BY MR. OVERHOLTZ:

13         Q.     This is Bates Number BPAG

14    01560271, Record Number 880160.  That

15    means that we got this out of Bayer's

16    file as it was sent to Dr. Kubitza,

17    Dr. Perzborn, and Dr. Mueck at Bayer.

18    It's an e-mail chain from June of 2010.

19              I'll let you take a chance

20    to take a look at it and I'll ask you a

21    couple questions about it.

22         A.     Sure.

23              MR. OVERHOLTZ:  If I could

24          have 255700, and 255699.

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2         Q.    So you see in Exhibit 20

3    what they are talking about is including

4    a paper from Dr. Samama from the Journal

5    of Thrombosis and Hemostasis in the Afib

6    submission for Xarelto, correct?

7         A.    It seems you're referring to

8    the original e-mail from Nini Bode to

9    myself where it's talking about -- are

10   you referencing the 2010-4?

11        Q.    Yeah.  If you look down at

12   the -- I think the e-mail at the bottom

13   of the second page, you send an e-mail to

14   Dagmar.  You say, "Hi Dagmar and

15   Wolfgang" --

16        A.    Mm-hmm.

17        Q.    -- "please see the e-mail

18   below from Nini."

19        A.    Right.

20        Q.    "I'm sure you've seen this

21   article.  Nice review of clotting assays

22   for riva."

23        A.    Mm-hmm.

24        Q.    Do you see that?

Protected - Subject to Further Protective Review

1       A.     Yeah.

2       Q.     And you sent that e-mail to

3   Dagmar and Wolfgang Mueck about the

4   article of the clotting assays for riva.

5   And you say, "Nini seemed to believe it

6   would be beneficial to mention this paper

7   within the clinical pharmacology section

8   of the CTD.  What do you think?"

9              Do you see that?

10      A.     I do, yes.

11      Q.     Okay.  You get a response

12  from Dagmar Kubitza.  And then Nini Bode

13  indicates that they are going to include

14  it in the clinical pharmacology section

15  of the -- of the submission to the FDA;

16  is that right?

17      A.     Looking at her e-mail, yes.

18             MR. OVERHOLTZ:  If I can

19         show you what we'll mark as --

20             MR. ZELLERS:  Hold on.  Hold

21         on.  Did you give an answer to

22         that question?

23             MR. OVERHOLTZ:  I'm sorry.

24         Are you -- you're talking --

Protected - Subject to Further Protective Review

1          MR. ZELLERS:  I'm not sure

2     he answered your question.

3          MR. OVERHOLTZ:  He did.

4          THE WITNESS:  So I'm now

5     looking at the response from

6     Nini -- Nini to Dagmar, myself --

7 BY MR. OVERHOLTZ:

8     Q.    Right.

9     A.    -- and Elisabeth Perzborn.

10     Q.    Correct.

11     A.    It says, "Thank you all.

12 Elizabeth, reading the e-mail string

13 below, I conclude that the Samama paper

14 reference given will be included in

15 Module 2.7.2 by our ClinPharm colleagues

16 and we don't need to include it in the

17 preclinical pharm Module 6 point" --

18 "2.6.12."

19          That was the --

20     Q.    That's correct.  So the --

21 based on the e-mail that we are seeing

22 from June 9, 2010, after the back and

23 forth between yourself and Dr. Kubitza

24 and Dr. Mueck, Nini Bode says, "After

Protected - Subject to Further Protective Review

1  reading this below we are going to

2  include it in the clinical pharmacology

3  section."

4        A.    That's what it states, yes.

5        Q.    Let me show you what we'll

6  mark as Exhibit 21 and 22 so we know what

7  we are talking about with the Samama

8  paper.

9             (Document marked for

10        identification as Exhibit

11        Moore-21.)

12             (Document marked for

13        identification as Exhibit

14        Moore-22.)

15  BY MR. OVERHOLTZ:

16        Q.    21 is an e-mail attaching

17  this, which is Bates Number 01182363,

18  Record 255699.  And the attachment is

19  Bates Janssen 01182364, record 255700.

20  That's the attachment.

21             So just so you know where

22  I'm going to go.

23        A.    Okay.

24        Q.    The e-mail that we looked at

1  on Exhibit 21 attaches an article by

2  Professor Samama and others from 2010 in

3  the thrombosis and hemostasis journal

4  regarding "Assessment of Laboratory

5  Assays to Measure Rivaroxaban, an Oral,

6  Direct Factor Xa Inhibitor," right?

7       A.   It looks like the article

8  seems to outline different assays and the

9  methodology behind it.

10      Q.   Okay.  And this was the same

11  article that you were talking about in

12  your e-mail that we looked at in

13  Exhibit 20 that you had e-mailed about

14  whether to include it in the clinical

15  pharmacology section of the submission to

16  the FDA.

17           Do you recall that?

18      A.   It was information with

19  regard to some of these assays that seem

20  relevant, yes.

21      Q.   So just so we know what we

22  are talking about before we read the

23  e-mail, let's just --

24           MR. ZELLERS:  I'm sorry.

Protected - Subject to Further Protective Review

1    BY MR. OVERHOLTZ:

2         Q.    -- let's take a look at the

3    article.

4              MR. ZELLERS:  Did you

5         reference FDA before?

6              MR. OVERHOLTZ:  Yes.

7              MR. ZELLERS:  And did you

8         intend to reference FDA?

9              MR. OVERHOLTZ:  Let's see.

10             MR. ZELLERS:  I just want to

11        make sure you did not misspeak.  I

12        know the --

13             MR. OVERHOLTZ:  I may have

14        misspoke.  If I did I'm sure it's

15        not the first time.  What did I

16        say here?

17             MR. ZELLERS:  I understood

18        your last question to the witness

19        to -- to be in reference to

20        submitting the Samama paper to the

21        FDA.  And my recollection of the

22        documents we've looked at regarded

23        submission to the EMA.

24             MR. OVERHOLTZ:  I think I

Protected - Subject to Further Protective Review

1          may have said FDA and I was

2          talking about the EMA.  Thank you,

3          I appreciate that.

4               MR. ZELLERS:  Thank you.

5     BY MR. OVERHOLTZ:

6          Q.   Okay.  So let me just go

7     back for a minute and talk about this.

8               The -- the e-mail that we

9     looked at in Exhibit 20 referenced

10    including this submission to the -- in

11    the Module 2.7.2 in the regulatory

12    submission that would go to the EMA; is

13    that correct?

14         A.   That is the -- that is the

15    designation of the module for the

16    clinical pharmacology review that would

17    be sent, I guess, both to the EMEA and

18    the FDA.

19         Q.   Okay.  And that was -- that

20    was the e-mail that was from June 9th of

21    2010, right?

22         A.   It appears to be here, yes.

23         Q.   Okay.  So now, if we look at

24    Exhibit 21 which we're looking at

1    June 15th of 2010.

2            A.    Mm-hmm.

3            Q.    If I can find it.

4                  That's the Bates 01182363.

5    It attaches the actual Samama paper,

6    correct?

