# EXHIBIT-19

# FILED UNDER SEAL

# EXHIBIT-19

## FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF LOUISIANA
 3              MDL No. 2592, Section L
 4    ***********************************************
 5    IN RE:  XARELTO (RIVAROXABAN)
 6    PRODUCTS LIABILITY LITIGATION
 7    THIS DOCUMENT RELATES TO ALL CASES
 8    ***********************************************
 9                   - PROTECTED -
10
        - SUBJECT TO FURTHER PROTECTIVE REVIEW -
11
                      — — —
12
              TUESDAY, MARCH 1, 2016
13
               ANDREA DERIX, Ph.D.
14
                    VOLUME I
15                    — — —
16
17        Videotaped deposition of ANDREA DERIX,
      Ph.D., held at the law offices of Allen &
18    Overy LLP, Apollolaan 15, 1077 AB Amsterdam,
      The Netherlands, commencing at 8:52 a.m., on
19    the above date, before Michael E. Miller,
      Fellow of the Academy of Professional
20    Reporters, Registered Diplomate Reporter,
      Certified Realtime Reporter, and Realtime
21    Systems Administrator.
22                    — — —
23         GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com
```

Protected - Subject to Further Protective Review

```
 1   A P P E A R A N C E S:
 2       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR PA
 3       BY:  NEIL E. "NED" MCWILLIAMS, ESQUIRE
                  nmcwilliams@levinlaw.com
 4            EMMIE PAULOS, ESQUIRE
                  epaulos@levinlaw.com
 5       316 South Baylen Street
         Suite 600
 6       Pensacola, Florida 32502-5996
         (850) 435-7000
 7       Counsel for Plaintiffs
 8
         SCHLICHTER BOGARD & DENTON LLP
 9       BY:  ROGER C. DENTON, ESQUIRE
                  rdenton@uselaws.com
10            ASHLEY BRITTAIN-LANDERS
                  alanders@uselaws.com
11       100 South Fourth Street
         Suite 900
12       St. Louis, Missouri 63102
         (314) 621-6115
13       Counsel for Plaintiffs
14
         FELDMAN & PINTO
15       BY:  ROSEMARY PINTO, ESQUIRE
                  rpinto@feldmanpinto.com
16       1604 Locust Street, Suite 2R
         Philadelphia, Pennsylvania 19103
17       (215) 546-2604
         Counsel for Plaintiffs
18
19       KAYE SCHOLER LLP
         BY:  WILLIAM HOFFMAN, ESQUIRE
20            william.hoffman@kayescholer.com
         The McPherson Building
21       901 Fifteenth Street, N.W.
         Washington, D.C. 20005
22       (202) 682-3500
         Counsel for Defendant Bayer Pharmaceuticals
23
24
```

Protected - Subject to Further Protective Review

```
 1   A P P E A R A N C E S:
 2       BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
         BY:   STEVEN E. DERRINGER, ESQUIRE
 3             steven.derringer@bartlit-beck.com
               JEANNIE TINKHAM, ESQUIRE
 4             jean.tinkham@bartlit-beck.com
         Courthouse Place
 5       54 West Hubbard Street
         Chicago, Illinois 60610
 6       (312) 494-4400
         Counsel for Defendant Bayer Pharmaceuticals
 7
 8       DRINKER BIDDLE & REATH LLP
         BY:   JULIE L. TERSIGNI, ESQUIRE
 9             julie.tersigni@dbr.com
         600 Campus Drive
10       Florham, Park, New Jersey 07932
         (973) 549-7350
11       Counsel for Defendants Janssen and
         Johnson & Johnson
12
13
      ALSO PRESENT:
14
         EDDA DOLZER, Bayer
15       LARISSA EUSTICE, Bayer
         MAX THUEMMEL, Bayer
16
17
      STAND-BY INTERPRETER:
18
         SYBILLE VON MÜLMANN
19
20
      VIDEOGRAPHERS/TECHNICIANS:
21
         DAVID LANE, Primary Videographer
22       OSWIN FRAAI, Secondary Videographer
         EVAN J. WOLFE, Trial Technician
23
                        — — —
24
```

Protected - Subject to Further Protective Review

1                          INDEX
2
     PROCEEDINGS                                10
3
4
     EXAMINATION OF ANDREA DERIX, Ph.D.:
5
          BY MR. McWILLIAMS                     11
6
          BY MR. DENTON                        375
7
8
     CERTIFICATE                               418
9
     ERRATA                                    420
10
     ACKNOWLEDGMENT OF DEPONENT                421
11
     LAWYER'S NOTES                            422
12
13
14
15
16
17
18
19
20
21
22
23
24

Protected - Subject to Further Protective Review

```
 1                    DEPOSITION EXHIBITS
                     ANDREA DERIX, Ph.D.
 2                     March 1, 2016
 3     NUMBER              DESCRIPTION            PAGE
 4     Derix-1    Xarelto Issue Report,             21
                  XARELTO_BPAG_25627238 -
 5                XARELTO_BPAG_25627242,
                  Ref. 3395732
 6
       Derix-2    E-mail(s) re: Review of           30
 7                Updated Assessment Report of
                  LEG 037,
 8                XARELTO_BHCP_08001755 -
                  XARELTO_BHCP_08001755,
 9                Ref. 3402466
10     Derix-3    Rapporteur's Updated Draft        31
                  Assessment Report,
11                XARELTO_BHCP_08001757 -
                  XARELTO_BHCP_08001802,
12                Ref. 3402467
13     Derix-4    EMA Assessment Report             50
                  [No Bates]
14
       Derix-5    E-mail(s) re: U.S. FDA Daily      58
15                Digest Bulletin,
                  XARELTO_JANSSEN_14522268 -
16                XARELTO_JANSSEN_14522271,
                  Ref. 2956104
17
       Derix-6    E-mail(s) re: NDA 202439 -        64
18                Clinical IR,
                  XARELTO_JANSSEN_04932509,
19                Ref. 748350
20     Derix-7    E-mail(s) re: BMJ query about     71
                  INRatio device,
21                XARELTO_JANSSEN_15527978 -
                  XARELTO_JANSSEN_15527979,
22                Ref. 3019911
23
24
```

Protected - Subject to Further Protective Review

```
 1                    DEPOSITION EXHIBITS
 2    Derix-8      E-mail(s) re: ROCKET AF and        90
                   target INR,
 3                 XARELTO_JANSSEN_14557985 -
                   XARELTO_JANSSEN_14557986,
 4                 Ref. 2959513
 5    Derix-9      E-mail(s) re: 1st Draft EMA       112
                   Response to Request 2,
 6                 XARELTO_JANSSEN_16381911,
                   Ref. 3394816
 7
      Derix-10     Response to EMA Request,          113
 8                 XARELTO_JANSSEN_16381912 -
                   XARELTO_JANSSEN_16381920,
 9                 Ref. 3394817
10    Derix-11     ROCKET AF Task Force Chat         121
                   Transcript,
11                 XARELTO_BHCP_07993872 -
                   XARELTO_BHCP_07993873,
12                 Ref. 3396352
13    Derix-12     Xarelto Teams Overview Org        137
                   Chart,
14                 XARELTO_BHCP_08065503 -
                   XARELTO_BHCP_08065505,
15                 Ref. 3407882
16    Derix-13     E-mail(s) re: References for      138
                   INR ratio specifications,
17                 XARELTO_JANSSEN_1552217 -
                   XARELTO_JANSSEN_1552218,
18                 Ref. 3109548
19    Derix-14     E-mail(s) re: IND 75238,          181
                   XARELTO_BHCP_08009903 -
20                 XARELTO_BHCP_08009904,
                   Ref. 3402844
21
      Derix-15     FDA Information Request,          182
22                 XARELTO_BHCP_08009905 -
                   XARELTO_BHCP_08009908,
23                 Ref. 3402845
24
```

Protected - Subject to Further Protective Review

```
 1              DEPOSITION EXHIBITS
 2    Derix-16   E-mail(s) re: POC/SAE,          187
                 XARELTO_JANSSEN_03933641 -
 3               XARELTO_JANSSEN_03933643,
                 Ref. 671161
 4
      Derix-17   E-mail(s) re: ROCKET AF,        198
 5               XARELTO_JANSSEN_13596622 -
                 XARELTO_JANSSEN_13596623,
 6               Ref. 2840934
 7    Derix-18   E-mail(s) [No Subject],         201
                 XARELTO_JANSSEN_07545453 -
 8               XARELTO_JANSSEN_07545456,
                 Ref. 1322746
 9
      Derix-19   E-mail(s) Another POC          209
10               Problem,
                 XARELTO_JANSSEN_11444538 -
11               XARELTO_JANSSEN_11444539,
                 Ref. 2416273
12
      Derix-20   E-mail(s) re: ROCKET - INR      219
13               Draft Proposal,
                 XARELTO_JANSSEN_04961856,
14               Ref. 753519
15    Derix-21   ROCKET Proposal for QC Checks   219
                 on HemoSense Device,
16               XARELTO_JANSSEN_04961857,
                 Ref. 753520
17
      Derix-22   ROCKET Proposal for            219
18               Additional Education on
                 HemoSense Device,
19               XARELTO_JANSSEN_04961858,
                 Ref. 753521
20
      Derix-23   Dear ROCKET Investigator       232
21               Letter,
                 XARELTO_JANSSEN_07050218,
22               Ref. 1052801
23
24
```

Protected - Subject to Further Protective Review

```
 1                    DEPOSITION EXHIBITS
 2      Derix-24    E-mail(s) re: INR check for      238
                    patient 111178,
 3                  XARELTO_JANSSEN_14556639,
                    Ref. 2959134
 4
        Derix-25    Blinded INRs from Covance        245
 5                  Spreadsheet,
                    XARELTO_JANSSEN_14724821 -
 6                  XARELTO_JANSSEN_14724826,
                    Ref. 2973209
 7
        Derix-26    E-mail(s) re: Your E-mail of     260
 8                  11/6/06 regarding rivaroxaban
                    SPAF protocol,
 9                  XARELTO_JANSSEN_13403496 -
                    XARELTO_JANSSEN_13403502,
10                  Ref. 2822412
11      Derix-27    E-mail(s) re: Ad Hoc Xarelto     271
                    JSC - PK/PD Analysis,
12                  XARELTO_JANSSEN_15329030,
                    Ref. 3064874
13
        Derix-28    Model Based E-R Analysis         272
14                  PowerPoint,
                    XARELTO_JANSSEN_15329031,
15                  Ref. 3064875
16      Derix-29    Feedback from the EMA            281
                    PowerPoint [No Bates]
17
        Derix-30    E-mail(s) re: To review at       301
18                  our update today,
                    XARELTO_BPAG_25183362,
19                  Ref. 3375706
20      Derix-31    Draft TDM Position               301
                    PowerPoint,
21                  XARELTO_BPAG_25183363,
                    Ref. 3375707
22
        Derix-32    CDER Summary Review              326
23                  [No Bates]
24
```

Protected - Subject to Further Protective Review

```
1              DEPOSITION EXHIBITS
2    Derix-33   2013 Mück et al Publication      334
3    Derix-34   NOAC Dosing: Pharmacometric      348
                Guidance Regulatory
4               Considerations PowerPoint
                [No Bates]
5
     Derix-35   E-mail(s) re: Xarelto - CHMP     369
6               Request on TDM,
                XARELTO_JANSSEN_15368506 -
7               XARELTO_JANSSEN_15368511,
                Ref. 3071268
8
     Derix-36   CHMP Assessment Report for       369
9               LEG 036,
                XARELTO_JANSSEN_15368512 -
10              XARELTO_JANSSEN_15368533,
                Ref. 3071269
11
12                    --o0o--
13
14
15
16
17
18
19
20
21
22
23
24
```

Protected - Subject to Further Protective Review

```
 1                    PROCEEDINGS

 2              (March 1, 2016 at 8:52 a.m.)

 3              THE VIDEOGRAPHER:  We're now on

 4       the record.  My name is David Lane.

 5       I'm a videographer for Golkow

 6       Technologies.  Today's date is

 7       March 1st, 2016.  Our time is

 8       8:52 a.m.

 9              This deposition is taking place

10       in Amsterdam, Netherlands, in the

11       matter of Xarelto Products Liability

12       Litigation.

13              Our deponent today is Andrea

14       Derix, Ph.D.

15              Counsel will be noted on the

16       stenographic record.

17              Our court reporter today is

18       Mike Miller, and he will now swear in

19       the interpreter as well as the

20       witness.

21              (Interpreter duly sworn.)

22              (Witness duly sworn.)

23              ///

24              ///
```

Protected - Subject to Further Protective Review

```
 1                   ANDREA DERIX, Ph.D.,

 2                 having been duly sworn,

 3                 testified as follows:

 4                      EXAMINATION

 5   BY MR. McWILLIAMS:

 6         Q.      Good morning.

 7         A.      Good morning.

 8         Q.      Would you please state your

 9   full name for the record?

10         A.      My name is Andrea Derix.

11         Q.      And are you a doctor?

12         A.      I'm a Ph.D.  I'm a doctor of

13   natural sciences.  My educational background

14   is I'm a pharmacist and with a Ph.D. in

15   medicinal chemistry.

16         Q.      Okay.  Is it okay if I refer to

17   you as "Dr. Derix"?

18         A.      Yes, that's okay.

19         Q.      Okay.  Dr. Derix, where are you

20   presently employed?

21         A.      Could you please repeat?

22         Q.      Where are you presently

23   employed?  Where do you work?

24         A.      I work at Bayer Research and
```

Protected - Subject to Further Protective Review

1    Development Center in Wuppertal, Germany.

2        Q.    And how long have you worked

3    there?

4        A.    I'm with Bayer since 2004.

5        Q.    Okay.  And what do you do with

6    Bayer?

7        A.    At present I'm leading the

8    global program team for Xarelto.  I'm also

9    heading the entire program management group

10   for thrombosis.  Bayer has other early

11   research projects in thrombosis ongoing, and

12   so I'm also responsible for those.

13       Q.    What does that mean, to lead

14   the global program team?

15       A.    I'm leading a team of -- a

16   cross-functional team of experts.  In the

17   team I have representatives from regulatory

18   affairs, from clinical medical affairs,

19   pharmacovigilance, marketing and market

20   access functions; and we work together in all

21   matters that are related to development

22   activities of Xarelto, leading the lifecycle

23   management activities, but also maintenance

24   activities, all activities that are required

Protected - Subject to Further Protective Review

1    to keep Xarelto adequately according to the

2    regulations on the market.

3          Q.     Okay.  And do those various

4    functional teams you just identified, do they

5    report to you?

6          A.     No, they don't report directly

7    to me, so there's a dotted line reporting.

8    They report directly into the functional

9    heads, so supervisors in the expert

10   functions.

11         Q.     Okay.  And have you ever had

12   your deposition taken before?

13         A.     No, this is my first

14   deposition.

15         Q.     Okay.  I'll try to make it as

16   painless as possible.  If you ever need to

17   take a break for any reason, you just let us

18   know.  Sometimes lawyers have a tendency to

19   do a marathon session, so if you ever just

20   need a break, just let us know, okay?

21         A.     Okay.

22         Q.     All right.  Can you tell us a

23   little bit about your education.  I

24   understand you have a master's degree in drug

Protected - Subject to Further Protective Review

1   regulatory affairs; is that correct?

2       A.     Yes, that's correct.  After

3   finishing my science work at university, I

4   entered into pharmaceutical industry, and my

5   first job employment was in regulatory

6   affairs, at the time at Takeda Pharma.

7              And during the time I was

8   employed at Takeda Pharma, I entered into the

9   master's courses at University of Bonn, and I

10  finished my master's at the time when I was

11  already employed as a regulatory manager at

12  the time.

13             At that time I was responsible

14  for local regulatory affairs, that means

15  everything that was going on in Germany,

16  Austria and Switzerland.  Later on in my next

17  job employment at PAION, I started working on

18  a global basis.

19             I was responsible for

20  regulatory affairs worldwide at that company.

21  It's a small biotech company, also located in

22  Aachen, and was focused at the time on

23  research in stroke treatment, so acute stroke

24  treatment.  We had projects in that area.

Protected - Subject to Further Protective Review

1            And in 2004, I then entered at

2    Bayer, also as a regulatory expert, so the

3    functional name was regulatory strategist at

4    the time.  I was responsible for some early

5    development programs before.  I then, after

6    one year, became part of the Xarelto program

7    team as the regulatory representative in that

8    team.

9            As the Xarelto program grew

10   over time, we had developments in several

11   indications in parallel.  I built up a small

12   team of regulatory experts and led this team,

13   and that's what I did until 2011.

14            Then I moved into another area

15   within Bayer.  At the time I was leading the

16   regulatory affairs group women's sales before

17   I then returned back into the Xarelto team in

18   a new function, and since then I'm leading

19   the program, and I'm no longer the regulatory

20   expert since then.  So I have a new

21   regulatory expert in the team, my successor.

22   But I'm now responsible for the entire

23   program development.

24        Q.     Thank you.

1           Going back to your education,

2   can you tell us a little bit about what the

3   discipline is of drug regulatory affairs?

4   What did you learn in achieving that degree?

5           A.     You learn the regulations that

6   apply worldwide in regulatory affairs law,

7   the pharmaceutical medicine legislation, and

8   then you also learn about the guidelines that

9   apply for pharmaceutical legislation, not

10  only the high-level legal text, but there is

11  also a set of guidances that are already,

12  really quite scientific, so it goes quite

13  into the detail of science already in those

14  legislations, and that has to also be

15  understood.  And that's what was part of this

16  program.

17          Also, regulatory affairs is an

18  area where you don't have really the

19  expertise as a scientist any longer, so you

20  rely very much on the scientists you work

21  with.  But you have to connect them, and you

22  have to make sure that they have appropriate

23  dialogue that you get some guidance on the

24  pharmaceutical legislation, the background,

Protected - Subject to Further Protective Review

1    and, so it's also quite a lot of

2    communication involved in that job.

3         Q.    So between your education and

4    your experience at Bayer, is it fair to say

5    you're knowledgeable on the topic of the type

6    of information that should be shared with

7    regulators and when that information should

8    be shared?

9              MR. HOFFMAN:  Objection to the

10        form of the question.

11        A.    I said already that I, yeah,

12   left this job five years ago, almost now, and

13   I'm now in a new responsibility, so I

14   certainly probably don't have the latest

15   knowledge because I did not follow any longer

16   this special area.

17             But in general, I have this

18   educational background, that's correct.

19   BY MR. McWILLIAMS:

20        Q.    You have the educational

21   background.  You also have the real world

22   experience of dealing with regulatory affairs

23   while at Bayer; is that fair?

24        A.    Yes, I have the experience of

Protected - Subject to Further Protective Review

1    interacting with health authorities also from

2    my past work.

3                (Clarification requested by the

4         reporter.)

5    BY MR. McWILLIAMS:

6         Q.      In one of your prior answers

7    you referred to yourself as a "regulatory

8    expert."  Did I hear you correctly?

9         A.      Yes, I kind of named it in a

10   different way, so sometimes the title,

11   regulatory affairs manager, regulatory

12   affairs strategist, or regulatory affairs

13   expert, so that's not a -- sort of a fixed

14   job title but different titles are used.

15        Q.      Understood.  And I understand

16   you also have a Ph.D. in medicinal chemistry

17   and pharmacology; is that correct?

18        A.      That's correct, yes.

19        Q.      And can you just briefly

20   explain to the jury what that discipline is?

21   What is pharmacology, generally?

22        A.      In my Ph.D. thesis, I worked on

23   a drug class that were supposed to be

24   antihypertensive drugs; and what I did, I did

Protected - Subject to Further Protective Review

1  chemical modifications to a certain molecule

2  in order to see how these chemical

3  modifications changed the properties.  And I

4  did pharmacological experiments to test the

5  properties.  So I looked what type of

6  molecule had higher antihypertensive activity

7  other than another one.

8           But in that context, I only

9  did, yeah, a LEP test and animal tests, but

10  not really any clinical studies.  So that did

11  not involve -- because I'm not a medical

12  doctor, so I'm a natural scientist, and so

13  all the work I did scientifically was really

14  in the lab.

15      Q.    But in obtaining that degree,

16  you became generally familiar with some of

17  the broad topics of pharmacology, such as

18  pharmacokinetics, pharmacodynamics; is that

19  fair?

20           MR. HOFFMAN:  Objection to the

21       form of the question.

22           You may answer.

23      A.    No, that did not belong to this

24  because that's another specialty so it's very

Protected - Subject to Further Protective Review

1   complex, the whole area of pharmacology.  And

2   my expertise is not in pharmacokinetics or

3   pharmacodynamics.

4   BY MR. McWILLIAMS:

5       Q.    Okay.  But do you understand

6   what those two terms mean, what they are?

7       A.    Yeah, I understand what the

8   terms mean.

9       Q.    Okay.  Now, did there come a

10  point in time when you became personally

11  aware that a recalled device was used to

12  measure INR in the warfarin arm of the ROCKET

13  clinical trial?

14      A.    Yes.  I learned last September

15  from the colleagues -- our pharma colleague

16  internally who had got information from

17  Janssen, our colleagues and our partner

18  company in the U.S.; and they had received a

19  call from an external third party, and

20  started to look into this question.

21      Q.    Is it fair to say that you were

22  part of the team that was put together to

23  help investigate and respond to issues

24  surrounding that topic?

Protected - Subject to Further Protective Review

1       A.      Yes.  We founded a team, what

2  we call task force, and I was a member of the

3  team.  My -- I was not involved in all parts

4  because also, there again, we worked as a

5  team of experts, and some experts dealt with

6  more the analytical part, and other experts,

7  yeah, looked into different topics.  And we

8  regularly met and exchanged information.

9            MR. McWILLIAMS:  Well, let me

10       hand you what's being marked as

11       Derix-1, which is Record No. 3395732.

12            (Whereupon, Deposition Exhibit

13       Derix-1, Xarelto Issue Report,

14       XARELTO_BPAG_25627238 -

15       XARELTO_BPAG_25627242, Ref. 3395732,

16       was marked for identification.)

17  BY MR. McWILLIAMS:

18       Q.      Do you recognize this as a

19  Bayer document, a global issue management?

20       A.      Yes, I do.

21       Q.      And you see on the very first

22  page of this is dated September 30th, 2015?

23  On the very first page.

24            MR. HOFFMAN:  First page.

Protected - Subject to Further Protective Review

1          A.     Ah.  Yes.

2     BY MR. McWILLIAMS:

3          Q.     And that's the same month I

4     believe you said that you first learned about

5     the recalled device being used in ROCKET?

6          A.     That's correct.

7          Q.     Okay.  And you see that this is

8     an issue report relating to the topic we've

9     been discussing the last few minutes?  It

10    says, "Xarelto - Potential applicability of

11    Alere INRatio Monitor System recall notice."

12               Do you see that on the first

13    page?

14               MR. HOFFMAN:  First page.

15    BY MR. McWILLIAMS:

16         Q.     And, again, one other thing,

17    Dr. Derix, I understand this is your first

18    deposition.  You can always look on the

19    screen there or you can look on the screen

20    right here.  Mr. Wolfe usually does a pretty

21    good job of pointing you to the area I'm

22    discussing, okay?

23         A.     Okay.

24         Q.     So, again --

Protected - Subject to Further Protective Review

1        A.      I prefer the paper.

2        Q.      Of course.  We all prefer the

3    paper, but just as an aid.

4        A.      Yeah.

5        Q.      So on the first page, you see

6    this is titled "Issue Report," discussing the

7    issue we've been discussing the last couple

8    of minutes?

9        A.      Yes, I see.  That's correct.

10        Q.      And then there's a team

11    identified; is that correct?

12        A.      Yes.  That's the Bayer internal

13    team that we -- that ran the issue management

14    process and met frequently, yes.

15        Q.      And nine individuals are

16    identified as being a member of this team,

17    you being one of them; is that correct?

18        A.      That's correct, yes.

19        Q.      And you are identified as the

20    GD - global program head.  Is that global

21    development - global program head?

22        A.      That's correct, yes.

23        Q.      Okay.  And the document

24    continues to discuss background information

Protected - Subject to Further Protective Review

1    on the issue; is that correct?

2         A.    Yes, that's correct.

3         Q.    And if we look at this first

4    bullet point, for example, on the second page

5    where it says, "On September 9th, 2015

6    through an inquiry from a journalist working

7    for the British Medical Journal, the BMJ, our

8    development partner Janssen became aware of

9    the potential applicability of a recall

10   notice of the Alere INRatio and

11   INRatio2 PT/INR Monitor System."

12             Do you see that?

13        A.    Yes, I see that.

14        Q.    And again, that's the same

15   issue we've been discussing the last few

16   minutes?

17        A.    Yes.

18        Q.    Okay.  In the second bullet

19   point, it goes on.  It says, "The BMJ

20   reporter mentioned that she was 'interested

21   in the use of diagnostics in clinical trials.

22   The focus may be on ROCKET and if the

23   warfarin arm used a potentially defective

24   point-of-care device for managing warfarin.'

Protected - Subject to Further Protective Review

1   She asked if we 'used blood draws for

2   analysis at a central lab to evaluate the

3   performance of the INRatio point of care.'"

4           Did I read that correctly?

5       A.      You read that correctly, yes.

6       Q.      Okay.  If you go to the next

7   page, page 3, this is the draft messages on

8   what Bayer would say to people that would ask

9   about this issue.  Is that a fair

10  characterization?

11      A.      Yes.  It says it's a draft and

12  that it's still under discussion at that

13  point of time when it was written here, so,

14  uh-huh.

15      Q.      Were under discussion, but on

16  the very first page it does say the status of

17  this report is final; is that correct?

18      A.      Yeah, it refers to what -- I

19  mean, it's somehow like minutes of one

20  meeting and -- that we got so it's certainly

21  considered as final, but not -- and it

22  says -- but it says clearly here that the

23  draft key messages that were discussed here

24  are still under discussion with the partner

Protected - Subject to Further Protective Review

1   Janssen, and -- but you can see from the list

2   of participants, they are all Bayer internal

3   participants.  So this was a Bayer internal

4   team, and we had another task force team

5   meeting with Janssen.

6          Q.     And were you a member of that

7   joint team?

8          A.     Yes, I was a member of that

9   joint team.

10         Q.     And if you go to page 4,

11  please, you'll see the section titled

12  "Communication to Health Authorities."  You

13  see where it says on September 23rd and 24th,

14  Bayer and Janssen provided notification to

15  health authorities including EMA and FDA?

16         A.     Yes, I see that.

17         Q.     So is that when Bayer and

18  Janssen first notified global regulators

19  about this potential issue?

20         A.     I would have to check this

21  exactly with my colleagues, because I'm no

22  longer the person who is doing the regulatory

23  interactions.  But I assume it's correct in

24  terms of providing a written notice, so it

Protected - Subject to Further Protective Review

 1   may well be that the colleagues already had

 2   an informal phone call beforehand; so I would

 3   have to check that because I don't remember

 4   exactly.

 5        Q.     Okay.  And I understand there

 6   was quite a bit of back and forth that

 7   happened after you formally notified the

 8   regulators, and then ultimately, on

 9   February 5th of this year, 2016, EMA issued

10   its formal assessment report; is that

11   accurate?

12        A.     Yes, that's correct, because

13   certainly we tried to provide as much

14   information as we could that we have

15   confirmed so far to the health authorities,

16   and the health authority, the European health

17   authority also came back with questions in

18   the course, yeah, of the review.  And we did

19   additional work that they requested before

20   they finally could conclude.

21        Q.     All right.  And prior to EMA

22   issuing their final assessment report, is it

23   fair to say that you and your colleagues at

24   Bayer were provided opportunity to edit and

Protected - Subject to Further Protective Review

1  provide input on the actual EMA assessment

2  report?

3       A.     No, not at Bayer.  That's not

4  typical that we provide edits to the

5  assessment report, but it's just a working

6  document where the assessment report also

7  includes questions that they,

8  rapporteur/co-rapporteur, are asking, and

9  those questions directly work, and so we have

10 to address the questions.  We can see what

11 they have already assessed and -- but then we

12 also can see what the new questions are,

13 whether they would like to get more

14 information, and that's where we respond to

15 them.

16      Q.     And, yes, ma'am, and I'm

17 familiar with the process, but isn't it also

18 true at the end of that process, prior to --

19 once the process has concluded, but prior to

20 EMA issuing its formal assessment report, you

21 and your colleagues at Bayer were provided an

22 opportunity to edit and make changes that you

23 felt were necessary to that EMA assessment

24 report?

Protected - Subject to Further Protective Review

1          MR. HOFFMAN:  Objection to the

2      form of the question.

3      A.     That's not correct.  As I said,

4  there is a round of review, yes, but EMA only

5  accepts comments that are related to certain

6  rules, I mean privacy rules, for example,

7  which are very high in Europe, and we cannot

8  change the content.  We can only ask them if

9  they are to redact certain information, names

10  primarily, that fall under the privacy rule.

11  BY MR. McWILLIAMS:

12      Q.     So you weren't provided an

13  opportunity to rephrase any of the wording in

14  the edits?

15      A.     Only in case it is very -- very

16  misunderstanding or it's very clear that a

17  word is missing in a sentence, just -- and

18  then we can ask if that's the correct

19  understanding that we're dismissing or a

20  sentence somehow is not easy to understand,

21  and it's always EMA's decision then to -- if

22  they change it, but we can just point at it.

23      Q.     Right.  So you did have an

24  opportunity to provide -- if you saw anything

Protected - Subject to Further Protective Review

1  that you felt was in error or misleading or

2  inaccurate, you had an opportunity to point

3  that out to EMA prior to them issuing their

4  final assessment report, correct?

5            MR. HOFFMAN:  Objection, asked

6       and answered.

7       A.    As I said, we could provide

8  suggestions to redact privacy information and

9  also, yeah, if we found something which is

10  not in line to -- for example, a prior

11  document, so it's not that you can change

12  content or you can change phrases.  It's

13  really kind of a -- yeah.  How do you say it?

14  It's a -- if you have --

15            MR. McWILLIAMS:  You can use

16       the interpreter.

17            (Interpretation.)

18            THE INTERPRETER:  Spelling

19       errors.

20            (Whereupon, Deposition Exhibit

21       Derix-2, E-mail(s) re: Review of

22       Updated Assessment Report of LEG 037,

23       XARELTO_BHCP_08001755 -

24       XARELTO_BHCP_08001755, Ref. 3402466,

Protected - Subject to Further Protective Review

1           was marked for identification.)

2                 (Whereupon, Deposition Exhibit

3           Derix-3, Rapporteur's Updated Draft

4           Assessment Report,

5           XARELTO_BHCP_08001757 -

6           XARELTO_BHCP_08001802, Ref. 3402467,

7           was marked for identification.)

8    BY MR. McWILLIAMS:

9           Q.     All right.  Let me see if I can

10   refresh your memory as to the process.  I'm

11   going to now hand you what's been marked as

12   Derix-2 and Derix-3, which is also Record

13   Nos. 3402466 and 3402467.

14               And, Dr. Derix, I'll represent

15   to you that these are -- this is an

16   attachment to the e-mail.  It's based on

17   information provided by your attorneys.

18               So do you have Derix Exhibit 2

19   and Derix Exhibit 3 in front of you?

20          A.     2 and 3, yes.

21          Q.     Yeah.  So let's look at Derix

22   Exhibit 2 first, which is an e-mail dated

23   January 28th, 2016; is that correct?

24          A.     Yes, that's correct.

Protected - Subject to Further Protective Review

1    Q.    And this an e-mail from Sabine

2    Frenzen; is that correct?

3    A.    That's correct.

4    Q.    And that's to you and others at

5    Bayer; is that correct?  Is that your name,

6    Andrea Derix?

7    A.    That's correct, uh-huh.

8    Q.    And the subject line is "Review

9    of updated Assessment report of LEG 37 (POC

10   device)"?

11   A.    Yes.

12   Q.    Okay.  And then what the e-mail

13   that was written to you reads, "Now that the

14   procedure is nearly finalized, we will be

15   asked by EMA to review the assessment report

16   that will be published afterwards due to the

17   high public interest of this topic.

18         "We do not have the final CHMP

19   report in our hands yet but would like to ask

20   you to review the attached document carefully

21   and mark everything that you feel should be

22   kept confidential or that should be

23   rephrased.  We assume that the final report

24   won't differ much from the one currently

Protected - Subject to Further Protective Review

1    available."

2              Did I read that correctly?

3        A.      You read it correctly, yes.

4        Q.      And did you follow the

5    recommendation of Ms. Frenzen and carefully

6    read and mark everything that you felt should

7    be kept confidential or rephrased?

8        A.      I reviewed the document, and --

9    but I do not recall that I had major topics

10   or any -- not any comment, but I would like

11   to comment on her e-mail here.  So it can be

12   easily misunderstood, because it has "should

13   be kept confidential," and that's exactly not

14   referring to something that should not be

15   shared with anyone or shared with public, so

16   it really is what I said, the privacy rules.

17              And -- yeah, and "should be

18   rephrased" is referring to what I just

19   explained, that if we find some difference

20   from prior reports or phrases that we felt

21   could be misunderstood or have obvious

22   mistakes, spelling mistakes, that we could

23   ask to -- EMA to change that.

24       Q.      Well, in addition to small

Protected - Subject to Further Protective Review

1   typos and spelling mistakes, if you saw

2   something that you felt was fundamentally

3   misleading, inaccurate or scientifically

4   invalid, a good scientist like you, you would

5   have raised it with EMA; is that fair?

6              MR. HOFFMAN:  Objection to the

7        form of the question.

8        A.     Typically, we would have raised

9   it already in the -- in the pre-work, because

10  we would have seen things in the

11  preassessment reports already.  And at the

12  time when we have the opportunity to submit

13  our responses to the questions, we could have

14  pointed that out.

15  BY MR. McWILLIAMS:

16       Q.     Yes.

17       A.     So that's not typically

18  happening here.

19       Q.     At this phase?

20       A.     At this phase.

21       Q.     So this would be the last and

22  kind of final chance to fix any errors that

23  you felt that -- you believed existed in the

24  document?

Protected - Subject to Further Protective Review

```
1        A.      As I just said, it is really

2   that we can point at things, misspelling and

3   some things.  But it's not really meant to

4   change the content.

5        Q.      Okay.  But you were provided

6   opportunity earlier to make sure that the

7   document contained truthful, accurate and

8   complete information; is that fair?

9               MR. HOFFMAN:  Objection to the

10        form of the question.

11       A.      I mean, it's always -- the

12  document is always issued by the health

13  authority, so we don't interfere in their

14  documents.  But when we see that there is

15  something in there where we could add with

16  information and just because we feel it's not

17  giving the full, yeah, picture or something

18  is missing, then we can submit this into our

19  responses.

20  BY MR. McWILLIAMS:

21       Q.      And if we look at Derix-3, this

22  is the attachment to the e-mail?

23       A.      Uh-huh.

24       Q.      And this is the draft
```

Protected - Subject to Further Protective Review

1  assessment report by EMA that you had the

2  opportunity to review and read and look for

3  any spelling errors or any other type of

4  errors; is that correct?

5          MR. HOFFMAN:  Objection to the

6      form of the question.

7      A.      Yes, this is a draft report

8  issued on January 22nd on the -- yeah,

9  post-authorization measure procedure.

10 BY MR. McWILLIAMS:

11     Q.      Did you, in fact, review the

12 draft report at the time it was provided to

13 you prior to the final report being issued in

14 February of 2016?

15     A.      I reviewed the part of the

16 document, but I only focused on those areas

17 where I really had the background on, so I

18 also told my colleague that I only looked at

19 the areas where I had been involved with in

20 the preparation phase, and so I did not

21 provide any comments to the -- the areas and

22 the analysis that the colleagues had done,

23 the clinical and statistical colleagues

24 because that's not my area of expertise.

Protected - Subject to Further Protective Review

1    Q.    Which areas did you focus on

2  that you had background in?

3    A.    I focused on the information,

4  basically the section where we described when

5  we learned about a potential interaction of

6  the -- or the potential impact of the Alere

7  recall notice and the ROCKET AF trial, and

8  also what we did in order to find out more

9  about the potential relation.

10            So that included, yeah,

11  contacts with Janssen because Janssen

12  colleagues were the primary contact to the

13  company in the area.  Janssen colleagues had

14  run the ROCKET AF trial from a clinical

15  operations perspective at the time, and so

16  they were certainly the primary contact.  And

17  I was somehow the contact to Janssen, and

18  when we had discussions, we needed documents

19  for Europe, I talked to Christopher Nessel

20  from Janssen how to get those documents from

21  the company in Europe because Bayer did not

22  have a direct contact to Europe.

23            So that was the part where I

24  focused on what we described what we did, and

Protected - Subject to Further Protective Review

1  but the other areas related to the analysis

2  that were done, I did not review because I

3  was not part of that group who decided on

4  the -- prepared for the analysis and proposed

5  and ran them and also, yeah, described and

6  drew conclusions from the analysis.

7      Q.    Aside from investigating when

8  it was first learned that there's a potential

9  impact of this recalled device used in the

10  trial and following up with your colleagues

11  at Janssen who were in direct contact with

12  Alere, what else, if anything, did you review

13  or have input on in this assessment report?

14      A.    That was what I -- what I had

15  input on, so I did not provide input to the

16  other sections.

17      Q.    You didn't have your own

18  responsibilities for the device

19  specifications?

20      A.    I was in a small subgroup

21  and -- or Janssen task force, together with

22  Sigmund Johnson, who led this group.  And

23  what we did, we looked up device

24  specification guidance, or we retrieved them

Protected - Subject to Further Protective Review

1    basically as a factfinding exercise and

2    provided them to the clinical team that ran

3    the sensitivity analysis.

4           Q.     Did you review that section of

5    the EMA assessment report?

6           A.     It's basically a copy of, yeah,

7    this -- it's somewhat a copy out of the ISO

8    guideline into it.

9           Q.     The International Standards

10   Organization guideline for point-of-care

11   devices?

12          A.     Yes.  Yes.

13          Q.     Okay.  Did you review that

14   section of the EMA assessment report?

15          A.     I just -- I mean, just this

16   part about the ISO standards that were put in

17   because we were kind of providing that

18   information to the team who then implemented

19   the knowledge into the analysis.

20          Q.     So why did you look up those

21   ISO standards?  What relevance, if any, do

22   they have to this topic?

23          A.     We looked at that because I

24   mentioned that there were -- I mean, we did

Protected - Subject to Further Protective Review

1    several things to analyze the potential

2    impact of the Alere recall notice to the

3    ROCKET AF data, and one part of the analysis

4    were the so-called sensitivity analysis were

5    based on the patient populations that were

6    described in the recall notice.  So those

7    patient populations that were proposed not to

8    use the Alere INR device in that recall

9    notice.

10            So we -- based on that

11   information, we prepared sensitivity analysis

12   excluding patients with that clinical

13   characteristics from the entire dataset, and

14   looked at whether the exclusion of those

15   patient populations from the entire dataset

16   changed the overall result.  So that was one

17   part.

18            And the second part was that in

19   the ROCKET AF trial, there had been samples

20   taken at two time points, plasma samples at

21   week 12 and week 24 initially for further

22   characterization of the pharmacokinetic

23   profile in this patient population.

24            And now the question was

```
1   whether these samples that have been taken

2   and measured at the central laboratory -- and

3   analyzed for coagulation parameters like, for

4   example, prothrombin time, whether they could

5   be used to compare results that might have

6   been measured with the Alere INR device at

7   the time point which was somehow in relation

8   to the measurement in the central lab.

9            And in that regard, we would

10  construct an analysis setting which is not

11  the same, but somehow similar to what you do

12  when you test new devices according to the

13  ISO standards.  Also when you test new

14  devices according to the ISO standards, the

15  new test device is tested against the

16  laboratory measurement, laboratory testing.

17           And so that's what made sense

18  to get oriented and to what, yeah, the ISO

19  guidance is describing as analytical

20  specification for this fixed type of setting,

21  and we could probably translate it to the

22  situation in the ROCKET AF trial, although

23  certainly the conditions are not the same as

24  if you'd run an analytical sample according
```

Protected - Subject to Further Protective Review

1   to ISO standards.

2        Q.    How is the situation different

3   than had you run analytical samples according

4   to ISO standards?

5        A.    I personally have to admit I

6   have not -- I'm not a medical device expert,

7   but -- and I really would want to refer to

8   experts for this kind of detailed

9   information, because I cannot give you the

10  full details.

11           But definitely, if you ran such

12  an experiment for the ISO standards, it's

13  really planned in time at the time of

14  measurement with the device and the plot

15  sampling time for the central laboratory

16  measurement much closer.

17           And also, in the clinical

18  trial, you can imagine we had, yeah, more

19  than 10,000 patients in the ROCKET trial, and

20  I don't recall the exact number of the

21  samplings here, but it was more than a

22  thousand, and they were taken at different

23  sites across the globe from patients.

24           And so it had to be transported

Protected - Subject to Further Protective Review

1   to the central laboratory first and were

2   analyzed in batches at the central

3   laboratory.  So it's a totally different type

4   of setting.

5        Q.    Does the ISO standard say that

6   they must be analyzed at the same time?

7        A.    I do not recall that, but

8   it's -- I mean, it's typically done in that

9   way, because, yeah, it's a different setting

10  here in this international clinical trial.

11       Q.    Well, other than the intent or

12  the reason for collecting the samples, how,

13  if at all, is the comparison between the

14  point of care in the week 12 and 24 lab data

15  any different than the analysis plan laid out

16  in the ISO standard?

17       A.    I already said, so they -- it's

18  different because it's information from

19  numerous sites around the world, plasma

20  samples that have been taken.  Also, the time

21  point between the INR point-of-care

22  measurement and the plasma sample taken time

23  point are not as close.  They may also vary.

24            But, again, here, I would like

Protected - Subject to Further Protective Review

1  to point you to my colleague, Christopher

2  Nessel, and his clinical team because they

3  were much closer into the details of the

4  ROCKET trial and can describe this much

5  better than I can do.

6       Q.     And I appreciate that, and we

7  certainly will do that.  But these -- the

8  answers you provided in your deposition

9  today, so I need to explore the basis for

10 your answers and understand why you gave the

11 testimony you did.

12            You -- I heard two explanations

13 on how the week 12 and 24 comparison with

14 point of care was different than ISO

15 evaluation.  I heard the number of sites, and

16 I heard you talk about the point in time

17 between the two sampling events.  Let's take

18 them one at a time.

19            What's the basis of your belief

20 that the numerous sites where blood samples

21 were collected, both with the point of care

22 and the central lab, is in any way

23 inconsistent with the standards set out by

24 ISO?

Protected - Subject to Further Protective Review

1      A.      That's all what I can share

2   from the discussion I attended, so I have not

3   personally, as I said, looked after this

4   information, and I have also not possibility

5   to do because I'm not a clinical expert who

6   could look into the clinical files.  So what

7   I just shared with you is what I know from

8   the discussion in the group which we had.

9      Q.      So this is something that

10   somebody told you, nothing that you

11   independently evaluated; is that fair?

12      A.      That's fair.

13      Q.      Okay.  And then the other point

14   you raised is that the samples were not

15   necessarily collected at the same point in

16   time.  Did I understand you correctly,

17   meaning the point of care and the central

18   lab?

19      A.      Yes.

20      Q.      And what's the basis of that

21   understanding?

22      A.      That's likewise, also, what,

23   you know, I learned in the discussion with

24   colleagues, and so I would have to ask the

1  colleagues who ran -- I mean, really worked

2  with the data and looked them up and prepared

3  for the analysis that were conducted for the

4  health associates who could provide more

5  detailed information on this.

6      Q.    But you understand there are

7  thousands, almost, I think, over 10,000

8  paired samples that were collected on the

9  exact same day in the exact same patient, one

10 analyzed by the point of care and the other

11 analyzed by a central lab.  You're aware of

12 that, right?

13     A.    Not by the same patient, so

14 there were -- I mean, there were as you said

15 a thousand plus.

16     Q.    Fair point.  Probably

17 supplied -- more than 5,000 patients provided

18 two split samples that were collected on the

19 same day.  You're aware of that, correct?

20     A.    I'm -- I cannot concur because

21 I don't know the detail.  I'm really here

22 working out of the zone where I'm really the

23 expert of, and so I would like to ask you to

24 check those details with the colleagues who

Protected - Subject to Further Protective Review

1  really worked with the data.

2      Q.    And we will.

3           So is there anything else --

4  because you decided that -- you added in that

5  point at the end of your answer that this

6  was -- that the ISO standards were different

7  than the data that was collected in ROCKET.

8           Is there any other basis you

9  have for making that statement, other than

10  the number of sites and the timing of the

11  collection of the samples?

12      A.    Not only the collection, also

13  the timing of the analysis, so because -- in

14  the central lab, if you have so many samples,

15  they're usually measured in batches, and so

16  that's also a difference.  And you have to

17  bear in mind that the data or the PK samples

18  collected were collected for a different

19  purpose, and so there was not a plan set up

20  as you would do if you do an experiment

21  according to ISO standards.  And so we

22  retrospectively used that information, but

23  that makes a difference.

24      Q.    Well, I understand it wasn't

Protected - Subject to Further Protective Review

1   prespecified, but that doesn't invalidate the

2   actual numbers generated by the lab, does it?

3        A.     I mean, the numbers that were

4   generated by the lab, so the PK data and PT

5   data, they were already measured and also

6   reported, yeah, in reports we had, so they

7   are certainly not -- I mean, they're not --

8   they are unchanged, so they are effects that

9   we had already, but just we used them now for

10  a different answer, different question, and

11  so that was not planned initially.

12       Q.     I understand that.

13       A.     It makes a difference.

14       Q.     Well, you would agree with me

15  that is a very important dataset, the week 12

16  and 24 data, that was what was relied upon by

17  regulators to inform them about the

18  pharmacodynamics of rivaroxaban?

19       A.     The health authority

20  appreciated very much the work we did.  They

21  evaluated the sensitivity analysis, but then

22  they came back and said, yeah, we want to

23  really have a very thorough look at the

24  question, and this is very reassuring, but

Protected - Subject to Further Protective Review

1    please do this additional step as well, and

2    look at these data.  We understand that there

3    are limitations to such retrospective

4    analysis, but it will complete the picture.

5              And so that's how we did it.

6         Q.    And I appreciate that.  But I

7    was more talking about whenever you collected

8    the week 12 and 24 data for an important

9    purpose, and that was to understand the

10   pharmacodynamics of rivaroxaban.  And your

11   company still today depends on that data in

12   evaluating the pharmacodynamics of

13   rivaroxaban, fair?

14        A.    I don't know exactly where

15   you're -- I mean, what you're referring to in

16   this question, because you're moving away to

17   a different topic here, and --

18        Q.    Well, your -- I'm backing up.

19   Why was the week 12 and 24 data collected in

20   the first place?

21        A.    To collect pharmacokinetic data

22   in the patient population.  We had already

23   numerous PK data beforehand and intense

24   characterization of the PK profile, but this

Protected - Subject to Further Protective Review

1    was just another piece of information to be

2    added specifically in this patient

3    population.

4              MR. McWILLIAMS:  Okay.  And I'd

5         like to hand you what we're marking as

6         Derix-4, and I believe this is the

7         final published EMA assessment report

8         on this topic.

9              (Whereupon, Deposition Exhibit

10        Derix-4, EMA Assessment Report

11        [No Bates], was marked for

12        identification.)

13   BY MR. McWILLIAMS:

14        Q.    Do you recognize this document

15   as the final EMA assessment report on the

16   topic we've been discussing here the last

17   30 minutes or so, the use of the recalled

18   device in ROCKET?

19        A.    Yes, this is the final report

20   issued on February 5th.

21        Q.    All right.  And have you

22   reviewed this document prior to today, the

23   final version?

24        A.    I have, yes, looked at parts of

Protected - Subject to Further Protective Review

1    it, probably not every table, but I'm --

2    yeah, I've looked at the document.

3         Q.    Okay.  And if we could read

4    through it together, if you go to page 5,

5    please.  And I believe you testified that

6    this was one of your areas of responsibility,

7    was to investigate and help answer EMA's

8    question as to why there was this apparent

9    delay between the recall notification in

10   December of 2014 and your company notifying

11   EMA in September of 2015 about the potential

12   applicability of the device recall to your

13   trial; is that fair?

14        A.    Yes, I was part of the team who

15   looked into this question and, yeah, wrote up

16   the document, uh-huh.

17        Q.    And essentially what you told

18   EMA was that it was Janssen that first

19   learned about the potential applicability

20   and -- but Janssen did not learn about the

21   potential applicability until September 9th,

22   2015; is that fair?

23        A.    That's fair, yes.

24        Q.    And tell me, what did you do,

Protected - Subject to Further Protective Review

1   if anything, to independently evaluate or

2   investigate whether or not that is a true and

3   accurate statement?

4        A.     We had frequent interactions

5   with our colleagues at Janssen and our -- the

6   nature of our collaboration with Janssen over

7   the years was very trustful, and so, yeah, we

8   got this information from our colleagues.

9        Q.     Okay.  Well, would it surprise

10  you to learn that members of regulatory

11  affairs at Janssen responsible for Xarelto,

12  specifically responsible,

13  with responsibilities for Xarelto in the

14  ROCKET trial, were made aware of the recall

15  in December of 2014, would that surprise you

16  to learn that today?

17       A.     It depends on the context.  It

18  may well be that colleagues who work in

19  regulatory receive regular notices from FDA,

20  so some colleagues have this, but they get

21  all the issue reports from FDA on a daily

22  basis.

23              And so that may well be, but it

24  does not mean automatically that they have --

1    really could pick it up easily.  That's also

2    laid out here in the -- in the document, that

3    even if somebody would have seen the notice,

4    it was not occurring easily that there was

5    any connection to our trial.

6              And if you would be receiving

7    like 10, 15, 20 notices of that kind a day

8    and reviewed them with a very specific focus,

9    it can easily happen that you don't mark that

10   as an important information.

11             And the reason why that there's

12   not an immediate connection between such a

13   notice and the ROCKET AF trial is on the

14   firsthand, that when -- when Janssen

15   purchased the device for the clinical -- for

16   the use in the ROCKET AF trial, they

17   purchased it under the name of HemoSense INR

18   device because HemoSense was the company that

19   at the time produced it.

20             HemoSense was later bought up

21   by the company Alere, and so they changed

22   also subsequently the name of the device into

23   Alere INR device.  And if you haven't

24   followed up that, yeah, sequence of events,

Protected - Subject to Further Protective Review

1   you would not naturally make a connection

2   between the two things.

3             And there are more factors

4   that, yeah, make it difficult to have that

5   connection immediately occurring to you,

6   because the recall notice also had a specific

7   time frame, and the time frame was after

8   finalization of the ROCKET AF trial.  So this

9   is a second reason why it's not immediately

10  occurring.

11            And thirdly, there are batch

12  number -- or batch numbers listed on the

13  recall notice, and, yeah, even when later on,

14  comparing the batch numbers that were used in

15  the ROCKET AF trial and the batch numbers in

16  the recall, they did not match, and so this

17  information about the potential impact of the

18  recall notice to the device that was used in

19  ROCKET AF could only be made by several

20  interactions and with the company Alere, and

21  them going back into their files and

22  providing the information that was not

23  publicly available.

24       Q.    Well, one correction.  The name

Protected - Subject to Further Protective Review

1    of the device has never changed.  It's always

2    been called INRatio, correct?

3        A.     But it was called HemoSense

4    INRatio, not called Alere INRatio.

5        Q.     That's just the name of the

6    company that makes it.  It's like Janssen

7    Xarelto or Bayer Xarelto.  The name of the

8    product is the same, right?

9            MR. HOFFMAN:  Objection to the

10           form of the question, but you can

11           answer.

12       A.     I recall always the name was

13   mentioned in connection to the company, so

14   HemoSense INR in the prior times and now

15   Alere INRatio device, and that's also how it

16   is called in the recall notice.

17   BY MR. McWILLIAMS:

18       Q.     Well, Doctor, as someone who

19   has experience in regulatory affairs, you

20   would agree with me that it's important to

21   carefully read communications from the FDA

22   that pertain to a drug over which you have

23   responsibility and a device that was used in

24   the clinical trial involving that drug, fair?

Protected - Subject to Further Protective Review

```
 1                    MR. HOFFMAN:  Objection to the
 2          form of the question.
 3          A.     I cannot fully agree because in
 4     general, certainly, regulatory
 5     representatives in the company very carefully
 6     read the information, and they -- yeah,
 7     that's part of the job.
 8                    But as I just explained to you,
 9     if you get numerous alerts every day, it's
10     perfectly fine to just focus on the
11     information and read it, yeah, and pick out
12     the information that you need for your daily
13     work.
14                    And that was certainly not
15     obvious in such a notice.
16     BY MR. McWILLIAMS:
17          Q.     Well, not obvious, but you
18     certainly could have done the investigation
19     sooner.  You didn't have to wait for the
20     British Medical Journal to contact you to do
21     this investigation to conclude that, in fact,
22     you had used a recalled device in your
23     clinical trial, fair?
24                    MR. HOFFMAN:  Objection to the
```

Protected - Subject to Further Protective Review

1        form of the question.

2        A.     As I said, there was no

3   awareness of this, and only very intense

4   interaction with the company, Alere finally

5   revealed that there was a potential impact.

6   And so, therefore, I think this is, yeah -- I

7   mean, this is very --

8   BY MR. McWILLIAMS:

9        Q.     An intense interaction could

10  have begun earlier, right?  That intense

11  interaction with Alere began in response to

12  questions from the British Medical Journal,

13  correct?

14       A.     It could only start once, yeah,

15  we became aware of the potential, and we --

16  this question was raised, and so that was

17  really the point in time when the work could

18  start.

19            MR. McWILLIAMS:  Well, let me

20       show you what's being marked as

21       Derix-5, and I'll represent to you

22       that this is an e-mail that was

23       produced to us by your colleagues at

24       Janssen.

Protected - Subject to Further Protective Review

1              (Whereupon Deposition Exhibit

2         Derix-5, E-mail(s) re: U.S. FDA Daily

3         Digest Bulletin,

4         XARELTO_JANSSEN_14522268 -

5         XARELTO_JANSSEN_14522271, Ref.

6         2956104, was marked for

7         identification.)

8  BY MR. McWILLIAMS:

9         Q.    This is an e-mail from the FDA

10 to Ms. Alla Rhoge.  Are you familiar with

11 that individual?

12        A.    Alla Rhoge, yes, is a

13 regulatory colleague who, in former times --

14 I'm not sure nowadays -- worked together with

15 Sanjay Jalota and his team, regulatory

16 affairs.

17 BY MR. McWILLIAMS:

18        Q.    But had -- specifically had

19 responsibilities for regulatory affairs for

20 the drug Xarelto, correct?

21        A.    At the time in the past she

22 had -- yes, she was also responsible for the

23 Xarelto product at Janssen.

24        Q.    And I apologize, this is

Protected - Subject to Further Protective Review

 1    Record No. 2956104.

 2              And if you go to page 2,

 3    please, Dr. Derix.  You'll see there's a

 4    section that says "FDA MedWatch - Alere

 5    INRatio2 PT/INR Professional Test Strips,"

 6    and then you go down underneath, it says

 7    "Update, 12/9/2014, Alere initiated a

 8    voluntary correction to inform US users of

 9    the Alere INRatio and INRatio2 PT/INR Monitor

10    system of certain medical conditions that

11    should not be tested with the system.  In

12    certain cases, the INRatio and

13    INRatio2 PT/INR Monitor system may provide an

14    INR result that is clinically significantly

15    lower than a result obtained using a

16    reference INR system (laboratory method)."

17              Did I read that correctly?

18         A.    Yes, you read that correctly.

19         Q.    That's all I asked, ma'am, if I

20    read it correctly.

21         A.    This is --

22              MR. HOFFMAN:  Just let him ask

23         his next question.

24         A.    Okay.  Sorry, because I wanted

Protected - Subject to Further Protective Review

1    to point that the last sentence is also

2    important of this paragraph in context.

3    BY MR. McWILLIAMS:

4         Q.    I appreciate that, but

5    ultimately, this same information is what was

6    communicated to you by the British Medical

7    Journal that triggered your investigation,

8    correct?  The December 2014 recall notice,

9    correct?

10        A.    It's not correct.  The

11   journalist from the British Medical Journal

12   asked whether there could be, yeah, a

13   connection between the recall notice and,

14   yeah --

15        Q.    In her e-mail to Dr. Nessel,

16   she linked to this same recall notice,

17   correct?

18        A.    That's correct, yes.

19        Q.    Okay.  And you and I both know

20   that Ms. Rhoge specifically had

21   responsibilities pertaining to the regulatory

22   affairs, including the performance of this

23   device in ROCKET?

24              MS. TERSIGNI:  Objection, form.

Protected - Subject to Further Protective Review

```
1              MR. HOFFMAN:  Object to the

2         form of the question.

3    BY MR. McWILLIAMS:

4         Q.     Did you know that?

5         A.     I cannot comment on this

6    because I am not aware of the tasks that Alla

7    Rhoge had exactly at the time during the

8    ROCKET AF trial, and especially also in

9    October 2014, I don't know whether she still

10   has -- is working on the Xarelto team,

11   because I haven't seen her for a while.

12              And just as we talked before,

13   you're showing me this document here now,

14   it's exactly what I said.  It's a list of

15   one, two, three, four, five, six, seven,

16   eight, nine, 10, 11, 12, 13, 14, 15 --

17   probably 20 -- 20 to 30, I haven't counted --

18        Q.     Paragraphs?

19        A.      -- I haven't counted them

20   quickly, paragraphs of alerts, and so she --

21   this is from a daily digest per her term, and

22   it's not -- it's not immediately obvious that

23   this connection can be made very quickly and

24   that she really could do that for the reasons
```

Protected - Subject to Further Protective Review

1    I just mentioned.

2         Q.    But you're able to make it

3    immediately obvious nine months later when

4    the BMJ pointed out the exact same recall

5    notice when you performed an investigation,

6    fair?

7              MR. HOFFMAN:  Objection to the

8         form of the question.

9              You may answer.

10        A.    I will have to go back to what

11   I said before, even when the British Medical

12   Journal made this inquiry, it took quite some

13   time before we really could go through all

14   the steps and find out of the potential --

15   BY MR. McWILLIAMS:

16        Q.    It took like two weeks, right?

17        A.    Yeah, but it took quite some

18   intensive interaction with the company Alere,

19   and without the help of the company Alere --

20        Q.    It took two weeks, right?

21             MR. HOFFMAN:  Please don't

22        interrupt.

23             Were you finished with your

24        answer?

Protected - Subject to Further Protective Review

```
 1        A.      I cannot comment on the exact
 2   time, maybe --
 3   BY MR. McWILLIAMS:
 4        Q.      It was less than a month,
 5   wasn't it, right?
 6        A.      Yeah.
 7        Q.      Yeah.  Okay.
 8                Now, back to my question about
 9   Alla Rhoge.  This wasn't just some nobody at
10   Janssen.  This was somebody who had specific
11   responsibilities for regulatory affairs for
12   ROCKET, including the performance of this
13   very device in ROCKET.
14                Are you aware of that?
15                MR. HOFFMAN:  Objection, asked
16        and answered.
17                MS. TERSIGNI:  Objection.
18        A.      As I said before, I'm not aware
19   of Alla's specific task in the Janssen team
20   because my primary contact partner at that
21   point in time was Sanjay Jalota, who was the
22   team lead at the time, and so you would
23   probably have to ask him if you would like to
24   understand the specific tasks of his
```

Protected - Subject to Further Protective Review

1    colleague.

2              MR. McWILLIAMS:  Okay.  Well,

3         let me hand you what's being marked as

4         Derix-6, which is Record No. 748350.

5              (Whereupon Deposition Exhibit

6         Derix-6, E-mail(s) re: NDA 202439 -

7         Clinical IR, XARELTO_JANSSEN_04932509,

8         Ref. 748350, was marked for

9         identification.)

10   BY MR. McWILLIAMS:

11        Q.    And this is an e-mail from the

12   FDA -- wait, I may have given you my copy.

13   Did I do that?

14             MR. HOFFMAN:  I think you may

15        have given her --

16             MR. McWILLIAMS:  No, I found it

17        actually.  Thank you for that.

18   BY MR. McWILLIAMS:

19        Q.    And this is an e-mail from

20   Ms. Alison Blaus at the FDA to Alla Rhoge and

21   Sanjay Jalota; is that correct?

22        A.    Yes, that's correct.

23        Q.    And this is -- and you see this

24   is a -- the FDA asking Janssen for

Protected - Subject to Further Protective Review

1    information about the INR point-of-care

2    device used in ROCKET.  Do you see that

3    question number 2, "Please also provide the

4    following information on the INR

5    point-of-care device used in ROCKET."

6            Do you see that, ma'am?

7        A.    Yes.

8        Q.    And see the last bullet point

9    it says, "Please provide us with any

10   available information on the performance

11   characteristics of the device beyond the

12   information found in the labeling."

13           Did I read that correctly?

14       A.    Yes, you read that correctly.

15       Q.    So the FDA was specifically

16   asking this person, Alla Rhoge, about the

17   performance of this device that we now know

18   has been recalled, right?

19           And this is the same individual

20   that received an e-mail in December of 2014

21   notifying Janssen of the recall of the

22   device, correct?  Is it --

23       A.    There's one point the FDA asks

24   about -- not about the performance as such,

Protected - Subject to Further Protective Review

1    but about the performance characteristics of

2    the device, so that could point into

3    information which is displayed, for example,

4    in the ISO guidance.

5                So that is not a direct request

6    on the performance, but it's correct what you

7    said, that the request is from Alison Blaus

8    to Alla Rhoge and Sanjay Jalota.

9         Q.    All right.  So this same person

10   has had communications with the FDA about

11   this device that was used in ROCKET, correct,

12   the exact same person?

13        A.    Yes, that's the same person.

14        Q.    Okay.  Now, let's keep reading

15   the EMA assessment report, and we're going to

16   keep going back to this so probably -- I

17   would recommend you keep that out.

18        A.    Document 3?

19        Q.    The final one, I believe it's

20   document 4.

21        A.    Okay.

22        Q.    If you go to page 5, please,

23   you can see the pages are numbered in the

24   bottom right corner.

Protected - Subject to Further Protective Review

1      A.     Yes.

2      Q.     And, again, this is a section

3  that you were tasked with investigating and

4  making sure that EMA was provided with

5  truthful and accurate responses, the timeline

6  of learning of the device recall?

7      A.     Uh-huh, yes.

8      Q.     And what's the -- in the very

9  bottom paragraph, it says, "On September 9th,

10  2015, JRD became aware through a third party

11  that the recall notice of the Alere INRatio

12  device be applicable to the HemoSense INRatio

13  devices used in the ROCKET AF trial program

14  as well."

15          Did I read that correctly?

16      A.     That's correct, yeah, uh-huh.

17      Q.     And the third party that's

18  referenced there, is that the e-mail from the

19  British Medical Journal?

20      A.     Yes.

21          MR. HOFFMAN:  Object.

22      A.     That's referring to, yeah, the

23  e-mail that -- I don't necessarily -- yeah,

24  at least this -- to -- to information that

1    was received from a third party and from the

2    British journal.

3    BY MR. McWILLIAMS:

4        Q.    And did you ask to see a copy

5    of that communication to make sure the date

6    was correct in this EMA report?

7        A.    No, I didn't -- not ask to see

8    a copy of that --

9        Q.    What --

10       A.    I got the information from our

11   Janssen colleagues, and they also reviewed,

12   yeah, the text.  So I -- that was for me to

13   make sure that we had really provided the

14   appropriate information.  And so I assumed

15   that this is the correct information.

16       Q.    What, if anything, did you do

17   to independently validate -- verify this

18   information?

19       A.    As I said, so we reviewed this

20   in the team and including the Janssen

21   colleagues, and so that after that review, I

22   think, yeah, we provided enough.

23       Q.    Have you ever actually seen the

24   communication from the British Medical

Protected - Subject to Further Protective Review

1    Journal to Janssen?

2         A.    I don't recall that.  So we

3    talked about this, and Christopher Nessel,

4    yeah, mentioned to me, but I don't recall

5    that I have seen it myself.

6         Q.    Did he ever tell you that he

7    actually received the e-mail on

8    September 4th, not September 9th?

9         A.    I'm not aware, so it may well

10   be that this was referring that not when the

11   e-mail was sent, but when -- when he -- when

12   he shared it with the colleagues at Janssen.

13   So that may be an explanation.  So that it

14   was the day when -- yeah, it was shared

15   between colleagues at JRD.

16        Q.    Well, as someone who has a

17   history of working in regulatory affairs,

18   would you agree with me it's important to be

19   truthful and accurate in communications with

20   regulatory bodies?

21             MR. HOFFMAN:  Objection to the

22        form of the question.

23   BY MR. McWILLIAMS:

24        Q.    And precise?

Protected - Subject to Further Protective Review

1              MR. HOFFMAN:  Same objection.

2         A.       Certainly, the information we

3    are providing, we are making sure that it is,

4    yeah, to our best knowledge, and that's what

5    we also did here.  And writing it up and

6    having it reviewed by -- by several

7    colleagues, and that's, yeah, what we did.

8    BY MR. McWILLIAMS:

9         Q.       And you understand there's --

10   again, as someone who's worked in regulatory

11   affairs and someone with a degree in that

12   field, that there are certain timelines and

13   reporting requirements upon learning of

14   certain information; there's reporting

15   deadlines of when certain information should

16   be provided to regulators, correct?

17        A.       There are reporting that --

18   timelines if -- in specific areas, but also

19   reporting timelines do not apply to all

20   information.  Those reporting timelines apply

21   to specific regulatory procedures, and so --

22        Q.       You understand this is a

23   specific regulatory procedure that the EMA

24   undertook, correct?

Protected - Subject to Further Protective Review

1          A.     That's a procedure that EMA

2    started after we informed them, and so, then,

3    only after assessing the first information

4    they had provided from us -- got from us, on

5    an informal basis, on a really daily, normal

6    communication basis, they decided that they

7    would like to have a so-called LEG procedure

8    because that gives them a framework to work

9    through.  So at the time when we gave the

10   information first time to EMA, it was not yet

11   in a formal procedure.  So they just opened

12   it then afterwards.

13              MR. McWILLIAMS:  Okay.  Let me

14        hand you what's being marked as

15        Derix-7, which is Record 3019911.

16              (Whereupon Deposition Exhibit

17        Derix-7, E-mail(s) re: BMJ query about

18        INRatio device,

19        XARELTO_JANSSEN_15527978 -

20        XARELTO_JANSSEN_15527979,

21        Ref. 3019911, was marked for

22        identification.)

23   BY MR. McWILLIAMS:

24        Q.     You'll see this is an e-mail

Protected - Subject to Further Protective Review

1   from Deborah Cohen.  Do you recognize that

2   name as the reporter at the British Medical

3   Journal?

4        A.    I recall that I have heard the

5   name.  I have not met her personally and

6   don't know her personally, but I recall the

7   name was mentioned by the team.

8        Q.    And you see this is an e-mail

9   to Christopher Nessel at Janssen?

10       A.    Yes.

11       Q.    And you see that this is dated

12  September 4th, 2015?

13       A.    Yes, I see that.

14       Q.    You see the subject is "BMJ

15  query about INRatio device"?

16            Do you see that?

17       A.    Yes, I see that.

18            And it says, "Dear Dr. Nessel:

19       I'm taking a look at devices used in

20       clinical trials.  I noted that the

21       ROCKET trial used the HemoSense

22       INRatio POC.  This is now owned by

23       Alere.

24            "Are you aware of this recall

1        notice relating to Alere's INRatio

2        POC?"

3            And she then provides a link to

4        the FDA recall notice that we read

5        previously in Ms. Rhoge -- Alla

6        Rhoge's e-mail.

7            Do you remember that?

8        A.    Yes, this is a link to the

9    safety MedWatch information from FDA.

10   BY MR. McWILLIAMS:

11       Q.    Dr. Cohen continues.  She says,

12   "Additional information relating to the

13   recall can be found at the manufacturer's

14   website," and she then gives a link to

15   Alere's website to provide more information;

16   is that correct?

17       A.    Yes, that's correct.

18       Q.    Okay.  And then Dr. Cohen

19   continues, she says, "The recall relates to

20   all of the devices that have been cleared

21   since 2002," and then she gives another link

22   in support of that statement.

23            Do you see that?

24       A.    Yes.

Protected - Subject to Further Protective Review

1       Q.      So Dr. Cohen was able to link

2   up the fact that Janssen had used a recalled

3   device in ROCKET prior to Janssen figuring it

4   out?  Do I understand that correctly?

5       A.      That's not correct because she

6   was not figuring it out.  She just pointed to

7   the potential, and so she just asked about

8   the awareness, and she also asked about

9   thoughts about this.  But she -- and also

10  she's indicating in her e-mail that she's

11  taking a look at devices used in clinical

12  trials.  So she was working on the topic of

13  devices in a more general sense and had done

14  obviously some specific research on devices.

15              And that's why she came

16  obviously across this information and then

17  asked, yeah.

18      Q.      But it turns out she was right.

19  I mean, the defective device, the recalled

20  device was used in ROCKET.

21      A.      You said, yeah, the

22  defective -- that's not correct.  It was -- I

23  mean, it wasn't really a --

24      Q.      The recalled device, I correct

Protected - Subject to Further Protective Review

1   myself.

2        A.      The recalled device, and

3   recalled in that context also is somewhat

4   misleading because it was never withdrawn

5   from the market.  It was a restriction of the

6   labeling of the device for patient

7   populations to be used.

8              Yeah, she had -- she had gone

9   through device research obviously, and that

10  question came across.  And she wanted to find

11  out more about it.

12       Q.      But it turned out she was

13  right, that the recalled device was used in

14  ROCKET, fair?

15       A.      Not completely.  She was right

16  in the fact that the HemoSense INR device

17  that was used in the ROCKET AF trial, yeah,

18  had a connection to this recall because

19  basically the HemoSense company had been

20  bought, and this is -- the Alere INRatio is

21  the follow-up device, successor device after

22  the HemoSense INR device.

23       Q.      And this communication was

24  dated September 4th, not September 9th as

Protected - Subject to Further Protective Review

1  indicated in the EMA report; is that fair?

2  Do you agree those are two different dates?

3       A.     Yes, this is September 4th, and

4  when the e-mail stated.

5       Q.     Do you have any intentions

6  on -- since this was a -- you had

7  responsibility for this section of the EMA

8  report, and you were earlier provided an

9  opportunity to correct any typos and errors,

10  did you have any intention on correcting this

11  error that exists in the EMA assessment

12  report?

13            MR. HOFFMAN:  Objection to the

14       form of the question.

15       A.     I do not recall any discussions

16  about the change, and really, I followed the

17  information that we had jointly received and

18  reviewed.  And, again, here, I correct, this

19  is a holiday time in the U.S. also, and it

20  may be that -- yeah, that Christopher really

21  just pointed at the time when he started

22  really actively reading, following up,

23  looking up the information and really started

24  realizing this.  And --

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2        Q.    Did Dr. Berkowitz not receive

3    the same e-mail on the same date?

4        A.    I'm not aware of.  Because when

5    I received the information, it came from

6    Janssen, and so I suppose that Janssen was

7    the primary point of contact here.

8        Q.    But if Dr. Berkowitz did

9    receive this same e-mail on the same date, we

10   would expect to find that in his e-mail

11   folder, fair?

12            MR. HOFFMAN:  Objection to the

13        form of the question.

14   BY MR. McWILLIAMS:

15       Q.    Unless he deleted it?

16            MR. HOFFMAN:  Objection.

17       A.    I would suppose that he, as

18   well as our other colleagues who are involved

19   in Xarelto at the moment, are adhering to the

20   retention policy of documents, and so...

21   BY MR. McWILLIAMS:

22       Q.    Okay.  Let's keep reading the

23   EMA report, which is Derix-4.  Let's see.

24            MR. McWILLIAMS:  Actually, why

Protected - Subject to Further Protective Review

1          don't we take our first quick break,

2          if that's okay.

3                    MR. HOFFMAN:  Yeah, that's

4          fine.  That's fine.

5                    THE VIDEOGRAPHER:  Going off

6          the record at 10:04 a.m.

7                    (Recess taken, 10:04 a.m. to

8          10:17 a.m.)

9                    THE VIDEOGRAPHER:  Back on

10         record at 10:17 a.m.

11    BY MR. McWILLIAMS:

12         Q.    Dr. Derix, if you would please

13    turn to page 8 of the EMA assessment report.

14    And so if I understand the first question

15    that EMA wanted an answer to was, you know,

16    explain when you learned about this device

17    and explain -- about this recall and why the

18    delay in informing EMA.

19                    Is that a fair paraphrase of

20    the first request from EMA?

21         A.    Yes, that's fair.

22         Q.    Okay.  And then the second

23    request from EMA was to basically ask the

24    sponsor of Bayer and Janssen what their

Protected - Subject to Further Protective Review

1    opinion was on the impact of the recalled

2    device on the results of ROCKET.

3                   Is that a fair paraphrase?  I

4    tried to --

5         A.      If you can again --

6         Q.      I tried to get you on page 8.

7    I think that's where it is.

8         A.      Uh-huh.

9         Q.      You see request number 2, they

10   asked for the MAH, that's the market

11   authorization holder, right?

12        A.      That's correct.

13        Q.      That's also known as the

14   sponsor, right?

15        A.      Yeah.

16        Q.      So they want to know the

17   sponsor's view on the impact on the results

18   of ROCKET, of the -- of use of this, what we

19   now know, recalled device, fair?

20        A.      Yes, they asked -- and that's a

21   typical question of EMA because they always

22   want to hear the company's position on

23   topics, and then they build their own opinion

24   independently on it, yeah, uh-huh.

Protected - Subject to Further Protective Review

1    Q.    Okay.  And then there's the --

2    it says the summary of the MAH response.  So

3    this is information that the -- Bayer and

4    Janssen provided to EMA that we see here on

5    the page 8, continuing on to page 9, page 10,

6    and then continuing on to page 11; is that

7    correct?

8    A.    Yeah, typically, EMA is using

9    part of the documents that are submitted by

10   the marketing authorization holder for their

11   summaries as well, and that weave that in --

12   they work that into their documents.

13   Q.    So it's a summary of what Bayer

14   and Janssen told EMA, correct?

15   A.    Yes.  It can also be partially

16   copied from the submission, so that depends

17   how they do it, yeah.

18   Q.    All right.  If we go to page --

19   and so what we see here is there's a -- in

20   the summary is background information on the

21   ROCKET trial, talking about what the

22   principal safety endpoint and principal

23   safety efficacy endpoints are, and then on

24   page 9 it has a table with the primary top

Protected - Subject to Further Protective Review

```
1    line data from ROCKET --

2          A.      Yes.

3          Q.      -- correct?  Or the efficacy

4    data.  Page 10 has a table with the safety

5    data.  Are you following me so far?

6          A.      Yes, uh-huh.

7          Q.      And then on the bottom of

8    page 10, there's a section titled "Potential

9    pertinence of the Alere Correction/Recall in

10   the ROCKET AF trial," and then there's a

11   discussion on the use of the device in the

12   trial; is that correct?  It talks about the

13   INR shamming mechanism that was in place to

14   provide the double-blind component of ROCKET?

15         A.      Yes, that's correct.

16         Q.      And there in the last paragraph

17   on page 11 is a discussion about the

18   unblinded monitor.

19                 Do you see that?

20         A.      Yes.

21         Q.      And, again, this is a summary

22   of information provided by the drug company

23   to the regulators, correct?

24         A.      That's correct.
```

Protected - Subject to Further Protective Review

1    Q.    Okay.  So let's read this

2  together.  This says, "A monitor unblinded to

3  study data was employed to review INR data

4  and ascertain if subjects were frequently out

5  of range.  This monitor could consult with a

6  physician unblinded to study data at DCRI to

7  discuss specifying cases, if needed."  And

8  I'll pause real quick.

9          DCRI, that's Duke Clinical

10 Research Institute, correct?

11   A.    That's correct.

12   Q.    That was the academic

13 institution that helped facilitate the ROCKET

14 trial?

15   A.    Yes, that's correct.

16   Q.    Let's keep reading.  It says,

17 "Occasionally and as a result of these

18 surveillance efforts, specific investigators

19 whose patients were found to be persistently

20 below or above the target range received

21 correspondence reminding them of the

22 importance of achieving the INR target.  The

23 monitor unblinded to study data was also

24 available to answer questions about

Protected - Subject to Further Protective Review

1   individual INR results, in a blinded fashion,

2   from investigators, through local medical

3   monitors.  At no time did the monitor

4   unblinded to study data evaluate aggregate

5   INR time in therapeutic range."

6              What does that sentence mean,

7   the last sentence I just read?

8        A.    Yeah.  Aggregate INR time in

9   therapeutic range would mean that the monitor

10  has data available from several patients over

11  a longer time period, and assesses over a

12  longer time period the adherence of the

13  patients to the optimal INR range.

14             It just says that this monitor

15  was really available to help physicians who

16  had questions and also to watch, yeah,

17  whether individually at one side or at one

18  patient level, subjects were frequently out

19  of range.

20       Q.    Well, what does that mean,

21  aggregate INR time in therapeutic range?

22       A.    That's a technical term, and

23  from this technical term, also I would like

24  to refer you to my colleagues in clinical

Protected - Subject to Further Protective Review

```
1    development because time in therapeutic range

2    is a term that is being used in clinical

3    trials to assess the adherence to the optimal

4    INR range.

5              But I don't know by myself,

6    because I'm not a specialist, how it's

7    exactly calculated.  You would have to talk

8    to statisticians or clinicians to know how

9    it's -- and aggregate just means that the

10   monitor has just more than individual patient

11   data; it means there's a database where data

12   are compiled from several patients or ideally

13   the entire patient population.

14        Q.     And the therapeutic range is an

15   INR between 2 and 3, and out of range would

16   be below 2 or above 3, correct?

17                   MR. HOFFMAN:  Objection to the

18        form of the question.

19        A.     The INR target range that is

20   applied, yeah, for vitamin K antagonist is 2

21   to 3, so that is where physicians target to

22   bring patients into.

23   BY MR. McWILLIAMS:

24        Q.     And this says at no time did
```

Protected - Subject to Further Protective Review

1    the monitor unblinded to study data evaluate

2    aggregate INR time in range.  That means at

3    no time at the beginning of the study, in the

4    middle of the study, or towards the end of

5    the study did he have access to that data,

6    correct?  That's what that --

7         A.    As far as I understand, is that

8    because the monitor was, yeah, available

9    during the conduct of the trial, that, yeah,

10   this does refer to this time point.

11              But as I said, I was not

12   involved in the operational details after

13   clinical trial, and so these are specifics

14   you would better ask the clinical team that

15   ran the study.

16        Q.    And we will, but just to be

17   clear, as someone who had an opportunity to

18   review this, what this means in English is

19   that at no time did this unblinded monitor

20   take aggregate data, at any point during the

21   trial, and look to see how many patients were

22   within range compared to those out of range,

23   right?

24              MR. HOFFMAN:  Objection, asked

Protected - Subject to Further Protective Review

1          and answered.

2          A.     At least as I understand the

3     task of the monitor, that really, this

4     monitor was there to look into individual

5     patient subject data and to consult with the

6     physician if there was an individual

7     patient's level of concern --

8     BY MR. McWILLIAMS:

9          Q.     I agree.

10         A.     -- and a need to unblind the

11    patient.

12    BY MR. McWILLIAMS:

13         Q.     Would you agree with me it

14    would be inappropriate for this unblinded

15    monitor to, at any point during the trial,

16    observe aggregate INR time in therapeutic

17    range of the warfarin patients in ROCKET?

18              MR. HOFFMAN:  Objection to the

19         form of the question.

20         A.     I said it was not his task, and

21    therefore, it really -- it -- he was not

22    tasked to do that.

23    BY MR. McWILLIAMS:

24         Q.     But not only was he not tasked

Protected - Subject to Further Protective Review

1  to do that, you specifically and

2  affirmatively told the EMA that he did not

3  see such data, correct?

4           MR. HOFFMAN:  Objection to the

5      form of the question.

6      A.     That's -- I mean, the sentence

7  is "At no time did the monitor unblinded to

8  study data evaluate aggregate INR time in

9  therapeutic range," so -- and that is how

10  it's -- yeah.

11  BY MR. McWILLIAMS:

12      Q.     Okay.  Let's -- so let's -- and

13  did any of your -- and if it were true -- and

14  I think you previously testified that Janssen

15  was primarily responsible for running the

16  ROCKET trial, correct?

17      A.     Yes, that's how we set up the

18  model.  We have -- in our collaboration, we

19  have responsibility agreement developed, and

20  underneath the contract level for each study,

21  some of the studies were operationally

22  conducted by Bayer, and in the grid, it's

23  clearly defined what responsibilities in that

24  case is.

Protected - Subject to Further Protective Review

1          And other trials like the

2   ROCKET AF trial were operationally conducted

3   by Janssen and, again, we have the

4   responsibility grid for what Janssen's

5   obligation is in that trial and what Bayer's

6   obligation is.

7          Q.     And if it were true --

8          A.     And all these things fall under

9   the obligation of the Janssen team.

10          Q.     All right.  And you expect

11   Janssen to communicate pertinent and relevant

12   information to you in a truthful, transparent

13   and honest manner; is that fair?

14              MR. HOFFMAN:  Objection.

15          A.     There was another, yeah, kind

16   of level of interaction.  We had for each

17   trial a so-called shadow team; so if the

18   primary responsibility for a trial was with

19   Janssen, we also had a shadow clinical leader

20   who worked with and attended meetings, team

21   meetings with Janssen and so could pick up

22   the relevant information.

23   BY MR. McWILLIAMS:

24          Q.     But if Janssen were to know

Protected - Subject to Further Protective Review

1    that this unblinded monitor had, in fact,

2    evaluated aggregate INR time in therapeutic

3    range data, is that something you would

4    expect to be communicated to Bayer as your --

5    as its development partner?

6                    MS. TERSIGNI:  Objection to

7         form.

8         A.    That is really far from my

9    experience level here, to judge on

10   operational aspects and rules in the clinical

11   trial.

12                  So as I said, we had colleagues

13   at the time really sitting in that team and,

14   yeah, and there was -- I was supposed to have

15   transparency to that colleague and the team.

16   BY MR. McWILLIAMS:

17        Q.    But you know Dr. Christopher

18   Nessel, correct?

19        A.    I know Christopher Nessel, yes.

20        Q.    Did Dr. Nessel ever tell you

21   that he personally had been provided

22   aggregate INR time in therapeutic range while

23   the trial was ongoing by the unblinded

24   monitor?  Did he ever tell you that?

Protected - Subject to Further Protective Review

 1          A.      I do not recall information

 2    like that.

 3                  MR. McWILLIAMS:  Let's see if

 4          this refreshes your memory.  This is

 5          Derix-8, Record 2959513.

 6                  (Whereupon, Deposition Exhibit

 7          Derix-8, E-mail(s) re: ROCKET AF and

 8          target INR, XARELTO_JANSSEN_14557985 -

 9          XARELTO_JANSSEN_14557986,

10          Ref. 2959513, was marked for

11          identification.)

12    BY MR. McWILLIAMS:

13          Q.      And just -- I should have asked

14    this earlier, but the unblinded monitor, you

15    understand that was a gentleman named

16    Mr. Bernard Chalecki?

17          A.      I don't know the name because

18    that level of detail, I was -- yeah, I wasn't

19    aware of.

20          Q.      Well, I'll show you documents

21    that are -- for now, I'll represent to you

22    that the unblinded monitor was, in fact, a

23    gentleman named Mr. Bernard Chalecki, okay?

24          A.      Okay.

Protected - Subject to Further Protective Review

```
 1          Q.      Okay.  And let's look at this
 2  exhibit, which is Derix-8, and this is an
 3  e-mail from Mr. Chalecki to Christopher
 4  Nessel; is that correct?
 5          A.      That's correct.
 6          Q.      And you see where -- and this
 7  is in April of 2008; is that correct?
 8          A.      Yes, April 2008.
 9          Q.      In April 2008, the ROCKET trial
10  was ongoing; is that correct?
11          A.      I would have -- yeah, I think
12  so, yeah.
13          Q.      Okay.  It started in late -- in
14  2007?
15          A.      I would have to look it up
16  exactly.  I don't know it in my heart.
17          Q.      Okay.  Let's look at what
18  Mr. Chalecki told Dr. Nessel, and then
19  ultimately, I want to ask whether or not
20  Dr. Nessel told -- relayed this information
21  to you.
22                  Mr. Chalecki wrote, "I took a
23  quick look at all the warfarin data collected
24  and the current compliance, not adjusted for
```

1    time between sampling nor allowing any time

2    for dose stabilization."

3              And down below he says, "We

4    have 20876 warfarin samples" collected --

5    well, collected so far, that's what that

6    means, "postrandomization," right?

7         A.    Uh-huh.

8         Q.    And he reports the data, the

9    aggregate time in therapeutic range at 45.2%,

10   as of April 1st, 2008, correct?  That's

11   what's written on this piece of paper, right,

12   Dr. Derix?

13        A.    I would have to read it

14   carefully first because I see this for the

15   first time, and I would have to also try to

16   understand the figures that are mentioned

17   here.  So I'd like to read it.

18        Q.    Well, let's -- you can do

19   whatever you need to do to answer my

20   question.  But is it true -- my question is

21   simply this:  Is it true that as of

22   April 1st, 2008, Mr. Chalecki was reporting

23   to Dr. Nessel the results of more than 20,000

24   warfarin samples taken so far in the trial

Protected - Subject to Further Protective Review

```
1   and reporting the ranges, the low range, in

2   range and above range?

3        A.    That's what I'm just trying to

4   find -- understand from the sentence --

5              MR. HOFFMAN:  Objection to

6        the --

7        A.    -- from this sentence and data

8   is correct, the timing you mentioned and the

9   topic and the people and the number of

10  samples, but I -- as I said, I would have to

11  make -- try to make sense from the figures

12  that are listed here.

13  BY MR. McWILLIAMS:

14       Q.    Okay.  Let's -- I think this is

15  an important topic, so let's take the time to

16  do that.

17             MR. HOFFMAN:  And, Doctor,

18        could you just wait one second before

19        starting to answer Mr. McWilliams'

20        questions so I have time to interpose

21        an objection?

22             THE WITNESS:  Uh-huh.

23             MR. HOFFMAN:  Thank you.

24             ///
```

Protected - Subject to Further Protective Review

1  BY MR. McWILLIAMS:

2      Q.    Just to make sure we're clear,

3  the question is:  Is it true that as of

4  April 1st, 2008, Dr. Nessel was in possession

5  of aggregate INR time in therapeutic range?

6            (Document review.)

7      A.    I have read the document now.

8  It is talking about a sample set that says

9  about all the warfarin data collected at the

10  beginning, and it talks about 20,876 warfarin

11  samples postrandomization.

12  BY MR. McWILLIAMS:

13      Q.    And it --

14      A.    And it's not adjusted for time

15  between sampling and not allowing any time

16  for dose stabilization, so -- and then it

17  gives percentages, yeah, for certain ranges

18  that were observed.

19            I assume -- but I don't know,

20  this is really not specific -- could be INR

21  ranges here, but -- so from the context,

22  could be assumed --

23      Q.    Well, it says INR --

24      A.    Really, this is a clinical

Protected - Subject to Further Protective Review

```
 1    expertise question.

 2         Q.     But you know the INR range is

 3    between 2 and 3?

 4         A.     Uh-huh.

 5         Q.     And that's what's right there

 6    on the page, right?

 7         A.     Uh-huh.

 8         Q.     45.2%?  Yes?

 9         A.     It says 2.0 to 3.0 is 45.2%,

10    yes.

11         Q.     And, Doctor, the subject line

12    of the e-mail is "ROCKET AF and target INR,"

13    right?

14         A.     The subject line is correct,

15    yes.

16         Q.     Okay.  All right.  But just to

17    be clear, I'm not accusing you of anything,

18    but did Dr. Nessel ever tell you about this

19    data he was in possession of back in April of

20    2008?

21              MR. HOFFMAN:  Objection to the

22         form of the question.

23         A.     I'm not aware.  I do not recall

24    that specifically I would have seen this
```

Protected - Subject to Further Protective Review

1    data.  This is a long time ago.  But I don't

2    really recall that we talked about it.

3    BY MR. McWILLIAMS:

4         Q.    All right.  Did any of your

5    colleagues at Janssen have an opportunity to

6    review this EMA assessment report to make

7    sure truthful and accurate and complete

8    information was being provided to EMA with

9    respect to whether or not the unblinded

10   monitor had evaluated aggregate INR data and

11   communicated it to the sponsor?

12             MR. HOFFMAN:  Objection to the

13        form of the question.

14        A.    I said before that when we

15   wrote the submission, we had a review

16   including our colleagues from Janssen that's

17   what we typically are doing for the

18   submissions, that one team is preparing them,

19   but the other team has also an opportunity to

20   review and provide comments.

21   BY MR. McWILLIAMS:

22        Q.    All right.  Let's keep reading.

23   Let's go to page 12, please, of the EMA

24   assessment report, and this is where a

Protected - Subject to Further Protective Review

1    discussion on the sensitivity analyses that

2    were performed, and you testified to that

3    earlier today.  You seemed to be generally

4    familiar with that; is that fair?

5         A.    I'm generally familiar about,

6    yeah, what was done, but I was -- I'm not in

7    the expert team that really discussed the

8    details.

9         Q.    I understand.  I'm not an

10   expert either, but we both read the document,

11   and I just want to see if we have a similar

12   understanding.

13             But you understand the original

14   sensitivity analyses was based upon the

15   conditions listed in the recall notice, and

16   you essentially looked to see -- you

17   identified those patients in ROCKET with

18   those conditions and looked to see if those

19   patients had a different rate of strokes and

20   bleeds compared to patients without those

21   conditions, in a nutshell, right?

22        A.    That's a long-winded question

23   you're asking, so I would not off --

24        Q.    Would you like me to repeat it?

Protected - Subject to Further Protective Review

1      A.     So, yeah, so maybe we put it in

2   parts that is easier for me to follow, so...

3      Q.     The original sensitivity

4   analysis was informed based upon the

5   conditions, the physiological conditions,

6   identified in the recall notice, correct?

7      A.     That's correct, yes.

8      Q.     Okay.  And then you essentially

9   looked for patients with those conditions in

10  the ROCKET clinical trial, correct?

11     A.     Yes, there was a clinical and

12  statistical team that translated the

13  information from the recall notice into,

14  yeah, information that could be used to

15  detect potentially patients with those

16  conditions in the ROCKET AF dataset.

17     Q.     Okay.  And essentially what you

18  did was you looked to see if those patients

19  had a different rate of strokes or bleeds

20  than patients without those conditions as a

21  way to determine whether or not this

22  defective device may have malfunctioned in

23  ROCKET, fair?

24              MR. HOFFMAN:  Objection to the

Protected - Subject to Further Protective Review

1          form of the question.

2          A.    I mean, there were a couple

3     of -- there were three different sensitivity

4     analyses run, and that's what you do

5     typically with sensitivity analyses.  If you

6     have a question about a subset of the data or

7     a subset of the population, you compare them

8     with the entire dataset, and to compare with

9     the, yeah --

10    BY MR. McWILLIAMS:

11         Q.    Right.

12         A.    -- remaining dataset.

13         Q.    Let's go to page 18 and the

14    conclusion of the sensitivity analysis.

15         A.    Page 18?

16         Q.    Yes, ma'am.  You see where it's

17    written -- it says, "In summary, the MAH" --

18    and again, that's Bayer and Janssen, right?

19         A.    In this case --

20         Q.    It's Bayer, right?

21         A.    -- in the European legislation,

22    it's Bayer.

23         Q.    Thank you.

24              So, "In summary, Bayer

Protected - Subject to Further Protective Review

1   concluded that the three sensitivity analyses

2   support the original efficacy and safety

3   analyses of ROCKET AF trial and confirm the

4   positive benefit-risk profile which

5   rivaroxaban provides."

6           Did I read that correctly?

7           MR. HOFFMAN:  I'm going to

8       object.  I think you misspoke.

9           MR. McWILLIAMS:  I did?

10          MR. HOFFMAN:  Yeah.  I think

11      you said, "In summary, Bayer

12      concluded" --

13          MR. McWILLIAMS:  Yeah, that's

14      because we had just established that

15      Bayer was the MAH.

16          MR. HOFFMAN:  I apologize to

17      you.  I'm sorry.

18          MR. McWILLIAMS:  That's okay.

19          MR. HOFFMAN:  You're right.

20          MR. McWILLIAMS:  That's all

21      right.  I'll try that again.

22  BY MR. McWILLIAMS:

23      Q.    So I just want to make sure,

24  just for the benefit of the jury, who may not

1    know what MAH stands for.  So "In summary,

2    Bayer concluded that the three sensitivity

3    analyses support the original efficacy and

4    safety analyses of the ROCKET AF trial and

5    confirm the positive benefit-risk profile

6    which rivaroxaban provides."

7                    Did I read that correctly with

8    the caveat of --

9         A.     Yes.

10        Q.     Okay.  And then the last

11   sentence on that paragraph, it says, "The

12   effect of potentially discrepant INR readings

13   does not alter the conclusions of ROCKET AF

14   trial."

15                   Did I read that correctly?

16        A.     Yeah, you read that correctly.

17        Q.     And I'm going to have you jump

18   to page 37, so now there's a lot more

19   analysis, but at the end of the day, I kind

20   of want to get the final company position.

21                   So, actually, go to page 36,

22   Section 2.3, at the title it says "MAH

23   conclusions on the scientific analyses

24   provided."

Protected - Subject to Further Protective Review

1          Do you see where I am?

2     A.    Yes.

3     Q.    And then if you will please

4  just continue to page 37, the very last

5  paragraph under the -- the section titled

6  "Conclusions."  It says, "The MAH would" --

7  and, again, that's Bayer, right?

8     A.    In this case it's Bayer.

9     Q.    All right.  So Bayer "would

10  like to reiterate that the initial response

11  dated 15 October 2015 with the three

12  sensitivity analyses constitutes the most

13  sound assessment of the effect of the Alere

14  correction notice on the ROCKET AF trial and

15  provides the evidence that the results and

16  conclusions from the ROCKET AF trial remain

17  valid."

18          Did I read that correctly?

19     A.    Yes.

20     Q.    And is that still Bayer's

21  position, that the original sensitivity

22  analyses is the best analyses to answer this

23  question as to whether or not this device

24  malfunctioned in ROCKET?

Protected - Subject to Further Protective Review

1       A.      That's different as it is

2  worded here.  So it says "constitutes the

3  most sound assessment of the effect of the

4  Alere correction notice" and as this -- the

5  sensitivity analyses are really directly

6  following the information from the Alere

7  correction notice.  Yeah, that's what it

8  says.  It does --

9       Q.      All right.  Okay.  And I

10  appreciate that correction, but would you

11  agree with me, Doctor, that really, the

12  spirit of this exercise was to investigate

13  and try to answer the question of whether or

14  not this device malfunctioned and had

15  clinical consequences as a result of that

16  malfunction.

17              That's what you were trying to

18  answer, correct?

19              MR. HOFFMAN:  Objection to the

20        form of the question.

21       A.      The spirit of the exercise was

22  really to investigate whether the information

23  that we got from the Alere INR recall notice

24  could have any potential impact on the

Protected - Subject to Further Protective Review

1  ROCKET AF data and its results.

2  BY MR. McWILLIAMS:

3       Q.     And the recall notice notified

4  Bayer that the device provided erroneously

5  low INR values, correct?

6       A.     It informed about a certain

7  patient population, that there was -- and

8  that that patient population should not use

9  the device any longer because of the

10  potential for erroneous INR.  And so these

11  sensitivity analyses strictly follow that

12  information in the Alere INR recall notice.

13       Q.     Well, let me ask you this way:

14  Do you think that the sensitivity analyses

15  performed -- the original sensitivity

16  analyses performed by Bayer and your

17  colleagues at Janssen provide the best

18  insight into whether or not this device

19  malfunctioned, and if so, to create clinical

20  consequences?

21            MR. HOFFMAN:  Objection to the

22       form of the question.

23       A.     That's not what it really here

24  says.

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.    I know that.  That's why I'm

3    asking you the question I'm asking.

4              MR. HOFFMAN:  Hold on.  Just

5         try not to speak over each other.  Go

6         ahead with your answer.

7              THE WITNESS:  Okay.

8    BY MR. McWILLIAMS:

9         Q.    So I want you to put this

10   document aside for a second and just answer

11   this question.

12             The original sensitivity

13   analyses, you know what I'm talking about,

14   right?

15        A.    Yes, uh-huh.

16        Q.    Do you believe that that work

17   is the best work to answer the question

18   whether or not the device malfunctioned in

19   the trial and results in additional bleeds in

20   warfarin patients?

21        A.    It's difficult for me to judge

22   what is really the best.  I mean, we did

23   several things, and all the pieces altogether

24   taken, yeah, led to the final conclusion.

Protected - Subject to Further Protective Review

1          And it's difficult really for

2     me to judge on which piece is the best piece,

3     so they all work together.  And certainly,

4     this was a step-wise process, and so every

5     step we did, we came after we did it to the

6     conclusion that the benefit-risk of the

7     ROCKET AF trial was not altered by the

8     information we had obtained.

9          And so the first step was the

10    sensitivity analysis, and then there were

11    continuous other analyses as described also

12    in the document.  And everything together has

13    to be taken into account.  And I cannot judge

14    what is the best piece of evidence.  I think

15    it's important that we look at everything

16    altogether.

17         Q.     In your opinion, is the

18    sensitivity analysis scientifically robust?

19         A.     That's depending on how you

20    define scientific robustness.  Typically in

21    clinical science, information from

22    prospective randomized double-blind big

23    pivotal studies is seen as robust, and so

24    it's important to look at this kind of

Protected - Subject to Further Protective Review

1    dataset.

2              And here in this case we really

3    did do the analysis retrospectively, but as

4    far as I can assess with my background what

5    the clinical and statistical colleagues did

6    is really that they -- they did it to the

7    best of their knowledge and tried to, for

8    example, predefine -- they predefined

9    analyses before they ran them, although

10   certainly, the ROCKET AF database was

11   unblinded already, so you could debate that,

12   whether anything -- you're doing an unblinded

13   database is robust, therefore, it's a

14   relative and not an absolute term.

15             But in that situation, given

16   that the data were already unblinded, we were

17   asked a question later on, did things

18   retrospectively, and taking that into

19   context, I think that the analysis as far as

20   I can judge, are robust.

21        Q.    Okay.  Are robust.

22             You talked about -- and I

23   understand there's different levels of

24   scientific evidence of prospective,

Protected - Subject to Further Protective Review

1    double-blind, multi-center is the best and it

2    goes down from there.

3         A.    Yes.

4         Q.    Fair?

5         A.    That's -- I mean, that's

6    typically the characteristics is

7    prospectively defined double-blind

8    randomized.

9         Q.    All right.  And also, there's a

10   certain methodology that should be employed,

11   the scientific method that's been around for

12   centuries, right?  Galileo articulated the

13   scientific method; hypothesis, generate data

14   to test the hypothesis, and then at the end

15   you form conclusions, right?

16        A.    That's typically how you do it

17   when you set up a new experiment or study.  I

18   mean, we don't call -- but certainly, you

19   provide an objective and a hypothesis, and

20   then you start it.  That's, yeah, what you

21   typically do.

22        Q.    You never start with a

23   conclusion.  That would be invalid?

24             MR. HOFFMAN:  Objection to the

Protected - Subject to Further Protective Review

```
1          form of the question.

2   BY MR. McWILLIAMS:

3          Q.     Fair?

4                 MR. HOFFMAN:  But you can

5          answer.

6          A.     I mean that's -- starting with

7   a conclusion is certainly not a typical way

8   of running a --

9   BY MR. McWILLIAMS:

10         Q.     I agree.  Isn't it true that

11  that's how you guys started the sensitivity

12  analysis, was with a conclusion?

13         A.     That's not true.

14         Q.     Okay.

15         A.     Because we certainly had a

16  framework for -- of information from the

17  Alere INR recall notice, and we had our

18  information from the entire ROCKET AF

19  dataset, but what was done was a statistical

20  analysis planned for this resensitivity

21  analysis, and then they were run afterwards.

22  So that was the most robust thing the team

23  could do in that situation.

24         Q.     Okay.  Well, again, my question
```

Protected - Subject to Further Protective Review

1  was whether or not you started with a

2  conclusion.  And did I hear you correctly

3  that you did not do that and that would be

4  inappropriate to do so?

5           MR. HOFFMAN:  Objection, asked

6      and answered.

7      A.    You did not phrase exactly what

8  you meant by it, and so certainly, we had --

9  we had the data of the ROCKET AF data in

10  hand, published, analyzed, and they had a

11  conclusion.  But the question here was a

12  different one, and it started going back to a

13  statistical analysis plan and a task to be

14  investigated.

15  BY MR. McWILLIAMS:

16      Q.    And I'm --

17      A.    And that led to a new

18  conclusion, if you want.

19      Q.    Well, I appreciate that, and

20  that's what I'm talking about.  The

21  sensitivity analyses, it would be

22  inappropriate to begin the sensitivity

23  analyses with a predetermined conclusion.

24  Would you agree with that?

Protected - Subject to Further Protective Review

 1              MR. HOFFMAN:  Objection, asked

 2        and answered.

 3        A.      I think that is -- I mean, that

 4   would be certainly not what you're typically

 5   doing, that you start like that.  But as I

 6   said, the data of the ROCKET AF trial were

 7   already available, and that could not be

 8   changed.

 9   BY MR. McWILLIAMS:

10        Q.      But that was for a different

11   analyses.  I'm talking about the sensitivity

12   analyses, and you've got to answer this

13   question.

14              Would you agree with me, ma'am,

15   that it would be inappropriate to start with

16   a conclusion prior to actually seeing the

17   results of the sensitivity analyses?

18              MR. HOFFMAN:  Objection, asked

19        and answered.

20        A.      I still don't understand why

21   you want to get at, because the question at

22   hand was whether the information that was

23   obtained from the Alere INR recall could have

24   any -- had any impact on the robustness of

Protected - Subject to Further Protective Review

```
 1   the ROCKET AF dataset, and so that is not a

 2   conclusion.  That's a question.

 3   BY MR. McWILLIAMS:

 4       Q.     Well, you have to run the data

 5   before you can answer that question, correct?

 6       A.     Right.

 7       Q.     All right.  And so it would be

 8   inappropriate to answer the question prior to

 9   running the data.

10           MR. HOFFMAN:  Objection to the

11       form of the question.

12   BY MR. McWILLIAMS:

13       Q.     Fair?

14       A.     I wouldn't call it

15   inappropriate.  It's just not possible

16   because you have to run the analysis before

17   you can do it.

18           MR. McWILLIAMS:  Okay.  Well,

19       let me hand you what's being marked as

20       Derix-9, which is Record No. 3394816.

21           (Whereupon, Deposition Exhibit

22       Derix-9, E-mail(s) re: 1st Draft EMA

23       Response to Request 2,

24       XARELTO_JANSSEN_16381911,
```

Protected - Subject to Further Protective Review

```
1          Ref. 3394816, was marked for

2          identification.)

3               MR. McWILLIAMS:  And its

4      attachment, which is Derix-10, which

5      is Record No. 3394817.

6               (Whereupon, Deposition Exhibit

7      Derix-10, Response to EMA Request,

8      XARELTO_JANSSEN_16381912 -

9      XARELTO_JANSSEN_16381920,

10      Ref. 3394817, was marked for

11      identification.)

12  BY MR. McWILLIAMS:

13      Q.    And so 9 -- and, again, this is

14  an e-mail you received from Dr. Berkowitz,

15  dated --

16      A.    Yes, it's from Scott Berkowitz.

17      Q.    Dated October 7th, 2015; is

18  that correct?

19      A.    Yes, that's correct.

20      Q.    So this is literally just a few

21  weeks after learning about the potential

22  impact -- strike that.

23               This was literally just a few

24  weeks after learning about the recall
```

Protected - Subject to Further Protective Review

1   applying to the device used in ROCKET,

2   correct?

3           A.      Yes, it's in the next month, so

4   we talked about September 9th.  This is

5   October 7th.

6           Q.      And you had not completed the

7   sensitivity analyses at this point, correct?

8           A.      May I read this first so I can

9   put it in context so I -- it's difficult to

10  remember all the different dates in the

11  course.  But it's clear -- yeah, here in the

12  text Scott says "No results yet," so --

13          Q.      No results yet.  So now let's

14  look at the attachment, which is marked as

15  Derix-10, which is a draft, you know, report,

16  reporting the sensitivity analyses.  And

17  let's go to the very end and see if there's

18  any conclusions.

19                  If you go to page 8, the final

20  bolded answers, down at the bottom, Evan, you

21  can see page 8.  Are you there, ma'am?  I

22  think you're on the wrong page, I apologize.

23  I think you want to go back one.

24                  MR. HOFFMAN:  She's on page 9.

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2        Q.     I apologize.  At the very

3    bottom it says --

4        A.     Page 8 -- it's a different

5    numbering at the bottom.

6            MR. HOFFMAN:  No, no.  You've

7        got it now.

8    BY MR. McWILLIAMS:

9        Q.     So "The MAH's view on the

10   impact of the results reported in the ROCKET

11   trials - initial thoughts ahead of

12   availability of sensitivity analyses."

13            And it's already written here

14   that the "Benefit-Risk, efficacy and safety

15   of Xarelto is not altered, results pending.

16   Issue related to the POC device/test strip

17   leading to potentially discrepant INRs."

18            Let's go to the next page.

19   "Efficacy of rivaroxaban in relation to

20   warfarin not anticipated to be affected, and

21   was not observed to be changed."  Again,

22   results pending.

23            Conclusions made without any

24   results.

Protected - Subject to Further Protective Review

```
1              Keeps going.  "Safety
2    comparison of rivaroxaban to warfarin not
3    found to be altered."  Again, making it very
4    clear, results pending.
5              Finally, "Whatever effect
6    device fault may have had on INR readings and
7    possible dose adjustments based on them did
8    not appear to affect the results of ROCKET,
9    results pending."
10             Did I read all that correctly?
11             MR. HOFFMAN:  Objection to the
12        form of the question.
13        A.    You read the text as far as
14   I -- yeah, as I have it in front of me.
15   BY MR. McWILLIAMS:
16        Q.    All right.  And that's because,
17   ma'am, you knew -- and this was an e-mail
18   sent to you by who, Dr. Berkowitz; is that
19   correct?
20        A.    It's an e-mail by Scott
21   Berkowitz, yes.
22        Q.    Okay.  And you were comfortable
23   or Dr. Berkowitz or whoever put that in the
24   conclusions in there, was comfortable putting
```

Protected - Subject to Further Protective Review

1    the conclusions to the sensitivity analysis

2    prior to actually seeing the data because you

3    all knew that sensitivity analyses can easily

4    be turned to say what one does or does not

5    want to hear.

6              MR. HOFFMAN:  Objection to the

7         form of the question.

8    BY MR. McWILLIAMS:

9         Q.    Right?

10        A.    I have to explain this type of

11   document here.  This is a typical document,

12   what we prepare in regulatory affairs teams

13   ahead of submissions in order to save time

14   until -- between availability of the

15   information and the actual submission.

16              And we call those documents

17   shell documents, and in those documents, we

18   outline what we already know, so the summary

19   of the analysis and those kind of things.

20              And after availability of the

21   analysis, the data are implemented in the

22   document and the document is finalized.  And

23   that was the type of document you're showing

24   here to me and which I have received as well.

Protected - Subject to Further Protective Review

1          Q.      But, Dr. Derix, the same

2    Dr. Berkowitz that sent you this draft

3    sensitivity analysis with the conclusions

4    inserted prior to any data being generated

5    had previously told you that this type of

6    analysis was essentially a fishing expedition

7    that holds no weight and can easily be turned

8    to say what one does or does not want -- let

9    me say that again.

10                 Dr. Derix, the same

11   Dr. Berkowitz that sent you this draft

12   sensitivity analysis with the conclusions

13   inserted prior to the data actually being

14   generated, is the same Dr. Berkowitz that had

15   previously told you that these type of

16   analyses are fishing expeditions and that

17   hold no weight, and that they can easily be

18   turned to say what one does or does not want

19   to hear, correct?

20                 MR. HOFFMAN:  Objection to the

21       form of the question.

22   BY MR. McWILLIAMS:

23         Q.      Do you remember him telling you

24   that?

Protected - Subject to Further Protective Review

1          MR. HOFFMAN:  Objection to the

2     form of the question.

3     A.     I cannot specifically recall

4     what you're citing from.

5     BY MR. McWILLIAMS:

6     Q.     Okay.  Then I won't --

7     A.     But certainly I'm working only

8     with one Scott Berkowitz, so if you could

9     just point me --

10    Q.     I'll try to refresh your

11    memory.

12    A.     And one point also in addition

13    to this document.  It clearly says "results

14    pending," so it clearly has this disclaimer,

15    and --

16    Q.     Right.  But right before the

17    "results pending" are -- just so happen to be

18    the exact same conclusions that we see in the

19    final EMA assessment report, right?  You guys

20    just -- you're that good, you just happened

21    to guess the right conclusion exactly right?

22          MR. HOFFMAN:  Objection to the

23    form of the question.

24    A.     Certainly, I said this is a

Protected - Subject to Further Protective Review

```
 1   draft document and it's a shell document

 2   before data are being imputed, and so as

 3   such, you have to look at it.

 4              And it doesn't mean that

 5   conclusions were firmly formulated because it

 6   says results pending, and that is the

 7   disclaimer for this can be changed once the

 8   data are available.  But it's certainly also

 9   showing a general confidence of the author

10   into our dataset as in general.

11   BY MR. McWILLIAMS:

12       Q.    All right.  I appreciate that,

13   Dr. Derix.  Let's get back to whether or not

14   Dr. Berkowitz had previously told you that

15   this type of analysis was just a fishing

16   expedition that held no weight, and that

17   essentially, your company was capable of

18   generating results that they wanted.

19              MR. HOFFMAN:  Objection --

20   BY MR. McWILLIAMS:

21       Q.    Do you have any memory of him

22   communicating that to you?

23              MR. HOFFMAN:  Objection to the

24       form of the question.
```

Protected - Subject to Further Protective Review

1      A.      I don't recall in context of

2   this document or this analysis.  Also there

3   may be some different context, but you would

4   have to refresh my memory.

5              (Whereupon Deposition Exhibit

6         Derix-11, ROCKET AF Task Force Chat

7         Transcript, XARELTO_BHCP_07993872 -

8         XARELTO_BHCP_07993873, Ref. 3396352,

9         was marked for identification.)

10  BY MR. McWILLIAMS:

11     Q.      Okay.  I'll refresh your

12  memory.  Let me hand you what's been marked

13  as Derix-11, which is Record 3396352.

14     A.      Okay.

15     Q.      And you see, this is a document

16  titled "ROCKET AF Task Force," dated

17  September 22nd, 2015; is that correct?

18     A.      Yes, sorry.

19     Q.      Have you seen this document in

20  the last two weeks?

21     A.      Yes, I've got it from William

22  Hoffman, yes.

23     Q.      You got -- your lawyer showed

24  this to you recently?

Protected - Subject to Further Protective Review

1      A.     Yes.

2      Q.     Okay.  So did you remember this

3  document when I asked you two minutes ago

4  whether or not Dr. Berkowitz told you this

5  was a fishing expedition that held no weight

6  and that you could turn the results to say

7  whatever you want?

8      A.     You made a citation, and I mean

9  I didn't hold the document, and so...

10     Q.     All right.  But your lawyer

11  showed you this document, right?

12     A.     Yes.

13     Q.     They knew this was going to

14  come up in your deposition.

15     A.     They showed it to me because

16  I --

17             MR. HOFFMAN:  Don't reveal any

18      of the discussions between counsel.

19      You've answered the question already.

20      That's fine.

21             MR. McWILLIAMS:  All right.

22  BY MR. McWILLIAMS:

23     Q.     Well, let's look at -- and this

24  is a chat, right, back and forth between you

Protected - Subject to Further Protective Review

1    and Dr. Berkowitz?

2         A.     Yeah, this is a recorded chat.

3         Q.     This is a communication back

4    and forth between the two of you, correct?

5         A.     That's correct, yes.

6         Q.     All right.  And the AF task

7    force, this was the group of people that set

8    up to evaluate and investigate this Alere

9    INRatio issue, correct?

10        A.     ROCKET AF task force, yeah, was

11   the -- the team was Janssen and Bayer.

12        Q.     That's what this whole -- okay.

13               And let's look at what

14   Dr. Berkowitz said to you on September 22nd,

15   2015, at 7:36 a.m.  He says, "Yes, I

16   understand that.  I always have difficulty

17   with these types -- with these kinds of

18   retrospective analyses, basically 'fishing

19   expeditions.'  They hold almost no weight for

20   me and can easily be turned to say what one

21   does or does not want to hear."

22               Did I read that correctly?

23        A.     I have to look where you are.

24   Okay, now I have it.  Uh-huh.

Protected - Subject to Further Protective Review

1       Q.      Does that refresh your memory

2  as to what Dr. Berkowitz told you about the

3  sensitivity analyses?

4       A.      That's a totally different

5  point in time, so this is really earlier.

6  This is the 22nd of September when it was at

7  a point in time when we really, yeah, were

8  starting to explore what we could do in order

9  to provide sufficient information and rule

10 out potential impact and investigate a

11 potential impact of the recall notice.

12              And I don't recall the specific

13 meeting, but it was really starting kind of

14 as brainstorming in the team, what could be

15 done to -- in the situation, with having not

16 so much information from Alere other than the

17 recall notice, having, yeah, closed our

18 database already for some years, and had to

19 go back, and that is in the context.

20              It was not in the context of

21 when we later on were already a step further

22 ahead, where we had made up our mind and had

23 some discussions.  And what Scott is writing

24 here is his general impression and attitude

Protected - Subject to Further Protective Review

 1   towards, yeah, retrospective analysis.  So he

 2   says that, in general, yeah, the

 3   retrospective analyses are weaker than

 4   prospective randomized, what we talked about

 5   beforehand, and that in the context he used

 6   is what -- of a fishing expedition, because

 7   if it is not done thoroughly, such

 8   retrospective analysis, it's just -- could be

 9   considered as weaker.

10            But later on, that's what you

11   see here in this communication as well, I

12   convinced him that we have only this

13   opportunity to work with the data that we

14   have to respond to the question, and that we

15   have to -- and that's the only way to analyze

16   if we would deny a retrospective analysis

17   just from the beginning, just because we feel

18   they are weaker than prospective analysis,

19   then we would -- could not, yeah, respond to

20   the questions that are -- that were

21   addressed.

22            And so it was important for us

23   to find a way to set up analysis that are as

24   vigorous as possible in this situation, and

```
 1    work through them.

 2              And it does not mean that

 3    really it was a preempting of conclusions

 4    here.  He's raising his general concern about

 5    retrospective analysis.

 6         Q.    Are you done?

 7              THE WITNESS:  Yes.

 8              MR. McWILLIAMS:  Okay.  I move

 9         to strike as nonresponsive.

10    BY MR. McWILLIAMS:

11         Q.    Doctor, my question was simply

12    whether or not this refreshes your memory as

13    to whether or not Dr. Berkowitz used those

14    words and communicating them to you in

15    September of 2015.

16              MR. HOFFMAN:  Objection.

17    BY MR. McWILLIAMS:

18         Q.    Yes?  Did he?

19         A.    He used those words --

20         Q.    That's all I'm asking.

21         A.    -- in this communication,

22    that's --

23         Q.    That's all I'm asking.

24         A.    That's correct.
```

Protected - Subject to Further Protective Review

1    Q.    I appreciate it.  And we'll ask

2  Dr. Berkowitz what he meant, but you seem to

3  have suddenly remembered a whole lot about

4  this conversation.  I'm impressed.

5           MR. HOFFMAN:  Object to the

6       colloquy from counsel.

7           MR. McWILLIAMS:  I'm genuinely

8       I'm impressed.

9           MR. HOFFMAN:  I'm genuinely

10      impressed too, but that doesn't mean

11      anything in a court of law.

12  BY MR. McWILLIAMS:

13    Q.    Well, did you ever communicate

14  to EMA that the sensitivity analyses was a

15  fishing expedition that holds almost no

16  weight?  Can I find that anywhere in the EMA

17  report, those words?

18    A.    Those words are in a

19  conversation, and they are, how do you say

20  this --

21           (Interpretation.)

22           THE INTERPRETER:  Everyday

23      language, in nontechnical language.

24    A.    And they were, as I said,

Protected - Subject to Further Protective Review

1     really of general nature, and they were not

2     related directly to the analyses that were

3     performed later on.

4               And I'm sure that EMA

5     understands the nature of retrospective

6     analysis, and that we had also set up the

7     analysis plan before we ran the analysis that

8     was the most strict approach we could take at

9     the -- in that situation.

10              MR. McWILLIAMS:  I move to

11         strike as nonresponsive.

12    BY MR. McWILLIAMS:

13         Q.    Doctor, my question was simply

14    whether or not we can find any of those

15    sentiments in this document, that

16    it's Dr. Berkowitz's opinion that these type

17    of analyses are fishing expeditions that hold

18    almost no weight and can be generated to

19    generate whatever data one does or does not

20    want to see.  Is that information in any way,

21    shape or form contained in this EMA

22    assessment report?

23              MR. HOFFMAN:  Objection, asked

24         and answered.

Protected - Subject to Further Protective Review

```
 1        A.      I do not agree to your

 2   statements and to also -- what you can find

 3   is in the assessment report, and I don't know

 4   exactly does -- about how to -- that EMA also

 5   acknowledges that some of the analysis that

 6   they asked for and that were run had

 7   limitations.

 8                And so they fully understand,

 9   and that's also the way how it was presented

10   and to discuss with EMA, that, yeah, those

11   are retrospective analyses, and they have to

12   be looked at knowing this and understanding

13   what the limitations are, but also what the

14   benefits are in gathering information.

15                MR. McWILLIAMS:  I move to

16        strike as nonresponsive.

17   BY MR. McWILLIAMS:

18        Q.      Let's continue looking through

19   Derix-4, which is the EMA assessment report.

20   If you go to the bottom of page 19, there's a

21   further discussion of the sensitivity

22   analyses.

23                At page 19, the very bottom,

24   Evan, it says, "The CHMP considered that
```

Protected - Subject to Further Protective Review

1  there are uncertainties related to these

2  analyses, and it is assumed that the

3  available information is probably somewhat

4  limited, for example, fibrinogen levels have

5  not been measured regularly and is rarely

6  measured in clinical routine.  The analyses

7  were based on the assumption that INR values

8  are only affected in case of recall-related

9  conditions."

10          Did I read that correctly?

11     A.     You read that correctly.

12     Q.     And is that consistent with

13  your understanding of the sensitivity

14  analyses, that they were based upon an

15  assumption that the INR values are only

16  affected in case of recall-related

17  conditions?

18     A.     That's correct, because that's

19  what the assumption was, that that was the

20  reason why FDA considered this warning or the

21  limitation of the patient population that

22  introduced the ratio, the INR ratio, revised,

23  because in those patients, the deviations had

24  occurred, so that was how we interpreted the

Protected - Subject to Further Protective Review

1    recall.

2         Q.    But we know now that the INR

3    values were not affected only in patients

4    with recall-related conditions, correct?

5         A.    It depends on how you define

6    "affected" and so that -- the only thing what

7    we know is that we did not see in some of the

8    analyses a difference in comparing the

9    patient populations that are affected by the

10   recall and patient populations that are not

11   affected by the recall.

12        Q.    But what, if anything, did you

13   do to test that assumption?

14        A.    Which assumption do you mean?

15        Q.    That the -- the assumption that

16   INR values are only affected in case of

17   recall-related conditions.

18        A.    That came from the information

19   we had from the recall notice.  I mean, that

20   was just what we took as fact and worked with

21   that as a fact.

22        Q.    But you understand you had

23   paired samples, you had 10,000 paired samples

24   when you could look to see if there was a

Protected - Subject to Further Protective Review

1    discrepancy between what the INR value was

2    generated by the point-of-care device as

3    compared to a central lab value, correct?

4         A.    We talked about this earlier,

5    yeah, these samples from week 12 and week 24

6    from the central lab.

7         Q.    And you did find that there

8    were differences, there were discrepancies?

9         A.    That's typically the -- if you

10   compare two analytical methods, there is a

11   variation around the mean, and so here again,

12   we're going into very much detail of lab and

13   analytical knowledge.  I would like to refer

14   you to colleagues who know this much better.

15   But that's, in very general terms, what --

16        Q.    I'm sure we will talk to your

17   colleagues about that.  But you would agree

18   that -- let's just see, but you are aware

19   that they compared the point-of-care values

20   with the central lab values, right?

21        A.    Yes, that's part of the

22   document here was displayed and some of the

23   analogies and plots that were made.

24        Q.    Let's go to page 21, please,

Protected - Subject to Further Protective Review

1    and let's see what the EMA says about that

2    comparison when you compare central lab with

3    point of care.

4                    Paragraph number 4, Mr. Wolfe.

5                    Are you on page 21, Doctor?

6    Let's read what they say.  They say, "The

7    preliminary data" --

8                    MR. HOFFMAN:  Hold on a second.

9         I don't think she's on the page.

10                   MR. McWILLIAMS:  Page 21.

11        A.    You said 21 or 20?

12   BY MR. McWILLIAMS:

13        Q.    21.

14        A.    Okay, uh-huh.

15        Q.    Numbered paragraph 4, it says,

16   "The preliminary data provided on INR values

17   estimated simultaneously on weeks 12 and 24

18   with the two methods (POC device vs. the lab)

19   indicate that discrepancies of potential

20   clinical relevance were rather frequently

21   observed (approximately in 35% of the

22   estimations)."

23                   Did I read that correctly?

24        A.    Yes, that is correct.

Protected - Subject to Further Protective Review

1      Q.     And that's just simple math,

2  that there is the values, the INR values that

3  were generated by the point-of-care device,

4  the device that was used to manage the

5  warfarin patients, was generating different

6  values than the lab when they analyzed blood

7  from the exact same patient, collected the

8  exact same day, right?

9      A.     I have to -- I don't know

10  whether it was exact same day, so --

11      Q.     It was.  It was.

12      A.     -- again it was very much in

13  detail --

14            MR. HOFFMAN:  Let her finish

15      her answer, please.

16      A.     And also, we discussed earlier

17  about the differences and this kind of

18  technicality around plasma sample collection

19  and the measurement.

20            But that's correct, it's the

21  same patient data.

22  BY MR. McWILLIAMS:

23      Q.     Will you accept my

24  representation that they were from the same

Protected - Subject to Further Protective Review

1    day?

2                    MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.    I don't -- I don't know that,

5    and I would have to --

6    BY MR. McWILLIAMS:

7         Q.    Do you have any reason to

8    disagree with me?

9         A.    I can nor disagree nor agree

10   because I just simply said I don't know.

11        Q.    Okay.  Let's go to page 25,

12   please.  Up at the top, the second full

13   paragraph, Evan, that begins with "A simple

14   graphical presentation."

15                    In that last sentence, it says,

16   "Furthermore the attachment provided a

17   discussion of the discrepancies between the

18   two methods where the definition for a

19   discrepancy was adapted from the 2007 ISO

20   guidance document."

21                    Did I read that correctly?

22        A.    Yes, you read that correctly.

23        Q.    And you were responsible for

24   collecting that guidance information,

Protected - Subject to Further Protective Review

1    correct?

2         A.    I was part of the team that

3    collected, yeah, the respective ISO guidance

4    information from other experts in the company

5    who have knowledge about medical devices and

6    standards, yes.  I made that contact.

7         Q.    And why were you selected to --

8    with that particular responsibility?

9         A.    When the team was formed, there

10   were -- yeah, we formed several sub-tasks for

11   this -- yeah, ROCKET AF investigation.  And

12   so we wanted to have one Bayer colleague in

13   each of the teams, and so most of the teams

14   had already representatives, but this one

15   not.

16              And therefore I deliberately

17   self-assigned myself into that team as a

18   Bayer representative, and also because I know

19   quite a number of colleagues in the company,

20   and proposed to reach out to them.

21        Q.    And your counterpart at Janssen

22   was Sig Johnson; is that correct?

23        A.    That's correct, yes.

24              MR. McWILLIAMS:  Okay.  Let me

Protected - Subject to Further Protective Review

1          hand you what we're marking as

2          Derix-12, Record 3407882.

3                    (Whereupon, Deposition Exhibit

4          Derix-12, Xarelto Teams Overview Org

5          Chart, XARELTO_BHCP_08065503 -

6          XARELTO_BHCP_08065505, Ref. 3407882,

7          was marked for identification.)

8     BY MR. McWILLIAMS:

9          Q.    And we can cover this quickly.

10    Is this a depiction of the teams, of the team

11    that was built to address this issue of the

12    potential device malfunction in ROCKET?

13         A.    I have to -- I just need to

14    look at it.

15                    (Document review.)

16         A.    This is, again, from the Bayer

17    issue management process, so this is the team

18    structure that was involved from a Bayer --

19    pure Bayer perspective.

20    BY MR. McWILLIAMS:

21         Q.    Okay.  But you see the section

22    titled "Device Characteristics," and it has

23    your name listed?

24         A.    I don't see it yet, but it must

Protected - Subject to Further Protective Review

1    be --

2                    MR. HOFFMAN:  Here.

3         A.     Yeah, yeah.  Yeah.

4    BY MR. McWILLIAMS:

5         Q.     And to the right of that it

6    says "Summary of device standards and related

7    standard deviations"?

8         A.     Yes, that was the task of the

9    team.

10        Q.     Okay.  And so one of the things

11   you looked up was the ISO standard that

12   applies to point-of-care INR measuring

13   devices, correct?

14        A.     That's correct.

15                   MR. McWILLIAMS:  Okay.  Give me

16        one second.  I'm going to pull that up

17        for you.

18             (Whereupon Deposition Exhibit

19        Derix-13, E-mail(s) re: References for

20        INR ratio specifications,

21        XARELTO_JANSSEN_1552217 -

22        XARELTO_JANSSEN_1552218, Ref. 3109548,

23        was marked for identification.)

24   BY MR. McWILLIAMS:

Protected - Subject to Further Protective Review

1        Q.       I'm going to hand you what's

2   been marked as Derix-13, Record 3109548.  Is

3   this an e-mail you received on November 12th,

4   2015?

5        A.       Yes.

6        Q.       The subject line is "References

7   for INR ratio specifications"?

8        A.       Yes.

9        Q.       Have you reviewed this e-mail

10  in the last couple of weeks in preparation

11  for your deposition?

12       A.       No, not specifically this

13  e-mail.

14       Q.       Okay.  Let's look at this

15  e-mail that you received -- and you received

16  this e-mail in the ordinary course of

17  business?

18       A.       What do you mean with that?

19       Q.       I don't know what that means

20  either.  It's a silly thing that lawyers ask.

21  I'll keep going.

22              "Dear All, The 30% acceptance

23  criteria is the specification stated in the

24  2007 ISO 17593 guidance document

Protected - Subject to Further Protective Review

```
 1   (Section 8.6, Minimum acceptable system

 2   accuracy), for INR interval between 2 and

 3   4.5."

 4                 Did I read that correctly?

 5       A.     Yes.

 6       Q.     And what does that mean,

 7   "minimal acceptable system accuracy"?

 8       A.     It's giving a kind of -- it's

 9   giving a specification that says that, yeah,

10   I mean, this 30% is the specification for --

11   that was describing somewhat the variability

12   I just mentioned between two measurements,

13   and it's kind of the --

14       Q.     Right.  You don't expect them

15   to line up perfectly --

16       A.     Right.

17       Q.     -- but you expect them to line

18   up to a certain degree; is that fair?

19       A.     Yes, that's fair.  So it's what

20   we call specification.

21       Q.     And the way you determine how

22   much alignment you expect is defined in this

23   ISO standard, correct?

24       A.     It's -- yeah, it's defined in
```

Protected - Subject to Further Protective Review

1    the ISO standard for this specific device and

2    also for the comparison to a reference

3    method.

4         Q.     Right.

5         A.     And as I mentioned before, it's

6    also certainly assuming to apply the method

7    in a certain way.

8         Q.     And "The minimum accepted

9    accuracy for results produced by an oral

10   anticoagulant monitoring system for

11   self-testing shall be as follows:  90% of the

12   difference between results from the oral

13   anticoagulant monitoring system and results

14   from the reference measurement procedure."

15             Do you see where I'm reading

16   from?

17        A.     I lost you.

18        Q.     This is in the e-mail.  It

19   says -- where it says "The exact guidance

20   follows."

21             MR. HOFFMAN:  Starting here.

22             THE WITNESS:  Ah, yeah, uh-huh.

23   BY MR. McWILLIAMS:

24        Q.     So you're aware of what the

Protected - Subject to Further Protective Review

1  minimum threshold was, what the minimum

2  performance that's expected according at

3  least to these ISO standards, correct?

4       A.    Yes.  So Sig cited from the ISO

5  standard specifications, and that's

6  understood here in the e-mail.

7       Q.    And the minimum expected per

8  this ISO standard is 90% or greater, correct?

9            MR. HOFFMAN:  Objection to the

10       form of the question.

11      A.    I mean, it says -- as to just

12  to me -- 90% of the difference is between

13  results from the system and results from the

14  reference measurement procedure, and then it

15  continues to be more specific as to the INR

16  ranges that are applied, yes.

17  BY MR. McWILLIAMS:

18      Q.    Right.  But the threshold, the

19  minimum acceptable threshold is 90%, correct?

20      A.    Minimum acceptable accuracy.

21      Q.    Right.  And the device -- the

22  point-of-care device, the INRatio device in

23  ROCKET compared to the central lab at week 12

24  and 24, failed to meet that minimum

Protected - Subject to Further Protective Review

1    acceptable system criteria, correct?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.     That's not how you can phrase

5    it because only Alere knows the results of

6    the testing of the Alere INR device according

7    to those ISO standards because they did

8    validation and analysis work that they had to

9    submit to the health authority.  We are

10   not -- we are not privileged to have this

11   information.

12              And that followed exactly those

13   guidance.  And by approval of the Alere INR

14   device, we have to assume that the

15   information that was looked at showed that

16   the accuracy of the device was within the

17   required specification.

18   BY MR. McWILLIAMS:

19        Q.     It wasn't -- you're saying it

20   was within the required specification?

21        A.     That's what I said, what the

22   approval of such a device --

23        Q.     Right.

24        A.     -- yeah --

Protected - Subject to Further Protective Review

1     Q.     Well, I'm talking about how the

2  device performed in ROCKET.  And your company

3  analyzed the data.  It compared the

4  point-of-care measurements with the central

5  lab measurements.

6     A.     Yes.

7     Q.     And then compared it to the ISO

8  standard, and concluded it failed to meet the

9  90% minimum criteria, correct?

10          MR. HOFFMAN:  Objection to the

11      form of the question.

12     A.     No, that's not correct in the

13  way you phrase it.  We used the ISO criteria

14  to guide and to apply our dataset to it, but

15  we did not really do the same thing as is

16  described in the ISO guidance.  We just used

17  this as a -- yeah, as a set of criteria to

18  guide the analysis.

19  BY MR. McWILLIAMS:

20     Q.     You did the analysis but you

21  didn't form any conclusion; is that fair?

22  You compared the data to the ISO standard,

23  correct?

24     A.     Yes.

Protected - Subject to Further Protective Review

1     Q.     Okay.  Well, let's look at that

2  together, and maybe we can form a conclusion

3  together.  So let's --

4     A.     Maybe I didn't -- I

5  misunderstood your question.  So I did not

6  mean it was my method.  We didn't take a

7  conclusion from it, so I just meant that we

8  used the ISO standards to guide the analysis,

9  yeah.

10     Q.     And did the point-of-care

11  device meet the ISO standards, meaning 90% or

12  more?

13     A.     No, it did not meet the 90%.

14     Q.     That's all I asked.

15          MR. HOFFMAN:  She's not

16     finished.

17     A.     It says also here in the

18  document that nearly 90% of the

19  warfarin-treated subjects had no discrepancy

20  observed between the lab INR and the device

21  INR at week 12 or 24, and is exactly, it

22  says, 87% of INR fall in range.

23  BY MR. McWILLIAMS:

24     Q.     So 87 is less than 90, right?

Protected - Subject to Further Protective Review

1      A.      87 is less than 90, that's

2   correct.

3      Q.      So if a passing grade is 90 and

4   you get an 87, do you pass the class?

5              MR. HOFFMAN:  Objection to the

6         form of the question.

7      A.      I said again, we used this

8   information to guide our analysis, and we did

9   not perform a validation analysis according

10  to the ISO standard.  That's what Alere did.

11             So we used the data that were

12  not supposed to build the plan for testing

13  according to ISO standards retrospectively as

14  a guidance, and so that's -- it was -- that's

15  something different.

16             MR. McWILLIAMS:  Move to strike

17        as nonresponsive.

18  BY MR. McWILLIAMS:

19     Q.      Doctor, you went to school and

20  you know what it means to -- you have to

21  perform to a certain degree to get a passing

22  grade, right?  You understand that basic

23  concept, right?

24     A.      Yes.

1    Q.    And you understand that if

2  you -- and there are certain scores that one

3  must achieve in order to get a passing grade,

4  correct?

5    A.    Yes, that's correct.

6    Q.    And if you -- and if your score

7  is less than the passing grade, you don't

8  pass the class, do you?

9    A.    It depends on the exam, and

10  that's exactly a good example, because the

11  passing grade is always related to the exam

12  it belongs to.  And we are here talking about

13  very similar approaches, but not exactly the

14  same.

15    Q.    But the INR --

16    A.    So, therefore, yeah...

17    Q.    The ISO passing grade is 90 or

18  better, and the INRatio device as used in

19  ROCKET had a score of 87, correct?

20        MR. HOFFMAN:  Objection to the

21      form of the question.  Asked and

22      answered.

23    A.    Your cite of the data are

24  correct of that 87%, and our analysis fall in

Protected - Subject to Further Protective Review

1  range.

2  BY MR. McWILLIAMS:

3       Q.     And 87 is less than 90,

4  correct?

5       A.     And 87 is less than 90, that's

6  correct.

7       Q.     Okay.  And there's no reference

8  to 87 in the ISO guidance.  The guidance

9  references 90, correct?

10       A.     The ISO guidance references 90,

11  right.

12       Q.     All right.  Like they have --

13  do they have drunk driving laws in Germany,

14  like a blood alcohol content?

15       A.     I don't understand what you're

16  referring to.

17       Q.     Well, in the United States, if

18  you have more than .08 blood alcohol content,

19  it's considered drunk and you're not allowed

20  to drive a car.

21            MR. HOFFMAN:  Do you want to

22       ask the translator about this, if you

23       don't understand it.

24            THE WITNESS:  I understand what

Protected - Subject to Further Protective Review

1    he means.

2              MR. McWILLIAMS:   Okay.

3              MR. HOFFMAN:   Okay.

4    BY MR. McWILLIAMS:

5         Q.    So if you're almost not drunk,

6    that doesn't get you out of jail, does it?

7              MR. HOFFMAN:   Objection to the

8         form of the question.

9         A.    It's -- again, it's an analogy

10   you can look at different things.  So I mean,

11   the alcohol test is also based on always the

12   same methods, and if you would have a

13   policeman who applied the alcohol test in a

14   totally -- in a different way, you would also

15   probably question whether this is okay.

16             And so we have to really bear

17   in mind that analyzing retrospectively data

18   from a sample set that was taken for a

19   totally different purpose and applying an ISO

20   standard that is designed -- or is based on

21   the specific design of an analysis, that

22   somehow I wouldn't say apple and pears is too

23   extreme because we said we make the link, but

24   they're not exactly the same.

Protected - Subject to Further Protective Review

1            And when you look at what the
2   health society concluded from that for them,
3   it finally -- looking at all the data they
4   analyzed, it was okay for them.  They
5   concluded that the data -- all the data and
6   all the information they had seen, including
7   this 87% INR fall in range, led them to the
8   final conclusion that there is -- such
9   information is sufficient, and they conclude
10  that the benefit-risk of ROCKET AF is not
11  altered.
12            MR. McWILLIAMS:  I move to
13        strike as nonresponsive.
14  BY MR. McWILLIAMS:
15      Q.    Do you remember my question?
16  What question were you just answering?
17      A.    You can repeat it for me if you
18  had the impression I did not respond
19  according to your expectation.
20            MR. McWILLIAMS:  I move to
21        strike as nonresponsive.  Let's keep
22        reading.
23  BY MR. McWILLIAMS:
24      Q.    Go to page 26, please.  Whose

Protected - Subject to Further Protective Review

1    idea was it to compare the point of care and

2    central lab with the ISO standards?  Was it

3    EMA's idea, or was it Bayer's idea?  Or if

4    you know.

5         A.     It was proposed by EMA, but I

6    remember that also in the team we had some

7    discussion whether this information could be

8    useful, and you showed me the e-mail from

9    Ms. Cohen, who somehow also had suggested to

10   use the information from week 12 and week 24.

11   And we had some discussion whether this could

12   also contribute and form --

13        Q.     She also suggested the ISO

14   standard too, didn't she?

15        A.     I don't recall that, but I just

16   recall that she mentioned the week 12 and 24

17   sampling.

18        Q.     But ultimately, it was EMA that

19   asked Bayer to include that analysis, to

20   compare the point of care and central lab

21   data to the ISO standard, correct?

22        A.     I do not recall the detail

23   because there was quite some work ongoing in

24   the regulatory team back and forth with EMA,

Protected - Subject to Further Protective Review

1    but, yeah, that's what you can see from the

2    sequence.

3              So our first proposal was the

4    sensitivity analysis, and then the additional

5    information was added later on.

6         Q.    Okay.  Let's go to page 26,

7    which is where they discussed the results of

8    the ISO comparison or the ISO analysis.

9              The very top, full paragraph,

10   Evan.  It's discussing, in this table,

11   "subjects with an unascertainable difference

12   are not included in the Yes or No category."

13             It continues and says, "No

14   discrepancy was observed in almost 90% of

15   those warfarin-treated subjects."

16             Did I read that correctly?

17        A.    Yes.

18        Q.    And, again, the reason that

19   you're using 90 is because you know 90 is the

20   standard.  That's why you're saying it's

21   almost 90?

22             MR. HOFFMAN:  Objection to the

23        form of the question.

24             ///

Protected - Subject to Further Protective Review

```
 1   BY MR. McWILLIAMS:

 2        Q.     Right?

 3        A.     Yeah, the ISO guidance is cited

 4   also here in the document, so --

 5        Q.     Almost 90 is less than -- is

 6   not 90, correct?

 7               MR. HOFFMAN:  Objection.

 8   BY MR. McWILLIAMS:

 9        Q.     Simple English, right?

10        A.     Almost 90 is -- yeah, okay.

11   Hard to say.

12               (Interpretation.)

13               THE INTERPRETER:

14        Approximation.

15        A.     Approximation to 90.

16   BY MR. McWILLIAMS:

17        Q.     Well, it's not an

18   approximation.  You could say approximately

19   90, but almost 90 means you're falling short

20   of 90, correct?

21        A.     If you look later --

22        Q.     I know, it says 87.

23        A.     -- in the section, it says 87.

24        Q.     I know.  We'll get there.  But
```

Protected - Subject to Further Protective Review

1    in this text, it says almost 90, right?

2         A.    Yeah, but that's almost 90,

3    yes.

4         Q.    And then down again, the next

5    full paragraph below, it says nearly 90.

6         A.    It says nearly 90, yes.

7         Q.    Again, not 90, but nearly 90,

8    less than 90, correct?

9         A.    Nearly 90, yeah.

10        Q.    And then it's confirmed at the

11   end and it tells us the actual number, 87,

12   right?

13        A.    Yes, it says 87.

14        Q.    So 90 is the threshold, and you

15   guys fell just short, right?

16             MR. HOFFMAN:  Objection,

17        misstates the evidence.

18             You may answer.

19        A.    Again, as we discussed, 90% is

20   a value that is given in the ISO guidance,

21   which was used here in this context as -- and

22   that is also mentioned in the text as a

23   guiding principle for the analyses that were

24   run with these existing data.

Protected - Subject to Further Protective Review

1  BY MR. McWILLIAMS:

2      Q.     Thank you for that.

3             If you go to page 27, please.

4      A.     Yes.

5      Q.     And so this is where the EMA is

6  discussing the point of care versus central

7  lab data.  And I want to draw your attention

8  this middle paragraph that begins, "It is

9  also concluded."

10            Do you see where I am?

11     A.     Uh-huh, yes.

12     Q.     And EMA writes, "It is also

13  concluded that the originally performed

14  sensitivity analyses provided in October 2015

15  do not seem to have captured the

16  discrepancies observed at week 12 and 24.

17  These analyses were based on retrospective

18  identification of patients with clinical or

19  laboratory conditions where the device

20  estimated INR would be unreliable according

21  to the Alere recall notice information."

22            Did I read that correctly?

23     A.     You read that correctly.

24     Q.     So what that means is that

Protected - Subject to Further Protective Review

1   there were discrepancies observed between the

2   point-of-care device and the central lab, but

3   it was not in alignment with the original

4   sensitivity analyses the company performed,

5   right?

6       A.    It's depending how you phrase

7   it again.  And we talked about it.  The -- if

8   you look at this graph here, you can see that

9   there are deviations from the -- I mean, in

10  this correlation graph and device-based INR,

11  whereas this lab-based INR, and that is what

12  is meant by deviation discrepancies.

13          And those discrepancies are

14  across the entire patient population.  That's

15  what we all saw, and so, therefore, it means

16  that -- certainly at the -- yeah, and that

17  says that the sensitivity analysis have --

18  does not seem to have captured -- or you

19  could say it the other way around, this does

20  not confirm in some way the recall notice.

21      Q.    Right.

22      A.    But --

23      Q.    But a discrepancy was observed,

24  right?  The INR values were not as expected,

Protected - Subject to Further Protective Review

1    as generated by the point-of-care device.

2         A.    It's not as you would say, it's

3    not as expected, and that's also not the

4    conclusion EMA drew here, so they just said

5    that -- you see -- I mean, the deviation from

6    the mean here, and we talked about it also in

7    that context of the 87% INR, but it -- it

8    just tells that there was no -- obviously, no

9    difference whether the patient had these

10   conditions or not.

11        Q.    Right.

12        A.    And so it's additional

13   information that -- that was obtained by both

14   analysis.

15        Q.    If you --

16             MR. HOFFMAN:  Hold on.

17        A.    So both analysis have their own

18   value in itself, and the whole package of

19   analysis was used by EMA to conclude that

20   it's not impact on the benefit-risk of the

21   ROCKET AF data.

22             MR. McWILLIAMS:  Move to strike

23        as nonresponsive.

24             ///

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2          Q.    I simply asked that a

3    discrepancy was observed, that INR values

4    were not as expected as generated by the

5    point-of-care device, correct?

6                MR. HOFFMAN:  Objection, asked

7          and answered.

8          A.    It says that discrepancies were

9    observed, but it does not say here that it

10   was not as expected.  That's your

11   interpretation.

12               But here it says discrepancies

13   were observed at week 12 and 24, and that was

14   displayed in the graph as well.

15   BY MR. McWILLIAMS:

16         Q.    Okay.  So you're saying

17   discrepancies were expected?  You were hoping

18   this device would generate accurate and

19   reliable INR values, correct?

20         A.    We talked about the methodology

21   beforehand, that if you compare two methods,

22   there is some discrepancy expected just

23   because of the technicality in the

24   measurements.

Protected - Subject to Further Protective Review

```
1              And so, yes, that's also

2   described in the ISO guidance that you would

3   not expect exactly the same value at any

4   point in time you measure it.

5        Q.    Right.

6        A.    Otherwise, you would see just a

7   line here in this graph, and that's not what

8   you see.

9        Q.    Right.  So it confirms that the

10  device malfunctioned, right?

11              MR. HOFFMAN:  Objection to the

12       form of the question.

13       A.    Again, that's the conclusion

14  that you are drawing here, which was not

15  taken by the health authority.  The health

16  authority says that the analysis captures the

17  discrepancies, but when they came to their

18  conclusion, they found that the data that

19  were provided do not alter the benefit-risk

20  trial -- the benefit-risk assessment in the

21  ROCKET AF trial.

22              MR. McWILLIAMS:  Move to strike

23       as nonresponsive.

24              ///
```

Protected - Subject to Further Protective Review

1  BY MR. McWILLIAMS:

2      Q.    Dr. Derix, did the device

3  malfunction in ROCKET?

4            MR. HOFFMAN:  Objection, asked

5       and answered.

6  BY MR. McWILLIAMS:

7      Q.    Your opinion.  Not EMA's

8  opinion, not Bayer's opinion.  In your

9  opinion, did the device malfunction?

10           MR. HOFFMAN:  Objection.

11     A.    I just -- I mean, I just refer

12 to the data that are here, and all the

13 information that we have, and we talked about

14 it, and we -- what is noted here, and that's

15 also what I stand behind is the information

16 about the variability, which we saw.

17           But that does not lead to the

18 conclusion that the device did malfunction in

19 my view, personally.

20 BY MR. McWILLIAMS:

21     Q.    All right.  So your personal

22 view is that the device did not malfunction

23 in ROCKET?  Did I hear you correctly?

24     A.    I just referred to all the

Protected - Subject to Further Protective Review

```
1    information that we have here and that we

2    have evaluated very transparently, and so

3    that's what I -- what I want.  I stand

4    behind.

5         Q.    That the device did not

6    malfunction in ROCKET?  Can I get you to say

7    those words, the device did not malfunction

8    in ROCKET?

9              MR. HOFFMAN:  Objection to the

10        form of the question.  Asked and

11        answered.

12        A.    I could respond to the question

13   if you have defined malfunction, because

14   that's not a term that has been used in any

15   of the definitions or -- and that's a

16   judgment call in my view, what --

17   BY MR. McWILLIAMS:

18        Q.    Well, do you agree with this

19   statement, that there were discrepancies

20   observed of potential clinical relevance and

21   they were observed rather frequently?

22              MR. HOFFMAN:  What page are you

23        on?

24        A.    Where did you get this from?
```

Protected - Subject to Further Protective Review

```
 1   BY MR. McWILLIAMS:

 2        Q.    No, that's just my statement.

 3   Do you agree with that?

 4             MR. HOFFMAN:  Objection to the

 5        form of the question.

 6   BY MR. McWILLIAMS:

 7        Q.    Because you said it depends on

 8   how I define "malfunction."

 9             Do you agree that discrepancies

10   were observed between the point of care and

11   central lab frequently and to a degree of

12   clinical relevance?

13             MR. HOFFMAN:  I think in

14        fairness to the witness, if you're

15        reading from a document --

16             MR. McWILLIAMS:  I'm not

17        reading from a document.

18             MR. HOFFMAN:  You were before

19        when you asked the question.

20             MR. McWILLIAMS:  I wasn't that

21        last time, so...

22             MR. HOFFMAN:  If you'd like to

23        take the time to look at the document

24        before you answer the question, go
```

Protected - Subject to Further Protective Review

1        ahead.

2                MR. McWILLIAMS:  Are you ready

3        for my question?

4    BY MR. McWILLIAMS:

5        Q.    Do you agree that discrepancies

6    were observed between the point-of-care

7    device and the central lab frequently and to

8    a degree of clinical relevance?

9        A.    I still haven't -- the document

10   in front of me, so clearly, I agree that

11   there was discrepancy observed at week 12 and

12   24 as described here in the document.

13       Q.    And do you agree that it was --

14   that the discrepancy was observed often and

15   to a degree of clinical relevance?

16       A.    I cannot judge on this, because

17   it's taken out of context.  I'm sorry.

18       Q.    Well, okay.  Well, let's do the

19   context.  Let's go to page 21 and let's see

20   if you agree with this statement.

21                MR. HOFFMAN:  Thank you,

22        Counsel.

23   BY MR. McWILLIAMS:

24       Q.    Paragraph number 4, "The

Protected - Subject to Further Protective Review

1  preliminary data provided on INR values

2  estimated simultaneously on weeks 12 and 24

3  with the two methods" comparing the device

4  with the lab, "indicate that discrepancies of

5  potential clinical relevance were rather

6  frequently observed."

7           Do you agree with that

8  statement?

9      A.    It's a statement made by the

10  health authority after the review, yes.

11      Q.    Do you agree with that

12  statement?

13      A.    Again, it's very difficult for

14  me to judge on how -- what I would use --

15  what frequently or clinical extent, that's

16  something I cannot evaluate myself, and so

17  because I'm not a medical doctor, I'm not a

18  clinician, and so in order to -- the person

19  who wrote this is a medical doctor.

20           So I can really not form an

21  opinion myself on the very details of

22  clinical relevance.  So here I would always

23  rely on my colleagues, and therefore, it's

24  just very difficult for me to assess those

Protected - Subject to Further Protective Review

1    statements based on my experience.

2         Q.     Well, you understand the target

3    INR range for the warfarin arm in ROCKET was

4    an INR between 2 and 3 -- actually, a target

5    of 2.5 with a range of 2 to 3.  You knew

6    that, right?

7         A.     Yes, I know that.

8         Q.     Okay.  And that INR value is

9    what informs the doctor in deciding what dose

10   to give the warfarin patient going forward,

11   right?

12        A.     That's right.  That's the

13   target range the physician is trying to keep

14   the patients in by its dose -- specific

15   dosing, yeah.

16        Q.     And if the doctor is provided

17   the incorrect INR value, the doctor may then

18   in turn provide the incorrect dose, correct?

19        A.     That may be, but, again, here I

20   would have to refer to my clinical

21   colleagues, because it's my understanding

22   that a physician is not reacting

23   automatically, for example, to a small

24   deviation.  And so it's always still a

Protected - Subject to Further Protective Review

1    judgment call of the physicians at which INR

2    level the physician is reacting to change the

3    dose.

4              But in principle, this INR

5    value is used to inform about dosing

6    decisions the physician is taking.

7         Q.    So if the doctor is provided

8    the wrong INR, the patient may get the wrong

9    dose, right?

10         A.    In the worst case that I --

11   that I cannot exclude that, but as I said,

12   the physician is always using a judgment

13   call, and if the physician also has some

14   doubt about the INR measurements or if he

15   receives a single measurement and has

16   experience with the patient for some time

17   already, he would start wondering if the

18   value is out of the normal range and probably

19   doing some more investigation.

20              That's at least how I

21   understand clinical practice, and so it's

22   often not only a single value that's

23   guiding --

24         Q.    But you understand the doctors

Protected - Subject to Further Protective Review

1    in ROCKET were specifically instructed to

2    only obtain INR values from the INRatio

3    point-of-care device, right?

4         A.    That's -- that was the

5    instruction that they had, but we said

6    beforehand there was always the opportunity

7    for the physician in case of a concern or

8    specific question to contact with the

9    monitor -- unblinded monitor and to get,

10   yeah, advice from that and --

11        Q.    All right.  Well, you know the

12   first thing they were instructed to do was to

13   test the INR with the other defective device.

14             Did you know that?

15             MR. HOFFMAN:  Objection to the

16        form of the question.

17        A.    I don't know the extent --

18   BY MR. McWILLIAMS:

19        Q.    Do you know every site was

20   provided two INRatio devices, and in the

21   instance a doctor felt uncomfortable with an

22   INR value, that doctor was instructed to test

23   with the other INRatio device?

24        A.    I was not aware and I'm not

Protected - Subject to Further Protective Review

1    aware -- I was not involved in the details of

2    the trial conduct.  I don't know.

3         Q.    Let me hand you what's being

4    marked --

5              MR. HOFFMAN:  Do you want to

6         take a break now --

7              MR. McWILLIAMS:  Sure.

8              MR. HOFFMAN:  -- and then shoot

9         for lunch at like 12:45, 1:00 o'clock?

10        Does that make sense?

11             MR. McWILLIAMS:  Yeah, take a

12        break.  Sure.

13             THE VIDEOGRAPHER:  Going off

14        the record at 11:47 a.m.

15             (Recess taken, 11:47 a.m. to

16        11:58 a.m.)

17             THE VIDEOGRAPHER:  We're back

18        on record at 11:58 a.m.

19   BY MR. McWILLIAMS:

20        Q.    Dr. Derix, before we took the

21   break, you mentioned that if any of the

22   physicians in ROCKET had concerns about the

23   potential error with the result of the

24   device, that they could reach out to the

Protected - Subject to Further Protective Review

1   unblinded monitor.

2              Did I hear you correctly?

3       A.      Yes, somehow in that -- yeah,

4   in that regard I responded to you, yes, there

5   was one monitor available and could be

6   contacted by investigators.

7       Q.      And you understand that one of

8   the mechanisms in place for the unblinded

9   monitor was to take a split sample, one with

10  the point-of-care device, and other to be

11  evaluated by central lab so that the

12  unblinded monitor could determine whether or

13  not the device was operating properly?

14      A.      I'm not aware of the detailed

15  proceedings that the monitor applied, no.

16      Q.      So do you have any knowledge of

17  that ever happening?

18      A.      No, I have -- no, because I was

19  not involved in that type of, yeah,

20  procedure, so I'm -- no, not that I recall at

21  least.

22      Q.      Have you ever heard the Covance

23  recheck program?

24      A.      I mean, no, not -- I cannot

Protected - Subject to Further Protective Review

1    connect any content to it.  Maybe if I heard

2    it, but I'm not -- I was not involved in it,

3    in that discussion or detail or if you could

4    get me any information.

5         Q.    So you certainly, then, haven't

6    heard that come up at all in any of the

7    discussions with EMA about this issue; is

8    that fair?

9         A.    I do not recall it.

10        Q.    Okay.  On the EMA report,

11   assessment report, which is Derix Exhibit 4,

12   if you would go to page 38, please.  And the

13   section in the middle titled "2.4.2, Request

14   4"?

15        A.    Uh-huh.

16        Q.    And Bayer was asked whether or

17   not there were any other ongoing regulatory

18   investigations; is that correct?

19        A.    That's correct.  Yes.

20        Q.    And you essentially reported

21   when you notified global regulators and when

22   about the potential issue; is that fair?

23        A.    Yes.

24        Q.    And then you go on to say that

Protected - Subject to Further Protective Review

1    on October 1, 2015, Bayer received a written

2    request from EMA to provide further

3    information about this issue.

4             Then on October 9th, you got an

5    information request from essentially the

6    Japanese FDA.  Is that accurate?

7         A.    Yes, that's the Japanese health

8    authority, MHLW.

9         Q.    And it goes on to say, "So far,

10   no other subsequent actions have been taken

11   in other jurisdictions."  And then it has a

12   cut-off date of October 11, 2015.

13        A.    Uh-huh, yes.  That's correct.

14        Q.    But -- and this is a report

15   that's dated February 5th, 2016, right?

16        A.    Yes.

17        Q.    And you knew at this point in

18   time FDA was doing an investigation into this

19   issue, right?

20        A.    I mean, we had shared all the

21   information with the health authority, also

22   with FDA about what was going on at EMA, and

23   I do not recall specifically when FDA started

24   asking additional questions.  So there was a

Protected - Subject to Further Protective Review

1    point in time, yes, FDA started additional

2    questions for investigation, but it may have

3    been after October 11th.  I don't recall

4    because I'm currently not working in

5    regulatory affairs anymore.

6         Q.    And I'm not disputing -- I

7    think it was after October 11th, but why pick

8    the date October -- I mean, don't you think

9    it's a little misleading?  Because this

10   suggests to the reader that you've told FDA,

11   but FDA is not doing any investigation?

12             MR. HOFFMAN:  Objection to the

13        form of the question.

14   BY MR. McWILLIAMS:

15        Q.    Right?  I mean, that's how this

16   reads.  You've told FDA, and as of

17   October 11, 2015, no other regulators have

18   launched an investigation, right?

19             MR. HOFFMAN:  Same objection.

20        A.    That's how you interpret, but I

21   think this is really just a factual

22   statement, and it clearly says also at the

23   beginning that also FDA was included in the

24   information flow as any other health

Protected - Subject to Further Protective Review

1  authority on the list as well.

2  BY MR. McWILLIAMS:

3      Q.    But you don't tell the readers

4  of this report, the citizens of Europe, that

5  FDA is doing its own investigation, and you

6  knew that when this report came out in

7  February of 2016, right?

8          MR. HOFFMAN:  Objection to the

9      form of the question.

10     A.    The sentence says "no other

11  subsequent actions have been taken," so that

12  would refer to issuing an official procedure

13  or so.  And as I said, I don't recall exactly

14  when FDA for the first time, after they got

15  informed by Janssen, when the first time they

16  started to ask questions and looking into it,

17  so...

18  BY MR. McWILLIAMS:

19     Q.    But you knew even in January of

20  this year FDA was issuing information

21  requests to your company and Janssen about

22  what they knew about this potential

23  malfunction, right?

24     A.    I said you know the dates

Protected - Subject to Further Protective Review

1    better than I, yeah.

2        Q.    Well, January 12th, 2016.  But

3    there's no mention of that here.  Don't you

4    think that's a little misleading, to use a

5    cut-off date?  If you're really trying to be

6    transparent and honest with the readers,

7    isn't it important to tell the readers that

8    the FDA is doing its own independent

9    investigation?

10            MR. HOFFMAN:  Objection to the

11        form of the question.

12       A.    This is a document -- sorry.

13            MR. HOFFMAN:  No, no, you may

14        answer.

15       A.    This is a document that was

16   written by EMA, and so -- and as I explained

17   to you before, there was a sequence of

18   information that was provided, and at the

19   end, an assessment report.

20            It's all -- it's all collected,

21   or sometimes it's reporting information that

22   was provided at an earlier time, but it's

23   just implemented as it was, and that's citing

24   the October cut-off date.

Protected - Subject to Further Protective Review

1                  So, therefore, it's making

2    clear that at that time, that was still the

3    status of information.  And so in my view, by

4    giving the cut-off date, it's not misleading.

5    BY MR. McWILLIAMS:

6         Q.    But back in January of 2016,

7    you had the opportunity to review this draft

8    report, and you knew that a week previously,

9    FDA had sent a very pointed letter asking for

10   additional information --

11                MR. HOFFMAN:  Objection to the

12        form of the question.

13   BY MR. McWILLIAMS:

14        Q.    -- right?

15        A.    I had the opportunity to review

16   the document, but as I said, it's not

17   misleading as long as the cut-off date is

18   mentioned in the document here.

19        Q.    Right.  As long as the cut-off

20   date is mentioned, it's not misleading.

21        A.    Yeah, because it clearly states

22   from which point in time this information

23   has --

24        Q.    Who picked the cut-off date?

Protected - Subject to Further Protective Review

```
1        A.      The cut-off date was picked by

2   end of submission at that time, and so --

3        Q.      Who?  Who picked it?

4               MR. HOFFMAN:  Let her finish

5          her answer.  She might actually get to

6          it.

7               MR. McWILLIAMS:  Fingers

8          crossed.

9        A.      The cut-off date was at the

10  time when it was submitted picked by the --

11  by the -- yeah, by the marketing association

12  or the team that provided that information

13  and --

14  BY MR. McWILLIAMS:

15       Q.      So Bayer.  Can you just say

16  Bayer?  It's a one-word answer, right?

17       A.      Yeah.

18               MR. HOFFMAN:  Objection to the

19          form of the question.

20  BY MR. McWILLIAMS:

21       Q.      Who picked the cut-off date.

22  Let's practice.  Who picked the cut-off date?

23               MR. HOFFMAN:  Don't answer that

24          question.  Next question.
```

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.    Who picked the cut-off date?

3    Ma'am?

4         A.    It's my interpretation from

5    this text that this was taken from the

6    submission documents that the marketing

7    authorization holder, namely Bayer, provided

8    to EMA at some point in time in the course of

9    the process, and that's how it is phrased

10   here.

11              MR. McWILLIAMS:  I'll move to

12        strike as nonresponsive.

13   BY MR. McWILLIAMS:

14        Q.    Let me try it another way:  Did

15   Bayer pick the cut-off date?

16        A.    As I interpret here as it is

17   written, it's taken from the documents that

18   were submitted by Bayer, and in that way, the

19   cut-off date was provided in the documents

20   submitted earlier time.

21        Q.    Is that a yes?  Did Bayer pick

22   the cut-off date?

23              MR. HOFFMAN:  Objection to the

24        form of the question.  Asked and

Protected - Subject to Further Protective Review

1      answered.

2   BY MR. McWILLIAMS:

3      Q.    Ma'am, if Bayer picked the

4   cut-off date, you can say yes.

5            MR. HOFFMAN:  Objection.

6      A.    As I said, I can only hear and

7   read from the document of all -- as I

8   interpret it, and I did not write this part

9   of the document myself.  So I would have

10  to -- yeah.

11  BY MR. McWILLIAMS:

12     Q.    So now you don't know?  Are

13  you -- I can't follow your answers.  Do you

14  know who picked the cut-off date?

15     A.    Are you asking now for a

16  specific name of a person or who worked on

17  this --

18     Q.    No, I'm just --

19     A.    I mean, this is --

20     Q.    Was it Bayer who picked the

21  cut-off date?

22            MR. HOFFMAN:  Objection, asked

23        and answered.

24            ///

Protected - Subject to Further Protective Review

 1   BY MR. McWILLIAMS:

 2        Q.     Was it?

 3        A.     It is -- as I interpret here,

 4   as it is written, that's taken from a

 5   document that was submitted by Bayer.

 6        Q.     Okay.  And so Bayer picked this

 7   cut-off date, not withstanding the fact that

 8   you personally and your colleagues at Bayer

 9   were aware the FDA's investigation was still

10   ongoing, correct?

11        A.     I would have to go back to give

12   you 100% answer to this, but as I -- I think

13   that this question was already answered in

14   the early phase of the proceeding with EMA,

15   so they -- we got all questions directly at

16   the beginning of the proceeding, and we

17   responded to all questions.

18              And then there was subsequent

19   questions, and as I read this here, this was

20   taken from an earlier response in the

21   procedure.  And so EMA considered this

22   question as responded to adequately, and

23   therefore it was not updated at a later point

24   in time.

Protected - Subject to Further Protective Review

1            That's how I interpret --

2    interpret what I'm reading here in this EMA

3    assessment report.

4            MR. McWILLIAMS:  I move to

5        strike as nonresponsive.

6    BY MR. McWILLIAMS:

7        Q.    Dr. Derix, are you aware or

8    were you aware in January of 2016 that FDA

9    issued a series of information requests to

10   your colleagues at Janssen specific to this

11   issue of whether or not the INRatio device

12   malfunctioned in ROCKET?

13       A.    I was aware that Janssen

14   received additional questions.  I'm not -- I

15   cannot recall the exact date and the exact

16   content of the questions, but I was aware

17   that FDA raised questions.

18       Q.    And you received a copy of

19   those questions, didn't you?

20       A.    May well be.  I...

21       Q.    You don't know?

22       A.    I don't specifically recall.

23       Q.    It was just a couple of weeks

24   ago, right?

Protected - Subject to Further Protective Review

1    A.    Right.  But as I said, I'm no

2  longer a regulatory responsible now.  My

3  responsibility is different, and so although

4  I'm copied in many documents and information

5  just to know that there's a request the team

6  is working on, doesn't mean that I, yeah,

7  reviewed all the content and follow the

8  content.

9    Q.    So how do you decide which

10  e-mails to read and which to not read?

11    A.    When I see it is an e-mail that

12  is referring to an expert question, and I see

13  that expert's already involved in that

14  question, I rely on the experts to follow up.

15         MR. McWILLIAMS:  Okay.  Well,

16      let me hand you what we're marking as

17      Derix-14 and 15.  Derix-14 is

18      Record 3402844, and its attachment,

19      which is Derix-15, which is

20      Record 3402845.

21         (Whereupon Deposition Exhibit

22      Derix-14, E-mail(s) re: IND 75238,

23      XARELTO_BHCP_08009903 -

24      XARELTO_BHCP_08009904, Ref. 3402844,

Protected - Subject to Further Protective Review

```
 1              was marked for identification.)

 2                    (Whereupon Deposition Exhibit

 3              Derix-15, FDA Information Request,

 4              XARELTO_BHCP_08009905 -

 5              XARELTO_BHCP_08009908, Ref. 3402845,

 6              was marked for identification.)

 7    BY MR. McWILLIAMS:

 8         Q.      And you see this is an e-mail

 9    dated January 13th, 2016?

10         A.      Uh-huh.  Yes.

11         Q.      And this is an e-mail you

12    received; is that correct?

13         A.      Yes, I received it, amongst

14    other colleagues.

15         Q.      Yes.  And you see that the

16    subject line is -- well, the attachment says

17    "ROCKET INRatio Information Request Letter."

18              Do you see that?

19         A.      Yes, I see that.

20         Q.      And you see then the next

21    document I handed you, which is the actual

22    copy of the information request that you were

23    provided?  Do you see that?

24         A.      Yes.
```

Protected - Subject to Further Protective Review

1     Q.     Does this refresh your memory

2    as to whether or not you ever read this

3    information request propounded by the FDA?

4     A.     As I said, I said it was

5    forwarded to me amongst other colleagues, and

6    I -- and I also said that I was aware that

7    there were questions from FDA.  But I'm

8    not -- not in -- I did not follow up in

9    detail.

10     Q.     But did you read the actual

11   request?

12     A.     I read this summary, most

13   likely.

14     Q.     Well, the summary was actually

15   not really a summary.  It's a cut and paste,

16   right?

17     A.     Uh-huh.

18     Q.     They said "Please provide

19   reports of any serious adverse events

20   mentioning the INRatio device in ROCKET,"

21   right?

22     A.     Yes, that's what it says.

23     Q.     And as someone who's worked in

24   regulatory affairs, you understand that the

Protected - Subject to Further Protective Review

1    spirit of that request is seeking evidence of

2    the device malfunctioning during ROCKET?

3             MR. HOFFMAN:  Objection to the

4        form of the question.

5    BY MR. McWILLIAMS:

6        Q.      Correct?

7        A.      I understand the request -- the

8    request in the way that FDA is obtaining

9    information, so that's all.  That's what

10   they're asking questions about.

11       Q.      Right.

12       A.      They want to have information

13   for their assessment.

14       Q.      And what information are they

15   requesting?

16       A.      They are requesting reports of

17   any serious adverse event reports mentioning

18   the INR device and ROCKET data.

19       Q.      And as someone who's got a

20   degree in regulatory affairs and who has

21   worked in regulatory affairs, and someone who

22   is familiar with this ROCKET point of care

23   issue, what is your understanding of the

24   spirit of that request?  What type of

Protected - Subject to Further Protective Review

1    information are they seeking?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.    For me, it's a typical

5    fact-finding request.  So FDA is asking for

6    this information to be provided to them in

7    order to -- for their assessment.

8    BY MR. McWILLIAMS:

9         Q.    And --

10        A.    It's not suggesting anything.

11   It just says that they want to have this data

12   and this information for their evaluation.

13        Q.    And if it were true that

14   Janssen was in possession of information that

15   the device did, in fact, malfunction and

16   resulted in an adverse event to warfarin

17   patients, would you expect Janssen to supply

18   that information in response to this FDA

19   information request?

20             MR. HOFFMAN:  Objection --

21             MS. TERSIGNI:  Objection.

22             MR. HOFFMAN:  -- to the form of

23        the question.

24        A.    FDA specifically asked about

Protected - Subject to Further Protective Review

1   any serious adverse event reports, so that's

2   a technical term.  And it refers to specific

3   documents, adverse event reports, and that's

4   a specific area of expertise of

5   pharmacovigilance colleagues you would have

6   to ask to define that.

7            And then it says that those

8   reports should mention INR device in a very

9   general term, just whether it's included in

10  any of those report documents or it's very

11  factual requests as it is written here.

12  BY MR. McWILLIAMS:

13      Q.    Okay.  I'm going to show you

14  some documents, and then we're just going to

15  have a little test.  I just want you to tell

16  me whether or not, just using -- putting on

17  your regulatory affairs hat, using your

18  degree and your experience, and you tell me

19  whether or not you think this is the type of

20  information that should be supplied to the

21  FDA, okay?

22            MR. HOFFMAN:  Objection to the

23      form of the question and all questions

24      under the umbrella of this speech.

Protected - Subject to Further Protective Review

1          MR. McWILLIAMS:  Okay.  I'm

2     handing you now what's been marked as

3     Derix-16, which is Record 671161.

4          (Whereupon, Deposition Exhibit

5     Derix-16, E-mail(s) re: POC/SAE,

6     XARELTO_JANSSEN_03933641 -

7     XARELTO_JANSSEN_03933643, Ref. 671161,

8     was marked for identification.)

9  BY MR. McWILLIAMS:

10     Q.    And you see this is an e-mail,

11  at the top dated October 17, 2007; is that

12  correct?

13     A.    Yes, that's correct.

14     Q.    And it's to -- it's from

15  someone named William Byra to Kenneth

16  Mahaffey.  Do you know Dr. Mahaffey?

17     A.    Yeah.  I don't know him

18  personally, but I've seen him, and he had a

19  role in the ROCKET AF trial in leading the

20  adjudication committee.

21     Q.    All right.  And you see that

22  this was also sent to Manesh Patel.  He was

23  the lead author of the ROCKET publication,

24  right?  That's the first time I caught that.

Protected - Subject to Further Protective Review

1              MR. HOFFMAN:  Congratulations.

2         A.    Yeah, Manesh Patel also was

3    part of the steering committee of the

4    ROCKET --

5    BY MR. McWILLIAMS:

6         Q.    He was the lead author, right?

7    I mean, you cite it as Patel 2010, right?

8         A.    I -- I would have to look up,

9    yeah, the documents you're referring to, the

10   publications.  There were several

11   publications on ROCKET AF, and --

12        Q.    Okay.  Anyways --

13        A.    -- so certainly, he's one of

14   the --

15        Q.    So there's people on this

16   e-mail that include people from Duke and

17   people from Janssen, but I don't see anyone

18   from Bayer, do you?

19        A.    No, I don't see anyone from

20   Bayer.

21        Q.    Okay.  Have you seen this

22   document in the last two weeks in preparation

23   for your deposition?

24        A.    No, I haven't seen this

Protected - Subject to Further Protective Review

1    document.

2         Q.    Okay.  Well, let's just start

3    at the top.  Do you see the subject line?

4         A.    Yes.

5         Q.    Okay.

6         A.    POC/SAE, uh-huh.

7         Q.    And someone who's familiar with

8    the issues in ROCKET, what does POC stand

9    for?

10        A.    Point-of-care device.

11        Q.    And what does SAE stand for?

12        A.    Typically, SAE is an

13   abbreviation that is used also for serious

14   adverse event, but not exclusively.

15        Q.    Right.  But that's -- but

16   that's exactly what the FDA was asking for,

17   right, serious adverse events involving the

18   point-of-care device in ROCKET, right?

19        A.    No.  They were asking for

20   serious adverse event reports.  So that's a

21   distinctive description, because serious

22   adverse event reports is a clearly described

23   document that requires certain procedures

24   report -- or has certain requirements in

Protected - Subject to Further Protective Review

```
1   terms of reporting.  And that's clearly

2   defined --

3        Q.    Okay.  But you see the author

4   of this e-mail put "SAE" in the subject line,

5   right?

6        A.    Yeah, but it doesn't say SAE

7   report.

8        Q.    It just saying SAE?

9        A.    Uh-huh, yeah.

10        Q.    Okay.  So it's a serious

11   adverse event that may or may not have been

12   reported is what you're saying?

13             MR. HOFFMAN:  Objection to the

14        form of the question.

15        A.    That's not what I'm saying.  I

16   just said that SAE is sometimes standing for

17   serious adverse event.

18   BY MR. McWILLIAMS:

19        Q.    Right.  And --

20        A.    And so I would have to read the

21   document before I can --

22        Q.    Well, let's read it together --

23        A.    -- explaining on POC and SAE.

24        Q.    No, I understand.  Let's read
```

Protected - Subject to Further Protective Review

1    it together.  Let's go to the very -- let's

2    go to the second page, because we'll look at

3    the very first e-mail that goes in the --

4    starts on the bottom.

5              And you see this is --

6    originally, this is an e-mail written by

7    Jonathan Piccini, dated October 17th, 2007,

8    written at 11:04 a.m. to Dr. Nessel, to

9    Dr. Byra and Kimberly Schwabe, and then cc's

10   a bunch of folks, including Dr. Patel.

11             Do you see that?

12        A.    Yes.

13        Q.    And then the subject line

14   there, in this original e-mail, the words

15   chosen by Dr. Piccini was "POC/SAE," right?

16        A.    Right.

17        Q.    Okay.  Now let's go to the next

18   page, and let's see what Dr. Piccini wrote.

19   He wrote, "Team, I received a number of

20   helpline calls this morning regarding a

21   ROCKET patient at site 11008."

22             Do you see where I'm reading,

23   Dr. Derix?

24        A.    Yes.

1    Q.    Okay.  It says, "Apparently

2  this patient was warfarin naive and was being

3  titrated on study drug, when he presented

4  with hematuria."  That's blood in your urine,

5  right?

6    A.    Right.

7    Q.    Okay.  "His POC in the office

8  was 2.9."  That's right within range, right?

9  That's between 2 and 3?

10    A.    If it is referring to the INR,

11  yeah, POC --

12    Q.    "Four hours later, he developed

13  severe epistaxis which required

14  hospitalization.  He had an 'unblinded' INR

15  of greater than 10.  He received 4 units of

16  fresh frozen plasma and IV vitamin K.  ENT

17  packed his nose and called me.  I spoke with

18  the ENT team, and helped them formulate a

19  plan.  I also asked them to keep the INR and

20  other info to themselves due to the blind,

21  but the study MD had already tracked down the

22  information.

23        "The study PI, study

24  coordinator, and family are very upset.  The

Protected - Subject to Further Protective Review

1   PI has concern that the POC device is

2   defective, since there was a 7-unit

3   difference in the INR between the POC and

4   serum assay within 4 years -- 4 hours.

5   Apparently, they had a previous episode of

6   what they considered 'bad POC data'."

7           Do you see where I'm reading

8   from?

9       A.    Yes, I see what you're reading

10  from.

11      Q.    Okay.  Now, just putting on

12  your regulatory affairs hat, is this not a

13  serious adverse event that should be

14  reported?

15          MR. HOFFMAN:  Objection to the

16      form of the question.

17          MR. McWILLIAMS:  I won't ask a

18      double negative.

19  BY MR. McWILLIAMS:

20      Q.    Is this a serious adverse event

21  that should be reported, in your opinion?

22          MR. HOFFMAN:  Objection to the

23      form of the question.

24      A.    I'm -- typically it's not part

Protected - Subject to Further Protective Review

1  of the role as a regulatory person, and also

2  not in my control to judge clinically on

3  adverse events or -- you have to be an expert

4  to do that, and you have to be a medical

5  doctor to do that, and so it's not upon me to

6  judge on this.

7                And as you see, there was a

8  clinical team involved who could certainly

9  better judge on this as I can do now here.

10  BY MR. McWILLIAMS:

11        Q.      I understand that.

12                Prior to today, have you ever

13  been made aware of this event that occurred

14  in this patient?

15                MR. HOFFMAN:  Objection to the

16        form of the question.

17        A.      We talked beforehand, so I'm

18  not copied on these e-mails and I have -- you

19  just showed them to me, so I just see it

20  here.

21  BY MR. McWILLIAMS:

22        Q.      Separate and apart from the

23  e-mail, have you ever been made aware of the

24  existence of patients in ROCKET whose

Protected - Subject to Further Protective Review

1  point-of-care device said they were perfectly

2  within range, who had a bleeding event and

3  whose non-point-of-care device said they were

4  out of range?  Are you aware of any such

5  incidences?

6       A.    I do not recall that we

7  discussed that in the team, and as I said

8  before, typically, that's really something

9  that is -- yeah, those -- information is

10  being evaluated in the clinical team and not

11  in the broader cross-functional team.

12  Because it's going very much into a detail of

13  one specific patient's side, and the

14  investigator's name, and that's really not

15  the level of detail of information that we,

16  the regulatory person, or in my view as

17  program lead that I'm working on.

18       Q.    Well, just maybe let's -- maybe

19  don't put on your regulatory hat.  Let's just

20  put on your common sense hat.

21            Doesn't this look like an

22  instance of the device malfunctioning and a

23  patient suffering a bleeding event as a

24  result?

Protected - Subject to Further Protective Review

```
 1              MR. HOFFMAN:  Objection to the

 2         form of the question.

 3         A.     I cannot judge this from the

 4    information provided here.  It just describes

 5    an event that, as you can see from the e-mail

 6    chain, that obviously caused some follow-up,

 7    and it was shared and discussed.  That's all

 8    I can comment on that.

 9    BY MR. McWILLIAMS:

10         Q.     But do you know if this event

11    was ever shared with the FDA or EMA?

12         A.     I cannot see this from this

13    e-mail chain because it's, again, a different

14    process you have, and applied about serious

15    adverse event reporting.

16         Q.     Well, in all your dealings with

17    EMA, are you aware of any communication to

18    EMA that the clinicians involved in ROCKET

19    observed instances of the device

20    malfunctioning?  In any of the communications

21    with EMA, was that ever told?

22         A.     I'm not aware of such

23    communication, but it's also not the typical

24    way of communication to health authorities,
```

Protected - Subject to Further Protective Review

1   because not -- I mean, there are certain

2   rules for information that is being shared

3   with the health authorities, and -- so that

4   they can also work in a structured way and to

5   have an opportunity to assess information

6   properly.

7          Q.    Well, they can't --

8          A.    So it's not typically that each

9   and every communication or source shared

10  immediately, so there's processes in place to

11  share the information in order to help them

12  to appropriately also assess the --

13         Q.    Well, you would agree it's

14  impossible for them to assess the information

15  if they're not provided the information,

16  right?

17               MR. HOFFMAN:  Objection to the

18         form of the question.

19  BY MR. McWILLIAMS:

20         Q.    Again, wearing your common

21  sense hat, you can agree to that, can't you?

22               MR. HOFFMAN:  Objection to the

23         form of the question.

24         A.    In general, EMA and other

Protected - Subject to Further Protective Review

1   health authorities can only, yeah, work with

2   the information that they have, that's --

3                   MR. McWILLIAMS:  Okay.  So let

4           me show you another e-mail relating to

5           this same subject.  This is Derix-17,

6           Record 2840934.

7                   (Whereupon, Deposition Exhibit

8           Derix-17, E-mail(s) re: ROCKET AF,

9           XARELTO_JANSSEN_13596622 -

10          XARELTO_JANSSEN_13596623,

11          Ref. 2840934, was marked for

12          identification.)

13  BY MR. McWILLIAMS:

14          Q.      Again, this is Dr. Nessel at

15  the top.  You've met him, haven't you?

16          A.      Yes, I have met him several

17  times in the course of the years of the

18  collaboration with Janssen.

19          Q.      And let's look at the second

20  e-mail down, the one dated September 18th,

21  2008.  And I'll represent to you that they're

22  talking about the same patient.

23          A.      I would like to read this

24  before I can --

Protected - Subject to Further Protective Review

1      Q.     You can read whatever you need

2   to to answer my question.

3      A.     Okay.

4      Q.     I promise it's not a trick.

5   Let's just read this together, and then I'll

6   ask you some questions.

7             Dr. Byra writes to Dr. Nessel

8   on September 18th, 2008, "This is another old

9   one from a year ago.  They are just catching

10  up on the queries for the bleed terms after

11  switching to inForm.  This was not just a

12  nosebleed.  This was bleeding from every

13  orifice with an INR of 10 -- greater than 10.

14  Somehow they got a wrong reading from the

15  HemoSense device - even though when we sent

16  it back it tested out okay at HemoSense.

17             "The SAEs were separated out --

18  rectal, urine, et cetera."

19             Did I read that correctly?

20     A.     You read it correctly.

21     Q.     And again, just from your

22  dealings with EMA, do you have any

23  recollection of this event being discussed in

24  any way, shape or form?

Protected - Subject to Further Protective Review

```
 1              MR. HOFFMAN:  Objection to the

 2         form of the question.

 3         A.     I'm not aware of discussing any

 4    patient level information in that regard, so

 5    we worked with the data that were collected

 6    in the ROCKET AF database, and used that as a

 7    basis for the information in our submission.

 8    BY MR. McWILLIAMS:

 9         Q.     But you understand the FDA did

10    specifically ask for patient level data?

11         A.     They asked for serious adverse

12    event reports, and --

13         Q.     And, again, if you don't report

14    it, you can't review it, right?  Wearing the

15    common sense hat?

16              MR. HOFFMAN:  Objection to the

17         form of the question.

18         A.     Certainly some obligation to

19    report adverse events according to the

20    guidelines, yes.

21              MR. McWILLIAMS:  Okay.  Let me

22         show you Derix-18, which is Record

23         No. 1322746.

24              (Whereupon, Deposition Exhibit
```

Protected - Subject to Further Protective Review

```
1          Derix-18, E-mail(s) [No Subject],

2          XARELTO_JANSSEN_07545453 -

3          XARELTO_JANSSEN_07545456,

4          Ref. 1322746, was marked for

5          identification.)

6    BY MR. McWILLIAMS:

7          Q.      This is another e-mail chain

8    involving Dr. Nessel, Dr. DiBattiste,

9    Dr. Byra, Dr. Peters.  You recognize those

10   names, don't you?

11         A.      Yes, I recognize.

12         Q.      It was the guys at Janssen that

13   were in charge of ROCKET, right?

14         A.      Yes.

15         Q.      All right.  So let's -- this is

16   an e-mail chain, so let's look at the first

17   e-mail in time, which is on the last page.

18   You see it says this is an e-mail from

19   Dr. DiBattiste, dated October 17th, 2010, to

20   Dr. Nessel and others at Janssen.

21               It says, "Gary and Christopher,

22   I see that you are online, so I want to make

23   you aware of a case that occurred today in

24   Canada.  A subject who had a HemoSense device
```

1    INR (or sham) value of 2.9 early today

2    subsequently developed epistaxis" -- I'm sure

3    I'm saying that wrong -- "and upon

4    presentation to the ER, had an INR of 10,

5    four hours after the device measurement.

6              "Questions have thus arisen

7    about the device and the accuracy of its

8    readouts, both for this particular device and

9    for the devices in general.  We've discussed

10   some plans for this subject and device.  Bill

11   can fill you in on the details.

12             "An immediate question relates

13   to how high of an INR can be seen with

14   rivaroxaban.  Has a value as high as 10 ever

15   been recorded?  If yes, what does this imply?

16   If no, is this the first such case?  On the

17   other hand, if the subject is on warfarin,

18   then do we have an issue with the accuracy of

19   this device?"

20             Did I read that correctly?

21        A.    You read the e-mail correctly,

22   yes.

23        Q.    And let me ask you this:  In

24   any of your dealings with Dr. Nessel,

1   Dr. DiBattiste, did they ever communicate to

2   you that they had questions or concerns about

3   the accuracy of the HemoSense INRatio device

4   in ROCKET?

5       A.      I do not recall any

6   conversation at the time -- yeah, before

7   the -- we ran --

8       Q.      Before Deborah Cohen?

9       A.      -- the INR analysis on this.

10      Q.      Okay.  Let's go to page -- the

11  Bates number ends in 454.  I told you that

12  earlier, these weird codes that we put on the

13  bottom of every page.

14      A.      Okay.

15      Q.      Go to 454.  This is

16  Dr. DiBattiste again, doing a reply all to

17  all these same colleagues that you know at

18  Janssen.  He writes, "Definitely agree with

19  you about warfarin - I don't think it is

20  possible for an INR to move that much in such

21  a short time.

22              And, of course, if the patient

23  is on riva, then the 2.9 is a sham value.  So

24  it seems that we would conclude, based on the

Protected - Subject to Further Protective Review

1  current knowledge and remaining blinded, that

2  either this patient is on riva or the device

3  is faulty."

4            Did I read that correctly?

5     A.     You read this correctly.

6     Q.     And would you accept my

7  representation that this patient was indeed

8  on warfarin?

9            MR. HOFFMAN:  Objection to the

10       form of the question.

11            MS. TERSIGNI:  Objection.

12    A.     I don't know where you took --

13  can take this conclusion from, just looking

14  at this document --

15  BY MR. McWILLIAMS:

16    Q.     That's a very fair point.  You

17  can't take it from reading just this

18  document, but I have access to the entire

19  clinical trial database, and I was able to

20  determine that this patient was indeed

21  randomized to warfarin.

22            So with that in mind, does it

23  concern you that Dr. DiBattiste said that it

24  would allow one to conclude that if this

Protected - Subject to Further Protective Review

```
1   patient is on warfarin, that the device is

2   faulty?

3              MR. HOFFMAN:  Objection to the

4        form of the question.

5   BY MR. McWILLIAMS:

6        Q.     So does that concern you?

7              MR. HOFFMAN:  Objection.

8        A.     We are talking here about,

9   yeah, a situation that is way back, and it's

10  from a daily clinical practice communication,

11  and it's one single case.  So --

12  BY MR. McWILLIAMS:

13       Q.     Well, this is one single

14  case --

15             MR. HOFFMAN:  Hold on a second,

16       let her finish.

17             MR. McWILLIAMS:  I apologize.

18             MR. HOFFMAN:  That's okay.

19       A.     I think it's not appropriate to

20  just take such a judgment from just one

21  e-mail chain we're looking at here.

22  BY MR. McWILLIAMS:

23       Q.     I agree.  Maybe one in

24  isolation, but perhaps a series might provide
```

Protected - Subject to Further Protective Review

1  evidence of a bigger problem.  Would you

2  agree with that?

3            MR. HOFFMAN:  Objection to the

4       form of the question.

5       A.    I would like to get this in the

6  hands of the clinical team.  We have more

7  than 14,000 patients in this trial, and so --

8  and the trial run many years under -- in our

9  measurements were done frequently, and also,

10  as I understand from what I heard from my

11  clinical colleagues, that such INR

12  measurements that are done repetitively,

13  those kind of situations also occur.

14            And we're live, and so

15  probably, yeah, only the clinical colleagues

16  can really make a judgment whether the single

17  case reported here, or as used supposed

18  sequence of potential cases, as falling out

19  of what normally happens in the daily

20  practice.  I cannot make that judgment for

21  them.

22  BY MR. McWILLIAMS:

23       Q.    Okay.  But sitting here today,

24  you have no recollection of Dr. Nessel,

Protected - Subject to Further Protective Review

1   Dr. DiBattiste, Dr. Peters sharing their

2   experience with this particular patient with

3   you?

4          A.     I have no recollection.  And

5   typically --

6          Q.     And therefore, you have no

7   recollection of that experience being shared

8   with regulators, either EMA, FDA or other?

9                 MR. HOFFMAN:  Objection to the

10         form of the question.

11  BY MR. McWILLIAMS:

12         Q.     Fair?

13         A.     As I said, there are really

14  clearly clear rules for serious adverse event

15  collection and reporting to the health

16  authorities, and they fall under the

17  responsibility of the pharmacovigilance team.

18                So I would have to talk to

19  those expert colleagues, whether they can

20  retrieve the information for you by knowing

21  the patient identification, the timing of the

22  event, and so whether there was a report

23  created.

24                MR. McWILLIAMS:  Move to strike

Protected - Subject to Further Protective Review

1      as nonresponsive.

2    BY MR. McWILLIAMS:

3      Q.      Ma'am, my question was simply

4    whether or not you had any recollection of

5    this incident being reported to EMA or FDA?

6          MR. HOFFMAN:  Objection to the

7          form of the question.  Asked and

8          answered.

9      A.      I don't have a recollection --

10   BY MR. McWILLIAMS:

11     Q.      Thank you.

12     A.      -- but I --

13     Q.      That's all I asked.

14          MR. HOFFMAN:  No.  Go ahead and

15          finish your answer.

16     A.      Because the information that is

17   sent by our regulatory representatives to the

18   health authorities is typically aggregate

19   information and is not just, yeah, this type

20   of information.

21          MR. McWILLIAMS:  Okay.  Well,

22          let me show you another one.  Let's

23          look at Derix-19, which is

24          Record 2416273.

Protected - Subject to Further Protective Review

```
 1              (Whereupon, Deposition Exhibit

 2         Derix-19, E-mail(s) Another POC

 3         Problem, XARELTO_JANSSEN_11444538 -

 4         XARELTO_JANSSEN_11444539,

 5         Ref. 2416273, was marked for

 6         identification.)

 7   BY MR. McWILLIAMS:

 8         Q.     You see this is another e-mail

 9   chain from Dr. Byra, sending it to

10   Dr. Nessel, Dr. Peters -- you see this?

11         A.     Yes, I see this.

12         Q.     And the e-mail at the very

13   bottom was written by Dr. Piccini again,

14   copying Manesh Patel, lead author, knew about

15   these issues.  Amazing.

16              You see at the bottom, the

17   original e-mail, bottommost e-mail, what's

18   the subject line of this e-mail?

19              MR. HOFFMAN:  I move to strike

20         the preface to the question.

21         A.     The subject line reads,

22   "Another POC problem."

23   BY MR. McWILLIAMS:

24         Q.     And another, just again, just
```

Protected - Subject to Further Protective Review

1    putting on your -- strike that.

2              That means this is not the

3    first problem with the point of care they've

4    observed, right?  That's what the word

5    "another" means?

6         A.    I would have to read the e-mail

7    to -- yeah, to discuss this, but if you --

8         Q.    That's what the word --

9         A.    From some general context, you

10   could suggest that.

11        Q.    Okay.  Well, perhaps.  Let's

12   try the context.  That's fair.  Let's read

13   this together.

14             "Team, I just got off the phone

15   with another troubling helpline call.  Rhonda

16   Olmstead (site coordinator in Lincoln,

17   Nebraska - site 1028) called me regarding a

18   patient with afib and diabetes who came into

19   the clinic on October 17th with a point of

20   care INR of 1.7.  The patient's warfarin was

21   changed from 2 milligrams 5 -- 2 milligrams 5

22   days a week with 2.5 Tuesday/Thursday, to a

23   new regimen of 2.5 daily."

24             So what they did was they saw

Protected - Subject to Further Protective Review

```
1    his point of care of 1.7, and they increased

2    the patient's dose is what they're saying,

3    correct?

4         A.    Yes, that's correct.  But as

5    far as interpreted here as -- you're not

6    talking about the blind and unblinded?  Is

7    this an unblinded report?  Because you have

8    to bear in mind that even for the rivaroxaban

9    patients, they had a warfarin dose, and also,

10   that warfarin dose kind of was a placebo

11   certainly, but it was adapted according to

12   measurements of the same INR device.

13             So here in this case, I cannot

14   say whether this was before or after

15   unblinding, and whether it was a true

16   warfarin dose, same regimen change, or

17   placebo.

18        Q.    You're a hundred percent right,

19   but I assure you this was a warfarin patient,

20   okay?  So with that in mind, let's continue

21   reading.

22             "48 hours later the patient had

23   an appointment with his primary care

24   physician for diabetes, et cetera.  His
```

Protected - Subject to Further Protective Review

1    primary care doctor checked a lab INR and

2    unfortunately communicated the result to

3    the -- to the ROCKET cardiologist.  The lab

4    INR was greater than 6, approximately

5    48 hours after the point of care.  She called

6    because she thought the patient needed to be

7    treated as if he was formally unblinded.  We

8    reviewed the difference, but she remains

9    concerned (as am I) about the INR

10   discordance."

11              Did I read that correctly?

12        A.    You read it correctly, yes.

13        Q.    And sitting here today, do you

14   have any recollection of this event being

15   communicated to any regulators anywhere?

16              MR. HOFFMAN:  Objection to the

17        form of the question.

18        A.    As I said before, there is a

19   process in place for the clinical team

20   information, the clinical studies information

21   is provided, and if appropriate according to

22   the guidance as put in the report forms and

23   submitted as a very regular procedure to the

24   health authorities and for very regulated.

Protected - Subject to Further Protective Review

1                    I have no recollect --

2    recollection whether this specific patient

3    information that is cited here in the e-mail

4    was, yeah, deemed -- yeah, for -- or was part

5    of an adverse event reporting later on that

6    I -- that I can see from this information.

7                    And I also can't recall and

8    know about this.

9    BY MR. McWILLIAMS:

10        Q.    But what you can see by looking

11   at the piece of paper is that the members of

12   the ROCKET executive committee were aware of

13   this information, right?  They were copied on

14   the e-mail; Dr. Patel, Dr. Nessel, right?

15        A.    Yes, some members were copied.

16        Q.    Okay.

17        A.    I don't know all the people who

18   are in this list, and know their function,

19   but Manesh Patel, I know.

20                    MR. McWILLIAMS:  Okay.  We'll

21        take a break for lunch.

22                    THE VIDEOGRAPHER:  Going off

23        the record at 12:42 p.m.

24                    (Recess taken, 12:42 p.m. to

Protected - Subject to Further Protective Review

1      1:35 p.m.)

2            THE VIDEOGRAPHER:  We're back

3      on record at 1:35 p.m.

4   BY MR. McWILLIAMS:

5      Q.     Dr. Derix, Exhibits 14 and 15

6   was an FDA information request dated

7   January 12th, 2016.  There's an e-mail

8   attaching the information request.

9            Do you know whether or not EMA

10  has been informed about this information

11  request?

12     A.     I don't know specifically about

13  this information request because it's work,

14  day-to-day work my colleagues in the

15  regulatory department do.  But I don't know.

16     Q.     Is there any type of policy or

17  procedure where that type of information

18  typically would be communicated to other

19  regulators?

20     A.     I mean, typically we are very

21  transparent, so that's the attitude, but it's

22  not a regulation.  This is a disquieting

23  attitude, but certainly there's also some

24  information that's per regulation also

Protected - Subject to Further Protective Review

1   shared.

2            And then there's also an

3   opportunity between the health authorities

4   they have -- especially EMA, FDA and the

5   Japanese health authority, they have an

6   agreement on -- a transparency agreement.

7   They can exchange on confidentiality basis

8   relevant information, and they can directly

9   talk to each other.  And they do this from

10  time to time when they feel it necessary.

11       Q.    What's the current status of

12  the Japanese FDA investigation into the

13  issue?

14       A.    As far as I recall the

15  information I have seen, they have also got

16  the submission that we did to EMA, and there

17  was a specifically conducted study to support

18  the approval in Japan called the ROCKET AF

19  study, and so similar set -- or the same set

20  of analysis was also applied to that study

21  and submitted.

22            And I do not recall any kind of

23  review feedback from Japanese health

24  authority so far, but they have received the

Protected - Subject to Further Protective Review

1   information.

2        Q.    Have any other health

3   authorities around the world expressed

4   interest in this topic?  I saw one reference

5   to Australia asked to be kept apprised of any

6   information exchange with FDA or EMA.  Are

7   you aware of any other global health

8   authorities?

9        A.    You may have to direct that

10  question to regulatory colleagues.  In their

11  daily work they may have some information I

12  don't have, but I don't recall.

13       Q.    Okay.  And I appreciate that,

14  and I'm just asking you just the best of your

15  knowledge or memory.  Who would be the best

16  person to ask at Bayer to figure out or to

17  find out what other health authorities, if

18  any, have expressed interest in this topic?

19       A.    The colleague who's currently

20  the representative of regulatory in the

21  Xarelto team is Jürgen Weber.

22                 (Clarification requested by the

23       reporter.)

24                 MR. HOFFMAN:  He needs to hear

Protected - Subject to Further Protective Review

1        what you said again.  "The

2        colleague"...

3        A.      The colleague who is currently

4   responsible for regulatory affairs in the

5   Bayer Xarelto team is Jürgen Weber.

6   BY MR. McWILLIAMS:

7        Q.      Okay.  Thank you.

8                Did anyone ever communicate to

9   you that -- strike that.  Let me back up.

10               What was the role of Duke,

11  DCRI, in ROCKET?

12       A.      Duke was the so-called ARO,

13  academic research organization, and in that

14  role they did specific things.  They would

15  try, for example, running the adjudication

16  committee.  But there were more tasks they

17  had to do, and I can't give you all of them

18  in detail because, again, that's clinical

19  operations teamwork, but just in general

20  terms to describe what they did.

21       Q.      But that would have included

22  Dr. Patel, Dr. Piccini, Dr. Mahaffey, those

23  were --

24       A.      Those were people, at least

Protected - Subject to Further Protective Review

1    Dr. Mahaffey and Dr. Patel, I recall.  Other

2    name, I'm not so familiar with who decided,

3    who were at the time at Duke, and they, yeah,

4    also supported the ROCKET AF trial.

5         Q.     Did anyone ever communicate to

6    you in your role and responsibility for

7    regulatory affairs for Xarelto that

8    individuals at Duke, at DCRI, had concerns

9    over the accuracy and reliability of the

10   INRatio device as used in ROCKET?

11        A.     I do not recall a discussion

12   about Duke members.

13        Q.     To your knowledge, has that

14   information -- have you seen any evidence

15   that such information has been communicated

16   to EMA or any other regulators, that

17   specifically Duke, DCRI, expressed concerns

18   over the accuracy and reliability of the

19   device as used in ROCKET?

20             MR. HOFFMAN:  Objection to the

21        form of the question.

22        A.     I don't know.

23             MR. McWILLIAMS:  Okay.  I'm

24        going to hand you what we're marking

Protected - Subject to Further Protective Review

1          as Derix-20, which is Record 753519,

2          and its two attachments, which is

3          Derix-21, 753520, and Derix-22, which

4          is Record 753521, and all of these go

5          together.

6                    (Whereupon, Deposition Exhibit

7          Derix-20, E-mail(s) re: ROCKET - INR

8          Draft Proposal,

9          XARELTO_JANSSEN_04961856, Ref. 753519,

10         was marked for identification.)

11                   (Whereupon, Deposition Exhibit

12         Derix-21, ROCKET Proposal for QC

13         Checks on HemoSense Device,

14         XARELTO_JANSSEN_04961857, Ref. 753520,

15         was marked for identification.)

16                   (Whereupon, Deposition Exhibit

17         Derix-22, ROCKET Proposal for

18         Additional Education on HemoSense

19         Device, XARELTO_JANSSEN_04961858,

20         Ref. 753521, was marked for

21         identification.)

22    BY MR. McWILLIAMS:

23         Q.    And you can see the top one is

24    the e-mail attaching the next two documents,

Protected - Subject to Further Protective Review

1    and this is dated October 29th, 2007.

2              Do you see that?

3        A.      Yes, I see that.

4        Q.      And this -- and they say, "All,

5    Attached is the draft proposal and recap of

6    the education piece we discussed on Friday.

7    I will send the draft proposal to Gary and

8    Pete for comment.  Let me know if you have

9    any questions."  And this is written by

10   Catherine Vanden Boom, clinical scientist at

11   Janssen; is that correct?

12       A.      That's correct.

13       Q.      And then attached to this

14   e-mail are two documents, the first being

15   "ROCKET Proposal for QC Checks of HemoSense

16   Device."

17              Do you see this?

18       A.      I see this.

19       Q.      And it says the "Issue:  The

20   ROCKET study lacks a mechanism to check the

21   accuracy of the HemoSense device.  Although

22   rare, a few investigator sites have expressed

23   concern regarding the accuracy of the Point

24   of Care device.  In addition, the unblinded

Protected - Subject to Further Protective Review

1    INR monitor could also request a QC check."

2              Did I read that correctly?

3         A.      Yes, it says could also

4    request, yeah, uh-huh.

5         Q.      Sitting here today, is this the

6    first time you've been made aware that

7    investigator sites have expressed concern

8    regarding the accuracy of the point-of-care

9    device in ROCKET?

10        A.      It talks about an education

11   piece, so I would have to bring it into

12   context.  So here in this communication, it

13   does not talk about the site.

14        Q.      No, I'm talking -- I'm looking

15   at the first attachment.

16              MR. HOFFMAN:  This document.

17        A.      Uh-huh.  Okay.  Uh-huh.

18   BY MR. McWILLIAMS:

19        Q.      You see where it's written --

20        A.      Where a few investigator sites

21   have -- yeah, okay.

22        Q.      And prior to today, had you

23   been made aware that investigator sites had

24   expressed concern specifically with respect

Protected - Subject to Further Protective Review

1    to the accuracy of the point-of-care device?

2         A.    No, I have not been involved in

3    this communication here.

4         Q.    Well, separate and apart from

5    this specific communication, was the

6    substance of this communication ever

7    communicated to you in any way, shape or

8    form?

9         A.    I do not recall that.

10        Q.    Okay.  Is that the -- as

11   someone with responsibility for regulatory

12   affairs, is that the type of information you

13   would expect to be communicated to you, that

14   specifically, doctors involved in the

15   clinical trial ROCKET were expressing

16   concerns over the accuracy of the device that

17   was informing their dosing decisions for the

18   warfarin patients?

19        A.    It would depend on the

20   evaluation of the situation by the clinical

21   team leaders, so not all information is just

22   flooded through, and there was an evaluation

23   by the people who are familiar and can assess

24   the information.  So that's the first level.

Protected - Subject to Further Protective Review

1              And depending on the assessment

2    of the clinical team leader, the information

3    would have, yeah, provided also to regulatory

4    colleagues.  But first of all, it's really

5    the assessment of the situation by the people

6    who, yeah, have the experience and knowledge

7    to do so.

8         Q.     Well, let's keep reading.  It

9    says for the draft proposal, "QC checks of

10   the HemoSense device (i.e., concurrent INR

11   testing) could be triggered by investigator.

12   For example, the investigator contacts

13   Parexel or the DCRI hotline or the unblinded

14   monitor.  At this time, it is felt that a

15   random surveillance of sites is not necessary

16   since the device has been validated by the

17   manufacturer and approved by the FDA.

18              "The site would be responsible

19   for obtaining a blood sample for a PT, as

20   well as standard INR reading through the

21   HemoSense device.  The PT blood samples would

22   then be shipped to Covance for analysis.  The

23   report would only be available to the

24   unblinded monitor."

Protected - Subject to Further Protective Review

1        Did I read that correctly?

2        A.    You read that correctly.

3        Q.    And sitting here today, had you

4    ever heard of this initiative to allow

5    investigators to collect split samples to

6    evaluate the accuracy of the point-of-care

7    device?

8              MR. HOFFMAN:  Objection to the

9         form of the question.

10        A.    I'm seeing this document for

11    the first time, so I -- even now, I would

12    have to read it twice in order to fully

13    understand the proposal that is made here.

14    BY MR. McWILLIAMS:

15        Q.    Okay.  Well, please do read it

16    twice.  And I'm not asking -- and I

17    understand you may not have seen this exact

18    document, but I want to know if you're

19    familiar with what's being discussed in this

20    document as someone responsible for

21    regulatory affairs for Xarelto at this time.

22              (Document review.)

23        A.    So this is information that is

24    still under -- on the clinical trial level,

Protected - Subject to Further Protective Review

```
1   and first of all, it's a draft proposal, so I

2   don't know where it really went finally.

3            And it's -- yeah, procedural

4   and information contained here would be part

5   of the -- or is certainly part of the

6   clinical trial master file.  So that's why I

7   would, yeah, think it is being recorded.  And

8   so not necessarily as a regulatory

9   representative to the team, I would get such

10  information.

11  BY MR. McWILLIAMS:

12       Q.     Well, do you know if this

13  proposal was actually enacted?

14       A.     I don't know.

15       Q.     Okay.  So you -- you understand

16  that what's being proposed here is a

17  mechanism to allow investigators to collect

18  split samples, one to be analyzed by the

19  point-of-care device --

20       A.     Yes.

21       Q.     -- the other to be analyzed by

22  a central lab, to evaluate the performance

23  and accuracy of that device?  You understand

24  that, right?
```

Protected - Subject to Further Protective Review

1        A.      Yeah, I understand that there's

2    a procedure proposed, yeah, in a blinded

3    fashion to -- yeah, to split the sample

4    and -- yeah, then there is equipment and

5    procedures, end result reporting procedures

6    proposed.

7        Q.      And you understand this was

8    proposed in response to concerns raised of

9    the accuracy of the point-of-care device?

10       A.      That is what I cannot judge on,

11   because suddenly the -- I wasn't involved in

12   the discussion about it.  It gives -- yeah,

13   it mentions that few investigator sites have

14   expressed concern, so --

15       Q.      Right.  Well, let's go to the

16   next page.  Again, this is meeting minutes

17   from a meeting that occurred on Friday,

18   October 26th, 2007.  The attendees included

19   Sanjay Jalota.  That was your counterpart at

20   Janssen; is that correct?

21       A.      That was correct.  At the time,

22   yeah, in 2007, he was my counterpart at --

23       Q.      And included Christopher

24   Nessel, he was a member of the ROCKET AF

Protected - Subject to Further Protective Review

1    executive committee; is that correct?

2         A.    Yes, he was the clinical lead

3    on the Janssen side for ROCKET AF.

4         Q.    And the issue reported is

5    "There is concern on the part of DCRI,

6    Parexel and the investigator sites with the

7    accuracy of the POC device."

8              Did I read that correctly?

9         A.    You read that correctly.

10        Q.    And so sitting here today, this

11   is the first time you ever learned that the

12   physicians at Duke, at DCRI, at your academic

13   research institute, had concerns about the

14   accuracy of this device that was being used

15   to manage the warfarin arm in ROCKET?

16        A.    Yes, I see this document the

17   first time, and it's referring to specific

18   point in time where -- where they obviously

19   discussed the topic.

20        Q.    Right.  And sitting here today,

21   you still don't know whether or not this was

22   actually enacted or dismissed?

23        A.    I don't know that, but I -- as

24   the study moved forward and all participants

Protected - Subject to Further Protective Review

1   continued working on the study and finally

2   also reported on the study, so I can only

3   assume that it was a resolve to do

4   satisfaction of the participants in this.

5              So that's only what I can

6   conclude from the process, but I am -- I

7   cannot comment on the specific note here and

8   the date.

9      Q.    Well, if it's true -- if they

10  did enact this procedure to take split

11  samples to evaluate the accuracy of the

12  point-of-care device that's being used to

13  manage the warfarin arm in ROCKET, is that

14  the type of information that should be shared

15  with regulators?

16             MR. HOFFMAN:  Objection to the

17        form of the question.

18     A.    You said -- I mean, should be

19  shared is always a question, and which type

20  of form and --

21  BY MR. McWILLIAMS:

22     Q.    In any form.

23     A.    -- in which context?

24             So as it is here, it is still

Protected - Subject to Further Protective Review

1   an operational meeting, an operational topic

2   that is in the course of the clinical trial,

3   and everything was happening also on a very

4   detailed level, even outside the clinical

5   trial report that is, at the end, submitted

6   to the health authorities.

7              There's a clinical trial master

8   file, and that file is auditable for the

9   health authorities and so also accessible.

10             So even without having a direct

11  reporting requirement for all information

12  that is captured in the course of a clinical

13  trial, there is this auditable file where

14  information can be found.

15       Q.    But what's being proposed here

16  is to generate and to collect data

17  specifically aimed to evaluate whether or not

18  this device is operating properly, correct?

19       A.    I'm not sure whether it is

20  really a general process, because it also

21  talks here about for urgent safety issues.

22  So special situations, I really cannot

23  comment on whether it was meant to be a

24  general process or how it was to be applied

Protected - Subject to Further Protective Review

 1   and how -- and what -- yeah, what -- yeah,

 2   how the data should be shared or were meant

 3   to be used.  So -- and because I'm reading

 4   this the first time, so it's --

 5        Q.    I understand.  I think that's

 6   part of my point, ma'am, is that you are

 7   just -- you are just now learning about this

 8   program for the first time.  And sitting here

 9   today, you don't know whether or not this

10   program was enacted and whether any data was

11   generated, what that data showed, and whether

12   that data has been shared with global

13   regulators.  Do I understand your testimony

14   correctly?

15        A.    At least in that first point

16   where you said that I was not aware of this

17   program and I don't know the results.  I

18   cannot comment because the people who are in

19   contact with the health authorities in the

20   U.S. are my Janssen colleagues, and so I

21   cannot comment on how they -- yeah, what type

22   of information they provided or not.

23               But at least for the first

24   part, it's correct, that I haven't seen this

Protected - Subject to Further Protective Review

1  before.

2      Q.    And if you look here at the

3  first attachment I showed you, it says

4  this -- the report, the data, the split

5  sample data will be available to the

6  unblinded monitor, and you see down below, it

7  identifies the unblinded monitor as Bud

8  Chalecki.

9            Do you see that?

10           Are you with me, Evan?  You can

11  always look on the screen.

12           So, Evan, highlight just the

13  report --

14     A.    Yeah, the reporting of

15  results -- I see where you are.

16     Q.    And so there would be this

17  individual, Bud Chalecki, who would be able

18  to see the results of these paired samples,

19  again, paired samples that were generated for

20  the sole purpose of evaluating whether or not

21  this device was malfunctioning.

22           And sitting here today, this is

23  the first time you knew that this individual

24  was given this job?

Protected - Subject to Further Protective Review

1             MR. HOFFMAN:  Objection to the

2        form of the question, misstates the

3        evidence.

4        A.    At least for the first time I

5   see this, yeah, draft proposal for the QC

6   checks and the procedure that was laid out

7   here in this document.

8   BY MR. McWILLIAMS:

9        Q.    Let me hand you -- and, again,

10  I guess, I think I've got it crystal clear.

11  But you don't know whether or not this

12  proposal was actually acted upon?

13       A.    I don't know that.

14            MR. McWILLIAMS:  Okay.  Let me

15       hand you Derix-23, which is Record

16       No. 1052801.

17            (Whereupon, Deposition Exhibit

18       Derix-23, Dear ROCKET Investigator

19       Letter, XARELTO_JANSSEN_07050218,

20       Ref. 1052801, was marked for

21       identification.)

22  BY MR. McWILLIAMS:

23       Q.    And this is a letter that was

24  sent to all 1,000 investigators in all

Protected - Subject to Further Protective Review

1    40-plus countries around the world that were

2    involved in ROCKET, notifying them of this

3    special program, where if they had concerns

4    about the accuracy of the point-of-care

5    device, they could take a split sample that

6    would then be analyzed by the unblinded INR

7    monitor, who we previously identified as Bud

8    Chalecki.

9              Have you ever seen this letter

10    before?

11        A.     I do not recall having seen the

12    letter before.

13        Q.     You see down at very bottom, it

14    says the un -- this is dated February 21,

15    2008, and it's signed by Christopher Nessel,

16    right?

17        A.     It's signed by Christopher

18    Nessel, yes.

19        Q.     It says in the top, "You will

20    be receiving or have recently received a

21    special kit for collecting single samples for

22    a Special Blinded INR which is to be drawn

23    only after discussion with one of the medical

24    monitors or with the Parexel or DCR helpline.

Protected - Subject to Further Protective Review

1          "These special blinded INRs,

2    performed through Covance" --

3          And Covance is the central

4    laboratory company, right?

5     A.     Yeah, Covance is a contract

6    research organization applying different

7    types of rules in trials.  And as far as I

8    recall, in the ROCKET AF trial, they ran the

9    central laboratory --

10    Q.     Right.

11    A.     -- for analysis.

12    Q.     So these -- "These special

13    blinded INRs, performed through Covance, are

14    designed to assist investigators who believe

15    that a subject's INR values obtained with the

16    HemoSense point-of-care device are greatly

17    different from what was expected."

18          Did I read that correctly?

19    A.     Yes, you read it correctly.

20    Q.     So does this indicate to you

21    that the proposal that we discussed

22    previously was actually enacted upon and that

23    the special blinded INR kits were sent to

24    investigators all over the world?

Protected - Subject to Further Protective Review

1      A.      At least there is, I mean,

2   similarity on the information, so from the

3   draft to this, yeah, letter on official

4   letterhead, that this kit was provided to

5   investigators or could be provided to

6   investigators.

7      Q.      And does this refresh your

8   memory at all as to whether or not this has

9   been communicated to EMA or global regulators

10   that this special procedure was put in place

11   after concerns were raised over the accuracy

12   of the device?

13            MR. HOFFMAN:  Objection to the

14        form of the question.

15   BY MR. McWILLIAMS:

16      Q.      This wasn't prespecified.  This

17   wasn't contemplated prior to patients being

18   enrolled in ROCKET.  This was a special

19   procedure put in place after doctors were

20   concerned that the device was malfunctioning.

21            You understand that, right?

22            MR. HOFFMAN:  Objection to the

23        form of the question.

24      A.      I understand that this was a

Protected - Subject to Further Protective Review

```
1   proposal that was made, yeah, during the

2   course -- during the course of the trial

3   while the trial was running.

4   BY MR. McWILLIAMS:

5        Q.     And you understand it was

6   proposed in response to concerns raised by

7   doctors, and Duke specifically, correct?

8   That's what the documents say, right?

9        A.     That's what this document says,

10  that a few investigator sites have expressed

11  concern.

12       Q.     Right.  And I just want to make

13  sure that sitting today, on March 1st, 2016,

14  this is the first time you've ever heard of

15  this special program that was enacted as part

16  of ROCKET.

17              Do I understand your testimony?

18       A.     Yes, I understand and I repeat,

19  I have not been aware of this procedure, and

20  so this is the first time that I read this

21  letter.

22       Q.     All right.

23       A.     At least I can recall to read

24  it.
```

Protected - Subject to Further Protective Review

```
1          Q.      And so if you didn't know about

2     it before today, there's no way you could

3     have told EMA about it in any of your recent

4     correspondence where they were investigating

5     this very topic; is that fair?

6                   MR. HOFFMAN:  Objection to the

7          form of the question.

8          A.      Yeah.  As I just said, I see

9     this here the first time, and I don't have,

10    yeah, information on even -- I mean,

11    important would be what followed this letter.

12    I mean, the letter was --

13    BY MR. McWILLIAMS:

14         Q.      We'll get to that.

15         A.      -- an offer, but it -- yeah, I

16    don't know how many, at the end, physicians

17    really took that offer, how the information

18    was processed, and -- yeah.

19         Q.      I want to say that's the same

20    question I have, so let's keep going a little

21    bit.  Let me show you one of these instances.

22                  MR. McWILLIAMS:  Evan, this is

23         Record 2959134.  We're marking this as

24         Derix-24.
```

1              (Whereupon, Deposition Exhibit

2        Derix-24, E-mail(s) re: INR check for

3        patient 111178,

4        XARELTO_JANSSEN_14556639,

5        Ref. 2959134, was marked for

6        identification.)

7   BY MR. McWILLIAMS:

8        Q.     I'm handing you Derix-24, which

9   is Record 2959134.  And I just want to focus

10  your attention on the very bottommost e-mail,

11  and it's from Bud Chalecki, dated August 5th,

12  2009, correct?

13       A.     Yes.

14       Q.     And this is the same Bud

15  Chalecki -- that's the name we saw referenced

16  earlier as the unblinded monitor?

17       A.     If I recall the name correctly,

18  yes, I think it's the same.

19       Q.     So that's the individual that

20  would have access to the data whenever a --

21  whenever a doctor had concerns about the

22  device malfunctioning, that doctor was given

23  this special kit where they could take a

24  split sample, one would be analyzed by the

Protected - Subject to Further Protective Review

1    point-of-care device, the other would be

2    analyzed by the Covance central lab.  And

3    then Mr. Bud Chalecki would have access to

4    see that data.

5              Do you remember that

6    discussion?

7        A.    Yeah.  It was kind of suggested

8    here in this procedure.  I don't know whether

9    it was really mentioned that Bud Chalecki has

10   this information, so at least he was

11   mentioned here as to -- in the reporting of

12   results section.

13       Q.    Right.  And let's look at what

14   Mr. Chalecki reports, and the subject line is

15   "INR check for patient 11178 at site 011608."

16             And I've looked it up, and that

17   is, in fact, a patient that was randomized to

18   warfarin.  And we'll have to sort that out

19   later, but I'll represent to you that that's

20   what my research showed.

21             And Mr. Chalecki reports to

22   Bill Byra at Janssen that "The INR check for

23   this patient was almost three units higher

24   than the result reported by the HemoSense

Protected - Subject to Further Protective Review

1    device."

2              Did I read that correctly?

3    A.        You read that correctly, yes.

4    Q.        So is this further evidence

5    that this proposal to investigate instances

6    where doctors fear or have concerns about the

7    accuracy of the device was actually enacted

8    upon and, in fact, confirmed, at least one

9    instance of the device generating a result

10   that's inconsistent with the central lab

11   value?

12   A.        Yeah.  I mean, in the e-mail,

13   it reads that there was an INR check.  If

14   that referred to the check procedure you just

15   mentioned, so I would have to take that from

16   the context, for one specific patient at one

17   specific site, was higher than the results

18   reported by the HemoSense device, yes.

19   Q.        All right.  And if you go to

20   the middle --

21   A.        So this information --

22   Q.        -- the middle e-mail, it says,

23   "There is a discrepancy between the POC INR

24   and the blinded Covance INR."

Protected - Subject to Further Protective Review

1           Does that further help you

2   understand that that's exactly what's being

3   discussed here, that this is one example of

4   the special blinded INR procedure being

5   implemented and confirming that the device is

6   generating a result that's inconsistent than

7   that observed by a central lab?

8           MR. HOFFMAN:  Objection to the

9       form of the question.

10      A.    It falls into the context of

11  what we just discussed, the procedure and

12  that there were two measurements done, and,

13  yeah, also there was -- for this one specific

14  patient found a difference in result for the

15  two different measurements.  That's what this

16  factually states.

17  BY MR. McWILLIAMS:

18      Q.    And sitting here today, have we

19  gotten any closer to refreshing your memory

20  of your being aware of this program at all?

21      A.    Again, I have -- I've not been

22  aware of this program.  I don't recall a

23  discussion about the program, and also, I

24  don't recall having seen any of their results

Protected - Subject to Further Protective Review

1    or any of that information from individual --

2    yeah, instances where the program might have

3    been used.

4         Q.    Okay.

5         A.    So --

6         Q.    So, again, if you weren't made

7    aware of it and someone who has got

8    responsibility for regulatory affairs, it's

9    fair to say that you see no evidence of this

10   being communicated to regulators, fair?

11             MR. HOFFMAN:  Objection to the

12        form of the question.

13        A.    At least I cannot recall, and

14   so from my work at the time, that I or

15   someone in my group actively had this

16   information or forwarded it, but this is

17   not -- I mean, this is not the only way of

18   communication to the health authorities.  Not

19   everything is going to the regulatory team,

20   but there are also other direct communication

21   links, for example, through the

22   pharmacovigilance department.  And so I

23   cannot exclude that some of information was

24   submitted through those channels.

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2        Q.    But, Doctor, don't you think

3    the fact that there was a special program

4    created in direct response to concerns of the

5    accuracy and reliability of this device,

6    don't you think that should have been

7    communicated to regulators, especially in

8    light of everything that's going on now with

9    this investigation with the device?

10           MR. HOFFMAN:  Objection to the

11       form of the question.

12   BY MR. McWILLIAMS:

13       Q.    I mean, isn't it a little

14   troubling to you that you're learning about

15   this today for the first time?

16       A.    I said earlier, in many things,

17   yeah, the regulatory function is relying on

18   experts and cannot judge by themselves on

19   cases, on single events.  And so also here, I

20   would have to refer to my colleagues and

21   really let them describe and also decide for

22   us -- or not decide, but to explain the

23   relevance and to judge on the relevance.

24   And, yeah, for -- how broadly to communicate.

Protected - Subject to Further Protective Review

```
1              Sometimes, I mean, there's a

2    question asked and a question answered in the

3    course of a trial, and there may be other

4    events where some special measures were

5    implied just because of learning during the

6    clinical trials.  And so that's not all

7    immediately going, yeah, into the -- I mean,

8    into the hands of the regulatory team at the

9    time.

10             So it's not complete -- it's

11   not completely unusual that not all the

12   information that is shared on the clinical

13   team is provided, yeah, to the regulatory

14   teams.

15        Q.    How many meetings, either in

16   person or telephone or video conference, have

17   you had in the last six months about this

18   very particular issue, this device

19   potentially malfunctioning in ROCKET.

20             Dozens, right?

21        A.    I don't know the number

22   exactly, but we met regularly --

23        Q.    Dozens?  Would you agree with

24   that?
```

Protected - Subject to Further Protective Review

1      A.     I cannot fix in on a number, so

2  it was -- it was frequent meetings, so --

3      Q.     Very frequent meetings.  And

4  this never came up?

5      A.     I do not recall, at least in

6  the meetings I participated in, that it came

7  up.

8            MR. McWILLIAMS:  Now, let me

9       hand you -- well, let me show you

10      because I think I know the answer.

11           (Whereupon, Deposition Exhibit

12      Derix-25, Blinded INRs from Covance

13      Spreadsheet,

14      XARELTO_JANSSEN_14724821 -

15      XARELTO_JANSSEN_14724826,

16      Ref. 2973209, was marked for

17      identification.)

18  BY MR. McWILLIAMS:

19      Q.     This is Derix-25,

20  Record No. 2973209.  And I'll represent to

21  you that counsel for Janssen -- I'll back up.

22            Dr. Nessel testified -- I asked

23  him how many times this special program was

24  actually utilized by doctors, and he told me

Protected - Subject to Further Protective Review

1    it was approximately 140.  And I asked

2    Dr. Nessel's attorney to provide us with

3    those results, and this is what they gave us.

4                    And I count 144 different

5    instances, again, where doctors had concerns

6    about the accuracy of this device, this

7    device that directly informed them on how to

8    dose their warfarin patients; over 140

9    instances where they had concerns about the

10   accuracy of that device that they actually

11   triggered this special program where a split

12   sample was collected, and then Mr. Bud

13   Chalecki observed the results.

14                   Sitting here, is this the first

15   time you've ever been made aware of that?

16        A.    This is the first time I see

17   this list of information and so -- yeah.

18   This is the first time I see this list.

19        Q.    And do you have any

20   recollection of this 144 instances of doctors

21   expressing concern about the accuracy and

22   reliability of this device and Janssen then

23   actually testing, taking split samples?

24                   Do you know -- do you have any

1    evidence that this data was ever actually

2    communicated to regulators?

3              MR. HOFFMAN:  Objection to the

4         form of the question.

5         A.     First of all, I mean, you say

6    it is a list of concerns, but if you look,

7    really it also includes other issues like out

8    of stability or deviations, so it does not

9    express directly a concern.

10             So it's really also again a

11   fact sheet where facts are collected, and I'm

12   not aware of this sheet and I have not been

13   aware.  And so I cannot --

14   BY MR. McWILLIAMS:

15        Q.     Let's go --

16        A.     -- comment on whether

17   information -- what information can be found

18   in the documentation.

19        Q.     Let's look at like cell 7.

20             Do you have this up, Evan?  And

21   go to the comments.

22             This is, you know, a doctor in

23   Australia, patient 104078, comment, "Sent

24   e-mail to J. Larsen, Parexel.  Some

Protected - Subject to Further Protective Review

1  discrepancy between, which may have been due

2  to misdispensed drug.  Repeat in 3 days."

3            Go down to cell 8 --

4      A.    But this is already a good

5  example that not every discrepancy was

6  directly linked to a device issue, because

7  there can also be other reasons, yeah, like

8  misdispensed drug, for example --

9      Q.    How --

10     A.    -- that led the physician to

11 ask the question and to get reconfirmation

12 for them whether the treatment they were

13 applying in the trial was correct.

14     Q.    Doctor, how does misdispensed

15 medicine have any bearing on a split sample?

16 If you measure the INR in a patient's blood

17 at one point in time and then you measure it

18 with two different methods, you would expect

19 the same number or a similar number.

20            MR. HOFFMAN:  Objection to the

21       form of the question.

22 BY MR. McWILLIAMS:

23     Q.    You can't -- right?

24     A.    That's correct, if the sample

Protected - Subject to Further Protective Review

```
1    is the same sample and measurement done

2    and --

3         Q.    So let's keep going then.

4               Cell 8.  It says, "Sent

5    follow-up to J. Larsen on 7/21.  INRs are

6    discrepant by 1.  Site to receive new devices

7    and strips."

8               Did I read that correctly?

9         A.    Which cell are you at?

10        Q.    Cell 8.

11        A.    8?  Okay.

12        Q.    So the question is whether I

13   read it correctly.

14        A.    Uh-huh, yes.

15        Q.    Then cell 11, again, another --

16   this is another doctor, Dr. David Packham in

17   Australia.  Cell 11, "E-mail sent on 8/20/08,

18   blinded INR not consistent with HemoSense."

19              Did I read that correctly?

20        A.    You read that correctly.

21        Q.    Let's go down to cell 15,

22   another doctor in Australia.  "E-mail sent --

23   sent e-mail to site on November 2nd, 2008.

24   Discrepancy exists, but subject still within
```

Protected - Subject to Further Protective Review

1   target range.  Repeat INR with POC and send

2   in blinded INR."

3            Did I read that correctly?

4        A.    You read that correctly.

5        Q.    Go down to cell 23, Dr. Michael

6   Ling in Canada.  The note says, "INR high

7   from Covance.  Replace the machines."

8            Go to the next --

9        A.    It says, "INR high from

10  Covance," but it doesn't say anything

11  about --

12            MR. HOFFMAN:  You read 24.

13            MR. McWILLIAMS:  Oh, I'm sorry.

14            THE WITNESS:  Ah.  Yeah, okay.

15  BY MR. McWILLIAMS:

16       Q.    Let me go to the next slide,

17  same doctor, same patient says, "Replace

18  machines," right?

19       A.    Okay.  I see.  Yeah.  Yeah.

20       Q.    Go to the next page, cell 35,

21  Dr. Neil Hudson in Canada, "Spoke with

22  nurse" -- her name was Flo -- "INR higher

23  than expected and subject may be taking

24  exogenous warfarin."

Protected - Subject to Further Protective Review

1          But, again, even if a doctor --

2   even if a patient is taking warfarin outside

3   of the study medication, you would expect the

4   INR to be the same if it's measured at the

5   same time, right?

6          MR. HOFFMAN:  Objection to the

7      form of the question.

8      A.    That is not to be -- yeah, you

9   cannot see this from the context.  It just

10  says higher than expected.

11  BY MR. McWILLIAMS:

12      Q.    Right.

13      A.    And just saying not --

14      Q.    Well, this is all in the

15  context of INR checks, of split samples --

16          (Simultaneous discussion

17      interrupted by the reporter.)

18  BY MR. McWILLIAMS:

19      Q.    And this was all in the context

20  of INR checks, split samples, right?  That's

21  what it says right there in column G, "INR

22  check," C-K.

23      A.    Yeah, the list represents

24  blinded INRs from Covance as of April 20th.

Protected - Subject to Further Protective Review

```
 1    So if that's --

 2         Q.    And "INR check" is the same

 3    language used by Doctor -- by Mr. Chalecki in

 4    the prior exhibit.  Dr. Derix, just look at

 5    the prior exhibit, you'll see that the

 6    subject line was "INR check for patient 11178

 7    at site 011608."

 8         A.    Now I lost you.

 9              MR. HOFFMAN:  He's referring

10         to --

11              (Simultaneous discussion

12         interrupted by the reporter.)

13    BY MR. McWILLIAMS:

14         Q.    You see the subject line is

15    "INR check."  That's the lingo Bud Chalecki

16    uses, right?

17         A.    Yes.  Yes.

18         Q.    So let's look and see if we can

19    find that patient.  That's cell 38.  Patient

20    11178 at site 011608.  Do you see that?  And

21    it's reported, "E-mail to Parexel Medical

22    Monitor.  INRs discrepant.  To check with

23    investigator."

24              Did I read that correctly?
```

Protected - Subject to Further Protective Review

```
1        A.      That's correct, yes.

2        Q.      And that's the same patient,

3   the same site and same date that Mr. Chalecki

4   reported as having a discrepancy of almost

5   three units between the HemoSense device and

6   the Covance central lab, right?

7        A.      In his e-mail, Bud Chalecki is

8   talking about three units higher from the INR

9   check, yes.

10        Q.      Okay.  Let's keep reading.

11   Let's go to page -- the third page.  Go down

12   to cell 74, a doctor in Lithuania had

13   concerns, "E-mail sent on 4/30.  Blinded INR

14   higher 2 units than the POC device.  Repeat

15   with other machine."

16              Repeating with another machine

17   doesn't help if all the machines are

18   defective; would you agree with that?

19              MR. HOFFMAN:  Objection to the

20         form of the question.

21        A.      You recall that we talked about

22   earlier that there is some variance, if you

23   compare to a different devices or --

24              ///
```

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.    You see --

3         A.       -- predicate with a new device,

4    and so some deviation --

5         Q.    Some discrepancy is expected,

6    but here they're talking about two whole

7    units, right?

8         A.    Yeah.  It doesn't really say

9    that it was two units higher.  It just could

10   also mean that the reported value was 2, but

11   okay, that's -- we really would have to look

12   into the context.

13        Q.    Okay.  Go to the next page,

14   please.  Cell 92, doctor in South Africa has

15   concerns, does the INR check.  Bud Chalecki

16   reports, "E-mail sent 5/20.  INRs elevated.

17   Repeat."

18             Did I read that correctly?

19        A.    Yes, you read that correctly.

20        Q.    Cell 96, a doctor in Taiwan in

21   May of '09 has concerns, has an INR check.

22   "E-mail sent 5/19/09.  INR discrepant with

23   POC.  Repeat Covance INR in about 2 weeks."

24             Did I read that correctly?

Protected - Subject to Further Protective Review

1        A.        You read that correctly.

2        Q.        Go to the last page, cell 142,

3    it's the Dr. Herzog in the United States.

4    Again, concerns about the device not working

5    properly, utilizes this special procedure

6    that Janssen put in place.  Reports, "Spoke

7    with Tanya.  Patient got wrong bottle of

8    study med.  INR greater than 3, higher than

9    POC, which was less than 2.  Hold warfarin

10   placebo for three days, then repeat INR and

11   blinded INR."

12             Did I read that correctly?

13       A.        You read that correctly, yes.

14       Q.        And to the best of your

15   knowledge, none of this data has been --

16   well, none of this data was presented in any

17   of the information that you recently

18   submitted to EMA when they were doing an

19   investigation into this device; is that

20   correct?

21             MR. HOFFMAN:  Objection to the

22        form of the question.

23       A.        We cannot conclude this from

24   this list and the information that was

Protected - Subject to Further Protective Review

1   included in the EMA response because

2   information out of the clinical database is

3   going into also the study reports, and so we

4   really would have to carefully check whether

5   some of this information also appeared in a

6   different way in other -- in information that

7   was also used for the sensitivity analysis

8   and other analysis.

9           So I cannot give you that

10  response from the information here because it

11  would require a detailed follow-up of the

12  subject numbers and the site numbers and --

13  yeah, to make that conclusion.

14  BY MR. McWILLIAMS:

15      Q.    But sitting here today, you've

16  seen no indication whatsoever this has ever

17  been done.  This is the first time today you

18  ever became even aware of this program, the

19  reason for the program or the data generated

20  as a result of the program, correct?

21      A.    I have not been aware of this

22  information you just told to me, yeah,

23  before.

24      Q.    Dr. Derix, isn't it true that

Protected - Subject to Further Protective Review

1    you specifically had been put on notice prior

2    to the first patient was ever randomized in

3    ROCKET, there was a Dr. Kaste from Finland

4    who reached out to you and your colleagues

5    about the need to validate the POC device

6    prior to randomizing the subjects in this

7    trial, and he raised the specification

8    concern about the device being inaccurate and

9    it resulting in improper dosing of the

10   warfarin patients?

11            MR. HOFFMAN:  Objection to the

12        form of the question.

13        A.    I cannot follow all the

14   information you just represented to me, but

15   the name -- Dr. Kaste is familiar to me.  He

16   is a well-known neurologist --

17   BY MR. McWILLIAMS:

18        Q.    Have you ever --

19        A.    And I think he was -- I recall

20   he was an investigator in the trial, the

21   ROCKET AF trial.

22        Q.    And have you reviewed any

23   e-mails or documents in the last week or two

24   that include correspondence from Dr. Kaste

Protected - Subject to Further Protective Review

1    specific to this issue, the use of

2    point-of-care devices in ROCKET?

3         A.    I have reviewed the document

4    at -- well, I was copied on -- from

5    Dr. Kaste, yeah, in the course of the

6    preparation of the ROCKET AF trial, yes.

7         Q.    Did you review it in

8    preparation for your deposition today?

9         A.    I reviewed it also in

10   preparation of the deposition.

11        Q.    And how long did you meet with

12   lawyers to prepare for your deposition?

13        A.    I don't know the exact time --

14        Q.    Well, how many days?

15        A.    I met primarily with William

16   Hoffman and Edda Dolzer from Bayer, and

17   several hours maybe, difficult, five days or

18   so in total, just -- yeah.

19        Q.    Five days total?

20        A.    Yeah.

21        Q.    And approximately how many

22   hours per day?

23        A.    Approximately five, six hours

24   per day.

Protected - Subject to Further Protective Review

```
1        Q.     Okay.  And how many documents

2   approximately did you review?

3        A.     I don't know the number of

4   documents.  I reviewed -- I identified a

5   number of documents as documents that I had

6   been familiar with, like the regulatory

7   submission documents primarily from the past

8   and meeting minutes from committees that I

9   attended.

10        Q.     But can you give me an

11   approximate number of documents?

12        A.     No.

13        Q.     Was it more than a thousand?

14        A.     I cannot give you a number of

15   documents that were --

16        Q.     Less than a million?

17        A.     Certainly, yes.

18        Q.     But other than that, you can't

19   tell me if it's -- this can be -- I promise,

20   this isn't a trick question.

21        A.     It could be totally wrong

22   because, I mean, what you consider is a

23   document and -- yeah, it's really -- I could

24   be totally off.
```

Protected - Subject to Further Protective Review

1              So, for example, a periodic

2    safety update report is already a totality of

3    a document that considers three boxes of

4    paper, but if it's counted as one document.

5    It's one document.  It's not that much.

6         Q.    I understand.

7         A.    So I find this question really

8    difficult to respond to.

9         Q.    I understand.  I understand.

10             (Whereupon, Deposition Exhibit

11             Derix-26, E-mail(s) re: Your E-mail of

12             11/6/06 regarding rivaroxaban SPAF

13             protocol, XARELTO_JANSSEN_13403496 -

14             XARELTO_JANSSEN_13403502,

15             Ref. 2822412, was marked for

16             identification.)

17   BY MR. McWILLIAMS:

18        Q.    Let me show you what we're

19   marking as Derix-26, Record 2822412, and I

20   guess I'd just like you to tell me if this is

21   the e-mail that you just referenced that you

22   reviewed in preparation for your deposition

23   today.

24             (Document review.)

Protected - Subject to Further Protective Review

```
 1          A.      Yes, I read this e-mail.

 2    BY MR. McWILLIAMS:

 3          Q.      And did you pick out this

 4    e-mail to review, or did the lawyers pick it

 5    out for you?

 6                  MR. HOFFMAN:  Don't answer that

 7          question.

 8                  MR. McWILLIAMS:  Is that

 9          privileged?

10                  MR. HOFFMAN:  I think it gets

11          into work product, whether I selected

12          it or not.  You're entitled to ask her

13          if she reviewed it.

14                  MR. McWILLIAMS:  Okay.

15    BY MR. McWILLIAMS:

16          Q.      Well, let's go to the

17    second-to-last page, please.  Just to make

18    sure, my understanding is that this is an

19    e-mail -- originally, it's an e-mail written

20    by Scott Berkowitz, reciting or just giving a

21    summary of a telephone conversation he had

22    with Dr. Kaste of Finland, who is a famous

23    neurologist, I think you said.

24          A.      Yes.  So it's an e-mail chain
```

Protected - Subject to Further Protective Review

1   between Christopher and Scott, and --

2        Q.    I just want to start with the

3   oldest e-mail in time.

4        A.    Okay.

5        Q.    Let's start with the

6   second-to-the-last page.

7              And Evan, if you'll just go to

8   the big paragraph in the middle, go down

9   about nine lines over on the right.

10             And, again, Doctor, you can

11  always look on the screen if it helps you

12  find it, but Professor Kaste --

13       A.    Yeah.

14       Q.    -- also raised the issue of

15  variation.  Do you see where I'm reading?

16  And, again, you can look on the screen if

17  that assists you.

18             MR. HOFFMAN:  It's in that

19       paragraph.

20             MR. McWILLIAMS:  Thank you.

21  BY MR. McWILLIAMS:

22       Q.    "Professor Kaste also raised

23  the issue of variations in point of care PT

24  monitor measurements and the discrepancy that

Protected - Subject to Further Protective Review

1    may exist between INR values from those

2    machines and those done in hospital labs.  He

3    would like to ensure that a few central PT

4    measurements are made at least early in

5    patients' enrollment to know that there is a

6    reasonable match between the POC and the

7    central/hospital 'wet' lab PT INRs."

8              Did I read that correctly?

9        A.    You read that correctly.

10       Q.    And is that -- and do you

11   remember receiving this e-mail from

12   Professor -- or from Dr. Berkowitz relaying

13   the concerns of Professor Kaste?

14       A.     I did not remember that

15   specific type of information.  I just --

16   yeah, now I have recently looked at it, but I

17   could not remember from the time because it

18   is -- that type of information as a

19   regulatory representative, you get to be kept

20   in the loop.

21              But you're not typically

22   digging into that because in the preparation

23   of a clinical trial there are two processes.

24   One is the ethic committee approval and one

Protected - Subject to Further Protective Review

1   is the regulatory, health authority approval

2   of a protocol.  And those run in parallel,

3   and those are done in each country separately

4   in -- that participate in the clinical trial.

5            And so it was important as a

6   regulatory representative to know that in the

7   course of the -- yeah, such discussions,

8   there -- I mean, there is an open -- open

9   topic in Finland with Professor Kaste and the

10  clinical team.  But it did not involve my

11  judgment or my call at that point in time.

12           MR. McWILLIAMS:  Move to strike

13       as nonresponsive.

14  BY MR. McWILLIAMS:

15       Q.    Doctor, I simply asked whether

16  or not you remember receiving this e-mail.

17  Either you do remember or you don't.

18       A.    I said I did not remember from

19  my heart, but I just looked at it recently,

20  yes, previous to this.

21       Q.    I appreciate that.

22           Let's go now to Professor

23  Kaste's e-mail response, which is on page --

24  if you look at the Bates numbers, its last

1   three digits are 499, and there's a series of

2   numbered paragraphs.  And then just to make

3   this extra confusing, my understanding of the

4   way this works is that -- and Evan, if you

5   could highlight "The trial leadership has

6   confidence" -- that section is actually

7   Dr. Berkowitz's response -- you know,

8   sometimes when you're looking at e-mails and

9   you'll reply to someone's e-mail by going to

10  the body of their original e-mail, Doctor?

11        A.     Uh-huh.

12        Q.     Okay.  And I'll represent to

13  you that that's what happened, but it's hard

14  to tell.  But I'll represent to you that the

15  yellow highlighting section is

16  Dr. Berkowitz's response to Dr. Kaste's

17  e-mail.

18             Do you have any reason to

19  disagree with that representation?

20             MR. HOFFMAN:  Objection to the

21        form of the question.

22        A.     On the top after -- no, it

23  says, "Dear Dr. Berkowitz...  my suggestions

24  are to minimize" -- sorry, it's written by

Protected - Subject to Further Protective Review

1    Professor Kaste --

2    BY MR. McWILLIAMS:

3         Q.    Right.

4         A.    -- yeah, to Scott, so I -- and

5    as I read it, it gives his suggestions to

6    Scott Berkowitz.

7         Q.    Okay.  Well, let's just read it

8    together and maybe, hopefully it will make

9    sense as we go along.  Let's read what

10   Professor Kaste -- Kaste -- how do you say

11   his name again?

12        A.    I don't.

13        Q.    Okay.  Is it --

14        A.    In German we would say "Kaste,"

15   maybe it's "Kaste," "Kaste"?

16        Q.    Well, we can both do it wrong.

17        A.    I don't know the Finnish.

18        Q.    Well, let's read what the good

19   doctor from Finland wrote.

20              "Among the 14- to 16,000

21   patients enrolled in the trial there will be

22   quite a few, in whom the point-of-care device

23   shows a .6 to .7 higher or lower value than

24   the true INR is.  In such a patient, the

Protected - Subject to Further Protective Review

```
 1    point-of-care device may show 2.1 and the
 2    true INR is 1.5, i.e., the patient is not
 3    properly treated and has a risk of
 4    cardioembolism.  In another patient, the
 5    point-of-care device may show 2.9 when the
 6    true INR is 3.6, i.e., the patient has an
 7    increased risk of intracranial hemorrhage.
 8              "To prevent such disasters, I
 9    propose that a blood test of every patient be
10    sent to a central laboratory at the beginning
11    of the participation in the trial to find out
12    if the patient is one of these peculiar
13    patients."
14              Did I read that correctly?
15         A.    Yeah, you read this correctly.
16         Q.    Now, the remainder of this
17    paragraph was my understanding is
18    Dr. Berkowitz's response.
19         A.    You could only see this --
20         Q.    Right, exactly.
21         A.    -- if it's highlighted in a
22    different color or something like that.
23         Q.    Right.  But let's see if -- and
24    Dr. Berkowitz responds, "The trial leadership
```

Protected - Subject to Further Protective Review

1   has confidence in the performance,

2   reliability and validity of the HemoSense

3   device.  The data from the company does not

4   support the variability described above.  The

5   device has exceptionally low and acceptable

6   intra- and inter-individual variability as

7   well as remarkable congruence with a

8   plasma-based assay."

9            Did I read that correctly?

10       A.    You read that correctly.

11       Q.    And to back up, Doctor, the

12  good doctor from Finland specifically

13  recommended that you take split samples

14  between the point of care and central lab to

15  evaluate the performance of the device at the

16  initiation of the trial; is that correct?  In

17  order to avoid disaster, to use his word.

18       A.    Yeah.  As I read it, he

19  proposed that one test per patient as being

20  sent to central lab, yeah.  It's the question

21  what he was really intending with that single

22  measurement.

23       Q.    He wanted to validate the

24  device because that's the best way, to

Protected - Subject to Further Protective Review

1    compare the device with the central lab.

2    That's how the device got approved.  You told

3    me that earlier today.

4              MR. HOFFMAN:  Objection to the

5         form of the question.

6    BY MR. McWILLIAMS:

7         Q.    Right?

8         A.    Usually this is done by --

9    yeah, where we take preventative measurements

10   and comparing it to a reference, then a

11   method, so --

12        Q.    And did you follow Dr. Kaste's

13   advice?

14        A.    I mean, as far as I understand,

15   we did at that time -- point in time there

16   was no such measure implemented so far that I

17   can recollect.

18             MR. McWILLIAMS:  All right.

19        We're changing topics.  You want to

20        take a quick break?

21             MR. HOFFMAN:  Up to you.

22             MR. McWILLIAMS:  Sure.

23             THE VIDEOGRAPHER:  Going off

24        the record at 2:30 p.m.

Protected - Subject to Further Protective Review

1            (Recess taken, 2:30 p.m. to

2        2:45 p.m.)

3            THE VIDEOGRAPHER:  We're back

4        on the record at 2:45 p.m.

5   BY MR. McWILLIAMS:

6        Q.    All right.  Changing topics, no

7   more INRatio, I promise.  I want to talk

8   about therapeutic drug monitoring, TDM.  Do

9   you know what that is?

10       A.    Yes, I heard the expression

11  several times, yeah.

12       Q.    Warfarin requires therapeutic

13  drug monitoring, correct?

14       A.    Yes, that's what we talked

15  about beforehand, that warfarin has a narrow

16  therapeutic window, and it's -- you can

17  achieve the best benefit-risk for the

18  patients if the patients are in the optimal

19  INR range.  And so that is meant by, yeah,

20  you're doing measurements and you're taking a

21  decision on the dosing based on those

22  measurements.

23       Q.    And I know it's your company's

24  very strongly held position that rivaroxaban

Protected - Subject to Further Protective Review

1   does not require therapeutic drug monitoring,

2   but would you agree with me that there is an

3   ongoing discussion or debate in the

4   scientific and regulatory fields around this

5   topic, about whether or not patient safety or

6   efficacy could be further improved by some

7   type of measurement of PK or PD parameter and

8   NOACs?

9        A.    I agree about the ongoing

10  general debate about the drug monitoring for

11  all new oral anticoagulants that came on the

12  market in the past years.

13            MR. McWILLIAMS:  Okay.  I'm

14        going to hand you an e-mail that you

15        sent along with a PowerPoint that was

16        attached to it.  This is Derix-27,

17        Record 3064874.

18            (Whereupon, Deposition Exhibit

19        Derix-27, E-mail(s) re: Ad Hoc Xarelto

20        JSC - PK/PD Analysis,

21        XARELTO_JANSSEN_15329030,

22        Ref. 3064874, was marked for

23        identification.)

24            MR. McWILLIAMS:  And this

1        attachment, which is Derix-28, which

2        is Record 3064875.

3              (Whereupon, Deposition Exhibit

4        Derix-28, Model Based E-R Analysis

5        PowerPoint, XARELTO_JANSSEN_15329031,

6        Ref. 3064875, was marked for

7        identification.)

8   BY MR. McWILLIAMS:

9        Q.     And is it fair to say that both

10  the EMA and FDA has expressed interest in

11  monitoring -- or I'm hesitant to use the word

12  monitor, but just a measurement in order to

13  tailor the dose for rivaroxaban?

14              MR. HOFFMAN:  Objection to the

15        form of the question.

16              You can answer.

17        A.     FDA as well as also EMA have

18  both, yeah, entered into a dialogue about

19  targeted monitoring, targeted dosing for all

20  oral anticoagulants, so it's not a request

21  that was sent specifically to Janssen or

22  Bayer, but it's an open dialogue.  Some part

23  of the meetings were public meetings, also

24  where a discussion was held about the topic

Protected - Subject to Further Protective Review

1    with different experts.

2    BY MR. McWILLIAMS:

3        Q.      Okay.  And this is an e-mail

4    you wrote on September 23rd, 2015; is that

5    correct?

6        A.      That's correct, yes.

7        Q.      And it's -- you said, "Dear JSC

8    members."  What does JSC stand for?

9        A.      It stands for joint steering

10   committee, and that's one of the alliance

11   committees that we have in our collaboration

12   per contract with Janssen, and joint steering

13   committee is consisting of management

14   representatives from both companies.

15            Yet another committee is called

16   GDC, global development committee.  That's

17   consisting of the working -- the so-called

18   working team with members from both

19   companies.

20       Q.      And that's who you sent this

21   e-mail to.  These are all the members of the

22   JSC ad hoc --

23       A.      Right, they are, indeed, yeah.

24       Q.      Okay.  And just -- so the

Protected - Subject to Further Protective Review

1    subject line is, "Ad hoc Xarelto JSC - PK/PD

2    analysis/EMA request"; is that correct?

3         A.    That's correct, yes.

4         Q.    And you said, "Dear JSC

5    members.  We scheduled the ad hoc JSC a while

6    ago because we wanted to share with you" --

7    and then you have several bullet points.

8    First is "our analysis to comply with the

9    PK/PD simulation analysis request from EMA;

10   feedback from the rapporteur and

11   co-rapporteur regarding the proposal; and the

12   latest update regarding scheduled public

13   meeting around the topic, both EMA and FDA;

14   and then resource implications for Bayer and

15   Janssen team."

16             And then you say, "I have

17   attached a short presentation for the ad hoc

18   JSC.  Probably the topic won't require the

19   full scheduled time."

20        A.    Uh-huh.

21        Q.    And then you attach this.

22             And so to be clear, EMA had a

23   very specific -- EMA had a very specific

24   request, very specific data request.  They

1    asked you to build a model to be able to

2    simulate or predict exposure levels in

3    individual patients to then correlate it with

4    outcomes to see if it's possible to find

5    essentially a therapeutic range; is that

6    fair?

7         A.    This EMA PK/PD simulation

8    proposal resulted out of communication with

9    EMA, and it was starting earlier in the year.

10   And in the course of that communication,

11   yeah, EMA -- it was agreed to provide this

12   PK/PD simulation analysis and subsequent

13   analysis to EMA, yeah, and that process is

14   still ongoing, so it's not all available yet.

15        Q.    All right.  So --

16        A.    Because it's a very complex

17   analysis and procedure.

18        Q.    I understand.  Thank you.

19             And let's look through this

20   PowerPoint.  Did you create this PowerPoint

21   that you circulated to the team?

22        A.    I did it together, as you can

23   see, with my colleague, Jürgen Weber, with

24   the regulatory affairs representatives in my

Protected - Subject to Further Protective Review

1    team at the moment, the Xarelto team for

2    Bayer.

3         Q.    All right.  So let's slowly --

4    let's go through this together.  The first

5    slide says it's a "Model-based

6    Exposure-Response Analysis on Rivaroxaban."

7    It's an EMA request LEG 36, correct?  I'm

8    on --

9         A.    Yes, uh-huh.

10        Q.    And the next page it says the

11   purpose of the presentation is "To inform the

12   JSC about the planned analyses on the

13   integrated data on the rivaroxaban clinical

14   development program as requested by EMA,"

15   right?

16        A.    Right.  Yeah.

17        Q.    And then the next, on slide

18   number 3, you say "Outline of presentation."

19   You're going to give the regulatory history,

20   the LEG request with detailed list of

21   questions, and, again, that was when the EMA

22   specifically asked for you to do analyses of

23   the relationship between dose, exposure,

24   pharmacodynamic markers and important

Protected - Subject to Further Protective Review

```
1    efficacy and safety outcomes; is that

2    correct?

3         A.      Yes, that's correct.

4         Q.      And then you told the team

5    about these upcoming public meetings being

6    held by both -- there's two held by FDA and

7    one by EMA; is that correct?

8         A.      Yeah.  Yes.  Uh-huh.

9         Q.      One in London, two in D.C.?

10        A.      So there was -- I mean, the

11   so-called think tank meetings by FDA that,

12   yeah, they held sometimes together with

13   academia for specific topics.

14               And FDA had such a meeting in

15   December last year, but they also had prior

16   meetings to a different topic, where they

17   already started, yeah, launching into this

18   discussion about the PK/PD information to be

19   used to inform dosing.

20        Q.      Let's go to page 4.  This is

21   where you provided the regulatory history for

22   this request from EMA, right?

23        A.      Yes.  That's the regulatory

24   history.  And here it just has that -- and it
```

Protected - Subject to Further Protective Review

```
 1   makes clear that this is a request that was

 2   sent to all manufacturers of marketing

 3   authorization holders from NOAC -- of all

 4   NOACs in the --

 5         Q.    But I want to start at the

 6   beginning, because it says that this --

 7   essentially what started this, and correct me

 8   if I'm wrong, but what initiated this whole

 9   process within EMA is this discussion around

10   Pradaxa, dabigatran, in 2014, whether routine

11   monitoring of dabigatran concentrations may

12   provide increased benefits and lower risks

13   for patients.  And that was what triggered

14   this broader request to go to all NOAC

15   manufacturers; is that correct?

16         A.    Yeah, that was our

17   understanding.  So we are not part of those

18   CHMP/PRAC discussions because they're

19   confidential in nature, but we -- yeah, it

20   was our assumption based on information we

21   had received from the coordinator at EMA.

22         Q.    But do you know what actually

23   prompted that -- I mean, Pradaxa had been out

24   since 2010, right?
```

Protected - Subject to Further Protective Review

1    A.    Pradaxa was approved, yeah, the

2    first NOAC on the market.

3    Q.    So what happened in 2014 that

4    made EMA get all interested in therapeutic

5    drug monitoring for Pradaxa, if you know?

6    A.    I can only guess that -- I

7    mean, the -- I mean, they have regular

8    discussions, and this would be guesswork.  I

9    don't know.

10    Q.    Yeah, I certainly don't want

11    you to guess.  I mean, I want to be helpful.

12    But are you aware of any events

13    that occurred in the year 2014, four years

14    after the drug had been approved, that may

15    have triggered interest in this topic?

16    A.    Certainly general interest in

17    this topic was triggered by a publication of

18    data from the RE-LY trial where Paul Reilly

19    published, yeah, data, PK data, that had been

20    previously unpublished at the time.

21    Q.    Right.  And there was --

22    there's lots of news that came out around

23    the -- the controversy around the publication

24    of that paper.  Are you familiar with the

Protected - Subject to Further Protective Review

1  New York Times article or the British Medical

2  Journal?

3       A.     No, I'm not so familiar with

4  that because that really was kind of a

5  clinical discussion, so here it became a

6  regulatory type of discussion.  So I have

7  faint knowledge about discussions, but I

8  didn't follow it in detail.

9       Q.     Did you attend the Cardiac

10  Safety Research Consortium meeting in D.C. in

11  December of 2015?

12       A.     I attended that meeting in

13  Washington, yes.

14       Q.     And did you hear -- so you saw

15  the presentation by the EMA representative

16  who explained what got this whole thing

17  started?  Do you remember that?

18       A.     Not in detail.

19       Q.     Okay.  Let me see if I can

20  refresh your memory.  Let me hand you what's

21  been marked as Derix-29, and this is

22  PowerPoint presentation by Jens Heisterberg,

23  who presented at the FDA meeting?

24       A.     Yes.

Protected - Subject to Further Protective Review

```
 1              (Whereupon, Deposition Exhibit

 2        Derix-29, Feedback from the EMA

 3        PowerPoint [No Bates], was marked for

 4        identification.)

 5   BY MR. McWILLIAMS:

 6        Q.     I mean, I was there, and if you

 7   just -- the first page is his cover page, the

 8   second page is where he declares his conflict

 9   of interest, and the third page is where he

10   told the participants in the meeting why

11   we're all here.

12              Do you remember that?  Do you

13   remember him putting the cover of the

14   July 2014 British Medical Journal up on the

15   screen and everyone kind of chuckled a

16   little?

17        A.     I did not specifically recall

18   this picture, but I recall certainly that he

19   brought up the discussion.

20        Q.     Did you read the July 2014

21   edition of the British Medical Journal?

22        A.     I -- no, I don't think I read

23   it, no.

24        Q.     Are you aware that this cover
```

Protected - Subject to Further Protective Review

1  article was based on information that was

2  uncovered in the litigation against the

3  makers of dabigatran?

4      A.    I cannot comment on that.  I

5  don't -- I mean, I -- I read some related

6  articles talking about that information might

7  not have been uncovered, but I did not

8  specifically follow this up because this is a

9  clinical team assessment or discussion.

10     Q.    Right?  But so -- well, then

11  maybe I can -- I'll let you know what they

12  found.

13           This -- the reason why this got

14  on the cover of the British Medical Journal

15  is because doctors within Boehringer

16  Ingelheim, including Dr. Reilly, had done

17  advanced clinical trial simulations, and they

18  concluded that relative to the way dabigatran

19  and all NOACs are currently prescribed, that

20  if you do a one-time blood test and adjust

21  the dose, you can maintain efficacy, but

22  reduce bleeds by 40%.

23           Is this the first time you've

24  heard that?

Protected - Subject to Further Protective Review

```
 1              MR. HOFFMAN:  Objection to the
 2      form of the question.
 3      A.     I cannot comment on this
 4  statement, because I -- the only time I --
 5  yeah, really, I heard Dr. Reilly speaking at
 6  those public meetings, and I do not recall
 7  that in these meetings he made such a
 8  comment.
 9  BY MR. McWILLIAMS:
10      Q.     All right.  And you see that
11  the -- you know, the title of the article is
12  "Dabigatran.  The analysis the regulators
13  didn't see."  And if you'd read the article,
14  you would have read that this was analysis
15  they had internally that they decided not to
16  share with the regulators for -- for whatever
17  reason.
18              MR. HOFFMAN:  Objection to the
19      form of the question.
20  BY MR. McWILLIAMS:
21      Q.     You're completely unaware of
22  that?
23      A.     I'm unaware of the background
24  of this.
```

Protected - Subject to Further Protective Review

```
1        Q.      But you don't dispute the fact

2    that this PowerPoint presentation titled

3    "Feedback from the EMA" meeting -- and this

4    is -- this was Dr. Heisterberg reporting on

5    the November 2015 meeting in London.  The

6    third slide was the cover of the BMJ article

7    relating to the data uncovered from the

8    dabigatran litigation.

9        A.      Yeah.  I mean, I agree that

10   this is part of the presentation you just

11   told me, so yeah.

12       Q.      Okay.  So back to your slide, I

13   just want to -- because again, that's my

14   understanding of how this whole issue got

15   started.  EMA took -- even though the drug

16   had been on the market for four years, it

17   wasn't until the British Medical Journal

18   revealed that a one-time blood test could

19   improve patient safety significantly that the

20   EMA took very keen interest in this topic.

21              MR. HOFFMAN:  Objection to the

22         form of the question.

23   BY MR. McWILLIAMS:

24       Q.      Does that sound about right?
```

Protected - Subject to Further Protective Review

1          MR. HOFFMAN:  Objection to the

2      form of the question.

3      A.     That's your interpretation.  I

4  can really not judge because I don't have the

5  background, and I don't know exactly what

6  triggered the discussion at EMA.  But at that

7  time, the Reilly paper was already published

8  so -- also, the paper itself could have

9  triggered the discussion.

10  BY MR. McWILLIAMS:

11      Q.     All right.  But nonetheless,

12  we'll agree that it was in 2014 that issues

13  or interest in Pradaxa is what triggered

14  this -- the class-wide issue of whether or

15  not tailored dosing could improve patient

16  safety; is that fair?

17      A.     That's our understanding, yes.

18      Q.     Okay.  And so in this slide

19  4 -- Evan, could you go back to this one?

20  Thank you.  Sorry.

21          And so, then, you lay out the

22  timeline in terms of the company's response

23  to the EMA's request on this very particular

24  topic of whether or not patient safety could

Protected - Subject to Further Protective Review

1    be improved through a blood test.

2         A.    Yes.

3         Q.    I mean, it's -- okay.

4               And it says in March of 2015,

5    "Initial request from EMA on 'the potential

6    need to measure plasma concentrations or

7    pharmacodynamic markers of anticoagulant

8    activity of the new oral anticoagulants' with

9    short response timelines."

10              Did I read that correctly?

11        A.    You read that correctly.

12        Q.    And then in April of 2015 was

13   the first Bayer response.  And in July of

14   2015 was a "Detailed request from EMA with

15   concrete proposals for a PopPK analysis,

16   exposure predictions and a PK/PD analysis

17   including clinical outcomes"?

18        A.    Yes, you read that correct.

19        Q.    And you understand -- or maybe

20   you don't understand, but that's exactly what

21   the makers of Pradaxa had done.  They had

22   done clinical trial simulations to predict

23   what the difference would be with safety and

24   efficacy if you did a blood test to inform

Protected - Subject to Further Protective Review

1   dosing.

2       A.      No, it's different.  What the

3   dabigatran team did was really they took a

4   huge number of blood samples from the RE-LY

5   trial for both dose and patients, and with

6   the intention to investigate PK and PD.  And

7   then they took the dose real measured values

8   and put them into perspective in this Reilly

9   paper, and with these clinical outcomes.

10              And certainly there was also

11  some simulation work involved, but it is

12  completely different from the EMA request

13  here, because for -- for rivaroxaban, the

14  amount of such similar amount of data or

15  similar data that were collected in the RE-LY

16  trial were not available.

17              And so this simulation approach

18  that we are conducting is much more

19  comprehensive and it's different.  And again

20  here, you would have to talk to experts in

21  pharmacokinetics and pharmacodynamics, yeah,

22  who can better explain the type of -- the

23  nature of simulation work that was done or is

24  being done currently still.

1      Q.     Well, I don't want to argue,

2  but I can tell you that I -- you're right,

3  they did have a much larger PK dataset in the

4  RE-LY trial, approximately 70% of the

5  patients versus the 161 from ROCKET.

6             But ultimately, all they did

7  was take that PK data and make a PopPK model,

8  and they validated it with the roughly 70% of

9  the patients, whereas your ROCKET model was

10 validated with 161 patients.

11            Ultimately, it was the PopPK

12 model that was used to predict exposure and

13 then correlate with the outcomes.  Are you

14 aware of that?

15            MR. HOFFMAN:  Objection to the

16      form of the question.

17      A.     And that's -- that is going

18 beyond my type of -- yeah, my involvement and

19 judgment on this topic.  So, yeah, I would

20 have to really relate this to my colleagues

21 who can better, yeah, talk about the

22 differences in how the RE-LY data were

23 generated and how, yeah, we are planning to

24 do this.

Protected - Subject to Further Protective Review

1   BY MR. McWILLIAMS:

2        Q.     All right.  Fair enough.  We're

3   here to talk about Xarelto, not Pradaxa.  I

4   agree.  Let's keep flipping.

5             Let's go to page 5 of your

6   PowerPoint, and I think this is where you're

7   talking about what triggered this discussion

8   in academia and health authorities.  You cite

9   to the FDA analysis and the Reilly paper on

10  Pradaxa.  And the question was posed, "Can

11  you improve the benefit-risk by individual

12  dosing based on biomarkers?"

13            Did I read that correctly?

14       A.     Yes, you read that correctly.

15       Q.     And then the next slide is

16  "Bayer's position in initial response to

17  EMA"?

18       A.     Yes.

19       Q.     And it's Bayer's position that

20  in routine clinical practice, there is no

21  need to monitor the anticoagulant effect of

22  rivaroxaban.  But you say in certain

23  exceptional circumstances, rivaroxaban levels

24  with a calibrated assay may be useful, such

Protected - Subject to Further Protective Review

1  as overdosage or emergency situations,

2  correct?

3      A.     That's correct.

4      Q.     And you've suggested PT with a

5  Neoplastin reagent or an anti-factor Xa

6  assay, which is a way to indirectly measure

7  drug concentration, correct?

8      A.     These are given here as

9  examples, yes.

10     Q.     But then you go on and you say,

11 "Attempting to incorporate a post hoc

12 adjustment for a drug... is deemed

13 scientifically inappropriate," and then you

14 say when -- and you have four bullet points.

15         You say when it "does not have

16 a narrow therapeutic index," correct?

17     A.     Never -- yeah, no -- doesn't

18 have a narrow therapeutic range, yeah.

19     Q.     So it's Bayer's position that

20 Xarelto does not have a narrow therapeutic

21 index, correct?

22     A.     That's not written here, so it

23 says --

24     Q.     Well, that's my question.

Protected - Subject to Further Protective Review

1      A.      -- very -- I mean, it's very

2   general, and that it also, yeah, in

3   congruence with the positions that were

4   shared by external experts that, in general,

5   incorporating dose adjustments for a drug

6   that does not have a narrow therapeutic range

7   is deemed scientifically appropriate.

8      Q.      Well, let me ask you this

9   question:  Does Xarelto have a narrow

10   therapeutic index or -- let me use these

11   exact words.

12            Does Xarelto have a narrow

13   therapeutic range?

14      A.      That's, again, a question I

15   would really want you to discuss with the

16   clinical pharmacology and my clinical

17   colleagues, but as far as I understand from

18   the discussions that I had with my

19   colleagues, it's my understanding that

20   Xarelto does not have a narrow therapeutic

21   range.

22      Q.      But you -- and then likewise,

23   it's Bayer's position that Xarelto does not

24   have marked pharmacokinetic variability?

Protected - Subject to Further Protective Review

1      A.      That's, again, a topic, yeah, I

2   would have to really intensively discuss with

3   the colleagues who are experts in -- and to

4   whom certainly also provided the input into

5   this statement.

6      Q.      And that's discussing

7   interpatient variability, correct?

8      A.      It's discussing pharmacokinetic

9   variability and -- so that can probably more

10  than one type of variability, but please

11  refer these type of questions on the

12  specifics to my colleagues.

13     Q.      Well, would you agree with me

14  that Pradaxa -- excuse me.  Would you agree

15  with me that Xarelto does exhibit high

16  interpatient variability?

17            MR. HOFFMAN:  Objection to the

18      form of the question.

19     A.      I don't agree, and I can also

20  say this is not my area of expertise.  And so

21  I refer that question to my colleagues who

22  can better inform -- respond to the question.

23  BY MR. McWILLIAMS:

24     Q.      Okay.  Let's go on to the next

Protected - Subject to Further Protective Review

1   page.  So the "Subsequent LEG 36 request with

2   detailed questions from EMA," and it

3   discusses how Bayer was provided with a

4   comprehensive basis for further discussion

5   for each of the licensed indications and the

6   following should be provided.  A PopPK

7   analysis, prediction of exposure, Ctrough, Cmax,

8   area under the curve, at steady state for

9   each of the indications and each patient

10  subgroups, and other things that influence

11  exposure such as concomitant medications.

12              And then you were asked to do a

13  pharmacokinetic/pharmacodynamic analysis to

14  evaluate whether or not there's a correlation

15  between drug levels or pharmacodynamic

16  markers and outcomes, strokes and bleeds,

17  right?

18       A.    Yeah.  So EMA is requesting to

19  look at these three

20  pharmacokinetic/pharmacodynamic analysis

21  parameters.

22       Q.    And on page 8 is a description

23  of the model that's going to be built -- so

24  this is the integrated PopPK model.  And

Protected - Subject to Further Protective Review

1   essentially what it's designed to do is to

2   take patient characteristics and predict drug

3   concentrations either, you know, Cmax, Ctrough,

4   area under the curve, correct?

5        A.    Yeah, that's how I understand

6   the model that first there are data that are

7   being imputed from PopPK data that are

8   available from phase two and other

9   information from phase one.

10             And then, yeah, the model is

11  created with all the information that is

12  available from all indications in which

13  Xarelto and all the others in which Xarelto

14  is applied to.

15             And then the model is supposed

16  to predict patient -- individual patient

17  level data for each patient based on the

18  characteristics that we know from the

19  patient, yes.

20        Q.    And then the next slide, slide

21  9, is where you describe, I think, what you

22  just touched on, is the various phase two and

23  phase three studies where PK data was

24  collected --

Protected - Subject to Further Protective Review

1      A.      Uh-huh.

2      Q.      -- and it's aggregated in order

3  to build this integrated PopPK model,

4  correct?

5      A.      Slide 9 is describing something

6  different, so I'll just -- and in the

7  phase -- I mean, in the PopPK model,

8  information went in from phase two studies as

9  well, so where we had those two aligning.

10     Q.      These two.

11     A.      And here it just says that we

12  have four different indications which Xarelto

13  is approved in Europe; VTE intervention, VTE

14  treatment, SPAF and ACS.  And for each of

15  those indications separately, there will be a

16  correlation analysis with the clinical

17  outcomes, that will not be done in a

18  totality.

19         So the totality data is only

20  used to inform the model, to provide as much

21  information into the model as possible, but

22  then the analysis will be conducted

23  separately for each indication.

24     Q.      Right.  And correct me if I'm

Protected - Subject to Further Protective Review

1  wrong, but my understanding is that you have

2  to build this PopPK model because you don't

3  have PK measurements for all the patients in

4  these clinical trials, but you do have

5  outcome data; you know who had a clot or a

6  stroke or a bleed, and so you're using the

7  PopPK model to predict the -- their exposure,

8  either Ctrough, Cmax or area under the curve,

9  and then correlate that with outcomes,

10  strokes and bleeds, to see if there's people

11  with high levels are having more bleeds or

12  people with low levels are having more

13  strokes relative to others, fair?

14          MR. HOFFMAN:  Objection to the

15      form of the question.

16      A.    My understanding is from --

17  from this analysis and model, that we used

18  information from the model, and as we said,

19  we correlate it to the clinical outcomes, and

20  then we will look at the data, and then we

21  will see whether such further conclusions can

22  be made.

23          So that's preemptive, but

24  certainly the purpose of this exercise is

Protected - Subject to Further Protective Review

```
1    from the predictor of plasma concentration

2    data for each patient correlate with the

3    clinical outcomes of efficacy and safety.

4    BY MR. McWILLIAMS:

5         Q.     And I understand and I

6    appreciate that Xarelto is originally

7    designed to go head to head with warfarin,

8    for example, but not require the routine

9    monitoring that warfarin does.

10             But are you guys going into

11   this exercise with an open mind?  If the data

12   says that patient safety could be improved,

13   are you going to embrace that data and

14   perhaps suggest some type of measurement to

15   improve patient safety?

16             MR. HOFFMAN:  Objection to the

17        form of the question.

18        A.     Certainly what I can say is

19   that we are going into this analysis with an

20   open mind, and really, yeah, we'll evaluate

21   the results of the analysis, which we don't

22   know yet, appropriately.

23   BY MR. McWILLIAMS:

24        Q.     So no predetermined conclusions
```

Protected - Subject to Further Protective Review

1    on this like we arguably saw in that other

2    document earlier today; is that fair?

3              MR. HOFFMAN:  Objection,

4         "arguably," argumentative.

5         A.    We talked about the other

6    situation, and we have not yet drafted any

7    shell documents here in this, because there's

8    still some work that's ongoing.

9    BY MR. McWILLIAMS:

10        Q.    Okay.  Would you just go to the

11   last page, please, under the "Summary and

12   Potential reactions by EMA"?

13        A.    Yes.

14        Q.    You see where you wrote -- and

15   this is, again, a PowerPoint you wrote with

16   one of your colleagues, that "The team is

17   confident that the simulation analysis will

18   deliver information to further substantiate

19   our position."

20              Did I read that correctly?

21        A.    Yes.

22        Q.    And your position is that

23   there's no need for therapeutic drug

24   monitoring, correct?

Protected - Subject to Further Protective Review

1    A.    That's the position that we're

2    having before running into --

3    Q.    And you wrote this statement

4    prior to doing any of the analysis, building

5    the model, doing exposure response.  You said

6    you're confident that the simulation will

7    support the position, right?

8    A.    That's right that we wrote

9    this, this statement.

10    Q.    That's not exactly the

11    scientific method we discussed earlier.

12    Remember Galileo, you start with the

13    hypothesis and you don't form conclusions

14    until the end, remember that?

15    MR. HOFFMAN:  Objection to the

16    form of the question.

17    A.    We are not talking here about a

18    hypothesis of an analysis.  It's really kind

19    of what our potential outcomes of the

20    discussion that's different.  And it also

21    says in the next bullet point that "EMA may

22    request a label change," for example,

23    depending on the results, and also gives

24    another example, EMA may decide on

Protected - Subject to Further Protective Review

1    information to healthcare professionals

2    depending on results.  So it gives different

3    options.

4    BY MR. McWILLIAMS:

5        Q.    All right.  But you didn't

6    dispute the fact that the very first thing

7    you wrote at the top of this is that the team

8    is confident that the simulation analysis,

9    that it's yet to be performed at this point

10   in time, right?  It had not been performed,

11   right?

12       A.    They had not been performed at

13   this point in time when we're speaking, so

14   ongoing.

15       Q.    When you wrote at this point in

16   time, when the simulation analysis had not

17   been performed, you wrote that you were

18   confident it would deliver information to

19   further substantiate the company's position

20   of no need to monitor, right?  That's what

21   you wrote?

22       A.    That's what we wrote, yes.

23            MR. McWILLIAMS:  Okay.  Let's

24       now move to what we're marking as

Protected - Subject to Further Protective Review

1        Derix-30 and 31, which is an e-mail

2        you received, and this is a Record

3        3375706 and 3375707.

4               (Whereupon, Deposition Exhibit

5        Derix-30, E-mail(s) re: To review at

6        our update today,

7        XARELTO_BPAG_25183362, Ref. 3375706,

8        was marked for identification.)

9               (Whereupon, Deposition Exhibit

10       Derix-31, Draft TDM Position

11       PowerPoint, XARELTO_BPAG_25183363,

12       Ref. 3375707, was marked for

13       identification.)

14              MR. McWILLIAMS:  Here's the

15       attachment.

16   BY MR. McWILLIAMS:

17       Q.     And is this an e-mail that you

18   received on October 21st, 2015?

19       A.     This is an e-mail I received,

20   yes.

21       Q.     Okay.  And the subject line is

22   "to review our update today at 9:30," and it

23   attaches the filename "Draft TDM Position

24   Janssen CDT," and then attaches a PowerPoint?

Protected - Subject to Further Protective Review

1        A.      Yes, that's correct.

2        Q.      Okay.  And let's look at the

3    PowerPoint together, please.  It says -- back

4    on the e-mail, I'm sorry, it says, "Hi,

5    Andrea" -- and this is directed to you and

6    only you, and I understand there's others

7    that are copied, but both the header of the

8    e-mail, then this body of the e-mail is

9    directed to you, correct?

10       A.      That's correct, yes.

11       Q.      And it says, "The Janssen CDT

12   met Monday of this week and drafted a

13   proposed position statement on TDM - take a

14   look and let's discuss at our update."

15              And let's look at what they

16   sent you.  And if you just go to the first

17   page, it cites to the February 3rd, 2015 CSRC

18   think tank agenda.  And that's where Bob

19   Temple first, I think, publicly advocated TDM

20   for NOACs; is that correct?

21              MR. HOFFMAN:  Objection to the

22        form of the question.

23       A.      I recall that he at the time,

24   for the first time, raised the question and

Protected - Subject to Further Protective Review

1   indicated that he would like to follow up on

2   the topic.

3   BY MR. McWILLIAMS:

4        Q.      And so quoting from that think

5   tank agenda, it says, "Using Pharmacokinetic

6   and pharmacodynamic parameters to inform NOAC

7   dosing:  Should we consider

8   pharmacometric-guided dosing of NOAC agents

9   to maximize the benefit-risk relationship?"

10              Did I read that correctly?

11       A.      You read that correctly.

12       Q.      And then in March of 2015, this

13  was another meeting, I believe, where Bob

14  Temple presented at.  This is an EMA meeting

15  he participated via videoconference -- or,

16  actually, just on the phone, I believe, but

17  his PowerPoint's available.  It's quote, the

18  "MAH are requested to discuss if the

19  benefit-risk balance based on available data

20  could be enhanced by implementing therapeutic

21  drug monitoring (TDM)."

22              Did I read that correctly?

23       A.      You read it correctly, but I'm

24  not too sure about the context of what Temple

1    is presenting, so it can also be taken from

2    one of the discussions we mentioned earlier

3    from starting in -- at the CHMP/PRAC meeting.

4         Q.     I think you're right.  I'll

5    check real quick.  You're right, that was

6    December 2014.  I stand corrected.  I

7    apologize.  Let's go to the next page,

8    please, page 2 of the PowerPoint.

9              This is, again, the three

10   public meetings we talked about previously?

11        A.     Uh-huh.

12        Q.     The FDA public workshop on --

13   and that was focused on assays and the stages

14   of development of various assays to measure

15   either the drug concentration or the effect

16   of the drug for NOACs; is that correct?

17        A.     It was a meeting to discuss the

18   availability and also, yeah, of in vitro

19   diagnostic testing for all --

20        Q.     Did you watch that webcast?

21        A.     I watched that webcast.

22        Q.     So you heard the FDA at the

23   end, do you remember her -- I forgot the

24   woman's name, but she said, "We hear you loud

Protected - Subject to Further Protective Review

1    and clear.  We need to get these things

2    approved."

3                 Do you remember that?

4                 MR. HOFFMAN:  Objection to the

5         form of the question.

6         A.     I don't recall every citation,

7    but certainly the tone of the meeting was

8    that certain specific in vitro diagnostic

9    testing such as, for example, the anti-Xa

10   testing -- tests are not yet approved in the

11   United States.

12   BY MR. McWILLIAMS:

13        Q.     Right.  And then the next

14   public meeting was the EMA public workshop,

15   which was held in London on November 23rd,

16   2015.  Were you there for that meeting?

17        A.     No, I was not attending the

18   meeting.  Only my colleagues attended the

19   meeting.

20        Q.     Okay.  Dr. Berkowitz was there,

21   right?

22        A.     Yes, Dr. Berkowitz --

23        Q.     Dr. Kubitza was there?

24        A.     Dr. Kubitza was there, yes,

Protected - Subject to Further Protective Review

1    and --

2         Q.    They actually even let me in.

3    It's crazy.

4              And then the third public

5    meeting was the CSRC meeting that took place

6    in D.C. on December 3rd.  Again, the topic

7    for that meeting is, "Is there a role for

8    pharmacokinetic/pharmacodynamic guided dosing

9    for novel anticoagulants?"

10             Did I read that correctly?

11        A.    Yes.

12        Q.    Were you at that meeting?

13        A.    I attended that meeting, yes.

14        Q.    So you -- do you remember

15   seeing me there?

16        A.    No.

17             MR. HOFFMAN:  It's okay.  Don't

18        get upset.

19             MR. McWILLIAMS:  No, it's okay.

20        No, I'm just saying I want to make

21        sure we --

22   BY MR. McWILLIAMS:

23        Q.    Did you sit through the whole

24   thing?

Protected - Subject to Further Protective Review

1       A.     Yeah, basically.  Maybe an

2   interruption for some calls that I had to

3   take --

4       Q.     But you heard Bob --

5       A.     -- but most of the time I was

6   sitting in the meeting.

7       Q.     But you heard Bob Temple.  No

8   uncertain terms, Bob Temple is in favor of

9   tailored dosing of NOACs.

10          Would you agree with that?

11          MR. HOFFMAN:  Objection to the

12      form of the question.

13      A.     I don't agree to that statement

14  that he's in favor of -- yeah, exploring the,

15  rather, targeted monitoring and targeted

16  dosing could further improve the benefit-risk

17  of new oral anticoagulant drugs, and he

18  several times made the statement that he

19  stands fully behind his and the FDA's

20  decision to approve the drugs without

21  targeted drug monitoring, but he's interested

22  scientifically in following, yeah, the

23  thinking and trying to explore, yeah,

24  information to learn more about this

Protected - Subject to Further Protective Review

1    scientific regression.

2    BY MR. McWILLIAMS:

3         Q.      And you understand the

4    rationale behind that, that while these are

5    fabulous, lifesaving drugs, they're also

6    very, very dangerous.

7                 MR. HOFFMAN:  Objection to the

8         form of the question.

9    BY MR. McWILLIAMS:

10        Q.      Would you agree with that?

11                MR. HOFFMAN:  Objection to the

12        form of the question.

13        A.      As most of the -- almost all, I

14   would say, pharmaceutical products have

15   benefits and have also safety risks

16   sometimes.  And that's the same also for new

17   oral anticoagulants, that given due to the

18   mechanism of action, they have very

19   beneficial effects, but there's also side

20   effects that physicians have to take into

21   consideration when prescribing the drugs and

22   treating the patients.

23   BY MR. McWILLIAMS:

24        Q.      But NOACs -- well, all oral

Protected - Subject to Further Protective Review

```
1    anticoagulants, they have a very serious but

2    quite common serious adverse effect in the

3    form of major bleeding.  You know that all

4    the NOACs, depending which study you look at,

5    you know, roughly 3% of patients per year

6    suffer a major bleeding event, and that means

7    someone in the hospital getting a

8    transfusion.

9              And that's -- and so 3% is a

10   relatively common side -- that's a pretty

11   high number for a serious side effect.  Would

12   you agree with that?

13             MR. HOFFMAN:  Objection to the

14        form of the question.

15   A.      You're making a series of

16   qualifiers here which, yeah, I really cannot

17   comment to what you say is common, and that's

18   really a discussion you will have to have

19   with a medical doctor, not with me, to judge

20   about the seriousness and also the ability to

21   handle certain bleeding events and the

22   frequency.

23             And, yeah, so that's really

24   a -- clearly a medical topic you will have to
```

Protected - Subject to Further Protective Review

1    follow up, but just bear in mind also the

2    seriousness of the events that are being

3    prevented by the therapy.  That's why, yeah,

4    we're talking about devastating strokes

5    and --

6    BY MR. McWILLIAMS:

7        Q.     Absolutely.

8        A.     -- cardiovascular death and

9    also myocardial infarction.

10       Q.     But you understand, though --

11       A.     I mean, you have to really put

12   this into perspective when you're -- that's

13   what always is being done when new drugs are

14   being approved, that both benefit and risk

15   are being put into perspective, and that's

16   the basis we have to look at.

17       Q.     I completely agree.

18              But you understand the

19   rationale behind the effort on the part of

20   EMA and FDA is that if we can reduce the

21   number of bleeding events, that's something

22   we should do.  Would you -- do you agree with

23   that general proposition?

24       A.     Again, for me, it's too general

Protected - Subject to Further Protective Review

1   because for them, it's really to look whether

2   they can improve the benefit-risk.  So that

3   means also not just --

4        Q.    Compromising efficacy --

5        A.    -- compromising on the

6   efficacy, so they would have to -- we would

7   have to find out whether there's a way to

8   improve on both sides at the same time.

9        Q.    Well, let's say if you could

10  maintain efficacy but improve safety, reduce

11  the number of bleeding events by way of a

12  one-time blood test, that would be a good

13  thing, wouldn't it?

14            MR. HOFFMAN:  Objection to the

15       form of the question.

16       A.    It's also very general.  I

17  mean, certain -- certainly there's always an

18  attempt to further improve, if -- a therapy

19  in any way or form, but it has to be

20  evaluated against the complications that it

21  implies, and really also the amount of

22  improvement you can achieve with it.

23  BY MR. McWILLIAMS:

24       Q.    Well, and, again, I think

 1    that's why it's important to talk about the

 2    relatively high event rate for major bleeds.

 3    If it's 3% a year and you're prescribing this

 4    drug to a million Americans a year, that's

 5    30,000 major bleeding events being caused by

 6    this drug every year.

 7                   And I understand it's

 8    preventing lots of strokes, and that's a good

 9    thing.  But if we could still prevent strokes

10    but reduce the 30,000 people that have to

11    spend the night in the hospital and get a

12    blood transfusion every year, that would be a

13    good thing, wouldn't it?

14                   MR. HOFFMAN:  Objection to the

15         form of the question.

16         A.    Again, you're mixing things,

17    whereas not -- for example, not every patient

18    who experiences major bleeding ends up in

19    hospital.  And really, this is very detailed

20    clinical discussion, and you cannot just

21    compare the numbers with certain events or --

22    and I really ask you to have that discussion

23    with my clinical colleagues who are much --

24    can much better judge on the figures, on the

Protected - Subject to Further Protective Review

```
1    seriousness, and on the impact.

2    BY MR. McWILLIAMS:

3         Q.      But you know the top line

4    results for ROCKET, don't you?  Do you not

5    know what the primary safety endpoint, major

6    bleed definition is?

7         A.      Yeah.  And as I understand

8    it --

9         Q.      It's roughly 3% -- more than 3%

10   a year, right?

11        A.      I -- we can -- you know, we

12   can -- I mean, we can look at the data, but

13   it -- I did not disagree with the numbers,

14   but I -- I just disagree with the conclusions

15   that --

16        Q.      That it would be a good idea to

17   reduce the number of people that go to the

18   hospital?  Just -- I want you to just

19   hypothetically accept -- here's a

20   hypothetical.  I want you to assume for a

21   second that it's true, that according to the

22   ROCKET data and according to your sales data,

23   that Xarelto's responsible for tens of

24   thousands of hospitalizations related to
```

Protected - Subject to Further Protective Review

1   bleeding events.

2               Assuming that's true, would you

3   agree with me that if you could reduce the

4   number of patients going into the hospital

5   and having to get blood transfusions by way

6   of a single blood test, that that would be a

7   good thing?

8               MR. HOFFMAN:  Objection to the

9        form of the question.

10      A.      I do not agree to the

11  statement, because it's just, again, only

12  looking into one aspect of safety, and it all

13  will have to fall into a bigger amount of

14  evaluation, also in terms of what the

15  additional measurements would mean to the

16  patient and -- sorry, it cannot really just

17  be seen as just a one sided.

18              And that's also why the health

19  authorities and also Bob Temple, as one of

20  the health authority representatives, have

21  called for these discussions.  If you

22  followed the meeting, it was very obvious

23  that at the meetings many experts went out of

24  the meetings and said this is much more

Protected - Subject to Further Protective Review

1    complex as we had thought it would be.

2            And doesn't mean that people

3    stop work on it, but it is really not an easy

4    yes/no or, yeah, analysis and judgment.

5    BY MR. McWILLIAMS:

6        Q.    Okay.  Let's keep looking at

7    this PowerPoint.  This is the last page.

8        A.    Yeah.

9        Q.    And this is Janssen's position

10   statement on therapeutic drug monitoring as

11   of fourth quarter 2015.  It says, "Based on

12   currently available data from the extensive

13   clinical development program and

14   postmarketing experience using fixed

15   rivaroxaban doses without TDM, the CDT does

16   not recommend TDM for rivaroxaban patients.

17            "We would consider TDM if the

18   following conditions are met:  A robust assay

19   were approved by FDA and available in the

20   U.S. to estimate rivaroxaban exposure."

21            Let's stop right there.  Did I

22   read that correctly?

23       A.    You read that correctly.

24       Q.    And what is your understanding

Protected - Subject to Further Protective Review

1   of the current status of the approval of an

2   assay that can estimate -- reliably estimate

3   rivaroxaban exposure?

4        A.     So the proposal that is made by

5   our research teams and also that is what we

6   supported from Bayer perspective was the

7   diagnostic companies and a Xa assay.  And so

8   we supported and, yeah, worked with several

9   companies that developed Xa assays, some of

10  which are approved in Europe, but not in the

11  U.S.

12              And that would be, from my

13  perspective as I understand the tests as a

14  nonexpert, again, be the most robust -- the

15  most robust assay in relation to

16  rivaroxaban --

17       Q.     And do you have any --

18       A.     -- and was not approved by FDA

19  so far.

20       Q.     Do you have any knowledge of

21  the -- any assays being approved in the near

22  future?

23       A.     I don't know about the status.

24  I just know that applications were made by

Protected - Subject to Further Protective Review

```
1   companies like, for example, Diagnostica

2   Stago was one of the companies which we

3   supported in developing the calibrators and

4   controls, but I don't know about the status

5   of their interaction and approval with FDA.

6        Q.      Okay.  And the next criteria

7   where, according to Janssen, they would

8   consider TDM would be if the

9   "Exposure/response analysis were to indicate

10  that substantial numbers of patients fall

11  outside the exposure range that delivers the

12  optimal benefit-risk."

13               Did I read that correctly?

14       A.      You read that correctly.

15       Q.      And can you put any more

16  substance on that?  What does it mean -- what

17  does substantial?  Is it 5%, 10%, 1%?  How

18  many patients would need to be helped before

19  your company would be willing to adopt a

20  proposal that could potentially improve

21  patient safety?

22               MR. HOFFMAN:  Objection to the

23       form of the question.

24       A.      Substantial numbers of patients
```

Protected - Subject to Further Protective Review

1   was not characterized further here in this

2   proposal.  The proposal, as we already read,

3   the Janssen CDT proposal, so it's the

4   proposal of the Janssen development team,

5   which they shared with us for discussion and

6   saw that's basically their text.  And so you

7   would have to ask about the understanding of

8   "substantial."  So I do not recall that we

9   discussed specific figures.

10  BY MR. McWILLIAMS:

11        Q.    Well, has the joint CDT adopted

12  this position?  Is that the current position

13  of the manufacturer of Xarelto?

14        A.    Not as a proposal that was

15  shared for discussion.

16        Q.    Was this proposal accepted or

17  rejected, amended?

18        A.    I recall that we discussed it,

19  but I don't recall that it was finalized or

20  that it went into further documents.

21        Q.    Would it be fair to say that

22  this is not the position of Bayer, that Bayer

23  would not consider TDM if these conditions

24  were met?

Protected - Subject to Further Protective Review

1      A.      I mean, we have not put out the

2   conditions; so, therefore, we would really

3   have to have discussion on, yeah, what it

4   really means, substantial numbers, and that's

5   also what I recall the way how we discussed

6   it, that certainly, does this in general --

7   can be supported, but it's not specific

8   enough to -- and so it would really be -- I

9   mean, we'd have to see the data and to

10  discuss the data with experts before we can

11  make such a judgment call.

12      Q.      Okay.  And this says -- the

13  last bullet point that would have to -- the

14  conditions that would have to be met before

15  they would endorse TDM is to "verify that

16  performing TDM will improve upon the number

17  of patients that fall within the exposure

18  range that delivers the optimal

19  benefit-risk."

20          Did I read that correctly?

21      A.      You read that correctly.

22      Q.      Is it Bayer's position that a

23  prospective randomized multicenter clinical

24  trial would need to be performed before TDM

Protected - Subject to Further Protective Review

1  could be endorsed?

2      A.     That's -- yeah, that's the

3  clinical team position and was shared also by

4  my colleague, Scott Berkowitz, at the

5  meeting, because it's one step that currently

6  is being done to look at whether we find

7  patients that are -- I'll use the word of

8  "temporesis," at the fringes, so that our --

9  in the outer range of the exposure.  And then

10  also, where these PK levels really correlate

11  to different outcomes than for the general

12  population.  So that would be the first step,

13  to find this out.

14              But it's -- and we think that

15  it's not enough to do so because we would

16  have to run a second trial where we would

17  have to first develop a new dosing regimen

18  from that information.  So it's all

19  hypothetical, but that would be the first

20  step from the information, to develop a new

21  dosing regimen.

22              And then we would have to apply

23  the new dosing regimen and compare it to the

24  existing one because that's what you

Protected - Subject to Further Protective Review

1    currently always have to do to approve new

2    drugs and new regimens to compare to the

3    existing ones, and only if you have that

4    information you could really conclude that

5    the targeted drug monitoring has a better

6    benefit-risk than the currently approved

7    regimen.

8         Q.    So who is in -- who has been

9    placed in charge of designing this clinical

10   trial?

11        A.    I mean, you cannot design the

12   clinical trial before you have to -- the

13   hypotheses are the first steps done.  So what

14   we currently are doing is to run the

15   simulation analysis.

16             Certainly I recall there were

17   some speculative kind of trial designs, not

18   only by us, but also by the other NOAC

19   manufacturers presented at such meetings.

20             And so suddenly, those trials

21   are supposed to be very large, simply because

22   I had -- the NOAC as approved are already

23   very effective, and so the number of events

24   that you detect are low.  And so if you want

Protected - Subject to Further Protective Review

```
 1    to design a non-inferiority trial in such a

 2    setting, it's automatically going to be a

 3    very large trial that will take also time

 4    before --

 5           Q.    And very expensive as well?

 6                 MR. HOFFMAN:  Objection to the

 7           form of the question.

 8    BY MR. McWILLIAMS:

 9           Q.    Fair?  It would probably cost

10    more than ROCKET, right?

11           A.    I mean, if you have more

12    patients involved in a trial, then -- where

13    in ROCKET you could assume that the trial is

14    also becoming more expensive than ROCKET

15    because the trial costs are depending on the

16    number of patients in a trial involved.

17           Q.    And ROCKET cost more than

18    $50 million; is that fair?

19           A.    You said 50?

20           Q.    50.

21           A.    Yes.

22           Q.    Okay.  And so -- and I don't

23    know if you've seen the news, but you guys

24    make more than like €1.7 billion a year on
```

Protected - Subject to Further Protective Review

1    Xarelto.  So how much money have you budgeted

2    for this new clinical trial to determine

3    whether or not TDM is safe and effective?

4              MR. HOFFMAN:  Objection to the

5         form of the question.

6         A.    That's -- yeah, that's just

7    speculative because, as I said, we would have

8    to first, yeah, run the first steps, and when

9    it becomes evident that there -- that we have

10   seen discrepancies that would lead to the

11   next steps, then we would start designing and

12   discussing about such a study.

13             And certainly, if studies are

14   deemed necessary for patient safety and

15   regulatory purposes in general, they are not

16   prospectively budgeted, so they are -- I

17   mean, they are to stand, and there's no

18   discussion about a budget if it is a study

19   that, yeah, investigates, yeah, safety

20   aspects and are also a requirement by the

21   health authority.

22   BY MR. McWILLIAMS:

23        Q.    Let's just be honest, we're

24   likely not going to get to that step because

Protected - Subject to Further Protective Review

1  you guys have built this model in such a way,

2  to use your own words, that you're confident

3  the analysis will deliver information that

4  substantiates the company's position.

5          MR. HOFFMAN:  Objection to the

6      form of the question.

7  BY MR. McWILLIAMS:

8      Q.    Right?  So this whole

9  discussion about a clinical trial is kind of

10  silly talk, right?

11          MR. HOFFMAN:  Objection.

12      A.    I do not agree because you're

13  suggesting that the model is not built in a

14  scientifically -- scientifically rigorous

15  way, and that's not what I can agree with.

16          And the statement you refer to

17  is really based on the knowledge that is

18  existing so far.

19  BY MR. McWILLIAMS:

20      Q.    The first thing I want to ask

21  you about is -- I mean, I think you said two

22  of the reasons why there's no need for

23  therapeutic drug monitoring is whenever we

24  get a drug with low interpatient variability

Protected - Subject to Further Protective Review

1    and a wide therapeutic index; is that fair?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.    I would have to go back.  I

5    mean, certainly one is the availability of an

6    appropriate assay that is predictive and

7    validated, and one is that there is really a

8    reason, yeah, to pause the targeted drug

9    monitoring because this drug has a narrow

10   therapeutic range.

11             And if you look into

12   pharmaceutical developments in general,

13   there's only -- I mean, to monitor the

14   products are the exceptions not --

15   BY MR. McWILLIAMS:

16        Q.    Do you agree with the statement

17   that anticoagulants are intrinsically narrow

18   therapeutic range drugs because their

19   principal toxicity, bleeding, is a result of

20   their intended pharmacodynamic activity; too

21   low a dose results in inadequate prevention

22   of pathological thrombosis and consequent

23   serious clinical events, and too high a dose

24   results in excessive inhibition of

1    physiologic clotting and excessive bleeding?

2        A.    Can you start the sentence

3    again --

4        Q.    Yeah, that's fair.  I'll show

5    you the document.

6        A.    -- because certainly parts I

7    understand and can agree to, but I did not

8    get the full context.

9            MR. McWILLIAMS:  I understand.

10        That was a long one.

11            Mr. Wolfe, this is the FDA

12        summary review.  I don't think it has

13        a Bates number.  Go to page 8.

14            I'm handing you there's being

15        marked as Derix-32.

16            (Whereupon, Deposition Exhibit

17        Derix-32, CDER Summary Review

18        [No Bates], was marked for

19        identification.)

20    BY MR. McWILLIAMS:

21        Q.    Tell me if you recognize this

22    document?

23            (Document review.)

24            ///

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.    Do you recognize this as the

3    FDA summary review for Xarelto afib

4    indication?

5         A.    Yes, it's summary of review,

6    dated from November 2011, just...

7         Q.    If you go to page 8, please.

8    In the paragraph under "Dose of Xarelto

9    administered in ROCKET."

10        A.    Yes.

11        Q.    And that's the statement I read

12   to you earlier.  And if you would just -- we

13   can read it aloud again or if you can just

14   read it quietly to yourself, my question is

15   whether you agree with this statement issued

16   by the United States Food and Drug

17   Administration.

18              (Document review.)

19        A.    It's -- the first part, that

20   does also strike to me when you read it --

21   it's really a judgment call -- it says

22   "Anticoagulants are intrinsically narrow

23   therapeutic range drugs because their

24   principal toxicity, bleeding, is a result of

Protected - Subject to Further Protective Review

1    their intended pharmacodynamic activity."

2              So it's a very general

3    statement, and also here it is not really

4    defining saying what narrow therapeutic range

5    really means.

6              And so, therefore, I have,

7    yeah, really -- based on all what I

8    understand from the discussions, this is not

9    something every expert would agree to, and I

10   have also some question marks around this

11   statement.

12             However, I agree that -- to the

13   following statements that are made here in

14   respect to, yeah, that generally, too low

15   doses would result in inadequate prevention,

16   and too high doses could result in excessive

17   bleeding.

18             And also, I follow that, yeah,

19   "prudent drug development of anticoagulants

20   should include robust investigation of the

21   relationship between dose and outcomes in

22   order to choose reasonable doses for

23   administration to patients," and that's what

24   I agree to.

Protected - Subject to Further Protective Review

```
 1              So I just have some trouble
 2   with the general nature of the first
 3   sentence.
 4   BY MR. McWILLIAMS:
 5      Q.    Okay.  But you don't dispute
 6   that's the statement and position of the
 7   USFDA, do you?
 8              MR. HOFFMAN:  Objection to the
 9         form of the question.
10      A.    I agree that this is a
11   statement taken out of the document that was
12   issued by the FDA as a summary document.
13   BY MR. McWILLIAMS:
14      Q.    So ultimately, at the end of
15   the day, whether or not their therapeutic
16   index is wide or narrow, that's a subjective
17   opinion; is that fair?
18      A.    That's the question the experts
19   are discussing because there's no accurate --
20   at least to my knowledge, accurate definition
21   for that.
22      Q.    So some people think Xarelto
23   has a narrow therapeutic index, others, such
24   as you and your company, think it's wide; is
```

Protected - Subject to Further Protective Review

1    that fair?

2         A.    This statement is made for

3    anticoagulants in general --

4         Q.    Yes.

5         A.    -- so it's not specific to

6    Xarelto.

7         Q.    Yes.

8         A.    And if you just say some people

9    think that anti -- new oral anticoagulants in

10   general have no therapeutic -- no narrow

11   therapeutic range, I can agree because I have

12   heard experts saying that in public, so --

13        Q.    And here, the FDA is saying

14   that in a public document.

15        A.    FDA is saying the opposite, so

16   the FDA's position is that it -- it is here,

17   at least as it reads here in this statement,

18   in the document, that they think

19   anticoagulants are intrinsically narrow

20   therapeutic range.  But I heard also experts

21   saying in public that they don't think that

22   new oral anticoagulants in general have a

23   narrow therapeutic range.

24        Q.    So different minds can

Protected - Subject to Further Protective Review

1    disagree?

2         A.     Yeah.  Explained different.

3         Q.     Okay.  And similarly, there's

4    some -- there's disagreement over whether or

5    not Xarelto exhibits high interpatient

6    variability, and that's one of the factors

7    you identified as why there's no need for

8    therapeutic drug monitoring for Xarelto,

9    correct?

10              MR. HOFFMAN:  Objection to the

11         form.

12         A.     That's not correct.  So we

13    talked about general pharmacokinetic

14    properties and variability, but not

15    specifically about intrapatient or --

16    interpatient or intrapatient variability, so

17    that's a specific -- yeah, content, in this

18    whole area.

19    BY MR. McWILLIAMS:

20         Q.     Well, pharmacokinetic

21    variability is demonstrated either within

22    patient variability or among patient

23    variability.  That's the only two types of

24    pharmacokinetic variability I'm aware of.

Protected - Subject to Further Protective Review

```
 1              MR. HOFFMAN:  Objection to the

 2         form of the question.

 3    BY MR. McWILLIAMS:

 4         Q.     Are there others?

 5         A.     To my knowledge, there's

 6    also -- it looks into a variability that is

 7    probably caused by interactions with other

 8    drugs, with food, specific patient

 9    characteristics and so on.  So that's --

10         Q.     Right.  But ultimately, all

11    that can be seen -- that's interpatient

12    variability, and that's what creates

13    interpatient variability, the different

14    kidney function, different patients have

15    different kidney function, different patients

16    are on different comedications, and all those

17    things are pharmacokinetic properties that

18    ultimately determine that individual

19    patient's exposure, correct?

20         A.     That's correct.

21         Q.     Okay.  And that's why simply

22    knowing what dose pill someone takes does not

23    tell you about their exposure because every

24    person has different pharmacokinetic
```

Protected - Subject to Further Protective Review

1   properties, correct?

2       A.      Now we're getting into an area

3   again of very much -- you would have to rely

4   on expertise of my colleagues.  So typically

5   the pharmaceutical development does not only

6   consist of what we discuss and what's here

7   now as the pivotal trial, phase three trial,

8   where adults as being -- a given dose is

9   being tested against the standard of care.

10          The development starts earlier,

11  and in those earlier phases, there's

12  characterization made of the pharmacokinetic

13  properties, as you just alluded to, and all

14  this information is then used to learn about

15  the most optimal dose to be brought forward

16  into testing into phase three.  So it's not

17  the kind of singular question that has been

18  asked during development.

19      Q.      Well, Doctor, you're aware that

20  there was a dedicated PK substudy in ROCKET

21  where they actually measured the amount of

22  Xarelto in the patient's blood, right?

23      A.      I'm aware there was a PK study,

24  but I do not recall the details and content

Protected - Subject to Further Protective Review

1    of the --

2              (Clarification requested by the

3        reporter.)

4        A.      -- and the content of the data,

5    and so I would have to refer that question to

6    experts who --

7        Q.     That would be like Dr. Mück?

8        A.     Dr. Mück, Dr. Kubitza, and also

9    Scott Berkowitz because he's also providing

10   clinical judgments when it comes to

11   affiliation of the outcomes.

12             MR. McWILLIAMS:  All right.

13        Well, let me hand you a paper by

14        Dr. Mück, Kubitza.  It doesn't have

15        Berkowitz, but two out of three isn't

16        bad.  This is Derix-33.

17             (Whereupon, Deposition Exhibit

18        Derix-33, 2013 Mück et al Publication

19        [No Bates], was marked for

20        identification.)

21   BY MR. McWILLIAMS:

22        Q.     And you see this is a

23   publication from 2014 titled "Clinical

24   Pharmacokinetic and Pharmacodynamic Profile

Protected - Subject to Further Protective Review

1    of Rivaroxaban."

2         A.    Yes, it's the application as --

3         Q.    And if you'd please turn to

4    page 7, Table 3.  And this is where the

5    results of the dedicated substudy for the

6    various indications is reported.  And to the

7    best of my knowledge, this is the only place

8    that it's reported.

9              And I want to direct your

10   attention to the two lines that read "Stroke

11   prevention in patients," because you know in

12   ROCKET, there's two different doses.

13        A.    Yes.

14        Q.    15 milligrams and 20 milligrams

15   depending on the kidney function.

16        A.    Right.  A patient with moderate

17   renal impairment are advised in the -- yeah,

18   advised in the study and also are advised in

19   the label to take the dose of 15 milligrams

20   once daily.

21        Q.    Okay.  And so then let's look

22   at for stroke provision, the 15 to

23   20 milligrams, let's look at the trough.  And

24   that's meant -- trough is meant to represent

Protected - Subject to Further Protective Review

1    the lowest amount of active drug in the body

2    prior to the next dose, correct?

3         A.     As I said, I'm not an expert in

4    pharmacokinetics, but as you explained, it's

5    also my understanding.

6         Q.     And so let's look at the trough

7    values for the patients in ROCKET.  And the

8    median trough value was 44 for the patients

9    on the 20 milligrams, correct?

10        A.     I would have to check whether

11   this is the median, but it's --

12        Q.     You can look at little C down

13   below?

14        A.     Yeah.

15        Q.     Evan, can we highlight little C

16   median?

17               So it gives -- that's the

18   median, and then in the brackets, it gives

19   you the 5th to the 95th percentile, correct?

20        A.     Yes, that's how it says in the

21   note, uh-huh.

22        Q.     So even though all of these

23   patients took the exact same pill, they took

24   the exact same 20-milligram Xarelto pill, and

Protected - Subject to Further Protective Review

1    they had their blood measured at the exact

2    same time, the concentration of Xarelto in

3    their blood ranged from 12 micrograms per

4    liter at the 5th percentile to 137 micrograms

5    per liter at the 95th percentile.  That's a

6    tenfold variation, correct?

7         A.    I don't know the information

8    about exact point in time that you just

9    stated because there's some -- also some

10   technicalities behind, and there's also

11   practical because, yeah --

12        Q.    Well, they're --

13        A.    I mean, I would have to check

14   just because I cannot conclude that it may --

15   must have been all at the exact time.

16        Q.    Well, they're all identified as

17   trough, and trough is time dependent,

18   correct?

19        A.    It's the measurement that is

20   taking at a certain time after the dose was

21   taken.

22        Q.    Right.

23        A.    But as again, I said, I am

24   really not the expert, but I can only give

1    some recollection of the discussion we had

2    that if you take the dose in the evening and

3    go back to the hospital in the morning to get

4    your blood sample taken, it probably cannot

5    be always the exact time.

6          Q.    But Dr. Mück and --

7          A.    So as -- yeah, as good as

8    possible as the measurements allowed --

9          Q.    But that's talking in the real

10   world and concerns over PK/PD.  Here in this

11   controlled clinical trial, Dr. Mück and

12   Dr. Kubitza were very careful to properly

13   identify what was the peak, what was trough,

14   what was area under the curve.

15               And for trough, they identify

16   the range from 5th to 95th percentile as

17   being 12 micrograms per liter all the way up

18   to 137 micrograms per liter, correct?

19         A.    That's correct, according to

20   the method they used.  And so we would have

21   to take that into consideration.  But that's

22   still numbers that they report here in the

23   publication.

24         Q.    And that's a tenfold variation,

Protected - Subject to Further Protective Review

1    despite these patients taking the exact same

2    pill.  Some patients had ten times as much

3    Xarelto in their blood compared to others,

4    correct?

5                    MR. HOFFMAN:  Objection to the

6          form of the question.

7          A.      Correct, that they took -- or

8    that we have to assume -- so that they took

9    the 20-milligram once daily, but as I said,

10   we would have to take more into

11   consideration, the details, and talk --

12   please talk to the colleagues about the

13   interpretation of the data.

14                   But I agree that as displayed

15   here, it's a range from 12 to 137, which

16   would represent ten times.

17   BY MR. McWILLIAMS:

18         Q.      And that's ten times higher,

19   right?

20         A.      Yes.

21         Q.      And would you agree with me

22   that if someone -- you'd agree with me that

23   anyone who takes a Xarelto pill has an

24   increased risk of a bleed compared to someone

Protected - Subject to Further Protective Review

1    who doesn't take a Xarelto pill?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4    BY MR. McWILLIAMS:

5         Q.    Taking Xarelto increasing your

6    risk of bleeding, right?

7              MR. HOFFMAN:  Objection to the

8         form of the question.

9         A.    I mean, it's clear that, yeah,

10   influencing the coagulation system by an

11   effective dosing of a new -- an anticoagulant

12   and as well Xarelto, there is an inherent

13   bleeding risk.

14   BY MR. McWILLIAMS:

15        Q.    And you went to pharmacology

16   school.  You understand dose-response, you

17   understand that as you're exposed to more

18   anticoagulant, your risk of a bleed goes up?

19             MR. HOFFMAN:  Objection to the

20        form of the question.

21        A.    That's again a question I would

22   like to ask you to discuss with my

23   colleagues.  Scott Berkowitz is a

24   hematologist and expert in the field of

Protected - Subject to Further Protective Review

1    anticoagulation, so he -- and that's also

2    what -- only what I can recall.  As told us

3    several times, that anticoagulation, it's not

4    an -- yeah, it's a complex procedure, so --

5    and several mechanisms apply, and it's not

6    always that easy to take the one to the

7    next -- I mean, to take A to B.  And so,

8    therefore, I would refer these questions to

9    him.

10   BY MR. McWILLIAMS:

11       Q.    I assure you we will talk to

12   Dr. Berkowitz about it, but today is my

13   opportunity to talk to you about it.

14       A.    Uh-huh.

15       Q.    So as one who's been working on

16   this drug for ten years, someone who's got a

17   background in pharmacology, you understand

18   there's a dose-response with respect to

19   exposure of anticoagulants, all

20   anticoagulants, including Xarelto, and your

21   risk of bleeding?

22       A.    Yes.  There is a dose-response,

23   and that is also shown in data we have in

24   phase two, where doses that were a multiple

Protected - Subject to Further Protective Review

1    of the 20-milligram dose were investigated.

2    However, what we see there is that the

3    dose-response is very flat, so there's no

4    steep increase of observed bleeding in those

5    phase two studies, even up to a total daily

6    dose of 60-milligram.  And so that's also

7    what has to be taken into context.

8         Q.    Okay.  But more exposure equals

9    higher bleed risk?

10             MR. HOFFMAN:  Objection to the

11        form of the question.

12   BY MR. McWILLIAMS:

13        Q.    Correct?

14             MR. HOFFMAN:  Objection to the

15        form of the question.

16   BY MR. McWILLIAMS:

17        Q.    Exposure matters.

18             MR. HOFFMAN:  Objection to the

19        form of the question.

20        A.    I just said there is a

21   dose-response which you can see in the phase

22   two trials, if you go beyond doses that were

23   investigated here in the ROCKET AF trial, and

24   this response is quite flat.

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.    I understand.  I understand it

3    eventually flattens out.

4         A.    But it is generally existing.

5         Q.    But just as the general basic

6    proposition is that as exposure goes up, your

7    bleed risk goes up?

8              MR. HOFFMAN:  Objection to the

9         form of the question, asked and

10        answered.

11   BY MR. McWILLIAMS:

12        Q.    Correct?

13        A.    I did not deny what you're

14   saying so that in general, there is -- there

15   is a dose-response --

16        Q.    Thank you.

17        A.     -- that can be seen if you test

18   several doses, and it's just to the matter of

19   extent that you have to also take into

20   consideration when you make such statement

21   that, yeah, if the exposure is going up to a

22   very high extent and that has to be

23   clinically evaluated again, there's a

24   response and an expect -- yeah, expected

Protected - Subject to Further Protective Review

1    response on both efficacy and safety.

2         Q.    Okay.  And so exposure matters.

3    Exposure is informative in determining

4    your -- the efficacy of response and the

5    safety of response.

6              MR. HOFFMAN:  Objection to the

7         form of the question.

8    BY MR. McWILLIAMS:

9         Q.    Correct?  You just said that

10   you see a dose-response for both efficacy and

11   safety, right?

12             MR. HOFFMAN:  Objection to the

13        form of the question.

14        A.    I -- I agree that we saw a

15   dose-response in the phase two studies,

16   although it was, yeah, a very flat and was

17   not -- it was not a steep increase of the

18   curve.

19             And also, we talked about this

20   before, the investigational pharmacokinetic

21   profiles and information is important, and in

22   that regard, I can agree that exposure is

23   important.

24             You can see this already in the

Protected - Subject to Further Protective Review

```
 1   dosing regimen that was applied in the

 2   ROCKET AF trial because exactly that was the

 3   information behind that patients with

 4   moderate renal impairment have, yeah, a -- or

 5   are predicted -- are predicted to have the

 6   same exposure or similar exposure if they

 7   take 15-milligram as compared to patients

 8   with normal renal function.

 9            So take 20-milligram, and so

10   that was how this dosing regimen was

11   developed, which was then later on tested

12   successfully in the phase two trial.

13   BY MR. McWILLIAMS:

14        Q.    Okay.  And you keep talking

15   about dose, and I understand you want to keep

16   talking about dose, but I'm talking about

17   something very different.  Because we've

18   already seen that dose doesn't tell you about

19   exposure.

20            There's tenfold variation in

21   patients who take the same dose in terms of

22   their exposure, and I'm asking you whether or

23   not, as a patient's exposure increases, not

24   their dose, as their exposure increases,
```

Protected - Subject to Further Protective Review

1    their risk of a bleed increases?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.    I do not agree to your

5    statement that the dose doesn't inform about

6    exposure.

7    BY MR. McWILLIAMS:

8         Q.    But I need you to answer my

9    question, and I'll need you to put dose aside

10   for a second, and I need you to focus on

11   exposure.

12             Do you agree that as exposure

13   increases, the risk of a bleed increases?

14             MR. HOFFMAN:  Objection to the

15        form of the question.

16        A.    We went back to that question

17   several times so --

18   BY MR. McWILLIAMS:

19        Q.    Is it a yes?

20        A.    -- it's a matter of -- it's a

21   matter of the extent of exposure increases

22   and not any exposure increases has an

23   immediate impact on the safety profile.

24             But I said that in terms of a

1  certain extent, and if this extent is

2  described in the phase two studies as up to

3  the exposure that is generated by

4  60 milligrams.  So in a maximum of total

5  daily dose, there isn't -- you can see an

6  increase in bleeding if you're -- if

7  you're -- increased exposure to -- in the

8  experiment, in the phase two.

9        Q.     I get you loud and clear.  I

10  understand there's a ceiling on the exposure

11  and in the increased bleed risk, and we can

12  argue until we're blue in the face about the

13  shape of the line.

14             I'm just trying to just cover

15  basic, pharmacology 101, that as exposure

16  increases, the risk of bleed increases,

17  generally.  Can you agree to that?

18             MR. HOFFMAN:  Objection to the

19        form of the question.

20  BY MR. McWILLIAMS:

21        Q.     Can you agree to that?  Yes?

22             MR. HOFFMAN:  Objection to the

23        form of the question.

24        A.     I think I responded to that

Protected - Subject to Further Protective Review

```
 1  question already.  I cannot give you a

 2  different response than I have given

 3  previously.

 4  BY MR. McWILLIAMS:

 5       Q.    Okay.  Did you attend the

 6  Cardiac Safety Research Consortium meeting in

 7  February of 2015?  There's one also in

 8  December of 2015, but there's one in

 9  February.  Did you attend that one?

10       A.    Yes, I attended that one too.

11       Q.    Okay.  And did you see

12  Dr. Temple's presentation on tailored dosing?

13       A.    Yes, I saw the presentation.

14            MR. McWILLIAMS:  Let me hand

15       you what we're marking as Derix-34.

16            (Whereupon, Deposition Exhibit

17       Derix-34, NOAC Dosing: Pharmacometric

18       Guidance Regulatory Considerations

19       PowerPoint [No Bates], was marked for

20       identification.)

21  BY MR. McWILLIAMS:

22       Q.    Do you recognize this as the

23  PowerPoint presentation that Dr. Temple

24  presented?
```

Protected - Subject to Further Protective Review

```
1        A.      Yes, I recognize this as his
2   presentation.
3              MR. McWILLIAMS:  Just a second.
4              (Pause.)
5   BY MR. McWILLIAMS:
6        Q.      All right.  Let's walk through
7   this together.  It's titled "NOAC Dosing:
8   Pharmacometric Guidance Regulatory
9   Considerations"?
10       A.      Uh-huh.
11       Q.      And this is by Dr. Robert
12  Temple; is that correct?
13       A.      Yes, that's correct.
14       Q.      This is dated February 3rd,
15  2015; is that correct?
16       A.      That's correct, yes.
17       Q.      Let's go through this together.
18  Page 2, it says, "What is different about
19  NOACs?  We dose by blood level or
20  pharmacologic effect very rarely...  Why?"
21              And he just says that "For most
22  drugs, dose-response or concentration
23  response is not steep in the therapeutic
24  range.  So getting the dose just right is not
```

Protected - Subject to Further Protective Review

1    so critical.  Most people will be in the

2    right place.  We often are on the flat part

3    of the dose-response curve (most

4    antihypertensives, antidepressants), so blood

5    levels are not critical.  If there is an

6    adverse effect, you can see it and lower the

7    dose," and he gives some examples.

8              "But suppose the benefits and

9    toxicity that are concentration of

10   dose-related are outcome events.  Then

11   monitoring benefit and risk is too late.  The

12   patient has had a stroke or bleed.  You need

13   to get to the right place right away."

14             Do you agree with that general

15   sentiment articulated by Dr. Temple in this

16   PowerPoint presentation?

17             MR. HOFFMAN:  Objection to the

18        form of the question.

19        A.    Yeah.  I have some difficulty

20   in translating what "general sentiment" means

21   in -- and you are -- yeah, your question.

22   BY MR. McWILLIAMS:

23        Q.    Well, do you agree you need --

24   you would ideally like to get the patient in

Protected - Subject to Further Protective Review

1    the right place right away in terms of their

2    exposure, this topic we've been discussing

3    for the last 15 minutes?

4                 MR. HOFFMAN:  Objection to the

5         form of the question.

6    BY MR. McWILLIAMS:

7         Q.     That's what he means by

8    concentration of dose.  He's talking about an

9    individual patient's level of exposure.

10                MR. HOFFMAN:  Objection to the

11        form of the question.

12   BY MR. McWILLIAMS:

13        Q.     Right?

14        A.     That's not immediately clear

15   from this here.

16        Q.     Okay.  Let's keep reading.

17   Maybe it will become clear.

18                Slide 3 says again,

19   continuation of "What's different about

20   NOACs?"  Number one, he says, "The

21   concentration relationship is very steep in

22   some places."  That's what he says, right?

23        A.     Yes, and it's underlined "in

24   some places" because it's not a general

Protected - Subject to Further Protective Review

1    statement.

2         Q.    Okay.  So is rivaroxaban the

3    only anticoagulant in the world that doesn't

4    have a steep dose-response curve for major

5    bleeding?

6              MR. HOFFMAN:  Objection.

7    BY MR. McWILLIAMS:

8         Q.    Is it a miracle pill?

9              MR. HOFFMAN:  Objection.

10             THE WITNESS:  Can you repeat

11        the question?

12   BY MR. McWILLIAMS:

13        Q.    Yeah.  Is it true -- is it your

14   position that Xarelto does not have a steep

15   dose-response curve for major bleeding?

16             MR. HOFFMAN:  Objection to the

17        form of the question.

18        A.    We talked about this earlier

19   about a narrow therapeutic range, and I made

20   the point that from the data that we have

21   from the phase two dose and by that also

22   exposure relationship by the doses that were

23   applied in that study was flat, was not

24   steep.

Protected - Subject to Further Protective Review

1    BY MR. McWILLIAMS:

2         Q.     And as we pointed out when we

3    looked at that FDA document, the FDA

4    respectfully disagrees with you, and they

5    view the data differently.  And they think

6    all anticoagulants, including Xarelto, has a

7    narrow therapeutic index.

8              Do you remember that?

9         A.     I remember that there was that

10   general statement that --

11        Q.     Thank you.  That's all I asked.

12        A.     -- was not related to Xarelto

13   specifically.

14        Q.     Ma'am, it was the summary

15   approval letter for Xarelto.  You understand

16   that, right?

17        A.     I understand that, but --

18        Q.     It was unrelated to --

19        A.     -- the statement was -- it was

20   unrelated, was in the document, but it was

21   still a general statement made in the text --

22        Q.     And it said all oral

23   anticoagulants are intrinsically narrow

24   therapeutic index drugs, right?  All oral

Protected - Subject to Further Protective Review

```
1   anticoagulants in the context of a document

2   discussing Xarelto, right?

3                MR. HOFFMAN:  Objection to the

4        form of the question.

5        A.    I think that is somehow how it

6   was read, but we would have to go back --

7   BY MR. McWILLIAMS:

8        Q.    Yes, I assure you, that's

9   what it says.

10               (Simultaneous discussion

11       interrupted by the reporter.)

12       A.    We would have to look back to

13   the exact wording, but this -- the general

14   statement was taken out of this summary

15   approval document for Xarelto.

16       Q.    Okay.  So let's keep reading

17   Dr. Temple's presentation.

18               Point number 2 is, "The

19   dose/concentration relationship is, for some

20   of the drugs, quite variable because of renal

21   excretion and other factors."

22               3, "It is easy to focus on the

23   overall comparison of results with warfarin

24   and not worry about 'optimal.'"
```

Protected - Subject to Further Protective Review

```
 1                    3 [sic], "We, the FDA, did not

 2      require any attempt to monitor or modify

 3      individual dosing, although we did encourage

 4      study of more than one dose, which was done

 5      for dabigatran and edoxaban.  Fortunately,

 6      for those 2 drugs, we also had extensive

 7      blood level data, allowing us to relate

 8      outcome to blood levels.

 9                    "And the results were, overall,

10      quite good."

11                    Did I read that correctly?

12          A.      You read that correctly, yes.

13          Q.      If you go to the next page,

14      page 4, Dr. Temple's heading is "NOAC Results

15      Are Good," and he includes results from

16      rivaroxaban ROCKET to make it crystal clear

17      that he is including Xarelto in this broader

18      discussion on NOACs, fair?

19          A.      That's fair.  So he had

20      included dabigatran, apixaban --

21                    (Clarification requested by the

22          reporter.)

23          A.      It included dabigatran,

24      rivaroxaban, apixaban, information in the
```

Protected - Subject to Further Protective Review

1    table, and he mentioned, I think, edoxaban

2    somewhere before.  And so that's a

3    comprehensive list of all NOACs that are

4    approved to date.

5    BY MR. McWILLIAMS:

6         Q.     So let's keep going.

7                On page 5, under the slide

8    title, "NOAC Results.  As the slide showed,

9    all 3 drugs were clearly superior to warfarin

10   on hemorrhagic stroke but only dabigatran was

11   superior for ischemic stroke, and only at the

12   higher dose.  Was that the best they could

13   do?

14               "We now have results with a

15   fourth drug, edoxaban, which shows reduced

16   hemorrhagic strokes and slightly lower

17   ischemic stroke at 60 milligrams."

18               It continues on the next page,

19   discussion of edoxaban data.  Let's go to

20   page 7, slide titled "Concentration

21   Response."  Dr. Temple writes, "These results

22   are no surprise.  We have long known warfarin

23   concentration and the resulting effect on INR

24   relate to the drug's benefits and risks and

Protected - Subject to Further Protective Review

1    would not dream of giving everyone the same

2    dose."

3              Did I read that correctly?

4        A.      You read it correctly, yes.

5        Q.      If you go to page 8, you can

6    see a chart you've probably seen more times

7    than I have, showing the relationship between

8    INR and warfarin patients and ischemic stroke

9    and hemorrhagic -- excuse me, and

10   intracranial bleeds; is that correct?

11       A.      That's correct.

12       Q.      And, again, this is why going

13   back -- I promised I wouldn't talk about it,

14   but I guess I lied.  The INRatio, that's why

15   it was so important for the doctors to get

16   the correct -- the most accurate INR reading

17   because if a patient is not within that

18   therapeutic range of between 2 and 3, you're

19   unnecessarily placing that patient at risk of

20   ischemic stroke or intracranial hemorrhage,

21   correct?

22       A.      I agree that it's important to

23   keep the patient in that range from 2 to 3,

24   but you can see that there are like from 1.8

Protected - Subject to Further Protective Review

1    or 3.2, and then the curve is really

2    increasing, yeah, most deeply, and indicating

3    that if the patient -- or if an INR is in

4    that range, there's an increased risk for

5    either ischemic stroke or intracranial

6    bleeding in this graph.

7         Q.    Okay.  Let's keep reading.  Go

8    to page 9, please.  And Dr. Temple writes,

9    "The slide shows the relation of INR to

10   thrombotic stroke and intracranial bleeding,

11   but the total bleeding curve is similar to

12   intracranial bleeding.

13              "We can see that INR of less

14   than 2 does not reduce stroke adequately and

15   the worsening with low INR is very steep, and

16   that beyond an INR of 2 there is very little

17   further benefit, but there is increased

18   bleeding.  The 'sweet spot' is an INR of

19   about 2 to 3, perhaps 2 to 3.5.

20              "So, for the previous standard

21   of care, warfarin, we do not use a fixed dose

22   but always use a dose titrated to

23   anticoagulant effect.  Why should NOACs be

24   any different," he postulates.

Protected - Subject to Further Protective Review

1          He goes on.  He says, "Maybe

2   they shouldn't be.  The next slide shows the

3   relationship of dabigatran blood levels to

4   stroke and bleeding."

5          And then on page 10 is the

6   famous Reilly chart that started this whole

7   commotion with the EMA and the FDA, right?

8          MR. HOFFMAN:  Is there a

9      question?

10         MR. McWILLIAMS:  Yeah.

11  BY MR. McWILLIAMS:

12     Q.    Did I read it correctly?

13         MR. HOFFMAN:  Objection, you

14     didn't.  But that's okay.

15  BY MR. McWILLIAMS:

16     Q.    Are you with me, Doctor?  Do

17  you recognize page 10 as the Reilly chart?

18     A.     It looks like, but it is not,

19  yeah, clearly quoted here as taking from

20  the -- from the publication.

21     Q.    Let's keep going.  Slide 11 --

22  and, again, you saw Dr. Temple present this

23  slideshow, correct?

24     A.    Yes, I saw this recent.

Protected - Subject to Further Protective Review

1        Q.      Okay.  Let's keep reading, see

2   if this -- he writes, "The curves, based on

3   trough blood levels, look a lot like

4   warfarin."

5             Do you agree with that?

6        A.      I don't agree that you can

7   necessarily compare them because they're --

8   yeah, they're just different type of display

9   here, and this is some -- on the one hand

10  side, it's a draft concentration level, and

11  on the other hand side is an INR range, which

12  is a pharmacodynamic parameter.  And so we

13  can say they look alike, but suddenly it's

14  very general.

15       Q.      Well, it's what he says, isn't

16  it, and that's what he presented at the

17  meeting you attended, correct?

18       A.      Yeah, he -- it's a citation --

19  or it's a quotation from the slides, yeah.

20       Q.      Okay.  So let's keep reading.

21  He writes, "In particular, the full benefit

22  on thromboembolic stroke is there at 75 to

23  150 nanograms per ml at trough; but bleeding

24  increases above that.  Below 50 nanograms per

Protected - Subject to Further Protective Review

1  ml strokes go up a lot."

2          You see where I'm reading from?

3      A.    Uh-huh.

4      Q.    So he's essentially comparing

drug concentration for dabigatran with INR

levels for warfarin, fair?

7      A.    Yeah, in those sentences he is

referring -- it was due to the curves on

dabigatran, where he cites the concentration

levels and, yeah, describes the curves.

11     Q.    All right.  He says, "Very few

dabigatran 150 patients were below

50 nanograms per ml, but a fair number on

dabigatran 110-milligram were.  On the other

hand, dabigatran 150 puts a fair number into

bleeding range."

17          And then he proposes, "Why not

adjust trough doses to get 75 to 150 or 75 to

100 in everyone," right?  That's what he

says?

21     A.    That's the question that he's

posing to --

23     Q.    And he's --

24     A.    -- and it's a rhetorical

Protected - Subject to Further Protective Review

1   question to the, yeah, audience.

2        Q.     Well, he's essentially

3   proposing a therapeutic range for dabigatran,

4   correct?

5        A.     He's raising a hypothesis here

6   to be further tested, and I recall there was

7   quite some discussion about it.  And you also

8   have to bear in mind that FDA, yeah, did not

9   approve one of the doses, and so that needs

10  to be taken also into the context here, into

11  the discussion.

12       Q.     He's just saying there appears

13  to be a therapeutic range for dabigatran

14  plasma concentrations measured at trough,

15  right?

16       A.     Not exactly.  He poses the

17  question for discussion and debate, yeah, why

18  adjustment of doses for dabigatran could --

19  yeah, why it could be done or why it could

20  not make sense in a way.

21       Q.     Okay.  If you go to page 17,

22  please.  This is skipping over his section on

23  edoxaban.  He then moves into a broader

24  discussion on other NOACs; in fact, that's

Protected - Subject to Further Protective Review

1    the title of the slide, right, "Other NOACs"?

2         A.    Yeah, that's right.  Yeah.

3         Q.    He says, "We don't have

4    concentration/response data on apixaban or

5    rivaroxaban.  They are less renally excreted

6    than dabigatran or rivaroxaban and perhaps

7    get most patients to the right place."

8              He says, "But neither was

9    superior to warfarin on ischemic stroke, so

10   perhaps they could do better."

11             Did I read that correctly?

12        A.    You read that correctly.

13        Q.    And so what Dr. Temple here is

14   proposing is that your drug could potentially

15   be used more safely or more effectively by

16   way of tailored dosing.

17             MR. HOFFMAN:  Objection to the

18        form of the question.

19   BY MR. McWILLIAMS:

20        Q.    Right?

21        A.    I do not agree because, first

22   of all, he says that perhaps it looks as if

23   most patients got to the right place, and

24   then he speaks to ischemic stroke, which is

Protected - Subject to Further Protective Review

1   the efficacy parameter.

2              And he has pointed out that

3   several times in his speeches, that for him,

4   it's the most important to prevent ischemic

5   stroke, and may just also as the reason why

6   he did not support approval of lower doses

7   for the two other drugs.

8              So here he just said that

9   neither was superior in efficacy to warfarin

10  on ischemic stroke specifically.

11       Q.    But --

12       A.    And so he -- then posing the

13  hypothesis, is it, yeah, probably there is

14  further room for improvement.  We don't know.

15  But he is saying this all on the basis, and

16  that's not standing here on the slide, but

17  he -- I definitely recall him saying that he

18  stands behind the approvals that the agencies

19  have -- yeah, made, because they stand behind

20  a positive benefit-risk assessment and

21  compares them to the standard of care.

22              And that they -- it was

23  important for them to have new oral

24  anticoagulants on the market, especially as

Protected - Subject to Further Protective Review

1    they believe that by these new drugs more

2    patients get access to the drug.

3             And so -- but still, he says in

4    a hypothetical way, yeah, perhaps there's

5    still room for improvement, and that's why,

6    yeah, he issued the dialogue.  He wanted to

7    get to know whether this is -- yeah,

8    what's -- if there's anything behind the

9    hypothesis he's raising here.

10       Q.    And the hypothesis is that

11   patient -- that improvement can be gained by

12   way of a blood test to tailor the dose.

13             MR. HOFFMAN:  Objection to the

14        form of the question.

15       A.    Yes.

16   BY MR. McWILLIAMS:

17       Q.    Yes?

18       A.    I mean, that's how you could,

19   yeah, interpret from reading and listening to

20   his statements, that he would like to

21   understand whether involving a specific

22   measurement of PK or PD could, yeah,

23   improve -- further improve.

24       Q.    Okay.  Let's -- and so what he

Protected - Subject to Further Protective Review

1    says is he continues, he says, "Note that

2    monitoring of trough blood level or an

3    appropriate coagulation measure does not need

4    to be done often; maybe once is enough, as

5    suggested by the dabigatran data.  This is

6    true because there's a range of

7    concentrations that are sufficient for stroke

8    reduction but do not cause a lot of

9    bleeding."

10            Did I read that correctly?

11       A.     You read that correctly.

12       Q.     Let's go on to the next slide,

13   page 18, the last page, on why it matters and

14   why this is of interest to Dr. Temple at FDA.

15            He says, "Not having the

16   optimal dose at initial dosing is tolerable

17   for many drugs.  You can adjust up or down

18   according to response.  But here, being too

19   low leads to a stroke, a very bad outcome,

20   and being too high leads to major bleeds,

21   also bad, so that early optimization seems

22   worthwhile."

23            Do you agree with that

24   sentiment --

Protected - Subject to Further Protective Review

```
 1                 MR. HOFFMAN:  Objection to the

 2         form of the question.

 3  BY MR. McWILLIAMS:

 4         Q.     -- articulated by Dr. Temple?

 5         A.     It's -- again, this is a --

 6  it's a suggestion that's not a statement that

 7  is a conclusion, and so he says that it seems

 8  worthwhile, and that's indicating that, yeah,

 9  that he wants to look into this question, and

10  so in that -- I mean, it's in his interest to

11  further explore this question.  I'm in

12  agreement with him.

13                 So -- but it does not mean that

14  this is already giving a definite statement.

15  It's really just the start of the discussion

16  and his question to the scientific community

17  and to NOAC marketing authorization holders.

18         Q.     And the last word, the final

19  word from Dr. Temple at this presentation

20  that you attended, is "So, the NOACs are very

21  good, but they could probably be better."

22                 That's what he said, right?

23         A.     That is what he said here in --

24  yeah, in the slide, and that's also congruent
```

Protected - Subject to Further Protective Review

1    to what I said before, that he several times

2    mentioned that he stands behind the approvals

3    that were given because he thinks that it's a

4    valuable addition to the -- yeah, to

5    armamentarium physicians have to treat

6    patients.

7              But he still is -- poses this

8    question about could -- could they probably

9    do better, and that's why he initiates the

10   discussion and we are continuing this

11   dialogue.

12        Q.    And that's the same theory or

13   hypothesis that has stimulated the discussion

14   with EMA and has triggered this very detailed

15   list of questions asking you to explore

16   therapeutic drug monitoring, correct?

17        A.    That's my understanding, yes,

18   that this is the same interest of the health

19   authority to find out whether by means of,

20   yeah, further scientific evaluation there is

21   room for improvement.

22              They don't know yet, but they

23   are interested in the question and would like

24   to further explore it.

Protected - Subject to Further Protective Review

```
 1            MR. McWILLIAMS:  All right.

 2       Okay.  And I'm going to -- I just want

 3       to put this document on the record and

 4       make sure we're clear that that is, in

 5       fact, the EMA's position on this.  So

 6       these next documents will be Derix-35

 7       and 36.  35 will be Record 3071268 and

 8       3071269.

 9            (Whereupon, Deposition Exhibit

10       Derix-35, E-mail(s) re: Xarelto - CHMP

11       Request on TDM,

12       XARELTO_JANSSEN_15368506 -

13       XARELTO_JANSSEN_15368511,

14       Ref. 3071268, was marked for

15       identification.)

16            (Whereupon, Deposition Exhibit

17       Derix-36, CHMP Assessment Report for

18       LEG 036, XARELTO_JANSSEN_15368512 -

19       XARELTO_JANSSEN_15368533,

20       Ref. 3071269, was marked for

21       identification.)

22  BY MR. McWILLIAMS:

23       Q.    So this is Derix-35.  This is

24  an e-mail I believe you received, and then
```

Protected - Subject to Further Protective Review

1   the attachment which has been marked as

2   Derix-36.

3              And so I just want to make sure

4   that this is an e-mail you received on

5   July 1st, 2015, from Jürgen Weber.  I don't

6   know if you can -- Evan, see, the name is

7   right here.

8              And, Dr. Derix, I know it's

9   getting late in the day.  If you just want to

10  look on the screen, you can see your name?

11       A.     Okay.  Yeah, it's from July.

12       Q.     So you received this e-mail --

13       A.     I received this e-mail, yes.

14       Q.     -- and the attachment, which is

15  the next exhibit to your right; is that

16  correct?

17       A.     Yes.

18       Q.     Okay.  And I just want to turn

19  your attention to page 9 of the attachment.

20  And, actually, I'm sorry, just back up for a

21  second.

22              Can you just please identify

23  for me what this is, this CHMP Assessment

24  Report For the Post-Authorization Measure

Protected - Subject to Further Protective Review

1  LEG 36?

2       A.     LEG is an abbreviation for a

3  specific type of procedure that EMA can apply

4  for questions that occur, irrespective of an

5  approval procedure of a drug.  And so this is

6  just a number system.

7       Q.     Okay.  And, again, this is

8  the -- this is the regulatory situation

9  dealing with therapeutic drug monitoring,

10 right?  The LEG --

11      A.     Yes, that's right, referring

12 to --

13             (Simultaneous discussion

14       interrupted by the reporter.)

15      A.     It is right that this is

16 dealing with the topic of target -- TDM, so

17 targeted drug monitoring, and it's called

18 LEG 36, yeah.

19      Q.     All right.  If we go to page 9,

20 Mike, I think this is my last document.

21             THE REPORTER:  Good.

22 BY MR. McWILLIAMS:

23      Q.     This is the summary, so

24 essentially the previous eight pages is the

Protected - Subject to Further Protective Review

1  position of the drug company of Bayer, the

2  MAH, and then down at the very bottom on

3  page 9 is the assessors' comments, which is

4  essentially EMA's response to Bayer's

5  position statement; is that fair?

6      A.    Yes, that's fair.

7      Q.    Okay.  And I'll just read this.

8  And so the EMA writes, in response to Bayer's

9  position statement, that "It is recognized

10  that all phase three studies supportive of

11  the approved indications were performed

12  without TDM guided dosage estimates.  The MAH

13  has, in his detailed response to this

14  question, rather extensively described the

15  data supportive for the approved indications

16  with some focus on subpopulations potentially

17  susceptible to increased bleeding risk, i.e.,

18  the elderly, low bodyweight, renal

19  impairment.

20          "It is, however, not questioned

21  by the Rapporteur that the overall

22  benefit-risk balance is favorable with the

23  approved treatment strategy based on the

24  standard doses without routinely applied

Protected - Subject to Further Protective Review

1    estimations of drug exposure.  The purpose

2    with CHMP initiative is rather to discuss

3    whether further improvement of the

4    benefit-risk balance can be achieved by

5    recommendation of some form of therapeutic

6    drug monitoring."

7              Did I read that correctly?

8        A.    You read that correctly.

9        Q.    And so that's the -- and that's

10   a very similar position that was articulated

11   by Dr. Temple at the February CSRC meeting,

12   correct, that while these are good drugs,

13   there may be potential benefit to improve

14   upon them by way of a blood test and tailored

15   dosing, correct?

16       A.    I agree that's the same tone of

17   the questions that -- yeah, that's addressed

18   here, yes.

19       Q.    Okay.  And that effort -- and

20   the drug company's currently undertaking all

21   efforts to try to address this question

22   that's been raised by both the FDA and EMA

23   now, fair?

24             MR. HOFFMAN:  Objection to the

Protected - Subject to Further Protective Review

 1          form of the question.

 2          A.     I can only comment for -- on

 3   what Bayer and Janssen are doing, and so we

 4   are slowly following the data requests that

 5   are -- and the proposals that are being made

 6   and address the questions from EMA in that

 7   regard.

 8               I cannot speculate on what the

 9   other companies are doing because although

10   the request was sent to all NOAC companies,

11   everybody is responding individually based on

12   their own data.

13          Q.     Okay.

14               MR. McWILLIAMS:  Dr. Derix, I

15          believe that's all the questions I

16          have.  My colleagues will likely have

17          some questions.  I don't know if we'll

18          start today or tomorrow, but let's

19          just go off the record.

20               MR. HOFFMAN:  Let's go off the

21          record.

22               THE VIDEOGRAPHER:  Going off

23          the record at 4:30.

24               (Recess taken, 4:30 p.m. to

Protected - Subject to Further Protective Review

1        4:41 p.m.)

2              THE VIDEOGRAPHER:  We're back

3        on record at 4:41 p.m.

4                    EXAMINATION

5   BY MR. DENTON:

6        Q.    Hello, Dr. Derix.  My name is

7   Roger Denton.

8        A.    Hello.

9        Q.    And I have a few different

10  questions to ask you.  First thing I want to

11  do is kind of step back to your time as the

12  regulatory person on Xarelto, okay?

13       A.    Okay.

14       Q.    And we've talked a lot today

15  about what EMA has done and what FDA has

16  done.  But I really want to put in

17  perspective what regulators do and what drug

18  manufacturers do when we talk about approval

19  of a drug to be sold, okay.  That's just the

20  background.

21              First of all, regulators,

22  whether it be EMA, FDA or any of the other

23  regulators around the world, do not conduct

24  clinical trials, do they?

Protected - Subject to Further Protective Review

1        A.      That's correct.  They do not

2    conduct clinical trials on their own.

3        Q.      I mean the regulators don't

4    test the drugs for safety or efficacy,

5    correct?

6        A.      That's not correct, because in

7    their way, testing is also that they work

8    with the data that they get from the -- the

9    marketing authorization holders; especially

10   FDA gets the full database of -- with patient

11   level data, and so they perform their

12   independent analysis on the dataset.  But

13   they do not run their own studies.

14       Q.      Well, my point is:  In this

15   case, Xarelto, or rivaroxaban, the clinical

16   trials were either conducted by Bayer or

17   Janssen or some contract resource

18   organization that either Bayer or Janssen

19   hired, correct?

20       A.      Yeah, the trials were conducted

21   either under the lead and so-called

22   sponsorship of Janssen or Bayer, and they

23   used sometimes the contract research

24   organization to --

1    Q.    Right.

2    A.    -- perform work, yes.

3    Q.    Okay.  And so it's the drug

4    companies that either conduct these studies

5    or sponsor these studies and collect all the

6    data that's submitted to the regulators,

7    right?

8    A.    That's correct.

9    Q.    All right.  And the maker of

10   the drug, in this case Xarelto, is

11   responsible for the safety and efficacy of

12   the drug, not the regulators, correct?

13             MR. HOFFMAN:  Objection to the

14        form of the question.

15   A.    The health authorities have a

16   different point in time that they can weigh

17   in, and so they also, in that form, by this

18   assessment share responsibility for the

19   assessment.

20             And so only -- also, before any

21   clinical trial is being conducted, the health

22   authorities have a look into the proposals

23   that the marketing authorization holder is

24   making, and so by that, they can already

Protected - Subject to Further Protective Review

```
 1   judge based on the information available,

 2   yeah, whether it is ethical to include

 3   patients in the trials.

 4              So they do not only after the

 5   trial was conducted see the data and look at

 6   them, but they also look before the trial

 7   even is starting.

 8   BY MR. DENTON:

 9       Q.    All right.  My question is much

10   simpler:  The maker of the drug is

11   responsible for the safety and efficacy of

12   the drug, true?

13              MR. HOFFMAN:  Objection to the

14        form of the question.

15       A.    The -- I mean, it's the

16   company's responsibility to assess the safety

17   and efficacy of the drug, and -- but they're

18   sharing this information, and then it's

19   evaluated by the health authorities as well.

20   So this will...

21   BY MR. DENTON:

22       Q.    Well, okay.  Let's move on

23   then.

24              And the maker of the drug has
```

Protected - Subject to Further Protective Review

1   more information and knowledge about the drug

2   than the regulators, true?

3        A.    The marketing authorization

4   holder has greater detail, but there are

5   clear processes and relations in place on the

6   type of information that has to be shared

7   with the health authority and also the time

8   when it is going to be shared with the

9   inform -- you know, with the health

10  authorities.

11            So certainly, there is a level

12  of detail that is, yeah, in the knowledge of

13  the marketing authorization holder.  But the

14  most pertinent information is always shared

15  with the health authorities as well.

16       Q.    Well, but the maker of the drug

17  is responsible for providing accurate and

18  complete internal information that the

19  company knows about the safety and efficacy

20  of the drug, true?

21       A.    This is -- as a general

22  statement, if it is related to a submission

23  or that is going to be made or any procedural

24  information, I would agree that in general,

Protected - Subject to Further Protective Review

1    the expectation is that information provided

2    in that is accurate and complete to the

3    question that is raised there.

4              But it does in no way mean that

5    there's an obligation by the marketing

6    authorization holder to share all the level

7    of information that existed at any day --

8    point in time in the company databases.  So

9    that would just overwhelm the health

10   authorities if every marketing authorization

11   holder would do that.

12        Q.    So, in other words, you've

13   agreed with me that the maker of the drug, in

14   this case Xarelto, knows more about the drug

15   than the regulators do?

16              MR. HOFFMAN:  Object to

17        the form.

18   BY MR. DENTON:

19        Q.    Fair?  Isn't that what you just

20   told me?

21              MR. HOFFMAN:  I'm sorry, I

22        apologize.  Objection to the form of

23        the question.  Asked and answered.

24        A.    Is the question about how you

Protected - Subject to Further Protective Review

1   qualify what it means more, and I explained

2   to you so that there's certainly a level of

3   detail that is in the information databases

4   that the manufacturer has, but it's clearly

5   regulated, yeah, what pertinent information

6   is being shared with the health authorities.

7              And they can always come back

8   and ask questions and -- for more detailed

9   information if it's deemed necessary from

10  their perspective.

11  BY MR. DENTON:

12      Q.     Would you agree that the

13  manufacturer of a drug is responsible for the

14  content of the label?

15      A.     The manufacturer of the drug is

16  proposing a label based on the information

17  that is available, and so certainly is also

18  responsible for the proposal and the data

19  that are underlying.

20             But the final approval of the

21  label is granted by the health authority.

22      Q.     So it's your understanding that

23  the law in the United States that the

24  manufacturer is not responsible for the

Protected - Subject to Further Protective Review

```
 1   content of the label?  Is that your

 2   understanding?

 3                 MR. HOFFMAN:  Objection to the

 4        form of the question.

 5        A.    That's not what I said.

 6   BY MR. DENTON:

 7        Q.    Okay.  Let me ask a different

 8   question, see if you can agree with me.

 9                 The manufacturer of the drug

10   sold in the United States is responsible for

11   the content of the label, true?

12        A.    The manufacturer is responsible

13   for the proposal to be made to the health

14   authority for the label text according to the

15   rules that apply, and the manufacturer is

16   also certainly having the background

17   information that is supported -- supportive

18   of any statement that's made in the label.

19                 The final approval of the label

20   is given by the health authority, and that

21   implies an agreement of the health authority

22   to what is written in the label.

23        Q.    You understand it's Bayer and

24   Janssen that are the defendants in this case,
```

Protected - Subject to Further Protective Review

1    not the FDA.  You understand that, right?

2           A.      Could you please respond --

3           Q.      You understand that --

4           A.      -- or repeat the question?

5           Q.      -- the patients in the United

6    States in this litigation are suing Bayer and

7    Janssen, not the FDA.  You understand that,

8    right?

9           A.      That's -- I understand why I'm

10   asked here in the deposition to give

11   information.

12          Q.      Okay.  All right.  So I want a

13   very clear answer.  I mean, you have a

14   master's degree, as I understand it, in

15   regulatory affairs, right?

16          A.      That's correct.

17          Q.      Okay.  And as I also understand

18   it, on Xarelto, you were either a regulatory

19   strategist or the head regulatory strategist

20   for Xarelto for at least seven years, right?

21          A.      That's correct.

22          Q.      From 2004 to 2011?

23          A.      That's correct, yes.

24          Q.      And that's when these drugs

Protected - Subject to Further Protective Review

1   were being evaluated by the regulators,

2   right?

3       A.    At least for the initial

4   indications that were approved in that time

5   frame.

6       Q.    Okay.  And so I want to ask you

7   very specifically:  The maker of the drug,

8   Bayer and Janssen, in the United States is

9   responsible to -- for the content of the

10  label?

11              MR. HOFFMAN:  Objection.

12  BY MR. DENTON:

13      Q.    You agree with that, right?

14              MR. HOFFMAN:  Objection to the

15          form of the question.

16      A.    I have to go back to my earlier

17  response, and as I said, that the proposal is

18  being made and the information that is

19  supportive to the label text, that is, again,

20  provided by the marketing authorization

21  holder, and it's also intensively discussed

22  also in internal documents, resources, but

23  it's finally approved by the health

24  authorities.

Protected - Subject to Further Protective Review

1           So only with the agreement of

2     the health authorities, and the label is

3     becoming really the legally binding document

4     that you're describing.

5     BY MR. DENTON:

6           Q.     Right.  Would you agree with me

7     that the maker of the drug is responsible for

8     accurate and complete information about the

9     potential risks of a drug and putting that in

10    a label?

11          A.     This is a very general

12    statement --

13          Q.     Yes, ma'am.

14          A.     -- so I'll just -- certainly I

15    agree that to the point of accurate

16    information, it's always the responsibility

17    of the marketing authorization holder to

18    provide the accurate data that, yeah, being

19    proposed for the labeling later on.

20          Q.     I mean, you would agree,

21    wouldn't you, Dr. Derix, that the company

22    scientists and the company physicians who

23    have worked on Xarelto know more about the

24    drug than the regulators; is that fair?

Protected - Subject to Further Protective Review

1          A.      I think, once again, I have to

2     go back to my prior response that this is a

3     structured information approach, and it is

4     strongly regulated, and so "more" is very

5     general, and if you would assume "more" in

6     the terms of amount of detailed day-to-day

7     information, I would have to agree with you.

8               But if it's meant to be like

9     relevant information or information that is

10    ultimately necessary to -- yeah, to assess

11    the benefit-risk, then it's the expectation

12    that the health authority also has access to

13    that information to make their decisions.

14         Q.      But I mean, we heard -- when

15    Mr. McWilliams was questioning you, we saw

16    that the company scientists and doctors knew

17    about defects or problems with the INRatio

18    device that was never shared with the

19    regulators, true?

20         A.      From the prior conversations,

21    we did not make that conclusion.  So we

22    just -- I mean, I would have to follow up to

23    really fully understand this.  We just looked

24    at -- but I saw this conversation for the

Protected - Subject to Further Protective Review

1   first time, which does not mean that they did

2   not -- yeah, were not implemented in other

3   reporting documents that were issued and

4   provided to FDA.

5              So -- but it's exactly what I

6   just described to you.  There's a day-to-day

7   working level in which things happen,

8   communication back and forth, and then there

9   is a clearly structured way of providing

10  information to FDA so that they also can

11  easily work with those data and information.

12  So these are two different levels.

13       Q.    Well, from 2004 to 2011, those

14  seven years, you were the global regulatory

15  strategist for Xarelto, true?

16       A.    Yes, that's true.

17       Q.    What does that mean?  What was

18  your role?

19       A.    That's, yeah, global regulatory

20  strategist is a title that we use in Bayer to

21  describe a role that is very much a

22  coordinative role, so it's a role that is

23  supposed to provide information on

24  regulations, on -- also on health authority,

Protected - Subject to Further Protective Review

```
 1   new information coming from health authority

 2   to the development team, to the other experts

 3   in the team.  So that's one part of the role.

 4                  And the other part of the role

 5   is to communicate directly with health

 6   authorities, and especially in Bayer, it's

 7   primarily the EMA in my team, because

 8   communication to FDA went through Janssen

 9   directly.

10                  It's also leading a team with

11   other regulatory experts, so there are

12   experts on labeling, there are experts on

13   CMC, experts for different regions in the

14   world.

15                  And so all this -- as such this

16   role also implies leading such a team of

17   experts that allows also the strategist to

18   get information from the people who are more

19   specialized in areas in regulatory affairs.

20        Q.     So one of the things you did as

21   global regulatory strategist was to be aware

22   of communications with EMA; is that fair, on

23   Xarelto?

24        A.     That's a part of the role.  So
```

Protected - Subject to Further Protective Review

1    I am -- yeah, one of my team members at the

2    time was the direct contact to EMA, so -- and

3    did the day-to-day communication, but most of

4    the time I was aware of this, yes.

5         Q.    Okay.  So let me ask you this:

6    The information that Mr. McWilliams went over

7    of all those reports of the INRatio device

8    not working properly, during the period of

9    2004 and 2011, was any of that communicated

10   to EMA?

11              MR. HOFFMAN:  Objection to the

12         form of the question.

13        A.    No.  I said this morning that I

14   saw this information for the first time, so

15   I -- in the form of e-mails, because I was

16   not copied on any of the e-mails, and I do

17   not recall a communication around this type

18   of information.

19              So in that regard, I'm not

20   aware that this type of information was

21   submitted.  However, it could well be that

22   the information which we discussed from

23   e-mails can also be found in the databases

24   that -- yeah, were reported to EMA.  So there

Protected - Subject to Further Protective Review

1    is another level of judgment implied here if

2    an event that is discussed and being reported

3    by an investigator is looked at again

4    independently.  And so sometimes it's

5    reported to the FDA.  It's according to

6    various clearly defined rules.

7              And those, yeah, investigations

8    and, really, medical assessment of single

9    information is being done by colleagues in

10   pharmacovigilance.  And so we would have to

11   follow up to see whether the information from

12   the e-mail exchange might have, yeah, been

13   implemented in their reporting and by that

14   way reported to the health authorities.

15             But I don't know that, because,

16   yeah, I would have to -- yeah, I would have

17   to further look this up.

18   BY MR. DENTON:

19        Q.    Where would we look?  If we

20   want to find out if any regulator anywhere in

21   the world was told about the malfunction of

22   the INRatio device during the ROCKET trial,

23   where would we go to look for that to see if

24   any regulator in the world knew anything

Protected - Subject to Further Protective Review

1    about this during the trial?

2              MR. HOFFMAN:  Objection to the

3         form of the question.

4         A.    Based on my own knowledge, I

5    have -- I would like to ask you to follow

6    this up with colleagues from the

7    pharmacovigilance group.  So if the events

8    reported by investigators qualified for a

9    certain type of adverse event reports that's

10   being reported, then they would be

11   implemented in the safety database.

12   BY MR. DENTON:

13        Q.    Who?  Who should we ask?  Can

14   you give us a name?

15        A.    In Bayer?

16        Q.    Sure.

17        A.    The colleagues who are

18   responsible for pharmacovigilance, data

19   collection and reporting are Andrea

20   Horvat-Bröcker and Sabine Dittmar.

21        Q.    And --

22        A.    Sabine Dittmar and Andrea

23   Horvat-Bröcker.

24        Q.    Okay.  So we asked Andrea

Protected - Subject to Further Protective Review

1  Horvat-Bröcker.  She said she never heard

2  about this.  Who else should we ask?

3      A.     I think it would be prudent to

4  follow up with the colleagues in the clinical

5  operation team at Janssen, because they

6  certainly at least were involved in this

7  e-mail communication.

8          So it's probably best to follow

9  up with them to -- yeah, also to locate the

10 patient identifiers with, yeah, reported

11 adverse events in the database.

12     Q.     But Janssen folks didn't

13 communicate with EMA with respect to Xarelto.

14 Bayer folks did, true?

15     A.     Janssen colleagues are

16 typically not talking to EMA, but we have --

17 in our collaboration in place that, yeah,

18 adverse event reporting, pharmacovigilance

19 reporting is ruled in a way that the

20 information is being provided to our

21 pharmacovigilance department at Bayer so they

22 could appropriately inform the health

23 authorities.

24          The root cause you have to look

Protected - Subject to Further Protective Review

1    at is really whether the information you just

2    referred to was brought in a different way,

3    not in the way of this e-mail.  So it would

4    have to, yeah, be brought into a different

5    way into this other information,

6    communication channel.

7         Q.    The truth is -- the truth is,

8    is no regulator anywhere in the world was

9    told about the defective INRatio device while

10   the trial was going on.  That's a fact, isn't

11   it?

12              MR. HOFFMAN:  Object to the --

13        A.    I cannot agree --

14              MR. HOFFMAN:  I'm sorry.  Just

15        give me time to object to the

16        question.

17              THE WITNESS:  I'm sorry.

18              MR. HOFFMAN:  It's okay.  Go

19        ahead.  You can answer his question

20        now.

21        A.    I cannot agree to this

22   statement, so I just discussed it.  You would

23   really have to investigate and look into the

24   database first before such conclusion can be

Protected - Subject to Further Protective Review

1    drawn.

2    BY MR. DENTON:

3         Q.     Okay.  What database?

4         A.     I just referred to you to the

5    pharmacovigilance database, so -- to look up

6    whether one of the report in this e-mail

7    chain mentioned events and described events

8    were also reported by the investigator as an

9    adverse event, and that way they are

10   classified and assessed and further

11   implemented into the safety database.

12        Q.     Okay.  So am I understanding

13   you correctly that these adverse events

14   related to the defective INRatio device

15   should be reported by the pharmacovigilance

16   group to the regulators?

17                MR. HOFFMAN:  Object to the

18        form.

19   BY MR. DENTON:

20        Q.     Do I understand that correctly?

21                MR. HOFFMAN:  Objection to the

22        form of the question.  Misstates

23        testimony.

24                You can answer.

```
1          A.     That's not what I said, so the
2    pharmacovigilance department is receiving
3    notifications of adverse events.  Typically,
4    then they evaluate and assess, and based on
5    the rules.  And then according to the rules,
6    the information flow is, yeah, to the health
7    authorities.
8               So it's not automatically what
9    you said.  And, first of all, they would have
10   to assess whether one of the events that were
11   reported in those e-mails, yeah, really
12   qualified for an adverse event in the way it
13   is defined in the regulation.
14              And so, then, they would have
15   certainly, if it did so, process this
16   notification accordingly.
17   BY MR. DENTON:
18         Q.     Certainly, as we saw in those
19   e-mails with the patient bleeding out of
20   every orifice in their body as those doctors
21   talked about is serious enough to report to
22   the regulators, true?
23              MR. HOFFMAN:  Objection to the
24        form of the question.
```

Protected - Subject to Further Protective Review

```
 1               Go ahead.

 2        A.     I would have to defer this

 3   question to the pharmacovigilance experts

 4   because there are a number of factors that

 5   are being taken into account for the

 6   assessment, so -- and I'm not the expert, but

 7   it is also kind of time of relation of the

 8   drug intake to the adverse event, and there

 9   are numerous factors that clinically are

10   taken into consideration, and those are in my

11   view as far as I can judge on the case, not

12   directly obvious from this e-mail, and so,

13   therefore, it requires further assessment by

14   experts before we can make such statements.

15   BY MR. DENTON:

16        Q.     All right.  Let me kind of

17   switch gears a bit.  As far as communications

18   with regulators, a lot of that is in writing

19   or submissions, formal written submissions,

20   true?  We've seen some of those today.

21        A.     Yes, it's in writing, a form of

22   submissions, but there's also communication.

23   Most of the time it's more procedural than

24   content related to the coordinator of --
```

Protected - Subject to Further Protective Review

```
 1                (Clarification requested by the

 2          reporter.)

 3          A.      -- content related to the

 4   coordinators of the procedures at the health

 5   authorities.  So it's the role of -- a job

 6   description of the health authorities that

 7   they have a person who is really taking

 8   responsibility of the primary communication

 9   and instead reaching out to the experts in

10   the agency, and that's the same kind of

11   mirroring what a regulatory strategist does

12   in Bayer.

13          Q.    And what I'm -- and I

14   appreciate that.  And what I'm trying to find

15   out is:  Do you maintain a file or a database

16   or a share room somewhere that would gather

17   all of those communications and store them so

18   one can go back and look at them?

19                MR. HOFFMAN:  Objection to the

20          form.  It's a little vague.  I mean,

21          do you want to break it up or:  --

22                MR. DENTON:  Let's see how she

23          does.  I'm just probing a bit.

24                MR. HOFFMAN:  I understand.
```

Protected - Subject to Further Protective Review

1        I'm sorry.

2             Go ahead.  You can answer his

3        question.

4             THE WITNESS:  Okay.

5        A.     There are different types of

6    databases you would have to look at.  So all

7    the pharmacovigilance reporting is kind of --

8    appears on its own because it has a direct

9    communication chain to the health

10   authorities.

11             Then there is, yeah, the

12   submission files that documents that were

13   submitted to the health authorities, so it's

14   also one regulatory database.

15             The third piece is what we call

16   a contact database, so that's a database

17   where colleagues provide communication --

18   yeah, colleagues provide communication in the

19   form of contact reports.

20   BY MR. DENTON:

21        Q.     So, for example, the contact

22   database, would that attempt to memorialize

23   things that the agencies would tell Bayer and

24   what Bayer would respond to the agencies?  Is

Protected - Subject to Further Protective Review

1    that what that generally does?

2         A.     In principle, yes.  It shortly

3    describes communication that's coming from

4    the agency to the company and the other way

5    around.

6         Q.     Okay.  And that's called a

7    contact database?

8         A.     Yes.

9         Q.     Okay.  And do you have one of

10   those contact data -- when I say you --

11   strike that.

12              Does Bayer have a contact

13   database for each regulator or are they

14   combined into one?  Can you help me in that

15   regard?

16        A.     Bayer has a database where,

17   yeah, where communications from all health

18   authorities is implemented, also for all

19   drugs across -- in the company.  For

20   rivaroxaban, it's the exemption that Janssen

21   is the IND and NDA holder, and therefore,

22   the -- I mean, the contact, back and forth

23   contact information that Janssen has with the

24   FDA is not implemented in the Bayer contact

Protected - Subject to Further Protective Review

1   database.

2           So it works in a way that every

3   regulatory strategist in Bayer has the

4   responsibility to provide the information to

5   the contact database for the contacts he or

6   she has had within the health authority, and

7   therefore, the FDA interaction is not

8   included on rivaroxaban.

9       Q.    Okay.  But on rivaroxaban, for

10  example, with EMA, Bayer would have the

11  contact database, true?

12      A.    Yes.

13      Q.    For example, the

14  communications -- let's say, with Health

15  Canada, Bayer would have that database for

16  rivaroxaban, wouldn't they?

17      A.    Yeah, I would expect that

18  information is also being put into the

19  database, yeah, for contacts at Health Canada

20  by the colleagues.

21      Q.    Okay.  So the only exception on

22  the contact database for rivaroxaban is

23  because Janssen is the authorization holder

24  in the U.S., and Janssen maintains that

Protected - Subject to Further Protective Review

1    contact database with the FDA for

2    rivaroxaban, true?

3              Did I understand you correctly?

4         A.    I can't confirm that -- the

5    exemptions, so I cannot comment on Janssen's

6    contact database.  So I only know about the

7    processes in Bayer, and I don't know how

8    Janssen is --

9         Q.    Fair enough.

10        A.    -- dealing with that, whether

11   they have the same type of contact databases

12   we have.

13        Q.    Well, who is the current global

14   regulatory strategist for Xarelto?  I

15   understand you left that job in 2011.  Who

16   took over for you?

17        A.    Jürgen Weber was my successor

18   on that role.

19        Q.    And he still has that role?

20        A.    Yes, he still has that role.

21   He was a team member at the time when I was

22   leaving, and he took over my position when I

23   left.

24        Q.    All right.  Do you have, at

Protected - Subject to Further Protective Review

1    Bayer, specific global regulatory folks that

2    communicate, for example, with EMA?  Do you

3    have an assigned person that is the primary

4    contact with the EMA folks on Xarelto?

5        A.    In our case it's not just one

6    person, and it also has changed over time

7    depending on the assignments the colleagues

8    had.  And at the moment, as far as I

9    recall -- but please, also confirm this with

10   Jürgen Weber, because it's in his area --

11   it's two colleagues who shared that

12   responsibility.  And they have -- just

13   topic-wise, share that responsibility, at

14   least it's my recollection, but --

15       Q.    Okay.  And can you share with

16   us your two colleagues' names, please?

17       A.    Colleagues' names are Sabine

18   Frenzen and Christina Tarenz.

19       Q.    In your current job, you're

20   vice president and head of program management

21   thrombosis, if I copied that correctly from

22   your CV?

23       A.    That's correct.

24       Q.    Okay.  And does that still

Protected - Subject to Further Protective Review

1  involve Xarelto?

2       A.     Yes, that still involves

3  Xarelto because Xarelto is considered as a

4  development program in thrombosis because

5  we're running a quite intensive, extensive

6  lifecycle management program exploring the

7  potential use of Xarelto in other patient

8  population, other diseases.  And it does also

9  include other, yeah, development programs in

10  the area of thrombosis that are unrelated to

11  Xarelto.

12       Q.     Okay.  I assume that was a

13  promotion when you became vice president and

14  head of program management thrombosis, true?

15       A.     Yes, that's true.

16       Q.     And what is your current

17  involvement with Xarelto?

18       A.     Together with two colleagues of

19  mine who support me in global program

20  management, I'm leading still the global

21  program team for Xarelto.  So that means,

22  yeah, we meet regularly, meeting and

23  following up on all activities that are,

24  yeah, continuing in the development of

Protected - Subject to Further Protective Review

1    Xarelto.

2              So as I mentioned, focus on the

3    lifecycle program, but it also includes

4    general activities that are being done in

5    the -- what we call maintenance, and that

6    means all activities that are required to

7    keep the product on the market, to support --

8    yeah, support -- report regular health

9    authority, yeah, submissions and the

10   information that are needed and so on.

11        Q.    I'm going to switch to clinical

12   trials for a second.  The phase one and phase

13   two trials on rivaroxaban, did Bayer conduct

14   those trials?

15        A.    Phase one and phase two, yeah,

16   most of the indications -- there's one

17   exemption on ACS phase two; the program was

18   conducted by Janssen.

19        Q.    Okay.  But the original, for

20   example, phase one and phase two studies,

21   other than ACS, were all conducted by Bayer,

22   correct?

23        A.    That's correct.

24        Q.    And who was the person that was

Protected - Subject to Further Protective Review

1    the -- was in charge of the clinical program,

2    the phase one and the phase two, if you

3    recall?

4         A.     Somehow before the time that I

5    joined the team, but typically, phase one

6    studies are falling under the leadership of

7    the clinical pharmacology department, and so

8    at the time when I joined the team, the

9    responsibility was with Dagmar Kubitza, and

10   she is still in charge.

11        Q.     All right.  Were any contact

12   research organizations used in phase one or

13   phase two on Xarelto, if you know?

14        A.     That's a question I have to

15   refer to my colleagues, because I'm

16   unfamiliar the number of trials that were

17   conducted, and so you would have to talk to

18   either, yeah, Dagmar Kubitza or the clinical

19   leaders, because starting from phase two,

20   there's a hand-over of the responsibility to

21   the clinical leaders.

22              And so our primary contact

23   point in that regard is Scott Berkowitz, so

24   he's currently the clinical lead for Xarelto

Protected - Subject to Further Protective Review

1    in my team.  He has also colleagues working

2    with him dedicated to specific indications,

3    but he's probably a primary go-to person for

4    those questions.

5         Q.    Let's move on to phase three a

6    second.  The first series of phase three

7    studies were the RECORD studies, true?

8         A.    That's true.

9         Q.    And that was to see if Xarelto

10   was helpful in reducing blood clot risk for

11   folks after hip and knee surgery, correct?

12        A.    Yeah, that's correct, VTE

13   prevention.

14        Q.    And as I understand it, there

15   were four record studies, and they were

16   actually numbered 1, 2, 3 and 4, correct?

17        A.    That's correct, yeah.

18        Q.    Did Bayer run those studies?

19   Did Bayer conduct those studies, RECORD1, 2,

20   3 and 4, do you know?

21        A.    Bayer conduct those studies,

22   RECORD1 to 4.

23        Q.    Do you know, was Scott

24   Berkowitz, Dr. Berkowitz, the clinical lead

Protected - Subject to Further Protective Review

1  on those studies?

2       A.    I would have to check back to

3  when he really joined the company, so the

4  clinical lead on those studies was Tiemo

5  Bandel, so he was, yeah, at the time --

6            (Clarification requested by the

7       reporter.)

8       A.    Tiemo Bandel.

9  BY MR. DENTON:

10      Q.    Is that a name?

11      A.    Yeah, that's a name of the

12  clinical lead.  And Scott Berkowitz joined in

13  the course of while the studies were still

14  running, focusing on -- yeah, more the

15  long-term indications, but he was already at

16  the time also partly in the team as I --

17      Q.    Okay.  Again, I'm just probing

18  for some information you might be able to

19  help me with.

20            Were any contract resource

21  organizations used for the phase three RECORD

22  studies?

23      A.    I specifically recall on one,

24  RECORD4, Kendle was involved as a clinical

Protected - Subject to Further Protective Review

1    research organization.

2         Q.     And why do you remember that

3    about RECORD4?  Was it because of all the

4    problems?

5         A.     I remember because there was a

6    discussion with the health authority and,

7    yeah, there was an investigation about

8    adherence to good clinical practice in this

9    trial.  And so in that context, yeah, I

10   recall that this was the only trial of the

11   RECORD program that -- where a CRO was

12   involved.

13        Q.     Right.  And that was the one

14   where the FDA found the work done in RECORD4

15   was unreliable.  You remember that, right?

16        A.     FDA criticized the DCP

17   adherence, and so decided that they did not

18   take this study into consideration for the

19   label, and as a pivotal study.  So they based

20   approval on the indications, primarily on

21   RECORD1, 2 and 3.

22        Q.     Who is Andy Hargreaves?

23        A.     Andy Hargreaves is a colleague

24   in Bayer in the quality assurance, clinical

Protected - Subject to Further Protective Review

```
 1    quality assurance group, and at the time --

 2    yeah, he's now leading the quality assurance

 3    strategy group for the area cardiovascular.

 4              At the time he was, yeah, in

 5    the audit group of quality assurance, and so

 6    he was responsible to, yeah, set up some of

 7    the activities in relation to FDA's requests,

 8    yeah, in terms of reauditing study

 9    information.

10        Q.    So Mr. Hargreaves is in a group

11    that audits or tries to oversee the quality

12    of the clinical trial work, in specific, this

13    gentleman did that with respect to

14    rivaroxaban or Xarelto, right?

15        A.    Yes.

16        Q.    And he's still with the

17    company?

18        A.    He's still with the company,

19    yes.

20        Q.    The ROCKET study, as I

21    understand, was sponsored by Janssen, but the

22    CRO -- or the CRO was Duke or DCRI, true?

23        A.    Janssen sponsored and so Duke

24    was the so-called ARO, the academic research
```

Protected - Subject to Further Protective Review

1    organization.  Janssen involved a subparty, a

2    serial clinical research organization, as far

3    as I recall, Parexel.

4         Q.    Right.  And Parexel did -- or

5    coordinated the clinical trials that were

6    done outside of the United States in the rest

7    of the world.  Is that your understanding or

8    do you not --

9         A.    That's not my area of

10   expertise --

11        Q.    Okay.

12        A.    -- so I would have to look it

13   up --

14        Q.    Fair enough.

15        A.    -- for what's really clearly

16   their delegation of tasks was to Parexel.

17        Q.    Bayer did the EINSTEIN studies,

18   true?

19        A.    That's true, yes.

20        Q.    Did Bayer have a CRO for the

21   EINSTEIN studies?

22        A.    Also here I would have to refer

23   you to the colleagues who -- the colleague

24   who ran the program, so there were external

Protected - Subject to Further Protective Review

```
1    groups also involved, but you would have to
2    look into really what the task was.
3              For example, sometimes also
4    Covance was a CRO, just involved in doing the
5    central laboratory, but not involved in other
6    conducts -- yeah, topics of the study like
7    monitoring.
8              So it's really a study by -- a
9    study looking at what you have to have.
10       Q.     Who was the Bayer clinical lead
11   on the EINSTEIN study, if you know?
12       A.     Bayer clinical lead on the
13   EINSTEIN studies has been -- or is still,
14   because we're still running one EINSTEIN
15   study.  It's Ton Lensing, Anthonie Lensing.
16       Q.     Tony Lensing?
17       A.     The full name is Anthonie
18   Lensing, but he lots of the time goes by
19   "Ton" Lensing.
20       Q.     Okay.  And is that a doctor?
21   Is that Dr. Lensing?
22       A.     Yes.
23       Q.     Medical doctor?
24       A.     Medical doctor.
```

Protected - Subject to Further Protective Review

```
 1          Q.     And does Dr. Lensing, does he

 2   work in Germany or the U.S., or do you know?

 3          A.     He's working from the

 4   Netherlands --

 5          Q.     Okay.

 6          A.     -- actually, from Amsterdam.

 7          Q.     So he's in Amsterdam; is that

 8   right?

 9          A.     That's right.

10          Q.     And has he been in Amsterdam

11   throughout the time he has worked as clinical

12   lead on the EINSTEIN project, as far as you

13   know?

14          A.     As far as I know, yes, sorry.

15          Q.     But does Dr. Lensing work for

16   Bayer, the same company you work for?

17                 MR. HOFFMAN:  Objection to the

18          form of the question.

19   BY MR. DENTON:

20          Q.     Or do you know?

21          A.     Dr. Lensing works for Bayer.

22   So Bayer also has a subsidiary in the

23   Netherlands.

24          Q.     Sure.
```

Protected - Subject to Further Protective Review

```
1          A.      And so he's not employed by the
2    same entity of the company.
3          Q.      Sure.
4          A.      But it's all under the umbrella
5    Bayer.
6          Q.      Okay.  Fair enough.  Thank you.
7                  The J-ROCKET study, the afib
8    study done on the Japanese population, you're
9    generally familiar with that study, are you
10   not?
11         A.      I'm generally familiar with
12   that study, yes.
13         Q.      Who conducted that study?  Was
14   it Bayer, was it Janssen, or was it a CRO, or
15   do you know?
16         A.      I'm not 100% sure, but also
17   here exactly the type of responsibility of --
18   but certainly the study was conducted under
19   the lead of Bayer, and specifically
20   colleagues in the Japanese organization of
21   Bayer.
22         Q.      And I might be testing you
23   here, but do you know who the clinical lead
24   was on the J-ROCKET study for Bayer?
```

Protected - Subject to Further Protective Review

1        A.      I do not recall.

2        Q.      Okay.

3        A.      So I would have to -- yeah, I

4    would have to refer to Scott Berkowitz.

5        Q.      So you think Scott Berkowitz

6    could answer that question?

7        A.      Yes, I think so, because he was

8    directly involved in the communication with

9    the team, the clinical team in Japan when the

10   trial was set up.

11       Q.      Okay.  The ATLAS study, is that

12   the ACS indication?

13       A.      That's the ACS indication, yes.

14       Q.      And did you tell me that

15   Janssen ran that study or Bayer, I forgot?

16       A.      Janssen ran the study, so it's

17   consisting of a phase two study called ATLAS

18   TIMI 46 and a phase three study, ATLAS

19   TIMI 51.

20       Q.      Okay.  The medically ill

21   studies, I think it's referred to as

22   MAGELLAN, which -- is it Janssen or Bayer

23   responsible for that?

24       A.      Bayer ran the MAGELLAN trial.

Protected - Subject to Further Protective Review

1    Q.    And did you have a CRO for

2    that?

3    A.    I do not recall, but I, again,

4    ask you to reconfirm that information with --

5    Q.    Dr. Berkowitz?

6    A.    -- Dr. Berkowitz, but I do not

7    recall in a typical sense of a CRO, which has

8    a broad involvement.

9    Q.    Sure.

10   A.    May again be in the way of

11   doing centralized measurements.

12   Q.    Are there ongoing clinical

13   trials with respect to a pediatric

14   indication?

15   A.    Yes, there are.  There's a

16   pediatric program and there are a number of

17   trials ongoing in pediatric indication.  And

18   here we're talking about VTE treatment, so

19   that's the same indication as in adults, you

20   refer to as the EINSTEIN program, is also

21   treatment of venous thromboembolism.

22        And so that's an indication

23   which is also relevant for children because

24   also children can have venous

Protected - Subject to Further Protective Review

1    thromboembolism.  And so, therefore, yeah,

2    this is a link between the programs.  They

3    have the same title.  They also run under the

4    EINSTEIN title.

5        Q.    And is Dr. Lensing running the

6    pediatric program, or someone else?

7        A.    In part.  So the pediatric

8    program also consists of phase one studies,

9    so they fall again under the responsibility

10   of Dagmar Kubitza.  Then there are phase two,

11   phase three parts, and they are running under

12   the responsibility of Ton Lensing and Jürgen

13   Heubach, who is a second GCL who is

14   supporting him because of the yet a number of

15   trials and the complexity of the trial; there

16   are two clinical leads in this program.

17       Q.    So in addition to Dr. Lensing,

18   there's another individual who's working as a

19   global clinical lead on --

20       A.    Yes.

21       Q.    -- the pediatric extension of

22   the EINSTEIN project, right?

23       A.    That's correct, yes.

24       Q.    And I didn't quite get that

Protected - Subject to Further Protective Review

1   name, but where does that individual work or

2   reside in addition to --

3         A.      The name is Jürgen Heubach.

4         Q.      Okay.

5         A.      And the colleague is based in

6   the Berlin offices in Germany.

7               MR. DENTON:  Okay.  Why don't

8         we quit there for the day.  It's about

9         5:30.

10              MR. HOFFMAN:  Yeah, that's

11        fine.

12              THE VIDEOGRAPHER:  Going off

13        the record.  The time is 5:28 p.m.

14              (Proceedings recessed at

15        5:28 p.m.)

16                    --o0o--

17

18

19

20

21

22

23

24

Protected - Subject to Further Protective Review

```
 1                      CERTIFICATE
 2            I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    ANDREA DERIX, Ph.D. was duly sworn by me to
      testify to the truth, the whole truth and
 6    nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public in and for the
22    State of Texas
      My Commission Expires:  7/9/2016
23
      Dated: March 3, 2016
24
```

Protected - Subject to Further Protective Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8          After doing so, please sign the

 9   errata sheet and date it.

10          You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14          It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24
```

Protected - Subject to Further Protective Review

1                          ERRATA

2     PAGE   LINE   CHANGE

3     _____  _____  _____

4            REASON: _____

5     _____  _____  _____

6            REASON: _____

7     _____  _____  _____

8            REASON: _____

9     _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

Protected - Subject to Further Protective Review

1                    ACKNOWLEDGMENT OF DEPONENT

2

3

4              I, ANDREA DERIX, Ph.D., do hereby
     certify that I have read the foregoing pages
5    and that the same is a correct transcription
     of the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or substance,
7    if any, noted in the attached
     Errata Sheet.

8

9

10

11

12   _____

      ANDREA DERIX, Ph.D.                    DATE
13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 _____.

17   My commission expires: _____

18

19   _____

20   Notary Public

21

22

23

24

Protected - Subject to Further Protective Review

```
 1                      LAWYER'S NOTES

 2

 3    PAGE      LINE

 4    _____     _____     _____

 5    _____     _____     _____

 6    _____     _____     _____

 7    _____     _____     _____

 8    _____     _____     _____

 9    _____     _____     _____

10    _____     _____     _____

11    _____     _____     _____

12    _____     _____     _____

13    _____     _____     _____

14    _____     _____     _____

15    _____     _____     _____

16    _____     _____     _____

17    _____     _____     _____

18    _____     _____     _____

19    _____     _____     _____

20    _____     _____     _____

21    _____     _____     _____

22    _____     _____     _____

23    _____     _____     _____

24    _____     _____     _____
```