# EXHIBIT-23

# FILED UNDER SEAL

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          UNITED STATES DISTRICT COURT

           EASTERN DISTRICT OF LOUISIANA

2

   ******************************

3

   IN RE:  XARELTO              MDL No. 2592

4  (RIVAROXABAN)                Section L

   PRODUCTS LIABILITY           Judge Eldon Fallon

5  LITIGATION                   Mag. Judge North

6  THIS DOCUMENT RELATES TO:

   JOSEPH J. BOUDREAUX

7  Case no. 2:14-CV-0270

8  ******************************

9

   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

10

11

12          VIDEOTAPED DEPOSITION OF

13          NATHANIEL S. WINSTEAD, MD

14

15          Monday, December 12th, 2016

16              8:55 a.m.

17

18      Held At:

19          The Lambert Law Firm

20          701 Magazine Street

21          New Orleans, Louisiana

22

23

24  REPORTED BY:

25  Maureen O'Connor Pollard, RMR, LA Cert #2011025

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:

 3       KIRK J. GOZA, ESQ.

 4           GOZA & HONNOLD, LLC

 5           11181 Overbrook Road, Suite 200

 6           Leawood, Kansas 66211

 7           913-451-3433

 8           kgoza@gohonlaw.com

 9                -and-

10       EMMA E. KINGSDORF, ESQ.

11           BARRIOS KINGSDORF & CASTEIX, LLP

12           701 Poydras Street

13           New Orleans, Louisiana 70139

14           504-524-3300

15           ekingsdorf@bkc-law.com

16

17   FOR THE BAYER DEFENDANTS:

18       BRIAN L. STEKLOFF, ESQ.

19       KIERAN GOSTIN, ESQ.

20           WILKINSON WALSH & ESKOVITZ

21           1900 M Street, NW, Suite 800

22           Washington, DC 20036

23           202-847-4030

24           bstekloff@wilkinsonwalsh.com

25           kgostin@wilkinsonwalsh.com
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   APPEARANCES (Continued):

 2

 3   FOR THE JANSSEN DEFENDANTS:

 4       MARGARET HOFFMANN, ESQ.

 5           SCHWABE, WILLIAMSON & WYATT

 6           1211 SW 5th Ave., Suite 1900

 7           Portland, Oregon 97204

 8           503-222-9981

 9           mhoffmann@schwabe.com

10               -and-

11       SHAUN P. McFALL, ESQ.

12           BARRASSO USDIN KUPPERMAN FREEMAN

13           & SARVER, LLC

14           909 Poydras Street, 24th Floor

15           New Orleans, Louisiana 70112

16           504-589-9764

17           smcfall@barrassousdin.com

18

19   Videographer:  Melissa Bardwell

20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                        INDEX
 2     EXAMINATION                              PAGE
 3     NATHANIEL S. WINSTEAD, MD
 4      BY MR. STEKLOFF                            7
 5      BY MS. HOFFMANN                          173
 6      BY MR. GOZA                              201
 7      BY MR. STEKLOFF                          206
 8      BY MS. HOFFMANN                          224
 9
10
11          E X H I B I T S
12     NO.        DESCRIPTION                    PAGE
13     1     Expert Report of Nathaniel S.
             Winstead, MD........................ 13
14
       2     Responses and Objections to
15           Defendants' Notice with Subpoena
             Duces Tecum of Oral Videotaped
16           Deposition.......................... 20
17     3     August, 2013 Xarelto label.......... 95
18     4     Graham, et al study titled Stroke,
             Bleeding, and Mortality Risks in
19           Elderly Medicare Beneficiaries
             Treated With Dabigatran or
20           Rivaroxaban for Nonvalvular Atrial
             Fibrillation........................135
21
       5     Lip, et al paper titled Real-world
22           comparison of major bleeding risk
             among non-valvular atrial
23           fibrillation patients initiated on
             apixaban, dabigatran, rivaroxaban,
24           or warfarin.........................135
25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1

        6      Lip, et al paper titled Indirect
 2              Comparisons of New Oral
                Anticoagulant Drugs for Efficacy
 3              and Safety When Used for Stroke
                Prevention in Atrial Fibrillation....135
 4
        7      Yao, et al paper titled
 5              Effectiveness and Safety of
                Dabigatran, Rivaroxaban, and
 6              Apixaban Versus Warfarin in
                Nonvalvular Atrial Fibrillation......136
 7
        8      Medical record, Bates
 8              JBoudreaux-OStAGH-MD-000056..........158
 9      9      Medical record, Bates
                JBoudreaux-PPR-001664 through 1673...163
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Melissa Bardwell,

5    videographer for Golkow Technologies.  Date

6    today is December 12, 2016.  Time is

7    approximately 8:55 a.m.

8              This videotaped deposition is being

9    held in New Orleans, Louisiana in reference to

10   the Xarelto (Rivaroxaban) Products Liability

11   Litigation.

12             The deponent today is Dr. Nathaniel

13   Scott Winstead.

14             Will counsel present please introduce

15   themselves and state their affiliations for the

16   record.

17             MR. GOZA:  Kirk Goza on behalf of

18   Plaintiffs.

19             MS. KINGSDORF:  Emma Kingsdorf on

20   behalf of Plaintiffs.

21             MR. STEKLOFF:  Brian Stekloff on

22   behalf of Bayer.

23             MR. GOSTIN:  Kieran Gostin on behalf

24   of Bayer.

25             MS. HOFFMANN:  Margaret Hoffmann on
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   behalf of Janssen.

 2            MR. MCFALL:  Shaun McFall on behalf of

 3   Janssen.

 4            THE VIDEOGRAPHER:  The court reporter

 5   today is Maureen Pollard, and she will now swear

 6   in the witness.

 7

 8            NATHANIEL S. WINSTEAD, MD,

 9   having been first duly sworn, was examined and

10   testified as follows:

11                   EXAMINATION

12   BY MR. STEKLOFF:

13       Q.    Good morning, Dr. Winstead.

14       A.    Good morning.

15       Q.    Have you ever been deposed before?

16       A.    Yes.

17       Q.    How many times?

18       A.    Once.

19       Q.    What was the context in which you were

20   deposed?

21       A.    That was a medical review panel for a

22   malpractice issue.

23       Q.    And was that litigation in court, or

24   was that Louisiana medical review process?

25       A.    That was a Louisiana medical review
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    process.

2        Q.    And when was that?

3        A.    That was approximately five years ago.

4        Q.    Can you briefly describe the issue of

5    the medical -- the topic of the medical review

6    panel?

7        A.    There was an allegation I failed to

8    meet the standard of care in the State of

9    Louisiana, and the panel found that I had, in

10   fact, met the standard of care.

11       Q.    What were the medical issues that the

12   patient was claiming?

13       A.    That -- you're familiar with these

14   things.  They allege about a million things.

15   The patient alleged that I was negligent, and

16   that they had had an esophageal perforation as a

17   consequence of a procedure I had performed.

18       Q.    Did it involve -- did the procedure

19   relate to a gastrointestinal bleed?

20       A.    No.

21       Q.    Did the patient have atrial

22   fibrillation?

23       A.    No.

24       Q.    Did the patient take any -- take

25   Warfarin or any DOAC?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.    No.

2    Q.    Do you prefer the term NOAC or DOAC

3    just so we can be --

4    A.    NOAC is fine.

5    Q.    Okay.  Is it fair to say this is the

6    first time you've been deposed in a litigation

7    between two parties unrelated to a medical

8    review board?

9    A.    So I performed expert services as a --

10    for the defense in a medical malpractice issue

11    in Florida.  I was never deposed in that matter,

12    though.  And apparently in Florida these things

13    drag on forever, and the files are all still

14    sitting in the office in the corner.  And I

15    check annually, and I keep being told that I

16    can't get rid of them.

17          MR. GOZA:  I think he just wants to

18    know if you've been deposed before.

19    A.    No, but I've always -- you know, it's

20    legal, I feel like I have to spill my guts.

21    BY MR. STEKLOFF:

22    Q.    Well, you anticipated another topic I

23    was going to ask, which is prior expert work.

24          Before we get into that, let me just

25    say, I'm sure Mr. Goza has gone over this with

1    you, but first of all, I think we're doing a

2    pretty good job, let's not try to talk over each

3    other.

4              Second of all, just please give verbal

5    answers, which I think you're very good at.

6              And, third, if you need a break at any

7    time, just let us know.  If a question is

8    pending, Mr. Goza and I may debate whether you

9    have to answer it or not, but otherwise if you

10   need a break, just let us know.

11        A.    Fair enough.

12        Q.    Let's go to your prior expert work.

13              You mentioned a case in Florida.  Is

14   that the only time you've served as an expert

15   before?

16        A.    That's the only time, yes, sir.

17        Q.    And so this would be the second time

18   you've served as an expert?

19        A.    Correct.

20        Q.    In the case in Florida, can you just

21   give a very general description of the issues

22   there?

23        A.    That surrounded a very narrow issue.

24   A patient alleged that a medication called

25   doxepin caused irreversible gastroparesis, which

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    is sort of best described as the stomach doesn't

2    squeeze and contract and empty normally anymore.

3    And that was six or so years ago.  That's been

4    quite a while.

5         Q.    And you don't know the status of that

6    litigation?

7         A.    My understanding from my annual check

8    as to whether or not I can dispose of the

9    records is that it's still pending.

10        Q.    When were you first retained in this

11   litigation?

12        A.    I believe it was April-May time frame.

13   I couldn't tell you exactly.

14        Q.    Do you recall who first contacted you?

15        A.    I was contacted by Mark Whitehead.

16        Q.    And in general, you'll -- Mr. Goza

17   will tell you not to answer if I ask about

18   discussions with attorneys, but I just want --

19   in terms of your prep today and other things,

20   but I do want to ask, when you were first

21   contacted by Mr. Whitehead, did he ask you --

22   did he explain to you before you were retained

23   why he was contacting you and what your

24   assignment might be in the litigation?

25             MR. GOZA:  No, I'll let you answer

1    that just generally.

2        A.    I would just say yes in very general

3    terms.

4    BY MR. STEKLOFF:

5        Q.    Can you describe in general terms what

6    you described?

7        A.    That's a long time ago.  I think that

8    he just explained to me that there were -- that

9    there was -- he was working with a group of

10   Plaintiffs' attorneys, and I believe he was very

11   general at that time and didn't name a specific

12   product, but was interested in if I was willing

13   or able to serve as an expert in a matter

14   involving gastrointestinal bleeding and new or

15   oral anticoagulant.  I'm not even sure he even

16   mentioned the specific drug during our initial

17   conversation, to be honest with you.

18       Q.    How much -- strike that.

19             What did you do to prepare for your

20   deposition today?  And again, I'm not asking

21   about specific discussions you had, but just

22   generally what you did to prepare.

23       A.    I reviewed 3 to 4,000 pages of medical

24   records for Mr. Boudreaux's case, reviewed

25   pertinent literature.  I tried to go back to the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    beginning, and I, you know, reviewed information

2    about the approval process, the initial studies

3    of rivaroxaban, and then follow-up studies in

4    general terms.

5           MR. GOZA:  You probably ought to tell

6    him, too, because I don't know what's in your

7    identification, you've read some depositions.

8       A.    Well, yeah, sorry, yeah, multiple --

9    yeah, multiple depositions.

10   BY MR. STEKLOFF:

11      Q.    So to break -- well, why don't we do

12   this.  I'm going to mark, just so we can work

13   off the same document, your report as Exhibit 1.

14           (Whereupon, Winstead Exhibit Number 1,

15           Expert Report of Nathaniel S.

16           Winstead, MD, was marked for

17           identification.)

18           MR. STEKLOFF:  Do you want a copy?

19           MR. GOZA:  That would be awesome.

20           MR. STEKLOFF:  All right (handing).

21           MR. GOZA:  Thank you.

22   BY MR. STEKLOFF:

23      Q.    Dr. Winstead, is this the report you

24   prepared in Mr. Boudreaux's matter?

25      A.    Yes, it is.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    And if you'd turn to Appendix A,

2  there's a list of materials that at the top it

3  says you relied on, reviewed and/or considered.

4          Do you see that?

5    A.    Mm-hmm.

6    Q.    And are those -- when you discuss

7  medical records, depositions, literature, and

8  there are two labels listed here, is that what

9  you're referencing?

10   A.    Correct.

11   Q.    So now to put the report down, I

12 assume you reviewed all of those materials prior

13 to completing your report?

14   A.    Yes.

15   Q.    And your report is dated October 14th?

16   A.    Yes.  Correct.

17   Q.    So then again, and I'm not asking

18 about any discussions with Mr. Goza, but since

19 October 14th, maybe even in the past week or so,

20 what have you done to prepare for this

21 deposition today?

22   A.    Well, I went back and reviewed my

23 report again and the supporting documents, and I

24 reviewed Mr. Boudreaux's records again.  I just

25 kind of went back through everything.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Did you meet with Mr. Goza or any

2   other attorneys?

3      A.    Yes.

4      Q.    When did you meet?

5      A.    I met with Ms. Kingsdorf and Mr. Goza

6   on Thursday and again briefly this morning, and

7   I met with Mr. Goza yesterday.

8      Q.    When you and Mr. Goza and

9   Ms. Kingsdorf met on Thursday, approximately how

10  long did you meet?

11     A.    That was about 50 minutes.

12     Q.    And then yesterday how long did you

13  meet with Mr. Goza?

14     A.    It was about an hour and 15 minutes or

15  so.

16     Q.    And then this morning was brief?

17     A.    15 minutes maybe.

18     Q.    Beyond the materials that you reviewed

19  prior to completing your October 14th report,

20  are there materials that you're now -- is there

21  anything to add to this list that I'm looking at

22  in Appendix A?

23     A.    No, I don't believe so.

24     Q.    So just to be clear, you haven't

25  reviewed any additional deposition transcripts

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

 1    since -- that you didn't have before

 2    October 14th?

 3        A.    I believe the Wong deposition I had a

 4    copy of, and I hadn't reviewed in detail, and I

 5    had gone back and looked at that over the

 6    weekend.  I mean, just in the matter of being

 7    thorough and comprehensive, this says all

 8    depositions, I believe I had a copy of the Wong

 9    deposition, I hadn't -- I don't recall if I had

10    reviewed it thoroughly, but I reviewed it some

11    more this weekend.

12        Q.    And we may come back to Dr. Wong's

13    testimony, but did anything in Dr. Wong's

14    testimony after having reviewed it in more

15    detail this weekend change or revise or --

16        A.    No.

17        Q.    -- in any way alter --

18        A.    No.

19        Q.    -- any of your opinions?

20        A.    No.

21        Q.    Did you review any deposition

22    transcripts of any other experts who have been

23    retained by the Plaintiffs that have been taking

24    place recently?

