# EXHIBIT-24

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF LOUISIANA
 3                   -   -   -
 4   IN RE: XARELTO            MDL NO. 2592
     (RIVAROXABAN) PRODUCTS
 5   LITIGATION                SECTION L
 6   THIS DOCUMENT RELATES      JUDGE ELDON
     JOSEPH J. BOUDREAUX        E. FALLON
 7   Case No. 2:14-CV-0270
                                MAG. JUDGE NORTH
 8                   -   -   -
 9            December 15, 2016
10                   -   -   -
11              - PROTECTED -
12     - SUBJECT TO FURTHER PROTECTIVE REVIEW -
13
14        Videotaped deposition of
15   HENRY MICHAEL RINDER, M.D., held at the law
16   office of Douglas & London, 59 Maiden Lane,
17   New York, New York, commencing at 8:12 a.m.,
18   on the above date, before Marie Foley, a
19   Registered Merit Reporter, Certified
20   Realtime Reporter and Notary Public.
21                   -   -   -
22        GOLKOW TECHNOLOGIES, INC.
23     877.370.3377 ph | 917.591.5672 fax
24            Deps@golkow.com
```

Protected - Subject to Further Protective Review

```
1    A P P E A R A N C E S:

2

3

4    SCHLICHTER, BOGARD & DENTON, LLP

5    BY: ROGER C. DENTON, ESQUIRE

6        100 South Fourth Street

7        Suite 1200

8        St. Louis, Missouri  63102

9        314.621.6115

10       rdenton@uselaws.com

11

12              - and -

13

14       HERMAN, HERMAN & KATZ

15       BY: ANNE (BESS) E. DeVAUGHN, ESQUIRE

16           820 O'Keefe Avenue

17           New Orleans, Louisiana  70113

18           504.581.4892

19           bdevaughn@hhklawfirm.com

20           Representing the Plaintiff

21

22

23

24
```

Protected - Subject to Further Protective Review

```
 1    A P P E A R A N C E S: (Cont.)

 2    WILKINSON WALSH & ESKOVITZ

 3    BY: BRIAN L. STEKLOFF, ESQUIRE

 4        MEG LOFTUS, ESQUIRE

 5        1900 M Street, NW, Suite 800

 6        Washington, DC  20036

 7        202.847.4030

 8        bstekloff@wilkinsonwalsh.com

 9        mloftus@wilkinsonwalsh.com

10        Representing Bayer Pharmaceuticals

11

12    BARRASSO, USDIN, KUPPERMAN,

13    FREEMAN & SARVER, LLC

14    BY: RICHARD E. SARVER, ESQUIRE

15        MADISON A. SHARKO, ESQUIRE

16        909 Poydras Street, Suite 2400

17        New Orleans Louisiana  70112

18        504.589.9700

19        rsarver@barrassousdin.com

20        msharko@barrassousdin.com

21        Representing Janssen entities

22

23    ALSO PRESENT:

24        Henry Marte, videographer
```

Protected - Subject to Further Protective Review

```
 1                    -   -   -

 2              TRANSCRIPT INDEX

 3                                 PAGE

 4    APPEARANCES..................... 2, 3

 5    INDEX OF EXHIBITS................ 5

 6    EXAMINATION OF HENRY MICHAEL RINDER, M.D.:

 7    BY:  MR. SARVER.................. 8

 8    REPORTER'S CERTIFICATE........... 196

 9    SIGNATURE PAGE................... 194

10    ERRATA.......................... 195

11

12

13

14                    -   -   -

15

16

17

18

19

20

21

22

23

24
```

Protected - Subject to Further Protective Review

```
 1                    -   -   -

 2               E X H I B I T S

 3                    -   -   -

 4      NO.        DESCRIPTION                PAGE

 5   1             Expert Report of Henry        11

 6                 Michael Rinder, M.D.,

 7                 dated October 14, 2016

 8   2             Ochsner Pathology and        120

 9                 Laboratory Medicine

10                 Laboratory Report for

11                 Joseph Boudreaux, dated

12                 June 1, 2013, Bates No.

13                 JBoudreaux-OStAGH-MD-

14                 000973 through

15                 JBoudreaux-OStAGH-MD-000979

16   3             STAH Emergency Department    124

17                 Lab Results for Joseph

18                 Boudreaux, dated January 7,

19                 2014, Bates No.

20                 JBoudreaux-OStAGH-MD-

21                 000029 through

22                 JBoudreaux-OStAGH-MD-

23                 000032

24
```

Protected - Subject to Further Protective Review

1    DEPOSITION SUPPORT INDEX

2

3    DIRECTION TO WITNESS NOT TO ANSWER

4       Page    Line

5        - -none- -

6

7

8    REQUEST FOR PRODUCTION OF DOCUMENTS

9       Page    Line

10       - -none- -

11

12

13   STIPULATIONS

14      Page    Line

15       - -none- -

16

17

18   QUESTIONS MARKED

19      Page    Line

20       - -none- -

21

22

23

24

Protected - Subject to Further Protective Review

```
1                    -   -   -

2                  8:12 a.m.

3             New York, New York

4                    -   -   -

5           THE VIDEOGRAPHER:  We are now on

6    the record.  My name is Henry Marte.

7    I'm a videographer for Golkow

8    Technologies.

9           Today's date is December 15th,

10   2016, and the time is 8:12 a.m.

11          This videotaped deposition is

12   being held at 59 Maiden Lane, New

13   York, New York taken in the matter of

14   Xarelto.

15          The deponent today is Dr. Henry

16   Rinder.

17          Counsel will be noted on the

18   stenographic record.

19          Will the court reporter please

20   administer the oath to the witness.

21                    -   -   -

22

23

24
```

Protected - Subject to Further Protective Review

```
 1   HENRY MICHAEL RINDER, M.D., the Witness

 2       herein, having been first duly sworn

 3       by a Notary Public in and of the

 4       State of New York, was examined and

 5       testified as follows:

 6                   -   -   -

 7             DIRECT EXAMINATION

 8                   -   -   -

 9   BY MR. SARVER:

10       Q.    Good morning, Dr. Rinder.

11       A.    Good morning, Mr. Sarver.

12       Q.    Would you just state your full

13   name for the record?

14       A.    It is Henry Michael Rinder.

15       Q.    Thank you.

16             MR. SARVER:  And I'm going to

17       read a statement on to the record that

18       I'm required to read.  You won't care,

19       Roger.

20             MR. DENTON:  Is it the

21       Pennsylvania?

22             MR. SARVER:  It is.

23             MR. DENTON:  I don't think he's

24       cross-noticed in that case specific.
```

Protected - Subject to Further Protective Review

1           MR. SARVER:  I know.  I was told

2     to read it.

3           MR. DENTON:  Okay.  This doesn't

4     mean anything.

5           MR. SARVER:  Don't worry about

6     it.

7           MR. DENTON:  Go ahead.

8           MR. SARVER:  Defendants are in

9     receipt of plaintiff's cross-notice

10    for the deposition of this witness who

11    has issued an expert report in the

12    federal MDL proceeding and is being

13    deposed in connection with that

14    report.  Plaintiff's cross-notice for

15    the Pennsylvania consolidated

16    proceeding is premature because case

17    specific discovery in the Bellwether

18    case has not yet commenced in

19    Pennsylvania, nor have expert reports

20    before served, and specifically the

21    Pennsylvania plaintiffs have not yet

22    served the expert report for this

23    witness.

24           Plaintiff's cross-notice also

Protected - Subject to Further Protective Review

1       fails to take into account the expert

2       protocol that was agreed to among the

3       parties in the MDL proceeding and as

4       entered as an order by the court.

5       Among other things, this protocol

6       limits the depositions of generic

7       experts to seven hours total.

8            In the spirit of cooperation

9       between the federal MDL and the

10      Pennsylvania consolidated proceeding,

11      however, the defendants will not

12      object to plaintiff's cross-notice for

13      the deposition.  This is being done

14      with full reservation of all rights

15      and objections pending negotiation of

16      a mutually acceptable process for

17      expert discovery in the Pennsylvania

18      cases.

19           MR. DENTON:  I understand you

20      made that for the record and I just,

21      two things.

22           First of all, there's no one

23      from Pennsylvania here, but as to this

24      specific deposition, this is a case

Protected - Subject to Further Protective Review

1    specific deposition of the Boudreaux

2    matter, and I'm not sure how that

3    particular legal concern is relevant

4    to this, but we both made our record.

5         MR. SARVER:  No harm done.

6         MR. DENTON:  And we'll proceed.

7         Correct.

8    BY MR. SARVER:

9    Q.    Dr. Rinder, I've passed you a

10   copy of something we've marked Exhibit 1

11   to your deposition.

12        What is it?

13        (Exhibit 1, Expert Report of

14   Henry Michael Rinder, M.D., dated

15   October 14, 2016, was marked for

16   identification, as of this date.)

17   A.    This is the expert report which

18   I issued in the matter of Joseph

19   Boudreaux.

20   Q.    Is it complete?  I see it's six

21   pages.

22        The signature is at the front,

23   not the back.  That's why I ask.

24   A.    Yes, this looks complete.

Protected - Subject to Further Protective Review

1      Q.      Okay, great.

2              When did you prepare your report

3      for Mr. Boudreaux's case?

4      A.      I finished this report on

5      October 14th.

6      Q.      Do you know when you started --

7      A.      2016.

8      Q.      When did you start, do you

9      remember?

10     A.      At least several weeks before,

11     I'm sure.

12     Q.      All right.  Is this your

13     complete report for Mr. Boudreaux's case?

14     Do you have any other opinions?

15     A.      No.

16     Q.      And have you listed all of the

17     references and things that you relied upon

18     in your report, either your generic expert

19     report or Exhibit A?

20     A.      Including my generic report.

21     Q.      Yes, sir.

22     A.      Yes, I believe that this is

23     complete.

24     Q.      All right.  Have you ever met

1    Mr. Boudreaux?

2       A.    Not that I know of.

3       Q.    All right.  Have you -- did you

4    view his videotaped deposition?

5       A.    I did not.

6       Q.    Okay.  Did you read his

7    deposition?

8       A.    I read parts of it that I

9    requested to see.

10      Q.    Okay.  Do you know how many

11   pages, what part of his deposition you

12   read?

13      A.    The -- the one -- the question

14   that I had with respect to Mr. Boudreaux's

15   history was with respect to his Indocin

16   use for episodes of gout.

17      Q.    And you've pulled a page --

18      A.    Hold on.

19      Q.    You go ahead.

20      A.    Let me just make sure that

21   that's all that I.

22            (Perusing document.)

23            I believe that I also asked to

24   see something in his report about when

Protected - Subject to Further Protective Review

1   he -- when he was taking his Xarelto

2   medications, but I don't -- I'm not sure

3   that I was able to make a complete

4   determination, from his deposition from

5   what I received from his deposition as to

6   whether that was definitive or not.

7        Q.    Right.  And we will talk about

8   that, because it's a bit of a puzzle,

9   isn't it, whether he was taking his

10  Xarelto?

11            MR. DENTON:  Object to the form

12      of the question.

13       A.    I'm not sure that it was a -- I

14  don't believe that it was a puzzle as to

15  whether he was taking his Xarelto, but

16  I -- I think there may have been confusion

17  about when he was taking his Xarelto.

18       Q.    We'll talk about that in a

19  moment.

20            Anything else?

21       A.    You're only talking about Mr.

22  Boudreaux's deposition?

23       Q.    Yes.

24       A.    I don't believe there was

Protected - Subject to Further Protective Review

1   anything else that I recall from his

2   deposition that's relevant in this report.

3       Q.   Okay.  Did you read any other

4   depositions relevant to Mr. Boudreaux's

5   case specific report?

6       A.   Yes.

7       Q.   Which ones?

8       A.   I wanted to get -- let me just

9   make sure that I have that -- this -- the

10  name correct.

11              (Perusing document.)

12              I wanted to get more information

13  regarding his use of Indocin for his

14  episodes of gout.  So I asked if there was

15  a -- any other deposition information

16  related to that, and I was sent

17  information from Kenneth, the deposition

18  of Kenneth Wong where he, I guess, was the

19  doctor that was taking care of Mr.

20  Boudreaux and could give information about

21  use of Indocin for episodes of gout.

22      Q.   Did you read Dr. Wong's

23  deposition?

24      A.   Not the entire deposition.  As

Protected - Subject to Further Protective Review

1   for Boudreaux, I only read the areas that

2   I was concerned about for that specific

3   question.

4       Q.    And the specific question you

5   were concerned about for Dr. Wong was the

6   Indocin use?

7       A.    And the episodes of -- and

8   whether there were episodes of gout

9   documented.

10      Q.    And that was it for Dr. Wong

11  that you were concerned about?

12      A.    Let me just make sure, because

13  I -- I'm -- I don't want to be incorrect.

14      Q.    I'm just trying to find out.

15      A.    (Perusing document.)

16            I think that's it.

17      Q.    Okay.  This might be faster if I

18  read a list of depositions unless you

19  recall others that you've read for Mr.

20  Boudreaux.

21            Do you recall off the top of

22  your head any other depositions you

23  reviewed?

24      A.    No.

Protected - Subject to Further Protective Review

1      Q.     Okay.  Let me go through just a

2  few.

3      A.     Okay.

4      Q.     We talked about Mr. Boudreaux's,

5  you read part of that?

6      A.     Correct.

7      Q.     And Dr. Wong, you read part of

8  that?

9      A.     Correct.

10     Q.     Nurse Theriot, did you read

11  Nurse Theriot's deposition?  It's a

12  Louisiana pronunciation, it's spelled

13  T-H-E-R-I-O-T.

14     A.     I'm trying to remember.  I think

15  I -- I may have read something about -- I

16  think I requested something about his

17  medication and that may have been part of

18  it.

19     Q.     Right.

20     A.     I'm sorry, sometimes I --

21  there's so many names.  I may have read

22  that one.

23     Q.     All right.  Maybe some of Nurse

24  Theriot's?

Protected - Subject to Further Protective Review

1    A.    I believe so.  I can't be sure.

2    Q.    Dr. Masri, M-A-S-R-I?

3    A.    I don't believe so.

4    Q.    Dr. Joshi, J-O-S-H-I?

5    A.    I recognize the name, but maybe

6    that was because of the medical record.  I

7    don't believe I read the deposition.

8    Q.    And an unfortunate name, Dr.

9    Fail, for a surgeon?

10         MR. DENTON:  We had an expert

11    named Dr. Maybe.

12    A.    Thank you for the levity.

13    Q.    Anyway, I apologize, Dr. Fail,

14    if you're listening.

15    A.    No, no, I don't -- I don't

16    believe that's one of the ones.

17    Q.    How about Nurse Torres?

18    A.    I don't recall.

19    Q.    Or Nurse Trosclare?

20    A.    Trosclare?

21    Q.    Trosclare.

22    A.    Trosclare, I don't recall.

23    Q.    Okay.  And in looking at your

24    specific report for Mr. Boudreaux, the

Protected - Subject to Further Protective Review

1    only specific literature that you have

2    cited are the Lip article, two Lip

3    articles, 2012 and 2016, and the Graham

4    article 2016.

5           Did I miss any?  I don't see any

6    other specific literature.

7       A.    Well, I believe that in writing

8    this, referring to my general report, I'm

9    being inclusive of all the literature that

10   I reviewed in the general report as well.

11   I'm only including, and again, I didn't

12   want to make this a 70-page document, so

13   I'm only including those for this specific

14   article.

15      Q.    Right.

16      A.    Or report, rather.

17      Q.    But for this report, you cited

18   in the report three articles, the three I

19   just discussed, Lip, Lip, and Graham.

20      A.    Those are cited, but as I said,

21   I'm relying on all of the articles that I

22   read for my general report.

23      Q.    Understand.

24           Did you review Mr. Boudreaux's

Protected - Subject to Further Protective Review

1  medical records?

2      A.    As much as I could.

3      Q.    Okay.  What I think you

4  described is that you read his relevant

5  medical records, and that doesn't tell me

6  which ones you consider relevant.

7            How do I know which ones you

8  read?

9      A.    Well, I was given everything --

10  I was given everything that I asked for

11  with respect to his records in terms of

12  encompassing the broad period of time that

13  we're talking about here in this report,

14  as well as records from prior, but --

15      Q.    How about -- don't let me

16  interrupt.  I almost did.  Go ahead.

17      A.    Okay.  The records that I asked

18  for were for basically his entire medical

19  record, but he has years and years of

20  records, decades.  So I -- I skimmed

21  through as much as I could and looked for

22  areas that I thought were relevant rather

23  than going through exhaustively, which

24  would have taken weeks.  I basically

Boudreaux_Henry Rinder, MD Deposition_00020

Protected - Subject to Further Protective Review

1    skimmed through the records in order to

2    sort of look for areas that I thought were

3    specific and relevant to his history and

4    to the matter at hand rather than trying

5    to make this an exhaustive, encompassing.

6           In doing that, I used my medical

7    judgment to try to decide what I think is

8    relevant and what is important information

9    for Mr. Boudreaux, but is not necessarily

10   relevant to the matter at hand.

11      Q.    Got it.

12           Is there any way you can help me

13   to understand which pages of his record

14   you read, or is that just impossible?

15      A.    I -- I can't really -- I can't

16   really give you the exact page numbers.

17      Q.    Did you review all of his

18   hematology reports?

19      A.    Can you be a little bit more

20   specific about that?

21      Q.    Blood tests that show the

22   hematocrit, hemoglobin, things like that,

23   full blood count, all that stuff.

24           I assume that's important to you

Protected - Subject to Further Protective Review

1   because you're a hematologist?

2        A.    Well, yes.  And I wouldn't want

3   to call it just stuff.  It's -- so, as I

4   said --

5        Q.    I'm sorry.  When I call it

6   stuff, I mean important medical records.

7        A.    I'm trying to be -- I'm also

8   trying to inject levity.

9        Q.    Thank you.

10       A.    Poorly.

11             So, when I say that I reviewed

12  his records for what I found to be

13  relevant, my -- my area of interest

14  obviously is hematology, his bleeding, his

15  hematologic records.  So I looked for

16  everything that I could find that was

17  directly or even indirectly related to his

18  hematologic status, and that would

19  encompass not just specific hematology

20  tests or records, but anything that could

21  be construed or would be associated in any

22  way with hematologic disorders or

23  hematologic complications.  So I tried to

24  look for, and when I say skim, I mean I

Protected - Subject to Further Protective Review

1    looked at each page and I quickly look to

2    see if there's something on that page that

3    is relevant to the matter at hand,

4    relevant to hematology, associated with

5    hematology or relevant or associated with

6    any hematologic complications or disorders

7    that might be associated with this.

8         Q.    I will show you some medical

9    records during the deposition today.  If

10   when I show it to you you have seen it,

11   will you tell me, please?

12        A.    I'll do my best.

13        Q.    And if when I show you one

14   record it prompts your memory of having

15   seen something related to that, will you

16   tell us that too?

17        A.    I will do my best.

18        Q.    Thanks.  And I know it's not

19   possible to get everything, but will you

20   try?

21        A.    I -- if -- as long as this is

22   not a memory test, I will do my best to

23   tell you whether I've seen it before and

24   what I understand it to be related to.

Protected - Subject to Further Protective Review

1      Q.      Perfect, thank you.

2              All right.  You've never spoken

3  to Mr. Boudreaux?

4      A.      I have not spoken to Mr.

5  Boudreaux, that I know of.

6      Q.      And have you spoken to Mrs.

7  Boudreaux, that you know of?

8      A.      No.

9      Q.      Have you ever examined Mr.

10 Boudreaux as a patient?

11     A.      I -- Mr. Boudreaux is not my

12 patient.

13     Q.      Okay.

14     A.      So I've never examined him.

15     Q.      And you have no doctor/patient

16 relationship with Mr. Boudreaux?

17     A.      Because he's not my patient, I

18 do not have a doctor/patient relationship

19 with him.

20     Q.      And you have never ordered the

21 performance of any blood tests or any

22 medical tests on Mr. Boudreaux at all?

23     A.      Again, since he's not my

24 patient, that would be inappropriate.

Protected - Subject to Further Protective Review

1      Q.    All right.  Do you have any

2  changes to your report before we get

3  started going through it?

4      A.    (Perusing document.)

5           I think there are two things

6  that I might say I could have written

7  better, more specifically.

8      Q.    I just want to make sure, are

9  these two things you would like to change

10  here today for us?  I'm happy to do it.  I

11  just want to make sure they're not just

12  things that you think you could have

13  written better, but you actually want to

14  change them.

15      A.    No, I'm not going to -- I'm not

16  asking to change the language.

17      Q.    Okay.

18      A.    But what I am going to do is

19  point out that I think that my language

20  could have been more specific and

21  therefore I would have -- I would have

22  wanted to have written it in a different

23  manner.

24      Q.    Okay.  Let's, it looks like

Protected - Subject to Further Protective Review

1  you're on page 4.

2          Tell us what you're referring

3  to, sir.

4      A.    Well, the -- in one aspect in

5  May of 2015 where it says:  "His atrial

6  fibrillation recurred."

7      Q.    Yes.

8      A.    I think rather than say

9  "recurred," you know, what I would have --

10  would have probably said in a better way

11  was that it was brought to attention again

12  in that it may have been symptomatic, or

13  it may have become more of a clinical

14  concern.  Recurred, I think, just may not

15  be as specific as I would have wanted to

16  have been.

17      Q.    Is that because you don't know

18  whether or not it ever stopped before May

19  of 2015?

20      A.    Well, I think the difficulty

21  with atrial fibrillation is that it is

22  something that is not always consistent,

23  not always continuous, and not always

24  episodic.  It is a condition which has

Protected - Subject to Further Protective Review

1   a -- an inconsistent course, and it can be

2   present but asymptomatic; it can be

3   absent; it can be present but symptomatic.

4   And the use of the word "recurred" I think

5   is just not as accurate -- well, not

6   really as accurate.  Not as specific as I

7   would have liked to have used.

8       Q.    Okay.  Anything else that you

9   would like to adjust the wording on?

10      A.    I think on page 6.

11      Q.    Okay.

12      A.    On the last paragraph, the

13  second sentence I said:  "Instead he

14  underwent an invasive ablation procedure

15  in May 2015 which was successful:

16      Q.    That's just not accurate, is it?

17      A.    Well, actually, when I say --

18  when I use the term "ablation" here, what

19  I was referring to was ablating the source

20  of the possible pulmonary emboli from the

21  left atrium.  And when I looked at that

22  later, I realized that someone else might

23  think that that meant an

24  electrophysiologic ablation.

Protected - Subject to Further Protective Review

1    So, what I should have been more
2  specific about saying was that it was
3  ablation of the source of a possible left
4  atrial clot rather than just leaving the
5  word "ablation."
6    Q.    And this isn't something I want
7  to debate for a long time, but there is a
8  specific medical term for a cardiac
9  ablation, and that isn't what Mr.
10  Boudreaux had.  He had something called a
11  lariat procedure, true?
12    A.    He had a lariat plication
13  procedure.
14    Q.    And that's not an ablation?
15    A.    What I'm saying is that when I
16  used the word "ablation" I meant ablating
17  the source --
18    Q.    Okay.
19    A.    -- of a possible embolism from
20  the left atrium, and I'm not a -- I'm not
21  a cardiologist.  So even though I work
22  with cardiologists, I may not have the
23  exact terminology that is more relevant
24  for them to use, but I'm just clarifying

1  that I would have been -- I would have

2  liked to have made this more specific that

3  I was ablating the source of the

4  pulmonary -- of a possible -- I'm sorry,

5  of a possible left atrial thrombus.

6      Q.    Right, and we can talk more

7  about this later, but the other word you

8  used here is "invasive."

9          An ablation procedure,

10  traditional ablation procedure would be

11  invasive, but do you know how a lariat is

12  performed?

13      A.    I have a -- I have a technical

14  understanding of it, and I would

15  definitely call it invasive.

16      Q.    Would you disagree with the

17  surgeons at Mount Sinai who have written

18  that it's a non-invasive procedure?

19      A.    Well, I don't have enough

20  expertise to be able to agree or disagree

21  with them.  I would like to see their

22  terminology and their description of the

23  technical aspects of that to see if that

24  agrees with mine.

Protected - Subject to Further Protective Review

1    Q.    Do you agree that it is an

2  alternative, a surgical alternative to the

3  use of anticoagulation drugs?

4    A.    Well, if -- if it is a surgical

5  alternative, then it is invasive, and I

6  believe that it is an alternative therapy

7  for patients with atrial fibrillation.

8    Q.    And it allows a patient to not

9  have to take anticoagulants for the rest

10  of their life.  That's one of the reasons

11  that it is used and is becoming more used

12  by cardiologists, correct?

13        MR. DENTON:  I object to the

14    form.

15        Go ahead.

16    A.    I have not -- well, there's two

17  parts to that.  Can --

18    Q.    Which one do you want me to ask

19  again?  Either one.

20    A.    The first part.

21    Q.    Do you agree that a lariat

22  procedure is a procedure that will allow a

23  patient to go without having to take

24  anticoagulant drugs for the rest of his or

Boudreaux_Henry Rinder, MD Deposition_00030

Protected - Subject to Further Protective Review

1    her life?

2        A.    No.  I think that it is a, as

3    you mentioned, an invasive surgical

4    alternative therapy for patients with

5    atrial fibrillation, but I think a blanket

6    statement saying that that obviates any

7    need for any coagulation for the duration

8    of that patient's life, I don't agree with

9    that.

10       Q.    Have you ever studied what the

11   lariat procedure is designed to do and the

12   benefits of the lariat?

13       A.    That is not my area of

14   expertise.

15       Q.    Okay.  And you do know that

16   there is no surgical incision for the

17   lariat procedure?  You know that, don't

18   you?

19       A.    Well, we can -- we can talk

20   about what I consider to be invasive and

21   what others consider to be invasive, but

22   my technical understanding of the lariat

23   procedure is that it is a surgical

24   alternative and I consider surgery to be

Protected - Subject to Further Protective Review

1    invasive.  If you're puncturing through

2    the skin, you're puncturing through the

3    heart, you're puncturing through other

4    areas that there are risks involved with

5    that, I consider that to be invasive.

6        Q.    So, for you, putting a needle

7    into a vein is an invasive procedure?

8        A.    Yes.

9        Q.    Okay.  All right.  That's your

10   understanding and definition of it?

11       A.    Well, that -- no, no, I'm not

12   saying that is my only definition.

13            I'm saying that a non-invasive

14   procedure is giving a medication.

15       Q.    Got it.

16       A.    Or not puncturing through the

17   body.  I think that the concept here of

18   invasiveness is something where you are

19   intervening through an intact structure

20   and making it no longer intact and that

21   brings risks and complications along with

22   it.

23       Q.    You wouldn't quarrel with a

24   cardiologist who said it's a non-invasive

Protected - Subject to Further Protective Review

1    procedure, would you?

2              MR. DENTON:  Object to form.

3         A.    I don't know that I would

4    quarrel.  I would certainly have a

5    discussion and we might agree to disagree.

6         Q.    All right.  And again, I don't

7    think it's important for us to go farther

8    down.

9              Anything else that you'd like to

10   change?

11             MR. DENTON:  Object to form.

12        A.    (Perusing document.)

13             No, I think -- I think

14   everything else is as it is.

15        Q.    Okay.  And I'm going to try to

16   go through some fairly basic questions as

17   quickly as we can.

18             Can we agree that Mr. Boudreaux

19   needed to be anticoagulated for his atrial

20   fibrillation?

21        A.    I -- I think that Mr. Boudreaux

22   fulfilled the indications for

23   anticoagulation with his atrial

24   fibrillation.

Protected - Subject to Further Protective Review

1    Q.    Do you have any disagreement

2    with his prescribing cardiologist, Dr.

3    Wong, who prescribed Xarelto for his

4    atrial fibrillation?

5         MR. DENTON:  Object to form.

6    A.    I think at the time of his being

7    prescribed Xarelto, Dr. Wong did not have

8    information that may have affected his

9    choice of anticoagulation.

10   Q.    All right.  That wasn't my

11   question.

12        My question is do you disagree

13   with Dr. Wong's decision to prescribe

14   Xarelto?

15        MR. DENTON:  Object to form.

16   A.    I agree with his decision to

17   anticoagulate.  I think that he made the

18   best decision that he could at the time.

19   Q.    You don't believe he violated a

20   standard of care by prescribing Xarelto,

21   do you?

22   A.    No, I do not believe that he

23   violated a standard of care.

24   Q.    And you think that Dr. Wong did

Protected - Subject to Further Protective Review

1    not know certain things at the time he

2    prescribed Xarelto.

3             How do you know that?

4        A.    The -- the labeling information

5    in January of 2014 did not have

6    information related to, as we've discussed

7    yesterday at the general opinion report,

8    we did not have information in the label

9    at that time with respect to the hazard

10   ratio and risk of bleeding in the U.S.

11   from the ROCKET-AF study.

12       Q.    All right.  Have you spoken to

13   Dr. Wong?

14       A.    I have not spoken with Dr. Wong.

15       Q.    Have you asked him what he knew?

16       A.    I have not.

17       Q.    Have you read his deposition

18   where he said what he knew at the time he

19   prescribed the drug?

20       A.    As I said, the only information

21   that I read from the deposition of Dr.

22   Wong was his information regarding the

23   Indocin and the episodes of gout.

24       Q.    Do you have any reason to doubt

Protected - Subject to Further Protective Review

1    Dr. Wong's testimony about what he knew

2    when he prescribed Xarelto?

3              MR. DENTON:  Object to the form.

4              Go ahead.

5         A.    I have -- not knowing Dr. Wong

6    and not having read that area, I have no

7    reason to question it.

8         Q.    Do you have any reason to doubt

9    the veracity of his testimony that he

10   would, in 2016 he would do exactly the

11   same thing and prescribe Xarelto to Mr.

12   Boudreaux?

13             MR. DENTON:  Object to the form

14       of the question.

15        A.    I'm sure that Dr. Wong has

16   opinions about what he would or would not

17   do, and I do not have any reason to

18   question his veracity.

19        Q.    Do you have an opinion about

20   what, if you were the cardiologist, do you

21   have an opinion about what drug you would

22   have prescribed to Mr. Boudreaux?

23        A.    Well, since I am not the

24   cardiologist, and as I've discussed

