IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) ) <br> PRODUCTS LIABILITY LITIGATION ) | MDL No. 2592 <br><br> Judge Eldon E. Fallon |

# Expert Report of Henry Michael Rinder, M.D.

By: _____     Date: 10/14/16
Henry Michael Rinder, M.D.

USCA5 4155

# EXPERT REPORT OF HENRY RINDER, M.D.

*Joseph J. Boudreaux, Jr., et al. v. Janssen Research & Development, LLC, et al.*

**October 14, 2016**

### Introduction

I have been asked to opine as to whether Xarelto was a substantial contributing factor to Mr. Boudreaux's gastrointestinal bleed. In formulating the opinions articulated in this report, which I hold to a reasonable degree of medical certainty, I reviewed the list of materials attached to my general report (Appendix A), including Mr. Boudreaux's relevant medical records. In forming my opinions, I have employed the same scientific method that I apply in the clinical setting when evaluating patients who present with or are at risk for hematologic disorders, including bleeding or thrombosis. My approach to diagnosis, evaluation of risk:benefit, and my recommendations for treatment remain the same whether I am retained as an expert in a litigation setting or treating a patient in the clinical setting. I also rely on my knowledge and experience gained over the past 30 years as a physician.

I have reviewed all of the relevant medical records and depositions regarding Mr. Boudreaux. The following is my summary of his medical history and my opinions regarding both his care and the events of his individual history. I incorporate by reference my general report in its entirety.

For my background and qualifications, please refer to my general report in this matter.

I reserve the right to supplement this report as information becomes available.

### Summary of Opinions

1. In forming my opinions, I considered all potential risk factors for gastrointestinal (GI) bleeding. Based on my review of the relevant materials and information, and after ruling in and ruling out potential risk factors, I conclude to a reasonable degree of medical certainty that Mr. Boudreax's use of Xarelto was the most probable cause of his GI bleed. Further, to the extent any other factors also may have contributed to the bleed, it is my opinion to a reasonable degree of medical certainty that Xarelto was the most substantial and significant contributing factor to his GI bleed.

2. Mr. Boudreaux underwent a complete and thorough GI workup with three different diagnostic procedures which ruled out any specific pathologic or anatomical source of his gastrointestinal bleed. Therefore, I was able to rule out anatomical and pathological sources of bleeding.

1

3. I have reasonably ruled out Mr. Boudreaux's use of other medications as a potential cause of his bleeding event.
    a. While the use of Aspirin could potentially be associated with a risk of bleeding, this patient had no bleeding episodes while he was on Aspirin prior to institution of Xarelto, and he continued on Aspirin after Xarelto was discontinued with no incident of bleeding. Therefore, Aspirin can be ruled out as a potential cause of the bleeding event.
    b. Indocin has the potential to increase the risk of bleeding, but based upon the testimony of the prescribing physician and the patient, he had not used Indocin at any time in the period prior to or during his Xarelto use, therefore Indocin can be ruled out as a potential cause of the bleeding event.
    c. Once Xarelto was discontinued, his GI bleed ceased without any other treatment, further confirming that Xarelto was a substantial factor in causing his GI bleed. In addition, after his discharge from the hospital, other medications including aspirin were continued, and he has not suffered any subsequent GI bleeding event.

4. As evidenced in part by the PT (Innovin reagent) value taken on admission for his GI bleed, and taking into account the time interval between this value and the last Xarelto administration, it is my opinion that had he been tested for Xarelto anticoagulant activity (the latter measured with the PT (Neoplastin)) at the onset of Xarelto treatment, his excessive exposure would have been identified and he could have been [a] titrated to a lower dose , or [b] had Xarelto discontinued and been switched to an anticoagulant with a lesser risk of bleeding/safer anticoagulant, such as Eliquis or Pradaxa (Lip, JACC 2012 and Thromb Haemostas 2016; Graham JAMA 2016).

