Protected - Subject to Further Protective Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

- - -

IN RE:  XARELTO          :   MDL NO. 2592
(RIVAROXABAN) PRODUCTS :
LITIGATION               :   SECTION L
                         :
THIS DOCUMENT RELATES    :   JUDGE ELDON
TO ALL CASES             :   E. FALLON
                         :
                         :
                         :   MAG. JUDGE
                         :   NORTH


- - -


December 15, 2016


- - -


- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -


                Videotaped deposition of
DAVID A. KESSLER, M.D., taken pursuant to
notice, was held at the law offices of
Douglas & London, 59 Maiden Lane, New
York, New York, beginning at 8:39 a.m.,
on the above date, before Michelle L.
Gray, a Registered Professional Reporter,
Certified Shorthand Reporter,  Certified
Realtime Reporter and Notary Public.


- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Protected - Subject to Further Protective Review

---

## Page 2

```
 1    APPEARANCES:
 2
 3    THE LAMBERT FIRM
      BY:  EMILY C. JEFFCOTT, ESQ.
 4    701 Magazine Street
      New Orleans, Louisiana 70130
 5    (504) 581-1750
      ejeffcott@thelambertfirm.com
 6
          - and -
 7
      SCHLICHTER, BOGARD & DENTON, LLP
 8    BY:  ROGER C. DENTON, ESQ.
      100 South Fourth Street
 9    Suite 1200
      St. Louis, Missouri 63102
10    (314) 621-6115
      rdenton@uselaws.com
11
          - and -
12
      DOUGLAS & LONDON, PC
13    BY:  LARA J. SAY, ESQ.
      59 Maiden Lane, 6th Floor
14    New York, New York 10038
      (212) 566-7500
15    lsay@douglasandlondon.com
16        - and -
17    LEVIN PAPANTONIO THOMAS
      MITCHELL RAFFERTY & PROCTOR, PA
18    BY:  NED McWILLIAMS, ESQ.
      (Via telephone)
19    316 South Baylen Street, Suite 600
      Pensacola, Florida 32502
20    (888) 435-7001
      nmcwilliams@levinlaw.com
21    Representing the Plaintiffs
22
23
24
```

## Page 3

```
 1    APPEARANCES:  (Cont'd.)
 2
 3    TUCKER ELLIS, LLP
      BY:  MICHAEL C. ZELLERS, ESQ.
 4    515 South Flower Street, 42nd Floor
      Los Angeles, California 90071
 5    (213) 430-3301
      Michael.zellers@tuckerellis.com
 6
          - and -
 7
      BARRASSO, USDIN, KUPPERMAN, FREEMAN
 8    & SARVER, LLC
      BY:  CELESTE COCO-EWING, ESQ.
 9    909 Poydras Street, Suite 2400
      New Orleans, Louisiana 70112
10    (504) 589-9700
      Ccoco-ewing@barrassousdin.com
11
          - and -
12
      DRINKER, BIDDLE & REATH, LLP
13    BY:  SEAN KENNEDY, ESQ.
      600 Campus Drive
14    Florham Park, New Jersey 07932
      (973) 549-7000
15    sean.kennedy@dbr.com
      Representing Janssen entities
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1    APPEARANCES:  (Cont'd.)
 2
      KAYE SCHOLER, LLP
 3    BY:  JEFFREY H. HOROWITZ, ESQ.
      250 West 55th Street
 4    New York, New York 10019
      (212) 836-7740
 5    jeffrey.horowitz@kayescholer.com
 6        - and -
 7    BRADLEY ARANT BOULT CUMMINGS, LLP
      BY:  LINDSEY C. BONEY, IV, ESQ.
 8    One Federal Place
      1819 Fifth Avenue North
 9    Birmingham, Alabama 35203
      (205) 521-8303
10    Lboney@bradley.com
      Representing Bayer Pharmaceuticals
11
12
13
      VIDEOTAPE TECHNICIAN:
14      Darnell Brown
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1          - - -
 2       I N D E X
 3          - - -
 4
      Testimony of:
 5
         DAVID A. KESSLER, M.D.
 6
      By Mr. Zellers        16
 7
      By Mr. Horowitz       383
 8
 9
10          - - -
11       E X H I B I T S
12          - - -
13
14    NO.      DESCRIPTION        PAGE
15    Kessler-1   Expert Report     20
               Of Dr. Kessler
16
      Kessler-2   Defendants' Notice  41
17             Of Deposition
               Subpoena Duces Tecum
18
      Kessler-3   Drawing/Sketch Pad  50
19    (3-A-T)
20
      Kessler-4   Errata Sheet      54
21             for the Expert
               Report of Kessler
22
      Kessler-5   Invoices for      61
23             Kessler
24
```

Protected - Subject to Further Protective Review

Page 6

```
 1            - - -
 2      E X H I B I T S  (Cont'd.)
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Kessler-6  Schedule 13    64
            Data on Inter-Patient
 7          Variability Associated
            With Approved Xarelto
 8          Indications
 9  Kessler-7  Schedule 17    67
            Chronology of
10          INRatio Performance
            Issues in ROCKET
11
    Kessler-8  Product Report    192
12          Xarelto
13  Kessler-9  Pharmacodynamic   192
            Analysis
14          12/15/10
15  Kessler-10  Statistical      196
            Analyses
16
    Kessler-11  Medical Review(s)  233
17
    Kessler-12  Clinical          275
18          Pharmacokinetic
            And Pharmacodynamic
19          Profile of Rivaroxaban
            (Mueck)
20
    Kessler-13  Laboratory        289
21          Assessment
            Of Rivaroxaban:
22          A Review
            (Samama)
23
24
```

Page 7

```
 1            - - -
 2      E X H I B I T S  (Cont'd.)
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Kessler-14  Prescribing      303
            Information
 7          2011
 8  Kessler-15  In Vitro Diagnostic  309
            Testing for Direct
 9          Oral Anticoagulants
            10/26/15
10
    Kessler-16  ROCKET AF        343
11          Reanalysis Reviews
12  Kessler-17  State Worker Salary  403
            Database
13          The Sacramento Bee
14  Kessler-18  Kessler's Travel  424
            Books Rife with
15          Overcharges
16  Kessler-19  Handwritten Notes  436
17  Kessler-20  Expert Report     436
            David A. Kessler, M.D.
18          (Marked up)
19  Kessler-21  Expert Report of  436
            Burt Gerstman, Ph.D.
20
    Kessler-22  Expert Statement  436
21          of Dena R. Hixon, M.D.
22  Kessler-23  Expert Report of  436
            Jan Rosing, Ph.D.
23
24
```

Page 8

```
 1            - - -
 2      E X H I B I T S  (Cont'd.)
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Kessler-24  FDA Draft Briefing  436
            Document for the
 7          CRDAC
            9/8/11
 8
    Kessler-25  CDER Medical      436
 9          Review(s)
10  Kessler-26  Integrated        436
            Summary of Safety
11          5.3.5.3.8
            XARELTO_JANSSEN_
12          01611674-871
13  Kessler-27  Handwritten Notes  436
14  Kessler-28  Expert Report of  436
            Henry Michael
15          Rinder, M.D.
16  Kessler-29  Berkowitz Excerpts  436
            From Transcripts
17
    Kessler-30  Part 320          436
18          Bioavailability
            And Bioequivalence
19          Requirements
20  Kessler-31  Agenda            436
            In Vitro Diagnostic
21          Testing for DOAC
            FDA Public Workshop
22          10/26/15
23
24
```

Page 9

```
 1            - - -
 2      E X H I B I T S  (Cont'd.)
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Kessler-32  Rivaroxaban       436
            Pharmacodynamic
 7          Coagulation Analysis
            Table 154
 8
    Kessler-33  Preventive        436
 9          Cardiology
            A Once Daily, Oral
10          Direct Factor Xa
            Inhibitor
11          (Eriksson)
12  Kessler-34  ROCKET AF Reanalysis  436
            Reviews
13          (Marked up)
14  Kessler-35  Schedule 20       436
            Table 12, FDA
15          ROCKET AF Reanalysis
            Reviews
16
    Kessler-36  Expert Report of  436
17          Burt Gerstman, Ph.D.
18  Kessler-37  Advanced Modeling  436
    (643708)    and Simulation Report
19          XARELTO_JANSSEN_
            03800316-83
20
    Kessler-38  Project 100       436
21  (3668404)   QS Draft
            PowerPoint
22          XARELTO_JANSSEN_
            18626228
23
24
```

Protected - Subject to Further Protective Review

Page 10

```
1          - - -
2      E X H I B I T S (Cont'd.)
3          - - -
4
5   NO.    DESCRIPTION      PAGE
6   Kessler-39  Clinical       436
    (2727463)  Pharmacology
7              Technical Report
               For PD-Outcome Analysis
8
    Kessler-40  Clinical       436
9   (385195)  Pharmacology Responses
              To Sponsor's Questions
10            Regarding PD-Outcome
              Analysis
11            XARELTO_JANSSEN_
              00273844-49
12
    Kessler-41  Response to FDA    436
13            Discipline Review
              Letter of 2/5/09
14
    Kessler-42  Clin Pharm Core   436
15  (1369010)  9/2/11 PowerPoint
              XARELTO_JANSSEN_
16            08159429
17  Kessler-43  Clinical Summary   436
              2.7.2 Summary
18            Of Clinical
              Pharmacology Studies
19            12/30/10
              XARELTO_JANSSEN_
20            24966406-800
21  Kessler-44  FDA Letter,      436
              6/6/13
22            To McGregor-Beck
23
24
```

Page 12

```
1          - - -
2      DEPOSITION SUPPORT INDEX
3          - - -
4
5   Direction to Witness Not to Answer
6   PAGE   LINE
    286   2
7   376   15
8
    Request for Production of Documents
9
    PAGE   LINE
10  None.
11
    Stipulations
12
    PAGE   LINE
13  None.
14
    Questions Marked
15
    PAGE   LINE
16  None.
17
18
19
20
21
22
23
24
```

Page 11

```
1          - - -
2      E X H I B I T S (Cont'd.)
3          - - -
4
5   NO.    DESCRIPTION      PAGE
6   Kessler-45  Black Binder    436
              Labeled "Labels"
7
    Kessler-46  Black Binder    436
8             Labeled "Expert Report
              Of David Kessler
9             Para. 1 - 49"
10  Kessler-47  Black Binder    436
              Labeled "Expert
11            Report of David
              Kessler
12            Para. 50-94"
13  Kessler-48  Black Binder    436
              Labeled "Expert
14            Report of
              David Kessler
15            Para. 95-139"
16  Kessler-49  Black Binder    436
              Labeled "Expert
17            Report of
              David Kessler
18            Para. 140-209"
19  Kessler-50  White Binder    436
              Tabbed with Tabs
20            168 through 195
21
22
23
24
```

Page 13

```
1          - - -
2        THE VIDEOGRAPHER:  Good
3   morning.  We are now on the
4   record.
5        My name is Darnell Brown.
6   I'm the videographer with Golkow
7   Technologies.
8        Today's date is December 15,
9   2016, and the time is 8:45 a.m.
10       This video deposition is
11  being held in New York, New York,
12  in the matter of In Re Xarelto for
13  the United States District Court
14  for the Eastern District of
15  Louisiana.
16       The deponent is Dr. David
17  Kessler.
18       Counsel will be noted on the
19  stenographic record.
20       The court reporter is
21  Michelle Gray and will now swear
22  in the witness.
23          - - -
24
```

Protected - Subject to Further Protective Review

Page 14

1      ... DAVID A. KESSLER, M.D.,
2      having been first duly sworn, was
3      examined and testified as follows:
4             - - -
5         MR. ZELLERS:  Before we get
6      started, I want to make a
7      statement for the record.
8         Defendants are in receipt of
9      Plaintiffs' cross-notice for the
10     deposition for this witness who
11     has issued an expert report in the
12     federal MDL proceeding and is
13     being deposed in connection with
14     that report.
15        Plaintiffs' cross-notice for
16     the Pennsylvania consolidated
17     proceeding is premature because
18     case specific discovery of the
19     bellwether cases has not yet
20     commenced in Pennsylvania, nor
21     have expert reports been served.
22     And specifically, the Pennsylvania
23     Plaintiffs have not yet served the
24     expert report for this witness.

Page 15

1         Plaintiffs' cross-notice
2      also fails to take into account
3      the expert protocol that was
4      agreed to among the parties in the
5      MDL proceeding and entered as an
6      order by the Court.
7         Among other things, this
8      protocol limits the deposition of
9      generic experts to seven hours
10     total.
11        In the spirit of cooperation
12     between the federal MDL proceeding
13     and Pennsylvania consolidated
14     proceeding, however, defendants
15     will not object to Plaintiffs'
16     cross-notice for the deposition.
17        This is being done with full
18     reservation of all rights and
19     objections pending negotiation of
20     a mutually acceptable process for
21     expert discovery in the
22     Pennsylvania cases.
23
24

Page 16

1             - - -
2             EXAMINATION
3             - - -
4      BY MR. ZELLERS:
5         Q.   State your name, please.
6         MS. JEFFCOTT:  Mr. Zellers,
7      we need to make an appearance for
8      the record, for counsel.
9         MR. ZELLERS:  Very good.
10        MS. JEFFCOTT:  Emily
11     Jeffcott for plaintiffs.
12        MS. SAY:  Lara Say for
13     plaintiffs.
14        MR. ZELLERS:  Ned, do you
15     want to make an appearance?
16        MR. McWILLIAMS:  I'll let
17     you do it for me.  Thank you.
18        MS. COCO-EWING:  Celeste
19     Coco-Ewing for Janssen.
20        MR. KENNEDY:  Sean Kennedy
21     for Janssen.
22        MR. BONEY::  Lindsey Boney
23     for Bayer.
24        MR. HOROWITZ:  Jeffrey

Page 17

1      Horowitz for Bayer.
2         MR. ZELLERS:  Michael
3      Zellers for Janssen.
4             - - -
5      BY MR. ZELLERS
6         Q.   I did ask you your name.
7         A.   David Kessler.
8         Q.   David Kessler.  You are here
9      for yourself, correct?
10        A.   Yes, sir.
11        Q.   All right.  What is your
12     business address?
13        A.   Mount Zion Hospital,
14     Divisadero Street, San Francisco,
15     California.
16        Q.   Dr. Kessler, as you heard at
17     the outset, my name is Mike Zellers and
18     I'm an attorney for Janssen.  I have some
19     questions for you here today.
20        You have been deposed
21     before, correct?
22        A.   I have, sir.
23        Q.   Do you have an estimate of
24     the number of times you've been deposed?

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1     A.   Maybe 25 times in my career.
2     Q.   You understand the
3  procedures that we're going to follow
4  here today?
5     A.   I do, sir.
6     Q.   You also understand that you
7  have been designated as an expert in the
8  Xarelto MDL to offer opinions in a
9  particular area?
10     A.   That's my understanding.
11     Q.   How would you define the
12  area of expertise in which you are
13  offering opinions?
14     A.   So this matter involves a
15  drug that people in the United States
16  took. There are certain causes of
17  actions that are being alleged about that
18  drug. And my expertise is really on the
19  regulatory scientific interaction about
20  drugs.
21        So it's on how drugs get
22  regulated, how specific drugs get
23  regulated, the duties of manufacturers,
24  the standards within the industry of --

Page 19

1  what are the rules and -- both laws and
2  practices that we as a country have sort
3  of adopted over the last hundred years
4  ago, to the regulation, safety and
5  warnings of drugs. I think it's that
6  intersection.
7        All right. So I'm a doc.
8  Happy to talk about hematology. Happy to
9  talk about laboratory tests. Can do
10  that.
11        But it's really in the -- if
12  you want to talk about hematology and
13  drugs and that intersection, right, there
14  may be a hematologist who knows more
15  hematology. I certainly can engage in
16  that as a licensed physician.
17        But it's really on the
18  intersection of the regulation and the
19  science and the medicine.
20     Q.   You understand today that
21  I'm going to ask you for whatever
22  opinions you have that you anticipate
23  testifying to at trial, correct?
24     A.   Yes.

Page 20

1     Q.   We have your report. Let's
2  mark that as Deposition Exhibit 1.
3        (Document marked for
4        identification as Exhibit
5        Kessler-1.)
6  BY MR. ZELLERS
7     Q.   Is Deposition Exhibit 1 your
8  report that was issued in this matter?
9     A.   I haven't turned every
10  single page. But I assume so. It looks
11  like my report. The answer is yes.
12     Q.   Do you have any addendums or
13  additions to your written report?
14     A.   Do me a favor, just -- I
15  don't mean to be -- just tell me what
16  addendums or additions to my report mean.
17  You mean an -- I mean, I just don't know
18  whether those are legal terms or in the
19  common usage of -- tell me what you're
20  asking.
21     Q.   My understanding is you are
22  both a physician and an attorney. Is
23  that right?
24     A.   So I graduated law school.

Page 21

1  I never took a bar. So you can decide
2  whether I'm an attorney. I have none of
3  the rights and privileges.
4     Q.   Have you prepared any
5  supplements or any additions to your
6  report which we've marked as Exhibit 1?
7     A.   So in a technical sense, I
8  think in this precise sense, no, there's
9  not a supplemental report, if that was
10  your question. Yeah.
11     Q.   As best you know, as you sit
12  here today, does your report which we've
13  marked as Deposition Exhibit 1 contain
14  and outline the opinions which you
15  anticipate providing at any trial of this
16  matter?
17     A.   So that was the goal. But
18  as you said about two minutes ago, we're
19  going to sit here and have a
20  conversation. You're going to have
21  certain questions. And you're going to
22  ask me about my opinions. And I assume
23  that will be a broad range of discussion.
24        So if the deposition stopped

Protected - Subject to Further Protective Review

Page 22

1    right now, I think it would be fair to
2    say these are my opinions, right.  That
3    was the goal of the report, you know, to
4    be able to give you sort of the -- you
5    know, what I was anticipating offering
6    opinions on.
7            But you're going to ask me
8    questions, so I will have opinions on the
9    answers to your questions.
10           So you know, it depends what
11   I'm asked, sir.  So I don't know if
12   that's helpful.
13       Q.   Are the opinions which you
14   are rendering in this case limited to the
15   atrial fibrillation indication for
16   Xarelto?
17       A.   There is one -- I think the
18   answer to that would be no.  There is one
19   package insert.  We can discuss what that
20   is, if you'd like, for the jury.  But
21   there is one package insert for the drug.
22   And that package insert is for all its
23   intended uses.
24           And so I think that the

Page 23

1    issues of concern and what has to be on
2    that label and what has to be applied to
3    that label, which applies to all intended
4    uses.
5        Q.   Is it your opinion that
6    Xarelto is safe and effective but
7    monitoring might increase safety, or that
8    Xarelto is currently unsafe without
9    routine monitoring?
10           MS. JEFFCOTT:  Objection to
11           form.
12           THE WITNESS:  So you're
13           asking me for my personal opinion
14           on that?
15   BY MR. ZELLERS
16       Q.   I'm asking you as an expert
17   in this litigation whether or not it is
18   your opinion that Xarelto is safe and
19   effective but monitoring might increase
20   safety, or that Xarelto is unsafe without
21   routine coagulation monitoring.
22       A.   So I have not -- again,
23   you're asking me an opinion that goes a
24   little beyond my report.  I'm happy to

Page 24

1    give you that.
2            My opinion, if I were FDA
3    commissioner, I would have in all
4    likelihood sided with the medical
5    reviewers on the drug.  And they were not
6    inclined to approve it, so they did not
7    think that it was safe.  They were
8    overruled.  Perfectly appropriate by
9    their colleagues at FDA.
10           So the drug was approved by
11   FDA.  So legally it meets that standard.
12   But if you ask my opinion, I would have
13   said -- I would have agreed with the
14   medical reviewers who did not think it
15   met that standard.
16       Q.   You are not second-guessing
17   the FDA's approval of Xarelto for any of
18   its indications, correct?
19       A.   Help me a little.  It's a
20   very broad statement.
21           You said second-guessing
22   FDA's approval.  I think I am
23   second-guessing FDA's approval.  Again,
24   it's a very broad question, sir.  What do

Page 25

1    you mean by "FDA's approval"?
2            So I do believe that the
3    sponsors did not follow the existing
4    regulations in the label.  I point that
5    out in my report.  There is a regulation.
6            By not following that, I
7    mean, I would not have approved the
8    FDA -- approved a drug without following
9    the regulations.  I mean, that was not
10   done.  So how it got approved without
11   that, I don't know.
12           So I think it would be fair
13   to say -- I don't know if second-guessing
14   is the right word.  I mean, I leave it,
15   you know, to others.  But there was a
16   regulation.  There was a requirement.
17   That requirement wasn't followed with
18   regard to the label.
19       Q.   Did the FDA have far more
20   information, data, and studies relating
21   to Xarelto as part of its approval
22   process than you have had in reviewing
23   the documents and information you have
24   been provided?

7 (Pages 22 to 25)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 26

1    MS. JEFFCOTT:  Objection to
2  form.
3    THE WITNESS:  We would have
4  to poll the medical reviewers
5  here, because who do you mean at
6  FDA?  If you asked the medical
7  reviewers, I mean, I'm sitting
8  here with the NDA -- with the NDA
9  on that hard drive there.  There's
10  the IND.  It goes on and on.  I
11  don't know how many gigabytes
12  there are.
13    I've gone through that.
14  I've gone through -- I've gone
15  through in detail studies.
16    I mean, there are a lot of
17  studies in Xarelto.
18    No one has gone through and
19  studied every page of that NDA, I
20  can assure you.  That would be
21  humanly impossible, one person.
22    So I may have, in fact, seen
23  things that the FDA didn't focus
24  on.  And FDA may have seen things

Page 27

1  that I didn't focus on.  You'd
2  have to -- you'd have to bring FDA
3  to the table, and I'd have to show
4  them certain things and you can
5  ask them, did they have more
6  information on this or did I have
7  more information on this.
8    So I -- you know, I can't
9  tell you.  I have the -- I have
10  the full NDA, at least what was
11  provided in discovery.
12  BY MR. ZELLERS
13    Q.  Are you able to answer
14  whether or not the FDA had more data and
15  information relating to Xarelto as part
16  of the approval process than you have had
17  access to in your capacity as an expert
18  on behalf of plaintiffs?
19    MS. JEFFCOTT:  Objection to
20  form.
21    THE WITNESS:  That should
22  not be the case.
23    I should have, which -- I
24  mean, I have asked and I've one

Page 28

1  through it.
2    Again, it's -- it's vast.
3  But I should have access to the
4  full NDA.
5    If you provided -- if
6  Janssen in discovery provided
7  everything to plaintiffs, I've
8  asked for the entire NDA and have
9  access to that.
10    That's what FDA has access
11  to.
12    Now, what -- no one person,
13  as I said, can read an entire NDA.
14  It would take probably the rest --
15  it would take, I don't know, 10
16  years, 20 years, something like
17  that.
18    Even FDA depends on
19  summaries.  I mean, then you go
20  look and you dig deeper if you
21  want to look at things.  I looked
22  at those summaries.  And I also
23  dig deeper within that NDA.
24    So but I should have access

Page 29

1  to the full NDA.
2  BY MR. ZELLERS
3    Q.  Would you agree that in
4  addition to the data and information the
5  FDA has, it has many scientists and
6  physicians in a variety of disciplines
7  who do an independent review of the data
8  and information and an independent
9  analysis as part of the approval process?
10    MS. JEFFCOTT:  Objection to
11  form.
12    THE WITNESS:  It is true
13  that FDA has many scientists and
14  physicians in a variety of
15  disciplines.  I think their review
16  is done independent.  It's done in
17  conjunction with the sponsor of
18  the data, and they -- they rely
19  both on -- they rely on the
20  manufacturer for -- for the data.
21    I mean, in certain instances
22  here, you see FDA just
23  wholesaling, lifting that analysis
24  from the -- the sponsor.

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1    So -- so I -- I would -- the
2    only word I would question a
3    little is the word "independent."
4    Because when you look at the
5    medical reviewer, the medical
6    reviewer, in fact, used certain
7    paragraphs that are -- I've seen
8    things that are exactly out of the
9    Janssen NDA.
10    So I'm not sure it's quite
11    independent.  I mean, I think they
12    think of themselves as
13    independent, but they -- we all
14    know that FDA relies on -- they
15    are only as good as what comes in
16    the door.
17    BY MR. ZELLERS
18    Q.   Does the FDA make an
19    independent review and analysis of data
20    that is provided independent of the
21    sponsors?
22    A.   So you used the word
23    "independent review and analysis,"
24    independent of the sponsor.

Page 31

1    As I said, FDA -- if you
2    look in this case in certain instances,
3    it looks like the medical reviewer was
4    dependent on the -- on the drug
5    companies.
6    Well, they are not
7    independent.  They'd like to think that
8    they are looking -- you know, I mean,
9    everyone wants to think that they are not
10    biased.  But if you look specifically at
11    the medical review write-up, and then on
12    one of the issues I think essential in
13    this case, you see that the language is
14    almost identical to what's in the
15    company's write-up.
16    So obviously, that was
17    dependent on what the company submitted.
18    Q.   Is it your testimony that
19    the FDA did not do an independent review
20    and analysis of the ROCKET study data?
21    A.   I think we are at a -- we're
22    probably at a Vitkaskynian (ph) moment.
23    Mr. Horowitz is smiling.
24    MR. HOROWITZ:  That's

Page 32

1    exactly what you said to me on
2    September 20th.  I didn't know
3    what it meant then, and I don't
4    know what it means now.
5    THE WITNESS:  Right.  So you
6    know, we can discuss what
7    independence means.
8    I mean are -- let me give
9    you an example.
10    Do you want me to give you
11    an example or are -- I mean --
12    BY MR. ZELLERS
13    Q.   Well, I'd like you to answer
14    my question.  Are you able to do that?
15    A.   Sure.
16    MS. JEFFCOTT:  He's answered
17    your question.
18    THE WITNESS:  Yeah, I mean,
19    I -- I mean, I -- so if -- if you
20    look at, for example, the medical
21    reviewer when it comes to whether
22    there's a correlation with
23    prothrombin and bleeding, right,
24    what I see in the medical reviewer

Page 33

1    is that the medical reviewer
2    changes a couple of words here or
3    there.  The paragraph is almost
4    identical to the ISS that Janssen
5    submits.
6    Right?  Now I cannot get
7    into people's mindset.  But if you
8    look at the output -- if you look
9    at the input and you look at the
10    output, it's -- that input and the
11    output looks the same.  So I
12    can't -- for example, in that key
13    area, I can't say it's not
14    dependent.
15    BY MR. ZELLERS
16    Q.   The FDA --
17    A.   Which -- which I find
18    striking, I mean to be honest, I mean in
19    this case.
20    Q.   That is the best answer you
21    can give to the question:  The FDA did
22    not do an independent review and analysis
23    of the ROCKET study data?
24    MS. JEFFCOTT:  Objection.

9 (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1    Asked and answered.
2        THE WITNESS:  No.  I'd be
3    happy to -- happy to discuss this,
4    you know, at length with you.
5        You're asking me what
6    independent means, and, you know,
7    let's define our terms for the
8    jury.  All right.
9        Did Janssen submit data and
10   a analysis and a write-up, for
11   example, on the issue of whether
12   there's a correlation between
13   prothrombin and bleeding?  Yes.
14       Did FDA then take that
15   almost wholesale and put it in the
16   medical review?  Yes.  Is the way
17   I see it.
18       So -- so -- so I would
19   argue -- and, again, is that
20   independent or not?  I mean, you
21   can draw your own conclusions.
22   I -- you know, I don't -- you
23   know, I'm sure the -- I'm sure the
24   FDA reviewer examined it.  That

Page 35

1    reviewer is not here to -- to
2    talk.  Okay.
3        I'm just saying that --
4    basically -- FDA is only as good
5    as the manufacturer, right?  I
6    mean, and the data that comes in.
7        FDA did not study this drug.
8    Okay.  FDA didn't do the clinical
9    trials on this drug.  FDA didn't
10   report the data on this drug.
11   That was all done by the company.
12   So FDA didn't independently do
13   clinical trials.  It didn't
14   independently report the data.
15       And it -- it may have
16   reviewed that data, right, but I
17   think it's still independent.
18   BY MR. ZELLERS
19   Q.   Your understanding of the
20   facts in this case are that the sponsor
21   found a correlation between prothrombin
22   time and the risk of bleeding, that it
23   advised the FDA of that, and that the FDA
24   repeated that in its analysis.

Page 36

1        Is that your understanding
2    of the facts?
3        MS. JEFFCOTT:  Objection to
4    form.
5        THE WITNESS:  No.  So -- so
6    I'm referring to the following.
7        Okay.  Let's go -- if you
8    turn, for example -- take for
9    example, what -- what Janssen
10   submitted as part of its
11   integrated summary of safety.
12   Section 1.5.1.6.1.5.
13       All right.  And if you look
14   at the title of what Janssen
15   submitted, it submitted "Bleeding
16   Risk and Correlation to
17   Prothrombin Time Prolongation."
18   That was the title on the Janssen
19   document.
20       If you also go to FDA's
21   medical reviewer, Min Lu, okay,
22   that is part of NDA 22406/N-000,
23   you see the same timing -- title,
24   "Bleeding Risk and Correlation to

Page 37

1    Prothrombin Time Prolongation" on
2    Page 79 of that medical review.
3        The write-up paragraph,
4    while not identical, is
5    essentially the same.
6        And both cite to Figure 1.7,
7    right, which was supplied by the
8    sponsors.  Basically, it's -- it's
9    a cut and paste of Figure 1.7, and
10   it's the identical graph.
11       FDA didn't do this
12   independently.  This matches
13   what -- exactly what Janssen said.
14   And I think -- I mean, the
15   conclusion, right, basically the
16   takeaway from this, I think, is
17   wrong.
18       And not only that, I think
19   the data masks what the real
20   issue -- what the real data show.
21   BY MR. ZELLERS
22   Q.   Do you agree that FDA
23   approval decisions are based on the data
24   and science and not on politics?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 38

```
 1        A.   You're asking me very broad
 2   questions.  I -- I've studied this.  You
 3   know, I've studied this for 40 years.  I
 4   was commissioner for seven years.  I've
 5   continued to be a student of the agency.
 6        Regrettably, I don't think
 7   your statement could be considered true
 8   all the time.  I would love to think it
 9   were true.
10        Take, for example, Plan B.
11   The -- it was a contraceptive, morning
12   after pill.  The agency was overruled by
13   a secretary.  So that approval -- that --
14   that decision was not -- I think it's
15   fair to say -- again, it's in the eyes of
16   the beholder.  I don't think it was the
17   science.  I think the science got over --
18   got overruled by politics.
19        So there are instances where
20   it does get overruled by politics,
21   regrettably.  Not something I'm in favor
22   of.  But I've seen it happen.  And I
23   think we would be naive to think that it
24   did not.
```

Page 39

```
 1        Q.   Do you have an opinion as to
 2   whether or not the Xarelto approvals for
 3   the approved indications were based on
 4   the data and science?
 5        MS. JEFFCOTT:  Objection to
 6   form.
 7        THE WITNESS:  Yeah, we don't
 8   have the full story.  I don't
 9   think we can have the full story.
10   The record doesn't show the full
11   story of exactly, you know, what
12   happened with Xarelto.
13        We see the record.  We see
14   the medical reviewers recommending
15   that it not be approved.
16        We see others overruling
17   that decision.  Right.  I have no
18   reason to believe it wasn't done
19   on good faith.  But we don't know,
20   nor should -- nor am I going to
21   get into what was in peoples heads
22   or why they made the decisions
23   they made.  I mean, there's some
24   record of it.  But there's not a
```

Page 40

```
 1   full record.
 2        We don't have every
 3   conversation between Bob Temple
 4   and Grant and -- on this.  And I
 5   can assure you there were many.
 6   So we just don't have the full
 7   record of that.  You'd have to ask
 8   them that question.
 9        But you do see that -- that
10   baroncy here.  It's not usual that
11   the medical reviewers get
12   overruled.
13        Again, it's certainly
14   permissible.  But whether --
15   when -- now, you're asking me
16   whether it was based on science?
17   I'm sure if you call Bob Temple,
18   Bob Temple would say sure, every
19   decision is based on science.
20        But it's the view of
21   Temple's interpretation of that
22   data or -- versus the medical
23   reviewer's interpretation of that
24   data.  Both were looking at the
```

Page 41

```
 1   same data.  So it -- I can't tell
 2   you what's in their heads.
 3   BY MR. ZELLERS
 4        Q.   The FDA has never suggested
 5   that Janssen or Bayer failed to update
 6   the Xarelto label with information on
 7   coagulation monitoring, correct?
 8        A.   I think that's probably
 9   right, with the one caveat that the
10   agency was very clear that the sponsor
11   chose not to use that information.
12        So failed to update?  I
13   mean, you have a -- I mean I don't want
14   to really opine on that, get into whether
15   that was the case.
16        You do have the statement by
17   the deputy director that there was this
18   correlation between concentration and PT
19   and PT and bleeding, and the fact that
20   the sponsors chose not to use it.
21        (Document marked for
22        identification as Exhibit
23        Kessler-2.)
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 42

BY MR. ZELLERS
1
2       Q.   I'm handing you Deposition
3  Exhibit 2, which is the notice of
4  deposition for today.
5            Have you seen this before?
6       A.   I have, sir.
7       Q.   Turn, if you can, to Exhibit
8  A, which asks you to bring certain
9  documents with you here today.
10           Do you see that?
11      A.   Yes.
12      Q.   Have you had an opportunity
13  to review that?
14      A.   I have.  I've -- I've looked
15  at this, yes, prior to this.
16      Q.   Have you brought with you
17  all documents in your possession that are
18  responsive to the deposition notice and
19  request for documents?
20      A.   So I brought a lot of
21  documents, I can tell you, that is
22  responsive to this.  There are other
23  things that, on the advice of counsel,
24  that was viewed as not -- that went

Page 43

1  beyond Rule 26.
2            MS. JEFFCOTT:  Just for the
3       record, we did object to the
4       subpoena.
5            MR. ZELLERS:  I'm sure that
6       you did.  And your objections will
7       be noted.
8            THE WITNESS:  That's what I
9       listened to.  I mean, they
10      objected and said certain things
11      to them.  But I've brought a lot
12      of things today.
13  BY MR. ZELLERS
14      Q.   What materials are in your
15  possession that are listed on Deposition
16  Exhibit 2 did you not bring with you
17  today?
18      A.   I'd have to go spend a lot
19  of time doing that.  I think it would be
20  easier if I can tell you what I did bring
21  that I have in front of me, but I don't
22  want to leave something out.  I'm under
23  oath.  So I can tell you what I did bring
24  today.

Page 44

1       Q.   Are you able to answer the
2  question as to what materials are called
3  for in the deposition notice, Exhibit 2,
4  that you did not bring with you today?
5            MS. JEFFCOTT:  Objection.
6       Asked and answered.
7            THE WITNESS:  So I can -- I
8       don't want to -- mean, for my
9       answer to be exclusive, I mean,
10      because I -- because I can't,
11      because there may be -- there's
12      14 points here and there's nuances
13      under each.
14           For example, you're asking
15      all transcripts of depositions or
16      trial testimony given by the
17      witness in each litigation
18      identified in response to Request
19      10, right?
20  BY MR. ZELLERS
21      Q.   My understanding is you have
22  those or have access to those.  But you
23  have not brought those with you today,
24  correct?

Page 45

1       A.   No.  No, I don't think
2  that's correct.  You're saying, first of
3  all, assuming all transcripts and
4  depositions of everything in the last
5  four years, I don't have.  I'm sure I
6  don't have every transcript in every
7  deposition.
8            Furthermore, it would be --
9  I think it goes well beyond what 26 calls
10  for.  But moreover, those -- as you know,
11  sometimes those things are confidential,
12  and we have to spend time -- you have to
13  spend time talking to counsel in each of
14  those cases to determine what is
15  confidential and what is not.
16      Q.   Dr. Kessler, I simply want
17  to know what you have in your possession
18  that you did not bring.  As I understand
19  your testimony as it relates to expert
20  reports and deposition transcripts in
21  other cases, you have some, not all.  But
22  whatever you do have, you have not
23  brought with you today, correct?
24      A.   Not -- not -- I think

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1  there's an objection to Number 11.  It
2  was advised not to bring that.  And the
3  reason, if I --
4       Q.   I don't need the reason.
5       A.   Well, the -- the reason is I
6  do know sometimes these things are
7  confidential.
8       Q.   Any other materials that you
9  believe are set forth on Deposition
10  Exhibit 2 and specifically Exhibit A that
11  are in your possession that you have not
12  brought with you?
13       A.   No.  I think that's -- or
14  you've had -- for example, my CV is
15  attached.  I mean, it's in the report.
16  So you've had it previously.  No, I think
17  there's a -- I mean, I think as far as
18  documents in this case, I think I've
19  tried to bring what I had to you.
20       Q.   Were there folks, other than
21  counsel, that assisted you in preparing
22  your report?
23            MS. JEFFCOTT:  Objection to
24       form.

Page 47

1            THE WITNESS:  No.
2  BY MR. ZELLERS
3       Q.   The report was prepared by
4  you and not by or assisted by any folks
5  in your office?
6       A.   That's correct.
7       Q.   You would then have access
8  to all documents that you reviewed or
9  that you relied upon in formulating your
10  opinions?
11       A.   I'd have -- you said access?
12       Q.   Yes.
13       A.   I'm sure I have access.  I
14  don't necessarily want to say that I have
15  every document.  I may have left a
16  document or two, I'm just guessing, on a
17  table with, you know, counsel at a
18  certain point.  I'm not going to
19  represent.  But I should have access
20  if -- you know, I'm sure I could get it.
21       Q.   Are there documents that you
22  have brought here today beyond what is
23  referenced in your report and what is set
24  forth in your reliance list, which is

Page 48

1  Exhibit C to your report?
2       A.   Yeah.  I've not done that --
3       Q.   I'm sorry, Doctor.  I
4  misspoke.  Your reliance list is Exhibit
5  D to your report.
6       A.   So I wouldn't want to
7  represent that I've done that
8  correlation, right, of what's exactly
9  underlying, what I have here.  So --
10       Q.   Here is my question.  Are
11  there new things or additional things
12  that you have brought with you today that
13  are not referenced in your report or in
14  the reliance list, Exhibit D?
15       A.   It's possible.  I think -- I
16  think a majority of stuff that I have
17  brought, at least I'm thinking -- well,
18  the entire NDA is referenced, right?  So
19  I mean, much of this is the NDA.
20            But there may be -- I mean,
21  I'd have to go through each.  And you'd
22  have to look at the reliance list if you
23  want me to testify accurately on that.
24            There may be some documents

Page 49

1  I have here.  For example, they may have
2  been -- depending on how you review the
3  reliance list, again, there are exhibits
4  in Homering that I read that aren't here.
5  There was -- are all the -- if all the
6  exhibits to the depositions are on -- of
7  the depositions are on the reliance list,
8  then that's covered.
9            But, again, I'd be happy to
10  go through and tell you what I have here.
11  I've not done the correl -- the -- what
12  is it called?  Is it not the correlation,
13  but the actual match up.
14       Q.   Are you able to answer the
15  question as to what documents, if any,
16  you have brought with you today that are
17  in addition to the documents set forth in
18  your report and on your reliance list?
19       A.   Not -- not without going
20  through each one of these documents and
21  checking them off.  I wouldn't want -- I
22  wouldn't want to swear that it would be
23  accurate.
24       Q.   I see that you have notes on

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1    a large desk pad in front of you.
2        A.   Yes.
3        Q.   Let's mark those as
4    Deposition Exhibit 3.  And can you
5    generally tell us what your notes are
6    that we've marked as Exhibit 3?
7            (Document marked for
8            identification as Exhibit
9            Kessler-3.)
10   BY MR. ZELLERS
11       Q.   As you mark it, if you could
12   tell us -- could you tell us how many
13   pages Exhibit 3 is?
14       A.   Probably not, because
15   there's going -- there's a lot of cut and
16   paste.  And there's a lot of loose pages.
17       Q.   Do your best to estimate, if
18   you will.
19       A.   Why don't we count together.
20   One, two.  This must be -- we'll count
21   this as three, four, five, six.  Okay.
22   That's fine.  We agree we're counting big
23   pictures.  That's four, that's five,
24   that's six, seven -- is this a good page?

Page 51

1    What was I up to?
2        Q.   Eight.
3        A.   Thank you.  9, 10, 11, 12,
4    13, 14, 15, 16, 17, 18, 19, 20, 21, 22.
5    About 22 big pages.
6        Q.   With some little pages that
7    we'll mark as A, B, and C to some of the
8    big pages.  Agreed?
9        A.   Fair.  Fair.
10       Q.   Okay.  The notes that make
11   up Exhibit 3, are those all notes and
12   materials that you prepared?
13       A.   Yes.
14       Q.   And what was the purpose of
15   your preparing Exhibit 3?
16       A.   Just -- so
17   actually -- there's -- wait just one
18   minute.  There's one document that has
19   some statistical numbers on it.  I asked
20   for help on that.  But the purpose of
21   this whole thing was -- I mean, as I'm
22   going along, I am just making notes for
23   myself to look at certain things, to do
24   certain analyses, to look at certain

Page 52

1    data, to deal with certain issues that
2    relate to this case.
3        Q.   Did you -- did you prepare
4    Exhibit 3 for your deposition or is
5    Exhibit 3 something that you have
6    utilized during your review of this
7    matter?
8        A.   I think it would be fair to
9    say for both purposes.
10       Q.   The statistical information
11   that is contained in Deposition
12   Exhibit 3, you indicated you had some
13   assistance with that?
14       A.   Yes.
15       Q.   Who provided you assistance?
16       A.   So counsel provided me with
17   the basic -- I asked that, for example,
18   on certain tables, what the odds ratios
19   were for certain numbers.
20       Q.   Did counsel provide
21   assistance or did anyone else provide
22   assistance with the statistical analyses?
23       A.   So counsel -- let me --
24   counsel sought -- for those odds ratios

Page 53

1    that I asked for, I asked counsel for
2    help on that, and my understanding is
3    they asked people who just are more in
4    depth than I am.  I'm a professor of
5    biostatistics, but I try not to run stuff
6    myself.
7        Q.   You reference in your report
8    that you have relied on Dr. Gerstman and
9    his statistical analyses relating to at
10   least the ROCKET study.
11       A.   Right.
12       Q.   Is that accurate?
13       A.   I have to go back and look
14   and see what paragraph that is.  It's not
15   unusual for me -- in fact, I think
16   Dr. Gerstman looked at one of the odds
17   ratios here.  Although I didn't speak to
18   him.
19       Q.   Is everything in your report
20   accurate to the best of your knowledge
21   and belief?
22       A.   No.  I -- I'm sure there --
23   there are erratas, and there is an errata
24   list.  I'm happy to give you that.

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1          MR. ZELLERS:  Counsel is
2    handing us what we will mark as
3    Deposition Exhibit 4, an errata
4    sheet for the expert report of
5    David Kessler.
6          (Document marked for
7    identification as Exhibit
8    Kessler-4.)
9    BY MR. ZELLERS
10         Q.   Is your report, Exhibit 1,
11   accurate, to the best of your knowledge,
12   as supplemented and amended by the errata
13   sheet which we've marked as Exhibit 4?
14         A.   I tried to make it that way.
15   But my experience is this is the size of
16   a book.  And the average book that's even
17   printed has 60 errors, even though you
18   don't know about them.  So I'm sure we
19   can find an error that's not on that
20   errata list.
21         But I am not -- the -- those
22   are the ones that I'm aware of.  But I'm
23   sure there has to be other errors.
24         Q.   Are you aware of any other

Page 55

1    errors in your report other than what are
2    reflected on Deposition Exhibit 4 as of
3    today?
4          A.   No.  That's what's in it --
5    that list was meant to reflect what I'm
6    aware of.
7          Q.   Who prepared your report?
8          A.   This is my report.  The
9    errata we'll have to see.
10         Q.   No, I'm not there yet.
11         Who prepared your report,
12   Deposition Exhibit 1?
13         A.   So I dictated my report.
14   Okay.  So it's my report.  But I didn't
15   type my report.  I didn't sit there and
16   enter the keys.
17         Q.   Did you have assistance in
18   terms of the preparation of your report?
19         A.   No.
20         MS. JEFFCOTT:  Objection to
21   form.
22   BY MR. ZELLERS
23         Q.   Independent of counsel.
24         A.   No.  I mean -- independent?

Page 56

1          Q.   Yes, independent of counsel,
2    did you have assistance in terms of
3    preparing your report?
4          A.   I don't -- I don't know what
5    you mean "independent."
6          Q.   Not including any
7    discussions or communications with
8    counsel, did anyone assist you in
9    preparing your report?
10         A.   No.
11         Q.   Who prepared the addendum,
12   Deposition Exhibit 4?
13         A.   It was done by counsel at my
14   request.
15         Q.   Have you spoken with
16   Dr. Gerstman or any other expert retained
17   by the plaintiffs in this matter?
18         A.   Not to my -- not that I
19   remember.
20         Q.   Have you reviewed any
21   deposition testimony or expert reports of
22   any of the experts retained in this
23   litigation?
24         A.   Yes.

Page 57

1          Q.   What expert reports have you
2    reviewed, if any?
3          A.   Expert reports, not
4    depositions.  So I've brought those with
5    me.
6          Q.   Are you able to quickly read
7    off to us the expert reports that you
8    have reviewed and considered?
9          A.   Look -- well, that's -- you
10   just changed the question.
11         Q.   I did not mean to make it
12   hard for you --
13         A.   No.  So it's just -- this is
14   what I have.  So there's -- what I have
15   available, okay, and I can tell you what
16   I've done with it.  Okay?
17         Q.   Please do.
18         A.   Okay.  So I have Hixon,
19   which I scanned.  Rosing, which I have
20   read.  Rinder, which I have read.
21   Gerstman, which I have, but I have not
22   read.
23         Q.   Any other expert reports
24   that you have been provided and/or

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 58

1    reviewed in this litigation?
2        A.   Those are the ones that I
3    believe I have reviewed -- that I have
4    and have reviewed.
5        Q.   Have you reviewed any
6    depositions in whole or in part of
7    experts in this litigation?
8        A.   So I have on the hard drive
9    a list of many depositions.  It might be
10   20 -- 20 plus.  I -- I can't -- I'm not
11   able to tell you who is expert and who is
12   not.
13       Q.   Are all of the depositions
14   that you have reviewed included in either
15   your report or your reliance list,
16   Exhibit D to Exhibit 1, your report?
17       A.   I'd have to go check.
18   The -- the depositions I have on this
19   hard drive, if you'd like, I have --
20       Q.   Let me see if we can
21   shortcut this.
22       A.   Sure.
23       Q.   Is it possible that at a
24   break we can confer with your counsel

Page 59

1    just in terms of the list of depositions
2    that you've been provided and then we can
3    decide if there's any questions that need
4    to be asked?
5        A.   Sure.  Of course.  And the
6    list is right there.
7        Q.   As you sit here, do you
8    recall reading any depositions in whole
9    or in part of experts in this litigation?
10       A.   So I believe I've looked
11   at -- and I'm not going to get the
12   name -- I was provided -- I have not
13   looked at their reports, but I've looked
14   at depositions of one hematologist in
15   this matter, I'm going to say Leisinger.
16   I'm going to -- I'm going to -- I have to
17   go back and double-check.  And I looked
18   briefly at a few aspects, but I was given
19   access to it.  And I did look at
20   Parisian, a few of -- of -- a few
21   portions.  I've searched that deposition.
22       Q.   Any others?
23       A.   Those are the two that I'm
24   aware of.

Page 60

1        Q.   Do you have any other
2    handwritten or electronic notes that you
3    have brought to the deposition other than
4    Exhibit 3?
5        A.   There may be -- may be
6    notes, for example, you'll see -- I just
7    showed you there's scribbles in one of
8    these.  And so there may be on certain
9    pages.  If those are considered notes.
10       Q.   Is it permissible if at the
11   break we take a quick look through your
12   materials just to see if there are any
13   additional notes, other than what you
14   have identified?
15       A.   Happy to do that.  I mean,
16   there is, for example, I'm sure on these
17   clinical studies, you're going to see
18   certain scribbles.
19       Q.   Have you brought with you
20   any invoices relating to work that you
21   have done in this matter?
22           MS. JEFFCOTT:  I have.
23           MR. ZELLERS:  We will mark
24   as Deposition Exhibit 5, two pages

Page 61

1    of invoices, one dated June 13,
2    2016, in the amount of $23,938.93.
3    The second invoice, so Page 2 of
4    Exhibit 5, dated October 18, 2016,
5    in the amount of $137,733.
6           (Document marked for
7    identification as Exhibit
8    Kessler-5.)
9    BY MR. ZELLERS
10       Q.   Dr. Kessler, does that
11   represent all of your billing on this
12   matter through October 17th?
13           And I'm going to need you to
14   take a look at this, because your
15   statement here states "Services through
16   October 17, 2014."  Yet the invoice is
17   dated October of 2016.  Is that a
18   typographical error?
19       A.   Yes, I believe that's a
20   typographical error.
21       Q.   If we totaled these two
22   invoices, which again we'll mark as
23   Exhibit 5, does that represent all of the
24   work that you have done in this

16 (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1  litigation through October 17th of 2016?
2      A.   Yes, that's correct.
3      Q.   Can you estimate for us the
4  amount of time that you have spent on
5  this litigation since the date in October
6  of 2016 where your invoices end?
7      A.   I cannot.  I do not have --
8      Q.   You can't give an estimate?
9      A.   I would -- I would be
10 guessing.
11     Q.   Your hourly rate for
12 reviewing records and materials in this
13 matter is what?
14     A.   It is as it was disclosed in
15 the report; $1,000.
16     Q.   Is your rate for appearing
17 at deposition and at any trial the same?
18     A.   Yes, sir.
19     Q.   Has our discussion jogged
20 your memory as to any materials that
21 either you or counsel have brought here
22 today responsive to Deposition Exhibit 2
23 that go beyond your reliance list and
24 your report, Deposition Exhibit 1?

Page 63

1      A.   Good question.  No.  But
2  there is one addendum to one of the
3  points that you've raised.  It's probably
4  not responsive to the depo notice.  But
5  it's responsive to -- I think that
6  this -- on Schedule 13, if I can, there's
7  some errata.  There's exact charts in
8  Schedule 13.
9      Q.   You have handed me two
10 documents.  One is Schedule 13.  Do you
11 believe this is what should be a
12 corrected copy of Schedule 13?
13     A.   Yeah, I think that's --
14 corrected -- yeah, I think that's
15 probably a good way of saying it.
16     Q.   It's different?
17     A.   It's not -- yes, it's not
18 the same, but it is -- it's basically the
19 same.
20     Q.   You believe that the
21 appropriate Schedule 13 for your report,
22 Exhibit 1, is what we will mark as
23 Exhibit 6?
24     A.   Yes.

Page 64

1      Q.   Correct?
2      A.   Yes.
3           (Document marked for
4      identification as Exhibit
5      Kessler-6.)
6  BY MR. ZELLERS
7      Q.   And just if we can do this
8  quickly.  Do you have your report in
9  front of you?
10     A.   I do, sir.
11     Q.   Can you turn to Schedule 13.
12     A.   Yes.
13     Q.   Just so we have a clear
14 record of what changes or differences
15 there are, it appears that the first page
16 of Schedule 13 is the Mueck 2014 Table 3,
17 correct?
18     A.   Yes.
19     Q.   That remains the same?
20     A.   Yes.
21     Q.   You have deleted the next
22 three box and-whisker figures from your
23 schedule; is that right?
24     A.   Yes.

Page 65

1      Q.   You have inserted into your
2  schedule Figure 17, which appears to be a
3  Bayer-produced document, Bate number
4  6581?
5      A.   Yes.
6      Q.   And you have added a table,
7  Table 154, which has a Janssen Bate
8  number of 2044?
9      A.   Yes.
10     Q.   Why did you make the change
11 to Schedule 13?
12     A.   Because I think those are
13 the underlying documents.  And I think
14 that they -- they probably, if we are
15 going to talk about the data, we should
16 probably use the underlying documents.
17     Q.   Underlying documents --
18     A.   The actual data.
19     Q.   The box and whisker -- let
20 me withdraw that.
21          Do you know what data
22 underlie the box and-whiskers plots that
23 are in Schedule 13 in your original
24 report?

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1      A.   Yes.  It's based off of
2 ROCKET.  But I think that the -- I wanted
3 to use the tables, because I thought they
4 more clearly represented the data.
5      Q.   You are withdrawing the last
6 three pages to the original Schedule 13,
7 and you are adding the two additional
8 pages that we have marked?
9      A.   Exactly.
10      Q.   You also have handed me --
11 when did you decide to amend your
12 Schedule 13?
13         MS. JEFFCOTT:  Objection to
14      form.
15         THE WITNESS:  A number of
16      days ago.
17 BY MR. ZELLERS
18      Q.   Are you able to tell me
19 specifically when you did it?
20      A.   I can't tell you exactly.
21      Q.   Are you able to tell me why
22 you decided to amend Schedule 13?
23      A.   Because, again, I wanted to
24 use the data that I saw in -- of the

Page 67

1 actual NDA.  So I wanted to go to the
2 underlying data.
3      Q.   Any other reason that you
4 decided to amend Schedule 13?
5      A.   No, that's the reason I
6 wanted to use, is the underlying data.
7      Q.   You have also provided me
8 with Schedule 17.  Are you making changes
9 to Schedule 17, or was that just in the
10 folder inadvertently?
11      A.   Oh, yes.  No, that's exactly
12 correct.  You're -- thank you very much
13 for that.  There are some -- there are
14 certain dates that -- in some of the
15 boxes, some of the AERs that I -- that I
16 caught that were inaccurate a couple of
17 weeks ago.  So I asked that those dates
18 be checked.  And, in fact, they were some
19 inaccurate dates.
20         (Document marked for
21      identification as Exhibit
22      Kessler-7.)
23 BY MR. ZELLERS
24      Q.   You are withdrawing Schedule

Page 68

1 17 to your report, Exhibit 1, and you are
2 replacing it with Schedule 17 which we
3 have marked as Exhibit 7; is that right?
4      A.   That's correct.
5      Q.   You made that decision when?
6      A.   That, I made several weeks
7 ago.
8      Q.   What is the basis or what
9 was the reason that you have chosen to
10 supplement your report with a new
11 Schedule 17?
12      A.   Exactly what I said earlier.
13 I was reading my report, and if you look
14 at the text, it has certain dates.  The
15 dates didn't match accurately.  So it
16 looked like there were certain typos in
17 that schedule.
18      Q.   Any other addendums or
19 changes that you have made or wish to
20 make to your report, Deposition
21 Exhibit 1?
22         And when I say "report," I
23 mean your CV, I mean your reliance list,
24 I mean your list of testimony, and the

Page 69

1 schedules.
2      A.   No.  Just -- I think we've
3 covered everything.
4         MS. JEFFCOTT:  Mr. Zellers,
5      can we take a break?  I think we
6      lost Ned on the phone.
7         MR. ZELLERS:  Sure.  Let's
8      take a break.
9         THE VIDEOGRAPHER:  The time
10      is now 9:43.  Going off the
11      record.
12         (Short break.)
13         THE VIDEOGRAPHER:  The time
14      is now 9:58.  We are back on the
15      record.
16 BY MR. ZELLERS
17      Q.   Dr. Kessler, any changes to
18 your earlier testimony?
19      A.   No.  The only thing I
20 just -- so I asked counsel for help on
21 the statistics.  They asked if Dr.
22 Gerstman, they can -- they can talk, to
23 calculate certain odds ratios, et cetera.
24      Q.   Any other changes to your

18 (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1    earlier testimony?
2        A.   No.
3        Q.   When were you first
4    contacted about this case?
5        A.   Don't hold me exactly to it.
6    About two years ago.
7        Q.   Who contacted -- were you
8    finished?
9        A.   Mr. McWilliams.
10       Q.   What were you asked to do?
11       A.   To look at the -- the record
12   from the lens that we talked about
13   earlier, that you and I discussed first
14   thing this morning and sort of the scope
15   of how I look at things through my
16   expertise.
17       Q.   Was there anything that
18   Mr. McWilliams or any of the counsel for
19   plaintiffs in this litigation asked you
20   to do that is not reflected in some way
21   in your final report?
22       A.   Nothing that they asked me
23   to do.  Nothing -- I mean, no, I don't
24   think that this is what I -- the report

Page 71

1    reflects what I did in my thinking.
2        Q.   When did you first begin
3    working on your report?
4        A.   I think -- again, first
5    begin?  I don't know.  Serious, serious
6    work was probably late winter, spring
7    this year is my guess.
8        Q.   What we have marked as
9    Exhibit 5, is that an accurate statement
10   of the amount of time you have spent
11   reviewing materials in this matter
12   through the middle of October of 2016?
13       A.   Yes.
14       Q.   Are you able to tell us how
15   much time you spent specifically
16   preparing your report Exhibit 1?
17       A.   No.  As opposed to reading
18   things?  No.
19       Q.   In addition to -- strike
20   that.
21            Did Mr. McWilliams and
22   plaintiff's counsel provide you with
23   materials to review?
24       A.   The way it worked was, in

Page 72

1    general, I asked for certain types of
2    documents or even specific documents.
3            I also had access to the
4    discovery database myself and did some
5    key searches.  Not that -- I mean, I sat
6    next to somebody and they typed things
7    in.
8        Q.   But --
9        A.   But I -- generally my
10   practice is -- is to ask for certain
11   things.  As I read, you find certain --
12   certain things.  And generally --
13   generally you ask for certain things and
14   then you ask for more things.  And then
15   as you read those things, you ask for
16   more things.
17       Q.   You had access to the
18   plaintiff document database, you reviewed
19   records and materials in that database,
20   and you selected materials that you would
21   review?
22       A.   Selected materials?  I'm not
23   sure "selected" is the right word.
24       Q.   What I'm trying --

Page 73

1        A.   I read stuff.  I read as
2    much as I could read within the time
3    allotted.
4        Q.   Was it some combination of
5    counsel providing you with materials and
6    you requesting additional materials of
7    counsel?
8        A.   I think -- I think it was
9    primarily -- it was very much me asking.
10   The vast majority, I believe, was stuff I
11   asked for.  I mean, if you look at
12   everything here, I think I asked for --
13   this is stuff I asked for.
14       Q.   In addition to materials
15   received from counsel or materials that
16   were contained in the document database,
17   did you do any literature search or
18   review?
19       A.   Yes.
20       Q.   What literature search or
21   review did you do?
22       A.   So for example, we would go
23   on the FDA.gov site.  If you type in the
24   word "Xarelto" on FDA.gov, at least at

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1  the time, and change the word -- the
2  accent -- so I would search the FDA
3  website.  I would search PubMed.  And,
4  again, I searched the -- sitting next --
5  because I -- the actual discovery,
6  certain -- I guess you're asking me about
7  public databases besides discovery
8  database.
9       Q.   I'm asking you what
10 databases did you search.
11      A.   So the discovery database,
12 PubMed, and the FDA website, and I'm sure
13 Google.
14      Q.   What generally was the
15 search that you did as you reviewed those
16 websites and databases?
17      A.   Oh, it would be numerous
18 searches.  I mean, you know, I type in a
19 word "prothrombin time" or "prothrombin"
20 or something like that.  I mean...
21      Q.   Are all of the materials
22 that you reviewed and considered and
23 relied upon in formulating your opinions
24 listed either in your report or your

Page 75

1  reliance list, which is attached as
2  Exhibit D to your report?
3       A.   Again, is that reliance
4  list -- counsel prepared that at my
5  request, I think with the caveat, take
6  the hard drive, take everything I've
7  brought.  Take that list.  Take
8  everything that I've cited in my report.
9  That should be the universe.
10      Q.   To the best of your
11 understanding, it is, correct?
12      A.   Well, what's the -- again,
13 the best way to do this, and we discussed
14 this earlier, take that hard drive, take
15 everything I have here, take everything I
16 cited in my report, and that reliance
17 list, that should be it.  If that's the
18 "it," then we're in agreement.
19      Q.   The hard drive that you are
20 referring to on the computer in front of
21 you, what is that hard drive?
22      A.   So that has, for example,
23 the NDA, the three -- there's multiple
24 NDAs on it.  It has multiple INDs on it.

Page 76

1  It has some 25 depositions on it.
2       Q.   The hard drive are materials
3  that you had available to you and that
4  you reviewed and considered in
5  formulating your opinions?
6       A.   Not exactly.  As I've said,
7  the -- it's the material that I had
8  available.  There's some 20,000 --
9  there's 27,000 pages of depositions that
10 I put together in one PDF, and I searched
11 it.  So I wouldn't want to represent that
12 I looked at every page.  Similarly the
13 NDA.
14      So this is just stuff that I
15 had available.  And in some manner or
16 not, I searched it.  As -- and -- but
17 there's no human way -- any way that you
18 can look at everything.
19      Q.   You also had available to
20 you for review all of the materials that
21 you have brought with you today and have
22 set out in front of us on the deposition
23 table, correct?
24      A.   And behind me.

Page 77

1       Q.   And behind you.  So I see
2  behind you various binders.  What binders
3  are those?
4       A.   So for each paragraph -- I
5  mean, with the exception -- I think those
6  binders include, for every paragraph in
7  my report, there are documents that are
8  cited.
9       And so those should -- all
10 those binders behind me should be tabbed
11 and guided to the paragraph and have the
12 citations and the actual documents cited
13 in my report.
14      Q.   I see behind the document
15 binders some cases, black cases.  Are
16 those empty or do those contain
17 additional materials?
18      A.   Those should be empty.
19      Q.   Looking at the hard drive,
20 the materials that you have in front of
21 you, and the materials that you have
22 behind you --
23      A.   And to the side of me.
24      Q.   And to the side of you?

Protected - Subject to Further Protective Review

Page 78

1     A.   Thank you.
2     Q.   Are those the materials that
3  you reviewed and relied upon in
4  formulating your opinions?
5     A.   Yes.  Plus the databases
6  that we talked about.  And obviously when
7  anyone does a database search, you can't
8  record everything that comes in front of
9  your eyes.
10     Q.   Other than what you have
11  testified to, did you consult with anyone
12  during the course of forming your
13  opinions?
14     A.   No.
15     Q.   Have you reviewed any
16  documents specific to any of the named
17  plaintiffs in this litigation?
18     A.   I have -- let's me just see
19  this.
20     Q.   And let me help you.
21  According to your reliance list, which is
22  Appendix D to your report, you have
23  reviewed medical records for Boudreaux or
24  Mingo and Henry.  You also have reviewed

Page 79

1  deposition transcripts for Dr. McCain in
2  Henry, Dr. Wong in Boudreaux, Dr. Saint
3  Martin in Orr, and Dr. Armstrong, Jordan,
4  and Mingo?
5     A.   I've had available all of
6  those, yes.
7     Q.   Have you actually reviewed
8  those in formulating your opinions?
9     A.   I have looked at -- I have
10  certainly searched those at different
11  times, yes.
12     Q.   Do you intend to render any
13  case-specific opinions in any of those
14  cases?
15     A.   Let me just think one second
16  on how to answer that question.  I
17  think -- I don't want to give you a legal
18  answer to your question.
19        There are certain -- well,
20  let me tell you what there is in my
21  report, and then what there is not.
22        I certainly -- on the
23  specific medical facts, while I'm always
24  interested in those, I am going to leave

Page 80

1  those to others.  That's case-specific.
2        The issue where the line --
3  where this is really a continuation of my
4  general opinions and that intersection,
5  you know, one of the questions is whether
6  information about PT could be helpful,
7  right, to -- in identifying patients at
8  an increased risk from bleeding.
9        So I mean, obviously that
10  information could be helpful.  I could
11  opine on that from just my own
12  experience.  But I did -- you know, I did
13  search, I mean, those -- those
14  depositions for what specific physicians
15  in those matters.
16        Now, is that case-specific?
17  I guess so.  But it really is just the
18  continuation.  It's sort of the natural
19  logical flow of what I'm opining on.
20     Q.   I did have an opportunity to
21  review your report.  And I see the
22  excerpts that you have provided.
23        My understanding is that you
24  will provide a general opinion that

Page 81

1  prothrombin time may or can be helpful to
2  physicians in an individual case, but
3  that you are not going to come in and say
4  in the Mingo case, it would have been
5  helpful because of X, Y, Z.  Is that
6  fair?
7     A.   I think that's probably a
8  fair statement, sir.  I mean, again, but
9  the fact is if you ask, "Dr. Kessler, why
10  do you think it's helpful?"  I can talk
11  about specific positions.  I didn't want
12  to just -- I wanted to test my own
13  opinion on that.
14     Q.   My hope is I'll get through
15  all of this, and I'll have a chance to
16  ask you why you think prothrombin time
17  may be helpful as we go through this.
18        You have stated that the
19  full list of depositions and transcripts
20  that you've had available to review are
21  on the hard drive, correct?
22     A.   I have certainly -- yes,
23  this has deposition transcripts, yes.
24     Q.   Have you communicated with

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

1    any physician who has prescribed Xarelto
2    about their use of Xarelto?
3         A.   I may have in certain
4    medical cases unrelated to this -- not as
5    part of my -- rendering my opinions.  But
6    just in the course of medical practice.
7         Q.   Do you prescribe
8    anticoagulants?
9         A.   I have in my career.
10   They've been used in children.  They have
11   been -- I have done that in the past.  I
12   don't do that currently.
13        Q.   In the past ten years, have
14   you prescribed anticoagulants?
15        A.   I probably have.  I was
16   attending hospitalist a number of years
17   back.  And I'm sure -- we'd have to go
18   back.  I was in charge of the whole
19   service.  I -- I'm almost sure I was --
20   there were kids who were being
21   anticoagulated.
22        Q.   I'll ask you more specific
23   questions in a bit about that.
24        But do you recall ever

Page 83

1    prescribing a NOAC as an anticoagulant?
2         A.   Sitting here today, I don't
3    have that recollection, sir.
4         Q.   Have you communicated with
5    Deborah Cohen, who is the associate
6    editor at the British Medical Journal, or
7    anyone at the British Medical Journal
8    regarding Xarelto?
9         A.   Not to my knowledge, no.
10        Q.   What did you do to prepare
11   for your deposition?
12        A.   I would actually like to
13   have done more.  I -- I came -- I wanted
14   to sort of read -- I got sick.  So I
15   didn't -- I sort of got food poisoning.
16        Q.   My question is what did you
17   do?
18        A.   I read.
19        Q.   You read what?
20        A.   I -- I read parts of the
21   NDA.  I probably read certain deposition
22   excerpts, depositions, I searched
23   depositions.  Right.
24        Q.   Are you able to estimate how

Page 84

1    much time you spent preparing for your
2    deposition?
3         A.   I don't know.
4         Q.   Excuse me for interrupting.
5    Are you able to give me an estimate for
6    that?
7         A.   I don't have that.
8         Q.   Did you meet or have the
9    opportunity to meet with plaintiffs'
10   counsel to prepare for your deposition?
11        A.   Yes.  I mean, specifically I
12   was asking them for materials, and we may
13   have discussed certain issues.
14        Q.   For how long did you meet
15   with plaintiffs' counsel in preparation
16   for your deposition?
17        A.   It would have been, you
18   know, a handful of hours the last couple
19   of days, past several days.
20        Q.   Did you review any documents
21   with counsel to refresh your recollection
22   in preparation for your deposition?
23        A.   I actually -- there was some
24   statistical stuff that I remember

Page 85

1    reviewing.  I'm -- I'm not sure I'm going
2    to discuss -- I'll let counsel object.
3    With my discussions with counsel, I'm not
4    comfortable talking about.
5         Q.   My question is simply, did
6    you review any documents with counsel to
7    prepare for your deposition?  That's a
8    yes or a no.
9         A.   I may have looked at certain
10   documents with counsel, yes.
11        Q.   Are the documents that you
12   reviewed with counsel documents that are
13   included in your reliance list or report?
14        A.   They -- they are -- they are
15   within the "it" that we talked about.
16        Q.   You had access to internal
17   Janssen documents?
18        A.   Sure.
19        Q.   You had access to internal
20   Bayer documents as a part of your review;
21   is that right?
22        A.   I believe so yes.
23        Q.   What percent of your
24   professional time do you currently spend

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1  performing litigation consulting work?
2      A.   I don't -- I have -- I -- I
3  don't know exactly that number.  I have
4  about five different streams of four or
5  five different areas.
6      Q.   Can you estimate?
7      A.   I'd be guessing.
8      Q.   What percent of your
9  income --
10     A.   No.  Go ahead.
11     Q.   Did you have an estimate for
12  me?
13     A.   You know, I went back, a
14  while back, I asked my wife who does my
15  schedule what time -- what percentage she
16  thought, and she used some 20 percent,
17  25 percent number or something like that.
18          But, again, I work all the
19  time, so I can't tell you exactly how you
20  split these things up.
21     Q.   Your best estimate, as you
22  sit here today, is that 20 to 25 percent
23  of your professional time is spent doing
24  work as a litigation consultant?

Page 87

1      A.   That was my wife's -- that
2  was my wife's, you know, and she does all
3  my scheduling.
4      Q.   Do you disagree with your
5  wife's estimate?
6      A.   One tries never to disagree
7  with one -- one's wife.
8      Q.   What percentage of your
9  income is from consulting on litigation
10  matters?
11     A.   I have no idea.  I have
12  multiple streams of income, each of which
13  are significant.
14     Q.   What percent of your time is
15  spent working as a consultant to provide
16  opinions in litigation matters?
17     A.   What was the difference of
18  that question and the earlier question?
19  Can you help me?
20     Q.   Are you able to answer it?
21     A.   I -- I thought I gave you my
22  time -- I thought -- maybe it was a
23  different question.
24          As a consultant to provide

Page 88

1  opinions.  I thought my -- I told you I
2  asked my wife that question, what
3  percentage of time I spent on these kinds
4  of things, and I gave you what her
5  estimate was.  I thought -- you just
6  asked me that question again?
7      Q.   Can you look at Appendix D
8  to your report?  I may have misspoke.
9          MR. ZELLERS:  Did I say B as
10  in boy?
11          THE COURT REPORTER:  D.  I
12  heard D.
13  BY MR. ZELLERS:
14     Q.   All right.  Let me withdraw
15  that question and ask you, Dr. Kessler,
16  to take a look at Appendix B to your
17  report.
18     A.   Could you hand me -- do it
19  off this version, because I only have the
20  schedules in this version.
21     Q.   I handed you when we
22  started --
23     A.   Here it is.  Here is B.
24  Thanks.  Got it.

Page 89

1      Q.   Does Appendix B of your
2  report contain a list of the cases in
3  which you have either testified at trial
4  or deposition in the last seven years?
5      A.   Yes.  I mean, it goes back,
6  I guess, to 2010.  So that's -- 2000 --
7  actually may go back to 2008.  So it says
8  seven years.  It may be a little
9  broader -- longer.
10     Q.   Dr. Kessler, is Appendix B
11  to your report, Deposition Exhibit 1, a
12  list of the cases in which you have
13  testified at trial or deposition since
14  2008?
15     A.   It -- it should be.
16     Q.   To your knowledge, is it a
17  complete list of the trial and deposition
18  testimony that you have given over that
19  period of time?
20     A.   It should be, yes.
21     Q.   Are there any cases in which
22  you have given trial or deposition
23  testimony that you do not disclose in
24  Appendix B?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 90

1     A.  I'd have to double-check.
2  The intent was to do this, and make this
3  complete.  The intent was to include
4  everything here.
5     Q.  As you sit here today,
6  looking at this list, can you think of
7  any omissions that would need to be
8  corrected to make this a complete and
9  accurate list?
10    A.  I have to think about
11 individual cases and see if they are on
12 here.  I try to keep this up-to-date.
13 There may be a mistake here.  I can't --
14 not -- not -- I'd have to --
15    Q.  My question is simply are
16 you aware.
17    A.  I'm not aware of any.
18    Q.  Do any of the cases that are
19 listed in Appendix B involve an
20 anticoagulant?
21    A.  No.
22    Q.  Have you been retained in
23 the Pradaxa litigation?
24        MS. JEFFCOTT:  Objection to

Page 91

1  form.
2        MR. ZELLERS:  Right now I
3  just want a yes or a no.
4        MS. JEFFCOTT:  You used
5  present tense.
6        THE WITNESS:  Yeah.
7        MR. ZELLERS:  If that makes
8  a difference.
9  BY MR. ZELLERS
10    Q.  Can you answer the question
11 as I've phrased it?
12    A.  I -- if you rephrase it, it
13 would be helpful.
14    Q.  Were you retained at any
15 time in the Pradaxa litigation?
16    A.  The answer to that is yes.
17    Q.  Who retained you?
18    A.  I'd have to look, but I --
19 I'd have to look.  I assume it was the
20 MDL.
21    Q.  Is -- is it further your
22 understanding that you were retained by
23 plaintiffs in the MDL?
24    A.  Yes.

Page 92

1     Q.  Have you reviewed documents
2  in the Pradaxa litigation?
3     A.  I would like to -- I don't
4  have the protective order that I'm under.
5  So exactly what I can and cannot say, if
6  you're going to release me from that
7  protective order, then I'm happy to
8  answer.
9     Q.  I --
10    A.  But I just -- there's a
11 protective order.
12    Q.  I understand.  Right now all
13 I want is a yes or a no to that question.
14        MS. JEFFCOTT:  You can
15 answer the question.
16        THE WITNESS:  I -- before I
17 answer it, I just want to know
18 whether that abuts against what
19 the protective order says.
20 BY MR. ZELLERS
21    Q.  Are you able to answer the
22 question?
23        And the question is:  Have
24 you reviewed documents in the Pradaxa

Page 93

1  litigation?
2     A.  I -- I'd have to go talk to
3  counsel and look at the protective order
4  and see whether I can answer that
5  question.
6     Q.  All right.  If -- if you can
7  do that some time today and tell me
8  whether or not you will answer that
9  question, I would appreciate it.
10    A.  Sure.
11    Q.  Have you drafted a report in
12 the Pradaxa litigation?
13    A.  Again, I'd want to
14 double-check.  I'm not sure that -- I'd
15 have to double-check the protective
16 order.  And I'd like to look at Rule
17 20 -- you know, 26, and see whether
18 that's disclosable.  I just don't know.
19    Q.  You --
20    A.  I have not testified in
21 that.  I've told you I've been retained.
22 I told you I'm under a protective order.
23        I mean, it's a legal, you
24 know, how far one can go.

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

1     Q.   Did you -- did you prepare a
2  final report in the Pradaxa litigation?
3     A.   Well, there was no -- again,
4  you've now changed the question.
5     Q.   It's a new question.
6     A.   Yes.
7        MR. HOROWITZ:  We're allowed
8  to do that.
9        THE WITNESS:  Sorry?
10       MR. HOROWITZ:  We're allowed
11  to do that.  Go ahead.  We'll talk
12  later about it.
13       THE WITNESS:  I look
14  forward --
15       MR. HOROWITZ:  -- on the
16  issue.
17       THE WITNESS:  I look forward
18  to having a nice conversation as
19  always, Mr. Horowitz.
20  BY MR. ZELLERS
21     Q.   Can you answer my question?
22     A.   Yeah.  Well, so I think it's
23  a matter of -- is it a matter of public
24  record?

Page 95

1        So I wouldn't agree -- a --
2  if a report -- if I worked on a report,
3  there certainly wasn't a final report.
4  Let's answer that question.  I...
5     Q.   Just to be clear.  Is it
6  your testimony that you did not prepare a
7  final report in the Pradaxa litigation?
8     A.   Again, your -- this -- there
9  was -- as I understand it, there were
10  not -- well, again, there's a protective
11  order.  I would -- there was not --
12     Q.   Can you answer the question?
13     A.   There's a protective order,
14  and I'd -- and I'd have to ask counsel.
15     Q.   Will you check with counsel
16  sometime today and --
17     A.   Sure.
18     Q.   -- then let us know if you
19  can answer that question?
20     A.   Sure.  I mean, but I think
21  you can rest assured, as I understand it,
22  there -- well, I don't know whether I can
23  say --
24       MS. JEFFCOTT:  Why don't --

Page 96

1        THE WITNESS:  Even if I
2  worked on a report, there was no
3  final report.
4        MS. JEFFCOTT:  Let me make a
5  suggestion.  Why don't we move on
6  from this, and we can revisit
7  later when we all have a chance to
8  confer.
9        THE WITNESS:  Right.
10  BY MR. ZELLERS
11     Q.   Did you use your Pradaxa
12  report in part to prepare your report in
13  Xarelto?
14       MS. JEFFCOTT:  Wait.  Wait.
15  Let's stop.  And we'll hold off on
16  this questioning until we have a
17  moment to confer.
18       MR. ZELLERS:  Okay.
19  BY MR. ZELLERS
20     Q.   That's a question that you
21  need to refer to counsel as well, discuss
22  with counsel?
23     A.   I think counsel just made
24  their opinion very clear on that.

Page 97

1     Q.   Okay.  So if you will, when
2  we next come back, or when you're able to
3  have a response to whether you will
4  answer those questions, then let me know.
5        In the cases that you have
6  testified in as set forth in Appendix B
7  to your report, were any of the alleged
8  injuries blood clots?
9     A.   Yes.
10     Q.   Do you recall in which cases
11  or case you testified relating to blood
12  clots?
13     A.   Well, certainly YAZ had to
14  do with systemic embolized DVT.
15  Certainly the Merck Vioxx had to do with
16  coronary emboli.
17     Q.   Any others?
18     A.   I'd have to go back.  But
19  certainly in those two, sir.
20     Q.   In any of the litigations
21  listed in Appendix B, were you consulting
22  on behalf of defendants?
23     A.   Yes.
24     Q.   What litigations or cases

25 (Pages 94 to 97)

Protected - Subject to Further Protective Review

Page 98

1    did you consult on behalf of defendants
2    in?
3        A.   Just looking -- don't hold
4    me to the exact list.  But Pharma v.
5    Sigma was defendants.  Smith and Nephew
6    v. NH Insurance Company.
7            And I believe if you go to
8    the bottom of the list, you can -- the
9    Cordero.  There are defendants,
10   including drug companies.  And I believe
11   it was Teva that I was retained on in
12   that case.
13       Q.   Other than the matters that
14   you have stated, was all of the other
15   litigation consulting work and testifying
16   on behalf of plaintiffs?
17       A.   I believe that's correct.
18       Q.   What percentage of your
19   litigation work is for plaintiffs?
20       A.   Certainly a significant
21   portion of that.
22       Q.   Are you able to be any more
23   precise than that?
24       A.   Not unless we pulled out a

Page 99

1    calculator.
2        Q.   Or check with your wife?
3        A.   She's counsel.  You can
4    always check with my wife.
5        Q.   Were any of the cases in
6    which you testified failure to warn cases
7    or involve adequacy of the label?
8        A.   I think -- I believe the
9    Cordero case was a failure to warn.
10       Q.   And to be more precise, and
11   I think you understood, my question was,
12   in the cases in which you have consulted
13   with defendants --
14       A.   Yes, that was --
15       Q.   -- are there any cases in
16   which they were failure to warn or
17   adequacy of the label at issue?
18       A.   Yes.  I believe in Cordero
19   those case -- those things were at issue,
20   and I was for defendants.
21       Q.   Any others?
22       A.   For Teva.  That's the one
23   that I recall.
24       Q.   Have you testified in any

Page 100

1    litigation this year?
2        A.   I'm sure.  I'm just trying
3    to go through.  We'd have to look at the
4    dates.  I don't recall any trial this
5    year that I've testified in.  I'm sure
6    there were several depositions this year.
7        Q.   Are you able to be any more
8    precise in terms of telling me --
9        A.   I'd have to -- it's some
10   percentage of these were -- I mean, this
11   is over seven years.  We'd have to look
12   at these.
13       Q.   In order to answer that
14   question, you would need to take
15   additional time to study Exhibit B, your
16   list of testimony?
17       A.   Sure.  Sure.
18       Q.   Are there any cases in which
19   a judge has limited or excluded any
20   testimony of yours from a case?
21       A.   Not based on qualifications,
22   I don't think.  I mean, there's -- I
23   would -- as I read these motions, these
24   Daubert motions, I think we would

Page 101

1    probably -- you know, if you read them,
2    there are probably more motion in limine,
3    don't give any expert opinion -- don't --
4    those kinds of challenges.
5            West Virginia in mesh may
6    have limited my FDA issues in general.
7    The judge said, you know, I could -- I
8    was always permitted to testify.  But
9    there was -- there would be certain areas
10   that the motion to exclude certain
11   testimony, and either the judge would
12   rule -- most of the time the judge would
13   say, well, I'll decide when he actually
14   testifies.
15           In general I can't do what
16   any expert can't do.  So I can't give
17   legal opinions.  I can't give evidence of
18   what was in a certain parties' mindset,
19   for example.  That's how I've been sort
20   of challenged.
21           And, of course, I'm excluded
22   from doing that like any other expert is
23   excluded from doing that.
24       Q.   Other than in the West

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1   Virginia mesh cases, are there any other
2   cases or litigations that you are aware
3   of in which a judge has limited or
4   excluded any testimony of yours?
5       A.   Not other than to the
6   general rule.  Of course, he can't
7   testify about legal conclusions.  Of
8   course, he can't testify about intent,
9   those kinds of things.  But those are
10  more motions in limine.
11      Q.   Do you recall litigations in
12  which those types of motion in limine
13  have been sustained as it results to your
14  limb?
15      A.   Usually -- it may -- yeah, I
16  don't want to use the word "sustained."
17  It may be, of course, he can't testify on
18  legal conclusions.  No one can testify on
19  legal conclusions.  If he does that, I'll
20  rule at the bench.  We'd have to go
21  through each one.
22          I mean, there's been -- my
23  qualifications have never been
24  challenged.  My expertise have never been

Page 103

1   challenged.  It's always a question of
2   what -- you know, can I get into this
3   area or that area of -- and because there
4   are general rules -- the rules that are
5   applicable to all experts.
6       Q.   Looking at your curriculum
7   vitae which was attached as Exhibit A --
8   let me withdraw that.
9           Looking at your curriculum
10  vitae which is attached as Appendix A to
11  your report, is your CV complete and
12  up-to-date?
13      A.   Absolutely not.
14      Q.   Do you know what additions
15  or changes would need to be made to bring
16  it up-to-date?
17      A.   Well, I -- let me take a
18  look.  The reason I say that, because at
19  a certain point in your career you just
20  don't put everything -- you know, you
21  sort of stop -- you stop updating it.
22  But let me -- let me look at it here.
23  Let me look at the essential features and
24  see if there's anything that would be

Page 104

1   relevant.
2           For example, my book this
3   year said publication date March 15th.
4   It actually came out in April.  So that's
5   a little off.
6           I think there's a Russian
7   version of the prior book.
8       Q.   Anything else?
9       A.   Well, let's just look at --
10  I think -- check the boards.  I'm sure
11  there's lectures that I've given that are
12  not up here.  Let's just check -- I mean,
13  the essential features are here.  Let's
14  just check boards.  Aptalis, Immucor,
15  Tokai, TPG.  All those are correct.
16      Q.   Are there any additional
17  boards that you serve on that are not
18  included in Appendix A?
19      A.   Yes.  It's listed in my
20  report but not on the CV.  It's not
21  updated.
22          There's a pharmaceutical
23  company called Stoke that I'm on the
24  board of.

Page 105

1       Q.   Where is Stoke located?
2       A.   In -- it's a Massachusetts
3   company.  I don't know where it's legally
4   registered.  Based in Massachusetts.
5       Q.   As you review Appendix A,
6   any other updates that you believe need
7   to be made?
8       A.   No.  I think those are the
9   essential kind of things.
10      Q.   You have never worked as an
11  FDA medical officer, correct?
12      A.   I was the ultimate FDA
13  medical officer.
14      Q.   Did you ever work as the
15  medical officers that did that reviewed
16  the ROCKET study?
17          MS. JEFFCOTT:  Objection to
18  form.
19          THE WITNESS:  Sure.
20  BY MR. ZELLERS
21      Q.   When?
22      A.   Reviewed the ROCKET site?
23      Q.   No.  You're aware -- you're
24  aware that there were two medical

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1   reviewers for the ROCKET study, correct?
2       A.   ROCKET study, yes.
3       Q.   Dr. Rose and Dr. Dunnmon?
4       A.   Yes.
5       Q.   Their position with FDA is
6   what, at least as of the time that they
7   reviewed the ROCKET study?
8       A.   We tend to call them medical
9   officers.  I'd have to go look at the
10  personnel system, exactly what their
11  title is.
12      Q.   Have you ever served in that
13  capacity at the FDA where you are doing
14  the initial hands-on evaluation of study
15  data?
16      A.   I certainly have -- I
17  certainly -- I've been in charge of them.
18  Now, you asked me the initial work.
19  There are certain times where I've done
20  the initial work of study data.  I think
21  that would be fair to say that I was on
22  certain teams that would do that.  I
23  would try not to substitute my opinion
24  for them, but I was their boss in

Page 107

1   essence.
2            But sometimes I was pretty
3   much a team member on -- on certain
4   studies, certain...
5       Q.   Can you name any studies on
6   which you served in the capacity as the
7   FDA medical officer?
8       A.   I think if you asked the
9   tobacco team at FDA, I was probably the
10  medical officer on that team.
11           If you look at certain
12  medical devices, if you -- anything that
13  becomes very controversial during my
14  tenure, I think people would tell you I
15  was pretty hands-on, rolled up my sleeves
16  and -- and got involved in reviewing the
17  studies.
18           Usually I -- I mean, in some
19  case -- rare instances was I the first
20  person to look at that.  I think that
21  would be exceptional.
22      Q.   You never -- are you
23  finished?  Can I ask my next question?
24      A.   Sure.  Go ahead.

Page 108

1       Q.   You never were a member of
2   the cardiovascular and renal drugs
3   advisory committee, correct?
4       A.   I used to sit there.  I
5   charged those committees with their
6   responsibilities, and I sat next to
7   the -- I sat next to multiple, almost
8   every advisory committee at one point or
9   another time.
10      Q.   Were you a member of that
11  committee during your time at the FDA?
12      A.   No.  My answer is that I
13  charged those committees and I sat there
14  and participated in the deliberations of
15  most of the advisory committees.
16      Q.   You left FDA in 1997?
17      A.   Yes.
18      Q.   Have you been employed by
19  FDA in any capacity since 1997?
20      A.   No.
21      Q.   You have not been a member
22  of any FDA advisory committee since you
23  left FDA in 1997, correct?
24      A.   No.  I've been very

Page 109

1   careful -- I mean, I've been very careful
2   for appearances sake.  You always want to
3   allow your successors room.  You don't
4   want to crowd your successors...
5       Q.   You are not here today
6   speaking for or on behalf of the FDA,
7   correct?
8       A.   That's exactly correct.  And
9   that should be emphasized.
10      Q.   And you have never been
11  designated the principal investigator on
12  a clinical trial, correct?
13      A.   Wrong.
14      Q.   What clinical trial have you
15  been -- let me withdraw that and ask a
16  different question.
17           Have you ever been
18  designated the principal investigator on
19  a clinical trial or epidemiology study?
20           MS. JEFFCOTT:  Objection to
21  form.
22           THE WITNESS:  Well, again,
23  there are a number of words there.
24  I certainly was, if you look -- I

28 (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1  was in charge of the clinical
2  research centers. I was the
3  principal investigator of major
4  clinical research centers post my
5  leaving.
6  BY MR. ZELLERS
7      Q.   What clinical trial or
8  trials were you designated as the
9  principal investigator on?
10     A.   So let me clarify that. I
11 was the principal investigator at the
12 clinical research centers that conducted
13 clinical trials. We'd have to go back.
14 So I was the principal investigator of
15 the center, of the GCRC that did the
16 principal trial.
17     Q.   You were the principal
18 investigator at the center, but not the
19 principal investigator on the specific
20 clinical trial, correct?
21     A.   They would report to me,
22 yes, the -- that's correct. That's the
23 way it worked.
24     Q.   You have never been --

Page 111

1      A.   I mean, to those -- to those
2  clinical investigations, they were part
3  of the GCRC apparatus, and many of them
4  are in the academic center.
5      Q.   You have never been an
6  investigator on a clinical study
7  involving patients on anticoagulants,
8  correct?
9      A.   We'd have to -- again, I was
10 not -- the answer to your question is
11 correct. But those studies may have been
12 conducted at the GCRC that I was
13 principal investigator on. So we'd have
14 to go back and look.
15     Q.   While you were at FDA, you
16 did not conduct the medical review for
17 warfarin; is that right?
18     A.   That's correct.
19     Q.   Do any of the companies for
20 which you sit on their Board of Directors
21 make or are developing anticoagulants?
22     A.   No.
23     Q.   Other than sitting on a
24 Board of Directors, you have never been

Page 112

1  employed by a pharmaceutical company,
2  correct?
3      A.   I think that's correct. I
4  mean, I've -- I have been -- your -- I
5  believe your company has consulted me, I
6  mean, over the years on certain issues,
7  but I don't think that's the word
8  employed.
9      Q.   You are currently a
10 professor of pediatrics, epidemiology,
11 and biostatistics at UCSF, correct?
12     A.   Yes.
13     Q.   You are not a cardiologist?
14     A.   I'm a licensed physician.
15 I'm not board trained in cardiology. But
16 certainly every physician has cardiology
17 experience.
18     Q.   You did not do a cardiology
19 residency, correct?
20     A.   Fellowship. You don't do --
21 there's no residencies in cardiology.
22     Q.   Okay.
23     A.   There's fellowships. So I
24 mean, I certainly did pediatric

Page 113

1  cardiology as part of my general
2  training. But, no, I did not -- I'm not
3  a specialist in cardiology.
4      Q.   Do you have experience
5  treating patients for atrial
6  fibrillation?
7      A.   It's not a disease. It's
8  not a general pediatric disease. So the
9  answer to that question is no.
10     Q.   Do you --
11     A.   I mean, other than as a
12 licensed physician. I'm licensed to
13 treat and -- I mean -- and I've read, but
14 pediatricians don't treat that disease.
15     Q.   Do you have hands-on
16 experience beyond your training in
17 prescribing and controlling warfarin,
18 including monitoring time and therapeutic
19 range?
20     A.   Not as the clinician, but --
21 but certainly -- I mean, at the
22 regulatory scientific interface. If you
23 wanted to discuss that, happy to discuss
24 it from the regulatory science

29 (Pages 110 to 113)

Protected - Subject to Further Protective Review

Page 114

1    perspective.
2        Q.    Not at the patient level,
3    correct?
4        A.    Well, I'd like to think that
5    the regulatory science, FDA.  It's
6    just -- when you are at the FDA, you have
7    a lot of patients, it's like the whole
8    nation.
9        Q.    I asked you before if you
10   had ever prescribed a NOAC.  I think you
11   said no.  Let me ask you --
12       A.    But I was involved -- I've
13   been involved in NOAC cases.
14       Q.    Have you ever prescribed
15   Xarelto to a patient?
16       A.    Not to my knowledge, sir.
17       Q.    Have you ever performed a
18   medical-legal review of a Xarelto case,
19   aside from what you have been retained to
20   do in this case?
21       A.    Only in this matter.
22       Q.    Do you hold yourself out to
23   be an expert in pharmacokinetics?
24            MS. JEFFCOTT:  Objection to

Page 115

1    form.
2            THE WITNESS:  I think -- I
3    think there's only one expert in
4    this country in pharmacokinetics
5    and that's Carl Pack.  I say that
6    somewhat facetious.  Carl ran our
7    center for -- for -- the center
8    for drugs.  And Carl -- Carl
9    believed every -- he was a
10   pharmacokineticist, and he
11   believed every drug question was a
12   question of pharmacokinetics.
13           So -- so let me -- let me
14   finish the question.  Carl -- the
15   answer is, I think it would be
16   fair to say as FDA commissioner, I
17   did a lot of pharmacokinetics and
18   pharmacodynamics.  It's an -- it's
19   an essential part of pharmacology.
20           I mean, I don't just do
21   pharmacokinetics.  I don't see the
22   whole world through
23   pharmacokinetic lenses as Carl
24   does.

Page 116

1    BY MR. ZELLERS:
2        Q.    Pharmacokinetics is
3    something that you have experience with,
4    you have been involved in, but you do not
5    consider yourself to be an expert in the
6    field of pharmacokinetics?
7        A.    No.  I only consider one
8    person in -- in the country to be a real
9    expert.  And it -- well, I mean -- I'm
10   doing that in part, because Carl -- that
11   was the joke within FDA.  Obviously, I'm
12   being -- I'm sorry.  I'm being a little
13   flip.
14           But to interrupt, if you
15   want to know who knows the most, I mean
16   it was Carl.  Carl taught me.  We all did
17   pharmacokinetics.  I'm certainly an
18   expert in pharmacokinetics.
19       Q.    There -- there are folks who
20   have specialized education and training
21   in the specialty of pharmacokinetics,
22   correct?
23       A.    Sure.  But, I mean, I think
24   it would be fair to say that as far as

Page 117

1    the regulatory aspects of
2    pharmacokinetics, I probably have as much
3    expertise as anyone in this nation.
4        Q.    Same set of questions in
5    terms of pharmacodynamics.  You generally
6    have familiarity with pharmacodynamics,
7    you have been involved with
8    pharmacodynamics, but you do not consider
9    yourself to be an expert in
10   pharmacodynamics?
11           MS. JEFFCOTT:  Objection to
12   form.
13           THE WITNESS:  If that was
14   your interpretation of my answer
15   on pharmacokinetics.  I mean, I am
16   an expert on pharmacokinetics and
17   pharmacodynamics as they are part
18   of the regulatory science
19   interface.  Certainly as how
20   the -- how drugs are looked at.
21   So, yes, I am an expert.  Right.
22   There are other people who -- I
23   don't spend my whole life just
24   doing that.  But I probably know

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1    as much about the regulatory
2    aspects as anyone on both the PK
3    and PD.
4    BY MR. ZELLERS
5        Q.   Are there folks who do spend
6    their professional lives working just on
7    pharmacokinetic and pharmacodynamic
8    issues?
9        A.   They -- they -- they may.
10   But they don't -- they are probably not
11   experts on the regulatory aspects.
12       Q.   You do not spend 100 percent
13   of your professional time on
14   pharmacokinetics and pharmacodynamics,
15   correct?
16       A.   That's correct.  But I do
17   have -- I certainly have -- you can't run
18   the FDA and be in charge of drugs without
19   being an expert on PK/PD, and I have that
20   expertise.  I mean, I -- I learned that
21   both in med school and very much as
22   running FDA.
23       Q.   Same questions with respect
24   to clinical pharmacology.  You give the

Page 119

1    same answers?
2        A.   No.  I think -- I think I
3    probably have as much expertise on the
4    regulatory aspects of clinical
5    pharmacology as anyone in this country.
6        Q.   There are folks who do
7    nothing but work in the clinical
8    pharmacology area, correct?
9        A.   Right.  But I think I
10   probably -- if you ask the interface
11   between FDA and clinical pharmacology and
12   that overlap, I probably have more
13   expertise than probably anybody.
14       Q.   Do you hold yourself out as
15   an expert in the pharmacology of
16   anticoagulants?
17           MS. JEFFCOTT:  Objection to
18       form.
19           THE WITNESS:  To the
20       extent -- to the extent that we
21       are talking about the regulatory
22       aspects of pharmacology of
23       anticoagulants, certainly it's --
24       that would be true.  I mean, I am

Page 120

1    an expert on the regulatory
2    aspects of pharmacology, and there
3    are probably very few drugs that I
4    haven't had some experience with
5    or training to deal with.
6           So I am -- I would consider
7       myself an expert.
8    BY MR. ZELLERS
9        Q.   Have you had formal
10   education and training in the field of
11   clinical pharmacology?
12       A.   Sure.
13       Q.   That would be your training
14   as a resident?
15       A.   No.  It's my training as a
16   medical student.  I've done special
17   fellow -- special training in things like
18   pharmacoepidemiology that involves
19   clinical -- clinical trials, et cetera.
20   It's -- it's what I did at FDA was
21   clinical pharmacology.
22       Q.   That background training and
23   experience would be contained on your CV
24   which is Appendix A to your report,

Page 121

1    correct?
2        A.   Seven years as head of the
3    agency that did the clinical pharmacology
4    of drugs, yes.
5        Q.   Have you written any
6    articles or publications regarding
7    anticoagulant medication?
8        A.   I don't think anything
9    specific to anticoagulant medicines.
10   There should be -- we'd have to go back
11   and -- I don't know whether there's any
12   reference to any of the regs that I
13   signed.  I'd have to go back.
14       Q.   As you sit here, do you
15   recall writing any articles or
16   publications relating to anticoagulant
17   medications?
18       A.   To the -- not -- things that
19   would be applicable to those drugs, yes,
20   but not specifically about those drugs.
21   So, for example, you know, the
22   regulations that govern those drugs, yes.
23   But there wouldn't be just that drug
24   class.

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1      Q.   Have you given any
2  presentations on anticoagulants?
3      A.   No.  Just -- only -- not
4  specifically about anticoagulants, but
5  about the rules and regulations of drugs
6  that -- that included anticoagulants.  So
7  it was not just about anticoagulants.
8      Q.   Have you written any
9  articles or publications regarding
10 treatment of a patient with atrial
11 fibrillation?
12     A.   No.
13     Q.   Written any articles or
14 publications regarding stroke diagnosis
15 and management?
16     A.   No.
17     Q.   Written any articles or
18 publications regarding cerebrovascular
19 disease?
20     A.   It may have been.  They may
21 have been referenced in certain
22 publications that I've done.  I have to
23 go back and check.
24     Q.   Any that you can recall

Page 123

1  specifically, as you sit here?
2      A.   Well, I've written a lot of
3  articles.  And I am sure stroke is part
4  of it.  It's not just on stroke.  I mean,
5  it may be -- but they're in the public
6  health sides of that, obviously.
7      Q.   Have you written any
8  articles or publications regarding
9  monitoring patients on warfarin?
10     A.   Not specifically on that.
11 Again, but on the rules in general, I'm
12 sure there are things that I have
13 published both in regulations and other
14 that govern, for example, drugs in
15 general, again, that would be applicable.
16     Q.   Have you written any
17 articles or publications regarding novel
18 oral anticoagulants?
19     A.   Again, the same answer.
20 I've written general articles on the
21 regulation of drugs including those, but
22 not specific to those drugs.
23     Q.   Have you conducted any
24 research on Xarelto independent of this

Page 124

1  litigation?
2      A.   No.
3      Q.   Have you conducted any
4  research on any NOAC independent of this
5  litigation?
6      A.   I'm going to talk to counsel
7  on what we can talk about.
8      Q.   Is it your opinion that as
9  currently labeled Xarelto should not be
10 on the market?
11     A.   I think that's probably --
12 so I didn't offer that opinion in my
13 report.  So we're going beyond my report
14 for my opinions, and that's fine.  You're
15 entitled to ask me those questions.
16         As I said earlier, I think
17 that technically the label doesn't -- I
18 mean, the label doesn't comply with the
19 regulations as written.
20         So the first question is --
21 so the drug is probably -- I mean, it
22 doesn't comply with those regulations.
23 So there are -- again, I don't want to
24 give a legal opinion.  There are

Page 125

1  consequences to that.
2          And I think if you're going
3  to continue to sell the drug, you have to
4  comply with the regulations or fix the
5  label.
6          As -- again, we talked
7  earlier about personally you asked me --
8  I mean, where I come out about safety.
9  And I told you I probably would have
10 sided, if I were commissioner, with the
11 medical reviewers, and -- because of
12 concern.
13         When you look at the U.S.
14 data, it's just strikingly different than
15 the foreign data when it comes to the
16 risk-benefit equation.  And that
17 concerned the medical reviewers.  And I
18 probably would have sided with them.
19     Q.   Okay.  My question is a
20 little different though.  Is it your
21 opinion that as currently labeled Xarelto
22 should not be on the market?
23     A.   If you don't fix the label,
24 you should take the drug off the market.

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1        Q.   That's your opinion based
2    upon what you've reviewed?
3        A.   The label doesn't come --
4    the label is not in compliance with
5    applicable regulations.  So I mean -- so
6    the label is inadequate.  I mean, I
7    don't -- again, you're pushing me to give
8    a legal opinion.  And I want to stay away
9    from that.
10       Q.   The reason or reasons --
11       A.   Mr. Horowitz may want to
12   add --
13            MR. HOROWITZ:  Yes, he does.
14            MR. ZELLERS:  Mr. Horowitz
15       will have his opportunity.
16            THE WITNESS:  It's always --
17       you know.
18   BY MR. ZELLERS
19       Q.   The reason or reasons that
20   you believe Xarelto does not comply with
21   the labeling regulations is what you set
22   forth in your report, correct?
23       A.   Yes.  But you also went
24   beyond that in your question.  And

Page 127

1    that -- I mean, and that goes to whether
2    the drug should be on the market.  And as
3    you know, the medical reviewers
4    recommended against that, and they were
5    overruled.
6            And so there is -- we can
7    discuss -- those reasons are independent
8    of the label reasons.
9            MR. ZELLERS:  How long have
10       we been going?
11            THE VIDEOGRAPHER:  Right now
12       close to two hours.  An hour
13       47 minutes right now.
14            MR. ZELLERS:  Do we need to
15       take a break or should we press
16       on?
17            THE WITNESS:  Please press
18       on.  Unless...
19            Actually, I would like to
20       fill up a glass.  If I can -- may
21       I do that?
22            MR. ZELLERS:  You certainly
23       may.
24            Should we take five minutes?

Page 128

1            MS. JEFFCOTT:  It won't take
2       but a second.
3    BY MR. ZELLERS
4        Q.   Are you ready to continue,
5    Doctor?
6        A.   Yes.
7        Q.   In Section 4 of your report,
8    Pages 80 to 83.
9        A.   Pages?
10       Q.   Pages 80 to 83, you set
11   forth your conclusions.
12       A.   Yes.
13       Q.   The footnote states that
14   this is not meant to be an exhaustive
15   list and that the entirety of your report
16   contain your opinions.
17       A.   Yes.
18       Q.   Have you ever published
19   these opinions outside of the work you're
20   doing in this litigation matter?
21       A.   We're -- are we not under a
22   protective order?
23       Q.   We are under a protective
24   order.

Page 129

1        A.   Okay.  How could -- so --
2    I'm sorry.  I'm permitted to publish my
3    opinions?
4        Q.   My question to you is, you
5    have only expressed your opinions with
6    respect to Xarelto in this litigation.
7    Is that fair?
8        A.   Well, so -- let's divide
9    these opinions up into two things.
10           There may be -- let me just
11   take a look.  So there are certain
12   opinions, for example, 198 and 199, that
13   I think you could probably find those
14   opinions in the law, the article that I
15   did, you know, that was cited -- you
16   know, I mean in certain -- just briefs,
17   and maybe the court ultimately cited a
18   footnote.
19           So those are opinions that I
20   have held and talked about publicly.
21           My understanding is that the
22   basis that my -- the discovery basis, the
23   discovery documents that I reviewed in
24   this matter are subject to a protective

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    order, so at least my understanding,
2    unless you're releasing me right now, I
3    mean, I could not, I mean, talk about
4    what I talk about in this report publicly
5    unless I misunderstand, except for those
6    general areas of law that I think are
7    applicable, for example in 198 and 199.
8        Q.   The opinions that you
9    express in your report as they relate
10   specifically to Xarelto, those were
11   developed once you were retained by
12   plaintiffs and as you had access to the
13   materials which you reviewed, correct?
14       A.   Exactly.  I looked at -- I
15   was given that record and was able to
16   review that record and make certain
17   opinions based on that record, which to
18   my understanding is confidential.
19       Q.   Your report includes 20
20   schedules.  We talked briefly about
21   those --
22       A.   Yeah.
23       Q.   -- at the outset.
24       A.   Yeah.  Yes.

Page 131

1        Q.   Footnote 1 on Page 3 of your
2    report states, "The schedules were
3    prepared by legal staff at my direction
4    and under my review."
5            When you refer to legal
6    staff, who were you referring to?
7        A.   Legal counsel in this
8    matter.  I mean, if I could explain, I
9    mean what those -- those schedules are --
10   base -- basically, they should be factual
11   data and information that I would hope
12   would be noncontroversial.  And, you
13   know, it's the list of studies, for
14   example.
15           So they are -- and if
16   there's anything wrong in those
17   schedules, they are meant not to be --
18   they are meant to be, you know, complete
19   and accurate and things that hopefully --
20   you know, the labeling changes, the back
21   and forth, they are chronologies of
22   events.
23           So they are meant to be
24   totally objective, factual, without

Page 132

1    opinion whatsoever.  So if there's
2    anything wrong, I stand ready to correct
3    it, and show me and I'm happy to do that.
4        Q.   That was your purpose and
5    intent in creating the schedules or, more
6    specifically, having the legal staff
7    prepare the schedules?
8        A.   Certain chronologies,
9    et cetera.  If you and I had a question,
10   you know, or the Court has a question,
11   you can't carry everything in your head,
12   so I wanted to make sure that that stuff
13   was available.
14       Q.   Is it accurate to say that
15   the opinions that you were rendering in
16   this case are, you know, contained in
17   your report, you know, through Page 83,
18   and that at least it was not your intent
19   to state new or additional opinions in
20   the schedules?
21       A.   That's correct.  There's
22   no -- there's no opinions.  There's
23   nothing hidden in the schedule.  We
24   don't -- I mean, that's -- I mean,

Page 133

1    obviously, again, the footnote is, you --
2    you've asked me for opinions today that
3    are beyond what's in the report.  And I'm
4    giving you those.
5            But, no, the schedules are
6    perfectly just meant to be factual
7    information if we wanted to look at a set
8    of facts.
9        Q.   If we take a look at
10   Schedule 8.
11       A.   Yes.
12       Q.   Schedule 8 are deposition
13   excerpts?
14       A.   Yes.
15       Q.   Are these deposition
16   excerpts that you relied on in forming
17   your opinions in this case?
18       A.   So what these are -- the
19   depositions are what's relied on.  But
20   there are certain quotes in the report,
21   all right, of depositions, you and I have
22   talked about some of them.  But whenever
23   you're writing a report, you don't want
24   to just go on for pages.  So all this is,

Protected - Subject to Further Protective Review

Page 134

1    is to try to give those -- those excerpts
2    that are in the report, to give you a
3    little more, some pages, so we have the
4    full context.
5              If you said, Dr. Kessler,
6    you didn't take -- you know, there's not
7    every objection, or there's -- I think
8    all the objections are in there.  But if
9    you didn't take -- well, what about the
10   preceding question or the question
11   afterwards.  This is meant to be more
12   expansive.  That's all this is.
13        Q.    Why did you identify these
14   specific excerpts which you include in
15   Schedule 8?
16        A.    Because they are in the
17   report.  Those are doctors that are in
18   the report, and I just wanted to give you
19   a broader concept.
20        Q.    Schedule 13, as amended, is
21   entitled "Data on Interpatient on
22   Variability Associated With Approved
23   Xarelto Indications."
24        A.    Right.

Page 135

1              MR. ZELLERS:  Can I have a
2    copy?
3              THE WITNESS:  You have
4    the -- you have the exhibit copy.
5    BY MR. ZELLERS
6        Q.    Doctor, can you -- and this
7    is Exhibit 7; is that correct?
8        A.    No -- yeah.  Exhibit 6, sir.
9        Q.    Exhibit 6.
10             Deposition Exhibit 6 is your
11   revised schedule relating to data on
12   interpatient variability associated with
13   approved Xarelto indications; is that
14   right?
15       A.    Yes.
16       Q.    Why did you include this
17   data?
18       A.    Because I just think -- I
19   mean, this is data -- again, this is
20   company data that should give us some
21   discussion.  If we wanted to look at the
22   range of either AUC, or C trough or -- or
23   CMAX in various patients, we could do
24   that.

Page 136

1        Q.    Schedule 13 is data that --
2    that you have reviewed and rely upon for
3    certain of the opinions that are
4    expressed in your report?
5        A.    I just -- I mean, I cite
6    Mueck for example.  I think he's in the
7    report.  And we -- I used certain numbers
8    of that.
9              Again, some of this is just
10   if we wanted to see what certain ranges
11   were.  It's just -- it's meant for more
12   edification.  I mean, I think it's fair
13   to say I rely on the total.
14             What -- for any paragraph,
15   what we should do -- I'm not sure I
16   relied on something called Schedule 13
17   for any one point.  I may rely on Mueck,
18   but then there's specific sites.  So
19   let's -- we'd have to go look
20   specifically at what I am asserting.
21       Q.    We should look at your
22   opinion and then look at the citations or
23   references that you give that support
24   that opinion, correct?

Page 137

1        A.    That's fair.  And, again, I
2    mean, I -- this is just meant if we want
3    to be able to talk about information.
4        Q.    What is your understanding
5    of Page 2 of Schedule 13?  And
6    specifically my question is, looking at
7    Figure 17, where did that come from and
8    what does it represent?
9        A.    So, again, it just show --
10   it's one example of predicted plasma
11   concentrations.  And this is in normal
12   and mild renally -- renally impaired and
13   over time.
14             So it gives you from zero to
15   24 hours, and it just gives you the range
16   of concentration.  It's just one example.
17       Q.    Is this data from a
18   particular study or studies?
19       A.    No.  It's -- it's
20   obviously -- we'd have to -- I'd have to
21   pull the -- I believe this is a
22   particular study, but I'd have to go back
23   and check the Bates numbers.  It's
24   company data.

35 (Pages 134 to 137)

Protected - Subject to Further Protective Review

Page 138

1      Q.   Do you know which study this
2  data relates to?  Again, I'm looking at
3  Figure 17 as part of your amended
4  Schedule 13.
5      A.   I believe it's ROCKET.  I'd
6  have to go back and check.
7      Q.   What is your purpose in
8  including Figure 17?
9      A.   Well, I mean, 17 is -- is
10  very similar to Mueck.  So go back and
11  look at Mueck for example.  Okay.  If you
12  go back to the -- I mean, the prior page,
13  let's take the third line.  So let's stay
14  with ROCKET.  Again, these are all
15  different -- slightly different datasets.
16          But in Mueck, you see, for
17  example, under stroke prevention of
18  patients with AF -- and this is for who
19  have a -- a creatinine clearance of
20  greater than 50.  You see it looks like a
21  C trough.  So you have a range from 12 to
22  137.  So you have about a tenfold
23  increase in variability.
24          And just so we have some

Page 139

1  sense of what that kind of variability
2  is.  That's all that is.
3      Q.   That is the reason that you
4  include Figure 17 as part of your amended
5  Schedule 13?
6      A.   It's just -- just to show
7  the -- the data on different
8  aspects of variability.  We can talk
9  about the coefficient of variation, stuff
10  like that, if you want to go into that on
11  this.
12      Q.   Any other reason that you
13  have included Figure 17?
14      A.   No, not at all.
15      Q.   Looking at the last page or
16  the third page of your amended
17  Schedule 13, Table 154, what does this
18  data represent?
19      A.   So this is data that
20  actually comes from -- I have it here,
21  let me give you the number.  Actually, is
22  this a number?
23          So this is Document Number
24  EDMS PSDB 10709985:2.0, and it's a

Page 140

1  pharmacodynamic analysis.
2          And this -- again, this --
3  this is one of many chart -- this is one
4  of many tables.  This table is just to
5  show the -- you know, the standard
6  deviation in PT measurements by quartile.
7      Q.   These data in Table 154,
8  where did they come from?
9      A.   Right here.
10      Q.   I understand that.
11          Do you know what study or
12  studies this came from?
13      A.   This is ROCKET.
14      Q.   Schedule 18 is titled
15  "Excerpts From FDA Reviews Concerning
16  Dose Selection and Time and Therapeutic
17  Range in ROCKET."
18      A.   Yes.
19      Q.   My understanding from your
20  earlier testimony is this is provided as
21  background factual information?
22      A.   Yeah.  I mean, again, it's
23  probably -- your -- we probably should --
24  if we're going to discuss this, I have

Page 141

1  the actual reviews in front of me.  It's
2  just background information, yes.
3      Q.   You are not offering an
4  opinion on dosing in this litigation,
5  correct?
6      A.   No.  No, that was not --
7  well, what was -- well, if you are going
8  to ask me a question about what the
9  medical reviewer thought about dosing, we
10  would turn to this.  But don't read this
11  as additional opinions.
12      Q.   You are similarly not
13  expressing an opinion with respect to
14  time and therapeutic range, correct?
15          MS. JEFFCOTT:  Objection to
16  form.
17          THE WITNESS:  That's --
18  that's correct.  I mean, other
19  than if you want to discuss it, we
20  can talk about it.
21          Mr. Horowitz will talk about
22  it with me, I'm sure.
23  BY MR. ZELLERS
24      Q.   You -- you have given us

36 (Pages 138 to 141)

Protected - Subject to Further Protective Review

Page 142

1    enough in your 83 pages of opinions to --
2    to talk to you about.
3        You are familiar with
4    warfarin; is that right?
5        A.   I am.
6        Q.   When was the last time you
7    reviewed the labeling for warfarin?
8        A.   Probably yesterday.  The
9    last time I reviewed -- I looked at it
10   yesterday.
11       Q.   You reviewed it in
12   preparation for your deposition today,
13   correct?
14       A.   I -- I looked at it, yes.  I
15   didn't look at it in a patient context
16   yesterday.
17       Q.   Prior to being retained in
18   this litigation, when was the last time
19   that you reviewed the labeling for
20   warfarin?
21       A.   I'd have to go back and
22   think about that.
23       Q.   Any estimate?
24       A.   No idea.

Page 143

1        Q.   When was the first time that
2    you reviewed the labeling for warfarin?
3        A.   Probably in medical school.
4        Q.   Would you agree that the
5    label for Xarelto contains more clinical
6    trial data than the label for warfarin?
7        MS. JEFFCOTT:  Objection to
8    form.
9        THE WITNESS:  Well, the
10   label comes out of a different
11   era, so -- and a different -- how
12   do I say this?  It comes out of a
13   very different era.  And
14   obviously -- so I mean, drug
15   companies want to be able to put
16   all their clinical trial data in.
17   They push to do that.
18       We can count up the clinical
19   trial pages.  I am sure you're
20   right that the sponsors wanted to
21   get their clinical trial data in
22   there.  There's probably more --
23   there's no doubt, I'm sure, that
24   there's more.

Page 144

1    BY MR. ZELLERS
2        Q.   Would you agree that there
3    is substantially more clinical trial data
4    for the label of Xarelto than the
5    labeling for warfarin?
6        MS. JEFFCOTT:  Objection to
7    form.
8        THE WITNESS:  Sure.
9    Because, again, the label comes
10   out of a different era, and
11   everyone pushes today to get their
12   clinical trials so they can make
13   claims on the basis of that
14   clinical trial data.
15   BY MR. ZELLERS
16       Q.   Do you know how many
17   patients were studied before warfarin was
18   approved by FDA?
19       A.   You're taking me back to
20   probably, you know, the decade that I was
21   born, right?  So you're dealing with the
22   '50s before the Kefauver-Harris
23   Amendments were enacted, if I'm correct,
24   right?  So you didn't have -- you didn't

Page 145

1    have effectiveness requirements.
2        If my memory serves me
3    right, approval date was what?  '50?  I'm
4    blocking.  So before there were clinical
5    trials required for drugs.
6        Q.   Can you answer that
7    question?  And if you can't or don't
8    know, that's fine.
9        Do you know how many
10   patients were studied before warfarin was
11   approved by FDA?
12       A.   I've read -- I've read
13   things about the history.  I don't have
14   it in my head.  I don't know the answer
15   to that.  But it would be a very small
16   number, I'm sure, compared to today's
17   standards, 70 years earlier.
18       Q.   Warfarin was approved
19   without a reversal agent, correct?
20       A.   Reversal agent came later,
21   yes.
22       Q.   Should FDA have --
23       A.   Well, I'm not even sure --
24   hold it.  You're asking me for

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1  information before Kefauver-Harris, which
2  is good.
3        So before the '62 amendment,
4  I'm not even sure we had, quote, approval
5  decisions as such.
6        Drugs were -- I've got to go
7  back whether there was an affirmative
8  signature or FDA could just reject the
9  drug, to even use the word "approval."
10  Do you have an approval letter
11  historically?  I mean, I'm not even
12  sure -- it's quite to say the drug was
13  approved if you go back to the '50s.
14  You're testing my history.
15        Q.   Today FDA makes a
16  determination that the drug is safe and
17  effective for use under the conditions
18  described in the label as part of the
19  approval process, correct?
20        MS. JEFFCOTT:  Objection to
21  form.
22        THE WITNESS:  That is the
23  standard by which FDA makes an
24  approval decision.  That's the

Page 147

1        standard, yes.  That's one of the
2        standards of CMC.  There's other
3        things.
4  BY MR. ZELLERS
5        Q.   You believe -- well, strike
6  that.
7        At some point did FDA
8  approval warfarin?
9        A.   We're going to have to go
10  back and look at the history because I
11  don't -- again, I gotta -- you're asking
12  me -- you're asking me about a pre-'62
13  drug.  So the -- pre-'62 FDA didn't have
14  to affirmatively approve drugs.  They
15  could stop drugs, right?
16        It was sort of -- it was
17  before thalidomide.  So, again, I'd have
18  to go back to the actual and see if we
19  can find an approval letter.
20        I mean, I think you would
21  probably think we approved -- FDA
22  approved it.  But, again, a pre-'62 drug
23  is sort of ancient.
24        Q.   Should FDA have approved or

Page 148

1  allowed warfarin to be on the market
2  without a reversal agent?
3        MS. JEFFCOTT:  Object to the
4  form of the question.
5        THE WITNESS:  Are you --
6  BY MR. ZELLERS
7        Q.   It's a question.
8        A.   No, I understand.  I mean,
9  we're not staying within the scope of my
10  report.
11        Q.   I'm asking you that
12  question.  Are you able to answer that
13  question?
14        A.   Yeah, I'm not going to give
15  you an opinion on that.  I think we're
16  going beyond the report so substantially.
17  I have not studied that and thought about
18  that in that -- in that kind of question.
19        Q.   Should --
20        A.   Other experts may be able to
21  tell you, put themselves back in 1950.
22  I'd want to study it.
23        Q.   Should FDA have approved or
24  allowed warfarin to remain on the market

Page 149

1  without a reliable way to monitor it?
2        MS. JEFFCOTT:  Objection to
3  form.
4        THE WITNESS:  Yeah, so I
5  do -- I do have strong opinions on
6  that question -- on that issue.
7        Do you understand?
8  BY MR. ZELLERS
9        Q.   I understand that you have
10  opinions, and I'll get to your --
11        A.   No, no, no.  But you're
12  asking my opinion --
13        Q.   I'm asking you --
14        A.   -- about warfarin and
15  whether it should be able to stay on the
16  market without monitoring.  That's your
17  question.
18        And my answer is the
19  following:
20        The standards that -- this
21  is going to take a little longer, bit of
22  an answer.  But I have to put it in
23  context, if you would just extend me that
24  courtesy.

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1      Drug development has changed
2  dramatic -- drug evaluation and review,
3  what FDA does, has changed dramatically
4  over the last 70 years.  So there is --
5  well, maybe in 1962 Congress wrote that
6  it was safe and effective.  And it's the
7  same standard in '62, even this is
8  pre-'62.  Let's assume this drug was
9  approved in '62.
10      The standards -- even under
11  that one same standard, the standards
12  that were used in 1962 are not
13  Kefauver-Harris Amendments, are certainly
14  far more rudimentary and do not afford
15  patients the degree of rigor that should
16  be afforded today, right?
17      So you can't -- I mean, your
18  question, I think, is flawed because
19  you're asking a question, at what point
20  in time, right?
21      So should FDA have allowed
22  the question -- the drug without
23  monitoring in 1962 with the state of
24  pharmacology in '62?  Or you're asking me

Page 151

1  should FDA allow warfarin without that
2  monitoring today?  So at what point in
3  time and in what context in the state of
4  pharmacology and the state of drug safety
5  and evaluation?
6      Certainly since 1979, the
7  regulations would be very clear.  Okay?
8  I mean, the regulation has been in place
9  that any test, laboratory test, that
10  could be helpful in following the
11  patients, or in evaluate -- at any risk
12  of adverse events must be put on the
13  label.  That's not discretionary.
14      So that would apply to
15  warfarin as of 1979.  That wasn't in
16  effect prior to that.
17      Q.   Today, when FDA approves a
18  new drug application, it means that
19  adequate tests by all methods reasonably
20  applicable have been done to demonstrate
21  that the drug is safe for its intended
22  use, correct?
23      MS. JEFFCOTT:  Objection to
24  form.

Page 152

1      THE WITNESS:  Yeah, you
2  know, maybe that's a quote of mine
3  that you're reading.  I think it's
4  adequate tests by all methods.
5      Just help me understand the
6  context of that.  Are we talking
7  about adequate directions for use?
8  Are we talking about how the drug
9  is going to be used?  Are we
10  talking about clinical trial
11  tests?  I just have to understand
12  the context of that quote.
13  BY MR. ZELLERS
14      Q.   With respect to labeling,
15  when FDA approves a new medication, at
16  that time, the FDA has made a
17  determination that the label is not false
18  or misleading in any particular, correct?
19      MS. JEFFCOTT:  Objection to
20  form.
21      THE WITNESS:  It depends
22  whether the company has been
23  straightforward with the agency.
24

Page 153

1  BY MR. ZELLERS
2      Q.   Based upon the information
3  that the FDA has at that time, its
4  approval of a medication is a finding by
5  the FDA that the label is not false or
6  misleading in any particular, correct?
7      MS. JEFFCOTT:  Objection to
8  form.
9      THE WITNESS:  No.
10  BY MR. ZELLERS
11      Q.   That's incorrect?
12      A.   No.  I mean, you have a
13  perfect example here.  It can't be,
14  right?  I mean, the company didn't follow
15  the regs.  FDA didn't invoke the regs --
16  the reg.  How could you say without the
17  regs being followed that the label is
18  adequate if the regs are not being
19  followed?  So, you know, companies mess
20  up.  FDA messes up.
21      You know, you have a perfect
22  example here where the reg couldn't be
23  clearer, and it's not in the label.
24      Q.   Do you agree that the

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1    regulations -- strike that.
2         Do you agree that pursuant
3    to the regulations, FDA may refuse to
4    approve an NDA if the proposed labeling
5    is false or misleading in any particular?
6         A.   That certainly is the case.
7         Q.   Do you agree that the
8    regulations provide that the FDA may
9    refuse to approve an NDA if the
10   investigations required under
11   Section 505(b) of the Federal Food, Drug
12   and Cosmetic Act do not include adequate
13   tests by all methods reasonably
14   applicable to show whether or not the
15   drug is safe for use under the conditions
16   prescribed, recommended or suggested in
17   the proposed labeling?
18        A.   Absolutely.  FDA -- as you
19   just read, FDA may do that.  And FDA
20   should do that.  But the question is does
21   FDA always catch stuff?
22        Q.   Do you agree that pursuant
23   to the regulations reports of adequate
24   and well-controlled investigations

Page 155

1    provide the primary basis for determining
2    whether there is substantial evidence to
3    support the claims of the effectiveness
4    for new drugs?
5         MS. JEFFCOTT:  Objection to
6    form.
7         THE WITNESS:  Why don't you
8    do me a -- why don't you do me a
9    favor and give me the actual
10   citations for the quotes of the
11   regs and the statute that you're
12   reading.
13   BY MR. ZELLERS
14        Q.   The one that I just read.
15   Do you agree with that?
16        A.   Yeah, I -- just -- just give
17   me -- just give me -- just give me the
18   citation.
19        Q.   The citation for -- that I
20   read is 21 C.F.R. Section 314.126 A.
21        A.   So, of course, I agree with
22   the regulation.
23        Q.   Do you agree that the moment
24   the FDA approves a new drug is the one

Page 156

1    moment the agency is in the best position
2    to be the exclusive arbiter of a drug's
3    safety and effectiveness?
4         MS. JEFFCOTT:  Objection to
5    form.
6         THE WITNESS:  Be careful
7    quoting me.
8    BY MR. ZELLERS
9         Q.   That's your quote, correct?
10        A.   Yes, in the context of
11   federal preemption, that was from an
12   article that Professor Vladeck and I
13   co-authored.  It -- it eventually got
14   cited by the Court in Wyeth.
15        The issue there was -- let's
16   just do it exactly.  The -- the -- I can
17   put it in context if we want to get into
18   federal preemption.  I wrote that.  Happy
19   to discuss preemption with you.
20        It's probably -- I mean, at
21   the time of approval, FDA probably knows
22   as much as it's going to know.  And it
23   was in context of preapproval and
24   postapproval, so I wrote that.  And I'm

Page 157

1    happy to talk about it in terms of
2    preemption.
3         Q.   Before warfarin was approved
4    and/or put on the market as a
5    pharmaceutical, what was its purpose, if
6    you know?
7         MS. JEFFCOTT:  Object to
8    form.
9         THE WITNESS:  Actually, it
10   was -- I don't want to be
11   theological.  But somebody put it
12   in -- mushrooms, I believe?  It
13   was -- it was found in plants.  So
14   whoever -- whatever theological or
15   evolutionary basis you believe in,
16   you would have to go ask that
17   higher power what their purpose
18   was, because it was naturally put
19   in product.
20   BY MR. ZELLERS
21        Q.   It then was found to be a
22   rat poison, right?
23        A.   1954, it was -- it was
24   approved as a rodenticide.  And then

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 158

1    very -- I think the same year, or
2    thereafter, it was viewed as having those
3    same biological properties. Again, many
4    drugs are both toxic and have benefits.
5         Q.    Scientists at a
6    pharmaceutical company were able to alter
7    the dosing and formulation so it could be
8    used as a medication?
9         A.    Again, with, I think what
10   one would say, sort of the ultimate
11   narrow therapeutic index, right?
12   Something that could be both rat poison
13   and can be a benefit to humans, where the
14   same mechanism of action, that same --
15   that same mechanism of action works both
16   as a rat poison and as a -- a human drug,
17   sort of the ultimate definition of an NTI
18   product.
19        Q.    For the next 50 years, there
20   were no oral alternatives to warfarin as
21   an anticoagulant, correct?
22        A.    That's correct.
23        Q.    Do you know how the initial
24   baseline dose for a warfarin patient is

Page 159

1    determined?
2         A.    I don't do it. I'd have to
3    go review it. I mean, I think it's in
4    the label.
5              I'm happy to look at a break
6    at the label and refresh the kind -- you
7    asked me about baseline specifically. I
8    can --
9         Q.    Let me ask you a new
10   question, Doctor.
11        A.    Sure.
12        Q.    Warfarin has individual
13   variability; is that right?
14        A.    Within a patient. Yeah --
15        Q.    Between patients?
16        A.    Interindividual or
17   intraindividual?
18        Q.    Well, my question went to
19   interindividual.
20        A.    Between individuals?
21        Q.    Yes.
22        A.    Yes.
23        Q.    If two patients take the
24   same dose of warfarin, one patient might

Page 160

1    be under-anticoagulated and another
2    patient might go over-anticoagulated,
3    correct?
4         A.    I'll let the hematologist
5    discuss that. I think that may be a
6    pretty simplistic way of viewing it, but,
7    yes.
8         Q.    The dose of warfarin needed
9    by each individual patient can depend on
10   a number of factors, correct?
11        A.    Sure.
12        Q.    Including a -- patient's
13   underlying genetic make-up, age, body
14   weight, other medications they are
15   taking, medical condition and
16   comorbidities, cytochrome P-450
17   differences, diet. All those can affect
18   the dose of warfarin that an individual
19   patient needs?
20        A.    And all -- all of which
21   became known over the last 70 years. I
22   mean, the pharmacogenetics took decades
23   to work out. I can assure you with the
24   NOACs that the pharmacogenetics, just as

Page 161

1    with warfarin, will be worked out. And
2    you -- and -- and our successors,
3    somebody will ask that question with
4    regard to somebody and say that, you
5    know, Dr. So-and-so don't you know that
6    the pharmacogenetics can affect a drug
7    like Xarelto?
8              We're not in that state of
9    knowledge, but I assure you that's going
10   to be the case.
11        Q.    Do you agree that warfarin
12   can be challenging for doctors and
13   patients to manage?
14        A.    Every -- I mean, any drug
15   that's both a rodenticide and a -- both a
16   rat poison and a human biologic, any drug
17   that's a narrow therapeutic index drug is
18   by definition challenging, right? It
19   only makes sense.
20        Q.    If a patient gets too much
21   warfarin, they can have an increased risk
22   of bleeding?
23        A.    Of course.
24        Q.    If a patient does not get

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1  enough warfarin, they are at an increased
2  risk of stroke?
3      A.   That could -- it could --
4  that could be the case, yes.
5      Q.   Patients on warfarin must be
6  regularly monitored by their doctors?
7      A.   Yes.
8      Q.   And frequently have their
9  dosage adjusted?
10     A.   Yes.
11     Q.   Because warfarin
12 anticoagulation can be affected by so
13 many factors, patients need to have their
14 blood drawn and tested regularly; is that
15 right?
16         MS. JEFFCOTT:  Object to
17     form.
18         THE WITNESS:  I think that's
19     a fair statement.  Again, the
20     hematologist can talk extensively
21     about that.  But happy to talk
22     about that, yes.
23 BY MR. ZELLERS
24     Q.   Is your understanding

Page 163

1  generally that there is a need to test
2  INR every one to four weeks?
3      A.   I think that would probably
4  be a standard, yes.
5      Q.   And every time a medication
6  is started, stopped, or taken
7  irregularly?
8      A.   Sure.
9      Q.   For patients with atrial
10 fibrillation, warfarin dosing needs to be
11 adjusted up or down to attempt to keep
12 patients INR in the range of 2 to 3.
13         Is that your understanding?
14     A.   Yes, sir.
15     Q.   Many patients have --
16     A.   Thanks for qualifying me as
17 a hematologist.
18     Q.   Many patients have a
19 difficult time keeping their INR in
20 range; is that right?
21     A.   Again, that's a subjective
22 state of mind.  Let -- let patients
23 discuss that.  I mean -- I mean, it
24 takes -- there's effort.  Nobody likes to

Page 164

1  do stuff, but, you know, these are potent
2  medicines.  So yes.  I mean, as -- as
3  with any -- with any drug that has a
4  narrow therapeutic index, it requires a
5  great deal of care.
6      Q.   Would you agree that even --
7      A.   But it's a drug that's
8  obviously had great -- it's played a
9  great role in American medicine.
10     Q.   Would you agree that even if
11 warfarin control is perfect, a patient
12 can have a stroke or serious hemorrhage?
13     A.   Absolutely.
14     Q.   Given this, do you
15 understand that doctors and patients were
16 eager and receptive for new
17 anticoagulants that were as effective as
18 warfarin but easier to manage?
19         MS. JEFFCOTT:  Objection to
20     form.
21         THE WITNESS:  Everybody --
22     everybody wants a magic bullet, of
23     course, you know.  The question is
24     can you deliver.

Page 165

1          MR. ZELLERS:  Let's take a
2      break.
3          THE VIDEOGRAPHER:  The time
4      is now 11:36.  We are going off
5      the record.
6          (Short break.)
7          THE VIDEOGRAPHER:  The time
8      is now 11:54.
9          We are back on the record.
10 BY MR. ZELLERS
11     Q.   Dr. Kessler, have you had an
12 opportunity to think about my Pradaxa
13 questions?
14     A.   Yes.
15     Q.   Can you tell me whether or
16 not you reviewed documents in the Pradaxa
17 litigation?
18     A.   So what I've been -- in
19 discussions with counsel, what I can say
20 is I prepared a draft report that wasn't
21 finalized.  And it was not a basis for
22 this litigation.
23     Q.   Did you use your report in
24 Pradaxa in some ways in terms of

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1  preparing your report in Xarelto?
2       A.   I've told you what I am
3  comfortable answering with regard to
4  Pradaxa.
5       Q.   Do you know what company
6  manufactures Pradaxa?
7       A.   BI.
8       Q.   Boehringer Ingelheim?
9       A.   Ingelheim.
10       Q.   Do you have Exhibit 1 in
11  front of you?
12       A.   I do.
13       Q.   Turn to Page 35,
14  Paragraph 88.
15       A.   Okay.
16       MS. JEFFCOTT:  What page was
17  that?
18       MR. ZELLERS:  Page 35.
19  Paragraph 88.
20       THE WITNESS:  Yes.
21  BY MR. ZELLERS
22       Q.   Do you have it in front of
23  you?
24       A.   I do.

Page 167

1       Q.   The reference to BI in
2  Paragraph 88 is to Boehringer Ingelheim,
3  correct?
4       A.   Please look at my errata
5  sheet.
6       Q.   You have corrected your
7  report?
8       A.   Yes.
9       Q.   In your original report that
10  was uncorrected, at least until we
11  started this deposition, you have a
12  reference to "BI's responsibility for the
13  safety of its product and the adequacy of
14  its warnings exist regardless of what the
15  FDA did, did not do, and/or required of
16  BI."
17       Do you see that language?
18       A.   A true statement.
19       Q.   Did that come from your
20  draft Pradaxa report or your final
21  Pradaxa report?
22       A.   There wasn't --
23       MS. JEFFCOTT:  Objection to
24  form.

Page 168

1       THE WITNESS:  There wasn't a
2  final Pradaxa report.  And that's
3  an error.
4       This is a true statement.
5  It's true for any pharmaceutical
6  company.  And, in essence, what I
7  can say is that if you go back,
8  Paragraph 88 has basically been in
9  virtually every report as applying
10  to pharmaceutical manufacturers.
11       There's an error there.
12  That's what I'm -- that's the
13  case.  It should read
14  pharmaceutical manufacturers or
15  responses in -- in this case.
16  BY MR. ZELLERS
17       Q.   Is it accurate to say that
18  this section of your report, Section 7,
19  which begins on Page 31 and continues
20  until the top of Page 35, that that is
21  standard set of opinions that you include
22  in many of the litigations in which you
23  are consulting on behalf of plaintiffs?
24       A.   It derived again from the

Page 169

1  work on -- I've published this stuff,
2  these principles are pretty much apple
3  pie and motherhood, and were adopted, I
4  guess -- basically, the Court adopted
5  this in Wyeth.
6       Q.   Going to my question though,
7  this section of your report is a general
8  opinion that you include in many of your
9  expert opinion reports, correct?
10       MS. JEFFCOTT:  Objection to
11  form.
12       THE WITNESS:  I think
13  that -- that would be correct.
14       MS. JEFFCOTT:  That's not
15  what he said.
16  BY MR. ZELLERS
17       Q.   You have amended or
18  corrected Paragraph 88 in your addendum
19  which we have marked as Exhibit 4; is
20  that right?
21       A.   That's correct.
22       Q.   Any other references in your
23  report to Pradaxa or to Boehringer
24  Ingelheim that were corrected?

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1      MS. JEFFCOTT: Objection to
2   form.
3      THE WITNESS: Yeah, I --
4   that's not related -- I mean,
5   again that applies to every
6   pharmaceutical company. Pradaxa
7   is an irrelevant for this -- this
8   matter.
9   BY MR. ZELLERS
10     Q.   I went one step beyond.
11  What I'm asking now, other than
12  Paragraph 88, which you have corrected on
13  your addendum or your errata, were there
14  any other references to Pradaxa or to
15  Boehringer Ingelheim in your report that
16  you've corrected?
17     A.   I -- I see no -- I see no
18  references.
19     MS. JEFFCOTT: Objection to
20  form. We've been through this in
21  terms of what he's corrected
22  and --
23     MR. ZELLERS: And I'm asking
24  now, Counsel, just if there are --

Page 171

1   is any other places where he's had
2   to make that type of --
3      MS. JEFFCOTT: You received
4   the errata sheet with the
5   corrections.
6      MR. ZELLERS: And I have not
7   had a chance to look at the errata
8   sheet. It's relatively long,
9   so --
10     THE WITNESS: I -- I
11  understand your -- I mean,
12  that's -- that was an error. I
13  don't -- I mean, there are other
14  errors, but not of that sort.
15  There are other citation errors.
16  BY MR. ZELLERS
17     Q.   You put forth a number of
18  opinions in your report relating to
19  laboratory tests and prothrombin time.
20  Specifically that laboratory tests should
21  be identified in the warnings and
22  precautions section. Serious bleeding is
23  an adverse event associated with the use
24  of Xarelto. There is variability in drug

Page 172

1   plasma concentration levels in patients
2   taking Xarelto. There is a relationship
3   between Xarelto to plasma concentration
4   levels and PT. And as of August 2011,
5   there is a relationship between
6   prothrombin time levels and risk of
7   bleeding.
8      All of those are your
9   opinions in this litigation, correct?
10     MS. JEFFCOTT: Object to
11  form.
12     THE WITNESS: So do me a
13  favor. Just give me -- and those
14  are all -- those are correctly --
15  I just want to -- can we look at
16  one --
17  BY MR. ZELLERS
18     Q.   So what I --
19     A.   No, no, no. Sorry. Just
20  show me that that -- you are reading a
21  composite of -- you have just read the
22  headings.
23     And I should -- and I just
24  want to clarify one of them, if I may,

Page 173

1   because I think hopefully these are
2   noncontroversial, right, and could be, I
3   would assume -- this is again -- you
4   know, this should not be --
5      Q.   Is there something that you
6   need to correct or amend?
7      A.   I think -- not correct, but
8   I think I need to clarify one thing that
9   you read.
10     Number 5 -- I'm sorry.
11  Number 6. I'm -- if you can just kindly
12  turn to my table of contents, because I
13  just want to make sure we're reading the
14  same thing in the table of contents. I
15  think you read basically Number 2 through
16  6 or close -- certainly 3 through 6; is
17  that correct?
18     Q.   I attempted to read 2, 3, 4,
19  5, 6, and then I believe you summarize
20  all these again in 7, 8, and 11.
21     But one of the opinions that
22  I did read to you, or at least referenced
23  was Number 6. "As of August 2011, there
24  is a relationship between prothrombin

Protected - Subject to Further Protective Review

Page 174

1    time levels and the risk of bleeding."
2        A.    Yeah.  So thanks for your
3    kindness there.
4            I want to put an asterisk
5    there and just a point of clarification,
6    because, again, this is a heading.
7            But what should be clear is
8    that is -- that's a true statement as it
9    relates to FDA's statement, because if
10   you look at the clinical pharm, that's
11   when I'm dating the August 11.
12           If, in fact, you look at
13   Bayer and Janssen documents, okay, if you
14   look at Bayer PH 35408, and if you look
15   at Janssen -- I think I mentioned before
16   EDMS PSDB 10709855:2.0, both -- one
17   document.  The first -- the former
18   document dated 6/12/2008, and the second
19   document dated December 15, 2010.
20           The sponsors had data.
21   Okay?  In both of those reports, one, if
22   you look at the tab, you can see -- you
23   know, you've got to -- you've got to dig
24   in those -- dig in those reports to find.

Page 175

1            But the company had data
2    earlier on.  And certainly if you go back
3    to 6/12/2008 with regard to Bayer, that
4    there was a relationship between Xarelto
5    and plasma concentration levels and
6    prothrombin time.
7            But you've got to go dig for
8    both of those.  It didn't -- it didn't
9    become apparent to FDA until August 2011.
10       Q.    Your testimony was a bit
11   different than the point I had understood
12   Section 6 was going to.
13           What you just testified to,
14   I believe, is that it was known to Bayer
15   as of June of 2008 and to Janssen as of
16   December of 2010 that there is a
17   relationship or correlation between
18   prothrombin time and Xarelto plasma
19   concentration.
20           Is that what you meant to
21   testify to?
22       A.    That's not exactly what I
23   think I said, nor would be accurate.
24           What I am saying is there is

Page 176

1    data that was available in Bayer's own
2    studies that when you look at it, both in
3    2008 and 2010, neither of which were
4    pointed out to FDA.
5            And, in fact, I would say,
6    if anything, if you read what was said,
7    the contrary impression was given as to
8    what kind of data is in both of these
9    studies.
10       Q.    What did the data in the
11   June 12, 2008, Bayer document state?
12       A.    Sure.
13       Q.    And if you could identify
14   the document.  I understand that you've
15   identified it by Bate number.  But if you
16   can tell us what the document is.
17       A.    Happy to -- happy to show
18   you.  So if you could turn to -- you
19   don't have it, but maybe others can pull
20   this up.
21           I am reading -- let's see if
22   there's a Bates number.  Yeah.  So I am
23   reading off XARELTO_BPAG_27674479 and
24   that's the first page.  And the title --

Page 177

1        Q.    Yes.  Please give --
2        A.    The title of the document is
3    "Integrated analysis of coagulation
4    parameters measured in subjects actively
5    treated with rivaroxaban based on pooled
6    analysis of data from the studies 11354,
7    11355, 11356, and 11357."
8            Those are the four ROCKET --
9    RECORD studies.  And let me answer your
10   question specifically.
11           Again, one footnote there.
12   We do have to be a little careful under
13   the use of RECORD, because we know that
14   the FDA had substantial concern on
15   RECORD4 on adverse reaction reporting.
16   But let's put that to the side.
17           What I'm specifically
18   referring to is if you turn to Table
19   14.4/10.3 -- let me see if I can give you
20   a Bates number -- yeah, if you -- and
21   it's XARELTO_BPAG_27674634.  This table
22   is basically -- these are pool quartiles
23   of PT Neoplastine Day 6 trough.
24           And what you see is that

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

1   there are four quartiles of PT. So the
2   patient who's -- this is trough. So the
3   first quartile divides patients up
4   between, I guess, 1 and a PT of 12.9.
5   That's Quartile 1.
6         And then you have Quartile
7   2, which is a PT of greater than 12.9 but
8   less than 13.6.
9         Third quartile is greater
10  than 13.6 to 14.71.
11        And the fourth quartile is
12  greater than 14.7 up to 36.4.
13        And you have, just for the
14  record, in the first quartile 1,235
15  patients. And the second quartile you
16  have 1,019. In the third quartile you
17  have 1,042. And in the fourth quartile
18  you have 1,077.
19        If you look across the
20  table, it goes through major bleeding, no
21  and yes. And you can't -- you really
22  can't do any analysis on major bleeding,
23  because you have very, very small
24  numbers. You have one major bleed in the

Page 179

1   first quartile, four in the second one
2   and the third, and four in the fourth.
3   So you can't do statistics on those small
4   numbers.
5         But if you look at
6   clinically relevant bleeding, what you
7   see is in the first quartile, you have 19
8   events over 13 point -- I'm sorry -- 19
9   over 1,235 patients. And compared to
10  Quartile 4, for clinically relevant, is
11  40 over 1,077. So you can do the
12  statistics and the odds ratios also.
13        But clinically relevant
14  Quartile 1, 19 over 1,235. Quartile 4,
15  the highest PTs, 40 over 1,077.
16        I get a med calc odds ratio
17  of 2.45 with a confidence interval of
18  1.42 to 4.29 for a P-value of P less than
19  .0013. So a highly statistically
20  significant difference. I mean, if
21  you're higher PT and odds ratio of 2.45,
22  that is statistically significant.
23        Q.   When --
24        A.   Can I -- can I just finish,

Page 180

1   please?
2         Q.   Sure.
3         A.   Right. So if you look at
4   this chart and you do the analysis, and
5   you aggregate Quartiles 1, 2, and 3
6   compared to Quartile 4 for clinically
7   relevant bleed, you get an odds ratio of
8   2.15, all right, with a confidence
9   interval of 1.43 to 3.24 and a P-value of
10  .0002.
11        Again, highly statistically
12  significant. That's what I'm saying -- so if
13  you're a higher PT quartile, you have a
14  twofold, right, increased risk of
15  bleeding that's statistically significant
16  according to this table.
17        Q.   If --
18        A.   Let me keep on going.
19  You've asked --
20        Q.   Well --
21        A.   I need to finish. I need to
22  finish what data you're asking.
23        Q.   No. My question to you,
24  Doctor, was, can you identify the

Page 181

1   document?
2         MS. JEFFCOTT:  You asked him
3     about the document. He's
4     describing --
5         MR. ZELLERS:  Okay.
6     Ms. Jeffcott, please. I asked him
7     a question. You can object to
8     form if need be. But we should
9     not be arguing.
10        THE WITNESS:  So let's go
11    back. Let me see what the
12    question you asked me.
13        That wasn't -- you asked
14    what the document is.
15  BY MR. ZELLERS:
16        Q.   Okay.
17        A.   So I think I can tell you
18  what the document is.
19        Q.   I now understand what the
20  document is.
21        A.   No, you don't. Let me --
22  let me -- let me tell you what the
23  document is. Okay?
24        Q.   Okay.

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1         MR. ZELLERS: Move to strike
2 as nonresponsive.
3 BY MR. ZELLERS:
4      Q.   If you need to finish your
5 answer, please finish it so I can ask you
6 another question.
7      A.   Sure.  Thanks.  Because
8 there's two sets of documents.  Okay?
9      Q.   I haven't asked you about
10 the second one yet, but I will.
11      A.   Okay.  That -- that's fine.
12 So let me just finish what the document
13 is, right, because, you know, again the
14 document is more than the Bates number.
15 I'm sure you want to know what the
16 document is.  Okay.  And -- and let me
17 just tell you what the document is.
18 Because -- let me just be again exact.
19         So for any bleeding, right,
20 as opposed to clinically relevant
21 bleeding, you have what the document is,
22 is Quartile 1 has 37 out of 1235 bleeds
23 versus Quartile 4 has 88 over 1077,
24 right?

Page 183

1         That is statistically
2 significant, right?  And with an odds
3 ratio of 2.88, a confidence interval of
4 1.94 to 4.27, and a P-value of .0001.
5 That is highly statistically significant
6 also.
7         You have similar
8 statistics -- if you'd like, but you may
9 not want me to do it.  But you may
10 want -- you may want to know what they
11 are for not only trough but for peak,
12 right?
13         So what you have -- what
14 this document shows is highly statistical
15 significant results that if patients
16 have -- high -- are in the highest
17 quartile, right, they have a twofold
18 increase of -- in this case, both
19 clinically relevant bleed or any bleeds
20 with a major bleeding being too small to
21 analyze.
22      Q.   Is -- is it your testimony
23 that is the data for both trough and
24 peak?

Page 184

1      A.   No.  So let me give you the
2 data for peak.
3      Q.   The data that you've given
4 me thus far has been for trough?
5      A.   Yeah.  Let me give you the
6 data for peak, if I may.
7         So if you turn to page -- to
8 Bates number XARELTO_BPAG_27674630, that
9 is data for peak.
10         And as I read that data for
11 clinically relevant in Quartile 1, it is
12 18 over 1090 -- 1081, and -- versus
13 Quartile 4, which is 37 over 1039.
14 Right.  So a Q4 -- Quartile 4 versus
15 Quartile 1, you have an odds ratio of 2
16 something.  I forget.  I don't have it
17 exactly marked, but a confidence interval
18 of 1.22 to 3.82.  And for any bleeds you
19 have 41 over 1068 and -- in Quartile 1,
20 and compared to those in Quartile 4, 87
21 over 989, and odds ratio of 2.29, and a
22 confidence interval of 1.57 to 3.35.
23         Again, no question,
24 statistically significant for peak here.

Page 185

1      Q.   Did you do the statistical
2 analysis that you've just given us?
3      A.   I -- I did not.  I mean, I
4 did the --
5      Q.   Who did the statistical
6 analysis?
7      A.   I -- I asked counsel do the
8 statistical analysis.
9      Q.   Counsel provided you with
10 the statistical analyses that you've
11 given to us relating to the June 2008
12 document, correct?
13      A.   Yeah.  I just -- I just
14 asked could counsel have it run.  Again,
15 it could be run.  When you look at the
16 data, it certainly looks statistically
17 significant.
18      Q.   The document that you
19 reference is not specifically identified
20 in your report or reliance list, correct?
21      A.   It's -- it's certainly
22 submitted as part of the NDA, unless
23 you're saying -- and so --
24         MR. HOROWITZ: I don't think

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 186

that was the question.
BY MR. ZELLERS
Q. Can you answer my question?
THE WITNESS: Your turn?
MR. HOROWITZ: Well, we're going to run out of time, Doc. And so we're going to have to go to court and ask for more time. I'm asking you to please answer his question --
THE WITNESS: I understand. It's part of the NDA, sir. That's on my list.
BY MR. ZELLERS
Q. My question was, was this document that you're referencing specifically identified in your report or reliance list?
MS. JEFFCOTT: Asked and answered.
THE WITNESS: It's -- it -- it's -- it's probably my document, my reliance list identified the NDA. This is one of the documents

Page 187

in the NDA.
BY MR. ZELLERS
Q. And -- and that's how it was identified, correct?
A. Yes.
Q. When did you become aware of the significance of this document in your review?
A. I saw this document days ago -- I saw this document a number of days ago. I was digging through the NDA.
Q. Did you understand when you saw this document some days ago that it would cause you to amend your opinion as stated in your report?
A. No.
MS. JEFFCOTT: Objection to form.
THE WITNESS: I -- I think it -- your words, amend my opinion. It is perfectly consistent with my -- my opinion.
What -- what is a little striking though, okay, that I did

Page 188

not see until yesterday, okay, but, again it's cited in my -- cited in my report, the documents, okay. Just let -- let me finish.
If you look at the sponsor's assertion in the ISS, right, basically the conclusion that is given to FDA is the data show that there was considerable overlap of prothrombin time values in subjects experiencing bleeding events compared with subjects who are not experiencing bleeding events. That was what was stated by the sponsor to FDA. And now I've seen that statement prior to the last couple of days.
When you -- when you compare that to what FDA wrote, FDA basically took that whole conclusion wholesale, some very -- variations, right, because it takes -- I mean other -- what I think is presentations that mask

Page 189

the data. FDA concludes there's no significant difference in PT values in subjects experiencing bleeding events compared with subjects who are not experiencing bleeding events, and yet, here in data that the company had available, there's clear evidence of a linear relationship.
BY MR. ZELLERS
Q. A linear relationship between what?
A. PT and bleeding. If you --
Q. The document that you're referring to is what? Just give me a Bates number or tell me -- just identify the document, please.
A. Well, I told you there were two documents that -- that have this.
So you -- so I told you that the -- well, let me actually give you more appropriate statistical terminology.
There is a statistically significant association between people

Protected - Subject to Further Protective Review

Page 190

1    who are -- have higher PT and bleed risk.
2    That's the more correct statistical
3    interpretation.  You see that in two
4    documents.
5          You see that in the Bayer
6    document, again, XARELTO_BPAG_27674479.
7    Let me just do that again to see if I'm
8    right.  XARELTO_BPAG_27674479.  This is
9    the four RECORD studies.  Okay?
10         But you also see that, if
11   you dig, it's here, and if you look in --
12   it's also here in another document.
13         Q.   Which document are you
14   referring to?  And by that, I'm asking
15   you to simply identify the December 2010
16   document.  What is the name of it?
17         A.   "Exploratory analyses" --
18   that's the -- the name of the -- it's
19   called "Pharmacodynamic Analysis" I
20   guess, is the name.  There's more.
21         "Exploratory analyses of
22   pharmacodynamic coagulation measurements
23   in subjects with nonvalvular atrial
24   fibrillation" -- "fibrillation treated

Page 191

1    with rivaroxaban for the prevention of
2    stroke and non central nervous system,
3    systemic embolism based on data from the
4    Study 39039039 AFL 3001.
5          Q.   We will mark as Deposition
6    Exhibit 8 the June 12, 2008, document
7    that you referenced.  We will mark as
8    Deposition Exhibit 9 the December 15,
9    2010, exploratory pharmacodynamic
10   analysis.
11         Looking at the Exhibit 9,
12   the December 15, 2010, exploratory
13   pharmacodynamic analysis.  That appears
14   to be a Janssen document, correct?
15         A.   Yes, sir.  Actually,
16   correct, it says Johnson & Johnson.
17         Q.   Your understanding is that's
18   a reference to Janssen in this
19   litigation?
20         A.   Sure.  I'm just being
21   accurate on what it's titled.
22         Q.   The analysis that's
23   contained in Exhibit 9, the December 15,
24   2010, relates to what data?

Page 192

1          A.   Could we just, so -- do you
2    want to put a sticker so I know which is
3    8 and which is 9.
4          Q.   And so our record is clear.
5    I'm marking your folder, which together
6    will be inclusive of Exhibit 8.  And
7    these are the June 2008 Bayer documents,
8    correct?
9          A.   Yes.
10         (Document marked for
11         identification as Exhibit
12         Kessler-8.)
13         (Document marked for
14         identification as Exhibit
15         Kessler-9.)
16   BY MR. ZELLERS
17         Q.   And I will hand you
18   Exhibit 9, which you -- oh, I'm sorry --
19   which you can put on the first page of
20   the exploratory pharmacodynamic analysis.
21         A.   Thank you.
22         Q.   Looking at Exhibit 9, those
23   data that are being analyzed are from
24   what study?

Page 193

1          A.   This is ROCKET, sir.
2          Q.   Your testimony is that data
3    within Exhibit 9 suggests a correlation
4    between prothrombin time and the risk of
5    bleeding?
6          MS. JEFFCOTT:  Object to
7    form.
8          THE WITNESS:  So I think --
9    so let's just not -- correlation
10   is a statistical term.
11         There is a highly
12   statistical association, I think
13   would be correct, if we can,
14   between bleeding risk and PT.
15   BY MR. ZELLERS
16         Q.   What page of the exploratory
17   analysis, Exhibit 9, are you referring
18   to?
19         A.   Well, actually, there are
20   several tables.  If you go to Xarelto --
21   I'll give you two.  XARELTO_BPAG_12242177
22   and XARELTO_BPAG_12242180.  One is
23   table -- this is in the -- these are
24   tables in the early 580s.

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

1          Q.   And for our record, it looks
2    like you're referring to the second page
3    of your large pad, which we have marked
4    as Exhibit 3, correct?
5          A.   Don't -- be a little careful
6    using Page 2, because Page 2 -- you're
7    right. It's right here. But it's also
8    Page 8.
9          Q.   It looks like you shuffled
10   our pages a bit.
11         A.   No. I think the pages were
12   always shuffled. There was preshuffling
13   prior to entering the room.
14         Q.   For the record, just so the
15   record is clear, we have separately
16   marked as Deposition Exhibits 8 and 9,
17   the 2008 and the 2010 documents that you
18   believe suggest a correlation between
19   prothrombin time and the risk of
20   bleeding, your --
21         A.   Just --
22         Q.   I'm ask -- let me finish my
23   question, and then you can respond.
24              The analysis that you have

Page 195

1    testified to, you have also separately
2    written out on Exhibit 3, the large pages
3    you have in front of you; is that
4    accurate?
5          A.   So a couple of things.
6    First of all, you again used the word
7    "correlation."
8          Q.   What word would you use
9    instead of --
10         A.   Association.
11         Q.   Association.
12         A.   Again, I'll let the
13   statisticians decide on correlation and
14   association. Okay?
15         Q.   And so we can just make sure
16   we're saying the same thing, to the
17   extent that either I or you have used a
18   word other than "association," what you
19   mean to state with respect to
20   Exhibit 9 -- strike that -- Exhibit 8 and
21   Exhibit 9 is that the 2008 and the 2010
22   documents suggest an association between
23   prothrombin time and the risk of
24   bleeding, correct?

Page 196

1          A.   In patients taking riva.
2          Q.   Yes.
3          A.   Yes, sir. And, again, to
4    make life easier -- and, again, I asked
5    that these be done. You may -- I don't
6    want to be suggestive, but you may --
7    rather than my sitting here and reading
8    all the statistical numbers, I asked
9    counsel to run -- I'd be happy -- I mean,
10   I have my -- my sort of calculations
11   here.
12              But just to make life
13   easier, you can see those are a number of
14   tables in the 580 runs, and others did
15   the statistical analysis, and you can
16   feel free to do the statistical analysis.
17         Q.   What I have marked as
18   Deposition Exhibit 10 are the four
19   pages -- well, let me withdraw that.
20              (Document marked for
21              identification as Exhibit
22              Kessler-10.)
23   BY MR. ZELLERS
24         Q.   Deposition Exhibit 10 are

Page 197

1    statistical analyses of data from the
2    exploratory pharmacodynamic analysis that
3    we've marked as Exhibit 9?
4          A.   From the pharmacodynamic
5    analysis. That's the key heading term.
6    There's a subtitle.
7              That includes both the table
8    data, right, and then the statistics are
9    in the beige.
10         Q.   The information from the
11   study report for Exhibit 9 is the
12   non-beige information that's contained on
13   the pages we've marked as Exhibit 10?
14         A.   Yes.
15         Q.   The statistical analyses
16   that are in beige for deposition
17   Exhibit 10 are statistical analyses that
18   were done by counsel, or on behalf of
19   counsel and provided to you?
20         A.   Yes. And, again, you can
21   feel free to do those. I mean, they
22   look -- I mean, to me, they look
23   statistically significant, but I wasn't
24   going -- to me, but I wasn't going to

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 198

1    rely on that. I wanted to be sure.
2        Q.   Did you request counsel to
3    do the statistical analyses that are on
4    Exhibit 10, or did counsel provide those
5    analyses to you?
6        A.   No.
7            MS. JEFFCOTT: Objection to
8        form.
9            THE WITNESS: That was
10       specifically done at my request.
11   BY MR. ZELLERS
12       Q.   When did you make that
13   request of counsel?
14       A.   A while -- I mean, more --
15   not this week, prior to this week.
16   Certainly I don't remember exactly. I
17   was reading -- well...
18       Q.   Are you able to estimate for
19   us when you made the request of counsel
20   to provide you with the statistical
21   analyses which have been marked as
22   Exhibit 10?
23       A.   Probably a couple of weeks
24   ago. I can't be exactly sure.

Page 199

1        Q.   Would that be the same for
2    Deposition Exhibit 8 and the statistical
3    analyses relating to the June 2008
4    documents?
5        A.   No. That was -- that was
6    after this. I'd be happy to tell you
7    how -- you know, why I got to this or how
8    I got to this. But you have to ask a
9    question.
10       Q.   Tell me how you got to this.
11       A.   So obviously my report says
12   there is a relationship between Xarelto
13   plasma -- actually concentration and
14   prothrombin. And then it says as of a
15   certain date, there was a relationship
16   between PT levels and the risk of
17   bleeding.
18           I have -- I was reading
19   depositions. And there was sort of -- I
20   don't know what the right way to say --
21   there was -- what -- the -- I guess the
22   way to say it was there was controversy
23   among -- when you read those between
24   lawyers or witnesses, something that

Page 200

1    is -- something that should be pretty
2    straightforward, that of course PT
3    predicts bleeding, and I guess the
4    question was did PT predict bleeding in
5    this particular drug.
6            I was reading the Homering
7    deposition and was reading along with
8    certain exhibits. And I found in that --
9    and those exhibits and that deposition
10   should be cited. I found -- I asked for
11   this document. I searched through all of
12   these tables. I did a search of this
13   document myself.
14       Q.   When you say "this
15   document," you're referring to Exhibit 9,
16   which is the exploratory pharmacodynamic
17   analysis, correct?
18       A.   The pharmacodynamic
19   analysis, the 2,700-page document. I
20   OCR'd it. I spent time searching this
21   document. I found Table 580, 583,
22   trough, postdose. The numbers when I
23   looked at them looked statistically
24   significant. And I asked counsel to run

Page 201

1    it, as I -- sorry.
2        Q.   Well, you did that when?
3        A.   Several weeks ago, I
4    believe.
5        Q.   You asked counsel to run a
6    statistical analyses?
7        A.   It looked statistically
8    significant, but I wanted to be sure.
9        Q.   Counsel did that?
10       A.   Yes. Had it done.
11       Q.   When did counsel provide you
12   with that document?
13       A.   Days ago. I don't remember
14   when.
15       Q.   Are you able to be more
16   specific than "days ago"?
17       A.   No. Not on that point, no.
18       Q.   With respect to Exhibit 8,
19   the June 2008 document, my understanding
20   is you became aware of those documents
21   when you read Mr. Homering's testimony?
22       A.   No. No.
23       Q.   Okay. When did you become
24   aware of the documents which we have

51 (Pages 198 to 201)

Protected - Subject to Further Protective Review

Page 202

1    marked as Exhibit 8?
2        A.   So when did I become aware
3    of the documents, which I marked as
4    Exhibit 8?
5            I did not -- I did not find
6    this document until searching yesterday
7    off the discovery database.
8            It's obviously part of the
9    NDA. But, you know, the way you've -- to
10   be honest, whoever supplied the NDA is
11   just the most obscene way. It's almost
12   impossible to search the NDA.
13           So I -- so in searching the
14   NDA, because this kind of analysis was
15   done for ROCKET, I was very interested in
16   whether it was done for RECORD.
17       Q.   Okay. You discovered
18   Deposition Exhibit 8 yesterday?
19       A.   No. No. This is a
20   deposition -- I believe this is a
21   deposition exhibit.
22       Q.   Okay. I misspoke. And I
23   apologize. You discovered -- well, this
24   Deposition Exhibit 8 --

Page 203

1        A.   I'm sorry.
2        Q.   We have enough trouble here,
3    Doctor. Let me ask a new question.
4            You discovered the documents
5    which we have marked as Deposition
6    Exhibit 8 yesterday.
7        A.   Well, this was all part of
8    the NDA which I'd had available. Okay.
9    I -- I did not see, right, this data
10   until yesterday, because the NDA is vast.
11       Q.   You requested then that a
12   statistical analyses be done?
13       A.   Yes.
14       Q.   Counsel was able to do that
15   and provide it to you between yesterday
16   and today?
17       A.   Actually, yesterday.
18       Q.   When did --
19       A.   Counsel is very talented
20   with a math --
21       Q.   When did --
22       A.   -- with a mathematical
23   background.
24       Q.   Are you done?

Page 204

1        A.   Yes.
2        Q.   When did you read
3    Mr. Homering's deposition?
4        A.   Weeks ago.
5        Q.   Do you know whether or not
6    the exhibit which we have marked as
7    Deposition Exhibit 8 was referred to in
8    Mr. Homering's deposition?
9        A.   I -- I -- no. I mean, I --
10   I am almost sure it's not -- and I just
11   want to be clear. I -- I am pretty sure
12   this was a deposition exhibit or -- or a
13   deposition exhibit led me to this actual
14   study. I'm pretty sure it was a
15   deposition, I'm -- I'm talking about 9.
16   But I'd have to double-check.
17       Q.   With respect to Exhibit 8,
18   you indicate that there are both trough
19   and peak rivaroxaban levels that are
20   included within the quartile analysis?
21       A.   Yes.
22       Q.   Would you agree that Xarelto
23   has a much shorter half-life than
24   warfarin?

Page 205

1        A.   I -- I wanted -- I think
2    that's -- I don't want to -- I want to
3    look that up exactly. So I don't -- I
4    don't want to give a judgment on much
5    without --
6        Q.   Do you know what the
7    half-life of Xarelto is?
8        A.   Depends on healthy or not
9    healthy. Five --
10       Q.   Let's start with healthy
11   individuals.
12       A.   Five -- five -- 5 to 9,
13   something like that.
14       Q.   Hours, correct?
15       A.   Yes.
16       Q.   In the elderly, what is your
17   understanding of the half-life of
18   Xarelto?
19       A.   It's right in the label.
20   Let's do it. It's 10 to 14. But let me
21   not do it from memory. Let's do it
22   exact. Exactly it's here.
23       Q.   Doctor, I'll accept 10 to
24   14 hours --

52 (Pages 202 to 205)

Protected - Subject to Further Protective Review

Page 206

1      A.   Let me just -- I just want
2  to be exact, sir.  That's what's in my
3  head, but I don't -- you know it probably
4  better than I do.
5      Q.   Which is why I'll accept 10
6  to 14 hours.  Okay.
7           Here is my question.
8      A.   Sure.
9      Q.   Would you agree that because
10 of the short half-life of Xarelto, that
11 any prothrombin time measurements are
12 very sensitive as to time?
13     A.   No.  Because if you look
14 at -- let me answer that question.
15          So that was a question that
16 the sponsor asked FDA.  Let me get you
17 that data.
18     Q.   As you're looking, let me
19 ask you --
20     A.   Just -- just give me one
21 second.  I need to be exact here.
22          So if -- if you look at
23 the -- that specific question or a
24 variant of that question was posed to the

Page 207

1  clinical pharmacology division, and the
2  clinical pharmacology division took --
3  looked at the sampling times and looked
4  at the impact of time sampling and -- and
5  found that it -- it -- it was not -- at
6  least in their question, that it was not
7  significant enough to introduce bias to
8  the evaluation.
9      Q.   Your testimony, based upon
10 what you were aware of, is that the
11 prothrombin time does not vary
12 significantly between the original dose
13 and just before the next dose?
14          MS. JEFFCOTT:  Objection to
15          form.
16          THE WITNESS:  No, that's --
17          that was not what I stated.
18 BY MR. ZELLERS
19     Q.   That's what I intended to
20 ask, which is why I wanted to clarify.
21 But go ahead.
22     A.   So as you know, evening
23 dose, next day patients come in.  So most
24 people are in a doctor's office some 12

Page 208

1  to 24 hours afterwards when those samples
2  are drawn, and what you see is FDA
3  basically concluded and did the analysis
4  in response to the specific sponsor's
5  request, that the difference in mean PT
6  between that period when samples were
7  drawn post dose was approximately
8  1.5 seconds.  And that is, if you look,
9  that's referenced in sponsor's report
10 AFL3001-sparse.pd.pdf, Page 78, Table 1,
11 which is not the -- "which is not
12 considered significant enough to
13 introduce bias into the evaluation."
14     Q.   Looking at Deposition
15 Exhibit 8, both trough and peak values
16 are reported, correct?
17     A.   Yes.
18     Q.   When were the trough values
19 taken for the patients in the analysis
20 you reviewed in Exhibit 8?
21     A.   So I have to go -- I'd have
22 to look -- I'm happy to look at that in
23 the study.
24     Q.   Well, my --

Page 209

1      A.   So the answer is, okay --
2  the -- understand that I'm happy to get
3  you that answer and supply that -- let me
4  just finish my answer.
5           Understand that Deposition
6  Exhibit 8 is the -- is a Bayer study that
7  integrates four different RECORD studies,
8  and --
9      Q.   And, Doctor, I do not want
10 you to take the time to go through the
11 study.  What I'm asking you is, if you
12 know, over what period of time were
13 trough samples taken, and -- and if you
14 don't know, that's fine.  We've marked
15 the exhibit and we can both go look for
16 it later on.
17     A.   Yeah, I'd want to look
18 exactly.
19     Q.   Let me then --
20     A.   I -- I don't see -- I don't
21 see the report, and I could be wrong,
22 defining trough in this analysis.  We'd
23 have to search for it.  I don't quickly
24 see it.

53 (Pages 206 to 209)

Protected - Subject to Further Protective Review

Page 210

1      Q.   Same -- same question with
2  respect to the peak quartile analysis.
3  Do you know over what period of time the
4  peak values were taken?
5      A.   I assume peak is probably 2
6  to 4, but we don't have document -- we
7  have to look at the documentation in this
8  report.
9          There is a statistical
10  plan -- I -- I just don't know without
11  checking.  We'd have to double-check
12  this.
13      Q.   Would you agree that there
14  can be variation in prothrombin time over
15  a 2 to 4-hour period both at peak and at
16  trough?
17          MS. JEFFCOTT:  Objection to
18      form.
19          THE WITNESS:  Well, there
20      always can be variation.  The
21      question is, is it significant
22      variation.  And --
23  BY MR. ZELLERS
24      Q.   Let me ask this question.

Page 211

1  If you have two patients with the exact
2  same concentration over time, one
3  patient's reading is taken at hour 20.
4  And another patient's concentration is
5  taken at hour 28.
6          Would it appear, looking at
7  those two readings of patients who have
8  exactly the same concentration, that they
9  had different troughs?
10          MS. JEFFCOTT:  Objection to
11      form.
12          THE WITNESS:  There
13      certainly could be differences,
14      but, again the question would be,
15      would those be significant.
16          But the important point here
17      is you can -- I mean, choose --
18      in -- in Deposition Exhibit 8,
19      choose peak, choose trough.
20          You have an increased
21      bleeding risk associated with Q4,
22      Quartile 4, compared to
23      Quartile 1, both for peak and for
24      trough.

Page 212

1          So you're -- I'm not
2  comparing peak against trough,
3  right?  We're comparing peak
4  against peak as reported by the
5  company, right, and trough against
6  trough by the company, right?  I
7  mean, so -- so we're not
8  dealing -- we're dealing with
9  apples and apples.  Both in
10  Exhibit 8, right, show statistical
11  significance.
12  BY MR. ZELLERS
13      Q.   For the statistical analyses
14  of the data, both in Exhibit 8 and in
15  Exhibit 9, would you defer to a
16  statistician?
17      A.   I'm a professor of
18  biostatistics.  I think it's -- I always
19  like -- I mean, I look at the data, and I
20  looked at it until it was -- I mean, it
21  was statistically significant in my head.
22  I don't want to rely on my head.  So I'm
23  not going to defer, but I'm going to
24  use as -- let's -- let's agree -- I mean,

Page 213

1  I would always want a statistician to
2  support what I am saying, but I'm not
3  going to defer.
4      Q.   Same question --
5          MS. JEFFCOTT:  If we can get
6      a break soon for lunch soon --
7      whenever.  I don't mean to
8      interrupt your flow.  Kind of on
9      the horizon.
10          MR. ZELLERS:  Let me finish
11      up these documents and then we
12      can -- or at least try to go a
13      little further with these
14      documents so I can understand what
15      the doctor did.
16  BY MR. ZELLERS
17      Q.   With respect to the
18  pharmacokinetic/pharmacodynamic analyses
19  of Exhibit 8 and Exhibit 9, would you
20  defer to a clinical pharmacologist?
21      A.   Absolutely not.  I'll defer
22  to myself.  I mean, certainly as --
23  let -- let me -- let me expand on that
24  answer.

54 (Pages 210 to 213)

Protected - Subject to Further Protective Review

Page 214

1        My report, understand, is --
2   it couldn't be clearer, and it says that
3   there is an association between PT and
4   bleeding or -- in the context of Xarelto.
5        Not something that should be
6   controversial.  All right.  FDA has said
7   that.
8        This -- so all this that
9   we've talked about just squarely supports
10  the opinions in my report.  I mean,
11  they -- they only support that.
12       To the extent that -- that
13  somebody wants to say that PT is not
14  related to bleeding and contradict the
15  FDA, all right, then this is further
16  support for that opinion in the report.
17  Q.   The FDA had all of the
18  information and data in Exhibit 8 as of
19  2008, correct?
20  A.   Had is a -- I think is a --
21  so let me answer to that question.
22       So I wanted to know that.
23       So, you know, you do see in
24  this -- here is all of these tables.  And

Page 215

1   here's all -- this is in --
2   Q.   Well, let's stick with 2008
3   just for right now.
4   A.   Right.  But so what's
5   striking, is it's in the NDA.  I have no
6   reason to believe it.  If it's on my
7   reliance list, it should be on the NDA.
8   I mean, this plus millions of other pages
9   were given to the FDA.
10       But in the clinical -- in
11  the key document that Bayer -- that the
12  sponsors provided, the integrated -- the
13  ISS where this stuff gets summarized,
14  right, it's not highlighted.  It's not
15  talked about.  In fact, the statement
16  just completely sort of contradicts or
17  masks what these findings have talked
18  about.
19       And what's striking to me is
20  that FDA buys wholesale, right, without
21  looking at this -- I mean, we don't -- I
22  mean, FDA didn't see this.  I mean,
23  there's no way, because FDA is basically
24  copying what the sponsor put in that ISS,

Page 216

1   and the ISS doesn't make any mention of
2   this.
3        So the answer, did the
4   reviewer have it?  You'd have to go ask
5   the -- but I can tell you that an FDA
6   reviewer looking at those tables now, if
7   I were that FDA reviewer and I look at
8   what I wrote -- I'm the FDA medical
9   reviewer, and I'm copying what the
10  sponsor says, I mean, that FDA reviewer
11  might -- you know, would be -- my sense
12  is highly embarrassed.
13       I mean, the only logical
14  answer is, no, they didn't have it.  Yes,
15  it's in that massive millions of pages.
16  But they would have never written what
17  they wrote in the light of that
18  statistically significant information.
19  Q.   Okay.  I need to ask you a
20  couple of questions so we can all go to
21  lunch.
22  A.   Great.
23  Q.   The information in
24  Deposition Exhibit 8 was part of the NDA

Page 217

1   that was made available to the FDA,
2   correct?
3   A.   Along with millions of other
4   pages.
5   Q.   The exploratory
6   pharmacodynamic analysis was provided to
7   the FDA as of December 2010, correct?
8   A.   This -- this, this along
9   with millions of other pages.  Yes.
10  Q.   Are you aware that there was
11  extensive back and forth between the FDA
12  and the sponsors relating to whether or
13  not the RECORD study data showed an
14  association between prothrombin time and
15  bleeding?
16  A.   Yes.  And the sponsor misled
17  FDA in that analysis.  I have that -- I
18  have the request for information.  And
19  when you look at those requests for
20  information, and you look at the
21  sponsors' answers, you see that at the
22  very best, the sponsor certainly didn't
23  talk, I mean, in -- about this data, did
24  not highlight this data, did not mention

55 (Pages 214 to 217)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 218

1    this data, but mentioned the exact
2    opposite than this data shows.
3            And let me -- let's just
4    make sure that I'm giving you --
5        Q.   Doctor, my question was
6    really a yes or no question.
7        A.   Yes, but let me just give
8    you the citation.  Well, I'll let you do
9    what you want.
10           But the citation to that, if
11   you look at that back and forth.
12   XARELTO_BHCP_0015521.  And if you look at
13   what the sponsor said, right, it is,
14   "Furthermore, the analysis" -- talking
15   about RECORD studies -- "also do not
16   indicate that subjects with bleeding
17   events exhibited higher PT values than
18   subjects without bleeding events."  And
19   yet there is no mention of the findings
20   that the company had that were
21   statistically significant that were
22   submitted in this back and forth, let
23   alone in the ISS, which is the document
24   that the company submits, that the

Page 219

1    reviewers look at.
2        Q.   Other than Deposition
3    Exhibit 8 being part of the NDA that was
4    submitted to the FDA, you do not include
5    any of the statistical analyses or
6    discussion of Exhibit 8 in your report,
7    correct?
8            MS. JEFFCOTT:  Objection to
9    form.
10           THE WITNESS:  I give the
11   major conclusion that there is an
12   association between PT and
13   bleeding in my report.
14   BY MR. ZELLERS
15       Q.   That wasn't my --
16       A.   This just supports that.
17       Q.   Okay.  That wasn't my
18   question.  Other than generally
19   referencing the NDA, you do not discuss
20   or cite to Deposition Exhibit 8 in your
21   report, correct?
22           MS. JEFFCOTT:  Objection to
23   form.
24           THE WITNESS:  Of course I

Page 220

1    cite --
2    BY MR. ZELLERS
3        Q.   Where do you cite?
4        A.   -- to the NDA.
5        Q.   I said other than the cite
6    to the general NDA, is there any cite or
7    discussion in your report to Deposition
8    Exhibit 8?
9        A.   No.  No.  You've asked me
10   about Deposition Exhibit 8 today.  And
11   I'm giving you this in my testimony in
12   response to your questions.
13       Q.   Same question with respect
14   to Deposition Exhibit 9.
15           Other than generally citing
16   to the NDA, is there any specific
17   discussion or reference to Deposition
18   Exhibit 9 in your report?
19       A.   In the reliance, my guess is
20   you'll see that it is an exhibit in
21   depositions.
22       Q.   Is there any discussion of
23   it as it relates to the findings and the
24   statistical analyses that you've given us

Page 221

1    which we've marked as Exhibit 10?
2        A.   The exact same statement
3    that there's an association between
4    bleeding and PT is the basis of my
5    report.  This is further -- this is
6    further support for that position.
7        Q.   Doctor, I'm not arguing with
8    you.  I'm just trying to, you know, pin
9    down the facts.
10           Deposition Exhibit 10, the
11   statistical analyses, that's new
12   information that you're providing us
13   today, correct?
14       A.   That is information that I
15   brought with me so that I could answer
16   your questions thoughtfully today.  You
17   asked me questions, and I wanted to be
18   able to have those answers, and that's
19   why I have those.
20           MR. ZELLERS:  Let's take a
21   break for lunch.  We're off the
22   record.
23           THE VIDEOGRAPHER:  The time
24   is now 12:58.  Going off the

56 (Pages 218 to 221)

Protected - Subject to Further Protective Review

Page 222

1    record.
2        (Lunch break.)
3        THE VIDEOGRAPHER:  The time
4    is now 1:50.  We are back on the
5    record.
6    BY MR. ZELLERS
7        Q.   Ready to resume?
8        A.   Yes, sir.
9        Q.   Take a look at your report
10   on Page 9, Paragraphs 15 and 18.
11       A.   Yes.
12       Q.   You give the opinion in
13   Paragraph 15 that any laboratory test
14   that is helpful in identifying patients
15   at risk for serious adverse events.  And
16   then in Paragraph 18 you refer to any
17   laboratory test that could be helpful in
18   identifying patients at increased risk of
19   bleeding.
20       A.   Yes.
21       Q.   Do you mean to reference
22   laboratory tests that are helpful or that
23   could be helpful?
24       MS. JEFFCOTT:  Objection to

Page 223

1    form.
2        THE WITNESS:  So -- so
3        the -- I mean -- I -- I think the
4        answer is both.  Because if you go
5        back to the -- the really
6        determining paragraph is the prior
7        paragraph in 14.  This is right
8        out of the reg.  And, you know, it
9        doesn't use either word, as you
10       see there.
11   BY MR. ZELLERS
12       Q.   It does state, and I'm
13   looking at Paragraph 14 and the reg that
14   you're citing, "Identify any laboratory
15   test helpful."
16       That appears to mean that
17   it's a lab test that is helpful as
18   opposed to one that could be helpful.
19       A.   I appreciate your statutory
20   or regulatory construction.  I am not
21   sure that I would agree with that.  In
22   fact, I -- to put --
23       Q.   All I need to know --
24       MS. JEFFCOTT:  Let him

Page 224

1        finish.
2    BY MR. ZELLERS
3        Q.   And, Doctor, I don't mean to
4    interrupt you --
5        A.   Please.
6        Q.   -- I'm just trying to push
7    you along.
8        A.   I understand.
9        Q.   Paragraphs 15 and 18, as I
10   understand your testimony, you mean both
11   phrases -- you mean to refer to any
12   laboratory test that is helpful, and you
13   also mean to refer to any laboratory test
14   that could be helpful.
15       A.   I think that would be fair.
16       Q.   Are you offering the opinion
17   that prothrombin time is a reliable assay
18   to measure the anticoagulation effect or
19   concentration of Xarelto?
20       A.   Not in exactly those words.
21   I don't believe I have stated it in those
22   words.
23       Q.   Tell me then what opinion
24   you are offering with respect to

Page 225

1    prothrombin time and whether or not it is
2    a reliable assay to measure the
3    anticoagulation effect or concentration
4    of Xarelto.
5        A.   So I -- I think ROCKET shows
6    it's a reliable assay to measure bleeding
7    risk in patients taking Xarelto.
8        So I think that is what
9    the -- the data show.  And I would
10   limit -- I mean, that's -- that's my
11   opinion.
12       Q.   You are not able to answer
13   the question as I phrased it.  You
14   instead believe you need to answer it the
15   way you did.  Is that accurate?
16       MS. JEFFCOTT:  Objection to
17   form.
18       THE WITNESS:  No, you asked
19   me, tell me what opinion you are
20   offering with regard -- with
21   respect to prothrombin time and
22   whether or not is it reliable to
23   measure anticoagulation effect,
24   right, or concentration of

57 (Pages 222 to 225)

Protected - Subject to Further Protective Review

Page 226

1    Xarelto.
2        As I read the data, okay, I
3    believe that pioplastine, done by
4    the Neoplastine assay, is helpful
5    and reliable in measuring bleeding
6    risk of patients.  And that
7    it's -- it's -- it's certainly
8    reliable.  It's statistically
9    significant.  Right.  It shows
10   above a certain level, you get
11   either -- you know, above with a
12   PT fourth quartile, you could
13   have 2 percent, two times is
14   likely to be a major bleed in the
15   fourth quartile.  That's what I
16   believe the data show.
17   BY MR. ZELLERS
18       Q.   That is based upon Exhibit 8
19   and your review of the pooled RECORD
20   data, correct?
21       A.   No.  So I just gave you the
22   data based on ROCKET which is Exhibit 9.
23   Right.  So what we know is in ROCKET, if
24   you look at Table 583, you see that there

Page 227

1    is an odds ratio of, I don't know,
2    depending on whether you do first against
3    second, first against fourth quarter,
4    first versus -- versus three.  Somewhere
5    between the two and threefold increase.
6    Certainly that's based on ROCKET.
7        That statistical
8    significance is also shown again in
9    ROCKET.  I mean, if you look at FDA and
10   you look at the report --
11       Q.   Doctor, I want you to
12   complete your answer, but I don't need to
13   repeat what we've already covered earlier
14   today.
15       A.   We didn't cover this.  Let
16   me -- let me just -- you're asking me
17   what I am basing that on --
18       Q.   That really wasn't my
19   question.  My question was, are you able
20   to say whether or not prothrombin time is
21   a reliable assay to measure the
22   anticoagulation effect or concentration
23   of Xarelto?
24       A.   No.  And -- and -- and I

Page 228

1    am -- specifically my opinion, which I've
2    stated, right, and I'll repeat again is
3    that it is helpful in assessing the risk
4    of bleeding for Xarelto.
5        Others can comment about
6    other kinds of -- whether the
7    relationship with other things.  My
8    opinion, it's helpful in assessing risk
9    of bleeding based on the data.
10       Q.   Is --
11       A.   And -- and -- and let me
12   finish this statement, because I didn't
13   say this this morning.
14       And, furthermore, if you
15   look at FDA's analysis which I cite in
16   Paragraph 31.  It's further supported not
17   just by -- I just want to make sure -- by
18   Exhibit 9.  But if you look at a logistic
19   regression, and you look at the error
20   bars and confidence -- you look at the
21   confidence interval, sorry, you see that
22   there's not an overlap with that fourth
23   quartile indicating that that's
24   statistically significant.

Page 229

1        Q.   Based upon your review of
2    the data, is there a close to linear
3    correlation between prothrombin time and
4    Xarelto concentration?
5        A.   Between PT and Xarelto
6    concentration.  Yes, I mean, I think
7    that -- I think FDA has found that to be
8    the case.  And if you look at Item B
9    of -- of Paragraph 24, you see the
10   prothrombin time versus rivaroxaban
11   plasma concentration.  And it says linear
12   is -- I can see a graph can be.
13       Q.   Did the medical reviewers in
14   analyzing the ROCKET study data do a
15   prothrombin time quartile analysis?
16       A.   So the clinical
17   pharmacologist, if I'm correct, did a
18   quartile analysis.
19       Q.   What is your understanding
20   of what that quartile analysis showed for
21   the ROCKET study data?  And by "quartile
22   analysis," I'm refer -- referring to
23   prothrombin time.
24       A.   Well, certainly pro -- they

58 (Pages 226 to 229)

Protected - Subject to Further Protective Review

Page 230

1  did an analysis.  The clinical pharm
2  folks looked at quartiles of prothrombin
3  time against major bleeds, and that's in
4  Figure 4, cited in Paragraph 31, and
5  those are divided -- as I understand it,
6  those confidence intervals are the
7  different quartiles, and the logistic
8  regression.
9      Q.   Are there any other quartile
10  analyses that you're aware of that the
11  medical reviewers did with respect to the
12  ROCKET data?
13      A.   I think that at the time --
14  if -- I have to go back and check.  I'm
15  pretty sure in my review, it's here, of
16  the medical reviewers, is that they cite
17  the clinical pharm.  But I think it
18  originated, I think it originated in the
19  clinical pharm review.
20      Q.   What is your recollection of
21  what the quartile analysis of prothrombin
22  time of the ROCKET study data showed with
23  respect to major bleeding?
24      A.   So if you turn, please, to

Page 231

1  Paragraph 31.
2      Q.   This is of your report?
3      A.   Please.  So you see the four
4  quartiles there, on the confidence
5  intervals -- with the confidence --
6  confidence intervals.  And I've
7  actually -- if you draw the line, if you
8  look at the fourth quartile and draw the
9  line across, you'll see that there's not
10  an overlap between the fourth quartile
11  and the earlier quartile.
12      Q.   You are aware that in the
13  medical review there's Table 6, which is
14  an analysis of major bleeding type versus
15  prothrombin time?
16      A.   First of all, which
17  medical -- there's multiple medical
18  reviews that were done.  So could you --
19  if you just hand me which medical review.
20  There's a medical review done for hip.
21  There was a medical review done for Afib.
22  I have both of them here.  There's
23  multiple medical reviews.
24      Q.   I thought we were talking

Page 232

1  about ROCKET study data.  Is that your
2  understanding of what we have been
3  talking about?
4      A.   Well, you said medical
5  review.  There's not a -- there's a
6  medical review for the NDA of which
7  ROCKET would be the Afib, right?
8      Q.   Okay.  I'm asking you about
9  the ROCKET study data, which is Exhibit 9
10  and it's also the data that you're
11  referring to in Paragraph 31, right?
12      A.   Exhibit 9 is not all -- is
13  the pharmacodynamic analysis of ROCKET.
14      Q.   Exhibit -- strike that.
15       Paragraph 31 in your report
16  is ROCKET study data; is that right?
17      A.   It's the logistic regression
18  done by FDA that's done slightly
19  differently, as I understand it.  FDA's
20  analysis, they did their analysis to
21  time -- they were looking at a PT that
22  was nearest the bleed time.  So it varies
23  a little.
24      Q.   And I'd like to show you the

Page 233

1  medical review I want to ask you a
2  question about.
3      A.   Sure.  I'm happy to look at
4  that.
5       (Document marked for
6       identification as Exhibit
7       Kessler-11.)
8  BY MR. ZELLERS
9      Q.   I'm handing you what we'll
10  mark as Deposition Exhibit 11.  It is the
11  medical review for the ROCKET study.
12      A.   Now, there's no such thing
13  as a medical review for a ROCKET study.
14  It shouldn't be there.  It should be --
15  there's a medical review for an NDA, of
16  which ROCKET can be one study.  But
17  there's no such thing as a medical review
18  for ROCKET.
19      Q.   Thank you.  I'll be more
20  precise.
21       Exhibit 11 is the medical
22  review for the atrial fibrillation
23  indication of submission.
24      A.   You're speaking my language.

59 (Pages 230 to 233)

Protected - Subject to Further Protective Review

Page 234

1  Thank you.
2      Q.   So on the same page?
3      A.   We're in good shape here.
4      Q.   So handing you what has been
5  marked as Deposition Exhibit 11.  If
6  you'll turn to Page 41.
7      A.   Right.  Yes.
8      Q.   Looking first at the bottom
9  figure, Figure 10.
10      A.   Hold on.  Let me get my
11  medical reviewer -- I just want to see if
12  I have -- just give me a second.  I will
13  work off yours.  I don't want to delay
14  you.  Yes.
15      Q.   Are you on Page 41?
16      A.   Yes.
17      Q.   Do you see Figure 10?
18      A.   Yes.
19      Q.   Figure 10 is a figure
20  created by the clinical pharmacologist at
21  the FDA based on the ROCKET study data,
22  correct?
23      A.   Let me just see.  Yes,
24  it's -- yes.  I believe it's from the

Page 235

1  clinical pharm, even though it's in the
2  medical reviewer, yes.
3      Q.   Figure 10 shows that aspirin
4  use is a significant confounder in
5  interpreting the prothrombin time as it
6  relates to major bleeding, correct?
7      A.   Actually not.  Janssen
8  raised that question specifically and
9  asked that question to the clinical
10  pharmacologist.
11          And, again, if you look at
12  the response to FDA that aspirin was
13  not -- it was .0 -- 0.06, but it was not
14  statistically significant as a covariate.
15      Q.   Is aspirin a confounder with
16  respect to an analysis of prothrombin
17  time and major bleeding in the ROCKET
18  study?
19      A.   It was -- it was viewed --
20  it was calculated not to be statistically
21  significant.  That was a specific
22  question that Janssen raised with FDA.
23          FDA did view it, took it --
24  you know, assumed that it was a

Page 236

1  covariate.  But it was found not to be
2  significant.
3          And it says, basically --
4  let me just read you the answer to your
5  question.
6          The parameter of PT by
7  aspirin use interaction was of marginal
8  significance, was the FDA view of it.
9      Q.   Figure 10 is a diagram of
10  prothrombin time and percent with major
11  bleeding for both rivaroxaban patients
12  that are taking aspirin and for
13  rivaroxaban patients that are not taking
14  aspirin, correct?
15      A.   Yes.
16      Q.   The gray line to the bottom,
17  the dotted line, are the prothrombin
18  times without aspirin use?
19      A.   Right.
20      Q.   The blue line at the top are
21  with aspirin use; is that right?
22      A.   That's what the graph shows.
23      Q.   Looking above at Table 6, is
24  this a quartile analysis of the ROCKET

Page 237

1  study data for major bleeding broken up
2  by quartiles of prothrombin time?
3      A.   Yes, it is.
4      Q.   This is a similar analysis
5  to the pooled analysis in the RECORD
6  study that you looked at earlier,
7  correct?
8      A.   Well, it is a quartile
9  analysis.
10      Q.   It's a quartile analysis
11  based on prothrombin time for patients
12  with major bleeding, correct?
13      A.   That's correct.
14      Q.   If we look at the quartile
15  analysis for critical organ bleeding,
16  there does not appear to be a
17  relationship based on the ROCKET study
18  data of critical organ bleeding by
19  prothrombin time quartile.  Do you agree?
20      A.   I don't see the statistics
21  on that.
22          FDA did conclude that there
23  was a -- they used the word
24  "correlation."  So you haven't given me

60 (Pages 234 to 237)

Protected - Subject to Further Protective Review

Page 238

1    the statistics here. So I don't want
2    to -- without that I'm not going to make
3    any judgments.
4        Q.   If you look at -- do you see
5    the column for critical organ bleed?
6        A.   I do see that.
7        Q.   Do you see the event rates
8    broken down by quartile of prothrombin
9    time?
10       A.   I do.
11       Q.   There does not appear to be
12   a trend toward increasing events by
13   quartile. Would you agree?
14       A.   I mean, if you -- if you
15   cherry-pick the data that way, sure.
16       Q.   Let's look at one other
17   column then.
18           Let's look at the bleed
19   result in death. We have a similar
20   finding where the event rate does not
21   increase based upon prothrombin time
22   quartile, correct?
23       A.   That's -- that's correct.
24   But, again, you're cherry-picking certain

Page 239

1    secondary endpoints, and major bleeding
2    events, right, I mean, did increase. So
3    just be careful.
4        Q.   The FDA concludes just above
5    Table 6, "It is reassuring that for the
6    overall population there does not appear
7    to be a shift from lesser severities
8    of" -- is that ISTH? -- "major bleeding,
9    i.e., hemoglobin drops and transfusions,
10   to the more severe forms, i.e., critical
11   organ bleeding and fatal bleeding as a
12   function of PT prolongation with
13   rivaroxaban, as could be seen in the FDA
14   analysis in Table 6."
15           Did I read that correctly?
16       A.   You read that correctly.
17   You read that exactly correctly. Hold on
18   one second.
19       Q.   I don't have another
20   question pending. Can I ask you another
21   question?
22       A.   Sure. As long as I can
23   expand on my answer because your --
24       Q.   Well, my question was did I

Page 240

1    read it correctly. I think you fully
2    answered that. So my next question --
3        A.   You don't need me to sit
4    here and tell you that you know how to
5    read.
6        Q.   Doctor, I want to ask you if
7    I'm reading the sentence just below Table
8    6 correctly.
9        A.   That -- okay. Do you have
10   another sentence you want to read?
11       Q.   I do.
12       A.   Okay.
13       Q.   "The relationship between
14   prothrombin time prolongation and major
15   bleeding is exacerbated in patients
16   taking concomitant aspirin at least
17   50 percent of the time and antedated in
18   patients not taking aspirin, FDA analysis
19   Figure 10 below."
20           Did I read that correctly?
21       A.   You read that correctly.
22   But you didn't read FDA's -- in order to
23   put the full picture on this, you didn't
24   read FDA's report when Janssen asked them

Page 241

1    whether it was a significant confounder.
2    And FDA later responded that it was not.
3        Q.   The report that you read
4    from earlier, what report is that? I
5    just need the name.
6        A.   So it is called "Clinical
7    pharmacology responses to sponsor's
8    questions regarding PD outcome analysis."
9            And it's -- may I give you
10   the Bates number?
11       Q.   It's not necessary. I think
12   we know what it is. Thank you, Doctor,
13   for responding.
14           Are you recommending
15   monitoring of blood levels for Xarelto
16   patients?
17       A.   That's a very general
18   statement. Tell me what you mean by
19   "monitoring."
20       Q.   I'm trying to understand
21   your opinions. Is one of your opinions
22   that Xarelto patients should be monitored
23   with respect to their coagulation status?
24       A.   So, again -- again you've

61 (Pages 238 to 241)

Protected - Subject to Further Protective Review

Page 242

1  added a couple of different words.
2         Yeah, I think very simply
3  put, I think that we see, with major
4  bleeds, in order to reduce the risk of
5  major bleeds, which we know that there is
6  a significant association, we -- patients
7  should have -- PT is helpful.
8         As the deputy director at
9  FDA said, right, the sponsor chose not to
10 use that information. How to use that --
11 that information has to be in the label.
12 I mean, I -- being able to see what at
13 baseline and certainly at one other
14 point, whether what one's PT is, and
15 certainly if -- if one's PT is greater in
16 the fourth quartile and you have a two or
17 threefold increased risk of major bleeds,
18 right, from two -- you know, two blood
19 measurements, I'm not sure that's, quote,
20 monitoring.
21        So I don't mean to -- so
22 I -- so do I believe that PT can be
23 helpful? Yes. Do I believe -- you asked
24 me as a clinician, would my patient want

Page 243

1  to know that they could reduce their --
2  their risk of bleeding from this, quote,
3  rat poison, as you said, by -- by half or
4  a third, by two vena punctures over
5  perhaps a period of time, I think that
6  would be helpful. That's certainly not
7  monitoring in the warfarin sense.
8         Q.  Number one, Xarelto is not
9  and never has been rat poison, correct?
10        A.  Warfarin was. But -- but --
11 but -- but in essence it has a narrow
12 therapeutic range. It -- I -- it will
13 kill rats. I can -- if you want to, we
14 can do the experiment. It certainly will
15 kill rats. You know that from your
16 animal toxicology.
17        Q.  I -- I asked you -- I asked
18 you before about warfarin. Now I'm
19 asking you about --
20        A.  But it -- but all the
21 anticoagulants are, in essence, I mean
22 can kill, because they -- they -- they
23 are very potent drugs.
24        Q.  My questions to you now

Page 244

1  relate to Xarelto. Understood?
2         A.  The -- the class of drug
3  that you're dealing with, right, is -- is
4  very potent.
5         Q.  My question was, do you
6  understand I'm asking you about Xarelto.
7         A.  Of course. That's what this
8  matter is.
9         Q.  Then let me ask you another
10 question.
11        A.  It makes no different -- I
12 mean, it's a very -- a blood thinner is
13 very potent whether you are warfarin or
14 you're Xarelto. Both can kill rats.
15        Q.  You've made that statement.
16 I want to ask you a question.
17        A.  Okay.
18        Q.  Your opinion is that a
19 prothrombin time measurement can be
20 helpful with a Xarelto patient.
21        A.  Certainly we know --
22        Q.  Is that correct?
23        A.  It's not --
24             MS. JEFFCOTT:  Objection to

Page 245

1  form.
2         THE WITNESS:  My statement
3      was that a prothrombin
4      measurement, right, could be
5      useful -- is useful, has been
6      demonstrated to give useful data
7      and of bleeding risk. So of
8      course it could be useful.
9  BY MR. ZELLERS:
10        Q.  Are you expressing an
11 opinion as to how prothrombin time should
12 be measured with a Xarelto patient or do
13 you defer that to other experts?
14        A.  Happy to engage in a
15 discussion of that. I think that -- with
16 you. I think with regard to, do you want
17 to do it two times a year? What's the
18 interval. I'd be happy to let the
19 hematologist discuss the interval.
20        But with regard to the
21 clinical utility and the bleeding risk,
22 I'm -- I'm not going to defer on that.
23        Q.  As much as I'd like to have
24 a discussion with you, we can have that

Protected - Subject to Further Protective Review

Page 246

1   once the deposition has concluded. Right
2   now I want to understand what your
3   opinions are.
4           Are you going to express an
5   opinion at trial as to how a prothrombin
6   time measurement should be done with a
7   Xarelto patient or will you defer that to
8   other experts?
9       A.   So I -- I am certainly going
10  to -- so I'm certainly going to -- I'm
11  certainly going to opine that a
12  prothrombin time measurement should be
13  done. Okay. I'm going to opine on that.
14          I certainly -- I think FDA,
15  you know, raised this question. And I
16  certainly would agree with FDA that it
17  seems reasonable to me in my opinion from
18  the data that I saw, some baseline, and
19  then some follow-up measurement would be
20  helpful.
21          Beyond that, I'll -- other
22  experts, you know, they can discuss the
23  refinement on that.
24      Q.   If a prothrombin time is

Page 247

1   measured with a Xarelto patient, what
2   clinically should the physician do with
3   the result?
4       A.   So if, in fact, let's say
5   someone would fall in the fourth
6   quartile, and fourth quartile for ROCKET,
7   that data was greater than 20. The most
8   important thing to do is to inform the
9   patient and have a discussion with the
10  patient about the -- the doubling to
11  tripling of the risk of major bleeds.
12          You would then want to
13  have -- you'd want to inform the patient.
14  You'd want to warn the patient of this,
15  right. You'd want to give helpful
16  information that, you know, that this --
17  this data shows this increased risk. So
18  it's a discussion.
19          And then if the patient is
20  in that high quartile, obviously that --
21  you get into the issues of doctor-patient
22  judgment. That's a discussion. You've
23  got to talk about switching to other
24  medicines. And I think at the very least

Page 248

1   that discussion has to happen.
2       Q.   Do you understand and accept
3   that if a physician takes a patient off
4   of the Xarelto or -- let me withdraw
5   that.
6           Are you expressing any
7   opinion as to whether a prothrombin time
8   measurement can be useful in adjusting
9   the dose of Xarelto?
10      A.   In fact, I -- I -- I talk
11  about that specifically in the report.
12  And I don't think the algorithms that
13  exist today support that.
14          So I think that -- I don't
15  see it as -- for titration, I think is, I
16  was just trying to pull up. The
17  testimony that I was reading was about
18  Spiro. I think that the question is if
19  you find someone who is at an increased
20  risk, I would tend to agree with him.
21  The issue is whether the patient should
22  be on that drug, whether should be on a
23  different drug that doesn't pose that
24  risk.

Page 249

1       Q.   In your opinion, a
2   prothrombin time measurement may be
3   useful to identify a patient that
4   potentially should not be on Xarelto?
5       A.   Your -- insert the fact that
6   I think it's useful in identifying
7   patients who are at statistically
8   significant increased risk of major
9   bleeds, and, therefore, that could lead
10  to a discontinuation of -- of the drug,
11  yes.
12      Q.   You would defer to the
13  individual physician or clinician in each
14  individual case as to whether or not the
15  patient should be continued on Xarelto,
16  changed to another medication, or have
17  his or her anticoagulation stopped,
18  correct?
19      A.   I -- I think we're probably
20  saying something similar.
21          What I'm not deferring on is
22  not giving the information to the
23  patient.
24          Once that information is

63 (Pages 246 to 249)

Protected - Subject to Further Protective Review

Page 250

1  shared, I would defer to a physician and
2  patient.
3      Q.  With respect to a
4  prothrombin time level with an atrial
5  fibrillation patient, have you quantified
6  above what prothrombin time a physician
7  should consider whether or not to
8  continue his or her patient on Xarelto?
9      A.  You know, so yes, we --
10 we -- well -- so what we quantified this
11 morning -- let me just finish.
12     Q.  We is you and me, or you?
13     A.  Well, you and I quantified
14 for the record this morning, right, when
15 you were kind enough to let me read the
16 data, we quantified the risk, right.  And
17 we saw that on -- on both -- and -- and
18 please understand that the quartiles in
19 the -- databases are slightly different
20 on trough and peak, for example.  But we
21 quantified the risk, right?  And -- and
22 that, to me, is the -- the thing that I
23 would opine on.
24         Now, what -- what to do,

Page 251

1  and, again I feel strongly, you know,
2  that the decision here is I'm told I have
3  a threefold risk of major bleeds, right.
4  I mean, the issue again is not titration
5  because we don't know how to do that.
6         But that -- that -- that
7  discussion, I think, is a doctor-patient
8  discussion.
9      Q.  When you look at the
10 prothrombin time, and as I understand
11 your opinion, when the patient is in the
12 fourth quartile of prothrombin time for a
13 particular indication based upon the
14 Phase III study, that's when you believe
15 a physician should make a medical
16 decision as to whether to continue the
17 patient on Xarelto or not; is that
18 correct?
19     A.  So somebody -- somebody
20 took -- I need back my exhibits in order
21 to answer this.
22     Q.  No one has taken your
23 exhibits, Doctor.
24     A.  No, no, they had taken them

Page 252

1  earlier and they returned them.
2         MR. HOROWITZ:  Why are you
3  looking at me?  I didn't take
4  them.  I didn't touch them.
5         THE WITNESS:  You didn't
6  take them.  Anything you say,
7  Mr. Horowitz, I agree with.
8         So let's again be specific.
9         What I think we've
10 quantitated is the increased risk
11 of a fourth quartile.  Okay.  I
12 mean -- I mean, that information,
13 I think, needs to be conveyed.
14         Janssen and Bayer are, I am
15 sure, looking at the regulation
16 now, knowing that, right, as we
17 sit here it's required, right,
18 that they disclose PT.
19         They are companies that are
20 able to, I'm sure, share
21 additional information and work
22 with doctors, right, I mean, to
23 put into place certain algorithms,
24 right, to give a cutoff, right.

Page 253

1         It would seem to me that if
2  there's a threefold increase
3  statistically significant, and it
4  begins at fourth quarter, sure, I
5  mean, I would think that
6  necessitates a conversation.
7         But I will -- happy to defer
8  to others to parse and see is
9  there an earlier point, is
10 there -- exactly how it should be
11 done.
12         What I'm saying, you've got
13 to -- the patient has to be warned
14 there is a threshold -- two to
15 threefold difference if they're in
16 the fourth quartile.  It's
17 required by the regs.
18 BY MR. ZELLERS
19     Q.  In your opinion, should
20 physicians rely on a trough or peak
21 prothrombin time measurement?
22     A.  So I mean I think that's an
23 interesting question.
24     Q.  And what I really want to

64 (Pages 250 to 253)

Protected - Subject to Further Protective Review

Page 254

1  know is if you have an opinion.
2      A.   So we know -- we know --
3  here's my opinion.  We know from the
4  RECORD data that it was both
5  statistically significant for both peak
6  and trough.
7      We also know that from
8  ROCKET it was significant for postdose
9  and trough, because there wasn't a lot
10  of -- there wasn't a lot of peak data
11  that could be collected -- I mean, that
12  could have -- you know, there are ways to
13  do that data.
14      So certainly with regard --
15  I think we've established clearly for
16  postdose on ROCKET, right, because that's
17  when the majority of these things were
18  taken.  And for both trough and in both
19  RECORD and ROCKET, that's assured.
20      But I would urge the company
21  to look and decide which one would be
22  better.  And there's also the reality,
23  you know, of when people take this
24  medicine.  But we certainly know it works

Page 255

1  at trough.  The correlation works in
2  trough in all of these studies.  And also
3  works between ROCKET and RECORD, the
4  association.
5      Q.   Early on, I asked whether or
6  not you agreed that as labeled Xarelto
7  should be on the market.
8      What labeling opinions do
9  you have in this case, and specifically
10  what needs to be done in your opinion to
11  the Xarelto label so that the label is
12  adequate?
13      A.   Right.  So to the warnings
14  and precaution section, to Section 5, I
15  would add four specific -- make sure
16  there's four specific items and one
17  general point.
18      But the four specific items
19  is to make sure -- well, the overall item
20  is that PT can be helpful in assessing
21  the risk of bleeding of patients on
22  Xarelto.
23      And under that I would
24  provide the following evidence:  That

Page 256

1  there's a -- there's a linear
2  relationship between drug exposure and
3  PT.  That there is a relationship between
4  PT levels and major bleeds.
5      I'd probably put in --
6  again, I think this is -- all these
7  labels are negotiations to some extent.
8      I would put in Table 583 of
9  the pharmacodynamic analysis, or one of
10  the other tables that showed statistical
11  significance at -- certainly at Week 24,
12  showed this.
13      And lastly I would say that
14  probably the fourth quartile based on
15  ROCKET, the PT greater than 20 was
16  associated with a -- again -- I think
17  it's fair to say between a two and
18  threefold high bleed risk.
19      Q.   Is there anything else in
20  your opinion that needs to be done to the
21  Xarelto label for it to be adequate under
22  the regulations?
23      A.   That's what I'm -- that --
24  those are my opinions.  I'm not -- I'm

Page 257

1  sure -- I mean, that's what I've looked
2  at the Xarelto label with reference to.
3      Q.   Are you aware that no
4  prothrombin time test is approved for use
5  by FDA with Xarelto?
6      A.   Not true.
7      Q.   Why do you believe that
8  statement is incorrect?
9      A.   So if you look at the way
10  510(k)s are done, you certainly have --
11  as the report says, you have PT
12  Neoplastin, which is a cleared device,
13  right?  So what you know, Xarelto, it is
14  a 510(k) in effect for PT Neoplastin.
15      Now, you're correct that it
16  doesn't mention -- it does not mention
17  Xarelto specifically, but Neoplastine was
18  substantially equivalent to prior PTs.
19  And it's no less reliable, by that
20  definition, than other PTs.  And there
21  certainly is data in the literature that
22  Neoplastine -- so, therefore, it's
23  certainly permissible to use.
24      And it's -- the data both in

65 (Pages 254 to 257)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 258

1    ROCKET and the published data show that
2    for measuring riva exposure, the
3    correlation between PT and drug
4    concentration -- PT Neoplastine is the
5    most sensitive, in fact, has a
6    correlation coefficient of .98.
7          There are laboratory
8    diagnostics, and we can get into this.
9    Sometimes there's a general -- 510(k) can
10   be specifically written or it can be
11   generally written.  And -- but
12   Neoplastine PT is substantial -- is on
13   the market.  It's a cleared device.
14        Q.   Is there any FDA regulation
15   or document which you can cite me to
16   which states that prothrombin time with
17   Neoplastine is approved by FDA for use
18   with Xarelto or rivaroxaban?
19        A.   So you -- please understand.
20   I wish FDA approved medical devices, but
21   as you know there are very few medical
22   devices that FDA approves under the PMA.
23   FDA uses the 510(k).  The question, is it
24   cleared?

Page 259

1         Q.   I will restate my question
2    and remove the word --
3         A.   Right.  Right.
4         Q.   -- "approved."
5         A.   So it's best to say --
6         Q.   Are we on the same page?
7         A.   -- is it a cleared device?
8         Q.   Yes.
9         A.   Right.  So, again, there are
10   many reagents on the market that are --
11   it's approved generally.  It doesn't have
12   to be approved specifically.
13        Q.   Prothrombin time is a
14   measure of how long it takes for blood to
15   clot; is that correct?
16        A.   Sure, for the sake of
17   agreeing to something.
18        Q.   At the lab, a substance
19   called a reagent is added to the blood;
20   is that right?
21        A.   Well, we can spend a couple
22   of minutes on the definition of reagent.
23   Whether you are talking about a reagent
24   kit or whether every chemical is a

Page 260

1    reagent, but sure.
2         Q.   There are many different
3    reagents, correct?
4         A.   Reagents -- again, are we
5    talking about it as a kit or are we
6    talking about the word "reagent" as a
7    chemical?
8         Q.   We are talking about reagent
9    as a chemical which causes the blood to
10   begin clotting.
11        A.   So -- so no doubt that there
12   are multiple reagents, you know, that go
13   into these tests.  But they're sold
14   sometimes as a reagent kit.
15        Q.   Have you done prothrombin
16   time testing?
17        A.   Sure.  I've ordered it, you
18   know.  There's no one who's licensed to
19   practice medicine, I mean, who -- who
20   have not used PT.  I grew up with it.
21        Q.   What is the prothrombin time
22   error rate, if you know?
23        A.   We're using what reagent?
24        Q.   Does it make a difference?

Page 261

1         A.   Well, there is -- you're
2    talking about ISI?  So -- you're
3    talking -- I mean, you are talking about
4    that variation?
5          So I have the ISI data.
6    Hold on.  So each lab you can have an
7    ISI, you know, index, you know.  And
8    there's a certain range.
9         Q.   Do you know what the
10   prothrombin time error rate is or the
11   range of prothrombin time errors?
12        MS. JEFFCOTT:  Object to
13        form.
14        THE WITNESS:  I don't know
15        it in those terms.  I can talk
16        about it in terms of ISI ranges.
17   BY MR. ZELLERS
18        Q.   Are there many factors that
19   can affect prothrombin time?  Let me ask
20   it a different way.
21          Is how old the sample is,
22   does that potentially affect a
23   prothrombin time test?
24        A.   Yes.  As it does virtually

66 (Pages 258 to 261)

Protected - Subject to Further Protective Review

Page 262

1    any laboratory test.  How old a sample
2    is, is going to affect your results.
3         Q.   Does blood sample clotting
4    potentially impact a prothrombin time
5    test?
6         A.   Yes.  As does any blood
7    clotting variation that occurs to any --
8    I mean -- laboratory test.  These things,
9    of course, have to be quality controlled.
10        Q.   There is --
11        A.   I mean, if -- if we limited
12   and said every test has to be perfect and
13   couldn't vary by age, you wouldn't have
14   any medical diagnostics on the market.
15        Q.   There is variation in
16   prothrombin time test results depending
17   upon which reagent is used, correct?
18        A.   Yes.  And what you do know
19   is, and what we do know is the
20   correlation coefficient between drug
21   concentration and PT using Neoplastine
22   was .98 which is exceptionally high.
23        Q.   High in terms of what?
24        A.   Accurate.

Page 263

1         Q.   There is variability in
2    prothrombin time testing between labs,
3    correct?
4         A.   True of every test in every
5    laboratory that I've ever seen with
6    regard to any laboratory test.
7         Q.   There is variability in the
8    prothrombin time test result within the
9    same lab?
10        A.   Variability on the same
11   samples run or between different
12   patients?  I'm not sure.  It's a very
13   general question.
14        Q.   Same samples.
15        A.   Well, that gets to the ISI
16   and what you see, and that's ISI road of
17   range.  And, I mean, these things can be
18   done with a pretty narrow range.  I think
19   your company was able to do it somewhere
20   between 1.21 and 1.24.  A pretty narrow
21   range of ISI sensitivity.
22        Q.   Are -- are you familiar with
23   the various types of reagents that can
24   and are used with prothrombin time?

Page 264

1         A.   So I'm looking at a graph
2    that shows the sensitivity of eight --
3    I'm sorry -- seven different reagents.
4         Q.   Do you agree that, with the
5    same blood sample, if tested with
6    different reagents you can have very
7    different prothrombin times?
8         A.   Yes.  I mean, that's why you
9    specify what the reagent is.  And that's
10   why you -- and because Neoplastine is the
11   most sensitive -- actually it's not the
12   most sensitive.  If I understand it,
13   TriniCLOT is the most sensitive reagent.
14   But that's why you specify the reagent.
15   It's true of any laboratory test.
16        Q.   When you -- when you say
17   most sensitive, you mean most sensitive
18   to rivaroxaban in this case?
19        A.   Well said.
20        Q.   INR was created to provide a
21   consistent way of expressing prothrombin
22   time with warfarin, correct?
23        A.   Yeah, with regard to PT use
24   and warfarin.

Page 265

1         Q.   INR adjustment does not work
2    properly and has not been validated for
3    Xarelto or any other NOAC?
4         A.   Correct.  But could be.  I
5    mean, the -- the similar kinds of, I am
6    sure normal -- normalization could be
7    achieved if your company, if your client
8    put their mind to it, but it does not
9    exist today.
10        Q.   On Page 10 of your report,
11   you state that there is variability in
12   drug plasma concentration levels in
13   patients taking Xarelto.
14            Is that one of the opinions
15   you are expressing in this case?
16        A.   That -- that's what I said.
17   I think it's a pretty given fact.
18        Q.   All drugs have some
19   variability, correct?
20        A.   Sure.
21        Q.   Do you agree that
22   variability at therapeutic doses is not
23   clinically meaningful unless correlated
24   with outcomes?

67 (Pages 262 to 265)

Protected - Subject to Further Protective Review

Page 266

1    A.   Well, you're -- you're
2  getting again a little metaphysical
3  question here.  Variability can be very
4  important and just we've not been smart
5  enough to correlate it with outcomes and
6  no one figured it out.  So it can cause
7  mortality, and no one has correlated it
8  yet.
9    Q.   You generally agree with
10  that statement?
11    A.   The -- the issue, the
12  variability here, is important, I would
13  agree with you, I mean, because patients
14  are -- have variable concentrations when
15  they take this drug, and it could lead to
16  something as important as major bleeds.
17  So that's what we're in agreement on.
18    Q.   You rely on Mueck and his
19  2014 article for -- at least in part for
20  your variability opinion; is that right?
21    A.   Yes.  I mean, he says it's
22  variable.
23    Q.   Specifically based on Mueck,
24  your opinion is that there is an

Page 267

1  approximately tenfold difference in drug
2  exposure between those patients who are
3  at 5 percent and the 95 percent trough
4  level.  I'm looking at your report,
5  Page 11, Paragraph 21.
6        Is that your statement?
7    A.   Yeah.  Based on the numbers
8  on the prior page, so I mean, I don't
9  think that's -- it's according to data in
10  Mueck.  So it's -- so it's not -- that's
11  not a judgment call.  That's what the
12  data show on the prior page.
13    Q.   Are you offering an opinion
14  on the specific variability of Xarelto?
15    A.   I'm not -- I mean, I -- I
16  am -- I leave this to -- I was very
17  careful.  There's variability here.  I
18  think we can all agree to it.  I know
19  Dr. Mueck has a coefficient of
20  variability of, I don't know, 30, 40,
21  something like that.
22        I think, you know, is this
23  moderate, what is this.  Others can get
24  into that.  I'm not going to -- I think

Page 268

1  it -- I think we can agree that a tenfold
2  difference means that it's variable.
3  And, again, what I care about is the
4  association between that and bleed.  I'll
5  leave it to others to talk about the
6  coefficient of variability, et cetera.
7    Q.   Let me just ask a few
8  foundational questions.
9    A.   Sure.
10    Q.   You are not offering an
11  independent opinion on the specific
12  variability of Xarelto, correct?  You are
13  looking at the literature and you're
14  making an assessment based upon, in this
15  case, the Mueck article.
16        MS. JEFFCOTT:  Objection to
17    form.
18        THE WITNESS:  No, no, I
19    think that the Mueck article -- I
20    mean, I have looked at the data on
21    the variability of plasma
22    concentration, I mean, in ROCKET.
23    So I've looked at that.
24        I mean, I've -- sorry.  I've

Page 269

1  looked at variability in a number
2  of underlying studies.  And the
3  Mueck article is, you know, it's
4  certain -- it's certainly -- there
5  is no disagreement about the
6  variability.  But it's not that
7  I'm -- I mean, I'm looking at the
8  data as Mueck is looking at the
9  data.
10  BY MR. ZELLERS:
11    Q.   You -- you are looking at
12  the research done by Dr. Mueck and you're
13  relying, at least in part, on his
14  research in terms of your opinion?
15        MS. JEFFCOTT:  Object to
16    form.
17        THE WITNESS:  No, I don't
18    think that's fair.  I think Mueck
19    is -- Mueck is not drawn -- Mueck
20    did not carry out the Phase III
21    trial, if I'm correct.  It was
22    carried out by -- by Duke.  He's
23    basing his research off the
24    underlying data, certainly in

68 (Pages 266 to 269)

Protected - Subject to Further Protective Review

Page 270

1    what's in 19 off the pivotal trial
2    in Afib.
3        So he's not -- he's not
4    drawing these samples himself.
5    BY MR. ZELLERS
6        Q.   And I don't, you know, mean
7    to fight on this point.  I'm just trying
8    to establish what you're looking at.
9        A.   We're -- we're both looking
10   at the same underlying data.
11       Q.   You and -- you and
12   Dr. Mueck?
13       A.   I mean, the -- the data
14   are -- I mean, you know, the sites drew
15   the data.  These data were reported.
16   Mueck is looking at that data.  I'm -- I
17   can look at that data, and there's
18   variability in that data.
19       Q.   You cite for your opinion
20   that there is approximately a tenfold
21   difference in drug exposure between those
22   patients who were at 5 percent and the
23   95 percent trough level.  Your cite is to
24   the deposition of Dr. Mueck, correct?

Page 271

1        A.   To the deposition?
2        Q.   Yes.  I'm looking at
3    Paragraph 21, Page 11 of your report.
4        A.   Right.  But it -- but
5    that -- that's -- what you're missing,
6    sir, and I apologize, is according to
7    these data.
8        So what -- I mean, Mueck
9    does confirm that, is what I'm saying.
10   But we're all -- go back to Paragraph 19,
11   right, and let's just see.  If -- if you
12   look, for example, at the 20-milligram
13   dose and you look at two and that's
14   not -- that is ROCKET data that Mueck
15   uses, you see, if you -- if you're
16   looking at trough, correct me if I'm
17   wrong, 5 percent and 95 percent, varies
18   between 12 and 137.  So that's a little
19   more than tenfold.  I mean --
20       Q.   Okay.  You -- you have --
21       A.   I'm happy to spend time on
22   this.
23       Q.   I just want to ask you some
24   foundational questions.

Page 272

1        A.   Sure.
2        Q.   You have not done any test
3    or testing on the specific variability of
4    Xarelto, correct?
5        A.   I've looked at the data in
6    the -- that were submitted to FDA that
7    was done as part of studies that were
8    submitted.  So I -- I have looked at that
9    raw data.
10       Q.   What methodology did you
11   follow in testing or calculating the
12   specific variability of Xarelto?
13       A.   Methodology.  I looked at
14   my -- I used my eyes and I divide -- and
15   I -- you can -- you can see that -- what
16   the range is.  And you can -- I don't
17   know.  It's just a question.  You decide
18   what, I mean, a 12 versus 127 -- 137, and
19   how much times one is than the other.  So
20   I probably used my eyes and, I don't
21   know, what is that, third grade math.
22       Q.   Any other testing or
23   calculations you did with respect to any
24   opinion on the specific variability of

Page 273

1    Xarelto?
2        A.   If you want to go into
3    Schedule 13, I'm happy to do it.
4        Q.   Is there any error rate for
5    the testing or calculations that you did?
6        A.   The tenfold difference --
7    I'm not sure why -- the -- the difference
8    between a 5th percentile and
9    95th percentile and what -- what fold
10   difference two numbers are.
11       I don't see it calling for
12   an error rate, but I'm happy to do one if
13   you want one.  I'm happy to provide that
14   for the record, if you'd like.
15       Q.   What is coefficient of
16   variation?
17       A.   I mean, you want the actual
18   formula?  I'm happy to give it to you.
19       Q.   Did you calculate the
20   coefficient of variation or are you
21   relying upon the studies that you have
22   seen and read with your eyes?
23       A.   So coefficient of variation
24   is one method, right, of calculating

69 (Pages 270 to 273)

Protected - Subject to Further Protective Review

Page 274

1    variability.
2          It's not the only method of
3    calculating variability.
4          Q.   All I am trying to find out
5    is whether or not you have done a
6    calculation for the coefficient of
7    variation in this case with Xarelto?
8          A.   I have not done my own
9    coefficient of variation.  I have no
10   reason to doubt Dr. Mueck's calculation
11   where he gets 30 to 40.
12         Q.   What is the coefficient of
13   variation for Xarelto?
14         A.   I just gave it to you.
15         Q.   Mueck, 30 to 40?
16         A.   I think that's probably
17   right.
18         Q.   Do you understand that a
19   coefficient of variation in the range of
20   25 to 40 percent is considered moderate?
21         A.   If you pick up a standard
22   textbook of pharmacology, that's probably
23   what the standard textbook would tell
24   you.

Page 275

1          MS. JEFFCOTT:  Mike, can we
2    go off the record to get Ned back
3    on.
4          MR. ZELLERS:  Sure.
5          THE VIDEOGRAPHER:  The time
6    is now 2:51.  We're going off the
7    record.
8          (Short break.)
9          THE VIDEOGRAPHER:  The time
10   is now 3:11.  And we are back on
11   the record.
12   BY MR. ZELLERS
13         Q.   Dr. Kessler, I'm handing you
14   what we will mark as Deposition
15   Exhibit 12.
16         (Document marked for
17         identification as Exhibit
18         Kessler-12.)
19   BY MR. ZELLERS
20         Q.   Can you just identify that
21   as the Mueck 2014 article that you cite?
22         A.   That's correct, sir.
23         Q.   Turn to page -- oh, excuse
24   me.

Page 276

1          MR. ZELLERS:  Do you need me
2    to do anything over again?  Okay.
3    BY MR. ZELLERS
4          Q.   Page 14.
5          A.   I'm there.
6          Q.   Reading the first sentence
7    on the page, first full sentence on
8    Page 14.  And I want to ask you if you
9    agree with Dr. Mueck's statement.
10         "However, there are
11   currently no data showing a direct
12   correlation between bleeding events and
13   rivaroxaban plasma levels in patients
14   receiving therapeutic doses of
15   rivaroxaban."
16         A.   That's an incorrect
17   statement.
18         Q.   Why is that an incorrect
19   statement, other than what you've already
20   testified to in this deposition?  And you
21   wrote --
22         A.   Let me -- let me just give
23   you one.  So we did, for example, okay,
24   this statistical analysis -- let me just

Page 277

1    do this --
2          Q.   By "this statistical
3    analysis," you're referring to deposition
4    Exhibit 10?
5          A.   Sure.  And it's a
6    statistical analysis off of -- it's
7    24-week trough data.  And it's all for
8    ROCKET.
9          This data is consistent.
10   Okay?  Where if -- and if you look at
11   this, it is, first of all, consistent
12   with the FDA on a chart in my report,
13   right, I mean, that -- that quartile
14   data.  So the FDA did its analysis.  This
15   analysis.  This analysis is consistent
16   with the data of what we also saw in the
17   other exhibit, Exhibit 8 for RECORD
18   study.  That is a misstatement.
19         Q.   You disagree with
20   Dr. Mueck's statement on the basis of the
21   FDA ROCKET analysis and Exhibits 8, 9,
22   and 10, which you've testified to at some
23   length in this deposition, correct?
24         A.   Yes.

70 (Pages 274 to 277)

Protected - Subject to Further Protective Review

Page 278

1          Q.   Is there anything else that
2    is a basis for you disagreeing with
3    Dr. Mueck's statement?
4              MS. JEFFCOTT:  Objection.
5        Form.
6    BY MR. ZELLERS
7          Q.   And I am -- you don't have
8    to repeat stuff that's in your report.
9          A.   No.  I think -- I think
10   that's a pretty good basis.  I mean,
11   those are the -- I mean, that's the major
12   data that's available.
13         Q.   Your testimony is that
14   Xarelto prolongs prothrombin time when
15   using reagents such as Neoplastine that
16   are sensitive to Xarelto, correct?
17         A.   Yes.
18         Q.   Sound like something you
19   said?
20         A.   Sounds like something that
21   we can agree on, I would hope.
22         Q.   Page 18, Paragraph 37.
23         A.   I mean, it was the basis of
24   ROCKET.

Page 279

1          Q.   I don't mean -- I want to
2    ask my next question.  Do you agree that
3    not all laboratories use Neoplastin?
4          A.   They could.
5          Q.   Today, do you have knowledge
6    as to whether or not all laboratories use
7    or have Neoplastine available?
8          A.   I would -- I would doubt
9    that would be the case.  It is a cleared
10   legally marketed device.  And the
11   technology is such with a clear legally
12   approvable device that it is readily
13   available to any laboratory that orders
14   it.
15         Q.   Is it your testimony that
16   the most accurate prothrombin time with
17   rivaroxaban is when a Neoplastine reagent
18   is used?
19         A.   I'm going to ask you to
20   define "accurate."
21         Q.   Sensitive.
22         A.   Good.  We're getting there.
23   Actually, if you look at the
24   data -- I love the question.  The

Page 280

1    question is a great question.
2          Q.   I hope it --
3          A.   It's one of my favorite of
4    the day.
5          Q.   Good.  I'd like a nice short
6    answer so I can ask you another good
7    question.
8          A.   Okay.  So -- so this is a
9    graph of -- from Dagmar Kubitza, a --
10   from one of your -- from your client --
11   I'm sorry -- your client.
12              And this has -- in fact, if
13   you look at Neoplastin, TriniCLOT PT
14   Excel has the same correlation.
15   Correlation was .98.  They have them both
16   at .99.
17              If you look at the graphs,
18   TriniCLOT PT Excel S looks a little more
19   sensitive by this data.  But I think
20   we're splitting hairs, to be accurate to
21   the answer.
22         Q.   What if the hospital does
23   not have the preferred test?  And by
24   "preferred test," I'm referring to

Page 281

1    Neoplastin.
2          A.   Order it.
3          Q.   Can a physician request a
4    specific reagent at a local medical
5    facility or hospital when requesting PT,
6    if you know?
7          A.   Certainly a -- on any lab
8    slip, there is -- in almost every lab
9    there's a reason -- a reason for the test
10   and what is being ordered.  So you would
11   write on this, Xarelto -- Xarelto --
12   patient on Xarelto.  And any laboratory
13   with an approved test would know what to
14   do.
15              And you would also put it in
16   the label, right, I mean, because
17   obviously one of the things that we
18   talked about and just -- it's an
19   important point.  When I talk about a
20   relationship between PT levels and major
21   bleeds in the fourth quartile PT, in all
22   of my answers -- I've shortcutted -- I
23   would put "(Neoplastine Plus)" so that
24   everybody would know that.

71 (Pages 278 to 281)

Protected - Subject to Further Protective Review

Page 282

1      And the world would
2   probably -- I mean, once you create the
3   commercial market, I can assure you every
4   hospital in the country would have that
5   available.
6      Q.   Since approval in 2011, the
7   label has referred to prothrombin time
8   with Neoplastine Plus reagent, correct?
9      A.   12.2.
10     Q.   Yes.
11     A.   If you want to give me the
12  dose-dependent sentence, yes.
13     Q.   Are you aware of any
14  peer-reviewed medical literature that
15  indicates that prothrombin time is a
16  reliable test for Xarelto anticoagulation
17  effects?
18     A.   Well, I think -- correct me
19  if I'm wrong.  I would want to read it
20  again, but if you look at both Kubitza --
21  I apologize if I'm not pronouncing it
22  correct.  If you look at Dagmar's paper,
23  and also if you look at the Thrombosis
24  Research 2012, again on Douxfils, I think

Page 283

1   both of those go into the data on -- on
2   the test.
3      Q.   Any others?
4      A.   I would guess.  I'd have to
5   take a look at it.  I mean, generally --
6   my guess is probably mentioned in the
7   major papers on ROCKET.  I mean, it
8   was -- it was huge.  I would have to go
9   back and look to see if it's mentioned.
10  But those two, I think, provide
11  peer-reviewed literature on this.
12     Q.   Do you agree that a
13  prothrombin time is only one aspect of
14  potentially assessing a Xarelto patient's
15  anticoagulation status?
16     A.   Let me quote Dr. Berkowitz.
17  It's probably the best we have.
18     Q.   Are you going to quote
19  Dr. Berkowitz or?
20     A.   Yeah.  I mean, think if you
21  look at Berkowitz's testimony -- I'm
22  happy to pull it.  I have it highlighted,
23  and if you want -- but it basically
24  says -- I mean, I think he agrees that PT

Page 284

1   Neoplastine is sort of the best we have
2   of the -- of the assays.
3      I mean, there's a direct --
4   there's a correlation of .98 with -- so
5   it's the best we have at the current
6   time.  It's clear.
7      Q.   Would you -- are you done?
8      A.   Yeah.
9      Q.   Would you agree that
10  assessing a patient's anticoagulation
11  status requires a clinical assessment of
12  which a laboratory test may be one part?
13     A.   Oh, I certainly -- you're
14  never going to -- you're never going to
15  get me to argue against clinical full --
16  total picture of clinical evaluation.  I
17  would agree with that.
18     But -- but I will tell you
19  that when one is assessing bleeding risk,
20  all right, from Xarelto, I see nothing
21  better than PT Neoplastine out there.
22     Q.   Are you aware of whether FDA
23  has approved any test or -- well, let me
24  withdraw that.

Page 285

1      Are you aware of whether FDA
2   has approved or cleared any test or lab
3   procedure specifically to monitor or
4   evaluate the anticoagulant effects of
5   Xarelto, Eliquis, or Pradaxa?
6      A.   I don't believe the -- well,
7   not -- FDA has cleared, as we went
8   through it before, Neoplastin, which we
9   know can be used reliably and predictably
10  and appropriately in Xarelto.
11     So FDA has put that on the
12  market.  And there's no prohibition for
13  that use.
14     Q.   Are you critical of FDA's
15  approval of all of the NOACs?
16     A.   I'm not here to give an
17  opinion on that.  I have not given an
18  opinion on that.
19     Q.   You have no opinion with
20  respect to FDA's approval of Pradaxa,
21  Eliquis, or Savaysa.  Is that your
22  testimony?
23        MS. JEFFCOTT:  I'm going to
24     instruct him not to answer with

Protected - Subject to Further Protective Review

Page 286

1    respect to Pradaxa.
2         MR. ZELLERS: Okay.
3         THE WITNESS: So the three
4    you picked were not -- Xarelto was
5    not in your list.
6    BY MR. ZELLERS
7         Q.   I've asked you about
8    Xarelto.  Now I'm asking about the other
9    NOACs.
10        A.   Yeah, I have -- I haven't
11   done the study of the others.  I'm not in
12   a position to give an opinion on the
13   others.
14        Q.   You are aware that Eliquis,
15   Pradaxa, and Savaysa have been approved
16   without any need for routine coagulation
17   monitoring, correct?
18        A.   Well, the trials were done
19   that way.  Okay.  That's what the trials
20   were done and designed without -- again,
21   your use of the word monitoring, I'm
22   not -- I'm being -- I'm not -- I don't
23   think -- I'm not arguing for monitoring,
24   right?

Page 287

1         For any -- as that word is
2    used, certainly in the warfarin kind of
3    context, that would not be appropriate.
4         Q.   For Xarelto.  That is your
5    opinion, correct?
6         A.   Well, you and I had that
7    exchange.
8         Q.   You believe that some
9    prothrombin time measurement, perhaps at
10   the initiation of therapy and perhaps at
11   some later time, may be a appropriate
12   with Xarelto?
13        A.   It would be helpful in
14   assessing -- well, my -- my first is I
15   certainly know that PT, the data show
16   that PT is helpful, right, can be helpful
17   in assessing bleeding risk.  We have --
18   in essence, your companies, in these
19   studies have validated that assertion,
20   right?  And even though you -- you
21   disagree, your clients disagree with
22   that, the data show that was, in fact,
23   the case, and the FDA has certainly --
24   you and I have discussed about the

Page 288

1    intervals, doing it.  And I gave you what
2    I thought would be reasonable.
3         Q.   My question now is, do you
4    have a similar opinion with respect to
5    Eliquis?
6         A.   I have not looked at the
7    data the -- the way I've looked at the
8    data here in this matter.
9         Q.   Do you have a similar
10   opinion with respect to Savaysa?
11        A.   I have not been -- I have
12   not looked at the data, that data in this
13   matter.
14        MR. ZELLERS:  Counsel, you
15   are instructing the witness, if I
16   ask the same question with respect
17   to Pradaxa, not to answer; is that
18   correct?
19        MS. JEFFCOTT:  That is
20   correct.
21   BY MR. ZELLERS
22        Q.   Another paper that you cite
23   is Samama 2013.  Are you generally
24   familiar with that paper?

Page 289

1         A.   Yeah, let's turn to the
2    paragraph.
3         Q.   It is Page 18, Footnote 31.
4         A.   So --
5         Q.   I haven't asked a question,
6    other than do you see the reference.
7         A.   You asked me whether I was
8    familiar with it.
9         Q.   Okay.  Are you familiar with
10   the Samama paper that you cite?
11        A.   I cited it, and I cited it
12   for a specific --
13        (Document marked for
14        identification as Exhibit
15        Kessler-13.)
16   BY MR. ZELLERS
17        Q.   I'm handing you what we have
18   marked as Deposition Exhibit 13, which is
19   the Samama 2013 paper.
20        A.   Yeah, I cited it for a
21   specific reason, for the specific point
22   of showing the actual Neoplastine
23   product.  If my memory serves me right,
24   in one of these paragraphs that citation

73 (Pages 286 to 289)

Protected - Subject to Further Protective Review

Page 290

1    is here.  I could be wrong.  It's
2    somewhere here.  Let me just look.
3        Someone can search if it's
4    in Diagnostica Stago.  I just want to see
5    if that's the reason I cited it or not.
6        Q.   I'll talk to you about
7    that --
8        A.   Yes -- no, no, no, no.  So
9    the reason I just -- the reason I cited
10   it was very simple.  Right.  Just so -- I
11   was looking for a reference for where it
12   was available.  Right.  So I was
13   literally looking for an address.  And I
14   wanted to use a publicly available cite
15   for that address.  That is why I cited
16   this paper.
17       Q.   Do you agree with the
18   conclusion on Page 5 of Exhibit 13, and
19   I'm reading at the very bottom of the
20   second column where it starts "Based on."
21       Do you agree, Dr. Kessler,
22   with the authors of this paper, "Based on
23   the consistent efficacy and safety" --
24       A.   Yes, I've got it.  I know

Page 291

1    exactly where you are.
2        Q.   You with me?
3        A.   Yes, sir.
4        Q.   Let me start over.
5        Dr. Kessler, do you agree
6    with the authors of the Samama paper that
7    "based on the consistent efficacy and
8    safety profiles demonstrated in the
9    large-scale Phase III clinical trial
10   program, fixed dose regimens of
11   rivaroxaban have been approved for
12   clinical use in several indications.
13   Routine measurement of rivaroxaban plasma
14   levels or its pharmacodynamic effects is
15   not required or recommended.  Clinicians
16   should adhere to the regulatory
17   recommendations or the label,
18   particularly in patients or clinical
19   situations associated with an increased
20   risk of bleeding."
21       Do you agree with that?
22       A.   No.
23       Q.   What -- what is the basis
24   for any disagreement with that statement?

Page 292

1    Same as we've already covered?
2        A.   I was hoping we didn't have
3    to go through the last five hours again.
4        Q.   Me as much as you, Doctor.
5        A.   I -- I mean, this points
6    to -- okay.  I mean, the -- the problem.
7    Okay.  Neither what we talked about in
8    Exhibit 8 or in Exhibit 9 is being
9    discussed, has not been highlighted by
10   the company.  It's not even in here.
11   There's no reference to it.
12       Q.   Dr. Kessler.  Dr. Kessler.
13       A.   Yes, sir.
14       Q.   The issue of any correlation
15   or association between prothrombin time
16   and a risk of bleeding was looked at and
17   analyzed extensively by the FDA in its
18   approval of Xarelto for atrial
19   fibrillation, correct?
20       MS. JEFFCOTT:  Object to
21   form.
22       THE WITNESS:  And -- and
23   you -- and your client's position
24   has been what?

Page 293

1    BY MR. ZELLERS
2        Q.   I've asked you the question.
3    Do you agree that the issue of an
4    association between prothrombin time and
5    the risk of bleeding was looked at
6    extensively by the FDA and by Janssen
7    prior to the approval of Xarelto in the
8    atrial fibrillation indication?
9        MS. JEFFCOTT:  Object to
10   form.
11       THE WITNESS:  It certainly
12   was looked at by FDA.  It is in
13   the -- the Janssen and Bayer
14   documents that we looked at.
15       Your clients, Bayer -- Bayer
16   and Janssen, both have argued to
17   the FDA to the contrary.
18       And basically, and correct
19   me if I'm wrong, if -- if -- if
20   those studies were in here -- they
21   are not in here --
22       Q.   You are --
23       A.   -- you're the -- I mean
24   citing the data that we've cited and --

74 (Pages 290 to 293)

Protected - Subject to Further Protective Review

Page 294

1  and those associations are not in this
2  paper.
3         You're -- you're -- so you
4  can't say that everybody knows when your
5  clients are basically saying the
6  opposite.
7  BY MR. ZELLERS
8         Q.   You are aware that Janssen
9  and/or Bayer submitted language as part
10  of the approval process which you cite in
11  your report discussing -- and I'm looking
12  at Page 70 -- strike that, Paragraph 71
13  of your report.
14         MS. JEFFCOTT: Page 30.
15  BY MR. ZELLERS
16         Q.   This may not be the section
17  of the report that I'm looking for.
18         A.   You're looking for the
19  chronology on the labeling.  I -- I
20  know that --
21         Q.   Let's -- I think we -- I
22  think you and I can cover this.
23         A.   Sure.
24         Q.   The sponsor submitted to FDA

Page 295

1  a proposed label dealing with prothrombin
2  time, which also had some language about
3  bleeding and bleeding risk, correct?
4         A.   No.  Now -- now --
5         Q.   Okay.  Let's find out --
6         A.   -- we should pull the actual
7  language, because -- let's get the --
8  actually I have the chart.
9         Basically, if I remember --
10  my -- my language is if a pharmacodynamic
11  is necessary, is thought useful, then you
12  can do PT.
13         I believe -- I don't think
14  it used the word "bleeding," if I'm
15  correct.
16         Q.   Let's take just a moment and
17  see if between the two of us we can
18  find...
19         A.   It's the section -- let me
20  get my chart too.
21         Q.   Okay.  I --
22         A.   Just give me -- just give me
23  one second.  I have -- I have the
24  chronology here, and it summarizes

Page 296

1  everything, and it would be very helpful
2  for me.
3         Q.   I have your report.  We can
4  do the same thing.
5         A.   You are very kind.  Just
6  give me one second.  I'm looking for my
7  chronology.  I want to see if I buried
8  it.
9         Give me one second.  I
10  apologize.  I've lost it.  I've got to
11  find a better system.
12         Q.   Doctor, I can make this
13  really easy.
14         A.   I -- I -- I -- let's go --
15         Q.   Paragraph 51.
16         A.   Yeah --
17         Q.   Generally between Paragraphs
18  51 and 60 that you set forth the labeling
19  of chronology.
20         A.   Right.  And I appreciate the
21  interrogatories, because, I mean, without
22  much exception, I think that we can agree
23  on the actual timing.  And the timing is,
24  I think -- much of this has to do with --

Page 297

1         Q.   Doctor, it's going to take
2  two or three questions, and we can move
3  on.
4         So Paragraph 51 back in July
5  of 2008, based upon the information that
6  you have reviewed, Janssen proposed to
7  FDA in Section 12.2 of the label
8  language, and I won't read it all, but
9  I'm reading, "The relationship between
10  prothrombin time and rivaroxaban plasma
11  concentration is linear and closely
12  related.
13         "If assessment of the
14  pharmacodynamics effect of rivaroxaban is
15  considered necessary in individual cases,
16  prothrombin time measured in seconds is
17  recommended."
18         So I read that correctly,
19  right?
20         A.   You read that correctly.
21         Q.   And there's a back and
22  forth.  But essentially, the FDA struck
23  that language; is that right?
24         A.   So, yes.  Because in

Protected - Subject to Further Protective Review

Page 298

1    July 2008, okay, what we know now is that
2    Exhibit 8 was known to -- certainly to
3    Bayer.  So -- so the company had data.
4    That, we know, that as of July 2008.  And
5    even through January 2011, right, that --
6    that data was not highlighted to FDA.
7           Furthermore, it wasn't till
8    August 2011 when FDA figured out in a
9    clinical pharm review that -- where FDA
10   figured out this linear relationship.
11          First of all, let me just
12   clarify.  There's not the use of the word
13   "bleeding" in this language.
14          This is not in Section 5.
15   FDA appropriately struck it because they
16   didn't realize -- no one told FDA about
17   this.  When FDA figured it out, there
18   was -- I mean, FDA had no problem.  It
19   didn't prevent the manufacturer from
20   doing this.
21      Q.   Are you done?
22      A.   I can go on.
23      Q.   I don't want you to go on.
24      A.   Okay.

Page 299

1       Q.   I think that you have
2    covered this.
3           So as of 2011, the FDA had
4    both the Bayer information and the
5    Janssen information, Exhibits 8, 9, and
6    10, correct?
7       A.   Not fair, no.  First of all,
8    it didn't have 10, right?  I mean --
9    well, in -- you used 2011.  So let's
10   stipulate, if we can agree, that it
11   had -- it had similar statistical data in
12   August of 2011.  Could we agree to that?
13      Q.   Are you done answering my
14   question, because I have a new question.
15      A.   Well, I'm not sure I'm done
16   answering your question.
17          MS. JEFFCOTT:  Yeah, I don't
18      think so.
19          THE WITNESS:  But -- because
20      you basically said this was in
21      possession of FDA.
22          FDA, as we went through this
23      morning, was misled by the ISI, by
24      your clients, into believing that

Page 300

1    there was not an association.
2           That's what was told FDA in the
3    NDA and in discussions.
4           FDA struck this.  FDA then
5    figured it out, as I see it, in
6    August of 2011.
7    BY MR. ZELLERS
8       Q.   Would you agree --
9       A.   And nothing your client did,
10   right -- I mean, to say that this page --
11   to hand FDA this document, this thick,
12   right, and not to tell FDA where the
13   association is, and yet in the summaries
14   of the important information that talk
15   about correlation, not to even mention
16   it, and to mention to the -- to the
17   contrary, I think is misleading.
18      Q.   Doctor.
19      A.   Yes.
20      Q.   Do you agree there was a
21   robust analysis and investigation of the
22   potential association between prothrombin
23   time and bleeding risk by the FDA in
24   2011?

Page 301

1           MS. JEFFCOTT:  Object.
2           THE WITNESS:  What month?
3      Well, let me tell you.  August.
4    BY MR. ZELLERS
5       Q.   Well, August is when the
6    conclusion was reached.
7       A.   Right.  So --
8       Q.   They were working on that
9    conclusion during 2011, right?
10      A.   I'm not sure they were
11   working on a conclusion.  They -- we can
12   go back and look specifically at the
13   timeline.  Yes, in August 2011 that
14   conclusion was reached that we talked
15   about.  Your -- and as we know, as the
16   record shows, your companies chose not to
17   use that data, according to FDA.
18      Q.   Doctor, looking at Paragraph
19   55, in June of 2011, the FDA removed the
20   prothrombin time language that had been
21   suggested by Janssen and what we know is
22   the 2008 language was renewed in January
23   of 2011.  It struck that language and it
24   proposed a statement, "The predictive

76 (Pages 298 to 301)

Protected - Subject to Further Protective Review

Page 302

1    value of these coagulation parameters for
2    bleeding risk or efficacy has not been
3    adequately studied."
4       A.   FDA didn't see this stuff.
5       Q.   Factually, that's correct?
6       A.   No.  The predictive value of
7    these coagulation parameters had been
8    studied.  Your company didn't highlight
9    this for FDA.
10      Q.   The label that was approved
11   by FDA ended up with the language, "The
12   predictive value of these coagulation
13   parameters for bleeding risk or efficacy
14   has not been established."  Is that
15   correct?
16      A.   Let's turn to the label.
17      Q.   Okay.
18      A.   Let's put the whole thing in
19   context.  And which label are we talking
20   about?  So we can be exactly sure.
21         MS. JEFFCOTT:  Michael, I'm
22   going to call Ned right now.
23   BY MR. ZELLERS
24      Q.   Take a look at Deposition

Page 303

1    Exhibit 14, which is the November 2011
2    label.
3         (Document marked for
4    identification as Exhibit
5    Kessler-14.)
6         THE WITNESS:  What's the
7    date?
8    BY MR. ZELLERS
9       Q.   The date is November of
10   2011.
11      A.   This just says -- this says
12   2011.  This has both indications on it?
13      Q.   Yes.
14      A.   Right.  Okay.
15      Q.   So if we look at --
16      A.   12.2, right?  So if I read
17   this, okay, what you're mixing up, sir,
18   FDA didn't have -- let's look at what's
19   in the label under 12.2 is -- on Page 18
20   is dose-dependent inhibition of Factor Xa
21   activity was observed in humans, and the
22   Neoplastine prothrombin time, right --
23   I'll shorten that -- prolonged dose
24   dependently.  That's what's in there.

Page 304

1    Show me where this is in there.
2       Q.   This is the label as of
3    November of 2011, correct?
4       A.   Yes, because that's when we
5    know that FDA had the data.  This was the
6    output.  That was the output.
7         FDA, I mean, had originally
8    removed this earlier in time.  But that's
9    not what ended up in the label.
10      Q.   Looking at Exhibit 14.  As
11   of November of 2011, after it had
12   completed its analysis, after it was
13   fully aware of the bleeding data and had
14   analyzed it, the label that was approved
15   by FDA, Exhibit 14, does not state or
16   make any reference to, "The predictive
17   value of these coagulation parameters for
18   bleeding risk or efficacy has been
19   established."  Correct?
20         MS. JEFFCOTT:  Objection.
21   BY MR. ZELLERS
22      Q.   That's not in the label?
23         MS. JEFFCOTT:  Object to
24   form.

Page 305

1         THE WITNESS:  That was
2    struck from an earlier label as
3    part of a negotiation prior to the
4    conclusion that we saw in August.
5         As we know, the FDA -- and
6    I'm a little surprised at this.
7    But FDA did do it.  The senior
8    management didn't do it, right?
9    The FDA said manufacturers chose
10   not to utilize this data.  That
11   was the statement.
12         FDA gave your companies a
13   choice.  That actually was wrong,
14   as I think, a matter of law.
15   BY MR. ZELLERS
16      Q.   My question to you is, as of
17   November of 2011, does the label that was
18   approved by the FDA state, "The
19   predictive value of these coagulation
20   parameters for bleeding risk or efficacy
21   has been established"?
22      A.   No, no.  You're -- you're
23   reading --
24      Q.   Is that anywhere in the

77 (Pages 302 to 305)

Protected - Subject to Further Protective Review

Page 306

1    label?
2        A.   No, no.  Read -- read -- go
3    read 55.
4        Q.   Can you answer my question?
5        A.   You -- you haven't read it
6    correctly.
7             What FDA struck --
8        Q.   I'm not talking about what
9    they struck.
10       A.   FDA struck the fact that it
11   has not been adequately studied.  The FDA
12   struck --
13       Q.   I need you to answer my
14   question if you're able to answer my
15   question so that we can try to complete
16   this deposition in the time allotted.
17            MS. JEFFCOTT:  He's
18       answering the question.
19   BY MR. ZELLERS
20       Q.   My question is, Dr. Kessler,
21   is there anywhere in Deposition
22   Exhibit 14, the approved November 2011
23   label, in which the FDA states, "The
24   predictive value of these coagulation

Page 307

1    parameters for bleeding risk or efficacy
2    has been established"?
3        A.   I'm not sure I under -- the
4    answer to that is no, because you
5    understand that earlier, right, FDA
6    proposed that "the predictive value of
7    these coagulation parameters for bleeding
8    risk or efficacy has not been adequately
9    studied."
10       Q.   And we discussed that at
11   length.  My question was a new question.
12       A.   And that -- okay.
13       Q.   And I think you've answered
14   it, and I'd like to move on.  Can we do
15   that?
16       A.   With -- with the one
17   footnote that as soon as FDA came to that
18   conclusion, it was -- in my view, in my
19   opinion, it was the sponsor's obligation
20   to push to make sure that this label had
21   information that was important for
22   patients and doctors and the company did
23   not do that.
24       Q.   Are you aware that the FDA

Page 308

1    has publicly stated that there is no FDA
2    approved assay to measure the
3    anticoagulation effect or concentration
4    of any NOAC or DOAC including Xarelto?
5            MS. JEFFCOTT:  Object to
6        form.
7            THE WITNESS:  Just give me
8        the quote.  Give me the actual
9        quote, where it is.
10   BY MR. ZELLERS
11       Q.   Sure.
12       A.   Just show me the document.
13       Q.   I will show it to you in a
14   second.
15            Can we agree that direct
16   oral anticoagulant is just another --
17       A.   Sure.
18       Q.   -- name for NOAC?
19       A.   Yeah, of course.
20       Q.   I'm going to hand you what
21   we'll mark as Deposition Exhibit 15.
22            (Document marked for
23       identification as Exhibit
24       Kessler-15.)

Page 309

1    BY MR. ZELLERS
2        Q.   Deposition Exhibit 15 is a
3    transcript of an FDA in vitro diagnostic
4    workshop October 26, 2015.
5        A.   I know it well.
6        Q.   Is this one of the materials
7    that you reviewed in preparation for your
8    opinions in this case?
9        A.   I'd have to go back and -- I
10   know -- I know the workshop was held.
11       Q.   All right.  Ms. Carrington
12   is an FDA officer who spoke at the
13   workshop, correct?
14       A.   I believe so.  Why don't you
15   give me the page --
16       Q.   Page 8.
17       A.   Thank you, sir.  I
18   appreciate it.
19       Q.   She is the director of the
20   division of immunology and hematology,
21   immunology devices in FDA's office of in
22   vitro diagnostics.
23       A.   Yes.
24       Q.   Correct?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 310

1      A.   Yes.
2      Q.   If you look at Page 9.
3      A.   Right.
4      Q.   And her testimony.
5      A.   Right.
6      Q.   Bottom paragraph.
7      A.   Right.
8      Q.   Does she state, "Importantly
9   the DOAC drugs were approved without a
10  requirement for monitoring" --
11     A.   Yes.
12     Q.   -- "so currently
13  manufacturers are developing devices to
14  assess the effect or concentration of
15  direct oral anticoagulants.  There are
16  currently no clear or approved devices
17  that measure that."
18         Do you agree with her
19  statement?
20     A.   I mean, I think that's
21  technically true.  It's what you expect a
22  device person to look at.  I mean, there
23  is the device -- Neoplastine is available
24  to measure PT.  It is approved to assess

Page 311

1   bleeding risk and can monitor bleeding
2   risk.  She doesn't discuss that.
3      Q.   Do you agree that no -- I'm
4   finished with that document.
5          Do you agree that no
6   regulatory agency or professional medical
7   or scientific society recommends or
8   requires routine coagulation monitoring?
9          MS. JEFFCOTT:  Object to
10         form.
11         THE WITNESS:  Again, I don't
12         think anyone is talking -- well,
13         no one -- I don't think anyone is
14         talking about routine coagulation
15         monitoring, as that term is used
16         in the warfarin context.
17         And I don't -- I mean, I
18         have not seen anybody do that.
19         That's not the issue I think in
20         this matter.
21  BY MR. ZELLERS
22     Q.   Do you agree that FDA does
23  not currently recommend or require
24  prothrombin time testing for Xarelto?

Page 312

1      A.   Well, who is FDA?  Tell me
2   who FDA is.  I think Bob has certainly
3   raised that issue.  He's -- he's talked
4   aloud.  I think everybody understands
5   that he has a belief that these -- from
6   his public statements, that it really
7   makes no sense not to reduce the bleeding
8   risk when that can happen.
9      Q.   Does the Xarelto label
10  currently recommend or require
11  prothrombin time testing for Xarelto?
12     A.   Your company didn't put it
13  in, no.
14     Q.   Are you aware of any
15  regulatory agency in the world that
16  currently recommends or requires
17  prothrombin time for Xarelto?
18     A.   So you want to look -- I
19  have -- I have the SPC label.  Let's
20  go -- I mean, they do talk about the
21  prothrombin time.  I have it here.  It
22  will take me a couple of minutes to
23  review, if you want to look at the SPC
24  together.

Page 313

1      Q.   I just want an answer to my
2   question if you're able to answer my
3   question.
4      A.   Well, I'm -- I'm certainly
5   happy to answer your question.  I mean --
6      Q.   Should I ask it again or do
7   you have it in mind?
8      A.   No, no.  I -- I -- I think
9   if you look at the SPC label, right,
10  which is the European label of the EMEA,
11  which has put it -- it talks about
12  under -- on it, it says the prothrombin
13  time, PT, is influenced by riva in a dose
14  dependent way with a close correlation to
15  plasma concentration and gives a .98 if
16  Neoplastine is used.  And then it talks
17  about the slope of the Neoplastine PT.
18         So I think there's no doubt
19  that the SPC label goes further than the
20  U.S. label.
21     Q.   Does the European label
22  recommend or require routine prothrombin
23  time, testing or monitoring for Xarelto?
24     A.   It says exactly what I said.

79 (Pages 310 to 313)

Protected - Subject to Further Protective Review

Page 314

1          Q.   Have we discussed all of the
2    bases for your opinion as expressed in
3    your report, Number 6, that as of
4    August 2011, there is a relationship
5    between prothrombin time levels and the
6    risk of bleeding?
7          A.   That should not be a -- I
8    mean, FDA has stated that unequivocally
9    in multiple forums.
10         Q.   All I want to do is make
11   sure that I've covered all of the bases
12   or reasons for the opinion you expressed.
13   I believe we have --
14         A.   Good.
15         Q.   -- but I'm double-checking.
16         A.   Good.
17         Q.   Do you believe we have as
18   well?
19         A.   Yes.
20         Q.   Are you aware that FDA has
21   stated that monitoring prothrombin time
22   to optimize safety outcomes cannot be
23   recommended?
24         A.   If you can show me the

Page 315

1    quote.
2          Q.   Sure.  Take a look at the
3    atrial fibrillation medical review, which
4    we marked as Exhibit 11.
5          A.   Okay.
6          Q.   And if you look at Page 44.
7          A.   Which exhibit is this?
8          Q.   This is Exhibit 11.  I'm
9    sorry.  Do you have it there, Doctor?
10         A.   This is dated -- just give
11   me the date of this.
12         Q.   This is dated, if we look
13   right inside the --
14         A.   The medical reviewer.
15         Q.   -- the medical reviewer,
16   it's submitted January 2011, but the
17   review completion date is August of 2011.
18         A.   Yes.  What page are we on?
19         Q.   We're on Page 44.  I'm
20   looking at the first bullet point on
21   Page 44.
22         A.   Yes.
23         Q.   I'm going to read it to you
24   and ask.

Page 316

1          A.   I cite it in my report.
2          Q.   Okay.  So you agree that the
3    medical review states, "Monitoring
4    rivaroxaban therapy with sequential
5    prothrombin times to optimize safety
6    outcomes cannot be recommended due to the
7    lack of information regarding, one,
8    within patient variability of prothrombin
9    time measurements on this drug in the
10   setting of a short half-life and rapidly
11   changing pharmacodynamic effects over
12   each 24-hour period; and two, what action
13   to recommend to the medical provider
14   based on prothrombin time results given
15   that only a single dose was tested in
16   ROCKET."
17              Did I read it correctly?
18         A.   Yeah, you cite this.  So
19   this is -- if I'm correct, this -- this
20   actually was written on August 10.  We
21   can go back in 2011.  When you look at
22   the data.  It's cited in Paragraph 45.
23   And -- and I cite that.  And I agree
24   that, you know, while measuring a PT

Page 317

1    level in a Xarelto-treated patient can be
2    helpful in identifying patients at risk
3    for serious bleeding, based on a
4    patient's response to Xarelto, it does
5    not allow a physician to titrate the dose
6    in sequential the way that warfarin is
7    used in sequential doses.
8              But it does allow a
9    physician and a patient to decide whether
10   the patient should continue on Xarelto, I
11   would argue.
12             Now, what's interesting is
13   if you look at the date of this -- and
14   I -- I want to go back and confirm
15   this -- it's the same date as the
16   clinical pharm that is written.
17             This is being put
18   together -- so my understanding is both
19   are coming out with results on this.  And
20   I would agree.  We talked earlier.  I
21   don't think you can use it to titrate or
22   do sequential PT.  But you can do to see
23   what the -- not sequential.  But you can
24   certainly determine whether you're in the

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 318

1    fourth quartile.
2            And, again, the -- just for
3    the record, I think it's important to put
4    on page -- Paragraph 48, that on
5    November 4, 2011, that the -- that -- it
6    says the clinical -- the deputy director
7    wrote, "The clinical pharmacology and
8    clinical reviewers demonstrate that there
9    is a linear correlation between riva
10   levels and prothrombin time.  They also
11   demonstrated that there is also a
12   correlation between PT and risk of
13   bleeding.".
14           This applicant has not
15   chosen to utilize this information.
16   Infrequent monitoring" -- they use the
17   word "monitoring" -- "perhaps at
18   initiation and yearly thereafter to
19   assure appropriate dosing in drugs that
20   prevent stroke and cause bleeding may
21   improve outcomes and be acceptable to
22   patients."
23       Q.   Doctor, doctor, I have your
24   report.  I've read your report.

Page 319

1        A.   No, but you -- but you
2    cited -- you cited part of the FDA
3    statements on this and not all the FDA
4    statements on this.
5        Q.   My job is to ask you
6    questions.  My question is, do you agree
7    with the statement that I read to you on
8    Page 44 of the medical review for atrial
9    fibrillation, Exhibit 14.
10       A.   I don't think there's enough
11   information --
12       Q.   I'm sorry.  I said
13   Exhibit 14.  I meant Exhibit 11.
14       A.   I don't think there's enough
15   information for a whole host reasons to
16   be able to use -- to sequentially monitor
17   as you monitor warfarin to titrate dose.
18   I do agree with FDA's analysis, right,
19   that --
20       Q.   Which you've read to us,
21   correct?
22       A.   Yes.
23       Q.   Okay.  Do you agree that
24   Phase III trials are necessary to prove

Page 320

1    the safety and efficacy of a drug?
2        A.   Okay.  So we can use the
3    rest of our time to talk about that.
4        Q.   I don't want to do that.
5        A.   Well, it could be because --
6    you know, the issue is in certain
7    instances, can a one -- can a Phase IIB
8    trial support safety and effectiveness.
9    It's a complex question.  It depends -- I
10   mean, I have approved drugs, I think it
11   would be fair to say, on Phase IIB
12   studies.  But they would be emergency
13   situations.
14       Q.   All right.  Absent an
15   emergency situation, do you agree that
16   Phase III trials are necessary to prove
17   the safety and efficacy of a particular
18   dose or dosing regimen of a drug?
19       A.   I think it's also a
20   complicated question.  Not just in
21   emergency circumstances, but in serious,
22   when you're dealing with serious and
23   life-threatening diseases.
24           If you have a drug that is

Page 321

1    a -- and there's no alternative, and
2    you're dealing with a serious and
3    life-threatening condition, I can
4    conceive -- I can conceive -- let's not
5    get into the Duchenne's argument of ten
6    patients.  No one would say that's an
7    uncontrolled trial that FDA approved a
8    drug that at best is probably an early
9    phase trial.
10       Q.   Doctor, I need you to be as
11   responsive as you can.
12       A.   I'm being -- I'm being very
13   responsive.  You're asking me a general
14   question about Phase III trials and
15   whether they're necessary.  And I'm
16   telling you that that kind of general
17   statement is not always correct.
18       Q.   So you disagree with that
19   statement?
20       A.   It's not always correct.  In
21   certain instances when there are not
22   alternative therapies, right, or in a
23   serious or life-threatening or in an
24   issues in emergency circumstances, FDA is

81 (Pages 318 to 321)

Protected - Subject to Further Protective Review

Page 322

1  not held to having a full Phase III
2  trial.
3      Q.   Do you agree that to
4  establish scientifically that safety
5  outcomes would, in fact, be improved
6  through monitoring or measuring
7  rivaroxaban, you would need to do a trial
8  comparing the outcomes in a group using
9  monitoring to the outcomes of a group not
10  using monitoring?
11      MS. JEFFCOTT:  Object to
12      form.
13      THE WITNESS:  No.  I think
14      you -- I think you -- I used
15      ROCKET right now, the tables in
16      ROCKET that I gave you, I think,
17      show statistically significant
18      evidence that -- where PT was done
19      in a clinical setting, and there's
20      a statistical association with
21      risk, that that information could
22      be useful.
23  BY MR. ZELLERS
24      Q.   Are you offering any opinion

Page 323

1  that the degree -- strike that.
2      Are you offering any opinion
3  about the degree to which patient safety
4  would likely be improved through
5  rivaroxaban measurement or monitoring as
6  you have described?
7      A.   Well, sure, let's --
8  let's -- you know, I mean, it's pretty
9  obvious.
10      If you -- if the fourth --
11  if rivaroxaban is no better on stroke at
12  a higher dose, as the data show, and you
13  can reduce that twofold -- two to
14  threefold increase in stroke -- in
15  bleeding risk, you can certainly have a
16  benefit on public health outcome.
17      Q.   What percentage reduction in
18  major bleeds do you contend would likely
19  be achieved if the rivaroxaban
20  measurement or monitoring that you are
21  opining on were done compared to the
22  current regimen of no routine monitoring?
23      A.   You could reduce the odds
24  ratio to the -- to the odds ratio of the

Page 324

1  first quartile, which would be a
2  reduction of 2 to 300 -- 200 to
3  300 percent.
4      Q.   What data are you basing
5  that on?
6      A.   The data we spent time
7  talking about.  I mean, once you have the
8  odds ratio, you have an odds ratio of,
9  what, two, or three, you can reduce that
10  to -- you should be able to reduce that
11  to an odds ratio of one.
12      Q.   You are relying upon the
13  statistical analyses as it relates to
14  Exhibits 8 and 9 that we discussed
15  earlier today?
16      A.   You are missing one.
17      Q.   And 10?
18      A.   And 10.  Just so let's do
19  one other.
20      Q.   I thought we were done.
21      A.   No.  And statistical
22  analysis that's in the report that's part
23  of FDA's -- on logistic regression, they
24  are statistically significant if you look

Page 325

1  at that data in that chart.
2      Q.   You are also including then
3  the statistical analyses that are done by
4  the FDA and are a part of the medical
5  review, Exhibit --
6      A.   Clinical pharm.
7      Q.   Clinical pharm.
8      A.   Clinical pharm.  And if you
9  look at those confidence intervals, you
10  can see the statistical analysis.
11      Again, my stuff that I did
12  today just confirmed that.
13      Q.   Clinical pharm reviewing the
14  ROCKET study data, correct?
15      A.   Well, and logistic
16  regression, yeah.  The stuff I did today
17  just confirms that Bayer had that data in
18  its possession before FDA did that
19  statistical analysis.
20      Q.   Do you hold yourself out as
21  an expert in in vitro diagnostics?
22      A.   Certainly on the regulatory
23  aspects of in vitro diagnostics, yes.
24      Q.   Are you an expert in in

82 (Pages 322 to 325)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 326

1    vitro laboratory assays?
2         A.   Certainly in the regulation
3    of them, yes.
4         Q.   Do you have any
5    experience --
6         A.   I mean, I ran the -- I was
7    responsible for the whole in vitro
8    diagnostic division at CDRH and CDRH and
9    CDER together.  And I have had plenty of
10   experience on these questions serving
11   on -- in my responsibility on boards.
12        Q.   Do you have any experience
13   or expertise with assay development?
14        A.   Sure.  I mean, I have lived
15   at -- in the companies that I've been on
16   the board of.
17        Q.   Have you ever performed a
18   prothrombin time assay?
19        A.   You asked me that earlier.
20        Q.   What was your answer?
21        A.   My answer was I have ordered
22   this test multiple times.  I've probably
23   been down the lab sitting next to the
24   tech.  I don't remember -- you're

Page 327

1    bringing me back my memories of my
2    hospital days.  But we all ordered these
3    tests.  These were standard tests.
4         Q.   Have you ever been involved
5    in the development of a prothrombin time
6    assay?
7         A.   I've been -- I don't believe
8    I've been involved in the development of
9    a prothrombin time assay.  I've been
10   involved in the development of many in
11   vitro diagnostics.
12        Q.   Have you ever been involved
13   in the development of an in vitro assay?
14        A.   Sure.
15        Q.   Are you familiar with the
16   FDA approval process for laboratory
17   assays like prothrombin time?
18        A.   It was my job.
19        Q.   Do you understand that there
20   is an anti-Factor Xa assay that is
21   sensitive to rivaroxaban?
22        A.   It's somewhere -- I've been
23   trying to understand the actual status of
24   that.

Page 328

1         Q.   This is the Diagnostica
2    Stago assay, correct?
3         A.   I -- it's getting late.  I
4    don't -- I don't -- I have not studied
5    the diagnostic -- the regulatory history
6    of Factor Xa, because I didn't think it
7    was at issue in this case.
8         Q.   Do you know whether or not
9    the anti-Factor Xa assay is sensitive to
10   rivaroxaban?
11        A.   I'm not issuing no opinion
12   on that in this case.
13        Q.   Do you know whether or not
14   Diagnostica Stago has tried for a number
15   of years to obtain clearance of that
16   assay from the FDA?
17        A.   Yeah, again, I've not --
18   I've not -- particularly I'm not going to
19   issue an opinion on that.  I didn't think
20   it was an issue in this case.
21        Q.   You have no opinion with
22   respect to whether or not that assay has
23   been submitted to the FDA, what the FDA's
24   position is, and whether or not the FDA

Page 329

1    has approved or cleared that assay?
2         MS. JEFFCOTT:  Object to
3    form.
4         THE WITNESS:  It's not been
5    a matter that's at issue, nor am I
6    opining on -- the data that I have
7    seen that I have studied that show
8    the relationship is between PT,
9    Neoplastine Plus, and bleeding, I
10   have not -- in the hours that I've
11   spent here, that's where I have
12   focused my time, because that's
13   where I see the association.
14        And that's where the company
15   also has understood there is an
16   association.
17   BY MR. ZELLERS
18        Q.   Dr. Kessler, do you agree
19   that the division responsible for
20   regulation of in-home and laboratory
21   diagnostic tests is the Office of
22   In Vitro Diagnostics and Radiological
23   Health, or OIR?
24        A.   Yes.

83 (Pages 326 to 329)

Protected - Subject to Further Protective Review

Page 330

1    Q.   Did you ever work at that
2  office?
3    A.   I ran it.  My -- my -- it
4  may have been called something else at
5  the time.  It may have changed its name.
6  I have to go back.  I was responsible for
7  that office, and it was very important.
8  A lot of our drugs, you know, have assays
9  like Herceptin assays and stuff like that
10  that are critically important.
11    Q.   Do you have any experience
12  or expertise in hemostasis or thrombosis?
13    A.   I'm a licensed physician.  I
14  take care of patients.  I take care of
15  patients who both bleed and clot
16  abnormally.
17       So, again, I'm not -- others
18  can -- I'm happy to talk about the
19  clotting assay -- clotting cascades.
20  It's part of basic medical knowledge.
21    Q.   Any experience or expertise
22  in coagulation?
23    A.   It's what we do as
24  physicians.

Page 331

1    Q.   What about in laboratory
2  coagulation testing?
3    A.   I was medical director of
4  Einstein.  I ran the laboratory services.
5  I usually kind of deferred on specific
6  coagulation testing to my lab director.
7  But certainly on the regulatory aspects
8  of coag assays or they should be used as
9  drugs, I lived that.
10    Q.   Have you ever interpreted a
11  coagulation test?
12    A.   Well, I'm a doctor, aren't
13  I?
14    Q.   Is that a yes?
15    A.   Yes.
16    Q.   Any formal training in
17  anatomic pathology?
18    A.   What case are we on?
19    Q.   We are on Xarelto.
20    A.   So if you ask Dr. Ravioli
21  -- Mr. Horowitz has put his head down.
22    Q.   I'd really like this to be a
23  yes or no.  Are you capable of answering
24  yes or no?

Page 332

1    A.   Well, I'll e-mail -- I'd be
2  happy to -- to give you my professors of
3  anatomical pathology and let you ask them
4  what my understanding is and how well I
5  did.
6    Q.   Are you able to answer that
7  question?
8    A.   Do I have an -- do I have an
9  understanding -- what is the -- what was
10  the actual?
11    Q.   The question was do you have
12  any formal training in anatomic
13  pathology?
14    A.   It's an essential part of
15  medical training in the United States.
16  You can't be a doctor.
17    Q.   Is that a yes?
18    A.   Do you watch TV?
19    Q.   I'm asking if that is yes or
20  no to my question --
21    A.   A doctor goes in and does
22  anatomy lab, don't you?
23    Q.   Is that a yes?
24    A.   Of course.

Page 333

1    Q.   Do you have any formal
2  training in analytical chemistry?
3    A.   Sure.
4    Q.   Any formal training in
5  clinical pathology?
6    A.   Of course.
7    Q.   Any experience or expertise
8  in laboratory methods?
9    A.   It's part of medical
10  training and I ran a hospital.  It was
11  JCAHO accredited.
12    Q.   Have you ever worked in a
13  bio-analytical laboratory?
14    A.   I ran it.  I was responsible
15  for it as medical director.
16    Q.   Have you ever published a
17  peer-reviewed article on laboratory
18  methods?
19    A.   Probably not.
20    Q.   Ever published a
21  peer-reviewed article on biomarker bio
22  analyses?
23    A.   I certainly -- written the
24  regs on bio surrogate markers, et cetera.

84 (Pages 330 to 333)

Protected - Subject to Further Protective Review

Page 334

1    Q.   Ever published a peer-review
2  article on prothrombin time or other
3  assays?
4    A.   Not specifically, I don't
5  believe.
6    Q.   Would you agree in general
7  that any in vitro diagnostic test should
8  be accurate?
9    A.   Yes.
10   Q.   Would you also agree that an
11 in vitro test should be accurate so that
12 patients and doctors don't seek
13 unnecessary treatment?
14   A.   Of course things should be
15 accurate.
16   Q.   Do you agree that for
17 rivaroxaban, prothrombin time shows
18 linearity but low dose-response may be
19 poor?
20   A.   I -- no.  I -- I would,
21 again, add the -- from the data that I
22 have seen, I've seen the statistical
23 association at all levels -- all trials.
24   Q.   You disagree that a low

Page 335

1  dose-response may be poor with respect to
2  prothrombin time and whether or not it
3  shows linearity for rivaroxaban?
4    A.   I -- that's not what I said
5  exactly.  I said I've looked at the
6  linearity between Quartiles 1 and
7  Quartiles 2, 3, and 4, and that data
8  seems robust.
9    Q.   That is your opinion as an
10 expert in this case; is that right?
11   A.   Yes.
12   Q.   You cite to a number of
13 articles in your section on postmarket
14 experience.  You are aware of that?
15   A.   Yes.
16   Q.   Those are observational
17 studies; is that correct?
18   A.   Epidemiological studies.
19   Q.   Observational
20 epidemiological studies, correct?
21   A.   Fair.
22   Q.   Would you agree that you
23 cannot cross-compare from one
24 observational study to another?

Page 336

1    A.   Again, a general statement.
2  My purpose was to try to be as inclusive
3  in that section.
4    I -- I try to give you a
5  range of the data and whether, in fact,
6  there's -- that there are studies that
7  question the bleeding risk.  There -- I
8  mean, there are studies.  Some studies,
9  not all studies, and I think that was --
10 that show that there's concern about
11 increased bleeding versus other drugs.
12   I do not -- I am -- I am
13 very careful to say there is a range of
14 studies, and nowhere do I -- nowhere do I
15 do that.  I cite the studies for
16 themselves and I try to be inclusive.
17   How one does metaanalyses
18 again probably is for another day.  Can
19 you pool epidemiological studies?  How
20 you pool them is a science in and of
21 itself.  I don't do that in this case.
22   Q.   Would you agree that even
23 among the studies that you cite, they
24 reach many different findings, some

Page 337

1  favorable for rivaroxaban, some favorable
2  for apixaban, some favorable for
3  dabigatran?
4    A.   The -- the -- the -- I think
5  it's fair to say that the studies are
6  mixed.  I think you are correct in that.
7  But I think there is -- I mean perhaps
8  you can -- you can -- I don't want to
9  start getting into it.  You can see a
10 trend that perhaps riva is worst in
11 class.
12   Q.   You are not expressing that
13 opinion; you are simply saying it's a
14 possibility?
15   A.   Yeah.  So what I'm saying is
16 it gives -- bleeding is a serious
17 concern.  There are studies out there
18 that make it very important, that even --
19 that -- that -- reinforce the fact that
20 bleeding is a very strong concern with
21 rivaroxaban.  And that supports the
22 reason why the -- the main opinion that
23 we should be mindful and do whatever we
24 can to reduce bleeding risk, I think they

Protected - Subject to Further Protective Review

Page 338

1  support that general conclusion.
2      Q.   Interpretation of
3  observational studies must be made with
4  caution as the quality of observational
5  studies can vary.  Fair?
6      A.   It's true of all data.
7      Q.   Agree that using existing
8  data resources can present limitations
9  since data were not collected with the
10  particular question being addressed in
11  the study?
12      A.   I -- I -- a general
13  statement.  I'm not sure the context that
14  you're raising it.
15      Q.   Do you generally agree?  Let
16  me withdraw.
17          There are limitations with
18  observational studies, correct?
19      A.   In fact, there's a whole
20  schedule that discusses the
21  limitations -- the strengths and
22  limitations.  That's -- that's also true
23  for randomized controlled clinical
24  trials.  And one -- when one assesses

Page 339

1  those and puts those in, it's important
2  to understand the strengths and the
3  limitations, and I tried to do that in
4  the -- in the schedule.
5      Q.   Last area.  You express an
6  opinion that --
7      A.   And then Mr. Horowitz is
8  going.
9      Q.   We'll see.
10      A.   I think I'm going to need a
11  break afterwards.
12      Q.   There was an INRatio device
13  that was utilized in the ROCKET study to
14  monitor INR, correct?
15      A.   Yes.
16      Q.   That device was 510(k)
17  cleared, correct?
18      A.   Yes.
19      Q.   That device was CLIA waived,
20  correct?
21      A.   I believe.  I mean, I -- I
22  think so.  I didn't get into it.
23      Q.   The INRatio point-of-care
24  device was recalled in 2016, correct?

Page 340

1  There was a notice in 2014, and then the
2  device was taken off the market in 2016?
3      A.   When were the warning
4  letters given?  There were warning
5  letters, I believe -- or -- if you want
6  to do the regulatory history, you have to
7  put the warning letters as well as the
8  recall -- your clients were in possession
9  of the warning letters earlier, I
10  believe.
11      Q.   I've -- I've read your
12  opinion.
13      A.   Sure.
14      Q.   What I'm trying to do is
15  move to the end of the story --
16      A.   Sure.
17      Q.   -- given even where we are
18  in terms of time.
19      A.   Yeah, of course.
20      Q.   Would you agree that there
21  have been a number of sensitivity
22  analyses and reviews that had been done
23  to try to determine what impact, if any,
24  the INRatio device had on the ROCKET

Page 341

1  study and study results?
2      A.   Yes.
3      Q.   Do you agree that the FDA
4  performed an independent review of that
5  issue?
6      A.   I'm not going to get into a
7  discussion of the word "independent."
8      Q.   Yeah --
9      A.   They performed a review of
10  that issue, yes, sir.
11      Q.   It was a comprehensive
12  review, correct?
13      A.   I -- I think they took it
14  seriously, yes.
15      Q.   Let me hand you --
16      A.   And -- and they concluded --
17  you are going to hand me the reanalysis?
18      Q.   I will.
19      A.   We can talk about it.  I
20  mean, the -- the FDA, the bottom line,
21  just from my -- my perspective is that we
22  can talk about it, if you want, both what
23  your client omitted from FDA, but really
24  the important thing here is, if you look,

86 (Pages 338 to 341)

Protected - Subject to Further Protective Review

Page 342

1    there was an increase in -- I believe in
2    the odds -- in the hazard ratio of stroke
3    from 1.03 to 1.10.  And, again, bleeding
4    risk.  So there was a little more
5    bleeding associated in the FDA.  There
6    was a little more bleeding.
7            There is, just so I can just
8    correct on that point, again, I relied --
9    the Gerstman -- if you look at my report,
10   I think Gerstman-- I'm going to get this.
11   There's a typo that's probably not on the
12   error sheet that I saw.  I just realized.
13   I think I said that the relative increase
14   risk was 1.12, and it was 1.13 or vice
15   versa.  That's just a typo.
16           But it's statistically
17   significant.  Again, there's a little
18   more bleeding risk with Xarelto.  And
19   that again reinforces the major point
20   that to the extent you can reduce the
21   bleeding risk, you should do it.  I think
22   that's what I'm saying.
23           MS. JEFFCOTT:  Is this 15?
24           MR. ZELLERS:  16.

Page 343

1            (Document marked for
2            identification as Exhibit
3            Kessler-16.)
4    BY MR. ZELLERS
5        Q.   Doctor, I handed you the FDA
6    ROCKET-AF reanalysis.
7            Do you see that?
8        A.   I don't -- is this the
9    entire thing?  I think there's more.
10       Q.   Okay.  Doctor --
11       A.   I don't think this --
12       Q.   -- we're going to use --
13       A.   I don't think this is the
14   whole document.
15       Q.   Okay.  The document that
16   I've handed you goes from Bates number or
17   ID Number 3990736 through 3984657.
18       A.   Yeah, that's correct.
19       Q.   This reanalysis was done by
20   Dr. Rose in or around September of 2016,
21   correct?
22       A.   I think there were a number
23   of different contributions to this, if
24   I'm correct.

Page 344

1        Q.   Dr. Rose is the one listed
2    on Page 1 of the reanalysis; is that
3    right?
4        A.   Yes.
5        Q.   FDA states what it did at
6    the bottom of Page 1.  "After learning of
7    the recall, Janssen and FDA independently
8    performed a variety of analyses intended
9    to characterize the impact of the use of
10   the INRatio device on the safety and
11   efficacy results of ROCKET."
12       A.   Right.
13       Q.   Do you agree that's what
14   they had done?
15       A.   Yes, that's what they tried
16   to do.
17       Q.   All right.  Looking at Page
18   2, and I'm looking at the middle of the
19   carryover paragraph, starting with "FDA
20   and Janssen."
21       A.   Right.
22       Q.   Do you see that?  Right
23   after ROCKET.
24       A.   You have to --

Page 345

1        Q.   Carryover paragraph, Page 2.
2        A.   Yes.
3        Q.   "FDA and Janssen also built
4    mathematical models of INR versus
5    outcomes that generated expected bleeding
6    and ischemic stroke rates in the two
7    study arms, rivaroxaban versus warfarin,
8    comparisons for these endpoints."
9    Correct?
10       A.   Right.  That sort of goes
11   against your independent -- they both did
12   it.  But keep on going.
13       Q.   They did it separately,
14   correct, in separate analyses?
15       A.   No, that's not quite --
16   earlier they used the word "independent."
17   Here they said they both built models.
18   I'll take you on your word.
19       Q.   All right.  Looking at the
20   conclusions, I'm looking at the last
21   bullet point on Page 2, about ten lines
22   up where it starts "Overall."
23           Do you see where I'm at?
24       A.   Yes.  There are some

87 (Pages 342 to 345)

Protected - Subject to Further Protective Review

Page 346

1  conclusions before that. "Each of these
2  analyses predicted a small decrease in
3  the expected range in major bleeding in
4  the warfarin arm compared to the observed
5  rate of 3.45 events per 100 patient years
6  in ROCKET."
7        So, I mean, there's some --
8  some conclusions before your quote.
9        Q.   Doctor, did the FDA state in
10  it's reanalysis document, Exhibit 16,
11  "Overall, these estimated reductions in
12  the rates of bleeding events in the
13  warfarin arm were small enough so that
14  the benefits of rivaroxaban would still
15  outweigh its risk if efficacy were not
16  affected. Notably, two of these three
17  analyses also estimated the rate of
18  ischemic stroke, and one estimated the
19  rate of the primary efficacy endpoint of
20  total stroke plus systemic embolism.
21        "Both these models predicted
22  that the rate of ischemic stroke would be
23  increased in the warfarin arm resulting
24  in an expected improvement of the

Page 347

1  efficacy of rivaroxaban related to
2  warfarin."
3        Did I read that correctly?
4        A.   Right. But you only talked
5  about the efficacy. Talk about the
6  safety -- because there was a concomitant
7  increase in safety risk. And that's
8  what -- I mean, that's why I feel so
9  strongly. You have to monitor bleeding
10  risk even after the reanalysis more,
11  because as we know there is an increased
12  risk of 1.03, 1.04 in major bleeding.
13        Q.   Doctor?
14        A.   Yes.
15        Q.   Looking at the last -- Page
16  3, right above "recommendations," the FDA
17  states, "Accordingly, the conclusion we
18  made in 2011 that the benefits of
19  rivaroxaban in patients with nonvalvular
20  atrial fibrillation outweigh its risk
21  should not be changed." Correct?
22        A.   So -- but -- but the --
23        Q.   Is that the conclusion?
24        A.   That's a bottom line

Page 348

1  conclusion. But recognize that
2  conclusion also means that after this
3  reanalysis, Xarelto was worse on bleed
4  risk and a little better on stroke risk.
5        So, again, what I -- the
6  reason why this is so important, if we
7  were concerned about the bleed risk
8  before the reanalysis, after the
9  reanalysis there's further evidence to be
10  concerned. I mean, there is a
11  statistical -- it's small, between 1.03
12  and 1.05 and the post-reanalysis. But
13  it's statistically significant.
14        Q.   The FDA recommended no
15  changes in rivaroxaban labeling to
16  reflect the impact of use of the INRatio
17  device in ROCKET are warranted. No other
18  major regulatory action should be taken
19  with respect to rivaroxaban.
20        Is that the recommendation
21  of the FDA?
22        A.   Not entirely. FDA did say,
23  if you read this, it had thought that the
24  public -- they didn't know how to do it

Page 349

1  concisely in the label, I think is what
2  they said.
3        Q.   Did I read the
4  recommendation of the FDA correctly?
5        A.   Then read the entire report.
6  Okay.
7        Q.   Doctor, we have marked the
8  entire report. It is an exhibit. You've
9  relied on it.
10        A.   No, you have to read -- no,
11  no, no. I mean, there is a rule of
12  completeness.
13        Q.   No. My --
14        A.   There's a rule of
15  completeness. If you're going to read a
16  document, right --
17        Q.   Doctor, there is no rule of
18  completeness in a deposition. I need to
19  ask you questions. We are running out of
20  time.
21        A.   I can certainly --
22        Q.   I want to try to finish.
23        A.   Please read the last
24  paragraph on Page 42.

88 (Pages 346 to 349)

Protected - Subject to Further Protective Review

Page 350

1       MR. HOROWITZ:  Just for the
2    record, I'm going to be forced to
3    ask for more time because of the
4    responsiveness of the witness.
5    Continue.
6  BY MR. ZELLERS:
7       Q.   Doctor --
8       A.   You can certainly read other
9    portions of the document.
10       MR. HOROWITZ:  I just need
11    to make a record here.
12       MS. JEFFCOTT:  Let me
13    interrupt real quick.  The
14    questions have been
15    extraordinarily broad.  He's doing
16    his best.
17       MR. HOROWITZ:  We're not
18    going to debate on our time here.
19    I'm just making a quick record.  I
20    think that the transcript reflects
21    a level of nonresponsive that
22    merits more time.
23       Continue.
24

Page 351

1  BY MR. ZELLERS
2       Q.   Doctor, you agree that --
3       A.   I want to put on the record,
4    that I've answered every question fully,
5    absolutely fully.
6       Q.   I want to finish, Doctor.
7       Are you aware that the EMA
8    reviewed all of the data and reached a
9    similar conclusion to the FDA that any
10    issue with the INRatio device did not
11    impact the ROCKET study results?
12       A.   What the EMA concluded is
13    cited in my report.  They also concluded
14    that there was not a change in the
15    risk-benefit equation.
16       Q.   Duke Research Institute
17    performed its own analyses and reached
18    the same conclusion, right?
19       A.   So, yes.  But everybody,
20    everybody, as I understand it, agrees
21    with the fact that there is increased
22    bleeding risk after this reanalysis.
23    You're focusing on the risk-benefit.  And
24    if you want to minimize the bleeding

Page 352

1    risk, if you're concerned about it, and
2    what you have to warn about that, there
3    is further reason to do that after that.
4       And I think everybody -- the
5    EMA, Duke, everybody agrees that the
6    bleeding risk is increased after the
7    reanalysis.
8       Q.   I -- I need to quit.  I've
9    got lots more questions to ask you.  But
10    Mr. Horowitz wants an opportunity to ask
11    you some questions.
12       Let -- let me ask you one
13    other question.  Other -- are there any
14    opinions that you intend to express at
15    trial other than what you've told us here
16    today in your deposition and what is in
17    your report?
18       A.   If we stopped right now, no.
19    But who knows what the good Mr. Horowitz
20    and I would come up with.
21       MR. ZELLERS:  Let -- let's
22    take a break.
23       THE VIDEOGRAPHER:  The time
24    is now 4:35.  We're going off the

Page 353

1    record.
2       (Short break.)
3       THE VIDEOGRAPHER:  The time
4    is now 4:52.  And we're back on
5    the record.
6             - - -
7       EXAMINATION
8             - - -
9  BY MR. HOROWITZ:
10       Q.   Good afternoon, Dr. Kessler.
11    Nice to see you again.
12       A.   Nice to see you.
13       Q.   I just knocked over a
14    computer.  We're off to a good start
15    here.  Okay.
16       You understand that I
17    represent Bayer here today?
18       A.   I do.
19       Q.   And that I'm here to ask you
20    questions in follow-up to Mr. Zellers and
21    some of my own original thoughts on your
22    opinions related to Xarelto and the
23    report that you filed and the testimony
24    that you've given so far.

89 (Pages 350 to 353)

Protected - Subject to Further Protective Review

Page 354

1      A.   Happy to hear them.
2      Q.   And you understand, it's a
3  little late in the day.  I'm kind of
4  tight for time.  So if you can do your
5  best to try to answer my questions as
6  concisely as you can, I'd really
7  appreciate it.  I understand --
8      A.   Yes.
9      Q.   Thank you.  That was good.
10         Let me ask you this.  You
11  understand -- you've been deposed 25-plus
12  times, right?
13      A.   Right.
14      Q.   And you're familiar with the
15  process?
16      A.   Yes.
17      Q.   And you understand that part
18  of the reason that we come here today, in
19  fact, the entire reason is to discuss
20  with you the opinions and the bases of
21  the opinions that you've formed about the
22  drugs that you might testifying about, in
23  this case it would be Xarelto, correct?
24      A.   Correct.

Page 355

1      Q.   You came here today with two
2  statistical analyses, based on Exhibits 8
3  and 9, one of which we've marked as
4  Kessler-10, and one of which is on your
5  Exhibit 3, your notepads that you brought
6  with you.  Is that fair?
7      A.   Yes.
8      Q.   And you said that these are
9  analyses -- I think that the analyses
10  that are on your scratchpad were done
11  yesterday.  Is that fair?
12      A.   Yes.
13      Q.   And the analyses that's in
14  Exhibit 10 was done within the last few
15  weeks, a couple weeks, something like
16  that?
17      A.   Sure.
18      Q.   You would understand -- and
19  these were statistical analyses that you
20  actually had the lawyers who have
21  retained you in this litigation prepare.
22  Is that fair?
23      A.   I asked them to be able to
24  get me a specific odds ratio.

Page 356

1      Q.   Okay.  You are currently
2  employed at the University of California
3  in San Francisco as a professor of
4  biostatistics?
5      A.   I am.
6      Q.   Do you have colleagues there
7  who are statisticians?
8      A.   Certainly there are
9  colleagues that I have on my academic
10  work I've used to do biostatistics.
11      Q.   And you certainly have
12  access to statisticians who are not by
13  and through the plaintiffs' lawyers who
14  retained you for this litigation, fair?
15      A.   I -- you know, I'd be very
16  happy to -- these documents that I have
17  and these charts are subject to a
18  protective order.  I'm not free to give
19  these documents or these numbers to
20  anybody.
21      Q.   So that's your rationale for
22  not independently getting these looked at
23  by a statistician?  You're saying that
24  the data that's in these documents that

Page 357

1  you relied upon is confidential.  Is that
2  your testimony?
3         MS. JEFFCOTT:  Objection to
4  form.
5         THE WITNESS:  Well,
6  certainly this clinical set of
7  data, both of these clinical sets
8  of data, my understanding, are
9  subject to protective orders.
10         I do think -- you know, I
11  thought it would be helpful to
12  have an odds ratio.  FDA did a
13  statistical analysis.  All the
14  stuff confirms, you know -- again,
15  to Mr. Zellers' point, you know,
16  earlier, and you just --
17  BY MR. HOROWITZ:
18      Q.   Doctor, doctor, I've got to
19  cut you off because you are not answering
20  my question.
21      A.   Well, but you need to know
22  this is part -- this is part --
23      Q.   For the record, I just want
24  you to know I am going to ask for more

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 358

1  time if you continue this.
2      A.   But I'm actually trying to
3  be helpful.
4          MS. JEFFCOTT:  He's trying
5  to answer.
6          THE WITNESS:  One of the
7  goals in the depositions to make
8  sure that you understand
9  everything that's in my head and
10  on this chart, right?
11  BY MR. HOROWITZ:
12     Q.   Can you answer my question?
13     A.   Yes.  But you should also
14  know that these statistics are also
15  consistent with both DVT-X and TIMI.
16     Q.   That's my question.  Good.
17         You would, of course, then
18  understand that Mr. Zellers and I -- you
19  didn't provide these to us before we came
20  in here for your deposition today, right?
21     A.   I provided my opinion, which
22  is there was an association.  This is all
23  supportive.
24     Q.   That wasn't my question.

Page 359

1  You changed my question.  My question
2  was, you didn't provide the statistical
3  analyses that you did with the
4  plaintiffs' lawyers until I came in here
5  today to talk to you.  Is that fair?
6          MS. JEFFCOTT:  Object to
7  form.
8          THE WITNESS:  I gave -- I
9  gave them to you -- I brought
10  these to -- you asked
11  questions that --
12  BY MR. HOROWITZ:
13     Q.   The question is, the first
14  time I've ever seen these was when I
15  walked in the door here today to depose
16  you.  Is that fair?
17     A.   You can do the statistical
18  analysis and have it done in five
19  minutes.  You don't need the statistical
20  analysis, right?  FDA did it.
21         MR. HOROWITZ:  Objection.
22  Move to strike.  Nonresponsive.
23  BY MR. HOROWITZ:
24     Q.   My question to you is, the

Page 360

1  first time that you provided the
2  statistical analyses to Mr. Zellers and I
3  is when we walked in the door to ask you
4  questions today.  Yes or no?
5      A.   I -- that -- that --
6          MS. JEFFCOTT:  Object to the
7  form of the question.  Asked and
8  answered.
9          THE WITNESS:  That is
10  exactly correct, and that is
11  exactly appropriate for me to do.
12  It is -- it is absolutely
13  consistent with what's in my
14  report.  I am certainly allowed to
15  continue to be able to look at
16  documents and be able to answer
17  your questions.
18  BY MR. HOROWITZ:
19     Q.   And so you would, of course,
20  understand that Mr. Zellers and I may
21  have some questions about these
22  statistical analyses that, of course, we
23  weren't able to prepare before today to
24  ask you.  Is that true?

Page 361

1          MS. JEFFCOTT:  Object to
2  form.
3          THE WITNESS:  All -- all you
4  have to do is look at the -- look
5  at the numbers, Mr. Horowitz.  And
6  you can see that Quartile 4 has an
7  increased risk versus Quartile 1.
8          That's about fourth grade
9  level.  You don't need the
10  statistics.  I was trying -- in
11  case you asked me about them, I
12  was trying to be prepared.
13  BY MR. HOROWITZ:
14     Q.   And you would understand,
15  Dr. Kessler, having been through this
16  process the number of times that you
17  have, that if we wanted to take your
18  statistical analyses that you did with
19  the plaintiffs' lawyers and gave to us
20  when you first got to the deposition, not
21  even when you first got, but when we
22  asked you questions at the deposition,
23  and have our own folks take a look at it,
24  and then if we had some follow-up

91 (Pages 358 to 361)

Protected - Subject to Further Protective Review

Page 362

1    questions, you'd understand if I wanted
2    to talk to you again about the veracity
3    of these numbers, wouldn't you?
4         MS. JEFFCOTT:  Object to
5    form.
6         THE WITNESS:  Mr. Horowitz,
7    I'm willing to even go further
8    because I don't think this is a
9    big deal.  If your statisticians
10   look at -- do the same numbers,
11   and they get to an odds ratio that
12   is different, it certainly should
13   be put on the table.
14        I mean, again, the odds
15   ratios are what the odds ratios.
16   So you can bring in two
17   statisticians independently.  I'm
18   happy to stipulate to whatever the
19   statistics are.
20        It's not a big deal here.
21        It's absolutely consistent
22   with what's in the report.
23   BY MR. HOROWITZ:
24        Q.   Would you resist if I wanted

Page 363

1    to come talk to you again about these
2    numbers?
3         MS. JEFFCOTT:  Object to
4    form.
5         THE WITNESS:  Would I
6    resist?
7         MS. JEFFCOTT:  You are
8    limited on time.  In this
9    deposition you have seven hours.
10   BY MR. HOROWITZ:
11        Q.   Would you resist if I said,
12   you know, I've got some follow-up
13   questions on these documents you brought
14   to the deposition with you, the
15   statistical analyses we've never seen
16   before that weren't in your report?
17        MS. JEFFCOTT:  Object to
18   form.
19        THE WITNESS:  So if your
20   statistician has a different
21   number, I'm happy for you to let
22   me know that and we can work
23   out -- I am sure that you and I
24   could come to agreement on --

Page 364

1         between, you know, statisticians
2    on this side and statisticians on
3    your side.
4         There's an odds ratio.
5    Again, this should be able to be
6    done non-controversially.  You
7    know, the number is what the
8    number is.
9         You have the data.  Just
10   calculate an odds ratio.  And if
11   you do it honestly, Mr. Horowitz,
12   I'm almost willing to agree to
13   your number, and you do it
14   straightforward, and I have no
15   reason you wouldn't do it.
16        So do your own odds ratio
17   and we can certainly talk about it
18   at trial.  And just let me know.
19   I'm happy to talk about if you
20   come to a different odds ratio.
21        I was trying to be helpful
22   and trying to be scientifically
23   accurate.  Of course, check it.
24   Not a big deal.

Page 365

1         MR. HOROWITZ:  Objection.
2    Move to strike it.  Nonresponsive.
3    BY MR. HOROWITZ:
4         Q.   Dr. Kessler, you are
5    charging $1,000 per hour in this
6    litigation as you do for all of your
7    litigations?
8         A.   That's correct.
9         Q.   And you charge $1,000 per
10   hour for every activity that you conduct
11   in this litigation for the plaintiffs'
12   lawyers, including review of documents.
13   Is that fair?
14        A.   Yes.
15        Q.   Literature searches,
16   correct?
17        A.   Yes.
18        Q.   $1,000 for drafting expert
19   report?
20        A.   Yes.
21        Q.   Meetings with the lawyers?
22        A.   My time.
23        Q.   Deposition preparation?
24        A.   Yes.

92 (Pages 362 to 365)

Protected - Subject to Further Protective Review

Page 366

1      Q.   Deposition testimony?
2      A.   Yeah.
3      Q.   Trial preparation?
4      A.   Yep.
5      Q.   Trial testimony?
6      A.   Yes.
7      Q.   All of the above, right?
8      A.   We haven't had trial
9   testimony, but...
10     Q.   Right.  That's what you
11  charge, $1,000 per hour, right?
12     A.   Yeah.
13     Q.   And you brought with you
14  apparently to the deposition, apparently
15  in response to the deposition notice and
16  subpoena duces tecum, attached, which is
17  Exhibit 2, you brought Exhibit 5, which
18  is two invoices that you discussed with
19  Mr. Zellers.  Is that fair?
20     A.   Yes.
21     Q.   And the date, as you
22  discussed with Mr. Zellers, is really for
23  work that was through October 16th.  And
24  I know it says 2014.  But you agreed that

Page 367

1   it was 2016?
2      A.   Right.  Typo.  My wife typed
3   it up.
4      Q.   And you have done work since
5   October 16th.  Is that fair?
6      A.   That's correct.
7      Q.   I mean, you fixed up your
8   schedules, which you provided to us
9   today, right?
10     A.   Yeah.
11     Q.   And you created an errata
12  sheet for your report, right?
13     A.   Yes.
14     Q.   And you prepared for your
15  deposition, right?
16     A.   Sure.
17     Q.   I know you didn't spend
18  quite as much time as you would have
19  liked, but you said you prepared.
20     A.   Right.
21     Q.   How have you kept track of
22  your time, and -- and, I mean,
23  physically.  What -- what have you
24  written down with respect to what you've

Page 368

1   done since October 16th through today?
2      A.   It may not be through today,
3   but generally at home, I -- I just -- I
4   write down -- my general practice is to
5   put numbers down on a little piece of
6   paper at different intervals.
7      Q.   I think you've called them
8   in the past scratch pads?
9      A.   That's correct.
10     Q.   So as we sit here now, you
11  currently have scratch pads that reflect
12  your time that you've -- you've spent on
13  Xarelto between October 16th and -- and
14  today --
15     A.   No.
16     Q.   -- even if it's not entirely
17  through today?
18     A.   It's not through, you know,
19  there should be scratch pads, yes.
20     Q.   Okay.  You understand --
21  you -- you said -- well, let me read this
22  to you.
23          Do you understand that the
24  subpoena duces tecum that you did respond

Page 369

1   to and brought Kessler's Exhibit 5, the
2   two invoices, says, "This request
3   includes all scratch pads and other
4   documents that the witness used to record
5   the number of hours he spent
6   investigating and evaluating issues
7   involved in the Xarelto litigation."
8          Were you aware of that
9   before I just read that to you?
10     A.   I -- I missed the word
11  scratch pad, sir.
12          MS. JEFFCOTT:  And,
13     Mr. Horowitz, you are aware that
14     we have objected to these document
15     requests.
16  BY MR. HOROWITZ:
17     Q.   Okay.  My question is, you
18  are in possession of the scratch pads and
19  you did not bring them here.
20     A.   There is -- there is --
21  there should be a scratch pad.  I can
22  check.  There should be a scratch pad.
23     Q.   And do you know whether or
24  not the reason you didn't bring the

Protected - Subject to Further Protective Review

Page 370

1    scratch pads is because the plaintiffs'
2    lawyers who have retained you objected or
3    did you just not -- you just weren't
4    aware that that was part of the request?
5         A.   I -- I actually missed the
6    word scratch pad when I looked at that.
7    I mean, it's part of a list.  A list of
8    things.
9              In my experience under Rule
10   26 is you're entitled to what I've been
11   paid.  And usually there's an arrangement
12   under Rule 26 -- I mean, you can see my
13   invoices under Rule 26, and you're
14   entitled to ask me what I've been paid.
15        Q.   Why do you think that's
16   your -- I mean, I don't understand that.
17   What are you relying -- is that just your
18   personal experience that you only have to
19   produce invoices and nothing else?  Is
20   that your basis for that testimony?
21        A.   Well, let's rule -- let's
22   read what Rule 26 says about
23   compensation.
24        Q.   Okay.

Page 371

1         A.   If I misunderstand it, I'm
2    not going to play lawyer here, that's
3    always been my experience is you're
4    entitled to my compensation.
5         Q.   Are you opposed to producing
6    to us the scratch pads that you have?
7         A.   You can -- you can work that
8    out with counsel.  Whether to invoice
9    or -- counsel should work -- they made
10   certain objections.  Let them work it
11   out.
12        Q.   Well, I guess my question
13   is, what do you do with the scratch pads?
14   How do they go from -- how does your time
15   go from scratch pad to an invoice such as
16   Exhibit 5?
17        A.   My lawyer.
18        Q.   Your wife?
19        A.   Yes.
20        Q.   What's your -- what's your
21   wife's name?
22        A.   Paulette.
23        Q.   She share your last name?
24        A.   Yes.

Page 372

1         Q.   Modern world.  I had to ask.
2         A.   Yeah.  I -- I have no
3    objection to knowing what -- what I get
4    paid.  You are entitled to know under the
5    rules.  You can ask me that.  That
6    information should be made available to
7    you.
8         Q.   When you were at the FDA as
9    commissioner, would you agree with me
10   that the mission of the FDA is to protect
11   the public health by ensuring the safety,
12   efficacy, and security of human and
13   veterinary drugs?
14        A.   When I was at FDA we didn't
15   use the word security.
16        Q.   That's a new one?
17        A.   That's a new one, sir.
18        Q.   Okay.  Do you agree that's
19   the current mission of the FDA, since I
20   just pulled it from the website?
21        A.   Yeah.  But I don't think
22   it's a full mission.
23        Q.   I am.  I'm asking about
24   drugs.  Of course, I'm asking about

Page 373

1    drugs, right?
2         A.   Yeah.  But FDA is bigger
3    than that.  Definitely that is the
4    mission of FDA.  It was a broad mission.
5         Q.   Yeah.  Yeah.
6         A.   But with regard to drugs,
7    sure.
8         Q.   So -- sure.  So, I mean,
9    protecting the public health by ensuring
10   the safety and efficacy, no question
11   that's at the core of the mission of the
12   FDA, right?
13        A.   With regard to drugs.  Also
14   with regard to food and analogous to
15   this.
16        Q.   Doctor, is Xarelto a food?
17        A.   It is the mission of the
18   FDA.
19        Q.   Is Xarelto a drug?
20        A.   I think we can agree on
21   that.
22        Q.   All right.  Let's focus on
23   drugs.
24              Doctor, one of the things

94 (Pages 370 to 373)

Protected - Subject to Further Protective Review

Page 374

1    that Mr. Zellers asked you about, and I
2    was a little confused, you have not
3    formed any opinions about whether the
4    other NOACs, Eliquis or Savaysa or
5    Pradaxa, should also have some sort of
6    monitoring requirement?
7            MS. JEFFCOTT:  I'm going to
8        object to any -- any discussion
9        about Pradaxa and instruct
10       Dr. Kessler not to answer.
11   BY MR. HOROWITZ:
12       Q.   Well, I'm going to pick at
13   that a little bit.  You told us earlier
14   you did a draft report for the
15   plaintiffs' lawyers in the Pradaxa
16   litigation, correct?
17           MS. JEFFCOTT:  I'm going to
18       object and instruct the witness
19       not to answer.  It's regarding the
20       draft of his report?
21           MR. HOROWITZ:  He already
22       testified to it.  It's in the
23       record.  He already told us that.
24           MS. JEFFCOTT:  I -- I

Page 375

1        disagree.  I'm going to instruct
2        the witness not to answer.
3    BY MR. HOROWITZ:
4        Q.   And -- okay.  Let me make my
5    record and then we'll test the absurdity
6    of that.
7            And, in fact, in preparing
8    your Xarelto report, you actually
9    mistakenly included a piece of your draft
10   Pradaxa report.  We talked about that as
11   well, right?
12           MS. JEFFCOTT:  Object.
13   BY MR. HOROWITZ:
14       Q.   Okay.
15       A.   That's not the testimony.
16       Q.   Okay.
17       A.   My testimony is there was an
18   error that was corrected.
19       Q.   Right.  And the error was
20   you included in your Xarelto report a
21   paragraph that you had pasted into your
22   Xarelto report from your Pradaxa report,
23   right?
24           MS. JEFFCOTT:  That's

Page 376

1        incorrect.  That's not what the
2        testimony says.  And it has
3        nothing to do with Pradaxa.
4    BY MR. HOROWITZ:
5        Q.   Okay.  Let me ask you this
6    then.  Is it fair for me to assume that
7    when you were retained by the plaintiffs'
8    lawyers, were they paying you $1,000 an
9    hour as well for Pradaxa?
10           MS. JEFFCOTT:  Object.  I'm
11       instructing him not to answer.
12   BY MR. HOROWITZ:
13       Q.   Okay.  Let's -- let's do it
14   this way then.  What about Eliquis?  Are
15   you currently retained by any lawyers
16   with respect to Eliquis?
17       A.   I've been called several
18   times on Eliquis.  I've accepted no
19   retention.
20       Q.   What about Savaysa?
21       A.   I have not had any contact
22   on Savaysa.
23       Q.   So for the --
24       A.   To -- to my knowledge.  I

Page 377

1    mean, I -- I get e-mails all the time and
2    I -- I don't pay attention to them.
3        Q.   Okay.  So putting aside your
4    retention by plaintiffs' lawyers in the
5    Pradaxa litigation and whatever opinions
6    you may be offering with respect to
7    Pradaxa there, the two other NOACs are
8    Eliquis and Savaysa.  And you have not
9    formed any opinions as to whether or not
10   Eliquis or Savaysa should have some form
11   of monitoring recommendation in their
12   labels.  Is that fair?
13           MS. JEFFCOTT:  Form.
14           THE WITNESS:  I have not
15       seen the record in those cases.
16       How could I?
17   BY MR. HOROWITZ:
18       Q.   Well, I guess my question
19   is, as the former FDA commissioner,
20   and -- of the body charged in our
21   country, in the United States, with
22   protecting the health and welfare of its
23   citizens with respect to the safety and
24   efficacy of drugs, would it concern you

95 (Pages 374 to 377)

Protected - Subject to Further Protective Review

Page 378

```
1    if the other NOACs, such as Eliquis and
2    Savaysa, should also have a monitoring
3    recommendation?  Is that something that
4    you should consider?
5            MS. JEFFCOTT:  Object to
6    form.
7            THE WITNESS:  So, again,
8        you're using the word "monitor."
9        We were careful throughout the day
10       to clarify.  Are you using the --
11       let's not use the word
12       "monitoring."  Substitute
13       something else that reflects my
14       testimony, and then I'd be happy
15       to -- I was never really talking
16       about monitoring as the way we
17       currently think about it.
18           The question is whether you
19       have to say whether a test can be
20       helpful, predicting a higher risk.
21       I mean, I -- but to answer your
22       question, I think that for any
23       drug where there is a laboratory
24       test that could be helpful -- any
```

Page 379

```
1        drug for which there's a
2        laboratory test could be helpful
3        in following a patient's response.
4            That -- that requirement
5        applies to -- to -- to all
6        manufacturers.  It's not a
7        regulation that just applies to
8        your client.
9    BY MR. HOROWITZ:
10       Q.   If somebody were to testify
11   to a court, to judge or jury, that
12   Xarelto requires monitoring, you would
13   disagree with that, correct?
14       A.   No.  I -- I -- I would --
15   words have meaning, sir, and I just want
16   to make sure that we -- we understand
17   what we're talking about.
18           So is a test that's helpful
19   in predicting PT bleed risk as
20   recommended -- as suggested by the deputy
21   director at initiation and then maybe
22   once a year, is that monitoring?  I -- I
23   wouldn't want to leave that vague.  I'd
24   want to be specific.  So, again, I try to
```

Page 380

```
1    avoid these general statements you're
2    asking me about.
3        Q.   You have not -- you have not
4    been retained by plaintiffs' lawyers for
5    Eliquis or Savaysa, correct?
6        A.   I have been approached --
7            MS. JEFFCOTT:  Objection.
8        Asked and answered.
9            THE WITNESS:  I -- I've been
10       approached in Eliquis.  I have
11       not -- I've deliberately not been
12       retained.
13   BY MR. HOROWITZ:
14       Q.   Okay.  And is it fair to say
15   then, Doctor, that you only consider the
16   safety and efficacy of drugs in this
17   context with respect to the NOACs for the
18   lawyers who have hired you to opine on
19   those drugs?
20       A.   No.
21           MS. JEFFCOTT:  Object to
22       form.
23           THE WITNESS:  Not at all.
24       I -- I base my opinions on the
```

Page 381

```
1        record that when I could see a
2        record.  And if I'm asked a
3        question -- if you -- you know, so
4        you give me the record.  I'm happy
5        to look at it if you want.  If you
6        think it's relevant in this
7        matter, give me that record and
8        make that available.  I'm happy to
9        look at that.
10   BY MR. HOROWITZ:
11       Q.   So you have not reviewed the
12   Eliquis or Savaysa record?
13       A.   I don't have access -- I
14   mean, you know, I don't have access to
15   that.  I mean, I had to dig within, you
16   know, protective documents, I mean that
17   are thousands of pages, in order to be
18   able to give an opinion here.
19       Q.   Your testimony is you could
20   not access the regulatory record with
21   respect to Savaysa or Eliquis in the
22   absence of assistance from the
23   plaintiffs' lawyers or the plaintiffs'
24   file --
```

96 (Pages 378 to 381)

Protected - Subject to Further Protective Review

Page 382

1      MS. JEFFCOTT:  Object to
2   form.  That's not what he said.
3      THE WITNESS:  No, I couldn't
4   do it without your assistance,
5   Mr. Horowitz.  You are the one who
6   provided it.  So --
7   BY MR. HOROWITZ:
8      Q.   Okay.  Go ahead --
9      A.   You provided the NDA, right?
10  Hold on a second.  It's your NDA that I
11  reviewed.  I don't -- right?  So if you
12  want to make available -- if you have the
13  NDA in the other drugs, make it -- and
14  you have access to it, happy -- as you
15  did in this case, make it available to
16  me, and if you want me to look at it, I
17  will look at it.
18     Q.   Doctor, you testified
19  earlier that you have five different
20  streams of income.  That's what you told
21  Mr. Zellers.  Do you recall that?
22     A.   Approximately.
23     Q.   What are your multiple
24  streams of income?

Page 383

1      A.   So I am a senior advisor at
2   TPG, which is a large private equity --
3   probably one of the top three private
4   equity.
5         I am -- I have book
6   royalties.
7         I have boards.
8         I have consulting.
9         And I have academic.
10        I think that -- you can --
11  you can -- some of those you could put
12  together.  For example, you know, if you
13  break it down, you consider it five,
14  four.  But those are different streams.
15     Q.   When you say "consulting,"
16  do you include your litigation expert
17  work in consulting?
18     A.   Yeah.  But there's other
19  consulting that I do, that I've been
20  asked to do outside of litigation.
21     Q.   How does your arrangement
22  with TPG work?  How are you paid?
23     A.   So it's complicated.
24     Q.   So in 30 seconds or less,

Page 384

1   uncomplicate it for me.
2      A.   Well, so I actually --
3      MS. JEFFCOTT:  Take all the
4   time you need.
5      THE WITNESS:  So I also --
6   BY MR. HOROWITZ:
7      Q.   31 seconds.
8      A.   So there's obviously -- I'm
9   paid for -- by TPG.  But I'm also a
10  senior advisor.
11        But the real revenue, I'm
12  paid by the companies that I serve --
13  that are TPG companies, that TPG manages.
14     Q.   Are you paid to sit on the
15  boards that you sit on?
16     A.   Yes.  As other board members
17  are.
18     Q.   And are these all companies
19  on whose boards you sit that are either
20  owned in whole or in part by TPG?
21     A.   No.
22     Q.   These are separate?
23     A.   Well, I'm on boards of both
24  TPG-owned as well as public as well as

Page 385

1   other private.
2      Q.   How many boards do you sit
3   on?
4      A.   You are talking about for
5   profit boards?
6      Q.   Yeah, for profit.
7      A.   Yeah, so I think we did
8   Immiuncor.  Aptalis was sold that was a
9   TPG board.  Immiuncor was a TPG board.
10  Stoke is an Apple Tree board.  And Tokai
11  is an Apple Tree board.
12     Q.   And you said that you have
13  book royalties, is another source of
14  income, right?
15     A.   Yes.
16     Q.   And then consulting, both
17  through litigation and then through
18  non-litigation?
19     A.   Yes.
20     Q.   And then academic.  Is that
21  fair?
22     A.   Yes.
23     Q.   When you say "academic,"
24  what are you referring to?

97 (Pages 382 to 385)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 386

1      A.   My -- my professorship.
2      Q.   Explain to me, if you would,
3  how your professorship works.  Is it --
4  do you consider it to be a full-time
5  position?
6      A.   Yes.  It's also my research.
7  My book and everything else is part of
8  that, yes.  I do research.
9      Q.   Okay.  But my question is,
10 you consider it to be a full-time
11 position?
12     A.   Yes, I think that's fair.
13     Q.   Are you tenured?
14     A.   Yes, I'm tenured.
15     Q.   Do you know what the Health
16 Services Compensation Plan is?
17     A.   Yes.
18     Q.   Are you a member of the
19 Health Services Compensation Plan?
20     A.   No.  I am exempt from it.  I
21 was exempted from the Health Services
22 Compensation Plan when I came to UCSF.
23     Q.   And why are you exempt from
24 it?

Page 387

1      A.   It was an exemption that was
2  granted by UCOP.
3      Q.   When?
4      A.   When I first came, by Robert
5  Dynes, I was exempt from it.
6      Q.   When you were still the
7  dean?
8      A.   It was when I was dean and
9  professor, before I came.  There was a
10 letter that exempts me from it.
11     Q.   And do you have possession
12 of a letter?
13     A.   I could find it somewhere.
14 I mean, just somewhere there's a letter
15 that exempts me from it.
16     Q.   Would you be opposed to
17 producing the letter to us?
18     A.   Let me think about it.
19     Q.   Do you recall the basis of
20 the exemption?
21     A.   That's what I was told.  I
22 mean, I think if you read the letter
23 itself, what I was told when I was
24 recruited, that I was exempt.  And they

Page 388

1  stuck to their word on it.
2      Q.   And have you had any
3  follow-up to make sure you still are
4  exempt?
5      A.   There's -- the exemption has
6  been for -- lifelong at UCOP.
7      Q.   Well, I guess my question
8  is, so you have not had any follow-up?
9           MS. JEFFCOTT:  Object to
10          form.
11          THE WITNESS:  I can't be --
12          there's no reason.  I am exempt,
13          the letter says.
14 BY MR. HOROWITZ:
15     Q.   Okay.  And your view is the
16 way the letter is written and crafted
17 there's no need to -- for you, after you
18 were terminated as dean and just kept
19 your professorship, you didn't -- you
20 didn't feel that you needed to reverify
21 whether you were still exempt?
22     A.   No.  The letter actually has
23 to do -- has nothing to do with me just
24 as dean.  It was during my recruitment

Page 389

1  for both.
2      Q.   And do you understand what
3  reporting obligations, if you were not
4  exempt, you might have to the university
5  with respect to your outside income?
6      A.   Yes.  But I'm not subject to
7  that.  I'm entitled to keep all my
8  outside income.  That was the deal.
9      Q.   Okay.  Is it fair to say
10 then you do not currently provide any of
11 your outside income information to the
12 university?
13     A.   I have to go back and check.
14 I mean, I am exempt from the health
15 sciences plan.
16     Q.   And is it fair to say then
17 that you do not share any of your outside
18 income with the university?
19          MS. JEFFCOTT:  Object to
20          form.  Asked and answered.
21          MR. HOROWITZ:  It's a
22          different question.
23          THE WITNESS:  The actual
24          income, no, I don't share income.

98 (Pages 386 to 389)

Protected - Subject to Further Protective Review

Page 390

1  BY MR. HOROWITZ:
2      Q.   So is it fair to say then
3  you keep all of the income personally
4  that you obtain from your work through
5  TPG, through boards of the -- of the for
6  profit companies, your book royalties,
7  your consulting, everything you do
8  outside of your academic professorship,
9  you keep all of that income.  Is that
10 fair?
11     A.   Per that agreement and
12 that -- per that agreement, yes.  That
13 was the agreement.
14     Q.   One of the things that I
15 wanted to ask you -- I actually didn't
16 notice this, but one of my colleagues.
17 Can you take a look at Appendix B of your
18 report.  Exhibit 1 -- or maybe you have a
19 separate --
20     A.   Sure.
21     Q.   And while you are pulling
22 that, Exhibit B is your list of prior
23 testimony?
24     A.   Sure.

Page 391

1      Q.   And I know you told
2  Mr. Zellers you thought that was a full
3  and complete list.  You and I, this isn't
4  the first time that you and I have met.
5  I've taken your deposition before, right?
6      A.   Right.
7      Q.   In a case for another
8  company and another drug.
9      A.   Right.
10     Q.   Zoloft.  And I don't -- I
11 don't see our deposition listed on here.
12     A.   Let me take a look.  It
13 should be on here.  Certainly there's no
14 reason not to have it on here.
15     Q.   I just want to say that I am
16 mildly offended that you forgot about me,
17 Dr. Kessler.
18     A.   I would never -- I would
19 never forget about you.
20          It absolutely should -- it
21 absolutely should be on this list.
22     Q.   And of course that leads to
23 my next question, which is, I have to
24 ask, and I'm not casting aspersions, but

Page 392

1  are you -- is there anything else that
2  may not be on this list?
3      A.   I'll go back and
4  double-check.  I mean, there may be
5  another more up-to-date list that I have,
6  and I will go back and double-check that.
7      Q.   Okay.  Certainly the fact
8  that the Zoloft deposition is not on here
9  is simply an oversight?
10     A.   Yeah, absolutely.  I mean,
11 it's a matter of public record.  I mean,
12 you know that.
13     Q.   I know better than anybody.
14     A.   Absolutely.  And, again, let
15 me go back and double-check to see if
16 there's anything.  It's possible that
17 just updating this list for some reason,
18 it's not on here.  Let me see if there's
19 anything else that needs to be updated.
20     Q.   And one of the questions
21 that I have is, when you -- you've been
22 identified and provided reports and given
23 testimony over the years as an expert
24 in -- we don't have to count, but in

Page 393

1  several failure to warn adequacy of the
2  label pharmaceutical cases for the
3  plaintiffs' bar.  Is that fair?
4      A.   Yes.
5      Q.   Do you allow -- for example,
6  if you do a report like you did in Zoloft
7  for me -- not for me, but for the case
8  that I deposed you, do you allow any
9  lawyer associated with that litigation to
10 serve your report or do you make sure
11 that somebody contacts you first?
12     MS. JEFFCOTT:  Object to
13 form.
14     THE WITNESS:  No, I'm in
15 control of my report, I think it's
16 fair to say, if I understand your
17 question right.
18 BY MR. HOROWITZ:
19     Q.   Yeah, that's exactly what I
20 was asking, because --
21     MS. JEFFCOTT:  Mr. Horowitz,
22 do you mind if I reconnect Ned?
23     MR. HOROWITZ:  Okay.  I
24 don't want this -- yeah, let's go

99 (Pages 390 to 393)

Protected - Subject to Further Protective Review

Page 394

```
1       off the clock just because I'm
2       sitting low on time.
3           THE WITNESS:  Let's -- it's
4       disconnected.  Keep on going, if
5       you don't mind the ringing.
6   BY MR. HOROWITZ:
7       Q.   Okay.  Well, let's -- were
8   you aware that your report, and frankly
9   the deposition that I took of you in your
10  CV were served in cases set for trial in
11  West Virginia by a lawyer named Jason
12  Itkin?
13      A.   Yes.
14      Q.   Okay.  And were you aware
15  that I was supposed to come out and
16  depose you on November 17 of this year?
17  Did you ever have that conversation with
18  Mr. Itkin?
19      A.   So, again, we're discussing
20  another matter, if I'm correct.
21      Q.   Right.
22      A.   Right.  I'm --
23      Q.   This is public.  I can show
24  you the disclosure.  It's been served in
```

Page 396

```
1   I don't know that specific set of facts.
2       Q.   Okay.  And just so I'm
3   clear, when I was about to get on a plane
4   to come out here and talk to you, you
5   were aware that Jason Itkin had served
6   your report?
7       A.   I knew he had served a
8   report, sir.  Don't hold me to the date
9   when he served the report.
10      Q.   Okay.  And do you know that
11  he withdrew you as an expert?  Did he
12  tell you that?
13      A.   I had that -- I told him
14  that I was, you know, busy with a whole
15  bunch of stuff.
16      Q.   Did you ever tell Mr. Itkin
17  that he or somebody from his law firm had
18  to be the one to represent you at the
19  deposition, and that's why the deposition
20  wasn't going to go forward?  Did you
21  ever -- did you ever hear this?
22      A.   I'd have to -- I had some
23  conversations.  He said there were a
24  number of issues, that I remember.  You
```

Page 395

```
1   open court.  So what I want to know is
2   did you know that Jason Itkin identified
3   you as his expert for the trials in West
4   Virginia where I was supposed to come out
5   and depose you?  Did you know that?
6       A.   Yes.
7           MS. JEFFCOTT:  Object to
8       form.
9           THE WITNESS:  Yes.  Well,
10      sorry.  I knew that he was going
11      to designate me, sir.  It was the
12      same report.  There was no change.
13      And I basically said, why are
14      we -- why waste time.  I mean, if
15      it's the exact same report --
16      that's what I understood.  I
17      didn't hear anything back.
18  BY MR. HOROWITZ:
19      Q.   Did you know that a
20  deposition notice was served for
21  November 17?  Did you know that?
22      A.   I didn't see -- well, I did
23  not see -- I think there were issues -- I
24  know there were issues.  I didn't know --
```

Page 397

```
1   know, I'd have to go back.  You know, I
2   just don't know, sir.
3           MS. JEFFCOTT:  And I just
4       want to caution Dr. Kessler in
5       case there's a protective order in
6       this other matter that we're not
7       aware of.
8           MR. HOROWITZ:  This isn't
9       going to protective order stuff.
10      This is going to credibility and
11      bias.
12  BY MR. HOROWITZ:
13      Q.   Doctor, let me ask you this.
14  You certainly didn't tell Jason Itkin
15  that you would refuse to work with
16  another lawyer, it had to be him or
17  somebody from his other firm.  Is that
18  fair?
19      A.   Another lawyer?
20      Q.   Another lawyer who wasn't
21  from his firm.  Did you ever tell him --
22      A.   I don't know -- I don't know
23  exactly what you're talking about.
24          MS. JEFFCOTT:  Mr. Horowitz,
```

100 (Pages 394 to 397)

Protected - Subject to Further Protective Review

Page 398

1    this is so beyond the scope of
2    this case.  It has absolutely no
3    bearing on what we're doing here.
4          THE WITNESS:  I had -- I --
5    you know -- Mr. Horowitz said
6    there was a Zoloft matter, if he
7    could serve my report.
8    BY MR. HOROWITZ:
9          Q.   Mr. Itkin, you mean?
10         A.   Mr. -- who did I say?
11         Q.   Horowitz.  It's getting
12   late.
13         A.   I'm sorry.  I apologize.
14         Q.   He's like 8 feet tall, and
15   I'm 3 feet tall, so you --
16         A.   No, you're both very tall.
17   In -- in -- you are -- he served my
18   report.  I am just busy on a whole bunch
19   of stuff.  And I made it very clear that,
20   you know, I mean, I take these things
21   obviously seriously, and it took a lot of
22   time and I have a lot of other
23   obligations and that I didn't see how I
24   could fit this in.

Page 399

1          Q.   Did you --
2          MS. JEFFCOTT:  I want to
3    make --
4          THE WITNESS:  And -- and,
5    again, if there is a protective
6    order -- you know what --
7    BY MR. HOROWITZ:
8          Q.   I have no more questions.
9    Can we move on?  No, no.  No, no --
10         A.   No, no, no, no --
11         Q.   Doctor, you can't just spiel
12   to me --
13         A.   I -- no, no, but hold on a
14   second --
15         MS. JEFFCOTT:  You asked him
16   a question.  He gets to answer.
17         THE WITNESS:  Just a second.
18   I -- you just --
19         MR. HOROWITZ:  There's no
20   question pending.
21         THE WITNESS:  You -- no,
22   but -- but hold on one second.
23   BY MR. HOROWITZ:
24         Q.   The last thing I said is

Page 400

1    he's about 8 feet tall and I'm about
2    3 feet tall.
3          A.   But -- but just hold on a
4    second --
5          MS. JEFFCOTT:  The preceding
6    question.
7          THE WITNESS:  You're
8    pushing -- you are pushing on
9    attorney work product, I think --
10   BY MR. HOROWITZ:
11         Q.   No, no.  Actually I'm not.
12         A.   But if you --
13         Q.   But let's just continue.
14   I'm done with this part --
15         A.   I'll -- I'll -- I'll take
16   your word on it, but let's just be
17   careful here --
18         MS. JEFFCOTT:  And I -- I
19   want to make a point --
20         THE WITNESS:  With the
21   conversations, again, I don't --
22   BY MR. HOROWITZ:
23         Q.   Doctor, I -- I really don't
24   have time --

Page 401

1          MS. JEFFCOTT:  You are
2    requesting additional information,
3    and we have wasted about ten
4    minutes on a topic that has
5    absolutely nothing to do with
6    Xarelto.
7          MR. HOROWITZ:  Just for the
8    record I think that the doctor's
9    bias and credibility, it would be
10   of interest to folks to know
11   whether he allows plaintiffs'
12   lawyers around the country to just
13   serve his report without his
14   knowledge.
15         THE WITNESS:  I don't agree.
16   That's not what I --
17   BY MR. HOROWITZ:
18         Q.   I know.  I agree.  That's
19   why I asked you the question because I
20   wasn't sure you knew that.
21         A.   No, no, no.  I --
22         Q.   Done with it.
23         A.   Let me be very clear, sir.
24         I mean, you -- you and I

101 (Pages 398 to 401)

Protected - Subject to Further Protective Review

Page 402

1    cannot be responsible for the action of
2    every lawyer in the United States.
3         Q.   That's what I wanted to
4    know.
5         A.   Right. So --
6         Q.   You verified it for me.
7    Let's move on.
8         A.   Yes.
9         Q.   Doctor, my question is, when
10   you -- hand me that exhibit. When you
11   were terminated as dean of the medical
12   school in December of 2007, did your
13   income drop from the university?
14        A.   Yes.
15             MS. JEFFCOTT: Object to
16   form.
17             THE WITNESS: Well, from the
18   university?
19   BY MR. HOROWITZ:
20        Q.   Yes.
21        A.   Yes, somewhat.
22        Q.   When you say "somewhat," do
23   you know how much?
24        A.   Oh. I -- I'd have to go

Page 403

1    back -- I'd have to go back and look.
2         Q.   Do you recall whether your
3    income when you were a professor was
4    approximately $530,000 -- I'm sorry --
5    when you were dean -- and then it went to
6    approximately $325,000. Does that sound
7    about right?
8         A.   I think so. Sounds right.
9         Q.   My colleague is going to get
10   the document. But I'm going to go ahead
11   and mark mine as an exhibit, as
12   Kessler-17.
13             (Document marked for
14             identification as Exhibit
15             Kessler-17.)
16   BY MR. HOROWITZ:
17        Q.   And I'll represent to you
18   this is from the Sacramento Bee, and I
19   just want to know whether you can verify
20   that these numbers are publicly available
21   information as an employee of the State,
22   whether those numbers look accurate to
23   you?
24        A.   Where is it on this? Help

Page 404

1    me see this.
2         Q.   The second page. If you
3    look --
4         A.   All right.
5         Q.   -- 2007, you were at
6    $530,000 total pay.
7             MS. JEFFCOTT: Can I have a
8    copy?
9    BY MR. HOROWITZ:
10        Q.   And then 325,000 in 2008.
11             Do you see that?
12        A.   317, 309. Yeah, I see that.
13   I have no reason to dispute this.
14        Q.   Okay. What year -- what was
15   the first year that you got involved with
16   the plaintiffs' lawyers in testifying in
17   drug cases with respect to adequacy of
18   the labeling?
19             MS. JEFFCOTT: Object to
20   form.
21             THE WITNESS: Adequacy of
22   the labeling. I'd have to go back
23   about seven years. We have on
24   the --

Page 405

1             MS. JEFFCOTT: A drug or
2    in -- in general?
3    BY MR. HOROWITZ:
4         Q.   Doctor, you understood the
5    question, right?
6         A.   Yeah. About seven years.
7         Q.   Didn't you serve a report in
8    a Neurontin litigation in 2008?
9         A.   That was an antitrust case.
10   I think it was actually served -- 2008 or
11   2010.
12        Q.   I have a report dated
13   July 31, 2008. Does that sound right?
14        A.   I'm not going to -- it's an
15   antitrust case.
16        Q.   Okay. So your testimony is
17   your first failure to warn case in the
18   context of the adequacy of the labeling
19   of the drug was in what year?
20        A.   I'd have to go -- I'd have
21   to go take a look specifically at that.
22   I don't have it in my head.
23        Q.   Have you ever testified
24   before Congress?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 406

1    A.   About a hundred times.
2    Q.   Have you ever testified on
3  the preemption issue that you were
4  discussing with Dr. Zellers?
5    A.   Yes.
6        MR. DENTON: Dr. Zellers?
7        MR. HOROWITZ: I'm sorry.
8  He is a doctor to me.  Okay?
9        THE WITNESS: Sure.  Sure.
10  I believe there was preemption
11  that I testified on in front of
12  energy and commerce.  Who is the
13  actor?  The heparin case?  I think
14  that had preemption implications.
15  I'm just -- I get -- I think --
16  well --
17    Q.   Let me ask you this.  In May
18  of 2008, did you testify before the House
19  of Representatives Committee on Oversight
20  and Government Reform?
21    A.   At the request of -- I mean,
22  I believe at the request of Henry Waxman.
23    Q.   Okay.  And the date of that
24  was May 14, 2008.  That sound about

Page 407

1  right?
2    A.   You're -- you're -- it's a
3  vague memory.  Congressman Waxman asked
4  me to test -- the staff asked me to
5  testify.
6    Q.   And the topic of the hearing
7  was should FDA drug and medical device
8  regulations bar state liability claims.
9        Do you recall that?
10    A.   I -- you -- you have the
11  testimony.  It sounds familiar, yes.
12    Q.   Okay.  And what that was
13  about was whether state laws should
14  permit plaintiffs to bring lawsuits
15  against drug manufacturers based on
16  claims that the drugs label is
17  inadequate, right?
18    A.   I had done -- there's a law
19  review article that I had worked on.
20    Q.   Right.  And we'll -- we'll
21  talk about that next.
22        So Congress at the time --
23  the United States government was actually
24  considering whether to preempt lawsuits

Page 408

1  like the one that we're sitting here
2  today about with respect to Xarelto, in
3  whether or not the labeling of an FDA
4  approved drug was adequate, correct?
5        MS. JEFFCOTT: Object to
6  form.
7        THE WITNESS: Well, you --
8  you have to put it into context of
9  Wyeth, right?
10  BY MR. HOROWITZ:
11    Q.   No.  This is pre-Wyeth.  And
12  so this is my question to you.  Please
13  answer my question, which is, the issue
14  that Congress was considering was whether
15  to enact, through legislation, a
16  preemption provision that would disallow
17  lawsuits like the one we're sitting here
18  today with respect to failure to warn of
19  an FDA approved drug label, correct?
20        MS. JEFFCOTT: Object to
21  form.
22        THE WITNESS: I -- I
23  don't -- you'd -- you'd have to --
24  we'd have to go back and look at

Page 409

1  the congressional history.  I
2  don't -- I mean, I -- I think
3  preemption came up.  But I --
4  you -- if you have my testimony --
5  I don't know exactly what Congress
6  was considering.  I doubt that
7  Henry Waxman was considering that,
8  so I just...
9  BY MR. HOROWITZ:
10    Q.   Well, the -- the name of the
11  hearing was "Should FDA drug and medical
12  device regulations bar state liability
13  claims?"
14        It is what it is, right?
15    A.   Well, that may have been --
16  you -- you're saying there was specific
17  legislation that that committee was
18  considering.
19    Q.   Let me ask you this.  Did
20  you testify that plaintiffs should be
21  able to bring lawsuits against drug
22  manufacturers with claims that the drug
23  had inadequate label for a drug during
24  the hearing before Congress where you

103 (Pages 406 to 409)

Protected - Subject to Further Protective Review

Page 410

1    testified?
2        A.   I -- I testified exactly
3    what's in my report.  It's -- we have to
4    pull the testimony.  We're going back
5    close to ten years, and my sense was that
6    we talked about what was in that law
7    review article, which is basically how
8    FDA regulation operates in tandem and
9    what our -- what my position was when I
10   was FDA commissioner.
11       Q.   Doctor, you said during the
12   hearing that plaintiffs should be allowed
13   to sue drug companies under state law
14   claims of failure to warn, correct?
15       A.   Can you -- can you give me
16   my testimony on that?
17       Q.   Do you recall?  I'm asking
18   if you recall.
19       A.   I -- no, I --
20           MS. JEFFCOTT:  He's
21       requesting his testimony.
22           MR. HOROWITZ:  He can
23       request whatever he wants.
24   BY MR. HOROWITZ:

Page 411

1        Q.   I'm asking, do you recall?
2        A.   No, I'm not -- it doesn't
3    sound like the way I would talk.  But, I
4    mean, if you have my testimony, let me
5    see it.
6        Q.   Well, let me ask you this.
7    Did you agree with anyone who testified
8    that there should be preemption or did
9    you argue against preemption?
10       A.   No, I --
11           MS. JEFFCOTT:  Object to the
12       form of the question.  He's
13       requested his testimony.
14           MR. HOROWITZ:  He can
15       request all he wants.
16   BY MR. HOROWITZ:
17       Q.   Answer my questions.
18           Did you testify for or
19   against preemption?
20       A.   I'm -- I'm going to --
21   before I answer I need to see my
22   testimony.  I don't have a recollection a
23   decade ago.
24           What I -- what I do recall

Page 412

1    is there were certain phrases that I
2    would talk about, what our -- what our
3    position was.
4            Oh, you're -- you're --
5    you're just --
6        Q.   Do you have a recollection
7    now?
8        A.   2000 -- 2000 -- I know
9    exactly what happened.  No, you're wrong.
10   It wasn't Congress was enacting
11   legislation.  That was not the subject of
12   the hearing.
13       Q.   I didn't say it was, Doctor.
14       A.   No, but you --
15       Q.   You twisted what I said, and
16   there's no question pending.
17       A.   No, no -- no--
18       Q.   No.
19       A.   Yes, you would --
20           MS. JEFFCOTT:  Objection.
21   BY MR. HOROWITZ:
22       Q.   No.
23       A.   Yes, you -- you led me to --
24   at least I heard, Mr. Horowitz, you were

Page 413

1    talking about Congress --
2        Q.   I am talking about Congress.
3    Did you testify before Congress in May of
4    2008, yes or no?
5            MS. JEFFCOTT:  Mr. Horowitz.
6    BY MR. HOROWITZ:
7        Q.   Answer my question.
8            MS. JEFFCOTT:  Mr. Horowitz,
9        be respectful.
10   BY MR. HOROWITZ:
11       Q.   Answer my question,
12   Dr. Kessler.  So did you testify before
13   Congress in May of 2008?
14       A.   Sir --
15       Q.   Yes or no.
16           MS. JEFFCOTT:  For the
17       record, Mr. Horowitz was
18       yelling --
19   BY MR. HOROWITZ:
20       Q.   Yes or no.
21           MS. JEFFCOTT:  -- at
22       Dr. Kessler.
23           MR. HOROWITZ:  The video
24       will show what it shows.

104 (Pages 410 to 413)

Protected - Subject to Further Protective Review

Page 414

```
1    BY MR. HOROWITZ:
2        Q.   Did you -- did you testify
3    before Congress?
4        A.   I -- I've already
5    established I testified.  I -- you just
6    jogged my memory of why I testified.
7        Q.   Doctor, do you understand
8    that "did you testify before Congress" is
9    a yes or no question?
10       A.   Yeah.  But you're -- you are
11   asking me a lot of questions basing on my
12   memory.  And I just remembered why that
13   hearing likely happened.
14       Q.   I'm not asking you why it
15   happened, Doctor.  I didn't ask that
16   question.
17       A.   Okay.  That's fine.
18       Q.   At any point during your
19   testimony before Congress, did you
20   disclose that you had intentions of
21   testifying on behalf of plaintiffs in
22   failure to warn lawsuits against drug
23   companies?
24       A.   I'm not sure --
```

Page 415

```
1        MS. JEFFCOTT:  Objection to
2    form.
3        THE WITNESS:  -- I had any
4    intention whatsoever.
5    BY MR. HOROWITZ:
6        Q.   Do you know whether you had
7    been retained at that point to testify
8    for any plaintiffs' lawyers in any
9    litigation?
10       A.   I have --
11       MS. JEFFCOTT:  Object to
12   form.
13       THE WITNESS:  -- no
14   recollection whatsoever.  Anything
15   I did was a matter of public
16   record.
17       My life is -- you know, it's
18   a matter of public record.
19       The -- the -- there was an
20   action by an individual at FDA
21   that concerned the chairman of
22   that committee, right, that was
23   viewed as a political act.  And
24   that was one of the reasons why
```

Page 416

```
1    that hearing was held.  It was --
2    it was not -- there was not --
3    Waxman was not moving preemption
4    legislation.
5    BY MR. HOROWITZ:
6        Q.   Doctor, are you done?
7        MS. JEFFCOTT:  If you're not
8    done, keep going.
9    BY MR. HOROWITZ:
10       Q.   I'm asking are you done
11   because I'm -- you're going way beyond my
12   question.
13       A.   Ask your question -- next
14   question.
15       Q.   So my question is, in how
16   many different drug litigations have you
17   testified over the years that there was a
18   failure to warn on behalf of a drug -- by
19   a drug company or that the label was
20   inadequate?  Do you know?
21       MS. JEFFCOTT:  Object to
22   form.  Asked and answered.
23       THE WITNESS:  You can count
24   them up on that list.
```

Page 417

```
1    BY MR. HOROWITZ:
2        Q.   And were you paid $1,000 an
3    hour by the lawyers in each of those
4    litigations?
5        A.   I was paid.  That's been the
6    rate for -- going back to my standard
7    rate.
8        Q.   And have you made millions
9    of dollars over the years testifying in
10   failure to warn litigation that is not
11   preempted by Congress?
12       MS. JEFFCOTT:  Object to
13   form.
14       THE WITNESS:  I have made
15   millions of dollars in this stream
16   of income, as I have in other
17   streams of income.
18   BY MR. HOROWITZ:
19       Q.   And this streams of income
20   includes, just to be clear, you're
21   talking about testifying in failure to
22   warn litigation when you've been retained
23   by plaintiffs' lawyers, right?
24       A.   As well as antitrust
```

105 (Pages 414 to 417)

Protected - Subject to Further Protective Review

Page 418

1    litigation and other matters.  The
2    position -- so even --
3        Q.   You -- oh, I'm sorry.
4        A.   Wait.  You're attacking my
5    credibility, so I do want to put on the
6    record something.
7        Q.   Doctor, this doesn't work
8    like this.
9        A.   Yes, it does.
10       Q.   You don't get to make
11   speeches.
12       A.   No, no, no, no, no.
13       Q.   You need to answer my
14   questions.
15           MS. JEFFCOTT:  Let him
16   finish.
17           MR. HOROWITZ:  Absolutely
18   not.  There's no question pending.
19           THE WITNESS:  No, no, but
20   you've --
21   BY MR. HOROWITZ:
22       Q.   Doctor --
23       A.   No, you've created certain
24   innuendo here.  What I testified to --

Page 419

1        Q.   Just for the record, you can
2    say what you want without putting it on
3    my time.
4        A.   Okay.  That's fine.  I'll
5    take --
6        Q.   That's fine.
7        A.   No, I'll -- I'll give you an
8    extra 30 seconds.  We'll do --
9        Q.   Little more than that,
10   Doctor.
11       A.   No, we're going to do 30 --
12           MS. JEFFCOTT:  Absolutely
13   not.
14           THE WITNESS:  Here's the
15   30 seconds.  What I testified to
16   at that hearing is what I
17   testify -- what I -- my position
18   was as FDA commissioner, and what
19   the FDA's long-standing position
20   was.  And it was what -- what FDA
21   had thought when -- the last
22   30 years was in the public
23   interest.  You can have back your
24   20 seconds.

Page 420

1            MS. JEFFCOTT:  Mr. Horowitz,
2    for the record, you could have
3    saved a lot of time if you would
4    have given him the testimony.
5    BY MR. HOROWITZ:
6        Q.   Doctor, if I wanted to know
7    how much you've made in each of the drug
8    or device cases where you've testified
9    that the label was inadequate, do you
10   have records of some kind that reflects
11   that?
12       A.   I don't have any, you know,
13   record, per se, of that.
14       Q.   Do you have invoices from --
15   such as what you've produced to us
16   today --
17       A.   I don't -- I --
18       Q.   -- in each of those
19   litigation?
20       A.   -- don't have that.
21       Q.   Who has that?
22       A.   I don't know.  You have to
23   check with my counsel.
24       Q.   Your wife has that?

Page 421

1        A.   My counsel.  You have to
2    check what she has.
3        Q.   Okay.  And so is it fair to
4    say that your counsel, who also happens
5    to be your wife, she keeps all the
6    invoices from all of your litigations
7    over the years?
8        A.   I have no idea what she
9    keeps.
10       Q.   So if I wanted to know like
11   the amounts of money that you've been
12   paid over the years for testifying as an
13   expert for plaintiffs, would she be the
14   most knowledgeable person?
15       A.   No.  I think --
16           MS. JEFFCOTT:  Object to
17   form.
18           THE WITNESS:  -- I mean, you
19   have, as a matter of public
20   record, and you can go back and
21   look at the transcripts.  Mr. Beck
22   at one point added it up.  And it
23   came to some $1.8 million.
24   BY MR. HOROWITZ:

106 (Pages 418 to 421)

Protected - Subject to Further Protective Review

Page 422

1    Q.   And so your -- sorry.  Go
2  ahead.
3    A.   So, I mean, you can go look
4  and calculate it as he did.
5    Q.   Okay.  So your testimony to
6  me is I would have to go transcript by
7  transcript and do the math?
8      MS. JEFFCOTT:  Object to
9      form.
10     THE WITNESS:  You certainly
11     can do that, yes.
12 BY MR. HOROWITZ:
13   Q.   But there are also invoices
14 that exist, but your counsel is in
15 possession of your invoices?
16   A.   I didn't say that.  I said I
17 don't have those invoices.  Right.
18   Q.   Doctor, were you -- was
19 there a congressional inquiry into your
20 travel expenses while you were director
21 of FDA?
22   A.   My taxicab receipts.  That
23 was instituted by the tobacco industry.
24 If you go look at the tobacco companies,

Page 423

1  it's great.
2      We did the investigation
3  into the tobacco companies.  They did 650
4  FOI requests, and you see that their
5  front groups tried to go after me for
6  some $800.  Completely fronted for the
7  tobacco industry.
8    Q.   And is it your testimony
9  that the only thing that was revealed by
10 the investigation for fraudulent billing
11 by Congress was the $800 that you paid
12 back, or $850?
13   A.   They tried to --
14     MS. JEFFCOTT:  Object to
15     form.
16     THE WITNESS:  Let me tell
17     you.  When you take on the tobacco
18     industry, they try to come after
19     you with everything they've got.
20     We went inside that
21     industry, and they brought
22     everything to try to stop us.  If
23     you want to go -- go watch a
24     movie, Mr. Horowitz, go watch

Page 424

1  Miss Sloane.  Okay?  Have you seen
2  it?  Because they try to bring
3  everything they could against us.
4      I hope, sir, your -- your
5  industry is not going to be acting
6  like the tobacco industry and
7  trying to throw stuff like that.
8  BY MR. HOROWITZ:
9    Q.   Doctor, let me show you
10 what's been marked as Exhibit 18.
11     (Document marked for
12     identification as Exhibit
13     Kessler-18.)
14 BY MR. HOROWITZ:
15   Q.   This is an Associated Press
16 article.
17   A.   Right.
18   Q.   You know who the Associated
19 Press is, right?
20   A.   Right.
21   Q.   The title of it is "Kessler
22 Travel Book Rife with Overcharges."
23     Do you see that?
24   A.   Yes.

Page 425

1    Q.   And it's dated November 2,
2  1996?
3    A.   Well, if you go back to
4  the -- go back to the -- look at the
5  documents that are now in the Tobacco
6  Legacy project, and you will see where
7  this started.  And it started with Tommy
8  Griscom and RJ Reynolds going to an
9  outside front group, going to a -- going
10 to the Associated Press.
11     They went through eight
12 years of travel expenses, and I think
13 they found a total of eight -- actually,
14 there's some -- and I'm happy to get it
15 for you.  They found --
16   Q.   Doctor --
17   A.   Just hold on, sir.
18   Q.   All I did was ask you if the
19 article was dated November 2, 1996.
20 That's the question pending.
21   A.   Right.  But you're going --
22 you're going back, and this is in the
23 context of -- so for the record -- and I
24 will be happy to get it for you.  Okay?

107 (Pages 422 to 425)

Protected - Subject to Further Protective Review

Page 426

1　There is a memo that says that I was not
2　even involved in submitting any of these
3　travel expenses, and I -- you know,
4　because you never want to blame others,
5　and you want to take the heat yourself.
6　　　　I paid back that $835. But
7　I will be happy to get you a record so
8　you can be under no misapprehension,
9　right, that I was not involved in
10　submitting those travel expenses.
11　　　Q.　Doctor, all I asked you, is
12　this article dated November 2, 1996?
13　　　A.　You better -- you should
14　know, for the record, sir, that I will
15　get you the letter that says I was not
16　involved in submitting that, and that's
17　an official government letter.
18　　　　But if you want to throw
19　stuff, go ahead.  But if you're going to
20　stoop to the level of the tobacco
21　industry, that has to be part of the
22　record, because that's where those
23　accusation come from.
24　　　Q.　Is the Deseret newspaper in

Page 427

1　Salt Lake City, Utah and the Associated
2　Press, that's not the tobacco industry,
3　is it?
4　　　A.　The tobacco industry --
5　　　　MS. JEFFCOTT:  Object to
6　　　form.
7　　　　THE WITNESS:  The tobacco
8　　　industry, you can see who the
9　　　tobacco industry -- go in.  Go
10　　　look.
11　BY MR. HOROWITZ:
12　　　Q.　Okay.
13　　　A.　Right.
14　　　Q.　Well, I asked --
15　　　A.　Just let's get the record
16　straight here.  Okay.
17　　　Q.　Doctor, can I ask you a
18　question, or are you just giving speeches
19　because you are --
20　　　A.　No, because you're --
21　　　　MS. JEFFCOTT:  Stop,
22　　　Mr. Horowitz.
23　BY MR. HOROWITZ:
24　　　Q.　If you're willing to stay a

Page 428

1　little bit longer, that's fine.
2　　　A.　No, no, because you're --
3　　　Q.　You are just giving
4　speeches.  I've got to ask a question.
5　　　A.　But -- and you have to have
6　the facts.
7　　　Q.　Doctor, I've got to ask you
8　a question.  You can't just --
9　　　A.　The facts -- go ask the
10　question.
11　　　Q.　Thank you.  Thank you.
12　　　　It says, "The Associated
13　Press reviewed some $17,377 in federal
14　reimbursements that Kessler claimed on
15　travel vouchers from mid 1990 to spring
16　1995."
17　　　A.　How's that -- what year
18　period?
19　　　Q.　I'm sorry?
20　　　A.　What year period.
21　　　Q.　Just read the sentence.  I'm
22　sure --
23　　　A.　Just -- just -- over a
24　six-year period correct?  Six-year

Page 429

1　period, $17,000.
2　　　Q.　Did I read it correctly?
3　　　A.　That's fine.
4　　　Q.　Okay.  Doctor, let's put
5　this aside for a second.
6　　　A.　No.  But I'm going to ask to
7　supplement the record so that you're
8　under notice that I was not involved in
9　submitting those records, for the record.
10　I can ask counsel to do that.
11　　　　MS. JEFFCOTT:  Two and a
12　　　half minutes.
13　BY MR. HOROWITZ:
14　　　Q.　Doctor, when you were
15　talking to Mr. Zellers -- I just want to
16　make sure I understand something with
17　respect to the regulations.
18　　　　I mean, when you were
19　talking about the initial approval, you
20　said the company didn't follow the
21　regulation, the FDA didn't invoke the
22　regulations.  And I guess my question --
23　I'm sorry -- that the FDA didn't invoke
24　the regulations.  And you said that

108 (Pages 426 to 429)

Protected - Subject to Further Protective Review

Page 430

```
1    Xarelto was an example here where it
2    couldn't be clear, that sometimes
3    companies mess up, FDA messes up.
4           Do you recall -- I mean,
5       these are --
6           MS. JEFFCOTT:  Object to
7       form.
8    BY MR. HOROWITZ:
9       Q.   This is what I wrote down
10   based on what you said.  I'm trying to do
11   this quickly.
12      A.   Ask your question.
13      Q.   Okay.  My question is, are
14   you offering the opinion that FDA failed
15   to correctly follow and apply the NDA
16   approval regulations for Xarelto?
17      A.   No, I'm -- I'm not here
18   sitting here to criticize the FDA.  FDA
19   has to follow the regulations.  It
20   didn't.  But I don't believe FDA's
21   conduct is at an issue in this matter.
22      Q.   Okay.  So are you -- you're
23   not offering an opinion that the FDA
24   failed to invoke the regulations at the
```

Page 431

```
1    time of FDA -- at the time of the
2    approval of the Xarelto NDA in particular
3    for the SPAF indication?
4       A.   It's not --
5           MS. JEFFCOTT:  One minute.
6           THE WITNESS:  The -- the
7       statement is not in the label.
8       It's the manufacture -- it's the
9       manufacturer whose label it is.
10      If you want to talk about FDA
11      conduct, I'm happy to talk about
12      that.
13   BY MR. HOROWITZ:
14      Q.   And then one other thing
15   that's on my list, and this will only
16   take a minute, is you said in response to
17   some of Mr. Zellers' questions that the
18   label doesn't comply with the regulations
19   as written.  And just to give you
20   context, this is when he was asking you
21   whether you thought Xarelto should be on
22   the market as labeled.  Do you recall
23   that conversation?
24      A.   Right.
```

Page 432

```
1       Q.   Okay.  I guess my question
2    is -- and then you said something about,
3    well, you know, you really are getting
4    into a legal area.  And what I was
5    wondering was, are you suggesting that as
6    labeled Xarelto is currently misbranded?
7       A.   It's a legal conclusion.
8    And --
9       Q.   I know the way you think.
10   And that's why I was wondering if that's
11   where you were going.
12      A.   Yeah, and I just wanted
13   to -- the question is if something is
14   misbranded, is it in violation of the
15   action.  You ship it in-state commerce.
16   There's all those things.  But I think
17   those are legal opinions.  I think the
18   public health issue here is -- you know,
19   I mean, is the issue of whether that
20   information appeared on the label.  It
21   did not, and my opinion is it should
22   have.
23          MS. JEFFCOTT:  Mr. Horowitz,
24      you are out of time.
```

Page 433

```
1    BY MR. HOROWITZ:
2       Q.   And you understand -- and
3    you understand that --
4           MR. HOROWITZ:  Can you just
5       let me finish this one question?
6           THE WITNESS:  Sure.  Go
7       ahead.
8    BY MR. HOROWITZ:
9       Q.   Thank you, Dr. Kessler.
10      A.   I'd be happy to...
11      Q.   We have a long history
12   together, and I appreciate your courtesy
13   given the time.
14      A.   Of course.
15      Q.   And you know I've tried to
16   be courteous as best I can when you and I
17   talk to each other.
18      A.   Except when you -- when you
19   enrolled the tobacco industry.  But, you
20   know, you --
21      Q.   I understand.
22      A.   You don't want to go there.
23      Q.   I understand --
24      A.   If you -- if you do, you'd
```

109 (Pages 430 to 433)

Protected - Subject to Further Protective Review

Page 434

1  bring down your -- you'd bring your
2  industry to that level.  You don't want
3  to do that.
4       Q.   Doctor, let me ask you just
5  a couple more --
6           MS. JEFFCOTT:  Just one more
7  question.
8           MR. HOROWITZ:  Well, I'm a
9  lawyer, so when I say one...
10 BY MR. HOROWITZ:
11      Q.   State versus Schaefer issue,
12 I want to do that -- we can do that
13 quickly --
14          MS. JEFFCOTT:  No.  Just one
15 more question.
16 BY MR. HOROWITZ:
17      Q.   -- but an unfortunate on
18 FDA --
19          MR. HOROWITZ:  The doctor is
20 complying with me.
21          MS. JEFFCOTT:  One more
22 question, as -- as counsel, ask
23 your question.  Let's go.
24 BY MR. HOROWITZ:

Page 435

1       Q.   Dr. Kessler, a couple
2  questions.  Number one --
3           MS. JEFFCOTT:  One more
4  question.
5           MR. HOROWITZ:  Please stop
6  interrupting me.
7           MS. JEFFCOTT:  Ask your
8  question.
9           MR. HOROWITZ:  I can't with
10 you chirping at me.  Stop yelling
11 at me.
12 BY MR. HOROWITZ:
13      Q.   Doctor --
14          MS. JEFFCOTT:  That's
15 yelling?  That's nothing compared
16 to what you did.  So ask a
17 question.
18 BY MR. HOROWITZ:
19      Q.   Doctor, do you understand
20 that there has been no enforcement action
21 by FDA with respect to the accuracy or
22 the adequacy of the labeling with respect
23 to Xarelto?
24      A.   That's a matter of record,

Page 436

1  correct.
2       Q.   You agree with that, right?
3       A.   That there has been no
4  enforcement action, that's correct.
5           MS. JEFFCOTT:  Okay.  That's
6  it.
7           MR. HOROWITZ:  Okay.  Thank
8  you.
9           (Documents marked for
10 identification as Exhibits
11 Kessler-19 through 50.)
12          THE VIDEOGRAPHER:  Time is
13 now 5:51.  This concludes the
14 deposition.  Going off the record.
15          (Excused.)
16          (Deposition concluded at
17 approximately 5:51 p.m.)
18
19
20
21
22
23
24

Page 437

1
2              CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
   deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, DAVID A. KESSLER, M.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12     _____
       MICHELLE L. GRAY,
       A Registered Professional
13     Reporter, Certified Shorthand
       Reporter, Certified Realtime
14     Reporter and Notary Public
       Dated:  December 19, 2016
15
16
17     (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

110 (Pages 434 to 437)

Protected - Subject to Further Protective Review

Page 438

```
 1          INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8          After doing so please sign
 9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 440

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 441, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   DAVID A. KESSLER, M.D.        DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20_____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```

Page 439

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3
 4   PAGE LINE CHANGE
 5          _____
 6   ____ ____   REASON: _____
 7          _____
 8   ____ ____   REASON: _____
 9          _____
10   ____ ____   REASON: _____
11          _____
12   ____ ____   REASON: _____
13          _____
14   ____ ____   REASON: _____
15          _____
16   ____ ____   REASON: _____
17          _____
18   ____ ____   REASON: _____
19          _____
20   ____ ____   REASON: _____
21          _____
22   ____ ____   REASON: _____
23          _____
24   ____ ____   REASON: _____
```

Page 441

```
 1          LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____   _____
 4   ____ ____   _____
 5   ____ ____   _____
 6   ____ ____   _____
 7   ____ ____   _____
 8   ____ ____   _____
 9   ____ ____   _____
10   ____ ____   _____
11   ____ ____   _____
12   ____ ____   _____
13   ____ ____   _____
14   ____ ____   _____
15   ____ ____   _____
16   ____ ____   _____
17   ____ ____   _____
18   ____ ____   _____
19   ____ ____   _____
20   ____ ____   _____
21   ____ ____   _____
22   ____ ____   _____
23   ____ ____   _____
24   ____ ____   _____
```

Golkow Technologies, Inc. - 1.877.370.DEPS