1          UNITED STATES DISTRICT COURT

           EASTERN DISTRICT OF LOUISIANA

2

   ******************************

3

   IN RE:  XARELTO                MDL No. 2592

4  (RIVAROXABAN)                  Section L

   PRODUCTS LIABILITY             Judge Eldon Fallon

5  LITIGATION                     Mag. Judge North

6  THIS DOCUMENT RELATES TO:

   DORA MINGO

7  Case No. 2:15-CV-03469

8  ******************************

9

   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

10

11

12

13    VIDEOTAPED DEPOSITION OF HENRY M. RINDER, MD

14

15           Tuesday, February 7, 2016

16                8:05 a.m.

17

18      Held At:

19           Douglas & London, PC

20           50 Maiden Lane

21           New York, New York

22

23

24  REPORTED BY:

25  Maureen O'Connor Pollard, RMR

1 APPEARANCES:
2
3 FOR THE PLAINTIFF:
4   BY: ROGER C. DENTON, ESQ.
5     SCHLICHTER BOGARD & DENTON, LLP
6     100 South Fourth Street, Suite 1200
7     St. Louis, Missouri 63102
8     314-621-6115
9     rdenton@uselaws.com
10       -and-
11   JOSEPH G. VANZANDT, ESQ.
12     BEASLEY ALLEN CROW METHVIN
13     PORTIS & MILES, PC
14     218 Commerce Street
15     Montgomery, Alabama 36104
16     334-269-2343
17     joseph.vanzandt@beasleyallen.com
18
19
20
21
22
23
24
25

1 APPEARANCES (Continued):
2
3 FOR THE BAYER DEFENDANTS:
4   PAMELA J. YATES, ESQ.
5     ARNOLD & PORTER KAYE SCHOLER LLP
6     77 South Figueroa Street, 44th Floor
7     Los Angeles, California 90017
8     213-243-4178
9     pamela.yates@apks.com
10       -and-
11   ADRIA W. CONKLIN, ESQ.
12     MITCHELL WILLIAMS
13     425 West Capitol Ave., Suite 1800
14     Little Rock, Arkansas 72201
15     501-688-8861
16     aconklin@mwlaw.com
17
18
19
20
21
22
23
24
25

1 APPEARANCES (Continued):
2
3 FOR THE JANSSEN DEFENDANTS:
4   BY: MARGARET HOFFMANN, ESQ.
5     SCHWABE, WILLIAMSON & WYATT
6     1211 SW 5th Ave., Suite 1900
7     Portland, Oregon 97204
8     503-222-9981
9     mhoffmann@schwabe.com
10       -and-
11   DARYL DALY, ESQ.
12     DRINKER BIDDLE & REATH LLP
13     600 Campus Drive
14     Florham Park, New Jersey 07932
15     973-549-7106
16     daryl.daly@dbr.com
17
18
19 Videographer: Danny Ortega
20
21
22
23
24
25

1            INDEX
2 EXAMINATION                 PAGE
3 HENRY M. RINDER, MD
4   BY MS. HOFFMANN            6
5   BY MS. YATES             128
6
7
8      E X H I B I T S
9 NO.      DESCRIPTION       PAGE
10 1   Defendants' Notice with Subpoena
       Duces Tecum of Oral Videotaped
11     Deposition.......................... 13
12 2   Expert Report of Henry Michael
       Rinder, MD.......................... 18
13
14
15
16
17
18
19
20
21
22
23
24
25

1  P R O C E E D I N G S
2
3      THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Danny Ortega, and I'm the
5  videographer for Golkow Technologies.  Today's
6  date is February 7th, 2017, and the time is
7  8:05 a.m.
8      This video deposition is being held at
9  59 Maiden Lane, New York, New York, in the
10  matter of Xarelto, Dora Mingo versus Janssen, et
11  al, for the United States District Court,
12  Eastern District of Louisiana.
13      The deponent is Dr. Henry Michael
14  Rinder.
15      Counsel will be noted on the
16  stenographic record.
17      The court reporter is Maureen Pollard,
18  and will now swear in the witness.
19
20      HENRY M. RINDER, MD,
21  having been first duly sworn, was examined and
22  testified as follows:
23          EXAMINATION
24  BY MS. HOFFMANN:
25  Q.  Good morning, Dr. Rinder.

1  A.  Good morning, Ms. Hoffmann.
2  Q.  I introduced myself off the record.
3  Allow me to do it again on the record.  I'm
4  Margaret Hoffmann.  I'm here from Portland,
5  Oregon.  I'm one of the attorneys representing
6  Janssen in the lawsuit brought by Mrs. Mingo.
7      We're here today to take your
8  deposition in connection with your expert report
9  and your anticipated expert testimony for the
10  trial in this case.
11      You understand that?
12  A.  Yes, I do.
13  Q.  Doctor, I know that you were
14  previously deposed in connection with a
15  different case in December of 2016, is that
16  correct?
17  A.  Yes, ma'am.
18  Q.  And at or about the time of that
19  deposition, you had provided documents,
20  invoices, that talked about or that portrayed
21  fees that you had charged so far in the
22  litigation, correct?
23  A.  I believe the lawyers presented those.
24  Q.  Okay.  The last invoice that I have or
25  that I have seen for time that you have billed

1  in this case was through -- I actually don't
2  have that date, so let me ask the question this
3  way.
4      Have you submitted any invoices for
5  your time spent in the Mingo case?
6  A.  No.
7      Well, I'm sorry, can you clarify that
8  again?  Any at all?  I'm sorry.
9  Q.  Let me try it again.
10  A.  Yeah.  I'm sorry.
11  Q.  You're here as an expert on behalf of
12  Dora Mingo, is that correct?
13  A.  Yes.
14  Q.  Okay.  And in connection with Dora
15  Mingo's case, you have spent time preparing a
16  report for this case?
17  A.  Yes.
18  Q.  And you have reviewed records in
19  connection with Ms. Mingo's case?
20  A.  Yes.
21  Q.  Do any invoices that you have
22  submitted in the past reflect time that you've
23  spent preparing or working on the Dora Mingo
24  case?
25  A.  Yes.  I don't know if they are

1  specific for that, but they do include time
2  spent reviewing Ms. Mingo's records.
3  Q.  Have you incurred fees for time that
4  you've spent in the Dora Mingo case since the
5  last invoice that you submitted?
6  A.  I don't think so.
7  Q.  So all of the time that you've spent
8  on the Dora Mingo case would have been part of
9  an invoice that has already been provided to
10  your lawyers?
11  A.  No, I'm sure I have spent time since
12  then, but I've not provided an invoice for time
13  since the last invoice.
14  Q.  Can you approximate for me the amount
15  of time that you spent since the last invoice
16  working on the Dora Mingo case?
17  A.  I don't have an idea of what that time
18  is.
19  Q.  Do you have an estimate?
20  A.  No.
21  Q.  Do you have any way of giving us any
22  information about the amount of time you spent
23  preparing since your last invoice for Dora
24  Mingo?
25  A.  I don't have that with me.

1    Q.  How do you keep track of your time?

2    A.  I usually make a notation somewhere on

3  my calendar about a date or something like that

4  when I've looked at things usually in the

5  evening or afternoon, but I just try to estimate

6  about the time that I spent when I get to the

7  time, about, for an invoice.

8    Q.  So the estimates for the time that you

9  spend on any particular matter such as the Dora

10  Mingo would be reflected on some calendar that

11  you keep at home?

12    A.  Yes.

13    Q.  Do you keep a separate computer file

14  where you set forth time that you spend on

15  cases?

16    A.  No.

17    Q.  You were deposed back in December of

18  2016 in connection with the general report that

19  you submitted in this case as well as the

20  Boudreaux specific case, correct?

21    A.  Yes, those were the two depositions.

22    Q.  Have you given depositions in any

23  matter since December of 2016?

24    A.  Yes.

25    Q.  As an expert witness?

1    A.  Yes.

2    Q.  And in what matter?

3    A.  That was in a matter with regards to

4  testosterone.

5    Q.  When did you give that deposition?

6    A.  I don't know the exact date.  I

7  believe it was in January.

8    Q.  January of 2017?

9    A.  Correct.

10    Q.  And for whom were you testifying?

11    A.  I was testifying for the plaintiffs.

12    Q.  And who were you -- what product was

13  involved, what medication?

14    A.  I believe it's the general

15  testosterone litigation.

16        Can I ask a quick question?  The

17  testosterone is a -- has a confidentiality

18  agreement.  Is it okay that I mention --

19        MR. DENTON:  I think you can testify

20  about generally what you did, you gave a

21  deposition, things like that.  But any specifics

22  about your testimony or materials you reviewed,

23  I believe, would be confidential.

24        THE WITNESS:  Okay.  Thank you.

25  BY MS. HOFFMANN:

1    Q.  Did you prepare an expert report in

2  advance of giving your deposition in January of

3  2017 in the testosterone matter?

4    A.  Yes.

5    Q.  And who is the -- is there a

6  pharmaceutical company involved in that?

7    A.  Yes.

8    Q.  And what's the name of the

9  pharmaceutical company?

10    A.  I'm not sure I know them all.  I know

11  that AbbVie, A-B-B-V-I-E, is one of them.

12    Q.  And can you tell us what your opinions

13  were with respect to the testosterone case?

14        MR. DENTON:  Well, I think there I'm

15  going to have to interject an objection, and

16  instruct you to not give opinions that would

17  violate the confidentiality order.  I assume he

18  looked at internal company documents.  Is that

19  true?

20        THE WITNESS:  Oh, yes.

21        MR. DENTON:  Then I just don't think

22  he can give those opinions in a public setting

23  in a litigation outside of that litigation

24  because of the confidentiality order.

25        I would suggest that you comply with

1  that order.

2  BY MS. HOFFMANN:

3    Q.  Did you sign a confidentiality order

4  in that case?

5    A.  Yes.

6    Q.  Do you have a copy of it with you?

7    A.  No.

8    Q.  Who were the attorneys that retained

9  you in the testosterone case?

10    A.  The main attorney that I'm working

11  with is Stephanie O'Connor.

12    Q.  What firm is Ms. O'Connor with?

13    A.  Douglas & London.

14    Q.  I've asked the court reporter to mark

15  as Exhibit 1 the notice of deposition in this

16  case.  I'd like you to take a look at that for a

17  moment, please.

18        (Whereupon, Rinder Exhibit Number 1,

19        Defendants' Notice with Subpoena Duces

20        Tecum of Oral Videotaped Deposition,

21        was marked for identification.)

22  BY MS. HOFFMANN:

23    Q.  Did you bring any documents with you

24  today?

25    A.  No, I did not.

1    Q.  Have you seen Exhibit 1 prior to this
2  morning?
3       (Witness reviewing document.)
4    A.  I believe that I've seen this in an
5  e-mail.
6  BY MS. HOFFMANN:
7    Q.  Okay.  As part of Exhibit 1, there is
8  an attachment to it which is Exhibit A.
9  Dr. Rinder, have you looked at the categories of
10  documents listed in Exhibit A to determine
11  whether or not you have any that are responsive
12  to the various requests?
13    A.  I'm sorry, you're going to have to --
14  can you make that -- I'm sorry, I'm not sure I
15  understand the question.
16    Q.  Sure.
17       I direct your attention to Exhibit A,
18  which is part of Exhibit 1.
19    A.  Correct.  Correct.
20    Q.  Correct?
21       And Exhibit A sets forth a series of
22  requests for various documentation, correct?
23    A.  Yes.
24    Q.  And my question to you is, prior to
25  today, have you checked your records to

1  determine whether or not you have documents that
2  are responsive to the requests set forth in
3  Exhibit A?
4    A.  I believe that I've -- everything that
5  is in Exhibit A I've supplied to the attorneys,
6  to the attorneys for them to have available for
7  this.
8    Q.  So you've looked at each one of the
9  requests in Exhibit A and made the determination
10  that if you have documents responsive to any of
11  the requests, you've provided those to your
12  attorneys?
13    A.  I believe that this is -- that I've
14  been complete in giving whatever the attorneys
15  wanted respective to this exhibit.
16    Q.  Okay.  And you've not brought any
17  documents with you today that are responsive to
18  any of the requests set forth in Exhibit A which
19  is part of Exhibit 1?
20    A.  I asked the attorneys to have
21  everything for me rather than me to try and go
22  through this, so I've asked the attorneys to
23  have everything that was necessary for this
24  exhibit.
25    Q.  Did you provide any documents to your

1  attorneys that are responsive to the requests
2  set forth in Exhibit A?
3    A.  In the past, yes.
4    Q.  Okay.  Can you tell us which
5  categories of requests you've supplied documents
6  in response to?
7    A.  Well, let's see.  The first one is
8  documents related to witness's review of
9  materials --
10    Q.  Doctor, you don't have to read each of
11  them out loud.
12    A.  Okay.
13    Q.  You don't need to read them out loud.
14  If you'll just tell me --
15    A.  Okay.
16    Q.  -- which of the requests you have
17  supplied documents to your attorneys, that would
18  suffice.
19    A.  I see.
20       Well, there have been many reference
21  and publications that I've found, and that I've
22  asked the attorneys to include on my list of
23  materials considered.
24       I've given them my most current CV.
25       They have all of my invoices and

1  bills.
2       I mean, besides the references that
3  I've found, the documents from internal memos
4  that they've given me, I'm not sure I understand
5  some of these.
6       They have my reports, both general and
7  case-specific.
8       Again, references.
9       Again, this should be all information
10  that they have that's part of my materials
11  considered.
12       I gave them my information at the time
13  of the reports regarding the previous expert or
14  witness aspects here.
15       I think they have -- I think they have
16  all of the transcripts that are related to
17  Xarelto.  That's in my CV.  That's also in my
18  CV.
19       I think, to the best of my knowledge,
20  I think that's all I can recollect.
21    Q.  Thank you, Doctor.
22       You prepared a report specifically for
23  the Mingo case, correct?
24    A.  Yes, ma'am.
25    Q.  And did you bring a copy of that

1  report with you today?
2      A.  No.
3      Q.  Did you have an opportunity, or did
4  you take an opportunity to review your
5  case-specific Mingo report prior to today?
6      A.  Yes.
7          (Whereupon, Rinder Exhibit Number 2,
8          Expert Report of Henry Michael Rinder,
9          MD, was marked for identification.)
10  BY MS. HOFFMANN:
11      Q.  I've had the court reporter mark as
12  Exhibit 2 a document entitled "Expert Report of
13  Henry Michael Rinder, MD."
14          Is that the case-specific report you
15  prepared for the Mingo case?
16          (Witness reviewing document.)
17      A.  Yes, I believe it is.
18  BY MS. HOFFMANN:
19      Q.  On the first page of Exhibit 2, is
20  that your signature?
21      A.  Yes, it is.
22      Q.  And next to it there's a date of
23  November 30th, 2016, correct?
24      A.  Yes, I see that.
25      Q.  That's the date you signed the report?

1      A.  Yes, ma'am.
2      Q.  After November 30th, 2016, can you
3  tell me what, if anything, you've done in
4  connection with the Mingo case?
5      A.  I've reviewed my -- the references
6  that I used to substantiate what I said here.
7  I've reviewed this.  I was sent some expert
8  reports from the defense.  I glanced over those.
9  I've done some literature searches on a fairly
10  regular basis regarding NOACs and bleeding.  I
11  think that's -- I think that is the sum of what
12  I've done since then.
13      Q.  Can you list for me the defense expert
14  reports that you were provided and that you
15  looked at?
16      A.  The last names of the experts were
17  Haynes, H-A-Y-N-E-S, Herrin, H-E-R-R-I-N, Jones,
18  and Persing.  I'm not sure.  I think it's
19  P-E-R-S-I-N-G.
20      Q.  And you reviewed each of those
21  reports?
22      A.  I read them.
23      Q.  Did you make notes about any of them?
24      A.  No.
25      Q.  Did you -- do any of those reports

1  that you read, Haynes, Herrin, Jones and
2  Persing, in any way change the opinions that you
3  have set in your report regarding Ms. Mingo?
4      A.  No.
5      Q.  Did you make note of any items that
6  you read in those reports that you disagree
7  with?
8      A.  Not in a checklist manner.  I sort
9  of -- when I went through, I noted in my head
10  things that I disagreed with or thought were
11  misinterpreted.
12      Q.  Other than noting -- I'm sorry.
13          MR. DENTON:  Let him finish.
14  BY MS. HOFFMANN:
15      Q.  I didn't let you finish.  I apologize.
16      A.  I looked through them to also see if
17  there were substantive items that were either
18  incorrect or were chronologically wrong or
19  things like that.  But basically I just -- I
20  went through them and just had a general feeling
21  about whether I agreed or disagreed with their
22  conclusions.
23      Q.  So other than making mental notes
24  about things that you either agreed or disagreed
25  with in the reports done by Drs. Haynes, Herrin,

1  Jones and Persing, did you commit any of that to
2  any form of writing?
3      A.  No.
4      Q.  So are you able to tell me from your
5  mind what parts of Dr. Haynes's report you
6  disagreed with?
7      A.  You know, I read them all at once.  I
8  don't think I can do that.  I'd be happy to look
9  at the report.
10      Q.  I'm just asking you, you told me you
11  made mental notes.  You did not document
12  anything, correct?
13      A.  Correct.
14      Q.  So I'm asking you about your mental
15  notes.  Can you tell me, based on your mental
16  notes from reading Dr. Haynes's report, what
17  parts, if any, you disagreed with?
18      A.  Again, I read them all at once, I
19  would be -- I would rather be able to see it in
20  front of me, because I'm concerned that what I'm
21  thinking I might have read in Haynes was
22  actually in a different report.  And so I had
23  disagreements --
24      Q.  I understand that, Doctor.
25          MR. DENTON:  Let him finish.

