IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN):MDL 2592
PRODUCTS LIABILITY LITIGATION:
                              :SECTION L
THIS DOCUMENT RELATES TO      :
ALL CASES                     :JUDGE ELDON E. FALLON
                              :MAG. JUDGE NORTH


- - -

NOVEMBER 22, 2016

- - -


- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -


Videotaped deposition of ROBERT C. GOSSELIN, held at The Fairmont Hotel, 170 South Market Street, San Jose, California, on the above date, beginning at approximately 6:23 a.m., before Diane S. Martin, Certified Shorthand Reporter and Certified Realtime Reporter.


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1    A P P E A R A N C E S :

2

3    For the Plaintiffs:

4        FERRER POIROT WANSBROUGH
        BY: RUSS ABNEY, ESQ.

5        2603 Oak Lawn, Suite 300
        Dallas, Texas 75219

6        866-589-0257
        rabney@lawyerworks.com

7

8        LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &
        PROCTOR, P.A.

9        BY: NED McWILLIAMS, ESQ.
        316 S. Baylen Street, Suite 600

10       Pensacola, Florida 32502
        850-435-7000

11       nmcwilliams@levinlaw.com

12

13

14    For the Bayer defendants:

15       NELSON MULLINS RILEY & SCARBOROUGH LLP
        BY: JANE T. DAVIS, ESQ.

16       151 Meeting Street, Suite 600
        Charleston, South Carolina 29401

17       843-534-4317
        jane.davis@nelsonmullins.com

18

19    For the Janssen defendants:

20       IRWIN FRITCHIE URQUHART & MOORE LLC
        BY: KIM E. MOORE, ESQ.

21          CARLOS A. BENACH, ESQ.
        400 Poydras Street, Suite 2700

22       New Orleans, Louisiana 70130
        kmoore@irwinllc.com

23       cbenach@irwinllc.com

24

25    The Videographer:    Joseph Mourgos

## Page 3

1          EXAMINATION INDEX

2   EXAMINATION BY:           PAGE

3   MS. DAVIS              7

4   MS. MOORE          211

5   MR. ABNEY           315

6

7   FURTHER EXAMINATION BY:

8   MS. DAVIS           364

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 4

1       EXHIBIT INDEX

2  DEFENDANTS'             PAGE

3   1  Expert Report of Robert Charles Gosselin  19

4   2  Defendants' Notice with Subpoena Duces  31
      Tecum of Oral Videotaped Deposition of

5      Robert Charles Gosselin

6   3  Appendix B, Curriculum Vitae    38

7   4  Thrombosis Research "Direct Oral    82
      Anticoagulants (DOACs) in the

8      Laboratory: 2015 Review"

9   5  Comparison of Anti-Xa and Dilute Russell  88
      Viper Venom Time Assays in Quantifying

10     Drug Levels in Patients on Therapeutic
      Doses of Rivaroxaban

11

     6  Assessing nonvitamin K antagonist oral  95

12     anticoagulants (NOACs) in the laboratory

13   7  Heparin-Calibrated Chromogenic Anti-Xa  112
      Activity Measurements in Patients

14     Receiving Rivaroxaban: Can This Test be
      Used to Quantify Drug Level?

15

16   8  Comparison of the effect of the anti-Xa  134
      direct oral anticoagulants apixaban

17     edoxaban and rivaroxaban on coagulation
      assays

18   9  Performance of coagulation tests in   136
      patients on therapeutic doses of

19     rivaroxaban

20  10  Assessment of the impact of rivaroxaban  145
      on coagulation assays: Laboratory

21     recommendations for the monitoring of
      rivaroxaban and review of the literature

22

    11  The laboratory's 2015 perspective on  151

23     direct oral anticoagulant testing

24  12  In vitro and in vivo studies of the   161
      novel antithrombotic agent BAY 59-7939 -

25     an oral, direct Factor Xa inhibitor

## Page 5

1      EXHIBIT INDEX (Continued)

2  DEFENDANTS'            PAGE

3  13  Pharmacodynamics and Drug Action    163
      "Safety, pharmacodynamics, and

4     pharmacokinetics of single doses of BAY
      59-7939, an oral, direct factor Xa

5     inhibitor"

6  14  Effects of the oral, direct factor Xa  173
      inhibitor rivaroxaban on commonly used

7     coagulation assays

8  15  Evaluating the use of commercial    181
      drug-specific calibrators for

9     determining PT and APTT reagent
      Sensitivity to dabigatran and rivaroxaban

10

    16  Rivaroxaban and Hemostasis in Emergency  186

11     Care

12  17  List of Billed Hours         208

13  18  A single test to assay warfarin,    260
      dabigatran, rivaroxaban, apixaban,

14     unfractionated heparin and enoxaparin in
      plasma

15

16  19  Test of the Month: The chromogenic   291
      antifactor Xa assay

17

18         --oOo--

19

20

21

22

23

24

25

Page 6

1    NOVEMBER 22, 2016            6:23 A.M.
2              P R O C E E D I N G S
3              --oOo--
4         THE VIDEOGRAPHER:  We are now on the
5    record.  My name is Joseph Mourgos.  I'm the
6    videographer for Golkow Technologies.  Today's date
7    is November 22nd, 2016, and the time on the video
8    monitor is 6:23 a.m.
9         This video deposition is being held in San
10   Jose, California in the matter of Xarelto Products
11   Liability Litigation, MDL number 2592, in the
12   United States District Court, Eastern District of
13   Louisiana.
14        The deponent is Robert C. Gosselin.
15        Counsel, please voice identify yourselves.
16        MS. DAVIS:  Jane Davis representing Bayer.
17        MS. MOORE:  Kim Moore for the Janssen
18   defendants.
19        MR. BENACH:  Carlos Benach for the Janssen
20   defendants.
21        MR. McWILLIAMS:  Ned McWilliams for the
22   plaintiffs.
23        MR. ABNEY:  Russ Abney for the plaintiffs.
24        THE VIDEOGRAPHER:  Thank you.
25        The court reporter is Diane Martin, and she

Page 7

1    will now administer the oath.
2              ROBERT C. GOSSELIN,
3    called as a witness, after having been duly sworn
4    by the Certified Shorthand Reporter to tell the
5    truth, the whole truth, and nothing but the truth,
6    testified as follows:
7              EXAMINATION
8    BY MS. DAVIS:
9         Q.  Good morning, Mr. Gosselin.
10        A.  Morning.
11        Q.  My name is Jane Davis, and I'm representing
12   the Bayer defendants in this litigation.
13        I just have a couple things I need to put
14   on the record before we begin the questioning.
15        First of all, I'd like to thank you for
16   accommodating us with our early morning start this
17   morning so that folks could make an attempt to get
18   home before Thanksgiving.  So we thank you for
19   that.
20        A.  Welcome.
21        Q.  And also, due to the early hour, our
22   telephone conference call -- or our conference
23   phone has not arrived yet.  So by agreement of
24   counsel, we're going to proceed with the deposition
25   until the telephone arrives and we can establish a

Page 8

1    conference call in line.
2         Is that agreeable?
3         MR. ABNEY:  Yes.
4         MS. DAVIS:  And one more thing.
5         In the event that this deposition has been
6    cross-noticed, I'd just like to put a short
7    statement on the record regarding that.
8         Defendants are in receipt of plaintiffs'
9    cross-notice for this deposition of this witness,
10   who has issued an expert report in the federal MDL
11   proceeding and is being deposed in connection with
12   that report.
13        Plaintiffs' cross-notice for the
14   Pennsylvania consolidated proceeding is premature
15   because case-specific discovery of the bellwether
16   cases has not yet commenced in Pennsylvania, nor
17   have expert reports been served.  And specifically
18   the Pennsylvania plaintiffs have not served the
19   expert report for this witness.
20        Plaintiffs' cross-notice also fails to take
21   into account the expert protocol that was agreed to
22   among the parties in the MDL proceeding and entered
23   as an order by the Court.
24        Among other things, this protocol limits
25   the depositions of generic experts to seven hours'

Page 9

1    total.
2         In the spirit of cooperation between the
3    federal MDL proceeding and the Pennsylvania
4    coordinated proceeding, however, defendants will
5    not object to plaintiffs' cross-notice to the
6    deposition.  This is being done with a full
7    reservation of all rights and objections pending
8    negotiation of a mutually acceptable process for
9    expert discovery in the Pennsylvania cases.
10        That concludes that statement.  Thank you.
11   BY MS. DAVIS:
12        Q.  Mr. Gosselin, would you please state your
13   full name?
14        A.  Robert Charles Gosselin.
15        Q.  And what is your business address?
16        A.  2315 Stockton Boulevard, Room 2P-344,
17   Sacramento, California.
18        Q.  And what is located at that address?
19        A.  University of California Davis Health
20   System.
21        Q.  And the room number that you gave me, is
22   that your office?
23        A.  It is my lab space, yes.
24        Q.  And if you were going to give someone the
25   name of your lab space, what would you call it?

3 (Pages 6 to 9)

1    A.  Pavilion Laboratory.
2    Q.  And what is located at Pavilion Laboratory?
3    A.  The clinical laboratory for pathology
4  department at UC Davis Health System.
5    Q.  Have you ever given a deposition before?
6    A.  No.
7    Q.  Well, let me just go over a few sort of
8  ground rules for today.
9        If you'd like to take a break at any time,
10  if you'll just let me know by just saying, "I'd
11  like to take a break," as long as there's not a
12  question pending, then we can accommodate you and
13  take a break.
14    A.  Okay.
15    Q.  Okay.  It's important that you answer the
16  questions out loud, even though we're on a video
17  record, because the court reporter needs to take
18  down the words that are spoken.
19        And it's important to use real words like
20  "yes" and "no" instead of slang like "uh-huh" or
21  "huh-uh," just so that we get a clear record; okay?
22    A.  Yes.
23    Q.  And I'm sure you understand that the oath
24  that the court reporter just placed you under is
25  the same oath that you would take if we were in a

1  courtroom before a judge and a jury.
2    A.  Yes.
3    Q.  And you understand that if you don't
4  understand a question, then you need to stop me and
5  tell me that you don't understand a question so
6  that I can rephrase it so that you do understand it
7  before you answer it; okay?
8    A.  Yes.
9    Q.  And you agree to do that?
10    A.  Yes.
11    Q.  And it's also important today that you hear
12  the questions.  So that if any disruptions occur or
13  if you lose your train of thought for any reason
14  and you need for me to repeat or rephrase a
15  question to make sure that we're accurately
16  communicating, then I want you to do that before
17  you answer.
18        Will you agree to that?
19    A.  Yes.
20    Q.  So if you do answer the questions today, is
21  it fair for the judge and jury to believe that you
22  understood the question?
23    A.  Yes.
24    Q.  And is it also fair for the judge and jury
25  to believe that when you answer my questions today,

1  that you're answering them honestly and completely?
2    A.  Of course, yes.
3    Q.  Where do you currently live?
4    A.  Specific address or just general area?
5    Q.  General area.
6    A.  Sacramento, California.
7    Q.  And what is your profession?
8    A.  I'm a clinical laboratory scientist.
9  That's my licensure.
10    Q.  Mr. Gosselin, how was it that you came to
11  be involved as an expert witness for the plaintiffs
12  in this litigation?
13    A.  I was referred to Mr. Abney by a colleague.
14  Then Mr. Abney contacted me.
15    Q.  So you were first contacted regarding this
16  litigation by Mr. Abney?
17    A.  Yes.
18    Q.  And what was it -- what -- what is your
19  understanding of your role or assignment in this
20  litigation?
21    A.  As an -- an expert in laboratory testing of
22  hemostasis.
23    Q.  Laboratory testing of hemostasis?
24    A.  Yes.
25    Q.  And when was it that you were first

1  contacted by Mr. Abney?
2    A.  I believe in July of 2015.
3    Q.  And have you had any meetings with counsel
4  for plaintiffs?
5    A.  Yes.
6    Q.  And when was the first meeting that you had
7  with counsel for plaintiffs?
8    A.  I first met Mr. Abney at -- at Silver
9  Spring in October of 2015.
10    Q.  And when you met with Mr. Abney then -- in
11  Silver Spring, Maryland?
12    A.  Yes.
13    Q.  In October of 2015, you had previously
14  spoken with him in July of 2015?
15    A.  On the phone or by e-mail.  That was our
16  only communication.  Yes.
17    Q.  And when were you retained as an expert by
18  the plaintiffs?
19    A.  In July of 2015.
20    Q.  And did that retention occur shortly after
21  you were contacted by Mr. Abney?
22    A.  "Shortly" meaning days?  Weeks?  I believe
23  it was maybe a week or so, yes.
24    Q.  And when did you begin your work in this
25  case?

1    MR. ABNEY: Object to form.
2    MS. DAVIS: I'll rephrase the question.
3    THE WITNESS: Okay.
4    BY MS. DAVIS:
5    Q. When did you first devote any time to your
6    acting as an expert witness for the plaintiffs in
7    this litigation?
8    A. I would guess July of 2015, in e-mail
9    conversations.
10   Q. And when you met with Mr. Abney in Silver
11   Spring in October of 2015, were there any other
12   plaintiffs' counsel present?
13   A. No.
14   Q. Was anyone else present?
15   A. It was an informal meeting at a bar. Yes.
16   Q. Okay.
17   A. And yes, there was one other person
18   present.
19   Q. Okay. And who was that?
20   A. Dr. Dot Adcock. Or Dorothy Adcock. I'm
21   sorry. That would be her.
22   Q. And have you had any subsequent meetings
23   with plaintiffs' counsel?
24   A. Yes.
25   Q. When did you next meet with plaintiffs'

1    counsel after the meeting in October of 2015?
2    A. I don't know the specific date. I think it
3    was this summer, in 2016, or it could have been
4    late last year. I don't recollect specifically.
5    But Mr. Abney came out to my laboratory.
6    Q. And how long was that meeting?
7    A. Half day.
8    Q. Any additional meetings with plaintiffs'
9    counsel since then?
10   A. Yes.
11   Q. And when was that?
12   A. Last night.
13   Q. And was that in preparation for this
14   deposition?
15   A. Yes.
16   Q. And how long was that meeting?
17   A. I would say about four hours.
18   Q. Did you have any prior relationship or just
19   know plaintiffs' counsel prior to being retained as
20   an expert in this litigation?
21   A. Relationship with Mr. Abney or his
22   colleagues?
23   Q. Yes.
24   A. No.
25   Q. Have you ever been retained by any of the

1    plaintiffs' firms or attorneys, that you're aware
2    of, as being involved for the plaintiffs in this
3    litigation?
4    A. No.
5    Q. Prior to this litigation.
6    A. Correct. Prior to this litigation, ever,
7    no.
8    Q. And what is your hourly rate for your
9    participation in this litigation?
10   A. I'm sorry?
11   Q. What is your hourly rate of compensation
12   for your participation in this litigation?
13   A. Believe it's 200 an hour except during
14   trial, and I think it's 400 an hour, but I'd have
15   to go and check the contract.
16   Q. So you entered into a written retention
17   contract with plaintiffs?
18   A. In July 2015.
19   Q. And how did you determine what your hourly
20   rate would be in this litigation?
21   A. Previous consulting rates. It was sort of
22   midway between two different clients.
23   Q. Other than a difference of $200 per hour
24   and $400 per hour for trial appearance, is there --
25   are there any other different rates in your

1    retention agreement with the plaintiffs?
2    A. I don't believe so.
3    Q. And how much time have you spent reviewing
4    materials and developing opinions concerning this
5    case?
6    A. From July 2015 I think we're roughly about
7    120 hours.
8    Q. And that's up until today?
9    A. That would be up until I believe last week.
10   Q. So you would add to that the meeting that
11   you had with plaintiffs' counsel?
12   A. Yes.
13   Q. Would you add any additional time to that?
14   A. Travel time.
15   Q. Travel time from Sacramento to San Jose?
16   A. Yes.
17   Q. Anything else?
18   A. Not that I can recall.
19   Q. And would all the hours that we just
20   discussed have been billed -- or -- or either have
21   been billed or will be billed at $200 an hour?
22   A. Yes.
23   Q. And have you sent any bills yet --
24   A. Yes.
25   Q. -- to counsel for plaintiffs?

1    A. Yes.
2        MS. DAVIS: And we would ask that those
3    bills be produced.
4    BY MS. DAVIS:
5        Q. When you are paid for expert witness work,
6    including on this case, are the checks that you
7    receive made out to you personally?
8        A. Sorry. Can you say that again?
9        Q. Sure.
10       A. Yeah.
11       Q. You told me that you have sent invoices --
12   or at least sent an invoice to counsel for
13   plaintiffs in this litigation.
14       A. Correct, yes.
15       Q. And have you received compensation from
16   them?
17       A. No.
18       Q. No?
19       A. No.
20       Q. Okay. When you do receive a check or
21   compensation from counsel for plaintiffs for the
22   time that you've spent on this litigation, do you
23   expect that check to be made out to you personally?
24       A. Yes.
25       Q. And does that money go to you personally as

1    personal income?
2        A. Yes.
3        (DEFENDANTS' EXHIBIT 1 WAS MARKED.)
4    BY MS. DAVIS:
5        Q. Mr. Gosselin, I'm going to hand you what
6    I've marked as Exhibit 1 to your deposition.
7        A. Would you like me to read it?
8        Q. Well, if -- if you would like to look at it
9    as much as --
10       A. Yeah.
11       Q. -- you need to answer this question about
12   it.
13       A. Okay.
14       Q. So the question is, do you agree that this
15   is a copy of the expert report that you submitted
16   in this litigation?
17       A. It appears to be the copy that I submitted,
18   yes.
19       Q. And would you agree that if you look at --
20   let's see. It's -- I guess your signature is
21   actually on the front. But do you agree that on
22   the front page of what we marked as Exhibit 1,
23   which is your report, that this report has your
24   signature?
25       A. Yes.

1        Q. And you prepared this report?
2        A. Yes.
3        Q. And when you -- excuse me -- when you were
4    preparing this report, you understood that this
5    report is to contain the opinions and basis and
6    reasons for the opinions that you have regarding
7    this litigation?
8        A. I'm sorry. One more time?
9        Q. Sure.
10       When you were preparing this report --
11       A. Yes.
12       Q. -- did you understand that your report was
13   to contain your opinions and the basis and reasons
14   for your opinions?
15       A. Yes.
16       Q. And it does?
17       A. Yes.
18       Q. And you understand that the reason that we
19   are taking your deposition today is for us to
20   explore the opinions stated in your report and to
21   fully learn your reasons and basis for holding
22   those opinions?
23       A. Yes.
24       Q. Now, other than counsel for the plaintiffs,
25   have you interviewed or spoken with anyone else in

1    preparing for your testimony today?
2        A. Not in preparation, no.
3        Q. How about regarding your expert work in
4    this case?
5        MR. ABNEY: Object to form.
6    BY MS. DAVIS:
7        Q. In other words, have you -- have you spoken
8    with any of the other experts retained by the
9    plaintiffs in this case?
10       A. No.
11       Q. And --
12       A. About this case, I'm sorry. Because I -- I
13   do know one of the experts. But not about this
14   case.
15       Q. So which of the plaintiffs' experts do you
16   know?
17       A. Not the plaintiff experts.
18       Q. Okay. Who do you know?
19       A. Dr. Chuck Eby.
20       Q. So what you're saying is that you know
21   Dr. Chuck Eby, but you have not spoken to him
22   regarding this case?
23       A. Correct. Yes.
24       Q. Okay. So do you know any of the other
25   experts retained by the plaintiffs?

Page 22

1      A.  No.
2      Q.  Okay.
3      A.  Can I clarify that statement?  I don't know
4   the list of them, but the ones I have seen, no.
5      Q.  In preparing for your testimony today, and
6   by that I mean preparing your opinions, preparing
7   your report or preparing for the deposition today,
8   have you spoken with anyone at the U.S. Food and
9   Drug Administration?
10      A.  No.
11      Q.  So in preparing for your testimony today,
12   in other words, in preparing your report and in
13   preparing for your deposition today, have you
14   spoken with or interviewed anyone other than
15   counsel for plaintiffs?
16      A.  No.
17         MR. ABNEY:  Object to form.
18         Slow down.
19   BY MS. DAVIS:
20      Q.  In looking at what we marked as Exhibit 1,
21   which is your expert report, Mr. Gosselin --
22   Gosselin, excuse me -- I'm sure you're aware that
23   there are a number of articles cited in your expert
24   report; correct?
25      A.  Yes.

Page 23

1      Q.  And how did you obtain the articles and
2   other materials that are cited to in your expert
3   report?
4      A.  How did I obtain them?  I did a PubMed
5   search and printed them out at work.
6      Q.  So did you perform any systematic review of
7   the medical literature regarding the topics covered
8   in your report?
9         MR. ABNEY:  Object to form.
10         THE WITNESS:  I'm not sure what you mean by
11   "systematic review."
12   BY MS. DAVIS:
13      Q.  Why don't you describe for me in a little
14   more detail how you obtained the articles that are
15   cited in your expert report.
16      A.  Okay.  So when I write papers, my
17   background is to get literature that's currently in
18   the field or in the area.  So these papers, the
19   majority of them were not collected for the purpose
20   of the deposition, but were in my possession prior
21   to writing the expert report because I've published
22   articles in the area -- in the field in the past.
23      Q.  So it sounds like what you're saying is
24   that the articles that you cite in your expert
25   report were already in your possession?

Page 24

1      A.  Yes.
2      Q.  And did you perform any comprehensive
3   review of the medical literature regarding the
4   topics covered in your report to ensure that you
5   had captured all of the available articles and
6   scientific literature on the topics that you cover
7   in your report?
8      A.  Related to the technical aspects of
9   measuring DOACs, I would say the majority of
10   literature that I have is from reputable journals.
11   I may not have obtained articles from lesser-known
12   journals or specific journals from countries I may
13   not have access to.
14      Q.  So as I understand your answer, you believe
15   that your report references the majority of
16   articles from repute -- reputable journals
17   concerning the technical aspects of laboratory
18   testing regarding the topics that you address in
19   your report?
20      A.  In my opinion, yes.
21      Q.  So my question was a little bit different.
22         So my question was, did you perform any
23   comprehensive systematic review of the medical
24   literature to ensure that you had gathered all such
25   articles?

Page 25

1      A.  At what point in time are you asking?
2      Q.  Before you signed this expert report on
3   October 11th, 2016.
4      A.  I believe I went back and relooked at the
5   literature, reread the papers, relooked at PubMed
6   for searching to get up-to-date articles.  But I
7   probably did not look back beyond 2010.
8      Q.  And why did you not look back beyond 2010?
9      A.  Because they were already in my possession.
10      Q.  And when you performed a search on PubMed,
11   how did you perform that search?  And -- and I
12   don't mean -- I mean like what search terms did you
13   use?
14      A.  "Rivaroxaban."
15      Q.  And -- and that was your only search term?
16      A.  I believe so.
17      Q.  Did you keep any records of your review of
18   that PubMed search, such as the PubMed search
19   itself or, you know, a list of any articles that
20   you looked at, or anything like that?
21      A.  No.
22      Q.  Would there be any way for me to go back
23   and recreate exactly what you looked at when you
24   did that PubMed search and searched for
25   rivaroxaban?

7 (Pages 22 to 25)

Page 26

1    A. Now you're asking me if I can answer what
2  you would be able to create?  I can't answer that.
3  I don't know what you'd be able to do.
4    Q. Would you be able to go back and recreate
5  that exact search and know that you obtained the
6  exact same articles that you obtained when you
7  actually did the search to prepare your report?
8    A. I think I would be able to capture the same
9  list, if not more, because of the time that has
10  elapsed.  You can't -- I believe in PubMed you can
11  change your search dates.  So it would be fairly
12  easy to capture.  But it's a very lengthy list.
13    Q. And then when you -- when -- tell me what
14  you did after you did that search and obtained that
15  list from PubMed.
16    A. I --
17    Q. In other words, can you describe the
18  process that you went through?
19    A. Mm-hm.  So when you do a PubMed search, and
20  depending on the keywords you pick, you get a list
21  of 20 per page, and it lists how many total
22  citations, the number of pages.  I would look at
23  the titles, I would look at the authors, and I
24  would look at the journal.  Because I'm not
25  interested in clinical applications of rivaroxaban.

Page 27

1  More the laboratory testing and measurements of
2  rivaroxaban.
3    Q. And in that vein, could you describe for me
4  the criteria that you used in deciding what
5  articles you would look at further?
6    A. It would be verbiage in the title.  So if I
7  saw keywords like "HPLC" or "PTs" or "prothrombin
8  times" or something that was lab related, then that
9  would be a article I would be interested in
10  reviewing.
11    Q. Did you have any set list of terms or
12  anything that you were looking for?  Or really just
13  looking for articles relating to laboratory
14  testing?
15    A. More the latter than the former.  I didn't
16  have, really, terms.  There were things that I
17  looked for specifically, but if you were to ask me
18  what the list was, I -- I don't recollect.
19    Q. It -- it sounds like you were looking to
20  narrow your focus to laboratory testing as opposed
21  to clinical application.
22    A. Absolutely.
23    Q. And regarding your opinions in this case,
24  are you relying on anything in addition to the
25  articles for which references are provided in your

Page 28

1  report?
2    A. Yes.
3    Q. Okay.  So regarding your opinions in this
4  case, are you relying on any medical literature, in
5  addition to the articles for which references are
6  provided in your report?
7    A. Outside of what I cited, is that what
8  you're asking?
9    Q. Correct.
10    A. Okay.
11    Q. So -- and let me just ask it again.
12    A. Okay.
13    Q. So -- so really what I want to know,
14  Mr. Gosselin, is, is there any medical literature,
15  published medical literature or unpublished
16  documents that you might have access to that you're
17  relying on to support the opinions that you offer
18  in your expert report, but to which you do not
19  provide references in your expert report?
20    A. Not medical literature, but my own personal
21  experience.
22    Q. So you are relying on your personal
23  experience, of course.
24    A. Yes.
25    Q. But you're not relying on any additional

Page 29

1  medical literature or documents for which
2  references are not provided in your report?
3    A. I believe so, yes.
4    Q. That's correct?
5    A. I believe so, yes.
6    Q. In other words, as -- and I just want to
7  make sure I understand your answer.
8       As you sit here today, you believe that
9  that's correct?
10    A. What I'm trying to answer is, I may not
11  cite every reference I read.  But that does not
12  mean I didn't read them.  And I'm citing references
13  that deal with a technical component of rivaroxaban
14  measurements.
15       Have I read articles that deal with
16  clinical rivaroxaban studies?  The answer is yes.
17  But they're not cited in my paper.  So I'm a little
18  perplexed about the answer you're trying to achieve
19  without making it look --
20    Q. So I'm just trying to find out what you're
21  relying on for your opinions.
22       So it sounds like that you -- that -- let
23  me ask you this:  In forming your opinions in this
24  case, is there literature that you considered that
25  is not cited in your report?

Page 30

1      MR. ABNEY: Object to form.
2      THE WITNESS: I would say that, again, that
3  for the technical component, the answer is no.
4  There is no other literature. There may be
5  presentations at meetings, but nothing in the
6  written form.
7  BY MS. DAVIS:
8      Q. So other than your personal experience, as
9  you sit here today, your belief and intention is
10  that the articles that you're relying on for your
11  opinions in this case, you cited them in your
12  report and provided references?
13     A. Yes.
14     Q. Okay. Now, if you'll turn to page 2
15  through 5 of your report.
16     Right before this list starts on page 2 --
17     A. Yes.
18     Q. -- do you see where you wrote, "I have
19  several peer-review publications about DOACs and
20  their effect on laboratory testing"?
21     A. Yes.
22     Q. And then you provided a list of articles.
23  And in this list on pages 2 through 5, did you
24  include all of your publications concerning DOACs
25  and their effect on laboratory testing?

Page 31

1      A. Believe so, yes.
2      Q. Would you agree, Mr. Gosselin, that there
3  are articles in the published peer-reviewed medical
4  literature that relate to laboratory testing
5  concerning Xarelto that are not cited to in your
6  report?
7      A. Yes.
8      Q. And would you agree that in that literature
9  that some of that literature contains information
10  that differs from what you provided in your summary
11  points in your report?
12     MR. ABNEY: Object to form.
13     THE WITNESS: My opinion is that this is an
14  evolving area. So early publications may differ
15  from information that we gathered in subsequent
16  years. Hence the recommendations have even
17  changed.
18     So yes.
19     (DEFENDANTS' EXHIBIT 2 WAS MARKED.)
20  BY MS. DAVIS:
21     Q. Mr. Gosselin, I'm going to hand you what I
22  marked as Exhibit 2 to your deposition. And you'll
23  see that this is a copy of the formal notice of
24  deposition asking you to appear here today.
25     Do you agree?

Page 32

1      A. Without reading the whole thing, yes.
2      Q. And if you turn to the third page of
3  Exhibit 2, do you see that that page is titled,
4  "Defendant's Exhibit A, Subpoena Duces Tecum"?
5      A. Yes.
6      Q. And have you gone over the categories of
7  requested documents in this notice?
8      A. Have I gone -- excuse me. I have to get a
9  little lozenge here.
10     Q. Sure. Take your time.
11     A. By "categories," I assume you mean by
12  number 1 through 8? Or 15, I'm sorry.
13     Q. Yes.
14     So my question is, have you read through
15  this notice, these categories of --
16     A. Brief --
17     Q. -- requested documents?
18     A. Briefly, yes.
19     Q. And did you bring anything to the
20  deposition responsive to this document request
21  contained in Exhibit A to the notice of deposition?
22     A. No, I did not.
23     Q. Do you have in your possession anything
24  responsive to this notice that you did not bring?
25     A. No, I did not. Or do not.

Page 33

1      Q. You do not?
2      A. I do not have in my possession. Sorry.
3      Q. Did counsel for plaintiffs provide you with
4  any materials, any facts or data on -- which you
5  used in any way at arriving at your opinions in
6  this case?
7      A. I don't believe so, no.
8      Q. So just to make sure that we're on the same
9  page, counsel for plaintiffs -- did counsel for
10  plaintiffs provide you with any -- any literature?
11     A. Yes.
12     Q. Okay. Did -- did counsel for plaintiffs
13  provide you with any literature that is not -- for
14  which citations are not provided in your expert
15  report?
16     A. Yes.
17     MS. DAVIS: We would ask that that
18  literature be produced.
19  BY MS. DAVIS:
20     Q. Can you describe for me or provide
21  citations to that literature?
22     A. I suppose I can. Not readily. I would
23  have to go and -- and ferret out some e-mails
24  and -- because these -- most of the, if not all, of
25  the shared manuscripts or summary reports were more

Page 34

1  clinically oriented, which is not my area of
2  expertise.
3      Q. So just to -- I just want to make sure that
4  I'm understanding you, we're on the same page.
5      There was some literature, a body of
6  literature that was provided to you by counsel for
7  plaintiffs?
8      A. I was asked to look at some papers or
9  abstracts of articles, yes.
10     Q. And you reviewed those?
11     A. To the extent that I could. Because some
12  of the abstracts were not available in paper form
13  to me through PubMed.
14     And as far as the summary reports for the
15  FDA on Xarelto, I had that in my possession
16  already.
17     I'm trying to recollect the documents.
18  It's a year and a half, almost, of e-mail
19  communications. So ...
20     Q. Did counsel for plaintiffs provide you with
21  any literature or documents other than this body of
22  documents that we've just been discussing?
23     A. They -- Mr. Abney may have provided me
24  articles I may -- already in my possession.
25     Q. But you'd agree that counsel for plaintiffs

Page 35

1  did provide you with some medical literature or
2  abstracts that were not in your possession?
3      A. Yes.
4      Q. And to the extent that you were able, you
5  reviewed that literature; and to the extent that
6  you're relying on any medical literature, as we've
7  already discussed, it's cited in your report?
8      A. The report contains laboratory-based data
9  that I felt was germane in monitoring or measuring
10  Xarelto.
11     Q. And that's what I mean by "relying on."
12     A. Mm-hm.
13     Q. In other words, if there's medical
14  literature that you intend to rely on, that you
15  intend to discuss in support of your opinions, then
16  that medical literature is contained in your
17  report?
18     A. Yes.
19     Q. And it's cited to in your report? In other
20  words, you have provided us with references to that
21  literature?
22     A. Yes.
23     Q. But there is some additional literature
24  that you reviewed that -- that was provided to you
25  by counsel for plaintiffs that's not cited to in

Page 36

1  your report?
2      A. Yes.
3      MS. DAVIS: And that's the literature that
4  we would ask to be produced.
5  BY MS. DAVIS:
6      Q. Other than this literature that we've been
7  talking about, did counsel for plaintiffs provide
8  you with any other facts or data concerning your
9  testimony in this case or that relate to your
10  testimony in this case?
11     A. Outside of what we already discussed?
12     Q. Yes.
13     A. No.
14     Q. Did counsel for plaintiffs provide you with
15  any assumptions that you were to use in forming
16  your opinions?
17     A. Did they tell me what to say?
18     Q. No. That's not -- that's not what I meant.
19     A. Okay.
20     Q. Sometimes with expert witnesses, counsel
21  will provide certain assumptions that they are to
22  use as a base or a groundwork for their opinions,
23  that they are to form an opinion with a certain
24  assumption as the base or the groundwork underlying
25  the opinion. Does that make sense?

Page 37

1      So what I'm asking you is, did counsel for
2  plaintiffs ask you to make any assumptions in
3  forming your opinions?
4      A. No. These are my opinions based on the
5  literature to date and what I published in my own
6  personal experience.
7      Q. And I don't think this is the case, but
8  have you reviewed any medical or laboratory records
9  or test results regarding any person who is a
10  plaintiff in a case involving Xarelto?
11     A. I don't know who the plaintiffs are, so I
12  can't answer truthfully about medical records,
13  because I do have access to medical records in our
14  institution.
15     Q. Okay. So I -- I think I understand what
16  you're saying. You could have seen records on a
17  person at UC Davis who was a patient there, who was
18  a plaintiff, and you wouldn't know they were a
19  plaintiff?
20     A. Correct, yes.
21     Q. That's what you meant by your answer?
22     A. Yes.
23     Q. So have counsel for plaintiffs in this
24  litigation provided you with any medical or
25  laboratory or test records regarding a person who

1  they are representing as a plaintiff in this
2  litigation for you to review?
3      A. No.
4      (DEFENDANTS' EXHIBIT 3 WAS MARKED.)
5  BY MS. DAVIS:
6      Q. Mr. Gosselin, I'm going to hand you what I
7  marked as Exhibit 3 to your deposition, which was
8  attached as Exhibit B to your report.
9      And do you agree that what was attached to
10  your -- excuse me. Let me rephrase that.
11     Do you agree that what we've marked as
12  Exhibit 3 was attached as Appendix B to your expert
13  report and is a copy of your CV?
14     A. It appears -- excuse me. It appears to be
15  so, yes.
16     Q. And is this CV current?
17     A. It appears to be, yes.
18     Q. And do you believe it to contain complete
19  and accurate information on the topics listed in
20  your CV, such as your -- the -- and what I mean is
21  by the licensure, certification, training and
22  experience, and then your awards, memberships,
23  committees, reviews, et cetera?
24     A. Yes.
25     Q. Now, in looking at your CV, I noticed that

1  you received training -- under "Training" you had
2  listed United States Navy, Navy Regional Medical
3  Center in San Diego from 1976 to 1978; correct?
4      A. Yes.
5      Q. And could you describe for us the training
6  that you received from the Navy?
7      A. Yes.
8      It was a year-long laboratory medicine, I
9  believe that's how we phrased it, training school
10  at Balboa Hospital.
11     Q. I'm -- I'm sorry, I just didn't quite catch
12  what you said. If you --
13     A. Oh, it's --
14     Q. If you could start over.
15     A. It's a year-long program --
16     Q. Okay.
17     A. -- for the U.S. Navy for -- I don't quite
18  recall what the -- the title was, but it was a
19  laboratory technologist and medical technology
20  program that lasted approximately one year. And it
21  was rotating between the classroom and the
22  laboratory.
23     Q. And what topics or aspects of laboratory
24  was covered in that training course?
25     A. So it would be topics covered in most

1  laboratory training class. That would include
2  hematology and microbiology, immunology, chemistry,
3  urinalysis, blood-banking.
4      Q. And are those sorts of all the different
5  areas that a, for example, a -- a hospital
6  laboratory that's offering full services would
7  provide?
8      A. Yes.
9      Q. So in this year-long rotation, you had time
10  periods that you spent on each one of those?
11     A. Yes.
12     Q. And were you in the Navy or a civilian
13  employee?
14     A. No, I -- I was in the Navy.
15     Q. I just didn't know.
16     A. For six years.
17     Q. Okay. And what were the years that you
18  were in the Navy?
19     A. 1976 to 1982.
20     Q. And how did you come to join the Navy?
21     A. The financial resources were not available
22  to me to go to college out of high school. And so
23  this seemed like the best alternative.
24     Q. So you volunteered?
25     A. Yes, ma'am. There was no draft.

1      Q. Right. Okay.
2      And did you join the Navy just out of high
3  school?
4      A. No.
5      Q. Okay. And so how old were you when you
6  joined the Navy?
7      A. Twenty.
8      Q. And what was the level of education that
9  you had completed prior to joining the Navy?
10     A. High school.
11     Q. And do you have any additional formal
12  education that's not listed in your CV?
13     A. Not that resulted in a degree or
14  certification. I believe that we were given an
15  A.A. through George Washington University for the
16  training in the Navy. But I don't recollect ever
17  receiving a A.A. certificate. But I did take
18  classes at Mesa Junior College, UC San Diego, UC
19  Davis and Sac State. But never obtained a degree.
20     Q. Now, as far as the -- the community
21  colleges that you mentioned, was that -- was that
22  training like a part of or connected to what you
23  did in the Navy, or was that separate?
24     A. Separate.
25     Q. Separate. Okay.

1    And did you do that before or after you
2  were in the Navy?
3    A.  The Mesa and UC San Diego were during the
4  Navy.  And Sac State and UC Davis were after I was
5  discharged.  Honorably discharged.
6    Q.  And what -- what was your area of -- of
7  study at the Mesa and UC San Diego that you did
8  while you were in the Navy?
9    A.  It was basic undergraduate classes.
10    Q.  And -- and I believe you said you didn't
11  obtain a degree from either one of those; right?
12    A.  Yes.
13    Q.  And then how about the -- and I'm sorry, I
14  didn't catch all the names, but the schools that
15  you said you went to after the Navy, what was your
16  area of study there?
17    A.  Again, most of it was basic undergraduate
18  classes.
19    Q.  Without completing a degree; right?
20    A.  Yes.
21    Q.  Okay.  And then I think you said that you
22  believed that the -- the training that you received
23  in the Navy qualified you for an A.A. degree from
24  George Washington University.  Did I understand
25  that right?

1    A.  That's what I said.
2    Q.  Okay.
3    A.  But I never got a piece of paper that
4  indicated the -- the same.
5    Q.  Okay.
6    A.  But there was an A.A. associated with that.
7    Q.  And what was your understanding of what
8  "A.A." stood for?  Sorry.  I'm just not familiar.
9    A.  Oh, a two-year degree from a community
10  college.
11    Q.  Okay.  And -- and then according -- oh, let
12  me go back and ask you, what did -- what were you
13  doing between the time you graduated from high
14  school and you went in the Navy?
15    A.  Specifically?
16    Q.  Were you employed?
17    A.  I believe so.
18    Q.  And do you recall where you were employed?
19    A.  Could have been a gas station.
20    Q.  Just trying to figure things out.
21    A.  I always knew the direction I wanted to go
22  in.  It was the opportunity and the fact that my
23  family allegedly made too much money to get a
24  grant.  So I could not afford to go to school the
25  routine way.  Yes.

1    Q.  Sort of caught in the middle?
2    A.  I'm not sure that was the middle.  I was
3  just caught.
4    Q.  Okay.  Now, in your -- on your CV you have
5  listed as United States Navy, general laboratory
6  technologist from 1978 to 1979.  And it looks like
7  that would have been the first year after you
8  completed the training?
9    A.  Yes.
10    Q.  And I guess one thing I was a little
11  confused about.  I think you mentioned that the
12  training in the Navy was a year-long program.  And
13  I guess I had originally thought it was two years,
14  looking -- from '76 to '78.  I'm just trying to
15  understand what you did in that program.
16    Could you clear that up for me?
17    A.  Okay.  So the Navy starts off first with
18  boot camp, and then I went to field medical
19  services school, which is with the Marine Corps,
20  because the Marine Corps gets their hospital people
21  from the Navy.
22    So after Marine field -- field medical
23  service school, then I was enrolled into the lab
24  program.  And I believe it went from December to
25  the following January.  So it was roughly a year.

1    Q.  So I understand now how that's two years.
2  But one year was like specifically devoted to the
3  lab program?
4    A.  Yes.
5    Q.  Okay.  And so when you finished that, you
6  became a general laboratory technologist in the
7  Navy?
8    A.  Yes.
9    Q.  And could you describe for me what your
10  duties were in that position?
11    A.  After graduation?
12    Q.  Yes.  When -- when you were a general
13  laboratory technologist, as listed in your CV, from
14  1978 to 1979.
15    A.  Okay.  So after graduation my duty station
16  was Port Hueneme, which is on the coast south of
17  Santa Barbara, where it was a small dispensary
18  where we performed microbiology, blood-banking,
19  chemistry and hematology testing.
20    Q.  And what were your duties or
21  responsibilities regarding the conduct of that
22  testing?
23    A.  Performing the tests.
24    Q.  So you would receive the samples and put
25  the samples through whatever analysis was needed to

Page 46

1  obtain the results that had been ordered by the
2  physician?
3      A. Yes, in addition to ancillary services as
4  maintenance of the equipment, running
5  quality-control materials. So all the aspects
6  related to running a medical sample, yes.
7      Q. Or making sure the machinery was giving
8  accurate results and was maintained and all that
9  sort of thing?
10     A. Yes.
11     Q. Okay. And then could you similarly
12 describe for me what your duties and
13 responsibilities were as a specialist
14 hematology/hemostasis from 1979 to 1982 as listed
15 in your CV?
16     A. Yes.
17        So Port Hueneme decided to change their
18 designation from a hospital to a dispensary. So I
19 was given the opportunity to relocate at my choice.
20 I wanted to go back to San Diego. And I was
21 stationed back at Balboa Hospital or the Navy
22 Regional Medical Center, specifically in the
23 hematology section.
24        And so my duties were there strictly
25 hematology, emphasis to the -- the hematology

Page 47

1  testing such as CBCs, differentials, coagulation
2  testing and urinalysis.
3      Q. And were your duties and responsibilities
4  basically the same as what you've already described
5  for me, they were just in the one -- in that more
6  narrow area, as opposed to also including chemistry
7  and other laboratory sections?
8      A. Similar, but a little bit more expanded as
9  we were also teaching future laboratory
10 technologists. So I had teaching responsibilities
11 at the technical level on the bench.
12     Q. So at that point you were involved in
13 teaching folks sort of the -- in the same manner
14 that you had been taught regarding laboratory
15 testing?
16     A. In the laboratory, yes. Not in the
17 classroom.
18     Q. So it was on-the-job training?
19     A. Yes.
20     Q. Okay. And I was just curious, did you --
21 to become a specialist in hematology/hemostasis at
22 the Naval Regional Medical Center that we've been
23 talking about in '79 to '82, did you have to take
24 any sort of test or get any additional license or
25 anything like that?

Page 48

1      A. In the Navy?
2      Q. Yes.
3      A. No.
4      Q. And when were you discharged from the Navy?
5      A. I don't remember the date, but it was
6  1970 -- no, 1982.
7      Q. So that corresponded with your shifting
8  from the Naval Regional Medical Center to Mercy
9  General Hospital?
10     A. Yes.
11     Q. And I know you said you were honorably
12 discharged.
13     A. Yes.
14     Q. But what was your reason for leaving the
15 Navy? Your six years was up? I mean --
16     A. It was not the career for me.
17        Can I expand why I went into the Navy?
18        I was promised something that was not
19 delivered. I was promised that if I were to do
20 class X, class Y and class C, that they would send
21 me to medical school. That program was
22 discontinued two years before I signed my paper.
23 So it was a classic misrepresentation by the
24 recruiter.
25     Q. And fair to say something you're still not

Page 49

1  happy about?
2      A. No, because I am where I am today because
3  of my military service. So it could have been
4  better, but I'm not bitter.
5        MS. DAVIS: We've been going for about an
6  hour. Would it be a good time to take a little
7  break?
8        MR. ABNEY: Sure.
9        MS. DAVIS: Sounds like people are thirsty.
10       THE VIDEOGRAPHER: Going off the record.
11 The time is 7:22 a.m.
12       (Recess taken.)
13       THE VIDEOGRAPHER: We are back on the
14 record. The time is 7:35 a.m.
15 BY MS. DAVIS:
16     Q. Mr. Gosselin, we just took a short break.
17 Are you ready to proceed?
18     A. Yes, ma'am.
19     Q. When I was asking you how it was that you
20 came to be involved as an expert witness for the
21 plaintiffs in this case, I believe you made some
22 mention of a referral from a colleague? Do you
23 recall that?
24     A. Yes.
25     Q. And could you tell me what you meant by

Page 50

1  that?
2      A. I don't recollect if I was told by
3  Mr. Abney or by the colleague that they were
4  sending this person my way.
5      Q. And who was the colleague?
6      A. Dr. Dorothy Adcock.
7      Q. And you said you can't recall if you were
8  told that by Dr. Adcock or -- or by Mr. Abney?
9      A. Yes.
10     Q. Okay. And just to save some time, I see
11 that after you left the Navy, you went to work at
12 Mercy General Hospital. And again, that was in the
13 mid to late 1980s. And you were again a general
14 laboratory technologist?
15     A. Not immediately. I was there as a
16 laboratory assistant. And then I was able to
17 challenge the California State boards for at that
18 time was medical technologist. And upon passing
19 the boards, I became a general laboratory medical
20 technician. I think at that time it was medical
21 technologist.
22     Q. And so what did you mean when you just said
23 something about challenging the California State
24 boards?
25     A. The typical process for being a medical

Page 51

1  technologist at the time was four years of college
2  and one-year internship program. Because of my
3  training and experience in the Navy they accepted,
4  and I had to have some college classes, I met the
5  criteria for challenging the boards, which meant
6  taking the State licensure exam and passing without
7  having a degree.
8      Q. So just to make sure I understand, I think
9  what you're saying is that because you didn't have
10 the four-year degree in medical technology and the
11 one year of internship, that the California State
12 boards accepted your training and experience in the
13 Navy, along with the classes that you had taken
14 that you told me about at the community colleges,
15 and allowed you to sit for the board, the same
16 boards that someone with a medical technology
17 degree would take?
18     A. It's --
19     Q. Is that --
20     A. It's not a medical technology degree. You
21 can have a degree in microbiology, chemistry,
22 biochemistry. But you applied for a program. Then
23 you did a year of internship.
24         So that year of internship qualifies you
25 for the -- the boards or licensure.

Page 52

1          So just having a four-year degree does not
2  qualify you to take the boards. It's -- the degree
3  is -- the typical road is the degree plus the
4  internship. Then you're eligible to take the
5  boards.
6          And yes, because of my experience and
7  training in the Navy and supplemental classes, I
8  became eligible to challenge the boards.
9      Q. And when you say "challenge the boards," do
10 you mean take the boards? I'm not really
11 understanding what you mean by "challenging."
12     A. Yes. Because I was told I was going to
13 fail by the board -- by the folks in Oakland who
14 give out the licensures because they've had people
15 with similar backgrounds apparently not pass. It
16 was a very difficult exam.
17     Q. But -- and the exam that you took to obtain
18 your license as a clinical laboratory scientist was
19 the same exam that, for example, someone would take
20 with a four-year college degree and the one year of
21 experience?
22     A. At that time it was not called clinical
23 laboratory scientist.
24     Q. Yeah.
25     A. It was called a medical technologist. But

Page 53

1  yes, it was the same exam.
2      Q. And you passed?
3      A. Yes, ma'am.
4      Q. I bet you passed the first time.
5      A. Yes, ma'am.
6      Q. And so that gave you a license at that --
7  license at that time by the State of California as
8  a medical technologist?
9      A. Yes.
10     Q. And you obtained that license sometime
11 while were you employed at Mercy General Hospital?
12     A. Yes.
13     Q. And did you have to do anything else to
14 obtain that license that we haven't talked about?
15     A. Pay them the money. But no.
16     Q. A fee?
17     A. Yeah, a fee.
18     Q. And is that -- is that the same license you
19 have now? Does -- is it like basically the same
20 license, they just call it something else?
21     A. Yes. I did not have to take another exam,
22 but they changed terminology from "medical
23 technologist" to "clinical laboratory scientist."
24     Q. Are medical technologists in California,
25 are -- they have the same licensure you do, or

## Page 54

1  different?
2      A.  To work in California you must have a
3  California license at that time.  I believe that
4  it's evolved and changed, because there used to be
5  three states that required licensures.  It was
6  Florida, New York and California.
7      So in order to work in this state, because
8  of our own state regulations, you had to have a
9  state licensure.  I believe that has changed to
10  a -- more global national licensures, but I -- I
11  can't say for certain.
12      Q.  When you say that's changed, do you mean
13  that's changed as concerns medical technologists?
14      A.  Well, they're called clinical laboratory
15  scientists now.  And I believe the licensure is
16  under the American -- A -- A -- ASCP or something
17  along those lines.  American Society of Clinical
18  Pathology.
19      Q.  ASCP?
20      A.  I believe that is now national licensures,
21  but I'm not sure if California has its own state
22  exam anymore.  There used to be two exams during my
23  time of taking the exam, ASCP and the state
24  licensure.  I did not take the ASCP because they
25  don't recognize the experience.  You had to have

## Page 55

1  the minimum requirements.
2      Q.  So are you qualified to take the ASCP exam?
3      A.  I don't know.
4      Q.  And you've never asked them, is that what
5  you're saying?
6      A.  That's correct.
7      Q.  Is the license that you have now, listed on
8  your CV, is that the same license that you obtained
9  by taking this test back in the 1980s that we've
10  been talking about?
11      A.  Listed under licensure MTA32188, yes.
12      Q.  And is that the only license that you have?
13  Other than a driver's license, I mean, but the only
14  professional license that you have?
15      A.  Yes.
16      Q.  And what does that mean, "MTA" on there?
17      A.  I have no idea.
18      Q.  So when you started at Mercy General, you
19  were a laboratory assistant?
20      A.  Yes.
21      Q.  And so your duties and responsibilities as
22  a general laboratory technologist at Mercy General,
23  was that similar to what you had done in the Navy?
24      A.  Yes.
25      Q.  Are there any significant differences that

## Page 56

1  you would describe?
2      A.  The salary is a lot better.
3      But no, the duties are very similar.  If
4  not exact.
5      Q.  To what you had already told me about?
6      A.  Yes.
7      Q.  And would that also hold true for -- at the
8  University of California Davis, for your positions
9  there?
10      A.  My position today?  I'm sorry, I -- I
11  didn't hear the last word.
12      Q.  Oh, for your positions there.  I mean, have
13  there -- are -- have they generally been -- would
14  they meet the same job descriptions as what you've
15  previously described to me?
16      A.  A little bit more robust because I had more
17  responsibilities at UC Davis.
18      Q.  And what additional responsibilities did
19  you have?
20      A.  My initial employment with UC Davis was as
21  a supervisor in the hematology section.  I was
22  hired to also change their coagulation practice.
23  Because when I was there -- when I first was
24  employed there, they were doing very little as far
25  as coag testing.  Routine testing, yes, but not

## Page 57

1  more robust, esoteric testing.  So that was -- part
2  of my responsibilities was to develop a more robust
3  coagulation testing center.
4      Q.  And when you -- you say "robust," do you
5  mean like add additional tests for other things
6  that they weren't testing for?
7      A.  Yes, ma'am.
8      Q.  And as -- as far as being a supervisor, you
9  were supervising others --
10      A.  Yes, ma'am.
11      Q.  -- as their superior?
12      A.  Yes, ma'am.
13      Q.  In your current position as a -- is a
14  senior specialist in hematology and hemostasis at
15  UC Davis?
16      A.  It's more hemostasis.  I don't do any
17  hematology anymore.
18      Q.  And that's coagulation testing?
19      A.  Yes, ma'am.
20      Q.  And how would you describe your
21  responsibilities at the -- at UC Davis for the
22  coag -- coag -- coagulation testing currently?
23      A.  My current duties?
24      Q.  Yes.
25      A.  I am a department of one.  I do all the

1  what I would refer to as esoteric testing.  So
2  workups for bleeding patients.  Workups for
3  thrombophilia patients.  Drug measurements.
4  Studies of platelet function.  Research.  New test
5  development.  I have oversight over the section.
6  So I have the responsibilities for quality control.
7  Quality assurance.  I do the interpretations for
8  the pathologists to agree and review.  I teach at
9  the bench level our residents, our pathology
10  residents who are medical physicians.  I teach at
11  the bench level the clinical laboratory scientist
12  students.  I provide consultant services to our
13  clinicians outside the department of pathology,
14  which include general medicine, surgery, internal
15  medicine, hematology, oncology, pharmacy.
16      Q.  Are you finished?
17      A.  That's enough.
18      Q.  Okay.  When you say you teach at the bench
19  level, what do you mean by that?
20      A.  I don't have formal class instructions, but
21  the path residents spend a month with me.  So we'd
22  go over the testing methodologies.  We'd go over
23  writeups of the testing that we do on patients with
24  thrombosis or bleeding workups.  So it's at the
25  bench level.  It's not in a formalized classroom.

1  It's in my -- it's in my lab space.
2      Q.  And you are teaching them regarding the
3  intricacies of coagulation testing?
4      A.  Yes, ma'am.
5      Q.  From the laboratory perspective?
6      A.  Yes, ma'am.
7      Q.  And do you agree that the primary overall
8  role of a medical laboratory is to provide accurate
9  and timely laboratory test results?
10      A.  Yes, ma'am.
11      Q.  And that your area of professional
12  expertise is in the performance of laboratory tests
13  on -- on human samples?
14      MR. ABNEY:  Object to form.
15      THE WITNESS:  I would narrow that down to
16  performance of hemostasis-related tests and not
17  just all laboratory tests.  I would not limit it to
18  humans since I have tested different animal samples
19  as well.
20  BY MS. DAVIS:
21      Q.  So you would agree that your professional
22  area of expertise is in the performance of
23  laboratory tests regarding hemostasis in animals
24  and human samples?
25      A.  Yes.

1      Q.  Just one other question about this
2  licensure that -- I don't really understand how
3  this works.
4      Since you're licensed by the State of
5  California, could you move and go to another state
6  and do the same things that you're doing?  Or would
7  you have to get another license?
8      MR. ABNEY:  Object to form.
9      THE WITNESS:  To my knowledge, I could move
10  to Colorado and work for the VA or the feds because
11  I don't think that's a requirement for licensure in
12  Colorado.
13      Could I go and work for Dr. Adcock in
14  Colorado?  And she has asked me to.  I don't know
15  the answer, but I do not think I'd be qualified to
16  work in Colorado.
17  BY MS. DAVIS:
18      Q.  Is there something special about Colorado,
19  or were you just --
20      A.  No.
21      Q.  -- using that as an example?
22      A.  Because the licensure is specific for
23  California.  And I don't know if any other states
24  accept that licensure to work in the same capacity,
25  as a laboratory technologist, clinical laboratory

1  scientist, to do work on human samples.
2      Q.  I was just trying to understand, because
3  every profession has its own ins and outs about all
4  this sort of stuff.
5      Does California require you to do like any
6  continuing education or anything to remain -- to
7  retain your license?
8      A.  Yes, ma'am.
9      Q.  Yes?
10      A.  Twelve hours a year.
11      Q.  Twelve hours a year.  Okay.
12      Now, in your CV you have that you have a
13  certification, this certification as a specialist
14  in clinical and applied hemostasis and thrombosis
15  from the International Society of Clinical and
16  Applied Hemostasis, Thrombosis and Vascular
17  Medicine.  And I just wondered what you were
18  required to do to receive that certification.
19      A.  This was a -- an organization that started
20  up, and they were soliciting prospective people to
21  take the exam as sort of a further attestation
22  about expertise in the area.  This was the first
23  exam they ever gave.  I don't recall if they ever
24  gave any more.  I don't know if even the journal is
25  still viable.

Page 62

1    So at the time it was -- seemed like an
2    opportunity to add to my sort of proof that yeah, I
3    know what I'm doing in this area of technical and
4    applied, which is, again, laboratory-based medicine
5    in hemostasis.
6        Q. Did having that certification allow you to
7    do anything that you weren't already doing?
8        A. No.
9        Q. I saw that at the -- at UC Davis, you're on
10    the subcommittee of the pharmacy and therapeutics
11    committee on thrombosis and hemostasis from 2002 to
12    the present?
13        A. Yes.
14        Q. And what is the purpose or responsibility
15    of that subcommittee?
16        A. It consists of stakeholders in the area of
17    thrombosis workups. So the committee consists of
18    mostly physicians and pharmacists. I was asked to
19    be a participant. It's by invitation only. So I
20    represent the laboratory aspects of testing or
21    monitoring patients who are on therapy.
22        The committee also reviews and makes
23    changes to our protocols for dosing, whether it be
24    any anticoagulants, antithrombotics or fibrimodics
25    or any drugs related to hemostasis or may impact

Page 63

1    hemostasis, and those recommendations get forwarded
2    to the P and T committee, the pharmacy and
3    therapeutics committee for approval, or things
4    along those lines.
5        Q. What's your understanding of the role of
6    the pharmacy and therapeutics committee?
7        A. My understanding is they approve the
8    practices of the institution about how they do drug
9    monitoring, or drug anticoagulation practices or
10    protocols.
11        Q. Is -- is Xarelto routinely prescribed at UC
12    Davis, as far as you know?
13        MR. ABNEY: Object to form.
14        THE WITNESS: As far as I know, we have
15    patients on Xarelto.
16    BY MS. DAVIS:
17        Q. And is -- you would agree that it's
18    available for use for prescription by physicians at
19    the hospital where you work?
20        A. I don't know the clinical practice of
21    physicians or what makes them choose a drug for
22    anticoagulation. The only reason I know we have
23    patients on them is if I get a sample and it has a
24    medical record number that belongs to us and
25    requesting the drug level.

Page 64

1        Q. Would any of the committees that you listed
2    on your CV involve any work discussion or
3    responsibility concerning Xarelto?
4        A. I'm sorry, any -- any of the committees?
5        Q. Yes.
6        A. These here?
7        And one more time on the question.
8        Q. Yes.
9        Would any of the committees that you listed
10    on your CV, would any of those involve any work on
11    your -- on the -- your part or the committee's part
12    or a discussion or responsibility concerning
13    Xarelto?
14        MR. ABNEY: Object to form.
15        THE WITNESS: Well, certainly the part of
16    the subcommittee for the pharmacy and therapeutics
17    would be yes. The national patient safety goals, I
18    am guessing yes.
19        These other committees that are part of
20    organizations or planning committees for meetings,
21    do they directly refer to Xarelto? No.
22    BY MS. DAVIS:
23        Q. There's a section on your CV called
24    "Disclosures." It's on page 3. If you take a look
25    at that.

Page 65

1        A. Yes.
2        Q. Have any of the items listed there under
3    "Disclosures" on your CV, have any of those
4    concerned Xarelto?
5        A. Specifically? No.
6        Q. Have any concerned -- well, what about 2015
7    consultant/expert opinion plaintiffs' executive
8    committee MDL 2592?
9        A. I guess that would be this guy. Yeah,
10    sorry. I'm -- I'm looking up.
11        Q. It wasn't a trick question.
12        A. Oh, okay.
13        Q. But I just --
14        A. My apologies.
15        Q. That's okay.
16        A. Yes. I --
17        Q. So other than that one?
18        A. I was more looking at the -- as a
19    consultant for Instrumentation Laboratory, was
20    there ever a point of them asking the group about
21    measuring, at the time, Xarelto. Because I don't
22    think apixaban was available yet as a -- as a
23    possible thing they should be doing.
24        So I think there was -- that's what I'm
25    kind of wondering, if -- did we mention Xarelto at

Page 66

1    one of the advisory committees for Instrumentation
2    Laboratory? The answer is probably, yes.
3        Q. And that was for this consultant
4    Instrumentation Laboratories, the third -- the
5    third and fourth thing listed on there?
6        A. Yes.
7        Q. And is there anything specific regarding
8    Xarelto that you can recall regarding those
9    consultancies?
10       A. Not specific. It was at the time. Again,
11   the -- the frustration with laboratories not
12   having -- I want to say somewhat official capacity
13   to measure the drug. And so the -- this is an IVD
14   company, in vitro diagnostic company, that makes
15   kits and instrumentation. And so they were
16   reaching out to people in this North American
17   advisory committee, which consisted of
18   clinicians -- and I think I was the only CLS on the
19   board -- about our -- our opinion on whether they
20   should pursue testing for the DOACs in general.
21   Not Xarelto specifically.
22       Q. As concerns the consultant expert opinion
23   for MDL 2592, do you have any role there, other
24   than providing the report and testimony that we're
25   here today -- that we're about here today?

Page 67

1        A. Mr. Abney has asked me other questions
2    about technical issues related to coagulation
3    testing that were possibly not specific to my
4    expert report.
5        Q. And -- and I'm not asking you about
6    conversations that you've had with Mr. Abney. I
7    just --
8        A. Okay.
9        Q. -- was more asking you, globally, do you
10   have any other formal position or role with the
11   plaintiffs' executive committee, other than serving
12   as an expert witness?
13       A. No.
14          That was much easier to understand.
15       Q. Sorry.
16       A. Thank you.
17       Q. And for these various consultancies in your
18   CVs, you're compensated?
19       A. Yes.
20       Q. And you mentioned earlier that you had some
21   range of compensation. What are the ranges of --
22   how were you compensated for each of these?
23       A. So for -- and again, I'm going to recollect
24   because I don't keep track. For UC speaker
25   honorary, it ranged anywhere between 750 to $1500

Page 68

1    for a speaking engagement. The advisory committees
2    were along the same lines. Roughly a thousand
3    dollars.
4        I was asked to -- by a consulting group to
5    go in and help out. It wasn't really a disclosure
6    because it's a management group. And they paid me
7    150 an hour. I believe Sekasile pays me 150 an
8    hour and 75 for travel time.
9        So I -- I don't recollect roughly, but some
10   were higher than others. Some were fixed amounts
11   for a day. Usually the pharmaceutical companies
12   were much more generous than the IVD companies.
13       Q. Is that management group that you just
14   mentioned, is that the Nichols Management Group
15   that you mention in your report?
16       A. Yes, ma'am.
17       Q. And did that have anything to do with
18   Xarelto?
19       A. No.
20       Q. Mr. Gosselin, are there regulations and
21   requirements that must be met for a -- a new
22   laboratory test to be generally accepted and
23   recommended for use?
24       A. Absolutely.
25       Q. And are they rigorous?

Page 69

1        MR. ABNEY: Object to form.
2        THE WITNESS: I think that's a relative
3    term. And I think that they're not rigorous per
4    se. They may be challenging, to satisfy the
5    federal requirements for verifying performance or
6    validating a method.
7    BY MS. DAVIS:
8        Q. And actually that was something I was going
9    to ask you.
10       You'd agree that the guidelines and
11   requirements for a new laboratory test include
12   valid -- validation and verification?
13       A. Yes.
14       Q. And there are organization -- or -- sorry.
15       There are organizations such as the
16   Clinical Laboratory Improvement -- well, I guess
17   these are regulations, amendments.
18       A. Mm-hm.
19       Q. But there are -- are those regulations?
20       A. The CLIA are regulations, are federal
21   regulations.
22       Q. So you have the clinical laboratory
23   improvement amendments that are called the CLIA.
24   And those are regulations that would apply to the
25   development of a new laboratory test?

18 (Pages 66 to 69)

Page 70

1      A. The implementation of new laboratory tests,
2  yes.
3      Q. So they apply to the implementation of a
4  new laboratory test as well as to existing -- the
5  performance of existing testing?
6      A. They don't distinguish between a -- let's
7  say a commercially available kit and one that's not
8  commercially available. They have increased
9  requirements for something that's not commercially
10 available, what we consider a laboratory developed
11 test.
12      There is a minimum bar that you have to
13 achieve to verify the performance of a test, even
14 though it may be an FDA-approved method that's
15 commercially available and been used for years and
16 years and years. One still has to go through a
17 minimum -- I want to say five different components
18 that one has to perform.
19      Q. To satisfy CLIA?
20      A. CLIA, yes.
21      Q. And you'd agree that the College of
22 American Pathology also has requirements for the
23 performance and implementation of laboratory
24 testing?
25      A. Yes.

Page 71

1      Q. And the FDA also has authority to clear
2  laboratory tests?
3      A. I don't know what you mean by "the FDA has
4  authority to clear laboratory tests."
5      Q. Would you agree that the FDA does clear
6  laboratory tests?
7      A. If you mean, by the phrase "clear," that
8  they anoint or approve something for clinical use,
9  that is their role in the IVD section, yes.
10      Q. That's the role in the what section?
11      A. The IVD, in vitro diagnostics.
12      Q. And do you consider what you do to be in
13 the in vitro diagnostics section?
14      A. Absolutely. Yes.
15      Q. I just want to make sure --
16      A. Yeah.
17      Q. -- we're on the same page.
18      A. Yes.
19      Q. Okay. So would you agree with me that
20 development and implementation of a laboratory test
21 is a complicated, scientific process?
22      A. No, I would not agree with that.
23      Q. Why not?
24      A. I don't --
25      Q. Or what -- or explain for me why you

Page 72

1  disagree with that statement.
2      A. I don't think it's necessarily complicated.
3      Q. Okay.
4      A. It may again be challenging, but that's not
5  the same thing as complicated.
6      Most of our laboratory testing that we do
7  for hemostasis is actually quite simple, easy to
8  perform, because of the technology and the
9  equipment available to us. There are challenges,
10 though.
11      Q. So you would agree that the development or
12 implementation of a laboratory test is a
13 challenging scientific process?
14      A. It can be.
15      Q. Would you agree that it often is?
16      MR. ABNEY: Object to form.
17      THE WITNESS: No.
18 BY MS. DAVIS:
19      Q. Would you agree that the implementation of
20 a laboratory test has multiple requirements, CLIA
21 requirements, CAP requirements, requirements
22 regarding validation and verification that must be
23 complied with and met before such a test can be
24 implemented?
25      MR. ABNEY: Object to form.

Page 73

1      THE WITNESS: I would say that the federal
2  CLIA requirements give you -- gives one an idea
3  of what needs to be done. However, they do not
4  tell you quantity or make recommendations for
5  the -- how robust the test needs to be or how long
6  it needs to extend for.
7      So they don't make specific
8  recommendations. That's up to the director of the
9  laboratory. Or the section director.
10      So the testing doesn't necessarily have to
11 be lengthy or incorporate hundreds of samples. It
12 could be as few as 20 for doing accuracy studies.
13      But I think that it's not particularly
14 challenging to do the majority of the tests
15 required by the CLIA recommendations. Just the
16 accuracy component may be challenging. We are
17 comparing your method that you wish to evaluate
18 with a predicate or a similar method.
19 BY MS. DAVIS:
20      Q. And you'd agree that that portion of
21 complying with CLIA can be challenging, the
22 accuracy portion?
23      A. Yes.
24      Q. And you'd agree that that's important?
25      MR. ABNEY: Object to form.

Page 74

1      THE WITNESS:  Yes.
2   BY MS. DAVIS:
3      Q.  Do you agree that laboratory testing has
4   changed or advanced while you've been involved in
5   it?
6      A.  Yes.
7      Q.  And as -- as science and technology
8   advances with new and different therapies, drugs
9   and laboratory tests are developed, additional
10  drugs and laboratory tests are developed to treat
11  these -- treat diseases and promote the health of
12  patients; right?
13     MR. ABNEY:  Object to form.
14     THE WITNESS:  You're going to have to
15  repeat that one more time.
16  BY MS. DAVIS:
17     Q.  Sure.
18     I'm just going over the basic sort of
19  concept and see if you agree that as science and
20  technology advances, that new and different
21  therapies and drugs and laboratory tests are
22  developed to better treat diseases and to promote
23  the health of patients?
24     A.  I would agree with that general statement.
25     Q.  And that's an ever ongoing process?

Page 75

1      A.  Yes, it's very fluidic.
2      Q.  On page 2 of your CV, the last bullet under
3   "Committees," you had listed -- you see where it
4   says, "2016 Chair, International Council for
5   Standardization in Hematology Guideline for DOAC
6   Assessment"?
7      A.  Yes, I do.
8      Q.  Has that council published or issued any
9   guidelines regarding DOACs?
10     A.  No.
11     Q.  Have you ever served as an expert in
12  litigation before?
13     A.  No.
14     Q.  Have you ever testified in a court of law
15  concerning laboratory testing before?
16     A.  No.
17     Q.  Have you ever worked for a pharmaceutical
18  company?
19     MR. ABNEY:  Object to form.
20  BY MS. DAVIS:
21     Q.  Been employed by a pharmaceutical company?
22     A.  Other than serving as the noted
23  consultants, no.
24     Q.  And when you said "noted consultants," you
25  meant on your CV?

Page 76

1      A.  Or advisory --
2      Q.  The -- the --
3      A.  -- capacities.
4      Q.  The things listed on your CV?
5      A.  Yes, ma'am.
6      Q.  Okay.  If you want to -- I think you have
7   your report right there in front of you.
8      If you could turn to page 5 of your report,
9   please.
10     In that first sentence under "Background"
11  -- and -- and if at any time that we're going over
12  things in your report or, you know, in -- in
13  literature and I get ahead of you or you don't see
14  where I'm talking about, you know, just speak up
15  and tell me, and I'll point you in the right
16  direction.  I want to make sure we're on the same
17  page before you answer questions; okay?
18     A.  I am not shy.
19     Q.  Okay.  Good.  You got it.
20     A.  Okay.
21     Q.  So in that first sentence there, when you
22  talk about hemostasis, you talk about hemostasis
23  within the blood; right?
24     A.  Yes.
25     Q.  And you are involved in laboratory testing

Page 77

1   of blood samples for hemostasis parameters; right?
2      A.  Yes.
3      Q.  Are you aware that clotting factors are
4   also present in tissues?
5      A.  Yes.
6      Q.  So in the laboratory, the testing that you
7   do, you're not testing tissues for clotting
8   factors; are you?
9      A.  That is correct.  I am not testing tissues
10  for clotting factors.
11     However, one considers blood to be a
12  tissue.  So if you mean outside of blood, I am not
13  testing endothelial cells, let's say.
14     Q.  For clotting factors?
15     A.  For anything.
16     Q.  So you'd agree that laboratory testing of
17  blood samples doesn't test for the presence of
18  clotting factors in tissues outside of blood?
19     A.  I would caveat that statement by saying
20  that part of our interpretation of certain reports
21  is that these levels may be influenced by release
22  of proteins that are stored in tissues as part of
23  our interpretive report.
24     Q.  But you'd agree that the actual testing
25  that you do does not test for the presence of

Page 78

1 clotting factors in tissue outside of blood;
2 correct?
3    A. Yes.
4    Q. On the top of page 7 in your report, you
5 describe the role of the laboratory.
6       Do you see that?
7    A. Yes.
8    Q. And you say that the clinical laboratory
9 serves as an integral tool to assist clinicians;
10 correct?
11    A. Yes.
12    Q. And so the laboratory provides test results
13 and interpretations; correct?
14    A. Definitely test results. The
15 interpretations may be at the discretion of the
16 institution for certain tests. But certainly not
17 all tests. Unless one were to infer that a
18 reference range is an interpretation. And if you
19 exceed the reference range, it's considered
20 abnormal.
21    Q. So the -- the primary function of the
22 laboratory is to provide test results to
23 clinicians?
24    A. Yes.
25    Q. And then the clinicians use that

Page 79

1 information to make decisions under what you've
2 listed here under number 1 and number 2, in using
3 that information to identify those patients at risk
4 for bleeding and thrombosis, and to assure adequate
5 therapeutic intervention for either the bleeding or
6 thrombotic-risk patient; correct?
7    A. I can only assume what clinicians do with
8 the results. I don't actually know what they do
9 with the results.
10    Q. But that's your understanding?
11    A. That's my hope.
12    Q. And a little farther down in the report,
13 you state that -- excuse me. Now I'm doing it.
14       You're -- you're talking about the
15 coagulation screening test, PT and APTT. And you
16 would agree, based on what you've provided in your
17 report here on page 7, that PT only provides an
18 estimation of the in vitro or outside-of-the-body
19 clotting process; correct?
20    A. I would say that's a reasonable
21 description.
22    Q. And on the next couple pages of your
23 report, on pages 8 and 9, you have an overview of
24 what you title, "The Waterfall Cascade, a Guide for
25 Interpreting Hemostasis; correct?

Page 80

1    A. As far as interpreting hemostasis
2 laboratory results, yes.
3    Q. And on page 9 you have a depiction of what
4 you call a traditional waterfall cascade there on
5 the left in the green and blue colors? Well, I
6 guess yours isn't colored. But it's the one on the
7 lower left of page 9?
8    A. If you have the color copy, I would say
9 yes.
10    Q. And in the -- thank you.
11       So just so we're looking at the same thing,
12 you're now looking at the color copy of -- of
13 your -- of your report, and the -- the traditional
14 waterfall cascade is produced there in blue and
15 green colors; right?
16    A. Yes.
17    Q. And the -- the blue line of the Y, which is
18 the upper-right portion of the Y, corresponds most
19 closely to what is being measured by the PT test;
20 correct?
21    A. The upper portion of the Y as well as
22 the -- the tail.
23    Q. And when you look at the upper portion of
24 the Y in the diagram that you provided on page 9 of
25 your report, factor VII is listed right there;

Page 81

1 correct?
2    A. Yes.
3    Q. And so the PT test is in large part testing
4 the clotting activity of factor VII; right?
5    A. No.
6    Q. Do you agree that the PT test is testing
7 the clotting activity of factor VII?
8    A. In addition to factors 10, 5, 2, and to
9 some degree fibrinogen.
10    Q. Do you have any understanding as to the
11 role that factor VII can have in affecting PT test
12 results?
13    A. Do I have an understanding?
14    Q. Yes.
15    A. Yes.
16    Q. And you do agree that the presence of
17 factor VII can impact PT test results?
18    A. That's an interesting way to put it.
19       I think that the presence or absence
20 certainly influences that, as well as the presence
21 or absence of factors 10, 5, 2 and fibrinogen will
22 influence the PT result.
23    Q. And do you believe that all of those
24 factors influence the PT result equally, or do you
25 know?

Page 82

1    MR. ABNEY: Object to form.
2    THE WITNESS: That -- that is difficult to
3    answer generically because it's going to be
4    dependent on the reagents and the sensitivity of
5    each reagent. So they all differ.
6    (DEFENDANTS' EXHIBIT 4 WAS MARKED.)
7    BY MS. DAVIS:
8    Q. Mr. Gosselin, I'm going to hand you what
9    I've marked as Exhibit 4 to your deposition.
10    And do you recognize this as an article on
11    which you are an author that was published in 2015
12    entitled, "Direct Oral Anticoagulants," parens,
13    "DOACs," close parens, "in the Laboratory: 2015
14    Review"?
15    A. Yes.
16    Q. And directing your attention to the first
17    page of Exhibit 4 under the abstract portion.
18    Do you see the first sentence there that
19    reads, "Direct oral anticoagulant therapies,
20    including direct anti-Xa and thrombin inhibitors
21    have recently been introduced and may have
22    advantages over vitamin K antagonists such as
23    warfarin"?
24    Did I read that correctly?
25    A. Yes.

Page 83

1    Q. And do you agree that that sentence appears
2    in an article on which you were an author?
3    A. Yes.
4    Q. And do you agree with that sentence?
5    A. Yes.
6    Q. And if you would turn over to the next page
7    of this article. At the -- in the top left-hand
8    corner in the first paragraph, beginning on the
9    second line. So it's the second line of page -- of
10    this page.
11    A. Up here?
12    Q. Yes.
13    A. Okay.
14    Q. Do you see the sentence that begins, "In
15    clinical trials"?
16    A. Yes.
17    Q. So the sentence that I was going to ask you
18    about reads, quote, "In clinical trials, DOACs have
19    been shown to be at least as effective as warfarin
20    but with a reduced incidence of intracranial
21    hemorrhage."
22    Did I read that correctly?
23    A. Yes.
24    Q. And you'd agree that that sentence appears
25    in an article in the medical literature that you

Page 84

1    authored?
2    A. Yes.
3    Q. And you agree with that sentence?
4    A. We cite references. I don't have the
5    expertise to either agree or disagree. We're
6    citing mere references that publish data that make
7    these claims. I'm not a clinician.
8    Q. Do you have any reason to disagree with
9    that sentence?
10    A. Again, it's outside my expertise. I don't
11    necessarily -- I don't monitor our intracranial
12    hemorrhages. I don't look at the -- the data to
13    compare the different studies looking at ICH.
14    So again, it's outside of my expertise. I
15    don't have an opinion one way or the other.
16    Q. When -- excuse me. When this article that
17    we marked as Exhibit 4 was published in the medical
18    literature in Thrombosis Research with your name as
19    an author, you would have reviewed this article
20    before it was published; correct?
21    A. Yes.
22    MR. ABNEY: Object to form.
23    BY MS. DAVIS:
24    Q. And therefore, you are aware that -- that
25    this sentence that I just read, that "In clinical

Page 85

1    trials, DOACs have been shown to be at least as
2    effective as warfarin but with a reduced incidence
3    of intracranial hemorrhage," citing references, you
4    were aware that that sentence was being published
5    in an article in the medical literature under your
6    name; correct?
7    MR. ABNEY: Asked and answered.
8    THE WITNESS: I'm sorry?
9    MR. ABNEY: Object to form.
10    THE WITNESS: Yes.
11    BY MS. DAVIS:
12    Q. And at the time that this article was
13    published, you believed that to be a true
14    statement?
15    A. I believe we cited the appropriate
16    references to make that sentence in this article as
17    an introduction to a laboratory-based paper.
18    Q. And you believed that it was an appropriate
19    sentence to include?
20    A. I think in my experience, both as a
21    manuscript submitter, as a manuscript reviewer, as
22    an associate editor of two journals, that
23    introduction to a paper includes background, and I
24    think this was appropriate background information
25    that was citable and referenced because neither Dot

Page 86

1  or myself are clinicians.  While she is a medical
2  doctor, she works in a reference laboratory and
3  does not see patients.  So we have to rely on
4  published information for providing the clinical
5  aspects of a introduction to, you know, why these
6  drugs are even being considered or under utility.
7      Q.  And when you say "Dot," who are you
8  referring to?
9      A.  I'm sorry, Dr. Dorothy Adcock.
10     Q.  Who was the co-author on this publication?
11     A.  Who is the lead author.
12     Q.  Well, see, my point, Mr. Gosselin, is just
13  this:  When -- when this article went out under
14  your -- under your name as an author, you believed
15  that sentence that we're talking about was a
16  correct interpretation of the medical literature?
17     MR. ABNEY:  Objection.  Asked and answered.
18     THE WITNESS:  I'm sorry?
19     MR. ABNEY:  You can answer it again.  She's
20  asking the same question that she asked three
21  minutes ago.
22     THE WITNESS:  Again, as the introduction to
23  the manuscript and the intent of the manuscript,
24  part of the background is providing some clinical
25  information of why these drugs were being used or

Page 87

1  what was noninferior or what was published.  But
2  it's not based on my personal experience or my
3  expertise.  It was reviewing the papers and citing
4  what was published information.
5      So I cannot personally verify that these
6  studies were performed correctly or how it was
7  determined.  But they were referenced appropriately
8  as what the trials demonstrated.
9  BY MS. DAVIS:
10     Q.  So based on review of the published
11  literature, you felt that that sentence reflected
12  an appropriate interpretation of what was in the
13  published literature?
14     A.  Yes.
15     MS. DAVIS:  They're telling me we need to
16  go off the record and change the tape.  So --
17     THE WITNESS:  Oh.
18     MS. DAVIS:  -- we need to go off the record
19  and change the tape.
20     THE VIDEOGRAPHER:  This marks the end of
21  Disc Number 1.  We are off the record at 8:29.
22     (Recess taken.)
23     THE VIDEOGRAPHER:  We are back on the
24  record.  This marks the beginning of Disc Number 2
25  in the deposition of Robert C. Gosselin.  The time

Page 88

1  is 8:37 a.m.
2  BY MS. DAVIS:
3      Q.  Mr. Gosselin, we just took a short break.
4  Are you ready to proceed?
5      A.  Yes, ma'am.
6      (DEFENDANTS' EXHIBIT 5 WAS MARKED.)
7  BY MS. DAVIS:
8      Q.  I'd like to hand you what I've marked as
9  Exhibit 5 to your deposition.
10     Ask you if you recognize that as an article
11  on which you are the lead author that was published
12  in the Archives of Pathology Laboratory Medicine in
13  December 2014 entitled, "A comparison of anti-Xa
14  and dilute Russell viper venom time assays in
15  quantifying drug levels in patients on therapeutic
16  doses of rivaroxaban."
17     A.  Yes.
18     Q.  And I'd like to call your attention to a
19  sentence on the first page of that article that's
20  in the right-hand column at the top of the -- at
21  the top of the right-hand column just under the end
22  of the abstract.
23     Do you see, in the second line there, that
24  there is a sentence that begins with the word
25  "Rivaroxaban has predictable"?

Page 89

1      Do you see that sentence?
2      A.  Yes.
3      Q.  Okay.
4      A.  Not in the abstract.  In the general text,
5  yes.
6      Q.  Correct.  In the text under the abstract.
7      A.  Yes.
8      Q.  And do you see the sentence that reads,
9  "Riva" -- sorry.  "Rivaroxaban" -- and -- and
10  rivaroxaban is Xarelto; correct?
11     A.  Yes.
12     Q.  "Rivaroxaban has predictable
13  pharmacokinetics, is not affected by diet, is given
14  at fixed doses, and does not require routine
15  coagulation monitoring."
16     And -- did I read that correctly?
17     A.  Yes.
18     Q.  And that sentence appears in this article
19  from 2014 on which you're the lead author?
20     A.  Yes.
21     Q.  And do you agree with that sentence?
22     A.  Yes, to the extent that I am not a
23  clinician.  And this should have been referenced,
24  but I am remiss for not referencing this sentence.
25     Q.  And with the understanding that you're not

23 (Pages 86 to 89)

Page 90

1  a clinician, you believe that sentence to be true;
2  correct?
3      A.  Not being a clinician, I cannot verify the
4  pharmacokinetics or pharmacodynamics, whether it's
5  predictable or affected by diets, or what doses is
6  given, because that's not my area of expertise.
7  This is information that I vetted from articles.
8      Q.  You would not have published something that
9  you did not to be -- that you did not believe to be
10  scientifically correct; would you?
11      MR. ABNEY:  Object to form.
12      THE WITNESS:  I rely on my co-authors, who
13  are clinicians, to identify areas that they may
14  have disagreement as clinicians.  But I would not
15  knowingly publish something that I thought was in
16  error or misleading or erroneous.
17  BY MS. DAVIS:
18      Q.  So when article was published that we
19  marked as Exhibit 5, you believe that it
20  reflected -- and in particular the sentence that we
21  just read -- you believe that that reflected the
22  appropriate interpretation of available information
23  about rivaroxaban; correct?
24      MR. ABNEY:  Object to form.
25      THE WITNESS:  This sentence was -- again,

Page 91

1  should have been cited and referenced.  There are
2  two articles by Perzborn or Prezborn, I think --
3  I'm not quite sure of the last name -- one in 2010
4  and one in 2005, that described and used these
5  terms.
6      Again, as a clinician or not as a
7  clinician, I would not have used these under my own
8  volition because I don't know about the PK and PD
9  and the dosing, et cetera, et cetera.  So I am
10  remiss in not citing this.  But this is not from my
11  personal expertise or experience about Xarelto.
12  BY MS. DAVIS:
13      Q.  So one thing that you said is that you
14  believe that there is medical literature that
15  supports what's in this sentence?
16      A.  Absolutely.
17      Q.  And you also stated that you rely on your
18  co-authors, who are clinicians, for this type of
19  information?
20      A.  I rely on co-authors as well as reviewers
21  that should have noted, if a statement like this
22  was being made, that it should have been
23  referenced.
24      Q.  But to the best of your understanding and
25  belief, when this article was published, the

Page 92

1  co-authors on this article, who are clinicians, to
2  your understanding and belief, were in agreement
3  with this sentence; correct?
4      A.  If I use the sort of reverse logic, there
5  was no comment that addressed this particular
6  statement from any of the co-authors, which had the
7  opportunity to review prior to submission.
8      Q.  So there was no disagreement with this
9  sentence that we have read by any of the co-authors
10  of this article; correct?
11      MR. ABNEY:  Object to form.
12      THE WITNESS:  Not that I can recall
13  specific to this sentence.
14  BY MS. DAVIS:
15      Q.  And this sentence that we've been
16  discussion -- discussing was and is your
17  understanding of the literature regarding
18  rivaroxaban?
19      A.  Published by a Bayer scientist, yes.
20      Q.  You agree that this article that we marked
21  as Exhibit 5 was published by you as lead author,
22  and it was published to the scientific community?
23      A.  Yes.
24      Q.  And you've never corrected or clarified
25  anything in this article or specifically the

Page 93

1  sentence that we've just been talking about; have
2  you?
3      MR. ABNEY:  Object to form.
4      THE WITNESS:  Again, as a technical person
5  and not a clinical person, I wouldn't have the
6  wherewithal to correct or even identify if there
7  was an incorrection in this sentence.
8  BY MS. DAVIS:
9      Q.  But you don't think there is an
10  incorrection in that sentence; do you?
11      A.  Based on the literature I read from the
12  Bayer scientists, I would say I would not see
13  anything wrong with this sentence.
14      Q.  And just to be clear, you -- as you sit
15  here today, do you know of any reason why this
16  sentence that was in what we marked as Exhibit 5,
17  that we just read into the record, would need to be
18  corrected or clarified or retracted?
19      A.  Again --
20      MR. ABNEY:  Object to form.
21      THE WITNESS:  -- as somebody who works in
22  the laboratory and not a clinician, I don't have
23  the wherewithal, the expertise, to address whether
24  the veracity is correct or incorrect, or anything
25  about this sentence, other than published

Page 94

1 literature.
2 BY MS. DAVIS:
3    Q.  And you'd agree that published literature
4 supports it?
5    A.  I can generate two papers from Dr. Prezborn
6 or Perzborn, who's a Bayer scientist, who used
7 almost these exact same terms.
8    Q.  Do you agree, Mr. Gosselin, that routine
9 monitoring of Xarelto and other DOACs is not
10 recommended by any healthcare guidelines or
11 government -- government agency?
12    A.  I don't keep up with that literature so I'm
13 not a good person to ask about the guidelines and
14 recommendations for clinicians.  I only keep up
15 with the literature related to my area, which is
16 laboratory testing.
17    Q.  Are you aware of any recommendations for
18 routine laboratory monitoring of Xarelto for any
19 purpose?
20    MR. ABNEY:  Object to form.
21    THE WITNESS:  I am certainly aware that
22 this is a controversial issue.  But as far as
23 recommendations or guideline, or even the term
24 "routine" as it applies to coagulation testing for
25 somebody on anticoagulants, I think that needs to

Page 95

1 be further vetted because what we're accustomed to
2 routine may be more episodic versus never.
3    MS. DAVIS:  I move to strike as
4 nonresponsive.
5    (DEFENDANTS' EXHIBIT 6 WAS MARKED.)
6 BY MS. DAVIS:
7    Q.  Mr. Gosselin, I'm going to hand you what
8 I've marked as Exhibit 6 to your deposition.
9    A.  I heard the "hand you" and I didn't hear
10 anything after that.
11    Q.  Oh, what I've marked as Exhibit 6 to your
12 deposition.
13    A.  Okay.
14    Q.  Ask you if you recognize that as an
15 article, again, on which you are the lead author?
16    A.  Yes.
17    Q.  It was published in 2015, entitled,
18 "Assessing Non-Vitamin K Antagonist Oral
19 Anticoagulants, NOACs, in the Laboratory."
20    A.  Yes.
21    Q.  And this is an article that you published
22 in the medical literature?
23    A.  Yes.
24    Q.  And looking at the first sentence in the
25 summary of this article that appears on the first

Page 96

1 page, do you see the sentence that reads,
2 "Non-vitamin K antagonist oral anticoagulants,
3 NOACs, are being used with increasing frequency due
4 to their safety profile, ease of use, and given
5 that therapeutic monitoring is not required"?
6    Did I read that correctly?
7    A.  Yes.
8    Q.  And you agree with that sentence?
9    A.  I would say yes.
10    Q.  And if you look at the first sentence that
11 appears under the introduction section to that
12 article, that reads, "For decades, vitamin K
13 antagonists served as the only option for long-term
14 oral anticoagulation.  While a proven track record
15 for efficacy, the requirement for frequent
16 laboratory monitoring, careful regulation of diet
17 and the potential for drug interactions prompted
18 the quest for alternative strategies."
19    Did I read that correctly?
20    A.  Yes.
21    Q.  And do you agree with that statement?
22    A.  Yes.
23    Q.  And when you used the term "alternative
24 strategies" in that sentence, you were talking
25 about alternatives to warfarin therapy?

Page 97

1    A.  Yes.
2    Q.  And if you turn over to the next page in
3 that article, at the top of page 47, in the
4 left-hand column, the beginning of the first
5 paragraph --
6    A.  Yes.
7    Q.  -- do you see the sentence that reads,
8 "Because of the predict -- predictable
9 pharmacokinetics and pharmacodynamics of these
10 NOACs, routine laboratory monitoring is not
11 required."
12    Did I read that correctly?
13    A.  Yes.
14    Q.  And you agree with that sentence?
15    A.  As a technical person reading the
16 literature, yes.
17    Q.  And if you didn't think that that sentence
18 was scientifically accurate, you would not have
19 published it in the literature; would you?
20    A.  I would not publish anything in the
21 literature that I did not have either, one,
22 personal experience with, or, two, published
23 literature with.  So in answer to your question,
24 yes.
25    Q.  If we could go back to what we marked as

Page 98

1   Exhibit 4 to your deposition.
2         And again, this is an article on which you
3   are a co-author with Dr. Adcock; correct?
4         A. Yes.
5         Q. And this was published in 2015?
6         A. Yes.
7         Q. And if you turn to the second page of this
8   article, you see at the top, of the left-hand
9   corner, where there's a sentence that's -- begins
10  with, "As each of these agents"?
11        A. Yes.
12        Q. Do you see that?
13        And in that sentence where you say "each of
14  these agents," you're referring to the DOACs;
15  right?
16        A. Yes.
17        Q. And that would include Xarelto,
18  rivaroxaban; correct?
19        A. Yes.
20        Q. And in that sentence, you say, "As each of
21  these agents has predictable pharmacodynamics,
22  pharmacokinetics, and wide therapeutic windows,
23  routine therapeutic monitoring is not required."
24        Did I read that correctly?
25        A. Yes.

Page 99

1         Q. And you agree with that sentence; don't
2   you?
3         A. The sentence is referenced, and so I agree
4   that these statements, which are clinical, can be
5   referenced, because neither of us are clinicians.
6         Q. But you believe that that sentence is
7   correct?
8         A. I believe that we appropriately cited the
9   references that would suggest this information is
10  true. But again, I am not a clinician. I don't
11  deal with pharmacodynamics, pharmacokinetics. I
12  have no idea about the wide therapeutic windows, et
13  cetera.
14        Q. When this article was published in the
15  medical literature, you reviewed that sentence
16  before it was published?
17        A. Yes.
18        Q. And when it was published, you believed it
19  to be a -- true and accurate information about the
20  DOACs, including Xarelto; correct?
21        MR. ABNEY: Objection. Asked and answered.
22        You can answer it again.
23        You can answer it again.
24        THE WITNESS: Oh, I'm sorry.
25        Again, as -- as a laboratory person, I

Page 100

1   don't have the wherewithal, the expertise, to
2   discuss this. So we merely had this as an
3   introductory statement, as with most articles.
4   This is a lab-based article. And it's
5   appropriately cited with the reference about these
6   statements and claims.
7   BY MS. DAVIS:
8         Q. Well, as we've previously established, you
9   would not publish something that you believed to be
10  incorrect or inaccurate; would you?
11        A. I would not knowingly publish something I
12  know to be incorrect -- incorrect or inaccurate.
13  My belief is that these published references
14  that -- were vetted by peer-review journals, so
15  therefore they can be cited with a certain degree
16  of accuracy.
17        But again, I can't verify the -- the claims
18  as a laboratory person, not as a clinician.
19        Q. But you believe that the references that
20  were provided for this sentence in the published
21  peer-review medical literature support the
22  information that you provided in this article and
23  that we just read?
24        A. I would say yes.
25        Q. And you'd agree that you submitted this

Page 101

1   article that we've marked as Exhibit 4 to a
2   peer-reviewed medical journal?
3         A. Yes.
4         Q. And in doing so, you must have believed
5   that this information that we just read in this
6   sentence was important and scientifically accurate;
7   right?
8         MR. ABNEY: Object to the form.
9         THE WITNESS: I don't necessarily believe
10  about the importance of -- of your -- your claim,
11  because this is an introductory statement about the
12  importance of laboratory testing. The merits of
13  the testing, why it should be done, is not really
14  the key feature of the paper. The paper just talks
15  about the laboratory perspective of these DOACs.
16        The clinical components, again, is merely
17  an introduction to the laboratory of the why or
18  what these drugs do. But it's not the key
19  component of this paper or any of the papers I have
20  written.
21        I have been a co-author on maybe one
22  clinical paper on DOACs. But the rest are all
23  laboratory-based articles that deal with laboratory
24  testing, DOACs, impact of the same, and very
25  little, if any, to do with the clinical component

26 (Pages 98 to 101)

1    of DOACs. That is not my area of expertise.
2    BY MS. DAVIS:
3        Q. But you provide information about -- for
4    example, about DOACs and about Xarelto, in your
5    articles; correct?
6        A. We --
7        MR. ABNEY: Object to form.
8        THE WITNESS: We provide references so
9    other people who read this can vet the information
10   for their own review.
11   BY MS. DAVIS:
12       Q. And all of the information about DOACs and
13   about Xarelto that you provided in this article
14   that we marked as Exhibit 4, you believed to be
15   accurate, correct information, or you would not
16   have put it out in the published literature; would
17   you?
18       MR. ABNEY: Objection. We're getting to
19   the point where this is badgering. You've asked
20   him the same question like six times now.
21       MS. DAVIS: I -- I'm not meaning it to be.
22   I'm just --
23       MR. ABNEY: Well --
24       MS. DAVIS: -- trying to get --
25       MR. ABNEY: Well --

1        MS. DAVIS: -- a straight answer.
2        MR. ABNEY: Well, he's given you a straight
3    answer five times, and you keep asking the same
4    question over and over and over again.
5        So I'm going to instruct the witness not to
6    answer if you're going to keep asking the same
7    questions over and over again.
8        I mean, we started this thing at 6 o'clock
9    so some of the defense lawyers could get their
10   flights. I'm not going to get my flight. So I
11   don't see, you know, badgering the witness with the
12   same question over and over and over again, given
13   everything that has been given in accommodation of
14   this deposition.
15       MS. MOORE: Counsel, let me just suggest
16   the setting for this deposition, it was suggested
17   by Mr. Denton, who wanted to start at 6:00. We
18   certainly agreed because we thought it would be
19   convenient to all on this holiday week. So it
20   wasn't simply in accommodation for defense counsel.
21   But thank you for your sentiments in that regard.
22       I'll also just add that I think you're
23   bordering on coaching the witness here. And we
24   need to stay kind of within the -- stay within our
25   lanes of objections to the form of the question.

1    BY MS. DAVIS:
2        Q. Just to wrap this up, Mr. Gosselin, the
3    sentence that we just read that -- that each of
4    these agents, the DOACs, has predictable
5    pharmacodynamics, pharmacokinetics, and wide
6    therapeutic windows, routine therapeutic monitoring
7    is not required, when that sentence was written,
8    did you believe that to be appropriately supported
9    by the medical literature that you cited?
10       A. Yes.
11       Q. And do you still believe that to be the
12   case?
13       MR. ABNEY: Object to the form.
14       THE WITNESS: I would say I don't know
15   because "routine" is not clearly defined.
16   BY MS. DAVIS:
17       Q. And "routine" is the word that you used in
18   this article?
19       A. Yes.
20       Q. And have you done anything to retract or
21   correct or clarify this statement?
22       A. It's not my statement. It's a reference to
23   work. So it's reference statements.
24       Q. But you would agree that that statement
25   appears in the medical literature in a paper on

1    which you are an author?
2        A. Yes.
3        Q. Okay.
4        A. But appropriately cited with references.
5    So it's not our work. We are citing other people's
6    work. That's what references do.
7        Q. And what does "routine" mean to you in the
8    context of the sentence that we just read?
9        A. That word, or coupled with the "therapeutic
10   monitoring"?
11       Q. So my question is, what does that word mean
12   in the context of that sentence?
13       A. So you want my personal opinion or my
14   professional opinion, or which opinion would you
15   like?
16       Q. I would like to know what you meant a few
17   minutes ago when you said because the word
18   "routine" was not -- I don't remember exactly what
19   you said, but you said --
20       A. Okay.
21       Q. -- something about the word "routine" not
22   being defined or something along those lines.
23       So I would like to know, what does the word
24   "routine," when used in a sentence in this way, in
25   the sentence that we just read, what does that word

1 "routine" mean to you in the context of that
2 sentence?
3     A. In the context of the sentence, it's cited.
4 So I can't speak for the author's citations, what
5 they define as routine.
6        If you would like my personal opinion, then
7 I would be willing to give that.
8     Q. Well, when the term "routine therapeutic
9 monitoring is not required" is used, what does that
10 mean to you?
11     A. Now you're asking my personal opinion. And
12 for me, we're talking about a anticoagulant, and
13 historically, "routine" meant episodic. Sometimes
14 hourly. Sometimes daily. Sometimes weekly. In
15 the same context can that same phrase be used for
16 the new drugs? I would say the answer is no.
17     Q. So you're aware that in -- historically and
18 even today, in patients taking warfarin, that
19 warfarin requires routine monitoring of blood for
20 the purposes of dose adjustment while a patient's
21 on warfarin?
22     A. I am aware of that.
23     Q. Such that you'd agree the DOACs, including
24 Xarelto, do not require routine, episodic,
25 therapeutic monitoring for dose adjustment, as

1 has -- as is done with warfarin?
2     A. I'm not a clinician. So it's outside my
3 area of expertise. But I do not see the same
4 frequency of monitoring with the patients I am
5 aware of are on Xarelto as compared to warfarin;
6 correct.
7     Q. And when you wrote this article that we
8 marked as Exhibit 4, your understanding of the
9 medical literature, as you've cited in that
10 article, was that routine therapeutic monitoring of
11 DOACs is -- including Xarelto, is not required;
12 correct?
13     A. My interpretation of that routine
14 monitoring would be in the same context as
15 warfarin.
16     Q. And you're aware that Xarelto and other
17 DOACs are not monitored for dose adjustment like
18 warfarin is; correct?
19     A. I -- I have conflicting answers for this
20 because I -- at the FDA meeting there was a
21 clinician who did look at DOAC levels in patients
22 who are not bleeding, versus our own experience
23 that we do not routinely measure it. So I -- I --
24 I'm aware of both scenarios.
25        I can only base our experience at our

1 institution, which is not a routine measurement.
2 It's similar context as warfarin.
3     Q. So you'd agree that at your institution,
4 your experience has been that Xarelto is not
5 routinely monitored for dose adjustment; correct?
6     A. The only thing I can say about my
7 institution is not why they're being assessed, but
8 the frequency, because I don't usually inquire as
9 to why the drug is being ordered, the drug level is
10 being ordered.
11        (Reporter clarification.)
12 BY MS. DAVIS:
13     Q. Do you have any information that at your
14 institution, at UC Davis, that routine therapeutic
15 monitoring of Xarelto is being ordered?
16     A. Again, I don't know why they asked for the
17 drug level. Sometimes I am told or sometimes I'm
18 given a heads-up, but I don't know the indications
19 for why they're ordering a rivaroxaban level at our
20 institution.
21        MS. DAVIS: Move to strike as
22 nonresponsive.
23 BY MS. DAVIS:
24     Q. What I asked you is, do you have any
25 information that routine therapeutic monitoring of

1 Xarelto is being ordered or is occurring at your
2 institution where you're employed?
3        MR. ABNEY: Objection. Asked and answered.
4        THE WITNESS: Again, I don't know who's on
5 Xarelto at our institution. I don't know the
6 frequency of testing at our institution. So it's
7 difficult for me to answer a question I don't have
8 the knowledge about the clinical components of
9 these patients. All I know is when we get a
10 request for a drug level. I don't know what it's
11 for. So I don't know if it's routine or what the
12 purpose of the drug level is being for. But
13 clearly we do not do as many Xarelto levels as we
14 do warfarin levels. But I do not know or have
15 access to patient population on who's on Xarelto at
16 U.S. Davis Health System.
17 BY MS. DAVIS:
18     Q. So, Mr. Gosselin, it sounds like what
19 you're telling me is that you agree that you are
20 not qualified to address the need for monitoring of
21 Xarelto; correct?
22     A. As I am not a clinician. That's a
23 clinician decision. My expertise is the capacity
24 to measure the drug by laboratory methods.
25     Q. But you acknowledge that in Exhibit 4, that

Page 110

1 you have published in a peer-reviewed article in
2 the medical literature, that Xarelto, being a DOAC,
3 has predictable pharmacokinetics,
4 pharmacokinetic -- I'm sorry -- has predictable
5 pharmacodynamics, pharmacokinetics, and wide
6 therapeutic windows, and routine therapeutic
7 monitoring is not required; correct?
8    MR. ABNEY: Objection. Are you -- you
9 started out that sentence -- that question as being
10 part of Exhibit 4. And then I think you read
11 something that's not from Exhibit 4.
12    MS. DAVIS: Okay. I didn't mean to, so let
13 me rephrase the question.
14 BY MS. DAVIS:
15    Q. So, Mr. Gosselin, my -- it's just a simple
16 question. You acknowledge that in the
17 peer-reviewed published medical literature, under
18 your name as an author, you have written that
19 routine therapeutic monitoring of Xarelto is not
20 required?
21    MR. ABNEY: Objection. Asked and
22 answered --
23 BY MS. DAVIS:
24    Q. Is that correct?
25    MR. ABNEY: -- many times. I mean, can we

Page 111

1 take a break and look through the record and see
2 how many times you've asked that exact question?
3    MS. DAVIS: It only takes a second for him
4 to answer it. If I've already asked it, I
5 apologize. I'm just trying to get --
6    MR. ABNEY: You've asked it --
7    MS. DAVIS: -- a clear record.
8    MR. ABNEY: -- like five times. It's not
9 like you only asked it once.
10    Go ahead and answer.
11    THE WITNESS: Well, again, we are citing
12 papers that make the claims. We are not
13 establishing these claims. We are merely
14 referencing material that's been published.
15    So we -- I cannot speak for Dr. Adcock. I
16 do not have the clinical wherewithal to make or
17 support any of these claims. Hence, the citation.
18    Again, this paper is a laboratory-based
19 article. This is an introductory statement. It is
20 not a statement of this is what clinicians need to
21 do. This is cited in reference material. It's not
22 our own work.
23 BY MS. DAVIS:
24    Q. And you've not published anything to the
25 contrary of that sentence; have you?

Page 112

1    A. As a laboratory individual, I would not
2 have the wherewithal to publish anything to be
3 contrary or supportive of this sentence.
4    Q. But if you thought that something that had
5 gone out under your name in the published medical
6 literature was incorrect or inaccurate, you would
7 do something to correct it; wouldn't you?
8    A. If this was an area that I knew for
9 certainty, a high degree of certainty, I would
10 certainly query my co-authors. This is not a
11 paper -- an individual paper, as I have co-authors
12 as well.
13    Q. And you've not done that; have you?
14    A. I have not done that.
15    (DEFENDANTS' EXHIBIT 7 WAS MARKED.)
16 BY MS. DAVIS:
17    Q. Mr. Gosselin, I'm going to hand you what
18 I've marked as Exhibit 7 to your deposition.
19    And do you recognize Exhibit 7 as an
20 article from the medical literature published in
21 the Annals of Pharmacotherapy in 2015 on which you
22 are the first author?
23    A. Yes.
24    Q. And is it titled, "Heparin-calibrated
25 chromogenic anti-Xa activity measurements in

Page 113

1 patients receiving rivaroxaban - can this test be
2 used to quantify drug level"?
3    A. Yes.
4    Q. And do you see, in looking at the
5 introduction section of this article, the last
6 sentence that begins at the bottom of the first
7 page, begins with the word "because"?
8    Do you see that?
9    A. Yes.
10    Q. And I'd like you to read along with me.
11    Do you see where Exhibit 7 says, "Because
12 of its predictable pharmacokinetics,
13 pharmacodynamics, and wide therapeutic range,
14 routine laboratory measurement of the drug's anti
15 -- anticoagulant effect is usually not required"?
16    Did I read that correctly?
17    A. Yes.
18    Q. And when use -- when you use the term "the
19 drug" in that sentence, you were referring to
20 rivaroxaban; correct?
21    A. Yes.
22    Q. And again, as this sentence appears in the
23 published medical literature, in an article on
24 which you were the first author, you agree with
25 that sentence; correct?

29 (Pages 110 to 113)

1    A.  It should have been referenced, but I have
2  clinicians on the manuscript, and they apparently
3  agreed with that statement.
4    Q.  I want to turn back to your report for a
5  minute and ask you to look at pages 9 --
6    A.  I'm sorry, which report?
7    Q.  Oh, your report, Exhibit 1.
8    A.  Okay.
9    Q.  And looking at page 9, underneath the sort
10  of graphics that we talked a little bit about
11  earlier, do you see where you wrote that "Unlike
12  potassium or sodium levels that can be quantified
13  using ion-specific electrodes, PT and APT -- APTT
14  can only provide an estimation of the coagulation
15  process"?
16    A.  Yes.
17    Q.  And you agree that PT test results do not
18  necessarily reflect in vivo or inside-the-body
19  coagulation; right?
20    A.  Yes.
21    Q.  And then you state in your report, "There
22  is some standardization for measuring the PT, but
23  only in patients treated with oral vitamin K
24  antagonists.  See below.  Otherwise, there are no
25  means for standardizing the measurements of

1  clotting time of these assays."
2      That's what you wrote in your report;
3  right?
4    A.  Yes.
5    Q.  And vitamin -- oral van -- oral vitamin K
6  antagonists would include warfarin; correct?
7    A.  Yes.
8    Q.  So at best, in warfarin patients where
9  there is some standardization, PT can provide an
10  estimation of the in vivo or inside-the-body
11  coagulation process; correct?
12    A.  Yes.
13    Q.  But even in a warfarin patient, PT is only
14  a surrogate marker of the hemostasis process and
15  may not be an accurate reflective -- reflection of
16  in-the-body coagulation; correct?
17    A.  I would agree with that statement.
18    Q.  Are you aware, based on your experience in
19  monitoring hemostasis testing, that warfarin was
20  used in patients for many years before the
21  laboratory testing relating to its anticoagulant
22  effect was standardized through the use of the INR?
23    A.  Yes.
24    Q.  And it's really the INR that's used to
25  monitor warfarin; correct?

1    A.  Now, yes.
2    Q.  As opposed to the PT?
3    A.  It's the standard practice, yes.
4    Q.  To use INR?
5    A.  Yes.
6    Q.  And that's because INR has become
7  standardized and harmonized between laboratories as
8  concerns hemostasis testing for warfarin?
9    Q.  And you would agree that INR is not
10  appropriate for evaluating the anticoagulant effect
11  of Xarelto; correct?
12    A.  I would say that's not its intended use.
13    Q.  And are you aware of published medical
14  literature that states that INR is not appropriate
15  for evaluating the anticoagulant effect of Xarelto?
16    A.  I believe there are published papers, but I
17  can't say with degree of certainty that
18  specifically the INR.  I think there are some
19  published reports on INR.  But I don't know for
20  certain.
21    Q.  Do you agree that for Xarelto and other
22  DOACs, that there is no process by which PT results
23  can be standardized in the same way that INR
24  results are standardized for war -- warfarin?

1    A.  There have been a couple of published
2  papers by Europeans attempting to standardize
3  rivaroxaban in the same context.  But that's all I
4  know.  It's been published.
5    Q.  Do you agree that for Xarelto and other
6  DOACs, that standardization of PT results has not
7  been achieved?
8    A.  I would agree with that statement.
9    Q.  And without standardization or
10  harmonization, the results of the same PT test
11  performed the same way on the same sample can -- as
12  concerns Xarelto, can vary from lab -- laboratory
13  to laboratory; correct?
14    A.  True, but the INR has not mitigated that
15  bias as well.  It's helped, but it's still there.
16    Q.  So what you're saying is that even with
17  standardization, the INR is not a perfect test.
18  There can still be some variation; correct?
19    A.  Yes.
20    Q.  But the INR has been standardized or
21  harmonized to an extent such that it has been
22  generally accepted as being standardized or
23  harmonized between laboratories; correct?
24    A.  If you understand the background of why the
25  INR was developed, it had more to do with

1  international travel between the U.S. and Europe
2  and how the reagents in the U.S. were primarily
3  made from rabbit brains, whereas the reagents made
4  in Europe are made from either human placenta,
5  human brains, or different sources. So we were
6  seriously overanticoagulating our patients here
7  because of the insensitivity of the reagent to
8  warfarin compared to Europe. That was the trigger
9  for developing INR, which has since made that
10 measurement better, improved, but it still has its
11 issues in the imprecision, meaning the -- the
12 number plus or minus whatever, there is still
13 variability amongst laboratories, but it's better
14 than the PT itself.
15     Q. And there's no such standardization as
16 concerns PT testing of Xarelto -- I mean, there's
17 no -- there's nothing like INR standardization for
18 PT testing for Xarelto at all; right?
19     A. Again, there's been a couple of papers
20 published by Europeans, I mean, Dr. Samama and
21 Dr. Chepote, who were attempting to look at whether
22 or not they would improve sensitivity with the
23 reagents. But it has not been an -- accepted
24 globally or even maybe in Europe. There's been
25 published reports.

1     Q. So you'd agree that with PT testing in a
2  Xarelto patient, you could have the same sample
3  using the same reagent but tested in a different
4  laboratory and the results could be different?
5     A. Oh, absolutely.
6     Q. Oops. Sorry. I don't know where I put
7  this exhibit. I just stuck it somewhere.
8        It's here.
9     MS. DAVIS: Let's just go off the record
10 for just a second.
11        THE VIDEOGRAPHER: We are off the record at
12 9:26 a.m.
13        (Recess taken.)
14        THE VIDEOGRAPHER: We are back on the
15 record. The time is 9:38 a.m.
16 BY MS. DAVIS:
17     Q. Mr. Gosselin, we just took a brief break.
18 Are you ready to proceed or --
19     A. Yes.
20     Q. Okay. Before the break, one of the things
21 that we were discussing was INR testing.
22        Do you recall that?
23     A. Yes.
24     Q. And I asked you if you agreed that INR was
25 not used for evaluating the anticoagulant effect of

1  Xarelto.
2        Do you recall that?
3     A. No.
4     Q. Okay.
5     A. That's not exactly what you said. Because
6  in our institution, we just report on the INRs,
7  regardless --
8     Q. I'm sorry, you just what?
9     A. In our institution we report out the INR,
10 regardless of who it's for. So I would not agree
11 to that statement. So it must have been something
12 similar to that. It's not used, I think,
13 generically for Xarelto.
14     Q. So you'd agree that INR is not used to
15 monitor the anticoagulation effect of Xarelto?
16     A. Again, I would have to sort of hedge the
17 answer since we just report out the INRs in our
18 institution. And they may be run on patients who
19 are on Xarelto.
20     Q. In your role in the hemostasis laboratory
21 at UC Davis, do you answer questions from residents
22 and physicians regarding laboratory testing?
23     A. Yes.
24     Q. And if -- if you were asked by a resident
25 physician at UC Davis if they should order and --

1  and use an INR test to interpret or assess the
2  anticoagulation effect of Xarelto, what would you
3  tell them?
4     A. I would ask them what's the question being
5  answered that they want to know the answer to. How
6  much is on board versus is it on board? And what
7  the alternative strategy would be. Because our PT
8  reagent is the least sensitive in the market for
9  measuring any of the anti-Xa DOACs.
10     Q. You don't routinely recommend INR to be
11 used to test or assess the anticoagulate --
12 anticoagulation effect of Xarelto; do you?
13     A. Because we have the capacity to measure
14 Xarelto quantitatively, I do not make that
15 recommendation to our staff.
16     Q. And you're not aware, just generally in the
17 world of laboratory medicine, INR being recommended
18 to assess the anticoagulation effect of Xarelto;
19 are you?
20     A. The INR results, correct, I am not aware.
21     Q. And what PT reagent do you -- you use at UC
22 Davis?
23     A. Innovin.
24     Q. I'd like you again to pull out what we
25 marked as Exhibit 4 to your deposition, which is

1  the 2015 article in Thrombosis Research on which
2  you're an author. And I'd like to refer you to the
3  second page of that article, under the title,
4  "Laboratory Assays and DOACs, an Overview."
5      Do you see that?
6      A. Yes.
7      Q. And do you see the beginning of the second
8  paragraph there that begins, "Routine coagulation
9  screening assays"?
10     A. Yes.
11     Q. And do you see the sentence that reads,
12 "Routine coagulation screening assays, including
13 the prothrombin time, PT, activated partial
14 thromboplastin time, APTT, and thrombin clotting
15 time, TCT, are widely available on a routine and
16 emergence -- emergent basis in most clinical
17 laboratories. These assays are not a reliable
18 measure of DOAC anticoagulant effect"?
19     Did I read that correctly?
20     A. Yes.
21     Q. And do you agree with that sentence?
22     A. Yes.
23     Q. And the -- the article goes on to state,
24 and I'm quoting, and I'm right after where I just
25 read, "This is because the sensitivity of the PT

1  and APT varies considerably based on reagents used,
2  as well as the specific DOAC being measured. Given
3  this," and -- and I'm leaving out the reference
4  numbers, but -- "Given this, PT or APTT results in
5  seconds in the presence of a given concentration of
6  DOAC cannot be standardized across laboratories."
7      Did I read that correctly?
8      A. Yes.
9      Q. And you agree with that statement?
10     A. We cited references to support that
11 statement because it didn't come from our work.
12     Q. And again, we -- we -- can we just agree
13 that generally that when you cite references and
14 write something in a medical article, that -- that
15 you're doing that because you believe that that
16 statement is correct as supported by those
17 references?
18     MR. ABNEY: Object to the form.
19     THE WITNESS: We put the statement in the
20 article if it's been published in peer-reviewed
21 journals. I don't know necessarily every statement
22 I put into a -- a journal or in a paper that's been
23 referenced I agree with. It's just putting the
24 information out there succinctly for somebody to
25 look at one article versus 30. So I think that's

1  the intent of citing references and claims or -- or
2  sentences that we as the authors of this have not
3  personally performed.
4  BY MS. DAVIS:
5      Q. But as an author, and in citing references,
6  you're synthesizing material and presenting that in
7  a -- in a referenced sentence. And -- and when you
8  present that referenced -- referenced sentence in
9  the peer-review published medical literature, you
10 believe that you're providing accurate information?
11     A. Well, you're --
12     MR. ABNEY: Objection. Asked and answered.
13     Go ahead.
14     THE WITNESS: We are providing information
15 that's been published by others. The accuracy of
16 that information -- again, if we had not done it
17 personally, this is why we cite references versus
18 our own work. Whether it's true or not true,
19 again, is up to a reader of those references.
20 BY MS. DAVIS:
21     Q. But the sentence that I just read that had
22 references, you believe that that -- that the
23 summary information that you provided in this
24 article reflected the appropriate interpretation of
25 those references?

1      A. I would say that these sentences and the
2  references, yes.
3      Q. And you would agree that in these -- in
4  this paragraph that we've just read from, when you
5  refer to DOACs, that would include Xarelto?
6      A. Yes.
7      Q. And if you turn over to page 11, which is
8  the last page in this article, in the conclusion
9  section -- and this sentence starts about six lines
10 down -- do you see the sentence that begins,
11 "Differences in the sensitivity"?
12     A. Yes.
13     Q. And this sentence reads, "Differences in
14 the sensitivity of routine coagulation screening
15 tests to DOACs prevent their use in reliably
16 determining drug concentration."
17     Do you agree with that sentence?
18     A. Yes.
19     Q. And that would include Xarelto?
20     A. Yes.
21     Q. And in your expert report in this
22 litigation, you address some of these differences
23 in sensitivity of the routine coagulation screening
24 tests for DOACs; right?
25     A. Yes.

Page 126

1    Q. And let's go ahead and look at the next
2  sentence there.
3    A. We're back on 4?
4    Q. I'm sorry.
5    A. Oh, okay.
6    Q. Back on page 11.
7    A. Mm-hm.
8    Q. The next sentence after the one I just
9  read.
10    A. Mm-hm.
11    Q. Do you see the sentence that -- that reads,
12  "While commercially available, the lack of
13  FDA-approved calibrators or methods for quantifying
14  DOACs have created a general reluctance to
15  implement quantitative assays."
16    Do you see that?
17    A. Yes.
18    Q. And a few lines down, there is a sentence
19  that reads, "Use of commercial calibrators to
20  assess reagent sensitivity to DOACs should be used
21  with caution, especially when assessing direct F --
22  FXa DOACs."
23    Do you see that sentence?
24    A. Yes.
25    Q. And you agree with those sentences?

Page 127

1    A. Based on our published studies, yes.
2    Q. And you agree that laboratories across the
3  United States use a number of different reagents to
4  perform PT testing?
5    A. Yes.
6    Q. And I believe you covered this in appendix
7  A to your report, but you reported that Innovin was
8  used by about 35 percent of laboratories?
9    A. Roughly, yes.
10    Q. And Neo -- Neoplastine CI Plus by about 33
11  percent of laboratories?
12    A. Sounds about right.
13    Q. And RecombiPlasTin 2G by about 25 percent
14  of laboratories?
15    A. Sounds about right.
16    Q. And I added that all up and got 93 percent.
17  So that would mean about seven percent or so use a
18  number of other different reagents?
19    A. Yes.
20    Q. So you'd agree that -- just to sort of wrap
21  up this area -- that many different PT reagents are
22  used by laboratories across the country?
23    MR. ABNEY: Object to form.
24    THE WITNESS: Yes.
25  BY MS. DAVIS:

Page 128

1    Q. And those reagents have varying
2  sensitivities as concerning Xarelto?
3    A. Yes.
4    Q. And that those reagents vary in sensitivity
5  from one to another?
6    In other --
7    A. Please --
8    Q. -- words, between each other they vary in
9  sensitivity?
10    A. So you're talking about different reagents?
11    Q. Yes.
12    A. Or are we talking about same reagent,
13  different labs?
14    Q. I'm -- well, I'm going --
15    A. Or both?
16    Q. -- to get to that.
17    A. Okay.
18    Q. Right now --
19    A. I'm not sure what you're --
20    Q. -- I'm only talking about --
21    A. -- when you say "differences," what are
22  we --
23    Q. Right.
24    A. -- specifically referring to?
25    Q. So it's just establishing that these

Page 129

1  various PT reagents or -- or various reagents that
2  are used in PT testing of Xarel --
3    A. Yes.
4    Q. -- that could be used --
5    A. Yes.
6    Q. -- in PT testing --
7    A. Yes.
8    Q. -- that they have -- if you -- when you
9  compare them one to the other, between each other,
10  did they have varying sensitivities as concerns
11  Xarelto?
12    A. Yes.
13    Q. And then they -- then if you just look at
14  one type, such as if you look at Innovin or if you
15  look at Neoplastine CI Plus --
16    A. Okay.
17    Q. -- so if you look at one type, that even
18  within one type of reagent, you would have
19  variations in sensitivity, as concerns Xarelto,
20  between lots of the same reagent?
21    A. Not just for Xarelto. Just in general,
22  yes.
23    Q. They vary in sensitivity between lots of
24  reagent even within the same type of reagent?
25    A. Yes.

33 (Pages 126 to 129)

1    Q.  And that variation could affect performance
2  of PT tests?
3        MR. ABNEY:  Object to form.
4  BY MS. DAVIS:
5    Q.  The results?
6        MR. ABNEY:  Object to form.
7        THE WITNESS:  I guess it depends on what
8  you mean by that, because we're looking at -- if
9  you're talking about variation, there's two ways
10  that we look at new lots.  We look at normal
11  samples, and we look at abnormal samples, and the
12  statistical difference between those two.
13        Would it require a change in our reference
14  interval, which determines what's normal versus
15  abnormal?  That may or may not occur with a lot
16  change.  It may.
17  BY MS. DAVIS:
18    Q.  Would you be able to say that if you took a
19  patient sample of blood of a patient who was on
20  Xarelto, and that same sample was tested under all
21  conditions being the same, in other words, the same
22  machine, the same reagent, but you used a different
23  lot of the reagent, you'd agree that you -- there
24  could be some variation in that test result?
25        MR. ABNEY:  Object to form.

1        THE WITNESS:  Not so -- answer?
2        MR. ABNEY:  Yeah, you can answer if you
3  can.
4        THE WITNESS:  Not -- I don't specifically
5  know about Xarelto, but I-- my experience working
6  in the clinical laboratory for 30 plus years is
7  they never match exactly.  So what variation's
8  acceptable is something that each laboratory
9  director would have to determine if they're
10  equivalent or different.  But they would unlikely
11  match exact number.
12  BY MS. DAVIS:
13    Q.  They'd be unlikely to match?
14    A.  It would be unlikely to match the exact
15  number.
16        But I -- can I expand on that?
17        Taking the same sample and run it ten times
18  may not match exactly the same number.
19    Q.  Could you pull out what we marked as
20  Exhibit 5, please.
21        And again, this is an article on which you
22  are the lead author that was published in 2014;
23  correct?
24    A.  Yes.
25    Q.  And in the abstract of this article, on --

1  in the section entitled, "Context," do you see the
2  sentence about halfway through that begins,
3  "Routine coagulation assays"?
4    A.  Yes.
5    Q.  And so if you'll just follow along while I
6  read, that this article states, "Routine
7  coagulation assays, such as the prothrombin time
8  and, to a lesser degree, activated partial
9  thromboplastin time, correlate the drug
10  concentration, but because of reagent variability,
11  these methods are not reliable for determining
12  rivaroxaban anticoagulation."
13        And you agree with that sentence?
14    A.  Yes.
15    Q.  And you agree that that sentence means that
16  these methods do not reliably measure the degree or
17  intensity of Xarelto's anticoagulation effects;
18  correct?
19        MR. ABNEY:  Object to form.
20        THE WITNESS:  The context is a statement
21  when you pull all the reagents together.  So we're
22  looking at this as a pooling of data as opposed to
23  specific data.
24        So do they correlate?  Yes, they all
25  correlate.  Does that make them reliable?  That's a

1  different question.
2  BY MS. DAVIS:
3    Q.  And the answer to that question, in looking
4  at them together, is no?
5    A.  It -- they would be unreliable to make a
6  global statement about the use for quantifying.
7    Q.  And if you look over on page 1682, which is
8  the third page of this article, do you see the
9  section entitled "Comment"?
10    A.  Yes.
11    Q.  And looking at the last sentence in that
12  paragraph that begins, "Overall," do you see that?
13    A.  Yes.
14    Q.  And do you agree that this article says,
15  "Overall, those studies showed the use of routine
16  activated partial thromboplastin time and
17  prothrombin time reagents is limited by the
18  variability and responsiveness to rivaroxaban among
19  reagents, and because those global assays cannot
20  reliably provide drug concentration, especially
21  throughout the expected broad range of
22  concentrations observed when collected at peak or
23  trough times"?
24        Did I read that correctly?
25    A.  You did.

1    Q. And you agree with that statement?
2    A. Based on the studies we're citing, yes.
3        (DEFENDANTS' EXHIBIT 8 WAS MARKED.)
4    BY MS. DAVIS:
5    Q. Mr. Gosselin, I'd like to hand you what
6    I've marked as Exhibit 8 to your deposition.
7        And do you recognize this as an article on
8    which you are the first author that was published
9    in the International Journal of Laboratory
10   Hematology in 2016, so just this year, that's
11   titled, "A comparison of the effect of the anti-Xa
12   direct oral anticoagulant apixaban, edoxaban and
13   rivaroxaban on coagulation assays"?
14   A. Yes.
15   Q. And if you look over to the second page of
16   that article under the introduction, there's a
17   sentence about three-quarters of the way down on
18   the left-hand column that begins, "With so few
19   laboratories."
20   Do you see that?
21   A. Three quarters. Three quarters.
22       Oh, yes. Okay.
23   Q. So do you see the sentence that reads,
24   "With so few laboratories executing methods to
25   quantitate DOACs, there appears to be a false sense

1    that the PT and APTT can be used effectively for
2    assessing DOAC drug presence and relative
3    concentration"?
4        Did I read that correctly?
5    A. You did.
6    Q. And you agree with that?
7    A. Yes.
8    Q. And you'd agree that PT cannot be used
9    effectively for assessing DOAC, including Xarelto,
10   drug presence and relative concentration?
11       MR. ABNEY: Object to form.
12       THE WITNESS: That's a two-part. The
13   presence means any level. And that clearly is no.
14       As far as the -- the relative
15   concentration, I think that would be reagent
16   dependent.
17   BY MS. DAVIS:
18   Q. But you agree that when you wrote this
19   sentence, that you were including Xarelto as a DOAC
20   and meant to refer to it; right?
21   A. We were not specific to a DOAC. Just
22   globally DOACs and making a global statement about
23   the global screening tests that are available.
24   Q. But when you wrote that sentence, you --
25   you meant to include Xarelto among the DOACs?

1    A. It was included amongst the DOACs.
2    Q. And as -- as -- as being a -- a global
3    statement, you agree with it?
4    A. As I already iterated and specified,
5    that's -- yes.
6        (DEFENDANTS' EXHIBIT 9 WAS MARKED.)
7    BY MS. DAVIS:
8    Q. Mr. Gosselin, I'm going to hand you what
9    I've marked as Exhibit 9 to your deposition.
10       And do you recognize this as an article
11   that was published in Thrombosis and Hemostasis
12   medical journal on which you are an author?
13   A. Yes.
14   Q. And it's entitled, "Performance of
15   coagulation tests in patients on therapeutic doses
16   of rivaroxaban"?
17   A. Yes.
18   Q. And if you look at the first page, page
19   1133, in the summary section at the bottom of the
20   first paragraph, do you see the sentence that
21   begins, "PT, APTT"? It's on the other side, at the
22   very bottom.
23   A. On the --
24   Q. Right here.
25   A. -- other side?

1        Oh, okay.
2    Q. Other side of the page, I meant.
3    A. Okay.
4    Q. Do you see the sentence that -- that
5    reads -- that begins, "PT"?
6        You with me? The -- it's the very last
7    line there on the abstract side.
8    A. Got it.
9    Q. Okay.
10   A. Okay.
11   Q. And it reads, "PT, A" -- comma, "APTT, and
12   activated clotting time, ACT, were insensitive to
13   trough rivaroxaban. 59 percent, 62 percent and 80
14   percent of samples had a normal result
15   respectively."
16       You see that?
17   A. Yes.
18   Q. And did I read that correctly?
19   A. Yes.
20   Q. And do you agree with that?
21   A. It's what the data demonstrated, yes.
22   Q. And that was data from a study that you
23   were involved in?
24   A. Yes.
25   Q. And if you look over to page 1138 of this

1 article.
2 You see the section called, "Prothrombin
3 Time"?
4 A. Yes.
5 Q. And I'd like to call your attention to the
6 very last sentence in that paragraph.
7 Do you see the sentence that reads, "A
8 normal PT value may rule out high on-therapy levels
9 but does not exclude the presence of potentially
10 clinically important low on-therapy levels"?
11 Did I read that correctly?
12 A. Yes.
13 Q. And you'd agree that that sentence, and in
14 fact this whole article, refers to rivaroxaban;
15 correct?
16 A. Yes.
17 Q. And do you agree with that statement?
18 A. I don't have the wherewithal to agree or
19 disagree. I can just comment on the laboratory
20 data that was submitted by us and analyzed by them.
21 I don't know about what's clinically important
22 since I'm not a clinician.
23 Q. But do you agree that that sentence was
24 supported by the data that was generated in this
25 study?

1 A. Again, you're asking about potentially
2 clinically important. And I -- I don't have any
3 information about the status of these patients, nor
4 am I a clinician.
5 I can comment about a normal PT in the
6 laboratory tests, but that's as far as I can go as
7 far as my contribution to the -- this article.
8 Q. And you'd agree that there were authors on
9 this article with you who are clinicians?
10 A. Yes.
11 Q. And it was your understanding that the --
12 this article was circulated to them for review and
13 comment before it was published?
14 A. The first author is usually the one who
15 writes it, yes, and she is a pharmacist at UNC.
16 University of North Carolina, sorry.
17 Q. It was certainly your understanding, when
18 this article was published, that -- that that
19 statement in the article was supported by the
20 clinicians who are authors?
21 A. I can only assume that.
22 Q. And you don't have any reason to believe
23 otherwise?
24 A. I don't.
25 Q. If you look over on page 1139 to 1140.

1 Sort of the last paragraph in 1139 page,
2 there is a -- a paragraph that begins, "In
3 conclusion."
4 Do you see that?
5 A. Yes.
6 Q. So this article states, "In -- in
7 conclusion, this study evaluating the performance
8 of a large variety of coagulation tests in patients
9 on therapeutic doses of rivaroxaban shows that A,
10 the PT, APTT and ACT are often normal in spite of,"
11 quote, "on-therapy," close quote, "rivaroxaban
12 plasma levels, but normal values do not rule out
13 that a patient is taking therapeutic doses of
14 rivaroxaban and do not prove the absence of
15 circulating drug."
16 Did I read that correctly?
17 A. Yes.
18 Q. And do you agree with that?
19 A. Yes.
20 Q. And if you look down at subsection C,
21 another part of this conclusion reads, "The -- the
22 PT and ACT are often prolonged at peak on-therapy
23 rivaroxaban levels but correlate poorly with drug
24 levels. Thus they can provide a rough estimate
25 that rivaroxaban is circulating but not provide

1 meaningful -- meaningful information on absolute
2 drug levels."
3 And then, D, "PT and APT measured from
4 whole blood" -- oh, never mind about that. We'll
5 just stop with C.
6 A. Okay.
7 Q. So the subsection C that I read, do you
8 agree with that?
9 A. Yes.
10 Q. So am I correct that what subsection C of
11 that sentence is saying is that what an elevated PT
12 in a rivaroxaban patient would tell you is that at
13 the time the blood is drawn, there is rivaroxaban
14 circulating in the blood?
15 MR. ABNEY: Object to form.
16 THE WITNESS: The way I read it is that
17 when we're talking specifically about the peak
18 sample collection on these patients, and what was
19 defined as "on therapy," it's prolonged in these
20 patients. Often prolonged.
21 BY MS. DAVIS:
22 Q. And -- and that information can provide you
23 a rough estimate that rivaroxaban is circulating
24 but does not provide meaning -- meaningful
25 information as to drug levels; correct?

Page 142

1    A. Because of the --
2    Q. Go ahead.
3    A. Because of the poor correlation. That's
4  why I can't make that more accurate determination
5  about quantitating the drug level."
6    Q. Mr. Gosselin, just based on your experience
7  in hemostasis, are you aware that when patients
8  take warfarin, that because of the way warfarin
9  works, to decrease production of vitamin K
10 dependent coagulation factors by the liver, that
11 when a patient stops taking the warfarin, that it
12 takes an amount of time, like days, for the rivar
13 to produce more vitamin K-dependent factors, such
14 that the anticoagulation effect of warfarin lingers
15 or stays in the body for a prolonged period of time
16 after warfarin is stopped?
17   A. You're technically incorrect by saying they
18 don't produce vitamin K-dependent factors. They
19 still produce them. They just don't work. So it
20 takes several days for that carboxylation process
21 to work and get the levels based on the half-lives
22 of factor II and factor X, not which are very long.
23 But factor VII recovers very quickly, because
24 half-life is only about 10 to 12 hours.
25   Q. But you'd agree as a general proposition

Page 143

1  that when a patient stops warfarin, it takes
2  several days for the anticoagulation effect of the
3  warfarin to disappear?
4    A. Completely, yes.
5    Q. And that's because of the way that warfarin
6  works?
7    A. Yes.
8    Q. And because of the way warfarin works on
9  the liver, it's considered an indirect-acting drug?
10   A. I'm not sure it's a term we use for
11 warfarin. We tend to use that for heparin. But
12 I'm not sure about that's what we use for warfarin.
13 That's an unfamiliar phrase to me in that context
14 of that drug.
15   Q. But you'd agree that Xarelto is a
16 direct-acting drug?
17   A. Hence under the classification of DOACs,
18 direct oral anticoagulants, yes.
19   Q. And it has a short half-life as com -- as
20 compared to what we've been talking about with
21 warfarin?
22   A. Well, "short" is relative, and I don't
23 remember what the half-life of Xarelto is. Again,
24 that's -- for me it's not important to have the
25 information about volume and distribution

Page 144

1  half-lives because that's not part of my clinical
2  practice.
3  BY MS. DAVIS:
4    Q. Is it -- is your general understanding
5  that -- that Xarelto is a drug that, when it's
6  present in the body, it's acting, but when it's
7  cleared from the body, anticoag -- coagulation is
8  restored, as opposed to the situation with warfarin
9  and the clotting factors?
10   A. You have to phrase that one over again for
11 me, please.
12   Q. Do you agree just generally that you get a
13 restoration of coagulation much more quickly when
14 you stop Xarelto than you do when you stop
15 warfarin?
16   A. I would assume that based on the half-life,
17 which I don't remember what it is, but I believe
18 it's fairly short compared to warfarin, whereas
19 warfarin would take days. It may not take that
20 long, with the assumption there is normal renal
21 capacity.
22   Q. That's your general understanding?
23   A. That's my general understanding as a lay
24 person in the clinical arena of Xarelto.
25   Q. And is it also your understanding, from

Page 145

1  your experience with laboratory hemostasis, that
2  it's much more important and critical to know the
3  timing of the blood draw in a Xarelto patient in
4  order to make any interpretation of it, as compared
5  to a warfarin patient?
6    A. I'm not sure I would agree with that
7  statement. I think it helps interpret the number.
8  But it may not be absolutely necessary.
9      (DEFENDANTS' EXHIBIT 10 WAS MARKED.)
10 BY MS. DAVIS:
11   Q. I'll hand you what I've marked as Exhibit
12 10 to your deposition.
13     And you'd agree that what I've marked
14 Exhibit 10 -- and I don't know how to pronounce
15 this name, but the first author is D-o-u-x-f-i-l-s?
16   A. Douxfils.
17   Q. Douxfils, okay.
18     And you'd agree that this is an article
19 that you discuss in your expert report?
20   A. I believe so, yes.
21   Q. And if you look at the last sentence in the
22 abstract of the Douxfils article that you discuss
23 in your report, do you see the sentence that reads,
24 "Standardization of the time between the last
25 intake of rivaroxaban and the sampling is

37 (Pages 142 to 145)

1  mandatory"?
2      Do you see that?
3      A. Yes.
4      Q. And do you -- you don't disagree with that
5  statement; do you?
6      A. I would -- I would caveat the statement by
7  saying that if you have a patient that comes into
8  the emergency department that gets a drug level
9  drawn, it's no longer mandatory that it be timed.
10  It's an assessment of the clinical scenario of the
11  patient.
12      So if Dr. Douxfils is implying that if
13  you're assessing, it's part of a routine or
14  clinical setting of a patient, then it's mandatory.
15      But a -- a random sample certainly has its
16  place. It depends on the clinical presentation, in
17  my opinion.
18      Q. Would you agree that it's -- that it's your
19  understanding and been your experience that knowing
20  the -- when the last intake of rivaroxaban occurred
21  may not be possible to find out, for example, if
22  the patient's unresponsive?
23      A. Yes.
24      Q. Okay. Do you agree that needing to know
25  the time between the last intake of rivaroxaban and

1  the time of the blood sampling and -- that that's
2  often a very difficult thing to do?
3      MR. ABNEY: Object to form.
4      THE WITNESS: I can't give an opinion one
5  way or the other. Again, I don't see the patients.
6  I'm not in the clinical arena. I just get a
7  sample. And so I don't know how difficult or easy
8  it would be. So I have no --
9  BY MS. DAVIS:
10      Q. Would you turn to --
11      A. Are we on 10 still?
12      Q. Yeah.
13      Exhibit 10. And actually -- yeah, Exhibit
14  10. In the -- the conclusion of the study.
15      So it says at the top, page 10.
16      And do you see, about -- it's actually the
17  second-to-the-last sentence in the conclusion,
18  there's a sentence that begins, "The time"?
19      Do you see that?
20      A. Yes.
21      Q. And the sentence reads, "The time between
22  the drug intake and the sampling is primary to
23  interpret correctly the results."
24      Do you agree with that as concerns
25  rivaroxaban?

1      A. Do I agree with that?
2      Q. Yes.
3      A. Okay. So I'm going to kind of backtrack on
4  what the premise of this article is. And if you
5  look at the introduction to the article, they talk
6  about searching for optimal dose in the patients.
7      And so everything is based on a -- a timed
8  study for this kind of -- not a random study. Just
9  a timed study. This is the premise of the article.
10      So with that premise, do I agree with the
11  statement that a timed collection is required?
12  Yes.
13      Q. Do you agree that with rivaroxaban, that
14  when you have a blood sample taken from a patient,
15  that in order to correctly interpret the results of
16  coagulation testing about rivaroxaban that are done
17  on that patient, that it's important to know the
18  time between the drug intake and the sampling?
19      MR. ABNEY: Object to form.
20      THE WITNESS: It depends on the question
21  being asked.
22      And again, if we're citing this Exhibit 10,
23  the concept that they're dealing with here is the
24  concept of dosing based on timed studies.
25      If you're asking me if somebody comes in

1  the emergency department that is unresponsive or a
2  poor historian and we give them a level, I don't
3  think that is as germane. But again, I am not a
4  clinician.
5      But based on my discussions with
6  pharmacists or clinicians, it's less of an issue to
7  interpret that result when they're dealing with a
8  patient with an acute event.
9      So I think the context is pretty important.
10  What's the premise of the question?
11      And in your Exhibit 10, it's -- the premise
12  is based on a dosing change potential in certain
13  population, in which case the timed study is
14  necessary.
15  BY MS. DAVIS:
16      Q. Do you --
17      A. In my opinion as a laboratory person; not a
18  clinician.
19      Q. Do you agree that if -- if -- if one were
20  attempting to assess the anticoagulation effect of
21  rivaroxaban, that it's important to know the time
22  between the drug intake and the time of the blood
23  sample?
24      A. Again, that's -- that is laboratory, and
25  it's not important to me. As a clinician, you have

1  to ask them and how they treat or deal with the
2  patient.
3       It doesn't impact a number I give them for
4  a drug level, whether it's a timed or it's a random
5  sample. The interpretation result would be up to
6  the clinician. And I would suspect it would impact
7  them. But I cannot speak on behalf of clinicians.
8     Q. If you were asked by a clinician at UC
9  Davis regarding a rivaroxaban -- if they were to
10  ask you, "If -- if I were going to assess through
11  some laboratory hemostasis test the -- or attempt
12  to assess the anticoagulation effect of Xarelto
13  through a laboratory test, would it be important
14  for me to know the time between when the patient
15  last took the drug and the time of the sample?"
16  what would you tell them?
17     MR. ABNEY: Object to form.
18     THE WITNESS: Again, I -- I think, based on
19  the publications that we have, I think there's two
20  questions that are being asked, typically, by
21  clinicians in my practice. Is it there? And how
22  much is there?
23     Usually the "Is it there?" is because
24  they're doing some sort of intervention. If they
25  have a patient that is having an acute event, it's,

1  "How much is there?"
2     Once I provide that information, any
3  questions that they refer to me that has to do with
4  any kind of clinical interpretation, I punt, and I
5  usually refer them to the anticoagulation
6  pharmacists, either by pager, by name or by office
7  number.
8  BY MS. DAVIS:
9     Q. In an emergency situation, you'd agree that
10  it's not always possible to know the timing of the
11  last dose?
12     A. Yes, I would agree with that.
13     Q. But would you agree that in all other
14  situations, that if that information can be
15  obtained, that it's helpful?
16     A. Again, not being a clinician, I would only
17  speculate that it provides useful information. But
18  I have no idea how they would use that number in
19  their management.
20     (DEFENDANTS' EXHIBIT 11 WAS MARKED.)
21  BY MS. DAVIS:
22     Q. Mr. Gosselin, I'm going to hand you what
23  I've marked as Exhibit 11 to your deposition.
24     And do you recognize this as an article on
25  which you're the first author that was published in

1  the Journal of Thrombosis and Hemostasis in 20 --
2  2016?
3     A. Yes.
4     Q. So this was just published this year?
5     A. Yes.
6     Q. And you're the lead author?
7     A. Yes.
8     Q. And it's entitled, "The laboratory's 2015
9  perspective on direct oral anticoagulant testing";
10  correct?
11     A. Yes.
12     Q. And if you look at page 889.
13     Do you see at the bottom of the first
14  column on page 889, there is a sentence begins,
15  "There is sufficient evidence"?
16     Do you see that?
17     A. Yes. Yes.
18     Q. And if you'll read along with me, do you
19  agree that this article states, "There is
20  sufficient evidence from the use of DOAC-treated
21  patient samples to indicate that routine screening
22  tests, such as the PT and APTT, are not adequate in
23  these situations"?
24     Do you agree with that statement?
25     A. If "these situations" are under the unknown

1  medication history, the answer is yes.
2     Q. And if you go over to the next page, page
3  890, do you see the section that's entitled, "How
4  much anti-factor Xa DOAC is present"?
5     A. Yes.
6     Q. And looking at the first sentence in that
7  section, do you see where this article that you
8  wrote states, "Although the PT may be relatively
9  sensitive," open paren, "as compared with the
10  APTT," close paren, "to anti-factor Xa DOACs, this
11  test should not be used to quantify or estimate
12  drug con -- drug concentration"?
13     Do you agree with that?
14     A. Yes.
15     Q. And do you agree that that sentence, in
16  other words, the fact that PT should not be used to
17  quantify or estimate drug concentration of Xarelto,
18  applies to each and every PT reagent?
19     A. I would not agree with that statement.
20     What I would agree with, when we say "PT,"
21  we're collectively pooling all the data together.
22  Because physicians, to my knowledge, don't really
23  know what method they have in the laboratory. And
24  so to say something as generic as the PT may be yes
25  or no, we have to take the lowest common

1  denominator and use that as the -- the yardstick,
2  as opposed to a -- a global application saying all
3  the protimes are sensitive or insensitive.
4      So I think it's -- we -- we caveat some of
5  our things when we're not specific. If we were
6  being specific, we would say so.
7      Q. You'd agree that in your experience -- or
8  that it's your belief that physicians are generally
9  not aware of what PT reagent is being used by a
10 laboratory?
11     A. I would agree with that statement.
12     Q. And you'd agree that as concerns Xarelto,
13 that PT should not be used to quantify or estimate
14 drug concentration; correct?
15     MR. ABNEY: Object to form.
16     THE WITNESS: I would say as a global
17 statement, that is correct.
18 BY MS. DAVIS:
19     Q. Let's turn back to your report for a
20 minute, and back to page 10.
21     If you look at the bottom of page 10, do
22 you see the sentence that begins, "Factitious
23 causes'"?
24     A. Mm-hm.
25     Q. And you --

1      A. Yes.
2      Q. And do you agree that in that sentence,
3  you're talking about factitious or false causes for
4  prolonged clotting times?
5      A. Yes.
6      Q. In other words, falsely high PT results?
7      A. Yes.
8      Q. And -- and you go over numerous reasons
9  that can result or can cause a PT result to give a
10 falsely high reading?
11     A. I don't think I'm specific to PT. I think
12 I say clotting times would be specific to PTTs,
13 anything a clot-based assay. So yes.
14     Q. But you were including PT in this
15 discussion?
16     A. I was not excluding it as well, so yes.
17     Q. And you're aware that there are, you know,
18 multiple things that can falsely increase a
19 prothrombin time result?
20     A. There are a few. It's not as many as
21 perhaps the PTT, but yes.
22     Q. And would you agree that one of the things
23 that can falsely increase a PT result is if the --
24 if more than 24 hours has passed since the sample
25 was drawn?

1      A. The 24-hour stability is what's currently
2  listed under CLSI, the Clinical Laboratory
3  Standards Institute. Stability is 24 hours. So
4  whether it goes prolonged or shortened, I don't
5  know.
6      And that would be at room temperature, by
7  the way, not frozen or -- that's a little bit
8  longer. So I assume that you meant 24 hours at
9  room temperature.
10     Q. So is it your testimony in this case that
11 you're not aware of whether a PT sample being more
12 than 24 hours old and being at room -- room
13 temperature would increase the PT result falsely?
14     A. No. What I said is I -- I don't know the
15 context of, let's say, a drug that has Xarelto in
16 it or -- and it's prolonged at six hours, will it
17 get shorter at 24 because the drug is gone or
18 whether instability of the drug. So it's unclear
19 to me. If we're talking about a normal sample, the
20 likelihood is the factor lability in that sample
21 would be degrading, so the pro -- the clotting time
22 would be increased. But if it starts out high, it
23 may go lower.
24     So it's unclear, the context when you
25 generically say, 24 hours, would it get prolonged?

1  I don't know. In a sample that has an
2  anticoagulant, it may get shorter. The direct
3  anticoagulant. Not a warfarin anticoagulant.
4      Q. But you'd agree that generally, as concerns
5  a test for prothrombin time done in a patient, that
6  if that sample sits at room temperature for longer
7  than 24 hours, you would expect that to be a factor
8  that could falsely prolong the PT time?
9      A. That sample should not be used for testing.
10     Q. Because it could falsely prolong the
11 prothrombin time?
12     A. Because it's been recommended by the
13 clinical CLSI that stability is at 24 hours, as
14 well as manufacturer package inserts. So it should
15 not be used for testing. Regardless of what may or
16 may not happen with the results.
17     Q. Now in your report, when you're talking
18 about things that can falsely prolong clotting
19 times, including PT times, one of the things is --
20 well, actually it's one of the things you don't
21 mention, but -- you don't mention problems with the
22 actual blood draw itself; do you?
23     A. True.
24     Q. But you would agree that there can be blood
25 collection problems, such as not filling the tube

Page 158

1    -- the sodium citrate tube full with blood, that
2    can also prolong a PT test result falsely?
3        A.  It may, yes.
4        Q.  And if for some reason the blood sample
5    clots before it's tested, that can prolong the PT
6    time result; right?
7        A.  It may, yes.
8        Q.  And if the blood is drawn from a patient
9    from an IV line, where the blood becomes diluted,
10   that can falsely increase the PT time; correct?
11       A.  That more likely will cause a false
12   prolongation.
13       Q.  And these are all lab -- either in the
14   passage of time, they're all lab or collection
15   areas that we've been discussing; right?
16       A.  I'm sorry?
17       Q.  I said, all these things that can falsely
18   prolong the PT time, such as the passage of time,
19   the temperature, the way the blood is drawn or
20   collected, those are all what you call preanalytic
21   variables that are either lab or collection errors?
22       A.  They would not be considered laboratory
23   errors.  They would be considered preanalytical
24   errors.  Analytical errors would be more related to
25   the lab.

Page 159

1        Q.  But you'd agree those are all preanalytical
2    errors that can falsely prolong the PT time?
3        A.  Those are preanalytical conditions that may
4    result in erroneous lab results.
5        Q.  And you'd agree that you're aware that are
6    there are clinical issues in patients that can
7    prolong the PT time?
8        A.  Yes.
9        Q.  And you'd agree that there are clinical
10   issues in patients that can prolong the PT time
11   that are unrelated to any anticoagulant drugs?
12       A.  Yes.
13       Q.  Such as liver disease --
14       A.  Yes.
15       Q.  -- that -- that affects vitamin K-dependent
16   factors?
17       A.  Yes.
18       Q.  Or inherited factor deficiencies?
19       A.  Which are rare, but yes.
20       Q.  And you mentioned in your report, at the
21   top of page 11, a couple of other things; right?
22       A.  Yes.
23           And I will have to correct you again for --
24   because I'm a purist.  It's not just vitamin K
25   factors.  The liver makes them -- makes all of them

Page 160

1    except for one.
2        Q.  Which is why liver disease can be
3    important?
4        A.  For other reasons.
5        Q.  Yes.
6            And over on page 12 of your report, near
7    the bottom of the page, you mention several other
8    conditions that can make -- in patients that can
9    make an abnormal PT result even in patients who
10   have normal coagulation factor levels?
11       A.  Yes.
12       Q.  If you would turn over to page 17 of your
13   report, that's the section of your report entitled,
14   "Xarelto assessment using screening tests, the
15   data"; correct?
16       A.  Yes.
17       Q.  And this is a section of your report where
18   you discuss literature?
19       A.  Yes.
20       Q.  And it looked to me like you discussed it
21   sort of in chronological order.
22       A.  Yes.
23       Q.  And you begin by citing to data from rats
24   and rabbits.  And you'd agree -- is it your
25   experience that -- especially with a -- a new

Page 161

1    compound, that animal tests are done prior to human
2    testing?
3        A.  Yes.
4        Q.  But you'd also agree that it's well
5    recognized that animal testing may not reflect the
6    human condition precisely?
7        A.  It definitely does not.
8            MS. DAVIS:  Well, he's telling me we need
9    to change the tape.  So why don't we take a break
10   for a minute.
11           THE WITNESS:  Those are little tapes.
12           THE VIDEOGRAPHER:  This is the end of Disc
13   Number 2.  We're off the record at 10:39 a.m.
14           (Recess taken.)
15           (DEFENDANTS' EXHIBIT 12 WAS MARKED.)
16           THE VIDEOGRAPHER:  We are back on the
17   record.  This marks the beginning of Disc Number 3
18   in the deposition of Robert C. Gosselin.  The time
19   is 10:48 a.m.
20   BY MS. DAVIS:
21       Q.  Mr. Gosselin, we just took a brief break.
22   Are you ready to continue?
23       A.  Yes.
24       Q.  And we were looking at page 17 of your
25   report, and I'd like to hand you what I've marked

41 (Pages 158 to 161)

1  as Exhibit 12 to your deposition.
2       And you recognize this as one of the
3  articles that you discuss on your -- in your
4  report?
5       A. Yes.
6       Q. And in your report you state that this
7  article -- this Perzborn article that we marked as
8  Exhibit 12, that the authors used the concept of the
9  amount of drug to double the clotting time from
10 baseline as a means to compare the sensitivity of a
11 laboratory test of the drug.
12      That's one of the things you wrote in this
13 article -- that you wrote in your report regarding this
14 article?
15      A. Yes.
16      Q. And if you turn to page 520 of this
17 article, and the very last concluding paragraph, do
18 you also agree that the authors of this article
19 also stated that the clinical revel -- relevance of
20 this data needs to be investigated?
21      A. I'm sorry, what do you want me to comment
22 on? Do I read that sentence?
23      Q. Yes.
24      Do you agree that this was data from its
25 testing on rats and rabbits, and that the authors

1  acknowledged that clinical relevance of these data
2  needs to be investigated?
3       A. I acknowledge they wrote that sentence in
4  their article, and yes, it was done on animal models.
5       Q. And it was submitted for publication in 2004;
6  correct?
7       A. Yes.
8       (DEFENDANTS' EXHIBIT 13 WAS MARKED.)
9  BY MS. DAVIS:
10      Q. I'd like to hand you what I've marked as
11 Exhibit 13 to your deposition.
12      And is this another article that you discuss
13 in your report?
14      A. Yes.
15      Q. And in your report, regarding this article,
16 you state that the reagent used for PT testing in
17 this article was Neoplastin Plus; is that correct?
18      And if you look on page 415 of Exhibit 13,
19 you'll find that information.
20      A. I don't believe I cited in my report that
21 it was Neoplastin. I just said they note the
22 linear relationship between BAY 59-7939 and PT
23 measurements. I believe that was the reference.
24      Q. Okay. I didn't mean to misspeak.
25      But you'd agree with me that you did

1  discuss Exhibit 13 in your report, and you -- in
2  your report you stated that these authors of
3  Exhibit 13 noted a linear relationship between BAY
4  59-7939 and PT measurements; that's what --
5       A. Yes.
6       Q. -- you state in your report; right?
7       A. Yes.
8       Q. And if you look at page 415 of Exhibit 13, on
9  the left-hand side under the diagrams, do you see where
10 it states that the PT reagent used in this testing was
11 Neoplastin Plus?
12      A. Where are we here? I'm on 415. And you said
13 PT.
14      Oh, okay. Okay. Now I see that, yes.
15      Q. Okay. Is there a difference between
16 Neoplastin Plus and Neoplastine CI Plus?
17      A. That's a very good question. But they --
18 the answer appears to be no, based on discussions
19 with Stago. There appears to be a lot of
20 literature with Neoplastin without the "e" and
21 Neoplastine with the "e." But asking the
22 manufacturer whether there were two different
23 reagents, the answer is no.
24      At first I thought it may have been because
25 the first one was distributed under Roche, perhaps

1  they relabeled the reagent, but that answer is
2  apparently no.
3       And I'm sorry, I believe you said
4  Neoplastin Plus and Neoplastine CI Plus, and I
5  believe there might be a manufacturing difference,
6  but I'm unaware of what that may be, but there is a
7  difference in the way that Neoplastine is spelled
8  in many articles and whether or not there was a
9  difference between those two reagents.
10      Q. And you're aware and acknowledge on -- in an
11 attachment to your report that Neoplastine CI and
12 Neoplastine CI Plus and Neoplastin R can have
13 different ISI values?
14      A. I can only speculate, because again, I -- I'm
15 not aware of the specifics of the Neoplastine series of
16 reagents. But if I have it here, then the answer is
17 yes. But I don't know if I have it here.
18      Q. So I was looking at the --
19      A. Supplemental.
20      Q. It should be the last page of Exhibit 1,
21 your report.
22      A. Oh, yes.
23      So this comes from Dr. Depasse, who's part
24 of Stago. And this is the information he did
25 provide me.

1    Q. And he provided you information that
2  Neoplastine CI and Neoplastine CI Plus and
3  Neoplastin R have different ISI values?
4    A. That's what he provided, yes.
5    Q. And you'd agree that having different ISI
6  values would make them perform differently as reagents
7  when used in PT testing?
8    A. It depends on the sample being tested, yes.
9     It is unclear whether the normal range would
10  be any different if it's a normal population, but
11  definitely would give you different clotting times with
12  warfarin-treated patients.
13    Q. But it's a variable between the reagents?
14    A. It is a --
15    MR. ABNEY: Object to form.
16    THE WITNESS: -- sensitivity --
17    MR. ABNEY: Go ahead.
18    THE WITNESS: It is a sensitivity difference
19  between the reagents, yes.
20  BY MS. DAVIS:
21    Q. So you agree that Neoplastine CI,
22  Neoplastine CI Plus and Neoplastin R have different
23  sensitivities?
24    A. In the context of ISI, which is determined
25  from WHO-prepared material in normal and stabilized

1  warfarin patients, that's a statement you can make
2  in those populations for warfarinized patients,
3  yes.
4    Q. If you would look at page 18 of your report,
5  please.
6     Right in the middle of the page, you have a
7  sentence that reads -- you say, "As with the Perzborn
8  group, this study used Neoplastin PT reagent on an
9  Amelung coagulation analyzer"?
10    A. Yes.
11    Q. Is that the same Perzborn that on page 17 you
12  said that there was poor description of the reagents
13  used for this analysis, other than they were from
14  commercially available kits?
15    A. I don't remember which Perzborn article I
16  cited for that one.
17    Q. Well, that was the only other Perzborn article
18  I saw cited in your report.
19     Are you aware of another Perzborn article?
20    A. Well, there's one here that's here on
21  the -- in the 2005 citation that's -- it is two
22  citations in the first one, and she is -- I believe
23  it's a she -- I don't know -- is a first author,
24  Journal of Thrombosis and Haemostasis.
25     I don't know if that's a similar article.

1  It may be the same one. I don't remember.
2    Q. Well, can you point me to what you meant
3  by -- when you said, "As with the Perzborn group,
4  this study used Neoplastin PTA reagent? Can you --
5    A. I -- yeah.
6    Q. Can you point to me where those two things are
7  the same?
8    A. Well, what I mean by "the Perzborn group" is
9  that she's a co -- and again, I'm not sure if it's a
10  she or a he -- is a co-author in studies. And I don't
11  specifically remember which article this is referring
12  to.
13    Q. Well, you'd agree that if you look at page 17
14  of your report --
15    A. I'm sorry?
16    Q. If you look at page 17 of your report --
17    A. Okay.
18    Q. -- the Perzborn article that you cite there --
19    A. Yes.
20    Q. -- which is, "In vitro and in vivo studies of
21  the novel antithrombotic agent BAY 59-7939" --
22    A. Yes.
23    Q. -- that you say there that -- you say,
24  regarding that article, that there -- that all that
25  was provided regarding reagents was that they were

1  from commercially available kits.
2     Right?
3    A. I'm sorry, one more time.
4    Q. Regarding the Perzborn article --
5    A. Yes.
6    Q. -- that's cited on page 17 of your report --
7    A. Yes.
8    Q. -- you -- all you say regarding the re --
9  description of the reagents used in that analysis was
10  that they were from commercially available kits."
11    A. Yes.
12    Q. And then on the next page, you say, "As with
13  the Perzborn group, this study used Neoplastin PT
14  reagent" --
15    A. Yes.
16    Q. -- where you're referring to the Kubitza
17  paper, the 2006 Kubitza paper; right?
18    A. Kubitza paper.
19     I guess I'm trying to figure out which
20  question you're trying to ask.
21    Q. You see, on page 18 of your report, where
22  you're --
23    A. 18?
24    Q. -- talking about the --
25    A. Yes.

1    Q. -- 2,000 bits -- bits of paper, that --
2    A. "As with the" --
3    Q. -- you say --
4    A. -- "Perzborn group, this study used Neoplastin
5  on an Amelung coagulation analyzer."
6        That sentence, yes.
7    Q. And what I want to know is --
8    A. Yes.
9    Q. -- what Perzborn group are you talking about?
10   A. This paper here.
11   Q. Okay.
12   A. It does list it.
13       So now we're going to go back here and say
14 that it was poorly defined; right? Is that what you
15 want to get to?
16       I'm trying to figure out where you're --
17   Q. So in the Perzborn paper --
18   A. Your Exhibit 12.
19   Q. Right.
20   A. It does list Neoplastin as a reagent.
21   Q. And show me what you're looking at on the
22 -- on Exhibit 12.
23   A. Here's the methods under the second page,
24 "Material and methods," towards the bottom,
25 "Neoplastin Plus from Roche Diagnostics."

1        So perhaps, when I drafted this, I used
2  notes from different articles, and there was
3  perhaps an article that was not clear about
4  commercially available kits.
5        But it's clear that the Perzborn article
6  here does cite Neoplastine CI Plus or CI -- no
7  Plus. I'm sorry, I don't recall which one it is.
8  Neoplastin Plus. In your article Exhibit 12 where
9  she is the first or he is the first author.
10   Q. So would you agree that on page 17, when
11 you were discussing the Perzborn article and you
12 commented that there was poor description of the
13 reagents used for this analysis, that that was
14 incorrect?
15   A. Apparently so.
16       Can I caveat this?
17       And where I'm getting that -- that citation
18 from is under "Coagulation" under "In vitro studies."
19       It cites "activated partial thromboplastin
20 time," in parentheses, "APT, and prothrombin time,"
21 parentheses, "PT," "were measured using
22 commercially available kits," pluralized.
23       And so I do not see "kits" pluralized in
24 this "Material and methods" under "Agents." And
25 so -- which made it a little bit unclear to me that

1  they were using more than one methodology.
2        So that's perhaps where I got the
3  "commercially available kits" as to my parentheses
4  and quotations, even though, under
5  "Material/methods," they cite one reagent.
6    Q. So you'd agree that on page 18 of your report,
7  where you say that both the Perzborn group and the
8  Kubitza group used Neoplastin PT, you'd say that your
9  testimony now is that you can't be sure about that?
10   A. I'm citing two different things in their own
11 article.
12       One is under "Material/methods" where they
13 cite the Neoplastin Plus. And then another portion
14 where they talk about coagulation assays and they
15 pluralized the "methodologies," which makes it unclear
16 to me if there was another method. So yes, it's
17 unclear.
18       So I'm not sure if I'm changing my -- I'm just
19 iterating what they provided.
20   Q. So what you're saying is that on page 18,
21 where you say, "As with the Perzborn group, this study
22 used Neoplastin PT," that it's unclear to you as to
23 whether they also used other reagents?
24   A. Correct.
25       MS. DAVIS: Should we break for lunch? Is

1  that suitable? Agreeable?
2        THE WITNESS: I'm sorry?
3        MS. DAVIS: Do you want to take a lunch break?
4        THE WITNESS: Yeah, I need breakfast.
5        MR. ABNEY: We'll take a breakfast break.
6        THE VIDEOGRAPHER: Going off the record. The
7  time is 11:04 a.m.
8        (Lunch recess taken.)
9        THE VIDEOGRAPHER: We are back on the
10 record. The time is 12:11 p.m.
11 BY MS. DAVIS:
12   Q. Mr. Gosselin, we just took a break for
13 lunch. Are you ready to proceed?
14   A. Yes, ma'am.
15   Q. Okay. This morning I had asked you what PT
16 reagent UC at California Davis, your institution
17 where you work, uses and you said Innovin?
18   A. Yes.
19   Q. Is that the only PT reagent that you use at
20 your institution?
21   A. For routine, clinical use, yes.
22       MS. DAVIS: Ready? Or do we need to go off
23 the record?
24       (DEFENDANTS' EXHIBIT 14 WAS MARKED.)
25 BY MS. DAVIS:

1    Q. Mr. Gosselin, I want to hand you what I've
2  marked as Exhibit 14 to your deposition. And this
3  is an article where the first author is named
4  Hillarp.
5        And do you recognize this article as one of
6  the ones that you discuss in your expert report?
7    A. I would have to verify that. But I'm --
8    Q. Okay.
9    A. -- going to assume it's correct.
10    Q. Well, if you'd like to pull it out, your
11  report, it's on page 21.
12    A. Yes.
13    Q. And if you'll turn to page 138 of the
14  Hillarp article that we marked as Exhibit 14.
15        I'd like to -- to direct your attention to
16  a sentence that appears near the end of the
17  article. It's in the paragraph above the
18  acknowledgements. And it begins -- if you look at
19  the left-hand column, about halfway down, it begins
20  with the words, "Thus the APTT and PT."
21    A. Oh, here. Yeah.
22    MR. ABNEY: I think she meant right-hand
23  column.
24        Right?
25    MS. DAVIS: I did. I meant right above the

1  acknowledgements.
2    MR. ABNEY: Right.
3    MS. DAVIS: Yeah, I'm sorry if I misspoke.
4  BY MS. DAVIS:
5    Q. Do you see the sentence that begins, "Thus the
6  APTT and PT"?
7    A. Yes, ma'am.
8    Q. Okay. So if you follow along when I read, do
9  you see where this Hillarp article that you discuss in
10  your report says, and I quote, "Thus the APTT and PT
11  are not useful for measuring the plasma concentration
12  of rivaroxaban and can merely be used to obtain a
13  crude estimate. If the aim is to measure the
14  pharmacodynamic effect of rizarox -- rivaroxaban,
15  more specific assays, preferably based on factor Xa
16  inhibition, should be used"?
17        Did I read that correctly?
18    A. Yes.
19    Q. And you agree with that sentence; don't you?
20    MR. ABNEY: Object to the form.
21    THE WITNESS: If they're basing their
22  conclusions on this study they did, I would have to
23  caveat the statement that they used contrived samples,
24  which are demonstrated to be subsequent to the
25  publication date of this, 2010, that that may not

1  be optimal for or mimic patient samples.
2  BY MS. DAVIS:
3    Q. So will you agree that another sort of issue
4  in doing coagulation testing regarding Xarelto,
5  rivaroxaban, is that there may be differences
6  between results in spike samples versus patient
7  samples?
8    A. Yes. We published that findings, yes.
9    Q. So that then presents a difficulty in
10  knowing or being able to say that results in a
11  spiked sample are -- can be correlated to results
12  in a human sample; right?
13    A. I think that we've demonstrated that it's
14  not always the case where they can be mimicked
15  between a contrived sample or a drug-enriched
16  sample, as I like, versus "spiked," versus a series
17  of clinical samples.
18    Q. Going back to this statement in the Hillarp
19  article, and just sort of narrowing it down a bit, the
20  Hillarp -- Hillarp authors state in part that "PT is
21  not useful for measuring the plasma concentration of
22  rivaroxaban and can merely be used to obtain a crude
23  estimate."
24        Do you agree with that?
25    A. I'd have to read --

1    MR. ABNEY: Objection. Form.
2    THE WITNESS: Sorry.
3        I would have to read and see what methodology
4  they used. They use several different types.
5        And again, if they globally encompass all
6  PTs as a generic statement because they use the Owren
7  type and the Quick type, the Owren type is not
8  sensitive, and so they do not specifying PT
9  specifically. So I think as a global statement,
10  they take a very conservative approach to their --
11  their conclusion.
12  BY MS. DAVIS:
13    Q. Well, this is an article that you cite in
14  your report and that you're familiar with; correct?
15    A. Yes.
16    Q. And so just -- just taking the statement
17  outside the context of this article, I just want to
18  ask you, I mean, do you agree with the proposition
19  that PT cannot be used to measure the plasma
20  concentration of rivaroxaban and can only be used
21  to obtain a crude estimate of that concentration?
22    A. Based on my --
23    MR. ABNEY: Object to the form.
24    THE WITNESS: Based on my own experience, I
25  would agree with that statement.

Page 178

BY MS. DAVIS:
Q. And the same would be true if you were to use the Neoplastine CI Plus reagent; right? You would still only get a crude estimate of the plasma concentration of rivaroxaban?
MR. ABNEY: Object to form.
THE WITNESS: I don't have a personal experience with Neoplastine so I can't give an opinion based on my experience. Just published data.
And what I would say, that it possibly could because it's very linear. The slope is pretty strong versus some of the reagents where the slope is not as indicative of sensitivity.
BY MS. DAVIS:
Q. But even -- even with what you've described as a linear strong slope using Neoplastine CI Plus as the PT reagent with rivaroxaban, it still does not give you a precise plasma concentration of rivaroxaban; does it?
A. That statement I would agree with.
Q. Now I'd like to go back to Exhibit 10. Do you have that in front of you?
And this Exhibit 10 is the -- and I've already forgotten how to pronounce it.
A. Douxfils.

Page 179

Q. -- Douxfils art -- article that you discuss in your report on pages 24 to 25. And we talked a little bit about this -- this this morning.
If you could turn to page 964 of Exhibit 10.
A. I don't have 964. I have 1 --
Q. It has -- table 3 is at the top, and then it has some text below it.
A. Table 3? Okay.
Q. I believe that's it right there.
A. No.
Q. Go back.
I think if you look in the very top left, it says "964."
A. This is table 2.
No, I've got numbers 1 through whatever.
Q. Oh.
A. I have a different printout.
Q. I'm sorry.
A. So I have table 3.
Q. Oh, it's page 9. I apologize.
MR. ABNEY: No worries.
MS. DAVIS: I guess different copies are paginated differently. Sorry.
BY MS. DAVIS:

Page 180

Q. Okay. So you have the page that has table 3 at the top?
A. Yes.
Q. And underneath all the tables, there is a section entitled, "Recommendation for an acute" -- I'm sorry. I misread that. "Recommendation for an accurate monitoring of patients on rivaroxaban."
Do you see that section?
A. Yes.
Q. And if you look down at the last part of the left-hand column, there's a sentence that begins, "Sensitivity of PT."
Do you see that sentence?
A. Yes.
Q. And if you'll read along with me, the Douxfils article states, and I'm quoting, "Sensitivity of PT is dependent on the reagent. Therefore, the use of PT for the monitoring of rivaroxaban requires a calibration for each lot on each instrument and in each laboratory to define local cutoff values."
Did I read that correctly?
A. Yes.
Q. And is that consistent with your understanding?
A. My understanding or the -- study data?

Page 181

Q. Is it -- is it your under -- is that consistent with your understanding of the situation regarding the sensitivity of PT, and that if PT is going to be used for monitoring rivaroxaban, it would require a calibration of each lot of PT reagent on each -- on each instrument and in each laboratory to define local cutoff values?
A. Again, based on this study, which is another contrived study, which is not ideal, these conclusions made by the authors were based on this information here. This is the calibration for each lot. Even the calibration for rivaroxaban is, again, not a concept that's been embraced in the U.S. or even in Europe.
So I -- I can agree with pieces and disagree with other pieces, since it's one big statement with a bunch of components in it.
Q. So you'd agree that, as you put it, the -- the concept of doing -- using a calibrated PT to assess rivaroxaban has not been embraced in the laboratory world?
A. I would agree with that statement.
(DEFENDANTS' EXHIBIT 15 WAS MARKED.)
BY MS. DAVIS:
Q. I'm going to hand you what I'm marking as Exhibit 15 to your deposition.

1     And do you agree that -- excuse me -- what
2  we marked as Exhibit 15 to your deposition is an
3  article on which you are the first author that was
4  published in Thrombosis and Haemostasis Journal in
5  2015 entitled, "Evaluating the use of commercial
6  drug-specific calibrators for determining PT and
7  APTT reagent sensitivity to dabigatran and
8  rivaroxaban"?
9     A. Yes.
10    Q. Okay. And if you turn over to the last page
11 of this article, the conclusion.
12    Do you see in this article where you stated,
13 "In conclusion"?
14    Do you see where I am?
15    A. Yes.
16    Q. And do you see where the article says, "In
17 conclusion, our data suggests that use of
18 drug-specific calibrators for assessing the
19 relative sensitivity of NOAC to PT and APTT assays
20 may not be optimal, as an overestimation of
21 sensitivity occurred with drug-specific calibrators
22 compared with patient samples"?
23    Is that -- did I read that correctly?
24    A. Yes.
25    Q. And you agree that we -- in this article or

1  in that sentence, when you were discussing the
2  relative sensitivity of NOAC to PT, that that would
3  include Xarelto?
4     A. Yes.
5     Q. And what does this mean to you in the
6  laboratory as concerns the potential usefulness of a PT
7  test to assess the anticoagulant effect of Xarelto?
8     A. Prior to our study, there were recommendations
9  made by the scientific subcommittee on control of
10 anticoagulation as part of the International Society of
11 Thrombosis and Haemostasis, which I believe we
12 cited. And their recommendations were to use
13 drug-specific calibrators and controls or controls
14 to -- for each laboratory to assess the relative
15 sensitivity to Xarelto.
16    And dabigatran, even though that had never
17 been published or even -- so is more folklore. So
18 we took on that task to see whether or not it was
19 true. And it was okay for some reagents and not
20 okay for others.
21    Q. So your conclusion was that as far as a --
22 a global assessment, that that was not true?
23    A. We refuted the recommendations that were
24 suggested by a very reputable organization for
25 laboratory assessment for the sensitivity of the

1  reagents at a local level.
2     Q. And does that make it easier or more difficult
3  to assess the potential anticoagulation effect of
4  Xarelto using PT?
5     MR. ABNEY: Object to form.
6     THE WITNESS: I don't think it does either.
7     What I am suggesting is that the
8  recommendations were flawed. And so they were
9  recommended without any evidence. And so we're
10 providing some evidence that suggests that that may not
11 be an optimal way for individual laboratories to assess
12 the reagent to the sensitivity of the drug.
13 BY MS. DAVIS:
14    Q. So if I'm understanding, basically what
15 you're saying is what they were recommending,
16 you're saying will not work?
17    A. It did not work all the time for some
18 reagents. It was okay if you used the concept of
19 doubling time. It was equivalent for some reagents but
20 not for others when comparing between patient samples
21 and -- and the commercial drug calibrators.
22    Q. And what was your understanding as to why that
23 recommendation had been made by the organization that
24 you mentioned?
25    In other words, what -- what were they

1  trying to address through making that
2  recommendation?
3     A. I think it was well intended, again, to sort
4  of alleviate some of the concerns from laboratories
5  because there was very little data that laboratorians
6  read in their journals or by recommending bodies for
7  laboratory medicine, to possibly assess the local
8  sensitivities because some of the published data was
9  very unclear about the reagents used or the instruments
10 used.
11    And so this was, again, a concept that, in
12 theory, would have assisted laboratories.
13    It's -- we have ideas of why it doesn't work
14 and would propose other ideas that would work.
15    Q. And when you say it would have assisted
16 laboratories, how would it have assisted laboratories?
17    A. For those that use, let's say, a reagent or
18 reagent instrument combination that was not ever
19 published, let's say Neoplastin on a different
20 device, it would be able to assist them to say is
21 there equivalence, or at certain levels you see
22 outside the threshold of their normal reference
23 range if properly performed.
24    Q. And what your testing determined was that
25 that was not universally true?

1    A. Correct.
2    (DEFENDANTS' EXHIBIT 16 WAS MARKED.)
3    BY MS. DAVIS:
4    Q. I'd like to hand you what I've marked as
5  Exhibit 16 to your deposition. And this is an article
6  by Koscielny?
7    A. You're on your own there.
8    Q. Oh, I'm on my own there. Yeah, I don't know
9  how to pronounce it. But Jurgen, I -- I get that part,
10  Jurgen Koscielny, entitled, "Rivaroxaban and hemostasis
11  in emergency care."
12    And if you'd like to double-check, I believe
13  you discussed this article at the bottom of page 27 and
14  the top of page 28 in your report.
15    A. Okay.
16    Q. Is that correct?
17    A. Yes.
18    Q. And I just wanted to take a minute and go
19  over what you had to say.
20    In your report you say, "In 2014 Koscielny
21  and colleagues reported a series of PT results in
22  different populations of patients treated with
23  rivaroxaban."
24    And you go over that they studied several
25  different doses for both VTE and atrial fibrillation;

1  right?
2    A. Yes.
3    Q. And then you say, "Based on their" -- on the
4  next page, you say, "Based on their findings, they
5  concluded in acute situation, the determination of PT
6  could deliver valuable preliminary information on
7  the effect of rivaroxaban. A normal PT value,
8  obtained using a sensitive thromboplastin reagent,
9  indicates that a clinically significant" red --
10  "residual level of rivaroxaban is unlikely."
11    That's -- that's what you included in your
12  report regarding the Koscielny article; right?
13    A. It's in quotations, so that is what they wrote
14  verbatim.
15    Q. And then looking at the Koscielny article
16  that we marked as Exhibit 16, if you turn to the
17  second page, there's a section titled, "Laboratory
18  Testing of Rivaroxaban."
19    Do you see that?
20    A. Yes.
21    Q. And do you see section 2.1 that's entitled,
22  "Qualitative assessment of rivaroxaban using
23  prothrombin time"?
24    A. Yes.
25    Q. And if you look at the second sentence in that

1  first paragraph in the Koscielny paper, it states,
2  "Because of the variable sensitivity of APTT assays
3  to rivaroxaban, a PTT" -- I'm sorry, "APTT is
4  regarded as unsuitable for determining the
5  pharmacodynamic effect of rivaroxaban."
6    And that's -- you agree with that; right?
7    A. Yes.
8    Q. And then in the next sentence, it says, "The
9  PT is more sensitive than the APTT and is prolonged in
10  a concentration-dependent manner when sensitive
11  thromboplastin reagents such as STA, Neoplastine CI
12  Plus," and then it gives the manufacturer, are
13  used."
14    And that's essentially what you say in your
15  report about Neoplastine Plus -- CI Plus reagent
16  and using it in PT and rivaroxaban?
17    A. I don't say it. I report what they say.
18    Q. Right.
19    A. Yes.
20    Q. Right.
21    A. Yes.
22    Q. But my question is, what they say there is
23  essentially the same thing that you say in your report
24  about the Neoplastine CI Plus reagent and using it in a
25  PT test for Xarelto?

1    MR. ABNEY: Object to form.
2    THE WITNESS: I would have to draw that
3  conclusion because it's under a header. But it says
4  it's more sensitive -- better grammar would have said
5  more sensitive to what? But it doesn't clearly define
6  what it's sensitive to. It just says it's more
7  sensitive than the APTT, even though it's under a
8  header. So one has to make sort of a leap conclusion
9  they're talking about rivaroxaban versus the PT in
10  general.
11  BY MS. DAVIS:
12    Q. Oh, okay.
13    But if you -- if -- well, they have it under a
14  title of "Qualitative Assessment of Rivaroxaban."
15  So -- but assuming that this paragraph result --
16  relates to rivaroxaban --
17    A. Okay.
18    Q. -- in the Koscielny article, then you'd agree
19  that that sentence about the PT is prolonged in a
20  concentration-dependent manner when sensitive
21  thromboplastin reagent such as STA Neoplastine CI Plus
22  is used, that's what you say in your report about
23  Neoplastine CI Plus and using it in PT tests with
24  Xarelto; right?
25    A. Again, I don't say the word "sensitive"

1  because I don't think that's ever been defined. I
2  think I used their verbiage saying "sensitive."
3       I may have. But I think that's one of the
4  contentions, that we don't have a definition of what
5  defines "sensitive."
6       And when you say "like Neoplastine," from a
7  standpoint of a laboratory and what does that mean,
8  does that mean a correlation of X, Y or Z, or I'm --
9  it's not been well defined.
10      Q. So my question is a -- is a little bit
11 different.
12      In your report you make some summary points;
13 correct?
14      A. I believe I did, yes.
15      Q. And do you consider those summary points to
16 be summary of your opinions in -- in this
17 litigation?
18      A. And I believe I state that are based on the
19 literature cited. So yes.
20      Q. So the -- the basis for all the summary
21 points that you list in your report is the
22 literature that you cite in your report? We talked
23 about that this morning --
24      A. As -- well as --
25      Q. -- right?

1       A. -- my personal experience --
2       Q. Right.
3       A. -- yes.
4       Q. And do you hold all of these opinions in your
5  summary points to a reasonable degree of scientific
6  certainty?
7       A. Yes.
8       Q. And really what I'm asking you about this -- I
9  forget the name of it -- the Kos -- Koscielny article,
10 is, in your first bullet point here in your summary
11 points, you talk about the suitability of Neoplastine
12 CI Plus in assessing rivaroxaban; correct?
13      A. What I talk about is that the published
14 findings are very consistent with that reagent.
15      And the second bullet point, the published
16 findings for that reagent are fairly consistent.
17      And the third bullet point, the published
18 findings of that reagent are a little bit more dicey.
19      So they're inconsistent.
20      So I'm using the published literature, our
21 own experience and our own studies that we
22 published, to make these -- these bullet points,
23 yes.
24      Q. My question is this: The point -- the point
25 that you were trying to make in your report about

1  Neoplastine CI Plus on page 31, is the same point that
2  Koscielny is making in the sentence that we just
3  read a few minutes ago about PT being prolonged in
4  a concentration-dependent manner when sensitive
5  thromboplastin reagents such as STA Neoplastine CI
6  Plus is used?
7       MR. ABNEY: Object to the form.
8       THE WITNESS: And the --
9  BY MS. DAVIS:
10      Q. Right?
11      A. And he cites three references because that was
12 not part of his initial study, so he's starting to cite
13 his prestudy publications.
14      Again, my issue would -- what defines
15 "sensitive"?
16      Q. Will you agree that it's your opinion that
17 Neoplastine CI Plus is a sensitive -- do you think it's
18 sensitive to rivaroxaban? Or you don't know?
19      A. I think that's a relative term when you say
20 it's sensitive. To what? What is the measure that
21 you need for it to be in order to be used as either
22 a rule-out or rule-in with any degree of certainty?
23      I don't know enough about Neoplastin, other
24 than what's published. And so I have to rely on the
25 published data using patient samples versus contrived

1  samples.
2       Q. So I'm just trying to understand.
3       So when -- so is what you're trying say about
4  Neoplastine CI Plus in your report on page 31 --
5       A. Okay.
6       Q. The point -- this is my question: The point
7  that you're trying to get across in your report about
8  Neo -- Neoplastine CI Plus, is the point that you're
9  trying to get across that if you use that reagent and
10 you perform a PT test in a Xarelto patient, that the PT
11 is prolonged in a concentration-dependent manner?
12      A. I would say, based on the literature, that's a
13 consistent finding, yes.
14      Q. And that's the point that you were trying to
15 get across in this bullet point about Neoplastine CI
16 Plus in your report?
17      MR. ABNEY: Object to form.
18      THE WITNESS: I would believe --
19      MR. ABNEY: Go ahead.
20      THE WITNESS: Based on the way I have it
21 written, I would agree with what I wrote.
22 BY MS. DAVIS:
23      Q. Well, my question was a little bit different.
24      A. Okay.
25      Q. My question is --

1    A. Re-ask it, then, please.
2    Q. So I just -- I'm just trying to understand
3  what you wrote.
4    A. Okay.
5    Q. Trying to understand what you meant by what
6  you wrote.
7    A. Okay.
8    Q. So my question is, do you agree that the point
9  that you were trying to get across with that bullet
10 point about Neoplastine CI Plus and its use in PT for
11 assessing Xarelto is that if you use a reagent such as
12 Neoplastine CI Plus, that, in your opinion, PT is
13 prolonged in a concentration-dependent manner?
14    A. That's not what I'm saying, because I'm not
15 using any other reagent as or similar to Neoplastine.
16    What I'm suggesting by the bullet point is
17 that the published findings are consistent that
18 Neoplastine can be used for assessing the relative
19 intent of rivaroxaban. I'm not talking about
20 comparison reagents or reagents like Neoplastine.
21 I'm saying specifically for the published findings
22 on Neoplastine, it makes it suitable.
23    So the article that you're referring to in
24 Exhibit 16, they're referring to reagents such as
25 Neoplastine.

1    And again, that is not defined. When you're
2  talking about comparative reagents, what does that
3  mean? I don't know what that means.
4    Q. And so I think you maybe misunderstood my
5  question a little bit. I wasn't really referring
6  exactly to this sentence in the article.
7    I'm just asking you conceptually. I'm trying
8  to understand --
9    A. Okay.
10    Q. -- what you wrote in your report about
11 Neoplastin --
12    A. Okay.
13    Q. -- and its -- and what you think about it.
14    A. Okay.
15    Q. And -- and what you meant when you wrote this
16 bullet point. I'm trying to understand what you meant.
17    So my question is, when you wrote this bullet
18 point about Neoplastine CI Plus and you said that it
19 was -- what you said about it in your report, is
20 that -- I mean, is what you meant by that that if
21 Neoplastine CI Plus is used, then PT with Xarelto is
22 prolonged in a concentration-dependent manner?
23    A. Based --
24    MR. ABNEY: Can you read back his last
25 answer and see if it answers your question?

1    MS. MOORE: Counsel, I'm going to object.
2  That's instructing a witness. I don't think you
3  can have a question --
4    MR. ABNEY: I'm not instructing the
5  witness.
6    MS. DAVIS: I -- I object, too.
7    MS. MOORE: Yeah. You can't ask the court
8  reporter to read back a question and say that's his
9  answer. I -- I think that goes way beyond "object to
10 the form of the question."
11    MR. ABNEY: I -- I was simply suggesting that
12 the court reporter read back the answer to see if it
13 was answering the question that Counsel keeps asking
14 because I think the witness answered it. I'm just not
15 sure she heard it.
16    MS. MOORE: I -- I think --
17    MS. DAVIS: I'm trying to hear it.
18    THE WITNESS: Russ, would you like me to keep
19 going?
20    MS. DAVIS: So let me rephrase the question.
21    MS. MOORE: Counsel, I have to object to
22 you directing the witness to something on the
23 screen over there. I -- I don't think that's
24 appropriate.
25    MR. ABNEY: I'm simply showing him his

1  testimony. Are you saying he's not entitled to see
2  his --
3    MS. MOORE: I think --
4    MR. ABNEY: -- testimony?
5    MS. MOORE: I think until he answers the
6  question, it's not appropriate for you to be directing
7  him to certain places in the transcript.
8    MR. ABNEY: There's no a question pending.
9    MS. MOORE: I think there was a question
10 pending.
11    MR. ABNEY: I believe Counsel said she was
12 going to rephrase.
13    MS. MOORE: And she is rephrasing, but I still
14 don't think it's appropriate for you to be directing
15 the witness to a certain part of the transcript.
16 BY MS. DAVIS:
17    Q. Mr. Gosselin, do you consider yourself an
18 expert in the use of Neoplastine CI Plus to do PT
19 testing on Xarelto?
20    MR. ABNEY: Object to the form.
21    THE WITNESS: No.
22 BY MS. DAVIS:
23    Q. And again, I'm just trying to understand what
24 you -- in a more -- little more practical way what you
25 meant by this bullet point in your report regarding

1 Neoplastine CI Plus, on page 31.
2 Is -- is what you are saying there, are you
3 saying that in general, that if you use that reagent,
4 in your opinion, with PT to test Xarelto, that the
5 results that you would get in general are that
6 increasing concentrations of rivaroxaban would prolong
7 PT incrementally?
8 A. What I said before and what I'm going to say
9 now is this is based on published literature. And so
10 I'm saying that there are consistent findings in the
11 published literature about Neoplastine CI Plus in both
12 contrived samples and real patient samples that make
13 this reagent suitable for assessing the intent of
14 rivaroxaban.
15 I don't make claims about other reagents or
16 comparative reagents or anything like that. I'm basing
17 it on published literature and consistency in the
18 published literature, including the literature
19 published by the Bayer scientists.
20 Q. So at the end of that sentence you say,
21 "although not suitable for determining precise
22 concentrations."
23 A. Measuring in nanograms per mill, which is a
24 precise concentration, cannot be done with a value
25 that's measured in seconds.

1 Q. So when you say, "not suitable for determining
2 precise concentrations," you meant precise
3 concentrations of rivaroxaban; correct?
4 A. Yes.
5 Q. Okay. And so when you say, "relative
6 intensity of rivaroxaban anticoagulation," you're
7 referring to increasing concentrations of rivaroxaban;
8 correct?
9 A. A drug --
10 MR. ABNEY: Object to form.
11 THE WITNESS: A drug-dependent, yes,
12 relationship between increasing drug concentration and
13 increasing clotting times, yes.
14 BY MS. DAVIS:
15 Q. And that's what you were trying to get across
16 in this bullet point?
17 A. That's what I thought I got across, yes.
18 Q. All right. And you would agree that even if a
19 Neoplastine CI Plus reagent were used in a PT test in a
20 Xarelto patient, you would not be able to reliably
21 determine the plasma concentration of Xarelto based on
22 that test; correct?
23 MR. ABNEY: Object to form.
24 BY MS. DAVIS:
25 Q. You could get an estimate but not a number;

1 correct?
2 A. I would agree with that statement. An
3 estimate, but not a precise concentration.
4 Q. And you would agree that the use of the
5 Neoplastine CI Plus for use in PT testing with Xarelto
6 has not been validated, verified or harmonized by any
7 laboratory organization; has it?
8 MR. ABNEY: Object to form.
9 THE WITNESS: Not to my knowledge.
10 BY MS. DAVIS:
11 Q. Does the statement that you made about
12 Neoplastine CI Plus in your report, does it apply to
13 all the Neoplastin reagents, like Neoplastin,
14 Neoplastin Plus, Neoplastin R, or only to Neoplastine
15 CI Plus?
16 A. As stated, it's only Neoplastine CI Plus.
17 Q. And would you agree that the package insert
18 for Neoplastine CI Plus does not recommend its use to
19 perform PT testing on rivaroxaban?
20 A. I am unaware of the package insert and
21 their relationship of that specific test to any
22 coag testing.
23 Q. But -- okay.
24 So you just don't know one way or the other?
25 A. Correct.

1 Q. But if it -- if it didn't recommend its use in
2 that way, you wouldn't disagree with it; would you?
3 MR. ABNEY: Object to form.
4 THE WITNESS: Boy, that's conjecture. I don't
5 even know where to go with that.
6 BY MS. DAVIS:
7 Q. Okay. As far as the summary points that you
8 make about PT results in your report, have you
9 published any of those summary points?
10 A. Where are we now?
11 Q. The summary points that you make on page 31
12 and 32 --
13 A. Okay.
14 Q. -- that concern these PT reagents --
15 A. Yep.
16 Q. -- the ones we've been talking about.
17 A. Have I published?
18 Q. Have you published those?
19 A. On re -- reagents used?
20 Q. Have you published these particular opinions?
21 MR. ABNEY: Object to form.
22 BY MS. DAVIS:
23 Q. For example, have you published this opinion
24 about Neoplastine CI Plus?
25 A. I have published papers that included

1    Neoplastine CI Plus.  I've published papers that
2    included Innovin.  I've published papers that included
3    RecombiPlasTin 2G.  I have published papers that only
4    deal with Quick PT methods.  My personal experience is
5    more on the bullet about prolonged PT.
6        Q.  So my question is a little bit different.
7        My question is, have you published this --
8    what you wrote about consistent findings with respect
9    to sensitivity for Neoplastine CI Plus, et cetera, in
10   that bullet point, have you published that particular
11   information about Neoplastine CI Plus?
12       A.  In the Francart paper, that was a
13   collaborative study with the UNC group, Neoplastine CI
14   Plus was one of the reagents used.  And I believe it
15   was the second most sensitive when you look at the
16   slopes.  So yes.
17       Q.  So it was the second most sensitive?
18       A.  It was the most sensitive laboratory-based
19   reagent, yes, but the second most sensitive reagent
20   tested.
21       Q.  So would you agree that when you look at your
22   opinions about Neoplastine CI Plus, Innovin -- I might
23   not get all of them -- Re -- RecombiPlasTin 2G, all
24   these PT reagents that you mention in your report,
25   would you agree that what you are saying here in these

1    bullet points is that in your opinion, Neoplastine CI
2    Plus is the most suitable reagent among this class of
3    reagents that are used to perform a test, the PT test,
4    the results of which cannot qual -- cannot quantify the
5    anticoagulant effect of rivaroxaban?
6        A.  Specifically for rivaroxaban, yes.
7        Q.  Would you agree that there is no FDA-approved
8    method, calibrator or control for using PT to assess
9    the anticoagulant effect of rivaroxaban?
10       A.  That is a true statement.
11       Q.  Do you agree that the FDA does not require
12   routine laboratory testing of Xarelto for any purpose?
13       A.  I'm unaware, again, the FDA requirements for
14   Xarelto.
15       Q.  So you just don't know one way or the other;
16   is that your testimony?
17       A.  Yes.
18       Q.  Looking at the chart that you have on page 31
19   of your report about doubling the clotting time from
20   various studies, if you look at Neoplastin on the
21   left-hand side, am I right that the Barrett -- you cite
22   the Barrett 2010 paper as reporting that with using the
23   Neoplastine CI Plus, the amount required to double the
24   clotting time of rivaroxaban was 546?
25       A.  Yes.

1        Q.  And the Douxfils, or however you say that,
2    2012 that you cited, the same result for Neoplastine CI
3    Plus in that study was 135?
4        A.  Yes.
5        Q.  And would you agree that that's a wide
6    variation?
7        A.  Yes.
8        Q.  And are you aware of what the rate of error
9    would be in that -- in that calculation?
10       A.  No.
11       Q.  Mr. Gosselin, would you agree that, using
12   reference literature, all you can do is guesstimate the
13   sensitivity of PT reagents as concerns Xarelto?
14       MR. ABNEY:  Object to form.
15       THE WITNESS:  I think it depends on the study
16   and the publication, yes.
17   BY MS. DAVIS:
18       Q.  So is the answer to my question "yes"?
19       A.  Depends on the study.  The answer would be a
20   caveated yes.
21       Q.  Is that a statement -- and the statement is,
22   using reference literature, would you agree that all
23   you can do is guesstimate the sensitivity of PT
24   reagents to Xarelto; is that a statement that you can
25   agree with or not agree with?

1        A.  No.  I think that there's a difference between
2    looking at literature that uses real-world patients and
3    looking at literature using contrived samples.
4        The idea of contrived samples give you a
5    concept of how reagents are different from each other,
6    but may not mimic the sensitivity in real-world
7    patients.
8        So I look at those two bodies of work as two
9    different mechanisms for interpreting the data.  Which
10   is more sensitive than the other, and then looking at
11   the real-world patient to see truly, in a population,
12   the sensitivity of the reagent.  And the longer
13   it's relative to other reagent system, would
14   potentially be used in your laboratory.
15       Q.  Would you agree that, using reference
16   literature regarding results in patients, that all you
17   can do is guesstimate the sensitivity of PT reagents to
18   Xarelto?
19       A.  Unless they provide data that states
20   otherwise, yes.
21       Q.  Are you aware of any laboratory test to
22   attempt to measure the level of anticoagulation present
23   in a Xarelto patient that is FDA, CLIA or CAP cleared
24   or approved for clinical purposes?
25       A.  Well, there's no such thing as F -- CLIA or

1 CAP approved.
2    As far as FDA approved, there are FDA-approved
3 kits for measuring anti-Xa. If you modify that kit,
4 that now becomes a laboratory-developed test and is
5 allowable both under FDA, CAP and CLIA, if you do your
6 due diligence of -- that performs verification.
7    Q. Are you aware of anything beyond that? In
8 other words, any other test that you would report to me
9 in answering the question?
10    MR. ABNEY: Object to form.
11    THE WITNESS: I'm a little confused by the
12 question.
13 BY MS. DAVIS:
14    Q. Okay. I'm sorry.
15    Other than what you just described to me --
16    A. Yes.
17    Q. -- are you aware of any laboratory test to
18 attempt to measure the level of anticoagulation present
19 in a Xarelto patient that, you know, meets FDA, CLIA
20 and CAP requirements?
21    A. Again, I'm trying to understand your question.
22    We have commercially available tests and
23 methods that have been on the market for 20, 30 years,
24 that can be modified to run and measure Xarelto. And
25 if you modify a test, you still are able to use that

1 under the federal and regulations or CAP regulations as
2 a laboratory-developed test.
3    So it's kind of yes-and-no. So I'm a little
4 perplexed by the question.
5    Q. So that particular test that you're referring
6 to has not been cleared by the FDA; correct? The
7 laboratory-developed test?
8    A. The FDA has not made their final ruling on
9 laboratory-developed tests. But they do have some
10 descriptions of what a laboratory-developed test is.
11    Q. Has a rivaroxaban-specific test been cleared
12 by the FDA?
13    A. No.
14    Q. And are you -- has a rivaroxaban-specific
15 test -- I'll withdraw that.
16    Going back to your CV for a minute, which I
17 know we marked earlier on as an exhibit.
18    There are a number of committees that you
19 mentioned on your CV that you had been a part of.
20    Here you go.
21    A. Oh, sorry.
22    Q. That's okay.
23    A. Yes.
24    Q. If you want to look down the list. It's under
25 the committees.

1    A. Okay.
2    Q. Do you see that?
3    A. Yes.
4    Q. So my question is, have any of the
5 committees on -- that you list there in your CV
6 that you have -- that you either have or do serve
7 on, have any of those committees issued any
8 guidelines or recommendations regarding Xarelto or
9 rivaroxaban?
10    A. Except for the last one. We're in
11 development. But no, nobody's -- of these
12 committees have published guidelines.
13    MS. DAVIS: Let's go off the record and
14 take a break.
15    THE VIDEOGRAPHER: Going off the record.
16 The time is 1:01 p.m.
17    (Recess taken.)
18    (DEFENDANTS' EXHIBIT 17 WAS MARKED.)
19    THE VIDEOGRAPHER: We're back on the
20 record. The time is 1:09 p.m.
21 BY MS. DAVIS:
22    Q. Mr. Gosselin, we just took a brief break.
23 Are you ready to proceed?
24    A. Yes.
25    Q. And while we were off the record, I handed

1 you what I marked as Exhibit 17.
2    And do you agree that that's a copy of the
3 invoice regarding the time that you've spent on
4 this litigation that you -- was given to me this
5 morning?
6    A. Yes.
7    Q. And you believe that to be accurate?
8    A. Yes, up until October 2016.
9    Q. And looking at page 32 of your report, do
10 you see the second bullet from the top that says,
11 "Prolonged PT in rivaroxaban-treated patients
12 should be considered secondary to rivaroxaban until
13 proven otherwise"?
14    A. Yes.
15    Q. And would you agree that in order for you
16 to make that statement, that that involves clinical
17 interpretation of how to apply a prolonged PT
18 result in -- to a patient?
19    A. I think this is based on my own clinical
20 practice, that there is some misinterpretation of
21 the data. And so in somebody with a known drug
22 exposure, they should assume the prolongation's due
23 to a drug first and then prove -- until proven
24 otherwise.
25    Q. So would you say that about any drug and a

1    prolonged PT in a patient who was known to be
2    taking that drug?
3        A.  If it's a known drug exposure, yes.
4        Q.  And do you not think that making a statement
5    that involves a clinical interpretation of how to apply
6    a test result to a patient is outside of your area of
7    expertise?
8        A.  I'm not asking about -- I'm not indicating
9    interpretation.  I'm saying that it should be
10    considered secondary to the drug.  Not interpreting the
11    results and making a clinical decision.  But I think it
12    would be prudent to do further evaluation in a
13    prolonged result that are abnormal results that
14    it's secondary in a known drug-exposure patient.
15        Q.  Would you consider a more scientifically
16    sound approach be to interpret such a result with
17    caution until all pre-analytical and analytical
18    variables have been excluded?
19        A.  That may take time.  But that would
20    certainly be part of the -- the differential
21    algorithm.
22        Q.  In other words, you would agree that all of
23    that would need to be done?
24        A.  Yes.
25        Q.  Before any decisions could be made about

1    how to use that test result?
2        A.  Yes.
3        MS. DAVIS:  I don't have -- I don't have any
4    more questions at this time.  I'm going to pass the
5    microphone to Ms. Moore.
6        Thank you, Mr. Gosselin.
7        THE WITNESS:  Thank you.
8        MS. MOORE:  Oh, I've got one right here that
9    I'm -- I think I had one.
10        I don't want to trip.  I can go behind you.
11        Why don't we put it -- let's go off the record
12    for a second.
13        THE VIDEOGRAPHER:  We're off the record at
14    1:13.
15        (Discussion off the record.)
16        THE VIDEOGRAPHER:  We are back on the record
17    at 1:15 p.m.
18        EXAMINATION
19    BY MS. MOORE:
20        Q.  Good afternoon, Mr. Gosselin.  I introduced
21    myself to you earlier.  My name is Kim Moore.  And
22    I'm going to ask you some questions.  Hopefully we
23    won't go over anything that you've already
24    discussed, but I do want to clarify a few things.
25        I'll begin by just thanking you for your

1    patience during this process.
2        Let me just ask you some preliminary
3    questions.
4        I want to make sure I understand your opinions
5    in this litigation.  And it -- and would it be fair to
6    say that you are here to testify that the tests that
7    you cite in your expert report are tests that could be
8    helpful in emergent scenarios?
9        Is that your focus and area of interest,
10    emergent scenarios?
11        A.  If you're talking about my publications, the
12    idea is to help my colleagues in a field that is
13    rapidly evolving more --
14        Q.  Right.  No, I -- I --
15        A.  Yes.  Whether it be --
16        MR. ABNEY:  Hold on.  Hold on.  Yeah, let's
17    not interrupt each other.
18    BY MS. MOORE:
19        Q.  Please.
20        A.  Whether it be an emergent situation or just a
21    routine assessment is to have the tools available
22    for clinicians to make any medical decision or
23    management decisions.
24        Q.  So as we move forward this afternoon, I
25    want to make sure that I understand what you're

1    talking about is the recommendation for something
2    in an emergency care situation versus a routine
3    monitoring.
4        Is that fair?
5        A.  That's fair.
6        Q.  All right.  And one other point of
7    clarification.  Ms. Davis asked you about one of the
8    points in your report, in your summary opinion section.
9        Do you remember that?
10        A.  I'm sorry --
11        Q.  It was on --
12        A.  -- which page?
13        Q.  -- page 32.  It was the -- "The prolonged PT
14    in rivaroxaban-treated patients should be considered
15    secondary to rivaroxaban until proven otherwise."
16        A.  Yes.
17        Q.  And she asked your -- if that was an opinion,
18    if that was a clinical opinion.
19        And I believe your testimony was that is a
20    recommendation with respect to all medications; is that
21    correct?
22        A.  My statement is clarified.  If we have
23    somebody with a known drug exposure, whether it be
24    Xarelto or any other drug, and you see a
25    prolongation of a test that is -- can be used to

Page 214

1  assess that drug or is affected by that drug, then
2  I think one should assume it's secondary to the
3  drug until proven otherwise.
4      Q.  And that assumption would be made by an --
5  a clinician, not you yourself in the laboratory;
6  correct?
7      A.  It should be made by a clinician and not by me
8  in the laboratory.
9      Q.  Because you told us earlier you're not a
10  doctor.  You don't treat patients.  You do your work in
11  the laboratory to assist the doctors in a making the
12  appropriate diagnosis and treatment; correct?
13      A.  The statement was made based on our -- my
14  personal professional experience with these
15  abnormalities in clotting times in patients in known
16  drug exposures.
17      Q.  And you say the statement was made, meaning
18  the statement that we're talking about in your expert
19  report, page 32?
20      A.  Yes.
21      Q.  All right.  And so what you're -- you're not
22  suggesting any clinical implications associated with
23  that statement.  You're merely making the same type
24  of recommendation you would make to a clinician
25  based on if you see a prolonged PT with any

Page 215

1  medication, that it would -- that -- that the
2  treated patient should be considered secondary to
3  that medication until proven otherwise?  It's kind
4  of a standard statement?
5      A.  Yes.
6      Q.  All right.  All right.
7      Let's -- let's go to your -- your opinions
8  in your report.  And I want you to focus in on --
9  back on that summary section where you're talking
10  about the capacity to rapidly assess, but ideally
11  quantify rivaroxaban --
12      A.  Can you help me out?
13      Q.  -- anticoagulant effects or levels could be
14  helpful in emergent situations.
15      A.  I'm sorry.  Can you help me out what page
16  you're on?
17      Q.  Sure.
18      It's on page 33.  It's your very last
19  bullet point.
20      Do you see that, Mr. Gosselin?
21      A.  Yes.  I'm sorry.
22      Q.  All right.  Now, in this one you specifically
23  are speaking to emergent situations; correct?
24      MR. ABNEY:  Object to form.
25      THE WITNESS:  That's the way it's written,

Page 216

1  yes.
2  BY MS. MOORE:
3      Q.  Okay.  And the way it's written is the way you
4  intended it?
5      A.  I'm sorry?
6      Q.  The way it's written, is that the way you
7  intended it?
8      A.  It -- it's -- it doesn't say "only," but yes,
9  certainly in emergent situations it would be ideal to
10  quantify the drug level.
11      Q.  All right.  And you also talked about the
12  arguable gold standards for measuring rivaroxaban.  And
13  you talked about the tandem mass spectrometry?
14      A.  Yes.
15      Q.  And you talked about how that particular test,
16  the tandem mass spectrometry, is equivalent to the
17  rivaroxaban-calibrated anti a -- anti-Xa
18  measurements?
19      A.  They have been demonstrated to be
20  equivalent.  They're drug calibrated in different
21  methodologies, yes.
22      Q.  In your report or article, Exhibit 4 that
23  we spent some afternoon -- some time this afternoon
24  discussing, you give a thorough overview of limits
25  of anti-Xa assays; correct?

Page 217

1      A.  I'm looking for -- number 4 you said?
2      Q.  Sure.
3      A.  Okay.  I'm sorry, what was the question again?
4      Q.  Sure.
5      This afternoon Mrs. Davis questioned you and
6  spent a lot of time talking to you about Exhibit 4;
7  correct?
8      A.  This afternoon?  No.  This morning, yes.
9      Q.  You've been asked questions about Exhibit 4
10  today, sir; correct?
11      A.  I'm -- I'm sorry.  One more time.  I've been
12  asked questions about?  Exhibit --
13      Q.  The document in front of you --
14      A.  -- 4.
15      Q.  -- is Exhibit 4?
16      A.  Yes.
17      Q.  Is it -- are you -- does that look familiar to
18  you?
19      A.  Yes.
20      Q.  All right.  You were asked questions about
21  that earlier?
22      A.  Yes.  I thought you said this afternoon.  I'm
23  sorry.
24      Q.  I -- and I may have.
25      A.  Okay.

1    Q. I may have.
2    A. My apologies.
3    Q. No worries.
4    A. Okay.
5    Q. So let's talk about the limitations that you
6    describe in that particular article.
7        The limitations that you discuss apply both to
8    low molecular weight heparin and to unfractionated
9    heparin-calibrated anti-Xa assays and to
10   rivaroxaban-calibrated anti-Xa assays in evaluating
11   NOACs or DOACs; correct?
12   A. Can you help me out what page you're on?
13   Q. 10.
14   A. Okay. And where on 10?
15   Q. Sir, are you familiar with the public --
16   you -- you wrote this publication in 2015?
17   A. Yes.
18   Q. All right. You want to take a moment and just
19   look at it?
20   A. Yes. It's, I believe, five or six pages, and
21   you're jumping in the middle. So if you can hone in on
22   this, and I can -- I can go to where you're going.
23       MR. ABNEY: Just review it.
24       THE WITNESS: I'm sorry?
25       MS. MOORE: You're -- you're free --

1        MR. ABNEY: Just review it.
2        MS. MOORE: You can review it if you'd like
3    or -- feel free to look at it.
4        MR. ABNEY: Just read the paper.
5        THE WITNESS: Okay.
6    BY MS. MOORE:
7    Q. And, sir, you're -- you're free, of course,
8    to look at whatever you'd like, but I do want to
9    focus your attention in on page 10 under "Direct
10   anti-Xa DOACs, drug-specific assays."
11   A. Okay.
12   Q. You see that?
13   A. Yes.
14   Q. All right. And if you want to go all the way
15   down about middle of the way through that paragraph, do
16   you recognize that?
17   A. Yes.
18   Q. All right. And do you see the sentence
19   beginning with, "While these heparin-calibrated anti-Xa
20   measurements have linear relationships to anti-Xa DOAC
21   concentrations, significant limitations exist using
22   these methods to quantify anti-X DOACs"?
23   A. Yes.
24   Q. Okay. And that's what I want to focus in on,
25   your terminology of "significant limitations."

1        You first began stating that the assays to
2    measure indirect Xa inhibitors are measured in
3    international units/milliliters, and direct Xa DOACs
4    are measured in nanograms/milliliters, and there's no
5    direct relationship between these units of measure;
6    correct?
7    A. Between the units of measure, correct.
8    Q. And what would be the significance of having
9    no direct relationship between these two types of
10   measurements?
11   A. I -- I don't understand the question.
12   Q. Well, I -- you yourself said there's no direct
13   relationship between these units of measure.
14       What did you mean by that?
15   A. I suppose if -- if one were to say can you
16   have a -- a calibration factor between heparin units
17   per mL and nanograms per mL for direct Xa, that's --
18   there's no relationship as far -- is there some common
19   denominator, some common factor for those, and the
20   answer is no.
21   Q. And what is the potential significance of not
22   having a common denominator?
23   A. That you can't have one calibrated test to
24   measure all of them in the same units.
25   Q. And that's a limitation; correct?

1    A. The units, yes.
2    Q. You also mention in your lab review in that
3    same paragraph, "Because indirect Xa inhibitors are
4    measured by measuring physiologic activity, and
5    direct Xa DOACs, like rivaroxaban, are measured in
6    nanograms per milliliter, which is a lab
7    measurement premised on volume, these measurements
8    cannot be directly compared"; correct?
9        MR. ABNEY: Object to form.
10       THE WITNESS: I'm -- I'm trying to see if
11   you're reading directly from this.
12   BY MS. MOORE:
13   Q. The "physiologic activity" is referenced
14   there.
15       Do you see that?
16   A. Are you still in the same --
17   Q. Yes, sir.
18   A. Here?
19   Q. So, sir, let me just ask you this way.
20   A. Okay.
21   Q. Because indirect Xa inhibitors are measured by
22   measuring physiologic activity and direct Xa DOACs like
23   rivaroxaban are measured in nanograms per milliliter,
24   which is premised on lab volume, these measurements
25   cannot be directly compared; correct?

1    A. Correct.
2    Q. Therefore they don't have use in the
3  clinical setting; correct?
4    A. I would disagree with that.
5    Q. You can't compare them and use them?
6    A. Just because you can't compare the units
7  doesn't mean they have no utility. It just means you
8  can't compare the units.
9    Q. And that in and of itself is a limitation, as
10  you point out in your article; correct?
11    A. It's a limitation for having a universal one
12  test, one reportable, because the units do not inter --
13  are not interchangeable.
14    Q. Sir, you say, "Significant limitations exist
15  using these methods to quantify anti-Xa DOACs.
16  Specifically, 1, assays to measure indirect Xa
17  inhibitors are measured in international
18  units/milliliters, and direct Xa DOACs are measured in
19  nanograms/milliliters, and there's no direct
20  relationship between these units of measure."
21      That is a, as you say, significant limitation;
22  correct?
23    A. That the units are not interchangeable, that
24  is a correct statement.
25    Q. Thank you.

1      Also, you state that "When using Xa
2  measurements, there's a significant variability in
3  measured drug concentration as demonstrated with
4  rivaroxaban between different manufactured anti-Xa
5  kits"; correct?
6    A. That is a correct statement as well.
7    Q. And anti-Xa kits present different degrees of
8  variability that would present concerns if a clinician
9  were to rely on the results; correct?
10    A. You're talking about anti-Xa kits, and it's a
11  little unclear to me if you're talking about
12  heparin-calibrated or direct-calibrated.
13    Q. In the situation where you have laid out for
14  us the significant concerns in measuring drug
15  concentrations demonstrated with rivaroxaban between
16  the different manufactured anti-Xa kits, that could
17  present different degrees of variability; correct?
18    MR. ABNEY: Object to form.
19    THE WITNESS: I believe this is under the line
20  that's talking about heparin-calibrated anti-Xas and
21  the limitations associated with heparin-calibrated
22  anti-Xa testing. We are listing those limitations
23  under that header.
24  BY MS. MOORE:
25    Q. Sir, my question, though, is that these

1  anti-Xa kits present different degrees of
2  variability; correct?
3    A. If you look --
4    MR. ABNEY: Object to form.
5    THE WITNESS: I'm going to have to look at
6  which are not in this article. I'm going to look at
7  anti-Xa when you talk about the -- well, what we're
8  citing in here, again, is about the calibrations
9  associated with the Xa kits and is that a variable as
10  well? And the answer is yes.
11  BY MS. MOORE:
12    Q. Okay. That's all. I'm just trying to get
13  through what you've listed as the significant
14  limitations.
15    A. And -- and I'm truly trying to understand what
16  you're trying to get at, because you're not being clear
17  to me as far as --
18    Q. All right.
19    A. -- what we're referring to.
20    Q. I know we have you --
21    A. So I apologize.
22    Q. No worries. I'll be happy to --
23    A. Okay.
24    Q. Just rephrase it. Try and --
25    A. Okay.

1    Q. -- accommodate you.
2      But I think, with respect to the second
3  limitation in your article, you acknowledge that those
4  anti-Xa kits present different degrees of variability,
5  and that could present a concern if a clinician were to
6  rely on the results?
7    A. The publications I have, again, address the
8  two primary questions clinicians have come to me for.
9  And that is, is there still drug on board, or whether
10  or not is there any drug on board, in which case any
11  heparin-calibrated method would satisfy one of those
12  questions, as far as yes or no. And it would be
13  limited but still useful in -- in those that you -- you
14  know it's on board, but it can tell you if it's so
15  much. Yes.
16    Q. All right. I'm --
17    A. Is there a variability for the reagents, yes.
18    Q. And that's -- I'm just focusing in on
19  variability.
20    A. Okay.
21    Q. That if there is, as you say, significant
22  variability -- those are your words; right?
23    A. Signif -- "significant" would be a statistical
24  term. And so if we demonstrate a statistical term,
25  that means we did a statistical analysis to show

Page 226

1    there was a difference between two methods.
2       Q. And, sir, using your words, if there is
3    significant variability in measured drug
4    concentrations as demonstrated with rivaroxaban
5    between different manufactured anti-Xa kits, that
6    could present a potential clinical dilemma for a
7    physician; correct?
8       MR. ABNEY: Object to form.
9       THE WITNESS: I don't know if I necessarily
10    agree with that because the clinician would not be
11    looking at a result from two or three different kits.
12    They'd be looking at a result from their laboratory
13    kit, which is usually only one.
14    BY MS. MOORE:
15       Q. And if there is significant variability in
16    measured drug concentrations, it could -- it could,
17    sir, present different results for a clinician;
18    correct?
19       MR. ABNEY: Object to form.
20       THE WITNESS: Again, you're -- you're asking
21    whether or not a clinician is going to see different
22    results from the laboratory because of different
23    methodologies, and laboratories usually have one
24    method. And so they would not be able to see or
25    appreciate any differences that we're referring to.

Page 227

1    BY MS. MOORE:
2       Q. And what I'm referencing is in your report
3    where you reference, under "Significant Limitations,"
4    "There is significant variability in measured drug
5    concentration as demonstrated with rivaroxaban between
6    different manufactured anti-Xa kits."
7       Correct?
8       MR. ABNEY: Did you mean his Exhibit 4 or did
9    you mean his report?
10       MS. MOORE: Exhibit 4. Thank you, Counsel.
11       THE WITNESS: Okay. So again, "significant"
12    means "statistical."
13    BY MS. MOORE:
14       Q. Right.
15       A. It doesn't necessarily translate to clinical
16    difference.
17       Q. Absolutely.
18       A. And so I think that when we're putting
19    information like this in a laboratory-based journal, if
20    one were to look at accuracy and they're comparing
21    their method to somebody else, it may be possible there
22    may not be good correlation or significant differences.
23       So I think it's, again, when you're honing in
24    on the different kits, hospitals don't have different
25    kits. They have one. So clinicians would not

Page 228

1    appreciate any differences that may be seen at a
2    different hospital using a different methodology.
3       MS. MOORE: Move to strike as nonresponsive.
4    BY MS. MOORE:
5       Q. Sir, because of the variability this presents
6    to a physician, it's a problem if the physician is
7    relying on the result because of the lack -- potential
8    lack of accuracy; correct?
9       MR. ABNEY: Objections. Asked and answered.
10       THE WITNESS: This is not an issue about
11    accuracy. This is an issue about difference between
12    methods.
13       And so, again, the difference in what
14    acceptable difference and what a statistical difference
15    may be may not be clinically significant. So when we
16    make a statement about significant, it's statistical.
17    BY MS. MOORE:
18       Q. Sir, I'm talking about in the clinical setting
19    as you've set for -- set forth in Exhibit 4, you've
20    listed, for the scientific and medical community, the
21    significant limitations that exist using the methods to
22    quantify the anti-X -- Xa DOACs; correct?
23       A. This article is not directed for clinicians,
24    but for laboratorians. So yes, this is --
25       Q. But -- please finish. I'm sorry.

Page 229

1       A. This is to let laboratorians know that they
2    may not have -- they may have challenges when
3    they're doing accuracy studies.
4       Q. All right. Thank you.
5       And clinicians may rely on the results from
6    laboratories; correct?
7       A. I can only assume what clinicians rely on.
8       Q. In your institution do doctors rely on the
9    results from your laboratory?
10       A. They get the results. What they do with it, I
11    don't know what they do --
12       Q. You wouldn't know if they rely on your work or
13    not?
14       A. I assume they do.
15       Q. And let's go to the third significant
16    limitation that you've laid out in your article Exhibit
17    4.
18       You state that "Therapeutic range, at least
19    for apixaban and rivaroxaban, far exceeds the typical
20    calibration range for the unfractionated heparin and
21    the low molecular weight heparin as is often in the
22    five to nine international units/milliliter range";
23    correct?
24       A. Yes, that is what's written.
25       Q. And in your report you recommend the use of

Page 230

1  unfractionated heparin and low molecular weight
2  heparin anti-Xa assays to measure rivaroxaban;
3  correct?
4      A. I'm saying it can be done, yes.
5      Q. So you -- all right.
6      And this -- this is a significant limitation
7  in the use of anti-Xa assays using low molecular weight
8  heparin or ultra -- or unfractionated heparin measuring
9  rivaroxaban; correct?
10     A. I would disagree with the term "significant."
11  It's not a significant limitation.
12     What you may have to do is dilute the sample
13  out to get it within the calibration range.
14     Q. So in your article you use the term
15  "significant." But now when I'm questioning you on it,
16  you're -- you're altering the word. It's no longer
17  significant, it's just a limitation?
18     MR. ABNEY: Object to the form.
19     THE WITNESS: You were suggesting that the
20  laboratory -- this is a significant problem, and I'm
21  suggesting that no, it's not a significant problem.
22  That there is a limitation as far as the threshold and
23  sensitivity of the calibration curve and the max amount
24  that it's willing to detect before you exceed that
25  number.

Page 231

1      So can you overcome that? And the answer
2  is yes, you can simply dilute the sample.
3      But is it a limitation, the answer is yes.
4  BY MS. MOORE:
5      Q. Thank you.
6      A. Running a sample neat, you may have outside,
7  but that is very informative.
8      Q. And you also talked about in your report that
9  the maximum measurement range for unfractionated
10  heparin and low molecular weight heparin cannot capture
11  therapeutic concentrations of rivaroxaban; correct?
12     MR. ABNEY: Object to form. Are you asking
13  about Exhibit 4 or his report?
14     MS. MOORE: Exhibit 4, which is the article.
15  And I'm sorry if I keep calling it the report.
16     Thank you, Counsel, for helping me.
17     THE WITNESS: The statement states that the
18  samples that may be in the therapeutic range, whatever
19  that is, may be -- may exceed the calibration curve,
20  yes.
21  BY MS. MOORE:
22     Q. Thank you.
23     And that's just the best science has to offer
24  at this point in time?
25     A. I'm sorry?

Page 232

1      Q. As far as the limitations that exist with
2  these types of measurements, that's just the best there
3  is for science and for scientists like you;
4  correct?
5      MR. ABNEY: Object to form.
6      THE WITNESS: I'm not quite sure what you --
7      MS. MOORE: All right.
8      THE WITNESS: -- mean by --
9  BY MS. MOORE:
10     Q. All right. The therapeutic range of
11  rivaroxaban --
12     A. Yes.
13     Q. -- far exceeds the range of the assay;
14  correct?
15     A. Not of the assay. It's of the calibrated
16  method when you're using unfractionated versus low
17  molecular weight heparin. If you use the same kit and
18  drug calibrators, you can get far outside the
19  therapeutic range. So it's just if you have low
20  molecular weight heparin- or unfractionated
21  heparin-calibrated curves.
22     Q. And when you use a test that can only give you
23  a limited view or measurement of a drug, it's not very
24  practical or very helpful; correct?
25     A. I would disagree with that statement.

Page 233

1      Q. And why?
2      A. Because if the alternative is to give them
3  nothing as opposed to giving them something, I
4  think giving them something is more valuable than
5  nothing.
6      Q. Even if it's inaccurate?
7      A. There's nothing in there about inaccuracy.
8  It's just a matter of exceeding a threshold of a
9  calibration curve. That does not make it inaccurate.
10  It just means you've exceeded the threshold. So it
11  would be equivalent to X amount of nanograms per mL.
12     Q. Let's look at your fourth significant
13  limitation in your article.
14     Do you have that in front of you, sir?
15     A. Is this -- are we still on 4?
16     Q. Yes, sir.
17     A. Okay.
18     Q. You state that the assay, the anti-Xa assay,
19  is not specific for anti-Xa DOACs and will detect all
20  anti-Xa anticoagulants; correct?
21     A. That is a correct statement.
22     Q. And what do you mean by the test not being
23  specific for anti-Xa DOACs?
24     A. Because it measures any drug that has any
25  anti-Xa activity. So that would be heparin. That

1  would be low molecular weight heparin.  That would
2  be fondaparinux, as well as the -- the anti-Xa.
3      So it cannot even differentiate rivaroxaban
4  from apixaban from -- from edoxaban from all the other
5  novel Xas that are coming out.
6      Q.  And this in some instances could give a
7  poor measurement of an anti-Xa inhibit --
8  inhibition caused by DOAC like a rivaroxaban;
9  correct?
10     A.  I don't know what you mean by that
11  statement.
12     Q.  It could give a false reading of a
13  medication; correct?
14         MR. ABNEY:  Object to form.
15         THE WITNESS:  Oh, gosh, no.  No.
16     It's -- it's -- it will tell you that there is
17  a Xa drug on board.  It is very, very specific.
18  BY MS. MOORE:
19     Q.  But it won't define or identify the
20  medication?
21     A.  It will not differentiate which drug.
22     Q.  And that could also be a significant
23  limitation in the use of these anti-Xa assays; correct?
24  At least it is in your article here?  You've listed
25  it in there?

1      A.  It could be.
2      Q.  Let's look at the last limitation.
3         You state, "The lower limit of detection
4  for these assays varies with calibrators used in
5  some unfractionated heparin, lower molecular weight
6  heparin.  Calibrate anti -- anti-Xa assays may
7  underestimate the level of drug present"; correct?
8      A.  That's what's written, yes.  It's not a
9  significant bullet point.  It's a separate sentence
10  entirely.
11     Q.  So when the anti-Xa assays are calibrated to
12  unfractionated heparin or low molecular weight heparin,
13  it could give a low reading of the concentration of
14  rivaroxaban in a particular patient; correct?
15     A.  What it's saying, it's -- a lower limit of
16  detection may not truly be no drug on board --
17     Q.  So --
18     A.  -- depending on the calibration method used --
19     Q.  And -- and to answer --
20     A.  -- methodology.
21     Q.  -- my question, to answer my question, that
22  means that that anti-Xa assay, when calibrated to
23  unfractionated heparin or low molecular weight heparin,
24  could give a low reading of the concentration of
25  rivaroxaban in a patient; correct?

1      A.  One more time?
2      Q.  Sure.
3      A.  You can skip the first part.  But you're --
4  after the, calibration can give a --
5      Q.  All right.  Let's see.
6         Could give a low reading of the concentration
7  of rivaroxaban in a patient?
8      A.  So it could underestimate the drug on board,
9  is that what you're alluding to?
10        Depending on the methodology employed and the
11  calibration employed, the answer could be yes.
12     Q.  And this could be, as you've mentioned, a
13  serious limitation because a low reading could have
14  serious negative clinical implications; correct?
15     A.  It depends on -- there is no definition of
16  what a significant low level is or what is a safe level
17  to do, let's say, a craniotomy or give a drug, an
18  epidural.  I've read 30 somewhere nanograms per mill.
19        Is it sensitive enough at that level?  I
20  believe yes, but I'd have to review the literature on
21  all the methods that we did.  The methods that we have
22  at our institution would rule out significant levels of
23  drug.
24        MS. MOORE:  All right.  And I'll move to
25  strike as nonresponsive.

1         THE WITNESS:  Okay.
2  BY MS. MOORE:
3      Q.  Sir, this is a limitation.  A low reading
4  could potentially have serious negative clinical
5  implications; correct?
6      A.  I don't know what that means.  I'm not a
7  clinician.
8      Q.  Okay.  Let's turn to your opinions about
9  rivaroxaban-calibrated anti-Xa assays.
10     A.  Are we still on number 4?
11     Q.  Yes, sir.
12     A.  Okay.
13     Q.  And that's -- we touched a little bit on this,
14  but you talk about the gold standard, the arguable gold
15  standard method for measuring rivaroxaban concentration
16  is considered to be tandem mass spectrometry?
17     A.  Arguable because there's been no consensus
18  document or formation saying that is the gold
19  standard --
20     Q.  Okay.  And --
21     A.  -- for measuring the drug.
22     Q.  And that helps.  So I was wondering what
23  you meant by "arguably."
24        There's no consensus on it?
25     A.  To my knowledge there's been no recommendation

Page 238

1    for any group or committee to say that mass spec.  It's
2    been, in our laboratory committee, almost an assumption
3    that mass spec is the gold standard for drug
4    measurements.
5         But the problem with mass spec, sometimes it
6    measures inactive metabolites.  They also get included,
7    and so kind of give a different reading.
8         Q.  So do you, as you sit here today, believe it
9    is the gold standard, or you're not sure?
10        A.  My personal opinion --
11        Q.  Yes, sir.
12        A.  -- in as a professional who's been doing this
13   for a long time, I would consider mass spec to be a
14   gold standard for drug measurements, yes.
15        Q.  In your report you also acknowledged that
16   rivaroxaban-calibrated anti-Xa measurements have been
17   demonstrated to be equivalent to those measured by the
18   tandem mass spectrometry; correct?
19        A.  Yes.
20        Q.  And I want to understand tandem mass
21   spectrometry a little better.
22             Would you tell me what that is, please?
23        A.  I wish I could, but I don't know tandem mass
24   spec other than what I read.  It's not an area of
25   expertise of mine.  I have never run tandem mass spec.

Page 239

1    Q.  Okay.  So you're not -- so you're not
2    qualified to answer specific questions about tandem
3    mass spectrometry?
4    A.  Correct.
5    Q.  All right.  But you do know there are
6    limitations with that type of measurement; correct?
7    A.  I would assume, as a lab professional,
8    there's been limitations for every single test that
9    we have.
10   Q.  Now, you said a few minutes ago that the
11   anti-Xa measurements of rivaroxaban have been
12   demonstrated to be the equivalent of tandem mass
13   spectrometry; correct?
14   A.  Yes.
15   Q.  That's based on your reading?
16   A.  Based on our published studies, yes.  And
17   readings as well.
18   Q.  And you're right.  You have some
19   publications.
20        But you have not yourself done work in the
21   area of tandem mass spectrometry; correct?
22   A.  That is correct.
23   Q.  And one of your studies, you published
24   about the use of rivaroxaban-calibrated anti-Xa
25   chromogenic assay?

Page 240

1    A.  Yes.
2    Q.  And -- and when you -- when you talk about the
3    anti-Xa assays with rivaroxaban-specific
4    calibration kits, they have not been approved by
5    the FDA; correct?
6    A.  That is correct.
7    Q.  And that's something you, of course, are aware
8    of and have referenced in your literature?
9    A.  Yes.
10   Q.  And you've also talked about -- let me see.
11   Exhibit 11.  If you'll look at Exhibit 11 for me,
12   please.
13   A.  I'm -- I'm sorry, did you say 11?
14   Q.  Yes, but --
15        MR. BENACH:  Exhibit 11.
16   BY MS. MOORE:
17   Q.  But I'm not going to -- I think this is --
18   yeah.
19        Actually, if you'll go to 7, sir.
20        And when you're ready.
21        MR. ABNEY:  No, she means Exhibit 7, I think.
22   You changed from Exhibit 11; right?
23        MS. MOORE:  I did.
24        MR. ABNEY:  Not page 7.
25        MS. MOORE:  I'm sorry.

Page 241

1    THE WITNESS:  Oh, I'm sorry.
2    MS. MOORE:  Yes.
3    No, no worries.
4    THE WITNESS:  All set.
5    MS. MOORE:  I started with Exhibit 11 and
6    then I changed to Exhibit 7.
7    THE WITNESS:  6 -- oh, I had it on top.
8    I'm sorry.
9    BY MS. MOORE:
10   Q.  And if you can turn to page 778 when you're
11   ready.
12        And again, this is kind of reiterating what
13   you've told us, but if you'll go down to the first full
14   paragraph in the second -- on the left column,
15   beginning with, "However."
16   A.  First full paragraph, left-hand column.
17   Q.  All the way --
18   A.  "However."
19   Q.  -- down.
20   A.  Okay.
21   Q.  "However, there are no currently" --
22   A.  Yes.
23   Q.  The statement reads, "However, there are no
24   currently -- there are currently no FDA-approved
25   commercial rivaroxaban-specific calibrators or controls

1    available for use in U.S."; correct?
2        A. That is correct.
3        Q. Now, if there are no standardized assays, do
4    you think it's safe to allow labs to run these tests
5    based on their own individual criteria?
6        A. So you're asking me my opinion, is it okay for
7    labs to run what, these tests, because they're not FDA
8    approved?
9        Q. Without the standardization and the
10   harmonization that you've referenced earlier for us
11   today.
12       A. I think you're confusing standardization with
13   FDA approval.  It doesn't mean there are not materials
14   available that we can purchase.  It just means the FDA
15   has not approved them for clinical use.  A laboratory
16   may use them, may acquire them.  They are materials
17   that have been measured by tandem mass spec.  There are
18   programs to assure longitudinal proficiency that are
19   drug measurements per -- from CAP and ECAT to assure
20   that you're doing good work.
21       So I -- I think there's a -- maybe there's
22   a -- a misunderstanding what "standardization" means
23   and "harmonization" means.
24       There's a reluctance in the U.S. to use these
25   materials that can be purchased.

1        Q. You said there's a reluctance in the U.S. to
2    use these materials?
3        A. I think, in laboratories, there's a reluctance
4    because they're not FDA approved.
5        Q. And -- and the reluctance is because they're
6    not FDA approved.
7        And why are they not FDA approved?
8        A. You would have to ask the FDA that.
9        Q. As someone who has presented to the FDA, and
10   you're holding yourself out to be an expert in this
11   field, what is your belief as to why the FDA has not
12   yet approved these measurements?
13       MR. ABNEY:  Object to form.
14       THE WITNESS:  Because I think that they're
15   asking the IVD companies to do unreasonable studies in
16   which, in methodologies in the past were able to be
17   done by doing -- comparing X to comparing Y.  And
18   they're no longer accepting that as -- as a viable
19   option.
20       They also want to have intended use of the
21   results.
22       So I think it's a hurdle that they're
23   requiring for companies to do that is too expensive
24   for them to accomplish because they want outcome
25   studies.

1        BY MS. MOORE:
2        Q. So it's your opinion that despite the fact
3    that the FDA has not yet approved these types of tests,
4    that they should be widely used throughout the country;
5    correct?
6        A. It's -- it's my opinion, and it's my practice
7    and -- at UC Davis Medical Center, that it is best to
8    give somebody a good result as opposed to giving them
9    no result.  The fact that there are not FDA-approved
10   calibrated controls should not be a limiting factor.
11       The methodologies that we use are FDA
12   approved, meaning the kits.  It's just the calibrators
13   are not.
14       There are different ways you can calibrate
15   without doing commercial, to do -- to achieve the same
16   sort of result.
17       Q. In one of your more recent articles -- Exhibit
18   11.  Let me see.  You talked about drug-specific
19   anti-Xa assays -- assays that cannot be performed on a
20   rapid turnaround, 24-hour basis.
21       Do you recall that?
22       A. I -- cannot be performed?  I -- I --
23       Q. Yeah, you -- you state -- and let me find you
24   the exact reference.  It will make it a little easier
25   for you.

1        A. Please.
2        Q. Sir, do you think a test that hasn't been
3    validated for clinical use should be tested in
4    emergency scenarios?
5        A. I'm sorry?
6        MR. ABNEY:  Object to form.
7        BY MS. MOORE:
8        Q. Do you think a test that has not been
9    validated for any type of clinical use should be tested
10   in emergency scenarios?
11       MR. ABNEY:  Object to form.
12       THE WITNESS:  My personal opinion is no.  But
13   I'm unsure what you mean by "validated in clinical
14   scenarios."
15       BY MS. MOORE:
16       Q. Well, what do you mean by "validated" in --
17   when you use the term "validation" --
18       A. Yes.
19       Q. -- what does that mean to you in your area of
20   work?
21       A. Oh, okay.
22       So to validate or verify the performance of a
23   test, there's five elements that we do.
24       We do precision studies.
25       We do accuracy studies.

1    We do linearity studies.
2    We do --
3    Q. Wait a second. Hold on.
4    Precision, accuracy --
5    A. Linearity.
6    Q. All right. Thank you.
7    A. Carryover, if necessary. And reference
8    interval, if necessary.
9    Q. Carryover, if necessary, and reference
10   interval?
11   A. Reference interval if -- if applicable, which
12   is not for drug levels.
13   Q. And these five steps are part of your
14   validation process?
15   A. Yes.
16   Q. And could you take me through them, please?
17   A. So precision would be -- there's two
18   components of precision that we do.
19   One is with end run, which means we take a
20   sample and we run it 10, 20 times, depending on the
21   laboratory and the test. That gives us an idea of the
22   imprecision of the result and the variability if you
23   ran that sample so many times.
24   The other precision test we do is day-to-day,
25   is -- so this is the variability seen with runs between

1    days. That would be the precision studies. And it's
2    measured by a coefficient of variation.
3    The accuracy studies would be comparing your
4    method that you're testing against a predicate, whether
5    that be mass spec or any other lab methodology that
6    measures the same -- whatever you're measuring.
7    Linearity would be taking a sample and making
8    serial dilutions to see at what point you have your
9    lower limit of quantitation.
10   Carryover is a process when you're using
11   automated equipment to make sure that the sample is not
12   being carried over by the probes into another reagent
13   or into another sample. Same with the reagents, that
14   the probes are actually washing appropriately so you
15   don't have carryover material, whether it be sample or
16   reagents, into other samples or reagents.
17   And the reference interval would be the normal
18   range determination again, if applicable, but not
19   always the case.
20   Q. And with respect to any of the assays that you
21   have discussed in your report, have you actually
22   subjected them through your validation process?
23   A. Yes.
24   Q. And tell me about that, please.
25   A. They were presented at the FDA workshop, as

1    far as apixaban, dabigatran, rivaroxaban. We
2    performed all elements of the CLIA-mandated
3    elements, which are those five.
4    Q. All right. So let's talk -- well, let's
5    talk about is that under you -- your low molecular
6    weight heparin and your unfractionated
7    heparin-calibrated anti-Xas, assays?
8    A. It's used in the kit, but not the same
9    calibration. So I use the same commercial kit, but I
10   use drug-specific calibrators.
11   Q. All right. Let's focus on the anti-Xa assays.
12   A. Okay.
13   Q. Let's start with when calibrated with
14   ultrafractionated heparin and low molecular weight
15   heparin.
16   You talked about emergent situations in your
17   report.
18   A. Yes.
19   Q. And you talked about how, when laboratories
20   use those types of assays, they should consider the
21   method for estimating drug concentration?
22   A. Yes.
23   Q. And that a lower limit of detection would
24   suggest an insignificant amount of rivaroxaban should
25   the purpose of the drug measurement be for emergent

1    surgery, thrombolytic therapy or other acute clinical
2    situations requiring immediate -- immediate
3    intervention; correct?
4    MR. ABNEY: Object to form.
5    THE WITNESS: In the absence of a method that
6    quantifies the drug, yes.
7    BY MS. MOORE:
8    Q. And then you go further to talk about how
9    published data may be useful in laboratories to
10   estimate their unfractionated heparin or low molecular
11   weight heparin-calibrated anti-Xa method?
12   A. Yes.
13   Q. And back to your Exhibit 4, in your article,
14   you again reference the significant limitations with
15   the use of this assay for measuring concentrations;
16   correct?
17   A. Yes.
18   Q. And we talked about how they -- how they're
19   measured, and you can't compare --
20   A. Yes.
21   Q. -- the two out -- there's no direct
22   relationship; correct?
23   A. Between the units.
24   Q. Between the units.
25   With respect to your statement that a result

1  below the lower limit of detection would suggest
2  insignificant amount of rivaroxaban should the purpose
3  of a drug measurement be for emergent surgery,
4  thrombolytic therapy or other acute clinical situations
5  requiring intermittent -- intermediate intervention,"
6  do you recall that statement?
7      A.  Yes.
8      Q.  You also in your article, Exhibit 4, on page
9  10 -- you had it just a minute ago.  It's one of the
10  first ones we were using.
11     A.  You said 4?
12     Q.  Yes.
13     A.  Sorry.
14     Q.  That's all right.
15         It's the laboratory report.
16         That -- that looks like Exhibit 4.
17     A.  Yeah.
18     Q.  And so you have it now?
19     A.  You said page 10?
20     Q.  Yes.
21     A.  Okay.
22     Q.  Thank you.
23         If you go down where you talk about
24  "Furthermore, the lower limit of detection for these
25  assays varies" --

1      A.  Yes.
2      Q.  -- "with calibrators used.  And some
3  unfractionated heparin or low molecular weight
4  heparin-calibrated anti-Xa assays may underestimate the
5  level of the drug present"; correct?
6      A.  Yes.
7      Q.  Correct?
8      A.  Yes.
9      Q.  And this variability could raise serious
10  clinical concerns about using low molecular weight
11  heparin and unfractionated heparin-calibrated anti
12  assays even when measuring results within the lower
13  limits of detection; correct?
14     A.  Yeah, sorry, were you reading that verbatim?
15     Q.  Pardon?
16     A.  Were you -- were you reading that?
17     Q.  That was a question.
18     A.  Okay.  I'm -- I'm going to refer to table 2,
19  which is what it refers to --
20     Q.  Yes.
21     A.  -- and it clearly sort of delineates the -- of
22  the six methodologies, what was the lower limit of
23  detection.  There was one of the six using a calibrated
24  method with a particular methodology that was higher
25  rivaroxaban level, at 35, versus the other ones, which

1  were less than 5 and 10.
2      Q.  So your -- your language on page 10 talks
3  about that it may underestimate the level of the drug
4  present; correct?
5      A.  If we're saying that the generic, yes.  If
6  you're generically -- if -- if -- this is why we have
7  "may," is that the -- it doesn't absolutely say that
8  the lower limit of quantitation means no significant
9  drug --
10     Q.  And I'm not --
11     A.  -- that is correct.
12     Q.  -- suggesting an absolute.  I'm just using --
13         MR. ABNEY:  Let him --
14  BY MS. MOORE:
15     Q.  -- your words.
16         MR. ABNEY:  -- finish his answer.  Just let
17  him finish his answer.
18         MS. MOORE:  Yeah, and I did not --
19         MR. ABNEY:  This is not --
20         MS. MOORE:  -- mean to interrupt you.
21         MR. ABNEY:  Just try and explain it.
22         THE WITNESS:  Okay.
23         So I -- I think again, when we refer to table
24  2, it's quite clear there is one methodology that the
25  lower limit of quantitation was higher than the others.

1  BY MS. MOORE:
2      Q.  But your language, sir, and I -- do you want
3  to change your language and retract the statement in
4  your report now, and in your article?
5      A.  Now you have -- you're jumping over on the
6  report now.  So what does that mean?
7      Q.  Would you like to retract the statement in
8  your article, Exhibit 4 --
9      A.  This article?
10     Q.  Yes, sir.
11     A.  No.
12     Q.  Okay.  So you do state that it may
13  underestimate the level of the drug present; correct?
14     A.  May.
15     Q.  Right.  I'm not saying an absolute.
16         You're the one that said it may happen;
17  correct?
18     A.  I'm saying the data that we describe, one of
19  the six, was higher than the other five --
20     Q.  Right.
21     A.  -- yes.
22     Q.  And these are your words?
23     A.  That's correct.
24     Q.  Okay.  And when you have a situation where you
25  may underestimate or you underestimate the level of the

1    drug present, this variability could cause or raise
2    clinical concerns about using low molecular weight
3    heparin or unfractionated heparin-calibrated anti
4    assays, even when they're within the lower limit of
5    detection; correct?
6        A.  It may.
7            MS. MOORE:  Right.
8            Off the record.
9            Thank you.
10           THE VIDEOGRAPHER:  This marks the end of Disc
11   Number 3.  We're off the record at 2:01 p.m.
12           (Recess taken.)
13           THE VIDEOGRAPHER:  We are back on the record.
14   This marks the beginning of Disc Number 4 in the
15   deposition of Robert Charles Gosselin.  The time is
16   2:21 p.m.
17   BY MS. MOORE:
18       Q.  All right.  Mr. Gosselin, we're back after a
19   short break.
20           Before we took a break, we were talking about
21   Exhibit 4, which is one of the articles that you
22   published.  I'd like to just finish off a couple of
23   questions on that if you'll get that in front of
24   you.  I think you have it.
25           And look at page -- I think it's 783.

1            No, wait.  It's actually Exhibit 7.
2            If you'll turn to the conclusion.
3        A.  It's always the last one.
4            Sorry.
5            I'm sorry, the conclusion?
6        Q.  Sure.
7            It's on the last page, 783.
8            And this is your article titled,
9    "Heparin-calibrated chromogenic anti-Xa activity
10   measurements in patients receiving rivaroxaban";
11   correct?
12       A.  "Can this test be used to quantify drug
13   levels," the continuing title?  Yes.
14       Q.  And you're the lead author, sir?
15       A.  I'm sorry?
16       Q.  You're the lead author?
17       A.  Yes.
18       Q.  And your conclusion is, "We do not advocate
19   the routine use of these assays to estimate rivaroxaban
20   concentration.  Furthermore, it is unclear what level
21   of rivaroxaban is safe to pursue interventional
22   procedures or neuraxial anesthesia."
23           Do you see that, sir?
24       A.  Yes.
25       Q.  And those are your words; correct?

1        A.  They're our words.  It's not a --
2        Q.  And you were one --
3        A.  -- publication of one.  It's a --
4        Q.  Right.
5        A.  -- publication of --
6        Q.  You're the --
7        A.  -- several.
8        Q.  -- lead author?
9        A.  Yes.
10       Q.  And those are your words, sir; right?
11       A.  They're our words --
12       Q.  Okay.  Which would --
13       A.  -- yes.
14       Q.  -- include you?
15       A.  Yes.
16       Q.  And then it goes, "Therefore, the use of
17   heparin calibrating anti-factor Xa methods for
18   estimating rivaroxaban concentration must be used
19   with caution and limitations clearly understood."
20       A.  Yes.
21       Q.  And you stand by those words today?
22       A.  I do indeed.
23       Q.  And when you talk about that the level of
24   rivaroxaban -- it's unclear whether the level of
25   rivaroxaban is safe to pursue interventional

1    procedures, this means there's no clear understanding
2    of the clinical significance or relevance of specific
3    levels of rivaroxaban; correct?
4        A.  This is verbiage from my clinical colleagues,
5    which I am not a clinical person.  And so the
6    guidelines that we, I believe, either cited here or
7    in other articles, do not determine what a safe
8    level is.  I think there's some -- some that may,
9    but I don't recall offhand about neuraxial
10   anesthesia and other interventions.
11       Q.  Sir, the statements in your conclusion are
12   the statements that you had in your article as the
13   lead auth -- as the lead author; correct?
14       A.  Are we back on this article --
15       Q.  Yes.
16       A.  -- right here?
17       Q.  Yeah.
18       A.  The statements?
19       Q.  Those statements are obviously -- the
20   statements in your paper, in 2015, where you were
21   the lead author; correct?
22       A.  I am not the sole author.  There --
23       Q.  I --
24       A.  -- are --
25       Q.  And you're absolutely --

Page 258

1     A. -- statements, yes.
2     Q. -- right. I never --
3         MR. ABNEY: Okay. Let's not talk over each
4  other.
5         I think you've clearly established he is the
6  first author on the paper and that that sentence says
7  what it says. You -- you're --
8         MS. MOORE: Move to strike comments of
9  Counsel.
10        MR. ABNEY: Well, you're asking him the
11 same questions over and over. It's getting really
12 late, and I'd appreciate if you'd just move on to a
13 new question.
14        MS. MOORE: Counsel, I'm not here to
15 satisfy your request. I'm here --
16        MR. ABNEY: You're not here to --
17        MS. MOORE: -- to ask questions.
18        MR. ABNEY: -- badger the witness by asking
19 him questions over and over and over again.
20        MS. MOORE: I --
21        Move to strike comments of Counsel.
22        I understand that you're getting irritated.
23 The day's gone on. That's certainly true.
24        MR. ABNEY: And you're repetitively asking
25 the same questions that are --

Page 259

1         MS. MOORE: Move to strike comments of
2  Counsel. I'm objecting that he --
3         MR. ABNEY: -- that are clearly stated on the
4  paper.
5         MS. MOORE: Move to the coaching of the --
6  move to strike the coaching of the witness.
7         MR. ABNEY: I'm coaching the witness?
8  BY MS. MOORE:
9     Q. So, sir, there's no correlation between -- to
10 your knowledge, there's no correlation between levels
11 of rivaroxaban and thrombotic or hemorrhagic events;
12 correct?
13    A. It's not under my bailiwick. So I do not have
14 any expertise to say --
15    Q. You're not --
16    A. -- yes or no.
17    Q. Thank you.
18        And let's look at an exhibit. I don't think
19 I've given you that one yet.
20        I'm going to hand you a copy of an article
21 entitled, "A single test to assay warfarin,
22 dabigatran, rivaroxaban, apixaban, unfractionated
23 heparin and enoxaparin in plasma."
24        Here you go.
25        MR. ABNEY: Are you going to mark it?

Page 260

1         MS. MOORE: We are going to mark that as
2  Exhibit 18.
3  BY MS. MOORE:
4     Q. And you're certainly free to look at
5  whatever you like, but if you want to turn to page
6  1051.
7     A. She's marking the paper first.
8     Q. Do you have it in front of you, sir?
9     A. She has it. So I will in a second.
10        Thank you.
11        (DEFENDANTS' EXHIBIT 18 WAS MARKED.)
12        THE WITNESS: So I'm sorry, go where?
13 BY MS. MOORE:
14    Q. Page 1051.
15        And it's going to be on the right-hand column.
16 Go down in that paragraph -- go down -- do you see, "To
17 our knowledge"?
18    A. Yes.
19    Q. "To our knowledge, correlation of drug levels
20 with drug efficacy and safety have not yet been
21 published for rivaroxaban or apixaban."
22        You see that, sir?
23    A. I read this, yes.
24    Q. And that goes along with what you've stated in
25 your previous article; correct?

Page 261

1     A. This is a clinician statement --
2     Q. Yes.
3     A. -- and I am not a clinician.
4     Q. I understand that.
5     A. And so previous articles that would not
6  have been made by me but my fellow authors who
7  are --
8     Q. That --
9     A. -- clinicians --
10    Q. Right.
11    A. -- yes.
12    Q. And I understand you're not a clinician, and
13 you've made that --
14        MR. ABNEY: Let's not --
15 BY MS. MOORE:
16    Q. -- clear.
17        MR. ABNEY: -- interrupt the witness, please.
18 BY MS. MOORE:
19    Q. But your article that we referenced did
20 contain a similar statement; correct?
21    A. It did contain a similar statement, yes.
22    Q. Thank you.
23        Would you agree that the use of anti-Xa assays
24 calibrated with low molecular weight heparin and
25 unfractionated heparin should not be used if a

Page 262

1  clinician cannot understand what level of
2  rivaroxaban is safe to pursue interventional
3  procedures?
4      A. That's a clinical decision that I don't
5  think I have the capacity to answer.
6      Q. But you have stated that the anti-Xa assay
7  calibrated to low molecular weight heparin or
8  unfractionated heparin should not be used to estimate
9  rivaroxaban concentrations; correct?
10     A. If that is stated somewhere and I wrote it in
11 my papers -- I've written a lot of papers -- then yes.
12     Q. You also stated that the use of
13 heparin-calibrated anti-Xa methods must be used with
14 caution and limitations clearly understood.
15     MR. ABNEY: Asked and answered.
16     THE WITNESS: I think that is a statement that
17 one would use for any laboratory tests and not just the
18 anti-Xa.
19 BY MS. MOORE:
20     Q. And so along those lines, because of the
21 limitations with that assay, it must be used with
22 caution?
23     A. But that can be extended to any lab tests.
24     Q. Fair enough.
25     A. Yes.

Page 263

1      Q. Fair enough.
2      And that would support the need for
3  standardization, sir, so that there is no or little
4  difference from lab to lab; correct?
5      MR. ABNEY: Object to form.
6      THE WITNESS: I'm not sure I understand what
7  you mean by the concept of standardization.
8  BY MS. MOORE:
9      Q. You stated in your article that "We don't
10 advocate the routine use of these assays to estimate
11 rivaroxaban concentration"; correct?
12     A. I'm not sure which article you're citing.
13     Q. It's the one -- hold on.
14     It's Exhibit 7. It's back where we were, page
15 783.
16     A. Yes.
17     Q. Does -- does that refresh your recollection of
18 the --
19     A. Yes.
20     Q. -- conclusions section?
21     A. Yes.
22     Q. Okay. And you -- have you responded to my
23 question?
24     My question was, you did, in fact, state in
25 this article, "We don't advocate the routine use of the

Page 264

1  assays to estimate rivaroxaban concentration"?
2      MR. ABNEY: Object to form.
3      THE WITNESS: The --
4  BY MS. MOORE:
5      Q. Correct?
6      A. The routine use, yes.
7      Q. That's my question, routine.
8      A. Yes.
9      Q. And in your expert report you state, "In
10 emergent situations, the laboratories that perform
11 unfractionated heparin or low molecular weight heparin
12 anti-Xa measurements should consider that method for
13 estimating drug concentration"; correct?
14     A. Yes.
15     Q. So despite not advocating its routine clinical
16 use, the laboratories that perform unfractionated
17 heparin and low molecular weight heparin anti-Xa
18 measurements should consider that method for estimating
19 drug concentration?
20     A. In emergent situations, yes, I think you're --
21 you're kind of combining a routine we'd like to know
22 there's no urgency of the situation to somebody who is
23 bleeding, somebody who has trauma, somebody -- these
24 are emergent situations that if you can provide them
25 some information, I believe it -- it makes an impact in

Page 265

1  their management.
2      But I'm not a clinician. You'd have to ask
3  a clinician, would they prefer nothing or would
4  they prefer something?
5      Q. So despite not advocating its routine
6  clinical use, this test that you described as
7  having significant limitations should be used in
8  emergent situations?
9      A. I think routine and emergent are -- are kind
10 of oxymorons, that yes, you would be willing to use
11 something in an emergent situation you may not use in a
12 routine situation where you have other options
13 available.
14     Q. But wouldn't you agree that you want accurate
15 and precise tests in acute circumstances?
16     A. Again, I am not a clinician. But if you ask a
17 clinician in an emergent situation, "Would you like to
18 have some information or no information?" that would be
19 the question I'd pose to them.
20     But as -- if I were a clinician, I would
21 advocate for something versus nothing.
22     Q. And if you asked a clinician if they wanted
23 a test with significant limitations
24     A. If I were a clinician --
25     MR. ABNEY: Object to form.

Page 266

1      Is there a question?
2  BY MS. MOORE:
3      Q. Is that the type of question that should be
4  posed to the clinicians at UC Davis?
5      A. I think that the -- any laboratory test has
6  significant limitations, and the onus is on the
7  laboratory to know those limitations and -- and share
8  those limitations with any clinician that utilizes the
9  test for management or intervention.
10     Q. You also state in your report that "Published
11 data may be useful for laboratories to estimate their
12 unfractionated heparin or low molecular weight
13 heparin-calibrated anti-Xa method and rivaroxaban
14 concentration"; correct?
15     A. Yes.
16     Q. What data are you referencing?
17     A. Ours and others.
18     Q. And when you say "ours and others," what does
19 that mean?
20     A. Ours would be Exhibit 4.
21     Q. Okay.
22     A. I'm sorry, 7.
23     Q. Thank you.
24     A. I'm sorry.
25        And others, I don't remember them offhand.

Page 267

1      Q. All right. Well, take a moment.
2      A. Yes.
3      Q. Because I just want to make sure I've got
4  this right.
5      A. Okay.
6      Q. "Published data may be useful for laboratories
7  to estimate their unfractionated heparin or low
8  molecular weight heparin-calibrated anti-Xa method and
9  rivaroxaban concentration."
10     A. Yes.
11     Q. What data would be helpful for laboratories to
12 use?
13     A. What data?
14     Q. You say "published data." Yes, what published
15 data?
16     A. The -- I have to find the table that we looked
17 at before.
18        But it was table 2 that showed the lower limit
19 of quantitation and how they related to drug levels.
20 It was specific for the kits employed.
21        An upper limit of quantitation. That's all
22 useful information.
23     Q. I'm sorry, sir, what was the last part?
24     A. The --
25     Q. I couldn't hear you very well.

Page 268

1      A. -- upper limit of quantitation based on the
2  calibration.
3        That's all useful information as a
4  laboratory person because it's kit specific. That
5  is useful information.
6        The limiting factor is the calibration.
7  That would be maybe not so kit specific. And that
8  would be one of the limitations that a laboratory
9  may have.
10     Q. So one of the limitations that a laboratory
11 may have would be the calibration?
12     A. Yes.
13     Q. Can you think of any other limitations?
14     A. The methodology.
15     Q. Anything else?
16     A. Those are the two biggest ones.
17     Q. Main ones?
18        And obviously you're comfortable with your --
19 your lab and your calibration; correct?
20     A. Me? Yes, ma'am.
21     Q. And you're comfortable with your methodology?
22     A. I'm comfortable in the fact that we've
23 demonstrated, over longitudinal years of work, that we
24 do well in proficiency, which is blinded samples
25 compared to peer groups. So yes.

Page 269

1      Q. And do you think that the laboratories
2  throughout the country in rural and community settings
3  would have the same amount of expertise in conducting
4  these types of assays or studies?
5      A. Well, I can't comment on the expertise of
6  others. I can speculate in the direction they're going
7  to, which is, I get calls episodically from
8  institutions all over the country asking how I did what
9  I did and how can I help them. So yes.
10     Q. So you get calls from scientists asking for
11 guidance?
12     A. Yes.
13     Q. And, of course, you provide that to them?
14     A. Yes.
15     Q. All right. In addition to the limitations
16 that you talked about, the calibration and
17 methodology, you did again reference the serious
18 limitations with the anti-Xa assay that we
19 previously discussed in your article, I believe
20 Exhibit 4; correct?
21     A. I'm sorry. Can you rephrase the question?
22     Q. Sure. No problem.
23     A. I'm trying to find the exhibits.
24     Q. Yeah. No --
25     A. Because this was the table I was looking --

68 (Pages 266 to 269)

Page 270

1    Q. No problem.
2    A. -- for before.
3    Q. It's been a long day.
4        So, sir, in addition to the limitations we
5    -- you talk about with respect to calibration and
6    methodology --
7    A. Yes.
8    Q. -- there are also the serious limitations
9    that you've referenced in your peer-reviewed
10   journal article, which is Exhibit 4; correct?
11   A. I'm not sure I'd categorize them as
12   serious. They're just --
13   Q. All right.
14   A. They're limitations that -- again, this is
15   directed for laboratories. And we're providing
16   them what I think is useful guidance for when they
17   go down this path, what they need to be aware of.
18   That's not serious. That's edification.
19   Q. And I stand corrected. You said
20   "significant."
21   A. But you said "serious."
22   Q. No, and that's -- that's why I said I stand
23   corrected.
24   A. Okay. I'm sorry.
25   Q. No worries.

Page 271

1    A. Okay.
2    Q. So in addition to calibration and methodology,
3    we also have to consider the significant limitations
4    that you've referenced in your peer-reviewed
5    article in 2015; correct?
6    A. They are listed, yes, that we've addressed
7    in the past, yes.
8    Q. I want to turn now to your rivaroxaban Xa
9    anti -- anti-Xa assays.
10       Let's look at the --
11   A. I'm sorry, can you help me out? Which --
12   Q. I'm going to get you the reference.
13       It's I think "Comparison" --
14       MR. BENACH: No, it's Exhibit 5.
15   BY MR. ABNEY:
16   Q. "Comparison" --
17   A. 5.
18   Q. -- "of anti-Xa and dilute Russell viper
19   venom time assays."
20       Say that three times and click your heels.
21   A. Okay.
22   Q. Tell me when you find that particular article.
23   A. Yes.
24   Q. All right. And what I'd like for you to do is
25   turn to the "Objective" section of the summary on the

Page 272

1    first page.
2        You ready?
3    A. Yes, ma'am.
4    Q. All right. And the objective was to
5    compare different methods and calibration for
6    measuring rivaroxaban including the chromogenic
7    anti-Xa assay, which, when calibrated with a
8    rivaroxaban standard, may be more appropriate for
9    determining anticoagulation; is that correct?
10   A. Yes.
11   Q. So the purpose of the study was to see how
12   effective rivaroxaban-calibrated anti assays were in
13   determining anticoagulation; correct?
14   A. No. The purpose of the article was to compare
15   different methods for quantitating rivaroxaban as
16   compared to mass spec.
17   Q. Let's look at the studies you described in
18   your "Materials and Methods" subsection on the next
19   page, 1681.
20       See that?
21   A. Yes.
22   Q. You get approval by the IRB, and looks like
23   you've got 30 patients taking either 15 or 20
24   milligrams of rivaroxaban?
25   A. Yes. These are samples from the Francart

Page 273

1    study, which was previously -- and I believe it's cited
2    here from the Francart study.
3    Q. Yes. Thank you.
4    A. Yes.
5    Q. And this is a study on a relatively small
6    population; would that be fair to say?
7    A. N equals 30? Yes.
8    Q. It's a small sample size?
9    A. Yes.
10   Q. Let's look at the conclusion of the study.
11   A. I don't have the conclusion.
12   Q. It says, "In conclusion" on your last page,
13   the first --
14   A. Oh, "In conclusion." I was looking for a
15   header. Okay.
16   Q. No worries.
17   A. So last paragraph.
18   Q. Yes, sir.
19       Your conclusion states, "In conclusion, we
20   demonstrated that statistically significant biases
21   exist among methods that report rivaroxaban levels, and
22   that those biases are associated with kit method
23   differences, because a single-source calibrator did not
24   alleviate result differences. Whether this variability
25   will be of clinical importance needs to be

69 (Pages 270 to 273)

Page 274

1 investigated."
2      Do you see that?
3      A. Yes.
4      Q. So the study here that -- that you've
5 published -- and again, you're the lead author --
6 in 2014, acknowledges the -- the concerns with the
7 rivaroxaban-calibrated anti-Xa assay kits
8 demonstrating statistically significant biases;
9 correct?
10     A. Statistically significant biases, yes.
11     Q. And the biases demonstrated significant levels
12 of uncertainty in measurements between the anti-Xa
13 kits; correct?
14     MR. ABNEY: Object to form.
15     THE WITNESS: The biases just mean they don't
16 match. That's what --
17 BY MS. MOORE:
18     Q. Well, because the biases didn't match in
19 this particular case, there were levels of
20 uncertainty in the measurements; correct?
21     MR. ABNEY: Object to form.
22     THE WITNESS: I'm not sure how to answer that.
23 I really -- I really am not sure. Because every -- or
24 lots of coag methods that we have statistically don't
25 match. Then we have to look beyond the statistics to

Page 275

1 determine whether or not it's a significant difference
2 or not.
3 BY MS. MOORE:
4      Q. Well, let's -- let's talk a little bit more
5 about this particular study.
6      A. Okay.
7      Q. In this study they didn't -- the biases -- or
8 in this study, you compared rivaroxaban clinic --
9 calibrated anti-Xa assays against the tandem mass
10 spectrometry readings; correct?
11     A. Yes.
12     Q. And they didn't match?
13     A. They were statistically significantly
14 different.
15     Q. All right. So to answer my question, the
16 biases demonstrated significant levels of uncertainty
17 in the measurements between the anti-Xa kits; correct?
18     A. I'm not sure what you mean by "levels of
19 uncertainty."
20     Q. There was, as you say, statistically
21 significant biases; correct?
22      What's a bias mean to you?
23     A. I'm saying there were differences. There were
24 significant differences between the two results. And
25 if you look at the scatter plot, it will show you that

Page 276

1 the measurements typically were lower with the Xa
2 methodologies compared to mass spec. That's the --
3 that's what makes it statistically significant, is
4 the fact they were in essentially one direction.
5 Even though the -- the diff -- the difference may
6 be small, but the fact they're all negative makes
7 them significantly different.
8      Q. Right. Right.
9      A. But that doesn't necessarily translate to a
10 clinically significant difference.
11     Q. Your biases -- you state the biases associated
12 with the kit method differences were because a
13 single-source calibrator did not alleviate the result
14 differences; correct?
15     MR. ABNEY: Object to form.
16     THE WITNESS: So what we're saying is --
17 BY MS. MOORE:
18     Q. Wait. Just first answer my question, please.
19     A. Can -- are you reading this? That because a
20 single-source calibrator did not alleviate the
21 difference, we were excluding a possible variable for
22 why there were differences, and that is the calibrator.
23 So yes.
24     Q. Thank you.
25      So despite your attempts to fix the biases by

Page 277

1 calibrating the anti-Xa assay, the calibrator did not
2 change these result differences; correct?
3      MR. ABNEY: Object to form.
4      THE WITNESS: There was not an attempt to
5 fix the bias. This was an observational study
6 using different calibrators, different
7 methodologies to present to laboratorians what to
8 expect if they went down this path with these
9 different methodologies.
10 BY MS. MOORE:
11     Q. The rivaroxaban-calibrated Xa assay results
12 demonstrated biased results based on the gold standard
13 of measuring DOACs; correct?
14     MR. ABNEY: Object to form.
15     THE WITNESS: There's been no accepted gold
16 standard for measuring DOACs as we currently -- we
17 previously indicated that there's been no consensus to
18 use mass spec.
19 BY MS. MOORE:
20     Q. But you told me it was your opinion -- you're
21 not an expert in the tandem mass spectrometry, but you
22 told me it was your opinion that that particular
23 technique was in fact the gold standard; correct?
24     A. No. I said if you're asking my personal
25 opinion, I would say mass spec. If you asked me if

1    there is a consensus opinion, the answer is no.
2    Q. Okay. So based on -- and you're here today --
3    A. Yes.
4    Q. -- and I want your opinion.
5    A. My opinion is mass spec is the --
6    Q. Okay.
7    A. -- gold standard --
8    Q. Thank you.
9    A. -- for measuring drug concentration.
10    Q. All right. So based on the riva --
11    rivaroxaban-calibrated anti-Xa assay, results
12    demonstrated biased results based on the gold standard;
13    correct?
14    MR. ABNEY: Object to form.
15    THE WITNESS: I'm -- I'm not sure where you're
16    going with this. I'm not sure what you're trying
17    ferret from this. I mean, there are differences
18    between the chromogenic Xa method and mass spec, yes.
19    BY MS. MOORE:
20    Q. And you also acknowledged that whether the
21    variability will be of clinical importance needs to be
22    investigated; correct?
23    A. Yes, because I am not a clinician.
24    Q. And as you not being a clinician, you can't
25    tell us the clinical significance of the anti-Xa

1    rivaroxaban-calibrated test, if any; correct?
2    A. I'm sorry?
3    MR. ABNEY: Object to form.
4    BY MS. MOORE:
5    Q. By not being a physician, you can obviously --
6    obviously cannot tell us the clinical significance of
7    the anti-Xa rivaroxaban-calibrated test; correct?
8    MR. ABNEY: Object to form.
9    THE WITNESS: The clinical significance,
10    correct, I cannot.
11    BY MS. MOORE:
12    Q. Thank you.
13    So this study showed significant bias, and the
14    test variability has not been clinically validated, but
15    you believe this test is comparable to the gold
16    standard of tandem mass spectrometry?
17    A. We believe that, as the other authors do on
18    the paper. It is not just me.
19    So is it equivalent? And the answer is yes.
20    Are they statistically significantly different? The
21    answer is still yes.
22    Q. So I want to have you turn back to -- maybe
23    it was -- I think it's Exhibit 18 we handed you a
24    few minutes ago.
25    A. I'm -- I'm sorry?

1    MS. MOORE: Yes?
2    MR. ABNEY: Exhibit 18?
3    MS. MOORE: Yes. Single-test assay.
4    BY MS. MOORE:
5    Q. You want to look at the first page?
6    THE WITNESS: I told you it's always the
7    last one.
8    MS. MOORE: Okay.
9    THE WITNESS: I'm sorry?
10    BY MS. MOORE:
11    Q. All right. If you want to look at the first
12    page, please.
13    A. Okay.
14    Q. And I want you to go down at the end of the
15    first page where it starts, "Currently different
16    methods are used."
17    You see that, sir?
18    A. Yes.
19    Q. "Currently different methods are used to
20    measure various levels of this anticoagulant drug."
21    You see where I am now?
22    A. Yes.
23    Q. "Standard coagulation assays activated
24    partial thromboplastin time and prothrombin time
25    are not suitable for measuring the effect of DOACs

1    because they lack sensitivity to the anticoagulant
2    effect of DOACs and yield markedly discrepant
3    results based on the reagents used."
4    You see that, sir?
5    A. I see that sentence.
6    Q. "Therefore, dabigatran may currently be
7    assayed best using the diluted thrombin time or the
8    ecarin clotting time and the anti-factor Xa oral
9    agents using chromogenic anti -- anti-factor Xa
10    assays using drug-specific anti-VIIa or anti-factor
11    Xa standards. However, most medical laboratories
12    cannot perform these tests on a rapid-turnaround
13    basis."
14    Do you see that?
15    MR. ABNEY: Object to form.
16    THE WITNESS: I do see that.
17    BY MS. MOORE:
18    Q. And in one of your more recent articles, you
19    explain that tests like the drug-specific anti-Xa
20    assays, they cannot be performed on a rapid turnaround
21    24-hour basis; correct?
22    A. I'm sorry, which article are you referring to?
23    Q. I'm -- I'm referring to the one I just handed
24    you, 18.
25    A. 18?

1    Q. Yes.
2    A. And -- and you're asking what question?
3    Q. You would agree that these tests cannot be
4  formed -- performed on a rapid turnaround 24-hour
5  basis?
6    A. No, I would disagree.
7        MR. ABNEY: Object to form.
8  BY MS. MOORE:
9    Q. So you're disagreeing with these authors?
10   A. I am a co-author, but I'm disagreeing with
11 that statement.
12   Q. Okay.
13   A. That's not what this statement is saying.
14      The statement is saying that most laboratories
15 don't perform the test and therefore cannot offer it on
16 a rapid 24-hour basis.
17   Q. And so you're disagreeing -- or your
18 colleagues have stated this -- the statement, "Most
19 medical laboratories cannot perform these tests on a
20 rapid turnaround 24-hour basis."
21      Correct?
22   A. That's what it says.
23   Q. All right.
24   A. Do I agree with that statement? The answer is
25 no, I do not agree with that statement in the U.S. If

1  you look at the authors, they're from everywhere.
2        So I cannot speak to Iceland. I cannot speak
3  to Sweden. I cannot speak to these other countries
4  where that statement may be true. It is not a true
5  statement in the U.S.
6    Q. But you are an author of this paper, sir.
7    A. That is true. But I am not the lead
8  author, as you alluded to in other articles.
9    Q. And what is the significance of a -- being
10 a lead author, in your mind?
11   A. It's usually the one who writes the paper.
12   Q. All right. And as an author in this
13 particular journal, the Journal of Thrombosis and
14 Haemostasis, when you submit the manuscript and
15 allow your name to be on the publication, do you
16 not, in fact, accept the paper as submitted,
17 including all references?
18   A. I would indeed.
19      But if you're asking me would I vet this one
20 sentence and say I object because in the U.S. this is
21 not true, when, in fact, it may be true in other
22 countries? I -- I -- I can't answer for that.
23   Q. All right.
24   A. If the author wrote that, from other country,
25 who am I to question that availability in other

1  hospitals?
2    Q. And you did not explain the difference in the
3  U.S. with some type of footnote or make a
4  suggestion about explaining the differences here in
5  the U.S. subpopulation?
6    A. No. Because it's not germane to the
7  article.
8    Q. Oh, that statement is not germane?
9    A. I think, if you look at the article, it's
10 talking about a single test to measure, and the fact
11 that some are not done -- on a 24-hour/7 is not a
12 significant component of the article.
13   Q. You would agree that your author, your
14 co-authors, at least, had the concerns that most
15 medical laboratories cannot perform these tests on a
16 rapid 24-hour basis; correct?
17   A. I don't know how to answer that. They -- they
18 clearly put it in there for a purpose.
19   Q. Okay. So not only is there a bias for
20 rivaroxaban-calibrated anti-Xa assays, but most labs
21 can't perform this test quickly or on a 24-hour basis;
22 correct?
23   A. That is --
24      MR. ABNEY: Object to form.
25      THE WITNESS: -- not a correct statement.

1  BY MS. MOORE:
2    Q. So you say that now, after you've been hired
3  in litigation, that it's not correct --
4    A. Oh, wow.
5    Q. -- but previously this is what you
6  submitted your name to; correct?
7        MR. ABNEY: Object to form.
8        THE WITNESS: That is not a correct statement.
9  And if you look at my other -- it's not a correct
10 statement.
11 BY MS. MOORE:
12   Q. Do you have anything with you today that would
13 support your belief that most medical laboratories can
14 perform these tests on a rapid turn -- turnaround
15 24-hour basis?
16      MR. ABNEY: Object to form.
17      THE WITNESS: If you were asking my
18 professional opinion, do laboratories have the capacity
19 to run anti-Xas? The answer is yes. Because of the
20 equipment.
21      If you're asking me do hospitals run anti-Xa
22 for 24/7, I would say the answer is no.
23      So it depends on the question you're asking.
24      Do they have the capacity? The answer is
25 unequivocally, yes. 24/7. It's an easy test on just

1 about any equipment in a clinical laboratory that runs
2 coagulation testing.
3 BY MS. MOORE:
4 Q. But would you agree that most labs in the
5 U.S. are not performing this test rapidly and
6 within a 24-hour period?
7 A. That is a true statement.
8 Q. And with respect to -- what -- what would be
9 your -- your explanation as to why you believe that
10 the majority of medical laboratories aren't
11 performing these tests on a rapid turnaround
12 24-hour basis?
13 A. Okay. You're -- you're adding a bunch of
14 stuff to a single sentence, and that is, why are they
15 not running that -- this test 24/7, and most decisions
16 about laboratory tests are based on cost and revenue,
17 or number of reportables, or any number of issues.
18 But if you're asking about the capacity and
19 whether or not they have the ability to run these
20 tests, the answer is yes.
21 But if they only have a request for one, then
22 it seems impractical to bring the test on board.
23 Q. And -- and I want to get a sense of --
24 you're an expert here today; correct?
25 A. That's as I'm entitled, yes. Not that I

1 entitle myself, but yes.
2 Q. Do you consider yourself to be an expert in
3 this field?
4 A. I consider, my colleagues consider me
5 enough to be an expert in this area that they ask
6 me to either write articles, chair committees or
7 participate in these kind of events, meaning.
8 Q. And -- and as an expert, what is it that
9 you're -- you -- you believe, what is your expert
10 opinion? I know you laid out some bullet points in
11 your report. And we've talked about most of them.
12 I've got a few more I want to cover before we leave in
13 a short amount of time.
14 But what is your expert opinion today with
15 respect to the Xarelto litigation?
16 A. My expert opinion about the litigation? I
17 don't have an opinion about the litigation. I'm hired
18 to talk about the -- can the laboratory perform tests?
19 Are the laboratory tests useful? You know, what are
20 the options that we have?
21 So I -- I have really no idea what the
22 litigation is about. And that's -- so I -- I -- I
23 can't answer about certain things.
24 I -- I think that my experience for doing
25 clinical laboratory work, doing the DOAC measurements,

1 and not somebody who sits in an office and hands data
2 to them, but I am, from square one, getting the drug,
3 enriching the samples, running the test, doing the data
4 analysis, writing the papers. So I do all of it.
5 Q. All right. Let me -- let me try to approach
6 it from this perspective.
7 A. Okay.
8 Q. Do you have any criticisms of the
9 companies, the manufacturers of Xarelto, either
10 Janssen or Bayer, with respect to this litigation?
11 A. I'm sorry. Can you say that one more time?
12 Q. Yes, sir. I'm happy to rephrase that.
13 You -- you have been proffered today as an
14 expert in the Xarelto litigation.
15 And my question is, quite simply, are you
16 critical of -- of Janssen or are you critical of Bayer
17 in the design, development, manufacturing and selling
18 of Xarelto?
19 A. Am I critical?
20 Q. Yes, sir.
21 A. No, ma'am. I'm here to just say what can the
22 laboratory do to help clinicians. That's my only goal,
23 is patient care, patient safety.
24 Q. All right. And so you're not saying that the
25 companies have been negligent or mishandled -- or

1 not -- mis -- are negligent in how they've conducted
2 studies or information that they've provided
3 clinicians; correct?
4 MR. ABNEY: Object to form.
5 THE WITNESS: I don't think I'm sitting in the
6 right shoes to be answering that question. I mean, I
7 have my concerns about what -- we were kind of late to
8 the game, meaning the laboratorians, in the DOACs.
9 And so we had a lot of catching up to do. And that
10 kind of was my role, along with Dr. Adcock, is
11 trying to catch up the local colleagues.
12 BY MS. MOORE:
13 Q. But with respect to your role in the
14 laboratory, your job, as I understand it, is to perform
15 tests and provide the best information you can to the
16 clinicians in your facility.
17 A. I would agree with that statement.
18 Q. And so as you sit here today, the opinions
19 that you're giving us in the -- the historical context
20 of all the different tests and their benefits and
21 limitations, that is something that you've been asked
22 to do today; correct?
23 A. I believe so, yes.
24 Q. But you are not sitting here critical of the
25 companies, Janssen or Bayer, for anything that they've

1 done with respect to Xarelto; is that fair to say?
2 A. I have no idea what they've done with Xarelto.
3 Yeah, my focus has just been on laboratory assessment
4 in -- in measurements in what we can or cannot do.
5 Q. All right. So let me just kind of make a few
6 other points and follow up with some of your other
7 opinions.
8 Going back to the anti-Xa tests.
9 When calibrated to DOACs, the laboratory
10 has to know what drug is on board; correct?
11 A. When it's calibrated to DOACs.
12 So you're talking about they need to know the
13 difference between apixaban, rivaroxaban or edoxaban?
14 Q. Yes.
15 A. Okay. My personal opinion is that rivaroxaban
16 and apixaban are very, very similar, will give you very
17 similar results, the drug-calibrated Xas. Based on our
18 data, meaning UC Davis, that they're very close.
19 Edoxaban is a little bit different.
20 So I think that it's maybe not so important,
21 because I think there is some efforts being made by IVD
22 companies to have a single-source calibrator --
23 Q. All right.
24 A. -- for all the DOACs.
25 Q. Let me just hand you this and see if we --

1 A. Okay.
2 Q. -- can kind of focus in.
3 Here's one for you.
4 MS. MOORE: And here you go, Counsel.
5 This is an article --
6 MR. ABNEY: That first.
7 MS. MOORE: Pardon?
8 MR. ABNEY: You going to mark that --
9 MS. DAVIS: Copy
10 MR. ABNEY: -- before we get --
11 BY MS. MOORE:
12 Q. This is something on the test of the month.
13 What is the test of the month?
14 A. I don't know.
15 Q. Okay.
16 A. What journal is this from?
17 Q. It -- I'll tell you it looks like it's from
18 American Journal of Hematology.
19 A. Okay.
20 MS. MOORE: And we're going to mark that one
21 as 19.
22 THE WITNESS: Okay.
23 MS. MOORE: There you go.
24 (DEFENDANTS' EXHIBIT 19 WAS MARKED.)
25 BY MS. MOORE:

1 Q. And it's entitled, "Test of the Month - the
2 chromogenic anti-factor Xa assay."
3 And if you'll look down to the second column,
4 the very last paragraph on the right. And in fact,
5 it's the last sentence, beginning with "Because."
6 And it begins --
7 A. "Because." Okay. I'm sorry.
8 Q. You ready?
9 A. Yes.
10 Q. All right.
11 "Because the reference ranges are different
12 depending on the therapeutic agent, it is essential
13 that the coagulation laboratory is aware of the
14 anticoagulant being monitored before reporting the
15 reference range. It is also important to consider the
16 timing of anti-factor Xa testing."
17 And then if you go further down into the first
18 full paragraph. And right underneath that, you see
19 that, beginning with, "The laboratory also needs to
20 know"?
21 A. Okay.
22 Q. "The laboratory also needs to know the
23 anticoagulant being monitored in order to select the
24 appropriate standard curve to use for the
25 anti-factor Xa assay."

1 You see that, sir?
2 A. Yes.
3 Q. And you would agree that at least in the
4 peer-reviewed literature, that others have
5 acknowledged that it is important for the
6 laboratory to know what type of NOAC or DOAC is on
7 board prior to testing"; correct?
8 A. That's not what they're saying in this.
9 They're talking about fondaparinux, which has a
10 different reporting unit than run fraction or low
11 molecular weight heparin, which can also be
12 measured with a hybrid curve.
13 So I think that you're making a leap of
14 conclusions talking about DOACs, which it's not in the
15 statements that you read.
16 Q. Well, if you look at table 1, it talks about
17 rivaroxaban; correct?
18 A. It does.
19 Q. Okay. So it is referencing -- this study
20 is referencing rivaroxaban too; sir, correct?
21 MR. ABNEY: Object to the form.
22 THE WITNESS: That may be true, but not the
23 sentence you read. It was specific about
24 fondaparinux, which has different reporting units
25 than low molecular weight heparin or unfractionated

1  heparin.
2  BY MS. MOORE:
3      Q. If you go back up to the point that a
4  coagulation lab needs to know the anticoagulant before
5  being monitored, that -- that could be important
6  information; correct?
7      A. If you go even before that line, it's
8  because the therapeutic target is based on the drug
9  being given. So this is more for clinicians and
10  not for laboratorians.
11     Q. Well, that's ultimately the goal, to
12  provide information to the clinicians; correct?
13     A. Well, it depends on the institution, how
14  the test is being ordered. Because I can --
15     Q. Now you're talking about it -- it depends.
16  I thought a minute ago the ultimate goal was the
17  information you could provide to your clinician.
18     A. And I --
19     MR. ABNEY: There's not a question.
20     THE WITNESS: I --
21     MR. ABNEY: There's not a question.
22     THE WITNESS: -- don't understand what --
23     MR. ABNEY: Don't -- don't answer anything.
24     I mean -- and please don't interrupt the
25  witness when he's trying to answer your question.

1  BY MS. MOORE:
2      Q. Is the clinical information ultimately the
3  most important thing to provide to the physician?
4      MR. ABNEY: Object to form.
5      THE WITNESS: The clinical information, the
6  physician has. So I don't know what you mean by
7  that.
8      If you look at the entire context of the
9  paragraph you're jumping in the middle of, it's talking
10  about the therapeutic target range for unfractionated
11  heparin from low molecular weight heparin being
12  different. And so the clinician would be aware of
13  that.
14     The laboratory may have to be aware of that if
15  they provide different methodologies for those two
16  drugs, which they may or may not.
17     So that all depends on the institution.
18  BY MS. MOORE:
19     Q. Based on your literature, it's fair to say
20  that the use of rivaroxaban-calibrated anti-Xa assays
21  is not necessarily designed for emergency scenarios;
22  correct?
23     A. I'm -- I'm sorry, I said that somewhere? It's
24  not designed for --
25     Q. The reference in your article, "A single-test

1  assay, warfarin, dabigatran, rivaroxaban.
2      A. Oh, the multinational paper that -- you want
3  to go back to the one sentence we talked about
4  before, about the single --
5      Q. It was one --
6      A. -- test?
7      Q. -- sentence in -- in your article, sir.
8  "However, most medical laboratories cannot perform
9  these tests on a rapid turnaround 24-hour basis."
10     A. This paper represents --
11     MR. ABNEY: Hold on. Wait. Wait. There's
12  not a question. Wait for her to ask a question. Then
13  answer it.
14     Do you have a question, or are you just
15  reading papers?
16     MS. MOORE: It's the same question that I
17  asked a minute ago. Let me ask the court reporter to
18  read it back.
19     MR. ABNEY: Sure.
20     MS. MOORE: I'll do it for you because I can
21  find it right here.
22  BY MS. MOORE:
23     Q. Based on your literature, it's fair to say
24  that the use of rivaroxaban-calibrated anti-Xa assays
25  is not necessarily designed for emergency scenarios;

1  correct?
2      A. Based on the literature. Is it my literature
3  or just the published literature?
4      Q. Let's start with your literature.
5      A. Okay. Do we offer that test on emergency
6  basis? Yes.
7      Q. You also acknowledged the limitations with
8  that test; correct?
9      A. With -- not drug-calibrated. I don't believe
10  we addressed drug-calibrated anti-Xas. We did with
11  unfractionated, low molecular weight heparin. I
12  don't recall drug calibrated anti-Xas.
13     Q. Is not being able to perform a test in a
14  rapid 24-hour basis a limitation in an emergency
15  room setting?
16     A. Again, you are citing a sentence from a
17  multinational paper where I cannot speak to the other
18  institutions in different countries. If we're talking
19  about the capacity versus current practice, they are
20  two different things.
21     Q. Okay.
22     A. I think that laboratories have to evolve to
23  changing practice.
24     Q. What evidence do you have to support your
25  opinion that the U.S. medical laboratories can perform

Page 298

1  these types of tests on a rapid 24-hour basis, other
2  than your own experience?
3      A.  Is -- all you have to do is look at CAP
4  surveys and see the equipment being used for PT and
5  PTT testing.  They all can do anti-Xa measurements.
6  Every one of those instruments.  That's capacity.
7      So they have the capacity to do it.  They
8  just choose not to.
9      Q.  And I think we -- we talked about that a
10  little bit, the different reasons.
11      A.  For whatever reason.
12      Q.  For whatever reasons.
13      And for the test to be calibrated to
14  rivaroxaban, the clinician needs to know or has to know
15  that the patient in an emergency scenario is on
16  rivaroxaban; correct?
17      A.  That would certainly be helpful.
18      Q.  But if they don't know what patient -- what
19  anticoagulant the patient's on, the
20  rivaroxaban-calibrated tests may not be informative?
21      MR. ABNEY:  Object to form.
22  BY MS. MOORE:
23      Q.  Correct?
24      A.  I don't know if that's a true statement or
25  not.

Page 299

1      Q.  Once a lab is calibrated for rivaroxaban,
2  would it be able to assess concentrations of other
3  DOACs?
4      MR. ABNEY:  Object to form.
5      THE WITNESS:  Again, in my experience,
6  apixaban and rivaroxaban give very equivalent results
7  as far as raw data results, which, if you extrapolate
8  from the calibration curves, they are very, very close,
9  perhaps because the molecular weights are very similar,
10  whereas edoxaban is not.
11  BY MS. MOORE:
12      Q.  Would a separate calibration be required for
13  each type of DOAC?
14      A.  That's the current practice.  But again, there
15  are IVD companies that are looking for single
16  calibrators to do DOAC assessment.
17      Q.  Right.  And I don't -- I obviously don't want
18  to get into what is a possibility in the future.
19      The -- the current practice is that if a lab
20  is calibrated for a particular DOAC like rivaroxaban,
21  it would have to be recalibrated for a different type
22  of DOAC; correct?
23      A.  That would be the current practice, correct.
24      Q.  We talked about there's no anti-Xa calibration
25  or reagent kit that's been approved by the FDA;

Page 300

1  correct?
2      A.  That is not a true statement.  There are
3  several anti-Xa kits that have been approved by the
4  FDA and that have been in use in laboratories for
5  20, 30 years.  There is no rivaroxaban-specific kit
6  that's --
7      Q.  Yeah.
8      A.  -- been FDA approved.
9      Q.  I should have -- I should have been clear.
10  Yes.
11      With respect to rivaroxaban, there is no
12  specific anti-a calibration or reagent kit that has
13  been approved by the FDA?
14      A.  True, but I don't anticipate there being a
15  specific rivaroxaban anti-Xa kit being approved,
16  because the kits that we currently have in practice
17  work.
18      Q.  And no anti calibration kit has been
19  standardized yet; correct?
20      A.  I'm sorry, one more time?
21      MR. ABNEY:  Object to form.
22  BY MS. MOORE:
23      Q.  There is -- we don't have today any anti-Xa
24  calibration or reagent kit that's been
25  calibrized -- I mean standardized; correct?

Page 301

1      MR. ABNEY:  Object to form.
2      THE WITNESS:  Again, you -- you folks use
3  terms like "standardize," and I'm not sure what you
4  mean by that.  And there are several manufacturers of
5  rivaroxaban calibrators and controls, none of which
6  have been FDA approved for use in the United States.
7  BY MS. MOORE:
8      Q.  What is the -- the result of the rivaroxaban
9  anti-X -- anti-Xa test in the rural setting?
10      A.  I'm sorry, in the rural setting?
11      Q.  Yes, sir.
12      A.  I don't understand the question.
13      Q.  Have you seen any studies on using
14  rivaroxaban anti-Xa tests in the rural setting?
15      MR. ABNEY:  Object to form.
16      THE WITNESS:  No.
17  BY MS. MOORE:
18      Q.  How about in the community setting?
19      A.  Define "community."
20      Q.  How would you define "community" in your
21  community hospitals?
22      A.  I'm not in a community hospital.
23      Q.  I know.
24      You've -- you've never talked about a
25  community hospital?

Page 302

1    A. I considered the local hospitals, but I'm
2  not sure I'd define them as community hospitals.
3  I'm not sure what that means.
4    Q. You don't know what a community hospital
5  setting is --
6    A. I don't know --
7    Q. -- as opposed to --
8    A. -- what that means.
9    Q. And as you stated in your Exhibit 4,
10 that -- well, as we've talked about, no
11 FDA-approved DOAC calibrators or kits.
12      And these are the problems that you say are
13 associated with the existing assays used to quantitate
14 DOACs, including rivaroxaban; correct?
15      MR. ABNEY: Object to form.
16      THE WITNESS: And help me out on where you are
17 so I can --
18 BY MS. MOORE:
19    Q. Yeah, this is on -- if you go to Exhibit 4.
20    A. Yes.
21    Q. Do you have it?
22      Go back to 10, page 10.
23    A. Okay. Where were we?
24    Q. You talk about the problems with existing
25 assays.

Page 303

1      And actually, you need to turn back to page 8,
2  please.
3      MR. ABNEY: She's on page 8 now.
4  BY MS. MOORE:
5    Q. To page 8, please.
6    A. Oh, I'm sorry.
7    Q. No worries.
8      And you see your statement, we talked about
9  this earlier, "Despite their availability"?
10    A. Where are you?
11    Q. On page 8.
12    A. Yes.
13    Q. Go down to about the --
14    A. Left or right?
15    Q. The right.
16    A. Thank you.
17    Q. If you go down to the middle -- further
18 down the middle of the page, "Despite their
19 available -- availability."
20      You see that?
21    A. I'm having a hard time hearing you.
22    Q. Okay. No -- no worries.
23      It says -- if you go down about eight lines
24 from the bottom, "Despite their availability."
25    A. It's under dabigatran?

Page 304

1    Q. In the first full paragraph on the
2  right-hand column.
3    A. Okay. This one right up here.
4    Q. Yeah. We -- we talked about this earlier.
5    A. Okay.
6    Q. Are you with me?
7    A. I'm waiting for the question.
8    Q. Okay. Do you see the quote, "Despite their
9  availability"?
10    A. "Despite their availability." Yes.
11    Q. But this is something that you -- you
12 published; right?
13    A. Yes.
14    Q. And you published this a year ago, in 2015?
15    A. Yes.
16    Q. And you say, "Despite their availability,
17 problems associated with existing assays used to
18 quantitate DOACs include lack of, 1, the FDA-approved
19 DOAC calibrators or kits."
20      That's correct?
21    A. Yes.
22    Q. "2, validated expected therapeutic plasma
23 concentrations."
24      Correct?
25    A. Yes.

Page 305

1    Q. And, "3, knowledge of plasma concentrations
2  associated with increased thrombotic or hemorrhagic
3  risk"; correct?
4    A. That's what's written, correct.
5    Q. "Furthermore, clot-based and chromogenic
6  assays demonstrates variation between instrument
7  reagent systems and also lack specificity";
8  correct?
9    A. That's what's written.
10    Q. You stand by these opinions?
11    A. Yes.
12    Q. These problems that you talk about, with
13 these existing assays, would also apply to PT and
14 anti-Xa assays; correct?
15    A. I'm not sure about the PTs because we're
16 talking about quantitating DOACs.
17    Q. But certainly the anti-Xa assays; correct?
18    A. Since we're talking about quantitating
19 DOACs, not just the anti-Xas, but the ecarin
20 methods for dilute thrombin times for dabigatran as
21 well.
22    Q. Okay. Thank you.
23      And your own work demonstrates that although
24 there may be a need for this assay, no assay to date
25 has been FDA approved or has been consistent enough to

Page 306

1  validate rivaroxaban concentrations or associate
2  concentrations with hemorrhagic or thrombotic events;
3  correct?
4      A.  I'm not sure you read that verbatim, but --
5  but I would say what's written is correct.
6      Q.  So my question, sir, was that your own work
7  demonstrates there -- there may be a need for an assay?
8  You would agree with that?
9      A.  There are assays already available.
10     Q.  Okay.  But no assay to date has been FDA
11 approved or consistent enough to validate
12 rivaroxaban concentration or associate
13 concentrations with hemorrhagic or thrombotic
14 events; correct?
15     MR. ABNEY:  Object to form.
16     THE WITNESS:  Those are multiple issues,
17 and one is clinical.
18     And as far as the assays being FDA
19 approved, there are -- there are no FDA-approved
20 mass spec --
21     MS. MOORE:  We -- we --
22     THE WITNESS:  -- assays.
23     MS. MOORE:  -- covered that.
24     THE WITNESS:  No, we --
25     MR. ABNEY:  Don't interrupt the witness,

Page 307

1  please.  Let him finish his answer.
2      THE WITNESS:  We didn't cover mass spec.
3  Because most laboratories can perform mass spec
4  without getting FDA approval.  Those are lab
5  already developed tests.  There are no commercial
6  kits that are FDA approved for use --
7  BY MS. MOORE:
8      Q.  And that's --
9      A.  -- for measuring DOACs --
10     Q.  And so --
11     MR. ABNEY:  No, please don't interrupt
12 the --
13     MS. MOORE:  I --
14     MR. ABNEY:  -- witness.  Let him finish his
15 answer.
16     MS. MOORE:  I -- let -- calm down.  It's
17 okay.
18     I didn't mean to interrupt you at all.
19     MR. ABNEY:  Well, you've done it three
20 times in the middle --
21     MS. MOORE:  No.
22     MR. ABNEY:  -- of his answer.  So --
23     MS. MOORE:  I -- I just -- I'm sorry.  We're
24 trying to get through it.  It's late in the day.  It's
25 okay.

Page 308

1      I'm sorry, sir.
2      THE WITNESS:  Let's move on.
3  BY MS. MOORE:
4      Q.  You also talked about in your report that it's
5  opinion -- let -- let's turn to the bullet points I
6  think at 31 and 32 in your report.
7      Do you have that in front of you?
8      Are you with me?
9      A.  31 and 32 --
10     Q.  Okay.
11     A.  -- yes, ma'am, I'm with you.
12     Q.  And you want to talk -- or -- or you mentioned
13 in your -- your report that "All rapid methods for
14 assessing the anticoagulant effect of rivaroxaban,
15 including PT, drug calibrated the anti-Xa methods
16 or drug cali -- calibrated DRVVT are relatively
17 inexpensive"; correct?
18     A.  We're on page 33 then?
19     Q.  Yes.
20     A.  Okay.  Yes.
21     Q.  I think the top one.
22     A.  Yes.
23     Q.  All right.  Thank you.
24     A.  Do I stand by that statement?  Or are you
25 just --

Page 309

1      Q.  I --
2      A.  -- reiterating the fact that I wrote that?
3      Q.  Well, you wrote that; correct?
4      You stand by --
5      A.  Yes.
6      Q.  -- that?
7      A.  Yes, I do, and I --
8      Q.  All right.  Thank you.
9      And how much do the assays cost?
10     A.  That depends on the institution, their
11 contractual arrangement with the manufacturer, and how
12 many tests they will do.
13     Q.  Okay.  When you say they're inexpensive, what
14 does that mean to you?
15     A.  I said relatively inexpensive.
16     Q.  What does "relatively inexpensive" mean?
17     A.  There are some tests that we have in the
18 laboratory that may cost $5,000, and there are
19 tests in the laboratory that may cost us pennies
20 because of the volume.
21     Q.  All right.  If you go back to Exhibit 4.
22 Keep that in front of you, your report.  But also
23 look at Exhibit 4.
24     A.  Yep.
25     Q.  Let me see.  Actually, I'm sorry.  Exhibit 11.

1      Are you with me?
2     A. No, not yet. Sorry.
3     Q. No worries.
4     A. I'll try to do it backwards this time because
5  it always was at the end.
6      Okay.
7     Q. All right.
8     A. I'm with you.
9     Q. All right. Thank you.
10     This again is an article of yours.
11  Is it Dr. Adcock or Ms. Adcock?
12     A. Dr. Adcock.
13     Q. Thank you.
14     It's the Laboratory's 2015 Perspective on
15  Direct Oral Anticoagulant Testing.
16     Let's look at page 889.
17     And you go down to the second column, and it's
18  about --
19     A. I'm sorry, right or left?
20     Q. Right.
21     A. Okay.
22     Q. About the sixth line down, and it says, "The
23  widespread use of anti-factor Xa testing has been
24  constrained because of the limited stability of the
25  reagent, whether on board the instrument or

1  refrigerated, and the cost of the reagents as
2  compared with PT, APTT and TT tests."
3      You see that?
4     A. Yes, I see that.
5     Q. In this particular publication in 2015, you
6  were raising as a concern the -- the cost of the
7  reagents; correct?
8      MR. ABNEY: Object to form.
9      THE WITNESS: I believe that that is a true
10  statement for laboratories in the U.S. marketplace.
11  BY MS. MOORE:
12     Q. Okay. And now in your report, you're saying
13  that these tests are relatively inexpensive.
14     A. And that still is a correct statement.
15     You're -- you're talking about cost versus
16  expense.
17     And again, it's not expensive to run these
18  tests. They don't cost very much. But if you run
19  one test, that becomes an expensive test when you
20  talk about cost per reportable.
21     So a kit may cost you $250. You can run
22  100 tests on there. That's a $2.50 test.
23     Q. And --
24     A. But that's not -- if you run one test, then
25  that now becomes a $250 test reportable.

1      So that's what I by "relatively expensive" or
2  "relatively inexpensive."
3      The kits are not expensive. There are
4  limiting factors associated with kits.
5     Q. Isn't it true that the kits actually will
6  expire once they're opened?
7     A. When they're opened? No. When they're
8  reconstituted.
9     Q. Thank you.
10     A. And they all have an expiration that varies
11  between manufacturers. But they also can be put on
12  and off and back in the frig. So when encased,
13  their stability increases.
14     Q. Does insurance cover these costs?
15     A. I don't know about recouping costs. That's
16  not my area.
17     Q. Does the patient have to pay out of pocket
18  expenses for these tests?
19     A. I have no idea about expenses by patients.
20     Q. And as you sit here today, do you have any
21  data to support your opinions re cost?
22     A. I'm sorry? Support my opinions of --
23     Q. Costs as referenced --
24     A. Any --
25     Q. -- in your report.

1     A. Any data.
2     Q. Yes, sir.
3     A. I might have --
4     Q. Any --
5     A. -- personal data from my own institution in
6  how many tests that we run and cost per reportable.
7     Q. Any other data, other than your personal
8  experience?
9     A. No, that's usually -- the published data I
10  found on costs are flawed because they do list costs,
11  which are -- nobody pays list cost in an institution.
12  They negotiate costs with the company. So each cost
13  would be different. And based on volume, if you
14  buy a hundred kits versus buying one kit.
15     MS. MOORE: All right. I'm going to -- I'm
16  going to take a quick break and go through my
17  notes, and we'll reconvene and see how quickly we
18  can wrap this up.
19     THE WITNESS: I'm sorry. I heard the
20  "quick break," which is really music to my ears,
21  and then --
22     MS. MOORE: Yeah.
23     THE WITNESS: -- everything sort of went down
24  after that.
25     MS. MOORE: No, no worries. We're going to

Page 314

1  take a quick break, see how quickly we can wrap it
2  up.
3      THE WITNESS: Okay.
4      MS. MOORE: Thank you.
5      THE VIDEOGRAPHER: Going off the record.
6  The time is 3:24 p.m.
7      (Recess taken.)
8      THE VIDEOGRAPHER: We're back on the record.
9  The time is 3:30 p.m.
10 BY MS. MOORE:
11     Q. All right. Mr. Gosselin, I think I just have
12 a few followup questions.
13        With respect to your lab, is it true that your
14 particular laboratory recommends trough collection for
15 anti-Xa assays re Xarelto?
16     A. That was the recommendation that was from
17 the subcommittee that I'm part of, yes.
18     Q. What was the last part you said?
19     A. That I'm part of, the subcommittee.
20     Q. That you're part of?
21     A. Yes.
22     Q. What was the title of that?
23     A. The thrombosis subcommittee, which is part
24 of the pharmacy and therapeutics committee, which
25 is listed on my CV, I believe.

Page 315

1      Q. Thank you.
2         And you believe that using trough
3  collections for anti-Xa assays regarding Xarelto is
4  important?
5      A. I don't personally have any vested
6  importance or nonimportance. It was a decision
7  made by the clinicians, this is what they preferred
8  if it were a timed collection.
9      MS. MOORE: That's all the questions I have
10 for you, and I appreciate your time today. I'm
11 going to pass the witness briefly.
12     MR. ABNEY: I have questions. If you want
13 to go first, that's fine.
14        Where are we on time?
15     MS. DAVIS: Why don't you go ahead, and
16 we'll just reserve our time, what we have left, for
17 when you finish.
18     MR. ABNEY: Sure.
19        EXAMINATION
20 BY MR. ABNEY:
21     Q. Mr. Gosselin, are you aware that Xarelto
22 prescribing -- well, strike that.
23        If you assume that Xarelto patients are
24 supposed to take the drug with their evening meal,
25 would it be very practical to try to take peak

Page 316

1  measurements for those patients?
2      MS. DAVIS: Objection.
3      THE WITNESS: I -- I don't know what that
4  means. On T.V. I would stop until somebody said go.
5  So -- okay.
6         I do not know the prescribing information
7  for Xarelto. I know it's -- through --
8      MR. ABNEY: Okay.
9      THE WITNESS: -- reading --
10 BY MR. ABNEY:
11     Q. Hold on.
12        My question was, if you assume that
13 patients are told to take the drug with their
14 evening meal, would it be practical to try to take
15 peak plasma samples from those patients?
16     MS. DAVIS: Objection.
17     MS. MOORE: Join in the objection.
18     THE WITNESS: And the answer would be no
19 because there typically are not blood drawing stations
20 open that late at night, assuming dinner is somewhere
21 between 4:00 and 6:00.
22 BY MR. ABNEY:
23     Q. You've been questioned -- it's 3:30. I think
24 we started about 6:20 this morning.
25        You were asked a lot of questions about

Page 317

1  anti-factor Xa testing.
2         Do you remember generally those subjects or
3  that subject?
4      A. Yes, sir.
5      Q. Okay.
6      MS. DAVIS: Objection to form.
7  BY MR. ABNEY:
8      Q. Is there a difference between an
9  anti-factor Xa test that has been calibrated for low
10 molecular weight heparin or unfractionated heparin
11 versus an anti-factor Xa test that has been
12 calibrated for Xarelto?
13     MS. DAVIS: Objection.
14     MS. MOORE: Join.
15     THE WITNESS: Difference in what respect? The
16 kits are exactly the same. The raw data that's
17 generated from the two different calibrations will be
18 different.
19 BY MR. ABNEY:
20     Q. Okay. So let's start with an anti-factor Xa
21 test that has been calibrated for low molecular weight
22 heparin or unfractionated heparin.
23        If a patient on Xarelto is administered that
24 test, what type of information would result from that
25 test?

80 (Pages 314 to 317)

1      MS. DAVIS: Objection.
2      THE WITNESS: From that test?
3      The question has been -- and I'm going to kind
4  of paraphrase the question based on a previous
5  conference I went to, which asked will you see a signal
6  if you had somebody on Xarelto and you ran it on an
7  unfractionated or low molecular weight-calibrated
8  curve, and the answer would be yes.
9  BY MR. ABNEY:
10     Q. And what does that mean to lay people, "a
11 signal"?
12     MS. DAVIS: Objection.
13     THE WITNESS: What you have to understand
14 is how the test works.
15     So how the test works is that the anti-Xa
16 is in the reagent. You were adding the plasma,
17 which has the drug, whether it be unfractionated
18 fondaparinux or a DOAC. It will bind to that
19 anti-Xa. So then what you're looking for is
20 anything that's unbound. And so the unbound
21 cleaves a peptide and you get a yellow color. So
22 the proportional amount.
23     So that degree of unbound Xa is going to be
24 variable, depending on the drug that's being
25 calibrated. And so you get different numbers. The raw

1  data can go anywhere from very little as far as an
2  optical density to very, very high, meaning very little
3  drug.
4  BY MR. ABNEY:
5      Q. So you were asked about emergent versus
6  routine testing.
7      Do you remember that?
8      A. Yes.
9      Q. So if a patient goes into a hospital and
10 they're unable to communicate their history, say the
11 patient has a stroke and goes into a hospital and
12 they're unable to talk, and the doctor is
13 wondering -- you know, the family says, "Patient's
14 on Xarelto, but we don't know if she's taken her
15 medication."
16     And the doctor calls you up and says, "I
17 know all you have is this anti-factor Xa that's
18 been calibrated for a low molecular weight heparin
19 or unfractionated heparin. Using that test, what
20 can you tell me about this patient?"
21     MS. DAVIS: Objection.
22 BY MR. ABNEY:
23     Q. What would you tell him?
24     MS. MOORE: Join in the objection.
25     THE WITNESS: I'm not sure what that means.

1      MR. ABNEY: Just ignore them.
2      THE WITNESS: Oh, just keep going?
3      MR. ABNEY: Yeah.
4      THE WITNESS: Okay.
5      Again, if it were our institution, it's all we
6  offered, based on the data that's been published, which
7  is ours, I would be able to assist them in
8  estimating some degree of drug concentration, with
9  the knowledge that it was a known Xarelto exposure.
10 BY MR. ABNEY:
11     Q. Would you be able to tell that physician
12 whether or not that patient had any significant amount
13 of Xarelto on board?
14     MS. MOORE: Object to the form.
15     MS. DAVIS: Objection.
16     THE WITNESS: It can be done.
17 BY MR. ABNEY:
18     Q. And when you were looking at -- I forgot what
19 article it was, but there was a table, on table 2 in
20 that article?
21     A. It was Exhibit 4.
22     Q. Exhibit 4. How could I forget?
23     Exhibit 4 -- let's find it. Hold on.
24     Okay. In Exhibit 4, what was the purpose
25 of this -- this study that you did with Dr. Adcock?

1      A. To look at the patients that we collected
2  in the UNC study, University of North Carolina
3  study, and determine whether or not using
4  unfractionated, low molecular weight-calibrated
5  curves could provide some useful information to
6  laboratories, who could then provide that
7  information to clinicians, as a possible
8  alternative test for them to assess DOACs, anti-Xa
9  DOACs, specifically rivaroxaban.
10     Q. And what's the significance of the information
11 provided in table 2?
12     MS. MOORE: Object to the form.
13     THE WITNESS: I think that it provides some
14 guidance to laboratories that use these methods,
15 both with the -- with the understanding the
16 calibration lower limit of quantitation would get
17 the lower threshold of absolute quantitation.
18     Conversely, the upper limit of quantitation
19 would be based on the highest calibration data point.
20 So that would correlate to the highest rivaroxaban
21 level associated with that calibration point.
22     You can expand the upper limit by using
23 calibrators that have higher values, or you can dilute
24 the samples with normal plasma that has no drug, to
25 get, again, corrected for the dilution factor to get

1 higher than that if you want to estimate the
2 concentration.
3 So I think it's useful for laboratories to
4 use this as a tool if they have methods that may
5 not be adequate for assessing rivaroxaban.
6 BY MR. ABNEY:
7 Q. You were asked a lot about statements in
8 this paper on page 10, which -- the sentence you
9 were asked about begins, "While these
10 heparin-calibrated anti-factor Xa measurements have
11 linear relationships to anti-factor Xa DOAC
12 concentrations, significant limitations exist using
13 these meth -- methods to quantify anti-factor Xa
14 DOACs, specifically," and then you list them there;
15 right?
16 A. Yes.
17 Q. Were you, in this paper, attempting to warn
18 physicians, clinicians, about the results of these
19 tests and how they could be faulty?
20 MS. MOORE: Object to the form. Leading.
21 MS. DAVIS: Objection.
22 THE WITNESS: This was an invited article from
23 Dr. Adcock's presentation at a meeting. And the
24 meeting is primarily geared towards clinical laboratory
25 folks or laboratory folks, people interested in

1 hemostasis. This is more a guide for laboratories and
2 not so much for clinicians.
3 BY MR. ABNEY:
4 Q. So when you're addressing the limitations on
5 using heparin-calibrated anti-Xa measurements, were you
6 attempting to explain to laboratory technicians the
7 issues that they would have to deal with in setting
8 up and calibrating these tests so that they would
9 have meaningful results to their physicians?
10 MS. MOORE: Object to the form. Leading.
11 MS. DAVIS: Objection.
12 THE WITNESS: I -- I think that the premise
13 that the articles that Dr. Adcock and I have published
14 in the past has been to guide our laboratory peers,
15 to alert them of the concerns and the issues that
16 may be associated with these methodologies.
17 BY MR. ABNEY:
18 Q. And if you're talking about anti-factor Xa
19 tests that are drug-specific calibrated, like for
20 Xarelto, do these issues apply to those laboratory
21 tests?
22 MS. MOORE: Same objection.
23 MS. DAVIS: Objection.
24 THE WITNESS: Other issues apply, but not
25 these issues.

1 BY MR. ABNEY:
2 Q. And based on the data that you have generated
3 and/or reviewed in the scientific literature, is it
4 your opinion that properly calibrated anti-factor Xa
5 test for rivaroxaban is equivalent to the gold standard
6 of mass spec?
7 MS. MOORE: Object to the form. Leading.
8 MS. DAVIS: Objection.
9 THE WITNESS: The current literature and many
10 of the recommendations, if you look at articles that
11 kind of summarize the laboratory and the DOACs under
12 rivaroxaban and under apixaban and less edoxaban, most
13 all of them refer to the best tests for assessing
14 rivaroxaban would be a drug-calibrated anti-Xa.
15 And in lieu of that, a PT with caveats.
16 BY MR. ABNEY:
17 Q. Okay. But is anti-factor Xa, properly
18 calibrated, considered to be equivalent to mass spec
19 for assessing Xarelto levels in rivaroxaban patients?
20 MS. MOORE: Objection.
21 MS. MOORE: Join.
22 THE WITNESS: I would say there's published
23 data to support that statement, yes.
24 BY MR. ABNEY:
25 Q. With respect to PT or prothrombin time tests,

1 you and others in the published literature have made
2 statements to the effect that PT tests generally are
3 not adequate or sufficient to quantify Xarelto
4 levels in rivaroxaban patients.
5 Would you agree with that?
6 A. I would agree that when we use "PT" as a
7 general, global term to describe all prothrombin
8 time assays, that's a safe statement to make, yes.
9 Q. Is that statement equally true if you limit
10 it to properly performed PT tests using Neoplastine
11 CI Plus?
12 MS. DAVIS: Object to the form.
13 THE WITNESS: I think, based on the literature
14 and our own data, that statement could probably be
15 modified.
16 BY MR. ABNEY:
17 Q. And how would it be modified?
18 A. That it is -- that it's been demonstrated to
19 have sufficient sensitivity to be useful in the
20 clinical setting for somebody on rivaroxaban.
21 Q. You were -- you were questioned ad nauseam
22 about statements that you made in the introduction to
23 several of your papers. The statement was concerning
24 the predictable PK, PD of rivaroxaban and -- and its
25 therapeutic index or therapeutic range.

Page 326

1     Do you remember that?
2        MS. MOORE:  Object to --
3        MS. DAVIS:  Object.
4        MS. MOORE:  -- the comments of counsel.
5        MS. DAVIS:  Object to the form.
6        MS. MOORE:  Join in the objection.
7        THE WITNESS:  Yes, I remember.
8  BY MR. ABNEY:
9     Q.  And I think you -- I think you explained this,
10 but just so we're clear, have you ever done any type of
11 pharmacokinetic or pharmacodynamic analysis of
12 rivaroxaban?
13    A.  No.
14    Q.  Have you set out to review all of the
15 studies, peer-reviewed or otherwise, that address
16 that issue?
17    A.  No.
18    Q.  Have you -- well, strike that.
19       Do you believe that the target audience for
20 your papers reads the introduction to your papers and
21 assumes that you have done detailed analysis or testing
22 to support those statements that you provide in the
23 introduction to your papers?
24       MS. DAVIS:  Objection.
25       MS. MOORE:  Object to the form of the

Page 327

1  question.  Leading.
2        THE WITNESS:  I would say that the
3  introduction is something that is fairly glossed
4  over in most science journals to sort of -- kind of
5  give some historical background, but is not
6  intended to mean that the authors are the providers
7  of that data or facts.
8  BY MR. ABNEY:
9     Q.  Is it true that other authors, other groups
10 that publish in the same area, include such generic
11 statements in their introductory paragraphs?
12       MS. DAVIS:  Objection.
13       MS. MOORE:  Join.
14       THE WITNESS:  I would say you'd find some
15 very similar verbiage on DOAC measurements if
16 you're talking about DOAC papers that deal with
17 laboratory measurements, about DOACs in general,
18 about their pharmacokinetic and pharmacodynamics
19 being predictable, and the expression of routine
20 monitoring not usually required, I think that would
21 be a -- several phrases you would find in just
22 about any introduction of a laboratory-based DOAC
23 paper.  Yes.
24 BY MR. ABNEY:
25    Q.  And with respect to rivaroxaban, does the

Page 328

1  source of those statements, to your knowledge, go back
2  to Bayer scientists who were publishing with respect
3  to studies that were funded by Bayer on the drug during
4  its development?
5        MS. DAVIS:  Objection.
6        MS. MOORE:  Join.
7        THE WITNESS:  I can recall one review article
8  by Perzborn in 2010, who cites their own paper in
9  2005 that used the same terminology and phrases.
10 BY MR. ABNEY:
11    Q.  Okay.  Let me show you Exhibit 10 to your
12 deposition, which is one of the papers that were shown
13 to you that you didn't author.  It's by the lead author
14 Douxfils.
15       Do you remember discussing this paper earlier?
16    A.  Yes.
17    Q.  And the bottom right-hand corner of the first
18 page, do you see the last paragraph where it begins,
19 "Thanks to its predictable pharmacokinetic and
20 pharmacodynamic profiles, monitoring is generally not
21 recommended"?
22    A.  Yes.
23    Q.  And the citation there is citation number 12.
24       What is that citation to?
25    A.  It is Mueck, Harrison, Bauer, Borris, et

Page 329

1  al., Clinical Pharmacokinetics 2008, and it's
2  "Population, pharmacokinetics, pharmacodynamics of
3  rivaroxaban in oral direct factor Xa inhibitor in
4  patients undergoing major orthopedic surgery."
5     Q.  And do you recognize this as being Bayer or
6  Bayer-related people that worked on the clinical trials
7  of Xarelto?
8        MS. DAVIS:  Objection.
9        THE WITNESS:  I know one author personally
10 who is not.  But I believe, because it's "et al.,"
11 there may be people that are not listed in this
12 citation, but I believe Mueck may be a -- a Bayer.
13 BY MR. ABNEY:
14    Q.  Employee?
15    A.  Scientist, yes.
16    Q.  And he was the lead author; correct?
17    A.  Yes.
18    Q.  Who generally is the one that writes the
19 paper; right?
20    A.  That's typically the -- the form of
21 professional papers.
22    Q.  If you flip over to the end of the Douxfils
23 paper.
24       What was the conclusion of these researchers?
25       First of all, are these researchers completely

## Page 330

1  independent of you and your institution?
2      A. Independent, meaning we have not collaborated?
3  Although I have collaborated with Jonathan on a paper
4  recently. And he's on my committee for DOACs for
5  the ICSH.
6      Q. No, I'm saying --
7      A. The --
8      Q. -- none of them worked at UC Davis?
9      A. None of these are employees here, no.
10  Sorry.
11      Q. Okay.
12      A. They're all overseas.
13      Q. And did -- did you have any -- any input or
14  editorial oversight of this article?
15      A. I did not know any of these folks in 2011 or
16  2012, which is when the data would have been collected
17  and presented.
18      Q. Okay. And what did these researchers conclude
19  with respect to the use of anti-Xa and PT with respect
20  to rivaroxaban?
21      A. Well, the second sentence, I think, kind of
22  sums it up. Their recommendations.
23      Q. Okay. Well, the -- the first sentence, so
24  we don't skip any conclusion, the first sentence says,
25  "In this study we showed that chromogenic anti-factor

## Page 331

1  Xa assays, and to a lesser spent PT, are clearly the
2  most appropriate assays to measure pharmacodynamic
3  effects of rivaroxaban on coagulation in routine
4  practice."
5      MS. DAVIS: Counsel --
6  BY MR. ABNEY:
7      Q. Did I read that right?
8      A. No.
9      MS. DAVIS: Not quite.
10      THE WITNESS: "Appreciate" versus
11  "appropriate."
12      It's an --
13  BY MR. ABNEY:
14      Q. Let me try it again.
15      A. -- interesting term --
16      Q. All right.
17      A. -- "appreciate."
18      Q. Let me try it again.
19      Is the first sentence of the conclusion in
20  this study, "We showed that chromogenic anti-factor Xa
21  assays, and to a lesser extent PT, are clearly the most
22  appreciate assays to measure pharmacodynamic effects in
23  rivaroxaban on the coagulation in routine practice"?
24      A. Closer.
25      Q. Closer. I've had a hard day.

## Page 332

1      A. I -- I think you said "in" instead of "on."
2      Q. And they -- the -- the sentence you were
3  looking at, "We therefore recommend performing
4  calibrated PT as a screening test. And if that
5  value exceeds specific cutoffs, calibrated
6  anti-factor Xa chromogenic assays should be done."
7      Did I read that one right?
8      A. Yes.
9      Q. Do you agree with that conclusion?
10      A. I would agree with part of that conclusion
11  because I don't know what PT assays they did. So I'd
12  have to go back and look. And they did several.
13      They did calibrated PTs, which again is a
14  practice that we would not commonly do.
15      So I would -- their first part of that
16  sentence kind of predicates the second part of the
17  sentence, that they're assuming that if it's
18  calibrated, it's prolonged. Then you go to plan B,
19  which would be the drug-calibrating anti-Xa.
20      Q. Would it be a reasonable approach in the U.S.
21  to screen patients using Neoplastin PT, and if it
22  exceeded an expected level, to then do anti-factor Xa
23  calibrated for rivaroxaban to get a precise level?
24      MS. DAVIS: Objection.
25      MS. MOORE: Object to the form. Leading.

## Page 333

1      THE WITNESS: I think if you had Neoplastin PT
2  in your laboratory as a routine reagent, that would be
3  a -- an acceptable algorithm.
4      If you did not, I would think you'd have to
5  have a plan B.
6  BY MR. ABNEY:
7      Q. What would you recommend as a plan B?
8      MS. DAVIS: Objection.
9      THE WITNESS: If --
10      MS. DAVIS: Outside the scope of his report.
11  BY MR. ABNEY:
12      Q. Go ahead.
13      A. If it were an emergent situation, anti-Xa.
14      If it were not an emergent situation, they can
15  send out for a mass spec or any other alternative
16  measurement.
17      Q. You mention in your report that the use of
18  dilute Russell viper venom is another means for
19  measuring the anticoagulant effect of rivaroxaban.
20      Do you recall that statement?
21      A. Yes.
22      Q. How does that method compare to Neoplastin --
23      MS. DAVIS: Objection.
24  BY MR. ABNEY:
25      Q. -- PT measurement?

Page 334

1    MS. DAVIS: Sorry.
2        Objection. It's outside the scope.
3        THE WITNESS: It's a little bit different
4    methodology.
5        What you're looking at in a PT test is you're
6    having an activator of the intrin -- or the extrinsic
7    cascade, so you have a factor VII activator which,
8    when it cascades down and activates, that dilute
9    Russell viper venom time is a snake venom that
10   directly activates factor X.
11       It's been shown to be, in both our
12   anecdotal observations and in our published
13   studies, to be very sensitive to DOAC
14   concentrations, whether it be dabigatran,
15   rivaroxaban, apixaban, which made us go down that
16   path to look to see whether or not you were to
17   calibrate that methodology, would it be another way
18   of providing a equivalent drug level.
19   BY MR. ABNEY:
20       Q. And I believe you -- and when you said that
21   all of these methods on page 33 of your report -- when
22   you said all those methods, all of these methods, you
23   were including the DR or DVT as dilute Russell
24   viper venom; right?
25       A. That is a fairly inexpensive method, yes.

Page 335

1        Q. The last bullet point in your report you were
2    asked about, I just want to -- for clarity's sake, you
3    were asked about the first portion of the statement,
4    but not the second portion.
5        Do you recall being asked about "The capacity
6    to rapidly assess but ideally quantify rivaroxaban
7    anticoagulant effect or levels could be helpful in an
8    emergent situation"? Do you remember talking about
9    the emergent situation?
10       A. Yes.
11       Q. Okay. Do -- you go on to say, "or in trying
12   to assess whether or not a person is at an increased
13   risk from high exposure to rivaroxaban"?
14       A. Yes.
15       Q. So were you intending to limit that -- that
16   capacity as being ideal to just emergent situations?
17       MS. DAVIS: Object to form.
18       MS. MOORE: Object to the form and leading.
19       MS. DAVIS: Objection.
20       THE WITNESS: I think that it's been our -- my
21   personal experience that we have patients with high
22   levels, and we were able to provide the clinicians the
23   necessary information by having a quantitative
24   rivaroxaban level that made -- clearly made their
25   management decisions based on that number.

Page 336

1        So yes.
2    BY MR. ABNEY:
3        Q. Just so we're clear, my question was, were you
4    intending to limit that, the benefit of that
5    capacity, only to emergent situations?
6        A. No.
7        MS. DAVIS: Objection.
8        MS. MOORE: Join.
9    BY MR. ABNEY:
10       Q. Okay. You were shown several papers,
11   Mr. Gosselin, where you were the fourth or fifth author
12   out of five or ten authors listed.
13       Do you recall some of the studies?
14       A. Yes.
15       Q. We can look at each one of them if you want,
16   if there's not a general kind of rule. But generally
17   speaking, when you are in the middle of the pack of
18   authors, what does that indicate, as far as your
19   role in that paper --
20       MS. DAVIS: Objection.
21   BY MR. ABNEY:
22       Q. -- in that study?
23       MS. MOORE: Join.
24       THE WITNESS: That varies depending on the --
25   on the paper.

Page 337

1        In the Francart study, I probably contributed
2    more of the laboratory tests. But after the first
3    author, it was somewhat negotiated as far as the
4    lineage, based on contribution to the paper.
5        On the article --
6    BY MR. ABNEY:
7        Q. Hold on a second.
8        The -- you -- the Francart article, you're
9    talking about Exhibit 9?
10       A. Yes.
11       Q. Okay. And so just kind of explain a little
12   bit, what would have been your contribution to the
13   writing of the article?
14       A. As a reviewer.
15       MS. MOORE: Object to the form of the
16   question.
17       THE WITNESS: I was primarily the reviewer.
18       The first art -- the first author generally
19   writes the draft, sends it to the co-authors, where
20   they make their comments or make their edits, and send
21   it back. And then they either incorporate the
22   edits and then send it back out to the authors for
23   their final approval before it gets submitted.
24   That's the professional, collegial way to do it.
25   BY MR. ABNEY:

**85 (Pages 334 to 337)**

1    Q. And is Dr. Francart a clinical doctor?
2    A. She's a pharmacist.
3    Q. Okay. And Dr. Ball, the senior author, is a
4  clinician?
5    A. He's a physician, yes, a clinician.
6    Q. Are there other physicians? I mean,
7  Dr. Adcock is a physician. But are there other
8  clinicians on this paper that you're aware of?
9    A. Ken Friedman is BloodCenter of Wisconsin,
10  who is a physician.
11    So -- Emily Hawes is a pharmacist.
12    I think -- I'm not sure about Allison Deal.
13  And I'm not sure about Cheryl.
14    Q. So in your review of the manuscript, would
15  you provide comment, correction or suggestions
16  regarding any clinical aspects of the paper?
17    MS. DAVIS: Objection.
18    THE WITNESS: No.
19    MS. MOORE: Join.
20  BY MR. ABNEY:
21    Q. You were asked about a portion of the summary
22  of this paper where it talks about PT, APTT and
23  activated clotting time being insensitive to trough
24  rivaroxaban 59 percent of the time; 62 and 80 percent
25  of the samples had a normal result respectively?

1    A. Yes.
2    Q. What does that mean?
3    A. The definition that was used in this paper was
4  on-therapy range. And that was defined as the -- I
5  believe we used a 90th percentile between the 60
6  samples, which was a peak and trough of the 30
7  patients. So the highest and lowest got bumped. And
8  so that was considered to be the on-therapy range
9  for the purpose of this study.
10    And then those results that did not exceed
11  by even one tenth of a second outside the reference
12  interval was considered to be normal.
13    Q. Is -- in your opinion is there a difference as
14  far as the utility of using different PT reagents to
15  assess rivaroxaban effect on patients?
16    A. Yes.
17    MS. DAVIS: Objection.
18    MS. MOORE: Join.
19  BY MR. ABNEY:
20    Q. Did this paper, did this study, did they
21  use Neoplastine CI Plus to do their PT testing?
22    A. I would have to check. That was not in my
23  cites. I would have to look, but I believe the answer
24  is yes. I believe that was done at North Carolina.
25    Oh.

1    Q. Look at the method section right there.
2    A. I'm -- I'm going to look at the table 1, which
3  summarize all the -- the reagents and instruments.
4    So Neoplastin was used, yes.
5    Q. Was Neoplastin the only reagent that was used?
6    A. No.
7    Q. So when they're making statements or when you
8  as the authors are making statements about PT, is
9  that a global statement about collectively the
10  results of all of these PT tests? Or are they
11  talking specifically about Neoplastine CI Plus?
12    A. If we're using the term "PT," it's -- it's
13  all comers.
14    Q. So you were, I think, read some portions of
15  this. I'm looking at the conclusion on page 1139.
16    And it says, in essence, PT are often normal
17  in spite of on-therapy rivaroxaban plasma levels.
18    Do you see that?
19    A. Yes.
20    Q. Would -- would that be a true statement if
21  you were talking only about Neoplastine CI Plus?
22    MS. DAVIS: Objection.
23    MS. MOORE: Join.
24    THE WITNESS: Again, I think that you have to
25  look at the definition of what "on-therapy" means. And

1  there were some patients with very low on-therapy
2  rivaroxaban levels, and I would not expect the PT to be
3  prolonged in those situations.
4  BY MR. ABNEY:
5    Q. Because on-therapy was designed as the entire
6  range of trough to peak, is that what you're saying?
7    MS. DAVIS: Objection.
8    MS. MOORE: Join in the objection.
9    THE WITNESS: Based on this study and how
10  we defined "on-therapy" was the limited sample size
11  we had of peak and troughs on 30 patients taking
12  the drug, excluding the highest and the lowest
13  value.
14    Q. Okay. Let me ask it a different way, then.
15    If -- if a PT with Neoplastin is reported as
16  elevated, is that a reliable test, in your opinion, to
17  suggest that the patient has significant levels of
18  rivaroxaban on board?
19    MS. DAVIS: Objection.
20    MS. MOORE: Join in the objection.
21    THE WITNESS: I would have to ask you what
22  "significant" means. What that -- if it's a value
23  associated with that -- that term.
24    But, I mean -- but according to this paper,
25  the trough -- the peak levels, I believe, all peak

1  levels were outside the normal reference range.
2  BY MR. ABNEY:
3  Q. If a patient has a trough level outside the
4  reference range for Neoplastine CI Plus, what would
5  that indicate with respect to their Xarelto levels?
6  MS. DAVIS: Objection.
7  MS. MOORE: Join.
8  THE WITNESS: I would have to go back and
9  look at the data and see what that means, as far as
10  is there a relationship between the one tenth of a
11  second, which is what we report PT values out, the
12  one tenth a second beyond the reference interval
13  with the using -- using a linear regression, what
14  did that correlate to as far as drug level. But
15  offhand, I don't know what that is.
16  BY MR. ABNEY:
17  Q. Okay. Would a PT using Neoplastine CI Plus of
18  20 seconds as a trough level indicate to you that the
19  person was -- had a very high level of rivaroxaban on
20  board?
21  MS. DAVIS: Objection.
22  MS. MOORE: Object to the form of the
23  question. Leading.
24  THE WITNESS: And not being a clinician,
25  not understanding or knowing what "high" means, a

1  PT of 20 seconds as trough collection, based on
2  some of the data that I've seen from the early
3  published studies, was equivalent to about 200
4  nanograms per mill.
5  And I don't know where that falls. I
6  believe that is the upper threshold of the
7  published reference range, whether it be in an FDA
8  summary report or other published range. I'm just
9  recollecting, but I'm not sure.
10  BY MR. ABNEY:
11  Q. Okay. In Exhibit 8, your paper with Dr. Grant
12  and Adcock --
13  MS. DAVIS: Which one is that? I'm sorry.
14  MR. ABNEY: Exhibit 8.
15  MS. DAVIS: I know, but I don't have a list.
16  So could you give me a comparison?
17  I'm sorry. Could you give me just a minute to
18  find that, please.
19  I found it. Thank you.
20  BY MR. ABNEY:
21  Q. Mr. Gosselin, on page 506, the left-hand
22  column, about two-thirds of the way down, you were
23  asked about the sentence, "With so few laboratories
24  executing methods to quantitate DOACs, there appears to
25  be a false sense that PT and APTT can be used

1  effectively for assessing DOAC drug presence and
2  relative concentration."
3  Do you see that?
4  A. Yes.
5  Q. Do you agree with that statement?
6  A. Yes.
7  Q. If you were asked about that statement but
8  with specific reference to PT using Neoplastine CI
9  Plus, would that statement be true?
10  MS. DAVIS: Objection.
11  MS. MOORE: Join.
12  MR. ABNEY: Strike that. Let me ask it a
13  different way.
14  BY MR. ABNEY:
15  Q. If -- if you were looking at that statement
16  and addressing the use of Neoplastine CI Plus as a PT
17  reagent, would you state that that test could be used
18  to effectively assess the presence and relative
19  concentration of Xarelto?
20  MS. DAVIS: Objection.
21  THE WITNESS: I would base that statement on
22  published literature, and I would say yes.
23  BY MR. ABNEY:
24  Q. In your peer-reviewed papers, Mr. Gosselin,
25  have you and your co-authors concluded that properly

1  calibrated anti-factor Xa is equivalent to mass spec
2  for evaluating rivaroxaban concentrations?
3  A. Which paper are you citing?
4  Q. I'm not. I'm just asking you generally.
5  A. Oh, just in general.
6  Would I agree with that? Yes.
7  Q. In your anti-factor Xa and dilute Russell
8  viper venom paper marked as Exhibit 5 to your
9  deposition --
10  A. Yes.
11  Q. -- you were asked about the conclusion
12  paragraph of the paper.
13  Do you recall that?
14  A. Yes.
15  Q. Are you aware of the use of the term "bias" in
16  studies, such as to describe studies that were
17  improperly designed so that they yield false results "a
18  biased study"?
19  MS. MOORE: Object to the form. Leading.
20  MS. DAVIS: Objection.
21  THE WITNESS: I would say that that term used
22  in a clinical study is different than the bias used
23  in a laboratory calculation, yes.
24  BY MR. ABNEY:
25  Q. Okay. Are you familiar with the way the term

Page 346

1    "bias study" is used in a clinical randomized trial,
2    for instance?
3        A.  Yes.
4        Q.  Is that the same -- does it have the same
5    meaning as the use of the word "bias" in a lab
6    study such as Exhibit 5?
7        A.  I would say the meanings are different.
8        MS. MOORE:  Object to the form.
9        I'm sorry.  I didn't mean to interrupt your
10   answer.
11       MS. DAVIS:  Same objection.
12       THE WITNESS:  In that we're describing a
13   numerical difference between methodologies.
14   BY MR. ABNEY:
15       Q.  And when you describe something as
16   statistically significant -- strike that.
17       When you say something has demonstrated a
18   statistically significant bias, what does that mean?
19       A.  That just means whatever calculations we will
20   use, the P value was less than .05, typically.  And if
21   you're comparing between two methods, that may be a
22   paired t-test.  But it's demonstrating that there
23   is a difference between the results of method A
24   versus method B.
25       Q.  And does the fact that something is

Page 347

1    statistically significantly different mean that
2    there -- there is a clinically significant difference
3    in the outcomes of the studies?
4        A.  I don't know about --
5        MS. DAVIS:  Objection.
6        MS. MOORE:  Objection.  Leading.
7        THE WITNESS:  -- outcomes, but it may not
8    mean a clinical difference.
9        For example, if you were to say if we were
10   to do measure A, and measure A is 50, and measure B
11   is always 49 or 48, statistically you will fail.
12   But the difference is only one or two.  But you
13   will have a statistically significant difference
14   between the two methods.
15       And so that's why sometimes just looking at
16   P values aren't telling the whole tale.  You have
17   to look at where the differences lie and are they
18   clinically significant.
19   BY MR. ABNEY:
20       Q.  In the conclusion you note that a
21   single-source calibrator did not alleviate result
22   differences.
23       Do you remember that?
24       A.  Yes.
25       Q.  What was -- what was the purpose in the

Page 348

1    research study of using a single-source calibrator?
2        A.  One of the things we try to determine is, if
3    you're using different calibrators, is that the cause
4    for the bias?
5        And you can rectify that one variable by
6    using that same calibrator against all the kits.
7    And if the bias still exists, then the calibrator
8    probably is not a variable.
9        Q.  Was the purpose of this study to look at
10   different kits to determine whether they would get
11   statistically similar results?
12       MS. DAVIS:  Objection.
13       MS. MOORE:  Object to the form.  Leading.
14       MR. ABNEY:  Strike that.  Let me ask it a
15   different way.
16   BY MR. ABNEY:
17       Q.  What was the purpose of this study,
18   Mr. Gosselin?
19       A.  So the purpose was to further carry on the
20   data analysis from the University of North Carolina
21   collaborative study with Dr. Francart and their
22   colleagues to say, with these samples, are there
23   alternative methods other than mass spec for providing
24   a decent drug level that would be acceptable for
25   clinical use?

Page 349

1        "Decent" is probably not the best word.
2    "Equivalent" might be a better -- a better term.
3        Q.  And what -- what did you conclude?  What did
4    your group conclude with respect to the use of
5    anti-factor Xa and dilute Russell viper venom?
6        MS. DAVIS:  Objection.
7        THE WITNESS:  I think if you look at the --
8    just the -- just the short summary that's in the
9    beginning of the conclusions --
10       MS. MOORE:  Join.
11       THE WITNESS:  -- that
12   rivaroxaban-calibrated anti-Xa measurements
13   correlate well, but then we also have the caveat
14   about the clinical extent as a variation is
15   uncertain.  And then we further add, and other
16   authors as well, that the methods that use anti --
17   antithrombin supplementing is -- is not
18   recommended.
19   BY MR. ABNEY:
20       Q.  Exhibit 11, the 2015 laboratory perspective
21   paper with Dr. Adcock --
22       MS. DAVIS:  Give me just a minute, please,
23   Counsel.
24       Okay.
25   BY MR. ABNEY:

1    Q. -- on page 890, I believe you were asked about
2  the first sentence, "Although the PT may be relatively
3  sensitive as compared with APTT to anti-factor Xa
4  DOACs, this test should not be used to quantify or
5  estimate drug concentrations."
6        Do you see that?
7    A. Yes.
8    Q. Was that statement speaking globally about all
9  PT reagents?
10    A. Yes.
11    Q. And again, if you were asked about the use
12  of PT tests with Neoplastine CI Plus, would your
13  opinion that it is appropriate to use that test to
14  quantify or estimate drug -- well, would it be your
15  opinion that that would be an appropriate test to
16  assess relative coagulation status of patients on
17  Xarelto?
18        MS. DAVIS: Objection.
19        MS. MOORE: Join.
20        THE WITNESS: I would modify that sentence to
21  reflect something along those lines, yes.
22  BY MR. ABNEY:
23    Q. You were asked if you were an expert with
24  respect to PT testing with Neoplastine CI Plus.
25        Do you remember that?

1    A. Yes.
2    Q. In what -- in what context did you answer that
3  question?
4        MS. DAVIS: Objection.
5        MS. MOORE: Join.
6        THE WITNESS: If any of you were to ask me how
7  I'd even reconstitute the material, I would not be
8  able to give you an answer because I've never used
9  the material in my life.
10        If I were to claim to be an expert in that
11  context, I would know everything about the reagent,
12  and that's why my immediate response was I -- I
13  don't know about the reconstitution properties. I
14  don't know about the stability. I don't know if it
15  needed to be warmed. I don't even know if it needs
16  a stir bar. I don't know any of that processes
17  which I think constitute somebody with an expert
18  specific to a reagent like that.
19        If you were to ask me about the context of
20  Neoplastin as a PT reagent in general or as used in
21  studies, in our published studies and others, do I have
22  the wherewithal and the background and the experience
23  to look at that data and provide an expert opinion as a
24  laboratory medical technologist or clinical laboratory
25  scientist that has been doing this for 30 years, I

1  would say yes, I'm an expert in that area.
2        But again, if you asked me if I knew how to
3  reconstitute the reagent, I would say no.
4  BY MR. ABNEY:
5    Q. Do you believe -- strike that.
6        Do you have the expertise to review data and
7  studies looking at Neoplastine CI Plus and Xarelto
8  levels in order to evaluate whether it is an
9  appropriate reagent to use to assess relative
10  coagulation status of Xarelto patients?
11        MS. DAVIS: Objection.
12        MS. MOORE: Join.
13        THE WITNESS: I believe that I have the
14  background and wherewithal to look at published data
15  and render an opinion on the use of that reagent in the
16  presence of Xarelto, yes.
17  BY MR. ABNEY:
18    Q. And do you set forth your opinion on that
19  subject in your written report?
20    A. Based on our published studies and others,
21  yes.
22    Q. Are you aware of others that agree with your
23  opinion with respect to the use of Neoplastine CI Plus
24  to evaluate rivaroxaban coagulation status of patients?
25        MS. DAVIS: Objection.

1        MS. MOORE: Join.
2        THE WITNESS: Yes. The early Bayer studies
3  all cited that reagent and even suggested its use for
4  assessing the drug.
5  BY MR. ABNEY:
6    Q. In this paper, you were also asked about the
7  cost issue of --
8    A. Yes.
9    Q. -- anti-factor Xa kits.
10        What's the -- I mean, from your experience,
11  what's the cost of an anti-factor Xa kit?
12    A. Again, that would vary based on the
13  utilization of the kit, how much you have.
14        When I talk about relative costs, for example,
15  UC Davis, we do approximately 60,000 PTs in a year.
16  Maybe even more than that.
17        And so that costs us maybe 50 cents.
18        Compared to a Xa, we may do 300 in a year.
19  That's including the heparins. Our costs may be 10
20  dollars.
21        So when you look at relative costs, you're
22  talking about something that's 20 times more
23  expensive than a high volume, routine test. This
24  is what I mean by "relative."
25        But when you look at costs of other tests

Page 354

1 that we may employ in the lab, it's not that
2 expensive.
3 MR. ABNEY: Okay. I think we need to take a
4 break.
5 THE VIDEOGRAPHER: This marks the end of Disc
6 Number 4. We're off the record at 4:23 p.m.
7 (Recess taken.)
8 THE VIDEOGRAPHER: We are back on the record.
9 This marks the beginning of Disc Number 5 in the
10 deposition of Robert Charles Gosselin. The time is
11 4:35 p.m.
12 BY MR. ABNEY:
13 Q. Mr. Gosselin, are you aware of anyone in the
14 peer-reviewed scientific literature suggesting that
15 properly calibrated anti-factor Xa is not a valid
16 method for determining rivaroxaban levels in plasma?
17 MS. MOORE: Object to the form. Leading.
18 MS. DAVIS: Objection.
19 THE WITNESS: No.
20 BY MR. ABNEY:
21 Q. Are you aware of anyone in the peer-reviewed
22 literature that suggests that using Neoplastine CI Plus
23 as a reagent is not a valid way to screen for patients
24 that may have high levels of Xarelto on board?
25 MS. DAVIS: Objection.

Page 355

1 MS. MOORE: Same objection.
2 THE WITNESS: No.
3 BY MR. ABNEY:
4 Q. Can anti-factor Xa calibrated to low molecular
5 weight heparin or unfractionated heparin quantify
6 Xarelto levels in plasma?
7 MS. DAVIS: Objection.
8 THE WITNESS: In my opinion and based on our
9 data and our published data, it can be used to
10 quantify, yes.
11 MR. ABNEY: Can you read back the question?
12 (Record read by the court reporter as
13 follows: "Q: Can anti-factor Xa
14 calibrated to low molecular weight heparin
15 or unfractionated heparin quantify Xarelto
16 levels in plasma?
17 "A: In my opinion and based on our
18 data and our published data, it can be used
19 to quantify, yes.")
20 BY MR. ABNEY:
21 Q. Is that correct?
22 A. I think in -- in the context if you -- if you
23 were asking me on my data, could I estimate versus
24 quantify, "estimate" might be a better term versus
25 quantify, yes.

Page 356

1 Q. Okay. But my question was, can you give a
2 precise micrograms per deciliter, or however it's
3 measured, can you do that if the anti-factor Xa is
4 calibrated for low molecular weight heparin or
5 unfractionated heparin?
6 A. I'm trying to understand the -- the question,
7 which has some nuances about the calibration in the
8 reporting and quantifying, because the units are
9 different.
10 I think that, again, if you were to look at
11 regression and if you were to look at some of the data,
12 you could certainly make a good estimation of the
13 amount of drug on board using these low molecular
14 weight or unfractionated calibrated methods as
15 published. And not just us, but others as well, yes.
16 Q. Would you get much greater precision if you
17 use it -- if you used rivaroxaban as a -- if -- if the
18 machine were calibrated for rivaroxaban?
19 MS. DAVIS: Objection.
20 MS. MOORE: Join.
21 THE WITNESS: Certainly the reportable range
22 would be more extensive and it would be specific for
23 that drug, with the assumption that the sample was in a
24 patient with a known rivaroxaban exposure, yes.
25 BY MR. ABNEY:

Page 357

1 Q. In your experience is it widely known by
2 physicians and lab technicians that rivaroxaban levels
3 can be either estimated using the appropriate PT or
4 quantified using anti-factor Xa?
5 MS. MOORE: Object to the form.
6 MS. DAVIS: Objection.
7 THE WITNESS: My opinion would be, without any
8 specific evidence, but just based on my
9 conversations with other institutions and other
10 individuals, and looking at the literature from
11 professional organizations that are not lab based,
12 that there's a general concept that all prothrombin
13 times are the same. All PTTs are the same. They
14 rarely use the caveat specific about Neoplastin
15 when dealing with Xarelto. They may have a generic
16 comment about reagent sensitivities may vary. But
17 they're not specific.
18 So a reader of a neurosurgical journal
19 probably won't have the wherewithal or interest to
20 pursue that reagent sensitivity, and that's true in our
21 own institution as well.
22 BY MR. ABNEY:
23 Q. Is the dilute Russell viper venom test,
24 does it require specific equipment for it to be
25 read on?

1    A. It can be adapted to any clot-based
2  analyzer. And so any analyzer that does a PT or
3  PTT can be modified or adopted to run the DRVV
4  t-test.
5    Q. Is the same true for the anti-factor Xa test?
6    MS. DAVIS: Objection.
7    MS. MOORE: Join.
8    THE WITNESS: The equipment required for the
9  factor Xa would be a little different in that it would
10  have to have the capacity to run chromogenic testing,
11  which is usually on a different filter. The majority
12  of the instruments used in the U.S., based on the CAP
13  surveys, have that capacity.
14  BY MR. ABNEY:
15    Q. You were asked about recalibrating for
16  different DOAC calibrators.
17    Do you remember that?
18    A. Yes.
19    Q. How -- how difficult is it to recalibrate
20  your machine to go from rivaroxaban to -- pick your
21  other anti-Xa drug?
22    MS. DAVIS: Objection.
23    MS. MOORE: Join.
24    THE WITNESS: To do calibrations on these
25  Xas is reconstituting the calibrators, which is

1  usually one mL of water. You let it sit for 20
2  minutes. You mix them. You put them on the
3  machine. You push a button. It runs the samples.
4  And it puts in some calibration curve. You're
5  ready to go.
6    The amount of time it takes to run an
7  anti-Xa typically is about three to four minutes.
8  And it won't impact routine testing if you have a
9  large analyzer. It's not going to impact the other
10  tests that's going to be done concurrently. It's a
11  very fast test.
12    The same with the DRVVT. That's about three-
13  or four-minute test as well.
14  BY MR. ABNEY:
15    Q. Do Quest and LabCorp offer rivaroxaban
16  level testing?
17    A. I believe LabCorp offers mass spec for the
18  DOACs at their Burlingame facility in North Carolina, I
19  believe. I'm not quite sure.
20    Quest, I am not sure.
21    Q. Mr. Gosselin, I showed you a list of documents
22  that I had identified as being documents that I had
23  sent to you. I have provided that list to opposing
24  counsel.
25    Were there any documents on that list that you

1  relied on in forming your opinions that you've
2  expressed in your report that were not documents that
3  you found on your own or already had in your library?
4    A. No.
5    Q. Were there documents that I had sent to you in
6  order for you to explain or so that I could ask you
7  questions about certain issues related to laboratory
8  science?
9    A. Yes.
10    MS. MOORE: Object to the form of the
11  question. Leading.
12    THE WITNESS: Oh.
13  BY MR. ABNEY:
14    Q. With respect to scientific study on the
15  measure of DOAC levels in plasma concentrations,
16  are you one of the scientists that is most
17  published in this area?
18    MS. DAVIS: Objection.
19    MS. MOORE: Join.
20    THE WITNESS: I would say in the U.S., between
21  Dr. Adcock and I, we are probably the -- the most
22  widely published in the laboratory arena, yes.
23  BY MR. ABNEY:
24    Q. And as part of your job and as part of your
25  effort to maintain your currency on the state of

1  the science, is that an area that you regularly
2  review papers on?
3    MS. MOORE: Object to the form.
4    MS. DAVIS: Objection.
5    THE WITNESS: As well as being an associate
6  editor of two journals and a reviewer of articles from
7  other journals, yes.
8  BY MR. ABNEY:
9    Q. Would it be fair to say that there are no
10  significant studies that have been published in the
11  peer-reviewed literature that address the issue of
12  measuring rivaroxaban in plasma that you have not
13  reviewed?
14    MS. MOORE: Object to form.
15  BY MR. ABNEY:
16    Q. Not as -- not as a reviewer, but that you have
17  not found in your PubMed search and looked at?
18    MS. MOORE: Objection.
19    MS. DAVIS: Objection.
20    THE WITNESS: No. I'd say there's been
21  articles that I have not reviewed. They may be case
22  reports. They may be small series studies. They may
23  be from journals that I do not have access to or are
24  not considered to be high-impact journals, either with
25  a factor or a readership. So I would not say that I

## Page 362

1 reviewed every single laboratory-based article.
2 I have reviewed what I think would be
3 considered the opinion leaders on laboratory DOAC
4 measurements. Those papers, yes.
5 BY MR. ABNEY:
6 Q. Okay. And if I said "papers," I misspoke.
7 I was ask -- I meant to ask you about studies,
8 where -- as in your laboratory studies where you take
9 either spike samples or -- researchers take spike
10 samples or -- strike that.
11 Has your research shown there to be a
12 difference between spike samples and human samples
13 with respect to measuring accurately rivaroxaban
14 levels in plasma?
15 A. We have demonstrated that there may be a
16 difference, depending on the reagent. That's not an
17 absolute statement. But it's a possible statement.
18 Q. With respect to human studies that have been
19 done addressing the issue of how best to measure or
20 quantify Xarelto levels in human plasma, do you believe
21 that you have read all of those studies that look at
22 that issue in the way that you have?
23 I'm not talking about case reports or review
24 papers, but where they have actually gone out and taken
25 plasma from a significant number of patients and looked

## Page 363

1 at different ways to analyze it and reached conclusions
2 about how best to study rivaroxaban levels in plasma.
3 Do you believe that you have reviewed all of
4 those studies?
5 MS. DAVIS: Objection.
6 MS. MOORE: Join.
7 THE WITNESS: That would be a hard question to
8 answer.
9 I have reviewed a lot of studies that have
10 looked at that. But whether or not I reviewed all of
11 them, I -- I don't know.
12 BY MR. ABNEY:
13 Q. Have you made an attempt through PubMed to
14 identify those studies and review them?
15 MS. DAVIS: Objection.
16 THE WITNESS: Yes.
17 MR. ABNEY: May have been a better question.
18 That's all I have. Thank you.
19 MS. DAVIS: Can we go off the record for a
20 moment?
21 MR. ABNEY: Sure.
22 MS. MOORE: Yeah, take a quick break.
23 THE VIDEOGRAPHER: We're off the record at
24 4:48 p.m.
25 (Recess taken.)

## Page 364

1 THE VIDEOGRAPHER: We're back on the record.
2 The time is 5:01 p.m.
3 FURTHER EXAMINATION
4 BY MS. DAVIS:
5 Q. Mr. Gosselin, you're not a medical doctor; are
6 you?
7 A. That is correct. I am not.
8 Q. You're not a physician?
9 A. That is correct. I am not.
10 Q. And you do not make decisions regarding
11 patient care; do you?
12 A. That is correct. I do not.
13 Q. And you do not make clinical treatment
14 decisions regarding patients; do you?
15 A. That is correct. I do not.
16 Q. Doctors do that?
17 A. And other caregivers. But yes, I do not.
18 Q. And you're not a pharmacist?
19 A. That is correct. I am not.
20 Q. And you're not a pharmacologist?
21 A. That is correct. I am not.
22 Q. And you're not an expert in pharmacokinetics
23 or pharmacodynamics; are you?
24 A. That is correct. I am not.
25 Q. On page 32 -- 31 of your expert report, the

## Page 365

1 bullet point regarding the sensitivity of Neoplastine
2 CI Plus --
3 A. I'm sorry, what page?
4 Q. Page 31, in your summary points --
5 A. Thank you.
6 Q. -- the first one concerning Neoplastine CI
7 Plus.
8 A. Yes.
9 Q. You would agree that in that bullet point, you
10 are not referring to a calibrated PT test with
11 Neoplastin CI Plus; are you?
12 A. That is correct.
13 Q. When you were discussing with counsel for
14 plaintiffs the article that you wrote about the Russell
15 viper venom, do you remember a discussion of bias,
16 and you described it as a numerical difference
17 between methodologies?
18 Do you recall that?
19 A. Yes.
20 Q. And you said that those differences may not
21 mean a clinically significant difference; correct?
22 A. That is correct.
23 Q. And you -- you would agree that you are not an
24 expert in determining whether those differences rise to
25 the level of clinical significance; correct?

1    A. That's why I said "may." That is correct.
2    Q. When plaintiffs' counsel was questioning you,
3 you said something like your hospital performs about
4 300 anti-factor Xa tests a year, including heparin
5 tests?
6    A. That would be a guesstimation, yes.
7    Q. And how many anti-factor Xa
8 rivaroxaban-calibrated tests per year would you say
9 that your institution performs?
10    A. Roughly 30.
11    Q. And when did your institution implement that
12 test?
13    A. I believe in 2012.
14    Q. And you are based at a large university
15 tertiary care hospital?
16    A. Yes.
17    Q. And concerning the anti-factor Xa
18 rivaroxaban-calculated test -- well, let me rephrase
19 that.
20        To the best of your knowledge, how many
21 laboratories in the United States are assessing
22 rivaroxaban levels?
23    A. That's -- that's difficult to determine
24 because I'm -- I'm not sure who does mass spec.
25        If one were to look at the CAP proficiency

1 program, which is, again, the blinded samples that
2 get sent to laboratories twice a year, there is
3 approximately 20 labs enrolled in that proficiency
4 survey program that look at rivaroxaban, at my last
5 recollection.
6    Q. And when you say there's 20 labs, what
7 specific test are you referring to?
8    A. The rivaroxaban quantitation in nanograms
9 per mL. It doesn't describe methodologies, I don't
10 believe. I don't think they're specific. But I
11 can't --
12    Q. So --
13    A. -- recall --
14    Q. So --
15    A. -- specifically.
16    Q. So what tests would that include, in your
17 opinion?
18    A. The nanograms per mill tests? It could be
19 either mass spec or it could be chromogenic
20 anti-Xas.
21    Q. So both of those together would only be 20
22 labs in the country?
23    A. Again, I would have to reread the
24 proficiency, but I don't think it includes mass
25 spec, but I am not sure with a high degree of

1 certainty. I don't remember.
2    Q. So to the best of your knowledge, as far as
3 the anti-factor at -- Xa rivaroxaban-calibrated
4 test, that would be around 20 labs in the country?
5    A. If I were to use the yardstick of the CAP
6 surveys.
7        Could there be other material they used?
8 Yes. Could there be other labs running the test
9 but not using CAP surveys? Yes. So that would be
10 just an estimation based on limited, limited data.
11    Q. But that would be the best estimate that
12 you're aware of?
13    A. Yes.
14    Q. And what is your understanding of the
15 reason why other laboratories have not used this
16 assay?
17    A. My impression is because there's no
18 FDA-approved calibrators or controls.
19        MS. DAVIS: Let's go off the record.
20        THE VIDEOGRAPHER: We're off the record at
21 5:06 p.m.
22        (Recess taken.)
23        THE VIDEOGRAPHER: We're back on the record
24 at 5:10 p.m.
25 BY MS. DAVIS:

1    Q. Mr. Gosselin, just before we went off the
2 record, I asked you about what's your understanding
3 of the reason other labs have not used this
4 assay, and you told me it was because of a lack of
5 FDA-approved calibrators and controls; right?
6        MR. ABNEY: Object to form.
7        THE WITNESS: That would be my impression,
8 because it's not instrumentation. It's not
9 reagents. It's strictly calibrators.
10 BY MS. DAVIS:
11    Q. And so to your knowledge, it's -- you don't
12 attribute this to anything that Bayer or Janssen
13 has done; correct?
14    A. I would agree with that.
15    Q. And do you have in front of you Exhibit 9
16 to your deposition?
17    A. Yes.
18    Q. And this is the Francart article?
19    A. Francart, yes.
20    Q. And do you recall, earlier in the
21 deposition, I asked you a question about the bullet
22 point on page 31 of your report concerning what you
23 wrote about the Neoplastine CI Plus reagent and
24 whether you had published that? And I believe that
25 you referred to Exhibit 9 --

## Page 370

1    A. Yes.
2    Q. -- is that correct?
3    A. If -- yes.
4    Q. And would you agree with me that this
5  sentence that appears on page 31 of your expert
6  report, this first bullet point about Neoplastine
7  CI Plus, that sentence does not appear in Exhibit
8  9, the Francart article; does it?
9    A. This bullet does not appear in this
10 article, that is correct.
11    MS. DAVIS: We are going to hold the record
12 open for the reason that the list of articles - the
13 information that was provided to you by counsel, that
14 was considered by you but not cited in your report, was
15 not provided in advance of the deposition.
16    But other than that, I don't have any
17 additional questions at this time.
18    Thank you for appearing today.
19    THE WITNESS: Thank you.
20    MR. ABNEY: Happy to come back for your five
21 minutes. All right.
22    THE VIDEOGRAPHER: This marks the end of Disc
23 Number 5 and today's testimony of Robert Charles
24 Gosselin.
25    Going off the record at 5:12 p.m.

## Page 371

1    (The deposition of ROBERT C. GOSSELIN
2    was adjourned at 5:12 p.m. this date.)
3    --oOo--

## Page 372

1    - - - - - -
     E R R A T A
2    - - - - - -
3
4  PAGE LINE CHANGE
5  _____
6   REASON: _____
7  _____
8   REASON: _____
9  _____
10  REASON: _____
11 _____
12  REASON: _____
13 _____
14  REASON: _____
15 _____
16  REASON: _____
17 _____
18  REASON: _____
19 _____
20  REASON: _____
21 _____
22  REASON: _____
23 _____
24  REASON: _____
25

## Page 373

1
2    ACKNOWLEDGMENT OF DEPONENT
3
4    I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10 changes in form or substance, if any,
11 noted in the attached Errata Sheet.
12
13
14 _____
15   ROBERT C. GOSSELIN        DATE
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
   _____
22 Notary Public
23
24
25

Page 374

1     REPORTER'S CERTIFICATE
2          The undersigned Certified Shorthand Reporter
3     licensed in the State of California does hereby
4     certify:
5          I am authorized to administer oaths or
6     affirmations pursuant to Code of Civil Procedure,
7     Section 2093(b), and prior to being examined, the
8     witness was duly administered an oath by me.
9          I am not a relative or employee or attorney or
10    counsel of any of the parties, nor am I a relative or
11    employee of such attorney or counsel, nor am I
      financially interested in the outcome of this action.
12         I am the deposition officer who
13    stenographically recorded the testimony in the
14    foregoing deposition, and the foregoing transcript is a
15    true record of the testimony given by the witness.
16         Before completion of the deposition, review of
17    the transcript [X] was [ ] was not requested.  If
18    requested, any changes made by the deponent (and
19    provided to the reporter) during the period allowed are
20    appended hereto.
21         In witness whereof, I have subscribed my name
22    this ____ day of _____, 2016.
23
24         _____
25         DIANE S. MARTIN, CSR No. 6464