UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO | ) | MDL No. 2592 |
| (RIVAROXABAN) | ) | |
| PRODUCTS LIABILITY | ) | SECTION:  L |
| LITIGATION | ) | |
| | ) | JUDGE ELDON E. |
| | ) | FALLON |
| THIS DOCUMENT RELATES | ) | |
| TO ALL CASES | ) | MAG. JUDGE NORTH |

FRIDAY, DECEMBER 2, 2016

- - -

Videotaped deposition of Phillip
Cuculich, M.D., held at the offices of
SCHLICHTER, BOGARD & DENTON, L.L.P., 100
South Fourth Street, Suite 1200, St. Louis,
Missouri, commencing at 9:03 a.m., on the
above date, before Carrie A. Campbell,
Registered Diplomate Reporter, Certified
Realtime Reporter, Illinois, California &
Texas Certified Shorthand Reporter, Missouri
& Kansas Certified Court Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1      A P P E A R A N C E S :
2
    SCHLICHTER, BOGARD & DENTON, L.L.P.
3     BY: KRISTINE KRAFT, ESQUIRE
      kkraft@uselaws.com
4     100 South Fourth Street, Suite 1200
      St. Louis, Missouri 63102
5     (314) 621-6115
6
7     LEVIN PAPANTONIO THOMAS MITCHELL
      RAFFERTY & PROCTOR, P.A.
8     BY: NED MCWILLIAMS, ESQUIRE
      nmcwilliams@levinlaw.com
9     316 South Baylen Street, Suite 600
      Pensacola, Florida 32502
10    (850) 435-7000
      Counsel for Plaintiffs
11
12
13    KAYE SCHOLER, LLP
      BY: JULIE B. DU PONT, ESQUIRE
14       Julie.dupont@kayescholer.com
      250 West 55th Street
15    New York, New York 10019
      (212) 836-8000
16    Counsel for Defendants Bayer
      HealthCare Pharmaceuticals and Bayer
17    Pharma AG
18
19    SEDGWICK, LLP
      BY: DAVID M. COVEY, ESQUIRE
20       david.covey@sedgwicklaw.com
      225 Liberty Street, 28th Floor
21    New York, New York 10281
      (212) 422-0202
22    Counsel for Janssen Pharmaceuticals
23
24
25

## Page 3

1     DRINKER BIDDLE & REATH, LLP
      BY:  SEAN A. KENNEDY, ESQUIRE
2        sean.kennedy@dbr.com
      600 Campus Drive
3     Florham Park, New Jersey 07932
      (973) 549-7000
4     Counsel for Janssen Pharmaceuticals
5
6     V I D E O G R A P H E R :
      ED FOPPE, CLVS,
      Golkow Technologies, Inc.
7
      _ _ _
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1           INDEX
2              PAGE
3     APPEARANCES................................  2
4     EXAMINATIONS
5      BY MS. DU PONT.........................  9
6      BY MR. COVEY..........................  252
7
8         EXHIBITS
9     No.  Description        Page
10    1   Defendants' Amended Notice with   11
      Subpoena Duces Tecum of Oral
11       Videotaped Deposition of Phillip
      S. Cuculich, MD
12
13    2   Phillip Cuculich billing sheet   12
14    3   Expert Report of Phillip S.   14
      Cuculich, MD
15    4   2014 American Heart Association,   62
      American College of Cardiology and
16       the Heart Rhythm Society Guideline
      for the Management of Patients
17       with Atrial Fibrillation
18    5   "Non-vitamin K antagonist   128
      anticoagulants:  Considerations on
19       once- versus twice-daily regimens
      and their potential impact on
20       medication adherence"
21    6   FDA Center for Drug Evaluation and   146
      Research, Application Number:
22       202439Orig1s000, medical review(s)
23    7   eCFR - Code of Federal   169
      Regulations, Title 21, Chapter 1,
24       Subchapter D, Part 320, Subpart B,
      §320.33
25

## Page 5

1     8   "Heparin-Calibrated Chromogenic
      Anti-Xa Activity Measurements in   178
2        Patients Receiving Rivaroxaban:
      Can This Test Be Used to Quantify
3        Drug Level?"
      9   "Direct Oral Anticoagulants in the   178
4        Laboratory:  2015 Review."
5     10  "Population Pharmacokinetics and   204
      Pharmacodynamics of Rivaroxaban in
6        Patients with Nonvalvular Atrial
      Fibrillation:  Results from
7        ROCKET-AF"
8
9
      CERTIFICATE................................. 349
10    ERRATA........................ 351
      ACKNOWLEDGMENT OF DEPONENT................. 352
11    LAWYER'S NOTES............................. 353
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1     MR. KENNEDY:  Defendants are in
2  receipt of plaintiff's cross-notice
3  for the deposition for Dr. Cuculich
4  who has issued an expert report in the
5  federal MDL proceeding and is being
6  deposed in connection with that
7  report.
8     Plaintiff's cross-notice for
9  the Pennsylvania consolidated
10  proceedings is premature because
11  case-specific discovery for the
12  bellwether cases has not yet commenced
13  in Pennsylvania, nor have the expert
14  reports been served.  And
15  specifically, the Pennsylvania
16  plaintiffs have not served the expert
17  reports for this witness.
18     Plaintiff's cross-notice also
19  fails to take into account the expert
20  protocol that was agreed to among the
21  parties in the MDL proceeding and
22  entered as an order by the Court.
23     Among other things, the
24  protocol limits the deposition of
25  generic experts to seven hours total.

Page 7

1     In the spirit of cooperation
2  between the federal MDL proceedings
3  and Pennsylvania consolidated
4  proceeding, however, defendants will
5  not object to plaintiff's cross-notice
6  for the deposition.  This is being
7  done with a full reservation of rights
8  and objections pending notice of a
9  mutually acceptable process for expert
10  discovery in the Pennsylvania cases.
11     VIDEOGRAPHER:  We are now on
12  the record.
13     My name is Ed Foppe.  I'm a
14  certified legal video specialist with
15  Golkow Technologies.
16     Today's date is December 2,
17  2016.  The time is 9:03 a.m. Central
18  Standard Time.
19     This video deposition is being
20  held in St. Louis, Missouri, in
21  reference to Xarelto Products
22  Liability Litigation MDL 2592.  This
23  case is pending in the United States
24  District Court for the Eastern
25  District of Louisiana.

Page 8

1     The deponent is Dr. Phillip
2  Cuculich.
3     Counselors, will you please
4  identify yourselves?
5     MR. MCWILLIAMS:  Ned McWilliams
6  on behalf of the plaintiffs.
7     MS. KRAFT:  Kristine Kraft on
8  behalf of the plaintiffs.
9     MS. DU PONT:  Julie du Pont on
10  behalf of the Bayer defendants.
11     MR. COVEY:  David Covey on
12  behalf of Janssen and related
13  companies.
14     MR. KENNEDY:  Sean Kennedy on
15  behalf of Janssen.
16     VIDEOGRAPHER:  The court
17  reporter is Carrie Campbell, and she
18  will now swear in the witness.
19
20     PHILLIP CUCULICH, M.D.,
21  of lawful age, having been first duly sworn
22  to tell the truth, the whole truth and
23  nothing but the truth, deposes and says on
24  behalf of the Defendants, as follows:
25     DIRECT EXAMINATION

Page 9

1  QUESTIONS BY MS. DU PONT:
2     Q.    Good morning, Doctor.
3     A.    Good morning.
4     Q.    My name is Julie du Pont.  I
5  represent the Bayer defendants in this
6  matter.
7     Can you just state your name
8  and business address for the record, please?
9     A.    My name is Phillip Cuculich.
10  My business address is 660 South Euclid
11  Avenue, Campus Box 8086, St. Louis, Missouri
12  63110.
13     Q.    And you're a medical doctor?
14     A.    I am.
15     Q.    Have you ever had your
16  deposition taken before?
17     A.    Yes.
18     Q.    And I'll just remind you, I'm
19  sure you've heard this before, but try to
20  answer with verbal answers, not just nod your
21  head or shake your head no.
22     If you need a break at any
23  time, I know you have patients, just let me
24  know.  You just have to finish your answer
25  before we take the break.

1     A.    Thank you.
2     Q.    And if you don't understand my
3  question, feel free to ask me to rephrase it.
4  We want to make sure we get a good record
5  here.
6           Okay?
7     A.    Yes, ma'am.
8     Q.    Now, you said you had your
9  deposition taken before.
10          In what capacity was that?
11          Were you named as the
12  defendant, or did you serve as an expert
13  witness?
14    A.    Both.  One I was named as a
15  defendant, and one I served as an expert
16  witness.
17    Q.    What lawsuit were you named as
18  the defendant?
19    A.    It was a case that was settled
20  some years ago with regards to a procedure
21  for atrial fibrillation.
22    Q.    And why were they suing you?
23    A.    It was an injury outcome of a
24  procedure, so I was named as one of the
25  defendants for the procedure -- or for the

1  lawsuit.
2     Q.    Was the name of that deposition
3  Dylewski?
4     A.    It's not.
5     Q.    It's not.
6           What was the name of the case?
7     A.    I could provide that to you
8  after.  I don't have that with me.
9     Q.    You can't remember right now?
10    A.    I don't.
11    Q.    Okay.  And you said that case
12  was resolved by settlement?
13    A.    Yes.
14          (Cuculich Exhibit 1 marked for
15     identification.)
16  QUESTIONS BY MS. DU PONT:
17    Q.    Okay.  Let me just go ahead and
18  mark as Exhibit 1 the notice of your
19  deposition today.
20          Have you seen this before?
21    A.    Yes.
22    Q.    And I will just -- I just want
23  to refer you to the Exhibit A of the notice.
24  It's on page 3.
25          And I'm sorry, did you say you

1  have seen this before?
2     A.    Yes.
3     Q.    Okay.  Did you bring with you
4  today any documents responsive to the
5  subpoena?
6     A.    No additional documents, no,
7  ma'am.
8     Q.    Okay.  Now, your counsel did
9  provide for me a record of your invoices.
10          Are you aware of that?
11    A.    Yes.
12          (Cuculich Exhibit 2 marked for
13     identification.)
14  QUESTIONS BY MS. DU PONT:
15    Q.    Okay.  So I'm just going to go
16  ahead and ask you about that.  That's marked
17  as Exhibit 2.
18          And, Doctor, it looks as if in
19  your work on the Xarelto matter to date you
20  have, as of September 2016, earned $39,750;
21  is that right?
22    A.    That's what I've billed for
23  this case as of the end of September 2016.
24    Q.    And since September 2016, have
25  you billed additional time -- or have you

1  worked additional hours?
2     A.    I've worked additional hours.
3  I've not yet billed additional time.
4     Q.    And how many additional hours
5  have you worked?
6     A.    I would have to look back and
7  see for specific numbers, but I would
8  estimate that it would be on the five- to
9  ten-hour range.
10    Q.    And did you -- did you spend
11  any time recently, like yesterday, preparing
12  for today's deposition?
13    A.    The five- to ten-hour range
14  would be something that I would have included
15  up until today.
16    Q.    Okay.  So and you charge $500
17  per hour?
18    A.    That's correct.
19    Q.    So my math is not very good.
20  So it's safe to assume that you've made
21  between an additional 2,500 and $5,000
22  since you billed this invoice?
23    A.    I've billed for that, yes.
24    Q.    You have -- you haven't
25  billed --

1    A.    I have not billed for that
2  component, yes.
3    Q.    But you intend to?
4    A.    That's right.
5    Q.    Okay.  And you also intend to
6  bill for your time today?
7    A.    That's correct.
8    Q.    And is your rate for your time
9  today the same?
10    A.    It is.
11        (Cuculich Exhibit 3 marked for
12    identification.)
13  QUESTIONS BY MS. DU PONT:
14    Q.    Okay.  I'm going to mark as
15  Exhibit 3 your expert report in this matter.
16        I think you have a copy, but
17  maybe if you could swap in the one that has
18  the exhibit tab, that would help me.
19        MR. MCWILLIAMS:  Julie, do you
20  have a clean copy -- thank you.
21  QUESTIONS BY MS. DU PONT:
22    Q.    And I just want to turn to
23  Exhibit C, which is, I think, the third to
24  the last page of the document.
25        And this is the disclosure of

1  your expert testimony that you've previously
2  provided?
3    A.    That's correct.
4    Q.    Can you tell me about the
5  arrhythmia case that you provided an expert
6  opinion in?
7    A.    Sure.
8        So in Appendix C, this is the
9  expert testimony over the course of the last
10  five years.  And I think you'll see four
11  cases that I've been involved in:  Two of
12  them have been on the defense side; two of
13  them have been on the plaintiff side.
14        I think you're asking
15  specifically about the first one; though, in
16  truth, all four of these have an arrhythmia
17  component to them.
18        Okay?
19    Q.    Okay.
20    A.    Were you asking me specifically
21  about the very first one?
22    Q.    Yeah, just tell me -- tell me
23  what you were -- what opinion were you
24  retained to offer in the arrhythmia case --
25    A.    Sure.

1    Q.    -- Hosseini versus Aquatic
2  Enterprises.
3    A.    Sure.
4        And I'll wait for her to
5  complete.
6        So in the Amrollah case, the
7  first one on this list, I was retained as an
8  expert to assess the cause and duration of
9  somebody's atrial fibrillation.
10        Should I continue through all
11  of them for you?
12    Q.    Yes, why don't you just go
13  ahead and do that.
14    A.    The second case was a case
15  where I was asked to weigh in with regards to
16  cause of death, mechanisms of death and
17  reasons for arrhythmias in that case.
18        The third bullet point, that
19  was one for defense -- and let me take a step
20  back.  Both of those other two, as I
21  mentioned, were in the defense side of
22  things.
23    Q.    Can I ask for both of those,
24  how did those resolve?
25        Was it settled before trial, or

1  what happened?
2    A.    Fair point.  I tried to write
3  them down on here.
4        So the first one was settled in
5  June of 2015, so that's on this document.
6        The second one was settled in
7  10 of 2015 as well.
8    Q.    And then tell me about the two
9  cases where you were an expert on behalf of
10  the plaintiff.
11    A.    Sure.
12        The third bullet point here,
13  the first case that I wrote for the expert,
14  is -- on the plaintiff side was specifically
15  about a complication that occurred in the
16  setting of treatment for atrial fibrillation
17  that had to do with bleeding risks and the
18  use of blood thinners.
19    Q.    What was the complication?
20    A.    It was bleeding trouble in the
21  abdomen after a procedure for an atrial
22  fibrillation.
23    Q.    And what was the allegation
24  against the Comprehensive Breast Center?
25    A.    The allegation from the

1  Dylewski family was that the treatment of the
2  bleeding and the treatment of the abdominal
3  complication was inadequate and caused
4  suffering and death.
5      Q.    And that case settled in July
6  of 2016?
7      A.    That's correct.
8      Q.    And the final case, Moore
9  versus Kaminski, tell me about that case.
10     A.    That was a case here in
11 St. Louis, a very sad case of -- I was
12 asked -- I was retained as an expert witness
13 by the Moore family, and it was in regards to
14 mechanism of death in a -- in a TASER® case,
15 a police use of a TASER®, and it caused
16 sudden cardiac arrest in Mr. Moore.
17         That one had just -- it says
18 "open" here.  That one recently settled I
19 think a week ago or two weeks ago.  So I was
20 retained as an expert to understand the
21 arrhythmia mechanisms.
22     Q.    And were you offering an
23 opinion that the TASER® caused the sudden
24 death?
25     A.    Yes.

1      Q.    Beyond the cases that you've
2  listed here where you have testified, have
3  you been retained as an expert in other
4  cases?
5      A.    I've been involved in other
6  cases to ask -- in the very front ends of
7  cases, I've been asked by numerous lawyers to
8  assess the adequacy of a case.  And those, I
9  generally don't get involved with most of
10 those.  Those are usually an hour's worth of
11 time or so, and I don't get involved any
12 further with that.
13     Q.    Have you been retained to offer
14 an opinion in any other litigation against a
15 pharmaceutical company?
16     A.    I was retained to offer an
17 opinion in a case against the manufacturers
18 of Pradaxa.
19     Q.    Okay.  And did you submit a
20 final report in that matter?
21         MR. MCWILLIAMS:  Object to
22 form.
23         And I'm going to instruct the
24 witness not to answer as to what
25 exactly he did in that matter.  You

1  can get into bias or billing or
2  anything like that, if you'd like.
3         MS. DU PONT:  Can't I just ask
4  him if he submitted a report?
5         MR. MCWILLIAMS:  You can ask,
6  but I'll instruct him not to answer.
7         MS. DU PONT:  That doesn't have
8  anything to do with the substance of
9  the report.
10         MR. MCWILLIAMS:  It gets into
11 what he did as a consultant on that
12 matter.
13 QUESTIONS BY MS. DU PONT:
14     Q.    How much money did you earn in
15 the Pradaxa litigation?
16     A.    I honestly don't remember.
17     Q.    How many hours did you work on
18 the Pradaxa litigation?
19     A.    If I had to guess, it would be
20 somewhere in the range of this.  Similar sort
21 of 80 hours' worth of time, but I don't have
22 any of those records anymore.
23     Q.    So your estimate is that you
24 worked approximately 80 hours on the Pradaxa
25 litigation, which would equate to over

1  $40,000?
2      A.    Again, I don't know what the
3  money that I charged for that was.  My work
4  in that was somewhere in the range of 50 to
5  100 hours, I would suspect.
6      Q.    Did you keep your billing
7  records?
8      A.    I didn't.  I destroyed all of
9  the records.
10     Q.    Is it reflected on your tax
11 returns?
12     A.    I don't know.  I don't know.
13     Q.    Shouldn't it be if you earned
14 that money?
15     A.    I would think so, but I don't
16 know the answer to your question.
17     Q.    Were you retained by the same
18 lawyers who are representing you today in the
19 Pradaxa litigation?
20     A.    One of those lawyers.
21     Q.    Who is that lawyer?
22     A.    Ms. Kraft.
23     Q.    Have you been retained by
24 Ms. Kraft in any other pharmaceutical
25 litigations?

Page 22

1   A.   I don't know the answer to that
2  question.  I have been retained in other
3  cases, but I don't know if it's specifically
4  from Ms. Kraft.  I've worked with her in
5  other cases, but I don't know if that -- I
6  don't know the answer to that question.
7   Q.   So what other cases have you
8  worked with Ms. Kraft on?
9   A.   I've worked with her on a case
10 with regards to the use of testosterone in
11 terms of blood clots and heart rhythm
12 troubles.
13  Q.   And what was your opinion that
14 you offered in that case?
15  A.   It's not formed yet.
16  Q.   Want to take a break for a
17 second?
18  A.   No.  Thank you.
19  Q.   It's not formed yet?
20  A.   I'm still working on forming
21 the opinions for that case.
22  Q.   Did you submit a report in that
23 case?
24  A.   Not yet.
25  Q.   Okay.  What are the opinions

Page 23

1  that you've -- what are your preliminary
2  opinions in that matter?
3   MR. MCWILLIAMS:  Object to
4   form, and I'm going to instruct the
5   witness not to answer.  I think that's
6   privileged.
7  QUESTIONS BY MS. DU PONT:
8   Q.   So sitting here today, you're
9  telling me that you've not submitted a report
10 in the testosterone replacement therapy
11 litigation?
12  A.   I'd have to go look back to see
13 where we stand in terms of the generation of
14 that.  But as my lawyer has not instructed me
15 to answer the depth to which I've come to the
16 conclusions for that case.
17  Q.   How much -- how many hours have
18 you spent working on the testosterone
19 replacement litigation?
20  A.   That, I don't know, and I have
21 not submitted any bills for the invoices for
22 that.
23  Q.   Can you give me a ballpark
24 figure?
25  A.   I cannot.  I have not looked at

Page 24

1  the invoices for that.  I've not submitted an
2  invoice for that.
3   Q.   Other than the testosterone
4  replacement therapy litigation and the
5  Pradaxa litigation and this litigation, have
6  you offered opinions against any other
7  pharmaceutical companies in pharmaceutical
8  litigation?
9   A.   Yes.  I've been retained to
10 offer opinions with regards to I think it's
11 Yaz, Yasmin, are the two names for it.  It's
12 an oral contraceptive.  And my opinions with
13 regards to that were -- had to do with the
14 role of blood clots and the cause of sudden
15 cardiac arrest or strokes or heart attacks in
16 that case.
17  Q.   And did you submit a report in
18 that case?
19  A.   Yes, I did submit a report in
20 that case.
21  Q.   Do you know what jurisdiction
22 it was in?
23  A.   I don't.
24  Q.   Was it in Missouri?
25  A.   I think so, but I don't know.

Page 25

1   Q.   Was it on behalf of the
2  plaintiff?
3   A.   It was on behalf of the
4  plaintiff, yes.
5   Q.   And how many hours did you work
6  on the Yaz, Yasmin litigation?
7   A.   Again, I would have to look
8  back.  I don't know if I still have those
9  records.  I would guess that it would be in
10 the 40 to 60 range or 40 to 80 range, but I
11 don't know for sure.
12  Q.   So your estimate would be that
13 you made an additional $40,000 in the Yaz,
14 Yasmin litigation testifying on behalf of
15 Bayer -- testifying against Bayer, correct?
16  A.   That's probably a good ballpark
17 estimate.
18   As you know, these cases take
19 time, and these cases take effort to try to
20 get through all of the data and give opinions
21 that are clear and balanced, and so I do my
22 best to try to make sure we get through all
23 of those things carefully.
24  Q.   Would you agree with me,
25 Doctor, that you've made approximately

7 (Pages 22 to 25)

1    $150,000 testifying against pharmaceutical
2    companies in litigation?
3            MR. MCWILLIAMS:  Object to
4    form.  Misstates evidence.
5            I didn't hear him say he
6    testified against Pradaxa.
7    QUESTIONS BY MS. DU PONT:
8        Q.    Is it safe to say -- would you
9    agree with me, Doctor, that you've made
10   approximately $150,000 serving as an expert
11   against pharmaceutical companies in
12   litigation?
13       A.    I think that's an approximate
14   estimation that's accurate.
15       Q.    Is it higher than that?
16       A.    I don't think so.  I think it's
17   likely lower.
18       Q.    Since your disclosure, have you
19   testified in any other cases?
20       A.    I have not.
21       Q.    What did you do to prepare for
22   your deposition today?
23       A.    Quite a bit, and it's outlined
24   in the Exhibit 2 and beyond that.  So I think
25   preparation for this in creating the expert

1    report goes back to the beginning of 2016 and
2    late 2015, as outlined there.
3            So in preparation of this
4    report, we go through a number of documents
5    and those sorts of things.
6            Do you want me to outline every
7    specific --
8        Q.    Let me stop you there because I
9    probably didn't ask my question well enough.
10           What have you done since
11   submitting your report to prepare for your
12   deposition today?
13       A.    Fair.
14           So I have reviewed
15   additional -- these documents that I have
16   shown here.  In particular, some of the
17   important literature that I cite in my expert
18   report --
19       Q.    And let me just be clear on the
20   record.  When you say you've "reviewed
21   documents," you're referring to your --
22   whatever is cited within the context of your
23   report as well as your appendix -- I believe
24   it's Appendix A?
25       A.    That's correct.  So I've had a

1    chance to go through Appendix A, some of the
2    documents from Appendix A, in preparation for
3    this report.
4            Let me make sure that's the
5    correct number.
6        Q.    And did you do that on your own
7    or --
8        A.    Oh, no, I did that on my own.
9            Additionally, I went back and
10   looked closer at the primary data,
11   particularly for the graphs and charts that I
12   provided here, because I think it's important
13   to be able to understand those in our
14   conversation today.
15       Q.    Okay.
16       A.    Additionally, if I may, I've
17   had one additional piece of information
18   that's not on my Appendix A that I've had a
19   chance to review in the last few days, and
20   that was the deposition taken by a
21   hematologist from Tulane University.  And I'm
22   going to ask you to help me with her name
23   again.
24       Q.    Bessinger.
25       A.    Thank you.

1            I've had a chance to review her
2    deposition report, preliminary deposition
3    report, and that's not on the materials
4    considered.
5        Q.    Is there anything else that's
6    not on your list that you reviewed?
7        A.    There may be others, but this
8    was -- this was what I used to make my
9    opinion.
10       Q.    Okay.  And did you meet with
11   counsel before the deposition today?
12       A.    I did.
13       Q.    How many times?
14       A.    I met them this morning about
15   30 minutes before this started.
16       Q.    And did you meet, you know,
17   sometime in recent -- sorry.
18       A.    I did.  I met two days ago -- I
19   was trying to complete that sentence.  I met
20   two days ago with them over the course of a
21   morning as well.
22       Q.    For how many hours?
23       A.    I think it was two hours.
24       Q.    And what documents did you
25   review at that session?

1    A.    Similar documents to what's
2  already been disclosed here for purposes of
3  generating my report.
4    Q.    Are there particular documents
5  that you reviewed that are on your list?
6    A.    Like I said, particularly went
7  through the report.  We went through the
8  primary data for the graphs and charts of my
9  report.  Those were the particulars that we
10 reviewed.
11   Q.    And what methodology did you
12 use to prepare your report?
13   A.    So it's the same methodology
14 that I would use when I treat my patients or
15 when I look at scientific questions.
16        When we take care of patients,
17 we use -- we have a rigorous sort of way that
18 we go about trying to understand their
19 questions, their problems, and get solutions
20 to their illnesses.
21        We take detailed histories.  We
22 try to gather as much information from the
23 primary source as possible.
24        We generate hypotheses.  We
25 think about what are the differential

1  diagnoses for what the problem could be.
2        We look to see if there's any
3  additional testing that could be done,
4  whether that's additional questions you could
5  answer or additional tests that could be
6  performed to try to get to the answer, and we
7  test the hypotheses and the different --
8  differential diseases that could be there.
9        So you look at each of those
10 diseases, you look at the totality of the
11 evidence that's available, and you weigh
12 whether those diseases are likely or not
13 likely and which one is most likely for
14 patients.
15        And then we have, you know,
16 conversations with patients about the -- if
17 any additional tests are needed or any
18 additional treatments are offered.
19        That's sort of the way that we
20 would go about a methodology of a clinical
21 side.  And I think it's valuable here because
22 most of my interaction with Xarelto is on a
23 clinical basis, with patients in my clinic,
24 but --
25   Q.    Did you --

1    A.    May I just finish?
2        On the other side of this, from
3  a researcher standpoint, which is what I do
4  about half of my time, in digging deeper into
5  questions that are more research-based and
6  not necessarily clinically-based, from a
7  research standpoint it's similar but
8  different in terms of the way that you answer
9  questions.  You ask your question on the
10 front end, you look at all the data that's
11 available, the quality of the data, the
12 biases of the data, the data on both sides of
13 the -- of sort of the question that you ask,
14 and then you weigh the overall totality of
15 the evidence and see which way your answer
16 falls.
17        So it's -- in some ways they're
18 similar from a clinical and from a research
19 standpoint, but in some ways they are
20 distinctly different.
21   Q.    When you say you "look at the
22 totality of the evidence," in preparing your
23 report today, did you do a literature search
24 to review what the totality of the evidence
25 says about atrial fibrillation and Xarelto --

1  or sorry, Xarelto and its treatment in atrial
2  fibrillation?
3    A.    So if I rephrase your question,
4  you asked me if I did a thorough search about
5  the relationship between Xarelto and atrial
6  fibrillation.
7    Q.    Yes.
8    A.    Is that a fair assessment?
9        Okay.  Yes.  And the answer is
10 yes.  And that's something that I've been
11 doing for quite some time.
12        When Xarelto was approved in
13 late 2011, it was a very popular topic and a
14 very popular drug among my patients.  I see a
15 lot of patients with atrial fibrillation.
16 It's -- I take a lot of my time to counsel my
17 patients about that.  So ever since late
18 2011, I've been fairly deep into the
19 understanding of the literature about this.
20   Q.    So how did you go about picking
21 which ones you considered, which pieces of
22 evidence you considered, and which ones you
23 rejected?
24   A.    Oh, I think we try to get all
25 the information that you can.  For me that

1 was -- you know, largely I spent a lot of
2 time on the clinical trials, particularly
3 randomized clinical trials, that kind of help
4 us understand that. But sometimes you have
5 to look at other types of data.
6 And in Xarelto's case, you try
7 to dig deeper into how that drug affects
8 different people in different ways. That has
9 some very direct clinical applicability that
10 I think we'll get into later.
11 But in addition to the primary
12 data that's available, you know, I rely upon
13 things like the product labeling from the FDA
14 to give us a nice, clear way of thinking
15 about this and a nice, clear way for me to
16 talk about things with my patients.
17 And we also rely upon the
18 information from the manufacturing company
19 and the marketers that help me understand
20 this drug and understand how it's best used.
21 Q. Now, we've marked as Exhibit 3
22 your expert report.
23 Do you have any corrections or
24 changes to your report at this time?
25 A. Not at this point.

1 Q. Do you agree with everything
2 that's stated in your report?
3 MR. MCWILLIAMS: Object to
4 form.
5 THE WITNESS: Sure. I would
6 agree with everything that I've stated
7 so far, though I would retain the
8 possibility of changing these opinions
9 if other additional information were
10 to come up.
11 QUESTIONS BY MS. DU PONT:
12 Q. Understood. Understood.
13 So let me turn to your CV,
14 which I think is Exhibit B.
15 Now, this CV obviously
16 summarizes your medical training and your
17 experience, correct?
18 A. It is a snapshot of my medical
19 training, and my clinical experience goes
20 beyond what's just even available on the CV.
21 Q. Understood.
22 And you're a cardiologist,
23 correct?
24 A. Yes.
25 Q. And an electrophysiologist?

1 A. That's correct.
2 Q. And what is your current
3 position?
4 A. So I'm an associate professor
5 of medicine at Washington University School
6 of Medicine.
7 Q. And are there administrative
8 roles that come with that job?
9 A. I'm fortunate enough not to
10 have very many administrative roles.
11 Q. Okay.
12 A. My roles there are largely
13 based on clinical care, research and
14 investigation and teaching.
15 Q. Okay. So there's three
16 aspects, you would say, of your job?
17 A. Yes.
18 Q. Clinical, research and
19 teaching.
20 What percentage of your time do
21 you spend researching?
22 A. So roughly half of my time is
23 considered researching, roughly 40 percent of
24 my time is considered clinical, and an
25 additional 10 percent may be considered in

1 teaching.
2 Q. So you're spending 40 percent
3 of your time actually treating patients,
4 correct?
5 A. Yeah, if I could -- it's
6 roughly in that -- in these ranges, yes.
7 Q. And when --
8 A. If I may just continue that
9 thought.
10 Q. Yes.
11 A. As I outline in here, because
12 people will oftentimes ask, "How do you see
13 the patients, and in what capacity do you see
14 them?"
15 So I see patients both
16 inpatient in the hospital, outpatient in the
17 clinic, and I do procedures on patients as
18 well in the hospital.
19 Q. Understood.
20 Okay. But let me just ask you
21 about your teaching work.
22 A. Yes.
23 Q. Do you actually teach classes?
24 A. So there are times when I teach
25 classes. There are times that I -- and

1  that's usually to medical students or
2  residents.
3      Q.   Are you currently teaching a
4  class?
5      A.   No. I'm currently having a
6  conversation with you.
7      Q.   No, but I mean, are you
8  teaching a class this semester?
9      A.   No, I'm not teaching a formal
10 course this semester to medical students,
11 though I did give a lecture just a week ago
12 as part of a course to residents and Ph.D.
13 students as well.
14      So I rarely -- I don't think
15 I've ever taught a formal semester-long
16 series of courses. I usually give lectures
17 within a series of semester-long courses, if
18 that makes sense.
19      Q.   That makes total sense.
20      A.   So I'll teach residents that
21 way and medical students that way.
22      I teach fellows, who are more
23 advanced in their training, oftentimes during
24 procedures and on the medical wards in the
25 intensive care unit and such.

1      Q.   Okay. Have you ever taught or
2  lectured on atrial fibrillation?
3      A.   Yes.
4      Q.   Explain that for me.
5      What have you taught?
6      A.   Fair.
7      So if I could just take a step
8  back. Atrial fibrillation is, as you know, a
9  very common disorder. It's the most common
10 heart rhythm problem. At least half of my
11 patients that I see have atrial fibrillation.
12 Approximately 90 percent of the procedures
13 that I do treat atrial fibrillation.
14      I have done research on atrial
15 fibrillation mechanisms and stroke risk
16 reductions. I do procedures that try to
17 treat atrial fibrillation and stroke risk
18 reduction. I talk with patients all the time
19 about managing their stroke risk with regards
20 to atrial fibrillation. It's the single most
21 common thing that I do.
22      And I'm diverting because you
23 asked me a very specific question, which was,
24 have I taught about atrial fibrillation, and
25 the answer is yes.

1      On Appendix B, starting on
2  page 5 are some of the invited lectureships
3  that I've done that date back a few years.
4  And it goes from page 5, 6 through 7. So on
5  those three pages -- I have not counted them,
6  but I would guess that at least half of these
7  conferences or lectures that I've given have
8  been with regards to atrial fibrillation.
9      Q.   Okay. Now, you are -- you
10 mentioned you do inpatient work and you do
11 outpatient work, correct?
12      A.   Yes.
13      Q.   And your inpatient work, you're
14 an attending at Barnes-Jewish Hospital in
15 St. Louis?
16      A.   Yes.
17      Q.   Any other hospitals that you're
18 an attending physician at?
19      A.   Not as an inpatient. I do go
20 down to Parkland Health Center in Farmington
21 to see outpatients there.
22      Q.   Okay. Of the 40 percent of
23 your time that you spend treating patients,
24 what percentage of the time are you treating
25 inpatients at Barnes-Jewish Hospital?

1      A.   Of the 40 percent?
2      A quarter of the 40 percent I
3  think would be a reasonable way to think
4  about that.
5      Q.   So 5 percent of your time.
6  10 percent of your time. Sorry. Math was
7  not my strong point.
8      And you -- with that 10 percent
9  of your time, you treat patients in the
10 cardiac intensive care unit; is that right?
11      A.   I do.
12      Q.   And you also spend time
13 treating inpatients for cardiac
14 electrophysiology; is that right?
15      A.   That's correct.
16      Q.   And in your work in those two
17 aspects, are you primarily doing procedures
18 to treat atrial fibrillation?
19      A.   The 10 percent of my time that
20 you speak of is seeing patients in the
21 hospital, talking to them, treating those
22 atrial fibrillation and stroke risk
23 reductions with medicines.
24      The other 30 percent of my time
25 would be the combination of seeing either

Page 42

1 outpatients and then doing procedures to
2 treat atrial fibrillation.
3     Q.    And that's at Parkland Health
4 Center?
5     A.    That's at Barnes-Jewish
6 Hospital.
7     Q.    So explain for me what you do
8 at Parkland Health Center then.  How is that
9 different?
10     A.    It's an outreach clinic.  I go
11 down to Parkland one time a month --
12     Q.    Okay.
13     A.    -- and I see patients in the
14 outpatient setting.  It's just easier for
15 patients to meet me there, especially if
16 they're from far away.
17     Q.    And what percentage of the
18 patients at Parkland are you treating for
19 atrial fibrillation?
20     A.    Probably the same.  About
21 50 percent of those patients are patients
22 with atrial fibrillation.
23     Q.    And are you treating their
24 atrial fibrillation by doing a surgical
25 intervention?

Page 43

1     A.    We can treat atrial
2 fibrillation in a number of ways.  Sometimes
3 it's with medicine; sometimes it's with
4 procedures.  There's different ways to
5 approach atrial fibrillation.  It's really
6 patient specific.
7     Q.    And I understand that.
8         I'm just trying to understand,
9 what percentage of the time are you doing a
10 surgical procedure versus just giving them a
11 medicine?
12     A.    I see.  When I'm down in
13 Parkland, if I can be very clear, it's just
14 on outpatient clinic.  There's no inpatient
15 work, and there's no procedures that are done
16 down there.
17     Q.    Okay.
18     A.    So I don't see patients in the
19 hospital there, and I don't do procedures
20 there.
21         Of the outpatients that I see
22 there, 50 percent of them have atrial
23 fibrillation, as we've said, approximately,
24 and treating them with medicines or
25 procedures are done -- are done.

Page 44

1     Q.    In an outpatient setting,
2 obviously?
3     A.    Yes.  If they needed medicines
4 or they needed procedures that would require
5 hospitalization, they're brought up to
6 Barnes-Jewish Hospital, and we would take
7 care of them there.
8     Q.    Got it.
9         I also notice that you're at
10 Washington University Center for
11 Cardiovascular Research?
12     A.    Yes.
13     Q.    That's a recent position?
14     A.    This is a conglomerate of
15 researchers in cardiology, vascular disease
16 and others who come together to share
17 research ideas.
18     Q.    And what are your roles there?
19     A.    I'm a member of this
20 conglomerate.
21     Q.    Understood.
22         Okay.  If you could turn to
23 page 8 and 9 of your CV, this lists your
24 research interests or research in the past
25 five years; is that right?

