1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3

      IN RE:  XARELTO        )  MDL No.:  2593
4     (RIVAROXABAN) PRODUCTS  )  Section:  L
      LIABILITY LITIGATION    )  Judge Eldon E. Fallon
5                             )  Mag. Judge North
                              )
6                             )
                              )
7                             )
      JOSEPH J. BOUDREAUX,    )  Case No.:  14-cv-2720
8     JR., ET AL              )

9

10

11    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14

15      Videotaped Deposition of CINDY A. LEISSINGER,

16    M.D., taken on Thursday, December 8, 2016, in the

17    office of The Lambert Firm, A.P.L.C., 701 Magazine

18    Street, New Orleans, Louisiana 70130, commencing

19    at 2:10 p.m.

20

21

22

23

      Reported by:
24    AURORA M. PERRIEN
      CERTIFIED COURT REPORTER
25    REGISTERED PROFESSIONAL REPORTER

# I N D E X

Page

Caption.............................1

Appearances........................4

Agreement of Counsel...............6

Witness' Certificate...............235

Reporter's Certificate.............236

## E X A M I N A T I O N

MS. MOORE..........................8

MS. duPONT.........................205

## E X H I B I T S

Exhibit No. 1.....................9
Defendants' Notice with Subpoena Duces
Tecum of Oral Videotaped Deposition...

Exhibit No. 2....................23
Expert Report of Cindy A. Leissinger,
M.D.

Exhibit No. 3....................75
Highlights of Prescribing Information

Exhibit No. 4....................80
Transcript of the Testimony of Videotaped
Deposition of Kenneth Wong, M.D.

Exhibit No. 5
STAH Emergency Department, Lab Results
1/7/14 - 1/7/14,
JBoudreaux-OStAGH-MD-000032

Exhibit No. 6.....................104
STAH Emergency Department, Lab Results
1/7/14 - 1/7/14,
JBoudreaux-OstAGH-MD-000031

Exhibit No. 7.....................107
STAH Emergency Department, Lab Results
1/7/14 - 1/7/14,
JBoudreaux-OStAGH-MD-000030

Exhibit No. 8
(Labs), JBoudreaux-PPR-000019

Exhibit No. 9
STAH 3rd Flr Medical Surgical Unit,
Progress Notes, Collection Time 1/9/14,
JBoudreaux-OStAGH-MD-000073 - 000074

Exhibit No. 10
STAH 3rd Flr Medical Surgical Unit,
History & Physical,
JBoudreaux-OStAGH-MD-000054

Exhibit No. 11....................143
STAH 3rd Floor Medical Surgical Unit,
Radiology Results, 1/8/14 - 1/8/14,
JBoudreaux-OStAGH-MD-000117

## C E R T I F I E D   Q U E S T I O N S

Page/Line

MS. MOORE.........................46/16,
50/24, 59/23, 79/8, 185/16, 188/13
MS. duPONT........................223/25

Reporter's Note: Exhibit Nos. 5, 8, 9, and 10
were marked but not identified on the record.

## A P P E A R A N C E S

REPRESENTING JOSEPH J. BOUDREAUX, JR. AND
LORETTA BOUDREAUX:

SCHLICHTER, BOGARD & DENTON, L.L.P.
BY:  ROGER DENTON, ESQ.
100 South 4th Street, Suite 1200
St. Louis, Missouri 63102
314.621.6115
Rdenton@uselaws.com

BARRIOS, KINGSDORF & CASTEIX, L.L.P.
BY:  EMMA E. KINGSDORF, ESQ.
701 Poydras Street, Suite 3650
New Orleans, Louisiana 70139-3650
504.524.3300
Ekingsdorf@bkc-law.com

REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
ORTHO, L.L.C.:

IRWIN, FRITCHIE, URQUHART & MOORE,
L.L.C.
BY:  KIM E. MOORE, ESQ.
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130-3280
504.310.2108
Kmoore@irwinllc.com

IRWIN, FRITCHIE, URQUHART & MOORE,
L.L.C.
BY:  JEANETTE F. MILLS, ESQ.
400 Convention Street, Suite 1001
Baton Rouge, Louisiana 70802
504.310.2100
Jmills@irwinllc.com

BARRASSO, USDIN, KUPPERMAN, FREEMAN &
SARVER, L.L.C.
BY:  ANDREA M. PRICE, ESQ.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
504.589.9700
Aprice@barrassousdin.com

REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
INC., and BAYER PHARMA AG:

KAYE SCHOLER, L.L.P.
BY:  JULIE B. duPONT, ESQ.
250 West 55th Street
New York, New York 10019-9710
212.836.8572
Julie.dupont@kayescholer.com

ALSO PRESENT:

MELISSA BARDWELL, VIDEOGRAPHER

Page 6

```
1        S T I P U L A T I O N
2    It is stipulated by and among Counsel that
3  the videotaped deposition of CINDY A. LEISSINGER,
4  M.D., is being taken under the Federal Rules of
5  Civil Procedure for all purposes permitted under
6  the law.
7    The formalities of reading and signing are
8  not waived.
9    The formalities of sealing, certification
10 and filing are not hereby waived.  The party
11 responsible for services of the discovery material
12 shall retain the original.
13   All objections, except those as to the
14 form of the questions and/or the responsiveness of
15 the answers, are reserved until the time of the
16 trial of this cause.
17        * * * * *
18        Aurora M. Perrien, Certified Court
19 Reporter, Registered Professional Reporter, in and
20 for the State of Louisiana, officiated in
21 administering the oath to the witness.
22
23
24
25
```

Page 7

```
1        P R O C E E D I N G S
2  THE VIDEOGRAPHER:
3        We are now on the record.  My name is
4  Melissa Bardwell, videographer here for
5  Golkow Technologies.  The date today is
6  December 8th, 2016.  The time is
7  approximately 2:10 p.m.  This videotaped
8  deposition is being held in New Orleans,
9  Louisiana, in reference to the Xarelto
10 (rivaroxaban) Products Liability
11 Litigation.  The deponent today is
12 Dr. Cindy Leissinger.
13        Would counsel present please introduce
14 themselves and state their affiliations
15 for the record.
16 MR. DENTON:
17        Roger Denton on behalf of all the
18 plaintiffs all by himself.
19 MS. MOORE:
20        Kim Moore on behalf of the Janssen
21 defendants.
22 MS. MILLS:
23        Jeanette Mills on behalf of the
24 Janssen defendants.
25 MS. duPONT:
```

Page 8

```
1        Julie duPont on behalf of the Bayer
2  defendants.
3  MS. PRICE:
4        Andrea Mahady Price on behalf of
5  Janssen.
6  THE VIDEOGRAPHER:
7        The court reporter is Aurora Perrien,
8  and she will now swear in the witness.
9        (The court reporter swore in the witness.)
10        E X A M I N A T I O N
11 BY MS. MOORE:
12   Q.  Good afternoon, Dr. Leissinger.
13   A.  Hello.
14   Q.  As I mentioned a moment ago, my name is
15 Kim Moore, and I am here today to ask you
16 questions about the report that you prepared with
17 respect to Mr. Boudreaux; and that is, your
18 case-specific report that you prepared on -- it
19 looks like October 14th, 2016.
20   A.  Yes.
21   Q.  All right.  You have given a deposition, I
22 know.
23   A.  Yes.
24   Q.  So you're familiar with the rules.  And
25 number one, obviously you're under oath.
```

Page 9

```
1    A.  Yes.
2    Q.  You need to respond verbally, as you're
3  doing.  And if at any time today I ask you a
4  question that you don't understand, let me know
5  and I'll be happy to rephrase it.
6    A.  Okay.
7    Q.  And if I ask a question and you answer it,
8  I'll assume that you understood my question.
9        Is that fair?
10   A.  Yes.
11   Q.  Of course if you need a break, let me
12 know.  I will happy to accommodate you as long as
13 a question isn't pending.
14        Let's begin with just attaching the
15 deposition notice.  I've marked it as Exhibit 1.
16        (Exhibit No. 1 was marked for
17        identification and attached hereto.)
18 BY MS. MOORE:
19   Q.  These exhibits will be numbered separately
20 from the generic deposition that you gave --
21   A.  Okay.
22   Q.  -- previously.  All right.
23        If you'll just take a moment and look at
24 that.  I really want to focus your attention to
25 Page 3, Exhibit A.  And what you have in front of
```

1  you is a request to bring certain documents with
2  you today, and the first one is a copy of your
3  most current CV.
4      Is -- would it be fair to say that you
5  provided the CV to the attorneys at your generic
6  -- your deposition a week or so ago?
7      A.  No.  I did not.  I last provided my CV to
8  the attorneys that I've been in communication
9  with, it's been a while ago.  And I don't
10 recall exactly when.
11     Q.  Do you have a copy of your current CV?
12 Has it been updated since you provided it to the
13 attorneys you're working with?
14     A.  Likely.  I do not have a copy --
15     Q.  All right.
16     A.  -- today.
17     Q.  If it's been updated, we're going to
18 request an updated copy.
19     A.  Okay.
20     MS. MOORE:
21         Counsel, if you could get that to us,
22     we'd appreciate it.
23     MR. DENTON:
24         Sure.  Would you remind me in an
25     e-mail, though, please?

1      MS. MOORE:
2          Yeah.  I'll do my best.
3      MR. DENTON:
4          Thank you.
5  BY MS. MOORE:
6      Q.  The second item that you'll see on the
7  request is for you to produce all time records,
8  bills, invoices, things along that nature that you
9  would have prepared in connection with this
10 Xarelto matter.
11     Do you have copies of the bills or
12 invoices that you would have provided the
13 plaintiff lawyers?
14     A.  I do not have those on me.  I -- I believe
15 that the attorneys I worked with did provide them
16 at the last deposition that I did a couple of
17 weeks ago.  And there have been no additional
18 invoices since that time.
19     Q.  Have you done any additional work since
20 that time?
21     A.  Yes.  I have.
22     Q.  All right.  Tell me about the additional
23 work.  Your deposition was on November 15th.
24 Today is December 8th.  What type of work have you
25 done since your deposition was concluded?

1      A.  I did some brief reviewing again of the
2  records that I had and some of the other documents
3  pertaining to Mr. Boudreaux and his case --
4      Q.  Okay.
5      A.  -- in preparation for today.
6      Q.  And how much time did you spend?
7      A.  I -- probably three hours, four hours,
8  something like that.
9      Q.  Three to four hours you spent reviewing
10 the documents that you've referenced in your
11 Leissinger report regarding Mr. Joseph Boudreaux?
12     A.  I -- I don't recall if they were
13 referenced in that report, but the -- the
14 documents that I would have used to create that
15 report.
16     Q.  Thank you.  And we'll go through those in
17 -- in a little bit today.
18     A.  Okay.
19     Q.  Did you have an opportunity to meet with
20 any of the plaintiff attorneys since your
21 deposition on November 15th?
22     A.  Yes.
23     Q.  And who did you meet with?
24     A.  Mr. Denton.
25     Q.  Anyone else?

1      A.  Emma.  I don't remember her last name.
2      Q.  And on how many occasions have you met
3  with Mr. Denton and Emma?
4      A.  Once.
5      Q.  Once.
6      And when was that?
7      A.  Yesterday.
8      Q.  And how long did you meet with those
9  individuals?
10     A.  It was about two hours.
11     Q.  And where did you meet?
12     A.  I'm sorry.  Where?
13     Q.  Where was the meeting held?
14     A.  In my office.
15     Q.  In your office.  Okay.
16     And what did you review at that time?
17     A.  I think we just kind of reviewed the
18 general case.  Again, as I said, I'm -- I'm --
19 maybe before we got started, medical records,
20 particularly in the electronic age, are very
21 difficult to pull together.  There's lab
22 duplication and that sort of thing.  So sometimes
23 there's just -- it just sort of takes time to kind
24 of process through.  Even when you're trying to
25 find a particular note or a particular doctor's

1 opinion, it just takes a little time. So I -- I
2 would say that that was probably where we spent
3 the bulk of our time.
4    Q. Trying to find medical records?
5    A. Trying to find -- you know, trying to find
6 a particular date or concept or -- or opinion or
7 recommendation --
8    Q. Okay.
9    A. -- or -- or a prescription or, you know,
10 whatever.
11    Q. With respect to opinions and
12 recommendations, what exactly is your opinion in
13 this case involving Mr. Boudreaux?
14    MR. DENTON:
15       Well, I object to the form. They're
16    listed in the report.
17    THE WITNESS:
18       So my opinion regarding the bleeding
19    episode -- I'm assuming that -- so -- so
20    more specifically, my opinion regarding
21    the bleeding, the relationship to Xarelto?
22 BY MS. MOORE:
23    Q. All of the above. Yes.
24    MR. DENTON:
25       Well, then I think it's a compound

1    question, and I object to the form.
2    THE WITNESS:
3       So I guess -- and I guess it's, you
4    know, probably stated in -- in my report
5    that I submitted, that, you know, to a
6    reasonable degree of certainty, my opinion
7    is that he experienced gastrointestinal
8    bleeding approximately -- beginning
9    approximately two to three weeks and
10    probably even a little sooner perhaps
11    after beginning Xarelto, and that it is
12    likely that the GI bleeding was related to
13    his beginning Xarelto.
14 BY MS. MOORE:
15    Q. Likely. You've word -- use the word
16 "likely"?
17    MR. DENTON:
18       He -- she used --
19    MS. MOORE:
20       Counsel --
21    MR. DENTON:
22       No. No. No.
23    MS. MOORE:
24       Counsel, I --
25    MR. DENTON:

1       No. No. No.
2    MS. MOORE:
3       We're not going down that road today.
4    I'm going to object to any coaching of
5    this witness. You can make an objection
6    to the form. But I -- especially we -- we
7    haven't been on the record. And now
8    you're -- I don't want you suggesting to
9    her what she just said. I think this
10    witness is more than capable of
11    remembering what she said less than
12    two minutes ago.
13    MR. DENTON:
14       Well, you misstated what she just
15    said, and I object to the --
16    MS. MOORE:
17       Well, this --
18    MR. DENTON:
19       -- form.
20    MS. MOORE:
21       -- witness is quite competent to
22    explain if I have misstated something.
23 BY MS. MOORE:
24    Q. And let me make that clear for you,
25 Dr. Leissinger. As we go throughout the next

1 couple of hours, if I misstate anything that you
2 say, I want you to, you know, feel free, of
3 course, to correct me.
4    Is that okay?
5    A. Yes. And -- and I mean, I guess I would
6 further ask -- at times I feel that there's a
7 certain innuendo in the way that some of the
8 questions are posed. And so I -- you know, I will
9 try to be as straightforward in my answers --
10    Q. Of course.
11    A. -- as possible. But there are -- you
12 know, so sometimes we use things, qualifiers like
13 "likely" or -- or -- you know, I'm a physician.
14 And, you know, we -- we often -- we often talk in
15 those terms. And so, you know, I'll be as direct
16 as I can be. And -- and if you have a question
17 about anything I say, I'd appreciate just the same
18 in return, just be --
19    Q. Absolutely.
20    A. -- as direct as possible.
21    Q. That's --
22    A. Thank you.
23    Q. That's a good way to proceed. Thank you.
24    So you spent about two hours yesterday
25 with Mr. Denton and -- I can't recall . . .

Page 18

1    A.  Emma.
2    Q.  Emma.
3      And you looked at some -- tried to look at
4  records, and you said talked about recommendations
5  and opinions?
6    A.  Physician -- from -- from the record, not
7  my opinions, but what I meant by that specifically
8  was looking for doctors' impressions, caregivers
9  that saw him, what their opinions were about what
10  was going on, and etcetera.  That's what I
11  meant --
12    Q.  Okay.
13    A.  -- when I said "opinions."
14    Q.  And is that important to you, to get input
15  from the caregivers that treated Mr. Boudreaux?
16    A.  Yes.
17    Q.  And why is that?
18    A.  Well, I think that in trying to understand
19  what happened with a patient during any kind of
20  medical illness or -- or problem, you know, the --
21  the source that we have is the medical record.
22  And what's documented in the medical record is --
23  of importance to me as I look at it is, you know,
24  the -- the -- the intake, the evaluation, the
25  physical exam, the -- the doctors' and some -- in

Page 19

1  some cases nurses' impression of what's going on,
2  and then their recommendations, how they want to
3  treat it.
4    Q.  You're not here today to render opinions
5  about any doctors performing care beneath the
6  standard of care; correct?
7      MR. DENTON:
8      Object to the form.
9      THE WITNESS:
10      Correct.  I'm -- that -- I -- you
11      know, I don't know that that -- if that
12      comes up in the course of discussion or
13      whatever.  But that's not primarily --
14      that was not my intent in reviewing this
15      case.
16  BY MS. MOORE:
17    Q.  You're not critical of any of the doctors
18  that you've reviewed in how they treated or cared
19  for Mr. Boudreaux; correct?
20    A.  Correct.
21    Q.  Going back to the Exhibit A, I asked for
22  your bills and invoices.  You said you don't have
23  any additional ones, but you've spent about three
24  to four hours working on this particular matter.
25  We'll call it the Boudreaux matter --

Page 20

1    A.  Okay.
2    Q.  -- okay -- since your deposition on
3  November 15th.  The remaining requests really
4  focus on your file that you had with respect to
5  Mr. Boudreaux.
6      Do you have a file with respect to the
7  documents that you would have reviewed, the
8  medicals, any type of notes or correspondence you
9  had with respect to your work on the Boudreaux
10  case?
11      MR. DENTON:
12      Object to the form.  And I think it's
13      -- we've responded, I believe, consistent
14      with the agreement on the deposition
15      protocol.  And that's what we've done, is
16      my understanding.
17  BY MS. MOORE:
18    Q.  So you don't have any additional documents
19  to bring today.  Is that --
20    A.  No.
21    Q.  -- fair to say?
22    A.  I do not.
23    Q.  Do you know the Boudreauxs?  Do you know
24  Mr. Boudreaux?
25    A.  I do not.

Page 21

1    Q.  Are you aware of his current medical
2  status?
3    A.  I am not.
4    Q.  Do you have any impression of his current
5  medical status?
6    A.  No.  I do not.
7    Q.  Is that not important to you?
8      MR. DENTON:
9      Object to the form.
10      THE WITNESS:
11      Regarding the assessment that I was
12      asked to make about the incident of
13      bleeding that occurred in 2014, how he is
14      doing today, you know, does not to me seem
15      extremely relevant to that one particular
16      episode of bleeding.  I mean, you asked me
17      do I -- I -- I think -- I'm not exactly
18      sure of your words, but do I want to know?
19      Of course, when I read the case of a
20      patient, I always -- I mean, it's just
21      sort of a personal and professional
22      interest, that I would like to know how
23      things turned out.
24      But as far as my trying to obtain
25      records or -- or something like that about

1  how he's doing now, I have not done that
2  as I did not think it was relevant to the
3  period of time that I was asked to make an
4  opinion about.
5  BY MS. MOORE:
6  Q. And what period of time were you asked to
7  render an opinion about?
8  A. So it was in 2014, I think starting in
9  January -- when he was diagnosed with atrial
10  fibrillation, he was started on rivaroxaban at
11  that time -- and then several weeks later, when he
12  represented to his physician complaining of
13  weakness, dark tarry stools, and was found to be
14  anemic and to have GI bleeding.
15  Q. Okay. So the last record with respect to
16  Mr. Boudreaux that you have and that you've
17  reviewed are the records that are referenced
18  in your report for Mr. Boudreaux. Is that fair to
19  say?
20  A. Again, I -- again, I don't recall that I
21  laid out a specific list of references in my
22  report. And I -- and I don't have my report here
23  in front of me, so I would have to sort of take a
24  look at it.
25  But I did review -- there were some

1  records that I reviewed that extended beyond that
2  period I think of February, March of 2014. I
3  could not tell you the -- I do not recall the
4  exact last date of records that I saw.
5  Q. All right. I'm going to hand you a copy
6  of your report --
7  A. Okay.
8  Q. -- dated October 14, 2016.
9  A. Okay.
10  Q. I'll label that --
11  A. Thank you.
12  Q. -- as Exhibit 2. Take a moment and look
13  at that.
14  (Exhibit No. 2 was marked for
15  identification and attached hereto.)
16  THE WITNESS:
17  Yeah. Actually in -- and in my report
18  I think I reference at least two medical
19  interventions, one in 2015 and the last
20  one in June of 2016.
21  MS. MOORE:
22  Okay.
23  THE WITNESS:
24  So that -- so obviously I -- at -- at
25  some point in the last few months, I did

1  review records extending to June of 2016.
2  BY MS. MOORE:
3  Q. All right. And anything after that?
4  A. Don't remember.
5  Q. And I --
6  A. I don't remember anything more current
7  than that.
8  Q. And would it be fair to say that if you
9  had any additional information that would have
10  been important to you, you would have listed it in
11  your report?
12  MR. DENTON:
13  Object to the form.
14  THE WITNESS:
15  I -- honestly, I -- I'm -- I'm not
16  sure I entirely agree with that. I mean,
17  I -- I -- I was asked to provide a summary
18  -- a brief summary of a -- of a case
19  study. It doesn't mean by -- you know,
20  this -- this could have been probably
21  twice as long. I mean, depending on how
22  much detail goes into a case summary, it
23  can be, you know, as brief as one
24  paragraph and as extensive as 10 pages.
25  And so, you know, I -- I guess that was

1  left up to me as -- as to --
2  MS. MOORE:
3  Yeah.
4  THE WITNESS:
5  -- how to abbreviate those records.
6  And so I put in high points. I don't -- I
7  -- I -- I wouldn't go so far as to say
8  that there were important things that I
9  left out. I mean, the -- but these to me
10  made the case or made the point that I was
11  trying to make.
12  BY MS. MOORE:
13  Q. Okay. And if there was something else
14  that was important to you, you would have
15  referenced that in your report; correct?
16  MR. DENTON:
17  Object to the form.
18  THE WITNESS:
19  Well, as I just said -- I -- I mean,
20  there may be other important things to
21  him, and I may find them important to his
22  case. But I tried to highlight those
23  things that I thought were pertinent to
24  the question at hand, which is the
25  bleeding, was it related to Xarelto and

Page 26

1  how did it impact him.
2  BY MS. MOORE:
3  Q.  All right.  And as you sit here today, can
4  you think of anything else that may have been
5  important that you did not reference in your
6  report?
7  A.  I can't, off the top of my head.
8  Q.  All right.  That's fair enough.
9  With respect to preparing this report, did
10  you have a chance to speak to any other physicians
11  that treated Mr. Boudreaux?
12  A.  No.  No.  No.  I did not.
13  Q.  Okay.  Do you know of -- any of the
14  treaters in this case?  Do you know of any these
15  doctors?
16  A.  I don't.  I don't.  I didn't recognize any
17  names.
18  Q.  Okay.  Let's look at your report for a
19  moment.  And we'll turn to -- actually, what I'd
20  like to do is -- just acknowledge you've
21  incorporated by reference your general report into
22  this particular report.  Is that fair to say?
23  A.  Yes.  I think in the beginning.  I forget
24  exactly how it's worded.  But yeah.
25  Q.  Okay.  And then if you turn to Page 2,

Page 27

1  under Case Summary, tell me about the records that
2  you would have reviewed in preparing this report.
3  And actually, if you want to go back to Roman --
4  Roman numeral two on Page 1, it talks about your
5  incorporating the substance and opinions contained
6  in your general report in this matter.  I've
7  "reviewed the relevant medical records of Joseph
8  Boudreaux . . . as well as depositions regarding"
9  his "case."
10  A.  Yes.  I'm --
11  Q.  And what are the relevant medicals?
12  A.  I'm sorry.  Go ahead.
13  Q.  No.  No.  I -- I didn't mean -- and I
14  don't mean to talk over you.
15  I just was asking if you could identify
16  for us the relevant medical records of
17  Mr. Boudreaux that you've reviewed in preparing
18  your report?
19  A.  So as best I recall -- and again, the --
20  the records were provided to me in electronic
21  form, and so there are -- there were many sort of
22  individual pieces of records that were provided to
23  me.  But again -- and -- and as I kind of think
24  back over that now -- you know, I -- there's no
25  way I can recall a comprehensive list of every

Page 28

1  single thing I reviewed.
2  But I do recall reviewing clinic notes
3  pertaining to his case prior to the episode in
4  question, going back some years.  And I think some
5  of those records might have even been from the --
6  the VA system.  And then records -- I think the
7  next system -- the next medical system he goes
8  into is the St. Anne Ochsner or Ochsner St. Anne
9  system, which again, I think includes some clinics
10  and -- perhaps there's a hospital there.  I'm
11  not really familiar with these -- with that
12  particular medical system.
13  But anyway, I did review records from --
14  from various points in time, clinic visits and the
15  like in that system.  And then notes around the
16  time of his initial presentation with atrial
17  fibrillation, there would have been a -- multiple
18  clinic notes.  And then following -- and then his
19  hospitalization record for that period of time
20  that he was hospitalized with the new diagnosis of
21  atrial fibrillation.  Then there were also clinic
22  notes following his discharge from that.  And then
23  there were -- there's a clinic note and then
24  hospital notes from several weeks later, when he
25  presents with GI bleeding.

