Protected - Subject to Further Protective Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO            )
(RIVAROXABAN) PRODUCTS     )
LIABILITY LITIGATION       )  MDL No.:  2592
                           )  Section:  L
                           )  Judge Eldon E. Fallon
                           )  Mag. Judge North
                           )
THIS DOCUMENT RELATES      )
TO ALL CASES               )




PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

VOLUME I


    Videotaped Deposition of LAURA M. PLUNKETT,

Ph.D., taken on Tuesday, December 6, 2016, in the

office of The Lambert Firm, A.P.L.C., 701 Magazine

Street, New Orleans, Louisiana 70130, commencing

at 8:02 a.m.




Reported by:
AURORA M. PERRIEN
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

Protected - Subject to Further Protective Review

## Page 2

```
1              I N D E X
                          Page
2
    Caption.............................1
3
    Appearances......................4
4
    Agreement of Counsel...............6
5
    Witness' Certificate...............543
6
    Reporter's Certificate.............544
7
8       E X A M I N A T I O N
9
    MR. IRWIN..........................9
10
    MR. HOROWITZ......................109
11
12
13      E X H I B I T S
14  Exhibit No. 1.......................19
    Full Prescribing Information
15
    Exhibit No. 2.......................19
16  Highlights of Prescribing Information
17  Exhibit No. 3.......................20
    Medication Guide, Xarelto tablets
18
    Exhibit No. 4
19  List of Testimony for Dr. Laura M.
    Plunkett, Ph.d. DABT
20
    Exhibit No. 5.......................25
21  Defendants' Notice with Subpoena Duces
    Tecum of Oral Videotaped Deposition...
22
    Exhibit No. 6.......................26
23  Integrative Biostrategies (invoices)
24  Exhibit No. 7.......................35
    Expert Report of Laura M. Plunkett,
25  Ph.D., D.A.B.T
```

## Page 3

```
1       Exhibit No. 8.......................230
    2.7.2 Summary of Clinical Pharmacology
2   Studies, Rivaroxaban
3   Exhibit No. 9.......................296
    Approaches to Demonstrate Bioequivalence
4   of Narrow Therapeutic Drug Index Drugs
5   Exhibit No. 10......................306
    "Therapeutic Equivalence of Generic
6   Drugs - Response to National Association
    of Boards of Pharmacy"
7
    Exhibit No. 11......................314
8   "A novel, rapid method to compare the
    therapeutic windows of oral
9   Anticoagulants using the Hill coefficient"
10  Exhibit No. 12......................405
    In Vitro Diagnostic Testing for Direct
11  Oral Anticoagulants on 10/26/15
12  Exhibit No. 13......................410
    Extract of the FDA Feedback STA -
13  Rivaroxaban Calibrator & Control
14  Exhibit No. 14......................415
    FDA Draft Briefing Document for the
15  Cardiovascular and Renal Drugs Advisory
    Committee (CRDAC)
16
    Exhibit No. 15......................442
17  "Laboratory assessment of rivaroxaban:
    a review"
18
    Exhibit No. 16
19  "Clinical Pharmacokinetic and
    Pharmacodynamic Profile of Rivaroxaban"
20
21
22
23
24
    **Reporter's Note: Exhibit Nos. 4 and 16 were
25  marked but not identified on the record.
```

## Page 4

```
1          A P P E A R A N C E S
2   REPRESENTING PLAINTIFFS:
3   SCHLICHTER, BOGARD & DENTON, L.L.P.
    BY:  ROGER DENTON, ESQ.
4   100 South 4th Street, Suite 1200
    St. Louis, Missouri 63102
5   314.621.6115
    Rdenton@uselaws.com
6
    GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
7   WARSHAUER, L.L.C., at times noted
    BY:  GERALD E. MEUNIER, ESQ.
8   1100 Poydras Street, Suite 2800
    New Orleans, Louisiana 70163-2800
9   504.522.2304
    Gmeunier@gainsben.com
10
11
12  REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
    INC., and BAYER PHARMA AG:
13  KAYE SCHOLER, L.L.P.
    BY:  JEFFREY H. HOROWITZ, ESQ.
14  250 West 55th Street
    New York, New York 10019-9710
15  212.836.7572
    Jeffrey.horowitz@kayescholer.com
16
    BRADLEY, ARANT, BOULT, CUMMINGS, L.L.P.
17  BY:  LINDSEY C. BONEY, IV, ESQ.
    1819 Fifth Avenue North
18  Birmingham, Alabama 35203-2119
    205.521.8914
19  Lboney@bradley.com
20
21
22
23
24
25
```

## Page 5

```
1   REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
    JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
2   ORTHO, L.L.C.:
3   IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
    BY:  JAMES B. IRWIN, ESQ.
4   400 Poydras Street, Suite 2700
    New Orleans, Louisiana 70130-3280
5   504.310.2106
    Jirwin@irwinllc.com
6
    IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
7   BY:  MEERA U. SOSSAMON, ESQ.
    400 Poydras Street, Suite 2700
8   New Orleans, Louisiana 70130-3280
    504.310.2106
9   Msossamon@irwinllc.com
10
11  ALSO PRESENT:
12  MELISSA BARDWELL, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 6

 1          S T I P U L A T I O N
 2      It is stipulated by and among Counsel that
 3  the videotaped deposition of LAURA M. PLUNKETT,
 4  Ph.D., is being taken under the Federal Rules of
 5  Civil Procedure for all purposes permitted under
 6  the law.
 7      The formalities of reading and signing are
 8  not waived.
 9      The formalities of sealing, certification
10  and filing are not hereby waived.  The party
11  responsible for services of the discovery material
12  shall retain the original.
13      All objections, except those as to the
14  form of the questions and/or the responsiveness of
15  the answers, are reserved until the time of the
16  trial of this cause.
17          * * * * *
18      Aurora M. Perrien, Certified Court
19  Reporter, Registered Professional Reporter, in and
20  for the State of Louisiana, officiated in
21  administering the oath to the witness.
22
23
24
25

Page 7

 1          P R O C E E D I N G S
 2  THE VIDEOGRAPHER:
 3      We are now on the record.  The date
 4  today is December 6th, 2016.  The time now
 5  is approximately 8:02 a.m.  This videotape
 6  deposition is being held in New Orleans,
 7  Louisiana, taken in the matter of Xarelto
 8  (rivaroxaban) Products Liability
 9  Litigation.  The deponent today is
10  Dr. Laura Plunkett.
11      Would counsel present please introduce
12  themselves and state their affiliations
13  for the record.
14  MR. DENTON:
15      Yes.  Good morning.  Roger Denton on
16  behalf of the plaintiffs.
17  MR. MEUNIER:
18      Jerry Meunier for the plaintiffs.
19  MR. IRWIN:
20      Jim Irwin for Janssen.
21  MS. SOSSAMON:
22      Meera Sossamon for Janssen.
23  MR. HOROWITZ:
24      Jeffrey Horowitz for Bayer.
25  MR. BONEY:

Page 8

 1      Lindsey Boney for Bayer.
 2  THE VIDEOGRAPHER:
 3      The court reporter today is
 4  Aurora Perrien, and she will now swear in
 5  the witness.
 6  (The court reporter swore in the witness.)
 7  MR. IRWIN:
 8      I believe we are in receipt of a
 9  cross-notice from Philadelphia; is that
10  right?  And the plaintiffs' cross-notice
11  for the Pennsylvania consolidated
12  proceeding is premature because case
13  discovery of the bellwether cases has not
14  yet commenced in Pennsylvania, nor have
15  expert reports been served.  And
16  specifically the Pennsylvania plaintiffs
17  have not yet served the expert report for
18  this witness.
19      Plaintiffs' cross-notice also fails to
20  take into account the expert protocol that
21  was agreed to among the parties in the MDL
22  proceeding and entered as an order by the
23  court.  Among other things, this protocol
24  limits the depositions of generic experts
25  to seven hours total.  In the spirit of

Page 9

 1  cooperation between the federal MDL
 2  proceeding and Pennsylvania consolidated
 3  proceeding, however, defendants will not
 4  object to plaintiffs' cross-notice for the
 5  deposition.  This is being done with full
 6  reservation of rights and objections
 7  pending negotiation of a mutually
 8  acceptable process for expert discovery in
 9  the Pennsylvania cases.
10          E X A M I N A T I O N
11  BY MR. IRWIN:
12      Q.  Good morning, Dr. Plunkett.
13      A.  Good morning.
14      Q.  Can you please tell us what you did to
15  prepare for this deposition today.
16      A.  I reviewed the report that had been filed
17  back in October, I believe, of this -- of 2016.  I
18  pulled out some of the references that were cited
19  to refresh my memory on some of the key issues in
20  my opinions.  I prepared or I pulled out my new
21  trial list, which I have brought today to provide
22  to you, which has an additional depo on it, so
23  that you can have that.  I checked to make sure my
24  CV had no new entries since October, and it did
25  not.  Essentially that's -- that's it other than I

Protected - Subject to Further Protective Review

Page 10

1    had a short meeting with plaintiffs' counsel
2    yesterday.
3        Q.  What references did you pull to refresh
4    your recollection?
5        A.  I pulled some of the references that I
6    have cited in my -- in certain paragraphs.  You
7    want me to tell you the paragraphs?
8        Q.  Please.
9        A.  That may be the easiest --
10       Q.  Yeah.
11       A.  -- way to do --
12       Q.  Yeah.
13       A.  -- it.
14           These are the background references.  So
15   they're discussed in Paragraphs 10 through 29.
16   And then I -- I have printed -- most of those I
17   think are printed --
18       Q.  Okay.
19       A.  -- here today too because I thought they
20   might come up.
21       Q.  The -- excuse me.
22       A.  I was --
23       Q.  Yeah.
24       A.  And I was going to say:  And then in
25   addition there, I think there were a few

Page 12

1    at the -- the summary -- the section that
2    discusses the relationship between prothrombin
3    time and concentrations of rivaroxaban, and then
4    also some of the discussion of the -- of the issue
5    related to major bleeding or bleeding events in
6    the -- in the ROCKET trial.
7        Q.  Did you look at any new documents that
8    were not either listed in your report or in your
9    materials reviewed list?
10       A.  No.
11       Q.  In your meeting with plaintiff counsel
12   recently, which we'll talk about in a little bit,
13   did -- did they present you with any new documents
14   to look at or to discuss that were not contained
15   either in your report or in your list of materials
16   reviewed?
17       A.  I can't tell you if they weren't in my
18   list of material -- materials reviewed because I
19   didn't -- I didn't -- didn't look at that.  We did
20   discuss some of the -- some documents that I know
21   are in my list of materials reviewed that were not
22   cited in my report.  So there's some background --
23   there's some other documents that are -- I guess
24   have similar -- similar areas to what I've cited,
25   but I didn't cite.

Page 11

1    in another -- in some -- in the -- maybe in the
2    opinion section starting on Page 26, Paragraph 45.
3        Q.  Are these background references generally
4    speaking literature, that sort of thing?
5        A.  Yes.  The ones that I printed out are
6    published literature.
7            And then I also reviewed some of the
8    references.  I didn't print those out, some of the
9    references that I cite that dealt with the -- the
10   FDA review of the product.  I think --
11       Q.  Okay.
12       A.  -- I cite the --
13       Q.  The summary review?
14       A.  Yes.  And also some --
15       Q.  Yeah.
16       A.  -- of the other documents from the FDA
17   website.  There -- there's -- there's a series of
18   documents that have to do with approval of the two
19   -- of two of the NDAs that I looked at.
20       Q.  Okay.
21       A.  And I cited those in my report.  And I
22   didn't read the -- didn't read them in any detail.
23   I just refreshed my memory for some of the -- some
24   of the sections that I -- I think I talk about
25   the -- the pharmacokinetics conclusions.  I looked

Page 13

1        Q.  And can you -- can you tell me as best as
2    you can remember what those documents were that
3    you reviewed with plaintiff counsel that are in
4    your materials reviewed but not specifically
5    decide -- cited in your report?
6        A.  I don't know all of them.  I can't recall
7    all of them as I sit here.  But certainly I know I
8    looked at some of the other Mueck documents,
9    M-U-E-C-K.  He has several.
10       Q.  Uh-huh.  Yeah.
11       A.  And I think I think I have four or five of
12   them in my materials reviewed list.  And I have
13   looked -- I -- I think I cite the 2014 article,
14   and I went back and looked at some of the other
15   papers that are essentially referred to in that
16   2014 article.
17       Q.  Were these pharmacokinetic and
18   pharmacodynamic-type documents that you were
19   looking at?
20       A.  Yes.  Because that's the area of -- if you
21   look at my opinions, you know, I focused on the
22   regulatory issues related around that -- those
23   particular points within the dataset and the
24   clinical data.
25       Q.  Would that be a fair -- would it be a fair

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

1    judgment to say that the core of your report and
2    opinions deals with pharmacokinetics and
3    pharmacodynamics?
4        A.  And regulatory issues regulated to those.
5    Because I talk about adequacy of the labeling.  So
6    it -- but yes.  Scientific basis within the
7    labeling that I'm talking about deal with either
8    pharmacokinetics or pharmacodynamic issues related
9    to Xarelto.
10       Q.  And do your labeling opinions deal with
11   the adequacy of labeling with respect to that
12   subject matter, pharmacokinetics and
13   pharmacodynamics?
14       A.  In general terms, yes.  Those would be --
15   I think I -- I give you very specific discussion
16   of -- of opinions.  I talk about the adequacy
17   related to discussion of -- or the lack of
18   discussion about the relationship with prothrombin
19   time as a -- as a measurement tool for --
20       Q.  Right.
21       A.  -- assuring safety.  I think I talk with
22   you about the -- at least in the original labels
23   the -- there's been some changes in 2015.  But in
24   2011, 2012, '13, '14, there was less information
25   provided about the clinical data having to do with

Page 15

1    safety issues related to bleeding.  So those are
2    things I can think of as I sit here.
3        Q.  Can I take a quick look at the references
4    that you did pull?
5        A.  Yeah.  Sure.  There's also -- I -- I
6    copied some labeling.  Do you want that too?
7        Q.  Let me just look at the references
8    first --
9        A.  Oh.
10       Q.  -- please.  We'll just . . . I'm just
11   going to go through this list and just describe
12   the title and the lead author.
13       A.  That's fine.
14       Q.  Is that okay?
15       The "Importance of" a -- "of
16   Pharmacokinetic Profile and Variability" -- and it
17   goes on -- by Gong, G-O-N-G.  "Assessment of the
18   impact of rivaroxaban on coagulation" by Douxfils.
19   That's D-O-U-X-F-I-L-S.  "Laboratory assessment of
20   rivaroxaban" by Samama.  That's the 2013 article.
21   "A randomized direct comparison of the
22   pharmacokinetics and pharmacodynamics of apixaban
23   and rivaroxaban" by Frost.  "Drugs with narrow
24   therapeutic index" by Blix, B-L-I-X.  "Drug-Review
25   Deadlines and Safety Problems" by Carpenter.  "A

Page 16

1    novel, rapid method to compare the therapeutic"
2    window "of oral anticoagulants" by Chang,
3    C-H-A-N-G.  "Diagnosis and Management of Chronic
4    Kidney Disease" by Dousdampanis.  I'll spell that.
5    D-O-U-S-D-A-M-P-A-N-I-S.  Maybe it's Dousdampanis.
6    "New oral anticoagulants" by Fenger, F-E-N-G-E-R,
7    hyphen, Eriksen.  "Era Of Faster FDA Drug
8    Approval" by Frank.  "P-glycoprotein:  a defense
9    mechanism limiting oral bioavailability" by Fromm,
10   F-R-O-M-M.
11       Dr. Plunkett, just jump in if you think
12   I'm mischaracterizing, accidentally miss --
13   misstating any of these materials.  I know you --
14       A.  No.  I'm -- I'm so -- I mean, I'm familiar
15   with the --
16       Q.  Yeah.
17       A.  -- most of the titles.
18       Q.  Okay.
19       A.  I don't think you're reading the entire
20   title for all.  But --
21       Q.  I am not.
22       A.  -- if you give the authors even, I know --
23       Q.  Yeah.
24       A.  -- what you're talking about --
25       Q.  I am --

Page 17

1        A.  -- and the year.
2        Q.  That is correct.  I'm not reading the
3    entire title.
4        "Computational tools for fitting the Hill
5    equation to dose-response curves" by Gadagkar,
6    G-A-D-A-G-K-A-R.  "Population Pharmacokinetics and
7    Pharmacodynamics of Rivaroxaban" by Girgis,
8    G-I-R-G-I-S.  "Practical guidance for using
9    rivaroxaban in patients with" a-fib by Haas,
10   H-A-A-S.  "Timing of new Black Box Warnings" by
11   Lasser, L-A-S-S-E-R.  "Role of P-Glycoprotein in
12   Pharmacokinetics" by Lin, L-I-N.  "Urgent
13   monitoring of direct oral anticoagulants" by
14   Lippi, L-I-P-P-I.  "The Effect of Cytochrome" P540
15   -- pardon me -- "P450 Metabolism on Drug Response"
16   by Lynch.  "Cofactor Proteins in the Assembly and
17   Expression of Blood Clotting" by Mann, M-A-N-N.
18   "Comparison of the Efficacy and Safety of Two
19   Rivaroxaban Doses" by Mega, M-E-G-A.  "Clinical
20   Pharmacokinetic and Pharmacodynamic Profile of
21   Rivaroxaban" by Mueck, 2013 article.  "Clinical
22   usefulness of measuring prothrombin time and
23   soluble fibrin levels in Japanese patients" by
24   Nakano.  "Rivaroxaban versus Warfarin in
25   Nonvalvular" -- Nonvalvular Atrial Fibrillation"

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1    by Patel, P-A-T-E-L. "In vitro and in vivo
2    studies of the novel antithrombotic agent BAY 59,"
3    dash, "7939" by Perzborn, P-E-R-Z-B-O-R-N. An
4    article from -- it looks like "Reviews," "Bleeding
5    with dabigatran, rivaroxaban, and apixaban," "No
6    antidote, and little clinical experience."
7        A.  The author of that is -- I think they just
8    list it as Review Prescrire, which is -- I think
9    they don't -- I think they're silent to the actual
10   authors.
11       Q.  Thank you.  I think that's right.  I'll
12   just say it was from the Prescrire International
13   June 2013 volume.
14       Next, "An observational case . . . of
15   dabigatran and rivaroxaban exposures" by
16   Stevenson.  Next, "Comparative efficacy and safety
17   of . . . novel oral anticoagulants" by Ufer,
18   U-F-E-R.  Next, "Letter to the Editors," "Is the
19   dose of dabigatran really more predictable than
20   warfarin" by Wright, W-R-I-G-H-T.  And finally,
21   "Laboratory monitoring of rivaroxaban and
22   assessment of its bleeding risk" by Zhang,
23   Z-H-A-N-G.
24       And, Doctor, I'm going to hand these back
25   to you.  One of my colleagues may want to look at

Page 19

1    this in a while.  I'm not sure.
2        And can you hand me the labeling?  And
3    we'll do the same thing.
4        A.  I just printed three --
5        Q.  Okay.
6        A.  -- different documents.
7        Q.  I think I will mark these.  I'm going to
8    call -- mark the first one Plunkett 1.
9        (Exhibit No. 1 was marked for
10       identification and attached hereto.)
11   BY MR. IRWIN:
12       Q.  And can you tell me what Plunkett 1 is,
13   please?
14       A.  This would be the original labeling for
15   the indication for atrial fibrillation.
16       Q.  Back in 2011?
17       A.  Yes.  I think it's November maybe or
18   September.  I'm not -- I think it's November.
19       Q.  And then Exhibit 2 looks to be the label
20   revised September 2015; is that correct?
21       (Exhibit No. 2 was marked for
22       identification and attached hereto.)
23       THE WITNESS:
24       Yes.
25   BY MR. IRWIN:

Page 20

1        Q.  And Exhibit 3 is the medication guide,
2    revised May 2016; is that right?
3        (Exhibit No. 3 was marked for
4        identification and attached hereto.)
5        THE WITNESS:
6        Yes.  I believe.  Well, let me see
7    that.  Hold on.
8    BY MR. IRWIN:
9        Q.  Why don't you look and tell us.
10       A.  Yes.
11       Q.  Okay.
12       A.  Do you need these back or . . .
13       Q.  Why don't you hang on to them for a while.
14       A.  Okay.
15       Q.  Okay?  You mentioned that you have a new
16   trial or deposition list --
17       A.  Yes.
18       Q.  -- that you were going to hand to me
19   or . . .
20       A.  I left that with Mr. Denton.
21       Q.  Okay.
22       MR. DENTON:
23       Sorry about that, Jim.
24       MR. IRWIN:
25       It's okay.

Page 21

1        THE WITNESS:
2        It has just one additional entry since
3    the one that -- from the October report.
4    BY MR. IRWIN:
5        Q.  It's just an additional deposition?  Is
6    that what it is, or is --
7        A.  No.  It's a -- it's a -- it's -- was a
8    trial appearance.
9        Q.  Okay.
10       MR. DENTON:
11       Make sure that's right.  (Tenders
12       document.)
13       THE WITNESS:
14       Yes.
15       MR. IRWIN:
16       Thank you.
17       THE WITNESS:
18       Oops.  Sorry.
19   BY MR. IRWIN:
20       Q.  And this is the Tobin Horn versus
21   Edward Liscombe case?
22       A.  Yes.
23       Q.  And what kind of case was that, please?
24       A.  A medical malpractice case.
25       Q.  Did it involve any drug or device?

6 (Pages 18 to 21)

Protected - Subject to Further Protective Review

Page 22

1     A. Yes.
2     Q. What was the drug or device that it
3   involved?
4     A. Involved lisinopril.
5     Q. And was that company -- who was the make
6   -- what's the maker of that medicine?  Who's the
7   maker?
8     A. Well, it's a generic.  And I don't -- so
9   it was a generic drug.  So it was not a company
10  being sued.  It was a doctor being sued.
11    Q. Okay.
12    A. Well, actually a physician practice,
13  because it was a physician's assistant who
14  actually inappropriately prescribed a dose of
15  the --
16    Q. So --
17    A. -- the dose of the drug.
18    Q. -- you testified on behalf of the
19  plaintiff, Tobin Horn?
20    A. Yes.  About the -- the failure to follow
21  the prescribing information and the labeling for
22  the drug, for the -- for the patient as a first
23  time exposure and then a adverse reaction that was
24  angioedema in the GI tract of the affected person.
25    Q. Did you express the opinion that

Page 23

1   prescription breached the standard of care?
2     A. Well, I don't do standard of care.  I was
3   doing background information and then describing
4   the known relationship between lisinopril as dose
5   increases.  So this is -- it's a toxic -- was a
6   toxicity discussion, that if you give as an
7   initial dose 20 milligrams when the labeling tells
8   you to start at 5 or 10, that there's a reason why
9   you get a more severe toxic reaction in the
10  individual than you would if you had started at
11  the lower dose.
12    Q. And you do not express medical malpractice
13  opinions because you're not a medical doctor; is
14  that correct?
15    A. Well, I have worked on medical malpractice
16  cases.  But you're correct.  I don't do standard
17  of care because I'm not a physician.  That's true.
18    Q. And when was your meeting with plaintiff
19  counsel?
20    A. Yesterday.
21    Q. And who was there?
22    A. Mr. Denton and Ms. Jeffcott from the
23  Lambert Firm and then very, very late, Mr. Meunier
24  joined us.
25    Q. And where did this --

Page 24

1     MR. MEUNIER:
2       Did you have to say "very, very late"?
3   THE WITNESS:
4       I'm sorry.  In other words --
5   MR. MEUNIER:
6       I was looking for one very.
7   MR. DENTON:
8       He showed up in his [inaudible].
9   THE WITNESS:
10      He wasn't late.  I -- I had not I
11  guess expected him to be here.  So I
12  should say that he -- he did appear at the
13  end, introduced himself mainly to me.  I
14  have not ever met him before.
15  BY MR. IRWIN:
16    Q. And where did this meeting take place?
17    A. In this room here in the Lambert Firm.
18    Q. And about how long did it last?
19    A. Three or four hours maybe.
20    Q. And when you had this meeting, did you go
21  over any internal Janssen documents?
22    A. Other than the labeling, which I don't --
23  it -- it is a Janssen document, but certainly is
24  not confidential.  No.  We did not go over, I
25  don't believe, any internal -- what I consider

Page 25

1   confidential documents.
2     Q. Next, let me show you the notice of
3   deposition.  Have you seen it yet in this case?
4     A. Yes.  I have seen it.
5     Q. Okay.
6     A. And I've seen the response from
7   plaintiffs' attorneys as well.
8     Q. Yeah.
9       And have you seen the -- the requested
10  information on the list listed on the -- on the
11  deposition notice?
12    A. Yes.  It -- I -- as typically, it has one.
13  Yes.
14    Q. Yeah.  All right.  Let me show you that,
15  which we've identified as Plunkett No. 5.
16      (Exhibit No. 5 was marked for
17      identification and attached hereto.)
18  BY MR. IRWIN:
19    Q. And let's go down that list on Exhibit A.
20  It shouldn't take too long.
21      Number 1 is your most current CV.  You've
22  given us the update to that; correct?
23    A. Well, it's -- there is no update.  So I
24  did --
25    Q. Okay.

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1     A. -- not -- I -- I can -- I can bring you
2  the exact same one again.  I actually brought a
3  copy.  But --
4     Q. I --
5     A. -- there's no change.
6     Q. I stand corrected.
7        Time records and invoices.  Have you kept
8  any time records in preparing your report?
9     A. I have invoices, and I have brought those
10 for you, which have a record of the days that I --
11    Q. Okay.
12    A. -- worked on the case.
13       MR. IRWIN:
14          And Roger's got those.
15       MR. DENTON:
16          (Tenders document.)
17       MR. IRWIN:
18          Thank you.
19 BY MR. IRWIN:
20    Q. I'm going to identify them collectively as
21 Plunkett 6 and ask you a few questions about them.
22       (Exhibit No. 6 was marked for
23        identification and attached hereto.)
24 BY MR. IRWIN:
25    Q. These invoices were issued to

Page 27

1  Ned McWilliams at Levin Papantonio.  And why was
2  -- why -- why are those sent to him?
3     A. He was the attorney that initially
4  contacted me to see if I was willing to assist in
5  the litigation.
6     Q. And when did he contact you,
7  approximately?
8     A. Sometime in 2015.
9     Q. 2015?
10    A. Yes.
11    Q. Can you estimate or give me a time frame
12 in 2015 when he reached out to you?
13    A. Probably right before I signed the
14 confidentiality protective order, which I believe
15 is dated -- my -- my signature I believe was
16 August of 2015.
17    Q. Do you have a copy of that with you?
18    A. No.  I didn't bring that.  I assumed that
19 you had that.
20    Q. August of 2015?
21    A. Yes.
22    Q. Okay.  And when did you start actually
23 reviewing materials and working?
24    A. Well, there's -- I started reviewing
25 materials back in 2015 because I first had to see

Page 28

1  whether I could -- was able to work on the case.
2  So as typical, I do some initial review of
3  information provided to see if there is opinions
4  that I could express that I -- that the plaintiffs
5  would like to have me express.  So I did -- that
6  -- so that work is not charged for, some of that
7  initial work.
8        I think on this case I spent a little more
9  than usual initially.  I probably spent six hours
10 -- five or six hours of time looking at some of
11 the internal company documents, the FDA website
12 documents, and a little bit of -- I did a -- I may
13 have done even an initial literature search at the
14 time.
15    Q. And was this your first exposure to any
16 cases involving novel anticoagulants?
17    A. No.
18    Q. Had you also had experience working with
19 respect to the Pradaxa litigation?
20    A. I did some initial work in the Pradaxa
21 litigations.
22    Q. And who retained you in the Pradaxa
23 litigation?
24    A. I don't know who actually paid the bills.
25 I can't remember that.  Although I did -- again, I

Page 29

1  was contacted by Mr. McWilliams.  I also worked
2  with a law firm there out of New York,
3  Douglas . . .
4     Q. Douglas & London?
5     A. That's it.  Yes.
6     Q. Were those the two main law firms you
7  worked with, with Levin Papantonio and
8  Douglas & London on Pradaxa?
9     A. Those are the -- the attorneys that I can
10 recall.  Yes.  I know that there were many other
11 attorneys involved in litigation.  But -- and I
12 know that at one time I had -- I was on a phone
13 call with many of them.  But I don't -- I don't
14 recall -- I only ever had a lot of direct
15 interactions with Mr. McWilliams or Lara Say at
16 Douglas.
17    Q. And were you actually retained to provide
18 expert services in the Pradaxa litigation?
19    A. I was retained to -- start work, yes.
20 And I did do some -- some work, but it never was
21 finalized.  The case settled.
22    Q. And did you get paid to do some of that
23 work?
24    A. Yes.  I did -- I -- I was paid for some of
25 the work that I did.

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1    Q.  And -- and -- and the gist of what your
2    work was was to express opinions on behalf of the
3    plaintiffs against the defendant, the maker of
4    Pradaxa?
5         MR. DENTON:
6             Object to the form of the question.
7         THE WITNESS:
8             I was hired to -- as a pharmacologist
9         and pharm -- mainly there, not -- I wasn't
10        doing regulatory work.  I was doing
11        pharmacology work.  And I was asked to
12        look at the -- some of the pharmacology
13        and pharmacokinetics issues related to the
14        litigation.  And I was working on behalf
15        of the plaintiffs.  Yes.
16   BY MR. IRWIN:
17        Q.  And do you remember who the defendant was?
18        A.  The company?
19        Q.  Yes.
20        A.  Boehringer Ingelheim, I believe.  But I
21   don't -- I don't remember the -- the names of the
22   attorneys, though.  Because again, I never had a
23   deposition.  I didn't finalize the report.
24        Q.  And did you -- did you come to any
25   opinions regarding pharmacokinetics or

Page 31

1    pharmacodynamics of Pradaxa?
2         A.  I have reviewed some literature and I had
3    -- was starting to form opinions, but I had not
4    finalized my opinions.  So I don't -- I can't tell
5    you -- I -- I mean, I did start to draft a report.
6    But I can't even recall.  All that was destroyed,
7    as required by the protective order.
8         Q.  Did you form any opinions regarding
9    Pradaxa's -- the quality or lack thereof of -- of
10   Pradaxa?
11        A.  I don't know what you mean by "quality or
12   lack thereof."
13        Q.  Safety and efficacy.
14        A.  Well, I certainly have had opinions
15   generally about Pradaxa and the -- and the novel
16   oral anticoagulants.  I don't recall any specific
17   opinions I had.
18             But certainly, yes, I did.  I -- I had --
19   what I had done at the point before the -- the
20   work was complete -- where I stopped work was I
21   mainly looked at the published medical literature
22   at that point in time and -- but I had also looked
23   at some internal company documents at that time
24   related to clinical development.  And I was
25   essentially going through those when we were told

Page 32

1    to stop work.
2         Q.  And what was the opinion that you formed
3    regarding Pradaxa before you ceased working on it?
4         MR. DENTON:
5             Jim, I'm -- excuse me, Laura.  I'm
6         going to have to object.  This is the
7         subject of a dispute -- disputed motion
8         that's pending, as you know.  And she's
9         just testified that she looked at internal
10        company documents.  And we believe because
11        of that, it would violate Judge Herman's
12        order in the Pradaxa litigation that she
13        is still subject to, to tell you about any
14        preliminary assessment she made.  And I
15        think it would be very unlikely she could
16        separate that from the public literature
17        search and the internal clinical
18        documents.  So I believe until
19        Judge Fallon resolves that disputed issue
20        or the parties come to some consensus on
21        that disputed issue, that it would be
22        inappropriate for her to answer those
23        questions.  And I would instruct her not
24        to answer those questions for those
25        reasons, because it would violate the

Page 33

1    confidentiality -- confidentiality order.
2    I think it's amended CMO2 in the Pradaxa
3    litigation.
4         MR. IRWIN:
5             Thank you.  Please note our objections
6         to that instruction.
7    BY MR. IRWIN:
8         Q.  Turning back to the -- to the invoices,
9    the first invoice is dated July 31, 2016.  And
10   there's one August 31, 2016; September 30, 2016;
11   and October 31, 2016.  Those four invoices, do
12   they comprise all of the invoices that you have
13   sent to plaintiff counsel in this Xarelto
14   litigation?
15        A.  Yes.  In the MDL, yes.
16        Q.  And I take it that you have not yet
17   submitted a November -- end of November invoice;
18   is that correct?
19        A.  I don't believe I have.  I was holding it
20   in order to -- since this was going to happen
21   before Christmas, I'm just going to send at -- one
22   invoice for the work, preparation --
23        Q.  All right.
24        A.  -- for the deposition and the deposition
25   itself.

9  (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1      MR. HOROWITZ:
2          Merry Christmas, Roger.
3      MR. DENTON:
4          We hope that your client ends up
5      paying it.
6  BY MR. IRWIN:
7      Q. Ballpark, it looks to me like you've
8  billed so far about $18,000. Does that sound
9  about right to you?
10     A. Whatever those add up to. But that sounds
11 about right.
12     Q. And do you know how much you would
13 anticipate billing Mr. McWilliams for the work for
14 the rest of the year?
15     A. Well, I don't know how -- I don't know the
16 exact number. But certainly it'll be -- for my
17 prep time, it was probably an additional 10 to
18 15 hours, so that's another -- times 300. So
19 $4,000, $4500 probably and then whatever the
20 deposition is.
21     Q. What's your billable rate or your hourly
22 rate for deposition?
23     A. For time giving the deposition, $400 an
24 hour.
25     Q. Is that the same as your rate for

Page 35

1  testifying at trial?
2      A. Yes.
3      Q. Number 3 on the -- on the -- on the -- on
4  the list, Exhibit A, Plunkett No. 5, is all --
5  your complete file in connection with your -- the
6  services you've provided.
7          Did you bring your complete file?
8      A. It had already been provided to you. So
9  no, I did not bring anything additional. When I
10 submitted my report, I provided you with
11 information on everything that I had reviewed and
12 -- and/or relied upon.
13     Q. So everything that you reviewed is listed
14 in your report, either in the narrative of the
15 report or in the list of materials reviewed?
16     A. Yes. And -- right. Exactly.
17     Q. And that -- that together with your report
18 is your complete file?
19     A. Yes.
20     Q. Next is all documents furnished to the
21 witness for review. Might as well go ahead and
22 identify your report at this point, which I will
23 identify as Plunkett 7.
24         (Exhibit No. 7 was marked for
25         identification and attached hereto.)

Page 36

1      MR. IRWIN:
2          (Tenders document.)
3      MR. DENTON:
4          Thank you.
5  BY MR. IRWIN:
6      Q. And let's look at Appendix C, materials
7  reviewed. Okay?
8          That's an 18-page list of materials
9  reviewed; is that correct?
10     A. Yes.
11     Q. And can you tell me which of these
12 materials were furnished to you by plaintiff
13 counsel and what --
14     A. Anything -- oh.
15     Q. Excuse me.
16         -- and which of them were collected by,
17 researched, or assembled by you?
18     A. So anything with a Bates number would have
19 been provided by plaintiffs' counsel, so things
20 that have Xarelto in caps and then go from there.
21 Anything that is a published medical article, I --
22 I retrieved on my own. And I retrieved the
23 approval package summary, all of the FDA reviews
24 that are on the web site for the two NDAs that I
25 cite, the original NDA for the -- the drug and

Page 37

1  then the atrial fibrillation indication NDA.
2      Q. Do you remember what the original
3  indication was for the first NDA?
4      A. For deep vein thrombosis. So -- and then
5  I also retrieved some of the 510k documents that
6  dealt with the in-ratio device. They're listed on
7  Page 2, the -- with K numbers.
8      Q. Do you say anything in your report about
9  the N -- the Alere device?
10     A. No. I did not -- I was not asked to
11 provide testimony and opinions related to the
12 performance of the device.
13     Q. May I safely assume that you will not get
14 on the witness stand and express any opinions
15 about the Alere POC device?
16     A. It's not planned at this time. I can't
17 tell you what you won't ask me or Mr. Denton will
18 ask me. But that isn't something -- if you read
19 my report, that's not something that I at this
20 point in time have formed specific opinions on
21 and -- and are ready to express at trial.
22     Q. If you changed your approach and mind on
23 that, you would most certainly let us know so that
24 we would not get surprised; is that right?
25     A. Absolutely. Yes.

Protected - Subject to Further Protective Review

Page 38

1    Q.  But for the time being, for today's
2  exercise, you have no opinions on that subject.
3  Is that fair?
4    A.  I have formed no -- no opinions on that
5  subject.  That is true.  Other than I am aware
6  that -- what the device was used for, because it
7  was referenced within the clinical trail for
8  ROCKET as the point-of-care device that was
9  used --
10    Q.  Right.
11    A.  -- for blinding to warfarin.  So . . .
12    Do you want me to tell you what else I
13  retrieved on my own or --
14    Q.  Yes.
15    A.  And then there would be labeling, so from
16  the FDA website.  When I talk about the labels on
17  Page 5 of my list, I talk about the labels from
18  2011, '14, '15 and then the '16 medication guide.
19  Those are things I -- I retrieved from the FDA
20  website or was able to get from the FDA website.
21    I also -- well, any -- any reference to
22  CFR documents, those are ones that -- that I
23  identified and -- and pulled on my own.
24    There are some -- some documents that --
25  that are referred to as slides.  Some of those

Page 39

1  slides are available publicly.  I don't know that
2  all of them were -- were available publicly.  But
3  certainly I know some of them are ones I pulled
4  off the site.  And --
5    Q.  There are a number of Bayer and Janssen --
6    MR. DENTON:
7    Jim, I don't think she was done.  If
8  you --
9    MR. IRWIN:
10    Oh.  I -- I apologize.
11    THE WITNESS:
12    That's okay.
13  BY MR. IRWIN:
14    Q.  No.  Keep going.
15    A.  All right.
16    Q.  I don't want to cut you off.
17    A.  All right.  And then there is some
18  documents referred to as Institute for -- ISMP
19  documents.  Those are ones that I got off the web
20  site for that particular group, where they
21  reviewed NOACs or -- or the oral anticoagulants,
22  including Xarelto.  And let me make sure.  I think
23  that's -- probably gives you all the general
24  areas.  Hold on.  Yes.  I think that's -- those
25  would give you an idea of the general things that

Page 40

1  I had retrieved on my own.
2    Q.  You were also provided a number of
3  internal documents with Bayer and Janssen Bates
4  numbers?
5    A.  Yes.
6    Q.  And those are listed on Pages 6 through
7  14?
8    A.  Yes.  But some are also listed before
9  that.  So --
10    Q.  Yes.
11    A.  -- Page 5 has -- and -- 5, 4, 3, and on
12  Page 2, there's also some of those.  Yes.
13    Q.  And with respect to Janssen, did you --
14  did you refer to any of those internal Janssen
15  documents in your report?
16    A.  I'd have to look.  I can't tell you off
17  the top of my head.
18    Q.  I wish --
19    A.  You want me --
20    Q.  I wish --
21    A.  -- to look?
22    Q.  -- you would.  Yeah.
23    A.  The only Janssen documents I believe I
24  referred to would be the labeling, which were not
25  protected confidential documents.

Page 41

1    Q.  So the answer to my question is no, you
2  did not refer to any of the internal Janssen
3  documents with the Bates numbers from Pages 7
4  through -- what did I say -- 14 in your report?
5    A.  That have Janssen in the title, yes.  I --
6  it's my understanding that some of -- that these
7  documents were related to Janssen as well as to
8  Bayer.  But certainly, yes, I did -- if -- if
9  you're asking about the title, the ones I refer to
10  have the Xarelto BHCP or BP -- starts with BP
11  Bates numbers, are the ones that I saw when I just
12  went through my report.
13    Q.  Well, looking at the long list of Janssen
14  documents beginning on Page 7 and going through
15  Page 14, can you identify any of those that you
16  relied upon in preparing anything in your report?
17    A.  I'd have to -- I'd have to look at them
18  again to tell you.  I mean, certainly anything in
19  my list was reviewed and relied upon if it's -- if
20  that area is mentioned.  There's many documents
21  that are not within the areas that I have
22  testified to.  So I guess that's how -- maybe the
23  best way to describe them.
24    There's many documents -- so, for example,
25  I don't -- I don't -- usually I put in my

11 (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

1 paragraphs -- when I'm citing internal company
2 documents, I might say "e.g.," which means that
3 there may be more than one document that I've
4 reviewed. But certainly there are -- I know many
5 of those documents were relevant and I did rely on
6 them, but they weren't specifically cited. And
7 when I say "rely," they gave me important
8 background information, for example, and maybe
9 context for information that I was reviewing, even
10 within the published medical literature.
11    Q. As we look at this list from Page 7 to 14,
12 can you tell me what any of these documents say?
13    A. No. I'd have to pull them. I -- I -- I
14 haven't memorized Bates numbers with content. No.
15    Q. Do you know how many pages of documents
16 these -- these accounted for?
17    A. Thousands of pages.
18    Q. Thousands or tens of thousands?
19    A. I -- I'm -- I'll just characterize it as
20 thousands. I -- I -- I couldn't tell you an exact
21 number. I haven't gone back and tried to account
22 by -- page by page for the number of document --
23 number of pages that are in each document.
24    Q. Okay. Number 5 on Exhibit A of Plunkett 5
25 is all documents were created by the witness.

Page 43

1       Aside from your report and materials that
2 we've just gone over in your report, which is I
3 guess -- what did we call that? Plunkett 7?
4    A. Yes.
5    Q. Did you prepare any other documents? Did
6 you create any other papers?
7    A. Other than billing, no.
8    Q. Okay.
9    A. And -- and trial list.
10    Q. Number 6, all documents reviewed or relied
11 upon, I think we've gone over that; correct?
12    A. I believe so. Yes.
13    Q. Number 7, photographs, videotapes,
14 audiotapes.
15       Did you review or have any of those kinds
16 of materials?
17    A. No. Photographs -- it's possible there
18 was a photograph within one of the confidential
19 documents, maybe of a label. But I -- I don't
20 recall there being any photographs or videotapes
21 or audiotapes that I could particularly point you
22 to.
23    Q. And did you prepare any such materials?
24    A. No.
25    Q. Number 8 is all documents reflecting

Page 44

1 factual observations and tests that were prepared
2 by or under your direction.
3       Did you prepare anything like that?
4    A. No.
5    Q. Number 9 is all facts and data and
6 assumptions that plaintiffs' counsel provided to
7 you and that you considered for forming your
8 opinions.
9       And is that all contained in the materials
10 reviewed?
11    A. Yes. Other than we certainly had some
12 oral conversations early on, which I couldn't give
13 you the -- the details other than I was asked to
14 look at issues related to pharmacology and
15 pharmacokinetics related to Xarelto.
16    Q. And No. 10 is your -- we'll talk about --
17 your list of -- of testimony and -- and expert
18 reports that you've done in the last four years;
19 is that right? That's attached to your report?
20    A. Yes. Actually I think I go back
21 five years. But yes, it's there.
22    Q. Okay. Number 11 is all reports given by
23 you in response to Request No. 10.
24       Did you bring that material?
25    A. Yes. I only have one report, which is the

Page 45

1 one that you have been provided. This is my first
2 deposition and my first report.
3    Q. Number 10 asked for all the reports that
4 you have given on the list of reports that you --
5 on -- on the list of litigation that you provided.
6    A. That's -- what -- what number are you on?
7 Number --
8    Q. I'm sorry.
9    A. -- 11?
10    Q. It's No. 11. Excuse me.
11    A. Oh.
12    Q. All -- all --
13    A. No. I -- I did not bring those. No. I
14 did not bring -- you're asking me for reports in
15 other litigation?
16    Q. Yes.
17    A. No. I have not brought those.
18    Q. And why not?
19    A. Because I typically don't bring those. If
20 -- if there's a particular one that you need, I'd
21 have to know whether or not it's subject to a
22 protective order. And many times in -- in
23 litigation, I've -- well, almost all drug
24 litigation, once the cases have settled, I'm --
25 I'm required to destroy my file, including my

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1  report.  But if there's one that isn't, I'd have
2  to check with the attorney if I still have it.
3      Q.  Number 12 is documents sufficient to
4  identify all research grants you've received
5  involving the study of atrial fibrillation and/or
6  the prevention or treatment of venous
7  thromboembolism and/or anticoagulation treatment.
8          Have you ever been given any such research
9  grants?
10     A.  No.
11     Q.  Number 13 is all articles or papers
12  written or presented by you concerning Xarelto.
13     A.  I have not written a peer -- a peer --
14  I -- I assume you were -- you were referring to
15  peer-reviewed publications, and no.  Or public
16  presentations, and I have not.
17     Q.  Any continuing medical education-type
18  presentations?
19     A.  On Xarelto specifically, no.
20     Q.  Any presentations presented to plaintiff
21  lawyers at lawyer meetings?
22     A.  No.  I don't do that typically.
23     Q.  Number 14 is all documents concerning the
24  research that you have undertaken that relates to
25  or concerns the subject matter of your testimony

Page 47

1  in the Xarelto litigation.
2          Did you do any research involving Xarelto?
3      A.  If by "research," you're talking about my
4  research to prepare my report, I brought you the
5  documents that I reviewed and relied upon.  And I
6  -- are you talking about something other than
7  that?
8      Q.  Have you done any research independent of
9  this opinion on Xarelto?
10     A.  Yes.  I have.
11     Q.  What did you do, and when did you do it?
12     A.  So maybe four years ago I researched all
13  of the oral anticoagulants for my mother-in-law,
14  who was being -- doctor wanted to switch her from
15  warfarin to a oral anticoagulant.
16     Q.  And what was the result of that research?
17     A.  The result was I went and talked to the
18  physician about the -- her particular, who she
19  was, why he wanted to switch her, and who -- where
20  she was well-controlled, and looking at the risk
21  factors she had for use of these drugs.  Because
22  she at the time was 87, had a pacemaker, heart --
23  severe heart disease with stents, but also had a
24  propensity to fall.  She's -- has some balance
25  issues.  So I was concerned about the bleeding

Page 48

1  risk with the drugs as well as the issue of
2  changing her when she had been on warfarin for
3  over a decade, if not 15 years well-controlled.
4      Q.  And what did the doctor want to change her
5  to?
6      MR. DENTON:
7          You know, Jim, I -- I think it's
8  inappropriate to ask about medical private
9  family stuff.  I -- I just don't think
10 that's appropriate.  And I don't -- you
11 know, if -- if you want to ask her what
12 the research was, I think that's fair
13 game.  But to get into her mother --
14 mother-in-law's medical care and
15 conversations with their personal
16 physician is out of bounds, and I'm going
17 to tell her not to answer these questions.
18 MR. IRWIN:
19     Note my objection.
20 BY MR. IRWIN:
21     Q.  What was your recommendation as to what
22 should be done as to whether she should stay on
23 warfarin or go to a novel anticoagulant?
24     A.  Well, I didn't make a recommendation
25 because I'm not her physician.  I had a discussion

Page 49

1  with her physician about the choices.  So my
2  recommendation was, Let's look at the choices and
3  look at her.  And that's what I was doing with the
4  physician.  I went over -- she lives in Atlanta.
5  I went over and -- and had a -- went to her
6  doctor's visit and talked.  Because she was
7  confused about why all of a sudden changing
8  something in her -- her regimen.
9      Q.  And as a pharmacist -- pharmacologist,
10 what was your opinion as to what was the proper
11 decision here?
12     A.  The proper decision was to -- to look at
13 her as an individual, which is what I felt the
14 doctor was not doing.  So it was -- I did not tell
15 him what to do.  I talked to him about the
16 pharmacology.  He actually was not that familiar
17 with these drugs, and he had -- was essentially
18 just -- when he had somebody like her, he was
19 making decisions based on the one that he had the
20 most experience with versus looking at her -- I
21 felt looking at her as an individual.  So that was
22 my concern.  And that's -- was the discussion that
23 I had with the -- with the physician.
24         But essentially she had to decide with her
25 doctor.  It was still her decision in the end,

13  (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1    what -- what she decided she wanted to do.  But I
2    wanted the discussion to be more detailed than him
3    -- than her going in and just saying, Whatever you
4    want to do.
5        Q.  And did you keep any records of this
6    research you did on the NOACs?
7        A.  No records other than I had papers in my
8    files.  Because I had pulled some papers on all of
9    the drugs in order to talk with him.
10       Q.  And which drugs did you actually pull
11   papers on?
12       A.  I think I pulled only on dabigatran,
13   Pradaxa, Xarelto, and Eliquis at the time.
14   Because I believe those were the only three that
15   were available.  And I don't know that Eliquis
16   even had an atrial fibrillation indication.  I'd
17   have to go back and look.  But we did discuss
18   Eliquis.
19       Q.  And did you have any concerns about either
20   dabigatran or rivaroxaban?
21       A.  Well, I had -- I had concerns from the
22   aspect of where she fit best, and that was my --
23   the -- my issue.  I had not formed the opinions
24   related to the adequacy of the labeling at that
25   time.  But I certainly was looking specifically at

Page 51

1    the pharmacology and who she was as an individual,
2    what was her physiology, and trying to allay her
3    fears about -- about changing to a new drug.  She
4    doesn't like change.
5        Q.  And did you form any opinions on the
6    pharmacology of those -- of those NOACs?
7        A.  General opinions.
8        But -- but it's things that -- that -- and
9    when I say "formed opinions," there -- there were
10   things I already knew about the drugs.  I was
11   familiar with these drugs from -- as a
12   pharmacologist, when new classes of drugs are
13   introduced, I read the medical literature.  So I
14   knew when these oral anticoagulants were coming
15   out, what -- what generally they were being used
16   for, the different targets, what the proposed
17   advantages and disadvantages were.
18       But I hadn't formed any specific opinion
19   about any particular drug at that time other than
20   for her.  It wasn't looking at it as a -- as a
21   litigation concern, you know, whether or not
22   the -- the label was adequate for physicians to be
23   able to talk to their patients.  I was really just
24   looking at what was the drug, what -- what were
25   the -- what were the pharmacokinetics.  Because I

Page 52

1    was concerned with that:  renal function issues,
2    metabolism issues.  And that was the discussion we
3    had with the --
4        Q.  And --
5        A.  -- doctor.
6        Q.  -- did you come to a decision at least in
7    your own mind as to what was preferable for her?
8        A.  Not -- it -- not that one particular was
9    preferable for her.  But I did believe that --
10   that we needed to worry about her compliance
11   issues.  We needed to worry about her falls.  And
12   we needed to -- with no antidote.  And we needed
13   to worry about the issue of -- that she was upset
14   about changing.  Again, she doesn't like change.
15   And so for her, she was -- was concerned about
16   that.  I -- I think she also had friends who were
17   taking different drugs, other -- other friends of
18   hers that were taking some of the other orals.
19   And, you know, so she had -- just didn't know
20   about them other than other people were taking
21   them and she needed to find out.
22       Q.  And did she stay on warfarin or change?
23       MR. DENTON:
24        Jim, now we're not going to talk about
25       her mother's -- her mother-in-law's

Page 53

1        medical care.  I -- that's out of bounds.
2        It violates her mother's privacy.  And I'm
3        going to object and instruct her not to
4        share the specific treatment of her
5        mother.
6        MR. IRWIN:
7         Note our objection.
8    BY MR. IRWIN:
9        Q.  Number 15 is copies of all affidavits,
10   report and sworn testimony, whether at deposition
11   or trial or otherwise, that relate or concern the
12   subject matter of your testimony in Xarelto.
13       I assume there is nothing responsive to
14   that?
15       A.  I have not brought any such documents.
16   And on sworn testimony, I don't have copies of
17   depositions.  Because typically I send -- I send
18   those back.  But I haven't brought any reports
19   from any of the other litigation that deal with,
20   for example, cardiovascular effects, things like
21   that.
22       Q.  Okay.  In what areas do you consider
23   yourself to be an expert?
24       A.  I'm a pharmacologist, toxicologist, human
25   health risk assessment, individual, and I also

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1    have expertise in the FDA regulation of -- of
2    products. I also have expertise in the regulation
3    of products by other federal agencies that -- that
4    deal with toxicology, such as the Environmental
5    Protection Agency.
6         Q. You're not an epidemiologist, are you?
7         A. I don't have a degree. But I have
8    expertise, and it's a tool I use every day in my
9    work.
10        Q. You've never been trained in epidemiology,
11   have you?
12        A. I've never been in a training program.
13   No. But I have taken courses in epidemiology.
14        Q. Have you ever been employed by the FDA?
15        A. Not as an employee. No.
16        Q. Have you ever been asked by the FDA to
17   give opinions on labeling issues?
18        A. Not by the FDA. No.
19        Q. Have you ever been hired by the FDA as a
20   consultant?
21        A. No.
22        Q. Have you ever been asked by the FDA to
23   review individual adverse event reports?
24        A. No.
25        Q. Have you ever been asked by the FDA to

Page 55

1    review any sort of case reports?
2         A. No.
3         Q. Have you ever been asked by the FDA to
4    give any opinions on labeling?
5         A. No.
6         Q. Have you ever published anything in the
7    peer-reviewed literature regarding prescription
8    drug regulations?
9         A. I have two book chapters that deal with
10   these issues, but certainly not -- I don't have a
11   -- an article in a journal.
12        Q. Those book chapters are not peer-reviewed,
13   are they?
14        A. Well, I consider them to be peer-reviewed
15   because they were reviewed by the editors, and the
16   editors in the two book chapters that I'm talking
17   about had specific expertise in the area that I
18   wrote in.
19        Q. You know what a -- you know what a
20   peer-reviewed medical journal is, don't you?
21        A. Yes. And I -- that's why I answered the
22   question the way I did.
23        Q. And so you have never published anything
24   in a peer-reviewed medical journal regarding
25   prescription drug regulations; is that correct?

Page 56

1         A. That is correct.
2         Q. Have you ever published anything in a
3    peer-reviewed medical journal regarding the FDA
4    approval process of prescription medications?
5         A. No.
6         Q. Have you ever sat in and participated on
7    any FDA committee?
8         A. No.
9         Q. Have you ever testified in front of the
10   FDA advisory committee?
11        A. Advisory committee, no. I've done
12   presentations before the FDA on behalf of my
13   clients, but not at an advisory committee meeting.
14        Q. Has the FDA ever consulted with you on any
15   prescription label?
16        A. No.
17        Q. Do you hold any boarding or certification
18   or academic degree in regulatory affairs?
19        A. No. I have experience and training, but
20   not -- I don't hold a degree or a certification
21   such as the RAC certification.
22        Q. Have you ever consulted with any
23   pharmaceutical company on the content of their
24   labeling?
25        A. General terms, yes.

Page 57

1         Q. Who?
2         A. At -- at ENVIRON, when we were working
3    with our clients, the data that we were -- we were
4    often hired to look at science issues that related
5    to labeling. So the issue there would be that we
6    had -- that we addressed with the companies was
7    whether or not the science issue we were
8    addressing would have an impact on their labeling.
9         Q. Was this with and for any drug companies?
10        A. Yes. At ENVIRON -- at ENVIRON, yes,
11   because we worked with all of the -- well, not
12   all. We worked with a lot of the major companies
13   through FDA regulatory attorneys.
14        Q. What companies did you work for at
15   ENVIRON?
16        A. The companies that I can -- that I can
17   list for you, many of them may not have the same
18   name. I'll just warn you of that. Because
19   there's been a lot of mergers in the industry. So
20   we worked for Schering-Plough, for Merck, for
21   Abbott, for Eli Lilly, for Johnson & Johnson, for
22   maybe McNeil -- I'm not sure on McNeil -- for
23   Glaxo Wellcome at the time. Those are the ones
24   off the top of my head. And -- and then several
25   other companies that were smaller. There was a

Protected - Subject to Further Protective Review

Page 58

1    couple of companies that -- for example, one where
2    we actually drafted and -- and submitted parts of
3    an NDA for a company out of France, and I can't
4    think of the name of the company there.  They were
5    -- they were actually sponsoring their -- the drug
6    on their own, not through a U.S. company.
7        Q.  Did ENVIRON actually bill
8    Johnson & Johnson for work that ENVIRON did for
9    Johnson & Johnson?
10       A.  No.  They always worked -- I believe that
11   the work for Johnson & Johnson was through a FDA
12   regulatory attorney.  So we would -- the attorney
13   would approach F -- ENVIRON about an issue.  And
14   then we would work though the attorney as -- as
15   privileged with Johnson & Johnson.  I don't recall
16   a specific project with Johnson & Johnson.
17   However, I do know that there were times that we
18   worked directly for companies.  So --
19       Q.  And what attorneys did you work for on
20   behalf of Johnson & Johnson?
21       A.  Oh, I couldn't --
22       Q.  Can you name me one?
23       A.  No.  I can't give you a name.
24       We worked for -- ENVIRON worked for most
25   of the major food and drug law firms in DC.  And

Page 59

1    again, they've changed names as well.  But I'd
2    have to -- I'd have to go back and look at my
3    records to tell you the names.
4        Q.  And what Johnson & Johnson drugs did you
5    work on?  Name --
6        A.  I can't -- I --
7        Q.  Name me one.
8        A.  I can't -- I can't discuss the specifics
9    because those were all confidential projects,
10   as --
11       Q.  You --
12       A.  -- as I've testified before.
13       Q.  Did you ever work on a drug for
14   Johnson & Johnson that went to market?
15       A.  I -- I can't answer that.  I don't --
16   first off, I don't recall the specifics of the
17   work.  But even if I did, I wouldn't be able to
18   give you the -- the -- that answer.  Because
19   again, our work was confidential almost all the
20   time, which is why we work through attorneys to
21   provide help to most of the companies we work for.
22       Q.  As part of that work, did you ever talk to
23   anybody at Johnson & Johnson?
24       A.  I don't recall.  Can't answer that.  I
25   don't know.  It's possible on a phone call, but I

Page 60

1    don't recall.
2        Q.  And when did you do this work for
3    Johnson & Johnson?
4        A.  Would have been when I was -- I don't know
5    the exact date, but it would have been during the
6    time period I was at -- there, where I was
7    actually at ENVIRON's Washington, DC office.  So
8    it would have probably been sometime between 1989
9    and very, very late '92.  I left the Washington
10   office and moved to Houston's ENVIRON office in
11   December of 1993 -- I mean -- sorry, 1992.
12       Q.  When did you start testifying for
13   plaintiff lawyers against drug companies?  What
14   year did that start?
15       MR. DENTON:
16           Object to the form.
17       THE WITNESS:
18           I took a -- probably my first
19       plaintiff case, which wasn't just for drug
20       company -- I don't think it was a drug
21       company case -- would have been in 2001,
22       2002.
23   BY MR. IRWIN:
24       Q.  My question was:  When did you start
25   testifying for plaintiff lawyers against drug

Page 61

1    companies?  What year did that begin?
2        MR. DENTON:
3           I object to the form of the question.
4        THE WITNESS:
5           It -- I -- plaintiff work started
6       after 2001.  At ENVIRON, we never worked
7       for plaintiffs.  It was a corporate
8       policy.  But I can't answer the question
9       specifically.  I know if -- if -- I know
10      some of the -- the first work I did in the
11      drug area for plaintiffs attorneys was in
12      phenylpropanolamine, which probably goes
13      back to '03, '04.  But I -- I don't -- I
14      can't give you an exact date.
15   BY MR. IRWIN:
16       Q.  That was a cold medicine, over-the-counter
17   cold medicine?
18       A.  It -- well, it was in cold medicines.  It
19   was also in allergy medicines as well.
20       And I worked on projects where several
21   companies were involved.  So different products --
22   because it was used in a variety of different
23   products, there were at least two or three
24   different companies that were involved.
25       Q.  You've been disqualified as a labeling

Protected - Subject to Further Protective Review

Page 62

1    expert on several occasions, haven't you?
2         A. I don't believe I've ever been totally
3    disqualified. I've had limitations placed in
4    certain cases only on my opinions. Yes.
5         Q. What kind of limitations have been placed
6    on your opinions by judges?
7         MR. DENTON:
8              Object to the form of the question.
9         THE WITNESS:
10             I can't give you all of the details.
11        I can tell you the ones that I -- I have
12        talked about before, because I actually
13        remember the -- I -- I was actually
14        consulted with attorneys about the orders
15        or was at trial.
16             So there was a case involving Baycol
17        back in two thousand and -- I want to say
18        that was probably '03, '04, '05, sometime
19        in that time range, where I was not
20        allowed to state what labeling change
21        would be -- a physician would like to see,
22        specific wording. So I was not allowed to
23        do that. But I have done that since then.
24        It was just this case in -- this was a
25        judge in Mississippi.

Page 63

1              And I believe in Vioxx, there were
2         some limitations, but I don't know what
3         they were.
4    BY MR. IRWIN:
5         Q. Do you know who the judge was that put the
6    limitations on your testimony in Vioxx?
7         A. I don't. No.
8         Q. Do you know where the litigation was
9    pending?
10        A. I don't know. I don't know whether it was
11   state or federal court. I can't answer that for
12   you.
13        Q. And what was the nature of the limitations
14   that were placed on you in the Vioxx litigation?
15        A. I don't --
16        MR. DENTON:
17             Object to the form of the question.
18        THE WITNESS:
19             I answered that for you. I don't
20        know. I didn't see the order. I just --
21        and that never went to -- I never went to
22        trial. The cases all settled. So it was
23        not -- it was not something where I
24        actually went to trial and provided
25        opinions.

Page 64

1              Whereas the Baycol case, the reason I
2         recall it is we were at trial and we were
3         doing the voir dire, and the judge was
4         asking areas of opinions and made some
5         rulings there at the trial.
6    BY MR. IRWIN:
7         Q. Well, were you concerned that a judge
8    limited your opinion to testify about labeling in
9    the -- in the -- in the Baycol case?
10        MR. DENTON:
11             Object to the form.
12        THE WITNESS:
13             I don't know I was concerned. I mean,
14        I believe that I have the expertise and
15        the qualifications to provide labeling
16        opinions. And I have done it in many,
17        many venues without limitation. I think
18        it depends on, you know, the specific
19        case, the specific judge. Also I think it
20        depends in part on the expertise of the
21        attorneys that are -- are -- that are
22        presenting you as well.
23   BY MR. IRWIN:
24        Q. Do you think the attorneys in that Baycol
25   litigation dropped the ball?

Page 65

1         MR. DENTON:
2              Jim, come on. This is out of bounds.
3         I object to the form.
4         MR. IRWIN:
5              No. No. It is not --
6         MR. DENTON:
7              The -- the form --
8         MR. IRWIN:
9              -- out of bounds.
10        MR. DENTON:
11             -- of the question are -- is -- is
12        becoming I think a bit sarcastic. You can
13        ask factual questions. But I think the
14        way you're asking the question is -- is --
15        is inappropriate.
16   BY MR. IRWIN:
17        Q. Did you think the attorneys dropped the
18   ball and let you end up with a judge in the Baycol
19   litigation from Texas who limited your testimony?
20        A. Well, it wasn't --
21        MR. DENTON:
22             Object to the form.
23        THE WITNESS:
24             -- Texas. It was Mississippi. And
25        no, I -- and I -- I can't say that they

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    dropped -- I didn't form an opinion that
2    they dropped the ball.  I don't believe
3    they did.  I'm just -- as I answered your
4    question, I'm describing for you I think
5    the factors that affect whether or not
6    limitations are put on.
7    BY MR. IRWIN:
8        Q.  Well -- but you were also excluded from
9    testifying not only about labeling in Baycol in
10   Mississippi, but you were also precluded from
11   testifying about Baycol in Texas as well.
12       Tell us about that?
13       MR. DENTON:
14           Object to the form.
15       THE WITNESS:
16           I'm not aware of that.  I can't -- I
17           don't -- I have no -- I never went to -- I
18           don't recall ever going to a trial in
19           Texas for Baycol, only in Mississippi.  So
20           I can't answer that.  I don't know.
21   BY MR. IRWIN:
22       Q.  Do you remember saying this, quote:  I was
23   -- I was excluded from making particular
24   statements, yes.  I mean, not on everything.  I
25   testified in a case, but certainly there were

Page 67

1    specific things the judge did not want me to talk
2    about.
3        Question:  And one of those things the
4    judge in that case didn't let you talk about were
5    the warnings; is that right?
6        Answer:  I don't know specifically.  I
7    know I didn't talk about warnings.
8        Do you remember that?
9        MR. DENTON:
10           Jim, if you're going to impeach her --
11       THE WITNESS:
12           No.
13       MR. DENTON:
14           -- with testimony, I want to see it.
15           You --
16       THE WITNESS:
17           No.  I -- I -- I -- you'd have to show
18           me what deposition that was, when it was.
19           I don't recall that.  No.
20   BY MR. IRWIN:
21       Q.  And why were you excluded from testifying
22   in Vioxx?
23       A.  I don't know.  That's what I'm saying to
24   you.  I just -- the only reason I know it is
25   because it's been brought up by defense.  They've

Page 68

1    asked me, Are you aware of that?
2        And I said, No.
3        And they said, Well, and they pulled out a
4    document and said, See this.
5        And I said, Okay, I wasn't aware of that.
6        So that's the only reason I answered for
7    Vioxx.  I'm sure there may be other cases I'm not
8    aware of.
9        Q.  So when they pulled out a document and
10   showed it to you, what did the document say about
11   how you were excluded or limited?
12       A.  I don't recall.  It's been years ago now.
13   I don't recall.
14       Q.  That was -- that was not a concern for
15   you?
16       A.  Well, it's always a concern at the time it
17   occurs.  But this was after the fact.  I was not
18   -- I was not aware any exclusions were placed.  I
19   never went to trial in Vioxx.  So as a result, it
20   didn't impact me in the Vioxx litigation, because
21   those cases settled.  If -- certainly when I go to
22   trial, if I'm told that there are limitations, I'm
23   concerned about why those limitations were placed.
24   It -- but many times there are no limitations
25   placed.  So it just depends -- again, it depends

Page 69

1    highly upon a situation.
2        Q.  When -- when you get excluded by a judge
3    or limited by a judge, do you think it's good
4    thing for your reputation?
5        MR. DENTON:
6            Object to the form.
7        THE WITNESS:
8            I don't think it has -- in -- in my
9            view, it doesn't affect me personally one
10           way or the other because I know that --
11           unfortunately that this is the way things
12           are, that certain people make certain
13           decisions.  Again, I'm -- I'm not aware of
14           ever been excluded.  I certainly am aware
15           that there are certain cases where
16           limitations are placed.  I do know that,
17           in some cases where I've had this
18           discussion during trial, sometimes
19           limitations are placed because the judge
20           doesn't want to hear duplicate testimony.
21           So sometimes that occurs as well.
22   BY MR. IRWIN:
23       Q.  Have you ever been in an investigator for
24   a clinical trial?
25       A.  An investigator, no.  But I certainly have

18  (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1    helped design a clinical trial before for a drug
2    company.
3        Q. Tell me about that. Who have you designed
4    a clinical trial for?
5        A. I worked with a company that is no longer
6    existing in Houston back in the mid to late 1990s,
7    and they were developing a drug for male
8    impotence. And I can't say that I have design and then also
9    analyze their Phase 1 clinical data.
10       Q. And what happened with that?
11       A. The company I believe got bought by
12   somebody. I -- I -- I don't -- I don't know --
13   don't believe that the -- there was ever an
14   approved NDA, but I can't say that I have
15   researched to find out that it didn't -- that
16   information didn't end up in someone else's drug
17   file. I can't answer that.
18       Q. You do not diagnose or treat patients, do
19   you?
20       A. No. That's -- I believe that's a role of
21   a physician. And I'm not a physician.
22       Q. You're not a biostatistician, are you,
23   either.
24       A. Not by degree.
25           But again, I have training in statistics.

Page 71

1    I use it all the time. It's a tool any scientist
2    in pharmacology and toxicology has to use. I used
3    to do academic research and had to apply
4    statistics to my -- my research.
5        Q. Do you have a degree in biostatistics?
6        A. No. I said that. I answered that for
7    you.
8            But I do have training, and it is
9    something that I have had to use, and I have
10   expertise in that area because of that use in my
11   research background.
12       Q. What is this company called
13   Scientific Evidence?
14       A. It no longer exists, I believe. I -- I'm
15   not affiliated with them or don't work with them
16   anymore. They used to be a company that worked in
17   the litigation support area, and I used to get
18   referrals from attorneys through them for certain
19   types of cases that I worked on.
20       Q. It was a company that provided expert
21   witness services to -- to lawyers?
22       A. Not just expert witness. They did more
23   than that. They also did consulting work with
24   lawyers. But yes, as my affiliation -- when I say
25   "affiliation," I never was a employee. But my

Page 72

1    work with them that I did years ago now was
2    related to serving as an expert witness for
3    attorneys that they had a relationship with.
4        Q. And you eventually formed
5    Plunkett & Associates?
6        A. So that was right after ENVIRON closed
7    their office in Houston. Yes. I -- when -- in
8    1997 ENVIRON closed their Houston office. And I
9    chose not to relocate with ENVIRON, so I started
10   my own company called Plunkett & Associates.
11       Q. And who were the associates?
12       A. My husband and then other subcontractors
13   that I hired on an as-needed basis.
14       Q. So really -- it would really be
15   Plunkett & Associate, not associates?
16       A. No. Because the subcontractors had
17   agreements with me to work. So I had three or
18   four people that were independent consultants that
19   I would use. And so I wanted to use the word
20   "associates" so when there were bills sent to my
21   clients and there were names other than me, that
22   they understood what that meant.
23       Q. So these associates other than your
24   husband were not employees?
25       A. No. They were subcontractors to me on an

Page 73

1    as-needed basis.
2        Q. And who were the subcontractors?
3        A. Well, I don't think I should share names
4    because much of the work was confidential with
5    those as well. I had an exposure assessment
6    person that I -- that I used. I had a college
7    student -- well, I can -- a college student that
8    -- that I sometimes had retrieve articles for me.
9    I had a statistician that I would sometimes call
10   if I had a complex dataset issue and would refer
11   them independently to clients.
12       Q. What was the name of the statistician?
13       A. I don't think I can share that without
14   asking their permission to do that.
15       Q. Why -- why can't you share the name of a
16   person you worked on? That doesn't expose any
17   private information.
18       A. Because it may -- it -- it has to do with
19   confidentiality with projects I worked on. I'm --
20   I'm -- you know, I can speak to them and ask them
21   and -- I mean, it's not that I'm -- I'm not trying
22   to hide something from you. But again, it's --
23   they were not an employee. It was somebody that I
24   would -- would refer to a client in order to help
25   a client with a need that they had.

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1    Q. And this biostatistician -- where does
2  this biostatistician live?
3    A. Now, I don't know. At the time they lived
4  in Houston.
5    Q. You say "they." It was more than one?
6    A. The person lived in Houston at the time.
7    Q. And when's the last contact you had with
8  this person?
9    A. Probably 2007.
10   Q. And what was the nature of the contact?
11   A. They were -- it was -- they were -- this
12 wasn't through Plunkett & Associates. It was --
13 they -- I happened to know them. They were
14 working in Houston on cases for other -- through
15 other parties, not through me. It wasn't a
16 subcontractor relationship. It was just the
17 person that I know.
18   Q. What kind of cases? Lawsuits?
19   A. Those were lawsuits. Yes.
20   Q. For plaintiffs?
21   A. The -- in 2007, it was a plaintiff's
22 lawsuit, yes, where I spoke with him.
23   Q. What is Integrative Biostrategies?
24   A. It's a company that I now own and -- and
25 initially joined back in I think 2001. It was

Page 75

1  owned by -- it was owned by someone else at the
2  time.
3    Q. And who are the employees in that company?
4    A. Initially there was my partner,
5  Larisa Rudenko, and myself. She left to go to
6  work for FDA back in 2003 or so. And now the
7  employees are myself and my husband.
8    Q. Your website says, "We have experience in
9  the application of the biological sciencs" [sic].
10       The "we" is you and your husband?
11   A. Well -- and -- yes, now. Initially it
12 was -- it would have been Larisa as well. She was
13 a molecular biologist and also a former employee
14 of ENVIRON, which is where I knew her.
15   Q. Well, that's what your website says now.
16 It says "we."
17   A. Yes. So it --
18   Q. And --
19   A. -- would be my husband, who has some
20 training in biology based on coursework that he
21 took at University of Houston. I -- I actually
22 asked him to go back to school to gain some
23 additional biology background, because he does a
24 lot of information retrieval for me.
25   Q. So the "we" is you and your husband?

Page 76

1    A. Now it is. Yes.
2    Q. And I see you billed Mr. McWilliams
3  through Integrative Biostrategies, LLC?
4    A. Yes. All of my work is through
5  Integrative Biostrategies, with the exception of
6  my patent work, where I work through a law firm.
7    Q. And what is the percentage of Bio --
8  Integrative Biostrategies' income from serving as
9  an expert witness as compared to other work?
10   A. I can't give you an exact figure. But
11 it's about 50 percent of the -- of my income comes
12 through litigation, about 30 percent of my work
13 through litigation.
14   Q. And how much of that litigation work is
15 plaintiff versus defendant work?
16   A. Depends on the -- on the area of
17 litigation. It -- it -- it varies by the area.
18   Q. Against pharmaceutical companies or
19 involving prescription medicines, it's 100 percent
20 plaintiff work, isn't it?
21   A. Currently, yes, it is. That's true.
22   Q. Why don't you take a look at Plunkett
23 No. 7, please, which is your expert report. And
24 I'd like to ask you about your list of cases and
25 work that you've done, Appendix B, deposition and

Page 77

1  trial list. Okay?
2    A. Do you want me to use the updated list
3  with the additional case, or just go --
4    Q. You can just --
5    A. -- from there?
6    Q. Yeah. I remember that we talked about the
7  Tobin Hall case -- that was it or -- or Horn.
8    A. Yes.
9    Q. Let's just use the one in your report.
10       It begins in 2011; is that right?
11   A. Yes. That's -- that would be five years
12 back.
13   Q. And you testified or you worked on the
14 Avandia MDL for Heard Robins, that firm?
15   A. Yes.
16   Q. And that was work you did testifying
17 against GSK; is that right?
18       MR. DENTON:
19          Object to the form of the question.
20       THE WITNESS:
21          I believe that's true. Yes. I --
22       sometimes I -- unless I've listed the name
23       of the company, I may not be able to tell
24       you. But I think that is true.
25 BY MR. IRWIN:

Protected - Subject to Further Protective Review

Page 78

1    Q. You think Avandia is made by GSK?
2    A. I believe that is true. Yes.
3    Q. And you testified for plaintiff lawyers
4  Heard Robins and against GSK and against the
5  Avandia medicine?
6    A. I wasn't -- I wasn't --
7      MR. DENTON:
8        Object to the form.
9      THE WITNESS:
10        -- test -- the medicine isn't a
11      person. You can't testify against them.
12      But certainly I was working on behalf of
13      the plaintiffs on pharmacology,
14      toxicology, and regulatory issues related
15      to Avandia, yes.
16  BY MR. IRWIN:
17    Q. Well, did you say anything good -- any
18  good things about the medicine?
19      MR. DENTON:
20        Object to --
21      THE WITNESS:
22        Well --
23      MR. DENTON:
24        -- the form.
25      THE WITNESS:

Page 79

1        -- yeah. I mean, I talk about the --
2      the benefits of the medicine. So yeah, I
3      do in my reports talk about -- about
4      benefits. Absolutely.
5  BY MR. IRWIN:
6    Q. And did you talk about risks?
7    A. Yes. I surely did.
8    Q. And what -- tell me. Did the benefits
9  outweigh the risks --
10      MR. DENTON:
11        Object to the form.
12  BY MR. IRWIN:
13    Q. -- in your opinion?
14      MR. DENTON:
15        Object to the form. About something
16      she testified to five years ago, Jim?
17      Come on.
18      THE WITNESS:
19        I don't know that I gave an opinion on
20      benefits and risks outweighing at the
21      time. I believe that -- I mean, I'd have
22      to go back and -- and look at my reports,
23      if I even have them. And this one I may
24      not because I believe this is one of those
25      things where I was asked to destroy. But

Page 80

1      certainly I was talking about the
2      pharmacology, the toxicology. And I was
3      focusing on labeling opinions as well. I
4      had labeling opinions in that particular
5      case and the -- and the adequacy of the
6      labeling to describe. But again, details
7      I couldn't recall for you. I -- it's been
8      a while.
9  BY MR. IRWIN:
10    Q. Did you testify that the labeling was
11  adequate in your opinion?
12      MR. DENTON:
13        Object to the form.
14      THE WITNESS:
15        I don't believe I did. But I -- I
16      can't tell you what my opinions were
17      because I don't have that report in front
18      of me.
19  BY MR. IRWIN:
20    Q. Well, the plaintiff lawyers wouldn't hire
21  you to testify against GSK and say that the
22  labeling was adequate, would they?
23      MR. DENTON:
24        Object to the form.
25      THE WITNESS:

Page 81

1        Again, I don't recall having the
2      opinion that the labeling was adequate.
3      But they're -- I get hired by attorneys to
4      do other than adequacy opinions. So . . .
5      But certainly if this -- if they were
6      suing the company, I assume that they --
7      the -- the attorneys probably believed it
8      was inadequate. And if I agreed to work
9      on it, then I would have had -- had an
10      agreement with their position.
11  BY MR. IRWIN:
12    Q. The next case is Sheets versus Alec
13  Ford -- Alex Ford.
14        Did that involve a pharmaceutical
15  prescription medication?
16    A. No.
17    Q. The next one is Risperdal New Jersey
18  cases. That involved a schizophrenia medicine
19  made by Janssen, the same -- same company that
20  we're here to talk about today; right?
21    A. One of the companies, yes, that we're here
22  to talk about today. Yes.
23    Q. And you were hired by a plaintiff firm in
24  Houston?
25    A. Yes.

21 (Pages 78 to 81)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 82

1    Q. Did you say good things about Risperdal in
2   that case?
3       MR. DENTON:
4           Object to the form.
5       THE WITNESS:
6           Well, it depends what you mean by
7       "good things." I was hired in many --
8       most of the Risperdal work I did was
9       looking at -- working on behalf of states
10      and taxpayers on Medicare/Medicaid fraud.
11      My issues related to labeling mainly in
12      the Risperdal, although I also described
13      some of the pharmacology and toxicology
14      and the risk of diabetes, for example.
15          And I'm currently working on
16      gynecomastia cases in the area of
17      Risperdal litigation as well, where I'm
18      talking about the adequacy of the labeling
19      to -- to describe gynecomastia to
20      patients.
21  BY MR. IRWIN:
22      Q. In all fairness, you're talking about the
23  alleged inadequacy of the labeling, aren't you?
24      MR. DENTON:
25          Object to the form.

Page 83

1       THE WITNESS:
2           In --
3       MR. DENTON:
4           It's been found to be inadequate by
5       five juries in a row.
6       THE WITNESS:
7           In both the -- the -- in -- in the
8       gynecomastia cases, yes, I am -- I have --
9       I have stated that the label is inadequate
10      to describe the risk of gynecomastia.
11          In the Risperdal cases, the -- the
12      issues were -- were multiple, more than
13      just adequacy of the labeling. But yes, I
14      did describe sections of the label that
15      were inadequate to describe the -- the
16      risk of diabetes and -- and hyperglycemia
17      as well.
18  BY MR. IRWIN:
19      Q. And in 2012, you testified for the Bailey
20  Perrin Bailey plaintiff firm from Houston, Texas
21  in the Risperdal Arkansas State Court case.
22      Do you remember that?
23      A. Yes. Again, I was working on behalf of
24  the State of Arkansas in -- in -- in the case and
25  doing the same basic things that I did in other

Page 84

1   states.
2       Q. That was -- the State of Arkansas was the
3   plaintiff in that case?
4       A. Yes.
5       Q. And then in 2012, you testified in a case
6   involving DePuy, a deposition, July 20, 2012.
7           What was that case about?
8       A. That's -- DePuy was a hip -- it was a
9   medical device case. I don't recall what the
10  specific areas of my testimony were other than I
11  -- I would imagine that they -- they dealt with
12  the toxicity of metals. Because it had to do with
13  metal -- metal breakdown of the -- of the
14  metal-on-metal hip. I do remember that. And
15  issues related to a 510(k) process and the
16  limitations of the 510(k) approval process.
17      Q. And did you testify that the DePuy
18  metal-on-metal hip was defective because it
19  released toxic ions of cobalt and chromium?
20      MR. DENTON:
21          Object to the form.
22      THE WITNESS:
23          I don't know that I used the word
24      "defective." That sounds like a legal
25      term. I would have said that -- that

Page 85

1       certainly it posed a risk to patients
2       because of the release of the -- of the
3       metals due to the abrasion of the
4       metal-on-metal implant, particularly
5       because many of the people implanted were
6       small women where the implants weren't
7       properly fitted.
8   BY MR. IRWIN:
9       Q. And you did the same thing in 2012 and
10  2013 in the Strum case; is that right?
11      A. Yes. And -- and I believe that those were
12  -- if the same -- well, if the same law firm, it
13  would have been the same -- the same case.
14      Q. And Accutane -- you testified against the
15  manufacturer of Accutane in a deposition of
16  February 2013?
17      MR. DENTON:
18          Object to the form.
19      THE WITNESS:
20          If you're talking about the entry for
21      the Esterbrook case, yes.
22  BY MR. IRWIN:
23      Q. And what kind of medicine is Accutane?
24      A. Accutane is a acne medicine that is
25  prescribed by prescription.

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1    Q. And you testified on behalf of the
2  plaintiffs in that case?
3    A. Yes.
4    Q. And gadolinium -- you testified or gave
5  trial testimony in the Gadolinium MDL against
6  General Electric?
7    A. Yes.
8    Q. In 2014, at the next page, at the bottom,
9  you testified in a case called Lyles versus
10  MacNeil [sic] and Johnson & Johnson on behalf of a
11  plaintiff firm by the name of Ashcraft & Gerel.
12     Do you remember that?
13    A. I don't remember the specifics.  But yes,
14  I remember generally doing that.  Yes.
15    Q. And what kind of medicine was that?
16    A. Tylenol.
17    Q. And you testified for the plaintiffs --
18    A. Yes.
19    Q. -- against Johnson & Johnson involving
20  Tylenol?
21    A. Yes.
22    Q. In 2014, you're testifying again in a
23  deposition involving an Avandia case; is that
24  right?
25    A. Yes.

Page 87

1    Q. That again is for the plaintiff?
2    A. Yeah.  Different law firm.  They were -- I
3  believe they were -- they were all cooperating
4  together, which is why I was working for more than
5  one firm.  But yes.
6    Q. And in 2015, you testified on behalf of
7  the Javier Law Firm in New Orleans involving
8  Sandoz Pharmaceuticals?
9    A. Yes.
10    Q. What was that case about?
11    A. It was a personal injury case involving
12  Clozaril.
13    Q. I'm sorry?  Involving what?
14    A. Clozaril, an antipsychotic.
15    Q. Yes.
16     And you testified against the maker of
17  Clozaril?
18    A. They were being sued.  Yes.  I believe
19  there was more -- there was more than them.  They
20  -- the doctors, I believe, may have also been in
21  the lawsuit as well.
22    Q. And what was the nature of your testimony
23  against the manufacturer?
24    A. Had to do with the pharmacology of
25  Clozaril.  I -- I was giving background

Page 88

1  information to the jury, teaching the jury about
2  -- well -- and it would eventually be -- I
3  actually eventually went to trial there.  But
4  teaching the jury and -- about the pharmacology
5  and toxicology of Clozaril, what is an
6  antipsychotic, and then discussing the limitations
7  in the labeling with regard to -- or the
8  inadequacy of the label with regard to just -- the
9  toxicity that had been experienced by Mr. Ezeb.
10    Q. In 2015, you testified in another Tylenol
11  case against Johnson & Johnson; is that right?
12    A. Yes.  The Hayes case, is that what you're
13  looking at?
14    Q. Yes.
15    A. Yes.
16    Q. And in 2015, you testified against Pfizer
17  in San Diego in the Good case?
18    A. Yes.
19    Q. And what was that drug?
20    A. I'd have to go back and see if I can tell
21  you.  I don't -- I don't recall the specifics on
22  that case.  It was just one case, though.
23    Q. And in 2015, in the next page, you
24  testified again for the Bailey -- Bailey firm
25  involving Paxil, which is an SSRI; is that right?

Page 89

1    A. Yes.
2    Q. And you testified against GSK, the maker
3  of Paxil; is that right?
4    A. That's who was being sued.  Yes.
5    Q. And in 2015, there is the Jacoby Moore
6  versus Janssen case.  Do you see that?
7    A. Yes.
8    Q. What drug did that involve?
9    A. That's gynecomastia and Risperdal.
10    Q. You testified against the maker of
11  Risperdal in that case?
12    A. Yes.
13    Q. And you -- your opinion was the labeling
14  was inadequate?
15    A. That wasn't my only opinion.  But yes,
16  that -- I was -- I was looking at the
17  pharmacology, again, the pharmacology, toxicology
18  mechanism but as well as the adequacy of the
19  labeling to describe specifically gynecomastia.
20    Q. And in 2016, you testified in the
21  Brownstein case against Merck?
22    A. Yes.
23    Q. What -- what Merck medicine did that
24  involve?
25    A. It was a very, very old drug called

23 (Pages 86 to 89)

Protected - Subject to Further Protective Review

Page 90

1  dienestrol.  It was a case involving birth
2  defects, and the case was a very strange case
3  because it -- the injury dated back to 1968.
4      Q.  What was the nature of your testimony in
5  that case?
6      A.  Having to do with the regulation of
7  pharmaceuticals, understanding what was or wasn't
8  typically done in 1968 versus today, understanding
9  the evolution of the regulations, and looking
10  specifically at the issue of whether or not there
11  was a duty of the -- of the manufacturer to look
12  at the potential to harm the fetus when a drug is
13  being given to a pregnant woman.
14      Q.  I assume you testified the -- the
15  manufacturer had that duty and failed to meet it?
16      MR. DENTON:
17          Object to the form.
18  THE WITNESS:
19          I testified that the manufacturer had
20      the duty.  Yes, that is true.  And I -- I
21      -- I believe I testified that -- and I
22      don't recall the details, but -- of the
23      way it was worded.  But it had to do with
24      the fact that there was inadequate
25      testing, not so much that the -- that

Page 91

1          there was no testing.  It was that it was
2          not adequate to define the -- the risk to
3          the fetus.
4  BY MR. IRWIN:
5      Q.  And if you go to the last page, there are
6  one, two, three, four, five, six, seven, eight,
7  nine, ten cases described in 2016 where you either
8  gave deposition or court testimony; is that
9  correct?
10      A.  Well, they're not all separate cases.  But
11  yes, there are ten times.  So, for example, the
12  first two entries, it's the same case.  One is a
13  deposition, and one is a trial.
14      Q.  And --
15      A.  And --
16      Q.  -- that involved Paxil again?
17      A.  Yes.  It was a Paxil case.
18      Q.  And then there's the Tylenol litigation,
19  the Taylor case?
20      A.  Yes.
21      Q.  And then you testified against Bayer
22  involving aspirin?
23      A.  Yes, a deposition only.
24      Q.  And what was the nature of your testimony
25  against Bayer involving aspirin?

Page 92

1      A.  It was a -- it was not a labeling issue.
2  It was a toxicity issue, describing what is
3  aspirin toxicity and whether or not the
4  individual's symptamology [sic] were consistent
5  with aspirin toxicity.
6      Q.  And did you testify that the individual's
7  symptamology was in fact consistent with aspirin
8  toxicity?
9      A.  I don't know if that's exactly how I put
10  it.  But we had -- actually had a blood level in
11  the toxic range.  So it was -- I certainly -- my
12  opinion was that -- that the blood level exist --
13  that -- that she was showing was consistent with
14  severe aspirin toxicity.  And then there was a
15  physician that talked about specific symptoms,
16  case-specific issues.  But I talked generally
17  about what types of things can happen.  So I
18  wasn't a case-specific expert on her specific
19  symptoms.
20      Q.  Was Bayer a defendant in that case?
21      A.  Yes.  I believe that they --
22      Q.  And --
23      A.  -- were.  Again, I -- I -- I believe that
24  the attorney that came to the deposition was
25  representing Bayer.  Yes.

Page 93

1      Q.  And did you testify against Bayer in that
2  case?
3      A.  To trial?  No.  We didn't go to trial.
4      Q.  In the deposition, did you?
5      A.  Well, I certainly was providing opinions
6  for the plaintiffs, yes, against -- that were
7  being -- was suing Bayer.  Yes.
8      Q.  And what was the Sandoz case that you did
9  in 2016?
10      A.  That's the same one we just described.
11      Q.  Same one?
12      A.  Yeah.  So the -- so this is the same case
13  as the deposition that was given back in 2015.
14      Q.  So I haven't tried to count these up.  But
15  over the last -- you -- you -- you gave us your
16  list of depositions and trial testimony for the
17  last five years; correct?
18      A.  Yes.
19      Q.  Can you show me a single one where you
20  testified on behalf of a drug company and against
21  the plaintiff?
22      A.  The -- the one that -- that I usually
23  point to, I believe, was before -- well, no.  Let
24  me look.  Hold on.  I -- well, I -- I was hired in
25  2013 by Foley Mansfield.  And it was two companies

Protected - Subject to Further Protective Review

Page 94

1    suing each other, so I -- I was providing
2    testimony on behalf of a drug company on toxicity
3    and risk.
4        Q. And which -- which case is that?
5        A. Oh, not Foley Mansfield. I'm sorry.
6    That's the -- that's the Rodan & Fields.
7        Q. So you went --
8        A. There's another law -- there's another
9    firm. Hold on. Let me look. Apologize. There's
10   a case for Morgan, Lewis & Bockius. And maybe it
11   was before this list goes for -- that far back.
12   It may have been earlier in 2011. So no, I don't
13   have one on this list, I don't believe.
14       Q. So I'll just restate my question to be
15   clear.
16       On this list of 61 cases, now 62 with the
17   case you added or 61 entries here, there's not a
18   single one where you testified on behalf of a drug
19   company and against a plaintiff; is that correct?
20       MR. DENTON:
21           Object to the form.
22       THE WITNESS:
23           Well, I would -- I would argue that
24       not all 61 are drug cases. But certainly
25       I would agree of the subset that are drug

Page 95

1        cases, they have been -- I have -- I have
2        been testifying on behalf of plaintiffs
3        against different -- on -- on different
4        issues where the drug company was being
5        sued. Yes. That is true.
6    BY MR. IRWIN:
7        Q. One hundred percent of the time; correct?
8        A. In these -- in this particular time
9    period, yes.
10       Q. There's some other matters you testified
11   that you have done product stewardship over the
12   years. What is that?
13       A. You -- are you asking me that I have
14   worked in the area of product stewardship?
15       Q. Yeah. Yes, ma'am.
16       A. So my definition of product stewardship
17   would be looking at -- working on regulatory
18   issues that have to -- that deal with products as
19   they have -- after they have been marketed. So it
20   would -- might not be a drug. It could be a drug.
21   I have worked on drug product stewardship, but
22   also on a variety of different types of consumer
23   products as well. So it's the idea of what is the
24   -- the duty of different manufacturers for
25   different type of products once the product has

Page 96

1    been marketed.
2        Q. Have you ever worked as a product steward
3    on a drug that ever made it to the market?
4        A. Well, many of the cases, the -- the
5    regulatory issues I worked on were drugs that were
6    marketed. So are you asking me on -- on -- on a
7    -- you're asking me have I worked on a drug before
8    it was marketed and then after it was marketed,
9    the same drug for product stewardship?
10       Q. I'm asking you: Have you ever worked as a
11   product steward on a drug that ever made it to the
12   market?
13       A. Okay. I guess I don't understand your
14   question. Does it -- are you asking me have I
15   worked on cases involving product stewardship for
16   marketed drugs? Yes. But are you asking -- are
17   you meaning to ask something different? I'm not
18   quite sure --
19       Q. I'm asking --
20       A. -- what you're --
21       Q. -- you: Did you ever work on a drug to
22   help get it to market?
23       A. Yes. I have done that. That's different.
24   That's a different question. So that's not the
25   product stewardship I was talking about.

Page 97

1        So if you're asking me have I worked with
2    companies that are attempting to develop drugs and
3    bring it to market, yes. And are -- are some of
4    the products that were marketed, yes.
5        Q. Name for me a drug you helped bring to
6    market.
7        A. It would be the work I did at ENVIRON for
8    an antihypertensive drug. And, gosh, I -- I don't
9    know the name of it. I'd have to go back and look
10   at the PDR to pull it out for you. But it was a
11   drug -- I was talking about having written an NDA
12   for the company. And that product was marketed.
13   I believe it was actually marketed in the U.S. by
14   another -- by U.S. -- larger U.S. company, a
15   codevelopment or comarketing issue, in other
16   words, developed by -- outside the U.S. but
17   marketed by a U.S. company.
18       Q. And can you name the drug for me?
19       A. It -- I -- I'd have to go back and look at
20   -- at the PDR. I don't know which one it
21   specifically was. But it certainly -- I know it
22   was marketed because the French company sent us a
23   thank-you letter for helping them get their NDA
24   approved.
25       Q. Can you name me any drug -- French or

Protected - Subject to Further Protective Review

Page 98

1  otherwise, can you just give me a name of a drug
2  that you worked on to help bring to market?
3      MR. DENTON:
4          She just did.  I --
5      THE WITNESS:
6          I'd have --
7      MR. DENTON:
8          -- object to the form.
9      THE WITNESS:
10         I -- I -- I'm telling you that there's
11         an antihypertensive drug.  I'd have to go
12         back and look.  This drug would have been
13         approved for marketing in the mid '90s.
14  BY MR. IRWIN:
15      Q.  Besides this antihypertensive drug whose
16  name you cannot remember, is there any other drug
17  that you helped bring to the market that you can
18  tell me the name of?
19      A.  I -- I can't recall a specific name.  But
20  I certainly worked on many projects related to
21  drugs while I was at ENVIRON, where the -- where
22  the issue was -- we were assisting the company
23  with an issue in order to bring the drug to
24  market, helping them design studies, interpret
25  data that was part of their IND or NDA.

Page 99

1      Q.  Have you ever designed a clinical trial?
2      A.  I thought I answered that for you.  I said
3  yes, I designed Phase 1 for the company that I
4  described for you earlier.
5      Q.  That was Synergen or something like that?
6      A.  No.  Zonagen --
7      Q.  Zonagen --
8      A.  -- was the name of the company at the
9  time.
10      Q.  And how -- how did you design this -- it
11  was a Phase 1 clinical trial?
12      A.  Yes.
13      Q.  How -- how -- what did you design?
14      A.  Design -- I started with what would be the
15  guidance from FDA about what goes into a clinical
16  trial in the Phase -- in the first phase.  So I
17  worked with the employees at the company to lay
18  out a -- I laid out a protocol:  Here's what we
19  need to do, how many patients we need to recruit,
20  what sampling you need to do for blood.  Because
21  it was a pharmacokinetic study.  Look -- I looked
22  at their data that they had in -- on happing --
23  helping to set the first safe dose for humans.  So
24  I -- I helped them interpret what the animal
25  studies were saying.  And we -- they submitted

Page 100

1  their -- they had submitted their IND.  We looked
2  at what FDA had told them they could do.  Because
3  they had to submit the protocol after that.  At
4  least after we got the FDA approval, I actually
5  then took the data that was -- came out of the
6  trial and summarized and analyzed the data and
7  wrote it up so that they could put it within their
8  clinical study reports that were then planned to
9  be submitted to the FDA as part of their -- their
10  NDA.
11      Q.  So what is a Phase 1 trial?
12      A.  It's the first-in-humans trial --
13      Q.  Yes.
14      A.  -- typically it's a pharmacokinetic trial,
15  although it also collects safety data as well.
16      Q.  So -- but you -- you -- you try -- it's a
17  small trial, as I understand it, and you try the
18  medicine in healthy patients?
19      A.  Typically it's in healthy patients, unless
20  there is a good reason for why you would not use.
21  So, for example, if you expected the kinetics to
22  be very different in a patient population, you may
23  actually look at the -- the population that would
24  be getting the drug as well.  But typically
25  healthy volunteers is typically -- in fact, the

Page 101

1  study I designed was for healthy volunteers.  And
2  we were using men only because the drug was going
3  to be used for impotence.
4      Q.  And what was the result of this Phase 1
5  trial?
6      A.  The trial that -- that I was involved
7  with?
8      Q.  Yes.
9      A.  We collected pharmacokinetic data.  We
10  calculated the standard parameters that you would
11  do.  So we analyzed the data looking at area under
12  the curve, Cmax, Tmax, elimination, half-life,
13  clearance.  And then working with the statistician
14  at the company, we provided the statistical
15  summary of the data and presented it within a
16  clinical study report.
17      Q.  And by the way, what was the name of this
18  drug, the medicine?
19      A.  I -- that's what -- I -- I don't recall
20  the name.  It was a -- it was a -- because it was
21  a development.  It didn't have a trade name yet.
22  But it was an impotence drug.  And I don't know if
23  -- I don't believe it actually went to market, but
24  I can't answer that for you.
25      Q.  Did -- was -- well -- well, did it work in

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1  the Phase 1 trial?  Did it do what it was supposed
2  to do?
3       MR. DENTON:
4            Object to the form.
5       THE WITNESS:
6            Well, it's not a benefit trial.  So
7       did it -- did -- we were able to detect
8       it?  Yes.  Did it have -- were we able to
9       measure pharmacokinetics?  Yes.  It was a
10      successful trial in that regard.
11 BY MR. IRWIN:
12      Q.  Well, it was a -- was an impotence drug;
13 is that right?
14      A.  It was -- it was -- it was being developed
15 as an -- as an impotence --
16      Q.  Was it --
17      A.  -- a treatment for impotence.
18      Q.  Was it for -- like Viagra, for erections?
19      A.  Yes, that's -- that was what they were
20 hoping to be able to effect.
21      Q.  Did it work in the Phase 1 trial?  Do you
22 know?
23      A.  Again --
24      MR. DENTON:
25            Object to the form.

Page 103

1       THE WITNESS:
2            -- they didn't test that.  They -- all
3       they did was collect blood levels of the
4       -- of the data.  They didn't -- didn't
5       actually do an efficacy endpoint.  They
6       looked at -- for safety measures, they
7       were looking -- we were looking to see
8       whether there were any anaphylactic
9       reactions or -- we were actually concerned
10      about hypotensive episodes or hypertensive
11      episodes as well.  So we were looking at
12      blood pressure, heart rate, EKG changes,
13      allergic reactions, things like that.
14 BY MR. IRWIN:
15      Q.  Do you remember the name being VasoMax?
16      A.  No.  I don't recall.  Because again, that
17 would be a trade name, and I don't recall VasoMax.
18      Q.  You don't remember that?
19      A.  No.  Uh-uh.  It may have been, but I don't
20 know.
21      Q.  Do you remember any of the people you
22 worked with at Zonagen or Zonagen?
23      A.  I don't remember the names anymore.  There
24 was -- there were several senior people --
25      Q.  Do you --

Page 104

1       A.  -- at the company.
2       Q.  -- remember a Joseph Podolsky?
3       A.  No.
4       Q.  Do you remember what the generic name of
5  this drug was?
6       A.  I already answered that for you.  I said
7  no.
8       Q.  Does phentolamine ring a bell?
9       A.  No.
10      Q.  Do you know what phentolamine is?
11      A.  I'd have -- it I would -- would assume
12 it's a -- it's a sympathomimetic drug by -- or
13 affects sympathomimetic systems by the name.  But
14 I don't know it.  I -- that -- I -- I can't -- I
15 can't recall the name of the drug.  I can't answer
16 that --
17      Q.  Do you --
18      A.  -- for you.
19      Q.  Do you know if its primary action is
20 vasodilation?
21      A.  Well, as an anti-impotence, that was my
22 understanding, yes, of their drug.  But I don't
23 know that that was the name of the drug.
24      Q.  Now, this -- this drug was supposed to be
25 taken orally?

Page 105

1       A.  Yes.  It was an oral drug.
2       Q.  Did you know that phentolamine had been
3  used to cause blood vessels to dilate and was
4  injected into the penis to increase blood flow to
5  the penis by injection?
6       MR. DENTON:
7            Object to the form.
8       THE WITNESS:
9            I don't recall that.  No.
10 BY MR. IRWIN:
11      Q.  Do you know what the strategy was to use
12 it orally?
13      A.  Again, I don't recall any of those
14 details.  I'd have to go back.  I don't even know
15 if I have those files, because that work has been
16 from the late '90s.  So I don't know.
17      Q.  Did you ever see any articles in the
18 Houston press about this company?
19      A.  The Houston press?
20      Q.  Yes.
21      A.  Well, the -- the -- we actually have a --
22 have a magazine called Houston Press.  Are you
23 talking about in the newspapers?
24      Q.  Did you ever see an article that described
25 this company as, quote, a phantom company, a

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1   make-believe outfit that manufactures myths and
2   stories for investors?
3        A.  No.  Because I don't -- I don't recall
4   that -- the -- the specifics of that particular
5   time.  No.  I don't recall ever reading that.
6        Q.  Do you ever remember the American
7   Urological Association's reaction to the
8   effectiveness or lack thereof of VasoMax?
9        A.  Again, I was not involved with the company
10  at that particular point in time, if -- if there
11  was some opinion that was developed.
12       Q.  Do you ever remember a woman by the name
13  of Bonnie Dunbar?
14       A.  No.
15       Q.  Do you ever remember the press describing
16  this company as -- its product pipeline as, quote,
17  intellectual compost piled high with retooled
18  patents of questionable commercial nature?
19       A.  I have not read any press like that.  No.
20  I don't recall that.  And I don't -- I don't
21  recall ever reading it.
22       Q.  So -- so whatever happened to your efforts
23  at this Phase 1 clinical trial?  Where did it go
24  from there?
25       A.  I support -- I submitted my analysis to

Page 107

1   the company, and that was the end of the work that
2   I did for them.
3        Q.  Why was that the end of the work?
4        A.  It's my understanding at the time -- in my
5   discussions, this is what I do recall, that they
6   were talking with other companies about
7   partnering, and so they hired -- they were going
8   to be hiring additional people, would no longer
9   need me as an outside consultant.
10       Q.  Can you name for me any other clinical
11  trials you've worked on besides this one?
12       A.  As far as from the design phase?
13       Q.  Yes.
14       A.  No.  Because I haven't -- I've never been
15  an employee of a drug company.
16       I have worked on clinical studies for
17  nonpharmaceuticals, for other types of consumer
18  products with some of my university-based
19  inventors, where I do patent work.  So I've done
20  that for dietary supplements and for compounds
21  that they were hoping to develop as
22  over-the-counter drugs.
23       Q.  Have you ever reviewed any medical records
24  for Mrs. Orr in this case?
25       A.  No.  I'm not a case-specific expert.

Page 108

1        Q.  Have you ever spoken to any of her
2   doctors, treating physicians?
3        A.  No.  I'm not a case-specific expert.
4        Q.  Have you ever read the depositions of
5   Dr. St. Martin, Dr. Bui, Dr. Gropen, Dr. Ogden,
6   Dr. Mahanna, Dr. Rai, Dr. Cruz?
7        A.  No.  I have not read any depositions in
8   this -- of any experts or treating physicians in
9   this case.
10       Q.  Have you reviewed any expert reports from
11  any of the plaintiff -- other plaintiff experts or
12  any of the defendant experts?
13       A.  Not any of the plaintiff experts.  No.  I
14  recently was sent three reports from pharmacology
15  experts from the defense.  And I haven't had time
16  to review those in any detail, but I have at least
17  skimmed them.  And I -- I am aware that there are
18  pharmacologists working on the defense.
19       Q.  Do you remember the names of those
20  experts?
21       A.  One was Fleckenstein, I believe.  Another
22  one starts with a T, maybe Taft.  I'm not sure on
23  that.  I may have that wrong.  Or tuft.  And the
24  other one, I don't recall the name.  No.
25       Q.  Have you formed any opinions having

Page 109

1   skimmed those three expert reports?
2        A.  No.  I haven't given them enough scrutiny
3   to have any opinions specifically about their
4   reports.
5        MR. IRWIN:
6            I think this is a good time for a
7        break.  Okay.
8        THE VIDEOGRAPHER:
9            The time now is 9:49 a.m.  We are off
10       the record.
11       (Brief recess was taken.)
12       THE VIDEOGRAPHER:
13           This begins Disk 2 of today's
14       deposition.  The time now is 10:00 a.m.
15       We are back on the record.
16  BY MR. HOROWITZ:
17       Q.  Dr. Plunkett, we -- we met briefly off the
18  record.  As you know, I'm Jeff Horowitz, and I
19  represent Bayer.  And I'm going to continue your
20  deposition now and follow up on a few things that
21  Mr. Irwin asked you and then of course ask you
22  some additional questions.
23       Is that okay with you?
24       A.  That's fine.
25       Q.  Okay.  And you understand that I'm here to

28 (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1 today -- today to try and understand the opinions
2 that you formed and the testimony that you're --
3 you may give at the trial of these cases?
4 A. Yes. I understand that.
5 Q. And one of the questions I wanted to ask
6 you: Have you discussed Xarelto with any of the
7 other plaintiffs' experts in this case?
8 A. No.
9 Q. Mr. --
10 A. Well, not that I know of. Let's put it
11 that way. I -- I haven't had a conversation with
12 anybody that's been identified as a plaintiff
13 expert. Let -- let -- I should say that. I don't
14 even know who-all the plaintiff's experts are.
15 Q. Okay. But let me ask you this, though --
16 it -- it -- what I really meant was about Xarelto.
17 A. That's what I'm saying. I don't know that
18 -- I -- there may have been a conference call
19 where somebody was on it that I'm not aware of.
20 But there was no one identified to me that I have
21 -- that I've talked to that has said to me that
22 they are a Xarelto plaintiffs' expert.
23 Q. Let me ask it differently. then.
24      You didn't talk to any plaintiffs' expert
25 that has been hired by the plaintiffs' lawyers in

Page 111

1 this case in the Xarelto litigation for any
2 specific purpose of your own to discuss Xarelto
3 with them?
4 A. That is correct. And I -- I don't recall
5 having done that.
6 Q. Just briefly, Mr. Irwin was asking you
7 about whether you reviewed any depositions in the
8 Orr case, and you said you're not a case-specific
9 expert.
10      Is it fair to say that you have not
11 reviewed any medical records or case-specific
12 depositions, you know, the plaintiffs or the
13 doctors involved in those cases as -- as treaters
14 or prescribers for either the Boudreaux case, the
15 Mingo case, or the Henry case?
16 A. That would be true. Yes.
17 Q. Have you ever done any original research
18 concerning coagulation?
19 A. By "original research," do you mean in the
20 laboratory with --
21 Q. Yes. I'm --
22 A. -- cell tissues or -- or animals?
23 Q. Yeah. I'm not talking about just looking
24 at the literature or doing a PubMed search. I'm
25 talking about actual research in the laboratory.

Page 112

1 A. No. I have not. My research did not
2 focus on -- on that area.
3 Q. Same question with respect to hemostasis.
4 Fair to say you've never done research with
5 respect to hemostasis?
6 A. No. I have not. Not in the laboratory.
7 Q. And same thing with respect to clotting
8 factors?
9 A. That's correct. Not in a laboratory.
10 Q. And also not in a laboratory, no research
11 with respect to anticoagulant therapies?
12 A. Yes. That is true. Not in the lab.
13 Q. What was your laboratory research focus,
14 and when was it?
15 A. So I did laboratory research from 1980
16 through 1989, and my focus was on -- well, it was
17 pretty broad actually. I was interested in
18 mechanisms for drugs that involved different
19 neurochemical systems, either peripherally or in
20 the brain. And I worked specifically initially on
21 drugs that affected cardiovascular function,
22 because I had a interest in drugs that were used
23 to treat different cardiovascular diseases. The
24 -- my major professor, that was his general area.
25 I also had an interest in pharmacokinetics as well

Page 113

1 as pharmacodynamics in the -- for those types of
2 -- of agents. And I was interested in
3 pharmacokinetics as it related to ways that it
4 could change both the pharmacology or the toxicity
5 of a -- of a drug as well.
6 Q. And from 1980 to 1989, when you did your
7 research that you said involved in some sense
8 drugs that might treat cardiovascular issues, did
9 you do anything with respect to any available
10 anticoagulant at that time?
11      MR. DENTON:
12           Object to the form.
13      THE WITNESS:
14           I don't recall that. No. I don't
15      recall ever administering an
16      anticoagulant, other than heparin in a
17      test tube when I collected a blood sample.
18      So, you know, I did use anticoagulants. I
19      often collected blood samples and did
20      analysis for different chemical mediators
21      within the blood.
22 BY MR. HOROWITZ:
23 Q. Okay. That would be the limit of -- when
24 you say your work with anticoagulations in that
25 time frame, it would be the heparin in the test

Protected - Subject to Further Protective Review

Page 114

1  tube and administering the anticoagulant in this
2  test tube of blood samples?
3       MR. DENTON:
4           Object to the form.
5       THE WITNESS:
6           That would have been the -- the major
7       use.  I -- although I -- I believe that I
8       also did administer heparin in an animal
9       before, but -- intravenously.  But it
10      was -- but it -- I was not studying the
11      pharmacology of heparin at the time.
12 BY MR. HOROWITZ:
13      Q.  That --
14      A.  So . . .
15      Q.  Was it just your own pet and it needed its
16 blood thinned or . . .
17      A.  No.  We had a colony of dogs at -- at the
18 university where I did my research.  And we often
19 had blood donors.  And so you had to often
20 administer some heparin in order to keep the
21 patency of the -- of the long-term cannulas that
22 you had.  The same would be for rats as well.  We
23 would have done the same thing with some of the
24 rat work I did.
25      Q.  Okay.  You've never received any research

Page 115

1  support or funding to study anticoagulants or the
2  diseases for which anticoagulants are prescribed?
3       A.  Certainly not to study anticoagulants.  I
4  did receive research funding that dealt with a --
5  looking at drugs to treat arrhythmias.  And a-fib
6  would have been an arrhythmia.  So -- but I
7  certainly wouldn't looking at anticoagulants as
8  their use in atrial fibrillation.  No.
9       Q.  Okay.  So the research that you just
10 described was not looking at anticoagulants in the
11 treatment of atrial fibrillation?
12      A.  No.  I was looking at antiarrhythmics in
13 the treatment of atrial fibrillation.
14      Q.  And those are different drugs than
15 anticoagulants?
16      A.  Yes.
17      Q.  Have you ever done or played any role in a
18 clinical study involving anticoagulation therapy?
19      A.  Not that I'm aware of.  No.
20      Q.  Well, is there a reason you wouldn't be
21 aware of it?
22      A.  Well, I mean, I -- I've worked on a lot of
23 projects at ENVIRON.  And it's possible that some
24 of the projects dealt with drugs that were going
25 to be used that way.  But I don't recall that.  I

Page 116

1  shouldn't have said -- I shouldn't have said
2  aware.  I'd say I don't recall that --
3       Q.  Okay.  So --
4       A.  -- based on my work at ENVIRON.
5       Q.  As we sit here now, you can't cite to me
6  any clinical trial or any clinical study you've
7  been involved in that involved anticoagulation
8  therapy?
9       A.  That's correct.
10      Q.  Has any pharmaceutical company -- can you
11 cite to me any pharmaceutical company that has
12 consulted with you concerning an anticoagulant?
13      A.  I don't -- I can't recall one for that.
14 So I don't think I can.  No.  I don't think I
15 have.  I don't recall that.
16      Q.  Has the FDA ever asked you to advise them
17 concerning any anticoagulant?
18      A.  No.
19      Q.  Have you ever been asked or invited to
20 speak at a seminar or conference on any
21 anticoagulant?
22      A.  No.
23      Q.  Have you ever been asked or invited to
24 speak at a seminar or conference in particular on
25 the novel oral anticoagulants or the NOACs?

Page 117

1       A.  No.
2       Q.  Have you ever attended a seminar or
3  conference where the subject matter was
4  anticoagulants?
5       A.  Yes.
6       Q.  What seminar or conference did you attend?
7       A.  So the -- within the Society of Toxicology
8  there have been sessions where anticoagulants like
9  the NOACs have been discussed as part of -- as
10 part of the scientific presentations that were
11 done.  And it's possible when I have attended the
12 American Association of Pharmaceutical Scientists
13 meeting, AAPS, that was also -- happened.  Because
14 I -- I had an interest in drugs used to treat
15 cardiovascular indications.  And so it's very
16 possible.  I can't recall a specific seminar
17 there.  But I do recall NOACs being discussed at
18 SOT.
19      Q.  At the Society of Toxicology?
20      A.  Yes.
21      Q.  You weren't one of the presenters, though,
22 on NOACs?
23      A.  No.
24      Q.  When was the last time you attended a
25 Society of Toxicology meeting where there was some

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1    presentation on NOACs?
2       A.  Probably last year.
3       Q.  And do you remember the subject matter of
4    the presentation?
5       A.  No.  I'd have to go back.  I mean, I could
6    probably find that out.  I'd -- I could pull out
7    my abstract booklet.  But I don't recall.
8       Q.  Is it fair to say that you didn't cite
9    that in your report, in your materials reviewed or
10   the text of your report, and you're not relying on
11   it for purposes of providing your opinions in
12   these cases?
13      A.  That's correct.  Because I don't typically
14   rely on abstracts.  Every once in a while I do,
15   but it's rare.  So no, I have not.
16      Q.  Have you ever published a peer-reviewed
17   scientific article related to anticoagulation
18   therapy?
19      A.  No.  I think you already asked that,
20   something like that.  But none of my papers have
21   to deal with that.
22      Q.  Okay.  Have you ever published a
23   scientific article related to warfarin?
24      A.  No.  Same answer.
25      Q.  Have you ever published a scientific

Page 119

1    article related to rivaroxaban?
2       A.  No.  Have not.
3       Q.  Have you ever published a scientific
4    article related to any oral anticoagulant?
5       A.  No.  And I think that was asked and
6    answered already.  But no, I have not.
7       Q.  Have you ever written anything with
8    respect to rivaroxaban or oral -- or -- or oral
9    anticoagulants other than the expert report you
10   prepared in this litigation?
11         MR. DENTON:
12            Object to the form.
13         THE WITNESS:
14            That's probably all.  Yes.
15      BY MR. HOROWITZ:
16      Q.  Outside of this litigation -- well, let me
17   -- let me strike that.
18         Do you consider yourself to be an expert
19   in hemostasis?
20         MR. DENTON:
21            Object to the form.
22         THE WITNESS:
23            I -- I have expertise in hemostasis
24         based on my training in pharmacology as an
25         underlying mechanism of action that drugs

Page 120

1    can act upon.  But I'm not a hematologist,
2    so I don't -- I don't research that every
3    day.
4    BY MR. HOROWITZ:
5       Q.  Have you ever done any research on
6    hemostasis?
7       A.  Well, I think I answered that for you.
8    When you mean research in the laboratory, no.  I
9    certainly have reviewed articles on drugs used to
10   affect hemostasis before, even outside of the
11   litigation context.
12      Q.  So you've gone to the published literature
13   and looked at other -- other work that's been done
14   with respect to hemostasis?
15      A.  Yes.  Because I -- as I answered earlier
16   today, that, you know, I have -- I was aware of
17   the class -- the new class of -- of drugs known as
18   NOACs before even working in litigation.  I had
19   read articles generally about what they were and
20   how they were being used.
21      Q.  Was this the discussion you had with
22   Mr. Irwin about your mother-in-law's care and
23   treatment as an atrial fibrillation patient?
24      A.  That, but also I -- as I mentioned to
25   him -- I think I told him -- I said I keep up with

Page 121

1    the literature on new classes of drugs.  So I
2    certainly had read some basic information about
3    NOACs before even I did the research for my
4    mother-in-law.
5       Q.  What literature do you keep up?  What are
6    -- what are your sources of information that you
7    rely upon?
8          MR. DENTON:
9             Object to the form.  It's too --
10         THE WITNESS:
11            Well --
12         MR. DENTON:
13            It's a compound question.
14         THE WITNESS:
15            Sources I review routinely would be
16         New England Journal of Medicine.  I have a
17         subscription to that.  So I -- I look at
18         that all the time, and there's often new
19         classes of drugs described in clinical
20         use.  I -- there's several other
21         pharmacology journals that I get as part
22         of my different memberships with different
23         organizations.  Regulatory Tox and Pharm,
24         for example, often discusses classes --
25         the new classes of drugs.  So that's the

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1    first -- the -- the answer to the first
2    part of your question.
3        As far as relying upon, I rely upon
4    literature from a variety of sources. I
5    often do PubMed searches and -- and -- for
6    even beyond my specific projects, just my
7    interest, to see what's new in certain
8    classes of drugs. And those would be a
9    variety of different articles that I may
10   or may not -- if they're free, I often --
11   often will retrieve them even if I don't
12   have a specific project that I'm working
13   on.
14   BY MR. HOROWITZ:
15       Q. So is it fair to say that before you got
16   involved in this litigation and were retained by
17   the plaintiffs' lawyers, your experience with
18   NOACs, including warfarin, would be keeping
19   apprised of the general literature of the -- the
20   journals that you just described and also this
21   one bit of research you did with your
22   mother-in-law?
23       A. Not if you're including warfarin. So
24   warfarin is also a rodenticide. And so --
25       Q. I'm sorry. My question was about NOACs.

Page 123

1    I'll ask you warfarin --
2        A. Well, I thought you said including
3    warfarin.
4        MR. DENTON:
5            You did.
6        MR. HOROWITZ:
7            I did. Okay. I'm sorry.
8        THE WITNESS:
9            It's . . .
10           Anyway, NOACs, the answer is I think I
11   have described that for you.
12           If you want to talk warfarin, warfarin
13   has uses outside of pharmaceuticals. And
14   I'm very familiar with it as a rodenticide
15   agent and have looked at its toxicology
16   within the pesticide arena, under EPA
17   regulations, under the regulation called
18   FIFRA.
19   BY MR. HOROWITZ:
20       Q. Let me ask -- let me clean that up a
21   little bit.
22           So is it fair to say that the extent of
23   your background in NOACs, and NOACs specifically,
24   before you were involved in this litigation and
25   retained by the plaintiffs' lawyers, was keeping

Page 124

1    generally apprised of the literature that you've
2    discussed and the one exercise you did in -- in
3    assisting your mother-in-law in talking to her
4    doctor?
5        A. Yes. I think that would describe
6    generally.
7        Q. Okay. What's a rodenticide?
8        A. It's a agent that's used to either kill or
9    harm rodents, what -- like rats or mice, that may
10   be in your home.
11       Q. Is it rat poison?
12       A. You could call it that. But it's also
13   used for mice as well.
14       Q. It's also mice poison?
15       A. It's -- yes, which is why you -- you use
16   the term "rodenticide." Rodent is the general
17   class where mice and rats belong.
18       Q. And the way this rodenticide warfarin
19   killed rats or mice -- I didn't know it also
20   killed mice -- was by causing them to hemorrhage;
21   right?
22       A. Yeah. It'll kill anybody. Any mammal can
23   be caused to -- to die by too much -- too much
24   or -- too much bleeding.
25       Q. Right. It's -- it can be toxic; right?

Page 125

1        A. Yes. And it's being exploited for its
2    toxicity as a rodenticide.
3        Q. What do you mean by "exploited"?
4        A. The doses that are given are high enough
5    to reliably cause rodent death. That's the whole
6    point. So when you develop an agent under the --
7    under FIFRA, you actually have to show a benefit.
8    So the benefit would be, We're giving doses high
9    enough that we show that we can reliably kill
10   rodents with -- with applications on -- as labeled
11   for the product.
12       Q. Right. So when -- do you agree that a
13   pharmaceutical company was able to alter the dose
14   and formulation of warfarin to make it so that it
15   could be used as a medication?
16       A. I don't know that that was the -- I don't
17   know that that was the process, and so I can't
18   answer that definitively yes or no.
19           But I would agree that there's a safe dose
20   of warfarin, just as there's a toxic dose of
21   warfarin. And so a safe dose of warfarin would be
22   the one that would be exploited for use in humans
23   as an anticoagulant.
24       Q. So is it fair to say you don't know what
25   the scientists did or didn't do to develop

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1   warfarin as a medication?
2       A.  I have not reviewed the NDA package for
3   warfarin.  That's correct.
4       Q.  Okay.  And you understand, though, that
5   warfarin can be challenging for doctors and
6   patients to use?
7           MR. DENTON:
8               Object to the form.
9       THE WITNESS:
10              I agree that there are times when it
11          can be.  I -- I -- however, my experience
12          -- my mother-in-law was well-controlled on
13          warfarin.  So I do know that certain
14          patients it works very well.  And then --
15          but there are, like any drug, certain
16          patients where it doesn't work very well.
17  BY MR. HOROWITZ:
18      Q.  And you understand if a patient gets too
19  much warfarin, they have an increased risk of
20  bleeding?
21      A.  Just like any oral anticoagulant as well,
22  yes.  That's true.
23      Q.  Well, let me ask my question again.
24          If a patient gets too much warfarin, they
25  have an increase of bleeding [sic]; correct?

Page 127

1       A.  Yes.  They do.  It's a -- it's a -- it's a
2   known toxicity of anticoagulants.
3       Q.  And warfarin am -- is the drug that I'm
4   asking about.
5           Is the reason you don't want to just admit
6   the warfarin has an increased risk of bleeding
7   if --
8           MR. DENTON:
9               Well --
10  BY MR. HOROWITZ:
11      Q.  -- you get too much?
12      A.  I'm --
13          MR. DENTON:
14              Object.
15      THE WITNESS:
16              I already told you it did.  I -- I
17          told you that's why it was exploited for
18          rodents.  I'm trying to be precise.
19          Essentially it's not just warfarin.
20          It's -- anticoagulants in general have
21          this as a class, and I describe this in my
22          report.
23  BY MR. HOROWITZ:
24      Q.  Is warfarin the same -- well, we'll come
25  back to that.

Page 128

1           If a patient doesn't get enough warfarin,
2   they're at increased risk of stroke?
3       A.  If it's being used for that purpose,
4   that's true.  Yes.
5       Q.  Okay.  If it's being used for atrial
6   fibrillation?
7       A.  Yes.  That's true.
8       Q.  And do patients on warfarin have to be
9   regularlyty -- regularly monitored by their
10  doctors?
11      A.  Yes.  They are.  There's a monitoring
12  requirement.
13      Q.  And that's because they frequently have to
14  have their dosing adjusted; correct?
15      A.  They may.  And again, it depends on the
16  patient.  But yes, they may.
17      Q.  Do you understand that doctors and
18  patients were eager for new anticoagulants that
19  were as effective with -- as warfarin but were
20  easier to manage?
21      A.  I --
22          MR. DENTON:
23              Object to the form.
24      THE WITNESS:
25              I can't speak for all doctors and

Page 129

1           patients.  I would agree that the
2           literature describes the benefit of having
3           other -- other forms -- other drugs
4           that -- that did the same thing as
5           warfarin.  So there were benefits to
6           having choices for patients.
7   BY MR. HOROWITZ:
8       Q.  That's written up in the literature;
9   right?
10      A.  Yes.  And I even cite some of those
11  articles for you in my reference list.
12      Q.  And you understand that warfarin is
13  subject to something called individual
14  variability?
15      A.  Yes.  All drugs are subject to individual
16  variability.
17      Q.  Well, isn't warfarin one of those unique
18  drugs that is uniquely susceptible to individual
19  variability?
20      A.  So define for me what you mean by
21  "uniquely susceptible."  Because I would argue
22  that all drugs have individual variability and
23  it's not a unique feature of drug therapy.
24      Q.  Are all drugs monitored like warfarin?
25      A.  No.  They -- Well, not monitored like

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    warfarin as far as the -- the frequency.  No.
2    That is true.
3        There are many drugs that are monitored --
4    like digitalis is -- is a drug that's monitored,
5    not as frequently even as warfarin, but it is
6    monitored.
7        Q.  All right.  Warfarin is well-known for --
8    for being monitored frequently; correct?
9        A.  I answered --
10       MR. DENTON:
11         Object to the form.
12       THE WITNESS:
13         -- that for you.  I said yes.  If --
14         if by "frequently," you're meaning
15         monthly, yes.  It's -- it's typically
16         monitored monthly in patients that are on
17         long-term therapy.
18   BY MR. HOROWITZ:
19       Q.  Okay.  And if two patients take the same
20   dose of warfarin, one patient might be
21   underanticoagulated and another patient might be
22   overanticoagulated; right?
23       A.  That is true.  But it has -- but it is not
24   unique to warfarin.  That would be an
25   anticoagulant class effect as well.

Page 131

1        Q.  You believe that the NOACs are no
2    different than warfarin.  Is that what you're
3    telling me?
4        MR. DENTON:
5          Object to the form.
6        THE WITNESS:
7          I believe that they share the same
8          liabilities as far as having to be able to
9          choose a dose and identify a dose that
10         people are reliably anticoagulated and
11         they're -- not experience either
12         undercoagulation or overcoagulation.
13   BY MR. HOROWITZ:
14       Q.  So if two patients take the same dose of
15   warfarin, one patient could be underanticoagulated
16   and another could can be overanticoagulated?
17       A.  Yes.  That is true.  But it's also true of
18   other drugs in this class.
19       MR. HOROWITZ:
20         Objection.  Move to strike everything
21         after yes, that was true.
22   BY MR. HOROWITZ:
23       Q.  What -- what things can affect the -- the
24   need to adjust dose in warfarin in a particular
25   patient?

Page 132

1        A.  Well, there's a number of things that are
2    mentioned within the labeling for the drug, such
3    as diet.  Certain types of food -- foods, things
4    that affect the -- the -- the -- essentially the
5    metabolism of the drug can affect it.  Things that
6    affect kidney function, a -- there's a variety of
7    list of things that are considered.  The ones that
8    are -- probably the -- the ones that are focused
9    on most have to do with diet.  And if you can
10   control the diet in a certain way or you can
11   adjust -- if you can take a patient and take the
12   diet they're on and adjust the warfarin to their
13   diet, it can be used safely as well.
14       Q.  Isn't warfarin uniquely susceptible to
15   variability if -- if a patient eats green leafy
16   vegetables?
17       MR. DENTON:
18         Object to the form.
19       THE WITNESS:
20         Well, green leafy vegetables can
21         change, yes, the -- the activity pattern
22         of the drug.  Yes.  And it -- it is again
23         one of those things that you can adjust
24         for.  But you would -- it can -- it can
25         change the -- the way that the drug is --

Page 133

1    the pharmacokinetics of the drug are
2    changed.
3    BY MR. HOROWITZ:
4        Q.  And eating the foods that interact with
5    warfarin can lead to the formation of blood clots
6    in a atrial fibrillation patient; correct?
7        MR. DENTON:
8          Object to the form.
9        THE WITNESS:
10         It -- it -- that is one of the
11         possibilities.  Yes.
12   BY MR. HOROWITZ:
13       Q.  And eating the foods that interact with
14   warfarin can lead to the formation of stroke or to
15   a stroke in patients --
16       MR. DENTON:
17         Jesus Christ.
18   BY MR. HOROWITZ:
19       Q.  -- who have --
20       MR. HOROWITZ:
21         Excuse me?  I'll ask my question
22         again.
23   BY MR. HOROWITZ:
24       Q.  Eating foods that interact with warfarin
25   can lead to the formation of blood clot that is

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1    strokes --
2        MR. DENTON:
3            Object to the form.
4    BY MR. HOROWITZ:
5        Q. -- in patients taking warfarin; correct?
6        MR. DENTON:
7            Object to the form.
8        THE WITNESS:
9            Is it possible?  Yes.  It's possible.
10   BY MR. HOROWITZ:
11       Q. Okay.  And that's one of the reasons that
12   the drug has to be monitored every one to
13   four weeks in order to make sure the dose is
14   accurate; correct?
15       A. Well, not just based on leafy green
16   vegetables.  But certainly I would agree that it
17   is monitored -- typically it's monitored.  And
18   again, it has to do with the -- being titrated to
19   that patient and what their -- their baseline is.
20       Q. It's not just greefy -- leafy green
21   vegetables.  It's also their medical condition and
22   comorbidities; right?
23       A. Yeah.  And again, that's common to other
24   anticoagulants as well.
25       Q. Okay.  It's also other medications they're

Page 135

1    taking; right?
2        A. Yes.  Again, also common issue for
3    anticoagulants as a class.
4        Q. Let me ask you this:  Do you know when
5    warfarin was first introduced as a -- an
6    anticoagulant?
7        A. I can't tell you the year.  No.  It's been
8    around for decades, but I can't tell you the year.
9        Q. And do you know for how many decades
10   warfarin was the only choice for doctors and
11   patients with atrial fibrillation?
12       A. I can't answer that.  I don't know.
13       Q. And you're -- again, you're not a medical
14   doctor.  You don't care for and treat these
15   patients who receive anticoagulant therapy?
16       A. That's true.  I -- I do not.
17       Q. Have you ever conducted any research on
18   the relationship between pharmacokinetic
19   parameters of anticoagulants and bleeding risk
20   and --
21       A. Did you ask me did I conduct any research?
22       Q. Yeah.  And by "research," I'm not talking
23   about just looking at the literature.  I'm talking
24   about independent bench-type research, laboratory
25   research.  Have you ever done that?

Page 136

1        A. No.  I already answered that for you.  So
2    my answer earlier when I said I hadn't done
3    research, that would include any application,
4    obviously, if I haven't administered it to an
5    animal, a cell, or a tissue.
6        Q. Anything with respect to warfarin,
7    Xarelto, or other anticoagulants?  You haven't
8    done any of that?
9        A. No.  Again, I -- asked and answered
10   earlier.
11       Q. Have you ever done any work on coagulation
12   assays such as prothrombin time?
13       A. Did you say "any work"?
14       Q. Uh-huh.
15       A. Okay.  So what do you mean by "work"?  I
16   guess what I'm asking:  Are you meaning bench
17   research, or are you meaning literature research?
18   As -- I've done literature research, as you can
19   tell from reading my report.  But if you're asking
20   me for bench research, I already answered for you.
21   I have not done that.
22       Q. Okay.  Well, with respect to your
23   literature search, was that done for purposes of
24   preparing your report in this litigation?
25       A. Yes.  That's what I -- well, actually --

Page 137

1    actually, I also did some of that -- I actually
2    pulled some articles on -- or looked for articles
3    on the issue of antidotes and monitoring when I
4    was addressing issues for my mother-in-law.
5        Q. So let me ask you --
6        A. But that was a general -- just a general
7    understanding of the differences, because there
8    were claims of no need to monitor, for example,
9    within the advertising for the drugs.
10       Q. So this was with respect to the research
11   that you say you did to assist your mother-in-law
12   and have a conversation with her doctor?
13       A. Yes.
14       Q. Other than that, have you -- had you
15   looked at anticoagulation assays and prothrombin
16   time in the literature other than the research you
17   did with respect to helping your mother-in-law and
18   having a conversation with her doctor?
19       MR. DENTON:
20           Object to the form.
21       THE WITNESS:
22           Generally, yes.  In the past I've
23   worked on cases where I've had -- actually
24   had case-specific materials from -- from
25   people, and I've had blood work.  So I

35 (Pages 134 to 137)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 138

1    have looked at reference values for
2    prothrombin time in the past. And I've --
3    I have -- and I've looked at hematology
4    reports and looked at those types of
5    values and how they may or may not relate
6    to any underlying physiological problems
7    in an individual in a case I was working
8    for. I can't name you a specific case,
9    but I know I have done that before.
10   Because I have a -- I had a -- I have
11   textbooks with tabs on them to sections
12   related to hematology tests, which would
13   include looking at clotting time.
14   BY MR. HOROWITZ:
15       Q. Sure. When you say "case," you're talking
16   about litigation; correct?
17       A. Yes.
18       Q. Are you talk --
19       A. I've done other kind -- other than
20   pharmaceutical litigation.
21       Q. Right. You've done -- you've been hired
22   by lawyers to provide opinions. And you're saying
23   that in that context, in the legal arena where
24   lawyers are paying you money to provide opinions,
25   you're done this work? Is that what you're

Page 139

1    talking about?
2        A. Well -- well, not always providing
3    opinions. Sometimes I'm doing the work as a
4    consultant to the attorneys, in other words, is
5    there an issue that they need to be worried about.
6    Because I worked for defense attorneys as well as
7    plaintiffs' attorneys in -- in areas that deal
8    outside of pharmaceutical litigation.
9        Q. Right. So -- and this is outside of the
10   area of pharmaceutical litigation you're talking
11   about?
12       A. Yes. These would be cases involving
13   individuals where I had medical records to look
14   at. And some of those have been for working for
15   the defense, for insurance industry, things like
16   that.
17       Q. So -- but still we're talking about
18   consulting with lawyers who are involved in
19   litigation, and it's in overall the litigation
20   context; right?
21       A. Yes. Those have been --
22       MR. DENTON:
23           Object to the form.
24       THE WITNESS:
25           -- through attorneys. And again, I'm

Page 140

1    not necessarily providing expert witness
2    opinion. Sometimes I'm doing just
3    consulting work.
4    BY MR. HOROWITZ:
5        Q. Sure. So my question was outside of
6    litigation; right? So we know that you've -- you
7    looked at the literature on PT to perform the task
8    of preparing your report for the lawyers in this
9    litigation. And now you've told me about other
10   litigation work that you've done.
11       But other than that, you would have had
12   this one time where you went and looked at some
13   literature or did some research, I should say, to
14   assist your mother-in-law, the -- who had atrial
15   fibrillation and to have a conversation with her
16   doctor. Is that fair?
17       MR. DENTON:
18           Object to the form.
19       THE WITNESS:
20           That is what I can recall. Although
21       again, during my training, hemostasis was
22       an -- was an area covered. So I -- but I
23       don't recall specifics about what I looked
24       at at that time or what was even
25       discussed. I took human physiology

Page 141

1    courses where clotting cascades were
2    discussed, and I would have looked at the
3    literature on, for example, prothrombin
4    time.
5    BY MR. HOROWITZ:
6        Q. And what years would that have been?
7        A. That would have been between 1980 and
8    probably 1986 time frame. '84 for sure. And then
9    I did do some additional training from '84 to '86
10   in my post-doc.
11       Q. And when was the first NOAC approved?
12       A. The NOACs, gosh, much after that. I don't
13   know the first one. I believe it would have been
14   in the 2000s. Yes.
15       Q. How about Xarelto? Do you know the first
16   approval for Xarelto?
17       A. Was 2011.
18       Q. Do you consider yourself to be an expert
19   in atrial fibrillation?
20       MR. DENTON:
21           Object to the form.
22       THE WITNESS:
23           Certainly as a cardiovascular
24       pharmacologist, yes, I have expertise in
25       cardiac physiology involving arrhythmia

36 (Pages 138 to 141)

Protected - Subject to Further Protective Review

Page 142

1    generation and drugs to treat arrhythmias.
2    Yes.  But I am not a physician, so I don't
3    diagnose and treat patients with atrial
4    fib.
5    BY MR. HOROWITZ:
6        Q.  Did you tell me about in your original
7    research -- and forgive me if you did -- with
8    respect to atrial fibrillation -- again, I'm not
9    talking about just reviewing literature.  I'm
10   talking about laboratory-type work with respect to
11   atrial fibrillation.
12       A.  I thought I did, because I told you that I
13   worked with dogs and I said that I had done work
14   on drugs used to --
15       Q.  Antiarrhythmics?
16       A.  Antiarrhythmics --
17       Q.  Okay.
18       A.  -- exactly.
19       Q.  But never anticoagulants; right?  We
20   talked about that.
21       A.  That's correct.
22       Q.  Okay.  I remember now.  I'm sorry.  You
23   get to be a man of my age, and this happens.
24       MR. DENTON:
25           Wait until you get to my age.

Page 143

1        MR. HOROWITZ:
2            You start muttering.
3        MR. DENTON:
4            I --
5        MR. HOROWITZ:
6            I heard you muttering.
7        MR. DENTON:
8            I -- you weren't supposed to.  I
9    apologize.
10       MR. HOROWITZ:
11           And that's okay.
12       MR. MEUNIER:
13           I'm going to start speaking French.
14       MR. HOROWITZ:
15           I was like:  That's your internal
16   monologue.  I can hear it.
17   BY MR. HOROWITZ:
18       Q.  What about -- well, let me ask you this:
19   What is deep vein thrombosis or DVT?
20       A.  It's a condition where you have a
21   propensity to generate a thrombus or a blood clot
22   which -- within the venous system of the body.
23   And it's a common problem with individuals after
24   surgery, especially if they're immobile for a
25   while.

Page 144

1        Q.  Have you done any original research
2    concerning DVT?  And again, I'm talking about not
3    just looking at literature but actual research.
4        A.  In a laboratory, no, I have not.
5        Q.  What is venous thromboembolism or VTE?
6    Are you familiar with that?
7        A.  In general terms, yes.  Again, it's the
8    idea of throwing a clot -- an emboli, which is a
9    clot, in the venous system.  And it can travel to
10   the lungs.  It can actually kill you.  It can go
11   to -- go to different parts of the body and create
12   problems.  It could even just close off blood
13   supply to a certain limb.
14       Q.  And this will shock you.  But I have the
15   same question.  Have you done any original
16   research with respect to VTE?  And again, I'm
17   talking about laboratory-type research.
18       A.  No.
19       Q.  Same question like this with respect to
20   pulmonary embolism, which you mentioned.  Have you
21   done any original research with respect to
22   pulmonary embolism?
23       A.  In the laboratory, no.  I have not.
24       Q.  What about ischemic strokes?  Same
25   question.  Original research with respect to

Page 145

1    ischemic stroke, laboratory-type research?
2        A.  Yes.  I have produced heart attacks in
3    dogs.
4        Q.  And what was -- is that in the
5    antiarrhythmia context?
6        A.  Yes.  It was the idea of looking at --
7    well, actually also just in general, looking at
8    heart damage that is produced by ligation of
9    coronary vessels.  So looking at changes within
10   the myocardial tissue in the laboratory.
11       Q.  When was the antiarrhythmia research that
12   you're describing?  When was it done?
13       A.  In the laboratory, it would -- would have
14   been up through 1989.  So I worked in academics in
15   a basic research lab.  And our department had
16   three or four cardiovascular pharmacologists.  And
17   one of the pharmacologists that I collaborated
18   with a great deal was testing antiarrhythmic
19   drugs, and I so assisted him in his research.  And
20   I was even listed I believe on -- as a
21   co-investigator on his grants.
22       Q.  You don't hold yourself out as an expert
23   in DVT, do you?
24       MR. DENTON:
25           Object to the form.

37 (Pages 142 to 145)

Page 146

1    THE WITNESS:
2        I have expertise in what it is. But I
3    certainly don't diagnose and treat
4    patients. No. So if you're asking as a
5    physician, I do not. As a pharmacologist,
6    I am familiar with what can cause it as
7    far as its existence, how serious it is,
8    and that there are drugs that are used
9    routinely to try to prevent the formation
10   of DVT as well as drugs that are used if
11   there is a -- the presence of a thrombus
12   and you need to break that down as well.
13   BY MR. HOROWITZ:
14       Q. The basis of your knowledge with respect
15   to DVT is the published literature that you've
16   looked at?
17       A. Well, I've not done research in that area.
18   So yes. It's literature training, it being
19   discussed within, you know, different classes that
20   I took over the years in my training.
21       Q. You've never published on DVT before, have
22   you?
23       A. No. I have not done -- not have a
24   peer-reviewed publication where I mention DVT.
25       Q. You've never stood up at a -- at a

Page 147

1    presentation --
2        A. Well, that's not --
3        Q. -- of a --
4        A. -- true actually. No. I should take that
5    back.
6        My book chapter on ketorolac that I
7    recently published, I believe I discuss DVT as
8    well as myocardial infarction and small thrombus
9    generation. I'd have to look, but I think it
10   might have been discussed in there.
11       Q. Okay. Well, we'll -- we'll find that and
12   take a look at that.
13       What do you think the context of that is?
14       A. Well, I was looking at -- my -- my chapter
15   is in a book called Drug Injury. And I was
16   talking about the experience with use of ketorolac
17   in the locker room on a chronic basis in college
18   athletes and the -- and the risks that are posed
19   by the long-term use of ketorolac.
20       Q. And would you cite that in support for
21   your view that you might have some expertise in
22   DVD [sic] in the context of anticoagulants and
23   treatment of venous thrombosis?
24       A. Yes. That's one of the -- well, I was
25   looking at it there as a toxicity that you could

Page 148

1    get from drugs that are NSAIDs. So -- but yes. I
2    certainly had the literature that I reviewed and
3    -- and looked at, the relationship specifically of
4    different types of NSAIDs. Ketorolac is a very
5    potent NSAID that was being used intramuscularly
6    inappropriately.
7        Q. Other than in this litigation, has anybody
8    ever hired you for providing them your views on
9    DVT?
10       MR. DENTON:
11       Object to the form.
12   THE WITNESS:
13       I don't recall having specific
14   opinions in other cases. But I -- I -- I
15   can't guarantee that it's never been asked
16   of me. But certainly.
17   BY MR. HOROWITZ:
18       Q. And other than this litigation, have you
19   ever been hired by anyone to discuss your views on
20   venous thromboembolism?
21       MR. DENTON:
22       Same objection.
23   THE WITNESS:
24       Well, I looked at the literature in
25   the initial work. And this is crossing

Page 149

1    into Pradaxa, unfortunately. I certainly
2    had literature on Pradaxa in these -- in
3    these issues. But I did not provide any
4    opinions because that work ended before I
5    had finalized or formed my final opinions.
6    BY MR. HOROWITZ:
7        Q. And to be clear, those are the same
8    lawyers who hired you in this case to testify with
9    respect to venous thromboembolism and Xarelto;
10   correct?
11       A. I can't tell you that it's all the same
12   attorneys. But certainly Mr. McWilliams was
13   involved in both cases. Yes. Like I don't recall
14   Mr. Denton, but he tells me that he was involved.
15   So . . .
16       Q. And Mr. -- you said Douglas & London. If
17   I represent to you that -- that I've sat across
18   this table from Mr. Douglas several times, that
19   wouldn't shock you; right?
20       A. Well, I'm not --
21       MR. DENTON:
22       Object to the form.
23   THE WITNESS:
24       I've never met Mr. Douglas. I worked
25   with Lara Say. So Mr. --

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1    MR. HOROWITZ:
2        You're lucky.
3    THE WITNESS:
4        Miss -- Miss Say, absolutely it would
5    not surprise me.
6    BY MR. HOROWITZ:
7    Q.  Okay.  And so it's fair to say that other
8    than the Pradaxa litigation and the Xarelto
9    litigation, nobody's hired you to give opinions on
10   venous thromboembolism?
11   MR. DENTON:
12       Object to the form.
13   THE WITNESS:
14       The same answer I gave you for the
15   DVT.  I -- not that I recall.  I can't
16   promise that there wasn't some other issue
17   that related to that.  But . . .
18   BY MR. HOROWITZ:
19   Q.  You certainly can't cite me anyone as we
20   sit here now?
21   A.  That's correct.
22   Q.  And the same question with respect to
23   atrial fibrillation.  Outside of the lawyers in
24   Pradaxa and the lawyers in Xarelto, nobody's hired
25   you to provide them with your views of atrial

Page 151

1    fibrillation?
2    MR. DENTON:
3        Object to the form.
4    THE WITNESS:
5        No.  I can't say that that's true.
6    Because I have actually -- on many
7    different regulatory projects I've worked
8    on where arrhythmias were side effects of
9    compounds in development even, atrial
10   fibrillation would have been in one of the
11   arrhythmias we would have described or
12   discussed and looked at in animal models,
13   and then also looked at the propensity in
14   people for a variety of arrhythmias.
15       But as far as a -- have I produced any
16   specific report that dealt with a drug
17   used to treat atrial fibrillation, I can't
18   recall that specifically.  But I --
19   certainly atrial fib is a -- is a -- also
20   a side effect of some types of compounds
21   in addition --
22   MR. HOROWITZ:
23       Right.
24   THE WITNESS:
25       -- to being a disease that is treated

Page 152

1    by a compound.
2    BY MR. HOROWITZ:
3    Q.  So some of your work over your years in
4    consulting with respect to pharmacology has
5    touched on atrial fibrillation.  Is that fair?
6    A.  That's true.  As one of a variety of
7    different types of arrhythmias.
8    Q.  And you talked about the fact that you are
9    not a medical doctor.  I don't need to ask you
10   that question again.  But I do want to ask you
11   some other questions surrounding that.  Okay?
12   A.  Okay.
13   Q.  So is it fair to say you've never treated
14   a patient for atrial fibrillation?
15   A.  Yes.  That's true.
16   Q.  You've never treated a patient who has had
17   a stroke?
18   A.  No.  I have not.
19   Q.  You've never treated a patient who has had
20   venous thromboembolism such as DVT or PE?
21   A.  No.  I have not.
22   Q.  You've never treated a patient with
23   internal bleeding?
24   A.  No.  I have not.
25   Q.  And of course you've never prescribed an

Page 153

1    anticoagulant?
2    A.  No.  I have not done that.
3    Q.  And of course that means you've never
4    prescribed Xarelto?
5    A.  That is correct.
6    Q.  You've never assessed a patient's bleeding
7    risk in the context of anticoagulation therapy?
8    MR. DENTON:
9        Object to the form.
10   THE WITNESS:
11       Not as in making a patient decision.
12   No.  But certainly when you look at the
13   clinical data for -- for drugs, the issue
14   is looking at the risk of -- of bleeding,
15   for example, or the risk of stroke.  So I
16   have looked at it in that sense within the
17   data, a dataset.  But I have not made a
18   patient decision or looked at a patient's
19   risk.  No.
20   BY MR. HOROWITZ:
21   Q.  Are you talking about datasets you've
22   looked at for purposes of preparing your expert
23   report in this case?
24   A.  Yes.  Some of the -- some of the ROCKET
25   data.  Yes.

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

```
 1        Q.  Okay.  And so again, that's in the context
 2   of litigation?
 3        A.  Yes.
 4        Q.  You've never experience [sic] in balancing
 5   a patient's risk -- a particular patient's risk of
 6   a stroke against the risk of a bleed?
 7        A.  Again, in the context of the datasets,
 8   yes, looking at patients overall, but not a
 9   specific patient.  Because I don't -- I'm not a
10   physician.  I do not treat patients.
11        Q.  So it's fair to say that you're not
12   somebody who on a day-to-day basis, like the
13   doctors who prescribe this drug, have to face that
14   task of balancing a particular patient's risk of a
15   stroke against the risk of a bleed when
16   prescribing one of these drugs?
17        A.  Not as a physician.  Yes.  And my only
18   venue into that was looking specifically at risks
19   in my mother-in-law, but that's a different issue.
20   You're talking about patient decisions.
21        Q.  Right.
22        A.  No.  I do not do that.
23        Q.  I just need to ask you.  Because when you
24   -- but are you relying upon -- because it's a
25   different animal, in my view, as a lawyer.
```

Page 155

```
 1        Are you relying upon your conversation
 2   with your mother-in-law's doctor and the research
 3   that you did surrounding that for purposes of
 4   forming your opinions in this case?
 5        A.  I don't think I relied on it for purposes
 6   of forming my opinions in this case.  But
 7   certainly it's part of my experience, because I've
 8   had that conversation with a doctor and I have
 9   made a judgment about what I believed his
10   knowledge was, for example, or lack of knowledge
11   about the pharmacology of the drugs.  But other
12   than that, it's not something that I have -- I
13   don't think I've expressed an opinion like that
14   specifically in my report here.
15        Q.  When was that conversation and the --
16        A.  It would have been -- I said five.  It may
17   have only been three years ago.  I don't recall
18   the exact date.  It's been several years ago.
19        Q.  And specifically now, what was the -- the
20   -- what'd you look at?  What did you -- what did
21   you do when you said you did some research?  What
22   did you go look at to -- to get up to speed?
23        A.  Well, I was familiar with my -- my
24   mother-in-law's medical history already.  So I
25   essentially made a list of the things -- the drugs
```

Page 156

```
 1   she was already taking, what I knew she -- her
 2   underlying conditions were.  And then I did a
 3   literature search on the different NOACs that were
 4   available.  And I -- and I also was already
 5   familiar -- I was generally familiar with
 6   warfarin, but I also did pull some papers.  But
 7   there were a few papers that were talking about
 8   clinical comparisons of warfarin that were in the
 9   published literature at that time.  So I looked at
10   those.
11        Q.  Did you --
12        A.  And I essentially was looking for
13   information that would allow -- allow me to have a
14   -- have a discussion with the doctor about what I
15   thought was important in her medical history that
16   may -- he may or may not have been considering,
17   and then also the issue -- overall, looking at how
18   these drugs were or weren't indicated, what were
19   they actually indicated for use.  Because
20   sometimes doctors are using drugs off-label.  So I
21   wanted to understand which drugs had actually been
22   approved for her condition.
23        I even looked at the labeling for the
24   drugs from the -- even the PDR only from the
25   aspect of seeing if there was a contraindication
```

Page 157

```
 1   for somebody like her.
 2        Q.  Yeah.  That was -- you anticipated my
 3   question.
 4        I wanted to know if one of the sources of
 5   information that you looked at and relied upon was
 6   the label?
 7        A.  Yes.  I did look at what the labeling said
 8   to see if the doctor was -- if the doctor -- we
 9   had this conversation.  I -- I wanted to make sure
10   the doctor was using the drug on-label.  I have a
11   problem sometime -- well, I do have a problem with
12   off-label use in certain situations, depending
13   upon what that issue is.
14        Q.  So when you looked at the label, was one
15   of the labels you look at the Xarelto label?
16        A.  Yes.  I looked at Xarelto, and I looked at
17   Pradaxa.  And I -- I believe I looked at Eliquis.
18   But I -- I don't think Eliquis was approved for
19   a-fib at the time, and that's why I can't recall.
20   But I know I -- he was -- he was talking about
21   Pradaxa and Xarelto specifically in the -- in --
22   when I -- when I had a conversation with him.
23        Q.  And based on your look at the label, did
24   that help you have that conversation with the
25   doctor that you wanted to have?
```

Protected - Subject to Further Protective Review

Page 158

1    A. Well, it gave me context. I mean, I don't
2  know if it helped me. I was already familiar with
3  the -- when I read the label, I wasn't surprised
4  at some of the things I saw. I was not doing an
5  in-depth comparison, though, of the labeling to
6  see whether or not I thought there was something
7  inadequate about it. That -- I already told you.
8  I didn't do that. I would have had to have looked
9  beyond and done a much more in-depth evaluation
10 like I do when I develop opinions like I -- I did
11 to prepare my report.
12   Q. So is it fair to say that when you looked
13 at the label three or four or five years ago in
14 the context of having a conversation with your
15 mother-in-law's doctor, you did not form an
16 opinion that the label was inadequate in any way?
17   MR. DENTON:
18     Object to the form.
19   THE WITNESS:
20     I -- I did not because I was not
21   attempting to do that. I was attempting
22   to put the published literature in context
23   with what was in the label. And again, I
24   was concerned about off-label use. So I
25   wanted to make sure that there wasn't

Page 159

1   something in the label that was actually
2   reported that was relevant to my
3   mother-in-law that would -- that the
4   doctor should be considering that he may
5   not have been. He was not familiar with
6   the labels. That was sure when I -- when
7   I talked to him.
8   COURT REPORTER:
9     (Indicating.)
10  THE WITNESS:
11    Sorry. Okay.
12 BY MR. HOROWITZ:
13   Q. So it's fair to say that when you first
14 looked at the Xarelto label you didn't deem it to
15 be inadequate?
16   MR. DENTON:
17     I --
18 BY MR. HOROWITZ:
19   Q. Is that fair?
20   MR. DENTON:
21     I object to the form. Asked and
22   answered.
23   THE WITNESS:
24     I did not do an assessment of whether
25   it was adequate or inadequate. I assume

Page 160

1   that the -- that the label had accurate
2   information that had been developed from
3   the NDA, and that's -- that was my
4   assumption. So I was looking at what was
5   said in the label as a starting point and
6   what I had seen in the published
7   literature to compare that.
8  BY MR. HOROWITZ:
9   Q. Is it fair to say that the first time you
10 developed an opinion as to the adequacy of the
11 Xarelto label was after you were retained by
12 Mr. McWilliams to provide your views in this
13 litigation?
14   MR. DENTON:
15     I object to the form of the question.
16   THE WITNESS:
17     I certainly -- certainly the first
18   time I did an in-depth analysis and looked
19   at specific adequacy language would have
20   been when I saw the documents that I had
21   access to in this litigation. That is
22   true.
23 BY MR. HOROWITZ:
24   Q. So the answer to my question is the first
25 time you formed the opinions about the adequacy of

Page 161

1   the label was not until you were retained to
2   provide your views in this litigation?
3     MR. DENTON:
4       I object to the form of the question
5     and repetitive nature. This is the last
6     time you're going to get to ask it.
7     THE WITNESS:
8       I tried to answer that for you. I
9     said that certainly this is the first time
10    as we sit here today that I'm absolutely
11    telling you my opinions. But I also would
12    have formed the in-depth opinions only
13    after the complete review I did as part of
14    my work in this case. That is true.
15 BY MR. HOROWITZ:
16   Q. Have you ever published your opinions that
17 are set forth in your report?
18   A. No.
19   Q. Have you ever subjected these opinions to
20 peer review?
21   A. As in submitting a publication? No. I
22 have not.
23   Q. Have you ever advised the FDA of your
24 opinions?
25   A. No. I have not.

41 (Pages 158 to 161)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 162

1    Q. Did you consult with FDA? And I'm not
2  talking about reviewing documents. But did you
3  consult with anybody at FDA in -- in forming your
4  opinions?
5    A. I have not had any conversations, but I
6  was going to point out that I certainly have
7  relied on FDA's statements in some other
8  documents.
9    Q. Sure.
10    You've reviewed documents and interpreted
11  those statements, but you've never spoken to any
12  of those folks who wrote those statements;
13  correct?
14    A. I have not spoken to the individuals that
15  have written the statements. That is --
16    Q. And --
17    A. -- true.
18    Q. And so the basis of your opinions are
19  reviewing the documents on their face. Is that
20  fair?
21    A. Well -- and then comparing what -- what is
22  there with what then has happened over time too.
23  I mean -- I mean, there's context for -- for those
24  documents as well. But yes, I -- I certainly was
25  -- was looking at those documents based upon what

Page 163

1  was stated, what -- what opinions were expressed,
2  what data was described. Yes.
3    Q. Have you ever spoken with any of the
4  medical officers at FDA who reviewed Xarelto?
5    A. In any context?
6    Q. No. With respect to Xarelto.
7    A. Oh. With respect to Xarelto, no.
8    Q. Did you ever talk to the clinical
9  pharmacology reviewer or review team at FDA with
10  respect to Xarelto?
11    A. No. I did not.
12    Q. Have you ever informed any of those folks
13  of your opinions about Xarelto?
14    MR. DENTON:
15      I object to the form. You know
16    everything is stamped confidential. She
17    couldn't do it if she had the opportunity.
18    MR. HOROWITZ:
19      Hey, don't coach.
20    MR. DENTON:
21      No.
22    MR. HOROWITZ:
23      You can say objection, form. We've
24    been letting you go. Don't coach her.
25    MR. DENTON:

Page 164

1      You're not letting --
2    MR. HOROWITZ:
3      You're planting --
4    MR. DENTON:
5      -- me go.
6    MR. HOROWITZ:
7      -- that seed.
8    MR. DENTON:
9      No. No. No. No. No. No. No. No.
10    MR. HOROWITZ:
11      Hey --
12    MR. DENTON:
13      I have not --
14    MR. HOROWITZ:
15      -- Roger.
16    MR. DENTON:
17      Don't hey me.
18    MR. HOROWITZ:
19      I'm heying you.
20    MR. DENTON:
21      Don't hey me.
22    MR. HOROWITZ:
23      You -- you need to be heyed. A little
24  objection, form, that's fine. I'm going
25  to let -- don't coach her, Brother. Come

Page 165

1  on.
2    MR. DENTON:
3      I'm not -- I'm not coaching anybody.
4  But you know all your documents are
5  stamped confidential. She's -- and you
6  then want to ask her if she shared that
7  with anybody, trying to get her to say
8  she --
9    MR. HOROWITZ:
10      Just --
11    MR. DENTON:
12      -- violated a court order or
13  something. That's ridiculous.
14    MR. HOROWITZ:
15      All right. Roger, no more speeches.
16    MR. DENTON:
17      I'm -- I'm going to object as
18  necessary, Jeff.
19    MR. HOROWITZ:
20      Yeah. But you're not going to give
21  speeches. We're going to have to shut it
22  down or get the judge on the phone.
23    MR. DENTON:
24      I'm happy to --
25    MR. HOROWITZ:

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1          You're giving me a headache.
2          MR. DENTON:
3              -- to get the judge on the phone.
4          MR. HOROWITZ:
5              Okay.
6          MR. DENTON:
7              I'm sorry for giving you a headache.
8     BY MR. HOROWITZ:
9      Q. So -- so --
10         MR. DENTON:
11             But I am going to object.
12    BY MR. HOROWITZ:
13     Q. -- Dr. Plunkett, let's go back to my
14    questions. I can't remember where I was.
15         But you never spoke to the ClinPharm
16    reviewer or the medical officers who reviewed
17    Xarelto about your opinions of Xarelto; correct?
18     A. No. I already answered that for you.
19     Q. Okay. And you've never offered these
20    opinions that you're offering in your report in
21    this litigation anywhere else other than in this
22    litigation. Is that fair?
23     A. At this point in time that is true. Yes.
24     Q. And you didn't hold these opinions -- I
25    think we talked about that -- before you were

Page 167

1     hired to do this in-depth review for the
2     plaintiffs' lawyers. Is that fair?
3          MR. DENTON:
4              Object. Asked and answered five times
5          now.
6          THE WITNESS:
7              I believe that you have asked that.
8          And -- and that is true.
9              Other than I would point out that
10         there are some statements in my report
11         that are ones that have nothing to do with
12         -- with this particular case. There's a
13         lot -- there's information --
14         MR. HOROWITZ:
15             Yeah.
16         THE WITNESS:
17             -- here -- there are opinions I have
18         held generally about what is a oral
19         anticoagulant well before I was hired in
20         the litigation. But yes, the opinions as
21         expressed in my opinions section, that is
22         true.
23    BY MR. HOROWITZ:
24     Q. Yeah. And that's a better way I should
25    have asked the question. So thank you.

Page 168

1          With respect to your opinion specifically
2     about Xarelto in your opinion section, those were
3     opinions that you formed after you were hired and
4     -- to do your in-depth review by the plaintiffs'
5     lawyers. Is that fair?
6          MR. DENTON:
7              Object to the form.
8          THE WITNESS:
9              Certainly they were formed after my
10         in-depth review. That is true.
11    BY MR. HOROWITZ:
12     Q. And the in-depth review occurred after you
13    spoke to Mr. McWilliams and he retained you for
14    this litigation?
15     A. Yes. That is true.
16     Q. If you take a look at your report -- or
17    you may not need to look. But I'll tell you what
18    I'm -- from my notes what I'm looking at. It's
19    Page 1, Paragraph 1. I just want to ask you about
20    this phrase. You say "Integrative Biostrategies"
21    -- I know I'm skipping some things -- "works at
22    the interface of biological science, regulatory
23    affairs and business decisions to provide its
24    clients with science-based solutions."
25         Do you see that?

Page 169

1      A. Yes.
2      Q. What is a science-based solution?
3      A. It means a -- it means a -- it -- it means
4     a problem that is -- that -- where I apply science
5     to it to help solve that problem. So in other
6     words, I'm not a -- I'm not a MBA. So I don't do
7     cost-benefit analysis, for example, if somebody
8     asks me, Does it make sense that I could market
9     this drug in this way. But certainly if somebody
10    comes to me in a business decision and says,
11    Should we put money in development of this drug,
12    then I may use my science to help make a decision
13    on whether or not -- what the risks may be to
14    making that business decision and whether or not
15    the science is there to support the further
16    development, for example.
17     Q. And you believe you applied good science?
18     A. Yes. I absolutely -- I absolutely attempt
19    always to apply what I call good science.
20     Q. It's important to apply good science;
21    right?
22     A. Yes. It is.
23     Q. And anyone on Page 4, Paragraph 9, I want
24    to ask you about -- you say, "All opinions
25    expressed in this report are based on a reasonable

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1    degree of scientific certainty."
2        Do you see that?
3        A.  You mean Paragraph 8 on Page 4?  At the
4    end?
5        Q.  It could be Paragraph 8.
6        A.  Yes.  I see that there.
7        Q.  Okay.
8        A.  Right before Summary of Opinions, I have a
9    statement that says, "All of the opinions
10   expressed in this report are based on a reasonable
11   degree of scientific certainty."  And I may say
12   that other places, but I know it's there.
13       Q.  Yeah.  I have it in Paragraph 9.  But
14   that's really no matter.
15           I guess the question is -- when you use
16   the phrase "reasonable degree of scientific
17   certainty," I need to know or understand how you
18   understand that phrase and how you're using it.
19       A.  That means that I have some confidence
20   that the opinions that I'm expressing are based on
21   scientific principles, application of scientific
22   principles.  Some cases it's based on a
23   weight-of-the-evidence determination that I make
24   as far as reasonable evidence.  That -- that'll --
25   that'll be part of it.  It depends on what opinion

Page 171

1    you're talking about.
2            But essentially it has to do with -- as a
3    scientist do I think that, for example, something
4    is more likely than not, it is -- there's good
5    science behind it, that the -- the -- it may even
6    be the overwhelming evidence says that the
7    scientific issue here is based upon good science.
8    It just depends upon the application and the
9    opinion.  But that's what I mean by that.
10       Q.  So do you change your view of reasonable
11   degree of scientific certainty depending on its
12   application and the opinion you're giving?
13       A.  No.
14           Not what I'm -- but I'm telling you you
15   can use it in different contexts.  So there may --
16   so there's a different methodology that I might
17   use.  And that same statement can be made whether
18   I'm doing a weight-of-the-evidence determination
19   or not.  So, for example, if I'm doing an
20   evaluation of adequacy of the labeling, that may
21   not be a weight of the evidence.  That may be a
22   strict interpretation of -- of one piece of data.
23           So that -- so that's what I'm saying.  It
24   can have a different method to arrive, but
25   certainly the standard is the same.  It's a good

Page 172

1    science, a sound basis, a methodology that I can
2    identify, and that I have the expertise applied to
3    be able to make that statement.
4        Q.  What are the methodologies that you're
5    applying to your review with respect to Xarelto to
6    form your opinions?
7        A.  Well, it depends.
8            Again, in the regulatory context, weight
9    of the evidence is commonly used.  FDA uses it.
10   EPA uses it.  Most regulatory bodies use it.  So
11   if I'm looking at an issue of whether or not I
12   believe that there should be a warning, for
13   example, in a -- added to a label of a certain
14   product, then I use weight of the evidence to say
15   whether or not I believe that there is enough
16   information there to answer the key question on
17   whether or not it's a real -- it's a real link and
18   not just by chance alone, for example.  But I
19   don't have to have causation proven, for example,
20   for a warning.  But I do apply weight of the
21   evidence.
22           I also use risk assessment as a tool in my
23   pharmacology and toxicology opinions.  So that's a
24   process where I identify the -- the hazard that
25   I'm looking at, what data is out there to identify

Page 173

1    the hazard.  I attempt to quantify what the
2    likelihood is that that risk will or will not be
3    seen.  That's the dose-response assessment and
4    part of the -- part of the process.
5            And then I will also in -- as part of my
6    risk assessment opinions try to characterize the
7    hazard, to try to tell you something about not
8    just the likelihood but also the -- maybe how that
9    relates to the issue at hand.  So I might try to
10   put it in context of its -- whether or not it's
11   highly relevant, for example, to the -- to the
12   injury, for example, in a case, or it's highly
13   relevant to a decision that will be made.
14       Q.  So you use different methodologies that
15   you just described.  You described at least two:
16   weight of the evidence and risk assessment.  Is
17   there any that I'm missing?
18       A.  Well, those are the two basic methods that
19   are used.
20           Weight of the evidence feeds into risk
21   assessment.  So I would say weight of the evidence
22   is a -- is a common methodology used by scientists
23   regardless of what they're doing when they're
24   trying to develop some type of a summary statement
25   about an issue they're looking at.

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1     But risk assessment is a more specific
2  process because there you are looking at exposure
3  as well as hazard.  So what -- what is is -- what
4  doses produce something and what is the exposure
5  and how do we compare that and so what's the
6  likelihood that something is or isn't going to
7  happen.
8     So exposure response goes into risk
9  assessment.
10     Q.  So if I understand you correctly, your
11  labeling opinions -- in your regulatory opinions,
12  you've applied a weight-of-the-evidence
13  methodology.  But for your PK/PD and your exposure
14  response and your variability in therapeutic
15  monitoring, that would be more risk assessment?
16     A.  Be both, because weight of the evidence
17  feeds into risk assessment.
18     As part of risk assessment -- so -- so,
19  for example, when I approached this project and
20  I'm looking at the pharmacokinetic data, I'm
21  looking across whatever I can get my hands on.  I
22  want more data, more information so I can -- can
23  compare that information, look at reproducibility
24  and reliability as well.
25     If someone is asking me a question,

Page 175

1  though, about is the information in the NDA
2  sufficient to support a labeling statement, there
3  the only evidence I'll have is what was used by
4  the -- at -- was submitted as part of the NDA.  So
5  there I may be limiting how I'm using weight of
6  the evidence because I'm not going -- collecting
7  from a variety of sources but I'm -- I'm limited
8  to that source of information, which is what was
9  submitted as part of the application.
10     Q.  Do you also use your
11  weight-of-the-evidence methodology when you're
12  doing a general causation assessment?
13     A.  Yes.  Because weight of the evidence is
14  the process that allows you to analyze information
15  for causation.  So it's the idea of you want to --
16  you want to draw on all sources of potential
17  information and try to consider that information
18  with -- I use it within the confines of the Hill
19  consideration.  So --
20     Q.  The Bradford Hill criteria?
21     A.  Yes.
22     Identifying, you know, what I call
23  categories of information that allow you to
24  understand whether or not there is a sufficient
25  dataset to say there is a cause and effect or

Page 176

1  maybe there's just an association.
2     Q.  What other areas have you applied the
3  weight-of-the-evidence methodology?  What -- what
4  else is on your list?
5     A.  Well, I apply it in -- in my regulatory
6  work, when I prepare a submission.
7     So, for example, I'm working on a
8  submission right now for one of my clients where
9  we're going to describe the weight of the evidence
10  as it relates to whether or not this particular
11  ingredient can be used safely as a dietary
12  supplement.  So I'm doing a -- sort of a review of
13  the literature, describing it all, and then
14  summarizing it based on the weight of the evidence
15  for the regulatory agency.  And we're going to
16  submit that as a -- part of a petition process.
17  So that's an example.
18     Q.  Have you ever published any articles about
19  your weight-of-the-evidence method?
20     A.  Well, I published articles where I use it.
21  Yes.  So my --
22     Q.  But that wasn't my --
23     A.  In my --
24     Q.  I'm sorry.  That --
25     MR. DENTON:

Page 177

1     Well, let --
2     THE WITNESS:
3     Yeah.
4     MR. DENTON:
5     -- her finish.
6  BY MR. HOROWITZ:
7     Q.  -- wasn't my question.
8     MR. DENTON:
9     Well, let her finish.
10     THE WITNESS:
11     Well --
12     MR. HOROWITZ:
13     You changed my question.
14     MR. DENTON:
15     No.  Let her --
16     THE WITNESS:
17     Well, no.
18     MR. DENTON:
19     -- finish.
20     THE WITNESS:
21     What -- what I'm -- what -- if you
22  look at my publications that deal with --
23  the publications that I've done on the
24  issue of reproductive toxicity testing
25  programs and things like that, weight of

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

1    the evidence is described as the tool you
2    use to help develop those testing
3    paradigms.
4        So yes. The title of the paper is the
5    weight of the evidence. But you'll see me
6    specifically describe using weight of the
7    evidence to make decisions on how to test
8    materials in the chemical field. So the
9    -- I have two or three papers like that
10   that I published in the last five years.
11   BY MR. HOROWITZ:
12       Q. Are each of those papers with respect to
13   reproductive toxicology or -- or some type of
14   chemical toxicology?
15       A. They're -- they're not just chemical tox
16   -- well, chemical toxicology is -- means drugs
17   too. But I'm applying it in the -- in these
18   particular cases, I think my -- if you look at the
19   titles in my discussion, it's based around more
20   than reproductive. I have one, I believe, on
21   cancer too.
22       Q. Right.
23       A. And the issue there is applications to
24   chemical risk assessment generally. And I'm
25   focusing on work I'm doing for the chemical

Page 179

1    industry as in industrial chemicals. But it
2    certainly applies regardless of the type of
3    compounds you're looking at.
4        Q. Well, have you ever published an article
5    in the peer-reviewed literature using your
6    weight-of-the-evidence methodology with respect to
7    a pharmaceutical drug?
8        MR. DENTON:
9            Object to the form.
10       THE WITNESS:
11           Let me look. Not in a peer-reviewed
12       publication. I have some abstracts that
13       deal with that, but not in a peer-reviewed
14       publication.
15   BY MR. HOROWITZ:
16       Q. What abstracts?
17       A. So I have some abstracts that deal with --
18       Q. Are you on your CV?
19       A. Yes. I'm looking at -- let me look at my
20   -- my abstracts, slash, presentations that I've
21   done.
22       Q. Can you tell me what page you're on?
23       A. I'm -- I'm looking -- starting at Page 7,
24   I'm looking through there. So the abstract --
25   well, this is a medical device. So I -- I guess

Page 180

1    you just want pharmaceuticals?
2        Q. Yes. I want --
3        A. You don't want medical devices?
4        Q. -- pharmaceutical drugs.
5        A. Pharmaceutical drugs. Okay. So there's a
6    medical device on Page 8 where we -- where that's
7    the methodology that we used, described it.
8        Q. Is that the -- the penile prostheses?
9        A. Yes. The publications where we talk about
10   complications and the comprehensive review we were
11   looking at --
12       Q. Yeah.
13       A. -- a weight-of-the-evidence method there.
14       Q. So you applied the weight of the evidence
15   to your "Review of clinical experience of the
16   Mentor Alpha I and Mark II inflatable penile
17   prostheses" published in the 1994 abstract?
18       A. Well, it would be the one above that, the
19   one about looking at the complications. Yes.
20       Q. The complications of the inflatable --
21       A. Right.
22       Q. -- penile prostheses?
23           That's also where you applied your
24   weight-of-the-evidence methodology?
25       A. Yes. Because that's what we did -- that's

Page 181

1    what we were asked to do by the manufacturer. So
2    that's what we did.
3        Q. Okay. But my question is --
4        A. Yeah. I'm looking for --
5        Q. -- the pharmaceutical drug.
6        MR. DENTON:
7            She's not finished.
8        THE WITNESS:
9            So let me look for drugs. I know.
10       And I -- I -- that's why I wanted to just
11       clarify that you didn't just mean medical
12       therapeutics.
13           So under -- Page 11 under
14       Presentations, where I talked about
15       "Strategies for reducing adverse drug
16       reactions," I talk about weight of the
17       evidence there in that presentation.
18   BY MR. HOROWITZ:
19       Q. So you're on Page 11 of your CV?
20       A. CV, yes.
21       Q. Under Presentations?
22       A. Right.
23       Q. -- you're citing to me No. 3 --
24       A. Yes.
25       Q. -- a presentation called "Strategies for

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1    reducing adverse drug reactions:  Science versus
2    regulatory considerations.  Invited speaker for
3    the AAPS Visiting Scientist Program, Texas A&M
4    University, College of Pharmacy, Kingsville, TX,
5    May 1, 2009"?
6        A.  Yes.
7        Q.  That's not a peer-reviewed publication, is
8    it?
9        A.  No.  I -- and I -- and I -- and I thought
10   I answered that for you a minute ago.  I said let
11   me look beyond the peer-reviewed papers.  And so
12   if you don't -- if you only want peer-reviewed
13   papers, I've already answered it for you.
14       Q.  Okay.  And the answer is no, you've
15   never --
16       A.  So . . .
17       Q.  -- published the weight-of-the-evidence
18   methodology in association with the discussion of
19   a pharmaceutical drug?
20       MR. DENTON:
21           Object to the form.
22       THE WITNESS:
23           In the peer-reviewed publication
24       section of my CV, that is true.
25       MR. HOROWITZ:

Page 183

1            Okay.
2        THE WITNESS:
3            But I've done presentations where I
4        describe it, in teaching of students where
5        I've described it.  And then I've done it
6        outside of the -- and for medical devices,
7        and I've also done it for chemicals in the
8        peer-reviewed literature.
9        MR. HOROWITZ:
10           Okay.
11       THE WITNESS:
12           Chemicals generally in the
13       peer-reviewed literature.
14   BY MR. HOROWITZ:
15       Q.  Right.  And did you look through your
16   abstracts too?  There's nothing in your abstracts?
17       A.  Well, they're not -- I don't consider them
18   quote/unquote peer-reviewed publications.
19           But yes, I did.  I -- I -- I pointed you
20   to the -- the ones that were medical therapeutics.
21   And you said so -- which were devices.  And you said
22   no.  So then I --
23       Q.  Right.
24       A.  -- was going to presentations.  Where in
25   the Presentation section, I've given a number of

Page 184

1    lectures and presentations to -- that talk about
2    drugs, regulations specifically, and then the
3    application of weight of the evidence, for
4    example, during the regular -- in the regulatory
5    environment as well.
6        Q.  Well, you said only one, No. 3?
7        A.  Yes.  And there are some others that are
8    similar to that.  So let me . . .
9            There's another one.  I did a similar
10   talk, No. 7 down there, in 2006.  I -- it wasn't
11   exactly the same, but it was similar.
12       Q.  Is there --
13       A.  The same program.
14       Q.  I'm sorry.
15           But with respect to -- for example, under
16   your Presentations, No. 3 and No. 7, are there
17   materials that were presented that reflect your
18   discussion of weight-of-the-evidence methodology?
19       A.  I don't know.  I'd have to -- I mean, I
20   certainly discussed it with it because it --
21   they're under the regulatory slides.  There would
22   have been a discussion of the evidence that
23   developed -- is used to develop a drug application
24   and the -- and the -- sort of the procedures and
25   processes that FDA uses, which is weight of the

Page 185

1    evidence.
2            I don't know if I used that word.  I could
3    -- I'd have to go see if I could pull those out
4    and look for you.
5        Q.  Do you have -- do you have materials on
6    that?
7        A.  I might still have the -- the -- the one
8    from -- the most recent one.  I don't know if I
9    have the one from '06 still.  I'd have to look in
10   my archive files for that.
11           Do you want to continue to . . .
12       Q.  No.  That's okay.  I think -- let -- let
13   me -- a couple more questions, and then maybe
14   we'll take a couple minute break and I'll get some
15   thoughts in order and see what we want to do next.
16           With respect to -- going back to your
17   report -- I'm sorry to jump around on you.  Part
18   of the fun of today's activities; right?  If you
19   --
20       A.  Keep me on my toes.
21       Q.  If you go back to -- to your -- I guess
22   it's -- let's look at Page 4, for example.  I
23   think that's where you have the footnote,
24   Footnote 1.  You actually give a footnote.  You
25   say, "Weight-of-the-evidence methodology is used

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1    as part of" the "regulatory decision making of
2    many documents including the FDA," and then you give
3    a footnote.
4         Do you see that?
5    A.  Yes.
6    Q.  And I was kind of curious.  When I went
7    and looked at these -- and that's why my eyebrows
8    raised when you mentioned reproductive toxicology
9    like in that context.
10        This all looked to me like it was in the
11   in vitro -- you know, these were in -- talking
12   about the in vitro studies to assess the potential
13   carcinogenicity of a compound, and that was the
14   context they were talking about in these FDA
15   guidances and documents.
16   A.  Well, these do.  But that -- that -- that
17   doesn't mean that there -- there are other
18   guidance documents.  So if you go to the FDA
19   website -- if you need an exhaustive list, I can
20   give you an exhaustive --
21   Q.  Well, no.
22   A.  -- list.
23   Q.  No.
24   A.  But there certainly are -- there are --
25   there's guidance by FDA on how to review

Page 187

1    reproductive toxicology data, on --
2    Q.  Right.
3    A.  -- you know, on how to review cancer data,
4    on how to -- how to review IN -- you know,
5    IND submission data in general.  I mean, the --
6    and then weight of the evidence just is a common
7    tool used by regulators.  And that's what they
8    have to do.  They look at all the information they
9    have if they're going to make a decision, for
10   example, on how to label a product in a certain
11   way.
12   Q.  Is there another regulation -- I'm sorry
13   -- another FDA guidance, either a guidance for
14   pharmaceutical companies or a guidance to medical
15   officer reviewers that you can cite me that
16   discusses the weight-of-the-evidence methodology
17   you're speaking about?
18   A.  I can't -- I -- I know I have others in my
19   files.  But I -- I would have to -- have to go and
20   get them.  I can't name them off the top of my
21   head.  I have always pointed to these because
22   these were -- when you do a quick Google search,
23   you'll find these.  So . . . But I have other
24   documents in my files.
25        Again, every project I've worked on since

Page 188

1    I started at ENVIRON in 1989, weight of the
2    evidence was something we always applied as a
3    strategy when we were making a -- helping a
4    company make a decision or looking through a
5    dataset and -- and applying it to an issue that
6    was developed in the regulatory context.
7    Q.  Did you apply your weight-of-the-evidence
8    methodology in the aspirin case you were
9    discussing with Mr. Irwin or my colleague,
10   Mr. Levine, the -- the other Aaron Levine that
11   took your deposition?
12   A.  Yes, I did generally.  Yes, when I looked
13   at the -- the -- the information that related
14   levels of aspirin in blood to types of effects
15   that were reported, and then also looking at -- I
16   know I used it there because I -- I waded through
17   a lot of literature.  I was looking at -- at what
18   I call dose response.
19   Q.  And you used a similar approach there as
20   you did here, where you -- you looked at
21   literature and assessed the literature to form
22   your opinions in that case.  Is that fair?
23        MR. DENTON:
24        Object to the form.
25        THE WITNESS:

Page 189

1         Yes.  I did.  Because again, that was
2         the question being asked of me in that
3         particular case.
4    BY MR. HOROWITZ:
5    Q.  And that's what the -- the lawyers who
6    hired you, that's the question they asked you, and
7    that's the exercise they asked you to engage in.
8    Is that fair?
9    A.  Not the exercise, but certainly the
10   question.
11        The question they had for me initially in
12   that case -- I don't remember the exact wording.
13   But essentially they wanted to understand whether
14   or not a blood level was indicative of toxicity,
15   and if -- if it was indicative of toxicity, what
16   types of toxic effects would you expect to see.
17   Q.  And the weight-of-the-evidence methodology
18   is what you applied to come up with your opinions
19   in that case?
20   A.  Part of it.  And then of course not
21   everything required weight of the evidence in that
22   case.  Because part of that case also was just
23   interpret -- interpretation of a -- of a reference
24   range, for example.  That doesn't require weight
25   of the evidence.  It's there is a reference range

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1    or there's not, for example.
2        Q. Do you know what happened to that case
3    after you were deposed?
4        A. I believe that the case was denied on
5    summary judgment after my -- well, after -- no.
6    It wasn't just my deposition. They went, deposed
7    all the plaintiffs' experts. And I believe the
8    issue was product ID and understanding how much
9    she was really exposed to.
10       Q. So it's -- you know that summary judgment
11   was granted for Bayer in that case? You know
12   that; right?
13           MR. DENTON:
14               Object to the form.
15           THE WITNESS:
16               Yes. And it was my understanding it
17           was based upon an issue of -- of the
18           credibility of the product ID and the dose
19           that was ingested. Even though we had a
20           blood level showing toxicity, the issue
21           was what was the ingestion pattern.
22   BY MR. HOROWITZ:
23       Q. And --
24       A. And we had to rely on the plaintiff for
25   that.

Page 191

1        Q. And you don't have any understanding that
2    summary judgment was granted because the expert
3    testimony that you and the other plaintiffs'
4    experts provided was found to be unreliable?
5            MR. DENTON:
6                Object to the form.
7            THE WITNESS:
8                I have not heard that. No. But I
9            haven't seen the order either. This was
10           just a phone call. I always -- it -- not
11           always, sometimes they're courteous and
12           they call me and tell me the disposition
13           of a case. And I did get a phone call
14           from this particular attorney. And he
15           indicated he was going to still try to
16           pursue things in a -- but I don't know if
17           that's actually happening.
18   BY MR. HOROWITZ:
19       Q. Okay. So you have -- you don't really --
20   didn't really have much of a conversation other
21   than he told you the case was over?
22       A. Well, no. He --
23           MR. DENTON:
24               She didn't say that. I object to the
25           form.

Page 192

1            MR. HOROWITZ:
2                Oh. I'm sorry.
3            THE WITNESS:
4                No. No. And he just --
5            MR. HOROWITZ:
6                I'm just trying to --
7            THE WITNESS:
8                Yeah.
9            MR. HOROWITZ:
10               -- close it off. Yeah.
11           THE WITNESS:
12               What I conveyed to you is what I was
13           relayed.
14           MR. HOROWITZ:
15               Okay.
16           THE WITNESS:
17               Okay? So that's my memory, is what I
18           told you. I don't recall any discussion
19           as -- the way you have -- you have made a
20           statement about unreliability. I did not
21           at all get that from --
22           MR. HOROWITZ:
23               Okay.
24           THE WITNESS:
25               -- my conversation with the attorney.

Page 193

1    BY MR. HOROWITZ:
2        Q. You had no discussion with the attorney
3    about what the judge decided with respect to the
4    reliability of your testimony?
5        A. No. I did not hear that.
6            MR. HOROWITZ:
7                Okay. Why don't we take a couple
8            minutes, if that's all right with you
9            guys. Are you okay if we do that --
10           THE WITNESS:
11               No. That's --
12           MR. HOROWITZ:
13               -- real quick?
14           THE WITNESS:
15               I can --
16           MR. HOROWITZ:
17               I need to -- to take a potty break.
18           THE VIDEOGRAPHER:
19               The time now is 11:13 a.m. We are off
20           the record.
21           (Brief recess was taken.)
22           THE VIDEOGRAPHER:
23               This begins Disk 3 of today's
24           deposition. The time now is 11:29 a.m.
25           We are back on the record.

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

```
1    BY MR. HOROWITZ:
2        Q. Dr. Plunkett, thank you for -- since I'm
3    the one who requested the break, thank you for
4    accommodating me.
5        A. Sure.
6        Q. Are you ready to proceed?
7        A. Yes.
8        Q. Okay. We'll -- we'll go for a bit until
9    lunchtime. Is that fair?
10       A. That's fine.
11       Q. So when you offer science-based solutions
12   like we talked about and opinions to a reasonable
13   degree of scientific certainty and you apply the
14   weight-of-the-evidence methodology or your risk
15   assessment methodology, do you agree that whatever
16   method you're using, you should consider all of
17   the relevant information to the best of your
18   ability?
19       A. Yes.
20       Q. And you agree of course you want to be
21   objective in your analysis and not come in with
22   any sort of preconceived or predetermined notions
23   but to look at the evidence and consider it?
24       A. Yes. That's true. Although everyone
25   brings their own experience and training to a
```

Page 195

```
1    question, which is why you can have sometimes
2    different answers to the same question.
3        Q. You want to do your best, though, to
4    provide objective unbiased scientific views,
5    scientific solutions, reasonable degree of medical
6    probability, those types of things? You want to
7    be as objective as possible. Is that fair?
8        A. Yes. And I -- I do that in all my work,
9    whether it's litigation or nonlitigation work.
10       Q. You wouldn't offer an opinion simply
11   because -- I mean, for example, I'm sure you've
12   turned down cases before if you felt like you
13   really couldn't give a certain type of opinion or
14   wasn't the opinion that folks were looking for.
15   Is that fair?
16       A. Yes. I --
17           MR. DENTON:
18           Object to the form of the question.
19           THE WITNESS:
20           Oh. Sorry.
21           Yes. I do -- I do turn cases down.
22   BY MR. MR. HOROWITZ:
23       Q. And so you wouldn't offer an opinion or
24   testimony simply because you're being paid for
25   your time to provide that?
```

Page 196

```
1        A. That would be true.
2        Q. And you agree then in putting together
3    your opinions and your -- your balancing of the
4    weight of the evidence, that it's important to
5    consider the totality of data, including the data
6    that both supports your opinion and also the data
7    that's contrary to your opinion. Is that fair?
8        A. In general terms, that is true. Yes.
9        Q. You shouldn't just ignore contrary data.
10   You agree with that?
11       A. Yes. You don't just ignore it.
12       Q. And you wouldn't want to just cherry-pick
13   from the available evidence and only pull out the
14   data that you think supports your opinions. Is
15   that fair?
16       A. That is true as far as the process. I
17   mean, sometimes when you write a report, you will
18   cite the ones you're relying upon, which will --
19   obviously would be ones that are supporting the
20   statements you're making. But absolutely, as far
21   as the overall process, you certainly would be
22   considering everything that you can reasonably
23   identify. Sometimes you don't have access, for
24   example, to certain things. But yes.
25       Q. And I've seen you say that before in
```

Page 197

```
1    putting together your report. So I just want to
2    make sure I understand that.
3            Is it fair to say that there is -- when
4    you put together your reports, you focus more on
5    citing the text of your report to the data or the
6    publications or the documents or the data or the
7    evidence that you find supports your opinions?
8            MR. DENTON:
9            Object to the form.
10           THE WITNESS:
11           As any scientist, when I write a
12       sentence in my report, I -- if it's
13       something that is not just mere opinion
14       but is something based on a -- on
15       information I am basing that opinion on,
16       yes, I cite the information. I'm not
17       citing for you all of the information on
18       the weight of the evidence. I've used
19       weight of the evidence to gain an insight,
20       formed an opinion, and then I cite for you
21       examples of studies which are statements
22       or papers or analyses that are consistent
23       with the statement, to show you that
24       there's a basis in the scientific
25       literature.
```

50 (Pages 194 to 197)

Protected - Subject to Further Protective Review

Page 198

1    BY MR. HOROWITZ:
2        Q.  Why don't you also cite the evidence that
3    -- that's contrary in the text of your report?
4    Shouldn't the judge who's reviewing your report or
5    jury who's hearing your testimony, shouldn't they
6    hear about that contrary evidence also?
7        A.  Well, I --
8        MR. DENTON:
9            Object to the form.
10       THE WITNESS:
11           I -- they actually usually do because
12       I'm usually asked about that at
13       depositions.  So typically at a deposition
14       I will describe -- or will be asked about
15       studies that are the opposite of what I'm
16       saying, for example, if that's possible.
17       But sometimes that's not totally opposite,
18       but information that may not be a hundred
19       percent consistent with something I've
20       said.
21           In this particular case, however,
22       that -- it's not the -- it -- the question
23       you're asking is very relevant, in my
24       view, when you're talking about a
25       causation analysis.  So when I'm doing

Page 199

1    cause and effect and weight of the
2    evidence and I give you a list of
3    references, I try very hard when I'm at my
4    deposition to point to you all of the
5    information that's there, in other words,
6    things that are relevant.  And in -- and
7    in some of my reports, I actually do
8    describe or discuss key studies that are
9    contrary to my -- my opinion.
10       But if I don't believe the weight of
11   the evidence supports my opinion, I'm not
12   going to form that opinion.  I guess
13   that's one way to answer that question.
14   In other words, I have -- when I state an
15   opinion that I have -- like, if I'm
16   looking at epidemiology and there's
17   16 studies and I cite for you nine of the
18   16 because they truly show a statistically
19   significant association, I will certainly
20   admit that there are 16 studies out there.
21   And if you want to discuss what those
22   others say, I certainly am -- am willing
23   to do that.  And I do that in
24   deposition.  And sometimes I may even pull
25   out a critical one that I know the other

Page 200

1    side's expert has used, and I will
2    describe that.
3        But it's not -- it's not -- in most of
4    the cases I work on, it would be
5    impossible for me to prepare a report that
6    in detail describes every step in my
7    thought process that goes into weight of
8    the evidence.
9    BY MR. HOROWITZ:
10       Q.  How hard would it be to say, There are
11   studies that go -- there's these two or three or
12   four studies that go the other way, but I believe
13   I'm going to rely upon or more heavily weight
14   these other three or four studies because I find
15   them to be more persuasive or something like that?
16   How come you don't write your report that way?
17       MR. DENTON:
18           I object to the -- to the form of the
19       question.
20       THE WITNESS:
21           I can only answer that -- that -- that
22       I have used the method I have used for
23       years.  It's been accepted in state and
24       federal court.
25           So, I mean, I -- I lay out for you --

Page 201

1    again, I give you a reference list which
2    has all of those -- those pieces of
3    information in it.  I don't hide the fact
4    that I've looked at, you know, certain --
5    certain -- and if it's not in my reference
6    list, then those are the things in my
7    deposition that may come up.  I may have
8    missed something, and so in -- in my
9    deposition, I will -- will talk about that
10   with the attorney that brings something
11   up.  But I try very hard to be honest and
12   transparent about what I have reviewed.
13   And then I try to describe with you within
14   my -- my language of my report what my
15   opinions are.
16   BY MR. MR. HOROWITZ:
17       Q.  So you view -- the deposition process,
18   part of it is for the other side to come in and
19   present you with the contrary data that you may
20   have missed?
21       MR. DENTON:
22           I object to the form.  I mean, mis --
23       rephrasing her answer inappropriately.
24       THE WITNESS:
25           No.  That's not what I'm saying.  I

51 (Pages 198 to 201)

Protected - Subject to Further Protective Review

Page 202

1    don't rely on that.  But it does happen,
2    is what I'm saying to you.  So I -- I
3    guess maybe -- maybe what -- maybe what I
4    can -- can state for you is that I believe
5    the deposition process is part of this
6    process for gathering my opinion.
7    BY MR. MR. HOROWITZ:
8    Q.  Do you --
9    A.  So I --
10   Q.  -- accept -- oh.  I'm sorry.
11   A.  So I try to come to the deposition
12   prepared to describe for you in detail any paper
13   that you want to talk about that's relevant to my
14   opinions.
15   Q.  And -- I totally lost my train of thought.
16   Shocking.  Okay.  Oh.  I know what I wanted to
17   ask.
18        With respect to the reference list, do you
19   attempt to include all of the articles that may
20   even be contrary to your views even if you don't
21   discuss them in the text of your report?
22        MR. DENTON:
23        Object to the form.
24        THE WITNESS:
25        I -- I list for you all the ones I

Page 203

1    have.  So it may be that my search did not
2    retrieve every -- I mean, I -- I never
3    would claim that I have pulled every
4    article that's out there.  I do -- I have
5    a search strategy, and I can describe that
6    for you in cases that I work on, what my
7    key words were and what my criteria are
8    for selecting articles for retrieval.  And
9    so what I retrieve shows up in my list, or
10   what is in the -- sometimes articles are
11   found within the discovery from the --
12   from the case.  So I may have articles
13   that -- that I missed that may show up in
14   discovery as well.
15   BY MR. HOROWITZ:
16   Q.  And do you attempt to -- when you discuss
17   an article in your text, do you attempt to fairly
18   characterize the articles that you -- you are
19   discussing?
20   A.  From my opinion, yes.  I mean, you -- two
21   people can read two different things and come to
22   different opinions based on, again, their
23   training, their experience, you know, what they
24   know about the topic.  But yes, I try to cite
25   articles fairly based upon my interpretation, but

Page 204

1    not just of one sentence.  I try to look at the
2    article as a whole too.
3    Q.  You try --
4    A.  You know, and -- and I look at it in -- in
5    the context then of the -- and I may cite it in a
6    narrow way because I'm citing it for that specific
7    opinion.  That doesn't mean there's not something
8    else in that article you could -- that you could
9    state.  It's just I'm trying to cite for you an
10   article that supports specifically what I'm saying
11   in that particular sentence.
12   Q.  Well, as -- I think you were getting at
13   this.
14        But you wouldn't want to cherry-pick or
15   just pull out of context statements or data from
16   studies just to try to find ways to support your
17   opinion?  You wouldn't want to do that?
18   A.  Not for just finding ways, but it's very
19   possible that I will cite something from a paper
20   that is not what somebody else would cite, because
21   they may use the paper differently.  So this comes
22   up sometimes because there -- there's a -- well,
23   there's a subset of data within that I'm pointing
24   to that I think's important.
25        So in this report -- give you an example.

Page 205

1    The Mueck 2014 article, Table 3 in that paper
2    provides important information that I relied upon
3    for my opinions.  There's a lot of other
4    information in the Mueck article that I maybe
5    could have cited somewhere else, but I don't.
6    It's not that I didn't read the whole article.
7    It's not that I don't understand what he is saying
8    in his opinion as an author.  But in my analysis,
9    I was looking for data to quantify something.  And
10   I found it within that table.  So that's how I
11   cite it.
12   Q.  We'll talk about Mueck 2014.
13        But that's an example where you -- you
14   refer largely to Table 3 but not other portions of
15   the paper?
16        MR. DENTON:
17        Object to the form.  Misphrasing her
18   answer.
19   THE WITNESS:
20        I have relied on the paper as a whole.
21   But I have cited the paper, the section
22   that I felt was important to my opinions
23   was Table 3 from that --
24   MR. HOROWITZ:
25        Okay.

52 (Pages 202 to 205)

Protected - Subject to Further Protective Review

Page 206

1    THE WITNESS:  And in fact, I think I
2    -- article.  And in fact, I think I
3    cite Mueck in -- and maybe I'm not saying
4    it right.  You're -- somebody else is
5    saying something --
6    MR. HOROWITZ:
7    Mueck.
8    THE WITNESS:
9    -- different.  Mueck.  Okay.
10   So I'm citing Mueck in different
11   paragraphs.  And so it may be different
12   parts of it are cited for different ways.
13   But I'm just -- that's -- I'm just trying
14   to describe for you that it's not as
15   simple in many cases as taking a paper and
16   writing in my report everything the paper
17   says.  But instead what I'm trying to do
18   is to look at the literature, evaluate it,
19   and determine whether or not there's
20   information that's relevant to other
21   articles that I've also identified that
22   says similar things.
23   BY MR. HOROWITZ:
24   Q.  So sometimes you do just pull or
25   cherry-pick data or statements from papers?  Is

Page 207

1    that what you're saying?
2    MR. DENTON:
3    I object to the rephrasing, absolutely
4    inaccurate rephrasing of her --
5    MR. HOROWITZ:
6    Object, form.
7    MR. DENTON:
8    -- previous answer.
9    MR. HOROWITZ:
10   That's a fair --
11   MR. DENTON:
12   No.  It's -- it's a form objection,
13   and I want to make sure it's clear on the
14   record when Judge Fallon looks at this
15   transcript --
16   THE WITNESS:
17   I do not --
18   MR. DENTON:
19   -- what you're doing.
20   THE WITNESS:
21   -- cherry-pick.  No.  Cherry-picking to
22   me is taking something totally out of
23   context, and I do not do that.
24   What I do do, however, is often be
25   using information in a paper in a way that

Page 208

1    may be different than the way that
2    somebody else would use the paper.  In
3    other words, you could cite the Mueck
4    paper simply as, The pharmacokinetics of
5    -- of -- of Xarelto have been reviewed.
6    You could cite it like that.  Because it's
7    a review; right?  But then you can also go
8    to the paper and look at the -- the -- the
9    specifics of the data.  And so I've done
10   that.  I've -- I've taken the -- the data
11   out which I believe is supportive of my
12   opinion, showing that there's variability
13   as the company was aware of -- variability
14   in pharmacokinetics that the company was
15   aware of.
16   BY MR. HOROWITZ:
17   Q.  So your definition of "cherry-picking" is
18   taking something totally out of context?  Is that
19   what you said?
20   MR. DENTON:
21   That's not -- I object.
22   MR. HOROWITZ:
23   You can read it back.  I think that
24   is --
25   MR. DENTON:

Page 209

1    No.  No.  I --
2    MR. HOROWITZ:
3    -- what you said.
4    MR. DENTON:
5    -- object to you rephrasing her answer
6    in your next question.  Absolutely
7    inappropriate --
8    MR. HOROWITZ:
9    Just say objection, form, Roger.  I've
10   had enough.  Objection, form.  Seriously,
11   it's enough.
12   MR. DENTON:
13   I -- I'm.
14   MR. HOROWITZ:
15   Enough with the speech in objections.
16   MR. DENTON:
17   No.  I'm going to make it clear in the
18   record because obviously you're --
19   MR. HOROWITZ:
20   Can you show me her answer?
21   MR. DENTON:
22   -- have a technique that is absolutely
23   inappropriate.  And I want Judge Fallon to
24   be aware of this technique when he reviews
25   these transcripts.

53 (Pages 206 to 209)

Protected - Subject to Further Protective Review

Page 210

1      MR. HOROWITZ:
2         Can you show me her prior answer,
3    please.
4    THE WITNESS:
5         Can I ask -- if you're going to ask me
6    a -- oh.  Sorry.
7    MR. HOROWITZ:
8         I'm going to ask you my question in a
9    second.
10   BY MR. HOROWITZ:
11   Q.  Okay.  Did you not just testify, I did not
12   cherry-pick.  Cherry-picking is taking something
13   out of context.  Isn't that what you just told me?
14   MR. DENTON:
15        Object to the form.
16   THE WITNESS:
17        If that's my language, I -- that's
18   what I stated.  However, that doesn't mean
19   that there's not other applications of the
20   word "cherry-pick," which is what you were
21   trying to get me to agree to.  I'm not
22   saying that you can't use "cherry-pick" in
23   other contexts as well.
24        But I certainly, in this case, in
25   the -- I'm just trying to cite you an

Page 211

1    example.  I did not cherry-pick that
2    information out of that paper out of
3    context, because that information in that
4    paper clearly is a summary of the clinical
5    information on the pharmacokinetics
6    and --
7    MR. HOROWITZ:
8         Ma'am --
9    THE WITNESS:
10        -- has information that's relevant to
11   the statement I'm making.
12   MR. MEUNIER:
13        Objection.  Move to strike.
14   Nonresponsive.
15   BY MR. HOROWITZ:
16   Q.  I didn't ask you about the Mueck 2014
17   paper.  You interjected that.  We were just having
18   a general discussion.
19   MR. DENTON:
20        No.  You weren't.  And I object to
21   this --
22   MR. HOROWITZ:
23        So --
24   MR. DENTON:
25        -- Mr. Horowitz.  I absolutely --

Page 212

1    MR. HOROWITZ:
2         Just --
3    MR. DENTON:
4         I know.  I absolutely --
5    MR. HOROWITZ:
6         Roger, stop cutting me off.  Let me --
7    MR. DENTON:
8         No.
9    MR. HOROWITZ:
10        -- ask my question.
11   MR. DENTON:
12        No.  Not when you're asking
13   inappropriate questions and clearly trying
14   to take things out of context and trying
15   to rephrase her answers inappropriately.
16   MR. HOROWITZ:
17        I just want --
18   MR. DENTON:
19        I do have a problem with that --
20   MR. HOROWITZ:
21        Okay, Roger.  You have --
22   MR. DENTON:
23        -- Mr. Horowitz.
24   MR. HOROWITZ:
25        -- a problem.

Page 213

1    MR. IRWIN:
2         Object to --
3    MR. HOROWITZ:
4         Form objection.
5    MR. IRWIN:
6         -- the form, Roger.  This is --
7    MR. DENTON:
8         No.  No.  No.  No.  No.  No.
9    MR. HOROWITZ:
10        This is way beyond the bounds, Roger,
11   way --
12   MR. DENTON:
13        No.  Here's --
14   MR. HOROWITZ:
15        -- way beyond the bounds.
16   MR. DENTON:
17        -- the problem, gentlemen.  Here's the
18   problem:  You guys want to have a
19   nondescript objection to an obvious
20   technique that is clearly here going on in
21   this deposition room that's absolutely
22   inappropriate.  And I want it clear on the
23   record when Judge Fallon reviews all these
24   objections, that he understands what is
25   going on from our perspective in this

54 (Pages 210 to 213)

Protected - Subject to Further Protective Review

Page 214

1    deposition. And I'm going to make that
2    record.
3    BY MR. HOROWITZ:
4        Q. Doctor, I just want to know -- I believe
5    you told me -- and I just want to confirm that
6    your definition of cherry-picking from a study
7    includes taking something totally out of context.
8    That's what you told me; right?
9        MR. DENTON:
10           Object to the form.
11       THE WITNESS:
12           You can discuss cherry-picking in the
13       context of taking things that -- that way.
14       Yes.
15       MR. HOROWITZ:
16           Okay.
17       THE WITNESS:
18           That is one. But there are -- again,
19       cherry-picking can mean more than that as
20       well.
21       MR. HOROWITZ:
22           I -- I understand that. I'm asking --
23       MR. DENTON:
24           Well, let her finish.
25       MR. HOROWITZ:

Page 215

1        -- a simple question.
2        MR. DENTON:
3            No. No. No. No.
4        MR. HOROWITZ:
5            Absolutely not.
6        MR. DENTON:
7            No. No.
8        MR. HOROWITZ:
9            You're going beyond -- you're just
10       filibustering.
11       MR. DENTON:
12           No.
13       THE WITNESS:
14           I'm not --
15       MR. HOROWITZ:
16           Answer my question.
17       THE WITNESS:
18           I --
19       MR. DENTON:
20           Wait a minute. We're going to take a
21       break. We're going to take a break so you
22       can calm down, Jeff.
23       MR. HOROWITZ:
24           I'm perfectly calm. The video will --
25       MR. DENTON:

Page 216

1            No. You --
2        MR. HOROWITZ:
3            -- show that --
4        MR. DENTON:
5            No.
6        MR. HOROWITZ:
7            -- absolutely.
8        MR. DENTON:
9            We're taking a break. We're taking a
10       break so you can calm down.
11       MR. HOROWITZ:
12           Roger, there's no need to take a
13       break. Nobody's --
14       MR. DENTON:
15           I am taking a break. I am --
16       MR. HOROWITZ:
17           You're the only one who seems up in
18       arms.
19       MR. DENTON:
20           No. I'm up in arms because you were
21       treating her disrespectfully.
22       MR. HOROWITZ:
23           Absolutely not.
24       MR. DENTON:
25           You're cutting --

Page 217

1        MR. HOROWITZ:
2            The video --
3        MR. DENTON:
4            -- off her answers.
5        MR. HOROWITZ:
6            The video will show exactly --
7        MR. DENTON:
8            I know that. You're --
9        MR. HOROWITZ:
10           -- how I'm being.
11       MR. DENTON:
12           -- cutting off her answers. You're
13       not liking her answers. You're repeating
14       her answers in questions out of context,
15       inappropriately. And then you're
16       frustrated and taking it out on me and
17       certainly taking -- which is fine.
18       MR. HOROWITZ:
19           I think you just --
20       MR. DENTON:
21           But -- but --
22       MR. HOROWITZ:
23           -- accused me of cherry-picking.
24       MR. DENTON:
25           But you are inappropriately treating

55 (Pages 214 to 217)

Protected - Subject to Further Protective Review

Page 218

1    Dr. Plunkett.
2    MR. HOROWITZ:
3        I am not.
4    MR. DENTON:
5        And I have a problem with that.  And
6    you can laugh.  You can smile.
7    MR. HOROWITZ:
8        And so -- so are you, Roger.  So --
9    there's no camera on you.
10   MR. DENTON:
11       No.  Actually I'm not.
12   MR. HOROWITZ:
13       But we're actually, you know --
14   MR. DENTON:
15       No.
16   MR. HOROWITZ:
17       -- trying to be gentlemen here.
18   MR. DENTON:
19       I am.
20   MR. HOROWITZ:
21       Dr. Plunkett --
22   MR. DENTON:
23       I am.  So please --
24   MR. HOROWITZ:
25       -- are you ready to proceed?  I'm --

Page 219

1    I'm being as gracious I can.  But if you
2    would do your best to answer my
3    questions --
4    MR. DENTON:
5        She --
6    MR. HOROWITZ:
7        -- I would appreciate it.
8    MR. DENTON:
9        She has been for the last three hours.
10   BY MR. HOROWITZ:
11       Q.  Okay.  So Doctor, I have a question about
12   something I didn't see on your review list.
13       Well, let me ask it this way:  You -- you
14   have a PhD in pharmacology; right?
15       A.  Yes.
16       Q.  And you consider your primary expertise of
17   course to be pharmacology.  Is that fair?
18       A.  Pharmacology and toxicology because I did
19   a pharmacology research project in my training on
20   a toxicity endpoint.  So I would say those two
21   hold equal -- equal value as far as my training
22   and experience.
23       Q.  Did you review any of the -- what I'll
24   call company witness depositions to prepare your
25   opinions in these cases?

Page 220

1        A.  No.  I have not seen any depositions of --
2    of I -- I don't believe anyone at this point in
3    time.  I usually will see them.  I mean, usually
4    that's discovery that comes later.
5        Q.  Well, do you know that the deposition of
6    the lead clinical pharmacologist program for
7    rivaroxaban was taken in January of 2016?  Did you
8    know that?
9        A.  No.  I -- I haven't seen any company
10   depositions.  So I couldn't tell you dates or who
11   they were.
12       Q.  Is that something you normally would look
13   at in forming your opinions?
14       A.  Well, it depends on the opinions that --
15   that I was attempting to develop.  I mean, this
16   particular case, I don't believe that I needed to
17   see company witness deposition testimony to form
18   the opinions that I did or I would have asked for
19   that.
20       Q.  So you didn't ask for the deposition for
21   the lead clinical pharmacologist on the
22   rivaroxaban program before forming your opinions
23   in this case?
24       A.  No.  I did not.
25       Q.  And do you know -- do you know who

Page 221

1    Wolfgang Mueck is, the author of the 2014 paper?
2        A.  Do I know him personally?  No.  Do I know
3    about his credentials as cited in the paper?  Yes.
4        Q.  Do you know what role he played on the
5    rivaroxaban program?
6        A.  No.  I don't know his specific title
7    within the program.  No.  I know he was an
8    employee working on the program.
9        Q.  Did you know that he was also deposed in
10   this litigation?
11       A.  Again, I can't -- no.  I do not.  And I --
12   if you -- you can ask me any name that's an
13   employee for Bayer or Janssen that's been deposed
14   and I would not know because I have not reviewed
15   any of those depositions.
16       Q.  So it's fair to say that before forming
17   your opinions in this case, you didn't review the
18   deposition of the lead pharmacokinetics expert on
19   the rivaroxaban program, Wolfgang Mueck?
20   MR. DENTON:
21       I -- well, I object to that -- form of
22   the question.
23   THE WITNESS:
24       I don't know who he was.  But I
25   certainly did not -- I mean, if -- I don't

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 222

1    know whether he fits the criteria you're
2    describing.  But certainly I have not
3    reviewed his deposition.
4    BY MR. HOROWITZ:
5        Q.  And the reason you don't know he fits the
6    criteria I'm describing is because you haven't
7    reviewed his deposition; right?
8        MR. DENTON:
9        I -- I object to the form.
10       THE WITNESS:
11       Well, no.  I probably could get that
12           from some other place.  But I certainly
13           did not review his deposition.
14   BY MR. HOROWITZ:
15       Q.  And as part of your methodology and your
16   weight-of-the-evidence methodology that you
17   applied in forming your opinions with respect to
18   rivaroxaban and its pharmacokinetics and its
19   pharmacodynamics and its -- its variability, you
20   did not factor into those opinions anything the
21   lead pharmacologist or the lead pharmacokineticist
22   from Bayer testified to in their deposition?
23       MR. DENTON:
24       I object to the form.
25       THE WITNESS:

Page 223

1        I have not read their depositions.
2           But certainly I did review and rely upon
3           published peer-reviewed information by at
4           least one of those individuals.  And I'd
5           have to look the name of the other up to
6           see if it's on any other papers.
7    BY MR. HOROWITZ:
8        Q.  I think you said earlier something -- I'm
9    not going to try and characterize exactly what you
10   said because these are my notes and I don't want
11   Roger to be angry with me.
12       MR. DENTON:
13       I'm not angry.  I'm just trying to
14           keep it within the bounds of the rules.
15       MR. HOROWITZ:
16       I don't want Roger to try and keep me
17           within the balance.
18   BY MR. HOROWITZ:
19       Q.  What I -- what I wanted to ask you about,
20   though, is -- you said you try to look at
21   something like whatever you can get your hands on,
22   whatever was submitted to FDA with respect to the
23   issues that you're opining about.  Do you recall
24   saying something like that?
25       MR. DENTON:

Page 224

1        Object to the form.
2    THE WITNESS:
3        If you were asking me about generally
4           in -- in methodology I used, I have done
5           that in the past.  Yes.
6    BY MR. HOROWITZ:
7        Q.  Do you agree that it would be important
8    here to have reviewed all of the information that
9    you could get your hands on that was actually
10   provided by the companies to FDA with respect to
11   the PK and PD and variability issues and
12   therapeutic drug monitoring issues that you've
13   opined about in your report?
14       MR. DENTON:
15       Object to the form.
16       THE WITNESS:
17       Not necessarily.  No.  Because the --
18           if you look at my opinions and the things
19           that I have stated and the information I
20           have relied upon, in many of -- many
21           cases, the opinions I rely upon is
22           actually pointing out that it was
23           something that was known that FDA -- FDA
24           had actually concluded as well.  So they
25           have reviewed all the information the

Page 225

1        company has sent in.  And this is a
2           conclusion I point to from FDA.
3    BY MR. HOROWITZ:
4        Q.  So one of the questions I wanted to ask
5    just popped into my little tiny brain.  I didn't
6    see this in your report.  So I'm not suggesting
7    you should opine on this.  Because when I ask
8    this, I'm like:  Oh.
9        But I don't think you're offering the
10   opinion that Bayer or Janssen failed to provide
11   information that they had to FDA about the issues
12   you're opining on.  Is that fair?
13       MR. DENTON:
14       Object to the form.
15       THE WITNESS:
16       Certainly I have not formed that
17           specific opinion at this period -- period
18           of time.  However, it doesn't mean that
19           that wouldn't become a relevant issue
20           depending upon how questions are asked at
21           trial.
22   BY MR. HOROWITZ:
23       Q.  Okay.  But as you sit here now, based on
24   your weight-of-the-evidence review of the
25   material, and your risk assessment review of the

57 (Pages 222 to 225)

Page 226

```
 1    material, you haven't identified any data or
 2    evidence that you feel the companies failed to
 3    provide to FDA?
 4        A. That --
 5            MR. DENTON:
 6                Object to form.
 7            THE WITNESS:
 8                -- isn't something that I have
 9            identified as a specific opinion at this
10            point in time.  That is true.
11    BY MR. HOROWITZ:
12        Q. Okay.  And same question that Mr. Irwin
13    asked you earlier.  Obviously if something comes
14    up between now and trial, so that we're not
15    surprised at trial, that's something you'd let us
16    know?
17        A. Yes.
18            And I would point out that -- that I think
19    when you look at my opinions, I'm talking about
20    what information was not provided to physicians.
21    And so I think those -- the opinions that you're
22    discussing, I think that's the relevant endpoint,
23    is what the physicians -- what were physicians
24    provided with.
25            MR. HOROWITZ:
```

Page 227

```
 1            Right.  Objection.  Move to strike.
 2        Nonresponsive.
 3    BY MR. HOROWITZ:
 4        Q. Do you think it would be important in
 5    forming your opinions in this case as to the
 6    adequacy of the labeling with respect to the
 7    issues that you have opined about in your report
 8    to have reviewed the data submitted by the company
 9    to FDA that formed the basis for the labeling that
10    was developed?
11            MR. DENTON:
12                Object to the form of the question.
13            THE WITNESS:
14                Well, I think I did do that with
15            looking at the FDA documents, because they
16            make very specific statements about the --
17            the data that actually fed into the
18            sections of labeling that -- that I think
19            I am describing.  So I think I did do
20            that.  I certainly did not attempt to
21            identify every piece of FDA
22            correspondence, however, at this point in
23            time.  That doesn't mean that later on
24            some documents will become available that
25            -- that would fit that category.  But I
```

Page 228

```
 1    haven't attempted to do that.
 2    BY MR. HOROWITZ:
 3        Q. So the basis of your opinions as to what
 4    formed the data that went into the labeling with
 5    respect to Xarelto in the -- in the -- on the
 6    issues that you've opined about is not the -- you
 7    haven't done your own independent review of the
 8    company's submissions.  You just looked at the
 9    FDA's reviews of the company's submissions.  Is
10    that fair?
11            MR. DENTON:
12                Object to the form.
13            THE WITNESS:
14                No.  That's not true.  So I have
15            looked at the ROCKET data.  So I have the
16            ROCKET -- I don't know.  It was like
17            2500 pages, a huge document.
18    BY MR. HOROWITZ:
19        Q. The clinical study report?
20        A. Yes.
21            And I have looked at sections that are
22    referred to with -- within the FDA document.  And
23    I have looked at some of the sections -- by going
24    through the table of contents, some of the
25    sections of that that are relevant to my opinions,
```

Page 229

```
 1    so some of the -- the -- the charts and graphs and
 2    tabulations of data that are there.
 3        Q. Okay.
 4        A. I have also looked at the published --
 5    there's some publications obviously as well that
 6    are summaries of the ROCKET clinical data.  I
 7    mean, the Mueck paper is an example of -- he's
 8    describing the clinical data.
 9        Q. Okay.
10        A. I have also looked at some of the
11    peer-reviewed articles that are publications of
12    ROCKET.  And then also I've seen other clinical
13    trials.  EINSTEIN I believe is a later trial,
14    possibly, maybe.  Maybe that's a different drug.
15    But the other -- I looked at the trials that had
16    to do with the original NDA submission as well.
17    So there are some published peer-reviewed articles
18    on that.
19        Q. You don't know what the EINSTEIN program
20    was?
21        A. I'd have to -- I -- that's -- it's an
22    acronym I -- I believe was related to this drug at
23    a later -- the -- the next indication, but I'd
24    have to go back and look.  I believe it was the
25    next indication beyond atrial fib.
```

58 (Pages 226 to 229)

Protected - Subject to Further Protective Review

Page 230

1    Q. Let me show you -- since I --
2    A. Maybe acute coronary syndrome, it might
3  have been.
4    Q. Since I took the trouble of shipping some
5  of these documents, I might as well use some of
6  them. I'm going to mark as Plunkett 8 a document
7  that was also Mueck 38's deposition exhibit.
8    (Exhibit No. 8 was marked for
9    identification and attached hereto.)
10   MR. DENTON:
11     How do you say his name?
12   MR. HOROWITZ:
13     You know, I say Mueck, and then Pamela
14   always yells at me and says it's Mueck.
15   MR. DENTON:
16     Well --
17   MR. HOROWITZ:
18     Mueck.
19   MR. DENTON:
20     -- somebody from Bayer the other day
21   called him Mueck.
22   MR. HOROWITZ:
23     Yeah. He's not Mueck.
24   MR. MEUNIER:
25     It's M-U-E-C-K?

Page 231

1    MR. HOROWITZ:
2      Yeah.
3    MR. MEUNIER:
4      It's like it's got the umlaut.
5    MR. DENTON:
6      I don't want to --
7    MR. HOROWITZ:
8      It's got the umlaut.
9    MR. DENTON:
10     -- be disrespectful to the -- the
11   doctor. I just don't know --
12   MR. HOROWITZ:
13     No. I know. I know you're not trying
14   to be.
15   MR. DENTON:
16     I just don't want to --
17   MR. HOROWITZ:
18     I will -- again, I've always called
19   him Mueck, and I actually think that's
20   wrong. I think it's Mueck.
21   MR. BONEY:
22     Like Über.
23   MR. DENTON:
24     Über.
25   MR. HOROWITZ:

Page 232

1      Yeah. I know. That's -- my face does
2    that too, Roger. So . . .
3    MR. MEUNIER:
4      Mueck.
5    THE WITNESS:
6      You know, I don't -- do they have the
7    umlaut in the public paper? Didn't see
8    that. I'd have to look.
9    MR. HOROWITZ:
10     That -- that is not --
11   THE WITNESS:
12     I don't remember that.
13   MR. HOROWITZ:
14     -- a pending question, Doctor.
15   THE WITNESS:
16     Yeah. I don't know that it was in
17   there. So . . .
18   MR. HOROWITZ:
19     We'll do that at lunch.
20   THE WITNESS:
21     But it does make a difference on
22   pronunciation. So that's a good point.
23   BY MR. HOROWITZ:
24   Q. So Doctor, going back to the task at hand,
25   I've handed you a document that was marked as

Page 233

1  Mueck 38. It's a Johnson & Johnson Pharmaceutical
2  Research & Development, LLC clinical summary of
3  rivaroxaban, 2.7.2, Summary of Clinical
4  Pharmacology Studies.
5      Have you seen this document before?
6    A. If it's in my list, I have. I don't
7  recall it. But that doesn't mean anything. If --
8  if you can -- if you want me to do a comparison
9  quickly to my list in Appendix C . . .
10   Q. Well, I've done that comparison. Because
11  I was interested to see obviously whether -- going
12  back to sort of your -- what the deposition
13  process is about in our discussion, I couldn't
14  find this. It certainly wasn't cited in the text
15  of your report, and it did not appear on your
16  materials reviewed list. And we tipped it upside
17  down to try and ascertain that.
18     Do you have any --
19   A. So if it's not in there, then I have not
20  seen it before. And so if you're going to ask me
21  questions on it, I'm going to need to take a look
22  at it. So --
23   Q. Sure. Sure. And you can -- you can take
24  a look. But let me ask you some high level
25  questions about the fact of it. And certainly if

59 (Pages 230 to 233)

Protected - Subject to Further Protective Review

Page 234

1    you want to take a moment now and look at it,
2    that's fine.  But I don't -- I don't need you
3    to --
4        A.  Well, ask --
5        Q.  -- review the whole thing.
6        A.  So ask your question, and I'll tell you
7    whether I need to look at it further.  How --
8        Q.  Okay.
9        A.  -- about that?
10       Q.  Well, let me start with this first
11   question:  It's fair to say if it wasn't on your
12   materials reviewed list, it's not cited in your
13   text, we can agree this is not a document you
14   reviewed and relied upon in forming your opinions
15   in this case?
16       A.  Yes.  That is true.
17       Q.  And do you know what a summary of clinical
18   pharmacology studies is in general terms?
19       A.  Yes.
20       Q.  And I assume in your consulting work and
21   all your work in -- in -- you know, with -- with
22   respect to consulting over the years, you have
23   reviewed summaries of clinical pharmacology
24   studies?
25       A.  Yes.

Page 235

1        Q.  And do you understand the importance of
2    clinical pharmacology studies to the regulatory
3    bodies like FDA in reviewing applications for new
4    drugs?
5        A.  In general terms, yes.
6        Q.  Okay.  And do you know what role this
7    document plays in forming the basis of labeling
8    with respect to drugs in general?
9        A.  Well -- yes.  In general terms, yes.
10       Q.  And do you understand that the data that
11   supports the labeling sections of the clinical
12   pharmacology section of the label is -- is to be
13   included in this type of document?
14           MR. DENTON:
15               Object to the form.
16           THE WITNESS:
17               It may be in other documents as well.
18       But certainly there should be some
19       information in -- in here that's relevant
20       to certain sections of the label, but not
21       all.
22   BY MR. HOROWITZ:
23       Q.  And did you review any of the individual
24   study reports for rivaroxaban other than -- and by
25   "study reports," I mean clinical study reports for

Page 236

1    either Phase 1, Phase 2, or Phase 3 other than the
2    ROCKET clinical study report that you mentioned?
3        A.  Not the actual study reports.  I reviewed
4    the summaries that were provided in the different
5    briefing materials where the -- the -- some of
6    those studies are described in some detail.  But I
7    did not pull the -- or ask to look at all of the
8    individual study reports.  No.
9        Q.  And the -- the summaries you're referring
10   to, they're in the FDA reviews of the materials
11   provided?
12       A.  The briefing materials as well.  So they
13   had an advisory committee, and there was briefing
14   materials that are described, which give a lot of
15   detail actually on data.  And in my experience, a
16   lot of the information there is lifted directly
17   out of the study reports.  That's typically what
18   FDA would do.
19       Q.  Right.  But just to be clear, for the FDA
20   advisory committee -- and we'll look at this
21   document in a little bit when I pull it out of my
22   enormous box over here.
23           But the briefing document you're talking
24   about is what FDA put together, which was largely
25   a compilation of the FDA medical officer review

Page 237

1    and the clinical pharmacology summary by FDA, as
2    well as the FDA summary review was put together in
3    a package which became the advisory committee
4    briefing document.  Is that fair?
5            MR. DENTON:
6                Object to the compound form --
7            THE WITNESS:
8                That is --
9            MR. DENTON:
10               -- of the question.
11           THE WITNESS:
12               Certainly that -- that document
13       contains generally those things you're
14       describing.  However, there is detail in
15       the document.  It's not just a
16       one-paragraph summary.  I mean, honestly
17       they -- the -- the -- the reviewers are
18       describing detailed pieces of data.  You
19       know, they -- they talk -- they show the
20       -- the same graphs and -- and charts that
21       you find within the summary report.  What
22       you won't find is the individual patient
23       data, for --
24           MR. HOROWITZ:
25               Right.

60 (Pages 234 to 237)

Protected - Subject to Further Protective Review

Page 238

1     THE WITNESS:
2     -- example.
3   BY MR. HOROWITZ:
4     Q. So -- but my question was:  You -- you
5   relied upon that, the FDA's review, other than
6   going to look at some pieces of the clinical study
7   report in ROCKET for purposes of assessing the
8   data itself?
9     MR. DENTON:
10     Object to the form.
11    THE WITNESS:
12     No.  I actually looked at ROCKET as
13    well, because the -- I wanted to compare
14    what was in ROCKET with what was in those
15    briefing materials.  Because I felt that
16    -- so the critical -- some of the very
17    specific data that I point you to in the
18    -- in those documents is data that's right
19    out of the ROCKET report.  So I'm -- I
20    found that that information -- I wanted to
21    take a look at that, and I did take a look
22    at that as well.
23  BY MR. HOROWITZ:
24    Q. Is it your understanding it's out of the
25  FDA's report or the company's report?

Page 239

1     MR. DENTON:
2     Object to the form.  What?
3     THE WITNESS:
4     ROCKET is a clinical study report.  I
5     reviewed the clinical study report.  I
6     also looked at what FDA describes in their
7     summary review based on their analysis of
8     the ROCKET data.
9     Does that answer your question?
10  BY MR. HOROWITZ:
11    Q. I think so.  We'll -- we'll get back to
12  this later, because it's hard to do without the
13  document.
14    With respect to the document in front of
15  you -- and if you want to take a moment to look at
16  it.  I mean, it just --
17    A. Well, it depends on what you're going to
18  ask me.
19    Q. Yeah.
20    A. That's why I said if you want to ask a
21  question and then I can maybe direct --
22    Q. Why -- why don't I ask --
23    A. -- my review.
24    Q. -- my question and -- and then, you
25  know -- just take a look at the table of contents

Page 240

1   just to orient yourself.  We can do it together, I
2   think.
3     MR. DENTON:
4     For the record, the document per the
5     table of contents is 393 pages long.
6     MR. HOROWITZ:
7     And -- right.
8   BY MR. HOROWITZ:
9     Q. And it's the -- it's section 2.7.2, the
10  summary of clinical pharmacology studies; correct?
11    A. That's in the title.  Yes.
12    Q. Okay.  And then the table of contents,
13  as -- as Mr. Denton conveniently pointed out -- I
14  mean, this is a 393-page document.  Is that fair?
15    A. Yes.
16    Q. And it's got several sections.  Section 1
17  is Background and Overview, which includes the
18  background.  And -- and then Section 1.2.2, PK and
19  metabolism; 1.2.3, PD and PK, slash, PD
20  relationships; 1.2.4, Influence of intrinsic
21  factors on rivaroxaban PK characteristics and PD
22  behavior; Section 1.2.5, Drug-drug interactions
23  potential of rivaroxaban (influence of extrinsic
24  factors of rivaroxaban PK and PD).  It includes PK
25  interaction studies, PD interaction studies.  And

Page 241

1   this is -- and then population PK/PD evaluations
2   and patient populations and then conclusions.  And
3   that's just Section 1, the Background and
4   Overview.  Do you see that?
5     (Mr. Meunier exits the deposition.)
6     THE WITNESS:
7     Yes.
8     Except I would point out that what
9     you're -- this section -- the ones where
10    you went into the detail on three numbers,
11    that's the executive summary.  So what
12    you're -- what -- what this section is is
13    a -- is a summary of then what is found
14    later on in the document in more detail.
15  BY MR. HOROWITZ:
16    Q. Right.  And then the --
17    A. So yes.  But -- so you were referring to
18  the executive summary section as written by the
19  company.  Yes.
20    Q. Right.  And this -- this is -- right.
21    And then No. 2, Summary of Results of
22  Individual Studies, do you see that?
23    A. Yes.
24    Q. Okay.  And when you say it's written by
25  the company -- but the company submits this to

61 (Pages 238 to 241)

Protected - Subject to Further Protective Review

Page 242

1    FDA; right?
2        MR. DENTON:
3        Well --
4        THE WITNESS:
5        Yes.
6        MR. DENTON:
7        -- object to the form.  Go ahead.
8        THE WITNESS:
9        Yes.  But the context is -- this is
10       the company's opinion of their studies,
11       and then there is the -- the FDA's
12       analysis of the studies and the -- and the
13       decision of the regulatory body on
14       approval or nonapproval, which is what the
15       documents that I -- that I have also cited
16       are talking about.
17       BY MR. HOROWITZ:
18       Q.  Did you go to Section 2.2?  See, it says
19       "Summary of Studies in Special Populations -
20       Extended Phase 1 Program."  Do you see that?
21       A.  Yes.
22       Q.  And then there's a list of studies,
23       Study 11529, Single-Dose escalation study in
24       elderly patients; Study 11569, Age comparison
25       study; Study 10850, Age and gender study;

Page 243

1    Study 11568, Body weight comparison study;
2    Study 11002, Renal impairment study; Study 11003,
3    Hepatic impairment study; Study 12980, PK, slash,
4    PD analysis in CF -- CHF patients, congestive
5    heart failure patients.
6        Do you see all those studies listed there?
7        A.  Yes.  I do.
8        Q.  Did you yourself go pull those study
9    reports and review the data yourself?
10       A.  I did not pull the study reports.  Instead
11   I relied upon -- in some of those cases I relied
12   upon the summaries of those data by the company
13   within the published peer-reviewed literature.
14   Some of the Mueck papers are describing those
15   particular studies.  And then I also reviewed the
16   FDA summary.
17       COURT REPORTER:
18       (Indicating).
19       THE WITNESS:
20       I'm sorry.  I was talking too fast.
21       FDA summary of those studies as well.
22       And actually some of those studies in the
23       FDA document are specifically pulled out.
24   BY MR. HOROWITZ:
25       Q.  So the answer to my question is,

Page 244

1    Mr. Horowitz, no, I did not go pull those study
2    reports and look at the raw data myself.  Is that
3    fair?
4        MR. DENTON:
5        I -- no.  It's not fair.  I object to
6        the form of the question and the
7        rephrasing of an answer inaccurately for
8        the follow-up question.  That's absolutely
9        inappropriate.
10       THE WITNESS:
11       I --
12   BY MR. HOROWITZ:
13       Q.  Either you did or you didn't do it.
14   Did -- did you go pull the study reports or didn't
15   you?
16       A.  I --
17       MR. DENTON:
18       I object to the form of the question,
19       Jeff.  Come on.  She's given you very
20       direct answers to these questions of what
21       she did.
22       THE WITNESS:
23       So I started out the question [sic] by
24       saying to you I did not pull the
25       individual study reports.  However, I told

Page 245

1    you what I did do, which includes --
2        MR. HOROWITZ:
3        I didn't ask you what --
4        THE WITNESS:
5        -- the -- the --
6        MR. HOROWITZ:
7        -- you did do.
8        MR. DENTON:
9        No.  Let her finish her answer.
10       MR. HOROWITZ:
11       I -- you'll get your chance.
12       MR. DENTON:
13       No.  Don't --
14       MR. HOROWITZ:
15       I didn't want ask you what you did do.
16       MR. DENTON:
17       Jeff, you can't cut off an answer.
18       That is absolutely inappropriate.  Either
19       strike the question or ask another one.
20       She's not going to be cut off in the
21       middle of an answer.
22       Go ahead and finish your answer,
23       Laura.
24       THE WITNESS:
25       But I wanted you to understand what I

62 (Pages 242 to 245)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 246

1      did do.  And so if you're not clear,
2      that's what I did do.
3  BY MR. HOROWITZ:
4      Q.  I didn't ask you what you did do.  I'm not
5  -- I'm entirely clear on what you did do.  I'm
6  asking you what you didn't do.
7          You didn't go pull these study reports,
8  did you?
9      MR. DENTON:
10         I object to the form, the repetitive
11     nature of the question.
12     THE WITNESS:
13         I already answered that for you.  I
14     started my -- my answer with that specific
15     answer.  I said, I have not done that,
16     However, I have done these steps.  And I
17     told you what I have done.
18 BY MR. HOROWITZ:
19     Q.  Right.  So if I ask you a yes-or-no
20 question, are you going to tack on a "however"
21 every time you answer it?
22     MR. DENTON:
23         Jeff, that's absolutely inappropriate.
24     Absolutely inappropriate treatment of a
25     witness.  She can answer the questions to

Page 247

1      the best she can, which is what she's
2      supposed to do, which is to tell the
3      truth.  You're trying to ask questions
4      that intend to try to get something that's
5      inaccurate about what she did or didn't
6      do, and I object to that technique.
7  BY MR. HOROWITZ:
8      Q.  If I go through each of these study
9  reports that are listed in the summary of clinical
10 pharmacology studies, is it fair to say that you
11 have not yourself gone and pulled any of the study
12 reports that are listed in this summary?
13     MR. DENTON:
14         Object to the repetitive question.
15     THE WITNESS:
16         I don't know.  I'd have to do a
17     comparison with documents that I do have.
18     That's what I explained to you.  I don't
19     know -- I would have to go and look at all
20     those documents that -- that I have listed
21     for you.  I would -- so the -- the best
22     way to answer that is I have reviewed what
23     I -- I've told you what I reviewed.  I
24     can't -- haven't done the comparison.
25     Never seen this document before, so I

Page 248

1      can't answer whether one of these studies
2      is actually also in the documents that I
3      have reviewed, because there were a number
4      of -- a lot of documents that are referred
5      to by Bates number.  And I have -- I can't
6      tell you what they are without opening
7      them up.
8  BY MR. HOROWITZ:
9      Q.  You know what a clinical study report is;
10 right?
11     A.  In general terms, yes.
12     Q.  And -- well, you're only generally
13 familiar with clinical study reports?  I don't
14 know what that means.
15     A.  Well, because you're asking me a question.
16 Am I -- am I familiar with clinical study reports?
17 Yes, generally I am.  If you're asking me am I
18 familiar with this particular one, I can't answer
19 that without knowing which one that -- having
20 looking at my documents to see if I've seen that
21 or not.  I'm trying to be precise in my answers.
22     Q.  Well, I'm asking a slightly different
23 question.
24         Did you -- as an expert in pharmacology
25 who is going to offer opinions about the PK and PD

Page 249

1  characteristics of Xarelto, did you go pull the
2  study reports that described the data generated by
3  the company that was used to support its new drug
4  application?  Did you do that exercise?  That's
5  all I'm asking.
6      MR. DENTON:
7          I object to the form.
8      THE WITNESS:
9          So I did not pull every individual
10     study.
11         Instead what I did is I looked at the
12     critical study where the decision was made
13     about the labeling having to do with the
14     -- the bleeding and the PT, which is the
15     ROCKET study.  And then I pulled out --
16     pulled out the -- the documents that dealt
17     with the -- the decision made by FDA and
18     what their -- and what was interpreted.
19     And then I looked in the peer-reviewed
20     literature for what the company described
21     as their summary of many of these studies.
22         But no, I did not ask to look at every
23     study report and didn't attempt to pull
24     each of those out because I didn't feel I
25     needed to in order to form the opinions

63 (Pages 246 to 249)

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 250

1    that I did in this case.
2    BY MR. HOROWITZ:
3        Q. And you also didn't feel that you needed
4    to look at the document before you, Exhibit 8, the
5    summary of clinical pharmacology studies submitted
6    by the companies to FDA in support of its new drug
7    application?
8        MR. DENTON:
9        I object to the form of the question.
10       THE WITNESS:
11       I did not ask to see this document.
12       That is true.
13   BY MR. HOROWITZ:
14       Q. And if you turn to Page 37, just so we're
15   clear as to what we're talking about here --
16   there's numbers at the bottom.  Do you see, the
17   bottom middle of the page, Page 37?
18       A. The Background and Overview, the first
19   page?
20       Q. Yeah.
21       A. Yes.
22       Q. I just want to take a look at the first
23   paragraph together.  It says, "This document
24   focuses on the pharmacokinetics . . . and
25   metabolism, pharmacodynamics (PD), population

Page 251

1    PK/PD and drug-drug interaction potential of
2    rivaroxaban for the prevention of stroke and non
3    CNS systemic embolism in patients with
4    non-valvular atrial fibrillation [abbreviated as
5    SPAF].  For completeness, information regarding
6    the population PK/PD evaluations in other studied
7    patient populations (prevention of venous
8    thromboembolism (VTE) in patients undergoing hip
9    or knee replacement surgery [indication will be
10   abbreviated as VTE-MOS] and treatment of deep vein
11   thrombosis (DVT) and prevention of recurrent DVT
12   and PE [abbreviated as DVT-T]) to support other
13   indications in the future, is included.  Lastly,
14   the pooled analyses of rivaroxaban exposure
15   (assessed via" NT -- I'm sorry -- "via PT
16   Neoplastin measurements) in respective Phase 3"
17   program "(SPAF, VTE-MOS and" DVT) "are reviewed."
18       Do you see that?
19       A. I --
20       MR. DENTON:
21       Object to the form.
22       THE WITNESS:
23       I see that paragraph.  Yes.
24   BY MR. HOROWITZ:
25       Q. Okay.  And is it fair to say that in

Page 252

1    forming your opinions in this case, everything
2    that comes after that introduction in Mueck -- I'm
3    sorry -- in Plunkett 8, Plunkett Exhibit 8, you
4    did not review the text or the tables of this
5    exhibit in forming your opinions?
6        MR. DENTON:
7        Object to the form.  It's been asked
8    and answered.
9        THE WITNESS:
10       I did not review this specific
11       document.  But I -- my opinion would be
12       that there are many things in here that
13       are found within documents I have
14       reviewed.
15   BY MR. HOROWITZ:
16       Q. Okay.  But the --
17       A. So . . .
18       Q. -- answer is you did not review this
19   specific document?
20       MR. DENTON:
21       She --
22       THE WITNESS:
23       I told you that.
24       MR. HOROWITZ:
25       Okay.

Page 253

1        THE WITNESS:
2        I have not seen this specific
3        document.
4    BY MR. HOROWITZ:
5        Q. And you would agree that based on the
6    introduction and your knowledge of summaries of
7    clinical pharmacology studies, that the data and
8    studies that are described in this document are
9    relevant to your consideration of the issues you
10   are opining on in your report?
11       MR. DENTON:
12       Object to the form of the question.
13       THE WITNESS:
14       I don't know that they're critical to
15       the opinions I have formed.  I would
16       disagree with that, because the opinions I
17       have formed are looking at what
18       information was used to make a decision by
19       FDA and -- and how FDA viewed that
20       information and how the company presented
21       that information within those -- within
22       that -- those papers that I -- were
23       publicly available for physicians.  So
24       based on that, I think -- I don't know
25       that that's true.

64 (Pages 250 to 253)

Protected - Subject to Further Protective Review

Page 254

1    However, certainly this general area
2    is part of the area that I am opining on
3    generally.  I would agree with that.
4    Because I do talk about pharmacokinetics,
5    and I talk about the critical -- the
6    critical PK data that was used to make the
7    approval decision for the atrial
8    fibrillation.  Yes.
9    BY MR. HOROWITZ:
10        Q.  Do you know the relationship -- if you're
11   opining, as you just said, on FDA's oversight and
12   review of Xarelto, do you know the relationship
13   between FDA's review of Xarelto and Plunkett 8,
14   the summary of clinical pharmacology studies?
15        MR. DENTON:
16            Object to --
17   BY MR. HOROWITZ:
18        Q.  Do you know what role this played?
19        A.  Well, I don't know --
20        MR. DENTON:
21            Object.
22        THE WITNESS:
23            -- that this -- I don't -- I don't
24        believe that this document was in the NDA
25        that I'm talking about.  I -- my guess is

Page 255

1    based on looking at some of these I'd have
2    to do a comparison.  But some of these
3    studies may have been done for the
4    Phase 3 work for the indication that was
5    submitted after the atrial fibrillation
6    NDA.  So that's a question -- again, I
7    haven't seen this document.  So I'd have
8    to do that comparison.
9    BY MR. HOROWITZ:
10        Q.  You're just speculating?
11        A.  However -- no.  No.  I'm not speculating.
12   I -- I -- I'm -- I'm basing it on what you -- what
13   you just read into the record here.
14        Q.  Well --
15        A.  So --
16        MR. DENTON:
17            Let her finish.
18        MR. HOROWITZ:
19            Okay.
20        THE WITNESS:
21            So -- okay.
22        MR. HOROWITZ:
23            This is getting better.  Go ahead.
24        THE WITNESS:
25            So -- but I would disagree that --

Page 256

1    with you if you are trying to insinuate
2    that I have missed a critical piece of
3    data that was -- that was used to make a
4    decision by FDA.  Because I don't believe
5    I did, based on my review of the FDA
6    materials that I have seen.
7    BY MR. HOROWITZ:
8        Q.  My question --
9        MR. HOROWITZ:
10            Objection.  Move to strike.
11        Nonresponsive.
12   BY MR. HOROWITZ:
13        Q.  You don't know what or wasn't in the NDA
14   with respect to clinical pharmacology and what the
15   company submitted, whether it was for SPAF or any
16   of the other indications, because you didn't do
17   the exercise to go look.  Isn't that true?
18        MR. DENTON:
19            Object to the form.
20        THE WITNESS:
21            No.  That's not true.  I actually -- I
22        haven't -- I can't tell you that without
23        going back and looking at my documents.
24        But all -- the documents I have seen, FDA
25        lists what is reviewed.  So I certainly

Page 257

1    could go back to the clinical pharmacology
2    review by FDA and tell you.  I'm -- and
3    that's where I would point you to.  That's
4    where I would start.  If you wanted me to
5    answer that question fully, I'll pull that
6    document out --
7        MR. HOROWITZ:
8            Right.
9        THE WITNESS:
10            -- and I'll look and see.
11   BY MR. HOROWITZ:
12        Q.  You just --
13        A.  But --
14        Q.  -- changed the question again.
15            And here's my question:  You're describing
16   for me the FDA reviews of the material that was
17   submitted by the company to FDA.  And of course
18   they list and describe in the FDA's reviews what
19   the companies submit; correct?
20        A.  They list all of the studies that they
21   reviewed as part of that NDA review process.
22        Q.  And then --
23        A.  Yes.
24        Q.  -- FDA reviews those studies and -- and
25   done an analysis; right?

65 (Pages 254 to 257)

Protected - Subject to Further Protective Review

Page 258

1   A. Yes.
2   Q. Did you separately -- outside of looking
3   at what FDA did, did you undertake your own
4   assessment and do your own review of the data
5   submitted by the company before you formed your
6   opinions about the Xarelto label?
7       MR. DENTON:
8       Object to the form.
9   THE WITNESS:
10      I did not attempt to do an independent
11      evaluation of every study in the NDA.
12      I did, however, do an evaluation of
13      the studies that I felt were critical to
14      the opinions I was forming in the case.
15      So I did look at ROCKET, and I did look at
16      the data in ROCKET that dealt with
17      exposure response, which there was a
18      subset of patients that were described
19      within that study. So this was the
20      clinical population. I also did look at
21      the -- data as described within the
22      FDA summaries, which gives very detailed
23      discussion of the data that was used as
24      part of the NDA.
25      So that's what I did. And I thought I

Page 259

1       told you that.
2       MR. HOROWITZ:
3       Right.
4       THE WITNESS:
5       And --
6   BY MR. HOROWITZ:
7   Q. So it's --
8   A. -- I am not trying to be -- not trying to
9   be confusing. I'm trying to make sure you
10  understand what it is that I reviewed.
11  Q. You know the difference between Phase 1,
12  Phase 2, and Phase 3; right?
13  A. Yes.
14  Q. Okay. And you understand that clinical
15  pharmacology studies are generally Phase 1
16  studies; right?
17  A. Not always, but yes. They can be --
18  they -- a lot -- the Phase 1 is a critical part of
19  clinical pharmacology, yes.
20  Q. And that Phase 2 is generally often proof
21  of concept and dose-ranging studies; right?
22  A. But also clinical pharmacology many times.
23  Q. Okay. And then ROCKET, which is a
24  Phase 3 study, is the clinical pivotal trial to
25  prove the safety and efficacy; right?

Page 260

1   A. Yes. And it has clinical pharmacology
2   data within it. But yes, that is true.
3   Q. Okay. And my question is: Did you go
4   back and look at the clinical pharmacology
5   studies -- the study reports, the study data from
6   Phase 1 that's described in the summary of
7   clinical pharmacology studies and the study from
8   data that's described from Phase 2, did you go
9   back and look at the individual studies, the --
10  the raw data? Did you do that exercise to form
11  your own judgments about Xarelto, or are you
12  simply relying on your review of the FDA
13  documents?
14      MR. DENTON:
15      Object to the form.
16  THE WITNESS:
17      I think I already answered this for
18      you. My answer is I -- and I already told
19      you. I did not pull each individual study
20      report.
21      However, it is my view that I didn't
22      need to do it based on what I was trying
23      to do and the opinions I was forming.
24      Because the information -- if you look at
25      my opinions -- you asked me the question

Page 261

1       earlier: Am I trying to say they didn't
2       submit something. That's an example of
3       when I would do this. So if I was trying
4       to say, You know what, They didn't give
5       FDA all of the information that I've seen
6       in their company files, then that would be
7       a comparison to absolutely do. And if I
8       was trying to make a determination whether
9       or not FDA made the right decision or the
10      wrong decision, I might need to do it.
11      But that wasn't what I was asked to do
12      and what I was -- what I was focusing on
13      in developing my opinions. So I think
14      you're -- you're -- you're asking me about
15      a exercise that was outside the -- the
16      realm of the exercise I was performing and
17      the opinions that I was developing.
18  BY MR. HOROWITZ:
19  Q. So if I understand correctly, it was not
20  part of your weight-of-the-evidence methodology to
21  feel the need to review the company's summary of
22  clinical pharmacology studies submitted to FDA in
23  support of its new drug application for the
24  Xarelto SPAF indication?
25      MR. DENTON:

66 (Pages 258 to 261)

Protected - Subject to Further Protective Review

Page 262

1      Object to the form.
2   THE WITNESS:
3      No.  That's not what I told you at
4   all.  That's not what I told you.
5      What I told you was that I performed a
6   weight-of-the-evidence and I gathered
7   information that was relevant to the
8   issues at hand that I was trying to
9   address.  I did not ask for or review this
10  document, however.  Absolutely.  I've told
11  you that.  I did not.
12  MR. HOROWITZ:
13     Should we eat lunch?
14  MR. DENTON:
15     Let's go a little bit longer.
16  MR. HOROWITZ:
17     You want to go a little longer?
18  MR. DENTON:
19     I don't care.  Is it 12:30?
20  MR. HOROWITZ:
21     Well, it's --
22  THE WITNESS:
23     No.
24  MR. HOROWITZ:
25     -- Dr. Plunkett.

Page 263

1   THE WITNESS:
2      It's a little shorter.  I said 12:30.
3   Ten more minutes.
4   MR. HOROWITZ:
5      Oh.  I thought you said 12 -- 12:15.
6   12 --
7   THE WITNESS:
8      No.
9   MR. HOROWITZ:
10     -- 30's fine.
11  THE WITNESS:
12     12:30.  Ten --
13  MR. HOROWITZ:
14     I'm sorry.
15  THE WITNESS:
16     -- more minutes.
17  MR. HOROWITZ:
18     Okay.  Okay.  I'm sorry.  I
19  misunderstood.  I thought I was -- I was
20  trying to hurry up so we could go eat.
21  MR. DENTON:
22     Well, I have to say that impression
23  hasn't come out yet.
24  MR. HOROWITZ:
25     Okay.

Page 264

1   THE WITNESS:
2      Do I need to keep this open?  Are you
3   done with this?  Are --
4   MR. HOROWITZ:
5      I'm done with it for now.
6   MR. DENTON:
7      But if it's a good breaking point,
8   Jeff, that's fine.
9   MR. HOROWITZ:
10     No.  Let's -- we can -- I can do
11  ten minutes.  Yeah.
12  BY MR. HOROWITZ:
13     Q.  Doctor, one of the things that you opine
14  about -- and we'll get into this more after lunch
15  -- is the use of prothrombin time as a measurement
16  tool for rivaroxaban pharmacodynamic effect and
17  also as a surrogate for concentration; correct?
18     A.  Yes.
19     Q.  Okay.  Do you consider yourself to be an
20  expert in PT assays?
21     A.  I think --
22  MR. DENTON:
23     Object to the form of the question.
24  THE WITNESS:
25     I think you actually asked me that

Page 265

1   earlier, and I told you I have expertise
2   in the assays as it relates to what the
3   endpoints are and how they relate to
4   exposure response.  I am not an expert in
5   -- in designing a PT assay.  But it -- but
6   it certainly is an expertise I have based
7   on my understanding of the mechanism of
8   action of this class of drugs.
9   BY MR. HOROWITZ:
10     Q.  Have you ever measured the concentration
11  level of -- of anticoagulant in a patient's plasma
12  sample?
13     A.  I think you asked me that too, and I said
14  no.  Because I have -- obviously if I haven't done
15  research, I would not have done that.
16     Q.  Have you ever performed a PT assay?
17     A.  No.  I have not.
18     Q.  Have you ever reviewed the results of an
19  individual patient's PT assay?
20     A.  Yeah.  I answered that for you.  Remember
21  I told you I had done medical records reviews,
22  where I have looked at those as part of a panel of
23  information collected on a patient?
24     Q.  In the litigation context?
25     A.  Yes.  That's -- remember, we had that

67 (Pages 262 to 265)

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 266

1    discussion?
2        Q. Yeah. I vaguely remember. I don't recall
3    asking you these questions, but maybe I did.
4        MR. DENTON:
5            You did. But go ahead.
6    BY MR. HOROWITZ:
7        Q. Okay. So that was litigation context.
8    Let me ask you this then: Have you ever
9    been involved in development of a prothrombin time
10   assay?
11       MR. DENTON:
12           Object to the form.
13       THE WITNESS:
14           No. I have not.
15   BY MR. HOROWITZ:
16       Q. Have you ever been involved in the
17   development of any in vitro laboratory assay?
18       A. Yes.
19       Q. Can you tell me about that?
20       A. So I have developed assays for looking at
21   levels of neurotransmitters in different types of
22   biological fluids in my lab, so taking -- taking
23   methods that others have published and trying to
24   enhance those, the sensitivity, so using an HPLC
25   method, changing the column size to be able to get

Page 267

1    a better sensitivity for looking at different
2    neurotransmitter and neuropeptide levels in
3    different biological fluids such as -- my issue
4    was taking a sample that looked -- was developed
5    -- an assay that was developed for an assay of
6    blood and applying it to cerebral spinal fluid.
7    Because that was the -- the matrix that I was
8    collecting in some of my research.
9            I've also been involved in developing
10   assays for detection of drugs for pharmacokinetic
11   analysis, so determining whether or not it was
12   better to use a radioimmunoassay or some type of
13   other assay in order to get the proper detection
14   of the drug.
15           I've also been involved in validating in
16   vitro assays for use in measuring or correlating
17   endpoints for endocrine disruption.
18       Q. Anything with respect to the work you've
19   described -- I know I asked you about PT. But
20   anything -- any other assay that's associated with
21   anticoagulation? Any involvement in the
22   development of that type of assay?
23       A. No. I answered that question first. Your
24   second question was more general. It just says in
25   vitro assays.

Page 268

1        Q. Right.
2        A. So yeah.
3        Q. I understand. That's why I'm following
4    up.
5        A. So no. The first question, I agree. I
6    had -- I have not done a PT assay or an
7    anticoagulant assay. But --
8        Q. Okay.
9        A. -- I have done other types of in vitro --
10       Q. -- right.
11       A. -- assay.
12       Q. I didn't realize I asked you about
13   anticoagulant.
14       MR. DENTON:
15           Your question --
16       MR. HOROWITZ:
17           I thought you said PT. I know. Well,
18       I need my lunch.
19   BY MR. HOROWITZ:
20       Q. Let me ask you this: Are you familiar
21   with the Office of In Vitro Diagnostics and
22   Radiological Health at FDA?
23       A. Yes.
24       Q. Do you understand that they regulate
25   laboratory assays?

Page 269

1        A. Yes. I have worked with them -- I have
2    worked with clients who are attempting to get
3    approval for such assays.
4        Q. Okay. Have you ever worked at the Office
5    of In Vitro Diagnostics?
6        A. Not as an employee. No. I've never
7    worked at FDA, generally.
8        Q. Okay. Have you ever evaluated a
9    laboratory assay on behalf of FDA?
10       A. Not on behalf -- on behalf of my clients,
11   but not on behalf of FDA.
12       Q. Okay. And when you say with respect to
13   your clients, that wasn't PT or anticoagulant-type
14   assays?
15       A. No. The -- the -- the work I've done so
16   far has not involved those assays.
17           And I would also state that for some of
18   these clients I can't tell you what they are
19   because it would be confidential development
20   issues.
21       Q. Yeah. I don't need to know what they are
22   as long as I know what they're not --
23       A. Okay.
24       Q. -- for this particular purpose.
25           Have you ever published a peer-reviewed

68 (Pages 266 to 269)

Protected - Subject to Further Protective Review

Page 270

1  article on in vitro assays?
2      A.  On the use of the data.  But on the
3  development of the assay?  I don't know.  Are you
4  asking me like a general background article or --
5  or my --
6      Q.  Let me ask it again.
7      A.  -- application?
8      Q.  I don't care about general back -- because
9  I know what you've done.  I -- I just have to ask
10 these questions to create a little bit of a
11 record.
12     But I'm going to limit it to say -- have
13 you ever published a peer-reviewed article on PT
14 assays or any assay related to anticoagulation?
15     A.  No.  I have not done that.
16     Q.  Do you have any peer-reviewed work or
17 publication on whether particular assays are
18 appropriate to measure rivaroxaban or any other
19 NOAC?
20     A.  Have I ever published that?  No.  I have
21 not.
22     MR. HOROWITZ:
23         It's -- why don't we -- it's just that
24 it's a good --
25     MR. DENTON:

Page 271

1          That's fine.
2      MR. HOROWITZ:
3          -- breaking point.  Yeah.
4      MR. DENTON:
5          That's fine.
6      MR. HOROWITZ:
7          Anything I start now I can't do in
8  two minutes.
9      THE VIDEOGRAPHER:
10         The time now is 12:27 p.m.  We are off
11 the record.
12     (Recess was taken.)
13     THE VIDEOGRAPHER:
14         This begins Disk 4 of today's
15 deposition.  The time now is 1:06 p.m.  we
16 are back on the record.
17 BY MR. HOROWITZ:
18     Q.  Dr. Plunkett, are you ready to continue?
19     A.  Yes.
20     Q.  One of the things I wanted to follow up
21 on -- you mentioned you reviewed the ROCKET
22 clinical study report when I was asking you
23 questions before lunch.  Do you recall that?
24     A.  Yes.
25     Q.  I will profess to you that we couldn't

Page 272

1  find it on your materials reviewed list.
2          Is it something you reviewed more
3  recently?
4      A.  It should have been on my materials
5  reviewed list.  Because I reviewed it -- it's not
6  been reviewed in the last month.  No.  It was
7  reviewed well before that.  So it should be on my
8  materials reviewed list.  And if it's not on
9  there, I don't know why.
10     Q.  And is it definitely something you felt
11 like you reviewed before you formed your opinions
12 or as part of the process and before you --
13     A.  I reviewed it before I finalized my
14 report.  Yes.  So I certainly -- in fact, I asked
15 for it.  I do believe I asked for it, in fact.
16     Q.  And as part of your file, you believe you
17 have the full clinical study report for ROCKET?
18     A.  I have what I think it is, which is a
19 2,500-and-some-odd-page report.  If that's not --
20 I don't know what the title is.  But I -- I asked
21 for the full study report for ROCKET, and this is
22 what I was sent.  Now that it -- I say that, I do
23 remember asking for it.  And they -- because they
24 said, It's really, really big, Do you still
25 want --

Page 273

1      Q.  Okay.  And was --
2      A.  -- it?  So . . .
3      Q.  -- there a particular section or sections
4  you recall focusing on?
5      A.  The ones that -- that -- I -- I want --
6  wanted to focus on the data that had to do with PT
7  -- a correlation between plasma levels and PT.  So
8  I was looking for that data and so sort of the 161
9  patients where you had the exposure response data
10 collected.
11     Q.  Right.
12     A.  But I also looked at other -- I also
13 looked at some of the other summary -- the
14 sections that were referred to as -- if you -- if
15 we go to the FDA document, I might be able to tell
16 you.  There were -- there were charts and graphs
17 with the FDA document that I wanted to go back and
18 look to within ROCKET.  So there were a number of
19 them, not just the PT issues, but some of the
20 safety issues, looking at bleeds, minor bleeds,
21 major bleeds, things like that.
22     Q.  Okay.  We'll get -- it's on my list,
23 obviously, to get to that document.  And then --
24     A.  So I can --
25     Q.  -- if I remember, I'll ask you then.  Or

69 (Pages 270 to 273)

Protected - Subject to Further Protective Review

Page 274

1  if you remember, you can point it out.
2      A. Okay. That's fine.
3      Q. And I'm sure I know the -- I know the
4  charts and graphs you're talking about because
5  it's in your report and it's the subject of a lot
6  of discussion, obviously, in this case.
7      A. Right.
8      Q. Let's start walking through some of the
9  opinions that you've put into your report. I want
10 to ask you obviously some questions about those.
11 If you can start with Page 27, Paragraph 46, you
12 write, "A key issue for all of the oral
13 anti-coagulant drugs, including Xarelto . . . is
14 the fact that they . . . have a low or narrow
15 margin of safety, or a narrow therapeutic index";
16 correct?
17     A. Yes.
18     Q. Are you offering the opinion that Xarelto
19 has a low margin of safety?
20     A. Has a narrow therapeutic index, which
21 means that it also has in my view a low margin of
22 safety. Yes. In other words, the same dose that
23 provides benefit has been shown to provide -- to
24 provide -- to -- in some individuals be a --
25 producing serious and life-threatening toxicity as

Page 275

1  well.
2      Q. Are you using narrow therapeutic index
3  interchangeably with low margin of safety, or are
4  you making some kind of distinction?
5      A. I'm not -- in this sentence, I'm not
6  trying to make a distinction. I'm using words
7  that I hear people describe in the literature.
8  And also when you talk with people, some people
9  will use the term interchangeably. But they can
10 have separate definitions. I totally agree with
11 that. But here I'm trying to just say -- I'm
12 trying to point out the issue of -- the fact
13 that -- that there is a very minimal difference,
14 if no difference in some individuals, for the dose
15 that is beneficial and the dose that is toxic.
16     Q. What methodology did you use to determine
17 that Xarelto has a narrow therapeutic index?
18     A. So it's part of my training. So when you
19 talk about anticoagulants, oral ones, and then you
20 talk about -- so when you talk about -- my -- in
21 my training, when you talk about margin of safety,
22 it's that concept of what is the dose that
23 produces effects that you want and then at what
24 doses do you start to see what I consider
25 clinically relevant toxicity. Okay. So that to

Page 276

1  me is the definition of a -- of a drug that either
2  has a narrow therapeutic index or a low margin of
3  safety for use in humans.
4      So based on that definition, then what I
5  -- then -- then what I'm relying on is the -- the
6  information that is within the -- the FDA summary
7  of the clinical data, the results of ROCKET. And
8  then also I'm citing for you some papers where
9  others have made the same statement about -- about
10 either margin of safety or therapeutic index.
11     Q. Have you reviewed peer-reviewed published
12 literature with statements that say the opposite,
13 that say Xarelto has a wide therapeutic index?
14     A. I have seen -- I don't know about the
15 words "wide therapeutic index." I've heard --
16 I've seen statements about the fact that it is --
17 can be used -- that it's a safe drug. I've seen
18 that. I've seen people call it having -- having
19 -- "predictable pharmacokinetics" is another word
20 I've seen used. I don't know about wide
21 therapeutic index. So that, I -- I can't recall
22 that. But if you want to show me something, I --
23 I -- I don't remember those words.
24     Q. And certainly as part of your process in
25 forming your opinions and doing your weight of

Page 277

1  evidence analysis for therapeutic index, as we
2  talked about, you would certainly look at and
3  consider contrary articles in forming your
4  opinions even if you don't discuss them in your
5  report?
6      A. Yes.
7      Although I wouldn't say that this is
8  something that you're going to find contrary
9  articles because of the fact that this is --
10 this is a -- this is a statement that is giving --
11 that you have to look at the context. Okay.
12     So I think if you look at -- even the
13 papers that may make a statement that it has an
14 acceptable margin of safety or has predictable
15 pharmacokinetics, if you look at what the context
16 of that statement is, I don't think that's
17 inconsistent with I'm -- what I'm saying. Because
18 I'm saying that predictability is -- is dependent
19 upon what -- the endpoint that you're looking at
20 and that safety for these drugs is understood to
21 be low -- a low margin just because of this
22 delicate balance, that we now have this -- the
23 mechanism of the drug and the fact that you can
24 move from acceptable clotting to not acceptable
25 clotting very easily and very quickly based on a

70 (Pages 274 to 277)

Protected - Subject to Further Protective Review

Page 278

1    small change.  I mean, that -- that to me is all
2    basic principles within the medical literature on
3    anticoagulants.
4        Q.  Respectfully, Doctor, I'm going to ask you
5    to sort of confine your answers to my question.
6    I -- I --
7        MR. DENTON:
8            Well, I think she did.
9    BY MR. HOROWITZ:
10       Q.  -- understand you need to explain.
11       MR. DENTON:
12           I think she did.
13   BY MR. HOROWITZ:
14       Q.  If there was literature -- peer-reviewed
15   published literature that says that Xarelto has a
16   -- and uses the phrase "wide therapeutic window,"
17   that of course should be something you'd want to
18   consider in forming your opinions and assessing
19   that article and seeing what you think of it in
20   terms of your weight-of-the-evidence analysis?
21       MR. DENTON:
22           Object to the form.
23       THE WITNESS:
24           I certainly would consider such
25           articles, and I believe I do.

Page 279

1            There are articles in the published
2    literature that -- for example, especially
3    on the issue of predictability.  There are
4    articles that state the opposite of what I
5    state.  But I think when you delve into
6    the statement they're making, I really
7    don't think we're disagreeing.  I think
8    it's an issue of what do you mean by --
9    how -- what is -- how predictable is
10   predictable and what endpoint are you
11   considering.  And that's all I'm trying to
12   say.  And so yes, certainly in -- in
13   weight of evidence I considered articles
14   that had statements that -- that, you
15   know, weren't exactly the same as my
16   statements.
17   BY MR. HOROWITZ:
18       Q.  Did you perform any calculations in
19   forming your opinions about the therapeutic index
20   of Xarelto?
21       A.  No.  I'm not trying to calculate the --
22   the -- the therapeutic index.  I'm simply trying
23   to describe it qualitatively.
24       Q.  Do you know whether there are methods that
25   can calculate therapeutic index?

Page 280

1        A.  Well, there are in certain contexts, yes.
2            You can calculate a therapeutic index
3    based on the comparison of animal data, for
4    example, for looking at effective doses and toxic
5    doses.  You can -- you can calculate a therapeutic
6    index that's based on looking at the ED50 values
7    and then the TD1 value, and you can come up with a
8    calculation.  So yes, you -- you can do that.
9            But you have to have dose-response data to
10   be able to do that, and that's what's lacking in
11   this case.  We don't have dose-response data in
12   a-fib patients in order to calculate an exact
13   therapeutic index.
14       Q.  So you have not calculated an exact
15   therapeutic index?
16       A.  For -- for -- for this particular
17   indication, no, because I don't believe it can be
18   done based on the -- the data -- the clinical data
19   that you have, which is a single-dose study.
20       Q.  Do you agree that a patient can have a
21   bleed even if they have no rivaroxaban in their
22   blood?
23       MR. DENTON:
24           Object to the form.
25       THE WITNESS:

Page 281

1            If you're asking me can patients bleed
2            for -- for other reasons, yes, that is
3            true.
4    BY MR. HOROWITZ:
5        Q.  And a patient can have a clot even if they
6    have a lot of rivaroxaban in their blood?
7        MR. DENTON:
8            Well, I object to the form.
9        THE WITNESS:
10           It is true that patients can clot
11           for -- for causes other than the presence
12           of -- or the lack of the presence of
13           rivaroxaban or Xarelto.
14   BY MR. HOROWITZ:
15       Q.  And it's true that a patient can have a bleed
16   even if they are in the therapeutic range of an
17   anticoagulant like rivaroxaban?
18       MR. DENTON:
19           Object to the form.
20       THE WITNESS:
21           Well, there you need to define what
22           you mean by "bleed."  I would agree that
23           people can bleed for reasons other than
24           drug-induced bleeding, if that's what
25           you're asking me.

71 (Pages 278 to 281)

Protected - Subject to Further Protective Review

Page 282

```
1    BY MR. HOROWITZ:
2       Q.  I'm asking you:  Isn't it true that a
3    patient can have a bleed even if they are in the
4    therapeutic range of an anticoagulant like
5    rivaroxaban?
6          MR. DENTON:
7             Object to the form.
8          THE WITNESS:
9             So what do you mean by "bleed"?  Are
10         you saying a dangerous bleed or just
11         bleed?  You cut your finger, you're going
12         to bleed whether you're on -- on Xarelto
13         or not.  That's true.  But the question
14         is:  Is it -- can you have uncontrolled
15         bleeding?  Is that what you're asking me,
16         or are --
17         MR. HOROWITZ:
18            No.
19         THE WITNESS:
20            -- you just asking me bleeding in
21         general?
22    BY MR. HOROWITZ:
23       Q.  I'm asking you:  Can a person bleed even
24    if they have -- even if they are in the
25    therapeutic range of an anticoagulant like
```

Page 283

```
1    rivaroxaban?  If you can't answer the question,
2    tell me you can't answer the question.
3          MR. DENTON:
4             She did answer.
5          THE WITNESS:
6             Well, I did answer it.  I said if what
7          you mean by that is can someone bleed even
8          if they're on -- regardless of what drug
9          they're on, people bleed.
10    BY MR. HOROWITZ:
11       Q.  Can --
12       A.  Absolutely.
13       Q.  Can somebody --
14       A.  And they can be --
15       Q.  -- have --
16       A.  -- in the therapeutic range and bleed.
17    Absolutely.
18       Q.  Can somebody have an intracranial
19    hemorrhage even if they are on -- in the
20    therapeutic range of an anticoagulant like
21    rivaroxaban?
22          MR. DENTON:
23             Object to the form.
24          THE WITNESS:
25             So I think then I need you to define
```

Page 284

```
1             what you mean by "therapeutic range."
2    BY MR. HOROWITZ:
3       Q.  Do you -- do you know what therapeutic
4    range is?
5       A.  Yes.  But I -- I -- I think -- I think
6    that what you're asking me -- I'm -- the answer
7    I'm going to give you I don't think is what you're
8    -- you're -- you're meaning to ask.
9             So define for me what you mean by
10         "therapeutic range."  Are you saying the
11         therapeutic range has been established for
12         rivaroxaban?  My argument would be that we don't
13         know the exact range of blood levels that are the
14         therapeutic range for any one individual.  But are
15         you asking me can someone take a therapeutic dose
16         of rivaroxaban that's intended to be therapeutic
17         and experience a bleed?  Yes, that can happen.
18       Q.  How about warfarin?  Even if warfarin's in
19    the therapeutic range, can a patient still have a
20    clot or a serious bleed?
21       A.  Yes.  That is true.
22             And it's the -- it's the same answers that
23    I'm -- that I'm giving you.  Any of these
24    anticoagulants or any -- any drug used to -- to
25    treat bleeding, that would be true.
```

Page 285

```
1       Q.  Are you offering an opinion about the
2    plasma concentrations that define a therapeutic
3    range for rivaroxaban?
4       A.  No.  I have not formed opinion on the
5    exact concentrations, although I have formed some
6    opinions based on data for ROCKET, which shows you
7    what the variability is and what that variability
8    -- how that variability impacts the safety of the
9    drug.  So I -- I formed opinions on plasma levels,
10    but not exactly in the way that you're asking me.
11       Q.  Right.  So could you answer my question
12    that I'm asking, which is:  You are not offering
13    an opinion about the plasma concentrations that
14    define a therapeutic range for rivaroxaban.  Is
15    that fair?
16       A.  And my answer to --
17          MR. DENTON:
18             Object to the form.
19          THE WITNESS:
20             -- that question was:  There is no
21          answer to that question because we don't
22          have the data to -- to define that.
23    BY MR. HOROWITZ:
24       Q.  You don't know the boundaries of the
25    therapeutic range; right?
```

72 (Pages 282 to 285)

Protected - Subject to Further Protective Review

Page 286

1      MR. DENTON:
2          Object to the form.
3      THE WITNESS:
4          The exact boundaries of therapeutic
5      range, the company has not identified what
6      those are. And they may -- they may vary
7      from person to person, which again is
8      consistent with the literature in this
9      area.
10     BY MR. HOROWITZ:
11     Q. My question was simply: You don't know
12     the boundaries of that therapeutic range; right?
13         MR. DENTON:
14         I object to the form.
15     THE WITNESS:
16         I already answered that for you. I
17     told you that we can't based on the data
18     we have. We can't give you the boundaries
19     of the therapeutic range other than we can
20     give you the variability that existed
21     within the study. That --
22     MR. HOROWITZ:
23         I --
24     THE WITNESS:
25         -- I can tell you.

Page 287

1      BY MR. HOROWITZ:
2      Q. I didn't tell you about the variability.
3      I didn't ask you anything other than: You don't
4      know the boundaries of therapeutic range, do you?
5          MR. DENTON:
6          Object for the fifth time to the same
7      question.
8      THE WITNESS:
9          I already answered that question for
10     you. I believe I did. I answered that
11     for you.
12     BY MR. HOROWITZ:
13     Q. And the answer is you don't know; correct?
14     A. I said we don't know based on the data we
15     have. But what we can tell you --
16     Q. I didn't ask you what you --
17     MR. DENTON:
18         Let her finish.
19     MR. HOROWITZ:
20         -- can tell me. Absolutely not.
21     MR. DENTON:
22         No.
23     MR. HOROWITZ:
24         Absolutely not.
25     MR. DENTON:

Page 288

1          No, Jeff. You're not going to --
2      MR. HOROWITZ:
3          No.
4      MR. DENTON:
5          -- cut off answers. You're not going
6      to cut off answers.
7      MR. HOROWITZ:
8          We're not going to play this game.
9      We're going to get more time. And --
10     MR. DENTON:
11         You're -- you've --
12     MR. HOROWITZ:
13         -- you're not going to be able to go
14     home --
15     MR. DENTON:
16         -- already had ten hours. And you've
17     wasted four of them. So if you would --
18     MR. HOROWITZ:
19         You got to answer --
20     MR. DENTON:
21         -- let --
22     MR. HOROWITZ:
23         -- my questions, Doc.
24     MR. DENTON:
25         She's -- she -- she has to answer the

Page 289

1      question in the way she sees appropriate,
2      and that's what she's been doing. That's
3      what she's going to continue to do. And
4      you're not going to cut off answers.
5      BY MR. HOROWITZ:
6      Q. Do you know the -- are you planning to
7      offer an opinion as to the plasma concentration
8      above which rivaroxaban is toxic?
9          MR. DENTON:
10         Object to the form.
11     THE WITNESS:
12         I -- I don't think I've given you that
13     in my report. But I certainly -- we can
14     get from the data the plasma
15     concentrations that were shown to be
16     toxic. So we certainly can get that from
17     the data.
18         But I haven't -- I haven't formed an
19     opinion that one specific plasma
20     concentration is toxic. And again, I -- I
21     don't believe the data would allow you to
22     identify the specific threshold, as FDA
23     has pointed out.
24     BY MR. HOROWITZ:
25     Q. Can we agree that there is not sufficient

73 (Pages 286 to 289)

Protected - Subject to Further Protective Review

Page 290

```
1    scientific evidence to establish a plasma
2    concentration above which rivaroxaban is toxic?
3        A.  No.  I don't think I could agree to that
4    because I can't -- I can't agree that -- that
5    there -- that there may not be some analysis that
6    I haven't seen.  I -- in other words, I haven't --
7        Q.  I don't know --
8        A.  -- attempted to --
9        Q.  -- what that means.  Could you explain --
10       MR. DENTON:
11           Wait.  Wait.
12   BY MR. HOROWITZ:
13       Q.  -- that?  Yeah.  Go ahead and explain
14   that.  I have no idea what that means.
15       A.  So in my experience, there may be analyses
16   that have been done that have not been provided to
17   FDA or to me.  So it's possible that there's an
18   analysis out there that I don't know about.  But I
19   would agree that I have not seen that in the data
20   that I have, and I have not done that calculation.
21       Q.  Based on the data that you've reviewed in
22   forming your opinions in this case in applying
23   your methodology, the weight-of-the-evidence
24   methodology, do you agree there's no -- there's
25   not scientific evidence sufficient to establish a
```

Page 291

```
1    plasma concentration above which rivaroxaban is
2    toxic?
3        MR. DENTON:
4            Object to the form.
5        THE WITNESS:
6            An exact threshold, no, we cannot do
7        that.
8    BY MR. HOROWITZ:
9        Q.  And the same question essentially with
10   respect to a threshold below which rivaroxaban is
11   ineffective, in terms of a defined plasma
12   concentration.  You're not offering an opinion on
13   that as well either, are you?
14       MR. DENTON:
15           Object to the form.
16       THE WITNESS:
17           I have not formed that opinion yet.
18       But that is likely more possible based on
19       the data we do have.
20   BY MR. HOROWITZ:
21       Q.  Are you planning to do some work to form
22   that opinion?
23       A.  I haven't been asked to do that.  I
24   haven't been asked to define those -- those
25   thresholds.  No.
```

Page 292

```
1        Q.  Do you believe there's currently enough
2    scientific evidence to establish a plasma
3    concentration below which rivaroxaban is
4    ineffective?
5        A.  I can't answer that without looking at --
6    doing the analysis.  But I believe that that's
7    more possible.
8        Q.  But you haven't done that analysis?
9        A.  I have not done it at this point in time.
10       Q.  Okay.
11       A.  That's correct.
12       Q.  And currently as we sit here now, nobody's
13   asked you to do that analysis?
14       A.  I have not been asked to form opinions in
15   that area.  I believe that there are other
16   experts.  Maybe one of them has done that.  But I
17   have not been asked to do that.
18       Q.  Okay.  If we could go to Paragraphs 28 and
19   29 of your report.  Or Pages 28 and 29.  I'm
20   sorry.
21       MR. DENTON:
22           I think you said paragraph.
23       MR. HOROWITZ:
24           I -- I said the opposite of what I
25       meant.  I do that a lot.
```

Page 293

```
1        MR. DENTON:
2            So where are we at now?
3        MR. HOROWITZ:
4            Well, on Pages 28 and 29,
5        Paragraph 48.  Is it easier for me to just
6        say the paragraph number?  I never know.
7        So I write both down, and then I get --
8        get them confused.
9        THE WITNESS:
10           Well, paragraphs to me are more useful
11       because there's multiple paragraphs on one
12       page.  But it's up to you, however you
13       want to do it.
14       MR. HOROWITZ:
15           I like the paragraphs too.  But
16       then --
17       THE WITNESS:
18           So . . .
19       MR. HOROWITZ:
20           -- sometimes you get like that long
21       Paragraph 9, where you had the bullet
22       points.  And it's like:  Which page is it?
23       THE WITNESS:
24           Yeah.
25       MR. HOROWITZ:
```

74 (Pages 290 to 293)

Protected - Subject to Further Protective Review

Page 294

1       All right.  We digress.
2  BY MR. HOROWITZ:
3       Q.  So it says -- in Paragraph 48, you wrote,
4  "FDA has attempted to define 'narrow therapeutic
5  index' within the context of bioequivalence
6  determinations" of "human drugs."
7       Do you see that?
8       A.  Yes.
9       Q.  And then you -- you cite a presentation in
10 2011 during which you say FDA proposed a
11 definition for narrow therapeutic index drugs;
12 correct?
13      A.  Yes.  That's true.
14      Q.  And you say that their proposed definition
15 includes "'Those drugs where small differences in
16 dose or blood concentration may lead to serious
17 therapeutic failures and/or adverse . . .
18 reactions"; right?
19      A.  Yes.
20      Q.  And you say that "FDA also pointed out
21 that drugs with a narrow therapeutic index
22 generally exhibit steep dose-response curves for
23 both efficacy and safety, or that the doses that
24 produce serious toxicity are close to those that
25 produce efficacy"; right?

Page 295

1       A.  Yes.  That's what I stated.
2       Q.  Okay.  Let's take a look at what you
3  cited.  You cited a document you pulled from the
4  FDA website that you cite in Footnote 4; correct?
5       A.  Yes.  That's what I'm -- I'm pointing to.
6  And I had did not print that one out.  So . . .
7       Q.  Yeah.  We printed it, I think.  It's a big
8  one.  Yeah.  I brought my handy-dandy mini
9  version.  But . . . Let's go ahead and mark --
10      MR. DENTON:
11          Where are we at?
12      MR. HOROWITZ:
13          Whoa.  Why is this flagged?  I guess
14 we can flag it.
15      MR. BONEY:
16          Sorry.
17      MR. HOROWITZ:
18          That's okay.  That'll make it faster.
19      MR. DENTON:
20          What exhibit number are we on?  Do you
21 know?
22      MR. BONEY:
23          This is 9.
24      MR. HOROWITZ:
25          I'm going to take the flags off.

Page 296

1       (Exhibit No. 9 was marked for
2       identification and attached hereto.)
3  BY MR. HOROWITZ:
4       Q.  I'm going to go ahead and hand you
5  Plunkett 9 and ask you if that's the slide
6  presentation that you're citing in Footnote 4?
7       A.  I'm citing part of this, yes.
8       Q.  Right.  And if you turn -- let's just
9  -- to make the record a little more clear, the --
10 the -- the title of this slide presentation is
11 "Approaches to Demonstrate Bioequivalence of
12 Narrow Therapeutic Index Drugs."  Then it says
13 "Advisory Committee for Pharmaceutical Science and
14 Clinical Pharmacology," "July 26, 2011"; correct?
15      A.  Yes.
16      Q.  And then you're citing Slide 14 as support
17 for your report and the statements you make in
18 your report; right?
19      A.  Yes.  That's the -- well, when I'm talking
20 about the proposed definition, that is true.  Yes.
21      Q.  Right.  And you have that -- it says NTI
22 -- the last sentence of the slide under Proposed
23 NTI Drug Definition says, "NTI drugs generally
24 have the following characteristics."  And you've
25 in your report identified one of the three things

Page 297

1  listed underneath there; correct?
2       A.  Yes.
3       Q.  Okay.  Your report does not include the
4  next two bullet points that are included on the
5  FDA slide that you're citing; correct?
6       A.  I don't give you all three bullets.  That
7  is true.
8       Q.  Right.  You skip the bullet that says,
9  "Subject to therapeutic drug monitoring based on
10 pharmacokinetic . . . or pharmacodynamic . . .
11 measures"; correct?
12      A.  Yes.  I did.
13      Q.  And you skipped "Generally small within
14 subject variability"; correct?
15      A.  Yes.
16      Q.  Now, you understand that Xarelto was
17 approved by the FDA as safe and effective without
18 the need for therapeutic drug monitoring; right?
19      A.  Yes.  That is true.
20      Although they did point out that there was
21 a relationship between monitoring data and the --
22 and the blood levels.
23      MR. HOROWITZ:
24          Objection.  Move to strike.
25 Nonresponsive.

75 (Pages 294 to 297)

Protected - Subject to Further Protective Review

Page 298

1  BY MR. HOROWITZ:
2      Q. You understand that Xarelto was approved
3  by FDA as safe and effective without the need for
4  therapeutic drug monitoring; correct?
5      A. They did not require it. That is true.
6      Q. And you believe that Xarelto has high
7  interpatient and high intrapatient variability,
8  but that would be inconsistent with the definition
9  here, "Generally small within subject
10  variability"; correct?
11     MR. DENTON:
12         Object to the form.
13     THE WITNESS:
14         It wouldn't be inconsistent, but --
15         but it certainly -- certainly would be not
16         the same as the statement here. That is
17         true.
18  BY MR. HOROWITZ:
19     Q. So Xarelto would actually not fit the full
20  proposed FDA definition that you are citing for a
21  narrow therapeutic index drug that you referred to
22  in this slide; correct?
23     A. No. I don't -- no. I don't necessarily
24  agree with that. I -- I -- I would agree -- I --
25  what I would agree to is what I have stated, that

Page 299

1  I believe it does fit based on the fact that
2  they're proposing that these drugs are ones that
3  have small differences in dose or blood
4  concentration that may lead to serious therapeutic
5  failures and/or adverse drug reactions. That's
6  the definition. And they're giving
7  characteristics which are -- may or may not be
8  always there.
9      Q. Well, do you see there's a -- there's a
10  comma after the first bullet point? Do you see
11  that?
12     A. Yes. I do see that.
13     Q. And you see there's an "and" after the
14  second bullet point?
15     A. Yes. I see that.
16     Q. Okay. And it says, "NTI drugs generally
17  have the following characteristics." And it
18  doesn't list one bullet point. It lists three;
19  correct?
20     A. It certainly has three bullets. I agree
21  with that.
22     Q. And you only included the first, but not
23  the second two; right?
24     A. To me, the first bullet was highly
25  relevant to the question at hand that I'm trying

Page 300

1  to answer.
2      Q. Right. And you didn't feel it was
3  relevant to include the ones that are contrary to
4  your opinions which say, "Subject to therapeutic
5  drug monitoring based on pharmacokinetic . . . or
6  pharmacodynamic . . . measures, and "Generally"
7  within -- "small within subject variability,"
8  because those are inconsistent with the opinions
9  you're offering in this litigation; correct?
10     MR. DENTON:
11         I disagree with you. Objection.
12     THE WITNESS:
13         No. I -- I don't think that they're
14         inconsistent. And I belive it is my
15         opinion and I believe FDA pointed out that
16         therapeutic drug monitoring for this drug
17         could play an important role.
18  BY MR. HOROWITZ:
19     Q. Do you know if a drug has high
20  variability, if it's presumed to have a wide
21  therapeutic ratio? Have you ever heard that?
22     A. I have heard that discussed. Yes.
23     Q. Do you know if FDA has ever said that?
24     A. I don't know.
25     Q. Take --

Page 301

1      A. If you want to point me to something.
2      Q. Yeah.
3      A. I don't know.
4      Q. Take a look at Slide 18. It's actually
5  like Page 74 of the PDF. You know what?
6      A. Okay. Well, it doesn't --
7      Q. Maybe --
8      MR. HOROWITZ:
9         Roger, can you -- because I think its
10        on his second flag. I foolishly took the
11        flags off to keep the exhibit clean.
12     MR. DENTON:
13        What now?
14     MR. HOROWITZ:
15        The second flag in yours, Roger.
16     MR. DENTON:
17        You mean this green tab? That's the
18        flag?
19     MR. HOROWITZ:
20        That's a flag.
21     MR. DENTON:
22        That's a flag?
23     MR. HOROWITZ:
24        That's what I thought they're called.
25     MR. DENTON:

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 302

```
1          It's the sticky.
2      MR. HOROWITZ:
3          I'm going straight to the therapist
4      after this, Roger.
5      MR. DENTON:
6          Where are you going?  Where?  What do
7      you want me to do to help you ask your
8      questions?
9   BY MR. HOROWITZ:
10      Q.  Do you see that, Doctor?  It's slide --
11      A.  I see this page.  But if you're going to
12   ask me that, I'm going to have to go read the
13   pages around it.
14      Q.  Okay.
15      A.  Because of -- this is only -- this is a
16   continuation thing.  Do you want me to go ahead
17   and . . . I'll --
18      Q.  No.  That's okay.
19      A.  -- turn to that.
20      Q.  I'll just -- well, I'll ask you a simpler
21   question.
22          You didn't include that citation to that
23   slide and that statement in your report, that if a
24   drug is highly variable, it presumably has a wide
25   therapeutic window?  You didn't include that in
```

Page 303

```
1   your report; right?
2      MR. DENTON:
3          Object to the form.
4      THE WITNESS:
5          I did not include the statement.  That
6      is true.
7   BY MR. HOROWITZ:
8      Q.  Okay.  You can put that aside.
9          Are you aware whether there is --
10      MR. DENTON:
11          Are you done with this document?
12      MR. HOROWITZ:
13          Oh, I'm sorry.
14      MR. DENTON:
15          Are you done with this one?
16      MR. HOROWITZ:
17          Yes, sir.
18      MR. DENTON:
19          Okay.  Thank you.
20      MR. HOROWITZ:
21          Thanks, Roger.
22   BY MR. HOROWITZ:
23      Q.  Well, let me ask it this way:  I know
24   you're familiar with the Code of Federal
25   Regulations; right?
```

Page 304

```
1      A.  Yes.
2      Q.  In fact, I think you cite Title 21 in
3   Appendix C of your report as something that -- you
4   know, as part of your materials relied upon
5   obviously for forming your opinions in this case?
6      A.  Yes.
7      Q.  And you understand that Title 21 of the
8   Code of Federal Regulations contains the FDA
9   regulations that apply to prescription drugs here
10   in the United States?
11      A.  Among other things, yes.  It also applies
12   -- just twenty -- Section 21 applies to all the
13   FDA-regulated products.  But yes.
14      Q.  Right.  Including drugs; right?
15      A.  Yes.
16      Q.  So if I'm a manufacturer of a prescription
17   pharmaceutical drug here in the United States, I
18   need to be in abidance with and comply with
19   Title 21 and the regulations set forth there?
20      A.  Yes.
21      Q.  And in forming your opinions in this case,
22   did you search the Code of Federal Regulations or
23   do any sort of analysis as to what is in the
24   Code of Federal Regulations with respect to the
25   definition of narrow therapeutic index drugs?
```

Page 305

```
1      MR. DENTON:
2          Object to the form.
3      THE WITNESS:
4          Yes.  And there is a discussion, I
5      believe, in the generic -- in the generic
6      drug section for sure -- bioequivalence
7      section, I guess is what I should say.
8   BY MR. HOROWITZ:
9      Q.  Let me -- do you understand that the FDA
10   has indicated that a specific section of the Code
11   of Federal Regulations, 21 CFR 320.33(c)
12   specifically, defines narrow therapeutic index?
13      A.  You'll need to show me.  I -- I -- I don't
14   know it off -- I don't know the sections off the
15   top of my head.  I -- so if you want to show me
16   what it is you're referring me to.
17      MR. HOROWITZ:
18          Let's go to the website.  Let me mark
19      as Plunkett 10 -- I've got to mark it
20      someplace I don't mess it up.  I'm going
21      to put this one on -- is this okay?
22      COURT REPORTER:
23          (Nods head.)
24      MR. HOROWITZ:
25          On top.
```

77 (Pages 302 to 305)

Protected - Subject to Further Protective Review

Page 306

1    (Exhibit No. 10 was marked for
2    identification and attached hereto.)
3    THE WITNESS:
4       So this is not the federal
5    regulations?
6  BY MR. HOROWITZ:
7    Q.  No.  I'm going to start with -- I'll get
8  to --
9    A.  Oh.  Oh, okay.  I'm sorry.
10    Q.  I'm sorry.  Yeah.
11       Take a look.  What I'm showing you now is
12  from the FDA's website, "Therapeutic Equivalence
13  of Generic Drugs - Response to National
14  Association of Boards of Pharmacy."
15       Do you see that?
16    A.  Yes.  I do.
17    Q.  Okay.  And if you turn to Page 4 of 9 --
18  you see they're numbered at the bottom?
19    A.  Yes.  I see the numbers on the bottom.
20  Yes.
21    Q.  Okay.  And it says, "Narrow therapeutic
22  INDEX is a term of art which has come into current
23  use, including use by the agency.  The term, more
24  correctly, is narrow therapeutic ratio.  Narrow
25  therapeutic ratio is defined in the regulations at

Page 307

1  21 CFR 320.33(c)."
2       Do you see that?
3    A.  Yes.
4       But this has -- and I -- this is what I
5  said.  I -- I believe this has to do with
6  bioequivalence.  So yes.  But I didn't know that
7  was the number.  But yes, this has to do with the
8  issue of bioequivalence.
9    Q.  Well, isn't it true, Dr. Plunkett, that
10  the slide deck that you pulled from FDA that we
11  just looked at, Plunkett 9, and the slide that you
12  cite is -- "Approaches to Demonstrate
13  Bioequivalence of Narrow Therapeutic Index Drugs";
14  correct?
15    A.  Yeah.  And I tell you that in the
16  paragraph.  I said FDA has attempted to define it
17  within the realm of bioequivalence.
18    Q.  Correct.
19       And are you familiar with 21 CFR 320.33,
20  where the FDA says, "Narrow therapeutic ratio is
21  defined in the regulations"?
22    A.  I am certainly aware that there is such a
23  section, yes, within the -- within the section on
24  bioequivalence.  And we're not talking
25  bioequivalence with Xarelto.  But yes, I am

Page 308

1  familiar with this.
2    Q.  Well, you keep saying that.  But you're
3  the one who cited the bioequivalence slide deck;
4  right?
5    A.  Yes.
6       And I'm -- I'm -- I'm trying to give you
7  some idea of the way that different contexts will
8  define it.  In the regulatory definition, the only
9  one I can find is this one within the
10  bioequivalence section.  Bioequivalence
11  definitions, however, are not necessarily apples
12  and oranges to Xarelto.
13       But I have no problem.  I absolutely agree
14  that it is defined there.  And I have cited it for
15  you here as well.  The reason I cited it is I
16  thought this slide deck and this -- this
17  discussion, which was right around the time that
18  the drug was approved, was pertinent to the
19  thinking of the FDA at the time that this drug --
20  the drug application was being reviewed.
21    MR. HOROWITZ:
22       Objection.  Move to strike.
23    Nonresponsive.
24  BY MR. HOROWITZ:
25    Q.  Is it fair to say that you do not cite 21

Page 309

1  CFR 320.33(c) anywhere in your report?
2    MR. DENTON:
3       Object to the form.
4    THE WITNESS:
5       I don't know that I cite it
6    specifically, but it certainly is among
7    the sections I cite.  Because I think I
8    cite -- I tell you to look at 21 CFR 199
9    through 499 or --
10  BY MR. HOROWITZ:
11    Q.  Where --
12    A.  -- something like that.
13    Q.  Where do you say -- where -- show me where
14  you do that.
15    A.  I usually have a paragraph under
16  Regulation of Drugs.  But let me see.  Yeah.
17  Right here.  "As a human drug product,"
18  Paragraph 30, "Xarelto manufacturing and marketing
19  are regulated by the FDA (21 CFR Parts 200 through
20  499 in particular)."
21    Q.  Is it fair to say that you do not
22  particularly cite or discuss 21 CFR 320.33(c)
23  anywhere in your report?
24    MR. DENTON:
25       Object to the form.

78 (Pages 306 to 309)

Protected - Subject to Further Protective Review

Page 310

1    THE WITNESS:
2        I already told you that.  I answered
3    that question.  I said yes, I don't cite
4    it by -- by section.  But it is included
5    within the sections that I'm referring you
6    to.
7    BY MR. HOROWITZ:
8        Q.  And do you do any analysis of Xarelto and
9    -- and whether or not it has a narrow therapeutic
10   index by applying the definition as set forth in
11   320.33(c) in your report?
12       MR. DENTON:
13           Object to the form.
14       THE WITNESS:
15           I don't do that exact comparison
16       because, again, I -- to me, it's apples
17       and oranges to the question.  The -- the
18       issue I'm trying to address is not whether
19       or not this drug would be applicable with
20       a different bioequivalent standard, which
21       is what that section is dealing with,
22       whether or not you would apply a different
23       standard for bioequivalence for the drug.
24   BY MR. HOROWITZ:
25       Q.  So somehow you're making a distinction.

Page 311

1    When you cited the bioequivalence discussion in
2    the slide deck with the proposed definition,
3    you're saying that that's more relevant than the
4    actual regulation that FDA has promulgated, where
5    they actually say there is a definition of narrow
6    therapeutic index governed by the regulations?
7        MR. DENTON:
8            Object to the form.
9        THE WITNESS:
10           I -- no -- no -- at no time did I say
11       it was more relevant at all.  I disagree
12       with that.  I'm not saying that at all.
13       Why don't we pull out 320.33(c), and let's
14       compare it.  Because I don't recall the
15       exact wording of the section.  I believe
16       there's some -- there's some similarity in
17       the wording as well.
18   BY MR. HOROWITZ:
19       Q.  You did not, before I came in and asked
20   you questions, go to 320.33(c) and apply the
21   definition to Xarelto.  Is that fair?
22       MR. DENTON:
23           Object to the form.
24       THE WITNESS:
25           I certainly was aware of the section,

Page 312

1    but I did not apply it.  That is true.  I
2    did not try to -- to analyze it.  Because
3    again, I wouldn't necessarily apply it
4    because that's not the point I'm trying to
5    make with the -- my discussion of narrow
6    therapeutic index.  I'm pointing out that
7    there are multiple definitions, and indeed
8    there are when you look at the published
9    literature.
10   BY MR. HOROWITZ:
11       Q.  So you did not apply FDA's regulation to
12   the definition of narrow therapeutic index as it
13   might apply to Xarelto?  You just didn't do that
14   exercise in forming your opinions in this case?
15       MR. DENTON:
16           Object to the form.  Asked and
17       answered.
18       THE WITNESS:
19           Again, I think I have answered it for
20       you.  I said I did not apply it.
21           To me, this is apples and oranges.
22       This is a bioequivalence section, which is
23       why I wouldn't apply it specifically with
24       an analysis.  But I'm certainly pointing
25       you -- to -- you to information that I

Page 313

1    identified.
2        In addition to the regulation in
3    existence, there is this very long
4    descriptive slide deck from the FDA that
5    gives you a lot more than the -- than the
6    simple regulation.  And I thought it was
7    pertinent when it was talking about --
8    particularly about the -- the first bullet
9    that -- that I had pulled out.
10   BY MR. HOROWITZ:
11       Q.  I want to talk to you now about one of the
12   articles that you cite.  It's Paragraph 59.  I'm
13   going to give you the page number also, because I
14   wrote them down.  Page 35, Paragraph 59.
15       A.  If you can hand me my articles and if I
16   have it --
17       Q.  Yeah.  I'm actually going to -- this --
18       A.  -- within that, I'd like to see --
19       Q.  -- is one I might -- I'm sorry.  Because
20   what I'm -- I'm going to give you your article for
21   sure.
22       A.  Okay.
23       Q.  I'm just going to decide whether I want to
24   mark it.
25       A.  That's fine.

79 (Pages 310 to 313)

Protected - Subject to Further Protective Review

Page 314

```
1    Q. But I knew it was one I was probably going
2  to ask about. So . . . Why don't we mark your
3  copy, if that's okay with you.
4    A. Yeah. As long as I get it -- if -- if I
5  can have my -- my copy -- a copy of my copy back.
6  Is that . . . So I don't have to print it out
7  again.
8    Q. Okay. Let me show you now what I'm going
9  to mark as Plunkett 11.
10     (Exhibit No. 11 was marked for
11      identification and attached hereto.)
12  BY MR. HOROWITZ:
13    Q. Well, I'm getting ahead of myself. Let me
14  do a little bit of what you say in your report,
15  and then I'll mark it and show it to you.
16     But just so we're on the same page, on --
17  in Paragraph 59, you say, "a recent paper compares
18  the therapeutic windows of various oral
19  anti-coagulants head-to-head" --
20    A. Just a second. I'm trying to find where
21  you are.
22    Q. Oh, I'm sorry. It's the first sentence.
23  It's the last part of it.
24    A. Oh, okay. You -- so you're referring to
25  the Chang paper?
```

Page 315

```
1    Q. Yes. The --
2    A. Yes.
3    Q. -- Chang 2016.
4    A. Yes. I see that.
5    Q. And --
6    A. Okay.
7    Q. Yeah. And you -- it says, "a recent paper
8  compares the therapeutic windows of various oral
9  anti-coagulants head-to-head," and you cite Chang
10  et al 2016; right?
11    A. Yes.
12    Q. And you say, "The authors report that
13  Xarelto's therapeutic window is smaller than other
14  oral anti-coagulant drugs such as Pradaxa and
15  Eliquis"; correct?
16    A. Yes.
17    Q. Okay. And if you flip to Page 36, at the
18  very end of your Paragraph 59, you say, "Based on
19  the results of their analysis, Xarelto would have
20  a smaller therapeutic window than some of the
21  other available anti-coagulant drugs."
22     Do you see that?
23    A. Yes.
24    Q. What do you mean by "would"? I'm not sure
25  I follow that.
```

Page 316

```
1    A. Has to do with the analysis they did. So
2  they have compared the Hill coefficients, I
3  believe. If I could see the paper --
4    Q. Yes. I don't --
5    A. Okay.
6    Q. -- mean to hold it from you. So let me
7  just mark it for the record. I'm going to hand
8  you Plunkett 11, which is the copy of Chang that
9  you brought to the deposition with you that you
10  said was one of the articles you pulled to help
11  sort of prepare yourself and refresh your
12  recollection.
13     Is that a fair characterization?
14    A. Yes. That's exactly right.
15    Q. And there's some yellow highlighting in
16  there. And I just want the record to be clear, of
17  course. If -- if you'll just confirm that the
18  yellow highlighting in Plunkett 11, the Chang
19  article, is highlighting that you actually did
20  yourself.
21    A. Well, not this one.
22    Q. Oh.
23    A. I don't think. Did you do that one?
24    Q. I did not do that one.
25    A. Okay. Well, I don't -- there are two
```

Page 317

```
1  different highlights. So I -- the ones I recall
2  doing are the ones that are in dark yellow.
3    Q. Okay.
4    A. So -- but maybe I did that one too. I
5  just don't recall that one.
6    Q. I can assure you it wasn't me.
7    A. So . . .
8    Q. But you don't --
9    A. Because --
10    Q. You don't recall --
11    A. -- these were done with a PDF document.
12  You can tell by the way they're highlighted.
13    Q. Yeah. I was --
14    A. So . . .
15    Q. -- actually curious about that. Because
16  the first one you're --
17    A. Yeah.
18    Q. -- saying you're not sure about was
19  actually done by hand.
20    A. So I might have done this one after I read
21  it the second time. I don't recall doing it,
22  but it's possible I did. So yeah, if -- if you
23  haven't highlighted it, then it's mine.
24    Q. Okay.
25    A. But they're done at two different times.
```

80 (Pages 314 to 317)

Protected - Subject to Further Protective Review

Page 318

1    Q. All right. Now, that you have Chang in
2  front of you and have stolen mine, I'm going to
3  pull mine out. There we go.
4      And can you agree that the title of the
5  article is "A novel, rapid method to compare the
6  therapeutic windows of oral anticoagulants using
7  the Hill coefficient"; correct?
8    A. Yes.
9    Q. And when they say "novel," what do you
10 understand that to mean?
11   A. New.
12   Q. And then --
13   A. I mean, I think the -- I think that this
14 is maybe the first time that this method has been
15 applied to this class of drugs. That's what I'm
16 taking away from this. Although there may have
17 been another paper on the same issue.
18   Q. Okay. Well, let's continue.
19     So your understanding is you think this is
20 the first time that this has ever been applied to
21 this class of drugs; right?
22     MR. DENTON:
23       Object to the form.
24     THE WITNESS:
25       I don't know that -- I can't confirm

Page 319

1  that. But I'm saying if you're asking me
2  what "new" means, that's how I would
3  define it. And I don't believe I had
4  another paper like this one --
5    MR. HOROWITZ:
6      Yeah.
7    THE WITNESS:
8      -- before this.
9  BY MR. HOROWITZ:
10   Q. Yeah. And I was going to say: If there's
11 any other paper, do you believe there's -- and
12 this is Change 2016. There's no other paper that
13 you've cited or provided or pulled that does this
14 type of analysis prior to Chang 2016; right?
15   A. For the oral anticoagulants. I -- I refer
16 to a paper in 2015 that talks about use of the --
17 of the Hill coefficient, I believe. So the Hill
18 equation is talking about its application in drug
19 -- in the drug arena.
20   Q. Yeah. I meant for oral -- oral
21 anticoagulants as part of my question; correct?
22   A. Yes. I already answered that for you.
23   Q. Thank you.
24     And the -- what's happening here is -- is
25 the authors compare five different anticoagulant

Page 320

1  drugs; right?
2    A. Yes.
3    Q. We've got apixaban, dabigatran,
4  rivaroxaban, argatroban, and fondaparinux;
5  correct?
6    A. Yes. Those are the five they looked at.
7    Q. Now, all -- not all of those are actually
8  oral anticoagulant medications; right? Or do you
9  know, I should ask.
10   A. I thought they all were. They're not on
11 -- I don't know that they're all -- they're not
12 all the same mechanism of action. Is that what
13 you're asking?
14   Q. No. I'm asking you if they're all --
15 because you said they're all oral anticoagulants.
16 And I think argatroban and fondaparinux are not
17 oral anticoagulants. Did you know that?
18   A. It -- it could be that I am -- I am aware
19 of that. I -- again, it's -- to me that wasn't
20 the important issue. But that's fine.
21   Q. Okay.
22   A. And --
23   Q. Well --
24   A. -- they're all anticoagulants, and they
25 all -- and they share mechanisms. Two of them are

Page 321

1  thrombin-selective inhibitors, and three of them
2  are Factor Xa-selective inhibitors.
3    Q. Argatroban is actually an intravenously
4  administrated [sic] drug. Did you know that?
5    A. I don't recall that. But I -- I'm -- I'm
6  sure I did. I looked all these drugs up at one
7  point --
8    Q. And --
9    A. -- to understand where the data came from.
10   Q. Right. So as part of your review and your
11 balancing of the -- of the weight of the evidence,
12 you had to look up what these drugs were. Is that
13 fair?
14   A. Well, they're not ones that I had seen on
15 the market in the U.S. So that's what I was
16 looking up, to -- in other words, they weren't
17 onces that I had seen in my review of the -- the
18 literature on oral anticoagulants.
19   Q. And so you weren't aware until I just told
20 you that fondaparinux is actually subcutaneously
21 administered to patients?
22   A. That I think -- I -- I -- I do -- that, I
23 do believe is true based on my review. Yes. But
24 as we -- when you first asked me the question, no,
25 I had to think about it.

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 322

1     Q. Yeah. But when you wrote in your report
2   that it "compares the therapeutic windows of
3   various oral anti-coagulants head-to-head," not
4   all the coagulants in here are actually oral
5   anticoagulants. Do you understand that?
6     A. I do.
7       But there's three important ones in here
8   that are that -- that we have a lot -- we have a
9   lot of experience with in the U.S. market.
10    Q. And if you take a look at Page 1, do you
11  agree with the authors in the article that you
12  cite when they say, "Recently, selective
13  inhibitors of factor Xa and IIa have become
14  available, and these may have wider therapeutic
15  windows as well as less variable pharmacokinetics
16  and pharmacodynamics than warfarin"? Do you agree
17  with that?
18    A. I don't necessarily -- I wouldn't
19  necessarily express it that way. But I don't
20  typically agree or disagree with any sentence.
21  That's the author's opinion. So I accept it for
22  -- for -- as his opinion.
23    Q. Okay.
24    A. I believe that there are variable
25  pharmacokinetics and pharmacodynamics for all of

Page 323

1   these drugs. As far as a head-to-head for
2   warfarin, I don't have the data to tell you that
3   that's true all -- always across the board. In
4   some cases that is true, and it depends on the
5   endpoint you're looking at.
6     Q. Well, don't you in Paragraph 46 of your
7   report -- take a look at Paragraph 46. You see
8   you cite -- you -- you have your sentence, "A key
9   issue for all of the oral anti-coagulant drugs,
10  including Xarelto specifically, is the fact that
11  they inherently have a low or narrow margin of
12  safety, or a narrow therapeutic index"? And then
13  you actually cite Chang et al 2016 in support of
14  that proposition. Do you see that?
15    A. Yes. I do. Because he is describing the
16  issue of therapeutic index in his -- in his paper.
17  That is true.
18    Q. And Dr. Chang says the opposite in his
19  paper. He says wider therapeutic windows as well
20  as less variable pharmacokinetics and
21  pharmacodynamics than warfarin; correct?
22    MR. DENTON:
23      Object to the form.
24    THE WITNESS:
25      I don't disagree that's the sentence.

Page 324

1     But I -- I -- I -- I would still cite this
2   paper as showing, as he described -- when
3   you read his paper, he's describing the
4   issues of margin of safety and narrow
5   therapeutic index for these drugs. So
6   this statement he had was a comparative
7   statement, and he's citing three. So I'd
8   have to go pull that article to see what
9   he is referring to, and he's referring to
10  a paper by Adams. So I'd have to pull
11  that to know if he's citing that properly.
12  BY MR. HOROWITZ:
13    Q. You haven't done that?
14    A. I did not pull Adams. No.
15    Q. Okay.
16    A. Again, my use of this paper is for
17  presenting the -- understanding that they have a
18  narrow -- narrow therapeutic index, as he proves
19  by his data. And then in the other paragraph I'm
20  talk about his findings where there's a difference
21  among the -- the drugs.
22    Q. Does Dr. Chang in his article actually use
23  that phraseology and say Xarelto has a narrow
24  therapeutic index?
25    MR. DENTON:

Page 325

1       Object to the form.
2     THE WITNESS:
3       If you want me to look at that phrase,
4     I'll have to look. I can't answer that.
5     I don't know.
6       This paper teaches me that it has a
7     narrow therapeutic index by the results he
8     -- he -- he -- he -- he describes. So
9     that's only -- the only way I can answer
10    that for you.
11  BY MR. HOROWITZ:
12    Q. The authors don't actually write that
13  conclusion that you're drawing from this paper in
14  the report; right?
15    A. I can't answer that. I'd have to look. I
16  don't know. That isn't -- that isn't --
17    Q. Okay.
18    A. I don't typically try to . . .
19    Q. Now, Doctor, the -- the IIa inhibitors in
20  this study -- I think you've already said this --
21  are dabigatran and argatroban; right?
22    A. Yes.
23    Q. And --
24    A. That's what is listed.
25    Q. And the Xa inhibitors are rivaroxaban,

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 326

1    apixaban, and fondaparinux; right?
2        A. Yes.
3        Q. And the paper uses a method called the
4    Hill coefficient?
5        A. Yes.
6        Q. And it says, "The Hill coefficient" -- I'm
7    just reading this from the abstract -- "is a
8    measure of the steepness of a dose-response
9    curve"; correct?
10       A. Yes.
11       Q. And according to the paper, "The Hill
12   coefficient, nH, which measures the steepness of a
13   dose-response relationship, may be a useful gauge
14   of . . . therapeutic window"; correct?
15       A. Yes.
16       Q. And it says "may be"; right?
17       A. It uses the word "may." Yes.
18       Q. And it says but the Hill coefficient
19   hasn't been established -- well, it doesn't say --
20       A. Where are --
21       Q. -- that.
22       A. -- you reading now?
23       Q. I'm reading to you from my outline. How
24   about them apples? All right. Let me ask the
25   question.

Page 327

1        MR. DENTON:
2            Horowitz pharmacokinetics, Edition 12.
3        MR. HOROWITZ:
4            Whoo. I'm going to need that coffee,
5        buddy. All right. So I'm going to try to
6        pretend like I'm -- I'm -- I'm not reading
7        this question to you. So I'm going to
8        make eye contact. But when I look down,
9        I'm actually reading it to you.
10           Okay.
11       BY MR. HOROWITZ:
12       Q. But the Hill coefficient has not been
13   established as a proven indicator of therapeutic
14   window; correct?
15       MR. DENTON:
16           Object to the form.
17       THE WITNESS:
18           So I -- I -- what do you -- what do
19       you mean by "a proven indicator"? Are you
20       saying to me that there's that statement
21       in the literature, or are you saying to me
22       people haven't used it that way? Because
23       he's using it that way --
24       BY MR. HOROWITZ:
25       Q. Well, let's go look and see --

Page 328

1        A. -- as an indicator -- as -- as -- as an
2    indicator.
3        Q. Let's see if Dr. Chang agrees with you.
4    Can you turn to Page 4.
5        MR. DENTON:
6            Object to the form. Move to strike.
7    BY MR. HOROWITZ:
8        Q. You see it says, "the use of the Hill
9    coefficient as an indicator of therapeutic window
10   should be evaluated in further modeling studies
11   . . . with experiments in vitro and in vivo";
12   correct?
13       A. That's what he states. Yes.
14       Q. Okay. And are you aware of -- well, let's
15   -- let's leave it at that.
16           Let's take a look at Table 1. You discuss
17   Table 1 in your report; correct?
18       A. Yes. I have that one highlighted.
19       Q. Yeah.
20       A. What paragraph are we back at again? I'm
21   sorry.
22       Q. Well, I'm -- we're in the same paragraph
23   we started with.
24       A. Yeah. I know. But we jumped around.
25       Q. Oh.

Page 329

1        A. So -- I'm sorry. I'm trying to get back
2    to where we were.
3        Q. Fifty-nine.
4        A. Thank you. Because we went back to the
5    other page.
6        Q. I'm with you.
7        A. Okay. I'm there. Yep.
8        Q. Okay. But I want to focus your attention
9    on -- on what the table actually shows. So let's
10   take a look at Table 1. Okay?
11       A. Yes.
12       Q. And you see -- let's start with the -- and
13   what we're talking about here is what the paper
14   shows with respect to the outcomes under the Hill
15   coefficient for each anticoagulant; right?
16       A. Yes.
17       Q. And if you start with the Factor IIa
18   inhibitors, let's look. The lowest Hill
19   coefficient, if you look, is for argatroban?
20       A. Yes.
21       Q. And that's 1.7 plus or minus 1.0; right?
22       A. Yes.
23       Q. And then that's -- that's the one that's
24   not an oral medication; right?
25       A. Yes. That's true.

83 (Pages 326 to 329)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 330

1    Q. And then you have dabigatran, which is
2  2.7 plus or minus 0.5; right?
3    A. Yes.
4    Q. And then if you look at the Xa inhibitors,
5  you got the highest, which is fondaparinux, which
6  is at 4.5 to plus or minus 1.3; right?
7    A. Yes.
8    Q. And then you have -- the next highest is
9  apixaban --
10    A. Yes.
11    Q. -- which is 4.1 plus or minus 1.0; right?
12    A. That's correct.
13    Q. And the lowest is rivaroxaban, which is
14  3.6 plus or minus 1.3; right?
15    A. Yes.
16    Q. So rivaroxaban has the lowest Hill
17  coefficient of the Factor Xa inhibitors; right?
18    A. As they report in this table, that is
19  true.
20    Q. Okay. And the only oral anticoagulant
21  that has a lower Hill coefficient is dabigatran;
22  right?
23    A. Yes.
24    Q. But the difference between the Hill
25  coefficient for rivaroxaban at 3.6 plus or minus

Page 331

1  1.3 and the Hill coefficient for dabigatran,
2  2.7 plus or minus 0.5, is actually not
3  statistically significant; right?
4    A. He doesn't give you statistics, I don't
5  think.
6    Q. Well, don't the confidence intervals
7  overlap?
8    A. Yes. They do.
9    But again, I haven't -- I haven't said
10  that they were statistically significantly
11  different.
12    Q. Okay.
13    A. That's what I'm -- I'm just trying to say
14  that I -- it -- nowhere do I say that.
15    Q. Well -- but you understand that the table
16  of course shows you that this finding -- but the
17  difference between rivaroxaban and dabigatran with
18  respect to the Hill coefficient is not
19  statistically significant because the confidence
20  intervals overlap as presented in Table 1; right?
21    MR. DENTON:
22       Object to the form.
23    THE WITNESS:
24       I would agree the confidentals [sic]
25    overlap. I just -- I'm just saying that I

Page 332

1  haven't -- I -- nowhere have I stated that
2  they were statistically significant. In
3  fact, if you look at my statement, I say
4  -- I don't just talk about orals. I say
5  other available anticoagulant drugs, which
6  would include all five in the table, and
7  indeed it does have a smaller therapeutic
8  window by their interpretation of these
9  values.
10    MR. HOROWITZ:
11       Objection. Move to strike.
12       Nonresponsive.
13  BY MR. HOROWITZ:
14    Q. Doctor, my only question is: The Hill
15  coefficient for rivaroxaban and the Hill
16  coefficient for dabigatran, the difference between
17  those as reflected in the table you're citing is
18  not statistically significant? Yes or no?
19    A. I --
20    MR. DENTON:
21       Object to the form.
22    THE WITNESS:
23       -- have not determined that they
24    aren't. I haven't done the tests. I
25    would --

Page 333

1    MR. HOROWITZ:
2       Okay.
3    THE WITNESS:
4       -- agree with you they don't appear to
5    be. But I can't -- I -- again, you're
6    asking me to -- if I found --
7  BY MR. HOROWITZ:
8    Q. I'm asking you --
9    A. -- something. And I have not done that,
10  so I can't agree or disagree without -- without
11  doing that.
12    Q. You can look at the table, though, and see
13  that the confidence intervals overlap; correct?
14    A. And I agreed with that. I told you that's
15  true.
16    Q. Right. And then the same is true for the
17  difference between the Hill coefficient for
18  rivaroxaban and the Hill coefficient for
19  argatroban. They're not statistically different
20  here either because the confidence intervals
21  overlap, as reflected in the table; right?
22    A. For which one?
23    MR. DENTON:
24       Yeah. I was going to say. What's --
25    THE WITNESS:

84 (Pages 330 to 333)

Protected - Subject to Further Protective Review

Page 334

1      No.  No.  That's not true for
2  argatroban.  It's -- 1.9 would be the
3  upper end, and you -- the other one would
4  be 2.3.  So they would not overlap.
5  BY MR. HOROWITZ:
6      Q.  No.  Argatroban's 1.7 plus or minus 0.2.
7      A.  Right.  Which is one -- the upper would be
8  1.9.  And if you take 3.6 minus 1.3, you don't
9  come up to 1.9.  But again, I haven't done the
10  statistics.  But they don't overlap, if that's
11  what you're asking me.
12      COURT REPORTER:
13      Can you slow down.
14      THE WITNESS:
15      Sorry.
16      MR. HOROWITZ:
17      Okay.
18      MR. DENTON:
19      You need the math?
20      MR. HOROWITZ:
21      I need --
22  BY MR. HOROWITZ:
23      Q.  So it's your position the confidence --
24  just tell me.  You don't think the confidence
25  intervals overlap but -- as reflected in Table 1?

Page 335

1      A.  Not in the paragraph -- not in the column
2  you're showing me.  You're telling me that -- if
3  that's the 95 percent confidence interval and I
4  added it to the top end for argatroban and then I
5  -- I take away 1.3 from rivaroxaban, I don't have
6  an overlap.  And I think that's what you were
7  referring to earlier.  Now, if you're referring to
8  something else, please tell me.
9      Q.  Well --
10      A.  But that's what you were doing with the
11  math in the questions before.
12      Q.  Okay.  At the end of the day, with respect
13  to the Xa inhibitors, rivaroxaban has the lowest
14  Hill coefficient as reflected in the table you
15  cited; correct?  Of the fact that --
16      A.  Say that again.
17      Q.  At end of the day, with respect to the
18  rivaroxaban fact -- in the Xa inhibitors that are
19  reflected in the table, rivaroxaban has the lowest
20  Hill coefficient of the Xa inhibitors; right?
21      A.  That -- that is reported by Chang, yes,
22  that is true.
23      Q.  Okay.  And we talked earlier.  Although
24  you haven't done this yourself, looking at the
25  table, the difference between rivaroxaban and

Page 336

1  dabigatran with respect to the Hill coefficient is
2  not statistically significant?
3      MR. DENTON:
4      Object to the form.
5      THE WITNESS:
6      I can't answer that because I haven't
7  done it.  What I told you was that I would
8  agree that the confidence intervals, those
9  two, that comparison, do appear to
10  overlap.
11  BY MR. HOROWITZ:
12      Q.  Okay.  And when you say in your report
13  that there's approximately threefold variation in
14  the Hill coefficient among the five anticoagulants
15  tested, isn't it true what you're referring to
16  there is the difference between argatroban and
17  fondaparinux, neither of which are oral
18  anticoagulants?
19      A.  Well, I'm not referring.  I'm giving you a
20  quote from the paper.  But let me see if that's
21  what those refer to.
22      Yes.  Those would be the two that would be
23  at the -- at the top of the -- at the -- the
24  largest difference would be between those two
25  drugs.  That is true.  And they -- that's --

Page 337

1  again, I'm just quoting from the paper.  I'm not
2  doing my own analysis there.
3      Q.  Okay.
4      A.  What they state.
5      Q.  But at the end of the day, what I said is
6  true?  It's the difference between argatroban and
7  fondaparinux, none of which are oral
8  anticoagulants?  That's the quote that you put in
9  your -- in your report?
10      A.  No.  I put -- this quote refers to --
11  refers to more than those two drugs.  That
12  sentence, I would agree, is referring to that
13  comparison.  But the -- the -- the next sentence
14  is important.  It says they -- this implies that
15  certain anticoagulants could have a significantly
16  wider sweet spot for delivering a beneficial
17  bleeding risk antithrombotic benefit ratio.
18      Q.  Did you put that --
19      A.  And --
20      Q.  -- sentence in your report?
21      MR. DENTON:
22      Yeah.
23      THE WITNESS:
24      Yeah.  It's right here.
25      MR. DENTON:

85 (Pages 334 to 337)

Protected - Subject to Further Protective Review

Page 338

1    She's reading it.
2    THE WITNESS:
3    I'm reading it.
4    MR. HOROWITZ:
5    Okay.
6    THE WITNESS:
7    And then I -- I followed that with my
8    interpretation of the data, which is that
9    -- which is what -- the point I was trying
10    to make with this paper, is that there
11    indeed based on this data would appear to
12    be a smaller therapeutic window for
13    Xarelto as compared to other
14    anticoagulants.
15    BY MR. HOROWITZ:
16    Q. Well, we just went through what the table
17    shows. But I want you to answer my question,
18    which is: When you quoted the authors in your
19    report and you quote the language that I'm
20    referring to, that there is an approximately
21    threefold variation in the Hill coefficient among
22    the five anticoagulants tested, that threefold
23    difference you're talking about is when you look
24    at argatroban versus fondaparinux, neither of
25    which are oral anticoagulants; correct?

Page 339

1    A. Those are certainly the ones on the outer
2    end that I believe that that -- that that
3    calculation would specifically refer to. But
4    there are still differences among all of the
5    drugs, including rivaroxaban as compared to other
6    drugs.
7    Q. And I think I asked you this: But are you
8    aware of any other authority other than the Chang
9    article that uses the Hill coefficient to
10    establish the therapeutic index for an
11    anticoagulant drug?
12    A. I already answered that for you. I said I
13    don't know of another paper that does it in this
14    way. But it -- certainly if you go to the other
15    paper I cite, I do believe it talks about the
16    concept of doing this for -- using this as a
17    measure of -- of therapeutic window.
18    Q. Do you remember the paper off the top of
19    your head? Or if we just look at your report --
20    A. Gadaskar -- Gadaskar and --
21    Q. Gadis -- Gadagkar --
22    A. Gadagkar.
23    Q. -- and Call?
24    A. -- and Call. Yes.
25    Q. Okay. Is there any authority that you can

Page 340

1    cite me other than what we've talked about with
2    respect to Chang that claims or -- well, that
3    claims to have quantified the therapeutic index
4    for rivaroxaban?
5    MR. DENTON:
6    Object to the form.
7    THE WITNESS:
8    I certainly haven't cited anyone else
9    who has quantified it. No. I can't tell
10    you that it doesn't exist. I don't think
11    I tried to -- to say that I have every
12    citation for what a therapeutic index may
13    or may not be. But I didn't -- I did not
14    cite another -- and again, I'm not saying
15    that's the ultimate therapeutic index.
16    I'm really using this to show -- this
17    paper, what's important about it to me is
18    to show that Xarelto is not the -- the --
19    the be-all, end-all of the -- of the
20    drug -- of the anticoagulants with the
21    widest therapeutic index, and I think
22    that's what this would indicate.
23    MR. HOROWITZ:
24    Objection. Move to strike.
25    Nonresponsive.

Page 341

1    BY MR. HOROWITZ:
2    Q. I simply asked you if you could as we sit
3    here now cite me any other paper that claims to
4    have quantified the therapeutic index for
5    rivaroxaban. And if I understand you correctly,
6    as we sit here now, you cannot do that?
7    A. I -- already answered that for you.
8    Yeah. I said that I -- I have not been able to --
9    but I also haven't looked to see if there's any
10    other paper out there that would do something
11    different -- say something different.
12    Q. Let's move on. If we could take a look at
13    Paragraph 62 of your report. How about that? And
14    what I want to ask you about is where you say,
15    "The available evidence clearly indicates
16    that . . . assessment of exposure, both at the
17    start of Xarelto therapy and at times after
18    initiation of therapy, will identify those
19    patients at increased risk of bleeding events; and
20    . . . some form of exposure assessment should be
21    implemented for all patients."
22    Do you see that?
23    A. Yes.
24    Q. Are you offering the opinion that
25    therapeutic drug monitoring should be implemented

Protected - Subject to Further Protective Review

Page 342

1    for Xarelto?
2        MR. DENTON:
3            Object to the form.
4        THE WITNESS:
5            I believe it would be appropriate
6        based upon the data.  And I believe that's
7        consistent with -- with what FDA says when
8        they talk about the use of monitoring as a
9        way to protect patient health.
10   BY MR. HOROWITZ:
11       Q.  Well, we -- you -- you understand that the
12   drug was approved without monitoring; right?
13       A.  I already answered that for you.  I said
14   yes, I am aware.
15       Q.  Okay.  Is it your view that Xarelto is
16   currently unsafe without monitoring?
17       A.  I don't think I formed an opinion that
18   it's absolutely unsafe.  But I have certainly
19   formed the opinion that patient safety is at risk
20   without monitoring.
21       So the idea that we -- because we -- we
22   have a tool that could indeed be used at certain
23   times -- not necessarily has to be done on a
24   monthly basis, but if there's changes in the
25   patient status over the initiation of the therapy,

Page 343

1    certainly at the beginning, to understand whether
2    the 20-milligram dose is -- is -- is appropriate
3    for everyone -- this is all information that was
4    missing as described by FDA in the -- in their
5    analysis.  Their -- the minimal effective dose was
6    not identified in the -- in the clinical trial.
7        And you're right.  They approved it.  But
8    they also pointed out that that information was
9    lacking.
10       So do I -- yes.  I do believe that -- that
11   monitoring will improve patient safety and that it
12   should be implemented.  I do believe it should be
13   implemented for this drug and could be done based
14   on the information and the tests we already have
15   available.
16       Q.  Is it your view that Xarelto is currently
17   safe and effective but that monitoring might
18   increase the safety?
19       MR. DENTON:
20           Object to the form.
21       THE WITNESS:
22           I believe that -- I don't disagree
23       that the clinical trial data show that the
24       drug had -- could be used safely -- safely
25       and effectively in certain populations,

Page 344

1    but I don't believe that that holds for
2    all.  And that's my concern with the drug.
3    It's the idea that there are patients out
4    there that indeed have been shown to be at
5    risk based on the fact that they develop
6    serious bleeding at -- with use of the
7    recommended dose of 20 milligrams a day.
8    So I think it's an improvement on patient
9    safety that's an issue.
10   BY MR. HOROWITZ:
11       Q.  So in other words, you don't believe that
12   the drug now is currently unsafe or ineffective?
13   You just think that its safety prong could be
14   improved with respect to -- well, let me -- let me
15   -- that was horrible.  Let me try that again.
16       MR. DENTON:
17           You're going to withdraw that?
18       MR. HOROWITZ:
19           Yeah.  I'm going to withdraw that.
20       I'm not going to say "strike it" because
21       there's nobody here to strike it, whatever
22       that means.
23   BY MR. HOROWITZ:
24       Q.  Do you believe that future research might
25   make Xarelto safer?

Page 345

1        A.  I don't think --
2        MR. DENTON:
3            Object to the form.
4        THE WITNESS:
5            I don't think you need to do future
6        research.  I think the -- that we -- that
7        you have a tool already available that
8        would make its use safer, and that's the
9        use of the monitoring of the PT, the
10       prothrombin time.  That's what the
11       clinical data in ROCKET showed.  It's what
12       FDA indicated also could be done.
13       So yes, I do believe it could be done
14       today.  Would more research develop
15       another method that could also be used?
16       It's very possible that that could also
17       happen.
18   BY MR. HOROWITZ:
19       Q.  So I just want to be clear.  It's not your
20   testimony that Xarelto is currently unsafe without
21   monitoring?  It's just that monitoring could make
22   it safer?
23       MR. DENTON:
24           Object.  Asked and answered.
25       THE WITNESS:

87 (Pages 342 to 345)

Protected - Subject to Further Protective Review

Page 346

1      I have not formed the opinion exactly
2  as you're describing it. And I've tried
3  to explain to you what my opinion is. My
4  opinion is that there's a patient safety
5  issue and that the monitoring should be
6  implemented. I do believe that monitoring
7  is an important tool for use in patients.
8      And if -- if -- I think as consistent
9  with what I've said in my report, this is
10  information that doctors need to be given
11  in the labeling. Because that's another
12  important component of this. In addition
13  to what I believe this data shows, the
14  most important part of this equation is
15  doctors have never been told that indeed
16  monitoring could be a useful tool.
17  Because this is a type of monitoring
18  prothrombin time that would be easy to
19  implement by physicians based on the fact
20  that it's a routine test that's done in
21  most hospital labs in my experience
22  looking at results that -- that come out
23  of hospital labs for -- for similar
24  hematology workups.
25  BY MR. HOROWITZ:

Page 347

1      Q. How do you define monitoring?
2      MR. DENTON:
3          Object to the form.
4      THE WITNESS:
5          Measuring response and exposure. So
6  it's understanding what is the
7  relationship between exposure and a
8  response. When you monitor, you typically
9  monitor the exposure, but you have to have
10  some indication that exposure or response
11  have some relationship that's useful.
12  BY MR. HOROWITZ:
13      Q. And are you limiting your opinions to the
14  PT, the use of the PT, prothrombin time, assay as
15  the means by which to monitor?
16      MR. DENTON:
17          Object to the form.
18      THE WITNESS:
19          I am telling you that that's what the
20  data would support, absolutely.
21          Although monitoring with the
22  Factor X -- Xa inhibitor -- inhibitor
23  assay would also -- has also been shown to
24  be correlated. So that's another --
25  another type of monitoring that could be

Page 348

1  done as well.
2  BY MR. HOROWITZ:
3      Q. And when you say -- well, have you heard
4  the phrase "routine anticoagulation monitoring"?
5  Are you familiar with that phrase?
6      A. I've seen it. Yes. I'm not a physician,
7  but I've seen it in -- in -- described in the --
8  in the articles and I know that's what was
9  discussed with my mother-in-law.
10      Q. Well, what do you understand it to mean?
11      A. It's routine monitoring for
12  anticoagulation. It typically is a -- it depends
13  on the -- on the agent. So for warfarin, it's --
14  it's typically an INR. For other anticoagulants,
15  I've seen monitoring involving prothrombin time
16  for anticoagulation status. So if somebody comes
17  into a hospital with an event, they will look at
18  the prothrombin time as a routine test for
19  anticoagulant monitoring.
20      Q. Do you believe that Xarelto should not be
21  on the market in the absence of a monitoring
22  recommendation?
23      MR. DENTON:
24          Object to the form.
25      THE WITNESS:

Page 349

1      I haven't formed that opinion, that
2  it's -- because I do believe it can be
3  monitored safely if monitoring is done.
4  BY MR. HOROWITZ:
5      Q. No. That's not my question.
6      A. I -- I answered the question first. I
7  said I haven't formed that opinion, but I do
8  believe that the drug can be used safely as long
9  as there is the understanding that monitoring
10  would definitely improve patient safety. I do
11  believe the labeling should be changed.
12      MR. HOROWITZ:
13          Objection. Move to strike.
14  BY MR. HOROWITZ:
15      Q. My question is: Do you believe that
16  Xarelto should not be on the market in the absence
17  of a monitoring requirement?
18      MR. DENTON:
19          Object to the form.
20      THE WITNESS:
21          I haven't formed the opinion as you
22  state it. But I guess that would be the
23  ultimate conclusion since I believe that
24  the labeling should be changed.
25          So the issue would be -- giving

88 (Pages 346 to 349)

Protected - Subject to Further Protective Review

Page 350

1    physicians that information may be enough.
2    If you tell physicians that there is a --
3    in -- in the labeling, that there is an
4    important tool of monitoring, regardless
5    of whether you make a statement on the
6    label, You must monitor, I believe
7    physicians would do that.
8  BY MR. HOROWITZ:
9    Q. And by "monitor," you're referring to
10   using the PT assay as a means to measure
11   anticoagulation activity or plasma concentration?
12   A. It's understanding -- yes. It's
13   understanding where the patient falls in terms of
14   exposure response.
15   Q. Is it your view that FDA never should have
16   approved Xarelto in the absence of a monitoring
17   recommendation?
18   A. I --
19     MR. DENTON:
20       Object to the form.
21     THE WITNESS:
22       -- have not formed that opinion.
23   BY MR. HOROWITZ:
24   Q. You simply aren't opining one way or the
25   other?

Page 351

1    A. I just haven't formed that opinion.
2    Q. I don't know what that means. Are you --
3    are -- in other words, is that not something you --
4    that's something you haven't considered?
5    A. I haven't -- I haven't formed that opinion
6    because in order to form that opinion I would
7    probably have to look at a lot more documents.
8    Q. You didn't do any --
9    A. So I have not --
10   Q. I'm sorry. Yeah. I know what you're
11   going to say. So . . .
12   A. So -- so based upon the review I have
13   done, I -- I have formed the opinion I have
14   formed, which is I believe that -- I believe that
15   the labeling is inadequate, that monitoring would
16   be -- would be an important safety tool. And I do
17   believe that -- that monitoring should be
18   implemented. I do think that would be an
19   important step forward to improve patient safety.
20   Q. And do you believe the drug should come
21   off the market until the monitoring is
22   recommended?
23     MR. DENTON:
24       Object to the form.
25     THE WITNESS:

Page 352

1    Same answer. I haven't formed that
2    opinion. You won't see that in my -- in
3    my report.
4  BY MR. HOROWITZ:
5    Q. Okay. What's your basis for saying in
6    your report -- in your opinion in Paragraph 62,
7    that there should be some sort of assessment done
8    at the start of Xarelto therapy with respect to a
9    PT assay? Where does that come from?
10   A. So you're looking at -- you -- are you
11   looking at the sentence that starts with "The
12   available evidence" --
13   Q. Yes.
14   A. -- and then No. 1?
15   Q. Uh-huh.
16   A. So that comes with -- that comes with
17   understanding what the exposure-response
18   relationship is for a patient. So it's
19   understanding what their -- what their PT value is
20   and then after treatment what that PT value
21   becomes? Does that -- does that make sense?
22   That's what I'm reporting -- that's what I'm --
23   Q. What data -- I'm asking you as a
24   scientist. We talked about scientific solutions
25   and a reasonable degree of medical -- or a

Page 353

1    reasonable degree of scientific certainty and
2    those types of things. What data are you relying
3    upon to support your opinion at the start of
4    Xarelto therapy?
5    A. So it's looking at the ROCKET data and
6    understanding that there's an exposure-response
7    relationship. So the idea at the start of
8    therapy -- it's showing that the drug works. In
9    other words, you're getting -- you have a person
10   who is actually becoming anticoagulated. And then
11   -- and after -- at times -- after initiation of
12   therapy, the issue would be what -- how -- what --
13   is something changed in the patient, so is the
14   patient sick, dehydrated, has there been a renal
15   function change, are they -- is their drug regimen
16   changed such that there's other drugs onboard that
17   can interfere with the pharmacokinetics and
18   therefore the exposure response for Xarelto.
19     So it's understanding that at the very
20   beginning, after you start, indeed they reach a
21   level that indicates they're in a safe range for
22   PT and therefore exposure response, and then
23   understanding what happens for people over time.
24   In other words, you don't have to monitor every
25   month. But if you have a patient who comes into

89 (Pages 350 to 353)

Protected - Subject to Further Protective Review

Page 354

1    the hospital or a doctor's office with an issue
2    that could affect exposure, then the -- that
3    monitoring would make sense.
4        Q.  Well, let's focus on that start of Xarelto
5    therapy, which was my question.  Okay?
6        MR. DENTON:
7            Which was half of that sentence.
8        MR. HOROWITZ:
9            Right.
10   BY MR. HOROWITZ:
11       Q.  You say, "at the start of Xarelto
12   therapy," which is what I want to talk about.  I
13   want to understand what data specifically points
14   to the -- to your -- or what data are you pointing
15   to to support your opinion that this should be
16   done at the start of therapy?  What specifically
17   are you talking about?
18       A.  I'm talking about the fact that within the
19   ROCKET data it shows that there are people that
20   respond with predict -- a predictable linear
21   relationship between prothrombin time and -- and
22   concentration in the plasma.
23           So we understand that if someone is taking
24   the drug -- it's the issue of if somebody takes
25   the drug and doesn't reach a range of prothrombin

Page 355

1    time that indicates benefit, that that's important
2    information too, as well as understanding that
3    they're beyond that level.  They're a high --
4    they're a superabsorber or they're a -- they're a
5    person that doesn't metabolize properly and that
6    even at the start of therapy, this person has a
7    prothrombin time above say 20 seconds.  And so we
8    need to realize they're at increased risk of a
9    bleed and maybe we need to either to decrease
10   their dose -- so it's the idea of optimizing dose
11   for the patient.  Maybe they weren't an elderly
12   person with compromised renal function such that
13   you would have -- have decreased them to 15
14   milligrams.  Maybe you need to based on that
15   response after they start taking the drug.
16       Q.  What data are you relying upon to support
17   your opinion that a doctor should do an initial
18   measurement of PT and then dose adjust or make an
19   adjustment to that patient's dose based on that
20   measurement?
21       A.  So that's their own data they collected
22   showing that, for example, as renal function
23   changes, exposure changes.  So it's the
24   understanding that they -- they have a
25   recommendation in the label that 15 milligrams is

Page 356

1    better for some people.
2           It's also looking across their clinical
3    data and showing that they get effective
4    anticoagulation in people at 10 milligrams in
5    other patient populations.  And yet in ROCKET they
6    never tested more than one dose.
7           So it's the idea that dose adjustment
8    could make sense and would be a patient safety
9    issue but also makes sense on the issue of -- of
10   making sure that the patient is exposed to a
11   minimally effective dose, in other words a dose
12   that is effective but also then will bring more
13   safety because it's a lower dose.
14       Q.  Where does your proposed 20 seconds that
15   you just put out there come from?
16       A.  In the literature you see discussions of
17   greater than 20 seconds as cutoffs.  I think the
18   FDA uses that in their quartiles as well, 19.8, I
19   believe, or something like that.  So it's --
20   there's discussions in the literature.  There's --
21   it's not the ultimate threshold.  But certainly I
22   believe there is some understanding that
23   20 seconds was a threshold that was used at least
24   in the regulatory context.
25       Q.  And then for times after initiation of

Page 357

1    therapy, which is different of course than -- than
2    at the beginning of therapy to choose a dose, but
3    once somebody's on a dose, explain to me what you
4    have in mind once somebody's on a dose, the doctor
5    has selected that dose.  What is it you're
6    proposing to be done?
7        A.  It's what I just told you an answer ago.
8    I actually answered that.  I told you that this is
9    when someone has a change in their physiology, so
10   they get sick with the flu and they're dehydrated.
11   So that could change their exposure-response
12   relationship.  The person has a abrupt change in
13   renal function because they get sick, a person has
14   a brand new set of drugs added onboard to their
15   therapy and those are -- could be drugs that
16   indeed interfere with -- we know that they could
17   interfere with Xarelto's pharmacokinetics.  So
18   you'd want to look at those.
19           So it's all of those things that actually
20   the company is aware of, because they talk about
21   -- about a number of these as being ones that
22   change exposure.  I mean, they have an
23   understanding of what some of those conditions
24   are.  So it's applying what they already have an
25   understanding of and making sure that patient

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 358

1 safety is number one.
2 Q. Is it your -- I've let you do this a few
3 times, so I have to ask you this question.
4 Are you -- are you intending to opine as
5 to what the company knew and didn't know and what
6 the company was aware and not aware of and what
7 the company's state of mind was?
8 A. I don't think I can tell you what the
9 company's state of mind was. But I can tell you
10 what they knew if I have a document that shows
11 it's their data. So yes, if I am asked a question
12 about what did the company know, if I can point to
13 a document which is their own data submitted as
14 part of the NDA, then they know that. Yes. So I
15 think that's an appropriate "knew."
16 Would I try to opine that they should have
17 known if I don't have a document to point to? No.
18 I don't intend to do that.
19 Q. And you agree, though, that you can't talk
20 about the company's state of mind; right?
21 A. No. I tend not to talk about state of
22 mind. Usually documents will speak for themselves
23 on that issue.
24 Q. Right. Fair enough.
25 With respect to -- how often are you

Page 359

1 proposing the measurements be taken after
2 initiation of therapy?
3 A. I haven't come up with a specific number
4 other than this issue of when things change. So
5 it's the idea -- however many times there's -- a
6 person shows up in the hospital or however many
7 times the person shows up with a major change in
8 their -- in their therapy, things like that.
9 I mean, I think there's -- there's doctor
10 judgment that could come into how often. And I
11 certainly wouldn't try to put words in the
12 doctor's mouth. But I believe as a pharmacologist
13 and toxicologist and risk assessor and someone who
14 understands the kinetics of this drug, that if the
15 doctor asked me, I would give him a list of things
16 like I just did: dehydration, renal function
17 changes, drug therapy changes. Those are probably
18 three of the most important things I can think --
19 and hospitalization, obviously. Somebody comes in
20 hospitalized, you'd want to know what's going on
21 with their prothrombin time if they're still on
22 that drug.
23 Q. So is it fair to say you have -- other
24 than saying at times, after initiation of therapy,
25 you have nothing more specific as part of your

Page 360

1 opinion in terms of how regularly somebody's blood
2 or PT should be tested?
3 A. I haven't --
4 MR. DENTON:
5 Object. Excuse me.
6 THE WITNESS:
7 I'm sorry.
8 MR. DENTON:
9 Let me object to the -- asked and
10 answered. She just answered it. Go
11 ahead.
12 THE WITNESS:
13 I was going to say. I thought I just
14 did. I told you that I haven't told you
15 there has to be a specific regimen.
16 But I think I have told you what I
17 think needs to be considered. And I do
18 think it's -- there are -- there are
19 multiple situations that I've tried to lay
20 out for you that -- that make sense about
21 when you would. And those things may not
22 happen for two or three years until --
23 once the patient's on the drug. Or these
24 are things that could happen within the
25 first two months of treatment on the drug.

Page 361

1 BY MR. HOROWITZ:
2 Q. And what's the doses that you have in mind
3 that they should use?
4 A. Well, I think that you would use their own
5 data to make that choice. So their own data
6 indicates that 15 milligrams is a dose that
7 reduces exposure and reduces risk for some patient
8 populations. But I would look at -- look at the
9 data that they already have. I mean, they have
10 data on 10. They have data on 15. Those kinds of
11 -- those kinds of pieces of information could be
12 used.
13 I think it would be doctor judgment based
14 upon what the doctor believes should or shouldn't
15 be done that could be guided by exposure. So you
16 change the person's dose and you run a prothrombin
17 time and you can see how that exposure response
18 has -- has altered with the change in the dose.
19 Q. What's the risk -- if you choose a lower
20 dose for a patient and it turns out that that
21 actually is too low a dose, what's the risk to the
22 patient?
23 A. That you're --
24 MR. DENTON:
25 Object.

Protected - Subject to Further Protective Review

Page 362

1          THE WITNESS:
2              -- not getting the benefit you want.
3          And that's why you would have to again --
4          you would have to monitor the patient for
5          the response to that change in therapy.
6          I'm not saying just change it and walk
7          away.  But certainly if you're changing
8          the dose, you would monitor just as you
9          would if you -- if you have a change in
10         physiology.
11    BY MR. HOROWITZ:
12         Q.  An atrial fibrillation patient, we're
13    talking about a stroke; right?
14         MR. DENTON:
15             Object to --
16         THE WITNESS:
17             Yes.
18         MR. DENTON:
19             -- the form.
20         THE WITNESS:
21             That is typically what -- typically --
22         well, if you're talking about the benefit
23         that you're going after, that is true.
24         That is the benefit that was indicated
25         based on the data that was collected.

Page 363

1    BY MR. HOROWITZ:
2         Q.  And how do you identify those patients who
3    have increased risk of bleeding events?  Where
4    does that come from?
5         MR. DENTON:
6             Object to the form.
7         THE WITNESS:
8             It has to do with the data they have
9         about increased risk.  Can I -- can they
10        -- can they find exactly which patient is
11        -- can you -- can I tell you that this
12        data tells me exactly which patient will
13        develop a bleeding event?  No.  But I can
14        tell you that patients that are within
15        this response are at increased risk.  So
16        it's the idea that you would want to
17        always decrease the risk if you can for
18        the patient.
19    BY MR. HOROWITZ:
20         Q.  How do you decrease the risk -- how do you
21    factor in making sure -- I mean, here the benefit
22    is -- if you don't get the benefit, you're
23    actually increasing risk; right?  How do you
24    factor that into your analysis?
25         MR. DENTON:

Page 364

1              Object to the form.
2          THE WITNESS:
3              Well, that's why you would have to
4          monitor to see that when you change the
5          dose that you're not going too far in the
6          other direction.  So it may be that
7          Xarelto is the wrong drug for this person.
8          It may that they be -- should be on a
9          different -- maybe back to warfarin if
10         they were well-controlled before, maybe
11         trying Eliquis, which has a different
12         profile in terms of pharmacokinetics, or
13         maybe even going to Pradaxa if the issue
14         is not renal function issues.
15             So yeah, I mean the big difference
16         between them is the renal function
17         issue --
18    BY MR. HOROWITZ:
19         Q.  A lot of maybes --
20         A.  -- and bioavailability.
21         Q.  -- right, Doctor?
22         MR. DENTON:
23             Object to the form.
24    BY MR. HOROWITZ:
25         Q.  A lot of maybes?

Page 365

1         A.  What do --
2         MR. DENTON:
3             Form.
4         THE WITNESS:
5             -- you mean by "a lot of maybes"?
6    BY MR. HOROWITZ:
7         Q.  You just used "maybe" to start every
8    sentence in that paragraph you just gave me.  So
9    I'm just asking:  Do you agree there's a lot of
10    "maybes" in your answer?
11        MR. DENTON:
12            Object to the form.
13        THE WITNESS:
14            If I have used the word "maybe," I
15        have used the word "maybe."  But you've
16        asked me a hypothetical question.  Because
17        this is -- again is something that is
18        not -- I have not stated for you the
19        opinion that you asked me.  But I'm
20        explaining to you how I would approach it.
21    BY MR. HOROWITZ:
22        Q.  Well, wait a second.  You say, to
23    "identify those patients at increased risk of
24    bleeding events."  So you seemed to have solved
25    the Rubik's Cube.  And I want to know from you how

92 (Pages 362 to 365)

Protected - Subject to Further Protective Review

Page 366

1  am I going to identify those patients who had
2  increased risk of bleeding events?  That's the
3  opinion you're offering.
4      A.  Well, I'll --
5      MR. DENTON:
6          Object.
7  BY MR. HOROWITZ:
8      Q.  How am I supposed to do that?
9      MR. DENTON:
10         I object to form and -- and strike the
11     comments of Counsel in that question.
12     THE WITNESS:
13         So I would say that my opinion is
14     consistent with FDA's recommendation
15     within their review.  They make the
16     statement that -- that they don't
17     understand why the -- the company is not
18     using this tool.  Because indeed it
19     identifies people at risk of bleeds.
20         Beyond that, what FDA has stated,
21     independently, it -- this is consistent
22     with general principles of pharmacology
23     and toxicology.  When you have an
24     exposure-response relationship and you
25     have an understanding at where risk

Page 367

1      increases, then what you want to do is you
2      want to dial back the dose to get below
3      that level where risk has been shown to
4      increase.  And for that patient -- it
5      would be an individual patient decision,
6      though.  We're not doing a population
7      study.  We're now dealing with an
8      individual patient where you can actually
9      look at what their PT time is or look at
10     what their Factor X -- Xa inhibitor status
11     is.
12         And you can then use that information
13     based on your clinical -- the doctor --
14     based on their clinical judgment.  They
15     know what a PT test means to them --
16     MR. HOROWITZ:
17         Object.  Are you done?
18     THE WITNESS:
19         -- and they can apply it.
20     MR. HOROWITZ:
21         Objection.  Move to strike.
22     Nonresponsive.
23  BY MR. HOROWITZ:
24     Q.  Do you think FDA got it wrong when they
25  approved Xarelto without a monitor recommendation?

Page 368

1      MR. DENTON:
2          Object to the form.
3      THE WITNESS:
4          I thought I already answered that for
5      you.  I said I haven't formed the opinion
6      that they got it wrong, but I do believe
7      it improves patient safety and I believe
8      it's something that -- that doctors at
9      least need to be told about --
10  BY MR. HOROWITZ:
11     Q.  Have you --
12     A.  -- in the label.
13     Q.  -- surveyed the public statements from FDA
14  on their view of whether monitoring is currently a
15  good idea for NOACs?
16     MR. DENTON:
17         Object.
18  BY MR. HOROWITZ:
19     Q.  Have you done that assessment?
20     MR. DENTON:
21         Object to the form.
22     THE WITNESS:
23         I have looked at the peer-reviewed
24     published literature and I haven't seen a
25     statement like you're describing that

Page 369

1      addresses that from FDA.  I have seen
2      peer-reviewed published literature,
3      however, that describes the utility of
4      prothrombin time in -- as a monitoring
5      tool.  In fact, back in 2005, the company
6      themselves had a publication that -- that
7      dealt with this issue.
8  BY MR. HOROWITZ:
9      Q.  Have you -- other than writing in your
10  report this opinion about the use of PT as a means
11  by which to monitor Xarelto and make dose
12  adjustments, have you published it anywhere
13  outside of this litigation?
14     A.  Not at this point in time.  No.  I have
15  not.  Again, part of it is because my opinions
16  have been formed based on some confidential
17  information I have reviewed.
18     Q.  Well, that PT analysis and the ROCKET data
19  that you keep referring to from FDA, that's in
20  publicly available documents; right?
21     A.  That is.  Yeah.  That is true.
22     Q.  Okay.  And the literature that you rely
23  upon, that's publicly available; right?
24     A.  Yes.  The publish -- the peer-reviewed
25  literature is.  Yes.

93 (Pages 366 to 369)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 370

1    Q. Okay. Have you subjected your opinions
2  that you are offering with respect to prothrombin
3  time assays and using them to monitor rivaroxaban
4  and make dose adjustments? Have you subjected
5  those theories to peer review?
6      MR. DENTON:
7        Object to --
8      THE WITNESS:
9        I have not --
10     MR. DENTON:
11       -- the form.
12     THE WITNESS:
13       -- written a paper and submitted it at
14  this point in time. No.
15  BY MR. HOROWITZ:
16     Q. Do you agree that Phase 3 trials are
17  necessary to prove the safety and efficacy of a
18  drug?
19     MR. DENTON:
20       Object to the form.
21     THE WITNESS:
22       Based on the current regulatory
23  standards, yes.
24  BY MR. HOROWITZ:
25     Q. And do you believe Phase 3 trials are

Page 371

1  necessary to prove the safety and efficacy of a
2  particular dose or dosing regimen of a drug?
3      MR. DENTON:
4        Object to the form.
5      THE WITNESS:
6        Based on current regulatory standards,
7  yes.
8  BY MR. HOROWITZ:
9     Q. And do you understand that just because
10  one dose has been shown in a Phase 3 trial to be
11  safe and efficacious, you can't assume that
12  another dose would be safe and efficacious; right?
13     MR. DENTON:
14       Object to the form.
15     THE WITNESS:
16       You can't assume, but you can predict.
17       And, in fact, that's what FDA has done in
18  their -- in their review.
19  BY MR. HOROWITZ:
20     Q. You would still have to test in a Phase 3
21  trial, though, the predicted dose; right?
22     A. If you wanted to have an indication and a
23  statement about that dose in your label, yes. But
24  certainly this -- this is the issue of -- of --
25  part of this is an issue of how drugs are used off

Page 372

1  label as well.
2     Q. If you wanted --
3     A. The --
4     Q. -- to have a --
5     A. -- idea --
6      MR. DENTON:
7        Let her finish.
8      THE WITNESS:
9        The idea that experience within the --
10  within the medical community -- and even
11  papers and clinical data developed by
12  companies can lead to use for not only
13  other indications but also additional dose
14  -- different dosage regimens as well.
15     MR. HOROWITZ:
16       Objection. Move to strike.
17  Nonresponsive. I didn't ask you anything
18  about off-label use. Right?
19  BY MR. HOROWITZ:
20     Q. Now, do you agree that all anticoagulant
21  medication -- medicines increase the risk of
22  bleeding?
23     A. Yes. It is a -- it -- I told -- told you
24  that in the beginning of my report. It's a --
25  it's a patient -- it's the -- it's the class

Page 373

1  patient safety issue of concern.
2     Q. And do you -- do you believe that all
3  anticoagulant medicines increase the risk of major
4  bleeding?
5     A. I think they have the potential to do
6  that. Are you asking -- but if you're asking me
7  can I point you to a Phase 3 clinical trial that
8  proves it, I'd have to go look to see whether that
9  -- the Phase 3 data is there. But certainly, yes,
10  they all have that capability and potential to do
11  that at some dose.
12     Q. Do you agree that it has not been tested
13  whether patient safety would in fact be improved
14  through a regimen of monitoring and dose
15  adjustment?
16     MR. DENTON:
17       Object to the form.
18     THE WITNESS:
19       No. Unfortunately the company has not
20  done that.
21  BY MR. HOROWITZ:
22     Q. So your view is that that's a sort of
23  failure to test or failure to do something on the
24  part of the company?
25     MR. DENTON:

94 (Pages 370 to 373)

Protected - Subject to Further Protective Review

Page 374

1    Object to the form.
2    THE WITNESS:
3        I have not formed that opinion.  No.
4    But certainly I would agree with that.
5    That is true.  I mean, I do think that the
6    company -- the company could improve the
7    patient safety by doing that study.  I
8    think you have enough information current
9    how -- currently, however, to support a --
10   information be included in the labeling
11   about the utility of the monitoring --
12   BY MR. HOROWITZ:
13   Q.  What --
14   A.  -- the fact that there was a linear
15   relationship in exposure response.
16   Q.  So you believe that we have enough
17   scientific evidence right now as we sit here now
18   to determine whether patient safety would be
19   improved through monitoring of rivaroxaban?
20   A.  I -- I -- I don't think that's what I've
21   said.  No.
22       What I told you was I have not formed the
23   opinion that we have the data to prove that
24   because the company hasn't done the study.
25   However, I do believe we have enough scientific

Page 375

1    data right now to justify putting information in
2    the labeling for the physician.  And again, that's
3    what -- that's one of the things I believe that
4    FDA has pointed out in their statements as well
5    within the -- within the document.  They -- they
6    talk about the -- the reliability of that data and
7    the fact that that data shows this effect, which
8    means it could be put into the labeling if the
9    company wanted to do that.
10   MR. HOROWITZ:
11       Objection.  Move to strike.
12   Nonresponsive.
13   BY MR. HOROWITZ:
14   Q.  What's the study that you're saying the
15   company hasn't done?  Can you describe it for me?
16   A.  It would be the study you just asked me
17   about.  It would be the idea they would -- they
18   would -- they would sign patients up and -- and
19   look at the -- look at the monitoring and whether
20   or not there was an effect to be able to change
21   the profile of bleeding risk within patients.
22   Q.  So --
23   A.  They could do it retrospectively from
24   looking back at the clinical data, comparison to
25   that trial, what that trial showed versus what

Page 376

1    they would do.  They could develop an
2    epidemiological design to do that as well.
3    Q.  So the first --
4    A.  I haven't -- I haven't tried to design it
5    for you as I sit here today.  So I might come up
6    with a different answer if I go home and think
7    about it.
8    Q.  Well, if you go -- come up with a
9    different answer, will you let Mr. Denton know
10   and --
11   MR. DENTON:
12       Well, she's here to --
13   BY MR. HOROWITZ:
14   Q.  -- he'll let us know?
15   MR. DENTON:
16       -- to answer questions about her
17   opinions, not --
18   MR. HOROWITZ:
19       Well --
20   MR. DENTON:
21       -- things that might help your company
22   improve the drug.
23   BY MR. HOROWITZ:
24   Q.  You said the company hasn't done a study.
25   And you're -- you're critical of the company for

Page 377

1    not doing a study.  And I want to understand what
2    exactly it is, and I think you said sign up
3    patients and look at monitoring.
4    MR. DENTON:
5        What --
6    BY MR. HOROWITZ:
7    Q.  Is that --
8    THE WITNESS:
9        Well, I think I told you that I had
10   not formed that opinion in my report.  But
11   as -- as we discuss it, I do believe that
12   having the company do a study would be a
13   good idea.  But I don't think you have to
14   do a study in order to provide that
15   information to physicians.  I'm saying you
16   have information that shows that -- that
17   this information would be important to
18   patient safety.  And so without even doing
19   a study, you could improve patient safety
20   by giving that information to physicians.
21   BY MR. HOROWITZ:
22   Q.  So I'm a little confused.  I'm sorry.  And
23   I -- I -- I just don't want to -- I don't want to
24   belabor this, but I can't understand what you're
25   telling me.

95  (Pages 374 to 377)

Protected - Subject to Further Protective Review

Page 378

1      On one hand you're telling me the company
2  has enough information to put in the label to
3  advise doctors that they can make decisions to
4  dose adjust based on that information, and then on
5  the other hand you're telling me, But the
6  company's done a terrible thing because they
7  haven't done the appropriate study to provide that
8  information. So I'm having trouble reconciling
9  those things.
10     So my question is: Which is it?
11     A. Well --
12     MR. DENTON:
13        Object to the form. I move to strike
14        the comments in the question. And I
15        object to the form.
16  BY MR. HOROWITZ:
17     Q. Okay. Go ahead and answer.
18     A. So I totally disagree with what you just
19  said because I don't think that's at all what I
20  told you. So maybe I can repeat again what I
21  think --
22     Q. Well, I'd rather --
23     A. -- I'm trying to --
24     Q. Try and --
25     A. -- tell you.

Page 379

1      Q. -- answer my question, though.
2      MR. DENTON:
3         She is.
4      THE WITNESS:
5         Well, I am. But -- the answer to the
6         question is: I don't agree with what you
7         just said because I don't --
8      MR. HOROWITZ:
9         Okay.
10     THE WITNESS:
11        -- believe that is what I just said.
12     So you want me to stop there? I will.
13     MR. HOROWITZ:
14        Yeah. Let's stop there.
15     THE WITNESS:
16        Absolutely, if you want to stop there.
17  BY MR. HOROWITZ:
18     Q. Let's -- let me ask you this: Do you have
19  any clinical -- well, let me ask you: Have you
20  ever designed a Phase 3 clinical trial?
21     A. On my own, no, I have not done that. I
22  have critiqued some designs for people, but I have
23  not done -- done a -- done a design.
24     Q. Is -- the critiquing, has that been done
25  in the context of litigation?

Page 380

1      A. No. It's been done outside litigation as
2  well for some of my regulatory clients.
3      Q. And if I understood you earlier this
4  morning, you -- you've participated or -- or did
5  one Phase 1 study?
6      A. As far as actually designing, I -- well,
7  actually it was more than one. I believe there
8  were three that we did. But yes.
9      Q. You did three Phase 1 studies that --
10     A. I believe that --
11     Q. -- you designed?
12     A. -- there was a series of three. Yes.
13     Q. Okay. Do you know how many Phase 1
14  studies were designed by Drs. Kubitza and her team
15  with respect to the Xarelto?
16     A. I have no idea.
17     Q. Do you agree that to establish
18  scientifically -- maybe this is the way to ask the
19  question.
20     Do you -- do you agree that to establish
21  scientifically that the safety outcomes would in
22  fact be improved through monitoring rivaroxaban,
23  you would need to do a trial comparing the
24  outcomes in a group using monitoring to the
25  outcomes of a group not using monitoring?

Page 381

1      MR. DENTON:
2         Object to the form.
3      THE WITNESS:
4         Are you asking me is -- that
5         absolutely have to be done in order to put
6         a statement within the label about --
7         about what monitoring can do?
8      BY MR. HOROWITZ:
9      Q. That's not what I asked you. So I'll --
10     A. Okay. So --
11     Q. -- ask it again.
12     A. -- ask it -- that's what --
13     Q. Try and --
14     A. -- I thought I understood you were asking
15  me. So . . .
16     Q. That -- well, that's a different question.
17     My question was this: To establish
18  scientifically that safety outcomes would in fact
19  be improved through monitoring rivaroxaban, you
20  would need to do a trial comparing the outcomes in
21  a group using monitoring to the outcomes of a
22  group not using monitoring; correct?
23     MR. DENTON:
24        Object to the form.
25     THE WITNESS:

96 (Pages 378 to 381)

Protected - Subject to Further Protective Review

Page 382

1    Well, that's something I haven't
2 stated in my reports.  Let me think about
3 what you're asking me.
4    Depends what you mean by "establish
5 scientifically."  To a standard wherein
6 you could make a specific claim within
7 your label, you would have to do some type
8 of scientific study.  To provide a label
9 statement, though, about the utility of
10 prothrombin for exposure-response
11 monitoring, that data would not have to be
12 collected.  That study would not have to
13 be done.
14 BY MR. HOROWITZ:
15    Q. Has there ever been a clinical trial that
16 you're aware of comparing safety outcomes in a
17 group that used rivaroxaban without monitoring to
18 a group that used rivaroxaban with monitoring?
19    A. What was the first part of your question?
20 A safety outcome study or . . .
21    Q. Yeah.
22    Has there ever been any clinical trial
23 comparing safety outcomes in a group that used
24 rivaroxaban without monitoring to a group that
25 used rivaroxaban with monitoring?

Page 384

1 relationship.  That's what FDA says in
2 their -- in their data.  So I'm saying
3 that alone is enough to be able to -- to
4 make a statement within your label that
5 there is a reliable relationship between
6 exposure response, and you could put that
7 within the warning section on bleeding.
8    Whether or not you then make the next
9 statement, We have scientifically proven
10 with this particular study -- if you don't
11 have a study, you couldn't say that.
12    But I'm -- I guess what I'm trying to
13 tell you is:  Patient safety information
14 in the label does not have to always be
15 based on the kind of study you're --
16 you're suggesting.
17 BY MR. HOROWITZ:
18    Q. I didn't ask you that.
19    A. So . . . Well --
20    Q. So you're twisting --
21    A. That's what --
22    Q. -- the answer.
23    A. -- I'm getting from the way you're asking
24 the question.
25    Q. Why don't you try --

Page 383

1    A. I don't believe I'm aware of one.  No.
2    Q. Okay.  And just so I understand, you don't
3 agree that to establish scientifically that safety
4 outcomes would in fact be improved through
5 monitoring rivaroxaban.  Your view is you actually
6 don't need to do that type of trial and compare
7 outcomes in a group using monitoring to outcomes
8 in a group not using monitoring?
9    MR. DENTON:
10    I object --
11 BY MR. HOROWITZ:
12    Q. No need to do that?
13    MR. DENTON:
14    I object to the form.  That's not what
15 she said.
16    THE WITNESS:
17    No.  I -- I agree.  I don't believe
18 that is what I said.
19    What I'm telling you is that you have
20 enough information already to know that
21 there's a reliable relationship between
22 exposure response by using PT.  And we
23 know that the -- know it deals with the
24 issue of -- of bleeds, because it's
25 talking about the -- that part of the

Page 385

1    A. So I apologize.
2    Q. Yeah.  Listen to the question.  Now let me
3 ask this one last question.  I want to understand.
4    Because there's no trial -- there's no
5 trial -- we've agreed there's been no trial done
6 that compares patient safety, you know, that --
7 showing that patient safety would in fact be
8 improved through a regimen of routine -- routinely
9 monitoring rivaroxaban levels or pharmacodynamic
10 effects.  We don't have data one way or the other;
11 right?
12    MR. DENTON:
13    Object to the form.
14    THE WITNESS:
15    I already told you that we don't have
16 a clinical study as you've described it.
17 No.  That isn't what ROCKET did, for
18 example.  Okay.  Because they haven't
19 wanted to do monitoring.  The companies
20 have -- have been -- as I state in my
21 report, these drugs were being developed
22 in order to avoid monitoring for patients.
23 That was an advantage that was being
24 pushed.  So no, that study has not been
25 done.

97 (Pages 382 to 385)

Protected - Subject to Further Protective Review

Page 386

1    Do I believe that you could design
2   potentially an epidemiological
3   investigation to address that?  I do think
4   that could be done based on the data
5   that's already been collected --
6        MR. HOROWITZ:
7            Objection.  Move --
8        THE WITNESS:
9            -- out there.
10       MR. HOROWITZ:
11           -- to strike.  Nonresponsive.
12   BY MR. HOROWITZ:
13       Q.  Has the study been done, and is there the
14   data?
15       MR. DENTON:
16           Objection.
17       THE WITNESS:
18           I already answered that for you.  I
19   said I'm not aware of it.  That
20   doesn't mean --
21       MR. HOROWITZ:
22           Okay.
23       THE WITNESS:
24           -- it hasn't been done that you know
25   about.  I'm not aware of it.

Page 387

1        MR. DENTON:
2            All right.  Let's take a break.
3        MR. HOROWITZ:
4            Let's take a break.  Good.
5        THE VIDEOGRAPHER:
6            The time now --
7        MR. HOROWITZ:
8            Whoo.
9        THE VIDEOGRAPHER:
10           -- is 2:37 p.m.  We are off the
11   record.
12       (Brief recess was taken.)
13       THE VIDEOGRAPHER:
14           This begins Disk 5 of today's
15   deposition.  The time now is 2:51 p.m.  We
16   are back on the record.
17   BY MR. HOROWITZ:
18       Q.  Doctor, I want to talk to you a little bit
19   more about prothrombin time before we move on, my
20   -- my new favorite topic and yours as well.
21       Do you believe or is it your opinion, I
22   should say, that PT is a reliable method for
23   predicting clinical outcomes in patients taking
24   Xarelto?
25       MR. DENTON:

Page 388

1            Object to the form.
2        THE WITNESS:
3            It is a reliable measure of exposure
4   response in patients taking Xarelto, which
5   is what the data available tells us.
6   BY MR. HOROWITZ:
7       Q.  And the data you're referring to is . . .
8       A.  The ROCKET data -- the subset data looking
9   at the issue of bleeding as the -- as -- as an
10   outcome.  But it's -- because it talks about that
11   side of the dose-response curve.  It -- that it
12   showed -- appeared to show a correlation.
13       Q.  Are you familiar with the various types of
14   PT reagents that are available?
15       A.  I'm familiar with the fact that there are
16   various types of reagents.  And I know that the
17   company has specified in their clinical trial what
18   they used.
19       Q.  And do you make a distinction -- well, let
20   me ask you this way:  Is there -- is there a
21   particular --
22       MR. BONEY:
23           (Tenders.)
24       MR. HOROWITZ:
25           Thank you, Lindsey.

Page 389

1   BY MR. HOROWITZ:
2       Q.  Is -- is there a particular reagent that
3   you think should be used?
4       A.  I haven't formed the opinion of a
5   particular reagent.  No.  But I would certainly
6   say that based upon the one that was used in their
7   trial, there's certainly data that that one is --
8   is reliable.
9       Q.  And do you believe that there's data that
10   shows that outside the context of a Phase 3
11   clinical trial, that that assay would be somehow
12   reliable?
13       A.  Oh, I think it would be reliable in -- for
14   clinical use, if that's what you're asking me.  I
15   -- I don't know what you mean by "outside the
16   context."  You're always -- it -- it -- I'm
17   talking about clinical use, and a clinical trial
18   is clinical use.  So . . .
19       Q.  Well, you understand the difference
20   between a clinical trial and then clinical
21   practice; right?
22       A.  There are two different ways to -- to
23   administer the drug, if that's what you're asking
24   me.  Yes.  I mean, you can give it in a trial, or
25   you can give them on a individual patient basis.

Protected - Subject to Further Protective Review

Page 390

1    Yes.
2        Q.  And you agree that there are regulations
3    and requirements that have to be met for a new
4    laboratory test to be accepted and recommended for
5    use?
6            MR. DENTON:
7                Object to the form.
8            THE WITNESS:
9                Yes.  I -- if you mean by the aspect
10               of -- if -- if you're going to require
11               that a very specific test be mentioned,
12               yes.  And if you're going to get one
13               approved, yeah.  That's the diagnostic and
14               in vitro group.  Or if you want to test to
15               be specifically marketed for that purpose,
16               a new one, you would have to develop it
17               that way.  But PT is already a test that's
18               out there in use.
19   BY MR. HOROWITZ:
20       Q.  Do you know whether PT is specifically
21   indicated for the use you're suggesting?
22           MR. DENTON:
23               What use?  I object to the form.
24           THE WITNESS:
25               Well, it's -- for -- for bleeding

Page 391

1                times, it's certainly indicated.  But what
2                are you asking me?
3    BY MR. HOROWITZ:
4        Q.  Well, you've offered the opinion, as I
5    understood it, that PT should be used at the
6    beginning of therapy and periodically throughout
7    to monitor and dose adjust Xarelto.
8            So my question is:  Do you know whether
9    it's been approved for that use?
10           MR. DENTON:
11               Object to the form of the question.
12           THE WITNESS:
13               I --
14           MR. DENTON:
15               Move to strike the -- and form.
16           THE WITNESS:
17               I doubt it because it's been -- the
18               desk has been -- test has been approved a
19               much longer time ago than -- than the
20               Xarelto development, if that's what you're
21               asking me, if you're put -- you're trying
22               to tie those two things together.  PT has
23               been available long before Xarelto was
24               conceived.
25   BY MR. HOROWITZ:

Page 392

1        Q.  And do you know what specifically the
2    various PT assays have been approved for?
3            MR. DENTON:
4                Object to the form.
5            THE WITNESS:
6                For the actual -- what the actual --
7    BY MR. HOROWITZ:
8        Q.  What the indications are.
9        A.  Indications were, I haven't looked for
10   that.  No.
11               But again, I -- I would argue that based
12   upon FDA's own statements, that it makes sense
13   that there could -- there would be information
14   useful for physicians.
15       Q.  Are you aware of factors that can affect
16   the results of a PT test?
17           MR. DENTON:
18               Object to the form.
19           THE WITNESS:
20               I am aware that each -- each test,
21               even -- even the PT test can --
22               performance can be affected by certain
23               factors, yes.
24               And I would now say -- if you're going
25               to get into details, I would point you to

Page 393

1                the hematologists, I'm sure, in the
2                litigation who are going to discuss those
3                issues.  I was not asked to discuss the --
4                the specific issues of -- outside of the
5                realm of the Xarelto data.
6    BY MR. HOROWITZ:
7        Q.  So you don't think it's important to your
8    opinions on the use of PT as a test to monitor
9    Xarelto in the opinions that you're offering, that
10   you should be familiar with all the various
11   factors that can affect a PT test when used in the
12   clinical setting?
13           MR. DENTON:
14               Object to the form.
15           THE WITNESS:
16               I don't -- I don't believe that that's
17               something that I -- I need to have
18               described to you in my report.  No.
19               Because the recommendation I'm make -- I'm
20               making to you and the conclusion that I'm
21               drawing is consistent with the regulatory
22               body has also stated.  So it's not
23               something -- I don't believe it's
24               something controversial --
25   BY MR. HOROWITZ:

99 (Pages 390 to 393)

Protected - Subject to Further Protective Review

Page 394

1    Q. And --
2    A. -- based upon what I have reviewed and
3  relied upon.
4    Q. And if I understood you correctly, you
5  would defer to a hematologist on the details as to
6  what can and cannot affect the results and the
7  factors that affect the results of a PT test?
8    MR. DENTON:
9      Object to the form.
10    THE WITNESS:
11      Yes. Or else I have to pull my papers
12      out, because I -- I don't have that at the
13      tip of my tongue or the top of my head. I
14      do have literature that describes some of
15      that.
16  BY MR. HOROWITZ:
17    Q. I understand you have literature.
18      But at the end of the day, with respect to
19  the expertise, you'd defer to the hematologist?
20    MR. DENTON:
21      Object to the form.
22    THE WITNESS:
23      I would -- no. I would defer to the
24      hematologist to provide you details
25      because I believe that is the person who

Page 395

1      will be doing it in the litigation. I
2      certainly have expertise as far as
3      understanding how it's used and how it was
4      used in this case.
5  BY MR. HOROWITZ:
6    Q. Outside of this litigation, have you ever
7  been asked to give your view as to how a PT test
8  should or shouldn't be used with respect to
9  measuring anticoagulation effect?
10    A. I don't know if I can answer that based on
11  the confidential nature of some of my work. So I
12  don't think I can provide you a yes or no to that.
13    Q. I don't know what that means. So you
14  won't answer the question?
15    MR. DENTON:
16      No. She's saying that she'd violate a
17      court order if she . . .
18    THE WITNESS:
19      I just can't -- I -- I -- I -- to
20      answer your question truthfully, I don't
21      feel I can do that based upon the
22      constraints -- based upon the
23      confidentiality documents --
24  BY MR. HOROWITZ:
25    Q. Was that purely in --

Page 396

1    A. -- order that I signed.
2    Q. Yeah.
3      So it was in -- and once again, we're
4  talking about the litigation context?
5    A. Yes.
6    Q. Okay. Outside of the litigation context,
7  have you ever been asked to give your view or
8  opinion as an expert on whether a PT test should
9  or shouldn't be used in the context of an
10  anticoagulant?
11    A. No.
12    Q. Can we agree that FDA does not currently
13  recommend or require PT testing for Xarelto?
14    MR. DENTON:
15      Object to the -- object to the form.
16    THE WITNESS:
17      I would agree that they don't -- they
18      don't require it. It's not in the label
19      as a requirement. As far as recommending,
20      I would state that the FDA documents
21      indicate that they're recommending it's
22      useful. But have they come out with a
23      public policy statement outside of the
24      review documents, no. I don't -- I don't
25      see that.

Page 397

1  BY MR. HOROWITZ:
2    Q. Do you think the medical officer review
3  that you're citing is an FDA public policy
4  statement on the utility of monitoring with
5  respect to Xarelto?
6    A. No. You didn't listen to what I said.
7  That's what I'm saying I don't believe it is.
8      But it certainly is -- there is a -- there
9  are recommendations to the company for -- in those
10  documents about the utility and -- and -- and the
11  use of it by the company. So I'm saying that
12  those statements are there.
13      But I would agree that I don't have a
14  public policy statement where FDA has -- has made
15  that outside of those documents, or at least I
16  haven't seen it.
17    Q. So I want you to answer my question. Do
18  you under -- because I don't understand what
19  you're saying.
20      Does FDA currently recommend or require PT
21  testing for Xarelto?
22    MR. DENTON:
23      Objection. Asked and answered.
24      Object to the form.
25    THE WITNESS:

100 (Pages 394 to 397)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 398

1    Well, it was -- it was two questions.
2  I answered half of it first with a -- with
3  a simple yes or no.  I said they do not
4  require it.  That is correct.  No.
5  Because it's not something that's within
6  the labeling.
7  BY MR. HOROWITZ:
8    Q.  And --
9    A.  And then I stated for you that in my view,
10 the -- the way -- the best way to answer that
11 question is to say that there certainly are FDA
12 reviewers who have recommended it as being useful
13 in the context of Xarelto and protecting patient
14 safety.  But it's certainly -- I'm not aware of it
15 being a policy statement from the FDA.  And --
16   Q.  Do you know what the --
17   A.  -- that's -- to me, there's -- there's
18 different types of statements FDA can make.
19   Q.  Do you know if the -- the same medical
20 officer reviewers who you are citing, do you
21 understand what their final conclusion was with
22 respect to PT?
23     MR. DENTON:
24       Object to the form.
25     THE WITNESS:

Page 399

1    I'd have to pull the documents out.
2  But --
3     MR. HOROWITZ:
4       Okay.
5     THE WITNESS:
6       -- I certainly have -- it's -- it's in
7       several of the documents, about their
8       recommending the utility of it.
9  BY MR. HOROWITZ:
10   Q.  Do you understand that there's no drug
11 regulatory agency in the world that currently
12 requires PT testing for Xarelto?
13     MR. DENTON:
14       Object to the form.
15     THE WITNESS:
16       I haven't done a search to answer
17       that.  So I can't answer that.
18 BY MR. HOROWITZ:
19   Q.  Do you understand that there's no
20 professional medical societies that have issued
21 medical practice guidelines that recommend or
22 require PT testing for Xarelto?
23     MR. DENTON:
24       Object to the form.
25     THE WITNESS:

Page 400

1    It would be the same answer.  I
2  haven't looked, so I can't answer that.
3  BY MR. HOROWITZ:
4    Q.  You didn't look to see if your view was in
5  line with other regulatory agencies in the world
6  or professional medical societies, wasn't part of
7  your weight-of-the-evidence analysis?
8    A.  I --
9     MR. DENTON:
10      Object to the form.
11    THE WITNESS:
12      In my literature review, it did not
13      come up.  But certainly there are
14      statements that I cite with the literature
15      where other scientists in this area have
16      described the -- the utility of using this
17      testing.
18 BY MR. HOROWITZ:
19   Q.  So can you cite for me any professional
20 medical society that has issued a practice
21 guideline that recommends or requires PT testing
22 for Xarelto?
23     MR. DENTON:
24       Object to the form.
25     THE WITNESS:

Page 401

1    I already answered that.  I told you I
2  haven't done that -- that search.  But
3  certainly in my literature review I did
4  not find a paper that came up that way.
5  BY MR. HOROWITZ:
6    Q.  Do you know if there's any regulatory
7  agency in the world that recommends PT monitoring?
8     MR. DENTON:
9       Object to the form.
10    THE WITNESS:
11      I think I already answered that.  I
12      told you I have not looked, so I can't
13      answer that.
14 BY MR. HOROWITZ:
15   Q.  And your support for the recommendation
16 part of your answer to me was the FDA medical
17 officer review you cited and some of the language
18 in the medical officer review.  Is that fair?
19     MR. DENTON:
20       No.  It's not.  Object to the form.
21 That's not what --
22     MR. HOROWITZ:
23       Will you --
24     MR. DENTON:
25       -- her answer is.

Protected - Subject to Further Protective Review

Page 402

1    MR. HOROWITZ:
2       -- just say "form," please.
3    MR. DENTON:
4       Okay. Well, why don't you just listen
5    to her answer --
6    MR. HOROWITZ:
7       I did --
8    MR. DENTON:
9       -- instead of reading --
10   MR. HOROWITZ:
11      -- Roger. Stop.
12   MR. DENTON:
13      -- from your outline.
14   MR. HOROWITZ:
15      I am not reading from my outline. I'm
16   listening to her.
17   BY MR. HOROWITZ:
18      Q. And my understanding is what you told me
19   -- and tell me if I'm wrong.
20      But when you -- this recommendation
21   language that you're referring to comes from the
22   medical officer review; isn't that right?
23      A. Comes from FDA documents where the medical
24   officers have reviewed --
25      Q. Okay.

Page 403

1       A. -- the data. That is true.
2       Q. Okay. Were any of the NOACs approved by
3    FDA with a recommendation or requirement for
4    monitoring?
5       A. Are you asking me about the --
6       Q. Pradaxa, Eliquis?
7       A. -- Pradaxa, Eliquis, and Xarelto? No.
8    They --
9       Q. And --
10      A. -- were not.
11      Q. And Savaysa. I can never pronounce that
12   word.
13      A. Savaysa, I think or -- no. No.
14      Q. Yeah.
15      A. Savaysa maybe.
16      No. I don't believe it was either.
17      Q. Are you familiar with the FDA approval
18   process for average -- for laboratory assays like
19   PT?
20      A. I'm -- I'm familiar with the -- the
21   general laboratory approval process for in vitro
22   diagnostics. I haven't gone to look and see if
23   there's guidance specific for PT tests, though.
24      Q. And do you have any understanding whether
25   FDA has approved PT to measure the level of

Page 404

1    Xarelto or the degree of anticoagulation?
2       MR. DENTON:
3          Object to the form.
4       THE WITNESS:
5          I am not aware that there is an
6       approved in vitro diagnostic specific to
7       Xarelto. But I am aware that certainly PT
8       testing is an approved diagnostic test.
9    BY MR. HOROWITZ:
10      Q. Are you familiar with the FDA in vitro
11   diagnostic workshop that occurred in October of
12   2015?
13      A. I don't recall it. That doesn't mean I --
14   if there -- if I have a document from it in my --
15   my disclosure, I don't recall. I don't know.
16      Q. Well, do you recall attending?
17      A. Oh. I did not attend. No. I didn't.
18      Q. Did you participate?
19      A. No. I did not participate.
20      Q. You weren't invited to present or attend?
21      A. No. I did not.
22      Q. Do you know what the FDA in vitro
23   diagnostic workshop was all about?
24      A. I'd have to go back and look. I have seen
25   documents related to this. I just don't know -- I

Page 405

1    don't recall whether it's in conjunction with this
2    litigation. I have clients who deal in this area,
3    and so that's where I may have seen it.
4       Q. Let me show you a document we'll mark as
5    Plunkett 12.
6       (Exhibit No. 12 was marked for
7       identification and attached hereto.)
8    BY MR. HOROWITZ:
9       Q. Yeah. You don't have to read the whole
10   thing. Now, I'd ask you to look at Page 9.
11      A. If you're going to ask me specific
12   questions other than just does it say that, I'm
13   going to have to look at this. Because I have not
14   seen this document.
15      Q. Yeah. Why don't you look at Page 9 -- or
16   actually Page 8.
17      And you see reference there to
18   Lea Carrington? "She's the director of the
19   Division of Immunology and Hematology, Immunology
20   Devices in FDA's Office of In Vitro Diagnostic."
21   Do you see that?
22      A. At the top of the page, you have read that
23   correctly. Yes.
24      Q. Okay. And if you go to Page 9, in the
25   course of Lea Carrington's presentation,

102 (Pages 402 to 405)

Protected - Subject to Further Protective Review

Page 406

1　Lea Carrington, the director of the division of
2　immunology and hematology and immunology devices
3　in FDA's office of in vitro diagnostics, if you go
4　to the bottom of Page 9, she says, "Importantly
5　the DOAC drugs" -- and DOACs are -- that's another
6　word for NOACs; right?
7　　A. I believe so. Yes.
8　　Q. And Xarelto of course is -- would be one
9　of those drugs, right?
10　　A. Yes. It should be included.
11　　Q. "Were approved without a requirement for
12　monitoring."
13　　　Do you see that?
14　　A. Yes. I see that.
15　　Q. It says, "So currently, manufacturers are
16　developing devices to assess the effect" of
17　"concentration of direct oral anticoagulants";
18　correct?
19　　　MR. DENTON:
20　　　　I mean -- wait a minute. Wait a
21　　　minute. Are you asking if you read it
22　　　correctly, or are you asking does she
23　　　agree with that? I object to the form of
24　　　the question.
25　　　THE WITNESS:

Page 407

1　　　I -- I was going to say I believe you
2　　　read that correctly. But I -- I haven't
3　　　-- I'd to read this document if you're
4　　　asking me if I agree or disagree.
5　　BY MR. HOROWITZ:
6　　Q. Did you -- did I read it correctly?
7　　A. You did read it correctly.
8　　Q. Okay. And it says, "There are currently
9　no cleared or approved devices that measure that";
10　right?
11　　A. You read that correctly. Yes.
12　　Q. Okay. Now my question is: Did you review
13　any -- this transcript that I put in front of you,
14　Plunkett Exhibit 12, before I just showed it to
15　you?
16　　A. I don't recall this. And again, I
17　certainly can take a look at it. But I -- I don't
18　recall this.
19　　Q. Do you have any reason to dispute that
20　there are currently no cleared or approved devices
21　that measure or assess the effect of concentration
22　of direct oral anticoagulants?
23　　　MR. DENTON:
24　　　　I object to the question.
25　　　THE WITNESS:

Page 408

1　　　Say that -- start with your sentence
2　　again.
3　BY MR. HOROWITZ:
4　　Q. Do --
5　　A. Do you have . . .
6　　Q. Do you have any reason to disagree with
7　Dr. Carrington from FDA who says, "There are
8　currently no cleared or approved devices that
9　measure the effect of concentration of direct oral
10　anticoagulants"?
11　　　MR. DENTON:
12　　　　Object to the question.
13　　　THE WITNESS:
14　　　　Are you asking me about cleared and
15　　　proved [sic] in the U.S., or are you
16　　　asking me in other countries? I would
17　　　agree that in the U.S. that is -- that is
18　　　likely true, but I don't believe that's
19　　　true with other countries.
20　BY MR. HOROWITZ:
21　　Q. In the United States, there are no cleared
22　or approved devices that measure the effect or
23　concentration of direct oral anticoagulants;
24　correct?
25　　　MR. DENTON:

Page 409

1　　　Object to the form.
2　　　THE WITNESS:
3　　　　I agree you read that correctly. And
4　　　I would agree that that is probably --
5　　　that is true as -- from my knowledge based
6　　　on the U.S. But I do -- I do not believe
7　　　that is true at all based upon worldwide.
8　BY MR. HOROWITZ:
9　　Q. Do you know the Diagnostica Stago --
10　you're referring to the anti-Factor Xa assay;
11　right?
12　　A. Yes.
13　　Q. Do you know that they have applied -- or
14　do you know anything about their application
15　process here in the U.S.?
16　　A. This is again an area I can no longer
17　answer questions about because I've seen internal
18　documents related to this in other litigation.
19　　Q. I don't understand.
20　　　MR. DENTON:
21　　　　She's seen confidential documents in
22　　　other litigation. She can't answer the
23　　　question. What part didn't you
24　　　understand?
25　　　MR. HOROWITZ:

103 (Pages 406 to 409)

Protected - Subject to Further Protective Review

Page 410

1        The whole part.
2   BY MR. HOROWITZ:
3        Q.  Confidential documents related to -- let
4   me just make sure I understand.
5        A.  You're asking me about -- am I aware of
6   things.  And I'm saying to you that I don't feel
7   comfortable going into this area about what I'm
8   aware of because of the fact that it crosses into
9   the area of confidential documents that I have
10  seen.
11       Q.  In other litigation?
12       A.  In other litigation.  Exactly.
13       Q.  Well, let me show you a document in this
14  litigation.  All right.  We're going to mark as
15  Plunkett 13 a document entitled "Extract of the
16  FDA Feedback," "STA - Rivaroxaban Calibrator &
17  Control."
18       (Exhibit No. 13 was marked for
19       identification and attached hereto.)
20  BY MR. HOROWITZ:
21       Q.  Do you see that?
22       A.  I see that title.  Yes.
23       Q.  Okay.  And is it fair to say you didn't
24  review this document in preparing your opinions in
25  this case?

Page 411

1        A.  I don't recall it.  And if it's not on my
2   list, I did not.  So I have -- but I would have to
3   compare it to tell you definitively it's not.  But
4   I don't --
5        Q.  Okay.
6        A.  -- recall it.
7        Q.  And do you have an understanding that
8   Diagnostica Stago has applied for approval of an
9   anti-Factor Xa assay in the United States?
10       A.  I don't know if the name of the company is
11  Stago.  No.  But I know that there has been an
12  application, and that's all I can say based upon
13  other information that I know based on
14  confidential documents in other litigation.
15       Q.  All right.  Well, take a look here.  It
16  says, "FDA responses to your questions are found
17  below."
18       Do you see that on the first page there,
19  very top of the first page?
20       A.  Yes.  I see that.
21       Q.  Okay.
22       A.  In bolded, your -- before Method
23  Comparison, yes.
24       Q.  Right.  And you see it says "Subject:"
25  120710, and the first thing is STA -Liquid Anti-Xa

Page 412

1   Assay and then it says "STA -Rivaroxaban Control"
2   twice?  Do you see that?
3        A.  Yes.
4        Q.  If you go to the next page, which at the
5   bottom is Bates numbered -- the last three numbers
6   are 984.  Do you see that at the bottom, where it
7   says, "Labeling - Does FDA agree with the IFU
8   strategy proposed"?
9        A.  Yes.  I see that.
10       Q.  Okay.  And then you see the FDA response?
11  Do you see that there?
12       A.  I see the words "FDA Response."
13       Q.  Okay.  And then it goes on to say, "The
14  approved" -- well, let me just read the whole
15  thing.  "In sections 1.1 and 4.0 - you state 'The
16  current STA Liquid Anti-Xa Instructions for use
17  (IFU) with the heparin application will be
18  modified to add rivaroxaban application."
19       Do you see that?
20       A.  I see that.  Yes.
21       Q.  It says, "Modification to the Intended Use
22  is acceptable provided that the clinical utility
23  of measuring rivaroxaban is supported"; correct?
24       MR. DENTON:
25          Well, again, I object --

Page 413

1        THE WITNESS:
2          I agree you have --
3        MR. DENTON:
4          -- to the form.
5        THE WITNESS:
6          -- read it correctly.
7   BY MR. HOROWITZ:
8        Q.  Okay.  When I -- when I read it and say
9   that, that's what it says; right?
10       A.  You have read that correctly.  Yes.
11       Q.  Okay.  "The approved New Drug Application
12  . . . does not recommend monitoring of coagulation
13  parameters during treatment with rivaroxaban in
14  routine clinical situations."
15       Did I read that correctly so far?
16       A.  You have read that correctly so far.
17       Q.  "Therefore, you will need to provide
18  justification for in vitro diagnostic use of the
19  assay to measure rivaroxaban levels.  Evidence of
20  the necessity for monitoring rivaroxaban should be
21  clearly outlined and supported in your
22  submission."
23       Did I read that correctly?
24       A.  Yes.  You did.
25       Q.  And then if you go to the last page,

104 (Pages 410 to 413)

Protected - Subject to Further Protective Review

Page 414

1   Page 986, it says at the top, as part of FDA's
2   feedback, "Please clarify what is the additional
3   value for measuring rivaroxaban levels when the
4   drug was approved as safe and effective without
5   testing drug levels."
6           Did I read that correctly?
7       A. You have read that correctly. Yes.
8       Q. And is it fair to say that in forming your
9   opinions in this case, you didn't consider these
10  statements from FDA?
11          MR. DENTON:
12              Object to the form.
13          THE WITNESS:
14              I don't recall this document.
15  BY MR. HOROWITZ:
16      Q. Okay. And now I want to talk to you about
17  the briefing document we've been discussing off
18  and on. We're going to pull that out of our --
19  our box.
20          MR. DENTON:
21              How many trees did you kill?
22          MR. HOROWITZ:
23              A lot. I'd rather not confess that on
24          the record. Thank you, Roger.
25  BY MR. HOROWITZ:

Page 415

1       Q. And we'll go ahead and mark as Plunkett 14
2   and have you confirm that this is the briefing
3   material that you've been -- we've been sort of
4   discussing off and on here and there today.
5           (Exhibit No. 14 was marked for
6           identification and attached hereto.)
7           THE WITNESS:
8               Yes. This is the document.
9   BY MR. HOROWITZ:
10      Q. Okay. And --
11      A. One of the documents. I've also discussed
12  other FDA documents. But certainly on the
13  briefing materials, this is what I was referring
14  to.
15      Q. Well, in Paragraphs 53 on Page 32 of your
16  report, to be clear -- I want to make sure that
17  this is the document you cite and where you draw
18  the figures from that discuss the linear
19  correlation between PT and concentration and then
20  the risk of major bleeding increasing with PT?
21      A. Well, I'm referring to two documents, the
22  FDA appendix, but also Figure 4 of the briefing
23  materials. So I'm referring to the FDA summary
24  review I think as well here in this paragraph.
25  But maybe you -- show me the -- is there a

Page 416

1   particular sentence where I'm only referring to
2   this? It's possible.
3       Q. Well, I'm not trying to limit you to this.
4   I think that the same figure and the same document
5   appears over and over again. It's both in the
6   ClinPharm review and it's in here. But we can
7   just look at it together and you can tell me if
8   you're relying upon it.
9           How about that? Well, let me ask you this
10  -- let's -- let's do it -- let's do it more
11  simply. Do you intend to testify that FDA found
12  based on its review of the ROCKET data that PT is
13  an appropriate tool to monitor and dose adjust
14  Xarelto?
15          MR. DENTON:
16              Object to the form.
17          THE WITNESS:
18              I don't think I've stated that -- that
19          FDA had that exact opinion. But I do
20          believe that the data and the statements
21          by FDA indicate that that -- that that is
22          true.
23  BY MR. HOROWITZ:
24      Q. Okay. And you understand that -- let --
25  let -- let's turn to -- where it says clinical

Page 417

1   review, the Page 1. I see you've already turned
2   to the figures. But I want to --
3       A. Well -- okay. You don't want that.
4       Q. -- go back a little bit.
5       A. Okay.
6       Q. Would you agree with me -- and we can do
7   this quickly -- that this is the medical officer
8   review by Drs. Dunnmon, Rose, and Beasley of
9   rivaroxaban for the SPAF NDA?
10      A. Yes. That is what is being discussed.
11      Q. Okay. And so to be clear, this is not the
12  document reflecting FDA's final determinations on
13  the approval of the SPAF indication? This is the
14  medical officer review document; correct?
15          MR. DENTON:
16              Object to the form.
17          THE WITNESS:
18              It's a different document, which is
19          why in my paragraph I'm citing you to two
20          different documents. But yes.
21          MR. HOROWITZ:
22              Okay.
23          THE WITNESS:
24              The dates are different too.
25  BY MR. HOROWITZ:

105 (Pages 414 to 417)

Protected - Subject to Further Protective Review

Page 418

1     Q.  Right.  This is not the final review and
2  approval document.  This is the medical officer
3  review; right?
4     A.  Yes.  This would always precede the final
5  review document.
6     Q.  And if you turn to Page 38, I believe this
7  is the figure that you're referring to where you
8  say FDA found that pharmacokinetic data from 161
9  ROCKET patients confirmed the linear relationship
10  between the plasma of rivaroxaban and PT?
11     A.  This is certainly a figure.  Do I -- do I
12  call it this figure?  I don't know if I cite you
13  this figure.  But this figure certainly shows it.
14  Yes.  Because that's what it says -- that's the
15  question, and that's what is stated.
16     Q.  Well, you say, "In the Advisory Committee
17  Briefing materials"; right?
18        MR. DENTON:
19           Say what where?
20        MR. HOROWITZ:
21           I'm looking at Paragraph 53.
22  BY MR. HOROWITZ:
23     Q.  I mean, I don't think this is very
24  controversial.
25        MR. DENTON:

Page 419

1           I don't think --
2  BY MR. HOROWITZ:
3     Q.  But if you want to make it -- yeah.
4     A.  So no.  I know -- I'm just trying to
5  understand where you are in Paragraph 53.
6        I agree with you that -- if the question
7  is can prothrombin time be used as a surrogate for
8  PK, that's the statement I'm talking about, the
9  linear relationship between plasma
10  concentration --
11        MR. HOROWITZ:
12           Yeah.
13        THE WITNESS:
14           -- and -- and the PT.
15  BY MR. HOROWITZ:
16     Q.  All right.  Let's just be clear.  If you
17  go to Paragraph 53, about halfway into the
18  paragraph, you write, "In the Advisory Committee
19  Briefing materials," which we've agreed is
20  Plunkett 15, "FDA" summarizes "the issues
21  surrounding measurement of PT as a surrogate for
22  rivaroxaban blood levels by posing several
23  questions."
24        That's what you wrote; right?
25     A.  Yes.  And that's -- that's the question

Page 420

1  that's here on this page --
2     Q.  Right.
3     A.  -- and then that's the answer.
4     Q.  Okay.  Have we solved world peace then and
5  then you are referring to the first question here:
6  "Can Prothrombin Time . . . be used as a surrogate
7  for PK," and then looking at Figure 6?
8     A.  Yes.  And I don't think that solves world
9  peace.  But certainly I agree with you that we're
10  on the same page here.
11     Q.  That's what I meant.  That was my
12  euphemism for same page.
13        MR. DENTON:
14           And you reference Plunkett 15, and I
15  don't have a Plunkett 15.
16        MR. BONEY:
17           He meant to say Plunkett 14.
18        MR. HOROWITZ:
19           Oh.  I -- you know what I did?  I
20  marked mine as 15.  Because --
21        MR. DENTON:
22           That's why I'm -- I'm sorry.
23        MR. HOROWITZ:
24           Yeah.  No.  You're correct.  I'm
25  sorry.  I mean Plunkett 14.  So may the

Page 421

1  record -- thank you, Roger.
2        MR. DENTON:
3           I'm glad I did something --
4        MR. HOROWITZ:
5           Yes.
6        MR. DENTON:
7           -- today.
8        MR. HOROWITZ:
9           You've earned your keep.
10        MR. DENTON:
11           We're only six hours into it.  I've
12  done something --
13  BY MR. HOROWITZ:
14     Q.  We're --
15        MR. DENTON:
16           -- helpful.
17  BY MR. HOROWITZ:
18     Q.  We're looking at Plunkett 14, and you've
19  cited ROCKET -- I'm sorry.  You've cited Page 38,
20  Question 1, and Figure 6 in your report; right?
21     A.  Yes.
22     Q.  And then you go on.  And you say -- in the
23  next sentence, you talk about another question FDA
24  asked related to PT as a marker of effect.  "'Is
25  there a PT-bleeding relationship?"  And I think

106 (Pages 418 to 421)

Protected - Subject to Further Protective Review

Page 422

1    what you're referring to -- if you could confirm
2    for me -- if you turn to Page 39, Question 3, and
3    then Figure 8.
4        A. Yes. And -- yes. That's exactly right.
5        Q. And then in your report, if I understand
6    correctly, you say, "The final conclusions reached
7    by FDA and presented in the Briefing materials,"
8    and you -- you say, No. 1, "PT can be used as a
9    surrogate for PK in the range of plasma
10   rivaroxaban concentrations demonstrated from this
11   sample of patients in ROCKET." And you say,
12   No. 2, "the risk for major bleeding is dependent
13   on PT." And then you say in 3, "twice a day
14   dosing provides less PT fluctuations compared to
15   once a day dosing in simulation modeling but the
16   impact on efficacy and/or bleeding cannot be
17   assessed due to lack of multiple dosing strategies
18   in ROCKET."
19       Do you see that?
20       A. Yes.
21       Q. Okay. And do you believe that you have
22   accurately characterized the FDA's conclusions
23   based on your summary that you gave of the
24   materials you reviewed and cite?
25       A. Well, I certainly believe that those are

Page 423

1    conclusions they drew. And then if you need the
2    page number, I'll have to look.
3        Q. Well, I didn't ask you --
4        A. So . . .
5        Q. -- that. I just think -- are you -- do
6    you think you're accurate -- are accurately
7    characterizing the FDA's conclusions?
8        A. I think -- as I'm presenting those
9    conclusions, I think those are accurate
10   reflections of things that they concluded. Yes.
11       Q. Take a look at Page 44 of the medical
12   officer review.
13       You don't cite anything from Page 44 in
14   your report; correct?
15       MR. DENTON:
16           Object to the form.
17       THE WITNESS:
18           I don't quote anything from Page 44.
19       But I think that there are -- some of the
20       same things that I'm talking about are
21       found on Page -- well, actually Page 43
22       and 44.
23       BY MR. HOROWITZ:
24       Q. You don't cite the language in the
25   conclusion section that starts on Page 43, as you

Page 424

1    said, where it says, "Reviewers' Conclusions:
2    PK-PD-Clinical Outcomes Relationships." You don't
3    include in your report the statement, "Monitoring
4    rivaroxaban therapy with sequential prothrombin
5    times to optimize safety outcomes cannot be
6    recommended due to a lack of information
7    regarding: within-patient variability of PT
8    measurements on this drug in the setting of a
9    short half-life and rapidly changing PD effects
10   over each 24 hour period, and What action to
11   recommend to the medical provider based on PT
12   results, given that only a single dose was tested
13   in ROCKET" --
14       MR. DENTON:
15           Object to the form.
16       BY MR. HOROWITZ:
17       Q. -- correct?
18       A. I agree that you have read those -- that
19   into the record correctly, that it certainly is
20   within this conclusions section. Yes.
21       Q. But -- but that wasn't my question to you.
22       My question was: You didn't include those
23   comments or statements in your expert report about
24   FDA's assessment of the use of PT as a means to
25   monitor Xarelto, did you?

Page 425

1        MR. DENTON:
2            Object to --
3        THE WITNESS:
4            I don't quote that. That is true.
5        BY MR. HOROWITZ:
6        Q. And if you go back to Figure 8, are you
7    relying upon Figure 8 as support for your position
8    that -- well, let me -- let me do it this way: Do
9    you intend to rely upon Figure 8 as support for
10   your position that bleeding increases with
11   increased PT?
12       MR. DENTON:
13           Object to the form.
14       THE WITNESS:
15           Well, I think that there's more than
16       -- than that here. But certainly it is
17       one of the graphs that FDA has relied upon
18       when answering that question.
19       BY MR. HOROWITZ:
20       Q. Are you relying upon this graph?
21       A. I'm relying upon the FDA document in
22   general, which would include these graphs. Yes.
23   There's other graphs as well in other documents
24   that talk about the same issue. So it's not just
25   one particular piece.

107 (Pages 422 to 425)

Protected - Subject to Further Protective Review

Page 426

1      Q. Well, this particular graph -- do you know
2  what "confounding" is?
3      A. In general terms, yes.
4      Q. What's confounding?
5      A. It's characteristics or variables that may
6  affect the outcome that you're -- that you're
7  looking at, the -- the -- the -- measuring the
8  relationship that involves the outcome you're
9  monitoring or measuring.
10     Q. Did you consider the effect of aspirin
11 users as -- as a potential confounder when you
12 looked at Figure 8?
13     A. Well, it's not presented. But they have
14 another figure that I did consider that is
15 presented in another part of the document. Or if
16 it's not in this document, I know it's in the --
17 the other review documents.
18     Q. Well, if --
19     A. Yes, I did consider the aspirin
20 confounder.
21     Q. Okay. So you didn't include -- if you
22 just flip to the next page, Figure 10. Is it fair
23 to --
24     MR. DENTON:
25         What page are you on?

Page 427

1      MR. HOROWITZ:
2          Page 41, literally the next page.
3      MR. DENTON:
4          I know. But I wasn't on the previous
5      page.
6  BY MR. HOROWITZ:
7      Q. If you flip the page to Figure 10, is it
8  fair to say you did not discuss or report
9  Figure 10 of the medical officer review in your
10 report?
11     A. Well, I did discuss the information in the
12 table from Figure 10. Because I talk about -- I
13 believe I talk about quartiles somewhere or at
14 least refer to that, I believe. It's certainly
15 one of the documents that I have and one of the
16 sections I've relied upon.
17     Q. You do not discuss Figure 10 in your
18 report, do you?
19     A. I don't -- I don't know that I mention
20 Figure 10. No. But certainly this data is in
21 other documents as well. And this quartile
22 discussion is the basis for -- remember I told you
23 about the issue of -- they're looking at the --
24 the risk -- when you get around 20 seconds and
25 there being a significant change in the event

Page 428

1  rate? And there is here, when you look at the
2  event rate in the lower quartile versus the upper
3  quartile.
4      MR. HOROWITZ:
5          Objection. Move to strike.
6          Nonresponsive.
7  BY MR. HOROWITZ:
8      Q. I'm not asking you if this figure appears
9  in FDA documents or the documents. I'm well aware
10 that it does.
11         My question is: You didn't point out this
12 figure or the effect of aspirin as a confounder in
13 your report; correct?
14     MR. DENTON:
15         I object to --
16     THE WITNESS:
17         I --
18     MR. DENTON:
19         -- the form.
20     THE WITNESS:
21         -- already answered that I don't cite
22 Figure 10 in my report. That is true.
23 But it certainly is one of the --
24 documents that I reviewed, considered, and
25 relied upon. And then I pointed out to

Page 429

1      you that -- earlier today when we were --
2      I mentioned to you about quartiles, and
3      this is what I was referring to.
4  BY MR. HOROWITZ:
5      Q. Okay. We'll talk about quartiles in a
6  second.
7          But do you agree that Figure 10 shows that
8  the apparent relationship between PT and bleeding
9  risk in the data from Figure 8 was actually very
10 much affected by aspirin use?
11     MR. DENTON:
12         Object. Object to the form.
13     THE WITNESS:
14         I don't know that I -- I would state
15 it quite the way you have. I would say
16 that this figure shows that aspirin use
17 has -- has -- has an effect -- an -- an
18 effect and the nonaspirin users have
19 another effect. In other words, there's a
20 independent effect by riva alone and then
21 also when you combine the two.
22 BY MR. HOROWITZ:
23     Q. When you say -- well, let me -- let me ask
24 this: When FDA took out aspirin users, the
25 relationship between PT and bleeding risk was much

108 (Pages 426 to 429)

Protected - Subject to Further Protective Review

Page 430

1   flatter.
2         MR. DENTON:
3            Object to the form.
4   BY MR. HOROWITZ:
5      Q.  Isn't that true?
6         MR. DENTON:
7            Object to --
8         THE WITNESS:
9            It is -- well, if by "flatter," you
10        mean did the slope decrease, yes.  That is
11        true.
12        MR. HOROWITZ:
13           Okay.
14        THE WITNESS:
15           But when you look -- and when you look
16        at this figure, it shows you that in
17        populations like this, where aspirin use
18        is common, that's another issue to
19        consider when you're talking about the
20        issue of the need to monitor.
21        MR. HOROWITZ:
22           Well -- objection.  Move to strike.
23        Nonresponsive.
24   BY MR. HOROWITZ:
25      Q.  The answer is it's flatter; right?

Page 431

1         MR. DENTON:
2            No.  It's not her --
3         THE WITNESS:
4            Answer.
5         MR. DENTON:
6            -- answer.  Object to --
7         THE WITNESS:
8            I said --
9         MR. DENTON:
10           -- the form.
11        THE WITNESS:
12           -- that the slope was decreased.
13        That's what I would -- how I would
14        describe it --
15        MR. HOROWITZ:
16           Okay.
17        THE WITNESS:
18           -- as a scientist.
19   BY MR. HOROWITZ:
20      Q.  And as a scientist, did you consider on
21   Page 41 of the clinical medical officer review the
22   comment that the FDA medical officers made, when
23   they said, "It is reassuring that for the overall
24   population, there does not appear to be a shift
25   from lesser severities of ISTH major bleeding

Page 432

1   (i.e. hemoglobin drops and transfusions) to the
2   more severe forms (i.e. critical organ bleeding
3   and fatal bleeding) as a function of PT
4   prolongation with rivaroxaban, as can be seen in
5   the FDA analysis in Table 6"?
6      A.  Did I consider that?  Is that your
7   question?  Yes.  I did.
8      Q.  And did you include that in your report?
9   You don't cite or quote from that section of the
10  document in your report, do you?
11     A.  I do not quote it.  But it -- it doesn't
12  change my opinion.  It -- it -- it -- it doesn't
13  say that there is no relationship, which is my
14  point of describing this -- this section of their
15  analysis, the idea that there is a utility to this
16  relationship.  And they point that out even
17  further when you read the documents that went with
18  the approval decision.
19        MR. HOROWITZ:
20           Objection.  Move to strike.
21        Nonresponsive.
22   BY MR. HOROWITZ:
23      Q.  You also didn't include in your report the
24   portion of the medical officer review underneath
25   Table 6 that says, "The relationship between PT

Page 433

1   prolongation and major bleeding is exacerbated in
2   patients taking concomitant" aspirin "at least 50%
3   of the time, and attenuated in patients not
4   taking" aspirin "(FDA analysis, Figure 10 below)"?
5   You didn't include that either; correct?
6         MR. DENTON:
7            Object to the form.
8         THE WITNESS:
9            I did not quote that statement.  But
10        it's not inconsistent with the opinions
11        that I have reached.  And I tried to
12        describe for you that I believe that this
13        is consistent with what I -- we talked
14        about this morning or earlier today.
15   BY MR. HOROWITZ:
16      Q.  You didn't include in your report the fact
17   that the figure you were citing, Figure 8, was
18   confounded by aspirin use and that when you looked
19   at Figure 10 and when the FDA accounted for
20   aspirin use, that the slope changed?  You didn't
21   discuss that in your report?
22      A.  Well --
23        MR. DENTON:
24           Object to the form.
25        THE WITNESS:

109 (Pages 430 to 433)

Protected - Subject to Further Protective Review

Page 434

1      -- first off, I didn't cite Figure 8,
2   I don't think, specifically.  But I told
3   you that this is one that I have relied
4   upon.  This whole section is something I
5   relied upon.  I believe that's what I told
6   you.  But there's more than one figure
7   that I have relied upon.
8   BY MR. HOROWITZ:
9      Q.  Well, you actually do quote in your report
10  the questions from Figure 8 and Figure 6, don't
11  you?
12     A.  I quote the questions and the -- and the
13  answers.  Yes.  I do.
14     Q.  Okay.
15     A.  And so the -- the answers are still the
16  answers.  These -- all this information is -- is
17  part of the answer.  But certainly it -- the
18  answers are still consistent with what is quoted
19  within here.
20     Q.  And take a look at Table 6.
21        Do you understand that Table 6 is titled
22  "ROCKET ISTH Major Bleeding Type vs. PT"?
23     A.  Yes.
24     Q.  And do you understand that FDA also found
25  that PT prolongation with rivaroxaban did not

Page 435

1   correlate with increases in the most serious kinds
2   of bleeds?
3        MR. DENTON:
4           Object to form.
5        THE WITNESS:
6           Show me what you were pointing to,
7        because I don't recall that language.
8   BY MR. HOROWITZ:
9      Q.  Okay.  Well, take a look at Quartile 2.
10     A.  In which table are you at?  Table 6?
11     Q.  Table 6.  Right.
12     A.  Okay.
13     Q.  We can do -- I mean, we already went
14  through the language.  But let's look at the table
15  itself.
16        Do you see Quartile 2?
17     A.  Yes.  I do.
18     Q.  And you see critical organ bleeds?
19     A.  Yes.  I do.
20     Q.  And that's at 1.30?
21     A.  That's the -- that's the -- the --
22  event rate.  Yes.
23     Q.  Right.  The event rate is higher than
24  Quartile 4.  It says 3, but we all know it really
25  means 4, which is critical organ bleed.  It's

Page 436

1   1.22; right?
2        MR. DENTON:
3           Object to the form.
4        THE WITNESS:
5           I see 0.52.  Where are you looking?
6        I'm sorry.  Second -- second -- oh.
7        You're looking down at Quartile 3.  I'm
8        sorry.
9   BY MR. HOROWITZ:
10     Q.  Well, it's --
11     A.  So the -- the very --
12     Q.  -- Quartile 4.
13     A.  Well -- and it says 3.  Okay.  I'm sorry.
14  Yes.  I -- I -- the 1.22, yes.  I see that.
15     Q.  Can we agree that people in the highest
16  quartile of PT had a lower rate of critical organ
17  bleed than people in the second quartile,
18  according to Table 6?
19        MR. DENTON:
20           Object to the form of the question.
21        THE WITNESS:
22           I would agree that that event rate
23        number is low.  Yes.
24  BY MR. HOROWITZ:
25     Q.  Okay.  And the same thing, if you look at

Page 437

1   bleedings resulting in death, if you look at the
2   highest quartile, which is 0.45, and then you look
3   at Quartile 2, which is 0.52, people in the
4   highest quartile of PT had a lower rate of bleeds
5   resulting in death than patients in the second
6   quartile; correct?
7        MR. DENTON:
8           Object to the form.
9        THE WITNESS:
10          I would say the number is lower.  But
11       I would say that's probably not a
12       significant difference in bleed rate
13       there.  But I would point you to the -- to
14       the column under -- requiring blood
15       transfusions and then also the column on
16       hemoglobin drop --
17       MR. HOROWITZ:
18          Objection.
19       THE WITNESS:
20          -- which indicates bleeding is --
21       MR. HOROWITZ:
22          Are you done?
23       THE WITNESS:
24          -- affected.
25       MR. HOROWITZ:

110 (Pages 434 to 437)

Protected - Subject to Further Protective Review

Page 438

1     Okay.  Objection.  Move to strike.
2     Nonresponsive.
3     BY MR. HOROWITZ:
4     Q.  My question is:  Are people in the highest
5     quartile of PT -- according to Table 6, the
6     document that you are -- and the section of the
7     document you've reviewed and relied upon, people
8     in the highest quartile of PT had a lower rate of
9     bleeds resulting in death than patients in the
10    second quartile?
11    MR. DENTON:
12        Objection.  Asked and answered.
13    BY MR. HOROWITZ:
14    Q.  Yes or no?
15    THE WITNESS:
16        I would say to you that the numbers
17    are essentially the same.  I wouldn't
18    necessarily -- that that's a different
19    event rate.  But I would agree with you
20    the number's lower.  Yes.  That is true.
21    BY MR. HOROWITZ:
22    Q.  .52 is a higher number than .45; right?
23    A.  There's one event difference, is what I'm
24    looking at.  So when you look at data and you have
25    so few events, that the power of you to discern --

Page 439

1     I bet there would be -- if I was to do the -- do
2     the statistics, my guess would be there would be
3     no statistically significant difference between
4     those two numbers even though the number is lower.
5     Q.  Did you do that analysis as part of your
6     weight-of-the-evidence methodology in forming your
7     opinions about the utility of -- of -- of using
8     prothrombin time to predict bleeds?
9     A.  No.  Because I didn't need to.  Because
10    the -- the -- it wasn't an issue of me saying that
11    it -- it only has to be one particular type of
12    bleed.
13        The issue is -- the issue is, as FDA
14    summarizes it, an effect on bleeding overall.
15    Q.  Right.  And what FDA says is "There does
16    not appear to be a shift from lesser severities of
17    ISTH major bleeding (i.e. hemoglobin drops and
18    transfusions) to the more severe forms (i.e.
19    critical organ bleeding and fatal bleeding) as a
20    function of PT prolongation with rivaroxaban," and
21    they cite their own table here, Table 6; correct?
22    A.  You have read that correctly.  I agree.
23    Q.  Well, do you agree with FDA's own
24    analysis, or do you reject this part of their
25    analysis?

Page 440

1     A.  I'm not rejecting it.  I'm just saying
2     that this is not a -- that sentence alone is not
3     an overall conclusion of what they found regarding
4     bleeding.
5     Q.  It would be wrong to just sort of
6     cherry-pick a single sentence and represented that
7     as an overall conclusion of -- of the FDA; right?
8     MR. DENTON:
9        Objection.
10    THE WITNESS:
11        Well, I haven't -- I have not done
12    that.  But if you -- if you're doing that,
13    I would agree that that's -- that sentence
14    alone is not a accurate reflection of
15    the -- of the answer that they gave --
16    gave to the question.
17    BY MR. HOROWITZ:
18    Q.  If --
19    A.  And if you look at the summary review
20    documents, you'll -- you'll see -- see that as
21    well.
22    Q.  If either of us did that, if we
23    cherry-picked a single sentence from a medical
24    officer review and represented that as FDA's final
25    conclusions, that wouldn't be the right thing to

Page 441

1     do, would it?
2     MR. DENTON:
3        Object to the form.
4     THE WITNESS:
5        It depends on the context.  If you're
6     saying that that is the final conclusion
7     and no other conclusions were drawn, that
8     would not be correct.  But to characterize
9     it as a conclusion, you could do that.
10    But I don't agree with that because I
11    believe the conclusion is actually in the
12    statements that are shown in -- in the
13    direct answer to the question on Page 39.
14    MR. HOROWITZ:
15        Objection.  Move to strike.
16    Nonresponsive.
17    BY MR. HOROWITZ:
18    Q.  One of the articles that you cite is
19    Samama.
20    MR. DENTON:
21        Are you done with this?
22    MR. HOROWITZ:
23        Yes.  For now.  I suspect we'll come
24    back to it eventually.
25    BY MR. HOROWITZ:

111  (Pages 438 to 441)

Protected - Subject to Further Protective Review

Page 442

1    Q.  You're familiar with Samama 2013; right?
2    A.  Yes.  But I'll need to look at it if
3  you're --
4    Q.  Yeah.
5    A.  -- going to ask me questions.
6    Q.  So this is one I'll go ahead and mark your
7  copy, and this time I will try and correctly mark
8  it as Plunkett 15.
9        (Exhibit No. 15 was marked for
10       identification and attached hereto.)
11  BY MR. HOROWITZ:
12    Q.  And ask you:  Is this your copy that you
13  brought to the deposition of Samama 2013?
14    A.  Yes.
15    Q.  And the yellow highlighting that appears
16  on Exhibit 15, Plunkett 15, is that your
17  highlighting?
18    A.  Yes.  This is mine.
19    Q.  And do you believe -- well, let me ask you
20  this -- if you turn to Page 35 of your report,
21  Paragraph 57, give you some context, build some
22  context, as my good friend Bill Curtis would say.
23    MR. DENTON:
24       You've got some good friends?
25    MR. HOROWITZ:

Page 443

1        I got one:  Bill.
2    MR. DENTON:
3        Does he cherry-pick too?
4    MR. HOROWITZ:
5        He's a cherry-picker.  Come on, Roger.
6  One more hour.
7    MR. DENTON:
8        You're starting to act like
9  Gary Douglas in your questions.
10    MR. HOROWITZ:
11        That's the worst thing you've ever
12  said to me.  All right.
13    MR. DENTON:
14        That's what it brought me back --
15    MR. HOROWITZ:
16        Come on.
17    MR. DENTON:
18        -- to.
19  BY MR. HOROWITZ:
20    Q.  Doctor, in Paragraph 57 -- have you had a
21  chance to orient yourself to Paragraph 57 --
22    A.  Yes.
23    Q.  -- despite Mr. Denton's banter over there?
24       You say, It is also" not -- "important to
25  note that peer-reviewed publications support both

Page 444

1  Janssen's and FDA's conclusions regarding the
2  validity of both rivaroxaban blood level
3  monitoring and exposure monitoring."
4        Do you see that?
5    A.  With the rest of the sentence, "using
6  PT" --
7    Q.  Yeah.  I'm going to keep --
8    A.  Yes.
9    Q.  -- going.  I'm just trying to -- right.
10        "Using PT as a way to monitor patient's
11  exposure and assure patient safety," and then you
12  cite several articles, including Samama 2013;
13  right?
14    A.  Yes.
15    Q.  And by the way, do you really think it's
16  Janssen's position or conclusion that -- that PT
17  can be used as a way to monitor patient exposure
18  and assess patient safety?
19    A.  Yeah.  There's a 2005 article, which I
20  don't cite here, but that I have in my -- that --
21  where -- where Janssen -- well, it may have been
22  Bayer scientists, Bayer scientists, which in my
23  view, quote/unquote, is Janssen at this particular
24  time.  They're working together.
25        So yes.  I do believe that there are

Page 445

1  documents out there where they drew the same
2  conclusion, that PT was a useful way for exposure
3  monitoring and -- and gives information on --
4  on -- on risk.
5    Q.  Okay.  So I need to know then based on
6  that answer exactly what you're referring to.  It
7  can't just be some document out there.  I want to
8  know exactly --
9    A.  Yeah.
10    Q.  -- what piece of information you are
11  referring to when you give that piece of your
12  opinion.
13    A.  Okay.  So 2005, the title has the name of
14  the drug, bay-something in it.  It's on my
15  reference list.  So let me . . .
16    Q.  Please.
17    A.  It's -- it's in my materials reviewed
18  because I looked at this this week.
19    Q.  And did you pull this yourself, or was
20  this something that was given to you?
21    A.  No.  I pulled this paper in my literature
22  reviews initially.
23    Q.  Okay.  If you --
24    A.  We discussed it yesterday, though.  Yes.
25  We did.

112 (Pages 442 to 445)

Protected - Subject to Further Protective Review

Page 446

1    Q. All right. If you could tell me which
2  one, that'd be great.
3    A. And I may have -- I may have to
4  unfortunately see the title to -- to pull it out.
5  But let's see if I recognize the author. It might
6  be -- it might be by the -- maybe Kubitza, twenty
7  -- 2005 maybe, Clinical Pharm and Therapeutics.
8    Q. Okay. Well, that's --
9    A. It's on Page 16 of my reliance list. Do
10  you have that one? If I see the title, I can tell
11  you if I saw it.
12    Q. Let's do this -- keep that in mind. We'll
13  start with that, but I -- I really would like to
14  know if there's something -- maybe something we
15  can talk about on our next break. I just want to
16  make sure that I pull it and look at it.
17    A. Okay. Well, that's -- I'm -- I would
18  point you there --
19    Q. Okay.
20    A. -- when I talk about Janssen. I'm
21  actually -- Janssen, slash, Bayer. And I think in
22  the beginning of my report, I tell you --
23    Q. I saw the air quotes. Yes.
24    A. So the -- I believe that was a Bayer
25  scientist at the time that -- that we were talking

Page 447

1  about.
2      And now you want to know if there's
3  anything else that I'm referring to? So we were
4  on Paragraph 57?
5    Q. Well, no. I guess I -- you said
6  specifically you had in mind some 2005 article.
7  And I was trying to ask you, you know, which
8  article that was. That's all that was about.
9    A. Yeah. Well, that was the first one that
10  comes to mind. But I -- you want me to answer if
11  there's anything else. Let me see.
12    Q. I -- I didn't actually ask you that. But
13  you can -- you can go ahead and answer that.
14    A. Well, I think you asked me what was my
15  basis for using the word "Janssen" there.
16    Q. Okay.
17    A. And I'm saying that --
18    Q. If there's more -- where's mine at? Oh.
19  Here it is.
20    A. And I guess the other -- the other
21  conclusion would be the -- well, let's just stick
22  with that paper right now.
23    Q. Okay.
24    A. Because that's the one on the top of my
25  head I can really recall.

Page 448

1    Q. Okay. And you cite Samama in support of
2  your view about the validity of both rivaroxaban
3  blood levels, monitoring, exposure monitoring
4  using PT as a way to monitor patients' exposure
5  and -- and assure patient safety; correct? Samama
6  2013?
7    A. Yeah. I'm using it -- well, this
8  particular paper deals with the issue of using PT
9  as a way to monitor patients' exposure. So there
10  are papers that support both contentions, papers
11  that support only one contention. But they --
12  these papers support my opinion that those two
13  things can be shown to be useful.
14    Q. Okay. And do you agree with the authors
15  of this paper you rely upon? If you turn to
16  Page 2 in the paragraph -- the first paragraph --
17  full paragraph in the left-hand column, it says,
18  "with apixaban and dabigatran, rivaroxaban does
19  not require routine coagulation monitoring or dose
20  titration (unlike VKAs and UFH). However, a
21  reliable" --
22    A. Okay. I'm -- I'm still trying to find
23  where you are. I apologize. Left-hand column?
24    Q. On Page 2. You're on Page 1.
25    A. Oh. I'm sorry.

Page 449

1    Q. Yeah. The other Page 2. There you go.
2    A. Let me see where you're highlighted.
3  That'll help me.
4    Q. (Indicating.) Right.
5    A. Okay. All right. I see that -- that
6  paragraph. Now go ahead.
7    Q. Okay.
8    A. I'm sorry.
9    Q. And you say, "As with apixaban and
10  dabigatran, rivaroxaban" -- you don't say this.
11  The article says this.
12    MR. DENTON:
13      Yeah. You've done that a few times.
14  BY MR. HOROWITZ:
15    Q. Do you -- let me ask you: Do you agree
16  with that statement, "As with apixaban and
17  dabigatran, rivaroxaban does not require routine
18  coagulation monitoring or dose titration"?
19    A. It depends what you're asking me. Does it
20  require it by the -- by the regulatory approvals?
21  No. But if you're asking me does it -- does it
22  require it, in my view, to improve patient safety,
23  I do believe that patient safety at least for the
24  -- for the issues related to -- for Xarelto, yes.
25  I -- I have not formed the opinion based on the

113 (Pages 446 to 449)

Protected - Subject to Further Protective Review

Page 450

1    other drugs at this point in time.
2       Q.  It says, "However, a reliable laboratory
3    assay that could measure exposure to rivaroxaban
4    may be necessary or helpful in certain clinical
5    circumstances."
6       Do you see that?
7       A.  Yes.  I see that.  You've --
8       Q.  And --
9       A.  -- read that correctly.
10      Q.  Okay.  And then it goes on.  It says,
11   "(e.g. prior to urgent surgery, for perioperative
12   management of those receiving rivaroxaban for
13   patient with thromboembolic or bleeding events, or
14   for suspected overdose)"; correct?
15      A.  That's what is stated.  Yes.  You read
16   that correctly.
17      Q.  Okay.  Do you understand that this article
18   is talking about measuring rivaroxaban plasma
19   concentrations in very specifical -- very specific
20   clinical situations?
21      MR. DENTON:
22         Object to the form.
23      THE WITNESS:
24         It -- it's -- this paragraph here that
25         you're reading is talking about that.

Page 451

1          That is correctly -- correct.  It's
2          talking about the context for why they're
3          doing their work, their interest in -- in
4          these patient safety issues.  Yes.
5    BY MR. HOROWITZ:
6       Q.  And is it fair to say that nowhere in this
7    article do they recommend therapeutic drug
8    monitoring for rivaroxaban or routine
9    anticoagulation monitoring?
10      MR. DENTON:
11         Object to the form.
12      THE WITNESS:
13         I'll have to look to see if they use
14         those words.
15   BY MR. HOROWITZ:
16      Q.  Well --
17      A.  Because I don't think that's what I have
18   said either.  But -- anyway . . . But . . . I
19   don't know that's consistent with the way I'm
20   citing it.  But if you want me to look, I'd have
21   to read the paper to answer that, because I
22   haven't looked for that specific language.
23      Q.  Okay.  But you read the paper -- this is
24   one of the papers you pulled, and it's marked as
25   an exhibit that there's even some highlighting

Page 452

1    on that you looked at to prepare yourself to come
2    in and give your deposition today; right?
3       A.  Yes.  I am -- I am prepared to do -- and
4    I -- and I have discussed this paper or used this
5    paper to -- to describe certain aspects of it.
6    But I have -- when you're asking me have I looked
7    for specific -- that -- that's very specific
8    language you're asking me.  To answer that, I'd
9    have to go look for that language in the paper.
10   And I certainly did not cite the paper that way,
11   so I don't know if that language is there.
12      Q.  Okay.  Do you make a distinction or
13   understand a distinction between routine
14   anticoagulation monitoring and the potential need
15   to measure in very particular medical
16   circumstances?
17      A.  I would say that I recognize that those
18   are different.  But I would also -- I would also
19   state that it would not necessarily have to be a
20   medical emergency in order to require monitoring,
21   as I've discussed with you already.
22      Q.  Do you make a distinction between the word
23   "monitoring" and "measuring"?
24      A.  Well, you could make a distinction.  I am
25   -- I am -- you -- if you use "monitor" and

Page 453

1    "measure" as verb -- as a -- as a verb, "to
2    monitor," "to measure," those could be synonyms.
3    But I -- there is a -- there is a discussion of
4    routine monitoring versus measurement.  Those
5    could be different terms.  It depends on the
6    context or the way you're using those words.
7       Q.  Do you understand that Samama's making
8    that distinction here?
9       A.  Well, you'll need to show me what you're
10   talking about.
11      Q.  Well, we just read it.  He said there's no
12   need for routine coagulation monitoring.  But he
13   said you could measure exposure in certain -- very
14   specific certain clinical circumstances.
15      Do you see that?
16      MR. DENTON:
17         Object to the form.
18      THE WITNESS:
19         I don't think that's exactly what he's
20         saying.  He's saying "a reliable . . .
21         assay that could measure exposure may be
22         necessary or helpful in certain clinical
23         circumstances," and he's giving examples.
24         But I don't think he's saying -- you're
25         saying something that's a little

114 (Pages 450 to 453)

Protected - Subject to Further Protective Review

Page 454

1        different, I believe, than what he's
2     saying here.  He says that they don't
3     require it, and I think that's a statement
4     -- to me, that's a statement based upon
5     the fact that the labeling does not
6     require routine monitoring.
7  BY MR. HOROWITZ:
8     Q.  You don't believe that's a statement based
9  on the science and a scientific article in the
10 peer-reviewed published literature?
11        MR. DENTON:
12           Object to the form.
13        THE WITNESS:
14           I'd say I have no opinion whether that
15        -- it's -- it -- it's one or the other.
16        That isn't -- that isn't a sentence that I
17        tried to cherry-pick out of here and use
18        in -- in any particular way.
19 BY MR. HOROWITZ:
20     Q.  No.  You got some other sentences, though;
21 right?
22     A.  I don't think I've cherry-picked.  I've
23 looked at the -- at the conclusions of the
24 article.  I mean, he --
25     Q.  Well --

Page 455

1     A.  -- in his abstract he --
2     Q.  Well, let's see if he makes the --
3     A.  -- talks about that.
4     Q.  -- distinction.  Take a look at Page 5.
5  And we're on the Conclusions section, which
6  actually starts at the bottom of Page 4.  But if
7  you go to Page 5 -- and by the way, if you could
8  just show me.  You didn't highlight this section
9  I'm about to read from in your version, did you?
10     A.  I highlighted the conclusions.  Let me
11 see.
12     Q.  No.  But go --
13     A.  Where are you -- where -- you're on --
14     Q.  I'm on --
15     A.  -- which page?
16     Q.  -- Page 5.  Maybe you can hold that up for
17 me.
18     A.  Page --
19     Q.  Yeah.  So --
20     A.  -- 5?  No.  This -- this paragraph here?
21     Q.  Yeah.  Why don't --
22     A.  No.
23     Q.  -- you hold that up and show me what you
24 -- can you just hold me [sic] up so I can see?
25     A.  (Complies.)

Page 456

1        Q.  Yeah.  So you highlighted over there but
2     not -- not what I'm about to read, which says,
3     "Based on the consistent efficacy and safety
4     profiles demonstrated in the large-scale phase III
5     clinical trial programme, fixed-dose regimens of
6     rivaroxaban have been approved for clinical use in
7     several indications.  Routine measurement of
8     rivaroxaban plasma levels or its pharmacodynamic
9     effects is not required or recommended."
10        Did I read that correctly so far?
11     A.  You have.  Yes.
12     Q.  And then it says, "Clinicians should
13  adhere to the regulatory recommendations or the
14  label, particularly in patients or clinical
15  situations associated with an increased risk of
16  bleeding."
17        Did I read that correctly?
18     A.  You read it correctly.
19     Q.  And these are not sentences or parts of
20  the Samama article that you cite in support of
21  your view that PT is appropriate for monitoring in
22  your report.  Is that true?
23        MR. DENTON:
24           Well, I object.  Read the next
25        sentence.  It's compound.

Page 457

1        MR. HOROWITZ:
2           Hey.  Hey.  Hey.  Hey.
3        MR. DENTON:
4           No.  No.  You're cherry-picking.  You
5     absolutely are.
6        THE WITNESS:
7           So I --
8        MR. HOROWITZ:
9           Roger --
10        THE WITNESS:
11           My answer to the question --
12        MR. HOROWITZ:
13           Objection, form is fine.  Don't do
14        that again.
15        MR. DENTON:
16           Don't threaten me.
17        MR. HOROWITZ:
18           I'm not threatening you.  But this is
19        ridiculous.  Objection, form.  I've
20        been --
21        MR. DENTON:
22           Well, your questions --
23        MR. HOROWITZ:
24           -- letting you do it.
25        MR. DENTON:

115 (Pages 454 to 457)

Protected - Subject to Further Protective Review

Page 458

1      -- have been out of line.
2  BY MR. HOROWITZ:
3      Q. Go ahead and answer my question.
4      Did you talk about the sentences that I
5  read to you in your report?
6      MR. DENTON:
7      Object.
8      THE WITNESS:
9      I talk about the paper which includes
10 those sentences.  I mean, I don't think
11 this is inconsistent with what we've
12 talked about today.
13     MR. HOROWITZ:
14     Okay.
15     THE WITNESS:
16     I -- I have -- I have told you that
17 yes, the labeling does not require it.
18 The approval did not require it.  But then
19 I'm telling you that based upon the
20 evidence -- and this -- this paper
21 provides evidence for the utility of PT
22 measurement.  So again, that's -- I don't
23 think I am cherry-picking.  I am using the
24 -- the -- the fact that this is reviewing
25 the fact that there is a relationship, and

Page 459

1      that's my point.
2  BY MR. HOROWITZ:
3      Q. Well, let's talk about the --
4      A. That was --
5      Q. -- relationship that they conclude.  If
6  you turn to Page 6 -- here's another portion that
7  you didn't highlight.  It says, "To conclude, the
8  choice of laboratory test for rivaroxaban will
9  depend on the clinical situation:  if a
10 qualitative assessment of the presence of
11 rivaroxaban in the blood is needed, the PT test is
12 suitable provided that a rivaroxaban-sensitive
13 reagent is used, whereas if a quantitative
14 measurement of plasma rivaroxaban is required, an
15 anti-Factor Xa chromogenic assay in tandem with
16 rivaroxaban calibrators and controls with results
17 expressed as rivaroxaban concentration can provide
18 accurate results," and then it says "(Table 3)."
19     Did I read that correctly?
20     A. You read it correctly.
21     Q. And do you understand what a
22 rivaroxaban-sensitive reagent is referring to?
23     A. Well, I certainly have seen discussion of
24 that in the literature, and that's why the
25 clinical trial was actually done with one that is,

Page 460

1  which is why I'm relying on the clinical trial
2  results and FDA's conclusions as -- as -- as good
3  science.
4      Q. Do you know how many not sensitive
5  rivaroxaban reagents are out there in
6  laboratories?
7      MR. DENTON:
8      Object to the form.
9      THE WITNESS:
10     Well, I think it depends on what you
11 mean by "sensitive."  So all of the
12 reagents have a ability to -- to interact
13 and produce results.  But it has to do
14 with the sensitivity of the blood level
15 that it's identifying.
16     So I would agree that there are papers
17 out there that show that different agents
18 are more sensitive than others, but that
19 doesn't mean that -- that they don't
20 provide -- still don't provide
21 information.  And there are other -- I
22 mean, reagents could be supplemented
23 within laboratories.  I can't tell you,
24 though, how common one is versus another
25 in -- in a hospital.  That, I can't -- I

Page 461

1      have not attempted to determine.
2  BY MR. HOROWITZ:
3      Q. What is the difference between qualitative
4  and quantitative measurement?
5      A. Qualitative is detecting.  Quantitative
6  is -- is -- is accurate -- oh, well, not accurate.
7  It may not be accurate.  It's providing an actual
8  number.  So qualitative is showing that there's a
9  presence above a certain -- above a certain
10 threshold, for example.  And then the quantitative
11 is telling you what the -- the measurement is --
12     Q. And --
13     A. -- based on level of accuracy.
14     Q. Right.  And this article concludes that
15 you might be able to use a rivaroxaban-sensitive
16 reagent -- you may be able to make a qualitative
17 assessment with PT assay, but if you want a
18 quantitative measurement, you need to use the
19 Factor X chromogenic assay.
20     MR. DENTON:
21     Object to --
22 BY MR. HOROWITZ:
23     Q. That's the conclusion; right?
24     MR. DENTON:
25     -- the form.

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 462

1      THE WITNESS:
2          I would say that that is certainly
3      what is stated here and that I don't
4      believe that's inconsistent with what I've
5      already told you.
6      BY MR. HOROWITZ:
7      Q.  And you understand there's not an approved
8  anti-Factor Xa assay in the United States for
9  measuring plasma of rivaroxaban?
10     A.  It's my understanding there is not, but
11 there are assays available internationally.
12     Q.  And you saw the document -- we don't need
13 to pull it out again -- where FDA commented on the
14 application from Stago with respect to getting
15 approval for an anti-Factor Xa assay.  We reviewed
16 that, and you saw that for the first time in the
17 deposition; right?
18     A.  I had not -- I don't recall having seen
19 that document.  And -- but I have seen other
20 documents that I can't talk about.
21     Q.  And the authors here don't suggest making
22 dose adjustments for Xarelto based on results of
23 PT testing; correct?
24     A.  I don't believe they do because I don't
25 believe I cite it that way.

Page 463

1      Q.  And nowhere in this study do the authors
2  recommend routine anticoagulation monitoring with
3  a PT assay; correct?
4      MR. DENTON:
5          Object to the form.
6      THE WITNESS:
7          If by "routine coagulation"
8      measurements you mean something similar to
9      what is done with warfarin on a monthly
10     basis, no.  And I have not recommended
11     that either.
12 BY MR. HOROWITZ:
13     Q.  Well, how often should they do it?
14     A.  I already told you.  We -- you asked me
15 that question.  I told you I have not formed an
16 opinion that it has to be a specific frequency.
17 But I do believe it should be done at times, as I
18 describe for you, where there are clinical reasons
19 to be worried about a patient's exposure,
20 hospital, hospitalization, all those things we
21 discussed a little while ago.
22     Q.  By the way, before they got to the
23 conclusions, if you look at Page 3 of the article,
24 there's two sections.  The first says, "Is
25 prothrombin time suitable for measuring

Page 464

1  rivaroxaban?"  And the second says, "Are
2  anti-Factor Xa chromogenic assays the preferred
3  method for measuring rivaroxaban?"  Do you see
4  that?
5      A.  Where are you pointing to?
6      Q.  (Indicating.)
7      A.  I see the -- if you're asking that title,
8  yes.  I --
9      Q.  Yes.
10     A.  -- see that.
11     Q.  Okay.  And then we've gone through the --
12 the conclusion after -- we've already discussed
13 the conclusion as to where Samama comes down
14 between anti-Factor Xa --
15     MR. DENTON:
16         Well, I do --
17 BY MR. HOROWITZ:
18     Q.  -- and PT; right?
19     MR. DENTON:
20         I do object, because you have
21     cherry-picked the conclusion.  I have a
22     problem with that.
23     MR. HOROWITZ:
24         Then do it on redirect.  You can't do
25     it --

Page 465

1      MR. DENTON:
2          No.  No.  No.  No.
3      MR. HOROWITZ:
4          -- this way.
5      MR. DENTON.
6          No.  You -- you -- it's an -- it's an
7      objection --
8      MR. HOROWITZ:
9          Yes.
10     MR. DENTON:
11         -- to the --
12     MR. HOROWITZ:
13         Objection, form.  Say the words
14     "objection, form" and nothing more.
15     That's the protocol.  That's the court
16     we're in.
17     MR. DENTON:
18         I do --
19     MR. HOROWITZ:
20         If you want to do something on
21     redirect, that's fine.
22     MR. DENTON:
23         No.  I want --
24     MR. HOROWITZ:
25         Knock yourself out.

117 (Pages 462 to 465)

Protected - Subject to Further Protective Review

Page 466

1       MR. DENTON:
2           I'm going to protect the record.
3       MR. HOROWITZ:
4           You're not protecting the record.
5       You're going beyond.  Enough, Roger.
6       MR. DENTON:
7           Well, then you need to ask proper
8       questions.
9       MR. HOROWITZ:
10          Well, thank you, Coach.
11   BY MR. HOROWITZ:
12      Q.  Doctor, one other question.
13          Do you believe that this study shows that
14   the authors have somehow concluded that PT has
15   been validated as a screen as you're proposing to
16   use it for bleeding risk with PT?
17      MR. DENTON:
18          Object to the form.
19      THE WITNESS:
20          Are you asking me is -- is there
21      language that it's been validated?  I -- I
22      would have to look.  I don't think they've
23      used that language.  We read the
24      conclusions already.  But I -- we can -- I
25      can look here and see if they use that

Page 467

1       language.
2    BY MR. HOROWITZ:
3       Q.  Do you know whether it would be
4    appropriate to make a dose adjustment of some kind
5    based on something that could only give you a
6    qualitative as opposed to a quantitative
7    assessment?
8       MR. DENTON:
9           Object to the form.
10      THE WITNESS:
11          I do think it would based on the --
12      their own labeling for dose adjustment
13      based on renal function, which is a
14      qualitative assessment of exposure as
15      well, potential exposure.
16          So no.  I -- I within the range of the
17      data that has already been collected on
18      the drug, I do think dose adjustments can
19      be done.  Do I think that you have data to
20      indicate you should drop it below what is
21      already label-indicated?  I think you have
22      data that shows that -- that doses at 5
23      and 2-and-a-half actually are too low for
24      some people.
25          So I would -- you know, again, I'm not

Page 468

1       telling you that the labeling
2    recommendation has to say, Drop the dose.
3    And I don't think you could.  You don't
4    have the data to tell the doctor how to
5    drop it.  But I think you have to tell the
6    doctor that there is a exposure-response
7    relationship that could help you use this
8    drug more safely.  And that's what I think
9    is an important improvement in the way
10   that the doctors would use -- be able to
11   use the drug.
12      MR. HOROWITZ:
13          Objection.  Move to strike.
14      Nonresponsive.
15   BY MR. HOROWITZ:
16      Q.  How could you use an assessment that
17   simply tells you whether there is rivaroxaban
18   circulated in the plasma but it can't tell you
19   quantitatively how much -- how can you use that to
20   make a decision as to whether to adjust the dose?
21      MR. DENTON:
22          Object to the form.
23   BY MR. HOROWITZ:
24      Q.  Explain to me scientifically, medically
25   how can you possibly do that?

Page 469

1       A.  It has --
2       MR. DENTON:
3           Object.
4       THE WITNESS:
5           -- to do with the relations -- the
6       relationship that you identified from your
7       -- your data.  You saw that there was a
8       linear relationship that was established.
9       You could use that curve as a basis for
10      the fact that if you were to change the
11      dose, what would you expect to happen.
12      But this is why you would have to be
13      monitoring PT again.  In other words --
14      MR. HOROWITZ:
15          Okay.
16      THE WITNESS:
17          -- you -- you take a PT measurement at
18      five hours after a dose in a patient and
19      you know what it is, and you see that it
20      indicates the patient is -- is -- is not
21      clotting properly and -- and would be at
22      increase to bleed.  You then change the
23      dose and you measure the same time period
24      afterward.  That would give you a
25      reflection of what -- whether or not you

118 (Pages 466 to 469)

Protected - Subject to Further Protective Review

Page 470

```
 1        were able to modify the risk for the
 2     patient.
 3     BY MR. HOROWITZ:
 4        Q.  Can we agree -- and this is the last thing
 5     I'll ask you about Samama.
 6        Samama doesn't make the conclusions or
 7     draw the conclusions that you are from what he
 8     presents in his paper?
 9        MR. DENTON:
10           Object to the form.
11        THE WITNESS:
12           Samama has not done the same
13        assessment I have done.  That is -- that
14        is very true.  So I wouldn't expect him to
15        draw the same conclusions that I have.  I
16        would also point out there is the other
17        option, which is you do this kind of --
18        MR. HOROWITZ:
19           Object.
20        MR. DENTON:
21           No.
22        THE WITNESS:
23           -- exposure monitoring.  And then what
24        you do is you put the -- the -- the person
25        on a different drug altogether.
```

Page 471

```
 1        MR. HOROWITZ:
 2           That's wonderful.  Objection.  Move to
 3        strike.  All I asked you was whether
 4        Samama draws the same conclusions.  I
 5        didn't ask you to just point something out
 6        to me.  So please --
 7        MR. DENTON:
 8           Well --
 9        MR. HOROWITZ:
10           -- answer my question.
11        THE WITNESS:
12           I did answer your question --
13        MR. DENTON:
14           She did.
15        THE WITNESS:
16           -- first.  I -- I've --
17        MR. HOROWITZ:
18           Okay.
19        THE WITNESS:
20           -- tried very hard to start out by
21        answering the question as asked first.
22        But to me, it was an important
23        clarification.
24     BY MR. HOROWITZ:
25        Q.  Do you disagree with FDA and the medical
```

Page 472

```
 1     officers who you cite from the FDA, that
 2     monitoring rivaroxaban therapy with sequential
 3     prothrombin times to optimize safety outcomes
 4     cannot be recommended?
 5        MR. DENTON:
 6           Object to the form.
 7        THE WITNESS:
 8           I don't think I formed that specific
 9        opinion.  No.
10     BY MR. HOROWITZ:
11        Q.  Do you know how many of the articles that
12     you cited in your paragraph here on PT -- I forgot
13     the paragraph number.
14        A.  You're talking about 57?
15        Q.  I think that's it.
16        Do you know how many of them discuss the
17     use of PT in the context of specific clinical
18     circumstances for purposes of measuring as opposed
19     to monitoring for dose adjustment?  Do you know
20     how many of them do that?
21        MR. DENTON:
22           Object to the form.
23        THE WITNESS:
24           I'd have to look.  I haven't attempted
25        to break it out that way.
```

Page 473

```
 1        MR. HOROWITZ:
 2           All right.  If we have time, we might
 3        do that, but I'm going to move on to
 4        something else for now.
 5     BY MR. HOROWITZ:
 6        Q.  You haven't done that exercise as we sit
 7     here now, though?
 8        MR. DENTON:
 9           What exercise?  I object to the form.
10        MR. HOROWITZ:
11           Okay.  I'll withdraw the question.
12     BY MR. HOROWITZ:
13        Q.  Doctor, if you take a look, on Page --
14        A.  Which -- which exhibit?
15        Q.  I'm sorry.  Your report.
16        A.  Oh, okay.  My report.
17        Q.  I should have had Lindsey get you a
18     coffee.  I'm sorry.  See, I've got the benefit of
19     the coffee in me.
20        MR. DENTON:
21           I don't know about the benefit.
22        But you --
23        MR. HOROWITZ:
24           Much to -- I was going to say much to
25        Roger's concern for my well-being and his.
```

119 (Pages 470 to 473)

Protected - Subject to Further Protective Review

Page 474

```
 1   BY MR. HOROWITZ:
 2       Q. Please take a look at Paragraph 9. It's
 3   the first bullet point on Page 5. We'll start
 4   there. You got it? Do you have it, Doctor?
 5       A. So are you on Page 9 or Paragraph 9?
 6       Q. Paragraph 9, Page 5.
 7       A. Okay.
 8       Q. The first --
 9       A. I'm sorry.
10       Q. -- bullet on Page 5.
11       A. Okay. I'm there.
12       Q. You say -- in your report, you write,
13   "Patients taking Xarelto exhibit a high degree of
14   inter-individual variability in various
15   pharmacokinetic parameters"; right? Is that -- is
16   that what you write?
17       A. My first bullet is "Xarelto has a 'narrow
18   therapeutic index', or margin of safety. This is
19   on Page 9, first bullet?
20       Q. No. Paragraph 9, Page 5.
21       A. Sorry.
22       Q. You're getting like Roger.
23       A. Okay. So the bullet starts with "Xarelto
24   does not have a highly predictable"? Is that what
25   you're talking about? Yes.
```

Page 475

```
 1       Q. That's --
 2       A. I --
 3       Q. -- what I'm talking about.
 4       A. -- see that bullet. Yes.
 5       Q. Okay. And then it says in the next
 6   sentence, "Patients taking Xarelto exhibit a high
 7   degree of inter-individual variability in various"
 8   PK or "pharmacokinetic parameters"; right?
 9       A. Yes.
10       Q. And what is "inter-individual
11   variability"?
12       A. It has to do between the response -- the
13   -- the measurements between people. So if you
14   have -- all of us in the room were to take a dose
15   and we were to measure different pharmaco --
16   pharmacokinetic parameters, depending on who we
17   were, we -- we would potentially get a great deal
18   of variability among us. It wouldn't be -- it
19   wouldn't be the same number or even very close to
20   the same number. And I'm using high variability
21   in the context of the numbers that I'm looking at
22   within the -- the -- documents that I'm
23   seeing.
24       Q. And the documents you're seeing -- in
25   particular, I think you cite Mueck 2014, Table 3?
```

Page 476

```
 1       A. Yes. And also the ROCKET -- the -- the
 2   ROCKET data as well. But yes. Mueck -- Mueck --
 3   in the ROCKET -- other descriptions of the ROCKET
 4   data you find similar numbers. But yes, the Mueck
 5   paper has a nice summary in Table 3. It gives me
 6   individual variability ranges, low to high.
 7       Q. And when we say pharmaco -- I probably
 8   should have asked you this about six hours ago,
 9   either Mr. Irwin or I should have.
10           But when we say "pharmacokinetic
11   parameters" and "pharmacodynamic" -- just give us
12   30 seconds on pharmacokinetics, pharmacodynamics.
13   What are we talking about there?
14       A. So pharmacokinetics as a discipline is the
15   measure of the way that the drug is handled by the
16   body, how it's absorbed, distributed, metabolized,
17   and excreted.
18           The -- pharmacodynamics is a study or a
19   measure of the biological responses that the drug
20   produces. So in this case, it would be effects on
21   the clotting mechanism to inhibit Factor Xa.
22       Q. Do you agree that all drugs have some
23   variability between exposure among different
24   patients at the same doses?
25       A. Yes.
```

Page 477

```
 1       Q. And do you agree that drug profiles are
 2   curves looking at 5th and 95th percentiles are
 3   common?
 4           MR. DENTON:
 5               Object to the form.
 6           THE WITNESS:
 7               Say that again.
 8   BY MR. HOROWITZ:
 9       Q. Do you agree that drug profiles are curves
10   that look at the nine -- at the 5th and 95th
11   percentiles, are common?
12       A. Are you asking me is it common to look at
13   those?
14       Q. Yes.
15       A. Yes.
16       Q. That's what I meant.
17       A. Typically you --
18       Q. I'm sorry.
19       A. Yeah. That's a way to bound. Yes.
20       Q. And do you understand that it's not
21   unusual to have patients above the mean, in other
22   words, above the 95th percentile?
23       A. That's not the mean. But certainly you
24   can have -- the -- the --
25       Q. I'm sorry.
```

120 (Pages 474 to 477)

Protected - Subject to Further Protective Review

Page 478

1    A. The --
2    Q. In the 95th percentile. I'm getting
3  tired.
4    A. You -- well, every -- every dataset will
5  have a 5th and a 95th. It -- the issue is how
6  tight --
7    Q. Right.
8    A. -- is that range. In other words, if your
9  mean is -- is 3 and your observations are 2 and 4,
10 or are your observations 1 and 10.
11   Q. Right.
12   A. That's a different variability around the
13 mean.
14   Q. I understand that. So -- let me ask the
15 question again. But just -- and I think we're
16 going to agree on this.
17     But it's not unusual -- I mean, you have
18 to look at it and assess each data point or -- or
19 do your own assessment of the drug and the data
20 you're looking at. But at the end of the day,
21 it's not unusual to have some patients above the
22 mean and some patients below the mean?
23   A. No. You -- I mean, I've never seen a
24 dataset where you don't. That's the --
25   Q. Right.

Page 479

1    A. -- whole point of computing a mean.
2    Q. Okay.
3    A. Even if they're off by just a tenth of
4  something, there are going to be some differences.
5    Q. All right. And so, I mean, at the end of
6  the day, all drugs show some variation of
7  concentration at a given dose. That's fair;
8  right?
9    A. Yes. And what's important is
10 understanding what that variability is.
11   Q. Okay. Now, do you agree as a general
12 proposition that variability is acceptable for a
13 drug if it doesn't lead to less efficacy or more
14 side effects or -- or worse safety?
15   MR. DENTON:
16     Object to the --
17   THE WITNESS:
18     Say that again --
19   MR. HOROWITZ:
20     Sure.
21   THE WITNESS:
22     Please.
23   BY MR. HOROWITZ:
24   Q. Do you agree that variability -- that the
25 degree of variability, I probably should say, is

Page 480

1  acceptable if it doesn't lead to less efficacy or
2  more side effects?
3    A. It depends --
4    MR. DENTON:
5      The same --
6    THE WITNESS:
7      -- on the context. That would not be
8      acceptable in a bioequivalence
9      determination. But it would be acceptable
10     potentially if the issue is is the drug
11     safe and effective. So it -- I think the
12     context is extremely important.
13 BY MR. HOROWITZ:
14   Q. Right. And obviously the context -- not
15 obviously. The context for me, though, was safety
16 and efficacy.
17   MR. DENTON:
18     Well -- but object to the form.
19 BY MR. HOROWITZ:
20   Q. That's --
21   A. Well -- but I'm -- I'm trying to be
22 precise and answer your questions. I don't want
23 you to come back later and said [sic], I -- I
24 thought it was good for bioequivalence, because
25 I'm not saying that --

Page 481

1    Q. No.
2    A. -- at all.
3    Q. I understand. That's why I appreciate --
4    A. So . . .
5    Q. -- your clarification. And so I just was
6  following up and saying I think we're on the same
7  page there.
8      And you agree that with respect to
9  variability and exposure to a drug, if all of the
10 various plasma concentrations are within the
11 therapeutic range of the drug, then -- well, let
12 me withdraw that.
13     Do you agree that variability and exposure
14 at a given dose of a drug is only a problem if it
15 affects safety or efficacy outcomes?
16   MR. DENTON:
17     Object to the form.
18   THE WITNESS:
19     Again, depends on context. But if
20     we're taking bioequivalence off of --
21 BY MR. HOROWITZ:
22   Q. Let's take --
23   A. -- the table --
24   Q. -- bioequivalence and put it to the side.
25   A. Okay.

121 (Pages 478 to 481)

Protected - Subject to Further Protective Review

Page 482

1    Q. Safety, efficacy.
2    A. All right. That's great.
3       If you're taking that aside, I do think
4  that it has certainly the most important -- much
5  more importance if safety and efficacy is of
6  concern. I can't tell you that it would be of no
7  concern. But I would say to you -- because I
8  would still -- what I would -- what I would be
9  concerned about with that variability is that when
10 you release the drug into populations that don't
11 fit the study population, that it could be an
12 issue. So I can't just -- I -- I could not say a
13 hundred percent no --
14   Q. Right.
15   A. -- concern.
16   Q. But if the data you're seeing -- if the
17 clinical data you're saying shows that there's no
18 increased risk of adverse effects and no increased
19 -- or I should say decreased efficacy, then it's
20 not -- not -- I don't want to say not a concern.
21 But you -- you know, it's okay; right?
22      MR. DENTON:
23        No. Object to the form.
24      THE WITNESS:
25        It would allow you to make an approval

Page 483

1  decision. But the -- again, the issue is
2  as the -- as we know, when datasets are
3  clinical datasets are developed for drug
4  development. And I'm -- I'm going to
5  assume you mean how drugs are typically
6  developed. They're done in studies that
7  have controls over the people, and there
8  are only certain types of patients. But
9  real world is not that clinical trial.
10     So I -- I -- I -- I -- I can't just
11 blanketly say that's true. I would say to
12 you I agree that that could be a premise I
13 would accept if you're focusing it on
14 could be that okay in order to make a
15 safety -- I mean make a decision on
16 approval. I think people do make
17 approvals on decision for variable drugs.
18      MR. HOROWITZ:
19        Okay.
20      THE WITNESS:
21        And they look at that issue: Does it
22 affect safety and efficacy?
23 BY MR. HOROWITZ:
24   Q. And that's good enough in terms of an FDA
25 regulatory approval?

Page 484

1    A. It depends on FDA and the size of the
2  trial, and all there's all these other things.
3  But, I mean, I'm not saying -- I would say to you
4  that possibly that decision could be made.
5    Q. Let me ask you about anticoagulants.
6       Is variability and exposure at a given
7  dose of an anticoagulant only a problem if it --
8  if you're seeing bleeds at higher concentrations
9  and you're seeing less efficacy at lower
10 concentrations?
11      MR. DENTON:
12        Object to the form.
13      THE WITNESS:
14        If you're -- in other words, both of
15    those things have to be occurring, or are
16    you saying --
17 BY MR. HOROWITZ:
18   Q. One or the other, both.
19      I mean, in other words, if -- if you're
20 not seeing an increased risk of bleeding and
21 you're not seeing decreased efficacy, is
22 variability a problem?
23      MR. DENTON:
24        Object to the form.
25      THE WITNESS:

Page 485

1        Still could be, depending on the data
2    that you have. In other words, did you do
3    a study that's big enough to be able to
4    make that conclusion? I mean --
5  BY MR. HOROWITZ:
6    Q. Okay.
7    A. I have --
8    Q. Let's just --
9    A. -- a hard time --
10   Q. Yeah.
11   A. -- with those generalizations because I
12 think you really have to look at the quality of
13 the data, and I think any -- any good scientist
14 and drug developer will tell you that: Quality of
15 the data, the quality of the study, how it was
16 designed, and then question you're asking me. So
17 do -- if you want to talk about ROCKET, maybe ask
18 some questions about ROCKET --
19   Q. Well, I --
20   A. -- you know, and I can tell you how I
21 feel.
22   Q. Well, I know how you feel about ROCKET.
23 And we'll talk about it, and Mr. Irwin will talk
24 to you about it. But I think there's a general
25 premise here. Maybe -- obviously anything's

122 (Pages 482 to 485)

Protected - Subject to Further Protective Review

Page 486

1    possible.  But if -- with respect to variability
2    and pharmacokinetics -- and you're -- you're an
3    expert pharmacologist; right?
4        A.  Yes.
5        Q.  Okay.  And we've talked about variability,
6    and you said it's -- it's, you know, perfectly
7    normal for all drugs to show variation of
8    concentration at a given dose; right?
9        MR. DENTON:
10           Object to the form.
11       THE WITNESS:
12           Yeah.  That premise I will agree to.
13   But then when --
14       MR. HOROWITZ:
15           Okay.
16       THE WITNESS:
17           -- you're stepping into
18       decision-making, you have to think about
19       the whole situation is --
20       MR. HOROWITZ:
21           Right.
22       THE WITNESS:
23           -- what I'm telling you.
24   BY MR. HOROWITZ:
25       Q.  So what -- my question is is if you have

Page 487

1    -- if you think there's a problem with your dose
2    based on variability because you're seeing a
3    higher -- too high a degree of variability, aren't
4    you looking to see whether there are increased
5    risk or decreased benefit?
6        MR. DENTON:
7            Object to the form.
8    BY MR. HOROWITZ:
9        Q.  Isn't that what you're looking for?
10       A.  Well, you certainly are.  But you're also
11   looking at can you define the variability.
12           So if the variability you're seeing is
13   something you just can't control at all, then
14   different situation than variability that you can
15   define based on things such as renal function,
16   age, gender, metabolism, food.  You know, there's
17   things you can do to mitigate the risk, and so you
18   may be able to actually feel comfortable on a
19   decision about the highly variable drug in
20   kinetics.  Right.
21           But if you have this highly variable
22   kinetics and you have a dose and you don't --
23       MR. BONEY:
24           (Tenders.)
25       MR. HOROWITZ:

Page 488

1        Thank you.
2    THE WITNESS:
3        -- think that you're seeing from the
4    dataset you have a safety or efficacy
5    issue, I would argue that you would still
6    need to know more about what that
7    variability is caused by or have some idea
8    before you'd say, It's okay, I can go
9    ahead and -- and make a decision that this
10   drug's fine to use for everybody.
11   MR. HOROWITZ:
12       Objection.  Move to strike everything
13   after "Well, you certainly are."
14   MR. DENTON:
15       Object to that.
16   BY MR. HOROWITZ:
17       Q.  Take a look at Page 29, Paragraph 49, if
18   you would, please, of your report.  Are you there?
19       A.  Yes.  I am.
20       Q.  Okay.  And in your discussion about
21   variability and -- and what you characterize as
22   highly variable levels of rivaroxaban exposure,
23   you say, "Supporting evidence is provided in the
24   paper of Mueck et al (2014."
25           And I think earlier before lunch today you

Page 489

1    actually brought up Mueck 2014.  Do you recall
2    that?
3        A.  Yes.
4        Q.  Okay.
5        A.  And I'm -- and I'm telling you what I'm
6    pulling out here, the last, that paragraph.  Yes.
7        Q.  Right.  And you focused primarily on
8    Table -- if not exclusively, on Table 3 in
9    Mueck 2014; right?
10       MR. DENTON:
11           Object to the form.
12       THE WITNESS:
13           Well, I -- I -- I -- as I told you, I
14       rely on Mueck for a number of things.  But
15       I certainly -- for this section, I'm
16       talking about that particular table.  So
17       yes, in this paragraph, I am looking at
18       that particular table.
19   BY MR. HOROWITZ:
20       Q.  With -- with respect to your paragraph and
21   opinion on variability, you're looking at Table 3
22   from Mueck 2014?
23       MR. DENTON:
24           Object to the form.
25       THE WITNESS:

123 (Pages 486 to 489)

Protected - Subject to Further Protective Review

Page 490

1      Well, no.  There's more about
2  variability in Mueck.
3      But this paragraph, the -- the next --
4  where I'm talking about, the thing you
5  just pointed me to, I'm going to tell you
6  about table -- that table.  And that's
7  what's here.  Because I --
8  MR. HOROWITZ:
9      Right.
10  THE WITNESS:
11      -- say following a 10-milligram dose,
12  blah -- that's all --
13  MR. HOROWITZ:
14      Yeah.
15  THE WITNESS:
16      -- from that table.
17  MR. HOROWITZ:
18      You're alligator-wrestling me on
19  something that's not controversy.
20  BY MR. HOROWITZ:
21  Q.  You say right in your report, "Thus, it is
22  not possible to reliably predict rivaroxaban blood
23  levels that will be achieved in any individual
24  patient based solely on knowledge of the Xarelto
25  dose administered."  And then you say, "Supporting

Page 491

1  evidence is provided in the paper of Mueck et al."
2  And then you go through a discussion --
3  A.  Right.
4  Q.  -- of trough levels, all of which are
5  pulled from Table 3 of Mueck 2014; right?
6  A.  Absolutely.  And that's what I'm just
7  trying to point to you.  But I --
8  Q.  Okay.
9  A.  -- do use Mueck other places in my -- I
10  was just trying to save you --
11  Q.  Yeah.  I wasn't asking you that.
12  A.  Okay.
13  Q.  But okay.
14  A.  Well, I -- I thought you were insinuating
15  that.  So . . .
16  Q.  You've been deposed too many times by too
17  many insinuators.
18  MR. DENTON:
19      She doesn't cross [inaudible].
20  BY MR. HOROWITZ:
21  Q.  All right.  I've handed you Mueck 2014.
22  That's the copy with your highlighting on it that
23  you brought to the deposition.  Is that fair?
24  A.  Yes.  And this looks different than --
25  Q.  Did I give you --

Page 492

1  A.  Did you show me Mueck?
2  Q.  Did I give you mine?
3  A.  No.  This is mine.
4  Q.  Okay.
5  A.  But yours, I think -- maybe yours is not
6  the online version.  Mine was the online version,
7  I think.
8  Q.  How do you know mine?  You're looking
9  at --
10  A.  Oh.  No.  No.
11  Q.  -- mine?
12  A.  Mine was not the online version.  Yours
13  may have been the online version.  Because I think
14  your table looked different.  Maybe I'm wrong.
15  Q.  How did you see my table?
16  A.  I thought you -- you held it up for me
17  earlier.  Okay.
18  Q.  Different -- different study.  That was --
19  A.  Oh, okay.
20  Q.  -- Samama.
21  A.  I'm sorry.  I thought it was the same
22  study.
23  Q.  Are you okay?  Do you need a break?
24  A.  No.  I'm fine.  I just -- I just --
25  MR. DENTON:

Page 493

1      I think you --
2  THE WITNESS:
3      I know --
4  MR. DENTON:
5      -- need a break.
6  THE WITNESS:
7      This --
8  MR. HOROWITZ:
9      I'm good.
10  THE WITNESS:
11      -- paper was available online before
12  it was available --
13  MR. HOROWITZ:
14      Right.
15  MR. DENTON:
16      -- in print.  And that's --
17  MR. HOROWITZ:
18      I understand.
19  THE WITNESS:
20      I just want to make sure that we're
21  looking at the same version so that it
22  looks the same when we talk about it.
23  MR. HOROWITZ:
24      Okay.
25  THE WITNESS:

124 (Pages 490 to 493)

Protected - Subject to Further Protective Review

Page 494

```
1          That's all.
2   BY MR. HOROWITZ:
3       Q.  So you've cited Mueck 2014 in support of
4   your proposition that the degree of variability
5   for Xarelto is high; right?
6       MR. DENTON:
7          Object to the form.
8       THE WITNESS:
9          Well, no.  I actually -- well, I mean,
10         certainly this part -- paper provides
11         data.  That is true.  But I cite it
12         as supporting evidence for the fact that
13         it is not possible to reliably predict
14         blood levels.  It will be achieved in an
15         individual based solely on the knowledge
16         of the dose.  That is what I'm talking
17         about in this paragraph with Mueck or
18         Mueck.
19  BY MR. HOROWITZ:
20      Q.  I guess my question is:  Are you -- does
21  -- do you believe Mueck 2014 supports your opinion
22  that the -- there's a high degree of
23  interindividual variability?
24      A.  I think --
25      MR. DENTON:
```

Page 496

```
1   "Variability in the pharmacokinetic parameters is
2   moderate (coefficient of variation 30" to "40%)";
3   correct?
4       A.  You have --
5       MR. DENTON:
6          Object to the form.
7       THE WITNESS:
8          -- read that correctly.  Yes.  I --
9       MR. HOROWITZ:
10         Right.
11      THE WITNESS:
12         -- agree.
13  BY MR. HOROWITZ:
14      Q.  And you did not quote that portion of
15  Mueck in your report, did you?
16      A.  Probably not.  But I -- I certainly -- in
17  this paragraph, I'm using it -- and it -- I'm
18  using this paper to talk about what the
19  relationship is between blood levels and dose.
20      Q.  Well, you would agree with me that the
21  statement "Variability in the pharmacokinetic
22  parameters is moderate (coefficient of variation
23  30" to "40%" is 180 degrees the opposite of the
24  conclusion you set forth in your report, which is
25  that the variability is high --
```

Page 495

```
1          Object to the form.
2       THE WITNESS:
3          -- it does support that opinion.  But
4          I'm citing it here because I'm talking
5          about it.  It -- it provides actual data
6          for the -- for this other concept I'm
7          talking about.  So I'm talking here about
8          the -- and -- that it's not possible to
9          reliably predict blood levels for any
10         individual patient.  Because I'm pointing
11         you here to the range of blood levels,
12         which is an indication of variability.
13         Yes.  I'm just trying to be precise,
14         again, how I'm using this paper.
15  BY MR. HOROWITZ:
16      Q.  It sounds like you're using it for the
17  same thing I just said.  But we'll let the record
18  speak for itself.  So --
19      MR. DENTON:
20         Move to strike.
21  BY MR. HOROWITZ:
22      Q.  -- do me a favor and take a look at the
23  abstract, if you would, of Mueck 2014.  Let's just
24  get right to it.
25         It says in the middle of the abstract,
```

Page 497

```
1       MR. DENTON:
2          Object to the form.
3   BY MR. HOROWITZ:
4       Q.  -- correct?
5       A.  No.  I don't think that's 180 degrees away
6   from high because it's how you define "high."  And
7   I'm dividing -- I'm defining high as clinically
8   relevant.  And variability is absolutely
9   clinically relevant for this drug when you look at
10  the ROCKET data.
11      Q.  Take a look at Page 13.
12      A.  So we're not going to go to Table 3?
13      Q.  We'll get there on my time.  And the
14  Mueck --
15      A.  So where on Page --
16      Q.  Page 13.  Let's take a look at the first
17  column.  It says, "In all patient populations
18  studied, the pharmacokinetic properties of
19  rivaroxaban were similar to those found in healthy
20  subjects."
21      A.  Okay.  I need to see where you are.  First
22  column.
23      Q.  I'll even show you my highlighting.
24      A.  Okay.  So -- okay.  Three -- four lines
25  down.  Okay.  I see that now.  Sorry.
```

125 (Pages 494 to 497)

Protected - Subject to Further Protective Review

Page 498

1    Q. "In all patient populations studied, the
2  pharmacokinetic properties of rivaroxaban were
3  similar to those found in healthy subjects. The
4  influence of demographic factors on the
5  pharmacokinetics of rivaroxaban was moderate, as
6  anticipated, and, on average, within the
7  variability of the overall patient population."
8      Did I read that correctly?
9    A. You read it correctular --
10   Q. And then --
11   A. -- correctly.
12   Q. And then it says, "Simulations of typical
13  patients with extreme demographics (such as
14  elderly with a low body weight and impaired renal
15  function) showed that the pharmacokinetic and
16  pharmacodynamic profiles of rivaroxaban in these
17  patients remain within the variability range
18  confidence interval of an average patient . . .
19  supporting fixed dosing without the need for
20  routine coagulation monitoring."
21      Did I read that correctly?
22   A. You read -- you read that correctly.
23   Q. Okay. And these are statements and
24  propositions in Mueck, the lead pharmacokineticist
25  at Bayer on the Xarelto project, as well as the

Page 499

1  published lead author on this article that you
2  cite. You didn't include these statements in your
3  report, did you?
4      MR. DENTON:
5        Object to the form.
6      THE WITNESS:
7        I certainly did not cite this. But I
8      certainly relied on this paper as a whole,
9      including these statements. Because if
10     you read the rest of that paragraph, he
11     talks about optimizing therapy --
12   BY MR. HOROWITZ:
13   Q. Right. He says --
14   A. -- in patients with -- and that -- that --
15  that -- that issue of optimization has to do with
16  the variability that they define within the
17  pharmacokinetics.
18      MR. HOROWITZ:
19        Objection. Move to strike.
20        Nonresponsive.
21   BY MR. HOROWITZ:
22   Q. If you turn to Page 14, the final
23  conclusion, the last sentence says, "With the
24  fixed-dose regimens tailored for specific
25  indications" with "routine coagulation" --

Page 500

1  "without" -- I'm sorry. Let me try that again.
2      "With the fixed-" --
3      MR. DENTON:
4        He should be on my side --
5    BY MR. HOROWITZ:
6    Q. -- "dose regimens" --
7      MR. DENTON:
8        -- of the table.
9    BY MR. HOROWITZ:
10   Q. "With the fixed-dose regimens tailored for
11  specific indications without routine coagulation
12  monitoring, rivaroxaban has the potential to
13  simplify and improve the management of
14  thromboembolic disorders."
15      Did I read that correctly?
16   A. Yes. You did.
17   Q. And you would agree with me that that is
18  something that you did not include in your report
19  -- in the text of your report, in your discussion
20  of variability, or your citation to Mueck 2014?
21      MR. DENTON:
22        Object to the form.
23      THE WITNESS:
24        I did not. But again, I did consider
25      this entire paper and relied upon it as a

Page 501

1      whole, including those statements. I
2      don't think they're inconsistent with what
3      we've discussed today.
4    BY MR. HOROWITZ:
5    Q. And going back to Page 13, there's a
6  little bit of a discussion there of prothrombin
7  time and the use of PT assays and anti-Factor Xa
8  assays.
9      Do you see that in the last paragraph on
10  Page 13, going on to Page 14?
11   A. So are you -- this -- the paragraph starts
12  with, "In all relevant studies"?
13   Q. Yes. That paragraph.
14   A. Okay. So how far down are you?
15   Q. Well, I'll go to the next sentence.
16      It said, "It is now well recognized that
17  anti-Factor Xa chromogenic assays are best suited
18  for the quantitative measurement of rivaroxaban
19  plasma levels instead of PT."
20      Do you see that?
21   A. Yes. I do. You've read that correctly.
22   Q. And that would be consistent with the
23  conclusion that we went over in the Samama article
24  as well; right?
25      MR. DENTON:

126 (Pages 498 to 501)

Protected - Subject to Further Protective Review

Page 502

1          Object to the form.
2      THE WITNESS:
3          I don't know if it's exactly the same,
4      but I think it's consistent.  Yes.  It
5      would be consistent --
6  BY MR. HOROWITZ:
7      Q.  And if --
8      A.  -- with -- with one of the conclusions
9  within the Samama article.
10     Q.  And it goes on to say at the bottom, "if
11 required in certain clinical circumstances such as
12 overdose, prior to emergency surgery, or when drug
13 accumulation is suspected (e.g. if patients
14 develop acute renal failure)" -- and that's
15 talking about the circumstances under which you
16 might want to measure rivaroxaban concentrations;
17 correct?
18     MR. DENTON:
19         Object to the form.
20     THE WITNESS:
21         Well, they're talking about the use of
22     the anti-Factor Xa kit, yes.  That is
23     true.  That's what they're talking about.
24 BY MR. HOROWITZ:
25     Q.  And it says, "However, there are currently

Page 503

1  no data showing a direct correlation between
2  bleeding events and rivaroxaban plasma levels in
3  patients receiving therapeutic doses of
4  rivaroxaban."
5          Did I read that correctly?
6      A.  You did read that correctly.
7      Q.  Okay.  And do you agree with that
8  statement?
9      A.  I don't disagree with that statement.  But
10 I think there's more to it than that.  Because the
11 data that they have shows that there is indeed a
12 predictive value of -- for -- PT testing for
13 identifying patients with increased risk of
14 bleeding.  So I think that is there.  And they do
15 have a correlation between plasma levels and PT
16 within their dataset on the -- on the -- on the
17 endpoint of looking for bleeding events.
18     Q.  And for purposes of forming that opinion,
19 are we back to Figure 8 in the discussion in the
20 medical officer review that we had earlier?
21     A.  No.  We're at more than that.  We're back
22 to the summary review document, which we didn't go
23 over.  We're back to the entire discussion within
24 that section, which includes more than just
25 Figure 8.

Page 504

1          But it's all of that.  It's the FDA's
2  conclusion.  It's the -- the findings within the
3  study.  It's even -- again, this is -- the --
4  what -- my statement is consistent with what they
5  said back in 2005 as well.
6      Q.  Okay.  Well, we'll -- we'll get back to
7  2005.
8          I want to -- this statement here,
9  "However, there are currently no data showing a
10 direct correlation between bleeding events and
11 rivaroxaban plasma levels in patients receiving
12 therapeutic doses of rivaroxaban," what data are
13 you pointing to that might be contrary to this
14 sentence?  What data do you have that -- that
15 Dr. Mueck didn't have?
16     A.  I'm point -- I'm saying he's parsing his
17 words.  And I'm saying that what there is is data
18 showing a correlation -- an important correlation
19 between PT and plasma levels to identify patients
20 at increased risk of bleeding.  So that's what is
21 there.
22         The -- I think that what he -- what -- I
23 mean, I'm not really sure.  I haven't talked to
24 him.  So I can't answer what was in his mind --
25     Q.  You didn't -- you didn't --

Page 505

1      A.  -- or state of mind.
2      Q.  You didn't read his deposition either,
3  right?
4      A.  But -- no.  I have not read his
5  deposition.
6          But my -- my statement would be to tell
7  you that -- that my position on this issue and my
8  statement I'm giving you is supported by the
9  reviews done by the regulatory agency and I
10 believe consistent with the findings of the
11 company in earlier statements they made about the
12 utility of PT monitoring or measurement or
13 whatever term you want to use.
14     Q.  Have you yourself done any research -- and
15 I'm not talking about looking at studies or
16 documents.  I'm talking about doing some sort of
17 assessment yourself of a correlation between
18 plasma concentration and outcomes.
19     A.  Have I done an analysis?  No.  I have not
20 done my own separate analysis.  I haven't torn
21 apart the data, things like that.  No.
22     Q.  Are you able to quantify for us how much
23 the risk of a bleed increases with concentration,
24 what that -- what the actual risk -- increased
25 risk looks like?

127 (Pages 502 to 505)

Protected - Subject to Further Protective Review

Page 506

1      A. I can give you an estimate based upon that
2  quartile analysis the FDA did, where it shows a
3  doubling of the event rate. But I -- I have not
4  calculated an odds ratio. So I can't -- I can't
5  give you an odds ratio. And I -- I don't believe
6  anybody else has done that either.
7      Q. Which quartile analysis are you referring
8  to?
9      A. That one we went over, the -- we've talked
10  about it two or three times.
11      Q. So the one that you and I went over that
12  showed that --
13      A. When you get --
14      Q. -- that fourth --
15      A. -- above 20 seconds, you get a --
16      Q. Right.
17      A. -- an event rate that's double what it is
18  at the lower -- at the -- at the -- at the lower
19  quartiles.
20      Q. Well, I thought what we showed was for
21  major risk of bleeding and risk of dying from
22  bleeding. The second quartile was actually higher
23  than the fourth quartile.
24      A. Wasn't your question a minute ago. I --
25  we're talking about bleeding. And bleeding

Page 507

1  includes --
2      Q. Okay.
3      A. -- all types of bleeding.
4      Q. Ah, okay.
5      A. And so again, you know -- I mean, it --
6  and we did go over this by looking -- and I agreed
7  with you. Those numbers were the way those
8  numbers fell out. But I would -- I would argue
9  that that data is useful to help you quantify.
10  But it is not an odds ratio. It's not the
11  definitive answer about what the risk ratio would
12  be. And I don't know that the company or anyone
13  else has done a study to -- to show me what that
14  actual risk would be other than there is an
15  increased risk down.
16      Q. So in other words, you can't give us an
17  actual number? You can just give us some sort of
18  guesstimate by looking at that quartile --
19      MR. DENTON:
20      I object --
21  BY MR. HOROWITZ:
22      Q. -- analysis?
23      MR. DENTON:
24      -- to the form.
25      THE WITNESS:

Page 508

1      I'm not going to guesstimate. I can
2  point you to that, where there is data on
3  the risk of bleeding at -- in that study
4  based on the data that -- that is
5  available to me.
6  BY MR. HOROWITZ:
7      Q. Have you published that analysis or
8  subjected it to peer review, that you're saying
9  you can look at the quartile analysis and come up
10  with a risk of bleeding? Have you -- have you
11  published that anywhere?
12      MR. DENTON:
13      Object to the form.
14      THE WITNESS:
15      I haven't published it. But I would
16  say to you that's consistent with FDA's
17  statement about that analysis, if you go
18  to their summary medical review. So I
19  don't --
20  BY MR. HOROWITZ:
21      Q. Which --
22      A. -- think what I'm saying -- I don't my --
23  my looking at that table and coming to that
24  conclusion would be controversial. I would agree
25  -- but I would -- would not try to tell you that

Page 509

1  that is the definitive odds ratio. Absolutely
2  not.
3      Q. Okay.
4      A. I haven't -- I haven't done that analysis.
5      Q. Other than whatever the summary review of
6  FDA, which is a document that you're just quoting
7  from, says, you don't have your own sort of
8  independent view of that?
9      MR. DENTON:
10      Object to the form.
11      THE WITNESS:
12      No. I have my independent view based
13  on the information I've seen. And that's
14  part of the information I've seen. And
15  I'm trying to define for you what I would
16  point you to. And I thought that's where
17  we started on this, what would --
18  BY MR. HOROWITZ:
19      Q. What -- what --
20      A. -- I point to.
21      Q. -- statement in the summary review are you
22  talking about?
23      A. I'm -- I'm talking about the relationship
24  between bleeding risk -- and I believe that they
25  have a statement about -- that this would be

128 (Pages 506 to 509)

Protected - Subject to Further Protective Review

Page 510

1 useful information for identifying patients at
2 risk. I mean, that's what I'm talking about.
3 They're --
4 Q. They don't say anything about doubling of
5 risk in there.
6 A. No. But the data they're referring to
7 shows that number, is what I'm trying to tell you.
8 They point to that quartile data. They talk about
9 it. And if I look at that, I'm telling you -- if
10 you asked me where the data would be, I'd look
11 there.
12 Q. Right. But they don't --
13 A. But . . .
14 Q. -- say -- you're say -- you're telling --
15 MR. DENTON:
16 Let -- let her finish.
17 BY MR. HOROWITZ:
18 Q. -- me that you can --
19 MR. DENTON:
20 Let -- let her finish her --
21 BY MR. HOROWITZ:
22 Q. -- quantify. And you said that the
23 summary review -- you suggested to me at least,
24 and maybe you didn't mean to do this. But I took
25 it as you suggesting that the summary review

Page 511

1 actually quantifies that there's like a doubling
2 of risk based on their data. That's not what that
3 says; right?
4 MR. DENTON:
5 Object to the form.
6 THE WITNESS:
7 I don't think that's what I told you.
8 I think what I told you is there's
9 numbers and there's quartiles that allow
10 you to see that there's a -- there's a
11 change of twofold between the event rates
12 that are seen in the quartiles that they
13 looked at from that clinical study. That
14 is not an odds ratio. I agree with you.
15 I'm not saying it's an odds ratio.
16 MR. HOROWITZ:
17 Okay.
18 THE WITNESS:
19 But I am saying to you it is
20 quantifying the fact that there is a
21 biologically significant increase in risk.
22 BY MR. HOROWITZ:
23 Q. Right. And the FDA summary review doesn't
24 quantify any sort of increased risk either;
25 correct?

Page 512

1 A. Well, there --
2 MR. DENTON:
3 Object to the --
4 THE WITNESS:
5 They did the quartiles, I think. And
6 so I think it's their analysis. I believe
7 that they did that. Maybe Janssen did it
8 too. But they certainly agreed with that
9 quartile analysis and -- and refer to it.
10 But they certainly -- I would -- I'm
11 not saying that they stated that it
12 doubles the risk. I'm just saying that
13 those are numbers that they reviewed and
14 relied upon and used those numbers when
15 they are then -- they're forming their
16 summary statements, which talk about the
17 utility.
18 BY MR. HOROWITZ:
19 Q. And just to be clear, you're talking about
20 what we went over, Table 6 in the medical officer
21 review, this quartile analysis; right?
22 A. Well, it's also down here --
23 Q. Right.
24 A. -- below. And --
25 Q. But that data; right?

Page 513

1 A. Yes. The -- it's the data -- it's the
2 only data they have, which is the one collected in
3 the Phase 3 study.
4 Q. Okay. And my question is -- here FDA says
5 there does not appear to be -- "It is reassuring
6 that for the overall population, there does not
7 appear to be a shift from lesser severities of" --
8 "severities of ISTH major bleeding (i.e.
9 hemoglobin drops and transfusions) to the more
10 severe forms (i.e. critical organ bleeding and
11 fatal bleeding) as a function of PT prolongation
12 with rivaroxaban, as can be seen in the FDA
13 analysis in Table 6."
14 That's their -- their statement with
15 respect to -- to Table 6 and the quartile
16 analysis; correct?
17 A. Well --
18 MR. DENTON:
19 Object to the form.
20 THE WITNESS:
21 -- it's one of their statements with
22 respect to it. I'm -- just because it's
23 reassuring doesn't mean there's still not
24 a patient safety. When you transfuse a
25 patient, there's a -- there's a risk to

Protected - Subject to Further Protective Review

Page 514

1     the patient.
2          MR. HOROWITZ:
3          Okay.
4          THE WITNESS:
5          I don't -- and I just -- I don't think
6     they're saying that there is no risk --
7          MR. HOROWITZ:
8          Okay.
9          THE WITNESS:
10         -- at all.
11    BY MR. HOROWITZ:
12         Q. And just to be clear, the summary review
13    that you were citing to me doesn't -- by itself,
14    doesn't -- in the text of that document doesn't
15    make any assessment of a quantification of the
16    risk; correct?
17         MR. DENTON:
18         Object to the form.
19         THE WITNESS:
20         I don't recall one.
21         MR. HOROWITZ:
22         Okay.
23         THE WITNESS:
24         But I would point -- you asked me
25         again to point you to -- and I'm pointing

Page 515

1     you to your own -- your own study, your
2     own data.
3          MR. HOROWITZ:
4          All right.  Why don't we take a quick
5     break.
6          THE VIDEOGRAPHER:
7          Okay.  The time now is 4:28 p.m.  We
8     are off the record.
9          (Brief recess was taken.)
10         THE VIDEOGRAPHER:
11         This begins Disk 6 of today's
12    deposition.  The time now is 4:44 p.m.  We
13    are back on the record.
14    BY MR. HOROWITZ:
15         Q. Doctor, let's talk about the -- the now
16    infamous Table 3 of Mueck 2014.  If you could turn
17    to that table, please.  And as we discussed
18    earlier, Page 34, Paragraph 56 of your report, you
19    cite Table 3 or certainly you're drawing data from
20    Table 3 to show that Xarelto exhibits a high level
21    of exposure variability; correct?
22         A. Well, actually I'm citing it to say that
23    you cannot reliably predict blood levels that will
24    be achieved in a patient based solely on knowledge
25    of the dose administered.  That's how I'm citing

Page 516

1     this table here.
2          Q. Do you believe that Table 3 supports your
3     opinion that Xarelto shows high variability with
4     respect to its pharmacokinetic profile?
5          A. Yes.
6          MR. DENTON:
7          Object.
8          THE WITNESS:
9          I also believe it does that.  But I --
10         I just want to be -- when we're talking
11         about this paragraph, I want to be
12         precise, that -- that when I'm talking
13         about the details in the data, I'm using
14         it here in this paragraph in this way.
15    BY MR. HOROWITZ:
16         Q. Okay.  And you say -- well, let's do this.
17    If you turn to the table, is it fair to say that
18    you've done is a basic mathematical calculation,
19    where you've taken the number reported at the 5th
20    percentile and looked at what the multiple was
21    required to achieve the number reported as the
22    95th percentile and focused on the trough
23    readings?
24         A. No.  I focused on the -- I'm talk -- on
25    the range from the -- from the -- from the -- the

Page 517

1     5th to the 95th.
2          Q. Well, when you say --
3          A. And I have looked at trough.  And I've
4     also -- but I -- do I talk about just trough here?
5     Let me look.  Hold on.  Let me look.  Apologize.
6          Q. Well --
7          A. Well, I actually -- I will tell you.  In
8     my -- my statements here, when I say, for example,
9     "Following a 10 mg once daily dose of rivaroxaban"
10    to -- "in patients being treated for prevention of
11    . . . (VTE), trough blood" -- yes.  So I'm --
12    there I'm talking about a factor of 30.
13         Q. Right.
14         A. There's -- there's also factors --
15    significant difference factors for other data as
16    well.  But I am focusing in that sentence on the
17    trough.  Yes.
18         Q. Yeah.  So what you did was you took -- you
19    looked at the 5th percentile reported in the
20    trough column.  For the example you just gave,
21    let's use that as an example.  And then you
22    compared it to the number reported in the 95th
23    percentile.  And you came up with a multiple.  So
24    for the example you gave where you say "more than
25    a factor of 30" -- and you say "trough blood

Protected - Subject to Further Protective Review

Page 518

1   levels varied by more than a factor of 30," it's
2   because what you're looking at is a 1 microgram
3   per liter and a multiple to get to 38 micrograms
4   per liter. Is that fair?
5       A. Yes.
6           It's important to remember that these are
7   the only estimate in this paper of what the
8   individual levels were. So in other words,
9   they're giving the range of levels. The levels
10  range from 1 to 38 in the 5th to the
11  95th percentile. So I'm using those as -- without
12  having the individual data here. I'm using the --
13  using those ranges for this.
14          So that's -- yeah. It's a -- it's a
15  measure of the -- of the level of -- levels in
16  blood you get from that dose that can range by a
17  fact of 30 even though the average is nine.
18      Q. You did a mathematical calculation;
19  correct?
20      A. Yes.
21      Q. Okay. And is this the methodology you
22  applied across the board with respect to all the
23  factors of variability that you report in your
24  report in Paragraphs 49 and 56?
25      A. Forty-nine --

Page 519

1           MR. DENTON:
2               Object.
3           THE WITNESS:
4               -- is certainly what I did.
5               Fifty-six --
6   BY MR. HOROWITZ:
7       Q. Take a look at Paragraph 56. Did you do
8   the same thing? I think you re-reported then
9   maybe added a few.
10          MR. DENTON:
11              Object to the form.
12          THE WITNESS:
13              Well, some of it, yes, but not all of
14          it. There's some other calculations here.
15          So . . .
16          MR. HOROWITZ:
17              Right.
18          THE WITNESS:
19              But yeah. I start out by pointing out
20          that -- that as I had discussed before,
21          there's -- this was the first time that
22          physicians would have seen the published
23          version of this data giving them these
24          variability measures. So that's the point
25          I'm making here.

Page 520

1           MR. HOROWITZ:
2               Objection. Move to strike.
3           Nonresponsive. I -- that's not what I
4           asked you.
5   BY MR. HOROWITZ:
6       Q. Let me ask you this: This methodology of
7   just looking at the 5th and 95th percentile and
8   doing that mathematical calculation, are you
9   suggesting that's a valid scientific basis for
10  determining interpatient blood plasma
11  concentrations for a drug?
12          MR. DENTON:
13              Object to the form.
14          THE WITNESS:
15              It is certainly a valid method for
16          assessing the amount of variability you
17          see. Yes. You can do other tests --
18          statistical tests of variability. But
19          this is truly just having an understanding
20          of what is the actual data that was
21          observed in the trial. In other words,
22          there was a high level of variability
23          across these blood levels that were
24          achieved.
25  BY MR. HOROWITZ:

Page 521

1       Q. What is coefficient of variation?
2       A. It is a statistic -- well, it's a -- it's
3   a statistical measure. And I can't tell you how
4   you derive it. I'd have to pull out my equations
5   to do it. But it's a measure of variation around
6   a number or a mean value or a rate -- a set of
7   values that are derived.
8       Q. So -- well, let me ask you this: Do you
9   understand that by convention, a coefficient of
10  variation in the range of 25 to 40 percent is
11  considered to be moderate?
12          MR. DENTON:
13              Object to the form.
14          THE WITNESS:
15              I have seen different numbers for
16          moderate. But I would agree that some
17          people describe that as moderate. Yes.
18  BY MR. HOROWITZ:
19      Q. And do you agree that Table 3 from
20  Mueck 2014 that you're relying upon here for your
21  opinions about interpatient variability does not
22  report information on coefficient of variation?
23      A. That is true. They don't.
24      Q. Okay. Do you know whether there's
25  portions of Mueck 2014 that actually do report

131 (Pages 518 to 521)

Protected - Subject to Further Protective Review

Page 522

1 information about coefficient of variation and
2 interindividual variability?
3      A. Well, you read a value into the record
4 earlier where the sentence talked about that. But
5 I think this is also important data apart from
6 looking at what the C -- the CV values were.
7      Q. Did you -- when you say I read it into
8 the record, you're talking about Mueck's statement,
9 "Variability in the pharmacokinetic parameters is
10 moderate (coefficient of variation 30" to "40%)";
11 correct?
12      A. Yes. You've read that into the record.
13 And you've read it -- you've read that into the
14 record correctly --
15      Q. Okay.
16      A. -- again.
17      Q. Now, the Mueck 2014 does not report that
18 Xarelto has high interindividual variability?
19 That's not the conclusion that is reported in --
20 in -- in the article; correct?
21      A. Say that --
22         MR. DENTON:
23            Object to the form.
24      THE WITNESS:
25            -- again. I'm sorry.

Page 523

1 BY MR. HOROWITZ:
2      Q. Sure.
3      Mueck 2014 does not report in the
4 conclusions of the article that the
5 interindividual variability is high; correct?
6         MR. DENTON:
7            Object to the form.
8      THE WITNESS:
9            Do they use those words? I doubt they
10 do. Because they -- they want to -- to --
11 to send a message that -- that it is not
12 high. I mean, this is the -- this is an
13 issue with -- this is people that were
14 developing the drug. I mean, they have a
15 message. I mean --
16 BY MR. HOROWITZ:
17      Q. So are you going in to question
18 Dr. Mueck's character and credibility in
19 challenging Dr. Mueck's scientific veracity based
20 on this statement in the publication?
21         MR. DENTON:
22            Object to the form.
23      THE WITNESS:
24            No. What I am claiming is that --
25 Dr. Mueck is a developer of the drug. He

Page 524

1      is using a definition that he is using.
2            And I'm telling you that there are
3      other ways to look at this data. And that
4      certainly, in my view, high variability is
5      shown by the actual blood level data that
6      I am reporting for you.
7 BY MR. HOROWITZ:
8      Q. Do you know how many articles Dr. Mueck
9 published on the pharmacokinetic studies that he
10 conducted with rivaroxaban that were subject to
11 peer review and published? Do you know how many?
12      A. No. I haven't tried to count them. I
13 have at least four, I believe, or maybe five in my
14 files.
15      Q. Do you know if it's five out of how many?
16      A. I -- again, I haven't done a -- done an
17 assessment of how -- what the exact number is.
18      Q. Okay. But you're -- you're just suggested
19 or insinuated that Dr. Mueck in -- in this 2014
20 article reports moderate variability because he
21 works for Bayer?
22      A. No. That's not what I said.
23            I said to you, however, that -- that the
24 -- that like every author, he has a message. That
25 is his message.

Page 525

1            And I'm telling you there's -- when you
2 look at this data as a pharmacokineticist, there's
3 more information in this paper than just looking
4 at a CV value of 30 to 40 percent. There's
5 important information for the first time that they
6 actually give in this paper, yet that this data
7 was data that they would have had many years
8 before the time it -- it -- it shows up, because
9 this is data that would have come out of the app
10 -- some of it out of the applications that were
11 submitted in 2011. Some of it was later.
12      Q. Doctor, you yourself have never calculated
13 the coefficient of variation for Xarelto; correct?
14      A. I have not independently. No. I have
15 assumed that the calculations were done properly
16 by those who report them.
17      Q. And by the way, it would be wrong for
18 somebody to send a message or give an opinion
19 simply because they were biased and being paid to
20 do that? You would be critical of somebody who
21 did that; right?
22      A. Certainly. You should not give a message
23 simply because you're being paid to do so.
24 Absolutely not.
25      Q. And do you know of -- other than the

132 (Pages 522 to 525)

Golkow Technologies,  Inc - 877.370.3377

Page 526

1  statement I read to you, do you know if there's
2  anything else in Mueck 2014 that discusses
3  coefficient of variation?
4       A. I don't know. I'd have to look. I
5  haven't tried to determine how many times he
6  mentions it.
7       Q. Okay.
8       A. Again --
9       Q. You didn't do that exercise as part of
10  forming your opinions?
11      A. No. I didn't need to do that. I wasn't
12  trying to count up how many times a particular
13  author mentions coefficient of variation.
14      Q. How did --
15      A. I'm looking across the data and
16  interpreting the data based on my expertise and
17  training.
18      Q. How did you come up with this idea of
19  looking at Table 3 and doing these basic
20  mathematical calculations to come up with your
21  opinions on variability? Where did -- where did
22  you come up with that?
23      A. Something --
24          MR. DENTON:
25              Well, first of all, I object to the

Page 527

1  form.
2          MR. HOROWITZ:
3              That's fine. You can object. Go
4  ahead.
5          THE WITNESS:
6              This is the kind of exercise I've done
7  before. I mean, I've looked at
8  pharmacokinetic data for other drugs even
9  outside the context of litigation. And
10  there's -- again, there's more information
11  than simply reporting a coefficient of
12  variation.
13              I would not disagree, however, if I
14  was doing a bioequivalence study, that
15  coefficient of variation is a standard FDA
16  looks at for determining whether or not
17  you can meet the criteria. That
18  certainly absolutely is a standard.
19  That's why I said to you early on when you
20  talk about things, you need to put them in
21  context.
22              In the context of drug development and
23  safety, this is an important concept,
24  Table 3, looking at what -- when you give
25  this dose, what are the -- what is the

Page 528

1  range of blood levels that -- that you
2  observe in people? Huge range, much more
3  than 30 percent. Thirty percent means if
4  you measured one, you'd only see a 1.3 or
5  a 1.4 if it was 40 percent, if you were
6  looking at -- at Cmax, for example. But
7  that's not what we're saying. We see
8  Cmax. It's ranging by much more than just
9  that 30 or 40 percent value across
10  individuals. And I think that's important
11  to understand.
12          MR. HOROWITZ:
13              Are you done?
14          THE WITNESS:
15              Well, I have -- can say more, if you'd
16  like.
17          MR. HOROWITZ:
18              No. That's --
19          THE WITNESS:
20              But I think --
21          MR. HOROWITZ:
22              -- okay.
23          THE WITNESS:
24              -- I'm done answering that question.
25          MR. HOROWITZ:

Page 529

1              Yeah.
2          THE WITNESS:
3              Yes.
4          MR. HOROWITZ:
5              Objection. Move to strike.
6  Nonresponsive.
7  BY MR. HOROWITZ:
8       Q. Let's -- let's take a look in your report
9  now. You start out -- let's -- we can use
10  Paragraph 56 for this.
11              In reporting your factors and doing the
12  mathematical calculation based on Table 3, you
13  focus first on trough, and you give fact -- a
14  factor of 30, a factor of almost 15, a factor of
15  6, a factor of more than 10, and a factor of 8.
16  Do you see that?
17      A. Yes.
18      Q. Okay. And do you agree that it's
19  generally accepted that area under the curve and
20  Cmax are the more appropriate measures of
21  exposure?
22          MR. DENTON:
23              Object to the form.
24          THE WITNESS:
25              It depends on the context you're

133 (Pages 526 to 529)

Protected - Subject to Further Protective Review

Page 530

```
 1    talking about.  I absolutely agree if you
 2    want to know about total exposure, area
 3    under the curve is a common measure that's
 4    looked at.  But if you want to understand
 5    risk, the -- the -- the shape of the
 6    curve, which could include looking at
 7    peaks and troughs, can be just as
 8    important.  It's the idea that if you --
 9    MR. HOROWITZ:
10        I'm going to have to ask --
11    MR. DENTON:
12        No.  No.
13    THE WITNESS:
14        I'm sorry.  I --
15    MR. HOROWITZ:
16        -- ask for more time.
17    THE WITNESS:
18        I'm sorry.
19    MR. HOROWITZ:
20        Yeah.  I mean, I'm going to ask for
21    more time.  That's all right.
22    MR. DENTON:
23        No.  You're not getting more time.
24    MR. HOROWITZ:
25        Yeah.
```

Page 531

```
 1    MR. DENTON:
 2        And you --
 3    MR. HOROWITZ:
 4        I might have to.
 5    MR. DENTON:
 6        You're reacting to her answer
 7    inappropriately.
 8    MR. HOROWITZ:
 9        Well, she's --
10    MR. DENTON:
11        Let her --
12    MR. HOROWITZ:
13        -- going on and on.  And it's going
14    way beyond the question.
15    MR. DENTON:
16        No.  It's --
17    MR. HOROWITZ:
18        And every answer --
19    MR. DENTON:
20        -- not.
21    MR. HOROWITZ:
22        -- is a speech.  It's getting --
23    MR. DENTON:
24        You know --
25    MR. HOROWITZ:
```

Page 532

```
 1        -- absurd.
 2    MR. DENTON:
 3        You know, listen to me.
 4    MR. HOROWITZ:
 5        It really is.
 6    MR. DENTON:
 7        It's not absurd and I take offense to
 8    that.  And it's --
 9    MR. HOROWITZ:
10        Well --
11    MR. DENTON:
12        -- disrespectful to the witness.
13    MR. HOROWITZ:
14        No.  It's not.  Absolutely --
15    MR. DENTON:
16        Yes.  It --
17    MR. HOROWITZ:
18        -- not.
19    MR. DENTON:
20        -- is.  And she's going to finish her
21    answers.  You ask open-ended questions
22    that are just totally out of context.  She
23    can put it in context.
24    BY MR. HOROWITZ:
25        Q.  I asked you simply:  Do you agree that
```

Page 533

```
 1    variability in trough measurements are not a good
 2    indicator of overall exposure for a medicine like
 3    rivaroxaban with a short half-life?  Do you agree
 4    with that?
 5        A.  That's not what you asked me.
 6    MR. DENTON:
 7        Yeah.  That's clearly not --
 8    MR. HOROWITZ:
 9        Okay.
10    MR. DENTON:
11        -- what you asked her.
12    THE WITNESS:
13        Now you're asking --
14    BY MR. HOROWITZ:
15        Q.  I -- I asked you:  Is it --
16        A.  -- about the --
17        Q.  -- generally accepted --
18    MR. DENTON:
19        No.
20    BY MR. HOROWITZ:
21        Q.  -- that area under curve and Cmax are the
22    more appropriate measures of exposure.
23    MR. DENTON:
24        That's what her --
25    THE WITNESS:
```

134 (Pages 530 to 533)

Protected - Subject to Further Protective Review

Page 534

1     And that's what I answered for you.  I
2  said --
3     MR. HOROWITZ:
4        Okay.
5     THE WITNESS:
6        -- I don't necessarily agree with
7  that.  I think it depends on context.
8  BY MR. HOROWITZ:
9     Q.  That's fine.
10     Do you agree --
11     A.  But what I did --
12     Q.  Okay.  But I don't want to hear your but.
13  Now, let me ask --
14     MR. DENTON:
15        No.  No.  No.  No.  No.  She gets
16     to --
17  BY MR. HOROWITZ:
18     Q.  -- you:  Did you agree --
19     MR. DENTON:
20        No.  She has the right to finish her
21     answer.  I'm sorry you're tired.  But let
22     her finish her answer.
23     MR. HOROWITZ:
24        No.  No.  No.  No.  And not every
25     answer is going to be two pages long.

Page 535

1     You're just wasting my time.
2     MR. DENTON:
3        She's not wasting --
4     THE WITNESS:
5        I --
6     MR. DENTON:
7        -- your time.  She's answering your
8     question.
9  BY MR. HOROWITZ:
10     Q.  Okay.  Here's my question -- are you
11  ready?
12     MR. HOROWITZ:
13        I'll move to strike that question.
14  BY MR. HOROWITZ:
15     Q.  Do you agree that the variability in
16  trough measurements are not a good indicator of
17  overall exposure for a medicine like rivaroxaban
18  with a short half-life?
19     MR. DENTON:
20        Object to the form.
21  BY MR. HOROWITZ:
22     Q.  Do you agree with that?  Yes --
23     A.  If you're --
24     Q.  -- or no?
25     MR. DENTON:

Page 536

1     No.  She doesn't have to answer yes or
2  no.  She can answer the question.  Go
3  ahead.
4  BY MR. HOROWITZ:
5     Q.  Do you agree?
6     A.  I would agree with a qualifier, if what
7  you're talking about in that is -- is the best
8  measure.  I would agree it's not the best measure.
9     Q.  Do you agree that small variations and low
10  concentration can give a misleading impression of
11  variability and exposure for a drug whose systemic
12  exposure is in fact only moderately variable?
13     MR. DENTON:
14        Object to the form.
15     THE WITNESS:
16        I would say that depends highly on the
17     situation you're talking about.  And I
18     would say in this particular case, that's
19     not -- I don't believe that I would --
20     would totally agree with that statement.
21     No.
22  BY MR. HOROWITZ:
23     Q.  Do you understand that trough readings are
24  just a snapshot at the moment when the drug is
25  least present?  Do you understand that?

Page 537

1     A.  I absolutely do, just like I understand
2  that Cmax is a snapshot to what the concentration
3  is when it reaches the max.
4     Q.  So my question just there -- I asked you
5  about trough, and you interjected something else.
6  So let me ask you my question.
7     A drug may have variable trough
8  concentrations but still be only moderately --
9  moderately variable in the measures of systemic
10  exposure that matter most, like area under the
11  curve and Cmax.  Would you --
12     A.  Okay.  I need you to --
13     Q.  -- agree with that?
14     A.  I need you to read that's -- that more --
15  there's a lot of information in that question.
16  Could you please slow down and read it more
17  slowly.  Because I'm getting tired too, just
18  like --
19     Q.  Okay.
20     A.  -- you are.
21     MR. HOROWITZ:
22        I'm going to move to strike that
23     question.  I think I'm okay with -- with
24     what we've already talked about.
25  BY MR. HOROWITZ:

135  (Pages 534 to 537)

Protected - Subject to Further Protective Review

Page 538

1    Q. Let me ask you this: Did you also in your
2  report, in Paragraph 56, look at Cmax where you
3  say "peak blood levels varied by . . . a factor of
4  two"?  Do you see that?
5    A. Yes.  I'm -- that's what I'm referring to.
6  I give -- I think I even give you some numbers
7  there.  But I --
8    Q. You do.  You say --
9    A. -- believe I do.
10    Q. -- "factor of two"; right?
11    A. Yes.  I'm -- I'm saying I think I -- did I
12  not give you some -- some actual ranges there?
13    Q. Right.  And then you say "varied by a
14  factor of three" with respect to area under the
15  curve; right?
16    A. Yes.
17    Q. And those are very different variability
18  factors or calculations than your almost 30 and
19  your 15 and your 10 with respect to trough; right?
20    MR. DENTON:
21      Object to form.
22    THE WITNESS:
23      They're different.  But they're also
24      very different than 30 and 40 percent.  So
25      again, I -- that's why I'm telling you I

Page 539

1      don't believe the 30 and 40 percent CV
2      value gives you an accurate reflection of
3      the whole dataset.
4  BY MR. HOROWITZ:
5    Q. You wouldn't focus on trough values just
6  because you know the factors will be higher;
7  right?  You wouldn't -- you wouldn't want to do
8  that?
9    A. I don't.
10      In your -- in my report I tell you about
11  the -- the table and the data, and then this is
12  why in this paragraph I went through the entire
13  range of -- of values that were there.
14      The reason the trough value was important
15  to me was looking at the issue of, as I cited it,
16  the variability that you can get with -- with a
17  single dose of the drug in this -- in -- between
18  individuals.  And that still is a -- is a
19  reflection of that.
20    MR. HOROWITZ:
21      I think it's probably -- I don't want
22      to start a new topic now if we're going to
23      come back tomorrow.  How much time was
24      that?  Yeah.  Let's pause for a second.
25      I'm sorry, Doctor.  I know you want to get

Page 540

1  out of here.  But an extra 15, 20 minutes
2  tomorrow I'm not sure is going to move
3  heaven and earth.  And the reality is I
4  think it might help me tighten some things
5  up.
6  MR. DENTON:
7    I don't believe it will help --
8  MR. HOROWITZ:
9    I don't --
10  MR. DENTON:
11    -- tighten things up.
12  MR. HOROWITZ:
13    You shouldn't believe me when I say
14  that.  But . . . Or I can take two minutes
15  now and see if there's something I can do
16  very quickly, if --
17  THE WITNESS:
18    Why don't --
19  MR. HOROWITZ:
20    -- you want.
21  THE WITNESS:
22    -- you take two --
23  MR. HOROWITZ:
24    Yeah.
25  THE WITNESS:

Page 541

1    -- minutes and --
2  MR. HOROWITZ:
3    But if -- don't shout --
4  THE WITNESS:
5    I'm willing --
6  MR. HOROWITZ:
7    -- at me if I feel like I can't.
8  Okay?
9  THE WITNESS:
10    Well, I'm not -- I promise you I'm
11  not -- I've tried really hard not to shout
12  at you today.
13  THE VIDEOGRAPHER:
14    The time now is --
15  MR. HOROWITZ:
16    You let Roger do that.
17  THE VIDEOGRAPHER:
18    The time now is 5:01 p.m.  We are off
19  the record.

136 (Pages 538 to 541)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 542

```
 1        CHANGES AND SIGNATURE
 2   WITNESS NAME: LAURA M. PLUNKETT, PH.D.
 3   DATE OF DEPOSITION: Tuesday, December 6, 2016
 4
 5    PAGE  LINE    CHANGE      REASON
 6   _____ _____ _____ _____
 7   _____ _____ _____ _____
 8   _____ _____ _____ _____
 9   _____ _____ _____ _____
10   _____ _____ _____ _____
11   _____ _____ _____ _____
12   _____ _____ _____ _____
13   _____ _____ _____ _____
14   _____ _____ _____ _____
15   _____ _____ _____ _____
16   _____ _____ _____ _____
17   _____ _____ _____ _____
18   _____ _____ _____ _____
19   _____ _____ _____ _____
20   _____ _____ _____ _____
21   _____ _____ _____ _____
22   _____ _____ _____ _____
23   _____ _____ _____ _____
24   _____ _____ _____ _____
25   _____ _____ _____ _____
```

Page 543

```
 1        WITNESS' CERTIFICATE
 2
 3       I have read or have had the foregoing
 4   testimony read to me and hereby certify that it is
 5   a true and correct transcription of my testimony
 6   with the exception of any attached corrections or
 7   changes.
 8
 9
10
11
12
13
14
15
16
17
18        _____
19          WITNESS' SIGNATURE
20
21
22
23   PLEASE INDICATE
24   []  NO CORRECTIONS
25   []  CORRECTIONS; ERRATA SHEET(S) ENCLOSED
```

Page 544

```
 1          C E R T I F I C A T E
 2       This certification is valid only for
 3   a transcript accompanied by my original signature
 4   and original seal on this page.
 5       I, AURORA M. PERRIEN, Registered Professional
 6   Reporter, Certified Court Reporter, in and for the
 7   State of Louisiana, as the officer before whom
 8   this testimony was taken, do hereby certify that
 9   LAURA M. PLUNKETT, PH.D., after having been duly
10   sworn by me upon the authority of R.S. 37:2554,
11   did testify as hereinbefore set forth in the
12   foregoing 543 pages; that this testimony was
13   reported by me in the stenotype reporting method,
14   was prepared and transcribed by me or under my
15   personal direction and supervision, and is a true
16   and correct transcript to the best of my ability
17   and understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of
```

Page 545

```
 1   Civil Procedure Article 1434 and in rules and
 2   advisory opinions of the board; that I have no
 3   actual knowledge of any prohibited employment or
 4   contractual relationship, direct or indirect,
 5   between a court reporting firm and any party
 6   litigant in this matter nor is there any such
 7   relationship between myself and a party litigant
 8   in this matter.  I am not related to counsel or to
 9   the parties herein, nor am I otherwise interested
10   in the outcome of this matter.
11
12
13
14
15          AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25
```

137 (Pages 542 to 545)