Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| IN RE: XARELTO (Rivaroxaban) PRODUCTS LIABILITY LITIGATION | MDL 2592 Section L JUDGE ELDON E. FALLON MAG. JUDGE MICHAEL B. NORTH |

* * * * * * * * * * * * * * * * * * * * * * * *

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

VIDEOTAPED EXPERT DEPOSITION

OF

CINDY A. LEISSINGER, M.D.

Taken on Tuesday, November 15, 2016

Commencing at 9:09 a.m.

At

THE LAMBERT LAW FIRM

701 Magazine Street

New Orleans, Louisiana

Protected - Subject to Further Protective Review

---

**Page 2**

```
 1   APPEARANCES:
 2
 3   ATTORNEYS FOR PLAINTIFFS
 4
 5   LEVIN PAPANTONIO THOMAS MITCHELL
     RAFFERTY PROCTOR, P.A.
 6   316 South Baylen Street, Suite 600
     Pensacola, Florida  32502
 7   850.435.7000
     nmcwilliams@levinlaw.com
 8   BY:  NED MCWILLIAMS, ESQ.
 9
10   THE LAMBERT FIRM
     701 Magazine Street
11   New Orleans, Louisiana 70130
     504.581.1750
12   ejeffcott@thelambertfirm.com
     BY:  EMILY C. JEFFCOTT, ESQ.
13
14   DOUGLAS & LONDON
     59 Maiden Lane, Sixth Floor
15   New York, New York  10038
     212.566-7500
16   lsay@douglasandlondon.com
     BY:  LARA J. SAY, ESQ.
17
18   ATTORNEYS FOR DEFENDANT BAYER
19
20   KAYE SCHOLER, LLP
     1999 Avenue of the Stars,
21   Suite 1600
     Los Angeles, California  90067-6048
22   310.788.1278
     pamela.yates@kayescholer.com
23   bert.slonim@kayescholer.com
     BY:  PAMELA J. YATES, ESQ.
24        BERT L. SLONIM, ESQ.
25
```

**Page 3**

```
 1   APPEARANCES (CONTINUED):
 2
 3   ATTORNEYS FOR DEFENDANT JANSSEN
 4
 5   VENABLE LLP
     750 East Pratt Street
 6   Suite 900
     Baltimore, Maryland 21202
 7   410.244.7655
     jmccauley@venable.com
 8   BY: JOHN A. MCCAULEY, ESQ.
 9
10   ATTORNEYS FOR DEFENDANT JANSSEN
11
12   BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
     909 Poydras Street
13   24th Floor
     New Orleans, Louisiana 70112
14   504.589.9733
     rsarver@barrassousdin.com
15   msharko@barrassousdin.com
     BY: RICHARD E. SARVER, ESQ.
16       MADISON A. SHARKO, ESQ.
17
18   VIDEOTAPED BY:
     MARK ANCALADE
19
20   REPORTED BY:
     Marybeth E. Muir, CCR, RPR
21   Certified Court Reporter
     In and for the State of
22   Louisiana and Registered
     Professional Reporter
23
24
25
```

**Page 4**

```
 1   * * * * * * * * * * * * * * * * * * * * * * * *
 2
             I N D E X
 3                                 Page
     Caption                         1
 4
     Appearances                    2-3
 5
     Stipulation                     7
 6
     Examination
 7   Ms. Yates                       9
     Mr. McCauley                  324
 8   Mr. McWilliams               351
 9
     Reporter's Certificate        354
10
11
             EXHIBITS
12
13   Exhibit No. 1  Defendants' Notice with
                    Subpoena Duces Tecum of
14                  Oral Videotaped Deposition
                    of Cindy A. Leissinger, MD    15
15   Exhibit No. 2  Defendants' Amended Notice
                    with Subpoena Duces Tecum
16                  of Oral Videotaped Deposition
                    of Cindy A. Leissinger, MD    18
17
18   Exhibit No. 3  Invoices, 10/31/16, 9/30/16   19
                    and 8/31/16
19
     Exhibit No. 4  Curriculum Vitae              21
20   Exhibit No. 5  Expert Report of Cindy A.
                    Leissinger, M.D., 10/14/16    35
21   Exhibit No. 6  List of additional materials
                    relied upon                   36
22
     Exhibit No. 7  Heparin-Calibrated
23                  Chromogenic Anti-Xa Activity
                    Measurements in Patients
24                  Receiving Rivaroxaban: Can
                    This Test Be Used to Quantify
25                  Drug Level?                  150
```

**Page 5**

```
 1           EXHIBITS
     Exhibit No. 8  Dabigatran With or Without
 2                  Concomitant Aspirin Compared
                    With Warfarin Alone in
 3                  Patients With Nonvalvular
                    Atrial Fibrillation
 4                  (PETRO study)                199
 5   Exhibit No. 9  Apixaban Exposure and Anti-Xa
                    Activity in Nonvalvular Atrial
 6                  Fibrillation Patients: An
                    Application of Population
 7                  PK/PD Analysis               202
 8   Exhibit No. 10 Randomised, parallel-group,
                    multicentre, multinational
 9                  phase 2 study comparing
                    edoxaban, an oral factor Xa
10                  inhibitor, with warfarin for
                    stroke prevention in patients
11                  with atrial fibrillation     204
12   Exhibit No. 11 Clinical pharmacokinetic and
                    pharmacodynamic profile of
13                  rivaroxaban                  212
14   Exhibit No. 12 Clinical Pharmacology Review,
                    1/5/11                       246
15
     Exhibit No. 13 EMA concludes defective device
16                  in ROCKET study does not impact
                    Xarelto's safety, 5/2/16     271
17
     Exhibit No. 14 FDA analyses conclude that
18                  Xarelto clinical trial results
                    were not affected by faulty
19                  monitoring device, 10/11/2016 272
20   Exhibit No. 15 New analyses of point-of-care
                    monitoring in ROCKET AF trial
21                  published                    275
22   Exhibit No. 16 Xarelto Prescribing
                    Information                  297
23
     Exhibit No. 17 Center for Drug Evaluation
24                  and Research, Application
                    Number: 202439Orig1s000
25                  Medical Review(s)            308
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

| | |
|---|---|
| Page 6 | Page 8 |

Page 6

1
EXHIBITS
2
Exhibit No. 18  Collaborative Development
3                and License Agreement by
                 and between Bayer
4                Healthcare AG and
                 Ortho-McNeil
5                Pharmaceutical, Inc.,
                 dated as of October 1, 2005   325
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1     THE VIDEOGRAPHER:  We're now on the record.
2  My name is Mark Ancalade, the videographer
3  with Golkow Technologies.  Today's date is
4  November the 15th, 2016, at the time
5  indicated on the video screen, which is
6  9:09.  Today's deposition is being held at
7  701 Magazine Street, New Orleans, Louisiana,
8  taken in the matter of Xarelto (rivaroxaban)
9  Products Liability Litigation, being heard
10 before the United States District Court,
11 Eastern District of Louisiana.
12    Today's deponent is Dr. Cindy A.
13 Leissinger.  The court reporter is
14 Ms. Marybeth Muir, and we're also with
15 Golkow Technologies.
16    I would ask that counsel please state
17 their names for the record, which thereafter
18 would the court reporter please swear in the
19 witness.
20 MR. MCWILLIAMS:  Ned McWilliams on behalf of
21 the plaintiffs.
22 MS. SAY:  Lara Say on behalf of the
23 plaintiffs.
24 MS. JEFFCOTT: Emily Jeffcott on behalf of
25 the plaintiffs.

Page 7

1        S T I P U L A T I O N
2        It is stipulated and agreed by and between
3  Counsel that the testimony of the witness, CINDY
4  A. LEISSINGER, M.D., is hereby being taken pursuant
5  to Notice under the Federal Rules of Civil Procedure
6  for all purposes permitted under law.
7        The witness waives the right to read and
8  sign the deposition. The original is to be delivered
9  to and retained by PAMELA J. YATES, ESQUIRE, for
10 proper filing with the Clerk of Court.
11       All objections, except those as to the form
12 of the questions and/or responsiveness of the
13 answers, are reserved until the time of the trial of
14 this cause.
15
16
17
18
19
20
21
22
23
24
25

Page 9

1     MS. YATES:  Pamela Yates on behalf of Bayer.
2     MR. SLONIM:  Bert Slonim on behalf of Bayer.
3     MR. MCCAULEY:  John McCauley on behalf of
4  Janssen.
5     MS. SHARKO:  Madison Sharko on behalf of
6  Janssen.
7     MR. SARVER:  Richard Sarver on behalf of
8  Janssen.
9     MS. YATES:  Now, if I have to nudge you,
10 we're in real trouble here.
11       CINDY A. LEISSINGER, M.D.,
12       1020 Philip Street, New Orleans,
13       Louisiana 70130, having been first
14       duly sworn, testified as follows:
15 EXAMINATION
16 BY MS. YATES:
17    Q.  Good morning, Doctor.  I introduced myself
18 off the record before we got started.  My name is
19 Pamela Yates, and I'm here representing Bayer.
20       Would you state your full name and your
21 business address, please.
22    A.  Cindy Anne Leissinger. My business address
23 is 1430 Tulane Avenue, New Orleans 70112.
24    Q.  And you're a medical doctor; is that
25 correct?

3  (Pages 6 to 9)

Protected - Subject to Further Protective Review

Page 10

1     A. I am.
2     Q. And what sort of doctor?
3     A. I am trained in internal medicine, and then
4   further trained in hematology and medical oncology,
5   and I currently maintain board certification in
6   hematology.
7     Q. Have you ever had your deposition taken
8   before?
9     A. I have.
10     Q. Now, we have in your report that you've not
11   had any depositions in the last four years; is that
12   correct?
13     A. That's correct.
14     Q. So how many times have you had your
15   deposition taken?
16     A. Probably I would say a total of five or six
17   depositions --
18     Q. And --
19     A. -- in my career.
20     Q. I'm sorry?
21     A. In my career.
22     Q. So, I assume you know the basic ground
23   rules for a deposition, that everything is
24   being taken down that we say. We try not to talk
25   over each other. If you don't understand a

Page 11

1   question, please tell me that you don't understand
2   so I can rephrase it.
3     A. Okay.
4     Q. And verbal responses, as opposed to nods
5   or shakes of the head or "uh-huhs." Yes?
6     A. Yes.
7     Q. Okay.
8      What sort of cases -- what sort of cases
9   were your depositions taken in? Were they medical
10   malpractice? Were they involving medicines? Can
11   you briefly describe?
12     A. Yes. The -- the depositions that I can
13   recall, a couple of them were testimonies where I
14   was subpoenaed to give testimony in medical
15   malpractice cases. There was also one in which I
16   gave a deposition related to my service on a medical
17   review panel. I'm not sure if there -- any further
18   explanation, medical review panels, but I understand
19   that's something maybe a little bit unique to
20   Louisiana and medical malpractice cases, and I do
21   occasionally serve on medical review panels.
22     Q. But that is tied to possible malpractice by
23   a doctor?
24     A. That is correct.
25     Q. Have you ever testified about a medicine

Page 12

1   causing harm to a patient in a case such -- such as
2   the one you're testifying to here?
3     A. Not -- not in any similarity to this.
4     Q. The medical malpractice or medical review
5   panel cases, did they involve inappropriate -- or
6   claims of inappropriate prescribing of medicines?
7     A. Yes, they did.
8     Q. Did they all?
9     A. Well, I've only been subpoenaed on one of
10   the medical review -- for my service on one medical
11   review panel, and that one did involve the use of a
12   drug in a cancer patient and the question as to
13   whether it was an appropriate use or not or led to
14   increased side effects or not.
15     Q. Have any -- has any of your prior deposition
16   testimony involved the prescription of
17   anticoagulants?
18     A. No.
19     Q. And by that, I mean not only the new oral
20   anticoagulants, but also warfarin, Coumadin, or the
21   heparin family.
22     A. No. I cannot recall any involving
23   anticoagulants.
24     Q. Do you remember the medicine involved in the
25   case with the cancer patient?

Page 13

1     A. I do. And I'm straining a little bit
2   because it's been a number of years. I believe it
3   was the drug Herceptin, which is used in some breast
4   cancer patients and can have some -- and can
5   certainly have some toxicities.
6     Q. And is there a reason why you haven't given
7   any depositions in the last four years?
8     A. I've not been subpoenaed to any in the last
9   four years.
10     Q. And you have not been asked to be an expert
11   on behalf of any other doctors during those four
12   years?
13     A. That's correct. I am occasionally
14   approached to be an expert. I almost uniformly turn
15   those down.
16     Q. When you testified in these or were
17   subpoenaed in these medical review panel or medical
18   malpractice cases, were you testifying typically
19   against the doctor who was alleged to have
20   committed malpractice or for the doctor or was it
21   an equal divide?
22      MR. MCWILLIAMS: Object to form.
23     A. As I recall, the case that I was called
24   to -- that I was subpoenaed for, my service on
25   the medical review panel, as I recall, the medical

Protected - Subject to Further Protective Review

Page 14

1  review panel was concerned about certain aspects
2  of the prescription of that particular drug for
3  that particular patient, and we stated so on the
4  document that came out of that.
5      Later, I learned and was then subpoenaed to
6  testify because the physician and -- so the patient
7  wanted to proceed with the malpractice case, and the
8  malpractice case actually did ultimately go to
9  court.  And so I was subpoenaed as a member of the
10 medical review panel to testify in a deposition.  I
11 also was subpoenaed to go to court in that case.
12     I -- I gave my opinion about the case, about
13 the concerns that I had as a member of the medical
14 review panel.  But also when testifying in a -- in a
15 broader, you know, kind of exposure to details about
16 the case, and we learned more about the case that we
17 did in the deposition and in court, I think that
18 my -- you know, my final opinion was that it was --
19 it was a -- it was a very sick patient with very
20 advanced cancer, and it was -- the issue was did
21 the -- was the patient aware of the risk that she
22 was taking in using this particular drug when there
23 was really very little option -- there was no other
24 options for her except going to hospice.
25     The patient did choose to take the drug.

Page 15

1  She did have a side effect from that drug and later
2  passed away due to other reasons that may have been
3  somewhat impacted by the side effect of the drug.
4  The family was suing the physician for the
5  administration of that drug to that patient at that
6  time.
7      In the broader scope of information that
8  came to light, it was clear to me that the patient
9  had accepted the risk of taking the drug.
10     When we looked at the materials provided to
11 the medical review panel, there was insufficient
12 information to know whether the patient had been
13 completely advised of the risks of taking the drug.
14 Q.  So -- and that's important, Doctor, right,
15 because you may form an opinion based upon a subset
16 of materials, but that opinion can change when you
17 actually see the full picture?
18 A.  That's correct.
19 Q.  And it sounds as if that might be what
20 happened in that particular case?
21 A.  That's correct.
22 Q.  Doctor, were you shown a -- what we call a
23 notice of deposition that had a document request?
24 Let me hand you what I've marked as Exhibit No. 1.
25     (Whereupon Exhibit No. 1, Defendants' Notice

Page 16

1      with Subpoena Duces Tecum of Oral Videotaped
2      Deposition of Cindy A. Leissinger, M.D., was
3      marked for identification.)
4  Q.  Have you seen that before?
5  A.  No, I have not seen this before.
6  Q.  Were you aware that certain materials were
7  requested, if you turn to Page 3 and 4?
8  A.  No.
9  Q.  Would you take a quick look at that list and
10 tell me if you think you have at least provided to
11 the plaintiff lawyers materials that are responsive
12 to those requests.
13 A.  Okay.  Can I just go through them one at a
14 time?  Current CV was provided a while ago, so
15 "current" being interpretable, I suppose.  Time
16 records, certainly I have submitted invoices.  I
17 think so.  I don't quite understand what No. 3 is.
18     All documents reviewed, referred to or
19 relied upon in arriving -- yes.  Photographs,
20 graphic reproductions, I don't have any of those.
21 I mean, I would say on the whole I believe that I
22 have provided to the attorneys I've worked with
23 these documents.  Some of this is describing things
24 in detail that I may not entirely understand.
25     You say, "The witness's complete file in

Page 17

1  connection with the witness's investigation and
2  evaluation of the issues involved in this" -- I
3  mean, all I can say is that the attorneys that I've
4  worked with certainly have a list and -- and I think
5  actual copies of all of the materials that I
6  reviewed for my report.
7  Q.  And then there was an amended notice of
8  deposition with a document request yesterday.  I
9  take it you have also not seen that?
10 MR. MCWILLIAMS:  Object to form.  Is that
11 different than Exhibit 1?
12 MS. YATES:  Yeah.  There was an amended
13 notice yesterday.
14 MR. MCWILLIAMS:  Is Exhibit 1 not the
15 amended notice?
16 MR. MCCAULEY:  It is the amended exhibit --
17 MS. YATES:  So I'm going off Exhibit A, I'm
18 sorry.  So I'm going off the original
19 because it was served while I was on a plane
20 coming here, so now there is an amended one
21 that includes additional categories.
22 MR. MCCAULEY:  Pam, here's --
23 MR. MCWILLIAMS:  Oh, I see what you're
24 saying.
25 MS. YATES:  Sorry, yes.

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1      MR. MCWILLIAMS:  That's what happens when I
2  don't take you up on your offer for a copy
3  of your exhibit.  I apologize.
4      MS. YATES:  And I had assumed that it was
5  just the new categories instead of a full
6  amendment.
7      (Whereupon Exhibit No. 2, Defendants'
8  Amended Notice with Subpoena Duces Tecum of
9  Oral Videotaped Deposition of Cindy A.
10  Leissinger, MD, was marked for
11  identification.)
12  BY MS. YATES:
13  Q.  Okay.
14      Doctor, I'm going to hand you what's marked
15  as Exhibit 2, which is the amended notice.
16      MR. MCWILLIAMS:  I learned my lesson.  Thank
17  you.
18  BY MS. YATES:
19  Q.  And you'll see that that contains some
20  additional categories of documents.  Can you just
21  quickly do what you just did and tell me if you have
22  produced the file of materials to the lawyers that
23  you are relying on and have reviewed in this matter?
24  A.  Yes.
25  Q.  Do you intend in your testimony to rely on

Page 19

1  specific information relating to any of your
2  patients?
3  A.  No.
4  Q.  Doctor, this morning I was handed three
5  separate pages that appear to be invoices dated
6  8/31, 9/30, and 10/31, 2016, and I will mark these
7  as Exhibit 3.
8      (Whereupon Exhibit No. 3, Invoices,
9  10/31/16, 9/30/16, and 8/31/16, was
10  marked for identification.)
11  Q.  And I don't have a clip.
12      MR. MCWILLIAMS:  Here is a paper clip if you
13  need one.
14      MS. YATES:  Thank you.
15  BY MS. YATES:
16  Q.  Would you take a look at those,
17  Dr. Leissinger, and just tell me if those are, in
18  fact, the invoices that you have submitted so far in
19  this matter?
20  A.  Yes, they are.
21  Q.  Have they been paid?
22  A.  Uhmm, yes, they have been paid.
23  Q.  Do you have any other outstanding invoices
24  that have not yet been submitted?
25  A.  I apologize.  I think Invoice No. 3 has not

Page 20

1  been paid, but Invoices 1 and 2 have been paid,
2  yeah, to be honest.
3  Q.  And -- but in addition to those three, do
4  you have any other invoices that have not yet been
5  submitted?
6  A.  No.
7  Q.  Can you estimate for me any additional time
8  beyond the time indicated on those three invoices
9  that you have spent on this matter?
10  A.  So my pattern is to submit an invoice at the
11  end of the month for work done during that month.
12  During this month there will be additional hours,
13  probably up till now for this month, November, 10
14  hours, 12 hours.  I have it.  I keep a log, but...
15  Q.  Who first contacted you to ask you to be an
16  expert?
17  A.  An attorney named Marc Whitehead.
18  Q.  And did you know Marc Whitehead?
19  A.  No, I did not.
20  Q.  And do you remember when this was?
21  A.  Uhmm, I don't remember precisely.  I believe
22  it was sometime in 2014.  That's my recollection.
23  I'm sorry, 2015.  This is -- I think it was 2015.
24  Q.  And at some point did you meet with
25  Mr. Whitehead or other plaintiff lawyers?

Page 21

1  A.  Yes, I did.
2  Q.  And who -- who else have you met with?
3  A.  My recollection is the first meeting I
4  had was with Marc Whitehead, and I believe Ned
5  McWilliams was there.  I don't recall anyone else at
6  that initial meeting, and that meeting has probably
7  been over a year ago.
8  Q.  Other than Mr. Whitehead and Mr. McWilliams,
9  have you met with other plaintiff lawyers?
10  A.  Ms. Lara Say.
11  Q.  Anyone else?
12  A.  Yes.  Roger Denton.
13  Q.  I was going to say, nobody can forget Roger.
14  A.  I remembered Roger.
15  Q.  All right.  We'll come back to that.
16      Doctor, you also provided a copy of your CV,
17  and I will mark that as Exhibit 4.
18      (Whereupon Exhibit No. 4, a Curriculum
19  Vitae, was marked for identification.)
20  Q.  It is the one that you produced.
21  A.  Golly, this one is much heavier weighted
22  than what my CVs usually are.  I think you printed
23  it on nice heavy stock.
24  Q.  Somehow my team decided to print on the
25  shiny paper that I think just makes the box

Protected - Subject to Further Protective Review

Page 22

1   weigh twice as much.
2       A. Yes, I'm sure of that.
3       Q. Just take a quick look, Doctor. Is that
4   CV current?
5       A. Uhmm, for the most part. It is dated 2015
6   and was likely provided by me last year, but there
7   haven't been substantial changes. Certainly my
8   clinical position remains the same. My academic
9   positions remain the same.
10      Q. Any -- so are there any updates, as you sit
11  here today, any updates that you would make?
12      A. Uhmm, there are updates that have been made.
13  You know, there are a few more publications, I think
14  a couple of abstracts that would go in the
15  bibliography. I think -- as I said, I don't believe
16  there are any really substantial -- substantial
17  changes to this.
18      Q. Are any of the publications or abstracts, do
19  any of them relate to anticoagulants?
20      A. I do not believe so. Let me just -- most of
21  my work, as you can see from my CV, has to do with
22  treating patients with bleeding disorders and
23  hemophilia, and I do think -- I have done -- I have
24  worked in a group that's done some work with
25  predicting clots in patients with hemophilia. That

Page 23

1   one I think was published this year. It did not
2   involve -- it was a -- it was a study trying to
3   determine the incidence of clots in patients with
4   hemophilia who undergo orthopedic procedures of the
5   lower extremities. It did not make recommendations
6   or it was not an interventional study, a drug
7   interventional study at all.
8       Q. But in terms of any updates or new
9   publications and abstracts that are not on that CV,
10  do any of those publications or abstracts involve
11  anticoagulants?
12      A. No. Only the -- the only one that I've
13  published that has to do with clotting at all is the
14  one that I just spoke about, and it's not listed on
15  here. It was published this year in 2016.
16      Q. And where was that published?
17      A. I am sorry, I do not recall the journal. My
18  recollection is -- I'm just one of a group of
19  authors. I'm not the first author. I was not the
20  one that submitted it directly to the journal. My
21  recollection is it was -- it went to a couple of
22  different journals before it was accepted, and I
23  do not recall which one was the final acceptance.
24      Q. Doctor, your CV accurately describes your
25  medical training and experience?

Page 24

1       A. Yes, it does.
2       Q. Can you describe for us briefly the nature
3   of your clinical practice? You've already referred
4   to treatment of bleeding disorders and hemophilia.
5   Is that the primary focus of your medical practice?
6           MR. MCWILLIAMS: Object to form.
7       A. It is certainly a focus of my medical
8   practice. I also care for -- as I describe in the
9   report, I also care for patients who have clotting
10  disorders. We have what's called the Center for
11  Bleeding and Clotting Disorders. I'm the medical
12  director of that center. As such, in my clinics
13  I see -- I see patients who have both bleeding
14  disorders, platelet disorders, and clotting
15  disorders.
16      Q. When you say your focus, though, is
17  hemophilia and bleeding disorders, how much -- what
18  percentage of your clinical practice is that focus?
19      A. I would say that if, you know, I averaged it
20  out, probably about 60 percent is hemophilia and
21  related blood disorders, about 40 percent thrombotic
22  disorders.
23      Q. And approximately how many patients do you
24  have in your clinical practice?
25      A. I would say, giving an estimate, of course,

Page 25

1   probably around 500, 600.
2       Q. And you obviously have an -- academic
3   positions as well?
4       A. I do.
5       Q. Can you divide for us the time you spend
6   on your academic side and your clinical practice
7   side?
8       A. Probably about 40 percent or so of my time
9   is spent on the clinical side. There's also some
10  time that's spent in research, which may very much
11  involve patients, because I do clinical research,
12  so that research may be actually carried out in my
13  interactions with patients. And that probably
14  accounts for another 25 percent of my time.
15  Teaching is about I'd say 10 to 15 percent of my
16  time, and the rest is administration.
17      Q. Doctor, you are not a cardiologist?
18      A. I am not.
19      Q. And do you agree that the condition atrial
20  fibrillation is treated mainly by cardiologists?
21      A. I agree.
22      Q. Do you have patients within your practice
23  that you treat who have been diagnosed with atrial
24  fibrillation?
25      A. I do.

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1    Q. But am I correct that you are not primarily
2  treating them for that condition?
3        MR. MCWILLIAMS:  Object to form.
4    A. There are some patients that I care for that
5  have cardiac disorders, including atrial
6  fibrillation, and they are seeing me for other and
7  often either bleeding or clotting disorders, and I
8  do work with the cardiologist and make
9  recommendations regarding their anticoagulation.
10   Q. The actual underlying medical condition of
11  atrial fibrillation, their cardiologist is primarily
12  response -- primarily responsible for?
13       MR. MCWILLIAMS:  Object to form.
14   A. I would say if they were getting an
15  intervention done, you know, to disrupt atrial
16  fibrillation, et cetera, of course, that would be
17  handled by cardiology, and in, you know, those
18  select patients that I take care of their
19  anticoagulant requirements and recommendations, I
20  would be involved in that.
21   Q. And do you prescribe anticoagulants for
22  patients with atrial fibrillation?
23   A. I do prescribe anticoagulants to patients
24  who have atrial fibrillation, but generally they
25  also have other clotting disorders as well.  So a

Page 27

1  patient who develops new atrial fibrillation would
2  not come to see me primarily to be placed on an
3  anticoagulant.
4    Q. And that's the -- I guess I'm being very
5  inarticulate, but that's what I'm trying to figure
6  out.  Let's see if I can break it down.
7        Obviously there are patients who are
8  diagnosed with atrial fibrillation.  They are under
9  the care of the cardiologist.  That type of patient
10  wouldn't make it to your patient population unless
11  they had some other either clotting disorder or
12  bleeding disorder; is that fair?
13   A. That's a fair statement.
14   Q. And so for a patient who -- who only has
15  atrial fibrillation without other clotting
16  disorders or hemophilia, you would not be their
17  primary physician?
18   A. That's correct.
19   Q. You said you conduct clinical research in
20  addition to treating patients.  What type of
21  clinical research?
22   A. The main focus of my research, my clinical
23  research, has been treating patients with hemophilia
24  and using various clotting factor products, studies
25  to try to prevent bleeding in those patients,

Page 28

1  studies to find the best treatment for bleeding in
2  those patients.
3    Q. Has any of your research involved atrial
4  fibrillation?
5    A. No.
6    Q. And what about anticoagulants?
7        MR. MCWILLIAMS:  Object to form.
8    A. Just thinking back over, I've participated
9  in many, many clinical trials over the years.  I
10  do not specifically recall an anticoagulant trial
11  that I was heavily involved in.
12   Q. And when you say "not heavily involved
13  in" --
14   A. I'm trying to remember if -- yeah, and it
15  seems like maybe years ago, you know, our center
16  participated but, you know, I really don't -- I
17  couldn't give you any details about that.
18       So, I mean, functionally the answer is no,
19  certainly not in many years, and I don't actively
20  seek out clinical trials or studies that relate to
21  anticoagulation.
22   Q. The articles and book chapters that you've
23  authored, none of those concern atrial fibrillation?
24   A. Correct.
25   Q. And you've not published anything on

Page 29

1  Xarelto?
2    A. That is correct.
3    Q. Have you published anything on any of the
4  new oral anticoagulants?
5    A. Uhmm, no, I have not.
6    Q. And going forward, if I refer to them as
7  NOACs --
8    A. That's fine, or DOACs, whichever you --
9    Q. Or DOACs, right, direct oral anti-
10  coagulants or new or formerly novel oral anti-
11  coagulants, you'll know what I'm talking about?
12   A. Yes, I will.
13   Q. Which states are you licensed to practice
14  medicine in?
15   A. Louisiana.
16   Q. Ever been licensed in any others?
17   A. No.
18   Q. On Page 8 of your CV, it says you are a
19  principal investigator for multiple pharmaceutical
20  companies.
21       MR. MCWILLIAMS:  Page 8?
22       MS. YATES:  Yes.
23   A. Page 6 on my copy.
24   Q. You're right.  I'm sorry, I can't read my
25  own writing.  Page 6.

Protected - Subject to Further Protective Review

Page 30

1    A. But that is correct, I am.
2    Q. Okay.
3       Is that -- well, without giving away
4    anything confidential, can you name the
5    pharmaceutical companies for which you are
6    currently or -- strike that.
7       I note the time description is 2013 to 2014?
8    A. That has not been updated, but that
9    statement is still true in 2016.
10   Q. All right.
11      So it should now read 2013 to present?
12   A. Or 2015 to '16 -- you know, our academic
13   year is '15 to '16, July 1 to June 30th, so much of
14   what I might state in here would be an academic
15   year, but yes.
16   Q. Okay.
17   A. So we're now in '16/'17, I guess.
18   Q. Okay.
19      So it says, "Institutional principal
20   investigator for numerous industry-sponsored
21   clinical trials." Which pharmaceutical companies
22   are you or have you been from 2013 a principal
23   investigator for?
24   A. Uhmm, numerous. Ones that come to mind
25   right off the bat are CSL Behring. I participated

Page 31

1    in a trial of a new modified clotting factor aid to
2    treat hemophilia. Roche, we've participated in a
3    trial that is investigating a new -- a new sort of
4    conceptual product that may be useful to treat
5    patients who have bleeding disorders, primarily
6    hemophilia A and complications of hemophilia A.
7       Also in that period, I believe that was a
8    period during which we had Biogen -- a Biogen study
9    open for also a factor VIII product for hemophilia.
10      I believe we also during that period had a
11   Baxter -- formerly it's a company now known as
12   Shire, but at the time we had a product made by
13   Baxter that we were also studying, and it was also
14   a hemophilia-related product.
15   Q. So it sounds to me as if the research that
16   you are involved in as a principal investigator has
17   primarily focused on hemophilia?
18   A. Yes, that's correct.
19   Q. Have you worked or are you working on any
20   factor Xa trials?
21   A. I am not.
22   Q. Never been an employee of a pharmaceutical
23   company?
24   A. Never been an employee.
25   Q. Not been involved in the manufacture or

Page 32

1    testing or marketing of a pharmaceutical product?
2    A. I have not.
3    Q. I take it, then, that you would not be an
4    expert in those areas of manufacture, testing and
5    marketing of pharmaceutical products?
6       MR. MCWILLIAMS: Object to form.
7    A. I certainly don't consider myself an expert
8    in marketing, and less -- I mean, in manufacturing
9    certainly, particularly with hemophilia products. I
10   do serve as a consultant for some industry sources
11   that produce clotting factor products and serve
12   on -- in an advisory capacity, so would have some,
13   you know, expertise or experience, I would say, in
14   manufacture in that regard.
15   Q. "In that regard" being hemophilia medicines?
16   A. Clotting factor --
17      MR. MCWILLIAMS: Object to form.
18   A. Clotting factor products. Products that
19   affect the hemostatic system.
20   Q. Right. No expertise in the manufacture of
21   NOACs?
22      MR. MCWILLIAMS: Object to form.
23   A. Correct.
24   Q. And no expertise in the testing of NOACs?
25      MR. MCWILLIAMS: Object to form.

Page 33

1    A. I -- I don't personally do testing. I have
2    not personally been involved in clinical testing of
3    NOACs. I do certainly understand the kind of
4    principles that are related to that.
5    Q. And the principles you're referring to are
6    clinical trials?
7    A. Clinical trials, yes, as well as
8    preclinical studies that would lead to clinical
9    trials.
10   Q. And your experience, that has related to
11   hemophilia-related products, not NOACs?
12   A. My direct experience, but certainly, you
13   know, as a person who deals with disorders of the
14   coagulation system, I mean, it's imperative for me
15   to keep up and, you know, maintain working knowledge
16   of -- of trials. I mean, I certainly use
17   anticoagulants, and while I'm not directly involved
18   in the clinical trials of those, I certainly have to
19   and, you know, it's, you know, my obligation to keep
20   up with how they are developed and how they are
21   studied and -- because I will be prescribing those
22   drugs.
23   Q. Doctor, as you sit here today, are you
24   saying that you are an expert in the conducting and
25   design of clinical trials as it relates to NOACs?

9 (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1           MR. MCWILLIAMS: Object to form. Asked
2       and answered.
3           A.  I would certainly -- I would certainly put
4   forth that I have some expertise in the design of
5   clinical trials, having designed some
6   multi-institutional clinical trials.  None
7   specifically related to anticoagulants, but related
8   to procoagulants, yes, absolutely I have done that,
9   and as such, have designed clinical trials and
10  participated in trials that impact the hemostatic
11  system, not specifically anticoagulants to answer
12  your question.
13          Q.  So my question was specifically with regard
14  to conducting and design of clinical trials relating
15  to anticoagulants.  Doctor, you have not done that,
16  you do not have expertise in that specific area,
17  correct?
18          MR. MCWILLIAMS: Objection to form.  Asked
19      and answered with respect to expertise.
20          A.  I have not done that.
21          Q.  Your experience has been in the procoagulant
22  arena?
23          A.  That is correct.
24          Q.  You're not an expert on FDA regulations as
25  it relates to testing, manufacture, or marketing

Page 35

1   of prescription drugs, correct?
2           MR. MCWILLIAMS: Object to form.
3           A.  I -- I've -- I don't claim any expertise --
4   particular expertise with FDA and how -- you know,
5   how they assess a drug.
6           Q.  Doctor, let's go ahead and mark your report
7   as Exhibit 5.
8           (Whereupon Exhibit No. 5, Expert Report of
9       Cindy A. Leissinger, M.D., 10/14/16, was
10      marked for identification.)
11          MS. YATES:  Does anyone else want a copy?
12          MR. MCCAULEY:  I've got one.  Thank you.
13  BY MS. YATES:
14          Q.  Doctor, is what I've handed you as
15  Exhibit 5, is that a copy of your general expert
16  report prepared in the Xarelto product liability
17  litigation?
18          A.  It appears to be.
19          Q.  And I'm -- I'm distinguishing here.  Do you
20  understand that we're here today to talk to you
21  about this report, Exhibit 5, and that there will be
22  another deposition on your opinions specifically
23  related to Mr. Boudreaux?
24          A.  Yes, I do understand that.
25          Q.  All right.

Page 36

1           And this report marked as Exhibit 5 has a
2   copy of your CV attached, and it also has a list of
3   materials that you have relied on, reviewed and/or
4   considered, and it's Appendix A.  Would you take a
5   look at that list, Doctor?
6           A.  Yes, those look familiar.  I think that's
7   an -- an accurate list of the literature that we
8   reviewed prior to the production of the report.
9           (Whereupon Exhibit No. 6, List of additional
10      materials relied upon, was marked for
11      identification.)
12          Q.  And then this morning I was handed a
13  document that I've marked as Exhibit 6, and I was
14  advised by counsel that those are additional
15  materials that you have relied on, reviewed and/or
16  considered; is that correct?
17          A.  Yes, that's correct.
18          Q.  All right.
19          Focusing on Exhibit 6 for a moment, do you
20  know why they weren't included in the Appendix A to
21  your report?
22          A.  These are additional references, studies,
23  publications, et cetera, that I wanted to take
24  a look at, that as I prepared for this deposition
25  and reviewed my original report, again, reviewing

Page 37

1   the references and delving into the references
2   that go -- that are behind this report, some of
3   which, as you know, numbered to 400 pages --
4   nearly 400 pages, but there were -- as I reviewed
5   and spent time reviewing those, there were
6   additional studies I had questions about, some of
7   the comments maybe made in an FDA report or some
8   other report, that I wanted to see what the basis
9   was, and so that led to additional literature
10  search, additional publications and reports.  And I
11  think this list, it looks like a fair -- I don't see
12  any -- everything I believe that I reviewed in addi-
13  tion is on this list.  I don't recall anything else.
14          Q.  Okay.
15          So I'm clear, Doctor, the materials listed
16  in Exhibit 6 you reviewed after you had prepared
17  your report?
18          A.  Uhmm, yes, with the -- you know, with the
19  understanding that much of what is -- so -- so in
20  scientific literature, I know everybody knows this,
21  but often things are reported sequentially, so there
22  are -- so much of what's in these reports is also in
23  subsequent reports that I did review.  So -- but
24  being kind of a, you know, kind of a person that
25  sort of likes to see all of the in-between the lines

Protected - Subject to Further Protective Review

Page 38

1    and the "thes" and "ands," I did want to go back and
2    review, but largely it was based on report -- the
3    carrying forward of data or information in these
4    reports into later publications that are referenced
5    in here.
6        Q.  Right.
7        A.  That's what led me -- I guess to say that is
8    what led me to those.
9        Q.  So, for example, your report is Exhibit 5,
10   and Appendix A lists the materials you relied on,
11   reviewed and/or considered in actually preparing
12   your report, correct?
13       A.  Yes.  Let me just see -- this includes --
14   does this include the FDA materials, other
15   documents?  I believe it does.  Yes.  So it does
16   look -- it does look like it includes those things
17   that are referenced in my report.
18       Q.  And then as you -- strike that.
19           After you had prepared your report based on
20   these materials, you went back and you started
21   looking and you requested additional materials, and
22   those additional materials are Exhibit 6?
23           MR. MCWILLIAMS:  Object to form.
24       A.  Yes, they are.
25       Q.  And perhaps some of them were referenced

Page 39

1    within these materials, and now you wanted to dig a
2    little deeper and get a more complete picture?
3        A.  I did.
4        Q.  All right.
5            And it's important to get that complete
6    picture, isn't it, Doctor, when you're offering
7    opinions about a medicine and the science?
8            MR. MCWILLIAMS:  Object to form.
9        A.  Certainly the more information one has, the
10   better.  I mean, there's no denying that.
11       Q.  Right.
12       A.  I mean, I guess too, you know, I did say I
13   reserve the right to supplement my opinions and, you
14   know, I feel strongly about that.
15       Q.  Right.
16           So let's turn to your report -- well, no,
17   let's -- strike that.
18           Let's stay with Exhibit 5 for a moment,
19   Doctor.  How were those materials selected as
20   materials that you reviewed, relied on, and/or
21   considered?
22       A.  A variety of ways.  Some of those were
23   related to literature searches that I did.  Some
24   of those were related to materials provided by the
25   attorneys, particularly materials referencing FDA

Page 40

1    meetings and reports, you know, specific reports
2    such as the -- what comes to mind are the PK/PD
3    report I think on Xarelto.  I mean, there were some
4    materials that were provided to me to review.
5        Q.  Can you identify for us which materials,
6    which literature you found based on your own search
7    or searches?
8        A.  I would hesitate to remember specifically --
9    of the, you know, 30 or so articles here, I -- I
10   would hesitate to try to pick out those that -- that
11   I specifically found as opposed to those I may have
12   asked for.  In some cases I also asked for
13   literature because, you know, I can't obtain it
14   online, and so I don't -- I would hesitate to go
15   through and pick apart these publications.
16       Q.  Can you --
17       A.  Certainly all of the internal documents that
18   are listed here were provided to me.  The clinical
19   study report, uhmm, and the other documents were all
20   provided to me.
21       Q.  Can you remember any search terms that you
22   used when you did your literature searches?
23       A.  Uhmm, I -- certainly rivaroxaban.
24       Q.  That would be a very broad search, wouldn't
25   it, Doctor?

Page 41

1        A.  It would be a broad search, depending on
2    what -- what I was looking for, but, you know, it
3    may have been -- I've done -- so I mean, just to
4    clarify, and perhaps this is quite standard among
5    physicians that you talk to, but I do literature
6    searches virtually every day related to what I'm
7    doing in my practice and what I'm doing in my
8    research.  So I do PubMed searches, you know, pretty
9    much without thinking.
10           But to clarify, I would say I had particular
11   interest in pharmacokinetics, pharmacodynamics, so
12   likely -- I guess I'm just trying to present a
13   little background -- likely my searches would have
14   said something like "rivaroxaban pharmacokinetics,"
15   "rivaroxaban pharmacodynamics."
16       Q.  Why did you have an interest in
17   pharmacokinetics and pharmacodynamics of
18   rivaroxaban?
19       A.  Well.
20       Q.  Let me back up.  You're a clinician, right?
21       A.  Yes, I am.
22       Q.  You're not a pharmacokineticist?
23       A.  Well, as a clinician who prescribes drugs,
24   I deal in that -- you know, indirectly deal with
25   pharmacokinetics/dynamics all the time.  I am not a

11 (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

1    pharmacologist.  I'm a medical doctor obviously.
2        Q.  Right.  Now, I keep hearing from you
3    "indirectly involved."  My questions are quite
4    simple:  You're not an expert in pharmacokinetics?
5    You don't hold yourself out to the world as somebody
6    who has a pharmacology degree and studies and
7    researches in the area of pharmacokinetics; is that
8    fair?
9        MR. MCWILLIAMS:  Object to form.  And,
10       Doctor, feel free to answer the questions
11       however you feel fit.
12       A.  Well, I mean, I certainly have conducted
13   studies of pharmacokinetics and pharmacodynamics.  I
14   have been a clinical investigator on trials of drugs
15   where we did study that.  So I do have experience
16   and expertise in pharmacokinetics and
17   pharmacodynamics.  I also, as I said, have -- have
18   an interest in this as it relates to how I
19   prescribe for my patients.
20       If I could maybe expand a little bit, you
21   asked me I think specifically why I would be
22   interested in rivaroxaban, Xarelto, and
23   pharmacokinetics, and one reason is, of course,
24   because of my preparation of this report and so much
25   is -- and there's so many points that I wanted to

Page 43

1    make that are dependent on that.
2        I will also tell you that from my clinical
3    experience coming into this experience of working
4    with attorneys on the Xarelto litigation, prior to
5    that time I have had, you know, some concerns about
6    uses of Xarelto and failures of Xarelto that I see
7    in my clinical practice.
8        So there are reasons why I'm interested in
9    how this drug is absorbed and how it works and, you
10   know, how much information we have about it.
11       Does that answer your question?
12       Q.  At this point, Doctor, I don't even remember
13   what my question was.
14       So let's -- you are licensed in internal
15   medicine, right?
16       A.  I am.
17       Q.  And subspecialty --
18       A.  I'm board certified, I guess I would say.
19       Q.  I'm sorry.
20       A.  Licensed to practice medicine, but board
21   certified in internal medicine.
22       Q.  Right.  Do you have any degree in
23   pharmacology?
24       A.  I do not.
25       Q.  Have you ever held yourself out to your

Page 44

1    colleagues at Tulane or otherwise that you are a
2    pharmacokineticist?
3        A.  Pam, the best that I can tell you is that I
4    have -- I don't know what you call an expert.  I
5    have given talks on pharmacokinetics of various
6    drugs.  You know, I have done that.  I have
7    experience in pharmacokinetics of drugs.  I have not
8    done any clinical trials or specific studies of the
9    pharmacokinetics of Xarelto.  But I have a deep
10   interest in this and that you asked me why I would
11   have searched the literature for this, and I guess
12   I'm trying to explain.  I am not a pharmacologist.
13   I am not, you know, an expert pharmacologist.  I
14   don't claim to be, but as someone who has conducted
15   studies that involve pharmacokinetics, you know, any
16   new drugs that we're involved in studies, often
17   there is a pharmacokinetic component to that,
18   pharmacodynamic component.  Studies that I've
19   designed I have put pharmacodynamic components to
20   those studies.
21       Q.  Sure.  And that would be the, what,
22   Phase I, Phase II, sometimes as a component in
23   Phase III clinical trials?
24       A.  Yes.  A clinical trial that -- that we
25   conducted a few years back was a Phase III trial,

Page 45

1    but had pharmacodynamic components to it that we
2    designed into the trial.
3        Q.  And you have an interest, you said, because
4    you want to know the PK/PD aspects sometimes for
5    your patients, fair?
6        A.  Fair.  I would perhaps restate it a little
7    bit and say my real concern is why do I see failures
8    of Xarelto?  And -- and to answer that question, you
9    know, we -- we have to get back to the -- the
10   pharmacokinetic properties of the drug.
11       If -- if a patient is failing, is it because
12   they are not absorbing, it or are they failing it
13   because they're on some end of a pharmacokinetic
14   curve where they may not -- where they may be
15   absorbing it, but it is not -- it's not an adequate
16   concentration.
17       Q.  When you say "failing on Xarelto," what do
18   you mean?
19       A.  In my practice, as I mentioned in my report,
20   I see patients who have -- typically, the patients I
21   see are referred to me because they have complex
22   clotting problems, so of the -- talking about the
23   percentage of patients I have that have clotting
24   problems.
25       And so those patients are typically referred

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1    to me because they have very complex thromboses, or
2    they have many other comorbidities that complicate
3    trying to treat their thromboses and anticoagulate
4    them.
5        I also have seen a somewhat steady stream of
6    referrals of patients who have failed Xarelto in the
7    sense that they have had clotting while taking
8    Xarelto.
9        Q. And have you seen -- I assume in your
10   medical practice you have seen patients fail on
11   other anticoagulants?
12       A. I have at times. This -- this has struck me
13   for a while as being a little bit out of what I
14   would have expected with the -- with a new -- with
15   the introduction of a new drug and not a large
16   population of patients that I -- you know, I would
17   think that as that drug has been taken up since its
18   approval, that the numbers of patients on -- on this
19   drug are probably not the same.
20       And I think we know -- I mean, I do think
21   it's true that if you look across the US, there are
22   still more patients, you know, very likely on, say,
23   warfarin, oral anticoagulant, than on Xarelto.
24       But the cases that I have most often been
25   asked to comment on, consult on, or deal with are

Page 47

1    patients who have failed on Xarelto. I do
2    occasionally get asked to see a patient who has
3    failed warfarin, as well, by having clotting.
4        Q. And other NOACs?
5        A. I don't recall seeing failures at this point
6    of dabigatran or -- or apixaban. I just don't
7    recall. Maybe I have, but I don't recall it.
8        Q. So when you say -- when you're talking about
9    failures, patients failing on Xarelto, you are
10   talking about patients who developed a clot while
11   taking Xarelto?
12       A. That's correct.
13       Q. You're not talking about patients who were
14   bleeding while on Xarelto?
15       A. That's correct.
16       Q. Because bleeding is a potential side effect
17   of all anticoagulants, right?
18       A. Absolutely. Absolutely.
19       Q. So would one way of saying it be that the
20   failures you have seen in your complex patient
21   population that there is a lack of efficacy of the
22   drug? It's not protecting them from clotting?
23       A. There's apparent lack of efficacy. If a
24   patient clots while on an anticoagulant, right, I
25   would deem that a lack of efficacy.

Page 48

1        Q. You're not seeing patients referred to you
2    because of a lack of safety due to a bleeding risk?
3        A. Very rarely, I'm asked to see a patient
4    like that. But -- but quite the -- but
5    you're right. My biggest concern, and that
6    which patients are most often referred to me, in
7    terms of some failure of an anticoagulant, is
8    because of clotting.
9        Q. Have you seen failure on heparin?
10       A. Yes.
11       Q. So you've seen failures on heparin,
12   warfarin, Xarelto, and I think you said occasionally
13   or rarely the other NOACs?
14       A. Yes.
15          MR. MCWILLIAMS: Object to form. Misstates
16   her testimony.
17   BY MS. YATES:
18       Q. Did that misstate your testimony, Doctor?
19       A. I -- I think what I said is I don't recall
20   seeing failures of apixaban or -- or dabigatran.
21   The -- the -- whether I've seen those or not, I just
22   don't recall those. I do recall having patients
23   referred who have failed rivaroxaban.
24       Q. I apologize. I thought you said rarely
25   if -- at most.

Page 49

1        A. I don't recall seeing any failures of those.
2        Q. Fair enough. So let -- let me clear it up.
3        You've seen failures on warfarin, Coumadin,
4    heparin, and Xarelto?
5        A. Yes.
6        Q. And the failures that you're talking about
7    in your -- I believe you described it as a complex
8    patient population with complex disorders, is a lack
9    of protection against stroke. It is not related to
10   the bleeding aspect?
11          MR. MCWILLIAMS: Object to form.
12       A. So that's not quite accurate. So let me
13   make sure that we're both not getting a little lost
14   in this.
15       But the patients that I have seen, although
16   the majority of my thrombosis patients are very
17   complex patients, I have also seen relatively
18   straightforward cases of, you know, middle-aged
19   patients who have had, you know, perhaps, you know,
20   a straightforward DVT, who have failed Xarelto by,
21   you know, having a PE or something -- or something
22   like that. I'm giving you some examples. I can't
23   remember, you know, particular specifics. But I
24   have seen and -- and deemed that I have seen
25   patients that I -- I believed and -- and diagnosed

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1   as failures of Xarelto.
2       I have also seen -- and those patients may
3   have been complicated, or they may have been fairly
4   straightforward.  They were sent to me because they
5   failed a -- an approved anticoagulant.
6       I have, throughout my career, of course,
7   seen failures of other anticoagulants, as well, yes.
8       Q.  How many Xarelto patients have you seen
9   where you've concluded they failed due to a lack of
10  efficacy?
11      A.  I could not tell you a number.  I would say,
12  you know, probably over the last year and a half or
13  so, two years, possibly eight to ten.  That's --
14  and, again, I want to be very clear because I'm
15  under oath.  I mean, I -- I can't give you an exact
16  number.
17      Q.  No.  I understand.
18      A.  I'm giving you an estimate.
19      Q.  Right, Doctor.  You know, I mean, you're
20  giving me an estimate.
21      A.  I'm just giving you an estimate.
22      Q.  And do you know, out of your total patient
23  population -- I think you said 500 to 600 patients.
24  Do you know how many patients are on Xarelto?
25      A.  In my patient population, not many, because

Page 51

1   I have had concerns about Xarelto.  So, again, these
2   are generally people referred to me who have failed.
3       Q.  So your answer to that is not many out of
4   the 500 to 600?
5       A.  No.  I think that would be, like, a
6   denominator of how many patients do I take care of
7   who are on Xarelto.  I -- I have not initiated
8   Xarelto in any of my thrombosis patients.
9       I do take care of -- I -- I do take care of
10  patients who are referred to me who are on Xarelto.
11  So I do have a population of patients who are on
12  Xarelto.  Again, the exact number of that -- that
13  denominator population, I -- I don't know.
14      Q.  Because your patient population comes to
15  you -- some of them are already on Xarelto when
16  prescribed by other doctors?
17      A.  Yes.
18      Q.  Including their cardiologist for atrial
19  fibrillation?
20      A.  That's correct.
21      Q.  Are you saying you take those patients off
22  Xarelto when they are referred to you?
23      A.  I have done.
24      Q.  Have you done so because they're having
25  problems with the medicine, or you just take them

Page 52

1   off?
2       A.  No.  I don't make it -- it is not a
3   universal decision to take everyone off Xarelto.  I
4   have taken off patients who I deemed had particular
5   bleeding risks, because with Xarelto, there -- you
6   know, obviously no way to monitor, no way to assess
7   whether they are at high risk for bleeding, and
8   there's, perhaps just as importantly, no reversal
9   agent.
10      So I have, you know, had elderly patients
11  who were at risk of falling and had other bleeding
12  risks, who I strongly recommended that they come off
13  of Xarelto.
14      Q.  If they're on it as prescribed by their
15  cardiologist for atrial fibrillation, do you -- do
16  you recommend that they go back and talk to the
17  doctor who prescribed it, or you just tell
18  them --
19      A.  I communicate with the doctor.  Oh, yes,
20  right.  I certainly don't stop a drug that another
21  doctor has a patient on.  That would spark
22  communication.
23      Q.  It would also spark incredible risk to the
24  patient, right, because they would not be protected
25  when the patient stops the drug with no replacement?

Page 53

1       A.  Oh, we would never do that.
2       Q.  Right.
3       A.  Never.
4       Q.  Right.
5       So you -- you recommend to their
6   cardiologist that they come off?  You talk to the
7   doctor, right?  You just don't --
8       A.  I do.
9       Q.  You don't tell the patient, "I don't like
10  Xarelto, stop taking it"?
11      A.  I -- I tell the patient that there are --
12  what the risks are of continuing with the Xarelto.
13  And I -- I discuss those risks with them.  And, you
14  know, if the -- if the patient says, "Absolutely
15  not.  I love this drug.  I won't come off of it,"
16  you know, I have -- I have done what -- what I am
17  obliged to do, and that is to give them my opinion
18  about the risks of the drug that they're on.  So I
19  will have done that.
20      But, you know, most of the time the patient
21  is -- you know, wants -- you know, does want to
22  discuss what other options are available and what
23  options I feel would be less dangerous, what options
24  would be more safe for them and for their particular
25  situation.

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1    I would then -- if the patient is in
2  agreement, I would then call the doctor prescribing
3  the drug, whether it's a cardiologist or primary
4  care doctor or whoever, and we would have a further
5  discussion.  If the decision is made for the patient
6  to convert to something else, then we -- we'll have
7  a plan to do that safely so that the patient does
8  not interrupt anticoagulation, which would be -- as
9  you state, would be a terrible idea and proven by
10  the -- proven by the ROCKET study when -- when
11  Xarelto was discontinued at the end of the study.
12  So -- so, yeah.  No, we would never do that.
13    Q.  Okay.
14      When you talk to patients about coming off
15  Xarelto due to bleeding risk, what other treatment
16  options do you offer?
17    A.  So the -- the -- the options that we most
18  frequently talk about is going to warfarin with a
19  home monitor.  I have a fairly significant
20  population of patients who are doing very, very well
21  on warfarin with the use of a -- of a home
22  monitoring device.  That's one option.
23      We have other patients who may use
24  fondaparinux or low-molecular weight heparins.  It
25  just depends.  It really just depends on other

Page 55

1  comorbidities or other preferences, other -- you
2  know, mainly, I would say driven by comorbidities
3  and how one can handle these various things.
4    Q.  Do you offer them other NOACs?
5    A.  For some patients who have failed Xarelto,
6  meaning that they have clotted on Xarelto, I will
7  give -- again, given sort of the profile of the
8  patient, I may discuss apixaban as an alternative,
9  if -- if other alternatives, you know, do not seem
10  to be appropriate.
11      And, again, it's what we do as physicians,
12  right?  I mean, we discuss treatment options with
13  our patients, the pros and the cons of each.
14    Q.  And it's nice to have those options, isn't
15  it, Doctor?
16    A.  It's very nice to have those options.  Yes,
17  it is.
18    Q.  Have you ever had a patient come to you and
19  not understand that there's a bleeding risk of being
20  on any anticoagulant?
21      MR. MCWILLIAMS:  Object to form.
22    A.  I have certainly thought that or that
23  perhaps they don't understand the gravity of that.
24  I think that's true.  I think patients are generally
25  informed about blood thinners, because, in fact,

Page 56

1  that's what we talk about with maybe patients who
2  are a little bit less sophisticated.  We call them
3  blood thinners.  And so I think -- you know, I think
4  even less sophisticated patients do understand that
5  there is a risk of bleeding.  I would say I do have
6  concerns that some patients may not fully understand
7  or appreciate the risk.
8    Q.  And that's probably true with just about any
9  drug, right, Doctor?
10    A.  It's -- I would say that that's probably
11  true, you know, although I would go even a little
12  farther and say that the side effects of blood
13  thinners or anticoagulants are particularly serious,
14  you know; whereas side effects of maybe, you know,
15  some drugs that may have headaches or, you know, GI
16  upset, et cetera, may be less significant.
17      So this is a drug that has very -- a very
18  significant side effect, and -- and I do feel that
19  patients -- and, again, I'll just kind of get back
20  to this.  A patient who is on three other drugs,
21  they take a blood pressure pill and a -- and a --
22  you know, a diabetes pill or whatever, may view it's
23  just another pill.  And, yes, there are side
24  effects, and, yes, my blood is a little thin, but
25  may not appreciate what I perceive as the depth of

Page 57

1  the risk; that these risks can be catastrophic, and
2  that in the case of some of these drugs, we have no
3  reversal agent.
4      So if and when this happens, we cannot stop
5  it necessarily or we will not -- we don't have a
6  guaranteed way to stop the bleeding.  If you're
7  bleeding into your brain, it's a particularly
8  serious consequence.  That risk increases as
9  patients are older and have comorbidities.
10      And so, yes, I do feel that perhaps the
11  extent of the risk is not always appreciated.
12    Q.  And that brings into play the importance of
13  the physician/patient relationship and discuss --
14  discussing the risks and the benefits of any
15  medicine, including anticoagulants that are very
16  serious medicines?
17    A.  I would agree.
18    Q.  Because the protection that is afforded the
19  patient from taking an anticoagulant is also very
20  significant, right?
21      MR. MCWILLIAMS:  Object to form.
22    A.  Correct.
23  BY MS. YATES:
24    Q.  We're trying to protect against stroke,
25  blood clot, very serious, possibly life-ending, if

15 (Pages 54 to 57)

Protected - Subject to Further Protective Review

Page 58

1    not life-altering, events, fair?
2        A.  That is correct.
3            MS. YATES:  We've been going just about an
4        hour.  I am happy to keep going.  How are
5        you doing?
6            THE WITNESS:  I'm good.
7            MR. MCWILLIAMS:  Do you want to take a
8        phone call?
9            THE WITNESS:  I think maybe, you know, in
10       15 or 20 minutes we could, or...
11           MS. YATES:  I've got news for you.  The most
12       important person in this room is actually
13       this court reporter lady who is taking down
14       everything, and I have a request for a
15       break.  So we'll take a ten-minute break.
16           THE VIDEOGRAPHER:  This is the end of
17       Tape 1, and we are now off the record.
18           THE COURT REPORTER:  The time is what, Mark?
19       10:16?
20           THE VIDEOGRAPHER:  10:16.
21           (Recess.)
22           THE VIDEOGRAPHER:  This is the beginning
23       of Tape 2.  We are now back on the record,
24       and the time is 10:31.
25       BY MS. YATES:

Page 59

1        Q.  Doctor, a couple of follow-ups from what we
2    talked about earlier.  I'd asked you a question
3    about whether patients who were referred to you who
4    experienced a bleed while on Xarelto, whether you
5    switched them to other NOACs.  And I think your
6    answer related to patients who develop clots.
7        So let me ask the question:  When patients
8    are referred to you for bleeding disorders,
9    hemophilia, your patient population who are on
10   Xarelto, who experience a bleed, do you switch them
11   to other NOACs?
12       A.  I absolutely would.  I'm sorry.  Let me
13   restate.  Not to other NOACs.  It's very unlikely
14   that I would switch someone who has had a bleed or
15   recommend switching someone who has had a bleed to
16   another unmonitorable or unreversible agent.
17       Q.  And you said that maybe you've had eight to
18   ten, your estimate, patients who have, quote,
19   failed Xarelto due to them developing clots while
20   on the medicine, and that you couldn't come up with
21   any patients that were on other NOACs who'd failed.
22       Do you have any idea of the percentage of
23   use of Xarelto versus other NOACs in the community
24   of patients that's referred to you?
25       A.  I believe it's -- I believe that the -- you

Page 60

1    know, thinking of the -- those three, and I don't
2    even count edoxaban because I -- I don't know of
3    anybody that's using that.  But I would say in the
4    last two years of patients that -- just my
5    familiarity in general with, you know, patients that
6    we see in the hospital or patients sent to my
7    clinic, of those on NOACs, I would say the majority
8    are on Xarelto with an increasing number now, I'm
9    starting to see, on apixaban.
10       So -- but, you know, if I go back two years
11   ago, I would say probably the vast majority -- I
12   mean, I'm just kind of estimating here -- maybe
13   80 percent were on Xarelto and 20 percent on
14   dabigatran.  And now I would say we're seeing more
15   on apixaban, but still, I would say the majority --
16   I would still say more than 50 percent, it's just
17   my -- it's just my gut feeling or observation, I
18   guess you'd say, would be on Xarelto.
19       Q.  And, Doctor, I asked you some questions
20   about PK/PD.  And when we're referring there,
21   we're talking about pharmacokinetics/
22   pharmacodynamics.  You're okay with PK/PD?
23       A.  Yes.
24       Q.  And you said, you know, you have an interest
25   in PK/PD.  And I want to know your interest -- when

Page 61

1    you started to specifically look at the Xarelto
2    PK/PD data, the studies, was that after you met with
3    the lawyers?
4        A.  Very likely.  I mean, the most time that
5    I've been able to spend in -- excuse me --
6    researching Xarelto has been since this has been
7    brought to my attention a couple of years ago or a
8    year -- what, a year and a half ago, whatever it's
9    been now.
10       Q.  All right.
11       Can you point to any PK/PD studies or data
12   that you had looked at before you met with the
13   lawyers on Xarelto?
14       A.  While I cannot point specifically to
15   anything, I -- I do attend many meetings and
16   conferences where novel oral anticoagulants have
17   been talked about for years.
18       And so to be perfectly honest, I mean,
19   through the years I have seen, in presentations, in
20   conferences where I've been, information presented
21   about the various developments in -- in novel oral
22   anticoagulants and seen presentations on, you know,
23   pharmacokinetics.
24       So to -- you know, to be honest about it,
25   have I specifically gone into the literature

16 (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1    myself?  No.  But I have seen those presentations.
2        Q.  Right.  And -- and my question, to be fair,
3    was:  I wanted to know, before you met with the
4    lawyers, had you specifically looked at the
5    literature on the PK and PD for Xarelto?
6        A.  Only in context of these various meetings
7    where, you know, we would sit and discuss these
8    things.
9        Q.  All right.
10       Let's set aside the conferences where
11   presentations are made, maybe abstracts, et cetera,
12   et cetera, had you, before you met with the lawyers,
13   researched any of the PK/PD data for Xarelto?
14       A.  No.
15       Q.  Doctor, your report, I think, is marked as
16   Exhibit 5.  Do you have that front of you?
17       A.  I do.
18       Q.  By the way, did you bring any materials with
19   you here today?
20       A.  I did not.  Just got my report.  It's just
21   an identical copy, only not in color.
22       Q.  Okay.
23       Do you have any notes on the version you
24   brought today?
25       A.  I do not.

Page 63

1        Q.  Okay.
2        On Page No. 2 at the top, you say:  "I have
3    no prior testimony as an expert witness for the past
4    four years, and my fee schedule for this litigation
5    is $1,000."
6        We've gone through that, about your prior
7    testimony.  The thousand dollars, has that been your
8    fee for testifying in other matters before this one?
9        A.  Has that been my fee?  You know, it's been
10   so long.  I think my fee used to be -- I can
11   remember one -- one set of fees maybe from ten years
12   ago where I was asked, you know, as you said -- or
13   asked to testify.  I think it was a thousand dollars
14   for a court appearance or a deposition and maybe
15   500, 600 -- I can't remember exactly -- for other
16   legal work.
17       Q.  How did you decide on a thousand dollars per
18   hour for this litigation?
19       A.  Honestly?
20       Q.  Yes, honestly.
21       A.  The most precious thing I have is time, and
22   I don't have a lot of it.  And so, you know, my fee
23   was set on, you know, what -- what it would take for
24   me to give up what is most precious to me, which is
25   my time, my free time, to do this.

Page 64

1        Q.  Okay.
2        Beneath there it says, "Summary of
3    Opinions."  You say:  "The following opinions and
4    those expressed throughout the report are stated
5    to a reasonable degree of medical certainty."
6        Doctor, what does "reasonable degree of
7    medical certainty" mean to you?
8        A.  To me, it means that any physician in my
9    position would find this to be -- these opinions to
10   be reasonable.
11       Q.  Does that mean more probable than not?
12       A.  Yes.
13       Q.  Or possible?
14       A.  Yes.
15       Q.  Had you heard that standard before you
16   included it in your report?
17       A.  Yeah.  I mean, I've heard that.
18   Reasonable -- reasonable degree of medical
19   certainty, yeah, I've encountered that before.
20       Q.  And I take it you would agree with me
21   that the interpretation of reasonable depends upon
22   the materials that are reviewed and relied on in
23   making that assessment?
24       A.  Yes, absolutely.
25       Q.  So if you were to see additional materials

Page 65

1    that dispute some of your opinions, your opinions
2    may become unreasonable once you see the full
3    evidence?
4        MR. MCWILLIAMS:  Object to form.
5        A.  Again, you know, I'm -- I'm -- I know what I
6    have reviewed.  I know the literature that I have
7    looked at.  I have not selected out anything or --
8    or refused to consider anything that I have found in
9    my searches of the literature.
10       However, having said that, of course, you
11   know, information, especially obtained in a
12   scientific manner, yeah, absolutely.  I mean, we
13   would want to look at everything.
14   BY MS. YATES:
15       Q.  Okay.
16       And, Doctor, if we go back to -- actually,
17   the bottom of Page No. 1, and you go through your
18   methodology.  You go through and identify that
19   you've attached materials as Appendix A and in
20   addition:  "I've also relied on my background,
21   education, training, clinical experience, and
22   applied the same method of review and analysis as I
23   use in my clinical/academic practice."
24       First of all, did I read that correctly?
25       A.  I believe you did.

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    Q.  What methodology of review and analysis do
2  you use in your clinical practice?
3    A.  So -- I'm sorry.  I'm trying to think about
4  how to condense all of the things I think about
5  as -- as ways that I access and interpret
6  information.  And they're -- you know, as you can
7  imagine, that is a very -- you know, there is a very
8  broad availability of information that we -- that --
9  that all of us, as practitioners and particularly as
10  subspecialists in our -- in our field, that -- that
11  we have to review, keep current with, et cetera.
12    So you're asking me -- the method of review
13  is, you know, methods that I learned as a -- you
14  know, as a medical student, as a -- as a scientist
15  in training.  I was at the NIH for several years.
16  Those are the -- you know the methods of how one
17  approaches information that's available, how one
18  obtains it, how one puts it together, and how one
19  interprets it, is -- I guess you'd say what I've
20  been trained to do, what physicians in my position
21  have been trained to do.
22    Q.  So -- well -- well, tell me.  What do you
23  do?  What method do you follow for review and
24  analysis in your clinical practice?
25    A.  Well, again, there is a topic, right, to

Page 67

1  be -- a topic to be explored.  And so given that
2  topic, I generally then go to the literature,
3  whether -- you know, so do literature searches.  I
4  may search textbooks, although -- you know, so
5  information in textbooks is not completely useless.
6  It's sometimes quite useful.
7    I search peer-reviewed publications.  I
8  search review articles on peer -- of peer-reviewed
9  publications.  I search for reviews that include
10  meta-analysis or, you know, in-depth analysis of
11  publications.
12    So, you know, again, I mean, I could go on
13  and on.  I mean, there's a -- there's a -- a lengthy
14  list of -- of ways that, you know, I search for
15  information; and then once I read and study that
16  information, put it together in a way that, you
17  know, I can best interpret what it means for the
18  topic at hand.
19    Q.  And let me ask you:  Does your method for
20  your academic practice differ in any way from the
21  method you just explained to me here for your
22  clinical practice?
23    A.  I would say it's the same process.  I guess
24  really, in a way, I consider -- I mean, I -- I say
25  that I have an academic practice.  So I -- the two

Page 68

1  are basically combined in my mind.
2    Q.  Right.  So same method?
3    MR. MCWILLIAMS:  Object to form.  Same
4  answer.
5  BY MS. YATES:
6    Q.  And let me see if I can break it down a
7  little bit.  But -- and if it's -- if it's too --
8  I'm a very simple person, but if I make it too
9  simple, I know that you will correct me.
10    But in forming a science- or
11  medicine-related opinion, an appropriate methodology
12  would be to review all of the relevant literature,
13  both pro and con, to assess it, to weigh it, and
14  reach a conclusion, fair?
15    A.  Yes.
16    Q.  Because a scientist or a medical doctor
17  shouldn't reach a conclusion based on reviewing just
18  one side of the story, right?
19    A.  So I would agree with you.  And I would, you
20  know, also say that in -- in good medical
21  literature, in well-designed studies, you know,
22  those are -- those are the things that we're looking
23  for.  That's why -- that is why we have a
24  scientific method and we have clinical -- you know,
25  designed clinical trials in order to answer those

Page 69

1  questions.
2    So, you know, again, we go to the
3  peer-reviewed literature.  And, I mean, you're
4  right.  We don't exclude, you know, when -- when
5  we're searching for literature on the -- on the
6  subject that we're dealing with, we don't, I guess,
7  a priori exclude something because it may take a
8  different opinion to -- to the -- the rest of the
9  literature.
10    Q.  Right.  Because if you only looked at one
11  side of the story, and you ignored science or data
12  to the contrary, that would be improper; that would
13  be a biased methodology, right, Doctor?
14    MR. MCWILLIAMS:  Object to form.
15    A.  If I could maybe rephrase that a little bit.
16    To ignore any valid scientific data would be
17  a disservice to our science and to our patients.
18  But -- I have forgetful disease, so I forgot what my
19  next point was going to be.  But -- but, anyway, so,
20  of course, we would not exclude anything that's
21  using the scientific method.
22    But I guess the point that I might be going
23  to make is the -- kind of the language used is that
24  there's two sides to a story.  I mean, I would
25  suggest that in very complex situations, it's not

18 (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1  that simple.  There are a -- a multitude of ways to
2  look at problems at hand, to look at the studies
3  that have been done.
4         Yes, we -- yes, we -- we need to critique
5  science.  I mean, so just because somebody designs a
6  trial doesn't -- doesn't mean that it's not subject
7  to being critiqued, but there's rarely a two side
8  to the story.
9     Q.  Yeah.  And I -- I promise you, I don't mean
10 to interrupt, but let me -- let me clarify
11 because --
12    A.  Okay.
13    Q.  -- I do have a limited time.
14       As I said, I simplify things too much.
15       No matter how many sides to a story, a good
16 scientist should consider and weigh all the data
17 that's relevant to the issue they're trying to
18 decide, and they should not discount immediately or
19 fail to look at parts of that data, fair?
20    MR. MCWILLIAMS:  Object to form.
21    A.  That's fair.
22    Q.  Because just finding science that supports
23 the conclusion that you've been asked to offer, that
24 would be biased, and I don't know if you're familiar
25 with the term "cherry picking," right?

Page 71

1     A.  Correct.
2     Q.  And that would not be a good methodology?
3     A.  Agreed.
4     Q.  And is it your testimony here today that for
5  each of your opinions, and I think you have 10 major
6  opinions, that you, in fact, followed the
7  methodology, the proper methodology that you have
8  identified, that you looked at all sides of the
9  literature, you weighed, you assessed it, before
10 reaching your conclusion for each of your opinions?
11    A.  I believe I did.
12    Q.  So, for example, you were provided some
13 internal company documents that I think you said
14 were provided by the lawyers.  It's listed on
15 Appendix A to your report, internal documents
16 and then also some FDA-related documents.
17       Let me start with the internal company
18 documents.  Do you know if you were provided the
19 full story relating to those documents?
20    MR. MCWILLIAMS:  Object to form.
21    A.  I only know what -- what I have in hand.
22    Q.  Right.  So you actually don't know whether
23 you were provided the full story as it relates to
24 those documents?
25    MR. MCWILLIAMS:  Object to form.

Page 72

1     A.  You know, I -- all I know is what I have in
2  hand.
3     Q.  So, for example, when you were getting
4  ready for your deposition after you prepared your
5  report, you saw some additional literature that was
6  provided to you as Exhibit 6, right, because you
7  wanted to see more.  Did you ask the lawyers for
8  any additional internal company documents?
9     A.  No.
10    Q.  You took what they gave you?
11    MR. MCWILLIAMS:  Object to the form.
12    A.  I did not ask for anything additional.  I
13 was more interested in the literature, and it
14 wasn't -- most of that was not in the sense provided
15 to me.  It was literature that I obtained.
16    Q.  You obtained or you asked the lawyers to
17 provide it to you based on a search you did?
18    A.  Yeah, or based on references that I wanted
19 to see, you know, so obviously papers reference
20 other articles.  That's often a way to chase back
21 issues of interest or issues that are not fully
22 explained in an -- in an article, and so, you know,
23 we go to the bibliography of that article and chase
24 down, you know, the references there.
25       There were a few of those articles that I

Page 73

1  did not have access to through my Tulane library,
2  and so I did ask them and they did provide an actual
3  copy of the article.
4     Q.  Let me ask you:  Before you met with the
5  lawyers, I think you said in 2015, did you have a
6  file of Xarelto literature or studies?
7     A.  I do.  I have files.  I'm very old-fashioned
8  and keep lots of files and interesting articles, and
9  I'm made fun of by my younger colleagues who don't
10 believe in paper anymore.  I have five filing
11 cabinets, and I do have files in there of just a
12 variety of topics related to thrombotic disorders,
13 new -- new drugs, et cetera.  I would not attest to,
14 you know, how thorough that -- that is.  I'm sure
15 there are many, many good articles that aren't in
16 my file, but those are articles of interest to me
17 that I encountered along the way.
18    Q.  My question was a little bit more specific:
19 Before you met with the lawyers, did you have a file
20 of Xarelto literature?
21    A.  Not a specific file just devoted to Xarelto.
22    Q.  Okay.
23       How did it work after you met with the
24 lawyers?  Did they provide you with your first batch
25 of literature, or did you go off and start searching

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1    the literature --
2        A. They --
3        Q. -- after you met with them?
4        A. They provided me with some things, and I
5    also searched.
6        Q. Okay.
7            And I'm just trying to get the sequence of
8    events.
9        A. Yeah, yeah.
10       Q. You meet with the lawyers, they provide you
11   some literature, and from that, you then do some
12   additional searches?
13       A. Well, I think after just discussing it with
14   the attorneys I was very interested, and I mean, I
15   think that I did some searching probably even before
16   I actually had the -- you know, again, I don't
17   remember exactly the sequence. But, no, I mean,
18   this was -- this was of great interest to me,
19   and uhmm, you know, most anything that's of
20   great interest to me scientifically or medically
21   will, as I said, spark a search. I can't tell you
22   how often I'm on PubMed.
23       Q. No. Doctor -- and I appreciate, I
24   understand your interest in various other things,
25   but my question is quite specific. I think you said

Page 75

1    you met with the lawyers. They provided you the
2    literature on Xarelto because you didn't have a file
3    on Xarelto, and from there, you then, because of
4    your interest, went on and did additional searches;
5    is that correct?
6        MR. MCWILLIAMS: Object to the form.
7        A. Again, my memory -- I mean, what I can tell
8    you is I think my first contact with Marc was a
9    telephone call, and I -- I and I don't recall him
10   sending me any particular literature at the time. I
11   think it was simply a telephone call. We discussed
12   some things. I don't remember really exactly what
13   we discussed, but I -- I believe that I did a quick
14   literature search at that time.
15           Did I spend hours and hours and hours doing
16   this? No, ma'am, I did not. But, again, to
17   actually answer your question about which came
18   first, I -- I don't really remember.
19       Q. Okay.
20           But at this point you at least have had a
21   conversation with one of the plaintiff lawyers,
22   which then may have triggered you to go do --
23       A. Yes.
24       Q. -- a literature search?
25       A. Yes, that is correct.

Page 76

1        Q. Should Xarelto be taken off the market?
2        A. It's a hard question to answer.
3        Q. Is it?
4        A. Uh-huh.
5        Q. Why?
6        A. Xarelto, the drug, is probably a very good
7    drug.
8        Q. It's saving patients' lives, isn't it,
9    Doctor?
10           MR. MCWILLIAMS: Let her finish her answer,
11   please.
12       A. I'm not -- I'm not done. It is probably a
13   good drug. I think the great disservice to the
14   community and to people who need a drug like
15   Xarelto, especially when, you know, it became
16   available as the first Xa inhibitor, there were just
17   a lot of reasons why that is a good direction for us
18   to move in as far as anticoagulation is concerned.
19           The great disservice is, in my opinion, the
20   way that it was not appropriately studied, the --
21   you know, again -- you know, I think that the drug,
22   if used properly, if we can figure out how to use it
23   properly, if we can figure out even a minimally
24   effective dose -- I cannot find that anywhere in
25   my search and maybe you have it and can show

Page 77

1    it to me. I cannot find anywhere where this drug
2    has been subjected to studies that identify even a
3    minimally effective dose, because we're talking
4    about a drug with a very narrow therapeutic index.
5    We are talking about a drug that interferes with
6    normal hemostasis.
7            So when we use this drug or drugs like this,
8    any anticoagulant, we are creating -- you are
9    creating an abnormality in a normal functioning
10   system in the body.
11           When a patient has atrial fibrillation, they
12   have a normal hemostatic system. When you treat
13   them with anticoagulation, you are giving them a
14   disorder of their hemostatic system. You are doing
15   that in an attempt to compensate for another
16   mechanism that's going on in their body that
17   promotes clotting. So you're basically giving them
18   one disorder to counterbalance another disorder.
19           When you do that, by definition, that means
20   the therapeutic index on that drug is negligible,
21   because with even a single dose, you are starting to
22   interrupt a normal functioning system.
23           My concern is not that -- and that's what we
24   do with any anticoagulant. It's not unique to
25   rivaroxaban. But, personally, my opinion is because

Protected - Subject to Further Protective Review

Page 78

1  of what you're ultimately doing in patients who have
2  atrial fibrillation, in that you are creating this
3  imbalance, you're creating an abnormality in the
4  hemostatic system, you -- I use "you" as a
5  manufacturer, as a company that is getting ready to
6  develop this drug for human use, I think there is a
7  tremendous ethical imperative to do this in a way
8  that you can bring this drug out in the safest form
9  possible and in a way that you can safely manage
10  patients, and, yes, reverse the effect when needed,
11  because any -- because we know that that is a risk
12  of any anticoagulant, there is a risk of bleeding.
13      I mean, this drug was released onto the
14  market with no way to reverse it, no proven way to
15  reverse it and with, you know, very little that I
16  can find, you know, studies that really try to
17  identify the best minimally most safe, effective
18  dose.  And that, therein, is my concern about this
19  drug.
20      Q.  So let me ask my question again:  Should it
21  be removed from the market?
22      A.  You know, that's a decision for the FDA to
23  make.  It should certainly be further studied in my
24  opinion.
25          If you're asking me if I'm the czar of the

Page 79

1  FDA and what should I do, I would certainly want to
2  consider stepping back on what patients can safely
3  take the drug -- I mean, again, there are lots
4  of -- this is not a simple answer because this is
5  not a simple problem, so there's layers to this.
6      But, basically, I think that further
7  studies need to be done to use this drug
8  effectively and safely, and whether it should be
9  taken off the market or put on a hiatus or look to
10  see, should we just be using it in certain really
11  good risk populations that have a very low incidence
12  of -- you know, likelihood of bleeding.
13      There are ways that -- there are ways that
14  smart people can come together and figure out how to
15  do this.  And so -- I mean, I'm certainly not
16  prepared to say it should be taken off the market,
17  but I do think serious consideration should be made
18  to modify -- to study and modify how we use it or
19  how we are told as physicians we can use it.
20      So, again, whether that involves a complete
21  hiatus, completely taken off the market for a period
22  of time, further study, I just know that the way
23  that it is currently licensed and used I think
24  constitutes a risk for many patients who are on it,
25  and a risk that's higher than the risk that we have

Page 80

1  with some of the other anticoagulants.
2      So in that sense, I think that Xarelto does
3  carry potentially more risk than other -- than other
4  therapies that are already on the market.
5      Q.  And when you say "other therapies already on
6  the market," are you including the other NOACs?
7      A.  So I am -- probably.  I think apixaban --
8  again, it's not as widely used.  We don't have as
9  much data on apixaban, but so far there are some
10  things about apixaban that to me favor it a little
11  bit now.  But I'm also talking about warfarin and
12  good patient control, good convenience with home
13  monitoring.
14      I mean, there are -- there are other ways
15  that we can anticoagulate patients safely and
16  effectively, and I -- you know, it is my opinion
17  that right now we do not and cannot, because we
18  don't have the data we need to do the same thing
19  with rivaroxaban.
20      Q.  Do you know how many patients worldwide have
21  taken Xarelto?
22      A.  I do not.
23      Q.  Millions?
24      A.  I doubt that at this point it's millions,
25  but probably in the hundred thousands -- I mean, you

Page 81

1  know, again, guessing -- I'm guessing, but...
2      Q.  So you have no idea?
3      A.  I know that it's many, but I don't have an
4  idea of the number.
5      Q.  All right.
6      Are you following the ongoing studies, the
7  real-world studies with Xarelto?
8      A.  I'm aware of some.
9      Q.  Would you say there's a lot of research
10  ongoing or just a few?
11      A.  I don't know.  I really don't know.
12      Q.  Have you discussed your opinion on Xarelto
13  with other doctors at Tulane?
14      A.  Yes.
15      Q.  Who?
16      A.  People I work with.  My other coagulation
17  folks at Tulane.  I work with Dr. Maissaa Janbain,
18  Dr. Tami Singleton, Dr. Marc Kahn.  We're the
19  group that does the most with hematology patients,
20  anticoagulant patients.
21      Q.  Have you expressed your views to doctors
22  outside of Tulane?
23      A.  Probably.
24      Q.  Have you published these views?
25      A.  No.

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

1    Q. Presented them at a public forum?
2    A. No, I have not.
3    Q. I think you said that we don't have as much
4  data on apixaban, but you're starting to favor it a
5  little bit. What about dabigatran? Should
6  dabigatran be removed from the market?
7    A. Where I practice or the patients I see, I
8  almost never see a patient on dabigatran. So,
9  again, I'm sure there are numbers available that
10 tell you how many people in the US are on
11 dabigatran. I effectively don't -- haven't for a
12 year or so seen anyone on dabigatran.
13    Do we need to take a deep breath and take a
14 hard look at all of these NOACs? Yes, we do. The
15 one thing that dabigatran has perhaps going for it
16 in a sense is we now have a reversal agent for it,
17 which we do not for the Xa inhibitors. I think
18 there's certainly one in the pipeline, and I think
19 that's important, but right now we don't have one
20 ready to hand, you know, to grab off the shelf when
21 a patient presents having a serious life-threatening
22 bleed. We do with dabigatran.
23    So should there be further analysis of --
24 you know, again, that at a regulatory level of all
25 of the NOACs? In my opinion, that wouldn't be a

Page 83

1  bad idea. But I'm really not here and not, you
2  know, sufficiently well versed in all of the
3  dabigatran literature to talk about dabigatran.
4    I will say about apixaban, as a Xa
5  inhibitor -- and dabigatran as well, but
6  particularly apixaban was studied and has been
7  released as a BID treatment, which makes a lot of
8  sense for a drug that has a half-life generally less
9  than 12 hours, right?
10    So when you look at Xarelto, the half-life
11 of Xarelto is -- the -- repeated through --
12 through all, you know, pharmacokinetic studies
13 is that in older populations that half-life goes up
14 to 13 hours, but is really nine to 13 hours, 10 to
15 13 hours, and in younger populations, much less,
16 six to nine hours.
17    So you're talking about groups of patients
18 who go on a drug, particularly on -- I'm kind of
19 segueing back to Xarelto. So if you have somebody
20 -- and it's apparent that within the sort of
21 normal, accepted range of half-life is six hours.
22 If you have somebody with a six-hour half-life,
23 you give them a drug that goes up to a maximum,
24 say 100 percent, in their blood at the time they
25 take it, by the time they're due for the next dose,

Page 84

1  you know, you're already down to like less than 10
2  percent of that drug in their system.
3    So, again, we've already talked about the
4  importance -- this is a narrow therapeutic -- this
5  drug has a narrow therapeutic index. You would want
6  to get the safest, most consistent levels of that
7  drug in a patient's body for the duration of
8  time that they are on it. Why would you, then,
9  want it to be a once-a-day drug where by design
10 you have a wide swing in what the concentration of
11 that drug is in the blood from a maximum peak all
12 the way down in many patients on this drug to less
13 than 10 percent of what it was in a drug that we
14 know has all of these problems?
15    So, you know, do we need a hiatus where we
16 think about how we're dosing it, where we study
17 it? I mean, we can't just -- you know, and I'm
18 certainly not sitting here and saying that I can
19 tell you how to fix Xarelto.
20    When you ask me, "Would you take it off
21 market?" I just think smart people need to come
22 together and think about how to make this drug more
23 safe and more effective than what it is.
24    Fundamentally, it inactivates --
25 activates -- it inhibits activated X. That's the

Page 85

1  same thing that apixaban and edoxaban, and who knows
2  what the whole pipeline is, that's what they do,
3  and these drugs are effective at doing that. We
4  just need to figure out how best to safely use them.
5  I don't think we figured that out yet, especially
6  with Xarelto.
7    Whether it's totally figured out with the
8  others, you know, is a debate for another group, but
9  this is what I feel about Xarelto.
10    Q. Doctor, I'm sorry, I do have a limited
11 amount of time. Do you remember my question?
12    A. No, ma'am.
13    Q. Okay.
14    So we need to try a little bit better on --
15 trust me, I will have follow-ups, but I have a
16 couple of pages of an answer there, and it was
17 actually whether you had the data on dabigatran was
18 my question, so --
19    A. I have a little bit of data -- I do have
20 some data on dabigatran.
21    Q. I need you to stay a little bit more
22 focused, if you don't mind. I don't mean to be
23 rude, but please understand, I'm on the clock, okay,
24 and I understand that you are quite interested in
25 this whole area.

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1        From a PK/PD aspect, does your inquiry about
2   the effectiveness of a drug end with the half-life?
3        A.  Oh, absolutely not.
4        Q.  Right.  That's the starting point, right?
5        A.  That's one of the important points.
6        Q.  Right.  And then you look to see, well, even
7   if the half-life is cleared in healthy young male
8   adults between five to nine hours, and more elderly,
9   11 to 13 hours, you actually also look to see how
10  long the effectiveness lasts, right?
11       A.  Correct.  But the effectiveness is indeed
12  tied directly to the concentration of this drug.  It
13  is a direct-acting anticoagulant.
14       Q.  Right.  So if the effect of the medicine
15  lasts longer than 24 hours, that is certainly part
16  of your consideration that goes into any dosing
17  decisions, right?
18       A.  That is correct.
19       Q.  Okay.
20           Do you know the PK/PD on Lovenox?
21       A.  Uhmm, I don't know that I could quote the
22  exact times, but Lovenox, you know, has about a
23  12-hour half-life as well.
24       Q.  And how long is its effectiveness?
25       A.  Probably more like 18 hours.

Page 87

1        Q.  Closer -- you think it's 18?
2        A.  Something like that.
3        Q.  You don't think it makes 24?
4        A.  I don't think it makes 24.
5        Q.  I don't see a section in your report on
6   criticizing once-a-day dosing, but now you've just
7   offered a new opinion here today that apparently you
8   have some criticism of Xarelto being once-a-day
9   dosing.  But there is -- you don't offer that in
10  your report, unless I missed it.
11           MR. MCWILLIAMS:  Is that a question?
12  BY MS. YATES:
13       Q.  Did I miss it?
14           MR. MCWILLIAMS:  Object to form.
15       A.  I'm checking as well whether I, you know,
16  specifically say that exact terminology.  I think I
17  talk about fixed dose, but I can see where -- I was
18  thinking once-a-day fixed dose, but maybe I didn't
19  say that specifically, and so you may, in fact, be
20  correct.  I don't know that I specifically say in
21  here a once-a-day dose.
22       Q.  And you do understand that when you prepared
23  this report, these are the opinions that you're
24  going to offer at the time of trial, right?
25       A.  Well --

Page 88

1           MR. MCWILLIAMS:  Object to form.
2        A.  -- that, and then I know that I said that I
3   can supplement those opinions as well.
4        Q.  Yeah, but you can't supplement it on the
5   morning of when I'm taking your deposition.  You
6   understand that's sandbagging, Doctor?
7           MR. MCWILLIAMS:  Object to form.
8        A.  Ma'am, I don't -- I don't know what that is,
9   but I'm answering the questions as best I can --
10       Q.  Okay.
11       A.  -- and with the knowledge that I have, and
12  so if you're asking me --
13           MR. MCWILLIAMS:  She discusses it at the
14           bottom of Page 5 of her report, I believe.
15       A.  So, again, I don't mean to sandbag, whatever
16  exactly that is, but I'm trying to give you my
17  honest answer.  I -- I am under oath.
18           MS. YATES:  I'm sorry, Ned.  Once-a-day
19           dosing on the bottom of Page 5?  She talks
20           about -- I have no problem -- narrow
21           therapeutic index and fixed dose, and we'll
22           get into fixed dose.  I have no problem with
23           any of that --
24           MR. MCWILLIAMS:  Fixed dose and the
25           predetermined intent, and then she cites to

Page 89

1   a document that I believe states that it was
2   the marketing plan to present a once-a-day
3   dosing medicine prior to any patient
4   actually being tested, but I think that's
5   probably good questions for her.
6           MS. YATES:  Yeah.
7   BY MS. YATES:
8        Q.  So let's go to the bottom of Page 5.  What
9   is that document that you refer to, Xarelto
10  BHCP, four zeros, 15914?
11       A.  I'm trying to find it.  Page 5, right?
12           MR. MCWILLIAMS:  Page 5.
13       A.  Okay.  Got it.
14       Q.  Right at the bottom.
15       A.  Yeah.  Uhmm --
16       Q.  What is that document?
17       A.  Well -- well, interestingly, that's a --
18  that's a document that is some sort of, I believe,
19  commercial agreement between -- I forget which two
20  companies.  I think it's Bayer and McNeil.  And
21  the -- in the end of that and in the appendix,
22  there is a marketing plan that's given in the
23  appendix.  The document is dated in mid to late
24  2005.
25           And in -- in the marketing -- the -- in that

23 (Pages 86 to 89)

Protected - Subject to Further Protective Review

Page 90

1    section that's listed as marketing, there is a
2    couple of statements that say -- I guess sort of
3    touting what the perceived marketing advantage will
4    be for this drug that's now being studied to be
5    brought to market, is that -- two things kind of
6    stand out in that introduction in -- in that
7    appendix.
8         And it is that, number one, we will have
9    a drug that doesn't need to be monitored.
10   Therefore -- I mean, the implication is giving it a
11   marketing advantage.  And we -- and we will
12   differentiate ourselves from other new oral
13   anticoagulants, which, at the time, I think it was
14   quite clear that the dose finding -- or the -- the
15   dose finding studies of other new oral
16   anticoagulants were largely on a BID dosing schedule
17   because of their half-life, because -- you know,
18   these half-lives of 12 hours or so.
19        And so -- so anyway, you asked me.
20   That's -- that's what that refers to.
21        Q.  Okay.
22        Do you know if the scientific program
23   developing Xarelto actually started as a BID
24   program?
25        A.  Yes, I absolutely know that it did.

Page 91

1         Q.  And at some point, for some indications, it
2    transitioned to once a day, correct?
3         A.  For some reason, in all indications it
4    transferred to once a day.
5         Q.  All indications once a day?
6         A.  Yes.
7         Q.  Okay.
8         Have you looked at the indications for the
9    DVT prevention treatment, the other indications?
10   You're sure it's once a day?
11        A.  No, ma'am.  I'm -- I'm referring to what's
12   been approved and what's in the label currently.
13        Q.  Okay.
14        All once a day?
15        A.  Yes.
16        Q.  Are you familiar that not in the US, but
17   another indication approved elsewhere in the world
18   for -- for acute coronary syndrome, that that's
19   actually twice a day?
20        A.  I -- I was aware that there were -- there
21   was intention to study it that way.
22        Q.  That's not my question.  Are you aware that
23   it's actually approved?
24        A.  No, I'm not.  Honestly, I am not aware of
25   what's approved in Europe or the Middle East or

Page 92

1    anywhere else.  What I'm aware of is what's approved
2    in this country.
3         Q.  Okay.
4         The approval in the United States, you will
5    agree with me that there are at least different
6    doses, right?
7         A.  For different indications, yes.
8         Q.  Okay.
9         Doctor, you're familiar with patient
10   compliance, right?
11        A.  Very much so.
12        Q.  Very important, right?
13        A.  Extremely.  No drug works if it's not taken.
14        Q.  You got it.
15        And particularly in medicines that are taken
16   to be long-term, patient compliance -- I mean, there
17   is data out there showing that a once-a-day drug has
18   much better compliance than a twice-a-day or
19   three-times-a-day drug, right?
20        A.  There is.  I'm sure there's some data on
21   that, yes.
22        Q.  And so if -- in your developmental program,
23   if you have a twice-a-day arm in a study and a
24   once-a-day arm in a study, and you're seeing the
25   same safety and efficacy, but you know that based on

Page 93

1    data, you have better compliance with once a day, do
2    you agree with me that the best choice to carry
3    forward would be once a day?
4         MR. MCWILLIAMS:  Object to form.
5         A.  Again, there is no simple answer to this,
6    right?  Because in the design of a study, you are
7    looking at a particular patient population.  So all
8    that you can speak to with the results of that
9    study is that particular patient population.
10        Moreover, as you know, one study is
11   generally not sufficient to -- to lead to approval
12   of a drug, especially one, again, that has such a
13   high -- not just side effect profile, but that the
14   side effect is such a dangerous side effect, that
15   this becomes -- I mean, again not -- not a simple
16   answer.
17        But all things being equal, of course, we'd
18   all rather take a once-a-day pill to a -- to a twice
19   a day or three times a day.  And yet many of the
20   medications that we prescribe all the time are drugs
21   that have to be taken more than once a day.  And we
22   don't just throw up our hands and say, "Oh, well, my
23   gosh, you know, patients are going to get -- be
24   inadequately treated."  We don't.  We -- we know
25   we -- we educate our patients, and we do as much as

Protected - Subject to Further Protective Review

Page 94

1  we can to help them.
2      But, I mean, all things being equal, of
3  course.  But I think that one can -- can certainly
4  argue that when we're looking at these drugs like
5  anticoagulants, that there's some really important
6  differences in when you take it once a day, and
7  potentially you can alleviate some of those
8  differences by a more frequent schedule.
9      Q.  The only way -- strike that.
10      Can you sit here today, based on all of the
11  science, and say that Xarelto would be safer and
12  more effective if it's given twice a day to patients
13  with atrial fibrillation?
14      A.  I personally believe that it would be.
15      Q.  Doctor, I understand what you personally
16  believe.
17      A.  Based on --
18      Q.  Do you -- sorry.  No, no, no.  Wait.  One at
19  a time.
20      A.  Go ahead.
21      Q.  I understand you --
22      MR. MCWILLIAMS:  I don't think she's done
23      with her answer.  I apologize.  Can she
24      please finish her answer?
25      MS. YATES:  No.  She said, "I personally

Page 95

1      believe that it would."  I started, then she
2      started again, so let's just clean it up.
3      MR. MCWILLIAMS:  She didn't start it again.
4      She was continuing her answer, so --
5  BY MS. YATES:
6      Q.  Doctor, let me ask it again.
7      MR. MCWILLIAMS:  Feel free to answer
8      however you need to, Doctor.  Don't let
9      her interrupt you.
10  BY MS. YATES:
11      Q.  I understand that you personally believe
12  that Xarelto would be more -- safer and more
13  effective if given twice a day to patients with
14  atrial fibrillation.
15      I want to know what science you can point to
16  to actually show better safety and better efficacy.
17      A.  So, again, a -- a rather layered answer,
18  which I know you would rather I simplify this,
19  but --
20      Q.  I just want data, Doctor.
21      MR. MCWILLIAMS:  Let her answer.
22      A.  Then let's look -- then let's look at the
23  figure here -- let me go to it -- on Page 7, which
24  is -- which is the observed plasma concentrations of
25  Xarelto in a group of patients who are on the ROCKET

Page 96

1  trial.  And -- and, of course, if you look to the
2  left-hand side of the graph, you can see basically
3  the -- the circles are indicating kind of the
4  peak, and then at 24 hours you can see troughs.
5      And what we see is tremendous
6  inter-individual -- inter-individual variability.
7  So -- so there's -- there's one problem.  I mean,
8  there are a multitude of problems.  So that's one
9  problem, is that you have a lot of individual
10  variations, so that some patients, at 24 hours, have
11  almost no Xarelto in their blood and others have a
12  high level of it.
13      It is possible, I think likely, that you
14  could reduce some of that by -- by having lower
15  doses given on a more frequent basis, right?  So
16  we've already talked about the difference between a
17  peak and a trough and how -- and how just even in --
18  in someone who just kind of fits in the median of
19  the population is going to have a pretty wide spread
20  between the peak and the trough.
21      How can you bring those two closer together?
22  Well, you do that by giving more frequent doses that
23  are adjusted to lower -- so you'd lower the dose and
24  give it more frequently so that you don't have that
25  wide splay of high and low.

Page 97

1      And there's -- there's actually graphs that
2  have been modeled on this in the -- in the FDA
3  reports and other reports that show giving it twice
4  a day basically brings up the -- the trough and
5  brings down the peak and puts people in -- in a
6  range where they are going to be safer than what
7  they are when you have this possibility of
8  patients -- of five percent of the patients that
9  are -- are -- you know, have trough levels that are
10  way above the peak levels than the rest of the
11  group.  Anyway, so there's one way to make it safer
12  and that's part of the answer.
13      Q.  Okay.
14      So you have a figure on Page 7 of your
15  report you believe shows that if Xarelto was dosed
16  twice a day in atrial fibrillation patients, that it
17  would be safer?
18      A.  I'm merely pointing out using this figure,
19  the wide inter-individual variability.  Until we
20  study what happens -- you know, again, as I said,
21  I -- I'm not prepared to tell you exactly what to do
22  with Xarelto as a drug and how it can be made safer.
23      I do think, though, that smart people can
24  design studies that would ask the question: Can we
25  make this drug safer?  And I think one of the ways

25 (Pages 94 to 97)

Protected - Subject to Further Protective Review

Page 98

1    and one of the things that they will design it to do
2    is to look at twice a day.
3         And I would -- I would also say to you that
4    if you go back and look at the dose-finding trials
5    that were started for both DVT indication and
6    postorthopedic surgery indication, those trials
7    were all initiated with BID dosing.  But before
8    those trials even completed, to where the data could
9    even be assessed, a second wave of trials were begun
10   using once-daily dosing.
11        And the justification given in those
12   peer-reviewed publications that describe this
13   transition from doing early Phase II dose-finding
14   studies BID, which was -- seemed absolutely
15   appropriate to anyone who understands what the
16   half-life of this drug is, that without even seeing
17   that data, because those trials were run in 2004,
18   from early 2004 to mid to late 2004, but yet in
19   November, December 2004, already sequential studies
20   were begun that could not have -- they could not
21   have even seen the data from the BID, but started
22   design in both the DVT arena and the postorthopedic
23   surgery arena of using once a day.
24        And the -- and the reason given in those
25   peer-reviewed publications is that they looked at --

Page 99

1    it says -- and I can only tell you what they say.
2    They're -- they say -- and it's in -- I have it
3    in -- in some of these references on -- in
4    Exhibit 6 -- say:  Well, this is -- well, we've
5    decided to do this because we've kind of looked at
6    normal people's PKs and because of thrombin
7    generation studies that show that thrombin
8    generation is still suppressed at 24 hours.
9         This, to me, is a very strange way of
10   progressing -- the kind of the -- progressing
11   the clinical trial designs of a study where you
12   start out with a BID trial design, you don't even
13   wait, apparently, to see what those results are
14   before launching into a once-a-day trial design
15   based on a thrombin generation assay, which, as you
16   know, I mean, thrombin generation assays have very
17   little clinical utility.  In fact, they've been
18   around for 20 years.
19        There's not one that's approved for use in
20   the US for any clinical indication because they're
21   so operator-dependent, they're so variable depending
22   on reagents that you use, et cetera, that it's -- I
23   find it very strange and somewhat disarming that --
24   that based on a thrombin generation study, we're
25   going to forget about looking anymore at BID

Page 100

1    studies.  We're just going to launch into our
2    preparation for our big Phase III trial by doing
3    a Phase II that just looks at a once-a-day dosing.
4         And so in -- in any event, as a -- as a
5    clinical trialist, I don't understand this,
6    except to say that -- you know, was that -- I mean,
7    again, I have to question what -- what was the
8    motivation to switch to a once-a-day, based on
9    thrombin generation?  I can't imagine that one
10   would use that as the science to base a -- moving
11   from a BID, which makes sense, to a once-a-day.
12   Q.  Do you remember my question?
13   A.  No, ma'am.
14   Q.  Okay.
15       I'm sorry.  I don't mean to cut you off, but
16   these answers are going on for pages.  So let me try
17   and ask -- tell me if my question is too simple.
18   I will ask you to explain why.
19   A.  Okay.
20   Q.  Is it your testimony that the decision to
21   go from BID to OD, once a day, was based solely on
22   a thrombin-generation assay?
23   A.  Well, according to the investigators that
24   launched those studies, that was the reason that was
25   given in the -- in their papers.

Page 101

1    Q.  Okay.
2        And that's the only -- that's the only piece
3    of science they had to go from BID to OD?
4    A.  So that and -- and the pharmaco -- and
5    pharmacokinetic studies in -- I believe they said in
6    normal individuals.
7    Q.  That's it?
8    A.  That's what I recollect.
9    Q.  And it's your testimony that they didn't
10   even complete the BID trials before they started --
11   or let me -- let me ask you:  Are you saying that
12   they abandoned the BID program and went straight to
13   once a day?
14   A.  That's what it appears.
15   Q.  They abandoned the BID program?
16   A.  That's what it appears.
17   Q.  Didn't follow -- didn't get the results of
18   those studies?
19   A.  They did.  They did get the results of those
20   studies, but my point being that if you look at the
21   time period that the -- if you look at the time
22   period that the once daily programs were begun,
23   those studies were enrolling patients shortly --
24   shortly after the last patient was enrolled in the
25   BID.

26  (Pages 98 to 101)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 102

1    So -- so they could not have -- they could
2  not have used -- in my opinion, looking at the
3  time -- the time scale, they could not -- the -- the
4  data from the BID studies, it just doesn't seem
5  possible that that could have informed their
6  decision to go with the once a day, nor did they say
7  it informed their decision to go with the once a
8  day.
9    Q. Okay.
10    So do you know if the BID studies showed
11  better safety and efficacy?
12    MR. MCWILLIAMS:  Object to form.  Better
13    than what?
14    MS. YATES:  Once a day.
15    MR. MCWILLIAMS:  Okay.
16    MS. YATES:  No, no, wait.  Thank you,
17    Counsel.
18    A. Well, yeah.  No, no.  The point is that they
19  were -- two of the three studies were only BID
20  dosing.  One of them had a once daily dose.  And
21  as I recall, they were, again, small numbers of
22  patients, because these were -- this was a Phase II
23  dose-finding study.  So in small numbers of
24  patients, as I recall, they were somewhat
25  equivalent.

Page 103

1    Q. Somewhat equivalent?
2    A. That's right.  Can we -- can we look at the
3  document?  I would like to.  I don't -- we would
4  have to look at the document before I could tell you
5  exact percentages and what those were, but that's my
6  recollection.
7    Q. Okay.
8    You can look at any document you want.  I
9  don't know if counsel has them, but sure.
10    A. Okay.
11    Q. You said Phase II was -- was small.  How
12  many patients were in the Xarelto Phase II program?
13    A. I don't recall.
14    Q. Hundreds?  Thousands?
15    A. I think it was hundreds, but I don't recall.
16    Q. Okay.
17    Well, you said it was small.  That's
18  why --
19    A. Yeah, compared to Phase III studies in which
20  you have thousands of patients, right.  Small
21  compared to that.
22    Q. Okay.
23    So compared to other Phase II programs on
24  other medicines, do you know if it was a small
25  program or a big program?

Page 104

1    A. I couldn't answer.  I don't -- because I
2  don't remember the number.
3    Q. Okay.
4    What dose ranges did Bayer look at in their
5  Phase II studies?
6    A. As I recall, it was in the ranges of, like
7  10 BID, maybe 15 BID, or 20 BID.  You know, again,
8  we'd have to go back, and we'd have to pull the
9  actual papers.
10    Q. Right.
11    A. So I don't want to speak to -- I mean,
12  there are three different papers that I'm
13  referring to.
14    Q. Right.  So pretty narrow range, then, in
15  Phase II, 10 to 20?
16    A. Again, don't remember exactly.
17    Q. Are you guessing, or is that your best
18  recollection?
19    MR. MCWILLIAMS:  Object to form.
20    A. Just my best recollection.
21  BY MS. YATES:
22    Q. Best recollection.  Okay.
23    Were any of Phase II studies stopped because
24  of excessive bleeding risk?
25    A. I do not think so.

Page 105

1    Q. Would it surprise you to know that,
2  actually, the dose ranging studies went all the way
3  from 5 milligrams to 80 milligrams?
4    A. Okay, okay.  That makes good sense.
5    Q. It makes good sense or it would surprise
6  you?
7    A. Well, that -- that -- I mean, that's
8  appropriate for a dose-finding study to use as wide
9  a range as is felt to be safe.  I mean, these
10  are -- so obviously, I did not see Phase I safety
11  trials, but I'm sure that -- you know, I'm sure
12  that different doses were used in safety trials.
13    Q. You switched to Phase I.  I'm talking about
14  Phase II, 5 milligrams all the way up 80 milligrams.
15    A. Okay.  That could be, yes.
16    Q. Pretty good range, right?
17    A. Yup.
18    Q. Are you aware that any of those trials were
19  discontinued because of excessive bleeding risk?
20    A. No, I'm not.  I am not aware.
21    Q. Okay.
22    Doctor, if we go to -- continue on Page 7
23  with the figure that you pointed to, wouldn't it be
24  important to know the corresponding outcome data on
25  these patients?

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1    A.  Oh, it surely would be.
2    Q.  Right, because that would actually tell you
3  if the patients, at the high end or low end, are
4  experiencing either a lack of efficacy or a bleeding
5  risk, right?
6    A.  Yes.
7    Q.  Do you have that data?
8    A.  No.  Does anybody have that data?
9    Q.  I'm not here to answer questions, Doctor.
10  I'm only here to ask them.  I apologize.
11    A.  I would love to see that data.  And
12  actually, on Page 8 and 9, we actually include
13  graphs of that very -- those -- that very issue with
14  edoxaban and with dabigatran where -- where trough
15  levels are correlated to the probability of stroke
16  and probabil- -- and -- and, indeed, until we are
17  able to look at that kind of data, we are not really
18  able to understand what these minimally effective
19  doses are, et cetera.
20    Q.  Right.
21      And so the only way for you to have an
22  opinion to a reasonable degree of medical certainty
23  that BID dosing in an atrial fibrillation patient
24  versus OD dosing is safer and more effective would
25  be to actually have that data and make the

Page 107

1  comparison?
2    A.  That's correct.
3    Q.  And you're saying that you don't have that
4  data, correct?
5    A.  I'm saying that.
6    Q.  Are there any corrections that you would
7  like to make to your report as we sit here today?
8    A.  I think I found a couple of typos, but other
9  than that, I don't -- let me see.
10    Q.  Typos I'm fine with.
11    A.  Yeah.
12    Q.  Unless it's missing a "not" or a "does not"
13  or --
14      MR. MCWILLIAMS:  She said typo.
15    A.  There was one thing.  Hold on one second.  I
16  think it's misstated.  Let's see.  I cannot remember
17  exactly what it was.  I'm sorry, I can't -- there
18  was a place where -- where I was looking back at
19  some of the -- the -- either the PK or PD data and
20  saying that this was higher than a peak or trough.
21  Anyway, I think -- I think it was confused.  I think
22  it should have been the other, where I said it was
23  higher than the trough, and it should have been
24  higher than a peak.  But anyway, I can't find it
25  right now, I mean --

Page 108

1    Q.  I tell you what -- and -- and that's kind
2  of important, trough versus peak.
3    A.  Yeah.  It is.
4    Q.  Let's go through and -- and with my
5  questioning I'm going to come to the PK/PD.  If
6  you spot it, great.
7    A.  Okay.
8    Q.  If not, maybe I'll ask you at some point to
9  find that -- what you think might be an error.
10    A.  Okay.
11    Q.  Doctor, can we go to Page 3 of your report.
12  Second full paragraph, under "Overview," it
13  starts -- I think it's the second sentence.
14      "The ROCKET trial's design and outcomes,
15  along with its flaws, are discussed in greater
16  detail in the expert reports of Drs. Henry Bussey
17  and Bud Gerstman."
18      Have you reviewed the reports of Dr. Bussey
19  and Dr. Gerstman?
20    A.  Yes, I have.
21    Q.  Have you spoken with them?
22    A.  I have not.
23    Q.  When did you review their reports?
24    A.  I couldn't tell you exactly, but within the
25  last couple of months.

Page 109

1    Q.  Was it before or after you prepared your
2  report?
3    A.  I'm sorry, I don't recall.
4    Q.  Did you write this report?
5    A.  Yes, I did.
6    Q.  Did you have any other expert reports that
7  you modeled after?
8      MR. MCWILLIAMS:  Object to form.  I don't
9      think she said she modeled after those
10      expert reports.
11      MS. YATES:  I'm sorry.  I'm asking her if
12      she had any expert --
13    A.  No, I did not.
14  BY MS. YATES:
15    Q.  Other than -- sorry.  I've forgotten if I
16  asked you this.  But did you review any other
17  reports other than Drs. Bussey and Gerstman?
18    A.  You know, FDA reports, the other things that
19  are referenced in here.
20    Q.  Okay.
21      Sorry.  I confused you.  I meant experts
22  hired by the plaintiffs, not documents on your
23  review list.
24    A.  I don't believe.
25    Q.  Okay.

28  (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1    Doctor, we established that you're not a
2  cardiologist, but you're certainly familiar with the
3  medical condition called atrial fibrillation, right?
4    A.  Yes, ma'am.
5    Q.  And if I go beyond your area of expertise,
6  please tell me and -- or whether you'd defer to a
7  cardiologist.  But atrial fibrillation is an
8  abnormal heartbeat, correct?
9    A.  Yes, that's correct.
10    Q.  And when a person has atrial fibrillation,
11  the beating of the two upper chambers is irregular,
12  correct?
13    A.  Correct.
14    Q.  And that irregular beating of the upper
15  chamber interferes with blood flow in the lower --
16  into the lower pumping chambers of the heart?
17    A.  Correct.
18    Q.  I warned you, I'm very simple.
19    A.  Yes, I agree.
20    Q.  Do you agree that atrial fibrillation
21  currently affects millions of people in the United
22  States?
23    A.  Yes, it does.
24    Q.  And do you agree that the risk of atrial
25  fibrillation increases as a person ages?

Page 111

1    A.  Yes, it does.
2    Q.  And, in fact, because the average age of the
3  population in the United States is getting older,
4  increasing, the number of patients with atrial
5  fibrillation is increasing at a pretty rapid rate?
6    A.  I agree.
7    Q.  And when a person has atrial fibrillation,
8  they are at an increased risk of having a stroke?
9    A.  That's correct.
10    Q.  And a stroke can cause brain damage?
11    A.  Correct.
12    Q.  Death?
13    A.  Correct.
14    Q.  It's a very serious medical event?
15    A.  It is.
16    Q.  And medicines such as Xarelto are pre-
17  scribed to try to prevent that from occurring?
18    A.  That's correct.
19    Q.  Do you agree with the following statement:
20  "Atrial fibrillation increases a person's risk for
21  stroke by four to five times compared with stroke
22  risk for people who do not have atrial
23  fibrillation"?
24    A.  That sounds about right.
25    Q.  Do you agree that strokes caused by atrial

Page 112

1  fibrillation are often more severe than strokes from
2  other underlying causes?  If you know.
3    A.  I don't know that.
4    Q.  Is it fair to say that a stroke caused by
5  atrial fibrillation is a leading cause of death and
6  disability in the United States?
7    A.  I would assume that to be the case.
8    Q.  Are you familiar with the statistic that
9  one American dies from stroke every four minutes?
10    A.  I would -- I'm sure that's probably true.
11    Q.  And the primary goal, accepting that all
12  medicines have risks and possible side effects, the
13  primary goal in prescribing an anticoagulation
14  medicine to patients with atrial fibrillation is to
15  prevent stroke?
16    A.  Yes.
17    Q.  In fact, do you agree that it's standard of
18  care to put patients with atrial fibrillation on
19  some kind of anticoagulant to reduce their risk of
20  stroke?
21    A.  I believe that that is now a standard for
22  cardiology, yup.
23    Q.  And there are several treatment options
24  available for that condition?
25    A.  Yes.

Page 113

1    Q.  You agree that any anticoagulant at any
2  dose, a patient is at an increased risk of having a
3  bleed?
4    A.  Yes.
5    Q.  Do you agree, Doctor, that Xarelto does not
6  cause bleeding, rather it unmasks an underlying
7  pathological condition and causes that to bleed, for
8  example, an underlying tumor or an underlying ulcer?
9    A.  No, I don't entirely agree with that.
10    Q.  Okay.
11    Tell me how you disagree.
12    A.  Any anticoagulant as, you know, we discussed
13  earlier, and I won't go into it, but you're
14  basically making a normal hemostatic system
15  abnormal.  So you have normal -- abnormal hemostasis.
16  You're not able to form a normal clot.
17    There are patients who have -- now, you're
18  asking is, well, they must just -- they don't just
19  start bleeding for no reason.  Well, it depends.  If
20  you're anticoagulated enough, you certainly can
21  start bleeding for no reason.  So, again, it's a
22  degree of anticoagulation.  But -- but certainly if
23  you're mildly anticoagulated, you're likely only to
24  bleed with trauma or -- or another abnormality.
25    However, as anticoagulation progresses with

29 (Pages 110 to 113)

Protected - Subject to Further Protective Review

Page 114

1  greater and greater concentrations of anticoagulant,
2  yes, you can see spontaneous hemorrhage --
3  spontaneous intracranial hemorrhage as well.
4      So it's -- it's dependent on the
5  concentration of the anticoagulant.
6      Q. So keeping it at the adequately coagulated
7  situation, a medicine like Xarelto and the other
8  NOACs doesn't go in and cause ulcerations that could
9  lead to bleeding, but it can unmask the presence of
10  an ulcer, make the bleeding detectable?
11      A. Certainly. Any anticoagulant, if you have
12  an abnormality that's prone to bleeding and you
13  anticoagulate a person, they are likely to get
14  bleeding from that site.
15      Q. And when you refer to people bleeding
16  spontaneously, you are talking about people who are
17  at such high levels that the bleeding can occur?
18      MR. MCWILLIAMS: Object to form.
19      A. Usually. Again -- again, there are many
20  variables, right? And we talk about elderly --
21  you know, we talk about people who are elderly and
22  people who are young and healthy, and so -- and --
23  and, you know, we've already made the point that
24  it's the -- you know, the elderly are the growing
25  population that have atrial fibrillation, so those

Page 115

1  patients -- and often because of comorbidities,
2  maybe not that they have necessarily an ulcer, but
3  they may have diabetes, they may have a little liver
4  dysfunction, their platelet count might be low due
5  to a variety of reasons, then certainly adding all
6  those factors together they can bleed spontaneously.
7      Q. I guess it's the "bleed spontaneously" that
8  I just don't understand. I mean, so you went from
9  an elderly patient, possibly diabetes, platelet
10  disorder -- I mean, so you're talking about
11  comedications, comorbidities. I mean, I guess I
12  need you to tell me, how does somebody bleed
13  spontaneously?
14      A. A spontaneous bleed, I'll just give you
15  some examples clinically. So someone wakes up in the
16  morning with a headache and it progresses through
17  the day and they go to the doctor and they've got an
18  intracranial hemorrhage. That would be someone who,
19  you know, doesn't remember ever hitting their head
20  or whatever.
21      Severe -- as you say, severe abnormalities
22  of the coagulation system can lead to what we call
23  spontaneous bleeds. Hemophilia patients have them
24  all the time. So if you -- if you disrupt the
25  hemostatic system, you can at -- and, again, it's

Page 116

1  patient dependent.
2      So a young healthy patient who has no other
3  comorbidities may be anticoagulated and not have a
4  spontaneous bleed, but somebody who is older with
5  maybe a slightly low platelet count can wake up in
6  the morning with a head bleed not having been
7  traumatized.
8      Spontaneous bleeding just means spontaneous.
9  That's all it means, not related to trauma or
10  underlying, you know, defect, open wound,
11  et cetera, spontaneous.
12      Q. And you agree that sometimes the cause of
13  those bleeds, while looked for, is not determined?
14      A. Correct.
15      Q. That doesn't mean there wasn't a cause?
16      A. That could well be, right.
17      Q. Somebody might not remember --
18      A. That's correct.
19      Q. -- hitting their head?
20      A. That's correct.
21      Q. Uhmm --
22      A. But, you know, again, just to segue on to
23  that, it's absolutely true and it may have been
24  extremely mild trauma, trauma that you and I would
25  think nothing of, right, you know.

Page 117

1      Q. So how does Xarelto -- what mechanism does
2  Xarelto cause bleeding, setting aside the underlying
3  pathological conditions where it unmasks it?
4      A. So it inhibits clotting factor X, activated
5  a clotting factor X, which is a key component. All
6  clotting factors are pretty key, but it is a key
7  component to the activation of prothrombin to become
8  thrombin. Thrombin is the key enzyme that drives
9  all of -- you know, basically, drives what we would
10  say all of coagulation. So if you can't make
11  thrombin, then you are going to be very deficient
12  in how well you can form a clot.
13      Q. But you need an outlet. So how does Xarelto
14  damage the outlet that leads to this bleed?
15      MR. MCWILLIAMS: Object to form. I didn't
16  hear her say anything like that.
17  BY MS. YATES:
18      Q. So, for example --
19      A. I don't understand what you mean by
20  "outlet."
21      Q. So, for example, aspirin, nonsteroidal
22  anti-inflammatories --
23      A. Okay.
24      Q. -- right? They can cause bleed?
25      A. Yes.

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1      Q. Gastric ulcerations that actually bleed?
2      A. Oh, well, they influence bleeding by another
3    very important mechanism. They shut down platelet
4    function.
5      Q. Okay.
6      A. So if you are on high enough doses of any of
7    these drugs, you have very poor platelet functions
8    and you can bleed. You may have nose bleeds, you
9    may have -- if you have an ulcer, certainly you
10   can -- and people who take a lot of these drugs can
11   get stomach irritation, so yes. But some people
12   bleed on aspirin and nonsteroidals who don't have
13   stomach irritation or ulcers.
14     Q. And that's my point, that there is --
15     A. Yes.
16     Q. -- it's known that nonsteroidals and aspirin
17   can actually cause bleeds in patients that don't
18   have underlying pathological conditions. It's the
19   actual medicine that can go in there and cause the
20   bleed?
21     A. By the mechanism shutting down platelet
22   function, right.
23     Q. So what I'm asking you is, what is the
24   mechanism by which Xarelto causes a bleed rather
25   than unmasking an underlying condition which may or

Page 119

1    may not be found, by the way?
2        MR. MCWILLIAMS: Object to the form. Asked
3      and answered.
4      A. Yeah. I'm not exactly sure what you're
5    getting at. I mean, by interrupting the
6    prothrombinase complex that converts prothrombin to
7    thrombin, you shut down the body's ability to form a
8    good solid clot, and when you do that, you can have
9    bleeding of all sorts, right? I mean, again,
10   there -- if you're lacking any of the essential
11   clotting factors, if you're lacking those, you're
12   going to be very prone to bleeding.
13     Q. Okay.
14       Let me see if I can go at it another way.
15   The --
16       MR. MCWILLIAMS: Seriously?
17       MS. YATES: What?
18       MR. MCWILLIAMS: I think -- never mind.
19   BY MS. YATES:
20     Q. Aspirin and nonsteroidal anti-inflammatories
21   can cause damage to the vasculature that directly
22   causes bleeding? We are on the same page there?
23     A. No, ma'am.
24     Q. No?
25     A. They shut down platelet function. So they

Page 120

1    don't have an effect on endothelial lining or
2    whatever.
3      Q. Okay.
4      A. They shut down platelet function, and
5    platelets are a critical ingredient to forming an
6    initial platelet plug that stops bleeding when you
7    cut yourself or hurt yourself.
8      Q. Do you agree that Xarelto does not damage
9    the vasculature?
10     A. Correct, it does not.
11     Q. Maybe I should have asked that question
12   first.
13       MR. MCWILLIAMS: That's what I was going to
14       offer.
15   BY MS. YATES:
16     Q. Doctor, prior to the 1950s, there were no
17   oral medications that doctors could prescribe to
18   patients who had atrial fibrillation, correct?
19     A. I was, hard to believe, not alive back then,
20   but yes, that's my understanding.
21     Q. This is a historical perspective that we've
22   read about.
23     A. I understand. Me too.
24     Q. I'm with you. Okay.
25       So those patients had no therapies and they

Page 121

1    experienced severe and debilitating strokes, right?
2      A. I think that's very likely.
3      Q. And then in about 1954, a pharmaceutical
4    company introduced warfarin, right?
5      A. That's my understanding.
6      Q. warfarin was actually used as a rat poison,
7    right?
8      A. Prior to that time it was used as a rat
9    poison.
10     Q. And, in fact, it killed rodents by causing
11   them to hemorrhage?
12     A. Correct.
13     Q. And scientists were able to alter the dosing
14   and the formulation so it could be used as a
15   medication in humans?
16     A. Right.
17     Q. But because it was toxic, it was a rat
18   poison, warfarin was difficult to manage, fair?
19       MR. MCWILLIAMS: Object to form.
20     A. Because of bleeding. I mean, right. To be
21   clear, the toxicity of warfarin is exactly the same
22   toxicity as with every other anticoagulant. The
23   toxicity is bleeding, you know, so I almost hesitate
24   to call that a toxicity, although I understand your
25   use of the term and I'll agree with it.

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1      It is exactly why you give it.  So what
2  we're calling toxic is the real reason you give it,
3  to interrupt coagulation.
4      Q.  And the desired effect actually can result
5  in the side effect, fair?
6      A.  As with every anticoagulant, yes.
7      Q.  But for the next 50 years, there were no
8  real -- there were no oral alternatives to warfarin,
9  right?
10     A.  That's correct.
11     Q.  Okay.
12         And is it fair to say that the medical
13 community, we're actually looking towards some type
14 of advancement in this treatment arena?
15     A.  Yes, absolutely.
16     Q.  And that was hematologists and
17 cardiologists?
18     A.  Absolutely.
19         MS. YATES:  I'm told there's two minutes on
20 the tape, so we're going to take a break.
21         THE VIDEOGRAPHER:  This is the end of Tape
22 2.  We're now off the record at 11:51.
23         (Recess.)
24         THE VIDEOGRAPHER:  This is the beginning of
25 Tape 3.  We are now back on the record.  The

Page 123

1      time is 12:01.
2  BY MS. YATES:
3      Q.  Doctor, we were talking about warfarin.  One
4  of the challenges with warfarin is that if a patient
5  gets too much warfarin, it increases their risk of
6  bleeding?
7      A.  Yes.
8      Q.  And another challenge is if they get too
9  little warfarin, they are at increased risk of
10 stroke?
11     A.  Yes.
12     Q.  And patients on warfarin must be regularly
13 monitored by their doctors and frequently have to
14 have dose adjustments?
15     A.  That's true.
16     Q.  And the monitoring that is done for
17 warfarin is primarily due to something called
18 intra-individual variability, right?
19     A.  That's largely true, yes.
20     Q.  And then there is a different concept called
21 inter-patient variability, right?
22     A.  Yes.
23     Q.  And let me just stick with intra-patient
24 variability.  That means that I can be taking my
25 warfarin for five days and I'm on the same dose, and

Page 124

1  then I change my diet one day.  I eat healthy one
2  day and I eat a bunch of leafy green vegetables, and
3  I take my INR and now my dose has to be adjusted?
4      A.  That can happen.
5      Q.  I can go on new medications and that can
6  alter the dose, right?
7      A.  Correct.
8      Q.  I can drink a little too much alcohol and I
9  might need a dose adjustment?
10     A.  Correct.
11     Q.  Okay.
12         And you're trying to keep warfarin within a
13 certain therapeutic range that lowers the risk of
14 stroke and lowers the risk of bleeding, right?
15     A.  Correct.
16     Q.  And that's generally understood to be an INR
17 of between 2 and 3?
18     A.  Yes.
19     Q.  And that's not to say that within that range
20 bleeds don't occur and strokes don't occur, but
21 that's the range for warfarin that over the years
22 has been determined to be the most safe and
23 effective?
24     A.  Yes.
25     Q.  Now, similarly with warfarin, not only is

Page 125

1  there the intra-patient variability, but there is
2  variability across the patient population as well?
3      A.  That's correct.
4      Q.  So you and I might not be started on the
5  same dose, right?
6      A.  We may be started on the same dose, but we
7  may end up on very different doses for maintenance,
8  that's correct.
9      Q.  Got it.
10         And they try to start you off with a low
11 dose and then watch to see where your INR is to
12 achieve that INR of between 2 and 3?
13     A.  Correct.  We typically start with five
14 milligrams a day.
15     Q.  The dose of warfarin can depend upon the
16 underlying genetic makeup of the patient?
17     A.  This is correct.
18     Q.  So it can depend on their age or their body
19 weight?
20     A.  Yes.
21     Q.  Other medications they're taking, right?
22     A.  Yes.
23     Q.  And we've already talked about diet and
24 alcohol?
25     A.  Yes.

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1    Q. So you start the patient off at a low dose
2   that may not be protecting them from stroke, right?
3   Until you have that INR, you don't know if that
4   first dose is offering them protection, correct?
5    A. That's correct.
6    Q. And you have to test the patient's blood
7   every few days, increase the dose, re-test, perhaps
8   modify it and adjust down, but that's the procedure
9   that's involved in finding the right dose for
10  patients on warfarin?
11   A. For patients with atrial fibrillation. We
12  would do it differently on patients who have blood
13  clots.
14   Q. Correct. Okay. Sorry, yes, let's stick to
15  atrial fibrillation.
16   A. Yes.
17   Q. And even though you get the patient to
18  within that INR range, as we've said, that patient
19  can go out of that range based upon a diet change, a
20  medication change, something quite simple in their
21  daily life, fair?
22   A. Yes.
23   Q. Yes?
24   A. Yes.
25   Q. The -- warfarin became available in the

Page 127

1   1950s. When was the INR recognized as a validated
2   test for measuring warfarin levels?
3    A. Oh, that's a good question, and I don't know
4   the answer.
5    Q. Would it surprise you to know that it came
6   30 years after warfarin was first prescribed?
7    A. I was going to say, it wasn't available when
8   I was in medical school, right. So it definitely
9   came after 1979, right?
10   Q. 1984.
11   A. '84.
12   Q. '83, '84.
13   A. I mean, I remember when this was, you know,
14  becoming a thing that was talked about, but I didn't
15  remember the year.
16   Q. So for all those years, 30 years of
17  warfarin, they didn't have that INR test, right?
18   A. Well, they were using PT measurements,
19  and -- but those were not standardized -- were not
20  adequately standardized across different labs,
21  different places, yeah.
22   Q. Right, because different PT tests have
23  different reagents, different sensitivities?
24   A. Right.
25   Q. And it took 30 years of science to finally

Page 128

1   come up with the INR?
2    A. Well, I mean, I don't know how actively
3   anyone was looking. I don't know that it took
4   30 years to do it, but certainly it -- it
5   certainly -- you're right, it did not exist or was
6   not done that way for 30 years, yep.
7    Q. Do you agree, Doctor, that while we know INR
8   is sensitive to warfarin, that INR is not sensitive
9   to any of the NOACs?
10   A. That seems to be the case, I mean, from
11  people who have actually looked at it.
12   Q. And in patients on warfarin, I mean, you
13  need to regularly test the INR?
14   A. That's correct.
15   Q. Sometimes every one to four weeks?
16   A. That's correct.
17   Q. And, in fact, coagulation clinics were set
18  up because doctor offices could not handle the
19  amount of testing that needed to be done, separate
20  clinics were set up?
21   A. Yeah. I mean, you could always send
22  patients to laboratories to have the test done, but
23  it just -- it became a -- kind of a model system for
24  trying to use treatment algorithms and bring some
25  consistency to how patients were managed. So I

Page 129

1   mean, that led to the kind of birth of these
2   anticoagulation clinics.
3    Q. And I apologize, I think I've already asked
4   this, but even if warfarin control in a patient is
5   perfectly in that range, a patient can still have a
6   stroke or a serious hemorrhagic event, correct?
7    A. Yes.
8    Q. And so this maintenance of the INR in the
9   therapeutic range does not by any means eliminate
10  risk?
11   A. It dramatically lowers risk, but it does not
12  eliminate it.
13   Q. Right. Okay.
14      And any patient on an anticoagulant can have
15  a bleed even if they are not over-anticoagulated,
16  correct?
17   A. That is correct.
18   Q. And the same is true for stroke, even if
19  anticoagulation control is perfect, a patient with
20  atrial fibrillation can have a stroke?
21   A. Again, these events absolutely can happen,
22  but, of course, they happen markedly less when a
23  patient is -- is adequately controlled, when we know
24  what the effective dose and safe dose -- doses are,
25  the more effective and more safe doses are, yes.

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1      Q.  And, in fact, you've published in the
2  peer-reviewed literature some of the challenges that
3  you're faced with for patients on warfarin therapy?
4      A.  I almost forgot about that, but yes, I did.
5      Q.  2008?
6      A.  Yeah, sounds right, about using reversal
7  with PCCs.
8      Q.  And some of the challenges, the major
9  bleeding --
10     A.  Yes.
11     Q.  -- the variations in dosage requirements?
12     A.  Yes.
13     Q.  Substantial individual variations?
14     A.  Yes.
15     Q.  Okay.
16        And you agree, Doctor, that warfarin has a
17  narrow therapeutic window?
18     A.  Yes.
19     Q.  And sometimes I see window, sometimes I see
20  index range, all the same?
21     A.  To me.
22     Q.  That's the important one.  To you they are
23  all the same, okay.  Yes?
24     A.  Yes.
25     Q.  Did you know that studies show that warfarin

Page 131

1  is responsible for one-third of all hospital
2  admissions relating to an adverse drug event?
3        MR. MCWILLIAMS:  Object to form.  What date
4        is that study?
5        MS. YATES:  2013.
6      A.  I -- I accept that as being very likely the
7  case.
8      Q.  And have you had patients to whom you've
9  prescribed warfarin that have had bleeding episodes?
10     A.  Yes.
11     Q.  Have some of them had severe bleeds?
12     A.  Yes.
13     Q.  Have you had patients who'd been prescribed
14  warfarin who've developed strokes?
15     A.  No.
16     Q.  And they wouldn't come to you for treatment
17  of strokes, to be fair.  They'd go to their
18  cardiology doctors?
19     A.  Right, but if they're my patients, I would
20  know about it.
21     Q.  Okay.
22        So you can't think of any who have been on
23  warfarin who's had strokes, in your patient --
24     A.  Not in my particular patient population.
25     Q.  And your patient population is not made up

Page 132

1  of the majority of atrial fibrillation patients?
2      A.  That's correct, right.
3      Q.  If you could come up with the ideal
4  anticoagulant, let me go through a list of features
5  and see if you agree they would be on your list.  It
6  would be given orally as opposed to injected?
7      A.  Yes.
8      Q.  No monitoring?
9      A.  No, that is not an ideal feature of an
10  anticoagulant.
11     Q.  And what do you mean by "monitoring"?  What
12  do you interpret I mean by "monitoring"?
13     A.  So my interpretation of that is a way to do
14  a rapid assessment of how much anticoagulant is in
15  the patient's system at a given point in time.
16  That's extremely important because anyone on an
17  anticoagulant can bleed, as we just said, whether
18  it's with warfarin or whether they're well
19  controlled, it doesn't really matter.
20        What matters most is that when they come in
21  bleeding, I need to know exactly how much
22  anticoagulant is in their system.  So the inability
23  to monitor is an extreme handicap in dealing with
24  patients.
25        Or conversely, if they have another clot,

Page 133

1  you know, if they're on a drug and they have another
2  clot, I need to be able to see whether they clotted
3  because they were inadequately anticoagulated or
4  were they adequately coagulated and there's
5  something else I need to be looking for.
6        So monitoring or being able -- I interpret
7  that being able to assess the concentration of
8  the -- the concentration or the effect of that drug
9  at that moment is extremely important.
10     Q.  So why don't we just use warfarin?
11     A.  I do.
12     Q.  You don't use any other anticoagulants?
13     A.  Very rarely.
14     Q.  Okay.
15        Do you agree that having no dietary
16  interactions would be a benefit?
17     A.  That would be a benefit.
18     Q.  No drug interactions would be a benefit?
19     A.  Very much so.
20     Q.  In light of the medication being given
21  long-term, do you agree because of patient
22  compliance that once daily would be a benefit?
23     A.  It would always be preferable, but of
24  course, obviously that's dependent on whether it
25  can, in fact, be given that way best, if that's the

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1  best way to give it.
2      Q. Right.
3          Reversal agent?
4      A. Absolutely important.
5      Q. And I suppose the perfect anticoagulant
6  would be to be able to uncouple the medication from
7  a bleeding risk?
8      A. Yes.
9      Q. And that doesn't exist, does it, Doctor?
10     A. No, it does not.
11     Q. Now, you know that Xarelto was approved by
12 the FDA in 2011 for treatment of patients with
13 atrial fibrillation?
14     A. Yes.
15     Q. The FDA found that Xarelto was effect -- was
16 as effective as warfarin in preventing strokes,
17 correct?
18     A. Correct.
19     Q. And --
20     A. Or I guess technically noninferior, but yes,
21 to me, the way I interpret that is just as good.
22 It's no worse. I guess a better way to say it is
23 it's no worse.
24     Q. And Xarelto does not have the food
25 interactions or dietary restrictions that are

Page 135

1  associated with warfarin, correct?
2      A. Well, not entirely. I mean, the
3  20-milligram dose has to be taken with food. I
4  mean, there is a 30 percent decrease in absorption
5  when taken without food on an empty stomach. So a
6  lower dose of Xarelto is -- is well absorbed and not
7  influenced by either an empty stomach or food.
8      Q. Well, so, let me break it down. The food
9  interactions we're talking about with warfarin are
10 types of food that interact with Vitamin K levels --
11     A. Yes.
12     Q. -- right?
13     A. Right. It is a different kind of
14 interaction, yes.
15     Q. Okay.
16         There aren't any food restrictions for
17 Xarelto along those lines, and I'm coming to your
18 point in a minute, but in terms of the warfarin, I
19 go and eat leafy green vegetables, I'm going to
20 throw my warfarin INR out of whack and I'm going to
21 need a dose adjustment potentially, right?
22     MR. MCWILLIAMS: Object to form.
23     A. That is -- potentially, but I would like to
24 answer more thoroughly. In my patient population, I
25 do not have food restrictions. We talk about being

Page 136

1  consistent in what we eat every day.
2          So the fact is that you can manage your
3  Vitamin K intake to where -- no, I have -- I think
4  we do our patients a horrible disservice to tell
5  them that they can't eat leafy greens. I mean,
6  you're telling people they can't eat vegetables.
7          So no, patients can eat leafy greens. They
8  just have to have a relatively consistent Vitamin K
9  intake from day to day, and we have many -- you
10 know, there are lists and handouts we can educate
11 people. There are dietary education materials that
12 help people to do that.
13         The other thing I would say is also if we
14 have someone who is extremely exclusively sensitive
15 to leafy green vegetables or whatever this is, there
16 are -- there are other things that we can do to
17 manipulate. We can give people Vitamin K every day.
18 We can give Vitamin K every day and then adjust the
19 warfarin around that. That amount of Vitamin K
20 completely removes -- it completely removes the
21 scatter from a little bit of greens today and none
22 tomorrow.
23         You give a daily dose of Vitamin K and then
24 you can adjust the warfarin and get a very
25 consistent INR pattern with warfarin. So there are

Page 137

1  ways to deal with it. I agree with, you know, what
2  you're saying in general though.
3      MS. YATES: I just lost my realtime.
4      MR. MCWILLIAMS: Ours is gone as well.
5      MR. SLONIM: Mine is fine.
6      MS. YATES: Good for you, Bert.
7      THE VIDEOGRAPHER: Off the record at 12:18.
8  (A discussion was held off the record.)
9      THE VIDEOGRAPHER: We are now back on the
10 record. The time is 12:19.
11 BY MS. YATES:
12     Q. So you're talking about consistency,
13 particularly as it relates to the amount of Vitamin
14 K, in order for patients to try to maintain a
15 therapeutic dose of warfarin without serious
16 adjustments?
17     A. I think -- I think that's what I said, yeah.
18 No, I agree, yeah.
19     Q. I'm talking about in the real world, Doctor,
20 patients try to be good, they try to be consistent,
21 but the truth of the matter is if you're on warfarin
22 and one day your Vitamin K intake exceeds or falls
23 below what you're trying to do consistently, it will
24 require in all likelihood a dose adjustment of your
25 warfarin?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 138

1    A. Yes.
2    Q. And that type of dose adjustment based on
3    the type of food intake is not associated with
4    Xarelto or the other NOACs?
5    A. That's correct.
6    Q. Okay.
7        What you're talking about is at the highest
8    approved dose of 20 milligrams, the recommendation
9    is that it be taken with food, correct?
10   A. Correct.
11   Q. And that's in the label to tell doctors, and
12   it's in the patient information, correct?
13   A. Correct.
14   Q. And the reason for that is because it helps
15   actually the patient absorb more of the medicine if
16   it's taken with food?
17   A. That's my understanding.
18   Q. That's not the same type of dietary
19   restriction that we know with warfarin?
20   A. That's correct.
21   Q. Okay.
22       On Page 4 of your report, Doctor, you say, I
23   think -- now I can't find it.
24       MR. MCWILLIAMS: I don't think you're on
25       Page 4.

Page 139

1    BY MS. YATES:
2    Q. Here we go. In the second full paragraph
3    under Section 5, "Therapeutic Drug Monitoring" --
4    A. Okay.
5    Q. -- partway down you say: "Thus for every
6    one million patients on Xarelto for atrial
7    fibrillation, approximately 150,000 persons per year
8    will have a clinically relevant bleeding event."
9        Can you tell me how many of those are major
10   bleeds versus non-major clinically relevant bleeds?
11   A. So, you know, this is just a kind of -- an
12   example, you know, based on what we know about the
13   likelihood of having bleeds. You know, on the
14   ROCKET trial I think there was, you know, about a
15   14-plus percent incidence of major and minor
16   bleeding.
17       The incidence of major bleeding was much
18   less, probably less than 5 percent in that
19   particular patient population.
20       So I think your question was how many -- you
21   know, again, these are just making some global broad
22   estimate. I think it's just to make the point that
23   there are a lot of people out there worldwide that
24   are going to be potentially at risk for having
25   bleeding.

Page 140

1    Q. But, Doctor, a number like that without some
2    type of explanation of whether it's a nosebleed or a
3    severe bleed requiring transfusions, that number can
4    be incredibly misleading, right?
5        MR. MCWILLIAMS: Object to form.
6    A. Again, this was only meant to be an example
7    of how big I see the problem of bleeding as we go
8    forward, right, as we adopt worldwide greater usage
9    of drugs that have, again, no ability to monitor and
10   no ability to reverse.
11       So, you know, I agree with you that not all
12   of these bleeds are going to be life threatening.
13   Many of them will be. Many of them will be very
14   problematic for the patient. I mean, a bad
15   nosebleed will -- you know, is -- is pretty
16   difficult to deal with.
17       My point here is not to give or cite exact
18   numbers of people who are going to experience a
19   certain type of bleed, but merely to say that I
20   think we're facing -- as you said, with an aging
21   population, we are facing more and more patients,
22   really very large numbers of patients, as you said
23   when we started, that are going to be on an
24   anticoagulation for atrial fibrillation use, and
25   we're -- you know, older people more likely to

Page 141

1    have bleeds, et cetera.
2        So yes, I think the numbers are going to be
3    significant, if not staggering over time, and if we
4    continue to use drugs that we cannot reverse when
5    people have bleeds, that is a problem.
6        So, again, that's -- it's more the point
7    here that I'm trying to make, not to give exact
8    numbers of who's going to bleed and what types of
9    bleeds.
10   Q. Okay.
11       So this number of 150,000 includes all
12   bleeds?
13   A. Yeah. Based on -- based on the data from
14   ROCKET and other studies. I mean, it's an estimate,
15   but if -- you know, if we believe that 14 percent of
16   people on anticoagulation have bleeding events, then
17   yeah, I mean, if you've got a million people on an
18   anticoagulant and 14 percent are going to have
19   bleeds, that's 140,000 people.
20   Q. But you cannot break down that number into
21   life-threatening or major bleeds versus --
22   A. Well, I mean --
23   Q. -- non-major?
24   A. I'm sorry. We have data that says that
25   life threatening bleeds is anywhere -- and, again,

Protected - Subject to Further Protective Review

Page 142

1   you can look at all the warfarin literature,
2   you can look at all the -- you know, anywhere
3   between 1 and 4 to 5 percent is major bleeds and/or
4   life-threatening bleeds in patients who are on
5   anticoagulation. And so yeah, we do know.
6       And so that would be in a million people --
7   you know, yes, it would be about 50,000 people a
8   year. So if you have a million people on
9   anticoagulation, uhmm, then we will have more than
10  that.
11      Q. And that's based upon the ROCKET data?
12      A. Well, as I said, that 1 to 5 percent is
13  based on trials of almost every anticoagulant, and
14  warfarin included. So that's typically what we
15  quote to patients is, you know, when we start
16  patients on anticoagulation, the serious or
17  life-threatening bleeds can be, you know, up to 5
18  percent per year. And maybe -- and again, higher in
19  people who are older and on aspirin and other
20  things.
21      I'm just -- you know, again, all we can
22  give are just some general statistics and chances
23  and that sort of thing.
24      Q. Can you tell me how many strokes are
25  prevented per year for every 1 million patients on

Page 143

1   Xarelto for atrial fibrillation?
2       A. Probably in the neighborhood of, you know, 1
3   to 5 percent as well, yep.
4       Q. You will agree with me that a nosebleed that
5   may be difficult to deal with is a lot less serious
6   than a stroke?
7       A. Absolutely.
8       Q. Doctor, let's go to your -- I believe it's
9   Pages 4 to 6 of your report, but it's actually -- if
10  we go to your summary of opinions on Page 2, it's
11  Opinion Number 2, "Xarelto has a narrow therapeutic
12  index."
13      Okay. Are you with me?
14      A. Yes.
15      Q. What methodology did you use to determine
16  that Xarelto has a narrow therapeutic index?
17      A. Well, we sort of addressed that earlier this
18  morning. By nature of what an anticoagulant does,
19  particularly in someone who has a normal hemostatic
20  system, somebody with atrial fibrillation, the very
21  first dose that you give is going to induce -- is
22  going to begin to make that hemostatic system
23  abnormal.
24      So, you know, the broad -- you know, the
25  definition of narrow therapeutic index, and I think

Page 144

1   I actually talk about that here, but, you know, we
2   typically think of that as the safest range of
3   therapies.
4       So, you know, on Page 4, the bottom of Page
5   4, I mean, the therapeutic window is the range of
6   doses that gives a good therapeutic response without
7   causing any meaningful side effects in patients.
8       So what we're saying about anticoagulants is
9   the very -- the very thing they're doing that gives
10  you benefit is they're causing the side effect.
11  They are causing a disruption of the hemostatic
12  system to give you the benefit you want.
13      Almost by definition they have an almost
14  negligible therapeutic window because of that very
15  fact. So I mean, that's -- you know, and I think
16  there are statements like that that you can find
17  from the FDA and -- and others that, you know, by
18  design, anticoagulants, all of them have a narrow
19  therapeutic window.
20      Q. And, in fact, I think you quote that
21  language from the FDA, right? That all --
22      A. Yes. I think that -- that substantiates --
23  I mean, as used as a -- as a -- yeah, something to
24  substantiate that opinion.
25      Q. Let me just finish my sentence. The FDA --

Page 145

1   all anticoagulants have a narrow therapeutic window.
2   That's the language you're referring to, right?
3       A. Yes.
4       Q. In your search of the literature, as -- as
5   your methodology, can you point to me a
6   peer-reviewed publication that specifically refers
7   to Xarelto as having a narrow therapeutic index?
8       A. I could not specifically point. I mean, I
9   reviewed many, many, many documents and papers. You
10  know, I -- I could not point you to one.
11      Q. Okay.
12      Can you cite to me the FDA's definition of
13  what is required for a medication to be considered
14  to have a narrow therapeutic index?
15      A. No, I couldn't quote that.
16      Q. Do you know the cutoff point for determining
17  a medication has a narrow therapeutic index?
18      A. What do you mean by "cutoff point"?
19      Q. Do you know what cutoff point means in terms
20  of narrow therapeutic index?
21      A. No, I -- no. I just --
22      MR. MCWILLIAMS: Object to the form.
23      A. -- would like clarification.
24  BY MS. YATES:
25      Q. Okay.

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1    So -- well, why don't you define for me
2    narrow therapeutic index.
3        MR. MCWILLIAMS:  Object to form.  Asked and
4    answered.
5    A.  Yeah.  I mean, I -- I think it's -- a narrow
6    index would be a drug that has a very small range of
7    effective doses that does not lead to increases in
8    side effects.
9    Q.  Okay.
10       Is there -- are you aware -- is there a
11   cutoff point for determining whether a medication
12   has a narrow therapeutic index?
13       MR. MCWILLIAMS:  Object to form, vague.
14   BY MS. YATES:
15   Q.  Some type of -- of cutoff point?
16   A.  I'm trying to understand.  You mean a
17   cutoff --
18       MR. MCWILLIAMS:  Same objection.
19   A.  I don't know what -- the cutoff of what?
20   I'm just not -- I'm not clear on that.
21   BY MS. YATES:
22   Q.  That question doesn't make sense to you?
23   A.  No, it does not.
24   Q.  Okay.
25       It won't be the first or the last one I ask

Page 147

1    that doesn't make sense.
2        Do you know the difference between median
3    lethal dose, LD 50, and median effective dose,
4    ED 50, values that would constitute a narrow
5    therapeutic index?
6    A.  For a particular anticoagulant, no, I do not
7    know those.  I could not tell you what those are.
8    Q.  What about generally?
9    A.  You know, again, my -- what I'm familiar
10   with is that in -- in studies that look at a proper
11   dosing of drugs, often they are done in animals.
12   And you are looking at what the median lethal
13   dose -- the dose that would kill an animal and
14   often -- and the dose that would be safe for the
15   animal and give some -- I mean, we don't study
16   lethal doses in humans, obviously, but that -- that
17   comes from preclinical data, animal data and -- and
18   the like.
19   Q.  But you don't know those values for any
20   particular anticoagulants?
21   A.  I do not.
22   Q.  Do you know what the median lethal dose for
23   Xarelto is?
24   A.  I do not.
25   Q.  Do you know what the median effective dose

Page 148

1    for Xarelto is?
2    A.  I wish I did.  I do not.  Does anyone?
3    Q.  What is the difference in the minimum toxic
4    concentrations and minimum effective concentrations
5    in the blood that would constitute a narrow
6    therapeutic index, if you know?
7    A.  Can you repeat the question?
8    Q.  Sure.
9    A.  I kind of got lost there.
10   Q.  What is the difference in the minimum toxic
11   concentrations and minimum effective concentrations
12   in the blood that would constitute a narrow
13   therapeutic index?
14       MR. MCWILLIAMS:  Object to form.
15   A.  So are you asking me specifically if I know
16   the concentration a particular drug, what the
17   two concentrations would be of minimally --
18   minimally toxic and minimally effective, you're
19   asking?  So obviously, that -- those are -- yeah,
20   those are very important parameters to know.
21   Q.  Right.
22   A.  And we would love to have that data on -- on
23   every drug that we use.  But, no, I do not know
24   specifically what those values are, like,
25   particularly with Xarelto.  I do not know what the

Page 149

1    concentration of Xarelto would be at the minimally
2    effective level and the minimally toxic level.
3    Q.  Okay.
4        So you don't know if it is -- speaking more
5    generally than Xarelto, in order to have a narrow --
6    a drug with a narrow therapeutic index, you don't
7    know if that would be a fivefold difference, a
8    threefold difference, a tenfold difference?
9    A.  No.
10   Q.  You don't know the minimum toxic
11   concentration for Xarelto, correct?
12   A.  That's correct.
13   Q.  And you don't know the minimum effective
14   concentration for Xarelto, correct?
15   A.  That's correct.
16       MR. MCWILLIAMS:  Object to form.  Asked
17   and answered.
18   A.  Because, to my knowledge, it has not been
19   published.
20   BY MS. YATES:
21   Q.  To your knowledge?
22   A.  To my knowledge.
23   Q.  In offering your opinion on narrow
24   therapeutic index, as part of your methodology, did
25   you review articles that said Xarelto has a wide

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1      therapeutic window?
2         A.  I perhaps have seen that language used, but
3      I couldn't tell you whether it's in a publication or
4      in a report.  I don't recall.
5         Q.  Okay.
6            Let me show you the paper that I'm going to
7      mark as Exhibit 7, I believe.  And I'm marking mine.
8      It has my super-duper highlighting on it.
9            MR. MCWILLIAMS:  7, you said?
10           MS. YATES:  Yes.
11           (Whereupon Exhibit No. 7, Heparin-Calibrated
12           Chromogenic Anti-Xa Activity Measurements in
13           Patients Receiving Rivaroxaban: Can This
14           Test Be Used to Quantify Drug Level?, was
15           marked for identification.)
16     BY MS. YATES:
17        Q.  Doctor, I've handed you Exhibit 7,
18     "Heparin-Calibrated Chromogenic Anti-Xa Activity
19     Measurements in Patients Receiving Rivaroxaban: Can
20     This Test Be Used to Quantify Drug Level?"
21           Are you familiar with this article?
22        A.  No, I'm not.
23        Q.  Well, it's on your list of materials
24     reviewed and relied on.  Did you know that?
25        A.  It may be.  So I may have -- as I've said,

Page 151

1      I've looked through many, many, many papers and
2      documents.  So I -- I don't recall this one
3      particularly, nor do I think I reference this one in
4      my report.
5         Q.  No, you didn't, but it's on your --
6         A.  Yeah.
7         Q.  -- list of materials?
8         A.  I know that I reviewed materials of
9      Dr. Adcock, Dr. Moll -- I don't recognize the
10     Gosselin, but if it's on -- you know, as I said, I
11     have a stack of papers.
12        Q.  Okay.
13           So I take it even though it's on your list
14     of materials that you reviewed -- sorry -- relied
15     on, reviewed, and/or considered, are you saying you
16     do not rely on this article or you just simply don't
17     remember it?
18        A.  I don't remember it.  I did not use it to
19     reference anything that's in my report.  There are a
20     number of articles there, as well as on, I think,
21     Exhibit 6, that are not specifically referencing
22     anything in my report.  It certainly doesn't --
23     doesn't imply that I think these are bad articles or
24     misleading in any way.  I just -- I just simply did
25     not rely on them.

Page 152

1         Q.  Do you know who Robert Gosselin is?
2         A.  I don't.
3         Q.  Do you know he is a plaintiff expert in this
4      litigation?
5         A.  I didn't know that.
6         Q.  Let me ask you:  I'm going to read a
7      statement from this article, bottom of page -- well,
8      it's actually the bottom of the first page, 777, to
9      the top of Page 778.
10           "Because of its predictable
11     pharmacokinetics, pharmacodynamics, and wide
12     therapeutic range, routine laboratory measurement
13     of the drug's anticoagulant effect is usually not
14     required."
15           Do you disagree with that statement?  And
16     by the way, that statement pertains to rivaroxaban.
17        A.  Yes, I disagree, disagree with it.
18        Q.  But here, we have a piece of published,
19     presumably peer-reviewed literature that says that
20     rivaroxaban has a wide therapeutic range, correct?
21        A.  Correct.
22        Q.  And you don't point that out in your report,
23     correct?
24        A.  No, I do not.
25        Q.  And you can't point to a specific article

Page 153

1      that specifically refers to Xarelto as having a
2      narrow therapeutic range, correct?
3            MR. MCWILLIAMS:  Other than the FDA
4            Center review she did cite to?
5            THE COURT REPORTER:  I'm sorry?
6            MS. YATES:  No coaching the witness, sir.
7            You will object to form.
8            MR. MCWILLIAMS:  I'm not coaching.  You just
9            discussed this.
10           MS. YATES:  Object to form.  That's it.
11     BY MS. YATES:
12        Q.  Right.  And that's why he's not supposed to
13     do that.
14        A.  Right.  No, I -- but my answer is -- and you
15     did ask me this earlier.  And what I did tell you is
16     that what I -- what I referenced in my paper was
17     from the FDA -- presentations made by the FDA.
18        Q.  Right.  FDA.  And it said all oral -- strike
19     that.
20           And the FDA document said "all anticoagu-
21     lants."  You can't point me to a specific paper in
22     the peer-reviewed literature that refers to Xarelto
23     as having a narrow therapeutic index or window?
24        A.  I have not looked specifically for that.
25     So, you know, I cannot point it out.  I don't know

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 154

1   whether it's in the literature or not.  I did not
2   specifically review literature looking for that
3   statement.
4       Q.  Well, you looked at studies and papers by
5   Dr. Wolfgang Mueck, correct?
6       A.  I did.
7       Q.  Did you discount them because he is a Bayer
8   scientist?
9       A.  Absolutely not.
10      Q.  Okay.
11          But you didn't even look for articles to
12  support your opinion; you just found the FDA
13  document?
14          MR. MCWILLIAMS:  Object to form.  Misstates
15          testimony.
16      A.  So, you know, again, I've explained why I
17  believe this has a narrow therapeutic index.
18  BY MS. YATES:
19      Q.  Doctor, I understand you believe.  I'm
20  looking for data --
21      A.  Okay.
22      Q.  -- and science.
23      A.  Okay.  And -- and I -- and I will admit that
24  I have not specifically looked for that language in
25  peer-reviewed literature.  I can do so in the

Page 155

1   future, but I have not done it to this point.
2       Q.  Okay.
3           Doctor, I have a couple of other questions
4   here on Page 5.  Just to clear up, on Page 5 you
5   have a figure from G&G, Goodman and Gilman?
6       A.  Goodman and Gilman.
7       Q.  You don't intend to represent that this
8   diagram is based on Xarelto data, correct?
9       A.  Absolutely not.
10      Q.  This figure can relate to any drug, right?
11      A.  It is, in fact, a diagram, just kind of,
12  yes, exhibiting what we mean by -- how we look at
13  therapeutic response and adverse events.
14      Q.  And your report does not include any data
15  indicating what this diagram would actually look
16  like for Xarelto, correct?
17      A.  Correct.
18      Q.  You're not claiming that you have clinical
19  data from which you can state, more probably than
20  not, what the therapeutic level of Xarelto is for
21  efficacy, correct?
22          MR. MCWILLIAMS:  Object to form.  Asked and
23          answered three times.
24      A.  I do not know -- ask your question again,
25  please.

Page 156

1   BY MS. YATES:
2       Q.  Sure.
3           You're not claiming to have clinical data
4   from which you can state, more probably than not,
5   what the therapeutic levels of rivaroxaban are for
6   efficacy, correct?
7           MR. MCWILLIAMS:  Same objection.
8       A.  Let me tell you kind of how I would
9   answer -- I'm not sure I can actually answer your
10  question.  I mean, we do have -- we have -- we have
11  some data -- not a lot, some data from the ROCKET
12  trial that shows what patients' concentration --
13  what their rivaroxaban concentrations were at
14  different time points after receiving drug.
15          What I don't know, in that particular
16  subgroup of patients, is what the incidence of
17  events was, whether it be bleeding or strokes.  I've
18  not found that.  If -- if that is available, I would
19  love to see it.  I've not seen that before.
20          But we know that at least for the majority
21  of those people, they did not have events, right?
22  I mean, we know that from the -- from the outcome
23  data.  So -- so at least within those ranges,
24  which is, what, 40 to 240, something median, I
25  think, to median C -- the minimal trough

Page 157

1   level -- I mean, the minimal concentration or the
2   trough concentration to the peak concentration
3   levels, there is about a fivefold difference.
4           And, you know, what we can say is that most
5   patients that fall within that zone have neither
6   bleeding nor clotting.  But what we -- we don't know
7   is what the risks of bleeding and clotting are for
8   patients at the 40 -- you know, at the 40 --
9   concentration 40 versus 240.  We -- we just don't
10  know that.
11      Q.  You don't know that?
12      A.  I -- I don't know that, right, the royal
13  "we."
14      Q.  And -- and you -- you need that data to find
15  out whether the higher concentrations or the lower
16  concentrations actually do affect safety and
17  efficacy, right?  You need that outcome data?
18      A.  What -- what we do have is -- I mean, we do
19  have reports of the PT assay using specific reagents
20  that correlates very, very closely with the Xarelto
21  concentration in the blood.  And so that's been
22  widely published by many people.
23          What we -- what has been done -- I think it
24  was in the FDA report, is because they did have
25  outcome measures with the PT data -- and I think

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

1    we -- I think I included those in here, and let's
2    see if I can tell you where those are. So on
3    Page 10 is one of the figures that looks at
4    rivaroxaban concentration versus PT. And that
5    is -- again, using an appropriate PT reagent, you
6    see a very linear, very close association of
7    rivaroxaban and PT.
8        So using that particular PT assay, you can
9    look at, and the data is known for what outcomes
10   were compared to PT. And that -- that's given on
11   Page 12 and 13. So -- so there is, essentially --
12   you know, if you look at the figure on Page 12,
13   there is -- looking at the quartiles of PT, from the
14   lowest quartile to the highest quartile, we don't
15   see any effect on efficacy of preventing strokes.
16       But if we look at the bleeding risk in the
17   quartiles of PT, we see at the -- with each
18   quartile of PT, with each, you know, 25 percent of
19   patients at these different PT measurements, the
20   risk of bleeding goes up dramatically.
21       So there is clearly -- and we know that PT
22   correlates almost identically to concentration. So
23   we can look at that, and we can make that -- we can
24   infer, we can make that -- that leap to say, yes, as
25   concentration increases of rivaroxaban in the blood,

Page 159

1    there is a very marked increase in percentage of
2    patients who have bleeding, right? And that's the
3    figure on Page 13. While with increase in
4    concentrations of rivaroxaban in the blood, we
5    really -- we don't see any increase in benefit.
6        So the benefit -- at least with the PT
7    measurement, the benefit seems to occur with
8    relatively low levels of rivaroxaban. Again, I'm --
9    I'm having to use indirect assertions because this
10   kind of data that is shown in -- in my report for
11   edoxaban, that is shown for dabigatran, we simply --
12   I simply don't have access to it for -- for Xarelto.
13   And I don't know where that is. I'd love to see it.
14   Q. Do you remember my question?
15   A. Uh-uh.
16       MS. YATES: And, unfortunately, we've lost
17       realtime again.
18       MR. MCWILLIAMS: Us, too.
19       MS. YATES: I think my question was much
20       simpler than that. But it's quarter to one.
21       Do you want to take a lunch break and I will
22       pick up where I left off.
23       THE VIDEOGRAPHER: Off the record at 12:46.
24       (Luncheon recess.)
25       THE VIDEOGRAPHER: This is the beginning of

Page 160

1        Tape 4. Back on the record at 1:24.
2    BY MS. YATES:
3    Q. Doctor, before we took a break for lunch,
4    there was just one point that I want to follow up
5    on.
6        You said that the risk of bleeding goes up
7    dramatically in relation to, I think, PT time that
8    there's a correlation, you said.
9        Do you know if that risk of bleeding goes up
10   across all doses or just the approved therapeutic
11   doses?
12       MR. MCWILLIAMS: Object to form.
13   A. That information that is in my report comes
14   from PT measurements taken on -- I believe it was
15   over 7,000 individual patients who are on the ROCKET
16   study -- sorry. What was it you asked specifically?
17   Q. You made a statement that the risk of
18   bleeding goes up dramatically.
19   A. Uh-huh.
20   Q. I want to know: Is that only based -- that
21   comment only based on the ROCKET data, or is that a
22   more general comment from a broader range of
23   studies?
24   A. I believe we were specifically talking about
25   that -- the data that's in my report and looking at

Page 161

1    the -- the graph. I believe that was what that
2    comment was in reference to.
3    Q. All right.
4        Doctor, on Page 2 of your report, we have
5    your summary of your ten opinions. And one of those
6    opinions is No. 6:
7        "The Prothrombin time (PT) laboratory test,
8    with the appropriate reagent, is a useful and
9    readily available test for identifying
10   Xarelto-treated patients at the highest risk of
11   experiencing a major bleeding event."
12       And that is the opinion you intend to offer
13   at trial in this case?
14   A. Yes. That's an opinion based on some of
15   that information we just looked at.
16   Q. Okay.
17       What methodology did you use to determine
18   that a PT test using the appropriate reagent is a
19   reliable test for identifying Xarelto patients at
20   the highest risk of bleeding?
21       MR. MCWILLIAMS: Object to form. Asked
22       and answered.
23   A. So, I mean, it -- although -- I mean,
24   reliable remains to be seen because it has to be put
25   into practice. I said it's a readily available test,

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1  and that is based on the -- the data that we looked
2  at here that was from the ROCKET trial, looking at
3  bleeding events in patients who had PT measurements
4  made at specific time points on the study.
5      Q.  All right.
6          And when you refer to a -- an appropriate
7  reagent, you understand that different PT reagents
8  exist, and some of them are sensitive to Xarelto,
9  and others are not sensitive?
10     A.  That's correct.  And actually, there is a
11 graph of that in here.
12     Q.  Right.  And we're going to -- we're going to
13 go through all of that.
14         Doctor, in fact, you said "reliable remains
15 to be seen."  That's the state of the science right
16 now, isn't it?  Reliable remains to be seen?
17     MR. MCWILLIAMS:  Object to form.
18     A.  Reliable is -- this -- we -- we need to have
19 studies that help us to understand how best to
20 apply.  I mean, what's very clear in all of the
21 PK/PD studies that have been done with Xarelto, that
22 PT, using an appropriate reagent, using a reagent
23 that is sensitive to the presence of rivaroxaban
24 shows a very strong correlation.  So the PT shows
25 very strong correlation to the concentration of

Page 163

1  rivaroxaban.  So that's information that tells us
2  that -- that this test could be extraordinarily
3  useful.
4          But -- but we -- you know, we need guidance.
5  We need to have presumably the company that markets
6  a drug to help define how best to use lab tests,
7  et cetera.  In -- you know, I mean, we've already
8  said these patients are vulnerable.  They are
9  vulnerable to you, know, to life-threatening,
10 life-altering events, whether it's stroke or
11 bleeding.
12         And, you know, the more help we can get as
13 clinicians in how to properly and safely use these
14 types of drugs, the better.  And, I mean, you know,
15 this is my editorial opinion.  I mean, I would think
16 that the company that makes these drugs would want
17 to do that, as well.
18     Q.  So, Doctor, we need studies to determine
19 reliability of use of the PT test with the
20 appropriate reagent, to answer the question?
21     A.  I actually think there's probably a lot of
22 data already available from patients on these
23 studies who've been on rivaroxaban, who've had PT
24 measurements done.  But again, you know, that's --
25 that's information that would be probably privy

Page 164

1  to, you know, the company.
2          But I -- I think -- I think what we need to
3  do first is gather all the available data that we
4  have to help us figure this out.  Whether it's a
5  PT -- I mean, I think anti-Xa levels are also
6  useful, and I think have been shown to be useful in
7  numerous pharmacokinetic studies of rivaroxaban.
8          The issue with the anti-Xa is that it's --
9  while we can obtain those studies, they are usually
10 not -- you know, we usually don't have, like, a
11 one-hour turnaround time on getting an anti-Xa level
12 done.
13         PTs, however, in this country are beyond
14 widely available.  Every single laboratory that I
15 can imagine would be able to do a PT realtime, and
16 that could be extraordinarily useful in a patient
17 who is failing Xarelto in one way or the other,
18 either having a clot or a bleed, as we mentioned
19 earlier.
20         So, you know, here is a test that's readily
21 available, quick turnaround time on results and
22 could be extremely helpful in managing patients.
23 And there certainly appears -- there is the
24 appearance that there's data to support its use in,
25 if not monitoring, at least looking to see -- using

Page 165

1  it as a surrogate marker for the concentration of
2  the drug in the blood.  And I think there's probably
3  a lot of data that currently exists that I imagine
4  the company has on this.  That would be a great
5  place to start.
6      Q.  You said it's a surrogate marker for
7  concentration, but do you have data showing what
8  that concentration means, what it is associated with
9  in terms of adverse outcomes?
10     A.  Not nearly as much data as we would like to
11 see -- as I would like to see.
12     Q.  Right.  And that's why, at this point in
13 time, it's readily available, but it certainly
14 hasn't shown to be reliable, has it, Doctor?  You
15 don't have that data?
16     MR. MCWILLIAMS:  Object to form.
17     A.  I personally don't have that data.
18 BY MS. YATES:
19     Q.  So if you do a test -- let's just say a PT
20 test --
21     A.  Uh-huh.
22     Q.  -- and you see a concentration that's
23 high --
24     A.  A PT level that's high.
25     Q.  A PT level that's high, I'm sorry.

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1    A. Yeah.
2    Q. You could dose adjust that atrial
3  fibrillation patient down because you're concerned
4  about the elevated PT level, right?
5    A. That would be very difficult to do, because
6  I have no -- I don't know how to adjust Xarelto.
7    Q. Sorry. And, in fact, if you did dose adjust
8  based on that simple PT test, you could actually be
9  exposing that patient to a risk of stroke because
10 you're going below the efficacy level, correct?
11   A. As I said, I would not. I would not, at
12 this point, adjust down. What I would do -- and I
13 think there -- you know, there are some reports of
14 this. I believe there was a report from Japan in
15 which -- a relatively small study, but in which the
16 investigator used a -- a sensitive PT reagent and
17 was able to identify patients who had the highest
18 bleeding risk.
19      You know, I mean, I think there are ways we
20 could utilize this. We certainly need more studies.
21 This -- this is an important point. And we
22 definitely need more input from the manufacturer
23 on -- on how we can best do this.
24      But -- but to get to your point, I
25 personally would not adjust down this drug, because

Page 167

1  we don't -- you know, again, we don't have an
2  algorithm for how to do it. There is no algorithm
3  that's been established and studied.
4      What I would do is, if I did a PT in a
5  high-risk patient for bleeding, and the PT was
6  prolonged, probably in that upper quartile, where
7  we see a significant incidence of bleeding, I would
8  likely change them to another drug. If I were going
9  to do anything, if I were going to use that -- that
10 model, if I were going to use a PT model to make
11 a decision, I would simply -- I would simply
12 transition them to another anticoagulant, because I
13 don't know how to adjust down a dose.
14   Q. And that alternative anticoagulant would not
15 be another NOACs; you would actually change them to
16 warfarin?
17   A. Probably.
18   Q. Right?
19   A. Probably.
20   Q. The Japanese study that you referred to --
21   A. Let's see --
22   Q. -- that showed you the bleeding risk, I
23 think -- is Nakano?
24   A. Yes, it is Nakano. I think it's at the --
25 in the appendix.

Page 168

1    Q. It's in your list?
2    A. Okay.
3    Q. Have you seen data that actually is the
4  complete opposite to Nakano?
5    A. Have I seen data -- no, I have not.
6    Q. Did you look for data that is inconsistent
7  with Nakano?
8    A. I looked for -- you know, I searched for
9  pharmacokinetic -- I mean, there is no way to
10 identify, pro or con, any particular opinion. But I
11 did search for data on pharmacokinetics. I did not
12 see -- if there was an article, I did not see it.
13   Q. Okay.
14      Are you aware of any real world data -- and,
15 Doctor, what I mean there is the NOACs that are out
16 in the real world, so beyond the clinical trial
17 setting.
18      Are you aware of real-world data showing
19 that for one of the NOACs, doctors actually were
20 dose-adjusting down, and the incidence of stroke
21 increased significantly?
22   A. I -- I haven't seen that paper.
23   Q. And based on the science and what we know
24 now, in fact, you would not dose adjust down?
25   A. No I -- as I said, I would not, because I

Page 169

1  don't have enough information that would reliably
2  tell me what to do.
3    Q. Okay.
4      You are aware that the manufacturers of the
5  NOACs are working towards getting a factor Xa assay
6  approved in this country?
7    A. I would certainly hope so.
8    Q. Well, I know you hope so. But are you aware
9  that they are?
10   A. I have not asked an industry representative
11 that specific question, but I -- I would assume they
12 are, and I've seen mention of that, opinions. But,
13 you know, like I said, I'm not privy to exactly what
14 they're doing.
15   Q. Well, you were certainly shown some internal
16 Bayer and Janssen documents and -- to prepare your
17 report, right?
18   A. I was.
19   Q. Were you provided any documents showing what
20 the manufacturers are trying to do working towards a
21 factor Xa assay?
22      MR. MCWILLIAMS: Object to form.
23   A. I -- I don't recall seeing that specifically
24 mentioned.
25 BY MS. YATES:

43 (Pages 166 to 169)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 170

1    Q. Would that be of interest to you?
2    A. Certainly. I mean, as I said, I would
3  assume they are. I would certainly hope they are,
4  just like I hope and assume they are working on a
5  reversal agent, and -- and I would assume that.
6  Yeah, I mean, but, of course, you know, that would
7  be -- that would be important.
8    Q. Did you ask if the companies had actually
9  done research to try to develop a reversal agent?
10    A. Did I ask whom?
11    Q. The lawyers.
12    A. I don't recall if I did or not. Probably
13  not.
14      I mean, if I could just follow up on that,
15  though, we are now five years past the time that
16  this received FDA approval. So, you know, if they
17  had been working on a reversal agent, I would have
18  hoped they would have been much farther along by
19  now. Again, I hope they are now. But we're five
20  years down the road. There have been a lot of
21  bleeds -- deaths related to bleeding, bleeds that
22  could not be reversed.
23    Q. What is the data showing, out in the real
24  world, with regard to length of time of
25  hospitalizations with Xarelto compared to warfarin

Page 171

1  due to bleeds?
2    A. I don't know that data.
3    Q. Okay.
4      What is -- what is the real world data
5  showing in terms of severity of bleed for Xarelto
6  versus warfarin out in the real world?
7    MR. MCWILLIAMS: Object to form.
8    A. I don't have that data.
9  BY MS. YATES:
10    Q. Wouldn't you be interested to know if
11  hospitalizations are less because the bleeding stops
12  more readily than with warfarin, and that the
13  bleeding is less severe?
14    A. The length of hospitalization, the -- I
15  mean, you know, these sort of indirect things,
16  again, are -- are kind of, to some degree, beside
17  the point of how I take care of patients.
18      When my patient is bleeding, I want to be
19  able to reverse it. Now, if we find data on some
20  hospital that this patient population stays in
21  five days and this four and a half days, that does
22  not really matter very much to me or my patients.
23      I can reverse warfarin bleeding. I cannot
24  reverse rivaroxaban bleeding.
25    Q. What are the standard medical procedures for

Page 172

1  reversing a bleed for a patient on warfarin?
2    A. Bleeds can be -- so -- so we have to just
3  reverse the effect of warfarin. So you can do
4  that -- and so there are a couple of different ways,
5  I guess is what I'm saying.
6      If it's a nonserious bleed, the warfarin can
7  be either stopped and let it reverse on its own or
8  you can administer Vitamin K, and that will often
9  reverse the warfarin effects within 12 to 24 hours.
10      If you need acute reversal, we have an
11  FDA-approved drug, which is Kcentra, a prothrombin
12  complex concentrate, that we can give that
13  immediately reverses warfarin. Prothrombin complex
14  concentrate.
15    Q. Isn't it standard bleeding management --
16  strike that.
17      When you have a warfarin patient, do you
18  immediately administer Vitamin K?
19    A. Again, tell me the scenario. A warfarin
20  patient who is bleeding?
21    Q. You immediately administer Vitamin K?
22    A. So these are patients who would be
23  presenting to the emergency room with bleeding on
24  warfarin. Yes, they would -- you know, again, I'm
25  not in the ER when those patients come in. But,

Page 173

1  yeah, that is the standard practice, is they would
2  be given Vitamin K.
3      However, if they're critically bleeding,
4  you've got to give them factors II, VII, IX, and X,
5  because that's what is not present in order for them
6  to form a clot. You do that by replacing -- by
7  giving Kcentra, which replaces II, VII, IX, and X
8  immediately, and it immediately reverses that
9  defect.
10    Q. How long is warfarin in a person's system?
11    A. So, you know, I don't know exactly, because,
12  of course, warfarin's effects are indirect, right?
13  This is not a direct anticoagulant. warfarin's
14  effects have to go through a sort of a chemical
15  reaction. So warfarin interrupts the -- you know,
16  the sort of cycle of Vitamin K reduction, and then
17  you have to have reduced Vitamin K to get
18  carboxylase -- all I'm saying is that you have a lot
19  of downstream things that happen when you give
20  warfarin.
21      As you know, you can't just give warfarin or
22  Coumadin, and then an hour later a patient is
23  anticoagulated. It doesn't work that way. It takes
24  days. When you start warfarin it takes several
25  days, because warfarin works by impacting certain

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

```
 1    biochemical processes that go into making these
 2    clotting factors, II, VII, IX, and X.
 3         Q. So it takes days, right?
 4         A. Correct.
 5         Q. And during those days, the patient is
 6    unprotected against possible stroke or blood clot?
 7         A. That -- that would well be the case. In the
 8    patients I take care of, they're never unprotected.
 9    They are on -- they're on a low-molecular weight
10    heparin or a heparin.
11         Q. You bridge them?
12         A. Yeah.
13         Q. So you have to -- you have to bridge
14    patients --
15         A. Yes.
16         Q. -- until that warfarin is effective?
17         A. Yes. If you -- to get anticoagulation in
18    those first few days, you have to have something
19    that provides anticoagulation, because you're right,
20    the warfarin alone will not do it.
21         Q. Okay.
22            And but you don't know how long warfarin
23    remains in a person's system; you haven't looked at
24    that data?
25            MR. MCWILLIAMS: Object to form.
```

Page 175

```
 1         A. Not in a long time. I mean, it -- it's
 2    not long. I mean, once we stop warfarin, it's
 3    really the effect of it on the Vitamin K that has a prolonged effect. The warfarin
 4    Vitamin K that has a prolonged effect. The warfarin
 5    itself, I think, is out of your system within -- I
 6    don't know, eight hours or so. But, again, I could
 7    be -- I could be wrong, and I haven't looked at that
 8    in a long time.
 9         Q. Are there any side effects associated with
10    the reversal agent used for warfarin?
11         A. There can be if you overdose, right? If you
12    overcorrect the II, VII, IX, and X, that reagent can
13    be somewhat thrombogenic because now you've got too
14    much of those clotting factors. So, you know, that
15    has to be dosed -- so what -- what is usually done
16    is a relatively low dose of it is given. You don't
17    need to completely correct II, VII, IX, and X. You
18    just need to get them partially corrected in order
19    to help the patient stop bleeding.
20         Q. Now, the administration of the reversal
21    agent -- by the way, one of the problems, if you
22    get that dose wrong, is that the patient can die
23    from too much, right?
24         A. Theoretically, but not usually. I mean,
25    that's -- that would be an un-- -- I mean,
```

Page 176

```
 1    I --
 2         Q. Do you know if that's in a black box warning
 3    in the product?
 4         A. I'm sure it is. With any PCC, we have --
 5    PCCs were developed to treat a form of hemophilia.
 6    So they've been around a long time. Kcentra is the
 7    only one that's FDA approved to treat the indication
 8    of warfarin overdose, and -- and that's because that
 9    was the one that was studied. The company that --
10    that created it created it deliberately for that
11    purpose, and it was studied for that specific
12    purpose. But we've had PCCs a long time. I've used
13    them a lot.
14         Q. Do you remember my question?
15         A. It was something about how people who will
16    die because of PCCs or have clots because of PCCs.
17    It would be rare if you use the indicated dose.
18         Q. Okay.
19         A. It would be extraordinarily rare.
20         Q. My question was actually: Do you know if
21    there is a black box warning related to --
22         A. I think there is, yes. I think there is.
23         Q. All right.
24         A. I might interject that, although you have
25    not asked it, there is, in fact, I believe, on the
```

Page 177

```
 1    label of rivaroxaban that if emergent reversal is
 2    needed, one can use -- I believe this is in the
 3    rivaroxaban label, and I would have to look and see.
 4    I think it's in -- it's in one of the DOACs that you
 5    can use a PCC or an activated VII.
 6         Q. Now, when you have a -- strike that.
 7            You are not in the emergency room treating
 8    patients that come in having a bleed on warfarin?
 9         A. That is correct.
10         Q. But you do know that in addition to
11    administering a reversal agent, the doctors are --
12    the priorities are find the bleed, stop the bleed,
13    and in conjunction with those, possibly
14    administering these other agents, right?
15            MR. MCWILLIAMS: Object to form.
16    BY MS. YATES:
17         Q. Do you know that?
18         A. I'm sorry. I'm not -- the way you're
19    making it sound is that that's some distant third
20    thing that they're going to just think about
21    later. I don't believe that's the case. I believe
22    reversing -- if it is known that a patient is on
23    an anticoagulant, if it's known that they are on
24    warfarin, that would be right at the top of the
25    priority list. I mean, right -- I mean, I don't
```

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

1  think -- and it's often, when you're in an emergency
2  situation, it's not "I'm going to do one, then I'm
3  going to do two, then I'm going do three." Often
4  we're doing three things at once because we've got
5  multiple -- you know, we have a team in place.
6       So this is actually quite important to me
7  because I treat patients who have deficiencies of
8  clotting factor who come into the emergency room
9  bleeding, and the most important thing is that their
10  clotting factor is replaced. That's done before
11  they get a CAT scan. Before we ever identify where
12  they're bleeding, they got their clotting factor
13  administered.
14       So this is just -- you know, this is how I
15  view -- when someone comes in bleeding, you have
16  to -- you have to -- and they have a defect in
17  their clotting system, you have to correct that.
18  There is no point in taking someone to have brain
19  surgery to evacuate the bleeding in their head if
20  you haven't corrected the anticoagulant.
21       Q. I think my question was much simpler.
22       A. Sorry about that. We were --
23       Q. It -- you made it sound as if you have a
24  patient coming into the emergency room experiencing
25  a bleed on warfarin. Is it your testimony that the

Page 179

1  first thing a doctor does is provide them a reversal
2  agent?
3       MR. MCWILLIAMS: Object to form. Asked and
4       answered.
5       A. I would believe that's one of the first
6  things that's done, is that it's ordered, you know,
7  that it -- whether it's kept in the emergency room
8  or in the pharmacy. But I would think an order for
9  that would be -- would be absolutely essential, and
10  would be done very soon after the patient comes
11  in.
12       Q. Do you see how you changed the words of
13  my question, though? You said "ordered." I said
14  "administered." So I want to get --
15       A. Okay.
16       Q. Perhaps I'm too simple. But is it your
17  testimony that a patient comes in bleeding to the
18  emergency room, the doctors know they're on
19  warfarin, the first thing they do is order the
20  reversal agent?
21       A. I would think that would be the case.
22       Q. And then do they -- obviously hopefully
23  obtain the reversal agent, but meanwhile other
24  things are going on with the patient?
25       A. Yes, of course. Of course. You don't just

Page 180

1  stop everything.
2       Q. So you're not saying it's a timeline of
3  first, reversal agent ordered and administered?
4       A. Right.
5       Q. And then you do the other standard operating
6  procedures for a bleed?
7       A. No. I think, as I said, you know, you're
8  doing multiple things at the same time. You have a
9  team of people, yeah.
10       Q. Right. Okay. We are on the same page. It
11  just took me a while to not be too simple.
12       Your opinion that PT is a readily available
13  test for identifying Xarelto-treated patients, have
14  you published that opinion?
15       A. I have not.
16       Q. Have you tested whether it's reliable?
17       A. I have not.
18       MR. MCWILLIAMS: Object to form.
19  BY MS. YATES:
20       Q. So you don't know your error rate?
21       A. That's correct.
22       Q. You don't know, sitting here today, how
23  unreliable using that PT test with an appropriate
24  reagent is?
25       MR. MCWILLIAMS: Object to the form.

Page 181

1       A. There are many things that I don't know
2  about using that. What I do know is that it is a
3  readily -- readily available test that has shown
4  very strong correlation with rivaroxaban levels in
5  the blood, and as such, could be -- could take
6  advantage of that for a patient's benefit.
7       But, of course we need -- you know, I alone
8  can't establish this algorithm of how to use it.
9  This needs to be done -- you know, we need to have,
10  you know, additional studies, real-world studies,
11  whatever, but in a way that we can gather enough
12  data to where we could -- we could utilize this.
13       Q. To find out if it actually is reliable?
14       MR. MCWILLIAMS: Object to form.
15       A. Well, I mean, it's going to be reliable in
16  determining what the concentration is.
17       Q. The next step, Doctor, what does that
18  concentration mean in terms of patient care?
19       A. And there we need the company to show us
20  their data.
21       Q. Or for the data to develop either through
22  continuing studies and research?
23       A. Or for it to develop through continuing
24  research, yes.
25       Q. Doctor, you understand -- let me back up for

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1    one second.  The word "monitoring" has been used.
2    What you're talking about in terms of monitoring is
3    some type of blood test to see if we can improve the
4    safety and efficacy of Xarelto?
5        A.  That would be a start.
6        Q.  Right?
7        A.  Correct.
8        Q.  And that's similar to the INR test that was
9    available 30 years after warfarin came on the
10   market, something similar to INR?
11       A.  That would be correct.
12       Q.  Okay.  And that doesn't exist right now?
13           MR. MCWILLIAMS:  Object to form.
14       A.  The -- I think the testing methodology
15   exists.  It's that we don't know how to apply it.
16       Q.  Understood.  Understood.
17           So what we're not talking about with regard
18   to monitoring is a doctor gives a patient with
19   atrial fibrillation a prescription for Xarelto and
20   says, "Go home.  You don't need to come back and see
21   me and be looked at or taken care of while you're on
22   this medicine."  Right?
23       A.  Right.  I mean, that -- that would be true
24   of any medication anybody gives a patient.
25       Q.  Right.  But certainly you can give a

Page 183

1    week-long course of antibiotics and there may not be
2    much follow-up if it works, versus Xarelto for
3    atrial fibrillation is a long-term, possibly
4    lifelong commitment, right?
5        A.  That's correct.
6        Q.  And what we're saying is these patients have
7    serious underlying medical conditions that certainly
8    require them to be monitored by their doctors,
9    right?
10       A.  Correct.
11       Q.  For example, with Xarelto, for atrial
12   fibrillation patients, we know that if their
13   creatinine clearance changes, that a simple blood
14   test will tell a doctor that actually they need to
15   go on the lower approved dose, correct?
16       A.  That's correct.
17       Q.  Doctor, you are aware that all of the NOACs,
18   including Xarelto, were approved by the FDA without
19   a requirement for monitoring either the drug level
20   or degree of anticoagulation, correct?
21       A.  Correct.
22       Q.  And do you know if the FDA actually had a
23   workshop on this issue where they discussed
24   monitoring?
25       A.  I don't know specifically about workshops

Page 184

1    that the FDA had.
2        Q.  But you agree that Xarelto and the other
3    NOACs were approved without a requirement of
4    therapeutic drug monitoring?
5        A.  I do know that.
6        Q.  And you know that currently there is no
7    FDA-approved standardized test or device that can
8    measure the drug level of Xarelto in a patient's
9    blood or a surrogate blood test that can assess the
10   degree of anticoagulation with Xarelto use, correct?
11           MR. MCWILLIAMS:  Object to form.
12       A.  I know that there is no recommended
13   FDA-approved test to do that.
14       Q.  Well, there is no FDA-approved standardized
15   test to do it, right?
16       A.  Correct.
17       Q.  And you understand that the -- I'm just
18   going to call it PT test, prothrombin time.  You
19   also understand that the PT test has not been
20   approved by the FDA to measure the level of Xarelto
21   or the degree of anticoagulation, correct?
22           MR. MCWILLIAMS:  Object to form.
23       A.  Yes.  As far as I know, that's correct.
24       Q.  And there is no approved -- FDA-approved
25   assay that can measure drug level or degree of

Page 185

1    anticoagulation for any of the NOACs, correct?
2        A.  That's --- I believe that's correct.
3        Q.  You agree that the FDA does not recommend or
4    require PT testing for Xarelto, correct?
5        A.  Correct.
6        Q.  In fact, are you aware of any drug
7    regulatory agency worldwide that recommends or
8    requires PT testing for Xarelto?
9        A.  Uhmm, right.  I can't speak -- I really
10   can't speak to that.  As far as I know, that's
11   correct.
12       Q.  You agree that there are no professional
13   medical societies that have issued medical practice
14   guidelines that recommend or require PT testing for
15   Xarelto, correct?
16       A.  As far as I know.  I don't -- you know, I
17   don't keep up with all the guidelines, but as far as
18   I know, I have not seen it.
19       Q.  And you are a member of several
20   organizations, right?
21       A.  I am.
22       Q.  Do they have any guidelines that you are
23   aware of recommending or requiring PT testing for
24   Xarelto?
25       A.  No, but they don't -- the societies that I

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1    belong to don't give -- don't have guidelines in the
2    sense that you're talking about.
3        Q.  Okay.
4            What about -- so no -- no practice
5    indications for anticoagulants?
6        A.  Right.  The ISTH, I don't think that has
7    any published guidelines, and certainly the other
8    societies that I belong to don't.
9        Q.  Your report notes that global regulators and
10   clinicians are currently investigating the
11   possibility of therapeutic drug monitoring for
12   Xarelto.
13           Doctor, the reason that regulators and
14   clinicians are currently investigating the
15   possibility of therapeutic drug monitoring for
16   Xarelto is because it hasn't been scientifically
17   established that the safety of the effic- -- or
18   efficacy of the medicine could actually be improved
19   by such monitoring, correct?
20           MR. MCWILLIAMS:  Object to form.
21       A.  Again, you know, I can only go back and tell
22   you that, you know, it's just a logical progression
23   that we know that the concentration of drug in the
24   system is directly correlated with bleeding, that
25   the higher the concentration, the more likely a

Page 187

1    patient is to bleed, and that there are some assays
2    notably PT using certain reagents, notably anti-Xa
3    that can be -- that have been shown to strongly
4    correlate with the blood concentrations of
5    rivaroxaban.
6            So, you know, are there ways that this can
7    be done?  Absolutely.  Do we have all of the
8    information that we need about what those safe
9    levels are?  No, we don't.
10       Q.  Doctor, as you sit here today, you do not
11   know if monitoring will improve the safety and
12   efficacy of Xarelto, correct?
13           MR. MCWILLIAMS:  Object to form.
14       A.  Certainly -- I can't possibly know that, but
15   I believe that it would.  I can't know that without
16   it actually being done.
17       Q.  And the ongoing investigations of
18   therapeutic drug monitoring are not limited to
19   Xarelto, right?  You know that it's the other NOACs
20   as well?
21       A.  Yes.
22       Q.  So let's talk a little bit more about PT,
23   and we've already established that stands for
24   prothrombin time, which for some reason I have a
25   hard time saying, prothrombin time, correct?

Page 188

1        A.  Yes.
2        Q.  And it's a measure of how quickly the
3    blood clots, right?
4        A.  Yes.
5        Q.  Very simple -- if it's too simple, correct
6    it, Doctor.  I'm a simple person.  The bottom line
7    is blood is drawn at a lab -- blood is drawn and
8    sent to a lab, right?
9        A.  Yes.
10       Q.  At that point a reagent is added to the
11   blood and it causes the blood to begin clotting?
12       A.  Yes.
13       Q.  And that time is measured in seconds?
14       A.  Correct.
15       Q.  And there are a variety of reagents that can
16   be used at labs when doing a PT test?
17       A.  That's correct.
18       Q.  And depending on the different reagent
19   that's used, that can affect the length of time for
20   the blood to clot, right?  There's variability
21   across reagents?
22       A.  Yes, there's -- there's variability,
23   especially when if you're using it to look for
24   something that modifies the plasma.
25       Q.  And because the PT times can differ

Page 189

1    depending on the reagent, a PT result obtained with
2    one reagent cannot necessarily be compared to a PT
3    result obtained with another reagent, correct?
4        A.  You know, it's more nuanced than that.
5    In -- in a normal sample of plasma -- so we don't
6    study whole blood.  It's plasma is the -- all the
7    red cells are separated, and we take plasma.  Most
8    PT reagents have a very similar normal range when
9    done in the lab.
10           Where the differences are going to be noted
11   is when something is aberrantly going on in that
12   plasma, that certain reagents will be more sensitive
13   to what's going on than others, but as far as like
14   the normal range in the normal person, it's roughly
15   very, very similar from one reagent to the other.
16       Q.  But they are not identical.  There are
17   different ranges in different labs because they use
18   different reagents?
19       A.  And different instruments.
20       Q.  Right?
21       A.  Yeah.
22       Q.  Okay.
23       A.  But, again, those ranges in normals are very
24   tight, so it's usually like 10 to 12 seconds, and
25   maybe it's 10.5 to 12.1 in one lab and 10.3 to 11.9,

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1    but, basically, they are very tight, generally
2    speaking, for normal people with normal plasma.
3        Q.  But the problem of comparing these PT times
4    with different reagents, that's actually what helped
5    or led to the development of the INR --
6        A.  That's correct.
7        Q.  -- because the INR normalized those
8    differences?
9        A.  Yeah.  Because as I said, it's when you --
10   it's when you create -- or when there's a problem in
11   the plasma, the different -- I'm sorry, for a normal
12   plasma they are very similar, but once you start
13   creating like a deficiency of a clotting factor,
14   some reagents are more sensitive than others.
15       So just like with warfarin where you have
16   deficiency of multiple clotting factors that, you
17   know, again, some reagents are more sensitive than
18   others, and so they've introduced this standard way
19   of making them comparable from one place to the
20   other.
21       Q.  Are you familiar with the EMA, the European
22   Medicines Agency?
23       A.  Uh-huh.  I am.
24       Q.  The European equivalent of the FDA?
25       A.  Yes.

Page 191

1        Q.  Are you aware that they have concluded that
2    PT is not very useful for NOACs?
3           MR. MCWILLIAMS:  Object to form.
4        A.  Uhmm, you know, I may have read that, and I
5    mean, I have gone through a stack of things, so I
6    possibly read it.  I wouldn't have remembered it if
7    you'd asked.
8        Q.  And that's a similar view to the FDA's
9    view, right?
10          MR. MCWILLIAMS:  Object to form.
11       A.  I do not recall seeing anything -- I did
12   read a fair number of documents from the FDA.  I
13   don't recall reading anything that said specifically
14   that PT would not be useful.
15       Q.  But you certainly know that it's not -- it's
16   not recommended or required by the FDA?
17       A.  Right.  I mean, right, yes, as far as I
18   know, there is absolutely no recommendation to use
19   it from the FDA.
20       Q.  And the FDA found that even without
21   therapeutic drug monitoring, whether it be PT
22   testing or otherwise, that the benefit -- the risk
23   profile of Xarelto was sufficient to warrant
24   regulatory approval in this country, correct?
25       A.  That is what the FDA did, they approved it.

Page 192

1        Q.  Now, you said that you don't initiate -- you
2    don't write prescriptions for Xarelto in your
3    patient population.  Did I understand you correctly?
4        A.  I have not initiated Xarelto in any of my
5    patients.
6        Q.  But you do refill prescriptions that
7    others --
8        A.  I have a few patients that are on Xarelto,
9    and I do refill those prescriptions.
10       Q.  For your patients on Xarelto, do you monitor
11   blood levels in those patients?
12       A.  So the patients that I have been somewhat
13   comfortable in leaving on Xarelto, if they came to
14   me on Xarelto, are patients who are otherwise
15   healthy, generally young, you know, patients that
16   I -- you know, if there's a group that I feel is
17   good risk and they wish to stay on Xarelto, I mean,
18   they -- certainly all of my patients get educated
19   about all anticoagulants, and these patients are no
20   exception.
21       But -- but I have a few who, you know, opted
22   that that's what they -- they've been on it, they
23   like it, they want to stay on it, I deem them to be
24   relatively low risk based on clinical reasons.  I do
25   not do a PT to screen them in -- you know, at this

Page 193

1    point.
2        Q.  So just so I'm clear, and -- and you're
3    telling us that -- strike that.
4        There are no patients in your practice who
5    are on Xarelto where you have continued to refill
6    that prescription that you are monitoring with
7    either a PT test or some other test?
8        A.  That's right.  I'm not currently doing it.
9        Q.  On your patients who you said failed
10   Xarelto, developed blood clots, did you file adverse
11   event reports?
12       A.  No, I didn't.
13       Q.  What about your patients on Xarelto who have
14   experienced bleeds, did you file adverse event
15   reports?
16       A.  I've not had any.
17          MR. MCCAULEY:  I'm sorry, I didn't hear that
18   last response.
19          THE WITNESS:  I said I have not had any
20   patients on Xarelto who have had bleeding.
21          MR. MCCAULEY:  Thank you very much.  Thank
22   you.
23   BY MS. YATES:
24       Q.  Doctor, let's go to Page 6 of your report.
25   And the heading is "Inter-patient Variability," and

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

1  it's your opinion that analysis of pharmacokinetic
2  data from patients participating in a variety of
3  clinical trials of Xarelto, including ROCKET, show
4  that there is significant inter-patient variability,
5  and then you cite Table 5B1.  What do you mean by
6  "significant inter-patient variability"?
7        A.  I think if I -- as I go on to sort of be
8  particular about -- with the -- with the rest of
9  this paragraph is that looking at -- especially
10  looking at trough levels and, uhmm, I think I say
11  this in the paragraph -- looking at trough levels
12  which are drawn, you know, at just -- right before
13  the next due dose on a daily regimen, and you can
14  see that there's a tenfold difference in the 5th
15  and 95th percentiles of patients, and that's
16  illustrated on the table.
17        So we're -- so looking at stroke prevention
18  in patients with normal creatinine clearance, so
19  that sort of third line down in the table,
20  20 milligrams daily, if you look over at the trough
21  levels, the concentration trough levels of 44 with
22  the 5th to 95th percentile range from 12 to 137,
23  that's a pretty big range.  That's a tenfold --
24  tenfold difference between the lower -- you know,
25  the lower 5 percent of patients and the upper 5

Page 195

1  percent of patients on Xarelto.
2        Q.  Doctor, when you have done PK/PD components
3  to clinical trials, you will agree with me that
4  there is a range of results you get?
5        A.  Of course.
6        Q.  And part of the reason for that range is
7  that even though somebody might be told to take
8  their medicine at 8 a.m., they might take it at
9  10 a.m., they might forget it, so the data is only
10  as reliable as the reliability of the patient
11  population?
12        A.  Sure, and that's true of any PK studies that
13  we do.
14        Q.  So you always in PK studies see a range?
15        A.  That's correct.
16        Q.  I mean, you might have an incredibly high
17  trough level 24 hours after a once-a-day medicine is
18  given, and you as a clinician should be scratching
19  your head saying, "Maybe they just took the dose
20  before they came in" instead of, "This is really
21  a trough after 24 levels"?
22        MR. MCWILLIAMS:  Object to form.
23        A.  That's true that we would question that
24  certainly in the setting of a clinical trial where
25  we're trying to, you know, get the best data we can.

Page 196

1  But I think it's also true that for every drug
2  there are inter-individual variations.  And some
3  people have, you know, short half-lives and long
4  half-lives, or, you know, therefore, we'll have low
5  trough levels or high trough levels.
6        I think when we talk about high
7  inter-patient variability, what we're talking about
8  are spreads that are pretty far apart.
9        So -- so -- and I would deem that looking at
10  this, because that's -- that's a pretty wide spread
11  for the -- and again, we're not talking about an
12  outlier, one patient.
13        You know, yes, of course, and even in this
14  data, one patient has zero, you know, who knows.
15  But we're talking about 5 percent of people.  So if
16  you've got, you know, 200 or 300 or a thousand
17  people, I mean, it's -- they're -- you know,
18  5 percent of them have a very low level and
19  5 percent of them have a very high level.
20        Q.  And 90 percent are within a range?
21        A.  But they're within that very broad range of,
22  you know, from -- from down here to up here, yeah.
23        Q.  Let me ask you:  Is it a proper methodology
24  when determining variability to go with the majority
25  or to go with the entire range in order to assess

Page 197

1  variability?
2        MR. MCWILLIAMS:  Object to form.
3        A.  Well, how else would you look for
4  variability if you're not looking for the entire
5  range.  That's what variability is, how variable is
6  this population of patients from top to bottom?
7        And, you know, I think that's -- and that's
8  why we choose cutoffs like 5th to 95th percentile.
9  I mean, certainly if you said, I'm going to look at
10  the entire range, well, like you said, you'd have
11  somebody who is zero and somebody who might be 800,
12  and, who knows, the person that's zero may not have
13  taken their drug, and the person at 800 might have
14  just taken three of them, you know, who knows.
15        So we're not going to look at the outliers.
16  But by convention we look at the percentiles between
17  the 5th and the 95th or the 10th and the 90th, what-
18  ever, somewhere in there, and we look at that range.
19        And when you see a range, that to me is --
20  you know, this looks -- this is a, you know, a very
21  variable range to be a tenfold difference between
22  the highest and the lowest subset of patients.
23        Q.  So in your opinion, Doctor, Xarelto has high
24  interpatient variability?
25        A.  In my opinion, it does.

50 (Pages 194 to 197)

Protected - Subject to Further Protective Review

Page 198

1    Q. Okay.
2        Did you see publications that talk about
3    moderate inter-patient variability?
4    A. I -- perhaps I did. I don't recall. I
5    wasn't looking at that specifically.
6    Q. Did you see publications that refer to it as
7    low to moderate inter-patient variability?
8    A. I don't recall that language.
9    Q. Okay.
10       Do you think you looked at all of the
11   relevant literature on the PK/PD profile for
12   Xarelto?
13       MR. MCWILLIAMS: Object to form, asked and
14   answered.
15   A. I looked at a fair bit. Again, you know, I
16   certainly didn't look at everything.
17   Q. Okay.
18       And the fair bit is identified either in
19   Exhibit 5 or Exhibit 6, correct?
20   A. Correct.
21   Q. Can you point to a specific publication from
22   the peer-reviewed literature that states Xarelto has
23   high inter-patient variability?
24   A. Again, I was not looking for those specific
25   phrases.

Page 199

1    Q. So you can?
2    A. I couldn't pull one out for you right now,
3    no.
4    Q. Do you also intend to tell the jury that
5    Xarelto appears to have the highest inter-patient
6    variability of all of the NOACs? And that's on Page
7    7.
8    A. From the data that I looked at, that's my
9    opinion. Uhmm, anyway, yeah, that's my opinion.
10   Q. Okay. And to make that comparison, you
11   would actually need some data making those
12   comparisons, right?
13   A. Yeah.
14   Q. Okay.
15       So you cite -- let's go to Ezekowitz, and
16   I'm sure I'm butchering Dr. Ezekowitz's name.
17       MS. YATES: And I'll mark this as Exhibit 8.
18       (Whereupon Exhibit No. 8, Dabigatran With
19       or Without Concomitant Aspirin Compared with
20       Warfarin Alone in Patients with Nonvalvular
21       Atrial Fibrillation (PETRO Study), was
22       marked for identification.)
23   BY MS. YATES:
24   Q. Doctor, this is the paper that you cite on
25   Page 7 of your report?

Page 200

1    A. Correct. And this is some pharmacokinetic
2    data and pharmacodynamic data on dabigatran.
3    Q. Right. This paper on dabigatran makes no
4    comparison to Xarelto, does it?
5    A. No, no. That's not -- that was not my point
6    in referencing this paper. I was really quite
7    interested in the -- because we're looking really
8    here not at comparing the dabigatran to -- to
9    Xarelto, but in looking at the inter-patient
10   variability, and I guess -- let's see if I can --
11   Page 1423 of the article does give a
12   box-and-whiskers plot of -- I'm sorry, my vision
13   is -- I'm sorry. I'm looking for the trough -- the
14   concentration. Oh, yeah, here it goes. Yeah, it
15   is Figure 2, which is the predose concentration.
16       So that would be a trough level on various
17   doses of dabigatran, and we are not looking at the
18   greatest outliers. Like I said before, we didn't do
19   that with Xarelto either. But, you know, if you
20   look at the 150-milligram, which is the dose
21   that's -- that's the standard does of dabigatran
22   and, basically, this is trough levels, and you look
23   at the whiskers, it's, you know, it's not really --
24   to me it's less than what I see when I look at
25   rivaroxaban.

Page 201

1    Q. And this Figure 2 looks at the 10th and 90th
2    percentiles, doesn't it, Doctor?
3    A. Correct, it does.
4    Q. And the Xarelto data looked at the 5th and
5    95th percentiles, didn't it?
6    A. That is correct.
7    Q. So that's not a direct comparison, is it?
8    A. It is not a direct comparison.
9    Q. But as you said, you don't look at the
10   outliers. That would not be good science, would it?
11       MR. MCWILLIAMS: Object to form.
12   A. We don't -- again, you know, not -- when you
13   see the point that's most -- you know, the upper
14   point, the bottom point, that's not necessarily what
15   we're looking for. We're, basically, looking for a
16   range.
17   Q. So what would this data look like for the
18   5th to the 95th percentile?
19   A. So that's a good question, and I don't know.
20   I don't have that information.
21   Q. If we go to the front page, actually it's
22   the third sentence: "However, Vitamin K antagonists
23   have a highly variable inter- and intra-individual
24   anticoagulant response with multiple drug and food
25   interactions necessitating regular monitoring and

51 (Pages 198 to 201)

Protected - Subject to Further Protective Review

Page 202

```
 1   adjustment of dose."
 2        First of all, you agree with that statement,
 3   right?
 4        A.  I do.
 5        Q.  And second of all, this article nowhere says
 6   the same thing about dabigatran or any of the NOACs,
 7   correct?
 8        A.  Says anything about what?
 9        Q.  Says the same thing about NOACs.
10        A.  The same thing as they're saying about
11   Vitamin K antagonists?
12        Q.  Correct.
13        A.  Right.  As far as I know, it doesn't.
14        Q.  Well, you looked at the article.  Do you
15   remember seeing anything in there?
16        A.  I don't recall seeing anything that said
17   that.
18        Q.  The next one you cite -- or one of the ones
19   you cite is Kowalski et al., and this is an
20   abstract.
21        MS. YATES:  I'll mark this as Exhibit 9.
22        (Whereupon Exhibit No. 9, Apixaban Exposure
23        and Anti-Xa Activity in Nonvalvular Atrial
24        Fibrillation Patients: An Application of
25        Population PK/PD Analysis, was marked for
```

Page 203

```
 1        identification.)
 2   BY MS. YATES:
 3        Q.  Doctor, do you know if this was published
 4   beyond the abstract stage in a peer-reviewed
 5   journal?
 6        A.  No, I don't know that.
 7        Q.  And this is an abstract about apixaban,
 8   right?
 9        A.  That's correct.
10        Q.  And it says there at the bottom, last
11   sentence of the conclusion:  "Individual intrinsic
12   and extrinsic factors have a modest effect on
13   apixaban exposure, thus supporting twice daily
14   administration of apixaban without dose adjustment
15   due to effects of individual factors."
16        Is there any comparison in this abstract to
17   Xarelto?
18        MR. MCWILLIAMS:  Object to form.
19        A.  Certainly not.  I don't see anything related
20   to that.  However, the table that's provided does
21   show the 5th to 95th percentile of the trough
22   levels, and in these trough levels are, again,
23   looking at the table on Page 2, the trough levels go
24   from 40 to 230.  So, again, that's about a five to
25   sixfold difference, but certainly not what we see
```

Page 204

```
 1   with Xarelto.
 2        So -- and, again, this is a drug with a
 3   half-life that as -- as I understand it, is not
 4   remarkably that different from Xarelto, but is now
 5   being administered twice-a-day in a -- you know, in
 6   a dosing -- in a dosing format that gives 5th to
 7   95th percentile trough levels that certainly don't
 8   have nearly as wide an inter-patient variability as
 9   what we see with Xarelto.
10        Q.  Okay.
11        A.  Clearly, again, would we like to see more
12   data?  Of course, we would.
13        Q.  And, in fact, what would be useful would be
14   a direct comparison, right?
15        A.  That is always desired.
16        Q.  So another article that you refer to here is
17   an article by Jeffrey Weitz.  And I'll mark that as
18   Exhibit No. 10, Doctor.
19        (Whereupon Exhibit No. 10, Randomised,
20        parallel-group, multicentre, multinational
21        phase 2 study comparing edoxaban, an oral
22        factor Xa inhibitor, with warfarin for
23        stroke prevention in patients with atrial
24        fibrillation, was marked for
25        identification.)
```

Page 205

```
 1        Q.  And, again, edoxaban shows a twice-a-day
 2   regimen, right?
 3        A.  Well, they had -- yeah, they had some
 4   once-a-day and twice-a-day regimens here.
 5        Q.  Right.  And, in fact, the incidence of
 6   bleeding was significantly higher with the edoxaban,
 7   60 milligrams BID, right?
 8        A.  Yes, and that's certainly possible.
 9        Q.  And also higher -- significantly higher with
10   the 30 milligrams BID, correct?
11        A.  Uhmm, I'm sorry, I'm just trying to target
12   where they give these -- I mean, that sounds right.
13        Q.  Okay.
14        And a twice-a-day drug, I think you talked
15   earlier about a twice-a-day drug would have lower
16   peaks, but higher troughs, right?
17        A.  That would be the -- the goal would be for a
18   steady state that has less variability between peak
19   and trough.
20        Q.  Okay.  And --
21        A.  And if I might add, that these kinds of
22   studies are important because you need to find the
23   right dose, and that's what the -- you know, this is
24   a dose-finding study -- study, and, you know, it may
25   be that these doses are not getting us to where we
```

52 (Pages 202 to 205)

Protected - Subject to Further Protective Review

Page 206

1    need to be, but you only know that when you look.
2    Q. Right. So let's look on Page 637 at the
3    bleeding events, Table 3. Let's look at major
4    bleeding, Doctor. And QD is once a day, right?
5    A. That's correct.
6    Q. Okay.
7        No bleeding -- no major bleeding,
8    edoxaban, 30 milligrams once-a-day?
9    A. Uh-huh.
10   Q. Five bleeding events for 30 milligrams
11   twice-a-day, correct? Did I read that correctly?
12   A. It goes from 13 to 31, so you have quite a
13   bit more bleeding events on the 30 twice-a-day, but
14   then you're giving twice as much drug.
15   Q. Right.
16   A. So the 30 milligrams once-a-day is overall a
17   relatively low dose.
18   Q. Okay.
19   A. But the twice-a-day is -- obviously you're
20   giving 60 milligrams for a day in that regimen.
21   Q. You think it's 30 milligrams each dose, so
22   they're getting 60 milligrams?
23   A. Uh-huh.
24   Q. Yes?
25   A. Uh-huh, yes.

Page 207

1    Q. And then you think 60 milligrams BID is
2    60 milligrams and 60 milligrams, so 120 total?
3    A. Yes.
4    Q. Okay.
5    A. I mean, that's what it says. So that's what
6    I interpreted.
7    Q. If we continue down major bleeding, then the
8    BID for 60 milligrams are six versus one for
9    60 milligrams once-a-day, right, six and one?
10   A. Yes, correct, because it's comparing
11   60 milligrams to 120 milligrams a day.
12   Q. Right.
13   A. Yeah.
14   Q. And the bleeding that they're looking at
15   here is associated with a higher trough level,
16   right?
17   A. Let's see. Are you referencing a particular
18   graph --
19   Q. Statement, no.
20   A. -- or a data graph? I'm sorry, are you
21   waiting for me to answer? Could you tell me the
22   question again?
23   Q. No. I believe the bleeding that they're
24   looking at here is associated with a higher trough
25   level, the increased bleeding from the BID?

Page 208

1        MR. MCWILLIAMS: Object to form.
2    A. I'm sorry, I'm just having trouble finding
3    that in the paper.
4    Q. Let me back up and ask more generally. The
5    BID doses in this paper would have higher trough
6    levels, right?
7    A. Well, you know, if you're comparing
8    30 milligrams once-a-day to 30 milligrams
9    twice-a-day, yeah, I mean, right. You know, I'm not
10   sure which ones you're trying to compare, higher and
11   lower.
12   Q. All right.
13       Well, let's actually do another comparison.
14   Let's go back to major bleeding.
15   A. Okay.
16   Q. And let's take a look at 30 milligrams BID,
17   five bleeds, right?
18   A. Major bleeding.
19   Q. Major bleeding, five bleeds?
20   A. Yes.
21   Q. Now let's look at 60 milligrams once a
22   day --
23   A. Yes.
24   Q. -- one bleed.
25   A. Yes.

Page 209

1    Q. So that actually is the correct comparison,
2    right?
3    A. Yeah, I agree with you. That is the correct
4    comparison.
5    Q. So with this data, BID with higher trough
6    levels have more bleeds?
7    A. Well, I don't -- I don't see the
8    statistics -- I mean, where does it show the
9    statistics and whether that's significant? This is
10   a relatively low number of individuals.
11   Q. Is the data useful or not?
12   A. Not --
13       MR. MCWILLIAMS: Object to form.
14   A. Not in that sense. You know, again, I think
15   that what I utilized or what I was interested in was
16   the -- looking at the -- looking at the range at
17   trough, and in looking at whether the -- again, this
18   goes to the point about inter-patient variability in
19   trough levels and trough concentrations of the drug.
20       And, again, you know, we're -- you know,
21   very readily admit that we're trying to make some --
22   you know, we're trying to tease as much information
23   about this point. The point is about inter-patient
24   variability in trough levels as well as peak levels,
25   but really what we're focused on, and what I was

53 (Pages 206 to 209)

Protected - Subject to Further Protective Review

Page 210

1  focused on and what I discussed in my report, is
2  the trough-level variability from one patient to
3  the other, and we see a very wide variability with
4  rivaroxaban, much less wide with apixaban. The
5  dabigatran, you know, admittedly, we don't have
6  the 5th to 95th percentile, and I think somewhat
7  similarly here we're looking at probably on the
8  order of 90 to -- 10th to 90th percentile.
9       But, again, that range, if we look at the
10 60 once-a-day in Figure 2, you can see that, you
11 know, it goes from at the 10th percentile around
12 120, not even to 250, and it's not even a
13 twofold, or right around a twofold difference
14 between the lowest and the highest of patients who
15 are getting 60 milligrams once-a-day, similarly with
16 twice-a-day.
17      Again, just speaking to the fact that albeit
18 this is, you know, an indirect approachness because
19 I don't -- I mean, I don't have the data.  No one
20 has -- nobody has sponsored the trial where we can
21 do a head-to-head comparison.  That would be ideal.
22 And I would love to see the manufacturers do that.
23      But in the absence of that kind of
24 comparative, comparison-driven information, I'm
25 trying to make a point in my report that it does

Page 211

1  appear to me that rivaroxaban has the highest
2  inter-patient variability based on what I'm looking
3  at in these published studies.  That's all.
4       Q.  And, again, this data on edoxaban is not 5th
5  to 95th percentile.  It's 10th to 90th, right?
6       A.  It is, but again, I mean, this is -- you
7  know, this is the data that I have.
8       Q.  Right.  But with all due respect, Doctor, my
9  question was very simple:  edoxaban, this data is
10 10th percentile to 90th percentile, correct?
11      A.  And it is only a twofold difference compared
12 to a tenfold difference that we see in Xarelto.  You
13 are correct in that this is not giving me data that
14 is exactly the same.  But I'm, you know -- I am
15 applying some logic to this, and that's the best
16 I can say.
17      Q.  So your methodology is logic or guess?
18      MR. MCWILLIAMS:  Object to form.
19      A.  I'd say common sense.
20      Q.  Okay.
21      And you don't know what the edoxaban data
22 would look like from the 5th percentile to the
23 95th percentile, do you?
24      A.  That is correct, I don't.
25      Q.  Okay.  And, again, this article makes no

Page 212

1  direct comparison to Xarelto, correct?
2       A.  That's correct.  Now, you've said that --
3  you know, you have not published your opinion that
4  Xarelto has high or significant inter-patient
5  variability, Doctor, but on your list of literature
6  on Page 7, you refer to an article by Dr. Mueck from
7  2014.
8       MS. YATES:  And I'm marking that as
9  Exhibit 2000 -- Exhibit No. 11.
10      MR. MCWILLIAMS:  It hasn't been that long of
11 a day.
12      MS. YATES:  Going back five years.
13      (Whereupon Exhibit No. 11, Clinical
14 Pharmacokinetic and Pharmacodynamic Profile
15 of Rivaroxaban, was marked for
16 identification.)
17      MS. YATES:  I didn't go to law school to
18 discuss numbers.  Where did I go wrong?
19      MR. MCWILLIAMS:  I practice more medicine
20 than law.
21      MS. YATES:  I'd be dangerous doing that too.
22 BY MS. YATES:
23      Q.  Doctor, is that the article you cite on Page
24 7 of your report?
25      A.  Yes, I do.  This is the source for the table

Page 213

1  that's on page -- the source in my report that's on
2  Page 6.  At the bottom of Page 6 I reference this
3  article.  This is where the data in the table comes
4  from.
5       Q.  Right.
6       And peer-reviewed, published study, right?
7       A.  Correct.  Yes, correct.
8       Q.  And --
9       A.  It's a review article, but yes, that's
10 generally peer reviewed.
11      Q.  So it's a review article by the scientists
12 who actually did the work?
13      A.  Right, yes.
14      Q.  And you don't discredit this paper because
15 Dr. Mueck and others are scientists at Bayer, do
16 you?
17      A.  Absolutely not.
18      Q.  Pharmaceutical companies and their employees
19 provide valuable research, right?
20      A.  Absolutely.
21      Q.  And valuable funding to institutions such as
22 yours to continue that research?
23      A.  Absolutely.
24      Q.  So, Doctor, the paper goes through several
25 different parameters such as age, sex and body

54 (Pages 210 to 213)

Page 214

1  weight, ethnicity, renal impairment, hepatic
2  impairment, and it's actually pediatric population,
3  and it discusses what the data shows with regard to
4  those various patient populations; is that right?
5      A. Yes, that's my understanding.
6      Q. All right.
7      And if you turn to Page 11, in the lower
8  right corner, it's under Discussion and
9  Conclusions. In this article it says,
10  "Variability in the pharmacokinetics of rivaroxaban
11  is moderate with inter-individual variability
12  (coefficient variation) of 30 to 40 percent."
13      Do you disagree with that statement?
14      MR. MCWILLIAMS: Object to form.
15      A. Well, you know, I've already stated that in
16  my opinion, the variability that we see with
17  rivaroxaban is beyond moderate. I think it's high.
18  I think that that variability is high. So I would
19  disagree with their conclusions. I'm looking at
20  their data, but I would disagree with their
21  conclusions.
22      Q. Okay.
23      So they conclude, based on their own data,
24  moderate inter-patient variability. You look at
25  their data and reach a different conclusion?

Page 215

1      A. Correct.
2      Q. I'm being told by somebody who is much
3  smarter than me to ask the following question, which
4  is why Ned is laughing at me: Do you agree --
5      MS. YATES: Just write it out for me. It's
6      been a long day.
7      MR. MCWILLIAMS: Do you agree that the
8      coefficient variation is 40 percent?
9      MS. YATES: Got it. Oh, thank you.
10  BY MS. YATES:
11      Q. Mr. McWilliams is going to ask my question
12  for me.
13      Do you agree with the statement by these
14  authors that the coefficient variation is 30 to
15  40 percent?
16      A. I do not recall seeing -- I mean, that's a
17  statistical calculation, the coefficient of
18  variation. I -- it's not given on the table, so,
19  you know, again, I don't have any -- I don't have
20  any cause to doubt their statistical approach that
21  they used. I don't -- I don't see that data on
22  here, but I don't have any -- like I said, I have no
23  reason doubt it.
24      Q. So no basis to disagree with that part?
25      A. No basis to disagree with that.

Page 216

1      MS. YATES: Is it time for a break?
2      MR. MCWILLIAMS: Can I take a turn?
3      MS. YATES: Maybe. In all seriousness,
4      how are we doing on time?
5      THE VIDEOGRAPHER: Ten minutes.
6      MR. MCWILLIAMS: We'll change the tape.
7      MS. YATES: We'll take a break. Okay.
8      THE VIDEOGRAPHER: This is the end of
9      Tape 4, and we are now off the record at
10      2:36.
11      (Recess.)
12      THE VIDEOGRAPHER: This begins Tape 5. We
13      are now back on the record. The time is
14      2:47.
15  BY MS. YATES:
16      Q. Doctor, I want to move to a section of your
17  report that begins on Page 7, "Dose Response." And
18  if we then turn to Page 8, you have a Figure V.C.1,
19  "Therapeutic Window," from an article called Blann,
20  2003.
21      And so we're clear, that's a graph that's
22  showing the therapeutic window for warfarin; is that
23  correct?
24      A. Yes, it is. And to be honest, this is more
25  of a stylized drawing than -- that one that -- that

Page 217

1  actually uses real numbers. As you can see on the Y
2  axis, we're just -- kind of clinical events and
3  intensity of anticoagulation, and so, again, I think
4  this is something that you could find in almost any
5  textbook of coagulation.
6      Q. Right.
7      And what that shows is that the optimal
8  range for the entire patient population taking
9  warfarin is in this range here of INR 2 to 3?
10      A. The only part of that I would disagree with
11  is you say for the entire population. Yes, this
12  is where we -- when we initiate therapy with
13  warfarin, 95 percent of the time our goal is to
14  achieve an INR between 2 and 3. There are
15  exceptions to that, like there are exceptions to
16  everything. But, yes, I mean, this is -- this
17  is the very typical thing that we will do.
18      Q. So since you appropriately quibbled with
19  "entire patient population," let -- let me rephrase
20  it slightly.
21      This is certainly the therapeutic window
22  that you try to obtain for the vast majority of
23  patients on warfarin?
24      A. Absolutely.
25      Q. Okay.

Protected - Subject to Further Protective Review

Page 218

1     Now, first, I want to go to the graph on the
2  next page, which is from Reilly 2014, right, Doctor?
3  And this -- this is actually just based on one
4  hypothetical patient?
5     A.  That is correct.
6     Q.  So you're not representing that this
7  exposure graphic applies to the vast majority of the
8  patient population who take dabigatran, right?
9     A.  So -- so that's correct.  This -- this graph
10  was a representation of a patient that's a certain
11  age, like in the 70s, that -- a population where
12  about 30 percent of patients are on aspirin, right,
13  which increases the risk of bleeding.  So -- so this
14  is a modeled approach or a -- you know, based on
15  data that was determined in the studies of -- of
16  dabigatran.  But -- but you're right.  This is an
17  example of, at the various ranges -- and at the top
18  you can see the line with the median and the -- the
19  ranges of 150 milligrams BID, and kind of shows you
20  in -- in this particular patient demographic, so an
21  older population, where, you know, 30 percent of
22  that population is on aspirin, but that has normal
23  renal function, you know, this is -- this is kind of
24  what that window looks like with 150 BID or with 110
25  BID.  So you've got the two, and you can just sort

Page 219

1  of, you know -- so if you -- right.  So I'm sorry.
2  So, you know, but that's basically what that
3  shows.
4     Q.  So, Doctor, this -- this figure from Reilly
5  is calculated for a 72-year old male, atrial
6  fibrillation patient with prior stroke and diabetes?
7     A.  Yes, correct.
8     Q.  Right.
9        It's not a patient population; it is that
10  patient, right?
11     A.  Well, the way that this was derived, in my
12  understanding of reading the article, is that -- is
13  that it's looking at a group of patients that would
14  fit this description.  They'd be in their mid-70s.
15  They would have prior stroke, have diabetes, and
16  many of them would be on aspirin.  That is an
17  important point about this that's not included
18  here.  But -- and that's why you see the event
19  portion of -- well, of course, here you're only
20  looking at event -- yeah, the bleeding probability,
21  I guess, is pink on yours.  But it -- anyway, yeah,
22  major bleeding and ischemic stroke.
23     Q.  You agree that this curve would look
24  different from this hypothetical 72 year old with
25  atrial fibrillation with prior stroke and diabetes

Page 220

1  if the other patient was a different age?
2     A.  Correct.  Or if they weren't on aspirin, you
3  know, it -- you would see a different bleeding risk
4  in that group.
5     Q.  Or a different gender?
6     A.  Possibly a different gender, yes.  There are
7  some -- some differences, and I understand that.  I
8  don't think there are major, major differences, but
9  there are some.
10     Q.  Different medical conditions from this
11  hypothetical patient's prior stroke and diabetes
12  history?
13     A.  Yes.
14     Q.  So that curve would change depending on the
15  demographics, right?
16     A.  Yes.
17     Q.  Now, this curve also uses trough values.  Do
18  you see that?
19     A.  Correct.
20     Q.  And it uses trough values instead of Cmax
21  values, correct?
22     A.  Yes, correct.
23     Q.  And is that because trough, not Cmax, is
24  more relevant to predicting bleedings, if you know?
25     A.  I don't think I know the answer to that, and

Page 221

1  I don't know that I've read any convincing opinion
2  about that one way or the other.
3     Q.  Okay.
4     A.  And I'd rather -- and my opinion is probably
5  that it does, but do I know that?  No.
6     Q.  Can you give me the science and the data --
7     A.  No.
8     Q.  -- that supports your opinion?
9     A.  No.
10     Q.  So it sounds as if -- to be fair, a couple
11  of times today you've said you believe.  It's your
12  belief that trough is more reliable, but as you sit
13  here today, you cannot provide me with any data?
14     A.  That -- that's correct, because I have not
15  seen good data that relates to events, particularly
16  with rivaroxaban.  And it may, in fact, be that peak
17  levels may -- may predict more bleeding rates than
18  trough levels.  We don't know until we look at real
19  world -- or real data based on, you know, PKs
20  compared to -- patients' PKs compared to what their
21  bleeding -- their actual bleeding events are.
22     Q.  Right.  And -- and you -- you don't have
23  that data?
24     A.  I do not.
25     Q.  So if -- let's ask a hypothetical.

Protected - Subject to Further Protective Review

Page 222

1     If trough is more relevant to predicting
2   bleeding, so higher trough means higher risk of
3   bleed, you'd actually want a lower trough, fair?
4     A.  Correct.
5     Q.  Let's turn back -- by the way, the Reilly
6   paper doesn't recommend therapeutic drug monitoring
7   based on the current available data for dabigatran,
8   correct?
9         MR. MCWILLIAMS:  Object to form.
10    A.  I -- I'm sure you're correct.  I don't
11  remember, per se, looking for that in the paper, but
12  I don't doubt you.
13    Q.  Let's take a look at the figure from Earp,
14  E-A-R-P.  The only one I can think of is Wyatt Earp,
15  but that dates me.
16    A.  I'm sorry, that's the -- yes.
17    Q.  Edoxaban dosing, page 8.
18    A.  Yeah, okay.
19    Q.  And this is "Dosing Considerations Based
20  on Renal Function"; is that right?
21    A.  So this, too --
22    Q.  I'm just reading the title of the --
23    A.  Yeah, yeah.  I'm trying to put it in
24  context.  It is also from a presentation that was
25  given as an illustration, yes, of -- and it was --

Page 223

1     Q.  These are the questions I'm going to ask
2   you, Doctor.  So -- so let me help -- see if I can
3   help you out here.
4     A.  Yeah, go ahead.
5     Q.  Do you know where you located this graph?
6     A.  I do know that it was a PowerPoint
7   presentation.  And at this moment, you know, I'm
8   sorry, I just can't quite remember all the context
9   of it and the -- you know, what exactly it's
10  describing.  I would have to go back and look at it.
11    Q.  That's fine.
12    Do you know if you reviewed the entire slide
13  presentation?
14    A.  I did look at -- I mean, yes, I did look at
15  all of the slides.
16    Q.  And do you also understand that this is a
17  hypothetical patient or hypothetical group of
18  patients with certain characteristics?
19        MR. MCWILLIAMS:  Object to form.
20    A.  Yes, I believe that's correct.  And, in
21  fact, I think, you know, if you look at three graphs
22  that I have here, as you say, they are all sort of
23  representations.  They were meant to be, I guess,
24  representational as opposed to actual data points.
25  BY MS. YATES:

Page 224

1     Q.  Right.  But, Doctor, my point is, you have
2   one that is actually representative of a vast
3   majority of patients, and then you have two others
4   that are actually based on either a single
5   hypothetical patient or a group of hypothetical
6   patients with similar characteristics.
7     So when you line the curves up they look
8   very similar, but they mean completely different
9   things, right?
10        MR. MCWILLIAMS:  Object to form.
11    A.  I don't see why you would say they mean
12  totally different things.
13  BY MS. YATES:
14    Q.  Because the INR therapeutic window has been
15  established for the vast majority of patients.
16    A.  Uh-huh.
17    Q.  And we know that for the Earp and the Reilly
18  curves, they vary when you put in different patient
19  information, right?
20        MR. MCWILLIAMS:  Object to form.  Misstates
21        evidence.
22    A.  Tell me the question again.  Ask me the
23  question again.
24  BY MS. YATES:
25    Q.  Sure.  So the therapeutic window graphic for

Page 225

1   warfarin is the optimal range for the vast majority
2   of patients on warfarin --
3     A.  Correct.
4     Q.  -- right?
5     A.  Correct, correct.  But might I add that
6   the -- the lines that illustrate thromboembolic risk
7   and hemorrhagic risk are very stylized, right?
8   Those -- those lines may be quite different
9   depending on the patient, whether they are on
10  aspirin, et cetera.  So this is just a kind of
11  general representation of what -- what we're talking
12  about when we're talking about that therapeutic
13  window.
14    Q.  Right.
15    A.  So we could have -- so there could be models
16  made of a patient on warfarin who -- who matches the
17  72-year-old man or population of 72-year-olds
18  who have some renal insufficiency or whatever.
19    Q.  Sure.  But this is the validated range?
20  This is --
21        MR. MCWILLIAMS:  Objection.
22    A.  Yes.  The -- the range between 2 and 3 is
23  the range that we typically use.  Now, having said
24  that, there are patients that I have where I may
25  modify that range.

Protected - Subject to Further Protective Review

Page 226

1    Q. Absolutely, which is why we went from entire
2  patient population to vast majority patient
3  population, right?
4    A. Yes, correct.
5    Q. But what I'm saying here is that the Earp
6  and the Reilly are based on either one hypothetical
7  patient with certain characteristics --
8    A. Correct.
9    Q. -- or a group of patients with a similar set
10 of characteristics.
11   A. Correct.
12   Q. And if we change those characteristics,
13 these curves will change?
14   A. Correct.
15     MR. MCWILLIAMS: Object to form. Assumes
16     facts not in evidence.
17   A. Just as they would if we changed some of
18 that with Coumadin, those curves would change. This
19 is an illustration of the fact -- of the fact
20 that whatever anticoagulant you're using, whether
21 it be Coumadin, whether it be edoxaban or whatever,
22 that basically, the curves are going to be --
23 they're going to have -- they're going to be similar
24 in appearance, that as you increase dose or
25 concentration of drug, the -- risk of clot

Page 227

1  goes -- goes down and asymptotes at some level,
2  right?
3    So it's not a -- it's not a linear decline.
4  It's an exponential decline with an asymptote and
5  the same thing with the risk of bleeding goes up.
6    So that -- you are correct in what you're
7  saying, but the point of these graphs is to
8  illustrate that whether it's warfarin or whether
9  it's edoxaban or whatever, that the nature of
10 these curves is very similar, and that somewhere
11 where these -- we're trying to find what's the
12 safest, most effective -- you know, what's the most
13 effective dose that's also the safest. And it's
14 somewhere near where they cross, usually, but not
15 always. I mean, we also have to look at what
16 these percentages are.
17   Q. But you can only say for Reilly and Earp
18 this is for this specific patient population or
19 hypothetical patient, right?
20   A. That's correct.
21   Q. Okay.
22     And my point is that you don't want to be
23 misleading by implying that the Earp slide from
24 edoxaban or Reilly figure is applicable to the
25 vast majority of patients who take these

Page 228

1  medicines as compared to the therapeutic window for
2  warfarin, fair?
3    MR. MCWILLIAMS: Object to the form.
4    A. Well, I think that -- I think the point
5  that I was trying to convey -- maybe I didn't do
6  it clearly -- was that regardless of whichever
7  anticoagulant you're using, it does actually take a
8  similar form, and it's -- they're quite similar to
9  what we see. I mean you are basically going to
10 have, on the one hand, a diminishing risk of stroke
11 and, on the other hand, an increasing risk of
12 bleeding. And that -- that those can be modified
13 by other comorbidities, et cetera.
14     But that's not -- that wasn't really meant
15 to be my point, just that these were illustrations
16 and predictions. Just as the Coumadin one, the
17 warfarin one is really just a -- it's not a
18 particular patient or a particular group of
19 patients. It's just a general schema of how we
20 think about the risks of clotting and the risks of
21 bleeding as it relates to concentration of drug.
22   Q. Okay.
23     Let me see if I can -- you didn't mean to --
24 if I was misled, you certainly did not mean to
25 mislead somebody as to why these three graphs line

Page 229

1  up one after the other?
2    MR. MCWILLIAMS: Object to form. Is that a
3    question?
4    A. No. This is just an illustration that --
5  that -- you know, this is the beginning of how we --
6  if we're going to derive -- you know, because you've
7  asked me several times, how do I want to derive a
8  safe and effective dose. I think this -- it's these
9  kinds of data curves that we have to look at before
10 we can start to derive what that -- what that
11 effective range is.
12     With warfarin, as you indicated, it took
13 many years. I mean, this is almost by convention.
14 It may be -- and I'm not familiar with literature
15 from 40 years ago. Maybe very discrete studies were
16 done to develop, you know, the INR 2 to 3. I really
17 don't know. I didn't go back and look at that.
18     But some of this was just developed by real
19 world practice in -- with warfarin and Coumadin.
20 And now I'm quite interested in it, but I'd like to
21 go back and see. Was there specific studies that
22 were done to determine that the INR of 2 to 3? I
23 think it was mostly real world experience.
24     But the point being that -- that all of
25 these anticoagulants are going to display a

58 (Pages 226 to 229)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 230

1    similar -- similar characteristics.  And we've got
2    to find -- we, the royal "we," the "we" that
3    includes the manufacturers of these drugs, who
4    have -- are privy to this information, which I am
5    not, we need that information.  We need to display
6    it in such a way that we can start to -- to derive
7    what the safe and effective range is, like we've
8    done with Coumadin.
9        Q.  Well, Doctor, with all due respect, the FDA
10   has determined the safe and effective doses for
11   Xarelto for the different indications, right?
12        MR. MCWILLIAMS:  Object to form.
13        A.  I disagree with that.
14   BY MS. YATES:
15        Q.  You disagree that the FDA has determined --
16        A.  I disagree with the FDA -- I'm sorry.  I
17   don't -- I don't disagree that the FDA did that.
18   I'm just telling you that I disagree that they have
19   -- that they have signed, sealed, and delivered the
20   final word on what's safe and effective for -- for
21   NOACs.
22        Q.  Okay.
23        A.  That's my opinion.
24        Q.  I understand.  But you did interrupt me, so
25   I need to ask it again.

Page 231

1        The FDA has determined the safe and
2    effective doses for Xarelto for the different
3    indications it's approved for in the United
4    States, correct?
5        A.  They have approved it for different
6    indications.
7        Q.  And they approved based on safe and
8    effective.  You know that, right?
9        A.  That was their opinion.  There were
10   dissenting opinions on the FDA committee, as you
11   know, but the -- whoever made the final decision did
12   decide to approve it -- as you say, they approved it
13   for what they -- they for safe and effective dosing.
14        Q.  Right.  You disagree with their approval?
15        A.  I do.
16        Q.  Okay.
17        For all indications?
18        A.  I think I'd rather limit, right now, this
19   discussion to atrial fibrillation.  I mean, I do
20   have thoughts and opinions and beliefs about others.
21   I've certainly read more and done more thinking
22   about the atrial fibrillation.  So I would prefer
23   to leave it at that --
24        Q.  Okay.
25        A.  -- for now.

Page 232

1        Q.  So you disagree with the FDA's approval of
2    Xarelto as safe and effective at the approved doses
3    for prevention of stroke in atrial fibrillation
4    patients?
5        A.  (No response.)
6        Q.  The FDA got it wrong?
7        MR. MCWILLIAMS:  Object to form.
8        A.  I -- I believe that had I been in charge of
9    the FDA, if I was the czar of the world, if I was
10   the czar of the FDA, I probably would have made a
11   different determination.
12   BY MS. YATES:
13        Q.  But you're not?
14        A.  But I'm not.
15        Q.  But what you're saying is you disagree with
16   the FDA?
17        MR. MCWILLIAMS:  Object to form.  Asked and
18        answered.
19        A.  I do.
20   BY MS. YATES:
21        Q.  And let me go back -- by the way, I assume,
22   therefore, you agree with all the other world
23   regulatory agencies that have approved this medicine
24   in over 100 countries to treat atrial fibrillation?
25        MR. MCWILLIAMS:  Object to form.

Page 233

1        A.  You know, I have no say in those.  I'm not
2    bound by -- I'm not privy to what they thought.  I'm
3    not bound by what they recommend.
4    BY MS. YATES:
5        Q.  Well, let me tell you what they thought.
6    They approved the medicine as safe and effective in
7    patients with atrial fibrillation to prevent
8    stroke.  Are all those regulatory agencies, that
9    cover over 100 countries, wrong?
10        MR. MCWILLIAMS:  Object to form.
11        A.  So the qualification that I'll give to my
12   answer is that many patients do just fine on
13   rivaroxaban.  My concern is that there are patients
14   who are at risk of both clotting and bleeding, and
15   that I have no way of predicting who -- who those
16   patients are, because I don't have a way to test.  I
17   don't have an indirect test that I can perform to
18   see who they are.  And I don't have a way to reverse
19   the most serious consequence of taking this drug,
20   which is bleeding.
21        So is it safe and effective for most people?
22   Probably.  Is it safe enough and effective enough
23   that if I were the czar of the FDA, I would have
24   said, "Fine, take it, done, sealed, delivered.  I
25   don't need to see anything else, it's good to go"?

59 (Pages 230 to 233)

Protected - Subject to Further Protective Review

Page 234

1    No, I wouldn't have done that. But that's my
2    opinion.
3        Q. Do you think that's what the FDA did?
4    "Done deal, sealed, delivered. Don't need to see
5    anything else"? Or do you think they actually
6    looked at the data and had their own scientists
7    evaluate safety and efficacy?
8        A. They certainly looked at the data. They
9    certainly looked at the data.
10       Q. Do you think they looked at more data than
11   you?
12       A. They very well may have.
13       Q. May have? Probably did?
14       A. Probably did. But that doesn't detract from
15   the data that I have seen and that I've been privy
16   to, and that I've looked at, and that some of the
17   FDA's own members also had dissenting opinions, very
18   strong dissenting opinions.
19       Q. How many?
20       A. Two that I know of.
21       Q. And how many people were on the other side
22   of that?
23       A. Don't know.
24       Q. Three? Ten? Nine?
25       A. I have no idea.

Page 235

1        Q. No idea?
2        A. No.
3        Q. Okay.
4            Doctor, let me just go and finish up a
5    point on these graphs.
6            The Earp slide on edoxaban and the Reilly
7    dabigatran exposure in a hypothetical patient, they
8    do not define the optimal dosing range for those
9    medicines in the majority of the patient population,
10   correct?
11       A. Right. I don't think we're at a point, just
12   by looking at this data, that we can say that the
13   optimal range has been defined. I think this is a
14   start, but I don't think we have enough filler data
15   to -- and, again, these are just graphic
16   illustrations.
17       Q. Okay.
18       A. Representations, I think, is a better way to
19   think about it.
20       Q. Okay.
21           Do you know, in the edoxaban dosing slide,
22   the hypothetical age of the patients?
23       A. I do not recall.
24       Q. Do you know if the patients were using
25   aspirin?

Page 236

1        A. I -- I can't recall.
2        Q. Do you know if the patient or group had had
3    a prior stroke?
4        A. And I do not recall. Again, it -- it
5    doesn't really matter, because any of those may
6    shift these curves. Again, this is just
7    representational.
8        Q. Based on the demographics for that
9    specific patient?
10       A. Yes, yes. And so, again, you know, I would
11   expect these curves to be somewhat moved one way or
12   the other by specific groups of patients. But the
13   idea is that they will -- all the curves will
14   resemble this -- you know, this -- the general
15   schematic of -- of decreasing probability of stroke
16   with increasing probability of bleed. I guess what
17   I'm saying is, if you look on the Y axis, the actual
18   points may be quite different depending on the --
19       Q. The values?
20       A. The values of these may be quite different
21   depending on the -- the other issues that the
22   patient has.
23       Q. Okay.
24           Do you know the name of the Phase III trial
25   on which edoxaban was approved for the atrial

Page 237

1    fibrillation indication?
2        A. Can't -- I've seen it. Can't recall it
3    right this second, no.
4        Q. Do you know whether that trial for edoxaban
5    tested the drug in patients with impaired kidney
6    function?
7        A. I do not know. I -- I do not know. I do
8    know that edoxaban is a little bit interesting, at
9    least in my -- I have not used it. I really have
10   not had a lot of interest in edoxaban. I do know
11   that it actually has a -- something that I've rarely
12   seen, that if your creatinine clearance is above a
13   certain amount, that the drug may not be effective.
14           And so -- and I just note that because it
15   was sort of remarkable to me. I've not seen
16   anything that looked at high levels of creatinine
17   clearance.
18           But, no, I could not give you chapter,
19   verse or tell you much more about the studies on
20   edoxaban.
21       Q. But you do know that Xarelto, in an arm of
22   ROCKET, looked at the efficacy of lower -- a lower
23   dose for kidney-impaired patients?
24       A. Yes, it did.
25       Q. And that was a good thing, right?

60 (Pages 234 to 237)

Page 238

```
1       A. Yes, I think it was a good thing, a smart
2   thing.
3       Q. Have you read Dr. Backe's expert report?
4       A. Dr. Backe? I don't believe that I have.
5       Q. Because I believe this slide presentation
6   from -- actually comes from a presentation you can
7   find on the FDA website.
8       Does that sound familiar to you?
9       A. I think that's correct. I think that's
10  maybe where that slide came from.
11      Q. Okay.
12      Sounds familiar?
13      A. Sounds familiar now that you say it, yes.
14      Q. Okay.
15      And your report says Slide 32, right,
16  Doctor?
17      A. I think that might be incorrect.
18      Q. Why do you think that might be incorrect?
19      A. It seems like I reviewed this, and I -- I
20  think I made a note of it. But I lost the note, so
21  I don't know.
22      Q. Do you have any idea why Dr. Backe's would
23  have made exactly the same mistake as you and have
24  the exact same wrong slide number?
25      A. No, I don't know.
```

Page 239

```
1       Q. Do you know if he copied your report?
2       A. I don't know.
3       Q. Okay.
4       You didn't copy his?
5       A. I did not.
6       Q. Doctor, have you looked at any of the
7   overdose case reports relating to Xarelto?
8       A. Overdose case reports? In the literature?
9       Q. Yup.
10      A. No.
11      Q. If somebody takes -- if the theory is
12  correct that higher levels of Xarelto increases
13  bleeding risk, patients who take massive amounts of
14  Xarelto are probably at the highest risk for
15  bleeding?
16      A. I would agree.
17      Q. Would it be of interest to you to know that
18  in the overdose papers, that there were no bleeds?
19      MR. MCWILLIAMS: Object to form.
20      A. I think that's interesting.
21  BY MS. YATES:
22      Q. Why?
23      A. Just because I've not seen that data before.
24      It would be equally true that I've had
25  patients who are on warfarin who have an INR of 10
```

Page 240

```
1   and are not bleeding. It doesn't mean that they are
2   not at great risk of bleeding. It just simply means
3   they haven't bled yet.
4       Again, that's interesting data. Of course,
5   I'd like to see it. But, I mean, it doesn't mean
6   that just because you have an increased level of an
7   anticoagulant in your system, that you are going to
8   bleed. But it certainly, in my opinion, would mean
9   that you are at increased risk.
10      Q. Okay.
11      We talked about absorbency of a drug. Is
12  that the pharmacodynamics or pharmacokinetics?
13      A. Absorption?
14      Q. Absorption is pharmacokinetics or
15  pharmacodynamics?
16      A. Well, any assays that we do to measure
17  the actual drug would be pharmacokinetics.
18      Q. So where does absorption fit in,
19  pharmacokinetics or pharmacodynamics or both?
20      MR. MCWILLIAMS: Object to form. Asked
21      and answered.
22      A. I think of it more as a PK parameter or
23  it -- you can't do either, PK or PD, unless you
24  absorb the drug, right? So if you don't absorb it,
25  it starts there. So peak concentration is -- is
```

Page 241

```
1   generally related or it happens at some set time
2   after absorption.
3       Q. And what does -- what does ceiling effect
4   mean when we're talking about absorption?
5       A. I'm really not sure what that would refer
6   to.
7       Q. Okay.
8       Let's go to your report Page -- starting on
9   Page 10, "Measuring Anticoagulant Activity." And
10  this portion of your report refers to therapeutic
11  drug monitoring and PT, right?
12      A. Yes.
13      Q. And let's turn to Page 12. You have a
14  figure there. It's marked Figure V.D.3, and cites
15  the FDA briefing document.
16      Are you with me?
17      A. Yes.
18      Q. And you state that this figure indicates
19  "that higher PT times did not offer greater
20  protection against clotting, but did correlate with
21  greater bleeding risks."
22      Did I read that correctly?
23      A. Correct.
24      Q. So are you saying there is no benefit from
25  taking Xarelto?
```

61 (Pages 238 to 241)

Protected - Subject to Further Protective Review

Page 242

1    A.  Certainly not.  I'm not saying that.
2    Q.  All right.
3       What this graph shows is that the baseline
4  risk of stroke, so the efficacy side of the Xarelto
5  equation, does not change in relation to PT.
6    A.  That's my understanding.
7    Q.  Okay.
8       And we know, of course, that in clinical
9  trials, Xarelto was demonstrated to reduce the risk
10  of stroke?
11    A.  Absolutely.
12    Q.  Okay.
13       So what the graph actually demonstrates is
14  that PT may not correlate with the clinical
15  effectiveness of Xarelto, correct?
16    A.  I think that's absolutely true.
17    Q.  Okay.
18       So let's go to your figure on Page 13, and
19  this is Figure V.D.4, at the top of the page.  Are
20  you with me?
21    A.  Yes.
22    Q.  And it's actually Figure 8 from the FDA
23  briefing document, right?
24    A.  I'm sorry, I don't have that document in
25  front of me.

Page 243

1    Q.  But you cite it in your paper?
2    A.  Yes, yes, I do.  I just didn't have the
3  figure number here.
4    Q.  Okay.
5       And based on this graph, do you intend to
6  tell the jury that this graphic represents
7  increased -- increased bleeding risk -- strike that.
8       Based on the graph on Page 13 of your
9  report, do you intend to tell the jury that this
10  graphic represents increased bleeding with increased
11  PT?
12    A.  Yes.
13    Q.  How did you decide to use this graph?
14    A.  Well, you know, it -- it was presented --
15  I'm trying to remember where I first saw this
16  presented.  I saw it presented in a couple of
17  different places.  Where -- what I quote from is --
18  is the actual FDA committee meeting where this data
19  was put together based on the PTs provided, you
20  know, by the study sponsor.  And this was PTs done
21  on all of the patients on rivaroxaban and broken in
22  to quartiles and then compared to the bleeding
23  events, patients with bleeding events.  So this is
24  data from the actual ROCKET trial.
25    Q.  Okay.

Page 244

1       What is confounding, Doctor?
2    A.  The definition of confounding, I suppose,
3  would be any -- you know, anything -- you know,
4  any -- anything that could impact another thing.  So
5  something could confound -- you know, again, I -- I
6  don't know.  I'm not sure I can give you a good
7  definition.  I think I know what it means.  I'm not
8  sure I can articulate that.
9    Q.  So let me give you an example and see if --
10    A.  Okay.
11    Q.  -- we're on the same page.
12       If this graph includes patients who were
13  taking aspirin at the same time as they were taking
14  Xarelto, the bleeding data could be confounded by
15  the use of aspirin, correct?
16    A.  Certainly anyone taking aspirin would be at
17  increased risk of bleeding regardless of what their
18  anticoagulant level was in their blood.
19    Q.  And, in fact, the label refers to an
20  increased bleeding risk for patients taking aspirin
21  who might also be prescribed Xarelto, correct?
22    A.  That's absolutely true.
23    Q.  So would that -- that's a fair use of the
24  word "confounding"?
25    A.  So, yes, aspirin can -- can confound or

Page 245

1  augment, even you could say, the -- the bleeding
2  risk in someone who is on an anticoagulant.
3    Q.  Right.
4    A.  Absolutely.
5    Q.  Do you know what happens to this graph on
6  Page 13 of your report when you take out the aspirin
7  users?
8    A.  I do not know.
9    Q.  Would you be interested to know?
10    A.  Yes, I would be.
11    Q.  Why would you be interested in knowing?
12    A.  Because I'd like to know what the effect of
13  aspirin is.
14    Q.  Okay.  Let's take --
15    A.  But again, just to be clear, whether there
16  is aspirin or not, the PT is still predicting for
17  increased bleeding, right?  So whether they are on
18  aspirin or they're not on aspirin doesn't diminish
19  the role of the PT in predicting the risk of
20  bleeding, because you will have -- because what we
21  do know is that aspirin does not affect the PT
22  measurement.  So you will have just as many people
23  taking aspirin in the lower quartile of PTs as you
24  will in the upper quartile of PTs because aspirin
25  simply does not influence PT.  So if there's

62 (Pages 242 to 245)

Protected - Subject to Further Protective Review

Page 246

1    30 percent of all of the patients on aspirin, then
2    30 percent of the patients in each of these
3    quartiles will be on aspirin.
4         MS. YATES:  Let me mark as Exhibit 12 --
5         this is actually the clinical pharmacology
6         review from the FDA as part of the new drug
7         application on Xarelto.
8         (Whereupon Exhibit No. 12, Clinical
9         Pharmacology Review, 01/05/2011, was marked
10        for identification.)
11   BY MS. YATES:
12        Q.  Doctor, unfortunately, you and I are not
13   going to spend a lot of time on it because it would
14   be incredibly dense.
15        But if you will turn to Page 33, do you see
16   Section 4.1.4.4, "Prothrombin Time - Major Bleeding
17   Relationship for Rivaroxaban"?
18        A.  Yes.
19        Q.  Okay.  And you've talked about tables with
20   quartiles, and that's on Pages 34, 35.  And then we
21   get to Page 36, and this is Figure 10, and it says:
22   "Predicted and observed probability of major
23   bleeding as a function of predose PT and aspirin
24   use."
25        Are you with me?

Page 247

1        A.  Uh-huh.
2        Q.  So if you look at the -- the curve that you
3    have is the blue curve, right, with aspirin users?
4        A.  Uh-huh.
5        Q.  And when you remove those aspirin users, the
6    curve for Xarelto and major bleed based on PT is a
7    vastly different curve, isn't it, Doctor?
8        A.  So it shifts the curve down, uh-huh.
9        Q.  Yeah.  Almost flat?
10       A.  Well I don't see that -- you know, again,
11   they will -- we would have to see the statistics.
12   It is -- you know, it depends on what your --
13   what your -- what your units are.  But, yeah, it
14   certainly shifts the curve down.
15       Q.  Significantly?
16       A.  You know, we'd have -- significant has --
17   right, that's a statistical term.  So is it
18   significant?  It looks significant.  I don't know if
19   it is or not.
20       Q.  Let's look, Doctor -- if you look at
21   baseline PT, percent of major bleed is about 4
22   percent, right?
23       A.  I'm sorry.  What page are you on?
24       Q.  Same -- same figure, Page 36.
25       A.  Okay.

Page 248

1        Q.  So look at baseline, prothrombin time,
2    percent major bleed about 4 percent, right,
3    nonaspirin users?
4        A.  Yes, yes, yes.
5        Q.  And if you go over to the right-hand side,
6    it's remarkably close to 4 percent still, right?
7    Doesn't reach 5 percent, does it, Doctor?
8        A.  Well, I mean, maybe the one that I'm looking
9    at is -- are you looking at top figure?
10       Q.  Yes.
11       A.  So, you know, it looks to me like the --
12   starting in the lower quartile -- maybe I'm -- it
13   looks like it's more like 2.9 or 3 percent, say,
14   right?  And is that, like, a dot down at 3 percent
15   and then goes up somewhat to about 4½ percent.
16       Q.  Wait.  Wait a minute.
17       A.  Are you -- are you looking at this dot?
18       Q.  Look at the dotted line.
19       A.  Right.
20            MR. MCWILLIAMS:  Regression?
21            THE WITNESS:  That's the fit.  That's the
22            regression fit.
23            Are you looking at -- I'm seeing a dot
24            here that's below the shaded area.
25            MS. YATES: Okay.

Page 249

1            THE WITNESS: I may not be seeing it
2            properly.
3            MR. MCWILLIAMS:  You're doing it exactly
4            right.
5            THE WITNESS:  I'm looking at here and it --
6            MS. YATES:  No coaching.
7            THE WITNESS:  -- looks like it's about 3
8            percent.  And then if you go --
9            MR. MCWILLIAMS:  I'm not coaching.  I'm just
10           clarifying it.
11           THE WITNESS:  -- if you take it up, then up
12           here, it looks like it's around 4.5 percent.
13   BY MS. YATES:
14       Q.  So the baseline, Doctor, is at the far
15   left axis, right?  Axis.  That's baseline?
16       A.  The point here, it's the quartile where
17   the prothrombin time in seconds is around 13
18   seconds, right?  And then if you take where the --
19   where the dot is, you have a dot in the whiskers,
20   right?  So the dot is the median, and that's
21   around 2 point -- or maybe 3, maybe 2.9 percent.
22       And then you follow it up to the highest
23   quartile, which is at PT of 24 seconds, and there
24   the percent with major bleeds are around, I don't
25   know, 5 percent or so.  Again, we're looking -- it's

63 (Pages 246 to 249)

Protected - Subject to Further Protective Review

Page 250

1  hard to trace it out.  But I think we're looking at
2  the same thing.
3       Q.  So, approximately either 2.9 or 3 percent to
4  a -- to a 5 percent range?
5       A.  Yes.
6       Q.  Versus what was that range when you included
7  aspirin users?
8       A.  It was higher than that.  Again, you know --
9  so, yeah, I mean, again, I know what you -- I
10  understand your point, and you're absolutely correct
11  that aspirin use clearly increases the risk of
12  bleeding.  But I think maybe what you're suggesting
13  is that the PT is no longer reliable when there is
14  aspirin use.
15       But remember that more -- you know, that
16  half or more of these patients are on aspirin,
17  right?  So -- so it's not as if aspirin is just a
18  minuscule percentage of people that are on it.
19  So -- so number one, you have a lot of people who
20  are concomitantly using aspirin.
21       So I'm sorry.  Go ahead.
22       Q.  Go ahead.  You're misinterpreting what I'm
23  saying.
24       A.  Go ahead.
25       Q.  What I'm saying, Doctor, is that PT, when

Page 251

1  patients are only on Xarelto, not on aspirin, the
2  percentage of major bleeds is significantly less
3  than when they're also on aspirin that's known --
4  known to cause bleeds?
5       A.  Yeah.  Oh, absolutely.  That is correct.
6       Q.  Okay.
7       A.  I agree with that.
8       Q.  Important data to know, right?
9       MR. MCWILLIAMS:  Object to form.
10       A.  Yeah, but that's absolutely true of any
11  anticoagulant.  Addition of aspirin is going to
12  increase the risk of bleeding.
13       Q.  Did you look at this for Xarelto in the
14  documents that you looked at?
15       A.  I did.  I saw this.
16       Q.  Did you think it was important to point
17  out to readers that when you remove aspirin, the
18  curve is almost flat?
19       MR. MCWILLIAMS:  Object to form.
20       A.  Well, I mean, remember this is modeling --
21  this is based on one PT assay.  We need validation
22  of these assays.  The fact is that the assay does
23  correlate -- again, it correlates with concentration
24  of drug.  And we need more data and we need more
25  information about how to inform these assays and how

Page 252

1  to use them.
2       So yes, it's important, and look at the
3  curve with the aspirin user.  Look how significant
4  that curve is.  So you go from at the lowest
5  quartile of 4 percent and at the highest quartile
6  you're up to 11 percent median of patients with
7  bleed, and most patients -- I mean, over 50 percent
8  of these patients were on aspirin.  So for most
9  patients, the PT in the highest quartile predicts an
10  almost 12 percent risk of major bleeding.
11       Q.  And what does the product label say about
12  that?
13       A.  It says that aspirin increases risk.  But
14  again, we're getting back to the assay itself.
15  You're asking about a PT and would it be useful.
16  You know, if for no one else -- I mean, you could
17  make the point, if you want to make the point, it's
18  not very useful in people who are on an aspirin, but
19  my goodness, I mean, it's completely impressive in
20  people who are on aspirin, and most are.
21       Q.  So are you now saying that this PT assay
22  may not be reliable?
23       A.  No, I'm not saying that at all.  I'm saying
24  what we need is, as I said in my summary statement,
25  this is a readily available assay that could be very

Page 253

1  helpful in helping us to manage these patients and
2  mitigate risks in these patients.
3       We need -- though we need information to
4  inform that.  We need information about, you know,
5  all of the things we've talked about all day long.
6  And we definitely need that.  Are they reliable or
7  not?  How would we know?  We don't have -- we've not
8  been given that kind of information.  We've not been
9  able to do real-world studies or any other kind of
10  studies that would look at that, but certainly the
11  data is there to suggest strongly that a PT could be
12  helpful in managing patients as a simple readily
13  available test.
14       Q.  But you need more data as to what it means?
15       MR. MCWILLIAMS:  Object to form, asked and
16  answered.
17       A.  I always need more data.  More data, not
18  less.
19       Q.  Particularly for making clinical decisions
20  in patients?
21       MR. MCWILLIAMS:  Same objection.
22       A.  It would be very helpful.
23       Q.  All right.
24       If we go to page 14 of your report, Doctor,
25  you have concerns about the validity of ROCKET

64 (Pages 250 to 253)

Protected - Subject to Further Protective Review

Page 254

1   results. And this section of your report is devoted
2   to a couple of topics. One of them is TTR, and is
3   that time and therapeutic range?
4       A. Yes, it is.
5       Q. And the other concern that you have is the
6   use of the point-of-care device?
7       A. Yes.
8       Q. Okay.
9           In a perfect world, we'd love patients to be
10  a hundred percent time and therapeutic range, right?
11      A. Absolutely.
12      Q. It's not the real world, is it, Doctor?
13      A. We get pretty close.
14      Q. And even -- you get pretty close to
15  100 percent?
16      A. Not 100 percent, but we get pretty close.
17      Q. When you say "we," who do you mean "we"?
18      A. I have a coordinator that I work with, and
19  our patients are all on home monitors, and we have
20  patients who monitor themselves very frequently, so
21  it's very doable. Nothing is 100 percent. No one
22  is that adherent, but certainly we can -- you know,
23  with very, you know, intense, sort of support,
24  education, hand holding, et cetera, and the ability
25  to monitor at home using a point-of-care device, we

Page 255

1   can -- we can get a pretty good time and therapeutic
2   range.
3       Q. All right.
4           You've gone from close to 100 percent to
5   pretty good. What percentage of time of your
6   patients on warfarin in TTR?
7       A. You know -- you know, I've never measured
8   it. I've never looked at it, but I will tell you
9   this: If they are not in therapeutic range more
10  than 75 percent of the time, we have a very serious
11  talk with them, and if they can't do it, you know, I
12  may not be the right doctor for them.
13          You know, if they are unable to adhere to
14  what we do in the way that we manage patients, but
15  in all fairness, I'm not managing atrial fib
16  patients. I'm managing people with very complex
17  thrombotic disorders who are at grave risk of having
18  clots if they are not in therapeutic range.
19          So to be fair, that is likely not true of a
20  large A fib population who have relatively norm --
21  they are not hypercoagulable in the sense that their
22  hemostatic system is hypercoagulable, like some
23  of the patients I manage. So it is a different
24  group of patients.
25      Q. The ROCKET TTR was 55 percent. Do you know

Page 256

1   what the TTR for the other Phase III clinical trials
2   for the NOACs?
3       A. I know they are reported to be higher than
4   60 percent in most of them, around 65 percent or
5   better.
6       Q. Do you know if their trials were blinded or
7   open label?
8       A. I do not remember that.
9       Q. Could make a difference, couldn't it,
10  Doctor? Let me give you an example.
11      A. Yeah. Give me an example.
12      Q. If you blind the study so the investigator
13  doesn't know if you're on the new medicine or
14  warfarin --
15      A. Okay.
16      Q. -- you're going to treat the patient
17  populations the same hopefully, right?
18      A. Right, because you don't -- okay. You don't
19  know whether they are on warfarin or not.
20      Q. If you know your patient is on warfarin
21  versus the new medication, in other words, it's
22  unblinded, you're going to encourage that patient
23  and work with that patient to stay within TTR
24  potentially?
25      A. Well, I don't know.

Page 257

1           MR. MCWILLIAMS: Object to form.
2       A. I would argue that an investigator of a
3   study would be following the protocol, which
4   would -- you know, again, I'm not sure I totally
5   agree with you on that.
6       Q. So what if the protocol said, "Doctors,
7   you need to keep your patients within therapeutic
8   range as often as you can. You need to work hard
9   at that." What if the protocol encouraged doctors
10  actually to differentiate between the people in the
11  trial on warfarin and those on the new medicine?
12      A. Uhmm, look, all I can tell you is doing --
13  when you participate in a clinical trial, if you've
14  got someone who may or may not be -- who has a 50/50
15  chance of being on warfarin, it doesn't matter
16  whether they are or not. You've got to -- you've
17  got to control them like they are.
18      Q. Doctor, do you know how the 55 percent TTR
19  obtained in ROCKET compares to real world use of
20  warfarin?
21      A. Again, I can only tell you what happens in
22  my clinic.
23      Q. Okay.
24          Well, when you criticize the TTR of
25  55 percent, wouldn't you like to know what goes on

65 (Pages 254 to 257)

Protected - Subject to Further Protective Review

Page 258

1    in the real world beyond your clinic that apparently
2    can achieve 75 percent compliance?  Wouldn't that be
3    important for you to know, Doctor?
4            MR. MCWILLIAMS:  Object to form.
5        A.  Not in the context of a clinical -- a major
6    clinical trial where you are trying to compare a new
7    drug to a standard therapy.  And you want to know --
8    you know, you're asking the sort of scientific
9    question of which one is better.  There should be
10   optimal management of the patients on warfarin.
11           There should be optimal management whether
12   they are on a trial or not, but especially on a
13   trial because you want to have optimally managed
14   patients.
15           I get your point, which is, oh, well,
16   we're going to go out in the real world and we are
17   going to treat people.  As a physician who is very
18   cognizant of managing my patients well, I just
19   don't buy that that's acceptable, and for a
20   company to say, "Well, we're just going to kind
21   of compare it to the sort of lowest common
22   denominator" is not really what I want to see
23   either in a new drug that's being studied.
24           That's just my opinion, but I don't know
25   that we should aspire to the, you know, the -- you

Page 259

1    know, the lowest or the most minimal standard.  I
2    mean, I think we should aspire to something a little
3    higher.
4        Q.  Are you aware that in the US, the time in
5    therapeutic range in community-based settings is
6    about 51 percent?
7        A.  It's very, very disappointing.
8        Q.  Are you even aware that that's a statistic
9    reported in the literature?
10       A.  You know -- I've seen statistics reported
11   all over the map.  I think that that's atrocious if
12   that is the case, and I'm sure you can go to
13   communities where that is the case.  It's -- it's
14   inadequate.
15       Q.  Are you aware --
16       A.  Again, but why would you want a new drug to
17   merely reflect an adequate or a less-than-adequate
18   threshold?  I'm just saying.  I -- you know, I mean,
19   I don't want to argue about it.  It's just -- I just
20   don't understand why we would use that to justify
21   that it's okay to have a lower time in therapeutic
22   range.  I just don't get it.
23       Q.  You don't get it?
24       A.  I don't get it.
25       Q.  You don't get why ROCKET was double blinded?

Page 260

1            MR. MCWILLIAMS:  What?  Object to form.
2        A.  I don't get why -- there were some issues
3    that I -- that I do know about ROCKET that were
4    disturbing.  One is that there did not seem to be a
5    therapeutic algorithm for physicians to follow, that
6    there were places in -- that patients were on ROCKET
7    where adjustments weren't made.  There was like a
8    length of time, I think as much as 28 days could go
9    by before an adjustment.  That's, in my opinion,
10   atrocious management of patients on a drug like
11   warfarin.
12           So, you know, I just don't get that.  I
13   don't get how you can design a trial with -- with,
14   you know, those kinds of thresholds and allowances.
15       Q.  Do you know if they were allowances
16   permitted by the protocol or were they violations of
17   protocol?
18       A.  As I understand it that the protocol allowed
19   quite a bit of time from the time an INR was
20   measured until the investigator adjusted -- you
21   know, if it was out of range until the patient was
22   adjusted.  It allowed quite a bit of time as I
23   recall in reading the protocol.  I wouldn't want to
24   quote exactly how many days, but it was certainly
25   beyond like a three- or four-day window.

Page 261

1        Q.  By the way, when you have a patient who has
2    an INR out of range, do you immediately dose adjust
3    or do you run another test?
4        A.  Well, again -- you know, again, I'm not
5    holding my patient population as being how all
6    patients are managed on warfarin.  We do it, you
7    know, very intensively.
8            So when the INR comes in from the home
9    monitor, it's faxed immediately to my coordinator.
10   She takes it and she makes an adjustment and she
11   calls the patient back and they talk about it and
12   they make an adjustment, or she finds out -- or she
13   talks to him.  Did you take -- start a new drug?
14           If they start a new drug or they went out
15   and ate salads for two days or something, you know,
16   out of the ordinary, then we may re-test.
17           So we don't have one size fits all.  This is
18   customized, basically, to the patient and what
19   they're doing.  But we make those determinations
20   quickly.  We don't let days go by without doing
21   that.
22       Q.  Okay.
23           Do you know what the time in therapeutic
24   range is in specialized coagulation clinics in the
25   United States?

66 (Pages 258 to 261)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 262

1    A. I have seen some data on that. I wouldn't
2  want to tell you an exact percentage, but it's cer-
3  tainly better than 55 percent, in my recollection.
4    Q. How about 60 percent?
5    A. That may be.
6    Q. Still not good enough by your standards?
7    A. No, it's not good enough by my standards.
8    Q. Doctor, I want to talk a little bit more
9  about time on drug. You agree that based on the
10  science you've seen that after 24 hours, a patient
11  taking Xarelto will lose anticoagulation coverage?
12    A. Yes, for most of them, yes.
13    Q. Right. And again --
14    A. Everyone -- right, everyone -- right.
15  Over time, depending on the half-life, of course.
16    Q. And they need to take another dose in order
17  to acquire that protection?
18    A. That's correct.
19    Q. Versus a patient taking warfarin can remain
20  anticoagulated for up to five days, right?
21    A. That's correct.
22    Q. And if we turn to ROCKET, one of the issues
23  there was that at the termination of the treatment
24  period -- you're nodding your head. You know where
25  I'm going, right?

Page 263

1    A. I think so.
2    Q. All patients enrolled in the study,
3  including those that were on Xarelto, were switched
4  to warfarin, correct?
5    A. That's my understanding.
6    Q. And then those patients actually were
7  continued to be observed for about 30 days after the
8  study, right?
9    A. Right.
10    Q. And the results of the study actually show
11  that more patients developed a stroke or had a
12  systemic embolism during this transition period in
13  the Xarelto group than in the warfarin group, right?
14  Yes?
15    A. Yes.
16    Q. Something like 22 versus seven, right?
17    A. That's about what I remember.
18    Q. And these patients, in fact, even though
19  they were off Xarelto, they were counted in the
20  Xarelto group as having had a stroke?
21    A. Only on the intent-to-treat analysis, not on
22  the per-protocol analysis.
23    Q. Right. And the intent-to-treat analysis is
24  what the FDA based their approval on, which actually
25  included these additional strokes, if you know?

Page 264

1    A. Do I know that that's what the FDA based its
2  decision on? I do not know what the FDA based its
3  decision on.
4    Q. Okay.
5      Do you know that they looked to the
6  intent-to-treat?
7    A. I would hope that they did. I mean, that
8  would be -- you would hope that that would be the
9  standard.
10    Q. And that would have included these patients
11  who had strokes who were actually off the medicine,
12  but they were counted as Xarelto strokes, right?
13    A. That's -- that's my understanding.
14    Q. And there would certainly be some time
15  necessary to achieve that transition to warfarin,
16  right? They weren't bridged with heparin, right?
17    A. Apparently not.
18    Q. Hindsight 20/20, now we know they should
19  have been bridged, right?
20    A. I think we would have known that before.
21    Q. You think so?
22    A. Absolutely.
23    Q. Okay.
24      And the strokes that occurred were probably
25  due to not being anticoagulated, right, because they

Page 265

1  were off the medicine that's protecting them?
2    A. I agree.
3    Q. If you take those strokes out of the ROCKET
4  data, would you agree that the data actually shifts
5  to showing a greater benefit of stroke protection
6  for Xarelto users?
7      MR. MCWILLIAMS: Object to form.
8    A. I think that you're now referring to --
9  there is a per-protocol analysis that's been done.
10    Q. The while-on-drug --
11    A. Right.
12    Q. -- or the time-on-drug analysis?
13    A. Right, and it extended to I think two days
14  after the last drug was taken, so that's -- and that
15  was the primary endpoint, as I recall, that was
16  looked at in the study.
17      So, again, we've had -- I don't want to
18  misquote the exact percentages of patients who had
19  strokes in the two different arms. I mean, and we
20  could easily pull it up. As I recall, there was no
21  difference. I mean, this is why it was a
22  noninferiority -- it was deemed to be noninferior,
23  but it was not statistically better than warfarin.
24    Q. Do you know if when you took out the
25  intent-to-treat data, the strokes that occurred off

67 (Pages 262 to 265)

Protected - Subject to Further Protective Review

Page 266

1  the medicine, and just looked at the time-on-drug
2  results, whether Xarelto actually showed
3  superiority?
4      A.  I don't think it did.  I mean, you'd have --
5  if we can pull up the article, let's look, I mean,
6  because you're talking about the per-protocol
7  analysis, which was the primary endpoint of the
8  study, right?  It was per protocol, and by
9  definition, that removed all of the strokes that
10 occurred after Xarelto was stopped.
11     And so as I recall, it was not -- there was
12 not a statistically significant difference in -- in
13 strokes in the two groups, and again, I don't want
14 to quote the exact percentages that had strokes
15 because I don't trust my memory that much, but --
16     Q.  That's fine.  Okay.
17     Your other criticism is the point-of-care
18 device.  And it's your opinion that the
19 point-of-care device used in ROCKET affected the
20 validity of the results of the study.  Is that your
21 opinion.
22     A.  I think there is a high probability that it
23 did.
24     Q.  And what analysis have you done to determine
25 if that opinion is correct?

Page 267

1      MR. MCWILLIAMS:  Object to form.
2      A.  So, uhmm, what I can tell you is -- again,
3  I'm kind of relying on my experience as someone
4  who's dealt an awful lot with patients on warfarin
5  and on what happens when patients on warfarin
6  are adjusted, right?  Because this is why we
7  monitor, so that we can adjust.
8      What I believe happened, and there is some
9  data that I think I put in here that looks at --
10 just for, you know, an idea, when you do have the
11 INR that's validated against the real laboratory,
12 and you can see that -- and I put in here the
13 numbers, but over 500 patients had a true INR
14 greater than four that was unrecognized because of
15 the point-of-care malfunction.
16     So this is on Page 15 in the second
17 paragraph from the top.  So I actually -- you know,
18 you can count these up.  So there are 500 patients
19 that had -- their true INR was greater than four,
20 which would have mandated adjustment in dose, right?
21     But because the point-of-care instrument had
22 those people as having less than four, they would
23 not have had the appropriate adjustments made.  And
24 there was, you know, a smaller group that actually
25 had an INR, real-time INR that's greater than four,

Page 268

1  but they came out as having INR less than two.  So
2  those people would have been adjusted for more
3  warfarin, right?
4      So you're taking some subset of these
5  patients that had a high INR, but they looked like
6  they had a low INR and they were given more
7  warfarin.
8      So, again, you know, you're asking -- you
9  know, I know by looking at this that -- and we know
10 that these are very significant differences in the
11 INR measurements, and I do think that some patients
12 had -- were probably overcorrected.  Some patients
13 were not corrected who should have been, and does
14 that affect outcome, statistically applying, you
15 know, esoteric statistical, you know, methodologies,
16 you know, I can't speak to that.
17     I can tell you, though, from managing
18 patients that there is a big concern when I see
19 something like this on a scale that we see it.
20     Q.  Have you conducted any analysis to determine
21 what effect the POC device malfunction had on the
22 overall results of safety and efficacy in the ROCKET
23 trial?
24     MR. MCWILLIAMS:  Object to form.  Asked and
25 answered.

Page 269

1      A.  Yeah.  My analysis is one of observation.  I
2  did not conduct any statistical, you know, programs,
3  statistical analysis of that.
4      Q.  Did you do any calculations at all?
5      A.  Other than what I've just talked to you
6  about, I mean, you can look at percentages of
7  patients that were clearly not appropriately -- that
8  didn't have appropriate INRs done.  So no, I did not
9  apply any statistical methodologies to this.
10     Q.  Did you look at whether the patients who you
11 state had erroneous INR readings from the device,
12 did you look at the outcome of those patients?
13     A.  No, I did not.
14     Q.  Did you look to see if they were dose
15 adjusted?
16     A.  No -- so I did review -- there's quite a bit
17 of data on this that I reviewed, and to be honest, I
18 don't recollect details, and maybe some of the
19 details you're asking me I did review, but just
20 don't remember.
21     Q.  And where does this data come from, from
22 table Roman Numeral VI.1 on Page 15?  I don't see a
23 citation.
24     A.  You're right.  I don't either.  It may
25 have -- again, it may have been from the Patel

68 (Pages 266 to 269)

Protected - Subject to Further Protective Review

Page 270

1  article that when Patel published the point of care,
2  the information about the point of care, uhmm, but
3  I'd have to go back and look, and that is an
4  omission.
5      Q. So we have you in your report citing a table
6  that may have come from Patel, but as part of
7  reaching your conclusion, your methodology did not
8  involve any type of statistical analysis or
9  calculations or any information on outcomes to the
10 patients who may have had a POC malfunction,
11 correct?
12     MR. MCWILLIAMS: Object to form.
13     A. That's correct. So this is -- you know,
14 this is my opinion about the problems with the POC
15 instrument.
16     Q. Right.
17        Have you reviewed any analyses that were
18 done on the data to see if the POC device affected
19 the results?
20     A. I have seen -- I have looked through and
21 reviewed some of that.
22     Q. Okay.
23        Did you review the announcement from the
24 EMA, the European Medicines Agency?
25     A. That one I don't recall.

Page 271

1      Q. Okay.  Let's take a look.
2         This is -- I hand you Exhibit No. 13,
3  Doctor.  Does that look familiar to you?
4         (Whereupon Exhibit No. 13, EMA concludes
5         defective device in ROCKET study does not
6         impact Xarelto's safety, was marked for
7         identification.)
8      A. Honestly, I may have seen it.  You know, it
9  doesn't look familiar right away to me, but I may
10 have well seen it.
11     Q. Okay.
12        The heading is "EMA Concludes Defective
13 Device in ROCKET Study Does Not Impact Xarelto
14 Safety".
15        Did I read that correctly?
16     A. You did.
17     Q. And then if you go down into the body of the
18 announcement, the fourth paragraph: "After further
19 analyses of the ROCKET study data taking into
20 account the defect in the INR device, EMA's
21 committee for Medicinal Products of Human Use
22 (CHMP) concluded that any incorrect measurements
23 obtained with a defective device would have had only
24 a marginal effect on the study results, and the
25 safety of Xarelto remains unchanged.  In addition,

Page 272

1  data from other large studies confirmed the compar-
2  ative safety of the warfarin and showed similar
3  rates of bleeding in their warfarin groups."
4         So that's what the EMA concluded, right?
5      A. That is.
6      Q. They did an analysis, right?  They actually
7  looked at the data, correct?
8         MR. MCWILLIAMS: Object to form.  Are you
9         suggesting that she didn't look at the data?
10        MS. YATES:  I'm suggesting that you object
11        to form, and that's it.
12        MR. MCWILLIAMS: Okay.
13        MS. YATES:  And that you not coach the
14        witness.
15        MR. MCWILLIAMS: I take that as a no.
16 BY MS. YATES:
17     Q. Right, Doctor, they looked at the data?
18     A. I would certainly hope they did.
19     Q. And that's their conclusion?
20     A. That is their conclusion.
21     Q. Let's look at the next one and mark this as
22 Exhibit No. 14.  I'll represent to you that that is
23 an FDA press release or announcement of some type.
24        (Whereupon Exhibit No. 14, FDA analyses
25        conclude that Xarelto clinical trial results

Page 273

1         were not affected by faulty monitoring
2         device, was marked for identification.)
3      Q. And it says, "FDA analyses conclude that
4  Xarelto clinical trial results were not affected by
5  faulty monitoring device."
6         Do you see that?
7      A. Uh-huh, I do.
8      Q. And it says that "because of the concern
9  about the Alere INRatio device, the FDA has
10 completed a variety of analyses to assess the impact
11 that this faulty monitoring device had on the
12 ROCKET-AF study results.  The agency has determined
13 that effects on strokes or bleeding, including
14 bleeding in the head, were minimal.  The FDA
15 concludes that Xarelto is a safe and effective
16 alternative to warfarin in patients with atrial
17 fibrillation."
18        Based on that statement, again, the FDA
19 completed a variety of analyses of the data,
20 correct?
21     A. That's what they state.
22     Q. What -- do you think they didn't and they're
23 just saying it?
24     A. I assume they did complete a variety of
25 analyses, yes, I do agree with that.

69 (Pages 270 to 273)

Protected - Subject to Further Protective Review

Page 274

1     Q. Have you seen that FDA release before?
2     A. I haven't seen this particular release, but
3  I think I have seen a report. Was there not an FDA
4  report on this?
5     Q. And, in fact, if you click on more
6  "information on these analyses can be found here" --
7     A. Yeah.
8     Q. -- that's an over 100-page document, and it
9  actually says, even with this, we would still
10 approve Xarelto as safe and effective, right?
11       MR. MCWILLIAMS: Object to form on multiple
12 counts.
13    A. So, yes, they are reaffirming that they
14 would do it all over again, approve it even with
15 that information, yes.
16    Q. Duke -- Duke is a reputable organization,
17 right?
18    A. It is.
19    Q. Are you familiar with that clinical trial
20 research center?
21    A. Yes, I am.
22    Q. And you know that Duke ran the ROCKET trial,
23 right?
24    A. Yes, I do. I know that.
25    Q. Do you know if Duke did an analysis of the

Page 275

1  data in light of concerns over the Alere recall?
2     A. Yes. I have read that they did.
3     Q. Have you read the results?
4     A. I think I have. I've skimmed over it,
5  uh-huh.
6     Q. And let's take a look. Exhibit 15.
7        (Whereupon Exhibit No. 15, New analyses of
8        point-of-care monitoring in ROCKET-AF trial
9        published, was marked for identification.)
10    Q. DCRI News - 2016, "New analyses of
11 point-of-care monitoring in ROCKET-AF trial
12 published," so they actually published their
13 analyses, right?
14    A. Yes.
15    Q. And if we go down to the bottom:
16       "ROCKET AF Executive Committee Chair Keith
17 A.A. Fox said, 'We believe these analyses we have
18 conducted over the last few months are thorough and
19 demonstrated consistent results with the overall
20 trial.'"
21       So, again, Duke did their own analysis,
22 right?
23    A. They did.
24    Q. And they stand by the results of the trial?
25    A. I'm sure they do.

Page 276

1     Q. You say that in a sort of somewhat
2  derogatory way. Are you saying --
3     A. No, no. I'm just saying I'm sure they
4  do, and it's quite clear that they do stand by the
5  results of the trial.
6     Q. Right. Because they actually looked to see
7  if this device actually affected the results of the
8  trial, right?
9     A. They conducted analytical -- they conducted
10 specific analyses to try to determine whether there
11 was any impact on the trial.
12    Q. And it would be very important for an
13 organization like Duke to ethically publish if they
14 found problems in the results of the trial, right?
15       MR. MCWILLIAMS: Object to form.
16    A. Yes.
17    Q. And they published that they did not, they
18 looked for months, they did their analyses, and they
19 stand by their results?
20    A. Yes, that's what they say.
21    Q. And you have no criticism of that if that's
22 what the analyses shows?
23    A. I have no criticism of Duke for doing an
24 analysis, nor for publishing it.
25    Q. Okay.

Page 277

1        So Duke, EMA and the FDA all did their own
2  separate analyses of the ROCKET trial to see if the
3  point-of-care device affected the results on safety
4  and efficacy, correct?
5     A. They did.
6     Q. You did no such analysis?
7        MR. MCWILLIAMS: Object to form.
8     A. I did not do an analysis in the same fashion
9  that they did; that's correct.
10    Q. In the same fashion? You did no
11 calculations, no analysis?
12       MR. MCWILLIAMS: Object to form, asked and
13       answered.
14    A. As I said, I certainly reviewed it. I
15 looked at the data that was published. And, you
16 know, I applied -- I applied some common sense, and
17 I'm giving you my opinion.
18       Do I think there were patients impacted by
19 this? Yes, I do. Did it rise to the level of being
20 detectable by a variety of esoteric, statistical
21 comparisons and analyses? Obviously not, because I
22 have no reason to doubt that they applied all, you
23 know, approved statistical methodology to do this.
24 I'm just saying that, you know, I can tell you that
25 I think patients were affected by this.

Protected - Subject to Further Protective Review

Page 278

1    Q.  You don't have data to support that belief?
2       MR. MCWILLIAMS:  Object to form, asked and
3    answered.
4    A.  Only the data that, you know, I've put in my
5    report.
6    Q.  And that's it on Page 15?
7    A.  Yes.
8    Q.  And nowhere does it say any of these
9    patients had adverse outcomes --
10   A.  That's correct.
11   Q.  -- correct?
12   A.  That's correct.
13   Q.  So you are speculating on that point?
14      MR. MCWILLIAMS:  Object to form.
15   A.  I am giving my opinion.
16   Q.  It's speculation, Doctor.
17      MR. MCWILLIAMS:  Object to form.
18   A.  I'm not sure what the difference between an
19   opinion and speculation is, but if they're exactly
20   the same thing, then you're right, but it's my
21   opinion.
22   Q.  Okay.  Do you know if Janssen also did an
23   independent analysis?
24   A.  I can't remember specifically.
25   Q.  Okay.

Page 279

1       You don't remember seeing it?
2    A.  No, I don't recall.
3       MS. YATES:  I have no idea how long we've
4    been going.
5       MR. MCWILLIAMS:  Probably at least an hour.
6       MS. YATES:  Six minutes to the tape?  There
7    you go.  Let's take a break.  We'll change
8    the tape.
9       THE VIDEOGRAPHER:  This is the end of Tape
10   5.  We are now off the record at 4:04.
11   (Recess.)
12      THE VIDEOGRAPHER:  This is the beginning
13   of Tape 6.  We are now back on the record
14   and the time is 4:14 p.m.
15   BY MS. YATES:
16   Q.  So, Doctor, I just want to spend -- I think
17   you're already looking at it -- your table on Page
18   15, and you couldn't recall where it came from.
19   Well, let me represent to you that it actually comes
20   from the EMA analysis.  Okay?
21   A.  Okay.
22   Q.  And they conclude that there is insufficient
23   evidence that the benefit-risk balance -- sorry.
24   There is -- strike that.
25      I think I just admitted the case away.

Page 280

1    Strike all of that from video, everything.
2       It comes from the EMA document that actually
3    looked and did their further analysis on this POC
4    device, and they actually conclude that there is
5    sufficient evidence that the benefit-risk balance
6    remained unchanged.  And you cite the data in
7    disagreement with their conclusion?
8    A.  I think, you know, and if I could just maybe
9    myself take a minute and kind of go back to what I
10   actually said.  It is late in the day, so I want to
11   make sure that I'm reflecting what I said in my
12   report.  And, you know, first I say that the
13   warfarin management in ROCKET has recently been
14   called further into question over and above just
15   the whole problem with time in therapeutic range
16   due to an issue with the point-of-care device.
17      And so, you know, what I say at the top of
18   Page 15 is that the findings are important, they're
19   compelling to me, and they call into question the
20   reliability of ROCKET.
21      Again, I think here what I really mean to
22   include is both the whole issue about time in
23   therapeutic range as well as the additional issue of
24   the point-of-care instrument.
25      So, again, as I point out, my opinion is

Page 281

1    because the true INR readings were under-reported,
2    it seems likely that bleed rates, which strongly
3    correlate with INR levels on the warfarin arm, were
4    higher than we would expect if the INR levels were
5    reported accurately.
6       So, again, that's my opinion about that.  I
7    did not, as we said, apply a statistical
8    methodologic approach to analyzing that, but I am
9    giving my opinion based on the fact that I
10   have, you know, a good deal of experience in working
11   with patients on warfarin, patients who have INR
12   values too low or too high, and how they're managed.
13      So, you know, and again, combining that with
14   what I also said earlier which was, in my opinion,
15   the way that the ROCKET trial was set up, which
16   allowed treating physicians to kind of manage their
17   patients on warfarin without giving them sort of set
18   protocols or ways to that management leaves open
19   a lot of question about how patients who -- who had
20   abnormal INRs were managed to begin with, and then
21   to find out that indeed, you know, many of them had
22   inaccurate INR measurements only compounds or
23   confounds, as we talked about earlier, the problems
24   that I think already exist.  That is, again, my --
25   this is my considered opinion about it.

71 (Pages 278 to 281)

Q. Okay.
Doctor, but I think my question and my point was much simpler than that. You cite this table from EMA, and you believe that you have concerns over the reliability of the POC instrument.
EMA, in the very document that you pull this table from, says that the benefit-risk balance after they did their analysis remained unchanged, right?
A. That is what they said.
Q. Okay.
And you have no data, you didn't look at any patient outcome data to determine if the numbers that show a potential malfunction affected a patient outcome, correct?
A. That's correct, but I would -- but what I'd also like to say, remember that this data was taken from one point in time, 7,000 patients who are on warfarin for many months, potentially on study, that we're looking at a single point in time. And all these analyses that are being applied to that is that you've got this one INR measurement that we're looking at done in the lab.
What we do know is that all those 7,000 patients over all those many months, quite a few of those patients were using defective instrument to

do their INR.
So this is a point in time, but there were many, many, many points in time that you do not have data on it, you do not have laboratory -- you know, central laboratory INRs on.
So, again, I'm saying in my opinion, you're talking about a faulty device that many patients were using over a long period of time, combine that with what I think in my opinion were inadequate ways that -- particularly in some parts of the world, many parts of the world the patients were being managed in terms of the adjustments on this.
I think you've got one confounding factor on top of the other, and I think you have multiple confounding factors, and it does -- and that leads to my conclusion that I started this with, which was I have concerns about the reliability of -- with the validity and reliability of the results of patients who are on warfarin in the ROCKET trial.
Q. I understand you have concerns, Doctor, but those organizations, EMA, FDA, Duke, Janssen, who actually analyzed the results and the data, all concluded the same, that the malfunctioning of the device did not affect the safety and efficacy profile of Xarelto in that trial, correct?

A. That is what they concluded.
Q. And, in fact, didn't they also look at real-world data to see if there was a discrepancy. If this device was defective, let's look at it out in the real world without the device, and the results confirmed the results of ROCKET, right?
MR. MCWILLIAMS: Objection -- object to form.
A. You know, listen, I've already said what I think, which is that this was -- they analyzed data taken at one point in time, which is -- you know, that's the data that they had to analyze. I'm thinking about patients who are over a particular long period of time using a defective instrument. I think there are problems with that, whether statistical analyses reveal those are not, and again, confounding what I already think about the trial, which was that there was not good management on the warfarin arm and compounded by using a faulty instrument, I think -- I think -- personally I think there's good justification for someone like myself to be skeptical of the results on the warfarin arm.
Q. How many INR measurements were taken from patients during the ROCKET trial?
A. You mean in the central laboratory or on the

point-of-care instrument? And I really don't know. Honestly, I mean, there would be many more using the point-of-care instrument, many, many more, because on the -- on the central lab testing, it was done at two points, at 12 weeks and 24 weeks.
Q. Right. So that was going to be another question. You said one point?
A. I'm sorry, clarify, two points.
Q. 12 and 24 weeks?
A. Yeah, I'm sorry, two points, correct. That is correct. But the data in this particular table, to be fair, is only at Week 12, so, you know, but you're right. To be fair, there were two points.
Q. Right.
And how many discrepancies were reported based on these -- the INR readings that were taken?
MR. MCWILLIAMS: Object to form.
A. I mean, I'd have to do -- I'd have to do the math here on the table.
Q. And you haven't done that math?
A. I did it. I did it at one point when I was reading this. I did not put that in here, and I would have to do the math again.
Q. Doctor, you are also going to offer opinions that the Xarelto label is inadequate; is that

Protected - Subject to Further Protective Review

Page 286

1    correct?
2        A. That is correct.
3        Q. What methodology did you use to form the
4    opinion that the Xarelto label is inadequate?
5        A. Shall we go to Page 18?
6        Q. Sure.
7        A. Because there's -- I think it's where --
8    where I point out problems with Xarelto labeling.
9        Q. So let me -- it's late in the day.  Let me
10   see -- actually let's go to Page 2.  As I understand
11   it, your Opinion No. 10, your criticisms are that
12   Xarelto does not have a black box warning regarding
13   the risk of major and fatal bleeding, right?
14       A. Uh-huh, yes, that's right.
15       Q. Fails to present the variability data, e.g.,
16   the 5th to the 95th percentiles for PK and PD
17   measurements, right?
18       A. That's correct.
19       Q. Fails to identify PT laboratory test with
20   the appropriate -- the agent as a useful and readily
21   available test, right?
22       A. Correct.
23       Q. And the fourth one is that prior to
24   September 2015, the label failed to properly inform
25   physicians of the increased bleeding risk seen in

Page 287

1    the U.S. patients?
2        A. Correct.
3        Q. Okay.
4        Those are your four inadequacies, right?
5        A. Correct.
6        Q. Okay.
7        What expertise do you have in drafting drug
8    labels?
9        MR. MCWILLIAMS:  Object to form.
10       A. I am giving my opinion on what I feel are
11   deficiencies in the label.  I do not work for the
12   FDA, and I have never been involved in a drafting of
13   a format that's -- you know, that gives labeling
14   indications.
15       What I can say is that there is clearly --
16   so let me back up a minute.
17       I mean, I think everyone agrees to the --
18   that the primary results of the ROCKET trial showed
19   it is noninferior to warfarin, does not show
20   superiority to warfarin, but shows noninferiority.
21       That being the case, it -- I find it very
22   strange that there is a black box warning with
23   warfarin that warns about bleeding risks, and that
24   no such -- no similar warning exists for
25   rivaroxaban.

Page 288

1        The bleeding risks were similar in the two
2    arms.  I don't know of -- I don't know of any data
3    or published data that would suggest that, uhmm,
4    rivaroxaban, particularly in the atrial fibrillation
5    indication, is superior to warfarin in terms of
6    bleeding risk.  And yet one product has a black box
7    warning and the other one doesn't.
8        I think that could well -- as I stated in my
9    opinion, I think that could well lead to patients,
10   potentially even physicians or caregivers or, you
11   know, ancillary health personnel, whoever, believing
12   that rivaroxaban is safer than warfarin when it
13   comes to bleeding risk, which the data does not
14   support.
15       Q. The bleeding risk data does support that it
16   has fewer fatal and critical bleeds, correct?
17       A. Again, I think that we could have a lot
18   more discussion about that and how that's related
19   potentially to how warfarin was managed on this
20   trial.  And so I think that's in large part why
21   regulatory agencies and others were willing to look
22   at the U.S.-only data in which patients had a more
23   standard, per se, time in therapeutic range, so
24   when U.S. data was pulled apart from the rest of
25   the world and that data showed that patients on

Page 289

1    warfarin in the U.S. had a more consistent time
2    in therapeutic range to the other studies that were
3    done, and that data was analyzed, that the risk of
4    bleeding was no different between rivaroxaban and
5    warfarin, and I think I have a table in my report
6    that details that.
7        Q. Let me go back to my original question:
8    What expertise do you have in drug labeling?
9        MR. MCWILLIAMS:  Object to form.
10       A. I do not write drug labels.  I read them.
11   And as a -- as a physician that counsels patients
12   and teaches other physicians, et cetera, I'm
13   familiar -- I'm certainly familiar with drug labels
14   and what they mean and what's in them.  I do not
15   write them.
16       Q. Do you even know who determines whether
17   there should be a black box warning and the issues
18   that are contained in it?
19       A. No, I do not specifically know who at the
20   FDA would make that determination.
21       Q. But it is the FDA?
22       A. That's what I believe.
23       Q. Do you know if a manufacturer can just make
24   a change and put a black box on a label?
25       A. You know, I imagine that is something that

73 (Pages 286 to 289)

Protected - Subject to Further Protective Review

Page 290

1  is done in discussion with the FDA. I mean --
2  again, no, I don't know the process, nor do I know
3  how a manufacturer would go about issuing a warning
4  or a labelling change.
5      Q. Can you identify for me any regulations that
6  tell you what's supposed to be included in a drug
7  label in the United States?
8      A. No.
9      Q. Do you think that an appropriate drug label
10 is supposed to mention every research that's ever
11 been done with respect to adverse events of a drug?
12     A. I do -- I do know that labels have generally
13 a very comprehensive list of side effects for the
14 drugs, you know, that these labels apply to.
15     Q. And that's true -- sorry.
16     A. And -- yeah, and that would be true of any
17 drug and every drug, and so thus labels are very
18 long -- often very long and very involved and do get
19 into reports of, you know, data reports.
20     Do they -- can they possibly encompass every
21 single report published in the many thousands of
22 journals around the world? You know, certainly not.
23 That would be, you know, not feasible or possible.
24 But they are -- in my experience, labels are very
25 comprehensive. It usually lists adverse events very

Page 291

1  comprehensively.
2      Q. And the Xarelto label lists adverse events
3  comprehensively?
4      A. It does.
5      Q. And bleeding is that major risk that's
6  identified repeatedly in that label, correct?
7      A. It is. That is correct.
8      Q. Ah --
9      A. But, you know, my -- my point here is not
10 about the whole label or that I think the label is,
11 you know, any particulars, other than this is
12 addressing the black box warning issue, which is
13 something that sits at the very top of every drug
14 label or -- and, again, in our field, in the field
15 of medicine, we do pay attention to black box
16 warnings, and they are front and center of a
17 document that may run to a hundred pages that with
18 fine print throughout, much gets lost or missed or
19 overlooked in a label by prescribing physicians, by
20 patients who take those drugs. But a black box
21 warning is kind of hard to miss because it's
22 generally right at the top and front and center, you
23 know, or front page of a label.
24     Q. Are you saying -- are you saying
25 physicians miss information and they're really

Page 292

1  only interested in a black box warning?
2      A. Everyone misses information. I mean, to --
3  of course. You know, again, we're talking about a
4  document that may run many dozens of pages, small
5  print and fine print, and I do think that black box
6  warnings -- that's why -- that's why they are done
7  that way, right? That's why that is a choice that's
8  been made.
9      I mean, you know, this is something to call
10 attention to particular problems with the drug. And
11 yes, it is put front and center because I think the
12 reality is very few practicing physicians would have
13 time to pick up a label on every drug that they
14 prescribe in their practice, read and remember and
15 retain everything on 60 pages in a drug label.
16 That's not -- that's not reasonable. That's not a
17 reasonable expectation of physicians, and certainly
18 for patients who now have access to these things on
19 the Internet, that would not be reasonable that they
20 would plow through all of that and understand it.
21     That is exactly why the black box label
22 exists, to call attention to particular problems of
23 importance and risk, and Coumadin has one.
24     Q. Right. As mandated by the FDA?
25     MR. MCWILLIAMS: Object to form.

Page 293

1  BY MS. YATES:
2      Q. Right?
3      A. That would be my assumption, that that was
4  mandated by the FDA.
5      Q. And none of the NOACs, including Xarelto,
6  have a black box on bleeding risk as mandated by the
7  FDA?
8      A. That is my understanding.
9      Q. And you are critical of the FDA for that?
10     A. In the case -- particularly, I mean, we are
11 talking today about rivaroxaban and in the case of
12 rivaroxaban, in which the comparative study with
13 warfarin in a well-controlled warfarin population
14 showed no difference in bleeding rates, yes, I find
15 it hard to understand why warfarin would have that
16 black box warning and Xarelto would not.
17     Q. Okay.
18     What would your black box warning say?
19     A. Probably much the same thing that the black
20 box warning for warfarin says.
21     Q. And did you review any of the materials from
22 the company from the FDA that went into the back and
23 forth on labeling?
24     A. I -- I honestly can't remember. I mean, I
25 did review quite a few documents from the FDA, but I

74 (Pages 290 to 293)

Protected - Subject to Further Protective Review

Page 294

1    don't remember if that was specifically in there.
2         Q.  Would those documents be on your list of
3    materials in Appendix A?
4         A.  Yeah, that would include the documents from
5    the FDA that I reviewed.
6         Q.  Okay.
7              Do you know who is responsible for preparing
8    the U.S. label for Xarelto?
9         A.  No, I don't.
10        Q.  Do you know how much was written by the FDA
11   or how much was written by the company?
12        A.  I do not.
13        Q.  Have you ever served on an FDA labeling
14   committee?
15        A.  I have not.
16        Q.  Ever served on an FDA advisory committee?
17        A.  No.
18        Q.  Have you ever been consulted with respect to
19   what should or should not be included in a label for
20   any medicine?
21        A.  Not that I can recall.
22        Q.  Are you familiar with the term "over
23   warning" in terms of labeling?
24        A.  Not as a specific terminology.
25        Q.  Are you familiar with the term "under

Page 295

1    warning"?
2         A.  Not with -- not in -- I mean, it has obvious
3    meaning to say under warning or over warning, but
4    no, I don't know of that.
5         Q.  Have you ever consulted the FDA regulations
6    regarding the requirements of what must be in a
7    pharmaceutical label?
8         A.  No.
9         Q.  Do you even know where to find those
10   guidelines?
11        A.  Not right this minute, no.
12        Q.  You will agree with me that the Xarelto
13   label warns of the risk of bleeding.  Xarelto can
14   cause serious and fatal bleeding.  Promptly
15   evaluate signs and symptoms of blood loss."
16             You agree that it warns?
17        A.  Yes.
18        Q.  You agree that it warns that bleeding was
19   the most common adverse reaction?
20        A.  I believe that's correct.  I don't have the
21   label in front of me, but yes, I think that's
22   correct.
23        Q.  And if we need to, we can come back to that.
24   But you understand that the labeling change in
25   September of 2015 that added the U.S. subgroup data

Page 296

1    was done to all NOACs, right?
2         A.  No, I didn't -- I didn't -- I didn't look.
3    Didn't question that.  I know that it was done for
4    rivaroxaban.
5         Q.  Well, let me represent to you that actually
6    it was done for all NOACs --
7         A.  Okay.
8         Q.  -- because the FDA wanted some consistency
9    in the labeling.
10        A.  Okay.
11        Q.  Okay.
12             The label also tells doctors, if you recall,
13   that a specific antidote for rivaroxaban is not
14   available, right?
15        A.  Yes.
16        Q.  It also goes through the different doses
17   and dosing regimens for the different approved
18   indications?
19        A.  Correct.
20        Q.  And it also, for atrial fibrillation
21   patients, specifically addresses patients with renal
22   impairment, right?
23        A.  Correct.
24        Q.  And you know that there is actually a lower
25   approved dose for patients with renal impairment?

Page 297

1         A.  Yes.
2         Q.  And, in fact, if your kidneys are impaired
3    to a greater degree, they shouldn't be prescribed
4    Xarelto, correct?
5         A.  Correct.
6         Q.  Doctor, I'm trying to short-cut it because
7    it's late in the day, but let me just spend a minute
8    on the label, and I think it's Exhibit 16.
9              (Whereupon Exhibit No. 16, Xarelto
10             prescribing information, was marked for
11             identification.)
12        Q.  This is, in fact, the label that was revised
13   September 2015, so that is -- that includes the
14   current subgroup analysis.  And you'll see that
15   actually Xarelto does have a black box warning,
16   right?
17        A.  Yes, it does.
18        Q.  And two reasons:  Premature discontinuation,
19   right?
20        A.  Correct.
21        Q.  And that increases the risk of thrombotic
22   events, and then spinal or epidural hematoma, right?
23        A.  Correct.
24        Q.  And then directly to the right of the black
25   box in bold, "Warnings and Precautions," and that

75 (Pages 294 to 297)

Protected - Subject to Further Protective Review

Page 298

1    was the language I read earlier, "Risk of bleeding,"
2    right?
3        A.   Correct.
4        Q.   "Serious and fatal"?
5        A.   Correct.
6        Q.   Then I want you to go to Page 4, I think,
7    and it's "Dosage and Administration."  Do you see
8    that?
9        A.   Yes.
10       Q.   And you had testified earlier that all
11   approved indications in the U.S. were once daily.
12   Do you remember that?
13       A.   Yes, I did.
14       Q.   You were wrong, weren't you?
15       MR. MCWILLIAMS:  Object to form.
16       A.   Yes.  The first three -- well, the first
17   three weeks when we treat DVTs we do twice a day,
18   and then convert to once a day is how it's done.
19       Q.   Right.  And --
20       A.   You're right.  I misspoke.
21       Q.   And this is not a one-size-fits-all dosage.
22   The dosages are different for the different
23   indications, right?
24       A.   Correct.
25       Q.   And the administration, including the

Page 299

1    treatment of DVT and treatment of PE is also
2    different with the one transitioning from twice a
3    day to once a day, correct?
4        A.   Right, that is correct.
5        Q.   And I mentioned the acute coronary syndrome
6    approval is also twice a day?
7        A.   Not --
8        Q.   But that's not approved in the U.S. yet,
9    right?
10       A.   Not in the U.S., right.
11       Q.   Okay.
12           And I just want to go to section -- well,
13   let's go to 5.2, Risk of Bleeding.  Again, that's
14   similar -- same language:  "Increases the risk of
15   bleeding and can cause serious or fatal bleeding.
16   In deciding whether to prescribe Xarelto to patients
17   at increased risk of bleeding, the risk of
18   thrombotic events should be weighed against the risk
19   of bleeding."
20           And I take it you agree with that?
21       A.   I do.
22       Q.   Now, go to Page 11, Section 6.1, and Table
23   1 -- what did I do here -- sorry, I'm trying to
24   speed things up.  I may have just slowed things down.
25           Okay, yes.  So Section 6.1 -- strike that.

Page 300

1            We talked about in September 2015 there was
2    a labeling change that included the U.S. subgroup.
3    Do you remember that?
4        A.   Yes.
5        Q.   Okay.
6            So if we go to Section 6.1, Table 1, this
7    data was in the earlier label, right?
8        A.   Yes.
9        Q.   This was already in there.  And if we go to
10   Figure 1 on Page 13, this is some of the additional
11   data that was then added based on a class-wide
12   label change, right?
13       A.   Correct.
14       Q.   Okay.
15           And if we look at all -- sorry.  We got it
16   as big as we could, Doctor, and my eyes are
17   straining.  But all patients, rivaroxaban, warfarin.
18   There is a hazard ratio and 95 percent confidence
19   interval, 1.04.  Do you see that?
20       MR. MCWILLIAMS:  I'm sorry, what page are we
21   on?
22       MS. YATES:  13.
23   BY MS. YATES:
24       Q.   Just the top line:  All patients,
25   rivaroxaban, warfarin, hazard ratio and 95 percent

Page 301

1    confidence interval, 1.04."
2        A.   Correct, yes, I see it.
3        Q.   And that's the same data in Table 1 on Page
4    11, right?  Same top line, major bleeding, 1.04?
5        A.   Yes.
6        Q.   Now, we get on Page 13, Figure 1, we now get
7    into some of the subgroups, right?
8        A.   Yes.
9        Q.   For example, if you go down, there's age,
10   gender, and then we get to weight, and it says,
11   "Less than 60 kilograms," and the hazard ratio and
12   95 percent confidence interval for that is .71,
13   right?
14       A.   Correct.
15       Q.   So that patient group had a lower risk of
16   bleeding than those that were on warfarin, right?
17       A.   This is the -- this analysis is for the
18   whole group, not U.S. only?
19       Q.   Correct.  So --
20       A.   Yes.  Correct, the whole group, yes.
21       Q.   Subgroups within the whole group?
22       A.   Within the whole group, that's correct.
23       Q.   And we get to the subgroup of the U.S. down
24   towards the bottom, right?
25       A.   Correct.

76  (Pages 298 to 301)

Protected - Subject to Further Protective Review

Page 302

1    Q. And that's a geographic subgroup of the
2  U.S., and the percentage of patients who constitute
3  that subgroup is 14 percent of the study, correct?
4    A. That's correct.
5    Q. And so the rest of the world made up
6  86 percent of the study --
7    A. Yes.
8    Q. -- correct?
9    A. Yes.
10    Q. And, in fact, that U.S. subgroup of 14
11  percent had an increased risk of major bleeds, 1.50,
12  confidence interval is 1.14 to 1.98, right?
13    A. I'm sorry, it's easier for me to see -- I
14  have a table in my -- in my report that's a little
15  bit easier for me to see those numbers. That's
16  looking at the U.S. only. Are you talking about the
17  U.S. only?
18    Q. Yes. I just went along that line.
19    A. I know I have it here. Let's see. Page 16
20  in my report, okay.
21    Q. Are you with me?
22    MR. MCWILLIAMS: No, that's not it. That's
23    the colored one.
24    THE WITNESS: Yeah, I don't have -- I
25    don't -- mine's not -- oh, yeah, I guess she

Page 303

1    did give it -- okay.
2    A. All right. Now I'm looking at the
3  U.S.-only data. You're still looking at Figure 1;
4  am I right?
5    Q. Correct, Page 13 of the label.
6    A. Okay. Okay.
7    Q. With me? U.S., 14 percent, 1.5?
8    A. Yes.
9    Q. Okay.
10    And then if we go to the footnote, or the
11  note under the chart it says, "The figure above
12  presents effects in various subgroups," right?
13    A. Uh-huh.
14    Q. And then it says, "The 95 percent confidence
15  limits that are shown do not take into account how
16  many comparisons were made nor do they reflect the
17  effect of a particular factor after adjustment for
18  all other factors." Did I read that correctly?
19    A. You did.
20    Q. And you understand that when a large data
21  set is broken into small subgroups like this, there
22  can be results that are a function of chance due to
23  the fact that multiple comparisons have been made,
24  fair?
25    A. It's fair to say that you lose the power of

Page 304

1  your statistical analysis because you're dealing
2  with a smaller number. So smaller numbers do
3  indicate that you're probably going to lose power in
4  the statistical analysis.
5    Q. Well, but, Doctor, it's more than just
6  power, right? It actually, when you look at the
7  subgroups, you can then find results that are a
8  function of chance due to multiple comparisons, or
9  do you not know?
10    MR. MCWILLIAMS: Object to form.
11    A. I don't agree necessarily. I mean, I think
12  it's how it's analyzed, and again, you know, this is
13  done with confidence intervals and in the -- it's so
14  hard for me to see this, but in the U.S. data, the
15  confidence intervals do not cross unity. They do
16  not cross one, so you have a haz ratio of 1.5, so
17  it's a 50 percent, you know, basically, increased
18  risk of -- of bleeding, and the confidence intervals
19  are all greater than one.
20    So, again, statistically speaking, those
21  results would be valid for the U.S. population.
22    Q. Doctor, I think my question was slightly
23  different, but I'm sure I was inarticulate.
24    You're not a statistician, correct?
25    A. I do understand statistics to an extent.

Page 305

1  I am not a statistician, per se.
2    Q. By qualification or training?
3    MR. MCWILLIAMS: Object to form.
4    A. Well, I've had training in statistics, and
5  I've certainly -- you know, and I've certainly
6  applied statistics to some degree. There are people
7  who know more about statistics than I do, that's for
8  sure.
9    Q. Do you hold yourself out to your colleagues
10  as an expert in statistics?
11    A. Again, you know, to answer the best I can is
12  that I certainly -- I certainly help junior people
13  to understand statistics. I do some training in it,
14  but, again, there are people who know more about
15  statistics than me. I have some experience with it.
16    Q. Okay.
17    Well, based on that some experience that you
18  have in statistics, do you understand that when a
19  set of data is broken into small subgroups such as
20  what occurred here, there can be results that are a
21  function of chance due to multiple comparisons being
22  performed?
23    A. So, again, when you apply statistics at all,
24  there is always the element of chance, and that's
25  why, you know, statistical processes try to reduce

Protected - Subject to Further Protective Review

Page 306

1    that, but you never completely do.
2        But, yes, I mean, of course, you're right.
3    The smaller the number that you are trying to
4    analyze, the more likely there is that there could
5    be chance impacts on the results and the outcomes.
6        Q.  And do you know if the FDA analyzed the
7    subgroup data and concluded that it could be a
8    chance finding?
9        MR. MCWILLIAMS:  Object to form.
10       A.  I do not know what -- you know, what
11   multiple members of the FDA had to say about it.  I
12   do know that this was added to the label so that the
13   U.S.-only group and the analysis of the U.S.-only
14   group would be indicated and would be shown in the
15   label.
16       Q.  But you don't know of their analysis?
17       MR. MCWILLIAMS:  Object to form.  What
18       analysis?
19       A.  I don't know exactly what it is, no.
20       Q.  So let's go to Page 16 of your report where
21   you include the table, right?  U.S. alone --
22       A.  Yes.
23       Q.  -- adjudicated bleeds?
24       A.  Yes.
25       Q.  And this is from Page 228 of a briefing

Page 307

1    document, right?
2        A.  Yes.
3        Q.  And I apologize, but apparently the person
4    who put it together thought two staples would meet
5    in the middle, and they didn't, so I will find a
6    clip.  This is how it writes.  Thank you.  Yes,
7    perfect.  You should have seen me trying to not
8    have them -- how about I clip them in two parts.
9        MR. MCWILLIAMS:  She's not going to take it
10       apart to go through it, so you might as
11       well.
12       MS. YATES:  I got it.
13   BY MS. YATES:
14       Q.  Doctor, we may have to replace that clip.
15       MS. YATES:  Ned, you don't get a clipped
16       one.
17       MR. MCWILLIAMS:  It's all good.
18       MS. YATES:  You get one.  Just keep it
19       together.
20       MR. MCWILLIAMS:  Thank you.
21   BY MS. YATES:
22       Q.  So in your report, Page 16, you cite the
23   table from Page 228 from this document, right?
24       MR. MCWILLIAMS:  Object to form.
25       A.  That sounds right.

Page 308

1        (Whereupon Exhibit No. 17, Center for Drug
2        Evaluation and Research, Application Number:
3        2-2439Orig1s000, Medical Review(s), was
4        marked for identification.)
5        Q.  And if we go to the FDA medical review,
6    which I just marked as Exhibit 17, Doctor, you will
7    see, in fact, that you are correct, that there is --
8    it is on Page 228, right?  The U.S. group on bleeds.
9    And then if you turn to Pages 229, 230, 231, 232,
10   the FDA review is actually going on to analyze the
11   subgroup data, right?
12       A.  Yes.
13       Q.  And I assume that you looked at that during
14   your review?
15       A.  Yes, I reviewed it, yes.
16       Q.  All right.
17       And on Page No. 233, after these five pages
18   of review, the clinical review by the FDA says,
19   "This suggests the possibility that the U.S. major
20   bleeding rate difference as compared to the global
21   trial may have been a chance finding in a relatively
22   small subset analysis."  Did I read that correctly?
23       A.  I'm sure you did.  I'm sorry, I can't find
24   it at the moment.
25       Q.  So you see the title of the document,

Page 309

1    and then it's the last sentence of that first
2    paragraph.
3        A.  What page are you on?
4        Q.  233, top, first paragraph.
5        A.  Yes, yes, yes, yes.
6        Q.  Last sentence, right?
7        A.  Yes.
8        Q.  So the FDA in their analysis looked at it
9    and concluded that this could be a chance finding,
10   right?
11       MR. MCWILLIAMS:  Object to the form.  It
12       said it may, with a possibility.
13       MS. YATES:  Okay.  No coaching the witness.
14       A.  I would also say that at the top -- top of
15   Page 230 is, you know, a comment that the finding of
16   excess bleeding for the U.S. population was robust
17   and that it was reproducible across virtually all
18   subgroups.
19       You know, and they go on to talk about why
20   they feel that this is robust data, and yes, of
21   course, any time you do an analysis, there is the
22   chance, however small, that it could be -- that the
23   findings could be due to chance.  But I think they
24   also make a case that this is robust -- that this is
25   a robust analysis.

78 (Pages 306 to 309)

Protected - Subject to Further Protective Review

Page 310

1    Q. And that's why they did the analysis and
2  they looked at it and they concluded that it might
3  be due to chance?
4    A. Or they concluded that it was important
5  enough to ask for a specific change in the label
6  and make sure that U.S. physicians were aware of
7  this in an area, in a place where we do a better
8  job of managing warfarin than many other places in
9  the world that were included on the ROCKET trial.
10    So, I mean, again, you're right, I'm not
11  expert in how one does labeling. But I also -- but
12  I do know that producing and changing labels is no
13  insignificant event for the FDA to do. So the fact
14  that the FDA felt it significant enough to ask for
15  a change in label suggests to me that they took it
16  very seriously.
17    Q. And as we discussed, you were not aware that
18  that labeling change was actually requested for all
19  NOACs?
20    A. I was not.
21    Q. Okay.
22    And, in fact, the label specifically
23  cautions physicians before this subdata was
24  included that there's insufficient experience to
25  determine how Xarelto and warfarin compare when

Page 311

1  warfarin therapy is well controlled, right?
2    A. Exactly.
3    Q. It's in the label, exactly --
4    A. Exactly.
5    Q. -- right? So that was already there?
6    A. Yes.
7    Q. Because of the concerns over the 55 percent
8  TTR?
9    A. Yes.
10    Q. And that's all in the label, right?
11    A. Yes.
12    Q. And the trial was designed to show
13  noninferiority; you know that, right?
14    A. Correct.
15    Q. Do you know how big a patient population it
16  would take to show superiority?
17    A. I do not know for this, you know, this
18  particular way. I do know, though, that you would
19  have to do an intent-to-treat analysis for
20  superiority. You can't do a per-protocol analysis,
21  but, you know, I don't know exactly how many
22  patients it would take. It takes a lot.
23    Q. Okay.
24    So let's see here.
25    MR. MCWILLIAMS: Getting close?

Page 312

1    MS. YATES: Yeah, I promise you we're
2       getting -- we're getting close.
3  BY MS. YATES:
4    Q. Doctor, I need you to stay in the same
5  document. Turn to Page 18 of the FDA medical
6  review, and this is a section entitled
7  "Benefit-Risk." Do you have that?
8    A. Yes, I do.
9    Q. And this section states:
10    "While U.S. major bleeding results may have
11  been due to a small sample in a post-hoc subgroup
12  analysis, for the purposes of a risk-benefit
13  assessment, this reviewer took the most conservative
14  approach in assuming that increased major bleeding
15  noted in the U.S. subgroup might be real because of
16  some undetermined influences, and so examined
17  risk-benefit analyses for both the global ROCKET
18  on-treatment safety population as well as the U.S.
19  on-treatment subpopulation?"
20    Did I read that correctly?
21    A. You did.
22    Q. So, the reviewing here recognizes that it
23  was potentially the result of a small sample size
24  in a post-hoc analysis, fair?
25    MR. MCWILLIAMS: Object to form.

Page 313

1    A. Uhmm --
2    Q. I just read it.
3    A. Right. I mean, you read what was there.
4    Q. Okay.
5    A. Uhmm --
6    Q. And "post-hoc" means after the fact?
7    A. After the fact, correct.
8    Q. And the reviewer is saying, but despite
9  those concerns, they took a conservative approach
10  and assumed an effect on increased bleeding in the
11  U.S. subgroup for purposes of their risk-benefit
12  review, right?
13    A. That's what they say.
14    Q. Okay.
15    Let's turn to Page 20 and the first bullet
16  there on the page. It says, "The point estimate for
17  the ratio of major bleeds per stroke prevented" in
18  "very similar" -- I'll start it over.
19    "The point estimate for the ratio of major
20  bleeds per stroke prevented is very similar in the
21  U.S. population and the global population when
22  comparing equivalent quartiles with TTR above about
23  64 percent (i.e., global quartile 4 and U.S.
24  quartiles 3 and 4). This result is a consequence
25  of the fact that while the hazard ratio for major

Protected - Subject to Further Protective Review

Page 314

1  bleeding was higher in the U.S., the hazard ratio
2  for the primary efficacy endpoint of ischemic
3  stroke and systemic embolization was lower in the
4  U.S. than for the global population overall."
5       So you understand that this concludes that
6  there was a better result in the U.S. subgroup for
7  the primary efficacy endpoint of ischemic stroke
8  and systemic embolization, right?  That's what that
9  says.
10      A.  Of course, because of better control of
11 warfarin, because of better control of INR, you
12 know, for all the reasons that we talked about.  I
13 mean, that would -- so if you have greater time in
14 therapeutic range, it not only protects you from
15 bleeding, it protects you from clotting as well.
16      Q.  Are you sure about that answer, Doctor?
17      A.  If you're asking me -- I mean, again, I'm
18 trying to understand what -- what you're asking me,
19 but if -- if you're looking at a population who has
20 a better time in therapeutic range, you're going to
21 improve their outcomes on both ends because they're
22 now -- they're not too low and they're not too high.
23      Q.  Okay.
24      A.  If they're too low, they will have strokes.
25 If they're too high, they will have bleeds.  Maybe

Page 315

1  I'm not interpreting what you're asking.
2       Q.  So I can clean it up.
3       So within that U.S. subgroup there actually
4  were fewer strokes and fewer systemic embolizations,
5  right?
6       A.  Within the group on rivaroxaban or within
7  the group on warfarin or both?
8       Q.  Within the group on rivaroxaban.
9       A.  Okay.  So we'll -- okay.  And that's --
10 yeah, again, I will take that at what it says, okay.
11      Q.  Right.
12      And then let's read the second bullet point:
13 "From the previously described analysis of major
14 bleeding subtypes, the excess of major bleeds is
15 driven by hemoglobin drops and transfusions, which
16 is offset by fewer critical organ bleeds,
17 intracranial hemorrhages, hemorrhagic strokes, and
18 fatal bleeds."  Did I read that correctly?
19      A.  You did.  I'm trying to understand what the
20 context of that is.  I mean, again, I'm looking at
21 the table with the data which shows for the U.S.
22 alone, the rate of hemoglobin dropped, the rate of
23 transfusion, the rate of critical site bleeding,
24 which is the same, the rate of death, which is
25 statistically the same.  Again, so I'm not exactly

Page 316

1  sure what the context of this is.  I'm just looking
2  at the data that's in the U.S. analysis.
3       Q.  Okay.
4       Critical site, rivaroxaban 1.13, warfarin
5  1.33, not statistically significant?
6       A.  Not significant.
7       Q.  Okay.
8       Death, .38 for rivaroxaban, .60 for
9  warfarin, but not statistically significant?
10      A.  Correct.
11      Q.  Okay.
12      But this reviewer comments on the fewer
13 critical organ bleeds, intracranial hemorrhages,
14 hemorrhagic strokes, and fatal bleeds, right?
15      A.  That appears to be what's being said.  I
16 mean, I'm just looking -- you're talking about on
17 warfarin.  I'm looking at the actual numbers in the
18 table, Table 99, and what I'm seeing in the table
19 reflects that there is no difference in critical
20 site bleeding in the two drugs, no difference in
21 death, and that there is a -- there is a worse
22 outcome in hemoglobin drop and need for transfusion
23 in the rivaroxaban group, with major bleeding
24 overall shows rivaroxaban to be statistically
25 inferior to warfarin for major bleeding.  I'm just

Page 317

1  reading from the table.
2       So I'm not exactly sure what this bullet
3  point is referencing.  I mean, you read it
4  correctly.  I don't know what the context of that
5  is.
6       Q.  Okay.
7       Read it correctly, but you don't know the
8  context?
9       A.  Right.
10      Q.  Got it.
11      Well, at least I passed on the reading.
12 No, Bert.
13      These people are -- they -- they try to
14 kill me.  I'm absolutely convinced.
15      Doctor, just briefly -- I promise.
16      You -- you say in your report that there's
17 a -- I want to use the correct language.
18      "There is emerging data demonstrating
19 potentially inferior performance when compared to
20 other NOACs."
21      And that's on Page 16, right?
22      A.  Yes.
23      Q.  In order to make a comparison between
24 safety and efficacy of different drugs, you agree
25 that you need a controlled clinical trial, right?

80 (Pages 314 to 317)

Protected - Subject to Further Protective Review

Page 318

1    A. Absolutely.
2    Q. Okay. And you cited some studies that
3  caution about how that data should be interpreted?
4    A. I did.
5    Q. Right.
6      And they are observational epidemiological
7  studies in -- for the most part, right?
8    A. Well, I think -- and I think that's why I
9  labeled this as emerging data.
10    Q. Have you looked at any emerging data that
11  actually shows data to the contrary, and, in fact,
12  the bleeding risk with Xarelto is lower than some of
13  the other NOACs?
14    A. I don't recall.
15    Q. Because it would be proper for you to say,
16  if there's emerging data, that you look at all
17  emerging data, right?
18    A. I am -- you know, I -- I may have missed it.
19  I don't know. But certainly nothing that -- that I
20  pulled up or read in my search indicated that.
21    Q. And you are not sitting here able to say
22  that you have the data that shows more probably than
23  not, Xarelto is less safe than the other NOACs,
24  correct?
25      MR. MCWILLIAMS: Object to form.

Page 319

1    A. I -- well, I think -- I think that there --
2  again, there are at least four -- four studies that
3  I do quote in here, and I wouldn't have put them in
4  here if I didn't think they were important. So, I
5  mean, you know, obviously I -- I think that it's
6  something for us to pay attention to.
7      A couple of these were from very large
8  databases of patients who are initiated on one or
9  another of the anti -- the oral anticoagulants. In
10  one case it's warfarin and the NOACs. In one case
11  I believe it was just the NOACs. And there was a
12  suggestion that there were more events and more
13  problems with rivaroxaban than the others.
14    Q. Do you know if Xarelto, in those studies,
15  were prescribed to the same type of patient
16  population as warfarin or the other NOACs?
17    A. So --
18    Q. Do you know?
19    A. In a couple of studies -- we don't know.
20  But in the Schneeweiss, or however you say his
21  name, he did -- he did apply a standard in that
22  the patients that were analyzed in each of the
23  groups had similar clinical characteristics.
24    Q. Well, Schneeweiss actually cautioned
25  that Xarelto was not being evaluated in

Page 320

1  lower-risk patients, right?
2    A. Correct. And when he designed his study to
3  look at the population, he only analyzed the
4  high-risk patients from the other groups, so that
5  they were -- so that they were -- I'm sorry. What
6  he did was he actually took the -- the study
7  population from the RE-LY trial, the ROCKET trial,
8  and ARISTOTLE, and pulled out the patients that were
9  the most similar to those who are on Xarelto.
10      So while it would be -- I totally agree
11  it would be improper to do a meta-analysis of the
12  three studies just straight on, because there was a
13  worse -- a sicker group of patients that were
14  studied in -- in ROCKET, and I don't think you can
15  compare the results of that to the other two
16  studies, which did not study patients as sick as
17  those in ROCKET. But what he attempted do was to
18  kind of control for that and pull out kind of the
19  worst group of patients that would match what was
20  studied in ROCKET.
21      So, again, I mean, it would be, you know,
22  ideal if Bayer or other companies would fund a -- a
23  randomized, prospective, comparative trial of, you
24  know, the different drugs, but that's going to cost
25  many millions of dollars. And I rather doubt that

Page 321

1  any company is going to be incentivized to do that.
2      So in the absence of that kind of trial, we
3  have no other alternative but to look for ways to
4  try to do these comparisons.
5      We're trying to get at what's the safest,
6  best treatment for our patients. So if we can't
7  have a randomized, prospective trial, then the next
8  best thing we can do is to try to take the data we
9  have and do the best we can to compare. No one is
10  suggesting that this data is as robust or as strong
11  as a randomized clinical trial.
12    Q. Okay.
13      And if there is emerging data, it's
14  important for you to look at all of the emerging
15  data to see if there's a trend?
16    A. Yes.
17    Q. And you -- you can't cite -- you didn't
18  cite in your report a single study that shows a
19  contrary conclusion?
20      MR. MCWILLIAMS: Object to form. Assumes
21      facts not in evidence.
22    Q. Right? That shows a lower bleeding risk
23  from Xarelto?
24    A. Correct.
25    Q. And you can't cite one as you sit here

81 (Pages 318 to 321)

Protected - Subject to Further Protective Review

Page 322

1    today?
2         A.  I cannot.
3         Q.  Doctor, isn't that cherry-picking?
4             MR. MCWILLIAMS:  Object to form.
5    BY MS. YATES:
6         Q.  Didn't you just pick studies that support
7    the conclusion you wanted to reach?
8         A.  Well, again, I based this on -- on a PubMed
9    search.  So I looked at -- I looked at articles, and
10   I was focused on rivaroxaban and rivaroxaban side
11   effects, rivaroxaban problems.  And that was what I
12   did my search on.
13            So, again, I can't remember specific
14   terminology that I used for my search, but I did
15   not -- actually, no.  I did search for -- I did
16   search for novel oral anticoagulants and -- and
17   risks of bleeding in comparison studies.  If
18   there are some comparative studies that show --
19   you know, favor rivaroxaban over others, I just
20   didn't see them.
21        Q.  And you are aware that the ROCKET patient
22   population was the sickest patient population that
23   this medicine -- that a NOAC was studied in, right?
24        A.  Yes.
25        Q.  And are you also aware that clinicians tend

Page 323

1    to prescribe Xarelto to sicker patients because the
2    data from the clinical trial is in their -- in the
3    sicker patient population?
4         A.  That may be true.  I have not seen that data
5    on that.  So I can't speak to that one way or the
6    other.
7         Q.  Okay.
8             And --
9         A.  I will say one thing.  You asked about
10   studies that I included.  There -- there was a
11   meta-analysis done of the three trials that I did
12   not include, because, again, I think it is unfair to
13   do a meta-analysis when the populations in the other
14   trials were not as sick.  So clearly that's not --
15   you know, then I did not include that as part -- but
16   that's published.  There is a publication that is a
17   meta-analysis that shows that rivaroxaban is -- you
18   know, does worse than other NOACs.  But I would
19   expect that to be the case because of the population
20   that was studied.  I did not include that in my --
21   in making my point.
22            MS. YATES:  Okay.
23            Let's take a five-minute break and
24   assess.
25            THE VIDEOGRAPHER:  This is the end of

Page 324

1             Tape 6, and we are now off the record at
2    5:13 p.m.
3         (Recess.)
4             THE VIDEOGRAPHER:  This begins Tape 7, and
5    we are now back on the record.  The time is
6    5:22 p.m.
7             MS. YATES:  Doctor, I want to thank you.
8    That's all the questions that I have for
9    now, and my colleague is going to ask a few
10   questions.
11   EXAMINATION
12   BY MR. MCCAULEY:
13        Q.  Dr. Leissinger, good afternoon.  It's been a
14   long day, and we -- for reasons of the clock, we
15   won't be long, although I wish I could spend a
16   little more time with you.
17            Can you please take out your report and
18   turn to Page 5.  Are you there with me, Doctor?
19        A.  Yes.
20        Q.  Doctor, I'm referring to the last paragraph
21   on Page 5, where you say:  "The fact that Xarelto
22   has been approved at a fixed dose reflects the
23   predetermined intent of the registration clinical
24   trial, rather than a scientifically developed
25   dose-finding study."

Page 325

1             Do you see that?
2         A.  Yes.
3         Q.  And then you put a citation there, and it's
4    to a -- a company document; is that right?
5         A.  Correct.
6         Q.  And the document is 15914?
7         A.  Correct.
8             (Whereupon Exhibit No. 18, Collaborative
9             Development And License Agreement by and
10            between Bayer Healthcare AG and Ortho-McNeil
11            Pharmaceutical, Inc., dated as of October 1,
12            2005, was marked for identification.)
13        Q.  And I've put a document, Exhibit 18, in
14   front of you that has 15914 on it.
15            Do you see that?
16        A.  I do.
17        Q.  Was that document your sole source for that
18   statement?
19            MR. MCWILLIAMS:  Object to the form.
20        A.  So that statement is my opinion.  I -- this
21   document has some material in it that I think may
22   support that statement that I made.
23            But -- but to be clear, that statement was
24   my opinion based on, you know, my understanding of,
25   you know, first and foremost, what the half-life of

82 (Pages 322 to 325)

Protected - Subject to Further Protective Review

Page 326

1    Xarelto is, the fact that there were -- there were
2    no Phase II dose-finding studies in the atrial
3    fibrillation population; that the major clinical
4    trial, the Phase III, the one significant major
5    Phase III clinical trial, was done with a
6    preselected dose.
7    BY MR. MCCAULEY:
8        Q. Doctor --
9            MR. MCWILLIAMS: Please let her finish.
10           MR. MCCAULEY: Excuse me. I'm going to
11   withdraw the question and ask a different
12   one.
13   BY MR. MCCAULEY:
14       Q. Doctor, I really -- I only get a limited
15   amount of time.
16       Do you have any other documentary sources to
17   support this opinion, other than a feeling you
18   have that maybe there was an intent to find a
19   one-dose drug -- a once-a-day dose as opposed to
20   twice-a-day? Are there any other documents?
21           MR. MCWILLIAMS: Object to form.
22       A. Yes. I mean, I would suggest -- and we can
23   go back and look at peer-reviewed publications by
24   Agnelli, by -- again -- I -- it's very late, and
25   my mind is not working quite as well.

Page 327

1    BY MR. MCCAULEY:
2        Q. Well --
3        A. But I want to -- but to answer your
4    question, yes, there -- again, when I look back and
5    try to understand what led to the accepted dosing
6    for these various indications, you know, the way
7    that I perceive clinical trials are done is that you
8    start with dose-finding studies, and then, you know,
9    you kind of move up from this -- first it was safety
10   studies and dose-finding studies.
11       Q. Doctor, I'm going to say with all respect --
12           MR. MCWILLIAMS: Are you withdrawing the
13   question? Hey, hey, wait. Are you
14   withdrawing the question?
15       If you are, then you can withdraw the
16   question. If not, you need to let her
17   finish.
18   BY MR. MCCAULEY:
19       Q. I'm withdrawing the question because I
20   don't think your answer was responsive to what I
21   was asking, Doctor, with respect.
22       Doctor, if you look at Page 16065 of
23   Exhibit 18 --
24           MR. MCWILLIAMS: The last four digits?
25       A. Okay. I'm sorry. Say it again.

Page 328

1    BY MR. MCCAULEY:
2        Q. 16065. Do you have that, Doctor?
3        A. Yes, I do. Yes.
4        Q. Doctor, earlier in your testimony, much
5    earlier today, you referred to a marketing plan that
6    you saw as one of the appendices to this particular
7    document, this agreement between Janssen and Bayer.
8    Is this the marketing agreement you had in mind?
9        A. Let me see. I'd have to read through it. I
10   think it is.
11       Q. Doctor, is it your under -- thank you.
12       Doctor, is it your understanding that
13   once-a-day dosing is a better marketing pitch than
14   twice-a-day dosing?
15       A. Yes.
16       Q. Is that your understanding?
17       Where did --
18       A. That is my --
19       Q. -- you get that understanding?
20       A. Oh, that is my -- that is my opinion that
21   that is a much better marketing approach because --
22   again, this is common sense. If you're given a
23   choice between a once-a-day or twice-a-day, both
24   being equal, all other things being equal, we're all
25   going to take a once-a-day.

Page 329

1        Q. And doctors like once-a-day because it
2    enhances patient compliance; isn't that so?
3        A. It -- it can enhance patient compliance
4    somewhat. It's also a concern with certain drugs
5    that if you are on a drug twice-a-day for a critical
6    indication, and you miss one of those drugs, you at
7    least still have some circulating drug in your
8    system. If you miss or are noncompliant or
9    nonadherent with a -- with a pill on a once-a-day
10   drug, that could lead to more significant problems.
11       So while I will grant you that all of us
12   would rather be on a once-a-day, there are reasons
13   and concerns about -- particularly with critical
14   drugs, why we might want to use a twice-a-day or
15   even a three-times-a-day drug.
16       Q. And, Doctor, a doctor who is prescribing the
17   drug is the one who makes the decision in the first
18   instance whether once a day or twice-a-day is better
19   for his patient?
20       A. Oh, I didn't -- I mean, well, I think the
21   patient also has input. I discuss therapies with my
22   patients. So -- but -- but, I mean, we are --
23   largely we are recommending therapies, correct.
24       Q. All right, Doctor.
25       And the -- and the doctor who understands

83 (Pages 326 to 329)

Protected - Subject to Further Protective Review

Page 330

```
1    that twice-a-day may be better than once a day would
2    not be susceptible to that kind of a marketing
3    pitch; isn't that true?
4         MR. MCWILLIAMS:  Object to form.
5         A.  I'm sorry, ask the question again.
6    BY MR. MCCAULEY:
7         Q.  Did you say, Doctor, just a moment ago
8    that many doctors understand that twice-a-day
9    might be better for their patients?
10        A.  Well, again, I think it depends on the
11   patient.  It depends on the drug.  It depends on --
12   so, again, if I can answer the question, adherence
13   is an extremely important thing I deal with with
14   every one of my patients, so -- and -- and have
15   actually conducted research on adherence in chronic
16   medical conditions.
17        And what I can tell you is that the single
18   most important thing that predicts adherence is past
19   adherence.  So if you take -- what I mean by that,
20   if you take someone who is very nonadherent to a
21   drug that is administered twice-a-day, and you think
22   because you're putting them on a once-a-day, that
23   they are suddenly going to become adherent, that is
24   also not the case.
25        There may be an incremental gain in
```

Page 331

```
1    adherence, but you do not have any guarantees that
2    adherence is going to go up in that individual
3    patient.  And, in fact, because adherence predicts
4    adherence, many of those patients will not adhere
5    any better to a once-a-day than they do a twice-a-
6    day.  And in those patients, the fact that they
7    are going to be missing drugs could be a problem.
8         So, yes, I do take that into consideration.
9    However, from a marketing standpoint, if, again,
10   you're -- you're asking me -- ask someone on
11   insulin, "Would you rather take your insulin once a
12   day or four times a day?"  It's kind of what we'd
13   say is a no-brainer.  Of course, you'd always rather
14   have it as once a day.
15        And if you could develop a drug that's
16   perfectly safe and effective and give it once a day,
17   absolutely, hallelujah, let's do it once a day,
18   rather than twice a day.
19        Q.  Have you finished, Doctor?
20        A.  I think I have.  Have I answered your
21   question?
22        Q.  No, I don't think you have, but I'll move
23   on.
24        A.  Okay.
25        Q.  Doctor, what do you tell your patients who
```

Page 332

```
1    are on Xarelto about aspirin use, if anything?
2         A.  Oh, absolutely counsel them on the risks of
3    adding -- of aspirin.  And, in fact, I think you may
4    have heard me mention that I have very few patients
5    on Xarelto.  And the patients that I have on
6    Xarelto, I can't remember -- maybe one or two are on
7    aspirin, but most are not.  I would convert them --
8    I would suggest that they take something else.
9         Q.  Take something other than aspirin?
10        A.  No.  It -- it depends on what their needs
11   for the aspirin is.
12        Q.  Take something other than Xarelto --
13        A.  Yes.
14        Q.  -- is what you're saying --
15        A.  Other than Xarelto, yes.
16        Q.  -- if they're on aspirin --
17        A.  Uh-huh.
18        Q.  -- is that what you said?
19        A.  Yes.
20        Q.  Doctor, your patients that come to see you
21   with thrombotic disorders -- I'm not talking about
22   your hemophiliac patients --
23        A.  Yes, sir.
24        Q.  -- those are patients who typically have
25   some kind of a clot deep in their vein or
```

Page 333

```
1    somewhere in their body.
2         A.  That is correct.
3         Q.  Is that right?
4         A.  That is correct.
5         Q.  It's a difficult, intractable clot that
6    they've tried to get rid of through normal channels
7    if they're sent to you as a -- as a referral, right?
8         A.  Sometimes.  I mean, I see some patients who
9    have sort of more garden-variety clots, but they may
10   have other issues that prevent them from taking
11   anticoagulation.
12        Q.  And -- and those patients who are -- who
13   come to you might be on Xarelto because Xarelto was
14   given to them to treat the clot; is that right?  Or
15   because they developed a clot while they were on
16   Xarelto in order to prevent a clot after an
17   operation; is that right?
18        A.  I'm sorry, I didn't -- what's the question?
19        Q.  Doctor, when your patients come to you, it's
20   either because they have a clot or because they
21   developed a clot while on Xarelto for purpose of
22   preventing a clot?
23        A.  I do see some patients like that, yes.
24        Q.  And you don't see any patients on Xarelto
25   who come to you because they need management for
```

84 (Pages 330 to 333)

Page 334

1  atrial fibrillation?
2        MR. MCWILLIAMS: Object to form. Asked
3    and answered.
4    A. That's correct.
5  BY MR. MCCAULEY:
6    Q. And you may have patients with atrial
7  fibrillation, but that's just coincidental to the
8  reason that you're seeing them; you're seeing them
9  for a clot?
10   A. That's correct.
11   Q. Okay.
12   A. Or a bleeding disorder.
13   Q. And you've never seen a patient on Xarelto,
14 I think you testified, with a bleed?
15   A. I have not personally dealt with that.
16   Q. And the bleeding disorders that you treat
17 are hemophilia patients, right?
18   A. I mean, there is a whole -- there are many
19 different bleeding disorders that I treat.
20   Q. But -- but in a hemophilia patient, that
21 means, to put it colloquially, their blood is too
22 thin; it doesn't coagulate properly?
23   A. Correct.
24   Q. All right. And some of those patients, I
25 think you said, might have spontaneous bleeds?

Page 335

1    A. Correct.
2    Q. You've never seen anyone on Xarelto have a
3  spontaneous bleed, have you?
4    A. No, I have not.
5    Q. You've never seen anyone on any DOAC have a
6  spontaneous bleed, have you?
7    A. I -- I have not.
8    Q. Have your patients who have had spontaneous
9  bleeds all been patients who are -- have a blood
10 clotting disorder; that is, they don't clot
11 properly?
12   A. Probably. I mean, it -- you're asking me
13 over 40 years of taking care of patients. So, again,
14 ever, never I stay away from. But that's correct,
15 for the most part what I deal with with spontaneous
16 or severe hemorrhages are people who have a bleeding
17 disorder.
18   Q. And those people with a bleeding disorder,
19 do they have their coagulability measurements taken
20 in some way?
21   A. Yes.
22   Q. Is that prothrombin time? Is that one of
23 those that you do?
24   A. For certain disorders. It's not -- it's not
25 useful for hemophilia because of just the way that

Page 336

1  clotting factor XIII and IX behave. PT does not
2  capture -- so PT is quite normal in somebody who has
3  a really severe bleeding disorder of hemophilia.
4    Q. And what do you do for patients who have a
5  severe bleeding disorder of hemophilia; that is,
6  they have too thin blood? What measurement do you
7  use for them to test their coagulability?
8    A. So we -- we actually measure their levels of
9  the clotting factor in their blood, so their factor
10 XIII levels. So in hemophilia, a patient has little
11 or no factor XIII. We can monitor them by giving
12 them factor XIII and then testing their blood levels
13 to make sure we get them to where we want them to be.
14   Q. Do you measure their clotting time in any
15 way?
16   A. No, not usually.
17   Q. Okay.
18     Do you know how many -- do you have an idea
19 of how many seconds somebody with a severe
20 hemophilia takes to clot, or is it that they simply
21 don't clot at all?
22   A. There's a -- there's -- there's a fairly
23 wide variety of how they behave. I mean, again,
24 you're talking about their blood and a test --
25 people with hemophilia, they walk around and look

Page 337

1  normal. So it's not like they're just spewing
2  blood. You know, it could be -- somebody around
3  this table would have hemophilia. But -- so I'm
4  not quite clear on your question.
5      But when they do bleed, it's very hard to
6  control. You can't control it without giving them
7  the clotting factor that they lack.
8    Q. Have any of your patients been patients who
9  have had -- what you characterized as spontaneous
10 bleeds, been patients who had spontaneous bleeds
11 because they were on an anticoagulant?
12   A. Again, through my career I'm -- you know, I
13 sure that I have seen a few. I can actually
14 remember one who was toxic with rat poison, who had
15 rat poison, a Coumadin derivative, who was bleeding
16 everywhere. But again, these are rare exceptions.
17   Q. Have you ever seen anyone have a spontaneous
18 bleed who was not -- who was on an anticoagulant,
19 not rat poison, but a prescribed anticoagulant,
20 Doctor?
21   A. Probably through the years I'm sure I have,
22 somebody -- I've taken care of enough patients on
23 warfarin, and I'm sure that that's been the case.
24   Q. Okay.
25     And, Doctor, do you know what their INR was

85 (Pages 334 to 337)

Protected - Subject to Further Protective Review

Page 338

1    when they had the spontaneous bleed?
2        A. It would very likely have been prolonged.
3        Q. All right.
4        Doctor, have you -- and -- and prolonged
5    meaning well above 3?
6        A. Likely above 4.
7        Q. Well above 9 or 10?
8        A. It could have been.  Between 5 and 10.
9        Q. Yeah.
10       Doctor, have you -- have you ever seen a
11   patient who had a gastrointestinal bleed that was
12   what you describe as spontaneous?
13       A. Probably.
14       Q. Can you think of any patient, as you sit
15   here today, who had a spontaneous gastrointestinal
16   bleed because he was on an anticoagulant, he or she?
17       A. Yeah.  You know, again, all I can tell you
18   is probably, many, many years of dealing with
19   anticoagulants and patients with bleeding.
20       Q. It is not something that you see very
21   often, is it?
22       A. It is not something -- no.  If we're doing
23   our job, we should see it very rarely.
24       Q. And have you read any reports in the
25   literature, Doctor, since NOACs came?  I know you

Page 339

1    haven't had any patients who have had bleeds on --
2    spontaneous bleeds.  Have you seen any reports in
3    the literature of spontaneous bleeds in any patient
4    taking a NOAC?
5        A. Sure.  Intracranial hemorrhages, yes, and
6    deaths due to intracranial hemorrhages.
7        Q. And so those are spontaneous bleeds?
8        A. Quite often they are thought to be.
9        Q. Have you seen any reports, Doctor, that
10   diagnosed a bleed as a spontaneous bleed, an
11   intracranial bleed?
12       A. To my knowledge -- again, can I remember
13   specific language and specific terminology in
14   reports?  No.  And I wouldn't pretend to give you
15   chapter and verse on that.  But am I aware of
16   patients who've had intracranial hemorrhages and
17   some of whom died on Xarelto?  Yes, I am aware of
18   that.
19       Q. I'm not asking about intracranial
20   hemorrhages --
21       A. Okay.
22       Q. -- in general, Doctor.
23       I'm talking about spontaneous bleeds where
24   there was no lesion that already existed when the
25   bleeding started.

Page 340

1        A. Am I -- yes.
2        Q. And, Doctor, are you -- have you -- have
3    you -- can you cite to me any report in any
4    literature anywhere of a spontaneous bleed as an
5    intracranial hemorrhage on Xarelto or any NOAC?
6        A. No, I can't cite any -- any literature on
7    that.
8        Q. And, Doctor, intracranial bleeds can happen
9    for lots of reasons, right?
10       A. I'm sorry?
11       Q. You can have an AVM, for example, in the
12   brain?
13       A. Sure.
14       Q. An aneurysm that burst, right?
15       A. Sure.  Of course, of course.  There are
16   multiple reasons, yes.
17       Q. If someone -- if someone has an intracranial
18   hemorrhage, Doctor, how do you know it was
19   precipitated or caused by an anticoagulant or
20   something else?
21       A. Well, I think it's clinical -- it's good
22   clinical judgment and clinical reasoning.  So if --
23   if someone who is, you know, otherwise healthy and
24   has no other risk factors, except that they are on
25   anticoagulants, and -- and have an intracranial

Page 341

1    bleed or a bleed that, you know, cannot be -- that
2    there is no obvious cause for, I mean, we would
3    ascribe some responsibility to the anticoagulant.
4        Q. Doctor, if -- have you ever seen any --
5    anyone in your practice with a spontaneous
6    gastrointestinal bleed due to anticoagulant?
7        A. Not that I can recall.
8        Q. All right.
9        Have you seen any reports of any such thing?
10       A. I haven't looked.
11       Q. Do you agree, Doctor, that if someone has a
12   subclinical bleed going on before an anticoagulant
13   is introduced, then that patient is more likely
14   than a person without a subclinical bleed to
15   develop a clinically significant bleed?
16       A. I would agree with that.
17       Q. Did I hear you say earlier, Doctor, that
18   the -- that the risk reduction for ischemic stroke
19   is about 1 to 5 percent for Xarelto, and the risk
20   for major bleeding is 1 to 5 percent?
21       A. Something in that range.
22       MR. MCWILLIAMS:  Five minutes, Counselor.
23       A. Again -- again, for -- you know, for an
24   average population.  I mean, those things can
25   change depending on the clinical scenario.

86 (Pages 338 to 341)

Protected - Subject to Further Protective Review

Page 342

1    BY MR. MCCAULEY:
2      Q. Doctor, if we're talking about -- if we're
3    talking about gastrointestinal bleeds, would you
4    agree with me that you would trade one
5    gastrointestinal bleed for an ischemic stroke any
6    day of the week?
7        MR. MCWILLIAMS: Object to form.
8      A. I'm sorry, I -- I would not necessarily
9    agree with that. I mean, again, we'd have to flesh
10   out those clinical scenarios. And you're asking for
11   a relative, would I accept this or that. I know
12   people who have had strokes who recover quite well.
13   I know people who've had GI bleeds who died from
14   them. So I don't think that's an automatic given
15   that, yes, I'll swap this for that.
16   BY MR. MCCAULEY:
17     Q. Doctor, when you are counseling patients, do
18   you advise them of the risk of gastrointestinal
19   bleeds when you're talking about --
20     A. I don't think that I --
21     Q. -- warfarin?
22     A. -- specifically talk about -- I talk about
23   bleeding and risks of bleeding, and I don't go
24   through -- because the bleeding could be anywhere.
25   It could be -- it could be gastrointestinal. It

Page 343

1    could be intracranial.
2      Q. Doctor --
3      A. It could be -- it could be other types of
4    bleeding, as well.
5      Q. Understood. Thank you.
6      Doctor, can you tell me if a patient asked
7    you, "Doctor, what would you say about taking the
8    risk of a gastrointestinal bleed, not knowing what
9    it might be like, or an ischemic stroke, not knowing
10   what it would be like? What would you recommend to
11   me, Doctor? Should I take the risk of the
12   gastrointestinal bleed or the risk of the ischemic
13   stroke, understanding that we don't know what
14   they're going to be like?"
15     A. I don't -- no, I don't recommend that we --
16   I recommend that we approach the problem to minimize
17   all risks, both stroke and bleed.
18     Q. Doctor, have you had any patients die from a
19   gastrointestinal bleed?
20     A. I have.
21     Q. Have you had patients die from stroke,
22   Doctor?
23     A. I have seen patients die from stroke.
24     Q. Doctor, would you say that the risk of dying
25   from stroke is far greater than the risk of dying

Page 344

1    from a gastrointestinal bleed?
2        MR. MCWILLIAMS: Object to form.
3      A. I -- you know, again, it depends on the
4    scenario, the severity, et cetera.
5      Q. I'm talking about generally, Doctor.
6    Statistically, is the risk -- is the risk of dying
7    from a gastrointestinal bleed better or worse than
8    the risk of dying from an ischemic stroke, in
9    general?
10     A. I'm sorry, I just don't know that data to
11   answer.
12     Q. All right.
13     Do you know whether -- has anybody, to your
14   knowledge, ever -- anyone ever who suffered a
15   gastrointestinal bleed lost their speech?
16     A. No, not that I know of.
17     Q. Has anybody lost the ability to talk to
18   family members and communicate?
19     A. No, sir. But I've had patients who have
20   lost their lives, so they've lost everything.
21     Q. Doctor, has anybody with a gastrointestinal
22   bleed ever been paralyzed and subject to sitting in
23   a wheelchair for the rest of their life?
24     A. Again, I've had patients who have lost their
25   lives from gastrointestinal bleeds.

Page 345

1      Q. You already said that, Doctor.
2      I'm asking: Has any patient ever been
3    subject to being confined to a wheelchair for the
4    rest of their life from a gastrointestinal bleed?
5      A. Not that I recall.
6      Q. All right.
7      Doctor, did you look at any data -- did you
8    look at any data, Doctor, from the company, from the
9    ROCKET trial, or anything else in preparing your
10   report, any of the underlying actual raw data?
11       MR. MCWILLIAMS: Object to form.
12     A. I -- I've looked through literally hundreds
13   of pages of information, and I feel sure that some
14   of that included raw data. I could not, you know,
15   quote to you chapter and verse right now.
16     Q. Doctor, did you ask for any raw data?
17     A. I did not ask for any raw data.
18     Q. Are you able to analyze the raw data from a
19   pharmacokinetic standpoint in your expertise?
20       MR. MCWILLIAMS: Object to form, vague.
21     A. I can -- so I can certainly interpret data,
22   the -- the pharmacokinetic data. Yes, I can.
23     Q. Did you ask to -- to look at some of the
24   data so you could interpret it for yourself, as an
25   expert in the case?

87 (Pages 342 to 345)

Protected - Subject to Further Protective Review

Page 346

1    A. I did see some data in the material that I
2  reviewed.
3    Q. But did you ask for any more, Doctor?  That
4  is the question, because I've heard you say several
5  times today that more information is better.
6    A. Well, I have asked the attorneys that I've
7  worked with if -- what -- what was available and
8  what I could look at, yes, I have.
9    Q. And did you ask them whether there was any
10  of the clinical trial data available to look at?
11    MR. MCWILLIAMS:  Object to form.
12    30 seconds, Counselor.
13    A. I can't remember specifically if I used
14  those words, those terms.
15  BY MS. YATES:
16    Q. Doctor, did you look at any of the data, the
17  paired PK/PD data from the 161-patient subgroup from
18  the ROCKET study?  Did you look at any of that raw
19  data, other than in the graph that you showed us
20  from some --
21    A. That is raw data -- right? -- in the graph,
22  yeah.
23    Q. Yes.  But I'm talking about, Doctor, did
24  you actually look at the data that -- that was
25  underlying those graphs that you found in some

Page 347

1  publication somewhere?
2    A. Data that was -- I'm sorry, I don't
3  understand.  That is --
4    Q. You don't understand what data is?
5    A. I certainly understand what data is.
6    Q. Okay.
7    A. And I believe that those -- I believe that
8  that graph contained data.
9    Q. Okay.
10    A. Those were data points on the graph.
11    Q. Did you go look at that data to see whether
12  any of those patients who had high -- high levels
13  on peak or high levels on trough had a bleeding
14  event?
15    MR. MCWILLIAMS:  Object to form.  Asked
16  and answered.
17    You're out of time.  You're repeating
18  questions now.  I'll ask you -- you're
19  going to get one more in.
20    MR. MCCAULEY:  That wasn't a repeat
21  question.
22    MR. MCWILLIAMS:  It was absolutely a
23  repeat, a hundred percent.
24  BY MS. YATES:
25    Q. Doctor, have you done anything to look at

Page 348

1  data to see whether any of those little circles on
2  the graph that you put in your report correlated
3  with a bleeding event?
4    MR. MCWILLIAMS:  Object to form, asked and
5  answered.
6    A. Again, I've -- I've asked for data.  I've
7  reviewed what I was given.
8  BY MR. MCCAULEY:
9    Q. But did you ask --
10    MR. MCWILLIAMS:  Sir, sir, I believe we're
11  out of time.  If you want to ask for more
12  time, you can ask me for more time, but
13  don't just ignore me and keep pounding away.
14  Be a gentleman.
15    MR. MCCAULEY:  Well, I'm trying to be a
16  gentleman, and I will be a gentleman.  May
17  I have two more minutes, please?
18    MR. MCWILLIAMS:  Well, do you -- are you
19  wrapping this up, or are you going to keep
20  bouncing around?
21    MR. MCCAULEY:  Yes, I'm wrapping it up.  I'm
22  trying to find out whether -- whether the
23  doctor asked for any data.
24    MR. MCWILLIAMS:  Okay.  If you continue to
25  repeat questions, I'm going to shut it down,

Page 349

1    but, yeah, you have two more minutes.
2  BY MR. MCCAULEY:
3    Q. Doctor, during -- did you understand that
4  the -- that there is data available to correlate
5  those little dots with bleeding events?
6    A. I have asked and -- and would like to see
7  that data.  I also -- I also understand that this is
8  a -- a start for data.  But this is only
9  representing 161 patients, and if you -- if you pull
10  out the ones that had renal insufficiency, I think
11  we're down to 130.  So I think the -- the graph
12  that's in my report reports on something like 136
13  individuals.
14    So, of course, I would love to see that.
15  But we're not going to get -- very -- it's very
16  unlikely that we would get any meaningful
17  correlations.  We need to see that data on a much
18  larger dataset of patients.
19    Q. So -- so, Doctor --
20    A. It's a beginning.
21    Q. -- did I hear you just say that you did ask
22  for that data?
23    A. I have -- I have -- I have asked to see
24  whatever data is available, yes.
25    Q. And you haven't gotten that data to

88 (Pages 346 to 349)

Protected - Subject to Further Protective Review

Page 350

1  correlate bleeding events with the dots on your
2  graph?
3       MR. MCWILLIAMS:  Object to form, asked and
4       answered.
5    A.  I've reviewed everything I've gotten.  So
6  what I've gotten is what I've gotten, and that's
7  what's in here.
8       MR. MCCAULEY:  Well, I guess I'm out of
9       time.  Thank you very much for your
10      indulgence.
11      MR. MCWILLIAMS:  Let's take a break.  I
12      think I might have one question.
13      MR. MCCAULEY:  Well, if you have questions,
14      we're going to go on after your questions
15      to ask -- to follow up.
16      MR. MCWILLIAMS:  Even if I ask her her
17      middle name?
18      MR. MCCAULEY:  Well, if you ask her middle
19      name, I may ask her what her confirmation
20      name is.
21      THE REPORTER:  Are we off or on?
22      THE VIDEOGRAPHER:  We are now off the record
23      at 5:48 p.m.
24      (Recess.)
25      THE VIDEOGRAPHER:  We are now back on the

Page 351

1        record, and the time is 5:53 p.m.
2  EXAMINATION
3  BY MR. MCWILLIAMS:
4    Q.  Good evening, Doctor.  How are you?
5    A.  Tired.
6    Q.  Yeah, I understand.  And I apologize for
7  asking one or maybe two more questions.  But I just
8  want to make sure everyone who reads this transcript
9  understands what exactly you've done here today in
10  formulating your report.
11       So my question is:  Would it be fair to say
12  that you speculated in forming your opinions, or did
13  you follow some type of scientific methodology?
14       MS. YATES:  Objection, form.
15    A.  So, no, I didn't speculate in forming my
16  opinions.  My opinions are based on, you know,
17  reviewing the literature, obtaining the literature.
18  I review it.  I study it.  I -- you know, I think
19  how to apply it.
20       You know, I've got 40 years of experience in
21  taking care of patients.  I have a good deal of
22  experience, training, expertise in applying what
23  I read and how I study the literature.
24       So, you know, this is what forms my opinion
25  and the opinion that I have in -- in the document

Page 352

1  that I submitted.
2       MR. MCWILLIAMS:  Okay.  I think that's all
3       the questions that I have.
4       Do you guys have any follow-up?
5       MS. YATES:  I don't have any follow-up.
6       MR. MCCAULEY:  Yes, just one second.
7       MR. MCWILLIAMS:  One minute, then we're
8       force-feeding him dinner.
9  CONTINUED EXAMINATION
10  BY MR. MCCAULEY:
11    Q.  Doctor, when you say you're not speculating,
12  you're using a scientific methodology, you don't
13  have a methodology to determine the company's
14  intent, some scientific methodology to do that,
15  do you?
16       MR. MCWILLIAMS:  Object to form.
17    A.  My methodology, as -- as it applies to the
18  information that I have and the information that
19  I've requested that I've, you know, found in
20  literature searches, et cetera, whatever I have
21  provided by the -- if I have any information
22  provided by the company or anyone else, I will
23  apply, you know, the same process to understanding
24  that that I do to everything else.
25    Q.  Doctor, what I -- what I'm asking, though,

Page 353

1  is:  What is the scientific methodology you have or
2  employed to -- to infer what the company's intent
3  was?  What expertise did you bring to bear on that
4  subject?
5    A.  Again, that may be just common sense.
6  You're right.  I don't -- I don't know intent in
7  anyone or intent of any group of people.  I only
8  know what is apparent in actions and in, you know,
9  the information that is available.
10       MR. MCCAULEY:  All right.  I don't have any
11       further questions.
12       MR. MCWILLIAMS:  Thank you.
13       THE VIDEOGRAPHER:  Today's deposition
14       consists of seven tapes.  This is the end
15       of Tape 7.  We are now off the record at
16       5:56 p.m.
17       THE REPORTER:  Do you want a copy of this?
18       MR. MCWILLIAMS:  Yes, please.
19       MS. YATES:  We have our standing order.
20
21       (Deposition adjourned at 5:56 p.m.)
22
23
24
25

89 (Pages 350 to 353)

Protected - Subject to Further Protective Review

Page 354

```
 1          C E R T I F I C A T E
 2
 3        Certification is valid only for a transcript
 4     accompanied by my original signature and
 5     Original required seal on this page.
 6
 7        I, Marybeth E. Muir, Certified Court
 8     Reporter in and for the State of Louisiana, and
 9     Registered Professional Reporter, as the officer
10     before whom this testimony was taken, do hereby
11     certify that CINDY A. LEISSINGER, M.D., after
12     having been duly sworn by me upon authority of R.S.
13     37:2554, did testify as hereinbefore set forth in
14     the foregoing 353 pages; that this testimony was
15     reported by me in the stenotype reporting method,
16     was prepared and transcribed by me or under my
17     personal direction and supervision, and is a true
18     and correct transcript to the best of my ability and
19     understanding; that the transcript has been prepared
20     in compliance with transcript format guidelines
21     required by statute or by rules of the board, and
22     that I am informed about the complete arrangement,
23     financial or otherwise, with the person or entity
24     making arrangements for deposition services; that I
25     have acted in compliance with the prohibition on
```

Page 355

```
 1     contractual relationships, as defined by Louisiana
 2     Code of Civil Procedure Article 1434 and in rules
 3     and advisory opinions of the board; that I have no
 4     actual knowledge of any prohibited employment or
 5     contractual relationship, direct or indirect,
 6     between a court reporting firm and any party
 7     litigant in this matter nor is there any such
 8     relationship between myself and a party litigant in
 9     this matter.  I am not related to counsel or to the
10     parties herein, nor am I otherwise interested in the
11     outcome of this matter.
12
13
          This 16th day of November, 2016.
14
15
16
17
18     _____
          MARYBETH E. MUIR, CCR, RPR
19
20
21
22
23
24
25
```