Protected - Subject to Further Protective Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

- - -

IN RE:  XARELTO          :  MDL NO. 2592
(RIVAROXABAN) PRODUCTS :
LITIGATION              :  SECTION L
                         :
THIS DOCUMENT RELATES  :  JUDGE ELDON
TO ALL CASES           :  E. FALLON
                         :
                         :
                         :  MAG. JUDGE
                         :  NORTH

- - -

December 14, 2016

- - -

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -

          Videotaped deposition of
HENRY MICHAEL RINDER, M.D., taken
pursuant to notice, was held at the law
offices of Douglas & London, 59 Maiden
Lane, New York, New York, beginning at
8:09 a.m., on the above date, before
Michelle L. Gray, a Registered
Professional Reporter, Certified
Shorthand Reporter,  Certified Realtime
Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

1    APPEARANCES:
2
3        SCHLICHTER, BOGARD & DENTON, LLP
         BY:  ROGER C. DENTON, ESQ.
4        100 South Fourth Street
         Suite 1200
5        St. Louis, Missouri 63102
         (314) 621-6115
6        rdenton@uselaws.com
7          - and -
8        HERMAN HERMAN & KATZ
         BY: ANNE (BESS) E. DeVAUGHN, ESQ.
9        820 O'Keefe Avenue
         New Orleans, Louisiana 70113
10       (504) 581-4892
         bdevaughn@hhklawfirm.com
11
           - and -
12
         DOUGLAS & LONDON, PC
13       BY:  LARA J. SAY, ESQ.
         59 Maiden Lane, 6th Floor
14       New York, New York 10038
         (212) 566-7500
15       lsay@douglasandlondon.com
         Representing the Plaintiffs
16
17
18
19
20
21
22
23
24

## Page 3

1    APPEARANCES:  (Cont'd.)
2
3        WILKINSON WALSH & ESKOVITZ
         BY:  BRIAN L. STEKLOFF, ESQ.
4        MEG LOFTUS, ESQ.
         1900 M Street, NW, Suite 800
5        Washington, D.C. 20036
         (202) 847-4030
6        bstekloff@wilkinsonwalsh.com
         mloftus@wilkinsonwalsh.com
7        Representing Bayer Pharmaceuticals
8
         BARRASSO, USDIN, KUPPERMAN, FREEMAN
9        & SARVER, LLC
         BY:  RICHARD E. SARVER, ESQ.
10       MADISON A. SHARKO, ESQ.
         909 Poydras Street, Suite 2400
11       New Orleans, Louisiana 70112
         (504) 589-9700
12       rsarver@barrassousdin.com
         msharko@barrassousdin.com
13       Representing Janssen entities
14
15       VIDEOTAPE TECHNICIAN:
16         Henry Marte
17
18
19
20
21
22
23
24

## Page 4

1              - - -
2          I N D E X
3              - - -
4
     Testimony of:
5
         HENRY MICHAEL RINDER, M.D.
6
     By Mr. Stekloff          9
7
8
9
              - - -
10
         E X H I B I T S
11
              - - -
12
13   NO.        DESCRIPTION        PAGE
14   Rinder-1    Expert Report of    9
                 Henry Michael Rinder, MD
15
16   Rinder-2    Clinical Usefulness  35
                 Of Measuring Prothrombin
17               Time and Soluble
                 Fibrin Levels in Japanese
18               Patients with Atrial
                 Fibrillation
19               (Nakano)
20   Rinder-3    Curriculum Vitae    105
21   Rinder-4    Direct Oral         186
                 Anticoagulants (DOACs)
22               In the Laboratory:
                 2015 Review
                 (Adcock & Gosselin)
23
24

## Page 5

1              - - -
2          E X H I B I T S  (Cont'd.)
3              - - -
4
5    NO.        DESCRIPTION        PAGE
6    Rinder-5    FDA Briefing        260
                 Document, Excerpt
7                9/8/11
8    Rinder-6    Full FDA Briefing   262
                 Document, 9/8/11
9
     Rinder-7    Expert Report       294
10               Of David R. Taft, Ph.D.
11   Rinder-8    Measurement of      306
                 Non-Coumadin
12               Anticoagulants and
                 Their Effects on Tests
13               Of Hemostasis
                 (Kitchen)
14
15   Rinder-9    Poor Compatibility   318
                 Of Coagulation
16               Screening Test
                 (Testa)
17   Rinder-10   Summary Review      338
18   Rinder-11   Comparative         345
                 Efficacy and Safety
19               of New Oral Anticoagulants
                 (Schneeweiss)
20
21   Rinder-12   Meta-Analysis of    350
                 Efficacy and Safety
22               Of New Oral Anticoagulants
                 (Miller)
23
24

2 (Pages 2 to 5)

Protected - Subject to Further Protective Review

Page 6

```
 1                - - -
 2        E X H I B I T S  (Cont'd.)
 3                - - -
 4
 5    NO.        DESCRIPTION        PAGE
 6    Rinder-13   Invoices of        379
                  Dr. Rinder
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1                - - -
 2        DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5    Direction to Witness Not to Answer
 6    PAGE  LINE
      57    1
 7    295   18
      296   5
 8    297   14
      298   17
 9
10    Request for Production of Documents
11    PAGE  LINE
      None.
12
13    Stipulations
14    PAGE  LINE
      None.
15
16    Questions Marked
17    PAGE  LINE
      None.
18
19
20
21
22
23
24
```

Page 8

```
 1                - - -
 2        THE VIDEOGRAPHER:  We are
 3    now on the record.
 4        My name is Henry Marte.  I'm
 5    a videographer for Golkow
 6    Technologies.
 7        Today's date is December 14,
 8    2016, and the time is 8:09 a.m.
 9        This videotaped deposition
10    is being held at 59 Maiden Lane,
11    New York, New York, taken in the
12    matter of In Re Xarelto Products
13    Liability Litigation, filed in the
14    United States District Court,
15    Eastern District of Louisiana.
16        The deponent today is
17    Dr. Henry Rinder.
18        Counsel will be noted on the
19    stenographic record.
20        The court reporter is
21    Michelle Gray and will now
22    administer the oath to the
23    witness.
24                - - -
```

Page 9

```
 1        ... HENRY MICHAEL RINDER, M.D.,
 2    having been first duly sworn, was
 3    examined and testified as follows:
 4                - - -
 5        DIRECT EXAMINATION
 6                - - -
 7    BY MR. STEKLOFF:
 8        Q.   Good morning, Dr. Rinder.
 9        A.   Good morning.
10        Q.   Doctor, you -- you've been
11    deposed before?
12        A.   Yes, I have.
13        Q.   I'm going to skip all the
14    ground rules and just say, if you need a
15    break, please let me know.  Okay?
16        A.   Thank you very much.
17        Q.   Dr. Rinder, we're going to
18    talk about your report today.  I'll hand
19    it to you now.  I'm marking it as
20    Exhibit 1.
21            (Document marked for
22        identification as Exhibit
23        Rinder-1.)
24    BY MR. STEKLOFF:
```

Protected - Subject to Further Protective Review

Page 10

1    Q.   This is the report that you
2 prepared in this litigation dated --
3 dated October 14, 2016?
4    A.   Yes, that's correct.
5    Q.   And one of your opinions,
6 and I'll point you to Page 14, if you
7 want to look at it, is that patients who
8 are taking Xarelto who have a PT of
9 greater than 20 seconds should be
10 discontinued from taking Xarelto; is that
11 right?
12    A.   With the caveat that this PT
13 ideally should be using the Neoplastine
14 reagent for that laboratory test and
15 collected in the 13 to 15-hour window
16 after dosing.
17    Q.   But with that caveat, you
18 believe the patients taking Xarelto who
19 have a PT of greater than 20 seconds
20 should be discontinued from their Xarelto
21 use, right?
22        MR. DENTON:  Objection to
23 form.  Asked and answered.
24        THE WITNESS:  I think that a

Page 11

1 PT of greater than 20 seconds is,
2 as I say here, a reasonable and
3 conservative cut-off point at
4 which the risks outweigh a
5 benefit.  And, therefore, a
6 reasonable physician would
7 consider discontinuing rivaroxaban
8 if that PT level was achieved.
9 BY MR. STEKLOFF:
10    Q.   I want to clarify.  Should a
11 reasonable physician consider
12 discontinuing rivaroxaban or discontinue
13 rivaroxaban?
14        MR. DENTON:  Object to the
15 form.
16        THE WITNESS:  In my opinion,
17 I'm saying that I think that the
18 PT with those caveats is high
19 enough that the risk-benefit may
20 be too high -- that the
21 risk-benefit may warrant
22 discontinuation.  That's my
23 general opinion.
24        Obviously any individual

Page 12

1 physician can look at that and
2 weigh that.  But that's my general
3 opinion in looking at the data
4 that I have reviewed.
5 BY MR. STEKLOFF:
6    Q.   Okay.  And -- but your
7 specific opinion says, "It is my opinion
8 that Xarelto should be discontinued."
9        So are you revising the word
10 "should" today?
11        MR. DENTON:  Objection to
12 form.  Asked and answered.
13        THE WITNESS:  No, I'm not.
14 BY MR. STEKLOFF:
15    Q.   So is it your opinion that
16 understanding that a reasonable physician
17 has to treat each patient as -- as an
18 individual, a reasonable physician
19 actually discontinue a patient whose PT
20 is greater than at least -- greater than
21 20.
22        MR. DENTON:  Object to the
23 form.
24        THE WITNESS:  No.  What I am

Page 13

1 saying here is it's my opinion, in
2 looking at the data, that I've
3 reached, that Xarelto should be
4 discontinued when the prothrombin
5 time, with all the appropriate
6 caveats, reaches that level.
7        That -- that means that
8 that's my opinion in looking at
9 the data.  I think any individual
10 patient has to be treated as an
11 individual patient.  And there may
12 be different caveats.  There may
13 be different situations with each
14 individual physician.
15        I would not want to take
16 away an individual physician's
17 ability to examine a situation and
18 make a decision based on that
19 individual patient.
20 BY MR. STEKLOFF:
21    Q.   But would you recommend that
22 essentially there's a presumption that
23 someone should be discontinued?
24        MR. DENTON:  Object to the

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

```
 1          form.  Asked and answered.
 2     BY MR. STEKLOFF:
 3          Q.   -- than taking into
 4     consideration the individual
 5     circumstances of the patient?
 6          MR. DENTON:  Objection.
 7     Asked and answered.  And to form.
 8          THE WITNESS:  I think
 9     that -- I don't presume to know
10     every single individual patient's
11     overall situation.  So I would not
12     have that as a presumption that
13     would somehow tie every physician
14     that they must.
15          All I am saying is, in my
16     opinion, based on the data that
17     I'm looking at, I think that that
18     level of PT is, in a conservative
19     way, probably a good consideration
20     for discontinuing the patient.
21          I'm saying in a general way
22     it should be discontinued.  But I
23     would not want to presume to have
24     that speak for every physician in
```

Page 15

```
 1     every situation in every patient.
 2     BY MR. STEKLOFF:
 3          Q.   And I understand you're not
 4     asking for an absolute rule for every
 5     physician for every single patient.  But
 6     as a general matter on a population
 7     basis, is it your presumption -- is it
 8     your recommendation that there should be
 9     a presumption that patients with a PT of
10     20 or greater should be discontinued from
11     Xarelto?
12          MR. DENTON:  Objection to
13     form.  Asked and answered.  It's
14     the last time he's answering it.
15     We're moving on.
16          THE WITNESS:  Again, I'm --
17     I'm not sure how I can answer it
18     any better.
19          I -- I would not presume to
20     make that a general rule for every
21     physician in every situation.
22          All I'm saying is that when
23     I look at the data and the
24     evidence, I feel that that is a
```

Page 16

```
 1     reasonable conservative point at
 2     which Xarelto should be
 3     discontinued.
 4          I'm not saying that that
 5     applies in every single case.  I'm
 6     putting that out there as, that's
 7     my opinion, it's a general
 8     opinion.
 9          It would have to be -- I
10     think any reasonable physician
11     might look at that and look at the
12     data, and they might, with their
13     individual patient, make their own
14     judgment based on that.
15          But I'm saying, in my
16     opinion with the data that I have,
17     I think it should be discontinued
18     at that point.
19     BY MR. STEKLOFF:
20          Q.   And does that opinion apply
21     to most patients?
22          MR. DENTON:  Object to the
23     form.
24          THE WITNESS:  I don't think
```

Page 17

```
 1     that that's -- I -- I wouldn't
 2     want to make that type of
 3     presumption.  I don't think that
 4     that is a -- a medically valid
 5     type of presumption.
 6          I think what I say here
 7     speaks for itself.  I'm not sure I
 8     can answer any better.
 9     BY MR. STEKLOFF:
10          Q.   Can you name any
11     circumstances in your clinical view that
12     might lead a physician to continue to
13     prescribe Xarelto to a patient who has a
14     PT of 20 or greater?
15          MR. DENTON:  Object to the
16     form.
17          THE WITNESS:  You know, I
18     think that would be speculation.
19     I think that every individual
20     situation for every individual
21     patient is unique.  And rather
22     than try to cherry-pick specific
23     aspects of every individual
24     patient that could possibly be out
```

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1      there, I think that that would
2      just be speculation.  I think it
3      would be better to -- to have hard
4      data that I've used here and then
5      let individual physicians make
6      their judgments based from there.
7  BY MR. STEKLOFF:
8      Q.   Can you give any examples of
9  things that you would consider as a
10 clinician in assessing whether to
11 continue a patient with a PT of 20 or
12 greater on Xarelto?
13          MR. DENTON:  Object to the
14      form.  Asked and answered.
15          THE WITNESS:  Again, I think
16      that would be speculation, and I
17      would rather not speculate.
18 BY MR. STEKLOFF:
19      Q.   You can't give the jury one
20 single example?
21          MR. DENTON:  Object to the
22      form.  Asked and answered.
23          THE WITNESS:  I think rather
24      than just sort of cherry-picking

Page 19

1      examples out of the air, it's
2      better to allow physicians to
3      evaluate their individual patient
4      at that time under those
5      circumstances and allow them to
6      make a considered medical judgment
7      in that situation.
8  BY MR. STEKLOFF:
9      Q.   Are you -- you are a
10 clinician, right?
11      A.   Yes.
12      Q.   Have you treated patients
13 who have taken Xarelto?
14      A.   Not as their primary, but,
15 yes, I have patients that are on Xarelto.
16      Q.   Have you ever prescribed
17 Xarelto?
18      A.   I am not their primary, so I
19 do not prescribe Xarelto for the patients
20 that I consult on.
21      Q.   Have you ever prescribed
22 Xarelto?
23      A.   No, I don't believe so.  In
24 our institution, the prescribing and --

Page 20

1      and the primary care is taken care of
2      either by the primary care physician, by
3      the fellows or the residents that are
4      taking care of that patient.
5          The -- the consulting
6      attendings tend to have a -- more of a
7      backseat to the actual prescribing.  And
8      so that's done by the primary care
9      residents, fellows, and the primary care
10 physicians or the primary taking care of
11 those patients, not the consultants.
12      Q.   Have you ever, as a
13 consulting physician, discussed the use
14 of Xarelto with a patient who is actively
15 taking Xarelto?
16      A.   I've discussed the use of
17 Xarelto with the primary physicians who
18 are taking care of that patient.  But not
19 one-on-one by myself with that patient.
20 It's always been as a consultant with the
21 referring physician.
22      Q.   And if you were talking to a
23 primary physician about someone's Xarelto
24 use and that patient had a PT of 20 or

Page 21

1      greater, you can't give the jury a single
2      example of things you might tell the
3      primary physician to consider and whether
4      to discontinue from Xarelto?
5          MR. DENTON:  I object to the
6      form, because now you haven't said
7      about all the other caveats on the
8      PT of 20.  And I want to make sure
9      that -- I want to make --
10          MR. SARVER:  This is Madison
11      Sharko from my office.
12          (Ms. Sharko enters the
13      room.)
14          MR. DENTON:  I just want to
15      make sure that all those caveats
16      that we talked about earlier are
17      in this question, because now you
18      are leading him on.
19 BY MR. STEKLOFF:
20      Q.   Can we agree, absent --
21 unless I say otherwise, we are
22 assuming -- when we talk about a PT of 20
23 or greater during this deposition, that
24 we can assume that the PT was taken using

6 (Pages 18 to 21)

Protected - Subject to Further Protective Review

Page 22

```
 1    Neoplastine, and we can assume that it
 2    was taken during the 13 to 15-hour
 3    window?
 4         A.    Somewhere in that range,
 5    sure.  That what we -- if that's a given
 6    caveat, is that what you mean?
 7         Q.    Yes, I want to make that a
 8    given caveat so Roger doesn't have to say
 9    that I'm not adding those caveats every
10    time I ask you about a PT of 20 or
11    greater.
12         A.    I understand that.
13         Q.    Okay.  So with that
14    understanding, I'm going to repeat my
15    question.  And if you were talking to a
16    primary physician about someone's Xarelto
17    use and that patient had a PT of 20 or
18    greater, you can't give the jury a single
19    example of things you might tell the
20    primary physician to consider in
21    determining whether to discontinue the
22    patient from Xarelto?
23         MR. DENTON:  Object to the
24    form.
```

Page 23

```
 1         THE WITNESS:  The way that I
 2    would approach that with that
 3    individual physician would be to
 4    discuss the evidence that I have
 5    and why -- why we would have that
 6    recommendation as a general
 7    recommendation.
 8         We would then go over that
 9    individual's care and that
10    individual's situation and
11    evaluate each individual aspect of
12    that from head to toe, their
13    medical history that's current,
14    their past medical history, the
15    drugs that they're on, possible
16    future situations for them.
17         The number of variables for
18    that is infinite.  And I don't --
19    I think it would be speculative
20    and misleading to try and
21    cherry-pick one or two aspects of
22    that.  It would really be looking
23    at the patient as a whole and
24    their situation to try and decide
```

Page 24

```
 1    whether to follow that
 2    recommendation or whether in the
 3    referring physician's opinion, he
 4    or she has reasons to feel that
 5    they would not follow that
 6    recommendation.
 7    BY MR. STEKLOFF:
 8         Q.    And to be clear, I'm not
 9    just asking for one or two.  You can give
10    us 50 things you may consider.  But you
11    think all of that would be speculation?
12         MR. DENTON:  Object to the
13    form.  That's not what he said.
14         THE WITNESS:  What I'm
15    saying is I don't think -- I think
16    it's misleading to try to pick one
17    to 10, 50, 100, and just throw
18    them all out there.
19         I think each individual
20    patient would have to be looked at
21    in the context of that patient.
22         It's just picking things out
23    of context.  And I think the
24    patient's context is the most
```

Page 25

```
 1    valuable aspect of that.
 2    BY MR. STEKLOFF:
 3         Q.    All of the data that you
 4    rely upon in forming this opinion about
 5    the 20-second cutoff is contained in your
 6    report.  Is that fair?
 7         MR. DENTON:  Object to the
 8    form.
 9         THE WITNESS:  I think that
10    the -- I think that the summary of
11    what I have written in the report
12    supports that.
13         I may not have included
14    every single aspect of every paper
15    or literature reference that I
16    have, but I've tried to summarize
17    that as best as I can to support
18    that conclusion.  I did not want
19    to make this a 400-page report.
20    BY MR. STEKLOFF:
21         Q.    Understood.
22         I'm not asking if you
23    pointed to every sentence in every
24    article or every data point in every
```

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1    summary of data. I'm trying to ask a
2    different question. I mean, is there
3    anything else that you're relying upon
4    for your opinion that there should be a
5    20-second cutoff that's not cited in your
6    report?
7        MR. DENTON: Well, I object
8    to the form. You're using the
9    words "20-second cutoff." He
10   doesn't use those words. So I
11   object to the form.
12   BY MR. STEKLOFF:
13       Q. Well, you say a 20 -- a PT
14   of 20 seconds is a reasonable and
15   conservative cutoff point, right?
16       A. Let's see.
17       MR. DENTON: Well, it
18   continues.
19       But go ahead.
20       THE WITNESS: I say -- I say
21   that discontinued in patients
22   whose PT using Neoplastine and
23   collected 13 to 15 hours postdose
24   is greater than 20 seconds. I

Page 27

1        believe this constitutes a
2        reasonable and conservative cutoff
3        point at which the risks outweigh
4        any benefit.
5    BY MR. STEKLOFF:
6        Q. Right. And so I mean, we
7    can spend all day with Roger objecting
8    and I can --
9        MR. DENTON: That's going to
10       happen, apparently.
11   BY MR. STEKLOFF:
12       Q. -- literally try to clarify
13   everything. But I'm just trying to get
14   through this. So when I say "20-second
15   cutoff," did you understand what I was
16   saying, Dr. Rinder?
17       MR. DENTON: I object to the
18       form.
19       Go ahead.
20       THE WITNESS: Sorry.
21       I understand what you're --
22       that you're referring to the
23       20-second cutoff that I'm
24       referring to here in this

Page 28

1        paragraph on Page 14.
2    BY MR. STEKLOFF:
3        Q. Okay. Thank you.
4        So now with that
5    understanding, my question is, are you
6    relying upon anything else that isn't
7    cited in your report in forming the
8    opinion offered on the paragraph we're
9    talking about on Page 14 of your report?
10       A. If that's including all of
11   the references and everything that's in
12   those references that's in my materials
13   considered -- and I hope that I've made
14   that as complete a list as possible. I'm
15   sure I may have left off one or two
16   things -- then, yes, the report and all
17   the materials considered, I believe
18   everything within that, I've considered
19   for that -- to make that statement.
20       Q. You understand today is the
21   day that I get to find out if there's
22   anything else out there that you're
23   relying upon, right?
24       A. Yes, I understand that.

Page 29

1        Q. And sitting here today, is
2    it fair to say that you can't point to
3    anything else that you're relying upon to
4    offer the opinion in the paragraph we're
5    talking about on Page 14?
6        A. As long as it's within one
7    of those references, then yes.
8        Q. Okay. Now, have you ever
9    published in a peer-reviewed article
10   your -- the opinion that you offer about
11   the 20-second reasonable and conservative
12   cutoff point at which the risks outweigh
13   any benefit in any scientific journal?
14       A. I have not published on this
15   cutoff point, no.
16       Q. Have you even drafted an
17   article for submission on this cutoff
18   point?
19       A. We have several -- we have
20   several manuscripts that our trainees and
21   residents are working on related to new
22   oral anticoagulants, but I do not believe
23   this is included, that this cutoff point
24   right now is included in those drafts.

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1      Q.   In other words, you are not
2   in the process of drafting a peer -- a
3   proposed peer-reviewed article that
4   specifically says that for Xarelto, there
5   should be a 20-second cutoff, reasonable
6   and conservative -- conservative cutoff
7   at which the risks outweigh the benefits?
8      A.   Well, I don't think there
9   would be -- well, I don't know that -- I
10  don't know that a journal would want an
11  article that was completely -- a
12  manuscript that was completely focused on
13  that point.  So no, we're not using --
14  we're not planning a manuscript that is
15  focused on that particular point.
16     Q.   And you'd agree that FDA has
17  never come out and said that there should
18  be a 20-second cutoff point at which the
19  risks outweigh the benefits for Xarelto?
20     MR. DENTON:  Object to form.
21     THE WITNESS:  I have seen --
22     I've seen the data that the FDA
23     has that shows the increased
24

Page 31

1      bleeding risk with increasing
2      quartile of prothrombin time that
3      forms the basis of this.  But I'm
4      not aware that -- I'm not aware of
5      any language in the AdCom or in an
6      FDA report that took that further
7      than showing the data.
8   BY MR. STEKLOFF:
9      Q.   So the FDA has never
10  recommended to clinicians that they use a
11  20-second cutoff in treating -- in
12  treating patients who take Xarelto,
13  right?
14     MR. DENTON:  Object to form.
15     THE WITNESS:  I'm not aware
16     of any language in FDA materials
17     or that is made public to
18     physicians or patients that
19     describes a cutoff for Xarelto
20     use.
21  BY MR. STEKLOFF:
22     Q.   Are you aware of any public
23  health organization or regulatory body
24  anywhere in the world who has made a

Page 32

1   recommendation about a reasonable and
2   conservative cutoff point for Xarelto at
3   which the risks outweigh the benefits?
4      MR. DENTON:  Object to form.
5      THE WITNESS:  The ISTH and
6      the British committee on standards
7      have examined using the
8      prothrombin time to monitor
9      rivaroxaban.  But their -- those
10     manuscripts only went as far as
11     talking about the utility of using
12     that.  They did not go so far as
13     to try to describe therapeutic
14     ranges in either direction,
15     whether it's for thrombosis or
16     bleeding.  They were focused only
17     on the utility of using the
18     prothrombin time as a monitoring
19     for rivaroxaban activity.
20  BY MR. STEKLOFF:
21     Q.   And we're going to talk
22  about that.  But you agree that there's
23  no public health organization or
24  regulatory body who has recommended a

Page 33

1   specific reasonable and conservative
2   cutoff point at which the PT -- strike
3   that.  I'll reword it so my words don't
4   get tangled.
5      A.   No problem.
6      Q.   I'm just -- you agree that
7   there's no public health organization or
8   regulatory body who has recommended a
9   specific reasonable and conservative
10  cutoff point at which -- for which
11  Xarelto should be discontinued using PT,
12  right?
13     MR. DENTON:  Object to the
14     form.  Asked and answered.
15     THE WITNESS:  They have not
16     reached that conclusion as yet.
17  BY MR. STEKLOFF:
18     Q.   Are you aware of any
19  peer-reviewed literature in which another
20  doctor or scientist recommends a specific
21  reasonable and conservative cutoff point
22  at which Xarelto should be discontinued
23  using PT?
24     A.   I think that the -- there's

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 34

1    one manuscript that I've cited in this
2    particular report from the Japanese
3    literature, which does examine bleeding
4    risk in a population and where they do
5    cite -- I believe it's 20 seconds, using
6    a reagent that is very similar to
7    Neoplastine in terms of its sensitivity.
8    And they cite that as a point at which
9    bleeding risk went up increasingly.
10        And I believe -- you can
11   look at that article if you want to look
12   at the exact language that they have
13   there.  But I believe that they proposed
14   that as a possible point at which one
15   should consider stopping Xarelto or
16   switching to -- or decreasing the dose.
17   We could look at that article to get
18   specifics if you would like.
19        Q.   Okay.  But your recollection
20   is that the Nakano authors do, in fact,
21   recommend 20 seconds as a reasonable and
22   conservative cutoff point, or is it that
23   they say that the risk increases at
24   20 seconds or above?

Page 35

1         MR. DENTON:  Object to the
2    form.  He's offered to talk to you
3    about the article.  If you want to
4    get specific -- this isn't a
5    memory test -- pull the article
6    out.  He'll answer all the
7    questions you have.
8         THE WITNESS:  That was
9    actually what I was going to say
10   next.  Nakano, I believe, is the
11   article.
12   BY MR. STEKLOFF:
13        Q.   Nakano.
14        A.   I'm happy to look at that to
15   see exactly what they say.  I don't want
16   to misstate.  I want to be accurate for
17   you as much as I can.
18        Q.   That's very fair.  That's
19   why we'll show you the article.
20        A.   Thank you.
21        (Document marked for
22   identification as Exhibit
23   Rinder-2.)
24   BY MR. STEKLOFF:

Page 36

1         Q.   Before Roger even
2    interjects, I'll just say take as long as
3    you want -- long as you want to look at
4    anything that I hand you today.
5         A.   That's very kind.
6         Q.   Even if it's the whole
7    article.  You cited this one, but feel
8    free.
9         MR. DENTON:  Can I have --
10   this will take me several hours to
11   get through it.
12        MR. STEKLOFF:  Only if we go
13   off the clock.
14        MR. DENTON:  I can probably
15   understand it better.
16   BY MR. STEKLOFF:
17        Q.   And just for the record,
18   I've handed you Exhibit 2, which is the
19   article by Dr. Nakano and his colleagues
20   titled "Clinical usefulness of measuring
21   prothrombin time and soluble fibrin
22   levels in Japanese patients with atrial
23   fibrillation receiving rivaroxaban."
24        And my specific question for

Page 37

1    you, Dr. Rinder, is whether, in this
2    article they, in your opinion, recommend
3    that Xarelto should be discontinued in
4    patients whose PT is greater than
5    20 seconds?
6         MR. DENTON:  Object to the
7    form.
8         Take your time.
9         THE WITNESS:  Thank you for
10   giving me time to look at this so
11   that I can be accurate.
12        What they say here is,
13   clinicians should be aware that
14   rivaroxaban patients with peak
15   PTT -- PTs -- I'm sorry --
16   PTs greater than or equal to
17   20 seconds may be at increased
18   risk of bleeding.
19        And one of their conclusions
20   is a prolonged PPT, greater than
21   or equal to 20 seconds, places
22   patients at increased risk of
23   bleeding.
24        So the answer to your

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1  question, in the context of an
2  article, is that they do not state
3  unequivocally that this is the
4  absolute cutoff and that all
5  patients with a value greater than
6  that should be discontinued from
7  rivaroxaban.
8       One of the reasons why they
9  are probably not saying that is
10 because -- and, again I'm --
11 I'm -- I -- I feel that when
12 people write articles, their job
13 is to present their data in as
14 narrow a way as possible and to
15 keep their conclusions related to
16 that.
17      This -- this article was not
18 meant as a review of all patients.
19 It was not meant to include the
20 FDA data.  And, therefore, I would
21 actually find it surprising if
22 they had a conclusion that said
23 that patients should be
24 discontinued if they had -- if

Page 39

1  they had a PT under those
2  estimates -- I'm -- I'm sorry --
3  under those caveats of greater
4  than or equal to 20 seconds.
5       But what they do say is they
6  are at increased risk of bleeding,
7  and I think that's a clear
8  clinical message to anyone reading
9  this article about monitoring
10 rivaroxaban and the risk-benefit
11 if the PT reaches that, what I'm
12 calling the cutoff.
13 BY MR. STEKLOFF:
14      Q.  Do you -- just to be clear,
15 do you think doctors in the medical
16 community who treat patients with Xarelto
17 would want to know in peer-reviewed
18 literature whether other doctors
19 recommended a specific cutoff or not?
20      MR. DENTON:  Object to the
21 form.
22      THE WITNESS:  So I think
23 that physicians prefer to examine
24 the data when it is -- when it's

Page 40

1  possible.
2       If -- if there is an
3  enormous amount of data that can
4  be summarized in a review to make
5  a recommendation, then that is
6  another venue that they would
7  examine.  But I think what they
8  want to see is -- are, rather,
9  studies that give them information
10 from which they can guide their
11 own therapy.
12      A study like this that shows
13 that patients at that higher level
14 of prothrombin time greater than
15 or equal to 20 seconds have an
16 increased risk of bleeding is
17 evidence.  That doesn't
18 necessarily mean that -- that the
19 only way doctors would follow
20 this would be if it was somehow
21 stated that this had to be the
22 cutoff, but it would be evidence.
23      And as I said before, that
24 would be something that a

Page 41

1  physician would consider in the
2  context of their individual
3  patient.
4       But having this data so that
5  they can see that there's evidence
6  for an increased risk for bleeding
7  is valuable to them.
8  BY MR. STEKLOFF:
9       Q.  We can agree now, though,
10 having looked at this article, you're not
11 aware of any peer-reviewed article in
12 which any physician makes a specific
13 recommendation of a cutoff at which
14 Xarelto patients should be discontinued.
15 Is that fair?
16      MR. DENTON:  Object to the
17 form.  Asked and answered.
18      THE WITNESS:  I'm not aware
19 of any manuscripts in the
20 published literature that in any
21 way review the overall safety and
22 efficacy related to prothrombin
23 time that are a comprehensive
24 review that could lead to such an

Protected - Subject to Further Protective Review

Page 42

1    explanation.
2        So there's a dearth of data.
3    It's not that -- I don't think
4    it's that physicians have avoided
5    saying that or have thought that.
6    I think it's that there is a
7    dearth of manuscripts that even
8    address that issue.  And,
9    therefore, there's no -- there's
10   no -- there's no manuscript
11   that -- that approaches the
12   ability to make that statement.
13   BY MR. STEKLOFF:
14       Q.   If you turn to Page 189 of
15   this article.  First of all, you find
16   this article scientifically reliable, I
17   assume, based on the fact you've cited
18   it?
19       A.   I find this article to have
20   value.  I've not evaluated the individual
21   data or the individual statistics in a
22   way that I could then be 110 percent
23   perfect with this.  But it's
24   peer-reviewed.  It's in a published

Page 43

1    journal that is in Index Medicus.  And in
2    reviewing the data, I find it to be at
3    least valid and scientifically plausible
4    to me.
5        Q.   So even you wouldn't say
6    that the data presented here is without
7    potential limitations?
8            MR. DENTON:  Object to the
9    form.
10           THE WITNESS:  I don't think
11       that any data anywhere lacks
12       potential limitations.  Every data
13       can be improved in some way or
14       another.
15   BY MR. STEKLOFF:
16       Q.   But I want to turn you -- do
17   you see this column on the left,
18   discussion, and in the paragraph under
19   that discussion, the second paragraph
20   that starts "Our -- our results for the
21   distribution"?
22       Do you see that?
23       A.   Yes, I do.
24       Q.   Do you see the third

Page 44

1    sentence where they write, the authors
2    write, "In routine medical practice" --
3    sorry -- the second sentence.
4        "As with other NOACs,
5    rivaroxaban normally does not require
6    routine coagulation function testing."
7        Do you see that?
8        A.   I do see that sentence.
9    You've read it correctly.
10       Q.   Do you agree with that
11   sentence?
12           MR. DENTON:  Object to the
13       form.
14           THE WITNESS:  Well, so I
15       don't know what routine
16       coagulation function testing is
17       meant by these authors.  I don't
18       know whether they are trying to
19       say daily, weekly.
20       I can't divine what their
21       intent from that question is.  So
22       on the face of it, I -- I can't
23       agree with it, because I don't
24       really know what the exact

Page 45

1    specificity of that routine
2    coagulation monitoring means.
3    BY MR. STEKLOFF:
4        Q.   Let's say they are saying
5    once a month.  Would you agree or
6    disagree with it?
7            MR. DENTON:  Object to the
8    form.
9            THE WITNESS:  I think -- I
10       think again that would have to be
11       in the context of an individual
12       patient.
13       Some patients might require
14       monthly monitoring on rivaroxaban.
15       Others might not.  But, again,
16       that's going to depend on the
17       context of the individual patient
18       and the physician's assessment of
19       them and their response to
20       rivaroxaban.
21   BY MR. STEKLOFF:
22       Q.   What -- as a general rule,
23   what do you believe -- how often do you
24   believe patients who take Xarelto should

Protected - Subject to Further Protective Review

Page 46

1  be blood monitored for their drug
2  concentration for PT level?
3       MR. DENTON:  Object to the
4  form.
5       THE WITNESS:  So I -- I
6  don't have general rules.  I
7  approach each patient in looking
8  at their diseases, their history,
9  their current anticoagulation
10  status, and their overall medical
11  status.
12       So I would say that if --
13  when I have patients that I
14  consult on who have
15  anticoagulation with rivaroxaban,
16  they span the gamut.
17       Some patients -- some
18  patients are extremely healthy.
19  Some are extremely sick.  And what
20  I would want to do is evaluate
21  each patient individually for how
22  I would or would not or and if I
23  would, what would be the
24  frequently or the utility of

Page 47

1       monitoring for them.
2  BY MR. STEKLOFF:
3       Q.  We'll come back to
4  monitoring therapeutic range.  I want to
5  go back to the 20-second cutoff.
6       A.  Okay.  In the report.
7       MR. DENTON:  Are you done
8  with this article?
9       MR. STEKLOFF:  For now, yes.
10       THE WITNESS:  Want me to
11  just hold it -- hold it to the
12  side?
13  BY MR. STEKLOFF:
14       Q.  The court reporter will want
15  it anyways, so hold it to the side and we
16  may come back to it.
17       A.  Okay.  Thank you.
18       Q.  Going back to Page 14 of
19  your report.  Have you ever presented at
20  any sort of conference your opinion
21  offered here in the first paragraph on
22  Page 14 with regard to the 20-second
23  cutoff?
24       A.  Not at a national

Page 48

1  conference.  In some of our teaching and
2  case and patient management conferences,
3  as part of our routine clinical care, we
4  have discussed Xarelto and, of course,
5  all the oral anticoagulants.  And we have
6  discussed monitoring and the questions of
7  monitoring, how to monitor, and risk.
8       So that has been a subject
9  of what we've discussed, but not -- but
10  we have not presented -- it hasn't
11  reached a level where we've presented it
12  at a national meeting or a -- a formal
13  type of meeting where there's an abstract
14  submitted and things like that.
15       Q.  All right.  Let me break
16  that down a little bit.
17       Can we agree that you have
18  not presented the opinion that Xarelto
19  should be discontinued in patients whose
20  PT is greater than 20 seconds, which you
21  believe is a reasonable and conservative
22  cut-off point at which the risks outweigh
23  any benefit at any formal type of meeting
24  or national conference?

Page 49

1       MR. DENTON:  Object to the
2  form.  Asked and answered.
3       THE WITNESS:  I would say --
4  I would say the latter at a
5  national conference.  But we -- we
6  have had formal -- I mean, these
7  are formal meetings.  There are --
8  they are scheduled.  They are
9  regularly attended by clinical
10  staff and other interested
11  individuals.
12  BY MR. STEKLOFF:
13       Q.  Bad question.  I didn't
14  break it down enough.
15       A.  That's all right.
16       Q.  I'm going to break it down
17  again.
18       Can we agree that you have
19  not presented the opinion that Xarelto
20  should be discontinued in patients whose
21  PT is greater than 20 seconds at any
22  national conference?
23       MR. DENTON:  Objection to
24  form.

Protected - Subject to Further Protective Review

Page 50

1     THE WITNESS: We have not
2        yet presented that data or opinion
3        at a national conference.
4  BY MR. STEKLOFF:
5     Q.   Now, my understanding is
6  that your testimony a moment ago was that
7  you have discussed all NOACs and
8  monitoring and therapeutic ranges within
9  Yale and amongst colleagues. Is that
10 fair?
11    A.   As part of our normal
12 clinical management, these -- we have
13 patients on all NOACs, warfarin, and all
14 oral -- other oral anticoagulants.
15        And so it is a constant part
16 of our practice. So we are always
17 discussing management, monitoring, and
18 trying to figure out the best patient
19 care possible.
20    Q.   I'm not trying to trick you
21 here. The answer to my question was
22 simply a yes, right?
23        MR. DENTON: Object to the
24     form.

Page 51

1     THE WITNESS: I'm sorry.
2        MR. DENTON: What's the
3     question?
4  BY MR. STEKLOFF:
5     Q.   My question -- my question
6  that I asked, it -- the answer was yes,
7  right? I'll read you the question again.
8     A.   Okay. I'm sorry.
9     Q.   My question was, my
10 understanding is that your testimony a
11 moment ago was that you have discussed
12 all NOACs and monitoring and therapeutic
13 ranges within Yale and amongst
14 colleagues. Is that fair? The answer to
15 that is yes, right?
16    A.   As I said before, we've --
17 as part of our clinical care, we discuss
18 NOACs, we discuss monitoring, we discuss
19 all aspects of that.
20    Q.   Yes. Now, you agree,
21 though, that you have never told your
22 colleagues at Yale in a clinical context
23 or any sort of meeting within -- of the
24 physicians at Yale that they should

Page 52

1  discontinue or even consider
2  discontinuing their patients who are
3  taking Xarelto specifically if their
4  patients have a PT of 20 or greater?
5        MR. DENTON: Object to the
6     form.
7        THE WITNESS: So the answer
8     to that is I don't tell my
9     colleagues what to do. We are --
10    we are a collegial group. We work
11    together.
12        I will present data to them.
13        If we have data that
14    indicates that someone is a -- has
15    a high level of Xarelto on board
16    or is a high responder, I would
17    certainly present that as
18    information that would be of use
19    to the -- for the group to
20    consider in this patient's care.
21 BY MR. STEKLOFF:
22    Q.   Have you ever presented to
23 your colleagues a recommendation that as
24 a general matter they should consider

Page 53

1  discontinuing their patients who are
2  taking Xarelto if their PT is 20 seconds
3  or greater?
4        MR. DENTON: Object to form.
5     Asked and answered.
6        THE WITNESS: I don't
7     present to them in general
8     matters.
9        I present to them in
10    specific case management, patient
11    management aspects, and that data
12    would be included in our
13    discussion of that patient. But
14    I'm not going to say that they
15    should generalize that to all of
16    their care. I'm saying that I've
17    brought that up and that they
18    consider that in the specific
19    management of that specific
20    patient.
21 BY MR. STEKLOFF:
22    Q.   So you've never presented
23 the opinion offered on Page 14, which is
24 an opinion as a general matter, to your

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1    colleagues at Yale; is that right?
2           MR. DENTON:  I object to the
3    form.  Asked and answered.
4           THE WITNESS:  So I'm a
5    little confused.  So I don't --
6    the writing of this report has a
7    different purpose.
8           I have spoken with my
9    colleagues in case management of
10   patients about what I know about
11   Xarelto and other oral
12   anticoagulants and their effect on
13   clotting times and the data that I
14   have summarized.
15          I've not -- I've not stood
16   up and put on the board, this is
17   the general rule.
18          I've simply discussed with
19   them what the data shows and let
20   them then apply that to the
21   individual patient.  And that
22   oftentimes turns into an involved
23   discussion about that patient.
24          But, again, I'm not dictating to

Page 55

1    them.
2    BY MR. STEKLOFF:
3        Q.   So you never, at a meeting
4    of your colleagues, have presented all of
5    the data that you believe supports your
6    opinion and said, as a general
7    consideration, as you treat your patients
8    who are taking Xarelto, you should
9    consider discontinuing them if their PT
10   is 20 seconds or greater; is that
11   correct?
12          MR. DENTON:  Object to the
13   form.  Asked and answered.  This
14   is the last time he's going to
15   answer it, and we're moving on.
16   BY MR. STEKLOFF:
17       Q.   Yes or no?  Is that correct?
18          MR. DENTON:  No, no, there's
19   no yes or no.  He can answer the
20   question appropriately.
21          MR. STEKLOFF:  Well, I would
22   like a yes or no answer.
23          MR. DENTON:  Well, he's
24   going to give an accurate answer.

Page 56

1           THE WITNESS:  With all due
2    respect, I don't believe that
3    physicians are -- in a case
4    management setting should ever
5    have presentations of data that
6    they feel is an absolute or a
7    general rule.  I don't think
8    that's appropriate.  I think it
9    stifles discussion.  I think it's
10   medically and scientifically
11   misleading and against the best
12   practice of a patient.
13          So presenting the data and
14   allowing for a meaningful
15   discussion is what's done.  But
16   somehow presenting it as an
17   absolute is just not -- that's
18   just not, I think, appropriate.
19   BY MR. STEKLOFF:
20       Q.   And for that reason, because
21   you don't think it's appropriate, you
22   have never presented the opinion offered
23   here on Page 14 as a general matter to
24   your colleagues at Yale.  Fair?

Page 57

1           MR. DENTON:  No.  Objection.
2    Move on.  I'm going to instruct
3    him not to answer.  You've asked
4    it eight or ten different ways.
5    We're done with this topic.  Move
6    on.
7    BY MR. STEKLOFF:
8        Q.   Are you following your
9    counsel's instruction?
10       A.   Yes.
11          MR. STEKLOFF:  He's not
12   answering the question.  I'm going
13   to continue to ask him.
14          MR. DENTON:  I'm going to
15   continue telling him not to.
16   Anybody -- any reasonable reading
17   of this transcript would agree
18   with me.  So that's why I'm taking
19   the position.
20   BY MR. STEKLOFF:
21       Q.   Have you ever personally
22   told a patient whose PT was 20 or
23   greater, 20 seconds or greater, based on
24   Neoplastine taken between 13 and

15  (Pages 54 to 57)

Protected - Subject to Further Protective Review

Page 58

1    15 hours, that he or she should be
2    discontinued from Xarelto?
3            MR. DENTON: Object to form.
4            THE WITNESS: As I said
5        before, the venue in which we take
6        care of our patients is in a
7        consultative capacity. So I am
8        working with the primary
9        physician, the residents, and
10       fellows in that situation.
11           They are -- they are the
12       ones that are primarily writing
13       the orders and managing the
14       patient on a daily basis.
15           So that is something that
16       just doesn't happen. And so
17       there's no circumstance under
18       which that would arise for me to
19       even consider that.
20   BY MR. STEKLOFF:
21       Q.   And for that reason, you've
22   never told the patient that, right?
23           MR. DENTON: Object to the
24       form. Asked and answered.

Page 59

1            THE WITNESS: I've not had
2        the opportunity, and that
3        situation has not arisen.
4    BY MR. STEKLOFF:
5        Q.   Have you ever -- as opposed
6    to presenting the data, have you ever
7    told a doctor who you were working with
8    to treat a patient that he or she should
9    consider discontinuing a patient from
10   Xarelto because the patient's PT was
11   20 seconds or greater?
12           MR. DENTON: Object to the
13       form.
14           THE WITNESS: I'm sorry.
15       Could you repeat the --
16           MR. DENTON: I'm sorry.
17           THE WITNESS: That's all
18       right. Could you repeat the
19       question again. I'm sorry.
20   BY MR. STEKLOFF:
21       Q.   No problem.
22           As opposed to presenting the
23   data, have you ever told a doctor who you
24   were working with to treat a patient that

Page 60

1    he or she, the doctor, should continue --
2    strike that.
3            I read the word wrong.
4            Okay. As opposed to
5    presenting the data to the doctor --
6        A.   Okay.
7        Q.   -- have you ever told a
8    doctor who you were working with to treat
9    a patient that the doctor should consider
10   discontinuing the patient from Xarelto
11   because the patient's PT was 20 seconds
12   or greater?
13           MR. DENTON: Object to the
14       form.
15           THE WITNESS: I am not sure
16       how that differs from the previous
17       questions. But...
18   BY MR. STEKLOFF:
19       Q.   Well, now, just so I
20   clarify, I want to understand if you've
21   told the doctor as opposed to -- I
22   understand that you don't have the
23   opportunity to tell patients. That was
24   your answer.

Page 61

1        A.   Oh, I see. I see.
2        Q.   Now I'm saying, have you
3    ever gone to a doctor who was responsible
4    for the patient's care. So do you
5    understand that's the context of my
6    question?
7        A.   Yes. Now I do. I'm sorry.
8        Q.   Okay. That's why I'm trying
9    to clarify and --
10       A.   Got it.
11       Q.   -- not cut you off.
12       A.   Got it. No, no, no. I --
13   no, no, you're not. I appreciate that.
14       Q.   And so in that context --
15       A.   Right.
16       Q.   -- you consult with doctors
17   who are treating patients who take
18   Xarelto, right?
19       A.   Yes.
20       Q.   Have you ever told one of
21   those doctors that they should consider
22   discontinuing their patient from Xarelto
23   because that patient did have a PT of
24   20 seconds or greater?

16 (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1    MR. DENTON: Object to the
2 form.
3    THE WITNESS: There have
4 been -- there have been cases
5 where we have had patients whose
6 PT was prolonged where
7 unfortunately they were not using
8 the Neoplastine reagent. So we
9 did not have specific data on the
10 caveat that we discussed before as
11 to the exact PT.
12    But we have had patients
13 where their PT was prolonged using
14 another reagent that appeared to
15 us to be at least equivalent in
16 terms of reaching that cutoff
17 point for what we would have used
18 as a 20-second cutoff for the
19 Neoplastine reagent.
20    In -- in those
21 circumstances, we have discussed
22 that specific result and discussed
23 and considered whether that
24 patient is receiving or has too

Page 63

1    much Xarelto activity on board.
2 BY MR. STEKLOFF:
3    Q.   And have you, in those
4 circumstances that you're talking about,
5 told the doctor who was responsible for
6 the Xarelto prescription that he or she
7 should discontinue the patient from
8 Xarelto?
9    MR. DENTON: Object to form.
10    THE WITNESS: As part of our
11 discussion, giving them the
12 context of what that particular PT
13 means, we've discussed the
14 fact that that patient is now
15 likely at higher bleeding risk
16 based on the results that we have.
17    And I've discussed that with
18 the physician in the context of
19 those individual patients. But
20 I've not told them, ordered them,
21 or instructed them in any way that
22 they must do something.
23    But that data I've -- we've
24 discussed and that has been part

Page 64

1 of our formulation of the final
2 management of that patient,
3 whether to continue, discontinue,
4 change the dose, whatever the
5 primary care person is most
6 comfortable with.
7 BY MR. STEKLOFF:
8    Q.   And understanding, it sounds
9 like you don't like to order doctors or
10 instruct doctors to do anything.
11    I want to ask the question
12 which is: Have you recommended to them
13 that they discontinue the patient?
14 Leave -- under -- leaving it to their
15 judgment on what the final decision
16 should be?
17    MR. DENTON: Object to the
18 form. Move to strike the
19 predicate.
20 BY MR. STEKLOFF:
21    Q.   And I'll -- I'll -- I'll ask
22 a different question.
23    Have you -- in the context
24 of -- to which you just -- withdraw that.

Page 65

1    In the context that you just
2 described --
3    A.   Yes.
4    Q.   -- have you ever, yourself,
5 recommended to the primary care doctor
6 that he or she discontinue his or her
7 patient from Xarelto based on the PT
8 score?
9    MR. DENTON: Object to form.
10    THE WITNESS: What I have
11 told in -- in -- in those
12 circumstances, what I have told
13 them is this is what the data
14 presents. This patient is at
15 higher bleeding risk because, in
16 my evaluation, they fulfill those
17 caveat-like criteria that I've
18 discussed here. And they are in
19 that situation.
20    Therefore, when we have that
21 discussion I present that to them
22 as part of our overall discussion.
23    My final recommendation
24 might be based on that plus ten

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    other factors.  It's not purely
2    based on that single item that I
3    would make my recommendation.
4         It would be part of our
5    general discussion of the overall
6    patient that I might make a
7    recommendation.  And there have
8    been circumstances where, as part
9    of the overall evaluation in the
10   context of that individual
11   patient, that we have recommended
12   changing or discontinuing Xarelto.
13   But it's not based solely on that.
14        That is simply one piece of
15   data that comes in the context of
16   that overall patient.
17   BY MR. STEKLOFF:
18        Q.   And now I just want to
19   clarify.  In this report in the
20   litigation context, you are recommending,
21   based on the data, that the 20-second
22   cutoff be used as a point at which
23   discontinuation should occur?
24        MR. DENTON:  Object to the

Page 67

1    form.  Asked and answered.
2         THE WITNESS:  I'm saying
3    that it's a reasonable and
4    conservative cut-off point based
5    on the data, and that that should
6    be considered in the context of
7    any individual patient.
8         This is just a general point
9    for the report and not a -- not
10   meant to be for every single
11   patient under every single
12   circumstance.
13   BY MR. STEKLOFF:
14        Q.   But it's meant to be for
15   most patients under most circumstances,
16   right?
17        MR. DENTON:  Object to the
18   form.  Asked and answered at least
19   four times.
20        Go ahead.
21        THE WITNESS:  As I said
22   before, I would not speculate.
23   BY MR. STEKLOFF:
24        Q.   What did you do to prepare

Page 68

1    for this deposition, Dr. Rinder?
2         A.   I re-read my report.  I
3    looked over as many references that I
4    included in the report as I could
5    tolerate given the amount of time.
6         I did an additional
7    literature search a couple of weeks ago,
8    well, maybe a week or two ago, on
9    rivaroxaban.  But that's -- I've been
10   doing that constantly, anyway.
11        I met with the attorneys
12   yesterday.  I think that's -- that pretty
13   much constitutes what I did in
14   preparation.
15        Q.   Did your additional
16   literature search turn up anything new?
17        A.   There are always new
18   articles coming out.  But I didn't really
19   find anything that I thought was germane
20   to my report that -- or that I felt was
21   worth bringing up.
22        Q.   So you didn't identify any
23   new reliance material?
24        A.   No.

Page 69

1         Q.   What did -- did you use any
2    keywords for your search or did you just
3    use "rivaroxaban" or something else?
4         A.   Actually, I just used
5    "rivaroxaban" to get the full -- well, I
6    think I put in "Xarelto" too, as well as
7    a -- as a keyword.  But that way it
8    just -- it's as broad as I could.  And
9    then I dated it from my previous search
10   so it would move forward from there.
11        Q.   So since October 14, 2016,
12   when you submitted your report in this
13   litigation, it's fair to say that you
14   haven't identified any new literature
15   that you're relying upon to support or
16   supplement your opinions?
17        A.   That is correct.  And if
18   there is anything that's out there that
19   I've somehow missed, hopefully I'll
20   eventually incorporate that.  And if it
21   makes me amend what I've said here, I'm
22   happy to read that and do that amendment.
23        Q.   And that's fine, but you'll
24   let us know if you do that?

18 (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1     A.   Of course.  Absolutely.
2     Q.   Sitting here today,
3  understanding you -- there may be things
4  that you're not aware of.  You're -- you
5  are -- there's nothing I need to know
6  about today that you haven't told us?
7     A.   I have no surprises for you,
8  I hope.
9        MR. DENTON:  Okay.  We're
10  finished, right?
11        MR. STEKLOFF:  No.  You said
12  you -- at this rate, we'll --
13  we'll -- we'll be here all day.
14        MR. DENTON:  I wouldn't
15  expect anything to be different.
16  BY MR. STEKLOFF:
17     Q.   You met with attorneys; is
18  that right?
19     A.   Yes, I did.
20     Q.   Okay.  Who did you meet
21  with?
22     A.   I met with Mr. Denton.  I
23  met with Mr. McWilliams.  I met with
24  Ms. Say.

Page 71

1        THE WITNESS:  And I forgot
2  your last name.
3        MS. DeVAUGHN:  DeVaughn.
4        THE WITNESS:  DeVaughn.  I'm
5  sorry.
6  BY MR. STEKLOFF:
7     Q.   When did you meet with those
8  attorneys to prepare for your deposition?
9     A.   I just met with them
10  yesterday.
11     Q.   How long was the meeting?
12     A.   About four hours.
13     Q.   When were you first
14  contacted to be potentially involved in
15  this litigation generally?
16     A.   Oh.  I -- I couldn't give
17  you the exact day.  I think it's probably
18  a year or more.
19     Q.   You testified at a science
20  day, right?
21     A.   Yes.
22     Q.   So it was obviously before
23  that?
24     A.   Yes.

Page 72

1     Q.   And I think that was in the
2  summer of 2015?
3     A.   That sounds -- that sounds
4  right.
5     Q.   Do you recall how long
6  before that approximately you were
7  contacted to be involved in the
8  litigation?
9     A.   I don't, but I don't think
10  it was that long.
11     Q.   Do you recall who first
12  contacted you?
13     A.   I don't.
14     Q.   Do you recall when you were
15  first contacted, what you were asked in
16  terms about your willingness or ability
17  to participate in litigation before you
18  were retained?
19     A.   I was asked if I would
20  review data on Xarelto.  And I told the
21  lawyer what I tell every lawyer, which is
22  that I will -- I'm happy to review the
23  data and come up with my own independent
24  assessment of what I think is going on

Page 73

1  and that may be contrary to what they
2  want.  And if that's okay with them, then
3  I'm happy to go ahead and assess things.
4  But if not, thank you, and we agree to
5  part company.
6     Q.   Have you submitted any
7  invoices to counsel to be paid for your
8  work thus far in the litigation?
9     A.   Yes.
10     Q.   Did you bring those with you
11  today?
12     A.   I -- I don't have them.
13  Everything that I have should be with the
14  lawyers.
15        MR. DENTON:  I'll check on
16  that.  We'll get that at a break.
17  I missed that in my whirlwind tour
18  of the universe.
19        MR. STEKLOFF:  No problem.
20        MR. DENTON:  But you're
21  entitled to those and we'll find
22  them.
23        MR. STEKLOFF:  I know you're
24  busy.  We'll skip over that and

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1    we'll come back after a break and
2    Mr. Denton can find those.
3  BY MR. STEKLOFF:
4    Q.  How many other --
5  actually -- so actually, if you look at
6  Exhibit 1, your report, in the back, I
7  think there are some appendix --
8  appendices.
9    So I want -- I want to look
10  at Appendix C, which has your fee
11  schedule and prior testimony.
12    A.  Yes.
13    Q.  Are those -- we'll come back
14  to how much you've invoiced thus far in
15  the litigation.
16    But are those fees still
17  accurate as of today?
18    A.  Yes, they are.
19    Q.  And below that you list the
20  litigation matters that you've testified
21  in, or -- or been retained in the past
22  four years.  Is that fair?
23    A.  Yes.
24    Q.  Have you actually -- have

Page 75

1  you been retained in any litigations in
2  which you have been designated as an
3  expert but haven't testified at a
4  deposition or trial in the last four
5  years?
6    A.  I'm not sure I understand
7  the question.
8    Q.  Sure.
9    Have you ever been retained
10  as an expert to -- to consult or offer
11  opinions or draft reports and then maybe
12  it just didn't get to the point of today
13  where you were -- never had to sit for a
14  deposition?
15    A.  Do you mean I've reviewed a
16  case, for example a medical malpractice
17  case for an attorney, and given them an
18  opinion but haven't been deposed?
19    Q.  Let's start with that, sure.
20  Have you done that in the last four
21  years?
22    A.  Yes.
23    Q.  Outside of the medical
24  malpractice context, have you been

Page 76

1  retained in any litigations in which you
2  have offered opinions to counsel who
3  retained you but never been deposed?
4    A.  I am not sure I understand
5  the question.
6    Q.  Sure.  And -- and you
7  understand here that the plaintiffs have
8  brought a lawsuit against two
9  pharmaceutical companies.  Is that fair?
10    A.  Yes.
11    Q.  Have -- let's start with
12  that specific question.
13    Are there other litigations
14  other than the ones listed here where
15  you've been retained to offer opinions,
16  for example, in similar litigation
17  against pharmaceutical companies but have
18  never had to sit for a deposition for one
19  reason or another?
20    A.  I see.  Am I allowed to --
21  there was -- there was one -- there was
22  one matter that was -- I don't know what
23  the final thing, but I was instructed to
24  destroy all my materials.

Page 77

1    Q.  Is that the Pradaxa --
2    A.  Am I allowed to --
3    MR. DENTON:  Harvey, you're
4  allowed to tell them generally
5  what you've been involved with.
6  You can't -- you cannot speak
7  about anything you learned from
8  that and any confidential
9  materials.  You have -- you're
10  still bound by that protective
11  order.  But I think it's fine for
12  you to say generally other
13  litigations that you've been
14  involved with, and maybe we'll
15  take it question by question and
16  see where it goes.
17    THE WITNESS:  Okay.  I'm
18  sorry.  I just -- I just wasn't
19  sure.
20    So I was retained to review
21  data on Pradaxa.
22  BY MR. STEKLOFF:
23    Q.  Did you ever -- let me
24  start -- did you draft a report in that

Protected - Subject to Further Protective Review

Page 78

1   litigation?
2           MR. DENTON:  Object to the
3       form.
4           THE WITNESS:  I never
5       finished my report at the -- at
6       the time that I was asked to --
7       instructed to destroy the report.
8   BY MR. STEKLOFF:
9       Q.   Without telling me what your
10  opinions were, did you reach opinions
11  about Pradaxa in that litigation?
12          MR. DENTON:  Object to the
13      form.
14          THE WITNESS:  I had not.  I
15      had not finished the report, and,
16      therefore, I did not have my
17      opinions completed.
18  BY MR. STEKLOFF:
19      Q.   In any respect?
20          MR. DENTON:  Object to form.
21      Asked and answered.
22  BY MR. STEKLOFF:
23      Q.   In other words, there was no
24  opinion -- and I don't want to know any

Page 79

1   of your opinions.  But you didn't come to
2   an opinion on, for example, the
3   therapeutic range of Pradaxa?
4           MR. DENTON:  Object to the
5       form.  I think that would, I
6       think, violate a confidentiality
7       rule.
8           MR. STEKLOFF:  I don't --
9       and just to be clear -- this is
10      more for Mr. Denton.  I'm not
11      trying to -- I'm trying to figure
12      out where the line is.  I'm not
13      trying to cross it.  And I'm
14      not -- so --
15          MR. DENTON:  I'm trying to
16      keep you in line.
17          THE WITNESS:  Do you want --
18      do you want --
19  BY MR. STEKLOFF:
20      Q.   I'm just asking for a simple
21  yes or no, and we'll see if Mr. Denton
22  will let you answer.
23          Did you come to a final
24  opinion about the therapeutic range of

Page 80

1   Pradaxa?
2           MR. DENTON:  Let me just
3       caution you.  Object to the form.
4       I think he's already asked and
5       answered that.  But if any of this
6       implicates any confidential
7       material you may have had
8       available to you, like company
9       documents, company data, then
10      you're not allowed to answer that
11      question because it would violate
12      the protective order in another
13      litigation.
14          MR. STEKLOFF:  I mean, I'm
15      not sure how saying yes or no,
16      without knowing what the opinion
17      is, would violate a
18      confidentiality or protective
19      order.
20          MR. DENTON:  I think it
21      does.  And if you would ask the
22      folks from Bayer, they would
23      agree.
24

Page 81

1   BY MR. STEKLOFF:
2       Q.   Can you answer that question
3   without saying --
4       A.   I think -- I think
5   because -- because there's data that I
6   did have as part of my consideration, I
7   am not comfortable answering that
8   question because I don't want to have a
9   federal judge angry at me.
10      Q.   And so just to try to ask
11  the general question so we can move on,
12  any question -- any topic that I ask you
13  about, even if I just wanted to know yes
14  or no did you come to a conclusion, you
15  wouldn't be able to answer because any
16  opinion that you started to form would
17  have been based on a review of company
18  documents.  Is that fair?
19          MR. DENTON:  Well, I object
20      to form and asked and answered.  I
21      believe the first answer you got
22      is he never reached any opinions
23      because they were in draft form.
24      But look, we have a deal on this.

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

1    I think you're crossing the line.
2    I'm trying to work with you so you
3    can get what you can get. But
4    he's answered that question. And
5    we're treading into a real serious
6    problem for me and for the witness
7    about a confidentiality order
8    that's in effect in a different
9    litigation that he cannot violate
10   and I cannot violate.
11   BY MR. STEKLOFF:
12       Q. Without considering any
13   confidential information that you may
14   have been privy to based on your work in
15   the Pradaxa litigation, do you have any
16   opinion, sitting here today, about
17   Pradaxa?
18       MR. DENTON: Object to form.
19       THE WITNESS: I can -- I
20   can -- I've considered Pradaxa
21   general literature that's
22   available to the public and to
23   physicians as part of my report.
24       So I would limit my opinions

Page 83

1    to what I've written in my report
2    that you have in front of you
3    today.
4    BY MR. STEKLOFF:
5        Q. And that's primarily where
6    you would look at observational studies
7    comparing some of the NOACs. Is that
8    fair?
9        A. That is part, but also
10   looking at nonobservational studies,
11   other trials, RE-LY, and other studies
12   that are publicly available. All of that
13   is -- I've read all of that data. So
14   that's all part of what I would be
15   considering and presented in this current
16   report.
17       Q. And going back to the --
18   actually to the 20-second cutoff in your
19   report with respect to Xarelto. If a
20   patient is discontinued from Xarelto,
21   what happens to the patient?
22       MR. DENTON: Object to the
23   broad nature of the question.
24       Object to form.

Page 84

1    BY MR. STEKLOFF:
2        Q. In other words, what --
3    I'll -- I'll phrase it differently.
4        MR. DENTON: Sorry.
5    BY MR. STEKLOFF:
6        Q. What is your recommendation
7    to a clinician who you're working with
8    who is treating a patient on Xarelto who
9    discontinues that patient because of in
10   part the 20-second cutoff?
11       MR. DENTON: Object to form.
12       THE WITNESS: It depends on
13   the context and situation of the
14   patient. There are just too many
15   variables. It could be anything.
16   There are just too many
17   hypotheticals there to give a
18   specific answer to that.
19   BY MR. STEKLOFF:
20       Q. So you don't -- you don't
21   have a specific recommendation for a
22   doctor who follows your opinion on Page
23   14 of your report and cuts off a patient
24   on Xarelto because of his or her PT of

Page 85

1    20 seconds or greater?
2        MR. DENTON: Object to form.
3    He's already answered.
4        THE WITNESS: I would -- if
5    I was working with a doctor on a
6    specific patient, I would work
7    with him on developing specific
8    recommendations for that patient
9    in the context of that individual
10   patient. I don't have a general
11   recommendation that I just throw
12   out there.
13   BY MR. STEKLOFF:
14       Q. Is it likely that patient
15   might have to use another anticoagulant?
16       MR. DENTON: Object to the
17   form. Asked and answered.
18       THE WITNESS: It depends on
19   the situation.
20   BY MR. STEKLOFF:
21       Q. Do you know the therapeutic
22   range of any of the other NOACs?
23       MR. DENTON: Object to the
24   form.

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1    THE WITNESS: It depends,
2    again, on the NOAC. It depends on
3    the patient. It depends on the
4    indication.
5    BY MR. STEKLOFF:
6    Q.   For atrial fibrillation, do
7    you know the therapeutic range of
8    Xarelto?
9    MR. DENTON: Object to the
10    form.
11    THE WITNESS: I have not
12    seen -- I have not seen data from
13    the publications or from any
14    internal documents that give me a
15    therapeutic index for Xarelto for
16    atrial fibrillation, neither a
17    minimal, nor a maximal point. I
18    would like to have that data. I
19    have physicians asking me for that
20    data all the time. But I'm not
21    aware that that data is publicly
22    available.
23    BY MR. STEKLOFF:
24    Q.   You think there should be

Page 87

1    more testing?
2    MR. DENTON: Object to the
3    form.
4    THE WITNESS: I always like
5    to have more testing and more
6    data. If the data is available, I
7    would like to have that.
8    If more testing is needed,
9    I'm always in favor of more
10    testing. But that doesn't mean
11    that I don't have opinions at this
12    point in time.
13    BY MR. STEKLOFF:
14    Q.   Well, you've been given
15    access to all of the ROCKET data, right?
16    A.   I have had access to all of
17    the data.
18    Q.   And you're not suggesting
19    that there's some sort of secret data
20    that Bayer and Janssen maintained that
21    you haven't had access to, right?
22    MR. DENTON: Object to the
23    form.
24    THE WITNESS: I have no idea

Page 88

1    as to -- I have no idea as to what
2    data is available from the
3    company. I don't know if it
4    hasn't been developed or is in
5    process. All I know is I was
6    given everything that I asked for.
7    BY MR. STEKLOFF:
8    Q.   Including all of the ROCKET
9    data?
10    MR. DENTON: Object to the
11    form.
12    THE WITNESS: That is
13    correct.
14    BY MR. STEKLOFF:
15    Q.   And having all of that data,
16    you don't know the therapeutic range of
17    Xarelto for patients with atrial
18    fibrillation, correct?
19    MR. DENTON: Object to the
20    form. Asked and answered.
21    THE WITNESS: I did not see
22    the data used by the company in
23    such a way as to devise a
24    therapeutic range.

Page 89

1    BY MR. STEKLOFF:
2    Q.   Do you know the therapeutic
3    range of Eliquis for patients who have
4    atrial fibrillation?
5    MR. DENTON: Object to form.
6    THE WITNESS: I do not
7    believe that that data has been
8    developed for monitoring as well.
9    BY MR. STEKLOFF:
10    Q.   Is that true of the other
11    NOACs as well?
12    MR. DENTON: Object to form.
13    THE WITNESS: No, that is
14    not true.
15    BY MR. STEKLOFF:
16    Q.   So break it down. Do you
17    know the therapeutic range of Pradaxa for
18    patients who have atrial fibrillation?
19    A.   I think that some of that
20    data is confidential.
21    MR. DENTON: It may be. I
22    think some of it is published and
23    some of it is confidential. I
24    don't know how you separate it.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 90

```
 1          THE WITNESS:  I don't know.
 2          MR. DENTON:  You can talk
 3     about anything that you know from
 4     a public source.  You can't talk
 5     about anything from the
 6     confidential documents.  If
 7     somehow you can fashion an answer
 8     that takes those competing
 9     interests into account, please
10     answer the question.
11          THE WITNESS:  I'm trying to
12     think if I can parse that out.
13     I'm sorry.  I'm not -- I don't
14     think I can parse that out,
15     because it is a mix of data that
16     is both public, but having read
17     the confidential things, I'm
18     interpreting it in a different
19     way.  I apologize.  I don't think
20     that I can parse that out without
21     using confidential data that would
22     violate that order.
23 BY MR. STEKLOFF:
24     Q.   What about Savaysa?
```

Page 91

```
 1          MR. DENTON:  Object to form.
 2 BY MR. STEKLOFF:
 3     Q.   Do you understand my
 4     question?
 5     A.   I do.  I do.  I don't think
 6     we've had enough experience with that to
 7     know that.
 8     Q.   Do you -- put aside Pradaxa
 9     for the moment.  Eliquis and Savaysa, do
10     you have an opinion about what a
11     reasonable and conservative cut-off point
12     would be with respect to PT for those
13     medications?
14          MR. DENTON:  Object to form.
15          THE WITNESS:  I have not
16     done a complete and wide enough
17     literature search to begin to make
18     that formulation.
19          So there may be, but I've
20     not done enough of the literature
21     and review to state that.
22 BY MR. STEKLOFF:
23     Q.   And I will let you follow
24     what I'm sure Mr. Denton will advise you,
```

Page 92

```
 1     if you can separate what you know from
 2     confidential information from public
 3     information, I'm going to ask this
 4     question.  If you can't, I understand.
 5     Say you can't.
 6          But do you have -- are
 7     you -- do you have an opinion with
 8     respect to Pradaxa about what the
 9     reasonable and conservative cutoff should
10     be for PT at which the risks outweigh the
11     benefits?
12          MR. DENTON:  Object to the
13     form.  Apparently, you haven't
14     read the Pradaxa literature.  It's
15     not PT.
16          THE WITNESS:  I think
17     regardless of what you're using
18     for monitoring of Pradaxa, and
19     there are several ways to do that,
20     I -- I don't think I can parse out
21     what's publicly available versus
22     what I know from confidential
23     documents in terms of making my
24     opinions about that.  So I -- I
```

Page 93

```
 1     respectfully decline.
 2 BY MR. STEKLOFF:
 3     Q.   I'm not asking you to
 4     violate any court orders.
 5     A.   Right.  I complete -- I
 6     completely understand that, and I
 7     appreciate your forbearance.
 8          MR. STEKLOFF:  Why don't we
 9     take a break.  We've been going an
10     hour and 15 minutes.  So we'll go
11     off the record.
12          THE VIDEOGRAPHER:  All
13     right.  The time is 9:23 a.m.
14          We are going off the record.
15          (Short break.)
16          THE VIDEOGRAPHER:  The time
17     is 9:37 a.m.  We are back on the
18     record.
19 BY MR. STEKLOFF:
20     Q.   Doctor, I want to follow up
21     about Pradaxa.  I don't want any
22     confidential information.
23          Is it fair to say that any
24     opinions you would offer in this
```

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

1   litigation about Pradaxa are informed in
2   part from the review of materials that
3   you were given access to during the
4   Pradaxa litigation?
5            MR. DENTON:  I object to the
6       form of the question.  I believe
7       it depends on the opinion you're
8       asking.
9            THE WITNESS:  The aspect
10      of -- the aspects of this report
11      that include or are related to
12      Pradaxa are solely based on
13      literature publications and
14      publicly available data that is
15      out on Pradaxa, so that any
16      clinician, anyone with PubMed
17      ability could search for those.
18          So everything that I am
19      either relating in this or would
20      be related to this would be
21      publicly available and would be
22      limited to that information.
23   BY MR. STEKLOFF:
24      Q.   So is it fair to say that

Page 95

1   you haven't disclosed any confidential
2   information about Pradaxa in your report?
3       A.   I have not disclosed any
4   information, nor have I used any
5   information that was available to me in
6   my preparation of this report.
7       Q.   But any opinion you have
8   about the safety and efficacy of Xarelto
9   compared to the safety and efficacy of
10  Pradaxa is impacted by your confidential
11  opinions about Pradaxa.  Isn't that fair?
12           MR. DENTON:  Object to the
13      form.  Asked and answered.
14           THE WITNESS:  No, I would --
15      I would not agree with that.  What
16      I'm saying is that the data that I
17      have used in this report that I
18      have written about Pradaxa in
19      relation to Xarelto, warfarin,
20      Eliquis, all of that data is
21      solely coming from and originating
22      from publicly available data.
23          None of that data is from a
24      confidential source or is related

Page 96

1   to any confidential --
2       confidential information that I
3       may have had access to in the
4       past.
5   BY MR. STEKLOFF:
6       Q.   But you agree, I can't ask
7   you how the therapeutic range of Pradaxa
8   compares to the therapeutic range of
9   Xarelto, because that would require you
10  to invoke confidential information,
11  correct?
12           MR. DENTON:  Object to the
13      form.
14           THE WITNESS:  First of all,
15      I'm not aware of anything that
16      I've written in here about
17      therapeutic range of Pradaxa.  So
18      that's not -- that's not contained
19      here, and that's not part of my
20      evaluation in this report related
21      to Pradaxa.
22          What you were asking me
23      before was very specific about did
24      I know the therapeutic range of

Page 97

1   Pradaxa in terms of laboratory
2   monitoring.
3          And that information, which
4       I'm not using in this report or in
5       the comparison that I've written
6       about in this report, that
7       information is impacted by that
8       confidential information.
9   BY MR. STEKLOFF:
10      Q.   Do you agree that the safety
11  profile of Pradaxa, your opinions about
12  the safety profile of Pradaxa, are
13  impacted by the confidential information
14  that you were given access to in that
15  litigation?
16           MR. DENTON:  Object to the
17      form of the question.  Asked and
18      answered.
19           THE WITNESS:  Again, in this
20      report, the profile of efficacy
21      and safety that I've limited
22      myself to in this report is
23      entirely coming from
24      nonconfidential, publicly

Protected - Subject to Further Protective Review

Page 98

1    available literature reports.  And
2    I am not using any of that data in
3    this report in comparison with any
4    of the other drugs.
5    BY MR. STEKLOFF:
6        Q.   I understand that.  But I
7    can never ask you your full opinions
8    about the safety profile of Pradaxa
9    compared to the safety profile of Xarelto
10   because you would have to invoke
11   confidential information to opine on
12   that, right?
13           MR. DENTON:  I object to the
14       form.  Asked and answered.  And I
15       think you're treading on
16       attempting to get around the
17       agreement the parties had with
18       respect to Pradaxa.
19           But this is the last time
20       he's going to try to answer the
21       same question.  You can try one
22       more time, Harv.  After that,
23       we're moving on.
24

Page 99

1    BY MR. STEKLOFF:
2        Q.   I just --
3        A.   I'm happy to try to answer
4    any question that you may have.
5            What I'm -- what I'm saying
6    is that the prior questions that you
7    asked me related to the therapeutic range
8    of Pradaxa and monitoring, which I have
9    not discussed in this report in any way,
10   shape, or form, are partly informed by
11   confidential information.
12           The data that I have looked
13   at to inform this report relative to
14   Pradaxa in its entirety in this report do
15   not have any information coming from a
16   confidential source as part of my -- in
17   forming my opinion that I've written
18   here.  I don't know any other way to say
19   that other than that -- other than that.
20       Q.   Can you say whether Pradaxa
21   would be a safer medication for any
22   individual patient as compared to Xarelto
23   without having to disclose confidential
24   information?

Page 100

1            MR. DENTON:  Object to form.
2        Asked and answered.
3            THE WITNESS:  I think
4        that -- I think that I can give --
5        the way that I've written in the
6        report, I can give some general
7        opinions related to the literature
8        that is publicly available on the
9        safety and efficacy of Pradaxa
10       that is limited to those publicly
11       available published reports.
12           If you want to give me -- if
13       you -- when I'm working with
14       patients, I would use the same
15       type of publicly available, known
16       literature to try to make
17       decisions as to what might be the
18       best practice for that patient in
19       terms of their anticoagulation.
20   BY MR. STEKLOFF:
21       Q.   So one last question and I'm
22   hopefully going to move on.
23           Is it fair to say that at
24   trial, if we wanted to ask you any

Page 101

1    questions about the profile of Xarelto
2    compared to the profile of Xarelto, you
3    would really be constrained by what's in
4    your report and it would be difficult for
5    you to go beyond that because that would
6    start to potentially invoke confidential
7    information?
8            MR. DENTON:  I have to say I
9        object to the form.  That might be
10       the worst one of them.  But do
11       your best if you understand it.
12           It's also asked and answered
13       to the extent that I understand
14       the question.
15           THE WITNESS:  I would do my
16       best -- if at trial and you asked
17       me a question related to
18       rivaroxaban and Pradaxa, I would
19       do my best to answer that question
20       based on public -- publicly
21       available information that would
22       be available to any physician or
23       anyone that looked at that.
24           If there was -- if that

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

```
 1      question, in my poor understanding
 2      of legalese, somehow was worrisome
 3      that it might be not allowed under
 4      that judge's ruling, I would ask
 5      for -- I would ask for help from
 6      the judge, or I would basically
 7      say I'm concerned that it's --
 8      that that would be imposing that.
 9          But I would do my best --
10      excuse me. I would do my best to
11      answer the -- every question that
12      you gave to me and especially if I
13      could base it purely on what is
14      publicly available.
15          But if the questions were
16      so -- are -- were directed at
17      something where the confidential
18      information was very important to
19      that, then I would be honest and
20      say that that's something that I
21      couldn't really answer.
22      BY MR. STEKLOFF:
23          Q.   And that's all that we
24      ask -- we -- we understand that.
```

Page 103

```
 1          A.   Oh, okay. All right.
 2          Q.   But you agree that you have
 3      a deeper knowledge of Pradaxa than is in
 4      this report based on the confidential
 5      information you were given, right?
 6          MR. DENTON: Object to the
 7      form.
 8          What do you mean by "deeper
 9      knowledge"?
10          THE WITNESS: I would -- I
11      would say that I would -- I would
12      say that my knowledge of certain
13      limited aspects of Pradaxa may be
14      partly informed by confidential
15      information.
16      BY MR. STEKLOFF:
17          Q.   Including the safety profile
18      of Pradaxa, right?
19          MR. DENTON: Object to the
20      form. You've asked this, I know,
21      12 times. I object. You're going
22      to have to move on. You're
23      badgering the witness just like I
24      read in Dr. Winstead's deposition
```

Page 104

```
 1      a few days ago. You've got to
 2      move on after you get answers to
 3      questions. You can't keep asking
 4      it multiple times hoping for a
 5      different answer.
 6          THE WITNESS: You have to
 7      ask the question again. I'm
 8      sorry.
 9      BY MR. STEKLOFF:
10          Q.   Including the safety profile
11      of Pradaxa, right?
12          MR. DENTON: Object to the
13      form of the question.
14          You can answer.
15          THE WITNESS: I'm sorry.
16      BY MR. STEKLOFF:
17          Q.   Well, your last answer was,
18      "I would say that my knowledge of certain
19      limited aspects of Pradaxa may be partly
20      informed by confidential information."
21          And then I said, "Including
22      the safety profile of Pradaxa," right?
23          MR. DENTON: And I said,
24      "Objection. Asked and answered 12
```

Page 105

```
 1      times."
 2          THE WITNESS: And I would
 3      say, depending on the specific
 4      question that you asked me and
 5      whether that was based on public
 6      information or information
 7      where -- confidential information
 8      would -- would hold sway.
 9      BY MR. STEKLOFF:
10          Q.   I'm going to hand you your
11      CV, which we'll mark as Exhibit 3.
12          A.   Thank you.
13          (Document marked for
14      identification as Exhibit
15      Rinder-3.)
16      BY MR. STEKLOFF:
17          Q.   Is this a -- well, first of
18      all, this is your CV as of October 9,
19      2016. Is that fair, Dr. Rinder, if you
20      look on the front page.
21          A.   Yes. I -- I just want to
22      check on a couple things.
23          Q.   Yeah, my first questions
24      are, have there been any material changes
```

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1    since October 9, 2016?
2        A.   No -- no -- no material
3    changes to the CV, no.
4        Q.   And you began your medical
5    education at the University of
6    Pennsylvania; is that correct?
7        A.   Yes, I did.
8        Q.   You transferred to the
9    University of Vermont; is that correct?
10       A.   Yes.  After my first year.
11       Q.   Why was that?
12       A.   Well, my -- my soon-to-be
13   wife and I were a year apart in our
14   educational, so I was a year older than
15   her.  And so I -- when I was accepted
16   into medical schools, I was looking at
17   University of Chicago and University of
18   Pennsylvania.  And I knew that University
19   of Pennsylvania had the identical
20   curriculum as the University of Vermont
21   where my wife is from and is a state
22   resident.  So I chose Penn as my -- for
23   my first year.  And then, luckily as
24   planned, my wife, who was also applying

Page 107

1    to medical school, applied to her state
2    school, University of Vermont and was
3    accepted.
4        So because we have the exact
5    same curriculum, I was able to apply to
6    University of Vermont to transfer from
7    Penn at the end of my first year.  And so
8    I just stepped into the -- the same
9    curriculum at University of Vermont and
10   continued my medical education at
11   Vermont.
12       Q.   So it was understandably to
13   be in the same medical school as your
14   wife?
15       A.   Well, we figured if we were
16   getting married, it would be nice to be
17   within the same, you know, winter
18   latitude.
19       Q.   Was -- but it wasn't for
20   financial reasons, right?
21       A.   Well, I have to say it was
22   certainly more affordable for us to
23   afford to Vermont.  We would have been in
24   much more debt if we had both tried to go

Page 108

1    to Penn.
2        Q.   When did you start focusing,
3    if at all, on hematology in your medical
4    education?
5        A.   I would say that my interest
6    in hematology began in my second --
7    excuse me -- in my second year of medical
8    residency training in internal medicine.
9        Q.   And just -- so I'm following
10   along, what year would that be?
11       A.   So -- so I started my
12   medical training in 1984 to '85 as an
13   intern.  And then I was a -- a junior and
14   senior assistant resident from 1985 to
15   1987.
16       So I -- I would say sometime
17   in that period between 1985 and 1987 was
18   when I began to develop my interest in
19   hematology.
20       Q.   And what were you doing when
21   you were a cytometry fellow at the Maine
22   Cytometry Research Institute?
23       A.   So that was -- that was
24   occurring simultaneous with -- with being

Page 109

1    the chief medical resident at Maine
2    Medical Center.  And in -- in Portland,
3    there is also a research facility that's
4    been associated with Maine Medical Center
5    Health for many years.  And the -- the
6    cytometry research institute is the basic
7    venue by which research gets done in that
8    area.
9        And so by working as a
10   cytometry fellow, I began to learn
11   specific research techniques, and start
12   to interact with people who were doing
13   research as their primary work rather
14   than only working with clinical faculty.
15       Q.   At some point did you become
16   board-certified in hematology?
17       A.   I did.
18       Q.   Did that certification
19   expire?
20       A.   It did.
21       Q.   When was that?  Do you
22   recall?
23       A.   I think it expired in
24   December of 2000.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 110

1    Q.   And why did you let that
2  certification expire?
3    A.   At the time I was
4  board-certified in internal medicine,
5  hematology, and clinical pathology.  And
6  trying to maintain three separate boards
7  was just too much work.  And I
8  determined, in consultation with my
9  faculty mentors, that -- and that -- and
10  with others, that that would not change
11  my practice at Yale or, frankly,
12  anywhere.  And so I allowed that to
13  lapse, but I maintained my boards in
14  internal medicine and clinical pathology.
15    Q.   So I want to ask you now
16  about your clinical practice.  And let's
17  start today.
18    A.   Sure.
19    Q.   Can you describe generally
20  your clinical practice today?
21    A.   So my clinical practice is
22  probably about at least 75 percent of my
23  time.  My clinical practice is related to
24  hematology.  So it is the care of

Page 111

1  patients with primary hematologic
2  disorders.  The care of patients with
3  other disorders where hematologic
4  complications or hematologic issues are
5  part and parcel of those primary
6  disorders.  It's the care of patients who
7  have other disorders where hematologic
8  complications may result.
9        And it's all aspects of
10  hematology.  Diagnosis, therapy,
11  management, and the -- and that's all
12  pretty much related in a -- wrapped
13  around the aspect of the hematologic
14  disorder.
15    Q.   What constitutes the other
16  20 -- approximately 25 percent of your
17  practice?
18    A.   So the other 20 -- 20 to
19  25 percent is, there's administrative
20  duties, there's research, there's
21  teaching.  That pretty much -- I think
22  that pretty much constitutes it.
23    Q.   What percentage of your work
24  relates to expert work in litigation?

Page 112

1    A.   Well, in my routine hours at
2  Yale, it's none.  And at Yale we are
3  limited to 10 percent of our total effort
4  to be outside of things that are for
5  Yale.
6    Q.   And is total effort measured
7  in financial terms or other terms?
8    A.   It's measured as hours.
9    Q.   Can you estimate what
10  percentage of your income in the last
11  five years has been related to expert
12  work in litigation?
13    A.   I don't have a -- I don't
14  have an estimate of that.
15    Q.   Not even rough?
16    A.   No.
17        MR. STEKLOFF:  Roger, were
18    you able to pull the invoices, by
19    any chance?
20        MR. DENTON:  Laura is trying
21    to find them.
22        MR. STEKLOFF:  We'll come
23    back to that.
24        MR. DENTON:  We will get

Page 113

1  them.
2        MR. STEKLOFF:  I understand.
3        MR. DENTON:  Hopefully by
4    noon.
5        MR. STEKLOFF:  Okay.
6        MR. DENTON:  They get
7    shipped off to New Orleans mother
8    ship and get paid, and then we've
9    got to get them back from the
10    mother ship to New York City.  And
11    we're somewhere in between there,
12    trying to figure this out.  And I
13    apologize for not doing it
14    yesterday.
15        MR. STEKLOFF:  It is no
16    problem.
17  BY MR. STEKLOFF:
18    Q.   You mentioned earlier that
19  you play, I believe -- I'll withdraw
20  that.
21        You mentioned earlier that
22  you -- your clinical practice is focused
23  on a consulting capacity; is that right?
24    A.   So at Yale there are

Protected - Subject to Further Protective Review

Page 114

1   multiple ways that physicians work with
2   patients. My area is primarily
3   consultative.
4           So I used to have a clinic
5   where I saw patients. Now I let the
6   younger faculty handle the clinic, and
7   I'm available to them mostly for
8   consultative work, inpatients,
9   outpatients, clinic patients, management,
10  and that's my practice right now, is
11  almost entirely consultative.
12       Q.   How long -- and that's the
13  75 percent of your practice that's
14  clinical care?
15       A.   Right.
16       Q.   How long has that been the
17  case, approximately?
18       A.   Probably about the last
19  three years.
20       Q.   And so what was different
21  about it approximately three years ago?
22       A.   Well, over time, as I got
23  more and more senior, the number of weeks
24  that I was on clinical service as the

Page 115

1   primary or taking care of patients in
2   clinic gradually declined as I became
3   more senior at Yale.
4       Q.   In what time frame did you
5   have a more direct patient management
6   role in terms of running a clinic or
7   seeing patients directly in a clinic in a
8   nonconsultative fashion?
9       A.   Oh, the first 20 or more
10  years of my practice.
11       Q.   When did that end,
12  approximately?
13       A.   It didn't really end. It
14  just sort of gradually morphed into more
15  of a consultative position.
16       Q.   Would you say that you've
17  been in more of a consultative position
18  since about 1999 or 2000?
19           MR. DENTON:  Object to the
20  form.
21           THE WITNESS:  I can't really
22  say. I don't know. There was no
23  real endpoint. It's just
24  gradually changed to becoming more

Page 116

1   senior and working with the
2   primary physicians and the younger
3   faculty as more of a looking over
4   their shoulder as opposed to being
5   the person that goes to the
6   emergency department.
7   BY MR. STEKLOFF:
8       Q.   What are the indications for
9   which Xarelto is approved? Do you know?
10       A.   Sure. They're in my report.
11       Q.   Okay.
12       A.   So in the United States --
13       Q.   I'm focused on the United
14  States.
15       A.   Okay. It's approved for
16  prophylaxis with orthopedic surgeries,
17  like hip and knee replacement. It's
18  approved for nonvalvular atrial
19  fibrillation. And it is also approved
20  for the treatment, as opposed to the
21  prophylaxis, of venous thromboembolism.
22       Q.   And what percentage of your
23  clinical practice today and over the last
24  five years involves treatment of patients

Page 117

1   who are suffering from one of those
2   conditions?
3           MR. DENTON:  Object to the
4   form.
5   BY MR. STEKLOFF:
6       Q.   Approximately?
7       A.   Oh, I would say at least
8   half.
9       Q.   And what about Afib
10  specifically?
11       A.   Afib tends to be treated
12  more -- in our institution, Afib tends to
13  be treated more primarily by the
14  cardiology services.
15           Those are their patients
16  because they have atrial fibrillation and
17  other cardiac disorders, and so that
18  tends to be their primaries.
19           But we do consult on their
20  patients and help them with management
21  when they feel that it's necessary to get
22  hematology involved.
23       Q.   You're not a cardiologist?
24       A.   So in my medical training, I

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1   spent many, many months on cardiology. I
2   did many, many cardiology procedures. I
3   work with cardiologists all the time. Am
4   I board-certified or did a fellowship in
5   cardiology? To the latter two, the
6   answer is no.
7       Q.   And how often -- you just
8   testified where there are times when the
9   cardiologists who are the primary
10  providers for patients with Afib might
11  consult with the hematology department.
12  How often does that happen?
13      A.   You mean -- you mean as a
14  percentage of --
15      Q.   I mean, let's say, as of --
16  whatever is easiest for you. On a
17  monthly basis, can you estimate how many
18  patients who are being treated by a
19  cardiologist for atrial fibrillation come
20  to you for a consult?
21      A.   I can't really give you an
22  estimate in terms of percentage. All I
23  know is we -- it's a common enough
24  problem that we have such patients in

Page 119

1   our -- in our practice, in our
2   consultations, and in our case management
3   reviews all the time.
4       I can't tell you -- I can't
5   give you numbers. I'd rather not
6   speculate.
7       Q.   And I'm not -- I don't want
8   you to speculate. I also don't need a
9   percentage. I mean, is it five patients
10  a month, ten patients a month, 50
11  patients a month, 100 patients a month?
12  Is there any way to estimate?
13      MR. DENTON: Object to the
14  form. Asked and answered.
15      THE WITNESS: I really
16  can't.
17  BY MR. STEKLOFF:
18      Q.   Okay. Have you ever
19  prescribed warfarin to a patient?
20      A.   Have I ever in my entire
21  time since I was a medical doctor and
22  able to prescribe?
23      Q.   Yes.
24      A.   Yes, I have.

Page 120

1       Q.   How many times
2   approximately, if you can estimate?
3       A.   I can't.
4       Q.   In what time frame did that
5   happen?
6       A.   I would say -- I mean, I
7   know that I began prescribing in 1984
8   when I got my medical degree. I would
9   say it probably started sometime around
10  then. And I would just be guessing; I
11  don't know the last time that I was a
12  primary prescriber of warfarin.
13      Q.   Do you think it's been in
14  the last five years?
15      A.   I can't say.
16      Q.   Do you think it's been in
17  the last ten years?
18      A.   I can't say.
19      Q.   Have you prescribed warfarin
20  since any of the NOACs have been on the
21  market?
22      A.   I just don't recall.
23      Q.   Have you ever prescribed a
24  NOAC?

Page 121

1       MR. DENTON: Object to the
2   form.
3       THE WITNESS: No, I don't
4   think that I have ever been a
5   primary prescriber for the NOAC.
6   BY MR. STEKLOFF:
7       Q.   When you are consulting a
8   patient who is -- I'll withdraw that.
9       All the questions that I'm
10  asking now are in your consultation role,
11  so I understand -- just so we're on the
12  same page, if that's okay.
13      A.   Of course.
14      Q.   So when you are treating a
15  patient in a consultative role who is
16  taking Xarelto, have you ever
17  specifically told that patient that he or
18  she needs to go have a PT test?
19      MR. DENTON: Object to the
20  form of the question.
21      THE WITNESS: So in my
22  consultative role working with the
23  physician, and we'll -- again, if
24  we can agree I'm not speaking by

Protected - Subject to Further Protective Review

Page 122

1    myself to the patient.  I'm
2    working with the team to take care
3    of that patient.
4         We have -- we have had
5    occasion where we have looked to
6    attempt to monitor the Xarelto
7    activity in patients.  And have
8    tried our best to use,
9    unfortunately, a non-Neoplastine
10   PT to make an estimate of where we
11   think that patient's activity of
12   Xarelto was.
13   BY MR. STEKLOFF:
14        Q.   How many times do you think
15   that that -- you have undergone that
16   process with a patient?
17        MR. DENTON:  Object to the
18   form.
19        THE WITNESS:  I can't -- I
20   can't give you a number for that.
21   BY MR. STEKLOFF:
22        Q.   More or less than 100?
23        MR. DENTON:  Object to form.
24   Asked and answered.

Page 123

1         THE WITNESS:  I don't have
2    an exact -- I would rather give
3    you an exact number if I had it
4    rather than just to speculate.
5    BY MR. STEKLOFF:
6         Q.   I mean, you can't tell me
7    anywhere between five patients and a
8    thousand patients, a ballpark estimate of
9    how many times that you've had that sort
10   of consultative role?
11        MR. DENTON:  Object to the
12   form of the question.
13        THE WITNESS:  No, I can't.
14   BY MR. STEKLOFF:
15        Q.   More than five?
16        MR. DENTON:  He said he
17   can't answer it.  Move on.
18        MR. STEKLOFF:  It's absurd.
19   I'm going to ask the question.
20        MR. DENTON:  Don't call his
21   answers absurd.  You can ask
22   questions.  I'll object.  The word
23   "absurd" does not happen today
24   directed to my witness's answers.

Page 124

1    BY MR. STEKLOFF:
2         Q.   More than once?
3         A.   I would prefer to give you
4    an exact number.
5         Q.   You said that it's
6    unfortunate that you've -- I -- I believe
7    you said, but I want to clarify, that
8    you -- it's unfortunate that you've had
9    to use a non-Neoplastine reagent; is that
10   correct?
11        A.   If -- I don't remember my
12   exact wording, but I would -- I would
13   prefer to have a Neoplastine or
14   Neoplastine-like reagent to be able to
15   monitor Xarelto.
16        Q.   Is Neoplastine available to
17   you at Yale?
18        A.   Currently it is not.
19        Q.   Do you know why that is?
20        A.   Well, there are multiple
21   reasons why.  One is that I can't just
22   snap my fingers and make Neoplastine PT
23   available.  I have a process that I have
24   to go through, including the laboratory

Page 125

1    formulary, a business plan, management,
2    clinical, the -- all the clinical
3    services that would be required to go
4    through that.  And that is something
5    that -- that we do all the time when we
6    are considering adding tests for clinical
7    care.
8         But right now we are
9    hampered because we don't have -- we
10   don't have -- it's very difficult for me
11   to bring something to the formulary if it
12   is not something that is in a guideline
13   or from the FDA or the FDA has included
14   that data as something that would be
15   preferable for patients.
16        So that is a significant
17   barrier to us bringing the Neoplastine
18   on, because I can't come to the formulary
19   and say, look, this data has been
20   included, and, therefore, we need to have
21   that.
22        And in addition, when I go
23   to them with a business plan, they are
24   going to ask me if I can get

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1 reimbursement for this. And, again,
2 without that data being officially
3 available in some form, I'm not sure that
4 I can get third-party payers to take care
5 of that.
6 So even though I would like
7 to have it, and we are working on that,
8 there are barriers. And I hope that
9 answers your question as to why we don't
10 have it.
11 Q. It does, but I might ask a
12 couple follow-up questions.
13 Have you taken -- I think
14 you mentioned four steps. Going to the
15 lab, formulary, a business plan, going to
16 management, and going to clinical
17 services; is that...
18 A. I think that fairly well --
19 I'm probably leaving something out by
20 someone else that has to rubber-stamp or
21 approve something. But I think that
22 pretty much covers the waterfront.
23 Q. And have you taken steps,
24 any of those steps, at your institution

Page 127

1 to try to gain access to Neoplastine
2 specifically?
3 A. So we have -- we have
4 started -- we have started the process
5 and have begun talking with our clinical
6 counter -- with our clinical colleagues
7 to discuss this with them and to start
8 marshalling their support and their
9 understanding of what would be needed.
10 We have started to look into
11 the testing itself, but have not yet made
12 a formal application to the laboratory
13 formulary.
14 As part of looking at the
15 test itself, we've also started to gather
16 data on costs, reagents, instrumentation,
17 et cetera. But that has not made it to
18 the -- to the state of a -- of a formal
19 business plan as yet.
20 Q. When did that process start?
21 A. I would say probably
22 about -- I'm trying to think. Maybe two
23 years ago. Something on that order.
24 Q. And thus far -- I'll

Page 128

1 withdraw that.
2 When you say "we" -- in your
3 answer, you're saying, "We have started
4 this process." Who -- who -- who
5 constitutes the "we"?
6 A. Well, the "we" is me and my
7 colleagues at -- at Yale.
8 Q. And are there specific
9 colleagues or is there a specific
10 department that's included in that?
11 A. It's -- it's more general.
12 We get a lot of requests for
13 understanding monitoring and for trying
14 to get an understanding of the physiology
15 of drugs.
16 And so it's a large group.
17 There's no one person that I can cite.
18 Q. When you say you get a lot
19 of requests for understanding monitoring
20 and trying to understand the
21 physiology -- physiology of drugs, is
22 that NOAC specific or that's just in
23 general?
24 A. It's both.

Page 129

1 Q. And I think you said one of
2 the challenges you face is that there's
3 no specific guideline or anything from
4 the FDA saying that Neoplastine should be
5 used for this monitoring purpose. Is
6 that fair?
7 MR. DENTON: Object to the
8 form.
9 THE WITNESS: I think that
10 those are barriers to us getting
11 monitoring set up.
12 BY MR. STEKLOFF:
13 Q. So we can agree that there
14 is no specific guideline or FDA
15 recommendation to use Neoplastine for
16 monitoring patients who are taking
17 Xarelto?
18 MR. DENTON: Object to form.
19 THE WITNESS: The data
20 regarding Neoplastine monitoring
21 is -- I believe is available, but
22 I'm not sure that it is -- reaches
23 a level of -- I think it was --
24 I'm trying to be accurate here.

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

```
1           I think that the FDA
2     considered that data.  I think
3     that there may even have been
4     recommendations to use that data,
5     but I am not aware that that data
6     is in the final documents that --
7     that come from the FDA on Xarelto.
8  BY MR. STEKLOFF:
9     Q.   There's no final
10 recommendation from the FDA or formal
11 recommendation from the FDA for
12 clinicians treating patients who are
13 taking Xarelto to use Neoplastine to
14 monitor drug concentration?
15          MR. DENTON:  Object to the
16     form of the question.
17          THE WITNESS:  Unfortunately,
18     no, there is not.
19 BY MR. STEKLOFF:
20     Q.   And there's also no
21 guideline from any public health
22 organization or group of scientists?
23          MR. DENTON:  Wait a minute.
24     We -- I object.  We talked about
```

Page 131

```
1     that an hour ago, but object to
2     the form.
3          MR. STEKLOFF:  We're now
4     talking about Neoplastine, so --
5          MR. DENTON:  Well, now wait
6     a minute.  You said we were
7     talking about Neoplastine all
8     morning, if you're referring to
9     PT.  So now you're telling me that
10     deal wasn't part of this?
11          MR. STEKLOFF:  We were
12     talking about that.  I'm now
13     asking specifically there's no
14     recommend --
15 BY MR. STEKLOFF:
16     Q.   We were talking about a
17 20-second cutoff before.  Now, I'm asking
18 a different question, which is,
19 regardless of any sort of cutoff, there
20 is no recommendation from a public health
21 organization or any other group of
22 scientists who recommend that Neoplastine
23 be used to monitor patients being --
24 taking Xarelto; is that correct?
```

Page 132

```
1           MR. DENTON:  I object to the
2     form.
3          THE WITNESS:  There are --
4     there are scientists who have
5     noted the data related to Xarelto
6     and its ability to be monitored by
7     activity, by the prothrombin time,
8     specifically with Neoplastine and
9     with other reagents.
10          And, as I said before, the
11     ISTH and the British committee on
12     standards have made publications
13     that relate to the ability to
14     monitor.
15          And I believe there are also
16     publications from within Bayer
17     from their own clinical
18     pharmacologists who have stated
19     that the ability to monitor
20     Xarelto activity with a
21     prothrombin time, and I believe
22     they used Neoplastine in those
23     studies, that that would be a
24     valid and clinically useful.
```

Page 133

```
1           Have those reached a -- some
2     sort of official statement by the
3     manufacturer of the drug or by the
4     FDA?  Unfortunately no, I do not
5     believe that they have reached
6     that status.
7  BY MR. STEKLOFF:
8     Q.   Or by any other group of
9  scientists as a -- not the ability to
10 monitor, but a recommendation that
11 monitoring is necessary using
12 Neoplastine?
13          MR. DENTON:  Object to the
14     form.  Asked and answered.
15          THE WITNESS:  I think, as I
16     said before, they -- they have --
17     they have published on the ability
18     to monitor.  The intent of that
19     study -- and the intent of those
20     publications was not to be a
21     guideline.  So it is purely noting
22     the utility of that monitoring.
23 BY MR. STEKLOFF:
24     Q.   Now, before in -- going back
```

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1   a little while, you mentioned that you
2   would like to be able to use a
3   Neoplastine or Neoplastine-like reagent
4   in your clinical practice. Am I right
5   about that?
6       A.   Yes, I think that's what I
7   stated.
8       Q.   So now I'd like to ask you
9   what are the Neoplastine-like reagents
10  that you're referring to?
11      A.   Well, if you don't mind,
12  I -- can I refer to my report?
13      Q.   You can refer to anything
14  that you need to.
15      A.   So --
16      Q.   Describe to me where you
17  are.
18      A.   Yes. Page 11.
19          So, unfortunately, this is
20  not in color, but there are --
21          MR. DENTON: Here. Well,
22  you've got your notes in there.
23  We've got -- the original is in
24  color.

Page 135

1           THE WITNESS: I think -- I
2   think it's fairly -- I think there
3   are several reagents. TriniCLOT
4   PT Excel. I think that is S, from
5   Stago. The Neoplastine R from
6   Stago. The RecombiPlasTin from
7   ACL TOP. The Neoplastine CL from
8   Stago.
9           I think those -- those four
10  reagents have a -- you know,
11  probably have the best
12  sensitivity.
13          Although there is a linear
14  correlation with almost -- with
15  every -- I'm sorry -- not almost.
16  But there is a linear correlation
17  with every PT reagent. Those
18  four, in my opinion, probably have
19  the best sensitivity.
20  BY MR. STEKLOFF:
21      Q.   And do you have access to
22  any of those four at Yale?
23          MR. DENTON: Object to the
24  form.

Page 136

1           THE WITNESS: We do not
2   perform any of those four
3   currently at Yale.
4   BY MR. STEKLOFF:
5       Q.   What is the reagent that you
6   currently use at Yale?
7       A.   The reagent that we use
8   currently at Yale is Innovin because the
9   majority -- the vast majority of our
10  patients being examined with the
11  prothrombin time are on warfarin. And
12  Innovin is probably the most sensitive
13  reagent for the particular indication of
14  monitoring warfarin.
15      Q.   Is Innovin sensitive enough
16  to tell you the drug concentration of
17  Xarelto, in your opinion?
18          MR. DENTON: Object to the
19  form.
20          THE WITNESS: So I think
21  that the fact that the Innovin PT
22  has a linear correlation and is
23  recommended by a letter from the
24  manufacturer of Xarelto to

Page 137

1   doctors, that if they need to
2   somehow monitor Xarelto activity,
3   that they can use a PT based on
4   Innovin and other reagents, I
5   think there's information that
6   says that it is useful in that.
7           If you're asking me is it as
8   sensitive as Neoplastine R, well,
9   the graph here would say that
10  that's -- it is not as sensitive.
11  But it is sensitive enough that it
12  even made that recommendation from
13  the committee that that could
14  be -- I'm sorry. Not from the
15  committee -- from the manufacturer
16  that it could be used to monitor
17  Xarelto activity.
18  BY MR. STEKLOFF:
19      Q.   And do you think it's a good
20  thing that the manufacturer made that
21  recommendation?
22          MR. DENTON: Object to the
23  form.
24          THE WITNESS: I think

35 (Pages 134 to 137)

Protected - Subject to Further Protective Review

Page 138

```
 1          getting more information in
 2       general is always good.
 3    BY MR. STEKLOFF:
 4          Q.   Now, earlier, I think you
 5       testified about contexts in which you've
 6       had patients who had PT -- Xarelto
 7       patients who had PT times from Innovin.
 8       And then you tried to extrapolate that to
 9       the 20-second PT cutoff that you -- that
10       we discussed in detail earlier.  Am I
11       right about that?
12             MR. DENTON:  Object to the
13          form.  Those aren't his words;
14          they're yours.
15             THE WITNESS:  I think a more
16          accurate way of stating it is that
17          we have, in individual patients,
18          examined all the data that we have
19          on that patient, including the
20          prothrombin time when they --
21          we're talking about patients on
22          Xarelto.  We've examined all of
23          their data, including the
24          prothrombin time, which in our
```

Page 139

```
 1          institution is based on an Innovin
 2          reagent.
 3             We have then used that data
 4          as best we could to try to
 5          determine if that PT could in some
 6          way be related to some of the data
 7          from these other publications
 8          where Neoplastine has been used,
 9          and in that respect tried to get a
10          feel for what we think the Xarelto
11          activity in the patient is.
12    BY MR. STEKLOFF:
13          Q.   And how have you used that
14       data as best you could to try to
15       determine if that PT could in some way be
16       related to the Neoplastine data that you
17       reviewed?
18             MR. DENTON:  Object to form.
19             THE WITNESS:  Well, again,
20          based on the individual patient,
21          we would look at the prothrombin
22          time on the Innovin, knowing at
23          what time that was drawn after
24          Xarelto was given, and see where
```

Page 140

```
 1          that prothrombin time falls on the
 2          data that's been generated from
 3          Xarelto studies using Innovin and
 4          from the literature, and do our
 5          best to estimate what we think
 6          that concentration of Xarelto is
 7          and whether that -- how that might
 8          relate to the Neoplastine
 9          literature.
10             MR. DENTON:  You might want
11          to look at that answer.  I think
12          you misspoke.
13             THE WITNESS:  Okay.  I'm
14          sorry.
15             MR. DENTON:  Go ahead and
16          look at it.  I'm not going to tell
17          you anything other than look at it
18          carefully.
19             I think it's obvious.
20             THE WITNESS:  I'm sorry.
21          The prothrombin time on Xarelto,
22          not on Innovin.
23             What I meant to say -- if I
24          can correct that, what I meant to
```

Page 141

```
 1          say was the prothrombin time using
 2          the Innovin reagent.
 3    BY MR. STEKLOFF:
 4          Q.   Is there any literature that
 5       allows you to try to draw that --
 6       directly draw that comparison between the
 7       PT on Neoplastine versus the PT on
 8       Innovin?
 9          A.   I think that the -- there
10       are several references that I've -- that
11       I've discussed in my paper where there
12       are multiple reagents being used.
13             Do they -- did they do
14       one-to-one comparisons for individual
15       patients?  I don't recall seeing that in
16       those particular studies.
17             But there are graphs
18       relating the sensitivities that could be
19       used to at least inform a medical
20       decision in that respect.
21          Q.   Do you have an opinion about
22       when Xarelto should be discontinued in
23       patients using Innovin to measure PT?
24             MR. DENTON:  Object to the
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 142

1     form.
2           THE WITNESS:  I think it
3     would have -- I think you would
4     have to, again, in each individual
5     patient, bring all that data
6     together.
7           When was it measured?  What
8     was the prothrombin time?  What
9     was the normal -- what was the
10    normal range?  What was that
11    patient's data?  Prior -- there
12    are just too many variables there
13    to make a broad statement.  I
14    think you would have to look at
15    each individual patient, and on
16    that individual patient try to
17    make that assessment.
18  BY MR. STEKLOFF:
19    Q.   Is that statement true for a
20  patient taking Xarelto whose PT is
21  measured by Neoplastine as well?
22          MR. DENTON:  Object to the
23    form.
24          THE WITNESS:  I think that

Page 143

1     that fits into what I was talking
2     about before, which is that my
3     general opinion about a PT greater
4     than 20 seconds on Neoplastine has
5     to be considered by the individual
6     physician for that individual
7     patient under their circumstances
8     and all the information that's
9     available to them to make that
10    decision.
11  BY MR. STEKLOFF:
12    Q.   Why is it your opinion that,
13  in determining whether a patient should
14  be discontinued or not from Xarelto, the
15  PT should be measured 13 to 15 hours
16  postdose?
17    A.   Can you show me where that
18  is, please?
19    Q.   Sure.  I'm looking at Page
20  14.  Back to that paragraph that we were
21  discussing before about 20 seconds or
22  greater.
23    A.   Ah, yes.
24    Q.   And two of the caveats that

Page 144

1     Mr. Denton made very clear needed to be
2     in every answer were that it should be
3     measured through Neoplastine and that the
4     collection should occur 13 to 15 hours
5     postdose.
6           Do you see that?
7     A.   Yes.
8           MR. DENTON:  I just point
9     out for the record that it was you
10    that mentioned the caveats, not
11    me, so you can stop me from
12    objecting every time.  But go
13    ahead.
14          MR. STEKLOFF:  That's fair.
15          MR. DENTON:  Mark --
16          MR. STEKLOFF:  That I didn't
17    want you to object every time is
18    fair.
19          MR. DENTON:  Mark that,
20    Michelle, where he said, "That's
21    fair."
22          MR. STEKLOFF:  We can have
23    moments of agreement, Roger.  We
24    don't even know each other.

Page 145

1           THE WITNESS:  Can you repeat
2     that question again.  I apologize.
3     BY MR. STEKLOFF:
4     Q.   Yeah, yeah.  Yeah, my
5     question is, why in this paragraph you
6     believe that 13 to 15 hours is the
7     optimal time -- 13 to 15 hours postdose
8     is the optimal time to measure PT?
9           MR. DENTON:  Object to the
10    form of the question.  He does not
11    use the word "optimal."
12    BY MR. STEKLOFF:
13    Q.   Well, okay.  So let me ask a
14  different question.
15          Do you think that in
16  determining a patient's PT in the context
17  of determining their drug concentration
18  and whether they should continue to be on
19  Xarelto, the optimal time to measure
20  their PT is 13 to 15 hours postdose?
21          MR. DENTON:  Object to the
22    form.
23          THE WITNESS:  What I am --
24    what I'm saying here is that

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

```
 1     the -- and I'm basing this on the
 2     data from the ROCKET study where,
 3     even though it was data that was
 4     generated as purely postdose and
 5     did not actually have a
 6     requirement for a specific time
 7     period, when you look at the dot
 8     plot for frequency of drawing, it
 9     really is centered around 13 to
10     15 hours, in that range.
11         And I think -- you know, I
12     think a reasonable person would be
13     able to sort of draw a line around
14     that.
15         That said, I know that the
16     FDA, when they evaluated this,
17     basically did not find a time
18     dependence. And -- and that was
19     their conclusion that it was a
20     general effect and did not require
21     that.
22         But I, looking at this data,
23     think that it's reasonable to use
24     the time period where the vast
```

Page 147

```
 1     majority, or the majority of
 2     samples were drawn using that
 3     study.
 4         So to measure activity --
 5     and I'm not talking about
 6     concentration. I'm talking about
 7     activity here -- I think that 13
 8     to 15 hours is a very reasonable
 9     time point to consider for
10     measuring the PT after Xarelto has
11     been taken.
12   BY MR. STEKLOFF:
13     Q.   And just for the record,
14     you're referring to the Figure 12 that's
15     cited on Page 12 of your report?
16     A.   That's correct. And you'll
17     note there that patients are drawn from
18     anywhere to zero up to -- it looks like
19     more than 30 hours after. But there is a
20     concentration in that time period. So --
21     and this was probably related to
22     convenience for patients being able to
23     get their blood drawn. And the fact that
24     the FDA showed there was no time
```

Page 148

```
 1     dependence gives us also some comfort
 2     knowing that you can probably not only do
 3     13 to 15 hours, but that you could draw
 4     around that or at other time points.
 5         But I'm saying for this
 6     purpose, trying to be as specific as I
 7     could, 13 to 15 hours seems to be a very
 8     reasonable time point to measure activity
 9     after Xarelto is taken.
10     Q.   You don't have any
11     criticisms of the way -- of the time of
12     when INR blood draws took place in the
13     ROCKET study. Is that fair?
14         MR. DENTON: Object to the
15     form. These aren't INRs.
16         THE WITNESS: Well
17     they're --
18         MR. DENTON: Prothrombin.
19         THE WITNESS: They're
20     prothrombin times.
21   BY MR. STEKLOFF:
22     Q.   Understood. But it was a
23     blinded test, right?
24     A.   Yes.
```

Page 149

```
 1     Q.   So I'll ask the question
 2     again.
 3     A.   Rephrase, please.
 4     Q.   You don't have any
 5     criticisms of the time when PT times were
 6     drawn during the ROCKET study. Is that
 7     fair?
 8         MR. DENTON: Object to the
 9     form.
10         THE WITNESS: Let's put it
11     this way: I think if -- if -- if
12     there had been maybe more
13     stringent criteria for drawing
14     these, I think we would have
15     better data.
16         Again, although the FDA --
17     the FDA did find that this was no
18     time point. But the -- the -- the
19     clinical trial side of me would
20     say, try and make it better. But
21     I am not specifically criticizing
22     on that respect.
23   BY MR. STEKLOFF:
24     Q.   Why though -- you -- you
```

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

```
 1    would want, if you were developing a
 2    recommended cutoff for when physicians
 3    should consider discontinuing their
 4    patients from Xarelto, you would want to
 5    have the best data available, right?
 6          MR. DENTON:  Object to form.
 7          THE WITNESS:  That would
 8      require an enormous clinical
 9      trial.
10    BY MR. STEKLOFF:
11        Q.   And is that why you think
12    that 13 to 15 hours is the best time?
13          MR. DENTON:  Object to the
14      form.
15          THE WITNESS:  That is not
16      the reason why.
17          The reason I'm stating is
18      based on the FDA data from ROCKET
19      that is available.
20    BY MR. STEKLOFF:
21        Q.   If you were developing the
22    test today to determine how clinicians
23    should have their patients' PT measured
24    so that they could determine whether the
```

Page 152

```
 1    of that data centered around that
 2    time point.
 3          There's less data at the
 4      others, and although, again, as we
 5      said before, the FDA has
 6      determined that it's not an issue,
 7      I think that it's reasonable to
 8      have that as a recommendation or a
 9      guideline for when I would want
10      that to be drawn.
11          Now, could there be -- could
12      there be a re-study of Xarelto for
13      monitoring with activity and to
14      check a whole bunch of time
15      points?  I'm happy if the company
16      would like to do that.
17    BY MR. STEKLOFF:
18        Q.   You would love more testing?
19          MR. DENTON:  Object to the
20      form.
21          THE WITNESS:  What I'm
22      saying is, data is always
23      important.  And if there were --
24      if that was done under the
```

Page 151

```
 1    drug concentration was too high or not,
 2    why wouldn't you recommend that they have
 3    their blood drawn closer to when they
 4    took the medication?
 5          MR. DENTON:  Object to the
 6      form.
 7          THE WITNESS:  I'm not sure I
 8      understand the question.
 9    BY MR. STEKLOFF:
10        Q.   Sure.
11          I mean, why in
12    Paragraph 14 -- the paragraph that we are
13    talking about --
14        A.   Yes.
15        Q.   -- paragraph -- on Page 14
16    would you not want the collection to
17    occur, say, 2 to 4 hours post dose?
18          MR. DENTON:  Object to the
19      form.
20          THE WITNESS:  What I'm
21      trying to say here is that the
22      best data that I have available to
23      me, the -- the -- that data, that
24      data in Figure 12 has the majority
```

Page 153

```
 1    right -- under the right
 2    circumstances, I'm sure that that
 3    data would be informative.
 4    BY MR. STEKLOFF:
 5        Q.   And is it fair to say that
 6    in forming the opinion set forth in the
 7    paragraph we are talking about on
 8    Page 14, it would really require you to
 9    speculate --
10          MR. DENTON:  About what?
11      Object to the form.
12          MR. STEKLOFF:  I haven't
13      finished my question.
14          MR. DENTON:  I didn't -- I
15      just want to make sure.
16          MR. STEKLOFF:  Okay.
17    BY MR. STEKLOFF:
18        Q.   Is it fair to say that in
19    forming your opinion set forth in the
20    paragraph that we are talking about on
21    Page 14, the reason you recommend 13 to
22    15 hours is because it would be
23    speculation based on the data available
24    to you how earlier or later collection
```

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1    times might impact your opinion?
2         MR. DENTON: Object to the
3    form of the question.
4         THE WITNESS: I'm not
5    speculating on anything at all.
6    I'm saying that there's hard data
7    from ROCKET that is centered
8    around that time point. And
9    that's why I'm saying that that 13
10   to 15-hour time point is
11   probably -- is a reasonable time
12   point at which measuring Xarelto
13   activity for the purposes of
14   monitoring your patient and
15   determining bleeding risk. I'm
16   not speculating on anything else.
17   BY MR. STEKLOFF:
18        Q.   And I -- I think -- I will
19   concede my question was poorly worded.
20        What I'm saying is, it would
21   have been speculation to say that the
22   collection should have occurred at any
23   other time period, because you don't have
24   the data from that table to back it up.

Page 155

1    Is that fair?
2         MR. DENTON: Objection to
3    form. Asked and answered.
4         THE WITNESS: I'm not
5    speculating.
6         I'm saying that, here is the
7    data in front of me. The majority
8    of the time points that I think
9    are useful are in that 13 to
10   15-hour time point. And that's
11   what I'm using.
12        I'm saying that the FDA
13   looked at the -- looked at other
14   possibilities and did not find a
15   time dependence, but I'm still
16   basing it on the peak here at that
17   13 to 15-hour time point.
18        I'm not speculating about
19   anything else, what would be
20   better, worse. I've not -- I have
21   no speculative opinions about that
22   at all. I'm basing it purely on
23   what I'm seeing in front of me.
24

Page 156

1    BY MR. STEKLOFF:
2         Q.   And I'm not saying that you
3    have -- that you have speculative
4    opinions. I'm just -- just -- we're
5    talking past each other. I'm going to
6    come at it from a different way.
7         Do you agree that a drug
8    concentration based on your opinions
9    would be higher at, say, the 2 to 4-hour
10   mark than the 13 to 15-hour mark with
11   respect to Xarelto?
12        MR. DENTON: Object to the
13   form.
14        THE WITNESS: Say that
15   again?
16   BY MR. STEKLOFF:
17        Q.   Do you agree -- is it your
18   opinion that patients taking Xarelto have
19   a higher drug concentration 2 to 4 hours
20   post dose than 13 to 15 hours post dose?
21        A.   Well, we're not talking
22   about drug concentration here. You are
23   asking a completely separate question
24   that is not related to this paragraph.

Page 157

1         Q.   Yes.
2         A.   Okay. My understanding of
3    the half-life of Xarelto is between 6 and
4    13 hours. And its bioavailability, if
5    taken with, say, an evening meal, is
6    fairly rapid.
7         So my understanding of the
8    data that I've seen is that Xarelto
9    concentrations at 2 to 4 hours, they're
10   peak -- let me just -- let me check that
11   to make sure. I don't want to misspeak.
12        I know it's in here
13   somewhere.
14        So if -- if you go to
15   Page 7, the table under B, variability.
16   So the CMAX, which is taken as
17   concentrations of drug at 2 to 4 hours,
18   as you can see, those are higher than
19   trough values.
20        And I think that accurately
21   reflects the physiology of Xarelto in my
22   understanding.
23        Q.   And is it your opinion that
24   the higher the drug concentration, the

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

```
 1    higher the PT?
 2              MR. DENTON:  Object to form.
 3              THE WITNESS:  I think that
 4    there has -- I think that the drug
 5    concentration has been shown to
 6    correlate with the prothrombin
 7    time, again, given the caveats of
 8    reagent and when it's been drawn,
 9    et cetera.  But I think that --
10    that the concentration does
11    correlate with PT.
12    BY MR. STEKLOFF:
13        Q.   So my question is, why
14    wouldn't you want -- your opinion in
15    Paragraph 14, why wouldn't you want the
16    blood to be drawn 2 to 4 hours post
17    dose --
18              MR. DENTON:  Object to form.
19    BY MR. STEKLOFF:
20        Q.   -- based on what we just
21    discussed?
22              MR. DENTON:  Object to form.
23              THE WITNESS:  Because the
24    data that has been developed, as I
```

Page 159

```
 1        showed in Figure 12, that -- that
 2        is from the ROCKET study, the
 3        majority of that data comes from
 4        that 13 to 15-hour time point.
 5             And so that speaks to me as
 6        having the most reasonable
 7        validity for being able to assess
 8        bleeding risk, which again is --
 9        which comes from that data
10        regarding PT quartiles.
11             So I don't -- I think you're
12        trying to compare apples and
13        oranges.  I would like to try and
14        keep that data consistent.  And I
15        think that that data -- the
16        majority of that data in Figure 12
17        is in that time point, therefore,
18        that seems to be a reasonable time
19        to draw PT activity.
20             Excuse me.  I need some
21        water.
22    BY MR. STEKLOFF:
23        Q.   And the best time to draw PT
24    activity based on the data that's
```

Page 160

```
 1    available?
 2              MR. DENTON:  Object to the
 3    form of the question.
 4              THE WITNESS:  I don't know
 5    if best.  I would -- I would
 6    prefer the term "reasonable."
 7    BY MR. STEKLOFF:
 8        Q.   Going back to your clinical
 9    practice, do you ever treat patients
10    yourself who come to the emergency room
11    or the hospital with bleeds?
12        A.   As I said, I am lucky enough
13    to be senior enough that the junior
14    faculty are the one that go to the
15    emergency room.  But I'm looking over
16    their shoulder helping in the management.
17        Q.   Now, turning to research.
18    Has any of your research ever involved
19    atrial fibrillation?
20        A.   I think it has.
21        Q.   Can you point me in your CV
22    to which articles may have involved
23    atrial fibrillation?
24        A.   So let -- let me go through
```

Page 161

```
 1    and get -- do you want me to give them to
 2    you one by one, or do you want me to go
 3    through and sort of pick off the ones
 4    that I think may be -- that I'm pretty
 5    sure mention this?
 6        Q.   Why don't we do them -- I
 7    don't want -- I don't want to stop you
 8    from reviewing anything.  Why don't we do
 9    them one by one, just in case I have any
10    follow-up questions on an article.
11        A.   Okay.  All right.  So on
12    Page 6, the fifth article from the top
13    where Fitch, JCK is the first author,
14    that was a trial of a C5 compliment
15    inhibitor in patients undergoing coronary
16    artery bypass grafting with bypass.  And
17    I believe that atrial fibrillation was
18    one of the outcomes that was measured in
19    that trial.  I believe.  I'm not sure
20    whether that was published or not.  But
21    I'm -- I'm pretty sure that was one of
22    the aspects of that clinical trial.
23        Q.   Just to stop you, did that
24    trial in any way involve warfarin or the
```

Protected - Subject to Further Protective Review

Page 162

1    testing of any NOACs?
2        A.   That was 1999. So I would
3    say the -- I think the answer to that is
4    no.
5        Q.   That's what I thought.
6    Sorry. I didn't want to stop you from
7    going --
8        A.   That's all right. I
9    think -- I'm operating from memory here.
10   But I think that -- I think that the
11   trial at the bottom of Page 6 and the top
12   of Page 7, I think that in one of those,
13   I think that we did look at atrial
14   fibrillation as an outcome in those
15   trials -- in that study.
16       Q.   And to be clear, in both of
17   these studies there were patients who
18   were undergoing some sort of bypass
19   surgery, and then in the follow-up one of
20   the things that the group was trying to
21   determine was whether those patients
22   developed atrial fibrillation?
23       A.   That is correct. And
24   whether -- whether certain laboratory

Page 163

1    measurements might predict or correlate
2    with development of atrial fibrillation.
3        Q.   Without going through the
4    rest of the studies, although I don't
5    want to stop you, but in general if
6    atrial fibrillation was involved in a
7    study, was it in a similar context, in
8    which -- in other words, something else
9    was being measured, was the -- was the
10   primary focus of the study, but one of
11   the potential endpoints was, did patients
12   receiving treatment develop atrial
13   fibrillation?
14           MR. DENTON: Object to form.
15           THE WITNESS: I think
16       that's -- I'm sorry. I think
17       that's a fair statement.
18   BY MR. STEKLOFF:
19       Q.   Then I understand there may
20   be other --
21       A.   There's one more at the
22   bottom of Page 7, the third from the
23   bottom, Fontes, ML. And that one -- that
24   one, again, as you mentioned, was

Page 164

1    directly related to the measurements
2    of -- was -- I'm sorry. Not
3    measurements -- was related to outcomes
4    and that is -- atrial fibrillation was
5    associated with activation of certain
6    cells after cardiac surgery,
7    cardiopulmonary bypass.
8        Q.   Have you ever been involved
9    in any research regarding anticoagulants?
10       A.   We have published -- on Page
11   10, the third article down, we have
12   published regarding dabigatran and using
13   the thrombin time as a marker for
14   clinical decisionmaking.
15           I've written in reviews and
16   chapters regarding anticoagulation. And
17   that's what I would limit it to.
18       Q.   Have you written in reviews
19   or chapters regarding NOACs specifically?
20       A.   I would have to look back to
21   see what specifically I've written. I
22   don't think I've written an article or a
23   chapter solely based on NOACs.
24       Q.   Do you believe you've

Page 165

1    written an article or a chapter in which
2    any part of it was focused on Xarelto
3    specifically?
4        A.   I just can't recall.
5            MR. STEKLOFF: We can go off
6        the record.
7            THE VIDEOGRAPHER: The time
8        is 10:49 a.m. We are going off
9        the record.
10           (Short break.)
11           THE VIDEOGRAPHER: And the
12       time is 11:03 a.m. We are back on
13       the record.
14   BY MR. STEKLOFF:
15       Q.   Doctor, we can agree all
16   anticoagulants have risk of bleeding,
17   right? Risk of causing bleeds?
18       A.   I think it's -- it's very
19   recognized that one of the risks of
20   anticoagulation is bleeding.
21       Q.   And it's very recognized
22   that one of the risks of Xarelto is that
23   it could cause bleeding, right?
24       A.   I don't know what you mean

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1  by "very recognized." But Xarelto is an
2  anticoagulant and has risk of bleeding,
3  and I think physicians instruct their
4  patients all the time that because they
5  are on an anticoagulant, whether it's
6  Xarelto or any other anticoagulant, there
7  is a risk of bleeding.
8      Q.   Now, I don't -- Roger may be
9  happy to hear this.  We're going to go a
10  little more piecemeal and try to get
11  through your report, so I'm going to --
12      MR. DENTON:  I'm -- I'm
13      happy when you say you're finished
14      for the day.  Until then I'm going
15      to be marginally unhappy.
16  BY MR. STEKLOFF:
17      Q.   All right.  Exhibit 1, we're
18  going to walk through it, and I want you
19  to turn to Page 7.
20           This is all -- I want to ask
21  you about the paragraph in the section
22  that you titled "Narrow Therapeutic
23  Index."
24           Do you see that?

Page 167

1      A.   Yes, at the -- at the top of
2  Page 7?
3      Q.   Yes.
4      A.   Yes.
5      Q.   And you cited definition
6  that NTI -- the definition of NTI
7  proffered by the FDA.
8           Do you see that?
9      A.   I see that paragraph, yes.
10      Q.   And that came from a slide
11  in a PowerPoint presentation; is that
12  right?
13      A.   I don't know if that's from
14  a PowerPoint.  I -- I saw that from
15  the -- the advisory committee for science
16  and -- and clinical pharmacology.
17           I -- I -- I don't know that
18  it was a PowerPoint, but it was listed as
19  Slide 15, so I'm assuming it was.  But I
20  didn't -- I had basically just a hardcopy
21  of that.
22      Q.   Did you make any effort to
23  see if the FDA has ever adopted that
24  definition of narrow therapeutic index

Page 168

1  beyond the advisory committee document
2  that you reviewed?
3           MR. DENTON:  Object to the
4      form.
5           THE WITNESS:  I'm not sure I
6      understand the question.  You'll
7      have to say it again.  I'm sorry.
8  BY MR. STEKLOFF:
9      Q.   Sure.
10           Did you make any effort to
11  see if the FDA has formally adopted that
12  definition of narrow therapeutic index in
13  any context?
14           MR. DENTON:  Object to the
15      broad nature of the question.
16           THE WITNESS:  Yeah, I -- I'm
17      not sure what you mean by FDA's
18      formal adoption.
19           I know that I -- I read
20      everything that I get from the FDA
21      or can find from the FDA that is
22      related to my area of practice.
23      For example, I read about
24      companion diagnostics and

Page 169

1      personalized medicine.
2           I -- there may be something
3      out there that is a -- I'm not
4      even sure what a formal adaptation
5      of that is.  But I'm not aware of
6      it.
7  BY MR. STEKLOFF:
8      Q.   Have you ever seen this
9  definition that you cite in your report
10  used anywhere else?
11           MR. DENTON:  Object to the
12      form.
13           THE WITNESS:  I haven't
14      looked for it anywhere else.  It
15      may exist.  I do not know.
16  BY MR. STEKLOFF:
17      Q.   And is it your view that all
18  of the NOACs have a narrow therapeutic
19  index?
20           MR. DENTON:  Object to form.
21           THE WITNESS:  I think that
22      any anticoagulant has a
23      therapeutic index because the --
24      the desired effect is the toxicity

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1    of the drug.  And to me that --
2    that is the best way of saying
3    that something has a narrow
4    therapeutic index.  It's not an
5    unrelated.  It's not a separate
6    aspect.  It's that the toxicity is
7    the effect.
8    BY MR. STEKLOFF:
9        Q.   And so for any drug, whether
10   it's a NOAC or not, if the toxicity is
11   the effect, would you say it has a narrow
12   therapeutic index?
13               MR. DENTON:  Object to the
14       form.
15               THE WITNESS:  I would need
16       to -- I would need to understand
17       those drugs.
18               My area of expertise is in
19       hematology, and so I would limit
20       my expertise to the drugs that I'm
21       familiar with, and the drugs that
22       I'm talking about with a narrow
23       therapeutic index are
24       anticoagulants.

Page 171

1    BY MR. STEKLOFF:
2        Q.   So you think warfarin has a
3    narrow therapeutic index?
4        A.   It's one of the
5    anticoagulants.
6        Q.   Same with Pradaxa?
7        A.   We can go through each one.
8    All anticoagulants, because the desired
9    effect is the toxicity, that, by
10   definition to me, is the most important
11   thing about their toxicity index.
12       Q.   And so do all of the
13   anticoagulants meet this definition that
14   you cite on Page 7 of your report?
15               MR. DENTON:  Object to the
16       form.
17               THE WITNESS:  You know, I --
18       some of this is I think FDA-ese.
19       I'm not really sure.
20               But to me, the -- the part
21       that's most -- the -- the part
22       that is most -- that fits my
23       understanding the best is that
24       "close, effective concentrations

Page 172

1    are associated with serious
2    toxicity."
3               So to me that encapsulates
4    the aspect of the effective -- the
5    effectiveness of the drug
6    immediately -- now, let me strike
7    that.  I'm sorry.
8               The effect of the drug is
9    its toxicity, and vice versa.
10   BY MR. STEKLOFF:
11       Q.   And is that the basis for
12   your opinion what you just testified to,
13   that Xarelto has a narrow therapeutic
14   index?
15       A.   I think --
16               MR. DENTON:  Object to form.
17               THE WITNESS:  I think -- I
18       think Xarelto is one of the
19       anticoagulants, and, therefore, it
20       has a narrow therapeutic index
21       because its effect is its
22       toxicity.
23   BY MR. STEKLOFF:
24       Q.   So by definition any

Page 173

1    anticoagulant has a narrow therapeutic
2    index?
3               MR. DENTON:  Object to the
4       form.
5               THE WITNESS:  Well, the
6       physiology of anticoagulation is
7       that the moment you give it, you
8       are increasing the risk of
9       bleeding to that patient.
10              That's it.  That's the
11      physiology, the pathophysiology of
12      the drug action.  And you -- its
13      effect is also based on that.
14              So any drug, any
15      anticoagulant that works in that
16      way -- now, there may be
17      anticoagulants that don't fit that
18      profile that are in development.
19              They -- I'm not aware of any
20      that have reached the level of
21      approval by the FDA.
22   BY MR. STEKLOFF:
23       Q.   So, yes, by definition, any
24   anticoagulant that is currently on the

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1    market has a narrow therapeutic index?
2         MR. DENTON: Object to the
3    form. Asked and answered.
4         THE WITNESS: Again, that
5    is, I think -- I think a fair
6    statement of this is that
7    anticoagulants that are currently
8    being used clinically, and,
9    therefore, I guess that means
10   they're on the market, they all
11   have the same characteristic,
12   which is their effectiveness and
13   their toxicity are the same
14   pathophysiology, and, therefore,
15   they have a narrow therapeutic
16   index.
17   BY MR. STEKLOFF:
18        Q.   Would you disagree with
19   any -- any doctor who thinks that NOACs
20   have a wide therapeutic index?
21        MR. DENTON: Object to the
22   form.
23        THE WITNESS: So I don't --
24   I don't know how -- I would have

Page 175

1         to look at what they are referring
2         to and how they are basing their
3         conclusion that something is wide.
4         I don't know what wide means. I
5         would like to look at the specific
6         data.
7    BY MR. STEKLOFF:
8         Q.   Are you familiar with two
9    doctors named Dr. Adcock and
10   Dr. Gosselin?
11        MR. DENTON: Object to the
12        form. He's not a doctor.
13        Gosselin is not a doctor.
14   BY MR. STEKLOFF:
15        Q.   Dr. Adcock and Mr. Gosselin.
16        A.   What was the question?
17        Q.   Are you familiar with
18   Dr. Adcock and Mr. Gosselin?
19        A.   You mean have I heard their
20   names in relation to literature?
21        Q.   Yes.
22        A.   Yes.
23        Q.   Have you ever met either of
24   them?

Page 176

1         A.   I don't recall. It's
2    possible.
3         Q.   Do you find their literature
4    the type of literature that you would
5    rely upon?
6         A.
7              MR. DENTON: Object. If you
8         want to show him some literature
9         he'll be happy to comment on it.
10             THE WITNESS: I don't -- I
11        don't rely upon things just on --
12        what I do is I read the literature
13        and then use that in a synthetic
14        way with all of the information
15        that's available to me.
16   BY MR. STEKLOFF:
17        Q.   Do you recall citing an
18   article by Mr. Gosselin in your report in
19   this litigation?
20        A.   I believe so.
21        Q.    And you found that something
22   that -- the type of scientifically
23   validity that you would rely upon it?
24             MR. DENTON: Object to the

Page 177

1         form. If you want to pull the
2         article out, he'll comment on it.
3         In the abstract, it's an improper
4         question.
5    BY MR. STEKLOFF:
6         Q.   You can answer.
7         A.   Can you show me where
8    that -- where are -- what we're talking
9    about?
10        Q.   Sure. On your reliance
11   list, it's the fifth article listed under
12   literature.
13        A.   Oh, it's not in my report.
14        Q.   It also is in your report, I
15   believe. But it's in your literature
16   list. It's the fifth down. We can find
17   it in your report as well. It's on the
18   top of Page 15 in your report, the second
19   line.
20        A.   Yes.
21        Q.   Do you see that?
22        A.   Yes. Where I mentioned
23   Gosselin in the International Journal of
24   Laboratory Hematology from 2015, confirm

Protected - Subject to Further Protective Review

Page 178

1    the correlation between prothrombin time
2    and rivaroxaban concentration.
3        Q.   And you found that -- you
4    reviewed that and found it scientifically
5    valid in order to rely upon it.  Is that
6    fair?
7            MR. DENTON:  Object to the
8        form.  If you want to get the
9        article out, he'll comment about
10       it.  Not in the abstract.
11           THE WITNESS:  All I'm going
12       to say is that what I wrote here
13       is related to that article and
14       supported by that article.
15           If you want to review the
16       overall article in terms of
17       everything else that's in it, I'm
18       happy to do so.
19   BY MR. STEKLOFF:
20       Q.   Did you do any literature
21   search to see if Mr. Gosselin published
22   any other articles about rivaroxaban?
23       A.   I did not do a literature
24   search.  My literature searches -- I'm

Page 179

1    sorry.  Can I strike the first answer?
2            My literature searches on
3    rivaroxaban were based on rivaroxaban and
4    not by individual authors.  That way --
5    that way I was able to make a wider
6    search for articles rather than an
7    individual.
8        Q.   While we are looking for
9    that article, did you look in the code of
10   federal regulations to see if the FDA had
11   a definition of narrow therapeutic index?
12       A.   I am not sure how to access
13   the code of federal regulations.
14       Q.   Fair enough.
15           MR. DENTON:  Neither am I.
16           MR. STEKLOFF:  Neither --
17       neither am I sometimes.
18   BY MR. STEKLOFF:
19       Q.   I'm going to come back to
20   that issue.  Staying on Page 7 of your
21   report, I want to ask you about
22   variability.
23       A.   Certainly.
24       Q.   Do you agree that

Page 180

1    interpatient variability -- withdraw
2    that.
3            Did you do anything to
4    correlate interpatient variability with
5    outcomes from the ROCKET data?
6            MR. DENTON:  Object to the
7        form.
8            THE WITNESS:  I am not aware
9        that that data was available in
10       the -- from ROCKET.
11           I don't recall seeing data
12       related to interpatient
13       variability and outcomes.  I may
14       have missed that, but I don't
15       recall seeing that in the dataset.
16   BY MR. STEKLOFF:
17       Q.   Did you do anything to
18   correlate PT scores from the ROCKET data
19   with outcomes?
20       A.   The data that I -- the data
21   that I reviewed regarding the 12-week and
22   24-week laboratory monitoring, I would --
23   I don't recall that I saw data regarding
24   outcomes to that.

Page 181

1            There may be data available
2    for that in terms of that group of
3    subjects.  But I, offhand, don't recall
4    seeing that in terms of the data broken
5    out for that.
6            It may be that that may be
7    extractable from the overall dataset from
8    those patients.  I did not perform that
9    assessment, which I think is what you're
10   asking here.
11       Q.   It is.  Did you ask for that
12   data?
13           MR. DENTON:  What data?
14           MR. STEKLOFF:  I haven't
15       finished my question.
16           MR. DENTON:  Sorry.
17           MR. STEKLOFF:  I'll start
18       over.
19   BY MR. STEKLOFF:
20       Q.   Did you ask for that data to
21   see if you could try to match PT times
22   with bleeding outcomes or other outcomes?
23           MR. DENTON:  Object to the
24       form.

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1    THE WITNESS:  After I wrote
2  my report, in reviewing -- in
3  reviewing this, I -- I thought
4  about the fact that the 12 to
5  24 -- the 12- and 24-week data
6  offered an opportunity to examine
7  outcomes related to those.
8    But because it was after my
9  report, I did not -- I did not
10  request that.
11    I think that that's -- I
12  think that's something that would
13  be very good to have because I
14  think that is -- that might be
15  valuable data to examine those
16  patients for their outcomes,
17  especially related to the ones
18  that have very discrepant
19  laboratory and POC INR studies.
20  BY MR. STEKLOFF:
21    Q.   With respect to patients who
22  were taking Xarelto in the ROCKET trial,
23  wouldn't you want to know if, in fact, a
24  PT of 20 or greater led to bleeding

Page 183

1  outcomes?
2    MR. DENTON:  Object to the
3  form.
4    THE WITNESS:  So we do know
5  that the -- that the fourth
6  quartile of prothrombin time
7  values does have a higher hazard
8  ratio for bleeding throughout the
9  study in all subjects and in the
10  U.S. data only.
11    I am not aware that the
12  datasets were broken out in that
13  way so that that data would be
14  easily obtainable to examine for
15  outcomes.
16    And I don't know if that was
17  because that data is not available
18  or it's not set up that way by the
19  company.  I don't -- I just don't
20  know.
21    I did not see that
22  particular dataset of, here are
23  the patients with those values.
24    To me, the quartiles are

Page 184

1    very instructive, because that is
2  a -- I think that shows a -- an
3  activity dependent change in risk.
4  BY MR. STEKLOFF:
5    Q.   We're going to talk about
6  the quartile data from the FDA.
7    Is it fair to say -- let me
8  ask this.
9    Have you reviewed any of
10  Bayer or Janssen experts' reports in this
11  litigation?
12    A.   You mean in depositions?
13    Q.   No.  Any of the reports that
14  were served on Mr. Denton and his
15  colleagues, who were the experts retained
16  by the defendants.
17    A.   I'm sorry.  You're going to
18  have to explain.
19    Q.   Sure.  You understand that
20  you were retained by the plaintiffs,
21  right?
22    A.   Oh.  Oh.  You mean for a
23  specific report?
24    Q.   Yeah.  Have you read any

Page 185

1  reports that have been served by our
2  experts?
3    A.   I don't think so.
4    Q.   Okay.  Have you read any
5  deposition transcripts of any experts who
6  have been deposed thus far in the
7  litigation whether they are retained by
8  the plaintiffs or the defendants?
9    A.   I think I was sent one
10  deposition of Leisinger.  Lesserer?  I'm
11  not sure of the name.
12    Q.   Leisinger.
13    A.   Leisinger.
14    Q.   I don't know how to
15  pronounce it, but that's close.
16    A.   That's the only one that I
17  was sent.
18    Q.   Did you read that?
19    A.   I have to say I basically --
20  I just skimmed it very quickly.
21    Q.   Okay.  And did you read
22  Dr. Leisinger's report?
23    A.   No.
24    Q.   Did you see that

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1    Dr. Leisinger thinks that NOACs have a
2    wide therapeutic index?
3              MR. DENTON:  I object.
4         That's absolutely false.  Where
5         are you getting that at?
6              THE WITNESS:  I have to say,
7         frankly, I would rather base my
8         opinions on the literature that
9         I've reviewed and the substantive
10        data rather than other people's
11        depositions or opinions.
12   BY MR. STEKLOFF:
13        Q.   So you are not relying upon
14   anyone else's depositions or opinions?
15        A.   No.
16        Q.   I'm going to mark as
17   Exhibit 4 an article.
18             (Document marked for
19             identification as Exhibit
20             Rinder-4.)
21   BY MR. STEKLOFF:
22        Q.   Do you see this is an
23   article, a 2015 review that was published
24   in Thrombosis Research in May of -- I

Page 187

1    believe in May of 2015 by Dr. Adcock and
2    Mr. Gosselin?
3         A.   Right.  It's an HTRS
4    article, "Direct Oral Anticoagulants in
5    the Laboratory."
6         Q.   And have you seen this
7    before?
8         A.   I have.
9         Q.   You have.  Do you -- do you
10   think that this is a reliable
11   publication?
12             MR. DENTON:  Object to the
13        form.
14             THE WITNESS:  I -- as I said
15        before, I don't evaluate articles
16        as reliable or not.  I review the
17        article in its entirety.  I
18        synthesize what I think they are
19        saying and the data that they are
20        using and put that together with
21        all of the information that I have
22        available to me to decide what
23        aspects of this are useful to me
24        in my opinion.

Page 188

1    BY MR. STEKLOFF:
2         Q.   Does this article contain
3    any useful information for you
4    personally?
5         A.   Well, can you give me a
6    minute to get -- just refamiliarize
7    myself with this?
8              MR. DENTON:  Take your time.
9    BY MR. STEKLOFF:
10        Q.   Sure.
11        A.   This is a review article.
12   This does not have a specific methodology
13   related to how the articles were -- the
14   references here were picked.  There is no
15   specific methodology as to how they
16   evaluated the evidence in these articles.
17             So I -- I would certainly --
18   I recall reading this.  Based on the fact
19   that it's a general review, it doesn't
20   have a methodology on how the articles
21   were picked for this review.  It doesn't
22   have any mention of how they assessed the
23   evidence.
24             I don't think this

Page 189

1    article -- I don't think this article is
2    comprehensive in terms of -- at least to
3    a quick look, I don't think it's as
4    comprehensive as it could be for a real
5    review.
6              And, frankly, it's a really
7    brief description that I think is not
8    comprehensive.
9         Q.   Your -- your process that
10   you testified to about, that you don't
11   consider articles as a whole to be
12   scientifically reliable and you want to
13   look at the individual methodology and
14   data, is that true for all -- not just --
15   is that true for all of the articles that
16   you cite in your report as well?
17        A.   As best I can.  That's my --
18   that's my methodology and that's what I
19   try to do.
20        Q.   And then if you turn to
21   Page 8 at the very top on the left column
22   of this review that we're looking at by
23   Dr. Adcock and Mr. Gosselin, do you agree
24   or disagree with their statement, four

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1    lines down that says, "As each of these
2    agents has predictable pharmacodynamic,
3    pharmacokinetic, and wide therapeutic
4    windows, routine therapeutic monitoring
5    is not required."
6            MR. DENTON:  Object to the
7    form.
8            Where are you?  I just want
9    to see it.
10           MR. STEKLOFF:  Page 8.
11   Left-hand column.  Four lines
12   down.
13           "As each of these agents."
14           THE WITNESS:  So --
15           MR. DENTON:  There it is.
16           THE WITNESS:  So first of
17   all, I believe neither doctor --
18   neither Adcock nor Gosselin is a
19   doctor, at least if I -- if I --
20   if I am thinking of the right
21   people.
22           That statement is based
23   on -- at least they are saying
24   it's based on References 9 and 11.

Page 191

1            And Reference 9 is an
2    article in Blood by Yeh and Weitz,
3    and another article in Journal of
4    Thrombosis and Hemostasis.
5            And I would have to -- I --
6    I recall these, and I -- I would
7    have to look at them.  I believe
8    these are also review articles.
9            So this is a statement in a
10   review article based on other
11   review articles.  So that's kind
12   of a -- that's kind of a low
13   hanging fruit for someone to write
14   something.
15           And I would -- I would
16   rather look at individual data
17   from articles that actually have
18   the scientific data to assess
19   that, rather than a review article
20   citing another review article.
21   BY MR. STEKLOFF:
22       Q.  Okay.  But regardless of
23   this -- of the cites, you disagree with
24   the statement that NOACs have wide

Page 192

1    therapeutic windows.  Is that fair?
2        A.  So you're specifically only
3    asking about those three words, "wide
4    therapeutic window."
5        Q.  I'm asking you -- you know,
6    you can put the article down if you want.
7    I'm not asking about the article.
8        A.  Sure.
9        Q.  Do you disagree with the
10   statement that NOACs have wide
11   therapeutic windows?
12           MR. DENTON:  Object to the
13   form.
14           THE WITNESS:  I don't know
15   what a wide therapeutic window is.
16   I think it -- it would -- I would
17   rather -- I would rather focus on
18   specifics.  Using a descriptor as
19   wide is meaningless to me.  I
20   don't know what that is referring
21   to.
22   BY MR. STEKLOFF:
23       Q.  But you're willing to use a
24   descriptor of narrow, right?

Page 193

1        A.  And I've given you my
2    definition of why I consider it to be
3    narrow.  Because the effect of the drug
4    is its toxicity.
5        Q.  Is there any way for you to
6    compare and contrast the therapeutic
7    ranges of warfarin versus NOACs?
8            MR. DENTON:  Object to the
9    compound nature, form.
10           THE WITNESS:  I think you
11   have to be more specific in that.
12   BY MR. STEKLOFF:
13       Q.  Well, we know that
14   warfarin's therapeutic rage is between a
15   2.0 and 3.0 INR, correct?
16       A.  I think we -- we know that
17   for certain populations, certain
18   indications, that 2.0 to 3.0 for warfarin
19   is a general therapeutic range, but that
20   has to be adjusted for each individual
21   patient.
22       Q.  And we know that through
23   years of studies that have determined
24   that therapeutic range?

49 (Pages 190 to 193)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 194

```
 1          MR. DENTON: Object to form.
 2          THE WITNESS: So we -- we
 3     know that that is a very
 4     well-tested therapeutic range and
 5     that there is a lot of data from
 6     many, many years and thousands of
 7     patients.
 8  BY MR. STEKLOFF:
 9     Q.   Do you remember how long
10  approximately it took the scientific
11  community to reach that determination
12  that was the therapeutic range as
13  you would describe it for the populations
14  that you described?
15     A.   I don't know what you mean
16  by how long to determine.  I mean, you
17  have early adapters and you have late.
18          I know that -- I know that
19  the prothrombin time as an initial test
20  was the original way of monitoring
21  warfarin and that that was originally
22  used as a ratio with prothrombin times of
23  a control, and that eventually
24  development of testing for
```

Page 195

```
 1  anticoagulation came up with an
 2  international normalized ratio which
 3  allows for an international calibrator to
 4  then make the prothrombin time in
 5  different laboratories with different
 6  reagents and different instruments
 7  applicable to many patients as an INR.
 8          And that data has been
 9  available for -- I'm just -- I think
10  probably 30 years.
11     Q.   1980s?
12     A.   That's my estimate.  I
13  don't -- I mean, I may be wrong, but I'm
14  pretty sure that that's about the time
15  period for using Coumadin with the PT and
16  the INR together.
17     Q.   And would you say that NOACs
18  have a wider therapeutic range than
19  Coumadin?
20          MR. DENTON: Object to the
21  form.
22          THE WITNESS: I -- I believe
23  that my opinion in my report says
24  that all oral anticoagulants have
```

Page 196

```
 1  a narrow therapeutic index.
 2  BY MR. STEKLOFF:
 3     Q.   That's been clear.  My
 4  question is a little different.
 5          Do you believe that NOACs
 6  have a wider therapeutic range than
 7  Coumadin or the same therapeutic range?
 8          MR. DENTON: Object to the
 9  form.
10  BY MR. STEKLOFF:
11     Q.   Or narrower?
12          MR. DENTON: Object to the
13  form.
14          THE WITNESS: I don't know
15  that enough data on the NOACs is
16  available to try to make that
17  assessment.
18          For example, I don't know
19  the therapeutic range, as we
20  talked about before, the lower
21  limit and the upper limit for,
22  say, Xarelto.
23          That data is not available.
24  So I don't know how I can compare
```

Page 197

```
 1  data that's not available to data
 2  that is extremely well-supported
 3  by thousands of patients and many,
 4  many trials over years with
 5  warfarin.
 6  BY MR. STEKLOFF:
 7     Q.   So you can't quantify the
 8  therapeutic range in any respect in terms
 9  of numbers for any of the NOACs; is that
10  right?
11          MR. DENTON: Object to the
12  form.
13          THE WITNESS: I don't think
14  it's necessary or clinically
15  useful to try to even quantify
16  that.
17          I think it's -- I think it
18  is -- well, I'm sorry.  Strike
19  that.
20          I think that -- I'm sorry.
21  BY MR. STEKLOFF:
22     Q.   You're turning into a
23  lawyer.
24     A.   I'm sorry.  What I -- what I
```

50 (Pages 194 to 197)

Protected - Subject to Further Protective Review

Page 198

1   should say is all anticoagulants have
2   that narrow therapeutic index.
3           I think it is useful from
4   data to be able to have a guidance for
5   where you want those patients to be in
6   terms of their activity of that
7   anticoagulant. That's why we monitor
8   warfarin. Because just giving it is not
9   adequate. By monitoring it, we're able
10  to establish that.
11          I think that oral
12  anticoagulants have that narrow
13  therapeutic index. And any information
14  that we have to try to quantify that
15  index is useful.
16          I don't necessarily know how
17  we would actually compare those, because
18  if their therapeutic indices are followed
19  for two drugs then you would have a
20  trial, and you would put those as a
21  head-to-head and say here are the
22  patients that are within the therapeutic
23  index in this drug and within the
24  therapeutic index in the comparator drug.

Page 199

1   Show me their outcomes in terms of
2   efficacy and safety.
3           But that data is not
4   available, as far as I know, for Xarelto.
5       Q.  Or any other NOAC?
6       A.  I can't say that based on
7   the confidentiality data with respect to
8   Pradaxa.
9       Q.  Okay.
10      A.  I can't answer that.
11      Q.  You can say it with respect
12  to Eliquis and Savaysa?
13      A.  I would limit myself to
14  apixaban in terms of the amount of
15  literature that's out there. I do not --
16  I have not seen a therapeutic index for
17  apixaban.
18      Q.  So you don't believe that
19  you could quantify in any way the
20  therapeutic index for Xarelto and
21  Eliquis. Is that fair?
22          MR. DENTON: Object to the
23      form. Asked and answered.
24          THE WITNESS: There's no

Page 200

1   data on Xarelto to make that
2   determination. So because there's
3   no data, I can't make that
4   determination.
5   BY MR. STEKLOFF:
6       Q.  So when you say that these
7   medications have a -- NOACs have a narrow
8   therapeutic index, there is no real
9   definition of narrow, right?
10          MR. DENTON: Object to the
11      form. He gave you his definition
12      four times already.
13          THE WITNESS: So you're
14      trying to put a number on this.
15      And what I'm saying is the
16      physiology of hemostasis is such
17      that I give you an anticoagulant.
18      You now are at risk of bleeding.
19          That's the effect and its
20      toxicity. It's as soon as that
21      drug is effective, you are now at
22      risk of bleeding. That's the
23      physiology of it. That's
24      inescapable, and that's for every

Page 201

1   anticoagulant.
2           That, to me, means narrow
3   therapeutic index, because it is
4   not -- it is not a side effect.
5   It is not a -- it is not something
6   that is somehow divorced from the
7   dose. It is not idiosyncratic.
8   It is the desired effect of the
9   drug gives you the undesirable
10  toxicity. And that's inescapable
11  for any oral anticoagulant.
12  BY MR. STEKLOFF:
13      Q.  And that's why all doctors
14  know that any anticoagulant could cause a
15  bleed, right?
16      A.  That's -- we're taught in
17  medical school that if you anticoagulate
18  a patient, you are putting them at
19  increased risk of bleeding. And that's
20  why doctors want to know how much risk am
21  I putting this patient for bleeding.
22  That's why we monitor warfarin. That's
23  why I'm having doctors call me about
24  monitoring rivaroxaban.

Protected - Subject to Further Protective Review

Page 202

1          Q.   And that's also why you
2  can't say how narrow any anticoagulant
3  is?
4              MR. DENTON:  I don't
5      understand the question.  I object
6      to the form.
7  BY MR. STEKLOFF:
8          Q.   In other words, your
9  testimony is that by -- your opinion is
10 by it's very nature, there are -- these
11 anticoagulants are all narrow, right?
12             MR. DENTON:  Object to the
13     form.
14             THE WITNESS:  Well, that's
15     not just my opinion.  The FDA
16     basically says that all oral
17     anticoagulants by definition have
18     a narrow therapeutic index, again,
19     based on the fact that the
20     physiology of the activity is
21     equivalent to the toxicity.
22 BY MR. STEKLOFF:
23         Q.   And you can't say how narrow
24 the therapeutic range is of any

Page 203

1  anticoagulant, right?
2              MR. DENTON:  Object.  Asked
3      and answered.  Object to form.
4              THE WITNESS:  With all due
5      respect, I have to say that's kind
6      of a medically misleading question
7      because the toxicity is there
8      right away.
9              To determine a therapeutic
10     range where the risk-benefit based
11     on a whole population of patients
12     is derived from studies the way
13     it's derived on thousands of
14     thousands of patients with
15     warfarin, that would be
16     meaningful.
17             But that's not the -- that's
18     not the therapeutic -- that's not
19     saying whether it's narrow.
20     That's simply saying here is data
21     that supports a therapeutic index.
22             Doctors come to me and would
23     like to know what that therapeutic
24     index is for other oral

Page 204

1      anticoagulants, but I don't have
2      that data, and here specifically
3      with respect to rivaroxaban.
4  BY MR. STEKLOFF:
5          Q.   But then -- but it could be
6  if you had the data, that, in fact, you
7  wouldn't have to regularly change the
8  doses of a NOAC in order to keep someone
9  in the therapeutic range like you do with
10 warfarin, right?
11             MR. DENTON:  Object to the
12     form.
13             THE WITNESS:  I'm sorry.
14     You're going to have to state that
15     again.
16 BY MR. STEKLOFF:
17         Q.   With warfarin you have to --
18 doctors regularly have to change their
19 patients' doses in order to maintain the
20 therapeutic range that has been
21 established with respect to warfarin.  Is
22 that fair?
23             MR. DENTON:  Object to form.
24             THE WITNESS:  I don't know

Page 205

1  what you mean by "regularly."
2              What I would say is we use a
3      monitoring method to try to keep
4      our patients in a therapeutic
5      range that we know is based on a
6      large amount of literature, that
7      is the best risk-benefit
8      profile for patients.  It could be
9      1.8 to 2.5, 2 to 3, 2.5 to 3.5.
10     We have that ability.
11             There are many, many
12     patients who are on warfarin who
13     are stable.  They have consistent
14     dosing.  They have a consistent
15     diet.  Their doctors and
16     pharmacists are monitoring what
17     they're on.  And they are tested
18     very infrequently.  So I'm not
19     sure what you mean by "regularly."
20             I mean, I have -- we have
21     patients who are tested regularly,
22     but we make no adjustments at all
23     because they're very consistent.
24             That freedom to manage the

52 (Pages 202 to 205)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 206

1    patient is what is given to us by
2    the fact that we have the ability
3    to monitor it.
4         I can't -- that, to me, is a
5    positive, being able to give the
6    benefit-risk profile for each
7    patient, and that's what I would
8    want for any oral anticoagulant.
9    BY MR. STEKLOFF:
10        Q.   Are you saying, sitting here
11   today, to a reasonable degree of
12   scientific certainty, based on the data
13   that is available, that monitoring would,
14   in fact, improve patient safety for
15   patients taking Xarelto?
16        MR. DENTON:  Object to form.
17        THE WITNESS:  So the data
18   that we have says that patients
19   that have a PT under all the
20   caveats that we described before,
21   if that's okay, the Neoplastine
22   taken at the right amount of time
23   after the dose, those caveats
24   basically give a higher hazard

Page 207

1    ratio for those patients for
2    bleeding.
3         It seems to me that if you
4    use that, if you're monitoring
5    Xarelto, I can't imagine how, in
6    any circumstance monitoring
7    Xarelto in that situation and
8    using that as a reasonable point
9    to consider changing your therapy
10   would somehow be less safe than
11   nonmonitored Xarelto.
12        You're going to be -- you're
13   going to be -- you might be
14   changing your denominator in terms
15   of the total number of patients
16   that you'd be treating.  But
17   the -- that hazard ratio for the
18   fourth quartile would, of
19   necessity, decreased the patients
20   that are bleeding.  And,
21   therefore, that -- that numerator
22   would probably be closer and you
23   might have a safer drug.  I can't
24   imagine why you would not want to

Page 208

1    have that data as -- to have a
2    safer drug.
3    BY MR. STEKLOFF:
4         Q.   So it's your testimony to a
5    reasonable degree of scientific certainty
6    that, as of today, if they had the
7    reagent available, Neoplastine, that all
8    clinicians who prescribe Xarelto should
9    monitor their patients' PT?
10        MR. DENTON:  Object to the
11   form.
12        THE WITNESS:  I think
13   that -- I think that having
14   that -- having the Neoplastine PT
15   available to see where their
16   patients were in respect to
17   Xarelto activity would be
18   valuable.
19   BY MR. STEKLOFF:
20        Q.   Do you know how many
21   patients who would have a PT of 20 or
22   greater and would need to be taken off of
23   Xarelto or otherwise treated, would
24   increase their risk of stroke?

Page 209

1         MR. DENTON:  Object to the
2    form.
3         THE WITNESS:  I don't
4    believe that that data was
5    developed by the ROCKET study.  I
6    think that -- I think that there
7    is data with respect to the PT
8    with respect to efficacy of
9    preventing stroke.  And that's
10   basically a flat line.
11        So using that PT, that
12   certainly would not indicate that
13   there was an uptick in thrombotic
14   risk in that -- in that data.
15        But in terms of making a
16   change to a different dose, I'm
17   not aware that that data is
18   available.
19   BY MR. STEKLOFF:
20        Q.   So would you have concerns
21   about patient safety in that changing to
22   another dose of Xarelto or discontinuing
23   Xarelto might increase that patient's
24   risk of stroke?

53 (Pages 206 to 209)

Protected - Subject to Further Protective Review

Page 210

1     MR. DENTON:  Object to the
2  form.  It's compound.
3     THE WITNESS:  I -- my
4  main -- my -- it -- it's possible
5  that the best alternative to that
6  would be to change the patient to
7  a different oral anticoagulant.
8  BY MR. STEKLOFF:
9     Q.   A different -- oral -- a
10 different oral anticoagulant where
11 putting -- I withdraw that.
12    If it was a NOAC, you would
13 confront the exact same issues -- could
14 potentially confront with the exact same
15 issues, right?
16    MR. DENTON:  Object to the
17 form of the question.
18    THE WITNESS:  The aspect
19 that you're talking about here is
20 how to somehow quantify each
21 individual patient on bleeding
22 risk.
23    And we have that for
24 warfarin.  I think the data

Page 211

1  support that for rivaroxaban.
2     We have population data that
3  says that the bleeding risk in a
4  general way is less with Pradaxa
5  and apixaban in several studies
6  that are cited in this report.
7     So there is both
8  individualized data with respect
9  to warfarin and there is
10 generalized data with respect to
11 other NOACs that would say that,
12 in a general way, it might be
13 safer.
14    But what I'm -- what I'm
15 really aiming at here is the fact
16 that you have data that identifies
17 patients on Xarelto at higher risk
18 of bleeding.  That's -- that's the
19 main thing.
20    Being able to identify that
21 group then allows physicians to
22 look at their overall situation
23 and decide, based on that, whether
24 they would consider adjusting

Page 212

1  their regimen, whether it's a
2  lower dose, whether it's changing
3  to a different oral anticoagulant
4  including warfarin and the others.
5  BY MR. STEKLOFF:
6     Q.   So just so I understand, to
7  a reasonable degree of medical certainty,
8  you believe that doctors who prescribe
9  Xarelto to their patients should, if
10 available, monitor them using Neoplastine
11 for PT?
12    MR. DENTON:  Object to the
13 form.
14    THE WITNESS:  I think
15 that -- I think that if that was
16 available, physicians would find
17 that to be a very useful and
18 helpful test for making decisions
19 on their anticoagulation regimen.
20 BY MR. STEKLOFF:
21    Q.   In the FDA briefing document
22 that you rely upon that has the quartile
23 analysis, did you look at the portion of
24 that analysis that identified patients

Page 213

1  who were taking concomitant aspirin?
2     A.   Yes.  I looked at the -- I
3  looked at the entire report.
4     Q.   Okay.  And you didn't cite
5  the portion of that report in your -- in
6  your expert report regarding patients who
7  were taking Xarelto and concomitant
8  aspirin.  Is that fair?
9     A.   I did not --
10    MR. DENTON:  Objection to
11 form.
12    THE WITNESS:  I'm sorry.
13    MR. DENTON:  Go ahead.
14    THE WITNESS:  I did not cite
15 that.  I -- in my drafts I
16 included things.  I then left them
17 out.  I left other things out, and
18 then included them.
19    I did not want to be writing
20 a 400-page report.  So things that
21 I felt that I wanted to include I
22 left in.  But I did -- I did
23 consider that and review that
24 data.

54 (Pages 210 to 213)

Protected - Subject to Further Protective Review

Page 214

BY MR. STEKLOFF:
    Q.   How, if at all, did that
data impact your opinions?
        MR. DENTON:  Object to the
form.
        THE WITNESS:  So I reviewed
the FDA data, and I reviewed the
aspects that they talked about for
other variables.
        The FDA did do an analysis
that I found compelling, which was
that they did not find that the
aspirin use reached what they
considered to be a statistically
significant value.  And the fact
that they -- the fact that they
have included this data in the --
in the new FDA label also was
compelling to me.
        Another aspect that I found
to be important was that aspirin,
although it does relate to
bleeding, has a completely
different pathophysiology than the

Page 215

oral anticoagulants where aspirin
is a cellular-based therapy that
acts on platelets and works on
inhibiting platelet functioning;
whereas the oral anticoagulants
work through their ability to
generate thrombin in the plasma
and are not related to platelet
inhibition.
        So you are talking about
apples and oranges here in terms
of effects on the patient.
        And, finally, what was
compelling to me was that the data
showed a PT quartile-based
increase in the hazard ratio which
cannot be explained in any way by
the pathophysiology of aspirin.
And since so many of our patients
are on concomitant aspirin and
Xarelto, it struck me that this
was a very good, real-world
approximation of the type of
clinical patients that we see.

Page 216

        So to my mind, whether the
patient is on aspirin or not in
this respect is not germane.  It's
really that quartile of the PT
measurement using the Neoplastine
reagent at the appropriate time
that I think is most -- strikes me
as most compelling.
BY MR. STEKLOFF:
    Q.   And you -- and that data is
sufficient for you to say that patient
safety would be improved through
monitoring of Xarelto?
        MR. DENTON:  Object to the
form.  Asked and answered.
        THE WITNESS:  I think that
having that data -- I can't -- I
would be -- I can't imagine how
having that data would not improve
safety.  I don't have -- there's
no data to -- there's no data.  No
one has developed that data from
the ROCKET study to show that.  If
that data was available I would

Page 217

love to see that.
BY MR. STEKLOFF:
    Q.   Do you think more data is
needed before you would recommend that
doctors monitor patients for PT, Xarelto
patients?
    A.   Using --
        MR. DENTON:  Object.
        THE WITNESS:  I'm sorry.
BY MR. STEKLOFF:
    Q.   Using Neoplastine at the 13
to 15 --
    A.   Using Neoplastine with all
the caveats?  No.  I think -- I think
there's good data right now, sufficient
evidence.  We can always use more data,
but I think there's sufficient evidence
to offer that as a reasonable way of
trying to decrease patient risk.
BY MR. STEKLOFF:
    Q.   So you would disagree with
another expert who thinks otherwise?
        MR. DENTON:  Object to the
form.

55 (Pages 214 to 217)

Protected - Subject to Further Protective Review

Page 218

1    If you want to put an expert
2    in front of him, fine.  I think
3    it's an inappropriate question.  I
4    mean, you guys have tendered 42
5    experts.  Which one?
6         MR. STEKLOFF:  It's actually
7    one of yours.
8         MR. DENTON:  We tendered 20.
9    It doesn't matter.  If you want to
10   put something in front of him, ask
11   him, but to say things out of
12   context is just inappropriate and
13   you know that.
14        THE WITNESS:  I would be
15   happy to review what someone else
16   is saying and to put their --
17   relate their opinions to mine in
18   the appropriate context and give
19   you my evaluation of that.
20   BY MR. STEKLOFF:
21        Q.   Can we agree you are not a
22   regulatory expert?
23        A.   Pardon me?
24        Q.   Can we agree you are not a

Page 219

1    regulatory expert?
2         A.   So I have -- I have worked
3    with companies.  I have helped them
4    gather data for regulatory submissions.
5    I have been responsible for entire -- I
6    have been responsible for segments of
7    submissions to regulatory agencies.  And
8    I'm constantly working with people on
9    clinical trials where that data is going
10   to be submitted.  And I have had
11   conference calls with regulatory
12   personnel at FDA.
13        I don't -- I don't know
14   what -- I don't -- can you get a Ph.D.
15   in -- I don't know what -- I don't know
16   what certifies you as a regulatory
17   person.
18        Those are the things I've
19   done with respect to regulatory.
20        I'm not on a -- I'm not on
21   any committees at the FDA that are
22   related to regulatory affairs.  But I
23   have participated in many of the things I
24   just mentioned.

Page 220

1         Q.   How many times?
2         A.   I have no idea.
3         Q.   How many companies?
4         A.   Oh, I'd -- I'd have to go
5    through.  I -- well, it's not -- even my
6    CV is probably not complete on that
7    because not everything led to a complete
8    publication.  So it would be -- I don't
9    know the number.
10        May I -- may we take a
11   break?
12        MR. STEKLOFF:  Yeah, sure,
13   we can go off the record.
14        THE VIDEOGRAPHER:  The time
15   is 11:56 a.m.  We are going off
16   the record.
17        (Short break.)
18        THE VIDEOGRAPHER:  The time
19   is 12:06 p.m.  We are back on the
20   record.
21        MR. DENTON:  I do have your
22   invoices.
23        MR. STEKLOFF:  Thank you.
24        MR. DENTON:  Would you like

Page 221

1    those?
2         MR. STEKLOFF:  We'll wait
3    for a moment.
4         MR. DENTON:  Oh, okay.
5    BY MR. STEKLOFF:
6         Q.   Dr. Rinder, do you -- is
7    it -- Dr. Rinder, do you believe that
8    actual bleeding outcomes correlated with
9    PT in the ROCKET study?
10        MR. DENTON:  Object to the
11   form.
12        THE WITNESS:  So I'm not
13   sure -- I'm not sure there's a
14   better way of looking at that than
15   the way that the FDA characterized
16   the quartiles of PT with respect
17   to hazard ratio for bleeding risk.
18        And in that respect, with
19   each quartile increase of PT, the
20   hazard ratio for bleeding with
21   Xarelto increased.  And my review
22   of the curve for the prothrombin
23   time with respect to the frequency
24   of bleeding looks to me as if that

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 222

1          is a significant relationship.
2   BY MR. STEKLOFF:
3        Q.   So it's your opinion that as
4   your PT increases, your risk of bleeding
5   increases.  Is that fair?
6        A.   I think the hazard ratios,
7   the hazard ratios increase.  Now whether
8   you would have to compare statistically
9   Quartile 1 versus Quartile 2, et cetera,
10  et cetera, to examine that.  But in terms
11  of what I looked at, the fourth quartile
12  clearly has the highest bleeding risk.
13         And according to the data
14  that I saw in the graphs from FDA, that
15  quartile seems to be -- to be clearly
16  significant.  I haven't done a
17  statistical analysis of that.  But based
18  on the graph itself, that looks to me to
19  be significant.
20         So that's why I'm offering
21  the opinion about the cutoff time that
22  where the fourth quartile is.
23       Q.   But you can't say whether
24  there were -- the vast majority of the

Page 223

1   patients in the ROCKET study who had a PT
2   greater than 20 never had a major
3   bleeding outcome?
4        MR. DENTON:  Object to the
5   form.
6        THE WITNESS:  That's not
7   really the relevant question, to
8   me.
9          The relevant question to me
10  is, where do you start to increase
11  the bleeding risk based on the PT,
12  and why would you want to have
13  patients that are increasing their
14  bleeding risk if you know where
15  that point is.  We're not looking
16  at -- I'm not -- I'm not -- that's
17  where I'm basing that.
18  BY MR. STEKLOFF:
19       Q.   And are you determining
20  statistical significance in the quartile
21  analysis by eyeballing it?
22       MR. DENTON:  Object to the
23  form.
24       THE WITNESS:  Well -- well,

Page 224

1          let's look at the actual graph.
2   So I'm on Page 13 looking at
3   Figure 8.  So if I -- can I -- can
4   I just borrow this as a straight
5   edge for a second?
6        MR. DENTON:  Yes.
7        THE WITNESS:  So if I look
8   at the confidence interval for the
9   PT of 20, and I take the bottom
10  level of that and I mark that
11  level and I draw a line across,
12  that level is higher than the
13  95 percent confidence interval for
14  a PT of 13.
15         So if 95 percent confidence
16  intervals have no overlap, that,
17  to me, is very clinically
18  important and likely significant.
19         Like I said, I have not done
20  the actual exact comparison of
21  that data.
22         But with -- with 95 percent
23  confidence intervals not
24  overlapping between 20 and 13,

Page 225

1   that clearly would mean -- to me
2   would be clinically important.
3   And that's -- that's how I'm --
4   that's how I'm relating that.  I'm
5   not eyeballing it.  I'm using the
6   95 percent confidence intervals
7   relative to the prothrombin time.
8        Thank you.
9   BY MR. STEKLOFF:
10       Q.   Now, I want you to look at,
11  while you have your report --
12       A.   Yes.
13       Q.   -- Page 10.
14         And do you see Figure 6 at
15  the top?
16       A.   Yes, I do.
17       Q.   And you could similarly take
18  a document and -- and look at the dots
19  that are just above the line of PT for
20  20 seconds, right?
21       A.   So if I -- yeah, if I drew a
22  straight edge, I would divide patients in
23  terms of who has a PT greater than that
24  and who has a PT below that.

57 (Pages 222 to 225)

Protected - Subject to Further Protective Review

Page 226

```
 1        Q.   Right.  And you could have
 2   patients who are below 20 seconds who
 3   have major bleeding events, right?
 4        MR. DENTON:  Object to the
 5        form.
 6        THE WITNESS:  As we said
 7        with oral anticoagulants, the
 8        narrow therapeutic index means
 9        they can bleed at any point.
10   BY MR. STEKLOFF:
11        Q.   And you could have PT --
12   patients with PT above 20 seconds who had
13   no bleeding event, right?
14        A.   I'm -- I'm sure that that
15   has occurred.  But, again, I'm not
16   relating it as an absolute for all
17   patients that the moment you hit
18   20 seconds, everyone bleeds.
19        I'm saying that the hazard
20   ratio for bleeding increases at that
21   fourth quartile of a PT greater than
22   20 seconds in a way that looks meaningful
23   to me as I just mentioned regarding the
24   confidence intervals.
```

Page 227

```
 1        Q.   And all of those patients
 2   who have PTs above 20 seconds, you did
 3   not go to the underlying data to see if
 4   they had bleeding events, right?
 5        A.   I -- I could not -- I did
 6   not see that data broken out in the
 7   ROCKET study.
 8        Q.   Do you think that data would
 9   have been useful to your opinions?
10        MR. DENTON:  Object to the
11        form.  What data?
12        THE WITNESS:  I think that
13        the data is presented as the
14        quartiles.
15        In other words, the patients
16        that have the -- the fourth
17        quartile include the patients who
18        have a PT greater than 20.  And
19        that hazard ratio goes up
20        significantly at that point, or at
21        least in my mind, significantly.
22        So I think that data is
23        available in one way, shape, or
24        form.
```

Page 228

```
 1        I was -- I'm not aware of
 2        another analysis in ROCKET that
 3        looked at a cut-off point.
 4   BY MR. STEKLOFF:
 5        Q.   If that data existed that
 6   showed you the outcomes at different PT
 7   levels, would you want to see it?
 8        MR. DENTON:  I don't
 9        understand the question.  Object
10        to the form.
11        THE WITNESS:  I'm sorry.
12        Could you repeat the question?  I
13        got distracted.
14   BY MR. STEKLOFF:
15        Q.   The question was:  If that
16   data existed that showed the outcomes at
17   PT levels, would you want to see it?
18        A.   I always want to see data.
19        Q.   And for your opinion that PT
20   does, in fact, lead to more outcomes of
21   bleeding, are you relying on any other
22   data other than the quartile analysis?
23        MR. DENTON:  Object to the
24        form.
```

Page 229

```
 1        THE WITNESS:  I'm relying on
 2        the data from the FDA's
 3        development of the quartile
 4        analysis.
 5        I'm relying on the data that
 6        I saw in the Nakano manuscript.
 7        In terms of the cutoff of
 8        greater than 20 seconds, at
 9        this -- I'm not sure that there's
10        any other data that I can relate
11        directly to that cutoff.
12   BY MR. STEKLOFF:
13        Q.   And putting aside the
14   20-second cutoff, for your opinion that
15   in the ROCKET study patients who had a PT
16   of 20 or greater were more likely to have
17   a bleeding outcome, is the only basis the
18   FDA quartile analysis in that 2011
19   document?
20        MR. DENTON:  I object to the
21        form.  He's answered the question.
22        It's asked and answered.
23   BY MR. STEKLOFF:
24        Q.   Well, the -- the Nakano
```

58 (Pages 226 to 229)

Protected - Subject to Further Protective Review

Page 230

1    manuscript isn't about the ROCKET data,
2    right?
3         A.   No, it is not about the --
4    it is not about the ROCKET data.
5         So if you're asking me about
6    what about the --
7         Q.   I'm --
8         A.   Maybe you want to rephrase
9    it.
10        Q.   Well, now, I'm actually
11   trying to explain through questions why
12   Mr. Denton is -- is wrong.
13        So my question is different.
14   Because I'm not asking about the
15   20-second cutoff in the abstract. I'm
16   asking specifically about the ROCKET
17   study.
18        So can we agree the Nakano
19   paper does not involve ROCKET data?
20        A.   The Nakano paper is separate
21   data from ROCKET.
22        Q.   And so my question is, with
23   respect to your opinion that patients in
24   the ROCKET study were -- had more bleed

Page 231

1    outcomes above 20 seconds, is the only
2    thing that you're relying on the 2011 FDA
3    quartile analysis?
4         MR. DENTON:  Object to form.
5         THE WITNESS:  Okay. So the
6         way that you are phrasing it is
7         slightly scientifically incorrect.
8         What I'm saying is that the
9         quartile analysis of the full
10        ROCKET data, all patients as well
11        as the subset with the U.S., shows
12        that bleeding risk, the hazard
13        ratio, increases with every
14        quartile.
15        And I'm saying that the data
16        that I see in the fourth quartile
17        looks to me to be clinically
18        meaningful, and that's what I'm
19        basing it on, the full ROCKET
20        data.
21   BY MR. STEKLOFF:
22        Q.   So do you disagree with the
23   statement that the ROCKET data -- my
24   statement, that the ROCKET data doesn't

Page 232

1    provide any way to predict whether a
2    patient would be more likely to have a
3    bleeding event based on the PT readings?
4         MR. DENTON:  Object to the
5         form and the content.
6         THE WITNESS:  Is that just a
7         statement or are you reading that
8         from some manuscript or guideline?
9    BY MR. STEKLOFF:
10        Q.   Just a statement.
11        A.   Okay. Again, I think you're
12   stating it in a way that is not
13   comporting with the way the data is
14   provided.
15        The data show the hazard
16   ratio of bleeding with respect to
17   quartile. They are -- the data has not
18   been evaluated as a threshold, as far as
19   I know. I have not seen data for that
20   threshold.
21        I have seen data for the
22   quartile aspect of that. So I'm relating
23   this entirely to the fourth quartile of
24   patients with PT having an increased

Page 233

1    hazard ratio for bleeding.
2         Q.   Would you want to see the
3    peak PT data at various times when PT was
4    taken in the ROCKET study correlated with
5    whether a major bleeding event occurred,
6    or whether a patient had no bleeding, or
7    whether a patient had a nonmajor
8    clinically relevant bleeding?
9         MR. DENTON:  Object to the
10        form. It's incomprehensible.
11        THE WITNESS:  I will -- I'm
12        not sure exactly what you're
13        referring to. But I'll use the
14        statement that I made before.
15        I welcome all data as long
16        as I have the ability to know
17        where it came from, how it was
18        obtained, and be able to have it
19        fully explained.
20   BY MR. STEKLOFF:
21        Q.   Wouldn't you want to see,
22   for example, at 25 seconds, all the
23   patients who had 25 seconds at one of the
24   readings in the ROCKET study, did --

59 (Pages 230 to 233)

Protected - Subject to Further Protective Review

Page 234

1  those patients, were they more likely to
2  have a bleeding event or not.  If that
3  data is available, wouldn't you want to
4  see it?
5          MR. DENTON:  Object to the
6  form.
7          THE WITNESS:  Well, you're
8      just -- that's just restating the
9      quartile data with a different --
10     with a different way of looking at
11     that.
12         You would have to know the
13     power of those.  You would have to
14     know the numbers.  You would have
15     to know the reliability of it.
16         Like I said, I'm happy to
17     look at all data.  But the data
18     that the FDA developed and which
19     they obviously felt was of
20     clinical import because they've
21     included it in their label now, is
22     that those quartiles are showing
23     an increased hazard ratio of
24     bleeding with each increase in

Page 235

1      quartile.
2  BY MR. STEKLOFF:
3      Q.   You can't point to anything
4  else that shows similar observations from
5  the ROCKET study?
6          MR. DENTON:  Object to the
7      form.  Asked and answered.
8          THE WITNESS:  The ROCKET
9      study was very large.  And I mean,
10     that's a lot of data.  I think
11     that has power.
12  BY MR. STEKLOFF:
13     Q.   And did the FDA measure
14  statistical significance between those
15  quartiles?
16     A.   I did not see -- other than
17  the aspect of looking at confounders or
18  covariates, I did not see a -- well, it
19  may be in that table.  I'm not sure.  I'd
20  have to look at one of the original
21  tables.  I can't recall whether or not
22  they said that this was a clinical
23  significance between the quartiles or
24  not.  Offhand I don't recall it.  But I

Page 236

1  may be misspeaking.  It may be there in
2  terms of those -- in terms of those
3  comparisons.  I don't recall that.
4          But, as I said, looking at
5  the data with no overlap of confidence
6  intervals between the fourth -- between a
7  PT of 20 and PT of 13, I'd be very
8  surprised if that type of analysis didn't
9  show clinical significance.
10     Q.   But is that how you conduct
11  statistical significance calculations in
12  your research that you conduct?
13         MR. DENTON:  Object to form.
14         THE WITNESS:  In the best of
15     all possible worlds, I would like
16     to have the original data to show
17     that.  But in terms of looking at
18     graphs, I have enough experience
19     with statistics to recognize that
20     when confidence intervals do not
21     overlap in any way, 5th to 95th
22     confidence intervals do not
23     overlap, that's very clinically
24     meaningful.  I've not seen any

Page 237

1      studies where that somehow is not.
2  BY MR. STEKLOFF:
3      Q.   You have no reason to
4  believe that FDA didn't have that data?
5          MR. DENTON:  What data?
6      Object to form.
7  BY MR. STEKLOFF:
8      Q.   The data that you were
9  looking at in that graph where you put a
10  piece of paper and tried to measure
11  statistical significance.
12     A.   I can't speak for the way
13  the FDA operates in that respect.
14     Q.   With respect to variability,
15  do you agree that variability of drug
16  concentration doesn't have a clinical
17  impact if the data demonstrates that the
18  dose is safe over a wide range of
19  concentration?
20         MR. DENTON:  Object to the
21     form.  Who wrote that one out for
22     you?
23         THE WITNESS:  I'm sorry.
24     You're going to have to rephrase.

Protected - Subject to Further Protective Review

Page 238

BY MR. STEKLOFF:
    Q.   I'll ask a different
question.
        Do you have any -- do you
have any opinions criticizing the dosing
that was used in the ROCKET study?
        MR. DENTON:  Object to the
    form.
        THE WITNESS:  The
    20 milligrams daily dose?
BY MR. STEKLOFF:
    Q.   Yes.
    A.   No, I do not have any
criticisms of that.  And I'm not aware
that I wrote anything in my report that
criticized that.
    Q.   I agree.  I just wanted to
make sure.
        And do you agree that using
a single 20-milligram dose in the ROCKET
study, the study demonstrated safety over
a wide range of drug concentration?
        MR. DENTON:  Again, I object
    to the form of the question.

Page 239

        THE WITNESS:  I -- I don't
think that that -- I think that
that question is -- I do not think
that question is, with all due
respect, scientifically valid in
the way that I look at
anticoagulation.
        Drug concentration, I think,
is useful for pharmacokinetics,
but in the situation that I'm
looking at here, the data is more
meaningful for activity.
        And with respect to
activity, there is a clear
indication of an increased hazard
ratio in the fourth quartile of
PT, not to belabor that point.
        But that, to me, is the --
is the more clinically meaningful
important aspect of whatever
variability you're looking at.
        And that, to me, is where I
would worry at that point in that
fourth quartile about the safety

Page 240

of the drug with respect to that
point.  It's immaterial, to me
where the -- where the rest of the
variability in that activity,
unless you can show that there
is the quartile significance.
        The fact that the efficacy
of PT related to outcomes is
relatively flat tells me that that
is a -- that that is something
that we can rely on at least in
that prothrombin time range and
that the difference between that
and the quartile change with ratio
for bleeding is most important.
        So I can't really answer
that concentration in that respect
the way that you're asking it.  I
relate it to the activity and
relate it to the quartiles for
efficacy and safety.
BY MR. STEKLOFF:
    Q.   I'm just really -- I'm
trying to understand your opinion.  Is

Page 241

your opinion drug concentration relates
to PT in the first step?
    A.   In a general way the drug
concentration has a linear correlation
with the prothrombin time.  I think
that's been shown in multiple studies,
including from within the manufacturer
from their -- I can't remember -- Kubitz,
Kubitzo, Kubitza.  Starts with a K.
        And he relates that the PT
can be used to measure the drug
concentration.
    Q.   And can you point me to the
cites that you're relying upon that
you've cited in your report for that
opinion?
        MR. DENTON:  What opinion?
BY MR. STEKLOFF:
    Q.   The stuff in your opinion
that you just --
    A.   Related to what Kubitza
said?
    Q.   Drug -- yes.  Drug
concentration relating to PT.

Protected - Subject to Further Protective Review

Page 242

1    A.   That's a 2005.  I think --
2  he's the first author.  Kubitza, Kubitzo.
3        MR. DENTON:  That's it.
4        It's actually a she.
5        THE WITNESS:  It's a
6        preclinical trial, I think, in
7        healthy volunteers.
8  BY MR. STEKLOFF:
9    Q.   Anything else that you can
10 think of that you're relying upon for
11 that?
12   A.   There are multiple studies.
13 There's -- let's go through my report.
14   Q.   That's what I'm trying to
15 do.
16   A.   Sure.  I appreciate that.
17 So we're limiting this to PT, to
18 prothrombin time?
19   Q.   Yes.
20   A.   So the briefing document for
21 the cardiovascular and renal drugs
22 advisory committee, the data that was
23 submitted by the manufacturer on Page 9
24 shows the PT to be beautifully linearly

Page 243

1  correlated with the concentration of drug
2  in micrograms per liter.  ROCKET-AF
3  patients were studied by Girgis looking
4  at the Neoplastine PT, looking at
5  rivaroxaban concentration versus
6  clot-based results.  They found a
7  sensitivity that was similar to studies
8  by Mueck -- I hope I'm pronouncing that
9  right.
10   Q.   Mueck.
11   A.   Mueck.  I'm sorry.
12        -- who looked at DVT
13 patients.  That's published in 2011.  ACS
14 patients published by Xu.  If we go to
15 the next page.
16   Q.   So it's really -- just to
17 try to narrow this, is it everything that
18 you cited on Pages 9 through the top of
19 12?
20   A.   There may be other in my
21 literature reference that I used for
22 this, but these are what I included for
23 cite for -- within in the report.
24   Q.   Okay.  And so in any

Page 244

1  individual patient, do you think you can
2  say because his or her drug concentration
3  is at a certain level, his or her PT is
4  going to be at a corresponding level?
5        MR. DENTON:  Object to the
6        form.
7        THE WITNESS:  The
8        interindividual variability is
9        such that I would not try to use
10       that.  What I would try to use is
11       the activity, the prothrombin time
12       and not worry about the
13       concentration of the drug.
14       I would use the activity.  I
15       think the data from ROCKET itself
16       developed the most robust data to
17       show where bleeding risk is at
18       that fourth quartile.  And I would
19       use that PT activity.
20       In fact, rivaroxaban
21       concentrations can be clinically
22       monitored and are being clinically
23       monitored by physicians right now.
24       For example, Quest offers an

Page 245

1        actual rivaroxaban concentration.
2        And I get calls from physicians
3        when they get that data, saying,
4        "What do I do with this
5        information?"
6  BY MR. STEKLOFF:
7    Q.   What's your answer?
8    A.   I tell them that it's of
9  no -- it's of no use, because there's no
10 therapeutic index that comes along with
11 that rivaroxaban concentration.  I tell
12 them if we are going to look at something
13 for trying to predict bleeding risk, we
14 need to look at the Neoplastine PT as an
15 assay that would have usefulness for
16 that.
17   Q.   So is your -- is it your
18 opinion that if you have a higher drug
19 concentration, you are more likely to
20 have a higher PT with the Neoplastine
21 reagent?
22   A.   Again, I don't want to use
23 words that could be misconstrued in terms
24 of being somehow studied in that respect.

Protected - Subject to Further Protective Review

Page 246

1      What I would say is there's
2 a linear correlation between the
3 rivaroxaban concentration by whatever
4 method used and the Neoplastine or other
5 reagent-based prothrombin time.
6      Q.   But it's the prothrombin
7 time that really matters because that's
8 what is tied to the quartile analysis?
9      MR. DENTON:  Object to form.
10 BY MR. STEKLOFF:
11     Q.   Is that fair?
12         MR. DENTON:  Object to form.
13         THE WITNESS:  As I said, the
14     robust data from ROCKET that are
15     related to bleeding risk are with
16     the PT.  And that's what I would
17     use.
18 BY MR. STEKLOFF:
19     Q.   And would you disagree with
20 any literature that says you shouldn't
21 use PT to monitor patients who are taking
22 Xarelto?
23         MR. DENTON:  Again, I
24     object.  If you're going to talk

Page 247

1     about literature, show him the
2     article.
3         THE WITNESS:  Again, I -- I
4     would be happy to look at the
5     specific article that you want and
6     to review it the way we did with
7     Adcock and Gosselin's article.
8 BY MR. STEKLOFF:
9     Q.   Do you agree that before the
10 companies could recommend that PT with a
11 Neoplastine reagent be used to monitor
12 patients who are taking Xarelto, the
13 companies would need FDA approval?
14         MR. DENTON:  Object to the
15     form.
16         THE WITNESS:  I'm sorry.
17     You're going to have to rephrase
18     that.  Before -- before the
19     companies --
20 BY MR. STEKLOFF:
21     Q.   Sir, you -- you wish the
22 companies would recommend that doctors
23 use PT as a way to monitor their Xarelto
24 patients, right?

Page 248

1         MR. DENTON:  Object to the
2     form.
3         THE WITNESS:  I would be --
4     I would be very happy if the -- if
5     the FDA label showed the data
6     related to PT monitoring in a way
7     that -- in a way that strongly
8     showed for physicians that this
9     could be clinically useful for
10     them.
11         I -- I am not worried about
12     FDA approval of an assay as a
13     requirement to monitor or to
14     somehow follow patients.
15         We use laboratory tests that
16     are laboratory developed that are
17     not FDA approved.  We have
18     laboratory tests that are analyte
19     specific and, therefore, not FDA
20     approved, and we use those
21     clinically all the time.
22         So relying on FDA approval
23     as the threshold for being able to
24     use the prothrombin time for

Page 249

1     clinical patient care, I don't
2     find of import.
3 BY MR. STEKLOFF:
4     Q.   Okay.  What do you think the
5 Xarelto label should say about PT that it
6 doesn't say today?
7     A.   Well, let's go to my report.
8         On Page 4.  My criticisms
9 related to PT are under 5-B.  It fails to
10 inform physicians like myself of, one,
11 the degree of inter-patient variability
12 with respect to drug plasma
13 concentrations.
14         And related to that, the
15 near linear correlation between drug
16 plasma concentration and PT with numerous
17 available reagents, the relationship
18 observed between PT and bleeding risk in
19 the ROCKET-AF trial; and, four, the
20 utility of using a PT measurement to
21 identify those patients at highest risk
22 of bleeding.
23         And although the data in C,
24 which is that the bleeding risk relative

63 (Pages 246 to 249)

Protected - Subject to Further Protective Review

Page 250

1  to well-controlled INR -- and so that is
2  related to PT, but is not -- not
3  necessarily related to what's in B --
4  that data was sufficient in September of
5  2015 to be added to the label.  I don't
6  see why that data was not equally
7  sufficient prior to that time, in
8  November of 2011.
9        And then my last aspect,
10  which is PT related but talks more about
11  the time and therapeutic range, is that
12  the label does not describe how the low
13  TTR in the ROCKET-AF trial affected
14  efficacy and safety.
15        So I realize that your
16  question was specifically on PT, but I
17  want to be complete in that those other
18  two relate to the prothrombin time
19  measurements as well.
20        MR. DENTON:  Lunchtime?
21        MR. STEKLOFF:  Sure.  We'll
22  go off the record.
23        THE VIDEOGRAPHER:  The time
24  is 12:36 p.m.  We are going off

Page 251

1  the record.
2        (Lunch break.)
3        THE VIDEOGRAPHER:  The time
4  is 1:36 p.m.  We are back on the
5  record.
6  BY MR. STEKLOFF:
7    Q.  Dr. Rinder, do you agree
8  that, for clinicians, fatal bleeds are
9  more concerning than nonfatal bleeds?
10        MR. DENTON:  Object to the
11  form.
12        THE WITNESS:  Well, what
13  context are you talking about
14  this?  Are you talking about it as
15  a -- as the endpoint of a
16  patient's care?
17  BY MR. STEKLOFF:
18    Q.  I'm talking about it in the
19  context of making a prescribing decision
20  for a patient who has atrial fibrillation
21  that, in terms of a bleeding risk, a
22  clinician would be more concerned about a
23  fatal bleed than a nonfatal bleed.
24        MR. DENTON:  Object to form.

Page 252

1        THE WITNESS:  So I think
2  what I would be more concerned
3  about -- what -- what -- I think
4  what I, and if I -- I'll speak for
5  what I would consider to be valid.
6  I think that I'm more concerned
7  about overall mortality for my
8  patients.  So I'm -- I'm certainly
9  going to consider all
10  complications and possible
11  complications related to a therapy
12  and their condition.  But I'm not
13  going to limit myself in the way
14  that I evaluate that patient to
15  a -- a single aspect that could be
16  related to their mortality.
17        I would be more concerned
18  about overall mortality.
19        So I'm going to investigate
20  or consider every aspect that goes
21  into that with respect to how that
22  is going to impact overall
23  mortality.
24

Page 253

1  BY MR. STEKLOFF:
2    Q.  Including the risk of
3  stroke?
4        MR. DENTON:  Object to the
5  form.
6        THE WITNESS:  Certainly I
7  would include everything in my
8  assessment of overall mortality
9  and risk.
10  BY MR. STEKLOFF:
11    Q.  Do you believe to a
12  reasonable degree of medical certainty
13  that as a Xarelto patient's PT increases,
14  he or she is at a greater risk of a fatal
15  bleed?
16        MR. DENTON:  Object to the
17  form and context.
18        THE WITNESS:  So I -- I have
19  not seen data developed that would
20  be able to inform me to make a
21  knowledgeable decision about that
22  aspect.
23  BY MR. STEKLOFF:
24    Q.  And is that true if I asked

64 (Pages 250 to 253)

Protected - Subject to Further Protective Review

Page 254

1  you the same question but focused on
2  critical organ bleeds?
3      MR. DENTON:  Object to the
4  form.
5      THE WITNESS:  Part of the
6  problem here is that the -- the
7  critical organ and fatal bleeds in
8  the ROCKET study were very low
9  numbers.  And I don't know if that
10 data was not developed because it
11 didn't have enough power to inform
12 that data for making accurate
13 decisions.
14     In addition, I don't recall
15 that part of the protocol for
16 ROCKET was to obtain laboratory
17 data at the time of critical organ
18 bleeds or fatal bleeds to be able
19 to inform that data for making
20 that decision.
21     I did not see that data.
22 I'm not aware that it was
23 gathered.  So I don't think
24 there's enough data to be able to

Page 255

1  make that judgment one way or the
2  other.
3      It would be nice to have had
4  that data.  I'm not aware that
5  that was collected as part of the
6  ROCKET study.
7  BY MR. STEKLOFF:
8      Q.  Well, with respect to less
9  severe but still major bleeds, was data
10 collected in the ROCKET study at the time
11 of the bleed that you're relying upon?
12     MR. DENTON:  Object to the
13 form.
14 BY MR. STEKLOFF:
15     Q.  PT data.
16     MR. DENTON:  Same objection.
17     THE WITNESS:  When -- the
18 P -- when you say "the data" that
19 I'm -- you're going to have to
20 help me out.
21     What data are you saying I
22 relied upon?
23 BY MR. STEKLOFF:
24     Q.  Well, I'm asking.  You --

Page 256

1  you said -- I'm going to read back your
2  answer, last answer, when I asked you
3  about the fatal bleeds.  You said, "I did
4  not see that data.  I'm not aware that it
5  was gathered.  So I don't think there's
6  enough data to be able to make that
7  judgment one way or the other.  It would
8  have been" -- "it would be nice to have
9  had that data.  I'm not aware that it was
10 collected as part of the ROCKET study."
11     That's your testimony with
12 respect to data about PT at the time of a
13 fatal bleed or critical organ bleed; is
14 that right?
15     A.  Yes.  I am not aware that
16 laboratory studies were collected, for
17 example prothrombin time, at the time of
18 critical organ or fatal bleeds.  Unlike
19 the way that we would examine a patient
20 if they came in clinically in my
21 hospital, we would be getting those
22 laboratory studies.  I did not -- I'm not
23 aware that that data was collected.
24     Q.  And my question is, is the

Page 257

1  same true for other types of major bleeds
2  that are less severe than fatal bleeds or
3  critical organ bleeds in the ROCKET
4  study?
5      MR. DENTON:  Object to the
6  form.
7      THE WITNESS:  Again, in the
8  protocol that -- that I'm aware of
9  for the ROCKET study, laboratory
10 studies are -- were not either
11 collected or available when
12 patients were admitted for
13 bleeding.
14 BY MR. STEKLOFF:
15     Q.  Any bleeding?
16     A.  I don't know -- I don't know
17 how that was performed.  I know that when
18 I tried to look for data for patients
19 with major bleeding, that I presume would
20 require admission, I did not see
21 laboratory data, for example, the
22 prothrombin time for that.  That's --
23 that that is not available, as far as I
24 know.

65 (Pages 254 to 257)

Protected - Subject to Further Protective Review

Page 258

```
1          Q.   So all of the PT data that
2    you're relying upon to opine that PT
3    should be used as -- I'll -- I'll -- let
4    me rephrase that.
5          All of the data that you're
6    relying upon from the quartile analysis
7    with respect to your opinions about PT
8    was taken not at the time of any of the
9    bleeds but at another collection point.
10   Is that fair?
11         MR. DENTON:  No, it's not.
12   I object to the form.
13         THE WITNESS:  The PT data
14   that was -- that's published by
15   the FDA in those quartiles.  That
16   is from when the patients were
17   collected, period.
18         How that relates to when
19   they had their bleed or not, I
20   don't believe that that --
21   intervals were shown for that
22   data.  I'm not aware of that data.
23   Some may have been collected at
24   the time of bleeds or just before;
```

Page 259

```
1    some may not.
2          There's -- I have no way of
3    knowing that data.
4          But what I do know is that
5    data was uniformly collected, is
6    published by the FDA as
7    informative, and those quartiles,
8    no matter where they were drawn,
9    show a relationship of increasing
10   hazard ratio.
11         I -- I do agree that if the
12   study had followed what I
13   considered to be good clinical
14   practice of drawing laboratory --
15   complete laboratory evaluations at
16   the time of a clinical bleed,
17   fatal, critical organ, whatever,
18   that would be good data to have
19   and might be informative.
20         But without that, I can't
21   know what that data would have
22   said.
23   BY MR. STEKLOFF:
24         Q.   You would just be
```

Page 260

```
1    speculating?
2          MR. DENTON:  Object to the
3    form.
4          THE WITNESS:  I'm not going
5    to speculate.  All I can do is say
6    that that is not available.
7    BY MR. STEKLOFF:
8          Q.   So I'm going to show you
9    what I believe is the quartile analysis
10   that you're relying upon.
11         MR. STEKLOFF:  We'll mark
12   this as Exhibit 5.
13         (Document marked for
14   identification as Exhibit
15   Rinder-5.)
16   BY MR. STEKLOFF:
17         Q.   The underlying document I
18   know you pull out.  There are tables and
19   other things that you cite in your
20   report.  And feel free to review that as
21   well.
22         Are you familiar with the
23   document that I just handed you as
24   Exhibit 5?
```

Page 261

```
1          A.   Yes.
2          Q.   And, for example, if you
3    turn to Page 38 and Page 40, those are
4    some of the tables that we looked at
5    before; is that right?
6          MR. DENTON:  Is this the
7    complete document?
8          MR. STEKLOFF:  This might be
9    a subset.  I'm happy to have the
10   massive complete document if you
11   want it.
12         MR. DENTON:  I'm asking if
13   this is a complete document,
14   because you asked him to identify
15   it.  And it clearly isn't.
16         THE WITNESS:  Well, I
17   recognize the front of this page.
18         MR. STEKLOFF:  I have one
19   copy.  If you would rather mark
20   this as Exhibit 5, I'll give you
21   the full document.
22         THE WITNESS:  I think that's
23   probably better.  Wouldn't you
24   think?
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 262

1    BY MR. STEKLOFF:
2        Q.   Okay.  Well, we'll keep that
3    as Exhibit 5.  But I'll ask you questions
4    Exhibit 6.
5        A.   Okay.
6        Q.   We'll make the full copy
7    Exhibit 6.
8            MR. STEKLOFF:  Sorry I don't
9    have a full copy for you, Roger.
10           (Document marked for
11           identification as Exhibit
12           Rinder-6.)
13   BY MR. STEKLOFF:
14       Q.   And my question was, for
15   example, on Pages 40 and 38, those are
16   some of the figures that you cited in
17   your report, right?
18       A.   Sorry.  So this figure on
19   Page 38, yes, this is the same as the
20   figure on Page 10 of my report.
21       Q.   Okay.  So now turn to
22   page --
23       A.   Wait.  Wait.  Page 40,
24   Figure 8, yes, on Page 40.

Page 263

1        Q.   Okay.  So now turning to
2    Page 41.  This is the -- what we've been
3    referring to today as the quartile
4    analysis; is that right?  Summary of
5    the -- is it fair to say that this is the
6    summary of the quartile data that we've
7    been discussing?  Table 6?
8        A.   Yeah, I see it.  I've looked
9    at this table.  But this table does not
10   have the hazard ratios that I was
11   describing.  Let's see if I include that
12   here in my -- so the quartile of PT
13   values that I was talking about was Table
14   5 of Section 4.1.4.4.
15           I'm not referring to this
16   Table 6.
17           This Table 6 is different
18   than the Table 6 that I'm referring to on
19   Page 13 where I'm looking at the
20   U.S.-only data and PT quartile.
21           So I was not referring
22   specifically to this particular table.
23       Q.   Okay.  Do you agree that
24   this table that I asked you about on Page

Page 264

1    41 also lays out the quartile analysis?
2            MR. DENTON:  Object to the
3    form.
4            THE WITNESS:  So I see that
5    this is PT quartiles.  And the
6    major bleeding subset is broken
7    out into four -- I'm sorry -- into
8    four different categories subsumed
9    under the major bleeding subset.
10   BY MR. STEKLOFF:
11       Q.   Can you remind me what page
12   you said you were relying upon or
13   citing -- or citing in your report?
14       A.   So clinical pharmacology
15   biopharmaceutical review.  Maybe that's a
16   different document.
17           MR. DENTON:  I think it is.
18   BY MR. STEKLOFF:
19       Q.   I think that's a different
20   document.
21       A.   I think that's a different
22   document.
23       Q.   Have you ever seen this
24   document before that we're looking at

Page 265

1    now, Exhibit 6?
2        A.   Yes.
3        Q.   Looking at Table 6 on Page
4    41, do you agree that that is a table
5    breaking down the major bleeding that
6    occurred during the ROCKET study by
7    quartile?
8            MR. DENTON:  Object to form.
9            THE WITNESS:  It has data
10           related to major bleeding per
11           quartile.
12   BY MR. STEKLOFF:
13       Q.   Okay.  The same -- in other
14   words, the FDA is looking at the same
15   data that you have -- maybe presented in
16   a different way, but it's the same data
17   that you are relying upon in your report;
18   is that right?
19           MR. DENTON:  Object to form.
20           THE WITNESS:  Well, it's
21           shown in a very different way.
22           It's not -- it's not looking at
23           hazard ratio compared to warfarin.
24           So it's just -- it's just

67 (Pages 262 to 265)

Protected - Subject to Further Protective Review

Page 266

1          pure data.  It's not the same as
2      what I'm referring to.
3   BY MR. STEKLOFF:
4          Q.   Okay.  Well, it's showing
5   the actual events of major bleeds that
6   occurred in the rivaroxaban arm of the
7   ROCKET study by quartile; is that right?
8          A.   It is showing that, correct.
9          Q.   Okay.  And if you look at,
10  for example, the column that says
11  "critical organ bleed."
12         Do you see that?
13         A.   Yes.
14         Q.   That actually shows that the
15  fourth quartile was lower as a percentage
16  of patients who experienced a critical
17  organ bleed than the second quartile or
18  the third quartile; is that right?
19         MR. DENTON:  Object to the
20     form.
21         THE WITNESS:  Looking at the
22     absolute numbers and without
23     knowing -- which are very small,
24     and without knowing the power with

Page 267

1      these small numbers to make a
2      distinction between whether they
3      are significant and have power to
4      have meaningfulness, I don't know
5      that answer.  I suspect that
6      because they're so small, I doubt
7      that breaking that data out per
8      quartile is meaningful.
9          I agree with you that if you
10     look at specific numbers, 15, 20,
11     25, 19, those are the numbers.
12     But their meaningfulness related
13     to quartile based on how low the
14     frequency of that is, it has no
15     meaning to me.
16  BY MR. STEKLOFF:
17         Q.   Okay.  So you'd be critical
18  of someone who thought that it does have
19  some meaning?
20         MR. DENTON:  Object to the
21     form and the context.
22         THE WITNESS:  I would -- I
23     would need to look at that
24     person's analysis, what they

Page 268

1      are -- what they're referring to
2      and how they are reading that and
3      look at that in order to evaluate
4      what they are saying.
5   BY MR. STEKLOFF:
6          Q.   Would you want to know what
7   the FDA thought about this data that's
8   presented in Table 6?
9          MR. DENTON:  Object to the
10     form.
11         THE WITNESS:  As I've said
12     before, I'm happy to look at all
13     data.
14  BY MR. STEKLOFF:
15         Q.   Okay.  So look right above
16  Table 6.  Do you see a table that starts
17  "It is reassuring"?
18         A.   I do.
19         Q.   Okay.  So I'm going to read
20  that, and then I'll ask you a few
21  questions.  It says, "It is reassuring
22  that for the overall population, there
23  does not appear to be a shift from lesser
24  severities of ISTH major bleeding, that

Page 269

1   is, hemoglobin drops and transfusions, to
2   the more severe forms, that is, critical
3   organ bleeding and fatal bleeding, as a
4   function of PT prolongation with
5   rivaroxaban as can be seen in the FDA
6   analysis in Table 6."
7          Did I read that right?
8          A.   You did.
9          Q.   Do you agree with the FDA's
10  comment that it is reassuring that for
11  the overall population there does not
12  appear to be a shift from lesser
13  severities of ISTH major bleeding to the
14  more severe forms of bleeding?
15         MR. DENTON:  Object to the
16     form of the question.
17         THE WITNESS:  So I'm -- I'm
18     having difficulty understanding
19     what that paragraph means.
20         In the -- in the groups that
21     have major bleeding, hemoglobin
22     drop, and two units of blood
23     transfusion, there's a clear
24     increase from first quartile to

68 (Pages 266 to 269)

Protected - Subject to Further Protective Review

Page 270

1    fourth quartile in the percentage
2    occurring in those groups.
3         So I don't -- I don't
4    understand what they're saying
5    here between a shift from lesser
6    severity to more severe.  That is
7    a -- that's not a very clear or
8    specific sentence.
9         So I really don't know what
10   the underlying meaning is this.
11        And I'm also not -- I don't
12   know what basis they're using to
13   say it's reassuring.  I don't know
14   whether they are -- whether they
15   are basing that on a power
16   analysis, or whether -- I frankly
17   don't have any basis to evaluate
18   that statement.
19   BY MR. STEKLOFF:
20        Q.   What information would you
21   need to be able to evaluate that
22   statement?
23             MR. DENTON:  Object to the
24   form.

Page 271

1         THE WITNESS:  I think I
2    would need to sit down and talk to
3    whomever wrote it and try and
4    figure out what they mean by a
5    shift from lesser severities of
6    bleeding to more severe forms.
7    That's just -- that's a
8    meaningless sentence to me.
9         If you're looking at this
10   data in a -- in a -- and just
11   translating what you see, in the
12   major bleeding subsets of
13   hemoglobin drop and two units of
14   transfusion, the incidence
15   increases from the first to the
16   second to the third to the fourth
17   quartile in both of those.
18   BY MR. STEKLOFF:
19        Q.   And don't --
20             MR. DENTON:  Let him --
21             THE WITNESS:  No, let -- let
22   me finish. I'm sorry.  In the
23   critical organ bleeding and the
24   bleed resulting in death where

Page 272

1    there are much, much smaller
2    numbers, you do not see the same
3    relationship.
4         But I don't know if the
5    power of that parsed out into
6    those fourth quartiles is
7    sufficient to say that is the
8    same, significant, different, or
9    what.
10        That's why I think that the
11   overall analysis which I'm
12   referring to in my report, I
13   think, is more meaningful.  I
14   don't understand what they're
15   saying in this sentence.  I don't
16   know who wrote this sentence,
17   whether that sentence came from
18   the company and was adapted by the
19   FDA, or whether it was written by
20   someone in the FDA.  I just -- I
21   just don't understand that
22   sentence.
23   BY MR. STEKLOFF:
24        Q.   Well, you can look at the

Page 273

1    top.  It says, "clinical review," and it
2    lists three people at the FDA, Nhi
3    Beasley, Preston Dunnmon, and Martin
4    Rose, who were the reviewers of the
5    application.  So do you have any question
6    that they're the ones who wrote that
7    sentence?
8             MR. DENTON:  Object to the
9    form.
10            THE WITNESS:  I can't know
11   who wrote that sentence.
12   BY MR. STEKLOFF:
13        Q.   And don't you think exactly
14   what you just described, that you see an
15   increase to Quarter 1 to Quarter 2 and
16   Quarter 3 to Quarter 4 in hemoglobin drop
17   and two units of blood transfusion as a
18   percentage basis of the patients who
19   experienced those events, what -- don't
20   you think what they are saying is
21   you've -- it's reassuring that you don't
22   see that when you look at the critical
23   organ bleeds and the bleed results --
24   the -- the bleeds that resulted in death?

69 (Pages 270 to 273)

Protected - Subject to Further Protective Review

Page 274

1          MR. DENTON: Does anybody
2     understand that? I don't. I
3     object to the form.
4          THE WITNESS: I --
5     BY MR. STEKLOFF:
6          Q.   Dr. Rinder, can I -- let me
7     interrupt. If you don't understand a
8     question today, you're going to let me
9     know, right? You've been doing a very
10    good job of that, correct?
11         A.   I will.
12         Q.   Okay. So we'll agree it's
13    irrelevant if Mr. Denton understands the
14    question --
15         MR. DENTON: No, we're
16    not -- we're not --
17         MR. STEKLOFF: When you can
18    make your objection -- I think
19    you've objected --
20         MR. DENTON: I -- I'm sure I
21    can -- it's not irrelevant if you
22    ask an incomprehensible question.
23         MR. STEKLOFF: Okay. It's
24    also irrelevant if you object to

Page 275

1     99 percent of my questions.
2     BY MR. STEKLOFF:
3          Q.   Now, I'm going to ask you,
4     Mr. Rinder -- Dr. Rinder, based on your
5     review of this language, don't you think
6     that the FDA reviewers found it
7     reassuring that they didn't see that
8     increase in quartiles -- across quartiles
9     in the critical organ bleed and the
10    bleeding that leads -- that results in
11    death?
12         MR. DENTON: Object to the
13    form. Asked and answered.
14         THE WITNESS: I don't
15    understand what this -- what this
16    paragraph says. A shift from
17    lesser to more severity is --
18    that's a meaningless -- that --
19    that has no meaning for me.
20    BY MR. STEKLOFF:
21         Q.   Okay.
22         A.   It would be much better to
23    present the data the way that I
24    specifically presented the data, which

Page 276

1     is, you see an increase in incidence in
2     each increasing quartile for the two
3     first aspects. And you do not see that
4     in the other aspects.
5          But as I said, for the other
6     aspects, the numbers are so low, that I
7     don't know if they have the power to show
8     a difference.
9          Q.   So you're critical of the
10    FDA reviewer's language, you find it
11    meaningless. Is that fair?
12         MR. DENTON: That's not what
13    he said. I object to form.
14         THE WITNESS: In this
15    particular paragraph I -- I just
16    don't understand. I would need to
17    talk to someone who wrote that and
18    get specific information as to
19    what they actually mean and have
20    that in a way that I understand.
21    BY MR. STEKLOFF:
22         Q.   Because you find it
23    meaningless?
24         MR. DENTON: That's not what

Page 277

1     he said.
2          I object to the form. Asked
3     and answered.
4          THE WITNESS: Reading this,
5     I can't make clear sense as to
6     what the intent of this paragraph
7     is to say.
8     BY MR. STEKLOFF:
9          Q.   And if I -- I'm going to
10    give you a hypothetical. Assume that the
11    intent of the paragraph is to say it's
12    reassuring that you don't see an increase
13    by quartile in the categories of critical
14    organ bleeds and bleeds resulting in
15    death. Do you agree that that's
16    reassuring? Yes or no?
17         MR. DENTON: Object to the
18    form. Asked and answered a
19    gazillion times.
20         THE WITNESS: No, I'm not --
21    I'm not going to answer yes or no.
22    I -- with the -- the
23    hypothetical, I would still need
24    to know whether the analysis of

70 (Pages 274 to 277)

Protected - Subject to Further Protective Review

Page 278

1       this data has enough events and
2       power to be meaningful.  And
3       that's not included here.
4   BY MR. STEKLOFF:
5       Q.   So you don't find it
6   reassuring as presented here?
7       MR. DENTON:  Object to the
8       form.  That's the last time that
9       you're going to ask the question,
10      and then we're moving on.
11      THE WITNESS:  Again, I don't
12      think I can answer it any better.
13      I don't understand the exact
14      nature and intent of this
15      paragraph.
16  BY MR. STEKLOFF:
17      Q.   Now, if you look at the next
18  paragraph, Figure 10, that shows major
19  bleeding in the ROCKET study versus PT by
20  ASA use.
21      Do you see that?
22      A.   You are talking about
23  Figure 10?
24      Q.   Yes.

Page 279

1       A.   So in this figure you have a
2   breakdown of prothrombin time versus
3   percent with major bleed in aspirin
4   users, nonaspirin users, and next to that
5   is the overall quartiles of major
6   bleeding for -- it looks like close to
7   the full group.  It's about 6172
8   patients.  So that shows that event rate.
9       Okay.  I'm -- I'm oriented
10  to that now.
11      Q.   Okay.  Did you consider this
12  figure in your analysis of the data?
13      A.   I think, as I mentioned
14  earlier in the day, I did review this and
15  I did consider this in my analysis of the
16  data.
17      As I said before, I think
18  there are several reasons why I feel that
19  this data is -- I think there are several
20  reasons why I do not feel that this data
21  is as informative to me as it might be.
22      First, as I said before, the
23  increase in event rate and in hazard
24  ratio in the other figure that I refer to

Page 280

1       back here, are going up by each PT
2   quartile.
3       Since aspirin does not
4   affect the pathophysiology of measuring
5   the prothrombin time, it's hard for me to
6   understand how you would maintain a
7   relationship between increasing quartile
8   and bleeding and explain that by aspirin.
9       The other aspect that -- now
10  that you've shown me this and I recall
11  reading this specific figure, is that
12  the -- the confidence intervals that are
13  shown in the shaded area I found to be
14  problematic, because the actual data is
15  shown in the standard deviation plots.
16      And they have a curve that
17  looks different than the reference --
18  than the shaded areas, and, in fact, is
19  in areas not even encompassed by those
20  shaded areas.
21      So I had concerns about how
22  this data was generated and whether it
23  was meaningful or not.
24      Q.   Do you know how this data

Page 281

1   that's presented in Figure 10 was
2   generated?
3       A.   Well, the -- excuse me.  The
4   quartiles, I think, are fairly
5   explanatory in terms of the -- the
6   numbers of patients within those
7   quartiles at the time they were tested,
8   their number of major bleeds and the
9   event rate.
10      In terms of the modeling or
11  however else, I can only -- I don't know
12  how those shaded intervals were created.
13      Q.   Are you critical of the FDA
14  reviewers for presenting the shaded
15  intervals as seen here in Figure 10?
16      MR. DENTON:  Object to the
17      form of the question.
18      THE WITNESS:  The fact that
19      they don't correspond with the
20      actual measured data, which is my
21      understanding of these SD plots,
22      makes me concerned that there's a
23      problem there with that data.  I
24      can't know without -- I can't know

71 (Pages 278 to 281)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 282

1    a priori what that problem is.
2    BY MR. STEKLOFF:
3        Q.   Now, if you look at the
4    language above the figure that starts the
5    relationship.  Do you see that?
6        A.   Yes I do.
7        Q.   And it says, "The
8    relationship between PT prolongation and
9    major bleeding is exacerbated in patients
10   taking concomitant ASA at least
11   50 percent of the time and attenuated in
12   patients not taking ASA."
13       Do you see that?
14       A.   I do.
15       Q.   Do you disagree or agree
16   with that statement?
17       MR. DENTON:  Object to the
18   form.
19       THE WITNESS:  I could not
20   find -- I could not find a
21   specific analysis that explained
22   how they came to the conclusion
23   that major bleeding was
24   exacerbated 50 percent of the time

Page 283

1    in patients taking concomitant
2    aspirin.
3        So I -- I don't -- I
4    don't -- I did not see data or an
5    analysis that explained that
6    situation.  And, similarly, when
7    they say attenuated in patients
8    not taking aspirin, that's
9    nonspecific.
10       Are they saying -- are they
11   applying the 50 percent of the
12   time to the second group?  I just
13   don't know.  It's a very -- it's a
14   very terse statement, which I
15   could not find data to
16   substantiate it.
17   BY MR. STEKLOFF:
18       Q.   If you assume that the data
19   does substantiate it, and the statement
20   is scientifically accurate, does it
21   change any of your opinions?
22       MR. DENTON:  Object to the
23   form.
24       THE WITNESS:  Well, I'm --

Page 284

1    I'm not going to assume -- I'm not
2    going to assume anything.
3        But what I would still state
4    is what I've noted before, which
5    is that the hazard ratio for
6    bleeding increases with each PT
7    quartile.  Aspirin has no effect
8    on the PT measurement, and,
9    therefore, should have no effect
10   on those quartiles.
11       So I can't explain how the
12   aspirin would somehow affect PT
13   quartiles in terms of hazard ratio
14   for bleeding.  And the
15   pathophysiology would not support
16   aspirin as affecting that.
17       So I don't -- based on the
18   fact that I don't know the -- the
19   science behind this and the
20   analysis, and the fact that
21   aspirin physiologically does not
22   affect the prothrombin time, I
23   can't explain that.
24

Page 285

1    BY MR. STEKLOFF:
2        Q.   But can aspirin
3    physiologically affect whether someone
4    has a bleed or not?
5        MR. DENTON:  Object to the
6    form.
7        THE WITNESS:  I think that
8    aspirin is certainly known to
9    affect platelet function.  I think
10   that when the FDA did their
11   analysis they included platelet
12   inhibitors -- I mean aspirin.  I'm
13   sorry.  They specifically included
14   aspirin use as part of their
15   analysis to determine if that was
16   a variable that was significant in
17   their analysis of bleeding data
18   according to PT quartile.  And my
19   recollection and understanding of
20   what they found was that it was
21   not significant as affecting the
22   bleeding risk in those quartiles.
23   BY MR. STEKLOFF:
24       Q.   But they say that in

72 (Pages 282 to 285)

Protected - Subject to Further Protective Review

Page 286

1    patients who weren't taking aspirin
2    concomitant with Xarelto, the
3    relationship between PT and major
4    bleeding was attenuated.
5             MR. DENTON:  Object to the
6    form.
7             THE WITNESS:  That's --
8    that's descriptive in a way that I
9    don't really know how to use that.
10            What is the scientific basis
11   for that?  Do they mean -- you
12   know, attenuated -- I just don't
13   know how to -- how to understand
14   that.  I don't know whether that's
15   clinically significant.  I
16   would -- I just -- I don't know
17   how to evaluate that.
18   BY MR. STEKLOFF:
19        Q.   So do you think that they --
20   they included it because they thought it
21   was clinically insignificant?
22            MR. DENTON:  Object to the
23   form of the question.
24            THE WITNESS:  The fact that

Page 287

1    they did not include this in their
2    relation of the data with respect
3    to the PT quartiles makes me think
4    that they did not find it as
5    compelling as the PT quartile
6    data.
7    BY MR. STEKLOFF:
8         Q.   But they are looking at the
9    PT quartile data here, right?
10        A.   I'm talking about the hazard
11   ratios related to bleeding.  I'm sorry.
12   I should be more specific.  I'm talking
13   about the hazard ratios related to
14   bleeding.
15            They did -- I did not see
16   any data from them saying that that data
17   was somehow affected by aspirin use.
18        Q.   We can agree, I think, that
19   the FDA had the PT quartile data when
20   they approved Xarelto; is that right?
21            MR. DENTON:  Object to the
22   form.
23            THE WITNESS:  I believe -- I
24   believe so.  I'm not aware that --

Page 288

1             I think that data was available at
2    the time of approval.
3    BY MR. STEKLOFF:
4         Q.   I mean, look at -- you can
5    go all the way to Page 1 of this document
6    to give you some context.
7             Do you agree that as of the
8    time of this document, they had the PT
9    quartile data?  Is that fair?
10            MR. DENTON:  Object to the
11   form.
12            THE WITNESS:  By November of
13   2011?
14   BY MR. STEKLOFF:
15        Q.   By the look on the front
16   page, by September 8, 2011.
17        A.   Oh, I'm sorry.  By
18   September 8, 2011.
19        Q.   Do you see that?
20        A.   Yep.
21        Q.   And do you recall when --
22   and can you tell from the context of
23   Page 1 that Xarelto had not yet been
24   approved by the FDA?

Page 289

1             MR. DENTON:  Well, I'm going
2    to have to interject here.
3    There's multiple indications.
4    We've talked about that.  You need
5    to be specific when you're talking
6    about an approval and an
7    indication.
8             Object to the form.
9             THE WITNESS:  So this is
10   the -- this is the indication for
11   prevention of stroke and systemic
12   embolism in atrial fibrillation.
13   And I'm assuming that this is the
14   meeting date for this particular
15   indication.
16            I believe -- I am not -- it
17   would be better if we could
18   actually go to that data to see if
19   it's in that document.  I have it
20   from the 2010 -- well, if it was
21   there from 2010, then that --
22   right.  Thank you.  If it was
23   there from 2010, they have that
24   information.

73 (Pages 286 to 289)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 290

1  BY MR. STEKLOFF:
2      Q.   And do you also agree that
3  the FDA did not require the companies to
4  include information about PT and
5  monitoring in the label before approving
6  the medication?
7          MR. DENTON:  Object to the
8      form of the question.
9          THE WITNESS:  I am aware
10     that they did not include that
11     information.  I don't agree.  But
12     I'm aware of that.
13 BY MR. STEKLOFF:
14     Q.   And you're aware that,
15 therefore, the FDA did not require them
16 to include that information?
17         MR. DENTON:  I object to the
18     form of the question.
19         THE WITNESS:  Say that
20     again.
21 BY MR. STEKLOFF:
22     Q.   You're aware that,
23 therefore, the FDA did not require them
24 to include that information in the label?

Page 291

1          MR. DENTON:  Object to form.
2          THE WITNESS:  I'm aware that
3      that information was not included
4      in the label.
5  BY MR. STEKLOFF:
6      Q.   Have you done anything to
7  look at the regulatory history of Xarelto
8  and the interaction between Janssen and
9  the FDA?
10     A.   I have looked at many, many
11 documents that were sent back and forth,
12 it looks like, from FDA and the
13 manufacturer.  I didn't include them in
14 my report.  I did not use those in
15 drawing my conclusions with respect to
16 what I've written here.
17     Q.   Did you use those in -- let
18 me start over.
19         Did you rely on those in any
20 way in forming your opinions about the
21 inadequacies of the label that you claim
22 exist?
23         MR. DENTON:  Use what?  This
24     is the loosest set of questions

Page 292

1  that I have heard in a long time.
2          THE WITNESS:  Can I answer?
3          MR. DENTON:  Sure.  If you
4      can.
5          THE WITNESS:  On page 4 of
6      my report where I talk about what
7      I think is inadequate with respect
8      to the rivaroxaban label, I'm
9      basing this on my clinical -- what
10     I find to be clinically meaningful
11     about the drug, about its bleeding
12     risk, and about information that,
13     as a clinical person, I would want
14     to have available to me in order
15     to be able to evaluate the drug.
16 BY MR. STEKLOFF:
17     Q.   So for example, with respect
18 to Subsection C, where you talk about the
19 U.S. subgroup data.  Do you see that?
20     A.   Yes.
21     Q.   Did you review any
22 correspondence between Janssen and the
23 FDA that occurred before September 2015
24 regarding the inclusion of U.S. subgroup

Page 293

1  data in the Xarelto label?
2          MR. DENTON:  Object to the
3      form.
4          THE WITNESS:  I know that
5      I've read a lot of back and forth
6      over this time period.
7          As I say, I did not -- I did
8      not rely upon that -- those
9      communications with respect to
10     writing this opinion here.
11 BY MR. STEKLOFF:
12     Q.   What about PT?  Did you
13 review any correspondence specifically
14 related to PT that was proposed by
15 Janssen but rejected by the FDA during
16 the process of having the label approved
17 at any point?
18         MR. DENTON:  Object to the
19     form of the question.
20         THE WITNESS:  If you'd like
21     to show me what you're referring
22     to, I'd be happy to look at that
23     to refresh my mind.
24         Like I said, there's tons of

74 (Pages 290 to 293)

Protected - Subject to Further Protective Review

Page 294

1    communication. I'd be happy to
2    look at that if you'd like.
3        (Document marked for
4    identification as Exhibit
5    Rinder-7.)
6  BY MR. STEKLOFF:
7    Q. Now I'll show you what I'll
8  mark as Exhibit 7. Have you seen this
9  document before, Dr. Rinder?
10   A. No.
11   Q. And feel free to orient
12 yourself with the document, but I'll
13 represent to you that this is an expert
14 who's been retained in this litigation on
15 behalf of Bayer who has been
16 designated -- disclosed to the plaintiffs
17 who produced this report to them in the
18 litigation.
19       I'm going to ask you to turn
20 to page --
21       MR. DENTON: No, you're not
22   going to ask him questions about
23   one of your expert reports. Not
24   happening. Completely

Page 295

1    inappropriate.
2        MR. STEKLOFF: I'm going to
3    ask him --
4        MR. DENTON: Not happening.
5    Not happening.
6        MR. STEKLOFF: You're not
7    going to let me ask him about
8    tables in this report?
9        MR. DENTON: Not happening.
10   It's a document that he said he's
11   never seen. It's your expert
12   who's not been deposed. You're
13   not going to ask questions about
14   your expert report of our witness.
15   Not happening.
16       MR. STEKLOFF: You're
17   instructing him not to answer?
18       MR. DENTON: Yes, I am.
19   That's exactly what I'm doing.
20       MR. STEKLOFF: Well, I'm
21   going to --
22 BY MR. STEKLOFF:
23   Q. You can follow -- we can go
24 question by question, and you can follow

Page 296

1    your counsel's instructions, but I'm
2    going to ask you a few questions.
3        So I'm going to ask you to
4    turn to Page 95 of the document.
5        MR. DENTON: Same objection.
6    Same instruction.
7  BY MR. STEKLOFF:
8    Q. You're not even going to
9    look at the document?
10   A. Well, this is a -- I don't
11 even know how many pages. This is at
12 least 150- to 200-page document. I have
13 no way of examining the veracity of this
14 without taking time to go through the
15 document in detail. I don't think you
16 would a want me to give you an analysis
17 of something that I hadn't reviewed in
18 detail because that would be
19 misleading --
20   Q. Well, what I'd like you
21 to --
22   A. -- and inaccurate. So what
23 I would rather do, if counsel wants me to
24 take this at some point and review it,

Page 297

1    or -- but I'm not -- I can't review this
2    now and give you answers. It would
3    take -- I need time to review this
4    document completely and thoroughly.
5        Q. Okay. I'm going to ask -- I
6  understand that answer. I'm going to ask
7  you to turn to Page 95. My question is
8  whether you recognize a table that is
9  reproduced on Page 95 or not. Are you
10 willing to do that?
11       MR. DENTON: He's not going
12   to talk about somebody's expert
13   report. He's not doing it.
14       I instruct you not to do it.
15   I instruct you not to answer.
16       We've made our record. It
17   will be the same instruction to
18   all questions. If you want to go
19   through the drill, we'll go
20   through the drill. I preserve my
21   right.
22 BY MR. STEKLOFF:
23   Q. Okay. I just want to be
24 clear, Dr. Rinder, you are unwilling,

75 (Pages 294 to 297)

Protected - Subject to Further Protective Review

Page 298

1  based on your counsel's instructions, to
2  turn to Page 95 to look at a table to see
3  if it's something that you have reviewed
4  before?
5       A.   I have not reviewed this
6  document before.  I'm following my
7  counsel's instructions.
8       Q.   I understand that you
9  haven't reviewed the document before.
10 I'm asking you if you refuse to even look
11 at a portion of the document to see if it
12 is an image of something that you've seen
13 before.
14      MR. DENTON:  Object to the
15 form of the question.
16      And I instruct you not to do
17 it.
18      This is crazy.  Ask him
19 about his report.  That's what
20 we're here about.
21 BY MR. STEKLOFF:
22      Q.   Do you refuse to look at the
23 document?
24      MR. DENTON:  He's -- he is

Page 299

1       going to follow my advice.  He's
2       told you that.  And however many
3       times you ask him, he's going to
4       continue to tell you that.
5  BY MR. STEKLOFF:
6       Q.   Dr. Rinder, do you refuse to
7  look at the document?
8       MR. DENTON:  No, he's --
9       that's not what he said.  What the
10      instruction is, is to follow my
11      advice and not to make comments
12      about this document that he's
13      never seen, apparently one of your
14      experts.  That's not an
15      appropriate question, and I've
16      instructed him not to do so, and
17      he's following my instruction.
18      MR. STEKLOFF:  I'm going to
19      reserve our right to reopen this
20      deposition subject to a court
21      order if Dr. Rinder is told to do
22      so.
23      MR. DENTON:  We reserve all
24      of our rights as well, including

Page 300

1       sanctions.
2  BY MR. STEKLOFF:
3       Q.   Dr. Rinder, are you going to
4  follow your counsel's instruction about
5  any questions that I ask, including even
6  opening up the document to look at
7  something?
8       MR. DENTON:  He's answered
9       that.  Now this is sanctionable.
10      You've made your record.  You've
11      said you were going to take it to
12      the court.  You reserved your
13      rights.  I hear all that.  You can
14      make your record.  But badgering
15      this witness based on his
16      following counsel's advice is
17      totally inappropriate and is
18      sanctionable.  And I will -- I
19      will definitely bring that to the
20      court's attention.
21      MR. STEKLOFF:  I'm just
22      trying to ask if he is going to
23      follow your advice.
24      MR. DENTON:  He said that

Page 301

1       three times.
2       MR. STEKLOFF:  Okay.
3       MR. DENTON:  And he will
4       continue to say that, no matter
5       how many times you ask him.
6       MR. STEKLOFF:  I will take
7       that as an answer on behalf of the
8       witness.
9       MR. DENTON:  Take it any way
10      you wish.
11      MR. STEKLOFF:  Can we go off
12      the record.
13      THE VIDEOGRAPHER:  The time
14      is 2:21 p.m.  We are going off the
15      record.
16      (Short break.)
17      THE VIDEOGRAPHER:  The time
18      is 2:34 p.m.  We are back on the
19      record.
20 BY MR. STEKLOFF:
21      Q.   Would more data, Dr. Rinder,
22 as PT increases in a patient taking
23 Xarelto, how, if at all, would that
24 impact a patient's risk of a fatal bleed

76 (Pages 298 to 301)

Protected - Subject to Further Protective Review

Page 302

1    or a critical organ bleed?
2         A.  I'm sorry.  Your head was
3    down.  I didn't catch the first part of
4    that question.
5         Q.  Sure.
6         So if you had more data -- I
7    really want to sort of understand your
8    physiological -- your opinion about PT,
9    which is if you had more data about PT
10   and Xarelto, how would you expect -- as
11   PT increases, how would you expect the
12   increase -- can I just start that over?
13        If you had more data, as PT
14   increases, how would you expect the risk
15   of a major fatal bleed or a critical
16   organ bleed to increase or not increase?
17             MR. DENTON:  Are you
18   finished?
19             MR. STEKLOFF:  Yes.
20             MR. DENTON:  Object to the
21   form of the question.
22             THE WITNESS:  So based on my
23   review of multiple studies looking
24   at anticoagulation and bleeding

Page 303

1    risk, I think that those -- the
2    studies have fairly uniformly
3    examined the category of major
4    clinical bleeding as their most
5    robust way of determining an
6    effect, and in terms of
7    complications.
8         I think that the difficulty
9    with what your -- with respect to
10   what you're asking about in terms
11   of -- I think I'm understanding --
12   fatal bleeding or what you're
13   somehow -- or what you're terming
14   critical bleeding.  So --
15   BY MR. STEKLOFF:
16        Q.  Critical organ bleeding.
17        A.  Critical organ bleeding.  So
18   sort of specifying certain organs where
19   the bleeding is.  I think that it is --
20   the studies that I've looked at over the
21   years have found that those categories
22   are too variable, too patient-dependent,
23   too population-dependent, and probably,
24   although -- although I don't know that

Page 304

1    anyone has shown this, but I would
2    suspect also physiologically-dependent on
3    the specific drugs that may be part of
4    it, that trying to use that as a -- as a
5    specifically determined endpoint, that
6    that is not powerful enough to do that.
7         And so I would rely on major
8    clinically relevant bleeding as a -- as a
9    larger subset that would subsume those as
10   something that I would think would be
11   more relevant.
12        And in terms of data, I
13   think the data from the ROCKET is 6,000
14   patients and a 15 percent bleeding risk
15   with respect -- with respect to major
16   clinical bleeding, I think that gives a
17   large enough dataset to be able to make
18   the conclusions that I've drawn
19   specifically with respect to the fourth
20   quartile of PT results.
21        Q.  So you don't think, to a
22   reasonable degree of scientific
23   certainty, that bleeds get worse as PT
24   increases?

Page 305

1              MR. DENTON:  Object to the
2    form of the question.
3              THE WITNESS:  I think that
4    that -- I think that that -- I
5    can't agree with that as a blanket
6    statement.  I think that there are
7    too many variables with respect to
8    individual patients and the drugs
9    that they're on and their
10   monitoring to make that statement.
11   BY MR. STEKLOFF:
12        Q.  Now, I think one of the
13   articles that you discussed early in the
14   deposition in the first hour was a
15   guidance from the British Committee For
16   Standards in Hematology; is that right?
17        A.  Give me a minute.
18        Q.  I think it's on the bottom
19   of Page 6 of your report, if it helps.
20        A.  Thank you.
21        Q.  Last paragraph.
22        A.  That's the Kitchen,
23   K-I-T-C-H-E-N, article that you're
24   talking about?

77 (Pages 302 to 305)

Protected - Subject to Further Protective Review

Page 306

1      Q.   Yes, that's what I'm
2  referring to.  Do you recall that that is
3  the article that -- I'm just going to
4  hand it to you, if that's easier.  This
5  is Exhibit 8.
6           (Document marked for
7           identification as Exhibit
8           Rinder-8.)
9           THE WITNESS:  Thank you.
10 BY MR. STEKLOFF:
11     Q.   Is this the same article
12 that you cite on the bottom of Page 6?
13     A.   I recognize this article.
14 But I'm trying to make sure -- I want to
15 make sure this is the one that I'm
16 citing.  Yes.  It is the one that I cited
17 at the bottom of Page 6.
18     Q.   Okay.  And you cite this
19 for -- to support that there are specific
20 circumstances in which knowing the
21 concentration or activity of an anti-Xa
22 anticoagulant like rivaroxaban would be
23 beneficial for clinical care; is that
24 accurate?

Page 307

1      A.   You've correctly read that
2  from the report.  Yes, sir.
3      Q.   Okay.  And it is your
4  opinion that the optimal way to know the
5  concentration or activity of an anti-Xa
6  anticoagulant like rivaroxaban is to
7  measure PT using Neoplastine during the
8  13- to 15-hour window?  Is that right?
9           MR. DENTON:  Object to the
10          form.
11          THE WITNESS:  I think what
12          I've said before was that I find
13          that the data developed from the
14          rivaroxaban trial using the
15          Neoplastine PT in that 13- to
16          15-hour window is clinically
17          meaningful.
18 BY MR. STEKLOFF:
19     Q.   Well, is there a better way
20 than the Neoplastine PT test in that
21 window to know the concentration or
22 activity of rivaroxaban?
23          MR. DENTON:  Objection to
24          the compound nature of the

Page 308

1  question.
2           THE WITNESS:  I don't
3  believe that there was data
4  developed from the ROCKET -- from
5  those particular samples in the
6  ROCKET trial that was examined in
7  another way.
8           There is data from other --
9  other studies that was examined
10 with both the Neoplastine PT and
11 other methodologies.
12          But with respect to the data
13 from ROCKET that was related to
14 the quartile bleeding risk, I'm
15 not aware that there was other
16 data developed from those time
17 points.
18 BY MR. STEKLOFF:
19     Q.   Based on everything you know
20 sitting here today, what is the best way
21 to know the concentration or activity of
22 rivaroxaban?
23          MR. DENTON:  Object to the
24          form.

Page 309

1           THE WITNESS:  Based on what
2  I know and what I've written in my
3  report, I think that the
4  Neoplastine PT is a clinically
5  meaningful coagulation test that
6  would inform me about bleeding
7  risk in patients on Xarelto.
8  BY MR. STEKLOFF:
9      Q.   And you can't point to a
10 different test or reagent that you would
11 say would give you better clinically
12 meaningful information.  Is that fair?
13          MR. DENTON:  Object to the
14          form of the question.
15          THE WITNESS:  I am not aware
16 of data that's been developed with
17 another test in those
18 circumstances that could be used.
19 I'm not aware of that data.  So I
20 can't -- I can't evaluate that if
21 there's no data available.
22 BY MR. STEKLOFF:
23     Q.   And we can agree, hopefully,
24 to a very simple concept, that

78 (Pages 306 to 309)

Protected - Subject to Further Protective Review

Page 310

```
 1    rivaroxaban is a Xa inhibitor, right?
 2         A.   Rivaroxaban is a Xa
 3    inhibitor.  That is my understanding of
 4    the way that the drug acts.
 5         Q.   Now, please turn to Page 835
 6    of the Kitchen study that you relied
 7    upon.
 8         A.   Certainly.
 9         Q.   Well, actually, turn first
10    to 834, just to give some context.
11         A.   Page 834?
12         Q.   Yes.
13              Do you see that there is a
14    section that says, "Direct Factor Xa
15    Inhibitors"?
16         A.   Yes, I do.
17         Q.   And -- so look through the
18    document.  Do you see that is the section
19    that would apply in this article to
20    rivaroxaban?
21              MR. DENTON:  Object to the
22         form of the question.
23              THE WITNESS:  There is --
24         there is some data in this section
```

Page 311

```
 1         related to rivaroxaban.
 2    BY MR. STEKLOFF:
 3         Q.   And do you see now on
 4    Page 835 in the left column where the
 5    group who published this article makes
 6    its recommendations?  Do you see that
 7    section?
 8         A.   I do.
 9         Q.   Do you see the bottom
10    bullet, it says, "PT and aPTT"?  What is
11    aPTT?
12         A.   I believe in this article
13    they are referring to something called
14    the activated partial thromboplastin
15    time.
16         Q.   Do you see that they say,
17    "PT and aPTT should not be used to
18    measure the plasma concentration of Xa
19    inhibitors"?
20              MR. DENTON:  Object to the
21         form.
22              THE WITNESS:  Yes, that's
23         what's written here.
24
```

Page 312

```
 1    BY MR. STEKLOFF:
 2         Q.   Do you disagree with that
 3    statement?
 4              MR. DENTON:  Object to the
 5         form.
 6              THE WITNESS:  So first of
 7         all, they are talking about plasma
 8         concentration of Xa inhibitor.
 9              So they are -- they are
10         relating the PT and the -- well,
11         they -- they are relating the PT
12         and the aPTT to the microgram per
13         liter concentration of the drug.
14              Whereas, what I'm talking
15         about in my report is the PT
16         related to the activity of the
17         drug.
18              So we're -- we're -- we're
19         not talking about the same thing.
20              In this review -- in this
21         review, I'm not sure that they
22         related the two activity.
23              So I'm not sure I -- I'm not
24         sure I -- I'm not sure I
```

Page 313

```
 1         understand the intent of what they
 2         are written -- writing here.
 3              If they are talking about
 4         concentration in terms of
 5         micrograms per liter, I would
 6         not -- I would not use the
 7         prothrombin time to measure the
 8         microgram per liter concentration
 9         of rivaroxaban.
10              So in that narrow aspect of
11         that, that's what I would say.
12    BY MR. STEKLOFF:
13         Q.   So you -- if they're
14         saying -- if the bullet here is saying
15         don't use PT to measure the micrograms
16         per liter concentration of rivaroxaban,
17         you agree; is that right?
18         A.   Well, right.  I would say
19         that I would not -- I would not recommend
20         that for two reasons.
21              One is the microgram per
22         liter concentration is less informative
23         to me than the activity of the drug.  So
24         I would want to measure the prothrombin
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 314

1    time as a measure of the activity of
2    rivaroxaban and not try to relate that to
3    the plasma concentration in terms of the
4    microgram per liter aspect.
5            So I -- I -- I guess I'm
6    not -- I'm not really sure what their
7    intent would be here.  I would agree with
8    measuring the PT for rivaroxaban
9    activity.  But I am not sure why they are
10   talking about plasma concentration for
11   that.
12      Q.   But you think that PT
13   activity increases with Xarelto --
14   rivaroxaban drug concentration, don't
15   you?
16           MR. DENTON:  Object to the
17       form.
18           THE WITNESS:  There's a
19       linear correlation between
20       rivaroxaban and the prothrombin
21       time values.
22   BY MR. STEKLOFF:
23      Q.   And so what can PT tell you
24   about activity beyond the fact that there

Page 315

1    might be too much drug in your body?
2            MR. DENTON:  Object to the
3        form.
4            THE WITNESS:  What the PT
5        tells us, and, again, specifically
6        we are talking about the
7        Neoplastine with the caveats of
8        when it's drawn.  From the
9        river -- from the ROCKET trial
10       we're talking about informing us
11       as to when you are having an
12       increased hazard ratio of
13       bleeding.
14           The PT activity is shown to
15       reflect that.  That's important.
16           The rivaroxaban
17       concentration, I'm not worried
18       about that because I haven't seen
19       the data developed to show that
20       relationship with hazard ratio.
21           What I'm showing is the --
22       the data from ROCKET itself shows
23       a relationship with hazard ratio
24       for bleeding, and that's the PT,

Page 316

1            which is the activity of the drug.
2    BY MR. STEKLOFF:
3        Q.   So based on the data that
4    you have, rivaroxaban concentration is
5    irrelevant to whether someone is at an
6    increased risk of bleeding?
7            MR. DENTON:  Object to the
8        form of the question.  He never
9        said that.
10           THE WITNESS:  I am not aware
11       of data that has been developed to
12       show hazard ratios of the
13       rivaroxaban concentration.  What
14       I -- what I've seen available from
15       the ROCKET study is the activity.
16           We know that the -- that the
17       basis of the PT being valid is
18       that it has a linear correlation
19       with rivaroxaban concentration.
20           That doesn't necessarily
21       mean that rivaroxaban
22       concentration isn't useful in some
23       way, but because activity probably
24       is the culmination of both

Page 317

1            concentration and specific effect
2        of the drug, the PT, as developed
3        by the ROCKET data itself, seems
4        to be sensitive to an increased
5        hazard ratio for bleeding.
6    BY MR. STEKLOFF:
7        Q.   Sitting here today, can you
8    say to a reasonable degree of medical
9    certainty that increased drug
10   concentration of rivaroxaban increases
11   a patient's risk of bleeding?
12           MR. DENTON:  Object to the
13       form of the question.
14           THE WITNESS:  I'm sorry,
15       you're going to have to repeat it
16       again.  I'm sorry.
17   BY MR. STEKLOFF:
18       Q.   First time I'll have a
19   question that doesn't have an objection.
20           Sitting here today, can you
21   say to a reasonable degree of medical
22   certainty that an increased drug
23   concentration of rivaroxaban increases a
24   patient's risk of bleeding?

80 (Pages 314 to 317)

Protected - Subject to Further Protective Review

Page 318

1      MR. DENTON: Object to form.
2      THE WITNESS: All I can say
3  is that the rivaroxaban
4  concentration correlates in a
5  linear fashion with the PT with
6  various reagents, and that with
7  the specific Neoplastine PT
8  reagent, the activity of the drug
9  correlates with bleeding. That's
10 the best I can do in that
11 circumstance.
12     MR. STEKLOFF: Why don't we
13 go off the record again.
14     THE VIDEOGRAPHER: The time
15 is 2:53 p.m. We are going off the
16 record.
17     (Short break.)
18     THE VIDEOGRAPHER: The time
19 is 3:07 p.m. We are back on
20 record.
21     (Document marked
22 for identification as Exhibit
23 Rinder-9.)
24

Page 319

1  BY MR. STEKLOFF:
2      Q.   Handing you Exhibit 9.
3      A.   Thank you.
4      Q.   Do you know if you've seen
5  this before, Dr. Rinder? It's not -- it
6  is not a trick question. It is not cited
7  in your report. I'm just curious if
8  you've otherwise seen it.
9      A.   Yes. I do recall reading
10 this Testa. It's going to take me a
11 little bit of time to quickly review it.
12 It's been a while since I've looked at
13 this. Okay. Thank you.
14     Q.   Okay. On Page 1 in the
15 abstract, I want to read the conclusion
16 to you, which is, "Overall: Poor
17 responsiveness of the screening tests to
18 DOAC concentrations was observed. PT and
19 aPTT normal values cannot exclude DOAC
20 anticoagulant activity and PT or aPTT
21 prolongation is not always associated
22 with DOAC anticoagulation effect as
23 determined with specific tests."
24          Do you see that?

Page 320

1      A.   I do.
2      Q.   Do you agree with that
3  statement?
4      MR. DENTON: Object to the
5  form of the question. Compound.
6      THE WITNESS: Well, taking
7  them one at a time. The first
8  sentence, "Overall: Poor
9  responsiveness of the screening
10 test to DOAC concentration was
11 observed."
12     I think that this study is a
13 scattershot. It is using
14 different instruments, different
15 reagents.
16     The -- it's not clear to me
17 that -- you know, that they
18 haven't tried to combine data for
19 that specific quest -- for that
20 specific sentence, which I don't
21 agree with because I think some of
22 their data shows a -- for example,
23 the responsiveness of the
24 Neoplastine prothrombin time to --

Page 321

1  even though it's not expressed
2  well, it's expressed as a PT
3  ratio, which I don't think is as
4  sensitive as the Neoplastine PT by
5  itself.
6      That still shows a nicely
7  linear relationship in terms of
8  rivaroxaban concentration.
9      So I don't agree -- I think
10 that -- I think that first
11 sentence is broad. I don't know
12 how it's trying to combine data on
13 different platforms and with
14 different aspects.
15     In terms of the second
16 sentence, with respect to "normal
17 values cannot exclude" -- I'm
18 sorry. I shouldn't say the second
19 sentence. I should say the first
20 part of the second sentence, "PT
21 and aPTT normal values cannot
22 exclude DOAC anticoagulant
23 activity."
24     I think that that's --

81 (Pages 318 to 321)

Protected - Subject to Further Protective Review

Page 322

1    that's so broad as to be
2    meaningless.
3         The -- the aspect of the
4    lower limit of the PT and the aPTT
5    somehow being in every patient
6    able to exclude the lower end of
7    low levels of anticoagulant
8    activity, they're -- those assays
9    are not designed for that aspect.
10   And I would not expect them to be
11   sensitive to that, simply because
12   at that level, the coefficient of
13   variation is such that I don't
14   think it's going to be sensitive.
15        So I think that's a -- that
16   to me is meaningless.
17        And then their last
18   sentence, "PT or aPTT prolongation
19   is not always associated with DOAC
20   anticoagulant effect as determined
21   with specific tests."
22        Well, saying something is
23   not always associated is a really
24   safe way of saying nothing.

Page 323

1    And -- so I don't -- I don't find
2    those conclusions useful.
3         What I find most interesting
4    is the fact that they show a --
5    although, again, as I say, the PT
6    ratio is not what I would use, and
7    I'm not -- when I read this
8    before, I think I had a problem
9    with, I wasn't exactly sure how
10   they -- how they did the ratio,
11   because it's patient clotting time
12   over normal clotting times.  And I
13   don't know how they are doing
14   that.
15        Are they using a single
16   reagent?  Are they using a -- a
17   pool?  Are they using it for the
18   day, or are they using it for -- I
19   don't know exactly how that's
20   done.
21        So with that caveat of it's
22   poorly defined here, they still
23   show a very nice linear
24   relationship of concentration with

Page 324

1         the Neoplastine prothrombin time.
2    BY MR. STEKLOFF:
3         Q.   And just -- I don't want to
4    spend too much more time on this article.
5    But which chart are you specifically
6    referring to, on page -- I assume 5?
7         A.   So on page --
8         Q.   I think in the upper right?
9         A.   Yes.  Thank you.
10        On Page 5, the -- I
11   believe -- see -- see, again, they left
12   out some data.
13        I believe that they are
14   saying that A, B, and D represent results
15   obtained at different clinics.
16        Now, they are not saying it
17   specifically, but I think we have to
18   assume that B represents -- see, that's
19   the problem.  See, their -- their figure
20   doesn't fit.  That's why I had a problem
21   with this, because their figure didn't
22   fit the categories.
23        They talk about A, B -- the
24   figures are A, B, and C.  But in their

Page 325

1    legend they say A, B, and D, and so
2    that -- that threw me off.  I was trying
3    to figure out -- you know, they didn't
4    mention whether they -- maybe they
5    combined.
6         But, you see, I -- I think,
7    you know, the data in B on the left, 2-B,
8    I think that is Neoplastine.
9         But based on the problem
10   with this paper, now that I remember it
11   in terms of labeling, I was concerned
12   about whether they had mislabeled
13   something or things like that.
14        So this doesn't -- this
15   doesn't affect my opinions one way or the
16   other.  I'm sorry.
17        Q.   You don't have to be sorry.
18   I just wanted to know.
19        And would you -- would you
20   say that this is mediocre, bad science?
21        MR. DENTON:  Object to the
22   form.
23        THE WITNESS:  No.  I'm not
24   going to -- I think the reasons

82 (Pages 322 to 325)

Protected - Subject to Further Protective Review

Page 326

1      that I've cited are why, even
2      though I reviewed this article, I
3      did not include it in my report.
4    BY MR. STEKLOFF:
5      Q.   Okay.  Now if you can turn
6    to your report.  I actually want to turn
7    to Page 16, please.
8         Are you with me?
9      A.   Yes, sir.
10     Q.   And I want to break this
11   down a little bit.
12        Some -- you know, some of
13   the opinions that are in this section
14   about warfarin management in ROCKET-AF.
15     A.   I understand.
16     Q.   Okay.  First of all, do you
17   agree that from day one the label for
18   Xarelto warned that there was limited
19   data on the relative effectiveness of
20   Xarelto and warfarin in reducing the risk
21   of stroke and system -- systemic embolism
22   when warfarin therapy is well-controlled?
23        MR. DENTON:  Object to the
24     form.

Page 328

1      ratio is, as I've stated here,
2      critical to understanding its
3      risk-benefit.
4         And although that data was
5      available at the onset, it was not
6      included in the label until almost
7      four years later.
8         That data, I think, is
9      informative in terms of bleeding
10     risk.  And I would have wanted
11     that included.
12        I think that I would have
13     liked to have seen -- I would like
14     to see a discussion of how the
15     fact that the ROCKET trial had a
16     TTR that was lower than other
17     similar trials of -- versus
18     warfarin -- of -- I'm sorry -- of
19     oral anticoagulants versus
20     warfarin, and a discussion as to
21     how that informs physicians in
22     terms of, again, understanding
23     efficacy and safety with respect
24     to that, specifically, the fact

Page 327

1         THE WITNESS:  I believe -- I
2      believe that that was included in
3      the initial label, that there was
4      limited data with respect to
5      well-controlled warfarin.  I don't
6      know how -- I don't find that very
7      useful, but that caveat was placed
8      there.
9    BY MR. STEKLOFF:
10     Q.   Okay.  So what specifically
11   would you have expected to be warned
12   about the warfarin management in
13   ROCKET-AF in the initial Xarelto label?
14        MR. DENTON:  Object to the
15     form.
16        THE WITNESS:  Well, I would
17     have wanted in the original -- in
18     the original label, I would have
19     wanted to be informed about the
20     bleeding risk for rivaroxaban
21     relative to well-controlled INR
22     for warfarin in U.S. patients.
23        So -- and the reason why is
24     because I think that that hazard

Page 329

1      that the event rates -- I want to
2      be specific here.
3         The event rates of ischemic
4      stroke and systemic embolism were
5      higher in ROCKET-AF compared with
6      ARISTOTLE and RE-LY specifically.
7      So that would have been, I think,
8      important information.
9         I'm sorry.  Your question
10     was again related to the TTR?  Can
11     you just repeat the original
12     question.  I'm sorry.
13   BY MR. STEKLOFF:
14     Q.   We're a long way off from
15   it.
16     A.   I'm sorry.  I thought I was
17   specifically answering that.
18     Q.   Well, I think you answered
19   it.  I think you can break it down.  You
20   basic -- I don't -- I really just want to
21   set up the question so we can go into
22   more detail.  I'm not trying to cut you
23   off.  But I'm really trying to move it
24   along.

83 (Pages 326 to 329)

Protected - Subject to Further Protective Review

Page 330

1      A.   I understand that.
2      Q.   Essentially, with respect to
3  warfarin management in ROCKET-AF, you had
4  two concerns.  One, the U.S. subgroup
5  data was not included; and, two, the TTR
6  issue that you just described.  Is that a
7  fair summary?
8      A.   I think -- I'm sorry.  I
9  took you to mean how would -- how did I
10 want the warfarin management and related
11 aspects to be included in the label.
12     Q.   Yes.
13     A.   Those are the aspects
14 regarding to warfarin management that I
15 would want in -- that I would have wanted
16 to have seen in the original label.  Yes,
17 correct.
18     Q.   Starting with the U.S.
19 subgroup data, do you agree that the FDA
20 had that U.S. subgroup data before it
21 approved the label?  Or do you know?
22         MR. DENTON:  Object to the
23     form.
24         THE WITNESS:  Yes, I believe

Page 331

1      they did have that data at the
2      time that they approved the label.
3  BY MR. STEKLOFF:
4      Q.   In 2011?
5      A.   I believe they had that data
6  developed in 2010.
7      Q.   Are you critical of the FDA
8  for not requiring that information to be
9  included in the 2011 Xarelto label?
10         MR. DENTON:  Object to the
11     form of the question.
12         THE WITNESS:  I'm critical
13     of the label.
14         I'm not -- I'm not pointing
15     to how -- who -- or how that's
16     determined.
17         I'm critical of the label.
18 BY MR. STEKLOFF:
19     Q.   In reviewing documents about
20 the regulatory history of the label, did
21 you review any documents about the
22 inclusion of the U.S. subgroup data in
23 the label in 2015?
24     A.   Oh, I know that I looked at

Page 332

1  a lot of communications and documents
2  with respect to that.  But, again, I did
3  not rely upon those to inform this,
4  whatever is in my report.
5      Q.   Do you have an understanding
6  that the inclusion of the U.S. subgroup
7  data in 2015 was a classwide labeling
8  change across the NOACs?
9         MR. DENTON:  Object to the
10     form.
11         THE WITNESS:  I am aware of
12     that.  I'm not sure I understand
13     why.  But I'm aware of that.
14 BY MR. STEKLOFF:
15     Q.   And have you seen any
16 statements by the FDA about the
17 limitations of the U.S. subgroup data?
18         Actually, let me ask you a
19 different question.
20         Do you believe there are any
21 limitations of the U.S. subgroup data?
22         MR. DENTON:  Object to the
23     form.
24         THE WITNESS:  I did not see

Page 333

1      any reason -- I did not see
2      substantial reasons to question
3      the data with respect to U.S. only
4      from the ROCKET study.
5  BY MR. STEKLOFF:
6      Q.   But as opposed to
7  questioning the data, do you see any
8  limitations in the data?
9         MR. DENTON:  Object to the
10     form.
11         THE WITNESS:  Again, to me
12     that's a relative question.  I
13     look at all data and try to
14     ascertain whether the conclusions
15     drawn from that data seem to be
16     well-supported.
17         Everything is always going
18     to have limitations.  So I could,
19     you know -- but when I look at
20     data with respect to drawing
21     conclusions, I try to determine if
22     I see something that is a red flag
23     to me that makes me question those
24     conclusions.

84 (Pages 330 to 333)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 334

1          I did not see red flags with
2     respect to that.
3     BY MR. STEKLOFF:
4          Q.    But do you think there are
5     any limitations to how much you can
6     extrapolate the data because of sample
7     size or anything else?
8               MR. DENTON:  Object to form.
9               THE WITNESS:  I think that
10    the -- I think that the -- the
11    data seem to me to be robust
12    enough in a way and consistent
13    enough in a way that I was not --
14    I did not see red flags.  The two
15    aspects that I felt were clearly
16    consistent were the 50 percent
17    increase of bleeding risk overall
18    in the U.S.  The fact that the
19    relationship between the U.S. and
20    the non-U.S. data was consistent
21    quartile on quartile gave me a
22    level of comfort with respect to
23    the validity of that data.
24

Page 335

1     BY MR. STEKLOFF:
2          Q.    Do you agree that -- I'll
3     withdraw that.
4          How would you describe the
5     warfarin -- the patients in ROCKET who
6     were taking warfarin in terms of age and
7     sickness compared to the general
8     population that takes warfarin?
9               MR. DENTON:  Object to
10    form.
11              THE WITNESS:  Well, I -- I
12    thought that the -- my impression
13    of the ROCKET study in general was
14    that the CHA2DS2 scores, which
15    is -- I tend to use for my
16    cardiology compatriots as a
17    relative indicator of patient
18    sickness and acuity of their
19    clinical situation.
20              There -- the ROCKET-AF trial
21    had a higher CHA2DS2 score than
22    other studies of oral
23    anticoagulants against warfarin.
24

Page 336

1     BY MR. STEKLOFF:
2          Q.    And isn't that true in the
3     ROCKET study for both the warfarin arm
4     and the rivaroxaban arm?
5               MR. DENTON:  Object to the
6     form.
7               THE WITNESS:  Well, it's
8     supposed to be a controlled study,
9     so you would expect that that
10    would be true throughout the
11    study.
12              And my recollection of the
13    data is there was not a
14    significant difference between the
15    two arms with respect to that.
16              We could -- we could look at
17    that, if you want, for the direct
18    ROCKET-AF study.
19    BY MR. STEKLOFF:
20         Q.    I think you've already --
21         A.    You're okay with that.
22         Q.    I'm okay with your answer on
23    that one.
24              And don't you agree that the

Page 337

1     patients that were in the warfarin arm,
2     if they were outside of a clinical trial
3     context would have been more difficult to
4     maintain their therapeutic -- time in
5     therapeutic range than the general
6     population given their age and their
7     health?
8               MR. DENTON:  Object to the
9     form.
10              THE WITNESS:  No, I don't
11    think I can agree with that.
12              And the data that supports
13    my opinion in that respect is that
14    in the U.S.-only aspect of the
15    trial -- I'm sorry -- U.S. and
16    Canada, the TTR was 64 percent for
17    that group.
18              And that is, I think, much
19    closer to what I would find in an
20    overall population including the
21    sickest types of patients and
22    things like that.
23              So I would think that if --
24    because the trial was aimed at

85 (Pages 334 to 337)

Protected - Subject to Further Protective Review

Page 338

1    patients with higher CHA2DS2
2    scores, that you would not find
3    that increase in the TTR at sites
4    in U.S. and Canada that I think
5    are better at achieving a higher
6    TTR than, say, for example than
7    East -- East Asia or India.
8        And so I don't -- I feel
9    that that does not support the
10   higher CHA2DS2 score as an
11   explanation for why the TTR for
12   the overall study is lower.
13       (Document marked for
14   identification as Exhibit
15   Rinder-10.)
16   BY MR. STEKLOFF:
17       Q.   I'm going to mark another
18   exhibit.  This will be Exhibit 10.
19       A.   Thank you.
20       MR. DENTON:  Thank you.
21   BY MR. STEKLOFF:
22       Q.   Are you familiar with this
23   document, the summary review from the
24   center for -- the CDER -- the CDER?

Page 339

1        A.   The CDER.  Yes, I -- I have
2    read this.  You're going to have to give
3    me a minute just to --
4        Q.   I can tell you, just to try
5    to move this along, that I'm going to
6    focus your attention on Page 4 of the
7    document.
8        A.   Okay.  This is the -- right,
9    this is the decisional memo.
10       MR. DENTON:  Harvey, you can
11   take all the time you need to
12   orientate yourself to that.
13   BY MR. STEKLOFF:
14       Q.   I agree you can take
15   whatever time you need, but I'm -- I just
16   want you to know that I'm just focused on
17   the --
18       A.   I understand --
19       Q.   -- section about TT -- TTR.
20       A.   No, I understand that.  I
21   understand that.
22       Right.  So this is the
23   document that I've -- I remember this.
24       Yep, okay.  I've familiar --

Page 340

1    I've -- I've read this, and I've
2    re-familiarized myself with it.
3        Q.   And do you recall reviewing
4    the portion on page -- the paragraph on
5    Page 4 that starts, "TTR is dependent not
6    only on prescriber's skill but also on
7    patient characteristics"?
8        A.   Yes.  I -- I've -- I've read
9    this whole thing, so I -- I do -- now
10   that I've re-read it, I do recall reading
11   this.
12       Q.   Is there anything in that
13   paragraph that you -- anything
14   specific -- I'm not asking for your
15   opinion on the whole paragraph, but I'm
16   asking you if there's anything specific
17   you disagree with in that paragraph?
18       MR. DENTON:  The one you
19   started to read?
20       THE WITNESS:  The -- the --
21   the one that says TT -- "TTR is
22   dependent not only on prescriber's
23   skill"?
24

Page 341

1    BY MR. STEKLOFF:
2        Q.   Yes.
3        MR. DENTON:  Take your time
4    on it.
5        Q.   Object to the form.
6        THE WITNESS:  Well, I think
7    you've picked -- I think you've
8    picked a paragraph in here that I
9    had a lot of difficulty with.
10       First of all, the -- the
11   first sentence is kind of a -- is
12   kind of a summary of several
13   things that have been -- that are
14   mentioned in every aspect and
15   is -- of warfarin use, and that is
16   not, I think, inclusive of the
17   effects of warfarin or the -- the
18   clinical situation that applies to
19   warfarin, and, therefore, to time
20   in therapeutic range.
21       And the -- and, again, this
22   is written by someone who says, "A
23   noncompliant patient will never
24   achieve a high TTR."

86 (Pages 338 to 341)

Protected - Subject to Further Protective Review

Page 342

1        Well, and patients who will
2    never attain a TTR no matter how
3    skillful the prescriber.  I -- and
4    they also say, "Some centers will
5    adjust" -- "that adjust for
6    warfarin will never attain high
7    TTR because of the characteristics
8    of the patients treated."
9        I -- I think those are
10   blanket statements that I have
11   not -- I recall reading this.  I
12   have not seen specific data to
13   support those statements.
14       I think those are -- those
15   are -- I'm not sure what the basis
16   for those statements are, so I
17   can't really agree with that.
18       And one of the advisory
19   committee members mentioned that
20   the TTR for his entire institution
21   was 54 percent.
22       Well, again, I -- I don't
23   know what an institution is.  In
24   general, a TTR is something that

Page 343

1    is based on a population of
2    outpatients.
3        And so if this person is at
4    an academic institution, I -- I
5    don't know what that constitutes.
6    And I don't know if that means
7    that these are patients that are
8    early in their therapy who are
9    then eventually become
10   outpatients.
11       So I -- I don't know what
12   the basis for that is.
13       And I do not agree that
14   TTR -- I mean, it looks like the
15   next sentence is implying that TTR
16   is useless to determine whether
17   warfarin was administered
18   skillfully or not.
19       I don't -- I don't know
20   about -- I am not sure what
21   they're -- what they're referring
22   to in terms of "skillfully."
23       There are other reviewers at
24   FDA who basically felt that,

Page 344

1    because the TTR was so low, that
2    they would have difficulty
3    approving the drug.
4        And I'm wondering if this
5    comment was somehow off-the-cuff
6    in response to that.
7        But, again, that's -- I
8    just -- I don't know what the
9    basis is for this -- for this
10   paragraph.
11       I don't know in terms of
12   data.  I don't understand this
13   sort of ad hoc mention of one
14   institution.
15       We have a bad TTR.  How is
16   that relevant to a clinical trial?
17       I -- I'm sorry.  I don't
18   find this paragraph meaningful to
19   me as a clinician.
20   BY MR. STEKLOFF:
21       Q.   Now, one of the studies you
22   cite in this Page 16 on the third line
23   down is the -- I'm not going to pronounce
24   this right -- it's the Schneeweiss?

Page 345

1        MR. DENTON:  Are you back to
2    his report?
3        MR. STEKLOFF:  Yeah.
4        THE WITNESS:  Back to my
5    report?
6    BY MR. STEKLOFF:
7        Q.   Back to your report.  The
8    Schneeweiss study.  Do you see that?
9        A.   Yes.  The -- I think that
10   was a metaanalysis.
11       Q.   I'm going to hand that to
12   you, but I -- so -- I'm going to give it
13   to you.
14       A.   Yes, thank you.
15       (Document marked for
16   identification as Exhibit
17   Rinder-11.)
18   BY MR. STEKLOFF:
19       Q.   Is that -- can you just
20   confirm, if possible, that that is the
21   right study that you were citing?
22       MR. DENTON:  Is this
23   Number 11?
24       MR. STEKLOFF:  Yes.  Thank

87 (Pages 342 to 345)

Protected - Subject to Further Protective Review

Page 346

1    you.
2        THE WITNESS:  Just give me a
3    second, please.
4        Yes, this is -- I remember
5    this article.  This is the one
6    with arrows everywhere.
7    BY MR. STEKLOFF:
8        Q.   Okay.  Now, I want you to
9    look at Page 484.  Upper left.  Are you
10   with me?
11       A.   Yes.
12       Q.   And one of your criticisms,
13   I think, that you just mentioned earlier
14   of rivaroxaban and ROCKET is that the
15   patients in the ROCKET study who are on
16   the warfarin arm spent less time in the
17   therapeutic range than in similar studies
18   of Pradaxa and Eliquis.  Is that fair?
19       MR. DENTON:  Objection to
20   form.
21       THE WITNESS:  I think my
22   specific -- I think my specific
23   criticism was that the TTR for
24   ROCKET-AF is lower than the two

Page 347

1    other Phase III critical trials,
2    ARISTOTLE and RE-LY.
3    BY MR. STEKLOFF:
4        Q.   And just for the jury, which
5    medication does RE-LY apply to?
6        A.   So RE-LY is dabigatran or
7    Pradaxa.  And ARISTOTLE is apixaban.
8        Q.   Now, if you look on Page 484
9    in the right-hand column, in the first
10   paragraph.  So carrying over from the
11   left column.
12       The third line down there's
13   a sentence that starts "Although
14   blinding."
15       Do you see that?
16       A.   I'm sorry.  484?
17       Q.   484.  Right-hand column.
18   Third line down -- third line down.  It
19   says, "Specific instances," and then it
20   says, "Although blinding generally" --
21   "generally reduces bias."
22       Do you see that?
23       A.   Yes, I do.
24       Q.   It says, "Although blinding

Page 348

1    generally reduces bias, the lack of
2    blinding in RE-LY may have resulted in
3    its greater mean time in therapeutic
4    range on warfarin" -- "warfarin, thus
5    increasing the apparent relative
6    effectiveness of warfarin compared with
7    dabigatran."
8        Do you see that?
9        A.   Yes, you've read that
10   sentence correctly.
11       Q.   Do you agree with that
12   sentence?
13       MR. DENTON:  Object to form.
14       THE WITNESS:  I agree that
15   this is a possible critique of the
16   RE-LY study.  Note that they use
17   the term "may have resulted."
18   They are not saying that it did.
19       But they also qualify that,
20   which says that "lack of complete
21   blinding can have a smaller effect
22   on endpoint ascertainment if
23   objectively measured endpoints are
24   of interest as in our study."

Page 349

1        And these endpoints were
2    objectively measured.  So I think
3    they're -- I think what they are
4    saying is they're -- they're
5    trying to be nonpartisan, and so
6    they are putting in what they
7    would possibly have as a critique
8    of RE-LY, but they are also then
9    qualifying that by the fact that
10   the endpoint ascertainments are
11   objective, and, therefore, the
12   effect on that is possibly even
13   less.
14   BY MR. STEKLOFF:
15       Q.   How, if at all, does that
16   impact your opinion that you just stated
17   about the warfarin control in ROCKET
18   versus RE-LY?
19       MR. DENTON:  Object to the
20   form.
21       THE WITNESS:  I think that
22   the -- the effect -- the -- I
23   think that the TTR rate in ROCKET
24   is still very low.  And I think I

88 (Pages 346 to 349)

Protected - Subject to Further Protective Review

Page 350

```
 1        would still want that
 2        information -- the discussion of
 3        that to have been in the label.
 4   BY MR. STEKLOFF:
 5        Q.   Are you in any way relying
 6   upon confidential information that you
 7   have about the RE-LY study in offering
 8   this opinion?
 9        MR. DENTON:  What opinion?
10   I object to the form.
11        THE WITNESS:  In the -- in
12        the way that I've discussed it
13        here in my report, I am not
14        relying on any confidential
15        information.
16        (Document marked for
17        identification as Exhibit
18        Rinder-12.)
19   BY MR. STEKLOFF:
20        Q.   I'm going to hand you the
21   Miller article, which is cited on the
22   second line on Page 18 under the NOAC for
23   AF section.
24        I'm going to ask you
```

Page 351

```
 1   questions about the well-controlled
 2   warfarin issue, even though I know you
 3   cited this for a different purpose.
 4        So first, can you just
 5   confirm this is the article that you
 6   cited?
 7        A.   Yes, it is.  You're going to
 8   have to give me a minute to refamiliarize
 9   myself with it.
10        And I'm sorry.  What -- you
11   said you wanted to review the --
12        Q.   I'll tell you what -- you
13   can re -- I'll tell you what I want to
14   ask you about, and you can refamiliarize
15   yourself.
16        A.   Okay.  That would save time.
17   Let's do that.
18        Q.   I agree.  Page 459,
19   left-hand column, second-to-last --
20   sorry.  Almost near the bottom, it says,
21   "Third, patients taking warfarin in the
22   included studies."  About ten lines up.
23        A.   Oh, I'm sorry.  I'm on the
24   wrong -- 459.
```

Page 352

```
 1        Q.   Yeah.  Above
 2   "acknowledgment."  Go above
 3   "acknowledgment" maybe ten lines up.
 4        A.   Yes.
 5        Q.   Do you see where it starts
 6   "Third"?
 7        A.   Yes.
 8        Q.   You've read that?
 9        A.   Let me take a look at this
10   paragraph, please.
11        Q.   Okay.  Then I will tell you
12   my question is whether you agree with
13   that --
14        A.   I understand.
15        Q.   Starting with "third,"
16   whether you agree with it or not.
17        A.   I understand that.  Thank
18   you.
19        Okay.  I've had a chance to
20   read that.  This is basically the -- the
21   final paragraph of a paper, which, in
22   deference to the way that publications
23   often are written, the last paragraph is
24   usually to include caveats so that
```

Page 353

```
 1   reviewers feel that the writer -- the
 2   authors of the paper are being all
 3   inclusive and not trying to be -- and
 4   acknowledging that even though their
 5   results may show a specific conclusion,
 6   that they are considering other
 7   possibilities.
 8        And that's -- that is the
 9   tone of this entire last paragraph.
10        Q.   It's good to include
11   potential limitations of your study in
12   your study, right?
13        A.   Always.
14        Q.   And do you -- in the context
15   of your opinion about the time in
16   therapeutic range of the warfarin arm of
17   ROCKET, do you agree to the statement
18   here which says that in the included
19   studies -- which includes ROCKET -- the
20   patients were more likely to be within
21   therapeutic range than in real practice?
22        MR. DENTON:  Is that the
23        question?  I object to the form.
24        THE WITNESS:  So -- so the
```

89 (Pages 350 to 353)

Protected - Subject to Further Protective Review

Page 354

1    sentence that you're talking about
2    says, "Third, patients taking
3    warfarin in the included studies
4    were more likely to be within its
5    therapeutic range than in real
6    practice."
7    BY MR. STEKLOFF:
8        Q.   Yes.
9        A.   Okay.  I -- I can't find any
10   reason why they would -- why the authors
11   included that line relative to the study
12   that they've done.
13           Their study is comparing,
14   and I believe using a random effects
15   model, the relative efficacies of these
16   drugs.  So this -- and in clinical trials
17   you want to have the best possible
18   control.  For example, in these studies
19   it's warfarin.  You would want to have
20   the highest possible TTR for those
21   studies.
22           So saying that these studies
23   have a higher TTR than in real practice
24   doesn't make sense relative to the

Page 355

1    analysis that they've done here.  It's
2    just a statement out of thin air.  I
3    don't see the relevance to these studies.
4            The aspect that I referred
5    to in my report is looking at the
6    comparison between the studies done in an
7    independent and peer-reviewed
8    publication.
9            How this -- I don't -- I
10   don't -- in fact, the relevance of this
11   to the study is nil.  So I don't really
12   understand why they put that in here.
13   It's not a limitation of the trial -- of
14   their study rather.  The study is a
15   direct comparison using those -- that
16   model, and their methodology seems to be
17   valid.
18           So I -- I question why the
19   statement was included here.
20       Q.   So you don't agree with it?
21           MR. DENTON:  Object to the
22   form.  He's answered the question.
23   Asked and answered.
24           THE WITNESS:  Well,

Page 356

1    there's -- there's no reference to
2    that particular sentence.
3            They do in the next sentence
4    state -- it says, "One study found
5    that patients in studies monitored
6    by community physicians spent
7    12.2 percent less time in the
8    therapeutic range compared to
9    patients in randomized trials."
10           Well, all that's saying is
11   that -- is that studies done by
12   community physicians may not be as
13   well conducted as studies by
14   academic or clinical trial
15   organizations that run studies for
16   sponsors.
17           So that -- again, that
18   doesn't -- that doesn't inform
19   this one way or another.
20           So I -- I don't know -- I
21   don't know why they put this in
22   there, and I don't know the basis,
23   and there's no reference for it.
24

Page 357

1    BY MR. STEKLOFF:
2        Q.   Now, in the context of your
3    opinion, while we have the study in front
4    of you about the comparison of NOACs --
5        A.   Yes.
6        Q.   -- do you think there are
7    any limitations of this study?
8            MR. DENTON:  Object to the
9    form.
10           THE WITNESS:  Well, I agree
11   with them -- I agree with the
12   limitations that they mention,
13   specifically that they say
14   heterogeneity among the included
15   trials.  I think that is a valid
16   thing to have mentioned.
17           They bring up the fact that
18   there are different oral
19   anticoagulants.  I think that's
20   kind of lip service to
21   heterogeneity.  I don't know that
22   that's really a critical thing.
23           They bring up the point that
24   patients in clinical trials are

90 (Pages 354 to 357)

Protected - Subject to Further Protective Review

Page 358

1   often at lower overall risk for
2   adverse events than patients seen
3   in everyday clinical practice, but
4   that's the nature of randomized
5   controlled trials.  You're trying
6   to get the best possible
7   population that is -- that can be
8   studied in order to define
9   significance in between groups.
10      So they're citing it as a
11  limitation.  I think that's -- I
12  think that's being overly
13  inclusive there.
14      That's the purpose of most
15  clinical trials is to try and get
16  something where you have power to
17  demonstrate that.
18      So I agree in a general way
19  with what they said in the
20  beginning of this paragraph.
21  BY MR. STEKLOFF:
22      Q.  In general, away from the
23  article now, opining on the relative
24  safety and efficacy of one NOAC to

Page 359

1   another, you would prefer a head-to-head
2   clinical trial that measured safety and
3   efficacy, right?
4          MR. DENTON:  Object to the
5       form.
6          THE WITNESS:  I don't know
7       what you mean by "prefer."  But
8       what I would say is that we always
9       would like to see head-to-head
10      clinical trials.  That doesn't
11      mean that the data that we have --
12      short of a randomized controlled
13      placebo-blinded trial, that
14      doesn't mean that the data short
15      of that is not meaningful.
16         But to get to the top of
17      that pyramid with the ideal
18      studies, I think everyone would
19      like to have data with that.  If
20      it's not being done, then we have
21      to use the data that we have short
22      of the ideal randomized controlled
23      trial.
24

Page 360

1   BY MR. STEKLOFF:
2       Q.  Do you think there's a
3   consensus in the scientific community
4   that, on safety and efficacy, Xarelto is
5   the worst of the NOACs based on the
6   observational studies you cite?
7          MR. DENTON:  Object to the
8       form of the question.
9          THE WITNESS:  I haven't done
10      a poll.  I -- I've not done a
11      poll.
12         I think that the -- I think
13      that these studies that have been
14      analyzed since the three Phase III
15      trials have come out and that
16      address them and that address
17      registry and other data studies
18      that are summarized here -- and
19      I've looked at other studies that
20      are involved in that -- I think
21      these are the strongest studies,
22      and they do show that rivaroxaban
23      has significant limitations
24      compared to apixaban and

Page 361

1       dabigatran.
2   BY MR. STEKLOFF:
3       Q.  Have you seen other
4   observational studies pointing in the
5   other direction?
6       A.  Yes, I have.
7       Q.  And do you have less faith
8   in those studies?
9          MR. DENTON:  Object to the
10      form.
11         THE WITNESS:  The two -- I
12      think it's two or three studies
13      that I looked at.  One study I
14      found -- we'd have to look at the
15      exact studies.
16         They had significant
17      limitations, I felt, in terms of
18      their methodology.
19         But, again, I'd be happy to
20      look at those and go through them
21      piece by piece.
22  BY MR. STEKLOFF:
23      Q.  We don't need to do that
24  today.

91 (Pages 358 to 361)

Protected - Subject to Further Protective Review

Page 362

1      A.   Okay.
2      Q.   So is it fair to say that
3   there was no observational study pointing
4   in the other direction that Xarelto
5   performed better on safety or efficacy
6   compared to another NOAC that you felt
7   was relying upon in your -- in forming
8   your opinions?
9           MR. DENTON:  Object to the
10          form of the question.
11          THE WITNESS:  Again, I would
12          have to look at those specific --
13          I know which -- the studies that
14          have looked at this in a similar
15          way to these, I would have to look
16          at those individually to parse out
17          which areas might fit that.
18   BY MR. STEKLOFF:
19      Q.   Well, why didn't you cite
20   any of those?
21          MR. DENTON:  Object to form.
22          THE WITNESS:  Again, as I
23          mentioned before, I felt that
24          there were methodologic aspects

Page 363

1          that made me feel those were less
2          reliable than these studies.
3   BY MR. STEKLOFF:
4      Q.   I want to -- unless you want
5   to break now, I have one other topic to
6   cover.
7           MR. DENTON:  We've taken
8           plenty of breaks.  Let's go.
9   BY MR. STEKLOFF:
10      Q.   So I want to ask you about
11   your opinions about -- going back now to
12   the warfarin control.
13      A.   I'm sorry.
14      Q.   Actually, let's do something
15   quickly.  On Page 17, you have a section,
16   "Rivaroxaban and warfarin anticoagulation
17   in clinical trials for treatment of VTE."
18          Do you see that?
19      A.   Yes, I do.
20      Q.   Do you have any criticisms
21   of the EINSTEIN study?
22          MR. DENTON:  Object to the
23          form of the question.
24          THE WITNESS:  It would have

Page 364

1          been -- in the first paragraph I
2          mentioned that the method for
3          monitoring INR in warfarin
4          subjects is not stated in the
5          published manuscript.  I think
6          that would have been informative.
7              I think that the bleeding
8          incidence of rivaroxaban of
9          .8 percent, which was quite a bit
10          lower than the 4.1 percent
11          incidence that's been found in
12          another data registry, I would
13          have liked to have -- you know,
14          although this was earlier, and
15          obviously, they can't address
16          something that occurs later,
17          that's an extremely low bleeding
18          incidence in general.
19              A little more discussion, I
20          think, there would have been
21          helpful.
22              And then I think similarly
23          in the EINSTEIN PE trial, again,
24          the method for monitoring was not

Page 365

1          there -- was not there.  And,
2          again the bleeding incidence
3          was -- was quite low at 1 percent.
4   BY MR. STEKLOFF:
5      Q.   And so understanding that
6   you have -- you would have liked more
7   information in the publications about the
8   EINSTEIN trial, do you have any
9   criticisms of the protocol or running
10   or -- of -- of the trial itself?
11          MR. DENTON:  Object to the
12          form.
13          THE WITNESS:  I've read
14          those, I think, in depth enough to
15          understand how they were done.
16          And I did not have any other
17          specific critiques other than what
18          I've -- I've already mentioned.
19   BY MR. STEKLOFF:
20      Q.   Now, going back a page, back
21   to the warfarin management in the
22   ROCKET-AF study.
23          I think we've talked about
24   the time and therapeutic range.

Protected - Subject to Further Protective Review

Page 366

1       The -- there's another part
2   of your opinion which relates to the
3   Alere device; is that right?
4       A.  The -- the -- the
5   point-of-care device.
6       Q.  Yes.  Which you know was --
7   was referred to as the Alere device?
8       A.  I -- yeah, I didn't know how
9   it was pronounced.  I -- I could -- I
10  think -- I think -- I've heard it
11  referred to as INRatio or INRatio.
12      Q.  Okay.
13      A.  But --
14      Q.  We're talking about -- well,
15  you -- you know what I'm talking about?
16      A.  Yes.  We're -- we're talking
17  about the same device that was recalled
18  in December 2014.
19      Q.  Okay.  And have you reviewed
20  the FDA's recent reanalysis that was
21  published on September 26th -- or
22  released on September 26, 2016?
23      A.  Yes, I have.
24      Q.  Do you have any criticisms

Page 367

1   of the FDA's reanalysis?
2       MR. DENTON:  Object to the
3       form.
4       If you need to look at it,
5       you can look at it.
6       THE WITNESS:  I think rather
7       than go through the specifics of
8       the -- of the FDA reanalysis, I --
9       I felt that the effects of the
10      faulty INR device were biased
11      enough that I would have had more
12      comfort in seeing a reanalysis of
13      the data by an independent third
14      party rather than the FDA.
15      And that is -- I think that
16      critique is -- overrides any
17      specifics.
18      I think that -- I think that
19      there may be small aspects within
20      that that I could critique.  But
21      it seems to me that a third -- an
22      independent third party review of
23      the data and reanalysis would have
24      put to rest, I think, any concerns

Page 368

1       regarding the device.
2   BY MR. STEKLOFF:
3       Q.  So you're questioning the
4   independence of the FDA to conduct the
5   reanalysis that was done of the ROCKET
6   study?
7       MR. DENTON:  Object to the
8       form.
9       THE WITNESS:  I don't
10      consider the -- the FDA an
11      independent third party to analyze
12      the data.
13  BY MR. STEKLOFF:
14      Q.  And that concerns you with
15  respect to their reanalysis?
16      A.  Well, that's -- that's not
17  just my opinion.  And I've -- I read
18  several editorials and other discussions
19  in the -- in the medical and lay press
20  regarding reanalysis of the data.  And
21  other medical experts advocated for
22  having an independent third party review
23  it.  And in -- in that respect, they were
24  not referring to the FDA as well.

Page 369

1       Q.  Why do you personally,
2   Dr. Rinder, believe that the FDA was not
3   independent enough to conduct the
4   reanalysis?
5       MR. DENTON:  Object to form.
6       THE WITNESS:  I don't
7       believe that they are an
8       independent third party in this
9       respect.
10  BY MR. STEKLOFF:
11      Q.  Why not?
12      A.  They have -- they are --
13  they are not independent of the drug --
14  they have already reviewed and approved
15  the drug, and so they're -- they're
16  already involved.  They are not a third
17  party.
18      I would have liked someone
19  who was not involved in the original
20  review, who has no -- who has no stake in
21  the results to be able to review that
22  data.
23  BY MR. STEKLOFF:
24      Q.  So you don't think in the

93 (Pages 366 to 369)

Protected - Subject to Further Protective Review

Page 370

1  review of the -- a re-review of the data
2  the FDA was trying to make sure that
3  Xarelto is a safe and effective
4  medication for patients who have atrial
5  fibrillation?
6          MR. DENTON: I object to the
7  form.
8          You changed that question
9  about three different ways. Why
10  don't you word it more in the way
11  you want to.
12         MR. STEKLOFF: That's not an
13  objection.
14         MR. DENTON: That's an
15  objection to form.
16  BY MR. STEKLOFF:
17     Q. Do you understand the
18  question?
19         MR. DENTON: Do you
20  understand the objection?
21         MR. STEKLOFF: Not really.
22         MR. DENTON: Okay. I'll --
23  I'll be happy to --
24         MR. STEKLOFF: I think your

Page 371

1  objections are terrible.
2  BY MR. STEKLOFF:
3     Q. Do you think -- do you --
4          MR. DENTON: Well, wait a
5  minute. Wait, wait, wait, wait, wait.
6  BY MR. STEKLOFF:
7     Q. Dr. Rinder, do you -- if you
8  don't understand the question, you can
9  let me know.
10         MR. STEKLOFF: You can
11  object to form -- form,
12  Mr. Denton.
13         MR. DENTON: Yes, sir.
14  Thank you, sir.
15  BY MR. STEKLOFF:
16     Q. Now, I will repeat the
17  question because I know you will want me
18  to do that.
19     A. Well, no, I can -- no, I can
20  answer it. I was able to focus this
21  time.
22     Q. I'm going to -- I would
23  rather repeat the question so it's
24  clear --

Page 372

1     A. No, I under -- okay. That's
2  fair.
3     Q. -- before -- after our
4  colloquy.
5          Is it your opinion that the
6  FDA was not trying to make sure that
7  Xarelto is a safe and effective
8  medication for patients who have atrial
9  fibrillation?
10         MR. DENTON: Object to the
11  form of the question.
12         THE WITNESS: I'm sure that
13  the FDA has the safety of the
14  population as its primary goal.
15  BY MR. STEKLOFF:
16     Q. Do you think that that was
17  their primary goal in re-reviewing the
18  ROCKET data?
19         MR. DENTON: Object to form.
20         THE WITNESS: I'm sure
21  that -- that the FDA has as its
22  primary goal the safety of the
23  U.S. population.
24

Page 373

1  BY MR. STEKLOFF:
2     Q. Do you think that was their
3  primary goal in re-reviewing the ROCKET
4  data?
5          MR. DENTON: Object to the
6  form.
7          THE WITNESS: I -- I was not
8  part of that evaluation, as I've
9  said before.
10         I would have more -- I would
11  have more comfort in the validity
12  and the full analysis of the data
13  if it had been conducted by an
14  independent third party.
15         I'm not questioning the
16  motives or the intent of the FDA
17  in any way with respect to this
18  reanalysis.
19  BY MR. STEKLOFF:
20     Q. What about the EMA?
21     A. Again --
22         MR. DENTON: Object to form.
23         THE WITNESS: -- I don't
24  find that they are an independent

94 (Pages 370 to 373)

Protected - Subject to Further Protective Review

Page 374

1        third party in the same way.
2   BY MR. STEKLOFF:
3        Q.   So same concerns about their
4   re-review of the data?
5            MR. DENTON:  Objection.
6            THE WITNESS:  Correct.
7   BY MR. STEKLOFF:
8        Q.   Your concern that -- with
9   respect to the FDA and the EMA, the fact
10  that they previously approved the
11  medication may have impacted their
12  ability to fairly assess the safety and
13  efficacy of Xarelto during their
14  re-review of the data?
15           MR. DENTON:  Object to the
16  form.
17           THE WITNESS:  Again, I was
18  not privy to their internal
19  review.
20           As I said before, I think
21  that the -- I think that the
22  medical community would have much
23  more comfort in seeing a review
24  being done by an independent third

Page 375

1        party.
2   BY MR. STEKLOFF:
3        Q.   So are you questioning the
4   results of the re-review?
5            MR. DENTON:  Object to the
6   form of the question.
7            THE WITNESS:  I would say
8   that my overall critique of this
9   not being done by an independent
10  third -- third party is my
11  overriding critique.
12  BY MR. STEKLOFF:
13       Q.   But do you think the results
14  would have been different?
15           MR. DENTON:  Object to the
16  form.  Asked and answered.
17           THE WITNESS:  I don't -- I
18  don't have the wherewithal or time
19  to go through a complete
20  reanalysis for that.
21           All I'm saying is that I
22  would have more comfort in
23  understanding the -- how the
24  limit -- how the limitations of

Page 376

1        the study were or were not
2   impacted by the faulty INR device
3   if the reanalysis had been
4   accomplished by an independent
5   third party.
6   BY MR. STEKLOFF:
7        Q.   Have you told the FDA that?
8        A.   I don't have any
9   communication with the FDA.
10       Q.   Have you also -- do you also
11  have the same concerns about the review
12  that was done by the researchers at Duke
13  University?
14           MR. DENTON:  Object to the
15  form.
16           THE WITNESS:  Again, I
17  would -- I would want to have an
18  independent third party review
19  and I don't consider the FDA, the EMA,
20  or the Duke clinical trials group
21  as being independent and third
22  party.
23           I'm not questioning their
24  motives or intent in any way.

Page 377

1   BY MR. STEKLOFF:
2        Q.   Do you have any specific
3   criticism of the FDA, the EMA, or Duke
4   with respect to the review -- re-review
5   of the data?
6            MR. DENTON:  In addition to
7   what he's already said?  Object to
8   the form.
9   BY MR. STEKLOFF:
10       Q.   So I understand that you
11  would have preferred a third party
12  review?
13       A.   Correct.
14       Q.   Okay.  So can we use that as
15  an assumption?
16       A.   That's the limit of my --
17  that is the limit of my critique --
18       Q.   So sitting here right now,
19  you don't have any other specific
20  critiques of the way the re-reviews were
21  conducted?
22       A.   Other than -- I'm sorry.
23           MR. DENTON:  No, go ahead.
24           THE WITNESS:  Other than

Protected - Subject to Further Protective Review

Page 378

1    what I've said about an
2    independent third-party
3    reanalysis, no.
4    BY MR. STEKLOFF:
5    Q.   And sitting here today, do
6    you think there should be a different
7    warning about the point-of-care device or
8    an additional warning -- I'll start over.
9        Do you think there should be
10   a different or additional warning about
11   the point-of-care device in the Xarelto
12   label, sitting here today?
13       MR. DENTON: Object to form.
14       THE WITNESS: Only with
15   respect to the label? That was
16   your question?
17   BY MR. STEKLOFF:
18   Q.   Yes.
19   A.   No.
20       MR. STEKLOFF: Can we go off
21   the record?
22       THE VIDEOGRAPHER: The time
23   is 4:08 p.m. We are going off the
24   record.

Page 379

1        (Short break.)
2        THE VIDEOGRAPHER: The time
3    is 4:29 p.m. We are back on the
4    record.
5        (Document marked for
6    identification as Exhibit
7    Rinder-13.)
8    BY MR. STEKLOFF:
9    Q.   Dr. Rinder, I've handed you
10   Exhibit 13, which are your invoices from
11   your work in this Xarelto litigation; is
12   that right?
13   A.   Let me take a look. These
14   are all -- let me just -- do you mind if
15   I just organize them by date? Because
16   they're -- they're out of order.
17   Q.   Yeah, I think they are by
18   date of invoice, but I agree --
19   A.   Well --
20   Q.   -- they're out of order of
21   your work.
22   A.   My guess is that the date --
23   the date that's under the invoice number
24   is maybe the data they were printed. And

Page 380

1    so if I can just organize them this way,
2    I think it will be a little bit more
3    valid.
4        So this is 16.
5        Okay. I think I have them
6    in the right order.
7    Q.   Okay. I'm not going to ask
8    a lot of questions about these. But is
9    the first one this review of documents
10   and discussion through May 25th, 2015?
11   A.   Yes. That's the one at the
12   top that says DL 05252015 for invoice
13   number.
14   Q.   Right. And December 14,
15   2016?
16   A.   Right. That's not the
17   actual date of the invoice. It's May
18   25th of 2015.
19   Q.   Got it. And so you --
20   sometime before May 25, 2015, you were
21   retained and up to that point had spent
22   25 hours doing work on the litigation?
23   A.   My recollection of this was
24   that this was several months of review

Page 381

1    related to Xarelto up through May 25.
2    Q.   Now, my other question is,
3    it looks like the last invoice takes us
4    through October 31st, 2016. And I'm
5    looking at --
6    A.   Yes.
7    Q.   -- the invoice dated
8    November 2nd.
9    A.   You've read that correctly.
10   Q.   Okay. So can you
11   approximate in any way how many hours you
12   have spent working on the litigation from
13   October 31, 2016 through today that you
14   have not invoiced for?
15   A.   Oh, I don't have -- I don't
16   have a listing of those hours.
17   Q.   Obviously, the prep for this
18   deposition that we talked about and the
19   deposition today, you'll invoice for
20   those?
21   A.   Yes.
22   Q.   Have you done other work,
23   without telling me what the work was?
24   A.   Well, I think that the -- I

96 (Pages 378 to 381)

Protected - Subject to Further Protective Review

Page 382

1   think that the report --
2        Q.   The report was October 14th?
3        A.   -- was October 14th.  So I
4   don't -- there may be -- there may be
5   something that was done in November, but
6   I just -- I don't -- I didn't -- don't
7   have a listing with me of what I did.
8        Q.   That's fine.  Now, going
9   back to your report, the last page, your
10  fee schedule and prior testimony.
11       A.   I'm sorry.  Yes.  Appendix
12  C, you're talking about?
13       Q.   Yes, sir.  Can you please
14  tell us approximately how much you were
15  compensated overall for the Sanofi and --
16  I don't know how to pronounce that --
17  Eisai litigation?
18       A.   I -- I -- I have no idea.
19  I -- again, that was -- that was
20  something that was -- I don't really know
21  exactly what the term that was used
22  legally, but they asked me to destroy
23  everything, so I have nothing left from
24  that.  I don't know -- I don't -- I don't

Page 383

1   have records, and that includes invoices.
2        Q.   You can't approximate based
3   on your best recollection --
4        A.   No.
5        Q.   -- any -- any approximate
6   value?
7        A.   No.
8        Q.   What about the YAZ
9   litigation listed in the last two
10  bullets?
11       A.   So I -- well, the -- the --
12  the -- the specific -- the last one is a
13  case that I believe was settled.  So I've
14  destroyed all my records related to that.
15  So I have no way of being able to give
16  you that information.
17            For the -- for the overall
18  YAZ MDL litigation, I don't have -- I
19  don't have a summation.  That's been
20  going on for several years.  I don't have
21  a -- a summative for that.
22       Q.   Let me try to ask it a
23  different way.  Did you do sort of a
24  similar amount of work to what you have

Page 384

1   done thus far in the Xarelto litigation
2   in the YAZ litigation?
3        A.   I couldn't really say.  It's
4   been so sporadic -- it's been sporadic.
5   It's sort of -- there will be a little
6   bit of activity, and then it will go
7   away.  Then there will be a little bit
8   more activity.
9            I don't really have a -- a
10  good estimate of the number of hours.
11       Q.   And what about -- and I'm
12  not asking for any confidential
13  information, but what about in Pradaxa?
14  Do you have any estimate of how much
15  you've invoiced for your work in that
16  litigation?
17       A.   Again, I destroyed all of
18  that data, including the invoices, so I
19  can't give you an estimate of that.
20       Q.   Is it fair to say -- this is
21  not an invoice-related question.  But is
22  it fair to say that any time there's been
23  a litigation between plaintiffs and a
24  pharmaceutical company, you have always

Page 385

1   been an expert on behalf of the
2   plaintiffs?
3        A.   With respect to depositions
4   or any involvement in a lawsuit?
5        Q.   First, let's start with
6   depositions.
7        A.   The only -- well, no.
8   Actually, I think I have had several
9   instances of quite a while ago where
10  there were depositions where I was
11  working with the pharmaceutical company.
12       Q.   Do you remember which
13  pharmaceutical -- pharmaceutical company?
14       A.   It was a long time ago.  I
15  can't remember.  It was related to -- it
16  was related to platelet inhibit --
17  inhibitory drugs.  I can't remember the
18  name of the company.
19       Q.   Do you remember the name of
20  the drug?
21       A.   No.  It had a -- it had a --
22  a scientific, you know, a number
23  designation.
24       Q.   Was it a similar litigation

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 386

1  in the sense that there were allegations
2  of -- or criticisms of the label and the
3  testing that had been done by the
4  pharmaceutical company?
5      A.   In that particular case, it
6  was more -- it was more related to the --
7  to the action of the drug.  It -- I don't
8  recall that it related to the label.
9      Q.   Were the plaintiffs
10  individual patients who had taken the
11  drug?
12      A.   I don't recall.
13      Q.   So could it -- could it have
14  been a business-to-business dispute about
15  a patent or something?
16      A.   No, I don't -- no, I know it
17  was not a patent.
18          No.  My -- my understanding
19  was that it was -- there was a -- that
20  there was actually plaintiffs that were
21  behind that, that -- that were involved.
22  I don't recall the exact.
23          I mean, obviously the Sanofi
24  Eisai is two pharmaceuticals.  I've

Page 387

1  consulted --
2      Q.   The -- the Sanofi Eisai, I
3  assume you were on the side of the
4  plaintiffs, or were you on the side of --
5      A.   Well -- well, no.  It was --
6  they are two pharmaceutical companies.
7      Q.   Right.  And who -- who were
8  you an expert on behalf of?
9      A.   One of the pharmaceutical
10  companies.
11      Q.   Oh, that -- okay.
12  That was -- they were -- they were in
13  litigation against each other.  Got it.
14      A.   Right.  Right.  It was -- it
15  was those two.
16          I have acted as a
17  consultant, but that's under
18  confidentiality for another
19  pharmaceutical company where I've been a
20  consultant only, and -- and that has not
21  gotten to a deposition.
22      Q.   You can put that aside.
23      A.   Okay.
24      Q.   Does -- I just want to

Page 388

1  clarify something that you may have said
2  before.
3          Does aspirin impact PT?
4          MR. DENTON:  Object to the
5  form.
6          THE WITNESS:  So aspirin
7  does not have a physiologic or
8  pathophysiologic effect on the
9  prothrombin time.
10  BY MR. STEKLOFF:
11      Q.   So aspirin by itself will
12  not increase someone's PT?
13          MR. DENTON:  Object to the
14  form.
15          THE WITNESS:  Aspirin will
16  not affect the prothrombin time.
17  BY MR. STEKLOFF:
18      Q.   Have you ever told any
19  doctor at Yale who is treating patients
20  with atrial fibrillation or any of the
21  other conditions for which Xarelto is
22  indicated?
23      A.   Okay.
24      Q.   Let me start over.

Page 389

1          Have you ever told a -- a
2  doctor at Yale that they should not
3  prescribe Xarelto?
4          MR. DENTON:  Object to the
5  form of the question.
6  BY MR. STEKLOFF:
7      Q.   As an initial prescription
8  for a condition?
9          MR. DENTON:  Same objection.
10          THE WITNESS:  Again, I -- I
11  would reiterate I don't tell
12  physicians to do or not to do
13  something.
14          I have been involved in
15  consultations with other
16  physicians where the consideration
17  of whether to start
18  anticoagulation and if -- once we
19  make the decision to start
20  anticoagulation, what is the best
21  anticoagulant for that patient.
22          In that respect, we've had
23  discussions about the different
24  anticoagulant venues available,

Protected - Subject to Further Protective Review

Page 390

1   and we've had discussions that
2   have ranged for all of the
3   different anticoagulants,
4   including Xarelto, and there have
5   been discussions where we may have
6   concluded together in the negative
7   that we were not going to start
8   Xarelto, and, in effect -- and in
9   actuality start a different
10  anticoagulant drug.
11  BY MR. STEKLOFF:
12      Q.   And that would be true for
13  all of the anticoagulants, correct?
14          MR. DENTON:  Object to the
15      form.
16          THE WITNESS:  We -- in my
17      discussions with clinical
18      colleagues, we constantly talk
19      about different anticoagulants and
20      different therapeutic modalities.
21      Not just Xarelto.
22  BY MR. STEKLOFF:
23      Q.   And there are some patients
24  for whom, in this discussion of what is

Page 391

1   the appropriate medication for a patient,
2   the conclusion has been Xarelto and
3   you've supported that, right?
4          MR. DENTON:  Object to the
5      form.
6          THE WITNESS:  In my -- in my
7      discussions with colleagues and
8      consultations, we have patients
9      that are on Xarelto.
10  BY MR. STEKLOFF:
11      Q.   You've never made a blake --
12  blanket statement to your colleagues that
13  Xarelto is a dangerous drug that
14  shouldn't be used, right?
15          MR. DENTON:  Object to the
16      form.
17          THE WITNESS:  Again, I -- I
18      don't -- that is something that I
19      would not say to a colleague.
20  BY MR. STEKLOFF:
21      Q.   And is it also fair to say
22  at trial you're not going to testify
23  about any specific -- putting aside the
24  Boudreaux case, but any specific patient

Page 392

1   that you've -- where you've been involved
2   in the clinical care?
3          MR. DENTON:  I don't
4      understand the question, so I
5      object to the form.
6   BY MR. STEKLOFF:
7      Q.   So I'm -- this is more of a
8   notice question.
9          You're not going to come
10  into court at trial and say, let me tell
11  you about my experience with Patient X at
12  Yale and what he or she went through.
13  You're -- that -- you're not relying on
14  that type of experience in offering
15  opinions in this litigation; is that
16  right?
17          MR. DENTON:  Objection to
18      form.
19          THE WITNESS:  Well, first of
20      all, talking about a patient would
21      be a violation of HIPAA privacy
22      rules, so I would not do that.
23  BY MR. STEKLOFF:
24      Q.   Do you agree that it is

Page 393

1   helpful for clinicians to have Xarelto on
2   the market as an option to treat their
3   patients?
4          MR. DENTON:  Object to the
5      form.
6          THE WITNESS:  Do you need to
7      get that?
8   BY MR. STEKLOFF:
9      Q.   No, I do not.
10      A.   Well, I don't know what -- I
11  don't know how you are defining
12  "helpful."  But what I would say is that
13  I think that physicians should have as
14  many options as possible, and that those
15  options should be as wide as possible for
16  what they can use for therapy.
17      Q.   So in your view, is it a
18  good thing that Xarelto is an option for
19  therapy for patients?
20          MR. DENTON:  Object.  Object
21      to the form of the question.
22          THE WITNESS:  So as a
23      general statement, I think I
24      would -- I would want to qualify

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 394

1    that.
2        And what I would say is I
3    would -- I would prefer that
4    monitored Xarelto was available as
5    an option for physicians to have
6    safer anticoagulation for their
7    patients.
8    BY MR. STEKLOFF:
9        Q.  So do you think that Xarelto
10   as it stands today should be pulled from
11   the market?
12       MR. DENTON:  We've been
13   through that a couple times.  I
14   object to the form of the
15   question.
16       THE WITNESS:  I'm -- I'm not
17   going to venture that opinion.
18       What I would venture is
19   that, as I said before,
20   unmonitored Xarelto, I feel, is
21   problematic for all the reasons
22   that we've gone through and that I
23   would be very -- I would favor a
24   monitored Xarelto, again for all

Page 395

1        the reasons that we've mentioned,
2    as the -- as the -- a better
3    option than unmonitored Xarelto.
4    BY MR. STEKLOFF:
5        Q.  But do you agree that
6    unmonitored Xarelto is still a good
7    option for some patients?
8        MR. DENTON:  Object to the
9    form.  Asked and answered.
10       THE WITNESS:  As I said
11   before -- your qualification of a
12   good option and my qualification
13   of a good option may be different.
14       What I would want to do with
15   each individual patient with -- in
16   conjunction with the primaries
17   that are prescribing the drug and
18   following that patient, is to
19   review all of the options and to
20   make that decision based on that
21   individual patient.
22   BY MR. STEKLOFF:
23       Q.  Should unmonitored Xarelto
24   be an option that clinicians that you

Page 396

1    work with at Yale consider for treating
2    patients with atrial fibrillation?
3        MR. DENTON:  Object to the
4    repetitive nature.  Object to the
5    form.
6        THE WITNESS:  As a matter of
7    practicality, right now
8    unmonitored Xarelto is an option.
9    But I would find it preferable to
10   have monitored Xarelto in its
11   place as a better option.
12   BY MR. STEKLOFF:
13       Q.  Do you agree that Xarelto as
14   it stands right now is effective in
15   reducing the risk of stroke in patients
16   with atrial fibrillation?
17       MR. DENTON:  Object to the
18   form.
19       THE WITNESS:  The problem
20   with that is that's compared to
21   what?  To my mind, it's not that
22   something is effective; it is in
23   comparison to other options that
24   are available.

Page 397

1        And I think that if you want
2    to go back, we can look at those
3    analyses in the report.  And I
4    think they show that there are
5    better options available.
6    BY MR. STEKLOFF:
7        Q.  So based on that, are you
8    saying that Xarelto is never the best
9    option for a patient?
10       MR. DENTON:  Object to the
11   form.
12       THE WITNESS:  Again, I
13   would -- I would say that
14   monitored Xarelto would be an
15   option that I would think would be
16   better than unmonitored Xarelto,
17   and, therefore, should be a
18   consideration.
19   BY MR. STEKLOFF:
20       Q.  Are you saying that
21   unmonitored Xarelto is never the best
22   option for a patient?
23       MR. DENTON:  Asked and
24   answered 27,000 times.  I object.

100 (Pages 394 to 397)

Protected - Subject to Further Protective Review

Page 398

1    Please move on to something else
2    after this final answer.
3        THE WITNESS: Okay. I --
4        MR. DENTON: He has answered
5    it.
6        THE WITNESS: I don't use
7    the term "never." That doesn't --
8    that is not, to me, a medically
9    valid or scientific term, because
10   we just -- that's not something
11   that -- where we operate.
12       So what I would say is that
13   for individual patients, right
14   now, unmonitored Xarelto is being
15   used, and I have patients that
16   I've worked with my colleagues on,
17   and there are patients in that
18   situation where it's being used.
19       So that is acceptable in
20   that situation.
21       What I'm saying in my report
22   is that monitored Xarelto would be
23   preferable.
24

Page 399

1    BY MR. STEKLOFF:
2        Q.   Are you saying that
3    unmonitored Xarelto is rarely the best
4    option for a patient?
5        MR. DENTON: Come on now.
6        Object to the form.
7        THE WITNESS: I'm sorry, but
8    I don't know how to quantitate
9    "rarely."
10   BY MR. STEKLOFF:
11       Q.   Do you think that Eliquis
12   should have monitoring?
13       MR. DENTON: Object to the
14   form. I don't think he's
15   evaluated Eliquis.
16       But go ahead.
17       THE WITNESS: I have not
18   evaluated Eliquis to the rigor
19   that I've evaluated --
20   BY MR. STEKLOFF:
21       Q.   So you don't have an opinion
22   on it?
23       A.   I haven't done the
24   groundwork necessary to be able to make

Page 400

1    that type of statement.
2        Q.   Do you think Pradaxa should
3    have monitoring?
4        A.   That's -- that's going to
5    fall into the confidentiality area.
6    Sorry.
7        Q.   Okay. Do you think that
8    Savaysa should have monitoring?
9        A.   The same answer as for
10   apixaban.
11       Q.   Do you think that the
12   Eliquis label should be different?
13       MR. DENTON: Different to
14   what? I object to the form.
15   BY MR. STEKLOFF:
16       Q.   With respect to what it
17   warns about, if anything, about
18   monitoring?
19       MR. DENTON: I just object.
20   I don't think he's even looked at
21   that. Certainly not --
22       MR. STEKLOFF: Well, he can
23   tell me if he's looked at it. You
24   don't need to testify for him.

Page 401

1        He will -- he will make
2    clear, I'm confident, if he can
3    offer an opinion on that or not.
4        THE WITNESS: I've -- as
5    with respect to your previous
6    question on apixaban, the same
7    answer holds true. I've not
8    evaluated the label for Eliquis,
9    apixaban, to a degree where I
10   would be comfortable commenting on
11   it.
12   BY MR. STEKLOFF:
13       Q.   Can I assume if I asked you
14   the question about Pradaxa, you wouldn't
15   be able to answer it because of the
16   confidential information that you've been
17   privy to?
18       A.   Yes, that would apply.
19       Q.   Would you prefer that the
20   clinicians that you work with did not
21   prescribe unmonitored Xarelto because of
22   everything we've discussed here today?
23       MR. DENTON: Object to the
24   form.

101 (Pages 398 to 401)

Protected - Subject to Further Protective Review

Page 402

1          THE WITNESS: What I
2    would -- what I would -- what I
3    would -- based on what we've
4    discussed here today, a more
5    optimal, better solution would be
6    if we had Neoplastine PT available
7    to us to monitor Xarelto and to
8    help -- and to use that data to
9    help us make decisions about
10   patient management.
11   BY MR. STEKLOFF:
12        Q.   But given that you don't in
13   your practice -- I want to deal with the
14   real world, what you have to face every
15   day in your practice.
16        A.   Right.
17        Q.   Would you prefer that the
18   clinicians at Yale that you work with did
19   not prescribe unmonitored Xarelto because
20   of your criticisms that you've described
21   here in detail today?
22        MR. DENTON: Object to the
23   form of the question.
24        THE WITNESS: When I take

Page 404

1    live with that, and we do the best
2    we can under that circumstance.
3          That's the best way I can
4    answer that question.
5          Am I -- am I completely
6    satisfied with how we monitor and
7    how we -- how we are unable to
8    monitor and how we evaluate and
9    manage those patients?  No.  Could
10   I be more satisfied if we had
11   monitoring?  Yes.  But we deal
12   with that level of variability on a
13   daily basis and do our best.
14   BY MR. STEKLOFF:
15        Q.   Have you ever told your
16   colleagues that you were uncomfortable
17   with their decision to prescribe
18   unmonitored Xarelto because of the high
19   degree of variability or your lack of
20   knowledge about the therapeutic effect of
21   Xarelto?
22        MR. DENTON:  Object to the
23   compound form of the question.
24        THE WITNESS:  It's not a

Page 403

1    care of patients, my -- my
2    preference is not something that I
3    find -- that I use as material for
4    evaluation.
5          What I'm trying to do is
6    look at a specific patient and
7    determine the evidence for that
8    specific patient.
9          Am I -- do I have a level of
10   discomfort in knowing that the
11   patients that I'm collaborating
12   with, with my colleagues who are
13   on Xarelto have a high degree of
14   variability in their -- in the
15   activity of Xarelto and that I
16   don't know where they are in
17   their -- the therapeutic effect of
18   Xarelto?  Yes, I have a lot of
19   discomfort with that.
20          But I have patients where --
21   and my colleagues and I have
22   patients where we have huge levels
23   of discomfort in all respects, and
24   in all types of diseases, and we

Page 405

1    lack of knowledge.  It's that
2    there is no ability to know the
3    therapeutic effect of Xarelto,
4    just to correct that.  And I
5    misspoke then.
6          The -- again, I don't tell
7    my colleagues what to think or how
8    to act.  What I would do is
9    discuss all of these variables of
10   Xarelto therapy and the variables.
11   That would be part of our
12   discussion.
13          But for me to give them a
14   blanket statement saying, no, you
15   can't do that or you shouldn't do
16   that, I don't use that
17   terminology.
18   BY MR. STEKLOFF:
19        Q.   My question is a little bit
20   different.  Have you ever told them, "I'm
21   uncomfortable with you prescribing
22   unmonitored Xarelto"?
23        A.   Using those specific words?
24        Q.   Or anything close to it.

102 (Pages 402 to 405)

Protected - Subject to Further Protective Review

Page 406

1          MR. DENTON:  Object to form.
2          THE WITNESS:  Look, in
3     working with my colleagues -- in
4     working with my colleagues on
5     specific patients, they're well
6     aware that Xarelto can't be
7     monitored and that they have no
8     idea where the patient is in terms
9     of the therapeutic effect.  They
10    know that.  We've discussed this.
11    This is part of our normal
12    colloquy on any drug.
13         So I don't find it necessary
14    to somehow remind them of that
15    with respect to their decision or
16    the fact that the patient is on
17    that drug.
18    BY MR. STEKLOFF:
19         Q.   Is that part of your normal
20    colloquy with -- I'll withdraw that.
21         Is that part of your normal
22    colloquy when discussing Eliquis with a
23    colleague?
24         MR. DENTON:  Object to form.

Page 407

1          THE WITNESS:  That's the
2     normal colloquy that I have --
3     there are too many Q's in this.
4     That's the normal colloquy that I
5     would have with my colleagues with
6     respect to all aspects of therapy
7     and management, regardless of the
8     drug, regardless of the situation.
9     BY MR. STEKLOFF:
10         Q.   And all NOACs?
11         MR. DENTON:  Object to form.
12         THE WITNESS:  Again, my
13    colloquy -- my colloquy is to be
14    sure that my colleagues understand
15    the information that's available
16    to us and that they understand the
17    pathophysiology of the situation
18    and the drug.
19         And if they understand that,
20    then we have a meaningful
21    discussion related to that.
22    BY MR. STEKLOFF:
23         Q.   Do you think Eliquis has a
24    high degree of variability?

Page 408

1          MR. DENTON:  Object to the
2     form.
3          THE WITNESS:  In what way?
4     BY MR. STEKLOFF:
5          Q.   In drug concentration?
6          MR. DENTON:  Same objection.
7          THE WITNESS:  In what way?
8     Interpatient, intrapatient?
9     BY MR. STEKLOFF:
10         Q.   Interpatient?
11         A.   Interpatient.
12         MR. DENTON:  Object to form.
13         THE WITNESS:  I don't think
14    I've read enough to be able to
15    give you a good answer on that.
16    BY MR. STEKLOFF:
17         Q.   And you can't, I assume,
18    tell me because of confidential
19    information whether you think Pradaxa has
20    a high degree of interpatient variability
21    with respect to drug concentration.  Is
22    that right?
23         A.   That's correct.
24         Q.   Last topic, and I will be

Page 409

1     done for the day.
2          Where is the best place in
3     your report -- there's two options.  I
4     just want to make sure I don't miss
5     anything.  Your labeling --
6          MR. SARVER:  I thought you
7     were going to say where is the
8     best place to eat?
9          MR. STEKLOFF:  Too many
10    places.
11    BY MR. STEKLOFF:
12         Q.   I really want to just get to
13    the -- make sure I understand all of your
14    criticisms of the label.  That's the last
15    thing I want to discuss with you today.
16         A.   Okay.
17         Q.   So you list some on Page 4,
18    and you list some on Page 19 to 20.  They
19    may -- they do overlap.  But I want to
20    make sure I --
21         MR. DENTON:  So what's the
22    question?
23         MR. STEKLOFF:  I'm just
24    trying to get him to tell me where

103 (Pages 406 to 409)

Protected - Subject to Further Protective Review

Page 410

1    I can ask him questions about his
2    labeling opinions and best -- make
3    sure I don't miss anything.
4        THE WITNESS:  Well, the -- I
5    believe that in my report the
6    two -- the two places that address
7    the label specifically are the top
8    of Page 4, Bullet 5, A through D.
9        And on Page 19, the last two
10   paragraphs of that page, the
11   continuation of that paragraph,
12   the last paragraph on 19 to Page
13   20.
14       And then the next two
15   paragraphs are specific to the
16   label.
17       The last paragraph of that
18   page is related to the label, but
19   I -- I don't know that that's a
20   specific critique.  It's more a --
21   an "if" aspect related to the
22   label.
23   BY MR. STEKLOFF:
24   Q.   Got it.  So let's -- let's

Page 411

1    just look at 19 through 20, which I think
2    is more -- they provide more detail than
3    the summary you provide on Page 4.
4    Q.   Can you describe why you
5    think the Xarelto label should have a
6    black box warning with respect to
7    bleeding risk?
8    A.   So I think -- I think I
9    could have written this a little more
10   specifically.  And what I'm going to say
11   is that I -- I feel that putting the
12   Xarelto label and the warfarin label side
13   by side and having them more similar in
14   terms of the way that they are written
15   out and where they have their -- the way
16   that they are organized and the way that
17   the labels relate bleeding risk, which
18   may include having a black box on the
19   Xarelto label related to bleeding risk,
20   since it is not safer than warfarin, and
21   in some instances is less safe, what
22   strikes me would be if the two labels
23   were more approximated each other.
24       Whereas right now they --

Page 412

1    it's -- it's more difficult to find the
2    data in the Xarelto label with respect to
3    the bleeding and the black box warning is
4    sort of in a separate area.
5        So I guess what I'm
6    inarticulately saying is that the basics
7    is that Xarelto and warfarin have similar
8    bleeding risk.  I don't think that that's
9    adequately communicated by the label.
10   Q.   And is that because of the
11   lack of a black box in the Xarelto label
12   or something else?  I -- I'm not quite
13   sure I understood that.
14   A.   Right.  So the Xarelto label
15   has a black box warning, but it's not
16   related to bleeding risk.
17       So if -- if it approximated
18   the warfarin black box, that to me would
19   be a better communication of the fact
20   that Xarelto and warfarin are not, at
21   least in the overall ROCKET study, did
22   not differ in terms of bleeding risk.
23   Q.   And so what would the
24   black -- what is the black box that you

Page 413

1    believe should be on the Xarelto label?
2    What would it say?
3    A.   It would relate to bleeding
4    risk rather than only related to
5    thrombotic risk or noncompliance.
6    Q.   And what would it say with
7    respect to bleeding risk?
8        MR. DENTON:  Object to form.
9        THE WITNESS:  I would say
10   that it would relate the aspect
11   that -- that Xarelto has -- is not
12   safer than warfarin in the trial
13   that was used to gain approval.
14   BY MR. STEKLOFF:
15   Q.   Those exact words?
16       MR. DENTON:  Object to form.
17       THE WITNESS:  Well, I'm
18   not -- I've never written a label
19   for the FDA, so I'm just
20   approximating what -- I would want
21   something to communicate to me
22   that Xarelto is not safer than
23   warfarin with respect to bleeding
24   risk.

104 (Pages 410 to 413)

Protected - Subject to Further Protective Review

Page 414

1  BY MR. STEKLOFF:
2      Q.   That it's not -- noninferior
3  with respect to bleeding risk?
4          MR. DENTON:  Object to the
5      form.
6          THE WITNESS:  No, I think --
7      to me bleeding risk is -- is -- is
8      important.  And the fact that
9      warfarin has a black box that says
10     you can bleed to death with this,
11     or you can have severe bleeds with
12     this, is important.
13         I would want something
14     similar with Xarelto, because,
15     again, in the ROCKET study, which
16     is the largest data that I have
17     available to me to look at, the
18     bleeding risk was the same as with
19     warfarin in the overall trial.  So
20     I would want that communicated in
21     the Xarelto label.
22 BY MR. STEKLOFF:
23     Q.   In case physicians compare
24 the warfarin label to the Xarelto label?

Page 416

1  to death or cause you severe bleeds," or
2  are you saying that it should say
3  something different, which is that in the
4  study Xarelto wasn't safer with respect
5  to bleeding than warfarin?
6          MR. DENTON:  Object to the
7      form.
8          THE WITNESS:  I don't know
9      exactly what the term -- I haven't
10     researched exactly what the
11     terminology should be.
12         But I think that what I'm
13     saying is that the absence of
14     similarity to the warfarin label
15     doesn't communicate to patients
16     and physicians that -- that
17     warfarin and Xarelto have a
18     similar bleeding risk.
19         And I think the lack of
20     that, the lack of the
21     comparability of those labels in
22     terms of the bleeding risk being
23     upfront, could be misinterpreted
24     and might inappropriately

Page 415

1  Is that the purpose of this?
2      A.   Well, it -- it seems to me
3  that if you have labels that looked
4  similar, that would -- that would be
5  easier for physicians to quickly
6  understand rather than to have to have
7  labels where the data is in different
8  parts of the label to find.
9          I mean, we want the
10     physicians to be able to quickly get the
11     information that they need.
12     Q.   And so -- and I'm not
13     trying -- I'm really just trying to
14     understand because I'm a little confused.
15         The war -- the warfarin
16     label used the black box, these aren't
17     the exact words, but says, "This can
18     cause you to bleed to death or severe
19     bleeds," right?
20     A.   Correct.
21     Q.   Are you saying that the
22     Xarelto label should say -- the black box
23     that you think should be on the label
24     should say, "This can cause you to bleed

Page 417

1      communicate to physicians that
2      Xarelto is somehow safer.
3  BY MR. STEKLOFF:
4      Q.   So it might -- so it might
5  be that if the Xarelto label had a black
6  box that had the same language as the
7  warfarin label about the risk of
8  bleeding, that would be sufficient for
9  you?
10         MR. DENTON:  Object to form.
11         THE WITNESS:  I'm not going
12     to go so far as to say exactly
13     what the language would be.  But I
14     think it would -- should be
15     changed to reflect the fact that
16     Xarelto is not safer than warfarin
17     with respect to bleeding risk.
18 BY MR. STEKLOFF:
19     Q.   All right.  The next
20 paragraph about interpatient variability,
21 PT and drug concentration, the
22 observations about PT and bleeding risk
23 in the ROCKET trial and the utility of
24 using PT as a measurement.

105 (Pages 414 to 417)

Protected - Subject to Further Protective Review

Page 418

1         We talked about that before,
2    right?
3         A.    Yes.  As I mentioned, if --
4    if that data were in the label, that
5    would be a -- that would be efficacious
6    for me to be able to implement testing
7    and to get support for that.
8         Q.    Because sitting here today,
9    you think that a PT measurement using
10   Neoplastine 13 to 15 hours after dose
11   is -- would be an effective way to
12   identify patients' bleeding risk?
13             MR. DENTON:  Object to the
14        form.
15             THE WITNESS:  I'm saying
16        that the data from ROCKET support
17        the fourth quartile of PT showing
18        a higher hazard ratio.
19             So I would want to, at the
20        least, use that information for
21        patient care using the Neoplastine
22        PT.
23   BY MR. STEKLOFF:
24        Q.    So that's what should be in

Page 419

1    the label?
2             MR. DENTON:  Object to the
3        form.
4             THE WITNESS:  I think -- I
5        think the data from the F -- the
6        data that the FDA has, it seems to
7        me, would be informative in the
8        label.
9    BY MR. STEKLOFF:
10        Q.    The quartile data?
11        A.    That would be one aspect of
12   it.
13        Q.    We talked about the U.S.
14   subgroup change that occurred in
15   September 2015.
16             Here your criticism is
17   really just that it should have been
18   added earlier; is that right?
19        A.    Since the data was available
20   earlier and it's sufficient to include it
21   in 2015, I don't see why it was not
22   included in earlier labeling.
23        Q.    That's your criticism in
24   this paragraph?

Page 420

1         A.    Correct.
2         Q.    And then the last criticism
3    is that -- we talked about this too --
4    that they should have had more
5    information about patients who were
6    taking warfarin and their time in
7    therapeutic range during the ROCKET trial
8    included in the label; is that right?
9             MR. DENTON:  Objection to
10        the form.  Asked and answered.
11             THE WITNESS:  I think what
12        I -- I think -- I think I would
13        term it differently.  I would say
14        that a discussion of how the low
15        TTR in the ROCKET trial might have
16        impacted efficacy and safety,
17        especially related to the higher
18        incidence of event -- of events.
19        That discussion, I think, within
20        the label would be informative.
21   BY MR. STEKLOFF:
22        Q.    And then the last paragraph,
23   I just want to understand exactly what
24   you are opining.

Page 421

1             First, this first sentence,
2    I won't read the whole sentence.  Can you
3    read the first sentence, please?
4         A.    The last -- the last
5    paragraph?
6         Q.    Yeah.  Starting "If
7    adequately warned of the risk of
8    bleeding."
9         A.    Right.  So if -- if
10   adequately warned of the risk of
11   bleeding --
12        Q.    You can read it to
13   yourself --
14        A.    Oh, I'm sorry.  I thought
15   you were asking me to read it in the
16   record.
17        Q.    No.  Sorry.  I'm trying to
18   actually be efficient, so I just want you
19   to read it so I can ask you about it.
20        A.    Okay.  The first sentence?
21        Q.    Yes.  I think you would tell
22   me that the sentences make different
23   points.
24        A.    Yes, I've read the first

106 (Pages 418 to 421)

Protected - Subject to Further Protective Review

Page 422

1    sentence.
2        Q.   Okay.  So you think -- is it
3    fair to say that you think that if the
4    information about the quartile analysis
5    in the utility of what you believe is the
6    utility of PT using Neoplastine at 13 to
7    15 hours were in the label, then a
8    clinician -- reasonable clinicians would
9    use Neoplastine between 13 and 15 hours
10   to monitor their patients?
11           MR. DENTON:  Object to the
12       form of the question.
13           THE WITNESS:  Yes.  I think
14       a reasonable physician -- and as I
15       said, in my consultations, I'm
16       always -- I'm being asked, what is
17       the level, you know, how do I know
18       that this patient is not at
19       increased risk, how do I know that
20       the patient -- where the patient's
21       level is.  I can't answer that
22       question right now.
23           I think that the data from
24       ROCKET would support that the

Page 423

1       Neoplastine PT would be able to
2       give that information.
3    BY MR. STEKLOFF:
4        Q.   Do you think the 20-second
5    cutoff that we talked about before should
6    be in the label?
7           MR. DENTON:  Object to the
8       form.
9           THE WITNESS:  I think that
10       the quartile data should be in the
11       label.  I think that a discussion
12       of that quartile data with other
13       data that might be available such
14       as Nakano should be in the label.
15       And I think that there could be a
16       discussion as to the monitoring of
17       those patients as in ROCKET at the
18       13 to 15-hour with the
19       Neoplastine, to try and use that
20       data to determine if patients were
21       at high risk of bleeding.
22           But, again, I would think
23       that would be -- that would be --
24       rather than saying you must not,

Page 424

1       or you must, I would say that data
2       would be included, and then that
3       could be again used by individual
4       physicians with individual
5       patients to help make those
6       decisions.
7    BY MR. STEKLOFF:
8        Q.   And understanding that
9    individual physicians would make
10   decisions about individual patients, do
11   you think that a reasonable physician, if
12   the data you just described were in the
13   label, would also use 20 seconds as a
14   reasonable and conservative cut-off point
15   at which the risks might outweigh the
16   benefits?
17           MR. DENTON:  Objection to
18       the form.  Asked and answered.
19           THE WITNESS:  I think that
20       the -- I think that the quartile
21       data and the Nakano data support
22       that as a possible and reasonable
23       cutoff.
24           I can't say what other

Page 425

1       physicians would consider in that
2       respect, but I think that -- I
3       think that there's data that would
4       support that.  And that would be
5       part of the discussion for a
6       physician to -- with respect to
7       their individual patient.
8    BY MR. STEKLOFF:
9        Q.   But you are willing here to
10   opine on what a reasonable physician
11   would do in two different ways in this
12   paragraph, right?  I know we haven't
13   gotten to the second sentence yet, but...
14       A.   Well, I -- I think that
15   if -- I think that if -- knowing the --
16   knowing the data and knowing that you
17   could monitor this to determine if your
18   patient is being placed at an
19   unreasonably high risk of bleeding, I
20   would say that a reasonable -- reasonable
21   physicians would take advantage of that.
22           Certainly in my experience,
23   I'm being asked by physicians how to
24   monitor the drug.

107 (Pages 422 to 425)

Protected - Subject to Further Protective Review

Page 426

1      Q.   And my question related --
2          MR. DENTON:  Let him finish.
3    BY MR. STEKLOFF:
4      Q.   -- to the 20-second
5    cutoff --
6          MR. DENTON:  Let him finish
7    his answer.
8          THE WITNESS:  I'm sorry.  I
9    wasn't --
10   BY MR. STEKLOFF:
11     Q.   My second -- my question
12   relates to the 20-second cutoff.
13         Do you think a reasonable
14   physician would apply the same 20-second
15   cutoff that you applied based on that
16   data you're talking about?
17         MR. DENTON:  Wait a minute.
18   I object.  You cut him off his
19   last answer.
20         If you need to finish your
21   last answer, you are free to do
22   so.
23         THE WITNESS:  I think I can
24   wrap that into your next question,

Page 427

1    your current question.
2          MR. DENTON:  Object to form.
3          THE WITNESS:  I think
4    that -- I think that based on each
5    individual patient, the -- the
6    individual physician taking care
7    of that patient has to put the
8    data together with what they know.
9          Their -- their reasoning
10   behind choice of anticoagulant may
11   include additional data that we
12   can't opine here.
13         I think that a reasonable
14   physician would look at the
15   quartile data and might agree
16   that -- that there is a cutoff
17   that is 20 seconds.
18         But they may not apply that
19   equally to all patients.  They
20   would look at the data.  They
21   might require multiple values.
22   They might be looking at patients
23   who have different clinical
24   situations.  Renal failure would

Page 428

1    be one.
2          Therefore, I think what they
3    would do is they would -- they
4    would use that data.  And I think
5    with experience they would then on
6    their own develop what they think
7    were reasonable criteria that they
8    would use to try and make
9    decisions on the patients.
10   BY MR. STEKLOFF:
11     Q.   Now, may -- depending on
12   your answer, this may be my last
13   question.
14         MR. DENTON:  The over and
15   under on that is no.
16   BY MR. STEKLOFF:
17     Q.   Can you just explain the
18   last sentence to me, which I don't
19   understand?
20     A.   So what I'm saying is that,
21   in the last sentence, I say, "The Xarelto
22   label does not contain information on the
23   PT evaluation to determine if the patient
24   is at an unreasonably high risk of

Page 429

1    bleeding."
2          And then based on what we've
3    discussed throughout this report, the
4    overall risk of bleeding, the -- the
5    interpatient variability such that a
6    patient is given Xarelto and you have no
7    idea where that patient is in the
8    spectrum of Xarelto activity.  You have
9    no idea.
10         Given the fact that we have
11   data on being able to monitor it.  But if
12   that data is not available, then again
13   you're still in the -- you're still in
14   the zone of we have no information on
15   that.
16         Given the fact that that --
17   that there is data that suggests fairly
18   strongly that Xarelto is less efficacious
19   and safe than other alternative
20   anticoagulants, I think that it would be
21   reasonable to make the decision to not
22   use Xarelto in patients.
23     Q.   Are you -- are you saying
24   that a reasonable physician more likely

108 (Pages 426 to 429)

Protected - Subject to Further Protective Review

Page 430

1      than not -- withdraw that.
2             Are you saying a reasonable
3      physician more likely would not prescribe
4      Xarelto because there's no data in the
5      label about interpatient variability and
6      monitoring?
7             MR. DENTON: Object to the
8         form. It's been asked and
9         answered.
10     BY MR. STEKLOFF:
11        Q.   How did the -- can you
12     explain to me how the two clauses of this
13     sentence, the clause before the comma and
14     after the comma, relate to each other?
15            What -- why would a
16     reasonable -- I mean, I'm not -- I'm
17     really just trying to understand.  I
18     mean, that's -- that's sort of my preface
19     for why I'm asking this.
20            Why is it that you believe
21     today, with the information that is in
22     the label, a reasonable physician more
23     likely would not prescribe Xarelto?
24            MR. DENTON:  I object to the

Page 431

1         form.  I don't think that's what
2         it says.
3             But do your best.
4      BY MR. STEKLOFF:
5         Q.   I'd like to know if that's
6      what you're saying.  I -- I -- I --
7         A.   What I'm -- what I'm trying
8      to -- what I'm trying to communicate here
9      is, the ROCKET trial has robust data that
10     indicates that monitoring Xarelto with a
11     Neoplastine PT can tell you whether a
12     patient is at a higher bleeding risk.
13            Right now we have no way of
14     knowing the patient -- we have no way of
15     knowing what the bleeding risk is for
16     individual patients.  It's just a black
17     box.
18            If we knew -- if the label
19     had information with that that included
20     the aspects of monitoring -- I'm sorry --
21     of measuring the Neoplastine PT to be
22     able to examine that data with respect to
23     the hazard ratio for bleeding risk from
24     the ROCKET trial that's in the FDA data,

Page 432

1      reasonable physicians -- as I said
2      before, I think reasonable physicians
3      would utilize that data.
4             Certainly in my practice,
5      physicians are asking for that ability to
6      monitor.
7             Without the ability to
8      monitor, so not having any idea of the
9      activity of the drug, and given the fact
10     that there is significant interpatient
11     variability, at least in the trough, it's
12     a tenfold change in interpatient
13     variability -- I'm sorry -- not change,
14     but a tenfold difference in interpatient
15     variability, and given that the risk of
16     bleeding at least in the trials that
17     we've looked at, that we talked about
18     here with ROCKET in the U.S. versus
19     well-controlled warfarin, and in the
20     analyses that have been done by Lipp and
21     Schneeweiss and those others where they
22     are not showing that -- where they are
23     showing that apixaban and dabigatran are
24     relatively safer and more efficacious,

Page 433

1      you have better options.  And so without
2      being able to monitor the PT and without
3      having that -- and -- and without having
4      that information in the label, such that
5      that would be an option for people to be
6      able to use, I think a reasonable
7      physician might say, I don't know where
8      this patient is in terms of their
9      activity, let me go with something that
10     is probably more effective and safe.
11        Q.   So do you believe that it's
12     unreasonable for a physician, given the
13     lack of information that you've described
14     in the label, to prescribe Xarelto today?
15            MR. DENTON:  Object to the
16        form.
17            THE WITNESS:  You know, I --
18        the fact that I'm saying a
19        reasonable physician more likely
20        than not would not prescribe
21        Xarelto, I don't -- I don't
22        believe in turning that over and
23        saying if they prescribe Xarelto
24        that that is unreasonable.  I

109 (Pages 430 to 433)

Protected - Subject to Further Protective Review

Page 434

1    don't -- I don't think those mean
2    the same thing.
3  BY MR. STEKLOFF:
4    Q.   What you think is that,
5  based on the lack of information in the
6  label, someone who you would deem
7  reasonable would choose something other
8  than Xarelto to prescribe to their
9  patient?
10       MR. DENTON:  Objection to
11   form.  Asked and answered.
12       THE WITNESS:  I think
13   that -- I think that based on the
14   data, a reasonable physician more
15   likely than not would not
16   prescribe Xarelto.
17  BY MR. STEKLOFF:
18   Q.   So if a reasonable physician
19  knew everything that's in your report,
20  they would not prescribe Xarelto?
21       MR. DENTON:  Object to the
22   form.
23       THE WITNESS:  No, I'm not
24   making it an absolute.  I'm saying

Page 436

1  have -- do you have questions for
2  today?  I don't think Rick does.
3  I assume -- I assume you don't.
4       MR. DENTON:  No, I don't
5  have any questions.
6       MR. STEKLOFF:  Okay.  We can
7  go off the record.
8       THE VIDEOGRAPHER:  This
9  marks the end of today's
10  deposition.  The time is 5:21 p.m.
11  We are going off the record.
12       (Excused.)
13       (Deposition adjourned at
14  approximately 5:21 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 435

1    that -- that a reasonable
2    physician would more likely than
3    not might make that decision to
4    not prescribe Xarelto.  I'm not
5    saying never.
6        I'm saying that there could
7    be other circumstances that come
8    to play, but I'm just saying,
9    without that data, more likely
10   than not it would be reasonable
11   not to prescribe Xarelto.
12       MR. STEKLOFF:  I am done.
13  Pass the witness.
14       MR. SARVER:  You want to
15  wait till tomorrow, don't you,
16  Roger, for the Boudreaux specific?
17       MR. DENTON:  Oh, yes.  Yeah,
18  we'll do Boudreaux tomorrow.
19       MR. SARVER:  Okay.  That's
20  fine.
21       MR. DENTON:  And I assume
22  you'll be asking questions?
23       MR. SARVER:  Yes.
24       MR. STEKLOFF:  Do you

Page 437

1
2           CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
      It was requested before
8  completion of the deposition that the
   witness, HENRY MICHAEL RINDER, M.D., have
9  the opportunity to read and sign the
   deposition transcript.
10
11
   _____
12  MICHELLE L. GRAY,
   A Registered Professional
13  Reporter, Certified Shorthand
   Reporter, Certified Realtime
14  Reporter and Notary Public
   Dated:  December 15, 2016
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 438

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so please sign
9   the errata sheet and date it.
10         You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14         It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 440

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4          I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 441, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  HENRY MICHAEL RINDER, M.D.      DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 439

1          - - - - - -
           E R R A T A
2          - - - - - -
3
4   PAGE LINE CHANGE
5
6   ____ ____ _____
    REASON: _____
7
8   ____ ____ _____
    REASON: _____
9
10  ____ ____ _____
    REASON: _____
11
12  ____ ____ _____
    REASON: _____
13
14  ____ ____ _____
    REASON: _____
15
16  ____ ____ _____
    REASON: _____
17
18  ____ ____ _____
    REASON: _____
19
20  ____ ____ _____
    REASON: _____
21
22  ____ ____ _____
    REASON: _____
23
24  ____ ____ _____
    REASON: _____

Page 441

1          LAWYER'S NOTES
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Golkow Technologies, Inc. - 1.877.370.DEPS