1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF LOUISIANA

3                    -   -   -

4  IN RE: XARELTO          MDL NO. 2592

   (RIVAROXABAN) PRODUCTS

5  LITIGATION              SECTION L

6  THIS DOCUMENT RELATES    JUDGE ELDON

   JOSEPH J. BOUDREAUX      E. FALLON

7  Case No. 2:14-CV-0270

                           MAG. JUDGE NORTH

8                    -   -   -

9              December 15, 2016

10                   -   -   -

11              - PROTECTED -

12    - SUBJECT TO FURTHER PROTECTIVE REVIEW -

13

14          Videotaped deposition of

15  HENRY MICHAEL RINDER, M.D., held at the law

16  office of Douglas & London, 59 Maiden Lane,

17  New York, New York, commencing at 8:12 a.m.,

18  on the above date, before Marie Foley, a

19  Registered Merit Reporter, Certified

20  Realtime Reporter and Notary Public.

21                   -   -   -

22         GOLKOW TECHNOLOGIES, INC.

23    877.370.3377 ph | 917.591.5672 fax

24            Deps@golkow.com

1  A P P E A R A N C E S:

2

3

4  SCHLICHTER, BOGARD & DENTON, LLP

5  BY: ROGER C. DENTON, ESQUIRE

6    100 South Fourth Street

7    Suite 1200

8    St. Louis, Missouri 63102

9    314.621.6115

10   rdenton@uselaws.com

11

12     - and -

13

14  HERMAN, HERMAN & KATZ

15  BY: ANNE (BESS) E. DeVAUGHN, ESQUIRE

16    820 O'Keefe Avenue

17    New Orleans, Louisiana 70113

18    504.581.4892

19    bdevaughn@hhklawfirm.com

20    Representing the Plaintiff

21

22

23

24

---

1  A P P E A R A N C E S: (Cont.)

2  WILKINSON WALSH & ESKOVITZ

3  BY: BRIAN L. STEKLOFF, ESQUIRE

4    MEG LOFTUS, ESQUIRE

5    1900 M Street, NW, Suite 800

6    Washington, DC 20036

7    202.847.4030

8    bstekloff@wilkinsonwalsh.com

9    mloftus@wilkinsonwalsh.com

10   Representing Bayer Pharmaceuticals

11

12  BARRASSO, USDIN, KUPPERMAN,

13  FREEMAN & SARVER, LLC

14  BY: RICHARD E. SARVER, ESQUIRE

15    MADISON A. SHARKO, ESQUIRE

16    909 Poydras Street, Suite 2400

17    New Orleans Louisiana 70112

18    504.589.9700

19    rsarver@barrassousdin.com

20    msharko@barrassousdin.com

21    Representing Janssen entities

22

23  ALSO PRESENT:

24    Henry Marte, videographer

---

1        - - -

2      TRANSCRIPT INDEX

3          PAGE

4  APPEARANCES...................... 2, 3

5  INDEX OF EXHIBITS................ 5

6  EXAMINATION OF HENRY MICHAEL RINDER, M.D.:

7  BY: MR. SARVER................... 8

8  REPORTER'S CERTIFICATE............ 196

9  SIGNATURE PAGE................... 194

10 ERRATA........................... 195

11

12

13

14        - - -

15

16

17

18

19

20

21

22

23

24

---

1        - - -

2      E X H I B I T S

3        - - -

4  NO.      DESCRIPTION          PAGE

5  1    Expert Report of Henry        11

6      Michael Rinder, M.D.,

7      dated October 14, 2016

8  2    Ochsner Pathology and        120

9      Laboratory Medicine

10     Laboratory Report for

11     Joseph Boudreaux, dated

12     June 1, 2013, Bates No.

13     JBoudreaux-OStAGH-MD-

14     000973 through

15     JBoudreaux-OStAGH-MD-000979

16 3    STAH Emergency Department     124

17     Lab Results for Joseph

18     Boudreaux, dated January 7,

19     2014, Bates No.

20     JBoudreaux-OStAGH-MD-

21     000029 through

22     JBoudreaux-OStAGH-MD-

23     000032

24

---

1  DEPOSITION SUPPORT INDEX

2

3  DIRECTION TO WITNESS NOT TO ANSWER

4  Page Line

5  - -none- -

6

7

8  REQUEST FOR PRODUCTION OF DOCUMENTS

9  Page Line

10  - -none- -

11

12

13  STIPULATIONS

14  Page Line

15  - -none- -

16

17

18  QUESTIONS MARKED

19  Page Line

20  - -none- -

21

22

23

24

1  HENRY MICHAEL RINDER, M.D., the Witness

2  herein, having been first duly sworn

3  by a Notary Public in and of the

4  State of New York, was examined and

5  testified as follows:

6  - - -

7  DIRECT EXAMINATION

8  - - -

9  BY MR. SARVER:

10  Q.   Good morning, Dr. Rinder.

11  A.   Good morning, Mr. Sarver.

12  Q.   Would you just state your full

13  name for the record?

14  A.   It is Henry Michael Rinder.

15  Q.   Thank you.

16  MR. SARVER:  And I'm going to

17  read a statement on to the record that

18  I'm required to read.  You won't care,

19  Roger.

20  MR. DENTON:  Is it the

21  Pennsylvania?

22  MR. SARVER:  It is.

23  MR. DENTON:  I don't think he's

24  cross-noticed in that case specific.

1  - - -

2  8:12 a.m.

3  New York, New York

4  - - -

5  THE VIDEOGRAPHER:  We are now on

6  the record.  My name is Henry Marte.

7  I'm a videographer for Golkow

8  Technologies.

9  Today's date is December 15th,

10  2016, and the time is 8:12 a.m.

11  This videotaped deposition is

12  being held at 59 Maiden Lane, New

13  York, New York taken in the matter of

14  Xarelto.

15  The deponent today is Dr. Henry

16  Rinder.

17  Counsel will be noted on the

18  stenographic record.

19  Will the court reporter please

20  administer the oath to the witness.

21  - - -

22

23

24

1  MR. SARVER:  I know.  I was told

2  to read it.

3  MR. DENTON:  Okay.  This doesn't

4  mean anything.

5  MR. SARVER:  Don't worry about

6  it.

7  MR. DENTON:  Go ahead.

8  MR. SARVER:  Defendants are in

9  receipt of plaintiff's cross-notice

10  for the deposition of this witness who

11  has issued an expert report in the

12  federal MDL proceeding and is being

13  deposed in connection with that

14  report.  Plaintiff's cross-notice for

15  the Pennsylvania consolidated

16  proceeding is premature because case

17  specific discovery in the Bellwether

18  case has not yet commenced in

19  Pennsylvania, nor have expert reports

20  before served, and specifically the

21  Pennsylvania plaintiffs have not yet

22  served the expert report for this

23  witness.

24  Plaintiff's cross-notice also

1　fails to take into account the expert
2　protocol that was agreed to among the
3　parties in the MDL proceeding and as
4　entered as an order by the court.
5　　　Among other things, this protocol
6　limits the depositions of generic
7　experts to seven hours total.
8　　　In the spirit of cooperation
9　between the federal MDL and the
10　Pennsylvania consolidated proceeding,
11　however, the defendants will not
12　object to plaintiff's cross-notice for
13　the deposition. This is being done
14　with full reservation of all rights
15　and objections pending negotiation of
16　a mutually acceptable process for
17　expert discovery in the Pennsylvania
18　cases.
19　　　MR. DENTON: I understand you
20　made that for the record and I just,
21　two things.
22　　　First of all, there's no one
23　from Pennsylvania here, but as to this
24　specific deposition, this is a case

1　specific deposition of the Boudreaux
2　matter, and I'm not sure how that
3　particular legal concern is relevant
4　to this, but we both made our record.
5　　　MR. SARVER: No harm done.
6　　　MR. DENTON: And we'll proceed.
7　　　Correct.
8　BY MR. SARVER:
9　　Q.　Dr. Rinder, I've passed you a
10　copy of something we've marked Exhibit 1
11　to your deposition.
12　　　What is it?
13　　　(Exhibit 1, Expert Report of
14　Henry Michael Rinder, M.D., dated
15　October 14, 2016, was marked for
16　identification, as of this date.)
17　　A.　This is the expert report which
18　I issued in the matter of Joseph
19　Boudreaux.
20　　Q.　Is it complete? I see it's six
21　pages.
22　　　The signature is at the front,
23　not the back. That's why I ask.
24　　A.　Yes, this looks complete.

1　　Q.　Okay, great.
2　　　When did you prepare your report
3　for Mr. Boudreaux's case?
4　　A.　I finished this report on
5　October 14th.
6　　Q.　Do you know when you started --
7　　A.　2016.
8　　Q.　When did you start, do you
9　remember?
10　　A.　At least several weeks before,
11　I'm sure.
12　　Q.　All right. Is this your
13　complete report for Mr. Boudreaux's case?
14　Do you have any other opinions?
15　　A.　No.
16　　Q.　And have you listed all of the
17　references and things that you relied upon
18　in your report, either your generic expert
19　report or Exhibit A?
20　　A.　Including my generic report.
21　　Q.　Yes, sir.
22　　A.　Yes, I believe that this is
23　complete.
24　　Q.　All right. Have you ever met

1　Mr. Boudreaux?
2　　A.　Not that I know of.
3　　Q.　All right. Have you -- did you
4　view his videotaped deposition?
5　　A.　I did not.
6　　Q.　Okay. Did you read his
7　deposition?
8　　A.　I read parts of it that I
9　requested to see.
10　　Q.　Okay. Do you know how many
11　pages, what part of his deposition you
12　read?
13　　A.　The -- the one -- the question
14　that I had with respect to Mr. Boudreaux's
15　history was with respect to his Indocin
16　use for episodes of gout.
17　　Q.　And you've pulled a page --
18　　A.　Hold on.
19　　Q.　You go ahead.
20　　A.　Let me just make sure that
21　that's all that I.
22　　　(Perusing document.)
23　　　I believe that I also asked to
24　see something in his report about when

1 he -- when he was taking his Xarelto
2 medications, but I don't -- I'm not sure
3 that I was able to make a complete
4 determination, from his deposition from
5 what I received from his deposition as to
6 whether that was definitive or not.
7    Q.   Right.  And we will talk about
8 that, because it's a bit of a puzzle,
9 isn't it, whether he was taking his
10 Xarelto?
11       MR. DENTON:  Object to the form
12    of the question.
13    A.   I'm not sure that it was a -- I
14 don't believe that it was a puzzle as to
15 whether he was taking his Xarelto, but
16 I -- I think there may have been confusion
17 about when he was taking his Xarelto.
18    Q.   We'll talk about that in a
19 moment.
20       Anything else?
21    A.   You're only talking about Mr.
22 Boudreaux's deposition?
23    Q.   Yes.
24    A.   I don't believe there was

1 anything else that I recall from his
2 deposition that's relevant in this report.
3    Q.   Okay.  Did you read any other
4 depositions relevant to Mr. Boudreaux's
5 case specific report?
6    A.   Yes.
7    Q.   Which ones?
8    A.   I wanted to get -- let me just
9 make sure that I have that -- this -- the
10 name correct.
11       (Perusing document.)
12       I wanted to get more information
13 regarding his use of Indocin for his
14 episodes of gout.  So I asked if there was
15 a -- any other deposition information
16 related to that, and I was sent
17 information from Kenneth, the deposition
18 of Kenneth Wong where he, I guess, was the
19 doctor that was taking care of Mr.
20 Boudreaux and could give information about
21 use of Indocin for episodes of gout.
22    Q.   Did you read Dr. Wong's
23 deposition?
24    A.   Not the entire deposition.  As

1 for Boudreaux, I only read the areas that
2 I was concerned about for that specific
3 question.
4    Q.   And the specific question you
5 were concerned about for Dr. Wong was the
6 Indocin use?
7    A.   And the episodes of -- and
8 whether there were episodes of gout
9 documented.
10    Q.   And that was it for Dr. Wong
11 that you were concerned about?
12    A.   Let me just make sure, because
13 I -- I'm -- I don't want to be incorrect.
14    Q.   I'm just trying to find out.
15    A.   (Perusing document.)
16       I think that's it.
17    Q.   Okay.  This might be faster if I
18 read a list of depositions unless you
19 recall others that you've read for Mr.
20 Boudreaux.
21       Do you recall off the top of
22 your head any other depositions you
23 reviewed?
24    A.   No.

1    Q.   Okay.  Let me go through just a
2 few.
3    A.   Okay.
4    Q.   We talked about Mr. Boudreaux's,
5 you read part of that?
6    A.   Correct.
7    Q.   And Dr. Wong, you read part of
8 that?
9    A.   Correct.
10    Q.   Nurse Theriot, did you read
11 Nurse Theriot's deposition?  It's a
12 Louisiana pronunciation, it's spelled
13 T-H-E-R-I-O-T.
14    A.   I'm trying to remember.  I think
15 I -- I may have read something about -- I
16 think I requested something about his
17 medication and that may have been part of
18 it.
19    Q.   Right.
20    A.   I'm sorry, sometimes I --
21 there's so many names.  I may have read
22 that one.
23    Q.   All right.  Maybe some of Nurse
24 Theriot's?

1  A.  I believe so.  I can't be sure.
2  Q.  Dr. Masri, M-A-S-R-I?
3  A.  I don't believe so.
4  Q.  Dr. Joshi, J-O-S-H-I?
5  A.  I recognize the name, but maybe
6 that was because of the medical record.  I
7 don't believe I read the deposition.
8  Q.  And an unfortunate name, Dr.
9 Fail, for a surgeon?
10  MR. DENTON:  We had an expert
11 named Dr. Maybe.
12  A.  Thank you for the levity.
13  Q.  Anyway, I apologize, Dr. Fail,
14 if you're listening.
15  A.  No, no, I don't -- I don't
16 believe that's one of the ones.
17  Q.  How about Nurse Torres?
18  A.  I don't recall.
19  Q.  Or Nurse Trosclare?
20  A.  Trosclare?
21  Q.  Trosclare.
22  A.  Trosclare, I don't recall.
23  Q.  Okay.  And in looking at your
24 specific report for Mr. Boudreaux, the

1 only specific literature that you have
2 cited are the Lip article, two Lip
3 articles, 2012 and 2016, and the Graham
4 article 2016.
5  Did I miss any?  I don't see any
6 other specific literature.
7  A.  Well, I believe that in writing
8 this, referring to my general report, I'm
9 being inclusive of all the literature that
10 I reviewed in the general report as well.
11 I'm only including, and again, I didn't
12 want to make this a 70-page document, so
13 I'm only including those for this specific
14 article.
15  Q.  Right.
16  A.  Or report, rather.
17  Q.  But for this report, you cited
18 in the report three articles, the three I
19 just discussed, Lip, Lip, and Graham.
20  A.  Those are cited, but as I said,
21 I'm relying on all of the articles that I
22 read for my general report.
23  Q.  Understand.
24  Did you review Mr. Boudreaux's

1 medical records?
2  A.  As much as I could.
3  Q.  Okay.  What I think you
4 described is that you read his relevant
5 medical records, and that doesn't tell me
6 which ones you consider relevant.
7  How do I know which ones you
8 read?
9  A.  Well, I was given everything --
10 I was given everything that I asked for
11 with respect to his records in terms of
12 encompassing the broad period of time that
13 we're talking about here in this report,
14 as well as records from prior, but --
15  Q.  How about -- don't let me
16 interrupt.  I almost did.  Go ahead.
17  A.  Okay.  The records that I asked
18 for were for basically his entire medical
19 record, but he has years and years of
20 records, decades.  So I -- I skimmed
21 through as much as I could and looked for
22 areas that I thought were relevant rather
23 than going through exhaustively, which
24 would have taken weeks.  I basically

1 skimmed through the records in order to
2 sort of look for areas that I thought were
3 specific and relevant to his history and
4 to the matter at hand rather than trying
5 to make this an exhaustive, encompassing.
6  In doing that, I used my medical
7 judgment to try to decide what I think is
8 relevant and what is important information
9 for Mr. Boudreaux, but is not necessarily
10 relevant to the matter at hand.
11  Q.  Got it.
12  Is there any way you can help me
13 to understand which pages of his record
14 you read, or is that just impossible?
15  A.  I -- I can't really -- I can't
16 really give you the exact page numbers.
17  Q.  Did you review all of his
18 hematology reports?
19  A.  Can you be a little bit more
20 specific about that?
21  Q.  Blood tests that show the
22 hematocrit, hemoglobin, things like that,
23 full blood count, all that stuff.
24  I assume that's important to you

1 because you're a hematologist?
2    A.   Well, yes.  And I wouldn't want
3 to call it just stuff.  It's -- so, as I
4 said --
5    Q.   I'm sorry.  When I call it
6 stuff, I mean important medical records.
7    A.   I'm trying to be -- I'm also
8 trying to inject levity.
9    Q.   Thank you.
10    A.   Poorly.
11       So, when I say that I reviewed
12 his records for what I found to be
13 relevant, my -- my area of interest
14 obviously is hematology, his bleeding, his
15 hematologic records.  So I looked for
16 everything that I could find that was
17 directly or even indirectly related to his
18 hematologic status, and that would
19 encompass not just specific hematology
20 tests or records, but anything that could
21 be construed or would be associated in any
22 way with hematologic disorders or
23 hematologic complications.  So I tried to
24 look for, and when I say skim, I mean I

1 looked at each page and I quickly look to
2 see if there's something on that page that
3 is relevant to the matter at hand,
4 relevant to hematology, associated with
5 hematology or relevant or associated with
6 any hematologic complications or disorders
7 that might be associated with this.
8    Q.   I will show you some medical
9 records during the deposition today.  If
10 when I show it to you you have seen it,
11 will you tell me, please?
12    A.   I'll do my best.
13    Q.   And if when I show you one
14 record it prompts your memory of having
15 seen something related to that, will you
16 tell us that too?
17    A.   I will do my best.
18    Q.   Thanks.  And I know it's not
19 possible to get everything, but will you
20 try?
21    A.   I -- if -- as long as this is
22 not a memory test, I will do my best to
23 tell you whether I've seen it before and
24 what I understand it to be related to.

1    Q.   Perfect, thank you.
2       All right.  You've never spoken
3 to Mr. Boudreaux?
4    A.   I have not spoken to Mr.
5 Boudreaux, that I know of.
6    Q.   And have you spoken to Mrs.
7 Boudreaux, that you know of?
8    A.   No.
9    Q.   Have you ever examined Mr.
10 Boudreaux as a patient?
11    A.   I -- Mr. Boudreaux is not my
12 patient.
13    Q.   Okay.
14    A.   So I've never examined him.
15    Q.   And you have no doctor/patient
16 relationship with Mr. Boudreaux?
17    A.   Because he's not my patient, I
18 do not have a doctor/patient relationship
19 with him.
20    Q.   And you have never ordered the
21 performance of any blood tests or any
22 medical tests on Mr. Boudreaux at all?
23    A.   Again, since he's not my
24 patient, that would be inappropriate.

