# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN) PRODUCTIONS LIABILITY LITIGATION

MDL NO. 2592
MAG. JUDGE NORTH

THIS DOCUMENT RELATES TO:
JOSEPH BOUDREAUX, NO. 14-0270

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

ORAL DEPOSITION
OF
STEVEN SCOTT BONIOL, M.D.

Taken at the offices of
Cook, Yancey, King & Galloway
333 Texas Street
Shreveport, Louisiana

January 14, 2017 9:13 a.m.

APPEARANCES:

FOR PLAINTIFF:

GOZA & HONNOLD
11150 Overbrook Road
Suite 250
Leawood, KS 66211
By: Bradley Honnold, Esquire

FOR JANSSEN:

BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER
Suite 2400
909 Poydras Street
New Orleans, LA 70112
By: Richard E. Sarver, Esquire
RSarver@BarrassoUsdin.com
Madison Sharko, Esquire
MSharko@BarrassoUsdin.com

IRWIN, FRITCHIE, URQUHART & MOORE
Suite 2700
404 Poydras Street
New Orleans, LA 70130
By: James Irwin, Esquire
JIrwin@IrwinLLC.com
Jeanette Mills
JMills@IrwinLLC.com

FOR BAYER:

WILKINSON, WALSH & ESKOVITZ
Suite 800
1900 M Street NW
Washington DC 20036
By: Kim Channick, Esquire
KChannick@WilkinsonWalsh.com
Kieran Gostin, Esquire
KGostin@WilkinsonWalsh.com

REPORTED BY: Sarah B. Townsley, CCR, CSR, RPR, Notary

VIDEOGRAPHER: Lyn Rieger, Golkow Technologies

STIPULATIONS

IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR THE PARTIES THAT THE ORAL VIDEO DEPOSITION OF STEVEN SCOTT BONIOL, M.D., IS BEING TAKEN BEFORE SARAH B. TOWNSLEY, CCR, RPR, CERTIFIED COURT REPORTER IN AND FOR THE STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS PROVIDED BY LAW, AT THE OFFICES OF COOK, YANCEY, KING & GALLOWAY, 333 TEXAS STREET, SHREVEPORT, LOUISIANA, ON JANUARY 14, 2017;

THE PARTIES HEREBY WAIVE ALL FORMALITIES IN CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE EXCEPTION OF THE SWEARING OF THE WITNESS AND THE REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE TIME THAT TAKING OF SAID DEPOSITION OR ANY PART THEREOF MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

SARAH B. TOWNSLEY, CCR, RPR, OFFICIATED IN ADMINISTERING THE OATH TO THE WITNESS.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 4

INDEX

| EXAMINATION BY | PAGE NO. |
|---|---|
| MR. HONNOLD | 6 |

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | expert report | 11 |
| 2 | "Gastrointestinal Safety of Direct Oral..." | 56 |

Golkow Technologies, Inc - 877.370.3377

PROCEEDINGS:

STEVEN SCOTT BONIOL, M.D.,

having been first duly sworn, testified on oath as follows:

VIDEOGRAPHER: We're now on the record. My name is Lyn Rieger, videographer for Golkow Technologies. Today's date is January 14, 2017. The approximate time is 9:13 a.m. The video deposition is being held in Shreveport, Louisiana, in the matter of Xarelto products liability litigation, filed in the United States District Court, Eastern Division of Louisiana. The deponent is Dr. Scott Boniol. The court reporter is Sarah Townsley, and the deposition right now is representing the family of Joseph Boudreaux, and attorneys, if you will introduce yourselves for the record, and then our court reporter will swear the witness.

MR. HONNOLD: Thank you. Brad Honnold for Mr. Boudreaux.

MR. SARVER: Rick Sarver for Janssen.

MS. SHARKO: Madeline Sharko for Janssen.

MS. MILLS: Jeanette Mills for Janssen.

MRS. CHANNICK: Kim Channick for Bayer.

MR. GOSTIN: Kieran Gostin for Bayer.
MR. IRWIN: Jim Irwin for Janssen.
[Witness was sworn.]

EXAMINATION BY MR. HONNOLD:

Q. Doctor, good morning. You know we're here today to take your deposition related to the Boudreaux case?
A. Yes, sir.
Q. And you know that's a case that you have reviewed some materials, medical records, and have been retained to express opinions in that regard?
A. Yes, sir.
Q. And I don't know if we have the benefit of the marked exhibits from yesterday. It looks like we do have them, so I might need to resort to them for some reason. Why don't we just put those out in the middle, because, if we go back and forth between the billing and things like that, it might be helpful. Do you recall that, yesterday, we were here, and we took -- you can either call it your general deposition or generic deposition, for kind of your global opinions related to Xarelto, right?
A. Yes, sir.
Q. And you know that we marked numerous things as exhibits in that deposition yesterday?

Certainly, you could have a perforated ulcer that could result in bleeding out, and possibly even death, so there's a huge spectrum of GI bleeding. Some of it is just, "Oh, by the way, Doctor, I'm on your study, and I saw some blood on the toilet paper", to, "I'm in the hospital because I'm bleeding profusely." There's a wide spectrum of bleeds there.

Q. For those patients at that end of the spectrum, a GI bleed can be a very significant adverse health spectrum for them?

