# EXHIBIT G

Protected - Subject to Further Protective Review

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF LOUISIANA
 3                     - - -
 4
     IN RE:  XARELTO          :   MDL NO. 2592
 5   (RIVAROXABAN) PRODUCTS   :
     LITIGATION               :   SECTION L
 6                            :
     THIS DOCUMENT RELATES     :   JUDGE ELDON
 7   TO ALL CASES             :   E. FALLON
                              :
 8                            :
                              :   MAG. JUDGE
 9                            :   NORTH
10
                     - - -
11
              December 14, 2016
12
                     - - -
13
              - PROTECTED -
14
   - SUBJECT TO FURTHER PROTECTIVE REVIEW -
15
16           Videotaped deposition of
     HENRY MICHAEL RINDER, M.D., taken
17   pursuant to notice, was held at the law
     offices of Douglas & London, 59 Maiden
18   Lane, New York, New York, beginning at
     8:09 a.m., on the above date, before
19   Michelle L. Gray, a Registered
     Professional Reporter, Certified
20   Shorthand Reporter,  Certified Realtime
     Reporter and Notary Public.
21
                     - - -
22
          GOLKOW TECHNOLOGIES, INC.
23    877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

1      Q.   And sitting here today, is
2 it fair to say that you can't point to
3 anything else that you're relying upon to
4 offer the opinion in the paragraph we're
5 talking about on Page 14?
6      A.   As long as it's within one
7 of those references, then yes.
8      Q.   Okay.  Now, have you ever
9 published in a peer-reviewed article
10 your -- the opinion that you offer about
11 the 20-second reasonable and conservative
12 cutoff point at which the risks outweigh
13 any benefit in any scientific journal?
14      A.   I have not published on this
15 cutoff point, no.
16      Q.   Have you even drafted an
17 article for submission on this cutoff
18 point?
19      A.   We have several -- we have
20 several manuscripts that our trainees and
21 residents are working on related to new
22 oral anticoagulants, but I do not believe
23 this is included, that this cutoff point
24 right now is included in those drafts.

Protected - Subject to Further Protective Review

1   Q.   In other words, you are not
2   in the process of drafting a peer -- a
3   proposed peer-reviewed article that
4   specifically says that for Xarelto, there
5   should be a 20-second cutoff, reasonable
6   and conservative -- conservative cutoff
7   at which the risks outweigh the benefits?
8   A.   Well, I don't think there
9   would be -- well, I don't know that -- I
10  don't know that a journal would want an
11  article that was completely -- a
12  manuscript that was completely focused on
13  that point.  So no, we're not using --
14  we're not planning a manuscript that is
15  focused on that particular point.
16  Q.   And you'd agree that FDA has
17  never come out and said that there should
18  be a 20-second reasonable and
19  conservative cutoff point at which the
20  risks outweigh the benefits for Xarelto?
21       MR. DENTON:  Object to form.
22       THE WITNESS:  I have seen --
23  I've seen the data that the FDA
24  has that shows the increased

1                monitoring for them.
2     BY MR. STEKLOFF:
3          Q.    We'll come back to
4     monitoring therapeutic range.  I want to
5     go back to the 20-second cutoff.
6          A.    Okay.  In the report.
7                MR. DENTON:  Are you done
8          with this article?
9                MR. STEKLOFF:  For now, yes.
10               THE WITNESS:  Want me to
11         just hold it -- hold it to the
12         side?
13    BY MR. STEKLOFF:
14         Q.    The court reporter will want
15    it anyways, so hold it to the side and we
16    may come back to it.
17         A.    Okay.  Thank you.
18         Q.    Going back to Page 14 of
19    your report.  Have you ever presented at
20    any sort of conference your opinion
21    offered here in the first paragraph on
22    Page 14 with regard to the 20-second
23    cutoff?
24         A.    Not at a national

