UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
|    *ALL CASES* | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE CERTAIN TESTIMONY FROM J. MICHAEL GAZIANO, MD, MPH**

**I.   INTRODUCTION**

As demonstrated below, Defendants' arguments in response to Plaintiffs' motion to preclude Dr. Gaziano from testifying about the adequacy of the Xarelto label, the Xarelto dosing scheme, and the Time in Therapeutic Range ("TTR") data should be rejected. Dr. Gaziano lacks the requisite experience and is therefore not qualified to provide expert opinions on any of these matters.

**II.  ARGUMENT**

    **A.   Defendants mischaracterize Dr. Gaziano's proposed label testimony.**

Dr. Gaziano has readily admitted that he is not a labeling expert, and he is not familiar with the federal regulatory drug-labeling process:

> Q. Okay. When did you acquire expertise in labeling?
>
> A. I didn't say I was an expert in label. I said I was an expert in being able to interpret the data in the label.
>
> Q. Okay. Is it your intention to offer an expert opinion as to the adequacy of the label in this case?

A. So it's -- it's my opinion that the data that is contained in the Xarelto label is a reasonable reflection of the literature in the field.

Q. Okay. Have you ever drafted a label for a pharmaceutical product?

A. No, sir.

Q. Okay. Have you ever been asked by the FDA to consult on drug labeling?

A. No, sir.

Q. Are you familiar with the federal regulations concerning drug labeling?

A. Vaguely but not in excruciating detail.

Q. Okay. What do you base your labeling opinions on?

A. So I never said I have opinions on labeling. I have opinions on what's in the label, and what's – what is contained in the Xarelto label, I think, is an adequate reflection of the literature that's been published on Xarelto and a reasonable representation of that labeling for a clinician to be able to use that product.

Q. Okay. Your opinion that the Xarelto label is an adequate reflection of the literature, what is that based on?

A. It's based on the reading of the label and my understanding of the literature.

Q. Okay. Is that based on any set of standards?

    MR. PIORKOWSKI: Object to form.

A. It's based on my expertise in being able to interpret the literature and synthesize it, as I've done in many forum, whether it be a lecture or even a review, book chapter, paper.

Q. Okay. So your opinion that the label is adequate is based – is not based on any objective set of standards, correct?

    MR. PIORKOWSKI: Object to form.

> A. You sort of mischaracterized what I said. I said that the label is an adequate reflection of the literature on the topic and as that literature is translated for a clinician to use the – use the information in clinical practice.
>
> Q. And you're basing that on your own experience?
>
> A. Yes, sir.
>
> Q. Okay. You're not basing that on any FDA standards as to what should be contained in the label, correct?
>
> A. Correct.[1]

Despite this testimony, Defendants oppose the instant motion on grounds that Dr. Gaziano does not plan to testify that the label comports with legal or regulatory requirements. Defendants claim that he instead simply intends to offer testimony that the Xarelto label "clearly conveys the important safety and efficacy information" about Xarelto and is "a reasonable reflection of the literature" concerning "the clinical application" of Xarelto.[2] Defendants' claim is remarkable, based on semantics that highlight a distinction without a difference, and made to suit their own needs in an attempt to expose the jury to their self-serving evidence. Indeed, Dr. Gaziano's proffered testimony – that the Xarelto label reasonably reflects the existing literature – is tantamount to an opinion that the label is adequate as a matter of law.

*Daubert* requires a trial court to determine whether the expert is proposing to offer testimony that "will assist the trier of fact to understand or determine a fact in issue."[3] "*Daubert* requires admissible expert testimony to be both reliable and relevant."[4] "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is

---

[1] Plaintiffs' Exhibit 3, Gaziano Dep., at 33:2-35:12 (attached to Plaintiffs' opening memorandum).

[2] *See* Defendants' Opposition to Plaintiffs' Motion to Preclude Certain Testimony from J. Michael Gaziano, MD, MPH ("Def. Opp.") at 2-3.

[3] *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993).

[4] *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[5] The expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[6]

"The threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual has the qualifications to do so."[7] Here, after their expert conducted only a cursory review of the existing Xarelto literature, Defendants now propose to offer Dr. Gaziano's *ipse dixit* that the contents of the label are appropriate. This opinion, however, lacks any "reliable basis in the knowledge and experience of [the relevant] discipline."[8]

Dr. Gaziano admitted at his deposition that he has not tracked the history of the Xarelto label.[9] He testified that he has no experience drafting a drug label or been asked by the FDA to assist with label creation.[10] In fact, he stated that he is only "vaguely" familiar with the regulations that govern the label creation process.[11] Yet he somehow proposes to testify that the content of the Xarelto label includes the appropriate synthesis of existing clinical data.

