FOOD AND DRUG ADMINISTRATION

CENTER FOR DRUG EVALUATION AND RESEARCH

CARDIOVASCULAR & RENAL DRUGS ADVISORY COMMITTEE

THURSDAY, SEPTEMBER 8, 2011

8:00 a.m. to 5:00 p.m.

Marriott Inn & Conference Center

University of Maryland University College (UMUC)

3501 University Boulevard

Adelphi, Maryland

1        **Meeting Roster**

2   **DESIGNATED FEDERAL OFFICER (Non-Voting)**

3   ==**Kristina A. Toliver, Pharm.D.**==

4   Division of Advisory Committee and

5   Consultant Management

6   Office of Executive Programs

7   Center for Drug Evaluation and Research (CDER), FDA

8

9   **CARDIOVASCULAR AND RENAL DRUGS ADVISORY COMMITTEE**

10  **MEMBERS (Voting)**

11  ==**Allan Coukell, B.Sc., Pharm.**==

12  ***(Consumer Representative)***

13  Director, The Pew Prescription Project

14  Pew Health Group

15  The Pew Charitable Trusts

16  Washington, District of Columbia

17

18

19

20

21

22

1    **Sanjay Kaul, M.D.**

2    Director, Cardiovascular Diseases Fellowship

3    Training Program

4    Cedars-Sinai Heart Institute

5    Professor, David Geffen School of Medicine at

6    UCLA Division of Cardiology

7    Cedars- Sinai Medical Center

8    Los Angeles, California

9

10   **Mori Krantz, M.D., F.A.C.C.**

11   Associate Professor, Cardiology

12   University of Colorado

13   Denver Health Medical Center

14   Denver, Colorado

15

16   **Darren K. McGuire, M.D., M.H.Sc.,F.A.C.C.**

17   Associate Professor of Medicine

18   University of Texas Southwestern Medical Center

19   Dallas, Texas

20

21

22

1  CARDIOVASCULAR AND RENAL DRUGS ADVISORY COMMITTEE

2  MEMBER (Non-Voting)

3  **Jonathan Fox, M.D.**, Ph.D., F.A.C.C.

4  *(Industry Representative)*

5  Vice President, Clinical Therapeutic Area

6  Cardiovascular and Gastrointestinal Diseases

7  AstraZeneca LP

8  Wilmington, Delaware

9

10  TEMPORARY MEMBERS (VOTING)

11  **Scott Emerson, M.D., Ph.D.**

12  Professor of Biostatistics

13  Department of Biostatistics

14  University of Washington

15  Seattle, Washington

16

17  **Thomas Fleming, Ph.D.**

18  Professor, Department of Biostatistics

19  University of Washington

20  Seattle, Washington

21

22

1    **Andrei Kindzelski, M.D.**

2    Medical Officer, Program Director

3    Thrombosis and Hemostasis Branch

4    Division of Blood Diseases and Resources

5    National Heart, Lung, and Blood Institute, NIH

6    National Institutes of Health

7    Bethesda, Maryland

8

9    **A. Michael Lincoff, M.D.** *(Acting Chair)*

10    Vice Chairman, Department of Cardiovascular

11    Medicine

12    Director, C5Research (Cleveland Clinic

13    Coordinating Center for Clinical Research)

14    Professor of Medicine

15    Cleveland Clinic

16    Cleveland, Ohio

17

18    **Debra McCall, B.S., MAM**

19    *(Patient Representative)*

20    Murrieta, California

21

22

1   **Steven Nissen, M.D.**

2   Chair, Department of Cardiovascular Medicine

3   Cleveland Clinic Foundation

4   Heart and Vascular Institute

5   Cleveland, Ohio

6

7   **Vasilios Papademetriou, M.D.**

8   Staff Cardiologist

9   Veterans Affairs Medical Center

10  Washington, District of Columbia

11

12  **Philip Sager, M.D.**

13  Pharmaceutical Consultant and Chair, Scientific

14  Programs Committee

15  Executive Committee Member, Cardiac Safety Research

16  Consortium

17  San Francisco, California

18

19

20

21

22

```
 1     FDA PARTICIPANTS (Non-Voting)

 2     Norman Stockbridge, M.D., Ph.D.

 3     Director, Division of Cardiovascular and Renal

 4     Drug Products

 5     Office of Drug Evaluation I, CDER

 6

 7     Robert Temple, M.D.

 8     Director, Office of Drug Evaluation I, CDER

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

```
1                       C O N T E N T S

2      AGENDA ITEM                                    PAGE

3      Call to Order and Opening Remarks

4      Introduction of Committee

5           Michael Lincoff, M.D.                      10

6      Conflict of Interest Statement

7           Kristina Toliver, Pharm.D.                 13

8      Opening Remarks

9           Norman Stockbridge, M.D., Ph.D.            17

10     Sponsor Presentation - Johnson & Johnson

11     Pharmaceutical Research and Development, LLC

12     Introduction

13           Gary Peters, M.D.                         26

14     Medical Landscape & Study Design

15           Kenneth Mahaffey, M.D.          .         31

16     Efficacy

17           Robert Califf, M.D.                       45

18     Safety

19           Christopher Nessel, M.D.        .         58

20     Key Issues, Benefit Risk and Conclusions

21           Robert Califf, M.D.                       64

22
```

C O N T E N T S (continued)

1   AGENDA ITEM                                    PAGE

2   Clarifying Questions for Sponsor Presenters    117

3   FDA Presentation – NDA 202439

4   Dose Selection

5        Preston Dunnmon, M.D.                      178

6   Issues Affecting Interpretation of the

7   Efficacy Data

8        Martin Rose, M.D., J.D.                    190

9   Clarifying Questions for FDA Presenters        227

10  Questions to the CRDAC and Discussion          279

11  Adjournment                                    417

1              <u>P R O C E E D I N G S</u>

2                   (8:01 a.m.)

3         **Call to Order and Opening Remarks**

4              **Introduction of Committee**

5         DR. LINCOFF:  Good morning.  I would first

6    like to remind everyone present to please silence

7    your cell phones, Blackberries, and other devices

8    if you've not already done so.  I'd also like to

9    identify the FDA press contact, Ms. Sandy Walsh.

10   If you're here, please stand.  Thank you.

11        My name is Mike Lincoff.  I'm the acting

12   chair of the Cardiovascular and Renal Drugs

13   Advisory Committee.  I will now call the meeting of

14   the Cardiovascular and Renal Drugs Advisory

15   Committee to order.  We'll go around the room and

16   identify ourselves.  We'll start with the FDA, and

17   Dr. Stockbridge to my left, and go around the

18   table.

19        DR. STOCKBRIDGE:  Good morning.  I'm Norman

20   Stockbridge.  I'm the director of the Division of

21   Cardiovascular and Renal Products at FDA.

22        DR. FLEMING:  Tom Fleming, University of

1    Washington.

2            DR. SAGER:  Philip Sager, consultant and

3    chair of the Scientific Programs Committee of the

4    Cardiac Safety Research Consortium.

5            DR. NISSEN:  Steve Nissen, Cleveland Clinic.

6            DR. MCGUIRE:  Good morning, Darren McGuire,

7    UT Southwestern Medical Center in Dallas.

8            DR. KRANTZ:  Good morning, Mori Krantz, a

9    cardiologist, University of Colorado.

10           DR. TOLIVER:  Kristina Toliver, designated

11   federal officer, Cardiovascular and Renal Drugs

12   Advisory Committee.

13           DR. LINCOFF:  Mike Lincoff from the

14   Cleveland Clinic.

15           DR. KAUL:  Sanjay Kaul, cardiologist,

16   Cedars-Sinai Medical Center in UCLA.

17           MR. COUKELL:  Good morning, Allan Coukell.

18   I'm a pharmacist with the Pew Health Group and the

19   consumer representative to the committee.

20           MS. MCCALL:  Good morning.  Debbie McCall.

21   I'm an AFIB patient.

22           DR. EMERSON:  Scott Emerson,

1    biostatistician, University of Washington.

2            DR. FOX:  Jonathan Fox.  I'm a cardiologist

3    with AstraZeneca in clinical development.  I'm the

4    industry representative to the committee.

5            DR. KINDZELSKI:  Andrei Kindzelski, medical

6    officer, NHLBI, NIH.

7            DR. LINCOFF:  For topics such as those being

8    discussed at today's meeting, there are often a

9    variety of opinions, some of which are quite

10   strongly held.  Our goal is that today's meeting

11   will be a fair and open forum for discussion of

12   these issues, and that individuals can express

13   their views without interruption.  Thus, as a

14   gentle reminder, individuals will be allowed to

15   speak into the record only if recognized by the

16   Chair.  We look forward to a productive meeting.

17           In the spirit of the Federal Advisory

18   Committee Act and the Government in the Sunshine

19   Act, we ask that the advisory committee members

20   take care that their conversations about the topic

21   at hand take place in the open forum of the

22   meeting.  We are aware that members of the media

1    are anxious to speak with the FDA about these

2    proceedings.  However, FDA will refrain from

3    discussing the details of this meeting with the

4    media until its conclusion.  Also, the committee is

5    reminded to please refrain from discussing the

6    meeting topics during breaks or lunch.  Thank you.

7         Now, Kristine Toliver will read the conflict

8    of interest statement.

9              **Conflict of Interest Statement**

10        DR. TOLIVER:  The Food and Drug

11   Administration is convening today's meeting of the

12   Cardiovascular and Renal Drugs Advisory Committee

13   under the authority of the Federal Advisory

14   Committee Act of 1972.  With the exception of the

15   industry representative, all members and temporary

16   voting members of the committee are special

17   government employees, SGEs, or regular federal

18   employees from other agencies, and are subject to

19   federal conflict of interest laws and regulations.

20        The following information on the status of

21   this committee's compliance with federal ethics and

22   conflict of interest laws, covered by but not

1   limited to, those found at 18 U.S.C., Section 208

2   and Section 712 of the federal Food, Drug, and

3   Cosmetic Act is being provided to participants in

4   today's meeting and to the public.

5       FDA has determined that members and

6   temporary voting members of this committee are in

7   compliance with the federal ethics and conflict of

8   interest laws.  Under 18 U.S.C., Section 208,

9   Congress has authorized FDA to grant waivers to

10   special government employees and regular federal

11   employees who have potential financial conflicts

12   when it is determined that the agency's need for a

13   particular individual's services outweighs his or

14   her potential financial conflict of interest.

15   Under Section 712 of the FD&C Act, Congress has

16   authorized FDA to grant waivers to special

17   government employees and regular federal employees

18   with potential financial conflicts, when necessary,

19   to afford the committee essential expertise.

20       Related to the discussion of today's

21   meeting, members and temporary voting members of

22   this committee have been screened for potential

1  financial conflicts of interest of their own, as

2  well as those imputed to them, including those of

3  their spouses or minor children, and, for purposes

4  of 18 U.S.C. Section 208, their employers.  These

5  interests may include investments, consulting,

6  expert witness testimony, contracts, grants,

7  CRADAs, teaching, speaking, writing, patents and

8  royalties, and primary employment.

9       Today's agenda involves the discussion of

10  the new drug application, NDA202439, rivaroxaban

11  tablets, submitted by Johnson & Johnson

12  Pharmaceutical Research and Development, LLC, on

13  behalf of Ortho-McNeil-Janssen Pharmaceuticals for

14  the prevention of stroke and systemic embolism,

15  blood clots other than in the head, in patients

16  with nonvalvular atrial fibrillation, abnormally

17  rapid contractions of the atria, the upper chambers

18  of the heart.

19       This is a particular matters meeting, during

20  which the specific matters related to NDA202439,

21  rivaroxaban tablets, will be discussed.  Based on

22  the agenda for today's meeting and all financial

1    interests reported by the committee members and

2    temporary voting members, no conflict of interest

3    waivers have been issued in connection with this

4    meeting.  To ensure transparency, we encourage all

5    standing committee members and temporary voting

6    members to disclose any public statements they have

7    made concerning the product at issue.

8         With respect to FDA's invited industry

9    representative, we would like to disclose that

10   Dr. Jonathan Fox is participating in this meeting

11   as a non-voting industry representative, acting on

12   behalf of regulated industry.  Dr. Fox's role at

13   this meeting is to represent industry in general

14   and not any particular company.  Dr. Fox is

15   employed with AstraZeneca.

16        We would like to remind members and

17   temporary voting members that if the discussions

18   involve any other products or firms not already on

19   the agenda for which an FDA participant has a

20   personal or imputed financial interest, the

21   participants need to exclude themselves from such

22   involvement, and their exclusion will be noted for

1    the record.  FDA encourages all other participants

2    to advise the committee of any financial

3    relationships that they may have with the firm at

4    issue.  Thank you.

5           DR. LINCOFF:  We'll now proceed with the

6    sponsor presentations.  Both the Food and Drug

7    Administration and the public believe in a

8    transparent process for information gathering and

9    decision making.  To ensure such transparency of

10   the advisory committee meeting, FDA believes it is

11   important to understand the context of an

12   individual's presentation.

13          I'm sorry.  I've moved ahead.

14          First, we'll start with Dr. Stockbridge's

15   opening remarks.

16                    **Opening Remarks**

17          DR. STOCKBRIDGE:  Actually, I think

18   Dr. Temple and I both have a couple of words to

19   say.  I'll be very brief.

20          Welcome back to many of you, and welcome

21   aboard to some of you new to the committee.  I

22   wanted to emphasize that no regulatory decision has

1    been made on this application.  And I'd

2    characterize our internal discussions so far as

3    being fairly ambivalent on it.  So what the

4    committee does today is likely to have considerable

5    influence on us.

6         No one, I believe, doubts that rivaroxaban

7    is effective in preventing stroke in patients with

8    AF; that is, what the result would be of a placebo-

9    controlled trial.  Nor are there safety issues that

10   would cause one to question that the stroke-

11   reduction benefit was, on the whole, worthwhile.

12   But a placebo-controlled trial was not possible

13   because, of course, several treatments are

14   available that prevent irreversible harm in this

15   setting, making a placebo control unethical.

16        By at least one analysis, rivaroxaban was

17   superior to warfarin in the ROCKET AF study.

18   Nevertheless, the clinical reviewers, from whom

19   you'll hear later today, questioned whether the

20   study can be interpreted as showing that

21   rivaroxaban is even as good as warfarin.

22        You'll be asked what you think about that

1    and how good a new drug for stroke prevention needs

2    to be in 2011.  You're also going to hear about

3    whether adequate instructions for use exist for

4    rivaroxaban, a concern that stems from the strokes

5    observed in patients transitioning from rivaroxaban

6    to warfarin at the end of the ROCKET study.

7         Late in the day, you're going to be asked to

8    vote whether you think that rivaroxaban should be

9    approved for the treatment of AF.  This is always a

10   dramatic moment, and the drama is heightened by the

11   formal process of voting that we implement to keep

12   you from influencing your colleagues around the

13   table.  The press is going to make much of what

14   your vote is.

15        As those of you who are veterans of the

16   committee know, we don't actually care how you

17   vote.  We do care about why you vote the way you

18   do, and how you interpret the findings, and what

19   you value in coming to your decision.  So we would

20   ask that as you explain what your thought process

21   is, you make sure that we understand all of that.

22             So, again, thank you all for coming, and we

1    look forward to an interesting discussion.

2          Bob?

3          DR. TEMPLE:  Yes.  Let me welcome everyone,

4    too.  We care a little bit about your vote, but as

5    Norm says, more about the reasoning behind it.

6    I'll try not to repeat much of what Norm said.  I

7    mean, in some sense, the drug we're looking at here

8    and the ROCKET study that supports it is relatively

9    straightforward.  They're familiar to us because

10   other studies of other drugs have been carried out

11   with sort of similar results.

12         I wanted to say a little bit about non-

13   inferiority studies, and the designs, and what

14   we've done over the years to say what the standards

15   should show.  So ROCKET AF was designed as a non-

16   inferiority study.  That means it was intended to

17   exclude a loss of the effect of the control agent,

18   warfarin; loss of too much of the effect of the

19   control agent, warfarin.

20         In this case, because the effect of warfarin

21   is very large, the non-inferiority margin was quite

22   large.  We agreed, in advance, that the study would

1   need to show that it preserved not just any of the

2   effect of warfarin, but 50 percent of it.

3           People are sometimes curious about the fact

4   that non-inferiority studies allow the loss of as

5   much as 50 percent of the enormously-valued effect

6   of the control agent.  But the reason is much

7   practical as anything else.  If you try to design

8   studies that preserve all of let's say,

9   10 percent -- or show that you've ruled out a loss

10  of 10 percent, you get studies in the hundred-

11  thousands and things like that, and so we have done

12  that.

13          It is worth remembering that when you rule

14  something out statistically, what you've ruled out

15  is not the only measurement you have.  When you

16  show the drug is effective compared to placebo at

17  .05, you've merely shown that it has some effect

18  greater than 0.  In fact, people look at the point

19  estimate of the effect and other things.

20          So in a non-inferiority study, when you rule

21  out a loss of 25, 50, or whatever percent it is,

22  you also have the point estimate of the two drugs

1  effects to look at.  And as a practical matter,

2  non-inferiority studies frequently give point

3  estimates that are right near 1, or, as in the case

4  at least by some analyses, better than 1 here.

5       The non-inferiority guidance that we wrote

6  and the whole concept of non-inferiority studies

7  is, in some way, a reflection of the Clinton-Gore

8  document that's going to be discussed later.  That

9  document, which was actually designed to

10  communicate to the outside world that we were not

11  imposing relative effectiveness requirements on

12  things, made an exception.  It said when the value

13  of an existing drug is very great, like it improves

14  survival or something like that, we really do care

15  about how a new drug compares to that drug.  And in

16  some sense, the non-inferiority approach, which has

17  greatly expanded since Clinton and Gore were in

18  office because there are so many drugs that clearly

19  work and have major effects, is, in some ways, the

20  manifestation of how we implemented that.

21       So it's worth looking at the standards we

22  impose and the expectations to see how we have

1    manifested it -- I mean, in a certain sense, proven

2    that a new drug is no worse than previous drugs;

3    that it's equivalent.  The only way to absolutely

4    show that is to show that it's superior.  That has

5    not, historically, been the requirement.  All these

6    are matters that one could realistically discuss.

7         I guess the only other thing I'd point out

8    is that apart from the magnitude of the effect

9    here -- oh, sorry.  I wanted to say one other

10   thing.  You can't have all this discussion without

11   being aware, at least as a background matter, that

12   there's a drug recently approved for this same use

13   that was shown to be superior to warfarin, and that

14   is plainly on people's minds.

15        What I think the main effect of this

16   is -- before dabigatran, if someone had come to us

17   with a drug that was reasonably close to warfarin,

18   even if it wasn't necessarily just as good, we

19   would have said, oh, that's fine, because a lot of

20   people have a lot of trouble taking warfarin.  And

21   I don't think there would have been that much worry

22   about exactly how effective it was.  I think the

1    existence of a drug that's clearly just as good

2    changes that, so that there is now interest in

3    whether the new agent is reasonably close to

4    warfarin, whether that's been manifested.  And as

5    you'll hear -- I'm not going to get into

6    that -- there's concern in this study about whether

7    warfarin was used fully, always a question in a

8    non-inferiority study, because one of the crucial

9    assumptions of a non-inferiority study is the so-

10   called constancy assumption, namely, that the drug

11   is having the effect that you calculated that it

12   had when you set the non-inferiority margin before.

13        So, in this case, as will be discussed at

14   great length, whether warfarin was used reasonably

15   well is going to be an important issue and that

16   should not surprise anybody.  The other question

17   you will hear -- this also is related to what the

18   primary endpoint was.  The primary endpoint here

19   was the as-treated endpoint.  Then on that

20   endpoint, the new drug looks quite good compared to

21   warfarin as used.  When you add in events that

22   happened shortly after discontinuation, it doesn't

1  look quite as good, and there was an increase after

2  the drug was stopped in certain events.  And that

3  needs to be looked at closely because people do

4  stop therapy.

5       So that, to my eye, apart from the magnitude

6  of the effect, what happened there is the second

7  major one of the two major issues.  You will hear

8  great attention to large numbers of other issues,

9  and I don't want to anticipate all that, but we

10  welcome your comments, and thanks for coming.

11       DR. LINCOFF:  If my apparent dyslexia is not

12  interfering, it looks like the next point on this

13  agenda now is the sponsor presentations.  So both

14  the FDA and the public believe in a transparent

15  process for information gathering and decision

16  making.  To ensure such transparency of the

17  advisory committee meeting, FDA believes that it's

18  important to understand the context of an

19  individual's presentation.

20       For this reason, FDA encourages all

21  participants, including the sponsor's non-employee

22  presenters, to advise the committee of any

1    financial relationships that they have with the

2    firm at issue, such as consulting fees, travel

3    expenses, honoraria, and interest in the sponsor,

4    including equity interests and those based upon the

5    outcome of the meeting.  Likewise, FDA encourages

6    you, at the beginning of your presentation, to

7    advise the committee if you do not have any such

8    financial relationships.  If you choose not to

9    address this issue of financial relationships at

10   the beginning of your presentation, it will not

11   preclude you from speaking.

12        So now we'll begin with the presentations

13   from the sponsor.

14   **Sponsor Presentation - Gary Peters**

15        DR. PETERS:  Good morning, Mr. Chairman,

16   members of the committee, ladies and gentlemen.  My

17   name is Gary Peters.  I'm the cardiovascular

18   development vice-president for Johnson & Johnson

19   Pharmaceutical Research & Development.  Today, it

20   is my privilege to presentation rivaroxaban, a

21   novel oral anticoagulant.

22        The schedule for the upcoming presentation

1    is displayed on this slide.  Two of the presenters,

2    Drs. Kenneth Mahaffey and Robert Califf, are

3    external experts in cardiovascular disease from

4    Duke University.  Both were on the executive

5    committee for the ROCKET AF study, with Dr. Califf

6    co-chairing this committee.  Other external experts

7    in hepatology and hematology are also present today

8    and available to discuss specific questions as they

9    arise.

10        The proposed indication under consideration

11    today is that rivaroxaban is indicated for the

12    prevention of stroke and systemic embolism in

13    patients with nonvalvular atrial fibrillation.  Our

14    presentations will show that rivaroxaban should be

15    approved for this indication for the reasons stated

16    on this slide.

17        ROCKET AF was a well-designed and executed

18    double-blind, global clinical study with an

19    intentional focus on higher stroke-risk patients.

20    The study results robustly demonstrate the non-

21    inferior efficacy of rivaroxaban compared with

22    warfarin, and there were fewer primary endpoint

1    events while on rivaroxaban treatment.  The safety

2    evaluation of rivaroxaban was also favorable, with

3    no differences in overall discontinuations or

4    bleeding events.

5         Finally, the clinically most important types

6    of bleeding events, intracranial hemorrhage and

7    those with a fatal outcome, were reduced with

8    rivaroxaban.  As you have heard, the sponsor and

9    FDA agree on these efficacy and safety analyses.

10        The important points we will review today

11   are summarized here.  First, the impact of the

12   observed 55-percent warfarin group INR time in

13   therapeutic range, TTR, on the study results is

14   limited for the following reasons.  TTR is a

15   biomarker that estimates the daily INR value

16   between two actual measurements for each patient.

17   It has high variability of both the patient and the

18   center level and has not been validated for cross-

19   study comparisons.  The TTR differences between

20   ROCKET AF and other recent studies are explainable

21   by the different distributions of patient

22   characteristics and country enrollment.

1        There is little relationship between TTR and

2    the treatment effect at either the center or the

3    region level.  In addition, the observed risk-

4    adjusted event rates for the warfarin group in

5    ROCKET AF were comparable to all recent studies.

6    This indicates well-managed warfarin therapy.

7        The increase in post-treatment thrombotic

8    events at the end of the study was related to the

9    double-blind study process for transition to open-

10   label therapy and can be avoided in clinical

11   practice by allowing overlap of rivaroxaban with

12   warfarin therapy.  The data supporting these

13   statements will be presented in detail by

14   Dr. Califf.

15        Rivaroxaban is an oral direct factor 10A

16   inhibitor.  Factor 10A catalyzes the conversion of

17   prothrombin to thrombin.  Rivaroxaban selectively

18   and directly acts on factor 10A without the

19   requirement for any co-factors.  Rivaroxaban

20   inhibits not only free factor 10A, but also

21   inhibits clot-associated factor 10A.  By virtue of

22   where it acts in the coagulation cascade,

1    rivaroxaban inhibits thrombin generation, as

2    opposed to blocking the activity of thrombin that

3    is already present.

4         Rivaroxaban has predictable pharmacokinetic

5    and pharmacodynamic properties that have been well

6    characterized in dedicated phase 1 studies and

7    phase 2, 3 population modeling.  Rivaroxaban has

8    high oral bioavailability when administered with

9    food and multiple routes of elimination.  It has

10   limited potential for clinically important

11   drug-drug interactions with very few restrictions

12   applied in the phase 3 study.  These properties

13   support once-daily oral dosing without routine

14   coagulation monitoring, as studied in ROCKET AF.

15        Rivaroxaban is being jointly developed by

16   Bayer Healthcare and Johnson & Johnson

17   Pharmaceutical Research and Development in the five

18   indications listed here:  the prevention of venous

19   thromboembolism in patients undergoing hip and knee

20   replacement surgery, which received approval in the

21   United States on July 1st of this year; secondary

22   prevention of myocardial infarction, stroke, and

1    death in patients after an acute coronary syndrome;

2    prevention of venous thromboembolism in patients

3    with acute medical illnesses; treatment and

4    secondary prevention of venous thromboembolism; and

5    for stroke and embolism prevention in atrial

6    fibrillation.

7         The primary focus of today's discussion will

8    be on the ROCKET development program in patients

9    with atrial fibrillation.  Over 60,000 patients

10   will have participated when these studies are

11   finished.

12        Now, I'd like to introduce Dr. Kenneth

13   Mahaffey.  Dr. Mahaffey is a cardiologist at Duke

14   University with extensive experience in

15   cardiovascular study design and conduct.  He will

16   present an overview of the current state of

17   thrombosis, prophylaxis, and atrial fibrillation,

18   and the ROCKET AF study design.

19        Dr. Mahaffey?

20   **Sponsor Presentation – Kenneth Mahaffey**

21        DR. MAHAFFEY:  Thank you, Gary.

22        Mr. Chairman, ladies and gentlemen, good

1   morning.  My full financial disclosures can be

2   found on the website www.dcri.org.  Relevant to

3   today, my institution, DCRI, has received research

4   grants from J&J for the ROCKET AF trial, and I am

5   being compensated for my time.  I have no equity in

6   the companies, nor do I have any benefit based on

7   the outcome of these proceedings.

8        It's going to be my pleasure this morning to

9   briefly review for you the medical landscape of

10  atrial fibrillation, and then describe for you the

11  ROCKET AF study design on behalf of the ROCKET AF

12  investigators.

13       Millions of patients in the United States

14  and around the world have atrial fibrillation.  And

15  as our populations continue to age, the prevalence

16  will increase.  There is a clear association with

17  increased risk of stroke in atrial fibrillation.

18  And anticoagulant therapy has shown to be able to

19  lower the risk of stroke.  Unfortunately, many

20  patients are not treated with this agent or treated

21  optimally.  Novel oral anticoagulants may offer

22  stroke protection comparable to the vitamin K

1  antagonists, but may also have additional clinical

2  benefits.

3  Twenty percent of all strokes occur in

4  patients with atrial fibrillation.  And,

5  unfortunately, these strokes are associated with

6  substantial morbidity and mortality, both acutely

7  and in long-term follow-up.  It is believed to be

8  due, in part, to the fact that strokes associated

9  with atrial fibrillation are larger and more

10  frequently have hemorrhagic transformation.

11  Cardiovascular societies have published

12  guidelines with recommendations about therapies for

13  thromboembolic prophylaxis in patients with atrial

14  fibrillation.  For patients without risk factors

15  for stroke, aspirin is recommended.  For patients

16  with at least one moderate risk factor, aspirin,

17  warfarin, or now, alternatively dabigatran is

18  recommended.  In patients at higher risk for

19  stroke, warfarin or dabigatran is recommended in

20  these guidelines.

21  The benefits of warfarin are well

22  recognized.  These data from Singer and colleagues

1   in the ATRIA study show, very importantly, however,

2   that the net clinical benefit associated with

3   warfarin is particularly prominent in patients with

4   higher risk for stroke, here shown by the CHADS2

5   score, with CHADS2 scores of 2, 3, or higher.

6          As I've mentioned, unfortunately, patients

7   are not often treated with warfarin when they are

8   candidates to be treated.  And when warfarin is

9   used, it's suboptimally managed.  There is much

10  literature published in this regard.  These data,

11  from a systematic overview of U.S. experiences,

12  published by Baker and colleagues two years ago,

13  show that when warfarin is managed by

14  anticoagulation clinics, in the top part of this

15  slide, only 63 percent of the time is the INR in

16  the therapeutic range of 2.0 to 3.0.

17         More importantly, in community-based

18  practices that manage warfarin without the use of

19  anticoagulation clinics, the time in therapeutic

20  range is only 51 percent, with an overall

21  experience reported in the United States from these

22  data of 55 percent, with the 95-percent confidence

1    intervals ranging from 51 percent to 58 percent.

2         On this backdrop, the ROCKET AF trial was

3    designed with the primary hypothesis of showing

4    that rivaroxaban was non-inferior to warfarin in

5    the prevention of the composite endpoint of stroke

6    and non-CNS embolism in subjects with nonvalvular

7    atrial fibrillation.  By design, it was intended to

8    recruit patients at high risk for subsequent

9    strokes.  Patients were recruited if they had had a

10   prior history of stroke, TIA, or non-CNS embolism.

11   If they had not had one of those prior events

12   previously, they needed to have at least two of the

13   other four risk factors shown:  heart failure,

14   hypertension, older age, or diabetes.

15        The enrollment of patients without a prior

16   stroke, TIA, or non-CNS embolism and only two of

17   these risk factors was capped at 10 percent in each

18   region, again, to enhance the risk of the patient

19   population.  The patients that were recruited were

20   then randomly assigned double-blind and

21   double-dummy therapy.  They were randomized to

22   rivaroxaban at a dose of 20 milligrams once a day

1  with a down titration of the dose in patients with

2  moderate renal insufficiency, defined as a

3  creatinine clearance of 30 to 49 milliliters per

4  minute.  Patients assigned warfarin were managed

5  with target INR of 2.5 with a range of 2.0 to 3.0.

6       These patients were all followed monthly.

7  Recommendations for therapies associated with

8  atrial fibrillation were not provided in the

9  protocol, but sites were recommended to adhere to

10  standard practice guidelines and local practice

11  patterns.  The primary endpoint was stroke and

12  non-CNS embolism, and the principal safety endpoint

13  was major and non-major clinically relevant

14  bleeding.  All of these were adjudicated by a

15  clinical events committee.

16       By design, patients who are randomized and

17  began receiving double-blind study drug therapy

18  were to be followed to the end of the trial.

19  During the period of the study drug therapy,

20  patients were seen every four weeks for mandatory

21  INR monitoring, assessment of adverse events, and

22  ascertainment of clinical endpoints.  This was to

1    continue until the point of site notification.

2          This date was the date that the sites were

3    notified that the requisite number of events had

4    been accrued in the trial, and the sites were told

5    to bring the patients back for an end-of-study

6    visit.  At this end-of-study visit, patients were

7    then stopped on the study drug, transitioned over

8    standard of care for anticoagulant therapy for

9    their atrial fibrillation, based on institutional

10   policies and guidelines.  Following this

11   transition, patients were then seen for a final

12   contact, and adverse events and clinical events

13   were also ascertained at that time, after study

14   drug had been discontinued.

15         Some patients, as you'll see from

16   Dr. Califf's presentation, did discontinue study

17   drug therapy before the end of the trial.  If these

18   patients were to discontinue study drug therapy,

19   they came in for a study visit and had a similar

20   transition to standard of care.  Importantly, even

21   though these patients stopped study drug before the

22   end of the trial, they continued to be followed

1  every three months for collection of adverse events

2  and clinical events off study drug.  At the data-

3  site notification, they were also contacted for a

4  final contact and ascertainment of events.

5        In order to maintain the study blind and

6  rigorously manage INRs during the trial, a modified

7  commercially available point-of-care device was

8  provided to each site, and they were educated in

9  its use.

10       On the left-hand side of the diagram is a

11 subject that was randomized to warfarin, and on the

12 right-hand side of the slide is a subject that was

13 randomized to rivaroxaban.  For both patients, a

14 blood sample would be obtained.  The point-of-care

15 device would be used, and instead of an actual INR

16 being provided, an encoded value would be given to

17 the clinician or clinical investigator.

18       This value would then be called into a

19 central computer by the telephone.  Additional

20 information would be provided and then the computer

21 would give the investigator either a true INR if

22 the patient was on warfarin, or a sham INR if the

1    patient was on rivaroxaban.  Obviously, the

2    investigator did not know if it was a true INR or a

3    sham INR, so they adjusted the warfarin or the

4    warfarin placebo appropriately, based on that INR

5    value.

6         The time in therapeutic range is a key issue

7    that Dr. Peters has identified and you've seen in

8    your briefing documents.  I'd like to review with

9    you what we did for the sites in terms of educating

10   them about the importance of quality INR

11   management.

12        Again, the target INR was 2.5.  No specific

13   warfarin dosing algorithm or protocol was provided

14   to the sites for recommendations about warfarin

15   dosing adjustment based on specific INRs.  However,

16   we provided comprehensive education and instruction

17   to the sites about the need for quality INR

18   control.  Each site was instructed to manage the

19   INR according to their local practice patterns and

20   standards, both for dose adjustment of warfarin and

21   scheduling follow-up visits to re-check the INR

22   after a dose changes.

1          Throughout the conduct of the study, we

2     continued to educate investigators at investigator

3     meetings, through newsletters, and study materials

4     about the importance of the target range of 2.0 to

5     3.0.  As you've heard, we had monthly visits, and

6     we only gave 35-day drug supply at those visits to

7     keep the patients coming back to the clinics.

8     Importantly, there was unblinded assistance that

9     was available if patient safety was an issue.

10         For the ROCKET AF trial, the warfarin event

11    rate was estimated to be 2.3 events per 100-patient

12    years based on trials that were available at the

13    time ROCKET AF was planned, as well as an

14    adjustment for the expected high-risk patient

15    population.  The non-inferiority margins are shown.

16    This was based on preservation of 50 percent of the

17    warfarin effect used in the heart overview.  There

18    is modest differences in the margins because of

19    different analytic techniques.  The FDA used a log

20    hazard ratio scale evaluation.  We will show the

21    1.38 margin in our figures.

22         A type I error was as shown.  It was

 1    estimated that 14,000 patients and 405 events in

 2    the per-protocol population would be needed.   The

 3    power was over 95 percent, regardless of the margin

 4    used, or 90 percent.

 5         As you have seen in your FDA and sponsor

 6    briefing documents, there were a number of analyses

 7    performed on specific patient populations and

 8    observation periods, and I'd like to walk you

 9    through these.   The intention-to-treat population

10    was obviously all those subjects who were

11    randomized to therapy, 14,264.   The safety

12    population, frequently called a modified intention-

13    to-treat population, were all participants in the

14    ITT population who received at least one dose of

15    study drug.   Only 28 patients in the overall trial

16    did not receive at least one dose of assigned

17    therapy.   Then the per-protocol population was all

18    patients in the safety population who did not have

19    any major pre-defined protocol violations.   An

20    additional 182 patients were excluded based on the

21    protocol violations and other factors.   And,

22    overall, 98.5 percent of the ROCKET AF population

1    was included in the per-protocol population.

2         In terms of observation periods,

3    on-treatment was defined as time on therapy up to

4    the last dose of study drug, plus two days to

5    account for continued pharmacological effect of the

6    study drugs after discontinuation.

7         Up-to site notification.  This included

8    events up to the date the sites were notified that

9    the requisite number of endpoints had been met.

10        Up-to the follow-up visit.  These were

11   events that occurred during study drug and off

12   study-drug administration up to the follow-up visit

13   that was about 30 days after the last dose of study

14   drug.

15        In the statistical analysis plan for

16   ROCKET AF, there was a prespecified, closed-loop

17   hierarchical testing procedure, as shown here.  The

18   primary analyses was non-inferiority.  Primary

19   endpoint was stroke and non-CNS embolism in the

20   per-protocol population that I've described while

21   on treatment, a conservative approach for assessing

22   non-inferiority.

1       If non-inferiority was achieved, superiority

2   testing would proceed in the following

3   sequence:  the primary endpoint and the safety on

4   treatment population, followed by a composite

5   endpoint that included vascular death in the same

6   population and observation period, another

7   composite endpoint that now included myocardial

8   infarction as well in the same population and

9   observation period, all-cause mortality in safety

10  on-treatment population, and then all-cause

11  mortality in the classic ITT analyses.

12      Additional analyses were performed,

13  including the primary efficacy endpoint in the ITT

14  population in the observation periods that I've

15  discussed.  Key secondary outcomes were also

16  evaluated in the ITT population as shown, the

17  individual components of the primary and key

18  secondary endpoints, and then I'll note, although

19  not prespecified in the statistical analysis plan,

20  the primary efficacy endpoint in the ITT population

21  while on treatment.

22      Mr. Chairman, in summary, ROCKET AF was a

1    large, global, double-blind clinical trial.

2    Practice guidelines and local standards of care

3    drove therapy for the management of these patients

4    with atrial fibrillation.  By intent, a high-risk

5    population with other co-morbidities was to be

6    enrolled, and there was rigorous ascertainment of

7    clinical events and adverse events, both while on

8    treatment and off treatment.

9        Multiple analyses were prespecified across

10    different patient populations and observation

11    periods.  We used hierarchical testing to preserve

12    the type I error.  We used the per-protocol

13    population as the generally accepted standard for

14    non-inferiority testing.

15        We did analyses in the ITT population

16    through the end of the study and recognized this as

17    the standard for superiority testing.  However,

18    despite the potential analytic limitations and the

19    biases that can be introduced, we did perform

20    on-treatment analyses due to the expected high rate

21    of discontinuations with the long-term follow-up

22    and co-morbidities in these patients.

1          Thank you very much for your time.  I'd like

2     to now introduce Dr. Robert Califf, vice-chancellor

3     of clinical research, Duke University, and co-

4     principal investigator of the ROCKET AF trial.

5          Rob?

6          **Sponsor Presentation - Robert Califf**

7          DR. CALIFF:  Thanks, Ken.

8          It's a privilege to be here today.  I'd also

9     like to acknowledge, as Dr. Mahaffey did, that my

10    relationships with industry can be found at the

11    website www.dcri.org.  As with Dr. Mahaffey, our

12    institution has received grants and contracts from

13    Johnson & Johnson to conduct this study.  I've also

14    received consulting fees.  I'll note that all of my

15    consulting fees are donated to not-for-profits, but

16    still constitute a potential conflict that should

17    be acknowledged.

18         Also, in addition, because of my job, our

19    institution receives numerous grants and contracts

20    from almost every competitor in this field.  And so

21    that should also be acknowledged and can be

22    recognized on our website for public display.  As

1    with Dr. Mahaffey, I don't believe the outcome of

2    these proceedings impact me in any financial way,

3    and I own no stock in either of the companies that

4    are directly involved.

5            So now, let's move to the efficacy results

6    of the trial.  And it's a privilege to present

7    these on behalf of the executive committee, the

8    steering committee, the many investigators, and

9    participants who volunteered for this research.

10           As has already been noted, there is

11   substantial agreement between the FDA and the

12   executive committee of the trial about the

13   computations for the results of the trial.  And so

14   this will be a relatively abbreviated presentation

15   compared to what might be presented if the

16   fundamental results in the computations were in

17   dispute.  We want to preserve most of the time for

18   the discussion of the key issues that were

19   identified by the FDA.

20           So the key points I'm going to make in this

21   part of the presentation, first, we found -- and

22   this represents a view of the executive committee,

 1    as presented in the New England Journal, a

 2    publication that came out last month, that

 3    rivaroxaban is not inferior to warfarin for all

 4    populations and observation periods.  It's superior

 5    to warfarin while on treatment in all populations,

 6    as Dr. Mahaffey reviewed with you the method of

 7    analysis.  There is a substantial reduction in

 8    hemorrhaging strokes in particular, an important

 9    endpoint that we will review in the last part of

10    the presentation.  And the results are consistent

11    across subgroups and for secondary endpoints.

12           Two points to make on this slide that shows

13    the overall number of sites, over a thousand, and

14    number of countries.  I'll refer to the FDA

15    briefing book about the discussion with the

16    sponsors about including a high-risk population.

17    We were not involved in that discussion as an

18    executive committee, but I can assure you, when we

19    were given the opportunity to study a high-risk

20    population that was global in nature, this was

21    something we were very excited about and that we

22    felt was much needed.

1      So, in designing the study, in thinking

2  about how the results would come out, we carefully

3  considered the need for a global clinical trial

4  that would be relevant in the United States, but

5  also in other parts of the world, and that would

6  truly involve the population in greatest need of

7  treatment for atrial fibrillation to prevent stroke

8  and systemic embolism.

9      This is a look at the study populations in

10  more detail.  Dr. Mahaffey has reviewed this with

11  you already, but when broken down by treatment

12  assignment, there are slight imbalances but nothing

13  significantly different between the two groups in

14  terms of interpretation of the trial.  We'll also

15  note here in the footnote that appears in several

16  slides, that one site was disqualified due to

17  violations in the protocol.

18      We indeed succeeded in enrolling a high-risk

19  population.  This gives the key risk factors,

20  according to treatment assignment, in the

21  randomized trial.  Over 60 percent had heart

22  failure.  The vast majority had a history of

1    hypertension.  Fully 43 plus percent of the

2    patients were over age 75.  Many had diabetes, and,

3    importantly, over half the patients already had a

4    history of stroke, TIA, or non-CMS systemic

5    embolism, a very high-risk population, compared to

6    other trials.

7           Indeed, if we look at the CHADS2 score,

8    which I know you're all familiar with either from

9    previous work or the briefing book, as you

10   remember, we attempted to cap the CHADS2 score of 2

11   at the 10-percent level.  We didn't quite make

12   that; 13 percent of the patients in the trial had a

13   CHADS2 score of 2.  But you can see, we had a very

14   large number of CHADS3, 4, and 5 patients in this

15   trial.  So we succeeded in getting what we believed

16   was a high-risk population, much in need of an

17   effective treatment.  It overlaps with the previous

18   trials but is very much skewed towards higher risk.

19          If we then look at the patient disposition

20   in more detail in this slide, I'll call your

21   attention to several key points.  First, on the two

22   outside boxes, you can see that just over a

1    thousand patients assigned to each treatment

2    discontinued study drug and follow-up.  Now, over

3    half of these in each group died as a reason for

4    that.  You might argue it's easy to follow patients

5    who have died.  That was the reason in over half.

6           Then, if we look, there were a large number

7    that withdrew consent, increasingly a problem in

8    global clinical trials, especially in the United

9    States.  We made every effort to follow the

10   patients as much as we possibly could, given the

11   legal issues involved there.

12          If we look at the two inside boxes, just

13   over 1,300 in each group completed the study off of

14   assigned study drug.  And Dr. Mahaffey has already

15   reviewed with you, in great detail, the efforts we

16   went to, to make sure we were ascertaining events

17   in this population.

18          Now, what about adherence to study

19   medication?  Now, I'll make several points with

20   this slide.  The first is that, as expected in

21   chronic trials, there was an early larger rate of

22   study drug discontinuation followed by a relatively

constant rate.  There was absolutely no difference

between the two treatments.  One might argue -- and

as an executive committee, we do believe

this -- the disadvantage of rivaroxaban

somewhat -- since in a double-dummy trial, there

are many things patients had to do, that they would

not have to do with a non-monitored once a day

drug.

On the other hand, the key point is that

there was no difference in discontinuations, and if

we look at the first year, it was about 22 percent

in each group.  And if we look at the second year,

it's summated at about 35 percent by Kaplan-Meier

plot in each group.

Now, the primary result of the trial, as

specified in the protocol as shown here, is a

hazard ratio of .79, with a very small p value for

non-inferiority.  If we then look at the multiple

ways of analyzing these data for sensitivity that

were done and in the closed hierarchical testing

procedure, I would call your attention to several

key points.  I'm somewhat hampered by not having a

1    pointer for this presentation podium, so I'll have

2    to describe it to you and hope that you can follow

3    it.

4           Most importantly, the per-protocol on

5    treatment at the top was a prespecified primary

6    analysis.  As we go down the list of analysis

7    populations and durations of follow-up, one can see

8    the point estimate gets closer to 1, but never

9    crosses the 1 line, and the outer estimate of the

10   confidence interval never even comes close to the

11   1.38 margin specified by the FDA.

12          Perhaps the most important second point to

13   look at on the entire slide is ITT, the site

14   notification, the next to the last analysis.  This

15   most closely approximates what has been done in the

16   other trials, who essentially stopped follow-up at

17   the point of the last -- at the taking of study

18   drug by the patient population when the study was

19   completed.  The very final point, ITT, regardless

20   of treatment exposure, includes those 30 days.

21          The only problem with the pointer, it was

22   pointed out to me, is some people are looking

1    backwards, but I'll do my best here.  If you look

2    at this last point, this includes the 30 days that

3    we'll discuss in detail later.  But I'll point out

4    that none of the other trials included this time

5    period in their analysis, nor did they actually do

6    anything other than continue patients on their

7    study drug at this time.

8         The second analysis in this specified

9    hierarchy was a superiority analysis on treatment.

10   And this, again, showed a hazard ratio of .79,

11   hardly surprising, considering the small difference

12   in the two patient populations.

13        As Dr. Mahaffey has pointed out, we fully

14   recognize that the standard for a superiority

15   analysis would be the full population up until the

16   end of the study, essentially being similar to what

17   we showed you as the next to last point in the

18   previous slide, but this was a prespecified

19   analysis.  And we think in looking at the entire

20   texture of the data, as shown in detail in the New

21   England Journal of Medicine, that while patients

22   were taking assigned study medication, there was a

1    benefit of rivaroxaban.

2          This shows a Kaplan-Meier graph for the

3    on-treatment analysis.  No surprises here.  The

4    curves diverge early and stay apart throughout the

5    duration of the time period when people were on

6    treatment.

7          This slide, then, again, talks about the ITT

8    population with the different methods of counting

9    people in follow-up.  At the top, ITT on-treatment,

10   we've already reviewed.  The next, the ITT, the

11   site notification, roughly equivalent to what the

12   other trials have looked at, and then we continue

13   to follow patients during this difficult transition

14   that we'll review in detail in the final part of

15   the presentation.  In none of these time points did

16   the non-inferiority margin become close to the

17   outer confidence interval of the point estimate of

18   treatment.

19         Now, what about the primary endpoint

20   component subgroups and secondary endpoints?  First

21   of all, with regard to the primary efficacy

22   endpoint components, as pointed out in the briefing

1    book, the effect was driven by the total stroke

2    rate, which was a major component.  But within

3    that, the primary hemorrhagic stroke rate was the

4    primary driver of the difference between the two

5    treatments.  We would also point out, however, that

6    with regard to primary ischemic stroke, the point

7    estimate is just to the left of 1, indicating that

8    the benefits of warfarin were preserved in this

9    population for ischemic stroke, in addition to the

10    reduction in primary hemorrhagic stroke.  You'll

11    also note the robust difference in non-CNS systemic

12    embolization, shown here, although there are a

13    small number of events in this part of the primary

14    component of the endpoint.

15         If we look at the many prespecified

16    endpoints, the most notable finding is that there

17    was really no significant heterogeneity when

18    controlling for the number of comparisons that were

19    done.  To make it easier for you to follow, we put

20    the orange dotted line in, which is the point

21    estimate for the overall trial for the treatment

22    effect.  And you'll notice all of the confidence

1    intervals for all the subgroups crossed that orange

2    line, indicating there really is no significant

3    heterogeneity.

4         If we go to the next set of prespecified

5    subgroups, the results are essentially the same.

6    And I'll just call out one group here, because it

7    was brought up in the FDA briefing book.  The

8    patients with a prior stroke, TIA, or non-CNS

9    systemic embolization, there was a nominally

10   significant .037 interaction here.  But I'll point

11   out, this is a quantitative interaction, not a

12   qualitative interaction.  The main difference here

13   is really that, in the people without prior strokes

14   or embolism, there is a point estimate of .59, much

15   better than the trial as a whole.  And then for

16   people with a history of these events, a point

17   estimate is to the left of 1.  So this is

18   quantitative, not qualitative; and we think, given

19   the number of comparisons as well within the play

20   of chance.

21        Now, what about the case secondary

22   endpoints?  And we added these in to look at

1    arterial thrombotic events.  One would like to know

2    about these if one is giving an anticoagulant.  And

3    the reassuring message here is that in the first

4    secondary efficacy endpoint at the top, you can see

5    that when we added in vascular death, it really had

6    no substantial effect on the hazard ratio and went

7    further in favor of rivaroxaban versus warfarin.

8    And then when we added in non-fatal myocardial

9    infarction, a very similar finding, numerically

10   fewer non-fatal infarctions in the rivaroxaban

11   group compared to warfarin.

12          If we look at the components again, we see

13   there's really no heterogeneity of treatment

14   effects.  With regard to every component,

15   numerically, rivaroxaban had fewer of these

16   important endpoints than warfarin.

17          So, in summary, then, for efficacy,

18   ROCKET AF was a double-blind study in a high-

19   stroke-risk population.  Rivaroxaban was not

20   inferior to warfarin in all populations and

21   observation periods, and was superior to warfarin

22   while on treatment in all populations.  There is a

1    substantial reduction in hemorrhagic strokes, and

2    the results were consistent across subgroups and

3    for secondary endpoints.

4         I'd now like to turn the podium over to

5    Dr. Christopher Nessel, senior director of clinical

6    research at Johnson & Johnson.

7         **Sponsor Presentation – Christopher Nessel**

8         DR. NESSEL:  Thank you, Dr. Califf.

9         Good morning, ladies and gentlemen,

10   Mr. Chairman, committee members, colleagues, and

11   distinguished guests.  I am Dr. Christopher Nessel

12   from Johnson & Johnson Pharmaceutical Research and

13   Development, and I am responsible for the safety

14   section of the sponsor's presentation.  In line

15   with Mr. Chairman's requests, I am an employee of

16   Johnson & Johnson.

17        All bleeding events in the principal safety

18   endpoint were adjudicated by an independent

19   committee blinded to treatment assignment, which

20   was comprised of physicians at the Duke Clinical

21   Research Institute.  The principal safety endpoint

22   was the composite of major and non-major clinically

1   relevant bleeding events.

2          Per the clinical study protocol, major

3   bleeding was defined as that which was clinically

4   overt and associated with one of the following.

5   Non-major clinically relevant bleeding was defined

6   as that which did not meet the criteria for major

7   bleeding, but was clinically overt and associated

8   with one of the following.

9          For the principal safety endpoint and its

10  components, there was comparability between the

11  treatment groups, as shown here.  The hazard ratios

12  for the composite, the major bleeding component,

13  and the non-major, clinically relevant bleeding

14  component, are 1.03, 1.04, and 1.04, respectively.

15         With respect to the major bleeding events

16  specifically, an interesting dichotomy emerges when

17  examining the elements comprising the endpoint.

18  The hazard ratios for the occurrence of hemoglobin

19  drop and transfusion are 1.22 and 1.25,

20  respectively.  Conversely, however, for the

21  occurrence of the more severe events of bleeding

22  into a critical organ or site and fatal bleeding,

the hazard ratios are 0.69 and 0.50, respectively.

Each of these four comparisons reached nominal statistical significance.  Of note, data on the occurrence of fatal bleeding events presented in this slide are taken directly from the adjudication of the clinical events committee; that is, the CEC determined that the event satisfied the definition of a major bleed because it resulted in a fatal outcome.  While there were more hemoglobin drops and transfusions in the rivaroxaban arm, the most severe of these events, as measured by the need for four or more units of blood, was balanced between the treatment groups.

There were 64 subjects in each treatment group who met this criterion.  Over 70 percent of these events were gastrointestinal hemorrhage with upper GI hemorrhage contributing the majority.  The CEC adjudicated intracranial hemorrhages as bleeding events.  Importantly, however, the committee also determined if the event met criteria for a primary hemorrhagic stroke.  Assuming the remaining protocol-defined criteria were met, the

1    event would be included in the efficacy analyses.

2    As such, primary hemorrhagic strokes are included

3    in both the primary efficacy and the primary safety

4    endpoints.  The CEC also assigned all relevant

5    intracranial hemorrhage subtypes to each event.

6         This is a Kaplan-Meier plot of the time from

7    the first dose of study medication to the

8    occurrence of the first intracranial hemorrhage.

9    This is the safety population while on treatment.

10   The hazard ratio is 0.67, with the p value as

11   noted.  The curves appear to separate before day 60

12   and remain so while patients are taking study

13   medication.

14        This is the data on the occurrence of

15   intracranial hemorrhage.  More than half of the

16   events were hemorrhagic strokes, and all elements

17   of intracranial hemorrhage shown here were lower in

18   the rivaroxaban group.

19        Here, I present data on the instance of

20   fatal bleeding events in the safety population on

21   treatment, by bleeding site as adjudicated by the

22   clinical events committee.  Major bleeding events

1    occurred more frequently in the GI and GU tract for

2    patients randomly assigned to receive rivaroxaban.

3    However, these events rarely resulted in death.

4    Contrast this with the outcome associated with

5    intracranial hemorrhage.  Intracranial hemorrhage

6    events occurred more frequently in patients

7    receiving warfarin, and in these patients, the

8    mortality approached 50 percent.

9          This is a Kaplan-Meier plot of the time from

10   the first dose of study medication to the

11   occurrence of a fatal bleeding event.  The curves

12   appear to separate within 30 days and remain so

13   while patients are taking study medication for a

14   hazard ratio of 0.61.

15         I presented the results of fatal bleeding

16   defined as an event adjudicated by the CEC as a

17   major bleed because it resulted in a fatal outcome.

18   To gain a different perspective about these

19   important events, we analyzed major bleeding events

20   followed by any death in the subsequent 30 days or

21   the broad definition, and major bleeding events

22   followed by a CEC-adjudicated vascular death in the

1    subsequent 30 days or narrow definition.  By any of

2    these definitions, the hazard ratios ranged from

3    0.50 to 0.61 with the p value as noted.

4         The number of subjects who experienced

5    adverse events, serious adverse events, and adverse

6    events leading to permanent study drug

7    discontinuation was essentially balanced between

8    the treatment groups.  Congruent with the data I

9    just presented, there were fewer patients in the

10   rivaroxaban arm who experienced an adverse event

11   with the outcome of death.

12        In summary, Mr. Chairman, there was

13   comparability between the treatment groups for the

14   principal safety endpoint and its components.

15   Rivaroxaban was associated with more hemoglobin

16   drops and transfusions.  Importantly, however,

17   rivaroxaban was also associated with fewer critical

18   organ bleeds, fewer intracranial hemorrhages, and

19   fewer fatal bleeding events.  There were similar

20   rates of AEs, SAEs, and premature discontinuations,

21   as noted by Dr. Califf.  But rivaroxaban was

22   associated with fewer AEs with an outcome of death.

1          Thank you for your kind attention, and at

2     this point, I would like to reintroduce Dr. Robert

3     Califf, who will conclude the sponsor's

4     presentation.

5          **Sponsor Presentation – Robert Califf**

6          DR. CALIFF:  Thanks, Christopher.

7          This may be one of the most difficult

8     presentations I've ever had to give publicly, and

9     that should be quite interesting.  As Dr. Temple

10    noted, I believe that if you look at the results of

11    the ROCKET AF trial in the context in which it was

12    designed, there would be very little to argue

13    about.

14         I want to give the FDA quite a bit of credit

15    because the issues that they have raised are

16    exactly the same issues that the executive

17    committee and steering committee wrestled with

18    almost from the moment of unblinding.  And we've

19    been wrestling with these issues for more than a

20    few months, doing a lot of work to try to

21    understand them and to try to make sure we get this

22    right because of the global implications of

1    decisions that will be made about this therapy for

2    a disease which is affecting a growing number of

3    people.  And I would urge, again, that everyone

4    consider not just in the United States.  Most of

5    these people do live in other parts of the world.

6    And it's a consideration that I believe has to be

7    part, although not the dominant consideration, in

8    these proceedings.

9         Also, we'll deviate from the usual standard

10   data presentation because the issues that have been

11   raised really require an understanding of the

12   entire picture of the treatment of atrial

13   fibrillation and the issues that are involved in

14   order to have the best discussion.  So we will show

15   you a lot of data that partly represents an

16   education on my part about these really complex and

17   difficult issues.

18        If you get a chance, you can look under my

19   chair and see there's a stack of papers that

20   actually comes up to the bottom of the chair to

21   represent the amazingly diverse and interesting

22   literature on this topic.

1    So I'm going to cover four issues, but

2    first, the very first issue is just to give a

3    perspective of the executive committee about the

4    benefit-risk balance, always an important

5    consideration.

6    As Dr. Mahaffey pointed out eloquently, we

7    don't really have to belabor the issue of atrial

8    fib.  It's common.  It's a serious problem.  The

9    negative outcomes, although not terribly frequent

10   per 100 patient-years, are devastating and critical

11   to the patient population involved.

12   Anticoagulation works.  However, many

13   patients don't receive effective or optimal

14   management.  And the relevant issues for patients

15   and families are, am I going to live longer, will I

16   have a better quality of life, and can I avoid

17   catastrophic and negative events?  And this is what

18   we designed ROCKET AF to measure in all these

19   countries around the world.

20   Warfarin is a highly effective drug, as

21   Dr. Temple pointed out in the beginning.  It has

22   proven benefits, but it also has proven risks,

1    particularly bleeding and especially intracranial

2    bleeding, which has caused a lot of people not to

3    take the drug and has scared a lot of physicians

4    from prescribing it.

5         There are other miscellaneous toxicities

6    that are important to consider, and there's quite a

7    bit of inconvenience in taking warfarin if you're

8    on the patient end of this situation.  This results

9    in failure to use the treatment in situations in

10   which it's known to be effective, and this has been

11   well documented, so I won't show you primary data

12   here.  When doctors are asked about this, it's

13   primarily a concern about bleeding.  When patients

14   are asked, it's primarily a concern about the

15   complexity of the regimen and the bleeding that

16   might occur.

17        So ROCKET AF was a double-blind, global

18   trial in a high-risk population, primarily intended

19   to find an alternative for warfarin, with an intent

20   to move onto superiority testing if non-inferiority

21   was demonstrated.  But make no mistake about it, we

22   were focused on non-inferiority to find an

1    alternative to warfarin.

2          We understood from the beginning -- and this

3    is another critical point -- that the high-risk

4    population would lead to significant

5    discontinuation with its attendant analytical

6    issues.  Just to give you a metric of the

7    complexity of the population, our average ROCKET AF

8    patient was on nine concomitant medications, with

9    an upper quartile well into the double digits.

10   This indicates that there were many difficult

11   issues in managing not only warfarin but the

12   general patient care of this population.  And I

13   would hate it if the message from these proceedings

14   were don't study high-risk populations; only stick

15   with the easier-to-study low-risk populations.

16          Then careful measurement was made of a broad

17   range of adverse events because in benefit-risk,

18   one wants to consider the whole story that patients

19   and doctors may be concerned about.  We really

20   found nothing about rivaroxaban -- and the FDA I

21   think is in substantial agreement -- other than

22   this tradeoff of prevention of ischemic events and

1    bleeding.

2         So as we look at this, this is an array of

3    all the key endpoints that were relevant to the

4    benefit-risk tradeoff that we came up with, and

5    I'll call your attention to several key points.

6    First, the point estimate -- and this is expressed

7    in risk difference per 10,000 patient-years, so

8    these are absolute numbers of events.  The point

9    estimate is reflected by the diamond.  The

10   confidence intervals for the efficacy endpoints are

11   reflected by the orange bars.  The confidence

12   intervals for the safety endpoints are projected in

13   the green bars.  Anything to the left of zero

14   indicates fewer events of rivaroxaban.  Anything to

15   the right indicates fewer events with warfarin.

16        Since these results are for the trial as a

17   whole and there was no significant heterogeneity,

18   we believe that these are the most important

19   results for doctors and patients to consider.

20        When one looks, then, at the efficacy

21   results, you'll notice they are all on the side of

22   rivaroxaban, although very often, the confidence

1   intervals cross 0.  I'll also point out here, for

2   reference, that we are showing the data in terms of

3   the safety on-treatment population.  Your briefing

4   book has all the data by intention to treat, up to

5   the end of study also, and it's available.

6         So the principal safety endpoint goes to the

7   side of warfarin, but you'll notice a pattern here

8   that Dr. Nessel reviewed.  Fatal and critical organ

9   bleeding, intracranial hemorrhage, favoring

10   rivaroxaban; transfusion and hemoglobin decreased,

11   favoring warfarin.

12         So what do doctors and patients actually

13   want?  And we're benefitted here by a lot of

14   previous studies that have been done in the context

15   of warfarin versus no warfarin.  And although the

16   details come out slightly different in different

17   studies, in general, across multiple studies,

18   patients and doctors agree that the most important

19   endpoint actually is death, not terribly

20   surprising.  But it's also notable that when

21   patients are asked, particularly those who have had

22   a stroke are asked, over 30 percent will rate a

1   disabling stroke as worse than death.  And so these

2   two endpoints do cluster at the top end of the

3   scale of what people would like to avoid.  Bleeding

4   is rated at the lower end of this continuum, with

5   non-disabling stroke and myocardial infarction in

6   the middle.

7        So if we look at these absolute numbers in

8   terms of the most severe at the top and the least

9   severe at the bottom, now couched in terms that

10  patients and doctors would think about, rather than

11  MI stroke, talking more about death, disabling

12  stroke, and embolism to the other part of your body

13  besides the brain, arrayed in this order, you can

14  see the most important endpoints tend to favor

15  rivaroxaban.  The least important endpoints tend to

16  favor warfarin.

17       We're not discounting the importance of

18  bleeding.  It is an important endpoint.  We're just

19  saying that as the executive committee looks at

20  these data, it's important for us to consider what

21  is most valued by those who will be prescribing and

22  much more important to consider what will be

1    considered by those who are contemplating taking

2    the treatment.

3            So the benefit-risk summary, from the point

4    of view of the executive committee, is that

5    rivaroxaban has a favorable benefit-risk balance.

6    This is not because of declaring superiority by

7    classical intention to treat.  This is because we

8    do believe that it's clear that rivaroxaban is non-

9    inferior for the primary endpoint, but has a lower

10   rate of intracranial and fatal bleeding.  And that

11   is a very important endpoint for the decision to

12   treat and to end up with better outcomes over all.

13           There are also other benefits in terms of

14   the once-a-day dose and the monitoring and the

15   limited potential for drug and food interactions

16   that are important in daily practice.  There is an

17   increased risk of blood transfusion and greater

18   than 2-gram per-deciliter falls in hemoglobin

19   concentration, but no significant difference in

20   bleeding overall.

21           Now, we get to the really interesting and I

22   think difficult issues that I know the discussion

1    will focus on today, and we look forward to the

2    panel's insight into these issues.  But we do have

3    a point of view that's been molded by months of

4    review from a global executive committee that

5    includes a number of experts in cardiology and in

6    coagulation, and specifically on the management of

7    warfarin.

8            These four issues that were raised by the

9    FDA are dose and regimen selection, events after

10   study drug discontinuation, what about the time in

11   therapeutic range, and this approval standard in

12   2011, a new issue that was not at all contemplated

13   at the time that the study was designed and

14   conducted.

15           So first of all, what about the dose

16   selection?  Now, I would point out here that dose

17   selection was made in the context of many studies

18   in venous thrombosis that looked at dosage ranging

19   from 20 to 60 milligrams, and looked at once- or

20   twice-daily dosing.  And across the range of these

21   studies, when looked at critically by the sponsor,

22   one could pick one study here or one study there

1    that might imply that once-a-day or twice-a-day

2    dosing is better.  But the fact is, across the

3    range of studies, what was seen was a flat dose

4    response for efficacy and a shallow dose response

5    for bleeding.  And similar results were once-a-day

6    or twice-daily dosing.

7         So having to make a decision, it was felt

8    that the convenience factor and the likely

9    improvement in adherence should dominate, and once-

10   daily dosing was picked.  In addition, there was

11   modeling of the coagulation system, based on what

12   was thought to be the type of consistent

13   anticoagulation needed to get the benefits from

14   warfarin, and pharmacodynamic studies were done in

15   normal populations for population PK/PD modeling.

16        The next slide shows what the population

17   modeling showed.  And it's a complicated slide.

18   I'll just point out that what it shows is a steady

19   state, whether you measure a dynamic measure like

20   prothrombin time ratio or prothrombin-induced

21   clotting time ratio at the top, or you measure the

22   concentration of the drug.

1          If you look at the right-hand side of the

2     slide at 24 hours, we're in a range where there

3     still is anticoagulation present.  Now, anyone who

4     says they know exactly what the right parameters

5     for these measurements should be, to be sure that

6     you have the best anticoagulation I think would

7     have insight that only some of our politicians

8     today actually seem to have, not that we would

9     claim to have the scientists.  But the best, as we

10    could judge, by looking at this, we were reassured

11    as an executive committee that once-a-day dosing

12    was rational.  We are not saying that it would be

13    irrational to pick twice-a-day dosing.  That's also

14    a viable alternative.

15          This is just a look at one slice of the

16    data.  These are the venous thrombosis studies that

17    looked at the total dose chosen for this trial,

18    20 milligrams a day, comparing 20 milligrams once a

19    day to 10 milligrams twice a day.  This is a cross-

20    study comparison.  It's not the ideal way to look

21    at data or to have data, but as we looked at it,

22    there was really no consistent pattern, either with

1     regard to bleeding or with regard to efficacy.

2         So we believe the once-a-day choice was

3     rational.  It's not the only choice that could have

4     been made.  Other choices could have been made and

5     rationally defended.  And so, in summary, the

6     modeling was consistent with good choice of a dose.

7     The phase 2 data support it, either once- or twice-

8     daily dosing.  We had reasons to pick the once-a-

9     day dose and to put it to the test.  And, after

10    all, we're here today, presenting results of a

11    trial with the dose that was chosen, and we think

12    that should be the determinant of a decision about

13    whether the patient should have access to this

14    treatment.

15        Now, what about thrombotic events after

16    discontinuation of the study drug?  In here, out of

17    necessity, I'm going to have to do something I'm a

18    bit uncomfortable with, and I want to lay out the

19    general precept that if you catch me going beyond

20    this precept, please regard it as a mistake.

21        The FDA, in its briefing book, and as

22    Dr. Temple pointed out, brought up the issue of

1   cross-study comparisons.  We don't typically do

2   that in this kind of a setting, but because it has

3   been raised and it is a key issue, I will have to

4   point out differences in studies.  But what I will

5   avoid, unless I slip up and make a mistake, is a

6   cross-study indirect comparison comparing the

7   treatment effects of the different drugs.  As we'll

8   say at the end, we think that is not only invalid.

9   We think it is treacherous and dangerous to the

10  public, to doing those kinds of comparisons.

11         In discussions with the FDA, they reasserted

12  that the purpose of the briefing book was not to

13  engender illegitimate cross-study treatment

14  comparisons, but to talk about the qualities of

15  anticoagulation, the designs of the trials, and the

16  other issues in the trials, that you can get a

17  rough estimate on by looking across the studies.

18  So I want to be clear about what I'm trying to do

19  when I bring up other trials.

20         So we had a prespecified method of

21  transition at the end of the trial.  This was based

22  on the fact that we had very little, other than

1    phase 1 data, data about giving both rivaroxaban

2    and warfarin together.  It was felt it would be

3    better to err on the side of not causing bleeding

4    by over-anticoagulating.  And so the prespecified

5    protocols start VKA at the expected maintenance

6    dose.  Remember that globally, warfarin is not the

7    only vitamin K antagonist -- there are many other

8    forms of vitamin K antagonists that are used -- no

9    overlap with the blinded study drug; no INRs for

10   three days; heparin bridging therapy to be allowed

11   but infrequently used.  And the impact, as we now

12   know, is an imbalance in anticoagulation between

13   the two treatment groups, leading to the results

14   that have been reviewed in the briefing book.

15        Now, you might ask, how could you possibly

16   do that?  Shouldn't you have known better?  And in

17   fact, as the FDA pointed out and we reflected in

18   the briefing book that was sent from Johnson &

19   Johnson, we did have access just at the end of the

20   trial to the J ROCKET data, which seemed to show

21   this pattern of excess events.

22        As an executive committee, we needed to stay

1    blinded.  We had a protocol.  We asked the data

2    monitoring committee, do you see a signal, looking

3    back at the ROCKET data, that we should change our

4    protocol to make it safer for the patients?  This

5    was delicate because we could not become unblinded.

6    The data monitoring committee could not give us

7    evidence that would show that would lead us to

8    become unblinded.  They sent us a note, which is in

9    the record, that said we don't see anything that

10   should cause you to have to change your protocol,

11   but of course, the decision is yours, not ours.

12   That was a good thing for them to say and perfectly

13   correct.

14        Now, as we look back at those data, just to

15   report it to you verbally, what they saw from

16   discontinuations in the midst of the trial was

17   that, actually, there were more events in the

18   warfarin group than the rivaroxaban group at the

19   time they looked, right near the end of the study.

20   So they were actually giving us an evidence-based

21   recommendation that turned out to be wrong for the

22   context in which it was used.

1          The result is shown here.  And what I think

2     is an elegant but simple slide, remember, the

3     context of this slide is, we're at the end of the

4     study.  We told all the sites the study's over.  We

5     want you to make a transition to whatever the

6     vitamin K antagonists that you use in your country

7     or region.

8          So what they did in the warfarin group is

9     they were transitioning from blinded warfarin to a

10    vitamin K antagonist, and this is a transition

11    from, essentially, one drug to the same drug.  And

12    there's a very high rate of INRs greater than 2 in

13    the population right from the start.

14         But in rivaroxaban, we were making a

15    transition with a three-day hiatus to a vitamin K

16    antagonist, and you can see that there were very

17    few INRs that were in the therapeutic range of

18    greater than 2, all the way out to a month, where

19    we only reached 52 percent out of those who

20    reported an INR.

21         So the executive committee believes that the

22    excess events at the end of the trial are a result

1  of the transition strategy that we take

2  accountability for, but we believe it was done in

3  good faith and with a lot of discussion and

4  thought.

5          But what about the data overall?  And I

6  think it's important, as one looks at this, to keep

7  in mind several things about the slide I'm showing

8  you now.  Obviously, during the trial, many people

9  discontinued study drug either temporarily or

10 permanently.  And if we look at the top row of this

11 slide, we can see that, indeed, there was an

12 imbalance in events overall between rivaroxaban and

13 warfarin after discontinuation with a hazard ratio

14 of 1.5.  However, the pattern is quite clear.  If

15 one looks in the second row at those who completed

16 study medication, you can see an event rate of 6.4

17 per 100 patient-years on rivaroxaban, 1.7 in

18 warfarin, clearly a problem, with a hazard ratio of

19 3.7.  But I'd point out a couple of things here.

20 The 6.4 rate, as I'll show you, is exactly what you

21 would expect in this population if they were not

22 anticoagulated.  It's not higher than you would

expect.   The 1.73 is what you would expect would go
to warfarin management, which is what we had at the
end of the trial.

Now, look at rows 2 and 3.  And here,
there's a little trick that I need to tell you,
that could be misleading if you didn't realize it.
We're obviously concerned about people that need to
stop anticoagulation for a procedure or because
something has happened in their lives.  Will there
be a recurrence of events?  And that would be
called, at the bottom, a temporary interruption of
treatment.  And you have those who just simply say,
I can't take this anymore, I'm going to stop the
study drug permanently.  That would be column 3.

But the trick is that if you intended to
have a temporary interruption and then a patient
had an event, they would stop it permanently, they
end up in column 3 instead of column 4 when the
intent was a temporary interruption.

So these numbers can be a little bit
misleading, but when you look at the two groups
together, I think what you see is that there's

1    really no significant trend.  There is a slight

2    excess, numerically.  You might argue we don't have

3    the ideal power, but there are a lot of people

4    discontinuing in this group, and a fair number of

5    events.

6         We then looked at the expanded endpoint

7    because you would think if there is a problem with

8    rebound as an issue, that you would see it on their

9    arterial side as well as the venous side.  So when

10   we add in vascular death and non-fatal myocardial

11   infarction, you'll see now we have for all

12   participants who discontinued treatment, a hazard

13   ratio of 1.00.  It's harder to get closer to a

14   quality than 1.00 in a clinical trial.

15        Now, there is a pattern here, with a 2.24

16   hazard ratio at the end of the study.  So we do

17   think there was a problem with transition at the

18   end of the study.  But let me point out, again,

19   this is not a lot of events.  It's a small event

20   rate, overall, in the population, and consistent

21   with what you would expect.  If we look, though, at

22   early study medication discontinuation and

1    temporary interruptions, we see really not a

2    scintilla of a trend towards a negative outcome for

3    rivaroxaban-treated patients, compared with

4    warfarin.

5         Then the next piece of evidence is what

6    would you have expected?  And as I've already told

7    you, if you do a literature review in a population

8    with this degree of risk, if you had an adequate

9    anticoagulation, you would expect an event rate on

10   the order of 6 or so, which is exactly what we

11   observed in the rivaroxaban patients who

12   discontinued treatment and where the transition was

13   not ideal.

14        In the ischemic stroke after transition to

15   VKA, in that population, when we looked at the INRs

16   in the population that had an ischemic stroke,

17   73 percent had a last INR that was less than 2.

18   Now, these are kind of messy data, as all of you

19   know that have dealt with clinical trials in this

20   kind of situation, but we've looked at this very

21   carefully and this is what we've found.

22        So the recommendation is to maintain

1    continuous anticoagulation, applying the same

2    principles as are used for low molecular weight

3    heparin around the world and in the clinical

4    practice guidelines when one is interrupting

5    vitamin K antagonists and to overlap the two drugs

6    until the INR is greater than 2, measured at the

7    trough of rivaroxaban.  And the reason for this is

8    there is an interaction between rivaroxaban and

9    warfarin, so you want to measure the INRs at the

10   trough.

11         This is only supported by clinical

12   pharmacology data -- we want to be clear about

13   that -- not by a clinical trial in this population.

14   We do have experience now, considerable experience,

15   with the overlap of the two drugs from the

16   beginning of this study.  But we also want to be

17   careful to not say the two situations are

18   equivalent.  Starting rivaroxaban from a patient on

19   warfarin is not the same as stopping rivaroxaban

20   and starting warfarin.  But, nevertheless, it does

21   give us data about the two drugs given together.

22         Now here I have to pause for a second and

1    remind the panel and everyone in the audience that

2    we actually don't know what to do for either

3    warfarin or for dabigatran when it's discontinued

4    at this point.  As you well know, most of you on

5    the panel, there are currently two NIH trials

6    looking at bridging with warfarin -- and we're the

7    coordinating center in one of those

8    trials -- because it's unclear whether bridging is

9    an effective strategy in modern times.

10        For dabigatran, patients were followed up to

11   the last study visit, and then they were

12   transitioned from blinded drug to open label drug,

13   exactly the same treatment that they were on

14   throughout the trial.  So there was no strategy for

15   transitioning in the RE-LY trial.  I'll also point

16   out, just as a way of anecdote, when I was a

17   resident, I used to round with an intern.  When I

18   asked about the lab values, they kept saying WNL,

19   and I thought that meant within normal limits, but

20   I found out at the end of the month, he was saying,

21   we never looked.

22        [Laughter.]

1        DR. CALIFF:  So we're not unique in this

2   regard of basing our transition strategy on

3   pharmacodynamics.  As clinical investigator, we

4   obviously think there needs to be more data, but we

5   don't necessarily think that this drug should be

6   held to a different standard than other treatments.

7        So, in summary, in events after

8   discontinuation, there are no excess events in the

9   midst of the trial, either with early permanent

10  discontinuation or temporary treatment

11  interruptions.  And the excess events at the end of

12  the trial we think were due to an imbalance in

13  anticoagulation due to the protocol that we asked

14  the investigators to adhere to.  And we have a

15  transition plan that we think will take care of

16  this, which is at least as good as the transition

17  plan basis for other drugs that are currently on

18  the market.

19        Now, what about time in therapeutic range?

20  And this, I've got to say, is a pretty amazing

21  topic.  I commend the FDA for bringing it up and

22  for raising it in quite a provocative way in the

1    briefing book.  I think most of you know I love the

2    FDA, so please don't interpret anything I say as

3    bashing the FDA.  I think that the questions were

4    raised in a very provocative way, and this compels

5    us to stand up for our investigators and tell you

6    that we gave warfarin not only in an acceptable

7    way, we gave it in a commendable way during this

8    trial, considering the complexity of the trial

9    design that we had.  And we think it's important to

10   study these kinds of patients around the world.

11         So the key points I want to make is that TTR

12   is a useful biomarker.  And it is a very useful

13   quality measure.  And once you've made the decision

14   that you're going to anticoagulate a patient or a

15   group of patients at your center, given their

16   characteristics, it is a very useful quality

17   measure, but it is not a surrogate for

18   anticoagulant benefit-risk balance.

19         The ROCKET AF TTR we're going to show you is

20   consistent with standards for use of warfarin,

21   considering the more complex patients and the

22   regional variations that are well documented and

1   reproducible in other studies.  And most

2   importantly I think for this discussion, there's

3   increasing evidence that TTR has no effect on the

4   benefit for novel anticoagulants versus warfarin.

5       Now, first of all, I want to reiterate

6   again, we are not here to bash TTR as a quality

7   measure.  If you decide that you're going to start

8   a patient on warfarin, achieving 2 to 3 INR is a

9   critical thing to do, and you should make every

10  effort to achieve it within the balance of culture,

11  reimbursement policies, and other issues that you

12  have to deal with in medical practice.  And when

13  you fall below 2, you're going to have more

14  ischemic strokes and less bleeding.  When you go

15  above 3, you're going to have more intracranial

16  bleeding and maybe, perhaps, even a slightly better

17  effect on ischemic strokes.

18      So I'm going to hit you with the key points

19  first.  I'm going to then go through some detail,

20  and then I'm going to come back to the final

21  points.  So what about quartile's center of INR?

22  And we'll go through this in more detail later.

1    But as you know, in our prespecified method,

2    without knowing how it was going to come out, we

3    simply found no relationship between center TTR and

4    the treatment effect of rivaroxaban versus

5    warfarin.

6        We're now bolstered in our thinking by the

7    actual results of the RE-LY trial, which was

8    referred to in the briefing book.  And here, the

9    FDA used a sleight of hand that we don't typically

10   recommend for our fellows.  What was done in your

11   briefing book was to compare quartile 1 with

12   quartile 4, without showing the data that was in

13   the middle, our mentioning that the test for

14   interaction had a p value that was not significant.

15       The interpretation of the RE-LY

16   investigators themselves is that there is no

17   interaction between center TTR and the impact of

18   rivaroxaban on stroke, compared with warfarin.  And

19   then finally, in data available on a public website

20   at the European Society of Cardiology, our

21   colleagues at the DCRI, together with their

22   sponsors, completed trial of another novel

1    anticoagulant, with even more patients than we had,

2    that showed absolutely no relationship between

3    center TTR and the estimate of the treatment

4    effect.

5        So the three most contemporary trials of

6    novel anticoagulant simply don't support the

7    concept that TTR should be used as an intermediate

8    variable to somehow decide whether or not you

9    should believe the results of the trial.

10       Now, the second key point I want to raise is

11   that, as was implied in the briefing book, we chose

12   unskillful investigators in order to make the

13   results come out better than they should have been.

14   You would have thought that the results in North

15   America, where the TTR was 64 percent, would have

16   looked worse for rivaroxaban than the results in

17   eastern Europe, where the TTR was 50 percent.

18       Well, the data just don't support that

19   conclusion, and it was certainly never anything

20   that we considered as we designed this global

21   trial, remembering that most people with atrial fib

22   don't live in the United States.   In fact, the

1    estimate of the treatment effect is more positive

2    for rivaroxaban in North America, and the least

3    positive two regions were Latin America and eastern

4    Europe.

5        The third point, despite the fact that the

6    FDA didn't seem to think this was important, as we

7    talked to multiple experts in anticoagulation

8    therapy, they've all told us that the event rates

9    that you get is the outcome of interest.  TTR is

10   what we typically call a process measure or a

11   biomarker.  What we're interested in is preventing

12   strokes.  And if you look at ROCKET AF, where the

13   TTR was lower but the CHADS score was significantly

14   higher, as you can see in the second column, and

15   then look for people with a CHADS score of 2, or a

16   CHADS score of 3, or greater, or you look at those

17   with a prior stroke, you'll see the event rates in

18   ROCKET were absolutely comparable to the event

19   rates that were achieved in the two other most

20   recent trials of novel anticoagulants versus

21   warfarin, RE-LY and ARISTOTLE.

22       Now, I just want to point out that we did

1    measure TTR using conventional methods.  And this

2    has been reviewed and agreed between the FDA and

3    the sponsor.  This Rosendaal method is used, and as

4    a standard for the field, it's important for

5    everyone to recognize, this involves an

6    interpolation.  The more often you measure it, if

7    you're in range, the better your TTR will look.

8    It's a linear interpolation.

9         We used a relatively conservative approach,

10   we believe, for the individual patient TTR, the

11   average for the trial as a whole, because we

12   included the start-up phase of the trial and only

13   excluded interruptions that were greater than seven

14   days.  Many other studies have excluded the start-

15   up of the trial, where you would expect the TTR to

16   be low.  I have to say, though, no matter how we

17   change the definition within definitions that

18   others have used, it had very little impact on the

19   result that we got.

20        So by our prespecified method, we had a mean

21   TTR of 55 and a median TTR of 58.  I would be lying

22   to you if I didn't tell you that when we unblinded

1    the trial and looked at this as an executive

2    committee, we went into high gear to try to

3    understand it because we wanted to be sure that we

4    had administered warfarin in an excellent manner.

5          Now, there's another measure which is

6    different, called the center TTR, which is the

7    subject of discussion, and I know will be reviewed

8    in detail by the FDA.  This can be done in several

9    ways.  We thought we had introduced, in advance in

10   the field in our prespecified method, because our

11   belief that when one looks at the amount of time in

12   therapeutic range, it would be better to count the

13   total time that one is on warfarin, so that one has

14   a total denominator and the total numerator, rather

15   than the way it's been done traditionally, in the

16   method of Connolly, where a patient on warfarin for

17   one week gets equal credit to a patient who's on

18   warfarin for five years.

19         We recognize the counter argument that,

20   since people who stay on warfarin tend to be those

21   who do better, that this could be regarded as maybe

22   not the best way.  We'd love to have a debate about

95

1    the best way, but it's not the main point today.

2    We just want to recognize that there were

3    differences.  We don't think they made a major

4    difference in terms of the interpretation of the

5    trial, and we'll show you why.

6          A slight caveat here; centers that have no

7    events and centers that have very few participants,

8    since you're averaging for patients in a center,

9    it's a little hard to come up with exactly how to

10   measure that.  It's just a problem with the method.

11         Finally, just to point out, when we look at

12   the quartile analysis across multiple ways of

13   measurement, with our way at the top, the FDA way

14   second from the top, you can see it really did not

15   have a significant impact on the multiple different

16   ways the quartiles end up being grouped.  So you

17   can imagine, if you change the definition slightly,

18   the centers end up in slightly different rank

19   order.

20         Now, I promise you, I did not come up with

21   this slide after we learned that Dr. Fleming was

22   going to be on the panel.  This only happened the

1   day before yesterday.  We got the roster.  But I

2   think it's not the most important argument, but I'm

3   worried that some people who have not worked in

4   this field may be misconstruing TTR for a surrogate

5   endpoint.  It simply does not make the cut as a

6   surrogate, and I refer you to the classic paper of

7   Fleming and Demets of 1997.

8         Now, you might believe, based on some of the

9   literature, that if you have atrial fib with a

10   potential for thrombus there, and you give

11   warfarin, and you measure time in therapeutic

12   range, you can explain all of the effect of

13   warfarin on the prevention of stroke and embolism.

14   But as Fleming and Demets showed, drugs don't work

15   that way.  Drugs have protean effects, and the

16   outcomes are affected by protean impacts from

17   things that are true to the drug and not true to

18   the drug.  Just as an example, atherosclerosis

19   itself, independent of thrombosis, can cause a

20   stroke.  That's not going to be impacted by the TTR

21   that you get.  Warfarin has effects on multiple

22   proteins that are not well quantified.  I can go on

1    and on about this, but I won't in the interest of

2    time.

3          The second key point to make in this section

4    is that, when one looks at the reference trials for

5    constancy, one can see that there is a broad range

6    of estimated time in therapeutic range.  Now, it's

7    critical to point out here, that these are old

8    trials.  Most of them didn't even have INR as a

9    measurement.  They had prothrombin ratio, the old

10   measurement that us old folks are used to.

11         But we did this in a think tank in 2008 and

12   published it.  It was our best estimate at the

13   time, not knowing how our data would come out.  And

14   you can see, there's really no very direct

15   correlation between the risk reduction ratio

16   compared to no warfarin and the TTR that was

17   observed in these trials.  And while it's

18   imprecise, if you thought the TTR was a great

19   predictor of what was going to happen with

20   prevention of stroke, you would expect to see the

21   studies line up in terms of risk reduction ratio as

22   a function of TTR.

1        So TTR just doesn't accurately predict risk-

2    benefit balance.  It is a predictor, and it is an

3    important quality measure in an individual site.

4    And the reasons are shown here.  I won't go into

5    them in detail.  I think you can all accept that

6    this is the case, but I'll show you more detail

7    from studies themselves that have recently been

8    done.  So we believe that TTR is a useful measure

9    for quality improvement, but it is not a valid

10   surrogate and we're happy to entertain any

11   discussion about that point.

12       So what about TTR in the context of this

13   study?  So first, let's think about what determines

14   TTR.  Here, I'm not giving references because there

15   are over 50, but there is really a consistent

16   result here when studies have looked at the

17   determinants of TTR, and the skill of the physician

18   is only one.  And we would argue that these

19   components outweigh the skill of the physician when

20   you look at the weights from the studies that have

21   been done.

22       Prior VKA use is a big factor; the

1    characteristics of the patient or the patients that

2    you're seeing in your clinic.  Comorbidities are

3    especially important.  The frequency of INR testing

4    itself is a measure for reasons I'll show you in a

5    minute.  Patient adherence is critical, and the

6    idea that a doctor can control that I think is a

7    little far-flung.  A doctor can influence it, but

8    not control it.

9         Structural factors in practice, in region,

10   and country are dominant factors.  There are social

11   mores by which people give warfarin for reasons

12   that we think we understand much better now.  But

13   even within the United States, a critical factor is

14   how much poverty there is in close proximity to

15   your clinic and how far away from the clinic your

16   people live and whether there is public

17   transportation available.

18        This is one of my favorite plots, but it's a

19   little hard to absorb.  Those of you who know Frank

20   Carroll recognize that we brought Frank in to

21   analyze this data from stem to stern, using

22   modeling techniques.  What this shows is if you go

1    out to predict TTR in the ROCKET population, what

2    predicted it?  If you start at the left-hand bottom

3    sign, you'll see that, starting with atrial

4    fibrillation type, there are a host of biological

5    clinical factors that have an impact on the TTR

6    that's achieved within the ROCKET trial when we

7    look at each of the sites and each of the

8    individual patients.  But the sum of all these is

9    relatively modest compared to whether or not the

10   patient was on a vitamin K antagonist and is also

11   modest, very modest, compared to the country that

12   the warfarin is being administered in.  In fact,

13   the country is three to four times more important

14   than all the other factors in aggregate.

15        Now, what about the trials themselves, not

16   only ROCKET AF, but the other trials, in terms of

17   the severity of illness of the population?  For

18   display, we picked out three of the baseline

19   characteristics that we thought were important.

20   And you'll notice that our centers with the worst

21   TTR also enrolled the highest-risk patients,

22   89 percent which adds 3 or greater, compared to

1   82 percent in those in the best quartile.  The same

2   holds for prior stroke and for heart failure.

3        If we then look at the ARISTOTLE trial, what

4   you see is the very same pattern, but a much lower

5   rate of these high-risk characteristics, a much

6   lower rate of these high-risk characteristics.  But

7   in ARISTOTLE, 32 percent of the patients in the

8   worst quartile were CHADS2, 3 or greater; 27

9   percent in the best quartile were CHADS2 or

10  greater.

11       Now, the best study to look in detail at

12  this and to quantify the impact of patient factors

13  on TTR is of area study (ph).  And this actually

14  shows the direct impact on the numerical percent

15  TTR for a population.  And you can see that being a

16  woman compared to a man, after adjusting for other

17  factors, has a 3 percent impact on TTR.  And we had

18  a very high number of women in our trial.  The

19  number of medications, an important factor,

20  hospitalization, socioeconomic status, all of these

21  are factors that were more heavily represented in

22  our trial than the others, and certainly had an

1     impact on our TTR.

2          Now, how does this stack up for U.S.

3     anticoagulation?  Dr. Mahaffey has already shown

4     you this slide.  The mean for the U.S. is .55,

5     exactly what we got for the trial as a whole.  But

6     some very recent data just shown last December from

7     the Quest Diagnostics, in practice in the United

8     States, when people check an INR, how does it look?

9     We have the modest sample size of 3,493,000 samples

10    in this population-based study.  And what you'll

11    see is that only 50.6 percent of them were in the

12    therapeutic range.

13         You'll also notice a pattern here that we

14    saw in our trial and every other study.  For those

15    who have not looked at these kinds of data, it's

16    important to recognize that, by and large, the

17    problem we see is that under-anticoagulation, not

18    over-anticoagulation, in the populations.  But when

19    we look at our trial, we find not only were we

20    better than U.S. practice in North America, we were

21    also comparable to the other studies in North

22    America.  Here, you see RE-LY, ACTIVE W, and

1    SPORTIF.  This is hardly a result that should be

2    attributed to unskillful clinicians.  And I have to

3    say, on behalf of the executive committee and the

4    over 1,000 investigators, we don't think we're

5    unskillful.  We think we're pretty good.

6         Now, if we then go and say, what about the

7    other regions, you'll find, when we match up with

8    RE-LY, the reference trial referred to by the FDA,

9    our results, taking into account the severity of

10   illness factors that I've just shown you, we think,

11   are directly comparable to the results that were

12   seen in RE-LY.  The sum is because we had more

13   patients that were enrolled in these other parts of

14   the world.  And, in fact, specifically, we had more

15   patients enrolled in eastern Europe, a point that

16   the FDA makes.  It's true.  People in eastern

17   Europe have atrial fibrillation also.

18        So when we take these regional differences

19   and the fact that we were the same as the other

20   studies, given the regions that were included in

21   our trial, and adjust for that, we find that we're

22   pretty close to RE-LY, and that if you take into

1    account the severity of illness, we believe we did

2    as well, or perhaps even better, than the other

3    trials in terms of management of anticoagulation.

4         So our conclusion in this part is that TTR

5    was similar to recent trials.  It was similar to

6    other trials in North America, despite the higher

7    risk.  It was better than global practice.  It was

8    similar to the standard U.S. practice with the

9    trial overall, and specifically in North America,

10   it was better than U.S. practice.

11        So do we have direct evidence of a cultural

12   effect?  And this is a fascinating sub-analysis,

13   and maybe even discussion we can go into more, but

14   in the interests of time, I'll do it quickly.

15        If one asked the question -- in our study,

16   if someone came in with a low INR -- and remember

17   the circumstance.  A patient comes in, once a

18   month.  There's a blinded INR that's done.  The

19   physician gets that result back immediately and is

20   instructed to make a dose adjustment either for the

21   blinded rivaroxaban dummy or for the real warfarin.

22   And you ask the question, when was the patient

1  brought back for the next measurement?  As you

2  would expect, in North America, if the INR was

3  really low, less than 1.5, within eight days on

4  average, the patient was brought back, within 14

5  days for a slightly less low INR; western Europe,

6  similar.  But as we get to Latin America, eastern

7  Europe, and Asia Pacific, you can see that what

8  they did was to bring the patient back at 30 days.

9  But remember, they adjusted the dose based on the

10  blinded INR they had at that time.

11        It's important to point out here, we

12  excluded the first three months because, during

13  that time, we had specified protocol study visits

14  at one week, two weeks, and four weeks.  And that

15  would make it look like people were coming back for

16  clinic, based on the clinician's recommendation,

17  when that was really what the protocol was asking

18  them to do.

19        We do have evidence, then, and you say, did

20  they make the right adjustment?  And here, we find

21  there's no material difference, according to

22  region, other than a slight underdosing in eastern

1    Europe and Asia Pacific.  And, frankly, what we

2    found in discussing this with colleagues all around

3    the world is that, in general, if a patient has

4    trouble getting back to clinic, you will tend to

5    underdose the anticoagulation, under the precept

6    that we're all taught to do no harm.  An

7    intracranial hemorrhage to a clinician, as you

8    know, is a devastating outcome that may cause them

9    not to prescribe anticoagulation in the next batch

10   of patients.

11          So, in conclusion, there is a variation by

12   region.  This induces a somewhat artificial

13   lowering of TTR, because with a linear

14   extrapolation, if you adjust the dose but you wait

15   30 days to bring the patient in, you get no credit

16   for that time, whereas if you bring them in

17   quickly, you get credit for that time in the linear

18   extrapolation.

19          For those of you who haven't caught onto

20   this yet, those of you who are looking at practice

21   measures in the U.S., this is a trick that all

22   American hospitals know now.  You can look really

1    good in your TTR to report for public purposes if

2    you bring people back alive and measure them when

3    they're within the therapeutic range already.

4         So now, finally, the really critical point I

5    think to this discussion, we just don't see

6    evidence that center TTR had an impact on the

7    estimate of the treatment effect.  Within our own

8    trial, regardless of the quartile that we looked

9    at, you can see that the confidence intervals, even

10   within each quartile, don't come close to the

11   prespecified non-inferiority margin.  I've already

12   shown you that the other two contemporary trials

13   show the same thing.

14        Now, this is the last part, and bear with

15   me.  This is the most complicated part, but I think

16   it's really important.  Those of you who are

17   accustomed to looking at data know that when one

18   changes definitions and moves people from one

19   quartile to another, you can hide some really

20   interesting and important data.

21        So together with Frank Carroll and the

22   statisticians at DCRI and J&J, we worked on some

1    modeling to look at every single center.  We'd

2    gotten used to using the term open kimono because

3    people understand exactly what that means.  This is

4    not hiding anything within any arbitrary quartile.

5    This is showing you all the data.

6         So this is using our prespecified

7    definition, and bear with me here.  In the spirit

8    of a global trial, I want you to start at the

9    right-hand side of the slide, not the left-hand.

10   So start on the right.  The first dot represents

11   centers with excellent anticoagulation if you

12   believe that TTR is all there is to it.  And you'll

13   see the estimate of the treatment effect is well

14   below the line of 1, indicating favoring

15   rivaroxaban in that group of sites.  You'll also

16   notice the confidence intervals go to the sky and

17   the ceiling, because this is the first small batch

18   of sites.

19        As we go from right to left, we enter one

20   site at a time or one group of sites at the time,

21   according to rank order, center, time in

22   therapeutic range.  And as you'll notice, as we get

to 65 and 60, the line begins to stabilize.  The
confidence intervals come together.

As the FDA rightly points out, we do not
have voluminous data in the greater-than-75
category, but when we look at this pattern, what we
see is really something that shows pretty much
constancy across the range and some random
variation, because you wouldn't expect the estimate
to go up at 70 and then come back down at greater
than 80 if this were a true trend.

This is looking at the primary efficacy
endpoint.  And this is looking at the FDA
definition for a greater-than threshold of safety
on-treatment population.  And you can see that,
with the FDA's definition, which defined the
outcome somewhat differently, and resulted in
grouping the centers somewhat differently, the line
looks modestly different.  But we would argue that
the pattern really looks the same.  There's up and
down action in the line, but nothing that I would
regard as something that's a true effect.

I think, very importantly, if we take this

1    really critical endpoint of intracranial bleeding,

2    one might think that if you have the most skillful

3    centers, that they would have a very low rate of

4    intracranial bleeding with warfarin.  And this is

5    where rivaroxaban would really not look better for

6    this endpoint.  But, if anything, rivaroxaban looks

7    even better than warfarin, the better the skill of

8    the center, up in that upper range.  And so there's

9    no evidence here that the center TTR should really

10   be impacting our overall thinking about either the

11   quality of the trial or the result that was

12   observed.

13        Now, we did some fancy modeling because,

14   since we did not see heterogeneity, we did not see

15   breakpoints, and swine plots, and other ways of

16   looking at it, that the best estimate of the event

17   rate on warfarin would be as a function of center

18   TTR is a linear relationship.  But look.  When we

19   add in rivaroxaban the same way, there is a much

20   lower slope, much smaller slope, but the very same

21   relationship.  And you'll notice that the lines do

22   not cross.  For completeness, we add in the

1    95 percent confidence intervals here.

2         Now, if we take the ratio of these two

3    plots, approximately the ratio of these two plots,

4    and look at the estimated treatment effect as a

5    function of center TTR, you'll notice that the line

6    never crosses 1 for the primary analysis.  And,

7    again, we're only claiming non-inferiority in this

8    analysis.  There is a slope to the line.  It's not

9    statistically significant.

10        Now, if we add in the quartiles that the FDA

11   uses, you'll see the capriciousness where the third

12   quartile drops below the line, and the fourth

13   quartile goes above the line.  And the straight

14   line would bring them into something that I think

15   would be a more reasonable estimate of what you're

16   actually seeing in the data.

17        Now, obviously, we get into opinion here,

18   and we have to fall back on the other recently

19   completed trials for validation of what we believe

20   to be the case with these data.  So we conclude

21   that when all the results are displayed, open

22   kimono, you can see everything that we have, there

1    is no evidence that center TTR is a significant

2    predictor of the estimate of the comparison of

3    rivaroxaban or warfarin.

4         Then finally, I think it's important to

5    bring up North America because it has been the

6    topic of much discussion in these committee

7    meetings recently, some of these involving our

8    coordinating center with fairly well-known clinical

9    trials.  And recent trials have highlighted these

10   differences.  It is important to show that the

11   trial was well done in North America and that

12   there's no reason to think there should be

13   heterogeneity in interpretation.

14        I've already shown you this slide.  I'll

15   move through it quickly, but just to point out,

16   North America had the highest time in therapeutic

17   range, comparable to other trials with a North

18   American result.  And a point estimate for the

19   rivaroxaban/warfarin comparison is most favorable

20   in this region, with the best time in therapeutic

21   range.  So we see no reason to exclude North

22   America from access to this treatment.

1          The very last point, event rates as a

2   measure of quality of anticoagulation, I only have

3   one slide on this.  I've already shown you this

4   slide.  Contrary to the FDA point of view, we spent

5   a lot of time trying to estimate what the event

6   rates would be.  There was numerous prior data.  We

7   pretty much hit it on the head.  And our event

8   rates for the same populations in other

9   contemporary trials show that our doctors were just

10  as good at using warfarin.  They may have used

11  slightly different methods because they're from

12  different countries, and we did not artificially

13  tell them to use the U.S. method, but they got

14  results that were just as good.

15          I also think it's important to realize that

16  these event rates are really representing a very

17  excellent level of anticoagulation in general.  And

18  you'll notice that, at the end of the trial where

19  we had under-anticoagulation with either treatment,

20  the event rates went back up to the basal rate that

21  you would expect.  So we think this is evidence of

22  excellent anticoagulation.

1            So, in summary, then, about TTR, there's no

2      relationship between treatment effect and center

3      TTR in our trial or the other two contemporary

4      trials that have recently been reported.  The best

5      TTR observed was in North America, with the most

6      favorable estimate of the effect, and the risk-

7      adjusted warfarin event rates are comparable to

8      other contemporary trials, indicating well-managed

9      warfarin.

10           Now, the final three slides, the approval

11     standard in 2011.  This is a tough one I think.

12     Representing the sponsor, it's not appropriate for

13     me to get into some of the things I would say in a

14     more academic environment about this.  But we think

15     that we designed a trial in good faith.  I intended

16     to find a substitute for warfarin.  We think, in

17     the spirit of non-inferiority trials, we preserved

18     the benefit of warfarin, and that there are

19     numerous other advantages that we have elucidated

20     that are important to patients and doctors and that

21     are critical to anticoagulation around the world.

22     We believe that indirect comparisons for treatment

1    effects are not reliable.

2         So what about these cross-study comparisons

3    that may be alluded to in a discussion?  We think

4    comparing studies to understand how the studies

5    were done, as the FDA has emphasized, are the right

6    thing to do.  But if we fall prey to a situation

7    where indirect comparisons across clinical trials

8    are used to rank drugs in terms of their safety and

9    effectiveness, we will be doing a disservice to the

10   public health.

11        Specifically, with regard to ROCKET and

12   RE-LY, we'll point out that nowhere in the FDA

13   briefing book does it point out that RE-LY was not

14   a blinded study.  This is a major factor in the way

15   clinical trials are done.  And if the point of the

16   briefing book is that we should do not-blinded

17   studies and hold them in the same regard as

18   complex, blinded studies and then to do away with

19   investigator bias, I think we're taking a step back

20   in terms of the history of clinical trials, and I

21   would hate to see that happen.

22        Let me be clear here.  I am not bashing

1    RE-LY.  It was a great trial.  I'm on record of

2    having said the ideal design would be two trials,

3    one blinded, one unblinded.  But at today's cost

4    and the complexity of doing these trials, it's not

5    necessarily the case that you can always do that in

6    one study program.  These different designs,

7    different drugs, different patient populations, and

8    different regions for a global problem simply do

9    not support using indirect comparisons to draw

10   conclusions about ranking one drug compared to

11   another on behalf of the public health.

12        Final slide.  I know you're worn out; I am,

13   too.  ROCKET AF was a definitive double-blind trial

14   comparing rivaroxaban with warfarin.  It shows

15   robust, non-inferiority efficacy for all analyses.

16   It shows superior efficacy while on treatment, but

17   a classical intention to treat does not reach the

18   mark for superiority in that regard.

19        It has a favorable safety profile, the

20   reduction, major clinically important but also very

21   psychologically important to practitioners' outcome

22   of intracranial hemorrhage.  And, therefore, it's a

1    proven alternative to warfarin for the prevention

2    of stroke and systemic embolism in patients with

3    nonvalvular atrial fibrillation.

4        Thank you very much for your attention

5    through this presentation.

6    **Clarifying Questions for the Sponsor Presenters**

7        DR. LINCOFF:  For about the next half-hour,

8    we'll move onto clarifying questions from the

9    committee for the sponsor.  I'll remind you that,

10   at this point, we'd really like to confine the

11   discussion to questions for the committee.  We'll

12   have time later -- for the sponsor.  We'll have

13   time later for discussions on other issues.

14       Dr. Kaul?

15       DR. KAUL:  Thank you, Mike.  I have three

16   questions that I would like to ask.  But I'd like

17   to start off with, the efficacy of warfarin as an

18   active control is established on the basis of

19   reduction in ischemic stroke, or hemorrhagic

20   stroke, or both?

21       DR. PETERS:  The non-inferiority margin

22   calculation was based on ischemic -- on stroke and

1    non-systemic embolism, so the same endpoint we used

2    in this trial.

3         DR. KAUL:  So the question I have is, does

4    warfarin reduce ischemic stroke or hemorrhagic

5    stroke?

6         DR. PETERS:  It reduces ischemic stroke.

7         DR. KAUL:  So why are we adding hemorrhagic

8    stroke in the assessment of efficacy?

9         DR. CALIFF:  This is a good point of

10   discussion and consideration.  You're well aware

11   that many people die from a stroke, and no one ever

12   knows whether it was ischemic or hemorrhagic.

13   We're in an era where, if one does an MRI, for

14   example, the classification itself has significant

15   bias.

16        So we thought the best thing to do, and what

17   is the standard in the field, for better or

18   worse -- I actually think for better -- is to say,

19   we got a big endpoint that's critical to patients

20   called stroke.  The summative effects of the

21   treatment should be beneficial in that regard.  I

22   fully understand the argument that one could look

1  at it differently, and it would not be totally

2  illogical, but it was not a prespecified plan.

3        DR. KAUL:  So the follow-up question is that

4  if you're going to count hemorrhagic stroke towards

5  an efficacy assessment, is it fair to also count

6  that towards a safety assessment?

7        DR. CALIFF:  Fair?  Some quotes come to mind

8  about fair, but I want to be clear with everyone,

9  and I think we were clear in our presentation.

10  Right at the beginning, we pointed out, we're

11  double-counting.  And it comes up in every

12  presentation and discussion that we have.

13        From my perspective, the most important

14  thing to know is what's the total effect on stroke.

15  And for a patient and a doctor, it's weighing this

16  array of ischemic and bleeding outcomes.  So I

17  think when you talk about efficacy and you talk

18  about safety, I would argue it's totally fair as

19  long as you're transparent about what you're doing.

20  When it comes to the risk-benefit balance question,

21  I think it's pretty irrelevant.

22        DR. KAUL:  Do you have data where you don't

1    count the hemorrhagic stroke as a bleeding

2    endpoint?  And so are the differences in bleeding

3    that don't count hemorrhagic stroke statistically

4    persuasive, in favor of rivaroxaban?  And

5    conversely, I also would like to see -- I mean, I

6    like the data that you showed, the graph that you

7    showed, slide 72.  But what I would like to see

8    there is also data for disabling stroke that

9    excludes hemorrhage.

10          DR. CALIFF:  I think we ought to start with

11   the first question.  Probably, Dr. Nessel can

12   answer this the best, but let me try to reinterpret

13   your question to make sure I got it right.  You

14   want to know about the bleeding outcomes with the

15   two treatments if you don't count hemorrhagic

16   stroke as part of the bleeding outcome.

17          So let's start with that.  We don't have

18   that?  Anything that you ask for, we can get before

19   the end of the day, and we certainly will.

20          DR. NESSEL:  Just a comment to the

21   committee.  Since hemorrhagic stroke was a

22   prespecified composite, or part of the composite

1    primary safety endpoint, it is included.

2            DR. PETERS:  The hemorrhagic stroke of the

3    intracranial hemorrhages -- hemorrhagic stroke was

4    the largest component of the intracranial

5    hemorrhages, but also subdural hemorrhages, and

6    there were a few subarachnoid hemorrhages, were

7    also numerically fewer with rivaroxaban compared

8    with warfarin, but in the intracranial hemorrhage

9    endpoint.

10           DR. CALIFF:  But we will get you the data

11   specifically that you asked for.

12           But if I could see the slide that had the

13   disabling strokes, the clinical outcomes.

14           DR. PETERS:  We could do the primary

15   endpoint with the stroke outcomes for the primary

16   endpoint.  We do a slide of that for the outcomes.

17   So this is stroke type and subtype.

18           If we could have the outcome for the primary

19   endpoint.

20           DR. CALIFF:  Disabling, not disabling.  We

21   saw it up here just a minute ago.

22           It'll take a second.  There are a few slides

1    in backup.

2         DR. PETERS:  While we're waiting for that,

3    there was a reduction both in death and disabling,

4    and the non-disabling was more equal.

5         DR. CALIFF:  Yes.  I think there is a story

6    here that I think you all recognize from all the

7    novel anticoagulants, which is a reduction in

8    intracranial hemorrhage.  And so you can see

9    there's a hefty reduction in disabling stroke,

10   really a quality in terms of non-disabling stroke.

11   So the worst outcomes are favoring rivaroxaban

12   here.

13        Is that what you wanted to see?

14        DR. KAUL:  No.  I wanted to see the

15   disabling stroke data, excluding hemorrhage.

16        DR. CALIFF: Excluding hemorrhage.  Okay.

17        DR. PETERS:  If we could look, we do have

18   ischemic stroke outcome data, if we could look for

19   that slide.  We're looking for outcome data by the

20   subtype of stroke, ischemic versus hemorrhagic.

21        What that will show is similar to what you

22   might expect, is that for the hemorrhagic strokes,

1    there's a clear reduction in the mortality and the

2    disabling; actually mostly in the mortality because

3    there are fewer of them, and they have a high

4    mortality rate.

5         Slide on.  But for the ischemic strokes,

6    what you can see here is that the -- so there are

7    three populations.  There's the on-treatment

8    population, which was most of the data you saw up

9    to last dose, plus seven days up to last dose, plus

10   30 days, the left side, the rivaroxaban, those

11   three on warfarin, the right side.

12        So the total number of strokes, you can see

13   there, are 149 versus 161 for the on-treatment; for

14   death, 26 versus 28, fairly comparable; for

15   disabling, numerically fewer, 37 versus 50; and for

16   the non-disabling, 79 versus 75.  So, clearly,

17   overall, some numerical reduction in the ischemic

18   strokes and no adverse impact in terms of the

19   outcome; if anything, a trend for a little bit

20   fewer disabling.

21        Is that what you were looking for?

22        DR. CALIFF:  Let's get the other data he

1    asked for and show it later.

2          DR. LINCOFF:  Dr. Nissen?

3          DR. NISSEN:  I have two quick questions, one

4    for Dr. Mahaffey.  You made the case that doctors

5    don't use warfarin very well, and, particularly, I

6    think in some of the third-world countries.  But I

7    was very puzzled by what you said, is that no

8    education of sites on INR management was performed,

9    nor was there any protocol-mandated approach to

10   this.

11         So my concern is whether you, in fact, made

12   an effort to get the sites to use warfarin as well

13   as they might.  Now, maybe I misunderstood what you

14   said.

15         DR. PETERS:  Dr. Mahaffey?

16         DR. MAHAFFEY:  Thanks, Dr. Nissen.  Sorry if

17   I wasn't clear.  We did comprehensively educate all

18   sites across the world in multiple investigator

19   meetings about the importance of INR management and

20   how to get to a target INR of 2.0 to 3.0.  What we

21   did not do, as some other investigators have done,

22   was to provide a cookbook algorithm for the sites

1   about what to do with a specific INR in terms of a

2   dose change.  That, we decided as an investigative

3   group, we weren't going to do, but we did educate

4   people at the beginning of the trial and then, as I

5   said, throughout the trial with subsequent

6   investigator meetings, newsletters about the

7   importance of INR management, and with study

8   materials.  And some of these specific details are

9   shown here.

10       DR. NISSEN:  Right.  But given the fact that

11   I think you guys knew that the TTR was going to be

12   a critical factor in the approvability of the drug,

13   I'm just puzzled as to why you didn't make an

14   effort to give sites, particularly third-world

15   sites, some guidance about what to do.  I mean,

16   basically, you sort of left them on their own, and

17   my concern is that that's why you got such a low

18   TTR.

19       DR. CALIFF:  So, Dr. Nissen, I'm sure you

20   didn't mean to use the term third world, because I

21   don't think that's an appropriate term anymore.

22   And, in fact, if you look at the news today, you

1    would find what you're calling third world actually

2    owns most of our national debt.

3         [Laughter.]

4         DR. CALIFF:  So I think investigators around

5    the world would be highly offended by this sort of

6    American-exceptional tone of some of the

7    discussion, not you personally, but it's part of

8    the background here we need to acknowledge.

9         DR. NISSEN:  But Rob, you --

10        DR. LINCOFF:  Let's focus on -- let's focus

11   on the science.

12        DR. NISSEN:  Robert, you showed us that

13   those sites in those countries didn't do a very

14   good job of managing warfarin.

15        DR. CALIFF:  Yes.  That's where I want to

16   go.

17        DR. NISSEN:  That's where this all comes

18   from.

19        DR. CALIFF:  But these two concepts are

20   related.  I don't think we need to show a slide

21   here, because I think the critical point is -- and

22   I think Dr. Mahaffey misspoke slightly.  It's not

1  that doctors do a lousy job.  This is a really hard

2  drug to use, and it's especially really hard to use

3  in various socioeconomic personality characteristic

4  circumstances.  You know that as well as I do.

5  　　　　I have an engineer patient that comes in

6  with his Excel spreadsheet.  He's right on the

7  numbers every time.  My mother does home INR

8  testing.  She's right on the numbers every time.

9  Most people don't live in that world.  So what we

10  felt obligated to do was to do better than standard

11  of practice.  Given the heterogeneity of the

12  practices in those centers, we spent a lot of time

13  with every site saying how do you do it?  Let's

14  make sure what you're doing is okay, but let's not

15  force you to use one specified algorithm.  Let's

16  make sure you make the appropriate dosing changes.

17  In fact, I showed you that it wasn't that they

18  weren't making the appropriate dosing changes.

19  They just brought the patients back when it was

20  feasible to do it.

21  　　　　Now, one could argue that one should spend a

22  fortune sending a limousine out to pick up patients

1    in countries that need anticoagulation and

2    artificially make the TTR come out better.  We

3    chose to really focus on the highest quality care

4    that we could get at these sites in a global trial.

5         DR. NISSEN:  But you could have told them

6    that if the INR was less than 1.5, that the patient

7    should be brought back quickly.  You could have

8    instructed them to do that.

9         DR. CALIFF:  We did instruct them to make

10   every effort to get the patient back.  I mean,

11   there were detailed investigator meetings.  We had

12   numerous monitoring visits to the sites, but there

13   are limitations on what a site can do in practice

14   in many places.

15        But, again, I want to emphasize, the TTR is

16   a somewhat artificial measure if you've already

17   adjusted the dose but you measured 30 days later.

18        DR. NISSEN:  My second quick question, if I

19   could, if you could bring up slide CC-47.

20        DR. PETERS:  While that is coming up, the

21   other point we showed is that, within those regions

22   that were poor, in ROCKET, they did as well as in

1   studies that did provide such advice, and they were

2   open label, and they had all the advantages

3   of -- or approximately the same given patient

4   characteristics.

5        DR. CALIFF:  Mr. Chair, could I -- I mean, I

6   think that last point is critical, and I'm sorry

7   that I neglected, but I want to pile on, on that

8   issue.

9        If you think that these extraordinary

10  measures make a difference, why is it that in these

11  same regions, we got exactly -- accounting for

12  slight differences in patient populations, exactly

13  the same TTR as the other studies did in the same

14  region?  So I think our methods were just as good

15  as the others.  We just chose a different route.

16       MR. COUKELL:  I'd like to see this slide,

17  exactly the same format, but not for the

18  on-treatment population, but for the full analysis

19  set, the full ITT analysis set through the end of

20  the study.  So this exact format.

21       DR. PETERS:  So this we have for ITT to site

22  notification for the primary endpoint?

1          MR. COUKELL:  Not site notification, but

2     through the end of the trial, not to site -- the

3     full ITT, full observation period.

4          DR. PETERS:  I'll have to check to see if we

5     have that.  Okay.  Slide on.  We do.

6          So here's the data, here to look at.  I

7     don't know, Rob, if you'd like to --

8          DR. CALIFF:  Yes.  So this is it.  Again,

9     I'd point out that no other trial has carried on

10    for 30 days after the final follow-up visit, so

11    we're including this transition period that we've

12    discussed in detail, but at least to executive

13    committee's satisfaction, the non-inferiority

14    criteria are met.  And we've shown you that in the

15    point estimate and confidence interval.

16          DR. NISSEN:  The reason I wanted to see this

17    is I wanted to see whether, in fact, there were

18    actually more ischemic strokes in the rivaroxaban

19    arm than the warfarin arm with the full analysis

20    set through the end of the trial.  And there are

21    slightly more, 226 versus 220.  So the point

22    estimate, in fact, is above 1 for rivaroxaban, if

1    you look through the end of the trial.

2         DR. CALIFF:  That's true, but I don't think,

3    in practice, there would be the entire population

4    taken off of a treatment and making a transition,

5    so it's a somewhat artificial last month.  But,

6    again, we looked.  The comparable data that are

7    being discussed today, nobody looked.

8         DR. PETERS:  So the other point, so this

9    analysis with this primary ischemic hazard ratio of

10   1.03, the upper bound is 1.24, which is still well

11   below the non-inferiority margin.  And this does

12   include the ischemic strokes in the post-treatment

13   period, where you saw there was clearly inadequate

14   anticoagulation in those who were on rivaroxaban

15   compared to those who were on warfarin.  So even

16   with that included, the hazard ratio was very close

17   to 1.

18        DR. NISSEN:  Later, I'd like to see this,

19   then, in the patients in whom the TTR was in the

20   upper range, up in the mid- and higher 60s.  In

21   other words, how does that, a point estimate,

22   drift -- if you use the full ITT analysis -- and

1    I'd be interested in later hearing from Dr. Fleming

2    who's, I think, been an advocate of that sort of an

3    approach -- if you looked at the patients where the

4    TTR was up in the mid- to upper 60s.  That's the

5    question.

6              DR. PETERS:  So you are asking for a

7    quartile analysis?

8              DR. NISSEN:  I think, at some point, I think

9    we are going to see that in the analysis from the

10   agency, but I'm just -- it's a rhetorical question.

11             DR. PETERS:  I'm not sure.  Okay.

12             DR. LINCOFF:  Dr. Sager?

13             DR. SAGER:  A few clarifying questions.  One

14   is, did the executive committee have a target TTR

15   for this study?  I mean, was there a number that

16   you would have liked to have seen, actually, when

17   you started the study, that you thought was

18   appropriate?

19             DR. CALIFF:  Well, of course, we'd like to

20   see as high a TTR as possible, and so shooting for

21   around 60 would be -- but at the time the study was

22   designed, we didn't have all these data about

1    regional differences and severity-of-illness

2    differences.

3         DR. PETERS:  I would say that SPORTIF III

4    and V were kind of the trials that these were being

5    designed, following on, an ACTIVE W a little bit

6    just before we started.  So we were looking at mid

7    60s, but we didn't set a specific target that I'm

8    aware of for the trial.

9         DR. SAGER:  Thank you.  And we looked at a

10   lot of data in the presentation, but I just want to

11   clarify that the sponsor would agree that higher

12   levels of TTR are associated with reductions in the

13   primary endpoint, stroke and embolic events, in

14   just the warfarin group.

15        DR. PETERS:  If you look within the warfarin

16   subjects, if you look at that center-based

17   quartile, or the line, with the model, you will see

18   that the event rates decrease as TTR gets better.

19   But also, event rates in the rivaroxaban group were

20   lowest in the best quartile because there are many

21   other factors.  Patient differences, intensity of

22   concomitant medications, other things.  So, again,

1    as we showed in the presentation, the relative

2    difference -- rivaroxaban line was always lower

3    than the warfarin line, and the relative difference

4    narrowed slightly, but not statistically

5    significantly differently.

6         DR. SAGER:  Thank you.  And then the last

7    question is -- and Tom Fleming may want to make a

8    comment here also.  With this whole question about

9    55 percent versus 65 percent, has the sponsor

10   attempted to do any kind of modeling?  And,

11   obviously, this is more hypothetical of course, but

12   what might have happened had the TTRs and the

13   warfarin group actually been a bit higher?

14        DR. PETERS:  I think, if we could put up

15   again the slide with the Connolly model, just to

16   review that, the one before this, since you've

17   presented this the first time.

18        DR. CALIFF:  I guess I went through this too

19   fast.  But this is not just the sponsor's modeling.

20   It's the executive committee's modeling and

21   independent consultants that also looked at it,

22   most notably Frank Carroll.  And the major point I

1    was trying to make is that, as best we can tell,

2    for the comparison of rivaroxaban and warfarin,

3    there's no significant interaction with center TTR

4    that we can detect.  And it's also true of the

5    other contemporary studies.  So the best model of

6    the data that you can do would say TTR should not

7    be a consideration when looking at a comparison of

8    the two drugs.

9             DR. LINCOFF:  Mori Krantz?

10            DR. KRANTZ:  Sorry.  I just had a quick

11   follow-on on the whole TTR thing, but it's more of

12   an operational question.  I think we alluded to, in

13   the briefing documents, that we're using Coumadin

14   clinics quite a bit now.  They're very common,

15   these programmatic approaches.  So I was curious.

16   What proportion of your sites, globally, had

17   systematic clinics or programs in place?  And then

18   what proportion actually used that operationally to

19   dictate changes in therapy?

20            DR. PETERS:  I'll ask Dr. Nessel to respond

21   to that question.

22            DR. NESSEL:  Thank you.  Patients in

1    ROCKET AF, as Dr. Califf indicated, were garnered

2    from 45 different countries.  The spread of

3    physicians included in this study included

4    internists, cardiologists, neurologists, and

5    occasionally hematologists.  While there was no

6    proscription against using an anticoagulant clinic,

7    they were included.  But I'm not certain that we

8    could possibly discern how many sites precisely had

9    a Coumadin clinic versus not.

10             DR. KRANTZ:  And I think in the U.S.

11   certainly we were aware of that, and there's data

12   in the literature that you cited, that Coumadin

13   clinics, irrespective of TTR, do better in terms of

14   outcome.  So is there any way we can just get a

15   feel for whether that was completely disregarded or

16   whether that was used in certain cases?

17             DR. PETERS:  To my knowledge -- we can

18   check.  But to my knowledge, we didn't record in

19   our database, either at baseline or during the

20   study, what form of management was being done

21   locally.  Again, the sites were free.  They had to

22   use the blinded device, but that could have been

1    done out of their clinic or out of their local

2    office.  And I don't believe we recorded that

3    information and which type of setting it was used

4    in.  But we will check into that.

5         DR. KRANTZ:  Let me just make one final

6    comment.  The reason I'm pursuing this is because I

7    think what's somewhat nice about your study is it

8    was designed to be a mimicking of what's happening

9    in real-life practice rather than something that's

10   artificial protocol.  If you accept that argument,

11   though, it would be useful to know if indeed we

12   followed what the standard of practice was.  That's

13   the reason I'm being persistent on that question.

14        DR. PETERS:  Right.  So I do know that,

15   within North America -- you saw the data, and we

16   were 64 percent in range for North America as a

17   whole, across the spread of sites.  For the U.S.

18   only, it was 63 percent.  Canada was 66, southern

19   North America.

20         So that's better than what was shown kind of

21   in the -- that's equivalent to the anticoagulation

22   clinic data that was shown and better than the

1    usual care data.  And we did have, obviously, a

2    range of sites, which some were on the lower end

3    and some were on the higher.  But on average, in

4    the U.S., the time in therapeutic range was

5    63 percent, which we think is very representative

6    of a high level of management of warfarin.

7         DR. CALIFF:  If I could just add briefly to

8    that, obviously, these were mostly high-volume

9    sites.  People that participate in clinical trials

10   have to have a certain number of patients who are

11   eligible to participate.  So I don't think we've

12   formally collected whether they're something called

13   a Coumadin clinic.  They were high-volume sites,

14   and we tried to show you that, actually, in the

15   dose adjustment, they did what they were supposed

16   to do, even in the sites where they didn't bring

17   the people back as quickly.

18        So we think the anticoagulation management

19   was better than standard practice.  I would call it

20   real world plus an adjustment for enhancing

21   practice to be closer to clinical practice

22   guidelines.

1        DR. PETERS:  I can make one additional

2   comment that came to mind.  In terms of that time

3   to return for an INR less than 1.5, there is

4   literature from a large group of coagulation clinic

5   data in the U.S., and the average time there was

6   right at seven to eight days, which very closely

7   matched what we saw in our study in the North

8   American population.

9        DR. LINCOFF:  Dr. Fox?

10       DR. FOX:  Yes.  This is quite apropos to the

11   line of questions in the last couple of minutes.

12   So you showed us the very nice observational data

13   in the United States, kind of giving the context of

14   a comparison between the best you can get, so to

15   speak, and a rigidly controlled clinical trial

16   atmosphere in the mid- to high 60s of TTR, versus

17   Coumadin clinics kind of getting close and usual

18   care, kind of falling down to about what was seen

19   in the trial overall, or maybe lower.

20       Are there similar data for other regions in

21   the world that would place some context around the

22   TTRs that were achieved in those regions?

1          DR. CALIFF:  The short answer is yes.  I had

2     a slide on this that we took out, and it probably

3     didn't make it to the deck, but I can show it to

4     you.  At the European Society of Cardiology that

5     just occurred, there was a very large registry that

6     was shown with the INR data from each region.

7          Do you think we have that?  If not, we can

8     get it and show it to you.  But on average in the

9     rest of the world, there's a tendency to

10    under-anticoagulate, very much mimicking what we

11    saw in the trial, that we had to overcome with a

12    dose adjustment approach that we used with the

13    blinded INRs.

14         DR. FOX:  That's pretty much what I would

15    have expected you to say, and I think it's relevant

16    to Dr. Krantz's comment about, which do you want.

17    Do you want a somewhat artifactual situation of a

18    clinical trial, or do you want it to resemble more

19    real-world medical practice?  And I think that's an

20    important distinction that we should talk about

21    later today.

22         DR. LINCOFF:  Dr. Emerson?

1        DR. EMERSON:  This is in reference to

2    slide 82, and I can ask the question better if you

3    bring that up.

4        DR. PETERS:  So slide 82 from the core?

5        Slide on.

6        DR. EMERSON:  So my question is, have you

7    done an analysis to look at these sorts of things,

8    within both the completed study medication,

9    separately from this early discontinuation, to see

10   what the event rate is during the first 30 days

11   after stopping, as a function of cumulative drug

12   exposure?

13       DR. PETERS:  We have Kaplan-Meiers of those

14   time periods over time, but not based on

15   cumulative -- nothing by cumulative drug exposure.

16       DR. EMERSON:  Is it possible to get that?

17       DR. PETERS:  Cumulative drug exposure to

18   their stopping to –

19       DR. EMERSON:  Yes, prior to their stopping.

20   So the difference between this --

21       DR. PETERS:  How far they were into the

22   trial before this stopped?

1        DR. EMERSON:  That's correct.  And I realize

2   that you have staggered entry, so even at

3   completed, there's quite a variation --

4        DR. PETERS:  We don't have analyses like

5   that currently.  The completers, obviously, went

6   all the way to the end, to the site --

7        DR. EMERSON:  But they didn't all start at

8   the same time?

9        DR. PETERS:  No.  Correct.  But enrollment

10  finished about June of -- they were in at least a

11  year from the last enrollment to the end.  So we

12  would have to look into that.  We don't have

13  anything that looks at the exposure before they

14  discontinued.

15       DR. CALIFF:  Just to make -- I mean, we have

16  the capability of doing analysis, I'm told, if we

17  need to.  So just to understand exactly what you're

18  asking for, and maybe why, so we can --

19       DR. EMERSON:  So if there is any sort of a

20  rebound or an aspect like this, the disparity -- I

21  mean, now you do actually have a slight excess,

22  even in the early study medication; but what this

1  disparity is, that if we were to buy that you had

2  different results from the early study medication

3  than you have when everybody's stopped, as you

4  notified the sites, that raises the question of is

5  this an aspect of cumulative dose exposure?

6       DR. CALIFF:  Yes.  So I think we could come

7  as close as possible, but the one caveat is, often

8  having an event is a reason to stop study

9  medication.

10       DR. EMERSON:  No question.  And you have

11  double the rate among the early discontinuation or,

12  actually -- yes, quartiles.

13       DR. PETERS:  The other thing I could comment

14  on this is that at the end of the study, 90 percent

15  plus of people did transition to another VKA, which

16  was mostly warfarin.  So it was 80 percent warfarin

17  to warfarin, which you would expect.  They were

18  doing well.  They weren't having events.  They were

19  on anticoagulation for the years of the study that

20  they should be on anticoagulation to continue.

21       The ones that discontinued in the middle of

22  the study, both groups discontinued, only about

1   50 percent went on a vitamin K antagonist.  So it

2   was a very different situation, discontinuing in

3   the middle of the study.  And at the end -- and

4   there didn't appear to be -- there wasn't a gap in

5   the anticoagulation in the middle as there were at

6   the end because most people stopped, or the

7   majority of people stopped both drugs and didn't

8   resume it.

9          DR. LINCOFF:  Just to comment on time, we're

10   running a little bit behind because one of the

11   presentations ran a little long, but there are a

12   number of additional questions here that I have.

13   So we don't have a public hearing, anyone who has

14   signed up in the afternoon, so we'll have time to

15   make up.

16          What I'm going to do is take three people

17   now, and then we'll take the break that was

18   scheduled for five minutes ago, and then we'll come

19   back and continue these questions to the sponsor.

20   So we'll move everything back a little bit.

21          So Dr. Kaul?

22          DR. KAUL:  Two quick questions.  Were there

1    any centers that participated both in the RE-LY

2    trial as well as the ROCKET AF trial?

3            DR. PETERS:  I don't know the answer to

4    that.  Out of a thousand centers, I would guess

5    there might be some.

6            Dr. Nessel?

7            DR. KAUL:  The question I have is that if

8    there were, what was the TTR in the centers that

9    participated both in the RE-LY as well as the

10   ROCKET afib trial?  And the reason for asking that

11   question is that, the difference in the trial

12   design, how the maintenance warfarin dosing was

13   managed, one centralized through protocol algorithm

14   and the other based on the local standard practice,

15   did that impact anticoagulation management?

16           DR. NESSEL:  That's a superb question,

17   Dr. Kaul.  I wish we had had the access to that

18   data, but the sites, of course, are required to

19   file FDA Form 1572.  But other than that, we did

20   not collect all the other clinical trials in which

21   they were participating, so we only have half of

22   the data that you're looking for.

1          DR. KAUL:  Second quick question, with a

2     quick answer if possible.  How many of the subjects

3     with a major bleed either resumed treatment or had

4     no interruption?  And of those who resumed

5     treatment, what was the percentage with another

6     recurrent major bleed?

7          DR. PETERS:  Dr. Nessel will respond to the

8     bleeding question.  And then, Dr. Califf, you

9     wanted to maybe make a follow-up comment?

10         DR. NESSEL:  So I'll ask my team to look for

11    a slide of multiple bleeds.  Other than the event

12    of intracranial hemorrhage, the protocol did not

13    require that patients come off study medication for

14    a major bleeding event, or even for a myocardial

15    infarction, for that matter.  So it was, of course,

16    at the treating physician's discretion, but they

17    could be kept on study medication for after a major

18    bleeding event.  I'm thinking of the slide of

19    bleeding events that occurred more than once per

20    subject.

21         DR. PETERS:  The other thing to say, while

22    we're waiting for that slide, is for the

1   interruptions, they obviously were for a variety of

2   reasons.  Some of them -- for the interruptions

3   greater than or equal to three days, the largest

4   reason was interruption for surgery or invasive

5   procedure, and then also adverse events, either

6   bleeding, or non-bleeding, or another fairly common

7   cause.  Between those three was about 75 percent of

8   the interruptions.

9           Slide on.

10          DR. NESSEL:  So Dr. Kaul, in this slide, you

11   will see the total number of subjects with one,

12   two, or three major bleeding events.  And, of

13   course, since this is the safety on-treatment

14   populations, all these patients remained on study

15   medication for each subsequent major bleeding

16   event.

17          I'll further remind you that the major

18   bleeding component was hemoglobin drop requirement

19   for a transfusion of two or more units, leading

20   into a critical organ or site, or a fatal.

21   Obviously, they wouldn't be counted here if they

22   don't bleed.

1          DR. CALIFF:  Just a quick comment.  I

2     wouldn't want the panel to leave your first

3     question thinking the only difference between RE-LY

4     and ROCKET was giving an algorithm for INR.  Doing

5     a blinded, double-dummy trial is very different

6     than an unblinded trial.  In an unblinded trial,

7     everyone knows the INR, the treating physician, the

8     patient, the study center.  It's a whole different

9     set of logistics that one has to go through in a

10    double-blind, double-dummy study, which is the

11    reason why I sort of favor having one of each, if

12    you could possibly do it, because I think there are

13    big differences in trial logistics in those

14    circumstances.

15          DR. LINCOFF:  Mr. Coukell?

16          MR. COUKELL:  Thank you.  Two quick

17    questions.  So the FDA has asked us to think about

18    rivaroxaban in the context of having dabigatran on

19    the market.  We haven't finished or maybe even

20    started that discussion yet, but is there any data

21    that suggests there's a subpopulation,

22    pharmacodynamic or clinical data, that would

1  respond better to this drug than the other, for

2  which this drug might be particularly suited?

3      My second question is, in ROCKET, you've

4  deliberately selected a higher-risk population,

5  where, presumably, the effect of both drugs would

6  be greater.  As I understand it, the indication

7  you're seeking is in the general afib population.

8  And what's the basis for that?

9      DR. PETERS:  Dr. Califf?

10     DR. CALIFF:  So let me try to respond to

11 both questions.  The first question, as I've said,

12 we are fundamentally opposed to cross-trial,

13 indirect comparisons, but there is one circumstance

14 that's relatively obvious I think to everyone.  And

15 that is someone who can't tolerate dabigatran,

16 can't take it, and so we have an alternative non-

17 warfarin opportunity for those people.

18     There's a significant rate of GI side

19 effects, for example, with dabigatran.  And that's

20 a minority of the population, but it's an obvious

21 group where, if you can't take a drug, having an

22 alternative, in our view, could be important.

1          Your second question again?

2          MR. COUKELL:  The second question was that

3     you've studied a higher-risk subset of the afib

4     population, but you're seeking an indication in, as

5     I understand it, the general population.

6          DR. CALIFF:  I'm sorry.  I forgot that.  Two

7     key points here I think that the committee should

8     think about.  The first is that while the two

9     populations -- one is high risk and the others are

10    more general -- there is a lot of overlap in those.

11         Remember that, per CHADS1, the patients that

12    we excluded right now, either anticoagulation or

13    aspirin is in the guidelines.  That may change in

14    the near future, but that's the current

15    recommendation.  So all the trials are dealing

16    pretty much with CHADS2 and above as the primary

17    population.  We just excluded many of the CHADS2

18    people on purpose to get this higher-risk

19    population.

20         So we think there's enough overlap that the

21    general indication holds, and there is no

22    heterogeneity in treatment effect across any of the

1    major subgroups that we looked at.  So we think the

2    result is generalizable.

3         Second point, just in terms of policy, we

4    routinely do trials in namby-pamby populations of

5    low-risk patients for a lot of reasons.  It's

6    easier to do the studies.  And then we extrapolate

7    to the 80-year-old person on 15 other medications.

8    We think it's time to begin to think about doing

9    trials in the more sick people and having enough

10   overlap that you can talk about the general

11   population.  We're somewhat responding to what

12   practitioners are saying, which is, you're doing

13   these trials.  They're not relevant to the patients

14   that are of biggest concern to us.

15        DR. PETERS:  I just have a follow-up point.

16   I think your first question was also about were

17   there any subpopulations within ROCKET that might

18   look particularly better or worse.  And as

19   Dr. Califf showed for the efficacy, the efficacy

20   was very consistent across all the subgroups.  The

21   safety subgroups are in the briefing book as an

22   appendix, and those were also very consistent.  So,

1    overall, our efficacy and safety was very

2    consistent across all the baseline factors that we

3    looked at.

4         DR. LINCOFF:  We'll take one last question

5    now, before the break, from Dr. Temple, and then I

6    have Drs. McGuire, Papademetriou, Fox, and Fleming,

7    and many others for afterward.

8         DR. TEMPLE:  It's possible this is a matter

9    for further discussion later.  This is somewhat

10   following up on a question Steve raised and Sanjay

11   hinted at.  The primary endpoint -- and we don't

12   disagree with this -- was both kinds of strokes

13   together, so I have a couple of questions related

14   to that.

15        Are you reasonably convinced you can tell

16   the difference, with available approaches, between

17   hemorrhagic and thrombotic strokes?  That's one

18   question.

19        Second, there's been not that much attention

20   to the implications of, for example, time in

21   therapeutic range on the two kinds of strokes.  If

22   you were too low, if you had a low INR, that might

1    affect the comparison for thrombotic strokes.  You

2    wouldn't expect it to advantage rivaroxaban for

3    hemorrhagic strokes.  And yet, almost all of the

4    effect on stroke is on hemorrhagic stroke.

5         Steve pointed out that when you add the

6    people after withdrawal, the effect goes slightly

7    the wrong way, but it was never very strong in the

8    first place.  The hazard ratio is only .95 for

9    thrombotic strokes, which is not very impressive.

10        In other situations, for example in dabi,

11   dabi had an effect on both thrombotic and

12   hemorrhagic strokes.  But even though hemorrhagic

13   strokes were less frequent, half of the effect of

14   that drug was on the hemorrhagic strokes.  And the

15   lower dose, which many people in our committee

16   thought should be approved, actually didn't have

17   any effect on thrombotic strokes at all.  It went

18   the wrong way.  So all of the effect of the low

19   dose was on that.

20        I also glanced briefly at the apixaban data.

21   We haven't reviewed it, but most of that effect is

22   on hemorrhagic strokes also.  So the considerations

1    of time and range, that all seems to be a very

2    important part of all of this.  I don't know if any

3    of these differences are real, but it's not being

4    discussed enough in my opinion.  I just want a

5    preliminary view on that, and we can talk about it

6    later.

7         DR. PETERS:  So that sounds like a long

8    answer, but I'll have Dr. Mahaffey come.  He led

9    the CEC efforts, so I think in terms of the

10   confidence of assigning a diagnosis of ischemic

11   versus hemorrhagic or unknown, we have confidence.

12   It's hard to do, but we did it.

13        Dr. Mahaffey?

14        DR. MAHAFFEY:  Dr. Temple, obviously, an

15   important issue across a variety of different

16   endpoints and adjudication efforts and different

17   disease states in patient populations.  We did go

18   to rigorous lengths to collect both clinical

19   information about stroke events, but also

20   radiographic imaging information about the strokes

21   as well.  And I think we did a fairly good job, and

22   we did a very rigorous job in this trial.  All of

1    the strokes were looked at by a neurologist who had

2    experience in event adjudication, as well as

3    understanding CEC issues and anticoagulant therapy

4    in patients with atrial fibrillation.

5         The second thing, then, is to point out that

6    the number of unknown strokes -- slide up,

7    please -- in this trial is also very low.  And I

8    think it reflects the rigor that we went after

9    this.  I think, though, you're right.

10        One of the subtle challenges that we have is

11   differentiating between ischemic strokes with early

12   hemorrhagic conversion or large hemorrhagic

13   conversions and primary intracranial hemorrhages.

14   And we spent significant time going over these

15   events to try and differentiate those, probably

16   erred on the side of calling them intracranial

17   hemorrhages if there wasn't clear evidence of an

18   infarct zone.

19        DR. PETERS:  We could actually show the

20   breakdown of the primary efficacy endpoint, shows

21   the unknown.  That was trying to classify different

22   types into mechanism, but the number of unknown was

1    the minority, compared to hemorrhagic or ischemic,

2    being able to show that.

3         So while we're waiting for that, if we

4    could -- so the later part, we did do some analyses

5    looking at, by quartiles, hemorrhagic events above

6    INR, above time, above 3, and for ischemic stroke,

7    INR below 2.

8         So this slide on , just quickly.  In the

9    primary endpoint safety on-treatment, there are

10   only 18 events that the CEC didn't assign to either

11   ischemic or hemorrhagic.

12        DR. CALIFF:  Just two points.  We want you

13   to believe that we went to the end of the earth to

14   try to classify these and that we had great people

15   doing it.  And we did come up with a small number

16   of unknowns.  But anyone that does this kind of

17   work knows this gray zone between hemorrhagic

18   conversion, particularly with better imaging

19   methods.  If you do reliability studies, it's far

20   from perfect.  So there is crossover.

21        I would like to go back to the slide of the

22   long plots, the one on intracranial hemorrhage that

1    I showed, because it may have gone by too fast.  I

2    think it's very pertinent to the point you made,

3    Bob.  One might suppose that if you pushed

4    anticoagulation, that you would cause more

5    intracranial bleeds.

6         What we show in this slide, just to review

7    it again, for intracranial hemorrhage, is that

8    trying to achieve a time in therapeutic range, our

9    best sites are the ones that look the worst in the

10   comparison of rivaroxaban.

11        So your point that this is complicated I

12   think is quite good.  And understanding what the

13   implications are, as with many other drugs, of

14   trying to hit an intermediate biomarker by pounding

15   the patient, perhaps in circumstances where it may

16   not be beneficial, can be complicated.

17        So the overall impact on the patient may be

18   a few more intracranial hemorrhages, relative to

19   what a once-a-day drug can do.

20        DR. PETERS:  So this slide shows -- and if

21   we could have the hemorrhagic stroke equivalent.

22   Slide on.

1      So this is a quartile analysis of ischemic

2  strokes, as diagnosed by CEC, by quartile time

3  below the range of 2.  You can see, the ischemic

4  stroke in the overall was pretty close to the line

5  of 1, and it's pretty close to the line of 1 here.

6      The most time below 2 is the bottom, so the

7  event rate was higher, 1.7, and it's a bit lower,

8  but you can see rivaroxaban versus warfarin, not

9  much difference.  Then the next slide is a little

10  bit different for format, but the same similar

11  analysis, where you can see in the gray.  And this

12  is now hemorrhagic stroke by quartile time above 3,

13  so above 3.0.  And the warfarin rate is not

14  strikingly different.  And actually may be even a

15  little bit lower with the quartile that had the

16  most time above 3,. and the rivaroxaban rates low

17  and comparable.

18      But these analyses, we did look at some of

19  these and didn't do a lot of because there's

20  relatively little time at the two extremes.  So I

21  actually think, as in the literature, the time in

22  the range, 2 to 3, is probably the most reliable

1    for looking at how things spread out by TTR.

2         Slide off.

3         DR. LINCOFF:  So we'll now take a 15-minute

4    break.  Panel members, please remember, there

5    should be no discussion of the meeting topic during

6    the break, amongst yourselves or with any member of

7    the audience.  We'll resume at 10:55 sharp, and

8    we'll have time for four additional questions.

9    We'll confine it to that so we can move on with the

10   FDA afterwards.

11        (Whereupon, a recess was taken.)

12        DR. LINCOFF:  We'll continue with the

13   sponsor on the hot seat for the next four

14   questioners, and then we'll move onto the FDA

15   presentations.

16        So Dr. McGuire?

17        DR. MCGUIRE:  Thanks, Mike.  I am going on

18   with this question about TTR.  What I've been

19   convinced, both in the briefing documents and the

20   presentations, is that this measure will join the

21   graveyard of other biomarkers proven invalidated as

22   surrogates.  And before we throw it away, one of

1    the reasons surrogates fail is because the concept

2    fails.  And I'm not sure many of us believe that.

3    So the question is, why does this fail?

4         I think there are two important

5    considerations that might be addressed.  One is,

6    the treatment of all patients outside of

7    therapeutic range, similarly, is a little bit

8    confusing to me, that people below therapeutic

9    range should bias in favor of the study drug for

10   efficacy, and above for safety.  And we saw a

11   little bit of that data at the end here.

12        But what I'd like to see is the overall

13   efficacy analyses and safety analyses stratified by

14   quartile of center performance for above and below

15   therapeutic range.  We have one table in the FDA

16   document below therapeutic range.  We saw some

17   above-therapeutic range data here just recently.

18        The second issue is the method of

19   interpolation.  And would it be more reasonable to

20   use the last observation carried backward, as the

21   interval data represents the dosing the patient is

22   on during the interval, being interpolated?  And I

1    wonder if anyone would have a comment if that

2    strategy has ever been employed.

3          DR. PETERS:  So if you could just clarify

4    the last part again, and then I'll have to clarify

5    further.

6          DR. MCGUIRE:  Yes.  As Dr. Califf brought up

7    the Rosendaal method biases against time in

8    therapeutic range for patients who undergo a dose

9    adjustment, especially when the interval between

10   evaluations is long.  So it's chasing a ghost to

11   think that we'll ever get anywhere close to

12   100 percent using that method of assessment of

13   therapeutic adherence.

14         DR. CALIFF:  Yes.  The second question is a

15   softball, because it's interesting, and I would

16   agree with it that that would actually be a way to

17   get around the bias.  What you're saying is, if you

18   have a dose adjustment, and you come back in

19   30 days, and you're in range at 30 days, the best

20   extrapolation would be looking backwards, not the

21   one looking forward.  But we haven't done that, and

22   I don't think we can do it in time for this.

1        Let's see.  Then your first question is -- I

2    think, a really good concept.  It's not one that

3    we -- despite having a lot of people come in and

4    look at our data in the executive committee, it's

5    not one that we formally addressed.

6        DR. MCGUIRE:  I would just add, in this

7    study, unlike several others, the ratio of time

8    below to time above is 2 to 1, where we've commonly

9    seen 3 to 1 and 4 to 1.  So for most prior studies,

10   time out of therapeutic range almost equated with

11   time below therapeutic range.

12        In this study, you have probably more power

13   than most to partition that out.  A comment earlier

14   that there weren't enough events, about 15 percent

15   of the time -- by my back-of-the-envelope math,

16   about 15 percent of the time, out of therapeutic

17   range was actually above.

18        DR. CALIFF:  We have an interesting plot

19   here, which I believe we should put up, but with

20   the caveat.  I'm sure you all understand.  We have

21   something like 4,000 slides, and having spent so

22   much time on it, we're anxious to show all the

1    data.  But some of these are very complicated

2    analyses that would be very hard to explain.

3         But let's put this slide up.  The caveat

4    here is that once you begin to slice by these

5    multiple different things, it takes a long time to

6    even understand what you're looking at in an

7    analysis.  So I think you're actually asking for

8    even slicing it one more time into safety and

9    efficacy.  But for the primary efficacy endpoint,

10   what you see here -- and I credit J&J for having

11   done this.  I didn't even know we had done it.

12   What you can see is that, for time in INR less than

13   2, by quartiles of centers, you can see that

14   rivaroxaban, the light blue line, is always better

15   than the gray.

16        Now, this is on-treatment analysis, so I'll

17   point that out.  And even for INR greater than 3

18   times by quartiles, rivaroxaban comes out ahead

19   again.  But this is integrating the safety and

20   efficacy into a common endpoint.

21        DR. PETERS:  The top panel is exactly what I

22   was asking.  I don't know if it's possible to do

1    the same analysis for safety for the bottom panel.

2    And the second, to follow-up, were interaction

3    tests done for that top panel analysis?

4         DR. MCGUIRE:  The top panel, for ischemic

5    stroke, we did show, if we want to show that one

6    again, was the equivalent analysis by quartiles,

7    for ischemic stroke with time below 2, if we could

8    pull that one up again.  And I think you were

9    asking for median, which would essentially just

10   combining the --

11        DR. PETERS:  Not necessarily.  This top

12   panel is exactly what I'm interested in.

13        DR. MCGUIRE:  So slide up.  So this is for

14   ischemic stroke now, not the primary endpoint.  So

15   it's just the ischemic events, and it's the time

16   below 2; where, at the bottom is the most time, 34

17   to 100 percent above -- below 2.  And the top row

18   is the best time.  And there's really no difference

19   in the treatment effect, relative to warfarin,

20   across those four quartiles.

21        DR. LINCOFF:  Dr. Papademetriou?

22        DR. PAPADEMETRIOU:  Thank you.  My question

```
 1    is related to the period at the end of the study,

 2    when the patients were transitioned to long-term

 3    warfarin.  And it was said that the investigators

 4    were allowed to treat patients with heparin during

 5    that period, but they were still blinded.

 6            Do we know how much heparin was utilized and

 7    if there was any difference between the two groups,

 8    rivaroxaban and Coumadin, and if the utilization or

 9    the lack of utilization of heparin was associated

10    with any events or hemorrhages?

11            DR. PETERS:  If we could do the completers

12    only.

13            So the use of heparin was allowed in the

14    protocol for interruptions during the study.  The

15    use of bridging therapy at the end was also allowed

16    and even recommended as appropriate in the

17    communications from the executive committee.  But

18    in the end -- slide on -- this is all

19    anticoagulants besides VKA for the completer group,

20    and you can see less than 3 percent in the

21    rivaroxaban and less than 2 percent in the warfarin

22    were actually used, some other anticoagulants.
```

1      So, in practice, even though it was allowed

2   and even recommended to follow guidelines, like

3   ACCP, it was considered at the investigator level

4   that they didn't implement that recommendation.

5      DR. CALIFF:  So in retrospect, this is

6   obviously very disappointing, but I think it's

7   important for panel members not intimately involved

8   in this field to understand that even in the case

9   of warfarin prolonged interruption, bridging is an

10   unproven strategy, with two randomized trials

11   currently ongoing.  And so what we're seeing in

12   clinical practice is that, for a variety of

13   reasons, people are not going to the trouble to do

14   it.  We now -- I think seeing this, we think the

15   best strategy for rivaroxaban is going to be

16   bridging.

17      DR. LINCOFF:  Dr. Fleming and then Dr. Fox?

18      DR. FLEMING:  Could I have slide 39?  And

19   while that's coming up, just a couple of quick

20   thoughts.  And that is, I think, Rob, you pointed

21   out cross-study comparisons are treacherous.

22   That's certainly true.  Of course, that fact

1    undermines the integrity of non-inferiority

2    analyses.

3         The second fact is, bridging or the blinding

4    of the trial could impact TTR, you were saying, as

5    you were noting that, to your credit, you have a

6    blinded trial.  Interestingly, though, for

7    ximelagatran, SPORTIF V that was blinded had a

8    higher TTR than SPORTIF III, that was open label.

9         The question that I want to get at here is,

10   Dr. Marciniak were here, as he has stated publicly

11   in some previous meetings, one of the biggest

12   issues that can undermine integrity of research is

13   missing data, missing follow-up.

14        The withdrawal of consent rates are very

15   high here.  I assume these 700 plus people did not

16   have additional follow-up after they withdrew

17   consent, based on your slide.

18        Is that correct?

19        DR. CALIFF:  Only in the case where the

20   study participant was the patient of a doctor who

21   talked them into coming back for follow-up, because

22   what we did was, of course, contact the sites once

1    we realized the withdrawal of consent; by the way,

2    let me just mention, commonly seen in North America

3    now and increasing in Europe due to laws that have

4    been passed, making it easy to withdraw in the

5    midst of a study.

6         So there were some cases, we made every

7    effort to reach the doctors and have them talk to

8    the patients, but by law, we can't follow --

9         DR. FLEMING:  So, in fact, as I'm

10   understanding, these people were not followed?

11        DR. CALIFF:  Right.

12        DR. FLEMING:  So my question is, what was

13   the nature of the instructions that were given to

14   investigators about what the exact proper context

15   is for use of withdrawal of consent?

16        DR. CALIFF:  Instructions were very clear,

17   that withdrawal of consent should only be an option

18   if the patient demands to stop the study drug and

19   have nothing to do with the trial for one reason or

20   another.  I think all of us involved in clinical

21   trials are aware that, particularly in long-term

22   trials now, particularly in North America, one

thing you'll notice on this slide is there are 89

patients from closed sites and 6 from retired

sites.  We're in an environment where investigators

feel under assault, and sometimes they take the

easy way out of telling a patient, if you just sign

this, then I don't have to follow you anymore, and

my work is done.  And we did our best, as we are in

all studies, to keep that from happening, but

people should be aware that this is an issue.

          DR. FLEMING:  So I am focusing only on the

withdrawal of consent, not the closed sites.  So

you're saying there were consistent efforts made to

ensure all investigators knew this had to be

patient initiated and that this did not just mean

they didn't want to continue treatment or

follow-up, but they did not authorize you to follow

them, and that was the basis for withdrawal of

consent.

          Were all investigators instructed about

that?

          DR. CALIFF:  Yes.  All investigators were

instructed multiple times, and even after

1   withdrawal of consent, investigators or their

2   doctors were re-contacted if they were having other

3   reasons to see the patients, to try to do their

4   best to get them back into the study, realizing

5   that as a coordinating center or a sponsor, we're

6   not legally allowed to contact the patient at that

7   point.

8           DR. FLEMING:  In the interest of time, could

9   I have slide CC-50?

10          DR. PETERS:  If I can make -- while we're

11  getting that --

12          DR. FLEMING:  Very brief.

13          DR. PETERS:  There were a number of patients

14  this large or a little bit larger that withdrew

15  consent to study drug, but did continue in the

16  study.  So what's reflected there is those who

17  actually refused continued participation in the

18  study.

19          DR. FLEMING:  I saw that.  Yes.

20          DR. CALIFF:  I'm sorry, Tom.  But you made a

21  comment, and then didn't ask a question that I

22  think deserves a response from us about the two

1    SPORTIF trials, because it was frankly an unfair

2    debating tactic, I felt.

3           Yes.  The blinded trial had better TTR than

4    the unblinded trial, but when you look at the

5    composition of the sites that were involved in that

6    trial, in those two trials, it follows exactly the

7    pattern that we showed here.  We've done pretty

8    extensive analysis on this.  So there, the blinding

9    and unblinding was overwhelmed by the regional

10   distribution of the sites.

11          DR. FLEMING:  On slide CC-50, you provide

12   results, again, for the safety on-treatment.

13   Dr. Nissen has saved me some time here because I

14   had the same question he did about CC-47, which is

15   to look at the results in stroke, not only by

16   on-treatment per protocol, but ITT.

17          My understanding here, when we're looking at

18   all-cause mortality, is there are 458 events.  When

19   I look at your briefing document, on page 94, in

20   terms of deaths, there are almost triple that

21   number of deaths.  So it's perplexing to me.  There

22   are about 25 percent -- from Dr. Nissen's answer,

about 25 percent more strokes when you look at the
ITT.   There are 200 percent more deaths.   I'm
perplexed about why there are so many more deaths.
And then the actual additional evidence that I want
to get is, can you give us the ITT results for MI?
And then I want to come to the last part of the
question, which is I'd like to see those results by
U.S. only.

So there's really probably three parts to
the question.  Why are there triple the number of
deaths when you look at ITT?  Secondly, what is the
MI ITT?  And thirdly, what are death and MI in the
U.S. sites?

DR. CALIFF:  That's a trifecta, as we say in
basketball.  But if we can put up the first slide
that's up here, I think the main point to make is,
in a sick population, we have non-fatal events as a
primary endpoint.  A lot of non-fatal events occur.
Let's take stroke as a good example.  If you don't
die from your stroke, there's a good chance you're
going to come off of study drug, not necessarily
because anybody wants to do it, but you may no

1    longer be a candidate for anticoagulation.  You may

2    be in a rehab center that can't manage the trial.

3    There are multiple reasons.

4         So what we had was a lot of deaths that

5    occurred either as subsequent events to the primary

6    event of the trial.  Or, remember, these were

7    people on nine medications, on average, with

8    multiple other diseases who died from a variety of

9    causes.

10        DR. FLEMING:  So what percent of person

11   years were occurring in the ITT?  So what you

12   referred to in the briefing document as the ITT

13   analysis used for efficacy, the ITT population used

14   for efficacy analysis, that has three times the

15   number of deaths than the number of deaths that are

16   on treatment, per protocol.  What's the difference

17   in the person years of follow-up, in total, for the

18   ITT versus for the per protocol?

19        DR. CALIFF:  We'd have to calculate that.

20   That's an interesting question.

21        DR. FLEMING:  So if you could get it for me

22   later on.

1        DR. CALIFF:  We will.

2        DR. FLEMING:  So, specifically, for MIs,

3    what is the MI distribution by treatment arm for

4    the ITT for efficacy analysis population?

5        DR. CALIFF:  Regardless of treatment

6    exposure is what you're saying.  But just to make

7    sure people absorb this slide, when taking into

8    account all deaths, there is, numerically, a

9    difference, and you see it there.  Let's put this

10   slide up.

11       I want to point out, again, when we show

12   regardless of treatment exposure, we're including

13   that 30 days, which is artificial compared to what

14   would happen in practice.  But here you see the

15   results for myocardial infarction.  Hazard ratio is

16   0.89; upper confidence interval 1.13.

17       DR. FLEMING:  And then the last question

18   that I had was, when you look at your on-study per

19   protocol, within the U.S., the mortality

20   differences that you see at .85 shrink to .97.  The

21   MI from .81 shrinks to .95 when you look within the

22   U.S. by the on-study.

1        What are the ITT results for U.S. for

2   survival and for MI?

3        DR. CALIFF:  We're going to put the slide

4   up, but I want to be clear again.  When you're

5   asking for ITT to end of study plus 30 days, you're

6   asking for something different than any other trial

7   has included in this field.  So we have an

8   artificial additional 30 days, but we do have the

9   data, and go ahead and put it up.

10       So you can see that -- and this is for North

11  America, not U.S.  These are the data that you

12  have.  And as you would expect, there were events

13  in those additional 30 days that moved the point

14  estimate.

15       DR. FLEMING:  So in the U.S., MI is in the

16  wrong direction, actually.  That's 41 -- that's

17  excess, more on rivaroxaban, 41 and 36.

18       DR. CALIFF:  Yes.  It's 41 versus 36.

19       If we could, put up the slide that's up now.

20  So this would be the data, as other trials have

21  looked at it, which you can see here.  The MI is

22  now 30 versus 29, not counting those additional

1    30 days after discontinuation.

2         DR. FLEMING:  But even as this analysis

3    says, in the U.S., MI and all-cause mortality are

4    neutral.

5         DR. CALIFF:  Yes.

6         DR. PETERS:  But, again, this is a subgroup.

7    About a thousand patients in each group were from

8    the U.S.  So compared to the overall trials, it's

9    much smaller numbers.

10        DR. LINCOFF:  Finally, Dr. Fox?

11        DR. FOX:  Yes.  Thanks.  A follow-on to one

12   of the points that Dr. Fleming made, I was afraid I

13   was going to be throwing this into the middle of

14   the TTR conversation, so I'm glad he brought up the

15   issue of missing data as it relates to patient

16   retention in these trials.

17        Speaking on behalf of industry, I think it's

18   important for everybody to recognize that keeping

19   patients in these long-term trials is extremely

20   difficult.  And I take it, as a demonstration of

21   the investigator's effort, that they had as few

22   patients withdrawing consent and refusing to be

1    followed up as they did.

2         Having said that, it does amount to about

3    5 percent with the simple math I did from the flow

4    diagram.  I wonder if the sponsor can reassure the

5    panel, if you've done any sensitivity analyses on

6    those patients that withdrew consent, if you assume

7    that they were all on treatment and you assume the

8    worst case scenario, that all the patients on riva

9    had a primary endpoint, and all the patients on

10   warfarin didn't.  As artificial as that might

11   sound, if it still comes out that your

12   non-inferiority analysis is intact, I think the

13   panel would be reassured.

14        DR. PETERS:  So slide on.  So this is an

15   analysis, as you describe, and there's a very

16   similar one in the FDA briefing book that gives a

17   very similar result.  So this takes the people with

18   the missing follow-up time that we were talking

19   about previously, and the observed event rates are

20   across the first row, so 2.2 percent, rivaroxaban,

21   2.4 percent, warfarin.  This is the ITT to site

22   notification, so the hazard ratio is .88.

1    The second row assumes that in those -- is

2    the number 77.  You would have to have 77 events in

3    the rivaroxaban group with that event rate, zero

4    events in the warfarin group to actually just hit

5    the point where you're inferior, the lower bound

6    hits 1, which is just a little bit before you would

7    hit the non-inferiority bound of 1.38.  So the FDA

8    came up with a number of, I think, 80, if I recall.

9    We came up with 77 because we stopped when the

10   upper bound was 136.  So that's a pretty extreme

11   result, to think that we would be missing almost 80

12   events out of -- we collected only about a little

13   over -- between 2 [200] and 300.

14        Slide off.

15        DR. LINCOFF:  Thank you.  We will now

16   proceed with our presentations from the FDA.

17        **FDA Presentation - Preston Dunnmon**

18        DR. DUNNMON:  Good afternoon, Mr. Chairman,

19   committee members, ladies and gentlemen.  My name

20   is Preston Dunnmon.  I was the medical safety

21   reviewer for this NDA.  And I'd like to talk to you

22   today and review with you the data that either was

1    available or has become available regarding dose

2    selection in the ROCKET trial, dose selection,

3    obviously, being something important, potentially

4    to all outcomes in clinical trials.

5            We have four sources of information for dose

6    selection in this trial.  And those four I'll cover

7    with you include the PK/PD profile of the drug, the

8    two small venous thromboembolism studies that were

9    essentially the basis for dose selection in ROCKET.

10   Subsequently, the ATLAS-ACS I TIMI 46 dose ranging

11   study for the Acute Coronary Syndrome Development

12   Program became available.  And that's something

13   that was of interest because this is a high-aspirin

14   use population, and there was also a high-aspirin

15   use within ROCKET.  And then, finally, data comes

16   from within ROCKET itself, in that the prothrombin

17   time was actually confirmed to be a surrogate for

18   exposure within ROCKET, as far as the range of

19   exposures within ROCKET.  Because of that,

20   exposure-driven efficacy and safety analyses were

21   performed, and I will show you those.

22           To begin, the half-life of rivaroxaban is

1   fairly short, 5 to 9 hours in healthy people.  And

2   arising from that characteristic, what you see here

3   is a prothrombin time-course of an average of

4   prothrombin times over time.  And this is a

5   simulation that was based on a combination of

6   matched PK/PD data when it was available from

7   ROCKET and then also the previously reported PK/PD

8   model from phase 2 studies that was confirmed

9   within the ROCKET trial itself.

10        The once-daily dose of 20 milligrams per day

11   is demonstrated here in the red hatched line, the

12   simulated 10-milligram BID dose in the blue solid

13   line.  And what you see here is the expected

14   greater fluctuation between peak prothrombin times

15   versus trough prothrombin times over the

16   interdosing interval.

17        To put this into perspective, dabigatran has

18   a longer half-life than rivaroxaban and is dosed

19   BID.  The other thing that you'll notice from this

20   simulation is the fact that, during the second half

21   of the interdosing interval, either in this slide

22   from hours 12 to 24, 36 to 48, or 60 to 72, the

1    drug's impact on the PT itself is actually fairly

2    minimal with the daily dose administration.

3         Next, we have data from the two small venous

4    thromboembolism studies that were used to select

5    the 20-milligram per-day once-daily dose that got

6    taken forward into ROCKET.  There was no dose

7    ranging done in atrial fibrillation patients, and

8    so these two studies were the basis for the dose

9    selection.

10        With respect to those two studies, it's

11   important to understand that the 20-milligram per-

12   day dose was actually the lowest dose that was

13   tested in either of them.  There were a small

14   number of outcome events, and neither of these

15   studies demonstrated an efficacy dose response.

16        What you saw this morning in the slide where

17   you saw 10-milligram BID data together with

18   20-milligram per day data was actually data from

19   two different studies.  One of the doses was in

20   study 11223, the 20-milligram per-day dose in

21   11528.  And so when you actually confine your

22   analysis to looking at a single dose of the drug

1   that was given as either daily dose or BID dose,

2   that only occurred in one dose in study 11223.  And

3   when you look at those results, which I'll show you

4   here, you get better efficacy with split BID dosing

5   and numerically fewer non-major bleeding events

6   with BID dosing.

7          This is the trial study 11223, the efficacy

8   results from that trial that were based on

9   resolution of thrombis by ultrasound.  And what you

10  see here is that the 40-milligram per-day total

11  daily dose was the only dose given both split and

12  as a daily dose.  And when you look at those

13  patients who were improved, by the definition of

14  this study, 59 percent improved with the split BID

15  dose versus 44 percent with the daily dose.  And

16  that, retrospectively analyzed by Fisher's exact

17  test, was statistically significant.

18         When you look at the bleeding from study

19  11223 for the 20-milligram BID versus 40-milligram

20  per-day dosage, using definitions of bleeding that

21  were very similar, if not identical, to ROCKET,

22  there were numerically fewer bleeding events in the

1    split dosing group, 11 versus 14.  But here, again,

2    the number of events was exceptionally small.

3            Proceeding forward, then, in time, this day

4    was not available at the time ROCKET was initially

5    designed.  It became available subsequently.  This

6    is the data from ATLAS-ACS I TIMI 46, which was

7    from the Acute Coronary Syndrome Development

8    Program with rivaroxaban.  And it was of interest

9    because when you look at the ROCKET population,

10   over 4,000 people in ROCKET were taking aspirin

11   concomitantly with their rivaroxaban, more than

12   2,000 people per treatment arm.  And it somewhat

13   makes sense because if you look at the CHADS

14   scoring system, encompassing age, diabetes, and

15   hypertension, those are things that not only

16   portend a bad outcome as far as strokes are

17   concerned with atrial fibrillation, but those are

18   also things that are certainly risk factors for the

19   development of atherosclerosis and acute coronary

20   syndrome.  So it's not surprising that there would

21   be overlap between these populations and if there

22   would be high aspirin use in ROCKET.

1      There was less triple therapy used in ROCKET

2  with aspirin, clopidogrel or thienopyridine and

3  rivaroxaban.  And so of interest was this data from

4  stratum 1, from TIMI 46, where this was concomitant

5  aspirin only.  And what you see here is a total

6  daily dose analyzed of 5 milligrams per day,

7  10 milligrams per day, or 20 milligrams per day,

8  given as either a once-daily dose, as you see in

9  this first set of columns, or as split dosing, as

10  here in this set of columns to your right.

11      What you see is no matter how you give this

12  drug, whether you give it once daily or BID, when

13  you increase the total daily dose from 5, to 10, to

14  20 milligrams per day, the hazard ratio for

15  bleeding increases in the daily dose from 1.67 up

16  to 6.69, going from the minimal dose to the maximal

17  dose tested.  And you see that very same

18  directional trend in the twice-daily dosing, going

19  from a hazard ratio of .81 for bleeding with twice-

20  daily dosing of the total daily dose, up to 6.43

21  when 20 milligrams per day is split as 10 BID.

22      The thing of note, though, is to compare

these two shaded columns horizontally, because
that's comparing the same total daily dose, split
to be given either as a single dose together or
split as BID dosing.  And what you can see here is
that 5 milligrams per day, total daily dose, has a
lower hazard ratio for bleeding when the dose is
split as 2.5 BID, as compared to when it's given
once daily.  That is also true for 10 milligrams,
given as 5 milligrams BID, with a lower hazard
ratio for bleeding than when the dose is given all
at once.  And when you get up to the high dose,
20 milligrams per day, there's not a lot of
difference.

     It was on the basis, then, of this safety
data, as well as maintained efficacy from this same
trial, that 2.5 milligrams BID and 5 milligrams BID
were carried forward into the acute coronary
syndrome phase 3 trial, the results of which have
not been reported.

     Then finally, the data that we can bring to
bear on the dose selection for ROCKET comes from
the ROCKET trial itself.  And I agree with the

1   sponsor's statement that the established close-to-

2   linear PT rivaroxaban plasma concentration

3   relationship in phase 2 supported the use of the

4   prothrombin time exposure-driven safety and

5   efficacy analyses for the phase 3 trials.

6           Of note, the PK/PD relationship that you're

7   seeing here, or the PT rivaroxaban concentration

8   relationship, is actually -- this is ROCKET data.

9   And so this very tight relationship between

10  rivaroxaban plasma concentration versus the

11  prothrombin time was actually reproduced again

12  within ROCKET.

13          Based on that relationship, we proceeded

14  forward with looking at outcomes from ROCKET,

15  either ischemic stroke or major bleeding, based on

16  the prothrombin time initially or the INR for

17  warfarin relationship.  What you see here -- and

18  we'll start with warfarin -- this is a logistic

19  regression, unadjusted, for the warfarin data in

20  ROCKET, looking at the percent of patients with

21  either ischemic stroke or major bleeding as a

22  function of the last observed INR in the study

before one of those two events.  And this solid

line is the logistic regression.  The shaded lines

are the 95th-percent confidence interval, and,

really, for informational purposes, we put the

medians of the various INR quartiles here in the

red diamonds, with standard errors around them.

What you can see here is what you've gotten

used to seeing with warfarin, that as INR

increases, there is a progressive decrease in the

incidence of ischemic stroke, and as INR increases,

there's a progressive increase in the incidence of

major bleeding, with the balance being what you're

used to seeing and what we target clinically with

the INR in the range of 2 to 3.

However, what you see with rivaroxaban is

quite a different pattern.  Again, these are

logistic regressions, unadjusted, looking at the

percent of these patients having ischemic strokes

or major bleeding, this time with the last observed

prothrombin time, approximate to the event.  And

what you see is a flat response here in ischemic

stroke, with respect to what's considered to be a

1   surrogate for drug exposure within ROCKET, as far

2   as the prothrombin times.  But you see a

3   progressive increase in the incidence of major

4   bleeding as a function of increased prothrombin

5   time.

6          This was a very robust finding, and we got

7   this same pattern of result, no matter whether you

8   looked at prothrombin time, prothrombinase-induced

9   clotting time, factor 10A activity, or the decoded

10  rivaroxaban INRs, which were available to us in the

11  dataset.

12         You also get this same pattern if you change

13  the definition of major bleeding.  We got the same

14  result if we used TIMI major bleeding, as we did

15  with the international society definitions of major

16  bleeding, or a modification of the international

17  society definitions, where we required a five-unit

18  blood transfusion to count as a major bleed.

19         The pattern was the same, and it also held

20  up when covariants that were -- covariants to these

21  clinical outcomes were adjusted for by Cox

22  proportional-hazards models regression.  Once those

1    variables were adjusted for, this pattern was still

2    present.

3           Therefore, Mr. Chairman, this reviewer

4    concludes that the clinical pharmacology attributes

5    suggest BID dosing of rivaroxaban.  The VT studies

6    do not provide a firm basis for the dosing regimen

7    that was studied in ROCKET.  The 20-milligram per-

8    day dose of rivaroxaban was tested in ROCKET, is

9    twice the approved dose, both in the U.S. and

10   globally, for the VT indication.  And lower-in-

11   split dosing was incorporated into the Acute

12   Coronary Syndrome Development program, as

13   2.5 milligrams BID or 5 milligrams BID.

14          Then, finally, when one uses pharmacodynamic

15   parameters to assess as a surrogate for exposure,

16   to assess ischemic stroke and major bleeding in

17   ROCKET, for warfarin, you see the expected decrease

18   in ischemic strokes and increase in major bleeding

19   as INR increases.  And then for rivaroxaban, there

20   is a flat PT ischemic stroke relationship, but

21   increasing the PT was associated with increasing

22   incidence of major bleeding.  And there again, this

1    finding was true no matter which pharmacodynamic

2    parameter that we looked at.  Thank you.

3        This is the completion of the dose selection

4    talk.  I'd like to now introduce Dr. Marty Rose.

5    Dr. Rose was the efficacy clinical reviewer for

6    rivaroxaban and will now go into that review for

7    you.

8              **FDA Presentation – Martin Rose**

9        DR. ROSE:  Thank you, Dr. Dunnmon.

10       Mr. Chairman, members of the panel, I'm here

11   to discuss issues affecting the interpretation of

12   efficacy, and there are four areas I'd like to

13   discuss.  I'll start with assessing efficacy in

14   non-inferiority and superiority trials.  I'll note

15   that Dr. Cahill indicated that superiority was off

16   the table, and I confirmed that with a

17   representative of the sponsor.  So I won't be

18   spending much time talking about superiority.

19       Next, I'll go onto adequacy of warfarin

20   management in ROCKET, which is where I'll be

21   spending most of my time, then post-treatment

22   primary endpoint events in ROCKET and J-ROCKET, and

1    finally finish up with the approval standard in

2    2011 for a drug to prevent stroke in patients with

3    AF.

4         A couple of caveats and statements.  First,

5    I'd like to remind you that the opinions that I

6    will be expressing are my own and do not

7    necessarily reflect those of my management.

8    Second, like everyone else here, I dislike or don't

9    trust cross-study comparisons, and I will not be

10   comparing data from one study to another.  However,

11   I will be comparing studies in terms of how they

12   were conducted.  At the very end, I will allude to

13   the results of RE-LY in talking about standards.

14        So in terms of non-inferiority and

15   superiority, I'm going to skip over all of the

16   superiority language and remind you that the

17   findings for non-inferiority were supported by

18   multiple supported analyses.  However, they were

19   analyses of the entire study population, and the

20   quality of warfarin management was not considered

21   in any of these analyses.

22        In terms of ITT analyses, I'd also like to

1    suggest that ITT refers to a patient population.

2    It does not tell what the observation -- it does

3    not tell you what the observation period is or was,

4    and it does not tell you the event window, as some

5    people call it.  And so those are two separate

6    concepts, and you have to keep that in mind in

7    considering any ITT analysis.  It's been stated,

8    and we agree, that most of the studies in this area

9    have collected events until a time corresponding to

10   site notification in this study, and we agree with

11   that.

12        So let's go onto the adequacy of warfarin

13   management in ROCKET.  I'll start with this

14   graphic.  You've seen it before.  This is from the

15   latest update of the guidelines for the management

16   of atrial fibrillation.  And it shows that if you

17   keep the patient within the range of 2 to 3, you

18   can minimize both ischemic stroke, which is

19   represented on the solid line here, which is pretty

20   flat all the way across here and then turns sharply

21   up at a level of 2, as well as intracranial

22   hemorrhage, a component of which is hemorrhagic

1  stroke, which again is pretty flat in this region

2  and then curves up, but its slope is much less

3  steep.  And that's something that you should keep

4  in mind and will come into play in a later slide.

5      This is a slide that Dr. Dunnmon showed you,

6  and it shows the relationship between INR and the

7  ischemic stroke rate in warfarin.  And it's quite

8  similar to what you saw in the previous slide.  As

9  INR gets closer to the target of 2 to 3, the

10  ischemic stroke rate drops.  So this is data within

11  ROCKET.

12      So briefly, management of INR in

13  ROCKET -- you've heard some of this before.  The

14  protocol included a procedure for starting study

15  drug in patients who entered the study on warfarin

16  or some other vitamin K antagonist.  However, there

17  was no algorithm for managing VKA dose.  However,

18  there were guidelines for bringing the patient back

19  in for INR more frequently at the start of the

20  study than later.  Other studies have provided

21  investigators with an algorithm.  These include

22  RE-LY and ARISTOTLE.  It may not have been

1    mandatory to use it, but at least they had the

2    paper in front of them at the site.  I'll discuss

3    transition to VKA at the end of the study later.

4         So this slide shows the percent time in

5    various INR ranges in the warfarin arm.  The yellow

6    row corresponds to the target range of 2 to 3, and

7    the mean is 55.2.  And that is the mean TTR, which

8    we've talked about.  And as Dr. Cahill indicated,

9    it is used as a quality control measure and there

10   are many studies that show that it has a

11   relationship with event rates in the warfarin arm.

12   And I will show you some of them in a few minutes.

13        You'll also note that there was more time

14   spent below range than above range, and, in fact,

15   those numbers are 30 and 15 percent.  If patients

16   were in range 55 percent of the time, they were out

17   of range 45 percent of the time.

18        These are our two studies that underline

19   that first graphic that I showed for the

20   relationship between ischemic stroke and INR.  The

21   one on the left is from a Hylek's paper in the New

22   England Journal in 1996, and I can't see that slide

1   very well, but you can.

2          So the yellow rows show odds ratio for

3   ischemic stroke versus patients at an INR of 2.

4   The yellow rows show the INRs of 1.9 and 1.8.  Both

5   of those have odds ratios that are modestly

6   elevated above 1.  The results appear to be

7   statistically significant.

8          The chart on the right are more recent data

9   from the ATRIA study.  The yellow row shows the

10  combined range of INR to 1.8 and 1.9.  You'll

11  notice that the odds ratio is in line with Hylek's

12  data.  And I emphasize this because some have

13  suggested that one can include that stippled area

14  when considering time in therapeutic range, which

15  adds about 15 percent to it.  And I think these

16  data show that that would not be appropriate in

17  terms of INRs below range.

18         For INRs above range, there's not a lot of

19  stroke risk, between 3 and 3.2, so there's about 5

20  percent there.  But if we added that in here, then

21  you probably should add it in for every other study

22  that's been performed in this area.  And I don't

1   have the data to do that, so I won't show you those

2   numbers.  So I think it would be wise to stick to 2

3   to 3 as the target range for INR, consistent with

4   the consensus guidelines.

5          So this shows INR in recent studies, and by

6   recent, I mean published since 2004.  ROCKET is at

7   the top.  They're arrayed in alphabetical order and

8   they range from 62 to 73.  ARISTOTLE, EMBRACE AC,

9   and RE-LY --  excuse me.  ARISTOTLE, EMBRACE AC,

10  and SPORTIF V were all double-blind studies.  The

11  rest, other than ROCKET, were open label.

12         You can see that it doesn't make a lot of

13  difference.  And I apologize to the committee for

14  failing to note that RE-LY was a blinded study.  I

15  thought I had done that, but it doesn't seem to

16  make a lot of difference.  And the largest of all

17  of the high TTR studies was SPORTIF V at

18  68 percent.

19         So from here on, I'm going to show a number

20  of slides about site mean TTR, which we defined

21  simply as the mean of the TTRs for all of the

22  individuals, all the patients who are in the

1    warfarin arm.  And I'll show you that later, but

2    it's very simple.

3          So there's a lot going on in this slide.

4    The rows represent two fairly recent studies.

5    ACTIVE W was a warfarin-controlled study.  The

6    experimental regimen there was aspirin plus

7    clopidogrel.  RE-LY was a warfarin-controlled

8    study.  The experimental agent there was dabigatran

9    in two doses.

10          The quartiles are quartiles of site mean

11   TTR, basically constructed by lining up all the

12   sites in order of their site mean TTR and then

13   dividing them into four, not always the same

14   way -- in ACTIVE W, which was the earlier study

15   done of these two, and is the one that most people

16   cite for methodology for site mean TTR.  In

17   ACTIVE W, the sites or the quartiles were divided

18   into an equal number of sites.  So the number of

19   patients was a little bit different.  In RE-LY, in

20   the publication, the quartiles were divided into

21   equal number of patients.  And I emphasize that

22   because we did it both ways, and it changes the

1    results in ROCKET.  It doesn't change it much in

2    other studies, but it changes the results a lot in

3    ROCKET.  And these are the annualized event rates.

4         So to the left of the dark vertical line,

5    you see the annualized event rates in the warfarin

6    arm, and you'll see that from Q1 to Q4, there's a

7    consistent drop here.  Better warfarin control is

8    associated with a lower event rate in the warfarin

9    arm, and the results are quite similar, obviously,

10    in the two arms.

11         To the right of the line, you see the hazard

12    ratio for the experimental treatment versus

13    warfarin.  For ACTIVE W, it's greater than 1

14    because warfarin is a better anticoagulant than

15    aspirin plus clopidogrel.  For RE-LY, it's less

16    than 1.  And, again, I'm not comparing any of these

17    to ROCKET, but I'm trying to show a pattern.

18         You'll notice that between the first

19    quartile and the fourth quartile, the hazard ratio

20    goes up in both.  And it goes up by about

21    70 percent in each one, which means that,

22    comparatively, warfarin looks better than the

comparator in the fourth quartile than in the first quartile.

There's not a lot of studies that have looked at this, but this is what you would expect. The experimental arm may also be affected. However, the warfarin arm is affected much more by whatever is happening between the first and the fourth quartile.  If it was simply better care in quartile 4 sites than in quartile 1 sites, you would expect the two arms to be affected the same way because of the nature of center-based TTR analyses.  They preserve the randomization.  When you put those patients into that first quartile or that fourth quartile, based on similarities in their TTRs, you take the experimental arm patients with them.  So you're comparing like to like in each quartile.

So, again, if it was something else, if it was quality of care, if it was better hypertension treatment, you would expect to see that affect both quartiles, but it doesn't.  It affects -- whatever is going on affects the warfarin arm much more.

1    And so, probably, the best explanation for what's

2    going on here is better control of warfarin, more

3    time in the therapeutic range.

4         So let's talk about calculating site TTR.

5    You'll see two ways of doing it.  Connolly, in that

6    paper from ACTIVE W that I referenced just a few

7    minutes ago, did it and described it as the average

8    of TTR values for individual patients at the site.

9    I have not seen a single published paper that uses

10   another method for calculating site TTR.  I expect

11   there'll be one soon, but it's in no paper that I

12   know of.

13        This is what we used for our analyses.  The

14   sponsor did something else, and I've described it

15   up there, but it's easier to understand in the

16   hypothetical example I'm going to show you.

17   The important thing to know about it is that it

18   gives more weight to patients who remain on study

19   drug longer.  It gives less weight to those who

20   leave the study early.  So a patient who goes in

21   and gets bad treatment, gets bad warfarin

22   treatment, and leaves the study in three weeks for

1    a stroke or maybe for a bleed is hardly counted at

2    all, basically disappears from the analysis.

3         So that may or may not be a good thing, but

4    the upshot of this is that the results of the

5    sponsor's method can't be compared to anything else

6    you've seen because no one else that we know of has

7    done it that way.

8         So here is TTR data for a hypothetical site

9    with four patients in it.  And each patient is

10   represented by a row.  And patient number 1 was

11   treated for 1,080 days.  That's 36 months, and

12   there were patients in ROCKET who were treated for

13   36 months.  That patient had 756 days in the

14   therapeutic range.  Some of those represent actual

15   values, and probably most of them would be imputed

16   values.

17        So we calculate that patient's individual

18   TTR by dividing 756 by 1080, and we get exactly

19   70 percent.  The other three patients, patients 2,

20   3, and 4, have similar data.  Each one in the study

21   was treated for 120 days and had 60 days in range,

22   and, of course, that yields a TTR of 50 percent for

1    each of those patients.

2         So here is the same slide I showed, plus a

3    couple of other rows.  FDA and Connolly would

4    calculate TTR simply by averaging 70, 50, 50, and

5    50, and we would get 55 percent for the TTR.  The

6    sponsor would add up the days treated, get 1440,

7    add up all the days in range, get 936, divide 936

8    by 1440, and get 65 percent.  So, obviously, this

9    method weights this patient much more than these

10    three patients.

11         As has been said, one would expect patients

12    who are doing better on warfarin to have higher

13    INRs, higher TTRs, and be in the study longer.  So

14    this would tend to inflate site TTR a little bit,

15    and we see that, in fact, in ROCKET, where the

16    cutoffs for the quartiles are all 2 to 3 percent

17    higher using the sponsor's method than using the

18    method of Connolly.

19         So let's move on and look at a number of TTR

20    analyses.  We analyzed TTR in several ways.  We

21    looked at it by quartiles, either containing

22    similar numbers of patients or similar numbers of

1   sites.  We used various TTR cut points, and we also

2   looked at the hazard ratio as a continuous function

3   of TTR.

4        We also looked at several event windows.  LD

5   plus two days, or last dose plus two days, is the

6   on-treatment analysis, randomization to the last

7   dose plus two days after VKA was discontinued.  And

8   we also looked at last dose plus 30 days.  All the

9   analysis you'll see here are in the safety

10  population.  The last dose plus 30 day analysis

11  includes a lot of post-treatment events and is in

12  between the on-treatment analysis and the site

13  notification analysis.

14       So let's start at the top.  This is a

15  quartile analysis, and I'll be showing either the

16  best quartile here, which is the fourth quartile,

17  or a cutoff at a fairly high level for TTR.  And

18  you'll see that as I go along.

19       So this is the best quartile in the safety

20  population, last dose plus two day analysis.  The

21  sponsor's TTR cutoff here was around 66.  We're

22  around 64.  But we and the sponsor got very similar

1    results, a hazard ratio of about .75 and event rate

2    less than 2, 1.75.

3         But that's not the first analysis we did.

4    The first quartile analysis we did after we saw the

5    sponsor's results was this one, which is, again,

6    the safety population, last dose plus two days, or

7    on treatment.  But this time, the quartiles were

8    constructed with similar numbers of sites.  And if

9    you look out to the right, you see a hazard ratio

10   that crosses 1 and a very wide confidence interval.

11   And we thought, what's going on here?  We looked

12   back and there's what's going on.  You have far

13   fewer patients.  When you construct the quartiles

14   this way, in this study, you get a much smaller

15   fourth quartile, and the TTR cutoff here is 67.8.

16   So something seems to be happening between a TTR of

17   around 64 and a TTR of around 67.

18        We did this analysis as well.  This is 72.6.

19   It's the TTR cutoff for the fourth quartile in the

20   published paper describing the quartile analysis of

21   RE-LY.  But, again, these are not RE-LY data; it's

22   just the cutoff that they used.  And you'll see

1    first that there are few patients left, 623, in the

2    warfarin arm.  These are all in the warfarin arm.

3    And there were only 11 events.  The event rate is

4    down to 1.05, and the hazard ratio is up to 1.17,

5    and a very wide confidence interval that spans a

6    fourfold range of values.  So this is quite

7    different from the other analyses.

8         The last two rows show last dose plus 30 day

9    analyses.  This population corresponds to this one,

10   and you'll notice that the event rate goes up and

11   so does the hazard ratio.  And this analysis

12   corresponds to this one.  And, again, the event

13   rate is higher, and the hazard ratio is 1.30.

14        So this suggests that if you look at high

15   levels of TTR, the evidence of superiority

16   certainly goes away.  And you begin to wonder

17   whether this drug is as effective as warfarin when

18   it's used well.  Certainly, the hazard ratios are

19   quite high.

20        So this is a continuous function analysis.

21   And I'll describe how we did it.  I think it's

22   really not too different from the way it was done

1    at J&J or Duke.  And we're starting -- first, we

2    calculated the site mean TTR for each site.  We

3    laid them out from low to high, and started at the

4    left-hand by including all of the sites.  And when

5    you do that, you get the hazard ratio for the whole

6    study, which is .79.  Then we took off one site at

7    a time from this end, moving across, again, with

8    fewer and fewer patients remaining in the analysis.

9         You see it's fairly level across here, and

10   then the hazard rate turns up at around a TTR level

11   of 64.  You'll also notice that there's this row

12   across the bottom, which is the percent of subjects

13   excluded.  And when you get up into the 70s, you

14   start excluding more than 90 percent of the

15   patients.  For that analysis with a TTR cutoff of

16   72.6, it's around 92 percent of the patients

17   excluded.  And there's very few events.

18        When you go above 72 or so, you'll notice

19   the hazard ratio drops down.  By the way, this is

20   the hazard ratio.  These are the 95-percent

21   confidence intervals.  The hazard ratio drops down

22   below 1 and then goes back up.  But now you're in a

1   range where you can count the number of events on

2   your fingers and toes.  And, in fact, at the very

3   end, you can count them on one hand.

4          So you're not going to get a very accurate

5   representation of the hazard ratio with that number

6   of events, and you would expect it to bounce around

7   because a change of one or two events, plus or

8   minus in either arm, could change the hazard ratio

9   markedly.  So, again, there's not a lot of patients

10   here.  There's not a lot of events in this region.

11   And you have to wonder whether this drug is as good

12   as warfarin when it's used well.

13          So give me a second while I catch up on my

14   notes with where we are in the slides.

15          So I've talked about using warfarin well or

16   using it skillfully, and if you've read the review,

17   you'll see that language in there.  That's a hard

18   concept to define.  Reasonable people could differ.

19   But no matter how you define it, it seems pretty

20   clear that, at the levels of TTR attained in such

21   places as England, where the overall country

22   average was 69, in Sweden, in New Zealand, in

1    Australia, all of which were around 70 or even

2    higher, or Duke University, where the TTR was 69.6,

3    there's not a lot of data in this study.  There

4    were 72 U.S. sites that had a site TTR greater than

5    70; 72 U.S. sites.  Didn't enroll a lot of

6    patients, but they did very well.  I looked closely

7    at 15 of them; 14 of them were community cardiology

8    sites with no apparent academic connection

9    whatsoever, so people in the community are getting

10   TTRs of 70.

11        The little clinical perspective that

12   followed Connolly's paper on TTR in ACTIVE W

13   suggested that practitioners should be aiming for a

14   TTR of at least 70 because of the benefit for their

15   patients.  So it's not unattainable.  It's

16   certainly not easy to get, but it ought to be a

17   goal.  It's an aspirational thing.  It ought to be

18   your goal.

19        So you've seen data suggesting that hazard

20   ratios looked pretty good in the top quartile in

21   ROCKET, so let's look at that a little bit.  This

22   is our top quartile.  Again, the hazard ratios in

1    our quartile and the sponsor's quartiles are very

2    similar.  The cut points are a little different.

3    Ours are a little lower.  It's not a huge

4    difference.

5         So these are the upper limits of the bottom

6    three quartiles, 46.8, 55.9, and 63.9.  And you'll

7    noticed that, again, comparing to the conduct of

8    other studies, not the results, that the first

9    quartile for RE-LY had a higher cutoff than the

10   second quartile for ROCKET.  And the second

11   quartile for RE-LY had a higher cutoff than the

12   third quartile for ROCKET.

13        So that fourth quartile for ROCKET, which

14   was everyone with a TTR above 63.9, included a lot

15   of patients who might have been in the third

16   quartile, in one of these other studies.  ACTIVE W

17   had very similar cutoffs to RE-LY.  So that fourth

18   ROCKET quartile has a lot of patients that would

19   have been in the third quartile in either of these

20   two studies, which may account for the fact that

21   you don't see much difference in the hazard ratios

22   there.

1          Finally, here is RE-LY, and, again, there is

2     no efficacy data here.  We're talking about study

3     conduct.  This is from Wallentin's paper on TTR

4     versus results in RE-LY.  And, again, these

5     quartiles were divided by equal numbers of

6     subjects.  RE-LY was an 18,000-patient study, so

7     each quartile had one-fourth of 18,000 patients, or

8     about 4500.  And in RE-LY, which, by the way, had

9     three arms, not two arms, they enrolled 4500

10    patients at a TTR greater than 72.6.  ROCKET had

11    around 1200 patients at that TTR.  They had

12    25 percent of the population.  ROCKET had about 8

13    percent of the population at really good levels.

14         So the sponsor suggests that this is

15    geography, and, indeed, it is.  It is geography.

16    So let's take a look at this.  This shows the

17    percentage of patients from each of the five

18    regions.  Let's start in order of regional TTR,

19    which, again, is just the mean of all of the

20    individual TTRs for all of the individual patients

21    in those regions, in the warfarin arm.

22         So in North America, 18.8 percent of

1  patients, Europe, 14.8, you add it up, and you get

2  around 34 percent of the regions with TTR better

3  than 60.  And, traditionally, these are the regions

4  that do well in terms of warfarin control and in

5  RE-LY.  So this was 34 percent.  In RE-LY, it was

6  62 percent of the people that came from regions

7  where the TTR was good.  Eastern Europe, in this

8  study, had the worst TTR, 49.7, but it enrolled

9  more than twice as many patients as any other

10  region.  It had about 39 percent.  In RE-LY, it was

11  12 percent.

12       So when the sponsor says that the results of

13  this study are related to geography and cultural

14  patient factors, they're absolutely right.  We're

15  not quibbling with that at all.  When you look at

16  it in an operational sense, what these data mean is

17  that the ROCKET study enrolled the majority of its

18  patients from regions where physicians don't use

19  warfarin very well.  They did a warfarin-controlled

20  study, compared themselves to warfarin in a study

21  where most of the patients were enrolled at sites

22  where warfarin is not used well.  And that's our

major concern with this study.

This is an interesting analysis, and it goes back to that curve that I showed you. And I'll be very fast. This is a plot of time below range, INR less than 2. And what you see -- and I'll just describe what I like about this -- the range here in terms of events per 100 patient-years is wider than in the TTR analysis. This now is the best quartile because it's the least time below range. And the warfarin event rate and the hazard ratios show a wider range, from 1 to 4. And this may be a better way of discerning warfarin control than looking at TTR.

A couple words on observed event rate as a measure of adequacy of warfarin administration. So the protocol for ROCKET specified an event rate of 2.3 in the warfarin arm. And they did meet that. How reassuring is that? They met their warfarin target, but we know that warfarin event rates can vary greatly. SPORTIF III and V were run under basically an identical protocol. One, of course, was blinded and one was not. And SPORTIF III had

1     an event rate of 2.3 percent, and the blinded study

2     had an event rate of 1.2 percent, despite identical

3     eligibility criteria.  They were run in different

4     parts of the world, but this suggests that you just

5     don't know what kind of event rates you're going to

6     get out of a study.

7           The protocol for ROCKET specified an event

8     rate of 10 percent per year.  That was their target

9     for the primary safety endpoint.  And they were

10    about 50 percent above that.  And even though TTR

11    was low, you just don't know what you're going to

12    get.

13          So, in summary, increasing levels of site

14    TTR are associated with a reduced rate of

15    thrombotic events in patients treated with warfarin

16    with atrial fibrillation.  Increasing levels of

17    site TTR are associated with changes in the hazard

18    ratio for thrombotic events that favor warfarin in

19    warfarin-controlled trials of novel anticoagulants.

20    And site mean TTR is a useful tool to understand

21    the impact of INR in warfarin-controlled studies.

22          INR controlled in ROCKET was worse than in

1  other recent trials, which might have biased the

2  overall results in favor of rivaroxaban.  Very few

3  patients were enrolled at sites where warfarin was

4  used skillfully, resulting in insufficient data to

5  assess the efficacy of rivaroxaban to warfarin when

6  the latter is used well.

7      Let's go to post-treatment events.  You've

8  seen a lot of this, so I won't show it to you

9  again.  You've seen these data.  The J-ROCKET was a

10  much smaller study, and we haven't talked about it

11  much.  It was run exclusively in Japan.  There were

12  no Japanese patients in ROCKET.  This study used a

13  lower dose of warfarin and a different INR target,

14  and also had the same phenomenon in terms of post-

15  treatment events, and completers was seen in this

16  study as well.  I'll scroll through these very

17  quickly.

18      I'd like to make some comments on the

19  sponsor's proposed transition regimen.  Starting

20  rivaroxaban in patients taking warfarin is not

21  comparable to starting warfarin in patients taking

22  rivaroxaban.  Rivaroxaban, as you saw, may increase

INR.  The top quartile was somewhat above 1.

Discontinuing rivaroxaban in patients who reach an

INR of 2, they'll lose their rivaroxaban support,

and they may drop under 2.  That could be a

problem.  They could be under-anticoagulated.  We

all know that the onset of warfarin is slow, that

time to therapeutic range is unpredictable, and

that INR can fluctuate in and out of the

therapeutic range during the initiation of therapy,

which, again, makes just reaching 2 problematic.

Also, concentrations of protein C, which is

antithrombotic, decrease faster than procoagulant

factors when you start warfarin.  So stopping

rivaroxaban too early may result in higher risk of

pathologic thrombosis.  So, again, I think there

are some issues with the regimen that the sponsor

has proposed.

So, in summary, completing patients in the

rivaroxaban arm of ROCKET had a 28-day post-

treatment stroke rate that was 3.7 times that of

warfarin-arm patients.  The J-ROCKET data were

consistent.  The rivaroxaban arm stroke rate was

1    not inconsistent with the observed pro-warfarin

2    control.  And we will grant that it was not good.

3    However, the data are also not inconsistent with

4    rebound hypercoagulability.  And the sponsor has

5    not done much to rule this out.  And I think that a

6    clinical study may be needed to evaluate rates of

7    bleeding in thrombotic events using the sponsor's

8    proposed strategy for transitioning patients from

9    rivaroxaban to warfarin, or perhaps a different

10   strategy.  This would not necessarily have to be a

11   study counting events, but perhaps a

12   pharmacodynamic study.  And this should be done

13   prior to approval.

14       Finally, moving onto drug standards, in

15   1995, FDA issued a federal register notice, that

16   was August 1st, 1995, that discusses the agency's

17   standards for demonstrating effectiveness of human

18   drug products, as well as devices.  This was an

19   outgrowth of the Clinton-Gore Reinventing

20   Government initiative, which Dr. Temple alluded to

21   earlier.

22       The policy indicates that, most of the time,

we don't require comparative studies -- I'm not
reading from the quote -- and that a placebo-
controlled study is good enough.  However, it goes
on to state -- and I will read this -- "in certain
circumstances, however, it may be important to
consider whether a new product is less effective
than available alternative therapies, when less-
effectiveness could present a danger to the patient
or to the public.  For example, it is essential for
public health protection that a new therapy be as
effective as alternatives that are already approved
for marketing when, one, the disease to be treated
is life-threatening or capable of causing
irreversible morbidity, e.g. stroke or heart
attack," and then it goes on to name a few others.

So stroke is a classic situation of a drug
covered by this policy.  It is essential that the
drug be as effective as what's on the market.  So
we've had occasion to apply this policy in
situations involving drugs for stroke prevention in
afib patients.  A dose of dabigatran that was
clearly non-inferior to warfarin was not approved

1    because it was significant inferior, in the same

2    study, to a higher dose of dabigatran in terms of

3    stroke rate.  That was RE-LY, of course.

4         We also have stated that an NDA for a drug

5    to prevent stroke in atrial fibrillation patients

6    that was based solely on a trial in which the

7    active comparator was warfarin would not be

8    approvable.  Our rationale for that was that, while

9    a finding of superiority to aspirin clearly

10   indicates that a drug is effective -- i.e. if it's

11   effective, it's better than aspirin, it's got to be

12   better than placebo -- however, warfarin is so much

13   more effective than aspirin as an anticoagulant

14   that aspirin is not an appropriate comparator.

15        The Federal Register notice, which is in

16   your packages, was a broad policy document, and

17   like most policy documents, and it didn't include a

18   lot of operational detail.  There are a number of

19   unanswered questions.  How much of the comparator's

20   efficacy has to be maintained?  How much

21   uncertainty about the efficacy results is

22   acceptable?  What if another treatment for the

1    indication is approved during the course of

2    development?

3         So, again, this is my opinion only.  I think

4    that the current landscape of anticoagulant therapy

5    for atrial fibrillation patients is an important

6    factor in answering these questions.  In 2006, when

7    ROCKET was planned, there was no alternative to

8    warfarin therapy, but dabigatran was approved last

9    year.  So there is now an alternative to warfarin

10   without warfarin's troubling interactions and

11   without the need for monitoring.  RE-LY

12   demonstrated that dabigatran was robustly non-

13   inferior to warfarin in patients at sites with TTR

14   above a study median of 67 percent.

15        I think it's reasonable that rivaroxaban

16   should have to meet the same standard, i.e., robust

17   non-inferiority to well-managed warfarin.  A lot of

18   our patients are well-managed on warfarin.  If they

19   switch to another drug, you should be comfortable

20   that it as good as warfarin when warfarin is used

21   well.  The alternative could be that the patient

22   would be less well-anticoagulated and might have a

1    stroke.  Rivaroxaban does not meet this test.

2         I'd like to go onto my backup slides here

3    because some issues have come up, so let me scroll

4    through.  I don't have far to go.

5         The U.S. data.  I've got three slides of

6    data from the U.S.  And the last one is a little

7    hard to read, but it is on page 132 in a very easy-

8    to-read form in my review.  So if you want to look

9    at it, but we've got a few slides to go before we

10   get there, and I think these are pretty reasonable.

11        So this is various data scopes, various

12   populations, and endpoint cuts in the U.S. only for

13   the ROCKET study population in the U.S.  The thing

14   I'll point out is that in the on-treatment

15   population, rivaroxaban looks very good.  The

16   hazard ratio here you'll see on the next slide is

17   .54.  There are only 15 events.  But as you go

18   out -- this is the on-treatment analysis, last dose

19   plus two days -- five days later, you're up to 20

20   events; 14 days later, 21; 30 days, 24.  And then,

21   if you go all the way to the end of the study,

22   you're at 36 events, and the hazard ratios move

1    much closer together.

2           So let's look at some more.  So this is

3    global data versus U.S. data, and I just want to

4    show you some patterns.  Again, there's a lot going

5    on, on this slide.  I'm sure you're quite familiar

6    with the various populations and the observation

7    periods.

8           At the top, we've got the rivaroxaban event

9    rate and the warfarin event rate in the white rows,

10   the hazard ratio out here.  These blue columns are

11   a little bit different.  The blue column, say, for

12   example, for ITT notification, is the ITT to site

13   notification event rate divided by the on-treatment

14   event rate.  In each case, it's the event rate

15   divided by the on-treatment event rate.  So it

16   starts at 1 at the top.

17          So let's look at warfarin first.  What you

18   see as you go down from here to here is that event

19   rate changes modestly, that this ratio in the blue

20   column starts at 1 and gets as high as 1.12.  So it

21   increases by 12 percent.  The hazard ratio goes up

22   modestly.  If you look at rivaroxaban globally, you

1    see that there's more change as you move through

2    time.  And this is quite consistent with an

3    increase in post-treatment events, both in patients

4    who discontinue early, where rivaroxaban was a

5    little bit worse than warfarin, and those who

6    complete and finish the trial, where rivaroxaban

7    was significantly worse than warfarin.

8        But, at worse -- so here it's 1.12 for the

9    ratio at the ITT, regardless of treatment exposure,

10   and here it's 1.29, so a 29 percent increase in the

11   hazard ratio.  And look what happens in the U.S.

12   So the warfarin arm looks very similar to the

13   global results.  And these global data include the

14   U.S., and this is the U.S. versus the U.S. plus the

15   rest of the world.

16       So this ratio goes from 1.00 to 1.19 for

17   warfarin, not too different from 1.12.  But look

18   what happens over here.  It goes from 1.00.  Thirty

19   days later, it's up to 1.55.  And for the ITT,

20   regardless, it's 1.93.

21       So what's going on here?  I don't know, but

22   I can speculate.  There are a lot of patients who

1   seem to leave the study and have events soon

2   afterward.  It certainly looks like informative

3   censoring.  Why would it be different in the

4   rivaroxaban group from the warfarin group?  Well,

5   probably, one of the first things that you do when

6   a patient gets into trouble is get an INR.  And if

7   the patient's not in your office, you have to get

8   an unblinded INR.  All this is speculation.  You

9   have to get an unblinded INR.  And that unblinded

10  INR, if it's 3, would tell you, probably, this is a

11  patient in the warfarin arm.  This is a drug that I

12  know how to use.  I've used it for years.  Everyone

13  I know has used it for years.  I can keep the

14  patient in the study.

15        If the INR is 1.1 or 1.2, then it's probably

16  a patient in the rivaroxaban arm.  I've got a

17  patient in trouble on an experimental drug.  What

18  should I do?  I'm going to take them out of the

19  study and put them on a drug that I know how to

20  manage.

21        So maybe that's what's going on here.  Maybe

22  this is informative censoring that we're seeing,

1   but at the end of the day, it's hard to trust that

2   on-treatment hazard ratio of .54 and those on-

3   treatment events.  And I think you have to look at

4   the ITT data in this study, especially in the U.S.,

5   where the on-treatment analysis is suspect.

6          One more issue that I'll go to.  There has

7   been discussion of adjustment --

8          DR. LINCOFF:  We're going to have to finish

9   this in about five minutes because of the time

10  constraints, please.

11         DR. ROSE:  -- okay -- adjustments of the TTR

12  for various demographic and other factors.  And we

13  did that, and that's in section 6.7.2.2, starting

14  on page 132 of the review in table 41.  And we did

15  it three ways.

16         I've left something out.  Another thing that

17  you need to know is that the dropout rate in the

18  U.S. was very high.  Overall, 35 percent of

19  patients in the study dropped out.  In the U.S., it

20  was over 40 percent.  And another 8 to 9 percent

21  were lost to follow-up in the U.S.  So that's

22  consistent with the possibility that there was

1   informative censoring.

2        So, going back to the adjustment, we

3   adjusted it three ways, and if you'd like, you can

4   read about it.  We did logistic regression.  We

5   adjusted for the various factors described in

6   Rose's -- now, no relation to me -- Rose's paper.

7   And we also adjusted to match the population to the

8   RE-LY population based on data from within ROCKET,

9   what would happen if the patients were like RE-LY.

10       For the first adjustment, we got less than

11  1 percent.  For the second adjustment, we got about

12  2 percent.  We also did a logistic regression,

13  again, based on RE-LY, and got a little bit over

14  2 percent.  So those two matched.  The first one

15  was algebraic.  I did it.  The second one was

16  logistic regression.  You can read the details in

17  the review.  But the bottom line is that when you

18  adjust the TTR for all these factors, region, sex,

19  everything else, it doesn't change it by more than

20  about 2 and a half points.

21       So that's it.  Thank you.

22       DR. LINCOFF:  We are going to break for

1    lunch now and come back with the questions for the

2    sponsors.  I'd like to shorten the lunch, if we

3    can, a bit, so instead of the full hour, if we

4    could, convene at 1:15, which would be 50 minutes,

5    to catch up some of the time, that would be great.

6    So thank you very much.

7            (Whereupon, at 12:26 p.m., a lunch recess

8    was taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1          A F T E R N O O N   S E S S I O N

2                    (12:26 p.m.)

3        **Clarifying Questions for FDA Presenters**

4          DR. LINCOFF:  We are going to resume now.

5    We're going to start with, now, questions,

6    clarification questions for the FDA, and we'll

7    begin with Dr. Kaul.

8          DR. KAUL:  Thank you, Mike.  I have three

9    questions and I'd like to be able to ask all three

10   questions, so the answers should be brief.  I was

11   very intrigued by the U.S. subgroup data, and you

12   showed data from the primary efficacy endpoint.

13         Two questions related to that.  I would have

14   liked to have seen the data for just the ischemic

15   endpoints, because I want to see what the upper

16   bound of the 95 percent confidence interval is.

17   With the primary efficacy endpoint, the point

18   estimate is .86, and the upper bound is closer to

19   about 1.33, which approaches the non-inferiority

20   margin.  But the non-inferiority margin was based

21   on trials that evaluated ischemic events.

22         So I want to see if you have done that

1    analysis primarily for ischemic events, number one.

2    And number two question related to the U.S. data

3    is, the primary efficacy data, you said there were

4    a lot of dropouts in the U.S. subgroup.

5         How many excess events would need to occur

6    in the rivaroxaban arm to negate non-inferiority?

7    So have you done that type of sensitivity analysis

8    in that subgroup?

9         DR. ROSE:  So your first question, could you

10   be a little more specific about which analysis

11   you're talking about?

12        DR. KAUL:  The U.S. data, the analysis that

13   you showed in your backup slides, 36 versus 42

14   primary efficacy.

15        DR. ROSE:  So the ITT?

16        DR. KAUL:  The ITT, all --

17        DR. ROSE:  Right.  So offhand, I don't

18   recall seeing the ischemic stroke data for that

19   analysis.  Those tables were all taken right out of

20   the sponsor's submission.  And they may know

21   whether those ischemic stroke data exists for that

22   analysis.  I don't remember them.

1        DR. KAUL:  What about the impact of the

2    dropouts?

3        DR. ROSE:  We did a calculation for the

4    number of events that it would take to overturn

5    efficacy in the global analysis.  We didn't do that

6    for the U.S.

7        DR. KAUL:  Okay.

8        DR. PETERS:  So we do have a Kaplan-Meier of

9    discontinuations in the U.S., if we could show that

10   first, and then the primary endpoint in the U.S.

11   So slide on.  I'm trying to go very quickly.  The

12   hazard ratio was 1.06.  And you can see the curves

13   are pretty close to each other over the course of

14   the study.

15        Actually, if we could show the table.  This

16   is the primary efficacy endpoint in the U.S. across

17   all of the analyses.  So you can see that it

18   actually meets the non-inferiority margin for all

19   of the analyses.  And then the next slide on.  This

20   is up to site notification, but if we could show

21   safety on treatment.  So the ischemic stroke here

22   up to site notification is actually .89.  You're

1    getting to small numbers of events, so the upper

2    bound of the confidence interval is 1.59.

3        This is the on-treatment data to be

4    comparable to what we presented earlier, and there,

5    it's 8 versus 16 for ischemic stroke in the U.S.,

6    so a hazard ratio of .52.

7        DR. KAUL:  The question number two for the

8    FDA is, in your last part of your talk, you focused

9    on the term "as effective as," which is the FDA

10   standard.  Can you clarify what you mean by as

11   effective as?  Are you trying to suggest

12   equivalence, similarity?

13       DR. ROSE:  That's a difficult question, and,

14   of course, it's not defined in that very broad

15   policy document.  And I have never seen a written

16   document that defines how to think about it.  It's

17   one of the questions we're asking you.

18       The way I think about it would be, it was

19   summed up in probably the last sentence, last two

20   sentences that I said, which is robust -- in this

21   case, it would be robust non-inferiority to

22   warfarin when it's used well.  And robust non-

inferiority is a vague term.

Let me just say that for dabigatran, in that analysis, the upper limit of the confidence interval was 1.05, and the hazard ratio was less than 1.  And so that was in the analysis for sites above the median, which was 67 percent TTR.  So the upper limit of the confidence interval in the comparison at those sites was 1.05.

So I would personally consider that robust non-inferiority, and that would be the standard I would expect in a population where warfarin was used well.

DR. KAUL:  From the philosophical underpinnings of the non-inferiority design, as best as I understand non-inferiority, it's that you don't design non-inferiority to demonstrate that the new therapy is as effective as the standard treatment.  You design it to rule out an unacceptable degree of harm or inferiority.

So how can we take the same construct and arrive at as effective as, when it was never designed to address that?  So can you routinely use

1    a non-inferiority platform to arrive at that

2    standard?

3         DR. ROSE:  Possibly, yes, if you choose your

4    margins carefully and choose your patient

5    population carefully.  At least, that's what I'm

6    proposing.  This is a difficult question.  I mean,

7    that policy didn't come with an instruction set.

8    And you've raised issues that have befuddled us.

9    We've certainly thought about these things, and

10   they're hard to grapple with.

11        Remember that the policy is to protect

12   public health, to prevent people from having

13   strokes, or other things that can kill them, or

14   leave them irreversibly maimed in some way.  And I

15   think behind it, if I may be so bold, the goal is

16   to protect people from the possibility of taking an

17   inferior therapy which won't do the job so well.

18        I think you have to approach it from that

19   angle.  And maybe that calls for a non-inferiority

20   margin that's considerably smaller than what we

21   usually deal with.  Maybe there's some other way of

22   doing it.  I haven't thought so.  Dr. Temple

1    certainly has thought about these things, and I

2    know Dr. Stockbridge has as well, and they may want

3    to add something to this.

4         DR. KAUL:  Before Dr. Temple answers that, I

5    want to get my last question in.  You were

6    concerned that about 40 percent, nearly 40 percent,

7    of the enrollees were enrolled from eastern Europe,

8    and the TTR was under 50 percent there, the mean

9    TTR.  But if you evaluate the impact on the

10    outcomes of that TTR, the event rate in the

11    warfarin arm is 3.3 percent, which is actually

12    lower than the 3.69 percent you see in Latin

13    America or the 4.3 percent you see in Asia Pacific.

14         So, ultimately, we are more concerned about

15    the impact of this less skillful TTR on outcomes,

16    rather than the degree of TTR.

17         DR. ROSE:  So I would remind you that this

18    whole study had about 400 events.  So eastern

19    Europe, we've already had around 39 percent of the

20    patients.  I forget how many were in Latin America

21    or Asia Pacific.  They were less than the U.S.

22    What, 10, 12 percent?  Something like that.

1   So their share of those 400 events would be 40

2   events, 20 per arm.  That's not a lot of events.

3   You're going to see a lot of swings around the

4   hazard ratio when you're talking about small

5   numbers of events.

6        So you can't expect everything to line up.

7   You can't expect the quartiles to line up when you

8   do a quartile analysis for overall, because you've

9   got eight cells and you're sharing 400 events among

10  eight cells, so that's 50 per arm.  That's more

11  than what you've got in Latin America, and they

12  don't line up, but they do show a consistent

13  pattern from first quarter to fourth quarter.

14       DR. KAUL:  I'm not talking about hazard

15  ratios.  I'm just talking about the event rate.

16       DR. ROSE:  Event rates drive hazard ratios.

17  If you're talking about 20 events from this

18  subgroup, and that subgroup, and another subgroup,

19  I don't think we can expect everything to line up

20  when the number of events is that small.

21       DR. TEMPLE:  I think the difficulty of the

22  situation has been well described by everybody.

1    The whole concept of -- I mean, you use non-

2    inferiority studies where it's unethical to use

3    placebo.  But more than that, where there's a

4    therapy that really works, you really want to know

5    more than that the new therapy is just better than

6    placebo.  That's probably not good enough, so you

7    use the non-inferiority design and you set a non-

8    inferiority margin.

9         One possibility -- we agreed on a non-

10   inferiority margin to be the one to be ruled out,

11   so-called M2, of about 36 percent.  It's not out of

12   the question that, being aware that there was

13   another drug that looked actually at least as good

14   or maybe better, we might have set a smaller margin

15   in the future.  I'm not saying that.  I'm not

16   predicting that.  But it's not out of the question.

17        Some of the irony is, in some ways, that

18   when a control drug is really, really, really

19   effective, you can have a sort of big margin.  I

20   don't know whether that's a satisfactory outcome or

21   not, but it's worth thinking about.

22        But what I was trying to say when I opened

1    up is that the manifestation of that 1995 policy in

2    some ways is reflected in the non-inferiority

3    guidance that we wrote.  And it certainly doesn't

4    say you have to show you're better.  It also

5    doesn't say you have to rule out all conceivable

6    possible differences.  It's trying to make a

7    balance of feasibility, and public protection, and

8    get all those things right.

9        So you want the study to be robust in one

10   important sense.  You want to be pretty sure that

11   the active control had its usual effect, the so-

12   called constancy assumption, and that's one of the

13   issues here, was Coumadin as good as usual?  I'd

14   want to point out, again, that much of the effect

15   of these drugs is on hemorrhagic stroke, and the

16   concerns about -- most of the advantage of these

17   drugs over Coumadin is over hemorrhagic stroke, and

18   that probably wouldn't be affected by having INR

19   too low, but that probably deserves more attention.

20       But if you look at the history of the

21   margins we've chosen, they plainly represent a

22   compromise between trying to be sure you're not

worse and trying to be sure you can still do the
study.  So with the margin of 36 percent, they
still needed 14,000 people.  And we went through
the same thing on thrombolytic agents.  We went to
an advisory meeting.  They said rule out a loss of
25 percent.  That would have required a study of
55,000 people, so we bought 50 percent.

I don't know.  But we also feel you should
look at the point estimate, too.  It's not only the
lower bound or the upper bound of the confidence
interval.  And in some of those cases, the point
estimate was actually favorable to the new one.  So
that was reassuring, even though all you'd really
ruled out rigorously was a loss of 50 percent of
the effect.  And you have similar considerations
here.  At least for certain analyses, it actually
doesn't look only non-inferior, it actually looks
better.  Well, that could be reassuring that you
haven't lost too much if you believe that the
control drug was used properly.

So, as Marty said, we didn't say exactly how
to do this, partly because we didn't know at the

1    time.  We'd really only begun to develop the non-

2    inferiority stuff.  And I can't even blame that on

3    anybody else.  I think I wrote that part.

4         So there it is.  It's a major problem of

5    practical enforcement.  You don't want to lose

6    anything really valuable, but you don't want to

7    make it impossible to get new drugs because you

8    never know what's going to happen to the older

9    drug.  We believe in having therapeutic

10   alternatives.  And the more I look at the data and

11   how there are these differences between hemorrhagic

12   stroke and thrombotic stroke, I'm not sure I

13   understand a lot of this stuff, and I think there's

14   still work to do.  So that's not as direct and

15   absolute a response as I'd like to be able to give.

16        DR. KAUL:  How do you operationalize as

17   effective as within the construct of non-

18   inferiority?  I mean, that's a key question.

19        DR. TEMPLE:  That's how we did it.  We said

20   you have to rule out a difference more than the

21   certain thing we're going to specify, and that will

22   be as effective as.

1    DR. KAUL:  But that depends on what the

2    ancillary advantages of what the new therapy are.

3    Is it safer?  Rivaroxaban lost on its safety

4    endpoint, didn't meet it.  Is it convenient?

5    Possibly.  Is it less expensive?  Probably not.  So

6    how much margin do you -- how much effect you want

7    to preserve depends on the ancillary advantages

8    that this drug brings.

9        If you have an active control that has a

10   60 percent risk reduction as a treatment effect

11   compared to placebo, are we just happy with

12   preserving just 50 percent?  Shouldn't we be

13   thinking about maybe 80 percent?  Why just 50

14   percent?

15       DR. TEMPLE:  That's what I was trying to

16   address.  What the choice of M2 is, is very much a

17   judgment call.  And there's no point in not

18   acknowledging that it's based partly on the desire

19   to not lose any useful effectiveness and the

20   practical limitations of doing a trial.  I mean, we

21   don't think you can realistically do a 100,000-

22   patient trial.  So maybe we want to preserve all

1    but 10 percent, and we want to be sure we haven't

2    lost 10 percent.  Probably, I do.  I don't -- you

3    don't.  But if that makes it impossible to ever

4    develop new drugs in this area, we've got to take

5    that into account, too.  And we do, frequently with

6    the help of advisory committees like you guys.  And

7    I don't think it's out of the question at all that

8    one could change from 50 percent to a smaller

9    value.  But, again, you have to think of whether

10   the study becomes doable.

11          I want to remind everybody, the point

12   estimate counts, too.  It isn't only the lower

13   bound.

14          Sorry, Tom.

15          DR. TOLIVER:  Just a reminder, please

16   identify yourself.

17          DR. ROSE:  Marty Rose, FDA.

18          So the large size of these studies stems

19   from the non-inferiority margin that we've

20   selected, but it also stems from the point estimate

21   that we select.  And we see studies based on the

22   assumption that the drug is equivalent to warfarin,

1    that the true hazard ratio is 1.0, and you want to

2    rule out a confidence interval of 1.38.  And you

3    get 16 [000] or 15,000 patients.

4         If you assume your hazard ratio is .9, it's

5    a lot smaller.  If you assume it's .8, it's a lot

6    smaller than that.  The study doesn't have to

7    assume a hazard ratio of 1.0.  And as we're seeing

8    more and more studies, we're getting the impression

9    that, at least in an on-treatment analysis, the

10   appropriate hazard ratio for powering a study may

11   be less than 1.0, considerably less, and that will

12   change the sample size.

13        DR. LINCOFF:  Dr. Emerson?

14        DR. EMERSON:  So, again, I want to sort of

15   try to understand exactly some of the comments you

16   were making regarding the fact that this study's

17   distribution of TTR was different in a non-

18   inferiority study.  And if I can -- I think what I

19   heard Dr. Fleming say -- and if he didn't, he

20   should have.  But the aspect of, necessarily, the

21   fact that we're here discussing a non-inferiority

22   study does mean that we're comparing cross-studies.

1     So protestations aside, to say, I'm not

2  comparing across studies is irrelevant.

3     So the issues that I can see with this

4  difference in the TTR populations can be, does it

5  change the margin due to the fact that this study

6  isn't comparable to the placebo-controlled studies

7  that presumably led to some comparison of

8  the -- choice of margin, or is this all the second

9  part of the as-effective-as, that we're just trying

10  to say, we want comparability to the dabigatran, so

11  that we can regard whether we have comparability

12  there?

13     So in this non-constancy question that keeps

14  coming up in any non-inferiority study, in this

15  study, we have the questions of, is this a

16  difference in the patient populations but the

17  treatment's the same -- they got warfarin -- or is

18  it a difference in the treatment, that they got

19  inadequate treatment?  And therefore, we don't know

20  how to compare it.  But either of those non-

21  constancy situations lead to problems in both of

22  those.

1          DR. ROSE:  That's a very interesting

2    question.  So the five placebo-controlled studies

3    that were used as the basis of the non-inferiority

4    margin led to that non-inferiority margin of 1.38,

5    based on an meta-analysis and the effect size.  And

6    I won't go through all the details of, but at the

7    end of the day, mathematical operation made its

8    windup at 1.38.  We took the geometric half of the

9    effect size, and we put basically the square root

10   of the effect size, and we ended up at 1.38.  We

11   were trying to preserve half of the effect size.

12          Those studies, five of them had a very low

13   percentage of patients at high risk.  The fifth had

14   a population that was 100 percent composed of

15   people with a prior history of stroke, or TIA.  So

16   that was EAFT.  The hazard ratio in EAFT was

17   basically the same as the hazard ratio in the other

18   placebo-controlled trials, suggesting that having

19   at least that one risk factor, which is a very big

20   risk factor, prior history of stroke or TIA,

21   doesn't really change the effect of warfarin vis a

22   vis placebo.

1     So that's one question.  Those studies had a

2  broad range of INR targets.  The INR targets ranged

3  from something like I think 1.4 to 4.5 in those

4  studies.  I'm talking about the lowest bottom and

5  the highest top, so a very broad range of INR

6  targets, some of which were quite low and some of

7  which went to 4.5

8     So the ROCKET target falls within that

9  range.  The level of attainment of that broad range

10  of INR was also broad, and ROCKET falls within that

11  broad level of attainment.  So you're talking about

12  INR range kind of all over the place, a level of

13  attainment that's all over the place.  Hard to say

14  you're outside of that range.  I'm not sure what it

15  all means, but it's hard to say you're outside of

16  that range.

17     So in that respect, I think ROCKET met the

18  constancy assumption with respect to those

19  parameters.  Recent studies, like ATRIA, also

20  suggest that more patients at higher risk for

21  stroke get a larger benefit from warfarin than

22  patients at lower risk.  Now, that's not a

1   controlled study.  ATRIA is an observational study,

2   but there's a lot of observations in ATRIA.

3        So that, too, suggests that this

4   study -- it's okay to use the original 1.38 for

5   this study.  There may be some other issues with

6   respect to, perhaps, a lowering of the efficacy of

7   warfarin, just because we're doing so many other

8   good things for patients, that adding warfarin

9   doesn't have quite as much of an effect as it used

10  to have when we weren't controlling, say,

11  hypertension so well.  Now, we control hypertension

12  really well.

13       But the problem, to me relates not to the

14  previous studies, but to what people do now, what's

15  been done now with respect to getting patients to a

16  good INR.  It has nothing to do with the placebo-

17  controlled studies.  It has to do with the fact

18  that, if you work at it, a site can get to an INR,

19  a TTR, of 70 if they work at it.  And whole

20  countries get to a TTR of 70, and they do that in

21  study after study, not a lot of studies, but a few

22  studies.

1          So that's where we ought to be.  That's what

2     we ought to be striving for.  So it's not really

3     based on BAATAF, AFASAK (ph), and all those studies

4     from 20 years ago.  It's based on what's been

5     happening in the last 10 years.

6          Does that answer your question?

7          DR. EMERSON:  So just to clarify, this goes

8     back to the very first statements that you all

9     made, saying that you're really willing to

10    stipulate, relative to placebo, that you have high

11    confidence that if we did a placebo-controlled

12    study, that we'd match that efficacy, so that

13    everything about this TTR is really hinging on your

14    point estimate, which I would agree with.  It's

15    this concept of looking at it relative to what else

16    could be done with dabigatran, rather than what's

17    the true non-inferiority just against placebo.

18         DR. ROSE:  That's what I believe, and I

19    think that's what Dr. Temple and Dr. Stockbridge

20    believe.  I personally think that this drug would

21    beat placebo in a placebo-controlled trial.  But

22    you should ask them what they think.

1          DR. TEMPLE:  You can't avoid the fact that

2     dabi exists.  There it is.  It did very well.  And

3     I think it increases the insistence we have that

4     the findings here seem robustly persuasive as to

5     non-inferiority.

6          So as Marty says, everybody agrees that this

7     drug is better than nothing.  But how sure are you,

8     from these data, that it's reasonably similar to

9     the control?  And I'm very leery of cross-study

10    comparisons.  They have different populations and

11    all that stuff.  But it does, I think, make us want

12    to be quite sure that it looks robustly non-

13    inferior.  And, remember, we accepted a 36 percent

14    difference as what had to be ruled out.  That's not

15    very aggressive.  But based on assumptions about

16    sample size that did not presume an

17    advantage -- maybe it could have -- that was what

18    seemed to be the necessary sample size, and that

19    was pretty big already.  But, of course, now you

20    have the data, so you get to look and see whether

21    you're reasonably convinced that non-inferiority of

22    a variety of degrees has been ruled out, and that

1    all depends on which analysis you look at.

2            I do want to say, again, that the concern

3    about INR is mostly about embolic or thrombotic

4    strokes.  And most of the advantage of the

5    drug -- a little bit maybe.  But most of the

6    advantage drugs are on hemorrhagic strokes.  So

7    these low INRs shouldn't have any impact on that.

8    I mean, if anything, it should make warfarin look

9    better.

10           DR. LINCOFF:  Dr. Krantz?

11           DR. KRANTZ:  Just real quick to follow up

12   with Dr. Rose, you had mentioned that generally,

13   those at greatest absolute risk derived the

14   greatest benefit.  And I was curious.  The folks

15   with prior strokes, which is the secondary

16   prevention population that I deal with in the

17   heart, mainly, you would think would do a lot

18   better.  And, in fact, their point estimate, their

19   hazard ratio, was diminished somewhat.

20           So I don't know.  Have you looked at data in

21   terms of CHADS score or other things that might

22   suggest, at least, that that principle is still in

1    place within the ROCKET study?

2         DR. ROSE:   In this study, patients with

3    higher CHADS scores tended to have less robust

4    results than patients with lower CHADS scores.

5    Yes, you would think it would go the other way.   I

6    agree with you, and I was surprised that the

7    history of prior stroke, or TIA, or SE subgroup had

8    that hazard ratio that it did.

9         But, remember, that's a comparison to

10   warfarin, so it was around .9.   But it doesn't mean

11   it didn't work.   It means it didn't work quite as

12   well, relative to warfarin, as it did in the lower

13   group.   Now, why it wasn't the other way, if I had

14   to bet going into it, I would have expected it to

15   go the other way, that the higher-risk subgroup

16   would do better.

17        Maybe a lot of those patients had sclerotic

18   vessels in their brain, and that's why they had

19   strokes.   They didn't have thrombotic strokes.

20   They had strokes that were based on arterial

21   sclerosis of the cerebral vasculature.   And that's

22   what we're seeing, and maybe warfarin doesn't do

1   much for that, and maybe dabigatran doesn't do too

2   much -- or excuse me -- rivaroxaban doesn't do too

3   much for that.

4          DR. KRANTZ:  I'm just a little puzzled.

5   Does that sort of lead to a question about the

6   robustness of the data or is that a function,

7   somehow, secondarily, of a moderator like TTR?  I

8   think the sponsor did a nice job showing that age,

9   heart failure, other co-morbidities, con

10  medications, all lead to lower time in therapeutic

11  range.

12         DR. ROSE:  Well, they do a little bit, but

13  not very much.  When you adjust the study to match,

14  say, the RE-LY population, the TTR doesn't change

15  all that much.  It's not that different, at least

16  when we do it.  And we did it three times, three

17  different ways, and it never changed more than

18  about 2 and a half points.

19         DR. LINCOFF:  Dr. Sager?

20         DR. SAGER:  Despite Bob's comment about how

21  lower INRs should reduce the incidence of warfarin-

22  induced hemorrhagic stroke, we're really struggling

1    with the TTRs and the difference between this study

2    versus other studies.

3         So the question I want to ask you is, you've

4    done many different types of statistical analyses.

5    Have you looked at the individuals on a center

6    basis who were between, let's say, 60 and

7    70 percent TTR, and calculated their primary

8    endpoint in the safety sets and the ITT sets, and

9    whether their confidence intervals fell within the

10   non-inferiority range?  Because that, again, would

11   kind of be comparing at least a little bit, even

12   though we say we don't want to compare across

13   studies, but it would be looking at the people who

14   at least have higher TTRs, more consistent with

15   previous investigations.

16        DR. ROSE:  So the answer to your question is

17   no.  We haven't looked at the subgroup of patients

18   between 60 and 70.  I would remind you that, as you

19   move up from 60, the patients start disappearing

20   fast.  And so most of the patients, if that

21   subgroup were 2,000 people, most of them would be

22   crowded in the lower end in ROCKET, maybe not in

1    other studies.  But in ROCKET, they would be

2    crowded at the lower end.

3          DR. SAGER:  A follow-up question, if I could

4    just quickly.  In RE-LY, I understand that it was

5    fairly equal both above 3 and those below 2.  Is

6    that correct?

7          DR. ROSE:  Those above 3 and those below 2?

8          DR. SAGER:  For INRs?

9          DR. ROSE:  Oh, you mean in terms of INR?  I

10   will defer to the team that did the RE-LY review.

11   You're speaking of TTR?

12         DR. SAGER:  Yes.

13         DR. ROSE:  I don't know the RE-LY TTR data

14   all that well.  I'll defer to them.

15         DR. THOMPSON:  Aliza Thompson.  My

16   recollection -- and perhaps someone from the

17   audience can also correct me -- was that it was

18   more common to have times below, but I don't

19   remember what the exact distribution was.

20         DR. SAGER:  Thank you.

21         DR. LINCOFF:  Dr. Fox?

22         DR. FOX:  Thanks.  With respect to Sanjay's

1    questions about the 1995 policy statement, as

2    effective as, I think the spirit behind that policy

3    statement was a correct one and a good one, but I

4    think it was intentionally non-operationally

5    detailed for some of the reasons Dr. Temple has

6    stated, because if you take it to its extreme, then

7    it's saying, well, prove equivalence.  And I'll

8    leave it to the statisticians around the table to

9    argue how legitimate an idea that might or might

10   not be.

11        Having said that, I think the FDA deserves a

12   lot of credit for choosing a reasonable and

13   pragmatic middle ground.  There is nothing magical

14   about preserving 50 percent of the treatment effect

15   of warfarin or ARBs versus ACEs, for that matter,

16   which is another area where a similar approach has

17   been taken in non-inferiority trials in the past.

18        Keeping in mind that there's nothing magical

19   about that 50 percent and also keeping in mind that

20   the FDA has taken a very consistent -- at least

21   this division has taken a very consistent approach

22   with different sponsors in this therapy area to say

1    we treated this sponsor and their product this way,

2    you've got to meet a 1.38 margin.  That's what we

3    like.  And they went to the other sponsor, and the

4    other one, and the other one, and it was the same

5    number.

6          They weren't capricious about it.  They

7    didn't change their mind in the middle, because you

8    can't plan and execute a trial like this -- it's a

9    gigantic undertaking that takes years.  And let's

10   not forget the 14,000 people who devoted their time

11   and morbidity and mortality to this study.  You

12   can't then get six or eight years down the road and

13   say, oh, well, never mind.  Let's take a different

14   approach and apply a different standard.

15         So you ought to give the agency some credit

16   for at least being consistent, even if there is no

17   perfect answer.  And as Dr. Temple said, he and the

18   FDA tried to capture this in a detailed way in the

19   guidance that they issued on the topic.

20         So going back to the policy statement, to me

21   it reads a bit consumeristic.  But let's remember,

22   this is not toothpaste or laundry detergent.  It's

1    not whiter than white.  We're talking about

2    people's lives and serious morbidity here.

3         The last point I'll make is, I agree with

4    putting the emphasis on, don't just say, okay, you

5    met the bar, but what's the point estimate?  When I

6    asked the sponsor the question in the morning

7    session about the sensitivity analysis, that

8    admittedly took a somewhat ridiculous extreme

9    position of assuming all the events happened, and

10   withdrawn consent in rivaroxaban, and essentially

11   none in the comparator, and how did that look.

12   That point estimate started to creep around to like

13   the 1.0 line, and the upper bound started to creep

14   up towards the 1.38 upper bound limit.  And I could

15   tell there was a little bit of discomfort on their

16   part when they got that, but it still was within

17   the bounds.  And I think it shows that they've done

18   their due diligence in exploring the data from as

19   many different angles as they could.

20        One last thing I'd like to say is, I'm not

21   persuaded --

22        DR. LINCOFF:  Comments are later.  So if

1    there's no question here, then I think we should

2    continue with the questions.

3         DR. FOX:  Okay.

4         DR. LINCOFF:  Dr. Nissen?

5         DR. NISSEN:  I'm still struggling, Norman

6    and Bob, with the regulatory standard question

7    here.  And let me see if I can pose this some.

8         So I understand that you set 1.38, and I

9    understand the logic behind that.  But there are

10   some other recent examples where you said that

11   wasn't nearly good enough.  And the example I'm

12   thinking about are the antiplatelet agents,

13   prasugrel and anticoagular (ph).  If I'm not

14   mistaken, didn't you say they had to really be

15   superior to -- or what - did you say 1.38?  Did you

16   use the same standard, non-inferiority?

17        DR. TEMPLE:  It wouldn't be the same

18   standard.  You'd have to make some estimate of what

19   the effect of clopidogrel was and then preserve

20   half of that.  I'm absolutely positive the effect

21   of clopidogrel is not the 75, 80 percent reduction

22   that you get with -

1          DR. NISSEN:  That you set a margin --

2          DR. TEMPLE:  What you do is you try to

3    figure out as best you can -- this is not easy.

4    Our biostatisticians spend a lot of time doing it.

5    You pull data.  You figure out what the effect of

6    the drug is.  I don't remember.  For clopidogrel,

7    it would have been in the neighborhood of

8    30 percent, or 25 percent, or something like that.

9    And then we would, typically -- although you can

10   debate this, our non-inferiority margin, M2, would

11   generally be half of that.  Now, somebody could

12   say, well, geez, I don't want to lose half of the

13   effect.  But as a practical matter, the trials were

14   already bordering on impossible.  So much more than

15   that, you just wouldn't have any trials.

16          As people have pointed out, the best way to

17   be non-inferior is to be a little better.  That

18   really helps you a lot with the margin.  Whether

19   it's safe to assume you're going to be better and

20   calculate your sample size that way is something

21   that companies have to figure out.

22          Anyway, the margin would have been

1    considerably smaller there, but we did not reach

2    the conclusion at all that it had to be superior.

3    That is not so.

4         DR. NISSEN:  So you use the same standard?

5         DR. TEMPLE:  Yes.

6         DR. LINCOFF:  Dr. Fleming?

7         DR. FLEMING:  So much to get into, but I,

8    too, want to wait for the discussion.  There's so

9    many issues to consider, such as the fact that the

10   sensitivity analysis wasn't done on ITT and many

11   issues around as effective that I want to come back

12   to.

13        I'd like to go to slide 23, maybe to just

14   address one issue.  And while that slide is coming

15   up, just to comment, I don't think the issue around

16   TTR is whether it's a valid surrogate.  I think the

17   fundamental issue here is, do we have different

18   warfarin regimens?  Is a regimen that would be

19   intending to get to a target of 55 TTR different

20   from one intending to get to, let's say, 68 percent

21   TTR?  Where the worry would be, if the non-

22   inferiority margin was based on the 68 but the

1    clinical trial was based on 55, and if that's less

2    effective, then we'd lose the constancy assumption.

3         However, we're not actually -- this

4    analysis, as useful as it is, doesn't get at the

5    question I just mentioned because it is a post hoc

6    indirect assessment.  When you target 55, you don't

7    get 55 in everybody.  When you target 68, you don't

8    get 68 in everybody.  So this is, I think, an

9    informative analysis, but one that has to be viewed

10   with caution.

11        When I look at it, if you look at 67,

12   68 percent, this result looks to be a little more

13   suggestive than what the sponsored showed, that INR

14   could be an effect modifier here, to a degree, of

15   achievement of INR, it could be an effect modifier.

16   Obviously, again, it's post hoc, small amounts of

17   data.  But once you get to about 68 percent, you

18   start approaching 1.0, which actually, though,

19   could be reassuring still.  It's 1.0 as a point

20   estimate, although two concerns.  One is the

21   missing data concern, and another one is the ITT

22   versus on-study concern in a trial like this, where

1   what happens after you go off per-protocol

2   on-treatment is not neutral and is a lot of the

3   events.

4           Therefore, do we have this analysis?  I

5   assume this analysis is based on the per-protocol

6   on-treatment.  Is that correct?

7           DR. ROSE:  That is correct.

8           DR. FLEMING:  Can you show us this analysis,

9   based on the ITT?

10          DR. ROSE:  I don't have it.

11          DR. LINCOFF:  The sponsor has very similar

12  slides.  Do you have that?

13          DR. FLEMING:  But I'd like to have the slide

14  that uses the exact same methodology used, because

15  this tends to show more effect.

16          DR. LINCOFF:  Yes.  I think the only

17  difference is, the X axis here is percent of

18  patients instead of TTR cutoff.

19          DR. ROSE:  It doesn't look --

20          DR. PETERS:   A primary endpoint ITT to

21  follow-up with our CSR method.  We only did ITT to

22  follow-up for these.  We did on-treatment and ITT

1   to follow-up.

2        DR. FLEMING:  I really want to see the

3   FDA's, and it sounds like the FDA is saying you

4   don't have it.

5        Okay.  We can move on.  I want to get to the

6   discussion.

7        DR. LINCOFF:  So are there any other

8   questions for the FDA?

9        DR. TEMPLE:  Can I just ask something?

10  Remember, the advantage that rivaroxaban had was

11  almost entirely, but not quite entirely, on

12  hemorrhagic stroke.  Okay?  So now you saw that

13  that advantage starts to go away when you look at

14  people who are more time in range.  And I just

15  wondered whether you thought that makes any sense,

16  because at time out of range is mostly below.  Why

17  should that interfere with the advantage on

18  hemorrhagic stroke?

19       DR. LINCOFF:  So since that is a question

20  maybe I -- mechanistically, first of all,

21  intracranial hemorrhage that were not related to

22  strokes, such as subarachnoid, although a minority,

1    were not part of that endpoint.  So, I mean,

2    mechanistically, hemorrhagic strokes can happen

3    from ischemic strokes that then transform, even

4    though they're not obviously hemorrhagic

5    transformations.  And maybe the CEC would want to

6    comment on that, but I think that preventing an

7    ischemic stroke that would then be more or less

8    likely to become hemorrhagic is still

9    mechanistically linked to anticoagulation.

10          The sponsor had been asked to -- yes?

11          DR. ROSE:  I did have a response to

12   Dr. Fleming.  We looked at that ITT to site

13   notification analysis in a couple of our TTR cuts.

14   And what we saw -- and I don't remember the data; I

15   didn't put them in any of our slides.  But

16   consistently, in the TTR cuts and in virtually

17   every other analysis, the hazard ratio for the site

18   notification cut or site notification analysis was

19   higher than for the last dose plus 30.

20          I can tell you what that is.  When you get

21   up into the 70s, the last dose plus 30 is around

22   1.30, 1.37 for the point estimate, and the hazard

ratios are maybe up to 3 or 4.  So it's going to be
higher than that.  And the last dose plus 30 is
around 1.3, in that range.

DR. FLEMING:  And the last dose plus 30 is
higher than the last dose plus 2, which is what
this is based on.

DR. LINCOFF:  Dr. Kaul?

DR. KAUL:  At the end of your talk,
Dr. Dunnmon, you said that clinical pharmacology
attributes suggest BID dosing of rivaroxaban.  And
how predictive are those data?  I mean, you utilize
the same pharmacometric modeling in the dabigatran
trial.  And the 150-milligram dose that was
approved, based on that pharmacometric modeling,
would have yielded a ratio of 1 stroke prevented
for 3 bleeding incurred.  And yet, the outcome data
was the opposite, 4 strokes prevented for 3
bleeding incurred.

So my question to you is, how often have you
seen that kind of pharmacometric modeling data be
congruent with the outcome data?  And, therefore,
what is the clinical relevance of that?

1          DR. DUNNMON:  Actually, I think I'll defer

2     to my clinical pharmacology colleagues on the

3     dabigatran modeling, because I was not involved in

4     that.

5          DR. MADABUSHI:  This is Raj Madabushi,

6     clinical pharmacology.  So what Dr. Dunnmon

7     presented was, if you believe the exposure of a

8     drug is important, you would want to have as much

9     as exposure without too much fluctuations within

10    the danger dosing interval within that date.

11         If you believe in that concept, then you

12    would think that a BID regimen, which gives almost

13    reasonable exposure over the entire area with less

14    fluctuation be more effective.  That is the type of

15    concept.

16         Now, what you are trying to bring up is a

17    comparison with what happened in dabigatran.  Let

18    us not forget, in dabigatran, the exposures which

19    were collected, that subpopulation.  If you were to

20    look at the point estimates when you compare it

21    with warfarin, it was different than the overall

22    population.  So we have this limitation of the

1    data, which has exposures available, and sometimes

2    even aren't expressed fully.  So there is a reason

3    why one may have to collect exposures in almost

4    everyone, so that you keep the overall events in

5    tact and not work off a smaller subset.

6         I don't know if that explains, but here we

7    are talking about if you believe exposure, systemic

8    exposures have any value, then you would want to

9    have them as smooth, which is how you would have it

10   for warfarin when it comes to INR.

11        DR. LINCOFF:  The sponsor had been asked to

12   provide some additional data over the lunch break,

13   and so if they want to make that presentation, then

14   we'll move onto the questions.

15        DR. PETERS:  If I could have Dr. Califf as

16   well, and I think we'll try to go in order.  The

17   first question was major bleeding without

18   hemorrhagic strokes.  Slide up.

19        So the overall hazard ratio was about 1.03,

20   and hemorrhagic strokes were in our favor.  So when

21   those come out, it's a hazard ratio of 1.11, with

22   an upper bound of 1.29.

1        I don't know, Rob, if you want to comment.

2        The next one was there was some discussion

3    of the hemorrhagic and the non-hemorrhagic

4    components of the primary endpoint.  So we actually

5    did the hemorrhagic, and combined the unknowns, and

6    the non-ischemic, and non-CNS embolism to see what

7    that split looks like.

8        Then after that was the time on

9    treatment -- or the time off treatment as a percent

10    of the total follow-up time in the study.  So slide

11    up.

12        This shows, again, the primary hemorrhagic

13    strokes were 25 and 50, with a hazard ratio of .59,

14    upper bound of .93.  The rest of the primary

15    efficacy endpoint, which would be, presumably,

16    thrombotic and the few unknowns had a hazard ratio

17    of .84, with an upper bound of 1.04, just to split

18    those out.

19        In the next slide up is the percent of the

20    time in the study.  So the total on-treatment

21    patient-years to our last contact -- so this is

22    ITT, regardless; I'm looking at James -- was a

1    little over 11,000 patient-years in both groups; or

2    the total was a bit over 13,000 in both groups, and

3    the on-treatment was about 11,000 in both groups,

4    so about 83 percent in both groups.  So the off-

5    treatment would be the other 18 percent.

6         We did have a few clarifying points to the

7    FDA presentation, if we'd be allowed to go through

8    those.  First, if we could have the core slide 97.

9         DR. FLEMING:  Before we leave this, could we

10   have one question on this?

11        DR. LINCOFF:  Yes.

12        DR. FLEMING:  This I think may have been in

13   response to the question I asked, which was trying

14   to understand what fraction of the total person-

15   years follow-up that would be in the ITT is also

16   included in the per-protocol on treatment.  And

17   these numbers are somewhat consistent with the

18   reflection that we have 20 to 30 percent more

19   events for strokes and MIs in the ITT.

20        Why do we have fourfold the number of

21   deaths?

22        DR. CALIFF:  Let me try again.  We spent a

1  lot of time worrying about this in the midst of the

2  trial.  And so I think you have to understand, a

3  sick population, multiple co-morbidities, non-fatal

4  events occur, bleeding events occur, people come

5  off of drug, and after you've had something happen,

6  your likelihood of something else really bad

7  happening goes up multiple fold at that point.

8        I mean, another reason, frankly, to come off

9  of a double-blind trial like this is you've got

10  very complex medical care going on.  And

11  participating in a clinical trial, if you have to

12  go to an assisted living facility or such, is just

13  very hard to do.  So all the events are compressed

14  into the time after people stopped study drug.

15  That's our best interpretation of it.

16        DR. FLEMING:  So I misspoke.  It's threefold

17  numbers of deaths, but the point is the same.  So,

18  in essence, what you're confirming, Rob, is that

19  this could be highly informative censoring, because

20  what happens as you discontinue could be very

21  different from when you are on the treatment, which

22  could be partially treatment related and partially

1    related to the inherent risk of the patient when

2    you discontinue.  That's my interpretation.

3           DR. CALIFF:  Yeah.  I don't think censoring

4    is uninformative in any clinical trial, and I

5    think --

6           DR. FLEMING:  On the other hand, you might

7    argue it's less informative for some other measures

8    that are occurring with the same frequency when you

9    go off than when you're on, as opposed to here,

10   that are occurring.  You've got 20 percent of the

11   person-years of follow-up contributing 200 percent

12   more events.

13          DR. CALIFF:  Yeah.

14          DR. FLEMING:  That's stunning, in my

15   experience, in clinical trials.

16          DR. CALIFF:  You shouldn't be stunned in a

17   trial like this, but I understand it's a new

18   adventure here.  So it's informative censoring, but

19   we've done a number of looks at this.  And it's

20   mostly informing that bad things are going on with

21   patients.  The dropout rates or coming off

22   treatment were the same in the two treatments.

1          What happens after people stop study drug is

2    they go back to the natural frequency of events.

3    And if you look at the time off treatment, the

4    event rates are the same in the two populations.

5          DR. FLEMING:  We're not saying that, but

6    we'll talk about that in discussion.

7          DR. CALIFF:  So, Dr. Rose -- by the way, my

8    name is Califf, for those of you who were confused.

9    It's not Cahill.  I just want to be identified

10   correctly.  But Dr. Rose made the point that

11   differences in definitions can move centers around

12   in center TTR.  And that is true, but the example

13   he chose was a pretty extreme example.  And we just

14   want to make the point that, in reality, when we

15   apply all the different definitions that might

16   occur and look at the quartile analysis, it comes

17   out roughly the same.  It's not causing great

18   inconsistency.  There is some difference, but it's

19   not causing great inconsistency.

20          Anyway, just one more slide, I think.  And I

21   think this is an important point.  When Dr. Rose

22   referred to the RE-LY study in the middle, he

1    showed that the lowest quartile, the one at the

2    top, and the highest quartile, the one at the

3    bottom, without statistics, and said the hazard

4    ratios are markedly different.

5         But if we look at the entire RE-LY study

6    with their own analysis, the interaction test is

7    not significant.  Things come out in between.

8    There is a trend, but I just think it's important

9    for everyone to recognize, most of what I think

10   we're talking about here is random noise because

11   tests for heterogeneity are not significant in

12   almost any part of this trial that we've looked at.

13        So we want to be sure that when we discuss

14   RE-LY as it relates to quartiles, that people

15   understand there was not a significant interaction

16   between center TTR and estimate of the treatment

17   effect.

18        DR. PETERS:  If I could just show the

19   clinical pharmacology for the switching study, the

20   table of the INRs, because there is an assertion

21   made that the INR, if we measured it at trough with

22   rivaroxaban, might not be accurate, so that we

1   might not have a good transition strategy.

2          Slide on.  So this is a phase 1 study we

3   did, and people were taken to steady state of

4   warfarin and then rivaroxaban added.  So we're

5   looking at the pharmacodynamics of the combination

6   of those two drugs.  The first day is the day zero

7   trough, the INR on the warfarin without

8   rivaroxaban.  You can see it's a little over 2 in

9   both groups.  And then rivaroxaban is given after

10  that trough value, and the next days reflect the

11  measurements on a 20-milligram dose of rivaroxaban.

12         You can see there's very little difference

13  in that measured INR.  It's very slightly higher in

14  the rivaroxaban group, which reflects the

15  interaction at trough.  At peak, there is a large

16  interaction, so that you would have to measure the

17  value at the trough to be able to know when to stop

18  the rivaroxaban therapy safely.

19         DR. CALIFF:  Mr. Chairman, I think I

20  misspoke a little bit, or Dr. Fleming didn't

21  understand what I was saying.  If I could clarify

22  one point about informative censoring.

1        If you start with the trial we have,

2    treatment A and treatment B, treatment B has a

3    better result than treatment A, which is what we

4    saw particularly in the U.S.  We would argue that's

5    random fluctuation because it's totally within the

6    range of the results, seeing it's a whole trial.

7    But it is the actual result in the U.S.

8        Then you stop treatment in both groups.

9    There's a lot of literature on this, as you know,

10   that typically, the hazard of the group that got

11   the better treatment is going to be somewhat higher

12   because the high-risk patients are the ones who

13   typically are spared from having an event.

14       So in the midst of the trial, you stop

15   treatment in both groups.  The event rates go up in

16   both groups, but more in the group that had the

17   better treatment effect to begin with.

18   But then particularly at the end of this trial, in

19   the warfarin group, you continue anticoagulation

20   with warfarin as it was before.  And in the

21   rivaroxaban group, you essentially have an

22   under-anticoagulated group, so it does go up.

1       So our argument is not that the event rates

2   are the same in both groups after discontinuation.

3   It's that there's an explanation for the

4   phenomenology that was seen, that at least seems to

5   us to be a consistent explanation with what was

6   observed.

7       DR. FLEMING:  And I don't think I

8   misunderstood.  I think I understood.  But the

9   issue about what you're saying, it's only

10  2.8 percent that people had events.  So while what

11  you're saying is true, it wouldn't seem to be

12  profoundly influential in a study like this.

13      DR. LINCOFF:  Are there any more questions

14  for the FDA?  Yes, Dr. Sager.

15      DR. PETERS:  Could I just make one comment

16  on the dose selection?  Just to make a very brief

17  comment about the last comment about the evening of

18  the dosing being a concept that would be better.

19  Certainly, in our data, when we looked at once

20  versus twice daily in the ATLAS study, there was

21  not much difference at the 20-milligram dose

22  between once and twice daily for bleeding or for

1   efficacy.  And there's other data with newer

2   compounds that actually suggest that BID dosing

3   with higher troughs might actually cause more

4   bleeding.  So I think it's really an open question

5   about whether once daily or twice daily would

6   actually be better, and we got the results we did

7   with the regimen we selected.

8          DR. LINCOFF:  Dr. Sager?

9          DR. SAGER:  For the sponsor, do you have the

10  categorical cuts like 60 to 70 or 60 to 75 percent

11  TTR, and particularly what the confidence intervals

12  were, the idea being if one looks at that higher

13  range, does it still meet the non-inferiority

14  bound?  That's really the question.

15         DR. PETERS:  The only analyses we did were

16  the quartiles and then the sliding figures.  I

17  mean, you can draw on the -- so the primary

18  efficacy slide.  I mean, if you draw -- that's a

19  center-based ranking of TTR.  But you could draw

20  the cut anywhere you would want on that line to at

21  least divide it by centers.

22         DR. SAGER:  I did that.  But it still

1   doesn't give you what the outer confidence interval

2   would clearly be on that.

3        DR. CALIFF:  This is the picture, and if you

4   follow along, you'll notice that right at about 70

5   is the least favorable point for rivaroxaban.  This

6   is the safety on-treatment population, not the ITT

7   to end of study population.

8        The confidence interval at that point, if

9   you considered all the sites to the left plus, that

10  would look within the bound, and all the sites to

11  the right plus, that would be above the bound.  But

12  let me just say that from the point of view of our

13  executive committee, you design a trial to have

14  power to achieve non-inferiority for the trial as a

15  whole.

16       When we start slicing off subgroups and say

17  does that particular subgroup meet the criteria,

18  it's pretty exciting when it does, but it really

19  shouldn't, because, otherwise, you should just do a

20  trial a quarter as big or whatever that is.

21       So our interpretation is that these results

22  are largely consistent with random fluctuation when

1    you get into that range, and you've heard the FDA's

2    interpretation.

3            DR. SAGER:  Thank you.

4            DR. LINCOFF:  One last question.

5            DR. KRANTZ:  Real quickly, just for

6    Dr. Califf.  Mori Krantz from Denver.  You had

7    mentioned that in explaining this rebound

8    phenomenon that Dr. Fleming mentioned, a threefold

9    increase in events, that, really, the higher-risk

10   patients are spared the events.  But I thought the

11   FDA had implied that, in your higher-risk strata,

12   they actually enjoyed a lesser or diminished

13   efficacy of rivaroxaban.

14           Am I wrong on that?

15           DR. PETERS:  Primary efficacy endpoint by

16   the CHADS score, the subgroup that shows that,

17   actually, there's no heterogeneity across the CHADS

18   scoring, as we're waiting for that slide to come

19   up.

20           DR. CALIFF:  So that raises a critical issue

21   about it, so go ahead and put the slide up.

22   There's no heterogeneity, and Dr. Rose knows his

1    data well.  And when you look at, for example,

2    CHADS score 5 and 6, it's right on the line of

3    identity.

4         These are all within the range of random

5    fluctuation.  And as you all know, when we talk

6    about a general result, the relative effect in all

7    the trials so far has been constant.  The

8    difference has been in the absolute difference.  So

9    if you have a higher-risk population with the same

10   relative treatment effect, you have, per 100

11   treated, a bigger impact.

12        So we're not claiming that the relative

13   treatment difference is usually greater in the

14   higher CHADS patients.  It's just for the same

15   relative difference, the absolute difference is

16   greater because you have more people who have

17   events in the control group.

18        Does that make sense?  That's what we're

19   thinking.

20        DR. PETERS:  The other group that went with

21   this was the prior stroke, TIA, and embolism, where

22   the hazard ratio was .91 with that event, still a

1    good result to the right side of the line.  It was

2    a bit more robust in the not-stroke, but in a

3    borderline interaction test, which we really think

4    those are consistent between the two groups.

5    **Questions to CRDAC and CRDAC Discussion**

6         DR. LINCOFF:  We are going to have to move

7    on now.  So we'll now begin the panel discussion

8    portion of the meeting.  And although this portion

9    is open to public observers, public attendees may

10   not participate except at the specific request of

11   the panel.  So we have approximately three hours, a

12   little short of that, including the break, devoted

13   now for questions.

14        There are nine questions.  Many of them are

15   subparts.  In order to try to keep the time of this

16   okay, what I'll try to do is group some of the

17   subparts together, and then when you speak, you can

18   address any or all of those subparts that you wish

19   to do, because otherwise, I don't think this is -

20        I think you all have your questions.  The

21   cover part is not in a slide.  The advisory

22   committee is asked to opine on the approvability of

1    rivaroxaban, a factor 10A inhibitor to reduce the

2    risk of stroke and non-central nervous system

3    systemic embolism in patients with nonvalvular

4    atrial fibrillation.  The support from the claim

5    comes primarily from ROCKET AF, a double-blind

6    study in which 14,264 subjects with persistent or

7    paroxysmal atrial fibrillation and additional risk

8    factors for stroke were randomized to warfarin or

9    to one regimen of rivaroxaban.  The trial was event

10   driven.  Mean exposure was 19 months.  Important

11   results are as follows, which you have.

12        The FDA review team identified bleeding as

13   the only significant safety issue.  However,

14   despite results in the primary endpoint that appear

15   to show superiority to warfarin in reduction of the

16   risk of stroke, and systemic embolism, and no

17   evident increase in bleeding risk, several issues

18   warrant discussion.

19        So question 1, the committee is being asked

20   to consider how effective rivaroxaban is and

21   whether that degree of effectiveness is adequate

22   for approval.  So please comment on the adequacy of

1    the design of ROCKET AF.  And I think we should

2    probably take each one of these separately.

3        Was the planned warfarin management strategy

4    reasonable?  Anybody?  Dr. Nissen?

5        DR. NISSEN:  I think it was not.  And there

6    are two reasons I come to that conclusion.  One is,

7    compared to all of the other contemporary trials,

8    the percent of the time that INR was in the

9    therapeutic range was substantially lower.

10   Secondly, compared to the other two trials with

11   similar drugs, there wasn't an active protocol for

12   how to manage out-of-range INRs.  And I think that

13   handicapped the effectiveness of INR management.

14   And I think that is probably one of the reasons why

15   the effectiveness was so much lower.

16       So I don't think the strategy was wise.

17   Knowing that we needed to see robust evidence of

18   non-inferiority with good use of warfarin, it would

19   have been much more prudent to have taken the

20   precautions necessary to make certain that the use

21   of warfarin met the highest contemporary standards,

22   and those measures were simply not taken.

1          DR. LINCOFF:  Dr. Emerson?

2          DR. EMERSON:  So this is just a question.

3     The reason we do attempt-to-treat analyses is

4     because we don't believe that patient's compliance

5     is necessarily voluntary, that there can be medical

6     conditions that are there.

7          So my question to you is, as the sponsor

8     presented it, they made the claim that this was a

9     far sicker population than is usually used in these

10    other trials.  What is your experience in managing

11    warfarin in sicker patients?  Are you able to get

12    the same times or do you back off on warfarin

13    therapy because these sicker patients can't handle

14    it?

15         DR. NISSEN:  Let me just respond and say

16    that, as pointed out by the FDA reviewers, there

17    were entire countries where, same population, same

18    entry criteria, they were able to do it.  So,

19    clearly, there is evidence that if you do a very

20    good job of instructing the sites, and you stay on

21    top of them -- and, again, I don't know what the

22    role of the data monitoring committee was here in

1   terms of giving some feedback during the study, but

2   they really fell off the curve in terms of the use

3   of warfarin.  But there were specific areas where

4   it was used very well, which suggested, in this

5   population, it can be used well.

6        DR. EMERSON:  I would agree with that as

7   well.  But if you went to Seattle and you went to

8   Northwest Hospital, or you went to Harborview for

9   the exact same indications, you'd get very

10   different patients.  And so that entire countries

11   and knowing how many sites there were at the

12   country -- and I'll grant you, I don't know that

13   this information is there.  But I do just question

14   that, again, is it harder to keep sicker patients

15   in the target range of a proper INR in warfarin?

16        DR. LINCOFF:  Maybe I can address that.  I

17   mean, the FDA's own analysis, by three different

18   ways, trying to adjust for the baseline factors and

19   the sickness factors of patients, did not show

20   significant change in the TTR, the average TTR, so

21   at least by criteria that you could measure.

22   But people's individual experience is probably less

1    relevant than what --

2         DR. NISSEN:  In what country is Seattle?

3    What country is Seattle?

4         DR. LINCOFF:  Other comments on this

5    question?

6         DR. KAUL:  The sponsor has to be

7    congratulated for doing a well-designed study.  But

8    no study is perfect, and there are some

9    imperfections in each trial.  And if there is one

10   imperfection in this trial, it was the lack of a

11   standardized algorithm for maintenance of warfarin

12   dose adjustment.  But some may view this

13   imperfection as a strength of the trial, because

14   that's what happens in the real world.  Every local

15   institution has their own practice pattern of doing

16   this.

17        But nonetheless, I think a dosing strategy,

18   a centralized dosing strategy, would have overcome

19   the mediocre TTRs that were achieved in this study,

20   and in other warfarin dosing procedures, such as

21   the use of centralized unblinded experts, as has

22   been done in previous studies, for example, in the

1    SPORTIF V or the AMADEUS study.  They would have

2    resulted in, perhaps, better TTRs.  So that is one

3    imperfection of this study that I identified.

4            DR. LINCOFF:  I would like to make a

5    comment, then.  The question is, was the strategy

6    reasonable?  I personally think that it was a

7    reasonable alternative.  There are really two

8    approaches.  One is to have it somewhat artificial,

9    but create the highest standard of a control.  The

10   other is to say that part of the advantage of an

11   alternative to a difficult-to-use drug like

12   warfarin is the fact that, in the real world, it is

13   used imperfectly and that an alternative agent may

14   be more effective in that regard.

15           If you looked at the meta-analysis, which

16   was presented, the TTR rate was very similar, what

17   was achieved in this trial.  And so I think it's

18   defensible that one would -- because the key point

19   was not to have provided some sort of algorithm.

20   And I gather that was an active, not a

21   passive -- not an oversight, but an active

22   decision, and a strategy.  I think it's a


defensible strategy because it does reflect how warfarin is, in fact, used.

DR. FOX:  Just to add to what you just said, I agree with everything you said, and would add that, outside of providing a strict algorithm for adjusting the dose, I think the sponsor and the executive committee did everything else that was reasonable to ensure that INRs were adjusted appropriately in the trial with respect to getting the data centrally, reviewing, getting feedback to the sites, education, and so forth.

DR. LINCOFF:  All right.  Then we'll move onto the next question.

Was it reasonable to test a single regimen of rivaroxaban and ROCKET AF?  Was the specific choice of regimen reasonable, given the short half-life and non-linear kinetics of rivaroxaban?

Dr. Sager?

DR. SAGER:  Yes.  I would say that it was reasonable.  I think, with the data that we've seen, while it may have shown some small differences between BID and QD dosing, those really

1   were not of clinical significance.  And even though

2   the PK modeling suggests that BID might be better,

3   that was not clearly borne out in the studies that

4   were shown to us.

5        DR. LINCOFF:  Dr. Nissen?

6        DR. NISSEN:  Yes.  I am going to disagree

7   and say that we're dealing with an area where too

8   little anticoagulation can cause serious problems

9   and too much anticoagulation cause serious

10  problems.  And given that fact, to have a drug

11  that's approximately half of the half-life -- it's

12  a much shorter half-life than dabigatran, which was

13  developed as a twice-a-day drug.

14       Maybe this is a little bit out of line, but

15  my concern was that the dose was selected more for

16  a marketing advantage rather than for the

17  scientific data that was available, and that was a

18  mistake; that, in fact, there are very wide

19  oscillations.  And what we don't know is exactly

20  when during those periods of time, events were

21  occurring.  And what you have to worry about is

22  that the more marginal benefits that were seen here

might have been due to this very large oscillation
between the peak and the trough.

I think it's very hard to argue, for a drug
that's being used for a critical indication, that a
drug with a 7- to 9-hour half-life ought to be
given once a day.  If you think about the history
of medicine in general, that tends not to work out
so well, and I think it maybe didn't work out so
well here.  So I think it was not the best
strategy, and I think it may have contributed to
the less-than-robust results.

DR. LINCOFF:  Dr. McGuire?

DR. MCGUIRE:  Yes.  I'll chime in on both A
and B, that I think they were reasonable, arguably
not perfect, and certainly with the ATLAS data, it
perhaps makes it a little less reasonable.  But I
think the data support the fact that it was
reasonable.  It was non-inferior to a very good
medical regimen.  So I think it was reasonable from
the beginning.  It may be improved upon, but I
think we have pretty good data to support its
reasonableness.

1          DR. LINCOFF:  Dr. Fox?

2          DR. FOX:  I'm going to agree that it was

3     reasonable.  I think that at the time the dose was

4     chosen, the data that they had at hand indicated a

5     couple of things:  number one, that the biomarkers

6     they had at hand to estimate pharmacodynamic effect

7     indicated a very flat dose effect relationship.

8     While I was a bit surprised when I first started

9     reading about it in the briefing materials, that

10    the huge trough ratios around those dosing regimens

11    were not considered as of primary importance, the

12    bleeding data, in fact, don't really bear out much

13    importance to that.

14          So I think they took a data-driven decision.

15    They didn't have the ATLAS data in hand at the time

16    they made the decision.  And, sure, they could have

17    added another arm to the study, but then you have a

18    21,000-patient study instead of a 14,000-patient

19    study, so it gets a little unwieldy.

20          So I think maybe some compromises were made,

21    but based on the data they had at hand at the time

22    they designed the trial, I thought it was

1    reasonable.

2         DR. KRANTZ:  Just real briefly, this is Mori

3    from Denver.  I think it's a good decision.  It

4    makes a lot of sense from the data.  The thing I

5    worry about is the one-size-fits-all approach with

6    this kind of drug.  I think, had we not had a look

7    through the prism of that real big spike of events

8    when you came off the drug, I wouldn't be as

9    concerned.  But I think that colors my thinking.

10        I look at some of the BMI data, for example,

11   and the ranges were anorexia nervosa on up to

12   40 meters per kilograms squared or whatever have

13   you.  And there was a lot of divergence in the

14   data.  I don't know if you guys have that slide.

15   But I wonder, this might be a problematic therapy

16   in those patients that really fall outside the bell

17   curve.  So I think not having an ability to adjust

18   it or having a BID could create problems.

19        DR. LINCOFF:  Dr. Emerson?

20        DR. EMERSON:  So I guess I am certainly in

21   the category of I sure I wish I had data on the

22   BID.  And I don't, as much, I guess -- if listening

1    to everyone tell me that, no, this was just not the

2    optimal warfarin therapy, then why couldn't we

3    prove superiority?  And we didn't hit that.  So

4    this constant focusing back on, yes, we've proved

5    non-inferior to a treatment that there's a

6    suspicion was non-inferior -- or I should say was

7    inferior, then I don't necessarily buy that the

8    fact that we were non-inferior to that was the

9    proof that we had the right dose.  And so I was

10   actually swayed by the data that we saw about the

11   pharmacokinetics and the BID versus QD.

12            DR. LINCOFF:  Yes.  Dr. Papademetriou?

13            DR. PAPADEMETRIOU:  I, too, believe that the

14   used-once-a-day regimen of this drug was a

15   disadvantage and didn't let it exert the full

16   benefits of the drug, and probably increased the

17   risk of bleeding, since we have seen some data

18   suggesting that the BID regimen of the same dose

19   were associated with fewer bleeding complications

20   risk.  So I would have liked to have seen the BID

21   regimen being used.

22            DR. LINCOFF:  I will express an opinion on

1    this as well.  I think that it may well have been

2    better with the BID dose, but the data's presented

3    for this dose -- and we should be looking at that

4    at face value.  There may be a better way to give

5    the drug, but I think the data we have is what we

6    have to evaluate.

7            I'm sorry, Doctor.  Go ahead.

8            DR. MCGUIRE:  Just a very brief comment to

9    Dr. Emerson's comment.  The question, as I read it,

10   is not was this the right dose, but was it a

11   reasonable dose to study.  So I'm not suggesting it

12   was the right dose, either.  I would love to see

13   some BID data, but I do think it was reasonable.

14           DR. LINCOFF:  Ms. McCall?

15           MS. MCCALL:  Reading a lot of comments from

16   four different patient forums, I do appreciate that

17   you had a very large elderly, and very ill

18   population in this.  But what the growing number is

19   on the forums that I'm seeing are young, healthy

20   people being diagnosed with AF, and it's their

21   first really big disease process.  They're not

22   taking medications for anything.

1      I really appreciated that there was just QD

2  dosing.  I think you'll get much better compliance

3  if they're only taking one med a day.  It would be

4  nice to see the BID study and to see what's going

5  on.  But I think for a younger, under-45 who have

6  never had anything major going on, you're going to

7  get them to take this drug because they've already

8  dug in their heels about warfarin, and they're

9  terrified of taking it.  And I think this will be a

10  happier thing for them, with one day, one time a

11  day.

12      DR. LINCOFF:  The next question, the primary

13  analysis included events that occurred within two

14  days of discontinuing study drug.  For how many

15  days should endpoint events that occurred after

16  discontinuation of study drug, during the study or

17  at its end, be counted?

18      Dr. Fleming?

19      DR. FLEMING:  There are different answers

20  that one might give for an ITT for a superiority

21  analysis versus for a non-inferiority analysis.

22  It's very important to preserve the integrity of

1    randomization.  As we can, in fact, be confident,

2    we are, if we have an ITT analysis where everybody

3    is followed to the protocol-specified endpoint, or

4    where censoring occurs in an uninformative way,

5    such as everybody being followed X months from

6    randomization or until some calendar date when the

7    target number of events are achieved.

8         So I have significant concerns with the

9    sponsor's analyses that were ITT, that were

10   prespecified as the primary -- rather that were

11   superiority, that were specified as primary to have

12   been set up as on-study plus two days.  So I

13   believe that, for superiority, it should be ITT.

14        For the non-inferiority analysis --

15        DR. LINCOFF:  Can I ask you to clarify?  The

16   question here, though, is the duration.  If you

17   don't think two days is right, what do you think

18   would have been?

19        DR. FLEMING:  So I have answered that.  If

20   this is ITT, the duration of follow-up is until you

21   have the target number of events or until you've

22   followed everybody X months from randomization.

1    It's not specifically following somebody X days

2    after discontinuing drug for a superiority

3    assessment.

4         For non-inferiority, there's been a lot of

5    discussion about whether it should be ITT or per-

6    protocol plus X days.  And those advocating ITT

7    say, even in non-inferiority analysis, you want to

8    preserve the integrity of randomization.  For those

9    that are advocating per protocol, the argument is,

10   we don't want to dilute the results toward the

11   alternative hypothesis of no difference by

12   including a lot of follow-up after somebody goes

13   off treatment.  In that event, though, when you are

14   doing -- if you're in the camp that says, for non-

15   inferiority, I want to do it per protocol, you

16   surely would want to continue to follow during the

17   time that you're still getting signal about

18   treatment effect.

19         So in this trial, the concern is not only

20   that there are a lot of events occurring after

21   people go off, two days post-treatment, but that

22   they are in fact not balanced by treatment arm.

1    And you seem to, though, capture a substantial

2    fraction of that when you go out 30 days in this

3    trial.  But the number of days you have to go out

4    could depend on the setting.  If you have an

5    immunosuppressive agent, and I'm worried about

6    inducing cancer risk, then X could be really large.

7         In this trial, it seems that if they had

8    gone 30 days, they would have captured a

9    substantial fraction of the differential treatment

10   effect.  But when you look at what happens in this

11   trial after two days, you've got 20 percent of the

12   primary endpoints, 20 percent of the MIs,

13   30 percent of the strokes, and 65 percent of the

14   deaths are all occurring after that two-day

15   endpoint.  And there are 26 excess primary

16   endpoints, 9 excess MIs, 19 excess strokes in the

17   experimental arm, in the rivaroxaban arm.

18        So in this particular setting, it becomes

19   very problematic to advocate for a per-protocol

20   on-study plus two day, as a way of getting rid of

21   the noise that's occurring after you go off

22   treatment, assuming it's just neutral noise.  A lot

1    of the events are occurring there, and they're not

2    neutral, and we've heard some of the reasons why,

3    in terms of the transitions that are occurring

4    thereafter.

5         So at least if they had gone 30 days here,

6    by my calculation, they would have captured a

7    substantially larger fraction of the continued

8    signal that exists for what the actual treatment

9    effect is in this non-inferiority analysis.

10        So bottom line is, many of us would argue,

11   for a non-inferiority analysis, you need to be

12   guided by the ITT as well as a proper per-protocol,

13   that it captures sufficient duration of follow-up

14   after treatment, that you're getting signal of what

15   the treatment effects' influence is.

16        DR. LINCOFF:  Dr. Nissen?

17        DR. NISSEN:  In my view, stopping study drug

18   is almost always informative in some way.  And the

19   problem is -- and I'm going to give you an analogy.

20   One that really was a wake-up call for me was when

21   I looked at the data for rofecoxib while on

22   treatment, and then when you look at it in a true

intent to treat, where you follow them for the complete observation period, what you saw is that when people stopped the drug over the next few weeks to months, they had a lot of events.  And what it was telling us is that people who stop drug, stop drug for a reason, and sometimes that reason is because they're sick.  And that's why a true intent-to-treat analysis has to consider the possibility that events that occur after you stop study drug are related in some way to the study drug.

So that's why two days is just too short. It doesn't take into account the fact that something bad may have happened that has made that patient stop the drug, and what happens to them subsequently can be very, very important.  And so to take that out and censor that all out of the study I think is not sensible.

Now, I can't tell you how many days to go. I think, appropriately, the agency and the sponsor show us data for various cuts at censoring.  And the one thing we can say for sure is, the further

out that you look, the better warfarin looks and
the worse rivaroxaban looks.  That part, we can be
sure of, but how far out you have to go, I don't
know.

DR. LINCOFF:  Dr. McGuire?

DR. MCGUIRE:  I just want, Dr. Fleming,
maybe for clarification, the plus 30 days, is that
within the proposed, for example, site notification
or accumulated endpoints, or is that being on the
end of study?  I agree completely with the plus
30 days or any point of time prior to the site
notification.  But to go beyond that after every
patient is forced off study drug and onto open-
label therapy, or no therapy at all, depending on
reasonable preference, those additional 30 days'
analyses aren't terribly informative to me for the
primary analysis of efficacy and safety.

I think we learn a lot from them in this
study about what we need to pay attention to if
this moves forward, but I don't know.  I would use
whichever comes first, plus 30 days, or plus X
number of days, or site notification.

1           DR. FLEMING:  I was referring to the

2    sponsor's primary analysis, per protocol, based on,

3    on-treatment plus two days.  So I was talking about

4    X from on treatment.  So in a per-protocol

5    approach, where the concept is, the argument for

6    per protocol, non-inferiority, is I don't want to

7    include a lot of follow-up after people are off

8    treatment when the effects of the treatment are no

9    longer influencing the outcomes, since those will

10   be neutral, and they will dilute me toward the

11   alternative hypothesis of no difference.

12           So, in that setting, I want X to be -- those

13   that believe that philosophy, you want X to be

14   large enough that you're capturing the treatment-

15   induced events or influence on events, but small

16   enough to leave out what's noise and what's not.

17           So I was arguing for the per-protocol

18   analysis, working from the end of treatment,

19   off-study.  I would argue X needs to be bigger than

20   two days, in this study, certainly 30 days.  This

21   is just evidence based.  Looking at the data in

22   this trial, 30 days seem to capture where the

1    excess events were occurring off study.  Once you

2    got past that for most of these, it was more or

3    less neutral.  And, in fact, in my experience, in

4    other settings, where people have used per

5    protocol, in my experience, plus 30 days has been a

6    pretty commonly used value of X.

7            This has nothing to do with what I am saying

8    I would do for ITT.  That was a different answer.

9            DR. LINCOFF:  Dr. Kaul?

10           DR. KAUL:  I think the period of follow-up

11   should not be fixed, but should be driven by the

12   pharmacologic properties of the compound of

13   interest and how the trial was designed.  So the

14   pharmacodynamic effect lasts for about two to three

15   days, so the two to three days after cessation of

16   therapy is quite useful.  And because of the trial

17   design, there was no formal protocol-driven

18   anticoagulation during the transition phase.

19           I would add another 7 to 14 days because I

20   want to be sure -- I want to rule out the

21   possibility of a rebound hypercoagulability versus

22   a resumption of ischemic events as a result of

1    inadequate anticoagulation.  So a reasonable

2    follow-up, given the pharmacologic property of

3    rivaroxaban plus the trial design is about 7 to 14

4    days.  And I'm also concerned about the events up

5    to 30 days, but if you carefully examine the data,

6    most of them occur within the first 7 to 14 days.

7    So a 14-day period would be quite reasonable, based

8    on that rationale.

9            DR. LINCOFF:  Dr. Sager?

10            DR. SAGER:  I'd also like to congratulate

11    the sponsors for doing what's really a very

12    difficult trial to do, a double-blind trial on

13    atrial fibrillation.  My concern with the two days

14    is that -- well, one is that many of the events, as

15    Thomas said, have occurred later.  And then,

16    secondly, it doesn't really reflect how the drug

17    will really be used in clinical practice.  Patients

18    stop drugs for multiple reasons, including that

19    they can't get the prescription filled, and they

20    may not get it filled within two days.  So I think

21    a longer time period, both to be just practical and

22    reflect how medicines are used by patients, as well

as the fact that so many events do occur at the

later time periods.  A longer time period is

necessary, whether it's 14 days, or 21 days, or a

month.  I'm not personally sure, but I think

14 days feels kind of like the minimum.

DR. LINCOFF:  Dr. Temple?

DR. TEMPLE:  How long to follow is one of

the subjects of infinite variability and

discussion.  But I just wanted to comment a little

bit on what Steve said.

If someone comes to us with a safety trial,

designed to rule out a risk of X or whatever it is,

and proposed to follow people for say -- and they

thought the average duration of treatment was going

to be six months, and they wanted to follow them

out to a year, we would throw them out the door

because there's going to be a regression to the

mean if you do that, and it's a way to obscure

things.

This goes to a little bit about the Vioxx

thing.  If someone came to us with a proposal to

study the toxicity of Vioxx or something and wanted

1    to look for two months, four months, eight months

2    afterward, we would be very skeptical, indeed.  The

3    attractiveness of looking at it in that case is

4    because it came out bad.  That's why everybody's so

5    enthusiastic about it.  These things have to be

6    done prospectively, with as much rationale as

7    possible.

8         The other thing, of course -- and I think

9    everybody's reached this point -- if you take the

10   drug away from someone and it was beneficial for a

11   while, after a certain amount of time, they're

12   going to have their events, and the groups are

13   going to be equal.

14        Well, we know that, but we do intend to

15   treat anyway because we're worried about -- and

16   this hasn't really been discussed

17   much -- informative censoring, that the people who

18   leave the study prematurely may be about to have an

19   event, and you lose them.  And we're all perfectly

20   worried about that.  But it's worth remembering

21   that the main disaster here in the people off

22   therapy, they didn't leave because they left.  They

1   left because the study was over.  And this gave us

2   an opportunity to see that the transition wasn't

3   very well described, and so that's what happened.

4   They had events during the transition.

5          It's also of interest, for what it's

6   worth -- I'm sorry to obsess about this -- that the

7   thing that happened after they stopped was that the

8   thrombotic events increased in the treated group.

9   It wasn't the hemorrhagic strokes, which is where

10  the advantage was early.

11         So it's really perfectly plausible about

12  what happened.  What to do about it is another

13  question.

14         DR. LINCOFF:  Dr. Emerson?

15         DR. EMERSON:  The aspect of using the

16  pharmacokinetic or pharmacodynamic properties to

17  determine the time of follow-up is a very real

18  concern and something that you do like to take into

19  account.  It's just that the pharmacodynamic

20  properties, depending upon which one you're talking

21  about, are very different time scales, and most of

22  which we don't know; and so the concept that we

1    have deep compartments.  And so I tend to go

2    with -- I'd like at least 30 days follow-up on

3    things, but I am very sensitive to the idea that a

4    treatment might merely be forestalling events, not

5    preventing them, and the second that you remove it,

6    you remove oxygen and I die immediately.  It's just

7    the same with heart-lung machines and things like

8    this.  The second that you take them off it, you'd

9    be in trouble.

10         But I will say, along with what Dr. McGuire

11   said, that I wouldn't have batted an eye if he said

12   that what we're going to do is follow it, and the

13   final outcome for the primary efficacy endpoint was

14   going to be the day that we declared the study

15   over.  I would want the additional safety outcomes

16   for that additional 28 days after the therapy

17   stopped, but you were trying to estimate what would

18   happen undertaking the therapy.  So I would treat

19   those who stopped the treatment early very

20   differently from those who stopped the treatment by

21   protocol.

22         DR. LINCOFF:  I'd like to comment as well.

1    I think these are two different issues.  And I

2    mean, we recognize it was a problem with the

3    planned discontinuation and the lack of a protocol

4    used for transition, but I don't think that

5    that -- and that's a separate issue that has to be

6    addressed, but I don't think, from my standpoint,

7    that that speaks to the efficacy of the drug

8    itself.

9         The unplanned or the early discontinuations

10   showed similar event rates in the two treatment

11   arms, and I think that's where the informative

12   censoring might have been important.  And even when

13   you follow it out to 30 days, the event rate, 24.8

14   and 22.1 in the two treatment arms, suggests that

15   when everybody comes off drug for whatever reason

16   and they're sick, this is what happens.

17        So I agree with Dr. Emerson and Dr. Temple.

18   These are two very different situations.  And from

19   my standpoint, I think it was reasonable to take

20   the two days, although one could argue that for the

21   early discontinuations, one might have done

22   differently.

1          Dr. Kaul, you had it last.

2          DR. KAUL:  Well, I just wanted to follow up

3     on Dr. Temple's comment.  In fact, there was

4     increased bleeding with rivaroxaban post-

5     discontinuation during the transition phase, 113

6     versus 68, with a hazard ratio of 1.65, confidence

7     limits 1.22 to 2.22.  So that would, on surface,

8     argue against hypercoagulability.  But the problem

9     was that it was probably attributable to poor

10    anticoagulation because there were more in

11    rivaroxaban, where the INR was greater than 3.

12         The problem with the efficacy versus safety

13    is, if by protocol, you're going to follow the

14    study for safety events for 30 days, then by

15    necessity, you have to follow them for 30 days for

16    efficacy, because the endpoint that is driving the

17    efficacy is a safety event.

18         So any which way you cut it, I think longer

19    follow-up is warranted, a minimum of 14 days, and

20    perhaps up to 30 days.

21         DR. LINCOFF:  We'll move onto the next

22    question.  Are there other aspects of study design

1    that, importantly, affect interpretation of the

2    study?  Dr. Fleming?

3         DR. FLEMING:  We've discussed some of these.

4    There are four or five that I think of as important

5    aspects that impact interpretation.  We've talked

6    about time to therapeutic range percentages.  We've

7    talked about the handling of the transition and how

8    that's impacted our interpretation.

9         A related point, then, is the way one is

10   defining the per-protocol analysis, whether it's on

11   treatment plus X, shouldn't X be a larger number

12   than 2?

13        Missing data, we talked about during the

14   earlier discussion.  As has been noted by FDA, and

15   by the Institute of Medicine, and many others, this

16   is a really important issue to interpretation of

17   results.  And I'm concerned that you'd have a

18   withdrawal of consent rate on the order of

19   5 percent.

20        Then, the choice of the control, and we'll

21   talk more about this later on, so I won't emphasize

22   it now, but it made sense to choose warfarin.  I

1    wish I knew what the results were against

2    dabigatran.  But those are some of the issues that

3    I think are influencing the interpretation of the

4    results.

5           DR. LINCOFF:  Dr. Krantz?

6           DR. KRANTZ:  The only thing that was a

7    little bit unusual was the exclusion of

8    cardioversion.  And the reason I bring it up is I

9    think Jonathan mentioned earlier the idea of this

10   being a more pragmatic trial, that we're really

11   looking at what real-world anticoagulation is like.

12   And I think it's also relevant what real-world

13   practice is.  And a lot of cardiologists will, in

14   first patients with afib, cardiovert them.

15          So I don't know if you have the data like

16   the RE-LY trial.  That might be interesting to look

17   at, but I think that was one thing that stuck out

18   as a design piece.

19          DR. LINCOFF:  Dr. Papademetriou?

20          DR. PAPADEMETRIOU:  I find it a little

21   disturbing that the protocol allowed the

22   investigators to wait up to four weeks to bring the

1    patients back, to check the patients with

2    subtherapeutic INR.  That's too long, and it allows

3    for a suboptimal treatment to go forward too long.

4    And this was not the case in the United States,

5    where the patients came back, on average, in a week

6    or 10 days.  But in other countries, it was up to

7    four weeks and I found this to be a limitation.

8         DR. LINCOFF:  Dr. Kaul?

9         DR. KAUL:  One fundamental issue I have with

10   this trial and trials similar to this is this

11   double counting of safety events towards efficacy.

12   And I think I have already made lots of comments on

13   that.

14        If you're going to count hemorrhagic events

15   to borrow an inference of non-inferiority with

16   regards to efficacy, then perhaps it's a good idea

17   not to double count it to infer superiority with

18   respect to safety.  I don't think you can say that.

19   You can't have your cake and eat it, too.

20        So if you're going to use hemorrhagic events

21   towards your efficacy assessment, perfectly

22   reasonable to do that because that's the real life,

1    and patients don't really care what kind of stroke

2    they have.  In fact, the case fatality rate with

3    hemorrhagic stroke is upwards of 50 percent in this

4    trial, and with ischemic stroke it's only

5    20 percent.  So one would argue that hemorrhagic

6    stroke is what's more clinically relevant.  I have

7    no problems with that, but I have problems with

8    then double counting it and claiming that it is

9    superior in terms of safety.  And I don't think

10   that's appropriate.

11        The other issue I have is a technical one.

12   If you're drawing a non-inferiority margin on the

13   basis of historical placebo-controlled trials, four

14   out of those six trials specify that the stroke was

15   ischemic stroke.  The other two don't specify.  So

16   it's hard to tell how many of them were hemorrhagic

17   or how many of them were hemorrhagic stroke.

18        So if your non-inferiority margin is based

19   on ischemic stroke, then the relevant dataset for

20   analysis should only be reflected -- the efficacy

21   analysis should only be reflected in ischemic

22   events, because that's why you're borrowing the

1  historical placebo-controlled data.  And I would

2  like to see those results being emphasized in the

3  discussion period in the afternoon, this intention

4  to treat ischemic events at a 14- to 30-day follow-

5  up, for us to be able to estimate what percent of

6  efficacy of warfarin is being preserved.  And the

7  efficacy of warfarin is, essentially, prevention of

8  ischemic stroke, not hemorrhagic stroke.

9        By the way, in this study, according to the

10  data that I read in the briefing material, of the

11  310 primary ischemic strokes, only 11 went on to

12  have hemorrhagic conversion.  So only a minority of

13  them, 3.5 percent, had a hemorrhagic conversion.

14        If you look at it the other way around, of

15  the 90 total hemorrhagic strokes, only 11,

16  12 percent were contributed by the hemorrhagic

17  conversion of the primary ischemic stroke.  So I

18  think it's important to draw this distinction for

19  both technical reasons and for also philosophical

20  reasons.

21        DR. LINCOFF:  Dr. Sager?

22        DR. SAGER:  Sanjay, I just wanted to follow

1    up on the excellent points you just made.  I'm

2    wondering if -- sometimes it's just hard to be sure

3    whether a hemorrhagic stroke is primary hemorrhagic

4    or secondary to conversion.  It depends on what the

5    timing was of the MRI, for example.

6         Just clinically, these are often very hard

7    to diagnose with, potentially, a fair amount of

8    clinical inaccuracy unless you get a very early MRI

9    and then serial MRIs, which is practical in some

10   medical centers, but isn't practical in many

11   medical centers, and also the time and

12   presentation.

13        So I mean, even clinically, these are often

14   a little bit hard to figure out which came first.

15   I just wanted to see what your thoughts were on

16   that.

17        DR. LINCOFF:  I'd also like to add to that

18   comment, that in these old studies you quote, they

19   weren't doing routine MRIs or CTs, so it's very

20   hard to say that those didn't include hemorrhagic

21   strokes that we clinically considered.  I mean,

22   from your own words, from a patient standpoint,

1    they don't care whether it's hemorrhagic or not

2    hemorrhagic.  They care about whether it's a

3    disabling stroke.  And I think these are reduced,

4    and it's a reasonable comparison.

5        DR. KAUL:  I don't have a problem with that.

6    The key issue here is that if you're borrowing one

7    endpoint towards inference of one assessment, I

8    think you probably shouldn't be borrowing the same

9    endpoint for assessment of safety.

10       DR. LINCOFF:  Dr. Temple?

11       DR. TEMPLE:  The distinguishing between the

12   two strokes strikes me as really important, because

13   you can easily imagine that a higher dose would

14   affect one favorably and the other unfavorably.

15   And you would really like to know that.  And I

16   think in some of the trials we're seeing, you're

17   seeing stuff like that.

18       But I just want to be sure.  You weren't

19   objecting to the idea that the primary endpoint, at

20   least, could be total stroke?

21       DR. KAUL:  No.  I'm not objecting to that.

22       DR. TEMPLE:  You just don't want that to be

1    counted as safety, benefit also.

2         DR. KAUL:  Right.

3         DR. TEMPLE:  Just checking.

4         DR. LINCOFF:  Move onto question 2.  The

5    interpretation of non-inferiority study depends

6    upon certain understanding of the effect of the

7    active control.  If the active control is used to

8    achieve less than its expected effect, defining of

9    non-inferiority may not be informative regarding

10   the effectiveness of the study drug.

11   Similarly, a finding of superiority to a

12   suboptimally administered active control cannot be

13   used to support superiority of the study drug.

14        Please comment on the adequacy of the

15   conduct of ROCKET AF.  One measure of the quality

16   of warfarin management, time in therapeutic range,

17   TTR, was not as good in ROCKET AF as in many recent

18   randomized controlled studies.  So we'll group

19   these together.

20        Was anticoagulation on warfarin in ROCKET AF

21   good enough so that the warfarin group is an

22   appropriate comparator to show, one, effectiveness

1   of rivaroxaban, two, superiority of rivaroxaban to

2   warfarin?  So please address both or either of

3   those with your answers.

4        Dr. Nissen?

5        DR. NISSEN:  I was hoping somebody else

6   would step up first.  But you look at those

7   studies, all of which have TTRs up in the mid- to

8   high 60s, and you look at ROCKET, and it really

9   stands out.  I understand that the sponsor doesn't

10  buy this argument that the TTR is such a powerful

11  predictor, but we've all seen the data on what

12  happens to event rates, both bleeding and ischemic

13  event rates, when you stay within that 2 to 3

14  range.

15       We know, and there's very good data in the

16  FDA analysis, of what happens when you go from 2.0

17  just to 1.9 or 1.8.  You're seeing increases in

18  event rates on the order of 20 percent or more.

19  And so all you have to do is downshift patients

20  modestly out of that 2 to 3 range into that 1.8 to

21  2 range.  And a fair number of people are shifting

22  there, and you will have a loss of warfarin

1    efficacy.

2         So it becomes a major issue about whether it

3    is an appropriate and adequate comparator.  This

4    would be a lot easier if we saw 65 percent mean TTR

5    in ROCKET, rather than 55 percent.  And no matter

6    how you cut the data, you have to believe that it

7    wasn't being used as well.  It wasn't being used as

8    well as it was being used in the trials that led to

9    the determination of the confidence interval for

10   non-inferiority, and it wasn't being used as well

11   as in other contemporary trials.  And so it just

12   kind of falls off the wagon there and it's a

13   problem.

14        DR. LINCOFF:  Dr. Sager?

15        DR. SAGER:  This is a really, really

16   difficult one.  It's fascinating that, actually,

17   the reductions in the primary endpoint are

18   predominantly hemorrhagic stroke.  You can imagine

19   if the TTR was increased, there'd be even more

20   hemorrhagic strokes in the warfarin group.

21        Looking at the curve, we didn't have the cut

22   of like 60 to 70 or 75 percent, but if you look

over that 60 to 70 percent range, it actually looks

like the confidence intervals in 60 to 70 percent

TTR, overall, would still be within the non-

inferiority, though we don't have that exact data.

So given the fact that the reductions in the

primary endpoint are on something that actually

would be worse with a higher TTR, again, is just

another factor here that as we deliberate, I think

makes this just all the more complicated.  I also

am concerned that it's at 55 percent and not in the

mid-60s, but I think there's a lot of factors here

that we have to carefully consider.

DR. LINCOFF:  Dr. Emerson?

DR. EMERSON:  So I was asking earlier, and

that people around the table who actually know

seemed to all believe that this is a measure of

inadequate treatment more than it is a measure of

different sorts of patients.  And so I'll defer to

that.

But I will point out that the comparisons of

the people at 1.9, versus 2.0, versus 1.8 were

almost certainly observational data.  We didn't

1   randomize them, and we can't randomize them to a

2   particular INR.  We can randomize them to a

3   strategy to try to get that.  And so, again,

4   there's just this uncertainty in my mind about

5   what's a patient effect and what's a clinician

6   effect here.

7          DR. LINCOFF:  Dr. Kaul?

8          DR. KAUL:  I read the question differently

9   from Dr. Nissen here.  Effectiveness of

10  rivaroxaban, I read it to see whether it is

11  superior to placebo.  And even with that poor TTR,

12  I would say, yes, it is superior to placebo.  So,

13  therefore, it is effective.  The superiority of

14  rivaroxaban to warfarin, now this becomes a

15  comparative analysis, and I would always like to

16  have the best available comparator to make those

17  inferences from.  Clearly, it is not superior to

18  warfarin.

19         DR. NISSEN:  Let me --

20         DR. LINCOFF:  Are you responding to this?

21         DR. NISSEN:  I just wanted to make one other

22  comment.  And that is that everybody's trying to

 1   make the effort here, or at least a lot of people

 2   are, the sponsor certainly, to say, well, what

 3   might have happened had -- let's look at the

 4   tertile or quartile subgroups of people that were

 5   at higher TTRs.

 6        What that means is that we're being asked to

 7   try to figure out what would have happened in this

 8   trial if conditions that really didn't exist

 9   actually had occurred.  And it's almost like

10   saying, well, I'm going to take the subgroup of

11   people in whom warfarin was used well, and based

12   upon the results in that subgroup, I'm going to

13   declare rivaroxaban to be as effective as.  And I

14   have a lot of trouble with that.

15        It is what it is.  And any effort to figure

16   out what might have happened had everybody been in

17   the 65 to 70 percent range is taking and torturing

18   the data to the point that I don't know that we can

19   go there.  I don't know what would happen, had

20   happened, if they'd had a higher TTR.  What I do

21   know is what happened here is it didn't have a TTR

22   that fits in with contemporary trials.

1               DR. LINCOFF:  Dr. McGuire?

2               DR. MCGUIRE:  I'll respond to yes and no to

3      the two questions.  To Dr. Emerson's point, to

4      underscore, the proposed odds ratios of

5      subtherapeutic INRs that have been presented were,

6      to my recollection, based on 69 cases and 69

7      controls.

8               If you look at the bottom of that table that

9      was truncated in the slide, but is in the briefing

10     document, the point estimate of hazard of 1.0

11     versus 2.0 was 18, which would imply a relative

12     treatment effect of Coumadin just getting to 2.0 of

13     94 percent, which, even at the 1.4 presented on the

14     slide, that would invoke a 77 percent relative risk

15     reduction, going from 1.4 to 2.  So those data are

16     terribly flawed, I would say, and I think they

17     overexaggerate the importance of the therapeutic

18     range.

19              I'm curious, and I don't know -- maybe our

20     hematologist -- what the variance of the standard

21     deviation of the INR assay is.  But I'm comfortable

22     at the 1.8 to 3.2 range.  I don't think the data

1  presented show us that being 1.8 versus 2.0 is so

2  dramatically different.

3       So getting back directly to this question,

4  do we all wish the TTR was higher here?  I would

5  say yes.  I've been completely unconvinced that TTR

6  reflects treatment adequacy or very reliably

7  affects the -- as a treatment modifier.  There are

8  cases presented where there were numeric

9  differences in the point estimates by TTR, but

10  we've seen a lot of examples where there were no

11  predictable differences either.  So I don't have

12  any confidence that the TTR really reflects what we

13  really think it does.

14       Particularly confounded here, and, again, to

15  a flaw, potentially, of the study design, was the

16  long durations between out-of-range measurement and

17  the subsequent measurement, forcing, probably,

18  unfairly, almost unilateral bias to increase time

19  out of range than the patient actually observed.

20       So I think this 55 percent is a worst-case

21  scenario.  And two other points.  I think it fairly

22  closely represents clinical practice.  I called our

1   anticoagulation clinic, and our anticoagulation

2   clinic TTR is 54 percent.  We treat an

3   underprivileged county indigent hospital patient

4   population.  So I'm not so sure this is so

5   different than clinical practice.

6        The last point is, this is fairly comparable

7   to the average TTR that was observed in the six

8   trials used to generate the confidence limit for

9   non-inferiority, so I think it's a fair comparison.

10        DR. LINCOFF:  From my point, I would like to

11   add that I agree with those statements, and in

12   particular, the issue that the quartile analyses

13   for each of the three major trials that have been

14   performed, that was shown by both the sponsor, and

15   I think also by the FDA, although without -- all

16   four quartiles showed no relationship between TTR

17   and the relative treatment effect of the new

18   anticoagulants versus warfarin.

19        I realize that's not the same as saying if

20   everybody was in quartile 4, what would the result

21   be.  The question is, looking at the trends, the

22   quartiles, do the quartiles predict treatment

1   effect?  And I think that they show fairly

2   convincingly that they don't.

3       DR. KRANTZ:  I just wanted to respond to

4   that.  Mori Krantz.  If I recall Dr. Rose's data,

5   when you got the quartile that was a TTR greater

6   than 68 percent, I think they did, indeed, bridge

7   the non-inferiority margin at 1.84.

8       Is that not correct with the FDA data?  Not

9   to be a stickler, but -- so I think one level of

10  the TTR analysis did suggest that there was non-

11  inferiority at that level.

12      But I think, overall, I agree more with

13  Darren, that it cuts both ways, that if you get too

14  stringent -- I realize it's an efficacy

15  trial -- you really run the risk of not having

16  generalizability.  And, to me, I think that's sort

17  of what's important here.  And I also wanted to

18  bring up that another advantage of this study that

19  sort of negates that is the fact that it was

20  blinded, whereas I think with dabigatran, when we

21  reviewed that data, there was the issue of

22  ascertainment bias that we don't have here.  So I

1   think there's a lot of factors that kind of go on,

2   and it's a very complicated issue.

3          DR. LINCOFF:  Dr. Emerson?

4          DR. EMERSON:  So I was just going to mention

5   that, if we really did want to study in a very

6   scientifically and statistically rigorous manner,

7   this concept of what would the people in the

8   highest quartile do, we know how to do that.

9   Right?  You first identify the people that you can

10  get a TTR in the acceptable range, and then you

11  randomize them.

12         But I would not really recommend that study.

13  I would really rather have the overall

14  effectiveness study of, say, in the patient

15  population.  And on the dabigatran advisory

16  committee meeting, I stated that I was perfectly

17  happy with that being an unblinded study because so

18  much of the argument was the difficulty of

19  monitoring the warfarin and a lot of that.

20         So for a superiority study, I think it's an

21  artificial setting not to have people monitoring

22  that as they would monitor it.  You don't want to

1   get complete incompetents doing it, but as long as

2   it's standard clinical practice, you want them to

3   do it the way they would do it.  And that would be

4   the way to establish the superiority, but that

5   wouldn't be as acceptable in a non-inferiority

6   study.

7           DR. LINCOFF:  Dr. Fox?

8           DR. FOX:  Thanks.  Others have covered what

9   I was going to say.

10          DR. LINCOFF:  Dr. Kindzelski?

11          DR. KINDZELSKI:  Thank you.  I would like to

12  continue what Dr. McGuire said about how difficult

13  it is to keep the INR in a very fixed range.  And

14  the short answer is, it is difficult, and it also

15  depends on what type of population you select for

16  the clinical trial.  It also depends on what kind

17  of resources and which country you are doing the

18  study.

19          However, we can all talk about how to make

20  the trial better, best.  We have the data right

21  now.  So we have to base our decisions on the data

22  that has been already received.

1       Coming back to the question about the

2    effectiveness of the drug and superiority, I do

3    think those are two different questions.  And I do

4    agree with Dr. Kaul about, yes, rivaroxaban shows

5    to be more effective than the placebo.  And the

6    question about superiority, this is something that

7    is not very easy to answer.

8       DR. LINCOFF:  Dr. Fleming?

9       DR. FLEMING:  For completeness, the low-

10   lying fruit here is regarding superiority by a

11   proper ITT analyses, superiority was not

12   established even prior to the concerns raised by

13   these TTR issues.  For non-inferiority, my sense,

14   it's difficult to understand what the influence of

15   TTR is in ROCKET.  The FDA slide 23, though, to my

16   view, does support at least the potential

17   importance of a lower TTR in ROCKET regarding the

18   validity of constancy assumption.

19       So my sense is, while I don't think this

20   invalidates, I think it does meaningfully

21   compromise the interpretation of non-inferiority

22   against warfarin.

1          DR. LINCOFF:  Dr. Sager?

2          DR. SAGER:  Just one quick point, and we've

3    really focused on the TTR, but if one looks at the

4    percent that maintained an INR greater than 2,

5    which includes those above 3, we're actually up to

6    about 71 percent.  That might have some bleeding

7    risk, but from the efficacy side, almost three-

8    fourths of the individuals in the study who were

9    actually above 2.

10          DR. LINCOFF:  The next part of this

11    question, disposition of subjects in ROCKET AF is

12    summarized below, and this is a table regarding the

13    patients who completed drug and died, withdrew.

14    Please comment on how the disposition data affect

15    your ability to infer, one, effectiveness of

16    rivaroxaban, or, two, superiority of rivaroxaban,

17    to warfarin.  Again, address both or either.

18          No comments?  Dr. Fleming?

19          DR. FLEMING:  My sense about this -- I'm

20    actually answering parts B and C at the same

21    time -- is somewhat similar to what I said in

22    part A.  Superiority is not an issue.  The ITT

1    analyses do not establish superiority, even before

2    you get into the irregularities that we're talking

3    about regarding TTR targets, and disposition, and

4    follow-up.

5         My sense, in general, is, again, I don't

6    know if it invalidates the non-inferiority, but it

7    is at least complicating the interpretation of the

8    non-inferiority with the high levels of missing

9    data that we have due to discontinuation, due to

10   withdrawal of consent, and the very strong

11   indication of informative missingness that we have

12   when we truncate the data for non-inferiority

13   assessments per protocol at day 2 with, as we've

14   already said, not only differential numbers of

15   events occurring, but a very high event rate,

16   particularly for endpoints like death.

17        So my sense is, in addition to the first

18   part, part A, which talks about the coagulation,

19   parts B and C, I'm looking at in terms of

20   completeness of information and informative

21   missingness.  It adds to the difficulty I have in

22   determining the degree of reliability of the

1    evidence for non-inferiority.

2         DR. LINCOFF:  So for others who may want to

3    combine these answers, C is, was follow-up for

4    endpoints adequate in both treatment groups; and D,

5    are there other aspects of study conduct that

6    importantly affect interpretation of study?  In

7    your comments, you can address any of those.

8         Dr. Papademetriou?

9         DR. PAPADEMETRIOU:  It seems like about

10   20 percent of the patients completed this study off

11   study medication.  And although the numbers are not

12   very different, the small difference is between the

13   two groups.  It seems like discontinuing the

14   medication put rivaroxaban in a disadvantage,

15   knowing that in the transition period, there were

16   more events and that these patients were started,

17   presumably, back to Coumadin.  And in the

18   transition period, if there was no coverage or

19   bridging with heparin, this may have resulted in

20   more events during that period in the group that

21   received rivaroxaban as compared to warfarin.

22         So the disposition may have affected at

1    least 20 percent of the patients that completed

2    this study off drug.  It may have affected

3    adversely the outcomes for rivaroxaban.

4         DR. LINCOFF:  Any other comments on this

5    question?

6         DR. SAGER:  Just quickly, I was somewhat

7    comforted by the sensitivity analysis that Jonathan

8    had asked for, showing that if one looked at worst-

9    case scenarios, still, the non-inferiority bound

10   was met.

11        DR. LINCOFF:  Dr. Kaul?

12        DR. KAUL:  I think Tom probably had

13   something first.

14        DR. FLEMING:  I would have felt more

15   comforted if I had seen that on the ITT analysis.

16   I mean, I'm trying to put together all the pieces

17   here that are confounding our interpretation.  And

18   it was reassuring for the non-inferiority, but much

19   more fragile is the ITT comparison, and we didn't

20   see any sensitivity analyses for that.

21        DR. PETERS:  That was ITT to site

22   notification for the 77 events.

1          DR. LINCOFF:  Could you go to microphone?

2     And if you have a slide, you can show that.

3          DR. PETERS:  What I showed was 77 events in

4     the ITT to site notification, so it wasn't the

5     safety on treatment.  It was up to the

6     notification.

7          DR. FLEMING:  Yes.  I was thinking in terms

8     of what the agency had done that was presented in

9     detail.  I thought the agency's presentation was

10    for the on-treatment plus two days.

11         DR. LINCOFF:  Does somebody from the agency

12    want to address that?

13         DR. ROSE:  I'll give it a try.  For the

14    overall analysis, not looking at any quartiles or

15    anything like that, we looked at both overturning

16    non-inferiority and overturning superiority.

17    Superiority is very easy to overturn.  I think it

18    took about 13 events.

19         John, why don't you talk about it?  You did

20    the analysis.  I'm sorry.  I didn't see you.

21         DR. LINCOFF:  Please identify yourself to

22    the mic.

 1          DR. LAWRENCE:  I'm John Lawrence.  That

 2     graph is for the on-treatment with less dose plus

 3     two days, as it was for the primary analysis for

 4     non-inferiority.

 5          DR. ROSE:  There was another statistician

 6     who worked on this project, and he's left us,

 7     unfortunately, but he did other analyses.  And they

 8     included ITT analyses of, I think, all the way

 9     to -- regardless of treatment.  I'm sorry.  I

10     haven't looked at those recently.

11          I think, at a minimum, to overturn non-

12     inferiority, it was something like 70 events, and

13     there were some -- it's in the review.  And then

14     for on-treatment, it was upwards of 80 events.  But

15     even to overturn non-inferiority, it took at least

16     70.  It might have been 80 also.

17          DR. LINCOFF:  Dr. Fleming?

18          DR. FLEMING:  It took 70 or 80 when you did

19     this analysis in the on-treatment plus two day

20     cohort, correct?

21          DR. ROSE:  Now, are you speaking.  There

22     were several analyses done, and maybe I responded

1    wrongly.  There was one analysis in which we looked

2    and made assumptions about patients who had dropped

3    out or were lost to follow-up.  And then there was

4    another analysis where we just looked and said, how

5    many extra events would it take to overturn the

6    finding of non-inferiority?

7           So which one are you talking about?

8           DR. FOX:  The one that I asked for in the

9    morning was for the patients who withdrew consent,

10   so they say, I don't want to take the drug anymore,

11   I don't want to talk to you anymore, I don't want

12   to come for visits anymore.  I'm gone.

13          If all the patients on rivaroxaban who left

14   the study under those circumstances had actually

15   had a primary event, or if you want to take a less

16   extreme approach, had events at the rate that the

17   patients on treatment had events, versus the

18   patients in the warfarin arm, and if you assume

19   they had no events after they left the trial on

20   treatment -- essentially a worst-case scenario

21   biased against the test article, what's that

22   sensitivity analysis?  And I believe that's what

1      the sponsor showed in an ITT population.

2              DR. LINCOFF:  There is a table 29 in the

3      FDA's -- so it's on page 116 -- sensitivity

4      analysis of non-inferiority to superiority.  And

5      for intention to treat, regardless of exposure, it

6      requires 88 events to overturn non-inferiority, and

7      intention to treat to follow-up requires 80 events.

8              So I don't know, Dr. Fleming, if that

9      addresses the issues.

10             DR. EMERSON:  So I don't believe they did

11     exactly the analysis that you were supposing.

12     Instead, they said, of those that we were missing

13     data, how many did they have to have?  They didn't

14     go to say everybody we were missing data on would

15     have failed on one arm, and everyone not on the

16     other.

17             DR. FOX:  No.  That's right.  If you apply

18     the observed event rate in the patients who were on

19     therapy, still in the trial.  I think that's a

20     reasonable sensitivity analysis, as opposed to

21     assuming everybody on test article drops dead as

22     soon as they withdraw their consent, versus nobody

1    in the other arm, and that's kind of ridiculous.

2          DR. TEMPLE:  But they did the more extreme

3    analysis.

4          DR. EMERSON:  Actually, as Tom's pointed out

5    repeatedly, the death rate is actually far higher

6    in the people as they've come off study.  And so we

7    ought to probably apply that to the people who

8    dropped off, rather than the event rate that we're

9    seeing in the people who did complete or were still

10   on treatment at the end.

11         DR. LINCOFF:  Question number 3.  Please

12   comment on effectiveness.  How does rivaroxaban

13   compare with warfarin as used in ROCKET AF, as used

14   in the U.S., when it is well managed?  Dr. Emerson?

15         DR. EMERSON:  According to the non-

16   inferiority margin that they agreed on beforehand,

17   it's non-inferior.  There was nothing that they did

18   that didn't hit that question.  So just that

19   question, in terms of as it's being used, we saw

20   that it didn't hit the margin in any of the

21   analyses.

22         DR. LINCOFF:  Dr. Nissen?

1      DR. NISSEN:  Make sure I understand the

2  context of the question.  If that's the question,

3  my answer is the same.  But, in fact, when warfarin

4  is well managed, I don't know that we know the

5  answer, and that's the problem.  And I want to make

6  sure I articulate this, because, again, it's not so

7  much how we're going to vote here.  It's what are

8  the policy implications of what we do here.

9      I worry about the slippery slope of creeping

10  non-inferiority.  So we say, well, okay, they had

11  non-inferior with 55 percent of the patients in the

12  therapeutic range.  And then somebody comes along

13  in a couple years and they are 50 percent.  And we

14  say, well, it's almost as good as they were in

15  ROCKET.

16      The problem is that this can get us into

17  some very dangerous territory.  And I do think that

18  we have to look at the other two comparators that

19  have been approved.  One is warfarin and the other

20  is dabigatran.  And we know that warfarin is very

21  effective when used well, when used in warfarin

22  clinics, the kind that we have.  We do a little

1    better than you do at the Cleveland Clinic.  I

2    actually checked as well, and it's not uncommon to

3    see rates up around 70 percent in well-managed

4    warfarin clinics.

5         So are we going to take a step back if we do

6    this?  And my worry here, when you ask the question

7    about when it is well managed, is that we approved

8    dabigatran with something in the mid-60s.  We

9    approved, based upon rivaroxaban, in the mid-50s.

10   Where do we draw the line?  At what point do we say

11   being non-inferior is no longer acceptable for

12   patients when the outcome is a morbid mortal event

13   of grave consequences?  And my concern is if we

14   don't draw the line in the sand somewhere, we're

15   going to get into a serious problem with this kind

16   of creeping non-inferiority margin.  So that's part

17   of my worry.

18        DR. LINCOFF:  Dr. Krantz?

19        DR. KRANTZ:  Yes.  I kind of agree with

20   Steve.  I think for the first two, it's a no-

21   brainer.  I think it's got the efficacy versus

22   warfarin.  But then the question of when it's well

1    managed is really the lynchpin, isn't it?  And I

2    know I shouldn't worry about quartiles of TTR

3    because we don't think it's a great surrogate and

4    it doesn't track, necessarily, with outcomes.  But

5    in that analysis, the point estimate was 1.14 with

6    an upper bound going to -- what was it -- 1.84.

7    So, again, technically speaking, you would say it

8    was non-inferior when it didn't meet non-inferior

9    criteria when it was well managed.

10          So I think it's a lingering question and I

11   think I don't know that we can adequately answer it.

12   But that's the lynchpin, really.

13          DR. LINCOFF:  We've been talking about upper

14   bounds of confidence intervals on subgroups.  And

15   I'm surprised that the statisticians in the groups

16   haven't yelled out.  I don't know why we're talking

17   about reaching boundaries or not reaching

18   boundaries when we're talking about subgroups.  The

19   trials are never powered for that.  I don't think

20   that that's, at all, a valid point and we shouldn't

21   be looking for that.  That would be my comment.

22          Are there any other?  Dr. Kaul?

1          DR. KAUL:  For 3A, yes.  It was non-inferior

2     to warfarin with regards to efficacy.  But I seldom

3     interpret non-inferior to efficacy without asking

4     the important question, what does it offer?

5          Okay.  If I'm willing to tolerate some

6     degree of non-inferiority, what is the tradeoff in

7     return?  It failed on primary safety endpoint,

8     which was the major bleeding.  It would still have

9     met non-inferiority in the U.S., although it's

10    getting closer to the margin; 1.33 is the upper

11    bound, even though the point estimate is in the

12    right direction.  And if you just focus on the

13    ischemic endpoints, it exceeds that non-inferiority

14    margin.

15          The answer to 3C, which is when it is well

16    managed, if you use 65 percent TTR as the cutoff

17    for well-managed warfarin use, which is the mean,

18    non-inferiority for a margin of 1.38 would still be

19    met in the on-safety plus two days dataset, but not

20    on the safety plus 30 days dataset.  The hazard

21    ratio of the point estimate there is 1.1.

22          If you use 68 percent TTR as the cutoff,

1    which is the median, non-inferiority would not be

2    met for either the plus two or plus the 30-day

3    dataset.  The point estimates for the hazard ratios

4    all exceed 1, 1.02 for the plus 2 and 1.30 for the

5    30-day datasets.

6          So if you were to borrow from Dr. Rose the

7    operational standard for as effective as warfarin,

8    which means that the point estimate favors

9    rivaroxaban with the upper 95 percent confidence

10   interval close to superiority, it could not be

11   supported in cohorts where warfarin was well

12   managed.  And if you can do the additional

13   analysis, the fractional preservation analysis, it

14   preserves 58 percent using one analysis synthesis

15   method and 75 percent using the other synthesis

16   method of the warfarin effect.

17         So using well-managed warfarin, an inference

18   of as effective as warfarin, based on the

19   operational or the quasi-operational standard I

20   heard from Dr. Rose, it does not meet that

21   criteria.

22         DR. LINCOFF:  Dr. Fleming?

1          DR. FLEMING:  So regarding 3A, if we look at

2    the primary endpoint, the hazard ratio by the per-

3    protocol on-treatment plus day 2 is .79, stroke

4    .85, death .85, MI .81.  Those are all favorable

5    point estimates.  And by the way, they illustrate

6    that you can actually do trials with rigorous non-

7    inferiority margins and not have extraordinary

8    sample sizes, because if you're a little better,

9    you can rule out that you're modestly worse without

10   huge sample sizes.

11          I think often we say, well, we can't do

12   rigorous non-inferiority margins because the sample

13   sizes will be enormous.  Yes, if you're identical.

14   And, in fact, how important is it, then, to approve

15   something that in truth is identical that could

16   have an estimate that says it's worse?

17          So if you're a little bit better -- and

18   these analyses would suggest you are -- then you

19   can, in fact, readily rule out you're worse, and

20   the sample size could have been, actually, a fair

21   amount smaller.

22          The issues, though, that come to

1    complicating this, as we've already extensively

2    discussed, are the issues around the truncation at

3    plus day 2, when things are happening afterwards in

4    large fractions of patients, in a way that is

5    imbalanced by treatment arm.

6            So if you look at the ITT analysis, those

7    four relative risks become .91, .94, .89, .89.

8    They're all still in the right direction, although

9    much more consistent with no difference, but still,

10   in my view, results that would establish non-

11   inferiority.

12           So the complication to this is, how much

13   influence does the joint issue of time in

14   therapeutic range and missingness have to

15   compromise the interpretation of those estimates

16   that are near 1 that would, in fact, rule out the

17   non-inferiority margin, if it weren't for those

18   other issues, that in my view -- I don't know

19   whether it means we cannot conclude non-

20   inferiority.  We may well, but it does complicate

21   the interpretation.

22           DR. LINCOFF:  Dr. Emerson?

1          DR. EMERSON:  I just would like to ask, as

2     we're looking at, for instance, the U.S. question,

3     and seizing on the 64 percent that's the mean, I'll

4     just note that unless we are only working in Lake

5     Wobegon, where everybody is above average, even as

6     we focus on the U.S. clinics, the fact that the

7     average is 64 percent doesn't mean all of the U.S.

8     clinics would be at 64 percent.  And so, really,

9     pulling down below that leaves us lots of room for

10    the robustness of the results in the U.S.

11         DR. LINCOFF:  Dr. Temple?

12         DR. TEMPLE:  Is anybody moved at all by the

13    following observation?  The ITT for hemorrhagic

14    stroke was essentially -- the point estimate was

15    essentially identical to the estimate for the

16    treatment plus two days.  The change was entirely

17    in the ischemic stroke, which is not surprising

18    because we already sort of knew that.  And there is

19    a plausible explanation for why that occurred.

20         Does that influence anybody's view of the

21    data?  Because it doesn't seem surprising, if you

22    didn't anticoagulate them, that they threw a few

1    strokes.  I guess what I'm asking is, don't you

2    have some sense that we might understand what's

3    going on here?

4         DR. LINCOFF:  From my standpoint -- I mean,,

5    I've already said I think they're two different

6    processes, what's happened afterward, and that

7    although that's an unfortunate occurrence and may

8    mandate either another study or some careful

9    evaluation of what to do afterward, that that

10    doesn't speak to the efficacy on therapy or the

11    results of coming off therapy if you had adequately

12    anticoagulated.  So I agree.

13         DR. NISSEN:  Bob, we can't know.  I mean,

14    that's the thing that makes this very frustrating.

15    We don't know what would have happened had the

16    protocol and the study conduct been done in a way

17    that protected patients during that transition

18    period because that wasn't what was done.  And so

19    we're in the position here of having to guess at

20    what might have happened.

21         I would make the same comment with regard to

22    this issue about, well, what about you take the

1   group of countries where TTR was better?  What

2   we're then trying to do is decide whether or not a

3   drug is approved based upon a subgroup in a larger

4   trial, where we really don't -- I mean, subgroup

5   analyses, as we all know, are fraught with hazards.

6        So I think we have to judge this the way it

7   was conducted, not the way it might have been

8   conducted.  And it wasn't conducted in a way -- and

9   the way it was conducted, some bad things happened

10  after that 2 to 30-day period.  And that's all we

11  can say.  And until somebody can prove to us that

12  that isn't going to happen if the drug is used

13  better, we don't know the answer.

14       DR. TEMPLE:  No.  I think that's true.  But

15  what happened was that the rather modest, barely-

16  there advantage on thrombotic stroke clearly went

17  away.  And maybe we don't know exactly why.  But

18  the other advantage -- it always surprises me; I'm

19  not sure I understand why -- wasn't affected at all

20  by that.  I mean, it's true, you've got to look at

21  the overall data, but we just always, nonetheless,

22  sort of look at the data, too, and help us

1    interpret it, and I just wondered what you thought.

2         DR. LINCOFF:  We do know what happened in

3    the sizeable proportion who stopped the study drug

4    early, who didn't have an excess risk.  I mean,

5    they didn't have that differential effect of

6    anticoagulation.  And it's one thing to say that

7    it's a subgroup, so we can't interpret it.  But the

8    subgroup of good TTR is the group that is

9    concordant with the others.

10        Dr. Fleming?

11        DR. FLEMING:  Just quickly on those numbers,

12   Bob, for hemorrhagic, the difference between the

13   on-study plus day 2 and ITT was plus 8 against plus

14   7.  Now, it's only 15 events.  The ischemic was

15   7759.  And you're right.  That may be where you

16   would expect it.  Of course, that's where most of

17   the events were, and there we saw it, 7759.  The

18   hemorrhagic was 8 against 7.

19        DR. TEMPLE:  But it's also where the drug

20   didn't seem to have much advantage.  The hazard

21   ratio for the on-therapy was only .95 in the first

22   place.  It was a very, very modest difference,

1    barely there, you'd have to say.

2         DR. FLEMING:  But you went from plus 12 to

3    minus 6.

4         DR. TEMPLE:  Yes.

5         DR. LINCOFF:  Dr. McGuire?

6         DR. MCGUIRE:  It's a nice segue.  I was

7    going to call Dr. Temple out the second time.  When

8    we talk about a point estimate of .95 against a

9    placebo, it's awfully disappointing.  Against

10   aspirin for primary prevention, it's awfully

11   disappointing.  But against warfarin in this

12   condition, I think it's fairly impressive to even

13   come close.

14        We don't have any drug in all of cardiology

15   that comes close to the treatment efficacy of

16   warfarin in stroke.  And so to have a drug that

17   comes close at a .95 point estimate is awfully

18   impressive.

19        DR. TEMPLE:  Okay.  But we just approved one

20   that actually was better.

21        DR. MCGUIRE:  Did better.  Understood.

22        DR. TEMPLE:  It's not impossible.

 1          DR. MCGUIRE:  A couple of comments.  I do

 2     think it was -- I think answer A is yes.  Answer B

 3     is probably.  I agree, all the limitations of

 4     subgroup analyses, but often it's better to be

 5     lucky than good, and we're lucky in this case, in

 6     that the U.S. population, the point estimate

 7     actually achieves the -- it's favorable, and the

 8     confidence limit is well within the 1.38, the

 9     conservative confidence limit of the FDA.  And I

10     agree, we can't answer C.

11          DR. LINCOFF:  Dr. Fox?

12          DR. FOX:  So I think the answers to A and B

13     are fairly straightforward.  As used in the trial,

14     yes.  As used in the U.S., I'll take a slight

15     different interpretation.  Maybe the FDA wants to

16     correct me on how they wrote the question.  But as

17     used in the U.S., to me, goes back to the meta-

18     analysis of how warfarin is actually used in the

19     U.S.  It doesn't say as used in the U.S. cohort of

20     ROCKET AF.  So if you say as used in the U.S., it

21     still looks pretty good.

22          I want to interject, maybe, some commentary

1    that goes back to the way Sanjay Kaul answered the

2    question about, when should the per-protocol

3    observation period have properly ended?  And in my

4    view, it ought to be 4 to 5, or 4 and a half

5    pharmacodynamic half-lives of the test article,

6    which, whether it's 1.5 days or two days, we can

7    argue about.  But it's not 7, and it's certainly

8    not 30.

9          I think that the excess of events that

10   happened at that 30-day visit is an unfortunate

11   design feature of the study around the transition

12   plan, which could have been a whole lot better in

13   retrospect.  But I don't think it's a reflection,

14   necessarily, of the test for effectiveness on a

15   per-protocol on-treatment patient population in the

16   study.  So maybe we should try and separate those

17   two issues because that whole transition plan idea

18   is supposed to be another part of our discussion,

19   right?

20         So then, to answer C, when it's well

21   managed, I'm actually not as persuaded as others

22   that TTR is, in fact, a reliable -- call it a

1    surrogate for treatment effect or treatment

2    modifier, if you prefer.  But when the sponsor did

3    the analysis of the other trials in terms of what

4    the center TTR was, proportionately speaking, in

5    the regions in which the trials were conducted, it

6    seemed comparable.

7         So I think it is codependent on where it's

8    done and in the sickness of the patient population.

9    I think that's important.

10        DR. LINCOFF:  We are going to take three

11   more comments on this, and then we're going to take

12   the break, so Dr. Sager, then Dr. Emerson, then

13   Dr. Nissen.

14        DR. SAGER:  Yes.  One is I just wanted to

15   respond to you and just raise the point that these

16   early temporary discontinuations who then restart

17   may be very different than the later

18   discontinuations.  These may have been people

19   having procedures who were put on heparin, were

20   temporarily stopped for some very specific reason

21   that might have been managed in a very different

22   way.

1   But I also wanted to come back to your

2   comment.  Yes.  No, it looks like, with a different

3   transition anticoagulation regimen, we might well

4   get pretty different results.  I guess the only

5   thing that concerns me a little bit is, A, we don't

6   have the data, and, B, just how we do that so we

7   don't, for example, have an increase in bleeding.

8   And without data, it's hard to be sure.  But I do

9   think it's hard for me to imagine that a regimen

10  can't be developed that would significantly change

11  the type of data that had to have been put in

12  place.

13          DR. LINCOFF:  Dr. Emerson?

14          DR. EMERSON:  Others have made it.

15          DR. LINCOFF:  Dr. Nissen?

16          DR. NISSEN:  I feel compelled to point out,

17  as somebody who takes care of a lot of these

18  patients, that it is very common to interrupt

19  therapy with warfarin.  And patients will interrupt

20  it on their own.  They'll get a lot of bruising.

21  They'll have bleeding gums.  Things will happen.

22  People don't get to the pharmacy, elderly people,

1    and don't get their drug.

2         One of the things about warfarin, even

3    though it's a drug we love to hate, is that its

4    pharmacodynamic effects are slow on, slow off, and

5    it's pretty forgiving.  And so, as Sanjay Kaul has

6    pointed out to us, in those first few days after

7    you stop rivaroxaban, pretty bad things happen.

8    And my fear here is without having studied a

9    regimen for what to do with those patients, the

10   drop-in, drop-out -- in a clinical trial, people

11   are more likely to actually take the drugs in a

12   reliable fashion.  They know they're being studied.

13   They're part of a project.  There's certain

14   phenomenon that occurs when you get in a clinical

15   trial.

16        I'll tell you, your 80-year-old AF patient

17   that can't get a ride to the pharmacy, who stops

18   rivaroxaban, what we seem to have here, is in the

19   first week, the potential for some really high

20   relative risks of events, and we've not studied

21   that.  We don't have any information on how to

22   ameliorate that risk, and it makes me concerned.

1          DR. LINCOFF:  Can you do this in 30 seconds?

2          DR. KAUL:  Yes.

3          DR. LINCOFF:  Okay.  30 seconds.

4          DR. KAUL:  I think it's important to

5     understand the question here.  It says well

6     managed.  While I agree that TTR may not be an

7     effect modifier, it certainly is a marker of

8     skillful care.  How else do you expect or explain

9     why rivaroxaban event rates goes down when the TTR

10    goes up?

11          So it is a marker of quality of care, and

12    that's what this question asks.  And you have to

13    use the TTR cutoffs that you pick up to define that

14    quality of care.  Is it 60 percent?  Is it 64

15    percent?  Is it 68 percent?  We can disagree on

16    that, but the key point here is that this is a

17    marker of the quality of care, not an effect

18    modifier.

19          DR. LINCOFF:  We have now completed three of

20    the nine questions.

21          DR. MCGUIRE:  After publicly admitting our

22    TTR rate at our institution is about 54 percent, I

1    have to defend that only one component of TTR is

2    the care of the physician and/or the process and

3    system.  We saw Dr. Harold's (ph) multiverbal

4    model, and about 20 patient-level characteristics

5    also contribute to predicting time in therapeutic

6    range.

7           So I will agree with Dr. Califf's comment

8    earlier.  I take some offense at the term

9    "unskillful use" because it's a little bit

10   accusatory, and it's a complicated therapeutic

11   strategy.

12          DR. LINCOFF:  We will resume this

13   controversy in 10 minutes.  We're going to take a

14   10-minute break.  Again, there should be no

15   discussion of the meeting topic.  Please come back

16   by 3:50, so we can finish the six questions.

17          (Whereupon, a recess was taken.)

18          DR. LINCOFF:  Dr. Fleming, did you have a

19   comment on the last question before we moved?  I

20   think you wanted to respond to the U.S.

21          DR. FLEMING:  Sure.  I want us to go onto

22   question 4 as well, but just to take 10 seconds in

1    the U.S., just a note.  As has been noted by

2    others, we have to be very cautious in subgroups

3    with 2,000 people here.  It is noteworthy, though,

4    that this issue of the events, the primary

5    endpoints occurring after two days, almost one and

6    a half times as many events in the U.S., patients

7    occurred after they went off the treatment, from

8    two days onward.

9         The other was that death and MI, even from

10   the per-protocol analysis, had hazard ratios that

11   were near 1 and were in fact effectively 1 when you

12   did the ITT analysis, so results that, in fact,

13   were consistent with the larger study, including

14   the concern about large numbers of events on

15   rivaroxaban that occurred after the patients went

16   off for two days.  But interestingly, the MI and

17   the death were neutral in the U.S.

18        DR. LINCOFF:  Moving to question 4, then.

19   As part of the Clinton administration Reinventing

20   Government initiative, FDA published a policy that

21   said, in part, the agency does not require new

22   human drug products or medical devices to be more

1   effective than existing therapies, nor does it

2   necessarily require the product to be compared to

3   other products.  However, for products intended to

4   treat life-threatening diseases, diseases with

5   irreversible morbidity and contagious diseases that

6   pose serious health risks to others, it is

7   essential for public health protection that a new

8   therapy be as effective as existing approved

9   therapies.

10          The as-effective policy explicitly does not

11   apply if the new therapy is studied in a new

12   population.  And considering how this exclusion

13   might apply to rivaroxaban, here are some points

14   for comparison of the warfarin arms in RE-LY and

15   ROCKET AF.

16          So this is all warfarin arms, and you can

17   see here different criteria, both on the left and

18   on the right, the right being endpoints according

19   to TTR.

20          The question, then, is, is the population in

21   ROCKET AF sufficiently distinct from the population

22   in RE-LY, that the as-effective policy does not

1    apply?  And if so, how?  Dr. Emerson?

2         DR. EMERSON:  Can I ask for a point of

3    clarification here?  Because I would have said that

4    this policy should be about what the indication is

5    and whether the indication is in the new

6    population, never mind the population that the drug

7    was studied in, which, ideally, would be the

8    population that the indication was there.  But as I

9    read the indication, it's very similar that they're

10   looking for, and that that's what's important; not

11   what the eligibility criteria were for the studies.

12        DR. TEMPLE:  I think the question is trying

13   to indicate our flexibility and willingness to

14   consider a variety of potentially interesting but

15   important differences, whether it really ended up

16   in a different indication or not; that is, does it

17   study a new population in a way that enthralls you?

18         I guess we thought that could be relevant,

19   even if the indication turned out to be the same.

20   I mean, you're sort of implying that you indicated

21   only for people with CHADS whatever, and we

22   wouldn't necessarily do that.  We don't necessarily

1    do that unless, for some reason, you thought the

2    data didn't apply to people who are less sick,

3    which you might think, but you wouldn't necessarily

4    think.

5         So if you thought studying the sicker people

6    gave you information about the less sick people,

7    you might indicate for everybody, but you still

8    might conclude we had interesting additional

9    information here.  That's what we were asking for,

10   advice.

11        DR. LINCOFF:  Dr. Fleming?

12        DR. FLEMING:  Actually, I had written down

13   something very similar to what Dr. Emerson said.

14   It seems that most of the discussion of this issue

15   is in question 5.  But in question 4, my sense was,

16   if the label, if the indication, is the same as for

17   another therapy, then I would think it applies.

18        DR. LINCOFF:  Dr. Nissen?

19        DR. NISSEN:  First of all, I do want to

20   commend the executive committee and company for

21   studying a particularly sick population.  You know,

22   that's very useful.  However, it's pretty clear

1    that there is substantial overlap between the

2    patients that were in RE-LY and the patients that

3    are in ROCKET.  And we don't have enough

4    information to suggest that these patients are so

5    different that they constitute a unique population.

6    Having said that, I'm glad that we have data on the

7    sicker population, because, frankly, these are the

8    people that probably the most need to be treated.

9            DR. LINCOFF:  Dr. Sager?

10           DR. SAGER:  I would say this study really

11   focused on the sicker patient population and

12   doesn't really say a great deal about the less-sick

13   patient population, but there is a lot of overlap

14   in the overall patient groups.  So I don't think it

15   really reaches this bar, this policy, in terms of

16   it really being a totally different patient group

17   that we would look at totally separately; though I

18   think, later on, as we get into some of the

19   nuances, it may be difficult to extrapolate this

20   data to a less sick population.

21           DR. LINCOFF:  Dr. Fox?

22           DR. FOX:  I actually think the question is

1　inappropriate to the policy.  So the policy says

2　something about, it doesn't require the product to

3　be compared to other products.  And then if you

4　infer that to be "as effective as" implies that

5　it's to be compared to an existing approved

6　therapy.

7　　　　　Well, when the trial was designed and run,

8　dabigatran wasn't existing or approved, so it

9　couldn't be compared.  So dabigatran is irrelevant

10　to the question, as it applies, as it's driven by

11　this policy.

12　　　　　But having said that, I kind of agree with

13　the people who are saying that, yes, it was a

14　little bit sicker, but it was still pretty much the

15　same population and generalizable.

16　　　　　DR. LINCOFF:  Dr. Papademetriou?

17　　　　　DR. PAPADEMETRIOU:  Yes.  I agree that the

18　warfarin arm of the two studies doesn't consist of

19　a new population one way or the other, but there's

20　a lot of other overlap between the populations,

21　except there are differences.  In the ROCKET study,

22　there were a lot more sicker patients with CHADS4

1    to 6 score; a more percentage were in the ROCKET

2    study.  They had some differences in age and

3    whether they were taking warfarin before, but there

4    is a lot of overlap between the two groups.

5         So I don't think this should be exempt from

6    the rule of as effective as.

7         DR. LINCOFF:  Dr. Krantz?

8         DR. KRANTZ:  No further comment on that,

9    just that I think there's an err potentially on the

10   age greater than 75.  ROCKET looks like it's lower

11   when, in fact, my sense is it should be higher.  If

12   you look at slide CC-37 from the sponsor, it seems

13   like it was 44 percent were over 75, which would

14   make sense for a sicker population.  I don't know

15   if that's accurate or not, but I just wanted to

16   make the comment.

17        DR. LINCOFF:  Dr. Kaul?

18        DR. KAUL:  I am somewhat confused.  Earlier

19   today, we were told that the non-inferiority

20   guidance document that came out in 2010 sort of

21   reflected or was influenced by this policy

22   statement.  And so this new population and new

1    therapy is not a concern when we are doing a non-

2    inferiority assessment because we are comparing it

3    to a treatment population that was never studied in

4    the old historical trials.  And, yet, there is a

5    concern when you apply it to RE-LY.

6           So I am somewhat confused, and there seems

7    to be a disconnect here.  So perhaps the FDA can

8    help clarify this.

9           DR. TEMPLE:  Well, I don't blame you for

10   being confused.  This was not my favorite question.

11          [Laughter.]

12          DR. TEMPLE:  I mean, there is an interesting

13   and provocative issue here that I'm not going to

14   try to address our policy on.  But suppose, in the

15   course of a study, something new and really hot

16   comes along?  Do we ever say, I'm sorry you

17   compared it to a dog, we have something better now?

18   We don't usually do that, but I wouldn't rule out

19   the possibility.  And this is a little bit about

20   that possibility, but I don't think we really meant

21   to get too much into that discussion.

22          I mean, it's the big dog; in the range,

there's this other drug that does something.  But I
don't think -- as many people have said repeatedly,
I don't a cross-study comparison here is plausible.
It's a different population, and I don't know
whether this study tells you anything about how the
drug compares to dabigatran.  I'm not sure it does
at all.

So I think this reflects the fact that it's
in the air.  We know it's there.  It's hard to
ignore it, but I'm not sure this is the most
important question.  The comparison that we focused
on when we discussed the trial with the company and
that we're focusing on now, really, is with
warfarin and not with dabi.

As I said at the opening, what dabi does
makes me, at least, more interested in being sure
that the comparison with warfarin is really solid;
whereas, before there was any alternative, just
having an alternative to the difficult-to-use
Coumadin would have seemed like a very good deal,
and any evidence of effectiveness might have been
okay.  But I don't think that's true anymore,

1   because you have alternatives that are really

2   solid.  But I don't think it makes dabi the

3   comparator.

4          DR. LINCOFF:  Dr. McGuire?

5          DR. MCGUIRE:  Yes, just a couple points of

6   clarification.  From the policy, I'll just point

7   out that the words "when skillfully used" are not

8   in the policy.  They're commonly linked in the FDA

9   briefing document, but it just has to be proved

10  against existing therapies.  Now, it may be implied

11  that it should be skillfully used, but it's not in

12  there.

13         I think there's a lot of confusion here.

14  Dr. Fox just alluded to approved therapy, but in

15  fact, the word is plural in the policy.  And so the

16  final word -- existing approved therapies, does

17  that imply it has to be proven against every

18  approved therapy, at least one approved therapy,

19  the very best approved therapy?  The guidance is,

20  as is in other places, non-operational.

21         So my interpretation is at least one

22  approved therapy is sufficient.  Warfarin was that

1   therapy at the time, and I don't think we should

2   consider the dabigatran comparison.

3         DR. LINCOFF:  Mr. Coukell?

4         MR. COUKELL:  I think the Federal Register

5   is certainly getting at a public health impact.

6   And so what the study population is, to me, is

7   irrelevant.  The question is, is there a population

8   out there?  And I asked the sponsor about that this

9   morning, and the answer was, essentially, no.

10        DR. LINCOFF:  The next question actually

11  overlaps quite a bit, so we'll go to it, we'll read

12  it, and then those who feel like they've answered

13  with the previous one don't need to answer it here

14  again, but those who have additional comments or

15  want to amplify, by all means.

16        So number 5.  If you concluded that the

17  policy does apply and that rivaroxaban needs to be

18  as effective as something, A, what does as

19  effective mean operationally; B, is it sufficient

20  to be as effective as warfarin?  If so, is it?  C,

21  is it necessary to be as effective as something

22  else?  And if so, do you need a direct comparison

1    to the something else?  And is it?  I assume that

2    means is it effective as something else.

3         So all of those questions, I think, are

4    quite a lot of overlap with the last one, but are

5    there any comments?

6         I think, Jonathan Fox, you had a comment

7    before?

8         DR. FOX:  Yes, just to Dr. Temple's comment

9    before, and then I'll segue into my answer to these

10   questions.  I guess one extreme case would be that

11   somebody comes along with a new therapy for a

12   disease, for which there is a long-standing

13   approved existing therapy and is so overwhelmingly

14   effective that the trial is stopped early, and it

15   makes big headlines.  And, meanwhile, that new

16   therapy still has to go through an approval process

17   before it can be approved, and launched, and made

18   available to people.

19        What would the trialists working on a

20   competing therapy that was about as effective as

21   supposed to do?  Are they supposed to stop their

22   trial because it's unethical to continue because

1   the newfangled thing is so much better, even if

2   it's not available yet?  I mean, there's a whole

3   host of things that come into -- so dabi doesn't

4   quite get to that extreme, not anywhere near it, in

5   my view, but it's something you want to keep in

6   mind when you start down that road.

7         As effective, I think, Dr. Temple, you set

8   this up at the very beginning.  Operationally, the

9   agency, and this division in particular, declared,

10  in your words and actions over the last number of

11  years, that preserving about 50 percent of the

12  treatment effect of the established therapy was a

13  pragmatic way of getting innovative new therapies

14  out there for patients, and you've been consistent

15  in that way.

16        So is it sufficient to be as effective as

17  warfarin?  Well, warfarin was the only approved

18  existing therapy at the time the trial was done, so

19  the answer to that is yes.

20        Necessary to be as effective or as something

21  else?  Well, I guess that's the interpretation of

22  the policy.  And I think industry's been okay with

that, and most of the science world has been okay

with that.  And the direct comparison, well, I'm

not sure how else you'd do it but to compare them

directly head to head.  And is it?  I think we've

had a long discussion about that already, about

meeting a non-inferiority standard.  So that's it.

DR. LINCOFF:  I believe the second part of

this question was directed at dabigatran, but I may

be wrong.

Dr. Fleming?

DR. FLEMING:  So to answer all three parts

here, the first part, what does as effective mean?

Well, technically, to be at least as effective

as -- and I think Dr. Temple already pointed this

out -- technically would mean you're ruling out a

quality, which is what superiority would allow you

to conclude.

Having said that, my interpretation of this,

my sense of what was meant I think is -- I think

similar to also what I heard Dr. Temple say a

little bit earlier today, not quite so stringent

that it would be sufficient to be non-inferior with

1    respect to an NI margin that preserves an

2    adequately large fraction of the -- to comparator's

3    effects.  It might be more than 50 percent, but I

4    don't think the intention was that we would have to

5    show superiority.

6          So for part number B, is it sufficient to be

7    as effective as warfarin?  My sense is, if no other

8    agents in this indication have been established to

9    be superior in benefit to risk to warfarin, then it

10   should be sufficient with a properly designed and

11   conducted trial to be non-inferior to warfarin.

12         What I struggle with, though, is if there is

13   another agent that's clearly superior to warfarin,

14   why is it sufficient to then be non-inferior to

15   warfarin?  It was stated earlier that this policy

16   says that we have to be as effective as other

17   therapies.

18         I think it's implicit to mean not as

19   effective as the worst of those.  I think it's

20   implicit to those other therapies, i.e., to

21   whichever would be the best of those, or at least

22   generally would be argued to be among the best of

1    those.

2         Does that mean that, if you're underway with

3    a trial and something else evolves, then you might

4    have to start again?  That's not unprecedented.

5    I go back to 1987, when in the colon adjuvant

6    setting when 5FU leucovorin was being compared

7    against placebo.  And two years later, in 1989, FDA

8    approved 5FU levamisole, having been shown to be

9    clearly superior to placebo.  Hence, the 5FU

10   leucovorin trial stopped in midstream, saying

11   that's not the question anymore.  The question now

12   is, 5FU leucovorin being non-inferior to 5FU

13   levamisole.  That's what happened.

14        My sense here is, do we have something

15   that's clearly superior to warfarin?  Obviously,

16   what comes to mind is the RE-LY trial with

17   dabigatran.  There are some negatives that the

18   sponsor and others have correctly pointed out about

19   that trial.  It's an open-label trial, and the

20   sponsor, to their credit, did a placebo-controlled

21   trial.

22        The dabigatran had unfavorable trends in MI,

1    and here we had positive trends in MI.  But the

2    primary endpoint, the primary stroke-based

3    endpoint, has a hazard ratio of .65 by ITT analysis

4    with four standard errors, ruling out a quality on

5    an ITT analysis, pretty robustly superior.  I think

6    the agency approved it with the label of being

7    superior.

8         Is that correct?  No?  Just non-inferior?

9    Well, to go on -- they can come back and ask that.

10        DR. TEMPLE:  Well, it shows -- I mean, I

11   don't know if superior is in the indications, but

12   if you read the description of the trials, it shows

13   a P less than whatever and shows an upper bound

14   that's well below 1.

15        DR. FLEMING:  So, at least then to make the

16   comment that it was four standard errors in a

17   superiority assessment, it was stated by the agency

18   that when the TTR subgroup greater than 67 percent

19   was assessed, that it was robustly favorable on

20   non-inferiority in those centers.  It didn't have

21   the interaction by prior stroke.  There were 6,500

22   U.S. patients to give you much more robustness in

1    the U.S.  There were two active arms.

2          So, collectively, at least I ask the

3    question, is there sufficient data to say

4    dabigatran is superior?  And, therefore, if we

5    would say it is, then I'm uncomfortable by stating

6    that the policy is addressed simply by showing that

7    you are non-inferior to something that is inferior

8    to an existing therapy.

9          The last part of the question is, well, is

10   this agent, then -- if one would say that we would

11   have to not only be non-inferior to warfarin, but

12   non-inferior to dabigatran, is it?  I don't know.

13   It might be, but we would need more data to answer

14   that question.

15          DR. LINCOFF:  Dr. Sager?

16          DR. SAGER:  Tom, I just wanted to ask you,

17   there are also differences in the patient

18   populations between RE-LY and ROCKET.  Does that

19   concern you at all, in terms of thinking about the

20   superiority issue?

21          DR. FLEMING:  A lot of things concern me,

22   and that's a very relevant concern.  I come back to

1    what Dr. Emerson said earlier, though.  In essence,

2    we're labeling this for a given indication.  And it

3    seems to me, the policy should be, if you're going

4    to use it in the same indication as another therapy

5    that is superior to warfarin, then why is it not

6    necessary to know that you are not giving up

7    efficacy, meaningful efficacy, against that other

8    agent with the same indication?

9         DR. LINCOFF:  But there is room for the true

10   scientific debate that a drug proven in a less sick

11   population to have a degree of superiority may not

12   have been superior in a sicker group of patients,

13   even ostensibly with the same indication.

14        I mean, I guess if we had unequivocal

15   evidence of superiority, that would be one thing,

16   but we have one trial with, as you point out, some

17   flaws, and in a somewhat different population.  So

18   I think, in this specific case, not as an overall

19   policy --

20        DR. FLEMING:  If one were to say, even -- to

21   correct what I'm saying.  If one were to say, well,

22   even if dabigatran has the broad label, quite

1   frankly, it's really not clear what its true

2   efficacy is against warfarin in a sicker

3   population, and this agent is non-inferior in a

4   sicker population, then I think that is a relevant

5   consideration.

6           DR. SAGER:  I think I would agree with you,

7   Tom.  I think that makes a lot of sense.

8           DR. LINCOFF:  Dr. Nissen?

9           DR. NISSEN:  This is more of a question for

10   everybody, but as I recall the data, warfarin's

11   efficacy is greater amongst sicker patients.  That

12   is, the sicker you are, the greater the relative

13   reduction in stroke risk.  And somebody correct me

14   if I'm wrong about that.

15           Is that right or wrong?

16           DR. LINCOFF:  I think the EAFT was similar,

17   which was the highest-risk trial to all the others,

18   or relative risk.

19           DR. NISSEN:  So either way, I guess the

20   question, then, would be, is it likely to be the

21   case here that the degree of risk is a modifier of

22   the efficacy of the drug?  And if it's flat, that's

1    fine.  If sicker patients get more effect from

2    warfarin, that's fine.  The issue is, do sicker

3    patients tend to get less benefit from warfarin?

4    And I don't think we have any evidence to suggest

5    that they do.  So, to me, it becomes a non-issue.

6             DR. LINCOFF:  Dr. McGuire?

7             DR. MCGUIRE:  Yes.  Just a few points.  I

8    agree completely with Dr. Fleming's comments on an

9    academic level, but from a practical level, I

10   completely agree with Dr. Fox's.  It gets to the

11   point where it would be impossible to continue to

12   execute these large-scale randomized clinical

13   trials without having to stop and start, and stop,

14   and start, as new agents come along.  We see, in

15   this space, there are four agents within a 12-month

16   period of time that we're going to be dealing with.

17   And so I think that just raises a bar that's

18   impractical to achieve.

19             I think it benefits patients to have

20   competitive therapies.  We have lots of examples

21   where some drugs within a class for a given

22   indication are slightly better or slightly worse,

1    and there are a lot of reasons why some may be

2    preferred for given patients, side effect profiles,

3    tolerability, third-party payer decisions, other

4    issues.

5         So for those reasons, I don't necessarily

6    think we have to continue to chase the tail of the

7    efficacy as long as it's defensible at the

8    execution of the trial, that it's a relevant

9    comparator to begin with.

10        Then there's also the issue, the long-term

11   track record of dabigatran isn't proven yet, we've

12   seen.  It wouldn't be the first drug that comes

13   into problems that were unforeseen, maybe down the

14   road.  There's no suggestion that's going to

15   happen.  But, again, to have extra in our arsenal

16   is not adverse.

17        I would just make a final comment.  We have

18   aspirin, and aspirin plus clopidogrel, or

19   clopidogrel available for this indication, for

20   patients who choose not, are unwilling, or are

21   unable to take warfarin.  So this certainly would

22   be better than those options.

1          DR. LINCOFF:  Dr. Kaul?

2          DR. KAUL:  What does as effective mean

3     operationally?  I really don't know, but this is

4     excerpted from the non-inferiority guidance

5     document.  "In most cases, a successful non-

6     inferiority study supports effectiveness of the

7     test drug, but it only rarely will support a

8     conclusion that the drug is equivalent or similar

9     to the active control," which is what I imply as

10    effective as to mean, a concept that has not been

11    well defined for these.  "Such similarity might be

12    concluded, however, if the point estimate of the

13    test drug favored it over the control, and the

14    upper bound of the 95 percent confidence interval

15    was close to showing superiority."  This is what

16    the statement says in the guidance document.

17          Now, if you use that as the operational

18    standard for some analyses, it meets that

19    operational standard.  But for other analyses,

20    which in my opinion are more robust than the

21    on-treatment plus 2 days or plus 30 days, it does

22    not.

1          So is it sufficient to be as effective as

2     warfarin?  Yes, if that's the standard of proof.

3     If so, is it?  Using that operational standard, it

4     is not.

5          C, is it necessary to be as effective as

6     something else?  Not necessary, but it's a shifting

7     target.  Maybe in the future, it might be necessary

8     to be as effective as another drug.

9          DR. LINCOFF:  We are going to move onto the

10    next question, 6.

11         DR. TEMPLE:  Can I just say something about

12    equivalence?  Equivalence is a poorly defined term.

13    We use it for bioequivalence, by which we mean

14    between 80 and 125 percent.  Most people would say

15    that's okay.

16         When you try to translate that into a

17    clinical endpoint, it gets very, very difficult,

18    and that's what that document says.  It says if you

19    almost make it, maybe we'll buy the idea that

20    you're equivalent, if you're almost superior.  But

21    it's very hard.

22         We wanted to remind everybody that just

1    because you are non-inferior doesn't mean you can

2    make the case that you're equivalent.  We don't

3    know that, usually, because the confidence interval

4    is larger than what we have historically called

5    equivalence, which is 80 to 125.  We're facing

6    this, in a major way, on the whole biosimilar

7    thing, I can tell you.

8         DR. LINCOFF:  Question number 6. Are there

9    adequate instructions for use with regard to A,

10   what regimen to use in most patients?  If not, does

11   this matter?  B, what dose adjustments are needed

12   in patients at extremes of exposure or risk?  If

13   not, does this matter?  C, transitioning between

14   rivaroxaban and other anticoagulant therapy?  If

15   not, does this matter?  And D, actions to take in

16   the event of serious bleeding?  If not, does this

17   matter?

18        In this regard, I've been told that the

19   sponsor would like to clarify one point regarding

20   the discontinuations.  And I think considering

21   there was a bit of discussion around it and relates

22   to item C, if they can do that quickly, we could do

1    that now.

2            DR. CALIFF:  We got a bit concerned when the

3    treatment interruptions were being discussed, that

4    some people may have been confusing what happened

5    at the end of the study from what happened in the

6    midst of the study.  We had over 7,000 treatment

7    interruptions in the midst of the study, with no

8    difference in the event rates in either group, in

9    that, during those interruption periods.

10           So I think -- the concern that was raised

11   about, well, people will forget a dose or stop a

12   drug, in fact, in the first two days after a

13   treatment interruption, the event rates favored

14   rivaroxaban over warfarin, which is a little

15   counterintuitive for the reasons that were given.

16           So I would just go back to the main slide

17   that we showed, if we look at rows 3 and 4, just to

18   repeat this, early discontinuation and temporary

19   interruptions, you can see that there were a lot of

20   interruptions, over 3,500 in each group, and you

21   had a very small number of events with no

22   significant difference between the two.

1      I just wanted to clarify that.  There's no

2  argument about the end of the study being a

3  transition problem.

4      DR. LINCOFF:  Thank you.

5      So in your answers, again, please address as

6  many of these items as you would like.

7      Takers?  Dr. Nissen?

8      DR. NISSEN:  I don't know how to transition

9  the drug, based upon what we've got from the ROCKET

10 trial.  I just don't think we have any information.

11 And so the question is, there will be people, for a

12 variety of reasons, as everyone's pointed out, who

13 may not tolerate a drug.  Who knows what they have?

14 They have a skin rash or they have GI intolerance.

15 And we need to know what to do.  And,

16 unfortunately, we're not informed about that.

17     I do think that's an issue.  In the absence

18 of data, physicians will do what their gut tells

19 them to do, and that may be right or that may be

20 wrong.  And so they may overlap therapies.  Who

21 knows what they'll use.  Will they use enoxaparin?

22 Will they use heparin?  Will they start warfarin

1   and have some overlap period?  None of that has

2   been answered here, and so we just don't have the

3   answer.

4           DR. LINCOFF:  I'd like to make a comment in

5   this regard as well.  When we sat here, maybe a

6   year ago, around the RE-LY panel, there was a lot

7   of criticism of the open-label design, but one of

8   the purported advantages was that they could adjust

9   the discontinuations specifically for the two drugs

10  because that was open label, and that did inform

11  us.

12          Now, we have a trial that was done as

13  many -- in the more pure way, wanted to see these

14  kind of trials done, as a blinded trial, but as a

15  necessity.  Then one couldn't adjust what they did

16  afterward, at least in a transparent fashion, based

17  upon what their treatment was.

18          So I agree that we don't know what to do,

19  and I think we probably need more data.  And I

20  think that in the FDA's booklet, there were some

21  suggestions on smaller trials that might be quite

22  reasonable to provide some information.  But I

1    think probably one could have predicted ahead of

2    time that we wouldn't be able to tell, from a trial

3    such as this, the optimal way.  I don't think we

4    could have predicted that the outcomes would have

5    been as bad as they were, and I think that's a

6    point of concern, but I don't think that speaks to

7    something we could have gained from this particular

8    trial.

9         With regard to the other points, I

10   think -- although, again, if the dose wasn't

11   optimal, BID may have been optimal, we know what we

12   know from this trial, which was the QD dosing, and

13   I think that's appropriate.

14        In terms of actions with serious bleeding, I

15   think that's a problem with most of the

16   anticoagulants that we have.  In virtually none of

17   them, the anti-platelets or anticoagulants have

18   specific reversal agents.  And we end up treating

19   them all about the same way, with some

20   consideration of exactly where the hemostatic

21   defect is.  But I think that most people who use

22   these drugs are fairly accustomed to dealing with

1    non-specific means of dealing with bleeding.

2         Dr. McGuire?

3         DR. MCGUIRE:  I'll agree both with

4    Drs. Lincoff and Nissen.  The reality is, though, I

5    don't know that we have instructions, adequate or

6    otherwise, for transitioning of any anticoagulant

7    to any other presently approved.  We have no idea

8    how to transition heparin, low molecular weight

9    heparin, warfarin.  We all make our best guesses,

10   and we think we're probably doing it the right way,

11   but I don't think this absence of data

12   distinguishes this drug from all others previously

13   approved.

14        I do think it would be certainly important

15   to pursue the proposed strategy, put in a PK/PD

16   trial, ideally in a smaller trial.  And certainly

17   to point D, it's imperative that we, for all of

18   these agents, explore how to reverse their bleeding

19   propensity for emergency, trauma, and et cetera.

20        DR. LINCOFF:  Dr. Nissen?

21        DR. NISSEN:  Just one follow-up comment.  I

22   agree with you.  The thing that makes this more

1    poignant is the fact that such bad things happened

2    in the first week or two after the drug was

3    discontinued.  So it makes the imperative

4    different.  And, yes, I don't know how to go from

5    enoxaparin to heparin and back again.  But we don't

6    have, at least any evident data that -- well, we

7    have some data there, but not a lot that suggests

8    that it's really going to produce serious problems.

9         Here, we've got what's in front of us.  And

10   what's in front of us says that we can get into a

11   lot of trouble when we go off drug here, and we

12   don't know what to do, and that makes it a problem.

13        DR. LINCOFF:  Dr. Fleming, did you have a

14   comment?  Oh, okay.

15        Yes?

16        DR. KINDZELSKI:  Just a comment.  Just

17   wanted to support what Dr. Nissen said.  We don't

18   really know how to bridge for practically any

19   anticoagulant drug.  And currently, there are a

20   couple of clinical trials that are looking

21   specifically to address these issues.

22   Again, one of them is for warfarin, as we are

1   considering the gold standard for the

2   anticoagulation.

3       So I don't think that the purpose of the

4   ROCKET was to answer that question.  That was found

5   during that clinical trial.  That raises a huge

6   issue, large issue.  And I believe at this point in

7   time, we can address that to FDA.  And if that drug

8   will be approved, there should be some instructions

9   about not termination of the drug, no rapid

10   termination of the drug, and some actions regarding

11   finding the way how to do the bridging or moving

12   out of the clinical dose.  Thank you.

13       DR. LINCOFF:  Dr. Papademetriou?

14       DR. PAPADEMETRIOU:  I, too, wanted to

15   register my concern about the lack of data on the

16   fact that we don't know how to bridge from one type

17   of anticoagulation drug to the other.  And we all

18   have examples in cases of patients that we see day

19   in and day out, that go into trouble when we try to

20   transition them from antiplatelet therapy, the

21   other one, catherization, and then we want to get

22   them back on Coumadin.

1    In an effort to bridge them with low

2 molecular weight heparin or heparin itself, many

3 times we go into issues with bleeding

4 complications, and other times, we have events,

5 actually, during the transitional period.  And this

6 is a problem with this particular anticoagulant,

7 that we have seen more events at the end of the

8 study until the effect of Coumadin took over.  And

9 it's important to acquire some organized data in

10 the best way to transition up from this

11 anticoagulation to long-term Coumadin.

12    DR. LINCOFF:  Dr. Sager?

13    DR. SAGER:  Yes.  Like everyone else, I

14 appreciate the increased event rate after

15 discontinuations.  I do believe that with a

16 properly performed, relatively small PD-type of

17 study, that one could develop and test a schema for

18 this, which wouldn't be tested in a large number of

19 patients, wouldn't be able to assess some things,

20 but probably would be sufficient to address these

21 medical needs, which, as we've already said, we

22 actually don't have for many of the other drugs

1    that we use in this setting.

2         DR. LINCOFF:  Any other comments?  I'll warn

3    you that we're coming up on the voting questions,

4    so if you have other comments, this is the time.

5         All right.  Now, we will be using the

6    electronic voting system for this meeting.  Each

7    voting member has three voting buttons on your

8    microphone, yes, no, and abstain.  What you'll do

9    is you'll vote by pushing the button located

10   immediately below the corresponding letter.  Again,

11   firmly push the same button three times.  After

12   everyone has completed their vote, the vote will be

13   complete, and the vote will then be displayed on

14   the screen.  I will read the vote from the screen

15   into the record.

16        Next, we will go around the room, and each

17   individual who voted will state their name and

18   their vote into the record, as well as the reason

19   for why they voted as you did.  So this is your

20   opportunity to make your comments about why you

21   made your discussion.

22        So we will now begin the voting process.

1    Please press the button three times on your

2    microphone that corresponds to your vote.  You'll

3    have approximately 20 seconds to vote.  Don't start

4    the flash yet, please, because I haven't even read

5    the question.  Please press the flashing button

6    firmly.  And after you've made your selection, the

7    light will continue to flash.  If you're unsure of

8    your vote, please press the corresponding button

9    again.

10           So the question is, should rivaroxaban be

11   approved for the reduction of stroke and non-CNS

12   systemic embolism in patients with nonvalvular

13   atrial fibrillation?  So again, firmly, three

14   times.

15           [Vote taken.]

16           DR. LINCOFF:  So I'll now read the result

17   into the record.  The voting result is yes, 9; no,

18   2; abstain, 1; and no voting zero.

19           Now, we'll go around the table, starting

20   please with Dr. Fleming.  If you could read your

21   vote into the record and then any comments you'd

22   like to make regarding why you voted as you did.

1          DR. FLEMING:  I abstained.  I think there

2    are many strengths in this blinded and very

3    informative, important trial.  By the way, I think

4    Dr. Califf's thoughtful presentation and the FDA's

5    reviews were also incredibly thorough and

6    informative, and I'm greatly appreciative to both

7    in helping us to be as informed as possible in

8    addressing these difficult issues.

9          Rivaroxaban is clearly superior to placebo,

10   and I believe these data do not allow us to

11   conclude that it's superior to warfarin.  On the

12   additional key issue, I think it might be possible

13   to justify a conclusion of non-inferiority to

14   warfarin.  And, in fact, I think I'm leaning in

15   that direction, but concerns still remain about the

16   influence of TTR levels, the per-protocol on-study

17   versus ITT, particularly in the context of the

18   increasing events that are occurring at transition,

19   the overall total excess events in the wrong

20   direction, and the large fraction of events,

21   particularly deaths, that are occurring after

22   2 days post, being on study drug and then the

1    missing data.

2          Also, I'm perplexed about the proper way to

3    address the dabigatran results, which I believe is

4    an agent now that we have considerable evidence to

5    be superior to warfarin in a clinically related

6    setting.  And if that's the case, it leaves me more

7    uncertain about how to interpret the adequacy of

8    showing non-inferiority to warfarin.

9          My vote a little bit reflects the fact that

10   I don't think an advisory committee -- being

11   advisory, the voting concerns me.  The essence of

12   what matters is the great discussion that occurred.

13   I hope that is what the agency will largely be

14   influenced by.  But I go beyond that to say, it's

15   difficult to answer yes/no in my case because I see

16   such issues that are still uncertain in my mind on

17   both sides, and I hope the agency will be

18   enlightened by all the discussion, and can make the

19   proper decision.

20         DR. LINCOFF:  Dr. Sager?

21         DR. SAGER:  Having treated thousands of

22   patients with atrial fibrillation and dealt with

1    the tremendous problems of using warfarin, and

2    patients having issues on warfarin, I think there's

3    a tremendous unmet medical need for new therapies.

4         I think the executive committee and the

5    sponsor have done a really nice job with this.

6    Being able to do a double-blind study here, though,

7    as we've just discussed, there are some significant

8    issues, such as the TTR, the transition period.

9         Despite all that, I believe that the

10   robustness of the non-inferiority being met through

11   multiple different types of analyses leaves me with

12   the belief that it is actually non-inferior to

13   warfarin, and, thus, would be a real advantage for

14   patients with atrial fibrillation.  There are

15   obviously a number of other things, though, that

16   will have to be discussed and worked out.

17        In particular, the study was done in high-

18   risk patients, which I think, again, is a group

19   that hasn't been studied in other venues, and I

20   think is a group that actually is at most risk for

21   having major events.

22        DR. LINCOFF:  For the formality, can you

1    just state your name and your vote into the record?

2         DR. SAGER:  Philip Sager.

3         DR. LINCOFF:  And your vote into the record?

4         DR. SAGER:  Yes.

5         DR. LINCOFF:  Dr. Nissen?

6         DR. NISSEN:  Dr. Nissen.  No.  Here is a

7    summary of my thinking.  First of all, I am worried

8    that we may have the wrong dose administration

9    schedule for the drug, that a drug with a

10   relatively short half-life was developed as a once-

11   a-day drug and that there may be a better way to

12   give this drug.  And we're not likely to find that

13   out at this point, if we approve the drug with the

14   current data.

15        But more importantly, if you look at the

16   evidence for non-inferiority, it is strongest in

17   the per-protocol population, but when you start to

18   look at differing censoring rules, particularly if

19   you go out -- we don't have the intermediate values

20   of, say, going on a couple of weeks as Dr. Kaul

21   suggested.  Basically, you end up with point

22   estimates that start to get pretty close to 1.

1    They start to approach 1.

2         If you then factor into that the fact that

3    the TTR was well below other studies that we looked

4    at -- I mean, again, they were all pretty much in

5    the mid- to high 60s -- now you introduce a level

6    of uncertainty as to the efficacy of the drug that

7    is substantial.

8         A question you can ask is, could the TTR

9    have been better?  And my conclusion is that it

10   could have been, that there was a fatal flaw in the

11   study design, in that there were not instructions

12   given.  And so, if you were cynical, you'd say that

13   warfarin was designed to not be given particularly

14   well in the trial.  And I think it was an

15   oversight, not necessarily an intent, but the other

16   trials in this field used algorithms for treatment

17   that allowed them to get the TTR up into the mid-

18   60s.

19        That wasn't done here, and it left me with a

20   sense of doubt that using the ITT analysis and then

21   further deflating evidence of non-inferiority

22   because of uncertainty about the TTR, now, you get

1   to the point where I worry.

2         Again, as I said earlier, I worry about

3   creeping non-inferiority.  This has happened in

4   other fields, where a trial comes along and the

5   comparator is not used as well as it was used

6   previously.  Now, I worry someone's going to come

7   along and have a TTR of 50 percent, not 55, and

8   they're going to argue, well, we're pretty close to

9   what they did in ROCKET, so maybe we're okay, too.

10         When you deal with a morbid, mortal

11   complication like this, we owe patients the best

12   therapy that we can get.  Now, if we didn't have

13   another agent, if we didn't have another oral agent

14   like dabigatran, maybe I might view it differently.

15   But it does change my thinking, and it makes me

16   concerned that this may be a step back, not a step

17   forward, and that we will come to regret approving

18   a drug without having the right pharmacokinetic,

19   pharmacodynamic properties studied.

20         Then, finally, the issue of what to do when

21   therapy is stopped or interrupted is a huge

22   approvability issue, from my perspective.  I'm

1    concerned that it hasn't been studied.  It could

2    have been studied in parallel.  It didn't have to

3    be studied in ROCKET.  It could have been studied

4    in another small trial, as has been suggested.  And

5    I still think that the agency should not approve

6    this drug without having the data on what to do

7    when you stop the drug.

8        We have to stop anticoagulation frequently

9    in patients for a variety of reasons, and when we

10   do, we need to have at least some information on

11   what we should do in those patients, particularly

12   when we have evidence that when we stop the drug,

13   there is a rather significant excess of morbid,

14   mortal events.  So those are my reasons for voting

15   no.

16        DR. LINCOFF:  Dr. McGuire?

17        DR. MCGUIRE:  I voted yes.  The reasons are

18   that I think the study was well designed and well

19   executed.  Certainly, by no means was it perfect,

20   and no trials are.  I think it's a large, well-

21   represented, across-the-globe, very diverse patient

22   population at a very high risk that was studied

1    bravely.  And I think the results, fairly

2    convincingly, demonstrate the primary objective of

3    the trial.

4        The TTR, although it deserves the

5    conversation we've had today, I don't think is a

6    fatal flaw of the trial.  I think going forward, it

7    will be a point of interest, and perhaps even

8    better modeling of time in therapeutic range or a

9    metric of INR/Coumadin performance could be

10   established.

11       Like Dr. Sager, I'm quite impressed by the

12   stability of the estimates across a wide array of

13   sensitivity analyses, including different data

14   scopes, different stratifications, and with fairly

15   monotonous point estimates of effect.

16       Finally, again, because it's a large,

17   pragmatic trial, it is broadly generalizable, not

18   just to patients in the U.S., but around the globe,

19   where, for whatever reason, Coumadin therapy is not

20   well done.  This will provide an additional option.

21       DR. KRANTZ:  Mori Krantz, University of

22   Colorado in Denver.  I was a cautious yes.  I think

1    what swayed me to vote yes was really the

2    consistency of the results I think across the

3    different populations and the treatment periods,

4    and I think that was really important to me.  I

5    think, certainly, it did fit a new need in terms of

6    the higher risk population, so I think that's

7    really important.

8        I do have a few caveats that I wonder about,

9    potentially pre-approval or post-approval issues,

10   that I think we talk about in number 9, so I'll

11   stop at that point.

12       DR. LINCOFF:  Michael Lincoff.  I voted yes.

13   Dr. McGuire as articulated many of the reasons and

14   the points, and I agree completely.  Just a few

15   points.  I think that it's clearly non-inferior.  I

16   think that the opportunity to prove superiority was

17   lost when the decision was made to use the type of

18   warfarin dosing and to raise those questions.  And

19   that may be irrelevant over the long term, but I

20   think that it was a decision, it was the

21   appropriate decision -- it was an understandable,

22   defendable decision, but I think it takes away the

1    opportunity to have the sort of data that

2    dabigatran has regarding superiority.

3         Nevertheless, I think the comparator was

4    appropriate and that dabigatran doesn't meet a

5    standard, particularly given that this trial tested

6    a much higher population of patients that would

7    have required it to have been the comparator.

8         I also agree that additional data probably

9    should be obtained before this drug is approved

10   regarding how to transition; not how to

11   discontinue, because I think the treatment

12   discontinuations did not suggest excess risk, but

13   that if you believe that a patient still must be

14   anticoagulated, I think we need to know better how

15   to do that.

16        DR. KAUL:  Sanjay Kaul.  I voted yes.  Like

17   Dr. Fleming, I don't pay much attention to the

18   little tally count.  I think it's the discussion

19   and the deliberation around that is key.  And the

20   only reason why I voted yes is because I was

21   heartened to see an option for a claim, claim

22   number D, claim from patients failing other

1    anticoagulant therapy.  And that's one of the

2    reasons why I voted, because I want it to be

3    available for those types of scenarios.

4         The key question that I still am struggling,

5    and I was struggling all throughout is are the

6    results of ROCKET AF so persuasive that approval

7    will represent no lowering of its standard of

8    proof?  I still don't have my arms wrapped around

9    that standard of proof, so I was willing to give it

10   a benefit of doubt, because I'm loathe to making

11   arbitrary scientific assessments in the absence of

12   any objective-basing points.

13        But I am concerned about one major issue,

14   and that is when you stop the treatment, what

15   happens?  We really haven't ruled out whether there

16   is rebound hypercoagulability or whether this was

17   all due to inadequate anticoagulation.

18        So the data are not definitive enough to

19   allay my concern regarding hypercoagulability, nor

20   are they persuasive enough to reassure me that this

21   was a quirk of the design, that patients were not

22   properly anticoagulated during the transition

1    phase.  So I think that ought to be addressed.

2    Whether that ought to be addressed pre-approval or

3    post-approval is entirely up to the division, but,

4    nonetheless, I think that certainly needs to be

5    addressed.

6         MR. COUKELL:  Allan Coukell.  I voted yes.

7    I'm convinced that rivaroxaban is superior to

8    placebo.  I think, clearly, the underlying question

9    in the Reinventing Government policy is would

10   patients be harmed if they were started on a new

11   therapy that was approved through this process?

12       Had there been a third arm to the ROCKET

13   trial that was a dabigatran arm that clearly

14   demonstrated superiority, I think the answer would

15   be quite clear.  We don't have that. and I think we

16   don't have the evidence to make a comparative

17   conclusion.

18       At the same time, the questions that we've

19   discussed about TTR and the transition issues

20   remain real, and I've heard nothing that convinces

21   me that rivaroxaban should be firstline therapy for

22   any patient or any subgroup of patients.  And so

1    while I voted yes, my lingering concern is that

2    once this drug is on the market, it'll be

3    aggressively promoted on the basis of once-daily

4    dosing or some other purported advantage and will

5    displace a drug that has a superiority indication.

6    So I know we're coming to that part of the

7    discussion.

8         MS. MCCALL:  Debra McCall, and I voted yes.

9    All afib patients are very familiar with the three

10   kinds of drugs they have to take.  We need a rate

11   med, we need a rhythm med, and we need a blood

12   thinner.  We have options for rate, we have options

13   for rhythm, and we have very few options for a

14   blood thinner.  Warfarin has been on the market for

15   70 years.  We have the new kid on the block,

16   dabigatran.  There are some physicians that will

17   also use aspirin with Plavix.  In my experience,

18   it's not offered very often.

19        I really liked how this study was done

20   because it is an older population.  It was a sicker

21   population.  These are mostly the people I see on

22   forums having problems, that they're managing

1   multiple drugs and multiple issues.  So it was nice

2   to see a study that was really, to me, targeted

3   towards this population.

4        I'd like them to have another choice.  Not

5   everyone can take warfarin, the interactions, the

6   contraindications.  Dabigatran is already having

7   problems, anecdotally, with patients because of the

8   GI upset.  So I'm happy to see that there is

9   another option.

10       Like has already been mentioned, I'm a

11  little concerned with bridging.  Patients go off

12  whatever blood thinner they are for the

13  colonoscopy, for dental surgery.  How are they

14  protected?  How are they covered?

15       We don't know.  That's not done for

16  anything, not even warfarin.  In the long run, I

17  hope that's done.  That's something that I think

18  clinicians and patients would really like to know.

19  But, overall, I'm still happy with this drug, and I

20  do hope it goes to market.

21       DR. EMERSON:  Scott Emerson, and I voted no.

22  It was not a firmly held opinion.  And it was

1   probably somewhere between Tom's and Steve's.  But,

2   primarily, this was more of a documentation sort of

3   issue.  I felt that there were issues about the

4   bridging that just raised questions.  I think,

5   perhaps, some of the data that they have might have

6   allayed my fears, but they didn't have analyses

7   that I would have wanted to see.

8        Then the other issue is just worrying about

9   the creep of indications, and diagnoses, and what

10  you're going to do about the QD dosing when there's

11  some evidence that BID might be better, and the

12  concept of supplanting that that just said -- I

13  would have liked to have seen a little bit more

14  data on that, but I certainly don't think this

15  would be the worst thing that happens in the world,

16  for it to be approved.

17       DR. PAPADEMETRIOU:  Vasilios Papademetriou.

18  I voted yes.  And I think this area is an area that

19  we need more drugs because the standard of care,

20  Coumadin, is a very difficult drug to use for many

21  patients.  The patients have difficulty in staying

22  on the drug and maintaining therapeutic ranges, and

1    there are a lot of interactions with food and other

2    drugs.

3           Frequently, almost daily, we see patients

4    that come in and they're subtherapeutic.  We need

5    to adjust their medicines frequently -- I mean,

6    their Coumadin frequently; so seeing drugs that

7    have less interactions and less problems.  And the

8    data show that -- I believe that's good in

9    preventing embolic and thrombotic strokes.  It's a

10   good thing, and it's just going to be good for our

11   patients.  And the data I have seen today convinced

12   me that this new drug, rivaroxaban, can prevent

13   embolic strokes and is not inferior to Coumadin.

14          Although there are questions that I'm

15   concerned about, the bridging, the lack of

16   guidance, and how to go about bridging with

17   heparin, when we are stopping

18   rivaroxaban -- bridging to Coumadin, I think it's

19   very useful to have it on the market.  It's going

20   to help a lot of our patients.

21          DR. KINDZELSKI:  Andrei Kindzelski.  I voted

22   yes.  And regardless that Dr. Rose mentioned that

1   it doesn't count really, I had a lot of hesitancy

2   to say yes.  And this is due to -- I really want to

3   see therapeutic alternatives for the oral

4   anticoagulation in the market.  At the same time,

5   there are a few serious concerns that I think

6   should be addressed.  One of them is indication,

7   who will be the target, the general public or only

8   patients who really have some serious reasons to go

9   on these drugs?

10          Second is the dosage.  Will it be once a

11  day, twice a day, and what will be the dose?

12          Third is, of course, transition or bridging.

13  From the trial that was not designed to answer this

14  question, there are hints that it might have more

15  complications than warfarin when it's stopped, or

16  for whatever reason.  But, in general, I

17  really -- and I think the American public needs

18  alternative anticoagulants -- oral anticoagulants.

19  Thank you.

20          DR. LINCOFF:  We have 10 minutes left to

21  answer two questions, to discuss two questions.  I

22  think these questions are fairly straightforward.

1   The first, if you voted to approve rivaroxaban, and

2   even those who did not if you'd like to contribute,

3   to prevent strokes in patients with atrial

4   fibrillation, does it merit, A, a superiority claim

5   to warfarin, B, a claim as an effective alternative

6   to warfarin, C, a claim as effective, or D, a claim

7   for patients failing other anticoagulant therapy?

8   And if so, what constitutes failure?

9           Dr. Kaul?

10          DR. KAUL:  No, for superiority claim.  No,

11  for a claim as an effective alternative to

12  warfarin.  I don't know what's C -- what's the

13  difference between B and C?  That may be technical.

14  But for certainly D, a claim for patients failing

15  other anticoagulant therapy.

16          What constitutes failure?  If patients, for

17  some reason, are not well-anticoagulated on

18  warfarin.  They don't want to be on warfarin

19  because of the diet or because of the medications

20  that they are on, or if patients simply refuse to

21  take warfarin because they don't want to be

22  bothered with monitoring anticoagulation, those

1   would be the types of patients where I think

2   rivaroxaban would be an effective alternative to

3   warfarin and other anticoagulants that are

4   approved.  So thirdline option..

5           DR. LINCOFF:  Dr. Nissen?

6           DR. NISSEN:  I would actually be okay with

7   8D, but under very specific circumstances.  I can

8   imagine a patient that's had warfarin skin necrosis

9   and gets put on dabigatran, and has severe GI

10  intolerance, which, by the way, is a problem in

11  some patients.  Can't take dabigatran, can't take

12  warfarin.  This would be a better alternative than

13  to giving that patient aspirin or aspirin and

14  clopidogrel.

15          So I think that would be a reasonable

16  population, pending further evidence of how this

17  drug compares to warfarin when used skillfully.

18          DR. LINCOFF:  Dr. Papademetriou?

19          DR. PAPADEMETRIOU:  I would vote no for A.

20  I don't think that the data supports superiority

21  compared to warfarin, but I would vote yes for B,

22  C, and D.

1           DR. LINCOFF:  Dr. Sager?

2           DR. SAGER:  No for A, no for B, no for C.

3    For D, I think that's fine.  I think the other

4    issue, though, is should the population be those

5    who are at high risk, CHADS score; for example, a

6    CHADS score more than 2?  Because that is the focus

7    of the study.

8           DR. LINCOFF:  Dr. McGuire?

9           DR. MCGUIRE:  I would also agree no for A,

10   but it's not clear to me how we can say no for B

11   and C.  We've proven in active control trial that

12   it's non-inferior to an excellent comparator.  And

13   so it's effective at least against placebo, so it

14   does have efficacy.  Whether it's as effective as

15   warfarin isn't the question.  The question is, it's

16   an effective alternative?  And so I think all

17   three, B, C, and D, should be yes.

18          DR. LINCOFF:  I echo Dr. McGuire exactly.

19          Dr. Emerson?

20          DR. EMERSON:  I can't go with A or B, but to

21   the extent that C is really just a claim comparing

22   it to placebo, I believe it is more effective than

1    placebo, and I think D is as acceptable.

2         DR. LINCOFF:  Dr. Sager?

3         DR. SAGER:  Yes.  Now, if C is meant to be

4    against placebo, that's fine with me.

5         DR. LINCOFF:  Dr. Fleming?

6         DR. FLEMING:  No for A.  I assume C was

7    asking -- can we give it a claim as being as

8    effective as warfarin.  I thought what's what you

9    meant.  Is that what you did mean?

10        DR. STOCKBRIDGE:  I think B was mostly

11   intended to imply you thought it was as good as

12   warfarin.

13        DR. FLEMING:  So let me answer the question,

14   then.  Whether it's B or C, can we say it's as

15   effective as warfarin?  I view that that's a proper

16   statement, when you've essentially shown something

17   very close to superiority.  So if the agency

18   believes that the upper limit of confidence

19   intervals here are pretty darn close to 1, then I

20   could accept that.

21        If, however, because of issues around TTR,

22   and the per-protocol censoring, and missing data,

1    and other irregularities, you're just confident you

2    can rule out 1.38, then I'm comfortable with saying

3    it's as effective as warfarin in that setting.   I

4    would be more comfortable with saying it's

5    established to preserve an adequate fraction of the

6    effect of warfarin, if you're only saying you're

7    ruling out 1.38.

8          Under part D, while it makes more sense to

9    me, as Sanjay was saying, that its use would be in

10   second- or thirdline, one of the concerns that I

11   have, being an evidence-based guy, is that we

12   didn't study it as what do you do when you can't

13   take warfarin, or dabigatran, or you failed to know

14   that it does something there?  So I'm torn because

15   I'd rather see it used in that setting, but I don't

16   have direct data to show its effective in that

17   setting.

18         DR. LINCOFF:  Dr. Kaul?

19         DR. KAUL:  I just wanted to stand corrected

20   for option C, which I voted no, but if it is an

21   efficacy claim against placebo, then the answer is

22   yes.

1          DR. LINCOFF:  Let's move onto the last.  If

2     rivaroxaban were to be approved for stroke

3     prevention in patients with atrial fibrillation, A,

4     are there any constraints you would place on the

5     population in whom it would be indicated; and, B,

6     are there any issues you would want to resolve

7     post-marketing?  Dr. Krantz?

8          DR. KRANTZ:  I'll take a stab at that.  Mori

9     Krantz from Denver.

10          I think the end-stage liver disease, end-

11     stage renal disease I think would fit pretty

12     clearly.  I still have this concern about extremes

13     of body weight with a single, fixed dose, and I

14     really think that might be something to consider.

15          I guess the other one is those that are

16     already on well-controlled warfarin, because I

17     don't think, beyond a shadow of a doubt, we've

18     proven that warfarin, under skillful or excellent

19     control, is not potentially still a better

20     alternative.  So I think I might include that.

21          To me, I felt the idea of having a pre-

22     approval study, looking at the PK/PD relationship

1    in terms of number of letter B, would be important.

2    And I would make it bi-directional.  I wouldn't

3    just look at going from the rivaroxaban to

4    warfarin, but also going from warfarin to

5    rivaroxaban, so you could get an understanding of

6    bleeding as well as thrombotic risk.

7            Sorry.  I put you guys asleep.

8            DR. LINCOFF:  Is that a hint?

9            Dr. Nissen?

10           DR. NISSEN:  Yes.  I would really like to

11   see this drug tested in this atrial fibrillation

12   population BID, because it makes a lot more sense

13   from a pharmacokinetic, pharmacodynamic point of

14   view.  And maybe this drug will have more -- at

15   point estimates and confidence intervals and look

16   more like dabigatran if it's studied in a more

17   optimal dosage regimen.

18           Actually, we're all sitting here saying,

19   yes, maybe it's better than warfarin, maybe it's

20   not; it's certainly better than placebo.  But that

21   kind of robustness that Tom has been looking for

22   here, you might just find if you give the drug in a

1    more optimal way.  And if you do such a study,

2    please, get a TTR up in the mid-60s.

3              DR. LINCOFF:  Dr. Papademetriou?

4              DR. PAPADEMETRIOU:  I would like to see the

5    different bridging regimens to be tested and some

6    guidance from industry on what is the best way to

7    bridge from rivaroxaban to Coumadin.

8              DR. LINCOFF:  Pre- or post-marketing.

9              DR. PAPADEMETRIOU:  Post-marketing.

10             DR. LINCOFF:  Dr. Sager?

11             DR. SAGER:  I don't think that this increase

12   in events that happened after discontinuation

13   represents a hypercoagulable state, but I think

14   still doing some type of study just to exclude that

15   would be beneficial.  Again, I think it's very low

16   yield, but I think it is kind of an important

17   checkbox.

18             DR. LINCOFF:  Dr. Fox?

19             DR. FOX:  I just throw my vote in with

20   Vasilios and Philip about those two issues should

21   be further investigated post-marketing.

22             DR. LINCOFF:  So this is not a question, but

1   just a point of clarification for me.  Is there

2   anybody here who thinks that the transitioning of

3   anticoagulation to warfarin needs to be studied

4   before marketing for this, or is everyone willing

5   to accept the sponsor's plan, and then validate

6   that at some point post-marketing?  Is there anyone

7   who would say that needed to be done pre-market?

8           Dr. Krantz, Dr. Emerson?

9           [No response.]

10          DR. LINCOFF:  Okay, all right, just for my

11  curiosity.

12          Are there any other further comments, then?

13  Dr. Temple or Dr. Stockbridge, do you have any?

14          DR. TEMPLE:  No comments.  We don't care

15  about votes either, but we thought the discussion

16  was extremely good, sophisticated, and well

17  informed, and we are very grateful for the

18  discussion.  We really do care about votes a

19  little.  I was just kidding.

20          [Laughter.]

21                        **Adjournment**

22          DR. LINCOFF:  I want to thank the panel for

1  a very stimulating discussion, and the sponsor, and

2  the FDA for their excellent presentations.  Thank

3  you.

4          (Whereupon, at 4:57 p.m., the meeting was

5  adjourned.)