UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: *ALL CASES* | * * | JUDGE ELDON E. FALLON |
| | * * | MAG. JUDGE NORTH |
| | * | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO PRECLUDE JAMES A. REIFFEL, MD (AND ANY OTHER MEDICAL EXPERT'S TESTIMONY) ABOUT ATTORNEY ADVERTISING AND EARLIER CANCER DETECTION FROM ANTICOAGULANT-RELATED BLEEDS**

## I. INTRODUCTION

Dr. Reiffel's personal and anecdotal opinions about attorney advertising and the alleged benefit of cancer detection as a sequela of Xarelto patients' bleeding events are completely unsupported by any scientific literature, and free from the intellectual rigor demanded by experts before their testimony may be presented to a jury. Defendants' efforts to justify the unfounded opinions of their "hired gun" expert do not meld with the strictures imposed on expert testimony under *Daubert*[1] or Fed. R. Evid. 702. Moreover, even if such junk science was found to pass muster (which it should not), it is completely irrelevant to facts of the bellwether plaintiffs, and unduly prejudicial. For these reasons, these matters should be precluded.[2]

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1986).

[2] Nevertheless, in light of the number of pretrial rulings already being asked of the Court, and considering the mutual benefit to the parties in discovering how bellwether trial juries will respond to certain matters in dispute, the PSC respectfully withdraws from the present motion that aspect of Dr. Reiffel's opinion touching upon early cancer detection.

Dr. Reiffel supports his specious opinion about attorney advertising by referencing two articles: an editorial opinion he authored, and another by Dr. Burton.[3] Neither article lends credence to the junk science being purveyed by Dr. Reiffel. Dr. Reiffel's editorial is by its very nature simply his personal commentary – not an analysis employing the scientific method. The Burton article recognizes its own "significant limitations" and concludes that inferences about attorney advertising on patient care "*cannot be definitively known*."[4]  Notwithstanding this morass of scientific uncertainty, Defendants steadfastly attempt to justify Dr. Reiffel's frolic into commentary as something based on scientific fact. Their justifications are as unfounded as are Dr. Reiffel's opinions.

**II.    ARGUMENT**

   **A.  Dr. Reiffel's *Ipse Dixit* Opinion Regarding the Effects of Attorney Advertising is Not Based on What is Known and Should Be Excluded**

To rationalize Dr. Reiffel's departure from *Daubert*'s norms, Defendants employ misdirection. They contend that, Plaintiffs' experts, e.g., Dr. Leissinger, Dr. Plunkett, Dr. Maggio and Mr. Backes, all refer to Medwatch adverse event reports to support the claim that Xarelto has a higher reported rate of adverse events, and thus Dr. Reiffels' reliance on reporting on the Medwatch reports from the Burton article is no different. Plaintiffs' experts, however, are using the Medwatch data for the facts they provide: statistics of adverse events. All parties can agree that "[t]hese reports . . . are a cornerstone of the nation's system for monitoring the safety of prescription drugs after FDA marketing approval."[5]

---

[3] These two articles were attached to Plaintiffs' initial motion as Exhibits B and C, respectively.

[4] Plaintiffs' Exhibit C, Burton article, at 249 (emphasis added).

[5] *See* Defendants' Exhibit G, ISMP, QuarterWatch Q4 2015, at 1.

Where Plaintiffs part ways with Defendants is Dr. Reiffel's leap from the incidence rate of adverse event reports to gleaning the effect of legal advertising on those that take and/or discontinue Xarelto. The Burton article does indeed cite to Medwatch reports, but highlights the "obvious numerous and significant limitations" of the Medwatch reports for the purpose of determining the effects legal advertising has on patients stopping Xarelto therapy.[6]  For example, the study was not able to decipher those patients who ceased using Xarelto and did not experience any adverse events, or those who suffered an adverse event but did not report it.  Additionally, the Burton article concedes that, "while these forms clearly states that patients viewed legal advertising and stopped their rivaroxaban, *this cannot be definitively known*."[7]  The authors, recognizing the limitations of the article, note the purpose is "to highlight the importance of following anticoagulant prescribing information, and that physicians should emphasize the patients should not stop anticoagulants without medical consultation."[8]  Thus, the purpose of the article is to instruct doctors on points to discuss with their anticoagulants patients.

