UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: *ALL CASES* | * * | JUDGE ELDON E. FALLON |
| | * * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO PRECLUDE SPECULATIVE TESTIMONY FROM SIX DEFENSE
EXPERTS ABOUT POTENTIAL OUTCOMES FROM OTHER ANTICOAGULANTS**

**I.    Defendants' Opposition is Based on False Premises.**

Bayer and Janssen's opposition to Plaintiff's motion to preclude speculative expert testimony about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto is based on a false premise: that another anticoagulant will be presented as the "alternative design" required to establish a design defect claim under the Louisiana Product Liability Act ("LPLA"). Defendants' repetitive efforts to misconstrue Plaintiffs' causes of action are no more factually correct in this motion than in the numerous other motions where Defendants have espoused theories of the case that are not being brought by Plaintiffs.

While Defendants correctly state that evidence of an "alternative design" must be presented to support a design defect claim,[1] Plaintiffs do not intend to assert that the alternative design of

---

[1] *See* La. Rev. Stat. § 9:2800.56. Proof of an "alternative design" is not required by Plaintiffs' other cause of action, failure to warn/instruct under La. Rev. Stat. § 9:2800.57.

Xarelto was warfarin or some other New Oral Anticoagulant ("NOAC"). Rather, Plaintiffs intend to assert that the alternative design of Xarelto was the same drug (Xarelto), with the addition of: (1) an anti-Factor Xa assay that would allow a clinician to assess whether to individually tailor the Xarelto dose to appropriately balance the risk/benefit of the drug or to take patients at too high of a bleeding risk off the drug; and/or (2) a reversal agent.[2] Thus, the only basis alleged by Defendants for presenting testimony about the potential outcomes from other anticoagulants – the need to show what would have happened if the proposed alternative design of other anticoagulants had been used – has no merit and is not applicable to the bellwether cases.[3]

Defendants also claim that Plaintiffs are trying to preclude testimony "that Mr. Boudreaux, Jr. and Mrs. Orr had underlying health conditions that predisposed them to a bleeding event on any anticoagulant and that it cannot be shown that other medicines – all of which carry an increased risk of bleeding based on the relevant studies and literature – would have avoided the alleged injuries in this case."[4] That is an overstatement of Plaintiffs' position. Plaintiffs have not sought to preclude any allegations about any underlying health conditions that may have predisposed Mr. Boudreaux or Mrs. Orr to bleeding because, unquestionably, opinions about other potential causes of bleeding are relevant. All that Plaintiffs seek to exclude is the latter part, with regard to what may or may not have happened if Mr. Boudreaux or Mrs. Orr had been using a different

---

[2] For a more detailed description of the design defect claim, please see Plaintiffs' Response in Opposition to Defendants' Joint Motion for Summary Judgment as to Plaintiffs' Design-Defect Claims Under the Louisiana Product Liability Act [Record Doc. 5606].

[3] Defendants' presentation of this argument is disingenuous, at best, given that they acknowledged in their opposition that "alternative methods of treatment are not alternative designs" and "the existence of alternative products does not demonstrate the existence of a specific alternative design." *See* Def. Opp. at 3. Further, Defendants conceded in their opposition that this evidence is only relevant as rebuttal evidence for a theory Plaintiffs are not bringing. *See id.* at 11-12 ("If Plaintiffs are permitted to pursue a theory under the LPLA based on the assertion that other anticoagulant medicines are safer alternatives, Defendants are entitled to rebut those assertions by showing that Plaintiffs cannot rule out that [Plaintiffs] would have experienced a bleeding event on a different medicine.")

[4] *See id.* at 2.

anticoagulant, because such testimony would be speculative and irrelevant, as addressed in Plaintiffs' opening memorandum.

## II. Only Defendants' Experts Have Proposed Presenting Speculative Evidence About Potential Outcomes from Other Anticoagulants.

Defendants have presented excerpts of testimony from two of Plaintiffs' experts – Dr. Leissinger and Dr. Liechty – stating they could not say the bleeding events at issue would not have occurred, or the outcomes would have been different, if Mr. Boudreaux or Mrs. Orr had used a different anticoagulant.[5] These statements were made, however, solely in response to questions asked during the cross-examination portion of their depositions.[6] These statements were not made in their reports,[7] and will not be elicited by Plaintiffs at trial, as Plaintiffs intend to try a case about Xarelto – not some other drug that neither Plaintiff took. Dr. Leissinger and Dr. Liechty instead intend to testify about the bleeding events that actually did occur while Mr. Boudreaux and Mrs. Orr were taking Xarelto.

The cited testimony does not even support Defendants' contention. Rather than agreeing with Defendants' experts that a bleeding event could not be ruled out, Dr. Leissinger testified that she "cannot comment."[8] She could not comment because testimony about whether Plaintiffs would have bled on some other unnamed anticoagulant that Plaintiffs were not taking is rank speculation. Dr. Liechty simply confirmed that he could not say, to a reasonable degree of medical certainty, that Mrs. Orr's outcome would have been any different on some other drug she was not taking.[9]

---

[5] *See id.* at 1, 3.

