

**JOHN F. OLINDE, PLC, PARTNER**

**Direct Dial No: 504-585-7241**
**Direct Fax No: 504-544-6084**
**E-mail: olinde@chaffe.com**

March 27, 2017

**Via ECF**
The Honorable Eldon E. Fallon
United States District Court
Eastern District of Louisiana
Section L, Room C456
500 Poydras Street
New Orleans, LA 70130

Re: **Xarelto (Rivaroxaban) Products Liability Litigation; MDL 2592 - Post Hearing Brief On Defendants' Joint Motion For Partial Summary Judgment On The Ground That Federal Law Preempts Plaintiffs' Dosing, Monitoring, And Other Design-Related Claims (Doc. 5109)**

Dear Judge Fallon:

Defendants submit this letter brief in connection with an issue that arose for the first time during the March 23 oral argument on Defendants' Joint Motion For Partial Summary Judgment On The Ground That Federal Law Preempts Plaintiffs' Dosing, Monitoring, And Other Design-Related Claims (Doc. 5109) (hereinafter, "Dosing & Monitoring Preemption MSJ"). During argument, Plaintiffs referred to the labels for two other products, Pradaxa and Arixtra. Because they had not referenced these labels in their opposition, Plaintiffs acknowledged that Defendants should be permitted to file a supplemental brief, and the Court agreed. *See* Rough OA Tr. 35:12–14, 47:21–48:3.

As an initial matter—and to put Plaintiffs' new argument in context—it is important to keep in mind that Defendants' Dosing & Monitoring Preemption MSJ addresses two different types of claims: (1) Plaintiffs' *design-defect* claims that Defendants should have sold Xarelto in combination with an anti-Factor-Xa assay and/or a reversal agent; and (2) Plaintiffs' separate *failure-to-warn* claim that Xarelto's label should have instructed doctors to use a different test—

New Orleans:  2300 Energy Centre • 1100 Poydras Street • New Orleans, LA 70163-2300 • Tel: (504) 585-7000 • Fax: (504) 585-7075
Baton Rouge:  103 Two United Plaza • 8550 United Plaza Blvd. • Baton Rouge, LA 70809 • Tel: (225) 922-4300 • Fax: (225) 922-4304
Houston:  801 Travis Street, Suite 1910 • Houston, TX 77002 • Tel: (713) 546-9800 • Fax: (713) 546-9806
Lake Charles: One Lakeshore Drive Suite 1640A • Lake Charles, LA 70629 • Tel: (337) 419-1825 • Fax: (504) 585-7075
www.chaffe.com

March 27, 2017
Page 2

Neoplastin PT—to determine whether particular patients should take Xarelto. All three claims are also subject to *Daubert* challenges. But as to preemption, Defendants have explained that federal law forecloses each claim, most fundamentally because Defendants could not "independently" or "unilaterally" do what Plaintiffs' claims would require. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011); *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). To be clear, Plaintiffs' new argument—about the Pradaxa and Arixtra labels—relates ***only*** to the failure-to-warn claim. It has no bearing on Plaintiffs' design-defect claims, which are clearly preempted.

It is also important to keep in mind that while there are three independent reasons why Plaintiffs' failure-to-warn claim is preempted, Plaintiffs' new argument pertains only to one of them. *First*, Defendants could not "independently" recommend in Xarelto's label an off-label use of Neoplastin, which was designed and cleared by FDA for use with warfarin, not rivaroxaban. *See* Defs.' Reply at 9–11. (Incidentally, in response to this point, at argument, Plaintiffs' counsel accused Defendants of misquoting the FDA's classification regulation for Neoplastin. In particular, counsel stated: "Mr. Newsom failed to state the entire description which makes clear that [Neoplastin PT] is a general test. Specifically the FDA states that PT is a general screening device for the detection of possible clotting factor deficiencies." Rough OA Tr. 146:14–17. The Court should read the regulation for itself, for it is in fact Plaintiffs' counsel who stopped reading too early. In the sentence that counsel partially quoted, the regulation continues: "… in the extrinsic coagulation pathway, *which involves the reaction between coagulation factors III and VII, and to monitor patients receiving coumarin therapy* …." 21 C.F.R. § 864.7750(a) (emphasis added).)

