

**JOHN F. OLINDE, PLC, PARTNER**

**Direct Dial No: 504-585-7241**
**Direct Fax No: 504-544-6084**
**E-mail: olinde@chaffe.com**

April 3, 2017

**Via ECF**
The Honorable Eldon E. Fallon
United States District Court
Eastern District of Louisiana
Section L, Room C456
500 Poydras Street
New Orleans, LA  70130

> Re:  **Xarelto (Rivaroxaban) Products Liability Litigation; MDL 2592 - Post Hearing Reply Brief On Defendants' Joint Motion For Partial Summary Judgment On The Ground That Federal Law Preempts Plaintiffs' Dosing, Monitoring, And Other Design-Related Claims (Doc. 5109)**

Dear Judge Fallon:

Plaintiffs' response to Defendants' post-argument letter brief helpfully narrows the focus of the parties' disagreement in several key respects:

- *First*, Plaintiffs do not dispute that their new argument concerning the Pradaxa and Arixtra labels has no bearing on either of their design-defect claims.  *See* Defs.' Post-Arg. Letter 1–2.

- *Second*, Plaintiffs do not fundamentally dispute that their new argument has no bearing on two of the three bases for finding that federal law preempts their Neoplastin-related failure-to-warn claim—specifically, (1) that Defendants could not have independently recommended an unapproved, off-label use of Neoplastin, and (2) that in any event, there is "clear evidence" that FDA would have rejected Plaintiffs' proposed Neoplastin-related instruction.  *See* Defs.' Post-Arg. Letter 2.

**New Orleans:**  2300 Energy Centre • 1100 Poydras Street • New Orleans, LA 70163-2300 • Tel: (504) 585-7000 • Fax: (504) 585-7075
**Baton Rouge:**   103 Two United Plaza • 8550 United Plaza Blvd. • Baton Rouge, LA 70809 • Tel: (225) 922-4300 • Fax: (225) 922-4304
**Houston:**  801 Travis Street, Suite 1910 • Houston, TX 77002 • Tel: (713) 546-9800 • Fax: (713) 546-9806
**Lake Charles:** One Lakeshore Drive Suite 1640A • Lake Charles, LA 70629 • Tel: (337) 419-1825 • Fax: (504) 585-7075
www.chaffe.com

April 3, 2017
Page 2

- *Finally*, and relatedly, Plaintiffs do not dispute that their proposed instruction to physicians *would* recommend an unapproved, off-label use Neoplastin—and that in initially arguing otherwise, they misstated Neoplastin's FDA classification regulation, 21 C.F.R. § 864.7750(a).  *See* Defs.' Post-Arg. Letter 2.

Plaintiffs' response thus confirms that their new argument pertains **only** to a single aspect of one of their claims—namely, to the question whether, consistent with FDA's "Highlights" regulation, Defendants could have unilaterally added a Neoplastin-related monitoring recommendation to Xarelto's label.  On that issue, Plaintiffs' position continues to mutate and evolve.  Having initially disputed it, Plaintiffs now concede that "[t]he Defendants are correct that they are prohibited from changing the Highlights portion of the label without prior FDA approval." Pls.' Supp. Br. 5.  So too, having initially disputed it, Plaintiffs now acknowledge that the instruction they seek constitutes a "monitoring recommendation" within the meaning of the Highlights regulation.  *Id*. at 3–4.  Even so, Plaintiffs assert that, despite the Highlights regulation, Defendants could have unilaterally added a Neoplastin-related monitoring recommendation to Xarelto's label.  On that score, Plaintiffs are either fundamentally misunderstanding or intentionally obfuscating the governing regulations.

FDA's regulations make absolutely clear that if an item is required to be included in a label's Highlights section, it cannot be added unilaterally but rather requires advance FDA approval.  In particular, the regulations specify that "[a]ny change to the information required by § 201.57(a)"—*i.e.*, information required to be included in the Highlights section—constitutes a "major change" that "require[s a] supplement submission and approval prior to distribution of the product." 21 C.F.R. § 314.70(b)(2)(v)(C).  Section 201.57(a), in turn, expressly states that "monitoring recommendations" must be included in the Highlights section.  21 C.F.R. § 201.57(a)(7).  It follows ineluctably that before any "monitoring recommendation[]" can be added a product's label, FDA must approve it.  No unilateral manufacturer action is permitted.