7            A.    Yes, I believe so.

8            Q.    Okay.  And if we can look at

9    the Samama paper for a minute just so

10   that we know what we are talking about.

11   That's Exhibit 22.

12                 And you agree with me that

13   this paper was looking at different

14   laboratory assays used to measure

15   rivaroxaban, correct?

16           A.    I would have to take time to

17   look through the -- the paper itself, but

18   based on the --

19           Q.    That's what the title says.

20           A.    -- the general title and

21   abstract, that appears that's what they

22   are doing.

23           Q.    Okay.  If you want to just

24   look quickly at the paper, then I can ask

Protected - Subject to Further Protective Review

1   you a couple questions about it.  I'm

2   really going to ask -- only ask you about

3   the section dealing with prothrombin time

4   under "Results."  And then the

5   "Conclusion" section under the discussion

6   section.

7           A.    So under the "Discussion"

8   section specific to prothrombin time?

9           Q.    Yes.  Under that second

10  column.

11          A.    All right.  I mean, I can

12  try to go through this with my --

13          Q.    Sure.  And I'm not going to

14  really ask you to analyze the study.  I

15  just want to --

16          A.    Sure.

17          Q.    -- so that we have some

18  context for the e-mail, just --

19          A.    Right.  I specifically

20  looked at the discussion section.

21          Q.    Okay.  And so if you can

22  look with me --

23              MR. ZELLERS:  Just identify

24          the exhibit, if you will.

Protected - Subject to Further Protective Review

1           MR. OVERHOLTZ:  Yes,

2      Exhibit 22.  And it's the Bates

3      Number from Janssen's file of

4      01182364 that was attached to

5      Exhibit 21.

6  BY MR. OVERHOLTZ:

7      Q.    And there is a section that

8  describes these different assays that

9  were evaluated.  And one of those assays

10  that was evaluated was prothrombin time,

11  correct?

12      A.    That is correct.

13      Q.    Okay.  And also one of the

14  assays that was used was this CoaguChek

15  XS, which is another PT test?

16      A.    I'm not so familiar with the

17  CoaguChek, quite honestly.

18      Q.    Okay.

19      A.    I can go back and look at

20  the article.

21      Q.    Okay.  So if we can go back

22  to the results page, which is the -- one,

23  two, three -- fourth page.

24      A.    Okay.

Protected - Subject to Further Protective Review

1    Q.    It's the overall of this --

2    one, two, three -- yeah, there you go.

3         And then right under the

4    "Results" page, there is a section for

5    prothrombin time.

6         Do you see that?

7    A.    Yes.

8    Q.    It says, "The direct Factor

9    Xa inhibitor rivaroxaban induced a

10   concentration-dependent prolongation of

11   PT.  However, the clotting time increase

12   varied depending on the thromboplastin

13   reagent used."

14        Do you see that?

15   A.    I do, yes.

16   Q.    And I don't know if we

17   talked much about the fact that different

18   reagents can result in different

19   measurements.  But that's one of the

20   reasons why the Neoplastin agent was

21   selected by Janssen and Bayer to use in

22   the clinical studies program, because it

23   had the closest linear relationship with

24   drug concentration, right?

Protected - Subject to Further Protective Review

1    A.    It seemed to be the most

2  sensitive, yes.

3    Q.    Okay.  It says,

4  "International normalized ratio, INR

5  conversion, did not reduce this

6  variation."  Then it says, "The

7  concentration dependent increase of PT

8  was linear over a broad concentration

9  range with all PT reagents as shown for

10  rivaroxaban."

11    Do you see that?

12    A.    I do, yes.

13    Q.    Okay.  Now, if you look with

14  me on the next column, without getting

15  too deep into this, generally what it

16  describes at the top is there was this

17  linear relationship between PT and the

18  concentration of rivaroxaban in plasma,

19  the results of PT measurement should be

20  expressed in plasma concentration of

21  rivaroxaban in micrograms per milliliter,

22  and that's to account for the differences

23  in reagents used, correct?

24    A.    Again, based on what is

Protected - Subject to Further Protective Review

1   written here, I assume that's correct,

2   yeah.

3          Q.    And so then if we can turn

4   over to the discussion section.  That's

5   after -- Table 3 is at the top.  There's

6   a discussion section.

7                Do you see that?

8          A.    Yes.

9          Q.    If you look with me at the

10  very bottom of the discussion section, it

11  says, "Therefore, PT sensitivity would be

12  a better assay than aPTT for monitoring

13  the anticoagulant effects of

14  rivaroxaban."

15               Do you see that?

16         A.    I see that statement, yes.

17         Q.    Okay.  It says, "However,

18  the CoaguChek XS, or a similar instrument

19  using the same thromboplastin reagent,

20  could overcome the problem of variability

21  due to different thromboplastin reagents.

22  There is no significant interindividual

23  variation for the results obtained with

24  CoaguChek XS, which has the advantage of

Protected - Subject to Further Protective Review

1    being largely used in several countries

2    for monitoring treatment with vitamin K

3    antagonist."

4                Do you see that?

5         A.    I do, yes.

6         Q.    Do you know whether or not

7    Janssen did any further studies with the

8    CoaguChek XS to see whether or not it

9    could be used as a way of measuring -- as

10   an indirect measure of rivaroxaban

11   concentration levels?

12        A.    I can only speak to my

13   experience within clinical pharmacology.

14   I don't believe we looked into the use of

15   CoaguChek XS in that.  I don't know if

16   Bayer or others had done it.

17        Q.    And then if you look with me

18   down at the bottom of that second column,

19   it says under -- right above the little

20   gray box.

21                Do you see that?

22        A.    Yes.

23        Q.    It says, "Under these

24   conditions, PT could be used for

1   monitoring the effects of rivaroxaban in

2   the clinical setting, if considered

3   necessary, at peak plasma levels but not

4   at trough levels."

5           Do you see that?

6       A.   I do, yes.

7       Q.   Okay.  Then if we can go to

8   kind of the next-to-last paragraph for

9   the study.

10          The "in conclusion"

11  paragraph?

12      A.   Yes.

13      Q.   The first paragraph in the

14  second column.

15      A.   Yes.

16      Q.   It says, "In conclusion, PT

17  with rivaroxaban-specific calibration or

18  using CoaguChek XS, dRVV screen, one-step

19  PiCT, and HepTest seem to be appropriate

20  assays to determine the pharmacodynamic

21  effects of rivaroxaban."

22          Did I read that correctly?

23      A.   It appears so, yes.

24      Q.   There's then a statement

Protected - Subject to Further Protective Review

1   about dRVV.  Then it says, "However, more

2   experiments need to be carried out to

3   confirm the preliminary results presented

4   in this paper.  The PT method is widely

5   available in all laboratories at anytime

6   of the day and should be preferred to

7   PiCT and HepTest."

8            Did you have a general

9   understanding that PT was a widely

10  available test?