25        A.    No.

```
 1      Q.    Did you review any additional

 2   literature beyond the four studies that are

 3   listed here in Appendix A?

 4           MR. GOZA:  You mean in preparation for

 5   the deposition?

 6   BY MR. STEKLOFF:

 7      Q.    Well, let's start with preparation for

 8   the deposition.

 9      A.    Specifically in preparation for the

10   deposition, no.  No, I think the one thing maybe

11   I did look at was the HAS-BLED score.  I looked

12   at that again just because I was curious about

13   it.  I would say that's about it, though.

14      Q.    Prior to October 14th, did you review

15   additional literature that you may have not put

16   on this because you are not relying on it or

17   considering it specifically for your opinions,

18   but is there anything else that you recall

19   reviewing?

20      A.    So you're asking me if prior to

21   October 14th I reviewed any other literature --

22           MR. GOZA:  Ever?

23      A.    -- ever?

24   BY MR. STEKLOFF:

25      Q.    No, not in -- we'll come back to your
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   medical practice, but anything that you reviewed

2   specifically to prepare your opinions or your

3   report in this matter that you reviewed but

4   didn't include on this document, Appendix A?

5        A.    So there were other studies that I

6   reviewed that are not -- that I didn't really

7   think I relied upon in order to formulate my

8   opinion.  Well, I mean, there are other things

9   that I reviewed that didn't really affect my

10  opinion very much.

11       Q.    And sitting here today, is there

12  anything that -- you know, this is my

13  opportunity to make sure that you're not going

14  to come in and say -- just so you understand,

15  I'm not trying to play any tricks, you're not

16  going to come into court and say, well, also,

17  this study is really important and it was a

18  major part of why I formed my opinions, or it

19  was a part of why I formed my opinions.  So I'm

20  just trying to understand, I'm not trying to do

21  a memory quiz or ask --

22       A.    Yeah.

23       Q.    -- every study you've ever read, but

24  make sure this is a comprehensive list of the

25  studies that you believe support and underlie

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    your opinions, and that there aren't any other

2    studies that do that, that are significant or

3    contribute significantly to your opinions.

4        A.    For this matter, for my opinion in

5    this matter, this is a reasonable -- this is a

6    list of the relevant literature.

7        Q.    And now moving away from Appendix A,

8    and obviously we're going to talk about your

9    opinions in your report, but are all of the

10   opinions that you intend to offer in

11   Mr. Boudreaux's case contained in the three

12   pages of your report?

13             MR. GOZA:  I'll just object to the

14   form.

15       A.    Restate your question again so I can

16   make sure I understand.

17   BY MR. STEKLOFF:

18       Q.    Sure.

19             Are all of the opinions that you

20   intend to offer in Mr. Boudreaux's case

21   contained in the three pages of your report?

22             MR. GOZA:  Same objection.  Form.

23       A.    That's kind of an impossible question

24   to answer.  I mean, you do your best to put

25   everything into three pages.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   BY MR. STEKLOFF:

2       Q.    Sitting here today, do you have any

3   other opinions relevant to Mr. Boudreaux's care

4   or treatment that weren't put in -- that aren't

5   included in your report?

6             MR. GOZA:  Same objection as to form.

7       A.    This report is an adequate explanation

8   of my opinion of Mr. Boudreaux and what

9   transpired.

10            (Whereupon, Winstead Exhibit Number 2,

11            Responses and Objections to

12            Defendants' Notice with Subpoena Duces

13            Tecum of Oral Videotaped Deposition,

14            was marked for identification.)

15  BY MR. STEKLOFF:

16      Q.    I'm just going to mark, I don't have

17  extra copies for Exhibit 2, just for the record,

18  a document called Responses and Objections to

19  Defendants' Notice with Subpoena Duces Tecum of

20  Oral Videotaped Deposition of Nathaniel S.

21  Winstead, MD (handing).

22            Dr. Winstead, have you seen either

23  this document or the notice that was -- that led

24  to this document before?

25      A.    I saw the notice.  I don't believe

1    I've seen this document before.

2        Q.    And I do not want to go through topic

3    by topic the notice.  But in general, have

4    you -- understanding that your counsel has made

5    some objections to our requests, have you

6    undertaken an effort to provide your counsel

7    with everything that was subject to the notice,

8    in terms of materials you reviewed or created in

9    drafting --

10       A.    Yes.

11       Q.    -- your report?

12       A.    Yes.

13       Q.    There's no other notes or documents

14   that you created or, really, anything else that

15   hasn't been provided at least to your counsel?

16       A.    No.

17       Q.    So if we --

18            MR. GOZA:  The only objection I have

19   to the form is we're not his counsel.

20            MR. STEKLOFF:  That's fair.  To

21   Plaintiffs' counsel.

22   BY MR. STEKLOFF:

23       Q.    So if you can turn back to Exhibit 1,

24   which is your report, I want to ask some

25   questions about your background.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.      Sure.

2      Q.      First of all, how do you pronounce

3  your business, so I don't -- just the first

4  word.

5      A.      The name of the town is Houma.

6      Q.      Okay.  And when did you open Houma

7  Digestive Health Specialists, LLC?

8      A.      Three years ago.

9      Q.      And how many doctors are employed at

10 Houma?

11     A.      It's myself and a physician assistant.

12     Q.      And on a general level, can you

13 describe your practice?

14     A.      It's a busy general gastroenterology

15 and hepatology practice.

16     Q.      Do you prescribe anticoagulants?

17     A.      No.

18     Q.      Have you ever prescribed

19 anticoagulants?

20     A.      When I was in training and practicing

21 general medicine.  That was before any of these

22 drugs came along, and all we had was warfarin.

23     Q.      When you were prescribing warfarin in

24 your training, what, if any, challenges did you

25 find in treating patients who were being

1    prescribed warfarin?

2              MR. GOZA:  I'm just going to object to

3    the vague nature of the question.

4        A.    You know, that's a long time ago.

5    It's been -- it's been 12 years since I

6    practiced general internal medicine.  I would

7    say just the usual issues of treating any

8    condition; compliance, adherence.  That's about

9    it.

10   BY MR. STEKLOFF:

11       Q.    With respect to warfarin, what were

12   the issues that you confronted with compliance?

13             MR. GOZA:  Same objection.  Goes to

14   form and speculation.  No foundation.

15             Go ahead.

16       A.    Just people not taking their

17   medication.

18   BY MR. STEKLOFF:

19       Q.    And when you use the word "adherence,"

20   is that the same thing, or something different?

21       A.    Correct.

22       Q.    Did you have any concerns at the time

23   that you were prescribing warfarin about keeping

24   your patients within the therapeutic range of

25   warfarin?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.    We always have these concerns.  You

2    know, in the system that I worked in, mostly

3    that was handled by a pharmacology clinic.  But

4    again, we're talking about something that was a

5    long time ago.

6    Q.    Were you still a student or a resident

7    or a fellow when this was happening?

8    A.    No, I was a resident.

9          As a, you know, board certified

10   licensing physician since completing internal --

11   since basically passing my internal medicine

12   board -- well, actually, since graduating

13   fellowship and finishing -- I mean, graduating

14   residency and being chief resident, I'm not sure

15   that I wrote a -- I haven't written an

16   anticoagulant prescription in, like, 13 years.

17   Q.    Do you have patients who come to see

18   you, in the absence of a bleed, who are taking

19   anticoagulants?

20   A.    Yes, all the time.

21   Q.    I assume all of the anticoagulants?

22   A.    Correct.

23   Q.    Do you have discussions with them

24   about maintaining a blood concentration within

25   the therapeutic range?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.    No.  That's well outside of my area of

2   expertise and practice.

3      Q.    And that's been true ever since you

4   completed your residency?

5      A.    Yes.

6      Q.    In terms of bleeds in your practice at

7   Houma Digestive Health Specialists, are you

8   focused on gastrointestinal bleeds?

9      A.    Correct.

10      Q.    Are there other types of bleeds that

11   you treat beyond gastrointestinal bleeds?

12      A.    No.

13      Q.    And what percentage of your practice

14   relates to, this can be very approximate, bleeds

15   as -- gastrointestinal bleeds as opposed to

16   other gastrointestinal issues?

17      A.    Oh, boy.  Acute bleeding or chronic

18   bleeding?

19      Q.    Let's start with acute.

20      A.    Acute bleeding is probably 5 to

21   10 percent of -- you know, 5 percent of my

22   aggregate professional time, boots on the

23   ground.

24          Chronic bleeding is probably, it could

25   probably be more, 5 to 10 percent.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    And can you just very -- on a very

2    high level describe to the jury the difference

3    between acute bleeding and chronic bleeding?

4    A.    Acute bleeding is, you know, if you

5    come into the emergency room with a low blood

6    pressure, passing blood in your stool, or

7    vomiting blood.

8          Chronic bleeding is patients who are,

9    you know, chronically off and on experiencing

10   some overt bleeding, or sometimes patients who

11   are chronically anemic with low red cell indexes

12   and abnormal -- abnormally low iron stores who

13   are losing blood chronically in their GI tract.

14   Q.    Prior to opening Houma Digestive

15   Health Specialists, when you were working at

16   Ochsner Health System, was your practice

17   similar?

18   A.    Very similar, yes.

19   Q.    And I see that you're also principal

20   of something called ClinRes, LLC?

21   A.    Yes.  We perform clinical research

22   studies, primarily drugs and devices.

23   Q.    And in that work, do you -- are the

24   clinicals trials always sponsored by

25   pharmaceutical or device companies?

1     A.     Yes.

2     Q.     Have you done any trials on behalf of

3  Bayer before?

4     A.     Not Bayer, no.

5     Q.     Have you done any trials on behalf of

6  Janssen?

7     A.     I'm trying to think what Janssen

8  makes.  I'm not being evasive.

9          The problem, there have been so many

10  mergers and acquisitions that I can't keep it

11  all straight in my head anymore.  I don't think

12  I've ever done anything for Janssen, no.

13     Q.     Have you done any clinical trials

14  associated with anticoagulants?

15     A.     No.

16     Q.     Have you done any clinical trials

17  associated with the treatment of atrial

18  fibrillation?

19     A.     No.

20     Q.     Have you done any clinical trials that

21  you would describe as relevant to the opinions

22  you're offering here today?

23     A.     No.

24     Q.     What percentage of your work is

25  clinical care of patients versus being an

1    investigator in clinical trials or something

2    else?

3         A.    That's in the midst of transitioning.

4    I mean, right now clinical trials probably

5    comprises 2 percent of my work.  But that's, in

6    the last three months, that's beginning to

7    change and evolve and that amount is picking up.

8    I'm anticipating it's going to be more like 5 or

9    10 percent next year.

10        Q.    Is that because of a specific trial?

11        A.    It's because we've brought in four to

12   five research trials.  And I'm in the midst of

13   hiring some support staff.

14        Q.    Is ClinRes a company or a business

15   that's owned by you?

16        A.    So I have two partners.  ClinRes has

17   actually wrapped up operations.  And so my --

18   the research studies now, we had some

19   contracting issues, and this is lawyer stuff

20   that I don't really understand.  PhRMA wants to

21   contract directly with practices rather than a

22   third party.  So we've kind of wrapped up

23   ClinRes, but I had two partners who were both

24   research coordinators.

25             But in the two or three months since I

1    prepared this report, or I think my CV was

2    prepared earlier than that, we've kind of

3    wrapped up ClinRes operations, and those

4    operations have folded back into my clinical

5    practice because of lawyer issues, contracts.

6        Q.    Those lawyers.

7        A.    Those lawyers.

8             MS. HOFFMANN:  Doctor, could I ask you

9    just to keep your voice up just a little?

10            THE WITNESS:  I am sorry.

11            MS. HOFFMANN:  Don't be sorry.  I'm a

12   older and a little, probably, harder of hearing.

13   Mr. Goza is smiling at that.

14            Thank you.

15            MR. GOZA:  Only because I can relate.

16   BY MR. STEKLOFF:

17       Q.    And so now any clinical trial work

18   that you'll be participating in will come

19   through Houma Medical -- sorry, Digestive Health

20   Specialists?

21       A.    Yes.

22       Q.    And will you have employees that are

23   specifically focused on that clinical trial

24   work, or just your team?

25       A.    Yes.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Okay.  And so you're adding employees?

2      A.    I'm adding one.  I'm working on a

3  contract.  Lawyers.

4      Q.    A doctor or someone else?

5      A.    She's a research coordinator

6  basically.  She coordinates the studies and

7  helps with logistics and execution.

8      Q.    And so beyond the approximately 5 to

9  10 percent of work that may become clinical

10  trial work, is the other -- is the remaining 90

11  to 95 percent --

12      A.    95 percent is clinical work, yes.

13      Q.    Do you still have any academic or

14  professorial responsibilities?

15      A.    So I'm what is -- what's the title?

16  I'm an associate professor, or a clinical

17  assistant professor at Tulane, is the official

18  title.  I have, off and on, done teaching and

19  lecturing for them.  I haven't done any in maybe

20  18 or 20 months.  I just -- if they invite me to

21  come do something, I'm usually happy to come

22  lecture.  And it's usually to residents in

23  training.

24      Q.    And is it usually a sort of one-day

25  ad hoc lecture?

1     A.     Yeah, it's usually a one-hour ad hoc.

2   I have a few things in the can that I usually

3   like to talk about.

4     Q.     I won't ask you to describe everything

5   in the can, but do any of your presentations

6   relate to the opinions that you're offering

7   here?

8     A.     No.  No, I mean, I think the ones that

9   I -- I have some odd little special niche

10   interests because of my mentor in fellowship.

11   And so I have a lovely talk that I give on

12   chronic vomiting.  And if you all want to stick

13   around afterwards I can bust out a PowerPoint.

14          So I tend to give sort of niche talks

15   on stuff that's not really lectured upon very

16   frequently.  The basic stuff, you know, is

17   usually handled by their regular full-time

18   faculty.

19     Q.     Nothing on NOACs?

20     A.     Nothing on NOACs.  Really nothing on

21   bleeding in general.

22     Q.     And nothing on the cause of

23   gastrointestinal bleeds?

24     A.     I don't believe I've done one of those

25   in quite some time.  It would have been back in

1    fellowship that maybe I did an off-the-cuff

2    thing for trainees.  I haven't done a standard

3    straight-up gastrointestinal bleeding talk in a

4    long time.

5        Q.    And when you, in your clinical

6    practice, have someone with a gastrointestinal

7    bleed, we'll talk about the process you go

8    through, is it fair to say that you're really

9    trying to find the source of the bleed as

10   opposed to the cause of the bleed?

11       A.    I think that --

12             MR. GOZA:  Object to form.

13             To the extent you understand.

14       A.    I think that you're asking the same

15   question twice.  Source of the bleed versus

16   cause of the bleed, if there's -- you have to

17   look at both.  I mean, you want to think about

18   cause and source and fix whatever you're able

19   to.

20   BY MR. STEKLOFF:

21       Q.    In your clinical practice, if you have

22   a patient who is taking an anticoagulant, do you

23   try to determine whether the anticoagulant is

24   the cause of the bleed?

25       A.    So in my scope of practice, if I have

1    a patient bleed on an anticoagulant, do I

2    decide -- do I make a determination as to

3    whether the anticoagulant is the cause of the

4    bleed?

5             So any patient who is anticoagulated

6    is going to have a higher risk of bleeding, and

7    the question becomes risk/benefit to that

8    individual patient.

9    Q.    Well, let me break that down a little

10   bit.

11            Any patient who is on an anticoagulant

12   has a higher risk of bleed, is that right?

13   A.    Than somebody walking around on the

14   street on no medication.

15   Q.    And that's true no matter which

16   anticoagulant the patient is taking?

17   A.    Some anticoagulants more likely than

18   others.

19   Q.    But to answer my question, there's a

20   higher risk of bleed for someone who is on any

21   anticoagulant compared to someone walking on the

22   street who is not on an anticoagulant?

23   A.    On no medications, yes.

24   Q.    And you testified that any patient who

25   is anticoagulant is going to have a higher risk

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    of bleeding, and the question becomes

2    risk/benefit to that individual patient, right?

3        A.    Correct.

4        Q.    And when you say "risk/benefit,"

5    that's a question of whether the person should

6    continue to be on an anticoagulant, correct?

7        A.    Or the particular anticoagulant that

8    they're on.

9        Q.    Okay.  So you may -- so a doctor, not

10   you because you wouldn't prescribe it, but could

11   recommend that they switch anticoagulants?

12       A.    Correct.

13       Q.    But to go back to my question, isn't

14   it fair to say that in your practice you

15   don't -- when you have someone who has a bleed,

16   you're focused on their treatment going forward,

17   and you are not trying to determine whether the

18   anticoagulant itself caused the bleed, is that

19   fair?

20            MR. GOZA:  The only objection I would

21   make is it's ambiguous.  You're trying to

22   separate two things that can't be.

23       A.    Yeah, I mean, I think that all that is

24   part of the continuing caring for the patient.

25   It's not two separate activities really.

1    BY MR. STEKLOFF:

2        Q.    In your practice, if someone is taking

3    an anticoagulant and they have a

4    gastrointestinal bleed, do you undergo a process

5    to determine whether the anticoagulant caused

6    the bleed?

7        A.    It's -- I guess I'm not trying to be

8    evasive.  Do I undertake a process.  I mean,

9    frankly that's not really a yes or a no question

10   either.  Each case is different.  I would say --

11   I would again reiterate that any patient who is

12   on an anticoagulant has a higher risk of

13   bleeding than someone walking around in general,

14   and there needs to be a careful consideration of

15   risks and benefits going forward.  So is it my

16   clinical practice to say, you bled because of X?

17   The problem in medicine is that it's very rare

18   that you can say that's definitively X.

19              And so I would just go back and say

20   again that anybody who is on any anticoagulant

21   is more likely to bleed.  It's very rare that

22   you can narrow something down to one thing and

23   say, you know, Mr. Smith, you bled because you

24   were on drug X, except in situations where, you

25   know, there's nothing else that you can find

1  when you look at someone's gastrointestinal

2  tract, they don't have any kind of lesion or

3  irritation or evidence of bleeding anywhere.

4          So, you know, in specific cases where

5  you have no other underlying identifiable

6  pathology after you do a comprehensive

7  evaluation of a patient, if they're on a drug

8  and they bled, you would -- I guess you would

9  say at that point that you need to consider if

10  the drug played a significant role in that

11  bleeding, and then weigh the risks and the

12  benefits for that particular patient going

13  forward.

14      Q.   So again to break that down a little

15  bit, is it fair to say in your clinical practice

16  you do not try to determine that a patient bled

17  because of a specific drug that he or she was

18  taking?

19          MR. GOZA:  Well, I'll object.  That

20  misstates what he just said.

21  BY MR. STEKLOFF:

22      Q.   I'm not -- just I'm not asking you to

23  restate, I'm not stating or restating --

24          MR. GOZA:  But you are -- well, but

25  you have, and you've misstated what he just

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    said.

2             MR. STEKLOFF:  I'll ask the question

3    again.

4             MR. GOZA:  Okay.

5    BY MR. STEKLOFF:

6        Q.    Regardless of what you've said already

7    or what you're going to say now, so I'm going to

8    ask a clean question and you can answer it.

9        A.    Okay.

10       Q.    Is it fair to say that in your

11   clinical practice you don't try to determine in

12   an individual patient that a specific drug

13   caused his or her gastrointestinal bleed?

14            MR. GOZA:  And my objection still

15   stands.

16       A.    So if you look at a patient and

17   they've bled and they were on some kind of

18   anticoagulant and you do a comprehensive

19   gastrointestinal tract workup, and you have no

20   other underlying reason, in that case I would

21   make a determination that the patient likely

22   bled because of drug, of the anticoagulant.

23   Okay?  In other cases, it may be more nuanced

24   than that.  And again, you have to raise the

25   risks, benefits, alternatives.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    BY MR. STEKLOFF:

2        Q.    Do you agree that even in the case

3    where you can't identify an underlying reason

4    during your gastrointestinal tract workup that

5    there has to be an underlying pathology before

6    there can be a bleed even if the person is

7    taking an anticoagulant?

8        A.    I wouldn't agree with that statement.

9        Q.    Why not?

10       A.    Because what you frequently see is

11   patients who in my professional opinion are

12   anticoagulated who will just kind of ooze

13   profusely throughout the GI tract because of the

14   way -- the anatomical structure of the GI tract.

15       Q.    And so in those cases are you saying

16   that the anticoagulant initiated the bleed?

17       A.    Correct.

18       Q.    And what is the mechanism of action

19   through which an anticoagulant can initiate a

20   gastrointestinal bleed?

21       A.    So there's -- there are a number that

22   have been proposed, and there's a number that

23   have been proposed specifically with the NOACs,

24   but one case would be systemic toxicity of the

25   drug, so drug levels which are too high.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          Another would be direct topical

2    effects of the medication, so in other words

3    biologically active non-absorbed drug within the

4    GI tract.

5          A third would be direct mucosal

6    toxicity of the drug, or substrates or additives

7    to the capsule or tablet or whatever form the

8    medication is in.

9          I think that would be a reasonable

10   list.

11     Q.   Do you believe that there's a

12   scientific consensus about any of those

13   theories?

14     A.   So a scientific consensus in general

15   about one of those proposed theories, I think

16   that they've all -- I think that they're all

17   extremely difficult -- well, let me back up.

18          I think on a case-by-case basis you

19   can possibly sometimes make a determination that

20   one of those is more likely than others.  I

21   think for different medications some of those

22   proposed mechanisms seem more likely than

23   others.

24          But you're asking for a general

25   statement about a general scientific consensus

1   across a range of medications.  That's an

2   impossible question to answer.

3        Q.    Let me clarify a little bit.

4            Do you agree that all three of those

5   proposed mechanisms apply to all anticoagulants?

6        A.    No.

7        Q.    Do they apply to all NOACs?

8        A.    Apply to all NOACs.  No, they do not

9   apply to all NOACs because I think -- I feel

10  like direct topical action of the NOACs is

11  important, and I feel like nobody has

12  demonstrated that any of the NOACs cause direct

13  mucosal toxicity like you would see with an

14  NSAID, for instance.  Nobody has described an

15  ulcer risk associated with the NOACs.

16       Q.    So I may be confused.  Of the three

17  theories that you laid out, I'll walk through

18  them, which ones apply to Xarelto?

19       A.    I think that the direct topical action

20  is most important for Xarelto, because there's a

21  large amount of drug excreted in the stool.  I

22  think also the systemic toxicity is important.

23  So I think in this particular case of

24  rivaroxaban, those are the two most important

25  factors.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    And do those two possible proposed

2  mechanisms of action apply to the other NOACs?

3    A.    My goal in preparing for this

4  deposition was not to exhaustively review the

5  data on other NOACs.  I think that the direct

6  topical action is probably more important for

7  rivaroxaban because a large amount of it is

8  excreted in the stool.

9    Q.    And what studies or other support are

10  you relying on in offering that opinion?

11    A.    I believe that information is in the

12  package insert.

13    Q.    And so just to be clear, you believe

14  that Xarelto can initiate a bleed in the absence

15  of any pre-existing or underlying pathology?

16    A.    Correct.

17    Q.    Do you have any opinion on whether

18  other NOACs beyond Xarelto can also initiate a

19  bleed in the absence of pre-existing pathology?

20        MR. GOZA:  Object to form.

21    A.    Well, I mean again, you know, any

22  patient can become toxic on any drug, and so the

23  concerns about systemic effects of the drug are

24  there, I think, for any anticoagulant, including

25  all the other NOACs.

1    BY MR. STEKLOFF:

2        Q.    And including Warfarin?

3        A.    Yes.

4        Q.    But in terms of direct mucosal

5    toxicity, does that theory apply to any -- do

6    you have an opinion on whether that applies to

7    any other anticoagulants?

8        A.    So let's clarify.  When I said

9    "mucosal toxicity," I was referring to mucosal

10   damage caused by the active compound or

11   something in the capsule or tablet.  There's the

12   risk of topical exposure to active drug, I

13   think, is more of a concern with rivaroxaban

14   than any other anticoagulant.

15       Q.    And what are you relying on to offer

16   that opinion beyond -- forget beyond.  Let me

17   ask again.

18            What are you relying on to offer that

19   opinion?

20       A.    That's been proposed as a potential

21   mechanism of action, and the package insert has

22   information about unchanged metabolites being

23   excreted in the stool.

24       Q.    Where has it been proposed?

25       A.    I can't tell you exactly where I came

1    across that.  I would have to check.  I think I

2    have -- it may be in one of the -- I'm trying to

3    remember exactly where I saw that.  I believe

4    it's in one of the articles referenced in my

5    opinion, but I would have to double check.

6        Q.    You believe that there's been a

7    peer-reviewed article in a scientific journal

8    that offers that potential mechanism of action?

9        A.    Yes.

10       Q.    And it's fine if the answer is no, but

11   you believe it's one of the articles that's

12   listed in Appendix A?

13       A.    Again, there's, you know, there's hard

14   science, prospective randomized controlled

15   trials, and then there's people trying to

16   hypothesize why things happen.  Do you follow

17   what I'm saying?

18       Q.    Absolutely.

19       A.    And I think that this falls under the

20   category of hypothesis, why people think things

21   happen.

22       Q.    But you're a very experienced doctor,

23   so I want to know what you think happens.

24             And so just going back, do you believe

25   that Xarelto causes bleeds in the absence of any

1    pre-existing pathology?

2        A.    Yes.

3        Q.    Do you believe that happened in

4    Mr. Boudreaux's case?

5        A.    Yes.

6        Q.    To a reasonable degree of scientific

7    certainty?

8        A.    To a reasonable degree of scientific

9    certainty.

10       Q.    And in Mr. Boudreaux's case, what is

11   the mechanism of action -- what is the theory of

12   mechanism of action that you believe, to a

13   reasonable degree of scientific certainty,

14   applies?

15       A.    Well, I think, again, either systemic

16   effects of Xarelto, so being on too high of a

17   dose or, you know, being a slow metabolizer of

18   the drug; so systemic effects, the presence of

19   the drug to begin with.  I should back up.  Or

20   possibly again, you know, direct topical

21   exposure of active drug to his GI tract, topical

22   exposure.

23       Q.    And is there any minimum amount of

24   Xarelto, in terms of number of Xarelto tablets

25   or length of time someone took Xarelto, for

1    there to be systematic effects that could lead

2    to a bleed?

3              MR. GOZA:  Object to form.

4        A.    No.

5    BY MR. STEKLOFF:

6        Q.    Could one tablet do it?

7        A.    That's beyond my area of expertise,

8    really.  I mean, I would assume, I would assume

9    it could.  But we're -- at this point we're

10   spitballing.

11             MS. HOFFMANN:  I'm sorry, what was

12   that?

13             THE WITNESS:  I said at this point

14   we're spitballing, you know, throwing spit

15   against the wall to see if it would stick.

16             You know, I couldn't tell you that.

17   That's a question for a pharmacologist, if one

18   tablet could increase your risk for bleeding.

19   BY MR. STEKLOFF:

20       Q.    Do you think there's any -- can you

21   point to any number of tablets that you think

22   could increase your risk of bleeding, that could

23   cause a bleed without pre-existing pathology?

24             MR. GOZA:  Same objection.  Form.

25       A.    Again, I -- it's a question -- that's

1   a question that steady state of drug, ingestion,

2   absorption.

3   BY MR. STEKLOFF:

4       Q.    Did you bring the articles, the four

5   articles that you cited with you?

6       A.    No, I don't have physical copies of

7   those with me.  No.

8       Q.    If on a break I'll mark them and

9   provide them to you, will you review them and

10  then point to me in which article this proposed

11  mechanism of action has been --

12      A.    Sure.

13      Q.    -- hypothesized?

14      A.    Certainly.

15      Q.    So is it fair to say you do not think

16  that Mr. Boudreaux had any pre-existing

17  pathology related to his gastrointestinal bleed

18  before he began taking Xarelto?

19      A.    Correct.  I don't think he had any

20  kind of pre-existing gastrointestinal tract

21  pathology.

22      Q.    Now, do you treat patients who

23  experience GI bleeds who take warfarin?

24      A.    Yes.

25      Q.    Have you ever had a patient who took

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    warfarin who -- where you were unable to

2    identify the source of the bleed --

3        A.    Yes.

4        Q.    -- through endoscopy and other means?

5        A.    Yes.

6        Q.    And in those cases, did you make a

7    determination that warfarin was the most likely

8    cause of the bleed?

9        A.    Yes.

10       Q.    And so can warfarin, in those cases,

11   cause the bleed without a pre-existing

12   pathology?

13       A.    Yes.

14       Q.    Did you make that determination in

15   those cases?

16       A.    Yes.

17       Q.    Without going through every NOAC, if I

18   asked you the same questions related to NOACs

19   other than Xarelto, would your answers be yes?

20       A.    I would answer the same to those exact

21   questions regarding other drugs, yes.

22       Q.    So you have treated patients who have

23   experienced GI bleeds taking NOACs?

24       A.    Correct.

25       Q.    And in some of those cases, you have

1   been unable to identify a source of the bleed?

2       A.    Correct.

3       Q.    And in those cases where you've been

4   unable to identify the source of the bleed, you

5   have determined that more likely than not the

6   non-Xarelto NOAC was the cause of the bleed?

7       A.    Yes.

8       Q.    And so it's fair to say that all

9   anticoagulants have a risk of causing a GI

10  bleed, correct?

11      A.    Correct.

12      Q.    And that all anticoagulants can cause

13  a GI bleed -- can -- strike that.

14            All anticoagulants can initiate a GI

15  bleed in the absence of underlying pathology?

16      A.    Yes.

17      Q.    And you also agree that all of the

18  labels of anticoagulants make clear that there's

19  a risk of bleeding?

20            MR. GOZA:  I'll just object as to

21  outside his expertise.

22      A.    Yeah, I haven't reviewed the package

23  insert for Pradaxa or Eliquis or -- you know, I

24  couldn't tell you exactly what those say.

25  BY MR. STEKLOFF:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    That's fair enough.

2          And is it fair to say you've only

3    reviewed the Coumadin or warfarin label probably

4    when you were back in medical school?

5    A.    It's been some time since I looked at

6    it.  I think I may have glanced at it for this

7    for review at some point.

8    Q.    Do you agree that the Xarelto label --

9    first of all, you did review some iterations of

10   the Xarelto label?

11   A.    Correct.

12   Q.    Do you agree that the Xarelto label

13   warns doctors of the risk of bleeding?

14   A.    Yes.

15   Q.    Do you agree, having reviewed

16   Dr. Wong's testimony, that he was aware of the

17   risk of bleeding associated with Xarelto prior

18   to prescribing it to Mr. Boudreaux?

19          MR. GOZA:  The only objection I'll

20   make is to the form and ambiguous nature of

21   being aware.

22          But go ahead.

23   A.    It would seem that he was.  Frankly, I

24   don't think like a litigator.  And I reviewed

25   his deposition.  I mean, it does seem that he

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1    does.  It also seemed like he -- he said that he

 2    had been up all night the night before, and his

 3    deposition is a bit hard to follow, so...

 4        Q.    I was not there, but we probably all

 5    agree he seemed tired.

 6        A.    Yes.

 7        Q.    I want to talk to you about risk

 8    factors for suffering a GI bleed --

 9        A.    Okay.

10        Q.    -- while on any anticoagulant.

11        A.    Okay.

12        Q.    You mentioned a HAS-BLED score --

13        A.    Correct.

14        Q.    -- before.

15              Can you describe to the jury what the

16    HAS-BLED score is?

17        A.    It's a risk assessment tool for

18    anticoagulating patients.  It's been studied on

19    patients on warfarin.  It tends to give you a

20    risk of bleeding going forward, if the patient

21    is to be anticoagulated, based upon risk

22    factors; they have a baseline.

23        Q.    Is that some -- you said that you

24    reviewed that prior to your deposition today,

25    correct?
```

```
 1        A.     Correct.

 2        Q.     Is that something that you utilize in

 3   your practice?

 4        A.     No.

 5        Q.     That's because you're not prescribing

 6   anticoagulants?

 7        A.     Not prescribing it, no.  I was unaware

 8   of it until I started doing this.

 9        Q.     Okay.  In general, even before doing

10   this, were you aware that hypertension was a

11   risk factor for bleeding?

12        A.     Well, it's interesting, that's a very

13   interesting medical point.  Because hypertension

14   is not identified as a risk factor independently

15   for gastrointestinal bleeding, but it's a risk

16   in the HAS-BLED score for what they call -- what

17   is the exact term they use, major -- major

18   hemorrhage requiring two or more units of blood

19   transfusion.

20             So, I mean, I'm aware of it.  I find

21   it a little bit interesting.  It's something I

22   want to read more about, because it's not --

23   it's not something we routinely identify.

24             Say a person comes in with an ulcer

25   and bleeding, otherwise healthy person, it's not
```

1    something we routinely use.  I don't advocate

2    for better hypertension management in my

3    patients with ulcers.  So it's interesting.

4        Q.    Interesting in the sense that you want

5    to understand it more to see if you should be

6    utilizing it more in your practice?

7        A.    Yeah, but I don't -- yeah.

8              MR. GOZA:  Object to the form.

9        A.    I think it's unrelated -- it's

10    unrelated to all this.

11   BY MR. STEKLOFF:

12        Q.    Do you agree that Mr. Boudreaux had

13    hypertension prior to being prescribed an

14    anticoagulant?

15             MR. GOZA:  Objection.

16        A.    I believe he did.  But I think in the

17    HAS-BLED score they -- it's not just having

18    hypertension, it's uncontrolled hypertension

19    with systolic blood pressures greater than 160.

20    So there's that.

21             Did he have hypertension?  Yes.  But I

22    don't think he meets their definition of

23    uncontrolled hypertension.

24   BY MR. STEKLOFF:

25        Q.    So do you believe that hypertension

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  was a risk factor for bleeding for Mr. Boudreaux

2  prior to being prescribed --

3      A.    If you believe the HAS-BLED scoring

4  and apply it appropriately, he would not get a

5  point for hypertension.

6      Q.    And apart from the HAS-BLED score, I'm

7  just asking what you believe, do you believe

8  that hypertension was a risk factor for bleeding

9  for Mr. Boudreaux prior to being prescribed

10  Xarelto?

11          MR. GOZA:  Just so we're clear, you

12  mean gastrointestinal bleeding?

13          MR. STEKLOFF:  Yes.

14      A.    It's -- so, again, hypertension has

15  not been identified as an independent risk

16  factor for gastrointestinal bleeding.  And,

17  again, just to reiterate, the HAS-BLED score

18  doesn't -- isn't specific for gastrointestinal

19  bleeding, it's major bleeding.

20          So no, I believe, is the answer that I

21  would give.

22  BY MR. STEKLOFF:

23      Q.    So you -- and gastrointestinal

24  bleeding can be -- is a subcomponent of major

25  bleeding, right?  Or can be a subcomponent?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.    Yes, can be.

2      Q.    Do you -- I'm not trying to repeat the

3   question.  I'm just trying to --

4      A.    That's fine.

5      Q.    Since there are some -- you know, lots

6   of words being used here.

7            Do you think that Mr. Boudreaux's

8   hypertension put him at a greater risk of a

9   gastrointestinal bleed prior to his prescription

10  for Xarelto?

11     A.    No.

12     Q.    What about age, is that -- can that

13  be, or is that a risk factor for a -- start with

14  a major bleed?

15     A.    Yes.

16     Q.    Is that something, before reviewing

17  the HAS-BLED score, that you were aware of?

18     A.    Yes.

19     Q.    Is that something that you believe is

20  a risk factor for a major bleed?

21     A.    A major bleed in general?

22     Q.    Yes.

23     A.    I believe it is, yes.

24     Q.    And is age also a risk factor for a

25  gastrointestinal bleed?

1      A.      Some studies, yes.  I mean, I would

2    say in my clinical practice I believe yes, age

3    is a relative risk factor.

4      Q.      Is there a specific age that you

5    believe at which you are at a greater risk of

6    suffering from a gastrointestinal bleed?

7             MR. GOZA:  The only objection I make

8    would be that's a very general question.  It

9    might depend on the specifics.

10     A.      I don't have a cutoff, to be honest

11   with you.  If anyone wants to throw a shoe at

12   me, I think you're old when you turn 65.  When

13   you get to 70, I start worrying more.  And most

14   of all, I'm afraid of 80-year-old women, because

15   something always seems to go wrong.

16     Q.      That's perfect.  That's why I asked

17   the question, because you can give me the

18   ranges.

19             What about aspirin, does that increase

20   someone's chances of suffering from a

21   gastrointestinal bleed?