```
 1    before, my role is as a consultant, the

 2    primary prescribers for atrial

 3    fibrillation are cardiologists.  So I

 4    would not venture that.

 5        Q.    Fair enough.

 6              Are you familiar with the CHADS

 7    score system?

 8        A.    In a general way.

 9        Q.    All right.  And the CHADS-VASc

10    system?

11        A.    In a general way.

12        Q.    Do you have an opinion about

13    what was the appropriate CHADS score for

14    Mr. Boudreaux at the time that he was

15    prescribed Xarelto?

16        A.    Let me see if I can refer to my

17    report regarding that, if that's all

18    right.

19        Q.    Sure, yeah, if you'd like to.

20        A.    (Perusing document.)

21        Q.    And I'd refer you to page 4.  It

22    might help.

23        A.    Yes, that's what I'm looking at.

24        Q.    Okay.
```

Protected - Subject to Further Protective Review

1    A.    Now, I know at the time of May

2   2015 he was graded as a CHADS score of 4.

3   I did not see in the record, and perhaps I

4   missed this, at the time that he was

5   prescribed Xarelto in January of 2014

6   whether that CHADS score was the same or

7   different from that.

8    Q.    You would agree that a CHADS

9   score of 4 presents a serious risk of

10  stroke to a patient?

11   A.    I think that a CHADS score of 4

12  is definitely a serious risk.

13   Q.    And a patient with a CHADS score

14  of 4 needs anticoagulation?

15   A.    As I said, I do not disagree

16  that Mr. Boudreaux needed to have

17  anticoagulation prescribed for his atrial

18  fibrillation in January of 2014.

19   Q.    Or he needed a lariat procedure?

20    MR. DENTON:  Object to form.

21   A.    I would leave that opinion to a

22  cardiologist.

23   Q.    That's fair.

24   A.    In terms of trying to make that

Protected - Subject to Further Protective Review

1    comparison of possible management

2    procedures.

3        Q.    That's fair.

4            Do you have any familiarity with

5    the American Heart Association American

6    Cardiology Foundation guideline for the

7    management of atrial fibrillation?

8        A.    In a very general way.

9        Q.    In a very general way, do you

10   understand that that society, that group

11   of cardiologists recommends

12   anticoagulation for a patient with a CHADS

13   score like Mr. Boudreaux's?

14       A.    I'm aware of the work that the

15   group does and of their recommendations

16   and the data that they use for their

17   sources.

18       Q.    Okay.  And are you aware that

19   they recommend the use of NOACs?

20           MR. DENTON:  Object to form.

21       A.    I'm aware that one of the

22   alternatives and one of the therapeutic

23   managements that they use is oral

24   anticoagulants.

Protected - Subject to Further Protective Review

1    Q.    Fair enough.

2         And are you aware that Dr. Wong

3    testified that he followed those

4    guidelines?

5    A.    I do not recall reading that

6    exact part of his deposition.

7    Q.    There's a whole lot of things

8    here that are very important, but we're

9    not going to do that today.

10        MR. DENTON:  You send that to me

11   before we try the case, would you?

12        MR. SARVER:  Absolutely.

13        MR. DENTON:  With your

14   highlighting.

15   BY MR. SARVER:

16   Q.    One of the drugs that was

17   prescribed to Mr. Boudreaux at the time

18   that he was prescribed Xarelto is a drug

19   called, and I may get this wrong, correct

20   me if I get the pronunciation wrong,

21   amniodarone?

22   A.    Amiodarone.

23   Q.    Amiodarone, okay.

24   A.    I believe that was prescribed in

Protected - Subject to Further Protective Review

1  January of 2014.

2      Q.    The same time that his Xarelto

3  was prescribed, correct?

4      A.    I believe that is correct.  He

5  was discharged with those two new

6  medications added to his prior regimen of

7  medications.

8      Q.    And the amiodarone was

9  prescribed at 400 milligrams three times a

10  day.

11        Do you know anything about that

12  drug?  Is that an appropriate dose?

13      A.    I think that the prescribing of

14  amiodarone, although I'm familiar with it

15  and have had many patients on it, I would

16  leave that prescription information and

17  recommendations to a cardiologist.

18      Q.    Okay.  For a patient on

19  amiodarone, do you know what drugs are

20  contraindicated?

21      A.    I know that in my area of work

22  in hematology that amiodarone can have a

23  drug interaction with warfarin.

24      Q.    So, warfarin, if you were on

Boudreaux_Henry Rinder, MD Deposition_00041

Protected - Subject to Further Protective Review

1   warfarin, you don't want to be on

2   amiodarone as well, do you?

3           MR. DENTON:  Object to the form.

4       A.    I don't -- I don't think that is

5   a -- I don't think that is a correct

6   statement in terms of medical care.  We

7   have patients that are on both drugs.  I

8   think that the being aware of the

9   interaction of the drugs is an important

10  consideration in their medical management.

11  The -- the pharmacist and the physician

12  work together on drug interactions to be

13  both aware and to have an understanding of

14  how management may need to be changed.

15  That does not mean that someone can't be

16  on one drug with the other.  It just means

17  that you need to be aware of that and that

18  you may need to make adjustments and

19  especially be consistent in therapy.

20      Q.    Do you prescribe amiodarone?

21      A.    Again, I -- I leave -- that is

22  something that is more in the bailiwick of

23  the primary cardiologist.  Although I do

24  consult with them on patients that are on

Protected - Subject to Further Protective Review

1    amiodarone.

2        Q.    What does it do?

3        A.    My non-cardiologist

4    understanding of amiodarone is that its

5    aim is to help control the rate of atrial

6    fibrillation.

7        Q.    And it's an appropriate

8    prescription for someone like Mr.

9    Boudreaux who's come in with new onset

10   atrial fibrillation?

11       A.    Again, I would defer that

12   judgment to a cardiologist, not myself as

13   a consulting hematologist.

14       Q.    But you are aware that there is

15   an interaction with amiodarone and

16   warfarin?

17       A.    As I said, my -- my work with

18   amiodarone tends to be in the hematologic

19   realm where we know that it has an

20   interaction with warfarin and we adjust

21   appropriately for that.

22       Q.    And would it be appropriate for

23   a cardiologist who is prescribing

24   amiodarone to say "Look, there's an

1    interaction with warfarin here.  I'd like

2    to avoid that.  Why don't I prescribe

3    NOAC?"  Would that be a proper

4    consideration?

5              MR. DENTON:  Object to the form

6         of the question.

7         A.    If you're asking me did the

8    prescriber violate a standard of care

9    here?

10        Q.    Well, that's a good question.

11   Answer that one first.

12        A.    I don't -- I don't think that

13   that is a violation of the standard of

14   care.

15        Q.    Okay.  Do you think it's

16   appropriate to consider the warfarin

17   interaction with amiodarone and factor

18   that into your decision to prescribe a

19   NOAC?

20        A.    I think that the physicians --

21   the physician prescribing the medications

22   for Mr. Boudreaux needs to take into every

23   aspect of his history, every aspect of his

24   medications, and their own assessment of

Protected - Subject to Further Protective Review

1   his condition and therapy and make what

2   they believe to be the best judgment that

3   they can with the information that they

4   have at that time.

5       Q.    Okay.  I didn't see this in your

6   report.  If it's in there, point me to it.

7           But, do you have an opinion as

8   to whether or not Mr. Boudreaux would have

9   had a GI bleed had he been on another

10  anticoagulant other than Xarelto?

11          MR. DENTON:  I object to the

12      form and relevance, but go ahead.

13      A.    Let me take a look at my report,

14  please.

15      Q.    Sure.

16      A.    To be sure.

17      Q.    I didn't see it there, but if I

18  missed it, tell me.

19      A.    (Perusing document.)

20          There are two place -- there are

21  several places where I refer to

22  alternative anticoagulant therapy.  On

23  page 2, section 4 I refer to the fact that

24  the -- one of the alternatives for Mr.

Protected - Subject to Further Protective Review

1    Boudreaux would have been to have had

2    Xarelto discontinued and switched to an

3    anticoagulant with a lesser risk of

4    bleeding, slash, a safer anticoagulant

5    such as Eliquis or Pradaxa.

6         Q.    We'll explore that for a while,

7    but my question --

8              MR. DENTON:  Let him finish.

9              MR. SARVER:  Well, let me make

10        sure the question is clear to us so he

11        knows --

12              MR. DENTON:  Are you going to

13        withdraw the last question?  Because

14        he was in the middle of an answer.

15              MR. SARVER:  This is just going

16        to speed things up.

17              MR. DENTON:  I understand, but I

18        want a clean record.

19        A.    Let me just make sure and I

20    apologize --

21        Q.    That's all right.  Go ahead.

22        A.    -- if it's not specific to your

23    question.

24              But I do mention that Xarelto

Protected - Subject to Further Protective Review

1    has a significantly increased risk of GI

2    hemorrhage compared with warfarin,

3    apixaban and dabigatran.

4         Q.     Which page are you on, 5?

5         A.     I'm sorry, page 5.

6         Q.     Thank you.

7                Anything else?

8         A.     There's a repeat of basically

9    the same from page --

10        Q.     2 paragraph 4?

11        A.     From page 2, paragraph 4 on page

12   6, the end of the first paragraph.

13        Q.     Right.

14        A.     Basically essentially the same.

15        Q.     Right.  And I appreciate that,

16   but let me ask you to focus on my

17   question.

18        A.     Sure.

19        Q.     Do you have an opinion that had

20   Mr. Boudreaux been prescribed another

21   anticoagulant at the outset that he would

22   not have had a GI bleed?

23               MR. DENTON:  Object to the form

24        and the relevance.

Protected - Subject to Further Protective Review

1          Go ahead.

2     A.    I think that -- I think that I

3  could only state that I would say that --

4  I can only state that I think that he

5  would have had a lesser risk of bleeding,

6  but I think that to try to state that

7  someone would not, as in never, have a

8  bleed I think is just impossible to know.

9     Q.    Now, you couldn't say that

10 because every anticoagulant increases a

11 patient's risk of bleeding, correct?

12    A.    Every anticoagulant carries a

13 risk of bleeding.

14    Q.    And one of the inherent risks of

15 all anticoagulants is the risk of a GI

16 bleed?

17    A.    As I said before, every

18 anticoagulant carries a risk of bleeding

19 and hemorrhage from the gastrointestinal

20 tract is one source of bleeding.

21    Q.    So it's simply impossible

22 scientifically to say that had Mr.

23 Boudreaux been prescribed any other

24 anticoagulant that he wouldn't have bled?

Protected - Subject to Further Protective Review

1   There's just no way to know that?

2           MR. DENTON:  I object to the

3       form.  That's not the proper legal

4       standard.

5           Go ahead and try to answer.

6   A.      So, to say something always or

7   never, we just don't say that in science

8   or medicine.

9   Q.      I understand.  But what you

10  can't say is that he would not have bled

11  had he been on any other anticoagulant?

12  You can't say that?

13          MR. DENTON:  I object to the

14      form of the question;  inappropriate

15      legal standard.

16  A.      I think what I'm understanding

17  from you, and I may be incorrect, is that

18  you're saying not, not have bled ever,

19  a -- a null situation of bleeding, and in

20  medicine there is risk all the time, even

21  of someone having a bleed from the GI

22  tract even if they're not on an

23  anticoagulant.

24          So, you never, ever say never,

Protected - Subject to Further Protective Review

1    and I've said it now three times in the

2    same sentence, but in medicine -- so I --

3        Q.    It's okay, we forgive you.

4        A.    I can't really even understand

5    what you're trying to get at that someone

6    can be assured that they will not have a

7    gastrointestinal hemorrhage, we just don't

8    deal with that type of question.

9        Q.    Let's take your answer and

10   approach it that way.

11            Everyone on the planet Earth is

12   at some risk of having a gastrointestinal

13   bleed, correct?

14       A.    Depending on their situation,

15   their medications, their medical history,

16   et cetera, they're somewhere on a spectrum

17   from extremely low to extremely high of

18   having a bleed.

19       Q.    And --

20       A.    I'm sorry, hold on.

21       Q.    Go ahead.  Go ahead.

22       A.    We know that anticoagulation

23   moves every individual patient along that

24   spectrum from where they were at first

Protected - Subject to Further Protective Review

1  without the anticoagulant to a higher risk

2  of hemorrhage, and that includes

3  gastrointestinal.  It's one of the largest

4  organs in the body, and so there's lots of

5  opportunities for hemorrhage from the

6  gastrointestinal tract.

7     Q.     You anticipated my next

8  question.

9           So, you take humans and they're

10 at some risk of gastrointestinal bleeds.

11 If you add to that any anticoagulant,

12 their risk goes up?

13          MR. DENTON:  Object to form.

14    A.    I think that -- I think that

15 when you say "some risk of

16 gastrointestinal hemorrhage," I think that

17 simplifies what's actually happening.  I

18 think that some people -- I think that

19 everyone is on a spectrum of every disease

20 risk, and I think that patients may have a

21 spectrum that is so low for that

22 particular patient based on their history

23 and situation that we don't even consider

24 them to be at risk of GI hemorrhage

Protected - Subject to Further Protective Review

1    because it's just so low.  Whereas other

2    patients have specific risk factors based

3    on their history or problems where they

4    may be -- that may be something that

5    reaches a level of consciousness for both

6    their physician and them.  Otherwise we

7    would be at risk for everything all the

8    time and we would never -- we would never

9    get off the mark.

10        Q.    Right.

11        A.    Anticoagulation moves every

12    patient in a more risk of hemorrhage, but

13    that's not to say that everyone is at some

14    risk of GI hemorrhage.

15        Q.    Do you know where Mr. Boudreaux

16    sat on that spectrum you described for us

17    when he came in to see Dr. Wong in January

18    of 2014 before he was prescribed Xarelto?

19            MR. DENTON:  Object to form.

20            Go ahead.

21        A.    Well, I don't think that there's

22    a -- I don't -- there's no number that I

23    can give you.  There's no -- there's no

24    graphic that I can show you.

Protected - Subject to Further Protective Review

1          But, what I can say is that Mr.

2    Boudreaux had a very long history of using

3    drugs that can cause bleeding.  So, he had

4    a very long history of using aspirin which

5    affects platelet function and can

6    predispose you to bleeding, including

7    gastrointestinal hemorrhage.  He never had

8    any episodes of bleeding that I could see

9    or that were indicated by his records for

10   all the time that he was on aspirin,

11   either before or after his January of two

12   thousand -- I'm sorry, his February,

13   excuse me, February of 2014

14   gastrointestinal hemorrhage.

15          He also in the distant past, I

16   believe, was taking Indocin, or

17   indomethacin which is another term for it,

18   for his periods of gout, and indomethacin

19   is also a drug which affects platelet

20   function when it is being used --

21          (Pause.)

22   Q.    I'm sorry.  He noticed I'm

23   writing on a napkin, so he was trying to

24   be nice and give me a piece of paper.

1    A.    Sorry.  I didn't know if I

2    should stop.

3    Q.    No, keep going.  Keep going.  I

4    want to make sure you're done.

5    A.    Okay.  Let me -- let me make

6    sure I -- so, I also noted in his record

7    that when he had episodes of gout, he was

8    taking Indocin.  Indocin is another drug

9    that when you are on it it affects

10   platelet function and again by inhibiting

11   platelet function it puts you at risk of

12   bleeding, and I was not -- I did not see

13   any indication in his records that when he

14   was taking Indocin that he had any

15   evidence or symptomatic -- or symptoms of

16   bleeding, whether it was gastrointestinal

17   or anywhere else, when he was on Indocin.

18   Q.    Anything else?

19   A.    I saw no other -- I saw no other

20   episodes of bleeding in general, whether

21   gastrointestinal or any other things that

22   came to his attention or to a physician.

23   So there's no -- there was no evidence of

24   bleeding when he was off Indocin but on

Protected - Subject to Further Protective Review

1    aspirin.

2            I saw no evidence of a -- I saw

3    no evidence of a family history of

4    bleeding.

5        Q.    Did you look?

6        A.    I looked through the records for

7    where that -- where that should have been

8    indicated, and I did not see that in

9    records that noted family history.

10       Q.    Did you ever look at his

11   mother's records or his father's records

12   or brother's or sister's records?

13       A.    Well, when I look at records, I

14   rely on my patient.  I ask them and that's

15   part of a normal review of systems.

16            So, in the medical record, I

17   think that reliance on that particular

18   patient for a review of their systems and

19   their family history and social history,

20   we ask them "Do you have anyone in the

21   family who has medical problems?"  Or a

22   hematologist is asking them they will ask

23   "Do you have any history of bleeding?"

24   And we rely on patients to have knowledge

Protected - Subject to Further Protective Review

1    of their family, and when we talk to them

2    about medications or risks that would be

3    part of our discussion with them.

4            So, if they don't give us a

5    family history, we rely on that as being

6    accurate.  We don't -- we don't take every

7    patient that's -- that is a non -- that's

8    not part of the standard of care is to not

9    rely on the patient and then to go review

10   all the first degree or second degree

11   relatives of a patient for their possible

12   history.

13      Q.    And I appreciate your answer.

14   Listen to my question.

15           Did you review his father's

16   medical records?

17      A.    Those were not -- those were not

18   part of the records that I reviewed.

19      Q.    You didn't review his mother's?

20      A.    The only records that I reviewed

21   were Mr. Boudreaux, but as I said, in his

22   records, he did not indicate a relevant

23   family history of bleeding, and I take

24   that to be reliable.

Protected - Subject to Further Protective Review

1        Q.    Now, at the time that Dr. Wong

2    prescribed Mr. Boudreaux's Xarelto, what

3    were -- what were the kind of things that

4    were going on in his body?  What symptoms

5    did he have?

6        A.    So, the -- the records that I

7    reviewed regarding that information in

8    January of 2014, he had shortness of

9    breath and chest heaviness and was found

10   to at that time be in atrial fibrillation.

11       Q.    And did he also have some

12   ongoing other medical problems?

13             Did he have diabetes?

14       A.    I'm sorry, you're talking about

15   now medical history rather than symptoms.

16       Q.    No, you answered that question.

17   I'm asking you a different one.

18             In addition to what symptoms was

19   he having, did he also have other

20   conditions, including diabetes?

21       A.    So, at that time, I noted that

22   he had a medical history of diabetes,

23   hypertension, and benign prostatic

24   hyperplasia, that he was not a smoker,

Protected - Subject to Further Protective Review

1   seldom drank alcohol, and as noted before,

2   he did have a history of gout.

3       Q.   And the gout, for that he took

4   Innovin?

5       A.   In the deposition testimony from

6   Mr. Boudreaux and from Dr. Wong, they

7   stated that he took Indocin for --

8       Q.   Indocin, my bad.

9       A.   I'm sorry, I-N-D-O-C-I-N.

10          MR. DENTON:  Indocin is a

11      reagent.

12          MR. SARVER:  We'll talk about

13      that.

14          MR. STEKLOFF:  That will come

15      later.

16      A.   And that he took Indocin for

17   episodes of gout which had not occurred

18   for several years.

19      Q.   And he had a current

20   prescription for Indocin, did he not?

21      A.   I think that the electronic

22   medical record carries information forward

23   at all times, and therefore if he had had

24   a prescription for Indocin in the past,

Protected - Subject to Further Protective Review

1    that may have been carried forward for

2    the -- the current record and made it

3    appear as if he had an active prescription

4    for Indocin.

5            I was not aware -- I did not see

6    any evidence that he had gout.  I did not

7    see any evidence that he was taking

8    Indocin.  And I think that the electronic

9    medical record, unfortunately, is so

10   compulsively cumulative that it may give a

11   false impression of as to what a patient

12   is taking at that time.

13       Q.    So, according to the medical

14   records, he had a current prescription for

15   Indocin?

16            MR. DENTON:  Object to the form.

17       A.    Again, I'm disagreeing with

18   that.  I'm saying that the electronic

19   medical record is a cumulative summary and

20   carries information forward that may not

21   be currently relevant.

22       Q.    Understand.  Listen to my

23   question.

24            Did the electronic medical

Protected - Subject to Further Protective Review

1    record indicate that he had a current

2    prescription for Indocin?

3              MR. DENTON:  Object to form.

4       A.    The electronic medical record

5    indicated that Indocin was in his record.

6       Q.    Right.

7       A.    There is no way of knowing

8    whether he actually had a current

9    prescription for it or whether that was

10   simply carried forward as part of his

11   previous medical care.

12      Q.    Did Mr. Boudreaux have Indocin

13   at home?

14      A.    I do not know.

15      Q.    Did you read his deposition

16   where he said he did?

17      A.    The only area of his deposition

18   where I read was whether he was taking

19   Indocin or not and whether he had episodes

20   of gout for which Indocin was prescribed.

21      Q.    Did you read where he said he

22   had Indocin at home?

23      A.    I will --

24              MR. DENTON:  Object to the form.

Protected - Subject to Further Protective Review

1          Go ahead.

2     A.    I will take your word for it

3    that he has probably many drugs in his

4    medicine cabinet that he is not taking.