5. In addition to the GI bleed, the patient suffered additional damages/injury when atrial fibrillation recurred in 2015 as he was no longer an acceptable candidate for anticoagulation because of the GI bleed caused by Xarelto. Instead of receiving anticoagulation, the patient underwent an invasive ablation procedure which subsequently resulted in the serious complication of pericardial effusion and the necessity of hospitalization for drainage of that effusion.

**Case Summary**

Mr. Boudreaux was born on ▬▬▬▬▬▬▬. His medical history includes: diabetes, hypertension, and benign prostatic hyperplasia. He is a never smoker and seldom drank alcohol. At the relevant time, he lived at home with his wife and functioned independently.

2

On January 7, 2014, Mr. Boudreaux presented to the hospital with dyspnea and chest heaviness and was found to be in atrial fibrillation. Prior to the onset of atrial fibrillation, his medications included Aspirin (81mg), Lasix, Norvasc, Proscar, Lisinopril, Allopurinol, and Metformin. His records also list Indocin PRN, but he indicated in his deposition testimony that he only took Indocin for episodes of gout, which had not occurred for several years [*see* Deposition of Joseph Boudreaux, June 23, 2016, 44:22-47:15; 133:24-134:6; 206:11-23], and which was confirmed by his doctor in deposition [*see* Deposition of Dr. Kenneth Wong, July 11, 2016, 102:24-103:25; 134:17-135:1]. He had no history of bleeding.

Lab testing at this admission found his CBC to be normal; INR was normal at 1.1; and PT was normal at 11.4 sec. Imaging demonstrated his left ventricular ejection fraction to be 40% with evidence of mild dysfunction globally; a perfusion study showed he was at low risk for infarction. He was started on Amiodarone and Xarelto (rivaroxaban) 20 mg daily in addition to his prior medicines. He was provided samples of Xarelto upon his discharge from the hospital on January 9th. That prescription was then submitted to his mail-order pharmacy for a 90 days' supply.

Mr. Boudreaux had multiple cardiology follow-up visits during January 2014, all of which note his Xarelto use.

On February 3, 2014, Mr. Boudreaux presented to his doctor complaining of weakness for the past three days accompanied by black stools. He was instructed to hold his Xarelto and Aspirin, to not use Indocin, and to present to the emergency room for a possible blood transfusion. Later that day, he presented to the hospital and was found to have an abnormally low Hematocrit (HCT) of 21.2%. He was ultimately diagnosed with a gastrointestinal (GI) bleed based on stool samples positive for blood. On admission, his Creatinine (Cr) was elevated at 1.4; his INR was also elevated at 1.4, with a corresponding elevated prothrombin time (PT) of 13.6 sec. Xarelto and Aspirin were discontinued. As noted above, Mr. Boudreaux indicated in testimony that he had not been using Indocin.

Mr. Boudreaux was admitted to the intensive care unit where he received 72 hours of Protonix therapy and was transfused two (2) units of red blood cells. Upper (EGD) and lower (colonoscopy) endoscopy exams did not detect a bleeding site, but indicated suspected Barrett's esophagus. However, the description of the esophagus did not include any objective evidence for Barrett's esophagus, nor was there any description of a bleeding source in the esophagus. His Amiodarone dosage was decreased. Just before discharge, he was transfused an additional two (2) units of red cells to obtain an HCT of 28.2%. His discharge medications included Aspirin (81mg) and Amiodarone; Xarelto was discontinued, and Indocin was discontinued.

On March 18, 2014, Mr. Boudreaux underwent a video capsule endoscopy based on the following indication: "GI bleeding source not documented by previous EGD and colonoscopy." The endoscopy revealed a normal duodenum, jejunum, and ileum.

Mr. Boudreaux was seen routinely in follow-up from March through July 2014. His Cr level had increased to 1.7. He was continued on Amiodarone and Aspirin, though his Amiodarone was subsequently stopped in July 2014.