1 MS. HOFFMANN: The question is a
2 mental note.
3 MR. DENTON: Wait a minute. Wait a
4 minute.
5 MS. HOFFMANN: We're going to be here
6 all day --
7 MR. DENTON: No, we're not.
8 MS. HOFFMANN: -- if we can't get
9 answers to these questions.
10 MR. DENTON: No, no, no, no, no. When
11 he's in the middle of an answer, he gets to
12 finish the answer, so let him finish his answer,
13 then ask your next question. Thank you.
14 BY MS. HOFFMANN:
15 Q. Let's make you sure you have the
16 question in mind. Okay?
17 A. Go ahead.
18 Q. Can you tell me from your mental notes
19 that you made what parts of Dr. Haynes's report,
20 if any, you disagree with?
21 MR. DENTON: Object to the form.
22 A. I -- again, I disagreed, I disagreed
23 with much of each of the reports in terms of
24 their opinions.
25 Rather than try to do this by memory,

1 which I'm sure I'll be picking the wrong thing
2 from the wrong expert, I'd rather look at them
3 and go through that, or based on the case I'm
4 happy to answer those questions.
5 BY MS. HOFFMANN:
6 Q. Can you tell me from the mental notes
7 you made what, if anything, you disagree with
8 that was set forth by Dr. Herrin?
9 A. It would be the same answer. I don't
10 think I can do better than that.
11 Q. And the same answer for Dr. Jones, you
12 cannot recite for me based on your mental notes
13 you made on your review of his report what, if
14 anything, you disagreed with?
15 A. I would rather be very specific than
16 to try and hope that I got the right
17 disagreement with the right expert.
18 Q. So as you sit here today, you have no
19 current recollection of any specifics that you
20 disagreed with with respect to any of the
21 defense reports that you read. Fair statement?
22 MR. DENTON: Object to the form of the
23 question.
24 A. No. I have general disagreements, but
25 I would rather -- to be specific, I would rather

1 go over them and give you the exact
2 disagreements from what they say rather than try
3 to make it a memory test.
4 BY MS. HOFFMANN:
5 Q. In connection with your preparation
6 for your testimony today, did you go back and
7 re-review any medical records for Mrs. Mingo?
8 A. I checked a few things just to make
9 sure that my memory was fairly up-to-date on
10 things that I had put in my report and that they
11 were still fresh in my mind.
12 Q. What things did you recheck with
13 respect to Ms. Mingo's medical records?
14 A. So I wanted to make sure that I
15 recalled her -- some of her laboratory values.
16 I looked at my -- I looked at her records of her
17 anticoagulation therapy. I looked at the
18 records regarding her -- between the time of her
19 DVT and her GI bleeding, I browsed through those
20 just to reassure myself that what I have written
21 in my report I still remembered correctly, and
22 some of her medication history following that.
23 I'm sure I looked at other things, but
24 that's -- I think I concentrated on those. I'm
25 sure there's other things that I'm leaving out,

1 but I just don't recall.
2 Q. And have you been provided with a
3 complete set of Ms. Mingo's medical records?
4 A. As far as I know, I believe I have.
5 Q. And when you review her medical
6 records, do you do it in paper copy, or
7 electronically?
8 A. I believe everything that I have been
9 sent was electronic.
10 Q. And so you look at them
11 electronically?
12 A. Yes.
13 Q. And do you take -- do you make notes
14 on the electronic copies that you review?
15 A. I don't know how to do that.
16 Q. So the answer would be no?
17 A. The answer would be no.
18 Q. Okay. And as you review her medical
19 records, do you make notes, not on the
20 electronic copies, but just notes for yourself?
21 A. No. I do not.
22 Q. Have you spoken with any of
23 Ms. Mingo's medical providers?
24 A. I don't think so.
25 Q. So you haven't made an attempt to

Page 26

1  contact any provider who has given treatment or
2  care to Ms. Mingo?
3      A.  I see what you're -- I see what you're
4  saying.  No, I have not.
5      Q.  Have you contacted any of the
6  hospitals where Ms. Mingo was treated?
7      A.  No, I have not.
8      Q.  Have you contacted any of the
9  laboratories where Ms. Mingo underwent any kind
10  of lab treatment?
11      A.  No, I have not.
12      Q.  Have you asked for any additional
13  records for Ms. Mingo?  In other words, in your
14  review of the medical records, did you see any
15  particular gaps and then ask to be provided with
16  any additional records?
17      A.  As I was reviewing the electronic
18  medical record from the first time that I was
19  given this case, there were times when I thought
20  that there might be a gap or maybe something was
21  out of chronological order, or I had trouble
22  with -- the imaging sometimes of the medical
23  record was blurry, and so I would ask to get
24  another copy, or to make sure that the dates
25  were correct and get something chronologic.  In

Page 27

1  the end, I don't think there was anything
2  missing.  I think that sometimes I got things
3  that were out of chronologic order or that were
4  not readable.
5      Q.  And when you made requests for better
6  copies or for different chronological order, did
7  you make those requests to the lawyers who
8  retained you, or did you make those requests to
9  the medical institutions?
10      A.  I thought that it was only supposed to
11  go through the lawyers, so I --
12      Q.  So it was the lawyers to whom you made
13  the request?
14      A.  Right.  I didn't think that I had any
15  standing to contact the hospital regarding
16  getting specific medical records.
17      Q.  In addition to reviewing Ms. Mingo's
18  medical records in this case, did you also
19  review depositions that were taken in this case?
20      A.  I don't believe that I've seen any
21  depositions.
22          When you say "depositions," you
23  mean -- that's different from expert reports?
24      Q.  Yes, sir.  You know what a deposition
25  is, don't you?

Page 28

1      A.  Yes.
2      Q.  Okay.  Did you review any depositions
3  in connection with your review of the Mingo
4  case?
5      A.  I don't believe so.
6      Q.  Doctor, if you take a look at
7  Exhibit 2, which is your report, and you go to
8  the reference section of your report.
9      A.  Yes.  It says "All depositions taken."
10  But I don't -- I can't recall that I read any.
11      Q.  You anticipated my question.
12          On your reference section it says "All
13  depositions taken in the matter of Dora Mingo."
14  Would that be, then, a correction that you'd
15  want to make to your reference list, that you,
16  in fact, did not review depositions in the Dora
17  Mingo case?
18      A.  I would have to go back and look at
19  that.  I've not -- I don't -- it's been a while,
20  and I don't recall.  Maybe I was sent them and
21  briefly looked at them.  I tend to make my
22  recommendations based purely on the -- as much
23  as I can, on the medical record rather than on
24  what someone says months or years later.  So I
25  may have been sent depositions.  I can't recall

Page 29

1  them specifically.
2      Q.  While you're looking at your reference
3  list, you also indicate in your reference list
4  that you reviewed all depositions taken in the
5  Boudreaux case.
6          My question, Doctor, is, why did you
7  review depositions taken in Boudreaux for your
8  Mingo case?
9      A.  I asked the lawyers to include
10  everything that they thought was pertinent for
11  this -- for legal purposes for this review.  I
12  assume that they are putting that in there
13  because it's somehow pertinent for a legal
14  review.  Nothing that I read related to
15  Mr. Boudreaux in terms of his medical records or
16  anything that's specific to his case is relevant
17  to Ms. Mingo.
18      Q.  Did you prepare this reference list?
19      A.  As much as I could.  I asked them to
20  put in -- I asked the lawyers to put in the
21  specifics of the internal documents and the
22  documents that they provided to me that were not
23  available to me from the start.
24      Q.  Your reference list for the Dora Mingo
25  case also indicates that you reviewed all

1  medical records for Joseph Boudreaux.  That's on
2  the last page of your reference.  What relevance
3  do the medical records of Joseph Boudreaux have
4  to the opinions that you're rendering in Dora
5  Mingo's case?
6      A.  Again, none of the records for
7  Mr. Boudreaux are relevant to my discussion or
8  my opinions regarding Ms. Mingo.  I asked the
9  lawyers to make sure that this is a complete
10  legal document, and I'm sure that that was
11  included by them for that purpose, not by me.
12      Q.  Do you know Dr. Renie Jordan?
13      A.  I know the name.  I do not know her or
14  him.
15      Q.  Do you know if it's a man or a woman?
16      A.  I do not.
17      Q.  Have you done any background research
18  about Dr. Renie Jordan?
19      A.  No.
20      Q.  Do you know Dr. Keith?
21      A.  I'm sorry, can you repeat that?
22      Q.  Certainly.
23        Do you know Dr. Keith?
24      A.  Dr. Keith.  I do not.
25      Q.  Are you familiar with the name?

1      A.  I believe that that is someone
2  involved in Ms. Mingo's care.
3      Q.  Do you know what role he played in
4  Ms. Mingo's care?
5      A.  I would have to go back through the
6  chart to see.
7      Q.  So as you sit here today, you have no
8  recollection of what role Dr. Keith played in
9  Ms. Mingo's care?
10      A.  I don't --
11      Q.  Is that a fair statement?
12      A.  Well, I don't try to -- I don't try to
13  memorize each detail.  I would have to go back
14  through the record to look at that.  I recall
15  the name.  That's it.
16      Q.  Okay.  And same question with respect
17  to Dr. Renie Jordan, do you know what role
18  Dr. Renie Jordan played in the care and
19  treatment of Ms. Mingo?
20      A.  I believe that Dr. Jordan was the
21  prescriber of Xarelto and the anticoagulation
22  for Ms. Mingo for her VTE.
23      Q.  Did you do any research on Dr. Keith?
24      A.  No.
25      Q.  Does Exhibit 2 contain the opinions

1  that you are prepared to testify to in the Dora
2  Mingo case?
3      A.  Yes.
4      Q.  Are there any opinions that are not in
5  that report that you now know you're going to be
6  offering?
7        MR. DENTON:  Object to the form of the
8  question.
9      A.  I'm sure there may be things I say
10  that are inclusive within this that may not be
11  in that exact language.  I'll try to make sure
12  that they comport with this report.
13      Q.  But is it fair to say, Doctor, that in
14  your preparation of Exhibit 2, which is your
15  expert report for Dora Mingo, you tried to be as
16  thorough and complete about the opinions that
17  you intend to testify to?
18      A.  Yes, that is correct.
19      Q.  Okay.  Because you understood when you
20  created this report that it would be the guide
21  used by the defense to understand what it is
22  you're going to testify to at trial?
23      A.  In a general way, I assume that is
24  true.
25      Q.  So with that in mind, you put in as

1  completely as you could those specific opinions
2  that you have regarding Ms. Mingo's care and
3  treatment that you intend to offer at trial?
4        MR. DENTON:  Again, I object to the
5  form of the question.
6      A.  As I said before, there may be aspects
7  of what I would say that I did not include in
8  this that support these opinions.  They're not
9  in there because I was asked to make this
10  concise.  But I would say that those things
11  would support the opinions that are in this
12  report.
13  BY MS. HOFFMANN:
14      Q.  So in other words, you don't intend to
15  offer an opinion at trial on a topic that is
16  completely different than the topics that are
17  listed in your report under the summary of your
18  opinions?
19      A.  Well, I would say I'm not going to --
20  I am going to give testimony and support to the
21  opinions that are here.  That may include
22  aspects or information that is not specifically
23  related to here.  What you say is different than
24  these reports may not say what -- may not agree
25  with what I think needs to be in this.  But as I

1  said, what I would testify to and say is in
2  support of what is here.
3      Q.  Okay.  Let me try it a different way
4  just to make sure that we're speaking the same
5  language.
6          If you go to Page 1 of your report --
7      A.  Yes.
8      Q.  -- to the bolded heading that says
9  "Summary of Opinions."
10         Do you see that?
11     A.  Yes.
12     Q.  Does that summarize the opinions that
13  you're going to give in this case?
14     A.  Again, that is the summary.  There may
15  be things that I say that would support that
16  summary that are not included here.
17     Q.  Correct.
18         But if you say things other than
19  what's in that Summary of Opinions, they would
20  just be information that supports one of those
21  four statements that you've made under Summary
22  of Opinions, is that what you're saying?
23     A.  I think that that would be a fair
24  statement, that I would be -- that I would be
25  using other information or discussing things

1  that support these four general opinions.
2      Q.  So we as the defense can rely on the
3  Summary of Opinions to know the topics that you
4  are going to address at trial?
5          MR. DENTON:  I object to the form.
6      A.  Well, I assume that I will be asked
7  about these things.  If I am asked about other
8  aspects of what I know regarding not just this
9  case but the general opinion report that I gave,
10  I would assume that I will have to answer those,
11  and those may be separate and distinct from
12  these opinions.
13  BY MS. HOFFMANN:
14     Q.  In preparing your report in this case
15  and in preparing for your testimony here today,
16  did you speak with any of your colleagues about
17  Ms. Mingo?
18     A.  No.  I'm sorry.
19         MR. DENTON:  I just object.  I don't
20  know what you mean by "colleagues."  You mean
21  physicians at work or something?
22         MS. HOFFMANN:  That's okay.
23  You can object to the form, sir.
24         MR. DENTON:  Well, I know.  But he may
25  consider me a colleague, and if he does, then

1  you can't ask him about that.
2  BY MS. HOFFMANN:
3      Q.  Outside of conversations with your
4  attorneys, did you speak with any of -- people
5  that you consider to be your colleagues about
6  Ms. Mingo?
7      A.  I have not spoken to anyone outside of
8  the attorneys regarding this case.
9      Q.  In your review of your report in
10  preparation for today's deposition, did you note
11  anything in there that's incorrect?
12     A.  You know, that's partly why I went
13  back over the record, to try to review the dates
14  and the different pharmacology and the lab
15  results.  I don't -- to the best of my
16  recollection, I don't believe that anything that
17  is in here is incorrect.  I might have -- you
18  know, in looking this over, I might have written
19  something in a slightly different way or used a
20  different verb or something like that, but --
21     Q.  Factually you have confirmed that the
22  information contained in your report is correct?
23     A.  To the best of my ability, yes.
24     Q.  And you're not changing any of the
25  opinions that you've set forth in your report?

1      A.  Again, I'm sorry, are you asking about
2  opinions, or the facts that are in the report?
3      Q.  The first question I asked had to do
4  with facts.  You've confirmed that the facts
5  that are in your report are correct?
6      A.  To the best of my ability, yes.
7      Q.  My next question is about the opinions
8  that you've given in your report.  After
9  reviewing it, are there any opinions you're
10  changing?
11         MR. DENTON:  Object to the form.
12     A.  Again, I -- there may be things that I
13  am -- that I may include in my support of these
14  opinions that is not here where I've changed --
15  somewhat changed my thinking about.  But I would
16  support the opinions that are here.
17  BY MS. HOFFMANN:
18     Q.  Okay.  Are you involved -- let me go
19  back and kind of set the table.
20         As I understand it, you have a -- what
21  you have termed a clinical practice where you
22  are a consultant.
23         Have I said that correctly?
24     A.  No.  I would say, if you'll allow me,
25  that my clinical practice is in a tertiary care

1  center where I'm one of the -- lucky enough to
2  be one of the senior faculty, so I do not have a
3  primary care clinic. The junior faculty have
4  that. I'm not the primary going to the
5  emergency room to see those patients. But I am
6  always involved in care, I'm available for the
7  care of those patients, and I'm involved in the
8  care of those patients, but I'm not necessarily
9  their primary physician.
10  Q.  In the care that you provide to
11  patients, is that as a consultant to another
12  physician who is doing the primary care?
13  A.  So the practice of hematology is very
14  often consultative. And in fact -- I'm sorry.
15  In fact, the majority of care that is given by
16  hematologists/oncologists that is not
17  consultative is in therapy of malignancies, and
18  those are separate. Whereas, the majority of
19  patients that have disorders of hemostasis are
20  being taken care of by other physicians. So the
21  majority of hematology care in that situation is
22  consultative, and that's my practice.
23  Q.  Your practice is primarily
24  consultative, correct statement?
25  MR. DENTON:  Object to the form of the

1  question. Asked and answered.
2  A.  Again, I don't think I can state it in
3  a better way other than that the practice of
4  hematology in this field is consultative, and I
5  follow that practice.
6  BY MS. HOFFMANN:
7  Q.  Do you consult in the care of patients
8  who are ready to undergo total joint
9  replacement?
10  A.  Yes.
11  Q.  Do you consult in the care of patients
12  after they have undergone total joint
13  replacement?
14  A.  Yes.
15  Q.  And is your consultation with patients
16  who are ready to or have just received total
17  joint replacement inpatient consultation?
18  A.  It is both.
19  Q.  Meaning you see them both in the
20  hospital and outside the hospital?
21  A.  Let me clarify. The patients who are
22  about to undergo total hip replacement are
23  almost always outpatients, and so we may be
24  asked to answer hematologic questions or issues
25  prior to their being admitted for their surgery,

1  or to help them with decision-making prior to
2  that, so that is -- that tends to be more
3  outpatient, sometimes inpatient.
4  When patients have had total hip
5  replacement and run into hematologic
6  complications or need guidance before their
7  discharge, those would tend to be inpatient
8  problems. But there are also patients that are
9  discharged after their total hip replacement and
10  then need hematologic consultation.
11  Q.  Do you make decisions about
12  anticoagulation for patients who have just
13  received total hip replacement?
14  A.  I help the medical team to come to
15  decisions on anticoagulation.
16  Q.  And when you say you "help the medical
17  team," what does the medical team consist of?
18  A.  Well, it's everyone involved in that
19  patient's specific care. If it's, as you're
20  discussing here, someone with total hip
21  replacement, it would be the orthopedic surgeon,
22  the anesthesiologist, physical or rehabilitation
23  therapy. If the patient has other medical
24  problems, then it would be all the other
25  physicians that are involved in those specific

1  medical problems. We tend to work as a team and
2  approach these issues as a team.
3  Q.  Do you provide consultation to the
4  medical team in charge of total hip replacements
5  as to which anticoagulation therapy should be
6  administered to patients?
7  A.  I think that in discussions with the
8  medical team, the question of which
9  anticoagulant is the best choice for that
10  particular patient is part of our discussion.
11  Q.  What orthopedic surgeons do you
12  consult with?
13  A.  Oh, there are lots.
14  Q.  Can you list them?
15  A.  I can't recall. I don't think I have
16  their names readily at hand. I'd be incomplete
17  with that list.
18  Q.  Can you give me the name of the last
19  orthopedic surgeon that you consulted with about
20  anticoagulation for a patient post hip surgery?
21  A.  I don't recall exactly who it was.
22  Q.  Can you give me the names of any
23  orthopedic surgeons that you've consulted with
24  about anticoagulation for a patient post hip
25  surgery in the last year?