Page 45

1     A.    Yes.
2     Q.    And it looks like your focus
3 has primarily been on ablation; is that
4 correct?
5     A.    I disagree.  It's on treatment
6 of arrhythmias.  My research involves a number
7 of different ways of diagnosing arrhythmias,
8 of treating arrhythmias, of trying to do the
9 treatments in a safer way, in a more
10 patient-tailored way and in a better way.
11     Q.    Your research hasn't focused,
12 though, on anticoagulation as a treatment for
13 AF-related stroke, correct?
14     A.    That's correct.
15     Q.    And you've never conducted any
16 research on anticoagulants, correct?
17     A.    That's correct.
18     Q.    Never conducted any research on
19 warfarin, correct?
20     A.    That's correct.
21     Q.    You've never conducted any
22 research on Xarelto, correct?
23     A.    That's correct.
24     Q.    And your research does not
25 focus on the real world experience of the

Page 46

1    direct oral anticoagulants, correct?
2        A.    That's correct.
3        Q.    And you've never participated
4    in a large clinical trial, a noninferiority
5    trial, correct?
6        A.    No, that's incorrect.  Some of
7    these trials that are listed here are large
8    trials.  And in particular, if I took you to,
9    you know, page 9 or so, there are a number of
10   trials there that I was a part of that are
11   large clinical trials, multiple sites,
12   looking at both inferiority and
13   noninferiority.
14       And if I could point to three
15   in particular, that would be the Echo-CRT
16   trial, the INOVATE-HF trial and the Tilt and
17   Tuned trial, which were all in many ways very
18   similar to the trials like ROCKET-AF, which I
19   quote in my document, where it's large groups
20   of patients, it's understanding the
21   statistics behind looking at superiority,
22   noninferiority and such.
23       If I could point to the very
24   first trial of this list, which is the ENCORE
25   trial, this is one that I'm the principal

Page 47

1    investigator for, and this is a trial where
2    we've had to build this really from the
3    ground up.  It's a brand new way of
4    noninvasively treating arrhythmias using
5    stereotactic beam radiation.  So we identify
6    where heart rhythm problems are, and then we
7    treat that almost like a cancer of the heart,
8    where we would zap it with radiation.
9        And in this trial where we've
10   had to build this really from the ground up,
11   there's a lot that goes into understanding
12   the background of how to set up trials, how
13   to set up the statistics for it, how to set
14   up the data safety monitoring boards, what
15   benchmark to make from a safety and efficacy
16   standpoint.
17       Q.    Okay.  You've authored articles
18   in the scientific literature, correct?
19       A.    Yes.
20       Q.    You've never written an article
21   or a book chapter about warfarin, correct?
22       A.    I disagree.  So in several of
23   the book chapters that I've written, and in
24   particular in the two books that I'm the
25   editor for, there are chapters dedicated to

Page 48

1    atrial fibrillation and, in particular,
2    stroke management, and they specifically go
3    through management of warfarin and now
4    anticoagulants.
5        And that would be on page 11,
6    the two textbooks, the Washington Manual of
7    Cardiology Subspecialty Consults.  It's very
8    extensive in those.
9        Q.    Which one on page 11?
10       A.    Page 11, textbook editor point
11   1, point 2, the Washington Manual of
12   Cardiology.
13       Q.    Okay.
14       A.    And if I could take you
15   further -- actually, I'll leave it there.
16       Q.    That's great.
17       You've never criticized Xarelto
18   in a peer-reviewed publication, correct?
19       A.    I've not.
20       Q.    And you discuss precision
21   medicine in your report?
22       A.    Yes.
23       Q.    None of your publications
24   address precision medicine verbatim, correct?
25       A.    Oh, I would disagree.

Page 49

1        Q.    Precision-made medicine?
2        A.    If you're asking me if the
3    words "precision medicine" have entered any
4    of my texts that I've published, I would say
5    no, because it's a relatively new term.
6        But the overall goal of my
7    research is very much driven towards
8    precision medicine, the idea that we should
9    not be treating patients as a population but
10   patients as people with unique, individual
11   ways that we manifest diseases, unique,
12   individual ways that we respond to
13   treatments, ways that really brings medicine
14   not just as a -- treat one size fits all but
15   treat each individual patient as their own
16   unique patient.
17       So much of the research that I
18   do, almost all of the publications that I
19   have, point towards ways that we can do that
20   for patients with arrhythmias.
21       Q.    What percentage of your atrial
22   fibrillation patients that you treat, either
23   in an outpatient or inpatient setting, are
24   candidates for ablation?
25       A.    I would have to estimate that

13 (Pages 46 to 49)

Page 50

1    to be about 25 to 50 percent of our patients
2    go forward with an AFib ablation, while 50 to
3    75 percent may choose either medicines or no
4    medicines based on the pattern of atrial
5    fibrillation they have and the symptoms that
6    they have.
7        Q.    And are you aware of any study
8    that proves that ablation saves more lives in
9    patients with atrial fibrillation?
10       A.    I would love to see that, but,
11   no, that's not the case right now.
12       Q.    Have you ever been an employee
13   of a pharmaceutical company?
14       A.    I've not.
15       Q.    Ever been a consultant to a
16   pharmaceutical company?
17       A.    No.
18       Q.    You've not been involved with
19   the manufacture, testing or marketing of
20   pharmaceutical products, correct?
21       A.    I've not.
22       Q.    And you're not an expert in any
23   of those subjects, correct?
24            MR. MCWILLIAMS:  Object to
25       form.

Page 51

1            THE WITNESS:  I disagree
2       that -- you know, I'm a prescriber of
3       medicines, and I'm the interpreter of
4       marketing messages and data that's
5       available for patients.  So when I sit
6       down with patients in clinic, they're
7       asking me for my professional opinion
8       and expert opinion with regards to the
9       medicines, how they are tested and
10      with what rigor those are tested.
11           So that comes up all the time
12      in clinic.
13   QUESTIONS BY MS. DU PONT:
14       Q.    You've not consulted for the
15   FDA regarding any of the direct oral
16   anticoagulants, correct?
17       A.    I have not.
18       Q.    You've never consulted -- been
19   consulted by the FDA about the direct oral
20   anticoagulants, correct?
21       A.    I've not.
22       Q.    And you aren't holding yourself
23   as an expert in FDA regulations, correct?
24            MR. MCWILLIAMS:  Object to
25       form.

Page 52

1            THE WITNESS:  While I'm not an
2       expert in FDA regulations, what the
3       FDA says and publishes and does has
4       very much of a direct impact on me.
5            FDA's approval, the ways that
6       they approve these drugs, in
7       particular oral anticoagulants, are
8       very much important to me and to the
9       patients that I take care of.
10   QUESTIONS BY MS. DU PONT:
11       Q.    But you're not an expert in FDA
12   regulations.  You can't sit here and cite to
13   me the code of federal regulations about
14   labeling, correct?
15            MR. MCWILLIAMS:  Object to
16       form.
17            THE WITNESS:  If citing that
18       code is what makes one an expert,
19       then, no.  I cannot cite you that
20       code.
21            But I would say that that
22       doesn't mean that I don't have
23       knowledge of what goes on from the
24       output of the FDA.
25

Page 53

1    QUESTIONS BY MS. DU PONT:
2        Q.    You've never worked for the
3    FDA, correct?
4            MS. KRAFT:  I don't think he
5       was finished.
6    QUESTIONS BY MS. DU PONT:
7        Q.    You can complete your answer.
8    I thought you were finished.
9        A.    Thank you.
10           What the FDA offers us as
11   prescribers in the guidance is very
12   important.  So what the FDA says and how they
13   say it is very important to me.
14       Q.    You're not a trained -- you're
15   not trained in pharmacology, correct?
16       A.    I've taken pharmacology
17   classes.  I talk with patients all the time
18   about the medicines --
19       Q.    Do you have a degree in
20   pharmacology?
21            MR. MCWILLIAMS:  You keep
22       cutting -- you keep cutting him off,
23       Julie.  I know it's not your intent,
24       but please let him try to finish.
25            MS. DU PONT:  Okay.

14 (Pages 50 to 53)

1      THE WITNESS: Right now there
2  are patients in the hospital that I'm
3  caring for who are in the hospital
4  specifically because they are starting
5  medicines, and I have to understand
6  the pharmacology of those medicines to
7  safely administer them.
8      So I deal with pharmacology
9  every day. I do not have a Ph.D. in
10  pharmacology, but the medicines that I
11  prescribe, the medicines that I offer
12  my patients, I have to know in and out
13  because they have safety profiles that
14  my patients require me to know.
15  QUESTIONS BY MS. DU PONT:
16      Q.   You're not board certified as a
17  nephrologist, correct?
18      A.   That's correct.
19      Q.   You're not board certified as a
20  hematologist, correct?
21      A.   That's correct.
22      Q.   You're not board certified as a
23  gastroenterologist; correct?
24      A.   That's correct.
25      Q.   You're not trained in

1  hepatology, correct?
2      MR. MCWILLIAMS: Object to
3  form.
4      THE WITNESS: So if I could --
5  I see where all of the questions are
6  going, if I may try to lump these
7  things together.
8      I take care of patients who
9  have kidneys and GI systems and livers
10  and blood, and I need to know about
11  all of these things. In medical
12  school we learn about these things.
13      I have not pursued individual
14  specialization in these fields, but I
15  know about liver and GI system and
16  blood and all of the things that you
17  are asking me.
18  QUESTIONS BY MS. DU PONT:
19      Q.   I understand that, and what I'm
20  just trying to get at is you're not a
21  specialist in hepatology, correct?
22      You've chose to specialize in
23  cardiology and electrophysiology, correct?
24      A.   I'm board certified in those
25  things. And I'm not board certified in

1  hepatology, but I have a lot of knowledge and
2  have to take care of patients who have those
3  diseases.
4      Q.   Fair.
5      Now, we've already talked a
6  little bit about atrial fibrillation,
7  correct?
8      A.   A little bit.
9      Q.   Yeah. So let's talk a little
10  more about it.
11      Atrial fibrillation is what is
12  known as an arrhythmia, right?
13      A.   Yes.
14      Q.   And as you state in your
15  report, it's the single-most common heart
16  rhythm disorder, correct?
17      A.   Yes.
18      Q.   And arrhythmia basically means
19  you have an irregular heartbeat, right?
20      A.   That's correct.
21      Q.   And --
22      A.   If I may, it's an abnormal
23  heartbeat. Irregular is usually what atrial
24  fibrillation is. It's irregular. But
25  arrhythmias could include fast heartbeats that

1  are regular, slow heartbeats that are
2  regular. It's a matter of semantics.
3      Q.   And what are the consequences
4  of atrial fibrillation for the patient?
5      A.   Sure.
6      The most important consequence
7  of atrial fibrillation is the increased risk
8  of a stroke. So when the heart goes in
9  atrial fibrillation, it's thought that there
10  is an increased risk of stroke relative to
11  blood clots forming. Some patients feel
12  their atrial fibrillation; others do not.
13      So our treatments, when we talk
14  to patients about atrial fibrillation, we
15  really talk about the stroke risk reduction
16  possibilities. We talk about whether we need
17  to do something about the atrial fibrillation
18  with regard to the speed of the heartbeat or
19  restoring regular rhythm.
20      And all of these decisions are
21  tailored to each of the individual patients,
22  their risks, their comorbid conditions and
23  other diseases that they have, because that
24  alters their risks for each of the different
25  either medicines or treatments that we might

1    offer.
2    Q.    And when you say that there's
3    "a risk of stroke with atrial fibrillation,"
4    would you agree with me that the risk of
5    stroke is four to five times higher in
6    someone with atrial fibrillation as compared
7    to someone that does not have atrial
8    fibrillation?
9    A.    That is an often-cited number,
10    yes, and I would agree with that.
11    Q.    And you state in your report as
12    well that 33.5 million people worldwide are
13    affected by atrial fibrillation?
14    A.    That's an estimation that's
15    been published, yes.
16    Q.    And in the United States alone,
17    there's about 4 million people with atrial
18    fibrillation?
19    A.    I think that's a rough number
20    estimate that's widely published, yes.
21    Q.    And the prevalence of AF
22    increases the older you get, correct?
23    A.    That is correct.
24    Q.    So because the US population is
25    getting older each year, that means the

1    number of people with atrial fibrillation is
2    increasing each year in the US, correct?
3    A.    Some semantics in what you
4    said, but I would generally agree, yes. We
5    all age one year as one year goes by --
6    Q.    Yes.
7    A.    -- but the average age of the
8    population --
9    Q.    The average age of the
10    population --
11    A.    -- is increasing, and there is
12    increased risk of developing atrial
13    fibrillation as you age.
14    Q.    Now, you would agree with me
15    that a stroke is a serious event, correct?
16    A.    Yes.
17    Q.    It can cause brain damage,
18    right?
19    A.    Yes.
20    Q.    It can be permanent brain
21    damage?
22    A.    It can be, yes.
23    Q.    And would you agree that the
24    strokes that are caused by atrial
25    fibrillation are more severe than strokes

1    that are not caused by atrial fibrillation?
2    A.    I think all strokes have the
3    possibility of being devastating. I've seen
4    wide varieties of strokes; some that have had
5    full recovery, some that are more permanent.
6    It's generally thought that the
7    strokes related to atrial fibrillation are
8    more -- are more severe.
9    Q.    And are strokes caused by
10    atrial fibrillation a leading cause of death
11    and disability in the US?
12    A.    Yes.
13    Q.    Stroke kills almost 130,000
14    Americans each year, doesn't it?
15    A.    I'd have to review the -- I
16    look to the American Heart Association and
17    stroke guidelines that come out roughly every
18    year. And I don't know if that number is
19    accurate or up to date, but that sounds about
20    right.
21    Q.    And when doctors treat patients
22    with atrial fibrillation, they're trying to
23    avoid that stroke, correct?
24    When they treat patients with
25    anticoagulants or with ablation actually,

1    right?
2    MR. MCWILLIAMS: Object to
3    form.
4    QUESTIONS BY MS. DU PONT:
5    Q.    Let me withdraw the question.
6    A.    Yeah.
7    Q.    Let me withdraw it.
8    When doctors treat patients
9    with atrial fibrillation with an
10    anticoagulant, they're trying to avoid
11    stroke?
12    A.    They're trying to minimize the
13    risks of stroke that are associated with
14    AFib, yes, I would agree with that statement.
15    Q.    And when you are prescribing an
16    anticoagulant to a patient, you want to take
17    a look at their individual risk of stroke,
18    correct?
19    A.    Yes.
20    Q.    And the -- I think you state in
21    your report that the scoring system that you
22    use is the CHA2DS2-VASc scoring system?
23    A.    That's correct.
24    Q.    Okay. Doctor, you just
25    referred to the American Heart Association

Page 62

1  guidelines that you say get revised every
2  other year or so, right?
3      A.   Yes, I referred to --
4  "guidelines" isn't the right word.  It's
5  stroke statistics.
6      Q.   Oh, then I'm talking about
7  something else.  Let me just mark what I'm...
8      A.   Okay.
9          (Cuculich Exhibit 4 marked for
10         identification.)
11  QUESTIONS BY MS. DU PONT:
12     Q.   I'm going to mark for the
13  record the 2014 American Heart Association,
14  American College of Cardiology and the Heart
15  Rhythm Society Guideline for the Management
16  of Patients with Atrial Fibrillation.  That's
17  Exhibit 4.
18         Are you familiar with these
19  guidelines, Doctor?
20     A.   I am familiar with these
21  guidelines.
22     Q.   And you're a member of the
23  American College of Cardiology, correct?
24     A.   Yes.
25     Q.   And you're also a member of the

Page 63

1  Heart Rhythm Society; correct?
2      A.   That's correct.
3      Q.   And do you follow these
4  guidelines in your practice?
5          MR. MCWILLIAMS:  Object to
6  form.
7          THE WITNESS:  Sure.  These
8  guidelines provide ways that we care
9  for our patients that are considered
10  to be reasonable, though they are just
11  guidelines.  They aren't meant to tell
12  you how to manage every single
13  patient.
14         Oftentimes we bump into
15  clinical situations where patients
16  just don't seem to fit into
17  guidelines, and you have to use your
18  common sense and other things as well.
19         But this is a set of guidelines
20  that do help us in the management of
21  our patients.
22  QUESTIONS BY MS. DU PONT:
23     Q.   And this is the most current
24  guideline from these organizations, correct?
25     A.   There are updates that actually

Page 64

1  come about periodically, and I'd have to look
2  to see if there are sections of this that may
3  be updated since 2014.
4      Q.   But this complete guideline is
5  the most current, correct?
6          MR. MCWILLIAMS:  Object to
7  form.
8          THE WITNESS:  I would largely
9  agree that this is -- in total this is
10  a reasonable guideline to have a
11  discussion about atrial fibrillation.
12         As I point out, there are
13  sometimes new pieces of information
14  that come about, and they may update
15  sections of this.
16  QUESTIONS BY MS. DU PONT:
17     Q.   Understood.
18         So we were just talking about
19  the CHA2DS2-VASc 2 scoring system, and if you
20  could turn to page E17, you'll see that that
21  table has both the CHADS2 scoring system and
22  the CHA2DS2-VASc scoring system listed in it.
23         Do you see that?
24     A.   I see that.  That's Table 7.
25     Q.   And do you follow the

Page 65

1  CHADS2 score at all in your practice?
2      A.   I do.
3      Q.   Some doctors I've talked to
4  have said they use both scores sometimes?
5      A.   That's a fair way to think
6  about it.
7      Q.   But let's focus on the
8  CHA2DS2-VASc score, because that's which one
9  you refer to in your report.
10         Would you agree with me that
11  the higher the score, the higher the risk of
12  stroke?
13     A.   The higher the risk of atrial
14  fibrillation-related stroke?
15         Yes, in general that's the
16  direction, though if we really want to get
17  into the specifics of it, there are times
18  when the score at 8 might be a little less
19  than the score at 7, but both of those scores
20  suggest very high risks.
21     Q.   And you would want to prescribe
22  an anticoagulant to a patient with those high
23  scores, correct?
24     A.   That would be the
25  recommendation here, and that's what I would

17 (Pages 62 to 65)

1  generally offer to my patients.
2      Q.   So if we just look at this
3  scoring system, if there's a patient that has
4  atrial fibrillation and has, for example,
5  congestive heart failure, hypertension, age
6  65 to 74 and diabetes, they would have a risk
7  of stroke of -- or a CHA2DS2-VASc score of 4,
8  correct?
9      A.   Yes.
10     Q.   And that would translate into a
11 risk of 4 percent stroke rate per year,
12 correct?
13     A.   If we had the crystal ball, we
14 would know for sure.  But based on large
15 populations with similar scores, it's roughly
16 a 4 percent yearly chance of a stroke.
17     Q.   Now, that's true if you were a
18 male.
19         Now, if you were a female and
20 you had those same characteristics, your
21 CHA2DS2-VASc score would actually be 5,
22 correct?
23     A.   The CHA2DS2-VASc score would be
24 a 5.  There is some debate in the field with
25 regards to the gender point in the

1  CHA2DS2-VASc.  But, yes, your CHA2DS2-VASc
2  score would be 5.
3      Q.   And that would translate to a
4  risk of stroke of 6.7 percent per year based
5  on the population statistics, correct?
6      A.   That's correct.
7      Q.   Now, would you agree with me --
8  and you can turn to page E16, and I'm just
9  going to refer you to number 5.
10     A.   You'll have to be a little more
11 specific.  So this is a list of Class I
12 indications, Ia, IIb.
13         Do you see the red titles on
14 this?
15     Q.   Yes.
16         So just -- so we are oriented
17 correctly, we're talking about the prevention
18 of thromboembolism, and it's the risk-based
19 antithrombotic therapy recommendations of the
20 ACC, AHA -- sorry, AHA and Heart Rhythm
21 Society, correct?
22         And their Class I
23 recommendation includes -- and now I'm going
24 to refer you to number 5 -- "For patients
25 with nonvalvular AF with prior stroke,

1  transient ischemic, TIA, or CHA2DS2-VASc
2  score of 2 or greater, oral anticoagulants
3  are recommended.  Options include warfarin,
4  dabigatran, rivaroxaban or apixaban,"
5  correct?
6      A.   That's correct.
7      Q.   So for patients with a
8  CHA2DS2-VASc score greater than 2, that's a
9  Class I recommendation from the American
10 Heart Association, the ACC and the Heart
11 Rhythm Society, correct?
12     A.   It's actually incorrect, but
13 it's 2 or more.  You said greater than 2.
14     Q.   Oh, 2 or more?
15     A.   2 or more is the way that it's
16 written here, yes.
17     Q.   My mistake.
18         But I just want to refer you to
19 page E4, where it talks about what a Class I
20 recommendation is.
21         Now, you'll see in the Table 1
22 that for a Class I recommendation, it means
23 the benefit outweighs the risk, correct?
24     A.   Correct.
25     Q.   And it says the procedure or

1  treatment should be performed, administered.
2          So this is a recommendation
3  that if you have a score of 2 or higher, you
4  should get an anticoagulant, correct?
5      A.   You should be offered that, and
6  you should have that discussion with your
7  doctor.
8      Q.   That's fair.
9      A.   I'll remind you that patients
10 still get to choose what they do for
11 themselves.  They still get to choose whether
12 they take a medicine or not.  They still get
13 to choose whether they want to be on this
14 medicine or they want to pay for this
15 medicine.
16         Doctors still get to choose
17 whether they want to offer these sorts of
18 medicines.  There are patients who fall
19 outside the guidelines, who we would not
20 throw away clinical judgment just because
21 this says that it should be performed or
22 should be administered.
23     Q.   But that's the recommendation
24 here, that it should be administered, taking
25 into account individual factors, correct?

1     A.   I would agree with that.

2     Q.   And that's the strongest

3  recommendation that you can get from the

4  American College of Cardiology, the American

5  Heart Association and the Heart Rhythm

6  Society, correct?

7     A.   Yes, that's correct.

8     Q.   And you'd agree that warfarin,

9  dabigatran, rivaroxaban and apixaban have all

10  received that Class I recommendation,

11  correct?

12        MR. MCWILLIAMS:  Object to

13     form.

14        THE WITNESS:  That's as you

15     read it in point 5 of the Class I

16     indications, recommendations, I would

17     agree with that, yes.

18  QUESTIONS BY MS. DU PONT:

19     Q.   Now, I just also want to -- do

20  you need to stop to get your beeper?

21     A.   One moment, please.

22        It would be good if I did.

23        MS. DU PONT:  Okay.  Let's just

24  take a break then.

25        THE WITNESS:  Thank you.

1        VIDEOGRAPHER:  We are going off

2     the record at 10:01 a.m.

3     (Off the record at 10:01 a.m.)

4        VIDEOGRAPHER:  We are back on

5     record at 10:11 a.m.

6  QUESTIONS BY MS. DU PONT:

7     Q.   Doctor, before we took a break,

8  we were talking about the 2014 guidelines

9  from the AHA, ACC and HRS, correct?

10     A.   Yes.

11     Q.   And I just want to direct you

12  back to those guidelines, to page E16 again.

13        And, Doctor, another Class I

14  guideline regarding recommendations for

15  risk-based antithrombotic therapy is

16  number 7, and I'll just read it for the

17  record.

18        "For patients with nonvalvular

19  atrial fibrillation, unable to maintain a

20  therapeutic INR level with warfarin, use of a

21  direct thrombin or factor Xa inhibitor,

22  parentheses, dabigatran, rivaroxaban or

23  apixaban, is recommended."

24        Do you see that?

25     A.   Yes.

1     Q.   And do you recommend that?

2        Do you agree with that

3  recommendation?

4     A.   I think that's a reasonable

5  recommendation.

6     Q.   And if you could just turn to

7  page E23, and this is a section entitled

8  "Considerations in Selecting Anticoagulants."

9        Do you see that on the

10  right-hand side?

11     A.   I do.

12     Q.   And the second full paragraph

13  in that section states, "All three new oral

14  anticoagulants represent important advances

15  over warfarin because they have more

16  predictable pharmacological profiles, fewer

17  drug-drug interactions, an absence of major

18  dietary effects and less risk of intracranial

19  bleeding than warfarin."

20        Do you see that?

21     A.   I see that.

22     Q.   And do you agree with that

23  recommendation from the American College of

24  Cardiology, the American Heart Association

25  and the Heart Rhythm Society?

1        MR. MCWILLIAMS:  Object to

2     form.  I don't think that's a

3     recommendation.

4  QUESTIONS BY MS. DU PONT:

5     Q.   That --

6        MR. MCWILLIAMS:  Statement.

7  QUESTIONS BY MS. DU PONT:

8     Q.   -- guideline.

9        MR. MCWILLIAMS:  Statement.

10     You're sticking with guideline?

11  QUESTIONS BY MS. DU PONT:

12     Q.   Statement, guideline --

13  statement.  Let's go with statement.

14        Do you agree with that

15  statement?

16     A.   I agree with components to that

17  statement.  I do think that anticoagulants

18  are important.  I think the new

19  anticoagulants are important.  I think

20  there -- I would agree with -- in general, I

21  think we have fewer drug-drug interactions,

22  though there clearly are drug-drug

23  interactions with several of the new

24  anticoagulants.  So it's not as if those are

25  absent.

1    I would disagree with the
2  absence of major dietary effects.  We do know
3  that eating or not eating very much affects
4  the bioavailability of drugs, including
5  several of the novel anticoagulants,
6  including Xarelto.
7    And, you know, the other
8  concerns about predictable pharmacologic
9  profiles, I think that that's a statement
10  that is said, but it's a statement that I
11  sure would like to have more data to support.
12    Warfarin has a great deal of
13  data with regards to its pharmacologic
14  profile, and those come from serial
15  examination of prothrombin and INR times,
16  weekly or monthly in patients, rigorously
17  studied in numerous large clinical trials.
18    We lack some of those
19  pharmacologic profiles for the patients with
20  many of the novel anticoagulants, including
21  Xarelto.
22    Q.   I just want to try to
23  understand what you just said because there
24  was a lot there.
25    You said that you disagree that

1  there's an absence of -- you disagree with --
2  let me withdraw the question.
3    You disagree with the American
4  Heart Association, the American College of
5  Cardiology and the Heart Rhythm Society when
6  they state, "There is an absence of major
7  dietary effects with the three new
8  anticoagulants"?
9    MR. MCWILLIAMS:  Object to
10  form.  Asked and answered.
11  QUESTIONS BY MS. DU PONT:
12    Q.   You can answer.
13    A.   So I don't know how many words
14  or sentences are in this document, but
15  chances are I will not agree with all of them
16  in the right ways, in the same ways.  I will
17  not think that that's consistent with what I
18  know about my clinical practice.  These
19  guidelines help point us in the right
20  direction.
21    You specifically asked me about
22  this sentence.  I think there are components
23  of this sentence that are not entirely
24  accurate, and I would generally disagree with
25  those components.

1    And if we take in particular
2  the absence of major dietary effects, I think
3  what the authors are saying there is there is
4  not a vitamin K interaction with the novel
5  anticoagulants -- and if we want to stay
6  specific, Xarelto -- like there is with
7  warfarin, and that's a major disadvantage of
8  warfarin.  It has to do with the vitamin K
9  intake and the dietary restrictions with
10  that.
11    But all of the other -- and if
12  we want to stay specific with Xarelto, there
13  is a dietary effect if you are eating or not
14  eating at the time of taking the medicine.
15  And that's a very fair statement, and I don't
16  think anybody would disagree with that
17  statement.  That's in the product labeling.
18  There's a recommendation to take it with
19  food, specifically for that reason.
20    Q.   But there's not a dietary
21  effect in terms of what you eat with the new
22  oral anticoagulants, correct?
23    A.   Oh, I would agree with that,
24  but when I see a dietary effect, that's
25  eating or not eating.  So I instruct my

1  patients to take their Xarelto, if they're
2  taking that medicine, with food, because we
3  understand that there are dietary differences
4  in bioavailability if you're taking it with
5  or without food.
6    Q.   And you said you also disagree
7  with the statement that the new oral
8  anticoagulants have more predictable
9  pharmacological profiles, correct?
10    A.   I would like to have more
11  evidence and more data from a day-to-day
12  standpoint on patients who are taking novel
13  anticoagulants.  And in particular, if we
14  want to stay with Xarelto -- and is it okay
15  if we just talk Xarelto versus warfarin on
16  this, or do we have to stay general?
17    Q.   I just want you to answer my
18  question.
19    A.   Yeah, no, I think -- fair.
20    Q.   Do you disagree with that or
21  agree with that?  That's what I want to know.
22    MR. MCWILLIAMS:  Object to
23  form.  Asked and answered.
24    THE WITNESS:  Let me sort of
25  repackage the question in a different

1    way.
2         The statement says that they
3    have more predictable pharmacologic
4    profiles, and I don't know that for
5    sure. That's the statement from this
6    writing committee who has had a chance
7    to look over things. That's their
8    opinions; that's their thoughts.
9         And I don't know if I have
10   enough data to support that and be on
11   board with that.
12   QUESTIONS BY MS. DU PONT:
13        Q.   Have you looked for that data?
14        A.   Sure.
15        Q.   What have you done to look for
16   it?
17        A.   I'm going to refer you to my
18   report. And if I point you to Figure 8,
19   Figure 9, on my report on page 17, Figure 10
20   on my report on page 18, these are some of
21   the, I think, very important data that
22   prescribers like me really need to see with
23   regards to predictable pharmacokinetics and
24   pharmacodynamics.
25        Q.   Okay. And that's fair --

1         A.   No, I'm not done, please.
2         So in particular, if I could
3    expand on Figure 10, for example, these are
4    plasma concentrations of patients who are
5    actually taking this medication, and at
6    different points in time: right after; at
7    one hour or shortly thereafter; at roughly
8    three hours; or further on over the course of
9    the day at 15 and 24 hours.
10        And if I look at the spread of
11   all of those patients, each one of those
12   individual patients, and the blood
13   concentration of this medication at those
14   different time points and the wide variation
15   among that, I can't look at that and say that
16   that's any more predictable than warfarin. I
17   don't have enough data to say that that's any
18   more predictable than warfarin.
19        Q.   That's fair. I just -- I'm
20   going to go back to my original question,
21   though.
22        Do you disagree with the
23   statement from the American College of
24   Cardiology, the American Heart Association
25   and the Heart Rhythm Society that the three

1    new oral anticoagulants have more predictable
2    pharmacological profiles?
3         MR. MCWILLIAMS: Object to
4    form. Asked and answered.
5         Do you want the court reporter
6    to read back his answer?
7         MS. DU PONT: No, I want him to
8    answer the question.
9         MR. COVEY: Probably not.
10        THE WITNESS: I feel like I've
11   answered this question several times.
12   QUESTIONS BY MS. DU PONT:
13        Q.   Yes or no?
14        MR. MCWILLIAMS: No, no, no,
15   no.
16        THE WITNESS: No, no, no, no,
17   no. I feel like I've answered this
18   question a number of times. We're
19   asking about this statement here --
20   QUESTIONS BY MS. DU PONT:
21        Q.   Do you disagree with it?
22        MR. MCWILLIAMS: Wait. Don't
23   interrupt. That's rude and
24   inappropriate --
25        MS. DU PONT: Then stop

1    coaching.
2         MR. MCWILLIAMS: I'm not
3    coaching. I'm talking to you. I'm
4    not talking to him. He knows he's
5    what doing.
6         You can't restrict him to a yes
7    or no answer, and you can't interrupt
8    his answer. You know the rules.
9    QUESTIONS BY MS. DU PONT:
10        Q.   Can you answer, please?
11        A.   Can you read back the question,
12   please? Or could you restate the question?
13        Q.   I'll just restate it one more
14   time.
15        "All three new oral
16   anticoagulants represent important advances
17   over warfarin because they have more
18   predictable pharmacological profiles."
19        And my question is: Do you
20   disagree with that statement from the ACC,
21   AHA and Heart Rhythm Society?
22        MR. MCWILLIAMS: Object to
23   form. Asked and answered.
24        THE WITNESS: And I have
25   answered this question, and I would

Page 82

1    say that I don't think that we have
2    enough information -- I don't have
3    enough information to support that
4    statement.
5    QUESTIONS BY MS. DU PONT:
6        Q.    So you don't have enough
7    information to agree with those
8    organizations, correct?
9             MR. MCWILLIAMS:  Object to
10            form.  Asked and answered.
11            THE WITNESS:  Again, we're
12            talking about this specific statement
13            on page E23, and you're asking me if I
14            agree with a component, a fragment, of
15            this.
16            And I've very clearly showed
17            that there are times that I disagree
18            with some of those statements, and
19            there's times that I can't support
20            those statements because we just don't
21            have that kind of information.
22    QUESTIONS BY MS. DU PONT:
23        Q.    That's fair.  Let's just move on.
24            I want to talk to you a little
25    bit about warfarin, and you talk about that

Page 83

1    in your report.
2             Would you agree with me that
3    prior to the 1950s there were no oral
4    medications that doctors could prescribe to
5    patients who had atrial fibrillation to
6    reduce their risk of stroke?
7        A.    I think that's fair.
8        Q.    So prior to 1954, patients had
9    no therapies and often had severe and
10    debilitating strokes because there was no
11    preventive method, correct?
12        A.    It's hard to know because I
13    wasn't alive in the 1950s and '40s and '30s,
14    so I don't really know what was going on as
15    far as atrial fibrillation management in the
16    '30s.
17            But I can say that there was no
18    oral anticoagulant that was FDA approved, as
19    you point out, until 1954, though the story
20    of warfarin dates back into the '20s and so.
21        Q.    Okay.  And in 1954, a
22    pharmaceutical company introduced warfarin,
23    correct?
24        A.    I believe so.
25        Q.    And warfarin was actually used

Page 84

1    as rat poison before it was used as a
2    medication for patients, correct?
3        A.    That's correct.
4        Q.    And it kills rodents by causing
5    them to hemorrhage, right?
6        A.    That's my understanding of it,
7    yes.
8        Q.    But scientists were able to
9    alter the dosing and formulation so it could
10    be used as a medication, in lay terms?
11        A.    I think it was more dosing than
12    alter the actual components of it.
13            The story of it dates back to
14    when there were a number of cows and bulls
15    that had died from bleeding complications,
16    and they tried to figure out what the cause
17    of those bleeding complications were.  And
18    that's how they harnessed this component that
19    blocks vitamin K, and that's how the warfarin
20    came about and was developed.
21            In 1954, as you point out, the
22    medication was introduced as a way to thin
23    the blood in an effort to try to prevent
24    thrombotic complications.
25        Q.    But warfarin can be toxic and

Page 85

1    difficult to manage, correct?
2        A.    Sure.
3        Q.    And for the next 50 years,
4    50-plus years, from 1954 until just in the
5    past decade, there were no alternatives to
6    warfarin, correct?
7        A.    Typically, that's correct.
8        Q.    And warfarin didn't have a
9    reversible agent when it was approved in
10    1954, did it?
11        A.    Again, I don't know when
12    reversal agents -- I was not alive in 1954.
13    But my guess would be no, but I don't know
14    that for sure.
15        Q.    And when warfarin was
16    introduced to the market in 1954, there was
17    no way to monitor warfarin, correct?
18        A.    I don't know that.
19        Q.    You have no reason to disagree
20    with that statement?
21        A.    I don't know when -- in what
22    recommendations in 1954 and '55, how medicine
23    was being done.  I was not alive then.
24        Q.    But you have no reason to sit
25    here today and say that there was a

22 (Pages 82 to 85)

1  monitoring available for warfarin in 1954 --
2       A.   I don't know that. I don't
3  think so, but I don't know that.
4       Q.   And you say in your report that
5  compliance with warfarin can be limited,
6  right?
7       A.   Compliance can be difficult?
8  "Limited" was the word that I used? I'm not
9  sure.
10      Q.   It's on page 6.
11      A.   Yeah, I'm not sure --
12  compliance is an issue when taking warfarin
13  or taking any medication, for that matter.
14      Q.   And what do you mean by
15  "compliance"?
16      A.   I mean patients acquiring the
17  medicine, remembering to take the medicine,
18  putting the medicine in their mouth,
19  swallowing the medicine. And then in the
20  case of warfarin, also following up for
21  periodic blood checks to make sure that the
22  effect of the medication was safe.
23      Q.   Now, warfarin has challenges,
24  right, as a medication?
25      A.   Sure, as do many medicines.