Page 29

1  Q.  Okay.  And you have a pretty good
2  description of what you've reviewed in preparing
3  this report.
4  Is it your opinion that you've reviewed
5  all of the Boudreaux medical records during that
6  relevant time period, that 2014 time period?
7  MR. DENTON:
8  Object to the form.
9  THE WITNESS:
10  I believe that I have reviewed many of
11  them.  But again, as I say -- I'm -- I'm
12  sorry.  I'm -- I'm just old school.  You
13  know, I -- for most of my career, medical
14  records came in a --
15  MS. MOORE:
16  Yes.  I remember.
17  THE WITNESS:
18  -- a -- kind of a -- you know, one
19  chart with -- with sequential, you know,
20  dated records.  And the -- records today,
21  because of the nature of the -- the --
22  these electronic records -- med -- medical
23  records -- and different systems have
24  different types of records.  And --
25  anyway, I -- I digress.

1    But -- but I -- to the best of my
2  ability, I reviewed, looked through what I
3  had available and what I could find and
4  what I could try to put together of these
5  dates in the time period that we're
6  talking about.
7  BY MS. MOORE:
8    Q. And these records were provided to you by
9  plaintiffs' counsel?
10   A. I'm sorry? By . . .
11   Q. Plaintiffs' counsel.
12   A. Yes.
13   Q. And specifically, do you recall the
14  individual that would provide you -- send you the
15  records?
16   A. I think Lara Say was probably the person
17  who provided the most of the records to me.
18   Q. When were you first contacted about
19  preparing a generic report in the Boudreaux
20  matter?
21   A. I would say --
22   MR. DENTON:
23    Can I just object to the form?
24  Because I don't think you mean generic
25  report in the --

1    MS. MOORE:
2    You are absolutely right. And you can
3  make that objection any time to help me
4  out. Thank you.
5    MR. DENTON:
6    Okay. I just want -- I --
7    MS. MOORE:
8    Yeah. I know. And you're right.
9  BY MS. MOORE:
10   Q. So let me -- let me start all over again.
11   When were you first contacted to provide a
12  case-specific report in the Boudreaux matter?
13   MS. MOORE:
14    Thanks.
15   THE WITNESS:
16    I would say maybe four to five months
17  ago. I -- the -- some in -- somewhere in
18  that time frame.
19  BY MS. MOORE:
20   Q. And who contacted you?
21   A. I believe it was a Mr. McWilliams.
22   Q. Ned McWilliams?
23   A. Ned -- Ned Mc -- I -- I think that's -- I
24  think that's who first mentioned it to me.
25   Q. And what was your reaction when he

1  contacted you? You'd already been retained to
2  work with Mr. Whitehead. Is that fair to say?
3    MR. DENTON:
4    Object to the form.
5    THE WITNESS:
6    Mr. -- Mr. Whitehead had -- is the
7  first person who contacted me about
8  working on the case, and that was some
9  time ago.
10   More recently, I think I had talked to
11  Mr. McWilliams. And -- I'm sorry. And
12  your -- your question was my first
13  reaction? Is -- what was your question?
14  I'm sorry. Beg your pardon. My memory's
15  not so good.
16  BY MS. MOORE:
17   Q. What was your reaction when he contacted
18  you, where -- he asked you to help or to assist in
19  this matter by reviewing the records pertaining to
20  Mr. Boudreaux. Would that be fair to say?
21   MR. DENTON:
22    Object to the form.
23   THE WITNESS:
24    So my reaction was -- when he asked, I
25  told him I would be -- I would be willing

1  to take a look at what was available and
2  if there was, you know, something I felt I
3  could render an opinion about and be clear
4  about, then I would.
5  BY MS. MOORE:
6   Q. Okay. And so records were sent to you?
7   A. Yes.
8   Q. And then you reviewed the --
9   A. That's how I recall it. Yes.
10   Q. And you prepared your report?
11   A. Yes.
12   Q. All right. And sitting here today, do you
13  feel like you have all the relevant records you
14  need to render opinion on Mr. Boudreaux and his
15  case involving Xarelto?
16   MR. DENTON:
17    Object to the form.
18   THE WITNESS:
19    Yes. I do.
20  BY MS. MOORE:
21   Q. Okay. In your report on Page 2, you --
22  and you have bolded sections under your    Case
23  Summary. You talk about, for example, prior
24  medical history and then you put in parentheses,
25  "(from Cardiology Consult Note 1/7/14.)"

1      Do you see that?
2      A. Yes.
3      Q. So the -- the following paragraph under
4    that would be information that comes from that
5    cardiology consult note?
6      A. Yes.
7      Q. All right.  I just wanted to make sure.
8      A. Yes.
9      Q. So your reference for -- if you do have a
10   reference, it would be in the header for that
11   particular paragraph?
12     A. Certainly for A through D.
13     Q. Okay.
14     A. I think not -- I think in E, perhaps that
15   is more of a combination of records that I
16   reviewed as opposed to just one single source.
17     Q. Okay.  Do you believe you've summarized
18   all of the clinically significant facts in your
19   report?
20     MR. DENTON:
21        Object to the form.
22     THE WITNESS:
23        You know, again, "all" is a big word.
24     I -- I -- I think I summarized what -- and
25     again, as I was developing the summary, I

1      summarized what I felt were the most
2      relevant and important, you know, to this.
3      You know, like I said, "all" is a big word
4      and -- and . . .
5    BY MS. MOORE:
6      Q. Yeah.  "All" is a big word.  But you also
7    are an expert here today.  So if I ask you a word
8    you don't understand, let me know and I'll be
9    happy to rephrase it.  But when I ask if you've
10   reviewed or -- strike that.
11        When I ask if you summarized all of the
12   clinically significant facts, I guess my -- my
13   question to you is:  Is there anything that you
14   believe is clinically significant with respect to
15   Mr. Boudreaux that you don't reference in your
16   report?
17     MR. DENTON:
18        Object to the form.
19     THE WITNESS:
20        It -- when -- when you say reference
21     in my report, like -- like actually refer
22     to something in his chart and put it in
23     here.  So -- so I'm not sure that I agree
24     -- you know, I -- I think there are
25     probably points I make that may not have a

1    specific reference to a specific place in
2    his chart.  Do I have everything in here?
3    If I -- you know, as I -- as I go through,
4    might I find something else?  I mean, all
5    of those things are possible.  I think I
6    even mention somewhere that, you know,
7    there -- I mean, one of the things that I
8    found as I've done this is, you know, we
9    reserve the right to supplement what --
10   what we -- what we have in our reports.
11   And so -- but -- but if you're asking me
12   now, in having reviewed this, I -- I think
13   the pertinents are here --
14     MS. MOORE:
15        Thank you.
16     THE WITNESS:
17        -- and . . .
18     MS. MOORE:
19        Thank you.  That was my point.
20     THE WITNESS:
21        Yeah.
22     MS. MOORE:
23        Okay.
24     THE WITNESS:
25        I do think the pertinents are here.

1    BY MS. MOORE:
2      Q. And let me ask you about depositions.  You
3    did reference depositions.
4        Have you -- can you tell us the ones
5    you've reviewed?
6      A. Oh.  Oh.  The depositions for
7    Mr. Boudreaux.  I -- I've looked at his
8    deposition.  I've looked at his wife's deposition.
9    I looked at one of the physicians.  I believe it
10   was the cardiologist.
11     Q. Dr. Kenneth Wong?
12     A. I think it was Dr. Wong.  Those are the
13   three that I can think of clearly right at the
14   moment.
15     Q. Now, you -- you seem to have chosen the
16   words very carefully, looked at.
17        When you say "looked at," do you mean you
18   read it from beginning to end, or --
19     A. No.  I --
20     Q. -- you just kind of flipped through it?
21     A. I did not read every word in every
22   deposition.  I -- I -- I went through those
23   depositions.  And often I might have been looking
24   for a particular point that -- that I needed
25   clarification on.

1    Q. Like -- could you give us an example? As
2  you sit here today, what was a particular point
3  that you would have been looking for in Dr. Wong's
4  deposition?
5    A. I'm trying to remember. I -- there was --
6  I -- there was -- there was -- it may have been --
7  I think it may -- it -- part of this is trying to
8  get dates straight in -- in my mind about when --
9  when he may have been at clinic visits or when --
10 when things may have been said. So -- so some
11 of -- there was some of that, and that may have
12 been, for instance, what I looked at Mr. Wong's.
13   Q. Anything you can recall with
14 Mr. Boudreaux's deposition? Anything specific
15 that you were looking for?
16   A. Yeah.
17     I do recall -- I -- I think perhaps the --
18 the thing that I recall best about looking through
19 Mr. Boudreaux's record is that I wanted to be very
20 clear about his use of indomethacin. Because he
21 had -- there -- you know, there was a history of
22 his being prescribed indomethacin for gout. And
23 -- and of course in medication lists, again,
24 electronically those lists are just carried
25 forward on every visit. And it includes, you

1  know, things like indomethacin to be taken as
2  needed and . . . So some clarification on, you
3  know, when he -- when he used indomethacin, when
4  he had last used -- or, you know, when -- how --
5  had he used it in the relevant time period.
6      So those were some of the things that I
7  recall looking for in -- in -- in that regard.
8    Q. With respect to your methodology in
9  preparing the report, if you found a contradiction
10 -- if the medical -- for example, if the medical
11 records indicated that Mr. Boudreaux had been on a
12 particular medication but yet he declined and said
13 he hadn't been on it, how would you explain that?
14 What would be your -- your -- how would you
15 unravel that, and what would be your opinion?
16   MR. DENTON:
17     Object to the form of the question.
18   THE WITNESS:
19     So in the -- in the event that -- so I
20 guess what I'm hearing you say -- so in
21 the event that there's perhaps a list of
22 medicines on a certain day that says,
23 Here's a list of Mr. Boudreaux's
24 medicines, but then on that same day he
25 gives a history that's recorded of saying,

1  I am not taking Drug X, then I would -- I
2  would go -- you know, I would believe with
3  -- I -- I would -- in my own practice,
4  what I would do is it -- it is what the
5  patient tells me they're doing.
6  BY MS. MOORE:
7    Q. Okay. Thank you.
8      The portions of the depositions that
9  you've read, did you have those preselected for
10 you from plaintiffs' counsel?
11   A. No. I had the whole depositions.
12   Q. Did you take any notes while reviewing any
13 of the transcripts?
14   A. No. I did not.
15   Q. Have you had an opportunity to review any
16 of the defense expert reports?
17   A. I don't believe so.
18   Q. Do you know who the defense experts are?
19   A. No. I do not.
20   Q. Are you familiar with a Dr. Mark Kahn?
21   A. Yes. I was just -- with the exception of
22 Dr. Kahn, yes. I was -- I was informed after I
23 gave my deposition last time that Dr. Kahn had
24 done -- had submitted a -- an expert report.
25   Q. And who informed you? Who -- who advised

1  you as to --
2    A. I think Mr. --
3    Q. -- Mr. --
4    A. -- McWilliams.
5    Q. Excuse me. You just -- you -- you guessed
6  my question. Let me just finish the -- is -- who
7  advised you as to the fact that Dr. Kahn was
8  involved in this litigation?
9    A. I -- I think it was Ned --
10   Q. Okay?
11   A. -- asked me if I -- you know, just -- he
12 had -- he said, I have a depo -- I don't -- I
13 don't know if it was a deposition or a report. I
14 can't remember what it was. And he said, from
15 someone at Tulane, Do you know him? And I --
16 Well, of course I do.
17   Q. And what is his reputation?
18   A. Dr. Khan is a very good hematologist.
19 It's a very good reputation.
20   Q. And you work in the same department?
21   A. We do.
22   Q. Did you review his report?
23   A. I did not. I -- I -- it was -- it was
24 sent to me, and -- and I really haven't had time.
25 I read the first page or so of it, but I did not

1 have time to read the whole report.
2    Q. Did you receive any other defense expert
3 reports?
4    A. No.
5    Q. The only one that you actually received
6 would be Dr. Kahn's?
7    A. Yeah.
8    Q. Did you look at any of the other plaintiff
9 expert reports?
10    A. Yes.
11    And I -- I -- I believe in my -- my
12 report -- the larger report that I did, I believe
13 I referenced -- there were two -- two expert
14 reports that I looked at. I think one was
15 Dr. Gerstman, and I'm blanking on the other. But
16 they are -- but they are spelled out in my -- in
17 my report.
18    Q. Rinder and Winstead?
19    A. No.
20    Q. No. All right.
21    So they would be identified in your --
22    A. They would be -- they were identified --
23    Q. -- generic report?
24    A. -- as reports -- in my generic report that
25 these were reports that I had reviewed and --

1 or -- or referred to or referenced in my report.
2    Q. But in preparing the report for
3 Mr. Boudreaux, is there any plaintiff expert
4 reports that you -- are there any that you
5 reviewed?
6    A. No.
7    Q. Anybody else that you've talked to? You
8 -- you mentioned speaking to Mr. McWilliams,
9 Mr. Denton. Anybody else that you've had a chance
10 to talk to over the last, I guess, four -- and I'm
11 saying now, or I'm saying specific to the
12 Boudreaux matter. Is there anybody else that
13 you've had a chance to speak to?
14    A. Ned McWilliams, Mr. Denton, I believe
15 Lara Say, and Emma.
16    Q. All right. Let me -- one thing I was just
17 curious about -- if you look on Page 3 of your
18 report, in the footnote, you -- you say, It's "my
19 understanding that the PT reagent used was
20 Innovin."
21    A. Uh-huh.
22    Q. What is that understanding based on?
23    A. This was information that I obtained from
24 the attorneys that I was working for. And it was
25 based on the -- I guess the -- you know, I --

1 again, I don't know exactly who in the lab they
2 spoke to at the lab that ran these tests, the PT
3 testing on -- on Mr. Boudreaux, both from his
4 admission with the atrial fib and when he
5 represented several weeks later. You know, his --
6 his coagulation studies were run in the same
7 laboratory. And it was of interest to me to know
8 what reagent was used in the prothrombin time
9 assay. And I was -- that information was provided
10 to me by the attorneys.
11    Q. Do you have a written document from the
12 facility --
13    A. No. I do --
14    Q. -- indicating --
15    A. -- not. No. I do --
16    Q. Okay.
17    A. -- not.
18    Q. All right. So do you practice
19 evidence-based medicine?
20    MR. DENTON:
21    Come on. Object to the form.
22    THE WITNESS:
23    So it's interesting you should ask. I
24 work in -- I -- I, in particular, work in
25 rare -- I -- I work in rare blood

1 disorders.
2    MS. MOORE:
3    I remember. I remember.
4    THE WITNESS:
5    You remember well.
6    MS. MOORE:
7    Yes.
8    THE WITNESS:
9    And so we -- and I do practice
10 evidence-based medicine to the extent that
11 I am able. However, many of the disorders
12 in situations that I deal with have a
13 dearth of the kinds of scientific evidence
14 that most people usually refer to. When
15 they say "evidence-based medicine,"
16 they're usually referring to a particular
17 standard of randomized clinical trials,
18 etcetera. So again, I'm -- I'm -- I'm
19 just trying to be precise. And --
20    MS. MOORE:
21    Yeah.
22    THE WITNESS:
23    -- when you say "evidence-based
24 medicine" --
25 BY MS. MOORE:

1    Q. And I -- I appreciate that, and I
2  appreciate the additional information about your
3  background and how you approach different
4  situations. I'm talking more specifically about
5  your opinions here today --
6    A. Okay.
7    Q. -- and what you've relied on in forming
8  the opinions that you are going to provide to us
9  and to the ladies and gentlemen of the jury.
10    And you told me a minute ago that the
11 footnote in your report on Innovin was information
12 that was provided to you from the plaintiff
13 lawyers. And I asked if you had anything
14 documenting that, and you said no.
15    A. No. I do not.
16    Q. So as we sit here today, as a doctor who
17 practices evidence-based medicine, you are not in
18 a position to rely on what you're told by a party
19 who has an interest in this litigation. Is that
20 fair to say?
21    MR. DENTON:
22      Object to the form. Is there some
23    dispute about the reagent? If you've got
24    different information, we're happy to see
25    it.

1    THE WITNESS:
2      Yeah.
3    MS. MOORE:
4      I move to strike comments of counsel.
5    And I'm going to ask you again, sir,
6    please do not try and coach the witness.
7    MR. DENTON:
8      I'm not coaching the witness.
9    MS. MOORE:
10      Okay. Ma'am, you may --
11    MR. DENTON:
12      Is there some --
13    MS. MOORE:
14      -- respond.
15    MR. DENTON:
16      -- dispute about this, Kim?
17    THE WITNESS:
18      So -- so, you know -- you know, I'll
19    just respond.
20      So -- so I -- I think that there is
21    evidence that the prothrombin time test,
22    particularly using certain reagents,
23    although potentially using multiple
24    reagents, can be sensitive to the presence
25    of rivaroxaban in the blood. I made

1  mention here because I was curious if --
2  to find out what the reagent was being
3  used in the lab. And I make note of it.
4      And -- and really, I think I -- I
5  think I've pretty much stated as best I
6  can, which it is my understanding. I'm
7  not saying here that I am absolutely
8  certain or that I have affirmed or
9  confirmed or have written documentation.
10 What I say is: "It is my understanding
11 that the PT reagent used was Innovin."
12 You know, again, I -- I find that to be of
13 some interest in -- in -- in doing -- in
14 -- in thinking about whether a PT might be
15 somewhat sensitive to the presence of
16 rivaroxaban.
17    MS. MOORE:
18      Okay. Move to --
19    THE WITNESS:
20      However, it doesn't have to be
21    Innovin. Other reagents too can be used.
22    MS. MOORE:
23      Move to strike comments of the
24    witness. They're nonresponsive.
25 BY MS. MOORE:

1    Q. My question, ma'am, was: The -- the
2  reference here in your footnote to your
3  understanding that the PT reagent used was Innovin
4  is not based on any scientific material, but was
5  on information provided to you by plaintiffs'
6  counsel?
7    A. Yes.
8      But with the caveat that -- you know, and
9  again, as a physician, I rely on -- I mean, what
10 -- so when we form our opinions, we rely on --
11 certainly on what we see, what we touch, what we
12 examine, what we review, the literature, etcetera.
13 But we also have to rely on -- to some degree on
14 what people who are experienced and that we trust
15 tell us.
16      So in my discussion with the attorney, the
17 attorney told me who she spoke with, and I don't
18 remember exactly who it was. But she gave me
19 enough detailed information about the person she
20 spoke to in the laboratory and their response to
21 make me reasonably comfortable that that was
22 indeed the case. And that's why I reference this
23 as I did. I don't say here that I am absolutely
24 certain that that's what they used. But it's my
25 understanding that that's what they used.

1  Q. Who's the attorney that provided you with
2  that information?
3  A. The one most recently, when I asked -- and
4  -- and I have asked multiple times. And so I -- I
5  -- and to be clear, I spoke with Emma yesterday
6  about it, and she again affirmed to me what I just
7  told you. I think originally I had spoken to --
8  and again, I -- it was either Lara or Ned.
9  Q. And it's your position today for the
10 ladies and gentlemen of the jury that some of your
11 opinions are based on just trusting what the
12 plaintiff lawyers tell you?
13     MR. DENTON:
14        I object to the form. That's not what
15     she said.
16     THE WITNESS:
17        Yeah. That's not really what I said.
18        What I said is: To a reasonable
19     degree, when I -- when they can provide
20     information that suggests to me that they
21     carried through on that, then I have no
22     reason to disbelieve it.
23 BY MS. MOORE:
24  Q. But you have no actual scientific
25 information from the facility to document that?

1  A. That's correct.
2  Q. Okay.
3  A. I do not.
4  Q. All right.
5  A. And -- and I might also add that -- that
6  this is an interesting but not necessarily
7  impactful issue regarding the case.
8     MS. MOORE:
9        I'm going to again move to strike the
10     comments of the witness, not responsive to
11     my question. And I'm just going to ask
12     the court reporter: When we have a
13     statement like "I might also add," I'm
14     going to ask you to certify and document
15     that. Because I have a limited amount of
16     time today. And if we get pushed, I might
17     have to bring this to the Court's
18     attention. So we need to stay obviously
19     focused. I know we're all working through
20     the beginnings of it. But if you'll help
21     me with that, Madam Court Reporter.
22 BY MS. MOORE:
23  Q. With respect to the labs, you've
24 referenced those a couple of times in your
25 answers. You did read and review the labs that

1  you felt were pertinent, of course?
2     MR. DENTON:
3        Object to the form.
4     THE WITNESS:
5        I did.
6  BY MS. MOORE:
7   Q. Okay. And would you have considered
8  opinions of any other treating physicians in -- in
9  your practice? I'm -- well, for example, you
10 reference here Dr. Wong. Were there any other
11 doctors that you thought would be important for
12 you to review their records or their -- their
13 depositions?
14     MR. DENTON:
15        Object to the form.
16     THE WITNESS:
17        Again, the records were absolutely
18     important to review. The depositions I
19     would say were a secondary source to
20     confirm or to clarify points that I may
21     not have -- that I may have had questions
22     about or didn't get from the -- the
23     medical records.
24 BY MS. MOORE:
25   Q. Dr. Leissinger, you would agree that there

1  are no guarantees with medicine; correct?
2     MR. DENTON:
3        Object to the form.
4     THE WITNESS:
5        There's no 100 percent, and there's no
6     zero percents, first thing we learned in
7     medical school.
8  BY MS. MOORE:
9   Q. And despite the best efforts of a doctor
10 like yourself with what you believe is an
11 appropriate medication with an appropriate patient
12 right indication, you can't guarantee an outcome;
13 correct?
14  A. That's correct.
15     MR. DENTON:
16        Object to the form.
17 BY MS. MOORE:
18  Q. Science just isn't there yet?
19     MR. DENTON:
20        Objection to the form.
21     THE WITNESS:
22        We make the -- we make the best
23     judgment we can to achieve the best result
24     we can.
25 BY MS. MOORE:

1  Q. And particularly with the patient
2 population that you deal with, there are many
3 challenges in achieving the desired outcome.
4  Would that be fair to say?
5  MR. DENTON:
6  Object to the form.
7  THE WITNESS:
8  There are always challenges with every
9 patient.
10 BY MS. MOORE:
11  Q. Thank you. Thank you.
12  Tell me about the discussion you would
13 have with a patient. If you're getting ready to
14 prescribe an anticoagulation, what kind of
15 discussion would you have?
16  A. So, you know, my discussions with my
17 patients are pretty comprehensive. And they would
18 involve any drug that I use, whether it's an
19 anticoagulant or any other drug, is going to
20 involve, you know, the nature of the drug, how you
21 use it, what the side effects are, what the
22 desired effect is.
23  Certainly with anticoagulants, I -- you
24 know, there's -- there are a lot of things that --
25 that you need to go over with patients when you

1 put them on anticoagulants. And the risk of
2 bleeding being a very significant risk, also the
3 risk of underachieving your goal. So, you know,
4 anticoagulants are -- are -- are -- are used to
5 prevent or to treat clots. And, you know, they
6 may -- they may cause side effects of bleeding, or
7 they may not be effective and -- and patients can
8 experience additional clots.
9  Q. So with respect to an anticoagulant and
10 telling a patient about the risk of bleeding,
11 please tell us specifically what you say.
12  MR. DENTON:
13  Object to the form.
14  THE WITNESS:
15  It -- it -- it actually depends on the
16 patient. Some patients have different
17 risks; right? I mean, it -- you know, so
18 an elderly patient may have a different
19 set of risks than someone who's 20 years
20 old.
21  MS. MOORE:
22  All right.
23  THE WITNESS:
24  I have one patient who is a rodeo
25 rider, so his risks are distinctly

1 different from most others. So again, I
2 mean, there's no one set.
3  But -- but in general, the -- the
4 risks of taking anticoagulants have to do
5 with risks related to bleeding, risks
6 related to activities that -- that -- and
7 -- and often we focus on the kinds of
8 activities that our patients have, the
9 kinds of challenges they have. In elderly
10 patients, there's concerns about falls or
11 fall risk and head trauma.
12  So again, it's -- it's a lengthy --
13 it -- it -- it's -- it's lengthy, and it's
14 going to be pretty much directed towards a
15 given individual.
16 BY MS. MOORE:
17  Q. With respect to the risk of bleeding, what
18 types of bleeding do you discuss with your
19 patients?
20  MR. DENTON:
21  Object to the form.
22 BY MS. MOORE:
23  Q. Is there a specific type, like you say,
24 Oh, you'll only get a nosebleed or You may have a
25 GI, or do you talk about that you can have serious

1 fatal bleeds associated with anticoagulants?
2  A. Yes.
3  MR. DENTON:
4  Object to the form.
5  THE WITNESS:
6  Absolutely. So, you know, the -- the
7  -- the -- what our -- what our real focus
8 is is how patients can recognize if
9 they're having a problem. So that's --
10 yes, they need to know the -- their risks.
11 But more importantly, they need to know
12 how to recognize if there is a bleed
13 that's starting or they're having, so, you
14 know, if they have increased bruising, if
15 they notice blood from --
16 MS. MOORE:
17  Right.
18 THE WITNESS:
19  -- anyplace that doesn't usually
20 bleed, whether it be the nose, the
21 mouth --
22 MS. MOORE:
23  Right. And -- and I -- I --
24 THE WITNESS:
25  -- stools.