1    Q.   All right.  Do you have any
2 changes to your report before we get
3 started going through it?
4    A.   (Perusing document.)
5       I think there are two things
6 that I might say I could have written
7 better, more specifically.
8    Q.   I just want to make sure, are
9 these two things you would like to change
10 here today for us?  I'm happy to do it.  I
11 just want to make sure they're not just
12 things that you think you could have
13 written better, but you actually want to
14 change them.
15    A.   No, I'm not going to -- I'm not
16 asking to change the language.
17    Q.   Okay.
18    A.   But what I am going to do is
19 point out that I think that my language
20 could have been more specific and
21 therefore I would have -- I would have
22 wanted to have written it in a different
23 manner.
24    Q.   Okay.  Let's, it looks like

Page 26

1  you're on page 4.
2      Tell us what you're referring
3  to, sir.
4      A.   Well, the -- in one aspect in
5  May of 2015 where it says:  "His atrial
6  fibrillation recurred."
7      Q.   Yes.
8      A.   I think rather than say
9  "recurred," you know, what I would have --
10  would have probably said in a better way
11  was that it was brought to attention again
12  in that it may have been symptomatic, or
13  it may have become more of a clinical
14  concern.  Recurred, I think, just may not
15  be as specific as I would have wanted to
16  have been.
17      Q.   Is that because you don't know
18  whether or not it ever stopped before May
19  of 2015?
20      A.   Well, I think the difficulty
21  with atrial fibrillation is that it is
22  something that is not always consistent,
23  not always continuous, and not always
24  episodic.  It is a condition which has

Page 27

1  a -- an inconsistent course, and it can be
2  present but asymptomatic; it can be
3  absent; it can be present but symptomatic.
4  And the use of the word "recurred" I think
5  is just not as accurate -- well, not
6  really as accurate.  Not as specific as I
7  would have liked to have used.
8      Q.   Okay.  Anything else that you
9  would like to adjust the wording on?
10     A.   I think on page 6.
11     Q.   Okay.
12     A.   On the last paragraph, the
13  second sentence I said:  "Instead he
14  underwent an invasive ablation procedure
15  in May 2015 which was successful:
16     Q.   That's just not accurate, is it?
17     A.   Well, actually, when I say --
18  when I use the term "ablation" here, what
19  I was referring to was ablating the source
20  of the possible pulmonary emboli from the
21  left atrium.  And when I looked at that
22  later, I realized that someone else might
23  think that that meant an
24  electrophysiologic ablation.

Page 28

1      So, what I should have been more
2  specific about saying was that it was
3  ablation of the source of a possible left
4  atrial clot rather than just leaving the
5  word "ablation."
6      Q.   And this isn't something I want
7  to debate for a long time, but there is a
8  specific medical term for a cardiac
9  ablation, and that isn't what Mr.
10  Boudreaux had.  He had something called a
11  lariat procedure, true?
12     A.   He had a lariat plication
13  procedure.
14     Q.   And that's not an ablation?
15     A.   What I'm saying is that when I
16  used the word "ablation" I meant ablating
17  the source --
18     Q.   Okay.
19     A.   -- of a possible embolism from
20  the left atrium, and I'm not a -- I'm not
21  a cardiologist.  So even though I work
22  with cardiologists, I may not have the
23  exact terminology that is more relevant
24  for them to use, but I'm just clarifying

Page 29

1  that I would have been -- I would have
2  liked to have made this more specific that
3  I was ablating the source of the
4  pulmonary -- of a possible -- I'm sorry,
5  of a possible left atrial thrombus.
6      Q.   Right, and we can talk more
7  about this later, but the other word you
8  used here is "invasive."
9          An ablation procedure,
10  traditional ablation procedure would be
11  invasive, but do you know how a lariat is
12  performed?
13     A.   I have a -- I have a technical
14  understanding of it, and I would
15  definitely call it invasive.
16     Q.   Would you disagree with the
17  surgeons at Mount Sinai who have written
18  that it's a non-invasive procedure?
19     A.   Well, I don't have enough
20  expertise to be able to agree or disagree
21  with them.  I would like to see their
22  terminology and their description of the
23  technical aspects of that to see if that
24  agrees with mine.

Q. Do you agree that it is an alternative, a surgical alternative to the use of anticoagulation drugs?

A. Well, if -- if it is a surgical alternative, then it is invasive, and I believe that it is an alternative therapy for patients with atrial fibrillation.

Q. And it allows a patient to not have to take anticoagulants for the rest of their life. That's one of the reasons that it is used and is becoming more used by cardiologists, correct?

MR. DENTON: I object to the form.

Go ahead.

A. I have not -- well, there's two parts to that. Can --

Q. Which one do you want me to ask again? Either one.

A. The first part.

Q. Do you agree that a lariat procedure is a procedure that will allow a patient to go without having to take anticoagulant drugs for the rest of his or

her life?

A. No. I think that it is a, as you mentioned, an invasive surgical alternative therapy for patients with atrial fibrillation, but I think a blanket statement saying that that obviates any need for any coagulation for the duration of that patient's life, I don't agree with that.

Q. Have you ever studied what the lariat procedure is designed to do and the benefits of the lariat?

A. That is not my area of expertise.

Q. Okay. And you do know that there is no surgical incision for the lariat procedure? You know that, don't you?

A. Well, we can -- we can talk about what I consider to be invasive and what others consider to be invasive, but my technical understanding of the lariat procedure is that it is a surgical alternative and I consider surgery to be

invasive. If you're puncturing through the skin, you're puncturing through the heart, you're puncturing through other areas that there are risks involved with that, I consider that to be invasive.

Q. So, for you, putting a needle into a vein is an invasive procedure?

A. Yes.

Q. Okay. All right. That's your understanding and definition of it?

A. Well, that -- no, no, I'm not saying that is my only definition.

I'm saying that a non-invasive procedure is giving a medication.

Q. Got it.

A. Or not puncturing through the body. I think that the concept here of invasiveness is something where you are intervening through an intact structure and making it no longer intact and that brings risks and complications along with it.

Q. You wouldn't quarrel with a cardiologist who said it's a non-invasive

procedure, would you?

MR. DENTON: Object to form.

A. I don't know that I would quarrel. I would certainly have a discussion and we might agree to disagree.

Q. All right. And again, I don't think it's important for us to go farther down.

Anything else that you'd like to change?

MR. DENTON: Object to form.

A. (Perusing document.)

No, I think -- I think everything else is as it is.

Q. Okay. And I'm going to try to go through some fairly basic questions as quickly as we can.

Can we agree that Mr. Boudreaux needed to be anticoagulated for his atrial fibrillation?

A. I -- I think that Mr. Boudreaux fulfilled the indications for anticoagulation with his atrial fibrillation.

1  Q.  Do you have any disagreement
2  with his prescribing cardiologist, Dr.
3  Wong, who prescribed Xarelto for his
4  atrial fibrillation?
5       MR. DENTON:  Object to form.
6  A.  I think at the time of his being
7  prescribed Xarelto, Dr. Wong did not have
8  information that may have affected his
9  choice of anticoagulation.
10  Q.  All right.  That wasn't my
11  question.
12       My question is do you disagree
13  with Dr. Wong's decision to prescribe
14  Xarelto?
15       MR. DENTON:  Object to form.
16  A.  I agree with his decision to
17  anticoagulate.  I think that he made the
18  best decision that he could at the time.
19  Q.  You don't believe he violated a
20  standard of care by prescribing Xarelto,
21  do you?
22  A.  No, I do not believe that he
23  violated a standard of care.
24  Q.  And you think that Dr. Wong did

1  not know certain things at the time he
2  prescribed Xarelto.
3       How do you know that?
4  A.  The -- the labeling information
5  in January of 2014 did not have
6  information related to, as we've discussed
7  yesterday at the general opinion report,
8  we did not have information in the label
9  at that time with respect to the hazard
10  ratio and risk of bleeding in the U.S.
11  from the ROCKET-AF study.
12  Q.  All right.  Have you spoken to
13  Dr. Wong?
14  A.  I have not spoken with Dr. Wong.
15  Q.  Have you asked him what he knew?
16  A.  I have not.
17  Q.  Have you read his deposition
18  where he said what he knew at the time he
19  prescribed the drug?
20  A.  As I said, the only information
21  that I read from the deposition of Dr.
22  Wong was his information regarding the
23  Indocin and the episodes of gout.
24  Q.  Do you have any reason to doubt

1  Dr. Wong's testimony about what he knew
2  when he prescribed Xarelto?
3       MR. DENTON:  Object to the form.
4  Go ahead.
5  A.  I have -- not knowing Dr. Wong
6  and not having read that area, I have no
7  reason to question it.
8  Q.  Do you have any reason to doubt
9  the veracity of his testimony that he
10  would, in 2016 he would do exactly the
11  same thing and prescribe Xarelto to Mr.
12  Boudreaux?
13       MR. DENTON:  Object to the form
14  of the question.
15  A.  I'm sure that Dr. Wong has
16  opinions about what he would or would not
17  do, and I do not have any reason to
18  question his veracity.
19  Q.  Do you have an opinion about
20  what, if you were the cardiologist, do you
21  have an opinion about what drug you would
22  have prescribed to Mr. Boudreaux?
23  A.  Well, since I am not the
24  cardiologist, and as I've discussed

1  before, my role is as a consultant, the
2  primary prescribers for atrial
3  fibrillation are cardiologists.  So I
4  would not venture that.
5  Q.  Fair enough.
6       Are you familiar with the CHADS
7  score system?
8  A.  In a general way.
9  Q.  All right.  And the CHADS-VASc
10  system?
11  A.  In a general way.
12  Q.  Do you have an opinion about
13  what was the appropriate CHADS score for
14  Mr. Boudreaux at the time that he was
15  prescribed Xarelto?
16  A.  Let me see if I can refer to my
17  report regarding that, if that's all
18  right.
19  Q.  Sure, yeah, if you'd like to.
20  A.  (Perusing document.)
21  Q.  And I'd refer you to page 4.  It
22  might help.
23  A.  Yes, that's what I'm looking at.
24  Q.  Okay.

1    A.    Now, I know at the time of May
2  2015 he was graded as a CHADS score of 4.
3  I did not see in the record, and perhaps I
4  missed this, at the time that he was
5  prescribed Xarelto in January of 2014
6  whether that CHADS score was the same or
7  different from that.
8    Q.    You would agree that a CHADS
9  score of 4 presents a serious risk of
10  stroke to a patient?
11    A.    I think that a CHADS score of 4
12  is definitely a serious risk.
13    Q.    And a patient with a CHADS score
14  of 4 needs anticoagulation?
15    A.    As I said, I do not disagree
16  that Mr. Boudreaux needed to have
17  anticoagulation prescribed for his atrial
18  fibrillation in January of 2014.
19    Q.    Or he needed a lariat procedure?
20        MR. DENTON:  Object to form.
21    A.    I would leave that opinion to a
22  cardiologist.
23    Q.    That's fair.
24    A.    In terms of trying to make that

1  comparison of possible management
2  procedures.
3    Q.    That's fair.
4        Do you have any familiarity with
5  the American Heart Association American
6  Cardiology Foundation guideline for the
7  management of atrial fibrillation?
8    A.    In a very general way.
9    Q.    In a very general way, do you
10  understand that that society, that group
11  of cardiologists recommends
12  anticoagulation for a patient with a CHADS
13  score like Mr. Boudreaux's?
14    A.    I'm aware of the work that the
15  group does and of their recommendations
16  and the data that they use for their
17  sources.
18    Q.    Okay.  And are you aware that
19  they recommend the use of NOACs?
20        MR. DENTON:  Object to form.
21    A.    I'm aware that one of the
22  alternatives and one of the therapeutic
23  managements that they use is oral
24  anticoagulants.

1    Q.    Fair enough.
2        And are you aware that Dr. Wong
3  testified that he followed those
4  guidelines?
5    A.    I do not recall reading that
6  exact part of his deposition.
7    Q.    There's a whole lot of things
8  here that are very important, but we're
9  not going to do that today.
10        MR. DENTON:  You send that to me
11  before we try the case, would you?
12        MR. SARVER:  Absolutely.
13        MR. DENTON:  With your
14  highlighting.
15  BY MR. SARVER:
16    Q.    One of the drugs that was
17  prescribed to Mr. Boudreaux at the time
18  that he was prescribed Xarelto is a drug
19  called, and I may get this wrong, correct
20  me if I get the pronunciation wrong,
21  amniodarone?
22    A.    Amiodarone.
23    Q.    Amiodarone, okay.
24    A.    I believe that was prescribed in

1  January of 2014.
2    Q.    The same time that his Xarelto
3  was prescribed, correct?
4    A.    I believe that is correct.  He
5  was discharged with those two new
6  medications added to his prior regimen of
7  medications.
8    Q.    And the amiodarone was
9  prescribed at 400 milligrams three times a
10  day.
11        Do you know anything about that
12  drug?  Is that an appropriate dose?
13    A.    I think that the prescribing of
14  amiodarone, although I'm familiar with it
15  and have had many patients on it, I would
16  leave that prescription information and
17  recommendations to a cardiologist.
18    Q.    Okay.  For a patient on
19  amiodarone, do you know what drugs are
20  contraindicated?
21    A.    I know that in my area of work
22  in hematology that amiodarone can have a
23  drug interaction with warfarin.
24    Q.    So, warfarin, if you were on

1 warfarin, you don't want to be on
2 amiodarone as well, do you?
3        MR. DENTON:  Object to the form.
4    A.   I don't -- I don't think that is
5 a -- I don't think that is a correct
6 statement in terms of medical care.  We
7 have patients that are on both drugs.  I
8 think that the being aware of the
9 interaction of the drugs is an important
10 consideration in their medical management.
11 The -- the pharmacist and the physician
12 work together on drug interactions to be
13 both aware and to have an understanding of
14 how management may need to be changed.
15 That does not mean that someone can't be
16 on one drug with the other.  It just means
17 that you need to be aware of that and that
18 you may need to make adjustments and
19 especially be consistent in therapy.
20    Q.   Do you prescribe amiodarone?
21    A.   Again, I -- I leave -- that is
22 something that is more in the bailiwick of
23 the primary cardiologist.  Although I do
24 consult with them on patients that are on

1 amiodarone.
2    Q.   What does it do?
3    A.   My non-cardiologist
4 understanding of amiodarone is that its
5 aim is to help control the rate of atrial
6 fibrillation.
7    Q.   And it's an appropriate
8 prescription for someone like Mr.
9 Boudreaux who's come in with new onset
10 atrial fibrillation?
11    A.   Again, I would defer that
12 judgment to a cardiologist, not myself as
13 a consulting hematologist.
14    Q.   But you are aware that there is
15 an interaction with amiodarone and
16 warfarin?
17    A.   As I said, my -- my work with
18 amiodarone tends to be in the hematologic
19 realm where we know that it has an
20 interaction with warfarin and we adjust
21 appropriately for that.
22    Q.   And would it be appropriate for
23 a cardiologist who is prescribing
24 amiodarone to say "Look, there's an

1 interaction with warfarin here.  I'd like
2 to avoid that.  Why don't I prescribe
3 NOAC?"  Would that be a proper
4 consideration?
5        MR. DENTON:  Object to the form
6    of the question.
7    A.   If you're asking me did the
8 prescriber violate a standard of care
9 here?
10    Q.   Well, that's a good question.
11 Answer that one first.
12    A.   I don't -- I don't think that
13 that is a violation of the standard of
14 care.
15    Q.   Okay.  Do you think it's
16 appropriate to consider the warfarin
17 interaction with amiodarone and factor
18 that into your decision to prescribe a
19 NOAC?
20    A.   I think that the physicians --
21 the physician prescribing the medications
22 for Mr. Boudreaux needs to take into every
23 aspect of his history, every aspect of his
24 medications, and their own assessment of

1 his condition and therapy and make what
2 they believe to be the best judgment that
3 they can with the information that they
4 have at that time.
5    Q.   Okay.  I didn't see this in your
6 report.  If it's in there, point me to it.
7        But, do you have an opinion as
8 to whether or not Mr. Boudreaux would have
9 had a GI bleed had he been on another
10 anticoagulant other than Xarelto?
11        MR. DENTON:  I object to the
12    form and relevance, but go ahead.
13    A.   Let me take a look at my report,
14 please.
15    Q.   Sure.
16    A.   To be sure.
17    Q.   I didn't see it there, but if I
18 missed it, tell me.
19    A.   (Perusing document.)
20        There are two place -- there are
21 several places where I refer to
22 alternative anticoagulant therapy.  On
23 page 2, section 4 I refer to the fact that
24 the -- one of the alternatives for Mr.

Page 46

1 Boudreaux would have been to have had
2 Xarelto discontinued and switched to an
3 anticoagulant with a lesser risk of
4 bleeding, slash, a safer anticoagulant
5 such as Eliquis or Pradaxa.
6     Q.   We'll explore that for a while,
7 but my question --
8         MR. DENTON:  Let him finish.
9         MR. SARVER:  Well, let me make
10 sure the question is clear to us so he
11 knows --
12        MR. DENTON:  Are you going to
13 withdraw the last question?  Because
14 he was in the middle of an answer.
15        MR. SARVER:  This is just going
16 to speed things up.
17        MR. DENTON:  I understand, but I
18 want a clean record.
19    A.   Let me just make sure and I
20 apologize --
21    Q.   That's all right.  Go ahead.
22    A.   -- if it's not specific to your
23 question.
24        But I do mention that Xarelto

Page 47

1 has a significantly increased risk of GI
2 hemorrhage compared with warfarin,
3 apixaban and dabigatran.
4     Q.   Which page are you on, 5?
5     A.   I'm sorry, page 5.
6     Q.   Thank you.
7         Anything else?
8     A.   There's a repeat of basically
9 the same from page --
10    Q.   2 paragraph 4?
11    A.   From page 2, paragraph 4 on page
12 6, the end of the first paragraph.
13    Q.   Right.
14    A.   Basically essentially the same.
15    Q.   Right.  And I appreciate that,
16 but let me ask you to focus on my
17 question.
18    A.   Sure.
19    Q.   Do you have an opinion that had
20 Mr. Boudreaux been prescribed another
21 anticoagulant at the outset that he would
22 not have had a GI bleed?
23        MR. DENTON:  Object to the form
24    and the relevance.

Page 48

1     Go ahead.
2     A.   I think that -- I think that I
3 could only state that I would say that --
4 I can only state that I think that he
5 would have had a lesser risk of bleeding,
6 but I think that to try to state that
7 someone would not, as in never, have a
8 bleed I think is just impossible to know.
9     Q.   Now, you couldn't say that
10 because every anticoagulant increases a
11 patient's risk of bleeding, correct?
12    A.   Every anticoagulant carries a
13 risk of bleeding.
14    Q.   And one of the inherent risks of
15 all anticoagulants is the risk of a GI
16 bleed?
17    A.   As I said before, every
18 anticoagulant carries a risk of bleeding
19 and hemorrhage from the gastrointestinal
20 tract is one source of bleeding.
21    Q.   So it's simply impossible
22 scientifically to say that had Mr.
23 Boudreaux been prescribed any other
24 anticoagulant that he wouldn't have bled?