A. At which end of the spectrum?

Q. The more severe end of the spectrum.

A. Yes, sir.

Q. You've seen that in your hospitals?

A. Correct.

Q. Do you believe that the issue of gastrointestinal bleeding is a key issue to consider when assessing the risk/benefit tradeoffs when deciding whether to anticoagulate a patient for atrial fibrillation?

A. So, to make the decision to anticoagulate yes or no, you know, if a patient has a known or active GI bleed, has peptic ulcer disease or a high risk to bleed, yes, you're going to try to opt to not anticoagulate that patient. Anyone who's had an

head-to-head trial, so I can't make any -- there's no conclusions I can make of this, other than it would -- maybe this needs to be looked at in a clinical trial. Maybe.

Q. I'm not saying that it is any more or any less than what it is --

A. Right.

Q. -- but I'm just saying this information, as you've seen it for the first time today, your sense is that it would not influence or cause you to vary your practice or prescribing --

A. Not at all. I think, when you look at this, you know, the biggest thing that I have as a hematologist that prescribes anticoagulants, is, you're looking at one side effect. Maybe GI's just interested in gastrointestinal. I'm not. I'm interested in a persona. I'm interested in a patient. They have a GI tract. They also have a pulmonary area or digestive tract, they have a brain, they have all kind of places that can bleed. I'm not worried about one particular side effect. Globally -- I take care of patients and people. I don't take care of GI tracts, so I need to know all the side effects, all the data, so, you know, this may be of some interest to a GI doctor. Do they suggest anything in here to change

practice at all? No. I mean, they clearly don't say, "Hey, based on this, do this." I mean, they don't say anything. They don't come to any conclusion, they don't come to any -- "Here's our guidelines. Here's an algorithm you can use." None of that's in here. All they say is, "Hey, you know what? If you look at a whole bunch of charts that we don't validate, retrospectively, based on some ICDN data, here's a little piece of information that may or may not be interesting." I happen to not find it very interesting.

Q. Again, I'm not saying anything other than what it is. My only question for you this past five minutes has been: Is Exhibit 2, as you see it today for the first time, would not cause you to alter or change your prescribing practices with NOACs, correct?

A. Right, and I understand, but I just gave an explanation as to why my answer is no, this would not change my practice of prescribing NOACs, for the reasons I just stated.

Q. Exhibit 2 would not change your practice of prescribing --

A. Absolutely not.

Q. -- NOACs, based upon all the things that you've stated, correct?

how the data is presented, it doesn't suggest that it's due to statistical chance, correct?

A. Correct.

Q. Anywhere in your report that we've marked as Exhibit 1, do you specifically state that Mr. Boudreaux would have had the exact same GI bleed if he'd been on Warfarin? Do you say that anywhere, in words, in your report?

A. I don't say that specifically. I do say that, you know, you can't say that he wouldn't have, but I don't say that you can say that he would, so the way you've specifically worded it, I do not say that, no.

Q. The treatment that Mr. Boudreaux had for his bleed, can you provide an overall summary of the treatment that he needed for that?

A. So when he came in with a GI bleed -- and obviously, the first thing that was done was he -- he was evaluated for his degree of anemia. Based on his low value and the change he'd had over the last three weeks, he had -- it was felt that he'd benefit from giving him blood, so he was initially transfused two units of packed red blood cells. His rivaroxaban was held, which is, again, as we talked about yesterday, effective to reverse the effects of that anticoagulant alone. Ultimately, a few days later, he was given two

further units, for a total of four units of blood transfusion, which is not an excessive amount of blood for a GI bleed. After stabilization, he was evaluated for a source of bleeding by both an upper GI tract camera, which is mouth to stomach, and later on, a couple days later after that, about three days after that, he had a colonoscopy, which looked from his anus to his cecum, so everything but his small bowels was imaged. He did really well just by withholding Xarelto and transfusing blood. He stabilized essentially immediately. His hemoglobin stayed up to where it should be, indicating no clinically-significant ongoing bleeding, and he was discharged home.

Q. What's your understanding as to whether Mr. Boudreaux is on any anticoagulant medication today?

A. He's not. Well, I'm sorry, as of June 7, 2016, which was the last medical record date that I have, he was not on anticoagulation.

Q. What's the last medical record that you have seen that confirmed, by evaluation of his rhythm, that Mr. Boudreaux still has atrial fibrillation?

A. I believe it's that same date, he had heart catheterization -- no, I'm sorry, his last date of atrial fibrillation, I don't recall. I'd have to go back and look up. It may have been that June date

**REPORTER'S CERTIFICATION**

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, SARAH B. TOWNSLEY, Certified Court Reporter, as the officer before whom this testimony was taken, hereby certify that STEVEN SCOTT BONIOL, M.D., having been duly sworn by me upon authority of R.S. 37:2554, testified as set forth in the previous 96 pages; this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me, is a true and correct transcript, to the best of my ability and understanding; the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and rules and advisory opinions of the board; I have no knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and party litigants in this matter, nor any such relationship between myself and party litigants n this matter, and am not related to counsel or parties herein, nor am I otherwise interested in the outcome of the matter.

Signed this 19th day of January, 2017.

______________________________

Sarah B. Townsley, CCR, RPR - LA CCR 92016; TX CSR 5746; RPR #814458