Protected - Subject to Further Protective Review

1   conference.  In some of our teaching and
2   case and patient management conferences,
3   as part of our routine clinical care, we
4   have discussed Xarelto and, of course,
5   all the oral anticoagulants.  And we have
6   discussed monitoring and the questions of
7   monitoring, how to monitor, and risk.
8               So that has been a subject
9   of what we've discussed, but not -- but
10  we have not presented -- it hasn't
11  reached a level where we've presented it
12  at a national meeting or a -- a formal
13  type of meeting where there's an abstract
14  submitted and things like that.
15      Q.   All right.  Let me break
16  that down a little bit.
17              Can we agree that you have
18  not presented the opinion that Xarelto
19  should be discontinued in patients whose
20  PT is greater than 20 seconds, which you
21  believe is a reasonable and conservative
22  cut-off point at which the risks outweigh
23  any benefit at any formal type of meeting
24  or national conference?

```
 1                    MR. DENTON:  Object to the
 2           form.  Asked and answered.
 3                    THE WITNESS:  I would say --
 4           I would say the latter at a
 5           national conference.  But we -- we
 6           have had formal -- I mean, these
 7           are formal meetings.  There are --
 8           they are scheduled.  They are
 9           regularly attended by clinical
10           staff and other interested
11           individuals.
12   BY MR. STEKLOFF:
13           Q.   Bad question.  I didn't
14   break it down enough.
15           A.   That's all right.
16           Q.   I'm going to break it down
17   again.
18                    Can we agree that you have
19   not presented the opinion that Xarelto
20   should be discontinued in patients whose
21   PT is greater than 20 seconds at any
22   national conference?
23                    MR. DENTON:  Objection to
24           form.
```

1                THE WITNESS:  We have not
2       yet presented that data or opinion
3       at a national conference.
4  BY MR. STEKLOFF:
5       Q.   Now, my understanding is
6  that your testimony a moment ago was that
7  you have discussed all NOACs and
8  monitoring and therapeutic ranges within
9  Yale and amongst colleagues.  Is that
10 fair?
11      A.   As part of our normal
12 clinical management, these -- we have
13 patients on all NOACs, warfarin, and all
14 oral -- other oral anticoagulants.
15                And so it is a constant part
16 of our practice.  So we are always
17 discussing management, monitoring, and
18 trying to figure out the best patient
19 care possible.
20      Q.   I'm not trying to trick you
21 here.  The answer to my question was
22 simply a yes, right?
23                MR. DENTON:  Object to the
24       form.

Protected - Subject to Further Protective Review

1                THE WITNESS:  I'm sorry.
2                MR. DENTON:  What's the
3        question?
4    BY MR. STEKLOFF:
5        Q.    My question -- my question
6    that I asked, it -- the answer was yes,
7    right?  I'll read you the question again.
8        A.    Okay.  I'm sorry.
9        Q.    My question was, my
10   understanding is that your testimony a
11   moment ago was that you have discussed
12   all NOACs and monitoring and therapeutic
13   ranges within Yale and amongst
14   colleagues.  Is that fair?  The answer to
15   that is yes, right?
16       A.    As I said before, we've --
17   as part of our clinical care, we discuss
18   NOACs, we discuss monitoring, we discuss
19   all aspects of that.
20       Q.    Yes.  Now, you agree,
21   though, that you have never told your
22   colleagues at Yale in a clinical context
23   or any sort of meeting within -- of the
24   physicians at Yale that they should

Protected - Subject to Further Protective Review

1   discontinue or even consider
2   discontinuing their patients who are
3   taking Xarelto specifically if their
4   patients have a PT of 20 or greater?
5              MR. DENTON:  Object to the
6        form.
7              THE WITNESS:  So the answer
8        to that is I don't tell my
9        colleagues what to do.  We are --
10       we are a collegial group.  We work
11       together.
12             I will present data to them.
13             If we have data that
14       indicates that someone is a -- has
15       a high level of Xarelto on board
16       or is a high responder, I would
17       certainly present that as
18       information that would be of use
19       to the -- for the group to
20       consider in this patient's care.
21  BY MR. STEKLOFF:
22       Q.   Have you ever presented to
23  your colleagues a recommendation that as
24  a general matter they should consider