Simply put, Dr. Gaziano's opinion about the Xarelto label is misleading, unhelpful, and uninformed. Because Dr. Gaziano does not possess the necessary expertise to offer an opinion about the contents of the Xarelto label, and his opinion in this regard is not based on sufficient evidence and is not the product of reliable methodology, his opinion should be excluded.

---

[5] *Id., quoting Daubert*, 509 U.S. at 592-93.

[6] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

[7] *See Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011), *citing* Fed. R. Evid. 702.

[8] *See Daubert,* 509 U.S. at 592; *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *Rhodes v. Bayer Healthcare Pharms., Inc.,* No. 10-cv-1695, 2013 WL 1289050, at *6-7 (W.D. La. Mar. 26, 2013) (holding that a doctor who had no regulatory or labeling experience was unqualified to give an opinion about the adequacy of a drug's warnings, and that his opinion also was not based on sufficient evidence and was not the product of a reliable methodology).

[9] *See* Plaintiffs' Exhibit 3, Gaziano Dep., at 234:6-10.

[10] *Id.* at 33:14-19.

[11] *Id.* at 33:20-23.

### B. Dr. Gaziano is not qualified to testify about Xarelto dosing.

According to Defendants, Dr. Gaziano's testimony regarding the dosing of Xarelto will be limited to his observation that the 15 mg and 20 mg doses selected by Defendants were proven to be safe and effective during the ROCKET AF trials, and he will not suggest that the selected doses were optimal or that existing data would not support a decision to select other doses.[12]

Defendants contend that Dr. Gaziano is qualified to offer the above opinions despite multiple failures on his part to review important dosing information. For example, Dr. Gaziano admits that he did not review all of the preclinical dosing studies that led to Defendants' decision to use 15 mg and 20 mg doses, nor did he review the correspondence between Janssen and the FDA questioning Defendants' dosing selections.[13] Dr. Gaziano also admits that he did not review Defendants' internal discussions regarding dosing, or their communications with outside consultants.[14] He also admits that he did not review most of the rivaroxaban pharmacology papers or any Bayer papers regarding pharmacokinetic dosing models.[15] Further, by conceding that he does not know whether the approved doses are optimal, Dr. Gaziano admits that he does not know which doses are safest. Such proposed expert testimony under these circumstances is unreliable and inadmissible under *Daubert* and its progeny.

---

[12] *See* Def. Opp. at 4-5. It is worth noting that ROCKET AF was not a dosing study, meaning it was not designed to compare doses or to determine the relationship of one dose to another. In fact, the FDA questioned the use of the doses selected by Defendants, but it lacked the statutory authority to dictate Defendants' dosage selection. *See* Exhibit 7, FDA Summary Review, at 3 (attached) ("There was no rational basis for the applicant's choice of the dose tested in ROCKET, 20 mg once a day. The pharmacokinetic/pharmacodynamic properties of rivaroxaban suggest the drug should be administered twice a day."); Exhibit 8, Nissen Testimony, at 287:15-18 (attached) ("[M]y concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and that was a mistake.").

[13] *See* Plaintiffs' Exhibit 3, Gaziano Dep., at 117:17-25, 124:6-19, 151:6-16.

[14] *Id.* at 118:12-20, 120:6-20.

[15] *Id.* at 126:11-18, 128:11-129:5, 234:23-235:5.

"[T]he Supreme Court recognized … that although an expert may extrapolate his opinions from existing data, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[16] The proponent of the expert testimony "must demonstrate that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable."[17]

As with his opinion regarding the adequacy of the Xarelto label, Dr. Gaziano's opinion about Xarelto dosing falls far short of the rigorous standard required under *Daubert* and its progeny. It is not based on sufficient knowledge or preparation, and it misrepresents the nature of the ROCKET AF study. Consequently, Dr. Gaziano's opinion about Defendants' Xarelto dosing regimens should be excluded.

### C. Dr. Gaziano is not qualified to testify regarding "real world" TTR values.

Finally, Defendants argue that Dr. Gaziano is qualified to testify that the time in therapeutic range ("TTR") achieved in ROCKET AF is comparable to TTRs achieved in "real world" clinical settings.[18] But like his other opinions, Dr. Gaziano's deposition testimony demonstrates that he lacks sufficient experience under the *Daubert* standard to testify as an expert on "real world" TTRs.