Undeterred from the lack of certainty provided by the Burton article, Dr. Reiffel leaps to conclusions in his own editorial – an editorial that is even more problematic than the Burton article as it is the paradigm of anecdotal evidence.  Dr. Reiffel states that after seeing legal advertising, "many patients have discontinued NOAC therapy" and "I have encountered such a patient on more than one occasion."[9]   Terms like "many" and "more than one" does not a statistic make,

---

[6] *See* Plaintiffs' Exhibit C, Burton Article, at 249.

[7] *Id.* (emphasis added).

[8] *Id*.

[9]  Plaintiffs' Exhibit B, Reiffel Article, at 1.  Importantly, Dr. Reiffel provides no objective evidence that such patients exist or have been encountered.  There is no possible way for the Plaintiffs to even cross examine Dr. Reiffel on this point as there is no basis for the assertion beyond his pure *ipse dixit*.

3

particularly when they are supported by unscientific methodology and purely subjective, anecdotal experiences. Recall that, but for science, physicians used to routinely apply leeches.

Therefore, Dr. Reiffel's opinion, which is unsupported by scientific analysis and justified only by his misinterpretation of the Burton article and a reprise of his editorial, fails to pass muster under *Daubert*. In applying *Daubert* and the relevant criteria of Rule 702, the Court must determine if the expert unjustifiably extrapolated from an accepted premise to an unfounded decision. In *Joiner*, the Supreme Court ruled that, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[10] In other words, there must not be too "great an analytical gap between the data and the opinion proffered."[11] Dr. Reiffel's opinions leap from accepted analytic scientific principles regarding the use of adverse event reports to unsupported ones.[12] To be a valid opinion, the expert's opinion must be "based on what is known."[13] Dr. Reiffel has ventured far from valid science, and what is known. Whatever he may be opining about, "application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his

---

[10] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[11] *Id.*

[12] Apparently recognizing this deficiency, Defendants attempt to backfill Dr. Reiffel's unsupported opinion by reference to David N. Juurlink, M.D., Ph.D*., The effect of publication on Internet-based solicitation of personal injury litigants,* Canadian Medical Association Journal, 177(11); 1369 (Nov. 20, 2007).  However, Dr. Reiffel never disclosed, much less relied on, the Juurlink article in his expert report or his deposition, and therefore, reference to the article is misplaced, if not prohibited.  *See* Fed. R. of Civ. P. 26(a)(2)(B)(i) (An expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them.")  Even if it were to be considered, which Plaintiffs' argue it should not, it is a red herring.  The article concludes that "the publication of a study concerning the adverse drug events associated with gatifloxacin led to a rapid, dramatic and sustained increase in Internet-based solicitation for litigants for personal injury claims."  Not only does the article focus on a different drug, but it relates to the ***effect of adverse event reports*** and publications of same ***on attorney advertising*** – the reverse of Reiffel's claims.

[13] *Daubert*, 509 U.S. at 590.

professional peers."[14]  His editorial is not the science of what is known – the Burton article disproves that notion. It is merely the personal commentary of a retained expert. [15]

Finally, Dr. Reiffel's speculative hypothesis about the effects of attorney advertising on patients taking Xarelto is irrelevant to any of the bellwether plaintiffs, and therefore does not "fit" the facts of the bellwether cases so as to be helpful to the jury. Absent this fit, the opinion is not helpful and should be precluded.[16]  For example, Mr. Boudreaux's prescribing physician, Dr. Wong, was asked about attorney advertising and he certainly had an opinion,[17] but none that was relevant to his patient. Dr. Wong did not testify to any relevant facts about Mr. Boudreaux seeing legal advertising that caused him to stop or change his use of Xarelto.[18]   Therefore, the mere fact that Dr. Wong has an opinion about attorney advertising does not bear on Mr. Boudreaux's treatment and is only being presented to portray plaintiff lawyers as complicit in the harm caused to Plaintiffs in general.  The only relevant evidence is that Mr. Boudreaux continued to take his Xarelto and was ordered to stop taking the drug by his doctors due to his severe gastrointestinal bleed – not because he saw a legal advertisement.