[6] *See* Defendants' Exhibit A, Leissinger Dep., at 178:8-21; Defendants' Exhibit B, Liechty Dep., at 377:9-14.

[7] *See* Defendants' Exhibit F, Leissinger Report, and Defendants' Exhibit C, Liechty Report.

[8] *See* Defendants' Exhibit A, Leissinger Dep., at 178:10-21 ("I cannot comment on whether he may have bled or may not have bled on any other … drug..").

[9] *See* Defendants' Exhibit B, Liechty Dep., at 377:9-14.

Of course he could not offer such testimony, as it is purely speculative. There is no evidence that Plaintiffs would or would not have bled on any other drug on the market that they were not taking.

Plaintiffs' experts have familiarized themselves with the evidence pertaining to Xarelto. This includes both publicly available information (which they would have pertaining to all anticoagulants) and information that has been provided to them through discovery from Defendants. This latter category of material was limited to information pertaining to Xarelto. Additional information that Defendants' experts may have had regarding other anticoagulants was not available to Plaintiffs' experts, and it was improper and unreliable to question Plaintiffs' experts about other anticoagulants for which they did not have equivalent information. This is especially true given that Plaintiffs are not alleging that Xarelto does not warn about the risk of bleeding.

The core theory of liability is that Defendants failed to instruct doctors how to safely use Xarelto and that, by conducting a simple blood test, people at a high risk of bleeding, like Plaintiffs, can be taken off Xarelto. Whether drugs with different dosing regimens and/or different monitoring requirements could have also lead to a bleed is irrelevant to these cases. The relevant inquiry is whether the specific bleed or the inability to immediately treat the specific bleed of these Plaintiffs would have occurred had Defendants properly warned their physicians – not if some unknown bleed at some unknown time on some unknown other anticoagulant would have occurred.

Defendants also cite excerpts from the reports of four of Plaintiffs' experts – Drs. Leissinger, Liechty, Rinder, and Cerri – that reference other anticoagulants, but none of those references are to statements about what may or may not have happened to Mr. Boudreaux or Mrs. Orr if they had used another anticoagulant. Rather, as evident from Defendants' own

memorandum, the statements were limited to general discussions about the overall risks and benefits of various anticoagulants.[10] Additionally, three of those experts painstakingly cited the studies and literature upon which they relied in making those statements.[11]

Finally, Defendants take the testimony of Plaintiffs' expert, Dr. Cerri, out of context, to try to give the false impression that he thinks Xarelto is the best and safest anticoagulant on the market.[12] When the exchange is read in its entirety, however, it is clear that Dr. Cerri testified that if one were to look only at the anticoagulant properties of the drug, Xarelto is the best, but if one were to look at the complete picture, and at what can and does happen when there is over-anticoagulation, Xarelto is so inferior because of the inability to evaluate or reverse its effects that he does not believe the benefits outweigh the risks.[13] For this reason, he does not prescribe Xarelto to his patients.[14]

### III. Defendants' Experts Remain Unqualified to Testify About Potential Outcomes from Other Anticoagulants

Plaintiffs stand by the statements in their opening memorandum regarding why Defendants' experts are unqualified to testify about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto.[15] It may be true that two of the experts are hematologists (Boniol, Kahn). It also may be true that out of the

---

[10] *See* Def. Opp. at 3 n.2.

[11] *See* Defendants' Exhibit F, Leissinger Report, at 16-17; Defendants' Exhibit C, Liechty Report, at 8-9; Defendants' Exhibit D, Rinder Report, at 18-19.

[12] *See* Def. Opp. at 3.

[13] *See* Plaintiffs' Exhibit 15, Deposition of Gianluca Cerri, MD, FACEP, FAAEM, at 274:10-286:22 (attached). Dr. Cerri became quite frustrated during the exchange, taking issue with defense counsel laughing at his testimony about the life and death situations he faces in attempting to treat Xarelto patients with bleeding events, *see id.,* and calling out defense counsel for "misstating" his testimony about the safety profile of Xarelto, similar to the way that testimony is being misstated here. *See id.* at 286:1-13.

[14] *See id.* at 277:4-6.

[15] *See* Plaintiffs' Memorandum in Support of Motion to Preclude Speculative Expert Testimony About Potential Outcomes from Other Anticoagulants [Record Doc. 5399-1], at 8-10.

5

four non-hematologists, two prescribe anticoagulants (Drs. Johnson and Khatib), three treat patients who take anticoagulants (Drs. Johnson, Khatib, and Eisworth), and two treat patients experiencing bleeding events (Drs. Johnson and Peacock). Those facts, however, are of no consequence. Those experiences do not provide any of those experts with clairvoyance to predict what may or may not have happened if a drug that was not taken had been taken.