*Second*, and separately, there is "clear evidence" that FDA would have rejected Plaintiffs' proposed Neoplastin-related instruction, because FDA repeatedly rejected Janssen's proposal to include very similar language in Xarelto's label. *See* Defs.' Reply at 12–15.

*Third*, and finally, Plaintiffs' proposed Neoplastin-related instruction is a "monitoring recommendation" that must (but cannot, absent prior FDA approval) be included in the "Highlights" section of Xarelto's label. *See id.* at 11–12. Plaintiffs' new argument about the Pradaxa and Arixtra labels relates ***only*** to this third basis for finding the failure-to-warn claim preempted—it has no bearing on the other two.

In any event, pointing to the Pradaxa and Arixtra labels, Plaintiffs now contend that Defendants could have invoked FDA's Changes Being Effected ("CBE") rule to "independently" add a statement to Xarelto's label that physicians should use Neoplastin PT measurements to make clinical decisions—and could have done so without making a similar change in the Highlights section of the label, which they seem to acknowledge (as they must) would require advance FDA approval. To be clear, at argument, Plaintiffs' counsel framed Plaintiffs' failure-to-warn claim as a contention that Xarelto's label should have instructed physicians to use a particular test (Neoplastin PT) to make a particular clinical decision—specifically, whether a patient should take the medicine:

March 27, 2017
Page 3

> We are saying basically one test at initiation or maybe once every year thereafter or if there's a clinical change in the condition that you test to see where the patient is at and you make a decision in the United States not to adjust dose, but to make a decision on the risk/benefit.

Rough OA Tr. 97:25–98:5 (Mr. Denton). Significantly, neither Pradaxa's nor Arixtra's label contains the sort of specific clinical instruction that Plaintiffs fault Defendants for failing to include in Xarelto's label. For the reasons explained below, Plaintiffs' new argument fails, and their monitoring-based failure-to-warn argument is preempted.[1]

\*   \*   \*

It is worth emphasizing at the outset that Xarelto, Pradaxa, and Arixtra are different (and different kinds of) medicines. Although a NOAC, Pradaxa is a direct thrombin inhibitor and thus has a different mechanism than Xarelto, a Factor Xa inhibitor. Arixtra is an altogether different kind of drug; it is not even a NOAC. And the products' regulatory histories are quite different, too. Plaintiffs certainly have not suggested, for instance, that FDA repeatedly rejected efforts to include proposed language in Pradaxa's and Arixtra's labels, as it did with respect to Xarelto. So to begin with, Plaintiffs' drug-to-drug comparisons are strained on multiple levels. But even setting aside the medicines' molecular and regulatory differences, Plaintiffs' new argument fails as a matter of both law and logic.

***Pradaxa label.*** Plaintiffs first suggested that the body of Pradaxa's label contains a "monitoring recommendation" and that because that recommendation does not appear in the label's Highlights section, their proposed addition to Xarelto's label likewise would not require an amendment to the Highlights section, which by law requires FDA preapproval. But Pradaxa's label does not even have the "Monitoring: Laboratory Tests" section that Plaintiffs say that Xarelto's label requires. *See* Pls.' Opp. 19–20. Moreover, even in the portion that Plaintiffs cited at argument, Pradaxa's label does not contain a "monitoring recommendation"—certainly not the sort of specific clinical instruction that Plaintiffs advocate here, *i.e.*, that doctors should