Plaintiffs' continuing reliance on the CBE regulation is badly misplaced.  It is true, of course, that the CBE rule *ordinarily* permits a manufacturer, if it obtains "newly acquired information," to unilaterally "add or strengthen a … warning … for which the evidence of a causal association satisfies the standard for inclusion in the labeling under 201.57(c) of this chapter." 21 C.F.R. § 314.70(c)(6)(iii).  But as Defendants have explained—and as Plaintiffs tellingly have not disputed—the CBE regulation *expressly exempts from its scope* information that Section 201.57(a) requires to be included in the Highlights section.  In particular, the rule permits "[c]hanges in the labeling to reflect newly acquired information, *except for changes to the information required in 201.57(a) of this chapter (which must be made under paragraph (b)(2)(v)(C) of this section)*." *Id*. (emphasis added).

Last go round, Plaintiffs sought to sidestep the Highlights regulation by asserting that if interpreted in accordance with its plain meaning, it would "gut" the CBE rule—presumably because it would reduce the number of CBE-eligible changes that could be made unilaterally, because some subset of those changes no doubt would require corresponding changes to the

April 3, 2017
Page 3

Highlights section, which require advance FDA approval.  *See* Rough OA Tr. 46:22–24.  Plaintiffs have now abandoned that position in light of the fact (which they do not now deny) that FDA itself has expressly considered that issue but declined to do anything about it.  *See* Defs.' Post-Arg. Letter 5–6.  In their most recent brief, Plaintiffs seem to be offering a new theory tied to a different provision, 21 C.F.R. § 201.57(c).  Although their position is difficult to discern, Plaintiffs appear to contend that Section 201.57(c) provides an alternative route (around Section 201.57(a)) to allow manufacturers to make unilateral changes:  "Defendants now quibble whether this testing amounts to a 'monitoring recommendation' applicable under 21 C.F.R. § 201.57(a), *even though Plaintiffs are asserting such "monitoring" instructions are subject to the CBE provisions of 21 C.F.R. §201.57(c).*"  Pls.' Supp. Br. 3–4 (emphasis added).

To be clear, that is **not** how the CBE rule works.  The provision that Plaintiffs cite, Section 201.57(c), imposes an additional requirement for label changes that fall *within* the CBE rule's scope.  For those changes, the manufacturer must show not only that it has "newly acquired information," but also that its proposed warning rests on "evidence of a causal association [that] satisfies the standard for inclusion in the labeling under 201.57(c)," 21 C.F.R. § 314.70(c)(6)(iii)(A)—which, in turn, specifies "reasonable evidence of a causal association with a drug," *id.* § 201.57(c)(6)(i).  Section 201.57(a) does something altogether different.  It specifies the categories of changes, including "monitoring recommendations," that must be included in the Highlights section—and that are therefore (by dint of Section 314.70(c)(6)(iii)'s plain terms) expressly excluded from the CBE rule's scope and require advance FDA approval.  Because the Neoplastin-related monitoring recommendation that Plaintiffs now advocate falls within Section 201.57(a)'s ambit, it must be included within the Highlights section—and because it must be included in the Highlights section, it cannot be added unilaterally but rather requires FDA's pre-approval.  The governing regulations admit of only one reading, and it forecloses Plaintiffs' position.

Because Plaintiffs have no legal leg to stand on, they seek support in FDA "practice," which they claim suggests (despite the law) what FDA would have done had Defendants attempted to add a Neoplastin-related instruction to Xarelto's label.  Plaintiffs assert that "taken together" the Pradaxa and Arixtra labels "are clear proof of FDA's willingness to incorporate meaningful labeling information …."  Pls.' Supp. Br. 5.  They further assert that FDA would have permitted the "very same type of testing instructions" that Plaintiffs propose here, and that because those instructions exist outside the Pradaxa and Arixtra labels' Highlights sections, a similar instruction here could have been added unilaterally outside the Xarelto label's Highlights section.  Pls.' Supp. Br. 1.