11           A.    Yes.

12           Q.    Okay.  It then talks about

13  the fact that commercially available PT

14  tests that provide results as a

15  percentage of normal or convert to INR

16  should not be used for monitoring the

17  anticoagulant effects of direct Factor Xa

18  inhibitors, such as rivaroxaban.

19           That's something that was

20  discovered, is that INR really doesn't

21  correlate to the PD affects of Xarelto,

22  correct?

23           A.    That's correct.

24           Q.    INR as a sensitivity index

Protected - Subject to Further Protective Review

1    is directly correlated to warfarin?

2        A.    That is correct.

3        Q.    Okay.  Now, if you look with

4    me in the study, there's an

5    acknowledgment section just below that.

6              Do you see that?

7        A.    Yes.

8        Q.    It says, "The authors would

9    like to acknowledge Shahid Salaria, who

10   provided medical writing services with

11   funding from Bayer Schering Pharma AG and

12   Johnson & Johnson Pharmaceutical

13   Research & Development."

14             Do you see that?

15       A.    I do, yes.

16       Q.    So J&J and Bayer both

17   actually supported this study by

18   Professor Samama, correct?

19       A.    It seems so, yes.

20       Q.    And then if we can take a

21   look at the e-mail that attached this

22   from Nini Bode for a second, on June 15th

23   of 2010.  That's Exhibit 21.

24             And she writes this e-mail

Protected - Subject to Further Protective Review

1    to several people at Janssen including

2    yourself, correct?

3         A.    That is correct.

4         Q.    Okay.  And the subject of

5    her e-mail is "Inclusion in the VTE

6    prevention Afib submission of attempts to

7    find assay for rivaroxaban measurement in

8    clinical practice."  And then the

9    attachment is the Samama paper, right?

10        A.    That is the subject line,

11   yes.

12        Q.    It says, "Dear all.  For the

13   upcoming VTE treatment, Bayer only and

14   Afib submission, preclinical is ahead of

15   clinical with regards to writing CDT

16   modules.  We uncovered the attached paper

17   by Samama on attempts to find an assay to

18   measure rivaroxaban in clinical

19   practice."

20              Do you see that?

21        A.    I do, yes.

22        Q.    Do you know why Janssen had

23   to uncover this attached paper in June of

24   2010 with one of the people that

Protected - Subject to Further Protective Review

1  sponsored the study?

2           MR. ZELLERS:  Object to

3      form.

4           THE WITNESS:  I can't speak

5      to what Nini was obviously trying

6      to state there.

7  BY MR. OVERHOLTZ:

8      Q.    Okay.  Do you know that

9  Professor Samama had been a consultant

10  for Janssen and continued to be so after

11  this?

12      A.    I am aware that Professor

13  Samama had done a lot of work in regards

14  to the different assays that could

15  potentially be looked at for rivaroxaban.

16      Q.    It says, "For now, we will

17  include the paper in Module 2.6.2,

18  pharmacology written summary, essentially

19  using the abstract as draft text."

20           Do you see that?

21      A.    I do, yes.

22      Q.    Then says, "After global

23  review planned end June 2010, there is a

24  possibility to remove it again."

Protected - Subject to Further Protective Review

1          Do you see that?

2     A.     I do, yes.

3     Q.     Do you know why she was

4  talking about removing this paper that

5  looks at ways to measure rivaroxaban in

6  the clinical setting from the submission?

7               MR. ZELLERS:  Object to

8          form.

9               THE WITNESS:  No.  Again, I

10         can't speak to what Nini was

11         planning to do or what she was

12         suggesting.

13              I do know that with every

14         filing, as more research becomes

15         available, we update all the

16         sections as appropriate.  The work

17         that Dr. Samama had done was --

18         continued well past this

19         publication and looked at other

20         assays.

21              Maybe that's what she's

22         referring to.

23  BY MR. OVERHOLTZ:

24     Q.     She's talking about making a

Protected - Subject to Further Protective Review

1  decision by end of June 2010 in her

2  e-mail, right?

3          A.    According to the e-mail,

4  yes.

5          Q.    Okay.  She says, "On the

6  preclinical team, we would want to make

7  sure this is done in alignment with the

8  joint clinical/regulatory/commercial

9  strategy."

10          Do you see that?

11          A.    I do, yes.

12          Q.    Now, did you know there was

13  a commercial strategy at Janssen with

14  respect to whether or not measurements of

15  Xarelto levels in the clinical setting

16  should be done?

17          MR. ZELLERS:  Object to

18          form.

19          THE WITNESS:  I'm not

20          familiar with a commercial

21          strategy in regards to what Nini

22          is implying or referencing.

23  BY MR. OVERHOLTZ:

24          Q.    She says, "Hence, we have

1    several questions."  First she says,

2    "With regard to the upcoming VTE

3    treatment, Afib submissions, what is the

4    strategy regarding rivaroxaban

5    measurements in clinical practice?"

6              Do you see that?

7         A.    I do, yes.

8         Q.    Do you agree that the most

9    important strategy should be to do

10   whatever is necessary to make the drug as

11   safe as possible for patients?

12             MR. ZELLERS:  Object to

13        form.

14             THE WITNESS:  Again, I would

15        agree that that is an important

16        strategy, along with many others,

17        yes.

18   BY MR. OVERHOLTZ:

19        Q.    Do you think it's the most

20   important strategy?

21             MR. ZELLERS:  Object to

22        form.

23             THE WITNESS:  I can't speak

24        to the strategy of what Johnson --

1        what Janssen does.  But I do

2        absolutely agree that safety is an

3        important aspect of drug

4        development, absolutely.

5   BY MR. OVERHOLTZ:

6        Q.    Certainly important for

7   doctors and their patients?

8        A.    Yes.

9        Q.    The next point says, "Number

10   2, do we want health authorities outside

11   EMA to find out about the Samama paper

12   themselves and draw their own

13   conclusions, or do we point them to the

14   Samama paper and present it together with

15   the joint Bayer/J&J agreed message

16   regarding rivaroxaban measurements?"

17        Do you see that?

18        A.    I do, yes.

19        Q.    Okay.  Now, when she talks

20   about health authorities outside the EMA,

21   we've said the EMA is the European

22   regulatory authority for drugs, right?

23        A.    That is correct.

24        Q.    Okay.  And so the FDA would

Protected - Subject to Further Protective Review

1    be a health authority outside the EMA,

2    right?

3              A.    It would be one of many.

4              Q.    Okay.  She then asks, "Is

5    there agreement with Bayer regarding 1

6    and 2?"

7                    Do you see that?

8              A.    I do see that, yes.

9              Q.    In her Point Number 2 she

10   says, "For the latter case," -- which was

11   about presenting it together with the

12   joint Bayer/J&J message regarding

13   rivaroxaban measurements -- "For the

14   latter case, what is the joint Bayer/J&J

15   message and how prominent, i.e., in which

16   CTD module do we want to present it?"

17                   That's what she asks,

18   correct?