22     A.      Yes.

23             MR. GOZA:  Again, just object to the

24   form.  Vague, without more specifics as to what

25   it might result in.

```
 1              MS. HOFFMANN:  At this point, Counsel,

 2   I'm going to ask you to really confine your

 3   objection to just the word "objection" or

 4   "objection to form."

 5              I do think that when you add those

 6   other terms, it could be construed as perhaps

 7   coaching the witness, and I know you don't want

 8   that to be reflected on the record.

 9              MR. GOZA:  Certainly, no, I don't

10   intend to do that.

11              MS. HOFFMANN:  Thank you.

12              MR. GOZA:  I do think I am able to

13   articulate why, the basis for my objection.

14   I've tried to limit it in that way.

15              MS. HOFFMANN:  I think not actually.

16   I think the rules --

17              MR. GOZA:  You and I are going to

18   fight about it.  So we'll just go forward.  If

19   you want to make something specific that you

20   think you need to take up with the court, we can

21   do it.

22              MS. HOFFMANN:  Thank you.

23              MR. GOZA:  Go ahead.  I don't remember

24   if there's a question pending.

25              MR. STEKLOFF:  He answered it,
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   actually, before the -- before the discussion.

2   BY MR. STEKLOFF:

3       Q.    And it's true that all NSAIDs increase

4   someone's chances of suffering from a

5   gastrointestinal bleed, correct?

6       A.    Correct.

7       Q.    As does impaired liver function?

8       A.    So you have to more carefully define

9   impaired liver function if you want an honest

10  answer to that question.

11      Q.    I want honest answers to everything.

12            So how would you define impaired liver

13  function with --

14      A.    Somebody whose, you know,

15  coagulopathic as a consequence of liver disease

16  has signs or symptoms of portal hypertension

17  disease, somebody with markedly abnormal liver

18  function tests, somebody with an ultrasound that

19  shows cirrhosis, I think clearly those patients

20  are at increased risk for portal hypertensive

21  gastrointestinal bleeding.  I think that the

22  best data is using the Child-Pugh score.  I

23  think if you're Child-Pugh C or D your risk is

24  reasonably higher.

25            But, yeah, people with compelling

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    evidence of chronic liver disease, yes.  You

2    know, increasingly we see people with

3    non-alcoholic steatohepatitis who are just

4    walking around with mildly abnormal liver tests.

5    In my heart of hearts, I don't believe those

6    people are at an increased risk for bleeding

7    because they don't have any of the other sort of

8    really strong risk factors for gastrointestinal

9    bleeding, but I'm not sure that that's been

10   looked at in the literature.  So if you just say

11   hepatic impairment or liver disease, you're kind

12   of using a blanket term to identify, you know,

13   specific risk factor.  That's not as easy as the

14   other questions.

15        Q.    What about diabetes, do you believe

16   diabetes is a risk factor for GI bleeds?

17        A.    An independent risk factor for

18   gastrointestinal bleeding, no.

19        Q.    What about major bleeding beyond

20   gastrointestinal bleeding?

21        A.    That's beyond my area of expertise.

22        Q.    What risk factors do you believe that

23   Mr. Boudreaux had for a gastrointestinal bleed

24   prior to being prescribed Xarelto?

25        A.    The only one would be age and his

1    aspirin use.  Those would be the only ones, in

2    my opinion.

3         Q.    You would not consider his

4    hypertension a risk factor?

5         A.    Well, again, he doesn't meet the

6    criteria.  If you look at the HAS-BLED score,

7    you're supposed to be uncontrolled hypertension

8    with systolic blood pressure greater than 160.

9    And so using the HAS-BLED score, I would say no,

10   his hypertension is not a significant risk

11   factor.

12        Q.    And what about, are you aware of any

13   other scores other than HAS-BLED that doctors

14   use to determine whether someone should be on an

15   anticoagulant?

16        A.    I'm aware that there are others.  What

17   the components of those scores are, I'm not

18   sure.  I think the HAS-BLED is probably the best

19   studied of them and has the strongest sort of --

20   you know, they propose these things, and then

21   epidemiologists go through all sorts of

22   machinations to validate them in general

23   populations, particularly things like the

24   HAS-BLED score because they're sort of easy to

25   use and remember and are very useful clinical

1    tools for predictions.  They go through a lot of

2    the mechanisms of validating these things.  And

3    my understanding is, and I'm not an

4    epidemiologist, but the HAS-BLED score is the

5    best validated of these measures.

6            Are there other ones?  There are other

7    ones out there.  I know that there are other

8    ones, but exactly what their components are, I'm

9    not completely clear on.

10    Q.    Are you familiar with the CHADS score?

11    A.    I am familiar with the CHADS score.

12    Q.    Do you know if hypertension is a risk

13    factor under that score?

14    A.    I think it's congestive heart failure,

15    age, diabetes, and stroke, right, so I don't

16    think that includes hypertension.

17    Q.    And do you think that the HAS-BLED

18    score is a more reliable measure than the CHADS

19    score?

20            MR. GOZA:  Object just to the form.

21    Apples and oranges.

22    A.    I think that they're apples and

23    oranges.  They're not even there to do the same

24    thing.

25    BY MR. STEKLOFF:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Okay.

2            MR. GOZA:  We're just a little bit

3    over an hour.  When you get to a --

4            MR. STEKLOFF:  I'm at a good stopping

5    point now if you want to take a break.

6            MR. GOZA:  Maybe take five minutes.

7            MR. STEKLOFF:  Sure.  We can go off

8    the record.

9            THE VIDEOGRAPHER:  The time now is

10   9:58.  We're going off the record.

11           (Whereupon, a recess was taken.)

12           THE VIDEOGRAPHER:  This begins disk

13   two of today's deposition.  Time now is

14   10:18 a.m.  We are back on the record.

15   BY MR. STEKLOFF:

16     Q.    Dr. Winstead, what's your rate for

17   work as an expert in this litigation?

18     A.    $500 an hour.

19     Q.    Is that true no matter what role

20   you're performing?

21     A.    Correct.

22     Q.    So today your rate is $500 an hour?

23     A.    Correct.

24     Q.    And for your review of the medical

25   records and other -- and literature, et cetera,

1   same rate?

2       A.    Correct.

3       Q.    And is your trial rate, if you're

4   called to testify, the same?

5       A.    As far as I know, yes.

6       Q.    Do you know approximately how many

7   hours you've spent thus far on the litigation?

8       A.    About 30.

9       Q.    And without breaking it down, that

10  includes your review of the records, your

11  preparation with counsel, and your drafting of

12  your report?

13      A.    Correct.

14      Q.    I want to come back to the theories

15  you laid out of how Xarelto can cause a bleed in

16  the absence of underlying pathology.

17      A.    Okay.

18      Q.    Before I do that, is it fair to say

19  that even in context in which you cannot

20  identify the underlying pathology through

21  endoscopies or other means, there still could be

22  an underlying pathology of a gastrointestinal

23  bleed?

24      A.    That's always possible, yes.

25      Q.    And that could be true for someone who

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    is taking Xarelto?

2        A.    It could be true of any patient,

3    including patients taking Xarelto.

4        Q.    Now, the three potential mechanisms of

5    action that you described before, you agree that

6    those are theories?

7        A.    Those are proposed mechanisms of

8    action.  I think that systemic toxicity is

9    something that can be directly observed, in the

10   case of something like Coumadin or warfarin.

11   Systemic toxicity can be -- in terms of a lab

12   value or number that you can hang things on.  So

13   I think that that's -- you know, when you have a

14   number, that's not really a theory.

15       Q.    Let me break it down.  So let's put

16   systemic toxicity aside.

17             Do you agree that the direct topical

18   effects and the direct mucosal toxicity

19   mechanisms of actions that you discussed before

20   are hypotheses?

21             MR. GOZA:  Object to form.

22       A.    In the case of which agent?

23   BY MR. STEKLOFF:

24       Q.    Let's start with Xarelto.

25       A.    So in the case of Xarelto, I think

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  that what I said before, and what I would say

2  again, is that direct mucosal injury, in terms

3  of causing ulcerations or damage to the mucosa

4  of the GI tract, that is a theory that has not

5  really been borne out by observation in clinical

6  use.

7              Number two, topical effect of active

8  drugs is a theory that has not been borne out.

9      Q.    And when you say "not borne out," what

10  do you mean with that phrase?

11      A.    Well, I don't think anyone is -- I

12  guess if you wanted -- all right.  So if you

13  wanted to study that, you would have to take

14  stool samples from patients on Xarelto and

15  prospectively determine bleeding risk based upon

16  stool concentrations, if you wanted it to be

17  more of -- more than a theory.

18      Q.    So just -- and I do this just so we're

19  talking about the same thing, can we call theory

20  one system toxicity?

21      A.    Okay.

22      Q.    Can we call theory two direct topical

23  effects?

24      A.    Okay.

25      Q.    And can we call three direct mucosal

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    toxicity?

2        A.    Injury.  I would call it injury, to

3    disambiguate it from number two.

4        Q.    Direct mucosal injury?

5        A.    Yes.

6        Q.    So for theories two and three, you

7    agree those are just hypotheses that --

8        A.    Those are hypotheses, correct.

9              MS. HOFFMANN:  Sir, you have to let

10   him finish his question --

11             THE WITNESS:  Sorry.

12             MS. HOFFMANN:  -- before you begin the

13   answer.

14             THE WITNESS:  My apologies.

15             MS. HOFFMANN:  For not only the court

16   reporter's sake, but for those of us that are

17   just busily trying to take notes.  Thanks.

18             THE WITNESS:  Fair enough.

19   BY MR. STEKLOFF:

20       Q.    And a hypothesis, by its very nature,

21   is something that hasn't been established

22   through the necessary studies, is that fair?

23       A.    Yes.

24       Q.    So for theories two and three, again

25   by their very nature, there's no scientific or

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    medical community consensus that Xarelto can

2    cause a bleed, can initiate a bleed through

3    either of those mechanisms?

4         A.    No.  No, I don't believe that there's

5    a consensus on that.

6         Q.    And you yourself in your clinical

7    practice don't determine that Xarelto has

8    initiated a bleed through either theory two or

9    three, because they're just hypotheses, right?

10        A.    I think that would be a fair

11   statement, yes.

12        Q.    And is it also a fair statement that

13   in Mr. Boudreaux's case you cannot say that

14   Xarelto initiated his bleed through either

15   theory two or three because they're just

16   hypotheses?

17        A.    That's a fair statement.

18        Q.    And just so I understand theory two,

19   the hypotheses, are you saying that it's

20   something on the Xarelto capsule that is causing

21   a bleed?

22        A.    No.  So that's direct topical effect

23   of non-absorbed active chemical, so in other

24   words direct effect in a topical fashion of

25   non-absorbed rivaroxaban.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Now, system toxicity, theory one, you

2    said -- sorry.

3            MR. GOZA:  I'll just object to the

4    categorization of Topic 1 as a theory.  But go

5    ahead.

6    BY MR. STEKLOFF:

7      Q.    Well, that -- okay.  So let's talk

8    about system toxicity.

9      A.    Okay.

10     Q.    That was the first possible

11   explanation for how Xarelto can initiate a bleed

12   in the absence of pre-existing pathology, right?

13     A.    Yes.

14     Q.    And is that a hypothesis with respect

15   to Xarelto?

16     A.    No.

17     Q.    And what is the basis for your opinion

18   that it is established that Xarelto can initiate

19   a bleed in the absence of pre-existing

20   pathology?

21     A.    Because it's an anticoagulant.

22     Q.    And so any anticoagulant, in your

23   opinion, can initiate a bleed in the absence of

24   pre-existing pathology?

25     A.    Correct, especially if there's no way

1    to monitor the systemic levels of that drug.

2        Q.    It is essentially, in layperson's

3    terms, if you thin out a patient's blood too

4    much it can cause -- it can initiate a bleed?

5        A.    Yes.

6        Q.    And that's true of warfarin?

7        A.    Yes.

8        Q.    And that's true of any of the NOACs?

9        A.    Yes.

10       Q.    And is it your opinion that the

11   potential for system toxicity to initiate a

12   bleed in the absence of pre-existing pathology

13   is equal for all anticoagulants?

14       A.    No.  Well-monitored, well-controlled

15   warfarin in a patient like Mr. Boudreaux, the

16   scores would predict that he would -- his risk

17   of bleeding is 1.8 events per 100 person-years.

18   The available data would suggest that for

19   rivaroxaban, or Xarelto, it's about 50 percent

20   greater.

21       Q.    And that's based on the US subgroup

22   data --

23       A.    Yes.

24       Q.    -- that was added to the label in

25   September, 2015?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.      Correct.

2      Q.      Do you believe that there are any

3   limitations to the US subgroup data?

4      A.      No.

5      Q.      You think that the US subgroup data is

6   equally reliable to the overall data from the

7   ROCKET study that was done on rivaroxaban?

8      A.      So now we're getting outside of my

9   area of expertise, because I'm not an

10  epidemiologist.  I have a master's degree in

11  public health, but it's in health economics.

12  That would be a question for an epidemiologist

13  or a biostatistician.

14          I think that the information is

15  important enough that the FDA wanted it put on

16  their label, and the FDA consistently employs

17  the best biostatisticians and epidemiologists

18  that are available.

19     Q.      And you're not an epidemiologist?

20     A.      I'm not an epidemiologist.

21     Q.      You're not a regulatory expert?

22     A.      I am not a regulatory expert.

23     Q.      You have no expertise in active

24  labeling, is that fair?

25     A.      I have no expertise in labeling.  I

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    have friends that graduated from public health

2    with me that went to work for Food and Drug, and

3    I know that they were pretty fricking smart.

4        Q.    Do you have any understanding about

5    the history of the labeling change that occurred

6    in September, 2015 between the manufacturers of

7    NOACs and the FDA?

8        A.    No, that's beyond my scope of

9    expertise.

10       Q.    Do you have any understanding of

11   whether or not it was a class labeling change?

12       A.    I don't even know what a class

13   labeling change is.

14       Q.    So are you offering any opinions about

15   whether -- strike that.

16            Do you have any opinions about the

17   level of system toxicity from Xarelto that can

18   cause, initiate a bleed in the absence of

19   pre-existing pathology?

20       A.    My understanding about that is that

21   there's significant disagreement among experts

22   about -- you mean like monitoring prothrombin

23   times or -- I mean, could you kind of focus your

24   question a little bit more?

25       Q.    Sure.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          How much Xarelto does someone have to

2   have for them to be at increased risk of having

3   a bleed initiated by Xarelto?

4       A.    That's a question again for a

5   pharmacologist.  You know, we went back and

6   forth with this on is one pill enough.  It's a

7   question for a pharmacologist.  I just -- I do

8   know, you know, there's not a reasonable way of

9   monitoring drug levels, and that makes Xarelto

10  problematic as well.

11      Q.    And do you agree that there's no blood

12  monitoring of drug levels for all NOACs?

13          MR. GOZA:  I'll object as outside his

14  area of expertise.

15      A.    Yeah, it's outside my area of

16  expertise.

17  BY MR. STEKLOFF:

18      Q.    Well, let's talk about that, because

19  it seems like it shouldn't be outside of your

20  expertise.

21          I mean, you treat patients who take

22  NOACs, right?

23          MR. GOZA:  I'm sorry.  What was the

24  first part that you said?

25          MR. STEKLOFF:  I said it seems like it

1    shouldn't be outside of your expertise, but I'll

2    strike that.  I'll withdraw that.

3         MR. GOZA:  I know you will.  I'm just

4    trying to understand what --

5       A.   I don't participate in the therapeutic

6    drug monitoring.  I mean, that's the bottom

7    line, so...

8    BY MR. STEKLOFF:

9       Q.   Do you ever --

10      A.   With the exception of Coumadin and

11   checking INRs, and I see people have those labs

12   checked.  Beyond that, that's the extent of what

13   I understand about therapeutic drug monitoring

14   for anticoagulated patients.

15      Q.   Well, you understand that patients

16   taking NOACs, regardless of the NOAC, do not go

17   to clinics to have routine blood monitoring?

18      A.   Yes, I understand that.

19      Q.   And in your practice, do you interact

20   with your patients' cardiologists or other

21   prescribers of NOACs?

22      A.   I interact with a cardiologist, yes.

23      Q.   And do you talk to a cardiologist

24   about, in general, across -- not for every

25   patient, but in general do you talk to the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    prescribing doctors of your patients who are

2    taking NOACs about which NOAC they're on or why

3    they're on a certain NOAC?

4              MR. GOZA:   Object to form.

5        A.    No.

6    BY MR. STEKLOFF:

7        Q.    That's not something that dictates

8    your clinic care of your patients?

9        A.    No.   I mean, you know, the one

10   circumstance where I may get involved in that is

11   patients who have had recurrent gastrointestinal

12   bleeding.   That's rare, though.   That's once a

13   year maybe.   And just -- and that's limited to a

14   general discussion about, hey, what's the safest

15   way, what's the risk/benefit ratio for this

16   patient, that kind of thing.

17       Q.    So given your testimony that you

18   understand that patients taking NOACs don't

19   undergo blood monitoring, do you believe that

20   all NOACs carry a risk of system toxicity that

21   can initiate a bleed?

22       A.    A gastrointestinal bleed?

23       Q.    Yes.

24       A.    So the risks for Xarelto would seem to

25   be higher than the other NOACs.

1    Q.    What's that based on?

2    A.    That's based on the materials

3  referenced, Graham, Lip, Lip, and the Yao study.

4    Q.    But do those studies say that NOACs

5  can initiate a bleed in the absence of

6  pre-existing pathology?

7    A.    Those studies refer to

8  gastrointestinal risk of bleeding as a general

9  condition, and don't narrow down on specific

10  etiologies or lack of etiologies for that

11  bleeding.

12    Q.    We agree.

13        And so I really am trying to come

14  back --

15        MR. GOZA:  Hold on.  I'll just move to

16  strike the commentary, but go ahead.

17        MR. STEKLOFF:  That's fine.  I'll

18  withdraw my commentary.

19        MR. GOZA:  Thank you.

20  BY MR. STEKLOFF:

21    Q.    I'm really now just -- we're going to

22  come to your opinions about different risks

23  between NOACs.

24    A.    Okay.

25    Q.    I really want to focus on this, I

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    won't even call it a theory, this mechanism of

2    action that you have described as system

3    toxicity.

4         A.    Systemic toxicity, yes.

5         Q.    Is system toxicity, given the nature

6    of all anticoagulants, something that can

7    initiate a gastrointestinal bleed in a patient

8    in the absence of pre-existing pathology?

9         A.    So can any patient -- and we're

10   talking about just NOACs, or NOACs and warfarin?

11        Q.    We've talked about warfarin.  I think

12   you said yes.  So now --

13        A.    So strictly talking about NOACs now.

14   And so the question, if I'm understanding you

15   correctly, correct me if I'm wrong, is can a

16   patient with no underlying gastrointestinal

17   tract pathology bleed on any NOAC.  Is that --

18        Q.    I'll clarify.

19        A.    Okay.

20        Q.    Can a patient with no underlying

21   gastrointestinal pathology have a bleed

22   initiated because of a NOAC regardless of the

23   NOAC?

24        A.    Yes.

25        Q.    And so of the three potential

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    mechanisms of action that you described earlier

2    in the deposition, do you agree now that system

3    toxicity is the only one that you believe is

4    established in the scientific literature?

5        A.    For NOACs, or for Xarelto in specific?

6        Q.    Let's start with -- let's start at the

7    top.  All anticoagulants.

8        A.    So all anticoagulants, yes.

9        Q.    And, therefore, all NOACs?

10       A.    Therefore, all NOACs.  And yes, and in

11   the specific case of Xarelto, yes.

12       Q.    And I want to mark all four articles

13   that you cited.  And if you want to take a

14   break, we can take a break, or if you want to

15   look at them here, I would like for you to

16   identify for me where in any of these articles

17   it says that because of system toxicity a NOAC,

18   or Xarelto specifically, can initiate a bleed in

19   the absence of pre-existing pathology.

20            Do you understand the question?

21       A.    Yeah, I think that you're sort of

22   taking the term "systemic toxicity" and having

23   your way with it.

24            You know, if somebody is on a blood

25   thinner and they bleed, I would say that that's

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    a toxic effect of a blood thinner.  So I mean, I

2    would answer your question very generally.

3         MS. HOFFMANN:  I'm going to object and

4    move to strike the first part of the answer as

5    not being responsive.

6         MR. GOZA:  Well, we can debate whether

7    it is.  I believe it is to his general question.

8         So go ahead if you've got another

9    question.

10    A.    I'm just -- I'm only attempting to

11   give you clarity on what my line of thinking is.

12   BY MR. STEKLOFF:

13    Q.    Okay.  I'll follow up.

14         But blood thinners can cause people to

15   have too thin -- to bleed, right?

16    A.    Correct.

17    Q.    You know that that's warned about in

18   every single label for all of these medications?

19    A.    Correct.

20    Q.    And I'm more focused now not on the

21   fact that people can bleed, because you agree

22   everyone understands that, right, in the medical

23   community?

24    A.    Right.

25    Q.    I'm focused on the mechanism of

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    action.

2        A.    Okay.

3        Q.    And it's your testimony that a blood

4    thinner, if it thins out the blood too much, can

5    initiate a bleed without pre-existing pathology,

6    correct?

7        A.    Correct.

8        Q.    And you're saying that that opinion

9    comes from the four -- somewhere in the four

10   articles that you cited, is that right?

11           MR. GOZA:  No.  I'll object.  That

12   misstates his testimony.

13       A.    Yeah, I don't think that's what I

14   said.

15   BY MR. STEKLOFF:

16       Q.    Okay.  So that's fine, too.

17           What is your basis for saying that any

18   blood thinner, any anticoagulant, can initiate a

19   bleed, a gastrointestinal bleed in the absence

20   of pre-existing pathology?

21       A.    Because I've seen it dozens and dozens

22   of times.

23       Q.    In each of those dozens and dozens of

24   times, isn't it possible that you through

25   endoscopy and other means just couldn't identify

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    the pre-existing pathology?

2              MR. GOZA:  Object to form.

3         A.    Your question was in any of them

4    specifically?

5    BY MR. STEKLOFF:

6         Q.    I'm saying in each of them.

7         A.    Well, I mean, you'd have to be --

8    you'd have to be missing a lot of stuff.

9         Q.    Well, do you believe there is a

10   peer-reviewed scientifically -- a peer-reviewed

11   published article in the scientific literature

12   that says an anticoagulant can initiate the

13   bleed in the absence -- a gastrointestinal bleed

14   in the absence of pre-existing pathology?

15        A.    I think there's a body of literature

16   surrounding that question.  That's sort of like

17   textbook stuff.  And there's also this thing

18   that's referred to as obscure gastrointestinal

19   bleeding, and there's a whole body of literature

20   about obscure gastrointestinal bleeding, and

21   that's really beyond the scope of my testimony

22   today.

23        Q.    But obscure gastrointestinal bleeding

24   means that there is a pathology that just can't

25   be identified, right?

1          MR. GOZA:  Object as misstating.

2      A.    No, it's obscure.  It means that

3  you've not been able to identify an etiology.

4  Am I -- I'm not sure if --

5  BY MR. STEKLOFF:

6      Q.    Sure.

7      A.    I'm not sure if I'm answering yes or

8  no to your question.

9      Q.    Me neither.  I'm just going to ask the

10  question again.

11      A.    Okay.

12      Q.    Can you tell me any specific article

13  that says that an anticoagulant can initiate the

14  bleed in the absence of a pre-existing

15  pathology?

16      A.    I can't think of one off the top of my

17  head.

18      Q.    Have you reviewed any of the other

19  expert reports that have been submitted by the

20  Plaintiffs in this litigation?

21      A.    No, no, I have not.

22      Q.    And you already previously testified

23  you have not reviewed any of the depositions

24  that have been taken of other experts that are

25  acting on behalf of the Plaintiffs, is that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    right?

2        A.    Correct.

3        Q.    Including other experts who have

4    offered opinions about Mr. Boudreaux, is that

5    fair?

6        A.    Correct.

7        Q.    If any other expert on behalf of the

8    Plaintiffs said that Xarelto cannot initiate a

9    gastrointestinal bleed in the absence of

10   pre-existing pathology, you would disagree with

11   that opinion, is that right?

12           MR. GOZA:  Two things.  One, I'm just

13   going to object to form.  You can't ask another

14   witness to comment on the testimony of something

15   he hasn't seen, or even testimony of another

16   witness.  So I'm just going to object to that

17   form.

18       A.    I would disagree.  And I would say

19   that in the case of Mr. Boudreaux, he bled, he

20   was on a medication that you had no way to

21   monitor its effects, and no gastrointestinal

22   source was identified.

23           My -- I would posit that he had, you

24   know, oozing from mucosa because of toxic

25   effects of Xarelto.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    BY MR. STEKLOFF:

2        Q.    Is the oozing of mucosa theory three

3    that we talked about before?

4        A.    That would be theory one that we've

5    talked about.

6        Q.    And do you believe that theory one is

7    a hypothesis that needs further testing, or

8    something that's scientifically established?

9              MR. GOZA:  Again, we've already kind

10   of been through theory one.  I'll object to the

11   form, describing it as a theory, which he

12   clearly testified is different.

13             MR. STEKLOFF:  I'm using his terms.

14   BY MR. STEKLOFF:

15       Q.    You understand what I'm saying when I

16   say theory one?

17       A.    I think that -- you know, so I

18   understand what you mean by theory one.

19             So again, you know, what we know from

20   observations of patients on, for instance,

21   poorly controlled warfarin is that if you took a

22   patient -- I'm trying to give you an explanation

23   so that you can understand where I'm coming

24   from.

25             If you took a patient who, for

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    instance, had an INR of 8, and they came into

2    the hospital and they were passing blood, and

3    you immediately took that patient and did an

4    upper endoscopy, what you would see, and what

5    I've seen in the circumstances where I have done

6    that, is diffuse oozing from the upper

7    gastrointestinal tract.

8            So what's happened is the drug has

9    interfered with the body's normal homeostatic

10   ability to make and dissolve clots, and because

11   of that, they're oozing blood from everywhere,

12   essentially.  And that's what I'm getting at.

13       Q.   But you agree that NOACs -- or let's

14   talk specifically Xarelto, acts differently on

15   body than warfarin, right?

16       A.   It has a different mechanism of

17   action, yes.

18       Q.   And so how is it that you're taking

19   what you've seen in patients with warfarin and

20   their INR levels, and then transferring that to

21   Xarelto?

22       A.   Well, because they both interfere with

23   the clotting cascade in the body.  They do have

24   a similar mechanism of action, but the end

25   result of that similar mechanism of action is

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    similar.

2        Q.    Then my next question is, but do you

3    agree that with respect to Xarelto that is a

4    hypothesis?

5            MR. GOZA:  I'll object to form.

6        A.    Yes, I guess I would.

7    BY MR. STEKLOFF:

8        Q.    And so your opinion that Xarelto more

9    likely than not initiated a bleed in

10   Mr. Boudreaux in the absence of pre-existing

11   pathology is based on that hypothesis about the

12   mechanism of action of Xarelto?

13           MR. GOZA:  I'm going to object.  That

14   misstates his prior testimony and his opinions

15   in the case.

16       A.    So the studies that I referred to, in

17   my opinion, risk for gastrointestinal bleeding

18   was increased.

19   BY MR. STEKLOFF:

20       Q.    But risk of a -- an increased risk of

21   gastrointestinal bleeding tells you nothing

22   about the underlying mechanism of action

23   regarding initiation, isn't that right?

24           MR. GOZA:  But -- object to form.

25       A.    You're kind of splitting hairs.  So,

1    you know -- and, again, hypotheses have levels

2    of strength associated with them.

3              So in Mr. Boudreaux's case, you know,

4    we know that he was on Xarelto, we know that his

5    prothrombin time is elevated, he had a bleeding

6    event with no identifiable source, he never bled

7    before Xarelto and he hasn't bled since Xarelto,

8    so I believe with a reasonable degree of medical

9    certainty that Xarelto caused his bleeding.

10             Is that -- is that based upon a

11   hypothesis?  No.  It's based upon my review of

12   3,500 pages of his medical record before,

13   during, and after his bleeding event, my review

14   of the literature surrounding Xarelto.

15        Q.    But there's a -- you understand the

16   difference between exacerbating a pre-existing

17   pathology versus initiation, right?

18        A.    Correct.

19        Q.    And for initiation, there has to be a

20   mechanism of action, right?

21        A.    Correct.

22        Q.    And in the scientific community -- in

23   terms of initiation, before the scientific

24   community will say, yes, X can cause Y, they

25   need to understand the mechanism of action, is

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   that fair?

2           MR. GOZA:  I'll object.  That

3   completely misstates the evidence.  And also, it

4   misstates the practice of pharmacology.

5           MR. STEKLOFF:  I'm asking Dr. Winstead

6   for his opinions.

7           MR. GOZA:  I know you are.  But you're

8   saying -- you're asking it like it's a pre --

9   it's a truth that's beyond doubt.  And, clearly,

10  that's not the case in the practice of the

11  pharmaceutical industry.

12          MR. STEKLOFF:  But he can testify to

13  whatever he thinks about this without you

14  telling him what to say.

15          MR. GOZA:  I'm not saying he can't.

16  I'm not instructing him not to answer.

17          MR. STEKLOFF:  I understand.  You're

18  tell him what to answer.

19          MR. GOZA:  No.  I'm just objecting,

20  because the way you formulated the question

21  basically asked him to assume something that's

22  not true.

23  BY MR. STEKLOFF:

24      Q.   Do you believe it's true that before

25  you can say that something initiates a bleed,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    you need to understand the mechanism of action?

2            MR. GOZA:  Object to form.

3        A.    Well, so, if you -- if you're speaking

4    in absolutes, which it sounds like you are, then

5    yes.

6            If you're speaking within a reasonable

7    degree of medical certainty, my opinion is that

8    with a reasonable degree of medical certainty

9    that Mr. Boudreaux bled because of his Xarelto.

10       Q.    And that the Xarelto initiated the

11   bleed?

12       A.    And that he -- he would -- my opinion

13   is that he would not have bled if he was not on

14   Xarelto.

15       Q.    That's not my question.

16           Did the Xarelto initiate his bleed?

17       A.    I would say yes.

18       Q.    And the mechanism of action that --

19   what is the mechanism of action that you would

20   say occurred to initiate that bleed in

21   Mr. Boudreaux's case?

22       A.    The mechanism of action is the fact

23   that he was on an oral anticoagulant, and he was

24   not -- there was no way to monitor the blood

25   levels of that anticoagulant.  And he bled

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    probably because he oozed from the mucosa of the

2    GI tract, and in his case probably the upper GI

3    tract.

4        Q.    And the portion of your answer where

5    you said "he probably oozed from the mucosa of

6    the GI tract, and in his case probably the upper

7    GI tract," that's a hypothesis?

8             MR. GOZA:  Object to form.  It's his

9    opinion.

10       A.    It's -- it's my opinion to a

11   reasonable degree of medical certainty.

12   BY MR. STEKLOFF:

13       Q.    And can you point me to anything in

14   the scientific literature --

15       A.    That says --

16       Q.    -- that says that if you take Xarelto,

17   it can, in the absence of pre-existing

18   pathology, cause a patient to ooze from the

19   mucosa of the GI tract?

20       A.    So a specific paper?  No, I cannot.

21       Q.    Because it's your hypothesis about how

22   the mechanism of action occurs, is that right?

23            MR. GOZA:  Object.  Object.  He's

24   already told you three times and answered the

25   question three times, saying it's his opinion

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    and what the basis is.

2        A.    My opinion.

3    BY MR. STEKLOFF:

4        Q.    But it's your hypothesis, right?

5             MR. GOZA:  Same objection.  We're not

6    just going to sit here and fight all day, with

7    him saying --

8             MR. STEKLOFF:  No --

9        A.    We can fight about the definition of a

10   hypothesis versus an opinion.  I mean, it's --

11   honestly, I don't think the two are all that

12   dissimilar.

13            But it's my opinion, to a reasonable

14   degree of medical certainty, that he bled

15   because of the Xarelto.  And he had no

16   underlying identifiable mucosal lesions,

17   vascular lesions, cancers, ulcers, anything that

18   could have bled.  He never bled before Xarelto,

19   he hasn't bled since being off of Xarelto.

20   BY MR. STEKLOFF:

21       Q.    And you would disagree with any expert

22   who thinks otherwise, right?

23       A.    Yeah.

24       Q.    We're going to turn away from the

25   mechanism of actions.  Kirk will be happy about

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that.  Although Margaret may come back to it.

2           You agree that stroke is a serious

3    condition, right?

4       A.    Yes.

5       Q.    Your risk of stroke is significantly

6    greater if you have Afib than if you don't have

7    Afib?

8           MR. GOZA:  Objection.  I mean, to the

9    extent you're talking about things outside of

10   generalities, it's outside his area of

11   expertise.

12      A.    Yes, that's correct.

13   BY MR. STEKLOFF:

14      Q.    You agree that all anticoagulants

15   decrease the risk of stroke, correct?

16      A.    I don't know that honestly, because I

17   don't prescribe anticoagulants.

18      Q.    Okay.  You don't try to determine that

19   in your clinical practice?

20      A.    I don't deal with stroke, except, you

21   know, gastrointestinal consequences of stroke.

22      Q.    So in your practice, you're not

23   focused on trying to balance the risk of stroke

24   versus the risk of bleeding for a patient?

25      A.    So the -- again, the only time -- I

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   think we talked about this briefly earlier, the

2   only time I ever really get involved in that is

3   patients who have recurrent bleeding.

4       Q.   When you say "recurrent bleeding," how

5   would you describe that?

6       A.   What I'm talking about in that

7   situation, and this genuinely really comes up

8   only once or twice a year, it's a patient who

9   has been hospitalized on multiple occasions,

10  required multiple blood transfusions, has had

11  multiple endoscopic workups, and probably needs

12  to get off of anticoagulation because the risk,

13  you know, from transfusion-related adverse

14  events or endoscopic-related adverse events in

15  trying to diagnose the bleeding has become so

16  high, that my opinion becomes it's not really --

17  the juice isn't worth the squeeze; in other

18  words, treating the patient with blood thinners

19  is causing so many complications that I start to

20  feel like, you know, if it was my grandmother I

21  wouldn't want them anticoagulated anymore.

22      Q.   And that's true of any -- with respect

23  to any --

24      A.   That's true for any blood thinner if a

25  patient was like that, yeah.

1    Q.    In absence of recurrent bleeding, so

2    just one GI bleed, do you automatically

3    recommend that a patient be taken off of

4    anticoagulants?

5    A.    It would depend on the severity of

6    that bleeding episode.  And I can't give you a

7    hard cutoff by what I mean by severity.

8           I mean, clearly, if somebody is on,

9    you know, an anticoagulant, they come in, they

10   almost die in the emergency room and need ten

11   units of blood, you know, and you would want to

12   think at that point about having the patient be

13   more carefully monitored if they needed to stay

14   on a blood thinner.  But those become difficult

15   situations with risk/benefit.

16   Q.    But just because someone is taking

17   Xarelto, then experiences a gastrointestinal

18   bleed and it doesn't rise to that level, it may

19   be appropriate for that patient to continue

20   taking Xarelto, in your opinion?

21          MR. GOZA:  And the only objection I'm

22   going to make is, again, that's -- he doesn't

23   make that risk/benefit analyses.

24   A.    Yeah, I don't really make those calls.

25   And it would depend upon the specific etiology

1    of the bleeding, if you follow me.

2              So in a patient who had no

3    identifiable source, you would probably want

4    to -- and it was a significant bleed, a

5    clinically significant bleed, you would probably

6    want to change that patient to very closely

7    monitored Coumadin therapy.  That's the extent

8    to which I get involved in those decisions.

9    BY MR. STEKLOFF:

10       Q.    How often are you involved in those

11   types of decisions?

12       A.    That, again, is an uncommon scenario.

13   Maybe a bit more frequent with a patient who has

14   had eight colonoscopies.  But probably two or

15   three times a year.

16       Q.    You largely defer to the

17   cardiologist --

18       A.    Yeah.

19       Q.    -- or the prescribing physician for

20   those types of decisions?

21       A.    Yeah.  And it's like a complete

22   deferral.  It's, hey, this happened, I think

23   maybe we should think about X, and what do you

24   want to do?

25       Q.    Now, you did review the Xarelto label

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    in forming your opinions?

2        A.    Yes.

3        Q.    And you agree that the label warns

4    that Xarelto can cause serious and fatal

5    bleeding?

6        A.    Yes.

7        Q.    You agree that the label indicates

8    that major bleeding is -- the risk of major

9    bleeding is similar for warfarin and Xarelto?

10            MR. GOZA:  Object to the form.  That

11   misstates the label.

12       A.    I don't have the label in front of me.

13   BY MR. STEKLOFF:

14       Q.    All right.  Let's look at the label.

15       A.    Do you want to look at the label?

16       Q.    Sure.

17            MR. GOZA:  Which year are you going to

18   look at?

19            MR. STEKLOFF:  The 2013 is fine.

20   We're going to look at August, 2013, which I

21   think you cited in your expert report.

22            MR. GOZA:  Do you have an extra?

23            MR. STEKLOFF:  Of course.

24            MR. GOZA:  I think I've got it.

25            MR. STEKLOFF:  I'm marking the August,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    2013 label as Exhibit 3.

2    BY MR. STEKLOFF:

3        Q.    Here you go, Dr. Winstead.

4              I think if you turn to Section 6.1,

5    that's what I'm going to ask a few questions

6    about.

7              (Whereupon, Winstead Exhibit Number 3,

8              August, 2013 Xarelto label, was marked

9              for identification.)

10   BY MR. STEKLOFF:

11       Q.    Are you with me?

12       A.    Yep.

13       Q.    Okay.  So I'm looking at Table 1.

14   Based on that, do you agree that the Xarelto

15   label as of August, 2013 indicated that the risk

16   of major bleeding was, in terms of statistical

17   significance, the same for Xarelto and warfarin?

18       A.    Yes.

19       Q.    And it warned that the risk of

20   gastrointestinal bleeding was higher, 2.0 events

21   in the Xarelto population and 1.2 events in the

22   warfarin population, is that right?

23       A.    Yes.  I'm just making sure I follow

24   the number exactly.

25              Yes.  Correct.

1    Q.    And at least in the ROCKET study, the

2    risk of fatal bleeding was actually lower in the

3    Xarelto population than in the warfarin

4    population, is that right?

5    A.    That's what Table 1 says, yes.

6    Q.    And would you agree that fatal bleeds

7    are of a greater concern in the medical

8    community than gastrointestinal bleeds?

9         MR. GOZA:  Let me just object to the

10   form of the question.

11        But go ahead.

12   A.    Well, you're always more concerned

13   about people dying than about people bleeding.

14   BY MR. STEKLOFF:

15   Q.    Are ICH bleeds also a greater concern

16   than GI bleeds, in general, in your opinion?

17        MR. GOZA:  Again, object to form,

18   without specific facts about the severity.

19   A.    Well, yeah.  I mean you can transfuse

20   blood, but you can't transfuse brain.

21   BY MR. STEKLOFF:

22   Q.    If you turn to Section 5.2, do you

23   agree that the Xarelto label warned about the

24   lack of a reversal agent?

25   A.    We're in 5.2?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    Yes, Doctor.  It's on Page 8.

2    A.    Yeah, yeah, that's what it says,

3    "Specific antidote for rivaroxaban is not

4    available."

5    Q.    And that's something that you know in

6    your clinical practice, right?

7    A.    Yes.

8          MR. GOZA:  Object.  Outside of his

9    clinical practice.

10         Go ahead.

11   A.    Correct.  Yes.

12   BY MR. STEKLOFF:

13   Q.    And you've known that since NOACs

14   first -- or since Xarelto first came on the

15   market?

16   A.    Yeah.  Essentially, yeah.  At the time

17   there was a significant amount of controversy

18   about whether or not they should have approved

19   because there was no available reversal agent.

20   Q.    Well, Mr. Goza said it's outside of

21   your clinical practice.  Do you use reversal

22   agents for patients suffering from GI bleeds who

23   are on warfarin?

24   A.    No.  Typically what happens is when

25   they come into the emergency room, they're given

1    Vitamin K or fresh frozen plasma prior to my

2    evaluating them.  There are occasions where I

3    may give extra doses of Vitamin K or fresh

4    frozen plasma, but those are uncommon.

5        Q.    So how long is it after a patient who

6    is suffering from a GI bleed on warfarin comes

7    into the emergency room, how many hours or days

8    is it typically that you see the patient?

9            MR. GOZA:  I'm just, because -- vague

10   and ambiguous without any foundation.

11       A.    It's extremely variable on a

12   patient-by-patient basis.  You know, sometimes

13   I'm called five minutes after they come in.

14   Sometimes I'm called, you know, 50 hours after

15   they come in.

16   BY MR. STEKLOFF:

17       Q.    Is that true for a patient bleeding

18   who also has been taking a NOAC, that it's

19   extremely variable?

20       A.    Yeah, very, extremely variable.

21       Q.    So I want to spend some time now on

22   your report, if you can turn to that, Exhibit 1.

23            Now, on the first page and a half, is

24   it fair to say that you laid out what you viewed

25   as the most relevant facts from Mr. Boudreaux's

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    medical history?

2           MR. GOZA:  Object to form.

3      A.    Can you restate your question again?

4    BY MR. STEKLOFF:

5      Q.    Sure.

6      A.    I'm looking at the first half page.

7      Q.    Sorry, I said page and a half.  Let me

8    just ask a different question.

9           In the report you laid out part of

10   Mr. Boudreaux's medical history, is that fair?

11     A.    Yes.

12     Q.    And I note that you didn't set forth

13   that he had hypertension, is that fair?

14     A.    That's correct.  I didn't mention

15   that.

16     Q.    And is that because, as we discussed

17   before, you don't see that -- you didn't see

18   that as a risk factor for Mr. Boudreaux in terms

19   of a risk of bleeding?

20     A.    Just give me a minute before I answer

21   your question, because I'm trying to look

22   through this again.

23           (Witness reviewing document.)

24     A.    To be honest, I'm not sure why it's

25   not in there.  And I'm not remembering off the

1  top of my head what medications he was on at

2  that initial time of presentation.  It's just --

3  I mean, it's just not in there.

4  BY MR. STEKLOFF:

5      Q.    Well, regardless of whether it's in

6  there or not, do you, sitting here, believe that

7  Mr. Boudreaux's hypertension was a risk factor

8  that put him at an increased risk of bleeding?

9            MR. GOZA:  Object.  Asked and

10 answered.

11     A.    Yeah, well, I've answered that before.

12 I don't think so, because the HAS-BLED score

13 defines hypertension as a risk factor if they

14 have poorly controlled blood pressure with

15 systolic greater than 160.

16 BY MR. STEKLOFF:

17     Q.    And so if Dr. Wong believed that

18 Mr. Boudreaux's hypertension put him at an

19 increased risk of bleeding, you disagree with

20 Dr. Wong?

21           MR. GOZA:  Improper form of your

22 question.  You can't ask a witness to comment on

23 the testimony of another witness.

24     A.    I can't, unless he is aware of

25 something with regards to the management of

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   Mr. Boudreaux's hypertension that I'm not aware

2   of.

3   BY MR. STEKLOFF:

4       Q.    Well, you read Dr. Wong's testimony,

5   right?

6       A.    I did.

7       Q.    In fact, in more detail when preparing

8   for today, right?

9       A.    Yeah, but it was kind of skimming.

10  And again, Dr. Wong had not slept well.  Did he

11  identify hypertension as a specific risk factor

12  for Mr. Boudreaux?  I mean, I don't recall that

13  specifically.  You all pick interesting things

14  to focus on that I wouldn't necessarily.

15          Again, I would say based on the

16  HAS-BLED score, I'm not aware of Mr. Boudreaux

17  having blood pressures that would give him the

18  point on the HAS-BLED score for hypertension as

19  a risk factor.

20      Q.    And you would focus on the HAS-BLED

21  score in determining whether hypertension is a

22  risk factor?

23      A.    Yeah.

24      Q.    Do you recall Mr. Boudreaux's age when

25  he was prescribed Xarelto?

1      A.    So he was 72, right, almost 73?  He

2  was between 72 and 73?

3      Q.    I think between 71 and 72.

4      A.    71, 72, yeah.

5      Q.    And that age put him as an increased

6  risk of bleeding?

7      A.    Yes, based upon the HAS-BLED score.

8            THE VIDEOGRAPHER:  Excuse me.  I'm

9  sorry.  Doctor, I'm about to lose you behind

10  Dr. Goza, and I just don't want to lose you.

11            THE WITNESS:  Sorry.

12            THE VIDEOGRAPHER:  Sorry about that.

13  Thank you.

14  BY MR. STEKLOFF:

15      Q.    You're aware that Mr. Boudreaux was

16  taking aspirin prior to being prescribed

17  Xarelto?

18      A.    Yes.

19      Q.    And in your opinion, did that put him

20  at an increased risk of bleeding?

21      A.    Yes.

22      Q.    So I want to ask you, if you turn to

23  the last paragraph of your report, about the

24  paragraph you have about aspirin.

25            MR. GOZA:  Say that again?

1            MR. STEKLOFF:  I'm going to focus on

2     the paragraph on the last page of his report at

3     the top that says "Aspirin."

4     BY MR. STEKLOFF:

5         Q.    Do you see that?

6         A.    Yeah.

7         Q.    Okay.  So I want to break this

8     paragraph down a little bit.

9            You say, "Mr. Boudreaux was actively

10    taking aspirin for years prior to his

11    gastrointestinal hemorrhage, and before starting

12    Xarelto, without any incidence of bleeding."

13           Do you see that?

14        A.    Yes.

15        Q.    It says, "He continued to take aspirin

16    after his gastrointestinal hemorrhage (and after

17    being discontinued from Xarelto), and has not

18    experienced further bleeding."

19           Do you see that?

20        A.    Yes.

21        Q.    What I want to focus on are this last

22    two sentences.  You say, "Further, from

23    Mr. Boudreaux's deposition, there is substantial

24    doubt as to whether Mr. Boudreaux was even

25    taking aspirin at the time of his

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    gastrointestinal hemorrhage."

2            Do you see that?

3    A.    Yes.

4    Q.    So is it your opinion to a reasonable

5    degree of medical certainty that Mr. Boudreaux

6    was not taking aspirin at the same time he was

7    taking Xarelto?

8            MR. GOZA:  I'll object to the extent

9    that -- object to form.

10   A.    I tend to believe what patients tell

11   me.  And if you read Mr. Boudreaux's deposition,

12   it seems to me that there is doubt in

13   Mr. Boudreaux's mind as to whether or not he was

14   actually taking the medication.

15           And I included that language because

16   it seems to me from reviewing his 3,000 pages of

17   medical records that -- actually more than

18   3,000 -- that this is a guy who is very vigilant

19   and aware of his medications.  This is a guy who

20   calls his doctor's office to follow up after he

21   makes a refill request from a mail order

22   pharmacy.

23           And so I think that given that

24   Mr. Boudreaux is unsure from his deposition if

25   he was actually taking the aspirin, I think that