5     Q.    All right.  Let's open up your

6    report.

7          You've already got it open.

8     A.    I'll reopen it.

9     Q.    Now, you indicate that on page

10   1, your first opinion, that Mr.

11   Boudreaux's use of Xarelto was the most

12   probable cause of his GI bleed.

13         Correct?  That's your opinion?

14    A.    Yes.

15    Q.    All right.  Would your opinion

16   change if Mr. Boudreaux had not taken his

17   Xarelto?

18         MR. DENTON:  Object to form.

19    A.    So, are you -- are you saying

20   that Mr. Boudreaux did not follow his

21   prescriber's recommendations and did not

22   use --

23    Q.    This is really simpler than

24   this.  Listen to my question.  Try to

Protected - Subject to Further Protective Review

1    answer my question.

2       A.    Well, no, I'm -- no, your

3    question is a little, all due respect,

4    vague.

5       Q.    It's not that hard.

6             Would your opinion change if Mr.

7    Boudreaux had not taken Xarelto?

8             MR. DENTON:  Object to form.

9             Go ahead.

10      A.    Are you saying -- can I get

11   clarification?  Are you saying had not

12   taken Xarelto ever?  Are you saying if he

13   had missed a day six week -- a week or two

14   prior, but had been taking it the day

15   before?  I -- you have --

16      Q.    Well, let's start with your

17   question.

18            If Mr. Boudreaux had never taken

19   Xarelto, would your opinion change?

20      A.    If Mr. Boudreaux was not on

21   Xarelto and never had taken Xarelto and we

22   had objective evidence for that, then

23   Xarelto can't be the cause of his -- of --

24   then he is not on the medication and --

Protected - Subject to Further Protective Review

1   but I have -- but I don't have any

2   evidence that he is not on a medication.

3   So we're just not taking it.  So it's just

4   a hypothetical.

5       Q.    This is not a hard question.

6   This is an easy one.

7            If Mr. Boudreaux never took

8   Xarelto, Xarelto couldn't have caused his

9   bleed.  That's easy, isn't it?

10           MR. DENTON:  Well, I object to

11       the form because -- I just object to

12       the form.

13           MR. SARVER:  Come on.

14           MR. DENTON:  No.

15      A.    But we have evidence that he was

16   taking Xarelto.

17      Q.    One of the things you can do as

18   an expert, and this is a great thing, you

19   can assume things, okay.

20           I want you to assume, assume for

21   me as an expert that Mr. Boudreaux did not

22   take Xarelto.

23           If that is true, Xarelto never

24   caused his bleed;  isn't that true?

Protected - Subject to Further Protective Review

1            MR. DENTON:  Object to form,

2       hypothetical form of the question.

3       A.    Well, I'm not sure -- I don't --

4    I don't know what is the -- I don't know

5    that experts are supposed to assume or

6    make hypotheticals.

7            What I try to do is look at the

8    objective data and give you my opinion on

9    what is -- what I think is real rather

10   than making assumptions that have no --

11   that I can't substantiate based on reality

12   or I can't make a -- a conjecture as to

13   how real, how possible, et cetera.

14   They're just nebulous.

15           All I'm saying is that when I

16   looked at the record, Mr. Boudreaux stated

17   that he was compliant with his

18   medications.  He came into the hospital

19   with his GI bleed with an abnormal

20   prothrombin time, which we know can be the

21   result of Xarelto, and he had a

22   gastrointestinal hemorrhage.

23           To -- to ask me to try to make

24   assumptions about did he take Xarelto,

Protected - Subject to Further Protective Review

1   when did he take Xarelto or not take

2   Xarelto, I mean, I'm just -- that's just

3   speculation.

4           And I understand what you're

5   asking, that experts can assume, but I'm

6   not comfortable making assumptions about

7   things that I just don't have any basis

8   for.  Then it's just speculation and you

9   don't even need an expert for that.

10          MR. SARVER:  Objection;

11      non-responsive.  Move to strike.

12  BY MR. SARVER:

13      Q.    If Mr. Boudreaux had not taken

14  Xarelto, Xarelto couldn't have caused his

15  bleed, true?

16          MR. DENTON:  Object to form;

17      asked and answered.

18          MR. SARVER:  If he'd answered

19      it, I wouldn't ask it again.

20          MR. DENTON:  Well, I disagree

21      with you, but.

22      A.    You're saying Mr. Xarelto --

23  you're saying to me Mr. Xarelto -- Mr.

24  Xarelto.  Mr. Boudreaux did not take his

Protected - Subject to Further Protective Review

1    Xarelto.

2        Q.    I'm asking you a question,

3    Doctor, and I think it's an easy one.

4    They're going to get harder later, but

5    this is easy.

6        A.    I'm sure they will.

7        Q.    This is easy.

8            If Mr. Boudreaux did not take

9    Xarelto, Xarelto couldn't have caused his

10   bleed?

11           MR. DENTON:  Object to form.

12       A.    Mr. Boudreaux says that he did

13   take Xarelto.  On two occasions in between

14   his admission for atrial fibrillation and

15   his GI hemorrhage, he told his

16   cardiologist that he was compliant with

17   his medication.  And as I said before, his

18   prothrombin time was elevated.  So I think

19   there is evidence that he did take

20   Xarelto.

21           If you're asking me if there's

22   evidence to the contrary that he did not

23   take Xarelto, there's none.

24           So, I'm saying he did take

Protected - Subject to Further Protective Review

1   Xarelto and that there is evidence for

2   that.

3           MR. SARVER:  Objection;

4       non-responsive.  Move to strike.

5           We'll do this once more, and

6       then, Roger, I'm going to get the

7       transcript and call the judge.  This

8       is ridiculous.

9           MR. DENTON:  No, it's not.

10      Look, it's not ridiculous.  He doesn't

11      understand the lawyer's questions.

12          Why don't you ask him

13      hypothetically, forget about Mr.

14      Boudreaux, if a person, any patient

15      didn't take Xarelto.

16          MR. SARVER:  Let's start there,

17      all right.

18          MR. DENTON:  Because I think his

19      problem is --

20          MR. SARVER:  We can start there.

21          MR. DENTON:  -- he doesn't

22      understand the hypothetical.

23          MR. SARVER:  But you know that

24      this isn't right.

Protected - Subject to Further Protective Review

1           MR. DENTON:  Well, I disagree

2      with that.

3           MR. SARVER:  All right.  So

4      let's just go on.

5           MR. DENTON:  This is lawyers

6      fighting in language that he does not

7      understand, so.

8           MR. SARVER:  I will try it your

9      way, but then I think I've got to take

10     it to the judge and have someone

11     instruct him to answer my question.

12          MR. DENTON:  I think that's

13     ridiculous.

14          MR. SARVER:  I know you do, but

15     it's not.

16  BY MR. SARVER:

17     Q.   So, I'd like you to -- I mean,

18  am I unclear?  Is my English bad?

19          MR. DENTON:  Come on, Rick.

20     Q.   Do you not understand my

21  questions?

22          MR. DENTON:  Come on.  He's not

23     here --

24     Q.   Do you understand my questions?

Protected - Subject to Further Protective Review

1      A.     Sir, with all due respect, I

2   think that you're asking me to opine on

3   hypotheticals, and I am on -- my

4   understanding of what I've been asked to

5   do is talk about objective data that I

6   have here.  If you want to ask me about a

7   hypothetical that's unrelated to objective

8   information and data that I've been asked

9   to review, I -- we can talk about

10  hypotheticals that are not related to this

11  case or the patient.

12     Q.     Let me start simply.

13            When I speak, do you understand

14  my words?

15            MR. DENTON:  Now, that is a

16     little sarcastic.

17     A.     Yes, sir.

18     Q.     Thank you.

19            MR. DENTON:  That's very

20     sarcastic.

21     Q.     If a human being does not take

22  Xarelto, Xarelto cannot cause that

23  patient, that person to bleed;  isn't that

24  true?

Protected - Subject to Further Protective Review

1    A.    That is correct, in a

2  hypothetical for any human being.

3    Q.    And if Mr. Boudreaux had not

4  taken Xarelto, like any other human being,

5  Xarelto could not cause his bleed, true?

6    A.    If in a hypothetical situation

7  Mr. Boudreaux was not prescribed Xarelto

8  or never took Xarelto and there was

9  evidence somehow for that situation, then

10  I would -- then Xarelto would not have

11  been the cause of his bleeding.

12    Q.    All right.  How many Xarelto

13  pills was Mr. Boudreaux prescribed?

14    A.    I believe that Mr. Boudreaux had

15  a mail-order pharmacy prescription for a

16  90-day supply.

17    Q.    And how many -- was he given

18  any, what do you call those things, the --

19    A.    Samples.

20    Q.    Sample drugs.

21        Was he given any samples?

22    A.    So, my -- my recollection from

23  the records was that he received two doses

24  of Xarelto in the hospital, and I believe

Protected - Subject to Further Protective Review

1    there's testimony from -- or maybe it was

2    deposition, from someone at the hospital

3    that he received I believe it was ten

4    pills as a sample that was separate from

5    his mail-order pharmacy prescription.

6        Q.    So if we add that up, he had 90

7    pills -- or, he had 100 pills?

8            MR. DENTON:  Object to the form.

9        A.    If those -- if those numbers are

10   correct, he should have had 100 pills.

11       Q.    Do you have any evidence that he

12   had any Xarelto, any more than 100 pills?

13   Have you seen any evidence of that?

14           MR. DENTON:  Object to form.

15       A.    I'm not aware of -- I'm not

16   aware of another source of pills other

17   than those two.

18       Q.    All right.  Did you read Mr.

19   Boudreaux's deposition where he was asked

20   to bring his remaining Xarelto pills to

21   his deposition?  Did you read that part?

22       A.    No.

23       Q.    All right.  If you had, you

24   would have seen that he brought 96 Xarelto

Protected - Subject to Further Protective Review

1    pills to his deposition.  I'd ask you to

2    assume that, since you didn't read it.

3              Would you do that?

4       A.    Certainly.

5       Q.    All right.  If my math is

6    correct, 100 minus 96 is 4.

7              You agree?

8       A.    100 minus 96 equals 4.

9       Q.    All right.  And he presented

10   with his bleed approximately a month after

11   he was prescribed Xarelto?

12      A.    So --

13      Q.    February 4th?

14      A.    From January -- let's see.  He

15   was discharged on the 9th to February 3rd

16   and he started bleeding about three days

17   before.  So it's about three weeks.

18      Q.    Three weeks, fair enough.

19             Three weeks, 21 days, true?

20      A.    Three weeks is 21 days, that is

21   correct.

22      Q.    If we take 100 and we subtract

23   21 from it, we would end up with 79, if my

24   math is correct?

Protected - Subject to Further Protective Review

1        A.     100 minus 21 does equal 79.

2        Q.     And yet he showed up at his

3    deposition with 96 pills.

4        A.     I'll have to take your word for

5    that.

6        Q.     Do you have any explanation how

7    that could happen except he didn't take

8    his Xarelto?

9               MR. DENTON:  Object to the form.

10        A.     No, I don't -- I don't believe

11    that that is the only possible

12    explanation.

13        Q.     Is that one possible

14    explanation?

15        A.     Well, I think that -- I think

16    that there are frequent mistakes in the --

17    in the medical record where people state

18    that they give something and don't or that

19    they give a number of something and the

20    number is incorrect.

21               For example, the electronic

22    medical record brought forward Indocin as

23    if he was taking that currently and we

24    know that he was not, based on his

Protected - Subject to Further Protective Review

1    testimony and on Dr. Wong's testimony.

2    So, the electronic medical record may

3    have -- may be incorrect and the person --

4    the person that gave him ten samples may

5    have given him a larger number of samples.

6            Another possibility is that the

7    pharmacy mail-order for a 90-day supply

8    was incorrect and gave him a larger

9    number.  For all I know, they give you a

10   buy one, get one free and you get 90 days

11   plus for a -- for that.

12           So, those are two other

13   possibilities.

14           You are right, there is a --

15   there is also the possibility that -- I'm

16   sorry, what was the third one?  How did

17   you phrase it?

18      Q.    My question really was pretty

19   simple.

20           One of the possibilities, and

21   you've mentioned others, but I didn't ask

22   you about those.  One of the possibilities

23   of why he ended up with 96 pills in his

24   possession, even though we're 21 days out,

Protected - Subject to Further Protective Review

1   is that he didn't take his Xarelto?

2   That's one of the possibilities, isn't it?

3           MR. DENTON:  Object to the form.

4       A.    As I said --

5           THE WITNESS:  I'm sorry.

6           MR. DENTON:  Go ahead.

7       A.    As I said, that is another

8   possibility, that he did not take his

9   Xarelto exactly as prescribed.

10      Q.    And one of the alternatives that

11  you offered was that maybe the prescriber

12  gave him more.  That's one of the things

13  you suggested, right?

14      A.    One of the -- one of the

15  alternative explanations would be that the

16  person that gave him the samples gave him

17  a larger number of samples than they

18  thought they did.

19      Q.    Do you -- did you read Nurse

20  Theriot's deposition?

21      A.    I believe that was part of that.

22      Q.    And she said "I gave him ten."

23          Do you have any reason to doubt

24  her?

Protected - Subject to Further Protective Review

1              MR. DENTON:  Object to the form.

2      A.     Not knowing Nurse Theriot, I

3   don't know how accurate she is.

4      Q.     And not knowing Mr. Boudreaux,

5   you don't know how accurate he is, true?

6      A.     As I said, those -- these are

7   all possibilities.  I have no reason to

8   know that one or the other is more likely.

9      Q.     And you don't know whether Mr.

10  Boudreaux is forgetful?

11     A.     I did not see any indication in

12  his record of neurologic complaints.

13     Q.     Did you read his wife's

14  deposition?

15     A.     I did not read his wife's

16  deposition.

17     Q.     Okay.  Do you know whether or

18  not she said he was forgetful?

19     A.     As I said, I did not read her

20  deposition.

21     Q.     Okay.  What we know, what we

22  know is that 100 minus 96 is 4.

23             And you take Xarelto once a day,

24  correct?

Protected - Subject to Further Protective Review

1      A.      Mr. Xarelto -- Mr. Boudreaux

2    was -- pardon me.  Mr. Boudreaux was

3    prescribed Xarelto as a once-a-day drug.

4      Q.      Right.  And unless there's some

5    loaves and fishes going on here, we don't

6    know how he could end up with 96 at his

7    deposition when he was supposed to have

8    taken them every day, right?

9              MR. DENTON:  Object to the form

10       of the question.

11      A.      I agree that several possible

12    explanations for the discrepancy exist,

13    and I don't see any evidence or indication

14    that one or the other is more likely.

15      Q.      All right.

16      A.      But I do see evidence in the

17    record that he said that he was compliant

18    on two instances with his cardiologist and

19    that when he was admitted to the hospital

20    with his GI hemorrhage that his

21    prothrombin time was prolonged out of the

22    normal range.

23      Q.      We're going to talk about that.

24              MR. DENTON:  Let him finish.

Protected - Subject to Further Protective Review

1    Q.    I'm sorry, go ahead.  Don't let

me interrupt.

2

3    A.    That's okay.

4          Which is evident of taking an

anticoagulant which is Xarelto which he

5

was prescribed.

6

7    Q.    We will talk about that.

8          Anything else on that question?

9    A.    That's it for now.

10   Q.    All right.

11         MR. DENTON:  Are you going to be

switching to a different topic?

12

13         MR. SARVER:  Yeah, we can take a

break.

14

15         MR. DENTON:  Can we take a

biologic break?

16

17         MR. SARVER:  Yeah, yeah, yeah.

18         MR. DENTON:  I didn't want to

finish that --

19

20         MR. SARVER:  Any time you want

to take a break, tell us.

21

22         THE VIDEOGRAPHER:  All right.

The time is 9:24 a.m.

23

24         We're going off the record.

Golkow Technologies, Inc.                    Page 78

Protected - Subject to Further Protective Review

1          (Recess taken.)

2          THE VIDEOGRAPHER:  The time is

3     9:37 a.m.

4          We are back on the record.

5  BY MR. SARVER:

6     Q.    Good morning again.

7     A.    Good morning again.

8     Q.    We were talking earlier about

9  the whole issue of the hundred pills and

10  the 96 pills, remember that?

11     A.    The pill count, yes.

12     Q.    Do you have -- do you remember

13  any evidence from the record about whether

14  or not Mr. Boudreaux was generally a

15  compliant patient for taking medications?

16     A.    I did not see, in the records

17  that I reviewed, which I felt were

18  relevant, I did not see any indication

19  that he was non-compliant.

20     Q.    And I asked you about the

21  depositions you read.

22          One that I asked you about was

23  Nurse Torres, and I don't think you've

24  read that; is that correct?

Protected - Subject to Further Protective Review

1            T-O-R-R-E-S, Torres.

2      A.    That's not the Louisiana.

3      Q.    No, Theriot.

4      A.    Theriot, thank you.  I'm sorry.

5            No, I did not -- did not read

6   Torres's deposition.

7      Q.    Do you know whether or not Mr.

8   Boudreaux was compliant in taking his

9   diabetes medicine?

10     A.    I did not read -- I did not read

11  anything that suggested in the record that

12  he was non-compliant.

13     Q.    Okay.  You don't recall then

14  Nurse Torres, because you didn't read her

15  deposition?

16     A.    I can't recall something I

17  didn't read.

18     Q.    Exactly, that's an unfair

19  question.

20     A.    I -- look, the areas of the

21  deposition that I asked to see were areas

22  that were -- that I wanted to use to try

23  to fill in aspects of the medical record.

24            In general, as I stated

Protected - Subject to Further Protective Review

1    yesterday, I try not to use depositions as

2    medical records or as indicators of

3    objective evidence.  People's -- people

4    have opinions, their memories change,

5    things like that.

6              So I only used the depositions,

7    as I stated before, to try to fill in

8    areas where I thought there might be gaps.

9        Q.    Because you didn't know what

10   Nurse Torres testified to, it can't form

11   your opinions, correct?

12       A.    That is correct, because I never

13   read that.

14       Q.    Right.

15             So you didn't know that Nurse

16   Torres testified that Mr. Boudreaux, he

17   wasn't adherent, he wasn't the most

18   adherent patient to his -- meaning to his

19   treatment; you didn't know that?

20             MR. DENTON:  I object to the

21        form.

22       A.    A, I didn't know that;  and B, I

23   don't know what that means.

24             I have many patients that are

1    elderly and forgetful.

2        Q.    Sometimes they don't take the

3    pills.

4        A.    He may be the average patient,

5    for all I know.

6        Q.    Your elderly patients who are

7    forgetful, sometimes they don't take their

8    pills, right?

9        A.    And that depends on what you

10   mean by elderly.  Is that older than me or

11   older than --

12       Q.    I just used your word.

13       A.    I know.  I'm, again, trying to

14   be levity.

15       Q.    Okay.  And I would say I'm

16   pretty elderly.  He's real elderly.

17             MR. DENTON:  Absolutely.  I've

18        got more miles on me than anybody in

19        this room.

20       A.    I think that compliance with

21   medications is always an issue and always

22   something that we are cognizant of at any

23   age.  It may be worse with people that

24   have neurologic deficits or mentation

Protected - Subject to Further Protective Review

1    disorders, I agree.

2        Q.    One of the ways to help with

3    compliance issues is to have a once-daily

4    dose rather than multiple doses during the

5    day, correct?

6            MR. DENTON:  Object to form.

7        A.    Frankly, I don't -- I don't

8    prescribe in that manner.  I prescribe

9    what I believe to be the best drug for

10   that patient, and the -- the dosing

11   frequency is not a significant part of my

12   prescription behavior.

13       Q.    Have you read in the medical

14   literature that compliance is increased

15   for once-daily dosing?

16       A.    I am aware of the general

17   literature regarding compliance.

18       Q.    All right.  Do you know whether

19   or not there is any data regarding the

20   interaction of amiodarone with Eliquis?

21       A.    I am not aware of data regarding

22   an interaction of Xarelto with -- I'm

23   sorry, what -- I'm sorry, what was the

24   question again?

Protected - Subject to Further Protective Review

1    Q.    That's all right.  Let me ask it

2   again so we're on the same page.

3    A.    Yeah, I'm sorry.

4    Q.    That's all right.  Any time I'm

5   not clear, I really want to know.

6    A.    No, I appreciate that.  Of

7   course.

8    Q.    Do you agree that there is no

9   data regarding the interaction of

10   amiodarone with Eliquis?

11    A.    With Eliquis.  I am not aware of

12   an interaction of amiodarone with Eliquis.

13    Q.    Do you know whether or not

14   there's any data on an interaction of

15   amiodarone with Xarelto?

16    A.    I think the same answer.  I am

17   not aware of an interaction of amiodarone

18   with Xarelto.

19    Q.    Okay.  And how about with

20   dabigatran?

21    A.    I am not aware of an interaction

22   of amiodarone with dabigatran.

23    Q.    And I've heard somebody

24   pronounce it dabigatran.

Protected - Subject to Further Protective Review

1          MR. DENTON:  It's the Germans.

2     Dabigatran.

3          MR. SARVER:  That's what they

4     do, it's the Germans, okay.

5     Q.    But for us in this country,

6     you're okay with dabigatran?

7     A.    I'm okay with however you want

8     to prescribe it -- or pronounce it.  Or

9     prescribe it.

10     Q.    Yeah, if I prescribe it, you're

11     in trouble.

12          Okay.  Do you have any

13     information about the interaction of

14     aspirin with Eliquis?

15     A.    I am not aware of a

16     pathophysiologic interaction of aspirin

17     and Eliquis.

18     Q.    Do you agree that taking aspirin

19     will add to the coagulation effect of any

20     of the anticoagulants?

21          MR. DENTON:  Object to the form.

22     A.    No.

23     Q.    Okay.  Do you agree that it does

24     so with Xarelto?

Protected - Subject to Further Protective Review