In May of 2015 his atrial fibrillation recurred. The patient was deemed a poor anticoagulation candidate because of his prior bleed, and he underwent a left atrial Lariat plication procedure. At that time, he was graded as a CHADS$_2$ score of 4. The CHADS$_2$ score (scale 1-6) indicates a patient's risk of stroke, with higher scores indicating higher risk. The CHADS$_2$ score reflects certain stroke risk factors: heart failure or a left ventricular ejection fraction ≤35%; hypertension; age ≥75 years; and presence of diabetes. It should be noted that during this time he had two PT measurements, both of which were normal: 13.2 sec on both May 8, 2015 and May 11, 2015.

In August of 2015, he experienced some GI issues, including partial bowel obstruction, and gall bladder complaints, and subsequently underwent a cholycystectomy.

In September of 2015, he had symptoms which eventually coalesced to dyspnea and was found to have a large pericardial effusion without tamponade; he subsequently underwent successful pericardiocentesis. He was, and still is, maintained on Aspirin 81mg. For some part of August through September of 2015, he also received Enoxaparin 40mg daily, presumably for VTE prophylaxis following his GI procedure.

Mr. Boudreaux's Amiodarone was eventually restarted in April 2016, and on June 7, 2016, Mr. Boudreaux underwent a cardioversion for his atrial fibrillation.

Regarding his GI bleed in February 2014, Mr. Boudreaux suffered a significant major GI bleed, requiring both ICU admission and the transfusion of four (4) red cell units. Potential risk factors for such a GI bleed include: coagulopathy; liver disease; anticoagulant therapy; regular use of steroids or nonsteroidal anti-inflammatory medications (NSAIDs); Aspirin use; alcohol abuse; other medications that induce a bleeding diathesis; and specific pathologic conditions such as arteriovenous malformation (AVM), gastritis, colorectal cancer, esophageal or gastric cancer, peptic ulcer disease, varices, Mallory-Weiss tear, polyps, colitis, hemorrhoids, perforation, and acid reflux disease.

Based on the relevant medical records, as well as my training and experience, I considered the above-referenced risk factors and was able to rule out the following risk factors as not applicable to Mr. Boudreaux's GI bleed.

There was no history, physical examination findings, or laboratory evidence to suggest the presence of liver disease or alcohol abuse. Therefore, I was able to rule out these risk factors.

Regarding pathologic or anatomical conditions, during and subsequent to his admission for the GI bleed, Mr. Boudreaux underwent a complete and thorough gastrointestinal (GI) workup with three different diagnostic procedures. Direct and indirect visualization of the GI tract showed a

4

normal anatomy without any evidence of any of the above entities. Therefore, this GI workup did not disclose a specific bleeding lesion and thereby ruled out any specific pathologic or anatomical source of his gastrointestinal bleed. Because his GI bleed cannot be attributed to an anatomic or pathologic abnormality, I was able to rule out pathologic or anatomical conditions as a cause of the bleeding event.

Regarding the use of steroids or nonsteroidal anti-inflammatory medications (NSAIDs), Aspirin, and other medications that induce a bleeding diathesis, the patient was not regularly using steroids or NSAIDs which can cause GI bleeding due to gastritis or gastric/duodenal ulcers, and the normal endoscopic examination of the esophagus, stomach, and small bowel also rules out these entities. None of Mr. Boudreaux's medications listed at the time of his hospital admission, besides Aspirin and Xarelto, are reasonably expected to induce a bleeding diathesis; hence, the other medications are ruled out as a cause of the GI bleeding. Specifically, while Indocin has the potential to increase the risk of bleeding, based upon the testimony of the prescribing physician and the patient, Mr. Boudreaux had not used Indocin at any time in the relevant period prior to or during his Xarelto use, therefore Indocin can be ruled out as a potential cause of the GI bleeding event. Further, while Mr. Boudreaux's concomitant use of Aspirin could potentially be associated with a risk of bleeding, he had no incidence of anemia or bleeding episodes while he was on Aspirin prior to institution of Xarelto, and he continued on Aspirin after Xarelto was discontinued with no further incident of bleeding. Therefore, aspirin can be ruled out as a potential cause of the GI bleeding event.