1    A.  You know, I just don't remember the
2  names.  We tend -- the other aspect is that we
3  tend to also interact with so many residents and
4  fellows who are taking care of the patients, and
5  sometimes not even -- the attendings are
6  changing services, so it's just very difficult
7  to keep track of who is who.
8    Q.  When you -- a couple times so far
9  you've used the word "we," when we do this or we
10  do that.  Who is the "we" that you're referring
11  to?
12    A.  Well, we're a team.  The hematology
13  consultation is not just me.  It's also a team.
14  I have residents, fellows, junior attendings,
15  these are approached in a team-based way, and we
16  work together for the patient's care.
17    Q.  Do you agree that anticoagulation is
18  the standard of care for patients following
19  total hip replacement?
20      MR. DENTON:  Object to the form.
21    A.  I think that anticoagulation is
22  important in patients who are getting total hip
23  replacement, and I think that it needs to be a
24  strong consideration for each individualized
25  patient.  I would say the -- I tend to be

1  concerned more about personalized medicine and
2  making sure that that choice is correct for each
3  patient.
4  BY MS. HOFFMANN:
5    Q.  Is the choice of whether to
6  anticoagulate or not anticoagulate a patient
7  following total hip replacement ultimately made
8  by the orthopedic surgeon and his or her team,
9  as opposed to you and your team who are
10  consultants?
11    A.  The team does have -- the team has to
12  have a captain, and if the patient is being
13  admitted for orthopedic surgery, the fellow,
14  chief resident and attending are the people that
15  are finally responsible for that.  So we can
16  make recommendations and have a discussion, but
17  they are ultimately responsible in that time
18  period for deciding how that patient's therapy
19  is administered, and the choice of therapies.
20    Q.  So regardless of what the hematologic
21  team consultants recommend, it is ultimately, in
22  your experience, up to the orthopedic surgeon
23  and his or her team to decide not only whether
24  to anticoagulate, but also what medications
25  they're going to use?

1      MR. DENTON:  Object to the form of the
2  question.  Asked and answered.
3    A.  I don't think I can say it any better
4  than I did before.  At the end of the day, the
5  orders have to be written by the team that is
6  admitting and doing the care of that patient's
7  specific problem, and so the orthopedic team is
8  going to write those final orders.  They may --
9  we have given our opinions and had a discussion
10  with them, but they're the final writing of
11  those orders.
12  BY MS. HOFFMANN:
13    Q.  In Ms. Mingo's case, you understand
14  that she underwent a total right hip replacement
15  on January 6, 2015, correct?
16    A.  That is my understanding.
17    Q.  And you understand that following her
18  total hip replacement, she was anticoagulated
19  with Lovenox for ten days, and then switched to
20  325 aspirin, correct?
21      MR. DENTON:  Object to the form of the
22  question.
23    A.  My reading of her records was that she
24  was discharged on aspirin, 81 milligrams, and
25  Lovenox prophylaxis, and that she was instructed

1  to use Lovenox and aspirin for seven days
2  following the surgery, and then transition to
3  aspirin, 325 milligrams by itself for continued
4  DVT prophylaxis.
5  BY MS. HOFFMANN:
6    Q.  You understand that her discharge was
7  on January 9, 2015, correct?
8    A.  That is correct.
9    Q.  And at the time of discharge, she was
10  told to continue the Lovenox for seven days, but
11  she had also been given Lovenox for three days
12  in the hospital, correct?
13      MR. DENTON:  Object to the form of the
14  question.
15    A.  I was not -- I found the records
16  difficult.  I could not tell whether she got
17  Lovenox for two days or three days prior to
18  discharge.
19  BY MS. HOFFMANN:
20    Q.  So you don't know, based on your
21  review of the records, whether or not she had
22  ten days of anticoagulation with Lovenox, or
23  something less, correct?
24    A.  My recollection was that she got, I
25  think, about nine days.  I can't -- I was not

Page 46

1  able to tell for sure whether it was a full ten
2  days.
3       Q.   And you understand that while she was
4  on Lovenox she was also on 81 milligrams of
5  aspirin, correct?
6       A.   She was on Lovenox -- I'm sorry.  She
7  was on aspirin, 81 milligrams while she was on
8  Lovenox.
9       Q.   And you understood that at the
10 conclusion of her Lovenox therapy, which was to
11 continue for seven days post discharge, she was
12 then to start taking aspirin, 325?
13      MR. DENTON:  I object to the form of
14 the question.
15      A.   My reading of her medical record was
16 that after the Lovenox and aspirin, 81 was
17 complete, she would then begin aspirin, 325.
18      Q.   And you understand that her use of
19 Lovenox and then the 325 milligrams of aspirin
20 was for prophylaxis to decrease the risk of the
21 development of a VTE, correct?
22      A.   Well, just to be accurate, it was
23 Lovenox and aspirin, followed by aspirin, 325.
24           But yes, my reading of the medical
25 record was that the purpose of that was for DVT

Page 47

1  prophylaxis.
2       Q.   And was your reading of the medical
3  record that the Lovenox plus the 81 milligrams
4  of aspirin, that it was that combination that
5  was being prescribed as prophylaxis for VTE?
6       A.   Well, she had been on aspirin prior
7  and was continued on the aspirin with the
8  Lovenox.  I think that the Lovenox and the
9  aspirin worked together as DVT prophylaxis.
10      Q.   Did you understand that that's what
11 her physician was ordering for prophylaxis,
12 81 milligrams of aspirin plus Lovenox, or was it
13 your understanding that the 81 milligrams of
14 aspirin was for some other medical condition or
15 reason?
16      A.   In my reading of the medical records,
17 I did not see a specific reference to the
18 patient's aspirin, 81 being continued for
19 another indication, or for prophylaxis.  My
20 understanding of the physiology of these drugs
21 is that both Lovenox and aspirin will work to
22 help prevent DVT prophylaxis.
23      Q.   And do you have any criticism of the
24 treatment for the prophylaxis of VTE?
25      A.   I don't know that I would call it a

Page 48

1  criticism.  I tend to use, or recommend -- I'm
2  sorry, I should say recommend.
3           In patients getting a total hip
4  replacement, I tend to recommend that patients
5  be considered for coumadin for, on average, two
6  weeks following total hip replacement.
7           Now, certainly within the orthopedic
8  surgeon's judgment, that is something that I
9  would -- I'm not saying I'm criticizing it.  I'm
10 saying that that's what I would tend to use as
11 my central therapy, and I would then change that
12 or modify that in conjunction with a discussion
13 with the orthopedic surgeon.
14      Q.   So you're not criticizing Dr. Gandy's
15 use of Lovenox to be followed by 325 aspirin for
16 the prophylactic treatment of VTE?
17      MR. DENTON:  Objection to form.  Asked
18 and answered.
19      A.   I do not have a -- I do not have a
20 specific criticism.  As I said, I tend not to
21 use that as my first line.  I would be
22 considering another form, but I don't have a
23 specific criticism of that.
24 BY MS. HOFFMANN:
25      Q.   Dr. Gandy operated within the standard

Page 49

1  of care, correct?
2       A.   You know, I'm not an orthopedic
3  surgeon, and so I don't think I can --
4       Q.   So you can't opine about the standard
5  of care for orthopedic surgeons, fair?
6       A.   I think other than what I do in terms
7  of my consultative work with orthopedic
8  surgeons, I'm happy to talk about that, but not
9  them.
10      Q.   Doctor, are you a member of the
11 American College of Chest Physicians?
12      A.   I am not.
13      Q.   Have you ever been a member of that
14 organization?
15      A.   No.
16      Q.   You understand that they publish
17 guidelines regarding prophylactic treatment for
18 patients following hip surgery?
19      A.   I'm aware that the American College of
20 Chest Physicians has many publications.
21      Q.   Let me go back to my question.
22           You're aware that they publish
23 guidelines with respect to the prophylactic
24 treatment of patients following total joint hip
25 replacement?

Page 50

1    MR. DENTON: Object to the form.
2        Go ahead.
3    A. Well, I -- they may call them
4  guidelines. I do not find that, you know, that
5  that is -- I do not find publications to be
6  authoritative, and so I find -- I would prefer
7  to use the term guidance. I think that's a
8  guidance. I think that that's part of what any
9  physician then can review and decide to use or
10 not.
11 BY MS. HOFFMANN:
12   Q. Doctor, whether or not you agree with
13 what they publish, we can agree that they, in
14 fact, publish guidance or guidelines for the
15 treatment of patients following total joint hip
16 replacement, correct?
17       MR. DENTON: Object to the form of the
18 question.
19   A. Again, they do publish guidance, yes.
20 BY MS. HOFFMANN:
21   Q. Thank you.
22       And you don't necessarily find their
23 guidance authoritative?
24   A. I find -- what I try to use is
25 guidance from every publication, whether it's

Page 51

1  from organizations or from individuals, I use
2  that in my evaluation and try to make the best
3  decisions based on that information.
4    Q. In your consultive practice, do you
5  consult with doctors who treat patients in the
6  emergency room for deep vein thromboses?
7        MR. DENTON: Object -- excuse me.
8  Object to the form of the question.
9    A. Yes, we do interact with emergency
10 department physicians in that respect.
11 BY MS. HOFFMANN:
12   Q. Do you interact with emergency room
13 doctors who are treating patients for deep vein
14 thrombosis?
15   A. I may not be on the scene most of the
16 time, but a lot of times I am in telephone
17 conversation with them or with the fellow or the
18 attending who is in the emergency department.
19   Q. Do you have a time, regular time on a
20 monthly or a periodic basis when you are on call
21 for the emergency room?
22   A. Only emergency physicians are on call
23 in the emergency room.
24   Q. So there's never a time when an
25 emergency room doctor who needed help would pick

Page 52

1  up the phone and you would be the designated
2  person for them to talk to?
3    A. My phone is available to the
4  physicians at my hospital 24/7, and so they can
5  call me 24/7, and they do.
6    Q. Can you quantify for me on either a
7  monthly basis, a yearly basis, how often you are
8  involved with the treatment of a patient who has
9  a deep vein thrombosis?
10   A. I don't quantify that. I have no
11 idea.
12   Q. What would be your best estimate?
13   A. I would rather be specific. I don't
14 have one.
15   Q. Well, can you say even in gross terms
16 whether it's frequent, infrequent, often? Can
17 you put any kind of descriptive term on your
18 involvement with a patient who has a deep vein
19 thrombosis?
20   A. Well, my clinical care
21 responsibilities are 75 percent of my time, and
22 I think that's about as good as I can give you.
23   Q. But you're not saying that 75 percent
24 of your time is spent with patients who are
25 experiencing a deep vein thrombosis?

Page 53

1    A. What I'm saying is that 75 percent of
2  my time is clinical care. That includes
3  patients with all manner of hematologic
4  disorders, including patients with deep vein
5  thrombosis.
6    Q. And 75 percent of your time is as a
7  consultant to those doctors who are doing direct
8  treatment of the patients, is that correct?
9        MR. DENTON: Object to the form.
10 Asked and answered.
11   A. Again, I don't think I can give a
12 better answer than I gave before.
13 BY MS. HOFFMANN:
14   Q. Do you prescribe medications for the
15 treatment of deep vein thrombosis? Do you
16 prescribe?
17   A. At our institution the prescribing is
18 done by the residents and fellows.
19   Q. So you do not write out prescriptions
20 for patients for medications to treat deep vein
21 thrombosis?
22   A. None of the hematology attendings and
23 attendings write prescriptions. The residents
24 and fellows are the primaries for those
25 patients. They write the prescriptions.

1    Q.  So the answer to my question would be,
2   correct, I, Dr. Rinder, do not write
3   prescriptions for patients for medications for
4   deep vein thrombosis?
5        MR. DENTON:  I object.
6   BY MS. HOFFMANN:
7    Q.  Is that right?
8        MR. DENTON:  I object to the form, and
9   it's been asked and answered.
10  BY MS. HOFFMANN:
11   Q.  Well, I've heard a lot about what
12  hematologists in general do, but I really want
13  to know what Dr. Rinder does.
14       MR. DENTON:  And he's been telling you
15  that for the last hour.  Listen.
16  BY MS. HOFFMANN:
17   Q.  Go ahead, sir.
18       MR. DENTON:  Just objecting to this
19  repetitive nature.
20       You can give her the same answer, or
21  whatever answer you think is appropriate.
22   A.  I would say, like the other attending
23  physicians in hematology practice at Yale, I do
24  not write the prescriptions.  The fellows and
25  residents write the prescriptions.  We help them

1   make those decisions.  We supervise that.  We're
2   responsible for it.  They are writing the
3   primary prescriptions.
4   BY MS. HOFFMANN:
5    Q.  Do you, Dr. Rinder, talk to patients
6   who are experiencing a deep vein thrombosis
7   about the risks and benefits of medications for
8   the treatment of their deep vein thrombosis?
9    A.  At times, usually as part of a team
10  consultation.
11   Q.  Is Xarelto prescribed by the
12  physicians that you consult with for the
13  treatment of deep vein thrombosis?
14   A.  I'm sorry, can you say that one more
15  time?  I'm sorry.  I have --
16   Q.  Sure.
17       Is Xarelto a medication that is
18  prescribed by the physicians that you consult
19  with for the treatment of deep vein thrombosis?
20   A.  Yes.
21       THE WITNESS:  Can we take a break?
22       MR. DENTON:  Sure, it's been about an
23  hour.
24       THE VIDEOGRAPHER:  The time right now
25  is 9:04 a.m., and we're off the record.

1        (Whereupon, a recess was taken.)
2        THE VIDEOGRAPHER:  This marks the
3   beginning of tape number two.  The time right
4   now is 9:13 a.m., and we're back on the record.
5   BY MS. HOFFMANN:
6    Q.  Doctor, we've just taken a break.
7   We're back on the record.
8        Are there any responses that you've
9   given to my questions so far today that you want
10  to change?
11   A.  No, not that I can think of.
12   Q.  Okay.  When we took a break, we were
13  talking about treatment of deep vein thrombosis.
14  Okay.  And would you agree that therapeutic
15  doses of Xarelto are within the standard of care
16  for the treatment of a deep vein thrombosis?
17       MR. DENTON:  Object to the form of the
18  question.  Object to the form of the question.
19   A.  Can you say that one again?
20  BY MS. HOFFMANN:
21   Q.  Sure.  Let me reword it.
22       Do you agree that use of Xarelto for
23  the treatment of a deep vein thrombosis is
24  within the standard of care?
25       MR. DENTON:  Object to the broad

1   nature of the form of the question.
2    A.  So I'm aware that Xarelto is one of
3   the medications that is approved by the FDA for
4   the treatment of venous thromboembolism.
5   BY MS. HOFFMANN:
6    Q.  Okay.  And it's one of the medications
7   that's used by your institution for the
8   treatment of deep vein thrombosis?
9    A.  Xarelto is one of the medications used
10  by physicians at Yale and in the area
11  surrounding it, that I know of.
12   Q.  Okay.  And let me divert for just a
13  minute.
14       At your institution, does your
15  hospital that you attend at have a formulary?
16   A.  Yes.
17   Q.  And is -- are you on the formulary
18  committee?
19   A.  No, I am not on the formulary
20  committee.
21   Q.  And does the formulary committee make
22  decisions about what medications to put on the
23  formulary?
24   A.  As best I understand, yes.
25   Q.  And Xarelto is one of the medications

Page 58

1  that's on the formulary at the hospital where
2  you attend, correct?
3      A.  Actually I don't know that for sure.
4  I would have to look at the formulary to know
5  exactly which NOACs are and are not -- or are
6  not on that.
7      Q.  And doctors who work within the
8  hospital are not required to prescribe only
9  those medications that are on the formulary,
10  correct?
11      A.  At our hospital, physicians have
12  leeway to use medications, whether they are on
13  the formulary or not.
14      Q.  Okay.  If a medication is on the
15  formulary at your hospital, that means that some
16  committee of physicians and medical
17  practitioners have looked at that medication and
18  deemed it an appropriate medication for
19  particular indications for use by doctors within
20  the hospital, correct?
21      MR. DENTON:  I object to the form of
22  the question.
23      A.  That sounds like a general description
24  of what a formulary committee does.
25  BY MS. HOFFMANN:

Page 59

1      Q.  And that sounds like a general
2  description of what the formulary committee at
3  the hospital where you practice does, correct?
4      A.  Well, since I'm not on that formulary,
5  I would basically defer to the general
6  description.
7      Q.  Okay.  Anticoagulation for the
8  treatment of a deep vein thrombosis is done to
9  avoid long-term complications from that deep
10  vein thrombosis, is that a correct statement?
11      MR. DENTON:  Object to the form of the
12  question.
13      A.  Say that one more time?
14  BY MS. HOFFMANN:
15      Q.  Sure.
16      Using an anticoagulant to treat a deep
17  vein thrombosis is done so as to avoid long-term
18  complications from that deep vein thrombosis, is
19  that a correct statement?
20      MR. DENTON:  Object to the form.
21      A.  I think a better evaluation of why
22  anticoagulation is used for a deep vein
23  thrombosis is to prevent extension of the
24  thrombosis, and to prevent, when applicable, the
25  risks, the -- to prevent as best as possible a

Page 60

1  pulmonary embolism.
2  BY MS. HOFFMANN:
3      Q.  Okay.  And Xarelto is an anticoagulant
4  that is used for treatment of deep vein
5  thrombosis?
6      A.  Again, as I said before, it is -- it
7  has an approved indication for treatment of VTE.
8      Q.  And when a physician chooses to use
9  Xarelto to treat a deep vein thrombosis, the FDA
10  approved dosage would be 15 milligrams twice a
11  day for the first 21 days, followed by
12  20 milligrams a day for the duration of
13  treatment, correct?
14      A.  I believe that that was the protocol
15  that was used that gave the FDA data for their
16  decisions.
17      Q.  And that's the dosing information
18  that's provided in the FDA approved labeling for
19  Xarelto, correct?
20      MR. DENTON:  Object to the form.
21      Go ahead.
22      A.  Again, that is my understanding of
23  what is in the label.
24  BY MS. HOFFMANN:
25      Q.  And you reviewed the label for Xarelto

Page 61

1  as part of your preparation in this case, right?
2      A.  Yes, ma'am.
3      Q.  Okay.  Do you agree that without
4  anticoagulation, people with proximal
5  symptomatic deep vein thrombosis 50 percent of
6  the time will develop a pulmonary embolism?
7      MR. DENTON:  Object to the form.
8      A.  There is data.  I don't know that the
9  50 percent is the correct estimate, but I would
10  say that there is clear evidence that patients
11  with a proximal, that is, above the knee deep
12  vein thrombosis are at greatly increased risk of
13  a pulmonary embolism, and therefore,
14  anticoagulation should be strongly considered in
15  such patients.
16  BY MS. HOFFMANN:
17      Q.  In Ms. Mingo's case, she developed a
18  deep vein thrombosis following her hip
19  replacement surgery, correct?
20      A.  So Ms. Mingo was -- Ms. Mingo was
21  16 days status post her hip surgery when she
22  developed a deep vein thrombosis of the right
23  peroneal vein.
24      Q.  She was diagnosed with a deep vein
25  thrombosis on January 22, 2015, correct?