1  Warfarin has unique challenges.
2       Q.   And as you say, one of the most
3  obvious and common concerns with warfarin is
4  major or fatal bleeding, right?
5       A.   Sure. It's a medicine that
6  thins the blood, that alters our ability to
7  coagulate and form clots, and so the concern
8  then is bleeding.
9       Q.   And if a patient gets too much
10  warfarin, then they're going to have an
11  increased risk of bleeding, right?
12      A.   If they --
13      MR. MCWILLIAMS: Object to
14  form.
15      THE WITNESS: Yeah. Let's
16  be -- it's highly variable per
17  patient, right? So instead of saying
18  "too much warfarin," I would probably
19  change that statement to "if their
20  blood test suggests that their
21  bleeding risk is high as a consequence
22  of warfarin use, then their bleeding
23  risk is high."
24      And I say that because in some
25  patients it's only 1 milligram of

1  warfarin or 2 milligrams of warfarin
2  that may put them at high risk; in
3  others it may be 15, 20 milligrams
4  that might put them at high risk.
5       Is that fair?
6  QUESTIONS BY MS. DU PONT:
7       Q.   Yeah.
8       And what you're talking about
9  right now is the interindividual variability,
10  right?
11      A.   That's correct. I'm talking
12  about the ability that different medications
13  at different doses affect different people
14  differently.
15      Q.   So just to break it down a
16  little bit.
17      If two patients take the same
18  dose of warfarin, for one they might be
19  underanticoagulated, and for the other person
20  they may be overanticoagulated, correct?
21      A.   Correct.
22      Q.   So the same dose of warfarin
23  can have dramatically different effects in
24  different individuals, right?
25      MR. MCWILLIAMS: Object to

1  form.
2       THE WITNESS: It can have
3  different effects. I would probably
4  take the "dramatically" out of it.
5  QUESTIONS BY MS. DU PONT:
6       Q.   That's fair.
7       A.   But, yes, it's -- two
8  different -- the same dose in two different
9  people can have two different effects with
10  regards to the bleeding spectrum.
11      Q.   And the dose of warfarin needed
12  for each patient can depend on the patient's
13  underlying genetic makeup, right?
14      A.   That's one of the components to
15  it, yes.
16      Q.   Their age, right?
17      A.   You know, I will tell you that
18  if we had all of the -- all of the specific
19  components of how to properly dose this and
20  we knew all of those things ahead of time, we
21  probably wouldn't have any problems, or we'd
22  have very few problems with warfarin.
23      So there are things that seem
24  to make some people more sensitive to
25  warfarin or less sensitive to them, of which

1    you're asking some of the questions. The
2    genetic makeup of how they metabolize vitamin
3    K is one of them. And people are looking at
4    other sorts of things, including the
5    medicines that they're on, their age, their
6    kidney function, their liver abilities, those
7    sorts of things.
8        Q.    The other medical conditions
9    that they may have could impact what dose
10   they need, correct?
11       A.    It's possible, but it's not
12   very predictable.
13       Q.    And their diet could impact
14   what dose they get, correct? We talked about
15   this a little earlier.
16       A.    Correct.
17       Q.    So to determine a patient's
18   baseline dose on warfarin, you have to start
19   with a low dose, right?
20       A.    You start with a dose, and then
21   you monitor and see what the body's effect --
22   the patient's body's effect is to that dose.
23       Q.    So the doctor gives the first
24   dose, and then you test the blood, right?
25       A.    Correct. You give a dose

1    and -- you say low dose, but that's not
2    necessarily true. You give a dose that you
3    think, a priori, will get you to where you
4    want to be from a blood thinning standpoint.
5            With warfarin you have to wait
6    several days to assess the effect of blocking
7    the vitamin K pathways in order to see how
8    that affects the bleeding coagulation
9    cascade.
10           So we do give doses on a daily
11   basis, and we're checking blood thinner
12   levels or effects --
13       Q.    INR?
14       A.    INR, prothrombin and INR, which
15   is just a way to standardize that, and we're
16   adjusting the doses based on that.
17       Q.    And once you determine what the
18   appropriate dose is for an individual
19   patient, that can change for that patient if,
20   for example, they change their diet, right?
21       A.    It can change, that's correct.
22       Q.    Because as you mentioned,
23   warfarin is very sensitive to interaction
24   with foods, particularly green, leafy
25   vegetables, that contain vitamin K, right?

1        A.    Particularly the vitamin K
2    intake, yes. I would agree, yes.
3        Q.    So --
4        A.    If I can just expound upon
5    that.
6        Q.    Right.
7        A.    We generally -- when we give
8    out warfarin and we talk about taking
9    warfarin for patients, we generally tell them
10   to have consistent diets. Not necessarily
11   avoid salads and green, leafy foods, they
12   have nutritional value, but have a consistent
13   diet so that we can be consistent with our
14   dosing of warfarin and avoid the overshoots
15   and the undershoots that are associated with
16   it.
17       Q.    But if a patient has trouble
18   having a consistent diet, that can lead to
19   dose changes, correct?
20       A.    Sure. Changes in -- changes in
21   INRs will then trigger us to change the doses
22   that the patient is taking to minimize the
23   bleeding risk and maximize the benefit of the
24   drug.
25       Q.    Now, anytime a patient changes

1    their -- another medication and is on
2    warfarin, you have to test their blood again,
3    correct?
4        A.    Not all medicines, but there
5    are several that interact with warfarin that
6    would warrant closer monitoring if you were
7    to start and stop medicines. But not all
8    drugs.
9        Q.    But it can include even
10   over-the-counter medicines, correct?
11       A.    It's potentially possible. I
12   don't know the full list of medicines that
13   interact with warfarin. It's a longer list.
14   But there are medicines out there that don't
15   interact with warfarin or medicines that you
16   may take for a short time, those sorts of
17   things, that would not necessarily require us
18   to do repeat monitoring.
19       Q.    But when a patient is taking
20   warfarin and comes in to see you and they've
21   added a new medication to their list, you're
22   going to check and see if it interacts with
23   warfarin. And if it does, you're going to
24   check their blood again to see if you have to
25   change the dose, correct?

1    A.    I think that's a fair way to --
2  that we would approach most patients who take
3  warfarin.
4    Q.    One of the medications that
5  impacts patients on warfarin is amiodarone,
6  correct?
7    A.    Yes.
8    Q.    And that can interact with the
9  effects of warfarin, correct?
10    A.    Yes.
11    Q.    And that drug is also used --
12  prescribed to patients with atrial
13  fibrillation to control the rate of their
14  heart, correct?
15    A.    Almost.  To control the rhythm
16  of their heart more so than the rate but,
17  yes.  Amiodarone is used in the management of
18  patients with atrial fibrillation.  It's a
19  medicine that is fairly potent but also has a
20  large number of side effects.
21        Most electrophysiologists do
22  not choose that as a first-line treatment for
23  atrial fibrillation, but it is --
24    Q.    Does that include you?  Do you
25  not choose it as a first-line therapy?

1    A.    For most patients, again,
2  decisions are tailored towards the individual
3  risks, other comorbid conditions and such.
4        I have used amiodarone, but in
5  general, it's not a first-line therapy for
6  most patients with atrial fibrillation.
7    Q.    Now, there can also -- hold on
8  one second.
9        When you put patients on
10  warfarin, you need to test their blood
11  essentially every one to four weeks, correct?
12    A.    Again, need, I don't know.  I
13  think you should check the blood frequently,
14  especially when you are starting the
15  medication, to titrate the dose safely.
16    Q.    But you wouldn't want the
17  patient to go beyond four weeks in checking
18  their blood, correct?
19    A.    Our preference in our practice
20  is to try to check the blood levels roughly
21  every week as we are titrating the medicine,
22  until we are in a stable situation, and then
23  we can space those checks out more
24  frequently.
25        We generally like the four-week

1  rule, once-a-month testing, in people who
2  have stable dosing of the medication.
3    Q.    And that's what the labeling
4  for Coumadin recommends, or the labeling for
5  warfarin recommends, correct?
6    A.    I believe so, but I haven't had
7  a chance to review that recently.
8    Q.    When was the last time you
9  looked at the warfarin label?
10    A.    It's probably been several
11  years ago, quite honestly.
12    Q.    And then for patients with
13  atrial fibrillation, their warfarin dosing
14  needs to be adjusted up and down to keep them
15  within the range, right, of 2 to 3 of an INR?
16    A.    That's our goal for most
17  patients.  Again, that can be tailored to
18  individual needs, including presence of metal
19  metallic valve -- valve -- heart valves or
20  prior risks of bleeding.  So we may adjust
21  that goal.
22        But in our overall practice,
23  the goal -- and these guidelines that you
24  provided to me in Exhibit 4, the overall goal
25  that we aim for is an INR of 2 to 3.

1    Q.    But even if you're in that
2  range of 2 to 3, even if the control is
3  perfect, a patient can still have a stroke or
4  a hemorrhage on warfarin, correct?
5    A.    That's correct, the patients
6  can still have a stroke or hemorrhage on --
7  at any point.  This minimizes the risks
8  associated with hemorrhage, and it minimizes
9  the risks associated with stroke.
10        And I think a good sort of
11  graph for that -- and I know you've seen this
12  sort of chart before -- is on Figure 4 in
13  my -- on my statement.  And it shows why we
14  would choose this target INR range of 2 to 3
15  where we're trying to balance the risks and
16  the benefits of using this medicine.
17    Q.    Now, any patient who is on an
18  anticoagulant, any anticoagulant, can have a
19  bleed even if they are not
20  overanticoagulated, correct?
21    A.    Patients who are on
22  anticoagulants or not on anticoagulants can
23  have a bleed at any point.
24        In general, patients who are on
25  anticoagulation -- who are on any

1  anticoagulants would likely have a higher
2  risk of a bleed than those who are not. And
3  in general, the greater the effect of an
4  anticoagulant, the higher the risk of a
5  bleed. And that's, again, shown similarly
6  here on Figure 4.
7      Q.   But bleeding is an inherent
8  risk -- I think you just said this -- an
9  inherent risk of any anticoagulant therapy,
10  right?
11      A.   I would agree with that
12  statement.
13      Q.   And that's knowledge you
14  probably learned in medical school, correct?
15      A.   I think that's a fair
16  statement.
17      Q.   Would you agree that even very
18  carefully monitored patients on warfarin can
19  have a bleeding event?
20      A.   As I said, I think people can
21  have bleeding events not on warfarin, on
22  warfarin, in range on warfarin and not in
23  range on warfarin.
24          I think to answer your question
25  specifically, yes, patients who have an INR

1  of 2 to 3 can still have bleeding events.
2      Q.   And they can still have
3  strokes, too, correct?
4      A.   That's correct.
5      Q.   Now, we talked a little earlier
6  about how you're a doctor that practices
7  precision medicine, right?
8      A.   Correct.
9      Q.   And wouldn't you agree with me
10  as someone that practices precision medicine
11  that it's a good thing to have options
12  available to patients so that you can tailor
13  the treatment to the individual?
14      A.   I would agree with that
15  statement. I think it's good to have options
16  that are available to patients, provided that
17  they're all safe and effective.
18      Q.   And prior to 2010, the only
19  option available to patients in the US was
20  warfarin, right, for an anticoagulant?
21      A.   For oral anticoagulants. There
22  were other IV forms and subcutaneous forms,
23  but I think we should just stay on oral
24  anticoagulants that patients can take
25  routinely at home.

1          And, yes, prior to 2010,
2  warfarin was the only oral anticoagulant that
3  was available.
4      Q.   But beginning in 2010, several
5  new anticoagulant medications became
6  available, right?
7      A.   That's correct.
8      Q.   One of those was Xarelto,
9  right?
10      A.   That's correct.
11      Q.   And Xarelto was approved by the
12  FDA for treatment of patients with atrial
13  fibrillation in 2011; is that right?
14      A.   I believe it was November
15  of 2011, yes.
16      Q.   And the FDA, in approving
17  Xarelto, found that Xarelto was as effective
18  as warfarin in preventing strokes in patients
19  with nonvalvular atrial fibrillation,
20  correct?
21          MR. MCWILLIAMS: Object to
22  form.
23          THE WITNESS: I think -- again,
24  I think it was "noninferior to" as
25  opposed to "as good as," if you look

1  at the way that it was set up through
2  the ROCKET AFib study.
3  QUESTIONS BY MS. DU PONT:
4      Q.   No, that's fair.
5      A.   Yes. So it was approved
6  because it was not inferior to warfarin with
7  regards to stroke prevention in patients with
8  nonvalvular atrial fibrillation.
9      Q.   And Xarelto is still on the
10  market today?
11      A.   Correct.
12      Q.   And Xarelto has dosage
13  estimates, correct?
14      A.   Xarelto comes in different
15  doses. To say "dose adjustment" requires
16  that there's ways that we can monitor and
17  adjust those doses. So I would disagree with
18  that statement.
19          It comes in different
20  strengths. Can we say that?
21      Q.   That's fair. Let me just ask
22  my question a little differently because I
23  didn't phrase it correctly.
24          In patients who are taking
25  Xarelto that have a moderate renal

1  impairment, there's a lower dose available
2  for those patients; is that correct?
3      A.    That's correct.
4      Q.    And that's 15 milligrams?
5      A.    Again, if we're looking at
6  the --
7      Q.    Atrial fibrillation.
8      A.    -- AFib guidelines alone, yeah,
9  15 milligrams is what's recommended for
10  patients with impaired renal function.
11     Q.    In patients without renal
12  impairment, the dose is 20 milligrams once
13  daily, correct, in patients with atrial
14  fibrillation?
15     A.    Correct, with the evening meal.
16  That's important to put in too.
17     Q.    So patients that are taking
18  Xarelto, when they start therapy have to have
19  something called creatinine clearance
20  checked, right?
21     A.    Correct. In theory. We don't
22  check creatinine clearances. You can
23  calculate creatinine clearance off of a blood
24  test that assesses the serum creatinine in
25  your body and adjusts for gender, body mass,

1  these sorts of things as well.
2      Q.    So when you start a patient on
3  Xarelto, you look at the creatinine level,
4  and you do a calculation that factors in all
5  of those factors?
6      A.    That's correct, you get to the
7  calculated creatinine clearance to properly
8  dose the medication.
9      Q.    And then you will periodically
10  test that creatinine going forward in those
11  patients on Xarelto to make sure you don't
12  have to adjust the dose up or down, correct?
13     A.    Yeah, in our practice we try to
14  do that on a yearly basis.
15     Q.    Now, you state in your
16  report that Xarelto has been approved for
17  other indications, right?
18     A.    Correct.
19     Q.    You're not offering an opinion
20  about those other indications today, correct?
21     A.    I'm not.
22          MR. MCWILLIAMS: Object to
23  form.
24          THE WITNESS: Sorry.
25

1  QUESTIONS BY MS. DU PONT:
2      Q.    Doctor, do you prescribe
3  Xarelto in your practice?
4      A.    I have prescribed Xarelto in my
5  practice.
6      Q.    Are you currently prescribing
7  Xarelto?
8      A.    Occasionally. Most of the
9  time -- and I would kind of phrase it, there
10  are patients who come to me on blood
11  thinners, and then there are patients that I
12  start blood thinners on. In general,
13  patients who have come to me on blood
14  thinners, we have conversations about the
15  risks and what is available commercially.
16          Most of the time I don't change
17  those things unless there's some important
18  reason to do that.
19          So if a different cardiologist
20  has already started a medicine, that medicine
21  is already on the shelves of that patient, I
22  generally don't switch that unless there's
23  some pressing indication to do so.
24          If we looked at the patients
25  that I start medications on and have that

1  conversation, it's rare that I prescribe
2  Xarelto.
3      Q.    When was the last time you
4  wrote a prescription for Xarelto?
5      A.    Oh, I don't know. It's been
6  within this year, but I don't know the
7  specific date.
8          The main reason I would do
9  that, to prescribe Xarelto, would be in
10  conversations with patients, and we talk
11  about the different medicines that are
12  available. And oftentimes, I'll make a
13  recommendation about one medicine or another
14  based on the patient's preferences and the
15  patient's ability to pay for these things and
16  try to maximize their ability to take these
17  medicines.
18          And then inevitably there's
19  also pushback from what insurance companies
20  will pay for as well. So sometimes if I may
21  prescribe something that is a NOAC that is
22  not Xarelto, and then I get pushback from an
23  insurance company that my prescription is
24  going to cost them $250 a month but we cover
25  Xarelto for $10 a month, that also factors in

1 for patients fairly substantially.
2     Q.   So for what patients have you
3 prescribed -- what are the characteristics of
4 the patients for whom -- let me withdraw
5 that.
6     MR. MCWILLIAMS:  Are we talking
7 new prescriptions or just
8 prescriptions?
9 QUESTIONS BY MS. DU PONT:
10     Q.   Let me stop for a second.
11     For patients in whom you're
12 prescribing new prescriptions of Xarelto,
13 what are the characteristics of those
14 patients that make you recommend Xarelto to
15 them as a medication?
16     A.   I generally don't.
17     Q.   So the patients that you're
18 prescribing Xarelto to, who are they?
19     What are the characteristics of
20 those patients?
21     A.   Again, I generally don't offer
22 that as my first-line novel anticoagulant. I
23 usually have conversations about -- in
24 general about novel anticoagulants and
25 warfarin, and how to take those and the risks

1 and benefits with those two treatments, the
2 costs, the testing, the reversibility of the
3 effect. We go through a lot of these
4 different things in clinic.
5     If they choose a novel
6 anticoagulant over warfarin, if that's their
7 choice, they will oftentimes ask me, "Which
8 novel anticoagulant would you recommend?"
9 And we sometimes talk about the differences.
10     Up until recently maybe these
11 differences were not as -- were not
12 particularly as great as the warfarin versus
13 NOAC differences, meaning the differences
14 between novel anticoagulants, but those
15 discussions happen.
16     And in general, when we go
17 through the risks and the benefits of the
18 different novel anticoagulants, I don't think
19 I've ever recommended Xarelto as a first-line
20 at that point.
21     The piece that is most
22 appealing to patients about Xarelto is the
23 once-daily dosing as opposed to the
24 twice-daily dosing of the other novel
25 anticoagulants.

1     But in general, I don't think
2 that I've ever written for Xarelto as a
3 first-line agent after having these
4 conversations.
5     Q.   Do you switch patients from
6 warfarin to Xarelto?
7     A.   I don't generally do that, no.
8     Q.   Have you done it in any
9 particular instance?
10     A.   I've switched people from novel
11 anti -- or from warfarin to other
12 anticoagulants, again, for a variety of
13 reason -- patient-specific reasons, but I
14 don't think I've ever switched anybody from
15 warfarin to Xarelto.
16     Q.   Have you ever switched a
17 patient from another NOAC to Xarelto?
18     A.   Again, not knowingly. That's
19 not a common sort of thing that happens.
20     Q.   And --
21     A.   Outside of cost. Let me just,
22 again, reiterate outside of cost. That might
23 be the only time that I have -- that's the
24 most common reason why I may have prescribed
25 Xarelto, because I have offered a different

1 novel anticoagulant. "That novel
2 anticoagulant is very expensive. What other
3 options do you have that I can afford? My
4 insurance says Xarelto is available on
5 formulary, and that's only going to cost me
6 $10 a month."
7     That would be my main and most
8 common reason that I would switch from a
9 different novel anticoagulant to Xarelto.
10     Q.   Now, if cost is the only
11 factor, then why would you prescribe Xarelto
12 versus warfarin? Because as I understand it,
13 warfarin is very inexpensive.
14     A.   Again, we go into all of the
15 different things that go into taking these
16 medicines. So some patients may weigh the
17 risks and the benefits after our conversation
18 about warfarin and about other
19 anticoagulants, and they may choose warfarin
20 for certain reasons, whether that's cost or
21 whether that's reversibility or long history
22 that we have with warfarin.
23     Some people may choose a novel
24 anticoagulant for other specific reasons.
25 And sometimes those are very personal

1  reasons.  They have a mother who had been on
2  warfarin, they saw how difficult it was for
3  her to manage it, and they don't want to go
4  down that road.  Or they don't like the
5  testing that's associated with warfarin.
6        So these are all very
7  individualized decisions with regards to
8  which medication and how to take it.
9        Q.    But for those patients that say
10 to you, "I'm going to choose Xarelto over
11 warfarin," do you recommend against taking
12 Xarelto?
13       A.    No.  If we go through the
14 choices and that's the choice that they would
15 like to have, I'm comfortable with that.
16       Q.    You're still comfortable
17 prescribing Xarelto to particular patients,
18 correct?
19             MR. MCWILLIAMS:  Object to
20 form.
21             THE WITNESS:  We have
22 discussions about the risks and the
23 benefits of each of these
24 anticoagulants.  And when I talk to my
25 patients and counsel my patients in

1  clinic, when we get to choosing the
2  novel anticoagulants, several patients
3  want to know, "Well, which one is
4  better or which one is more risky or
5  which one would you recommend?"  These
6  are the questions that do come up.
7        So, you know, in those
8  situations I don't recommend Xarelto
9  as a first-line option.  I think I've
10 made that clear.
11       When patients come to me after
12 having those discussions and hearing
13 all of the risks and benefits and they
14 still say, "I want something that's
15 once a day, that works better for my
16 personality," you know, then they've
17 thought about the risks and benefits,
18 and I'm comfortable with giving them
19 that medicine.
20 QUESTIONS BY MS. DU PONT:
21       Q.    And that medicine is Xarelto?
22       A.    Correct.
23       Q.    You say in your report that at
24 trial you may refer to examples of personal
25 experience of patients who have asked you

1  your opinions about blood thinner use.
2        What specifically are you
3  referring to there?
4        A.    I'm not referring to specific
5  patients' names that I'm going to give you,
6  but these sorts of discussions that we're
7  talking about here in the last five, ten
8  minutes, the discussions where we think about
9  the different reasons why somebody would
10 choose one medicine over another.
11       What are the particular
12 influencers of -- in patients' minds, of my
13 patients' minds, where -- which would help
14 them decide one type of treatment course
15 versus another.
16       Q.    But when you're referring to
17 examples of patients, there are particular
18 patients with whom you've had those
19 conversations, right?
20       A.    Yes.
21       Q.    Who are those patients?
22       A.    Okay.  I can't tell you
23 specific names, and I'm certainly not going
24 to share those names with you, but these are
25 my patients, and these sorts of things are

1  confidential between us.
2        Q.    Understood.
3        And I just want to understand
4  if you're going to get up at trial and talk
5  about anecdotes of particular patients and
6  not mention their names, we should be
7  entitled to the medical records of those
8  patients to understand if you're representing
9  it accurately.
10       A.    Sure.  I'm not planning on
11 talking about specific patients when it comes
12 down to trial.  I am planning on talking
13 about my experience as a clinician and taking
14 care of patients with atrial fibrillation.
15       Q.    In the patients that you do
16 prescribe Xarelto to, are you monitoring
17 their blood levels?
18       A.    No.
19       Q.    Uhm --
20       A.    If I may continue, we don't
21 have any approved ways to monitor those blood
22 levels.
23       The conversations that I do
24 have with my patients, perhaps the single
25 biggest benefit to warfarin is the fact that

1  we can monitor those things and maintain a
2  safety profile.
3       And I wish we did have those,
4  not just for Xarelto, but for all of the
5  novel anticoagulants.
6       Q.   Do you do a PT test on patients
7  that are taking Xarelto?
8       A.   I do not.  There are PT tests
9  that have been looked at.  As you probably
10  already know, PT tests come in different --
11  with different reagents and come with
12  different varieties.  And that's what
13  triggered the idea of an INR, a way to
14  normalize those different PT tests.
15       A PT test that is most
16  associated with Xarelto effect and Xarelto
17  level of concentration is the Neoplastin
18  reagent with PT.  And we don't have that
19  available at our hospital.  I wish we did.
20       Q.   But currently, right now,
21  you're not doing a PT test on any of the
22  patients that you're prescribing Xarelto to,
23  correct?
24       MR. MCWILLIAMS:  Object to
25  form.  Asked and answered.

1       THE WITNESS:  That's correct.
2  Because I don't have a way to get the
3  PT Neoplastin which may help me --
4  which is the one that would help me
5  most.
6  QUESTIONS BY MS. DU PONT:
7       Q.   Do you know what reagent
8  Washington University uses?
9       A.   I don't know.
10       Q.   Have you asked?
11       A.   I have.
12       Q.   And you just can't get an
13  answer?
14       A.   I asked if they had Neoplastin
15  because I want to do that study for my
16  patients, and they said, "No, we don't have
17  that."
18       Q.   Have you ever had a patient
19  bleed on Xarelto?
20       A.   Yes.
21       Q.   How many?
22       A.   I couldn't quantify.  And
23  again, you know, bleeding, you want to say
24  brain bleeding, GI bleeding --
25       Q.   Why don't we say major

1  bleeding.
2       Have you ever had a patient --
3       A.   Because many, many -- yes, many
4  patients have, you know, minor bleeding on
5  any blood thinners, and this is a thing that
6  we talk about in our clinic to try to screen
7  for these sorts of things.
8       So I've had a number of
9  patients who have had increased bruises,
10  bleeding when they're cut, hemorrhoidal
11  bleeding or minor GI bleeding.  That's fairly
12  common.
13       Fortunately, severe bleeding
14  episodes are rare in both well-managed
15  warfarin and in several of the NOACs as well.
16       If you're asking me
17  specifically have I taken care of patients
18  who have had bleeding -- severe bleeding
19  episodes while taking Xarelto, the answer is
20  yes.
21       Q.   How many?
22       A.   Again, I don't know over the
23  course of -- you know, since -- late 2011,
24  2012.  It would probably be roughly a
25  handful, five to ten, but I haven't gone back

1  over every patient that I've seen in the last
2  five years.
3       Q.   And what was the outcome of
4  those severe bleeds?
5       A.   Again, I couldn't tell you
6  specifically.  I know some patients survived,
7  and I know others did not.
8       Q.   Do you know how many out of the
9  five to ten did not survive?
10       A.   No, I don't.
11       Q.   But you still prescribe Xarelto
12  to patients today despite those bleeding
13  events, correct?
14       A.   I still have conversations
15  about that medicine because it is
16  FDA-available and in our recommendations, and
17  we discuss the risks and benefits, and I have
18  written prescriptions for Xarelto.
19       Q.   Have you ever diagnosed a
20  patient with a bleed that was caused by
21  Xarelto?
22       MR. MCWILLIAMS:  Object to
23  form.
24       Diagnosed what?
25       THE WITNESS:  It's a difficult

30 (Pages 114 to 117)

1  question to answer because cause and
2  effect is a challenge.
3        I have taken care of patients
4  who have had major bleeding events
5  which were probably made more severe
6  or potentially caused by taking
7  Xarelto.  But, of course, you don't
8  know because you don't have a
9  different patient who doesn't -- isn't
10  on Xarelto who might have had a
11  bleeding event that might be less
12  severe.
13        I've definitely taken care of
14  patients who have major bleeding
15  events, and I'm asked to comment on
16  what to do with their oral
17  anticoagulation, and they are taking
18  Xarelto at that time.
19  QUESTIONS BY MS. DU PONT:
20      Q.   But in those circumstances
21  where the patient has had a bleed on Xarelto,
22  have you reached the conclusion that the
23  bleed was caused by Xarelto?
24      A.   Likely, yes.
25      Q.   How did you reach that

1  Different illnesses.
2        I take into account the
3  opinions of the consultants that we involve.
4  And so, for example, people who have ulcers
5  at certain locations in their GI systems
6  might be -- might have those ulcers for
7  certain reasons versus if they have it at
8  different locations in their GI system.  So
9  it really is a patient-specific sort of
10  thing.
11        In all of these cases,
12  regardless of if an ulcer formed for one
13  reason or another, when they bleed, the
14  bleeding is worse in the presence of oral
15  anticoagulants, including Xarelto.
16      Q.   You would agree that
17  anticoagulants, warfarin, Xarelto, all of the
18  NOACs, they don't cause an underlying injury
19  to the GI tract, for example?
20      A.   I think that's a fair
21  statement, but they are part -- that's not a
22  fair thing to tell the patients' families
23  when they're laying there in the intensive
24  care unit, intubated, receiving rapid
25  infusions of blood.

1  conclusion?
2      A.   Again, totality of the
3  evidence, totality of the data.  You know, if
4  we use hypothetical examples, you know, I sit
5  down with the intensive care team to talk
6  about why a severe bleed would cause somebody
7  to lose half of their blood volume in their
8  GI system.  And we talk with the
9  gastrointestinal doctors, and they have
10  determined that it looks like it's coming
11  from a bleeding lesion within the GI system.
12  Bleeding is very profound and likely
13  profound -- and likely made worse because of
14  oral anticoagulants, including Xarelto.
15      Q.   Do you consider other factors
16  that could have caused the bleeding event,
17  other than Xarelto?
18      A.   Of course.
19      Q.   What are some of those other
20  factors?
21      A.   Sure, and it depends on each
22  individual patient and the type of bleed that
23  they have and the type of -- the location of
24  the bleed and the influences of other
25  medications and different things like that.

1        It's very clear that in that
2  patient they had an underlying illness that
3  caused some bleeding.  That bleeding was made
4  worse.  And the clinical condition that we're
5  left with is a factor of both of those
6  things.
7      Q.   Have any -- have you reported
8  any of the bleeding events that we talked
9  about on Xarelto to the FDA?
10      A.   I believe our hospital has made
11  reports on these when we've taken care of the
12  patients in the intensive care unit.  I have
13  not been the author of any of those to the
14  FDA.
15      Q.   Why not?
16      A.   In general, when I see these
17  patients, I'm oftentimes brought in as a
18  consultant to be a part of their care.  And
19  in general, I think it's the intensive care
20  unit teams that have largely been the driving
21  factor and the reporters of this.
22      Q.   Could you provide the adverse
23  event reports that have been filed for the
24  events that you're referring to?
25      A.   I could not.  I'd have to

1  inquire if the hospital would be willing to
2  do that. Again, I was not the author of
3  those.
4      Q.    So you don't feel you have a
5  personal obligation to report adverse
6  events --
7          MR. MCWILLIAMS: Object to
8      form.
9  QUESTIONS BY MS. DU PONT:
10     Q.    -- for Xarelto-related bleeds?
11     A.    No, I think all of us as people
12 caring for patients have an obligation to
13 make sure that we do things in the safest way
14 possible, and that's reporting adverse
15 events, and that's thinking about ways that
16 we can administer our medicines in the safest
17 way possible.
18     Q.    Let's move to a different topic.
19         On page 13 of your report, you
20 talk about the fact that rivaroxaban is a
21 better twice-daily dose.
22         Do you see that?
23     A.    Yes.
24     Q.    And you state that "the
25 conventional pharmacological strategies make

1  you think that rivaroxaban would be best
2  suited as a twice-daily rather than
3  once-daily regimen," right?
4      A.    Correct.
5      Q.    What conventional
6  pharmacological strategy are you using to
7  determine that?
8      A.    Yeah. And I think it's shown
9  nicely on the next page on Figure 5, which is
10 on page 14. And these are simulated plasma
11 concentrations of an anticoagulant drug that
12 has a roughly 12-hour half-life.
13         And though the colors don't
14 show with green and red in the printout that
15 I have, one can see that the once-daily
16 dosing strategy tends to have higher peaks,
17 lower troughs, across the course of taking
18 the medicine, as opposed to twice-daily,
19 smaller-dosing strategies which tends to
20 achieve a lower peak, higher trough, less of
21 a variation over the course of taking the
22 medicine.
23         So this, I think, is a nice
24 visual example of the simulations that are --
25 that can be done for any single-dose --

1  single-day dosing versus twice-daily dosing
2  strategy.
3      Q.    So I guess my question was a
4  little different, and I'll get into this
5  graph in a bit, but what did you do -- what
6  research did you do to come to the conclusion
7  that twice-daily Xarelto is better than
8  once-daily?
9      A.    I think it is best suited as a
10 twice-daily drug with the short half-life
11 that it has.
12         So if we look at half-lives
13 that are in that five- to eight-hour range,
14 which is typically -- or five- to nine-hour
15 range, which is typically what we would see
16 with our younger patients with normal kidneys
17 and otherwise fit into some of the studies
18 that have been done, it's difficult to think
19 that with a five-hour half-life you have an
20 effect of a drug that lasts 24 hours.
21         Common sense would tell you
22 that that -- you would like to spread the
23 effect of that medication over the course of
24 24 hours, not just in the first period of
25 time. And if you go to twice-daily dosing

1  and you can achieve a longer time within that
2  therapeutic range over the course of a day,
3  conventional wisdom, teaching from medical
4  school, all of the knowledge that we know
5  about pharmacology, would say that that would
6  be a better way to administer a medicine. It
7  gives you more time within the therapeutic
8  range and less time within the risky range.
9      Q.    So it's common sense that is
10 driving your opinion here?
11         MR. MCWILLIAMS: Object to
12     form.
13         THE WITNESS: To clarify, I
14 said that it's common sense, it's my
15 medical school training, it's the
16 pharmacology training, it's the
17 understanding of drug half-lives, the
18 medicine that we give.
19         We frequently administer
20 medications throughout the course of
21 somebody's stay in a hospital or as an
22 outpatient who have the possibility of
23 having single-day dosing or
24 twice-a-day dosing or
25 three-times-a-day dosing, and there

1 are values and advantages to each of
2 those strategies, particularly -- and
3 one common example might be something
4 like over-the -- or antibiotics.
5 Some antibiotics are
6 distributed in twice-daily dosing and
7 some might be in a larger single-daily
8 dosing. And in general, the more
9 frequent dosing throughout the course
10 of the day achieves a smoother, steady
11 state, with more time within a
12 therapeutic range and less time
13 outside of those therapeutic ranges.
14 Now in the case of a blood
15 thinner, you can't miss. You don't
16 want to miss. We don't want to
17 overshoot the therapeutic range and
18 have patients at unnecessarily
19 increased risk of a stroke, and we
20 don't want to undershoot the
21 therapeutic range to leave patients at
22 unnecessarily high risks for stroke.
23 QUESTIONS BY MS. DU PONT:
24 Q. So I think my question is a
25 little different, though. I'm trying to

1 understand what materials you considered that
2 say once-daily Xarelto is worse than
3 twice-daily Xarelto.
4 A. And --
5 Q. What are those materials?
6 A. So those materials are medical
7 school training, pharmacology school --
8 pharmacology classes. I show this example
9 that was published in Europace 2015 which
10 shows a very nice simulated plasma
11 concentration of single-dose versus
12 twice-daily dose that very clearly
13 demonstrates that.
14 Q. So you're saying one of your --
15 one support for your opinion that twice daily
16 is better than once daily is this article in
17 Eurospace?
18 A. It's Europace.
19 Q. Europace, sorry.
20 A. That's okay.
21 That is one of the things
22 that -- and it highlights the idea that you
23 can achieve a steady state without overshoot,
24 without undershoot. And if you can tailor
25 your medications for each patient this way

1 and be able to keep the concentrations of the
2 medicine and the effect of the medicine
3 within the therapeutic range and not outside
4 the therapeutic range, you'll deliver that
5 medicine better and safer.
6 And I think if we used warfarin
7 as the example, back on Figure 4, that very
8 common sort of graph we use, this is a great
9 way that we tailor drug therapies to try to
10 keep somebody within a good therapeutic
11 window without overshooting, without
12 undershooting.
13 And for a medication like
14 rivaroxaban, a twice-daily medication will
15 keep you within that steady state in a better
16 way than once daily will.
17 (Cuculich Exhibit 5 marked for
18 identification.)
19 QUESTIONS BY MS. DU PONT:
20 Q. Let's just take a look at the
21 Europace article that you cited and you took
22 the graph out of. I'm marking this as
23 Exhibit 5.
24 And for the record, it's an
25 article by Vrijens and Heidbuchel published

1 in Europace entitled, "Non-vitamin K
2 anticoagulant -- antagonist anticoagulants:
3 Considerations on once- versus twice-daily
4 dose recommendations."
5 Now, if you turn to page 522 of
6 that article, in the second column on the
7 right-hand side, first full paragraph, the
8 authors conclude, "Once-daily dosing may
9 increase absolute adherence, but twice-daily
10 dosing regimens may be more forgiving in
11 patients with suboptimal adherence.
12 Prospective clinical evaluation is needed
13 also to relate outcome factors of drug
14 regimen to the type of patient; one regimen
15 may not suit all."
16 Did I read that correctly?
17 A. You read it word for word.
18 Q. And the authors of the Europace
19 article are not concluding that twice-daily
20 dosing of Xarelto is better than twice daily
21 {sic}, are they? They're saying both options
22 should be available.
23 MR. MCWILLIAMS: Object to
24 form.
25 THE WITNESS: They're saying

1  that -- there's a number of
2  conclusions that they come to. You
3  read one paragraph of this entire
4  section.
5      If I could read the paragraph
6  before that, the conclusion in the
7  main sentence that they say there,
8  "There's an urgent need for research
9  on adherence-optimizing technology and
10 intervention in the NOAC field because
11 suboptimal adherence is widely
12 prevalent and has severe consequences,
13 including bleeding or increased
14 thrombotic risk, which may be fatal."
15     And I would certainly agree
16 with that statement. We need to dose
17 the NOACs in ways that are better for
18 patients.
19     One of the ways, which was
20 looked at in this paper that you
21 provided, is the idea of taking these
22 medications in a twice-daily way.
23     Now for some patients, that
24 might be the preferred way. And I
25 think that that would likely be the

1  safest way to do it. For some
2  patients, that may be difficult.
3      The common reason that patients
4  like to take rivaroxaban over the
5  others is the single-daily dosing.
6      But it's clear that with the
7  single-daily dosing in these computer
8  models and in what we know about
9  pharmacology, there will be overshoot
10 and undershoot with that.
11     My patients who take medicines,
12 and most of my patients do after we
13 have our conversations, would likely
14 do better in terms of their risks, in
15 terms of their stroke risks and
16 bleeding risks, if we have them take
17 it twice a day and if we have ways to
18 track what those levels were while
19 they were taking the medicines, which
20 is what the conclusion is of this
21 paper.
22 QUESTIONS BY MS. DU PONT:
23     Q.   But the conclusion is not that
24 Xarelto twice daily is better than once
25 daily, is it?

1          MR. MCWILLIAMS: Object to
2     form.
3  QUESTIONS BY MS. DU PONT:
4      Q.   That's not the conclusion of
5  the article; that's your interpretation?
6      A.   I disagree. I think we -- you
7  know, there are ways that this has shown, and
8  so this article -- this article talks -- and
9  if I can take you to page 518, and if I could
10 ask you to read the -- on the left-hand
11 panel, the blue little heading of that
12 section, could you read that for me?
13     Q.   I'm asking the questions,
14 Doctor.
15     A.   All right. Fine. So I will
16 read it for you. "Superior therapeutic
17 coverage with twice-daily dosing regimens."
18     So of the many things that this
19 paper looks at, it includes an entire section
20 that is dedicated to superior therapeutic
21 coverage with twice-daily dosing regimens.
22     Q.   And then I would like you to
23 read, though, the last part of that section.
24 Look at the last paragraph. It's starting
25 with the second sentence.