Page 58

1    MS. MOORE:
2        -- appreciate that. I -- I don't want
3    to get to recognizing a bleeding right
4    now. We may talk about that in a little
5    bit.
6    BY MS. MOORE:
7    Q. I really want to focus on exactly what you
8    tell your patients about the risk of bleeding.
9        MR. DENTON:
10        Object to the form.
11        THE WITNESS:
12        Well -- well, that -- that is what I'm
13    telling -- I mean, I'm talking --
14    BY MS. MOORE:
15    Q. Do you just say -- you -- you just say,
16    You may have a risk of bleeding? That's it? Or
17    do you say -- do you describe the types of
18    bleeding? Let's say a 70-something-year-old man.
19    What would you tell that individual about the
20    types of bleeding that they may experience if they
21    are on an anticoagulant?
22        MR. DENTON:
23        Object to the form.
24        THE WITNESS:
25        So, I mean, bleeding is bleeding. So

Page 59

1    I -- I mean, when you say "types of
2    bleeding," I'm not exactly sure what you
3    mean.
4        But -- but again, my focus is more
5    helping my patients to recognize if
6    they're -- so my time spent with my
7    patient is going over recognition of easy
8    bleeding, bleeding that's not there
9    before. And the bleeding can be from
10    anywhere. It can be -- as I said, again,
11    I -- you asked me the types of bleeding.
12    It can be nosebleeds. It can be oral
13    bleeding. It can be blood in the stools,
14    it can be blood in the urine, blood in the
15    semen. It can be bruising. So, you know,
16    there's all -- there can be bleeding into
17    the head, particularly with head trauma.
18        So these are all things --
19    BY MS. MOORE:
20    Q. And do you cover all those types of
21    bleeding?
22    A. Generally.
23    Q. Okay. And do you --
24    A. Yeah, in general.
25    Q. -- talk about the risk of death too from a

Page 60

1    fatal bleed?
2    A. When you say the -- I mean, I don't -- I
3    don't necessarily give people -- they don't -- I
4    don't give them like percent, you know, I think
5    you have a --
6    Q. Oh, I'm not saying --
7    A. -- X percent chance of dying on -- on any
8    particular drug.
9        But certainly, if we're using an
10    anticoagulant, it's for a very serious matter. So
11    we would talk about what happens if we don't use
12    it, what are our options. You know, there's
13    always the option not to anticoagulate. So we
14    talk about that. We talk about what the risks are
15    with that.
16        Then we talk about the -- the alternative
17    treatments. Anticoagulants -- we talk about all
18    the different types of anticoagulants. And we
19    talk about the various risks and the various
20    modalities that we have to use to -- to mitigate
21    those risks, and then monitoring if we monitor.
22    So, I mean, we have a whole -- you know, we have
23    six, seven different anticoagulants we can choose
24    from. So that time that I spent counseling
25    patients has to do with risks, but risks relevant

Page 61

1    to them and relevant to what type -- and -- and
2    mitigation relevant -- relative to what type of
3    anticoagulants we're going to use.
4        So I mean, again, I'm -- I'm -- I'm -- I'm
5    trying to take you through. You're asking me how
6    I counsel patients. It's pretty extensive, and it
7    covers a lot of ground.
8        MS. MOORE:
9        Move to strike anything with respect
10    to mitigation.
11    BY MS. MOORE:
12    Q. Doctor, with respect to the risks of
13    bleeding that you discuss with your patients, it's
14    your job, I guess, to make sure that they are
15    adequately informed about the potential risks of
16    bleeding; correct?
17        MR. DENTON:
18        Object to the form.
19        THE WITNESS:
20        Yes. That's correct.
21    BY MS. MOORE:
22    Q. And, you know, the -- the fact that
23    anticoagulants are -- can be associated with
24    bleeding is something you've known since your med
25    school days; correct?

Page 62

1    A.  That's correct.
2    Q.  No surprise there.
3       And the risk of bleeding can be serious
4  fatal bleeding; correct?
5    A.  It is possible.
6    Q.  Have you seen plaintiff advertising on
7  Xarelto?
8    A.  You mean like on television?
9    Q.  Or billboards or . . .
10   A.  Yeah.  I think I have.  I -- I hardly ever
11 watch television.  But I -- I do think I -- it
12 seems like I was -- I -- I saw one not long ago.
13 I was at somebody's house, and the television was
14 on and there was something.  I don't remember
15 Xarelto or one of the other -- one of the other --
16   Q.  Pradaxa?
17   A.  -- anticoagulants or one -- one of them,
18 yeah.
19   Q.  Are you involved in those litigations?
20     MR. DENTON:
21        Objection.
22     THE WITNESS:
23        No.
24 BY MS. MOORE:
25   Q.  Pradaxa litigation?

Page 63

1    A.  No.  No.  Uh-uh.
2    Q.  Are you involved in the Eliquis
3  litigation?
4    A.  No.
5    Q.  Have you had patients come to you and ask
6  your input on what they're seeing on TV with
7  respect to, you know, 1-800 dangerous drugs?
8      MR. DENTON:
9        Object to the form.
10     THE WITNESS:
11        I don't think I have.  I can't recall
12        -- may -- maybe one person in the last
13        couple of years may have asked about
14        something they saw on TV.  But I -- and I
15        don't remember which one it was or . . .
16        It was something they weren't even taking,
17        but I -- I think had some concerns --
18 BY MS. MOORE:
19   Q.  And what --
20   A.  -- about it.
21   Q.  -- did you tell them?
22   A.  I -- I don't remember.  I mean, just --
23 you know, we would have -- I would have just
24 answered their questions.  Whatever their specific
25 questions were, I would have answered those the --

Page 64

1    Q.  Do you --
2    A.  -- best that I could --
3    Q.  Do you think it's appropriate for --
4    A.  -- if I had answers.
5    Q.  -- a patient to take medal advice --
6  medical advice from a lawyer?
7      MR. DENTON:
8        Object to the form.
9      THE WITNESS:
10        Do I think it's appropriate?  I --
11        I -- you know, I -- I'm not sure.  Can you
12        give me a context for that or an example?
13        I have met --
14 BY MS. MOORE:
15   Q.  Can you answer my question?
16   A.  -- lawyers who are -- I have -- I have met
17 lawyers who are doctors like --
18   Q.  Like Mr. Whitehead?
19   A.  -- like Mr. Whitehead.  So, you know, I
20 suppose he might be able to give some reasonable
21 medical advice.  And, you know, again, I -- I
22 would just need some context on that.
23     MR. DENTON:
24        I played --
25 BY MS. MOORE:

Page 65

1    Q.  Let's look at --
2      MR. DENTON:
3        I played a doctor on TV.
4      MS. MOORE:
5        I can see that.
6  BY MS. MOORE:
7    Q.  All right.  Let's turn to your report
8  under Prior Medical History.  That's Page 2.  And
9  -- and you're discussing Mr. Boudreaux presenting
10 with shortness of breath, indigestion, heaviness
11 in his chest, and EKJ -- EKG that showed new onset
12 atrial fribrillation.  And --
13     MR. DENTON:
14        I didn't realize -- I'm learning how
15        to say that.
16     MS. MOORE:
17        I didn't realize.
18     MR. DENTON:
19        Anyway, it's not frib.
20     MS. MOORE:
21        Yeah.  Did I -- did I say frib?  All
22        right.  Thank you.  Fib.  Fibrillation.
23     MR. DENTON:
24        I've been having trouble with that for
25        about two years.  I call it a-fib.

BY MS. MOORE:

Q. All right. And looking into the second paragraph, Dr. Leissinger, you talk about the medical history that you believe you say was "significant for high blood pressure, diabetes mellitus and benign prostatic hypertrophy"; is that right?

A. Yes.

Q. All right. Do you recall reviewing anything in the records about Mr. Boudreaux having gout?

A. Yes. I do recall that.

Q. All right. But you didn't mention that in your medical history?

A. I didn't.

Q. Any reason why?

A. No.

Q. All right. Do you recall Mr. Boudreaux having hyperlipidemia?

A. I do recall that.

Q. And you left that out?

A. I did.

Q. Any reason why?

A. No. No particular reason.

Q. Do you recall anything about Mr. Boudreaux

being obese?

A. I do.

Q. And is there a reason why you left that out?

A. No particular reason.

Q. Okay. Let's look at the medications.
You go through and you list for us aspirin, allopurinol, Proscar, Norvasc -- I'm saying them -- lisinopril, metformin, and Hytrin; is that right?

A. Yes.

Q. Okay. You don't have on there Vicodin.
Did you see any reference to Vicodin?

A. I did.

Q. And you don't have that in here?

A. Right.

Q. Any reason why?

A. I -- what I -- what I put here were the regularly taken medications. So there were some -- there -- it -- so there were some PRN medications that I didn't include. There were also, I think, maybe one or two over-the-counter medications that I didn't include. So this -- this was just -- you know, as I said, this was not intended necessarily to be a complete list. But

what -- what -- as I said, his home medications included these drugs. And -- and for me, what I was putting down here were the medications that he took daily, the prescribed medications that he took daily.

Q. And your opinion that these are the medications Mr. Boudreaux took daily would be based on what, his deposition?

MR. DENTON:
Object to the form.

THE WITNESS:
No. No. No. Again, if you -- again, I believe that this information in this, under A, is from the cardiology consult note that I reference in the first line.

MS. MOORE:
Okay. All right.

THE WITNESS:
So, you know, basically I was -- and -- and that -- you know, again, this is just a brief -- this is just sort of brief summation of information that came from that cardiology consult --

BY MS. MOORE:

Q. What about the indomethacin? That is

something you didn't reference in your list of --

A. The --

Q. -- medicines.

A. -- indomethacin, Vicodin -- and there -- I -- I can't remember if there was a -- like a sinus medicine, and that might have been from some previous record. But those were all PRN medications. So what I -- again, as I said, what I included in this list were medications that he was taking on a daily basis.

Q. Could a PNR -- or strike that.
Could a PRN medication be significant?

A. Absolutely.

Q. But you didn't include those?

A. For the -- for the -- as far as like for his prior medical history, no, I didn't.

Q. Okay. Let's keep going.
With respect to Section 4, under D, you -- you talk about Mr. Boudreaux's January 7th, 2014 admission for a-fib --

MS. MOORE:
Roger, that was for you.

BY MS. MOORE:

Q. -- where he's --

MR. DENTON:

Page 70

1    I heard it.
2  BY MS. MOORE:
3    Q.  -- where he's starting Xarelto.
4       Do you see that?
5    A.  Yes.
6    Q.  And you acknowledge that he had congestive
7  heart failure, hypertension, and age, diabetes.
8       All those were several significant risk
9  factors for stroke; correct?
10   A.  Yes.  Those would be risk -- I'm sorry.
11 You said age, you said heart failure, what else
12 did you say?
13   Q.  Hypertension.
14   A.  Hypertension -- yeah -- age, and heart
15 failure.
16   Q.  And diabetes?
17   A.  And diabetes.
18   Q.  Of course.  And so you -- you're aware of
19 the American Heart Association guidelines, that
20 score, under the CHADS VASc --
21   A.  CHAD --
22   Q.  -- scores?
23   A.  -- score, yes, I am.
24   Q.  And you would agree that based on
25 Mr. Boudreaux's history of congestive heart

Page 71

1  failure, hypertension, diabetes, and his age, that
2  he would have a CHADS score of 4, which translates
3  to a 4 percent rate of stroke per year?
4       MR. DENTON:
5       Object to form.
6       THE WITNESS:
7       So just to back up, there are a couple
8  different CHADS scores.
9  BY MS. MOORE:
10   Q.  It's the --
11   A.  The --
12   Q.  -- CHADS VASc.
13   A.  Yeah.  The CHADS2 is typically what I
14 think of.  So on a CHADS2 score, he's going -- and
15 -- and I -- this is -- you know, I'm just more
16 familiar with CHADS.  So I think he would be a 3.
17 Seventy-five is usually the age cutoff for CHADS2.
18 But in -- in any event, the -- the answer is -- is
19 going to be similar, which is -- yeah, I mean, he
20 had a CHADS2 score of 3.  And as such, yeah, his
21 risk is around 4 percent.
22   Q.  And --
23   A.  Correct.
24   Q.  -- you would agree that it was appropriate
25 for a patient like Mr. Boudreaux to receive a

Page 72

1  prescription of an anticoagulant?
2    A.  I do.
3    Q.  And that would have been of course
4  standard of care?
5    A.  That's right.
6    Q.  And of course the reason he received the
7  anticoagulant, Xarelto, was to assist in
8  preventing strokes associated with a-fib; correct?
9    A.  That's correct.
10   Q.  With respect to the dosage that Dr. Wong
11 -- Dr. Kenneth Wong is the cardiologist that
12 prescribed Xarelto for Mr. Boudreaux.
13      With respect to the dosage, you are aware
14 that he received 20 milligrams; correct?
15   A.  Uh-huh.
16   Q.  And you are aware that Dr. Wong, in fact,
17 tested Mr. Boudreaux's creatinine and it was
18 normal?
19   A.  Uh-huh.
20   Q.  And you have no questions about the dosage
21 that he was given on Xarelto; correct?
22      MR. DENTON:
23      Object to the form.
24      THE WITNESS:
25      I -- I -- again, I can't remember

Page 73

1  exactly what his creatinine -- his
2  calculated creatinine clearance was.  I'd
3  have to go back and look at the records
4  from the admission.  But as I recall, it
5  was greater than 50, which would have made
6  the 20 milligrams appropriate.
7  BY MS. MOORE:
8    Q.  Okay.  And so as we sit here today, you're
9  not critical of Dr. Wong for prescribing
10 20-milligram dose of Xarelto to Mr. Boudreaux;
11 correct?
12   A.  I'm not critical of that decision.
13   Q.  You are also aware -- at the time that
14 Dr. Wong placed Mr. Boudreaux on Xarelto, he was
15 also placed on metoprolol and amiodarone?
16   A.  Yes.
17   Q.  Are you familiar with the Coumadin label?
18      MR. DENTON:
19      Object to the form.
20      THE WITNESS:
21      To some degree.  I -- I know that I've
22      reviewed it in the past.  I'm not sure I
23      could quote from it.
24 BY MS. MOORE:
25   Q.  When's the last time you had a chance to

Page 74

1 review the Coumadin label?
2    A. Oh --
3    MR. DENTON:
4       It looks like real soon.
5    THE WITNESS:
6       Probably at some point in the last
7    four, five, or six months.
8  BY MS. MOORE:
9    Q. And as part of your work in this
10 litigation, you reviewed the Coumadin label?
11    A. Yes.
12    Q. Were you asked to review it?
13    A. No.
14    Q. Why did you review it?
15    A. Well, you know, I -- I was -- my -- I
16 guess my -- I'm not sure if I'd call it my job.
17 My -- my charge was to develop a report about an
18 anticoagulant, Xarelto. And so there were quite a
19 few documents that I reviewed about
20 anticoagulation of all kinds in addition to
21 Xarelto.
22    Q. And tell me what additional information
23 you would have reviewed, what additional
24 documents. So you would have looked at this
25 Coumadin label; correct?

Page 75

1    A. At some point I did.
2    Q. In the last four or five months.
3       And what else have you looked at with
4  respect to anticoagulation in the last four or
5  five months?
6    A. Labels of other anticoagulants, a
7  smattering of -- of, you know, papers, published
8  papers. I -- I reviewed many documents. And I --
9  you know, I'm -- I'm sorry. I -- there's no way I
10 could even remember a list to tell you today. But
11 I certainly reviewed a number of documents.
12    Q. And when you were looking at the Coumadin
13 package insert that we've marked as Exhibit 3 --
14    MS. MOORE:
15       I need to mark it.
16    (Exhibit No. 3 was marked for
17    identification and attached hereto.)
18    MR. DENTON:
19       I was going to say it's marked as
20    Exhibit 11 right now.
21    MS. MOORE:
22       I've got -- I've got -- yours is.
23    MR. DENTON:
24       Well, I've got one with 11 on it.
25    MS. MOORE:

Page 76

1       Yeah.
2    MS. MILLS:
3       It was 11 to Wong's deposition.
4    That's okay. Take a photocopy.
5    MS. MOORE:
6       Roger, (indicating).
7    MR. DENTON:
8       I knew that [inaudible]. Give me a
9    break. I'm running on awful low fumes --
10    MS. MOORE:
11       All right.
12    MR. DENTON:
13       -- trying to keep up with this --
14    MS. MOORE:
15       So --
16    MR. DENTON:
17       -- group of lawyers on the other side.
18  BY MS. MOORE:
19    Q. Dr. Leissinger, with respect to Exhibit 3,
20 which is the Coumadin label, when you went back
21 and -- and looked at that four or five months ago,
22 what were you looking for?
23    A. General information, mechanism of action,
24 metabolism, pharmacokinetics --
25    Q. Okay.

Page 77

1    A. -- or really it's not pharmacokinetics so
2  much as pharmacodynamics, I guess, with warfarin
3  because of its indirect mechanism of action.
4  Certainly -- you know, I'm -- I'm certainly quite
5  familiar with it as a drug. I -- I use it
6  frequently.
7       But again, when asked to do a very
8  thorough review of an anticoagulant, it seemed
9  pertinent to me to review, remind myself, and
10 learn new things as much as I could about the
11 field of anticoagulants.
12    Q. The other package inserts that you
13 reviewed?
14    A. Certainly the one for Xarelto. I believe
15 that I also at least partially reviewed package
16 inserts for some of the other novel oral
17 anticoagulants.
18    Q. Do you recall the specific ones?
19    A. Probably apixaban and dabigatran. I would
20 say I did not review the -- the newest,
21 edoxaban --
22    Q. And when reviewing all of the package
23 inserts for the NOACs, the Xarelto, the -- the
24 dabigatran, the apixaban, you were reminded again
25 that all of those package inserts warn of the risk

1  of bleeding, sometimes serious fatal bleeding
2  associated with anticoagulants?
3     A. Yes. Uh-huh. That's --
4     Q. No surprise --
5     A. -- correct.
6     Q. -- there?
7     A. I'm sorry?
8     Q. No surprise there.
9     A. No surprise there.
10    Q. And again, that's information you've known
11 ever since that came on the market?
12    A. Correct.
13    Q. Now, with respect to the Coumadin label,
14 let's -- let's look on Page 14, 7.1, and Page 15.
15    You're aware that the Coumadin label --
16 and this is 2014, just for your reference, the
17 year that Mr. Boudreaux received or was prescribed
18 Xarelto. This particular 2014 label does warn
19 about interactions between warfarin and
20 amiodarone; correct?
21    A. The -- can you point out to me? Is
22 that --
23    Q. Of course.
24    A. -- in the Table 2?
25    Q. Yes, ma'am. That's --

1     A. Yeah.
2     Q. It's probably --
3     A. Okay. Yeah. Because the --
4     Q. -- the easiest place to find --
5     A. -- CYP3A4. Okay. Uh-huh.
6     Q. You see that?
7     A. Yep.
8     Q. Did you know that before reading this
9  here?
10    A. I don't know that I knew -- I -- I
11 certainly couldn't have quoted this list of -- of
12 drugs that interact with warfarin. I know in
13 general I use a lot of warfarin. And so I'm quite
14 aware that in general many, many drugs interact
15 with warfarin.
16    Of course the flip side of that is with
17 warfarin, we can monitor its effect. And so we
18 can very safely give warfarin in addition to any
19 or all of these drugs by simply doing the
20 appropriate monitoring.
21    MS. MOORE:
22       Move to strike comments after "we can
23       monitor" as being nonresponsive.
24 BY MS. MOORE:
25    Q. Dr. Leissinger, so you did acknowledge

1  that there was a warning about interactions
2  between warfarin and amiodarone in the Coumadin
3  label; correct?
4     A. Correct.
5     Q. And you also see that -- you said you read
6  Dr. Wong's testimony.
7     Do you recall where he said that the fact
8  that Mr. Boudreaux was on amiodarone made him tend
9  to not want to prescribe warfarin for
10 Mr. Boudreaux? Do you recall seeing that?
11    A. Don't remember it.
12    Q. I'm going to hand you what is labeled as
13 Exhibit 4.
14    (Exhibit No. 4 was marked for
15    identification and attached hereto.)
16    THE WITNESS:
17       Okay.
18 BY MS. MOORE:
19    Q. It's Dr. Kenneth Wong's deposition taken
20 on July 11th, 2016.
21    A. Uh-huh.
22    Q. If you turn to Page 92, it says -- you --
23 you with me?
24    A. Uh-huh. Yes.
25    Q. Further down --

1     A. It's 92.
2     Q. -- on Line 14?
3     A. Yeah.
4     MR. DENTON:
5       I'm not with you. Hold on.
6     MS. MOORE:
7       Okay. Line 42 -- Line 14, Page 92.
8  Counsel, are you ready?
9     MR. DENTON:
10      Oh, yes. I'm ready. Well . . .
11    MS. MOORE:
12      Don't want to start without you.
13 BY MS. MOORE:
14    Q. All right. So we're here on Page 92 of
15 Dr. Wong's deposition.
16    And you see where Line 14, it begins:
17 "Would the fact the he," Mr. Boudreaux "was on
18 amiodarone, would that tend to make you want to
19 not prescribe Warfarin to him and possibly
20 something else?"
21    Answer: "Yes."
22    Question: "And -- one of the new oral
23 anticoagulants, correct?"
24    Answer: "Yes."
25    You see that?

Page 82

1    A.  Uh-huh.
2    Q.  And you're not here to second-guess
3  Dr. Wong's decision not to use warfarin with
4  Mr. Boudreaux; correct?
5        MR. DENTON:
6          Object to --
7        THE WITNESS:
8          That was --
9        MR. DENTON:
10          -- the form.
11        THE WITNESS:
12          -- Dr. Wong's decision.  I may have
13          made a different decision.  But, you know,
14          I -- I'm not second-guessing Dr. Wong.
15  BY MS. MOORE:
16    Q.  And further down, you see on Line 22:
17  ". . . the fact that he was also on allopurinol,
18  which is an inhibitor of CYP1A2" --
19        "Yes."
20        -- "is . . . another factor that you would
21  consider in not prescribing Warfarin, but possibly
22  one of the other novel anticoagulants?"
23        And he says, "Yes."
24        You see that?
25    A.  Uh-huh.

Page 83

1    Q.  So those are at least two reasons Dr. Wong
2  was not comfortable prescribing warfarin for
3  Mr. Boudreaux; correct?
4        MR. DENTON:
5          Object to the form.  There's nothing
6          about not being comfortable in here.
7        THE WITNESS:
8          I -- it's -- Dr. Wong answers the
9          questions that he was asked.  So he was
10          asked about these drugs that -- that can
11          interfere with or can augment or
12          potentiate warfarin, and he agreed that --
13          that those were concerns of his.
14  BY MS. MOORE:
15    Q.  And he did not -- his language --
16        MS. MOORE:
17          Again, thank you, Mr. Denton.
18  BY MS. MOORE:
19    Q.  He did not want to prescribe warfarin?
20        MR. DENTON:
21          Where does it say that?
22  BY MS. MOORE:
23    Q.  Dr. Leissinger?
24        MR. DENTON:
25          Object to the form.

Page 84

1        THE WITNESS:
2          I'm -- I'm sorry.  I'm just flipping
3          back.  Page 92, was it?
4        MS. MOORE:
5          I believe so.
6        THE WITNESS:
7          Ninety-three.
8        MS. MOORE:
9          Yeah.  Page 92, we began on.
10        THE WITNESS:
11          It says, "would you consider" -- let's
12          see -- "is that another factor that you
13          would consider in not prescribing
14          Warfarin, but possibly one of the other
15          anticoagulants?"
16          And he said, "Yes."
17  BY MS. MOORE:
18    Q.  And then you go down.
19        And "Would the fact that he was on
20  amiodarone, would that tend to make you want to
21  not prescribe Warfarin to him and possibly
22  something else?"
23        MR. DENTON:
24          What -- what line are you on, Kim?
25        MS. MOORE:

Page 85

1          Pardon?
2        MR. DENTON:
3          What line are you on?  I didn't see
4          it.
5        MS. MOORE:
6          Fourteen, on Page 92.
7        THE WITNESS:
8          Oh.  Back on Page 92.  Okay.
9        MS. MOORE:
10          Yeah.  I'm sorry.  Sorry.
11        THE WITNESS:
12          "Would that . . . make you want
13          to . . ."  Okay.
14          And he said, "Yes."
15  BY MS. MOORE:
16    Q.  Okay.  So he did not want to prescribe
17  warfarin because for Mr. Boudreaux because of the
18  fact that he was on amiodarone and allopurinol;
19  correct?
20        MR. DENTON:
21          Object to the form.
22        THE WITNESS:
23          That's what he said.
24        MR. DENTON:
25          Are you done with the dep and the

Page 86

1  label for a while, I mean?
2  MS. MOORE:
3      Let's go ahead and -- I think I marked
4  the -- the label -- the dep, I don't need
5  to -- well, I guess I'll go ahead and
6  label as Exhibit 4.
7  MS. MILLS:
8      It's marked.
9  MR. DENTON:
10     No.  The -- the Wong dep is Exhibit 4.
11 MS. MILLS:
12     The Wong deposition --
13 MR. DENTON:
14     The label is 3.
15 MS. MILLS:
16     -- is Exhibit 4.  Coumadin label is 3.
17 MR. DENTON:
18     Right.  I thought I heard something
19 else.
20 BY MS. MOORE:
21 Q.  All right.  Doctor, I want to look again
22 back at your report, Section 4D.  The initial
23 laboratory studies were normal.  It's on Page 2.
24 A.  Okay.
25 Q.  And you reference the information from

Page 87

1  January 7th, 2014; is that right?
2  A.  Certainly in the first paragraph under D,
3  I did.  Later in that -- later under D, I -- I
4  note, you know, some other things that were
5  happening by January 9th and then January -- and
6  then continued on.
7  Q.  Thank you.  All right, Doctor.
8      I want you to look at this particular
9  document.  It is a lab report from the cardiology
10 -- I'm sorry -- lab report for Mr. Boudreaux from
11 the emergency department on January 7th, 2014.  It
12 looks like a CBC results.  And it's Boudreaux --
13 A.  Uh-huh.  Yes.  It is.
14 Q.  -- 32.  Let's take a moment and look at
15 that.
16     You -- you in your report talk about how
17 the initial laboratory studies were normal.  Do
18 you see that?
19 A.  Yes.
20 Q.  What does "normal" mean to you?
21 A.  "Normal" means within what -- you know,
22 within a normal range, within a normal accepted
23 range or an accepted range of normal, however you
24 want to define it.
25 Q.  Okay.  Well, let's go down and look at

Page 88

1  this CBC document.  And --
2  A.  Uh-huh.
3  Q.  -- look at the hemoglobin for me.
4  A.  Okay.  13.8.
5  Q.  And it says thirteen -- and you go across,
6  and you have the reference range?
7  A.  Uh-huh.
8  Q.  14.0 to 18.0?
9  A.  Uh-huh.
10 Q.  And then it's got an L.  What does that
11 "L" mean?
12 A.  It's the lab reporting that that is
13 beneath the reference range.  So the reference
14 range for this lab is recorded as 14 to 18, which
15 is in general what -- what most reference ranges
16 are for -- for hemoglobins.  Some -- some labs
17 will be 13.5 to 17.5.  Some will be 14 to 18.  So
18 that's -- that's consistent with most
19 laboratory --
20 Q.  All right.
21 A.  -- studies.
22 Q.  So it -- the lab report flags that
23 Mr. Boudreaux's hemoglobin is low or outside of
24 the normal range; is that correct?
25 A.  It does.