Page 49

1 There's just no way to know that?
2         MR. DENTON:  I object to the
3     form.  That's not the proper legal
4     standard.
5         Go ahead and try to answer.
6     A.   So, to say something always or
7 never, we just don't say that in science
8 or medicine.
9     Q.   I understand.  But what you
10 can't say is that he would not have bled
11 had he been on any other anticoagulant?
12 You can't say that?
13        MR. DENTON:  I object to the
14    form of the question;  inappropriate
15    legal standard.
16    A.   I think what I'm understanding
17 from you, and I may be incorrect, is that
18 you're saying not, not have bled ever,
19 a -- a null situation of bleeding, and in
20 medicine there is risk all the time, even
21 of someone having a bleed from the GI
22 tract even if they're not on an
23 anticoagulant.
24        So, you never, ever say never,

Page 50

1 and I've said it now three times in the
2 same sentence, but in medicine -- so I --
3    Q.   It's okay, we forgive you.
4    A.   I can't really even understand
5 what you're trying to get at that someone
6 can be assured that they will not have a
7 gastrointestinal hemorrhage, we just don't
8 deal with that type of question.
9    Q.   Let's take your answer and
10 approach it that way.
11       Everyone on the planet Earth is
12 at some risk of having a gastrointestinal
13 bleed, correct?
14    A.   Depending on their situation,
15 their medications, their medical history,
16 et cetera, they're somewhere on a spectrum
17 from extremely low to extremely high of
18 having a bleed.
19    Q.   And --
20    A.   I'm sorry, hold on.
21    Q.   Go ahead.  Go ahead.
22    A.   We know that anticoagulation
23 moves every individual patient along that
24 spectrum from where they were at first

Page 51

1 without the anticoagulant to a higher risk
2 of hemorrhage, and that includes
3 gastrointestinal.  It's one of the largest
4 organs in the body, and so there's lots of
5 opportunities for hemorrhage from the
6 gastrointestinal tract.
7    Q.   You anticipated my next
8 question.
9       So, you take humans and they're
10 at some risk of gastrointestinal bleeds.
11 If you add to that any anticoagulant,
12 their risk goes up?
13       MR. DENTON:  Object to form.
14    A.   I think that -- I think that
15 when you say "some risk of
16 gastrointestinal hemorrhage," I think that
17 simplifies what's actually happening.  I
18 think that some people -- I think that
19 everyone is on a spectrum of every disease
20 risk, and I think that patients may have a
21 spectrum that is so low for that
22 particular patient based on their history
23 and situation that we don't even consider
24 them to be at risk of GI hemorrhage

Page 52

1 because it's just so low.  Whereas other
2 patients have specific risk factors based
3 on their history or problems where they
4 may be -- that may be something that
5 reaches a level of consciousness for both
6 their physician and them.  Otherwise we
7 would be at risk for everything all the
8 time and we would never -- we would never
9 get off the mark.
10    Q.   Right.
11    A.   Anticoagulation moves every
12 patient in a more risk of hemorrhage, but
13 that's not to say that everyone is at some
14 risk of GI hemorrhage.
15    Q.   Do you know where Mr. Boudreaux
16 sat on that spectrum you described for us
17 when he came in to see Dr. Wong in January
18 of 2014 before he was prescribed Xarelto?
19       MR. DENTON:  Object to form.
20       Go ahead.
21    A.   Well, I don't think that there's
22 a -- I don't -- there's no number that I
23 can give you.  There's no -- there's no
24 graphic that I can show you.

Page 53

1       But, what I can say is that Mr.
2 Boudreaux had a very long history of using
3 drugs that can cause bleeding.  So, he had
4 a very long history of using aspirin which
5 affects platelet function and can
6 predispose you to bleeding, including
7 gastrointestinal hemorrhage.  He never had
8 any episodes of bleeding that I could see
9 or that were indicated by his records for
10 all the time that he was on aspirin,
11 either before or after his January of two
12 thousand -- I'm sorry, his February,
13 excuse me, February of 2014
14 gastrointestinal hemorrhage.
15       He also in the distant past, I
16 believe, was taking Indocin, or
17 indomethacin which is another term for it,
18 for his periods of gout, and indomethacin
19 is also a drug which affects platelet
20 function when it is being used --
21       (Pause.)
22    Q.   I'm sorry.  He noticed I'm
23 writing on a napkin, so he was trying to
24 be nice and give me a piece of paper.

1   A.   Sorry.  I didn't know if I
2  should stop.
3   Q.   No, keep going.  Keep going.  I
4  want to make sure you're done.
5   A.   Okay.  Let me -- let me make
6  sure I -- so, I also noted in his record
7  that when he had episodes of gout, he was
8  taking Indocin.  Indocin is another drug
9  that when you are on it it affects
10 platelet function and again by inhibiting
11 platelet function it puts you at risk of
12 bleeding, and I was not -- I did not see
13 any indication in his records that when he
14 was taking Indocin that he had any
15 evidence or symptomatic -- or symptoms of
16 bleeding, whether it was gastrointestinal
17 or anywhere else, when he was on Indocin.
18   Q.   Anything else?
19   A.   I saw no other -- I saw no other
20 episodes of bleeding in general, whether
21 gastrointestinal or any other things that
22 came to his attention or to a physician.
23 So there's no -- there was no evidence of
24 bleeding when he was off Indocin but on

1  aspirin.
2        I saw no evidence of a -- I saw
3  no evidence of a family history of
4  bleeding.
5   Q.   Did you look?
6   A.   I looked through the records for
7  where that -- where that should have been
8  indicated, and I did not see that in
9  records that noted family history.
10   Q.   Did you ever look at his
11 mother's records or his father's records
12 or brother's or sister's records?
13   A.   Well, when I look at records, I
14 rely on my patient.  I ask them and that's
15 part of a normal review of systems.
16        So, in the medical record, I
17 think that reliance on that particular
18 patient for a review of their systems and
19 their family history and social history,
20 we ask them "Do you have anyone in the
21 family who has medical problems?"  Or a
22 hematologist is asking them they will ask
23 "Do you have any history of bleeding?"
24 And we rely on patients to have knowledge

1  of their family, and when we talk to them
2  about medications or risks that would be
3  part of our discussion with them.
4        So, if they don't give us a
5  family history, we rely on that as being
6  accurate.  We don't -- we don't take every
7  patient that's -- that is a non -- that's
8  not part of the standard of care is to not
9  rely on the patient and then to go review
10 all the first degree or second degree
11 relatives of a patient for their possible
12 history.
13   Q.   And I appreciate your answer.
14 Listen to my question.
15        Did you review his father's
16 medical records?
17   A.   Those were not -- those were not
18 part of the records that I reviewed.
19   Q.   You didn't review his mother's?
20   A.   The only records that I reviewed
21 were Mr. Boudreaux, but as I said, in his
22 records, he did not indicate a relevant
23 family history of bleeding, and I take
24 that to be reliable.

1   Q.   Now, at the time that Dr. Wong
2  prescribed Mr. Boudreaux's Xarelto, what
3  were -- what were the kind of things that
4  were going on in his body?  What symptoms
5  did he have?
6   A.   So, the -- the records that I
7  reviewed regarding that information in
8  January of 2014, he had shortness of
9  breath and chest heaviness and was found
10 to at that time be in atrial fibrillation.
11   Q.   And did he also have some
12 ongoing other medical problems?
13        Did he have diabetes?
14   A.   I'm sorry, you're talking about
15 now medical history rather than symptoms.
16   Q.   No, you answered that question.
17 I'm asking you a different one.
18        In addition to what symptoms was
19 he having, did he also have other
20 conditions, including diabetes?
21   A.   So, at that time, I noted that
22 he had a medical history of diabetes,
23 hypertension, and benign prostatic
24 hyperplasia, that he was not a smoker,

1 seldom drank alcohol, and as noted before,
2 he did have a history of gout.
3    Q.   And the gout, for that he took
4 Innovin?
5    A.   In the deposition testimony from
6 Mr. Boudreaux and from Dr. Wong, they
7 stated that he took Indocin for --
8    Q.   Indocin, my bad.
9    A.   I'm sorry, I-N-D-O-C-I-N.
10     MR. DENTON:  Indocin is a
11 reagent.
12     MR. SARVER:  We'll talk about
13 that.
14     MR. STEKLOFF:  That will come
15 later.
16    A.   And that he took Indocin for
17 episodes of gout which had not occurred
18 for several years.
19    Q.   And he had a current
20 prescription for Indocin, did he not?
21    A.   I think that the electronic
22 medical record carries information forward
23 at all times, and therefore if he had had
24 a prescription for Indocin in the past,

1 that may have been carried forward for
2 the -- the current record and made it
3 appear as if he had an active prescription
4 for Indocin.
5     I was not aware -- I did not see
6 any evidence that he had gout.  I did not
7 see any evidence that he was taking
8 Indocin.  And I think that the electronic
9 medical record, unfortunately, is so
10 compulsively cumulative that it may give a
11 false impression of as to what a patient
12 is taking at that time.
13    Q.   So, according to the medical
14 records, he had a current prescription for
15 Indocin?
16     MR. DENTON:  Object to the form.
17    A.   Again, I'm disagreeing with
18 that.  I'm saying that the electronic
19 medical record is a cumulative summary and
20 carries information forward that may not
21 be currently relevant.
22    Q.   Understand.  Listen to my
23 question.
24     Did the electronic medical

1 record indicate that he had a current
2 prescription for Indocin?
3     MR. DENTON:  Object to form.
4    A.   The electronic medical record
5 indicated that Indocin was in his record.
6    Q.   Right.
7    A.   There is no way of knowing
8 whether he actually had a current
9 prescription for it or whether that was
10 simply carried forward as part of his
11 previous medical care.
12    Q.   Did Mr. Boudreaux have Indocin
13 at home?
14    A.   I do not know.
15    Q.   Did you read his deposition
16 where he said he did?
17    A.   The only area of his deposition
18 where I read was whether he was taking
19 Indocin or not and whether he had episodes
20 of gout for which Indocin was prescribed.
21    Q.   Did you read where he said he
22 had Indocin at home?
23    A.   I will --
24     MR. DENTON:  Object to the form.

1     Go ahead.
2    A.   I will take your word for it
3 that he has probably many drugs in his
4 medicine cabinet that he is not taking.
5    Q.   All right.  Let's open up your
6 report.
7     You've already got it open.
8    A.   I'll reopen it.
9    Q.   Now, you indicate that on page
10 1, your first opinion, that Mr.
11 Boudreaux's use of Xarelto was the most
12 probable cause of his GI bleed.
13     Correct?  That's your opinion?
14    A.   Yes.
15    Q.   All right.  Would your opinion
16 change if Mr. Boudreaux had not taken his
17 Xarelto?
18     MR. DENTON:  Object to form.
19    A.   So, are you -- are you saying
20 that Mr. Boudreaux did not follow his
21 prescriber's recommendations and did not
22 use --
23    Q.   This is really simpler than
24 this.  Listen to my question.  Try to

Page 62

1 answer my question.
2    A.   Well, no, I'm -- no, your
3 question is a little, all due respect,
4 vague.
5    Q.   It's not that hard.
6        Would your opinion change if Mr.
7 Boudreaux had not taken Xarelto?
8        MR. DENTON:  Object to form.
9        Go ahead.
10   A.   Are you saying -- can I get
11 clarification?  Are you saying had not
12 taken Xarelto ever?  Are you saying if he
13 had missed a day six week -- a week or two
14 prior, but had been taking it the day
15 before?  I -- you have --
16   Q.   Well, let's start with your
17 question.
18       If Mr. Boudreaux had never taken
19 Xarelto, would your opinion change?
20   A.   If Mr. Boudreaux was not on
21 Xarelto and never had taken Xarelto and we
22 had objective evidence for that, then
23 Xarelto can't be the cause of his -- of --
24 then he is not on the medication and --

Page 63

1 but I have -- but I don't have any
2 evidence that he is not on a medication.
3 So we're just not taking it.  So it's just
4 a hypothetical.
5    Q.   This is not a hard question.
6 This is an easy one.
7        If Mr. Boudreaux never took
8 Xarelto, Xarelto couldn't have caused his
9 bleed.  That's easy, isn't it?
10       MR. DENTON:  Well, I object to
11    the form because -- I just object to
12    the form.
13       MR. SARVER:  Come on.
14       MR. DENTON:  No.
15   A.   But we have evidence that he was
16 taking Xarelto.
17   Q.   One of the things you can do as
18 an expert, and this is a great thing, you
19 can assume things, okay.
20       I want you to assume, assume for
21 me as an expert that Mr. Boudreaux did not
22 take Xarelto.
23       If that is true, Xarelto never
24 caused his bleed;  isn't that true?

Page 64

1    MR. DENTON:  Object to form,
2    hypothetical form of the question.
3    A.   Well, I'm not sure -- I don't --
4 I don't know what is the -- I don't know
5 that experts are supposed to assume or
6 make hypotheticals.
7        What I try to do is look at the
8 objective data and give you my opinion on
9 what is -- what I think is real rather
10 than making assumptions that have no --
11 that I can't substantiate based on reality
12 or I can't make a -- a conjecture as to
13 how real, how possible, et cetera.
14 They're just nebulous.
15       All I'm saying is that when I
16 looked at the record, Mr. Boudreaux stated
17 that he was compliant with his
18 medications.  He came into the hospital
19 with his GI bleed with an abnormal
20 prothrombin time, which we know can be the
21 result of Xarelto, and he had a
22 gastrointestinal hemorrhage.
23       To -- to ask me to try to make
24 assumptions about did he take Xarelto,

Page 65

1 when did he take Xarelto or not take
2 Xarelto, I mean, I'm just -- that's just
3 speculation.
4        And I understand what you're
5 asking, that experts can assume, but I'm
6 not comfortable making assumptions about
7 things that I just don't have any basis
8 for.  Then it's just speculation and you
9 don't even need an expert for that.
10       MR. SARVER:  Objection;
11    non-responsive.  Move to strike.
12 BY MR. SARVER:
13   Q.   If Mr. Boudreaux had not taken
14 Xarelto, Xarelto couldn't have caused his
15 bleed, true?
16       MR. DENTON:  Object to form;
17    asked and answered.
18       MR. SARVER:  If he'd answered
19    it, I wouldn't ask it again.
20       MR. DENTON:  Well, I disagree
21    with you, but.
22   A.   You're saying Mr. Xarelto --
23 you're saying to me Mr. Xarelto -- Mr.
24 Xarelto.  Mr. Boudreaux did not take his

Page 66

1 Xarelto.
2     Q.   I'm asking you a question,
3 Doctor, and I think it's an easy one.
4 They're going to get harder later, but
5 this is easy.
6     A.   I'm sure they will.
7     Q.   This is easy.
8         If Mr. Boudreaux did not take
9 Xarelto, Xarelto couldn't have caused his
10 bleed?
11         MR. DENTON:  Object to form.
12     A.   Mr. Boudreaux says that he did
13 take Xarelto.  On two occasions in between
14 his admission for atrial fibrillation and
15 his GI hemorrhage, he told his
16 cardiologist that he was compliant with
17 his medication.  And as I said before, his
18 prothrombin time was elevated.  So I think
19 there is evidence that he did take
20 Xarelto.
21         If you're asking me if there's
22 evidence to the contrary that he did not
23 take Xarelto, there's none.
24         So, I'm saying he did take

Page 67

1 Xarelto and that there is evidence for
2 that.
3         MR. SARVER:  Objection;
4 non-responsive.  Move to strike.
5         We'll do this once more, and
6 then, Roger, I'm going to get the
7 transcript and call the judge.  This
8 is ridiculous.
9         MR. DENTON:  No, it's not.
10 Look, it's not ridiculous.  He doesn't
11 understand the lawyer's questions.
12         Why don't you ask him
13 hypothetically, forget about Mr.
14 Boudreaux, if a person, any patient
15 didn't take Xarelto.
16         MR. SARVER:  Let's start there,
17 all right.
18         MR. DENTON:  Because I think his
19 problem is --
20         MR. SARVER:  We can start there.
21         MR. DENTON:  -- he doesn't
22 understand the hypothetical.
23         MR. SARVER:  But you know that
24 this isn't right.

Page 68

1         MR. DENTON:  Well, I disagree
2 with that.
3         MR. SARVER:  All right.  So
4 let's just go on.
5         MR. DENTON:  This is lawyers
6 fighting in language that he does not
7 understand, so.
8         MR. SARVER:  I will try it your
9 way, but then I think I've got to take
10 it to the judge and have someone
11 instruct him to answer my question.
12         MR. DENTON:  I think that's
13 ridiculous.
14         MR. SARVER:  I know you do, but
15 it's not.
16 BY MR. SARVER:
17     Q.   So, I'd like you to -- I mean,
18 am I unclear?  Is my English bad?
19         MR. DENTON:  Come on, Rick.
20     Q.   Do you not understand my
21 questions?
22         MR. DENTON:  Come on.  He's not
23 here --
24     Q.   Do you understand my questions?

Page 69

1     A.   Sir, with all due respect, I
2 think that you're asking me to opine on
3 hypotheticals, and I am on -- my
4 understanding of what I've been asked to
5 do is talk about objective data that I
6 have here.  If you want to ask me about a
7 hypothetical that's unrelated to objective
8 information and data that I've been asked
9 to review, I -- we can talk about
10 hypotheticals that are not related to this
11 case or the patient.
12     Q.   Let me start simply.
13         When I speak, do you understand
14 my words?
15         MR. DENTON:  Now, that is a
16 little sarcastic.
17     A.   Yes, sir.
18     Q.   Thank you.
19         MR. DENTON:  That's very
20 sarcastic.
21     Q.   If a human being does not take
22 Xarelto, Xarelto cannot cause that
23 patient, that person to bleed;  isn't that
24 true?

1    A.    That is correct, in a
2  hypothetical for any human being.
3    Q.    And if Mr. Boudreaux had not
4  taken Xarelto, like any other human being,
5  Xarelto could not cause his bleed, true?
6    A.    If in a hypothetical situation
7  Mr. Boudreaux was not prescribed Xarelto
8  or never took Xarelto and there was
9  evidence somehow for that situation, then
10  I would -- then Xarelto would not have
11  been the cause of his bleeding.
12    Q.    All right.  How many Xarelto
13  pills was Mr. Boudreaux prescribed?
14    A.    I believe that Mr. Boudreaux had
15  a mail-order pharmacy prescription for a
16  90-day supply.
17    Q.    And how many -- was he given
18  any, what do you call those things, the --
19    A.    Samples.
20    Q.    Sample drugs.
21        Was he given any samples?
22    A.    So, my -- my recollection from
23  the records was that he received two doses
24  of Xarelto in the hospital, and I believe

1  there's testimony from -- or maybe it was
2  deposition, from someone at the hospital
3  that he received I believe it was ten
4  pills as a sample that was separate from
5  his mail-order pharmacy prescription.
6    Q.    So if we add that up, he had 90
7  pills -- or, he had 100 pills?
8        MR. DENTON:  Object to the form.
9    A.    If those -- if those numbers are
10  correct, he should have had 100 pills.
11    Q.    Do you have any evidence that he
12  had any Xarelto, any more than 100 pills?
13  Have you seen any evidence of that?
14        MR. DENTON:  Object to form.
15    A.    I'm not aware of -- I'm not
16  aware of another source of pills other
17  than those two.
18    Q.    All right.  Did you read Mr.
19  Boudreaux's deposition where he was asked
20  to bring his remaining Xarelto pills to
21  his deposition?  Did you read that part?
22    A.    No.
23    Q.    All right.  If you had, you
24  would have seen that he brought 96 Xarelto

1  pills to his deposition.  I'd ask you to
2  assume that, since you didn't read it.
3        Would you do that?
4    A.    Certainly.
5    Q.    All right.  If my math is
6  correct, 100 minus 96 is 4.
7        You agree?
8    A.    100 minus 96 equals 4.
9    Q.    All right.  And he presented
10  with his bleed approximately a month after
11  he was prescribed Xarelto?
12    A.    So --
13    Q.    February 4th?
14    A.    From January -- let's see.  He
15  was discharged on the 9th to February 3rd
16  and he started bleeding about three days
17  before.  So it's about three weeks.
18    Q.    Three weeks, fair enough.
19        Three weeks, 21 days, true?
20    A.    Three weeks is 21 days, that is
21  correct.
22    Q.    If we take 100 and we subtract
23  21 from it, we would end up with 79, if my
24  math is correct?