Golkow Technologies, Inc.                                    Page 52

1   discontinuing their patients who are
2   taking Xarelto if their PT is 20 seconds
3   or greater?
4             MR. DENTON:  Object to form.
5        Asked and answered.
6             THE WITNESS:  I don't
7        present to them in general
8        matters.
9             I present to them in
10       specific case management, patient
11       management aspects, and that data
12       would be included in our
13       discussion of that patient.  But
14       I'm not going to say that they
15       should generalize that to all of
16       their care.  I'm saying that I've
17       brought that up and that they
18       consider that in the specific
19       management of that specific
20       patient.
21  BY MR. STEKLOFF:
22       Q.   So you've never presented
23  the opinion offered on Page 14, which is
24  an opinion as a general matter, to your

Protected - Subject to Further Protective Review

1    colleagues at Yale; is that right?
2              MR. DENTON:  I object to the
3         form.  Asked and answered.
4              THE WITNESS:  So I'm a
5         little confused.  So I don't --
6         the writing of this report has a
7         different purpose.
8              I have spoken with my
9         colleagues in case management of
10        patients about what I know about
11        Xarelto and other oral
12        anticoagulants and their effect on
13        clotting times and the data that I
14        have summarized.
15             I've not -- I've not stood
16        up and put on the board, this is
17        the general rule.
18             I've simply discussed with
19        them what the data shows and let
20        them then apply that to the
21        individual patient.  And that
22        oftentimes turns into an involved
23        discussion about that patient.
24             But, again, I'm not dictating to

Protected - Subject to Further Protective Review

1          them.
2 BY MR. STEKLOFF:
3          Q. So you never, at a meeting
4 of your colleagues, have presented all of
5 the data that you believe supports your
6 opinion and said, as a general
7 consideration, as you treat your patients
8 who are taking Xarelto, you should
9 consider discontinuing them if their PT
10 is 20 seconds or greater; is that
11 correct?
12          MR. DENTON: Object to the
13          form. Asked and answered. This
14          is the last time he's going to
15          answer it, and we're moving on.
16 BY MR. STEKLOFF:
17          Q. Yes or no? Is that correct?
18          MR. DENTON: No, no, there's
19          no yes or no. He can answer the
20          question appropriately.
21          MR. STEKLOFF: Well, I would
22          like a yes or no answer.
23          MR. DENTON: Well, he's
24          going to give an accurate answer.

Protected - Subject to Further Protective Review

1          THE WITNESS:  With all due
2     respect, I don't believe that
3     physicians are -- in a case
4     management setting should ever
5     have presentations of data that
6     they feel is an absolute or a
7     general rule.  I don't think
8     that's appropriate.  I think it
9     stifles discussion.  I think it's
10    medically and scientifically
11    misleading and against the best
12    practice of a patient.
13          So presenting the data and
14    allowing for a meaningful
15    discussion is what's done.  But
16    somehow presenting it as an
17    absolute is just not -- that's
18    just not, I think, appropriate.
19  BY MR. STEKLOFF:
20     Q.    And for that reason, because
21  you don't think it's appropriate, you
22  have never presented the opinion offered
23  here on Page 14 as a general matter to
24  your colleagues at Yale.  Fair?

Protected - Subject to Further Protective Review

```
 1                  MR. DENTON:  No.  Objection.
 2          Move on.  I'm going to instruct
 3          him not to answer.  You've asked
 4          it eight or ten different ways.
 5          We're done with this topic.  Move
 6          on.
 7   BY MR. STEKLOFF:
 8          Q.     Are you following your
 9   counsel's instruction?
10          A.     Yes.
11                  MR. STEKLOFF:  He's not
12          answering the question.  I'm going
13          to continue to ask him.
14                  MR. DENTON:  I'm going to
15          continue telling him not to.
16          Anybody -- any reasonable reading
17          of this transcript would agree
18          with me.  So that's why I'm taking
19          the position.
20   BY MR. STEKLOFF:
21          Q.     Have you ever personally
22   told a patient whose PT was 20 or
23   greater, 20 seconds or greater, based on
24   Neoplastine taken between 13 and
```