Defendants cite *Vioxx* for the proposition that an expert may testify based on personal experience provided that the experience is supported by "scientifically reliable data."[19] However,

---

[16] *In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 616 (E.D. La. 2003), *quoting Gen. Elec.,* 522 U.S. at 146 (internal quotations and citations omitted).

[17] *See Curtis v. M&S Petroleum*, 174 F.3d 661, 668 (5th Cir. 1999) (citation omitted).

[18] Def. Opp. at 5.

[19] *Id.* at 6, *citing In re Vioxx Prods. Liab. Litig.*, 401 Supp. 2d 565, 580 (E.D. La. 2005).

Defendants do not even attempt to demonstrate that Dr. Gaziano meets that burden. Instead, they merely imply that "Dr. Gaziano's experience and review of the literature" somehow act as an effective substitute for the "scientifically reliable data" required under the *Vioxx* standard.[20] In fact, it is clear from Dr. Gaziano's testimony that he is not able to support his opinion with scientifically reliable data:

> Q. Other than taking your word for it, is there anything I could do to validate what your patients and your practice time within therapeutic range is for warfarin?
>
> A. What my patients or the patients in general at the institutions that I work you could – you could look at – I don't know that we've done a specific study, but if you wanted to, you could pull the data on all the INRs that have been drawn on either all the patients that go to the clinic like I send my patients or all of my patients within that clinic over the last 20 years and look at the time that they spend in that therapeutic range.
>
> Q. Okay. But you haven't done that yourself?
>
> A. No, no, but I read the literature.
>
> Q. Okay. But you're speculating about patients in your own practice, correct?
>
> A. Well, yes.[21]

Compounding his rank speculation, Dr. Gaziano does not cite to *any* warfarin literature in his report to support his assertion that the TTR in ROCKET AF is "in the range that would be expected in many real world settings."[22] Moreover, during his deposition, Dr. Gaziano was unable to name a single study to support this assertion.[23]

---

[20] *Id.*

[21] Plaintiffs' Exhibit 3, Gaziano Dep., at 195:25-196:19.

[22] *See* Plaintiffs' Exhibit 1, Gaziano Report, at 15 (attached to Plaintiffs' opening memorandum).

[23] Plaintiffs' Exhibit 3, Gaziano Dep., at 194:11-199:19.

Defendants argue that Dr. Gaziano's clinical experience with warfarin qualifies him to testify regarding what should be considered normal TTR levels, claiming that Dr. Gaziano's role as the founder and manager of his preventative cardiology clinic is "far more important" than the fact that he does not currently see in-hospital patients.[24] But as Plaintiffs have repeatedly pointed out, Dr. Gaziano's personal experience with warfarin treatment and management is limited, particularly in recent years. As Dr. Gaziano admitted at his deposition, he does not see all of the patients at his clinic and he is no longer directly involved in inpatient treatment at the hospitals where he is employed.[25] His "prescribing" typically involves co-signing the note of a resident or fellow.[26] This indirect exposure to warfarin treatment, management, and resulting TTR values cannot render him an expert in this area.

Moreover, Dr. Gaziano's opinion about typical TTR values is based on hearsay. As noted above, his opinion regarding "real world" TTR ranges comes primarily from values obtained by other physicians practicing at his clinic, which have not been compiled and assessed. He does not attempt to support his opinion with documentation from the clinic, and he does not delineate any other source for his beliefs. Instead, Dr. Gaziano simply states that "[t]he TTR for ROCKET is in the range that would be expected in many real world settings."[27] Thus, Dr. Gaziano's opinion is based on TTR values of unknown quantities and origins – values that are impossible to verify. These data are hearsay; they do not fall within any exceptions to the hearsay rule;[28] and they should not be exempt from the normal requirements of admissibility.

---

[24] Def. Opp. at 6.

[25] Plaintiffs' Exhibit 3, Gaziano Dep., at 38:20-39:2; 50:3-9; 50:19-51:9.

[26] *Id.* at 44:10-21.

[27] Plaintiffs' Exhibit 1, Gaziano Report, at 15.

[28] *See* Fed. R. Evid. 801, 803.

### III.     CONCLUSION

For all the above reasons, as well as those set forth in Plaintiffs' opening memorandum, Plaintiffs respectfully request that Dr. Gaziano be precluded from testifying on the above subjects.

Dated: March 10, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 10, 2017, the foregoing memorandum was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**