---

[14] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997), *citing Navarro v. Fuji Heavy Indus., Ltd.*, 117 F.3d 1027, 1031 (7th Cir. 1997) ("[A] conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence.").

[15] "[C]onjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Per curiam, table op.).

[16] *Daubert*, 509 U.S. at 591 ("'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes…. The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

[17] Dr. Wong's unsolicited legal opinion is that "there should be a law that [says] . . . it's negligent advertising sometimes." Defendants' Exhibit H, Deposition of Kenneth Wong, M.D. (July 11, 2016), at 146:11-13.

[18] *Id.*

Similarly, Kimberly Orr DeAgano (the daughter of the decedent, Mrs. Orr) stated that she believed the Xarelto labels may be misleading because "of the cases that are coming out with issues with this drug."[19] She understands that more cases are coming out, after "[s]eeing the commercials and . . . being aware that there are a lot of cases." *Id*. at 154:17-21. However, Mrs. DeAgano never states: 1) that *her mother* ever saw any legal advertisements; 2) that her mother stopped taking her Xarelto because of seeing an advertisement; or 3) that her mother's injury/death was a result of her stopping taking Xarelto after seeing a legal advertisement. Again, the only evidence that exists related to this issue is that Mrs. Orr continued to take her Xarelto until it was ordered to be stopped by her treating doctors so they could begin the twelve hour wait period to perform emergency surgery due to her intracranial hemorrhage.

These fact witnesses demonstrate nothing except for the fact that legal advertisements exist. Dr. Reiffel's and Defendants' purpose is clear – they want to malign Plaintiffs' counsel and impugn the integrity of Plaintiffs for exercising their constitutional rights to seek redress in this Court. But Dr. Wong's and Mrs. DeAgano's testimony fails to prove that legal advertising had any role in either bellwether Plaintiff's injury. What little probative value there may be, if any, is substantially outweighed by the potential for "unfair prejudice, confusing the issues, and/or misleading the jury." Fed. R. Evid. 403.

Thus, any opinion by Dr. Reiffel (or any of Defendants' experts) on the subject of attorney advertising is unsupported in scientific knowledge and therefore speculative, unhelpful to the jury, prejudicial, confusing, and misleading. By any account, such opinions should not reach the jury.

---

[19] *See* Defendants' Exhibit I, Deposition of Kimberly Orr DeAgano, at 154:8-9.

### B. Plaintiffs' Request to Exclude Dr. Reiffel's Speculation About the Benefits of Early Cancer Detection Through Use of Xarelto Is Withdrawn

Defendants contend that causing patients to have life-threatening major bleeds is a ***benefit*** due to the remote, untested, unproven and completely speculative chance that some unknown patient that will suffer a major bleed due to Xarelto may have a cancer detected while being treated for the bleed. To support this thesis they offer Dr. Reiffel whose second opinion -- "there have been multiple reports of lives saved by bleeding as a consequence of earlier detection of a small cancer"[20] – remains a bald assertion lacking any scientific support whatsoever. Defendants counter that "Dr. Reiffel cites literature supporting this opinion, which is uncontested."[21] This statement is false. Dr. Reiffel has offered nothing to support his speculative opinions about early cancer detection. Nevertheless, as discussed above, fn 1, *supra*, Plaintiffs withdraw this aspect of their motion to exclude Dr. Reiffel's testimony only.

### III. CONCLUSION

For these reasons, and those set forth in their moving papers, Plaintiffs respectfully request that Dr. Reiffel and any other expert be precluded from testifying about the alleged effects of attorney advertising. While Plaintiffs have withdrawn their challenge to Dr. Reiffel testifying to early detection of cancer, Plaintiffs reserve the right to challenge any similar testimony from other Defense experts at trial.

---

[20] Plaintiffs' Exhibit A, Expert Report of James A. Reiffel, M.D., at 14.

[21] *See* Defendants' Brief, at 11.

Respectfully submitted,

Dated:  March 10, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone:  (504) 581-4892
Fax:  (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone:  (504) 522-2304
Fax: (504) 528-9973
Email:  gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 10, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

                                                */s/ Leonard A. Davis*
                                                **LEONARD A. DAVIS**