Additionally, the scientific support for the opinions of these experts is either non-existent or severely limited. For example, Drs. Johnson and Eisworth claimed they relied on "scientific literature in [the] field," but not even one article has been identified.[16] While the other four experts (Drs. Boniol, Kahn, Peacock, and Khatib) cited a limited number of articles to try to support their broad statements about overall comparative outcomes, it is clear from Defendants' own memorandum that not one of the articles compared Xarelto to any other NOAC; rather, they compared only NOACs (either individually or collectively) to warfarin.[17] So, without any doubt, there is absolutely no support for any statements comparing the potential effects of Xarelto versus the potential effects of any other NOAC. Indeed, Dr. Khatib was adamant in his deposition about the inability to compare NOACs to one another.[18]

As to the limited citations that were provided, many were of studies sponsored by Defendants or performed by consultants for Defendants, some during the pendency of this

---

[16] *See* Def. Opp. at 5-6 (Johnson), 7-8 (Eisworth); *see also* Defendants' Exhibit J, Johnson Report; Defendants' Exhibit Q, Eisworth Report.

[17] *See* Def. Opp. at 4-5 (Boniol), 6-7 (Kahn), 8 (Peacock), and 8-10 (Khatib); *see also* Defendants' Exhibit H, Boniol Generic Report, at 13 n.20 (citing PLoS One); Defendants' Exhibit P, Kahn *Orr* Report, at 9-10 (citing Patel 2011 and Coleman 2016); Defendants' Exhibit T, Peacock *Orr* Report, at 6-7 (citing Lancet 2014 and American Academy of Neurology Study); Plaintiffs' Exhibit 16, Deposition of Sammy Khatib, MD (*Boudreaux*) ("Khatib *Boudreaux* Dep.") (attached), at 43:17-23, 63:13-17 (citing ROCKET, registry data, and randomized studies based on registry data).

[18] *See* Plaintiffs' Exhibit 16, Khatib *Boudreaux* Dep., at 42:11-43:7 ("So, for instance, the comparison of different novel oral agents, one being better than the other, I think you get into trouble without that specifically being addressed in a direct head-to-head comparison…. I would not feel comfortable with the direct comparisons of Xarelto to Pradaxa to Eliquis to Savaysa. But yeah. So with Eliquis versus warfarin from ARISTOTLE, Savaysa versus warfarin from ENGAGE AF and Pradaxa versus warfarin, I think you have to stay in those lines.").

litigation.[19] Also, the studies support only statements about broad overall comparisons between NOACs and warfarin based on retrospective reviews of databases[20] or an observation of only 11 NOAC-ICH patients and 52 warfarin-ICH patients.[21] There were no randomized, double-blinded studies over extended periods to compare statistically significant samples of patients with health conditions similar to those of Mr. Boudreaux or Mrs. Orr to assess the incidence of bleeding, or the severity of bleeding, or the ultimate outcome of bleeding.

## IV.   CONCLUSION

For these reasons, and the reasons stated in Plaintiffs' opening memorandum, Plaintiffs respectfully request that Drs. Boniol, Johnson, Kahn, Eisworth, Peacock, and Khatib be precluded from testifying about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto.

Respectfully submitted,

Dated: March 15, 2017

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

---

[19] *See* Plaintiffs' Exhibit 17, Manesh Patel, et al., *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation,* 365 New England Journal of Medicine 883, at 4/5 (2011) ("Patel 2011") (attached) (supported by Johnson & Johnson and Bayer); Plaintiffs' Exhibit 18, Craig Coleman, et al., *Real-world evidence of stroke prevention in patients with nonvalvular atrial fibrillation in the United States: the REVISIT-US study,* 32 Current Medical Research and Opinion 2047, at 2052 (2016) ("Coleman 2016") (attached) (supported by Bayer); Plaintiffs' Exhibit 19, Duncan Wilson, et al., *Volume and functional outcome of intracerebral hemorrhage according to oral anticoagulant type,* 86 Neurology 360, at 6/8 (2016) (attached) ("American Academy of Neurology Study") (co-authored by Dr. Lip, consultant of and member of the speakers' bureau for Bayer).

[20] *See* Exhibit 18, Coleman 2016, at 2047; Exhibit 20, Christian Ruff, et al., *Comparison of the efficacy and safety of new oral anticoagulants with warfarin in patients with atrial fibrillation: a meta-analysis of randomised trials,* 383 Lancet 955, at 1/3 (2014) ("Lancet 2014") (attached); Exhibit 21, Joel Skaistis, et al., *Risk of Fatal Bleeding in Episodes of Major Bleeding with New Oral Anticoagulants and Vitamin K Antagonists: A Systematic Review and Meta-Analysis,* 10 PLoS One 137444, at 3/15 (2015) (PLoS One 2015") (attached).

[21] *See* Exhibit 19, American Academy of Neurology Study, at 1/8.

                                    Gerald E. Meunier (Bar No. 9471)
                                    **GAINSBURGH BENJAMIN DAVID MEUNIER**
                                    **& WARSHAUER, LLC**
                                    2800 Energy Centre, 1100 Poydras Street
                                    New Orleans, LA  70163-2800
                                    Phone: (504) 522-2304
                                    Fax: (504) 528-9973
                                    Email: gmeunier@gainsben.com

                                    *Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on March 15, 2017, the foregoing memorandum of law was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

                                    */s/ Leonard A. Davis*
                                      **LEONARD A. DAVIS**