---

[1] As Defendants have explained in detail, Plaintiffs have no reliable scientific data to support the addition of their proposed instruction. The data to which Plaintiffs point show *only* a linear correlation between PT results and Xarelto *concentration* in patients' blood. But those data do not help Plaintiffs' bridge the gap about which the Court inquired at argument—that is, whether patients using Xarelto exhibit variability in terms of drug concentration at a given dose. *See* Rough OA Tr. 7:2–10 ("The issue is with the plaintiffs' position they take the position as I understand it that it's a variable medicine that it works differently on different people and, therefore, treaters should endeavor to ascertain the effect of the drug and how it's leaving or staying in the body so that they can deal with the administration of the drug."). That is a bridge too far—it is a theory supported *only* by Plaintiffs' litigation experts. There are no reliable data to support Plaintiffs' variability theory, or the related theory that there is a correlation between PT and *bleeding risk* in Xarelto patients. It is no surprise, then, that Plaintiffs have been unable to point to *any* scientist not connected to this litigation (let alone any regulatory agency, including FDA) who believes that PT is a useful metric for making clinical decisions for Xarelto patients. *See* Defs.' Dosing & Monitoring *Daubert* Reply Br. 5–12.

March 27, 2017
Page 4

use a particular device, unapproved for use with Xarelto, to assess whether a particular patient should take the medicine.

Instead, Plaintiffs pointed only to more general statements in Pradaxa's label about the "median" values for the coagulation marker aPTT:

> **12.2 Pharmacodynamics**
> At recommended therapeutic doses, dabigatran etexilate prolongs the coagulation markers such as aPTT, ECT, and TT. INR is relatively insensitive to the exposure to dabigatran and cannot be interpreted the same way as used for warfarin monitoring.
>
> The aPTT test provides an approximation of PRADAXA's anticoagulant effect. The average time course for effects on aPTT, following approved dosing regimens in patients with various degrees of renal impairment is shown in Figure 2. The curves represent mean levels without confidence intervals; variations should be expected when measuring aPTT. While advice cannot be provided on the level of recovery of aPTT needed in any particular clinical setting, the curves can be used to estimate the time to get to a particular level of recovery, even when the time since the last dose of PRADAXA is not precisely known. In the RE-LY trial, the median (10th to 90th percentile) trough aPTT in patients receiving the 150 mg dose was 52 (40 to 76) seconds.

Pradaxa USPI § 12.2 (current; Nov. 2015) (Exh. 1).[2] These general median-value references—to be used as estimates for "the time to get to a particular level of recovery"—bear no resemblance to Plaintiffs' demand in this case, that Xarelto's label provide a specific clinical instruction directing doctors to use a specific PT test (Neoplastin) to determine specific patients' treatment. Unlike the instruction that Plaintiffs advocate here, the information in Pradaxa's label does not constitute a "monitoring recommendation" that must be included in the label's Highlights section. 21 C.F.R. § 201.57(a).

*Arixtra label.* Plaintiffs' reference to Arixtra (an injectable anticoagulant) is even further afield. Plaintiffs directed the Court to the following portion of Arixtra's labeling:

> **5.6   Monitoring: Laboratory Tests**
> Routine coagulation tests such as Prothrombin Time (PT) and Activated Partial Thromboplastin Time (aPTT) are relatively insensitive measures of the activity of ARIXTRA and international standards of heparin or LMWH are not calibrators to measure anti-Factor Xa activity of ARIXTRA. If unexpected changes in coagulation parameters or major bleeding occur during therapy with ARIXTRA, discontinue ARIXTRA. In postmarketing experience, isolated occurrences of aPTT elevations have been reported following administration of ARIXTRA *[see Adverse Reactions (6.5)]*.
>
> Periodic routine complete blood counts (including platelet count), serum creatinine level, and stool occult blood tests are recommended during the course of treatment with ARIXTRA.
>
> The anti-Factor Xa activity of fondaparinux sodium can be measured by anti-Xa assay using the appropriate calibrator (fondaparinux). The activity of fondaparinux sodium is expressed in milligrams (mg) of the fondaparinux and cannot be compared with activities of heparin or low molecular weight heparins. *[See Clinical Pharmacology (12.2, 12.3).]*

---

[2] Activated partial thromboplastin time (aPTT)—like the prothrombin time (PT) test that Plaintiffs reference in this litigation—is a generic coagulation marker. The Xarelto label references aPTT alongside Neoplastin PT. *See* Xarelto USPI § 12.2.