Plaintiffs' reliance on the Pradaxa and Arixtra labels (even as a factual matter) is misplaced in two key respects.  *First*, the Pradaxa and Arixtra labels do **not** include "the very same type of testing instructions" that Plaintiffs advocate here.  (Indeed, Plaintiffs do not deny that Pradaxa's label does not even contain the "Monitoring: Laboratory Tests" section that Plaintiffs say that Xarelto's label should have included.  *See id.* at 2; *see also* Pls.' Opp. to Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5652) at 19–20.)  Most fundamentally, Pradaxa's

April 3, 2017
Page 4

and Arixtra's labels do not have anything close to the specific clinical instruction that Plaintiffs contend that Xarelto's label should have included. As Plaintiffs explained their theory at oral argument, Xarelto's label should have instructed doctors to conduct a Neoplastin PT test "at initiation" of Xarelto—"or maybe once a year thereafter or if there's a clinical change in the condition"—to determine whether the patient is lower than their proposed PT cut-off and then "make a decision . . . not to adjust dose, but to make a decision on the risk/benefit," *i.e.*, whether the patient should use Xarelto at all. Rough OA Tr. 97:25–98:5 (Mr. Denton). Neither Pradaxa's nor Arixtra's label instructs doctors to use (1) a particular test, (2) at a particular time, and (3) to determine the course of treatment based on a particular lab value. For that reason alone, Plaintiffs' argument based on Pradaxa's and Arixtra's labels falls flat.

*Second*, Plaintiffs' argument gains no momentum from their suggestion that Pradaxa's and Arixtra's labels describe the sorts of tests that might be used for patients taking those medicines. *See* Pls.' Supp. Br. 5 ("Taken together, these labels are clear proof of the FDA's willingness to incorporate meaningful labeling information on which laboratory tests are most useful in assessing the anticoagulant effects of these agents."). For starters, that is **not** Plaintiffs' claim here—as already explained, Plaintiffs want an instruction in Xarelto's label directing doctors to conduct a Neoplastin PT test and use the results to make specific clinical decisions. In any event, Pradaxa's label merely describes the median time—measured by the general coagulation marker aPTT—"to get [a patient] to a particular level of recovery." Pradaxa USPI § 12.2 (Doc. 5094-1)). It does not specify any particular threshold value (of the sort Plaintiffs advocate here) at which physicians should make clinical decisions about Pradaxa. To be clear, Xarelto's label also includes general information about the utility of certain coagulation tests. *See* Xarelto USPI § 12.2 (Doc. 5109-3) ("Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin® prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban."). And, as the Court will recall, FDA *rejected* Janssen's attempts to provide in Xarelto's label information about PT values in clinical-trial patients (like the references in Pradaxa's label to the median value of aPTT values in clinical-trial patients). *See* Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5109) at 27; Defs.' Dosing & Monitoring Preemption Reply (Doc. 5678) at 13. The same is true with regard to Arixtra's label, which provides general information that certain tests are "insensitive measures of the activity of Arixtra." Arixtra USPI § 5.6 (Doc. 5094-2). Janssen recommended similar information for inclusion in Xarelto's label, but FDA rejected it. *See* Doc. 5678, at 13. Finally, as Defendants have explained, although Plaintiffs note that Arixtra's label states that anti-Factor Xa activity "can be measured by anti-Xa assay using the appropriate calibrator" (Arixtra USPI § 5.6), there is currently no FDA-approved anti-Factor Xa assay that is calibrated to Xarelto. *See* Doc. 5678, at 4–5.

April 3, 2017
Page 5

      Neither the law nor FDA's practice in connection with the Pradaxa and Arixtra labels provides any support for Plaintiffs' position that their Neoplastin-related failure-to-warn claim can survive preemption. The Court should find that federal law preempts that claim, just as it preempts Plaintiffs' design-defect claims.

                                      Respectfully,

                                      CHAFFE McCALL, LLP

                                      */s/ John F. Olinde*
                                      John F. Olinde

cc:    *(via email)*

| | |
|---|---|
| Leonard A. Davis | Andy D. Birchfield, Jr. |
| Susan M. Sharko | Gerald E. Meunier |
| Steven Glickstein | Brian H. Barr |
| Andrew Solow | |
| James B. Irwin | |