19             A.    That's what it states here,

20   yes.

21             Q.    Sometimes when you submit

22   things to regulatory authorities, you can

23   make it less prominent or more prominent,

24   right?

Protected - Subject to Further Protective Review

1          MR. ZELLERS:  Object to

2     form.

3          THE WITNESS:  In the

4     documents that I work with we --

5     it is a full disclosure of the

6     scientific information that we --

7     we collected.

8          It is organized in a

9     scientifically and logical method.

10    I don't think we point out one

11    section over the other in regards

12    to the clinical pharmacology of

13    the drug.

14         MR. OVERHOLTZ:  Object as

15    nonresponsive.

16  BY MR. OVERHOLTZ:

17         Q.   But let me see if I can ask

18  it this way.

19         A.   Okay.

20         Q.   When you present something

21  in a submission to a health authority

22  like the F -- FDA, you can either call

23  the FDA's attention to it by putting it

24  in a prominent section of the submission

Protected - Subject to Further Protective Review

1  or you can put it in a less important

2  section of a large drug submission,

3  correct?

4              MR. ZELLERS:  Object to

5       form.

6              THE WITNESS:  Could you help

7       me understand what is a prominent

8       part of the submission?

9  BY MR. OVERHOLTZ:

10      Q.    Well, let me ask you this.

11 When Ms. Bode sent you this e-mail in

12 2010, she talked about how prominent --

13 she said, "i.e., in which CTD module."

14              Do you see that?

15      A.    I do, yeah.

16      Q.    Okay.  So there are

17 different modules in a submission to FDA,

18 to a health authority, correct?

19      A.    Yes, there is.

20      Q.    Okay.  And some are more

21 prominent than others in the submission?

22              MR. ZELLERS:  Object to

23       form.

24              THE WITNESS:  I -- I guess

Protected - Subject to Further Protective Review

1    I'm -- I'm having difficulty in

2    defining what prominent is when it

3    comes to the different modules.

4        From a clinical pharmacology

5    standpoint, we generate Modules

6    7 -- 2.7.1 and 2.7.2.  Those in my

7    mind, as clinical pharmacology,

8    are prominent modules.

9        And, you know, from --

10   because that is an accumulation of

11   all of the information that we

12   have had both scientifically

13   regarding the pharmacokinetic and

14   pharmacodynamic aspects of the

15   drug that we've collected in the

16   many years in studying the drug,

17   so I would say that that's a

18   pretty prominent document.  So I

19   don't know how to compare that to

20   others, who from a clinical

21   standpoint may feel that their

22   documents are more prominent.

23   BY MR. OVERHOLTZ:

24       Q.   So certainly with respect to

1   Xarelto, an anticoagulant, clinical

2   pharmacology information and how to

3   measure clinical pharmacology type

4   measurements, PK/PD measurements, would

5   be prominent for a health authority's

6   consideration?

7              MR. ZELLERS:  Object to

8        form.

9              THE WITNESS:  It would be --

10       it would be important to let the

11       regulatory agencies know the

12       information that we have collected

13       to date in regards to the assays

14       that assess the pharmacodynamic

15       parameters within development of

16       the program.  And we did that.

17              And so the assays that

18       are -- some of the assays that are

19       listed here in the publication as

20       far as prothrombin time, we

21       certainly did assess.  And it was

22       part of Module 7 point -- 2.7.2 in

23       our submissions.

24   BY MR. OVERHOLTZ:

Protected - Subject to Further Protective Review

1    Q.    She notes after Point 3,

2    that, "Note, EMA" -- that is the European

3    authority -- "is fully aware of the

4    ongoing efforts regarding setting up a

5    method to measure rivaroxaban in clinical

6    practice, as there are update reports

7    every six months as part of the EMA

8    postapproval commitment."

9         Do you see that?

10   A.    I do, yes.

11   Q.    Okay.  And so that was

12   something that she was informing you in

13   2010 about, that there was actually a

14   commitment by Bayer and the EMA to report

15   about the efforts to find a way to

16   measure rivaroxaban levels in clinical

17   practice, right?

18   A.    That is my understanding,

19   yes.

20   Q.    She says, "Note, for the

21   U.S. there is the specific requirement to

22   submit in Module 5.3.4 other study

23   reports, a summary of relevant published

24   literature.  This typically is a Medline

Protected - Subject to Further Protective Review

1  search listing and a short conclusion

2  like everything published was already

3  discussed in other modules, or

4  conclusions reached in other modules are

5  not changed by these data.

6           "For" -- "specifically for

7  the Samama April 2010 paper, a one-line

8  conclusion could be added in line with

9  the joint Bayer/J&J message on

10  rivaroxaban measurements in clinical

11  practice."

12           Do you see that?

13       A.    I do, yes.

14       Q.    Okay.  She was suggesting a

15  less prominent way of providing the

16  information to the FDA, correct?

17           MR. ZELLERS:  Object to

18       form.

19           THE WITNESS:  I'm sorry.  I

20       was reading as you were saying it.

21       Could you repeat that question?

22  BY MR. OVERHOLTZ:

23       Q.    Sure.  She was suggesting

24  that there might be a less prominent way

Protected - Subject to Further Protective Review

1    to include this information in the

2    submission to the FDA?

3              MR. ZELLERS:  Object to

4         form.

5              THE WITNESS:  I don't -- I

6         really don't know whether or not

7         that was the intent of what she

8         wrote.

9    BY MR. OVERHOLTZ:

10        Q.    Okay.

11             MR. OVERHOLTZ:  Let me show

12        you what we'll mark as Exhibit

13        Number 23.

14             (Document marked for

15        identification as Exhibit

16        Moore-23.)

17   BY MR. OVERHOLTZ:

18        Q.    This is Janssen 06608858.

19   It's Record Number zero -- I mean

20   1023223.

21             This is an e-mail response

22   from June 15, 2010, from Nauman Shah to

23   Nini Bode's e-mail.

24        A.    Okay.

Protected - Subject to Further Protective Review

1    Q.    Now, when Nauman Shah

2   responds to Nini Bode, he says, "Thanks

3   for forwarding this on.  From a

4   commercial strategy standpoint we do not

5   want to recommend or encourage the use of

6   any measurements for rivaroxaban, given

7   they will not accomplish the primary

8   purpose that most clinicians have for

9   measuring levels in chronic treatment

10   situations:  Compliance."

11            Do you see that?

12    A.    I do, yes.

13    Q.    Okay.  Now, you and I talked

14   about a little bit about that earlier,

15   that one of the ways -- ways that you can

16   use measuring rivaroxaban levels is just

17   to determine whether or not the drug is

18   on board and the patient's taking the

19   drug, right?

20    A.    Yes.

21    Q.    Okay.  And what Nauman Shah

22   points out is, because Xarelto is

23   different than warfarin, it doesn't

24   really reach this steady state that the

Protected - Subject to Further Protective Review

¹ test may provide an indication of whether

² rivaroxaban is on board.  It doesn't

³ convey whether the patient has been

⁴ taking the drug regularly, right?