```
 1   there's doubt about whether he's actually taking

 2   the aspirin, because I believe the guy.

 3   BY MR. STEKLOFF:

 4       Q.    And are there any parts of his

 5   deposition that you don't -- that you didn't

 6   find credible?

 7       A.    No.

 8       Q.    And would you put more credit in his

 9   medical records at the time, or his testimony in

10   a litigation years later?

11            MR. GOZA:  Object to form.

12       A.    I tend to believe what people tell me.

13   So along that vein, I would tend to believe a

14   deposition.

15   BY MR. STEKLOFF:

16       Q.    More than medical records that are

17   documenting what he was telling the doctor at

18   the time?

19       A.    In this specific case, I feel like, I

20   don't know, I feel like the deposition is what

21   the guy is telling me if I had the opportunity

22   to ask him questions, and so I would take that

23   on face.

24            The other problem I see sometimes is

25   in the era of electronic medical records,
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    medication lists aren't consistently reviewed,

2    and sometimes they just cut and paste medication

3    from prior visits.  I don't know if there was

4    anything specific in his medical records as to

5    whether he was asked if he was compliant with

6    his aspirin therapy.

7              But in general, I believe what people

8    tell me, and I kind of feel like the deposition

9    is what Mr. Boudreaux could tell me.

10     Q.    And do you think that Mr. Boudreaux

11   had any incentives based on the fact that he was

12   in litigation to state that he wasn't taking

13   aspirin at the time, or couldn't recall whether

14   he was taking aspirin at the time?

15             MR. GOZA:  Object to the form of the

16   question.

17     A.    I mean, he was involved in litigation,

18   so there's always the possibility.

19   BY MR. STEKLOFF:

20     Q.    There's tons of medical literature

21   about how litigation can --

22     A.    Yeah, I mean -- so, yeah, absolutely.

23     Q.    And did you factor that into your

24   credibility determination of Mr. Boudreaux's

25   testimony?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1       A.      Making credibility determinations

2   based on depositions is not something I do on a

3   regular basis.

4       Q.      But do you agree that's what you did

5   here?

6               MR. GOZA:  Object just to the extent

7   it makes it sound like his opinion is based on

8   that, and it's not.  Object to form.

9       A.      I tend to believe what people tell me,

10  and what I would say is I believe his

11  deposition.  I believe what he was told -- what

12  he told.  I mean, he seems -- you know, I don't

13  know the guy, but he seems like a stand-up guy.

14  He was -- he seems very vigilant about what he

15  does.

16  BY MR. STEKLOFF:

17      Q.      And you made a credibility

18  determination in offering an opinion about his

19  aspirin use in this case, right?

20              MR. GOZA:  Object.  Object to form.

21      A.      I said that there was substantial

22  doubt as to whether Mr. Boudreaux was even

23  taking aspirin at the time of his

24  gastrointestinal hemorrhage.

25  BY MR. STEKLOFF:
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Based on your credibility

2   determination of his testimony, fair?

3      A.    Yeah, fair.  I mean, I would determine

4   his testimony to be credible.

5      Q.    In fact, if you go to the first page

6   of your report, you said in forming your

7   opinions they're all based on -- they're all to

8   a reasonable degree of medical certainty, right?

9      A.    Mm-hmm.

10     Q.    That's a yes?

11     A.    Yes, that's a yes.  I'm sorry.

12     Q.    And it's your opinion that

13  Mr. Boudreaux more likely than not was not

14  taking aspirin at the time of his

15  gastrointestinal bleed, right?

16          MR. GOZA:  First, I'll object.  That's

17  not what his report says.  And secondly, it's

18  not an opinion.  It's about fact.

19     A.    My report just says that there's doubt

20  as to whether he was even taking aspirin.

21  BY MR. STEKLOFF:

22     Q.    Right.

23          And in part you ruled out aspirin as a

24  potential cause based on your -- based on that

25  doubt, right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.    As well as the fact that he took

2  aspirin for quite some time before experiencing

3  his Xarelto bleeding, and afterwards for some

4  time without considering -- you know, without

5  any evidence of further bleeding.

6    Q.    But part of your -- the basis for you

7  ruling out aspirin as a cause was your

8  credibility determination that Mr. Boudreaux

9  more likely than not was not taking aspirin at

10  the time of his bleed?

11        MR. GOZA:  Objection.  Same, to the

12  form, asked and answered several times.

13    A.    Yeah, yeah.  That's at least part of

14  it.

15  BY MR. STEKLOFF:

16    Q.    Now, did you review the medical

17  records to see what they said about

18  Mr. Boudreaux's aspirin use?

19    A.    It was consistently listed on his list

20  of medications.

21    Q.    But you found his testimony more

22  credible than the list of medications in his

23  medical records?

24    A.    I said in my statement that there's

25  doubt as to whether or not he was taking it.  I

1    don't think that there's a -- I don't think I've

2    assigned some kind of value weight to either

3    statement.

4          I think that there's some doubt as to

5    whether or not he was taking it, because I tend

6    to believe what people tell me, patients tell

7    me.

8    Q.    And if Mr. Boudreaux was taking

9    aspirin at the same time as his gastrointestinal

10   bleed, is it possible that the aspirin was also,

11   not the sole factor, not the only factor, but

12   was also a factor in his bleed?

13         MR. GOZA:  Object to form.

14   A.    Yes.  And I've answered that.  If

15   you're concomitantly on aspirin and a NOAC, you

16   have a higher risk of bleeding than if you were

17   on just a NOAC without aspirin.

18   BY MR. STEKLOFF:

19   Q.    And do you recall that at one point in

20   his deposition Mr. Boudreaux was asked, "And you

21   understand that you were taking aspirin and

22   Xarelto at the same time?"  And his answer was

23   "Yes"?

24   A.    Yeah, I saw that part of his

25   deposition.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1            I can't -- I don't recall if that's
 2   before or after he talked about whether there
 3   was doubt that he was taking aspirin.
 4       Q.    It was the page before.
 5       A.    It was the page before?
 6       Q.    Yes.
 7            Can you describe, when a patient comes
 8   in with a GI bleed like the GI bleed that --
 9   similar to the GI bleed that Mr. Boudreaux
10   experienced, your course of treatment?
11       A.    So --
12       Q.    If you don't like the question, I'll
13   rephrase it, if you don't like the phrase --
14            MR. GOZA:  No, I was trying to think
15   of it in the context of -- well --
16   BY MR. STEKLOFF:
17       Q.    If Mr. Boudreaux had come in with a GI
18   bleed that he came in with and you were there to
19   treat him, let's say within -- you were already
20   at the hospital, so within minutes of him
21   arriving at the hospital, can you describe for
22   the jury what you would have done?
23       A.    I would have done exactly what
24   happened.  I would have assessed him, tried to
25   make a determination as to whether or not it was
```

1    an upper or lower gastrointestinal bleeding

2    source, and then performed appropriate

3    diagnostic intervention.

4            Depending upon the time of day,

5    there's significant debate about, you know, who

6    should be done as emergency within six hours and

7    who should be done in 24 hours.  I think, based

8    on his initial presentation, he probably needed

9    to be resuscitated.  And so, yeah, to -- my

10   management wouldn't vary significantly at all

11   from what he actually had.

12   Q.    When you say there's a significant

13   debate of who should be done with an emergency

14   in six hours versus who should be done within

15   24 hours, can you explain that debate?

16   A.    Yeah, there's -- you know, there's

17   pros and cons, it's one of those weigh the pros

18   and the cons type of items.  You know, if he

19   came in at 3:00 in the morning, you might be

20   more inclined to wait until normal business

21   hours.

22           Do you follow what I'm saying?  If he

23   had a strong history of -- so in other words, if

24   you had a patient who had cirrhosis or

25   significant portal hypertension, like we were

1    talking about earlier, and you were concerned

2    that they were having a catastrophic bleeding

3    event, you would be -- you'd be more inclined to

4    immediately go ahead and do, you know, what

5    would hopefully be interventional endoscopy to

6    sort of manage the bleeding procedurally.

7              And so there's pros and cons.  It's

8    kind of -- there's a whole body of literature

9    about that.

10   Q.    Is it fair to say that with someone

11   like Mr. Boudreaux and his GI bleed, that an

12   antidote, if it existed, would have served no

13   purpose?

14             MR. GOZA:  Object to form.

15   A.    That's hard for me to say, because I

16   didn't -- I was unable to assess him.  And I

17   didn't assess him.  I'm going to review those

18   records.

19             It's hard.  That's all retrospective

20   kind of stuff.  What I have -- you're asking me,

21   like, a very fine-tuned medical question.  And

22   you understand, medicine isn't like law, there's

23   not, like --

24             MR. GOZA:  He's just asking you, he

25   just wants to know -- so we'll try to get --

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   restate the question, and let's see if we can

2   get an answer.

3            MR. STEKLOFF:  Sure.

4   BY MR. STEKLOFF:

5     Q.    I understand that everything you're

6   doing is sort of looking backwards because you

7   can only review the medical records.

8            So my question -- I mean, I think all

9   of your opinions, I'm not trying -- just so

10  we're on the same page, fall into that category.

11  So like every other opinion that you are

12  offering, I want to understand.

13           Based on your review of the medical

14  records, isn't it fair to say that an antidote

15  would have served no purpose in treating

16  Mr. Boudreaux, even if it existed?

17           MR. GOZA:  Object to the form.

18    A.    I would say yes.

19           MS. HOFFMANN:  Are you saying you

20  agree with what he said?

21    A.    I agree that in this particular case

22  that an antidote would have served no purpose.

23           MS. HOFFMANN:  Thank you.

24           MR. GOZA:  What time did we pick back

25  up?

```
 1              MR. STEKLOFF:  I was going to ask the

 2    same thing.