```
 1            MR. DENTON:  I'm sorry, I

 2     didn't -- I don't understand the

 3     question.  Object to the form.

 4            MR. SARVER:  Sure.

 5     A.    Could you maybe ask -- can you

 6  rephrase the question?

 7     Q.    Let me ask the question in a

 8  simpler way.

 9            Do you agree that there is

10  evidence from the ROCKET trials that

11  aspirin enhances the anticoagulation

12  effect of Xarelto?

13     A.    No.

14     Q.    All right.  You have seen -- you

15  actually relied upon some graphs and you

16  talked about them yesterday in your

17  general deposition.

18            Do you remember those?

19     A.    Yes, I did.

20     Q.    And there was a -- a graph that

21  showed Xarelto and aspirin and the number

22  of bleeds.

23            Do you remember seeing that

24  graph?
```

Protected - Subject to Further Protective Review

1    A.    Yes.  We were talking about the

2  confidence intervals modeled for that in

3  the FDA.

4    Q.    Right.

5        And then did you see the graph

6  that showed Xarelto without aspirin?

7    A.    Those were -- that was the same

8  graph, I believe.

9    Q.    Right.

10       And the graph was very

11  different.  One had a much steeper curve

12  and one was much flatter, correct?

13   A.    As I -- as I testified

14  yesterday, I found that the -- the actual

15  data differed from the model data that was

16  depicted there, and because aspirin does

17  not have an anticoagulant effect, nor does

18  it interact with Xarelto's anticoagulant

19  effect, I found the data from the FDA's,

20  from the same FDA data regarding their

21  quartile bleeding risk to be more

22  compelling.

23   Q.    I'm with you, but do you have

24  any understanding of why the FDA data

Protected - Subject to Further Protective Review

1    would have shown a greater rate of

2    bleeding with the combination of Xarelto

3    and aspirin as opposed to the rate of

4    bleeding with just Xarelto?  How could

5    that happen?

6              MR. DENTON:  Object to form.

7              Go ahead.

8        A.    So, we're talking about --

9    you're asking about -- your original

10   questions asked if aspirin exacerbated or

11   affected the anticoagulant effect of

12   Xarelto, and what I'm saying is that is

13   not the pathophysiologic basis of aspirin.

14   It does not affect the anticoagulant.  It

15   does not affect the prothrombin time,

16   which is the activity of Xarelto.

17       Q.    It deals with platelets?

18       A.    Aspirin inhibits platelets.

19       Q.    I'm with you.

20       A.    And --

21       Q.    Go ahead, finish, but I want to

22   come back to my question pretty soon.

23       A.    Now I lost my train of thought.

24       Q.    Can I ask the question again?

Boudreaux_Henry Rinder, MD Deposition_00088

Protected - Subject to Further Protective Review

1       A.    Can you just give me one second

2    to see if I can pick up my train of

3    thought?

4       Q.    Okay, go ahead.

5       A.    The aspect of bleeding which I

6    also found compelling from the FDA's data

7    was that when they looked at the

8    confounding factors and other variables

9    that were related to bleeding, aspirin did

10   not reach statistical significance.

11            So even though you have that

12   data that shows those graphs, the actual

13   statistical analysis by the FDA did not

14   find aspirin to be a significant factor in

15   the bleeding risk.

16      Q.    Finished?

17      A.    Yes.

18      Q.    Okay.  So, what I'm trying to

19   understand is you -- we've both seen the

20   graphs and we know that the rate of

21   bleeding is higher with the combination of

22   Xarelto and aspirin than it is with simply

23   Xarelto alone, correct?

24      A.    We know that the graphs are not

Protected - Subject to Further Protective Review

1   perfectly aligned.  But simply stating

2   that something is higher or lower is not

3   medically correct in this respect.  When

4   the FDA analyzed the data for if aspirin

5   was a significant variable affecting

6   bleeding, it did not meet their criteria

7   for significance.

8           So, saying higher or lower is

9   misleading.  You can write -- you can put

10  those graphs there, but that is not

11  informative.  What is informative, what is

12  informative is the analysis by the FDA as

13  to whether aspirin was a significant

14  variable in the bleeding, and they did not

15  find it to be significant.

16      Q.    Right.

17          But when you're talking about

18  the graphs being, they could be higher or

19  lower, what we know is the higher rate of

20  bleeding was with the combination of

21  Xarelto as opposed -- and aspirin, as

22  opposed to Xarelto alone.  That's how the

23  graphs look, at least.

24          Fair?

Protected - Subject to Further Protective Review

1          MR. DENTON:  Object to form.

2     A.     The representation of the graphs

3   is what it is, but when I look at that, I

4   don't look at that as a scientist or a

5   medical doctor saying oh, this is higher

6   and this is lower and therefore that is

7   the conclusion that I can draw.

8          What I want to do is see how

9   that data was analyzed in a multivariate

10  analysis that the FDA conducted, and their

11  criteria for significance to examine that

12  was that the aspirin was not a significant

13  factor in the bleeding.  They found that

14  it did not meet a significant factor as

15  one of the variables with Xarelto.

16    Q.     Okay.  Let's do it this way.

17          I want you to assume that Mr.

18  Boudreaux was not taking aspirin at the

19  time he was prescribed Xarelto.

20          Can you do that for me?

21          MR. DENTON:  Object to form.

22    A.     So we're back to -- we're back

23  to --

24    Q.     Is this something you can do?

Protected - Subject to Further Protective Review

1       A.      -- speculations.

2       Q.      Are you willing to assume?

3               No, I'm asking you to assume

4    something.

5               MR. DENTON:  Well, you're asking

6          him to assume something that's not

7          based on reality, and I think that's

8          his problem.

9               MR. SARVER:  You know he can do

10         that.  It's an expert that --

11              MR. DENTON:  Well, look, he's a

12         doctor, he's not a lawyer, and that's

13         where we're having the problem.

14              MR. SARVER:  Okay.

15   BY MR. SARVER:

16      Q.      Let me ask you to assume this.

17              Are you willing to assume facts

18   that I ask?  If I'm wrong about it, you

19   know, no harm, no foul, but I'm entitled

20   to ask you questions.  And if you're not

21   willing to assume it, that's another

22   issue.  We'll take it up at a later time.

23   But tell me if you're not willing to

24   assume things.

Protected - Subject to Further Protective Review

1      Are you just unwilling?

2      A.    Well, look, I -- I want to be as

3  helpful as I can in the most objective and

4  valid way that I can here.

5           I have no -- I have no objective

6  evidence that Mr. Boudreaux was not taking

7  his aspirin.  So you're asking me to -- I

8  mean, how many assumptions do you want me

9  to put together?  He -- you know, they're

10  infinite in terms of his medications.  I

11  mean, we can -- we can come up with an

12  infinite amount of assumptions.

13          What I'd like to focus on is

14  what we actually know and what we -- what

15  we have from the data and from his

16  history.  So, I would rather focus on

17  that.  If you want to -- if we can -- I

18  would be more comfortable talking about a

19  hypothetical person rather than Mr.

20  Boudreaux, and I realize you'll bring it

21  back to Mr. Boudreaux, but I'm just not

22  comfortable making an infinite number of

23  assumptions.

24      Q.    It is your opinion Mr. Boudreaux

Boudreaux_Henry Rinder, MD Deposition_00093

Protected - Subject to Further Protective Review

1    was taking his aspirin during the time he

2    was taking Xarelto?  Is that your opinion?

3              MR. DENTON:  Object to the form.

4              But go ahead and answer that.

5        A.    I know that he was prescribed

6    aspirin on a daily basis and that he had

7    been on that drug for many years as not a

8    PRN, but to take it every day.

9              I have no reason to think that

10   he did not take it every day as best he

11   could.

12       Q.    Okay, I'm with you.  That's

13   what -- that is your opinion and I

14   understand that.

15             MR. DENTON:  I -- I object to

16        the form.

17             MR. SARVER:  I understand.  You

18        can object.

19             MR. DENTON:  I don't know

20        whether it's an opinion or not.  It's

21        fact.

22             MR. SARVER:  Roger, come on.

23             MR. DENTON:  No, I'm not.  No.

24             MR. SARVER:  Just object to the

Protected - Subject to Further Protective Review

1      form, and I'll do the same for you.

2      You don't want me making these

3      speaking objections.  You did it all

4      day yesterday.

5          MR. DENTON:  I did not do it all

6      day yesterday.

7          MR. SARVER:  Yeah, you did.

8          MR. STEKLOFF:  Roger, will you

9      stipulate that he was taking his

10     aspirin the entire time he was taking

11     Xarelto and that it's a fact in this

12     litigation?

13         MR. DENTON:  I have no ability

14     to stipulate about anything.

15         MR. STEKLOFF:  All right.  Then

16     don't say it's a fact.  If you want to

17     stipulate, we'll stipulate.

18         MR. DENTON:  Look, now, I do

19     have a problem with getting

20     tag-teamed.  You're capable of

21     handling me, I'm sure.  You don't need

22     help from him.

23         MR. STEKLOFF:  I'm allowed to

24     participate in this deposition.

Protected - Subject to Further Protective Review

1        MR. SARVER:  Okay.  I'm just

2     trying to figure out how we get

3     through this --

4        MR. DENTON:  Keep that down.

5     That's annoying, please.

6        Go ahead.  I'm sorry.

7        MR. SARVER:  No, that's all

8     right.  I'm just trying to figure out

9     how we do this the most efficient way.

10       MR. DENTON:  Understood.

11  BY MR. SARVER:

12     Q.    It is your opinion that Mr.

13  Boudreaux was taking both Xarelto and

14  aspirin; is that correct?

15     A.    I have no -- I saw no evidence

16  in the medical record that he was not

17  taking aspirin and Xarelto.

18     Q.    Can you assume for me, I'm going

19  to ask this question, if Mr. Boudreaux had

20  not been taking aspirin along with his

21  Xarelto, do you know one way or another

22  whether he would have had his GI bleed?

23       MR. DENTON:  I object to form.

24     I just want to read it.

Protected - Subject to Further Protective Review

1              Did you get the question?

2      That's all I'm asking.

3              THE WITNESS:  I think so.

4              MR. DENTON:  Object to form.

5      A.    It's my opinion that based on

6  what I saw in the evidence, Mr. Boudreaux

7  never had an episode of bleeding prior to

8  taking Xarelto.

9      Q.    I didn't ask you that.

10     A.    No, but that's -- let me -- I'm

11  using that as the basis --

12     Q.    Please try to answer my

13  question.

14             MR. DENTON:  Please don't

15      interrupt.

16     A.    No, I'm using that as the basis

17  to try to answer your question as best I

18  can.

19             He never had any bleeding prior

20  to taking Xarelto.  He never had any

21  bleeding after being taken off Xarelto.

22  In those time periods, he was prescribed

23  aspirin.

24             Therefore, I believe that if

Protected - Subject to Further Protective Review

1   you're saying that he was not taking

2   aspirin before and not taking aspirin

3   after and the only time he bled was when

4   he was prescribed Xarelto, and we're

5   assuming that he never took aspirin in

6   that entire time period, then Xarelto is

7   the probable cause of his GI bleeding.

8           You asked me to assume that he's

9   not taking aspirin and therefore can I

10  make a determination that Xarelto was the

11  cause of bleed in that situation.  Is --

12  maybe I misunderstood.  I apologize if I

13  did.

14      Q.    Perhaps you did, and we'll just

15  try it again.

16      A.    Okay.

17      Q.    It is your opinion that he was

18  taking both Xarelto and aspirin at the

19  time of his bleed, right?

20      A.    I saw no evidence to the

21  contrary.

22      Q.    Now, I want you to take one of

23  those out of the equation.  I want you to

24  assume he was not taking aspirin at the

Protected - Subject to Further Protective Review

1    time of his bleed.

2              If you take that factor out of

3    the equation, are you able to say with

4    scientific certainty that he would have

5    bled only on Xarelto?

6              MR. DENTON:  Object to form.

7         A.    You're saying that he was not on

8    aspirin.

9         Q.    I'm asking you to assume if he

10   was not on aspirin, would he have bled?

11        A.    Well, and I'm saying that the

12   data showed that he never bled before he

13   took Xarelto and he never bled after he

14   took Xarelto.

15             So, if he was not on aspirin at

16   that time and bled when he was prescribed

17   Xarelto, then Xarelto is the most probable

18   cause of his GI bleed.

19        Q.    So, before he was prescribed

20   Xarelto, right, he was taking aspirin?

21        A.    No, no, I'm sorry, you said he

22   was not.  You're asking me to assume he

23   was not taking aspirin.

24        Q.    Have you finished answering my

Protected - Subject to Further Protective Review

1    question about assuming he was not taking

2    aspirin?

3            I thought you gave me a long

4    answer about -- about that.

5        A.    Well, I'm sorry.

6        Q.    Have you finished answering that

7    question?

8        A.    Yes, I am.

9        Q.    I'm asking you a different

10   question, all right?

11       A.    Okay.

12       Q.    You've testified that he was

13   taking aspirin before he was started on

14   Xarelto, right?

15       A.    He was prescribed aspirin before

16   and after he took Xarelto.

17       Q.    And you're telling us that it's

18   important to you because there's no bleed

19   reported in his medical records while he

20   was taking aspirin and before Xarelto,

21   right?

22       A.    That is correct.

23       Q.    And then you're telling us after

24   the Xarelto was stopped, he continued

Protected - Subject to Further Protective Review

1    taking aspirin and it's important to you

2    because there was no bleed reported then,

3    right?

4        A.    That is correct.

5        Q.    The only period where he was

6    taking both aspirin and Xarelto was during

7    that --

8        A.    January --

9        Q.    -- time January 7th to February,

10   right?

11           MR. DENTON:  Is that a -- I

12       object to the form.

13           MR. SARVER:  Go ahead.

14           MR. DENTON:  I'm lost.

15       A.    My understanding is that from

16   January 9th to February 3rd he was taking

17   both aspirin and Xarelto.

18       Q.    Very good.

19       A.    I saw no evidence that that was

20   not -- that that was not true, that he was

21   taking both drugs.

22       Q.    So we have no period of time in

23   Mr. Boudreaux's entire history where he

24   was taking only Xarelto and not aspirin,

Protected - Subject to Further Protective Review

1 right?

2   A.   I have no evidence that there

3 was a time period when he was only taking

4 Xarelto.  He was prescribed both drugs for

5 that time period.

6   Q.   So, because of that, is there

7 any way to know with medical certainty

8 that he would have bled had he been taking

9 only Xarelto?

10      MR. DENTON:  Object to the form

11   of the question.

12   A.   Based on the FDA's data -- let

13 me answer this.  I realize you don't like

14 it.

15      Based on the FDA's data, aspirin

16 was not found to be a significant

17 variable.  That means that the bleed risk

18 with Xarelto, with or without aspirin, is

19 there and is equivalent.  Aspirin is not

20 found to be a significant variable in

21 affecting that bleeding risk.  Therefore

22 the bleeding risk is abnormal and high and

23 the hazard ratio is high with or without

24 aspirin.

Protected - Subject to Further Protective Review

1      Q.    Could you answer my question?

2           MR. DENTON:  He did.

3      Q.    And the question, the question

4    is do you have scientific evidence to tell

5    me that he would have bled had he only

6    been on Xarelto?  Because what we know is

7    there was never a time period in his

8    entire life where that was true.

9           MR. DENTON:  Object to form.

10          Answer it again.

11     A.    And I'm saying that the

12   scientific evidence from the FDA data --

13   you're asking me to have a crystal ball

14   for one individual patient, and what I'm

15   saying is --

16     Q.    Yes.

17     A.    -- there is no crystal ball.  No

18   one can answer that question in a

19   medically valid way.

20     Q.    Fair enough.

21     A.    But what I am saying is that

22   there is scientific evidence from the FDA

23   that looks at the hazard ratio of bleeding

24   with respect to Xarelto in terms of their

1   effect and that he looked at that with the

2   variables of aspirin use and they did not

3   find it to be significant.

4        Q.    It was important to you, I think

5   in part of your answer I think you told us

6   that he was on aspirin for a long period

7   of time before he took Xarelto, correct?

8        A.    He was on aspirin for many, many

9   years prior to taking Xarelto.

10       Q.    And it was important to you

11  because there's no evidence in the medical

12  record of any acute bleed, correct?

13       A.    I saw no evidence of bleeding.

14       Q.    And the same is true after he

15  stopped Xarelto, he remained on aspirin

16  and you saw no evidence of an acute bleed

17  in the medical record then?

18       A.    Again, I would -- I saw no

19  evidence of bleeding.

20       Q.    Is anemia evidence of occult

21  bleeding?

22       A.    Anemia is its own entity, and I

23  would not make the assumption that occult

24  bleeding is the etiology of that.

1    Q.    Is occult bleeding one of the

2    things that can cause anemia?

3    A.    Well, you are -- you're

4    basically saying that something that is

5    occult, which means hidden, not known, a

6    hypothetical, is a possible cause.

7    Q.    Yes.

8    A.    And what I'm saying is that is

9    basically a waste basket term which

10   usually is brought up when any other

11   possibility to account for anemia is there

12   and it's not objective, it's not

13   determined.  It's simply a waste basket of

14   well, let's throw it into that

15   possibility.

16   Q.    Is occult bleeding one possible

17   cause of anemia?

18   A.    I don't consider the category of

19   occult bleeding because there's no

20   objective evidence for it and it's simply

21   a, like I said, it is a diagnosis of

22   exclusion which I don't think is a valid

23   diagnosis.

24   Q.    Is bleeding a cause of anemia?

Protected - Subject to Further Protective Review

1    A.    When you have symptoms, signs

2    and evidence of bleeding, then I would

3    look at that as true signs of bleeding

4    which can cause anemia.

5    Q.    Okay.  So bleeding can cause

6    anemia, we can agree with that?

7    A.    Bleeding can cause anemia.

8    Q.    Very good, all right.

9         Small amounts of bleeding over a

10   long period of time, can that cause

11   anemia?

12   A.    I would --

13        MR. DENTON:  Object to the form.

14        Go ahead.

15   A.    If there is evidence of

16   bleeding, then I would say that when

17   there's evidence, that that can be true,

18   but if there is no evidence of bleeding,

19   then I think that is just a speculation.

20   Q.    Can anemia be related to an

21   internal bleed, into the body, so you're

22   not bleeding out of your hands or

23   something?

24        MR. DENTON:  Object to the form.

Protected - Subject to Further Protective Review

1       A.    When -- what do you mean by "an

2    internal bleed"?  You have to be more

3    specific.

4       Q.    Gastric bleed, stomach bleed.

5       A.    So you're just saying a

6    gastrointestinal hemorrhage.

7       Q.    Sure.

8       A.    So if there is evidence of a

9    gastrointestinal hemorrhage by, say,

10   finding a lesion, by endoscopy, by

11   colonoscopy, by pill imaging, by Hemoccult

12   testing, if there's actual evidence of

13   that, then that's evidence of

14   gastrointestinal hemorrhage, and if it's

15   severe enough, it can cause anemia.

16      Q.    All those things you described

17   were done to Mr. Boudreaux, right, all

18   those imaging?

19      A.    All that imaging was done.

20      Q.    Didn't find any evidence of a

21   bleed, did they?

22      A.    Yes, they did find evidence of a

23   bleed.

24      Q.    What was the evidence of the

1   bleed they found on imaging?

2      A.    He had -- no, I'm sorry,

3   you're -- you're misconstruing my words.

4            He had evidence of bleeding by

5   his occult blood in his stool.

6      Q.    In his stool.

7      A.    And he also had a history of

8   tarry stools for three days, which in

9   medical terms we call melena, and which is

10  evidence of gastrointestinal bleeding, and

11  I have no reason to doubt that he did not

12  have tarry stools.

13     Q.    Right.  My question is you

14  mentioned these different studies, the

15  scope, colonoscopy, the endoscopy, the

16  pill that goes through.

17           None of those showed any

18  evidence of pathology, did they?

19     A.    They did not find an anatomic

20  lesion in his gastrointestinal tract.

21     Q.    Okay.  And they looked.  I mean,

22  this is good medical work, don't you

23  think, looking for the source of the

24  bleed?

Protected - Subject to Further Protective Review

1      A.    Well, they -- they didn't find a

2   cancer, they didn't find an arterial

3   venous malformation, they didn't find a

4   specific lesion that was in his

5   gastrointestinal tract.  That doesn't mean

6   that he didn't have a gastrointestinal

7   bleed.  He has evidence from his tarry

8   stools.  He has evidence from the positive

9   blood in his stools, and his entire

10  symptomatic aspect of hematocrit dropping

11  to 21 percent without any signs anywhere

12  else of a bleed, which would have been

13  symptomatic in that case, anywhere else of

14  having an internal hemorrhage of that

15  extent he would have had evidence, but the

16  only evidence was in his stool where he

17  had tarry stools.

18      Q.    I'm just asking if they did the

19  right imaging to look for the source of

20  the bleed.

21            Did they do that?

22      A.    I believe that his workup for