Regarding anticoagulant use, on admission for his GI bleed, Mr. Boudreaux's medications included Xarelto 20 mg (and no other anticoagulants). Xarelto is an anticoagulant associated with a significantly increased risk of gastrointestinal hemorrhage compared with warfarin (HR = 1.21) [Yao J Am Heart Assoc 2016], apixaban [Lip, JACC 2012 and Thromb Haemostas 2016] and dabigatran [Graham 2016].[1] Indeed, the clinical team in charge of Mr. Boudreaux's medical care during that admission clearly attributed the GI bleed to Xarelto and, therefore, did not restart Xarelto upon discharge, unlike his Aspirin, which was re-instituted. Moreover, once Xarelto was discontinued, Mr. Boudreaux's GI bleed ceased without any other treatment, further confirming that Xarelto was a substantial factor in causing his GI bleed. Further, as noted above, after his discharge from the hospital, other medications, including Aspirin were continued, and he has not suffered any subsequent GI bleeding event. In addition to the above considerations, he suffered the bleeding event less than one month after starting Xarelto, which was the only change in his medications relevant to bleeding risk.

Regarding coagulopathy, bleeding in the gastrointestinal tract can occur because of an inherited or acquired (other than anticoagulation with Xarelto) coagulopathy. In this case, the lack of relevant prior bleeding history, the absence of laboratory evidence (other than the prolonged PT associated with Xarelto use), and the lack of a succeeding bleeding history exclude the presence

---

[1] For further discussion regarding the risks and benefits of Xarelto, see my general report in this matter.

5

of coagulopathies other than anticoagulation with Xarelto. Moreover, he had a PT (collected between 1500-1600 hours) that was higher than the normal range at 13.6 sec (corresponding INR = 1.4); if Mr. Boudreaux followed his physician's orders for taking Xarelto with his evening meal (as recommended in the prescribing information), then his PT was elevated at 21 hours after taking his last dose of Xarelto. These data indicate that this patient was anticoagulated as a result of his Xarelto use. Even if Mr. Boudreaux was mistaken in his instructions and took the medication with his breakfast (0700-0800 hours) the morning of his admission, this PT elevation is occurring 8-9 hours after his last Xarelto dose, which indicates he was anticoagulated from his Xarelto use. It is my understanding based on discussion with the Oschner St. Anne coagulation laboratory technologist that the reagent employed to measure the PT at Oschner St. Anne is Innovin. Had Mr. Boudreaux been tested for Xarelto anticoagulant activity (the latter measured with PT (Neoplastin)) at the onset of Xarelto treatment, his excessive exposure would have been identified and he could have been [a] titrated to 15 mg once daily Xarelto or a lower Xarelto dose (if one were available), or [b] had Xarelto discontinued and been switched to an anticoagulant with a lesser risk of bleeding/safer anticoagulant, such as Eliquis [Lip, JACC 2012 and Thromb Haemostas 2016] or Pradaxa [Graham JAMA 2016].

After extensive review, and having ruled in and ruled out potential risk factors, as discussed above, I conclude to a reasonable degree of medical certainty that Mr. Boudreax's use of Xarelto was the most probable cause of his GI bleed in February 2014. Further, to the extent any other factors also may have contributed to the bleed, it is my opinion to a reasonable degree of medical certainty that Xarelto was the most substantial and significant contributing factor to his GI bleed.

Moreover, because Mr. Boudreaux had a prior anticoagulant-induced bleed, when his atrial fibrillation recurred, he was not considered for re-anticoagulation. Instead, he underwent an invasive ablation procedure in May 2015 which was successful. However, his subsequent pericardial effusion was likely a complication of that procedure, for which he required yet another invasive procedure, pericardiocentesis, in September 2015. A pericardial effusion is the accumulation of fluid in the sac surrounding the heart, a common complication of cardiac procedures. This build-up of fluid can compromise heart function if it becomes large enough; therefore, the fluid must be drained by a surgical procedure which carries the risk of perforation, infection, and hemorrhage.