1    A.   That is my recollection, which is
2 16 days after her hip surgery on January 6th.
3    Q.   Okay.  And she was initially given a
4 10-milligram dose of coumadin and 40 milligrams
5 of Lovenox while she was in the hospital for her
6 deep vein thrombosis, correct?
7    A.   On January 22nd, I believe that she
8 was given Lovenox and coumadin.
9    Q.   In the dosages that I just mentioned?
10    A.   Could you say those dosages again,
11 please?
12    Q.   Sure.  Let me try the question again.
13    A.   Sure.
14    Q.   When Ms. Mingo was hospitalized on
15 January 22nd for her deep vein thrombosis, she
16 was initially given 10 milligrams of coumadin
17 and 40 milligrams of Lovenox, correct?
18    A.   I believe that is correct.
19    Q.   And the next day, on January 23rd, she
20 was started on Xarelto for the treatment of her
21 deep vein thrombosis, correct?
22    A.   I believe that on the 23rd she
23 received two doses of Xarelto.
24    Q.   So my statement is correct, on
25 January 23rd she was started on Xarelto for the

1 treatment of her deep vein thrombosis?
2    A.   I believe that is correct.
3    Q.   And she was given the FDA approved
4 dosage of Xarelto for the treatment of DVT,
5 which was 15 milligrams twice a day, correct?
6    A.   Yes, she received 15 milligrams twice
7 on the 23rd.
8    Q.   And then she was given instructions to
9 take Xarelto, 15 milligrams, twice a day for the
10 next 20 days, so that she would have it for a
11 total of 21 days at that dosage, correct?
12    A.   I believe that on the -- yes, I think
13 that on the 24th, when she was discharged, she
14 filled a prescription for 20 days of additional
15 Xarelto BID.  I don't know that it -- I don't
16 know -- I'm not sure that she did not get
17 Xarelto that morning from -- but it was probably
18 between 21 and 22 days.
19    Q.   Okay.  And then she was told that at
20 the completion of a total of 21 days, taking
21 Xarelto 15 milligrams twice a day, that she
22 would then change to 20 milligrams of Xarelto
23 once a day for duration of treatment?
24    A.   That is my understanding of her
25 discharge instructions.

1    Q.   Doctor, I want to turn now for a few
2 minutes to your report, and the opinions in your
3 report.
4        If you would, go to Page 2 of your
5 report.  I want to start with Number 4.
6        Are you with me?
7    A.   Yes, on Page 2.
8    Q.   Okay.  So let's talk for a minute
9 about the prothrombin test, the PT test that was
10 taken on January 24, 2015 that you make
11 reference to on Page 2, Number 4.  Okay?
12    A.   Yes.
13    Q.   Are you with me?
14        That PT was collected at 0.623 hours,
15 correct?
16    A.   0623 hours on the 24th, yes.
17    Q.   And as of that time, Ms. Mingo had
18 previously been administered 10 milligrams of
19 coumadin on January 22nd, correct?
20    A.   That is correct.
21    Q.   She had been administered
22 40 milligrams of Lovenox on January 22nd,
23 correct?
24    A.   That is correct.
25    Q.   She had been given Lovenox on 1/23 --

1 strike that.
2        She had been given 15 milligrams of
3 Xarelto on January 23rd at 9:00 o'clock a.m.?
4    A.   I have it at 0830 on the 23rd.
5    Q.   Okay.  I'll go with that.
6        So she had been given Xarelto on
7 January 23rd at about 8:30 in the morning,
8 correct?
9    A.   That is correct.
10    Q.   And then she had received Xarelto on
11 January 23rd at about 20:40 p.m., or 2040 hours?
12    A.   Right, in the evening of January 23rd.
13    Q.   And then that PT was collected about
14 ten hours after her last dose of Xarelto,
15 correct?
16    A.   That is correct.
17    Q.   And you don't know what reagent was
18 used in administering that PT test, do you?
19    A.   I do not know the specific
20 thromboplastin reagent that was used for the
21 prothrombin time.
22    Q.   You do not know whether or not
23 Neoplastin or Neoplastin Plus was used by the
24 lab in doing that PT, correct?
25    A.   I do not know the specific

thromboplastin reagent. It could have been
Neoplastin. It could have been Innovin. I
don't know.

Q. Or it could be none of the above?

A. Or it could be one of the other
accepted thromboplastin reagents.

Q. So it would be pure speculation on
your part to guess at what reagent was used by
the lab in calculating -- or in administering
the PT test that was collected at 623 hours on
1/24, correct?

MR. DENTON: I object to the form of
the question.

A. Well, my report does not refer to the
specific thromboplastin reagent. But the fact
that the pro time is so significantly prolonged,
frankly it doesn't really matter which reagent
was used. Even the most insensitive reagents,
that's an extreme prolongation of the
prothrombin time after Xarelto.

BY MS. HOFFMANN:

Q. Let me go back to my question and just
make sure we're on the same page.

It would be speculation on your part
to guess at what reagent was used by the lab for

the PT test done on January 24th, correct?

MR. DENTON: Object to the form of the
question. It's been asked and answered.

A. As I said, in my report I do not refer
to the thromboplastin reagent, so I'm not
guessing and I'm not speculating.

BY MS. HOFFMANN:

Q. Right. You're not going to guess or
speculate. You flat don't know what reagent was
used, right?

MR. DENTON: Object to the form.

A. As I said, it's irrelevant. I'm not
going to guess or speculate. But the data is
what the data is in terms of the prolongation of
the prothrombin time and what we know regarding
the sensitivity of different prothrombin time
reagents.

BY MS. HOFFMANN:

Q. I guess at this point, Doctor, just
bear with me, I'm not asking for your opinion
about the prothrombin time at this juncture.
I'm really just trying to establish that you do
not know what reagent was used. Fair?

A. I have -- I do not have information on
what thromboplastin reagent was used in this

assay, as I said before.

Q. Okay. And you told me earlier in the
deposition that you did not pick up the phone in
this case and call the lab or call the hospital
and inquire about what reagents they currently
use, or what reagents were used at the time that
this PT test was done, correct?

A. I did not do that for the reason that
I stated before, which is because that is
irrelevant based on the fact that the
prothrombin time is so prolonged. Even if it
was the most insensitive reagents, that
information is not germane.

Q. The prothrombin time for the January
24th test that was taken would be influenced by
the coumadin and the Lovenox as well as the
Xarelto, wouldn't it?

A. No.

Q. Okay. You've previously given the
opinion that rivaroxaban should be discontinued
in rivaroxaban treated patients who have a PT
greater than 20 seconds as measured with the
appropriate agent at the appropriate time,
correct?

A. I believe that is in my general

report.

Q. And you have further refined that
opinion to say that the appropriate agent to
support your opinion that rivaroxaban patients
should be discontinued if they have a PT greater
than 20 seconds is if the reagent used for the
PT test is Neoplastin and if the PT test is
collected between 13 and 15 hours post last dose
of Xarelto, correct?

MR. DENTON: Object to the form of the
question.

A. Again, that is -- I believe you're
reading that from my general opinion report.

BY MS. HOFFMANN:

Q. You're absolutely right that I'm
reading it from your report. I don't pretend to
be smart enough to be able to figure that out.

But the opinion that you've given is
that when -- let me make sure I get this
right -- that when a patient is on rivaroxaban,
if they have a PT test done with Neoplastin and
that PT is -- and that specimen is collected
between 13 and 15 hours, if the PT time is
greater than 20 seconds, then your
recommendation and opinion is that patient is at

1  a greater risk of bleeding and should,
2  therefore, either be discontinued from Xarelto,
3  have the Xarelto reduced in dosage, or they
4  should be changed to another anticoagulant?
5      MR. DENTON:  Object to the form, broad
6  nature of the question.
7      A.  In writing the general opinion report,
8  I strive to be as specific as I can based on the
9  data, which is most complete and instructive
10 based on the ideal situation of using the
11 Neoplastin reagent for the prothrombin time
12 which has the largest amount of data, and the
13 FDA's examination of that data which -- for
14 which the majority of that data was done between
15 13 and 15 hours.
16     So that opinion is reflecting the
17 ideal situation of the best, at least most
18 sensitive and most well-supported by the
19 company's data for measuring the PT, and in a
20 general way where that data was most
21 concentrated.
22     The FDA examined that data and found
23 it relevant and included it.  They examined that
24 in terms of time dependence and did not find
25 that there was a time dependence, even though

1  the majority of that data was between 13 and
2  15 hours.
3      Q.  Is the data that you're --
4      A.  Let me finish.  I apologize.
5      So that is the general opinion that I
6  wrote in order to be supported by the most ideal
7  data with the most relevant information that the
8  FDA was using.
9      Q.  The data that you're referring to that
10 was used by the FDA, and you referred to the
11 company, that's data that came from patients who
12 were taking Xarelto, 20 milligrams a day for
13 reduction of risk of blood clots in atrial
14 fibrillation patients, correct?
15     A.  That data is from the ROCKET trial
16 which was, as you -- was for 20 milligrams a day
17 for -- not prevention of clots, but prevention
18 of systemic stroke and embolism.
19     Q.  So let me say it again, Doctor,
20 because I think we're saying the same thing.
21     The data that you're referring to is
22 data that was derived from patients who were
23 taking Xarelto, 20 milligrams a day, because
24 they had atrial fibrillation, correct?
25     A.  That is the -- that's the ROCKET data,

1  and that is the data that was used to determine
2  bleeding risk.
3      Q.  Right.  You're not talking about data
4  that was taken from patients who were taking
5  Xarelto, 15 milligrams a day, twice a day for
6  the treatment of DVT, correct?
7      A.  That is the best data that is out
8  there, and it's applicable to patients taking
9  Xarelto in general.  If anything, that data is
10 probably more instructive for patients that are
11 taking even higher doses of Xarelto than the
12 20 milligrams once a day.  So the data from the
13 other trials was very small.  The Afib data has
14 a very, very large amount of data, and so that's
15 very instructive in terms of bleeding risk --
16     Q.  Let's try --
17     A.  -- and should be used to inform
18 patient -- to inform doctors taking -- with
19 patients on Xarelto.
20     Q.  Doctor, let's try this and see if it
21 works, okay?  Let's try first seeing if we can
22 agree on the facts.  Then, if you have opinions
23 about those facts, you are more than welcome to
24 give those in response to questions by your
25 lawyers.  But what I want to do first before you

1  launch off into opinions that you may have is to
2  see if we can just start out with some basic
3  agreement on the facts.  Can we try that?
4      MR. DENTON:  I object to you directing
5  Dr. Rinder on how to answer your questions.
6  He's able to answer your questions as he sees
7  fit in his professional judgment.  So you can
8  ask your question, he'll give you the best
9  answer.  But you're not going to tell him how to
10 answer your questions.
11 BY MS. HOFFMANN:
12     Q.  Let's see if we can just establish the
13 facts.  Okay?  The data that you're referring to
14 is data that was derived from patients who were
15 taking Xarelto for atrial fibrillation,
16 20 milligrams, once a day, correct?
17     A.  As I said before, with the caveats
18 that I used, that is the data that is most
19 robust that the FDA is using to inform
20 physicians on bleeding risk.
21     Q.  Okay.  And that's the data that you
22 are relying on when you render your opinion that
23 rivaroxaban should be discontinued in
24 rivaroxaban treated patients who have a PT
25 greater than 20 seconds as measured with

1  Neoplastin as the reagent and when collected
2  between 13 and 15 hours after their last dosage?
3      MR. DENTON:  I object to the form.
4      If we're going to get into the general
5  report, then pull out the general report,
6  because there's much more information in that
7  report.  I mean, you're --
8      MS. HOFFMANN:  Well, it's in this
9  report.
10     MR. DENTON:  But you're asking him
11 questions from his general report, as you well
12 know.  You're reading from his general report,
13 as you admitted.  So if we're going to talk
14 about all the references and data in his general
15 report, I don't think that was appropriately
16 noticed for today, but you ought to at least
17 give him the professional courtesy of putting
18 his general report in front of him.
19 BY MS. HOFFMANN:
20     Q.  Do you want me to read the question
21 back to you, or do you have it in mind?
22     A.  Well, if we're going to get off into
23 the specifics, I'd like to have the general
24 report in front of me.  If we want to talk about
25 with respect to Ms. Mingo, I'm happy to answer

1  those questions and to put them in that context.
2      Q.  So without having your general report
3  in front of you, you cannot confirm whether or
4  not it is your opinion that rivaroxaban should
5  be discontinued in rivaroxaban treated patients
6  with a PT greater than 20 seconds as measured
7  with Neoplastin and collected within 13 to
8  15 hours after the last dose?
9      A.  No, that's not what I'm saying.  I'm
10 saying if we're going to get into all the
11 specifics of why I hold these opinions for
12 Ms. Mingo and we're going to start using all of
13 the data from the general opinion report that is
14 not here, because it's referenced, then I'm
15 happy to have the general opinion report in
16 front of me to start answering those questions.
17     Q.  So you can't answer the question I
18 just posed?
19     MR. DENTON:  No, that's not what he
20 said.
21 BY MS. HOFFMANN:
22     Q.  Either you can answer it or you can't,
23 and then we can move on.  Can you confirm that
24 that's your opinion?
25     MR. DENTON:  Object to the form, and

1  asked and answered.
2      What's the question?
3      MS. HOFFMANN:  Do you want to read it
4  back?  Why don't you hold on one minute.  I'm
5  going to have the court reporter read it back.
6      (Whereupon, the reporter read back the
7  pending question.)
8      MR. DENTON:  Read his answer.
9      MS. HOFFMANN:  No, that's the
10 question.
11 BY MS. HOFFMANN:
12     Q.  Can you answer it, or not?
13     MR. DENTON:  It's been asked and
14 answered.
15 BY MS. HOFFMANN:
16     Q.  Is that your opinion?
17     MR. DENTON:  Come on.  Ask an
18 appropriate question, quit playing games, and
19 he'll answer your questions.  I object to the
20 form.  It's been asked and answered.
21     MS. YATES:  It's been asked.  It
22 hasn't been answered.
23     MR. DENTON:  Yes, it has.  Pam, stay
24 out of it.  You're not asking questions right
25 now.

1      MS. YATES:  But you stop -- you need
2  to stop making speeches.
3      MR. DENTON:  She can handle it.
4  Margaret is taking the deposition.
5  BY MS. HOFFMANN:
6      Q.  Doctor, can you answer that question?
7      A.  I'm not even sure of the question
8  anymore.  But, I believe that I have answered to
9  the best of my ability your question.  So I
10 recognize that you're quoting from my general
11 opinion report, I stand by my general opinion
12 report.
13     Q.  Okay.
14     A.  If you would like to talk specifically
15 about Mingo and the data and the rationale why I
16 am opining on that, I'm happy to answer those
17 questions.  If you want to ask more about the
18 general opinion report and the specifics, just
19 to be specific, I'd like to have the general
20 opinion report in front of me so that I don't
21 misstate anything.
22     Q.  Maybe we can do this.  Let's try it
23 this way, Doctor.
24     You just said you stand by your
25 general opinion report.  That's a correct

Page 78

1  statement, right?
2      A.  I wrote it.
3      Q.  Okay.  So you stand by that report,
4  and you stand by what's in that report, correct?
5      A.  Again, with that -- but I do not want
6  to -- I do not want to limit myself to that
7  specific aspect.  I want to be able to bring in
8  the specifics of the cases in what we're
9  discussing today that bear on that.
10     Q.  Sure.  I get that.
11         But as far as what is in your general
12  report, you stand by what's in there?  We can
13  rely on what's in there as being truthful and
14  accurate, right?
15     A.  I wrote that general opinion report,
16  and to the best of my ability.
17     Q.  Okay.  And similarly, you gave a
18  deposition on that general report on
19  December 14, 2016, correct?
20     A.  I believe that that is the date.
21     Q.  And you stand by the testimony that
22  you gave in that deposition, is that a fair
23  statement?
24     A.  As best -- to my best recollection,
25  yes.

Page 79

1      Q.  You told the truth in that deposition?
2      A.  Yes, I did.
3      Q.  And you were thorough and complete in
4  that deposition?
5          MR. DENTON:  Well, I object to the
6  form.  He answered questions that were asked.
7  BY MS. HOFFMANN:
8      Q.  You answered the questions that were
9  asked thoroughly and completely in that
10  deposition, correct?
11     A.  I answered the questions to the best
12  of my ability at that time.
13     Q.  Okay.  If you go back to Page 2 of
14  your Mingo report, you indicate in the first
15  sentence that the PT that was taken on
16  January 24th was taken ten hours after her
17  second dose of Xarelto.  I'm going to stop with
18  that paragraph.  I know the sentence goes on.
19         You would agree with me that
20  collection for a PT ten hours after the second
21  dose is not within the 13 to 15 hours that
22  you've previously testified would be the optimal
23  time to do it, correct?
24         MR. DENTON:  I object to the form of
25  the question.