1      "Clearly, the above-mentioned
2  findings cannot be extrapolated to NOAC
3  therapy. Not only may the consequences of
4  nonadherence differ depending upon the
5  specific characteristics of the drug, also
6  the patients taking NOAC are different from
7  those taking HIV medication and may,
8  therefore, have specific issues due to,
9  example, aging or dementia. Thus, it would
10 be useful to obtain electronic dosing
11 histories and related consequences of
12 nonadherence from patients on NOAC therapy."
13     I read that correctly?
14     A.   You read that correctly.
15     And I really like that
16 statement because it really hammers home the
17 idea of precision medicine, doesn't it; that
18 we really want to be able to tailor our
19 medicines and tailor the way that we give
20 these medicines on an individual patient
21 basis.
22     Q.   And if we take precision
23 medicine, once daily -- they're saying
24 once-daily dosing, twice-daily dosing, those
25 are both options for patients, but there's

1  not one that's better than the other?
2      A.    No, that's not what they're
3  saying.  Again, they said "superior
4  therapeutic coverage with twice-daily dosing
5  regimens."
6          And they talk about how we can
7  apply this medicine in a more thoughtful way
8  to have a better coverage of therapeutic time
9  and reduce the risks of being outside of that
10  therapeutic range.
11         And they say that -- and I
12  would agree, that we would love to test that,
13  which is -- I think that last sentence talks
14  about you can't just extrapolate that.  But
15  we do want to understand how this works in
16  the real world.  We would love to test this.
17         But short of having those
18  tests, short of having that ability, this is
19  a very reasonable thing.
20         And I will tell you, in the
21  field of novel anticoagulants right now -- I
22  just returned from American Heart Association
23  national meeting down in New Orleans, and
24  there are active conversations going on about
25  how we can best give patients, in the safest

1  way and the best way, these novel
2  anticoagulants.  And one of the first things
3  they talk about is being able to test the
4  patient's effect to the medicine and being
5  able to change the way we dose the medicine,
6  whether that be the frequency of doses or
7  whether we talk about the quantity of
8  medicine that we give patients.
9          This is precision medicine.
10  This is exactly what we're aiming to do.
11     Q.    Doctor, sitting here today you
12  can't tell me or point me to any evidence
13  which says twice-daily dosing is better than
14  once-daily dosing of Xarelto, can you?
15         MR. MCWILLIAMS:  Object to
16  form.  Asked and answered numerous
17  times.
18         THE WITNESS:  I'm going to take
19  it even further.
20         So if you're talking
21  specifically for the treatment
22  of atrial fib -- for stroke prevention
23  in atrial fibrillation, I cannot tell
24  you in a randomized clinical trial
25  that once daily versus twice daily has

1  any effect, because we don't have that
2  data.
3          But we do know that when this
4  medication was brought -- was being
5  brought to market, it was studied as a
6  twice-a-day drug.  When it is brought
7  to -- very important times when we
8  need to have excellent coverage,
9  consistent coverage across 24 hours,
10  such as for treatment of pulmonary
11  embolism, high-stakes-type situations,
12  this is dosed as a twice-a-day drug.
13         So it is available as
14  twice-a-day dosing.
15  QUESTIONS BY MS. DU PONT:
16     Q.    But there's no evidence in a
17  randomized clinical trial that once daily
18  versus twice daily has any effect, correct?
19     A.    Again, let's be specific about
20  for atrial fibrillation, because we do have
21  twice-daily dosing for other indications.
22         For the indication of stroke
23  prevention in atrial fibrillation, we have no
24  data on twice-daily versus once-daily dosing
25  at this point.

1      Q.    Thank you.
2      A.    But I would tell you that the
3  field is moving towards that idea in order to
4  tailor these medicines in the safest way.
5      Q.    Now, I just want to look at the
6  graph in the paper on page 14 that you took
7  from Europace.
8          Are you saying that because
9  there's a higher peak, that the bleeds are
10  going to occur at the higher peak?
11     A.    So if we can extrapolate this
12  Figure 5 that I used here in my statement and
13  compare it to the use of warfarin, which I
14  show in Figure 4 in my statement, at times
15  when the bleeding effect of an anticoagulant,
16  whether that be rivaroxaban or warfarin, at
17  the time when that bleeding effect is
18  highest, patients are at highest risk for
19  bleeds, and I think everybody would agree
20  upon that.
21         And when those effects are
22  below the range of benefit of
23  anticoagulation, we might be at higher risks
24  for stroke than if we were in that medium
25  range.

1  So I think if you think about a
2 high range, a medium range, a low range,
3 similar to Figure 4 for warfarin, and you
4 extrapolate that to Figure 5, which I'm
5 sharing with you here, which you provided in
6 the Europace article, we avoid the
7 overshoots, we avoid the undershoots, with
8 twice-daily dosing compared to once-daily
9 dosing.
10  Q.  But I'm trying to understand.
11 Is your reason for saying that once daily is
12 less safe than twice daily because there are
13 higher peaks which are associated with higher
14 risk of bleeding?
15  A.  That would be one of the
16 reasons why.  It would be nice to have those
17 concentration values for each patient, but I
18 think it's very fair to say that in patients
19 who have the very high risk, the high
20 concentrations of blood plasma levels of this
21 drug or have high effect of the bleeding,
22 such as a prothrombin time, those patients
23 would be at a higher risk for bleeding.
24  And once-daily dosing of a
25 higher dose of a drug would get you to that

1 more commonly than if you took a twice-a-day
2 drug at half of that -- half of the drug
3 concentration.
4  Q.  I'm just focused on the graph,
5 though, and I'm looking at the peaks and the
6 troughs, right?  And it shows higher peaks
7 for once-daily dosing.
8  And if I'm understanding your
9 opinion correctly, you're saying at that
10 higher peak, a patient is more at risk for
11 bleeding, correct?
12  A.  I think that seems reasonable.
13 But we do have to -- with the caveat being
14 that we would like to know what that specific
15 value is of concentrations.  What is the
16 cutoff levels by which our bleeding risk
17 increases.
18  We know that for warfarin.
19 We've watched that.  That was involved in the
20 clinical trials for warfarin through the '80s
21 and '90s.
22  We don't have those numbers yet
23 for our -- for rivaroxaban.
24  So in general, yes, the green
25 peak that goes higher than the red peak

1 suggests that you are more at risk at that
2 time point, but I think it's going to be
3 whatever that threshold value is.
4  For warfarin that would be a
5 INR of greater than 3 or greater than 4 or
6 greater than 4 and a half.  It's a gradation.
7 It's a continuum.
8  And so in this case, we'd like
9 to know what those values are for the peaks.
10 Is it a PT of 20?  Is it a PT of 40?  We
11 don't know those values yet.
12  But you're more likely to get
13 the higher PTs on single dose than on dual
14 dose, and I think that graph shows that
15 pretty clearly.
16  Q.  Are you aware of any data that
17 shows, though, that a higher peak is
18 associated with a higher risk of bleeding?
19  Can you point me to any data?
20  A.  Sure.
21  Again, with any anticoagulant,
22 we do note the higher the bleeding effect,
23 the higher the risk of bleeding.  So that's
24 that graph from Figure 4, where when the PT
25 or the INR is elevated, and substantially

1 elevated, your risk of bleeding is
2 dramatically increased.  Figure 4, not
3 Figure 5.
4  Let me complete.
5  If we go to the FDA's analysis
6 of patients who are taking rivaroxaban, we do
7 see -- and I'm going to point you to -- let
8 me point you to my report, page 20, where we
9 have rivaroxaban plasma concentrations
10 increasing and prothrombin time increasing.
11  So we do know that at higher --
12 at higher concentrations of rivaroxaban we
13 have higher prothrombin times.  We do know
14 that with higher prothrombin times there are
15 higher risks of bleeding.
16  Do we know what that specific
17 number is?  We do not.  Because we would like
18 to have that information from the randomized
19 clinical trials, but we don't have reported
20 PTs throughout the course of patients taking
21 rivaroxaban.
22  But if you look at my page 21
23 on my report, again, from the FDA
24 briefings -- and in this case it says
25 Figure 8; it's the bottom of the figures on

Page 142

1    page 21 -- we clearly see that as the
2    prothrombin time goes up, the percent with
3    major bleeds goes up.
4         So it doesn't -- it doesn't
5    take very complex math to get to the point
6    that if you have higher rates of
7    concentration in the blood, and that
8    translates into higher PTs, which is the
9    bleeding effect of the medicine, and those
10   higher PTs translate into major bleeds, both
11   in ROCKET and with other anticoagulants, it's
12   pretty easy to make that connection.
13        Q.   That graph, though, that you
14   have in your report from the Europace doesn't
15   refer to PTs in this, does it?
16        A.   The graph from Europace talks
17   about the concentration of a medication --
18        Q.   Right.
19        A.   -- over the course of several
20   days.
21        Q.   It doesn't -- it's not -- PT is
22   not on this graft?
23        A.   I'll agree with that, but if I
24   just talked you through --
25        Q.   I understand what you talked me

Page 143

1    through.  I just want to understand.
2         This graph does not represent
3    PT, correct?
4         A.   Correct.
5         Q.   Here's my question for you:  Do
6    you know any literature to suggest that
7    actually the trough is what is associated
8    with higher risk of bleeding?
9         A.   I think there's a lot of
10   different effects that go into the higher
11   risk of bleeding, and I would say there's
12   probably a couple different components.
13        One would be the, as we've
14   talked about, sort of the peaks when you put
15   yourself in a situation where the bleeding
16   risks seem to be high.  But anytime you have
17   anticoagulant in the system, you are also at
18   higher risk for bleeding.  And I think that's
19   a fair assessment.  Not only is it the
20   overshoots, but it's anytime you have any
21   anticoagulant.
22        One of the things that we
23   started this discussion with was any
24   anticoagulant would increase your risk of
25   bleeding.

Page 144

1         So the more time you spent over
2    the course of the day with that bleeding
3    effect on board, the anticoagulant effect on
4    board, you're going to have bleeding effect
5    as well.
6         So I would agree with both of
7    those statements, that if you have a higher
8    trough over the course of a day, that means
9    that you're spending more time within that
10   therapeutic range or more time with having
11   exposure to a bleeding effect.  So I would
12   agree that both of those I think are
13   important.
14        Q.   So twice-daily dosing has
15   higher troughs than once-daily dosing,
16   correct?
17        A.   Correct.
18        Q.   So if trough is what is driving
19   a bleeding risk, then twice-daily dosing may
20   be associated with a higher risk of bleeding,
21   correct?
22        A.   I see where you're going with
23   that.  It depends on, again, where those
24   bleeding risks start and where we see those
25   things happen.

Page 145

1         Having the ability to test that
2    on an individual patient basis would be very
3    important, much like we do for warfarin.
4         We do know that warfarin at an
5    INR of 2 gives you higher rates of bleeding
6    than if you weren't taking warfarin.
7         We know that -- let me
8    continue.  We know that warfarin at an INR of
9    2 gives you the benefit of stroke prevention
10   if you're not taking it.
11        So even though the trough of
12   twice-daily dosing is higher and potentially
13   there are risks of bleeding that are higher,
14   staying within the therapeutic range improves
15   your stroke prevention time and stroke
16   prevention abilities to that medicine, and so
17   the risk/benefit ratio is very much in favor
18   of the patient if we're within that range.
19        So while the bleeding risk is
20   higher with the trough that's higher -- I
21   would agree with that -- the benefit of being
22   within the therapeutic range outweighs that
23   small increased risk of a bleeding.
24        Q.   So you're telling me that there
25   is support for the fact that twice-daily

1  dosing has a higher risk of bleeding because
2  it has higher dose, right?
3      MR. MCWILLIAMS:  Object to
4  form.
5      THE WITNESS:  I feel like I've
6  answered this question to you.
7      I would agree that there are
8  higher risks of bleeding if your
9  trough is higher, but I would say that
10  the tradeoff of being within range for
11  stroke prevention alters the balance
12  of risk/benefit so that it is more
13  beneficial for patients to be
14  prevented from their stroke throughout
15  the course of being within that
16  therapeutic range.
17      (Cuculich Exhibit 6 marked for
18  identification.)
19  QUESTIONS BY MS. DU PONT:
20      Q.   Okay.  I'm going to mark as
21  Exhibit 6 excerpts from the FDA medical
22  review which, Doctor, you cite in your -- in
23  your report throughout.
24      And this is from 2001 and the
25  FDA Center for Drug Evaluation and Research.

1  And if I could just direct you to page 34 of
2  that.
3      Do you see that?
4      A.   I do.
5      Q.   And I apologize, I'm only
6  giving you excerpts, but this is a huge
7  document.
8      A.   I thank you for only giving me
9  excerpts.
10      Q.   Okay.  And you see there's a --
11  Figure 3 shows the simulation of
12  20 milligrams versus 10 milligrams --
13      A.   Yes.
14      Q.   -- BID.
15      This is similar to what we saw
16  in Europace, correct?
17      A.   I think --
18      Q.   From what you put your report?
19      A.   I think that's a fair
20  assessment.  This is a -- it looks like a
21  computer simulation similar to that Europace
22  article.  This looks like it's specifically
23  bringing in PT as opposed to the drug
24  concentration, which was the question that
25  you had asked me before.

1      Q.   Okay.  And I'm just going to
2  direct you to the paragraph underneath
3  Figure 3, which states, "Because neither a
4  BID regimen nor a lower total daily
5  rivaroxaban dose was tested in ROCKET, the
6  implications of these two different PD
7  profiles with respect to efficacy and/or
8  bleeding cannot be assessed."
9      Did I read that right?
10      A.   You did.
11      Q.   And do you agree with that
12  statement?
13      A.   I would agree with that
14  statement.
15      Q.   And then the last sentence in
16  that paragraph states, "A BID dosing schedule
17  with its higher trough values might
18  exacerbate the bleeding proclivity if the
19  same total daily dose is used."
20      Do you see that?
21      A.   I see that.
22      Q.   And you agree with that?
23      A.   I would say, similar to how I
24  answered your own questions about Figure 6
25  and Europace data, I would agree that that is

1  possible.  Patients -- if you look at the
2  graph here, patients spend time with -- if
3  you look at the blue line, which is the
4  10 milligrams twice daily, patients spend
5  more time in this simulation between a PT of
6  15 and 18 over the course of these 144 hours
7  than if they took it once daily.  There are
8  times once daily that they are outside above
9  and outside below that level.
10      So I think it is likely that if
11  you looked at time point 48 hours, at that
12  time point, at that snapshot in time, a
13  patient who has taken once-daily dosing
14  appears to have a lower PT than a patient who
15  had 10 milligrams twice-daily dosing.
16      And so I would agree that at
17  that moment it seems like the risk for a
18  bleed would be higher for that 10-milligram
19  twice-daily dosing.  So in that sense I
20  agree.
21      However, I think there is a
22  balance and an important tradeoff when we're
23  looking at stroke prevention, which is the
24  reason we're taking this medicine, and I
25  would say it's likely that the patient taking

1  twice daily with the modestly higher PT is at
2  better chance of not having a stroke than the
3  person who has a PT of 14 or below.
4      Q.    But there's still a higher risk
5  of bleeding, correct?
6      A.    So I've said this before.  I
7  think that the risk of -- the risk of
8  bleeding is going to be higher and that the
9  tradeoff for stroke prevention would be
10  beneficial.
11      Q.    That's fine.  You can set that
12  aside.
13          You say that you "asked the
14  sales reps for dose-finding data but were
15  told dosing was internally validated but was
16  not published or publicly available."
17          Is that correct?
18      A.    That's correct.
19      Q.    Do you stand by that statement
20  today?
21      A.    I do.
22      Q.    Did you do a literature search
23  for dose-finding studies at the time?
24      A.    Yes.  I had looked for the
25  information for the -- coming upon the dose

1  of 20 milligrams daily for the treatment
2  of -- for the prevention of strokes in
3  patients with atrial fibrillation.
4      Q.    And so have you read the
5  scientific studies investigating Xarelto
6  dosing and dose regimens?
7      A.    I have read many of them, and
8  certainly when the medication was approved in
9  2011, I was very eager to learn more about
10  this.
11          My group of colleagues, this
12  was going to be an important question that
13  comes in our clinic, so we had met at one of
14  our morning roundtable meetings to try to
15  have discussions about this.  And we all
16  tried to look for the evidence with regards
17  to safety and efficacy in a particular drug
18  dosing and that sort of thing, and those data
19  were not readily available.
20          We turned to our colleagues
21  from Janssen and tried to get some of that
22  information, and that information was not
23  necessarily provided.
24          The information we're really
25  looking for, I think, was at least provided

1  in 2014.  I think the bare minimum of what we
2  were hoping to see was Figure 10 from my
3  report, which is sort of the distribution of
4  dose ranges over a population of patients and
5  looking at each of them individually.
6          But that wasn't available to us
7  in 2011.
8      Q.    So you aren't aware that there
9  were dose-ranging studies that look at both
10  twice-daily and once-daily dosing prior to
11  2011?
12          MR. MCWILLIAMS:  Object to
13  form.
14          THE WITNESS:  No.  There were,
15  in fact -- sorry.
16          MR. MCWILLIAMS:  Go ahead,
17  sorry.
18          THE WITNESS:  There were, in
19  fact, dose-ranging studies that were
20  done.  This medicine would never have
21  gotten anywhere within the company
22  without these things.
23          The indications for such a
24  thing were not relevant for atrial
25  fibrillation where patients are taking

1  these medicines for very long periods
2  of time.
3          I'm aware of some twice-daily
4  and once-daily dosing looking at DVT
5  prophylaxis and these sorts of things.
6  But again, these data were not very
7  readily available for us.
8          And in particular, in the AFib
9  population where we're taking these
10  patients and are giving them 20 or
11  30 years of continued exposure, we
12  wanted to have more of a long-term
13  data set than just the first hour of a
14  selected group of patients.
15  QUESTIONS BY MS. DU PONT:
16      Q.    But you agree with me that
17  there were dose-ranging studies done
18  comparing twice daily to once daily?
19      A.    There had to have been studies
20  that used twice daily and once daily and then
21  could also look at plasma concentrations of
22  that.
23      Q.    And do you know how many
24  patients those dose-ranging studies looked at?
25      A.    I don't.  They were large --

1  again, they were exclusively done in patients
2  who were being prevented for DVTs in that
3  patient population which really didn't
4  translate into our atrial fibrillation
5  population.  But that's where the
6  dose-ranging and dose-finding studies were
7  done.
8      Q.    Would it surprise you that they
9  were done in over 4,000 patients?
10     A.    No, it would not surprise me at
11  all.  That's the data that they have from
12  that population.
13     Q.    Have you investigated what the
14  actual reasoning was that led to the
15  selection of 20 milligrams once daily?
16     A.    You know, it's been -- it's the
17  source of much speculation and thought, and
18  there are -- there are well-intentioned
19  reasons why that could be, and there are less
20  well-intentioned reasons why that could be.
21         I've tried to dig deep into
22  that.  It's really unclear, the decision to
23  bring this medicine out as a once-daily dose
24  for patients with atrial fibrillation.  I
25  think -- I think it is convenient for

1  patients to have single-daily dose as opposed
2  to twice-daily dose.
3         I like that option for patients
4  if everything else is the same.  If the
5  efficacy, if the medications are similar, I
6  would choose a once daily over twice daily.
7  But there is great concern among my group
8  that with the short half-life, once daily was
9  just not providing the adequate coverage for
10  our patients.
11     Q.    Are you aware that the
12  dose-ranging studies that were done showed
13  that once daily and twice daily had similar
14  efficacy and safety profiles?
15     A.    Again, not in patients with
16  atrial fibrillation.  These are in patients
17  with DVT -- or preventing DVTs is my
18  understanding.
19         Again, you know the data for
20  DVTs better than I do, I suppose, but we
21  looked into this.  We found that these data
22  were not particularly applicable to the
23  patients that we are caring for.
24     Q.    Do you know why the decision
25  was made to rely on the DVT dose-finding

1  studies for atrial fibrillation and model off
2  of those studies?
3      A.    I don't know why, but I
4  would -- they were the only data that were
5  available, and so computer modeling was made
6  off of that, from my understanding.
7      Q.    Did you look?  Did you look to
8  see why?
9      A.    Yes.  We've done -- my group
10  and I have looked deeply into this, and
11  that's kind of what gets to these computer
12  modeling responses.
13         So, you know, looking at, for
14  example, Figure 6 on my report that's on
15  page 15, these are some of the computer-based
16  modeling of rivaroxaban using patients that
17  were off of -- from those dose-finding
18  studies that you point to.
19         And here it is published in
20  2014.  These are the sorts of things that we
21  were asking for in 2011, 2012, to get a sense
22  of what kind of range we had and what kind of
23  differences the different patient populations
24  might have.  And we were asking for things
25  like Figure 10 on page 18, which is the

1  plasma concentrations of patients who have
2  been taking these medications over longer
3  periods of time.
4      Q.    My question was a little
5  different.  I'm just wondering:  Do you know
6  why the decision was made and whether the FDA
7  approved that decision to do modeling based
8  off of the DVT studies?
9      A.    I was not involved in making
10  that decision, so, no, I don't know the
11  actual discussion that went on.  So that was
12  not my decision to be made.
13     Q.    Have you reviewed any documents
14  from the FDA that would shed some light on
15  why that decision was made?
16     A.    I've reviewed a number of
17  documents from the FDA, including an excerpt
18  of one of the -- of the FDA medical review.
19         But the documents that I
20  reviewed have not provided a satisfactory
21  answer as to why once a day versus twice a
22  day was chosen.
23     Q.    Do you understand that when you
24  do a dose-finding study you may underdose
25  patients?

1    A.    Yes, I am aware of that.
2    Q.    And so if you were studying --
3  doing a dose-finding study in patients with
4  atrial fibrillation, a consequence of that
5  study could be to cause strokes in those
6  patients because they did not get the
7  appropriate high enough dose to prevent
8  strokes, correct?
9    A.    I don't like your use of
10 "cause," but I would largely agree.  I mean,
11 it didn't cause.  It left them at a higher
12 risk for a stroke than if they were protected
13 in an -- in an appropriate anticoagulant
14 range.
15         Can I just rephrase the
16 question in that way and agree with it then?
17   Q.    That's fine.
18         And then if the FDA approved of
19 using modeling based on the DVT studies
20 because there was an ethical consideration,
21 would that change your opinion about why
22 dose-finding studies were not done in atrial
23 fibrillation patients?
24         MR. MCWILLIAMS:  Object to
25 form.

1         THE WITNESS:  I think that -- I
2  would be happy to know if that was one
3  of the reasons why.  I would be
4  comforted to know that the FDA is
5  worried about the ethical
6  considerations of these sorts of
7  things.
8         Being able to track people's
9  plasma concentrations or PTs or effect
10 of the medication on bleeding would
11 minimize that ethical risk of being
12 too low.
13         It would be trying a medication
14 at a certain dose.  It would be
15 testing that medication's effect and
16 adjusting the dose to that in ways
17 that we could probably minimize the
18 ethical concerns.  So I'd be happy to
19 know if it was an ethical reason that
20 dose findings weren't done.
21         But dose findings are done in
22 all sorts of patients.  It was also
23 done in patients with DVTs.  It was
24 done in patients with PEs as well.  So
25 it's -- these are the difficulties of

1  dose finding, I suppose.
2  QUESTIONS BY MS. DU PONT:
3    Q.    Well, you stated that
4  rivaroxaban has been prescribed twice daily
5  for other indications, right?
6    A.    Correct.
7    Q.    So you would agree that Bayer
8  and Janssen didn't uniformly choose
9  once-daily dosing for Xarelto?
10   A.    That they didn't choose it?
11 They did choose once-daily dosing for
12 Xarelto.
13   Q.    Across the board, for all
14 indications.
15   A.    I mean, they clearly made that
16 choice for atrial fibrillation.
17   Q.    But not for all indications,
18 correct?
19   A.    I would agree with that.
20 There's indications for twice a day and
21 there's indications for once a day.
22         MS. DU PONT:  Why don't we just
23 take a five-minute break.  Is that
24 cool?
25         VIDEOGRAPHER:  We are going off

1  the record at 11:34 a.m.
2    (Off the record at 11:34 a.m.)
3         VIDEOGRAPHER:  We are back on
4  the record at 11:42 a.m.
5  QUESTIONS BY MS. DU PONT:
6    Q.    Okay.  Doctor, I'm going to
7  move on to a new topic, and I'll refer you to
8  your report at page 14, and you talk here
9  about Xarelto having a narrow therapeutic
10 window.
11         Do you see that?
12   A.    I do.
13   Q.    And can you define for me, what
14 is a therapeutic index?
15   A.    Yes.  In my report, I do
16 mention therapeutic window and therapeutic
17 index, and I think for the purposes of our
18 conversation today, we could probably use the
19 two interchangeably.
20         This is a concept where you're
21 assessing at what doses of a medication
22 you'll achieve the therapeutic effect and at
23 what additional doses of the medication will
24 you achieve the risks that are associated
25 with the medicine.

1    And so the index is really just
2 kind of a quotient or a divisibility sort of
3 thing. And it means different things in the
4 clinic versus in dose-find -- or in true
5 pharmacology.
6    But I think the overall idea is
7 that if you can give a medicine to achieve
8 the effect, and then how much more medicine
9 do you need to achieve the potential risks
10 with that.
11    And I'll stop there because
12 you're going to ask more questions.
13    Q.   Yeah.
14    No, I'm just wondering, what's
15 the methodology that you use to determine
16 that Xarelto has a narrow therapeutic index?
17    A.   Well, first and foremost, the
18 FDA declares it as a blood thinner, and blood
19 thinners do have narrow therapeutic indices.
20 I would agree with that statement from the
21 FDA, and I point that out here.
22    You know, I manage patients who
23 take medicines that are generally considered
24 narrow therapeutic index, that sort of makes
25 them kind of dangerous. Flecainide is one of

1 those medicines. Digoxin is one of those
2 medicines. Warfarin is certainly one of
3 those medicines.
4    It's a small step from being on
5 a therapeutic dose to having a risk that is
6 associated with that.
7    And in some of these medicines
8 for warfarin, for example, I might even argue
9 it's not just even narrow therapeutic window,
10 if you look at a per patient/per dose sort of
11 story, it's actually no therapeutic window on
12 some of these anticoagulants.
13    So if you -- if the same
14 person -- if I had two people taking
15 5 milligrams of warfarin, one of those
16 patients may be very much in the therapeutic
17 window and doing fine and not have any
18 trouble with being in and out of an INR of 2
19 to 3 at the goal that we want.
20    In another person taking the
21 exact same dose, 5 milligrams, could have an
22 INR that's 7 at a very high risk for bleeding
23 complications. And so from a very strict
24 sense there is no therapeutic window. It's
25 almost closed entirely because the same dose

1 can provide the therapeutic effect and the
2 risk that we're trying to avoid.
3    Q.   So --
4    A.   I'm just -- I'm going to just
5 round it out. Blood thinners belong in that
6 case.
7    Q.   So other than the statement by
8 the FDA that you refer to, is there any other
9 medical literature that you're relying on
10 that says Xarelto has a narrow therapeutic
11 index?
12    A.   Again, my clinical experience,
13 my classes in pharmacology, my understanding
14 and use of this medication and others in the
15 anticoagulant range. And my understanding of
16 what a therapeutic index or therapeutic
17 window is. Those are the things that I would
18 rely upon to very comfortably say that the
19 FDA agrees with that.
20    Q.   I'm asking something a little
21 different.
22    Is there any peer-reviewed
23 publication that you can point me to that
24 says Xarelto has a narrow therapeutic index?
25    A.   You know, if I looked at the --

1 if I looked at the paper that we, you know,
2 had been kind of asking for, the Figure 10,
3 the Girgis paper from the Journal of
4 Pharmacology in 2014, these are the sorts of
5 things that we would want to look at.
6    So all of these patients are
7 taking the same dose of rivaroxaban. And at
8 one hour, if you look at the scatter of each
9 of those points, if you look at the drug
10 concentration, they're all taking
11 20 milligrams by mouth, and one hour later
12 some people have drug concentrations that are
13 nearly indetectable {sic}, and others have
14 drug concentrations that are near 800.
15 That's an extremely wide range.
16    And knowing that the high drug
17 concentrations equate with high PTs, which
18 equate with bleeding risks, we now have
19 patients who are taking the same amount of
20 medicine, and at one hour some of them are at
21 high risk for bleeding and some of them have
22 no anticoagulant effect whatsoever.
23    This is the definition of a
24 narrow or absent therapeutic window. This is
25 the reason why you would want to test blood

1  levels to be able to adjust doses in
2  individual patients.
3      Q.    The authors of the Girgis
4  article don't conclude that Xarelto has a
5  narrow therapeutic index, do they?
6      A.    I'd have to look at that, but I
7  don't think that they do.
8      Q.    So that's your interpretation
9  of the Girgis article, correct?
10     A.    That's, I think, a very
11 reasonable interpretation that most
12 physicians who look at this graph would say.
13         And that includes mine, to
14 answer your question.
15     Q.    And I'm not asking you to speak
16 for other physicians.  I just want to know
17 your opinion.
18         Can you cite me to the FDA
19 definition of what is required for a
20 medication to be considered to have a narrow
21 therapeutic index?
22     A.    I cannot cite you what the FDA
23 uses to define that, although the FDA clearly
24 says that blood thinners belong in that
25 class, and I would agree with that.

1      Q.    So what's the cutoff point for
2  determining whether a medication has a narrow
3  therapeutic index?
4          Is there a number?
5      A.    There is no -- from my
6  understanding of it, there's no agreed-upon
7  number of what that -- that defines a narrow
8  or moderate or wide.  There is no agreed-upon
9  number.
10         But, you know, in the case of
11 blood thinners and in the case of the data
12 that we have from Figure 10, that is the
13 definition, that at the same dose, two
14 different people can have such widely
15 variable effect, some of which is intentional
16 therapeutic and some of which is risky.
17     Q.    What is the -- what is the
18 narrow therapeutic index for Xarelto?
19         What's the number?
20     A.    So I'm talking about a concept
21 of therapeutic index.  I'm not giving you a
22 number for therapeutic index.  There is no --
23 my understanding is that there's no
24 agreed-upon number of what that would be.  Is
25 it 2, 5, 10?

1          I'm telling you that the same
2  person -- or two people take the same dose of
3  medication and an hour later have widely
4  varying blood concentrations, some of which
5  we believe to be therapeutic, some of which
6  we would say is either above or below the
7  therapeutic range.  And in particular, it's
8  the above the therapeutic range which defines
9  the therapeutic index.  These patients are at
10 high risk for bleeding.
11         So there is no answer from a
12 numbers standpoint that I'm going to give
13 you, but the concept is shown very nicely
14 here on Figure 10.
15     Q.    So you disagree with the FDA
16 that has a number to assign to a narrow
17 therapeutic index?
18         MR. MCWILLIAMS:  Object to
19     form.
20         THE WITNESS:  I would be happy
21     if the FDA had a rigorous way to
22     assess that.  I just don't know what
23     the FDA's rigorous way to assess that
24     number is.
25         MS. DU PONT:  Can we just go

1  off the record for a second?
2          VIDEOGRAPHER:  We are going off
3     the record at 11:50 a.m.
4      (Off the record at 11:50 a.m.)
5          VIDEOGRAPHER:  We are back on
6     the record at 11:51 a.m.
7      (Cuculich Exhibit 7 marked for
8     identification.)
9  QUESTIONS BY MS. DU PONT:
10     Q.    I'm going to mark as Exhibit 7
11 the FDA's criteria on evidence to assess
12 actual or potential bioequivalence problems.
13 I show that to you, Doctor.
14         And I'll just refer you to C
15 under 320.33.  You'll see that it says,
16 "Evidence that drug products exhibit a narrow
17 therapeutic ratio."
18         Would you agree with me that's
19 the same thing as a therapeutic index?
20     A.    Yes.
21     Q.    "There is less than a twofold
22 difference" --
23         MR. MCWILLIAMS:  You forgot the
24     "for example."
25

QUESTIONS BY MS. DU PONT:

Q. "For example, there is less than a twofold difference in median/lethal dose and a median/effective dose values or have less than a twofold difference in the minimum toxic concentrations and minimum effective concentrations in the blood."

Do you see that?

A. I see that.

Q. So the FDA says that the -- there needs to be a twofold difference or less to qualify as a narrow therapeutic index?

MR. MCWILLIAMS: Object to form. You misstated the document. That's not what it says. It said that's an example of one way of doing it.

MS. DU PONT: Thank you for coaching the witness.

QUESTIONS BY MS. DU PONT:

Q. You can answer.

A. As I point out, the therapeutic ratio, or the therapeutic index, is a concept, which you've shown me here is a

document that uses an example of a twofold difference.

It also discusses lethal dose and effective dose, which is really not terms that I think would be used in a clinical context but much further upstream in terms of drug development and testing preclinically in animal models and those sorts of things.

And if we move to the second part of it, "have a less than twofold difference in the minimum toxic concentrations" -- and toxic not being death but being in the case here bleeding risks or bleeding consequences -- "and minimum effective concentrations in the blood."

So we -- I would generally agree that this defines narrow therapeutic ratio well. I would disagree that twofold is a hard-and-fast number, although I appreciate that you're trying to put it on there. And I would say that we would love to know this information because I do think it would translate into safer use of this medication.

Q. Do you know, though, what the number is for Xarelto?

A. No.

MR. MCWILLIAMS: Object to form.

THE WITNESS: I don't think we -- I don't think that we know the number in terms of a therapeutic ratio because it is a concept, not necessarily a number.

I would also say that the values that are associated with toxic concentrations in this case are a minimum -- and let me say that differently -- that the values that we put in the numerator and denominator positions, the minimum toxic concentrations and the minimum effective concentrations, are largely unknown. So we would like to know those.

I think we can extrapolate some of the data from having PTs on patients and how it translates into -- from concentrations of medicine through PTs to bleeding risks, so I think we can get an idea of toxic

concentrations. I generally -- I don't know what the minimum effective concentration is or how you would study that.

QUESTIONS BY MS. DU PONT:

Q. So you don't know the minimum effective concentration of Xarelto, correct?

A. I'm not sure that the FDA knows that. I've not seen that.

Q. And you don't know the max -- or the median/lethal dose for Xarelto, correct?

A. Again, you're saying "lethal," and I'm telling you that that's done much further upstream in terms of drug development. We're not talking about the dose that it takes for somebody to take Xarelto -- for somebody to take rivaroxaban and die.

What we're looking at is the dose, the minimum dose, that it takes to have that medicine and have an increased risk of bleeding. That would be what we ought to be talking about here. So lethal dose is not appropriate when we're talking about the

1 clinical side of things.
2 These information are very
3 important, and these are the sorts of
4 information that I and my group wanted in
5 2011, and these are the sorts of things that
6 still remain unknown in 2016.
7 But we have some guidance here
8 in 2014 from Figure 10 in my document showing
9 that there seems to be a very narrow or no
10 therapeutic window when we talk about people
11 taking the same amount of this medicine and
12 having wide ranges of plasma concentration of
13 this medicine in their body.
14 Q. Has the FDA defined
15 "therapeutic index" for Xarelto?
16 A. I don't think that they have,
17 and I don't know for sure. They have said
18 that -- we all agree it's a blood thinner,
19 and they said that blood thinners,
20 anticoagulants, have narrow therapeutic
21 window.
22 So I don't think they've given
23 a number to it, but they've clearly
24 classified it as a therapeutic window.
25 Q. Does Xarelto have a wider

1 therapeutic window than warfarin?
2 A. Because we don't know what that
3 therapeutic window is of Xarelto, I can't
4 answer that question. So I don't know.
5 Q. So how can you say that the
6 therapeutic window for Xarelto is narrow when
7 you don't know what it is?
8 A. Because I'm showing you here on
9 Figure 10 -- and I think I've answered this
10 now a couple of times.
11 So two patients taking the same
12 amount of medicine, at one hour later, have a
13 thousandfold differences of concentration in
14 their blood. These concentrations translate
15 directly into blood thinning. Some of those
16 patients are within range, and some of those
17 patients are beyond range and in range of
18 risk, increased risk of bleeding.
19 Because of that, there is no
20 therapeutic window or a narrow therapeutic
21 window. And because of such, we should be
22 able to test in order to safely deliver this
23 medicine.
24 So I don't think anywhere I've
25 mentioned that Xarelto had a comparator

1 therapeutic window to warfarin, which is what
2 your question was. I would classify them
3 both as being narrow therapeutic windows, and
4 both have wide ranges of plasma concentration
5 despite taking the same amount of medicine.
6 And so, therefore, we know that
7 the safest way to administer warfarin is to
8 be able to test. We ought to be able to have
9 that testing capabilities to safely
10 administer rivaroxaban.
11 Q. Other than the FDA statement
12 and the Girgis graph you continue to refer
13 to, are you relying on anything else for your
14 statement that Xarelto has a narrow
15 therapeutic window?
16 MR. MCWILLIAMS: Object to
17 form. Asked and answered.
18 THE WITNESS: So I wish we had
19 more data to know what that
20 therapeutic window was.
21 As I pointed out earlier in my
22 deposition, I think that the
23 opportunity was there during the
24 randomized trial to assess what
25 those -- what the doses were of either

1 concentration or PT of patients who
2 are taking Xarelto. That would help
3 us answer that question.
4 But we don't have much of that
5 information. As a prescriber, I'm
6 left with very limited information.
7 I have many articles about
8 rivaroxaban where the authors purport
9 it to be a wide therapeutic window,
10 but I don't have any hard data to
11 support that statement, which is what
12 got us to these sorts of questioning
13 of our -- of our representatives from
14 Janssen and what ultimately made us so
15 interested in the Figure 10 Girgis
16 article.
17 QUESTIONS BY MS. DU PONT:
18 Q. So you are aware that there's
19 medical literature that says that Xarelto
20 actually has a wide therapeutic window,
21 correct?
22 A. There are many manuscripts that
23 have that statement in it, but I'm unaware of
24 any that -- especially in 2011, 2012 when
25 we're struggling over this, I'm not aware of

1  anything that pointed me to data that
2  supported that statement.
3          The data that we wanted was
4  here in 2014, and the data continues to be
5  missing from really longer-term follow-up.
6          (Cuculich Exhibits 8 and 9
7          marked for identification.)
8  QUESTIONS BY MS. DU PONT:
9      Q.    I'm going to mark as Exhibit 9
10 an article by -- oh, no, you know what?  It's
11 fine.
12         I'm going to mark as Exhibit 8
13 an article by Robert Gosselin entitled
14 "Heparin-Calibrated Chromogenic Anti-Xa
15 Activity Measurements in Patients Receiving
16 Rivaroxaban:  Can This Test Be Used to
17 Quantify Drug Level?"  And this is in the
18 Annals of Pharmacotherapy in 2015.
19         So just taking a look at this
20 article, have you seen this before?
21     A.    I've come across this.  I
22 haven't put much stock in this, but I think
23 I've come across this in my studies of this.
24     Q.    Did you see this in your
25 preparation for your deposition today?