Page 89

1  Q.  And you didn't tell the jury about that;
2  correct?
3  A.  I don't consider 13.8 low.
4  Q.  All right.  I -- what I'm asking you --
5  and as we go forward, just so the record's clear,
6  I obviously want your opinion, but I also want you
7  to be very clear about what the records say and if
8  there are times when your opinion differs from the
9  records.
10 A.  Okay.  Okay.
11 Q.  But in -- in fairness, the -- the record
12 that you have in front of you from -- for
13 Mr. Boudreaux does indicate that his hemoglobin is
14 low on that date; correct?
15 MR. DENTON:
16     Object to the form.
17 THE WITNESS:
18     It indicates that it's slightly below
19 normal.  Yes.
20 MS. MOORE:
21     All right.
22 THE WITNESS:
23     Or the normal range for that lab.
24 BY MS. MOORE:
25 Q.  And -- and the red blood cells carry

1 hemoglobin?
2    A. They do.
3    Q. It's an iron-rich protein that attaches to
4 oxygen in the lungs and then carries it throughout
5 the tissues, throughout the body. Is that pretty
6 good?
7       MR. DENTON:
8         Who -- who wrote that --
9       THE WITNESS:
10        Yeah. That's pretty good.
11      MR. DENTON:
12        Who wrote that for you?
13      MS. MOORE:
14        (Indicating.)
15      MR. DENTON:
16        What --
17      THE WITNESS:
18        It's close. No. That -- close
19      enough.
20 BY MS. MOORE:
21    Q. So hemoglobin is -- is an important
22 parameter that you would look for in a complete
23 blood count?
24    A. Yes. It is.
25    Q. Something that as a hematologist you look

1 at --
2    A. All the time.
3    Q. -- pretty routinely, I would think?
4    A. All the time.
5    Q. All right. Let's keep going. MCV is 88.
6 And if you go across, there's an 82 to a 98;
7 right?
8    A. Yes.
9    Q. And let's see. With respect to the
10 hemoglobin, you would acknowledge that at least
11 based on that -- and I'm going back to hemoglobin
12 for a minute.
13       So --
14    A. Okay.
15    Q. -- you would acknowledge that that reading
16 there is showing him, Mr. Boudreaux, to be
17 anemic --
18    A. No. I disagree.
19    Q. -- before the first dose of Xarelto?
20    A. I disagree.
21    Q. Okay.
22    A. That's not anemia. He -- he has -- per
23 these laboratory parameters, his hemoglobin is,
24 you know, less than 5 percent below the normal
25 range. And so that's not what we would in our

1 judgment call an anemia.
2    Q. What would you in your judgment call
3 anemia?
4    A. Something on the order of about 1 gram of
5 hemoglobin below --
6    Q. I'm sorry?
7    A. About 1 gram of hemoglobin below the
8 range. That's when we start to pay attention.
9    Q. So that would be about what?
10    A. So if it were -- if -- if he were 13 or
11 below 13 --
12    Q. Okay.
13    A. -- it would be more relevant for that
14 particular test. Different tests have different
15 sort of -- what's the word I'm looking for? Kind
16 of -- kind of wriggle room with -- with the lab
17 tests. But -- but a 13.8 in a -- in a lab that is
18 using a 14 to 18 for hemoglobin, that -- that
19 would not trigger a hematologic consult or a
20 work-up for anemia or a diagnosis of anemia.
21    Q. Okay. Just so the jury's clear, define
22 "anemia." Is -- that's when you don't have enough
23 red blood cells or when the red blood cells you
24 have aren't --
25    A. No. No. The first --

1    Q. -- functioning properly?
2    A. -- first one was right. When you don't
3 have -- when you don't have enough red blood
4 cells --
5    Q. Or --
6    A. -- that's anemia.
7    Q. But what if you have red blood cells and
8 they're not functioning properly? Is that anemia?
9    A. Often things that cause red cells to not
10 function properly will lead to anemia, in other
11 words will lead to a low red cell count.
12    Q. If you --
13    A. But -- yeah. I mean --
14    Q. No. No.
15    A. -- we -- we could get into the leads.
16    Q. Yeah.
17    A. I mean, there are -- there are disorders
18 in which you can have abnormal red blood cells but
19 you're not anemic. In other words, your
20 hemoglobin would be 14, but you may have abnormal
21 red cells. But that's -- those are unique
22 disorders that Mr. Boudreaux does not have.
23    Q. Thank you. Let's look on that same
24 document we're looking at, the RDW.
25    A. Uh-huh.

1  Q.  And that's red blood cell distribution
2  width?
3  A.  Yes.
4  Q.  And does the lab report we're looking at
5  here show Mr. Boudreaux's red blood cell
6  distribution with -- worth [sic] is abnormal?
7  MR. DENTON:
8  Object to --
9  THE WITNESS:
10  For this --
11  MR. DENTON:
12  -- the form.
13  THE WITNESS:
14  -- particular lab, he is recorded at
15  15.1 percent.  And their upper limit that
16  they call their normal range is
17  14.5 percent.
18  BY MS. MOORE:
19  Q.  So what --
20  A.  This is a value that's very rarely used.
21  I -- I mean, most hematologists don't pay much
22  attention to it.  It's not very relevant.
23  Q.  Okay.  Now, despite the fact that you may
24  not think it's very relevant, the lab has
25  indicated an H, which would tell the reader that

1  that is high; correct?
2  A.  It would.
3  Q.  All right.  So what is RDW?
4  A.  Red cell distribution width.  So it's --
5  it's essentially a way of sort of describing if
6  you have different sizes of red blood cells.  So
7  if you have many small red cells and then you also
8  have many large red cells, that means the
9  distribution of size is great.  So that would lead
10  to a high distribution width.  If they're all the
11  same size, it narrows the distribution width.  So
12  that's really kind of what that tells you.  And --
13  Q.  Okay.
14  A.  -- it's not a -- it's -- very rarely would
15  that ever be relevant to -- to a hematologic
16  disorder.
17  Q.  So RDW is a measure of the variation of
18  red blood -- red blood cell size or volume;
19  correct?
20  A.  Yes.  Correct.
21  Q.  And an elevated RDW means that there is a
22  higher than normal variation in Mr. Boudreaux's
23  red blood cell size, doesn't it?
24  MR. DENTON:
25  Object to the form.

1  THE WITNESS:
2  Well, again, I -- you know, I don't
3  consider a less than one -- you know, less
4  than -- than ten -- less than 5 percent
5  deviation from what this particular lab
6  calls normal.  Other labs will have
7  slightly different ranges --
8  MS. MOORE:
9  Okay.
10  THE WITNESS:
11  -- that might include this.  So -- so
12  again, he -- I don't know that he has an
13  abnormal RDW -- a distinctly abnormal RDW.
14  They record it as being high based on
15  their -- their particular normal range.
16  But usually when -- you know, if we see a
17  high RDW, somewhere in the neighborhood of
18  a 20 percent or so.
19  BY MS. MOORE:
20  Q.  All right.  But, Doctor, you will
21  acknowledge that the RDW on this particular
22  document is high?
23  A.  It is listed as -- as an H, which I'm
24  assuming means high.
25  Q.  Let's look at the MCV.  What is the -- and

1  I understand that means mean core vascular [sic]
2  volume?
3  A.  Corpuscular, but close.  Mean corpuscular
4  volume.
5  Q.  Okay.
6  A.  So the corpuscular volume -- that's just
7  the mean red cell volume.  So it's the volume of
8  the red cell.  So it's -- its basically the size
9  of a red cell.
10  Q.  Okay.
11  A.  All right.  So the small red cells will be
12  low in the MCV.  Very large red cells will have a
13  high MCV.
14  Q.  And in this particular report, it looks
15  like the MCV is normal?
16  A.  His MCV is right in the -- in the --
17  usually the normal range is about 80 to a hundred.
18  And his is 88.
19  Q.  So as a hematologist, what does an
20  elevated RDW and a normal MCV mean to you?
21  MR. DENTON:
22  Object to the form.
23  THE WITNESS:
24  Again, if I'm looking at this
25  particular elevated --

BY MS. MOORE:
Q. And I'm going to get to that in a minute.
I'm --
A. Okay.
Q. -- just asking you: As a hematologist, if
I am a colleague and I say -- or a student, which
might be more appropriate, what would that mean to
you, an elevated RDW and a normal --
A. If it was --
Q. -- MCV?
A. -- distinctly elevated with a normal MCV,
it would indicate that -- that the patient would
likely have multiple populations of cells, some
large and some small.
Q. And what could be causing the mixture of
the larger-than-normal RBCs with the
smaller-than-normal RBCs in Mr. Boudreaux's blood?
MR. DENTON:
Okay. So you're back to Mr. Boudreaux
now?
THE WITNESS:
Yeah. Are we talking about
Mr. Boudreaux?
MS. MOORE:
Yeah.

THE WITNESS:
Because there is no -- this is not a
wide distribution width. Again, in my --
my --
MS. MOORE:
Yeah. It --
THE WITNESS:
-- hematologic opinion, this is not --
MS. MOORE:
Okay.
THE WITNESS:
-- an elevation.
BY MS. MOORE:
Q. In -- in --
A. So . . .
But in -- if you're asking me in general
if there truly is a wide RDW, then again, you
would have to examine all the causes for small red
cells and large red cells and why those might
coexist in -- in a given patient. And there's a
long list of things that can cause small red cells
and a long list of things that can cause large red
cells.
Q. And why did your report not reference what
this lab -- now, this lab has no interest in the

litigation; right? It's -- it's just a lab
reporting values?
MR. DENTON:
What's the question?
THE WITNESS:
Yeah. I'm --
MR. DENTON:
Object to the form.
THE WITNESS:
-- sorry. Your . . .
BY MS. MOORE:
Q. Why did you not reference in your report
the lab values -- the abnormal lab values?
MR. DENTON:
Object to the form.
THE WITNESS:
I was asked to give my professional
opinion about Mr. Boudreaux's case. And
when I look at this CBC, to me this is a
normal CBC.
BY MS. MOORE:
Q. Despite the fact that there are at least
two entries indicating that the readings are
abnormal, the --
MR. DENTON:

Object to --
BY MS. MOORE:
Q. -- hemoglobin and RD --
A. Again, as I -- as I --
Q. Ma'am, just let me finish, and
I'll try to do the same with you.
The hemoglobin, low. And the RDW is high.
You chose not to mention that?
MR. DENTON:
Object to the form. That's a
different question than you started with.
THE WITNESS:
As I explained, this is not an anemia.
This -- the degree of the -- the -- the
degree of aberration in the hemoglobin
measurement is insignificant -- clinically
insignificant, insignificant to me as a --
as a hematologist. And it -- you know,
again, he -- to me -- I look at this and I
see a normal CBC.
BY MS. MOORE:
Q. So when you're reviewing CBC results for
your patients, if they come back low or high, you
have the prerogative just to say it is what you
think it is, and you disregard what the labs say?

1  MR. DENTON:
2      Object to the form.
3  THE WITNESS:
4      The labs are very important in my
5  determination of what's wrong with my
6  patients. But the labs are not -- so a
7  lab is -- it's a test that somebody, you
8  know, obviously runs on a machine. And
9  while we have -- we have reference ranges,
10 those are not always absolute. In fact,
11 they rarely are absolute. But you have to
12 have a reference range of some kind.
13     So again, as I said, things that fall
14 on the edges of reference ranges are quite
15 often not abnormal and may be just within
16 scatter that occurs with the
17 instrumentation, with the reagents that
18 day, whoever was running the test. So
19 something that's less than, you know,
20 5 percent or, you know, even less outside
21 of a reference range is not considered by
22 me certainly and in -- in the -- the work
23 that I do to be abnormal. So --
24 MS. MOORE:
25     Yeah.

1  THE WITNESS:
2      -- I'm giving you -- you know, I was
3  asked to give my opinion. I'm giving my
4  opinion. I -- I was not asked to give an
5  exact rendering of every laboratory test
6  that was done.
7  BY MS. MOORE:
8  Q. Right. I'm asking you as your opinion as
9  the plaintiffs' expert.
10 A. Correct. And --
11 Q. And you're being paid to give these
12 opinions; right?
13 A. Correct. And he --
14 Q. Okay.
15 A. -- does not have anemia. So --
16 Q. Okay.
17 A. -- it is --
18 Q. But --
19 A. -- normal.
20 Q. And along those lines, you would agree
21 that the presence of B12 deficiency and iron
22 deficiency could result in a normal MCV and a high
23 RDW; correct?
24 A. It could.
25 Q. Okay. All right. Let's keep going.

1      I'm going to hand you now Exhibit 6.
2      (Exhibit No. 6 was marked for
3      identification and attached hereto.)
4  BY MS. MOORE:
5  Q. Would you take a look at that. This is
6  again --
7  MR. DENTON:
8      We're done with 5?
9  MS. MOORE:
10     Yes.
11 MR. DENTON:
12     Okay. All right.
13 BY MS. MOORE:
14 Q. This again, Dr. Leissinger, is a
15 January 7, 2014. It's an inpatient record from
16 the emergency department, again, lab results.
17 A. Uh-huh.
18 Q. And I want to focus your attention down to
19 the total bilirubin. It's --
20 A. Yes.
21 Q. You see that?
22 A. Yes.
23 Q. And you go across. It says 1.5.
24 A. Uh-huh. Uh-huh.
25 Q. And then you see the reference range --

1  A. Uh-huh.
2  Q. -- .1 to --
3  A. Uh-huh.
4  Q. -- 1. And then again it says high. You
5  see that?
6  A. Uh-huh. Uh-huh. Yes. It is high. That
7  is high.
8  Q. Okay. Did you reference that in your
9  report?
10 A. No. I did not.
11 Q. And why not?
12 A. You know, to be honest, on the chemistries
13 -- I mean, hematologic -- I am a hematologist, so
14 I -- I focus much more on the CBC.
15     And I -- what I was looking for in the
16 chemistries was primarily his renal function. And
17 so my -- you know, I was -- I -- I was rather
18 brief in summarizing this. And I was -- I really
19 was focused on his -- looking at his renal
20 function, certainly looking at it in -- in detail.
21     His glucose was high. Again, you know,
22 that could be because it's not a fasting sample.
23 So I guess I didn't pay much attention to that or
24 wouldn't really.
25     But his total bilirubin and his -- and his

1 alkaline phosphatase were both elevated. So --
2    Q. That was going to be --
3    A. -- that is interesting. Yeah.
4    Q. Yeah.
5    A. Uh-huh.
6    Q. Yeah. That was my --
7    A. Uh-huh.
8    Q. -- next question.
9    A. Yeah. And I did not -- I did not
10 reference that. I -- I did not -- and -- and
11 truly, I didn't feel it to be important in what I
12 -- in what I was talking about.
13    But it is of interest. And -- and that
14 was one thing that interested me. Really actually
15 going way back in his records -- I digress. But
16 he had high alkaline phosphatase intermittently
17 for years. And I -- I found it very curious.
18 And -- and no one really had addressed it. I
19 think it ultimately became clear that that was
20 related to his gallbladder. And he did ultimately
21 have a cholecystectomy a couple years later.
22    So -- but yeah, it shows up here. It
23 does. It shows up here as abnormal. And his
24 bilirubin is also abnormal and -- and very well
25 may have also been related to -- to gallbladder

1 or -- or could have been related to other things
2 as well.
3    Q. And, Doctor, these abnormal lab findings
4 that we've discussed were all prior to the
5 initiation of Xarelto?
6    A. That is correct.
7    Q. Let's look now at -- I'm going to hand you
8 another record, January 7th, 2014.
9    So this is again the time period that
10 you're focusing in on for your --
11    A. Uh-huh.
12    Q. -- report; right?
13    A. Yes.
14    Q. All right. This is a -- again, part of
15 the emergency department record. And it's
16 St. Anne. It's again more lab results for
17 Mr. Boudreaux, January 7th, 2014. We'll go ahead
18 and mark this as Exhibit 7.
19    (Exhibit No. 7 was marked for
20    identification and attached hereto.)
21 BY MS. MOORE:
22    Q. And if you'll go down, you see the doctor
23 ordering is a Dr. Wolfort. I guess he's --
24    A. Uh-huh.
25    Q. -- the ER doctor --

1    A. Yes.
2    Q. -- my assumption.
3    And it says, "D dimer, quantitative . . .
4 (Abnormal)?
5    A. Yes.
6    Q. You see that?
7    A. Yes.
8    Q. And it goes down. And it has the D-dimer.
9 The D-dimer's a test to determine when a person --
10 or whether a person has a blood clot?
11    MR. DENTON:
12      Object to the form.
13    THE WITNESS:
14      So -- so D, D-dimers are byproducts of
15    the clotting system. So D-dimers are
16    formed when fibrin clots form. And so
17    they are often elevated, and they're --
18    and they're actually used as a diagnostic
19    test for blood clots. That is correct.
20    But -- but that -- that's -- it's -- there
21    are other conditions, etcetera, that can
22    lead to high D-dimers. It's not specific
23    for blood clots.
24 BY MS. MOORE:
25    Q. All right. Doctor, my question was very

1 specific.
2    You would agree that the D-dimer is a test
3 to determine whether a person has had a blood
4 clot; correct?
5    A. It is -- it is one test that can be used.
6 Yes.
7    Q. Thank you. Thank you.
8    And a D-dimer elevation is consistent with
9 a process of clot formation going on in the body?
10    A. It is consistent with activation of
11 hemostasis. An activation of clotting --
12    Q. A better way of --
13    A. -- factors.
14    Q. -- saying it.
15    A. Yeah.
16    Q. And that of -- that activation of
17 hemostasis could be a sign of internal bleeding
18 somewhere?
19    MR. DENTON:
20      Object to --
21    THE WITNESS:
22      It could --
23    MR. DENTON:
24      -- the form.
25    THE WITNESS:

1    -- be. But his is not elevated for
2  his age. So we adjust D-dimers. And so
3  the -- the -- the -- the -- so
4  hematologists adjust D-dimers for age.
5  Because as we age, all -- all of us have
6  D-dimers that increase, you know, possibly
7  due to increasing arthrosclerosis or
8  whatever. So we generally multiply the
9  age times .1 milligrams per liter. So as
10  a 72-year-old, he -- his -- we would
11  typically look at that and say that a .5
12  is not elevated.
13 BY MS. MOORE:
14    Q. So here is -- I'm trying to think. Is it
15  -- one, two -- this is the third or fourth lab
16  result that has an abnormality, and you're again
17  disagreeing with this?
18    A. Yes.
19    Q. Okay. And it's your opinion, looking at
20  the lab result in Exhibit 7, that it's normal?
21    MR. DENTON:
22    Are you --
23    THE WITNESS:
24    Correct.
25    MR. DENTON:

1    -- talking about the D-dimer?
2    MS. MOORE:
3    Yes.
4    MR. DENTON:
5    Okay. Because there's other lab
6  results on here.
7    MS. MOORE:
8    D-dimer.
9    MR. DENTON:
10    What?
11    MS. MOORE:
12    D-dimer.
13    MR. DENTON:
14    Okay. Just making --
15    THE WITNESS:
16    Yeah. And -- and -- and, you know, to
17  be -- and -- and to be fair, his D-dimer
18  is .5 with the reference range being in
19  this lab less than .5, and that's pretty
20  standard.
21    But again, in older folks, that -- so
22  -- so while that is a -- a reference
23  that -- if you gathered a hundred people
24  off the street and you run normal people,
25  you'll get a reference range of less than

1    .5. But we know that as people age,
2  normally -- so healthy older people have
3  higher D-dimers.
4    MS. MOORE:
5    Okay.
6    THE WITNESS:
7    And so -- correct. As a hematologist,
8  I look at that and recognize that .5 is
9  not considered elevated for a man in his
10  70s.
11 BY MS. MOORE:
12    Q. And the literature that you have to
13  support that this D-dimer assay was normal would
14  be based on what?
15    A. There's published literature on adjusting
16  D-dimers for age. I --
17    Q. Is there published literature on adjusting
18  D-dimer assays for litigation?
19    MR. DENTON:
20    Kim, I find that insulting, totally
21  insulting and disrespectful.
22    THE WITNESS:
23    You would know better than I.
24    MS. MOORE:
25    I'll withdraw the question.

1    MR. DENTON:
2    That was not nice and uncalled for.
3  BY MS. MOORE:
4    Q. Let's look at some more lab results.
5  Let's look at January 8th, 2014.
6    I notice that you don't have any reference
7  to anything on January 8th, 2014. Do you have any
8  reason why you would not have referenced
9  additional lab results during that time period?
10    A. No. There's no particular reason why I
11  would not have referenced it. Again, as I said,
12  this was a very -- I intended to make this a
13  rather brief report.
14    Q. A brief report, but yet it's -- it's
15  important to you as a doctor who practices
16  evidence-based medicine and as someone --
17    MR. DENTON:
18    What number is this?
19    MS. MILLS:
20    Eight.
21    MS. duPONT:
22    Eight.
23 BY MS. MOORE:
24    Q. -- someone who's rendering an opinion here
25  to be truthful?

1  A. Okay. Yes.
2  Q. Accurate?
3  A. Certainly.
4  Q. Thorough?
5  A. I will be.
6     Do you have a question.
7  Q. That was a question.
8     Is it important for you to be --
9  A. Yes.
10  Q. -- thorough?
11  A. Of course.
12  Q. All right. Let's see if you're thorough.
13  This is on January 8th, 2014, and it is a lab
14  result, CBC again. Let's go down.
15     And I believe earlier you testified for
16  the hemoglobin to be something significant it
17  would need to be around 13; right?
18  A. Yes.
19  Q. All right. What are --
20  A. That's correct.
21  Q. -- we seeing here?
22  A. So his hemoglobin is 13.
23  Q. Okay.
24     MR. DENTON:
25        What's that asterisk?

1     MS. MOORE:
2        That's --
3  BY MS. MOORE:
4  Q. What does the asterisk symbolize to you,
5  Dr. Leissinger?
6  A. I'm assuming that, again, it's just their
7  way of indicating -- like the little letters on
8  the other -- the other lab you showed us, I'm
9  assuming that they're indicating it's outside of
10  their range.
11  Q. All right. So it's now 13. The range is
12  14 to 8?
13  A. Uh-huh. Uh-huh.
14  Q. Is this -- you would acknowledge that this
15  is a low hemoglobin?
16  A. Yeah. At that -- at this point, I would
17  be keeping my eyes on that.
18  Q. Okay.
19  A. Yep.
20  Q. And -- and just like the lab from the day
21  before, the 7th, this particular lab has an
22  asterisk to highlight that it's an abnormal value,
23  a low value?
24  A. The -- the -- of the hemoglobin, right.
25  Q. Yes, ma'am.