1    A.    100 minus 21 does equal 79.
2    Q.    And yet he showed up at his
3  deposition with 96 pills.
4    A.    I'll have to take your word for
5  that.
6    Q.    Do you have any explanation how
7  that could happen except he didn't take
8  his Xarelto?
9        MR. DENTON:  Object to the form.
10    A.    No, I don't -- I don't believe
11  that that is the only possible
12  explanation.
13    Q.    Is that one possible
14  explanation?
15    A.    Well, I think that -- I think
16  that there are frequent mistakes in the --
17  in the medical record where people state
18  that they give something and don't or that
19  they give a number of something and the
20  number is incorrect.
21        For example, the electronic
22  medical record brought forward Indocin as
23  if he was taking that currently and we
24  know that he was not, based on his

1 testimony and on Dr. Wong's testimony.
2 So, the electronic medical record may
3 have -- may be incorrect and the person --
4 the person that gave him ten samples may
5 have given him a larger number of samples.
6      Another possibility is that the
7 pharmacy mail-order for a 90-day supply
8 was incorrect and gave him a larger
9 number.  For all I know, they give you a
10 buy one, get one free and you get 90 days
11 plus for a -- for that.
12      So, those are two other
13 possibilities.
14      You are right, there is a --
15 there is also the possibility that -- I'm
16 sorry, what was the third one?  How did
17 you phrase it?
18    Q.   My question really was pretty
19 simple.
20      One of the possibilities, and
21 you've mentioned others, but I didn't ask
22 you about those.  One of the possibilities
23 of why he ended up with 96 pills in his
24 possession, even though we're 21 days out,

1 is that he didn't take his Xarelto?
2 That's one of the possibilities, isn't it?
3      MR. DENTON:  Object to the form.
4    A.   As I said --
5      THE WITNESS:  I'm sorry.
6      MR. DENTON:  Go ahead.
7    A.   As I said, that is another
8 possibility, that he did not take his
9 Xarelto exactly as prescribed.
10    Q.   And one of the alternatives that
11 you offered was that maybe the prescriber
12 gave him more.  That's one of the things
13 you suggested, right?
14    A.   One of the -- one of the
15 alternative explanations would be that the
16 person that gave him the samples gave him
17 a larger number of samples than they
18 thought they did.
19    Q.   Do you -- did you read Nurse
20 Theriot's deposition?
21    A.   I believe that was part of that.
22    Q.   And she said "I gave him ten."
23      Do you have any reason to doubt
24 her?

1      MR. DENTON:  Object to the form.
2    A.   Not knowing Nurse Theriot, I
3 don't know how accurate she is.
4    Q.   And not knowing Mr. Boudreaux,
5 you don't know how accurate he is, true?
6    A.   As I said, those -- these are
7 all possibilities.  I have no reason to
8 know that one or the other is more likely.
9    Q.   And you don't know whether Mr.
10 Boudreaux is forgetful?
11    A.   I did not see any indication in
12 his record of neurologic complaints.
13    Q.   Did you read his wife's
14 deposition?
15    A.   I did not read his wife's
16 deposition.
17    Q.   Okay.  Do you know whether or
18 not she said he was forgetful?
19    A.   As I said, I did not read her
20 deposition.
21    Q.   Okay.  What we know, what we
22 know is that 100 minus 96 is 4.
23      And you take Xarelto once a day,
24 correct?

1    A.   Mr. Xarelto -- Mr. Boudreaux
2 was -- pardon me.  Mr. Boudreaux was
3 prescribed Xarelto as a once-a-day drug.
4    Q.   Right.  And unless there's some
5 loaves and fishes going on here, we don't
6 know how he could end up with 96 at his
7 deposition when he was supposed to have
8 taken them every day, right?
9      MR. DENTON:  Object to the form
10 of the question.
11    A.   I agree that several possible
12 explanations for the discrepancy exist,
13 and I don't see any evidence or indication
14 that one or the other is more likely.
15    Q.   All right.
16    A.   But I do see evidence in the
17 record that he said that he was compliant
18 on two instances with his cardiologist and
19 that when he was admitted to the hospital
20 with his GI hemorrhage that his
21 prothrombin time was prolonged out of the
22 normal range.
23    Q.   We're going to talk about that.
24      MR. DENTON:  Let him finish.

1    Q.   I'm sorry, go ahead.  Don't let
2  me interrupt.
3    A.   That's okay.
4        Which is evident of taking an
5  anticoagulant which is Xarelto which he
6  was prescribed.
7    Q.   We will talk about that.
8        Anything else on that question?
9    A.   That's it for now.
10   Q.   All right.
11       MR. DENTON:  Are you going to be
12  switching to a different topic?
13       MR. SARVER:  Yeah, we can take a
14  break.
15       MR. DENTON:  Can we take a
16  biologic break?
17       MR. SARVER:  Yeah, yeah, yeah.
18       MR. DENTON:  I didn't want to
19  finish that --
20       MR. SARVER:  Any time you want
21  to take a break, tell us.
22       THE VIDEOGRAPHER:  All right.
23  The time is 9:24 a.m.
24       We're going off the record.

1        (Recess taken.)
2        THE VIDEOGRAPHER:  The time is
3  9:37 a.m.
4        We are back on the record.
5  BY MR. SARVER:
6    Q.   Good morning again.
7    A.   Good morning again.
8    Q.   We were talking earlier about
9  the whole issue of the hundred pills and
10  the 96 pills, remember that?
11   A.   The pill count, yes.
12   Q.   Do you have -- do you remember
13  any evidence from the record about whether
14  or not Mr. Boudreaux was generally a
15  compliant patient for taking medications?
16   A.   I did not see, in the records
17  that I reviewed, which I felt were
18  relevant, I did not see any indication
19  that he was non-compliant.
20   Q.   And I asked you about the
21  depositions you read.
22       One that I asked you about was
23  Nurse Torres, and I don't think you've
24  read that; is that correct?

1        T-O-R-R-E-S, Torres.
2    A.   That's not the Louisiana.
3    Q.   No, Theriot.
4    A.   Theriot, thank you.  I'm sorry.
5        No, I did not -- did not read
6  Torres's deposition.
7    Q.   Do you know whether or not Mr.
8  Boudreaux was compliant in taking his
9  diabetes medicine?
10   A.   I did not read -- I did not read
11  anything that suggested in the record that
12  he was non-compliant.
13   Q.   Okay.  You don't recall then
14  Nurse Torres, because you didn't read her
15  deposition?
16   A.   I can't recall something I
17  didn't read.
18   Q.   Exactly, that's an unfair
19  question.
20   A.   I -- look, the areas of the
21  deposition that I asked to see were areas
22  that were -- that I wanted to use to try
23  to fill in aspects of the medical record.
24       In general, as I stated

1  yesterday, I try not to use depositions as
2  medical records or as indicators of
3  objective evidence.  People's -- people
4  have opinions, their memories change,
5  things like that.
6        So I only used the depositions,
7  as I stated before, to try to fill in
8  areas where I thought there might be gaps.
9    Q.   Because you didn't know what
10  Nurse Torres testified to, it can't form
11  your opinions, correct?
12   A.   That is correct, because I never
13  read that.
14   Q.   Right.
15       So you didn't know that Nurse
16  Torres testified that Mr. Boudreaux, he
17  wasn't adherent, he wasn't the most
18  adherent patient to his -- meaning to his
19  treatment; you didn't know that?
20       MR. DENTON:  I object to the
21  form.
22   A.   A, I didn't know that;  and B, I
23  don't know what that means.
24       I have many patients that are

1 elderly and forgetful.
2    Q.    Sometimes they don't take the
3 pills.
4    A.    He may be the average patient,
5 for all I know.
6    Q.    Your elderly patients who are
7 forgetful, sometimes they don't take their
8 pills, right?
9    A.    And that depends on what you
10 mean by elderly.  Is that older than me or
11 older than --
12    Q.    I just used your word.
13    A.    I know.  I'm, again, trying to
14 be levity.
15    Q.    Okay.  And I would say I'm
16 pretty elderly.  He's real elderly.
17        MR. DENTON:  Absolutely.  I've
18    got more miles on me than anybody in
19    this room.
20    A.    I think that compliance with
21 medications is always an issue and always
22 something that we are cognizant of at any
23 age.  It may be worse with people that
24 have neurologic deficits or mentation

1 disorders, I agree.
2    Q.    One of the ways to help with
3 compliance issues is to have a once-daily
4 dose rather than multiple doses during the
5 day, correct?
6        MR. DENTON:  Object to form.
7    A.    Frankly, I don't -- I don't
8 prescribe in that manner.  I prescribe
9 what I believe to be the best drug for
10 that patient, and the -- the dosing
11 frequency is not a significant part of my
12 prescription behavior.
13    Q.    Have you read in the medical
14 literature that compliance is increased
15 for once-daily dosing?
16    A.    I am aware of the general
17 literature regarding compliance.
18    Q.    All right.  Do you know whether
19 or not there is any data regarding the
20 interaction of amiodarone with Eliquis?
21    A.    I am not aware of data regarding
22 an interaction of Xarelto with -- I'm
23 sorry, what -- I'm sorry, what was the
24 question again?

1    Q.    That's all right.  Let me ask it
2 again so we're on the same page.
3    A.    Yeah, I'm sorry.
4    Q.    That's all right.  Any time I'm
5 not clear, I really want to know.
6    A.    No, I appreciate that.  Of
7 course.
8    Q.    Do you agree that there is no
9 data regarding the interaction of
10 amiodarone with Eliquis?
11    A.    With Eliquis.  I am not aware of
12 an interaction of amiodarone with Eliquis.
13    Q.    Do you know whether or not
14 there's any data on an interaction of
15 amiodarone with Xarelto?
16    A.    I think the same answer.  I am
17 not aware of an interaction of amiodarone
18 with Xarelto.
19    Q.    Okay.  And how about with
20 dabigatran?
21    A.    I am not aware of an interaction
22 of amiodarone with dabigatran.
23    Q.    And I've heard somebody
24 pronounce it dabigatran.

1        MR. DENTON:  It's the Germans.
2    Dabigatran.
3        MR. SARVER:  That's what they
4    do, it's the Germans, okay.
5    Q.    But for us in this country,
6 you're okay with dabigatran?
7    A.    I'm okay with however you want
8 to prescribe it -- or pronounce it.  Or
9 prescribe it.
10    Q.    Yeah, if I prescribe it, you're
11 in trouble.
12        Okay.  Do you have any
13 information about the interaction of
14 aspirin with Eliquis?
15    A.    I am not aware of a
16 pathophysiologic interaction of aspirin
17 and Eliquis.
18    Q.    Do you agree that taking aspirin
19 will add to the coagulation effect of any
20 of the anticoagulants?
21        MR. DENTON:  Object to the form.
22    A.    No.
23    Q.    Okay.  Do you agree that it does
24 so with Xarelto?

1  MR. DENTON: I'm sorry, I
2  didn't -- I don't understand the
3  question. Object to the form.
4  MR. SARVER: Sure.
5  A. Could you maybe ask -- can you
6  rephrase the question?
7  Q. Let me ask the question in a
8  simpler way.
9  Do you agree that there is
10  evidence from the ROCKET trials that
11  aspirin enhances the anticoagulation
12  effect of Xarelto?
13  A. No.
14  Q. All right. You have seen -- you
15  actually relied upon some graphs and you
16  talked about them yesterday in your
17  general deposition.
18  Do you remember those?
19  A. Yes, I did.
20  Q. And there was a -- a graph that
21  showed Xarelto and aspirin and the number
22  of bleeds.
23  Do you remember seeing that
24  graph?

1  A. Yes. We were talking about the
2  confidence intervals modeled for that in
3  the FDA.
4  Q. Right.
5  And then did you see the graph
6  that showed Xarelto without aspirin?
7  A. Those were -- that was the same
8  graph, I believe.
9  Q. Right.
10  And the graph was very
11  different. One had a much steeper curve
12  and one was much flatter, correct?
13  A. As I -- as I testified
14  yesterday, I found that the -- the actual
15  data differed from the model data that was
16  depicted there, and because aspirin does
17  not have an anticoagulant effect, nor does
18  it interact with Xarelto's anticoagulant
19  effect, I found the data from the FDA's,
20  from the same FDA data regarding their
21  quartile bleeding risk to be more
22  compelling.
23  Q. I'm with you, but do you have
24  any understanding of why the FDA data

1  would have shown a greater rate of
2  bleeding with the combination of Xarelto
3  and aspirin as opposed to the rate of
4  bleeding with just Xarelto? How could
5  that happen?
6  MR. DENTON: Object to form.
7  Go ahead.
8  A. So, we're talking about --
9  you're asking about -- your original
10  questions asked if aspirin exacerbated or
11  affected the anticoagulant effect of
12  Xarelto, and what I'm saying is that is
13  not the pathophysiologic basis of aspirin.
14  It does not affect the anticoagulant. It
15  does not affect the prothrombin time,
16  which is the activity of Xarelto.
17  Q. It deals with platelets?
18  A. Aspirin inhibits platelets.
19  Q. I'm with you.
20  A. And --
21  Q. Go ahead, finish, but I want to
22  come back to my question pretty soon.
23  A. Now I lost my train of thought.
24  Q. Can I ask the question again?

1  A. Can you just give me one second
2  to see if I can pick up my train of
3  thought?
4  Q. Okay, go ahead.
5  A. The aspect of bleeding which I
6  also found compelling from the FDA's data
7  was that when they looked at the
8  confounding factors and other variables
9  that were related to bleeding, aspirin did
10  not reach statistical significance.
11  So even though you have that
12  data that shows those graphs, the actual
13  statistical analysis by the FDA did not
14  find aspirin to be a significant factor in
15  the bleeding risk.
16  Q. Finished?
17  A. Yes.
18  Q. Okay. So, what I'm trying to
19  understand is you -- we've both seen the
20  graphs and we know that the rate of
21  bleeding is higher with the combination of
22  Xarelto and aspirin than it is with simply
23  Xarelto alone, correct?
24  A. We know that the graphs are not

1 perfectly aligned. But simply stating
2 that something is higher or lower is not
3 medically correct in this respect. When
4 the FDA analyzed the data for if aspirin
5 was a significant variable affecting
6 bleeding, it did not meet their criteria
7 for significance.
8     So, saying higher or lower is
9 misleading. You can write -- you can put
10 those graphs there, but that is not
11 informative. What is informative, what is
12 informative is the analysis by the FDA as
13 to whether aspirin was a significant
14 variable in the bleeding, and they did not
15 find it to be significant.
16     Q.   Right.
17     But when you're talking about
18 the graphs being, they could be higher or
19 lower, what we know is the higher rate of
20 bleeding was with the combination of
21 Xarelto as opposed -- and aspirin, as
22 opposed to Xarelto alone. That's how the
23 graphs look, at least.
24     Fair?

1     MR. DENTON: Object to form.
2     A.   The representation of the graphs
3 is what it is, but when I look at that, I
4 don't look at that as a scientist or a
5 medical doctor saying oh, this is higher
6 and this is lower and therefore that is
7 the conclusion that I can draw.
8     What I want to do is see how
9 that data was analyzed in a multivariate
10 analysis that the FDA conducted, and their
11 criteria for significance to examine that
12 was that the aspirin was not a significant
13 factor in the bleeding. They found that
14 it did not meet a significant factor as
15 one of the variables with Xarelto.
16     Q.   Okay. Let's do it this way.
17     I want you to assume that Mr.
18 Boudreaux was not taking aspirin at the
19 time he was prescribed Xarelto.
20     Can you do that for me?
21     MR. DENTON: Object to form.
22     A.   So we're back to -- we're back
23 to --
24     Q.   Is this something you can do?

1     A.   -- speculations.
2     Q.   Are you willing to assume?
3     No, I'm asking you to assume
4 something.
5     MR. DENTON: Well, you're asking
6 him to assume something that's not
7 based on reality, and I think that's
8 his problem.
9     MR. SARVER: You know he can do
10 that. It's an expert that --
11     MR. DENTON: Well, look, he's a
12 doctor, he's not a lawyer, and that's
13 where we're having the problem.
14     MR. SARVER: Okay.
15 BY MR. SARVER:
16     Q.   Let me ask you to assume this.
17     Are you willing to assume facts
18 that I ask? If I'm wrong about it, you
19 know, no harm, no foul, but I'm entitled
20 to ask you questions. And if you're not
21 willing to assume it, that's another
22 issue. We'll take it up at a later time.
23 But tell me if you're not willing to
24 assume things.

1     Are you just unwilling?
2     A.   Well, look, I -- I want to be as
3 helpful as I can in the most objective and
4 valid way that I can here.
5     I have no -- I have no objective
6 evidence that Mr. Boudreaux was not taking
7 his aspirin. So you're asking me to -- I
8 mean, how many assumptions do you want me
9 to put together? He -- you know, they're
10 infinite in terms of his medications. I
11 mean, we can -- we can come up with an
12 infinite amount of assumptions.
13     What I'd like to focus on is
14 what we actually know and what we -- what
15 we have from the data and from his
16 history. So, I would rather focus on
17 that. If you want to -- if we can -- I
18 would be more comfortable talking about a
19 hypothetical person rather than Mr.
20 Boudreaux, and I realize you'll bring it
21 back to Mr. Boudreaux, but I'm just not
22 comfortable making an infinite number of
23 assumptions.
24     Q.   It is your opinion Mr. Boudreaux

Page 94

1 was taking his aspirin during the time he
2 was taking Xarelto? Is that your opinion?
3 　　MR. DENTON: Object to the form.
4 　　But go ahead and answer that.
5 　A. I know that he was prescribed
6 aspirin on a daily basis and that he had
7 been on that drug for many years as not a
8 PRN, but to take it every day.
9 　　I have no reason to think that
10 he did not take it every day as best he
11 could.
12 　Q. Okay, I'm with you. That's
13 what -- that is your opinion and I
14 understand that.
15 　　MR. DENTON: I -- I object to
16 the form.
17 　　MR. SARVER: I understand. You
18 can object.
19 　　MR. DENTON: I don't know
20 whether it's an opinion or not. It's
21 fact.
22 　　MR. SARVER: Roger, come on.
23 　　MR. DENTON: No, I'm not. No.
24 　　MR. SARVER: Just object to the

Page 95

1 form, and I'll do the same for you.
2 You don't want me making these
3 speaking objections. You did it all
4 day yesterday.
5 　　MR. DENTON: I did not do it all
6 day yesterday.
7 　　MR. SARVER: Yeah, you did.
8 　　MR. STEKLOFF: Roger, will you
9 stipulate that he was taking his
10 aspirin the entire time he was taking
11 Xarelto and that it's a fact in this
12 litigation?
13 　　MR. DENTON: I have no ability
14 to stipulate about anything.
15 　　MR. STEKLOFF: All right. Then
16 don't say it's a fact. If you want to
17 stipulate, we'll stipulate.
18 　　MR. DENTON: Look, now, I do
19 have a problem with getting
20 tag-teamed. You're capable of
21 handling me, I'm sure. You don't need
22 help from him.
23 　　MR. STEKLOFF: I'm allowed to
24 participate in this deposition.

Page 96

1 　　MR. SARVER: Okay. I'm just
2 trying to figure out how we get
3 through this --
4 　　MR. DENTON: Keep that down.
5 That's annoying, please.
6 　　Go ahead. I'm sorry.
7 　　MR. SARVER: No, that's all
8 right. I'm just trying to figure out
9 how we do this the most efficient way.
10 　　MR. DENTON: Understood.
11 BY MR. SARVER:
12 　Q. It is your opinion that Mr.
13 Boudreaux was taking both Xarelto and
14 aspirin; is that correct?
15 　A. I have no -- I saw no evidence
16 in the medical record that he was not
17 taking aspirin and Xarelto.
18 　Q. Can you assume for me, I'm going
19 to ask this question, if Mr. Boudreaux had
20 not been taking aspirin along with his
21 Xarelto, do you know one way or another
22 whether he would have had his GI bleed?
23 　　MR. DENTON: I object to form.
24 I just want to read it.