March 27, 2017
Page 5

Arixtra USPI § 5.6 (current; July 2014) (Exh. 2). That language actually proves *Defendants'* point. Although Arixtra's label references "routine coagulation tests such as Prothrombin Time (PT) and Activated Partial Thromboplastin Time (aPTT)," it expressly states that these "are relatively insensitive measures of the activity of Arixtra."

Plaintiffs also pointed to the Arixtra label's reference to "anti-Factor Xa activity . . . measured by anti-Xa assay using the appropriate calibrator (fondaparinux)" and argued that this language is not in the Highlights section. But that argument likewise boomerangs on Plaintiffs. The reference in Arixtra's label that Plaintiffs quote (again) provides no specific clinical instruction of the sort that Plaintiffs demand here—namely, to instruct a doctor to use a particular device as a means of assessing whether a particular patient should take the medicine. And indeed, the only clinical recommendation in Arixtra's section 5.4 *is* included in the Highlights section of Arixtra's label:

---------------------- WARNINGS AND PRECAUTIONS ----------------
- Use with caution in patients who have conditions or are taking concomitant medications that increase risk of hemorrhage. (5.1)
- Bleeding risk is increased in renal impairment and in patients with low body weight <50 kg. (5.2, 5.3)
- Thrombocytopenia can occur with administration of ARIXTRA. (5.4)
- Periodic routine complete blood counts (including platelet counts), serum creatinine level, and stool occult blood tests are recommended (5.6)
- The packaging (needle guard) contains dry natural rubber and may cause allergic reactions in latex sensitive individuals (5.7)

*Id.* Highlights of Prescribing Information, § 5.6. Arixtra's label thus serves to accentuate Defendants' point—that they are unable to "independently" amend Xarelto's label in the way that Plaintiffs' demand because such a change would need to be included in the Highlights section of the label, which all agree requires prior FDA approval. *See* Defs.' Reply at 11–12; Parisian Dep. at 50, 56 (Exh. 19 to Defs.' Dosing & Monitoring MSJ).

\* \* \*

Accordingly, upon examination, Plaintiffs' effort to use other products' labels to escape the significance of FDA's Highlights regulations falls flat. And to be clear, Plaintiffs' contention that enforcement of the Highlights regulations' plain text would "gut" the CBE rule, *see* Tr. 46:23, has been made and rejected before—by FDA itself. In 2013, FDA proposed a labeling rule that, among other things, would have permitted manufacturers using the CBE process to simultaneously—and unilaterally—change accompanying provision of the Highlights section. *See* 78 Fed. Reg. 67985, 67993 (Nov. 13, 2013) ("We are proposing to revise §§ 314.70(c)(6) and 601.12(f)(1) and (f)(2) to remove the limitation on submission of CBE–0 supplements for changes to the Highlights of drug labeling in the PLR format."). *But FDA never approved that rule*—making clear that the current law is precisely as Defendants have described it: Because

March 27, 2017
Page 6

Defendants could not have "independently" added any "monitoring recommendation" (of any sort) to Xarelto's label, Plaintiffs' Neoplastin-related failure-to-warn claim is preempted.

                              Respectfully,

                              CHAFFE McCALL, LLP

                              */s/ John F. Olinde*
                              John F. Olinde

cc:  *(via email)*
      Leonard A. Davis         Andy D. Birchfield, Jr.
      Susan M. Sharko          Gerald E. Meunier
      Steven Glickstein          Brian H. Barr
      Andrew Solow
      James B. Irwin