⁵         A.    That's basically what he

⁶ states in the next sentence.

⁷         Q.    Okay.  Now, do you recall

⁸ coming to understand that there was a

⁹ commercial strategy within Janssen to

¹⁰ avoid recommending or encouraging the use

¹¹ of any measurements of rivaroxaban?

¹²              MR. ZELLERS:  Object to

¹³         form.

¹⁴              THE WITNESS:  No, I -- I

¹⁵         can't speak to what Nauman Shah

¹⁶         has stated here with regards to

¹⁷         the commercial strategy

¹⁸         standpoint.

¹⁹              I know that we've -- as I

²⁰         mentioned, we -- we have assessed

²¹         a lot of different pharmacodynamic

²²         assays and parameters and provided

²³         all that information to the -- the

²⁴         regulatory agencies.

Protected - Subject to Further Protective Review

1   BY MR. OVERHOLTZ:

2        Q.    I mean, there are other

3   reasons to measure the concentration

4   levels of rivaroxaban in blood plasma

5   than simply looking at whether it's on

6   board or not, correct?

7              MR. ZELLERS:  Object to

8         form.

9              THE WITNESS:  To -- to my

10        knowledge, again, the times that a

11        physician may want to know if

12        rivaroxaban is -- a level of

13        rivaroxaban is within the plasma

14        is, as we mentioned, compliance,

15        and maybe emergency surgery

16        situations when they are making a

17        decision whether or not they

18        should wait for the half-life of

19        the drug to -- to washout or

20        whether or not they know to go

21        into a surgery and prepare for the

22        subject to be anticoagulated.

23              So those are two examples of

24        times when a physician may want to

Protected - Subject to Further Protective Review

1    understand whether or not

2    rivaroxaban is actually in the

3    system or not.

4  BY MR. OVERHOLTZ:

5       Q.    You also believe that

6  measurement of rivaroxaban concentration

7  levels could be used to make sure that a

8  patient's plasma levels of the drug are

9  within the expected range of -- of

10 treatment concentration range seen for

11 most patients, correct?

12            MR. ZELLERS:  Object to

13       form.

14            THE WITNESS:  You would be

15       a -- you would be able to only use

16       an assay, be it a PT assay to

17       indirectly measure rivaroxaban

18       concentration or a formal assay to

19       measure rivaroxaban concentration

20       to see whether or not the PT value

21       or the concentration assessed from

22       that assay fell within what was

23       observed in the ROCKET trial.

24 BY MR. OVERHOLTZ:

Protected - Subject to Further Protective Review

1     Q.    It says, "Finally, it's my

2   understanding that while the measurements

3   may indicate current rivaroxaban levels

4   in the body, they don't correlate to

5   risks of bleeding or other outcomes."

6          Do you see that?

7     A.    I do, yes.

8     Q.    Okay.  But you know that

9   there were studies conducted within -- by

10  Janssen that actually did determine that

11  there was a correlation between higher

12  levels of rivaroxaban in the body and

13  higher risk of bleeding, correct?

14          MR. ZELLERS:  Object to

15      form.

16          THE WITNESS:  The Phase II

17      studies looked at multiple doses,

18      in which case they showed that as

19      you increase the dose, you

20      certainly can increase your risk

21      of bleeding.  Within a particular

22      dose level, for example

23      20 milligrams, to my knowledge,

24      there is no differences in

Protected - Subject to Further Protective Review

1          exposure within 20 milligrams that

2          would lead a patient to a greater

3          risk of bleeding.  And that's what

4          I assume he is referring to.

5   BY MR. OVERHOLTZ:

6          Q.    Okay.  At this point in

7   time, had the analysis of the exposure

8   response analysis in the ACS TIMI 46

9   study been completed?

10         A.    By 2010?

11         Q.    Right.

12         A.    I can't say for sure whether

13  or not that was completed by this time.

14         Q.    Okay.  Are you aware that

15  that analysis showed that both for area

16  under the curve, CMAX, and CMIN there was

17  a statistically significant correlation

18  for those patients with the highest

19  levels and increased bleeding risk?

20              MR. ZELLERS:  Object to

21         form.

22              THE WITNESS:  I would have

23         to either take a look at the

24         analysis that was run or refer you

1    back again to the modeling

2    simulation colleagues that did

3    such analyses.

4  BY MR. OVERHOLTZ:

5    Q.    Okay.  We can maybe take a

6  look at that later.

7        Let me ask you this.  Nauman

8  Shah goes on and says, "Therefore,

9  assuming this is indeed the case, we are

10 planning to stick with a simple strategy

11 to not recommend measurement."

12       Do you see that?

13   A.    I do, yes.

14   Q.    And that became the strategy

15 moving forward for Janssen and Bayer for

16 Xarelto, correct?

17       MR. ZELLERS:  Object to

18   form.

19       THE WITNESS:  Again, based

20   on what he says, I would assume

21   that it is -- there is, again, no

22   need for routine monitoring of

23   rivaroxaban, which is consistent

24   across the studies that were

Protected - Subject to Further Protective Review

1       conducted.

2  BY MR. OVERHOLTZ:

3       Q.   Now, one of the things that

4  certainly Janssen wanted to avoid is

5  whether or not to give the impression

6  that they were recommending some form of

7  routine clinical monitoring, right?

8            MR. ZELLERS:  Object to

9       form.

10           THE WITNESS:  Would you mind

11      restating?

12 BY MR. OVERHOLTZ:

13      Q.   Sure.  One of the things

14 that Janssen wanted to make sure with

15 respect to anything that they recommended

16 with respect to measurement of

17 rivaroxaban levels was that they were not

18 implying that there was a need for

19 routine clinical monitoring, right?

20           MR. ZELLERS:  Object to

21      form.

22           THE WITNESS:  There had been

23      substantial analyses that were

24      done from the start of the program

Protected - Subject to Further Protective Review

1    before I even started and then

2    after, that assessed the different

3    markers that potentially could be

4    used to indirectly measure

5    rivaroxaban concentration.

6            None of that analysis showed

7    that routine monitoring would

8    be -- would be needed for this

9    type of medication.

10   BY MR. OVERHOLTZ:

11       Q.    Let me see if we can look at

12   Exhibit Number 24.

13            (Document marked for

14       identification as Exhibit

15       Moore-24.)

16   BY MR. OVERHOLTZ:

17       Q.    This is Janssen 01182389,

18   Record Number 255705.  And this is a

19   response from Christopher Nessel to

20   Nauman Shah's e-mail related to this

21   inclusion of the Samama paper and the

22   submissions.

23            Did you have a chance to

24   take a look at Christopher Nessel's

Protected - Subject to Further Protective Review

1  response?

2      A.    Yeah.  I was reading the

3  second paragraph here.  Okay.