 3              THE VIDEOGRAPHER:  10:18 when we

 4    started.  We've been going two hours and about

 5    almost three minutes.

 6              MR. GOZA:  When you get to another --

 7    I kind of like to take a break about every hour

 8    or so.

 9              MR. STEKLOFF:  I do as well.  And I

10    actually organize my thoughts --

11              MR. GOZA:  You were at a stopping

12    point.  We don't need to have this --

13              THE VIDEOGRAPHER:  Do you want to go

14    off the record?

15              MR. GOZA:  Yes, we can go off the

16    record.

17              THE VIDEOGRAPHER:  The time is

18    11:17 a.m.  We are off the record.

19              (Whereupon, a recess was taken.)

20              THE VIDEOGRAPHER:  This begins disk

21    three of today's deposition.  The time now is

22    11:44 a.m.  We are back on the record.

23              MR. GOZA:  Just for the record, the

24    doctor had a recollection while looking at his

25    CV that would cause him to amend a prior answer.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    So...

2         A.    So I've had three studies which were

3    funded by Janssen in the past that have closed

4    enrollment, and then I have two active studies.

5              As an explanation, the studies are

6    usually run by third parties, so it's never

7    really completely apparent in the front of your

8    mind where it's coming from.

9    BY MR. STEKLOFF:

10        Q.    Just following up on that,

11   Dr. Winstead, based on your specific experience

12   in those studies, were those studies run

13   ethically?

14        A.    Oh, yeah.  They were run ethically,

15   yeah.  Yes, absolutely.

16        Q.    You had no concerns about the safety

17   of patients?

18        A.    No.

19        Q.    Or on any unethical issues in those

20   studies?

21        A.    (Nodding in the negative).

22        Q.    And you continue to work indirectly

23   with Janssen, is that fair?

24        A.    Correct.

25        Q.    Now, I'd like to turn to the second

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    page of your report, and if you look at the

2    third paragraph down, if you have, I believe

3    Exhibit 1, there's a paragraph that starts, "The

4    absence of a recommendation."

5         A.    Third page?

6         Q.    Sorry, second page, third paragraph.

7         A.    Okay.

8         Q.    Are you with me?

9         A.    Yes.

10        Q.    Okay.  So I'll just read that

11   sentence, the first sentence, and that's the

12   sentence I want to talk to you about now.  It

13   says, "The absence of a recommendation for

14   appropriate laboratory studies to measure his,"

15   Mr. Boudreaux's, "anticoagulation contributed to

16   the difficulty managing his gastrointestinal

17   bleeding."

18              Do you see that?

19        A.    Yes.

20        Q.    Now, you agree that the FDA approved

21   Xarelto understanding that there were -- that

22   there wouldn't be routine blood monitoring, is

23   that fair?

24        A.    Yes.

25        Q.    And that's true for all NOACs,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1    correct?

2        A.    Yes.

3        Q.    And you understand that the FDA

4    continues to approve Xarelto, understanding that

5    there's no routine blood monitoring, right?

6        A.    Yes.

7        Q.    And that that's also true for all

8    NOACs, is that right?

9        A.    Yes.

10       Q.    And you don't have the opinion that

11   Xarelto should be pulled from the market because

12   there's no routine blood monitoring?

13             MR. GOZA:  Object to form.

14       A.    I am of the opinion that --

15   BY MR. STEKLOFF:

16       Q.    You don't have the opinion that

17   Xarelto should be pulled from the market?

18       A.    No, I do not.

19       Q.    In other words, Xarelto can be an

20   effective medication for patients being treated

21   with atrial fibrillation?

22             MR. GOZA:  Object again to form and

23   ambiguous nature.

24       A.    Yeah, I think it's a useful -- I think

25   it's a useful drug.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    BY MR. STEKLOFF:

2        Q.    And you say that even though there is

3    no routine blood monitoring for it?

4             MR. GOZA:  I'll again object to

5    whether there's monitoring or not.  It's outside

6    his area of expertise.  Object to form.

7        A.    Yeah, and again, I don't manage

8    patients who need to be anticoagulated.

9    BY MR. STEKLOFF:

10       Q.    But you treat patients who take

11   Xarelto, right?

12       A.    Yes, I treat patients who take

13   Xarelto.

14       Q.    And for some patients, Xarelto is a

15   useful medication that treats their atrial

16   fibrillation, right?

17       A.    Correct.

18       Q.    Now, this sentence that we just read,

19   can you explain how the absence of a

20   recommendation for appropriate laboratory

21   studies to measure Mr. Boudreaux's

22   anticoagulation contributed to the difficulty in

23   managing his GI bleed?

24       A.    Well, so that there's no -- there's

25   no -- let me think about this, how to best put

1    this.

2            There's no way, that I'm aware of,

3    that's been recommended to risk-stratify

4    patients taking Xarelto into low, medium, high

5    bleeding risk while on Xarelto.  And so the fact

6    that you could not risk-stratify Mr. Boudreaux

7    after, say, he had been on the medication for

8    one or two or three weeks contributed to

9    managing -- you know, management issues going

10   forward.

11       Q.   Do you agree that as of today, there

12   is no reliable measurement tool to stratify

13   patients on Xarelto?

14            MR. GOZA:  I'll object.  Misstates

15   evidence, outside of his area of expertise.

16       A.   Yeah, again, I think I answered a

17   similar question earlier.  I think there's

18   considerable debate in terms of labs to use,

19   reagents to use, that kind of thing, so I don't

20   know the answer to that question.

21   BY MR. STEKLOFF:

22       Q.   Okay.  So then maybe we can wrap up

23   this portion of the deposition quickly.

24            Are you -- you're not offering --

25   despite this sentence, are you offering any

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   opinions about whether there should be an assay

2   or a test to measure patients --

3           MR. GOZA:  Can I be a lot more

4   specific and tell you what we're not using him

5   to do?  Would that be helpful?  Because he's not

6   going to offer an opinion about whether or not

7   there is a test that is presently available to

8   risk-stratify a patient.  Whether that exists or

9   not, and whether the whole issue of monitoring

10  with respect to the risk stratification, whether

11  a test exists, he's not going to offer an

12  opinion about that.

13  BY MR. STEKLOFF:

14      Q.    So you're not offering any opinions

15  about PT?

16          MS. HOFFMANN:  Let's let the witness

17  answer.

18          MR. GOZA:  That's a little different.

19          Go ahead.

20      A.    So a PT can give you, from my

21  understanding, can give you evidence of whether

22  or not the patient's been exposed, and my

23  understanding is that there may be a linear

24  relationship between PT value and drug levels.

25          But beyond that, I honestly don't

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

 1   understand the pharmacology well enough, and I

 2   don't understand the mechanics of that lab test

 3   well enough to start giving you specific

 4   opinions about what level PT matters, those kind

 5   of things.

 6   BY MR. STEKLOFF:

 7       Q.    Okay.  So I'm going to follow up a

 8   little bit on what you just said.

 9             You say a PT can give you evidence of

10   whether or not a patient has been exposed?

11       A.    Correct.

12       Q.    What do you mean by that?

13       A.    Been exposed to Xarelto, been taking

14   Xarelto.

15       Q.    And what is your basis for saying

16   that?

17       A.    I believe that is in the -- it may be

18   in the PI.  I believe it's also in the ROCKET

19   study, which is basically the PI.

20       Q.    Okay.  So look at the PI.  I just want

21   to know for all of your opinions specifically

22   what you're relying upon.

23             And while I'm at it, just so you have

24   them in front of you, I will mark all -- the

25   four articles that you cite in your report.  You

1    can look at those at any time for the remainder

2    of the day to offer any of your opinions.

3        A.    Here, Section 12.2, "Dose-dependent

4    inhibition of Factor Xa activity was observed in

5    humans and the Neoplastin prothrombin time,

6    activated partial thromboplastin time and

7    HepTest are prolonged dose-dependently.  The

8    anti-Factor Xa activity is also influenced by

9    rivaroxaban."

10   BY MR. STEKLOFF:

11       Q.    Okay.  So that was warned about in the

12   label?

13       A.    Yes.

14             MR. GOZA:  In the 2013 label.

15   BY MR. STEKLOFF:

16       Q.    And have you gone -- have you

17   conducted any -- in preparing your opinions in

18   this case, have you looked at any literature to

19   see what the scientific community says about

20   using PT or activated partial thromboplastin

21   time as measures of drug concentrations?

22       A.    No.

23       Q.    You don't have an opinion one way or

24   the other?  You would defer to other experts on

25   the utility of using PT in clinical practice as

1  a measure of how much drug is in someone's

2  system?

3      A.    Correct.

4      Q.    And are you offering any opinions on

5  the therapeutic range of Xarelto?

6      A.    The blood level ranges, dose ranges,

7  no.

8      Q.    So you would defer to other experts on

9  whether monitoring is needed to keep -- whether

10 they believe monitoring is needed -- strike

11 that.

12          You would defer to other experts on

13 whether you can even quantify a range or

14 determine a Xarelto concentration level that

15 optimizes the risk/benefit profile of Xarelto?

16     A.    Yeah, I would defer.  I don't have a

17 very clear -- I don't have a clear enough

18 understanding of that to formulate an opinion.

19     Q.    And you're not planning on offering

20 any opinions on that topic?

21     A.    I wouldn't, no.  It's beyond my area

22 of expertise.

23     Q.    And you also would defer to other

24 experts in the litigation on whether Xarelto is

25 an -- on interpatient variability and whether

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that impacts -- whether that can impact a

2    patient's risk/benefit profile, is that fair?

3         A.    Interpatient variability of what?

4         Q.    Of the drug concentration of Xarelto.

5               MR. GOZA:  I'm just going to object to

6    form.

7         A.    So I would defer to another expert on

8    whether interpatient variability of drug level

9    is clinically significant in weighing a

10   risk/benefit ratio.  That's a correct statement.

11   BY MR. STEKLOFF:

12        Q.    You don't have an opinion on that?

13        A.    I don't have an opinion on that.

14        Q.    And you're not going to offer an

15   opinion on that?

16        A.    No.

17        Q.    And would you, similarly, defer to

18   other experts in the litigation on whether there

19   is a PT score that tells you whether a patient

20   is at risk -- a higher risk of bleeding?

21        A.    Yeah, I would.  I mean, I just know

22   that, you know, again, from the PI that there's

23   some prolongation of the prothrombin time.  You

24   know, at what point does that become clinically

25   significant, I don't have an opinion on.  I'm

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   not sure that, I'm not sure --

2            MR. GOZA:  You're not going to offer

3   an opinion.

4       A.    Yeah.

5   BY MR. STEKLOFF:

6       Q.    It may not have any clinical

7   significance?

8       A.    It may not.

9            MR. GOZA:  Well, I think that's

10  outside his area of expertise.

11      A.    Except for -- except for being exposed

12  to drug.

13  BY MR. STEKLOFF:

14      Q.    Any drug?  It doesn't matter what the

15  drug is?

16      A.    For prothrombin time?

17      Q.    No.  I mean -- strike that.

18      A.    Okay.

19      Q.    You agree that -- strike that.

20           Do you agree that prothrombin time

21  would only have meaning if it was correlated

22  with bleeding events?

23           MR. GOZA:  I'm going to again object.

24  It's outside of his area of expertise and not

25  relevant to his opinions in this case.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.    No.  No, I wouldn't, because you would

2   also have to -- you would also have to -- you

3   would also care about stroke risk.

4   BY MR. STEKLOFF:

5      Q.    Exactly.  If you're -- you can't

6   ignore stroke risk in looking at prothrombin

7   time, right?  You have to balance the stroke

8   risk with the bleeding risk, right?

9           MR. GOZA:  Again, I'm just going to

10   object, only because -- you are free to spend

11   your time however you want, but he's not

12   offering opinions about these, and it's outside

13   his area of expertise.  So I'm going to object

14   again.  He told you 50 times he doesn't do that

15   risk/benefit analysis.

16      A.    Yeah, so everything is a risk/benefit.

17   I don't perform those kind of risk/benefit

18   analyses.

19   BY MR. STEKLOFF:

20      Q.    But do you agree that any -- given

21   that -- your clinical practice treating patients

22   who have bleeds who take anticoagulants, do you

23   agree that any risk/benefit analysis has to

24   balance the risk of stroke versus the risk of

25   bleeding?

1    A.    I just answered yes to that question.

2    So I would say yes again.

3    Q.    I understand.  Sometimes I have to ask

4    questions because lawyers interject with

5    speaking objections.

6          And do you agree that in assessing

7    that risk/benefit analysis, in terms of the risk

8    of bleeding, you would want to correlate PT with

9    bleeding events?

10          MR. GOZA:  Object.  Again, outside of

11    his area of expertise.  Requires speculation.

12    A.    In the case of patients on Xarelto, or

13    any other anticoagulant, or warfarin?

14    BY MR. STEKLOFF:

15    Q.    Xarelto.

16    A.    So would I think that correlating

17    prothrombin time with bleeding risk is

18    important?

19    Q.    Yes.

20    A.    Is that basically the question you're

21    asking?

22          Yes, I would think that that's

23    important.

24    Q.    And in the absence of doing so, do you

25    agree it would be dangerous to establish a PT

1    cutoff at which patients should be taken off of

2    Xarelto?

3              MR. GOZA:  Again, this is a point

4    where now you're asking him to offer comments,

5    expert opinions about things that are way

6    outside his area of expertise, which he's not

7    been designated for.

8         A.    Yeah.  I mean, you're kind of way off

9    the track of what I --

10   BY MR. STEKLOFF:

11        Q.    You're the one who has an opinion

12   about how the lack of laboratory studies to

13   measure anticoagulation contributed to

14   Mr. Boudreaux's case.  So I'm trying to explore

15   that opinion.

16             MR. GOZA:  But that's not what you're

17   asking.  The lack of something doesn't mean that

18   he can specify what it would be or how it would

19   work or anything else.

20             I mean, he's already said ten

21   different ways that he doesn't have any opinions

22   about those.

23             MR. STEKLOFF:  Okay.  But then he's

24   trying to tie PT in the label to his opinion

25   here.  So he does have opinions about PT.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          MR. GOZA:  He's read what from your

2     label says.  He's not going into what -- we made

3     very clear -- I think what I said was he's not

4     going to offer any opinions about what tests,

5     what level would make a difference clinically,

6     and he's going to leave it to all the other

7     experts to fight about that.  He just

8     understands there's a debate about that.  He

9     said that three times.

10    BY MR. STEKLOFF:

11        Q.    So tell me how PT specifically could

12    have -- or how -- strike that.

13          Tell me how the absence of a

14    recommendation for PT measurements contributed

15    to the difficulty managing Mr. Boudreaux's

16    gastrointestinal bleed.

17        A.    I didn't say PT measurements in my

18    opinion.

19        Q.    Okay.  But the only thing you can

20    point to for your opinion is the statement about

21    PT in the label?

22        A.    No.  You had -- you had asked a number

23    of questions regarding PT.  You had asked if

24    there was anything that you could measure, and I

25    said, well, this was what's in the label.  So

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    you're then trying to take that and infer this.

2        Q.    Okay.  So you're not saying that PT is

3    a valid way to measure patients -- their

4    anticoagulation on Xarelto?

5            MR. GOZA:  He's not offering an

6    opinion on --

7        A.    It's not been proposed by the FDA.

8    It's not in the product label.  We just know

9    that there's some relationship.

10   BY MR. STEKLOFF:

11       Q.    So do you think -- are you aware of

12   any laboratory study that exists that could have

13   helped manage Mr. Boudreaux's gastrointestinal

14   bleeding?

15       A.    No.  I mean, that's inferred in my

16   report, it's that there's an absence of a

17   recommendation for appropriate laboratory

18   studies.

19       Q.    And are you criticizing Bayer and

20   Janssen for not making such a laboratory study

21   available?

22       A.    I think that that -- I think it would

23   be nice if there was some way you could

24   risk-stratify bleeding in patients who are

25   anticoagulated.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.    And my question is, are you

2   criticizing the Defendants in this case?

3     A.    Am I criticizing?  Well, I certainly

4   think it -- well, yes, I guess, if you get down

5   to -- yes.

6     Q.    In what way?

7     A.    In that there's no way to

8   risk-stratify bleeding risk for patients on

9   Xarelto, and that it's a one-size-fits-all dose,

10  and there's no way to monitor if that

11  one-size-fits-most works for all patients.

12    Q.    So it's your opinion that the

13  Defendants should have come up with a way to

14  monitor patients even if one doesn't exist?

15  That's the core of your opinion here?

16    A.    Yes.

17    Q.    And then you're speculating that if

18  that existed, it could have impacted

19  Mr. Boudreaux's treatment?

20        MR. GOZA:  Object to the form of the

21  question.

22    A.    Yes.

23  BY MR. STEKLOFF:

24    Q.    You don't know in any way how it would

25  have impacted his treatment?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          MR. GOZA:  Well, object, again, to the

2     form of the question.

3     A.     You're talking about a hypothetical

4     lab for a hypothetical clinical scenario.

5     BY MR. STEKLOFF:

6     Q.     And everything that happened to

7     Mr. Boudreaux could have happened if he was on

8     warfarin, right?

9          MR. GOZA:  Well, again, object as to

10    the form of the question.

11    A.     So what we know from the best

12    head-to-head studies is that if Mr. Boudreaux

13    had been on well-controlled warfarin therapy

14    with an INR of 1 to 2, his risk of bleeding

15    would have been approximately 1.8 events per 100

16    patient years.  And from the best head-to-head

17    data we have, we know that his risk from

18    bleeding was higher on Xarelto.

19    BY MR. STEKLOFF:

20    Q.     And that was in the label?

21    A.     I believe that's in the label.  We

22    covered that already.

23    Q.     And Dr. Wong was aware of that?  You

24    read his testimony?

25         MR. GOZA:  Object to speculation.

```
 1      A.    So yeah, again, Dr. Wong's deposition

 2   is bit hard to follow.  But yes, I believe

 3   Dr. Wong was aware of that.

 4   BY MR. STEKLOFF:

 5      Q.    Now, everything that we've discussed

 6   that happened to Mr. Boudreaux could have

 7   happened if he was taking any other NOAC other

 8   than Xarelto, right?

 9          MR. GOZA:  Object to form.

10      A.    Anything is possible.  But Xarelto

11   seems to have a higher risk of gastrointestinal

12   bleeding.

13   BY MR. STEKLOFF:

14      Q.    What are you basing your opinion on to

15   say that?

16      A.    What I just talked about.  You

17   asked -- oh, specifically about NOACs?

18      Q.    Yes.

19      A.    So I would refer you to the list of

20   literature, the Graham, the Lip, the Lip, and

21   the Yao studies.

22          MR. STEKLOFF:  Now I'm just going to

23   mark those studies, so we -- so we have done it.

24   Because I'll probably come back to this.  I'm

25   going to make the Graham study, study 4.
```

```
 1                   (Whereupon, Winstead Exhibit Number 4,

 2                   Graham, et al study titled Stroke,

 3                   Bleeding, and Mortality Risks in

 4                   Elderly Medicare Beneficiaries Treated

 5                   With Dabigatran or Rivaroxaban for

 6                   Nonvalvular Atrial Fibrillation, was

 7                   marked for identification.)

 8                   MR. STEKLOFF:  2016 Lip, we'll make

 9      Exhibit 5.

10                   (Whereupon, Winstead Exhibit Number 5,

11                   Lip, et al paper titled Real-world

12                   comparison of major bleeding risk

13                   among non-valvular atrial fibrillation

14                   patients initiated on apixaban,

15                   dabigatran, rivaroxaban, or warfarin,

16                   was marked for identification.)

17                   MR. STEKLOFF:  2012 Lip, we'll make

18      Exhibit 6.

19                   (Whereupon, Winstead Exhibit Number 6,

20                   Lip, et al paper titled Indirect

21                   Comparisons of New Oral Anticoagulant

22                   Drugs for Efficacy and Safety When

23                   Used for Stroke Prevention in Atrial

24                   Fibrillation, was marked for

25                   identification.)
```

1            MR. STEKLOFF:  And the Yao study we

2    will make Exhibit 7.

3            (Whereupon, Winstead Exhibit Number 7,

4            Yao, et al paper titled Effectiveness

5            and Safety of Dabigatran, Rivaroxaban,

6            and Apixaban Versus Warfarin in

7            Nonvalvular Atrial Fibrillation, was

8            marked for identification.)

9    BY MR. STEKLOFF:

10       Q.   Do you agree, Dr. Winstead, that these

11   are all observational studies?

12            MR. GOZA:  Which one is this one?

13            MR. STEKLOFF:  Yao, which is Number 7.

14   They go in order on -- they follow the same

15   order, 4, 5, 6, 7, on his Appendix A.

16   BY MR. STEKLOFF:

17       Q.   Would you agree, Dr. Winstead, that

18   these are all observational studies?

19       A.   These are all observational studies.

20       Q.   And there are -- you're not relying on

21   any head-to-head clinical trials comparing

22   Xarelto to any other NOAC, correct?

23       A.   I don't believe there is any

24   head-to-head trials.

25       Q.   And so an observational study -- all

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    four of these observational studies have

2    limitations, would you agree?

3         A.    Correct.

4         Q.    And many of them state those

5    limitations explicitly, right?

6         A.    Yes.

7         Q.    And is that -- if you really wanted to

8    understand the relative risk of, for example, GI

9    bleeding between Xarelto and another NOAC, you

10   would prefer to have a head-to-head clinical

11   trial, right?

12        A.    Correct.

13        Q.    Because of the limitations expressed

14   in these studies?

15        A.    Correct.

16        Q.    If Mr. Boudreaux had taken another

17   NOAC, he may have had a gastrointestinal bleed?

18             MR. GOZA:  Object to the form of the

19   question.

20        A.    Anything is possible.

21   BY MR. STEKLOFF:

22        Q.    By their very nature, they thin out

23   your blood, and that, I don't -- that, for lack

24   of a better phrase, theory one about systematic

25   exposure could occur with any of these other

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    NOACs, right?

2        A.    Yes.

3        Q.    And similarly, you can't monitor the

4    other NOACs, correct?

5        A.    Right.

6        Q.    So with any of the other NOACs, you

7    could have had too much drug concentration that

8    thinned out the blood too much and led to a

9    gastrointestinal bleed in Mr. Boudreaux?

10            MR. GOZA:  Object to form.

11       A.    Yes.

12   BY MR. STEKLOFF:

13       Q.    And when you said -- and the

14   systematic toxicity, that's basically just too

15   much drug?

16       A.    Too much drug is circulating in the

17   blood supply, or too much drug -- yeah, too much

18   drug is circulating in the -- or too much drug

19   absorbed in target tissues.

20       Q.    Now, and that systematic toxicity

21   theory of mechanism of action applies equally to

22   all the NOACs?

23            MR. GOZA:  Object, when you say

24   "equally."

25       A.    Yeah, I mean, I think that there's

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    some issues with metabolism that vary amongst

2    the drugs.  You all have some -- there's some

3    issues about -- in your PI about use with P-gp

4    and strong CYP3A4 inhibitors, which is somewhat

5    beyond my area of expertise, but there are

6    drug-drug interactions that are specific to

7    Xarelto.  I'm not sure to the extent -- what the

8    extent of their issues with other drugs or drug

9    metabolism and other drugs is.

10   BY MR. STEKLOFF:

11       Q.    Well, with respect to Mr. Boudreaux,

12   he wasn't taking any of those drugs that had

13   drug-to-drug interaction, is that right?

14       A.    With respect to Mr. Boudreaux.  Can

15   you state the question again?  I'm sorry.

16       Q.    Sure.

17             You were discussing drugs that may, I

18   think, hypothetically have caused metabolism

19   considerations with Xarelto, right?

20       A.    Right.

21       Q.    And Mr. Boudreaux --

22             MR. GOZA:  I'm just going to object to

23   the form.  I didn't get it in there fast enough,

24   but go ahead.

25   BY MR. STEKLOFF:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    Mr. Boudreaux wasn't taking any of

2    those drugs, right?

3    A.    The ones that are specifically called

4    out in the PI, let's see.

5           (Witness reviewing document.)

6    A.    He wasn't on any of the medications

7    that are specifically called out in Section 5.6

8    of the PI.  And then there's also 7.1, which is

9    cross-referenced in there.  Let's see the drugs

10   they list in there.

11          I don't think he was on any of these

12   drugs that are specifically called out in the

13   PI.

14   BY MR. STEKLOFF:

15   Q.    So in Mr. Boudreaux's case, there

16   wouldn't have been another drug that could have

17   impacted his metabolism related to Xarelto,

18   right?

19   A.    Well, I can't tell you for certain,

20   because, you know, the issue is that they call

21   out about five drugs that are very strong

22   inhibitors, and there's -- the list of the drugs

23   that are potential inhibitors is quite -- I

24   mean, it's a huge list.  So can I say for

25   certain?  No.

1    Q.    More likely than not, though?

2    A.    As far as I could tell.

3    Q.    And in Mr. Boudreaux's case, he also

4    had no renal impairment that was impacting his

5    metabolism, right?

6    A.    No, he did not.

7    Q.    And so in Mr. Boudreaux's case, given

8    those two considerations, he could have had the

9    same hypothetical systematic exposure if he was

10   taking another NOAC, is that right?

11         MR. GOZA:  Object to form.

12   A.    That's correct.

13   BY MR. STEKLOFF:

14   Q.    And earlier in the deposition at the

15   beginning, you stated that your opinions were

16   supported in the medical literature that you

17   cited, right?

18   A.    Mm-hmm.

19   Q.    That's a yes?

20         MS. HOFFMANN:  Is that yes?

21   A.    Yes.  Sorry.

22   BY MR. STEKLOFF:

23   Q.    And now, and take your time and review

24   all four articles, but do you agree that there

25   is nowhere in any of those four articles that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    says Xarelto can initiate a bleed through

2    systematic toxicity, or otherwise, without a

3    pre-existing pathology?

4            MR. GOZA:  Well, object to the extent

5    it assumes that it addresses it at all, so...

6            MR. STEKLOFF:  I'm actually not

7    assuming that.  I don't think it does address

8    that.

9            MR. GOZA:  He already said it didn't,

10   and that wasn't what he was pointing to.  We

11   already went through this.

12   A.    These are -- these studies are about

13   the incidence of outcomes and patients exposed

14   to drugs.  They don't discuss -- let's see.

15           (Witness reviewing documents.)

16           MR. STEKLOFF:  Just so the record is

17   clear, while you review those I'm going to ask

18   the question again.  You can state an objection,

19   but we were talking over, you and I

20   appropriately were talking over each other.  I

21   just want there to be a clear question and then

22   a clear answer.

23   BY MR. STEKLOFF:

24   Q.    Dr. Winstead, there's nowhere in any

25   of the articles that you rely upon to form your

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    opinions in which the authors state Xarelto can

2    initiate a gastrointestinal bleed through

3    systematic toxicity in the absence of

4    pre-existing pathology?

5            MR. GOZA:  And my objection is he's

6    already asked and answered that and explained

7    the specifics of that.

8    A.    Yeah, I don't believe any of these

9    studies actually call that out, or I don't think

10   any of these actually propose mechanisms for

11   bleeding.  They're all just discussing the

12   risks, the risk for bleeding.