23  his GI bleed was thorough.

24      Q.    And they didn't find the source

1    or any kind of pathology that would tell

2    them this is where the bleed happened?

3        A.    I think you have evidence that

4    the bleed happened in the gastrointestinal

5    tract.  They did not determine a

6    pathologic lesion, such as a cancer or an

7    arterial venous malformation or another

8    lesion that is -- that would be

9    actionable.  That doesn't mean that he

10    didn't have bleeding from his

11    gastrointestinal tract.

12        Q.    Where did he bleed from?  What

13    point in his gastrointestinal tract?

14        A.    Tarry stools and melena usually

15    indicate bleeding above the colon.

16        Q.    And what do you use to look for

17    the source of the bleeding above the

18    colon?

19        A.    So, esophagogastroduodenoscopy

20    and the pill base.

21        Q.    And that was done, right?

22        A.    That was done, correct.

23        Q.    Didn't find any source of

24    bleeding?

Protected - Subject to Further Protective Review

1    A.    He did not have an ulcer, he did

2  not have a cancer, he did not have an AVM.

3  They did not find those things in that

4  examination.

5    Q.    My question was they didn't find

6  any source of bleeding when they looked,

7  did they?

8         MR. DENTON:  Object to the form.

9         Go ahead.

10   A.    As I said, they are not -- they

11  are not looking -- they are not doing

12  somehow a comprehensive review of the

13  entire intactness of the gastrointestinal

14  endothelial layer.

15   Q.    Do you think they missed it?

16        MR. DENTON:  Let him finish.

17   A.    Let me finish.

18        What they're looking for are

19  overt lesions, like cancers, AVMs, ulcers,

20  et cetera.  That does not mean that at the

21  time of his gastrointestinal bleed he had

22  a completely intact gastrointestinal

23  endothelium.  He bled in his

24  gastrointestinal tract.  We know that

1   because he had tarry stools and he had

2   blood in his stool and his hematocrit

3   dropped to such an extent that if it had

4   been anywhere else it would have been

5   symptomatic and he had no other symptoms

6   of that.

7       Q.    What was the word that you used

8   about he had some kind of a defect?  What

9   was your word?  I want to use your word.

10      A.    That his --

11      Q.    Was not intact?

12      A.    The endothelial lining of the

13  gastrointestinal tract may not have been

14  intact.

15      Q.    Okay.  What caused the

16  endothelial lining of his gastrointestinal

17  tract to not be intact?

18      A.    Xarelto.

19      Q.    And how does Xarelto do that?

20      A.    In the normal pathophysiology of

21  the way that of the gastrointestinal tract

22  is maintained, there is constant breaching

23  of that in -- of that endothelial lining.

24      Q.    Whether or not you've got

Protected - Subject to Further Protective Review

1   Xarelto on board?

2       A.     I'm saying -- I'm not talking

3   about Xarelto yet.  I'm just talking about

4   in the normal pathophysiology, we are --

5   we have an endothelial tract that is

6   always in the process of being healed, of

7   sealing, of being disrupted, et cetera.

8   These are microscopic.  They do not result

9   in significant blood loss.  They do not

10  result in anemia.  People just do this all

11  the time.  That's part of our normal

12  pathophysiology.

13          I told you about that -- that --

14  that range of bleeding risk, and this

15  is -- people who are -- have no

16  significant risk factors for that

17  hemorrhage, this is happening in them as

18  well as people who have higher risk

19  factors, such as Xarelto.

20          When someone is placed on an

21  anticoagulant, it disrupts the normal

22  hemostatic mechanisms.  I'm not talking

23  about anatomic mechanisms.  I'm talking

24  about the normal hemostatic mechanisms and

Boudreaux_Henry Rinder, MD Deposition_00113

Protected - Subject to Further Protective Review

1   the normal physiology that keep that

2   sealing and constant interaction such that

3   you don't lose blood.

4        Q.    It doesn't cause a defect, but

5   if there is a defect, it doesn't clot as

6   quickly; is that fair?

7        A.    No, I'm not -- no, I'm not

8   saying -- no, I'm not saying that there is

9   a -- when you say "defect," to me that's

10  something that is related to a cancer, an

11  ulcer.  I'm talking about the --

12       Q.    Use your word again.  I forgot

13  it already.

14             Not intact.

15       A.    Not intact.

16       Q.    So, Xarelto doesn't cause the --

17  the bowel to become not intact, but if it

18  does become not intact on its own, it

19  might delay the hemostatic process of

20  clotting.

21             Is that fair?

22             MR. DENTON:  Object to form.

23       A.    I think a more accurate way of

24  stating this is that your body is always

Protected - Subject to Further Protective Review

1  undergoing periods of time where it is not

2  intact.  It is not as if there is a single

3  point in time where suddenly something

4  appears.  That hemostatic mechanism is

5  always making sure that the constant

6  anatomic maintenance is being sealed by

7  hemostatic mechanisms, and anticoagulation

8  disrupts that hemostatic mechanism such

9  that the normal variance in anatomic

10  structures can't be maintained as well and

11  puts you at a higher risk of hemorrhage.

12      Q.    And that's any anticoagulation

13  therapy, right?

14          MR. DENTON:  Let him finish his

15      answer.

16      A.    Well, what I was going to say is

17  that on that -- on that spectrum, the

18  anticoagulation therapy moves you up that

19  spectrum, and we know that from the data

20  from ROCKET that Xarelto moves you higher

21  than warfarin on that spectrum and from

22  the most recent data from Lipidol it moves

23  you higher than apixaban and dabigatran.

24      Q.    No anticoagulant causes the

Protected - Subject to Further Protective Review

1    colon to become not intact, correct?

2              MR. DENTON:  Object to the form.

3         Q.    That happens just, according to

4    you, according to your life process?

5         A.    As I said, these are -- these

6    are in -- these two processes are

7    inextricably bound, the normal disruption

8    of the vascular layer and the hemostatic

9    mechanisms that act to seal them up and

10   allow healing.  They're inextricable.

11   They're going on all the time.

12             So, you can't really separate

13   anticoagulation from this normal

14   hemostatic.  If you give anticoagulation,

15   and as I said, any anticoagulant will move

16   you up that spectrum of hemorrhagic risk

17   from these normal homeostatic mechanisms

18   that exist without cancers or ulcers or

19   AVMs.  It's where you move on that risk

20   spectrum that determines your risk of

21   bleeding.

22             MR. SARVER:  Objection;

23         non-responsive.  Move to strike.

24

1    BY MR. SARVER:

2        Q.    My question is this, again.

3              Anticoagulants do not cause the

4    disruption in the vascular layer;  isn't

5    that true?

6              MR. DENTON:  Object to the form

7        of the question.

8        A.    And what I'm saying is that's

9    not a scientifically accurate statement.

10       Q.    Okay.  Telling me "no" is just

11   fine.

12             MR. DENTON:  No, he can answer

13       the question how he feels appropriate.

14       Q.    Any anticoagulant that you take

15   can disrupt the hemostatic process and

16   cause you to have a greater risk of a

17   bleed?

18       A.    Anticoagulation, as I said

19   before, anticoagulation moves you up that

20   spectrum of increased bleeding risk.

21       Q.    Got it.

22             Was Mr. Boudreaux anemic before

23   he was prescribed Xarelto?

24       A.    Not in my opinion.

Protected - Subject to Further Protective Review

1    Q.    Was Mr. Boudreaux anemic after

2    he was taken off Xarelto and for years

3    afterwards?

4            MR. DENTON:  Object to the form.

5    A.    I do not believe that Mr.

6    Xarelto -- Mr. Boudreaux, I do not believe

7    that Mr. Boudreaux restored his hematocrit

8    and hemoglobin to his pre-GI bleed levels.

9    Q.    So you think he was anemic after

10   he was taken off Xarelto?

11   A.    Well, he was -- he was

12   transfused in the early part of the period

13   and was not transfused up to that level,

14   and then subsequently he did not

15   completely recover to the pre-levels.

16   Q.    I'm sorry, my question was, in

17   your opinion, was Mr. Boudreaux anemic

18   after he was taken off Xarelto?

19   A.    I would have to look at that

20   specific data.

21   Q.    You don't know?

22   A.    My recollection is that he did

23   not completely recover to the pre-level,

24   but I would have to look at the data to

Protected - Subject to Further Protective Review

1    see whether I believe it's anemic or not.

2        Q.    Okay.  Can we define anemia as a

3    deficiency in red blood cells?  Is that a

4    reasonable definition?

5        A.    No, I think that that's --

6        Q.    Give us yours.

7        A.    What I would say is relative to

8    his normal physiology and his relevant --

9    relative to his -- to his physiology,

10   medications and condition, that he would

11   have a relative and unexplained -- and

12   not, sorry, unexplained.  A relative lack

13   of red blood cells for his condition.

14       Q.    That's your definition of

15   anemia, a relative lack of red blood cells

16   for his condition?

17       A.    For his condition.

18       Q.    Got it, okay.

19             And, do you know what Mr.

20   Boudreaux's baseline level of red blood

21   cells for his condition was before

22   Xarelto?

23       A.    My recollection that it was that

24   his hematocrit was -- well, could we look

1    at -- could we look at the specific data?

2        Q.    That's what I'm going to do.

3        A.    Yeah, let's look at the specific

4    data.

5        Q.    Do you have any recollection

6    sitting there without looking at the

7    report?

8            You were about to testify.  I

9    don't want to stop you.

10           MR. DENTON:  That's a first.

11           MR. SARVER:  Actually, I want

12       to, but I'm not supposed to.

13       A.    Let's -- let's look at the

14    specific data.

15           (Exhibit 2, Ochsner Pathology

16       and Laboratory Medicine Laboratory

17       Report for Joseph Boudreaux, dated

18       June 1, 2013, Bates No.

19       JBoudreaux-OStAGH-MD-000973 through

20       JBoudreaux-OStAGH-MD-000979, was

21       marked for identification, as of this

22       date.)

23    BY MR. SARVER:

24       Q.    Let me show you what's been

Protected - Subject to Further Protective Review

1    marked as Exhibit 2 to your deposition.

2            Do you see that this is a

3    laboratory report for Ochsner for Mr.

4    Boudreaux?

5        A.    Yes, from June 1st, 2013.

6        Q.    From June 1st, 2013.

7            Can we agree that was before he

8    was given any Xarelto?

9        A.    Yes.  He was prescribed Xarelto

10   six months later, I think.

11       Q.    Right, okay.

12           So, Xarelto could not have

13   anything to do with his blood levels at

14   this time?

15       A.    He was not taking Xarelto.

16       Q.    All right, good.

17           Do you see his hemoglobin level,

18   if you look at the second page, do you see

19   there's a whole blood count?

20       A.    This is a -- this is a complete

21   blood count.

22       Q.    And do you see part of that

23   shows his hematocrit and his hemoglobin

24   level?

Protected - Subject to Further Protective Review

1        A.      So, the aspects that I look at

2     for his red blood cell status are the red

3     blood cell count, which is the RBC, which

4     is within the normal limits, the

5     hemoglobin, which is within the normal

6     limits, the hematocrit.

7        Q.      Hemoglobin is right at the

8     bottom, isn't it?  The range is 14 to 18

9     and he's at 14?

10       A.      He's within the normal range.

11       Q.      Right, but please answer my

12    question.

13              He was at 14 and the range is 14

14    to 18?

15       A.      Well, I don't know -- I do not

16    know how this normal limit is established.

17    I don't know if it is relative to elderly

18    men or whether that is a range that's

19    established for all adults from 18 years

20    on up.

21              To my mind, a hemoglobin of 14

22    and a hematocrit of 42.6 in a 71 year old

23    man is robust without any evidence of

24    anemia.

Protected - Subject to Further Protective Review

1        Q.    All right.  You're okay with

2    that as the level.  Let me just ask the

3    question.

4              Could you read for us what was

5    his hemoglobin level?

6        A.    His hemoglobin level is 14.0.

7        Q.    And what was the range of normal

8    for this laboratory for hemoglobin level?

9              MR. DENTON:  Object to the form.

10             Go ahead.

11       A.    As I said, that range is 14.0 to

12   18.0, but without knowing the context of

13   that reference range establishment, I

14   don't know how relevant it is to a 71 year

15   old man.

16             MR. SARVER:  Object to the

17       non-responsive answer.

18       Q.    What was Mr. Boudreaux's

19   hematocrit level?

20       A.    42.6 percent.

21       Q.    And what is the range of

22   hematocrit for this laboratory?

23       A.    40.0 to 54.0.

24       Q.    All right.  Had you reviewed

Protected - Subject to Further Protective Review

1    these records before you wrote your

2    report?

3            MR. DENTON:  What records, this

4       exhibit?

5    A.    This exhibit?

6    Q.    This exhibit, Exhibit Number 2.

7    A.    This looks familiar to me.

8            MR. SARVER:  Okay.  Let's take a

9       look at the next lab report.  It's

10      document number 30.

11            (Exhibit 3, STAH Emergency

12      Department Lab Results for Joseph

13      Boudreaux, dated January 7, 2014,

14      Bates No. JBoudreaux-OStAGH-MD-000029

15      through JBoudreaux-OStAGH-MD-000032,

16      was marked for identification, as of

17      this date.)

18            MR. SARVER:  I'm marking this as

19      Exhibit 3, Doctor.

20            THE WITNESS:  Wait, you gave me

21      two things.

22            MR. SARVER:  I gave you two

23      things?

24            THE WITNESS:  You want to take

Protected - Subject to Further Protective Review

1       this back?

2              MR. SARVER:  This is just an

3       extra copy.

4              THE WITNESS:  Okay.

5   BY MR. SARVER:

6       Q.    Okay.  What do we have in front

7   of us, Doctor, as Exhibit 3?  Record for

8   Mr. Boudreaux showing lab results?

9       A.    Give me a second.

10      Q.    Well, no.  At the top of the

11  page you can tell me it's lab results for

12  Mr. Boudreaux, can't you?

13      A.    Yes, I can.

14      Q.    Okay, very good.  That's the

15  first question.

16      A.    From January 7th, 2014.

17      Q.    And that's the relevant date

18  because that's the date he came in and

19  received his Xarelto prescription,

20  correct?

21             MR. DENTON:  Object to the form

22      of the question.

23             You may answer.

24      A.    So, this is when he was admitted

1   with his symptoms of atrial fibrillation.

2       Q.    Can we agree that on this date,

3   the laboratory results would not have

4   indicated -- he wouldn't have been taking

5   Xarelto at the time of this lab report?

6       A.    I do not believe that he was

7   taking Xarelto at this time.

8       Q.    Okay, very good.

9            And take your time to look at

10  whatever you need to, and I'll ask you

11  questions.  Tell me when you're ready.

12      A.    Thank you.  I have reviewed this

13  before, but let me just re-acclimate

14  myself to it.

15           (Perusing document.)

16           Okay.

17      Q.    All right.  I direct you to the

18  third page of the document.  There's a 32

19  at the bottom, if it helps.

20           MR. DENTON:  I think that's the

21      fourth page.

22           MR. SARVER:  It's the fourth?

23      Sorry.  It's page 32 at the bottom

24      with the Bates number.

Protected - Subject to Further Protective Review

1        THE WITNESS:  Yes.

2        MR. DENTON:  I'm sorry, you're

3    looking at the record number and I was

4    looking at the Bates stamp.

5        MR. SARVER:  That's all right.

6    No problem.

7        MR. DENTON:  We were both right

8    and we were both wrong.

9    BY MR. SARVER:

10   Q.    Do you see here we've got

11   laboratory results showing different

12   components of Mr. Boudreaux's blood?

13   A.    So, this is another complete

14   blood count from the 7th, which is about

15   six months after the one you previously

16   showed me.

17   Q.    Yes.

18        And what was Mr. Boudreaux's

19   hemoglobin level on January 7th of 2014?

20   A.    13.8.

21   Q.    And what was the reference range

22   for normal?

23   A.    As I said before, it's 14.0 to

24   18.0.

Protected - Subject to Further Protective Review

1      Q.     And there was a flag there.

2             What did the flag indicate?

3      A.     It indicates that it is lower

4    than the normal range.

5      Q.     And what does a low hemoglobin

6    level indicate?

7      A.     I don't consider this to be a

8    low hemoglobin level.

9      Q.     There is a flag from the

10   laboratory indicating low.

11            What does a low hemoglobin level

12   indicate?

13     A.     As I said, the -- this reference

14   range is meant as a guideline for what the

15   laboratory considers to be its reference

16   range, which may or may not be relevant to

17   a 71 year old man.

18            In looking at this as a clinical

19   person, I do not consider this to be a low

20   hemoglobin.

21     Q.     Yes, I understand.

22     A.     Although -- although it --

23   although it is by federal regulation

24   flagged, because it does not meet these

Protected - Subject to Further Protective Review

1  criteria, I do not consider that to be a

2  low hemoglobin.

3      Q.    So, my question is what does a

4  low hemoglobin level indicate?  Not

5  whether you think this was low.  What does

6  a low hemoglobin level indicate?

7          MR. DENTON:  Object to form.

8          Go ahead.

9      A.    I think that -- I think that it

10  is difficult to answer that question

11  without being medically misleading.

12      Q.    Do you know what a low

13  hemoglobin level is?

14      A.    I know in looking at patients in

15  assessing them whether the patient has

16  what I consider to be a low hemoglobin

17  level or not.

18      Q.    All right.  So, when you think

19  that there is a low hemoglobin level, what

20  does it mean to you?

21      A.    A -- in a hypothetical patient,

22  not this patient, if I see that there's

23  evidence in the complete blood count of an

24  abnormality, then I would work that

Protected - Subject to Further Protective Review

1  patient up and consider that as an

2  abnormality, but in this patient you're

3  looking at one statistical marker that I

4  would not qualify as a low hemoglobin

5  level.

6          MR. SARVER:  Object to the

7      non-responsive answer.

8  BY MR. SARVER:

9      Q.    My question to you is what does

10  a low hemoglobin level mean?

11          Can you answer that?

12      A.    In this case, all it means is

13  that this patient's value taken at one

14  point in time does not meet the reference

15  range in this laboratory which we do not

16  know is relevant to this patient or not.

17      Q.    In your practice, do you treat

18  patients with low hemoglobin levels?

19      A.    I treat all types of hematology

20  patients and including patients with

21  anemia.

22      Q.    All right.  And when a -- what

23  does a low hemoglobin level -- just you

24  don't like the numbers here, I get that.

Protected - Subject to Further Protective Review

1    But tell us what does it mean to you when

2    there is a low hemoglobin level?  What

3    does it mean?

4              MR. DENTON:  Object to the form.

5         A.    Well, I think, again, you're

6    asking a question which is medically

7    misleading.  We do not -- a hematologist

8    does not simply take one value out of

9    context of the entire CBC result, out of

10   context with the patient's condition, age,

11   and their -- their status.

12             We don't simply pull,

13   cherry-pick one particular value and make

14   an entire diagnosis on that.  We look at

15   it relative to the entire picture.

16             And if you would like me to

17   opine about the entire picture in a way

18   that makes medical sense, I'm happy to do

19   that.

20        Q.    I'm really trying something a

21   whole lot simpler, and I think you can do

22   this.

23             You know what a low hemoglobin

24   level means, don't you?  Can you tell us?

Protected - Subject to Further Protective Review

1      A.    What I'm saying here is that in

2  this instance, a low hemoglobin level

3  means that the value measured in this

4  patient at one particular time is 0.2

5  grams per deciliter below a reference

6  range which I have no idea is relevant or

7  not to this patient.

8      Q.    Okay, and we can take it out of

9  the context of this patient.  Let's take

10  it back to your patients, all right.

11          Can you do that?

12      A.    My patients in general.

13      Q.    Yes, in general.

14      A.    Sure.

15      Q.    One of your patients comes in

16  and he or she has what you consider a low

17  hemoglobin level.  Don't even have to put

18  a number on it, but you think it's low.

19          What does that tell you about

20  that patient?

21      A.    What that tells me is that is

22  the starting point for me to evaluate the

23  entire blood count with respect to that in

24  this patient and to use that data with all

1    other existing data I have to investigate

2    whether or not I think there is an

3    abnormality in that patient.

4        Q.    Okay.

5        A.    But --

6        Q.    Go ahead.

7        A.    As part of that assessment is

8    determining whether I truly think that a

9    statistical abnormality from the

10   laboratory has true clinical significance

11   for that patient.

12       Q.    All right.  If you believe that

13   the patient really has a low hemoglobin

14   level, what's going on in their body?

15       A.    Again --

16             MR. DENTON:  Object to the form.

17             Answer it, please.

18       A.    Again, no -- no reasonable

19   clinical hematologist is going to take a

20   single hemoglobin level in isolation and

21   use that in any way to decide what is

22   clinically wrong with that patient or to

23   determine what is the course of action or