Page 80

1      A.  I agree that it was drawn at ten
2  hours, and that that is -- ten hours is not
3  between 13 and 15 hours.
4          However, as I noted before, in the FDA
5  analysis of that data, there was no time
6  dependency, and therefore, they felt that any
7  prothrombin time drawn within that window was
8  relevant for evaluating bleeding risk.
9  BY MS. HOFFMANN:
10     Q.  Ms. Mingo's PT on January 24, 2015 was
11  taken ten hours, not 13 to 15 hours, correct?
12     A.  I agree that it is ten hours, yes.
13     Q.  And her PT was not -- that Neoplastin,
14  you don't know whether it was the reagent that
15  was used for that PT, correct?
16         MR. DENTON:  I'm confused as to the
17  question.  Object to the form.
18  BY MS. HOFFMANN:
19     Q.  The PT done on January 24th, you do
20  not know what reagent was used, correct?
21     A.  As I said, I did not inquire as to the
22  PT reagent used because that was not relevant to
23  my opinion.
24     Q.  And -- okay.  And you've previously
25  testified, correct me if I'm wrong, that the

Page 81

1  optimal time to test is four to six days after
2  somebody has been on Xarelto, correct?
3          MR. DENTON:  Object to the form.
4      A.  I think that depending on the
5  situation in the -- I believe that that
6  situation was a hypothetical related to patients
7  being treated for atrial fibrillation receiving
8  20 milligrams daily, and therefore, it was to --
9  again, in a hypothetical, as one possibility of
10  monitoring such patients to determine whether
11  they were unnecessarily sensitive to the Xarelto
12  drug.  That's my recollection of that statement.
13  BY MS. HOFFMANN:
14     Q.  As of January 24, 2015, you would
15  agree with me that Ms. Mingo had not been on
16  Xarelto for four to six days, correct?
17     A.  Ms. Xarelto on the 24th --
18     Q.  You mean Ms. Mingo.
19     A.  Excuse me.  Thank you.
20     Q.  Start over.
21     A.  Thank you.
22         Ms. Mingo had received two doses,
23  24 hours of Xarelto.
24     Q.  As of January 24, 2015, Ms. Mingo had
25  not been on Xarelto for four to six days, is

1  that a correct statement?
2      A.   As I said, she only had received
3  24 hours of Xarelto.
4      Q.   Then your sentence goes on to say that
5  she had a prolonged PT on admission for her GI
6  hemorrhage three hours after her last Xarelto
7  dose.  So I want to stop there and talk about
8  that PT test.  Okay?
9      A.   Yes, ma'am.
10     Q.   You state right here that the second
11 PT test that you're referring to was done three
12 hours, not 13 to 15 hours, after her last
13 Xarelto use.  Is that a correct statement?
14     A.   Again, with the same caveat and with
15 the same explanation that I said before, it is
16 three hours after her last Xarelto dose after
17 she's been on Xarelto for approximately 20 days.
18     Q.   But three hours after her last dose is
19 not the same as 13 to 15 hours after her last
20 dose.  Would you agree with that statement?
21     MR. DENTON:  Object to the form.
22     A.   Again, as I stated before, the 13 to
23 15 hour is what I have written as the optimal
24 time period based on the data that is out there
25 with the most -- with the most information, and

1  that as the FDA analyzed that data they did not
2  find a time dependence, therefore, they
3  concluded that any post Xarelto measurement was
4  relevant to bleeding risk.
5      Q.   But you initially picked the 13 to
6  15 hours because you felt, based on the data
7  that you looked at, that that would be the most
8  -- give the most reliable results, isn't that
9  right?
10     MR. DENTON:  No.  I object to the form
11 of the question.
12     A.   I used that data because --
13 BY MS. HOFFMANN:
14     Q.   Not the data, the time period.
15     MR. DENTON:  Let him finish his
16 answer.
17     A.   No, no.  Please let me finish.
18         I used that entire data that included
19 that time frame to evaluate what I thought was
20 the most relevant for bleeding risk.  The FDA
21 also evaluated that data and found, as I said
22 before, no time dependency on that aspect of
23 bleeding risk.  I'm including that because that
24 was the largest concentration of data at that
25 time point, and, therefore, I wanted to be

1  specific as to where that data was centered in
2  its collection.
3      Q.   And because it was the largest
4  concentration of data at that time point, you
5  felt that it would be more reliable than if you
6  looked at data in different time frames, isn't
7  that a fair statement?
8      MR. DENTON:  I object to the form of
9  the question.
10     A.   No, I can't agree with that.  What I'm
11 saying is that I used that data in that 13 to 15
12 hour window, or thereabouts, because that was
13 the data where it was centered on its Gaussian
14 distribution.  That's G-A-U-S-S-I-A-N.  The FDA
15 had access to that full data and, as I said
16 before, did not find a time dependence on that
17 for bleeding risk, and that also informs my
18 opinion on that.
19 BY MS. HOFFMANN:
20     Q.   The FDA also has not recommended or
21 required PT tests to be done in connection with
22 monitoring Xarelto, correct?
23     MR. DENTON:  Object to the compound
24 nature of the form of the question.
25     A.   My understanding is that the FDA has

1  included this information as guidance for
2  physicians, as well as the company itself has
3  included information on using the PT for
4  measuring as guidance.
5  BY MS. HOFFMANN:
6      Q.   There is no requirement by the FDA
7  that the company put anything in its labeling
8  about the monitoring of Xarelto in patients,
9  correct?
10     MR. DENTON:  Object to the form of the
11 question.
12     A.   I am not aware that -- I'm not aware
13 of the current label stating anything about a
14 requirement.  I'm not even sure how that would
15 be put in there in terms of therapy.  But as I
16 said, the FDA has this data, has the data there
17 for guidance, as does the company.
18 BY MS. HOFFMANN:
19     Q.   In Opinion Number 4, you take the two
20 PTs, the one done on January 24th, the one done
21 on February 13th, neither of which were done
22 within 13 to 15 hours of the last dose, and
23 neither of which were done with Neoplastin, and
24 conclude that they show that Ms. Mingo had an
25 unnecessary high risk of Xarelto-dependent major

1  bleeding, is that correct?
2      MR. DENTON:  I object to the form.
3      You've now added a fact.  Do you know
4  it wasn't Neoplastin?  If you want to tell us
5  what the reagent is, I'm sure he'd be
6  interested.
7  BY MS. HOFFMANN:
8      Q.  Can you answer my question, Doctor?
9      A.  Well, the -- you have paraphrased what
10  I've said in this report, and I stand by this
11  report that says that the PT taken approximately
12  ten hours after her second dose of Xarelto, and
13  the prolonged PT on admission for her GI
14  hemorrhage three hours after her last Xarelto
15  dose and 15 hours after the prior Xarelto dose,
16  which I would add, those inform my opinion that
17  she had an unnecessary high risk of
18  Xarelto-dependent major bleeding.
19      Q.  Is there anything other than those two
20  PT tests that you reference that inform your
21  opinion that Mrs. Mingo had an unnecessary high
22  risk of Xarelto-dependent major bleeding?
23      A.  Well, the FDA data, the data regarding
24  a prolonged PT with patients in the highest
25  quartile of PTs who had a greater than two-fold

1  increase in their bleeding risk compared to the
2  patients in the first quartile prothrombin time,
3  and that's part and parcel of this opinion.
4      Q.  And then you go on to say "Had her
5  physicians known to test for Xarelto
6  anticoagulant activity and the latter measured
7  with the PT (Neoplastin) at the onset of Xarelto
8  treatment, her excessive exposure and
9  unnecessary high risk of major bleeding would
10  have been identified."
11      I want to stop right there for a
12  second and say, isn't that your way of saying
13  that Neoplastin would be a necessary component
14  to the PT testing to determine whether or not
15  she had an excessive exposure and unnecessary
16  high risk of major bleeding?
17      MR. DENTON:  Object to the form of the
18  question.
19      A.  As I said before, I tried to write
20  this report with the basis of the most reliable
21  and most significant data, and the data that was
22  developed by the company and by the
23  investigators in general used the Neoplastin
24  reagent to monitor PT, because that is the
25  reagent that had the best slope of sensitivity

1  for determining activity, and that is the data
2  that was used by the FDA to determine the
3  excessive bleeding risk of the patients in the
4  highest quartile.  And that's why I'm including
5  that.
6      However, in other data that's included
7  in my general opinion report, it's clear that
8  the Neoplastin PT is the most sensitive, or at
9  least one of the most sensitive reagents, and
10  that the other thromboplastin reagents, although
11  linear in their response, have a more shallow
12  slope.
13      The fact that the PT is so
14  significantly prolonged in her, in Ms. Mingo,
15  even without knowing what the thromboplastin
16  reagent is, that's a significant prolongation.
17  If they had the Neoplastin reagent they could
18  have completely identified that and related that
19  to the data that's out in the literature.
20  BY MS. HOFFMANN:
21      Q.  You say "Had her physicians known to
22  test."  At what point in time is it your
23  recommendation and opinion that the test should
24  have been done?
25      MR. DENTON:  I assume you mean --

1  BY MS. HOFFMANN:
2      Q.  With Ms. Mingo.
3      MR. DENTON:  Okay.  Fair enough.
4      A.  With Ms. Mingo?
5  BY MS. HOFFMANN:
6      Q.  Yes, sir.
7      A.  Based on the fact that she has BID
8  treatment, I think the optimal timing of the
9  test, if that can be done, is at 48 -- after
10  48 hours, after four doses of the drug.  That's
11  optimal.
12      Q.  And what do you base that on?  What
13  science do you base that on?
14      MR. DENTON:  Let him finish his
15  previous answer.
16      A.  I'm saying that's optimal, because
17  that's based on the fact that the patient might
18  be being discharged from the hospital, they may
19  not be able to get follow-up in such a -- in
20  that time period.  I think that is a good
21  time period.  It allows the patient to have four
22  doses that encompass the patient's -- the
23  half-life of the drug, which is 12 hours, so at
24  that point, the patient should be relatively
25  optimally treated at that point, and so I think

Page 90

1  that would be fine.
2  BY MS. HOFFMANN:
3      Q.  So your recommend --
4      A.  Let me finish.
5          But, again, I'm saying that's optimal.
6  If getting the value at an earlier point because
7  of convenience is necessary, I would let -- I
8  would let the physician decide that.  The fact
9  that it's so high so quickly is of concern.
10     Q.  Well, let me go back.  Your opinion in
11 this case is that her physicians should have
12 known because the drug manufacturer should have
13 told them that they had to test Xarelto.  Isn't
14 that what you're saying here, is that it was the
15 obligation of the drug companies to let the
16 physicians know that they were to test the
17 Xarelto anticoagulant activity, right?
18         MR. DENTON:  I object to the form.
19 That's not what he stated in his report.
20     A.  I think, I believe that my general
21 opinion report --
22 BY MS. HOFFMANN:
23     Q.  I'm not asking your general opinion.
24 Actually right here --
25     A.  No, I'm --

Page 91

1      Q.  -- right here where it says "Had her
2  physicians known to test for Xarelto," I'm
3  wanting to know when -- who should have told
4  them, and at what point should they have been
5  told to test.  48 hours after dose, is that your
6  testimony?
7          MR. DENTON:  I object to the compound
8  nature and form of the question.
9      A.  This opinion is in part based on the
10 general opinion report which is critical of the
11 fact that the data with respect to being able to
12 monitor the PT, and especially with the
13 sensitive reagent Neoplastin, was not included
14 in the information that was made available to
15 physicians, nor was the data with respect to the
16 prolonged PT and increased bleeding risk not
17 made available to the physicians.
18         I'm saying that if that data was
19 available, then that would be an option that
20 physicians could choose to use to know whether
21 their patients were at unnecessary high risk of
22 Xarelto-dependent bleeding.
23 BY MS. HOFFMANN:
24     Q.  Is it your testimony, Dr. Rinder, that
25 the Xarelto anticoagulant activity should have

Page 92

1  been measured with PT Neoplastin within 48 hours
2  of the initiation of Xarelto?
3          MR. DENTON:  I object to the form.
4          Again, are you talking about
5  Mrs. Mingo?
6          MS. HOFFMANN:  Yes.
7          MR. DENTON:  You keep bouncing back
8  and forth, the general.
9          MS. HOFFMANN:  I'm not doing the
10 general.  Let me rephrase.
11         MR. DENTON:  Well, you have --
12         MS. HOFFMANN:  Thank you, sir.  I will
13 rephrase it.
14 BY MS. HOFFMANN:
15     Q.  In this case, is it your opinion that
16 Ms. Mingo's physicians should have tested her
17 Xarelto anticoagulant activity with PT
18 Neoplastin within 48 hours of the initiation of
19 Xarelto?
20         MR. DENTON:  Object to the form.
21 Asked and answered.
22     A.  When you asked that question before,
23 my understanding was that that was a
24 hypothetical.  If the Neoplastin PT reagent was
25 available, you asked me what would you have --

Page 93

1  what would be an appropriate time for testing.
2  And I'm saying that after four doses, in my poor
3  understanding of physiology and pharmacology, I
4  think that would be an appropriate time.  I'm
5  not saying that her physicians were -- did
6  anything incorrect here.  I'm saying that they
7  simply did not know that the prothrombin time,
8  especially Neoplastin, could be used to monitor
9  Xarelto activity and bleeding risk.
10 BY MS. HOFFMANN:
11     Q.  Is it your opinion, sir, that the
12 appropriate time to measure Ms. Mingo's Xarelto
13 anticoagulant activity to determine an excessive
14 exposure would have been 48 hours after her
15 initiation of Xarelto?
16         MR. DENTON:  Object to the form.
17         Go ahead.
18     A.  I'm saying that I previously answered
19 your question.
20 BY MS. HOFFMANN:
21     Q.  I don't want to know previously.
22 Answer this question.
23         MR. DENTON:  Hey, don't yell at him,
24 and don't point your finger at him.  He's
25 answering --

1    MS. HOFFMANN:  I was pointing at the
2  court reporter.
3    MR. DENTON:  No, you weren't.
4    MS. HOFFMANN:  Yes, I was.
5    MR. DENTON:  No, you weren't.  No, you
6  were not.  But if you're trying to apologize,
7  that's fine.
8  BY MS. HOFFMANN:
9    Q.  I do apologize if I pointed my finger
10  at you.  I do apologize.
11    MR. DENTON:  Thank you.
12    A.  Your apology is accepted.
13  BY MS. HOFFMANN:
14    Q.  Thank you, sir.
15    MR. DENTON:  Now, ask your question,
16  and he'll give you his best answer.
17  BY MS. HOFFMANN:
18    Q.  Try this, if we can.  I don't want you
19  to go backwards and answer previous questions.
20  Just answer this question, the current question.
21  And the current question --
22    MR. DENTON:  Which is the same as the
23  previous.
24  BY MS. HOFFMANN:
25    Q.  And the current question is, is it

1  your testimony that the appropriate time to test
2  Ms. Mingo's Xarelto anticoagulant activity would
3  have been 48 hours after the initiation of
4  Xarelto?
5    MR. DENTON:  Object to the form.
6  Asked and answered.
7    Try it again.
8    A.  I think that the best way that I can
9  answer that is that under optimal conditions, a
10  measurement at 48 hours would be, well, would be
11  optimal.
12    I do not, though, as I said before,
13  have a concern that a sample measured before or
14  after that 48 hours is not also informative.
15  BY MS. HOFFMANN:
16    Q.  And when her physicians tested the
17  Xarelto anticoagulant activity for Ms. Mingo, it
18  is your recommendation that it be done with
19  Neoplastin because that is the most sensitive
20  reagent, correct?
21    MR. DENTON:  Object to the form.
22  Asked and answered.
23    A.  I don't believe that I'm saying that
24  there was a recommendation.  I'm saying that had
25  her physicians had information that the

1  prothrombin time, and especially with the
2  Neoplastin, was useful for monitoring Xarelto
3  activity and risk of bleeding, that they could
4  have utilized that information in assessing her
5  bleeding risk.
6  BY MS. HOFFMANN:
7    Q.  And then you go on to say that if they
8  had done the things you recommend and they'd
9  identified her as having an unnecessary high
10  risk of major bleeding risk, she could have been
11  titrated to a lower dose.
12    What lower dose of Xarelto would you
13  say she should have been titrated to?
14    MR. DENTON:  I object to the form.
15  The sentence continues.
16    A.  Well, just to be clear, I'm giving --
17  I'm saying that they have several options.  One
18  is that they could have considered titrating her
19  to a lower dose.
20  BY MS. HOFFMANN:
21    Q.  And that's the option I'm asking you
22  about.
23    A.  Let me finish.  Let me finish.  Let me
24  just finish.
25    Or if that was not an option, or if

1  that was felt to be suboptimal, they could have
2  discontinued Xarelto and switched her to an
3  anticoagulant with a lesser risk of bleeding.
4    The aspect of -- I'll go back to
5  answer the first part of that question.  They
6  could have considered titrating her to a lower
7  dose.  That's within their purview.  They do not
8  have to follow FDA guidelines.  They can choose
9  dosing that they feel is safer for the patient
10  even though it is not necessarily following
11  specific FDA guidelines.
12    I don't know how they would do that.
13  They could try to break the pills in half, they
14  could give -- which I don't know that that's
15  possible.  They could give a cumulative dose
16  over time that was less than 30 per day, or if
17  that's not possible they could then switch, they
18  could then decide that they can't do that with
19  Xarelto and switch to a different anticoagulant.
20    Q.  You've used the disjunctive "or" in
21  setting forth these options, correct?
22    A.  That is correct, it says "or."
23    Q.  And so you're offering two options,
24  and the first option would be to titrate the
25  Xarelto to a lower dose.  That's the first

1 option you put in your report, right?
2    A.   That is correct.
3    Q.   And what you're -- but you would agree
4 with me that there is no approved or tested
5 treatment dosage of Xarelto for DVT other than
6 15 milligrams twice a day?
7        MR. DENTON:  Object to the form.
8 BY MS. HOFFMANN:
9    Q.   Is that a correct statement?
10        MR. DENTON:  Object to the form.
11    A.   As I said before, when I approach
12 this, I want to give the physicians the leeway
13 to be able to use medications in a way that they
14 feel is the most appropriate, including
15 off-label use of the anticoagulants.
16 BY MS. HOFFMANN:
17    Q.   So you agree that changing the dose of
18 Xarelto for the treatment of DVT would be an
19 off-label use by the doctor?
20        MR. DENTON:  Object to the form.
21    A.   The dosage that is in the label is 15
22 BID followed by 20 per day.  If that is not the
23 appropriate dose for this patient, I would want
24 the physician to have the ability to modify that
25 if that's, they feel, the best alternative.