1      A.    I'd have to look back and see
2  if we have this in our -- in my file.
3      Q.    It's not on your reference
4  list.
5      A.    Yeah, I think I've seen this or
6  heard of it at some point, but it wouldn't be
7  something that I would reference.
8      Q.    Do you know who Robert Gosselin
9  is?
10     A.    I do not.
11     Q.    Do you know that he was
12 retained by the plaintiffs in this litigation
13 to serve as an expert?
14     A.    I don't know that.
15     Q.    Let me just direct you to the
16 last line in the first paragraph in the
17 introduction where it says, "Rivaroxaban is
18 used for prevention of stroke and systemic
19 arterial thromboembolism in nonvalvular
20 atrial fibrillation, treatment of venous
21 thromboembolism, thromboprophylaxis in
22 patients after knee and hip replacement
23 surgery, and treatment of acute coronary
24 syndrome as well as acutely ill medical
25 patients.  Because of its predictable

1  pharmacokinetics, pharmacodynamics and wide
2  therapeutic range, routine laboratory
3  measurement of the drug's anticoagulant
4  effect is usually not required."
5      Q.    Do you see that?
6      A.    I see it.
7      Q.    And do you disagree with that
8  statement?
9      A.    So these are the sorts of
10 statements that bother me and should bother
11 reasonable physicians.
12         When you read this sentence
13 that you just read, if you look, after every
14 disease there's a citation, right?  So you
15 read it to me that it's used for the
16 prevention of stroke and systemic arterial
17 thromboembolism in nonvalvular atrial
18 fibrillation.
19         Here is the citation,
20 citation 1, for VTE; here's the citation 2
21 and 3; for hip replacement, there's citation
22 4, and on and on.
23         And then when we go to that
24 statement, "Because of its predictable
25 pharmacokinetics, pharmacodynamics and wide

1  therapeutic range, routine lab measurement
2  and drug anticoagulant effect is usually not
3  required" -- and there's no citation to that.
4          And you will -- we could show
5  each other dozens of articles with similar
6  statements that have no citation beyond that.
7  And that's the sort of thing that we had
8  asked for in 2011.  Those are the sorts of
9  data that we wanted to know.
10         And I think it's even more
11 interesting that they put the word "usually
12 not required," because there are times that
13 we really want to know that anticoagulant
14 effect.
15     Q.    Do you know if the Annals of
16 Pharmacotherapy is a peer-reviewed journal?
17     A.    I don't know that.
18     Q.    Are you saying that
19 Dr. Gosselin is lying here when he says that
20 Xarelto has a wide therapeutic window?
21         MR. MCWILLIAMS:  I believe it's
22 Mr. Gosselin.
23 QUESTIONS BY MS. DU PONT:
24     Q.    Mr. Gosselin.
25     A.    So I'm not saying that he's

1  lying or telling the truth. He may be
2  writing -- it is a he, right?
3        So he may be writing what he
4  believes to be his knowledge of this, but I
5  don't have any reason to know if that is a
6  true statement or not.
7        And I'm going to go beyond
8  that, because I've looked to see if that's a
9  true statement. We were looking in 2011 and
10  2012 to see if that was a true statement for
11  our patients, and we just don't know that.
12        Here in 2014, we get some of
13  that information. So I can sit here in 2016
14  and tell you that I don't agree with all of
15  the pieces of that statement there.
16      Q.   Dr. Gosselin is writing this --
17      A.   Mister.
18      Q.   Mr. Gosselin is writing this in
19  2015, correct? Or 2016?
20      A.   This is published in 2015, so
21  I'm assuming that he wrote it somewhere
22  contemporary to that, so, sure.
23      Q.   After the Girgis article was
24  published, correct?
25      A.   I'm going to assume that, but I

1  don't know if he has access to Dr. Girgis'
2  information.
3        Like I said, this is a
4  statement that you can find in a number of
5  articles that are published with regards to
6  rivaroxaban, but I've never seen one that
7  cites information that shows that statement
8  to be true.
9      Q.   Let's take a look at a
10  different article by Dr. -- sorry --
11  Mr. Gosselin published in Thrombosis
12  Research, "Direct Oral Anticoagulants in the
13  Laboratory: 2015 Review." I'll mark that as
14  Exhibit 9.
15        And if you could turn to page 8
16  of that article, you'll see in the second
17  full sentence, "In clinical trials, DOACs
18  have been shown to be at least as effective
19  as warfarin but with reduced incidence of
20  intracranial hemorrhage. As each of these
21  agents has predictable pharmacodynamics,
22  pharmacokinetics and wide therapeutic
23  windows, routine therapeutic monitoring is
24  not required."
25        Do you see that?

1      A.   I do.
2      Q.   And Mr. Gosselin does cite two
3  references here, doesn't he?
4      A.   Sure. So let's look at these
5  references. So reference 9 and reference 11.
6        Reference 9 and reference 11 --
7  reference 9 is entitled "Evolving use of new
8  oral anticoagulants for the treatment of
9  venous thromboembolism," which sounds like a
10  review article.
11        I would like to have a chance
12  to look at that to see if that is actually
13  telling us that it has wide or narrow
14  therapeutic windows. My suspicion is that it
15  may not, but I would have to look at that to
16  see if it could help me with understanding
17  doses. But my hunch is that this is a review
18  article that is just saying the same thing,
19  that there's predictable pharmacodynamics and
20  pharmacokinetics.
21        The more you say it, it doesn't
22  get any more truthful. So --
23      Q.   But you haven't --
24      A.   Let me continue this.
25        MR. MCWILLIAMS: Well, let him

1  finish, please.
2        THE WITNESS: But you're
3  quoting this one, and you're showing
4  me that this is something that's going
5  to show me pharmacodynamics,
6  pharmacokinetics and wide therapeutic
7  windows. And my hunch is that this --
8  the title of this suggests that this
9  is a review article, not necessarily
10  the primary data that we want to see
11  to support that statement of
12  pharmacodynamics, pharmacokinetics and
13  wide therapeutic windows.
14        I'll take you further.
15  Number 11 is a paper that's entitled
16  "New oral anticoagulants: A need for
17  laboratory monitoring."
18        Wow, I would agree with that
19  statement there. And that was from
20  2010.
21  QUESTIONS BY MS. DU PONT:
22      Q.   You haven't reviewed either the
23  Yeh article or the Bounameaux -- I'm just
24  going to butcher everyone's name today --
25  article, correct?

1    You don't know what those
2 articles say?
3    A.   I would like to if somebody's
4 using that as a way to show me
5 pharmacodynamics, pharmacokinetics and wide
6 therapeutic windows.  But again, I think --
7 my hunch is that these are going to be not
8 the primary data that supports that
9 statement.
10    Q.    And just so I'm clear, you
11 disagree with the statement in this article
12 by Dr. Adcock and Gosselin that there is a
13 wide therapeutic window for DOACs, right?
14    You disagree with that?
15    A.   I've made that pretty clear,
16 that I think the entire class shouldn't be
17 considered a narrow therapeutic window.
18    Q.    Okay.  You can set that aside.
19    Let me ask you about your
20 opinions on page 13.  You're offering an
21 opinion that the Xarelto label should have
22 included information about the variability in
23 drug concentration of the patient over time.
24    Do you see that, the top of 13?
25    It's the second sentence on the

1 page.
2    A.   I see that sentence, yes.
3    Q.    And you're also suggesting that
4 the Xarelto label should have included
5 information about the variability and effect
6 of the medication as measured by prothrombin
7 time, correct?
8    A.   That would be a nice thing to
9 have for prescribers like me.
10    Q.    What specifically should have
11 gone into the label?
12    A.   So it would be appropriate for
13 prescribers like me to have information about
14 how to dose this medicine.  And if we're
15 going to apply the principles of precision
16 medicine, or apply the principles that each
17 patient has unique ways of metabolizing and
18 using the medicines, particularly when we're
19 talking about a medicine with a narrow
20 therapeutic window, like a blood thinner, it
21 would be very nice for us to have a way to
22 assess the effect of this medicine to avoid
23 the overshoots and put patients at high risks
24 of bleeding.
25    In the product -- in the

1 product label, what I talk about here, I
2 would love to have seen the distribution of
3 the plasma effects, such as the Figure 10
4 that I keep quoting from Girgis.  I would
5 love to have seen that from personal
6 interpretation of the data.
7    I would loved to have seen
8 information about what the PT was for the
9 different doses, the different
10 concentrations, of patients who are taking
11 that.
12    I would love to have some
13 guidance in terms of who are the patients
14 that we consider to be at higher risk for
15 bleeding or ways that we could readjust and
16 retreat patients.
17    There's a lot of guidance that
18 I think we were hungry for in 2011, 2012,
19 with regards to patient safety.
20    Q.    What I'm trying to get at is
21 what specific language do you think should be
22 in the label?
23    MR. MCWILLIAMS:  Object to
24 form.  Asked and answered.
25    THE WITNESS:  These are the

1 specific informations, the specific
2 pieces of data, that I would have
3 wanted.  In particular, I would have
4 liked a way to test the effect of the
5 medicine and do it in a reliable way
6 that ultimately did help us decide who
7 would be at higher risks.  And if we
8 just want to stay on the bleeding
9 side, we can, but it also -- people
10 who might be undercovered or might be
11 at higher risk for a stroke.
12    Now, similar to what we do for
13 warfarin, where we'd have a way to be
14 able to test, a way to be able to
15 assess the result of that test and
16 modulate our treatment, whether that's
17 adjusting dose or adjusting frequency
18 of that medicine or changing medicines
19 altogether, it would be nice for us to
20 be able to apply that in a way that
21 keeps patients' safety first.
22 QUESTIONS BY MS. DU PONT:
23    Q.    So are you suggesting that
24 there should have been information in the
25 label about prothrombin time concentrations?

1      MR. MCWILLIAMS: Object to
2  form.
3      THE WITNESS: I think that
4  would have helped -- I'm sorry.
5      MR. MCWILLIAMS: I think she
6  misspoke. Concentrations.
7  QUESTIONS BY MS. DU PONT:
8      Q.   I didn't mean to say that.
9      Are you -- so you're suggesting
10  there should have been information in the
11  label about prothrombin time?
12      A.   As a prescriber of this
13  medicine, I would certainly have liked to
14  have seen information with regards to the
15  concentration of this medicine across the
16  populations who take it, the variability
17  among people who take the same doses.
18      I would like to see what the
19  PTs were among those and how it related to
20  plasma concentrations, and ultimately
21  guidance in terms of how to help manage --
22  identify the patients who might be at higher
23  risk. And I think that's really going to be
24  with checking of PT. And then maybe even
25  some thought about how we could modulate

1  therapy to reduce that risk of bleeding.
2      Q.   So should the label have had
3  certain percentages, the 5th to the 95th
4  percentile for PT patients?
5      A.   You know, I use that -- I use
6  that as an example of something that could
7  have been done to help a guy like me when I'm
8  sitting there with patients.
9      As you pointed out earlier, I
10  don't write the words for the FDA. But what
11  I do want to do is I want to read the product
12  label, and I want to have an idea of what's
13  the safety of this medicine, and how can I
14  give it to my patients in the safest way.
15      If we're leaving something off
16  that product label that would help me and my
17  patients, well, I would be hungry for that.
18  I would welcome that.
19      And I've given you several
20  examples of how I think that could have been
21  done. I both write them here, and I told you
22  about different ways that could be helpful.
23      And I think in particular -- I
24  mean, I think in particular, if we're going
25  to focus down on one that's really important,

1  it would be the idea that we could test the
2  blood of patients who we start this
3  medication on and find the people who might
4  be at highest risk for bleeding, because
5  that, to me, seems very realistic and a very
6  tangible thing that we can do.
7      Q.   Is the PT, or the prothrombin
8  time, the test you're referring to?
9      A.   Of all of the things that I've
10  read, that seems -- and FDA would agree with
11  this -- that one seems to be the one that
12  ties in most closest. If we do the
13  Neoplastin and PT, that one is the one that
14  ties closest with the concentration and
15  ultimately would make sense for bleeding
16  risks. So that would be the one that I would
17  propose.
18      Now, a PT test is widely
19  available. That's kind of a nice piece to
20  this is that if it were recommended to do a
21  PT, particularly with a Neoplastin agent, and
22  we did that at a certain time period after
23  starting the medication, I think that would
24  help us identify the people who have very
25  high levels and might be at excess risk for

1  bleeds.
2      Q.   So would your proposed label
3  include information about the 5th to 95th
4  percentile for PT in patients who are taking
5  Xarelto for stroke prevention and ablation?
6      MR. MCWILLIAMS: Object to
7  form. Asked and answered.
8      THE WITNESS: I think that's
9  one of the many ways that you can show
10  to prescribers like me the wide
11  variation that is available.
12      The 5th to 95th percentile that
13  I speak of is essentially the data
14  that I keep coming back to on
15  Figure 10, this idea that I can look
16  at actual real people and their actual
17  plasma concentrations and actual real
18  time points after taking the medicine
19  and make an assessment on the wide
20  variability.
21      My interpretation, and I think
22  reasonable interpretation, of
23  Figure 10 is inconsistent with the
24  message that was there in 2011, 2012,
25  when we started prescribing this, in

1    that one size does not fit all in this
2    medication.  There's a wide variation
3    of range.
4        The idea that you brought out
5    there of the 5 to 95th percentile
6    would give me this information.  If I
7    had this information in the product
8    label, I would look at that and say,
9    "Whoa, we need to do better."
10       This has concern for me.  This,
11   in my mind, leaves my patients at risk
12   for both bleeding and for stroke,
13   whether they're at the top end or the
14   bottom end.  And I would welcome a way
15   to be able to identify those patients.
16   QUESTIONS BY MS. DU PONT:
17       Q.    Are you aware that Janssen
18   actually submitted draft labeling that
19   included the 5th to 95th percentile of PT and
20   the FDA struck that language?
21       MR. MCWILLIAMS:  Object to
22   form.
23       THE WITNESS:  I'm not aware of
24   that.
25

1    QUESTIONS BY MS. DU PONT:
2        Q.    Would that -- is that something
3    you looked for?
4        A.    I think that would be one of
5    the things that would help me make that
6    decision or interpret how to give the
7    medicine.  I think that would be welcomed.
8        Q.    But would that change your
9    opinion that you just offered, that PT
10   should -- PT levels should go in the label
11   because the FDA decided it didn't need to be
12   there?
13       MR. MCWILLIAMS:  Object to
14   form.  That's not what the FDA said.
15       THE WITNESS:  Well, whether it
16   was the FDA or Janssen who said yes or
17   said no, it doesn't change my opinion.
18   I would have wanted that information.
19   QUESTIONS BY MS. DU PONT:
20       Q.    You're aware that the PT tests,
21   there's different regions {sic} that can be
22   used by labs, right?
23       A.    Correct.
24       Q.    And different regions {sic}
25   affect the length of the time it takes --

1        MR. MCWILLIAMS:  Do you mean to
2    say "reagent" or "region"?
3        MS. DU PONT:  Reagent, sorry.
4    QUESTIONS BY MS. DU PONT:
5        Q.    Different reagents that can
6    affect the length of time it takes for blood
7    to clot?
8        A.    That's my understanding as
9    well.
10       Q.    And the same blood sample
11   tested with different reagents can have
12   different PT times, right?
13       A.    That's my understanding.  That
14   forms the basis for warfarin use in a
15   standardized INR, the normalized ratio.
16       Q.    But INR is specific to
17   warfarin, right?
18       A.    Correct.
19       Q.    It doesn't work properly when
20   you try to apply it to the NOACs?
21       A.    That's my understanding, but I
22   think that has to do with particular use of
23   one PT that seems to be best and most
24   specific for this.
25       The INR helps bring in multiple

1    different kinds of PTs through different
2    reagents and apply it to a more universal
3    result.
4        We don't have that kind of
5    universal result with rivaroxaban.  The
6    closest thing we have is -- from my reading
7    of this is the Neoplastin PT.
8        Q.    That's just one specific
9    reagent?
10       A.    That's correct.
11       Q.    That your hospital does not
12   use?
13       A.    That's correct.
14       Q.    Now, you say that rivaroxaban
15   seems to have at least moderate interpatient
16   variability, right?
17       A.    Yes.
18       Q.    You also say that it has wide
19   interpatient variability, right?
20       A.    Show me where that was said.
21       Q.    Page 18.
22       A.    Just so I can understand the
23   context behind it.
24       Q.    It's on the first -- or the
25   second paragraph on page 18.

1    A.    Thank you.
2         Yes.
3    Q.    I'm just trying to understand,
4  do you think it's wide, or do you think it's
5  moderate?  Because your report says two
6  things.
7    A.    Fair enough.
8         I think both levels seem high.
9  If you wanted to use moderate or wide, the
10  moderate comes from a specific quoted paper,
11  and I think that actually has some numbers
12  behind it.
13         Give me one moment to find it.
14  That's the Mueck assessment of it.
15    Q.    It's Mueck 2014?
16    A.    Yeah.  I think it actually
17  might be before then.  Give me one moment.
18  I'll find it in here.
19         I put it in bold letters.  It
20  is Mueck 2014, and it's on my report at page
21  15 in the first paragraph.
22         "As described by Dr. Mueck, a
23  chief scientist in rivaroxaban development,
24  in quote, interindividual variability in
25  pharmacokinetics was moderate," and he puts

1  30 to 40 percent, and it "was consistent over
2  the 12-week duration of the studies."
3    Q.    And do you agree with that
4  statement by Dr. Mueck?
5    A.    He has access to the data to
6  see what the number in terms of
7  interindividual variability was, and his
8  conclusion from this trial -- or from this
9  study was that that was moderate, from 30 to
10  40 percent.
11         I think if I interpret
12  Figure 10, I don't know how he would get 30
13  to 40 percent from interpretation of
14  Figure 10.
15         If you looked at Figure 10 you
16  would say, certainly at one hour or even at
17  24 hours, it appears that the interpatient
18  variability is extreme, anywhere from almost
19  negligible or negligible concentrations at
20  24 hours to concentration peak that looks
21  like it's at about 700.
22         Let me see if I'm saying that
23  right.  Yeah, about 6 or 700.  I mean, it's a
24  wide range from essentially zero to 600 in
25  terms of the concentration.

1         So I don't know how I would
2  quantify, or how Dr. Mueck quantified,
3  moderate being 30 to 40.  I think that 30 to
4  40 is a number that is accepted in studies of
5  pharmacokinetics.
6         My interpretation of seeing
7  this would really open my eyes in terms of
8  there's a very wide interpatient variability
9  here.
10    Q.    So you disagree with
11  Dr. Mueck's conclusion that rivaroxaban
12  interpatient variability is --
13         MR. MCWILLIAMS:  Object to
14  form.
15         THE WITNESS:  Yeah, I don't
16  disagree with the fact that he said --
17  if you found a 30 to 40 percent
18  interindividual variability, that
19  indeed would be moderate based on
20  the -- what I understand of the
21  pharmacokinetic definitions.
22         I think I would challenge
23  Dr. Mueck and others to look at the
24  clinical data from ROCKET-AF and say
25  that at 24 hours, I'm not sure how you

1  could comfortably use 30 to 40 percent
2  in terms of how that range fits.
3         When I think about patients who
4  I'm treating at 24 hours, some of them
5  have really high levels of plasma
6  concentration; some are absent.
7  That's a very wide variability from 6
8  to 700.
9         So I don't disagree that 30 to
10  40 percent is considered moderate, but
11  I would disagree that it seems like
12  it's moderate based on what we have
13  seen here with the limited data that
14  we have.
15  QUESTIONS BY MS. DU PONT:
16    Q.    Did you do a mathematical
17  calculation based on that figure to figure
18  out what the interpatient variability is?
19         MR. MCWILLIAMS:  Other than
20  what he just testified to?
21         THE WITNESS:  Right.  I will
22  tell you that at 24 hours or at one
23  hours, the variation of these patients
24  goes from essentially zero, or right
25  around zero, to roughly 6 or 700.  And

1    we could do all sorts of math on that.
2        I don't have the specific
3    numbers of each of those dots to know
4    where -- how you would best apply the
5    math, but if I took a 1 to a 600
6    range, that seems awfully broad.
7    QUESTIONS BY MS. DU PONT:
8       Q.   Is that how you calculate
9    interpatient variability?
10        MR. MCWILLIAMS:  Object to
11    form.
12        THE WITNESS:  Fair enough.
13        So this is the sort of data
14    that is helpful and applicable to
15    physicians who are applying this data
16    to patients.  This is the sort of
17    thing that we want to see, that wasn't
18    available in 2011 and 2012 when we
19    were prescribing this medication.
20        If Dr. Mueck says that there's
21    a 30 to 40 percent interindividual
22    variability over the way that he
23    studied it, I'm neither going to agree
24    nor disagree.  That was his
25    observation there.

1        But what I really want is not
2    so much Dr. Mueck's interpretation of
3    his data.  What I really want is the
4    actual data for me to be able to
5    interpret.
6        And if I sit down with a
7    patient and we say that, you know, at
8    24 hours a third of patients are going
9    to have higher than 200 of their
10    concentration, and that translates
11    into high bleeding risks, and then
12    we're going to ask them to take
13    another dose, that doesn't sit well
14    with me or my patients.
15    QUESTIONS BY MS. DU PONT:
16       Q.   What do pharmacokinetic experts
17    use to quantify interpatient variability?
18        Do you know the name of that?
19       A.   I don't know the definition
20    that one would use to come up with that.
21       Q.   And you haven't done that
22    mathematical calculation, correct?
23       A.   I have not done the
24    mathematical calculation.  But as I just
25    mentioned, I think, from a clinical

1    applicability standpoint, what I need to see
2    is this type of a graph.  I don't need
3    somebody's interpretation of it.
4        And let's be frank.  I welcome
5    drugs have that low interindividual
6    variability.  We want that.  As clinicians,
7    we want to able to prescribe this.  I want
8    the promise of rivaroxaban to be true.
9        But my interpretation of the
10    data that I've seen, provided based on
11    publications in 2014, is inconsistent with
12    the message that was given to me in 2011.
13        (Cuculich Exhibit 10 marked for
14    identification.)
15    QUESTIONS BY MS. DU PONT:
16       Q.   Let's take a look at
17    Dr. Girgis' article.
18        And just for the record, this
19    is Exhibit 10.  It's an article by Girgis, et
20    al., entitled "Population Pharmacokinetics
21    and Pharmacodynamics of Rivaroxaban in
22    Patients with Nonvalvular Atrial
23    Fibrillation:  Results from ROCKET-AF."
24        Now, Doctor, does Dr. Girgis
25    say anywhere in this article that there's

1    large or wide interpatient variability for
2    Xarelto?
3       A.   Give me just a few moments to
4    look through the very specific -- based on
5    the question, the way you asked it, I'm
6    guessing no, but could you give me a moment
7    to try to skim --
8       Q.   Sure.
9       A.   -- for a modest answer to that
10    based on this?
11        While I'm skimming, can I ask
12    that you just repeat the question?  Or could
13    you repeat the question for me, please?
14       Q.   Does it say anywhere in this
15    article that there's a large or wide
16    interpatient variability for Xarelto?
17       A.   I strongly doubt that he used
18    those words.  If I could look into the
19    section that he seems to discuss, at least in
20    the results section -- that would be page 921
21    on the right-hand side -- that is where in
22    the large paragraph on the right-hand side,
23    about a third of the way down there's a
24    sentence that says, "The interindividual
25    variability," and then it talks about three

1  different ways, the CL over F or the V over F
2  or the residual variability terms, and it
3  gives those numbers.
4        And it gives those numbers for
5  different data sets. And in particular in
6  this study, it's 35 percent, 18 percent and
7  48 percent. So he reports specifically what
8  these interindividual variabilities are.
9        Q.   But he doesn't say here in this
10 article that Xarelto has a large or wide
11 interpatient variability, does he?
12       A.   I'm just -- short of reading
13 all of this looking for more, I'm going to
14 say he probably does not say that. Because
15 I've read over this article several times,
16 and the interpretation of the data generally
17 doesn't come out that this is a wide
18 variability.
19       In this case, though, if you
20 looked at the percentages that are
21 reported -- and they use three different
22 ways: 35 percent, 18 percent, 48 percent.
23 Again, you'd have to use those numbers then
24 to plug in to whatever those definitions are.
25       The Mueck article talked about

1  30 to 40 percent being moderate. You know,
2  one of these numbers is 48 percent, which is
3  even more variable. But I don't know what
4  numbers you would classify for each of these.
5        Q.   And you haven't done these
6  calculations?
7        A.   No, I've not done those
8  calculations, but that was done for me here
9  on the 35, 18 and 48 percent. These are the
10 sorts of explanations and math of the
11 variability that we've been looking for and
12 that we wanted to see.
13       Q.   So let's take a look at
14 Dr. Girgis' conclusion on page 926, and it's
15 the first sentence in the second -- the
16 right-hand column.
17       "The overall PK and PT" --
18 sorry, "PK and PD similarity in many analyses
19 across different populations suggests that
20 rivaroxaban provides anticoagulation in all
21 studied populations that is both consistent
22 and predictable. Reliable estimations of
23 rivaroxaban exposure as a result of this
24 predictability, coupled with low
25 interindividual variation, should facilitate

1  optimal management of anticoagulation."
2        Do you see that?
3        A.   I do. It's kind of interesting
4  because we just defined the moderate
5  interindividual variability as 30 to
6  40 percent, and then he provides us
7  information that says it ranges in three
8  different methods of 35, 18 and 48; 48 being
9  large -- or 18 being smaller and 35 kind of
10 falling within the moderate range.
11       So his interpretation of the
12 data in that discussion is particularly
13 reassuring but may not be consistent with
14 what we call moderate interpatient
15 variability, 48 percent being greater than 30
16 to 40 percent.
17       So there's at least residual
18 variability terms that are 48 percent
19 interindividual variability. That is more
20 than moderate based on what has been defined
21 before.
22       I'm careful to -- I'm careful
23 to take the words of somebody in discussion.
24 I appreciate their efforts to try to
25 summarize the data. The real impact is in

1  the data, though.
2        And, you know, when we look at
3  this -- and however you want to call the
4  data, however you want to explain the data,
5  the data still remain the data. And the
6  ability to see the wide spread of plasma
7  concentrations in patients who take the same
8  dose in Figure 1 C, which is what I used for
9  Figure 10, but the way to see that is very
10 impactful and doesn't make me feel very
11 reassured.
12       Q.   So let's just go back, though,
13 to the conclusions of Girgis and the other
14 authors of this paper.
15       Are you saying you disagree
16 with their conclusions here?
17       A.   If you say that moderate
18 interpatient variability as defined by Mueck
19 being 30 to 40 percent, we have some
20 parameters of interpatient variability that
21 are more variable, so those sound at least
22 moderate or more variable.
23       So the idea that this is -- and
24 which statement did you want to point to?
25       Q.   The overall -- the one we just

1  read.
2          MR. MCWILLIAMS: It says the
3  variability is low.
4          THE WITNESS: Yeah, I just -- I
5  was looking to see the exact statement
6  before I agree or disagree with it.
7          I would generally disagree that
8  the variability is low after reading
9  this, so -- I don't have the specific
10  statement that she quoted, but, yes, I
11  would disagree that the results of
12  this make me feel like the
13  interpatient variability is low.
14  QUESTIONS BY MS. DU PONT:
15      Q.  If we look at the figure that
16  you keep referring to from Girgis in your
17  Mueck paper, each of these dots is a patient,
18  correct?
19      A.  That's my interpretation of
20  this.
21      Q.  Do you know whether the
22  patients that had high concentrations had a
23  bleeding event?
24      A.  No, that -- my understanding is
25  that the points in time that these doses --

1  or these blood tests were taken is sort of
2  described through here. We go back to sort
3  of the methods of this.
4          The points in time were taken
5  outside of the points of clinically
6  actionable events like a stroke or like a
7  bleed. So these largely were random samples
8  that were taken over the course of ROCKET-AF.
9  They describe that they tried to take certain
10  time points for patients, but there was
11  nothing that specifically tied it to bleeding
12  events.
13      Q.  So you don't have any data to
14  support that a higher concentration or a
15  higher PT for a specific patient was
16  associated with higher bleeding in this
17  paper?
18          MR. MCWILLIAMS: Object to
19  form. Asked and answered and
20  misstates evidence.
21          THE WITNESS: So I think I
22  showed you the pretty clear evidence,
23  both in warfarin and in the FDA's
24  review of rivaroxaban, that tied
25  higher concentrations of the drug to

1  higher PTs, which then corresponds
2  very clearly to higher rates of
3  bleeding events. So I think it's very
4  easy to take those back and apply that
5  here.
6          And as I answered before, these
7  samples were taken outside of the
8  realm of bleeding events.
9  QUESTIONS BY MS. DU PONT:
10      Q.  Thank you.
11          Let's talk about that figure
12  from the FDA. And if you can refer back to
13  Exhibit 6.
14          And in Figure 6, that's
15  actually in the medical review from the FDA
16  at page 38, right?
17      A.  Right. I'm with you on
18  page 38.
19      Q.  You take this Figure 6 in the
20  FDA medical review and put this in your
21  report, correct?
22      A.  Correct.
23      Q.  Okay. And then you also refer
24  to Figure 8 in your report, correct?
25      A.  And just so we're clear, that's

1  the FDA Figure 8 on page 40 of Exhibit 6?
2      Q.  Yes.
3      A.  Yes.
4      Q.  And from this graph, you are
5  asserting that the risk of major bleeds
6  increases with PT, correct?
7      A.  I think that would be a fair
8  assessment of the data here, that on the X
9  axis as prothrombin time gets higher, the
10  percent with major bleeds also increases.
11  That's a reasonable conclusion.
12      Q.  So now turn to page 41. And
13  just take a look at the graph on the
14  left-hand side of Figure 1.
15          Do you see that?
16      A.  Which figure?
17      Q.  Figure 10.
18      A.  Figure 10? Okay.
19      Q.  Sorry. I said Figure 1. I
20  meant Figure 10.
21      A.  Yes.
22      Q.  And that describes ROCKET ISTH
23  major bleeding versus PT by ASA use.
24          And ASA is referring to
25  aspirin?

1     A.   Uh-huh.
2     Q.   And if we look at this graph,
3 the blue line is aspirin users who are also
4 taking Xarelto, correct?
5     A.   It looks like the blue line is
6 patients who are taking aspirin and Xarelto,
7 correct.
8     Q.   And the dotted line are
9 patients that are just taking asp -- or just
10 taking Xarelto and are not on aspirin,
11 correct?
12     A.   That is correct.
13     Q.   So if we look at this -- and
14 this is what the FDA says, just above that
15 figure. "The relationship between PT
16 prolongation and major bleeding is
17 exacerbated in patients taking concomitant
18 aspirin at least 50 percent and attenuated in
19 patients not taking aspirin," right?
20     A.   That's the statement there,
21 yes.
22     Q.   So you didn't include Figure 10
23 in your report, right?
24     A.   I did not.
25     Q.   Wouldn't you agree that it's

1 important for a jury to understand that
2 aspirin use impacts whether PT increases
3 bleeding risk?
4     A.   I think that's fair. I think
5 it is important to know all of the different
6 situations by which the bleeding risks for
7 rivaroxaban are increased.
8     It's difficult -- I don't know
9 what the -- and there's a couple caveats that
10 I want to put in. I don't know what the
11 overall numbers in terms of aspirin use or
12 nonaspirin users. Sometimes the populations,
13 when you start cutting large data, large
14 trials, into smaller populations, the number
15 of patients in each group is obviously
16 smaller, and the power with which you can
17 make your conclusions and form your
18 conclusions is decreased.
19     So I just don't know what the
20 overall N, or number, is in terms of aspirin
21 or nonaspirin users. You get a sense of what
22 that is based on the confidence intervals of
23 the bars, but it's difficult to know for
24 sure.
25     Would I be surprised that

1 patients who take an oral anticoagulant plus
2 an antiplatelet agent are at higher risk for
3 bleeding? I am not surprised. Concomitant
4 use of any antiplatelet, antithrombin, any
5 type of blood thinner concomitantly used
6 would increase the risk.
7     So I'm not at all surprised
8 about this.
9     Q.   In fact, that's in the label
10 for the --
11     A.   I'm not done yet. Hold on.
12 Let me continue that thought. Because I was
13 saying that I don't know what the size of
14 these groups are, I would not be surprised
15 about this. And I don't think that there's
16 anything that is earth shattering or changes
17 the way I would necessarily approach this.
18     Both lines do trend up, both
19 lines go up, meaning that at lower
20 prothrombins your risk of bleeding is lower,
21 and at higher prothrombins your risk of
22 bleeding is greater. And that -- I agree
23 that the conclusion that you make from
24 looking at Figure 10, assuming that these are
25 appropriately sized in a retrospective

1 analysis, would suggest that aspirin use does
2 increase the risk of stroke -- or I'm sorry,
3 increase the risk of bleeding.
4     Now that would also be
5 important for prescribers like me to know.
6     Q.   But, Doctor, the exposure
7 response for nonaspirin Xarelto users -- or
8 Xarelto users who are not using aspirin is
9 flat.
10     MR. MCWILLIAMS: Object to
11 form.
12     THE WITNESS: No, I disagree.
13 That goes up. It goes up from 14 up
14 to 30. I mean, that line continues to
15 go up.
16     And again, I don't -- I would
17 be careful about making broad
18 generalizations looking at small
19 subgroups of a prospective trial
20 before making those conclusions.
21     But I would say that that trend
22 still goes up. And the PT being
23 higher is still associated with higher
24 risks of bleeding than the PT being
25 lower.

1          MR. MCWILLIAMS:  And, Counsel,
2     there's numerical values over on the
3     right side.  Instead of just
4     eyeballing the chart, you can actually
5     see how it goes up, if at all.
6     QUESTIONS BY MS. DU PONT:
7          Q.    Doctor, you didn't disclose
8     this information about aspirin users and
9     nonaspirin users in your report, did you?
10          MR. MCWILLIAMS:  Object to
11     form.  Asked and answered.
12          THE WITNESS:  I did not include
13     Figure 10 in my report, no.
14     QUESTIONS BY MS. DU PONT:
15          Q.    Don't you think it's important
16     for jurors to know about the fact that
17     nonaspirin users have a very small slope with
18     PT?
19          MR. MCWILLIAMS:  Object to
20     form.  Assumes facts not in evidence.
21          THE WITNESS:  So I think that
22     patients and jurors should understand
23     that when you take rivaroxaban there's
24     a higher risk of bleeding, and it
25     is -- and that's clearly shown in

1     Figure 10.  With or without aspirin,
2     the slopes are up.  So there's a
3     higher risk of bleeding.
4          And if I had a way to be able
5     to test what that prothrombin time
6     would be on any of my patients, I
7     could help try to mitigate that risk.
8          It should come as no surprise
9     to me or to others that being on two
10     medicines that cause bleeding
11     increases the risk.
12     QUESTIONS BY MS. DU PONT:
13          Q.    Have you asked your hospital to
14     get the PT Neoplastin test?
15          A.    No.  I've asked them if we
16     carry it, and they say we don't carry it.
17          Q.    If you think that PT Neoplastin
18     should be used in a patient, why haven't
19     asked your hospital to get it?
20          A.    There's many reasons that go
21     into that.  Asking the hospital to spend more
22     money on these sorts of tests that are
23     unlikely to be covered by insurance anyway
24     puts my patients at risk for unnecessary
25     cost.