1  A. Uh-huh.
2  Q. Thank you.
3  A. And -- and yeah. No, I -- I would agree
4  that 13 -- at 13, I'm -- as I said, I'm -- I'm
5  going to be -- if it's my patient, I'm going to be
6  paying attention. I may not launch a workup
7  immediately, but we'll be, you know, watching his
8  labs.
9  Q. All right. So in an effort to be complete
10  and thorough, why did you not reference this
11  particular document in your report when you
12  specifically addressed that his lab values were
13  normal?
14     MR. DENTON:
15        Object to the form.
16     THE WITNESS:
17        Again, there was no particular reason.
18  BY MS. MOORE:
19  Q. Okay. So you were aware of this, but
20  didn't --
21  A. I -- I -- I did -- you know, as I said, I
22  looked through the -- you know, I did my best to
23  look through the records as -- as I had them from
24  the various pieces of records that I have. I
25  probably did see this.

1     Again, I would not have been overly
2  concerned. The gentleman's in the hospital. He's
3  undergoing fluid shifts, etcetera. So, you know,
4  those are things that we would be watching for.
5     This would not -- this would not elicit or
6  instigate a workup for anemia. I mean, this would
7  simply be something that we would get -- you know,
8  it could have represented fluid shift. So -- so
9  hemoglobins can drop if your fluid volume
10  increases. Likewise, they can go up if you become
11  dehydrated.
12     So, you know, again -- and -- and it also
13  can be tied to some degree if there's some shifts
14  in the renal function. You know, so there are a
15  lot of things going on with this gentleman in an
16  acute illness that would not trigger us to be
17  concerned about anemia. And certainly a
18  hemoglobin of 13, I would be observant of it at
19  this point, but it would not trigger a workup
20  necessarily at that point of anemia.
21  Q. All right. And let's keep going. You
22  look at the RDW down there, and again, you see
23  it's at 15.1?
24  A. Yeah. And -- and still not something that
25  I would consider relevant or -- or, you know,

particularly troublesome.
Q. But it is abnormal, according --
A. It is --
Q. -- to this --
A. It is listed as outside of their range.
Q. All right. Now, with respect to the low hemoglobin noted on this January 8th, 2014 document, this is -- you're not saying that this low hemoglobin was caused by Xarelto; correct?
A. No. Certainly not. I don't know that he had even started Xarelto at this point.
Q. All right. Let's keep going down on that same document. I want you to look at the bilirubin, 1.4 --
A. Yes.
Q. -- with an asterisk.
A. Yeah. And the alkaline phosphatase, though.
Q. There it is again.
A. Yeah. Uh-huh.
Q. Okay. That's the --
MR. DENTON:
I can't keep up. The page -- you know this better. Where is this at? Going down there?

MS. MOORE:
All right. Yeah. Just keep -- go -- go down the right-hand column, under Comprehensive Metabolic Panel. And you see one, two, three, four, five, six --
MR. DENTON:
Albumin.
MS. MOORE:
There you go.
MR. DENTON:
Total bilirubin.
MS. MOORE:
And the one right above it.
THE WITNESS:
Yeah. His bilirubin is slightly prolonged. His alkaline phosphatase is prolonged. And his potassium is a little bit low.
MS. MOORE:
All right.
THE WITNESS:
Yep.
BY MS. MOORE:
Q. Let's -- let's keep going. Let's look at on January 9th.

Did you -- so you looked at these records, but you didn't reference these?
A. You know, again, as I said, I looked at many different documents from these hospitalizations and I didn't -- certainly didn't reference all of them or not even close.
Q. The ones you referenced would be ones that, at least based on what we've read so far, kind of contradict what the lab reports say?
MR. DENTON:
Object to the form.
THE WITNESS:
I disagree, but we can --
BY MS. MOORE:
Q. So --
A. -- agree to disagree.
Q. All right. But at least the lab reports we've reviewed so far do indicate in some instances abnormalities?
A. Yes. There are some abnormalities --
Q. And --
A. -- in his chemistries in particular. And by the second day, his hemoglobin is 13. So as I said, I would be keeping a close eye on that if I were taking care of --

Q. And --
A. -- him.
Q. And just so the ladies and gentlemen of the jury understand, these types of lab results are -- are they lab results that you look at, or are these something that would not be in your area of expertise?
A. The CBC is something I would look at --
Q. Okay. All right.
A. -- absolutely. And -- and quite often, chemistries as well.
Q. Thank you.
So let's look on this next document. It's January 9th, 2014. And again, I think I'd like for you to -- actually, if you want to go to the second page, that's where I -- I want to focus in on. And then we'll turn back. The second page --
A. Okay.
Q. -- of that document. Yes, ma'am. It's a two-page document.
A. Yes.
Q. And what is the hemoglobin on that date?
A. It's again 13.
Q. All right. Again, it appears to be low?
A. Uh-huh. Yes.

1    Q.  And -- and you agree with the lab in this
2    instance?  It's low?
3    A.  Yes.  I do.
4    Q.  Okay.  And the RDW again is 15.1?
5    A.  Correct.
6    Q.  And that's high, at least according to the
7    lab?
8    A.  According to the lab, it is.
9    Q.  And let's turn to the first page.
10       And you look down at the total bilirubin
11   and the alk phos?
12   A.  Right.  And both are -- are improving.
13   And -- but interestingly, his creatinine and --
14   and his -- and his -- and his BUN are going up a
15   little bit.
16   Q.  Okay.
17   A.  Yep.
18   Q.  So on the total bilirubin and the alkaline
19   phosphatase, they are still documented, according
20   to this lab, as outside of the reference range and
21   being abnormal; correct?
22       MR. DENTON:
23          Object to the form.
24       THE WITNESS:
25          Yes.  They're -- they're indicated

1       that they are outside of the reference --
2       reference range, and -- and they are both
3       high.
4    BY MS. MOORE:
5    Q.  Now, you're not attributing any of these
6    findings to Xarelto; correct?
7    A.  Correct.
8    Q.  And you don't reference any of these
9    findings in your report; correct?
10   A.  Correct.
11   Q.  And why are you not referencing the labs
12   we've seen on the 7th, the 8th, and the 9th in
13   your report?
14       MR. DENTON:
15          Object to the form.
16       THE WITNESS:
17          Well, I mean, I'm really not sure how
18       they would be relevant to the issues that
19       I was dealing with the most in my report.
20       You know, again, it -- you know, reviewing
21       these and looking -- I mean, there's a lot
22       of detail in this gentleman's hospital
23       course.  We're only looking at laboratory
24       results.  There also -- there's also the
25       clinical condition of this gentleman that

1    we're, you know, completely ignoring as
2    we're looking at a bunch --
3    MS. MOORE:
4       We're going to --
5    THE WITNESS:
6       -- of numbers.
7    MS. MOORE:
8       -- get to that.  So --
9    MR. DENTON:
10      Well, no.  Let --
11   THE WITNESS:
12      But -- no.
13   MR. DENTON:
14      Let her --
15   THE WITNESS:
16      But -- but --
17   MS. MOORE:
18      Okay.  I apologize.  I didn't mean to
19   speak over.
20   THE WITNESS:
21      So -- so one -- one never and never
22   should look at numbers from a laboratory
23   separate from or apart from the patient,
24   what's going on with the patient.  And so,
25   you know, one of the things that we all do

1    as physicians is we incorporate labs into
2    our ongoing assessment on a daily basis of
3    a patient.
4       And so this is a gentleman that
5    presents with congestive heart failure.
6    So there's a lot of stuff going on -- a
7    lot of clinical things going on with this
8    gentleman that -- and -- and what we're
9    looking for when we get labs is to see if
10   it's pointing us in one direction or
11   another, if there's something we should be
12   concerned about.
13      And so looking at his labs, again, you
14   know, we know there are fluid shifts going
15   on.  So while we -- while we would be --
16   while I would be looking at his hemoglobin
17   and following it very closely, I'm not
18   yet -- you know, I'm not yet extremely
19   concerned about it.  His alkaline
20   phosphatase and total bilirubin were
21   abnormal.  They're improving.
22      I mean, I -- I think -- and I will
23   tell you that when -- as I'm thinking
24   about this as we're looking at it, I think
25   when I first looked at these records, I

1 was -- I was thinking he might have had a
2 little passive congestion in his liver as
3 one of the explanations for why that alk
4 phos and total bilirubin might have been
5 elevated. But I -- I was saying I, as I said, I
6 think, you know, the alk phos had been
7 sort of intriguing for a while. And I
8 think in retrospect it -- it may have been
9 that he had gallstones and some degree
10 of -- and that may have also accounted for
11 his bilirubin abnormalities.
12 So again, I'm just trying to put this
13 in perspective. Because we would never
14 just, you know, take a lab and look at it
15 without really trying to match it to
16 what's going on with the patient.
17 BY MS. MOORE:
18 Q. All right. And we're going to turn to
19 that in just a minute and --
20 A. Okay.
21 Q. -- see exactly what's going on with the
22 patient. But before we do, just go back up on
23 that same document for me and look at the --
24 MR. DENTON:
25 Which one, Kim?

1 THE WITNESS:
2 Which one?
3 MS. MOORE:
4 It's the --
5 THE WITNESS:
6 Number 9?
7 MS. MOORE:
8 -- January 9th. Yes, ma'am.
9 THE WITNESS:
10 Okay.
11 MS. MOORE:
12 And please look at the BUN.
13 MR. DENTON:
14 The BUN?
15 THE WITNESS:
16 Yes.
17 MR. DENTON:
18 B-U-N.
19 THE WITNESS:
20 Yes.
21 MS. MOORE:
22 Yeah.
23 THE WITNESS:
24 Yes.
25 BY MS. MOORE:

1 Q. It's high?
2 A. It's high. Uh-huh.
3 And -- and even though his creatinine is
4 not elevated, it's again, you know, something that
5 I'm sure his docs were watching. Because it --
6 I'm trying to remember what -- see, it was .8 when
7 he was admitted. Now it's 1.2.
8 So again, here are instances where labs
9 may not be abnormal. They may not be asterisks or
10 have a notation by them. but they're important as
11 we try to assess what's going on. So it indicates
12 that his renal function may have been impacted a
13 little bit in these few, and not surprisingly in
14 somebody who's got diabetes, hypertension, and now
15 is presenting with fluid shifts due to congestive
16 heart failure.
17 So again, it's -- you know, it's looking
18 at the -- the total of these labs and what they
19 might indicate.
20 Q. And this is just another example of
21 additional information that you did not include in
22 your report; correct?
23 A. That's --
24 MR. DENTON:
25 Well, I object to the form.

1 THE WITNESS:
2 It is correct. And as I -- I started
3 out by saying, this -- my -- my report is
4 a very brief case summary, could have been
5 many pages longer and included much more
6 detail. But it -- it -- it -- it was
7 summarized and, you know, it is what it
8 is.
9 BY MS. MOORE:
10 Q. Let's turn to the physical findings that
11 you were referencing a few minutes ago. Look at
12 Section 4D of your report, discussing the
13 January 2014th [sic] admission.
14 A. I'm sorry. The January 7th, yes.
15 Q. Okay. Are you --
16 A. Okay.
17 Q. -- with me?
18 MR. DENTON:
19 Where -- where are we at now?
20 MS. MOORE:
21 It's her -- Dr. Leissinger's report.
22 Section --
23 THE WITNESS:
24 Page 2.
25 MS. MOORE:

1    Thank you.
2    MR. DENTON:
3        Oh.  You said Page 4.
4    MS. MOORE:
5        Section 4.  I'm sorry.  Section 4D.
6    THE WITNESS:
7        4D, okay.
8    MR. DENTON:
9        Oh.  Got you.  Thank you.
10   BY MS. MOORE:
11   Q.  All right.  Here you go, Doctor.  Take a
12   look --
13   A.  Okay.
14   Q.  -- at that.  And this is again, more
15   information that -- I don't see this in your
16   report.  But take a moment.  This is a document
17   that I want to see if you actually looked at.
18   A.  I -- you know, I -- I really -- I -- I
19   could not tell you specifically.  It looks like an
20   H&P by Dr. Heldenreich [sic].  I know that I -- I
21   -- as I indicate in my report, I think the
22   findings that I've indicated -- and I -- I think I
23   even say that this was information from Dr. Wong's
24   note.
25   Q.  Okay.  So you took information to put in

1    your report from one particular doctor and did not
2    review --
3    A.  Yeah.  There was -- I'm sorry.
4    Q.  Yeah.
5    -- did not review other doctors to get a
6    more complete picture?
7    MR. DENTON:
8        Object to the form.
9    THE WITNESS:
10       I did review.  I reviewed several
11   other physicians' notes.  I -- you know,
12   this particular one, I cannot -- I --
13   again, I reviewed what I had access to or
14   what I had.  I don't know if I reviewed
15   this particular page or not.  There --
16   MS. MOORE:
17       Okay.
18   THE WITNESS:
19       -- were many, many pages that I did
20   review.  But no, I did review several
21   different physicians who saw him on or
22   around the time that he was admitted --
23   MS. MOORE:
24       All right.
25   THE WITNESS:

1    -- including -- I think there was one
2    emergency note.  I -- I, again, don't
3    remember the doc's name.  I believe there
4    was a hospitalist whose note I reviewed.
5    I do not remember the name.  I don't --
6    off -- off the hand -- offhand recognize
7    Dr. Heldenreich's name, though.
8    BY MS. MOORE:
9    Q.  All right.  Look down for me under
10   Physical Exam, because you were saying that it's
11   important to consider how the patient presents
12   along with the lab results.  So here's a physical
13   exam by a doctor on January 7th, 2014, again that
14   time period that you thought is important and
15   you're focusing in on.
16   A.  Uh-huh.
17   Q.  This is a report from Dr. Heinreich [sic].
18   And he's saying under Abdomen, "Distended and
19   tense with large umbilical hernia, air-fluid wave"
20   -- "fluid wave, consistent with massive abdominal
21   ascites."
22   A.  Yes.
23   Q.  And why didn't you wrote -- report that in
24   your report?
25   A.  No particular reason.  I -- it -- again,

1    this is supportive of congestive heart failure.
2    And that was I think what -- you know, again, that
3    -- that was I think the impression of the
4    physicians that were evaluating him at that time
5    as he presented with congestive heart failure,
6    which can include a whole plethora of signs and
7    symptoms.  I didn't really make an attempt to
8    include all of them --
9    Q.  All right.
10   A.  -- in this note.
11   Q.  So it's not -- that note is not complete?
12   MR. DENTON:
13       What -- what note is not complete?
14   THE WITNESS:
15       What note?
16   BY MS. MOORE:
17   Q.  You said you did not make an effort to
18   complete the -- include all of them in this note.
19   MR. DENTON:
20       What note?
21   THE WITNESS:
22       Right.  As I said, this is --
23   MS. MOORE:
24       Her note.  I'm --
25   THE WITNESS:

1    This is --
2    MS. MOORE:
3    -- asking her.
4    THE WITNESS:
5    This is a brief summary. You know, as
6 I mentioned when I started, this is a
7 brief summary of the case. So it -- it
8 does not include every -- every finding,
9 every note. It -- it was not meant to.
10 BY MS. MOORE:
11   Q. What was it meant to do?
12   A. It was, again -- I -- again, I -- my
13 charge was to give a case summary of
14 Mr. Boudreaux's admission in the relevant time
15 period, and so that's --
16   Q. Don't you find --
17   A. -- what I did.
18   Q. -- it -- well, it's interesting that you
19 have not referenced one abnormal lab report.
20   MR. DENTON:
21    Object to the form.
22 BY MS. MOORE:
23   Q. Why didn't you mention one?
24   MR. DENTON:
25    Object to the form.

1    THE WITNESS:
2    Again, in my review of his admission
3 labs, I was looking at his CBC primarily.
4 I didn't see anything that was abnormal.
5 I did not -- I -- I -- I did not -- when I
6 said the normal chemistries, I was
7 primarily focusing on his renal function
8 on admission. And I think I just have
9 that in parentheses. But he did have a
10 abnormal alkaline phosphatase, abnormal --
11 an abnormal bilirubin that I did not
12 include. And, you know, in retrospect,
13 I -- I may have included the -- and if I
14 did it over again, I would include that,
15 because those were distinctly abnormal on
16 presentation and I would have been paying
17 attention to that. But in any event, I --
18 I didn't. For whatever reason, I
19 overlooked it in my note.
20 BY MS. MOORE:
21   Q. Ascites, that -- what is that? That's a
22 buildup of --
23   A. Fluid.
24   Q. -- fluid?
25    And is that an indication that the liver

1 may be not working properly?
2   A. Yes. it is.
3   Q. And, Doctor, you would agree that these
4 symptoms, the presentation of massive abdominal
5 ascites, were present before Mr. Boudreaux started
6 Xarelto; correct?
7   A. Correct.
8   Q. Now, you in your report talked about how
9 Mr. Boudreaux's physical exam was unremarkable.
10   A. I'm sorry. Where -- where -- where are
11 you looking now?
12   Q. On your report.
13   A. I -- I mean, under D, I talk about the
14 physical exam findings, and they certainly weren't
15 unremarkable. Dr. Wong notes positive jugular
16 venous distention, irregular heart rhythm, gallop,
17 crackles at the base of the lung, edema of the
18 extremities. And again, I -- I believe that I was
19 pulling this information from his note. I -- I --
20 I would -- we would have to go back -- we could
21 look at his note and see. Perhaps I missed -- if
22 he mentioned the abdominal distention, I may have
23 missed it on his note. But -- but I was pulling
24 -- that paragraph, as I indicate there, came from
25 a cardiology consult note.

1   Q. All right. And let's just look at that
2 paragraph, the very first one under D --
3   A. Okay.
4   Q. -- I think it's the third sentence.
5 "On physical examination related to heart and
6 lungs, Dr. Wong notes positive jugular venous
7 distention, irregular heart rhythm with a soft
8 heart murmur . . . S3 gallop on" ausculation
9 [sic], "and crackles at the base of the lungs. He
10 also noted" positive one or "1+ edema of
11 extremities. The remainder of the exam was
12 unremarkable."
13   A. Yes.
14    And as I said, if -- if you have his note
15 from that day, the cardio -- we can go back and
16 look. It -- if he mentioned the abdominal
17 swelling --
18   Q. Okay.
19   A. -- that the other doctor mentions, I --
20 perhaps I -- I just missed it. But I was -- I
21 based -- you know, again, as I said and indicate
22 in the first line, this information comes from
23 Dr. Wong's note.
24   Q. Right. And --
25   A. So I think he -- I don't know if he said

Page 138

1 the remainder of the exam was unremarkable or if I
2 just didn't see any additional remarkable findings
3 that were remarked upon. So we'd have to look at
4 his note to be --
5    Q. Okay.
6    A. -- sure.
7    Q. All right. And we'll pull that. And
8 while --
9    A. Okay.
10    Q. -- I'm pulling that, so at least now
11 knowing, with looking at the information from
12 Dr. Heidenreich, who -- I think he's a
13 hospitalist. Looking at his information and the
14 finding of massive abdominal ascites --
15      MR. DENTON:
16      No. That's not a finding. He said
17    consistent with.
18 BY MS. MOORE:
19    Q. You would agree that your summary here is
20 incomplete; correct?
21      MR. DENTON:
22      Object to the form.
23      THE WITNESS:
24      No, ma'am.
25      My summary is of what Dr. Wong said.

Page 139

1      I -- I took this -- again, this that I
2    indicate in the first paragraph is -- as I
3    say, this history is taken from the
4    cardiology consult note on 1/17. So
5    again, if Dr. Wong mentioned it, then I
6    did miss it and I didn't include it. But
7    -- but I -- I mean, I'm very clear in
8    this, that -- that this is where -- what
9    -- I even say "Dr. Wong notes positive
10    jugular venous distention." So this is --
11    I am reporting what Dr. Wong has reported
12    in his note.
13 BY MS. MOORE:
14    Q. Okay. And so why would you --
15    A. Had he --
16    Q. -- not include this in your report?
17      MR. DENTON:
18      Object to the form.
19      THE WITNESS:
20      Again, in this -- in this summary that
21    I -- that I compiled on Mr. Boudreaux, I
22    was primarily working, at least in the
23    early part of my summary, with the note
24    and the information that was given by
25    Dr. Wong, who was the cardiologist on the

Page 140

1 case. Again, because to me the most
2 significant reason that Mr. Boudreaux was
3 in the hospital at the time was because of
4 a cardiac problem. So I was looking
5 primarily at the cardiology note. I did
6 look at other things. But in my summary,
7 I was relying on Dr. Wong's reports.
8 BY MS. MOORE:
9    Q. So is it fair to say that your -- your
10 report is based on limited information?
11      MR. DENTON:
12      No. It's not. I object.
13      THE WITNESS:
14      Well --
15      MS. MOORE:
16      Object, Counsel. You can't --
17      MR. DENTON:
18      I object.
19      MS. MOORE:
20      -- be coaching a witness here.
21      MR. DENTON:
22      I'm not --
23      MS. MOORE:
24      This is a question --
25      MR. DENTON:

Page 141

1      -- coaching the witness. You're
2 asking questions that are way out of
3 bounds, Kim. And you're being very
4 disrespectful, and I don't appreciate it.
5      MS. MOORE:
6      Am I being disrespectful?
7      MR. DENTON:
8      I think you have been.
9      MS. MOORE:
10      I -- I just --
11      THE WITNESS:
12      Well, we'll try again. What --
13      MS. MOORE:
14      Okay.
15      THE WITNESS:
16      -- was your question?
17 BY MS. MOORE:
18    Q. So is it fair to say your report is based
19 on limited information?
20      MR. DENTON:
21      Object to the form.
22      THE WITNESS:
23      I had information that, again,
24 involved numerous pieces of data that were
25 from various doctors that saw him. I --

1  you know, I reviewed all of that. I
2  primarily relied on Dr. Wong's evaluation
3  as I prepared my summary. As I started
4  out by saying, this is not intended to be
5  a comprehensive all-encompassing summary
6  of everything that happened to or was
7  noticed about Mr. Boudreaux.
8      MS. MOORE:
9      Okay.
10     THE WITNESS:
11     It was -- I -- it was not my intention
12  to develop something that comprehensive.
13  BY MS. MOORE:
14     Q. All right. Let's look at the next day
15  with respect to the treatment of Mr. Boudreaux and
16  if he, in fact, did get an ultrasound.
17     Do you recall if he got an ultrasound or
18  not?
19     A. An echocardiogram or an -- an ultrasound
20  of what?
21     Q. His kidneys.
22     A. Of his kidneys. Do I recall off the top
23  of my head? No. I do not recall.
24     Q. Okay. All right. Let me hand this to
25  you. We've marked this as Exhibit --

1      MS. MOORE:
2      What do I have?
3      MR. DENTON:
4      Thirty-six.
5      MS. MILLS:
6      Eleven.
7      MS. MOORE:
8      Eleven? Here you go.
9      (Exhibit No. 11 was marked for
10     identification and attached hereto.)
11     THE WITNESS:
12     Okay.
13  BY MS. MOORE:
14     Q. And if you'll take a moment and go down
15  halfway through.
16     MR. DENTON:
17     This [inaudible] per the document.
18  BY MS. MOORE:
19     Q. This Exhibit 11, it looks like a --
20  radiology results, US abdomen complete -- or US --
21  yeah, the result on January 8th, 2014. And it
22  talks about -- first, it says the findings.
23     A. Uh-huh.
24     Q. The liver measures 19.7 centimeters in
25  length.

1      A. Uh-huh.
2      Q. You see that?
3      A. Yes. I do.
4      Q. That would be a large --
5      A. Yes.
6      Q. That would be a large finding?
7      A. Yes. Uh-huh.
8      Q. And you go down further. Hepatomegaly --
9  megaly?
10     A. Uh-huh.
11     Q. "Etiology of" the "finding is uncertain"?
12     A. Yes.
13     Q. And what does that mean to you?
14     A. My interpretation, again, given the
15  information that I have and in context of
16  Mr. Boudreaux, I might -- you know, the first
17  thing on my differential of hepatomegaly would be
18  passive congestion.
19     Q. Okay. And what is -- what is passive --
20     MR. DENTON:
21     Well, let her -- let her finish.
22     THE WITNESS:
23     So passive congestion is a condition
24  that is secondary to congestive heart
25  failure in which fluid backs up behind the

1  heart, and that fluid can accumulate more
2  or less in the liver and cause the liver
3  to be enlarged and cause there to be some
4  abnormalities in the liver -- in the liver
5  tests.
6  BY MS. MOORE:
7      Q. So the findings that we are seeing here
8  with the enlarged liver and the massive abdominal
9  ascites are not related to Xarelto; correct?
10     A. That's correct.
11     Q. I'm going to hand you -- I did that.
12     MS. MILLS:
13     We need to take a break for the video.
14     MS. MOORE:
15     Yeah. Let's take a quick break for
16  the video.
17     THE VIDEOGRAPHER:
18     Okay. The time now is 4:05 p.m. We
19  are off the record.
20     (Brief recess was taken.)
21     THE VIDEOGRAPHER:
22     This begins Disk 2 of today's
23  deposition. The time now is 4:28 p.m. We
24  are back on the record.
25  BY MS. MOORE:

1    Q.  All right.  We're back after a short
2   break.  And I'm going to try and speed things
3   along so that we can all get out of here.
4        Dr. Leissinger, you would agree that
5   Mr. Boudreaux's right-sided heart failure, which
6   caused the liver congestion, could be an
7   independent risk factor for a risk of bleeding?
8        MR. DENTON:
9            Object to the form.
10       THE WITNESS:
11           In -- I'm sorry?  A risk of bleeding
12           from heart failure?
13  BY MS. MOORE:
14       Q.  Could cause the congestion you were
15  talking about in the liver, the backup --
16       A.  Passive congestion.  If it is so severe
17  that it creates a coagulopathy due to liver
18  dysfunction, that could be a potential problem,
19  although I don't think there was any -- I -- I
20  didn't see any laboratory evidence that that was
21  the case.
22       Q.  But it -- we've seen instances where you
23  don't have all the laboratory evidence?
24       A.  No.  But we -- sorry.
25       MR. DENTON:

1            Object to the form.
2        THE WITNESS:
3            Sorry.
4   BY MS. MOORE:
5        Q.  It is a possibility; correct?
6        MR. DENTON:
7            Object to the form.
8        THE WITNESS:
9            Not in his case.  His --
10       MS. MOORE:
11           Okay.
12       THE WITNESS:
13           -- PT was normal.
14  BY MS. MOORE:
15       Q.  All right.  With respect to PT in your
16  report -- your report with respect to
17  Mr. Boudreaux, you want to turn to that for a
18  moment.
19       A.  My report?
20       Q.  Yes.
21       A.  Okay.
22       Q.  Got it in front of you?  And you talk
23  about Mr. Boudreaux's PT on February 3rd, 2014?
24       A.  Okay.  Going to February --
25       Q.  3rd, 2014.