Page 97

1 　　Did you get the question?
2 That's all I'm asking.
3 　　THE WITNESS: I think so.
4 　　MR. DENTON: Object to form.
5 　A. It's my opinion that based on
6 what I saw in the evidence, Mr. Boudreaux
7 never had an episode of bleeding prior to
8 taking Xarelto.
9 　Q. I didn't ask you that.
10 　A. No, but that's -- let me -- I'm
11 using that as the basis --
12 　Q. Please try to answer my
13 question.
14 　　MR. DENTON: Please don't
15 interrupt.
16 　A. No, I'm using that as the basis
17 to try to answer your question as best I
18 can.
19 　　He never had any bleeding prior
20 to taking Xarelto. He never had any
21 bleeding after being taken off Xarelto.
22 In those time periods, he was prescribed
23 aspirin.
24 　　Therefore, I believe that if

1  you're saying that he was not taking
2  aspirin before and not taking aspirin
3  after and the only time he bled was when
4  he was prescribed Xarelto, and we're
5  assuming that he never took aspirin in
6  that entire time period, then Xarelto is
7  the probable cause of his GI bleeding.
8        You asked me to assume that he's
9  not taking aspirin and therefore can I
10  make a determination that Xarelto was the
11  cause of bleed in that situation.  Is --
12  maybe I misunderstood.  I apologize if I
13  did.
14     Q.   Perhaps you did, and we'll just
15  try it again.
16     A.   Okay.
17     Q.   It is your opinion that he was
18  taking both Xarelto and aspirin at the
19  time of his bleed, right?
20     A.   I saw no evidence to the
21  contrary.
22     Q.   Now, I want you to take one of
23  those out of the equation.  I want you to
24  assume he was not taking aspirin at the

1  time of his bleed.
2        If you take that factor out of
3  the equation, are you able to say with
4  scientific certainty that he would have
5  bled only on Xarelto?
6        MR. DENTON:  Object to form.
7     A.   You're saying that he was not on
8  aspirin.
9     Q.   I'm asking you to assume if he
10  was not on aspirin, would he have bled?
11     A.   Well, and I'm saying that the
12  data showed that he never bled before he
13  took Xarelto and he never bled after he
14  took Xarelto.
15        So, if he was not on aspirin at
16  that time and bled when he was prescribed
17  Xarelto, then Xarelto is the most probable
18  cause of his GI bleed.
19     Q.   So, before he was prescribed
20  Xarelto, right, he was taking aspirin?
21     A.   No, no, I'm sorry, you said he
22  was not.  You're asking me to assume he
23  was not taking aspirin.
24     Q.   Have you finished answering my

1  question about assuming he was not taking
2  aspirin?
3        I thought you gave me a long
4  answer about -- about that.
5     A.   Well, I'm sorry.
6     Q.   Have you finished answering that
7  question?
8     A.   Yes, I am.
9     Q.   I'm asking you a different
10  question, all right?
11     A.   Okay.
12     Q.   You've testified that he was
13  taking aspirin before he was started on
14  Xarelto, right?
15     A.   He was prescribed aspirin before
16  and after he took Xarelto.
17     Q.   And you're telling us that it's
18  important to you because there's no bleed
19  reported in his medical records while he
20  was taking aspirin and before Xarelto,
21  right?
22     A.   That is correct.
23     Q.   And then you're telling us after
24  the Xarelto was stopped, he continued

1  taking aspirin and it's important to you
2  because there was no bleed reported then,
3  right?
4     A.   That is correct.
5     Q.   The only period where he was
6  taking both aspirin and Xarelto was during
7  that --
8     A.   January --
9     Q.   -- time January 7th to February,
10  right?
11        MR. DENTON:  Is that a -- I
12  object to the form.
13        MR. SARVER:  Go ahead.
14        MR. DENTON:  I'm lost.
15     A.   My understanding is that from
16  January 9th to February 3rd he was taking
17  both aspirin and Xarelto.
18     Q.   Very good.
19     A.   I saw no evidence that that was
20  not -- that that was not true, that he was
21  taking both drugs.
22     Q.   So we have no period of time in
23  Mr. Boudreaux's entire history where he
24  was taking only Xarelto and not aspirin,

right?

A.   I have no evidence that there was a time period when he was only taking Xarelto.  He was prescribed both drugs for that time period.

Q.   So, because of that, is there any way to know with medical certainty that he would have bled had he been taking only Xarelto?

MR. DENTON:  Object to the form of the question.

A.   Based on the FDA's data -- let me answer this.  I realize you don't like it.

Based on the FDA's data, aspirin was not found to be a significant variable.  That means that the bleed risk with Xarelto, with or without aspirin, is there and is equivalent.  Aspirin is not found to be a significant variable in affecting that bleeding risk.  Therefore the bleeding risk is abnormal and high and the hazard ratio is high with or without aspirin.

Q.   Could you answer my question?

MR. DENTON:  He did.

Q.   And the question, the question is do you have scientific evidence to tell me that he would have bled had he only been on Xarelto?  Because what we know is there was never a time period in his entire life where that was true.

MR. DENTON:  Object to form.

Answer it again.

A.   And I'm saying that the scientific evidence from the FDA data -- you're asking me to have a crystal ball for one individual patient, and what I'm saying is --

Q.   Yes.

A.   -- there is no crystal ball.  No one can answer that question in a medically valid way.

Q.   Fair enough.

A.   But what I am saying is that there is scientific evidence from the FDA that looks at the hazard ratio of bleeding with respect to Xarelto in terms of their

effect and that he looked at that with the variables of aspirin use and they did not find it to be significant.

Q.   It was important to you, I think in part of your answer I think you told us that he was on aspirin for a long period of time before he took Xarelto, correct?

A.   He was on aspirin for many, many years prior to taking Xarelto.

Q.   And it was important to you because there's no evidence in the medical record of any acute bleed, correct?

A.   I saw no evidence of bleeding.

Q.   And the same is true after he stopped Xarelto, he remained on aspirin and you saw no evidence of an acute bleed in the medical record then?

A.   Again, I would -- I saw no evidence of bleeding.

Q.   Is anemia evidence of occult bleeding?

A.   Anemia is its own entity, and I would not make the assumption that occult bleeding is the etiology of that.

Q.   Is occult bleeding one of the things that can cause anemia?

A.   Well, you are -- you're basically saying that something that is occult, which means hidden, not known, a hypothetical, is a possible cause.

Q.   Yes.

A.   And what I'm saying is that is basically a waste basket term which usually is brought up when any other possibility to account for anemia is there and it's not objective, it's not determined.  It's simply a waste basket of well, let's throw it into that possibility.

Q.   Is occult bleeding one possible cause of anemia?

A.   I don't consider the category of occult bleeding because there's no objective evidence for it and it's simply a, like I said, it is a diagnosis of exclusion which I don't think is a valid diagnosis.

Q.   Is bleeding a cause of anemia?

1    A.    When you have symptoms, signs
2 and evidence of bleeding, then I would
3 look at that as true signs of bleeding
4 which can cause anemia.
5    Q.    Okay.  So bleeding can cause
6 anemia, we can agree with that?
7    A.    Bleeding can cause anemia.
8    Q.    Very good, all right.
9         Small amounts of bleeding over a
10 long period of time, can that cause
11 anemia?
12    A.    I would --
13         MR. DENTON:  Object to the form.
14    Go ahead.
15    A.    If there is evidence of
16 bleeding, then I would say that when
17 there's evidence, that that can be true,
18 but if there is no evidence of bleeding,
19 then I think that is just a speculation.
20    Q.    Can anemia be related to an
21 internal bleed, into the body, so you're
22 not bleeding out of your hands or
23 something?
24         MR. DENTON:  Object to the form.

1    A.    When -- what do you mean by "an
2 internal bleed"?  You have to be more
3 specific.
4    Q.    Gastric bleed, stomach bleed.
5    A.    So you're just saying a
6 gastrointestinal hemorrhage.
7    Q.    Sure.
8    A.    So if there is evidence of a
9 gastrointestinal hemorrhage by, say,
10 finding a lesion, by endoscopy, by
11 colonoscopy, by pill imaging, by Hemoccult
12 testing, if there's actual evidence of
13 that, then that's evidence of
14 gastrointestinal hemorrhage, and if it's
15 severe enough, it can cause anemia.
16    Q.    All those things you described
17 were done to Mr. Boudreaux, right, all
18 those imaging?
19    A.    All that imaging was done.
20    Q.    Didn't find any evidence of a
21 bleed, did they?
22    A.    Yes, they did find evidence of a
23 bleed.
24    Q.    What was the evidence of the

1 bleed they found on imaging?
2    A.    He had -- no, I'm sorry,
3 you're -- you're misconstruing my words.
4         He had evidence of bleeding by
5 his occult blood in his stool.
6    Q.    In his stool.
7    A.    And he also had a history of
8 tarry stools for three days, which in
9 medical terms we call melena, and which is
10 evidence of gastrointestinal bleeding, and
11 I have no reason to doubt that he did not
12 have tarry stools.
13    Q.    Right.  My question is you
14 mentioned these different studies, the
15 scope, colonoscopy, the endoscopy, the
16 pill that goes through.
17         None of those showed any
18 evidence of pathology, did they?
19    A.    They did not find an anatomic
20 lesion in his gastrointestinal tract.
21    Q.    Okay.  And they looked.  I mean,
22 this is good medical work, don't you
23 think, looking for the source of the
24 bleed?

1    A.    Well, they -- they didn't find a
2 cancer, they didn't find an arterial
3 venous malformation, they didn't find a
4 specific lesion that was in his
5 gastrointestinal tract.  That doesn't mean
6 that he didn't have a gastrointestinal
7 bleed.  He has evidence from his tarry
8 stools.  He has evidence from the positive
9 blood in his stools, and his entire
10 symptomatic aspect of hematocrit dropping
11 to 21 percent without any signs anywhere
12 else of a bleed, which would have been
13 symptomatic in that case, anywhere else of
14 having an internal hemorrhage of that
15 extent he would have had evidence, but the
16 only evidence was in his stool where he
17 had tarry stools.
18    Q.    I'm just asking if they did the
19 right imaging to look for the source of
20 the bleed.
21         Did they do that?
22    A.    I believe that his workup for
23 his GI bleed was thorough.
24    Q.    And they didn't find the source

1 or any kind of pathology that would tell
2 them this is where the bleed happened?
3     A.   I think you have evidence that
4 the bleed happened in the gastrointestinal
5 tract. They did not determine a
6 pathologic lesion, such as a cancer or an
7 arterial venous malformation or another
8 lesion that is -- that would be
9 actionable. That doesn't mean that he
10 didn't have bleeding from his
11 gastrointestinal tract.
12     Q.   Where did he bleed from? What
13 point in his gastrointestinal tract?
14     A.   Tarry stools and melena usually
15 indicate bleeding above the colon.
16     Q.   And what do you use to look for
17 the source of the bleeding above the
18 colon?
19     A.   So, esophagogastroduodenoscopy
20 and the pill base.
21     Q.   And that was done, right?
22     A.   That was done, correct.
23     Q.   Didn't find any source of
24 bleeding?

1     A.   He did not have an ulcer, he did
2 not have a cancer, he did not have an AVM.
3 They did not find those things in that
4 examination.
5     Q.   My question was they didn't find
6 any source of bleeding when they looked,
7 did they?
8         MR. DENTON:  Object to the form.
9         Go ahead.
10     A.   As I said, they are not -- they
11 are not looking -- they are not doing
12 somehow a comprehensive review of the
13 entire intactness of the gastrointestinal
14 endothelial layer.
15     Q.   Do you think they missed it?
16         MR. DENTON:  Let him finish.
17     A.   Let me finish.
18         What they're looking for are
19 overt lesions, like cancers, AVMs, ulcers,
20 et cetera. That does not mean that at the
21 time of his gastrointestinal bleed he had
22 a completely intact gastrointestinal
23 endothelium. He bled in his
24 gastrointestinal tract. We know that

1 because he had tarry stools and he had
2 blood in his stool and his hematocrit
3 dropped to such an extent that if it had
4 been anywhere else it would have been
5 symptomatic and he had no other symptoms
6 of that.
7     Q.   What was the word that you used
8 about he had some kind of a defect? What
9 was your word? I want to use your word.
10     A.   That his --
11     Q.   Was not intact?
12     A.   The endothelial lining of the
13 gastrointestinal tract may not have been
14 intact.
15     Q.   Okay. What caused the
16 endothelial lining of his gastrointestinal
17 tract to not be intact?
18     A.   Xarelto.
19     Q.   And how does Xarelto do that?
20     A.   In the normal pathophysiology of
21 the way that of the gastrointestinal tract
22 is maintained, there is constant breaching
23 of that in -- of that endothelial lining.
24     Q.   Whether or not you've got

1 Xarelto on board?
2     A.   I'm saying -- I'm not talking
3 about Xarelto yet. I'm just talking about
4 in the normal pathophysiology, we are --
5 we have an endothelial tract that is
6 always in the process of being healed, of
7 sealing, of being disrupted, et cetera.
8 These are microscopic. They do not result
9 in significant blood loss. They do not
10 result in anemia. People just do this all
11 the time. That's part of our normal
12 pathophysiology.
13         I told you about that -- that --
14 that range of bleeding risk, and this
15 is -- people who are -- have no
16 significant risk factors for that
17 hemorrhage, this is happening in them as
18 well as people who have higher risk
19 factors, such as Xarelto.
20         When someone is placed on an
21 anticoagulant, it disrupts the normal
22 hemostatic mechanisms. I'm not talking
23 about anatomic mechanisms. I'm talking
24 about the normal hemostatic mechanisms and

1 the normal physiology that keep that
2 sealing and constant interaction such that
3 you don't lose blood.
4     Q.   It doesn't cause a defect, but
5 if there is a defect, it doesn't clot as
6 quickly; is that fair?
7     A.   No, I'm not -- no, I'm not
8 saying -- no, I'm not saying that there is
9 a -- when you say "defect," to me that's
10 something that is related to a cancer, an
11 ulcer. I'm talking about the --
12     Q.   Use your word again. I forgot
13 it already.
14        Not intact.
15     A.   Not intact.
16     Q.   So, Xarelto doesn't cause the --
17 the bowel to become not intact, but if it
18 does become not intact on its own, it
19 might delay the hemostatic process of
20 clotting.
21        Is that fair?
22        MR. DENTON: Object to form.
23     A.   I think a more accurate way of
24 stating this is that your body is always

1 undergoing periods of time where it is not
2 intact. It is not as if there is a single
3 point in time where suddenly something
4 appears. That hemostatic mechanism is
5 always making sure that the constant
6 anatomic maintenance is being sealed by
7 hemostatic mechanisms, and anticoagulation
8 disrupts that hemostatic mechanism such
9 that the normal variance in anatomic
10 structures can't be maintained as well and
11 puts you at a higher risk of hemorrhage.
12     Q.   And that's any anticoagulation
13 therapy, right?
14        MR. DENTON: Let him finish his
15   answer.
16     A.   Well, what I was going to say is
17 that on that -- on that spectrum, the
18 anticoagulation therapy moves you up that
19 spectrum, and we know that from the data
20 from ROCKET that Xarelto moves you higher
21 than warfarin on that spectrum and from
22 the most recent data from Lipidol it moves
23 you higher than apixaban and dabigatran.
24     Q.   No anticoagulant causes the

1 colon to become not intact, correct?
2        MR. DENTON: Object to the form.
3     Q.   That happens just, according to
4 you, according to your life process?
5     A.   As I said, these are -- these
6 are in -- these two processes are
7 inextricably bound, the normal disruption
8 of the vascular layer and the hemostatic
9 mechanisms that act to seal them up and
10 allow healing. They're inextricable.
11 They're going on all the time.
12        So, you can't really separate
13 anticoagulation from this normal
14 hemostatic. If you give anticoagulation,
15 and as I said, any anticoagulant will move
16 you up that spectrum of hemorrhagic risk
17 from these normal homeostatic mechanisms
18 that exist without cancers or ulcers or
19 AVMs. It's where you move on that risk
20 spectrum that determines your risk of
21 bleeding.
22        MR. SARVER: Objection;
23   non-responsive. Move to strike.
24

1 BY MR. SARVER:
2     Q.   My question is this, again.
3        Anticoagulants do not cause the
4 disruption in the vascular layer; isn't
5 that true?
6        MR. DENTON: Object to the form
7   of the question.
8     A.   And what I'm saying is that's
9 not a scientifically accurate statement.
10     Q.   Okay. Telling me "no" is just
11 fine.
12        MR. DENTON: No, he can answer
13   the question how he feels appropriate.
14     Q.   Any anticoagulant that you take
15 can disrupt the hemostatic process and
16 cause you to have a greater risk of a
17 bleed?
18     A.   Anticoagulation, as I said
19 before, anticoagulation moves you up that
20 spectrum of increased bleeding risk.
21     Q.   Got it.
22        Was Mr. Boudreaux anemic before
23 he was prescribed Xarelto?
24     A.   Not in my opinion.

1    Q.   Was Mr. Boudreaux anemic after
2  he was taken off Xarelto and for years
3  afterwards?
4        MR. DENTON:  Object to the form.
5    A.   I do not believe that Mr.
6  Xarelto -- Mr. Boudreaux, I do not believe
7  that Mr. Boudreaux restored his hematocrit
8  and hemoglobin to his pre-GI bleed levels.
9    Q.   So you think he was anemic after
10  he was taken off Xarelto?
11    A.   Well, he was -- he was
12  transfused in the early part of the period
13  and was not transfused up to that level,
14  and then subsequently he did not
15  completely recover to the pre-levels.
16    Q.   I'm sorry, my question was, in
17  your opinion, was Mr. Boudreaux anemic
18  after he was taken off Xarelto?
19    A.   I would have to look at that
20  specific data.
21    Q.   You don't know?
22    A.   My recollection is that he did
23  not completely recover to the pre-level,
24  but I would have to look at the data to

1  see whether I believe it's anemic or not.
2    Q.   Okay.  Can we define anemia as a
3  deficiency in red blood cells?  Is that a
4  reasonable definition?
5    A.   No, I think that that's --
6    Q.   Give us yours.
7    A.   What I would say is relative to
8  his normal physiology and his relevant --
9  relative to his -- to his physiology,
10  medications and condition, that he would
11  have a relative and unexplained -- and
12  not, sorry, unexplained.  A relative lack
13  of red blood cells for his condition.
14    Q.   That's your definition of
15  anemia, a relative lack of red blood cells
16  for his condition?
17    A.   For his condition.
18    Q.   Got it, okay.
19        And, do you know what Mr.
20  Boudreaux's baseline level of red blood
21  cells for his condition was before
22  Xarelto?
23    A.   My recollection that it was that
24  his hematocrit was -- well, could we look

1  at -- could we look at the specific data?
2    Q.   That's what I'm going to do.
3    A.   Yeah, let's look at the specific
4  data.
5    Q.   Do you have any recollection
6  sitting there without looking at the
7  report?
8        You were about to testify.  I
9  don't want to stop you.
10        MR. DENTON:  That's a first.
11        MR. SARVER:  Actually, I want
12    to, but I'm not supposed to.
13    A.   Let's -- let's look at the
14    specific data.
15        (Exhibit 2, Ochsner Pathology
16    and Laboratory Medicine Laboratory
17    Report for Joseph Boudreaux, dated
18    June 1, 2013, Bates No.
19    JBoudreaux-OStAGH-MD-000973 through
20    JBoudreaux-OStAGH-MD-000979, was
21    marked for identification, as of this
22    date.)
23  BY MR. SARVER:
24    Q.   Let me show you what's been

1  marked as Exhibit 2 to your deposition.
2        Do you see that this is a
3  laboratory report for Ochsner for Mr.
4  Boudreaux?
5    A.   Yes, from June 1st, 2013.
6    Q.   From June 1st, 2013.
7        Can we agree that was before he
8  was given any Xarelto?
9    A.   Yes.  He was prescribed Xarelto
10  six months later, I think.
11    Q.   Right, okay.
12        So, Xarelto could not have
13  anything to do with his blood levels at
14  this time?
15    A.   He was not taking Xarelto.
16    Q.   All right, good.
17        Do you see his hemoglobin level,
18  if you look at the second page, do you see
19  there's a whole blood count?
20    A.   This is a -- this is a complete
21  blood count.
22    Q.   And do you see part of that
23  shows his hematocrit and his hemoglobin
24  level?