4      Q.    He responds and says, "I

5  agree with Nauman that a direct

6  measurement akin to the INR would not

7  likely be of substantial clinical

8  utility.  I have heard at several

9  advisory boards, though, that some

10  indicator of the presence of rivaroxaban

11  would be useful," correct?

12      A.    That is correct.

13      Q.    Okay.  And when he talks

14  about advisory boards, the company would

15  sometimes put together boards of outside

16  consultants, physicians, and scientists

17  that would provide information to them,

18  to the company, related to what they

19  would like to see or not see related to

20  the drug.  Is that a fair statement?

21      A.    I think that's a fair

22  statement, yes.

23      Q.    Okay.  He says, "No test

24  will indicate long-term compliance,"

1    which you and I talked about, right?

2            A.    Correct.

3            Q.    Okay.  He says, "An

4    indicator test, though, would be

5    informative to the physician considering

6    a procedure in a patient for whom the

7    last dose is uncertain.  The management

8    of a patient presenting to the ER with

9    peritoneal signs and rivaroxaban on the

10   medication list would be quite

11   challenging to the attending surgeon,

12   even if the patient was reasonably sure

13   about the time of their last dose.  A

14   simple appendectomy might not be a

15   problem, but I would be very reluctant to

16   get into an aortic dissection unless I

17   was certain about the coagulation status

18   of the patient."

19            Do you see that?

20           A.    I do, yes.

21           Q.    "I believe there is clinical

22   utility in an on/off test for this

23   compound."

24            Do you see that?

Protected - Subject to Further Protective Review

1     A.    I do, yes.

2     Q.    He says, "This can be kept

3  distinct from, and, therefore, avoid

4  confusion with routine clinical

5  monitoring."

6          Do you see that?

7     A.    I do, yes.

8     Q.    And that was an important

9  goal for the company, was to make sure

10 that they avoided any recommendation of

11 routine clinical monitoring, right?

12          MR. ZELLERS:  Object to

13          form.

14          THE WITNESS:  Again, I can't

15          speak to whether or not that was a

16          goal.  I know that we consistently

17          assessed the data that was at hand

18          to see whether or not monitoring

19          was appropriate for Xarelto.  So,

20          again, I can't speak to whether or

21          not it was a quote-unquote goal.

22          MR. OVERHOLTZ:  Do you want

23          to keep going until 5:30 or take a

24          quick break?  What do you want to

Protected - Subject to Further Protective Review

1  do?

2      MR. ZELLERS:  I do not want

3  to take a break.  Are you okay?

4      (Whereupon, a discussion was

5  held off the record.)

6      MR. OVERHOLTZ:  Can we take

7  a two-minute bathroom break, and

8  we'll do 15 minutes and be out of

9  here.  I don't want to run out of

10  tape.

11      MR. ZELLERS:  I understand.

12      THE VIDEOGRAPHER:  The time

13  is 5:18 p.m.  We are going off the

14  record.

15      (Short break.)

16      THE VIDEOGRAPHER:  This

17  marks the beginning of Videotape

18  Number 5.  The time is 5:27 p.m.

19  Back on the record.

20  BY MR. OVERHOLTZ:

21      Q.    Okay.  So one of the topics

22  we've been talking about is the idea that

23  Xarelto is recommended for use and that

24  it does not -- does not require routine

Protected - Subject to Further Protective Review

1    clinical monitoring, right?

2         A.    Correct.

3         Q.    Okay.  And -- now, one of

4    the things that we see and that we also

5    see used, besides just talking about

6    routine clinical monitoring, is also the

7    term "therapeutic drug monitoring."  You

8    are familiar with that term?

9         A.    I'm familiar with the term

10   of "therapeutic drug monitoring."

11        Q.    I think the EMA's recent

12   request has kind of called the

13   therapeutic drug monitoring TDM request,

14   correct?

15        A.    Again, I'm not involved in

16   the -- that work.  I'm sorry.

17        Q.    Therapeutic drug monitoring

18   means monitoring the drug levels,

19   measuring the drug levels and then making

20   some kind of clinical decision for the

21   patient's therapy based on that.

22             Is that a fair statement?

23             MR. ZELLERS:  Object to

24        form.

Protected - Subject to Further Protective Review

1           THE WITNESS:  I think it is

2       a very simplified definition for

3       it --

4   BY MR. OVERHOLTZ:

5       Q.    That's what I was shooting

6   for.

7       A.    I think it's -- is a way to

8   monitor the concentration within the

9   plasma of a medicine that has a

10  corresponding pharmacodynamic effect

11  which either has a desirable or

12  undesirable outcome.

13      Q.    Okay.  Routine clinical

14  monitoring can be part of therapeutic

15  drug monitoring?

16          MR. ZELLERS:  Object to

17      form.

18          THE WITNESS:  Could you

19      state that again?  I'm sorry.

20  BY MR. OVERHOLTZ:

21      Q.    Sure.  Routine clinical

22  monitoring --

23      A.    Yes.

24      Q.    -- like you do with warfarin

1  can be part of therapeutic drug

2  monitoring?

3                MR. ZELLERS:  Same.

4                THE WITNESS:  Yes.

5  BY MR. OVERHOLTZ:

6        Q.    Is a type of therapeutic

7  drug monitoring, routine clinical

8  monitoring?

9                MR. ZELLERS:  Object to

10       form.

11  BY MR. OVERHOLTZ:

12       Q.    Or is it a component of

13  therapeutic drug monitoring?

14       A.    From my, again, limited

15  understanding since I'm not involved in

16  that, that would be a component of or a

17  possible component of.

18       Q.    Okay.  Now, I think you told

19  me before that Professor Samama continued

20  to work on additional assay work with

21  respect to measuring riva concentrate --

22  riva concentration levels, correct?

23       A.    That is correct.

24       Q.    Okay.  As well as there were

Protected - Subject to Further Protective Review

1  actually other companies that worked on

2  assays to measure rivaroxaban

3  concentration levels, correct?

4       A.    Yes.  There were some

5  companies within the EU that worked on

6  other assays that could potentially

7  measure that, yes.

8       Q.    One of those assays was an

9  anti-Factor Xa assay; is that right?

10      A.    If I could be more specific,

11  that was an anti-Factor Xa assay with

12  rivaroxaban calibrators and controls.

13      Q.    Okay.  And that was

14  developed by Stago; is that right?

15      A.    I believe Stago was one of a

16  few companies that were looking into it,

17  yes.

18      Q.    And Bayer and Janssen worked

19  with Stago in the development of an

20  anti-Factor Xa assay with rivaroxaban

21  calibrators and controls; is that right?

22      A.    I believe we supported Stago

23  in their efforts, yes.

24      Q.    And is it a fair statement

1    that you believe that both the

2    anti-factor -- let me break it apart.  I

3    don't want to get an objection.

4              MR. ZELLERS:  You might

5         anyway, Mr. Overholtz.  But go

6         ahead and try.