13   BY MR. STEKLOFF:

14   Q.    And your core opinion in this case is

15   that Mr. Boudreaux's gastrointestinal bleed was

16   initiated by Xarelto in the absence of

17   pre-existing pathology?

18   A.    Xarelto increased his risk for

19   gastrointestinal bleeding.  His evaluation

20   revealed no underlying etiology.  He's not bled

21   before, he didn't bleed before, he hasn't bled

22   since.  So my opinion is that he bled because of

23   the Xarelto.

24   Q.    And that Xarelto initiated the bleed

25   in the absence of pre-existing pathology?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1           MR. GOZA:  Well, object.  Now you're

2    misstating his testimony.

3      A.    So, well, yeah, I mean, I think his

4    risk for bleeding was -- I think he bled because

5    he took Xarelto.  So his evaluation did not show

6    any specific etiology, so I think he bled

7    because he was anticoagulated.

8    BY MR. STEKLOFF:

9      Q.    So if you look at the last paragraph

10   of your report, going back to Exhibit 1,

11   starting on the second line, we can read the

12   whole thing, you write, "In light of my review

13   of the relevant materials, and having ruled in

14   and ruled out all potential risk factors, I

15   conclude to a reasonable degree of medical

16   certainty that Mr. Boudreaux suffered a

17   gastrointestinal hemorrhage and that his Xarelto

18   (rivaroxaban) use was the most probable cause of

19   that bleed."

20           When you say that -- first of all, did

21   I read that correctly?

22     A.    You read that correctly.

23     Q.    And when you say that, your opinion is

24   based on your view that Xarelto initiated

25   Mr. Boudreaux's gastrointestinal bleed in the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    absence of pre-existing pathology?

2            MR. GOZA:  And I'll object because

3    that misstates his testimony, and it misstates

4    what's specifically written here.  You want to

5    add conditions to it.

6        A.    He never bled before he took Xarelto,

7    he took Xarelto and he bled, he hasn't bled

8    since.  So the one identifiable risk factor is

9    his Xarelto use.  So that's my opinion in the

10   last paragraph of the last page.

11   BY MR. STEKLOFF:

12       Q.    And things can cause bleeds in

13   different ways, right?

14       A.    Correct.

15       Q.    Things can initiate bleeds, correct?

16       A.    Correct.

17       Q.    Things -- there could be pre-existing

18   pathology to which something contributes, right?

19       A.    Correct.

20       Q.    Your opinion of causation is that

21   Xarelto initiated the bleed, correct?

22            MR. GOZA:  Well, object.  I'm going to

23   object.  He has an opinion about causation.  Now

24   you're asking a separate question.

25            MR. STEKLOFF:  I'm asking him a

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  question that he can answer.

2          MR. GOZA:  But they're not dependent

3  upon one another.  He's answered the question

4  that you've asked ten times and so.  You know,

5  we could sit here and fight, but you're asking

6  him the exact same question that you asked him

7  before, and you're trying to make the two

8  dependent.  It's argumentative.

9  BY MR. STEKLOFF:

10     Q.    When you say "the most probable cause

11  of Mr. Boudreaux's bleed," how do you define the

12  word "cause" in terms of initiation or

13  contribution or anything else?

14     A.    His exposure to Xarelto increased his

15  risk for gastrointestinal bleeding, and he had a

16  bleed while he was on Xarelto.  So within a

17  reasonable degree of medical certainty, given

18  the fact that he never bled before and he hasn't

19  bled since, that's what I would define as cause.

20     Q.    And the mechanism for action of that

21  cause is an initiation, is that correct?

22          MR. GOZA:  Object.

23     A.    He had no identifiable mucosal lesion,

24  no bleeding was seen on upper or lower endoscopy

25  or video capsule.  One would assume, given those

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  facts, like I talked about before, that he oozed

2  blood into probably his upper gastrointestinal

3  tract.  Had he not been taking Xarelto, his

4  chances of that happening would have been quite

5  low.  So in that regard, Xarelto caused his

6  gastrointestinal bleeding.

7  BY MR. STEKLOFF:

8      Q.    And that theory of oozing blood is the

9  systematic toxicity that we're talking about,

10  right?

11      A.    That's exposure to anticoagulation and

12  the breakdown of natural homeostasis between

13  clotting and dissolving clotting from exposure

14  to anticoagulants.

15      Q.    So that can occur, or could have

16  occurred in Mr. Boudreaux's case if he was

17  taking warfarin?

18      A.    If he was on -- so if he was on

19  carefully monitored warfarin therapy, his risk

20  of that happening would have been 1.8 events per

21  100 years.  And we know from the head-to-head

22  comparison with Xarelto that on Xarelto his risk

23  of that happening is higher.

24      Q.    What was the quantification of that

25  risk on Xarelto?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.    What's the hazard ratio?

2    Q.    No.  You say 1.8 out of 100 on

3    warfarin.  I'm asking --

4    A.    That's based upon the HAS-BLED score.

5    And the risk of -- what was the table we were

6    looking at earlier?

7          MR. GOZA:  2.

8    A.    Table 2?

9          MR. GOZA:  I think it was 2.

10   A.    Gastrointestinal --

11   BY MR. STEKLOFF:

12   Q.    Earlier we were looking at Table 1 in

13   6.1.

14   A.    Table 1.

15         So I don't have a calculator to create

16   a hazard ratio, but there were 2.0 events of

17   gastrointestinal bleeding per 100 patient-years

18   in the Xarelto group, and 1.2 in the warfarin

19   group in the ROCKET AF study.

20   Q.    Okay.  And understanding that --

21   strike that.

22         The discussion of oozing blood and

23   systematic toxicity, that also could have

24   occurred in Mr. Boudreaux's case had he been

25   taking any of the other NOACs, correct?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1            MR. GOZA:  The only objection I'll

 2   make is I know you've asked that question like

 3   ten times.

 4       A.    I think I've said yes.

 5            MR. STEKLOFF:  All right.  Let's take

 6   a break.

 7            THE VIDEOGRAPHER:  The time now is

 8   12:22 p.m.  We are off the record.

 9            (Whereupon, a luncheon recess was

10            taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              AFTERNOON SESSION

 2

 3              THE VIDEOGRAPHER:  This begins disk

 4    four of today's deposition.  The time now is

 5    1:09 p.m.  We are back on the record.

 6    BY MR. STEKLOFF:

 7        Q.    Dr. Winstead, going back to the

 8    sentence in your report on Page 2 about the

 9    absence of a recommendation for appropriate

10    laboratory studies.

11        A.    Yes.

12        Q.    Now, do you agree that the absence of

13    a recommendation for appropriate laboratory

14    studies did not impact the treatment of

15    Mr. Boudreaux once he arrived at the hospital?

16              MR. GOZA:  You're talking about the

17    second time for the bleed?

18              MR. STEKLOFF:  For the bleed.

19        A.    Talking about -- so at that point, the

20    absence of a hypothetically available laboratory

21    test, while -- it doesn't appear to have

22    affected his management at the time he presents

23    to the hospital with his bleeding.

24    BY MR. STEKLOFF:

25        Q.    So you do agree with my statement?
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1      A.    Yes.

 2      Q.    And, in fact, you agree with the

 3  management of Mr. Boudreaux's bleed once he

 4  arrived at the hospital, correct?

 5      A.    Correct.

 6      Q.    By his treating physicians?

 7      A.    Correct.

 8      Q.    And agreeing that we would always

 9  prefer for a patient to never have a

10  gastrointestinal bleed, that there's nothing

11  good about a gastrointestinal bleed, can we

12  agree that Mr. Boudreaux's gastrointestinal

13  bleed was routine in the context of your

14  clinical care?

15            MR. GOZA:  That, I'm going to object

16  just to the -- it's ambiguous.

17            But go ahead.

18      A.    Yeah, he had a non-fatal but

19  clinically significant gastrointestinal bleeding

20  event.  So is that routine?

21  BY MR. STEKLOFF:

22      Q.    Let me -- that's a fair objection.

23      A.    Depends on what you mean by "routine."

24      Q.    Let me ask this.  With someone who

25  presents like Mr. Boudreaux did at the hospital
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    with a gastrointestinal bleed that he had, in

2    terms of, then, his treatment in the hospital

3    over the course of a couple days, was that

4    typical of what other patients who have similar

5    gastrointestinal bleeds would go through?

6        A.    Yes, his hospital course was

7    relatively typical.

8        Q.    And his recovery was relatively

9    typical?

10        A.    Yes.

11        Q.    And is it fair to say that you're not

12    offering any opinions about Mr. Boudreaux's care

13    and treatment once he left the hospital after he

14    was treated for that gastrointestinal bleed?

15        A.    With the exception of the fact that he

16    followed up for the video capsule study, which

17    was done, I think, a couple of weeks after

18    discharge, right?

19        Q.    And that video capsule study, that was

20    an appropriate course of treatment, correct?

21        A.    That was an appropriate course of

22    treatment.  But I think at that point, you know,

23    my opinion ends.  I would think at that point my

24    opinion ends.

25        Q.    You're not offering any opinions about

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1   whether or not Mr. Boudreaux could have or

2   should have been placed on an anticoagulant

3   following the resolution of his gastrointestinal

4   bleeding?

5       A.    That's -- yeah, that's outside of my

6   area of clinical practice.

7       Q.    And similarly, you're not offering any

8   opinions about the LARIAT procedure that

9   Mr. Boudreaux ultimately underwent?

10      A.    About the appropriateness, is that

11  what you said?

12      Q.    Correct.

13      A.    No, I mean, that's -- I don't know

14  enough about that to -- except sort of what it

15  does.

16      Q.    Turning to a slightly different topic,

17  based on your review of Mr. Boudreaux's medical

18  records and the deposition testimony, do you

19  agree that there's confusion about the number of

20  Xarelto capsules that he took?

21          MR. GOZA:  I'll object to the form.

22      A.    Do I agree that there's confusion over

23  the number of capsules that he took?  I would go

24  back to my earlier testimony and say that he,

25  Mr. Boudreaux, testified that, in his
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    deposition, that he was taking it on a daily

2    basis.  And I would believe Mr. Boudreaux was

3    taking it on a daily basis.

4        Q.    You credit his testimony on that?

5        A.    I would credit his testimony on that.

6        Q.    And are you aware that Nurse Theriot's

7    records indicate she prescribed 100 capsules,

8    plus gave him 10 capsules as a sample?

9             MR. GOZA:  Objection to the extent --

10   BY MR. STEKLOFF:

11       Q.    I'm sorry, just to -- actually, to ask

12   a more accurate question.

13            That she actually prescribed 90

14   capsules and gave him 10 capsules as a sample?

15            MR. GOZA:  First of all, let me just

16   object, just because you said it's her records.

17   It's not her records.  That's been clearly

18   established.  So I would object to the form and

19   the assumption that's made.

20            MR. STEKLOFF:  I'll ask a different

21   question.

22   BY MR. STEKLOFF:

23       Q.    Have you seen medical records that you

24   reviewed indicating that he received 90 capsules

25   as part of his prescription and 10 capsules as

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    part of a sample?

2         A.    Did I see medical records?  I don't

3    think I -- that's a narrowly focused question.

4               I don't recall if I saw that in his

5    records, or if my memory of that comes from the

6    deposition of Nurse Theriot, to be honest with

7    you.

8         Q.    Are you aware that Mr. Boudreaux

9    brought 96 capsules to his deposition?

10        A.    I am aware of that, yes.

11        Q.    And if he had taken four capsules in

12   total of Xarelto, how, if at all, would that

13   impact your opinion about causation?

14        A.    Well, I think he had taken more than

15   that because he said he was taking it on a daily

16   basis.

17        Q.    And my question is, if the jury

18   determines that he didn't take it on a daily

19   basis --

20        A.    If the jury determines that he doesn't

21   take it on a daily basis, you're kind of getting

22   back at the question that you had for me

23   earlier, which was how much Xarelto do you need

24   to take to increase your bleeding risk.  And I

25   would refer you to my answer for that question,

1   which is it's probably a better question for a

2   pharmacologist.

3        Q.   And does it also matter, in your

4   opinion, when he took the Xarelto, if he only

5   took four capsules, for example, as -- in

6   relation to when the bleed occurred?

7             MR. GOZA:  I'm just going to object to

8   the form.

9        A.   So if you're -- I mean, I guess I

10  suppose that if upon his discharge for his

11  atrial fibrillation hospitalization, if you

12  really believe that he only had -- ever had 100

13  capsules in his possession, and he took the

14  medicine the first four days and then was

15  hospitalized, what's it supposed to be, like,

16  three -- it should be, I think, three weeks

17  afterwards, 20 days?

18       Q.   There was 26 days between his

19  prescription and his --

20       A.   Right.  So it would be 20 days later

21  that he bleeds.

22            Under that scenario, I think it would

23  be unlikely that he bled from Xarelto, because

24  he wouldn't have received it for 20 days.

25            But there's a number of hypotheticals

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that lead up to that that I don't think I

2    believe.  I think I credit his testimony.  I

3    think he was probably given more Xarelto than

4    Nurse Theriot recalls, because my experience is

5    that we drown in prescription samples and do

6    everything we can to get them out of there.

7        Q.    But is it fair to say that you agree

8    that if he only took four capsules, and that he

9    did so closer in time to his prescription than

10   his bleed, you would have a difficult time

11   saying that Xarelto was more likely than not the

12   cause of his bleed?

13       A.    Correct.

14       Q.    And so your causation opinion is,

15   therefore, one of the -- I'll withdraw that.

16            One of the key assumptions for your

17   causation opinion is that he was given more

18   Xarelto capsules and, in fact, took it every

19   day?

20            MR. GOZA:  Well, now I'll object to

21   the -- I think that misstates what he just told

22   you.

23       A.    What I'm -- what I'm assuming

24   is that -- I, again, believe Mr. Boudreaux's

25   testimony that he was taking it on a daily

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1    basis.
2    BY MR. STEKLOFF:
3         Q.    And that's a fundamental premise of
4    your causation opinion?
5         A.    Is that I --
6               MR. GOZA:  Objection.
7         A.    -- believe Mr. Boudreaux's deposition.
8    BY MR. STEKLOFF:
9         Q.    Yes.
10              So the answer to my question is yes?
11        A.    In his own words, yes.
12              MR. STEKLOFF:  I'm going to mark as
13   Exhibit 8 a record from one of Mr. Boudreaux's
14   medical records.
15              (Whereupon, Winstead Exhibit Number 8,
16              Medical record, Bates
17              JBoudreaux-OStAGH-MD-000056, was
18              marked for identification.)
19   BY MR. STEKLOFF:
20        Q.    Do you recall seeing this record?
21        A.    Yes.
22        Q.    Do you recall that Mr. Boudreaux was
23   prescribed Xarelto on January 9th, 2014?
24        A.    Yes.
25        Q.    And do you see that the records
```

1    document that he was sent home with a 90-day

2    prescription, and samples given per Veronica RN

3    for next ten days?

4         A.    That's what it says.

5         Q.    And you are assuming, based on

6    Mr. Boudreaux's deposition testimony, that he

7    was given more samples than documented in this

8    record?

9         A.    Correct.

10        Q.    And that's based on your credibility

11   determination of Mr. Boudreaux?

12        A.    Correct.

13        Q.    And nothing else?

14        A.    Correct.

15        Q.    Moving to a new topic.

16              Do you --

17        A.    Excuse me, may I -- may I amend my

18   answer -- my previous answer, rather?

19              MR. GOZA:  You can.

20        A.    That, and the fact that when he

21   presented bleeding he had an abnormal

22   prothrombin time, which would be consistent with

23   using the Xarelto, as we discussed earlier.

24   BY MR. STEKLOFF:

25        Q.    What was his prothrombin time that was

1    unusual?

2        A.    When he initially presented?

3        Q.    Yes.

4              MR. GOZA:  He didn't say it was

5    unusual.

6        A.    Bleeding --

7    BY MR. STEKLOFF:

8        Q.    Okay.  What was his prothrombin time

9    that was abnormal?

10       A.    Well, let's look.

11             13.6.

12       Q.    What was -- do you recall any records

13   of what his prothrombin time was before he ever

14   took Xarelto?

15       A.    I believe he had one in the hospital

16   when he was admitted for atrial fibrillation.

17   He had at least one.

18       Q.    And what was it?

19       A.    I can't remember off the top of my

20   head.

21       Q.    What makes you say that 13.6 is an

22   abnormal prothrombin time?

23       A.    It's, I believe, for that laboratory,

24   and I'm going by memory, that that's outside the

25   upper limit of normal.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    Based on the laboratory records,

2  you're saying?

3      A.    Correct.

4      Q.    Do you know what reagent was used?

5      A.    No.

6      Q.    Do you recall whether he had

7  prothrombin times measured following his bleed

8  and after he was off Xarelto?

9      A.    I don't recall seeing one.

10     Q.    If they were almost exactly the same,

11  13, would you say that his prothrombin time when

12  he presented at the hospital with his bleed was

13  abnormal?

14          MR. GOZA:  I'll object to the form.

15  It misstates evidence.

16     A.    If there were -- well, the answer is

17  it depends if there's something else that he was

18  taking or some other medical condition which

19  would extend his prothrombin time.

20  BY MR. STEKLOFF:

21     Q.    Well, you reviewed all of his medical

22  records.

23          So following his bleed and after he

24  stopped taking Xarelto, did he ever take any

25  medications or have any other medical conditions

1    that would have extended his prothrombin time?

2        A.    Well, yeah, he's had -- my

3    understanding and my recollection is that he's

4    had issues, ongoing issues with mild to moderate

5    congestive heart failure, which can cause

6    passive liver congestion.

7        Q.    And that can increase your prothrombin

8    time?

9        A.    It can increase your prothrombin time.

10       Q.    So why couldn't that have increased

11   his prothrombin time when it was taken on

12   February -- in February of 2014 and presented

13   with a bleed?

14       A.    Because at that time he was not in

15   heart failure, to my understanding.  When he

16   presented to the -- when he presented initially

17   with his gastrointestinal bleeding, I don't

18   believe that there was evidence that he was also

19   in heart failure.

20       Q.    Okay.  Now --

21       A.    He wasn't managed as though he was in

22   heart failure.

23       Q.    Do you know, was he in heart failure

24   in May of 2015?

25       A.    I can't recall.  I mean --

1       Q.    Do you recall seeing that he had a

2   prothrombin time of 13.2 in May of 2015?

3       A.    No, I mean, I don't recall looking at

4   that.

5       Q.    Is that an abnormal score in May of

6   2015?

7             MR. GOZA:  Are you going to show him

8   the reference range so he can --

9       A.    Show me the reference.  It depends on

10  the reference range for that lab, and that

11  depends somewhat upon the --

12            MR. STEKLOFF:  Happy to show it to

13  you.

14            MR. GOZA:  Now we're talking a year

15  and a half later?

16            MR. STEKLOFF:  We're talking May of

17  2015.

18            MR. GOZA:  So a year and a half later.

19            MR. STEKLOFF:  So what?

20            MR. GOZA:  A year and a half later?

21            MR. STEKLOFF:  Yes.  I said May 2015

22  from the start.

23            (Whereupon, Winstead Exhibit Number 9,

24            Medical record, Bates

25            JBoudreaux-PPR-001664 through 1673,

```
 1            was marked for identification.)

 2     A.    So I don't know the differences

 3  between the reagents between Terrebonne General

 4  and Ochsner St. Anne.  I don't know what the

 5  normal range for Ochsner St. Anne is.

 6            Where are we looking here?  You don't

 7  have a copy of his labs from Ochsner St. Anne

 8  that you --

 9  BY MR. STEKLOFF:

10     Q.    Well, are you --

11            MR. GOZA:  Well, I'll tell -- do you

12  want me to tell you what the reference range

13  was?

14            MS. HOFFMANN:  No.

15            MR. STEKLOFF:  No.

16            MS. HOFFMANN:  He's asking questions.

17  Kirk --

18            MR. STEKLOFF:  You can ask a

19  question --

20            MR. GOZA:  But you can't just give him

21  part information and then say, "is that

22  abnormal."

23            MR. STEKLOFF:  I can do whatever I

24  want, and he can answer the questions.

25            MR. GOZA:  Well, you can, but then I
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    can object and tell him that.

2            Go ahead.

3        A.    So 13.2 for Terrebonne General Medical

4    Center on this particular day, May 11, '15, is

5    within the normal range, and it provides an INR

6    of 1.0.

7    BY MR. STEKLOFF:

8        Q.    Okay.  And so just to go back to this,

9    you are basing your opinion that Mr. Boudreaux

10   took more -- took daily -- took a daily pill of

11   Xarelto from the day he was prescribed Xarelto

12   up until the bleed on two factors; one, his

13   testimony, and two, his prothrombin time on

14   February 3, 2014?

15           MR. GOZA:  And I'll object to the

16   extent that misstates his testimony.

17           Go ahead.

18       A.    The testimony as well as -- the

19   testimony as well as that information, yes.

20   BY MR. STEKLOFF:

21       Q.    So exactly what I said in my question?

22       A.    Correct.

23       Q.    But you have already testified you're

24   not an expert in prothrombin time?

25       A.    No, or laboratory medicine or

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   pathology or hematology.

2       Q.    And do you agree there are other

3   factors that could have put Mr. Boudreaux's

4   prothrombin time at 13.6, outside of the

5   reference range on February 3, 2014?

6       A.    So again, he had no prior evidence of

7   liver disease or coagulopathy.  At that time in

8   February, there was no compelling evidence that

9   he was in heart failure.  And the only

10  medication that he was on that prolongs

11  prothrombin time is the Xarelto, that I'm aware

12  of.

13      Q.    So are you now going back to our

14  discussion that we had an hour and a half ago

15  offering any opinions to try to correlate

16  prothrombin time with the risk of bleeding?

17      A.    No, I mean, we went around and around

18  on that.

19      Q.    I just want to make sure.

20          MR. GOZA:  This is -- no, but what he

21  said --

22      A.    What I said --

23          THE COURT REPORTER:  I'm sorry.  One

24  at a time, please.

25          MR. GOZA:  Let me object, just

1  because, first of all, the question is

2  argumentative, secondly completely misstates

3  what the doctor spent two hours explaining.

4        MS. HOFFMANN:  Counsel, I think it's

5  easiest and in compliance with the rules if you

6  just say objection.

7        MR. GOZA:  I know what you think.  And

8  if it weren't so completely apparent, I might

9  agree with you in certain circumstances, but now

10  he's asked this question like 50 times and he's

11  trying to misstate what the doctor said in order

12  to try to -- he didn't like the answer the first

13  time so now he wants to change it.

14        So go ahead.

15     A.    I would direct you again to my

16  comments that I made earlier about the package

17  insert.

18  BY MR. STEKLOFF:

19     Q.    And so in Mr. Boudreaux's specific

20  case, are you saying his prothrombin time was

21  elevated because of Xarelto?

22     A.    Yeah, that's what you just asked me.

23  Yes, that is on the day that he presented with

24  his gastrointestinal bleeding episode.  I think

25  that there's no other identifiable source for

1    his abnormal prothrombin time, and I think that

2    that's one of the things that I used to

3    formulate my opinion that he was taking his

4    medication.

5        Q.    But you agree that even at a

6    prothrombin time at 13.6 on the day of his

7    bleed, that you're not the expert to say whether

8    that still placed him in the right risk/benefit

9    range?

10       A.    That's correct.

11       Q.    You're really just relying -- and I'm

12   not trying to repeat a question, just I want to

13   make sure I understand -- you're really just

14   relying on this prothrombin time right now to

15   say that that's part of your basis for

16   concluding that he was taking Xarelto?

17       A.    Correct.

18       Q.    And so again, other than that, you

19   don't intend on offering any opinions on

20   prothrombin time?

21       A.    Correct.

22       Q.    Last topic for me before Ms. Hoffman

23   may have some questions.

24             Did you look for observational

25   studies, other than the four, that demonstrated

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that Xarelto performed better on safety and/or

2    efficacy measures than other NOACs?

3              MR. GOZA:  You said Xarelto performed

4    better?

5    BY MR. STEKLOFF:

6        Q.    Or Xarelto -- I won't use the word

7    "performed" since it wasn't a clinical trial.

8              Did you look for observational

9    studies, other than the four that you cited in

10   your report, that conclude that Xarelto compares

11   better on safety and/or efficacy measures than

12   other NOACs?

13             MR. GOZA:  And I don't want to be

14   argumentative, so I'm just going to object

15   because I think it assumes that these four

16   concluded what you just said, which I don't

17   think is true, so...

18   BY MR. STEKLOFF:

19       Q.    No, well, just to be clear, you are

20   setting those -- you're setting four -- we're

21   talking past each other?

22             You're setting four for the view that

23   Xarelto is actually worse on safety and efficacy

24   measures than the other NOACs, correct?

25       A.    Correct.

1    Q.    And my question is, are you aware that

there are lots of other observational studies

out there about NOACs?

4    A.    I am aware of those.

5    Q.    Okay.  Did you --

6    A.    Wait.  I didn't finish my answer.

7    Q.    Okay.

8    A.    They have their own sets of

limitations.

10    Q.    They all have their own?

11    A.    Yes.

12    Q.    They all have the same limitations

frankly, right?  Some may be more exaggerated

than others, depending on the populations?

15    A.    I would disagree with that contention

actually.  I think that what I appreciated

reviewing this literature in preparing my

statement, my opinion, is that many of the

studies that were done early on, like the

immediate postmarketing studies, had very small

numbers of patients in the Xarelto arms and made

it very difficult to make any compelling

conclusions.  That's, in general, what I would

observe to you.

25    Q.    Did you look for more recent studies

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that compared Xarelto to other NOACs in terms of

2    safety or efficacy?

3         A.    I did look for more recent studies.

4         Q.    Did you see studies that in certain

5    areas of safety or efficacy stated that Xarelto

6    performed better than the other NOACs that were

7    more recent?

8         A.    You're talking general safety and

9    efficacy on general points rather than broad

10   statement.  Yes, I have seen some studies that

11   said -- yeah.

12        Q.    What about the risk of major bleeds?

13        A.    No.

14        Q.    What about the risk of fatal bleeds?

15        A.    I think the answer is no.  But I'm --

16   you know, you get into some very narrowly

17   focused questions, and I can't remember

18   everything that I've ever seen, to be honest

19   with you.

20        Q.    If those studies exist, would you want

21   to consider them in forming your opinion?

22        A.    I'd want to consider those as well as

23   their limitations, yes.

24        Q.    Just like the limitations in the

25   studies you cite?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1      A.      Correct.

 2      Q.      For example, some of the studies that

 3  you cited compared Xarelto in older populations

 4  to NOAC -- another NOAC used in another

 5  population, right?

 6      A.      That's not a completely true

 7  statement, because they did what's called

 8  propensity scoring and attempting to control the

 9  populations that were observed.  So while that

10  statement is true of a direct comparison, they

11  attempted to compensate for it, and a full

12  discussion of that is for an epidemiologist, and

13  I don't want to get into it because I'll get it

14  wrong and everyone will go to sleep.