24   management.

Protected - Subject to Further Protective Review

1          They, as I said before, they

2    would use that value in conjunction with

3    the entire results of the complete blood

4    count because that is the medically valid

5    way to examine this and to then determine

6    what would be the course of action and

7    what were the possible etiologies and to

8    determine if there is truly an

9    abnormality.

10       Q.    All right.  Are you familiar

11   with the term "D-dimer"?

12       A.    Yes, I am.

13       Q.    What is that?

14       A.    The -- in patients who have --

15   in patients who have conditions where they

16   are making a overt symptomatic venous

17   thrombosis, those patients will have

18   symptoms of a thrombosis and when they are

19   making large amounts of clot, the body

20   attempts to break down that clot.  This is

21   formed clot.  These are not -- these are

22   not occult.  They are not hidden.  They

23   are symptomatic.

24          When those patients have such

Protected - Subject to Further Protective Review

1    symptoms, one test that we use is to

2    examine for a breakdown product of a

3    formed clot.

4          The D-dimer is one aspect that

5    can be measured to try to make the

6    diagnosis or to -- I'm sorry, let me

7    rephrase that last part.

8          To try to increase the ability

9    to determine if a patient has a venous

10   thrombosis.  If the D-dimer is

11   significantly elevated, then there is --

12   then you cannot rule out a venous

13   thrombosis in that patient based on the

14   D-dimer alone if they meet certain

15   specific criteria of risk for a venous

16   thrombosis when they have an overt

17   symptomology of a venous thrombosis.

18       Q.    What D-dimer is measuring is the

19   breakdown products from a clot; is that

20   right?

21       A.    No, I would qualify that.

22       Q.    Go ahead.

23       A.    The D-dimer is -- is a measure

24   of the breakdown products of a venous

Protected - Subject to Further Protective Review

1  thrombosis that is overt and symptomatic

2  and which is used in patients who are at

3  low risk or generally low risk of a venous

4  thrombosis to help in the management of

5  that patient to determine if additional

6  studies are needed to make the diagnosis

7  of a venous thrombosis.

8     Q.    Are you saying that D-dimer only

9  measures the breakdown products from a

10 venous thrombosis, doesn't measure any

11 other clots?

12        That's what I thought I heard.

13    A.    That is the -- that is the

14 most -- let me give you the second aspect

15 of the D-dimer.

16        The D-dimer is also clinically

17 useful as a measure of when a patient has

18 a condition called disseminated

19 intravascular coagulation, which is a

20 life-threatening, overt, massive

21 disruption of the coagulation system by

22 such things as sepsis, shock, disseminated

23 malignancies.

24        In that situation, there is such

Protected - Subject to Further Protective Review

1   massive formation of clots and concurrent

2   breakdown of those clots such that there

3   will be complete disruption of the

4   coagulation system in that the patient is

5   forming massive amounts of clot, breaking

6   down massive amounts of clot, and then

7   they begin to bleed.

8          So, in the workup of patients

9   who have sepsis, shock, et cetera, when

10  they are bleeding, the D-dimer is used to

11  try and determine if disseminated

12  intravascular coagulation is going on in

13  that situation.

14         MR. SARVER:  Objection;

15     non-responsive.

16     A.    Those are the two situations

17  where D-dimer is clinically useful.

18     Q.    I'm going to try to be very,

19  very clear.

20         Does D-dimer simply measure

21  anticoag -- or coag -- the breakdown of

22  clotting factors, that's what it measures?

23         MR. DENTON:  Object to form.

24     A.    That is a medically inaccurate

Protected - Subject to Further Protective Review

1    term.

2         Q.    Okay.

3         A.    And I do not agree with that.

4    The D-dimer --

5         Q.    Tell me exactly what it

6    measures.  I don't care about the

7    conditions.

8         A.    Well, I'm sorry, but the

9    conditions that are part of its

10   measurement are part and parcel of its use

11   and interpretation.

12        Q.    Okay.  If you don't have one of

13   those two conditions, can you have a high

14   D-dimer?

15             MR. DENTON:  Object to form.

16             Go ahead.

17        A.    So, any laboratory test has

18   false positive elevations that are --

19   well, I shouldn't say false positive

20   elevations.  I should say conditions under

21   which elevations are meaningless.

22             So for example, in liver

23   failure, it is possible to have a -- an

24   elevated D-dimer when a patient has severe

Protected - Subject to Further Protective Review

1    synthetic liver dysfunction and that is

2    because the clearance which would normally

3    give you a low D-dimer is affected, and so

4    a high D-dimer could be attributed to

5    someone with severe synthetic liver

6    dysfunction, but that is not used, but the

7    D-dimer is not used in that case to make

8    that diagnosis.  It's simply an elevation.

9         Q.    Did you consider Mr. Boudreaux's

10   D-dimer level in your opinions?

11        A.    I looked at Mr. Boudreaux's

12   D-dimer.  I found that to be of no

13   relevance to my opinions.

14        Q.    You did not consider it in your

15   opinions?

16             MR. DENTON:  That's not what he

17        said.  I object to the form.

18        A.    No, I evaluated all of the

19   laboratories that were drawn and I find

20   that this D-dimer level has no relevance

21   to his conditions.

22        Q.    I think you're referring to page

23   Bates number 30, is that correct, on

24   Exhibit Number 3, I believe?  Is it 3 or

Protected - Subject to Further Protective Review

1  4?

2      A.    This is on Exhibit 3.

3      Q.    3.

4      A.    On Bates 30 there's a D-dimer

5  value of 0.50 which is right literally at

6  the upper range -- I'm sorry, is -- is

7  literally equivalent to the upper range of

8  the D-dimer, and -- but what I'm saying is

9  I do not find that this data is in any way

10  relevant to Mr. Boudreaux.

11      Q.    And the laboratory flagged Mr.

12  Boudreaux's D-dimer level on January the,

13  what was the date of this?

14      A.    7th.

15      Q.    January 7th of 2014 as high,

16  correct?

17      A.    Again, as a -- as a statistical

18  value, 0.50 is greater than -- less than

19  0.50.  So --

20      Q.    No, my question is --

21      A.    So there is a statistical

22  flagging of this value.

23      Q.    My question is simply the

24  laboratory for Mr. Boudreaux's test on the

1    7th of January 2014 flagged his D-dimer

2    level as high?

3        A.    I would say that this D-dimer

4    level is inappropriately flagged because

5    there is clear evidence in the literature

6    that D-dimer values in people over the age

7    of 50 increase in the normal range over

8    time.  I would venture that this reference

9    range is based on the manufacturer's

10   reference range, which does not take into

11   account age, and there is clear data and

12   literature that says that the D-dimer

13   should be considered as a function of age,

14   and this reference range does not take

15   that into account.

16            So, the fact that this is 0.5, I

17   would not -- I would not count that as an

18   abnormal value, even though, as you say,

19   it is flagged by the lab.

20            MR. SARVER:  Objection;

21       non-responsive.

22   BY MR. SARVER:

23       Q.    The question is a simple one.

24            Did the lab for Mr. Boudreaux's

Protected - Subject to Further Protective Review

1    test flag his D-dimer as high?

2        A.    I see a flag that says "H."

3        Q.    Does that mean high to you?

4        A.    No.

5        Q.    What does "H" mean to you?

6        A.    It means to me that this value

7    does not meet the statistical valuation by

8    the laboratory.  That does not necessarily

9    mean that the value is actually high.

10   That is one indicator for which any

11   reasonable physician is going to evaluate

12   this in the context of the patient and

13   their conditions, including age, which as

14   we know increases the normal reference

15   range of the D-dimer.

16           MR. SARVER:  Objection;

17       non-responsive.

18   BY MR. SARVER:

19       Q.    When you see a laboratory report

20   and it has an "H," a large capital "H,"

21   does that mean high to you?

22       A.    That means -- that to me is a

23   flag that indicates I need to look at the

24   value.

Protected - Subject to Further Protective Review

1    Q.    What does the "H" stand for?

2    A.    It means it is not within the

3  normal reference range.  It is higher than

4  the normal reference range.  But any

5  clinician that just uses these flags is

6  not exercising medical practice to

7  evaluate a value.

8    Q.    I'm just asking you what "H"

9  means.

10        Does "H" mean high?

11   A.    That -- I assume that that is

12  what it means in this laboratory.

13   Q.    That was the question.

14        And does "L" mean low when you

15  look at these laboratories?

16   A.    Yes, it does.

17   Q.    Okay, very good.

18        And you didn't consider Mr.

19  Boudreaux's D-dimer level to be something

20  important to you?

21        MR. DENTON:  Object to the form.

22  That's not what he said.

23   A.    In looking at Mr. D-dime -- Mr.

24  Boudreaux's D-dimer, I looked at this and

Protected - Subject to Further Protective Review

1    I considered it and I find it not relevant

2    to his condition because, as I said, in a

3    71 year old, I don't believe that this is

4    the correct reference range for a D-dimer.

5    The reference range should be higher.  The

6    fact that it is literally right at the

7    reference range limit tells me that this

8    is not a relevant value.  Nor does Mr., as

9    I said before, Mr. Boudreaux have any --

10   when I talked about venous thrombosis

11   which is mentioned here in the comment,

12   he's not being examined for a venous

13   thrombosis.  So I'm not even sure why the

14   D-dimer value was measured.

15            MR. SARVER:  Objection;

16       non-responsive.

17   BY MR. SARVER:

18       Q.    Did you form an opinion one way

19   or another as to whether Mr. Boudreaux was

20   anemic before he was prescribed Xarelto?

21       A.    Yes.

22       Q.    And what is that opinion?

23       A.    Based on the data that I'm

24   looking at here from January 7th, he is

Protected - Subject to Further Protective Review

1  not anemic.

2      Q.    Did you form an opinion as to

3  whether or not Mr. Boudreaux was anemic

4  after he was taken off Xarelto?

5      A.    I would like to look at that

6  data, if you wouldn't mind.

7      Q.    I'm just asking you if you had

8  formed that opinion when you wrote your

9  report.

10         Did you have an opinion as to

11  whether Mr. Boudreaux was anemic after he

12  was taken off Xarelto?

13      A.    In my report, the last

14  hematocrit that I noted for the purposes

15  of the report was that he was discharged

16  with a hematocrit of 28.2 percent, and I

17  believe that is the last hematocrit that I

18  evaluated for this in part because I was

19  focusing on his bleeding event, but I

20  would be happy to look at data after that

21  hematocrit was drawn.

22      Q.    I'm just trying to understand

23  what -- where your opinions come from.

24         As I understand it, and tell me

Protected - Subject to Further Protective Review

1    if I'm wrong, you don't have an opinion as

2    to whether or not Mr. Boudreaux was anemic

3    after he was taken off Xarelto; is that

4    correct?

5            MR. DENTON:  Objection to form.

6        A.    That is not a part of my report.

7    I would be happy to look at those -- that

8    data, if you would like me to give you an

9    evaluation.

10       Q.    And because it's not part of

11   your report, you don't have that opinion,

12   correct?

13       A.    That is correct.

14       Q.    All right, very good.

15            You haven't reviewed the

16   laboratory reports for Mr. Boudreaux going

17   all the way through 2015 and up through

18   June of 2016, have not reviewed those?

19       A.    I have reviewed those, but they

20   were not part of my report.

21            I would be happy to look at them

22   and give you specific opinions, if you

23   would like.

24       Q.    But you've not formed the

Protected - Subject to Further Protective Review

1    opinion that Mr. Boudreaux was anemic or

2    not anemic?

3         A.    Those did not inform my report.

4         Q.    Okay, very good.

5               Are you familiar with a term,

6    medical term called "iron deficiency

7    anemia"?

8         A.    Yes.

9         Q.    What is that?

10        A.    So, iron is a required part of

11   the composition of hemoglobin in red blood

12   cells, and if someone develops a total

13   body deficiency of iron, then they will

14   eventually become anemic.

15        Q.    Okay.  I want to make sure

16   you're done.

17              So, iron deficiency anemia, is

18   it ordinarily associated with an acute

19   bleed?

20        A.    I can't answer that question in

21   the general way.

22              I think that iron deficiency

23   anemia is something that we look for when

24   we evaluate patients that are anemic, when

Protected - Subject to Further Protective Review

1    we have specific evidence for that, and we

2    try to determine what is the etiology for

3    it.

4         Q.    Iron deficiency anemia is most

5    commonly found in patients with common --

6    with chronic bleeding, isn't it?

7              MR. DENTON:  Object to form.

8         A.    Again, it depends on patient

9    population that you're examining.  It

10   depends on their age.  It depends on

11   conditions.  I think that's a -- that's a

12   generalization that I would not

13   characterize.

14        Q.    You don't agree with that

15   generalization that iron deficiency anemia

16   is most commonly found in patients with

17   chronic bleeding?

18             MR. DENTON:  Object to form;

19        asked and answered.

20             Go ahead.

21        A.    So, again I would say it depends

22   on the patient population that you are

23   examining.

24        Q.    As a general matter am I correct

Protected - Subject to Further Protective Review

1  or not?  Tell me yes or no, I don't care.

2          MR. DENTON:  No.

3      Q.    I mean, I don't care whether the

4  answer's yes or no, but I'd like an

5  answer.

6          MR. DENTON:  He's given you the

7      answer twice.

8          Give it to him a third time.

9      A.    What I'm saying is that that is

10  an inaccurate generalization.  I would --

11  it depends on the patient populations that

12  you are examining.

13      Q.    All right.  And what tests do

14  you rely upon to determine whether a

15  patient has iron deficiency anemia?

16      A.    So, besides the evaluation of

17  their complete blood count, I would want

18  to know their serum iron, their total iron

19  binding capacity, and their ferritin.  I

20  might also need to look at their bone

21  marrow, and I would probably evaluate that

22  with other clinical and laboratory

23  parameters that are going to depend on the

24  specific patient.  I can't give you those

Protected - Subject to Further Protective Review

1  without knowing which clinical -- what is

2  the clinical situation and how I would

3  evaluate an individual patient, but there

4  would likely be other laboratories and

5  other clinical or other data that I would

6  want.

7      Q.    Would you want to know what the

8  patient's saturated iron level was?

9      A.    Well, the -- that is usually a

10  calculation rather than a -- rather than

11  a -- that is a calculation rather than a

12  measured laboratory value, but that can be

13  derived from the iron and the total iron

14  binding capacity.

15      Q.    To the -- the parameters you

16  wanted to see?

17      A.    That would be -- that would be

18  one of the parameters that I would want to

19  evaluate in the context of the individual

20  patient.

21      Q.    And the saturated iron level

22  comes as a percentage, doesn't it?

23      A.    That is correct.

24      Q.    Okay.  And it's a percentage of

Protected - Subject to Further Protective Review

1  what over what?

2      A.    So, the -- the way that I use

3  the saturation of iron is the serum iron

4  divided by the total iron binding

5  capacity.  But again, that is not meant to

6  be used in a vacuum.  It's meant to be

7  evaluated in the context of the total

8  patient and, as I mentioned, the complete

9  blood count, the ferritin, and all other

10  aspects.

11      Q.    Is a low saturated iron level

12  some evidence that the patient has iron

13  deficiency anemia?

14      A.    That is -- that is possible

15  evidence.  It is not diagnostic, and again

16  would need to be in context of other data

17  and the evaluation of the patient.

18      Q.    Okay.  Did you look to see

19  whether or not Mr. Boudreaux had a low

20  saturated iron level before he was

21  prescribed Xarelto?

22      A.    So, if we're talking about the

23  January 7th.

24      Q.    I'm asking whether or not when

1    you wrote your report you looked to see if

2    he had a low saturated iron level.

3        A.    So, if I'm looking at the data

4    from June 31st -- I'm sorry, let me get

5    the correct.

6              June 1st, 2013 and January 7th,

7    2014 where Mr. Boudreaux had his blood

8    levels drawn prior to starting Xarelto, I

9    see no indication from his complete blood

10   count why anyone would draw iron studies

11   in Mr. Boudreaux.  That would be a -- an

12   irrelevant and medically inappropriate

13   order based on his complete blood count.

14       Q.    Did you find any laboratory

15   reports showing Mr. Boudreaux's saturated

16   iron levels?  Did you see those?

17       A.    I don't recall, but if you have

18   them, I would like to look at them.

19       Q.    And you'd like to look at them

20   because it's important because it is some

21   evidence of iron deficiency anemia, isn't

22   it?

23       A.    I don't see evidence of iron

24   deficiency anemia in his complete blood

Protected - Subject to Further Protective Review

1    count.

2        Q.    That wasn't my question.

3        A.    Well --

4        Q.    Is saturated iron level some

5    evidence of iron deficiency anemia?

6        A.    And as I said before, the iron

7    saturation is one component of the

8    evaluation for iron deficiency anemia.

9    And what I'm saying is Mr. Boudreaux is

10   not anemic prior to beginning Xarelto.

11   Therefore, there's no indication for

12   anemia.

13       Q.    This may be on your -- be beyond

14   your expertise, and tell me if it is,

15   please.  Not being disparaging.  It's just

16   a different area.

17            Do you agree that evidence of

18   iron deficiency anemia in a man of 71

19   years is good evidence that that man has a

20   chronic gastric bleed?

21            MR. DENTON:  Object to the form.

22       A.    I'm sorry, could you rephrase

23   it?

24       Q.    Sure.

Protected - Subject to Further Protective Review

1           Is a patient of 71 years, a male

2    with evidence of iron saturation anemia,

3    is that an indication that he has a

4    chronic gastric bleed?

5           MR. DENTON:  Object to form.

6           Go ahead.

7       A.    So we're not talking about Mr.

8    Boudreaux here.  We're doing a

9    hypothetical, because he's not anemic.

10      Q.    If you remember my question,

11   please answer it.

12      A.    So --

13      Q.    I'll ask it again, if you need

14   it.

15      A.    No.

16      Q.    All right.

17      A.    So, if -- if I had -- if I have

18   a 71 year old patient who has anemia,

19   examining their iron indices would be one

20   part of my evaluation.  If I found them to

21   be anemic, unlike Mr. Boudreaux, and they

22   had evidence of iron deficiency, which is

23   based on my overall evaluation of them,

24   not simply limited to iron saturation, I

Protected - Subject to Further Protective Review

1    would evaluate them for all of the

2    possible causes of iron deficiency which

3    could include occult or chronic bleeding.

4        Q.    Okay.  And tell me if this is

5    beyond your expertise as well.

6            In patients with iron deficiency

7    anemia, is that associated with red blood

8    cells that are smaller in size than normal

9    red blood cells?

10       A.    So, what you're talking about is

11   patients with patients with a low mean

12   corpuscular volume.

13       Q.    Well, what I'm talking about is

14   in iron deficiency patients, would you

15   expect them to have red blood cells that

16   are smaller in size than normal red blood

17   cells, however you define that?

18           MR. DENTON:  Object to form.

19           Go ahead.

20       A.    So, we're talking about, we're

21   speculating in a patient who is anemic,

22   unlike Mr. Boudreaux.

23       Q.    I'm asking you a general medical

24   question.

Protected - Subject to Further Protective Review

1       A.    I think that each individual --

2   I think that patients respond to iron

3   deficiency in different ways.  They may or

4   may not have abnormalities that are

5   characterized by smaller red blood cells.

6   It depends on their overall condition

7   because multiple conditions impact red

8   blood cells.  And therefore, you cannot,

9   in a generalizable way, say that that

10  always occurs.  That is one possible piece

11  of evidence, but it is not necessarily

12  specific.

13      Q.    There is medical literature

14  saying that patients with iron deficiency

15  anemia often have smaller red blood cells?

16          MR. DENTON:  Object to the form.

17      Q.    You don't agree?

18      A.    There is evidence in the

19  literature that patients with iron

20  deficiency have a hemoglobin synthesis

21  abnormality.  Depending on the situation

22  with each individual patient, that may or

23  may not be manifest as abnormalities in

24  red blood cell size, but it depends on the

Protected - Subject to Further Protective Review

1   individual patient and can't be used as a

2   blanket statement.

3       Q.    And the abnormality would be the

4   low, not high, smaller, not bigger cells?

5           MR. DENTON:  Object to form.

6       A.    It depends on the patient's

7   situation.  You could have interactions

8   such that you might not have a net

9   abnormality in the patient's red blood

10  cell size.

11      Q.    Was Mr. Boudreaux vitamin B12

12  deficient?

13          MR. DENTON:  Could we take a

14      break?