1 BY MS. HOFFMANN:
2    Q.   And the other option that you're
3 suggesting is to switch Ms. Mingo to a different
4 anticoagulant, correct?
5    A.   With a lesser risk of bleeding.
6    Q.   And the two anticoagulants that you
7 suggest are either Eliquis or Pradaxa, correct?
8    A.   Those are the oral anticoagulants that
9 have been most recently shown in several studies
10 to have a lesser risk of gastrointestinal
11 hemorrhage.
12    Q.   And we're going to get to that in a
13 minute.  But for the first part of this, I just
14 want to make sure that the other option that
15 you're suggesting is that Ms. Mingo could have
16 been switched to either Eliquis or Pradaxa.
17    A.   That's what it says in my report.
18    Q.   You're not suggesting any other form
19 of anticoagulation for Ms. Mingo for treatment
20 of her DVT if these other contingencies are met,
21 in other words?  These are two that you're
22 suggesting?
23        MR. DENTON:  Object to the form.
24    A.   I'm using -- in my language here I say
25 "such as."  That means that those are two

1 examples.  I would not rule out other
2 anticoagulant or other anticoagulant strategies
3 in the physician's ability to take care of in a
4 personalized way Ms. Mingo.
5 BY MS. HOFFMANN:
6    Q.   And in the event that the physician
7 had followed your recommendation and had opted
8 to change Ms. Mingo to Eliquis, what is your
9 recommendation as to how that physician should
10 have monitored the Eliquis?
11        MR. DENTON:  Object to the form.
12    A.   I do not -- I have not examined
13 Eliquis to the extent that I'm ready to make a
14 recommendation as to whether it needs to be
15 monitored or not and the specifics of that.
16 BY MS. HOFFMANN:
17    Q.   So in this opinion what you're saying,
18 if I understand it correctly, is if the decision
19 was made by the physician to switch Ms. Mingo
20 from Xarelto to Eliquis, you have not looked
21 sufficiently at Eliquis to determine whether or
22 not the physician should in some way monitor the
23 anticoagulant activity of Eliquis?
24        MR. DENTON:  Object to the form.
25 Asked and answered.

1    A.   As I've said, I have examined the data
2 with respect to Eliquis, but I do not feel yet
3 that my opinions have reached a maturity that I
4 can state here whether or not I think it should
5 be monitored.
6 BY MS. HOFFMANN:
7    Q.   In the event that you are recommending
8 to a physician that they -- let me start over
9 again.
10        So if I distill this, your opinion is
11 that with Xarelto, the physician should have
12 known to do a PT within 15 to 13 hours after the
13 last dose with Neoplastin, and if it was a
14 prolonged PT of 20 or greater, switched her to
15 Eliquis or Pradaxa, neither of which you have an
16 opinion one way or another should be monitored
17 for their anticoagulant activity?
18        MR. DENTON:  I object to the form.
19 BY MS. HOFFMANN:
20    Q.   Is that right?
21        MR. DENTON:  That might have been the
22 most incomprehensive question you've asked all
23 day.
24    A.   First of all, I'm not saying that the
25 physician should have known.  What I'm saying is

1 that the data with respect to monitoring the PT
2 as a measure of the patient's anticoagulant
3 activity on Xarelto was not available to the
4 physicians. Therefore, the physicians could not
5 have known. The physicians had a prothrombin
6 time that was extremely prolonged. It is highly
7 likely that that was being monitored with a
8 prothrombin time thromboplastin that was much
9 less sensitive than Neoplastin.
10 As I said before, I'm using the
11 Neoplastin data as part of my general opinion
12 report as the central thromboplastin which has
13 the most data, but there is data on other
14 Neoplastins that equally show a linear
15 relationship between PT. That data was not
16 available to physicians at that time; therefore,
17 they could not have known.
18 With respect to switching to other
19 medications, as I've said before, with respect
20 to Eliquis, I'll limit my remarks to that, I
21 have not yet in my mind made a determination as
22 to whether that is -- needs to be monitored or
23 not.
24 With respect to Pradaxa, I have to
25 respectfully decline because of the

1 confidentiality agreement that I signed with
2 respect to Pradaxa.
3 Q. Do the physicians that you work with
4 prescribe Pradaxa for treatment of DVT?
5 A. Pradaxa is one of the medications
6 that's used by our physicians, that's true.
7 Q. How, if at all, do your physicians
8 monitor the anticoagulant activity of Pradaxa
9 while a patient is on it for the treatment of
10 DVT?
11 A. I'm concerned that I'm going to get
12 into the confidentiality aspect.
13 Q. I'm talking about the physicians you
14 work with.
15 A. Okay. Well, the physicians that I
16 work with use the PT and PTT to some extent, but
17 they would like to have a dilute thrombin time
18 in order to measure Pradaxa. That was more of a
19 concern before the reversal agent was available.
20 We still are getting requests for monitoring
21 Pradaxa by sending out for -- I'm sorry, not by
22 sending out, by trying to examine the thrombin
23 time, but that is a difficult proposition.
24 Q. What reagent is used by the physicians
25 that you work with to monitor the PT of Pradaxa?

1 A. I'm not saying they used the PT, PTT
2 to monitor Pradaxa. I'm saying that they will
3 measure that and try to glean information from
4 that in terms of residual activity. The best
5 way to monitor it, I believe, is the dilute
6 thrombin time which is not available at our
7 institution.
8 Q. And so when you make the
9 recommendation that had the physicians for
10 Ms. Mingo determined that she was at an excess
11 risk of bleeding with Xarelto and put her on
12 Pradaxa, is that the method of monitoring the
13 anticoagulant activity of Pradaxa that you would
14 recommend?
15 MR. DENTON: I just object to the
16 form.
17 A. Since I'm not aware of endogenous
18 thrombin time, I'm not aware of the specifics of
19 whether endogenous -- I'm sorry, dilute thrombin
20 time -- it should not be exogenous, I'm sorry --
21 dilute thrombin time is available for those
22 physicians, I would not make those
23 recommendations.
24 BY MS. HOFFMANN:
25 Q. You state in this fourth part of your

1 opinion that Eliquis and Pradaxa have a lesser
2 risk of bleeding. You cite Lip, 2012 and
3 Graham, 2016, correct?
4 A. Actually I cite two articles by Lip in
5 both 2012 and 2016.
6 Q. I'm sorry.
7 You would agree with me that Lip, 2012
8 and 2016 as well as Graham 2016 are all studies
9 that are looking at atrial fibrillation patients
10 who are taking therapeutic doses of
11 anticoagulant to reduce their risk of stroke?
12 MR. DENTON: Object to the form.
13 A. I believe that that is true.
14 BY MS. HOFFMANN:
15 Q. And you would agree with me that Lip
16 2012, Lip 2016, and Graham 2016 are not
17 head-to-head studies comparing the risk of
18 bleeding between Eliquis and Xarelto or Pradaxa
19 and Xarelto, is that correct?
20 MR. DENTON: Object to the form.
21 A. Unfortunately we do not have studies
22 that are head-to-head comparisons. Therefore,
23 we have to use the best studies that are out
24 there at this point in time. The data with
25 respect to Afib has very, very large numbers of

1 patients, but there are also studies out there,
2 for example the Dresden study, which also
3 examines the risk of bleeding with VTE and
4 Xarelto, and finds that that has a major
5 bleeding risk that is higher than the Afib
6 population, and, therefore, these data can
7 inform our assessment of bleeding risk with
8 Xarelto.
9    Q. The three studies that you've cited
10 here are not head-to-head studies comparing
11 Xarelto with another anticoagulant, are they?
12    Let me rephrase that. The studies
13 you've cited here, Lip 2012 and 2016 as well as
14 Graham 2016 are not head-to-head studies between
15 Xarelto and one of the other NOACs, correct?
16    A. My understanding is there are no --
17 there are no randomized controlled trials doing
18 head-to-head comparisons, but these are studies
19 that have usable data, they have large numbers
20 of patients, and they've been published in the
21 peer-reviewed literature and, therefore, should
22 be evaluated to inform our opinions.
23    THE WITNESS: Could we take a break
24 for a moment?
25    MR. DENTON: Sure. I think we're

1 right at another hour anyway.
2    THE VIDEOGRAPHER: The time right now
3 is 10:15 a.m., and we're off the record.
4    (Whereupon, a recess was taken.)
5    THE VIDEOGRAPHER: This marks the
6 beginning of tape number three. The time right
7 now is 10:23 a.m., and we're back on the record.
8 BY MS. HOFFMANN:
9    Q. Doctor, if Ms. Mingo's doctors had
10 opted to follow your recommendations and switch
11 her to either Eliquis or Pradaxa for the
12 treatment of her DVT, can you tell us what doses
13 of Eliquis and what doses of Pradaxa they should
14 have put her on?
15    MR. DENTON: Object to form.
16    A. In the theoretical here, if they had
17 decided, on the 24th, if they had decided that
18 her initial response to Xarelto -- I'm sorry,
19 let me rephrase that.
20    If they had responded to her -- the PT
21 on the 24th as being -- wait, I'm sorry. Can I
22 just read -- let me just look at my -- yes. I'm
23 sorry.
24    On the 24th, so that's early on in her
25 treatment course. The drug I'm most comfortable

1 with in using in this situation is Eliquis,
2 apixaban. I would say they could have
3 considered her for apixaban, which I believe the
4 recommended dosing for VTE therapy is
5 10 milligrams twice a day as the initial,
6 followed by 5 milligrams twice a day for the
7 prolonged therapy for apixaban.
8    Q. And had they switched her at that time
9 to Eliquis, would you have recommended any
10 modification in that dosage due to any of her
11 medical conditions or other medications?
12    MR. DENTON: Object to the
13 hypothetical form.
14    A. I would say that that would certainly be
15 within the purview of the physicians to review
16 her full history, and her medication history as
17 well, and to determine if they felt that was the
18 appropriate dose, or whether they felt that they
19 should modify that.
20 BY MS. HOFFMANN:
21    Q. So you would not have a recommendation
22 for her physicians about any modification to the
23 dosage for treatment of VTE based on any other
24 medications she was taking at the time, or any
25 other underlying medical conditions?

1    MR. DENTON: Object to the form.
2    A. Again, under this hypothetical, I
3 would have the consultation the way we normally
4 do with physicians regarding this, and we would
5 have had a discussion, and we would have
6 researched this in-depth and come to some sort
7 of discussion with respect to that.
8    On that hypothetical, I can't say that
9 would be -- what would be the exact outcome of
10 that. It would have to be a discussion that
11 would be done in real-time in this patient.
12 BY MS. HOFFMANN:
13    Q. Well, with all due respect, Doctor,
14 I'm just following through on your hypothetical
15 which is part of your Opinion Number 4, which is
16 that had her physicians done certain things,
17 then you would recommend one of two options, one
18 of which would be to switch her to Pradaxa or
19 Eliquis.
20    Following up on that, are there any of
21 Ms. Mingo's other medications or other medical
22 conditions that you would have included in that
23 consult in deciding what dosage of Eliquis to
24 give her?
25    MR. DENTON: Object to the form.

1  Asked and answered.
2      A.  Again, I'm not sure I can answer it
3  better.  I'm not making a specific
4  recommendation on which drug and/or which
5  dosage.  I'm saying she could have been
6  switched.  That, then, would have required
7  another entire consultative procedure to
8  determine -- to make that decision and choice.
9  I did not do that as part of this report.  I'm
10 simply saying that she could have been switched.
11 BY MS. HOFFMANN:
12     Q.  If the doctors had followed your
13 recommendation and switched her to Pradaxa, what
14 dosage of Pradaxa would you have recommended?
15     MR. DENTON:  Again, I object to the
16 form of the question.
17     A.  Again, I think in terms of the
18 hypothetical, I would again use that in the same
19 way with the apixaban.  I would have had that as
20 a discussion with the physicians to make that
21 determination.
22 BY MS. HOFFMANN:
23     Q.  So let me approach it from a different
24 angle, Doctor.
25         Had you been consulted in the care and

1  treatment of Ms. Mingo at the time she was
2  diagnosed with her DVT, what recommendations
3  would you have given about the care and
4  treatment for Ms. Mingo of her DVT?
5      MR. DENTON:  Same objection.
6      A.  So we would have had a generalized
7  discussion regarding her presentation with an
8  isolated distal deep vein thrombosis.  We would
9  have had a discussion regarding the
10 possibilities for therapy.  There is a
11 significant literature on patients with isolated
12 distal deep vein thrombosis where those patients
13 are not anticoagulated.  And, in fact, those
14 patients can be followed safely to determine
15 that they -- that withholding of anticoagulation
16 is a reasonable option in such patients.  That
17 would be one aspect that we would have had a
18 consultation on.
19         Another aspect would have been if we
20 decided that that was not optimal and that we
21 felt that she needed to be anticoagulated, we
22 would have a discussion as to the different
23 types of anticoagulation available.  If we
24 had -- if the information had been available at
25 that time regarding testing Xarelto and the

1  ability to monitor Xarelto with PT, especially
2  with Neoplastin, was available, then that would
3  have also been included in our consultation with
4  respect to trying to decide on anticoagulation
5  and the choice of anticoagulation.
6      Let me --
7      Q.  Are you done?
8      A.  No.
9      Q.  I don't think you've gotten yet to
10 what your recommendation would have been for her
11 treatment.
12     MR. DENTON:  Let him finish his
13 answer.
14     A.  No, my -- frankly, I think we would
15 have -- we would have had to have had a
16 significant discussion on whether she needed to
17 be treated for the isolated distal DVT with
18 anticoagulation or not.  That would have
19 probably been our initial discussion, followed
20 by if she needed anticoagulation.  I think we've
21 had a discussion over all of these.
22         Based on bleeding risk in general,
23 we're tending to see -- if this was in our
24 institution, we're tending to see more patients
25 being treated with Eliquis or Pradaxa.

1  Depending on other aspects of the patient and
2  their comfort level, we're still in some
3  patients using warfarin.  So all of those would
4  have been part of this.
5          I was not asked to make a specific
6  recommendation as to what the anticoagulation
7  for this patient was, so I'm not -- I did not
8  take this to the level of making that specific
9  recommendation.
10 BY MS. HOFFMANN:
11     Q.  So as you sit here today, you don't
12 have a recommendation about what anticoagulant
13 should have been used on Ms. Mingo for the
14 treatment of her DVT, is that a fair statement?
15     MR. DENTON:  I object to the form.
16 Asked and answered.
17     A.  As I said, I was not asked as part of
18 this report to decide on what I would have done
19 in this case.  All I'm doing is examining what
20 the physicians did.  I'm not criticizing their
21 judgment or use of therapy in any way.
22 BY MS. HOFFMANN:
23     Q.  Well, even though you weren't asked by
24 the lawyers who retained you to give an opinion
25 about what anticoagulant you would have used

1  with Ms. Mingo, did you, in fact, think about
2  that as you were reviewing her medical records
3  and preparing to be an expert in this case?
4      MR. DENTON:  Object to the form.
5  Asked and answered.
6      A.  So I think when I'm involved in a
7  consultation on a patient, I'm going to be
8  seeing that patient, listening to them, getting
9  a feel for their personality, what they are
10  comfortable with, as well as, of course, their
11  entire medical history and their findings.  So I
12  would -- I use that as a significant part of my
13  evaluation of a patient in trying to decide, as
14  well as a discussion with the physicians and
15  their comfort levels.
16      So without that personal contact with
17  the physicians and the patient to make this a
18  personalized decision for the patient, I can't
19  do that on a record that I'm reading and that
20  I'm only being asked to evaluate what happened
21  to the patient and not to second-guess the
22  physicians.
23  BY MS. HOFFMANN:
24      Q.  So if I understand correctly, Doctor,
25  you are not offering any criticisms of the

1  choice of treatment by Ms. Mingo's prescribing
2  doctor, Renie Jordan?
3      MR. DENTON:  Object to the form.
4  BY MS. HOFFMANN:
5      Q.  Is that correct?
6      A.  So if I'm asked, do I have a criticism
7  of Dr. Jordan, the answer is no.
8      Q.  Okay.  And you are not critical of the
9  decision to treat Ms. Mingo's DVT with an
10  anticoagulant, correct?
11      A.  Again, I do not have specific
12  criticisms of Dr. Jordan.
13      Q.  Okay.  Taking into consideration that
14  Ms. Mingo was post total hip replacement, that
15  she was somewhat inactive, that she was a
16  smoker, those would all be factors that would
17  weigh in on whether or not to anticoagulate her
18  DVT, wouldn't they?
19      MR. DENTON:  Object to the form.
20      A.  I'm sure that Dr. Jordan considered
21  all of the relevant factors in that decision to
22  begin anticoagulation in Ms. Mingo.
23  BY MS. HOFFMANN:
24      Q.  And is it fair to say that you are not
25  critical of Dr. Jordan's decision to prescribe

1  Xarelto to her at 15 milligrams twice a day for
2  the first 21 days for the treatment of that DVT?
3      MR. DENTON:  Objection.  Form, asked
4  and answered.
5      A.  As I said, I do not have any specific
6  criticisms of Dr. Jordan.
7  BY MS. HOFFMANN:
8      Q.  Okay.  Or his -- I just want to make
9  sure it's complete.  I know you don't have
10  criticisms of Dr. Jordan.  But are you also
11  saying that you do not have any criticisms of
12  the care and treatment that Dr. Jordan rendered
13  to Ms. Mingo?
14      MR. DENTON:  I only object to the
15  form.  I don't know how that's a different
16  question.
17      Go ahead.
18      A.  I'm -- my opinion with respect to not
19  having a criticism of Dr. Jordan is inclusive of
20  all of what I know of what Dr. Jordan did with
21  Ms. Mingo, and that's as best as I can say it.
22  BY MS. HOFFMANN:
23      Q.  And just to clarify, so you have no
24  criticism of Dr. Jordan's initial decision to
25  prescribe Xarelto for her DVT at 15 milligrams

1  twice a day for 21 days?
2      MR. DENTON:  Object to the form.
3  Asked and answered.
4      A.  Again, that is inclusive within
5  Dr. Jordan's work, and I am not criticism --
6  criticizing Dr. Jordan's work with Ms. Mingo.
7  BY MS. HOFFMANN:
8      Q.  And you're not suggesting that his
9  decision to prescribe Xarelto, he should have
10  prescribed some other dosage other than the
11  dosage that he prescribed?
12      MR. DENTON:  Again, I object to the
13  form.  Asked and answered.
14      A.  As I said before, although I am not
15  critical of Dr. Jordan, my opinions with respect
16  to had Dr. Jordan known of the PT ability to
17  monitor Xarelto activity and the PT related
18  increased bleeding risk with Xarelto, then the
19  options and the decisions that I've laid out in
20  my report, I think, are relevant.  I'm not
21  critical of Dr. Jordan for not knowing this
22  information because I don't believe this
23  information was made available to Dr. Jordan.
24  BY MS. HOFFMANN:
25      Q.  Okay.  Now, Ms. Mingo was ultimately

Page 118

1 diagnosed as having a gastric ulcer, correct?
2 A. Let's see. I believe it was an oozing
3 gastric fundus ulcer, correct.
4 Q. Okay. And you would agree with me
5 that Xarelto did not cause the creation of that
6 gastric ulcer, right?
7 MR. DENTON: Object to the form.
8 A. So I am not aware of -- I am not aware
9 of data that shows a physiology of Xarelto in
10 the initiation of ulceration of the stomach.
11 BY MS. HOFFMANN:
12 Q. So you're --
13 A. That does not -- I'm sorry, let me
14 finish.
15 That does not mean that Xarelto may
16 not have a role in the progression of an ulcer
17 or an erosion of the stomach once it is present.
18 Q. And my question, Doctor, quite simply
19 was that you would agree that Xarelto did not
20 cause the creation of that gastric ulcer. You
21 would agree with that statement, right?
22 MR. DENTON: I object to the form.
23 Asked and answered.
24 A. Well, I think, with all due respect,
25 that is not a medically valid way that I think I

Page 119

1 can answer the question. People have
2 ulceration, erosions of their gastrointestinal
3 tract all the time. Those heal on their own,
4 they heal with medication, they wax and wane.
5 In a patient on anticoagulation,
6 especially with Xarelto which is known to have a
7 higher risk of GI bleeding compared to the other
8 anticoagulants, that may potentiate not just the
9 bleeding which has been noted by one of your
10 experts, but also may prevent, because of that
11 potentiation, healing of that ulcer. Therefore,
12 I'm afraid that I can't agree with the way that
13 you're terming that.
14 BY MS. HOFFMANN:
15 Q. Doctor, can you say to a reasonable
16 degree of medical certainty that without that
17 ulcer, it's more probable than not that
18 Ms. Mingo would have had a gastric bleed?
19 MR. DENTON: I object to the form of
20 the question.
21 A. I'm sorry, can you state that again?
22 BY MS. HOFFMANN:
23 Q. Sure. Let me see if I can do it a
24 different way.
25 MR. DENTON: You had a double negative

Page 120

1 in there or something.
2 BY MS. HOFFMANN:
3 Q. Absent that ulcer, are you able to say
4 to a reasonable degree of medical certainty that
5 Ms. Mingo would not have bled?
6 MR. DENTON: I object to the form.
7 A. I think that question can't really be
8 answered without context. If we're saying that
9 Ms. Mingo has to be put on anticoagulation, we
10 know that rivaroxaban increases the risk of
11 bleeding, and in her case because of her
12 sensitivity to it that risk is probably at
13 least 50 percent higher than without -- than,
14 say, for example, compared to warfarin. In
15 other studies in terms of GI bleeding, that risk
16 is more than double, again, not head-to-head,
17 but in comparison to apixaban the risk of
18 bleeding is more than double.
19 So I'm afraid that your question can't
20 be answered in a medically valid way without
21 some context. She requires anticoagulation. We
22 have more than half of patients that have GI
23 bleeding with anticoagulation are not
24 endoscopically examined and found to have an
25 ulcer.