1          You know, I could ask the
2     hospital to do it; they may or may not choose
3     to do it.  They may not be able to bill for
4     those -- for the patients.  The patients may
5     be stuck with 300, 400, $500 bills.
6          It would be nice to do that.
7     It would be nice to have that.  It would be
8     nice if that was widely available, but it's
9     just not realistic at this point.
10          Q.    Have you looked into how the
11     hospital could get it?
12          A.    It would be certainly be easier
13     for me to ask the hospital to get this if
14     Neoplastin was in the product label of
15     Xarelto.  If that was there, I could point to
16     something and say, "This is the product
17     labeling, this is available, and this is what
18     to do with it."
19          But because it's not
20     recommended within the product label makes it
21     very difficult for me to ask the hospital to
22     spend more money.
23          MS. DU PONT:  Why don't we take
24     a break for lunch?
25          VIDEOGRAPHER:  We are going off

1     the record at 12:44 p.m.
2          (Off the record at 12:44 p.m.)
3          VIDEOGRAPHER:  We are back on
4     the record at 1:14 p.m.
5     QUESTIONS BY MS. DU PONT:
6          Q.    Doctor, we've been talking
7     about these PT, correct, in patients with
8     rivaroxaban?
9          A.    Yes.
10          Q.    Taking rivaroxaban.
11          And you explained that there
12     should be certain instructions to doctors for
13     patients that are taking rivaroxaban and how
14     to use PT.
15          What specific instructions are
16     you saying should be included in the label?
17          MR. MCWILLIAMS:  Object to
18     form.
19          THE WITNESS:  Right.  And I
20     never said that it should.  I said it
21     would be very helpful for us to be
22     able to monitor those sorts of things.
23          You know, in clinical trials it
24     would be nice to know what those high
25     risks are and draw some cutoffs with

56 (Pages 218 to 221)

Page 222

1    regards to the PT values.  It would be
2    important for you to know the timing
3    of these blood draws to properly
4    interpret the data.
5        And then it would be helpful to
6    have some consensus about what to do
7    with that information, again, whether
8    that be adjust the dose, adjust the
9    frequency or consider other medical
10   treatments other than rivaroxaban at
11   the current dose.
12   QUESTIONS BY MS. DU PONT:
13       Q.   And you suggested on page 20 of
14   your report that a single blood test should
15   be done three hours after the first dose of
16   Xarelto, right?
17       A.   Yeah, I believe that's on
18   page 19.
19       Q.   Sorry.
20       A.   But, yes, I think there are
21   many different ways that we can improve the
22   safety of using this medicine for our
23   patients.  And one, I think, very simple
24   suggestion -- and this is only one of a
25   number of possibilities that we could

Page 223

1    consider.
2        But using -- and again,
3    Figure 11 is from Mueck, the 2011 paper, the
4    online supplement.  That's a graph where they
5    look at the distribution of concentrations in
6    patients' blood of rivaroxaban.  And I
7    believe that's a one-hour or a three-hour --
8    I forget what hour time point that is.
9        But after the, you know, single
10   dose on day one, you just started it, and one
11   can see -- again, similar to other
12   information that we've had and seen, we see a
13   wide spread of concentrations of medication
14   in this patient population.  You see some
15   that's close to zero, and you see others as
16   high as 800, and this is micrograms per
17   liter.
18       You know, if we were to start a
19   medication and we had this wide distribution,
20   I think it would be fair to consider drawing
21   a PTT if it -- or a PT, provided that it
22   corresponded like it does to the
23   concentration levels, and we could identify
24   the patients who were at excess levels or at
25   remarkably no response to the medication.

Page 224

1        So one of the ways that I think
2    we could deliver rivaroxaban in a safer way
3    to our patients would be to do these sorts of
4    blood tests.
5        Q.   But is there a specific number
6    of PT that would -- you would tell doctors in
7    the label to discontinue Xarelto at?
8        A.   Right.
9            MR. MCWILLIAMS:  Object to
10   form.
11           THE WITNESS:  You know, again,
12   I'm not writing these sorts of
13   recommendations.  I think that
14   certainly there's a gradation as we've
15   talked about before.  A PT of 20 is
16   lower risk of bleeding than 30 is
17   lower risk of 40.
18       Where do we want to draw that
19   cutoff?  We'd have to look at all of
20   the data that's available.
21       Of the data that I have access
22   to, of the things that I've shared, it
23   would make sense to at least report
24   what that PT is to the prescribing
25   physician.  And if that PT is 40 or

Page 225

1    more, it's akin to having an INR
2    that's, you know, very high, higher
3    than 4.  We know that those patients
4    are at higher risk for bleeding.
5        It would be very helpful, and I
6    think very safe, for patients to know
7    that they are a, quote/unquote, super
8    responder or that their levels of
9    blood thinning are beyond what we
10   consider normal and are in risky
11   range.
12       So if you ask me for a specific
13   line to draw in the sand, I don't have
14   that for you.  I would tell you that
15   in my practice if, you know, I would
16   be able to do these sorts of things, I
17   would talk to patients when their
18   Neoplastin PT got above 30, 35, 40,
19   and I'd say, "This is -- this may be
20   abnormal.  We don't know, we don't
21   have guidance from the FDA on this,
22   but this may be abnormal, and this may
23   require us to rethink your
24   anticoagulation strategy."
25

57 (Pages 222 to 225)

1 QUESTIONS BY MS. DU PONT:
2 Q. What methodology did you use
3 for determining that a PT test is a reliable
4 test for identifying Xarelto patients at the
5 highest risk of bleeding?
6 MR. MCWILLIAMS: Object to
7 form. Asked and answered.
8 THE WITNESS: So I would say
9 that there's a number of things that
10 go into that sort of conclusion that
11 you've built for me.
12 You know, we build on our
13 clinical history of, as you point out,
14 five decades of working with warfarin
15 and, you know, four decades or so of
16 working with warfarin with INRs, where
17 we know that elevated PTs do increase
18 the risk of bleeding, and extremely
19 elevated PTs very much magnify that
20 risk of bleeding.
21 So based on the knowledge that
22 high PT does translate to a higher
23 risk of bleeding, one can come to that
24 conclusion.
25 I've walked you through

1 previously how we've been able to
2 correlate the high concentrations of
3 rivaroxaban in the blood with higher
4 rates of PT.
5 As I show in Figure 6 on
6 page 20 of my report that -- we've
7 looked at this before. And it's
8 fairly clear, I think, that you can
9 connect all of those things to say
10 elevated PTs equal elevated risks of
11 bleeding.
12 QUESTIONS BY MS. DU PONT:
13 Q. The opinion that you have that
14 PT is a reliable test for identifying Xarelto
15 patients at the highest risk of bleeding, you
16 haven't published that opinion, correct?
17 A. No, that's correct. Of all of
18 the tests that had been looked at or had been
19 studied, the one that seems to be closest in
20 terms of its ability to predict levels of
21 rivaroxaban in the blood or seems to be most
22 closely correlated, as we've talked about, is
23 the Neoplastin PT. It's the one that is
24 particularly mentioned in publications as
25 well as in FDA product labels. So that would

1 be the one that seems to be closest related.
2 Q. You can't cite for me, sitting
3 here today, any generally accepted practice
4 guide, regulatory guideline or other
5 peer-reviewed authority that concludes that
6 PT is a reliable test for monitoring Xarelto,
7 can you?
8 MR. MCWILLIAMS: Object to
9 form. Asked and answered. Misstates
10 testimony and evidence.
11 THE WITNESS: Yeah, I would
12 disagree with your statement, at least
13 parts of it. I cannot show you
14 randomized clinical trials of
15 different ways to manage patients who
16 take rivaroxaban and adjust the dose
17 based on the PT, because that trial
18 simply is not done. You and I both
19 know that.
20 What we have is what we have,
21 and we have to make the best use of
22 the data that we do have.
23 We have patients who have had
24 their PTs -- blood work drawn. We
25 have patients who have had concomitant

1 rivaroxaban concentrations that have
2 been drawn. We have a close tie-in
3 with rivaroxaban concentrations and
4 PTs. We have elevated PTs that are
5 clearly associated with higher risk of
6 bleeding. And so connecting all of
7 these things together is, again, a
8 pretty simple task, I think.
9 What you're asking is, do we
10 have guidelines how to manage it
11 beyond that. We do not yet have
12 those, but those are sorely needed.
13 QUESTIONS BY MS. DU PONT:
14 Q. The FDA does not recommend or
15 require PT testing for Xarelto, correct?
16 MR. MCWILLIAMS: Object to
17 form.
18 THE WITNESS: So when published
19 or when shared, it was mentioned that
20 PT could be used to help, you know,
21 physicians try to guide in terms of
22 this management, but we have no way to
23 use that data presently.
24 QUESTIONS BY MS. DU PONT:
25 Q. That's not the question I

Page 230

1  asked.
2       I'm asking: Does the FDA
3  currently recommend or require PT testing for
4  Xarelto?
5       MR. MCWILLIAMS: Object to
6  form.
7       THE WITNESS: Right.
8       It does not require it, and it
9  has -- you know, it has mentioned in
10  the internal discussions with the
11  FDA -- again, I'm not sure if you
12  shared it with me on Exhibit 6.
13       Let me see. One moment.
14       No. I don't think you gave it
15  to me.
16       The medical review does talk
17  about the use of PT as a potential way
18  to understand the effect.
19  QUESTIONS BY MS. DU PONT:
20       Q.   The FDA medical review does
21  not, however, recommend the use of PT for
22  Xarelto, correct?
23       A.   That's what I said, and I agree
24  to that portion of the statement, yes.
25       Q.   No professional medical

Page 231

1  societies have issued medical practice
2  guidelines that recommend or require PT
3  testing for Xarelto, correct?
4       A.   That's correct. None that I
5  know of.
6       Q.   And you're not aware of any
7  regulatory authority that has concluded that
8  PT is reliable to measure the degree of
9  Xarelto anticoagulation, are you?
10       MR. MCWILLIAMS: Object to
11  form. Asked and answered. Misstates
12  the evidence.
13       THE WITNESS: Well, I do think
14  that it is reliable, but it's not
15  recommended in other advisory councils
16  and things like that.
17  QUESTIONS BY MS. DU PONT:
18       Q.   So you're aware of no
19  regulatory authority that has recommended the
20  use of Xarelto as a monitoring agent --
21  sorry. Let me withdraw that.
22       You're not aware of any
23  regulatory authority that has recommended the
24  use of PT to monitor Xarelto, correct?
25       A.   Correct.

Page 232

1       Q.   But you didn't mention that in
2  your report, did you?
3       MR. MCWILLIAMS: Object to
4  form.
5       THE WITNESS: There's a lot of
6  things that I read that I didn't
7  necessarily put into my report.
8       I will tell you that as a
9  prescriber, my interpretation of the
10  data and taking care of patients on
11  oral anticoagulants, frequently,
12  having that ability to test the blood
13  could be a very helpful way to avoid
14  the risks of bleeding.
15  QUESTIONS BY MS. DU PONT:
16       Q.   Doctor, you're aware that there
17  are multiple scientific articles that have
18  investigated PT and concluded that it is not
19  a clinically reliable measure of the
20  anticoagulant effect of Xarelto, correct?
21       MR. MCWILLIAMS: Object to
22  form. Misstates the numerous
23  articles. When you group all the
24  reagents together like that, you know
25  it's misleading.

Page 233

1       THE WITNESS: Right. The --
2       MS. DU PONT: I'm going to
3  object to the speaking objection.
4       Go ahead.
5       MR. COVEY: I thought we were
6  just going with "object to form," Ned.
7  Those are the rules we've been playing
8  under.
9       Sorry, Dr. Cuculich.
10       THE WITNESS: I'm going to
11  disagree with your statement there
12  because I do think that we do have a
13  Neoplastin PT which is closely
14  associated with the effects and the
15  concentrations of the medication.
16       So there are ways to try to
17  account for the effect of rivaroxaban.
18  The closest is the Neoplastin PT, and
19  it's a fairly close association. It's
20  one, like I said, that if I had that
21  opportunity to use it and study it, I
22  certainly would for my patients.
23  QUESTIONS BY MS. DU PONT:
24       Q.   That wasn't my question.
25       My question is: Is there a

1    medical or scientific article that has
2    concluded that PT is a reliable measure of
3    Xarelto anticoagulation?
4         Can you point me to an article?
5         MR. MCWILLIAMS: Same
6    objection.
7         THE WITNESS: Right.
8         So it's very fair to say that
9    the articles that include all levels
10   of PT, in the different ways that you
11   can study PT with the different
12   reagents that we talked about, show
13   variation across the reagents, but
14   that the best reagent-specific PT is
15   the Neoplastin PT, and that it does
16   have a close association to the
17   effects of rivaroxaban.
18   QUESTIONS BY MS. DU PONT:
19        Q.    Tell me the article that you're
20   relying on that says Neoplastin PT should be
21   used to quantify the Xarelto anticoagulation
22   rate.
23        A.    You can't. You used the word
24   "should" -- I'm sorry.
25        MR. MCWILLIAMS: Object to

1    form.
2         THE WITNESS: You used the word
3    "should," and I don't have anything
4    that says that it should be done or
5    needs to be done. That recommendation
6    is not available.
7         That it could be used is
8    something that the FDA has put in
9    their position in September of 2011
10   and again in November of 2011.
11   QUESTIONS BY MS. DU PONT:
12        Q.    But you're aware of no
13   recommendation, correct?
14        A.    Again --
15        MR. MCWILLIAMS: Object to
16   form.
17        THE WITNESS: -- the FDA has
18   said both in September of 2011 and
19   November of 2011 that that is a
20   possible way to do that. I'm not
21   aware of any recommendation that says
22   that it needs to be done.
23        Obviously the product was
24   approved without the need to safely
25   give it, though my opinion stands that

1    if we had an ability to safely check
2    the blood levels or the effect of the
3    blood levels, we could improve the
4    safety of the way that we take this
5    medication or prescribe this
6    medication.
7    QUESTIONS BY MS. DU PONT:
8         Q.    So can you refer back to
9    Exhibit 6? Go to the last page of the
10   excerpts that we've marked here.
11        And just for the record, this
12   is the medical review from the FDA from 2011
13   that you've referred to.
14        And I just want to read the
15   first bullet on page 44.
16        A.    One moment.
17        MR. MCWILLIAMS: And I'm going
18   to object to the use of an incomplete
19   exhibit. It's misleading to at least
20   not show him all of the conclusions.
21   QUESTIONS BY MS. DU PONT:
22        Q.    I'm just going to direct you to
23   the first bullet. It says, "Monitoring
24   rivaroxaban therapy with sequential
25   prothrombin times to optimize safety outcomes

1    cannot be recommended."
2         Do you see that?
3         MR. MCWILLIAMS: Object to
4    form.
5    QUESTIONS BY MS. DU PONT:
6         Q.    I'm reading that correctly?
7         A.    You're reading that correctly.
8         MR. MCWILLIAMS: Incompletely.
9    Incompletely.
10   QUESTIONS BY MS. DU PONT:
11        Q.    That was the conclusion of the
12   FDA, correct?
13        MR. MCWILLIAMS: Object to
14   form.
15        THE WITNESS: I would -- again,
16   I'd continue the rest of the statement
17   there and wonder why. Because they go
18   on to explain why it cannot be
19   recommended at that time due to the
20   lack of information.
21        And in particular, the lack of
22   information is the interpatient
23   variability of PT measurements in the
24   setting of a short half-life and
25   rapidly changing PT effects over each

1    24-hour period, and what action to
2    recommend to the medical provider
3    based on the PT results, given that
4    only a single dose was tested in
5    ROCKET.
6        So it's -- I think you should
7    interpret that by saying it's not that
8    it should not be recommended.  There
9    is a paucity of data to support its
10   recommendation for those reasons.  And
11   these are reasons that I think you and
12   I have already discussed.
13   QUESTIONS BY MS. DU PONT:
14       Q.    The FDA has not recommended the
15   use of PT in this medical review, correct?
16           MR. MCWILLIAMS:  Object to
17   form.  Misstates the document.
18           THE WITNESS:  So I'm going to
19   disagree with that.  So I would go to
20   page 22 of my report.
21           And if you look towards the end
22   here, accordingly, it's my opinion
23   that the PT lab test, with the
24   appropriate reagent collected at the
25   appropriate time, is a helpful and

1    necessary method to identify my
2    patients at highest risk.
3           And then I quote the FDA in the
4    summary review memorandum, "Where the
5    clinical pharmacology and clinical
6    reviewers demonstrated that there is a
7    linear correlation between rivaroxaban
8    levels and prothrombin time, they also
9    demonstrated that there's correlation
10   between PT and risk of bleeding.  This
11   applicant," meaning rivaroxaban, "has
12   not chosen to utilize this
13   information.  However, infrequent
14   monitoring to assure appropriate
15   dosing of drugs that prevent stroke
16   and cause bleeding may improve
17   outcomes and be acceptable to
18   patients."
19   QUESTIONS BY MS. DU PONT:
20       Q.    So --
21       A.    So the FDA does say this in
22   their summary review.
23       Q.    And they also say "monitoring
24   rivaroxaban therapy with sequential
25   prothrombin times to optimize safety outcomes

1    cannot be recommended due to lack of
2    information," correct?
3           MR. MCWILLIAMS:  When do they
4    say that?
5           MS. DU PONT:  In 2011.
6           MR. MCWILLIAMS:  At what month
7    in 2011 compared to the statement you
8    just read?
9           MS. DU PONT:  You're not asking
10   the questions here.
11           MR. MCWILLIAMS:  This is wholly
12   misleading.
13           MR. COVEY:  It must be a good
14   question.
15           MR. MCWILLIAMS:  It's
16   misleading.
17           MS. DU PONT:  Let me just ask
18   my question again because Ned has
19   interrupted.
20   QUESTIONS BY MS. DU PONT:
21       Q.    You agree, though, that the FDA
22   in 2011 says "monitoring rivaroxaban therapy
23   with sequential prothrombin time to optimize
24   safety outcomes cannot be recommended due to
25   lack of information."

1    That's their conclusion, right?
2           MR. MCWILLIAMS:  Object to
3    form.
4           THE WITNESS:  You're reading it
5    correctly.  And it clearly states that
6    it can't be recommended -- not that it
7    shouldn't be recommended, but it can't
8    be recommended -- because there is a
9    paucity of data and no clear
10   recommendation for action based on the
11   fact that ROCKET was incompletely --
12   incompletely studied this patient
13   population.
14           So, you know, I -- my document
15   clearly shows on page 22 that the FDA
16   does support this and said that there
17   is a possibility here to prevent
18   stroke and prevent the bleeding issues
19   and may improve outcomes and be
20   acceptable to patients.
21           So we're both reading from the
22   FDA, and we're both interpreting the
23   FDA in different ways.
24   QUESTIONS BY MS. DU PONT:
25       Q.    A possibility does not mean

1  it's a recommendation, does it?
2      A.    Correct.  If there was a
3  recommendation, it would be in the product
4  label, and it would be part of the acceptance
5  of the drug.
6      Q.    And it's not?
7      A.    And it's not.  That doesn't
8  mean that there's not safer ways to deliver
9  this medication.
10      Q.    So I'm going to move topics for
11  just a second.
12          You refer to "super responders"
13  in your report.
14          Is that a technical term?
15      A.    I think that's an easy way to
16  describe the people who seem to have the
17  highest concentrations in their blood, above
18  and beyond the 90 or the 95th percentile of
19  the regular population.
20          For example, if I point to
21  Figure 11, again, one can see that wide
22  separation of drug concentrations in patients
23  who take the same 20 milligrams on the first
24  day.  And I would say the super responders
25  are the outliers, the people who are in that

1  highest 5 percent or 10 percent of the drug
2  concentrations.
3      Q.    Is that a term you made up?
4      A.    It's a term that I'm not going
5  to say I made up.  I've probably read that at
6  different points, but I think that --
7      Q.    Where did you read it?
8      A.    I don't know.  It's a term that
9  clearly one could use it and use the tools of
10  communication verbally to be able to explain
11  the population that I speak of on Figure 11.
12      Q.    Super responders, does that
13  come from a medical textbook?
14      A.    I'm not sure if it's in a
15  medical textbook.  It's a term that I would
16  use to describe the outliers such as shown in
17  Figure 11.
18      Q.    It's not a medical term, let's
19  be clear.
20          MR. MCWILLIAMS:  Object to
21  form.
22          THE WITNESS:  Oh, I disagree.
23  It's certainly a term that we could
24  use to people who -- again, going back
25  to the idea of precision medicine,

1  there are people who take a medicine
2  and have very high responses.  There
3  are people who take a medicine and
4  don't have very high responses.
5          I think it's very clear to call
6  the people who have high responses
7  super responders.  They are responding
8  to your medicine or your treatment or
9  your therapy in ways that are outside
10  what you would normally predict from a
11  normal human population.
12  QUESTIONS BY MS. DU PONT:
13      Q.    Before you were retained for
14  this litigation, did you use the term "super
15  responder"?
16      A.    Probably, though I can't show
17  you any quoted data for that.  It's a way to
18  describe patients who are outside the norms.
19  And we see patients who are outside the norms
20  all the time.
21      Q.    Sitting here today, can you
22  point me to a medical textbook or any medical
23  literature that uses the term "super
24  responder"?
25      A.    I'd have to look for that and

1  show that to you --
2      Q.    Have you looked --
3      A.    -- and I can't do that --
4          MR. MCWILLIAMS:  Please don't
5  interrupt the witness.
6          THE WITNESS:  I have not looked
7  because I have not been asked to look
8  like you're asking me.
9  QUESTIONS BY MS. DU PONT:
10      Q.    Have you reviewed the dose
11  escalation studies for Xarelto?
12          MR. MCWILLIAMS:  Object to
13  form.  Asked and answered.
14          THE WITNESS:  And by dose
15  escalation studies, what specifically
16  are you asking about?
17  QUESTIONS BY MS. DU PONT:
18      Q.    There were dose escalation
19  studies that were done in healthy, older
20  individuals that tested various doses of
21  Xarelto up to -- the original plan was to
22  test up to 80 milligrams dosage.
23          Are you aware of those studies?
24      A.    I am aware of those.  I believe
25  those were done in the context of getting

1  ready for the DVT and PE indications there.
2      We would call those the phase 1
3  or phase 2 trials for escalating doses to
4  understand safety and concentrations.
5      Q.   So are you aware that there's a
6  ceiling effect in the pharmacokinetic and
7  pharmacodynamic variables of Xarelto?
8      MR. MCWILLIAMS:  Object to form.
9      THE WITNESS:  Yeah, I don't
10     know if I understand your question
11     very clearly.
12          Could you restate that, please?
13  QUESTIONS BY MS. DU PONT:
14     Q.   Sure.
15          Are you aware that there's a
16  ceiling effect with Xarelto, meaning once you
17  get to a certain dose, it hits a ceiling and
18  it's not effective above that dose?
19     A.   Yeah, I'm not really sure of
20  the term "ceiling effect."  Is that a medical
21  term?
22          I think it describes the
23  situation reasonably well, though.  If you
24  say a "ceiling effect" meaning that the blood
25  can no longer be thinned beyond a certain

1  degree, I would not be surprised that that
2  would be the case.  But I'm not really aware
3  of where that is or what that is.
4      Q.   So you didn't know that the
5  pharmacokinetic variables differed less than
6  dosed proportionally between 30-milligram and
7  40-milligram doses of rivaroxaban and not at
8  all between the 40- and 50-milligram doses of
9  rivaroxaban?
10     A.   Ask question again, please.
11     Q.   You're not aware that the
12  pharmacokinetic variables differed less than
13  dose proportionally between the 30-milligram
14  dose and the 50-milligram dose of rivaroxaban
15  and not at all between the 40-milligram dose
16  and the 50-milligram dose?
17     MR. MCWILLIAMS:  Object to
18     form.  That question doesn't make any
19     sense.
20     THE WITNESS:  No, I don't know
21     that data to the specifics at which
22     you did that, though I'd be happy to
23     go over that data that you provided
24     and do that.  But I don't know that
25     data as well as you just described it

1  there.
2  QUESTIONS BY MS. DU PONT:
3      Q.   You would agree that the PK
4  effect of Xarelto doesn't rise at the same
5  level as the dosage, right?
6      A.   No, I don't know if I would
7  agree with that.
8      MR. MCWILLIAMS:  Object to
9      form.
10     THE WITNESS:  I don't know if
11     we know that as clearly as you've
12     asked it.
13  QUESTIONS BY MS. DU PONT:
14     Q.   Have you reviewed literature
15  regarding what happens to patients who
16  overdose on Xarelto?
17     A.   I'm aware of some of the
18  literature.
19     Q.   Are you aware that multiple
20  studies of overdoses on Xarelto show no major
21  bleeds in people that overdose on Xarelto?
22     MR. MCWILLIAMS:  Did you say
23     studies or case reports?
24     MS. DU PONT:  Can you --
25     MR. MCWILLIAMS:  Object to

1  form.
2      MS. DU PONT:  Object to form,
3      please.
4      THE WITNESS:  So I'm not aware
5      of studies that looked at such a
6      thing.
7          As we've talked about before,
8      having higher risks -- or having
9      higher blood levels of rivaroxaban or,
10     for that matter, warfarin does
11     increase your risk of bleeding, and I
12     think we all agree with that.
13          The fact that you have a high
14     level of rivaroxaban or warfarin in
15     your blood does not automatically mean
16     that you will bleed.  I have seen
17     numerous patients, dozens, maybe more,
18     who have very high INR levels from,
19     quote/unquote, warfarin overdose.
20     They are at a position where they are
21     at very high risk of bleeding, and yet
22     they don't bleed.
23          Fortunately, the risk is not
24     100 percent when you reach these areas
25     in terms of bleeding.

1    So I would not be surprised if
2  there were reports of patients who
3  have taken high doses of rivaroxaban
4  and have not spontaneously bled. So I
5  think we've seen that in warfarin
6  quite a bit. I would not be surprised
7  if you saw that with rivaroxaban as
8  well.
9  QUESTIONS BY MS. DU PONT:
10    Q.    And do you know that patients
11  who are actually exposed to high doses of
12  Xarelto in the dose-finding studies did not
13  experience excessive bleeding?
14    A.    I would hope that would be the
15  case, because otherwise you wouldn't take
16  this product to the market.
17    Again, when you have high PTs,
18  or you have high concentrations of blood
19  thinners in your body, it doesn't
20  automatically mean that you're going to
21  bleed. It increases the risk of that,
22  increases the probability of such an event.
23    The dose-finding studies were
24  likely done in a very controlled environment
25  with single doses or short courses of doses.

1  They were unlikely to be done over the course
2  of years or decades of the medication, such
3  as the patients who I treat who have atrial
4  fibrillation and will be on these medicines
5  for long periods of time.
6    So I wouldn't be surprised if
7  you gave somebody a high dose of a single
8  medication and they didn't bleed. I'd be
9  happy that that's the case.
10    Q.    What if you gave somebody 96
11  pills of Xarelto and they didn't bleed, would
12  that be meaningful to you?
13    A.    Again, it's all on a gradation.
14  It's all on a level. I would tell you that
15  somebody who took 96 pills of Xarelto all at
16  once would be at a higher risk of bleeding
17  than somebody who took one. And it's a risk
18  of bleeding, whether that's 10 percent,
19  20 percent, 50 percent, 98 percent. I don't
20  know what that risk would be, but they're at
21  a higher risk than somebody who took one
22  pill. And somebody who took one pill is
23  likely to be at higher risk than somebody who
24  didn't take any pills.
25    And among the more common

1  things that we deal with, the people who take
2  one pill, there are people who take one pill
3  and are at higher risk for bleeding than
4  people who take one pill and are not at high
5  risk for bleeding based on the very narrow
6  therapeutic window.
7    MS. DU PONT: I'm just going to
8  move to strike that response as
9  nonresponsive.
10    And with that, I will turn it
11  over to Mr. Covey.
12    CROSS-EXAMINATION
13  QUESTIONS BY MR. COVEY:
14    Q.    Doctor, a number of your
15  answers you talked about precision medicine.
16  I'm going to try and do precision lawyering
17  and ask you really some narrow questions.
18  I'd appreciate, obviously, responsive and
19  brief answers if that's at all possible.
20    You were asked whether -- well,
21  you may not have been.
22    Have you ever been a plaintiff
23  in any lawsuit?
24    A.    No.
25    Q.    Have you ever given a

1  deposition in a lawsuit involving yourself?
2    A.    Yes.
3    Q.    Were you not a plaintiff in
4  that lawsuit?
5    A.    Correct.
6    Q.    You were or you weren't?
7    A.    I was not a plaintiff. I was a
8  defendant in that lawsuit.
9    Q.    I thought I said plaintiff,
10  excuse me.
11    Did you ever bring an action
12  against the IRS?
13    A.    No.
14    Q.    So if somebody, one of my
15  legions of paralegals, found a Phillip
16  Cuculich versus the IRS, that wasn't you?
17    A.    Probably not.
18    Q.    Let's talk about medical
19  school. It is common in every medical school
20  that you know of in the United States, as
21  part of the core curriculum, that physicians
22  are taught that blood thinners,
23  anticoagulation agents, are associated with
24  bleeding, correct?
25    A.    That's fair, yes.

1    Q.    You can't think of a single
2    medical school where that isn't common
3    knowledge, can you?
4    A.    I've only gone to one medical
5    school, but in my medical school that was how
6    they taught it.
7    Q.    But you've lectured at lots of
8    hospitals, you've been at university
9    settings, and it is true as far as you sit
10   here today, as far as you know, that every
11   doctor who would prescribe a blood thinner in
12   the United States knows that part and parcel
13   of prescribing a blood thinner is that
14   there's a risk that if a patient bleeds, that
15   bleeding is going to be worse?
16        MR. MCWILLIAMS:  Object to
17   form.  Calls for speculation as to
18   other medical schools he may or may
19   not have attended.
20        MR. COVEY:  I think you ought
21   to just object to form.
22        MR. MCWILLIAMS:  I got it under
23   control.  I appreciate the advice.
24        MR. COVEY:  I don't think you do.
25   QUESTIONS BY MR. COVEY:

1    Q.    Go ahead, Doctor.
2    A.    There's multiple parts to that
3    question that you asked.  I think if I could
4    just break them down into the components, I
5    would agree that most/all doctors who
6    prescribe an anticoagulant would expect that
7    bleeding is possible, and more likely by
8    being on the medicine than not on the
9    medicine.
10        I think most or all doctors who
11   prescribe oral anticoagulants would agree
12   that if bleeding occurred, it would likely be
13   worse if you were taking oral anticoagulants
14   than not.
15        I think that was the direction
16   you were going with the question.
17   Q.    Blood thinners don't cause
18   bleeding, do they?
19   A.    Usually not.  Blood thinners
20   increase the likelihood of bleeding.
21   Q.    Blood thinners increase the
22   likelihood that there'll be clinically
23   apparent or obvious bleeding; isn't that a
24   more accurate statement?
25        MR. MCWILLIAMS:  Object to form.

1        THE WITNESS:  That's one way of
2    to think of it.  I --
3    QUESTIONS BY MR. COVEY:
4    Q.    In other words --
5        MR. MCWILLIAMS:  I feel like
6    you're interrupting the witness.  I
7    don't think it's your intention --
8        MR. COVEY:  Wait a minute.
9        MR. MCWILLIAMS:  Please let
10   him -- please take a pause to make
11   sure he finishes.
12        THE WITNESS:  Let me finish.
13        MR. COVEY:  Go ahead.
14        THE WITNESS:  So I agree with
15   the statement that patients who are on
16   blood thinners are more likely to have
17   clinically apparent bleeding, which I
18   think was the question that you had
19   asked, and are likely to have more
20   severe bleeding, which I think you had
21   asked in the prior question.
22        I'll stop there.
23   QUESTIONS BY MR. COVEY:
24   Q.    There is no data showing that
25   blood thinners cause de novo bleeding that

1    you're aware of, is there?
2    A.    No, I think that's a fair
3    statement.
4    Q.    You were asked by my colleague
5    some questions about have you published
6    anything in the peer-reviewed literature
7    concerning Xarelto.  And if I recall
8    correctly, the only thing that you mentioned
9    that might be responsive to that was that you
10   edited a text in which some chapters were
11   written that discussed NOACs.
12        Was that the gist of your
13   testimony?
14   A.    Yes, sir.
15   Q.    So you didn't write those
16   chapters, but you were the editor of the
17   entire text, correct?
18   A.    I would agree with that.
19   Q.    Okay.
20   A.    Yes, I would agree with that.
21   Q.    A lot of testimony you've given
22   today that if studies that I saw, Mueck study
23   in 2014, had been available in 2011, that
24   would have been nice to see.  I would have
25   liked to have seen that.

**65 (Pages 254 to 257)**

Page 258

1    You recall that general topic?
2    A.    Yes, those are the sorts of
3  data that I had asked our representatives
4  from Janssen to provide to help us get some
5  idea of what the patient variability of --
6  the concentrations after you've taken
7  rivaroxaban.
8    Q.    You understand that once a
9  product is approved, that doesn't mean that
10  science stops and the product is not -- the
11  medication is not continued to be studied,
12  correct?
13    A.    I understand that, yes.
14    Q.    And thus, are you critical that
15  if the Mueck study, 2014, didn't exist in
16  2011, that FDA should have never approved
17  Xarelto?
18    MR. MCWILLIAMS:  Object to form.
19    THE WITNESS:  I am not critical
20    of -- if the FDA should or should not
21    have approved Xarelto.  I think we
22    feel -- and in the conversations I
23    have with my patients about NOACs in
24    general, I think you can see that
25    there are great potential benefits to

Page 259

1    this.  There are many upsides to these
2    medicines, and I will try to be direct
3    to your answer.
4    But I do think that it's
5    important for us to do it in the
6    safest way possible, and that's really
7    the direction of my document.  I'm not
8    critical of the FDA for approving or
9    not approving.  As a prescriber,
10    though, I certainly would like to
11    deliver this medication in the safest
12    way possible for my patients.
13    MR. COVEY:  Motion to strike
14    everything after "I'm not critical of
15    the FDA."
16  QUESTIONS BY MR. COVEY:
17    Q.    You can't be advised of science
18  that doesn't exist until it exists; would you
19  agree with that?
20    MR. MCWILLIAMS:  Object to form.
21    Are you suggesting the Mueck
22    data didn't exist in 2010?
23    MR. COVEY:  I'm suggesting it
24    hadn't been published in 2011, and I'm
25    suggesting that it hadn't been put in

Page 260

1    the label by anybody at that time
2    because it wasn't completely analyzed.
3  QUESTIONS BY MR. COVEY:
4    Q.    Anyway, I'll withdraw that
5  question.
6    Are you critical of Eliquis for
7  lacking the same sort of information
8  concerning monitoring that you've been
9  talking about with respect to Xarelto?
10    A.    I am critical of anything that
11  puts my patients at higher risk if there's
12  something that's available that we can do
13  more safely.  So broadly speaking and then
14  directly to your answer -- you give me a
15  moment -- directly to your answer, I am
16  critical in general of how the novel
17  anticoagulants have been rolled out.
18    I wish we had ways to monitor
19  the effect or the concentration of any or all
20  of these medications because I do think that
21  the same principles that we're talking about
22  today apply to other novel anticoagulants
23  that are in the same boat.
24    All of these novel
25  anticoagulants have a narrow therapeutic

Page 261

1    window.  All of these novel anticoagulants
2    would benefit from having testing.  So the
3    answer is yes.
4    MR. COVEY:  So let's go off the
5    record for a second.
6    VIDEOGRAPHER:  We are going off
7    record at 1:50 p.m.
8    (Off the record at 1:50 p.m.)
9    VIDEOGRAPHER:  We are back on
10    the record at 1:51 p.m.
11  QUESTIONS BY MR. COVEY:
12    Q.    What I'm asking, is it your
13  opinion -- you understand I'm asking your
14  opinion within a reasonable degree of medical
15  probability, correct?
16    A.    Yes, sir.
17    Q.    Medical probability refers to
18  the existence of data as well as opinion; is
19  that correct in your understanding?
20    A.    Medical probability is a broad
21  thing, including data, including the
22  knowledge and clinical experience, including
23  recommendations from guidelines, including
24  recommendations from FDA.
25    Q.    Is it your opinion that none of

1  the NOACs should have been approved unless
2  and until the FDA was satisfied there was
3  some way to monitor?
4      A.   It's my opinion that that
5  should have been part of the approval
6  process.  I do think that there's a role for
7  these medicines.  I do think that they are as
8  good and better than warfarin in certain
9  situations, and I think that if we -- my
10  recommendation or my -- if I were in the FDA,
11  I would have approved it with some way of
12  monitoring.
13      Q.   The FDA approved the NOACs
14  without monitoring, correct?
15      A.   That's correct.
16      Q.   There's no monitoring today
17  that has been approved by the FDA, correct?
18      A.   That's correct.
19      Q.   Is it your opinion that today
20  the NOACs should not be approved for sale in
21  the United States because there is no way to
22  monitor them that has reached the
23  satisfaction of the FDA?
24      A.   I think that they should be
25  approved for use with monitoring.  That, to

1  me, makes the most sense.
2          Until that monitoring is
3  available and proven, we are at where we are
4  today, which is some patients are at high
5  risk for bleeding that we don't know who they
6  are.
7      Q.   Doctor, I asked you a very
8  simple question.  Is it your opinion that the
9  FDA should not have approved the NOACs
10  because there's no way to monitor that has
11  been approved by the FDA yet?
12          MR. MCWILLIAMS:  Object to
13      form.  Asked and answered.
14          THE WITNESS:  So the FDA can
15      make its own decisions about how it
16      wants to accept or decline
17      applications.
18          If I were in charge of the FDA,
19      I would have looked very critically at
20      the possibility of approving a
21      medicine with a narrow therapeutic
22      window without the ability to measure
23      its effect.
24  QUESTIONS BY MR. COVEY:
25      Q.   Let me try to get a direct

1  answer from you this way.
2          If you were in charge of the
3  FDA in 2011 or 2012 or 2013, would you have
4  approved any of the NOACs?
5      A.   I would have liked to have
6  looked at all of the data, and if I had the
7  data that I have here today, I would have
8  approved the NOACs only if there was a way to
9  test.  I think that's the safest way to go.
10          If the application was in front
11  of me as the director of the FDA, without
12  clinical testing, then, no, I would have
13  pushed back fairly considerably.
14      Q.   And as we sit here today, there
15  is no method of testing or monitoring that
16  has been proven to be of clinical benefit for
17  the NOACs; isn't that correct?
18          MR. MCWILLIAMS:  Object to
19      form.  Asked and answered.
20          THE WITNESS:  You know, I would
21      disagree with that.
22  QUESTIONS BY MR. COVEY:
23      Q.   Who was the sales rep that you
24  asked information -- well, that's a bad
25  question.