1        A.  -- 3rd 2014.
2        Q.  It's on Page 4, your --
3        A.  Okay.
4        Q.  -- PT opinions.  You --
5        A.  Okay.
6        Q.  -- begin with "Upon admission."
7        A.  Okay.
8        Q.  And you note his PT, 13.6 seconds;
9   INR, 1.4; PTT, 24.3 seconds?
10       A.  Correct.  Yes.
11       Q.  You would agree that these results don't
12  indicate that Mr. Boudreaux was
13  overanticoagulated; correct?
14       MR. DENTON:
15           Object to the form.
16       THE WITNESS:
17           They -- they're not going to indicate
18           any degree of anti -- they -- they don't
19           indicate a degree of anticoagulation.  But
20           they do suggest that he has anticoagulant
21           -- an anticoagulant in his system.
22  BY MS. MOORE:
23       Q.  Okay.  But they -- they don't give you any
24  clinical significance with respect to the amount
25  of coagulation?

1        MR. DENTON:
2            Object to the form.
3        THE WITNESS:
4            I would agree to that.  Yes.
5   BY MS. MOORE:
6        Q.  Okay.  All right.  We talked briefly about
7   Xarelto earlier.  And -- and I want to follow down
8   on Page 4 of your report and the paragraph
9   beginning, "Thus, based on my review of the
10  relevant materials" -- and you go on -- "and after
11  ruling in and ruling out all of the above . . .
12  it's my opinion . . ."
13       MR. DENTON:
14           "Above risk factors."  You've got to
15           read it carefully.
16  BY MS. MOORE:
17       Q.  "It is my opinion" -- yeah -- "to a
18  reasonable degree of medical certainty that
19  Mr. Boudreaux's use of Xarelto was the most
20  probable cause of his GI bleed."  You see that?
21       A.  Yes.
22       Q.  If Xarelto was the cause of
23  Mr. Boudreaux's GI bleed, why did Mr. Boudreaux's
24  treating physicians -- why did they not start him
25  up on another anticoagulant after that February

Page 150

1  bleeding event?
2      MR. DENTON:
3          Object to the form.
4      THE WITNESS:
5          I mean, you're asking me why a
6  physician did or did not do something, and
7  I -- I really don't know that I can answer
8  that for that physician. I can tell you
9  that once a patient has a significant or
10 life-threatening bleed on an anticoagulant
11 I think most physicians would be reluctant
12 to resume anticoagulation.
13 BY MS. MOORE:
14     Q. So it wouldn't matter what anticoagulant
15 Mr. Boudreaux had been on. After this type of
16 event, you would have recommended that he not be
17 -- not continue to be anticoagulated?
18     MR. DENTON:
19         Object to the form.
20     THE WITNESS:
21         Yeah. I -- I mean, I -- I -- I think
22 what I'm hearing you ask is that if a
23 patient bleeds on an anticoagulant -- and
24 I would agree, that if a patient has a
25 serious significant bleed on an

Page 151

1  anticoagulant, particularly when you don't
2  find a correctable condition or cause of
3  the bleed, then there would be reluctance
4  to -- to move to another anticoagulant.
5  BY MS. MOORE:
6      Q. And so more specifically, the reason the
7  doctors in this particular case decided not to
8  continue Mr. Boudreaux on anticoagulation wasn't
9  Xarelto-specific. It was just the fact that he
10 had been on an anticoagulant; correct?
11     MR. DENTON:
12         Object to the form.
13     THE WITNESS:
14         So -- so -- you know, again, you'd
15 have to ask them because you're --
16     MS. MOORE:
17         Okay.
18     THE WITNESS:
19         But -- and I don't know that they
20 state precisely why they didn't. But I
21 would say that, again, most -- you know, I
22 would agree that most physicians, given a
23 scenario where someone has had a critical
24 bleed on an anticoagulant, would be
25 reluctant to go to another anticoagulant.

Page 152

1  Particular -- you know, particularly
2  problematic is that with a drug like
3  Xarelto, where you have no ability to
4  truly monitor or know whether they were
5  overanticoagulated or not -- I mean, that
6  certainly is going to influence you as
7  a -- as a doctor.
8          If a patient bleeds -- since you asked
9  in general on anticoagulation, if a
10 patient bleeds on warfarin, but we -- we
11 test the laboratory and we find that they
12 are greatly overanticoagulated, so their
13 INR comes back at 8 or 9 or 10 and they
14 have bled on warfarin in that situation,
15 then, yes, we would be comfortable
16 restarting them on anticoagulation --
17 potentially restarting them on
18 anticoagulation as long as they didn't
19 have a distinct source of bleeding and we
20 could then monitor and know that -- you
21 know, keep them within the range -- the
22 range. Now, we don't have any way to do
23 that with the NOACs.
24 BY MS. MOORE:
25     Q. What evidence do you have that monitoring

Page 153

1  anything other than creatinine clearance would
2  have made a difference with Mr. Boudreaux?
3      MR. DENTON:
4          A difference in what? I object to the
5  form.
6      THE WITNESS:
7          So what -- I'm sorry. What evidence
8  do I have that monitoring . . .
9  Unfortunately, this is one of the big
10 problems with Xarelto, is that we do not
11 have a well-studied, well-characterized
12 validated approach to monitor. And that's
13 what makes this drug, you know, relatively
14 difficult to use and potentially dangerous
15 to patients who are at risk for bleeding,
16 which, you know, almost anyone is -- has
17 some risk for bleeding. That combined
18 with the fact that we don't have a
19 reversal agent, those two things are very
20 problematic for Xarelto.
21 BY MS. MOORE:
22     Q. You would agree that a reversal agent
23 would not have made a difference in this case with
24 Mr. Boudreaux; correct?
25     MR. DENTON:

Page 154

1    Object to the form.
2    THE WITNESS:
3        I'm sorry? Say that again.
4  BY MS. MOORE:
5    Q. You would agree that in this particular
6  case, a reversal agent would not have mattered
7  with Mr. Boudreaux; correct?
8    MR. DENTON:
9        Object to the form.
10   THE WITNESS:
11       Oh. I disagree with that.
12   MS. MOORE:
13       All right.
14   THE WITNESS:
15       I don't -- I don't know -- I certainly
16       -- I mean, the way that it was phrased, I
17       think what you asked me is: Would I say
18       categorically that a reversal agent would
19       not have made a difference? I would not
20       say that categorically, that it would not
21       have made a difference.
22  BY MS. MOORE:
23   Q. Is there any evidence in the records that
24  Mr. Boudreaux continued to bleed at the hospital?
25   MR. DENTON:

Page 155

1    Object to the form.
2    THE WITNESS:
3        There are occult blood tests that
4        remained positive during the
5        hospitalization. There was also notations
6        from nurses' notes that indicated he
7        continued to pass black tarry stools while
8        he was in the hospital.
9  BY MS. MOORE:
10   Q. Can you cite those to me?
11   A. We can -- we'd have to look through the
12  records. But yes, I -- I -- I know that there are
13  -- there are records that state those things.
14   Q. What randomized control study can you cite
15  to that identifies or shows that reversal is the
16  right thing to do in an instance like this with
17  Mr. Boudreaux?
18   MR. DENTON:
19       Object to the form.
20   THE WITNESS:
21       A little bit hard for me to understand
22       the question because we don't have the
23       capacity to reverse and we don't have
24       studies available to us that tell us, you
25       know, how to reverse Xarelto or what --

Page 156

1    you know -- I mean, we just -- we just
2    don't have that.
3  BY MS. MOORE:
4    Q. Do you agree with the treating --
5  Dr. Masri's clinical judgment that Mr. Boudreaux
6  did not need a PCC or a reversal agent?
7    MR. DENTON:
8        Object to -- object to the form.
9    THE WITNESS:
10       I don't know.
11       I think that I would have had to -- so
12       the decision to give a reversal agent like
13       a PCC, which mind you, is a -- what we
14       call a bypassing agent, is not a -- it is
15       not specific for Xarelto. A PCC carries
16       some risk. So what one has to do is
17       balance the risk versus the benefit of
18       using a reversal agent.
19       If you have a -- a specific reversal
20       agent for the drug -- and let's use
21       Coumadin as an example or warfarin as an
22       example, where we have a specific reversal
23       agent for the drug. Had this been
24       bleeding on warfarin, we certainly would
25       have used the reversal agent, which

Page 157

1    have either been Vitamin K or even a PCC.
2    However, a PCC is not a specific reversal
3    agent for Xarelto. And as such, you carry
4    certain risks in using PCCs, certain
5    thrombotic risk. So one would have had to
6    judge whether the bleeding was continuing
7    to a significant enough degree to risk his
8    life or to risk, you know, potentially --
9    potential harm by giving him a PCC. So
10   that would have been a kind of bedside,
11   you know, hour-to-hour, day-to-day kind of
12   evaluation that -- that I would have
13   certainly done with this patient.
14       In the -- in the way that I read the
15   records, he was transfused with blood, and
16   over the next couple of days, his -- he
17   responded adequately to -- to the blood
18   transfusions that he was given. And
19   that's really how you would follow, you
20   know, ongoing life-threatening bleed. If
21   he had continued to have life-threatening
22   bleeding, I think that we would have seen
23   his hemoglobin start to drop again. At
24   that point, then yes, giving a reversal
25   agent. So I -- I mean, a lot of this

Page 158

1    depends on how he was doing at the time.
2    I wasn't --
3    MS. MOORE:
4      Okay.
5    THE WITNESS:
6      -- there at the bedside.
7  BY MS. MOORE:
8    Q.  Yeah.
9      And you would defer to the doctors that
10  were there; correct?
11    MR. DENTON:
12      Object to the form.
13    THE WITNESS:
14      Well, I would certainly defer to what
15    the condition -- and again, I wasn't
16    there. What I'm reading in the -- in the
17    notes and put -- piecing it together, I
18    think that probably withholding the PCC
19    was the better course of action. That
20    would be my opinion, because of the risks
21    that go with giving a PCC --
22    MS. MOORE:
23      Okay.
24    THE WITNESS:
25      -- to a Xarelto patient. Had he been

Page 159

1    a warfarin patient, that's different.
2  BY MS. MOORE:
3    Q.  And you would agree that there is no
4    evidence, random -- randomized controlled studies
5    showing that reversal of warfarin improves
6    outcomes with a --
7    MR. DENTON:
8      I don't understand. I object to the
9    form.
10    THE WITNESS:
11      Yeah. I'm -- I'm sorry. I don't
12    understand the question either.
13  BY MS. MOORE:
14    Q.  Doctor, you agree a patient can have a
15    bleed on any anticoagulant even if they're not
16    overanticoagulated; correct?
17    MR. DENTON:
18      Object to the form.
19    THE WITNESS:
20      A patient can have a bleed with or
21    without an anticoagulant, but certainly on
22    any anticoagulant. That is correct.
23  BY MS. MOORE:
24    Q.  All right. With respect to Xarelto use in
25    this particular case, are you aware of the

Page 160

1  discrepancy between the medical records and
2  Mr. Boudreaux's testimony regarding
3  Mr. Boudreaux's Xarelto use?
4    A.  In what way? Specifically?
5    Q.  The medical records document a hundred
6  pills were given. There were 96 left at the --
7  left, and we have documentation of that. And it
8  appears that Mr. Boudreaux would have taken four
9  pills.
10    MR. DENTON:
11      I -- now, wait a minute. I object to
12    the form.
13    THE WITNESS:
14      So I'm -- Mr. Boudreaux gives a
15    history that he was using Xarelto. He was
16    -- I do -- I -- I do see where he was
17    given Xarelto. He was given samples of
18    Xarelto when he left the hospital. He
19    also had a Xarelto prescription filled. I
20    don't know where it's documented the, you
21    know, exact pill counts on -- on any of
22    these things. But I would -- I would go
23    with what the patient said.
24  BY MS. MOORE:
25    Q.  All right. And you haven't looked at any

Page 161

1  of the other evidence indicating that there is a
2  possibility that Mr. Boudreaux did not, in fact,
3  take the Xarelto? You have not seen that, or your
4  attorneys have not presented you with that
5  information; correct?
6    MR. DENTON:
7      Object to the form.
8    THE WITNESS:
9      I --
10    MR. DENTON:
11      First of all, I'm not --
12    THE WITNESS:
13      I'm --
14    MR. DENTON:
15      -- her attorney. I'm Mr. Boudreaux's
16    attorney. Second of all, she's told you
17    she's seen Mr. and Mrs. Boudreaux's
18    deposition and the medical records.
19    THE WITNESS:
20      I've seen medical records. I've seen
21    that he was given samples to go home with
22    and I -- and that he was given a
23    prescription for 90 pills. Again, is
24    there document -- it -- was there further
25    documentation or records that show exactly

1  how many pills he had?  I -- you know,
2  that, I would not have seen.
3  BY MS. MOORE:
4  Q.  And do you consider the possibility that
5  Mr. Boudreaux did not take -- did you even
6  consider that possibility, that he didn't take his
7  Xarelto?
8  MR. DENTON:
9  Object to the form.
10  THE WITNESS:
11  I -- I've evaluated the case on the --
12  the face value of what the patient -- what
13  history the patient gives.
14  BY MS. MOORE:
15  Q.  Okay.  Thank you.
16  Let's turn to your report, Section 7,
17  Damages.  You go -- you talk about --
18  MR. DENTON:
19  Section 7?
20  BY MS. MOORE:
21  Q.  -- Mr. Boudreaux did not under --
22  A.  Is it under G, maybe or . . .
23  MR. DENTON:
24  There's no Section 7 in this report.
25  MS. MOORE:

1  The damages, Pages 4 to 5 --
2  THE WITNESS:
3  Four --
4  MS. MOORE:
5  -- G.
6  THE WITNESS:
7  -- at the bottom, G.  Okay.
8  BY MS. MOORE:
9  Q.  You see that in here?  Do you see the
10  reference that Mr. Boudreaux had to have an
11  ablation?
12  A.  Yes.
13  Q.  Would you be surprised to learn that he
14  did not undergo an ablation?
15  A.  That may be the case.  I -- you know,
16  again, I -- what I reviewed was -- I thought he
17  had an -- either an ablation or an attempted
18  ablation, a procedure to do an ablation.
19  Q.  If he didn't have an ablation, that would
20  be another inaccuracy in your report?
21  A.  I'm sorry.  Are you saying he did not have
22  a procedure to do an ablation?
23  Q.  He did not.
24  A.  Okay.  Then I must have misunderstood.
25  Q.  So that is a mistake -- another mistake?

1  A.  Well --
2  MR. DENTON:
3  Well --
4  THE WITNESS:
5  -- you'd have to show it to me.  I
6  mean, I -- I -- you know, I'd have to
7  see --
8  MS. MOORE:
9  Okay.
10  THE WITNESS:
11  -- what you're talking about.
12  BY MS. MOORE:
13  Q.  Are you aware that he had a LARIAT and a
14  cardioversion?
15  A.  I did read that.
16  Q.  Okay.  And you didn't reference that.  You
17  referenced the -- the ablation?
18  A.  Yes.
19  Q.  All right.  Are you aware that after the
20  LARIAT procedure on May 11th, 2015, no
21  complications were noted and Mr. Boudreaux was
22  discharged?
23  A.  You know, at some point, I did review
24  that.  I think --
25  Q.  Okay.

1  A.  -- I indicated earlier -- I -- I think I
2  gave a couple of dates.  Is that the -- the
3  May '15 -- the May 2015?
4  Q.  All right.  You don't mention that in your
5  report, that he didn't have any complications;
6  correct?
7  A.  Maybe -- perhaps I'm using the wrong
8  terminology.  On Page 3 I say, "In May of 2015,"
9  he "underwent a cardiac ablation procedure in an
10  effort to treat his atrial fibrillation.  He
11  subsequently developed pericardial effusion and
12  underwent pericardiocentesis in" 20 -- "in
13  September 2015."  Truly, you know, I would have to
14  go back and review those records from those dates.
15  I don't remember exactly what was in them.
16  Q.  So you're testifying here today you don't
17  remember the records?
18  MR. DENTON:
19  That stack right there (indicating)
20  she doesn't have --
21  THE WITNESS:
22  Right.
23  MR. DENTON:
24  -- memorized?  No.
25  THE WITNESS:

Page 166

1    That's -- that's correct.
2    MS. MOORE:
3        All right.
4    THE WITNESS:
5        I -- I couldn't --
6    BY MS. MOORE:
7    Q. But you didn't mention that in your
8 report; correct?
9    MR. DENTON:
10       Mention what?
11   MS. MOORE:
12       The LARIAT procedure and the fact that
13   there were no complications.
14   THE WITNESS:
15       Right. If it's not -- right. It's
16   not in here.
17   BY MS. MOORE:
18   Q. All right. Let's talk about -- in your
19 report you reference that there were additional --
20 "Mr. Boudreaux suffered harm from severe anemia
21 which was associated with fatigue and weakness,
22 and additional stress on his heart. In addition,
23 he had to be hospitalized and undergo invasive
24 . . . procedures."
25       You are not a cardiologist; correct?

Page 167

1    A. That's correct.
2    Q. You're not board-certified in cardiology?
3    A. That's correct.
4    Q. And you don't routinely assess stress on
5 the heart of the patients?
6    A. I am an --
7    MR. DENTON:
8        Object to the form.
9    THE WITNESS:
10       -- internist. I am a board-certified
11   internist. And --
12   BY MS. MOORE:
13   Q. No. I -- I understand that --
14   A. And as such --
15   MR. DENTON:
16       Well, let her finish the answer.
17   MS. MOORE:
18       Okay.
19   THE WITNESS:
20       And as -- such, I certainly have
21   cardiology training. I -- I don't put
22   myself forward as an -- as a cardiologist.
23   BY MS. MOORE:
24   Q. That was my question. You're not a
25 cardiologist --

Page 168

1    A. I am --
2    Q. -- right?
3    A. -- not a cardiologist.
4    Q. Okay.
5    MR. DENTON:
6        Yeah. But that wasn't the question
7        you asked. Just slow down.
8    BY MS. MOORE:
9    Q. Do you treat --
10   MR. DENTON:
11       Wait a second.
12   BY MS. MOORE:
13   Q. -- patients with cardiac problems --
14   A. Yes. I have treated --
15   Q. And --
16   A. -- patients with cardiac --
17   Q. Is that --
18   A. -- problems.
19   Q. -- what you're known for in the medical
20 community?
21   MR. DENTON:
22       Object to the form.
23   THE WITNESS:
24       I am -- I currently am practicing
25       hematology, and so that is -- the bulk of

Page 169

1    my practice is hematology.
2    BY MS. MOORE:
3    Q. But other than that, your colleagues would
4 know you as someone who treats cardiology -- or
5 cardiac patients?
6    MR. DENTON:
7        Object to the form.
8    THE WITNESS:
9        At the present time, I don't treat a
10       lot -- well -- well, actually I -- I --
11       many of my patients have cardiac problems,
12       because I take care of elderly patients
13       and I work in conjunction with the
14       cardiologist. I am not a cardiologist.
15       I'm very clear about that. But -- but I
16       am a board-certified internist.
17   BY MS. MOORE:
18   Q. And my question is very specific.
19       If you had a patient like Mr. Boudreaux
20 with alleged stress on his heart, you would refer
21 him to a cardiologist?
22   A. I would work closely with the
23 cardiologist. Yes.
24   Q. In fact, a patient like Mr. Boudreaux
25 would not be the typical type patient you would

1  see?
2      MR. DENTON:
3          Object to the form.
4      THE WITNESS:
5          I -- certainly when bleeding comes
6  into play or anticoagulation or problems
7  with anticoagulation, those are very
8  typical of the kinds of patients I'm asked
9  to see. I would not have been asked to
10 consult on him to deal with congestive
11 heart failure or atrial fibrillation.
12 BY MS. MOORE:
13     Q. Thank you.
14     He had A-fib before this event; correct?
15     MR. DENTON:
16         Jesus. Slow down. Object to the --
17     THE WITNESS:
18         Yes.
19     MR. DENTON:
20         -- form.
21 BY MS. MOORE:
22     Q. You know what event I'm referencing;
23 right?
24     MR. DENTON:
25         I don't. What is it? Would you just

1      tell us?
2  BY MS. MOORE:
3      Q. He had the -- he had A-fib before the
4  LARIAT procedure?
5      A. He developed A-fib in January of 2014.
6      Q. Thank you.
7      And to your knowledge, Mr. Boudreaux has
8  never had a heart attack; correct?
9      A. I did not see anything in the records that
10 indicated that he had had a specific myocardial
11 infarction.
12     Q. Is it your opinion Mr. Boudreaux could
13 have gone back on anticoagulant therapy?
14     MR. DENTON:
15         Object to the form.
16     MS. MOORE:
17         How much time do I have?
18     THE WITNESS:
19         I don't know. Again, that would have
20 been something I would have had to
21 evaluate very closely and follow up with
22 him. I -- you know, I -- I think, as I
23 said, most physicians, having had someone
24 who just had a life-threatening bleed,
25 certainly right away there would have been

1      great concern. Later, I'm -- I'm not
2  prepared to say that I would have never
3  gone back on anticoagulation. I -- I may,
4  in fact, have. But --
5  BY MS. MOORE:
6      Q. And --
7      A. -- that's, you know . . .
8      Q. And which ones?
9      MR. DENTON:
10         What was the question?
11     THE WITNESS:
12         In his case, I would have likely used
13 warfarin, in which I could have done close
14 monitoring of it.
15 BY MS. MOORE:
16     Q. Despite the fact that his treating
17 cardiologist, Dr. Wong, was not comfortable
18 prescribing warfarin to Mr. Boudreaux because of
19 the amiodarone and the allopurinol, you would have
20 felt comfortable and put him on warfarin?
21     A. Yes. Absolutely.
22     Q. Okay.
23     A. I have many patients on warfarin. I -- I
24 -- there's -- there are ways that one can deal
25 with these complications and other drugs on

1  warfarin, and we do that routinely.
2      Q. Any other anticoagulants other than
3  warfarin that you would have put Mr. Boudreaux
4  back on?
5      MR. DENTON:
6          Object to the form.
7      THE WITNESS:
8          There are -- there are a variety of
9  anticoagulants we might have considered,
10 again, depend -- you know, it just would
11 have depended on his situation and what --
12 you know, there -- there lots of
13 considerations. So warfarin would have
14 likely been my first choice with a home
15 monitor in which I could have very
16 carefully monitored him on a very regular
17 basis, much more frequently than what
18 cardiologists typically do in a Coumadin
19 clinic.
20         So, you know, there are very complex
21 patients that I take care of on warfarin
22 who do very well for -- and -- and are on
23 a variety of drugs that can interfere, but
24 it's because we can monitor, which is what
25 we cannot do with Xarelto.

BY MS. MOORE:

Q. Any other NOACs that you would have put Mr. Boudreaux on?

A. Likely not Mr. Boudreaux, because of that reason. Yeah.

Q. All right. And going back to the section in your Damages portion of your report, do you believe that Xarelto caused Mr. Boudreaux to have to have the LARIAT procedure?

MR. DENTON:

Object to the form.

THE WITNESS:

You know, again, I think cause and effect is -- is -- is sometimes tricky in medicine. And so typically one thing leads to another, leads to another, leads to another, and there may be numerous steps in between.

Certainly the fact that Mr. Boudreaux, and his physicians particularly felt uncomfortable going back on anticoagulation led them to alternative ways to deal with his atrial fibrillation. And in so doing, it certainly, you know, prolonged medical care. It -- it -- it it,

you know, introduced additional medical procedures, clinic visits, you know. It -- it -- it certainly introduced many complications that he would not have had had he had a smooth course of anticoagulation.

So it's likely. Again, a -- you know, his doctor would have to be the one to tell you for sure because you're asking what are the likelihood they would have done one thing or another. But it does -- it does, in my opinion, appear to me that the fact that he bled on -- had a life-threatening bleed on anticoagulation led to additional alternative ways to deal with his atrial fibrillation that probably would not have happened had he not bled.

BY MS. MOORE:

Q. And as you sit here today, you can't say that that bleed would not have occurred on another anticoagulant; correct?

A. I --

MR. DENTON:

Object to the form.