1    A.    So, the aspects that I look at
2  for his red blood cell status are the red
3  blood cell count, which is the RBC, which
4  is within the normal limits, the
5  hemoglobin, which is within the normal
6  limits, the hematocrit.
7    Q.    Hemoglobin is right at the
8  bottom, isn't it?  The range is 14 to 18
9  and he's at 14?
10    A.    He's within the normal range.
11    Q.    Right, but please answer my
12  question.
13        He was at 14 and the range is 14
14  to 18?
15    A.    Well, I don't know -- I do not
16  know how this normal limit is established.
17  I don't know if it is relative to elderly
18  men or whether that is a range that's
19  established for all adults from 18 years
20  on up.
21        To my mind, a hemoglobin of 14
22  and a hematocrit of 42.6 in a 71 year old
23  man is robust without any evidence of
24  anemia.

1    Q.    All right.  You're okay with
2  that as the level.  Let me just ask the
3  question.
4        Could you read for us what was
5  his hemoglobin level?
6    A.    His hemoglobin level is 14.0.
7    Q.    And what was the range of normal
8  for this laboratory for hemoglobin level?
9        MR. DENTON:  Object to the form.
10    Go ahead.
11    A.    As I said, that range is 14.0 to
12  18.0, but without knowing the context of
13  that reference range establishment, I
14  don't know how relevant it is to a 71 year
15  old man.
16        MR. SARVER:  Object to the
17    non-responsive answer.
18    Q.    What was Mr. Boudreaux's
19  hematocrit level?
20    A.    42.6 percent.
21    Q.    And what is the range of
22  hematocrit for this laboratory?
23    A.    40.0 to 54.0.
24    Q.    All right.  Had you reviewed

1  these records before you wrote your
2  report?
3        MR. DENTON:  What records, this
4    exhibit?
5    A.    This exhibit?
6    Q.    This exhibit, Exhibit Number 2.
7    A.    This looks familiar to me.
8        MR. SARVER:  Okay.  Let's take a
9    look at the next lab report.  It's
10    document number 30.
11        (Exhibit 3, STAH Emergency
12    Department Lab Results for Joseph
13    Boudreaux, dated January 7, 2014,
14    Bates No. JBoudreaux-OStAGH-MD-000029
15    through JBoudreaux-OStAGH-MD-000032,
16    was marked for identification, as of
17    this date.)
18        MR. SARVER:  I'm marking this as
19    Exhibit 3, Doctor.
20        THE WITNESS:  Wait, you gave me
21    two things.
22        MR. SARVER:  I gave you two
23    things?
24        THE WITNESS:  You want to take

1  this back?
2        MR. SARVER:  This is just an
3    extra copy.
4        THE WITNESS:  Okay.
5  BY MR. SARVER:
6    Q.    Okay.  What do we have in front
7  of us, Doctor, as Exhibit 3?  Record for
8  Mr. Boudreaux showing lab results?
9    A.    Give me a second.
10    Q.    Well, no.  At the top of the
11  page you can tell me it's lab results for
12  Mr. Boudreaux, can't you?
13    A.    Yes, I can.
14    Q.    Okay, very good.  That's the
15  first question.
16    A.    From January 7th, 2014.
17    Q.    And that's the relevant date
18  because that's the date he came in and
19  received his Xarelto prescription,
20  correct?
21        MR. DENTON:  Object to the form
22    of the question.
23        You may answer.
24    A.    So, this is when he was admitted

1  with his symptoms of atrial fibrillation.
2  Q.   Can we agree that on this date,
3  the laboratory results would not have
4  indicated -- he wouldn't have been taking
5  Xarelto at the time of this lab report?
6  A.   I do not believe that he was
7  taking Xarelto at this time.
8  Q.   Okay, very good.
9  And take your time to look at
10 whatever you need to, and I'll ask you
11 questions.  Tell me when you're ready.
12 A.   Thank you.  I have reviewed this
13 before, but let me just re-acclimate
14 myself to it.
15 (Perusing document.)
16 Okay.
17 Q.   All right.  I direct you to the
18 third page of the document.  There's a 32
19 at the bottom, if it helps.
20 MR. DENTON:  I think that's the
21 fourth page.
22 MR. SARVER:  It's the fourth?
23 Sorry.  It's page 32 at the bottom
24 with the Bates number.

1  THE WITNESS:  Yes.
2  MR. DENTON:  I'm sorry, you're
3  looking at the record number and I was
4  looking at the Bates stamp.
5  MR. SARVER:  That's all right.
6  No problem.
7  MR. DENTON:  We were both right
8  and we were both wrong.
9  BY MR. SARVER:
10 Q.   Do you see here we've got
11 laboratory results showing different
12 components of Mr. Boudreaux's blood?
13 A.   So, this is another complete
14 blood count from the 7th, which is about
15 six months after the one you previously
16 showed me.
17 Q.   Yes.
18 And what was Mr. Boudreaux's
19 hemoglobin level on January 7th of 2014?
20 A.   13.8.
21 Q.   And what was the reference range
22 for normal?
23 A.   As I said before, it's 14.0 to
24 18.0.

1  Q.   And there was a flag there.
2  What did the flag indicate?
3  A.   It indicates that it is lower
4  than the normal range.
5  Q.   And what does a low hemoglobin
6  level indicate?
7  A.   I don't consider this to be a
8  low hemoglobin level.
9  Q.   There is a flag from the
10 laboratory indicating low.
11 What does a low hemoglobin level
12 indicate?
13 A.   As I said, the -- this reference
14 range is meant as a guideline for what the
15 laboratory considers to be its reference
16 range, which may or may not be relevant to
17 a 71 year old man.
18 In looking at this as a clinical
19 person, I do not consider this to be a low
20 hemoglobin.
21 Q.   Yes, I understand.
22 A.   Although -- although it --
23 although it is by federal regulation
24 flagged, because it does not meet these

1  criteria, I do not consider that to be a
2  low hemoglobin.
3  Q.   So, my question is what does a
4  low hemoglobin level indicate?  Not
5  whether you think this was low.  What does
6  a low hemoglobin level indicate?
7  MR. DENTON:  Object to form.
8  Go ahead.
9  A.   I think that -- I think that it
10 is difficult to answer that question
11 without being medically misleading.
12 Q.   Do you know what a low
13 hemoglobin level is?
14 A.   I know in looking at patients in
15 assessing them whether the patient has
16 what I consider to be a low hemoglobin
17 level or not.
18 Q.   All right.  So, when you think
19 that there is a low hemoglobin level, what
20 does it mean to you?
21 A.   A -- in a hypothetical patient,
22 not this patient, if I see that there's
23 evidence in the complete blood count of an
24 abnormality, then I would work that

1 patient up and consider that as an
2 abnormality, but in this patient you're
3 looking at one statistical marker that I
4 would not qualify as a low hemoglobin
5 level.
6      MR. SARVER:  Object to the
7 non-responsive answer.
8 BY MR. SARVER:
9    Q.   My question to you is what does
10 a low hemoglobin level mean?
11      Can you answer that?
12    A.   In this case, all it means is
13 that this patient's value taken at one
14 point in time does not meet the reference
15 range in this laboratory which we do not
16 know is relevant to this patient or not.
17    Q.   In your practice, do you treat
18 patients with low hemoglobin levels?
19    A.   I treat all types of hematology
20 patients and including patients with
21 anemia.
22    Q.   All right.  And when a -- what
23 does a low hemoglobin level -- just you
24 don't like the numbers here, I get that.

1 But tell us what does it mean to you when
2 there is a low hemoglobin level?  What
3 does it mean?
4      MR. DENTON:  Object to the form.
5    A.   Well, I think, again, you're
6 asking a question which is medically
7 misleading.  We do not -- a hematologist
8 does not simply take one value out of
9 context of the entire CBC result, out of
10 context with the patient's condition, age,
11 and their -- their status.
12      We don't simply pull,
13 cherry-pick one particular value and make
14 an entire diagnosis on that.  We look at
15 it relative to the entire picture.
16      And if you would like me to
17 opine about the entire picture in a way
18 that makes medical sense, I'm happy to do
19 that.
20    Q.   I'm really trying something a
21 whole lot simpler, and I think you can do
22 this.
23      You know what a low hemoglobin
24 level means, don't you?  Can you tell us?

1    A.   What I'm saying here is that in
2 this instance, a low hemoglobin level
3 means that the value measured in this
4 patient at one particular time is 0.2
5 grams per deciliter below a reference
6 range which I have no idea is relevant or
7 not to this patient.
8    Q.   Okay, and we can take it out of
9 the context of this patient.  Let's take
10 it back to your patients, all right.
11      Can you do that?
12    A.   My patients in general.
13    Q.   Yes, in general.
14    A.   Sure.
15    Q.   One of your patients comes in
16 and he or she has what you consider a low
17 hemoglobin level.  Don't even have to put
18 a number on it, but you think it's low.
19      What does that tell you about
20 that patient?
21    A.   What that tells me is that is
22 the starting point for me to evaluate the
23 entire blood count with respect to that in
24 this patient and to use that data with all

1 other existing data I have to investigate
2 whether or not I think there is an
3 abnormality in that patient.
4    Q.   Okay.
5    A.   But --
6    Q.   Go ahead.
7    A.   As part of that assessment is
8 determining whether I truly think that a
9 statistical abnormality from the
10 laboratory has true clinical significance
11 for that patient.
12    Q.   All right.  If you believe that
13 the patient really has a low hemoglobin
14 level, what's going on in their body?
15    A.   Again --
16      MR. DENTON:  Object to the form.
17      Answer it, please.
18    A.   Again, no -- no reasonable
19 clinical hematologist is going to take a
20 single hemoglobin level in isolation and
21 use that in any way to decide what is
22 clinically wrong with that patient or to
23 determine what is the course of action or
24 management.

Page 134

1  They, as I said before, they
2  would use that value in conjunction with
3  the entire results of the complete blood
4  count because that is the medically valid
5  way to examine this and to then determine
6  what would be the course of action and
7  what were the possible etiologies and to
8  determine if there is truly an
9  abnormality.
10  Q.  All right.  Are you familiar
11  with the term "D-dimer"?
12  A.  Yes, I am.
13  Q.  What is that?
14  A.  The -- in patients who have --
15  in patients who have conditions where they
16  are making a overt symptomatic venous
17  thrombosis, those patients will have
18  symptoms of a thrombosis and when they are
19  making large amounts of clot, the body
20  attempts to break down that clot.  This is
21  formed clot.  These are not -- these are
22  not occult.  They are not hidden.  They
23  are symptomatic.
24  When those patients have such

Page 135

1  symptoms, one test that we use is to
2  examine for a breakdown product of a
3  formed clot.
4  The D-dimer is one aspect that
5  can be measured to try to make the
6  diagnosis or to -- I'm sorry, let me
7  rephrase that last part.
8  To try to increase the ability
9  to determine if a patient has a venous
10  thrombosis.  If the D-dimer is
11  significantly elevated, then there is --
12  then you cannot rule out a venous
13  thrombosis in that patient based on the
14  D-dimer alone if they meet certain
15  specific criteria of risk for a venous
16  thrombosis when they have an overt
17  symptomology of a venous thrombosis.
18  Q.  What D-dimer is measuring is the
19  breakdown products from a clot; is that
20  right?
21  A.  No, I would qualify that.
22  Q.  Go ahead.
23  A.  The D-dimer is -- is a measure
24  of the breakdown products of a venous

Page 136

1  thrombosis that is overt and symptomatic
2  and which is used in patients who are at
3  low risk or generally low risk of a venous
4  thrombosis to help in the management of
5  that patient to determine if additional
6  studies are needed to make the diagnosis
7  of a venous thrombosis.
8  Q.  Are you saying that D-dimer only
9  measures the breakdown products from a
10  venous thrombosis, doesn't measure any
11  other clots?
12  That's what I thought I heard.
13  A.  That is the -- that is the
14  most -- let me give you the second aspect
15  of the D-dimer.
16  The D-dimer is also clinically
17  useful as a measure of when a patient has
18  a condition called disseminated
19  intravascular coagulation, which is a
20  life-threatening, overt, massive
21  disruption of the coagulation system by
22  such things as sepsis, shock, disseminated
23  malignancies.
24  In that situation, there is such

Page 137

1  massive formation of clots and concurrent
2  breakdown of those clots such that there
3  will be complete disruption of the
4  coagulation system in that the patient is
5  forming massive amounts of clot, breaking
6  down massive amounts of clot, and then
7  they begin to bleed.
8  So, in the workup of patients
9  who have sepsis, shock, et cetera, when
10  they are bleeding, the D-dimer is used to
11  try and determine if disseminated
12  intravascular coagulation is going on in
13  that situation.
14  MR. SARVER:  Objection;
15  non-responsive.
16  A.  Those are the two situations
17  where D-dimer is clinically useful.
18  Q.  I'm going to try to be very,
19  very clear.
20  Does D-dimer simply measure
21  anticoag -- or coag -- the breakdown of
22  clotting factors, that's what it measures?
23  MR. DENTON:  Object to form.
24  A.  That is a medically inaccurate

1 term.
2    Q.    Okay.
3    A.    And I do not agree with that.
4 The D-dimer --
5    Q.    Tell me exactly what it
6 measures.  I don't care about the
7 conditions.
8    A.    Well, I'm sorry, but the
9 conditions that are part of its
10 measurement are part and parcel of its use
11 and interpretation.
12    Q.    Okay.  If you don't have one of
13 those two conditions, can you have a high
14 D-dimer?
15       MR. DENTON:  Object to form.
16       Go ahead.
17    A.    So, any laboratory test has
18 false positive elevations that are --
19 well, I shouldn't say false positive
20 elevations.  I should say conditions under
21 which elevations are meaningless.
22       So for example, in liver
23 failure, it is possible to have a -- an
24 elevated D-dimer when a patient has severe

1 synthetic liver dysfunction and that is
2 because the clearance which would normally
3 give you a low D-dimer is affected, and so
4 a high D-dimer could be attributed to
5 someone with severe synthetic liver
6 dysfunction, but that is not used, but the
7 D-dimer is not used in that case to make
8 that diagnosis.  It's simply an elevation.
9    Q.    Did you consider Mr. Boudreaux's
10 D-dimer level in your opinions?
11    A.    I looked at Mr. Boudreaux's
12 D-dimer.  I found that to be of no
13 relevance to my opinions.
14    Q.    You did not consider it in your
15 opinions?
16       MR. DENTON:  That's not what he
17    said.  I object to the form.
18    A.    No, I evaluated all of the
19 laboratories that were drawn and I find
20 that this D-dimer level has no relevance
21 to his conditions.
22    Q.    I think you're referring to page
23 Bates number 30, is that correct, on
24 Exhibit Number 3, I believe?  Is it 3 or

1 4?
2    A.    This is on Exhibit 3.
3    Q.    3.
4    A.    On Bates 30 there's a D-dimer
5 value of 0.50 which is right literally at
6 the upper range -- I'm sorry, is -- is
7 literally equivalent to the upper range of
8 the D-dimer, and -- but what I'm saying is
9 I do not find that this data is in any way
10 relevant to Mr. Boudreaux.
11    Q.    And the laboratory flagged Mr.
12 Boudreaux's D-dimer level on January the,
13 what was the date of this?
14    A.    7th.
15    Q.    January 7th of 2014 as high,
16 correct?
17    A.    Again, as a -- as a statistical
18 value, 0.50 is greater than -- less than
19 0.50.  So --
20    Q.    No, my question is --
21    A.    So there is a statistical
22 flagging of this value.
23    Q.    My question is simply the
24 laboratory for Mr. Boudreaux's test on the

1 7th of January 2014 flagged his D-dimer
2 level as high?
3    A.    I would say that this D-dimer
4 level is inappropriately flagged because
5 there is clear evidence in the literature
6 that D-dimer values in people over the age
7 of 50 increase in the normal range over
8 time.  I would venture that this reference
9 range is based on the manufacturer's
10 reference range, which does not take into
11 account age, and there is clear data and
12 literature that says that the D-dimer
13 should be considered as a function of age,
14 and this reference range does not take
15 that into account.
16       So, the fact that this is 0.5, I
17 would not -- I would not count that as an
18 abnormal value, even though, as you say,
19 it is flagged by the lab.
20       MR. SARVER:  Objection;
21    non-responsive.
22 BY MR. SARVER:
23    Q.    The question is a simple one.
24       Did the lab for Mr. Boudreaux's

1 test flag his D-dimer as high?
2     A.   I see a flag that says "H."
3     Q.   Does that mean high to you?
4     A.   No.
5     Q.   What does "H" mean to you?
6     A.   It means to me that this value
7 does not meet the statistical valuation by
8 the laboratory.  That does not necessarily
9 mean that the value is actually high.
10 That is one indicator for which any
11 reasonable physician is going to evaluate
12 this in the context of the patient and
13 their conditions, including age, which as
14 we know increases the normal reference
15 range of the D-dimer.
16         MR. SARVER:  Objection;
17     non-responsive.
18 BY MR. SARVER:
19     Q.   When you see a laboratory report
20 and it has an "H," a large capital "H,"
21 does that mean high to you?
22     A.   That means -- that to me is a
23 flag that indicates I need to look at the
24 value.