7    BY MR. OVERHOLTZ:

8         Q.    All right.  Is it a fair

9    statement that you believe that the

10   anti-Factor Xa assays with specific

11   rivaroxaban calibrators and controls

12   could be used for therapeutic monitoring

13   of Xarelto?

14        A.    I believe it could be used

15   to, again, indirectly measure rivaroxaban

16   concentration within the plasma.

17        Q.    Okay.  And if a physician

18   wanted to use PT to measure rivaroxaban

19   levels, you believe that the right agent

20   to use would be the Neoplastin plus

21   reagent; is that right?

22        A.    If a physician wanted to

23   indirectly measure rivaroxaban

24   concentrations in plasma, they can use PT

1    with Neoplastin plus reagent, yes.

2          Q.    Okay.   Did you believe that

3    if a -- if a physician used PT and used

4    the Neoplastin plus reagent PT test, that

5    that could be used for therapeutic

6    monitoring of Xarelto in patients?

7                MR. ZELLERS:   Object to

8          form.

9                THE WITNESS:   Again, I

10         would -- I don't feel qualified

11         enough to say that using PT or the

12         anti-Factor Xa could be used

13         specifically for therapeutic drug

14         monitoring, versus what the assay

15         was intended for, which was to

16         measure -- indirectly measure the

17         concentrations of rivaroxaban

18         within the plasma.

19               (Document marked for

20         identification as Exhibit

21         Moore-25.)

22   BY MR. OVERHOLTZ:

23         Q.    Okay.   Let me show you what

24   we'll mark as Exhibit 25.   This is

Protected - Subject to Further Protective Review

1    Janssen 01479607, and it's Record Number

2    318386.  And it's an e-mail from you to

3    Chris Nessel, Achiel Van Peer, Kenneth

4    Turner, Troy Sarich, and Vicki Brennan,

5    on July 12th of 2012.

6              Let me know when you had a

7    chance to take a look at that.

8         A.    Okay.

9         Q.    A couple of questions kind

10   of about some of the subject matter here.

11        A.    Sure.

12        Q.    The subject line of the

13   e-mail is "7/12/12, mock AdCom VTE

14   treatment."

15             Do you see that?

16        A.    I do, yes.

17        Q.    Okay.  Now, you and I kind

18   of talked about there never really was an

19   AdCom for VTE treatment --

20        A.    No.

21        Q.    -- but does this kind of

22   refresh your recollection about there

23   being a mock AdCom for VTE treatment?

24        A.    Again, I -- I remember there

Protected - Subject to Further Protective Review

1    was meetings about it.  But I can't

2    recall whether or not there were true

3    mock AdComs where you had independent

4    professionals within the medical and

5    scientific community that come in and

6    assess your program.

7              But to answer your question,

8    yes, I believe that there was some

9    preparation in case an AdCom would

10   actually occur, as I mentioned before.

11        Q.    Okay.  Do you -- do you have

12   an understanding of why an actual AdCom

13   didn't occur for VTE treatment?

14        A.    As far as I understand, the

15   federal government didn't see that being

16   a necessary component for its approval.

17        Q.    Okay.  So the VTE treatment

18   indication was given without an AdCom?

19        A.    It's my understanding, yes.

20        Q.    If you can look -- there's

21   obviously several attachments to this

22   e-mail, several that are described as

23   unnamed presentations, and then one

24   that's the clinical pharmacology, VTE

Protected - Subject to Further Protective Review

1  AdCom draft.

2              Do you see that?

3        A.    I do, yes.

4        Q.    Okay.  And you say, "Dear

5  Chris.  Great job today.  I figured I

6  would just send you a quick e-mail while

7  the information is 'fresh' in my mind.

8  Some questions raised by the panel and

9  some ClinPharm approaches to answer

10  them."

11              Do you see that?

12        A.    Yes.

13        Q.    And when it talks about

14  questions raised by the panel, does that

15  indicate to you that there actually was a

16  mock AdCom panel that presentations were

17  being made to?

18        A.    Again, with the panel, that

19  may have been internal expertise versus

20  external, so...

21        Q.    Sitting here today, you

22  don't remember whether it was an outside

23  consultant panel or just internal

24  Janssen?

Protected - Subject to Further Protective Review

1        A.    I don't, because a lot of

2    the panels, even thinking back towards

3    the Afib AdCom and the ACS AdCom, you

4    would have both a mix of internal experts

5    and external experts that would comment.

6    The VTE, since that didn't go anywhere,

7    it's hard for me to recollect as far as

8    who were -- the substantial makeup of

9    what that panel would be.

10        Q.    Okay.   Number 1 on here is,

11   "Use of PCCs for rivaroxaban reversal."

12             Let me start over.

13             (Brief telephonic

14   interruption.)

15             MR. ZELLERS:  I would just

16        pick it up and hang up.

17   BY MR. OVERHOLTZ:

18        Q.    The first bullet point in

19   your e-mail to Chris Nessel and others on

20   July 2012 is, "Use of PCCs for

21   rivaroxaban reversal, Eerenberg et al.,

22   Trial (Slide CP-027)."

23             Do you see that?

24        A.    I do, yes.

Protected - Subject to Further Protective Review

1    Q.    Now, you actually worked on

2    the information related to the use of

3    PCCs for rivaroxaban reversal; is that

4    correct?

5    A.    I performed two studies that

6    assessed the use of PCCs to assess the

7    pharmacodynamic effects of rivaroxaban.

8    Q.    By PCCs.  What are PCCs?

9    A.    PCCs are prothrombin complex

10   concentrate, which is an already marketed

11   product by another company that is

12   sometimes used with hemophilia and other

13   conditions that people may have a

14   bleeding condition for.

15   Q.    Okay.  And so I may ask you

16   a couple questions tomorrow about your

17   PCC studies.  But generally you have

18   published on -- you actually published on

19   a couple of the studies related to the

20   use of PCCs; is that right?

21   A.    I published one study as

22   secondary author to Marcel Levi, who was

23   on our team at the time.

24   Q.    Now, bullet Point Number 2,

Protected - Subject to Further Protective Review

1  do you see that it says, "Therapeutic

2  monitoring."

3          Do you see that?

4      A.    I do, yes.

5      Q.    Okay.  You said,

6  "Therapeutic monitoring.  I believe there

7  is preference to use anti-Factor Xa

8  chromogenic assay with specific

9  rivaroxaban calibrators and controls

10  versus PT, based on the work done by

11  Bayer and Samama et al."

12          Do you see that?

13      A.    I do, yes.

14      Q.    Okay.  "Now I believe this

15  assay is available in the EU, and we are

16  trying to develop this assay in the

17  U.S.," correct?

18      A.    That is correct.

19      Q.    And that was your

20  understanding about what was going on

21  back in July of 2012, right?

22      A.    That is correct.

23      Q.    Has that assay been approved

24  in the United States at this point?