15      Q.      It's still a limitation even if you

16  try to control for it?

17      A.      It's still a limitation even if you

18  try to control for it.

19      Q.      Especially in the context of an

20  observational study as opposed to a head-to-head

21  clinical trial?

22      A.      Well, yeah.  Observational studies are

23  we're always doing those kind of attempts at

24  controlling for things.

25          MR. STEKLOFF:  I pass the witness to
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Ms. Hoffmann.

2            MR. GOZA:  Are we physically going to

3    move?

4            MS. HOFFMANN:  I don't think so.  I

5    speak loudly and clearly.  If there's a problem,

6    you can let me know.  I don't have that many

7    questions to ask.  I leave it up to Madam Court

8    Reporter.

9            THE COURT REPORTER:  Fine.

10           MS. HOFFMAN:  She's the most

11   important.  I have no doubt that you all can

12   hear me.

13                   EXAMINATION

14   BY MS. HOFFMANN:

15       Q.    Doctor, I want to go back.  You have

16   indicated a couple times today that you reviewed

17   over 3,000 pages of medical records that

18   pertained to Mr. Boudreaux, correct?

19       A.    Correct.

20       Q.    And you reviewed those medical records

21   so that you could come here and give your

22   opinions today?

23       A.    Correct.

24       Q.    One of your opinions that you've given

25   today, and I think you've said it a couple

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   times, is that you believe that Xarelto caused

2   Mr. Boudreaux's bleed in part because he didn't

3   bleed before he was on Xarelto and he didn't

4   bleed once he stopped taking Xarelto, correct?

5       A.    Correct.

6       Q.    And you've now indicated that that

7   opinion is at least qualified by the fact that

8   you believe for it to be your opinion, there has

9   to be evidence that Mr. Boudreaux actually took

10  Xarelto at or near the time that he had the

11  clinically overt symptoms for his GI bleeding,

12  is that correct?

13      A.    Yes.

14      Q.    Okay.  And you know, because you've

15  also read the depositions that have been done in

16  this case, that Mr. Boudreaux presented at his

17  deposition with 96 pills, and testified that he

18  had prescriptions for 100 pills, correct?

19      A.    Correct.

20            MR. GOZA:  Well --

21  BY MS. HOFFMAN:

22      Q.    How do you --

23            MR. GOZA:  -- I was going to object

24  that he testified to that.  That's...

25  BY MS. HOFFMANN:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    You read his deposition, did you not?

2      A.    Yes.

3      Q.    Okay.  And you read that at the time

4   of his deposition he physically presented 96

5   Xarelto tablets, correct?

6      A.    Correct.

7      Q.    And he testified in his deposition

8   that upon discharge from the hospital he was

9   given samples, correct?

10      A.    Correct.

11      Q.    And that a prescription for 90 pills

12   was ordered, and that he received those,

13   correct?

14      A.    Yes.

15      Q.    And then you read the nurse's

16   deposition testimony in conjunction with the

17   discharge papers, and you see that according to

18   that documentation, Mr. Boudreaux got ten days'

19   worth of samples, correct?

20      A.    Yes.

21            MR. GOZA:  I'll object to the form of

22   that.  That misstates the evidence.

23      A.    Correct.

24   BY MS. HOFFMANN:

25      Q.    Okay.  You'll agree with me?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1        A.    I agree that that's what's in the
 2   records we're discussing.
 3        Q.    Okay.  And so how do you reconcile the
 4   96 pills that were brought to the deposition
 5   with the notion that there were 100 pills that
 6   were actually prescribed?  Have you formulated a
 7   basis for that reconciliation?
 8            MR. GOZA:  The only objection I'll
 9   make is to the form of "prescribe."
10   BY MS. HOFFMANN:
11        Q.    You can answer.
12            MR. GOZA:  Yeah.
13        A.    I would direct you to my earlier
14   answer, which is that I believe Mr. Boudreaux's
15   testimony.  And as a practicing physician, my
16   experience has been that you are inundated with
17   so many samples that it's difficult to get rid
18   of them, and I also know that we are very bad at
19   documenting how many samples are given to who
20   and for what.  And so --
21   BY MS. HOFFMAN:
22        Q.    So in formulating -- I'm sorry.
23        A.    And so primarily I would rely on
24   Mr. Boudreaux's testimony, because I think him
25   taking the medication on a daily basis is
```

1    plausible and he's believable.  And again, this

2    is a guy who called his doctors' office to

3    follow up after he made refill requests from a

4    mail order pharmacy, which is unusual.

5        Q.    So at least in part, as I understand

6    your answer, you're taking your own clinical

7    experience at being bad about properly

8    documenting samples that are given and

9    transposing that to the nurse and the

10   practitioners who were dealing with

11   Mr. Boudreaux, is that correct?

12            MR. GOZA:  And I'll object as to the

13   form of the question.

14       A.    I'm not bad at documenting giving away

15   samples.  I'm saying my experience has been that

16   many providers are bad about accounting for

17   those things.

18   BY MS. HOFFMANN:

19       Q.    In reviewing Mr. Boudreaux's medical

20   records to form your opinions in this case, you

21   reviewed his medical records both prior to the

22   time that he was given the Xarelto prescription,

23   as well as you reviewed his medical records

24   following his discharge from the hospital?

25       A.    Yes.

1    Q.    And in reviewing those medical

2    records, you looked at not only the medical

3    records, but all of his laboratory findings or

4    results?

5    A.    Yes.

6    Q.    And, Doctor, would you agree with me

7    that based on a review of Mr. Boudreaux's

8    laboratory findings prior to the time that he

9    was prescribed Xarelto, that you cannot rule out

10   that he had a mild chronic occult GI bleed?

11   A.    I would not agree with that, because

12   he was not anemic, he had never described any

13   blood in his stool, he had had his stool checked

14   for blood as a routine colorectal cancer

15   screening on a few occasions and there was never

16   any evidence of blood in his stool.

17   Q.    So at least from your review of the

18   laboratory findings prior to the time that

19   Mr. Boudreaux was prescribed Xarelto, you found

20   nothing in those laboratory findings that would

21   suggest the possibility of a mild chronic occult

22   bleed?

23   A.    That's correct, I have not found

24   anything to suggest that.

25   Q.    Now, you mentioned anemia.  Post

1  discharge from the hospital, would you agree

2  with me that Mr. Boudreaux has had laboratory

3  findings indicating that he continues to be

4  anemic?

5      A.    Post discharge from what hospital

6  when?

7      Q.    I'm sorry, post -- let me go back.

8            You know that he was in the hospital

9  for his overt clinical GI bleed from about

10  February the 4th until his discharge on February

11  the 8th; you know that from your review of the

12  medical records, right?

13     A.    Yes, ma'am.

14     Q.    So if we talk about the time frame

15  following his discharge on February 8, 2014,

16  you're aware, based on your review of the

17  medical records, that he has had laboratory

18  findings of anemia following that discharge,

19  correct?

20     A.    Correct.

21     Q.    Would you agree with me that given

22  laboratory findings that are in his medical

23  records post February 8, 2014, you cannot rule

24  out a subsequent mild chronic occult bleed?

25     A.    Well, I think he's anemic, I think it

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   needs to be worked up.  I mean, I -- can you --

2   you've ruled it out at this point to a

3   reasonable degree of medical certainty again

4   because he's had a comprehensive digestive tract

5   workup.

6           MS. HOFFMANN:  I'm sorry, will you

7   read back my question?  I'm not sure -- I'm not

8   sure you heard my question --

9           MR. GOZA:  I think it was directly

10  responsive.

11          Go ahead, read it back.

12          (Whereupon, the reporter read back the

13  pending question.)

14          MR. GOZA:  And what was the answer?

15      A.   My answer would be that --

16          MR. GOZA:  No, I want her to read it.

17  I just wanted to make sure I heard it correctly.

18  BY MS. HOFFMANN:

19      Q.   That's okay, you can answer it again.

20  If you --

21      A.   I think, to a reasonable degree of

22  medical certainty, a chronic occult

23  gastrointestinal bleed for Mr. Boudreaux has

24  been ruled out.

25      Q.   Post his discharge from the hospital,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   is that correct?

2       A.      Correct.  Yes.

3       Q.      Okay.  And do you have an explanation,

4   then, for his anemic laboratory findings post

5   discharge on February 8, 2014?

6       A.      No.  And he needs to see a

7   hematologist, frankly.

8       Q.      So why would you recommend that he see

9   a hematologist if there is -- if you've already

10  ruled -- if you have already ruled out a mild

11  chronic occult bleed?

12      A.      Because he could have a primary bone

13  marrow problem.  He could have mild dysplasia.

14  He could be on medications which are making him

15  anemic.

16      Q.      And could --

17      A.      He could be B12 deficient.

18      Q.      He could also be having a mild chronic

19  occult bleed that's making him anemic?

20      A.      No.  Again, we ruled that out to a

21  reasonable degree of medical certainty.  He's

22  had a full evaluation of his gastrointestinal

23  tract.

24      Q.      You indicated earlier that he had a

25  pill cam study, correct?

1       A.    Yes.

2       Q.    Now, he was discharged from the

3   hospital on February 8th, 2014, correct?

4       A.    Yes.

5       Q.    And that pill cam study was done on

6   March 28, 2014, correct?

7       A.    Mm-hmm.

8       Q.    Is that yes?

9       A.    I'm sorry.  Yes.

10      Q.    Would you have preferred to see that

11  pill cam study done sooner in time to his

12  discharge from the hospital?

13            MR. GOZA:  Object to the form of the

14  question.  Outside of his identification as an

15  expert.

16      A.    That's a really difficult question to

17  answer.  I mean, yeah, you would have liked to

18  have seen it been done a bit sooner, perhaps.

19      Q.    Would you find the results of the pill

20  cam study to be more reliable if they are done

21  closer in time to the discharge from the

22  hospital?

23      A.    Not really.  When you do a pill cam,

24  you're looking for things like tumors and

25  ulcers, vascular malformations in the small

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    intestine that can bleed sporadically.  And so

2    those things, you know, tumors, polyps, don't

3    just go away.  Vascular malformations don't just

4    go away.  So, I mean, how relevant is it?  I'm

5    not completely sure.

6        Q.    Are the results of a pill cam study

7    more reliable, if they're looking for AVM, if

8    they are done closer in time to the diagnosis of

9    the clinically overt bleed?

10       A.    Only in that you may see blood in the

11   gastrointestinal lumen.

12       Q.    And if you see blood in the

13   gastrointestinal lumen, that helps identify a

14   pathological -- I mean an anatomical source for

15   the bleed, is that right?

16       A.    If you see blood, you look for

17   something nearby in temporal or spatial

18   relationship to the blood that you're seeing,

19   and that gives you an idea of what's causing the

20   bleeding.

21       Q.    With a pill cam study, you end up

22   getting a video of what the camera has filmed as

23   it goes through the system.  Is that the basic

24   idea?

25       A.    That's the basic idea.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    And you get about eight hours' worth

2  of film, is that correct?

3    A.    It's one frame every six seconds for

4  an eight-hour recording.

5    Q.    And when the reader of the AVM is

6  looking at the tape from -- I'm sorry.

7          When a reader of the pill cam study is

8  looking at the tape, he or she is not looking at

9  all eight hours of the film, are they?

10    A.    No, in fact, they are.

11    Q.    They sit for eight hours and look at

12  every part of the film?

13    A.    So it's one frame every six seconds is

14  what's captured.  Traditional video playback of

15  TV, I believe, is -- I believe in the US is

16  29.97 frames per second.  When the video capsule

17  recording is played back, it can be played back

18  at regular speed.  It can also be played back, I

19  think, up to 24 times regular speed.  The speed

20  that it's played back at is adjustable by the

21  reader.  And those preferences for how fast it's

22  played back vary from reader to reader.

23    Q.    As you sit here today, you have no

24  idea who the reader was of the pill cam study

25  that was done on Mr. Boudreaux, correct?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1           MR. GOZA:  I'll object.

2      A.    That's in the medical records.  It was

3  Dr. Joshi.

4  BY MR. STEKLOFF:

5      Q.    Dr. Joshi actually read it, or do

6  you -- was it one of his assistants or fellows

7  or research people, do you know?

8      A.    I believe his name is signed to the

9  report.

10      Q.    Do you know how much of the film he

11  actually looked at?

12      A.    Well, I have no way of knowing that.

13      Q.    I'm sorry?

14      A.    I have no way of knowing that.

15      Q.    Okay.  You don't know how much of the

16  film was looked at, correct?

17      A.    That's what I just said.

18      Q.    And it's possible, when anybody is

19  looking at those films, to either not look at

20  all of it or to miss something, fair statement?

21      A.    Yeah, that's a fair statement.

22      Q.    You talked before about the mechanism

23  that you propose was the mechanism in place for

24  Xarelto to have caused Mr. Boudreaux to bleed,

25  correct?

1    A.    Yes.

2    Q.    And that mechanism, I think you said,

3  is a systemic or system toxicity, correct?

4    A.    So I believe he was taking Xarelto,

5  and Xarelto increased his chances of bleeding.

6    Q.    I understand that part, Doctor.  I'm

7  more focused on the mechanism that you talked

8  about before, which I think you called system

9  toxicity.

10        Is that the mechanism that you're

11  relying on?

12    A.    So I'm -- he was -- his system was

13  exposed to Xarelto, and that caused him to be at

14  increased risk for bleeding.

15    Q.    Okay.  But all anticoagulants expose a

16  system to be at an increased risk of bleeding,

17  right?

18    A.    Yes, and Xarelto more than others.

19    Q.    And you base that on these four

20  studies that you have looked at -- oh, no, I'm

21  sorry.

22        For the GI bleeding, you're referring

23  to the ROCKET study?

24    A.    I'm referring both to the ROCKET study

25  and the four studies that are laid out in my

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    opinion.

2        Q.    I guess my question is this.  When you

3    talk about this systemic toxicity and this

4    oozing of blood from the mucosal area, is that

5    what you're proposing happened to Mr. Boudreaux?

6        A.    Yes.  I'm proposing that he oozed from

7    probably his upper GI tract because he was

8    anticoagulated with Xarelto.

9        Q.    When you say "he oozed from his upper

10   GI tract," would that oozing leave a mark?

11       A.    No.

12       Q.    So the oozing from the upper GI tract

13   that you opine happened to Mr. Boudreaux because

14   of Xarelto would not leave any kind of

15   identification?

16       A.    No.

17       Q.    So you wouldn't see it on endoscopy?

18       A.    No.  Unless he was bleeding at the

19   time we looked.

20       Q.    So the oozing that you propose was

21   self-limiting?

22       A.    He stopped at -- his Xarelto was

23   stopped and he stopped bleeding.

24       Q.    So according to the records and

25   according to his deposition testimony, the last

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    time he took Xarelto would be the morning of

2    February the 3rd, is that correct?

3              MR. GOZA:  I'll object.  I don't think

4    that's been testified to, or even asked.

5              MS. HOFFMANN:  Pardon me?

6              MR. GOZA:  I'm saying that wasn't even

7    asked of him at his deposition.

8              MS. HOFFMANN:  Sure it was.

9              MR. GOZA:  No.  But anyway...

10   BY MS. HOFFMANN:

11        Q.   What do you understand was the last

12   time that Mr. Boudreaux took a Xarelto tablet?

13        A.   I assume it was on or before when he

14   presented to the emergency room.

15        Q.   Okay.  And he presented to the

16   emergency room on what day?

17        A.   Let's look so I tell you the right

18   answer.

19              (Witness reviewing document.)

20        A.   That would be February 3rd.

21   BY MS. HOFFMANN:

22        Q.   Okay.  So you understand he took his

23   last Xarelto tablet the morning of February 3rd,

24   he presented to the emergency room.

25              The Xarelto, in your view, had caused

1   this oozing of blood from the upper GI mucosa,

2   correct?

3       A.    Correct.

4       Q.    But that it had stopped by the time he

5   had the endoscopy?

6       A.    Correct.

7       Q.    And that's why there was no -- you

8   couldn't see it on endoscopy?

9       A.    Correct.

10      Q.    So there was no indication of any

11  bleeding, active bleeding by Mr. Boudreaux at

12  any time that he was in the emergency room or

13  after he was hospitalized, is that correct?

14      A.    With the exception he had -- his stool

15  was positive for blood when he presented to

16  St. Anne's, so that would be a sign of ongoing

17  bleeding.

18      Q.    Well, would it be a sign of ongoing

19  bleeding, or would it -- does it take time

20  for --

21      A.    Well, that's a fair question.  I mean,

22  yeah, I would concede that that could be a sign

23  that he had bled sometime in the last 24 hours.

24      Q.    But it's not necessarily indicative of

25  a current active bleed, you'd agree with that?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1        A.     Not always, no.

2        Q.     I'm talking about Mr. Boudreaux.  So

3   let's just focus on him.

4               Here's the point that I'm trying to

5   understand.  Your opinion that the Xarelto

6   caused a direct toxic effect to his upper GI

7   mucosa that resulted in bleeding was not seen on

8   endoscopy, that we know, correct?

9        A.     You're using a different phrase.  So

10  again, he was exposed to Xarelto, and he had an

11  upper GI bleed.

12              I think the fact that his blood was

13  thin and that the normal homeostasis between

14  forming clot and breaking down -- breaking down

15  a clot was interrupted caused him to ooze from

16  his upper GI tract.

17              He never bled before Xarelto, and once

18  Xarelto was stopped he didn't bleed anymore.  So

19  that's what I think happened to Mr. Boudreaux.

20       Q.     But when you say he didn't bleed

21  before he was exposed to Xarelto, what you're

22  really saying is that he didn't have a

23  clinically overt bleed, is that right?

24              MR. GOZA:  I'll object.  That

25  misstates what he's already testified to.
```

1    A.   No.  What I testified to earlier was

2   he had never been anemic, he had his stool

3   checked for blood, and that had been negative,

4   so there was no evidence of overt or obscure

5   gastrointestinal bleeding in Mr. Boudreaux

6   before he ever took Xarelto.

7   BY MS. HOFFMANN:

8    Q.   How is it, then, that you can rule out

9   that he didn't have some self-limiting bleed in

10   the GI tract before he was on an anticoagulant

11   that just resolved itself?

12    A.   How can I rule out that before he was

13   ever on Xarelto that he had a self-limited

14   gastrointestinal tract bleeding that was

15   subclinical and never diagnosed and never

16   presented with any kind of laboratory

17   abnormality?  Is that what you're asking me?

18    Q.   That's my question.

19    A.   That's kind of -- I mean, you would

20   have some kind of lab abnormality, you would

21   feel poorly, you would be anemic, you know.

22    Q.   You looked carefully at all of his lab

23   values prior to his admission to St. Anne's and

24   then to Ochsner, correct?

25    A.   In February?  Yes.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    You looked at his -- all of his prior

2  lab values?

3    A.    Correct.

4    Q.    For how long a period back?

5    A.    As far back as I had records, which

6  was several years.

7    Q.    And you found nothing in those

8  laboratory values that suggested to you that

9  there could have been a prior mild occult bleed?

10    A.    No.

11    Q.    Okay.

12          MR. GOZA:  Can we take a short one?  I

13  need to use the restroom.

14          MS. HOFFMANN:  Sure.

15          THE VIDEOGRAPHER:  The time now is

16  1:54 p.m.  We are off the record.

17          (Whereupon, a recess was taken.)

18          THE VIDEOGRAPHER:  Time now is

19  2:05 p.m.  We are back on the record.

20  BY MS. HOFFMANN:

21    Q.    Doctor, I want to change gears for a

22  couple of minutes.

23          Can you tell me, do you do rounds at a

24  local hospital, or do you call at a local

25  hospital?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.     Yes.

2      Q.     And how frequently do you do that?

3      A.     Sort of always on call, so that's

4    pretty much a daily event that I make rounds at

5    a hospital.

6      Q.     So you don't do like other -- I know

7    I've talked to some GI docs who will have one

8    week every six weeks where they're the

9    designated person on call.  Do you have anything

10   like that, or are you just generally always on

11   call?

12     A.     I'm generally always on call.

13     Q.     And do you encounter most of the GI

14   bleeds that you deal with in the hospital

15   setting?

16     A.     Yeah.  I mean it's maybe once a year

17   somebody walks in the clinic and has signs or

18   symptoms of -- you know, that started today of

19   gastrointestinal bleeding.  But most of the time

20   it's in the hospital.

21     Q.     So can you give me your best estimate,

22   and I don't know if you want to do it on a

23   weekly basis or a monthly basis, but how many GI

24   bleeds you deal with on a, let's say, monthly

25   basis?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.    I would guess two to four a week, two

2    to five a week, which would give you, you know,

3    10 to 20 a year, a couple hundred a year.

4    Q.    And of the one to 200 per year GI

5    bleeds that you deal with, can you estimate how

6    many of those patients are on an anticoagulant?

7    A.    I mean, it would just be a guess, but

8    I would say maybe one in three, one in four.

9    Q.    Is that -- I know you said it's a

10   guess.  Would it be your best estimate?

11          MR. GOZA:  Object to the form.

12   A.    That's what I'm saying, yeah, it's my

13   best estimate.

14   BY MS. HOFFMANN:

15   Q.    Okay.  So about one in four of the GI

16   bleeds that you see are in association with a

17   patient who is on an anticoagulant?

18   A.    Correct.

19   Q.    And can you break that down any

20   further?  Of the one in four that you see who

21   are on an anticoagulant, how many of those are

22   on coumadin as opposed to a NOAC?

23   A.    I can't even give you a best guess in

24   that sense.

25   Q.    Okay.  Is it more of the bleeds that

1   you see are associated with patients on Coumadin

2   than patients who are on NOACs?

3       A.    I'm not certain, to be honest with

4   you.

5       Q.    Would you agree that even patients who

6   are on Coumadin and they are within the

7   therapeutic range still are at increased risk of

8   a GI bleed?

9       A.    Yes.

10      Q.    When you deal with patients who have a

11  GI bleed and you go through the various tests

12  available to you and are unable to determine the

13  site of that bleed, do you regularly conclude

14  that it was the anticoagulant itself that

15  initiated the bleed?

16      A.    Yes.

17      Q.    And when you conclude that it was the

18  anticoagulant itself that initiated the bleed,

19  is that information that you share with the

20  patient?

21      A.    Yes.

22      Q.    And I know you said before that you do

23  not initiate anticoagulant prescriptions,

24  correct?

25      A.    Correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    But when you are dealing with a

2   patient who has a bleed who has taken an

3   anticoagulant and you have determined that the

4   anticoagulant was the cause of initiating the

5   bleed, do you share that information with the

6   doctor who was prescribing anticoagulation?

7      A.    Yes.

8      Q.    And do you recommend to the doctor who

9   was prescribing the anticoagulation that the

10  patient not be reanticoagulated?  Do you go that

11  far?

12         MR. GOZA:  I'll object, because I

13  think that's been asked and answered.

14     A.    Yeah, I've answered that question.  I

15  mean, there -- I outline -- I would just refer

16  you to my earlier answers in the transcript,

17  because I answered that exact question.

18         There are certain circumstances where

19  I have discussions with the other doctor that,

20  perhaps, the patient should be managed

21  differently, and I've outlined those scenarios

22  for you.

23  BY MS. HOFFMANN:

24     Q.    When you determine that an

25  anticoagulant was the cause of a patient's

1    bleed, do you report that information to the

2    FDA?

3        A.    No, not routinely.

4        Q.    And why is that?

5        A.    So any anticoagulant at all, if a

6    patient has gastrointestinal bleeding on an

7    anticoagulant, why do I not?  I just don't do it

8    in routine clinical practice.  Should I?  I

9    mean, if you read the letters of the rule, any

10   type of adverse reaction to any medication is, I

11   believe, supposed to be reported to the FDA.

12   But do I do it in routine clinical practice?  I

13   do not.

14       Q.    Do you -- when you determine that a

15   patient has had a system toxic reaction to an

16   anticoagulant, is that information you provide

17   to the patient?

18       A.    So if I believe that a patient has

19   received too high of a level of drug and that

20   has led to them being at increased risk for

21   bleeding, do I discuss that with the patient?

22   Yes.  So, yes.

23       Q.    Is there a difference in what you're

24   saying between a person being at an increased

25   risk of a gastrointestinal bleed because they're

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   on an anticoagulant and versus an anticoagulant

2   directly causing the bleed?  Is there a

3   difference in those two?

4        A.    I'm not sure I --

5              MR. GOZA:  I'll object to the form.

6        A.    I'm not sure I completely understand

7   the question.

8              But I think what I said to you all

9   before was patients on an anticoagulation, any

10  kind of anticoagulant, warfarin, NOAC, and they

11  have bleeding, they then have systemic exposure

12  to the drug because they've been taking it, and

13  they have toxicity in the form of the bleeding.

14             So a patient who is on an

15  anticoagulant, and that anticoagulant increases

16  their risk of bleeding, that's a toxic effect of

17  medication.

18  BY MS. HOFFMANN:

19       Q.    The goal of an anticoagulant is to

20  inhibit the blood's ability to clot, correct?

21       A.    Correct.

22       Q.    So is it your testimony that the toxic

23  result of an anticoagulant is the same as its

24  intended effect?

25       A.    No, because nobody has ever said that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   the intended effect was for a patient to have a

2   gastrointestinal bleed or major bleeding.

3       Q.    Isn't major bleeding inherent in the

4   notion that if a person is on an anticoagulant

5   and there's a pathological reason for the bleed,

6   the anticoagulant is going to step in and do its

7   job, which is to prevent clotting, the result

8   being more of a bleed?

9           MR. GOZA:  Object to form.

10      A.    Start your question again at the

11  beginning, please.

12  BY MS. HOFFMANN:

13      Q.    Sure.  Let me try it again.

14          If a person has an underlying

15  pathology that starts, puts a hole in their

16  gastrointestinal system such that they start to

17  bleed from that hole, isn't the role of the

18  anticoagulant to inhibit clotting?

19          MR. GOZA:  Object to the form.

20      A.    I mean, you're asking me if

21  anticoagulants are anticoagulants is

22  functionally the question.  So yes,

23  anticoagulants are anticoagulants.

24  BY MS. HOFFMANN:

25      Q.    So that if there is an anatomical and

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   pathological compromise to the GI system such

2   that a bleed starts, you would expect a person

3   on an anticoagulant to bleed more than a person

4   who is not on an anticoagulant?

5       A.    Correct.  But you don't need something

6   to start the bleeding, which has been my

7   testimony.

8       Q.    That's exactly right.  Your testimony

9   has been that you don't need that underlying

10  pathology because there can be a direct toxic

11  effect between the anticoagulant and the GI

12  system, right?

13      A.    No.  I think you're taking my words

14  and twisting them around a little bit.

15      Q.    Okay.

16      A.    If you're on a blood thinner, it's

17  going to increase your risk of bleeding.  If you

18  bleed on a blood thinner, you have systemic

19  toxicity from the blood thinner.  So in other

20  words, your blood has been thinned, you're

21  bleeding, that's -- the bleeding would be the

22  toxic effect.