15          MR. SARVER:  Absolutely.

16      Always.

17          MR. DENTON:  I'm getting hot.  I

18      didn't want to interrupt.

19          MR. SARVER:  It's fine.

20          MR. DENTON:  It seems like a

21      slightly different topic.

22          THE VIDEOGRAPHER:  Stand by,

23      please.

24          The time is 10:58 a.m.

1          We are going off the record.

2          (Recess taken.)

3          THE VIDEOGRAPHER:  The time is

4     11:10 a.m.

5          We are back on the record.

6     BY MR. SARVER:

7     Q.    Dr. Rinder, I'm on a time

8     crunch, so I'm going to go to a different

9     area and try to go through it as quickly

10    as we can.

11         If you look at page 2 of your

12    report, do you see your paragraph 4?  Do

13    you see paragraph 4?

14    A.    I do.

15    Q.    Okay.  You write that the

16    prothrombin time with Innovin reagent that

17    was taken on admission for the GI bleed

18    was important to you.

19         Is that right?

20    A.    Yes, that -- to me that was

21    evidence that I considered.

22    Q.    All right.  And the prothrombin

23    time was 13.6 seconds, correct?

24    A.    Yes, which was out of the normal

Protected - Subject to Further Protective Review

1   range.

2       Q.     And Innovin was the reagent?

3       A.     That is my understanding.

4       Q.     Okay.  And what -- how does the

5   prothrombin time of 13.6 with Innovin as

6   the reagent relate to a prothrombin time

7   if Neoplastine had been the reagent?

8       A.     So, in published literature,

9   examining the effect of Xarelto on

10  prothrombin time with different reagents,

11  there is data that relates the -- the --

12  with a -- there is standardized data that

13  relates prothrombin time with those

14  different reagents in graphs of -- on --

15  of Xarelto.  And so, it is -- it is an

16  indirect comparison, but one could use

17  that graph to show approximately where a

18  prothrombin time value using the Innovin

19  reagent would correspond to a prothrombin

20  time using a different prothrombin time

21  reagent.

22      Q.     Did you do that?

23      A.     Yes.

24      Q.     And what did it correspond to in

Protected - Subject to Further Protective Review

1   your calculations with respect to

2   Neoplastine?

3        A.    In my calculations, the

4   prothrombin time with the Innovin of 13.6

5   corresponded to a prothrombin time between

6   21 and 25 with different Neoplastine

7   reagents.

8        Q.    And have you -- did you write

9   those calculations out?

10       A.    I did not.

11       Q.    How -- did you make any notes?

12             It's not in your report.

13             Where can we find your

14   calculations?

15       A.    They're -- they're in my head.

16   I looked at the -- I looked at the data

17   and I examined the figure and that's where

18   it looks like those -- again, I said it's

19   an indirect comparison, but from the

20   graphs that I looked at, I think that the

21   prothrombin time would fall in that range

22   with different Neoplastine reagents.

23       Q.    And tell us the source of these

24   graphs.

Protected - Subject to Further Protective Review

1    A.    I believe -- I believe that is

2  the Douxfils manuscript.

3    Q.    Douxfils, and spell that for us.

4    A.    D-O-U-X-F-I-L-S.

5    Q.    Okay.  Did you cite that in your

6  references for your general report?

7    A.    I'm pretty sure it's in my

8  general report.

9    Q.    And did you use any other

10  references other than Douxfils?

11    A.    I thought Douxfils' report had

12  the most comprehensive data that I could

13  find for comparing a large number of

14  prothrombin time reagents for Xarelto.

15    Q.    My question is did you use any

16  other reference other than Douxfils to

17  make this comparison?

18    A.    I looked at other references,

19  but that seemed to me to be the best

20  graphing to be able to make that

21  comparison.

22    Q.    Okay.  And did you call the

23  Terrebonne Hospital to determine what

24  reagent was used on later tests of Mr.

Protected - Subject to Further Protective Review

1    Boudreaux's PT time?

2            MR. DENTON:  I just want be to

3       be specific.

4       A.    Yeah, I --

5            MR. DENTON:  Object to form.

6       Q.    You called Ochsner St. Anne's,

7    didn't you, the laboratory there?

8       A.    Yes.

9       Q.    Who did you talk to?

10      A.    I spoke to, I can't remember her

11   name, but she was the -- I was asked to --

12   I asked to be transferred to the

13   coagulation specialist.

14      Q.    Okay.

15      A.    And I spoke with a technologist

16   who said that she was the coagulation

17   specialist.  I'm sorry, I can't remember

18   her name.

19      Q.    It was a woman?

20      A.    Yes.

21      Q.    And when was that conversation?

22      A.    I think some time in October of

23   this year.

24      Q.    Okay.  Did you take any notes?

Protected - Subject to Further Protective Review

1      A.     I did not.

2      Q.     Make any writings at all

3  summarizing the conversation?

4      A.     No.

5      Q.     All right.  Did you ask whether

6  any other reagents were used at St. Anne's

7  for measuring PT times?

8      A.     So, what I -- what I

9  specifically asked her was did she know

10  what was the specific prothrombin time

11  reagent that was used in 2014, and she

12  told me that it was Innovin and that

13  Innovin had been used for several years

14  prior to that time.  She didn't know

15  exactly when Innovin had been begun, but

16  she was confident that Innovin was the

17  reagent that was used at the time of Mr.

18  Boudreaux's admission at Ochsner.

19      Q.     Did you ask her specifically

20  about what reagent was used for Mr.

21  Boudreaux?

22      A.     Since the prothrombin time is

23  done with a single reagent and it would be

24  against the standard of care to do -- to

Protected - Subject to Further Protective Review

1   use different reagents within the same

2   hospital for a prothrombin time, that

3   question never answered -- never entered

4   my mind.  I asked her -- I did not ask her

5   about Mr. Boudreaux.  I thought that would

6   be an inappropriate thing because that

7   would be private health.

8           I just asked her what was the

9   Innovin -- what was the reagent used for

10  the prothrombin time in that time period,

11  and she said that it was Innovin and

12  volunteered that it had been used for many

13  years prior to that time and was still

14  being used, I believe.

15      Q.   Did you ask her whether the

16  laboratory used any other reagents for

17  prothrombin time?

18      A.   That -- you mean at that time?

19      Q.   Yes, when you were on the phone

20  with her.

21          You were only on the phone with

22  her once, right?

23      A.   Correct.

24      Q.   During that conversation, did

Protected - Subject to Further Protective Review

1    you ask her whether or not any other

2    reagent was used at the laboratory at

3    Ochsner?

4        A.    I'm sorry, I meant -- I didn't

5    mean at that time that I asked.  I meant,

6    to clarify, at that time that Mr.

7    Boudreaux was evaluated.

8        Q.    Let me make my question as clear

9    as it can be.

10       A.    Okay.

11       Q.    Did you ask the person you

12   talked to at Ochsner whether or not at any

13   time Ochsner had used different reagents

14   other than Innovin?

15       A.    I was only focused on the time

16   period during which Mr. Boudreaux was

17   admitted to Ochsner.  It is the standard

18   of care to use a single prothrombin time

19   reagent.  Therefore, asking about a

20   different prothrombin time reagent for use

21   at that time is -- doesn't make sense.

22       Q.    Is the answer to my question,

23   "No, I didn't ask about any other

24   reagent"?

Protected - Subject to Further Protective Review

1    A.    Since that -- since that would

2  be a nonsensical question, I didn't ask

3  it.

4    Q.    Okay.  Did you obtain any

5  documents from the Ochsner lab regarding

6  the use of reagents or the reference

7  levels, reference range of the PT levels?

8    A.    Well, we -- we have that data, I

9  believe.

10          So, is this -- is this Ochsner?

11    Q.    I'm asking if you got any other

12  documents from Ochsner after the phone

13  call.

14    A.    No, I relied on the documents,

15  the medical records from Ochsner to

16  examine the prothrombin time reference

17  interval.

18    Q.    Do you know what reagent was

19  used at the Terrebonne laboratory for Mr.

20  Boudreaux?

21          MR. DENTON:  Which date, please?

22          MR. SARVER:  At any time.

23  BY MR. SARVER:

24    Q.    Do you have any idea what

Protected - Subject to Further Protective Review

1  reagent the Terrebonne laboratory uses?

2      A.    I did not -- I did not

3  question -- I did not call them up to ask

4  them that.

5      Q.    Okay.  Did you make any

6  assumptions about what reagent was used at

7  Terrebonne?

8      A.    No, I did not.

9      Q.    Okay.  Do you know what reagent

10  was used at Terrebonne?

11      A.    No, I do not.

12      Q.    Do you know what the normal

13  range of PT is for a patient who is on an

14  anticoagulant when Innovin is used as the

15  reagent?

16          MR. DENTON:  Object to the form.

17      A.    Which anticoagulant are you

18  referring to?

19      Q.    Any anticoagulant.

20      A.    So, I -- I know the reference

21  range for the INR when warfarin is being

22  used as an anticoagulant.  I'm not

23  aware -- I would like to see data that

24  someone has regarding specific

Protected - Subject to Further Protective Review

1   anticoagulants for reference ranges in

2   that.  I would find it -- I would like to

3   see that data because I'm not sure what

4   that data would be used for.

5       Q.    You would anticipate that the PT

6   for a patient on an anticoagulant would be

7   higher than the PT for a patient not on

8   anticoagulant?

9       A.    So --

10          MR. DENTON:  Object to form.

11          Go ahead.

12      A.    So, I'm aware of data that

13  Xarelto has an effect on the prothrombin

14  time and will increase the prothrombin

15  time in a linear fashion and, depending on

16  the sensitivity of the reagent, that

17  you'll have increases in the prothrombin

18  time for that.

19      Q.    And the same is true for

20  Pradaxa, isn't it?

21          MR. DENTON:  Object to form.

22          THE WITNESS:  That has data

23      that's -- that's confidential involved

24      in it.

Protected - Subject to Further Protective Review

1    Q.    I can't effectively examine you

2    without asking that question.

3            MR. DENTON:  Yeah, you can.

4    Q.    Can you answer it?

5            MR. DENTON:  You can talk about

6    the published literature.

7            MR. SARVER:  I cannot ask --

8    A.    Well, the data --

9    Q.    Can you tell me whether or not

10   Pradaxa does the same thing in terms of

11   the reference range for PT as Xarelto?

12           MR. DENTON:  Object to form.

13           Talk about published literature.

14   That's fine.

15   A.    In the published literature, I

16   think that the data for Pradaxa are more

17   relevant related to dilute thrombin time,

18   rather than prothrombin time.

19   Q.    I'm not asking you to limit your

20   answer to public literature.

21           I want to know based on your

22   opinion and your knowledge and whatever

23   basis it is whether or not Pradaxa would

24   do the same thing to prothrombin time as

Protected - Subject to Further Protective Review

1    Xarelto.

2            MR. DENTON:  Object to form.

3       A.    I would not use -- I would not

4    find the prothrombin time to be a reliable

5    measure of Pradaxa activity.

6       Q.    You cited Douxfils, that

7    article?

8       A.    I believe that's it.

9       Q.    Is that the one?

10           You know that Neoplastine wasn't

11   even referenced in that chart, right?

12           MR. DENTON:  What chart?

13      A.    Can you show me the chart?

14      Q.    You're the one that brought up

15   the chart.

16           MR. DENTON:  No.  There are

17      bunches of charts in that article.

18      A.    The Douxfils article that I

19   looked at has two curves in it that are

20   related to different Neoplastine reagents.

21      Q.    What was the date of this

22   Douxfils article that you're relying on?

23      A.    Can I go back to my general

24   report to find that?

1          MR. DENTON:  Sure.

2     Q.    Do whatever you need to do.

3          MR. DENTON:  Do we have a copy

4     of it?  We had it yesterday.

5     Q.    (Handing.)

6     A.    Thank you.

7          (Perusing document.)

8          2012.

9     Q.    Okay.  And, are you saying that

10    there is a chart comparing Innovin with

11    Neoplastine times?

12    A.    So, there is a chart in the

13    Douxfils that examines, as I said,

14    prothrombin time with standardized

15    rivaroxaban concentrations against

16    reagents, the following reagents:

17    Innovin, TriniCLOT PT Excel, TriniCLOT PT

18    HTS, Neoplastine CL Plus, RecombiPlasTin,

19    Neoplastine R, and TriniCLOT PT Excel S.

20    Q.    And that's what you based your

21    opinion on?  Is that the chart?

22    A.    Yes.

23    Q.    Is wasn't another one?

24    A.    No.

Protected - Subject to Further Protective Review

1    Q.    Okay.

2    A.    I think -- I think this is a

3  reasonable comparison.

4    Q.    Okay.

5    A.    Would you like that back?

6    Q.    You can keep it if you like it

7  for posterity.

8    A.    Only if you guys all sign it.

9    Q.    All right.  So, we know that Mr.

10  Boudreaux was not tested as Neoplastine as

11  a reagent for his PT time?

12    A.    Correct.  He was tested with

13  Innovin.

14    Q.    All right.  And your general

15  report refers to a 20 second time with

16  Neoplastine as the reagent, not with

17  Innovin?

18    A.    That is correct.

19    Q.    You don't have any time in your

20  report that is relevant to Innovin as the

21  reagent, do you?

22    A.    The only -- my only reference to

23  Innovin in that report is respect to

24  the -- is with respect to that it has a

Protected - Subject to Further Protective Review

1  linear relationship with rivaroxaban

2  concentration.

3           You are correct that the data

4  that was developed with respect to

5  bleeding risk, which was done by the

6  company with ROCKET, is with a Neoplastine

7  reagent.

8      Q.   All right.  Now, if we return to

9  your report paragraph 4, you have your

10  opinion that:  "Had he been tested for

11  Xarelto anticoagulant activity, the latter

12  measured with PT Neoplastine."

13          Do you see that?

14     A.   Yes, in the fourth line.

15     Q.   Yes.

16          "At the onset of Xarelto

17  treatment his excessive exposure would

18  have been identified."

19          What did you mean by "excessive

20  exposure"?

21     A.   My clarification of that is

22  that, as I said before, his Innovin level,

23  his Innovin-based prothrombin time

24  activity corresponded to a Neoplastine

Protected - Subject to Further Protective Review

1  activity based on the Douxfils paper of

2  greater than 20 seconds. And I'm basing

3  that -- and therefore, I'm saying that he

4  would have fallen in that fourth quartile

5  of hazard ratio based on the ROCKET-AF

6  data which we know had a higher risk of

7  bleeding compared to the third, second and

8  first quartiles.

9      Q.   So you're taking the 13.6

10  Innovin time and saying that would

11  translate to something over 21 with

12  Neoplastine or PT time and saying that's

13  excessive exposure based on the fourth

14  quartile?

15      A.   I'm saying that because the

16  Neoplastine time was, I think it was 19.8,

17  but in my report I rounded off to 20

18  seconds, that is the fourth quartile and

19  therefore that would put him at excessive

20  risk of bleeding.

21      Q.   All right. When would this test

22  have been -- have to have been conducted

23  to find out what his neo -- his PT time

24  was that you think could have been used to

Protected - Subject to Further Protective Review

1    adjust his exposure?

2        A.    So --

3        Q.    A day after he's on Xarelto, two

4    days?  How long?

5        A.    I've talked to my colleagues

6    about this in terms of what they think

7    would be the -- the right timing to

8    monitor, and most of them feel that

9    they -- they would like to try to do their

10   best to establish a steady state.  So that

11   they would think that taking the drug --

12   they -- they -- we've discussed that they

13   feel that taking a level some time in --

14   after four, five, six days is enough time

15   for the patient to establish some sort of

16   hemostatic range for that.

17       Q.    So some time around a week you

18   might check?

19       A.    Give or take, but that, you

20   know, and again, it could be done at a

21   patient's convenience.

22       Q.    Okay.

23       A.    I don't think there's a magic

24   number there, but I'm talking about you

Protected - Subject to Further Protective Review

1   would not want to do it a day after

2   beginning the drug.  They would want

3   enough time to pass such that they felt

4   the patient was stable, that their drug

5   levels were -- that they were taking the

6   drug regularly and therefore it would be

7   stable.

8       Q.    And then you write:  "He could

9   have been titrated to a lower dose."

10          What lower dose would you

11  recommend?

12      A.    Well, I -- I put that in because

13  that might speak to a cardiologist.  I

14  would not -- I do not venture to discuss

15  what dose, what specific dose or to make

16  that decision.  That's to the

17  cardiologist.  I put that in simply as a

18  possible option for a cardiologist.

19      Q.    One of the options -- I'm sorry.

20          One of the options that you note

21  in your report as an acceptable option is

22  that he could have been titrated to a

23  lower dose of Xarelto, correct?

24      A.    Yes, with the caveat that if

Protected - Subject to Further Protective Review

1    that is approved by the cardiologist who's

2    doing the primary treatment of the atrial

3    fibrillation.

4        Q.     And you can't tell us what that

5    lower dose would have been?

6        A.     That is dependent on the

7    cardiologist.

8        Q.     Would that lower dose have been

9    off-label use of Xarelto?

10       A.     Again, that's for the

11   cardiologist to decide.

12       Q.     Well, you know what the -- the

13   label -- the FDA approved label says, and

14   it's a 20 milligram dose for certain

15   creatine clearance levels and a 15

16   milligram dose for lower creatine

17   clearance levels, correct?

18       A.     That -- you're -- that is the

19   correct interpretation of the FDA data

20   that I know of.

21       Q.     And Mr. Boudreaux fell into the

22   20 milligram category for dosage, didn't

23   he?

24       A.     I believe that his eGFR would

Protected - Subject to Further Protective Review

1   classify him in that category.

2       Q.    And so any lower dose would have

3   been off-label?

4       A.    Again, that -- I leave that to

5   the cardiologist to make that

6   determination.

7       Q.    The other option would be to

8   discontinue Xarelto and switch to an

9   anticoagulant with a lesser risk of

10  bleeding, safer anticoagulant, such as

11  Eliquis or Pradaxa, and then you cite Lip

12  2012, 2016 and Graham 2016, correct?

13      A.    That is correct.

14      Q.    Are those -- is there any other

15  basis for your statement that another

16  anticoagulant has a lesser risk of

17  bleeding or is a safer anticoagulant?

18      A.    Again, these are the -- these

19  are for the sake of time, the references

20  that I included here.  If we want, we can

21  go back to my general opinion report and I

22  can give you the other references that are

23  the basis of this but which I didn't

24  happen to include.  I can't -- I think one

Protected - Subject to Further Protective Review

1    of them is Yu, but if you want, we can go

2    back to the general opinion report.

3        Q.    I'm asking you now.

4            You included these references,

5    these three and no others, in the specific

6    report for Mr. Boudreaux; isn't that

7    correct?

8            MR. DENTON:  No, I object

9        because he incorporates his entire

10       general report.  So that's a

11       misstatement of his report.

12           MR. SARVER:  Please object to

13       the form.  Don't coach him, Roger.

14       Come on.

15           MR. DENTON:  Well, then ask

16       appropriate questions, Rick.  You know

17       that.

18           MR. SARVER:  Come on, Roger, we

19       got to stop this.

20           You want me to do this to your

21       experts?

22           MR. DENTON:  You will.

23           MR. SARVER:  I will not.  I'll

24       behave.  I'll do what the court says.

Protected - Subject to Further Protective Review

1          MR. DENTON:  Well, none of your

2      colleagues have been doing it for the

3      last year-and-a-half, so.

4          MR. SARVER:  Shame on them.

5          MR. DENTON:  I know that.  See,

6      if you had been involved in the

7      beginning, it would have been very

8      different.

9   BY MR. SARVER:

10      Q.    Okay.  What you wrote in your

11  specific report is you referenced three

12  articles, correct?

13      A.    In this -- in this particular

14  paragraph, I do reference those articles,

15  but it's my understanding, and I believe

16  that there's language here that I am using

17  all of the background -- all of the

18  general report as well to substantiate

19  this.  I simply included these as

20  examples.  It was not meant to be

21  comprehensive.

22          And as I said, I'm happy to look

23  at the general opinion report to give you

24  those other references.

Protected - Subject to Further Protective Review

1     Q.    All right.  You didn't refer to

2   or cite any of the literature that shows

3   that Xarelto is actually more effective

4   than other NOACs and more safe than other

5   NOACs.

6           Why not?

7           MR. DENTON:  Object to the form.

8     A.    As I discussed yesterday, I did

9   look at that data and did review that

10  data, and in trying to be comprehensive

11  but not overload my report with every

12  possible article, I found those to be less

13  compelling than these articles from 2012

14  and 2016 which I found to be more

15  compelling toward the -- the fact that

16  I -- that Xarelto was a lesser risk of

17  bleeding.

18    Q.    Okay.

19    A.    And a safer anticoagulant.

20    Q.    All right.  Would you have

21  suggested that Mr. Boudreaux go back on

22  what you consider to be a safer

23  anticoagulant after he had recovered from

24  his bleed?

Protected - Subject to Further Protective Review