Page 121

1 So there's just no way of being able
2 to answer that question, I'm afraid, in a
3 medically valid way.
4 BY MS. HOFFMANN:
5 Q. So you can't tell me one way or
6 another whether or not she would have bled in
7 the absence of an ulcer?
8 MR. DENTON: Object to the form.
9 Asked and answered.
10 A. No, I don't think I can answer it in a
11 better way than I just did. I'm saying in a
12 medically valid way, I don't think that
13 question -- I don't think I can answer that
14 question in a better way than I just did.
15 BY MS. HOFFMANN:
16 Q. Now, you said you have no criticisms
17 of Dr. Jordan. How about Dr. Keith, do you have
18 any criticisms of the care and treatment that
19 Dr. Keith rendered to Ms. Mingo in this case?
20 A. Can we be specific about that? Can
21 you -- because I recognize the name, but I am
22 not sure exactly what orders Dr. Keith did or
23 did not do. So could we look at the specifics
24 that you're asking me to discuss?
25 Q. Are you prepared to render any opinion

1  in this case about the care and treatment
2  rendered to Ms. Mingo by Dr. Keith? I asked the
3  question because I see nothing in your report
4  about it, so I just want to make sure.
5      MR. DENTON: Object to the form.
6      A.  Well, I would have to know
7  specifically what Dr. Keith's orders or actions
8  were to go through that. I did not -- that was
9  not part of the scope of my report. I was not
10  asked to make recommendations in a general way,
11  or to critique. But as I say, I'd be happy to
12  answer that if you would like to get into
13  specifics on what Dr. Keith did or did not
14  order, or do.
15  BY MS. HOFFMANN:
16      Q.  As you sit here today, you have no
17  opinion that you're prepared to give with
18  respect to the care and treatment by Dr. Keith,
19  is that a fair statement?
20      MR. DENTON: Object to the form.
21      A.  Again, as I stated before, I was not
22  asked to render other criticisms or other
23  opinions, whether they were criticisms or not,
24  of the general care of the patient, so I would
25  say I'd be happy me to answer specific questions

1  about what you're -- about Dr. Keith if you have
2  them.
3  BY MS. HOFFMANN:
4      Q.  Have you met Mrs. Mingo?
5      A.  I have not.
6      Q.  Have you examined Mrs. Mingo?
7      A.  I have not.
8      Q.  Did you read her deposition testimony?
9      A.  I think it was made available to me,
10  and I think I just -- I think I scanned it. I
11  just don't recall.
12      Q.  Did you look at the videotape of her
13  deposition?
14      A.  No.
15      Q.  Do you have any plans to meet her
16  before the trial in this case?
17      A.  At this moment in time, I don't.
18      Q.  And you intend to testify at the trial
19  in this case?
20      A.  If called, yes.
21      Q.  You've talked a lot today about the
22  fact that you're a hematologist and you work
23  with a hematology team, right?
24      A.  That is one of the things that we've
25  talked about.

1      Q.  You consider your primary practice to
2  be in the field of hematology?
3      A.  Yes.
4      Q.  You are not board certified as a
5  hematologist, correct?
6      A.  I am no longer board certified as a
7  hematologist. I was -- let me finish.
8      Q.  You haven't been board certified as a
9  hematologist since 2000?
10      A.  I was board certified. I allowed my
11  boards to lapse in 2000. As I said, as I've
12  said before, I am still board certified in
13  internal medicine and in clinical pathology, and
14  that has not affected the way that I practice
15  hematology.
16      Q.  Fair to say you do not consider
17  yourself to be an expert in the field of
18  gastroenterology?
19      A.  So although -- well, let me answer it
20  this way. I -- as part of my practice, I deal
21  with patients with gastrointestinal diseases and
22  problems quite a bit. The GI tract is a very
23  sensitive area, it's bleeding, so many of the
24  patients that we see have gastrointestinal
25  diseases, have gastrointestinal bleeding or

1  hematologic complications within their GI tract,
2  and so we see many patients with
3  gastroenterology. And in my internal medicine
4  practice, I took care of patients on the
5  gastroenterology specialty service. I have not
6  taken a fellowship in gastroenterology, or been
7  boarded in gastroenterology.
8      Q.  Well, you consult with -- strike that.
9      You consult with gastroenterologists
10  currently?
11      MR. DENTON: Object to form.
12      A.  Well, in a broad way we work with
13  specialists in all areas, so I may -- they may
14  be asking me to help them with problems, and
15  vice-versa, I may be asking them to help us with
16  problems, so we work as a team.
17  BY MS. HOFFMANN:
18      Q.  In your consultive capacity, do
19  people -- do other physicians ask for your
20  expertise in GI matters?
21      MR. DENTON: Object to form.
22      A.  Well, we -- in a consultive capacity
23  with a team, we may be asked to give opinions
24  about risks of gastrointestinal bleeding, we may
25  be asked about risks of thrombosis in patients

1  who have gastroenterologic disorders, so those
2  are -- those may be relevant if you're -- well,
3  I don't want to assume what you're asking me.
4  BY MS. HOFFMANN:
5  Q.  Thank you.
6  A.  So I'll limit my answer to that.
7  Q.  Thank you, Doctor.
8  You're not a nephrologist, correct?
9  A.  Well, same answer as -- same answer as
10  before.  Although I'm not a board certified
11  nephrologist, and I've not done a fellowship in
12  nephrology, we have many patients that have
13  renal diseases that we consult on and work with
14  them all the time.  And in my internal medicine
15  training, we had significant training in the
16  nephrology specialty as well.
17  Q.  Do you consider yourself an expert in
18  the field of nephrology?
19  MR. DENTON:  Object to the form.
20  Asked and answered.
21  A.  As I said, I have significant
22  experience in that area.  I'm not board
23  certified.  I did not do a fellowship in
24  nephrology.
25  BY MS. HOFFMANN:

1  Q.  Maybe it would be easier if I approach
2  it this way.
3  Is there an area of medicine that you
4  do not consider yourself to be an expert in?
5  MR. DENTON:  I object to the form of
6  the question.  I don't know what that means.
7  A.  I don't even know how to answer that
8  question.  I have --
9  BY MS. HOFFMANN:
10  Q.  I'll bet you can think of a way.
11  That's the biggest smile I've seen all day.
12  You know what, Doctor, let's do this.
13  You don't even have to answer that question.
14  I'll withdraw it.
15  MR. DENTON:  Are you withdrawing --
16  okay.
17  MS. HOFFMANN:  I'll withdraw it.
18  Let's take a break.  I need to speak
19  with my colleagues.  And I do appreciate the
20  smile.  Thank you.
21  I hope you got that on camera.
22  THE VIDEOGRAPHER:  The time right now
23  is 10:49.  We are off the record.
24  (Whereupon, a recess was taken.)
25  THE VIDEOGRAPHER:  The time right now

1  is 11:00 a.m.  We are back on the record.
2  MS. HOFFMANN:  I'm just going to say
3  for the record that, while I'm not done, Doctor,
4  I have many more things that I'd love to discuss
5  with you about Ms. Mingo, in the interest of
6  time I'm going to pass to my colleague, and I
7  thank you.
8  THE WITNESS:  Thank you, ma'am.
9  EXAMINATION
10  BY MS. YATES:
11  Q.  Good morning, Dr. Rinder.  I
12  introduced myself to you off of the record.  My
13  name is Pamela Yates, and I represent Bayer.
14  Nice to see you today.
15  A.  Same to you.
16  Q.  I apologize, I may jump around a
17  little bit.  If you don't understand my
18  question, please tell me, and I'll try to reword
19  it.
20  A.  I will do that.  Thank you.
21  Q.  Dr. Rinder, having reviewed the
22  medical records of Ms. Mingo's case, in your
23  opinion, is there any evidence of a bleed before
24  she took Xarelto?
25  MR. DENTON:  Object to the form.

1  A.  So you're talking about in her entire
2  medical history?
3  BY MS. YATES:
4  Q.  Yes, sir.
5  A.  So when Ms. Mingo was hospitalized for
6  her total hip surgery on January 6th, her
7  postoperative hemoglobin was, I believe, nadired
8  at about 8.7, and her preoperative hemoglobin
9  was higher than that.  I'm not sure of the --
10  I'd have to go back to her records to note that.
11  I don't have that noted here, but I know that
12  that was higher.
13  So that is a decrease in hemoglobin
14  that is consistent with the usual type of
15  postoperative hemorrhage that we see around a
16  total hip surgery.  There's going to be
17  hemorrhage in and around the area of the
18  procedure, and that is -- that's normal, that's
19  expected.
20  I did not see any notes from the
21  physicians during that hospitalization for her
22  hip surgery that were of concern that this was
23  out of the ordinary.  But I would consider that
24  to be the usual amount of postoperative
25  bleeding.  There's probably some bleeding.

1 There may also be some aspect of hemodilution
2 because of the anesthesia and the fluid therapy
3 at that time.
4 　　But usually that decrease in
5 hemoglobin is what we see following an
6 orthopedic surgery like this. And I did not
7 consider that to be out of the ordinary in terms
8 of the amount of bleeding that would occur with
9 that, and I did not see any notes from the
10 physician that felt that -- that would disagree
11 with that.
12 　　Q. Anything other than the decrease in
13 hemoglobin to indicate that Ms. Mingo may have
14 had a bleed prior to taking Xarelto?
15 　　MR. DENTON: Object to the form.
16 Asked and answered.
17 BY MS. YATES:
18 　　Q. I said, anything in addition to what
19 you just described.
20 　　A. In addition to what I've just
21 described regarding the hip surgery, I'm not
22 aware of any diagnosis of a specific bleeding
23 episode or diathesis in Ms. Mingo other than
24 what I've just described and other than with
25 Xarelto.

1 　　Q. Did you see any evidence of any sign
2 or symptom that could be consistent with a bleed
3 prior to taking Xarelto, other than the drop in
4 hemoglobin that you've already noted?
5 　　MR. DENTON: Object to the form.
6 　　A. So I noticed -- I noted that Ms. Mingo
7 in the -- I just want to make sure I'm correct
8 on my dates -- in the two years prior to her
9 Xarelto-induced hemorrhage had CBC values that
10 were -- where the hemoglobin and hematocrit were
11 in the normal, for the most part, range, but
12 were in the low normal range, and so I looked at
13 those records to determine if there was evidence
14 of bleeding. I did not see any objective
15 documentation of bleeding. I saw in one
16 record -- well, no, that would be following the
17 Xarelto.
18 　　So I did look at that data. My
19 concern with her having a hemoglobin and
20 hematocrit in the normal range, but as I said
21 before they were in the lower part of that
22 range, I did look at that and consider it, but I
23 did not see evidence or documentation of a
24 bleed. I'd be happy to go over those specifics
25 if you would like.

1 BY MS. YATES:
2 　　Q. Sure. So let me see if I understand.
3 　　You saw at least some indication in
4 the records that perhaps something was
5 consistent with a bleed, but there was -- the
6 doctors had those records and they did not
7 diagnose a bleed?
8 　　MR. DENTON: Object to the form.
9 Asked and answered.
10 　　A. No, I don't think that's a correct
11 characterization of what I'm inarticulately
12 trying to get out. What I would say is I looked
13 over her records, and I noticed that in her CBC
14 data in the two years prior she was not anemic,
15 but I did see data that was -- at one point I do
16 recall hemoglobin that was slightly lower than
17 the normal range, and I looked through those
18 records to see if I could find any evidence, not
19 just documentation by her physicians, but also
20 any evidence that would make me be concerned
21 regarding hemorrhage. And I did not find
22 evidence either from the physician records,
23 objective data that's included in the records,
24 or any other aspects of her records that gave me
25 a strong indication that there was hemorrhage

1 occurring.
2 BY MS. YATES:
3 　　Q. Doctor, sometimes you use the word
4 "hemorrhage" and sometimes you use the word
5 "bleed." Do you have a distinction when you use
6 those words?
7 　　A. Not really.
8 　　Q. If you have a patient like Mrs. Mingo,
9 your team is being consulted, do you tell the
10 patient they have a hemorrhage or a bleed?
11 　　MR. DENTON: Object to the form.
12 　　A. When we're talking with a patient we
13 try to use language that is understandable as
14 much as possible, so we'll usually use
15 terminology that is appropriate for that
16 patient, and we'll talk about bleeding. We may
17 use the word "hemorrhage," but we will certainly
18 explain that in that context to the patient that
19 when we say that, we might also be meaning
20 bleeding.
21 BY MS. YATES:
22 　　Q. And, Doctor, part of the reason for
23 that actually "hemorrhage" is a more frightening
24 word than "bleed"?
25 　　MR. DENTON: Object to the form.

A. I don't know. I don't really know that that's true. I think that hemorrhage is the medical terminology that is used. I think that maybe someone might -- no, I just think that's the medical terminology. I think that the thing that's more frightening about bleeding is the amount and the symptoms that would come from that. So I think that's what I would use to be concerned about whether there is a subjective component to that.

When I use the word "bleeding" with patients, I'm trying to be understandable. I'm certainly not trying to say anything to them that's going to frighten them or give them a subjective response.

BY MS. YATES:

Q. So, Doctor, you went through the records, you saw the postoperative drop in hemoglobin, you saw some CBC data two years prior to her surgery. Anything else in the records that could be consistent with a bleed?

MR. DENTON: I object to the form of the question.

A. You know, as I said, I went through not just what you've said, but all of the

records that I could find. If you have specific aspects of her record that you would like to discuss with respect to how I evaluated that, I'm happy to do so.

BY MS. YATES:

Q. No, no, no. And I'm certainly not a hematologist, but I was just wondering, obviously there's evidence of a bleed after her surgery. I'm just wondering, in your review of the records as a hematologist, there are some signs or symptoms that are deemed consistent with a bleed, but a bleed is not necessarily diagnosed. That's all I want to know, Doctor.

Did you see anything else in the records that could be consistent with a bleed?

MR. DENTON: Well, I object to the form.

MS. YATES: That's it, Roger. Object to the form.

MR. DENTON: I understand. I am objecting to the form. It's been asked and answered.

A. You know, as I said, I went through her records. I reviewed everything that was available to me. I -- being a hematologist, the

areas that I'm centered on are bleeding and thrombosis, and so I went through those records. As I said before, I found an area of time where her CBC values were normal, but flirting with the low normal range. I looked through those records, I did an assessment of what I saw, I did not find definitive objective evidence of a bleed.

BY MS. YATES:

Q. Fair enough.

Was Ms. Mingo anemic before her hip surgery?

A. I believe that her -- I don't think I have that data here. But in my recollection of her preoperative CBC, I believe that her hemoglobin was within the normal range.

Q. And so that's immediately before the surgery. What about earlier in time?

MR. DENTON: Object to the form. Asked and answered.

A. I think that's what I've alluded to already, that in the CBCs that I have seen prior to that time period, her hemoglobin and hematocrit have been within the normal range in the majority of samples that I saw. I did not

see any trend or something that would make me concerned. I did see an occasional value, I evaluated that in its entirety in terms of looking at all the other laboratory data, the physical examination, and the records at those time points. That's what I valued it.

BY MS. YATES:

Q. So an occasional value, but you looked at it big picture, in your opinion she was not anemic before her hip surgery?

MR. DENTON: Objection. Asked --

BY MS. YATES:

Q. Correct?

MR. DENTON: Object to form. Asked and answered.

A. Well, I'm referring to the CBC that was done immediately prior. She was not anemic. She was cleared for her surgery. Her physicians obviously felt that she was able to withstand a major orthopedic procedure based on her blood counts. And as I said before, in the time period prior, as I said, I looked at those CBC results, I looked at all of her records, I did not find a -- I would not have made a diagnosis of anemia in that time period.