1          You talked earlier that you had
2  asked a Bayer/Janssen, a Janssen/Bayer, sales
3  rep for information shortly after Xarelto
4  came on the market, correct?
5      A.   Correct.
6      Q.   And the information you wanted
7  was information related, to put it in a broad
8  basket, concerning dosing and data supporting
9  dosing; fair enough?
10      A.   Yes.
11      Q.   Who was that sales rep?
12      A.   His name is Alan Clausen.
13      Q.   And when was the last time you
14  saw Alan Clausen?
15      A.   I don't recall, but it's been
16  at least three years.  At least two years.
17      Q.   And to your knowledge, what did
18  Mr. Clausen do with respect to your request?
19      A.   You know, as outlined here, we
20  talked about getting the information that was
21  available with regards to plasma
22  concentrations and distributions of plasma
23  concentrations among patients who are taking
24  rivaroxaban.
25          And he told me that it was

1    largely unavailable, not published, internal
2    data.
3        Q.    And are you suggesting that
4    when he told you it was unavailable,
5    unpublished, that that was inaccurate?
6        A.    I am saying neither that -- if
7    it was accurate or inaccurate.  That was the
8    answer that I received.  I -- as I mentioned,
9    I certainly would like that sort of
10   information that helps a provider like me --
11       Q.    Right.
12             And if he's telling you that
13   the information has not been validated,
14   doesn't exist, that's an honest and correct
15   answer, making that assumption?
16       A.    To your question, if he told me
17   that the data didn't exist, he would be
18   inaccurate.  If he told me that the data
19   wasn't published, that would be accurate.
20             The data was collected --
21       Q.    Do you -- sorry.
22             Do you understand that
23   pharmaceutical companies, just like
24   physicians, until something has undergone
25   complete analysis and peer review,

1    information is not yet ready for distribution
2    to all physicians who might be practicing in
3    the country or in a given specialty?
4        A.    I understand that, yes.
5        Q.    Do you recall the names of any
6    other sales reps for Janssen or Bayer?
7        A.    No.
8        Q.    Did Mr. Clausen ever provide
9    you any information with respect to any other
10   requests that you had?
11       A.    He had provided largely
12   marketing-type materials.  We had a number of
13   discussions about how to best use the
14   medication.  I don't have any of those
15   materials.  I didn't save them.  I didn't
16   think I would be sitting here today.
17             But no scientific data.  It was
18   largely the marketing materials that were
19   available.
20       Q.    Is it your understanding that
21   the package insert is a collaborative effort
22   between the FDA and the sponsor of a
23   medication?
24       A.    That's my understanding.
25       Q.    And is it your understanding

1    that sales reps are required to stick to the
2    approved package insert and the underlying
3    study that formed the basis for approval in
4    terms of what they say to physicians?
5        A.    I understand that.
6        Q.    Are you critical of Mr. Clausen
7    for in any way going beyond or outside of the
8    package insert or the published ROCKET study
9    with respect to any conversations or
10   materials that he provided to you concerning
11   Xarelto?
12       A.    I'm a little concerned or a
13   little bit upset about the lack of support
14   towards understanding this process.  He did
15   stick with the materials that he had on him
16   for the marketing and from the sales side of
17   things.
18             And I would not expect him to
19   provide documents that were classified or had
20   not been published.  I don't have that type
21   of expectation.
22             I certainly -- I would have
23   liked to have known that there were ways to
24   test this medication's effect, in particular
25   the Neoplastin PT.  That would have been a

1    helpful piece.  And in particular, it would
2    have been helpful to see that distribution of
3    the concentrations of patients who were
4    taking this.
5             Now, it's not Mr. Clausen's job
6    to get me that information, but I do think
7    that it is information that should have been
8    provided to providers like me.
9        Q.    You wanted the information that
10   ultimately appeared in the Mueck article back
11   in 2011, correct?
12       A.    In the Girgis article, I think
13   if we're going to be clear about it, yes.
14       Q.    You're not criticizing -- I
15   need to make sure if somebody is going after
16   a sales rep for doing something that the
17   sales rep should never have done, that the
18   sales rep should be fired for or something
19   else, I want to know that that's what you're
20   saying.
21             If you're not saying that, if
22   you're saying, "I understand he was
23   restricted to the package insert, and the
24   ROCKET study and Mueck hadn't been published
25   yet and Girgis hadn't been published yet.

Page 270

1    I'm not criticizing him for going beyond what
2    was appropriate." That's the reason for my
3    questions.
4        A.    And thank you for the
5    clarification. I think that helps me answer
6    your question more clearly.
7            I think that the representative
8    from the sales force was acting well within
9    the powers and restrictions that he had, so I
10   think Mr. Clausen was doing the things that
11   he needed to do in answering my questions as
12   best as he could.
13           I think that the data that was
14   published in 2014 was likely available and
15   collected in 2011. That is data that was
16   valuable to me.
17           But to answer your question
18   specifically, I don't have any criticisms
19   about the way that the representative handled
20   himself and handled my questions.
21       Q.    Thank you for that.
22           You said that the data which
23   was published in 2014 was likely available in
24   2011.
25           You don't know that as you sit

Page 271

1    here today?
2        A.    Well --
3        Q.    That's speculative, correct?
4            MR. MCWILLIAMS:  Object to form.
5            THE WITNESS:  No. Disagree.
6            That was data that was
7    collected during the ROCKET study, and
8    that ROCKET study had been completed
9    and submitted and was already accepted
10   for publication. It was the main crux
11   for how rivaroxaban was accepted by
12   the FDA.
13           The data from the ROCKET-AF
14   study was available. The blood
15   testing was already done. But I don't
16   know how far along the manuscript was
17   or how far along the data was in terms
18   of its evaluation, but the data was
19   collected in 2011. Let's be clear.
20   QUESTIONS BY MR. COVEY:
21       Q.    Data exists does not mean that
22   the data has been analyzed and verified and
23   gone through the process that makes it
24   scientifically appropriate to be in the
25   general domain; would you agree?

Page 272

1            MR. MCWILLIAMS:  Object to form.
2            THE WITNESS:  Yeah, I would
3    agree with part of that.
4            And let me expound on that.
5    QUESTIONS BY MR. COVEY:
6        Q.    Not unless it's responsive to
7    the question. There is a time for you to
8    expound. Counsel can ask you those
9    questions. This, at least in my view, is not
10   the appropriate time for you to do that.
11           MR. MCWILLIAMS:  Please finish
12       your answer if you have more to add to
13       your answer.
14           THE WITNESS:  There's great
15       interest right now in academic
16       medicine about publishing results
17       quickly. There has been a concern
18       about data that is not published
19       quickly, particularly if it has
20       adverse effects on outcomes or sales
21       or results with regards to the use of
22       a medication or use of a product.
23           I would posit that in 2011, if
24       that data was available for the Girgis
25       study that was published in 2014, it

Page 273

1    is not a complex body of data to
2    report. There was unlikely to be a
3    very extensive analytical process that
4    was associated with that.
5            I think that data was
6    available, and it was just not
7    provided. It was not published in a
8    timely manner. It just wasn't
9    provided for doctors like me.
10           MR. COVEY:  Motion to strike
11       the nonresponsive portions.
12   QUESTIONS BY MR. COVEY:
13       Q.    When you say "I think that data
14   was available," you don't know whether it was
15   analyzed such that it could have been
16   verified and put into something meaningful to
17   a physician at that time, do you?
18           MR. MCWILLIAMS:  Object to
19       form. Asked and answered.
20           THE WITNESS:  The words that I
21       used was that that data was available.
22       And I stand by that. That data was
23       available because it was collected
24       during the ROCKET-AF study.
25

69 (Pages 270 to 273)

1  QUESTIONS BY MR. COVEY:
2      Q.    Have you ever consulted with
3  Bristol-Myers or Pfizer?
4      A.    I don't think I have.
5      Q.    And have you consulted with any
6  attorneys who are suing those companies with
7  respect to Eliquis?
8      A.    I'm not.
9      Q.    You've talked, even in response
10 to some of the very few questions that I
11 asked you, about the risks and benefits of
12 NOACs versus warfarin, so I just want to
13 direct you there for a minute.
14      Do you agree that the NOACs as
15 a group have a lower risk of intracranial
16 bleeding and death than warfarin?
17      A.    I think if we lump all of the
18 NOACs together, I think that's a fair
19 assessment of the data, that there are --
20 that there do seem to be lower risks of
21 intracranial hemorrhage, and in some products
22 there seem to be a lower risk of death.
23      Mortality was not -- to be
24 fair, mortality was not necessarily end
25 points in some of the trials that you're

1  discussing of all of the NOACs.
2      Q.    The reason that you prescribe
3  either a NOAC or warfarin to a patient is to
4  prevent intracranial bleeding, stroke,
5  paralysis and death, is it not?
6      That's the ultimate goal of
7  prescribing the medication?
8      MR. MCWILLIAMS:  Object to form.
9      THE WITNESS:  I disagree.
10 There's a lot of different reasons to
11 prescribe the medicine.  The primary
12 goal that we're using in terms of
13 these medicines is to prevent an
14 ischemic stroke.
15      You are correct in saying that
16 NOACs have lower rates of intracranial
17 hemorrhage, and that is a favorable
18 aspect of it.  I do not prescribe
19 NOACs specifically for that, but that
20 is part of the discussion that we
21 have.
22 QUESTIONS BY MR. COVEY:
23      Q.    Why would you prescribe
24 warfarin instead of a NOAC, given what we've
25 just been talking about?

1      A.    So we have 50 years of data
2  on -- or 50-plus years of data on a medicine
3  that has a reversal agent, that has a widely
4  available reversal agent that is available to
5  my patients for less than $2 a month.  These
6  are all reasons that patients would choose
7  warfarin over NOACs.  There are several
8  others.
9      These decisions -- there's a
10 reason that the NOACs have not completely
11 taken over the entire market here, and it's
12 because warfarin still has a very valuable
13 piece to this market.
14      Q.    How long does it take the
15 reversal for warfarin to work?
16      A.    Well, that depends which
17 reversal agent you use.
18      Q.    What's the best?
19      A.    Depends on your situation.
20      Q.    Take up to a day?
21      A.    Are you asking me to walk you
22 through the different reversal agents?
23 Because that may take a little bit of time.
24      Q.    No, I asked you a very specific
25 question.  I asked you:  How long does it

1  take a reversal agent for warfarin to work?
2  And you answered that there are many.
3      So I'm asking you whether
4  typically it takes up to 24 hours for a
5  reversal agent for warfarin to work.
6      A.    And I said it depends on the
7  clinical situation.  Some reversal agents can
8  be much quicker than that.  Those are the
9  ones that are administered through the vein
10 of blood products like fresh frozen plasma or
11 some of the other types of products that can
12 reverse warfarin's effects much quicker than
13 the 24-hour period.
14      In situations where there's not
15 active bleeding, one can oftentimes give
16 vitamin K as a reversal agent.  That doesn't
17 require the risks that are associated with
18 giving blood products.  So it really depends
19 on the clinical situation.
20      Q.    Fresh frozen plasma can be used
21 for any bleeding, including a patient who is
22 bleeding while taking a NOAC, correct?
23      A.    It's my -- my understanding is
24 it's not particularly effective, that there
25 are certain types of plasma that would get

1    you to the effect that you're asking for.  In
2    particular, PCC, a prothrombin complex, would
3    be the one that we typically use in our
4    hospital to try to reverse the effects of
5    novel anticoagulants, particularly Direct Xa
6    inhibitors.
7        Q.    Are you in the emergency room
8    treating that, or is that typically something
9    emergency room docs do?
10       A.    I'm in the intensive care unit,
11   and I oftentimes manage patients who have
12   severe bleeding.  I am oftentimes asked to go
13   to the emergency room and help understand the
14   risks of coming off of medications in
15   patients who have atrial fibrillation.
16       So I'm involved in those
17   decisions.
18       Q.    Did you ever ask Mr. Clausen or
19   any of the other sales reps for information
20   concerning Xarelto and what would happen if
21   you needed to operate on somebody?
22       A.    Yes.
23       Q.    And what was his response?
24       A.    I don't remember the specifics
25   of it, but I will tell you that in general I

1    was told that the reversal agents were not
2    available but being worked on.  I was told
3    that if you just waited long enough, that the
4    bleeding would stop or that the effect of
5    Xarelto would wear off.
6        I was referred to short plasma
7    half-lives of the medication as one way.
8        And I oftentimes countered that
9    with, "We don't have those kind of times in
10   life-threatening bleeds.  We don't have the
11   time to wait the requisite five, eight,
12   ten hours for a plasma half-life to wear
13   off."
14       Most of the guidance that I
15   received with regards to reversal of
16   anticoagulants came from our hematology
17   department.
18       Q.    Information that was provided
19   to you by Clausen or that was in the insert
20   with respect to lack of a reversal agent for
21   Xarelto was accurate; is that correct?
22       A.    Yes, everything that he told me
23   was reasonably accurate.
24       Q.    And FDA approved Xarelto,
25   Pradaxa, warfarin, Eliquis, edoxaban, without

1    reversal agents; is that correct?
2        A.    That's correct.
3        Q.    Vitamin K, when used as a
4    reversal agent for warfarin -- have you ever
5    read the package insert with respect to
6    vitamin K?
7        A.    I'm not sure that I have.  If I
8    had, it's been a long time ago.
9        Q.    So package inserts change over
10   time?
11       A.    I couldn't quote the package
12   insert for vitamin K.
13       Q.    Are there certain risks for
14   trying to reverse bleeding in a patient who
15   is on warfarin who needs a reversal agent?
16       A.    Yes.
17       Q.    And what are those risks?
18       A.    There are several.
19       Q.    Including death?
20       Which will make it easier,
21   because that's the only -- then you don't
22   have to answer all the others.  That's the
23   one I'm interested in.
24       Agreed?
25       A.    I don't understand your

1    question.
2        Q.    One of the risks of giving
3    vitamin K to a patient who has a bleed while
4    on warfarin is death.
5        A.    Is that a statement or a
6    question?
7        Q.    Question mark.
8        A.    Question mark.
9        Possibly.
10       Q.    Okay.  Exhibit 5, just briefly,
11   if I can put my hands on it.  That was the --
12   I never pronounce it correctly -- Vrijens,
13   V-r-i-j-e-n-s.  Three questions.  I hope just
14   three.
15       This entire publication or
16   study is computer modeling, correct?
17       A.    I believe so.  I know the graph
18   that I used in my report is a computer
19   modeling graph.
20       Q.    Computer modeling, in order to
21   be scientifically valid, has to be confirmed
22   by clinical studies?
23       A.    I don't know if that's truly
24   the case.  I think computer modeling has
25   value.  We like clinical studies that support

1 the computer modeling or help guide the
2 computer modeling.
3      I think that the computer
4 modeling here in Figure 2 and throughout the
5 course of this is accurate and trustworthy.
6     Q.  If you look at the last
7 sentence of the abstract, it says, quote,
8 "Integration of these principles into
9 real-world medication management is the next
10 step in the improvement of oral
11 anticoagulation."
12      I obviously read that
13 correctly?
14     A.  You did.
15     Q.  And the authors there are
16 indicating that we've come up with some
17 principles from computer modeling, we think
18 they may be very important, and the next step
19 is to do real-world testing, correct?
20     A.  Correct.
21     Q.  So real-world testing is
22 something that most of the time you want to
23 do after you have a computer model that says
24 something may be helpful, right?
25     A.  Depends on your real-world

1 concerns.
2      And I'm just going to say that
3 it's important because there are controlled
4 trials that you probably want to take this in
5 next, where you're more carefully managing
6 and more carefully watching the levels as
7 opposed to real world, which would mean turn
8 it loose on the population. And it's
9 important --
10     Q.  I understand where you're
11 going, and I wasn't going there.
12     A.  No. No, let me finish.
13      It's important just because in
14 a controlled trial, you can check PTs and you
15 can check plasma concentrations and really
16 support this before you turned it loose
17 without any sort of PT, which is where the
18 real world stands right now.
19     Q.  And what the authors have said
20 here in their last sentence -- well, no, one
21 other question for you to that.
22      Xarelto specifically wasn't
23 studied in the computer modeling in this
24 paper, was it?
25     A.  I don't know if the word

1 "Xarelto" or "rivaroxaban" was specifically
2 used for this.
3      If I showed you the purpose for
4 this, if I took you to page 518 on the
5 left-hand panel where it says, "Superior
6 therapeutic coverage with twice-daily dosing
7 regimens," the very first sentence talks
8 about "analyses that combine patient's dosing
9 history analyses and the pharmacokinetics
10 properties of the assessed drug have clearly
11 shown that a twice-daily dosing regimen
12 maintains a better continuity of drug plasma
13 levels than once-daily dosing for drugs with
14 a half-life of less than 12 hours," for which
15 Xarelto is one that is commonly touted here.
16     Q.  Precision questioning. You
17 cannot sit there and tell me that Xarelto was
18 used in this computer modeling, can you?
19     MR. MCWILLIAMS: Object to form.
20     THE WITNESS: I can tell you
21 that once-daily and twice-daily
22 regimens of an anticoagulant with less
23 than 12 hours of a half-life were used
24 in this modeling, and all of those are
25 consistent with Xarelto.

1 QUESTIONS BY MR. COVEY:
2     Q.  When the authors said -- but
3 you can't tell me with Xarelto. That's my
4 point.
5      I understand you're saying it
6 may have been. I'm asking you whether you
7 have any knowledge that it was Xarelto that
8 was used for the computer model.
9     MR. MCWILLIAMS: Object to
10 form. Asked and answered.
11     THE WITNESS: If we want to be
12 very specific about it, it's very
13 difficult to take a drug and do a
14 computer model of it directly. You do
15 computer models of drugs that have
16 certain features. So you can't do a
17 computer model on a pill that's
18 sitting on the table.
19 QUESTIONS BY MR. COVEY:
20     Q.  So in this last sentence of the
21 abstract where they talk about "integration
22 of these principles into real-world
23 medication management is the next step," you
24 agree with that, don't you?
25     A.  Again, we discussed the

1　real-world component of it versus the
2　controlled-trial aspect of it. I think you
3　take this into a controlled trial where one
4　can measure the effects of the drug or the
5　concentrations of the drug to prove that you
6　can indeed have absence of peaks and a higher
7　regular trough level, which is what this
8　article demonstrates.
9　　Q. Aren't the authors suggesting
10　that this article was a real good one for
11　generating a hypothesis that needs to be
12　confirmed by some clinical testing?
13　　A. That would be one way to assess
14　this.
15　　There's an important need,
16　obviously, in clinical medicine with regards
17　to this question. They are addressing a very
18　important clinical question.
19　　They say that the next step is
20　to test this in people and to prove that
21　these are there. So I would agree with those
22　statements.
23　　Q. Yeah.
24　　But you used this article in
25　support for one of your opinions that you

1　want to give in the litigation when, in fact,
2　it's just a hypothesis, correct?
3　　MR. MCWILLIAMS: Object to form.
4　　THE WITNESS: No, I'm showing
5　　you the data from this, and that's
6　　quite clear. This data is how a drug
7　　like Xarelto, with a half-life as it
8　　is with once-a-day and twice-a-day
9　　dosing, this is a very clear way that
10　　we could improve the safety, or
11　　potentially improve the safety, of the
12　　medication.
13　QUESTIONS BY MR. COVEY:
14　　Q. Do you know what the FDA has
15　said as to why it approved Xarelto or Eliquis
16　or Pradaxa without the reversal agent?
17　　A. That's a broad statement or a
18　broad question as to why they did. So, I
19　mean --
20　　Q. You either know what they said
21　or you don't.
22　　A. Well, no, I don't.
23　　Q. Fair enough.
24　　In your -- I'm shifting gears
25　just to -- so you can stick with me.

1　However, you haven't seemed to have evidenced
2　much of a problem in sticking with me.
3　　You do not have a private
4　practice of medicine where you're on the
5　front line seeing, as a primary care doctor,
6　patients who have a wide variety of medical
7　issues, correct?
8　　A. I --
9　　Q. You're a specialist?
10　　A. I see patients who have a wide
11　variety of medical issues.
12　　Q. Sorry. It probably wasn't a
13　good question.
14　　You're not in private practice,
15　right?
16　　A. That's a fair question -- or
17　yes, I would agree.
18　　Q. You're not an internist who
19　sees patients who may have any -- a huge,
20　wide spectrum of diseases. You specialize in
21　cardiology and some subspecialties within
22　cardiology; fair enough?
23　　A. Those are fair statements.
24　　Q. Typically when you see a
25　patient and you're dealing with that patient,

1　giving him or her an informed consent about
2　anticoagulation, you're doing that in a
3　clinic at the hospital, correct?
4　　A. Either at an outpatient clinic
5　or an inpatient clinic, yes, sir. Or
6　inpatient hospitals.
7　　Q. Right.
8　　And typically you don't follow
9　that patient week to week or month to month;
10　is that correct?
11　　A. I do see patients regularly. I
12　do not see patients weekly on a normal basis,
13　but I do follow up with patients regularly.
14　　Q. Do you follow -- how many
15　patients do you see month to month that are
16　the same patients?
17　　I recognize you're seeing
18　patients when you go to the clinic.
19　　A. Yeah.
20　　Q. I'm trying to draw the
21　distinction between I'm a doctor, I go to the
22　clinic, versus I have 3,000 patients, I am
23　treating them 24/7 as their regular doctor.
24　　Do you understand the
25　distinction I'm trying to draw?

1     MR. MCWILLIAMS: I don't.
2     MR. COVEY: He doesn't have to.
3     THE WITNESS: I see the
4  distinction, but it's incomplete.
5  It's in between.
6  QUESTIONS BY MR. COVEY:
7     Q.    Okay. Have you ever --
8     A.    Let me finish.
9        I have patients who I see, and
10  I'm in charge of their arrhythmia care 24/7
11  and -- all the time. Patients have my cell
12  phone number. They have my pager number.
13  They call me with arrhythmia issues. They
14  call me with issues with atrial fibrillation.
15  They call me with issues with regards to
16  taking blood thinners.
17     Q.    So you have patients that you
18  manage their warfarin care?
19     A.    We're fortunate to have a
20  warfarin clinic, or a Coumadin clinic, at
21  Washington University, so I use their
22  specialty resources for my patients who are
23  on warfarin.
24     Q.    You've got patients that you
25  personally manage their warfarin care and

1  treatment?
2     A.    I make decisions about warfarin
3  doses, and so, yes, I do have those patients.
4  I try to have them taken care of through the
5  warfarin clinic, or the Coumadin clinic,
6  whenever possible.
7     Q.    Pre-2009, are you familiar with
8  studies looking across the United States at
9  time in therapeutic range for warfarin
10  patients?
11     A.    Yes.
12     Q.    And are you familiar with --
13  there are either patients who are managed in
14  a private physician's practice, correct?
15  That would be one group of patients?
16     A.    There are patients who go to
17  private physicians, I would agree with that
18  statement.
19     Q.    And there are patients who go
20  into anticoagulation clinics?
21     A.    I would agree with that.
22     Q.    And are there patients who go
23  someplace else for their warfarin management?
24     A.    I don't know. There are a lot
25  of different places you could get your

1  warfarin managed, but I would imagine it
2  would be at your primary care doctor, your
3  cardiologist.
4        Again, whether they're in
5  private practice or academic medicine
6  probably doesn't matter. We have a number of
7  my colleagues in academic cardiology who
8  manage warfarin on a daily basis. We have a
9  dedicated anticoagulation clinic for it as
10  well.
11     Q.    Back in 2009, are you familiar
12  with studies looking across the United States
13  at warfarin and what percentage of time
14  patients were kept in the therapeutic
15  treatment range?
16     A.    I'm not familiar with the data.
17  I do know that I have regular conversations
18  with our warfarin clinic with ideas of where
19  we try to stand in terms of our TTRs and how
20  we manage, but these are my patients who are
21  being managed --
22     Q.    I was asking about 2009. You
23  weren't doing this in 2009, so -- I'll get to
24  the present time.
25     A.    Sure.

1     Q.    Back in 2009, just to finish
2  this, you're not aware of what the literature
3  said with respect to how frequently or what
4  percentage of time patients were within
5  therapeutic treatment range for warfarin?
6     A.    It's a wide body of data
7  looking at these types of questions, and I'm
8  not very familiar with, you know, one
9  specific number that comes of that wide body
10  of data.
11     Q.    In your report, you do discuss
12  ROCKET versus RE-LY versus -- what was the --
13  ARISTOTLE?
14     A.    Uh-huh.
15     Q.    Those were the three major
16  studies for NOACs, comparing them to warfarin
17  with respect to AFib; is that correct?
18     A.    That's correct.
19     Q.    Was there a difference in the
20  patient population studied in ROCKET compared
21  to RE-LY or ARISTOTLE?
22     A.    Yes. Looking at the overall
23  risks of each of those patient groups, there
24  were differences between those.
25     Q.    What was the major difference

Page 294

1    between the study group -- the patients
2    looked at in ROCKET versus ARISTOTLE and
3    RE-LY?
4        A.   I think the most commonly
5    cited and probably the most clinically
6    important is the difference in terms of the
7    underlying risks for stroke, known as the
8    CHAD score or the CHA2DS2-VASc score.
9        Patients in ROCKET, to
10   anticipate your next question, patients in
11   ROCKET --
12       Q.   Never a smart idea.
13       A.   I'll let you answer -- or I'll
14   let you ask.
15       Q.   No, you had me right on this
16   one.
17       Patients in ROCKET had higher
18   CHAD scores than the patients in RE-LY or
19   ARISTOTLE, correct?
20       A.   Yes.
21       Q.   And it was a statistically
22   significant higher CHAD score, wasn't it?
23       A.   Both statistically and
24   clinically, too.
25       Q.   Now, you talked a lot this

Page 295

1    morning -- not a lot, but you talked at least
2    for 10 or 15 minutes about your informed
3    consent to patients who you may have on a
4    NOAC or might be considering one NOAC versus
5    another or a NOAC versus warfarin, just to
6    give you a frame of reference.
7        Do you recall those questions?
8       A.   Yes.
9       Q.   You did not mention having
10   discussions with patients that, you know,
11   "You're 75, you have high blood pressure,
12   you've had transient ischemic attacks, you
13   have a very high CHAD score. I think you
14   might be a better patient for Xarelto, which
15   was studied in a patient population that more
16   closely monitors you, than the other NOACs."
17       I didn't hear that this
18   morning. Correct me if I'm wrong.
19       A.   I did not discuss that this
20   morning.
21       Q.   Is that a topic of discussion
22   that you routinely have with some of your
23   patients who might fit into that particular
24   category?
25       A.   I think that's a fair question.

Page 296

1       Q.   Thank you.
2       A.   Were I to have the luxury of
3    going into all the intricacies of the
4    different studies with my patients, that
5    certainly would be something that could come
6    up.
7        So I agree that whenever
8    possible, we should be looking at the
9    applicability of the data that's studied to
10   the clinical population, as you described
11   with high CHA2DS2-VASc scores being more
12   clinically applicable to ROCKET AFib, or
13   ROCKET-AF, than others.
14       That difference -- speaking
15   frankly, that difference between those two is
16   not particularly great from a clinical
17   standpoint.
18       The patient that you just
19   described has a CHA2DS2-VASc score that's in
20   excess of 6, and the CHA2DS2-VASc scores that
21   we're looking at in these trials is much less
22   than that.
23       So I think it's one point to
24   consider that the applicability of ROCKET-AF
25   in those very sick patients who are in the

Page 297

1    higher risk, that that may be a component of
2    it. But in my assessment, that's sort of a
3    minor point to compare to the totality of all
4    the other data.
5       Q.   Isn't that part and parcel of
6    precision medicine, though, to pick your
7    patients based upon what group was studied
8    with respect to the approval for a particular
9    medication?
10       A.   That is one of the many things
11   that go into it. You have to look at all of
12   the different pieces and then assess which
13   one seems to be most important. Which one is
14   probably going to have the biggest effect or
15   the largest effort.
16       And if we're going to mince
17   whether somebody has a CHA2DS2-VASc score of
18   1.4 or 2.3, to me that is much lower down on
19   my decision-making tree than if we're going
20   to discuss risks of bleeding or superiority
21   or noninferiority to the gold standard of
22   warfarin.
23       Q.   You would agree that you can't
24   compare ROCKET to RE-LY to ARISTOTLE
25   direct to direct to direct, because they were

1 different studies looking at different
2 populations, correct?
3         MR. MCWILLIAMS: Object to form.
4         THE WITNESS: Until we have a
5     head-to-head trial that compares those
6     three, that would give me the best
7     possible data that I could use.
8         In the absence of that, I have
9     to use the three individually and use
10    my best assessments of those three.
11 QUESTIONS BY MR. COVEY:
12    Q.    As a -- would you agree that
13 the higher the CHAD score the lower the
14 amount of time within therapeutic treatment
15 range for warfarin patients?
16    A.    In general, that has borne out,
17 but that's clearly not for everybody. You
18 bring up precision medicine and those sorts
19 of things. That's clearly not the case. We
20 have many patients in our clinic who have
21 high CHADS scores, or CHA2DS2-VASc scores,
22 who are very well-managed with their TTRs.
23    Q.    In general, looking across
24 populations -- so we're not looking at
25 individual patients -- the literature is

1 clear that the higher the CHAD score for
2 patients taking warfarin, the less time in
3 therapeutic treatment range?
4         MR. MCWILLIAMS: Object to form.
5         THE WITNESS: I'm not familiar
6     with the totality of that data. I
7     wouldn't dispute it, but I'm not very
8     familiar with that data.
9 QUESTIONS BY MR. COVEY:
10    Q.    Well, you criticize ROCKET in
11 your opinions as having a low time in TTR,
12 and you criticize -- withdrawn.
13         You criticize ROCKET for a low
14 time in TTR, correct --
15    A.    I do.
16    Q.    -- in your report?
17    A.    I do.
18    Q.    What was the average time in
19 TTR across the United States at the time
20 ROCKET was being conducted?
21    A.    That's a fair question. I
22 think the best thing we should look at is the
23 patients who were in the study in the United
24 States. I think that's a more fair question.
25         It wasn't 55 percent TTR for

1 the United-States-only patients in ROCKET.
2 It was considerably higher.
3         And across the board, when you
4 look at clinical trials, we have shown time
5 and time again that the clinical trials TTRs
6 are oftentimes higher than the real-world
7 TTRs as well. These patients are -- tend to
8 be seen more frequently and have management
9 that's closer and tighter with regards to the
10 warfarin levels and the INR management.
11         To see a clinical trial as low
12 as 55 percent is, to me, very astounding.
13 That's very inconsistent with the other
14 clinical trials that have been performed in
15 the years and decades prior to ROCKET.
16         MR. COVEY: Motion to strike as
17     nonresponsive.
18 QUESTIONS BY MR. COVEY:
19    Q.    Do you know, can you point me
20 to literature that provides a representative
21 figure in the United States at the time
22 ROCKET was being conducted for time in
23 therapeutic treatment range?
24         MR. MCWILLIAMS: Object to
25     form. Asked and answered.

1         THE WITNESS: So I cannot
2     provide you with that specific data,
3     and I don't know if such data exists
4     that you ask.
5         I think it's fair to look at
6     the United States patients who are in
7     ROCKET and look at their TTRs and
8     their warfarin management. And when
9     you look at the warfarin management of
10    a contemporary United States cohort,
11    you see that that warfarin management
12    is considerably higher.
13         And with that better management
14    of warfarin, we see lower risks of
15    bleeding.
16 QUESTIONS BY MR. COVEY:
17    Q.    What was the TTR in RE-LY?
18    A.    I want to get it specifically
19 correct. 64 percent.
20    Q.    And what was it in ARISTOTLE?
21    A.    62 percent.
22    Q.    And what was it in ROCKET?
23    A.    55 percent.
24    Q.    And what was -- and --
25    A.    If we're going to continue

1  this --
2      Q.   We're not.
3      A.   -- the prior trials had 70, 74
4  and 83 in the various trials that I showed
5  you.
6          MR. COVEY: Motion to strike.
7  There was no question pending.
8  QUESTIONS BY MR. COVEY:
9      Q.   In point of fact, as we've
10  already discussed, RE-LY and ARISTOTLE had
11  qualitatively healthier patients, although
12  still with AFib, than ROCKET; will you agree?
13     A.   We agreed on that before.
14         In the United States, the TTR
15  for ROCKET-AF was 64 percent.  So it is
16  possible that with your high CHADS score that
17  you suggest, we are still able to maintain 64
18  percent TTRs.
19     Q.   You have amongst your opinions
20  in your report criticism that the US subset
21  population data and chart were not in the
22  2011 package insert, correct?
23     A.   That's correct.
24     Q.   You're not aware of the byplay
25  between FDA and Janssen concerning what went

1  into that label or what didn't go into that
2  label?
3      A.   I'm not.
4      Q.   Is that a fair statement?
5      A.   That's a fair statement.
6      Q.   So you don't know how FDA may
7  have looked at the US subset data or not?
8      A.   That is a fair statement.
9      Q.   And typically, lawyers less
10  experienced than me ask a ton of questions
11  about you're not this, you're not that,
12  you're not this.
13         You're not an epidemiologist;
14  you're not a statistician, correct?
15     A.   By training I'm not those
16  things, though I use those things every day.
17     Q.   And we'll get there.
18         You understand that subset
19  data -- and I think you talked about it this
20  morning with respect to another group of
21  data, that subset data is not as reliable as
22  data of the whole in a study, correct?
23     A.   I would agree with that
24  statement in general, though I think that as
25  you think about -- the subset that we talked

1  about before was looking back at a whole
2  group of patients and then trying to dive
3  back in deeper and look at individuals in
4  terms of bleeding risk and aspirin.  That was
5  the discussion that we had.
6          Thinking about subset analysis
7  in countries or in cultures when the control
8  group, the management of the control group,
9  is very much culturally driven is important.
10  So it's different to say, I'm going to do a
11  subgroup analysis of ROCKET and look to see
12  who had Coca-Cola for lunch and who had 7UP
13  for lunch than it is to say that the
14  comparator group taking warfarin has
15  different cultural and -- different TTRs and
16  different cultural expectations to management
17  of warfarin.
18         Remember, warfarin is not just
19  a drug.  It's the drug and the management.
20  The culture does manage the TTRs.
21         So it's very fair, I think, to
22  consider that for the FDA to be approving a
23  drug to be taken in the United States, we
24  should be thinking about the comparator group
25  that is accurate for the patients in the

1  United States, which includes warfarin and a
2  management that in ROCKET-AF had a TTR of
3  64 percent.
4          MR. COVEY: Motion to strike
5  the nonresponsive portions of that
6  answer, which were about 98 percent.
7  QUESTIONS BY MR. COVEY:
8      Q.   Would you agree that from 2011
9  to 2000 -- what did they say?  '15?
10         MR. MCWILLIAMS: September 2015.
11  QUESTIONS BY MR. COVEY:
12     Q.   Right.
13         -- 2015, there was language in
14  the insert suggesting that a direct
15  comparison of Xarelto to well-controlled
16  patients on warfarin could not be made based
17  upon the ROCKET study?
18         MR. MCWILLIAMS: With respect
19  to efficacy.
20         MR. COVEY: Yes.
21         MR. MCWILLIAMS: Efficacy,
22  right?
23         THE WITNESS: Right.
24  QUESTIONS BY MR. COVEY:
25     Q.   You're familiar with that, yes?

1    A.    I am familiar with it and
2  indeed included it on page 11.  And again,
3  that's with respect to the efficacy.
4    Q.    And that's -- withdrawn.
5          You have a number of opinions,
6  at least a few, that talk about wide
7  therapeutic index claims with respect to
8  Xarelto?
9    A.    I believe mine are narrow
10 therapeutic range.
11   Q.    I'm sorry, did I say wide?
12   A.    Yeah.
13   Q.    That's because I wrote down
14 "not narrow."
15         Is there anywhere in the
16 package insert where the claim is made that
17 Xarelto has a wide therapeutic index or
18 ratio?
19   A.    I'd have to look it over
20 closely.  I'm not aware of it as far as
21 the -- a qualitative description of its
22 therapeutic range.
23   Q.    And would you agree that as
24 best you can tell, sitting here today, there
25 haven't been any promotional pieces that you

1  saw where Janssen or Bayer were saying
2  Xarelto has a wide therapeutic index?
3    A.    I've not seen any promotional
4  pieces of that.  That certainly was the
5  marketing message that was put out.
6    Q.    By whom?
7    A.    By Mr. Clausen and others who
8  we interact with.
9    Q.    So are you telling me that
10 Mr. Clausen went beyond the package insert
11 and beyond ROCKET and told you that Xarelto
12 had a wide therapeutic index?
13   A.    I think Mr. Clausen provided me
14 with many of the data that were published --
15 I shouldn't say data -- many of the papers
16 that were published in 2011, 2012, 2013, that
17 showed very similar things.
18         I'll direct you back to --
19   Q.    I --
20   A.    No.  Let me finish.  I'll
21 direct you back to Exhibit 9 and Exhibit 8
22 where there's these statements that say
23 because of its predictable pharmacokinetics,
24 pharmacodynamics, et cetera, that it has a
25 wide range.