THE WITNESS:

-- absolutely cannot say that that bleed would have occurred on another anticoagulate [sic].

BY MS. MOORE:

Q. And you can't say it would not have --

MR. DENTON:

Object to the form.

THE WITNESS:

I -- I --

BY MS. MOORE:

Q. -- is that correct?

MR. DENTON:

Slow down.

THE WITNESS:

So --

MR. DENTON:

Slow down. Object to the form.

THE WITNESS:

So I think there is evidence -- some evidence that has been published that Xarelto may have a greater risk of bleeding than some of the other anticoagulants that we use. And as such, I absolutely -- no one can say -- no one can say what might or might not happen.

But I think there's at least a chance that he may not have bled had he been --

MS. MOORE:

Okay.

THE WITNESS:

-- on another anticoagulant.

BY MS. MOORE:

Q. I'm going to -- you're under oath. And this is an important deposition, as you very well know. I'm not asking you about chance.

I'm asking you if you can say to a reasonable degree of medical certainty that Mr. Boudreaux would not have bled had he been another anticoagulant?

A. You were just --

MR. DENTON:

Object.

THE WITNESS:

You were asking me about chance. You just said you're not going to ask me about chance, but that's exactly what that is. You're asking me to a reasonable degree of certainty, which is is there a chance that he would have bled on any . . .

There's a chance he would have bled on

Page 178

1 nothing. I mean, the -- there -- but if
2 you're asking me whether all other
3 anticoagulants are -- carry the same risk
4 of bleeding as Xarelto, I believe not.
5 BY MS. MOORE:
6 Q. That's not --
7 A. But that's my opinion.
8 Q. Yes. And I understand that. My question
9 is really very specific.
10 Can you say to a reasonable degree of
11 medical certainty that Mr. Boudreaux would not
12 have bled had he been on another anticoagulant?
13 MR. DENTON:
14 Well, I object to the form.
15 THE WITNESS:
16 So again, I -- I -- I cannot comment
17 on whether he may have bled or may not
18 have bled on any other --
19 BY MS. MOORE:
20 Q. You just --
21 A. -- drug.
22 Q. -- can't say?
23 MR. DENTON:
24 No.
25 THE WITNESS:

Page 179

1 You can't -- you can't -- --
2 MR. DENTON:
3 Don't interrupt --
4 THE WITNESS:
5 I think that he is --
6 MR. DENTON:
7 -- her answer, Kim.
8 THE WITNESS:
9 -- more likely --
10 MR. DENTON:
11 Stop.
12 THE WITNESS:
13 -- to have bled on Xarelto. But
14 that's the -- that's all I can say. I --
15 because, you know, no one knows. It's --
16 it's -- it's something that is an unknown.
17 BY MS. MOORE:
18 Q. And all the other anticoagulants carry
19 risk of GI bleeding to varying degrees; correct?
20 A. All anticoagulants carry risk of bleeding.
21 Q. And going back, I just want to make sure I
22 understood.
23 You're not saying that the Xarelto caused
24 Mr. Boudreaux's need for the LARIAT procedure.
25 That's something you would defer to the doctors

Page 180

1 who actually recommended the procedure and treated
2 him --
3 MR. DENTON:
4 Well, I --
5 BY MS. MOORE:
6 Q. -- correct?
7 MR. DENTON:
8 -- object to the form. That's been
9 asked and answered. She stands on her
10 previous answer. You can't keep --
11 MS. MOORE:
12 I'm going to -- I'm --
13 MR. DENTON:
14 -- asking the same question.
15 MS. MOORE:
16 -- going to instruct you to not coach
17 the witness.
18 MS. duPONT:
19 Roger, you've got --
20 MS. MOORE:
21 It's late in the day.
22 MS. duPONT:
23 -- to stop.
24 MR. DENTON:
25 I don't have to do --

Page 181

1 MS. duPONT:
2 You've got --
3 MR. DENTON:
4 -- anything.
5 MS. duPONT:
6 -- to stop.
7 MS. MOORE:
8 It's late in the day. Okay.
9 MR. DENTON:
10 No. No. No.
11 BY MS. MOORE:
12 Q. Doctor, please --
13 MR. DENTON:
14 No. No.
15 BY MS. MOORE:
16 Q. -- respond.
17 MS. MOORE:
18 I want the court reporter -- this
19 time I'm not going to have it counted
20 against me that we're doing all this.
21 MR. DENTON:
22 This 35 seconds?
23 MS. MOORE:
24 Okay.
25 MR. DENTON:

1    Okay.  You can have an extra
2  35 seconds.  Now 37.
3  MS. MOORE:
4    I want 45.
5  MR. DENTON:
6    You can have 42.  So . . .
7  MS. MOORE:
8    Okay, Doctor.
9  MR. DENTON:
10    What's the question?  Slow down before
11  -- look, we're bantering.
12  MS. MOORE:
13    I'm trying to help you.
14  MR. DENTON:
15    No.  You're not.
16  MS. MOORE:
17    Yeah.  I am.
18  MR. DENTON:
19    No.  You're not.  Slow down.  You said
20  it was important.  Ask a deliberate
21  question.  She'll give a deliberate
22  answer, assuming the form is --
23  BY MS. MOORE:
24  Q.  You may --
25  MR. DENTON:

1    -- proper.
2  BY MS. MOORE:
3  Q.  -- answer, Doctor.
4  MR. DENTON:
5    What's the question?
6  THE WITNESS:
7    What's the question?
8  MS. MOORE:
9    Sure.  I'll give it to you again.
10  BY MS. MOORE:
11  Q.  As we sit here today, you're not saying
12  Xarelto caused the need for Mr. Boudreaux's LARIAT
13  procedure.  That's something you would refer to
14  the -- defer to the doctors who actually
15  recommended the procedure and treated
16  Mr. Boudreaux; correct?
17  MR. DENTON:
18    Object to the form.
19  THE WITNESS:
20    That's correct.
21  BY MS. MOORE:
22  Q.  Now, I don't know if you're aware.
23    Did -- did you read Dr. Fail's testimony?
24  He's another doctor for Mr. Boudreaux.  Have you
25  had a chance --

1  MR. DENTON:
2    He's not --
3  BY MS. MOORE:
4  Q.  -- to read his --
5  MR. DENTON:
6    What do you mean for?
7  MS. MOORE:
8    Oh, wait.  Yeah.  He's another
9  doctor --
10  MR. DENTON:
11    That treated Mr. Boudreaux.
12  MS. MOORE:
13    -- that treated Mr. Boudreaux.
14  MR. DENTON:
15    That doesn't mean he's for or against
16  Mr. Boudreaux.
17  BY MS. MOORE:
18  Q.  Have you had a chance --
19  MR. DENTON:
20    Object to the form.
21  BY MS. MOORE:
22  Q.  -- to read the --
23  A.  I'm sorry.  What was the name?
24  Q.  Dr. Fail.
25  A.  I -- I don't recall.

1  Q.  All right.
2  A.  I -- I -- I did not read his testimony.
3  If you're asking me if I read his records, I --
4  and I don't -- I just don't recall that.  I did
5  not read any --
6  Q.  Okay.
7  A.  -- testimony of his.
8  Q.  And so you would not have been aware that
9  he testified from a cardiologic standpoint that
10  Mr. Boudreaux is now in a better state than he was
11  in January of 2014, when he presented with A-fib?
12  MR. DENTON:
13    Object to the form.  You want to show
14  it to us?
15  BY MS. MOORE:
16  Q.  You're not aware of that; correct?
17  A.  That he's in a better state because he
18  bled?  I'm just --
19  MS. MOORE:
20    Move to strike as nonresponsive.
21  THE WITNESS:
22    I'm just -- I -- I'm -- I'm sorry.
23  I'm not -- I do not -- I'm not familiar
24  with his testimony.  So if you want to --
25  if you have something I can read, I will.

1    But . . .
2  BY MS. MOORE:
3    Q. You did look at Dr. Wong's testimony?
4    A. I did.
5    Q. All right. And you then would have read
6  where Dr. Wong testified that prescribing
7  information at the time he prescribed Xarelto, if
8  that type of information had contained information
9  about the U.S. subgroup, it wouldn't have changed
10  his risk-benefit analysis or any discussions with
11  Mr. Boudreaux. Do you remember that?
12    A. No. I -- I didn't. I actually -- I -- I
13  didn't read that. But I -- you know, I accept
14  that --
15    MR. DENTON:
16      Well --
17    THE WITNESS:
18      -- it's there.
19    MS. MOORE:
20      Okay.
21    MR. DENTON:
22      Well, I don't want to accept it unless
23    you're going to show it to us, because I
24    wasn't there.
25  BY MS. MOORE:

1    Q. Now, Miss -- Dr. Leissinger, did you read
2  Dr. Wong's testimony? He understood that Xarelto
3  could not be monitored and was not reversible --
4    MR. DENTON:
5      Object to --
6  BY MS. MOORE:
7    Q. -- at the time he prescribed Xarelto to
8  Mr. Boudreaux?
9    MR. DENTON:
10      Object to the form. If you're reading
11    from a transcript, let's see it.
12    THE WITNESS:
13      I will say that he would certainly
14    have known that. I think that --
15  BY MS. MOORE:
16    Q. It's your belief --
17    A. -- any physician would have known that --
18    Q. Okay.
19    A. -- who -- who prescribes those drugs,
20  anticoagulant drugs.
21    Q. So with respect to information about
22  Xarelto, like other anticoagulants having the
23  possibility of causing bleed, it's your
24  understanding that is information that Dr. Wong
25  would have known?

1    MR. DENTON:
2      Object to the form.
3    THE WITNESS:
4      As I said, I think any physician
5    realize two things: one, that you cannot
6    monitor Xarelto, and that you cannot
7    reverse it.
8  BY MS. MOORE:
9    Q. And that it causes -- it -- it can be
10  associated with bleeding, sometimes serious and
11  fatal outcomes?
12    A. I'm -- I feel sure that he knew that.
13    Q. As you sit here today, can you identify
14  any information you believe Dr. Wong was lacking
15  to make a fully informed prescribing decision
16  about Xarelto?
17    MR. DENTON:
18      Object to the form. You --
19    THE WITNESS:
20      Yeah. In -- in general, yes, I -- I
21    think there's a lot of information that is
22    probably -- it -- that I feel is pertinent
23    to the safe use of a drug like Xarelto
24    that was not in, I would say -- I don't
25    know if "public domain" is exactly

1    right way to say it, but information that
2    was not readily available or known by
3    physicians, even many who use Xarelto very
4    routinely. So I think that -- you know,
5    and -- and these are -- these are issues I
6    -- I -- I know that were brought up in the
7    general report. And I -- I would just --
8    I would just say -- in fact, I think you
9    may have referenced it more specifically.
10      When we're looking at the safe use of
11    Xarelto and we're relying on the
12    registration trial, which is the ROCKET
13    trial, it's very clear that there was --
14    that warfarin management was inferior in
15    that trial compared to other studies of
16    other anticoagulants that were comparing
17    themselves to warfarin. So the, you
18    know -- you know, as you know, the time in
19    therapeutic range was -- was very low.
20    And there is, in fact, you know, statement
21    on -- you know, that -- that is now made
22    that says that, you know, one cannot say
23    that -- how rivaroxaban would perform
24    against warfarin if warfarin were expertly
25    managed.

1   And so, you know, again, I think there
2   are some real concerns about Xarelto in
3   particular, that, you know, we're just --
4   we're just not -- that information was not
5   readily available. So I -- you know,
6   again --
7   MS. MOORE:
8       Move to strike as nonresponsive.
9   BY MS. MOORE:
10  Q. Doctor, you would agree that a patient
11  taking an anticoagulant like Xarelto for A-fib can
12  develop major bleeding even if the degree of
13  anticoagulation is providing the optimal reduction
14  in blood clotting and stroke; correct?
15  MR. DENTON:
16      Object to the form.
17  THE WITNESS:
18      Well, as we've already said, any
19  anticoagulant can be associated with
20  bleeding.
21  BY MS. MOORE:
22  Q. So my answer -- your answer would be yes?
23  MR. DENTON:
24      No.
25  THE WITNESS:

1   Any anticoagulant can be associated
2   with bleeding.
3   BY MS. MOORE:
4   Q. At any dose?
5   MR. DENTON:
6       Well --
7   THE WITNESS:
8       No. Not at any dose -- well, wait.
9   I'm -- I'm sorry. I'd like to -- I'd like
10  to rephrase that.
11      The risk of bleeding is dependent on
12  dose, but bleeding can occur with any
13  dose. So yes, I do agree with that. But
14  clearly the risk for bleeding and the
15  incidence of bleeding is going to increase
16  as the dose increases with any
17  anticoagulant.
18  BY MS. MOORE:
19  Q. If a patient's already bleeding in his
20  GI tract, even if the bleeding is subclinical or
21  undiagnosed, that patient would be more likely
22  than a patient without preexisting bleeding to
23  develop clinically significant bleeding once an
24  anticoagulant is introduced; correct?
25  A. That is likely.

1   Q. There's no evidence that Mr. Boudreaux was
2   overanticoagulated; correct?
3   MR. DENTON:
4       Object to the form of the question.
5   THE WITNESS:
6       We have no way of testing. We have no
7   way to monitor. We have no way to test.
8   We have no way to know whether he was anti
9   -- overanticoagulated or -- or precisely
10  anticoagulated or not, which is the
11  problem with Xarelto.
12  BY MS. MOORE:
13  Q. Have you formed an opinion about why he
14  continues to be anemic two years after his GI
15  bleed and the discontinuation of anticoagulation
16  with Xarelto?
17  MR. DENTON:
18      Object to the form.
19  THE WITNESS:
20      So there are many causes for anemia.
21  And as one ages, there are a variety of --
22  of reasons why someone -- someone can
23  become more anemic. So, you know, again,
24  I -- you know, we -- we could go over that
25  in detail and I could render an opinion.

1   But that was really not -- that was really
2   not something that I looked at thoroughly.
3       I -- for one thing, his renal function
4   did deteriorate a bit as he aged beyond
5   this point.
6   BY MS. MOORE:
7   Q. So --
8   A. He developed infection and inflammatory
9   problems. He had cholecystitis. He had some
10  other things going on. He does -- and my opinion
11  is he would benefit from a hematologist seeing him
12  to try to find out why he is anemic. And -- but
13  again, that's, you know, neither here nor there.
14  Q. You don't have -- your report and you're
15  not prepared to render an opinion today about why
16  he continues to be anemic two years after the GI
17  bleed --
18  A. That's correct.
19  Q. -- and the discontinuation? Okay.
20  A. That's correct.
21  Q. In your practice, have you ever seen a
22  patient where an occult or an obscure bleed is
23  known to exist and can't be found?
24  MR. DENTON:
25      Object to the form.

Page 194

1    THE WITNESS:
2        I'm just trying to think if -- if
3    we've ever seen that. I -- I can't recall
4    one off -- off the top of my head.
5    Generally if someone is bleeding and it's
6    clinically significant, it's going to
7    declare itself. The bleeding will declare
8    itself clinically.
9    BY MS. MOORE:
10    Q. And you would agree there are a number of
11    GI diagnostic workups that fail to identify a
12    source of bleeding even when one's known to exist;
13    correct?
14        MR. DENTON:
15        Object to the form.
16    THE WITNESS:
17        So -- and I'm sorry. Maybe it's just
18    because it's getting late. But I'm --
19    I'm -- it -- it's like I'm hearing a
20    negative question. So what exactly is the
21    question? Like a direct question, was
22    it . . .
23    BY MS. MOORE:
24    Q. You would agree that there's a percentage
25    of GI diagnostic workups that fail to identify

Page 195

1    source of bleeding even when one is known to
2    exist?
3        MR. DENTON:
4        Well, object to the form.
5    THE WITNESS:
6        I -- I think what you're saying is
7    with the current modalities we have of
8    doing a GI workup, can we do a GI workup
9    on somebody who's having GI bleeding and
10    not see a discrete source of bleeding?
11    And I would agree with that.
12    MS. MOORE:
13    Thank you.
14    THE WITNESS:
15    Yes.
16    BY MS. MOORE:
17    Q. All right. A positive finding on a GI
18    diagnostic testing confirms an anatomical cause of
19    bleeding, but you can't say the opposite, that a
20    negative finding confirms a patient does not have
21    an anatomical cause of bleeding; correct?
22        MR. DENTON:
23        Object to the form. Who wrote these
24    questions?
25    THE WITNESS:

Page 196

1    It is a little confusing.
2        You -- when someone bleeds, it means
3    that there has been a disruption of a
4    blood vessel and possibly the overlying
5    tissue. So, you know, when you say
6    "anatomic," I'm not exactly sure what you
7    mean. But we -- you know, we don't -- we
8    don't just bleed through a normal blood
9    vessel. I mean, that doesn't happen. So
10    there has to be some disruption that
11    occurs. Now, it might be at a microscopic
12    level; right? So I'm -- again, I'm not
13    exactly sure what you're asking.
14    But . . .
15    BY MS. MOORE:
16    Q. When you have --
17    A. So I'm not sure I answered you.
18    Q. All right. That's fine. It is getting
19    late in the day.
20        I guess my point is that if you have --
21    you do these -- you do some of the GI workups, the
22    EGD or the colonoscopy, the PillCam, all of those,
23    and they come back negative, that doesn't
24    necessarily mean that there isn't some source of
25    bleeding in the GI tract?

Page 197

1        MR. DENTON:
2        Object to the form.
3    THE WITNESS:
4        Right. I agree. But there --
5    MS. MOORE:
6    And that's all.
7    THE WITNESS:
8    -- would be --
9    MS. MOORE:
10    That's all.
11    THE WITNESS:
12    -- a source, and it may be a very --
13    you know, very small, very -- you know,
14    something that can't be visualized.
15    There's always a limit to every technique
16    that one uses.
17    BY MS. MOORE:
18    Q. Okay. And also the Indocins and the
19    ibuprofens can cause GI bleeding. Is that
20    something you know?
21        MR. DENTON:
22        Object to the form.
23    THE WITNESS:
24        They cause -- they generally cause
25    IG -- I -- GI bleeding because of

1  gastritis or ulcerations in the -- in the
2  upper GI tract.
3  BY MS. MOORE:
4  Q. All right. And, Doctor, with respect to
5  aspirin -- the concomitant use of aspirin can --
6  with an anticoagulant like Xarelto can increase
7  one's chances of having a bleed?
8  MR. DENTON:
9  Object to the form.
10  THE WITNESS:
11  Yeah. Or I'd just say just the
12  opposite: Adding an anticoagulant to
13  aspirin use will -- can increase the
14  chances that somebody will bleed. Yes.
15  BY MS. MOORE:
16  Q. Okay. The medication aldactone was one of
17  the medicines prescribed for Mr. Boudreaux when he
18  had his A-fib diagnosis.
19  Are you aware that that particular
20  medicine also lists gastric bleeding as an adverse
21  events -- a potential adverse event?
22  A. No. And, you know, it's an old drug. We
23  used it -- I used it quite a bit years ago. I --
24  I must say I've never seen a bleed caused by that,
25  but, you know, I -- there may be reports of that.

1  Q. Okay. And that again is something that is
2  not referenced in your report?
3  A. Yeah. I would not have referenced that in
4  the report.
5  Q. And as you sit here today, you -- you
6  can't with a hundred percent certainty rule out
7  the presence of an occult or obscure bleed prior
8  to Mr. Boudreaux taking Xarelto; correct?
9  MR. DENTON:
10  Object to the form. You know that's
11  not the proper causation standards, a
12  reasonable degree of medical certainty.
13  THE WITNESS:
14  So -- again --
15  MS. MOORE:
16  Sorry.
17  THE WITNESS:
18  -- so you're asking whether -- you're
19  asking whether he may have been bleeding
20  prior to taking Xarelto?
21  BY MS. MOORE:
22  Q. Yes.
23  I -- my question was: If -- if you can
24  rule out with a hundred percent certainty to a
25  reasonable degree of medical certainty that there

1  wasn't a -- the presence of an occult or obscure
2  bleed prior to Xarelto --
3  MR. DENTON:
4  Well, of course it's still
5  [inaudible] --
6  THE WITNESS:
7  So -- so, I mean, there was --
8  MR. DENTON:
9  Object to the form.
10  THE WITNESS:
11  There was no evidence of
12  gastrointestinal bleed prior to beginning
13  Xarelto. Certainly, I saw none in his
14  record or in any of the -- the tests that
15  were run. And, I mean, clearly his
16  doctors didn't think so either or they
17  wouldn't have started him on
18  anticoagulation.
19  BY MS. MOORE:
20  Q. They continued to look for a bleed with
21  the diagnostic studies that they did; correct?
22  MR. DENTON:
23  When -- object to the form.
24  THE WITNESS:
25  After the bleed. You're talking about

1  after the bleed?
2  MS. MOORE:
3  Yes.
4  THE WITNESS:
5  Right. As I -- as I recall, he had an
6  EGD and a colonoscopy during the
7  hospitalization, and then I think it was a
8  couple weeks later that he had the capsule
9  endoscopy done.
10  BY MS. MOORE:
11  Q. As we sit here today -- I -- I know we've
12  gone through a lot of records. And there's been a
13  significant number of records that you did not
14  reference or include in your report; correct?
15  A. Correct.
16  MR. DENTON:
17  You know about that.
18  THE WITNESS:
19  Correct. So there's --
20  MR. DENTON:
21  They can't --
22  THE WITNESS:
23  -- you know, 5 inches of records.
24  BY MS. MOORE:
25  Q. And --

1    A. Yes.
2    Q. And the questions I asked you about
3  abnormal lab findings were routinely left out of
4  your report --
5    MR. DENTON:
6      Object.
7  BY MS. MOORE:
8    Q. -- correct?
9    MR. DENTON:
10      I object to --
11    THE WITNESS:
12      Oh, I --
13    MR. DENTON:
14      -- the form.
15    THE WITNESS:
16      -- disagree. I mean, I -- I -- I -- I
17      gave my opinion about his -- the lab
18      findings that I looked at, particularly
19      with reference to his CBC, his blood
20      counts. And as a hematologist, that's
21      what I look at.
22  BY MS. MOORE:
23    Q. And that's your opinion under oath that
24  you'd like to tell the court, that you've
25  considered all the CBC labs and those were -- you

1  were thorough, complete --
2    A. Uh-huh.
3    Q. -- and accurate in your report?
4    A. Right. And that --
5    Q. All right.
6    A. And what I stated was that on admission he
7  had a normal blood count. And yes, I -- I stand
8  by that. He had --
9    Q. Okay.
10    A. -- a normal blood count. A day later, his
11  hemoglobin fell, a gram of hemoglobin. And -- and
12  yes, that would have been something we would have
13  looked at. But there were clinical -- so, you
14  know, again, we don't look at numbers apart from
15  looking at the patient in the clinical scenario.
16  And there were reasons why his hemoglobin -- we --
17  there are -- there are reasons why his hemoglobin
18  may have dropped at -- at that point.
19      And so yeah, I mean, again, you know,
20  what's in my report, particularly regarding the
21  CBC and the blood counts, is -- reflects what I
22  believe in my opinion.
23    Q. Okay. All right. And so, Doctor, that's
24  what you would -- you would treat -- teach your
25  fellow doctors and students, that it's okay to

1  disregard the findings in a laboratory study and
2  disregard potential findings from a physical exam?
3    MR. DENTON:
4      Kim, that's not her answer. I object
5    to the sarcasm. This is unprofessional.
6    THE WITNESS:
7      So I absolutely would teach my fellows
8    to disregard a 0.2 decrease in hemoglobin.
9    If someone presents with a 13.8, we're not
10    going to launch into a 500-dollar anemia
11    workup because that really -- it does not
12    reflect an anemia. So that is very
13    important, that I teach my fellows how --
14    I mean, we're -- numbers are numbers.
15    It's how we incorporate that into the
16    evaluation of the patient.
17      And so yes, that is one thing that
18    we're very careful to do, is that we don't
19    -- we don't treat a number. We treat the
20    patient. And in this case, I absolutely
21    would have, you know, counseled my -- my
22    trainees and my fellows to approach the
23    patient much as I've described here.
24  BY MS. MOORE:
25    Q. And how much are you being charged an hour

1  for your opinions, please?
2    MR. DENTON:
3      She's not being charged.
4    THE WITNESS:
5      I'm not being charged.
6  BY MS. MOORE:
7    Q. I meant to say: How much are you charging
8  an hour for your opinions?
9    A. I am charging $1,000 an hour.
10    MS. MOORE:
11      Okay. Thank you. No further
12    questions.
13    THE WITNESS:
14      You're welcome.
15    MS. MOORE:
16      I'm going to pass the witness.
17    MS. duPONT:
18      I just -- I don't have that much. I
19    have until the end of our time.
20    MS. MOORE:
21      How much time do we have left?
22    THE VIDEOGRAPHER:
23      We have 22 minutes left.
24  BY MS. duPONT:
25    Q. Hi, Doctor.