1     Q.   What does the "H" stand for?
2     A.   It means it is not within the
3 normal reference range.  It is higher than
4 the normal reference range.  But any
5 clinician that just uses these flags is
6 not exercising medical practice to
7 evaluate a value.
8     Q.   I'm just asking you what "H"
9 means.
10         Does "H" mean high?
11     A.   That -- I assume that that is
12 what it means in this laboratory.
13     Q.   That was the question.
14         And does "L" mean low when you
15 look at these laboratories?
16     A.   Yes, it does.
17     Q.   Okay, very good.
18         And you didn't consider Mr.
19 Boudreaux's D-dimer level to be something
20 important to you?
21         MR. DENTON:  Object to the form.
22     That's not what he said.
23     A.   In looking at Mr. D-dime -- Mr.
24 Boudreaux's D-dimer, I looked at this and

1 I considered it and I find it not relevant
2 to his condition because, as I said, in a
3 71 year old, I don't believe that this is
4 the correct reference range for a D-dimer.
5 The reference range should be higher.  The
6 fact that it is literally right at the
7 reference range limit tells me that this
8 is not a relevant value.  Nor does Mr., as
9 I said before, Mr. Boudreaux have any --
10 when I talked about venous thrombosis
11 which is mentioned here in the comment,
12 he's not being examined for a venous
13 thrombosis.  So I'm not even sure why the
14 D-dimer value was measured.
15         MR. SARVER:  Objection;
16     non-responsive.
17 BY MR. SARVER:
18     Q.   Did you form an opinion one way
19 or another as to whether Mr. Boudreaux was
20 anemic before he was prescribed Xarelto?
21     A.   Yes.
22     Q.   And what is that opinion?
23     A.   Based on the data that I'm
24 looking at here from January 7th, he is

1 not anemic.
2     Q.   Did you form an opinion as to
3 whether or not Mr. Boudreaux was anemic
4 after he was taken off Xarelto?
5     A.   I would like to look at that
6 data, if you wouldn't mind.
7     Q.   I'm just asking you if you had
8 formed that opinion when you wrote your
9 report.
10         Did you have an opinion as to
11 whether Mr. Boudreaux was anemic after he
12 was taken off Xarelto?
13     A.   In my report, the last
14 hematocrit that I noted for the purposes
15 of the report was that he was discharged
16 with a hematocrit of 28.2 percent, and I
17 believe that is the last hematocrit that I
18 evaluated for this in part because I was
19 focusing on his bleeding event, but I
20 would be happy to look at data after that
21 hematocrit was drawn.
22     Q.   I'm just trying to understand
23 what -- where your opinions come from.
24         As I understand it, and tell me

1 if I'm wrong, you don't have an opinion as
2 to whether or not Mr. Boudreaux was anemic
3 after he was taken off Xarelto; is that
4 correct?
5      MR. DENTON:  Objection to form.
6   A.   That is not a part of my report.
7 I would be happy to look at those -- that
8 data, if you would like me to give you an
9 evaluation.
10   Q.   And because it's not part of
11 your report, you don't have that opinion,
12 correct?
13   A.   That is correct.
14   Q.   All right, very good.
15      You haven't reviewed the
16 laboratory reports for Mr. Boudreaux going
17 all the way through 2015 and up through
18 June of 2016, have not reviewed those?
19   A.   I have reviewed those, but they
20 were not part of my report.
21      I would be happy to look at them
22 and give you specific opinions, if you
23 would like.
24   Q.   But you've not formed the

1 opinion that Mr. Boudreaux was anemic or
2 not anemic?
3   A.   Those did not inform my report.
4   Q.   Okay, very good.
5      Are you familiar with a term,
6 medical term called "iron deficiency
7 anemia"?
8   A.   Yes.
9   Q.   What is that?
10   A.   So, iron is a required part of
11 the composition of hemoglobin in red blood
12 cells, and if someone develops a total
13 body deficiency of iron, then they will
14 eventually become anemic.
15   Q.   Okay.  I want to make sure
16 you're done.
17      So, iron deficiency anemia, is
18 it ordinarily associated with an acute
19 bleed?
20   A.   I can't answer that question in
21 the general way.
22      I think that iron deficiency
23 anemia is something that we look for when
24 we evaluate patients that are anemic, when

1 we have specific evidence for that, and we
2 try to determine what is the etiology for
3 it.
4   Q.   Iron deficiency anemia is most
5 commonly found in patients with common --
6 with chronic bleeding, isn't it?
7      MR. DENTON:  Object to form.
8   A.   Again, it depends on patient
9 population that you're examining.  It
10 depends on their age.  It depends on
11 conditions.  I think that's a -- that's a
12 generalization that I would not
13 characterize.
14   Q.   You don't agree with that
15 generalization that iron deficiency anemia
16 is most commonly found in patients with
17 chronic bleeding?
18      MR. DENTON:  Object to form;
19   asked and answered.
20      Go ahead.
21   A.   So, again I would say it depends
22 on the patient population that you are
23 examining.
24   Q.   As a general matter am I correct

1 or not?  Tell me yes or no, I don't care.
2      MR. DENTON:  No.
3   Q.   I mean, I don't care whether the
4 answer's yes or no, but I'd like an
5 answer.
6      MR. DENTON:  He's given you the
7   answer twice.
8      Give it to him a third time.
9   A.   What I'm saying is that that is
10 an inaccurate generalization.  I would --
11 it depends on the patient populations that
12 you are examining.
13   Q.   All right.  And what tests do
14 you rely upon to determine whether a
15 patient has iron deficiency anemia?
16   A.   So, besides the evaluation of
17 their complete blood count, I would want
18 to know their serum iron, their total iron
19 binding capacity, and their ferritin.  I
20 might also need to look at their bone
21 marrow, and I would probably evaluate that
22 with other clinical and laboratory
23 parameters that are going to depend on the
24 specific patient.  I can't give you those

1 without knowing which clinical -- what is
2 the clinical situation and how I would
3 evaluate an individual patient, but there
4 would likely be other laboratories and
5 other clinical or other data that I would
6 want.
7    Q.    Would you want to know what the
8 patient's saturated iron level was?
9    A.    Well, the -- that is usually a
10 calculation rather than a -- rather than
11 a -- that is a calculation rather than a
12 measured laboratory value, but that can be
13 derived from the iron and the total iron
14 binding capacity.
15    Q.    To the -- the parameters you
16 wanted to see?
17    A.    That would be -- that would be
18 one of the parameters that I would want to
19 evaluate in the context of the individual
20 patient.
21    Q.    And the saturated iron level
22 comes as a percentage, doesn't it?
23    A.    That is correct.
24    Q.    Okay.  And it's a percentage of

1 what over what?
2    A.    So, the -- the way that I use
3 the saturation of iron is the serum iron
4 divided by the total iron binding
5 capacity.  But again, that is not meant to
6 be used in a vacuum.  It's meant to be
7 evaluated in the context of the total
8 patient and, as I mentioned, the complete
9 blood count, the ferritin, and all other
10 aspects.
11    Q.    Is a low saturated iron level
12 some evidence that the patient has iron
13 deficiency anemia?
14    A.    That is -- that is possible
15 evidence.  It is not diagnostic, and again
16 would need to be in context of other data
17 and the evaluation of the patient.
18    Q.    Okay.  Did you look to see
19 whether or not Mr. Boudreaux had a low
20 saturated iron level before he was
21 prescribed Xarelto?
22    A.    So, if we're talking about the
23 January 7th.
24    Q.    I'm asking whether or not when

1 you wrote your report you looked to see if
2 he had a low saturated iron level.
3    A.    So, if I'm looking at the data
4 from June 31st -- I'm sorry, let me get
5 the correct.
6        June 1st, 2013 and January 7th,
7 2014 where Mr. Boudreaux had his blood
8 levels drawn prior to starting Xarelto, I
9 see no indication from his complete blood
10 count why anyone would draw iron studies
11 in Mr. Boudreaux.  That would be a -- an
12 irrelevant and medically inappropriate
13 order based on his complete blood count.
14    Q.    Did you find any laboratory
15 reports showing Mr. Boudreaux's saturated
16 iron levels?  Did you see those?
17    A.    I don't recall, but if you have
18 them, I would like to look at them.
19    Q.    And you'd like to look at them
20 because it's important because it is some
21 evidence of iron deficiency anemia, isn't
22 it?
23    A.    I don't see evidence of iron
24 deficiency anemia in his complete blood

1 count.
2    Q.    That wasn't my question.
3    A.    Well --
4    Q.    Is saturated iron level some
5 evidence of iron deficiency anemia?
6    A.    And as I said before, the iron
7 saturation is one component of the
8 evaluation for iron deficiency anemia.
9 And what I'm saying is Mr. Boudreaux is
10 not anemic prior to beginning Xarelto.
11 Therefore, there's no indication for
12 anemia.
13    Q.    This may be on your -- be beyond
14 your expertise, and tell me if it is,
15 please.  Not being disparaging.  It's just
16 a different area.
17        Do you agree that evidence of
18 iron deficiency anemia in a man of 71
19 years is good evidence that that man has a
20 chronic gastric bleed?
21        MR. DENTON:  Object to the form.
22    A.    I'm sorry, could you rephrase
23 it?
24    Q.    Sure.

1    Is a patient of 71 years, a male
2 with evidence of iron saturation anemia,
3 is that an indication that he has a
4 chronic gastric bleed?
5    MR. DENTON: Object to form.
6    Go ahead.
7    A.   So we're not talking about Mr.
8 Boudreaux here. We're doing a
9 hypothetical, because he's not anemic.
10   Q.   If you remember my question,
11 please answer it.
12   A.   So --
13   Q.   I'll ask it again, if you need
14 it.
15   A.   No.
16   Q.   All right.
17   A.   So, if -- if I had -- if I have
18 a 71 year old patient who has anemia,
19 examining their iron indices would be one
20 part of my evaluation. If I found them to
21 be anemic, unlike Mr. Boudreaux, and they
22 had evidence of iron deficiency, which is
23 based on my overall evaluation of them,
24 not simply limited to iron saturation, I

1 would evaluate them for all of the
2 possible causes of iron deficiency which
3 could include occult or chronic bleeding.
4    Q.   Okay. And tell me if this is
5 beyond your expertise as well.
6        In patients with iron deficiency
7 anemia, is that associated with red blood
8 cells that are smaller in size than normal
9 red blood cells?
10   A.   So, what you're talking about is
11 patients with patients with a low mean
12 corpuscular volume.
13   Q.   Well, what I'm talking about is
14 in iron deficiency patients, would you
15 expect them to have red blood cells that
16 are smaller in size than normal red blood
17 cells, however you define that?
18       MR. DENTON: Object to form.
19       Go ahead.
20   A.   So, we're talking about, we're
21 speculating in a patient who is anemic,
22 unlike Mr. Boudreaux.
23   Q.   I'm asking you a general medical
24 question.

1    A.   I think that each individual --
2 I think that patients respond to iron
3 deficiency in different ways. They may or
4 may not have abnormalities that are
5 characterized by smaller red blood cells.
6 It depends on their overall condition
7 because multiple conditions impact red
8 blood cells. And therefore, you cannot,
9 in a generalizable way, say that that
10 always occurs. That is one possible piece
11 of evidence, but it is not necessarily
12 specific.
13   Q.   There is medical literature
14 saying that patients with iron deficiency
15 anemia often have smaller red blood cells?
16       MR. DENTON: Object to the form.
17   Q.   You don't agree?
18   A.   There is evidence in the
19 literature that patients with iron
20 deficiency have a hemoglobin synthesis
21 abnormality. Depending on the situation
22 with each individual patient, that may or
23 may not be manifest as abnormalities in
24 red blood cell size, but it depends on the

1 individual patient and can't be used as a
2 blanket statement.
3    Q.   And the abnormality would be the
4 low, not high, smaller, not bigger cells?
5        MR. DENTON: Object to form.
6    A.   It depends on the patient's
7 situation. You could have interactions
8 such that you might not have a net
9 abnormality in the patient's red blood
10 cell size.
11   Q.   Was Mr. Boudreaux vitamin B12
12 deficient?
13       MR. DENTON: Could we take a
14 break?
15       MR. SARVER: Absolutely.
16 Always.
17       MR. DENTON: I'm getting hot. I
18 didn't want to interrupt.
19       MR. SARVER: It's fine.
20       MR. DENTON: It seems like a
21 slightly different topic.
22       THE VIDEOGRAPHER: Stand by,
23 please.
24       The time is 10:58 a.m.

Page 158

1 We are going off the record.
2 (Recess taken.)
3 THE VIDEOGRAPHER: The time is
4 11:10 a.m.
5 We are back on the record.
6 BY MR. SARVER:
7 Q. Dr. Rinder, I'm on a time
8 crunch, so I'm going to go to a different
9 area and try to go through it as quickly
10 as we can.
11 If you look at page 2 of your
12 report, do you see your paragraph 4? Do
13 you see paragraph 4?
14 A. I do.
15 Q. Okay. You write that the
16 prothrombin time with Innovin reagent that
17 was taken on admission for the GI bleed
18 was important to you.
19 Is that right?
20 A. Yes, that -- to me that was
21 evidence that I considered.
22 Q. All right. And the prothrombin
23 time was 13.6 seconds, correct?
24 A. Yes, which was out of the normal

Page 159

1 range.
2 Q. And Innovin was the reagent?
3 A. That is my understanding.
4 Q. Okay. And what -- how does the
5 prothrombin time of 13.6 with Innovin as
6 the reagent relate to a prothrombin time
7 if Neoplastine had been the reagent?
8 A. So, in published literature,
9 examining the effect of Xarelto on
10 prothrombin time with different reagents,
11 there is data that relates the -- the --
12 with a -- there is standardized data that
13 relates prothrombin time with those
14 different reagents in graphs of -- on --
15 of Xarelto. And so, it is -- it is an
16 indirect comparison, but one could use
17 that graph to show approximately where a
18 prothrombin time value using the Innovin
19 reagent would correspond to a prothrombin
20 time using a different prothrombin time
21 reagent.
22 Q. Did you do that?
23 A. Yes.
24 Q. And what did it correspond to in

Page 160

1 your calculations with respect to
2 Neoplastine?
3 A. In my calculations, the
4 prothrombin time with the Innovin of 13.6
5 corresponded to a prothrombin time between
6 21 and 25 with different Neoplastine
7 reagents.
8 Q. And have you -- did you write
9 those calculations out?
10 A. I did not.
11 Q. How -- did you make any notes?
12 It's not in your report.
13 Where can we find your
14 calculations?
15 A. They're -- they're in my head.
16 I looked at the -- I looked at the data
17 and I examined the figure and that's where
18 it looks like those -- again, I said it's
19 an indirect comparison, but from the
20 graphs that I looked at, I think that the
21 prothrombin time would fall in that range
22 with different Neoplastine reagents.
23 Q. And tell us the source of these
24 graphs.

Page 161

1 A. I believe -- I believe that is
2 the Douxfils manuscript.
3 Q. Douxfils, and spell that for us.
4 A. D-O-U-X-F-I-L-S.
5 Q. Okay. Did you cite that in your
6 references for your general report?
7 A. I'm pretty sure it's in my
8 general report.
9 Q. And did you use any other
10 references other than Douxfils?
11 A. I thought Douxfils' report had
12 the most comprehensive data that I could
13 find for comparing a large number of
14 prothrombin time reagents for Xarelto.
15 Q. My question is did you use any
16 other reference other than Douxfils to
17 make this comparison?
18 A. I looked at other references,
19 but that seemed to me to be the best
20 graphing to be able to make that
21 comparison.
22 Q. Okay. And did you call the
23 Terrebonne Hospital to determine what
24 reagent was used on later tests of Mr.

1 Boudreaux's PT time?
2     MR. DENTON: I just want be to
3 be specific.
4     A.   Yeah, I --
5     MR. DENTON: Object to form.
6     Q.   You called Ochsner St. Anne's,
7 didn't you, the laboratory there?
8     A.   Yes.
9     Q.   Who did you talk to?
10    A.   I spoke to, I can't remember her
11 name, but she was the -- I was asked to --
12 I asked to be transferred to the
13 coagulation specialist.
14    Q.   Okay.
15    A.   And I spoke with a technologist
16 who said that she was the coagulation
17 specialist. I'm sorry, I can't remember
18 her name.
19    Q.   It was a woman?
20    A.   Yes.
21    Q.   And when was that conversation?
22    A.   I think some time in October of
23 this year.
24    Q.   Okay. Did you take any notes?

1     A.   I did not.
2     Q.   Make any writings at all
3 summarizing the conversation?
4     A.   No.
5     Q.   All right. Did you ask whether
6 any other reagents were used at St. Anne's
7 for measuring PT times?
8     A.   So, what I -- what I
9 specifically asked her was did she know
10 what was the specific prothrombin time
11 reagent that was used in 2014, and she
12 told me that it was Innovin and that
13 Innovin had been used for several years
14 prior to that time. She didn't know
15 exactly when Innovin had been begun, but
16 she was confident that Innovin was the
17 reagent that was used at the time of Mr.
18 Boudreaux's admission at Ochsner.
19    Q.   Did you ask her specifically
20 about what reagent was used for Mr.
21 Boudreaux?
22    A.   Since the prothrombin time is
23 done with a single reagent and it would be
24 against the standard of care to do -- to

1 use different reagents within the same
2 hospital for a prothrombin time, that
3 question never answered -- never entered
4 my mind. I asked her -- I did not ask her
5 about Mr. Boudreaux. I thought that would
6 be an inappropriate thing because that
7 would be private health.
8     I just asked her what was the
9 Innovin -- what was the reagent used for
10 the prothrombin time in that time period,
11 and she said that it was Innovin and
12 volunteered that it had been used for many
13 years prior to that time and was still
14 being used, I believe.
15    Q.   Did you ask her whether the
16 laboratory used any other reagents for
17 prothrombin time?
18    A.   That -- you mean at that time?
19    Q.   Yes, when you were on the phone
20 with her.
21    You were only on the phone with
22 her once, right?
23    A.   Correct.
24    Q.   During that conversation, did

1 you ask her whether or not any other
2 reagent was used at the laboratory at
3 Ochsner?
4     A.   I'm sorry, I meant -- I didn't
5 mean at that time that I asked. I meant,
6 to clarify, at that time that Mr.
7 Boudreaux was evaluated.
8     Q.   Let me make my question as clear
9 as it can be.
10    A.   Okay.
11    Q.   Did you ask the person you
12 talked to at Ochsner whether or not at any
13 time Ochsner had used different reagents
14 other than Innovin?
15    A.   I was only focused on the time
16 period during which Mr. Boudreaux was
17 admitted to Ochsner. It is the standard
18 of care to use a single prothrombin time
19 reagent. Therefore, asking about a
20 different prothrombin time reagent for use
21 at that time is -- doesn't make sense.
22    Q.   Is the answer to my question,
23 "No, I didn't ask about any other
24 reagent"?

1  A.  Since that -- since that would
2 be a nonsensical question, I didn't ask
3 it.
4  Q.  Okay.  Did you obtain any
5 documents from the Ochsner lab regarding
6 the use of reagents or the reference
7 levels, reference range of the PT levels?
8  A.  Well, we -- we have that data, I
9 believe.
10  So, is this -- is this Ochsner?
11  Q.  I'm asking if you got any other
12 documents from Ochsner after the phone
13 call.
14  A.  No, I relied on the documents,
15 medical records from Ochsner to
16 examine the prothrombin time reference
17 interval.
18  Q.  Do you know what reagent was
19 used at the Terrebonne laboratory for Mr.
20 Boudreaux?
21  MR. DENTON:  Which date, please?
22  MR. SARVER:  At any time.
23 BY MR. SARVER:
24  Q.  Do you have any idea what

1 reagent the Terrebonne laboratory uses?
2  A.  I did not -- I did not
3 question -- I did not call them up to ask
4 them that.
5  Q.  Okay.  Did you make any
6 assumptions about what reagent was used at
7 Terrebonne?
8  A.  No, I did not.
9  Q.  Okay.  Do you know what reagent
10 was used at Terrebonne?
11  A.  No, I do not.
12  Q.  Do you know what the normal
13 range of PT is for a patient who is on an
14 anticoagulant when Innovin is used as the
15 reagent?
16  MR. DENTON:  Object to the form.
17  A.  Which anticoagulant are you
18 referring to?
19  Q.  Any anticoagulant.
20  A.  So, I -- I know the reference
21 range for the INR when warfarin is being
22 used as an anticoagulant.  I'm not
23 aware -- I would like to see data that
24 someone has regarding specific

1 anticoagulants for reference ranges in
2 that.  I would find it -- I would like to
3 see that data because I'm not sure what
4 that data would be used for.
5  Q.  You would anticipate that the PT
6 for a patient on an anticoagulant would be
7 higher than the PT for a patient not on
8 anticoagulant?
9  A.  So --
10  MR. DENTON:  Object to form.
11  Go ahead.
12  A.  So, I'm aware of data that
13 Xarelto has an effect on the prothrombin
14 time and will increase the prothrombin
15 time in a linear fashion and, depending on
16 the sensitivity of the reagent, that
17 you'll have increases in the prothrombin
18 time for that.
19  Q.  And the same is true for
20 Pradaxa, isn't it?
21  MR. DENTON:  Object to form.
22  THE WITNESS:  That has data
23 that's -- that's confidential involved
24 in it.

1  Q.  I can't effectively examine you
2 without asking that question.
3  MR. DENTON:  Yeah, you can.
4  Q.  Can you answer it?
5  MR. DENTON:  You can talk about
6 the published literature.
7  MR. SARVER:  I cannot ask --
8  A.  Well, the data --
9  Q.  Can you tell me whether or not
10 Pradaxa does the same thing in terms of
11 the reference range for PT as Xarelto?
12  MR. DENTON:  Object to form.
13  Talk about published literature.
14 That's fine.
15  A.  In the published literature, I
16 think that the data for Pradaxa are more
17 relevant related to dilute thrombin time,
18 rather than prothrombin time.
19  Q.  I'm not asking you to limit your
20 answer to public literature.
21  I want to know based on your
22 opinion and your knowledge and whatever
23 basis it is whether or not Pradaxa would
24 do the same thing to prothrombin time as

1 Xarelto.
2     MR. DENTON:  Object to form.
3     A.   I would not use -- I would not
4 find the prothrombin time to be a reliable
5 measure of Pradaxa activity.
6     Q.   You cited Douxfils, that
7 article?
8     A.   I believe that's it.
9     Q.   Is that the one?
10     You know that Neoplastine wasn't
11 even referenced in that chart, right?
12     MR. DENTON:  What chart?
13     A.   Can you show me the chart?
14     Q.   You're the one that brought up
15 the chart.
16     MR. DENTON:  No.  There are
17 bunches of charts in that article.
18     A.   The Douxfils article that I
19 looked at has two curves in it that are
20 related to different Neoplastine reagents.
21     Q.   What was the date of this
22 Douxfils article that you're relying on?
23     A.   Can I go back to my general
24 report to find that?