Protected - Subject to Further Protective Review

1          A.    Not as far as I know.  No.

2          Q.    Okay.  Now -- but you had an

3     understanding, obviously, when you wrote

4     this e-mail in July of 2012 that Bayer

5     had done work with Samama to look at the

6     use of an anti-Factor Xa assay versus PT

7     in measuring rivaroxaban levels, right?

8          A.    That was my understanding,

9     yes.

10         Q.    Okay.  You then state, "If

11    PT is used, then recommend using the PT

12    assay with Neoplastin Plus reagent (as

13    that was the reagent used throughout

14    rivaroxaban development)."

15              Do you see that?

16         A.    Yes.

17         Q.    And you were making that

18    recommendation with respect to the

19    subject of therapeutic monitoring,

20    correct?

21         A.    Based on that, yes.

22         Q.    Okay.  Now, a couple more

23    questions about this document.  Number 3

24    talks about fragile population.

1            Do you see that?

2        A.    I do, yes.

3        Q.    Okay.  When you were talking

4    about a fragile population, and you

5    referenced Phase II DVT/PE data, what

6    would you consider to be a fragile

7    population?

8        A.    I would have to go back and

9    look at the exact definition of what was

10   considered fragile in the Phase II DVT

11   data, but it generally it was combination

12   of age and renal function.  So again, age

13   and some renal function.  The exact

14   components, I'll have to go back and take

15   a look at.

16       Q.    If you look with me at

17   Number 5.  It says "African-American

18   subjects."  Do you see that one at the

19   bottom of the page?

20       A.    I do, yes.

21       Q.    Okay.  You say, "Although

22   there may be limited safety/efficacy on

23   black subjects, note that there is no

24   difference in the rivaroxaban

Protected - Subject to Further Protective Review

1   exposures...  Perhaps this can help in a

2   pinch.  Note subject numbers are low."

3          Do you see that?

4      A.    I do, yes.

5      Q.    Okay.  Now, just a couple of

6   questions so I can understand the context

7   of this.

8          One is, was there a question

9   being raised by people in these mock

10  AdComs about the PK or PD issues with the

11  drug in African-American patients?

12     A.    Not that I remember

13  specifically, but looking at ethnicity

14  type differences is always a question

15  that comes up in any clinical development

16  program.  So in doing your due diligence,

17  you want to be able to assess that the

18  clinical pharmacology from an

19  African-American to a Caucasian to an

20  Asian or so forth and their genetic

21  makeup is similar.

22     Q.    And, in fact, there was some

23  ethnicity differences that were found

24  with respect to Japanese patients for

1  example, correct?

2        A.    I believe Bayer had shown

3  that there was some minor differences

4  between the two populations.

5        Q.    That was confirmed in the

6  J-ROCKET Phase III clinical study,

7  correct?

8        A.    I would have to refer back

9  to my Bayer colleagues in regards to

10  exactly was seen with regard to that

11  study.  I'm not that familiar with it.

12        Q.    Did you ever look at the PK

13  information coming out of that J-ROCKET

14  study to see whether it was consistent

15  with the idea that there was an ethnic

16  difference for Japanese patients?

17        A.    I focused more on the pool

18  analyses that were done by Bayer on an

19  ongoing basis when they took all that

20  ethnicity data they had from their trials

21  specific to the pharmacokinetic and

22  pharmacodynamic information.  Whether or

23  not that included, again, patients from

24  the J-ROCKET, or the Japanese program, I

Protected - Subject to Further Protective Review

1    can't speak to specifically that.

2              But I focused more on the

3    pooled analyses that included all of the

4    data collected to date.

5         Q.    And one of the things that

6    you bring up here is that the subject

7    numbers for African-American patients was

8    low, correct?

9         A.    That's what I mention here,

10   yes.

11        Q.    Okay.  And do you know

12   what -- the reason why there was a low

13   number of African-American subjects in

14   the population?

15        A.    No.  I believe this is

16   referencing a pharmacokinetic -- a small

17   Phase I pharmacokinetic and

18   pharmacodynamic study to assess the

19   differences in ethnicity versus a larger

20   trial.

21        Q.    Okay.  So you think you are

22   referring to a lower -- a small study

23   that was done early on in Phase I?

24        A.    I believe so, because that

Protected - Subject to Further Protective Review

1   is typically what is done.  You run a

2   short study to assess the PK differences

3   in those population.

4         Q.    Okay.  Do you know what the

5   percentage of African-American patients

6   were in the ROCKET trial?

7         A.    I don't off the top of my

8   head, no.

9         Q.    Number 6 on the next page

10  talks about "effects of extreme weights,

11  greater than 400 kilograms... Granted, I

12  doubt we have any data on these types of

13  extreme weights.  We have at least some

14  data from the DVT patients from the Phase

15  II program we could simulate."

16           Did you ever do any work in

17  looking at the effect of the drug in

18  patients that are either -- have extreme

19  high body weights or extreme low body

20  weights?

21        A.    I believe the effect of

22  extreme body weights was both assessed

23  from a pharmacokinetic and dynamic point

24  of view in a Phase I study that was done

Protected - Subject to Further Protective Review

1    by Bayer.  So they did assess the

2    extremes.  And that, results from those

3    trials or that trial did end up

4    supporting the claims within the label.

5              Additionally, we went back,

6    and there's been other publications in

7    the Phase III trial to look the different

8    safety and efficacy endpoints from the

9    trials for those that have been

10   categorized as having extreme weight or

11   obesity.  Again, that's all published.

12             MR. OVERHOLTZ:  Why don't we

13        stop for the day and we'll pick

14        back up in the morning.

15             THE VIDEOGRAPHER:  The time

16        is 5:45 p.m.  We are going off the

17        record.

18             (Witness excused.)

19             (Deposition adjourned at

20        approximately 5:45 p.m.)

21

22

23

24

Protected - Subject to Further Protective Review

1

2                     CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, KENNETH TODD MOORE, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12
        _____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter and Notary Public
        Dated:  July 12, 2016

15

16

17          (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)

22

23

24

1          INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4      over carefully and make any necessary

5      corrections.  You should state the reason

6      in the appropriate space on the errata

7      sheet for any corrections that are made.

8              After doing so, please sign

9      the errata sheet and date it.

10             You are signing same subject

11     to the changes you have noted on the

12     errata sheet, which will be attached to

13     your deposition.

14             It is imperative that you

15     return the original errata sheet to the

16     deposing attorney within thirty (30) days

17     of receipt of the deposition transcript

18     by you.  If you fail to do so, the

19     deposition transcript may be deemed to be

20     accurate and may be used in court.

21

22

23

24

Protected - Subject to Further Protective Review

1                    —   —   —   —   —   —

                     E R R A T A

2                    —   —   —   —   —   —

3

4     PAGE   LINE   CHANGE

5     _____  _____  _____

6            REASON: _____

7     _____  _____  _____

8            REASON: _____

9     _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

Protected - Subject to Further Protective Review

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 403, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    KENNETH TODD MOORE                    DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Protected - Subject to Further Protective Review

1                    LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____