23          So you've been exposed to the drug and

24  you're bleeding, so your risk of bleeding has

25  been increased because of the medication.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1        Q.    And that, what you just said,

 2   summarizes your opinion in this case?

 3             MR. GOZA:  I'll object as to the

 4   extent, extensive opinion.

 5        A.    No, this is my opinion in the

 6   document.

 7             MS. HOFFMANN:  I don't have any

 8   further questions.

 9             MR. GOZA:  Do you have some more?  I

10   have just a few.

11             MR. STEKLOFF:  You can go ahead.

12                    EXAMINATION

13   BY MR. GOZA:

14        Q.    I just have a few, Doctor.  I want to

15   make sure I understand something.

16             You were asked a little bit about the

17   basis upon which you determined that

18   Mr. Boudreaux was anticoagulated on the date of

19   his bleed on February 3, 2014.

20             Do you recall that?

21        A.    Yes.

22        Q.    And part of your testimony -- and

23   there were several things that I think you

24   testified about, but I want to make sure they're

25   clear for the record.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              One was Mr. Boudreaux's testimony

 2    himself, true?

 3        A.    True.

 4        Q.    You also looked at the PT levels that

 5    were before, at the time of the bleed, and

 6    after, true?

 7        A.    True.

 8        Q.    And the PT level that was taken on

 9    January 7, 2014 at the hospital when

10    Mr. Boudreaux had his diagnosis of atrial

11    fibrillation was 11.4 with a reference range of

12    9.0 to 12.5.  That would be within normal

13    limits, true?

14              MS. HOFFMANN:  Objection.  Leading.

15        A.    True.

16    BY MR. GOZA:

17        Q.    And that was only three weeks before

18    his bleed?

19        A.    Correct.

20        Q.    At the time of his bleed, his PT was

21    13.6, again with the reference range of 9 to

22    12.5.

23              That would be abnormal, and indicate a

24    state of anticoagulation, correct?

25              MS. HOFFMANN:  Objection.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1      A.    Correct.

 2   BY MR. GOZA:

 3      Q.    The next PT that had been referenced

 4   by counsel for the defense was 13.2, but that

 5   was at a hospital that had a different reference

 6   range, correct?

 7      A.    Correct.

 8      Q.    The reference range for that hospital,

 9   I will represent to you, was 11.5 to 14.0.

10            Is that consistent with your reading

11   of the record?

12      A.    Correct.

13      Q.    Then that would have been within the

14   normal limits and, therefore, not indicative of

15   any level of anticoagulation at that time,

16   correct?

17            MS. HOFFMANN:   Objection.

18      A.    Correct.

19   BY MR. GOZA:

20      Q.    And in addition to those laboratory

21   studies and Mr. Boudreaux's testimony,

22   Mr. Boudreaux also made a number of visits to

23   the cardiologist in between the time he was

24   diagnosed with atrial fibrillation and the time

25   that he had his gastrointestinal bleed, would
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    that be correct?

2        A.    That's correct.

3        Q.    And I think I counted three visits.

4    And in each and every one of those visits, did

5    the documentation show that he was taking

6    Xarelto?

7        A.    Correct.

8        Q.    And was that another thing that you

9    looked at in terms of formulating your opinions

10   in this case today?

11       A.    Yes.

12             MS. HOFFMANN:  Objection.

13   BY MR. GOZA:

14       Q.    I think, and I want to make sure,

15   we've gone through your report, which was marked

16   as Exhibit -- is it 1 or 2?

17             MR. STEKLOFF:  1.

18             MR. GOZA:  1.

19   BY MR. GOZA:

20       Q.    We've gone through that in a fair

21   amount of detail, but I want to just make sure

22   of a couple things.

23             You've had an opportunity now to offer

24   your opinion that Xarelto, in fact, caused

25   Mr. Boudreaux's gastrointestinal bleed that he

```
 1   suffered on February 3rd of 2014, is that

 2   correct?

 3       A.    Correct.

 4       Q.    And do you hold that opinion to a

 5   reasonable degree of medical certainty?

 6       A.    Yes, I do.

 7       Q.    And you have also indicated on

 8   numerous occasions that you believe Xarelto

 9   created an increased risk of bleeding in this

10   patient over and above Coumadin and other NOACs,

11   true?

12       A.    Correct.

13       Q.    Is it also your opinion that had

14   Mr. Boudreaux, in fact, been on well-controlled

15   Coumadin, more likely than not he would not have

16   had a gastrointestinal bleed?

17           MS. HOFFMANN:  Objection.

18       A.    Correct.

19   BY MR. GOZA:

20       Q.    And is that based upon all the things

21   that you've explained here today, including the

22   HAS-BLED score, the risk of being less than 1.88

23   over patient years of 100, and all the other

24   things that you have gone through?

25           MR. STEKLOFF:  Object to form.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1        A.    Yes.

2   BY MR. GOZA:

3        Q.    And similarly speaking, was it your --

4   was it also your testimony that based on your

5   review of the observational comparisons that

6   exist, and your review of the literature, that

7   it's your opinion more likely than not he would

8   not have suffered a bleed on another NOAC?

9        A.    I think it --

10            MS. HOFFMANN:  Objection.

11       A.    I believe his risk was higher, and

12  that's borne out by the observational studies.

13  BY MR. GOZA:

14       Q.    Meaning he was at much or

15  substantially increased risk on another -- with

16  respect to Xarelto as opposed to other NOACs?

17            MS. HOFFMANN:  Objection.

18       A.    From the observational studies, yes,

19  that's correct.

20            MR. GOZA:  I don't have any other

21  questions.

22            MR. STEKLOFF:  I have some follow-up.

23                 FURTHER EXAMINATION

24  BY MR. STEKLOFF:

25       Q.    You were just asked about one of the
```

Case 2:14-md-02592-EEF-MBN   Document 5629-23   Filed 03/03/17   Page 208 of 233

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    bases for your opinions that he was taking

2    Xarelto contemporaneously with his bleed was the

3    fact that Xarelto was listed in his medical

4    records between the time he was prescribed

5    Xarelto and between the time he went to the

6    hospital, is that right?

7         A.    Yes.

8         Q.    Aspirin was listed, too, right?

9         A.    Yes.

10         Q.    You don't believe he was taking

11    aspirin, right?

12         A.    Again, about the aspirin issue, so

13    there were multiple, multiple things about the

14    aspirin.  And, you know, so first and foremost,

15    if the aspirin was playing a role, I would have

16    expected to see some erosion, gastritis,

17    irritation when they had done his endoscopy.  If

18    aspirin was playing a role, I would think of

19    that.

20              Second of all, Mr. Boudreaux testified

21    that he -- you know, there was considerable

22    doubt in his testimony that he was taking his

23    aspirin or not.

24              There wasn't considerable doubt in his

25    testimony as to whether or not he was taking

Golkow Technologies, Inc.                          Page 207

Boudreaux_Nathaniel Winstead, MD Deposition_00207

1    Xarelto.  He said that he had been taking it

2    every day.

3              So these -- all these things weigh on

4    my mind.

5        Q.    All of those things weigh on your mind

6    to lead you to find it credible that he was

7    taking Xarelto, but not credible -- incredible

8    that he was taking aspirin?

9        A.    Correct.

10       Q.    Now, Mr. Goza asked you a few

11   questions about his PT scores.

12             Do you recall that?

13       A.    Yes.

14       Q.    Now, you are not an expert in PT

15   reagents, right?

16       A.    Correct.

17       Q.    Sitting here today, can you tell us

18   any of the reagents that were used on any of

19   those three scores?

20       A.    No.  But I can tell you that they use

21   different reference ranges, which would -- they

22   used different reference ranges, which would

23   compel me to believe that they're using

24   different reagents.  But, again, I'm not an

25   expert.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.    Okay.  But you can't tell this jury

2  whether any of those reagents are a reliable

3  measurement tool for Xarelto concentrations

4  specifically?

5    A.    Correct.

6    Q.    You would defer to other experts on

7  that?

8    A.    I would defer to other experts on that

9  matter.

10   Q.    And if other experts on behalf of the

11 Plaintiffs say that there's no reagent that is a

12 reliable indicator of Xarelto concentration, you

13 would defer to that opinion?

14        MR. GOZA:  Well, let me just object to

15 the extent it might depend on who the expert was

16 and the nature of his expertise.  That's vague

17 and ambiguous.

18 BY MR. STEKLOFF:

19   Q.    Would you still defer, if the expert

20 was offering opinions about reagents?

21   A.    I would defer to somebody who is

22 qualified to make those kind of statements.

23   Q.    Especially if the Plaintiffs' lawyers,

24 in their judgment to retain the lawyer, thought

25 that they were qualified, right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          MR. GOZA:  I think you meant doctor.

2   I think you said "lawyer."

3   BY MR. STEKLOFF:

4      Q.    I'm saying the Plaintiffs' lawyers

5   retained a doctor --

6          MR. GOZA:  I think you said "retained

7   a lawyer."  That's what I thought --

8          MR. STEKLOFF:  Sorry.

9   BY MR. STEKLOFF:

10     Q.    And hired a doctor to offer opinions

11  about things like PT and reagents, you would

12  defer to that person's medical judgment,

13  correct?

14     A.    Yes.

15     Q.    Okay.  So it's possible that with

16  respect to that 13.6 PT score that occurred on

17  February 3, 2014, that the reagent used was not

18  sensitive enough to measure Xarelto

19  concentration, right?

20     A.    I've testified that I'm not an expert

21  in reagents.

22     Q.    So the answer to my question is yes,

23  right?

24     A.    Start your question over from the

25  beginning so I make sure I understand it.

```
 1      Q.    Sure.

 2            It's possible that with respect --

 3   with respect to the 13.6 PT score that occurred

 4   on February 3, 2014 that the reagent used was

 5   not sensitive to measure Xarelto concentration,

 6   correct?

 7            MR. GOZA:  Object to form.

 8      A.    Yeah, so I'm not an expert on PT

 9   reagents.  Is it possible?  Yes.  But I'm not an

10   expert on PT reagents.

11   BY MR. STEKLOFF:

12      Q.    And if the jury determined that the

13   reagent used on that day is not sensitive enough

14   to measure Xarelto concentration, you would have

15   to -- then that really wouldn't factor into your

16   view about whether he was taking Xarelto the day

17   of his bleed, right?

18            MR. GOZA:  Object.  Object to the form

19   of the question.

20      A.    Well, you asked a question about a

21   jury.

22   BY MR. STEKLOFF:

23      Q.    I'll rephrase it.

24            If an expert who was qualified to

25   testify about reagents said that the reagent
```

1  used on that day to measure the 13.6 was not

2  sensitive enough to measure Xarelto

3  concentration, you would defer to that expert's

4  opinion, and you then would not include that in

5  the basis for your opinion that he was taking

6  Xarelto on the day of the bleed?

7       MR. GOZA:  Excuse me, I have to

8  object, because, I mean, that completely

9  misstates his testimony.  And the fact that it's

10 not sensitive doesn't have anything to do with

11 whether it shows anticoagulation.  I object.

12 That completely misstates what he said.

13     A.    If that expert were an expert on PT,

14 PT reagents, and was offering for the record

15 some kind of evidence that was compelling and

16 supported by other experts and he wasn't just

17 somebody out on a limb, then yes.

18 BY MR. STEKLOFF:

19     Q.    Now turning to one last topic.

20          When asked in your final questions by

21 Mr. Goza about the likelihood or the possibility

22 of whether Mr. Boudreaux would have experienced

23 the bleed on warfarin or any of the other NOACs,

24 you kept using the word in part of your answers

25 "risk," right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1       A.      Correct.

2       Q.      You understand the difference between

3   an increased risk and a cause, correct?

4       A.      In legal terms or medical terms?

5       Q.      Let's start with medical terms.

6       A.      Okay.  So again, so Xarelto put

7   Mr. Boudreaux at increased risk for

8   gastrointestinal bleeding more so than

9   well-controlled Coumadin from the direct

10  head-to-head studies.  Assuming a direct cause,

11  would he have bled on a different NOAC or

12  well-controlled Coumadin, I think that the

13  observational data would suggest that he was

14  much more at risk for bleeding on Xarelto, and

15  more likely than not would not have bled on a

16  different NOAC or well-controlled Coumadin.

17      Q.      You had a lot in that answer there.

18              So my basic question is, you

19  understand the medical terms -- without anything

20  about Mr. Boudreaux or causation, just as a pure

21  definitional question, you understand the

22  difference between an increased risk and a

23  cause?

24      A.      Correct.

25      Q.      An increased risk is a statistical

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  analysis that says you are at a higher risk of

2  something that may or may not occur, correct?

3      A.    Correct.

4      Q.    A cause says it did happen and I think

5  it happened because of X, correct?

6      A.    Correct.

7      Q.    It's your view that Xarelto caused

8  Mr. Boudreaux's bleed, correct?

9      A.    Correct.  Because he never bled before

10  he was on Xarelto, and he hasn't bled since he's

11  been off of Xarelto.

12      Q.    Okay.  It's your view that he would

13  have had a lower risk of having a bleed had he

14  taken well-controlled warfarin, is that fair?

15          MR. GOZA:  I'll object.  Misstates his

16  opinion.

17  BY MR. STEKLOFF:

18      Q.    I'm not asking for your whole opinion.

19  I'm just asking that question.

20      A.    Mr. -- the head-to-head evidence would

21  suggest that Mr. Boudreaux would have a lower

22  risk of bleeding on well-controlled warfarin?

23      Q.    A lower risk of a GI bleed?

24      A.    Correct, a lower risk of a GI bleed.

25  Thank you.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    He may have had a higher risk of

2    another type of bleed?

3      A.    Correct.

4      Q.    And that was in the label?

5      A.    That was in the label.

6      Q.    From day one?

7      A.    We covered that.

8      Q.    Now, are you also saying that you can

9    say to a reasonable degree of medical certainty

10   that Mr. Boudreaux would not have had a bleed

11   caused by well-controlled warfarin had he been

12   on well-controlled warfarin?

13     A.    Am I saying that -- there's no way to

14   guarantee that.

15     Q.    It is certainly possible that he could

16   have had a bleed caused by warfarin had he been

17   on well-controlled warfarin?

18     A.    It's possible.

19     Q.    And you can't say more likely than not

20   whether or not that would have occurred in a

21   world in which he was taking well-controlled

22   warfarin?

23          MR. GOZA:  Well, I'll object because

24   he already has testified to that.  It misstates

25   his testimony.

 1      A.    His risk would be much lower.

 2   BY MR. STEKLOFF:

 3      Q.    You can't say more likely than not

 4   whether he would have had a bleed caused by

 5   well-controlled warfarin, if that's what he was

 6   taking?

 7            MR. GOZA:  Same objection.  Same

 8   objection to form.

 9      A.    If you take the numbers and you say

10   more like -- you know, more likely than not, I

11   think you can safely say that the Xarelto

12   increased his risk above, and if that is what

13   you can use as a basis for the term "more likely

14   than not," then yes, I would say more likely

15   than not he would not have bled on

16   well-controlled warfarin.

17   BY MR. STEKLOFF:

18      Q.    Can someone bleed on -- anyone in the

19   world, can they bleed on well-controlled

20   warfarin?

21      A.    Yes.

22      Q.    Can well-controlled warfarin be the

23   cause of their bleeding?

24      A.    Yes.

25      Q.    If Mr. Boudreaux had been on

well-controlled warfarin, could well-controlled warfarin have caused his bleed?

MR. GOZA: Object. Asked and answered numerous times.

A. Yes.

BY MR. STEKLOFF:

Q. Can you say -- I want you -- not talk about risk. I want you to answer my question.

Can you say more likely than not, whether Mr. Boudreaux had been on well-controlled warfarin, whether he would have had a bleed caused by that well-controlled warfarin?

MR. GOZA: My objection is now you've asked and answered --

MR. STEKLOFF: He's not answering my question.

MR. GOZA: He just answered.

MR. STEKLOFF: Just say object to form. Asked and answered.

MR. GOZA: I'm trying to get to the part about asked and answered. You interrupted me.

MR. STEKLOFF: No, but there are too many words.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1          MR. GOZA:  Object to form.  Asked and
 2   answered at least three times.  He's told you
 3   his opinion.
 4          MR. STEKLOFF:  Okay.  I'm going to
 5   read it again without interruption.  You can
 6   say, object to form, asked and answered.  We
 7   will all acknowledge that you've made that
 8   objection and a judge can determine later
 9   whether your objection is sustained or not.
10   BY MR. STEKLOFF:
11     Q.    Can you say more likely than not
12   whether Mr. Boudreaux had been on
13   well-controlled warfarin whether he would have
14   had a bleed caused by that well-controlled
15   warfarin?
16          MR. GOZA:  Object to form.
17     A.    If you look at the -- all right.  So
18   you don't want me to talk about risk.
19   BY MR. STEKLOFF:
20     Q.    I'm not asking you to compare his risk
21   compared to Xarelto.
22          I'm saying, in a world in which he
23   never took Xarelto and Dr. Wong had decided to
24   prescribe him warfarin, can you say whether more
25   likely than not he would have had a bleed caused
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    by that well-controlled warfarin?

2            MR. GOZA:  Would not have had a bleed?

3            MR. STEKLOFF:  Would not have had a

4    bleed.

5        A.    If you looked at his HAS-BLED score,

6    his HAS-BLED score would be .18 per 100

7    person-years, so if by -- if the term "more

8    likely than not" is satisfied by .18 per 100

9    person-years chance, then, yes, I could say that

10   more likely than not he would not have bled on

11   well-controlled warfarin.

12   BY MR. STEKLOFF:

13       Q.    Now, can you say whether more likely

14   than not he would have been well-controlled on

15   his warfarin?

16       A.    I don't manage warfarin, so I have no

17   way of answering that question.

18       Q.    Can you say whether more likely than

19   not he would have had a bleed caused by warfarin

20   that was not well-controlled?

21       A.    So if you look at the HAS-BLED score,

22   patients with a labile INR are at increased risk

23   for bleeding.  And I believe if the same

24   baseline characteristics held true and

25   Mr. Boudreaux had a history of a poorly

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    controlled INR, I believe his HAS-BLED score

2    would go from 1 to 2, and I believe that that is

3    then associated with approximately -- I'm going

4    by memory here -- about four events per 100

5    patient-years, so he would be about twice as

6    likely.

7            And so if you -- again, if you

8    still -- if you're willing to accept that, you

9    know, four events per 100 patient-years

10   satisfies the term "more likely than not," more

11   likely than not he would not have had a bleed on

12   poorly controlled warfarin.

13       Q.    Okay.  What are the number of events

14   per 100 patient-years for Xarelto patients who

15   experience gastrointestinal bleeds?

16       A.    What are the number of events per 100

17   patient-years for patients on Xarelto?  It's in

18   Table 1 in here.

19       Q.    Right.  It's lower than four.

20       A.    It's two.

21       Q.    So knowing that, what would you say

22   about warfarin that wasn't well-controlled,

23   whether that -- in Mr. Boudreaux's case had he

24   been on warfarin and it wasn't well-controlled,

25   whether it would have caused the bleed for him?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

 1      A.    So would he have -- so his -- you

 2  know, again, the likelihood, four events per 100

 3  patient-years is still fairly low.  But, you

 4  know, a two-event-per-100 patient-years was

 5  enough to make Mr. Boudreaux bleed.  So there's

 6  a lot of -- you know, there's a lot of hand

 7  waving and conjecture going on here.

 8            But assuming, you know, a two-per-100

 9  person-year, you know, rate of bleeding was

10  enough to get Mr. Boudreaux to bleed, I would

11  assume a four would be more likely to get him to

12  bleed.

13      Q.    Now, I'm going to ask about the other

14  NOACs.

15      A.    Okay.

16      Q.    Again, I'm not asking about risk.  I'm

17  asking about cause.

18      A.    Okay.

19      Q.    Can you say more likely than not that

20  had Mr. Boudreaux been prescribed one of the

21  other NOACs he would not have had a bleed caused

22  by that NOAC?

23      A.    Just because --

24            MR. GOZA:  I'm just going to object to

25  form and asked and answered.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1          But go ahead.

2     A.    Just because you bleed on one does not

3   mean you're going to bleed on another one, you

4   know.  And I think that the observational

5   studies would suggest that his -- you keep not

6   wanting me to use the word "risk," but his risk

7   from the observational studies would be higher

8   on Xarelto than it is on other NOACs.

9          So could I say more likely than not?

10  Well, so, you know, I think that the variation

11  of the degree of risk for major bleeding events

12  is, you know, to a reasonable degree, you know,

13  he would have a lower risk on another NOACs.  I

14  mean, that's a really hard question to get.

15  BY MR. STEKLOFF:

16    Q.    Right.  Because we're talking -- I'm

17  asking a lot of hypotheticals and asking you to

18  speculate, right?

19    A.    Yeah.  Right.

20    Q.    And so really that's my ultimate

21  point.

22          Isn't it just speculation to say

23  whether or not another anticoagulant other than

24  Xarelto would have caused a bleed in

25  Mr. Boudreaux had that been his prescription?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1              MR. GOZA:  Object.  Misstates his

2     testimony.  He's already offered opinions to a

3     reasonable degree of medical certainty.

4              MR. STEKLOFF:  I'm allowed that.

5              MR. GOZA:  I mean, I know you're

6     allowed.  I'm not fussing about asking, but I

7     can make objections.  It's misstating his

8     testimony.

9         A.    Hit me with the question again --

10    BY MR. STEKLOFF:

11        Q.    Sure.

12        A.    -- so I remember to get it correctly.

13        Q.    Isn't it just speculation to say

14    whether or not another anticoagulant other than

15    Xarelto would or would not have caused a bleed

16    in Mr. Boudreaux?

17             MR. GOZA:  Same objection.

18        A.    Yeah, I mean it's -- yes, I would

19    agree it's speculation.

20    BY MR. STEKLOFF:

21        Q.    And at the end of the day, to the

22    extent you do have the opinion that he would not

23    have bled on another anticoagulation, that's

24    really just based on the relative risk that

25    we're talking about?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1        A.      And my medical knowledge, and my

2   review of the facts of the case, and

3   Mr. Boudreaux's medical records, and depositions

4   of other experts.

5             MS. HOFFMANN:  Excuse me, deposition

6   of other experts?  I thought you testified

7   earlier you haven't read depositions --

8             MR. GOZA:  He meant other witnesses.

9   Don't get too excited.

10       A.      I'm not a lawyer.  I'm not a lawyer.

11  I don't have any of the other expert reports.

12            MR. GOZA:  He meant other treating

13  physicians.

14            MR. STEKLOFF:  He understood.  We

15  don't need to -- yeah, we have that.

16            MS. HOFFMANN:  I thought we were going

17  to be here three more hours.

18            THE WITNESS:  No.

19            MR. STEKLOFF:  With that, I have no

20  further questions.

21       A.      Thank you.

22                  FURTHER EXAMINATION

23  BY MS. HOFFMANN:

24       Q.      And I just want to clarify for the

25  record, your testimony just a minute ago when
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   you referred to your review of depositions of

2   other experts, you were referring to the

3   treating doctors --

4        A.    As experts.

5        Q.    -- for Mr. Boudreaux, is that correct?

6        A.    Yes.

7        Q.    And just to clarify, you have not been

8   made aware of the identity of other experts who

9   have been nominated in this case by the

10  Plaintiff?

11       A.    No.

12       Q.    And you have not been made aware of

13  the identity of experts in Mr. Boudreaux's case

14  who have been proposed by the defense, is that

15  correct?

16       A.    Correct.

17       Q.    You have not read any testimony or

18  reports of any experts who have been nominated

19  or proposed by the Plaintiffs or by the

20  Defendants in this case, is that correct?

21       A.    That's correct.  I just proved the

22  wrong word coming out of your mouth could mean a

23  world of hurt.

24       Q.    I'm sorry?

25       A.    I just meant his treating physicians.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    I was referring to his treating physicians as

2    experts.

3        Q.    Just a point of clarification.

4              Thank you, Doctor?

5              MR. GOZA:  I don't have any questions

6    for you.

7              I think we're done.

8              THE VIDEOGRAPHER:  The time now is

9    2:38 p.m.  Today's deposition of Dr. Nathaniel

10   Winstead is now concluded.

11             (Whereupon, the deposition was

12   concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              REPORTER'S CERTIFICATE

 2

 3         This transcript is valid only for a

 4    transcript accompanied by my original signature

 5    and original required seal on this page.

 6         I, MAUREEN O'CONNOR POLLARD, Certified

 7    Court Reporter (LA Certificate #2011025), in and

 8    for the State of Louisiana, as the officer

 9    before whom this testimony was taken, do hereby

10    certify that NATHANIEL S. WINSTEAD, MD, after

11    having been duly sworn by me upon authority of

12    R.S. 37:2554, did testify as hereinbefore set

13    forth in the foregoing pages; that this

14    testimony was reported by me in the stenotype

15    reporting method, was prepared and transcribed

16    by me or under my personal direction and

17    supervision, and is a true and correct

18    transcript to the best of my ability and

19    understanding; that the transcript has been

20    prepared in compliance with transcript format

21    guidelines required by the statute or by rules

22    of the board, that I have acted in compliance

23    with the prohibition on contractual

24    relationships, as defined by Louisiana Code of

25    Civil Procedure Article 1434 and in rules and
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    advisory opinions of the board.

2        That I am not related to counsel or to the

3    parties herein, nor am I otherwise interested in

4    the outcome of this matter.

5

6        Signed this the 12th day of December, 2016.

7

8

9

10   _____

11   MAUREEN O'CONNOR POLLARD, CCR, RMR, CLR

12   Realtime Systems Administrator

13   LA Certificate #2011025

14

15

16

17

18

19

20

21

22

23

24

25

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                INSTRUCTIONS TO WITNESS

 2

 3               Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8               After doing so, please sign the

 9    errata sheet and date it.  It will be attached

10    to your deposition.

11               It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                  - - - - - -

                E R R A T A

 2                  - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5       REASON: _____

 6    ____  _____   _____

 7       REASON: _____

 8    _____  _____  _____

 9       REASON: _____

10    _____  _____  _____

11       REASON: _____

12    _____  _____  _____

13       REASON: _____

14    _____  _____  _____

15       REASON: _____

16    _____  _____  _____

17       REASON: _____

18    _____  _____  _____

19       REASON: _____

20    _____  _____  _____

21       REASON: _____

22    _____  _____  _____

23       REASON: _____

24    _____  _____  _____

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3           I, _____, do
   Hereby certify that I have read the foregoing
4  pages, and that the same is a correct
   transcription of the answers given by me to the
5  questions therein propounded, except for the
   corrections or changes in form or substance, if
6  any, noted in the attached Errata Sheet.

7

8  _____
   WITNESS NAME                DATE
9

10

11

12

13

14

15 Subscribed and sworn
   To before me this
16 _____ day of _____, 20____.
17 My commission expires: _____
18

   _____
19 Notary Public
20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1                    LAWYER'S NOTES

2     PAGE   LINE

3     _____  _____   _____

4     _____  _____   _____

5     _____  _____   _____

6     _____  _____   _____

7     _____  _____   _____

8     _____  _____   _____

9     _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____

25