```
1            MR. DENTON:  Object to form.

2            Go ahead.

3       A.    So, that would have been a --

4   that would have been a consultation with

5   his cardiologist, perhaps with --

6   depending on that cardiologist's expertise

7   and their -- their abilities, perhaps an

8   invasive cardiologist as well, and we

9   would have had a discussion as to the

10  relative risk in Mr. Boudreaux

11  specifically of bleeding, of

12  anticoagulation.  That would include all

13  of the data that we have on his workup,

14  including looking for an anatomic AVM,

15  ulcer, et cetera.

16            I tend to be, in my consults, I

17  tend to be very -- I tend to favor in my

18  consultation considering and not a priori

19  dismissing the ability to anticoagulate

20  patients.  There -- you can imagine that

21  someone gets put on an anticoagulant and

22  they bleed and then the physicians are --

23  say we can never anticoagulate this

24  patient again.  Sometimes that is a
```

Protected - Subject to Further Protective Review

1  consideration that they'll use as a

2  blanket statement.

3        I tend to not operate in that

4  mode as a -- as an automatic.  What I try

5  and do is talk to them about okay, is --

6  are there situations where anticoagulation

7  would be the better situation.  Even

8  though we have the patient has had a

9  bleed, should we consider restarting a

10  different anticoagulant and evaluating

11  that.

12        It's consultative.  I'm not

13  going to tell the cardiologist that they

14  must do that, but I would definitely put

15  that as a consideration in the consult as

16  to whether the patient should be restarted

17  on anticoagulation at whatever appropriate

18  time if that as a group agrees that that's

19  the best course for that patient and would

20  consider that.

21     Q.    Would you have recommended

22  starting Mr. Boudreaux on another

23  anticoagulant after he had recovered from

24  his bleed?

1    A.    Again, my -- the nature of my

2    practice is to do that in the context of a

3    group consultation rather than to say this

4    is what I think should be done.  It is

5    more of a consultative group discussion to

6    determine what is the best course for that

7    patient.

8    Q.    In that consultative group

9    discussion you've described, would you

10   have suggested, recommended, advised,

11   however you want to phrase it, that Mr.

12   Boudreaux go on another anticoagulant

13   after he recovered from his bleed?

14   A.    I would -- I would use the word

15   "consider."  And that should be part of

16   the consideration.

17        In fact, we know that Mr.

18   Boudreaux was anticoagulated at a later

19   date with low molecular weight heparin,

20   and that would have been a similar type of

21   situation of weighing the risks and

22   benefits and deciding whether or not that

23   was of sufficient benefit that had

24   outweighed the risk.  We would do the same

Protected - Subject to Further Protective Review

1  consideration for thinking about

2  anticoagulation for his atrial

3  fibrillation.

4      Q.    Would you have any

5  recommendation at all regarding Mr.

6  Boudreaux after he recovered from his

7  bleed about starting another

8  anticoagulant?

9      A.    I would have, in that

10  discussion, considered the use -- well, at

11  that time, we did -- this is in 2014.  At

12  that time, we had less data than is

13  available at 2016.  So we would have had

14  to have considered the data at the time

15  relative to bleeding risk of other

16  anticoagulants and considered it.  That's

17  all I'm saying.  We would consider it.

18      Q.    And I'm asking, maybe you

19  don't -- you don't have an answer, but I'm

20  wondering what would you have recommended?

21  Would you have recommended nothing?

22          I mean, they consult you.  When

23  they consult you, they're asking for your

24  advice, right?

Protected - Subject to Further Protective Review

1      A.    They're asking for my

2   information and to have a discussion.

3   They're not asking for me to say this is

4   what I say.

5           My -- my consultative nature is

6   to have a discussion and to give them my

7   understanding of the relevant data at that

8   point in time with respect to the patient

9   and to hear what their analogous

10  understanding is and then within that, to

11  synthesize what we think is best for the

12  patient.

13     Q.    All right.  And if the doctor

14  had said well, let's give Eliquis a shot,

15  what would you have said?

16          MR. DENTON:  Object to form.

17          Go ahead.

18     A.    Well, I don't think -- I don't

19  think that -- I don't think that the

20  consultation is let's give it a shot and,

21  you know, cross our fingers and hope that

22  things are okay with that.

23          I think what we would do is have

24  a more specific discussion relative to Mr.

Protected - Subject to Further Protective Review

1    Boudreaux, relative to what the primary

2    care doctor's feel is, their course of

3    therapy with those risks, and we would

4    have a discussion of that.  We would

5    consider Eliquis.  We would consider

6    Pradaxa.  We would examine whatever was

7    available at that time, including

8    warfarin.

9         Q.    Okay.

10        A.    We would have looked at every

11   possibility and gone -- and gone with

12   whatever the -- the primary care doctor,

13   or the cardiologist is the person doing

14   that prescription.  They have to be the

15   one that is at the end comfortable with

16   what they're doing and --

17        Q.    Did any -- I'm sorry, go ahead.

18        A.    And all I'm saying is I would --

19   I would encourage consideration of all

20   options.  I'm not saying that I would push

21   in one direction or another.  I would just

22   go through those options relative to the

23   patient.

24        Q.    Did anything about the bleed on

Protected - Subject to Further Protective Review

1    Xarelto increase Mr. Boudreaux's risk of

2    having a bleed on another anticoagulant?

3        A.    I'm trying to think if there's

4    any objective data that can be used to

5    answer that in a valid scientific way.

6             Can you ask me that one more

7    time?

8        Q.    All right.

9        A.    I'm sorry.

10       Q.    It's okay.

11            Did the fact that Mr. Boudreaux

12   bled while he was on aspirin and Xarelto

13   put him at an increased risk of bleeding

14   on another anticoagulant?

15            MR. DENTON:  Object to form.

16            Please answer it if you can.

17       A.    Got it, okay.

18            I'm not -- when we talk about

19   that spectrum of bleeding risk and the

20   fact that current data seems to have

21   Xarelto at a higher bleeding risk than

22   other drugs, I'm not aware of objective

23   data that allows within an individual

24   patient to somehow differentiate risk

Protected - Subject to Further Protective Review

1    factors with the different anticoagulants

2    in that patient.  Therefore, I -- I can't

3    say that that exists.

4        Q.    Okay.  Certainly being on

5    Xarelto for a period of time doesn't make

6    you allergic to another anticoagulant?

7        A.    I can't answer that.  I don't

8    know enough about the pharmaco -- I can't

9    answer -- I don't know enough about the

10   possibility of an antibody to a drug to be

11   able to opine on that.

12       Q.    You just can't answer one way or

13   the other?

14       A.    Well, when you talk about an

15   allergic reaction, that's an immunologic

16   aspect of a possible complication, and I

17   don't have an opinion on that.

18       Q.    And did you see any evidence

19   that there was any kind of a weakness or

20   defect or injury to the gastrointestinal

21   tract of Mr. Boudreaux that would make him

22   more susceptible to bleeding after the

23   Xarelto bleed?

24       A.    When you say "more," you're

Protected - Subject to Further Protective Review

1    going to have to clarify.

2         Do you mean more susceptible to

3    just bleeding in general?

4    Q.    Yes.

5    A.    Without an anticoagulant on

6    board, I would say that being stopped --

7    having stopped Xarelto, Mr. Boudreaux

8    would probably return to his pre-Xarelto

9    aspect of bleeding risk.  I did not -- I

10   can't see any data that would make me

11   think that that's different.

12   Q.    Okay.

13        MR. DENTON:  How close are you,

14   Rick?

15        MR. SARVER:  I'm hours away.  So

16   if you want to stop me, it's your

17   call, but I'm nowhere near done.

18        MR. DENTON:  Well, what time are

19   we on, Mr. Videographer?

20        THE VIDEOGRAPHER:  We're at

21   three hours and nine minutes.

22        MR. DENTON:  I mean, I think

23   he's got another 15 or 20 minutes.

24   That's all he's got.

Protected - Subject to Further Protective Review

1      MR. SARVER:  Yeah, I can't

2   finish, but of course you can tell me

3   I need to stop.

4      MR. DENTON:  No, I'm just

5   telling you that the rules and the

6   agreement between the parties --

7      MR. SARVER:  I know.

8      MR. DENTON:  -- indicate you

9   need to stop.

10      MR. SARVER:  And I'm not arguing

11   that.  I will stop as soon as you tell

12   me to stop asking questions.  It's

13   your call.

14      MR. DENTON:  What I'm trying to

15   say is is if you could do what you

16   needed to accomplish, as an

17   accommodation, the doctor has another

18   10, maybe 15 minutes.

19      If you're saying that that would

20   not resolve any concern you have, then

21   I think we have no choice other than

22   to end here.

23      MR. SARVER:  It wouldn't solve

24   my problem, Roger.  I appreciate the

Boudreaux_Henry Rinder, MD Deposition_00191

Protected - Subject to Further Protective Review

1       offer of 10 minutes.  It is

2       appreciated.

3              MR. DENTON:  Well, it's 10 in

4       addition to the 10 you've already had.

5              MR. SARVER:  Yes, it's 19 or 20

6       minutes.  Much appreciated.

7              For the issues we talked about,

8       and I don't want to be disparaging at

9       all, but we're likely to be filing a

10      motion asking for more time, and that

11      will be resolved however it's

12      resolved.

13             MR. DENTON:  Understood.

14             MR. SARVER:  Yeah.

15             MR. DENTON:  I understand.  So I

16      guess we're finished for today.

17             MR. SARVER:  Okay.

18             MR. STEKLOFF:  I'm just going to

19      reserve my right to ask some follow-up

20      questions as well, if the motion is

21      granted.

22             THE VIDEOGRAPHER:  Okay.  Stand

23      by, please.

24             Should I go off the record?

Protected - Subject to Further Protective Review

1          MR. DENTON:  I think we should

2     go off the record.

3          MR. SARVER:  We should go off

4     the record, yes.

5          THE VIDEOGRAPHER:  This marks

6     the end of this deposition.

7          The time is 11:47 a.m.

8          We are going off the record.

9          (Time noted:  11:47 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Protected - Subject to Further Protective Review

```
 1              -   -   -   -   -   -

              E R R A T A

 2              -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6         REASON:  _____

 7    _____  _____  _____

 8         REASON:  _____

 9    _____  _____  _____

10         REASON:  _____

11    _____  _____  _____

12         REASON:  _____

13    _____  _____  _____

14         REASON:  _____

15    _____  _____  _____

16         REASON:  _____

17    _____  _____  _____

18         REASON:  _____

19    _____  _____  _____

20         REASON:  _____

21    _____  _____  _____

22         REASON:  _____

23    _____  _____  _____

24         REASON:  _____
```

Protected - Subject to Further Protective Review

```
 1

 2           ACKNOWLEDGMENT OF DEPONENT

 3

 4          I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     HENRY MICHAEL RINDER, M.D.        DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```

Protected - Subject to Further Protective Review

```
1              C E R T I F I C A T E

2    STATE OF NEW YORK

3    COUNTY OF NEW YORK

4

5           I, Marie Foley, RMR, CRR, a

6    Certified Realtime Reporter and Notary

7    Public within and for the State of New

8    York, do hereby certify:

9           That HENRY MICHAEL RINDER, M.D.,

10   the witness whose deposition is

11   hereinbefore set forth, was duly sworn by

12   me and that such deposition is a true

13   record of the testimony given by the

14   witness.

15          I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I am

18   in no way interested in the outcome of

19   this matter.

20          IN WITNESS WHEREOF, I have

21   hereunto set my hand this 15th day of

22   December, 2016.

23

     _____

24            MARIE FOLEY, RMR, CRR
```

Protected - Subject to Further Protective Review

1                    LAWYER'S NOTES

2    PAGE / LINE

3    _____  _____  _____

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____