BY MS. YATES:

Q. Did you see any sign or symptom in the medical records you reviewed of a bleed while Ms. Mingo was on Lovenox and 81 milligrams of aspirin?

A. So in the time period that that would have encompassed, that would be from January 6th to 16th, she was -- as I said before, she was anemic on January 9th at 8.7, and that is entirely consistent, as I said before, with a major orthopedic procedure and the usual amount of bleeding that goes around the wound, surgical incision, the implant, etcetera.

So yes, she is anemic during that time period, she has a completely plausible explanation for that, which is that that is, to my mind, the usual amount of -- the usual type of decrease in hemoglobin that we would see in a postoperative patient undergoing that type of procedure. Not just the bleeding, though, the hemoglobin can also be affected by fluid changes, and between the anesthesia, the fluids that the patient is given and third spacing because of that procedure, again that's entirely consistent with a postoperative drop in

hemoglobin. And as I said, I did not see any notes in the record that questioned that or were overly concerned about that.

Q. Doctor, will you agree with me that we don't know when Mrs. Mingo first developed her gastric ulcer?

A. Well, I would be concerned that she had evidence of a GI bleed on February 2nd when she had objectively determined in the King's Daughters -- at the emergency room there that she had weakly heme positive stools. So that is objective evidence of gastrointestinal bleeding.

Now, a nuclear medicine GI bleed scan was negative at that -- I believe that was the same day. But that does not mean that she did not have GI bleeding. My understanding of the GI bleeding scan is that that is relatively insensitive if there is a low rate of bleeding, and so the fact that she has heme positive stools at that time, I would be concerned that she has GI bleeding then.

Now, whether that is due to an actual ulcer being formed or whether that is the normal erosion and occurrence of GI bleeding because she's on an anticoagulant that's part of the

normal, we can't know that. I think that's all I want to say about that.

Q. Do you remember my question?

MR. DENTON: He answered your question.

BY MS. YATES:

Q. No, no, no. Do you remember my question?

A. I do.

Q. What was it?

A. It was related to the -- when we think that a gastrointestinal ulcer may have occurred, and I'm saying the first objective evidence of GI bleeding is on February 2nd, so there may have been an ulcer present there or not.

Q. So that's the first date we have occurrence of bleed.

But, Doctor, my question is much simpler than that. And I'm clearly not a medical doctor. We don't know when Mrs. Mingo's ulcer first developed, true?

MR. DENTON: Object to the form. Asked and answered.

A. Well, we are not -- we don't have -- there's no -- we have no EGD, I'm sorry,

endoscopy prior to this. We have no predictive ability. I would defer the EGD -- there was an EGD done on this patient on February 14th, so that physician is examining the ulcer. I would defer -- I would defer that opinion to someone who actually saw the ulcer who might be able to give a physical examination of that to determine whether they thought it was recent or not.

Q. Okay. And you can't do that, based on the records you've had available to you, you can't say if it had been there for years, if it was more recent, but we do know as of that date she clearly had a gastric ulcer?

MR. DENTON: Object to the form. Asked and answered.

A. We know that the ulcer was confirmed in her February 14th admission.

BY MS. YATES:

Q. Right.

A. We know that on February 2nd she had weakly heme positive stools. I think the fact she had an ulcer confirmed on February 14th and that she had weekly heme positive stools on February 2nd, I think a reasonable physician would be concerned that she has the ulcer

1  developed by February 2nd, but whether that --
2  and we see ulcers in postoperative patients and
3  post-hospitalized patients all the time. Stress
4  ulcers are a common part of patients who have
5  been hospitalized who then return with symptoms,
6  or if they're anticoagulated with bleeding.
7      So it's certainly possible that it was
8  there, but I don't have a crystal ball. As I
9  said, I would defer to the GI specialist who
10 examined the ulcer by endoscopy.
11     Q. Doctor, what does "anatomic etiology"
12 mean?
13     A. So in my -- in the way that I consider
14 bleeding, the aspect of trying to determine the
15 source of bleeding is important to discriminate
16 between actual separate lesions such as a
17 cancer, a malignancy, a lesion that requires
18 surgical, or intervention. Those are, to my
19 mind, lesions that are macroscopic. They are
20 lesions that can be seen, you can see bleeding
21 from the lesion, you may see oozing, as in the
22 case of Ms. Mingo, from that lesion. That is
23 something where because there is a gross
24 macroscopic abnormality, to me that is an
25 anatomic lesion.

1      Q. Okay. I apologize, but maybe I
2  misunderstood. I just really want your
3  definition of anatomic etiology. And let me
4  give you an example.
5      Mr. Denton is one of your patients.
6  And he sees --
7      MR. DENTON: No, he's not.
8  BY MS. YATES:
9      Q. Mr. Denton's cousin is one of your
10 patients --
11     MR. DENTON: I don't have any cousins.
12 BY MS. YATES:
13     Q. -- and he sees in his medical records
14 "anatomic etiology," and he says, "Doc, what
15 does anatomic etiology mean?" And you're going
16 to explain it to someone, a layperson. What
17 does it mean?
18     MR. DENTON: Object to the form.
19     I don't have any cousins, by the way.
20     MS. YATES: Brother.
21     MR. DENTON: I don't have a brother.
22     MS. YATES: Whatever.
23     A. I don't think that I can explain it
24 better than what I've already done. When I talk
25 to patients and describe to them, for example,

1  that they have bleeding, I describe to them what
2  we have found, and if we can find something that
3  is macroscopic, something we can see without a
4  microscope, we can find those types of lesions
5  that we would worry about, would be a
6  malignancy, a cancer, a surgical -- a wound that
7  requires a surgical or another intervention,
8  those are the types of things that we -- those
9  are the examples that I would use in having a
10 discussion with a patient to try to explain to
11 them, if they ask me where am I bleeding from,
12 and if I can give them that site.
13     Now, many times, unfortunately, we
14 examine patients who have bleeding, and we can't
15 find an anatomic etiology for that. We can't
16 find something that I can give them a picture of
17 or point to or give them a surgical intervention
18 that occurs with that. In that case, I describe
19 to them the fact that even though there may not
20 be something gross that I can give them a
21 picture of, there is still the ability of their
22 body to have bleeding which is part of their
23 normal process that's part of the normal back
24 and forth between wound healing and wound
25 production, and that in this case or with a

1  patient that's on anticoagulation, that
2  anticoagulation can make -- can tip that balance
3  in the wrong direction and they'll bleed from
4  that.
5  BY MS. YATES:
6      Q. Does etiology mean cause?
7      MR. DENTON: Object to the form.
8      A. To my mind, etiology means that we
9  have -- we can describe something that we think
10 is responsible. It may not be --
11 BY MS. YATES:
12     Q. Is that the same as cause?
13     MR. DENTON: Object to the form.
14     A. Well, I don't think of that. In
15 medical terminology I don't usually use "cause."
16 I say it's responsible, I say it increases the
17 bleeding, it increases risk. We may say that we
18 think something is responsible for it. There
19 may be multiple factors in trying to sort of
20 parse that out with patients. We try to pick
21 the thing that we think is most responsible or
22 is the major contributing factor in their
23 problem.
24 BY MS. YATES:
25     Q. What does "substantial contributing

1  factor" mean to you?
2      A.  So to me, if I was talking to a
3  patient and they asked me, you know,
4  "Dr. Rinder, why did I bleed here?  What was the
5  thing that tipped me over to bleed?", I would
6  try to give them the thing that I feel is the
7  most significant factor responsible for them
8  bleeding.  And that's how I talk to my patients,
9  and that's how I approached this case.
10     Q.  Doctor, you were asked some questions
11 about the defense expert reports that you had
12 reviewed, Dr. Haynes, Dr. Herrin, Dr. Jones, and
13 Dr. Persing, and fair on your part, without the
14 actual reports in front of you, you did not want
15 to give specific disagreements.  So I want to
16 dial it back a little bit.
17         Give us your general disagreements
18 with the defense expert reports without
19 identifying a specific expert.
20         MR. DENTON:  Again, I object to the
21 form.
22     A.  I would rather be specific.  I can say
23 that I read them and I had -- I read what they
24 said, and I had a general feeling that the
25 things that they were saying I was not in

1  agreement with.  But again, I would rather put
2  in front of me the specifics that you would like
3  me to discuss, and I can give you my rationale
4  and my reasoning behind why I disagree.
5  BY MS. YATES:
6      Q.  Okay.  So unless you go through the
7  reports, you cannot give us even a general
8  disagreement you have with the defense expert
9  reports?
10         MR. DENTON:  Objection.  Asked and
11 answered.
12     A.  I think that would be -- I think that
13 would be a medically invalid way of approaching
14 this.  I don't -- when I talk to patients, I
15 don't give them general, I never use the word
16 gestalt or anything like that when I'm talking
17 to those patients.  I talk to them about
18 specifics.
19         These reports I read in a general way.
20 I have problems with things that were written in
21 those reports, but I would rather discuss them
22 in a specific way rather than to, from memory,
23 try to recall who said what or when.
24 BY MS. YATES:
25     Q.  Okay.  And I've acknowledged that you

1  would rather, if you're going to give a specific
2  comment about a specific expert, you'd rather
3  see the report.  You didn't bring those reports
4  with you today, right?
5      A.  I don't have them, no.
6      Q.  Right.  I just want one, two
7  disagreements that you remember that were in the
8  expert reports that you reviewed in a general
9  way.  And I'm not asking you to attribute your
10 specific disagreements to any specific expert.
11         MR. DENTON:  Again, I object to the
12 form.  Asked and answered.
13     A.  I respectfully would say that I would
14 rather -- that I don't think that it is --
15 serves a medically valid purpose or reasonable
16 purpose to opine in a general way and perhaps
17 attribute something that I've read in one report
18 but not in another.  They may disagree with one
19 another.  I would rather have a look at what you
20 would like to specifically ask me with respect
21 to Ms. Mingo, and give you my rationale for
22 that.  I'm happy to do it on a specific basis.
23 BY MS. YATES:
24     Q.  So you're refusing to answer my more
25 general question?

1          MR. DENTON:  He is not.  He's answered
2  it.  I object to that.
3      A.  I'm not refusing anything.  What I'm
4  saying is I think that it would be more
5  medically valid and reasonable with respect to
6  the matter that we have here for a specific case
7  to discuss it with specifics rather than in a
8  general way where I may misremember something,
9  and I would not want to do that with respect to
10 this case.
11 BY MS. YATES:
12     Q.  Okay.  Well, I know you'd rather do
13 that.  But I get to ask the questions.
14         And I don't have the reports, you
15 don't have the reports, so can you give me any
16 area of general disagreement from the expert
17 reports, defense expert reports you reviewed in
18 the Mingo case?
19         MR. DENTON:  Objection.  Asked and
20 answered.
21     A.  Again, with all due respect, I feel
22 that the evaluation of a specific case requires
23 dealing with the specifics, and not to get into
24 a generalized sense of what I may incorrectly
25 recall from the different opinions that were

Page 150

1  given by the other experts. I'm sure you may
2  have them available to you. As I say, I'm happy
3  to discuss the specifics and to go over those,
4  and if there are general opinions that they have
5  that are not related to the Mingo case, I would
6  be happy to review those as well. But I'm
7  more -- I would be -- I feel that that would not
8  be a medically honest way of giving you my
9  opinions with respect to this case.
10 BY MS. YATES:
11     Q. Okay. So as you sit here today, you
12 can't give me any area of general disagreement,
13 or any other area of specific disagreement,
14 because you'd have to go report by report?
15     MR. DENTON: Object to the form.
16     Go ahead.
17     A. I think having the reports in front of
18 me and getting specific questions about what's
19 said in those reports would be the more
20 medically valid way for me to address your
21 questions.
22 BY MS. YATES:
23     Q. You've referred to the quartile
24 bleeding data, and I think we're all on the same
25 page as to what you mean by that, as evidence

Page 151

1  that there's a correlation between PT and
2  bleeding with Xarelto.
3         And my question is, is there any
4  regulatory agency or body that has applied
5  bleeding data on the atrial fibrillation
6  population to the other populations that use
7  Xarelto?
8     (Phone interruption.)
9     A. I'm sorry, can you say the last part
10 of that question again?
11     MS. YATES: After I've killed
12 Margaret.
13     MR. DENTON: Turn it up louder,
14 Margaret.
15     MS. YATES: That was the best question
16 I've asked in my life.
17     MR. DENTON: I know it. It's your
18 last one, too.
19     MS. YATES: Is it?
20     MR. DENTON: You're out of time.
21     MS. YATES: Oh, come on.
22     Q. Please --
23     MS. YATES: Madame Court Reporter, I'm
24 so sorry, could you possibly read that back?
25     (Whereupon, the reporter read back the

Page 152

1  pending question.)
2     A. So I -- my understanding of the data
3  that the FDA included in the Xarelto label
4  currently is there for anybody to look at
5  regarding Xarelto therapy, and it is -- the data
6  is developed from the atrial fibrillation, but
7  we have to use whatever data we have at that
8  moment in time to examine bleeding risk and to
9  try and give best care to patients. So that
10 data is not -- that data is developed in atrial
11 fibrillation, and that is noted, but it's there
12 in the label for anyone given Xarelto for any
13 indication.
14 BY MS. YATES:
15     Q. Right. And it's in the atrial
16 fibrillation part of the label, right, sir?
17     A. That is to the best of my
18 recollection, correct.
19     Q. And it doesn't say, apply this data to
20 non-atrial fibrillation patients, does it?
21     MR. DENTON: Object to form.
22     A. I don't think I've ever seen that type
23 of language in any FDA label.
24 BY MS. YATES:
25     Q. So it's not in the Xarelto one, is it,

Page 153

1  Doctor?
2     A. I think that the fact that it's in the
3  label is important, because it gives physicians
4  an understanding as to bleeding risk and the
5  prothrombin time. The fact that the data was
6  developed in atrial fibrillation patients, which
7  is the largest concentration of patients studied
8  in that way, that's acknowledged. That data can
9  be used by physicians to examine Xarelto use in
10 any indication.
11     MS. YATES: Just a couple more, I
12 promise. Please.
13     MR. DENTON: He's got patients. I
14 know he's late, so --
15     MS. YATES: I understand.
16     MR. DENTON: -- I'll give you two more
17 minutes.
18 BY MS. YATES:
19     Q. Okay. Doctor, same question, but
20 instead of a regulatory body, any medical
21 organization that has endorsed or offered
22 guidance that doctors should use data developed
23 in the atrial fibrillation population and apply
24 it to a different population using Xarelto?
25     MR. DENTON: Object to form.

1    A.   There is guidance from the British
2  Committee on Standards for using the prothrombin
3  time in patients in general on Xarelto.  There
4  is guidance from multiple publications from the
5  company from Mueck, from Kubitza on using the
6  prothrombin time as an indicator of Xarelto
7  activity.  One can certainly extrapolate the
8  atrial fibrillation data to inform that use of
9  the prothrombin time.  I am not aware of a
10  consensus on that for VTE.
11  BY MS. YATES:
12    Q.   Okay.
13       MR. DENTON:  We're done.
14       MS. YATES:  Okay.  Let the record
15  reflect that I probably had three or four more
16  questions, and I'm being shut down.
17       MR. DENTON:  No, you're not being shut
18  down.  The rule is three hours, and I think
19  we're over three hours.
20       Aren't we, Mr. Video?  He nods yes.
21       MS. YATES:  Okay.
22       MR. DENTON:  So it's three hours.
23  We're done.
24       MS. YATES:  And the record will
25  reflect that Mr. Denton ended it.  I still had

1  questions to ask, and so that will be the
2  goose/gander rule when it comes to defense
3  experts.
4       Thank you for your time, Doctor.
5       THE WITNESS:  Thank you, ma'am.
6       THE VIDEOGRAPHER:  The time right now
7  is 11:35 a.m., and we're off the record.
8       (Whereupon, the deposition was
9       concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF NEW YORK )
2  COUNTY OF ERIE   )
3       I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Notary Public in and for the State of New
5  York, do certify that on the 7th day of
6  February, 2017, at 8:05 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10  direction, and is a true record of the testimony
11  given by the witness.  I further certify that I
12  am neither attorney, related or employed by any
13  of the parties to this action, and that I am not
14  a relative or employee of any attorney employed
15  by the parties hereto, or financially interested
16  in the action.
17       In witness whereof, I have hereunto
18  set my hand this 7th day of February, 2017.
19
20       _____
21       MAUREEN O. POLLARD, Notary Public
22       My Commission Expires:  3/14/19
23       Realtime Systems Administrator
24
25

1       INSTRUCTIONS TO WITNESS
2
3            Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8            After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11            It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 158

```
1          ------
              E R R A T A
2          ------
3      PAGE  LINE  CHANGE
4      ___  ___  _____
5        REASON: _____
6      ___  ___  _____
7        REASON: _____
8      ___  ___  _____
9        REASON: _____
10     ___  ___  _____
11       REASON: _____
12     ___  ___  _____
13       REASON: _____
14     ___  ___  _____
15       REASON: _____
16     ___  ___  _____
17       REASON: _____
18     ___  ___  _____
19       REASON: _____
20     ___  ___  _____
21       REASON: _____
22     ___  ___  _____
23       REASON: _____
24     ___  ___  _____
25
```

Page 160

```
1           LAWYER'S NOTES
2      PAGE  LINE
3      ___  ___  _____
4      ___  ___  _____
5      ___  ___  _____
6      ___  ___  _____
7      ___  ___  _____
8      ___  ___  _____
9      ___  ___  _____
10     ___  ___  _____
11     ___  ___  _____
12     ___  ___  _____
13     ___  ___  _____
14     ___  ___  _____
15     ___  ___  _____
16     ___  ___  _____
17     ___  ___  _____
18     ___  ___  _____
19     ___  ___  _____
20     ___  ___  _____
21     ___  ___  _____
22     ___  ___  _____
23     ___  ___  _____
24     ___  ___  _____
25
```

Page 159

```
1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, _____, do
       Hereby certify that I have read the foregoing
4      pages, and that the same is a correct
       transcription of the answers given by me to the
5      questions therein propounded, except for the
       corrections or changes in form or substance, if
6      any, noted in the attached Errata Sheet.
7
8      _____
       HENRY M. RINDER, MD        DATE
9
10
11
12
13
14
15     Subscribed and sworn
       To before me this
16     _____ day of _____, 20____.
17     My commission expires: _____
18
19     _____
       Notary Public
20
21
22
23
24
25
```