1    Q.    There's a difference between
2  providing you published peer-reviewed data
3  and making a claim that is unsubstantiated,
4  correct?
5          And that's where I'm getting
6  at?
7          MR. MCWILLIAMS:  Is there?
8  QUESTIONS BY MR. COVEY:
9    Q.    If you're sitting here telling
10 me that Mr. Clausen provided you his opinion
11 that there's a wide therapeutic index, and
12 that goes beyond the package insert, that's
13 one thing.
14         If you're saying that as a
15 sales rep he provided you with peer-reviewed
16 literature, that's quite a different
17 situation.
18         You would agree?
19   A.    I think they're similar.  And
20 these are the sorts of discussions that we
21 would have, where we would look at these
22 sorts of paragraphs or these sorts of
23 statements and I would say, "How can you
24 stand by this?  How is this something that is
25 true?  I need to see this sort of data."

1    Q.    You wanted Mr. Clausen to give
2  you peer-reviewed studies that might be
3  relevant to the topics, didn't you?  That's
4  why you asked him the question.
5    A.    Oh, that's true.  But what I
6  would really like to have is the actual data,
7  not statements that are unsubstantiated.
8    Q.    But we already discussed he may
9  or may not be at liberty to provide you with
10 data, correct?
11   A.    That's fair.
12         MR. MCWILLIAMS:  Object to form.
13         THE WITNESS:  But you're asking
14 me whether -- you know, if those
15 discussions were had about a narrow
16 therapeutic or wide therapeutic range.
17 The answer is yes.  And if -- and when
18 asked to say -- when asked to, you
19 know, see that there is a wide
20 therapeutic effect, these are the
21 types of statements that are shown.
22         He did provide me with
23 peer-reviewed literature that were
24 unsubstantiated statements like the
25 ones that we showed.

1  QUESTIONS BY MR. COVEY:
2      Q.   Are you suggesting to me that
3  Mr. Clausen did something he should not have
4  done?
5          MR. MCWILLIAMS:  Object to
6      form.  Asked and answered.  I don't
7      think he...
8          THE WITNESS:  So I've answered
9      that question before.
10 QUESTIONS BY MR. COVEY:
11     Q.   I'll ask a different question.
12     A.   Let me answer it.
13     Q.   If you've answered it already,
14 I'll ask you a different question.
15         Are you suggesting that
16 Mr. Clausen --
17         MR. MCWILLIAMS:  No.  Pause a
18     second.
19         Watch your tone.  Don't be
20     argumentative.  Don't be demeaning.
21 QUESTIONS BY MR. COVEY:
22     Q.   Are you suggesting that
23 Mr. Clausen violated his professional
24 responsibilities in providing you these
25 peer-reviewed journals?

1          MR. MCWILLIAMS:  Object to form.
2  QUESTIONS BY MR. COVEY:
3      Q.   Articles?
4          MR. MCWILLIAMS:  Asked and
5      answered.
6          THE WITNESS:  No, I don't think
7      so.
8  QUESTIONS BY MR. COVEY:
9      Q.   Okay.  Are you suggesting that
10 anybody else from Janssen violated their
11 professional responsibilities in providing
12 you either the insert or promotional material
13 or peer-reviewed studies?
14     A.   I sure would have liked the
15 results of the peer-reviewed studies that
16 were -- that came out later, but I don't have
17 any specific trouble with what was provided
18 with me that was clinically available at the
19 time in 2011.
20     Q.   You know, they say hindsight is
21 20/20.  We'd all love to know what's coming
22 down in the future, too, wouldn't we?
23         Withdrawn.
24     A.   That's not a very sensitive
25 statement to a lot of my patients, so I'm

1  glad that you withdrew that statement.
2      Q.   I'm not making that statement
3  to anybody.  I withdrew it.
4          Do you follow -- well,
5  withdraw.
6          You're critical of HemoSense
7  and the issues that occurred with respect to
8  ROCKET that related to that device, correct?
9      A.   I'm familiar with that.
10     Q.   You understand that Janssen --
11 HemoSense wasn't Janssen's device?
12     A.   I understand that.
13     Q.   And you understand that
14 HemoSense had been -- gone through the
15 regulatory necessities to obtain FDA
16 clearance to be marketed, correct?
17     A.   I'm assuming that's the case.
18 I have not looked deeply into how that device
19 was approved for use.
20     Q.   Have you compared HemoSense to
21 CoaguChek, which I think was one of two other
22 devices that may have been available at the
23 time ROCKET was done?
24     A.   I've not compared those two.
25     Q.   Are you aware that there's

1  literature comparing the two and essentially
2  determining that they were comparable?
3      A.   I'm not aware of that
4  literature.
5      Q.   Problems were reported to
6  Janssen, reported to the FDA, that some of
7  the readings in HemoSense may not have been
8  accurate, correct?
9      A.   That's correct.
10     Q.   And this caused reanalysis of
11 the data from ROCKET to determine whether
12 regulatory action needed to be taken?
13     A.   I think that's a broad summary
14 of some of the things that happened but an
15 accurate statement, yes.
16     Q.   Duke, the Duke Research
17 Institute, which had been involved in the
18 original ROCKET study, undertook an
19 independent analysis that you reviewed,
20 correct?
21     A.   Correct.
22     Q.   It was Dr. Patel?
23     A.   Correct.
24     Q.   The EMA, what's the EMA?  We
25 haven't talked about them before.

Page 314

1      A.   No.  I think you're talking
2    about the European Medicines Agency.
3      Q.   I think you got that right.
4      A.   Okay.
5      Q.   They undertook an independent
6    review?
7           MR. MCWILLIAMS:  Object to form.
8    QUESTIONS BY MR. COVEY:
9      Q.   And published their results; is
10   that correct?
11          MR. MCWILLIAMS:  Object to
12          form.
13          THE WITNESS:  Okay.
14          MR. MCWILLIAMS:  Misstates
15          evidence.
16          THE WITNESS:  That's my
17          understanding.
18          MR. COVEY:  My understanding,
19          too.  Perhaps I have it wrong.  We can
20          correct it later.
21          MR. MCWILLIAMS:  That's okay.
22          I'll tell you on break.
23          MR. COVEY:  Is it that crucial?
24          MR. MCWILLIAMS:  No, it just
25          wasn't independent.

Page 315

1    QUESTIONS BY MR. COVEY:
2      Q.   Bayer conducted an analysis,
3    some statistical analyses, and provided those
4    to EMA and FDA; is that correct?
5      A.   That's my understanding as well.
6      Q.   And Janssen did their own
7    independent analyses and provided those to
8    the regulatory agencies also; is that
9    correct?
10     A.   I wasn't aware of that, but
11   okay.
12     Q.   So you didn't read anything
13   that Janssen did with respect to determining
14   whether the results of ROCKET were still
15   valid?
16     A.   I don't know which of the
17   studies were done by what companies or by
18   whom with regards to Bayer or Janssen --
19     Q.   And you're relying -- sorry.
20          In your reliance material, do
21   you recall that you listed the Janssen
22   materials?
23     A.   Yes, right.
24     Q.   Okay.  So you were aware that
25   Janssen did do an analysis?

Page 316

1      A.   Yes.  Correct.
2      Q.   And then finally, just I think
3    two months ago, maybe three months ago now or
4    closing on three months ago, FDA published a
5    pretty lengthy document indicating they had
6    done their own, correct?
7      A.   Correct.
8      Q.   And do you recall how many
9    people at FDA worked on their reanalysis of
10   the data?
11     A.   I do not know.
12     Q.   And obviously you don't know
13   how many people at EMA looked at their data
14   set and did the tests that they thought were
15   necessary?
16     A.   I don't know.
17     Q.   And you don't know what tests,
18   statistical or otherwise, Janssen or Bayer or
19   Duke did with respect to their analysis,
20   correct?
21     A.   No, I don't know how many
22   people worked on the reanalysis at the
23   individual locations.
24     Q.   Nor do you know what the
25   specific backgrounds of any of the

Page 317

1    individuals at any of these agencies or
2    companies who worked on this, whether they're
3    epidemiologists, statisticians, cardiologists
4    or any other relevant scientific or medical
5    specialty, correct?
6      A.   That's a fair statement.
7      Q.   You, yourself, have reached a
8    different opinion from all five of those
9    entities, correct?
10          MR. MCWILLIAMS:  Object to form.
11          THE WITNESS:  In some ways
12          they're similar, but in some ways
13          they're different.
14   QUESTIONS BY MR. COVEY:
15     Q.   You believe that the problem
16   with HemoSense renders the conclusions of the
17   ROCKET study invalid?
18     A.   I think that it weakens the
19   conclusions of ROCKET-AF.
20     Q.   In a statistically meaningful
21   way?
22     A.   I think it's essentially
23   impossible to really know that.  We have so
24   little data to make that conclusion.
25          I think that the people in all

80 (Pages 314 to 317)

Page 318

1  of the different places that you have just
2  cited to me are trying their best to use
3  whatever data is available and whatever
4  advanced scientifical calculations that they
5  can do to extrapolate two pieces of data
6  across the course of an entirety of several
7  years' worth of a patient experience.  So I
8  think they're trying their best.
9       Q.    But yet you have differences --
10 withdrawn.
11       You understand that EMA has
12 said, we're satisfied that any differences
13 were not material, and we're not going to
14 withdraw approval for Xarelto for any of the
15 European countries that are part of EMA,
16 correct?
17      A.    I'm not sure that they're
18 satisfied with the data.  It's hard to be
19 satisfied with two points.  But I am familiar
20 with the fact that they did not remove
21 Xarelto from the formulary.
22      Q.    And you know that the United
23 States has not withdrawn -- how easy for me
24 to say -- has not withdrawn Xarelto from its
25 list of approved medications?

Page 319

1       A.    That's correct.
2       Q.    And the FDA, in fact, did not
3  feel that there was any need to change the
4  label in any way.
5       Are you familiar with that?
6       A.    That's correct.
7       Q.    Do you know how many countries
8  have approved Xarelto for AFib?
9       A.    I do not.
10      Q.    Do you know any country that
11 has not approved Xarelto for AFib?
12      A.    I don't know, but I don't know
13 deeply into the inner workings of all of the
14 countries.
15      Q.    Canada has got an equivalent to
16 an FDA, don't they?
17      A.    I suppose to.
18      Q.    Not familiar with that?
19      A.    I'm familiar a little bit with
20 it.  I don't know the depths of their
21 approval process, but they do have an
22 approval agency.
23      Q.    Didn't FDA approve Xarelto and
24 Eliquis and Pradaxa without reversal agents
25 because the results of the key studies in

Page 320

1  AFib demonstrated that even without reversal
2  agents, the NOACs were either equal to or
3  better than warfarin in terms of preventing
4  problems?
5           MR. MCWILLIAMS:  Object to form.
6           THE WITNESS:  I would agree
7       with you that all three of those
8       medications that you just described
9       were approved without a reversal agent
10      that's available, and part of that
11      decision-making was performed off of
12      the results of those studies.
13          But I would also posit that
14      reversal agents on a real-world,
15      boots-on-the-ground standpoint would
16      help in terms of managing risks of
17      bleeding and potentially even
18      mortality with regards to patients who
19      take these medicines.
20 QUESTIONS BY MR. COVEY:
21      Q.    Do you know what efforts are
22 being undertaken to obtain FDA approval of
23 reversal agents?
24      A.    I don't know specifics of it.
25 We all hear about --

Page 321

1       Q.    Do you know --
2       A.    I'm not finished.
3       But we do know that dabigatran
4  has an FDA-approved medication for --
5       Q.    Recently?
6       A.    I'm sorry.
7       Q.    Recently?
8       A.    Recently.
9       Q.    Right.  It was approved without
10 it.
11      Now, do you know what efforts
12 are being undertaken to figure out whether
13 there is any method of monitoring patients on
14 Eliquis or Xarelto that would have a
15 demonstrated clinical benefit?
16      A.    There are discussions and
17 efforts that are being led, but these efforts
18 and discussions are not being led from the
19 top.  It's more of a grassroots effort to try
20 to improve the way that we deliver these
21 medicines.
22      Q.    When you say they're "not being
23 led from the top," what do you mean?
24      A.    These are not --
25      Q.    Are you saying the companies

81 (Pages 318 to 321)

1  aren't doing it? It's just physicians in the
2  field who are leading discussions and leading
3  the research?
4      A.   All right. So please let me
5  finish my statements first.
6      Q.   Okay.
7      A.   As I mentioned --
8      Q.   Well, actually, answers rather
9  than statements would be great.
10      Maybe we'll take a break for
11  five minutes.
12      MR. MCWILLIAMS: Sounds good.
13      VIDEOGRAPHER: We are going off
14  record at 2:46 p.m.
15      (Off the record at 2:46 p.m.)
16      VIDEOGRAPHER: We are back on
17  record at 2:55 p.m.
18  QUESTIONS BY MR. COVEY:
19      Q.   Doctor, before we took a break,
20  I had asked you whether you were aware of
21  efforts being made to determine a way to
22  monitor NOACs that would provide clinical
23  benefit to patients, and you gave me an
24  answer saying you're not aware of whether
25  it's top down and it's more of a grassroots

1  effort.
2      When you say "top down," are
3  you saying you're unaware of what efforts the
4  companies are being made, or it's your
5  understanding that the companies are making
6  no efforts?
7      A.   Oh, it actually has nothing to
8  do with companies.
9      Q.   Good.
10      A.   It was more talking about the
11  FDA is not making this a mandated piece to
12  delivery of these medicines. There are more
13  physicians who are on the front lines who
14  wish that there were better ways that we
15  could do this.
16      So there's discussions, as I
17  mentioned, you know, American Heart
18  Association that I -- the national meeting
19  that I was just at, in ways that we can think
20  about using testing or using dose adjustment,
21  using these sorts of things to try to study,
22  but it's not coming from the FDA.
23      Q.   Hasn't FDA participated in peer
24  group expert panels talking about monitoring
25  for NOACs?

1      A.   I believe that they have, and I
2  believe that the overall consensus is
3  similar, though I don't know what the action
4  items are from these sorts of meetings.
5      Q.   Are you familiar with what the
6  EMA has said and done on this particular
7  issue?
8      A.   There's a lot that the EMA has
9  done --
10      Q.   On this issue, I'm asking.
11      A.   No, I am not.
12      Q.   Fair enough. I won't ask you
13  about it.
14      Are you familiar with what
15  Janssen or Bayer is doing with respect to
16  monitoring agents?
17      A.   I'm not.
18      Q.   Are you familiar with what
19  Janssen and Bayer are doing and have done
20  over the last several years with respect to
21  reversal agents?
22      A.   I hope that we have one soon
23  for this medication, but I -- I'm not --
24      Q.   That wasn't --
25      A.   I'm not inter -- there is a

1  need for it, but I don't know specifically
2  what Bayer and Janssen are doing to make that
3  happen.
4      Q.   Are any of the NOACs indicated
5  for use in conjunction with cardiac ablation?
6      A.   They have been studied in
7  patients who have had cardiac ablations.
8  There is working -- so, yes, they're moving
9  into prime time use after cardiac ablation.
10  So that's a long answer to say yes.
11      Q.   It's not that long compared to
12  some others you've given.
13      Are you familiar with which
14  companies have studied the population who
15  have had cardiac ablation and whether a NOAC
16  might provide better quality of life or
17  longer life or healthier life?
18      A.   I'm not aware of which company
19  studied such a thing. My hunch would be that
20  they would not necessarily look at better
21  quality of life after ablation.
22      But likely "to be as safe as
23  warfarin" would be the bar by which I would
24  expect them to perform those studies.
25      Q.   Are you familiar with what

1  studies are being conducted by Janssen or
2  Boehringer Ingelheim, Bayer or Pfizer with
3  respect to other unmet need populations that
4  might benefit from NOAC therapy?
5      A.   I'm not aware.
6      Q.   What percentage of AFib
7  patients are appropriate candidates for
8  cardiac ablation?
9      A.   That's a difficult number to
10 put on with precision. I've seen reported as
11 few as 2 percent and as many as 25 percent.
12 In general, the indications to offer a
13 cardiac ablation for atrial fibrillation are
14 symptomatic atrial fibrillation.
15          Not all patients with AFib have
16 symptoms. But of the patients who have
17 symptomatic AFib, it's reasonable to consider
18 a cardiac ablation.
19     Q.   Now, what percentage of AFib
20 patients have symptomatic AFib?
21     A.   Roughly two-thirds, 50 percent
22 to two-thirds, will have symptoms of atrial
23 fibrillation, and those symptoms then have
24 broad ranges of kind of mild symptoms to more
25 severe.

1      Q.   So there are millions of
2  patients in the United States with
3  symptomatic AFib who might be candidates for
4  cardiac ablation?
5      A.   Probably on the order of
6  500,000 to one and a half million based on
7  sort of the distribution that we just
8  discussed.
9      Q.   And how many cardiac ablations
10 are performed every year?
11     A.   I don't know. I don't have
12 access to that.
13     Q.   Do you have an estimate, rough
14 estimate -- I'll give you that weasel room --
15     A.   Yeah.
16     Q.   -- rough estimate for the
17 United States?
18     A.   Do you mean wiggle room or
19 weasel room?
20     Q.   I'll adopt wiggle. I didn't
21 mean to use a pejorative --
22     A.   You still have an abomination
23 on me.
24     Q.   No, I didn't mean it to be
25 pejorative. In that one I didn't mean to be

1  pejorative.
2      A.   Fair enough.
3          I don't know, but I would guess
4  that it would be on the order of 50,000 to
5  100,000.
6      Q.   How long have cardiac ablations
7  been approved in the United States?
8      A.   Are we going to specifically
9  talk about atrial fibrillation --
10     Q.   Yeah.
11     A.   -- or dating back --
12     Q.   Yeah, we're just talking about
13 AFib.
14     A.   The original atrial
15 fibrillation studies were done in the mid
16 1990s, and the tools that were necessary to
17 do those ablations were developed over the
18 course of the late 1990s into the early
19 2000s.
20          I would say that pulmonary vein
21 isolation, the standard of atrial
22 fibrillation care, I mean, it really hit sort
23 of midstream or mainstream around the early
24 to mid 2000s.
25          So to answer your question,

1  we're talking really rough about 10 to
2  15 years' worth of mainstream use.
3      Q.   And if cardiac ablation is done
4  and done successfully, that means that
5  patient may not ever need to take a NOAC or
6  warfarin; is that correct?
7      A.   That's incorrect.
8      Q.   So irrespective of whether the
9  ablation is done successfully, all patients
10 who have ablation, who have symptomatic AFib,
11 are going to go on warfarin or a NOAC?
12     A.   That's also incorrect.
13     Q.   What medication will -- if any,
14 will AFib patients who have successful
15 cardiac ablation go on?
16     A.   And are we going to
17 specifically talk about anticoagulants? Is
18 that your question?
19     Q.   Yeah, absolutely.
20     A.   So the recommendations after an
21 atrial fibrillation ablation would be to stay
22 on an oral anticoagulant for a minimum of two
23 months, and that's specifically to help
24 prevent strokes from clots that we generally
25 think come from the disruption of the tissues

1  that are done during an ablation.
2      So for the first two to three
3  months has been our practice. We have
4  patients, all patients, take oral
5  anticoagulants to minimize their stroke risk
6  during the recovery.
7      Q.    Which oral anticoagulants do
8  you use?
9      A.    Traditionally it's been
10 warfarin, though increasingly it's been all
11 NOACs.
12     Q.    And after that two-month period
13 of time, are the patients weaned from their
14 NOACs?
15     A.    No. The decisions to come on
16 and off -- to come off of the NOAC or off of
17 warfarin are largely driven by their stroke
18 risks. So the CHADS2 or the CHA2DS2-VASc
19 score largely still decide that.
20     Q.    So the hope with cardiac
21 ablation for patients with relatively lower
22 CHADS risks is that they may not need to be
23 on an anticoagulant?
24     A.    If I can answer your question
25 in a different way, the purpose for doing an

1  AFib ablation is to improve symptoms. We do
2  not yet have good data that says atrial
3  fibrillation ablations equate to altered
4  stroke risks down the road. So we do this to
5  improve symptoms and quality of life.
6      Patients who still have a high
7  CHA2DS2-VASc score, we still continue them on
8  oral anticoagulants or recommend to continue
9  them on oral anticoagulants. Some patients
10 may not follow those directions, but that's
11 generally our recommendation.
12     Q.    So your discussion with a
13 patient who might be a candidate for cardiac
14 ablation is basically, "I can't tell you that
15 this is going to prolong your life. I can
16 tell you that it's got, as any surgical
17 procedure does, risks that would include
18 anesthesia and death. But it may make you
19 feel better, and that's the major reason you
20 should consider it. If your symptoms are
21 interfering with your life, you don't like
22 knowing that you've got an arrhythmia, this
23 may help"?
24     A.    Not a very precision question.
25     Q.    No, I'm not a doctor. And by

1  the way, my parents would have been thrilled
2  if I was.
3      A.    Your assessment was fair. We
4  do AFib ablations for symptoms, not for
5  stroke risk reduction or prolonging life.
6      Q.    I'm switching and going back
7  just briefly to make sure we're clear on the
8  record, something my colleague covered.
9      To prepare your report and for
10 your deposition today, you did not review the
11 records of any specific patients?
12     A.    That's correct.
13     Q.    And you're not offering and
14 will not be offering any opinions based upon
15 a specific John Smith patient that you may
16 have treated. By that I mean bringing the
17 records and going, "This is what happened in
18 this patient."
19     A.    That's correct.
20     Q.    What percentage of your AFib
21 patients do you have on warfarin?
22     A.    I don't have the accurate
23 numbers. I would have to give you a
24 guesstimate, and I would say it's probably
25 about 50 percent.

1      Q.    Would you agree that in terms
2  of precision medicine, absent a very reliable
3  patient and a patient who religiously goes
4  for monitoring, it is difficult to maintain
5  patients within the therapeutic range on
6  warfarin?
7      MR. MCWILLIAMS: Object to form.
8      THE WITNESS: I would entirely
9  disagree.
10 QUESTIONS BY MR. COVEY:
11     Q.    FDA has various panels they put
12 together for approval of a drug, outside
13 panels. They have their outside advisors for
14 Xarelto and for Eliquis.
15     Have you ever been consulted by
16 FDA?
17     A.    I have not.
18     Q.    For anything?
19     A.    Correct.
20     Q.    Okay. Would it be correct that
21 for a pharmaceutical medication you've never
22 participated in the process of writing a
23 label?
24     A.    That's correct.
25     Q.    When you offer your opinions

1  thus far today and in your report, you're
2  doing so from the point of view of a treating
3  physician who would like as much information
4  as might be relevant to help determine what
5  your recommendation is going to be and might
6  answer questions that your patients may have,
7  correct?
8      A.    Absolutely.  I use these
9  product labels all the time.  I'm the person
10 that these product labels are written for.
11     Q.    And I think I asked you this,
12 but you're not aware of what the interplay is
13 between the sponsor of a medication, be it
14 Janssen or Pfizer, and the FDA in terms of
15 what goes into a label or not?
16     A.    You specifically asked me about
17 the interplay between Janssen and the FDA
18 with regards to Xarelto in a prior question,
19 and I don't know the interaction that goes
20 between those two.
21           I do know that there is
22 interaction between those two and that there
23 is a back and forth with regards to what
24 makes it into the product label and what does
25 not.

1      Q.    You're not aware of what the
2  regulations are with respect to labeling for
3  a pharmaceutical product.  It's not an area
4  that you studied?
5      A.    No, I'm a consumer of the
6  product labels, but I'm not -- I don't know
7  the rules and regulations that go into the
8  interactions between the pharmaceutical
9  company and the FDA.
10     Q.    Are you aware of whether there
11 are any differences with respect to -- let me
12 withdraw that and see if I can phrase it more
13 artfully.
14           Do you know whether FDA has an
15 even more heightened interest or concern with
16 respect to what language goes into a black
17 box warning in a package insert?
18     A.    I don't know that for sure.  I
19 would expect that to be the case, but I don't
20 know that.
21     Q.    Now, the Xarelto package insert
22 has a black box warning, correct?
23     A.    Yes.
24     Q.    And you're familiar with what's
25 in there, right?

1      A.    I am.  If we're going to ask
2  specifics of it, we should probably bring it
3  out, but --
4      Q.    I'm not going to go into
5  specific-enough specifics to necessitate
6  that --
7      A.    Okay.
8      Q.    -- but I'm going to discuss it
9  with you.
10           We had discussed earlier that
11 it's basic medical school education to
12 physicians that blood thinners can exacerbate
13 bleeding.
14           Do you recall those questions?
15     A.    Yes.
16     Q.    Okay.  And in your report, you
17 have an opinion that is critical of the
18 Xarelto label for not having a warning with
19 respect to bleeding, correct?
20     A.    That's correct.
21     Q.    You are aware, based upon your
22 review of the label at the time you wrote
23 your report, that in many places in that
24 label, including on the first page under
25 warnings, there is references to bleeding and

1  cautions about bleeding, warnings about
2  bleeding, tables about bleeding, correct?
3      A.    I'm aware of that.
4      Q.    So you're not saying that the
5  label is deficient for not discussing
6  bleeding.  To you it's a question of bleeding
7  should be in the black box?
8      A.    That's a very important and
9  really the key side effect and potential
10 cause of harm.  And in particular, when you
11 line up the various product labels of the
12 various blood thinners, if one blood thinner
13 has a black box warning for bleeding and the
14 other one does not, I think that implies that
15 one is a safer option than the other, and
16 that certainly is inconsistent with the data
17 that we have.
18     Q.    In fact, it's only one blood
19 thinner that has a warning in the black box
20 for bleeding, correct?
21     A.    To my knowledge.  And we should
22 say oral anticoagulants.
23     Q.    Yes.  Fair enough.
24     A.    I just don't know what the
25 risks are for the IVs and the subcu's.

1          Yes, I would agree with you
2     that for oral anticoagulants, warfarin has a
3     black box label with regards to that --
4          Q.    To the extent --
5          A.    -- and that -- and that --
6          Q.    Sorry.
7          A.    -- Xarelto does not.  And that
8     when one puts those two labels together,
9     there may be an impression that one is safer
10    from a bleeding risk that the other one is
11    not, and that's inconsistent with the data.
12         Q.    Well, Eliquis, Pradaxa,
13    edoxaban, don't have warnings about bleeding
14    in black boxes either in their label,
15    correct?
16         A.    That's correct.
17         Q.    And you might only form that
18    impression that you talked about if you went
19    no further than to look at the black box.
20         Certainly you teach your
21    students to read the package insert, don't
22    you?
23         A.    Yes, but certainly you would
24    agree that the first thing your eyes are
25    drawn to and the reason that you put a big

1     black box around it and you write it in bold
2     letters in larger font is to draw your
3     attention to it.
4          Q.    Right.
5          And the second thing you look
6     at is the warnings, right?
7          A.    I'm not sure what direction I
8     look at all of these different things, but
9     the safety is an important first piece of
10    analysis.
11         Q.    Safety and efficacy.  You want
12    to know is this going to hurt somebody, and
13    if so, under what circumstances.
14         And no physician should be
15    prescribing a medication without reading the
16    warnings and the adverse reactions.
17         We can agree on that, can't we?
18         A.    Unfortunately, I think many
19    physicians do prescribe medications without
20    reading the product label thoroughly.  I
21    don't think that it's something that all
22    physicians do.  It's something that I do.
23         MR. COVEY:  Motion to strike.
24    QUESTIONS BY MR. COVEY:
25         Q.    I said that we can agree that

1     all physicians should read the package insert
2     with respect to indications and safety
3     information before prescribing medication?
4          A.    Again, I don't know if I would
5     agree with that.  I would like for that to
6     happen, but that's not always the case.
7          Q.    I asked you whether all
8     physicians should do that.
9          Are you not willing to agree
10    with me that all physicians, before
11    prescribing a medication, should look at the
12    package insert to determine the indications
13    and safety information?
14         A.    So, I can't speak for all
15    physicians in terms of their knowledge about
16    the different medications, in terms of what
17    they've already learned, in terms of what
18    they've already read.
19         I will tell you that I make it
20    my practice to read those product labels
21    fairly thoroughly before I prescribe those
22    medications.
23         Q.    How frequently?
24         In other words, do you review
25    every package insert once a year because they

1     may change once a year?
2          A.    I do not routinely line up
3     package inserts on a regular organized basis.
4     I do try to stay abreast of when changes do
5     happen with regards to the warnings or
6     labeling that might go into it or indications
7     that happen.
8          Q.    So the first reference inside
9     the black box warning for Xarelto, and it's
10    with both the 2012 and present label, relates
11    to discontinuing Xarelto, and the patients
12    should not discontinue unless under the care
13    and treatment of a physician.
14         Are you familiar with that?
15         A.    Yes.
16         Q.    Is that important?
17         A.    Yes, it's important.
18         Q.    Why?
19         A.    Because, again, it's a safety
20    signal that was assessed in the literature
21    and was shared with physicians in what the
22    FDA believed to be the most important way:
23    inside the black box.
24         Q.    You came here today, I think
25    you said early in your testimony, to give a

1  fair and balanced opinion based upon
2  everything you reviewed.
3         Is it important to you that
4  patients on NOACs be safeguarded?
5         MR. MCWILLIAMS:  Object to form.
6         THE WITNESS:  I think all
7  patients should be safeguarded,
8  including patients who are on
9  anticoagulants.
10 QUESTIONS BY MR. COVEY:
11     Q.    When did you first consult
12 with -- may have mentioned Ms. Kraft, but
13 I'll just say any lawyer with respect to
14 Pradaxa litigation?  All I want is the date.
15 I understand counsel is going to object to
16 everything else, and we'll battle that out
17 with Judge Fallon.
18        So approximately when?  Two
19 years ago?  Three years ago?
20     A.    You know, I honestly cannot
21 tell you the date or the time of that, and if
22 I did, it would be just complete guessing.
23     Q.    When did you first consult with
24 either any of the lawyers here or those that
25 are working on Xarelto?

1      A.    As I point out in my billing, I
2  think that was in December of 2015.
3      Q.    And --
4      A.    That was roughly 12 months ago.
5      Q.    -- not suggesting there was a
6  reason for you to do this, but had you become
7  aware of any of the -- I think they're called
8  bad drug ads that were out there either with
9  respect to Pradaxa or Xarelto?
10     A.    I am aware of those.
11     Q.    When did you become aware of
12 those?
13     A.    I don't recall a particular
14 date.
15     Q.    And was there anything about
16 any of those ads that concerned you at all?
17     A.    Not particularly, other than
18 the fact that they are the source of some
19 conversations in our clinic visits with my
20 patients.
21     Q.    Meaning patients will come in
22 and go, "I saw an ad on TV.  Maybe I should
23 go off this medication and on different one"?
24     A.    We have discussions about that,
25 because that is influential in their

1  decisions about which anticoagulant to take.
2  So we have discussions about it.
3      Q.    Did you ever review any of the
4  ads on the websites of the law firms who are
5  representing plaintiffs in Xarelto?
6      A.    I have not.
7      Q.    And have you ever -- did you
8  ever pay attention when the TV ads were run
9  that you sometimes see, "If you took Xarelto,
10 you know, you may want to consult with me"?
11     A.    I haven't.
12     Q.    Were you ever concerned that
13 these ads, whether it be TV or on websites,
14 were misleading patients or not providing
15 patients with crucial information not to stop
16 taking the medication without talking to a
17 doctor?
18     A.    I don't know -- I don't know
19 what kind of advice those ads give.  I will
20 tell you that those are -- you know, those
21 discussions do take some time.  They are
22 several minutes in my clinic visits with my
23 patients and unlikely to be able to assess
24 all of your risks and benefits over the
25 course of a 30-second ad.

1      Q.    Would you be critical if those
2  ads did not contain information saying, "By
3  all means, come consult with us, but do not
4  stop taking your medication unless you're
5  under the care and treatment of a physician"?
6      A.    I don't think there should be
7  any advice given over television.  I would
8  expect my patients to not hear something on
9  television and react but to talk with me
10 about that.
11     Q.    Let ask my question again.
12        Would you be critical of any ad
13 reaching out to patients who might be on
14 Xarelto or Pradaxa that didn't -- that talks
15 about the risks of bleeding and the
16 possibility that you might be entitled to
17 monetary damages that didn't say, "Do not
18 stop taking any medication on this medication
19 without consulting with a doctor"?
20     A.    Oh, I see your question now.
21        Would I be critical of it?
22 Likely critical, I guess, but I understand
23 that there's only so many things that can fit
24 into a 30-second sound bite.
25        I would expect that my patients

1  would not make those changes without talking
2  with me.
3       Q.   You have patients who are on
4  NOACs who are elderly, don't you?
5       A.   Yes.
6       Q.   You have patients who are on
7  NOACs who are not quite as sharp mentally as
8  they used to be, don't you?
9       A.   That's not a very fair
10  statement.  It's not a nice statement.
11      Q.   Isn't that true?
12      A.   That's not a very nice
13  statement.
14      Q.   I'm not saying every patient.
15           Don't you have some patients
16  who are on Xarelto who are not as sharp
17  mentally as they may have been 10, 20 or
18  30 years ago?
19      A.   I don't know them 10, 20,
20  30 years ago.
21      Q.   Fair enough.
22           When you do your assessments of
23  patients, there's a variety of mental
24  responsiveness and responsibility among any
25  group of patients, including yours, correct?

1       A.   I'm going to say yes.  I'm not
2  really sure the answer to that question, but,
3  yes.
4       Q.   Are you familiar with any
5  editorials or studies or papers that have
6  been published in any peer-reviewed journals
7  about how many patients have had problems
8  because they became scared by plaintiff bad
9  drug ads and stopped taking their medication
10  not under the supervision of a physician?
11      A.   Yeah, I'm not aware of that.
12      Q.   So in all the materials that
13  you reviewed, you didn't see such articles or
14  publications?
15      A.   That's correct.
16      Q.   And would that be a topic of
17  interest to you?
18      A.   The health of my patients is
19  the topic of interest to me.  The task that I
20  was given with regards to -- the task at hand
21  in formulating my opinions today was not
22  along the lines of TV advertisements.
23           MR. COVEY:  Let's take a break
24  for a few minutes.  Either I'm going
25  to hand it off or cover enough stuff

1  while we're on a break and not hand it
2  off.  But let's just take a break for
3  five minutes.
4           VIDEOGRAPHER:  We're going off
5  the record at 3:20 p.m.
6       (Off the record at 3:20 p.m.)
7           VIDEOGRAPHER:  We are back on
8  record at 3:39 p.m.
9           MR. COVEY:  Doctor, I think off
10  the record I indicated I had no
11  further questions at this time.  I
12  will amend that to no further
13  questions unless some court gives me
14  the opportunity to question you about
15  Pradaxa.
16           Thank you for your time today.
17  I appreciate it.
18           THE WITNESS:  Thank you.
19           MR. MCWILLIAMS:  And I have no
20  questions.  Thanks, everybody.
21           VIDEOGRAPHER:  This is the end
22  of the deposition.  The time is
23  3:39 p.m.  We're going off record.
24       (Deposition concluded at 3:39 p.m.)
25           ﹘﹘﹘﹘﹘﹘﹘

1            CERTIFICATE
2
3       I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Phillip Cuculich, M.D.
   was duly sworn by me to testify to the truth,
6  the whole truth and nothing but the truth.
7       I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
        I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13  that I am not financially interested in the
   action.
14
15
16
17     _____
        CARRIE A. CAMPBELL,
18     NCRA Registered Diplomate Reporter
        Certified Realtime Reporter
19     California Certified Shorthand
        Reporter #13921
        Missouri Certified Court Reporter #859
20     Illinois Certified Shorthand Reporter
        #084-004229
21     Texas Certified Shorthand Reporter #9328
        Kansas Certified Court Reporter #1715
22     Notary Public
23     Dated:  December 6, 2016
24
25

## Page 350

1     INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4     carefully and make any necessary corrections.
5     You should state the reason in the
6     appropriate space on the errata sheet for any
7     corrections that are made.
8          After doing so, please sign the
9     errata sheet and date it.  You are signing
10    same subject to the changes you have noted on
11    the errata sheet, which will be attached to
12    your deposition.
13         It is imperative that you return
14    the original errata sheet to the deposing
15    attorney within thirty (30) days of receipt
16    of the deposition transcript by you.  If you
17    fail to do so, the deposition transcript may
18    be deemed to be accurate and may be used in
19    court.
20
21
22
23
24
25

## Page 352

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5     hereby certify that I have read the
6     foregoing pages, and that the same is
7     a correct transcription of the answers
8     given by me to the questions therein
9     propounded, except for the corrections or
10    changes in form or substance, if any,
11    noted in the attached Errata Sheet.
12
13
14    _____
15    PHILLIP CUCULICH, M.D.          DATE
16
17
18    Subscribed and sworn
      to before me this
19    _____ day of _____, 20____.
20    My commission expires:_____
21
22    _____
      Notary Public
23
24
25

## Page 351

1          - - - - - -
          E R R A T A
2          - - - - - -
3
4     PAGE  LINE  CHANGE
5     ____  ____  _____
6          REASON: _____
7     ____  ____  _____
8          REASON: _____
9     ____  ____  _____
10         REASON: _____
11    ____  ____  _____
12         REASON: _____
13    ____  ____  _____
14         REASON: _____
15    ____  ____  _____
16         REASON: _____
17    ____  ____  _____
18         REASON: _____
19    ____  ____  _____
20         REASON: _____
21    ____  ____  _____
22         REASON: _____
23    ____  ____  _____
24         REASON: _____
25

## Page 353

1          - - - - - - -
          LAWYER'S NOTES
2          - - - - - - -
3     PAGE  LINE
4     ____  ____  _____
5     ____  ____  _____
6     ____  ____  _____
7     ____  ____  _____
8     ____  ____  _____
9     ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25