Page 206

1    A.  Hi.
2    Q.  My name is Julie duPont.  I represent the
3  Bayer defendants.  I just have a few additional
4  questions for you today.
5      As I understand it, when you treat
6  patients with atrial fibrillation, you're treating
7  patients that also have a clotting disorder or a
8  bleeding disorder; correct?
9    A.  That's correct.  Right.  Someone who
10 presents with atrial fibrillation and has no other
11 hematologic abnormality would not be somebody that
12 I would see.  They would go see a cardiologist.
13   Q.  Okay.  So in your practice -- or let me
14 strike that.
15      Mr. Boudreaux didn't have a clotting or
16 bleeding disorder; correct?
17   A.  That is my opinion.  Right.  Reading what
18 I have of his medical records, I see no evidence
19 that he had either a bleeding disorder or a
20 clotting disorder prior to his developing atrial
21 fibrillation.
22   Q.  So in your practice, you would never treat
23 a patient like Mr. Boudreaux, who didn't have --
24 or who had atrial fibrillation but did not have a
25 clotting disorder?

Page 207

1    A.  A patient presenting like Mr. Boudreaux
2  would -- would not have been sent to me.  I -- and
3  -- and likely, I would not have been consulted on
4  him unless his doctors felt he had a hematologic
5  abnormality.  And I'll go back to the CD -- CBC
6  that your colleague was -- kept referring to as --
7  as being abnormal.  I mean, if his doctors thought
8  that was abnormal, they likely would have
9  consulted a hematologist, which they did not.  So,
10 you know, there's -- until -- unless and until
11 there's a hematologic problem that arises, it
12 would be unusual for me to consulted on someone
13 like this.
14   Q.  And the main focus of your research is on
15 patients who have blood clotting disorders or
16 bleeding disorders.  Fair?
17   A.  Disorders of hemostasis, yes.
18   Q.  And you haven't done research on patients
19 like Mr. Boudreaux, who simply just have atrial
20 fibrillation --
21   A.  No.
22   Q.  -- correct?
23   A.  I have not.
24   Q.  You agree that Mr. Boudreaux's prescriber,
25 Dr. Wong, was aware of the risk of serious and

Page 208

1  fatal bleeding associated with Xarelto --
2    MR. DENTON:
3      Objection.
4  BY MS. duPONT:
5    Q.  -- correct?
6    MR. DENTON:
7      Object to the form.
8    THE WITNESS:
9      I feel sure he was.  You know, you're
10     asking me to get inside of his head, which
11     I can't.  But -- but I feel sure that as
12     a -- as a competent cardiologist, he would
13     have had -- he would have been aware of
14     those things.
15 BY MS. duPONT:
16   Q.  But you read his testimony -- correct --
17 in this case?
18   A.  I've read a lot of his -- you know, I
19 didn't -- I did not read every bit of his
20 deposition by no means.  But . . .
21   Q.  If you read his testimony, you would have
22 understood that he testified that he knew there
23 was a serious and potentially fatal bleeding that
24 was associated with Xarelto?
25   A.  Okay.  And -- and I feel sure he did.

Page 209

1    Q.  You also know that Mr. Boudreaux had the
2  risks of Xarelto explained to him by a nurse at
3  the hospital.
4    MR. DENTON:
5      Object to the --
6  BY MS. duPONT:
7    Q.  Fair?
8    MR. DENTON:
9      -- form.
10   THE WITNESS:
11     I -- I read in the record that a nurse
12     came by to give him education.
13 BY MS. duPONT:
14   Q.  Do you understand that she went over an
15 anticoagulation checklist with him?
16   A.  I did see that in the note.
17   Q.  And you read Mr. Boudreaux's deposition.
18 Fair?
19   A.  I read parts of it, not the whole thing.
20   Q.  And you understand that he testified that
21 he did sign the anticoagulation checklist?
22   A.  I -- yes.  I have no reason to doubt that
23 he signed it.
24   Q.  And the nurse who provided the counseling
25 to him and went over the anticoagulation

1 checklist, you understand that she testified that
2 she had warned Mr. Boudreaux about the serious
3 risk of bleeding?
4     MR. DENTON:
5         Well, slow down.  I object to the form
6     of the question.  Reading testimony from
7     someone, that's not -- you either impeach
8     or you show them the document.  That's
9     inappropriate form.
10     MS. duPONT:
11         Object to form, Roger.
12     MR. DENTON:
13         I -- I -- and I'm --
14     MS. duPONT:
15         Object to form.
16     MR. DENTON:
17         -- explaining to you what's wrong with
18     the form of your question.
19     MS. duPONT:
20         I don't need the explanation.  That's
21     all --
22     MR. DENTON:
23         But I -- but the --
24     MS. duPONT:
25         -- I'm saying.  I don't need --

1     MR. DENTON:
2         But the judge -- but the --
3     MS. duPONT:
4         -- the explanation.
5     MR. DENTON:
6         -- judge is going to need it when he
7     reviews this transcript, because you guys
8     are out of bounds on a lot of these
9     questions.
10     MS. MOORE:
11         Object to the comments of Counsel.
12     MR. DENTON:
13         Object to your comments.
14     MS. MOORE:
15         I'm sorry.
16 BY MS. duPONT:
17     Q.  You understand that there -- you would --
18 I'm sorry.
19     MS. duPONT:
20         I'm taking back another minute for
21     that.
22     MR. DENTON:
23         I'm giving you guys a minute, 34.
24 BY MS. duPONT:
25     Q.  So the nurse -- you understand, though,

1 that the nurse that went over the checklist with
2 him, she understood that there was a risk of
3 bleeding with Xarelto as well?
4     A.  I'm sure she did.
5     Q.  And she conveyed that risk to
6 Mr. Boudreaux?
7     MR. DENTON:
8         Object to the form.
9     THE WITNESS:
10         I feel sure she did.  I have no reason
11     to doubt that.
12 BY MS. duPONT:
13     Q.  And you have no reason to doubt that
14 Mr. -- or that Dr. Wong closely followed
15 Mr. Boudreaux after he put him on the Xarelto;
16 correct?
17     A.  I -- I can see that he -- you know,
18 I've -- I've read his notes from follow-up and it
19 certainly seemed to be an appropriate follow-up.
20     Q.  He saw him three times in -- in a
21 three-week period.  Fair?
22     A.  Right.  Correct.
23     Q.  And when Mr. Boudreaux presented with his
24 bleed in February of 2014, you would agree that he
25 had been experiencing symptoms of that bleed for

1 about a week --
2     MR. DENTON:
3         Object to the form.
4 BY MS. duPONT:
5     Q.  -- right?
6     A.  That seemed to be -- there -- there were
7 several notes, of course, written by various
8 physicians who saw him when he presented and was
9 admitted to the hospital.  And -- but -- but, you
10 know, reading all of those notes, it -- it seemed
11 to me that his symptoms had probably been going on
12 at least a week.  Certainly the -- the -- I guess
13 the most remarkable of the symptoms were going on
14 at least a week, is what it seemed.  Again,
15 pulling to -- I think one physician who saw him
16 said he had had three days history of -- of, you
17 know, some symptoms.  And then someone else said a
18 week.  And then I think someone else said, Well,
19 he did well for a couple of weeks, but then in the
20 last week he was having symptoms.  So, again, you
21 know, it seemed to me it must have been at least a
22 week.
23     Q.  And you would agree that if Mr. Boudreaux
24 had come to the hospital when he first began
25 experiencing those symptoms, he probably would

1 have had a shorter hospitalization stay?
2     MR. DENTON:
3         Object to the form.
4     THE WITNESS:
5         That, I -- I really -- you know, I --
6     I couldn't say one way or the other.  I
7     mean, certainly we'd always like to catch
8     somebody earlier rather than later so they
9     don't get as anemic, as -- as at risk
10     of -- of other problems.  But yeah, I
11     mean, how long his hospitalization would
12     have been, I -- you know, I couldn't --
13     couldn't answer.
14 BY MS. duPONT:
15     Q.  You've said several times today that it's
16 your opinion that you can't monitor patients on
17 Xarelto.  Is that an accurate representation of
18 your --
19     A.  That we --
20     Q.  -- summary?
21     A.  That's -- that is an accurate
22 representation, that we cannot adequately monitor
23 patients on Xarelto.
24     Q.  So you could not have used PT to monitor
25 Mr. Boudreaux.  Fair?

1     MR. DENTON:
2         Object to the form.
3     THE WITNESS:
4         With our current knowledge and lack of
5     validation studies, we really can't.  But
6     there is a lot of evidence that -- that
7     PT, particularly using certain reagents,
8     could be adapted for use as a monitoring
9     tool.  Now, again, that's with proper
10     study and proper validation, etcetera.
11     And we -- we don't have that.  That has
12     not been done.  That information's not
13     available to us as physicians.
14 BY MS. duPONT:
15     Q.  So in 2014, when Mr. Boudreaux was
16 prescribed Xarelto, you could not have used PT to
17 monitor him?
18     MR. DENTON:
19         Well --
20     THE WITNESS:
21         I --
22     MR. DENTON:
23         -- object to --
24 BY MS. duPONT:
25     Q.  Fair?

1     MR. DENTON:
2         -- the form.
3     THE WITNESS:
4         I agree with that.
5 BY MS. duPONT:
6     Q.  You said earlier that there needs to be a
7 disruption or some sort of injury in the GI tract
8 in order for there to be a bleed; correct?
9     MR. DENTON:
10         Object to --
11     THE WITNESS:
12         "Injury" might be too strong a word,
13     but a disruption of some sort, you know,
14     caused by -- and, you know, again, a GI
15     doc could probably speak to this better
16     than I can.
17         But when -- when -- when we begin to
18     lose blood, it's because there is a
19     disruption in the -- the -- the blood
20     vessel -- the -- the wall of the blood
21     vessel that allows blood to escape.  So,
22     you know, something had to disrupt it.
23     Could it be something as simple as food
24     passing through or -- or material passing
25     through the GI tract?  I mean, again, you

1 know, a GI doc could speak better to that
2 than I.
3         But, I mean, in the case -- and in
4     this particular case, using the
5     methodologies that were available at the
6     time of looking at the mucosal surface of
7     the gut from the stomach on down through
8     the colon, there was no obvious source or
9     no obvious disruption, ulcer, tumor,
10     whatever, that would have been an obvious
11     source of bleeding.
12 BY MS. duPONT:
13     Q.  But just simply because you couldn't find
14 that obvious source doesn't mean there wasn't a
15 source of bleeding there --
16     A.  That's correct.
17     Q.  -- correct?
18         So you can't rule out that there was some
19 underlying less obvious source of bleeding in
20 Mr. Boudreaux's case; correct?
21     MR. DENTON:
22         Object to the form.
23     THE WITNESS:
24         So -- right.  We can't -- you know, we
25     can't rule out, I think -- say it again.

Page 218

1  BY MS. duPONT:
2      Q. You can't rule out that there was some
3  underlying source that contributed to
4  Mr. Boudreaux's bleed; correct?
5      MR. DENTON:
6          Object to the form.
7      THE WITNESS:
8          Whatever source may have been there
9      was beneath the limit of detection of the
10     -- of the modalities that we have to look
11     at a GI tract.
12  BY MS. duPONT:
13     Q. And so -- but you can't rule out that
14  that -- that underlying source of bleeding was
15  there; correct?
16     MR. DENTON:
17         Object to the form.
18     THE WITNESS:
19         Right.
20  BY MS. duPONT:
21     Q. You said right?
22     A. Right. No. He -- he was bleeding from
23  his GI tract. The blood was coming from his GI
24  tract.
25     Q. Is it your opinion that it's less likely

Page 219

1  that Mr. Boudreaux would have bled on another
2  DOAC?
3      MR. DENTON:
4          Object. You know, you -- you guys
5      can't tag team and go back into the same
6      topics. That's against the rules. Object
7      to this question.
8  BY MS. duPONT:
9      Q. You can answer.
10     A. So can I hear the way you crafted the
11  question again?
12     Q. Is it your opinion that it was less likely
13  Mr. Boudreaux would have bled on a different DOAC
14  other than Xarelto?
15     MR. DENTON:
16         Object to the form.
17     THE WITNESS:
18         My opinion is that it would have been
19     less likely that he bled on another DOAC.
20  BY MS. duPONT:
21     Q. You --
22     A. But -- but it's just an -- less likely,
23  not zero percent chance; right? So . . .
24     Q. Every -- for -- for every anticoagulant --
25     A. For every anticoagulant -- right -- as

Page 220

1  we've already said. So . . .
2      Q. For every anticoagulant, there's a --
3  there's a risk of bleeding; correct?
4      A. That's correct.
5      Q. And for every anticoagulant, there's a
6  risk of GI bleeding; correct?
7      A. That's correct.
8      Q. And so you can never rule out that
9  Mr. Boudreaux would not have bled on another
10  anticoagulant. Fair?
11     MR. DENTON:
12         Object -- no.
13     THE WITNESS:
14         And we've already --
15     MR. DENTON:
16         Object to the form. We've --
17     THE WITNESS:
18         Yeah. Kind of covered that.
19     MR. DENTON:
20         -- been through this.
21     THE WITNESS:
22         Yeah. So -- so again, I think it was
23     less likely, not zero likely.
24  BY MS. duPONT:
25     Q. And because it's not zero likely, you

Page 221

1  can't rule that out. Fair?
2      MR. DENTON:
3          Well -- well -- that's not the
4      standard. You know it. I object to the
5      form. It's more likely than not.
6      MS. duPONT:
7          She's done a differential diagnosis.
8      And I'm trying to understand --
9      MR. DENTON:
10         Yeah. But you're in a legal --
11     MS. duPONT:
12         -- how she ruled it out.
13     MR. DENTON:
14         You're in a legal proceeding. So you
15     have to ask the questions within the rules
16     of the --
17     MS. duPONT:
18         No. I can ask whatever questions I
19     want. And you need to stop --
20     MS. MOORE:
21         Yeah.
22     MS. duPONT:
23         -- coaching your witness in your
24     objections.
25     MR. DENTON:

1    No. I'm trying to stop totally
2  inappropriate questions.
3    MS. duPONT:
4    No. You're not.
5    MR. DENTON:
6    Yeah. They -- you --
7    MS. duPONT:
8    You just don't --
9    MR. DENTON:
10    You --
11    MS. duPONT:
12    -- like the question.
13    MR. DENTON:
14    No. I love the questions. And I love
15  that you're both laughing at me. But
16  you're not going to get away --
17    MS. duPONT:
18    I get another minute.
19    MR. DENTON:
20    -- with totally inappropriate
21  questions.
22    MS. MOORE:
23    We're even smiling.
24    MR. DENTON:
25    You should be.

1    THE WITNESS:
2    So, I mean, we've covered that before.
3    MS. duPONT:
4    This isn't even working anymore.
5    MR. DENTON:
6    It stops at 5:25.
7    MS. duPONT:
8    Can I just take one -- one break?
9  And -- just give me one second. Okay.
10    MR. DENTON:
11    Is that your break?
12    MS. duPONT:
13    No.
14  BY MS. duPONT:
15    Q. Let me ask you one -- a few additional
16  questions.
17    How much less likely is it that
18  Mr. Boudreaux would not have bled on another DOAC?
19    MR. DENTON:
20    Object to the form.
21    THE WITNESS:
22    I have no way to estimate percent,
23    chance, risk, etcetera. I mean, you're --
24  BY MS. duPONT:
25    Q. Because that study hasn't been done.

1  Fair?
2    MR. DENTON:
3    Object to the form.
4    THE WITNESS:
5    Well, there are studies that have
6  looked at and assessed -- in -- population
7  studies that have assessed risks of
8  bleeding. And, you know, exact terms, no,
9  of course we can't say. But, you know, in
10  some of these studies, it would suggest
11  that there may be as much as a 50 percent
12  reduction in -- in -- in bleeding.
13    But again, there -- you know, a
14  definitive study would be one where we
15  compare head-to-head all three. And we
16  would love it if your company would pay
17  for that study, but no company is going to
18  pay for that study. So we're probably
19  never going to have that answer precisely.
20  Therefore, we have to use indirect
21  studies, population studies, etcetera, and
22  -- and do our best to interpret what those
23  are and analyze the -- that data.
24    MS. duPONT:
25    Yeah. I'm going to just move to

1  strike that answer as nonresponsive.
2    I am just going to take two minutes to
3  just go over my notes. I think we're
4  almost done, Doctor.
5    THE VIDEOGRAPHER:
6    The time now is 5:24 p.m. We are off
7  the record.
8    (Brief recess was taken.)
9    THE VIDEOGRAPHER:
10    The time now is 5:29 p.m. We are back
11  on the record.
12  BY MS. duPONT:
13    Q. Doctor, you agree that the addition of
14  aspirin is going to increase the bleeding for any
15  anticoagulant; right?
16    MR. DENTON:
17    Object to the form.
18  BY MS. duPONT:
19    Q. Increase the risk --
20    A. The -- the --
21    Q. -- of bleeding?
22    A. The combination of aspirin and
23  anticoagulant increases the risk of bleeding over
24  either of those alone.
25    Q. So sitting here today, you can't rule out

1  to a reasonable degree of medical certainty that
2  the aspirin was a contributing factor to
3  Mr. Boudreaux's bleed. Fair?
4      MR. DENTON:
5          Object to the form.
6      THE WITNESS:
7          So -- so, I mean, what we do know is
8      that he had been on aspirin since 2004 and
9      had not had any GI bleeding. And, you
10     know, I -- I believe that he's been on
11     aspirin since then. In fact, he went home
12     on aspirin after the Xarelto was
13     discontinued and did not have any GI
14     bleeding.
15         So I -- you know, can I say how much
16     the aspirin may have contributed to
17     bleeding? I think very little. But it
18     could have contributed some because it --
19     it -- it has some augmenting effects for
20     -- for -- on top of anticoagulation.
21 BY MS. duPONT:
22     Q. When you are talking to patients about an
23 anticoagulant, would you agree with me that you
24 talk about all the risks that could be out there
25 and -- and all the benefits that could be out

1  there for that medication?
2      MR. DENTON:
3          Object.
4      THE WITNESS:
5          Well --
6      MR. DENTON:
7          Object to the form.
8      THE WITNESS:
9          Sorry.
10         Again, you know, that "all" word is --
11     I mean, I -- to the -- to the best of my
12     ability, I go over with my patients what
13     the risks and the benefits are of -- of,
14     you know, any drug we start.
15         But it's -- you know, especially we
16     spend time with anticoagulants because --
17     because the risks on either end are great;
18     right? The -- the risks of clotting are
19     great, and the risks of bleeding are
20     great. And both of those things can be
21     life-threatening or limb-threatening
22     and . . . You know, so it's really
23     important that we go over that. So to the
24     best of my ability, I go over as much and
25     geared to what the patient can understand.

1  BY MS. duPONT:
2      Q. And you don't isolate one specific risk,
3  like GI bleeding, when you're talking to your
4  patients. Fair?
5      A. I do not.
6      Q. And you agree with me that the DOACs, as a
7  class, have a lower risk of intracranial
8  hemorrhage than warfarin --
9      MR. DENTON:
10         Object to --
11 BY MS. duPONT:
12     Q. -- correct?
13     MR. DENTON:
14         -- the form.
15     THE WITNESS:
16         Let's -- I mean, I -- let's talk about
17     Xarelto. I -- I -- I am not convinced
18     that Xarelto has a lower risk of
19     intracranial hemorrhage than warfarin --
20     than well-controlled warfarin does. So
21     again, I think -- unfortunately I think
22     the studies that we have that compare
23     Xarelto to -- to warfarin in the -- in the
24     A-fib setting, the ROCKET trial, was a --
25     was -- Xarelto was being compared to a

1  very poorly controlled warfarin group.
2  BY MS. duPONT:
3      Q. But in the ROCKET trial, there was a
4  statistically significant lower risk of
5  intracranial hemorrhage in Xarelto users versus
6  warfarin users?
7      MR. DENTON:
8          Well, I --
9  BY MS. duPONT:
10     Q. Fair?
11     MR. DENTON:
12         Object.
13     THE WITNESS:
14         In -- no. In -- I think it's very
15     important to make a distinction: When
16     compared to very poorly controlled, a
17     group of poorly controlled warfarin users.
18         And -- and -- and I think that that --
19     you know, that is the problem with the
20     ROCKET trial, that -- amongst others, but
21     mainly that, that the time in therapeutic
22     range was very low in the ROCKET trial
23     compared to certainly other
24     DOAC-versus-warfarin trials, and compared
25     to even good -- you know, good standard

Page 230

1  management in anticoagulation clinics such
2  as those in North America.  And -- you
3  know, and when that separate analysis was
4  done in -- in the U.S. patient population,
5  where the time in therapeutic range was
6  63 percent, comparable to what other
7  studies are, the -- the risks of -- of
8  major hemorrhage, including intracranial
9  hemorrhage, was not greater -- was not
10 less in Xarelto than in warfarin.
11     And -- and so -- so I have great
12 concerns about that.  And -- and -- so
13 that -- that -- those are the reasons why
14 I do not agree with that statement.
15 BY MS. duPONT:
16   Q.  But, Doctor, you're -- you're aware that
17 the FDA was aware that there was a 55 percent TTR
18 in ROCKET --
19     MR. DENTON:
20        Well, wait a minute.  Wait.
21 BY MS. duPONT:
22   Q.  -- right?
23     MR. DENTON:
24        Stop.  Stop.  We're not going back to
25 her generic deposition.  Ask about her --

Page 231

1     MS. duPONT:
2        I just am asking a follow-up to her
3  answer that was fairly large -- and
4  largely nonresponsive.
5     MR. DENTON:
6        Julie, don't raise your voice.  The
7  first question should have been objected
8  to as being outside the scope of the
9  Boudreaux case.
10       And I will raise this again:  We have
11 got a deal that we don't go back to the
12 generic issues.  We're in a case-specific.
13 That's the deal.
14    MS. MOORE:
15       Counsel, the witness --
16 BY MS. duPONT:
17   Q.  The F -- the FDA approved the medication
18 for Xarelto; correct?
19   A.  That's not in question.  The FDA clearly
20 approved it.
21    MR. DENTON:
22       We wouldn't be here if they didn't.
23 BY MS. duPONT:
24   Q.  With the knowledge that the TTR was at
25 55 percent.  Fair?

Page 232

1     MR. DENTON:
2        Object to the form.
3  THE WITNESS:
4        I would assume -- I'm sure that the
5  FDA was aware of that.
6  MS. duPONT:
7        Thank you.  I don't think we have any
8  further questions.  Thank you.
9  MR. DENTON:
10       You're kidding me.
11 THE WITNESS:
12       Wonderful.
13 MS. duPONT:
14       Go.
15 THE VIDEOGRAPHER:
16       The time now is --
17 MS. duPONT:
18       Get off.
19 MS. MOORE:
20       Go.
21 THE VIDEOGRAPHER:
22       -- 5:34 p.m.  Today's --
23 MS. duPONT:
24       Get your -- get your flight.
25 MS. MOORE:

Page 233

1  Get Uber.  Do you have Uber?
2  THE VIDEOGRAPHER:
3        -- deposition of Dr. Cindy Leissinger
4  consisting of two disks is now concluded.

1       CHANGES AND SIGNATURE
2 WITNESS NAME: CINDY A. LEISSINGER, M.D.
3 DATE OF DEPOSITION: Thursday, December 8, 2016
4
5 PAGE LINE    CHANGE     REASON
6 ____ ____ _____ _____
7 ____ ____ _____ _____
8 ____ ____ _____ _____
9 ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 ____ ____ _____ _____
20 ____ ____ _____ _____
21 ____ ____ _____ _____
22 ____ ____ _____ _____
23 ____ ____ _____ _____
24 ____ ____ _____ _____
25 ____ ____ _____ _____

1      C E R T I F I C A T E
2   This certification is valid only for
3 a transcript accompanied by my original signature
4 and original seal on this page.
5   I, AURORA M. PERRIEN, Registered Professional
6 Reporter, Certified Court Reporter, in and for the
7 State of Louisiana, as the officer before whom
8 this testimony was taken, do hereby certify that
9 CINDY A. LEISSINGER, M.D., after having been duly
10 sworn by me upon the authority of R.S. 37:2554,
11 did testify as hereinbefore set forth in the
12 foregoing 235 pages; that this testimony was
13 reported by me in the stenotype reporting method,
14 was prepared and transcribed by me or under my
15 personal direction and supervision, and is a true
16 and correct transcript to the best of my ability
17 and understanding; that the transcript has been
18 prepared in compliance with transcript format
19 guidelines required by statute or by rules of the
20 board; and that I am informed about the complete
21 arrangement, financial or otherwise, with the
22 person or entity making arrangements for
23 deposition services; that I have acted in
24 compliance with the prohibition on contractual
25 relationships, as defined by Louisiana Code of

1     WITNESS' CERTIFICATE
2
3   I have read or have had the foregoing
4 testimony read to me and hereby certify that it is
5 a true and correct transcription of my testimony
6 with the exception of any attached corrections or
7 changes.
8
9
10
11
12
13
14
15
16
17
18 _____
19    WITNESS' SIGNATURE
20
21
22
23 PLEASE INDICATE
24 [] NO CORRECTIONS
25 [] CORRECTIONS; ERRATA SHEET(S) ENCLOSED

1 Civil Procedure Article 1434 and in rules and
2 advisory opinions of the board; that I have no
3 actual knowledge of any prohibited employment or
4 contractual relationship, direct or indirect,
5 between a court reporting firm and any party
6 litigant in this matter nor is there any such
7 relationship between myself and a party litigant
8 in this matter. I am not related to counsel or to
9 the parties herein, nor am I otherwise interested
10 in the outcome of this matter.
11
12
13
14
15    AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25