1     MR. DENTON:  Sure.
2     Q.   Do whatever you need to do.
3     MR. DENTON:  Do we have a copy
4 of it?  We had it yesterday.
5     Q.   (Handing.)
6     A.   Thank you.
7     (Perusing document.)
8     2012.
9     Q.   Okay.  And, are you saying that
10 there is a chart comparing Innovin with
11 Neoplastine times?
12     A.   So, there is a chart in the
13 Douxfils that examines, as I said,
14 prothrombin time with standardized
15 rivaroxaban concentrations against
16 reagents, the following reagents:
17 Innovin, TriniCLOT PT Excel, TriniCLOT PT
18 HTS, Neoplastine CL Plus, RecombiPlasTin,
19 Neoplastine R, and TriniCLOT PT Excel S.
20     Q.   And that's what you based your
21 opinion on?  Is that the chart?
22     A.   Yes.
23     Q.   Is wasn't another one?
24     A.   No.

1     Q.   Okay.
2     A.   I think -- I think this is a
3 reasonable comparison.
4     Q.   Okay.
5     A.   Would you like that back?
6     Q.   You can keep it if you like it
7 for posterity.
8     A.   Only if you guys all sign it.
9     Q.   All right.  So, we know that Mr.
10 Boudreaux was not tested as Neoplastine as
11 a reagent for his PT time?
12     A.   Correct.  He was tested with
13 Innovin.
14     Q.   All right.  And your general
15 report refers to a 20 second time with
16 Neoplastine as the reagent, not with
17 Innovin?
18     A.   That is correct.
19     Q.   You don't have any time in your
20 report that is relevant to Innovin as the
21 reagent, do you?
22     A.   The only -- my only reference to
23 Innovin in that report is respect to
24 the -- is with respect to that it has a

1 linear relationship with rivaroxaban
2 concentration.
3     You are correct that the data
4 that was developed with respect to
5 bleeding risk, which was done by the
6 company with ROCKET, is with a Neoplastine
7 reagent.
8     Q.   All right.  Now, if we return to
9 your report paragraph 4, you have your
10 opinion that:  "Had he been tested for
11 Xarelto anticoagulant activity, the latter
12 measured with PT Neoplastine."
13     Do you see that?
14     A.   Yes, in the fourth line.
15     Q.   Yes.
16     "At the onset of Xarelto
17 treatment his excessive exposure would
18 have been identified."
19     What did you mean by "excessive
20 exposure"?
21     A.   My clarification of that is
22 that, as I said before, his Innovin level,
23 his Innovin-based prothrombin time
24 activity corresponded to a Neoplastine

1 activity based on the Douxfils paper of
2 greater than 20 seconds. And I'm basing
3 that -- and therefore, I'm saying that he
4 would have fallen in that fourth quartile
5 of hazard ratio based on the ROCKET-AF
6 data which we know had a higher risk of
7 bleeding compared to the third, second and
8 first quartiles.
9    Q.   So you're taking the 13.6
10 Innovin time and saying that would
11 translate to something over 21 with
12 Neoplastine or PT time and saying that's
13 excessive exposure based on the fourth
14 quartile?
15    A.   I'm saying that because the
16 Neoplastine time was, I think it was 19.8,
17 but in my report I rounded off to 20
18 seconds, that is the fourth quartile and
19 therefore that would put him at excessive
20 risk of bleeding.
21    Q.   All right. When would this test
22 have been -- have to have been conducted
23 to find out what his neo -- his PT time
24 was that you think could have been used to

1 adjust his exposure?
2    A.   So --
3    Q.   A day after he's on Xarelto, two
4 days? How long?
5    A.   I've talked to my colleagues
6 about this in terms of what they think
7 would be the -- the right timing to
8 monitor, and most of them feel that
9 they -- they would like to try to do their
10 best to establish a steady state. So that
11 they would think that taking the drug --
12 they -- they -- we've discussed that they
13 feel that taking a level some time in --
14 after four, five, six days is enough time
15 for the patient to establish some sort of
16 hemostatic range for that.
17    Q.   So some time around a week you
18 might check?
19    A.   Give or take, but that, you
20 know, and again, it could be done at a
21 patient's convenience.
22    Q.   Okay.
23    A.   I don't think there's a magic
24 number there, but I'm talking about you

1 would not want to do it a day after
2 beginning the drug. They would want
3 enough time to pass such that they felt
4 the patient was stable, that their drug
5 levels were -- that they were taking the
6 drug regularly and therefore it would be
7 stable.
8    Q.   And then you write: "He could
9 have been titrated to a lower dose."
10       What lower dose would you
11 recommend?
12    A.   Well, I -- I put that in because
13 that might speak to a cardiologist. I
14 would not -- I do not venture to discuss
15 what dose, what specific dose or to make
16 that decision. That's to the
17 cardiologist. I put that in simply as a
18 possible option for a cardiologist.
19    Q.   One of the options -- I'm sorry.
20       One of the options that you note
21 in your report as an acceptable option is
22 that he could have been titrated to a
23 lower dose of Xarelto, correct?
24    A.   Yes, with the caveat that if

1 that is approved by the cardiologist who's
2 doing the primary treatment of the atrial
3 fibrillation.
4    Q.   And you can't tell us what that
5 lower dose would have been?
6    A.   That is dependent on the
7 cardiologist.
8    Q.   Would that lower dose have been
9 off-label use of Xarelto?
10    A.   Again, that's for the
11 cardiologist to decide.
12    Q.   Well, you know what the -- the
13 label -- the FDA approved label says, and
14 it's a 20 milligram dose for certain
15 creatine clearance levels and a 15
16 milligram dose for lower creatine
17 clearance levels, correct?
18    A.   That -- you're -- that is the
19 correct interpretation of the FDA data
20 that I know of.
21    Q.   And Mr. Boudreaux fell into the
22 20 milligram category for dosage, didn't
23 he?
24    A.   I believe that his eGFR would

1 classify him in that category.

2    Q.   And so any lower dose would have
3 been off-label?

4    A.   Again, that -- I leave that to
5 the cardiologist to make that
6 determination.

7    Q.   The other option would be to
8 discontinue Xarelto and switch to an
9 anticoagulant with a lesser risk of
10 bleeding, safer anticoagulant, such as
11 Eliquis or Pradaxa, and then you cite Lip
12 2012, 2016 and Graham 2016, correct?

13    A.   That is correct.

14    Q.   Are those -- is there any other
15 basis for your statement that another
16 anticoagulant has a lesser risk of
17 bleeding or is a safer anticoagulant?

18    A.   Again, these are the -- these
19 are for the sake of time, the references
20 that I included here.  If we want, we can
21 go back to my general opinion report and I
22 can give you the other references that are
23 the basis of this but which I didn't
24 happen to include.  I can't -- I think one

1 of them is Yu, but if you want, we can go
2 back to the general opinion report.

3    Q.   I'm asking you now.

4         You included these references,
5 these three and no others, in the specific
6 report for Mr. Boudreaux; isn't that
7 correct?

8         MR. DENTON:  No, I object
9 because he incorporates his entire
10 general report.  So that's a
11 misstatement of his report.

12         MR. SARVER:  Please object to
13 the form.  Don't coach him, Roger.
14 Come on.

15         MR. DENTON:  Well, then ask
16 appropriate questions, Rick.  You know
17 that.

18         MR. SARVER:  Come on, Roger, we
19 got to stop this.

20         You want me to do this to your
21 experts?

22         MR. DENTON:  You will.

23         MR. SARVER:  I will not.  I'll
24 behave.  I'll do what the court says.

1         MR. DENTON:  Well, none of your
2 colleagues have been doing it for the
3 last year-and-a-half, so.

4         MR. SARVER:  Shame on them.

5         MR. DENTON:  I know that.  See,
6 if you had been involved in the
7 beginning, it would have been very
8 different.

9 BY MR. SARVER:

10    Q.   Okay.  What you wrote in your
11 specific report is you referenced three
12 articles, correct?

13    A.   In this -- in this particular
14 paragraph, I do reference those articles,
15 but it's my understanding, and I believe
16 that there's language here that I am using
17 all of the background -- all of the
18 general report as well to substantiate
19 this.  I simply included these as
20 examples.  It was not meant to be
21 comprehensive.

22         And as I said, I'm happy to look
23 at the general opinion report to give you
24 those other references.

1    Q.   All right.  You didn't refer to
2 or cite any of the literature that shows
3 that Xarelto is actually more effective
4 than other NOACs and more safe than other
5 NOACs.

6         Why not?

7         MR. DENTON:  Object to the form.

8    A.   As I discussed yesterday, I did
9 look at that data and did review that
10 data, and in trying to be comprehensive
11 but not overload my report with every
12 possible article, I found those to be less
13 compelling than these articles from 2012
14 and 2016 which I found to be more
15 compelling toward the -- the fact that
16 I -- that Xarelto was a lesser risk of
17 bleeding.

18    Q.   Okay.

19    A.   And a safer anticoagulant.

20    Q.   All right.  Would you have
21 suggested that Mr. Boudreaux go back on
22 what you consider to be a safer
23 anticoagulant after he had recovered from
24 his bleed?

MR. DENTON: Object to form.

Go ahead.

A. So, that would have been a -- that would have been a consultation with his cardiologist, perhaps with -- depending on that cardiologist's expertise and their -- their abilities, perhaps an invasive cardiologist as well, and we would have had a discussion as to the relative risk in Mr. Boudreaux specifically of bleeding, of anticoagulation. That would include all of the data that we have on his workup, including looking for an anatomic AVM, ulcer, et cetera.

I tend to be, in my consults, I tend to be very -- I tend to favor in my consultation considering and not a priori dismissing the ability to anticoagulate patients. There -- you can imagine that someone gets put on an anticoagulant and they bleed and then the physicians are -- say we can never anticoagulate this patient again. Sometimes that is a

consideration that they'll use as a blanket statement.

I tend to not operate in that mode as a -- as an automatic. What I try and do is talk to them about okay, is -- are there situations where anticoagulation would be the better situation. Even though we have the patient has had a bleed, should we consider restarting a different anticoagulant and evaluating that.

It's consultative. I'm not going to tell the cardiologist that they must do that, but I would definitely put that as a consideration in the consult as to whether the patient should be restarted on anticoagulation at whatever appropriate time if that as a group agrees that that's the best course for that patient and would consider that.

Q. Would you have recommended starting Mr. Boudreaux on another anticoagulant after he had recovered from his bleed?

A. Again, my -- the nature of my practice is to do that in the context of a group consultation rather than to say this is what I think should be done. It is more of a consultative group discussion to determine what is the best course for that patient.

Q. In that consultative group discussion you've described, would you have suggested, recommended, advised, however you want to phrase it, that Mr. Boudreaux go on another anticoagulant after he recovered from his bleed?

A. I would -- I would use the word "consider." And that should be part of the consideration.

In fact, we know that Mr. Boudreaux was anticoagulated at a later date with low molecular weight heparin, and that would have been a similar type of situation of weighing the risks and benefits and deciding whether or not that was of sufficient benefit that had outweighed the risk. We would do the same

consideration for thinking about anticoagulation for his atrial fibrillation.

Q. Would you have any recommendation at all regarding Mr. Boudreaux after he recovered from his bleed about starting another anticoagulant?

A. I would have, in that discussion, considered the use -- well, at that time, we did -- this is in 2014. At that time, we had less data than is available at 2016. So we would have had to have considered the data at the time relative to bleeding risk of other anticoagulants and considered it. That's all I'm saying. We would consider it.

Q. And I'm asking, maybe you don't -- you don't have an answer, but I'm wondering what would you have recommended? Would you have recommended nothing?

I mean, they consult you. When they consult you, they're asking for your advice, right?

1  A.   They're asking for my
2  information and to have a discussion.
3  They're not asking for me to say this is
4  what I say.
5        My -- my consultative nature is
6  to have a discussion and to give them my
7  understanding of the relevant data at that
8  point in time with respect to the patient
9  and to hear what their analogous
10  understanding is and then within that, to
11  synthesize what we think is best for the
12  patient.
13  Q.   All right.  And if the doctor
14  had said well, let's give Eliquis a shot,
15  what would you have said?
16        MR. DENTON:  Object to form.
17        Go ahead.
18  A.   Well, I don't think -- I don't
19  think that -- I don't think that the
20  consultation is let's give it a shot and,
21  you know, cross our fingers and hope that
22  things are okay with that.
23        I think what we would do is have
24  a more specific discussion relative to Mr.

1  Boudreaux, relative to what the primary
2  care doctor's feel is, their course of
3  therapy with those risks, and we would
4  have a discussion of that.  We would
5  consider Eliquis.  We would consider
6  Pradaxa.  We would examine whatever was
7  available at that time, including
8  warfarin.
9  Q.   Okay.
10  A.   We would have looked at every
11  possibility and gone -- and gone with
12  whatever the -- the primary care doctor,
13  or the cardiologist is the person doing
14  that prescription.  They have to be the
15  one that is at the end comfortable with
16  what they're doing and --
17  Q.   Did any -- I'm sorry, go ahead.
18  A.   And all I'm saying is I would --
19  I would encourage consideration of all
20  options.  I'm not saying that I would push
21  in one direction or another.  I would just
22  go through those options relative to the
23  patient.
24  Q.   Did anything about the bleed on

1  Xarelto increase Mr. Boudreaux's risk of
2  having a bleed on another anticoagulant?
3  A.   I'm trying to think if there's
4  any objective data that can be used to
5  answer that in a valid scientific way.
6        Can you ask me that one more
7  time?
8  Q.   All right.
9  A.   I'm sorry.
10  Q.   It's okay.
11        Did the fact that Mr. Boudreaux
12  bled while he was on aspirin and Xarelto
13  put him at an increased risk of bleeding
14  on another anticoagulant?
15        MR. DENTON:  Object to form.
16        Please answer it if you can.
17  A.   Got it, okay.
18        I'm not -- when we talk about
19  that spectrum of bleeding risk and the
20  fact that current data seems to have
21  Xarelto at a higher bleeding risk than
22  other drugs, I'm not aware of objective
23  data that allows within an individual
24  patient to somehow differentiate risk

1  factors with the different anticoagulants
2  in that patient.  Therefore, I -- I can't
3  say that that exists.
4  Q.   Okay.  Certainly being on
5  Xarelto for a period of time doesn't make
6  you allergic to another anticoagulant?
7  A.   I can't answer that.  I don't
8  know enough about the pharmaco -- I can't
9  answer -- I don't know enough about the
10  possibility of an antibody to a drug to be
11  able to opine on that.
12  Q.   You just can't answer one way or
13  the other?
14  A.   Well, when you talk about an
15  allergic reaction, that's an immunologic
16  aspect of a possible complication, and I
17  don't have an opinion on that.
18  Q.   And did you see any evidence
19  that there was any kind of a weakness or
20  defect or injury to the gastrointestinal
21  tract of Mr. Boudreaux that would make him
22  more susceptible to bleeding after the
23  Xarelto bleed?
24  A.   When you say "more," you're

Page 190

1 going to have to clarify.
2     Do you mean more susceptible to
3 just bleeding in general?
4     Q.   Yes.
5     A.   Without an anticoagulant on
6 board, I would say that being stopped --
7 having stopped Xarelto, Mr. Boudreaux
8 would probably return to his pre-Xarelto
9 aspect of bleeding risk.  I did not -- I
10 can't see any data that would make me
11 think that that's different.
12     Q.   Okay.
13     MR. DENTON:  How close are you,
14 Rick?
15     MR. SARVER:  I'm hours away.  So
16 if you want to stop me, it's your
17 call, but I'm nowhere near done.
18     MR. DENTON:  Well, what time are
19 we on, Mr. Videographer?
20     THE VIDEOGRAPHER:  We're at
21 three hours and nine minutes.
22     MR. DENTON:  I mean, I think
23 he's got another 15 or 20 minutes.
24 That's all he's got.

Page 191

1     MR. SARVER:  Yeah, I can't
2 finish, but of course you can tell me
3 I need to stop.
4     MR. DENTON:  No, I'm just
5 telling you that the rules and the
6 agreement between the parties --
7     MR. SARVER:  I know.
8     MR. DENTON:  -- indicate you
9 need to stop.
10     MR. SARVER:  And I'm not arguing
11 that.  I will stop as soon as you tell
12 me to stop asking questions.  It's
13 your call.
14     MR. DENTON:  What I'm trying to
15 say is is if you could do what you
16 needed to accomplish, as an
17 accommodation, the doctor has another
18 10, maybe 15 minutes.
19     If you're saying that that would
20 not resolve any concern you have, then
21 I think we have no choice other than
22 to end here.
23     MR. SARVER:  It wouldn't solve
24 my problem, Roger.  I appreciate the

Page 192

1 offer of 10 minutes.  It is
2 appreciated.
3     MR. DENTON:  Well, it's 10 in
4 addition to the 10 you've already had.
5     MR. SARVER:  Yes, it's 19 or 20
6 minutes.  Much appreciated.
7     For the issues we talked about,
8 and I don't want to be disparaging at
9 all, but we're likely to be filing a
10 motion asking for more time, and that
11 will be resolved however it's
12 resolved.
13     MR. DENTON:  Understood.
14     MR. SARVER:  Yeah.
15     MR. DENTON:  I understand.  So I
16 guess we're finished for today.
17     MR. SARVER:  Okay.
18     MR. STEKLOFF:  I'm just going to
19 reserve my right to ask some follow-up
20 questions as well, if the motion is
21 granted.
22     THE VIDEOGRAPHER:  Okay.  Stand
23 by, please.
24     Should I go off the record?

Page 193

1     MR. DENTON:  I think we should
2 go off the record.
3     MR. SARVER:  We should go off
4 the record, yes.
5     THE VIDEOGRAPHER:  This marks
6 the end of this deposition.
7     The time is 11:47 a.m.
8     We are going off the record.
9     (Time noted:  11:47 p.m.)

```
1        - - - - - -
         E R R A T A
2        - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6     REASON: _____
7              _____
8     REASON: _____
9  ____  ____  _____
10    REASON: _____
11 ____  ____  _____
12    REASON: _____
13 ____  ____  _____
14    REASON: _____
15 ____  ____  _____
16    REASON: _____
17 ____  ____  _____
18    REASON: _____
19 ____  ____  _____
20    REASON: _____
21 ____  ____  _____
22    REASON: _____
23 ____  ____  _____
24    REASON: _____
```

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10 changes in form or substance, if any,
11 noted in the attached Errata Sheet.
12
13
14 _____
15 HENRY MICHAEL RINDER, M.D.      DATE
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
22 _____
   Notary Public
23
24
```

```
1         C E R T I F I C A T E
2  STATE OF NEW YORK
3  COUNTY OF NEW YORK
4
5        I, Marie Foley, RMR, CRR, a
6  Certified Realtime Reporter and Notary
7  Public within and for the State of New
8  York, do hereby certify:
9        That HENRY MICHAEL RINDER, M.D.,
10 the witness whose deposition is
11 hereinbefore set forth, was duly sworn by
12 me and that such deposition is a true
13 record of the testimony given by the
14 witness.
15       I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of
19 this matter.
20       IN WITNESS WHEREOF, I have
21 hereunto set my hand this 15th day of
22 December, 2016.
23
                 _____
24       MARIE FOLEY, RMR, CRR
```

```
1        LAWYER'S NOTES
2  PAGE / LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
```