UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *          14-MD-2592
PRODUCTS LIABILITY LITIGATION *
                              *          Section L
                              *
Relates to:  All Cases        *          March 23, 2017
                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


ORAL ARGUMENT BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida 32502


For the Plaintiffs:          Levin Sedran & Berman
                             BY:  FREDERICK S. LONGER, ESQ.
                             510 Walnut Street, Suite 500
                             Philadelphia, Pennsylvania 19106


For the Plaintiffs:          Schlichter Bogard & Denton, LLP
                             BY:  ROGER DENTON, ESQ.
                             100 S. Fourth Street, Suite 1200
                             St. Louis, Missouri 63102


For the Plaintiffs:          The Lambert Firm
                             BY:  EMILY C. JEFFCOTT, ESQ.
                             701 Magazine Street
                             New Orleans, Louisiana 70130

Appearances:

For the Defendants:            Irwin Fritchie Urquhart
                                 & Moore, LLC
                               BY:  JAMES B. IRWIN, ESQ.
                               400 Poydras Street, Suite 2700
                               New Orleans, Louisiana 70130


For the Defendants:            Bradley Arant Boult Cummings, LLP
                               BY:  KEVIN C. NEWSOM, ESQ.
                               1819 5th Avenue N
                               Birmingham, Alabama 35203


For the Defendants:            Drinker Biddle & Reath, LLP
                               BY:  RODNEY M. HUDSON, ESQ.
                               50 Fremont Street, 20th Floor
                               San Francisco, California 94105


For the Defendants:            Drinker Biddle & Reath, LLP
                               BY:  SUSAN M. SHARKO, ESQ.
                               600 Campus Drive
                               Florham Park, New Jersey 07932


For the Defendants:            Barrasso Usdin Kupperman
                                 Freeman & Sarver, LLC
                               BY:  RICHARD E. SARVER, ESQ.
                               909 Poydras Street, Suite 2400
                               New Orleans, Louisiana 70112


Official Court Reporter:       Toni Doyle Tusa, CCR, FCRR
                               500 Poydras Street, Room B-275
                               New Orleans, Louisiana 70130
                               (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**INDEX**

|  | Page |
|---|---|
| Oral Argument | |
| Kevin C. Newsom, Esq. | 4 |
| Brian H. Barr, Esq. | 20 |
| Kevin C. Newsom, Esq. | 43 |
| Rodney M. Hudson, Esq. | 58 |
| Frederick S. Longer, Esq. | 70 |
| Rodney M. Hudson, Esq. | 78 |
| Frederick S. Longer, Esq. | 81 |
| James B. Irwin, Esq. | 85 |
| Frederick S. Longer, Esq. | 93 |
| Susan M. Sharko, Esq. | 95 |
| Roger Denton, Esq. | 108 |
| Susan M. Sharko, Esq. | 122 |
| Richard E. Sarver, Esq. | 124 |
| Brian H. Barr, Esq. | 132 |
| Richard E. Sarver, Esq. | 143 |
| James B. Irwin, Esq. | 148 |
| Emily C. Jeffcott, Esq. | 160 |
| James B. Irwin, Esq. | 172 |

<u>**PROCEEDINGS**</u>

**(March 23, 2017)**

1
2
3          **THE COURT:**  Be seated, please.  Good morning, ladies
4     and gentlemen.
5               Call the case, please.
6          **THE DEPUTY CLERK:**  MDL 2592, *In Re:  Xarelto Products*
7     *Liability Litigation.*
8          **THE COURT:**  Liaison counsel, make your appearance for
9     the record, please.
10         **MR. BARR:**  Your Honor, Brian Barr for the plaintiffs.
11         **MR. IRWIN:**  Good morning, Your Honor.  Jim Irwin for
12    the defendants.
13         **THE COURT:**  We are here today on a number of motions.
14    Several motions have been filed.  We will only have oral
15    argument on six.  The parties have given to me a list of the
16    motions.  We will take them in order.  The first one is the
17    defendants' preemption motion.
18         **MR. NEWSOM:**  Good morning, Your Honor.  May it please
19    the Court.  Kevin Newsom on behalf of the defendants.  I'm your
20    leadoff batter.  My specific task, as Your Honor has already
21    mentioned, is to argue the document listed at 5109, defendants'
22    motion for summary judgment on the ground that federal law
23    preempts plaintiffs' dosing, monitoring, and other design-
24    related claims.
25               As Your Honor knows from the briefing in the

08:58

1   case, plaintiffs have now expressly abandoned a number of the

2   claims that they had originally articulated, including several

3   that were once subject to my motion; namely, that Xarelto's

4   15- and 20-milligram doses are too high, that the once-daily

5   dosing regime is unreasonably dangerous, and that doctors

6   should be instructed in certain circumstances to adjust their

7   patients' doses.

8          It is our contention that whatever else you do

9   in response to these motions, in order to enhance the

10  efficiency and, frankly, the fairness of the trial proceedings,

11  you should enter an order dismissing with prejudice the claims

12  plaintiffs have abandoned.

13         As matters now stand for purposes of this

14  motion, plaintiffs really are only pursuing three claims:  two

15  what I will call combination product design defect claims and

16  one monitoring related failure-to-warn claim.

17         I will just introduce them briefly.  The first,

18  the principal, or as plaintiffs have called it, the actual

19  design defect claim, is that defendants had a state law

20  obligation to develop and market Xarelto in combination with an

21  altogether separate product; namely, this anti-factor Xa assay.

22         Second, there is what I have called an also-ran

23  design defect claim, so-called because the plaintiffs have

24  flagged it, but they haven't really developed it in the papers.

25  But that is a contention that defendants had a state law

09:00

1  obligation to develop and market Xarelto in combination with

2  another, separate product, a reversal agent.

3          Finally, there is this monitoring-related

4  failure-to-warn claim that Xarelto's label should have

5  instructed doctors to assess patients' coagulation status using

6  a different test, not the anti-factor XA assay but, instead, a

7  prothrombin time test, specifically using the Neoplastin

8  reagent.  I hope to convince you this morning that all three of

9  those claims are preempted by federal law.

10          First some good news.  The parties, I think,

11  disagree about plenty, but I don't think there is fundamental

12  disagreement about the standard that Your Honor should use in

13  assessing these preemption claims.  This standard arises out of

14  the Supreme Court's trilogy of cases in *Levine*, *Mensing*, and

15  *Bartlett*.  Those cases apply fundamentally the same standard,

16  and it is essentially this:  The question, for impossibility

17  purposes, is whether the defendant, the drug manufacturer,

18  could independently or, in *Levine*'s terms, unilaterally do

19  under federal law what state law requires.  Then the Court

20  clarifies that where a party can't satisfy its state duties

21  without the federal government -- in this case the FDA's

22  special permission and assistance, that is, the FDA's further

23  approval -- then it cannot act independently.

24          So I will ask Your Honor, as you consider these

25  claims, in turn, to ask yourself:  Could the defendants have

09:01

1   done what plaintiffs are requesting all by themselves,

2   unilaterally, independently, without the involvement of FDA?

3   If the answer is yes, then I have to concede that the claims

4   are not preempted.  However, if the answer is no, if defendants

5   would have had to get additional FDA approval to do what

6   plaintiffs are requesting, then the claims indeed are

7   preempted.

8                Let's tackle plaintiffs' claims.  I'm going to

9   handle the pure design defect claims first, and then we will

10  deal with the failure-to-warn claim.

11               The first principal or actual design defect

12  claim, again, is that defendants have this obligation to market

13  Xarelto in combination with an anti-factor Xa assay.  To be

14  clear, that claim is not that Xarelto as currently designed,

15  approved, and sold is not safe and effective or that it should

16  be pulled from the market.  It's not a contention, as

17  pharmaceutical plaintiffs typically make, that Xarelto's label

18  fails to warn about the adverse event, that is, bleeding the

19  plaintiffs claim to have suffered.

20               It is also not, in the wake of the briefing,

21  even what one might call a traditional design defect claim.  It

22  is not a contention that Xarelto's compound or composition

23  should be reconfigured in some way.  Instead, it is this much

24  more aggressive design defect claim that defendants had this

25  obligation to design and market Xarelto in combination with an

1  altogether separate and separately regulated product; namely,
2  this anti-factor Xa assay.
3           Now, whatever preemption analysis might pretend
4  for the claim the plaintiffs have not made, that claim, we
5  contend, is preempted.  It is preempted for a simple and
6  straightforward reason.  I think it's a reason that plaintiffs
7  have not fundamentally disputed.  The assay that plaintiffs
8  propose is an altogether separate product, separately regulated
9  medical device that would require its own separate FDA
10  approval.  The plaintiffs concede, as they must, that at
11  present there is no Xarelto-specific anti-factor Xa assay that
12  has been approved by FDA.  The FDA said as much in October of
13  2015.  It's as true now as it was then.
14           These DOAC drugs like Xarelto were approved
15  without a requirement for monitoring.  Currently manufacturers
16  are developing devices to assess the effect or concentration of
17  these drugs, but there are currently no clear or approved
18  devices that measure that.  What that means, at No. 3 here, is
19  that plaintiffs' proposed assay would require an entirely new
20  round of FDA review and approval.
21           So back to the question that I asked Your Honor
22  to consider as we march through these claims:  Could defendants
23  have done what plaintiffs are demanding here, that is, to haul
24  off and market an anti-factor Xa assay in combination with
25  Xarelto all by themselves, without FDA's permission and

09:04

1   assistance?  It seems to me the clear answer is no.  And

2   because they could not have acted independently or

3   unilaterally, that claim is preempted.

4           **THE COURT:**  See, as I read the documents, though, to

5   some extent I see y'all are passing in the night.  You are

6   arguing one thing and they are arguing another.  They take the

7   position that what they are doing -- what their position is, is

8   for you to alert treaters that there is an antidote available

9   and that the -- they are not saying that you should market it.

10  They are simply taking the position, as I understand it, that

11  you failed to advise treaters of the mode or method -- or a

12  safer or a better method of treating with Xarelto.

13          In most of the drug cases that I have been

14  involved in or at least know something about, the problem that

15  the plaintiffs complain of is something happening that is a

16  side effect or a risk of the drug, that the drug is designed to

17  treat one thing and it causes another thing.  That's not the

18  position here.

19          The position here -- as I understand it, this is

20  a blood thinner.  It works.  It should be a blood thinner.  It

21  is a blood thinner.  People take it and it works.  It's a blood

22  thinner.  The issue is the plaintiffs' take the position, as I

23  understand it, that it's a variable medicine, that it works

24  differently on different people and, therefore, treaters should

25  endeavor to ascertain the effect of the drug and how it's

09:06

1    leaving or staying in the body so that they can deal with the

2    administration of the drug.

3              As I understand it, the drug in the body is

4    secreted two-thirds by the liver and one-third by the kidneys;

5    and if people have different functions of kidneys and liver,

6    there's a different amount of residual in the patient.

7    Therefore, the treater should do something before they just

8    administer the one pill.  At least that's what I understand

9    their issue is.

10             **MR. NEWSOM:**  I think, for preemption purposes,

11   Your Honor, it's important to distinguish between two things

12   going on with the case.  The plaintiffs made very clear in

13   their opposition briefing that they have a pure design defect

14   claim, which is about this anti-factor Xa assay.  That's not a

15   warnings-based claim; that's a design claim.  They've called it

16   their actual design defect claim.  That's all we were talking

17   about to this point.

18             There is, with respect to Neoplastin PT, a

19   warnings-based claim, which I will get to in a moment.  But the

20   first two claims here you see in the first two columns, the

21   anti-factor Xa assay and the reversal agent, those, to be sure,

22   are claims that the defendants had an obligation to bring this

23   product, Xarelto, to market in combination with other products;

24   namely, the assay and the reversal agent.  Those are not

25   fundamentally warnings-based claims.  When we get to

09:08

1   Neoplastin PT, that is a warnings-based claim, and I certainly

2   want to address Your Honor's concerns with respect to that.

3          **THE COURT:**  Okay.

4          **MR. NEWSOM:**  Then you will have Ms. Sharko, who is

5   much more steeped in the science than I, to discuss the science

6   with you when you are talking about *Daubert*.

7                 With respect to the reversal agent, that claim,

8   too, fails or is preempted for the same basic reasons.  Again,

9   the reversal agent is indeed a separate part and a separately

10  regulated product, likely a biologic.  Whereas the

11  anti-factor Xa is a device, this is likely a biologic, but

12  subject to separate FDA approval.  The plaintiffs concede, as

13  they must, that there is currently no reversal agent that has

14  been approved by FDA for use with Xarelto.  Accordingly, again,

15  plaintiffs' preferred antidote or positive antidote would

16  require an entirely new round of FDA review and approval.

17                 So, again, could defendants have done this

18  unilaterally?  Could they have simply gone to market with a

19  reversal agent in combination with Xarelto without FDA's

20  involvement?  The answer is a clear no.

21                 And so those two design claims, the first two

22  claims on this slide here, are preempted for that reason.

23  Because defendants could not have acted unilaterally under

24  *Levine, Mensing*, and *Bartlett*, those claims, the pure design

25  claims, are undoubtedly preempted.

09:09

1    Now, the more interesting question that
2  Your Honor has posited is whether -- you know what I should do?
3  Before I move on to the failure-to-warn claims, let me just
4  pause briefly so that Your Honor will understand the
5  implications of plaintiffs' positions on the design claims.
6  Plaintiffs' position, in essence, is that the defendants had an
7  obligation to wait even to approach FDA about approving Xarelto
8  until these adjunct products, the assay and the reversal agent,
9  were ready, available, and approvable.  That would have been a
10  catastrophic result.
11    On plaintiffs' reasoning, Xarelto -- which FDA,
12  as Your Honor said, has deemed both safe and effective to
13  prevent strokes -- still wouldn't be on the market, and the
14  reason is because neither the assay nor the reversal agent is
15  yet ready, available, and approvable.  So for the last
16  5 1/2 years, Xarelto wouldn't have been on the market, the last
17  5 1/2 years, when it has served thousands upon thousands upon
18  thousands of patients who otherwise would have suffered
19  debilitating or deadly strokes.  Those people would have
20  suffered mightily.
21    I suspect, before moving on, that when
22  plaintiffs talk to you, we will hear plenty about
23  Judge Feldman's recent decision in *Guidry*.  I want to address
24  *Guidry*.  So I don't run out of time to address the warnings
25  issue that Your Honor is interested in, I will stand down and

09:11

1    deal with *Guidry* in my rebuttal if that's all right with you.

2              THE COURT:  Sure.

3              MR. NEWSOM:  Let's talk about the Neoplastin PT-

4    related failure-to-warn claim.  To recap, this, too, is a very

5    specific allegation that plaintiffs have honed in on in their

6    briefing.  Having initially argued as a design defect matter

7    that defendants had a obligation to market Xarelto with the

8    anti-factor Xa assay, now they are saying, on the warnings

9    side, as Your Honor suggests, that defendants had a duty to

10   instruct doctors, in the label, to use a different test that

11   measures a different marker; that is, the Neoplastin PT test,

12   which measures prothrombin time instead.

13             That claim, too, we submit, is preempted for

14   three independent reasons that I would like to discuss with you

15   briefly.  All of these reasons importantly distinguish the

16   failure-to-warn claim at issue with respect to Neoplastin PT

17   here from the failure-to-warn claim that survived preemption in

18   *Levine*.  Let's just consider those in turn.  I will introduce

19   them and discuss them.

20             Defendants couldn't, Your Honor, unilaterally or

21   independently alter Xarelto's label to recommend what is in

22   effect an unapproved, off-label use of this product,

23   Neoplastin PT.  We will discuss that in a moment.

24             Nor could defendants have independently altered

25   Xarelto's label to add a monitoring recommendation of any sort,

09:12   1   about Neoplastin PT or otherwise.
        2                   Finally, should you find the need to address it
        3   on this record, there is uniquely clear evidence that FDA not
        4   only would have rejected this proposal but, in fact, did reject
        5   it.
        6                   Let's talk about the first reason defendants
        7   could not unilaterally instruct doctors to use Neoplastin PT,
        8   which is a separate and separately regulated product, for an
        9   unapproved, off-label use.  To be clear, Neoplastin was
       10   designed and has been approved by FDA as a prothrombin time
       11   test for use in monitoring patients receiving coumarin therapy.
       12   That's at 21 C.F.R. 864.7750.  That is specifically what the
       13   Code of Federal Regulations recognizes Neoplastin's clearance
       14   for, not Xarelto.
       15                   Neoplastin's label further specifies Neoplastin
       16   is commonly used for monitoring vitamin K antagonists, not
       17   factor Xa inhibitors like Xarelto.  Neoplastin's label
       18   specifically mentions the drug Coumadin, not rivaroxaban.  To
       19   the extent it says anything about Xa inhibitors, the label says
       20   that Neoplastin may be insensitive to certain anti-Xa levels.
       21                   So neither Neoplastin nor any other PT test has
       22   ever been approved by FDA for use with Xarelto.  We saw the
       23   quote earlier.  The FDA said as recently as October 2015 --
       24   it's as true now as it was then -- that there is no approved
       25   test for measuring the concentration or effect of these DOAC

09:14

1    drugs like Xarelto.

2              Again, so what that means is that this proposed

3    Neoplastin-related instruction that Your Honor referred to

4    would have required multiple additional FDA approvals.  The IVD

5    guidance document that we have discussed at some detail in the

6    briefs addresses this very circumstance specifically.  It says

7    that when there is an IVD device like Neoplastin on the market

8    used in conjunction with an existing drug product like warfarin

9    and there is an intention to repurpose that device for use with

10   a different drug product -- as plaintiffs propose here,

11   Neoplastin for Xarelto -- FDA must issue at least three

12   additional approvals.

13             First, they must approve the new use of the

14   device, the new use of Neoplastin, previously cleared for use

15   with warfarin, to be used with Xarelto.

16             Second, FDA must approve an amendment to

17   Neoplastin's label to specify use with Xarelto.

18             Correspondingly, third, FDA must approve an

19   amendment to Xarelto's label to recommend or to specify use of

20   Neoplastin.

21             Again to the question could defendants have done

22   any of this unilaterally, independently, without FDA's

23   involvement, the answer, again, is a clear no.  And because

24   defendants could not have acted unilaterally, that claim is

25   preempted.

1          Now, there is a second and perhaps even more
2     straightforward reason this PT-related instruction or warning
3     claim is preempted.  That is that the FDA regulations make
4     perfectly clear that a manufacturer may not unilaterally add
5     what is called a monitoring recommendation to the label.
6          Number one, the regulation specified that any
7     item required to be included in the highlights section at the
8     top of page 1 of a label may not be added unilaterally.
9     Instead, any addition to that section of the label requires
10    advance FDA approval.  Importantly, the highlights required
11    information are expressly carved out of the operation of the
12    CBE rule that pharmaceutical plaintiffs typically point to,
13    including in this case, as evidence that manufacturers can
14    unilaterally change the label.  This provision says not with
15    respect to stuff that has to go in the highlights section.
16          So the critical question is:  What has to be in
17    the highlights section and does it cover this case?  Indeed,
18    21 C.F.R. 201.57(a)(7) says that monitoring recommendations are
19    among those items that must be included in the highlights
20    section.
21          So when you put those two together, it tells you
22    that any addition of a monitoring recommendation -- which is,
23    in effect, what plaintiffs' Neoplastin PT-related instruction
24    here would be -- requires advance FDA approval; and because it
25    does so, because defendants could not have acted unilaterally,

09:17

1  that claim is preempted.

2          Now, the final reason -- and then I will sit

3  down and hear what the plaintiffs have to say -- that this

4  PT-related claim is preempted -- and it's a reason, frankly,

5  you don't even need to address unless you disagreed with

6  everything I have said to this point.  But on this record there

7  is uniquely clear evidence that FDA not only would have

8  rejected but, in fact, did reject precisely the sort of

9  PT-related instruction that plaintiffs here have suggested.

10          Now, as Your Honor may know, just yesterday the

11  Third Circuit issued a decision suggesting that clear evidence

12  is typically a fact question that should be left to the jury.

13  I don't necessarily agree with that, but I don't think that you

14  need to disagree with it in order to reach and decide clear

15  evidence for the defendant in this case.  The key difference

16  between that case and this is that in that case the defendants

17  were trying to cobble together a counterfactual story about

18  what FDA might or might not have done under certain

19  circumstances.  Here you don't have to speculate.  Here we have

20  in black and white what FDA, in fact, did.

21          Let me just show you that language.  This is the

22  key language from Janssen's proposed label with respect to

23  Neoplastin PT.  To be clear, Janssen -- not some unaffiliated

24  third-party citizen group, but Janssen, the NDA holder for

25  Xarelto, specifically proposed to include the following

09:18

1   language.  You will see the first sentence beginning in the
2   main strike-out provision:  "The relationship between PT and
3   rivaroxaban plasma concentration is linear and closely
4   correlated."  Second sentence:  "If assessment of the
5   pharmacodynamic effect of rivaroxaban is considered necessary
6   in individual cases, then PT is recommended," specifically, it
7   says "with the Neoplastin PT assay."

8           That's what plaintiffs are asking for here, but
9   FDA specifically struck that language.  Indeed, by my count,
10  Janssen proposed and reproposed that language or some variation
11  of it on five separate occasions, both in connection with the
12  orthopedic label and in connection with the AFib label, and on
13  each occasion FDA refused.

14          Instead, what FDA approved was a very, very
15  different label.  FDA approved a label that didn't make any
16  reference to any linear relationship between PT and
17  concentration, didn't make any reference to Neoplastin PT, and
18  instead said, and I quote:  "The anticoagulant effect of
19  Xarelto cannot be reliably monitored with standard laboratory
20  testing."

21          So given those unique facts, this is a
22  quintessential clear evidence case.  Plaintiffs are left,
23  really, to argue that if only Janssen had proposed this
24  language for a different section, Section 5 rather than
25  Section 12, surely the FDA would have accepted it.  With all

09:20

1    due respect, I don't think that makes any sense.  If FDA really

2    wanted to include the language plaintiffs are proposing now and

3    that Janssen had proposed then, it's inconceivable that they

4    would have just struck it out of hand rather than suggest

5    perhaps that it be promoted seven sections northward in the

6    label.

7                  If ever, we submit, Your Honor, there was a

8    clear evidence case, this is it, although again I will

9    reiterate that I don't think you need to address clear evidence

10   unless you have rejected the other two bases for finding this

11   claim preempted.

12                 Why don't I stop on this slide.  I will

13   summarize briefly, then cede the podium and reserve the

14   remainder of my time.

15                 The key, Your Honor, is that every one of

16   plaintiffs' remaining design- and monitoring-related claims

17   demands that defendants do things that they cannot do now and

18   never could have done all by themselves.  And that, in effect,

19   is the test:  Could defendants have acted all by themselves to

20   do what plaintiffs are demanding?

21                 Rather, every one of plaintiffs' requests to

22   sell Xarelto in combination with a new and as yet unapproved

23   assay, to sell Xarelto in combination with a new and as yet

24   unapproved reversal agent, and to add a Neoplastin-related

25   monitoring recommendation to Xarelto's label would have

09:21

1    required FDA's permission and assistance; that is, FDA's

2    further approval.  Under the clear teaching of *Levine* and

3    *Mensing*, and *Bartlett*, that means those claims are preempted.

4            Thank you, Your Honor.  I will reserve the

5    remainder of my time.

6            **THE COURT:**  Thank you.

7            Let me hear a response.  He says your claims are

8    preempted.  He wonders what you are doing here.

9            **MR. BARR:**  Sometimes he makes me wonder that myself.

10           Before I get started, I do want to hand to the

11   Court and to opposing counsel two opinions that are not in the

12   briefing.  One is the *Fosamax* opinion that came out yesterday.

13           May I approach?

14           **THE COURT:**  Yes.

15           **MR. BARR:**  Second is the *Young* case, out of the

16   Northern District of Mississippi, that came out in

17   February 2017.

18           As soon as I have my visual aid, I will start.

19           Your Honor, plaintiffs oppose defendants' motion

20   to preempt our claims related to Neoplastin PT and the failure

21   to warn and their attempt to prove, which is their burden, that

22   our design defect claims are preempted.  It is the defendants'

23   burden.  They are obligated to show by clear evidence that it

24   would be impossible -- that's a large standard under federal

25   law -- to comply with both federal standards as established by

09:23

1   the FDA and their state law duties under the Louisiana Products

2   Liability Act to sell products that are not unreasonably

3   dangerous.

4           Impossibility preemption, as *Wyeth v. Levine*

5   laid out, is a demanding defense.  As the *Fosamax* court laid

6   out yesterday, it is generally a fact question for the jury

7   unless the defendants are able to show by clear evidence that

8   the claim is preempted.

9           I want to read to you, Your Honor, a portion of

10  the *Fosamax* opinion that I think is relevant.  This is the

11  third paragraph of the opinion.  It says:

12          "Preemption is an affirmative defense, and Merck

13  has not carried its burden to prove that it is entitled to that

14  defense as a matter of law.  The *Wyeth* clear evidence standard

15  is demanding and fact-sensitive.  It requires the fact finder

16  to predict a highly probable outcome in a counterfactual world

17  and, therefore, requires a court sitting in summary judgment to

18  anticipate both the range of conclusions that a reasonable

19  juror might reach and the certainty with which the juror would

20  reach them.  Here, plaintiffs have produced sufficient evidence

21  for a reasonable jury to conclude that the FDA would have

22  approved a properly worded warning about the risk of thigh

23  fractures or, at the very least, to conclude that the odds of

24  FDA rejection were less than highly probable.  Under *Wyeth* and

25  Rule 56, that is enough for plaintiffs to defeat summary

09:25

1    judgment and proceed to trial."

2            **THE COURT:**  They take the position that they

3    requested it, the very language you want, and the FDA said no.

4            **MR. BARR:**  Your Honor, I'm going to get into that in

5    a little bit.  I'm going to address the design defect case

6    first and then get into the PT argument.

7            I think what you will see when you lay out the

8    chronology of what actually happened at FDA, at the point the

9    FDA struck the PT language in June of 2011, there were two

10   different NDAs proceeding forward at the same time.  Our case

11   is primarily dealing with the cardiorenal division.  That's the

12   AFib indication.  That was lagging behind the hematology

13   division, which was the orthopedic surgery indication.

14           It was the folks in the hematology division who

15   had concluded, as a result of their analysis of the RECORD

16   studies, that there was not a relationship between PT and bleed

17   risk that struck that language.

18           The people on the AFib side never made that

19   decision.  You will see that.  Their actual finding was that

20   there is a linear relationship and there is a correlation

21   between Neoplastin PT and bleed risk.  And it's our view at

22   that point in time it was defendants' obligation to come

23   forward with new language.  They have argued throughout the

24   briefing and in oral argument today that, well, if the FDA

25   wanted to do something, they could have done it.

09:26

1          That may or may not be true, but that's not the

2    standard.  As *Wyeth* laid out, it is their burden to maintain

3    the adequacy of the label, not the FDA.  And what the clear

4    evidence shows is that at the point they struck that language

5    and at the point the different divisions' analysis of ROCKET, a

6    different study, gave a different result, they did nothing.

7    They proposed no new language.  But I will talk about that a

8    little more once we get into it.

9          Now, the preapproval design defect claim is also

10   not preempted by *Bartlett*.  I think plaintiffs have to agree

11   that if we were talking about a design change postapproval,

12   that we would be preempted.  But that's not what we are talking

13   about.  We are talking about the type of process where they

14   should have submitted a reasonable design at the point of

15   approval, prior to the FDA ever making a decision.  And that is

16   specifically allowed under *Guidry*, and it's specifically

17   allowed under *Yates*.  The only case -- I mean not *Yates; Young*,

18   the case I handed you today.

19          **THE COURT:**  Yes.

20          **MR. BARR:**  They cite to the Sixth Circuit and say,

21   well, that's the reasoning you should follow, the

22   Sixth Circuit.

23          Well, *Guidry* makes the very clear proposition

24   that if you accept what *Yates* says, no resident in the state of

25   Louisiana, regardless of the facts, could ever bring a design

1    defect claim for an approved drug.  That's what they are

2    saying, that once the FDA puts their seal of approval on it,

3    design defect is barred forever.  They want to point to *Guidry*

4    being a Rule 12 or *Young* being a Rule 12 and *Yates* being a

5    Rule 56.  It really doesn't matter.  Their argument doesn't

6    depend upon the facts.  Their argument is purely the FDA

7    blessed it, so you move on.

8              *Guidry* says that's not what you do.  *Guidry* says

9    that it is not too far attenuated for a plaintiff to submit

10   evidence that a different design, a safer design would have

11   also been approved by the FDA.  Jurors do that every day in the

12   design defect context.  They are looking at a hypothetical

13   situation.  So this isn't uncommon, and we don't believe that's

14   preempted, Your Honor.

15             Now, one of the things they talked about this

16   morning and they talked about in their briefing is this idea of

17   dismissal of what I will call facts.  They are saying that the

18   idea of once-a-day dosing or the higher dose or the lack of a

19   reversal agent, those types of things, are things that we have

20   abandoned.  Well, that's not true, Your Honor.  Our theory all

21   along has been that it was their obligation to warn doctors --

22   you said it this morning -- their obligation to warn doctors

23   about the availability of Neoplastin PT to assess bleeders.

24   That has always been our core theory.

25             Things like once-a-day dosing versus twice-a-day

09:30

1    dosing, 20-milligram pill rather than a 15-milligram pill,

2    those are facts that support our theory.  It is because they

3    designed this drug as once a day.  If you design a drug as once

4    a day, you have to give somebody a higher dose to have 24-hour

5    anticoagulant effect.  It is because they don't have a reversal

6    agent that we have to give doctors the ability to identify

7    people at high bleed risk, people they are putting at high

8    bleed risk purely because of the design of the drug.  That's

9    why the test is necessary, and that's why we don't dismiss

10   allegations.  We dismiss causes of action.  They haven't moved

11   to dismiss causes of action, and now they have attached -- I

12   think it's Exhibit 47 -- a proposed order dismissing all these

13   specific allegations in the *Boudreaux* and *Orr* complaint.

14           Your Honor, I would suggest, if you are inclined

15   to consider that, that is something that has to be briefed by

16   the parties.  They have thrown that in, in their reply brief,

17   and now suggested you should do this.  I don't think it's

18   proper, to start with, particularly when you consider that

19   these are facts in support of our claims.  If they want to file

20   a motion in limine, we could have that argument, but it's not

21   proper to dismiss them, particularly the way they are trying to

22   do it, by throwing it into a group like this.

23           **THE COURT:**  What is the design defect you see in this

24   drug?

25           **MR. BARR:**  Our design defect claim -- here it is.

09:31

1    The design defect claim is that Xarelto is unreasonably

2    dangerous in design because prior to approval, defendants

3    failed to develop and incorporate into the design of the drug a

4    Xarelto-calibrated, anti-factor Xa assay that allows doctors to

5    manage patient anticoagulation.  The assay does more than

6    Neoplastin PT.  Neoplastin PT is very effective for determining

7    people at high bleed risk, and it's very effective to determine

8    if somebody has drug on board.

9              So in the situation of Mrs. Orr, she has gone

10   into the emergency room.  She is bleeding.  Her doctor knows

11   she is taking Xarelto.  They look at the label.  It says wait;

12   you have to wait until Xarelto has cleared the system.  They

13   say, We can't do anything.

14              They didn't know and weren't told that

15   Neoplastin PT would have told them and, in fact, did tell them

16   that she had no drug on board, and they could have operated

17   immediately.  That's what Neoplastin PT could do.

18              The anti-factor Xa allows people to tailor a

19   dose.  So if you knew somebody took too much of the

20   20-milligram pill, you could cut the dose down, and you could

21   understand where their concentration was, to know they were

22   getting an effective benefit.

23              So that's what the design defect case is.  We

24   believe, because of the characteristics of the drug as once a

25   day, has no reversal agent, that they needed to design for

09:33

1    this.  That's our reasonable alternative design that is a safer

2    design than what was approved by the FDA.  So according to the

3    reasoning of *Guidry*, of course it would have been approved.

4                Next slide.  Design defect.  I want to remind

5    the Court of a couple of things about the characteristics of

6    the drug.  We have talked about this.  Xarelto has some unique

7    characteristics.  I'm giving this overview because they've

8    attempted to dismiss allegations in our complaint.  Xarelto has

9    these unique characteristics of high inter-patient variability,

10   once-a-day dosing, and lack of a reversal agent.

11               Next slide.  So let's talk about that.  You may

12   remember this slide from Science Day.  This is the concept that

13   you give one group of patients Xarelto, and it's like giving

14   them one pill; and then according to their studies, other

15   people that take that same pill are getting the equivalent of

16   10 doses when they take it.  That, at the time, was when we

17   believed there was a ten-fold difference in concentration.

18   It's the dose that makes the poison.  That's the important

19   concept.

20               So next slide.  This is Exhibit 33 of the

21   defendants' briefing.  Your Honor, let me hand this to you

22   because this was not given to you as part of the defendants'

23   Exhibit 33.  They gave you just an extract of this.  May I

24   approach, Your Honor?

25               They gave you just the one page of this

1    transcript, but this is Dr. Adam Cuker at the University of

2    Pennsylvania.  He made these statements October 26, 2015, at

3    this in vitro diagnostic meeting for DOACs, which at the time,

4    DOACs, NOACs, they are talking about Xarelto, Pradaxa, Eliquis.

5    Those are the drugs they are talking about at this meeting.

6              Dr. Cuker is not my expert; he is not their

7    expert.  He is an independent doctor talking at this meeting,

8    and what he says is that rivaroxaban patients taking

9    20 milligrams daily, the median trough level is 27 micrograms

10   per milliliter, and the 5th to 95th percentage ranges from 6 to

11   87.  That is a 14-1/2-fold difference, so 14-1/2-times

12   difference.  One pill, 14 1/2 pills.  He calls that really a

13   lot of biological variability.  So he says this is significant.

14             Next slide.  The concept of once-a-day versus

15   twice-a-day dosing, this is what I was talking about earlier.

16   If you want to anticoagulate somebody for a 24-hour period with

17   one pill, you have to give them a higher dose.  So what you

18   have seen -- this is data from their studies.  It's simulated

19   data from their studies where they show -- you can see it --

20   the red line is once-a-day dosing.  You go a lot higher with

21   your PT with once a day, and you come down to a lower trough.

22   So you are exposing people to much higher variations in the

23   concentration, and you are putting people at high risk.

24             Next slide.  So because you are putting them at

25   high risk, you have to have a way to identify them.  I have

09:37

1    talked about this one.  We can move on.

2                Now I want to talk about the failure-to-warn

3    claim, Your Honor, and respond to the defendants' assertions

4    about the three bases for saying that our failure-to-warn claim

5    related to the Neoplastin PT is preempted.

6                Next slide.  Under FDA regulations a warning is

7    required if a laboratory test is helpful -- that's the

8    standard, helpful -- in following the patient's response or in

9    identifying possible adverse reactions.  This isn't a

10   suggestion from FDA.  It's not a recommendation.  It's a

11   mandate.  You must do this.

12               It has been proven throughout the study of this

13   drug that Neoplastin PT is a helpful laboratory test for

14   assessing bleed risk.  It meets this standard.  They have not

15   even attempted to put it in the label.

16               Next slide.  The defendants are required to come

17   to you with clear evidence.  They cannot do it.

18               Next slide.  Now, a central premise -- and this

19   is what I was talking about earlier, where they appear to be

20   trying to shift the burden to the FDA.  You heard that this

21   morning:  If the FDA wanted this, they could have required it.

22               *Wyeth v. Levine* makes a very clear point on

23   this.  A central premise of federal drug regulation is that the

24   manufacturer bears responsibility for the content of the label

25   at all times.  It doesn't stop at some point when the FDA

09:39

1   decides you can't do something.  If the evidence changes, you
2   have a responsibility to update your label.  They didn't do it.
3   It is charged with both crafting an adequate label and with
4   ensuring that its warnings remain adequate as long as the drug
5   is on the market.  This is where they fail.
6                   Regulations also allow, despite what they tell
7   you about the highlights section -- and I'm going to explain
8   that to you.  Regulations allow a manufacturer to add or
9   strengthen a contraindication, warning, precaution, or adverse
10  reaction without FDA approval at any time.  That is what they
11  can do.
12                  Now, let's get into this concept that the FDA
13  struck language and wouldn't allow it.  I talked to you about
14  this a little bit, but I wanted to give you a visual because I
15  think a lot of these things, you see the words on the page and
16  it's kind of hard to track what's happening.  So with a visual
17  I think we can kind of see what's happening here.
18                  You had two different NDAs: NDA 22406 is with
19  the orthopedic indication; and NDA 202439.  They were within
20  two different divisions at FDA.  There were different reviewers
21  looking at these studies.  They were looking at different
22  studies, so they weren't analyzing the same things.  They are
23  proceeding forward on a close to parallel track.
24                  The orthopedic indication was approved finally
25  July 2011, and the AFib indication was approved in November of

09:40

1   2011, so approvals lagged four months, but the AFib was clearly

2   behind orthopedic.  And they negotiated the label for

3   orthopedic and finalized it before negotiating the label for

4   AFib.  That's going to be very important, Your Honor.

5           Next slide.  Now, defendants pointed this out to

6   you today.  They put up on the screen language that they had

7   proposed in the orthopedic label.  Now, I will agree that there

8   was similar language proposed for the AFib indication, but I

9   have seen no evidence, defendants have presented no evidence

10  that anybody in the cardiorenal division -- not the hematology

11  division, the cardiorenal division -- ever struck the language

12  that was proposed dealing with AFib.  This is the only language

13  that was ever struck.  This label, the orthopedic label, became

14  the basis for the AFib label.

15          The cardiorenal folks never came back to this,

16  and that's important.  What you end up with is the FDA strikes

17  the proposed language, and they put in that the predictive

18  value of these coagulation parameters has not been adequately

19  studied.  That was their position.  So, of course, they are not

20  going to let them put it in the label.  If they believe that

21  you have not adequately studied the relationship between

22  bleeding risk and PT, they are not going to let you tell

23  doctors about that.

24          Next slide.  This was the finding of the

25  hematology division.  This is Plaintiffs' Exhibit 29.  The

09:42

1    hematology division reviewing RECORD came to the conclusion,

2    the same conclusion the defendants came to, that there was no

3    relationship between PT levels and proportion of patients with

4    major bleeding in the 11527 study and the RECORD study.   The

5    defendants said there is no relationship between PT and

6    relevant bleeding risk.   It almost makes you wonder why they

7    even tried to put the language in there because they clearly

8    decided there's no relationship here.   Hematology agreed.

9              Next slide.   This ends up being the final label

10   for the approved product in July of 2011.   What the defendants

11   managed to get FDA to do is change this last sentence to "The

12   predictive value of these coagulation parameters . . . has not

13   been established" rather than "has not been adequately

14   studied."   So that's where we are on July 1, 2011, with the

15   approval of the orthopedic indication.   This is the view of the

16   defendants.   This is the view of the hematology division at

17   FDA, that there's no relationship.

18             Next slide.   Two months later, August 1, 2011 --

19   this is Plaintiffs' Exhibit 30 -- the defendants received from

20   FDA a report from the office of clinical pharmacology, and what

21   it tells them is the probability of bleeding was associated

22   with PD measurements.   That's PT, Your Honor.

23             But look.   This is cardiorenal; this is not

24   hematology.   Hematology has moved on.   They have approved the

25   orthopedic indication.   We are now on the AFib indication.   The

1    different reviewers reviewing the ROCKET study, not RECORD,

2    come to the conclusion that there's a relationship.

3              Next slide.  Here's the actual report from the

4    cardiorenal division in August of 2011, two months later, two

5    months after the language was struck.  The probability for

6    major bleeding increased with an increase in PT.  Overall the

7    results demonstrated that the risk of bleeding was associated

8    with PD measurements, and they list three different ways of

9    measuring.  The results were consistent with findings from our

10   primary analysis of a PT major bleeding relationship.

11             This is a fundamental change in the evidence.

12   It's newly acquired information that they did nothing with.

13   They ignore it; they don't do anything.  They never go back to

14   FDA and say, Okay, well, since you have found this relationship

15   in our study, let's put this language in the label.  They never

16   do that.  They sit on their hands.

17             Next slide.  Why did they do that?  Well, they

18   knew because they had a meeting with FDA in July of 2011, and

19   they were told that hematology owned the label.  This is

20   defendants' own Exhibit 43 to the motion.  Hematology division

21   was the owner of the label.  Alison is their liaison at FDA.

22   It's Alison Blaus, who is with the FDA.  She is telling them

23   that hematology is the owner of the label.  "Common sections to

24   both indications did not need updating as the cardiorenal

25   division would not rereview them."  So they are only wanting to

1    look at new stuff.  We don't need to go back through the old

2    stuff.

3                    So if these defendants wanted to follow their

4    regulatory obligations and come into this court and say,

5    There's clear evidence that cardiorenal would not have allowed

6    us to use that language, maybe they should have submitted it.

7    They didn't give them that opportunity.  So they used the

8    hematology label, and there was never a discussion on the AFib

9    label itself after this memo where they tried to get the PT

10   language put into the label.

11                   Next slide.  So why did that happen?  This is

12   plaintiffs' exhibit -- I think it's 34 or 35.  I'll give that

13   to Your Honor.  It should be on my slide, but it's not.  This

14   is what they called a label contingency document.  It was

15   attached to an e-mail of June 1, 2011.  So this is around the

16   same time that FDA is striking the PT language in the

17   hematology label.

18                   Defendants are having an internal discussion

19   about whether or not they should propose PT language in

20   Section 5, the warnings section.  Not Section 12.  Section 5.

21   They make the decision and they point out:  Should we have a

22   5.4 laboratory test section like Lovenox?  They point out

23   Pradaxa, their competitor that had been approved at this point,

24   does not have this section.  So it's going to be tough for us

25   to put something in that our competitor doesn't have.  So they

1    decide only if it's requested by FDA.  So we are only going to

2    go to FDA and make this proposal if FDA asks for it.  They

3    didn't, so they never gave it to them.

4              They point out that "This is what we say in

5    Canada."  So they are telling folks in Canada that prothrombin

6    time is influenced by Xarelto in a dose-dependent way and that

7    if you have excessive doses, PT is expected to be outside of

8    the range.  They knew it.  They stayed silent.  They made the

9    decision that they would defend not having any laboratory

10   monitoring statement.

11             Next slide.  So what happened?  You end up with

12   an approved label from cardiorenal.  I have the hematology

13   Section 12.2 on top and the cardiorenal 12.2 on the bottom.

14   They have made a change, but the change the FDA made was to get

15   rid of the statement that the predictive value of these

16   coagulation parameters has not been established because, in

17   cardiorenal's view, at this point it has been.  So they took

18   that out of the label.

19             But what Janssen never gave them -- and,

20   Your Honor, this is Janssen.  They are collaborators on this

21   drug.  Janssen is the NDA holder.  This was their obligation to

22   come forward and say, FDA, you need to put this in the label.

23             They never made that submission.  And the FDA,

24   Your Honor -- next slide.  The FDA made clear that this

25   information should have been utilized as part of the approval

09:50

1    package that came out November 4, 2011.  They attach all these

2    reviews from all these different medical officers.  One of

3    those reviews is a summary review by Dr. Grant, who is the

4    division director.  He writes that FDA has demonstrated that

5    there is a correlation between PT and risk of bleeding, but the

6    applicant has not chosen to utilize this information.  It was

7    their choice, according to the FDA, not to utilize this.

8    "Infrequent monitoring . . . to assure appropriate dosing of

9    drugs that prevent stroke and cause bleeding may improve

10   outcomes and be acceptable to patients."

11          This is giving an indication, If you would have

12   submitted language to us, we would have approved it.  But it's

13   certainly -- this alone defeats the idea there is clear

14   evidence that they have proven that the FDA would have rejected

15   language about Neoplastin PT.  When you look at the entire

16   chronology of events, you cannot come to that conclusion.  You

17   cannot say, for a decision that was made in June of 2011, when

18   the FDA thought there was no relationship between Neoplastin PT

19   and bleed risk, that we know in November of 2011, 2013, 2014,

20   today that FDA would reject that language.  They can't prove

21   that.  They haven't proven it.

22          Next slide.  The evidence on the relationship

23   between PT and bleed risk is continuing to build.  Newly

24   acquired evidence is coming out all the time.  They have done

25   nothing.  They haven't proposed any language to the FDA.  They

09:52

1    haven't pointed out the ROCKET finding.  They haven't sent the
2    FDA these studies and said, Look, we need to put this language
3    in our label.  We are putting patients at really high risk, and
4    we have a way to identify them.  They aren't doing that.  They
5    are not meeting their regulatory obligation.
6               Next slide.  Now, this is interesting.  One of
7    the things I heard was that Neoplastin PT in its label says it
8    might be insensitive to anti-factor Xa inhibitors like Xarelto.
9    Well, that's the same -- Neoplastin PT is the same test they
10   used in their clinical trials to monitor these very parameters.
11   They proved it's extraordinarily sensitive to determine PT with
12   Xarelto and they, Bayer, warns about it.  This is a label in
13   Canada.  Remember, they wouldn't -- Janssen decided "We are not
14   going to give the FDA this language that we put in the label in
15   Canada."
16              Here's what they say in Canada:  The prothrombin
17   time measured in seconds is influenced by Xarelto in a
18   dose-dependent way, and there's a close correlation.  In
19   patients who are bleeding, measuring PT using Neoplastin may be
20   useful to assist in determining an excess of anticoagulant
21   activity.  They not only do that, they also give doctors in
22   Canada a chart that gives the ranges of the 5th to 95th
23   percentile.  That's nowhere in the label either.  They have
24   literally disarmed doctors in the United States from giving
25   them the ability to identify patients that they are putting at

09:54

1    high bleed risks.

2                    Next slide.  So, Your Honor, there's no way that

3    they can show or they have shown that the FDA, after August 1,

4    2011, would have rejected language about PT and bleed risk.

5                    I'm going to try and move through these next few

6    rather quickly.  They are talking about -- their second basis

7    is this idea that Neoplastin PT has to be approved for use with

8    Xarelto.  Well, there's no clear evidence that it would be

9    impossible for Janssen to change their labeling due to the

10   clearance status of Neoplastin PT.

11                   Number one, remember, under the regulations they

12   are required to identify helpful laboratory tests.  A mandate,

13   not a recommendation or suggestion.

14                   Number two, Neoplastin PT is a general

15   coagulation test used in hospitals and laboratories throughout

16   the United States every day.  This isn't some unique device.

17   It is generally approved for testing PT.  It was used in their

18   clinical trials.

19                   Do they really mean to come to this Court and

20   say that "The very test we used to monitor people we put into

21   our clinical trials, we aren't going to tell doctors in the

22   United States about that because our hands are tied"?  They

23   have cited no case, no regulation that says that they can't

24   warn about a test because of its approval or clearance status.

25   The only thing they have cited to you is an FDA guidance

09:56

1    document.

2              Let's go to the next side.  According to the

3    document itself, the guidance, it says:  "This guidance

4    represents the FDA's current thinking on this topic.  It does

5    not create or confer any rights on any person and does not

6    operate to bind FDA or the public."  A disclaimer like that

7    cannot possibly be clear evidence.

8              It goes on to say:  "You can use an alternative

9    approach."  You don't even have to follow the guidance.  But

10   what you do have to do is -- you can follow "an alternative

11   approach if the approach satisfies the requirements of the

12   applicable statutes and regulations."  That's the standard:

13   the statutes and the regulations.  They haven't pointed to one.

14   So, Your Honor, this guidance has no effect.

15             Next slide.  But what do we have?  We have

16   evidence that the FDA will actually allow manufacturers to put

17   language about unapproved testing in their label.  Defendants'

18   Exhibit 33, they talk to you about this.  This is the one they

19   cite where they have the FDA person that says, "DOAC drugs were

20   approved without a requirement for monitoring.  So currently

21   manufacturers are developing devices to assess the effect or

22   concentration of direct oral anticoagulants.  There are

23   currently no cleared or approved devices that measure that."

24   That's the part of the transcript they point out to you, but,

25   again, there's another part of this transcript they didn't show

09:57

1    you.

2            Next slide.  This is Dr. Reilly.  Your Honor,

3    I'm sure you don't know this, but Dr. Reilly was a scientist

4    with Boehringer who was talking at this meeting.  Boehringer is

5    the manufacturer of Pradaxa, their competitor, another DOAC,

6    NOAC, whatever you want to call them; the same type of drug for

7    which there has been no cleared device for approval.

8            What does Dr. Reilly say?  "And the FDA approved

9    last week a label with purposely included aPTT" -- that's not

10   been approved for use us with Pradaxa -- "thrombin time, dilute

11   thrombin time, and ecarin clotting time and the profiles, not

12   necessarily knowing what their value is in an individual

13   patient, but so that the clinicians have some information about

14   what happens to these tests."  The FDA clearly allows it.

15           Your Honor, this wasn't attached to the

16   briefing, but given that they didn't show you this --

17           And if you guys want to brief this or whatever,

18   I would have to consent to that.

19           The Pradaxa label itself, if you go to it, just

20   so I can show you the language, it has the language in here:

21   "The aPTT test provides an approximation of Pradaxa's

22   anticoagulant effect."  So this idea that it's not in the

23   label, it's flatly rejected just by looking at their primary

24   competitor because there is language about testing with devices

25   that aren't specifically cleared in the Pradaxa label.

09:59

1          There's no clear evidence, Your Honor.

2          Next slide.  I will wrap up with this,

3    addressing the final argument on the highlights.  Defendants

4    are now coming to Your Honor -- and this really is a new

5    argument that appears on this slide.  There was a footnote

6    buried in the opposition that talked about the highlights, but

7    it had nothing to do with this idea of monitoring.  This is

8    brand-new.  We are seeing it for the first time as a part of

9    this reply.

10          Defendants have cited no authority for the

11    position that a helpful laboratory test must also

12    simultaneously be put in the highlights.  What they have

13    pointed out to you is this concept that monitoring is exempted,

14    and because monitoring has to go into the highlights, we can't

15    do a CBE to add Neoplastin-PT, because at the same time we

16    would have to amend the highlights.

17          Number one, that would completely gut the entire

18    purpose of the changes being effected regulation.  Any major

19    change like that, they are essentially saying, would have to go

20    into the highlights, so you could never change the warnings.

21          But here's the important point.  We can point to

22    real-world actions of the FDA to see if the FDA believes if you

23    add measurement tests to the label, whether or not you have to

24    put it in the highlights.  Your Honor, if you go to -- and I

25    have copies of them for you here.  I'll hand them out.

10:01

1       If you look at the Pradaxa label -- I just

2  showed you the language -- there's nothing in the highlights.

3  It doesn't say the first thing in the highlights section about

4  aPTT.

5       Arixtra is another drug.  Next slide.  Skip

6  through this one.

7       You remember that this is Exhibit 35, that label

8  contingency document.  One of the labels they looked at was the

9  Arixtra label in June of 2011.  The Arixtra label includes in

10  Section 5 -- so that's the actual warnings section.  So now we

11  have moved up the seven sections, from 12 to 5.  And Arixtra

12  includes language about the use of different laboratory tests

13  to monitor the effect of Arixtra.  It's right there in the

14  label.

15       Next slide.  Here's the label, 5.6, monitoring

16  laboratory tests for Arixtra.  It talks about the

17  anti-factor Xa of -- I can't say it -- Arixtra -- that's the

18  generic name -- can be measured by anti-factor Xa assay using

19  the appropriate calibrator, right there in the label.

20       But if you go to the highlights, the next

21  section, nothing.  The only thing it says under warnings and

22  precautions is that periodic, routine, complete blood counts

23  are recommended, nothing about anti-factor Xa or any of these

24  other things that are in that monitoring.  So the possible has

25  disproved the impossible because clearly it can be done.  You

10:03

1   can add monitoring statements in your label without amending

2   the highlights.

3               With all that, Your Honor, just let me sum up

4   and finish.  You're probably tired of hearing from me at this

5   point.  The defendants have not shown by clear evidence that

6   it's impossible for them to amend the label to include

7   instructions on Neoplastin PT, and under the guidance of *Guidry*

8   and *Young*, preapproval design defect claims are not preempted.

9               Thank you, Your Honor.

10       **THE COURT:**  Okay.  Thank you.

11               Let's have rebuttal.

12       **MR. NEWSOM:**  Am I waiting on this?

13       **THE DEPUTY CLERK:**  Yes.

14       **MR. NEWSOM:**  I just want to make sure.  It's trying.

15   Would you prefer, Judge, that I just try to ELMO it?

16       **THE COURT:**  Yes, let's stay with it.

17       **MR. NEWSOM:**  Let's do it the old-fashioned way,

18   Judge.

19               Perfect.  Thank you so much.

20               So a number of rabbits to try to chase down

21   here.  What I would like to do, Judge, if I can, is separate

22   very clearly the pure design claims from the PT-related,

23   monitoring-related, failure-to-warn claims because the design

24   claims -- you heard about 3 minutes on design and about

25   27 minutes on the failure-to-warn claim.

1    So let's talk about design first.  You asked

2  specifically:  What is it that you find defective about this

3  design?  And counsel said that the defendants had a duty to

4  come forward to FDA -- I tried to write this down -- a duty to

5  come forward to FDA with a reasonable design, which he then

6  explained a design that incorporated either an

7  anti-factor Xa assay or a reversal agent or both, very little

8  about defendants' independent or unilateral ability to do such

9  a thing without passing through FDA, seeking FDA's permission,

10  assistance, or approval.  There is essentially no dispute that

11  in order to get those components of this now-combination

12  product to market, defendants would have had to have had

13  additional FDA approval.

14    Now, to defeat that commonsensical proposition,

15  the plaintiffs are relying not surprisingly on *Guidry*.  I

16  would, too, if I were them.  *Guidry*, though, as we have

17  explained, is both distinguishable -- and if you have to

18  address the issue --

19    Somebody help me.  Somebody help the appellate

20  lawyer in the room who doesn't use these things.  Need to

21  shrink it?  Many thanks.  Many thanks.

22    *Guidry* is distinguishable in the first instance,

23  Your Honor, because in *Guidry* what you had was a very

24  traditional design defect claim.  Your Honor has read the

25  decision, *Invokana*.  The claim there was that Invokana's

chemical compound or molecule could be tweaked or refashioned
in some way so that it didn't put such a strain on the kidneys.

The design claims here are much more aggressive,
much more outside the box:  Again, an obligation to take to FDA
and then ultimately to market a product, a combination product
that incorporates entirely different and separately regulated
products, a device and a biologic, respectively.  So I think
that *Guidry* both -- in any event, on its own terms is not going
to get plaintiffs where they need to go.  *Guidry*, in any event,
we submit, should you find it necessary to address it, is wrong
for all of the reasons we have explained in the briefs and that
plaintiffs really haven't dealt with.  It's tough to see.

I'll tell you what it says.  *Guidry* in the first
instance was premised on a public policy determination that
decided any other way these plaintiffs would be without a
remedy.

Now, number one, that is precisely how the
Supreme Court has told us not -- let's wait for a second.

That's good enough.

It's precisely how the Supreme Court has said
not to address preemption questions.  The Supreme Court, both
in *Bartlett* and in *Mensing*, said that despite the tragic
circumstances in which those cases arose -- let's see if we can
read this one a little bit better -- both in *Bartlett* and in
*Mensing* -- so, for instance, in *Bartlett* the Supreme Court says

10:09

1    sympathy for a plaintiff does not relieve us of the
2    responsibility of following the law.  This case arises out of
3    tragic circumstances, as do these cases.  Plaintiff's
4    "situation is tragic and evokes deep sympathy, but a
5    straightforward application of preemption law requires that the
6    judgment below be reversed."
7              So, too, in *Mensing*.  The Supreme Court says:
8    "We are not at liberty to remake the law of preemption
9    jurisprudence simply to create a remedy for a plaintiff in a
10   particular case."
11             In any event, I would submit, Your Honor, that
12   the flip side, the suggestion that there would be no design
13   defect claims if defendants prevailed here, is not right,
14   because under *Guidry* the very different-looking design defect
15   claim there might survive; whereas the much more aggressive,
16   unprecedented combination product design defect claims here may
17   be preempted.
18             In any event, we have not heard anything from
19   plaintiffs about the flip side, the oddity and perversity of
20   plaintiffs' position that defendants had an obligation to wait,
21   wait, wait until these combination aspects of the product, the
22   assay and the reversal agent, were ready, available, and
23   approvable before they even approached FDA.  As I said, what
24   that would mean is that Xarelto would still not be on the
25   market.  It has been serving patients effectively for

10:10

1    5 1/2 years, saving people from strokes, and it still wouldn't

2    be on the market under plaintiffs' position.

3                In any event, *Guidry*, as we have pointed out to

4    Your Honor, it asks and answers the wrong question.  The court

5    in *Guidry* says, Can a defendant design a different product?

6    Well, of course a defendant can design a different product, but

7    merely designing the product doesn't do the public health

8    situation in the country any good at all.  You have to get that

9    product to market so that consumers can use it.  In order to

10   get that product to market, all agree, as they must, that FDA

11   must approve that product.  And you can't, as plaintiffs'

12   counsel suggested here today, simply assume, well, of course,

13   if it was safer, FDA would have approved it, for two reasons.

14               Number one, don't forget that the FDA approves

15   products not based solely on safety but on safety and efficacy.

16   Consider the real-world situation that the company that has

17   marketed the anti-factor Xa assay in Europe, called Diagnostica

18   Stago, has experienced here in the U.S.  Stago has been seeking

19   FDA approval for this anti-factor Xa assay here in the U.S.

20   since 2013.  That product still is not approved, because the

21   FDA initially said, in essence, What are you talking about?

22   These products have been approved without a requirement of

23   monitoring.  Why would we need this assay?

24               Even recently Stago said, trying to sort of

25   retool its approach to FDA, We are going to try to do this for

10:12

1  some reason other than monitoring, other than the reason the

2  plaintiffs here have suggested.

3  So I think it's far too simplistic simply to

4  say, Of course the FDA would have approved this product, so we

5  can simply bypass the requirement of this under Supreme Court

6  precedent that the FDA approve it.

7  The last thing I would say, Your Honor, is that

8  the flip side is also true.  Under plaintiffs' position there

9  will never again be preemption of a design defect claim because

10  any plaintiffs' lawyer worth his salt, as these men and women

11  certainly are, can always come up with some other hypothetical

12  design that they say would have been safer or better.  If all

13  they have to do is allege that, there will never be preemption

14  again.  That's what the preapproval regime would usher in:

15  never-again preemption of a design defect claim.

16  Keep in mind, even if it were true -- and I

17  don't think it is.  But even if it were true that every design

18  defect claim were preempted, that would hardly leave plaintiffs

19  without an oar in the water.  Design defect claims, as

20  Your Honor knows -- and then we will pivot to talk about the

21  warning claims.  Design defect claims have never been where the

22  real action in pharmaceutical litigation is, largely by virtue

23  of comment k, which many states have adopted, that

24  pharmaceutical products are unavoidably unsafe, in a certain

25  manner of speaking, and, therefore, design claims get funneled,

10:13

1    if you will, into warnings-based allegations.  So the fact that

2    a design claim may go by the by as a result of binding

3    Supreme Court precedent does not leave plaintiffs without a

4    remedy.

5              So with that, let's talk about the warnings

6    issues in the case.  On the warnings side we heard a lot about

7    clear evidence, way down in the weeds about clear evidence.  I

8    will address some of that, but there's very little about the

9    other two independent bases for finding this Neoplastin-related

10   failure-to-warn claim preempted.

11             Remember, as I said at the outset, clear

12   evidence is the third of three arguments, the third of three

13   independent bases for finding the claim preempted.  You don't

14   even really have to get into clear evidence if you don't find

15   the need to.

16             Let's talk about the other two aspects.  First,

17   the notion that defendants could not independently or

18   unilaterally have recommended an off-label use, an unapproved

19   use of the Neoplastin, I believe that plaintiffs' counsel said

20   I hadn't cited to you any law or regulation.  I don't have this

21   on the ELMO, but I will give you a citation:  21 C.F.R.

22   864.7750.  That is the classification regulation in which FDA

23   classified Neoplastin as a PT test for monitoring patients

24   receiving coumarin therapy -- Coumadin, warfarin -- not Xarelto

25   or rivaroxaban.

10:15

1          Second, I think we should take a close look --

2  thank you for refocusing this, whoever did that -- at the IVD

3  guidance document.  Of course, I confess that this isn't

4  binding in a regulatory sense, but it is FDA's view on the

5  subject, and it addresses this very issue expressly.

6          So let's just look at each of these quotations

7  briefly.  At the top:  "If an IVD diagnostic device" -- that's

8  what Neoplastin is -- "is already legally marketed and the IVD

9  diagnostic device manufacturer intends to market its device for

10 a new use as an IVD companion diagnostic device for a novel

11 therapeutic product" -- that would be use in connection with

12 Xarelto -- "FDA would likely consider the new use of the IVD

13 diagnostic device with the novel therapeutic product as a new

14 use for the device that would require an additional premarket

15 submission."  That's FDA approval required.

16         Second quotation:  "When an IVD companion

17 diagnostic device has been approved or cleared for use with one

18 therapeutic product" -- as Neoplastin has with respect to

19 warfarin -- "and evidence becomes available that use of the

20 same device is essential for the safe and effective use of a

21 different therapeutic product" -- as plaintiffs contend with

22 Xarelto -- "then the IVD companion diagnostic device labeling

23 should be expanded through approval or clearance of a new

24 premarket submission" -- that's FDA approval -- "or PMA

25 supplement to include the new therapeutic product," that is,

1    amend Neoplastin's label to specify use with Xarelto and get

2    FDA's approval for it.

3                 Last quote --

4         THE COURT:  Can you do it first and then get FDA

5    approval?

6         MR. NEWSOM:  No, sir.  Where it says here "premarket

7    submission," that is something altogether different from the

8    CBE procedure.

9         THE COURT:  Postmarket, once it's on the market, if

10   you find something that's helpful, what do you do then?  Can

11   you put it on the label?

12        MR. NEWSOM:  If you find -- if there are postmarket

13   events --

14        THE COURT:  Right.

15        MR. NEWSOM:  -- then you may actually in certain

16   circumstances be able to use the CBE procedure, but only if it

17   fits within the CBE procedure.  So, for instance, if there were

18   new data that bore on bleeding risks, then perhaps those data

19   could be added to the label per the CBE provision.  But, of

20   course, that's not the claim the plaintiffs have made here.

21   They are not suggesting -- as they couldn't, because the label

22   so painfully and clearly warns about the risk of bleeding.

23   That's not the claim that plaintiffs have made here.  So what

24   they are saying here is that this device, this Neoplastin

25   device, should be repurposed for a different drug.

10:17

1      The last quotation here says that the labeling
2  of the product, that is, Xarelto, should also be amended
3  through submission of a supplement.  "Supplement" is FDA-speak
4  for get FDA's approval in advance.

5      My only point here is that not only the
6  regulation which classifies Neoplastin's use, but also the
7  FDA's current guidance about this to manufacturers, both of
8  devices and of drugs, says you had better get our approval
9  before you haul off and take an existing device and repurpose
10  it for another product.

11      Now, let's talk also about the highlights issue
12  because this is an important piece of the puzzle.  I'm afraid I
13  blasted through this too quickly in my opening.  I was duly
14  chastened by one of my co-counsel for moving through this a
15  little too quickly, and so I want to show you the language of
16  the regulation.

17      So 201.57(a)(7), that's the quotation at the
18  top.  This tells you what needs to be in the highlights
19  section.  The highlights section, I'm sure Your Honor has seen
20  it.  It's the section on page 1 of the new labeling format,
21  applies to this drug, that basically says this is the most
22  important stuff about the drug.  It says that required to be in
23  the highlights section are a number of issues, including dosing
24  regimen, starting dose, dose range, and monitoring
25  recommendations.

10:19

1          Now, importantly, in the next regulation that
2  you see there -- I won't put you through a forced march, but
3  that regulation says that changes requiring supplemental
4  submission and approval, that is, premarket approval of FDA,
5  those things must be submitted, among other things, for any
6  change to the information required by 201.57(a).  So that is
7  including monitoring recommendations.
8          I want to provide you, Your Honor, the citation.
9  I don't have it here on the ELMO, but the citation for the
10 provision, I'm going to read it to you briefly.  The CBE
11 regulation upon which plaintiffs here and plaintiffs in most
12 pharmaceutical litigation rely is 314.70(c)(6)(iii).  It says
13 the following:  "Changes in the labeling to reflect newly
14 acquired information, except for changes to the information
15 required in 201.57(a) of this chapter (which must be made under
16 paragraph (b)(2)(v)(C) of this section)" -- that is, which must
17 be made to the FDA in advance, can be accomplished in certain
18 circumstances unilaterally.
19         "Except for changes to the information required
20 by 201.57(a)," that's the express carve-out for this
21 highlights-required information from the operation of the CBE
22 provision.  I should add, Your Honor, that there was
23 recently -- counsel suggested that, well, this would gut the
24 operation of the CBE provision.
25         There was recently an effort, perhaps in

10:21

1    recognition of that fact, to change that and to allow

2    manufacturers to change this -- to allow manufacturers to make

3    changes to the highlights information that corresponded to a

4    CBE change unilaterally, and that regulation died on the vine.

5    It went nowhere.  That only underscores that the current law is

6    that a manufacturer cannot make a unilateral change to any of

7    this information required to be in the highlights section.

8            THE COURT:  You say you can't change the label

9    without putting it in the highlights section?  Is that your

10   position?

11           MR. NEWSOM:  Correct.  What we are talking about

12   fundamentally here is a monitoring recommendation that is a

13   particular aspect of the label that cannot be changed

14   unilaterally.

15           THE COURT:  After the label is approved, if they find

16   that it's problematic, they can't change it without getting it

17   approved?

18           MR. NEWSOM:  Correct.  You go to FDA and ask

19   permission.  I'm not here to suggest that FDA wouldn't grant

20   permission, but that's not the test.  Under *Levine, Mensing*,

21   and *Bartlett*, that test, of course, is whether the

22   manufacturer, in my southern-speak, can haul off and do it all

23   by itself.

24           THE COURT:  How do you deal with the two drugs,

25   Pradaxa and something else, where they show it was approved by

10:22

1   putting it in the label but not in the highlights?

2           MR. NEWSOM:  Your Honor, that was news to me today.

3   I think counsel has offered us the opportunity to brief that.

4   We would be happy to do that very shortly and very quickly if

5   Your Honor would permit it.

6           THE COURT:  Sure.

7           MR. NEWSOM:  The last thing I will say, Your Honor --

8   I should address clear evidence, because counsel spent so much

9   time with it, very briefly.  Again, I don't think you need to

10  get into clear evidence.  Counsel now is suggesting that there

11  is a way to read the regulatory chronology in a way that

12  doesn't suggest that FDA, in fact, would have rejected this

13  language, notwithstanding the fact that it had rejected it five

14  to six different times in connection with both labels.

15          I want to show you the timeline so you will get

16  sort of a handle on when these various things happen.  So the

17  keys here really are, in January of 2011, the second bullet

18  there, that's when Janssen provided the FDA with the full

19  ROCKET AF study results.  They proposed the same language, that

20  is, the Neoplastin and linear relationship language for the

21  AFib labeling.  In March 2011, importantly, FDA flagged,

22  specifically in connection with the FDA label:  We plan to

23  review whether the benefit/risk of rivaroxaban could be

24  substantially improved by routine monitoring of coagulation

25  parameters.

10:23

1          In March 2011 the FDA says, We are onto this
2     monitoring issue.  We have your submission.  We have your data.
3     We are onto this monitoring issue.
4               Now, counsel pointed to the August 2011 bullet
5     there where FDA's clinical pharmacology review suggests there
6     may be a relationship between PT concentration and bleeding
7     risk.  The difficulty with that, look at the label after that
8     fact.  Look at the label that FDA approved for the AFib
9     indication.  Nothing about linear relationship.  Nothing about
10    Neoplastin.
11              Instead, as I said earlier, no response, a
12    statement in the label that the anticoagulant effect of Xarelto
13    cannot be reliably monitored through standard laboratory
14    testing.  So you have bookends around this supposed change of
15    opinion in August of 2011 where the FDA has repeatedly rejected
16    this language.  There is this supposed revelation in
17    August 2011.  Then three months later, in November, the FDA
18    says nothing about linear relationship, nothing about
19    Neoplastin can't be monitored with standard laboratory testing.
20              So, Your Honor, with that, I am going to cede
21    the podium to the next group of presenters.  I do just want to
22    emphasize the clear distinction for Your Honor between the two
23    pure design claims, that is, the anti-factor Xa assay claim and
24    the reversal agent claim, they are in one bucket.  The other
25    bucket is the Neoplastin-related failure-to-warn claim.  We

10:25

1   heard a lot about the latter, not much about the former.  I

2   would submit that all three claims in both buckets are

3   preempted.

4           **THE COURT:**  Before you leave, what's your response to

5   the argument that the one group, the hematology group, was

6   reviewing it and the cardiorenal group was reviewing it, and

7   there's some difference there?

8           **MR. NEWSOM:**  Two responses, Your Honor.  Number one,

9   it's basically an argument that FDA is incompetent, that the

10   right hand doesn't know what the left hand is doing.  FDA is

11   FDA.  When FDA, the agency itself, approved the label for the

12   AFib indication, as we just discussed, in November of 2011,

13   three months after this supposed revelation of one division in

14   August of 2011, again, they approved a label that conspicuously

15   said nothing about this linear relationship, nothing about

16   Neoplastin; instead said, By the way, these parameters cannot

17   be reliably monitored using standard laboratory testing.

18           So the FDA, when the agency itself spoke,

19   presumably for all of its constituent divisions, it approved a

20   label that was consistent with its rejection of Janssen's

21   proposals over the years -- or over the months to include this

22   language in the label.

23           **THE COURT:**  Okay.

24           **MR. NEWSOM:**  Thank you very much, Your Honor.

25           **THE COURT:**  Thank you.

10:26

1          Where are we now?  The next one, 5110,

2     preemption on the warnings.

3          **MR. HUDSON:**  Good morning, Your Honor.  Rodney Hudson

4     for the defendants.

5          So on the labeling preemption motion,

6     Your Honor, our motion focused on the claims that the

7     plaintiffs alleged that our label failed to disclose the risk

8     of bleeding.  Those claims, as initially pled, Your Honor,

9     alleged, one, that we failed to include information in the

10    label about the Alere recall and its impact on the ROCKET

11    trial.

12         They also alleged, number two, Your Honor, that

13    we should have included information in the Xarelto label about

14    the U.S. subgroup data from the ROCKET trial.

15         Third, Your Honor, they had alleged that we

16    should have included a black box warning to highlight the risk

17    of bleeding with the use of Xarelto.

18         Today, Your Honor, I want to focus my comments

19    on the Alere recall and the U.S. subgroup data.  I believe, as

20    part of the briefing, as you heard Mr. Newsom mention, some of

21    the claims have been abandoned.  And I think the black box

22    claim has been abandoned as a separate basis for relief.  I

23    understand the plaintiffs are arguing that that evidence may be

24    admissible for other purposes.

25         But we do think it's important, Your Honor, for

10:29

1    an order to be entered at some point confirming that these

2    claims are not viable.  I think it's very clear on the black

3    box warning claim that it is preempted as a matter of law, but

4    today I will focus on the other two claims.  And if it's raised

5    in opposition, I will address the black box.

6              So in ruling on this motion, Your Honor, I think

7    there's really three issues that the Court needs to address,

8    and I want to cover those very briefly, Your Honor.

9              I think the first issue that's important -- and

10   we have heard a lot about the standard for preemption.  I want

11   to clarify what the standard is.  I think the plaintiffs took a

12   position in their brief that does not exist.  I will clarify

13   that for Your Honor on the clear evidence standard and what is

14   required to show that a claim is preempted.

15             Number two, Your Honor, I want to cover the

16   evidence related to the Alere recall and its impact on ROCKET

17   and the FDA's views on that issue as well as the U.S. subgroup

18   data.

19             So if we turn to the first question, which is

20   the standards for preemption -- and you heard Mr. Newsom

21   mention claims are preempted if defendants could not have

22   independently made a label change without prior FDA approval.

23   With respect to this motion, Your Honor, there's really two

24   issues on the standard that are important to consider.  One is

25   the changes being effected regulation.  We heard that discussed

10:30

1    in the first motion.  I think what's important for this motion,

2    Your Honor, is that the words from the changes being effected

3    regulations say "changes in the labeling to reflect newly

4    acquired information."  That's a very important part of the

5    analysis here, Your Honor.  The FDA regulations define

6    *newly acquired information* as data, analysis, or other

7    information not previously submitted to the agency.

8              As we see and look at the evidence, Your Honor,

9    the evidence will be that the FDA has considered the evidence

10   that the plaintiffs claim should have warranted a label change

11   here and, therefore, the claims are preempted.

12             The other aspect of preemption that you have

13   heard about today, Your Honor, is the clear evidence standard.

14   I want to be crystal clear on what that standard is because I

15   think there's been some confusion, at least in the briefing on

16   this motion and perhaps in oral argument earlier today.

17             Taking the words of *Wyeth*:  "Where there is

18   clear evidence FDA would not have approved the proposed label

19   change, the claims are preempted."  There, Your Honor, we have

20   language from the Supreme Court saying that where there is

21   evidence the FDA would have not approved the label change, the

22   claim is preempted.

23             I think the plaintiffs took the position, and

24   they certainly argued earlier today, that we were required to

25   submit a CBE in order to assert preemption and to demonstrate

that there is clear evidence.  That's simply not true.  We have
cited here, Your Honor, I think, one of the more recent cases
that has considered preemption in a similar context to what
we're dealing with here, where the FDA actually looked at an
issue, looked at the risk of pancreatic cancer and concluded it
wasn't connected to a product, published an article, made its
views known.  The court held that the claims are preempted.  As
I will discuss in a minute, that is really the issue we are
dealing with here on the Alere recall.

          That court observed -- when it considered the
issue, it said the relevant inquiry in each conflict preemption
case since *Levine* is stated as whether the FDA would have
rejected a proposed labeling change, not whether the FDA did,
in fact, issue an explicit rejection.

          So I want to be clear, Your Honor.  When we talk
about this issue and we hear the plaintiffs, when they say we
couldn't submit a CBE, that's not the requirement under the
standard articulated by the Supreme Court.

          So if we look at where Your Honor looks to, to
find clear evidence, for purposes of the present motion, we
look to the FDA's actions and inactions.  We look at decisions
made by the FDA during the approval process, the FDA's review
of additional information after the fact, and whether the FDA
on its own initiative decided to review a specific issue that
is at issue in this case; and we look at the conclusions

10:33

1    reached by the FDA to ascertain whether or not the FDA would

2    have, in fact, rejected the proposed label change that

3    plaintiffs are seeking here.  So with that and through that

4    prism, Your Honor, if we look at the evidence that relates to

5    the two claims here, we think there is clear evidence that the

6    claims are preempted.

7                We turn first to the failure to warn of the

8    recall of the INRatio device used in ROCKET.  Now, the

9    plaintiffs claim here that the labeling should have included

10   information about the recall of this device and its impact on

11   ROCKET.  They claim that it impacted and skewed the results of

12   the study.

13               Based on the evidence at Exhibit E in our

14   briefing, Your Honor, we know the FDA undertook an extensive

15   and comprehensive analysis of the impact of the recall on the

16   ROCKET trial in a lengthy report entitled "ROCKET Reanalysis

17   Review."

18               What's important here, Your Honor, if the

19   plaintiffs say, Well, the defendants didn't submit a CBE, well,

20   the FDA undertook the analysis itself.  This analysis involved

21   mathematical modeling.  It involved a team of reviewers that

22   looked at the evidence the plaintiffs claim warranted a label

23   change.

24               If we look here, Your Honor, as to the FDA's

25   conclusions, again, conclusions in the context of the labeling

10:35

1   change, the FDA said, quote:  "No changes in rivaroxaban

2   labeling to reflect the impact of use of the INRatio device in

3   ROCKET are warranted.  No other major regulatory action should

4   be taken with respect to rivaroxaban."

5            Your Honor, this is a clear, unambiguous

6   statement by the FDA.

7           **THE COURT:**  When was that?

8           **MR. HUDSON:**  That was in September of 2016, after the

9   alleged uses in this case.

10          So, Your Honor, we don't have the instance

11   where -- I think the plaintiffs cite to a number of cases where

12   maybe the FDA makes the decision newly acquired information

13   comes and they allege a label change.  Here it's after the

14   fact, based on all the evidence that's out there that the FDA

15   considered.

16          **THE COURT:**  How do you deal with the fact that they

17   say that there's other blood thinners -- other medications

18   where the label has changed?

19          **MR. HUDSON:**  Your Honor, I think -- well, first of

20   all, I wouldn't say that's relevant.  Each drug is different.

21   Here we have the FDA expressly looking at the ROCKET study for

22   Xarelto and making a conclusion about the impact of the recall

23   of this device on this study and concluding that no label

24   changes were necessary.

25          Now, importantly, Your Honor, the FDA also, in

10:36

1    connection with its study, issued a press release.  And so,

2    again, we don't have to guess about what the FDA thinks or

3    knows or understands, right?  We know that the FDA issued this

4    report and clearly indicated that no label changes were

5    necessary.

6              But the FDA goes a step further.  It says in a

7    press release:  "FDA concludes that Xarelto is a safe and

8    effective alternative to warfarin in patients with atrial

9    fibrillation."

10             Here we go, Your Honor, in the second statement:

11   "FDA analyses conclude that Xarelto clinical trial results were

12   not affected by this faulty monitor device."  So any claim that

13   we should have said something in the label about the recall of

14   this device or that it was faulty simply is preempted,

15   Your Honor, based on the statements by the FDA.

16             We don't have the hypothetical scenario where --

17   I think the plaintiffs suggested in their briefing that, well,

18   Your Honor can't decide issues as a hypothetical matter.  This

19   is no hypothetical.  The FDA has considered it.  It's crystal

20   clear evidence.  It's the same type of evidence that existed in

21   the *Seufert* case.

22             **THE COURT:**  Do you think that's restricted to the

23   response to ROCKET or not?

24             **MR. HUDSON:**  Your Honor, I believe the analysis done

25   by the FDA was specifically on the impact of the recall on the

10:37

1    ROCKET trial.

2               Your Honor, what we have here, if we look at the

3    standard that applies to this motion, there's no newly acquired

4    information.  The FDA had the information, and it decided in

5    September 2016 that no label change was necessary.

6               Now, what happens next in the plaintiffs'

7    brief -- and no response to this, because there is no response

8    to it that has a legal basis, Your Honor.  They then take an

9    internal memo prepared by the FDA, and the author of that memo

10   was actually communicating to colleagues within the FDA.  That

11   author said, Well, if other people within the FDA think a label

12   change is necessary, we might consider one.

13              Well, we know that the FDA concluded that no

14   label change was necessary, at the end of the day, and it

15   published those results.  But the plaintiffs claim that that

16   statement intended for other people within the FDA actually was

17   directed to the defendants to implement a label change.  Well,

18   Your Honor, that is a complete misreading of the document.  The

19   document was sent internally to the FDA, which the FDA later

20   decided to publish in its findings.

21              So, Your Honor, if the FDA wanted the defendants

22   to change the label based on ROCKET, they would have sent them

23   a letter.  They didn't do that, Your Honor.  So a fair reading

24   and an accurate reading of that document isn't that that

25   communication was intended for the defendants.  It was clearly

10:39

1    an internal memo that the FDA later decided to publish.

2              Second, Your Honor, the plaintiffs claim, well,

3    the defendants should have published the FDA's results, should

4    have published this internal memo from the FDA.  Well, again,

5    Your Honor, that claim is based on the internal author's notes

6    to his colleagues about a recommendation to publish the FDA's

7    findings by the FDA itself.  That is exactly what the FDA did.

8    The FDA published its findings on its website.  So this notion,

9    parsing through this memo to save this claim, Your Honor,

10   really has no legal basis.  We know what the FDA thinks

11   regardless of these claims.  The FDA thinks there is no label

12   change that's necessary and that the recall of the device did

13   not impact the results of ROCKET.

14             So that claim, Your Honor, is clearly preempted

15   in unambiguous ways.  This is really a unique situation where

16   the FDA looked closely at the issue in a comprehensive study,

17   and the claim is preempted.

18             So, Your Honor, if we turn to the second claim,

19   which I think is that the defendants should have included U.S.

20   subgroup data in the label -- and I think what's important for

21   this analysis, Your Honor, is to consider the timeline here.

22   And, again, we focused on this newly acquired information and

23   clear evidence standard.  If we look at the timeline here with

24   respect to the language in the U.S. subgroup data, we have the

25   ROCKET data being submitted to the FDA early on.  We have a

10:40

1    discussion and a proposal with the FDA -- again, this is an
2    exchange between the FDA and Janssen about what the label
3    should look like.

4              In August of 2011 Janssen had proposed to add
5    certain information about the subgroup of the North American
6    subgroup and information across subgroups.  We have on
7    October 11, 2011, the FDA itself considering language about the
8    North American subgroup.  The FDA there deleted language
9    stating North American subjects have higher rates of bleeding.
10   So the FDA there is considering parsing the data, slicing the
11   data in a certain way.  Then the FDA decides against it.  For
12   whatever reason, the FDA exercises its policy judgment to make
13   a decision not to include that information.

14             Then we have additional exchanges with Janssen,
15   I believe, October 14 and October 19, 2011, about the inclusion
16   of additional information about U.S. practice and isolating
17   U.S. practice and what that may mean for the results of the
18   ROCKET trial.  Then we have a rejection of those ideas to
19   include subgroup data, either on the North American side or
20   about U.S. practice.  On November 4, 2011, the FDA approved the
21   atrial fibrillation indication labeling.

22             So for the preemption analysis, Your Honor, if
23   we look at the issues here, we have the ROCKET data being
24   submitted years earlier.  If you look at cases that we cited,
25   Your Honor, the *Celexa* case and the *Bextra* case, Your Honor,

10:42

1    what is important is that once the FDA has a clinical study and
2    considers the data and decides how that should be presented in
3    the label, there's no newly acquired information that arises
4    out of that study that's already been submitted to the FDA.
5            THE COURT:  Doesn't the newly acquired information
6    also encompass new analysis of previously submitted data?
7            MR. HUDSON:  Exactly, Your Honor.  Yes, it does.  I
8    think where that comes into play is when the FDA comes back to
9    Janssen in 2014, again, after the fact, after years of having
10   made a decision a certain way about how this information should
11   be represented in the label, wants to harmonize labeling across
12   the class.
13            Again, this isn't a new analysis from Janssen's
14   perspective.  This was an analysis and a decision made by the
15   FDA when it had previously made a different decision about what
16   should be reflected in the label.  So the new analysis is the
17   FDA's new analysis.  It's not something that we created on our
18   own and submitted after the fact.  There was no obligation to
19   submit that or slice the data in a certain way.  The plaintiffs
20   could always come up with a new situation where maybe the FDA
21   didn't look at data in a certain way or the defendants didn't
22   look at data in a certain way, but that's not the standard for
23   preemption.  Once the FDA makes a decision based on data,
24   whatever it is, Your Honor, that's a policy judgment of the FDA
25   and the fact --

10:44

1     THE COURT:  But if you have new data, if you have

2  additional information and you change the label to add or

3  strengthen an instruction or dosage, do you need the FDA for

4  that?

5     MR. HUDSON:  Your Honor, on the labeling side.  On

6  the dosing I think it's a different question.  On the labeling

7  side, where there is newly acquired information, labeling

8  changes may be implemented under the CBE, sure.  But I don't

9  think that's the circumstance here.  We have really the FDA

10  taking a different position than it did years earlier about the

11  same evidence that it had before.  So, Your Honor, we don't

12  have newly acquired information, for purposes of this argument,

13  that was independently derived by the defendants.

14        Then we also have, I think, earlier in the

15  analysis clear evidence based on the standards.  We don't have

16  to submit a CBE.  We know the FDA actually looked at the issue

17  and made a decision not to include subgroup information.  So we

18  have clear evidence that the FDA declined to include subgroup

19  information years earlier.

20        So, Your Honor, just in concluding on this

21  motion -- I know we devoted less time to this than the dosing

22  motion.  I think, if you really look at this case and look at

23  the decisions cited by the plaintiffs, these are a unique set

24  of facts.  We really don't have newly acquired information, and

25  we have clear evidence, both on the Alere recall and on the

10:45

1    U.S. subgroup data, of what the FDA is thinking.  This is not a
2    hypothetical scenario where the plaintiffs posit what if, what
3    if, what if.  That's not this situation.  We know what the FDA
4    thinks, and we believe that the claims are preempted.

5                        That's all I have.  Thank you, your Honor.

6              THE COURT:  Okay.  Thanks very much.

7              MR. LONGER:  Good morning, Your Honor.  Fred Longer
8    on behalf of Mr. Boudreaux and Mrs. Orr and, I guess I will
9    say, on behalf of all the plaintiffs.

10                       If I may begin, Your Honor.

11             THE COURT:  Yes.

12             MR. LONGER:  So we heard Mr. Hudson go over the legal
13   standards, and I suppose that's where all of this begins.  I
14   would like to also begin with it, but since we have covered
15   this ground, I don't want to belabor it.  There are some
16   points, though, that I noticed in Mr. Hudson's presentation
17   where there were ellipses, and often what you are told is one
18   thing, but the whole story is a little bit different.  So with
19   that --

20                       The point that I would like to begin with is
21   that we are governed here by *Wyeth v. Levine*, which is a
22   prescription drug owned by -- it was a branded prescription
23   drug that was owned by *Wyeth*.  We are not talking about generic
24   drugs and the impossibility issues that were presented by
25   generics who were guided by the branded, and that's the cases

10:47

1    the defendants have been talking about previously, the *PLIVA*

2    and the *Mensing* cases*, Bartlett* as well.

3                We are not in that situation.  This is a branded

4    drug by these defendants.  We are governed by *Wyeth v. Levine*.

5    *Wyeth* says -- and Mr. Barr read this to you earlier, so I don't

6    want to belabor the point, but the manufacturer bears

7    responsibility for the contents of its label at all times.  As

8    long as the drug is on the market, the manufacturer has to obey

9    the laws of the FDA, the regulations; and if new information is

10   acquired, that the manufacturer needs to come forward and put

11   that into the label.  That's indicated as well in 21 C.F.R.

12   201.80(e), which requires a manufacturer to revise its label to

13   include a warning as soon as there is reasonable evidence of an

14   association of a serious hazard with a drug.  Notably, a causal

15   relationship need not have been proved.

16               If we flip to the next slide, under *Wyeth* we

17   know that preemption is a demanding defense, and the defendants

18   have a very heavy burden on their part to prove preemption.

19   It's not our burden here.  They are the moving parties.  They

20   have to show, absent clear evidence, that the FDA would not

21   have approved a change to any particular label.

22               Mr. Barr earlier handed up to you yesterday's

23   opinion of the Third Circuit.  Being from Philadelphia, I

24   always like to tout my own circuit.  The judges there are

25   pretty bright guys, and they said on the summary judgment

10:49

1    standard -- and Your Honor has this.  It's on page 15 of what
2    we handed up to you from the Westlaw cite -- well, it's on
3    page 15 of the document.
4             How does this ELMO work?
5         THE DEPUTY CLERK:  I'll get it.  It takes a minute or
6    two.  There we go.
7         MR. LONGER:  Good.
8             So special considerations arise in the
9    preemption context.  Impossibility preemption is an affirmative
10   defense on which Merck bears the burdens of production and
11   persuasion.  Crucially, the inquiry involved in a ruling on a
12   motion for summary judgment necessarily implicates the
13   substantive evidentiary standard of proof that would apply at
14   the trial on the merits.
15            As discussed above, *Wyeth*'s clear evidence
16   standard of proof requires the manufacturer to prove that it is
17   highly probable that the FDA would not have approved a change
18   to the drug's label.  Therefore -- and this is summary judgment
19   that we are dealing with, Your Honor.  Therefore, the question
20   for summary judgment purposes is not just whether a reasonable
21   juror could find that the FDA would have approved plaintiffs'
22   proposed warning; it is whether a reasonable juror could find
23   that it is highly probable that the FDA would have rejected the
24   warning.
25            So this is the defendants' burden.  They have to

10:51

1    show that it is highly probable that the FDA would have

2    rejected the two issues we are about to discuss today.

3                The first one is about the INRatio device.  What

4    we know is that in December 2014, Janssen learned of the

5    defective device used in ROCKET.  That's our Exhibit 14, which

6    we have provided to Your Honor.

7                In September 2015, months later, Janssen finally

8    gets around to tell the FDA, That INRatio device that we used

9    in our ROCKET study, well, the devices involved in that ROCKET

10   study have been recalled.

11               As a result of this, patients in ROCKET who were

12   treated with warfarin got higher doses of warfarin than were

13   appropriate.  In some instances the incidence of bleeding

14   events in that group were 7 to 10 percent, and that skewed the

15   ROCKET result because this was a comparison between rivaroxaban

16   and warfarin, and it was to prove noninferiority.  Here, when

17   you have an imbalance on the warfarin side, it actually makes

18   your product look pretty good.  Here we are only looking for

19   noninferiority, not even superiority.  So it is significant,

20   Your Honor, the facts of the ROCKET study, as well as the

21   imbalance of measurement as a result of the INRatio device.

22               In June 2016, though, the device division of the

23   FDA demanded a permanent ban of the device.  That was based on

24   the inaccuracies of the device that was used in ROCKET.

25               THE COURT:  Didn't the FDA then come out and say it

10:54

1    doesn't matter?

2           MR. LONGER:  Well, that's where the ellipsis comes

3    in, Your Honor.

4           If we could go to the next slide.  So the

5    recommendations that you were presented begin at the very top

6    of this demonstration.  It says:  "No changes in rivaroxaban

7    labeling to reflect the impact of use of the INRatio

8    device . . . are warranted.  No other major regulatory action

9    should be taken with respect to rivaroxaban."  That's what the

10   defendants point to, and I understand why.

11          But later on in the document -- and you have to

12   go towards the back of the document -- what they say is:  "We

13   think that a labeling change to describe the modeling results

14   would be very difficult to write in a concise manner and might

15   be more likely to confuse than to edify, and is not warranted."

16          Now, again, they have to show that it was highly

17   probable that the FDA would not have allowed a concise, clear,

18   accurate description of the ROCKET device -- I'm sorry -- the

19   INRatio device and its impact on the ROCKET analysis.  It is

20   precisely that point, Your Honor, which is their burden to

21   show.  They never came forward with such an analysis to try to

22   demonstrate the impact of the ROCKET device.  That's our point

23   here.  It's their burden.  They need to show there is

24   absolutely clear evidence that the FDA would not have permitted

25   it.

10:55

1          Now, here I agree that the document itself says
2     the FDA says nothing is warranted now.  But at the same time,
3     in the same document, the FDA also says, We think it might be
4     hard to write this.  But they are not saying it's impossible to
5     write it.  That's my point.
6          Had Janssen, had Bayer come forward with an
7     accurate description, then FDA might have considered it and may
8     have allowed it.  In that counterfactual world there is no
9     preemption.
10          So the defendants have the burden to show that
11     this was not going to be permitted.  Frankly, the fact that the
12     FDA said what it said didn't preclude the opportunity for the
13     defendants to come forward with a better story, and that is our
14     position on the INRatio device.
15          The next point that's in contention, Your Honor,
16     is whether or not there's clear evidence that the FDA would
17     have rejected a change in the label about the United States
18     safety data.  We are not talking about North American data; we
19     are talking about U.S. data.  I heard my colleague opposite
20     here talking about North American data.  That actually is much
21     broader because it incorporates geographic locations other than
22     the United States.
23          We are talking about the United States data now,
24     Your Honor.  The fact is, in the United States warfarin is
25     well-controlled, generally speaking, and that would have skewed

10:57

1    or at least provided treaters/prescribers a better picture of

2    what actually happens with Xarelto in the United States.

3                    The point that I want to make here,

4    Your Honor -- and you actually raised it with Mr. Hudson

5    previously -- is how you deal with changes being effected.  The

6    CBE regulation is before you.  It's in 21 C.F.R.  It says that

7    a manufacturer may "add or strengthen a contraindication

8    warning, precaution, or adverse reaction" in a drug's label

9    without prior approval of the FDA.  Adjunct to that is the

10   definition of what newly acquired information is.

11                    And if we could, Jessica, skip forward.

12                    *Newly acquired information* is data, analysis, or

13   other information not previously submitted to the agency --

14   which obviously the ROCKET AF study had been in the agency's

15   hands, and we don't dispute that -- which may include (but is

16   not limited to) data derived from new clinical studies, reports

17   of adverse events -- and, as Your Honor pointed out -- or a new

18   analysis of previously submitted data.  That could be virtually

19   anything that includes events, analyses that reveal the risk of

20   a different type or greater severity or frequency than

21   previously included in the submissions to the FDA.

22                    Now, what I heard Mr. Hudson talk about

23   previously was that the FDA in 2015 asked for a new analysis.

24   He says this was the FDA's analysis.  He says, We had no

25   obligation to come up with a new analysis.

10:59

1        That's where we cross paths, Your Honor, because

2  in 2012 there were 2,081 adverse event reports on Xarelto.

3  There were 151 deaths reported associated with Xarelto.  That

4  information took a whole year to assemble.  The defendants get

5  the adverse event reports as well as FDA.  They monitored this.

6  They have an obligation of pharmacovigilance.  That growing

7  number of deaths and adverse events is a significant point for

8  any doctor to know in terms of treating.

9        What we see in the *QuarterWatch* here which I

10  think is significant, Your Honor -- this came out October 17,

11  2013.  They say numerous steps -- they were talking about not

12  just -- you will see in the document they are talking not just

13  about rivaroxaban; they were talking about Pradaxa.  But they

14  were talking about these anticoagulants, and they were taken --

15  they said -- and this is an independent group, Your Honor, but

16  I'm sure it's in the public domain, and I'm sure the defendants

17  had this information available to them-- that there was a

18  growing cry in the medical community for -- and I have

19  highlighted it here:  "More and better information for

20  clinicians is needed about how to manage hemorrhages that occur

21  either as a side effect or as a result of accident or trauma."

22        But the point here is that more and better

23  information was necessary.  The defendants say it's FDA's job.

24  They are waiting for them to come up.  A few months later we

25  find out that the FDA says, Yeah, we really need to get some

11:01

1    better information into the marketplace.

2            Meantime, they know the same information.  It's

3    our point that that defeats preemption.

4            **THE COURT:**  I've got it.  I understand it.

5            **MR. LONGER:**  The last thing, Your Honor, we cited in

6    our brief is the quote from a judge in Mississippi:  "This

7    Court cannot say the FDA would have clearly rejected a change

8    they asked to be implemented."

9            Ultimately this information we are talking

10   about, it's in the label today.  Why would the FDA have

11   rejected something that would have been proposed -- we are

12   saying should have been in the label prior to Mr. Boudreaux or

13   Mrs. Orr ingesting the drug in 2014?  They knew this

14   information in 2012.  They certainly got information in 2013

15   from this *QuarterWatch* more and better information was

16   necessary.  They didn't do anything.  They sat on their hands

17   until the FDA finally did something.  The FDA is not the owner

18   of the label.  They are the owner of the label.  It's their

19   responsibility to come forward.  They waited, they delayed, and

20   that caused injury in the United States.  That should not be

21   preempted, Your Honor.

22           **THE COURT:**  All right.

23           **MR. LONGER:**  Thank you.

24           **THE COURT:**  Let me hear a brief response.

25           **MR. HUDSON:**  Yes, Your Honor.

1          Your Honor, just a couple points.  Just for the
2    record, the standard that applied in *Bartlett, Mensing*, and
3    *Wyeth* is all the same standard.  The difference in those cases
4    has to do with the underlying regulation.  The standard is
5    where it was impossible for the defendant to make a label
6    change independent of the FDA, the claim is preempted.

7          Your Honor heard, I think, a discussion of the
8    *Fosamax* decision from the Third Circuit.  It's our position,
9    Your Honor, that you apply the clear evidence standard.  It is
10   a pure question of law, if Your Honor were to consider it under
11   Rule 56 standards.  The plaintiffs can't dispute what the FDA
12   has already concluded.  You can't create a disputed issue of
13   fact by saying the FDA did not say this, and we know what the
14   FDA said on both the recall of the Alere product as well as the
15   U.S. subgroup population.

16         Now, when the plaintiffs get up and say, Well,
17   Your Honor, perhaps there could have been this little window
18   for the defendants to submit a label change, again, that memo
19   went to the internal colleagues at the FDA, asking them whether
20   they had a view on whether a label change would have been
21   implemented.  The label change would have said there was no
22   impact on the ROCKET trial.  That's an important point,
23   Your Honor.  The FDA had all the information.  They did not
24   point to you a single piece of new information that was not
25   considered by the FDA that would have supported a label change.

11:04

1   This is not an instance -- and the standard isn't that the

2   plaintiffs can always come up with new theories or debate

3   what's in an FDA document when the FDA has already reached a

4   conclusion about the precise issue that forms the basis for the

5   claims.

6             Finally, Your Honor, the *QuarterWatch* comment

7   that was shown to you, the claim here is that we should have

8   included information about the U.S. subgroup data in ROCKET.

9   That's not ROCKET.  This is a completely different analysis.

10  It has nothing to do with the claims that have been alleged

11  that we should have described the ROCKET study differently, the

12  information that was already given to the FDA.

13            Your Honor, I think that even one of plaintiffs'

14  experts sits on the board of editors for the *QuarterWatch*.

15  That is not new information that would have supported a label

16  change.  The label mentions bleeding in more than a hundred

17  instances.  The notion that we should have described a study

18  already considered by the FDA differently, based on some sliver

19  of data, Your Honor, really has no merit, and the claim is

20  preempted.  Thank you.

21            **THE COURT:**  Let's take a 10 minute break here and

22  come back.  We are on the third one by now.  Court will stand

23  in recess.

24            **THE DEPUTY CLERK:**  All rise.

25            (Recess.)

11:20

1    **THE COURT:**  Be seated, please.

2          Our third motion is the plaintiffs' motion on

3    other coagulants.

4    **MR. LONGER:**  Hello again, Your Honor.  Fred Longer on

5    behalf of the plaintiffs.

6          This is plaintiffs' motion to preclude

7    speculative expert testimony about potential outcomes from

8    other anticoagulants.  It's at Record Document 5121.

9    Your Honor, I really don't have much of a presentation, so I'm

10   just going to begin with what I think are some universal facts

11   that we can all agree upon, which is that the plaintiffs here

12   have sued because of their injuries from Xarelto.  They sued

13   the manufacturers of Xarelto.

14         The plaintiffs are not claiming that their

15   injuries were caused from drugs that they did not take.

16   Therefore, they have only sued these drug manufacturers.

17   Xarelto is going to be the only drug that is front and center

18   in these cases.

19   **THE COURT:**  Well, defendants take the position,

20   though, that your theory is that it's defectively designed.

21   When you do that, you then have to show that there's an

22   alternate design that's available, and their evidence is what

23   they put forward.  So if you give up that, they will give up

24   the objection.

25   **MR. LONGER:**  Your Honor, our point -- and I

11:21

1    understand how you have just captured everything.  Our point

2    is -- and you have sort of taken away where I was going, which

3    is their point is in rebuttal.  They are saying that Xarelto is

4    a unique molecule, and you're saying -- you, the plaintiffs,

5    are saying that an alternative design is a different molecule,

6    like Pradaxa and so on.

7              That's not our claim.  You heard Mr. Barr go

8    through what our alternative design theory is.  It has nothing

9    to do with the alternative design of Pradaxa or some other

10   drug.  What we are saying is that there should have been an

11   anti-factor Xa assay, and that is how we arrived at an

12   alternative design.  But as you say, we are not pursuing that.

13   Now they are saying that all of this evidence is for rebuttal,

14   that, you know, the plaintiff would have bled on another

15   anticoagulant.

16             Here we have the reports of Dr. Piazza.

17   "There's no way to rule out that Mr. Boudreaux would have

18   experienced the same GI bleed if he was taking a different

19   anticoagulant."

20             The same as Dr. Branch.  He says that it is

21   impossible to say that Mrs. Orr would have avoided her injury

22   or had a better outcome if she had taken a different

23   anticoagulant.  You see this again and again.  This slide

24   presentation is just all of the reports of all of the

25   doctors -- Dr. Smith, Dr. Boniol, Dr. Johnson, Dr. Kahn,

1   Dr. Eiswirth, Dr. Peacock -- and they are all basically

2   saying -- and Dr. Khatib as well.  They are all basically

3   saying that the patients would have bled out -- Mr. Boudreaux,

4   Mrs. Orr would have the same bleed on any other anticoagulant.

5             Our point, Your Honor, is, one, we are not

6   making the assertion -- they say this evidence is necessary for

7   their rebuttal of an alternative design.

8             Two, under *Daubert* there has to be some "there"

9   there, and there is nothing behind these statements.  They are

10  just pulling it out of the air.  They are saying -- it's rank

11  speculation on their part how any particular patient would have

12  done on another drug.  We think that just doesn't belong in a

13  court right now, and it doesn't belong in this court today.

14            That's our whole position, Your Honor.

15            **THE COURT:**  All right.  Let me hear a response from

16  the defendant.

17            He says, in effect, that it's not relevant and

18  you have to have something relevant first before you get to it.

19            **MR. IRWIN:**  Yes, Your Honor.

20            Your Honor, it may have some relevance to

21  alternative designs.

22            This is not a rebuttal argument.  What this is

23  relevant to is their fundamental burden of proving causation.

24  This is their burden.  They know it and they knew it.  When

25  they filed these lawsuits, they knew it.  When they prepared

1    their expert reports, they knew this was their burden.  Their

2    expert opinions addressed this burden.

3               The problem is that when their experts stood up

4    to testify in their depositions, they couldn't sustain it.

5    That's why we are having this motion today.

6               This overview will give Your Honor a road map of

7    the comments for the next few minutes.  I would respectfully

8    suggest to my friends at this table that this really isn't a

9    *Daubert* motion.  This is a motion to exclude damaging causation

10   evidence.  When they brought their lawsuits -- and I will show

11   you this by a snapshot or two, Judge -- many of their

12   allegations compared Xarelto to other anticoagulants.  Their

13   expert reports compared Xarelto to other anticoagulants.  Their

14   expert opinions, both of the experts as well as the treaters,

15   compared the performance of Xarelto to other anticoagulants.

16              And why?  The answer is because of the

17   substantial factor test.  Their burden is to prove that these

18   events that occurred to Mrs. Orr and Mr. Boudreaux would not

19   have occurred but for Xarelto.  What brings it all together is

20   that both Mr. Boudreaux and Mrs. Orr had to be on

21   anticoagulants.  There's no question about that.  There is no

22   debate about that.  Once they are on anticoagulants, you cannot

23   compare Xarelto's treatment to a naive patient who does not

24   require any anticoagulation.  They have to prove but for

25   Xarelto this event would not have happened.

11:27

1    **THE COURT:**  The interesting thing, as I said before

2    on this case, is that in other drug cases we have all dealt

3    with, the drug is given for a purpose and there's a side effect

4    that results.  The plaintiff is damaged by the side effect, and

5    the theory is:  You should have advised us of the side effect.

6    The treater wouldn't have given it.

7                Here it's not a side effect.  It's a bleed-out

8    because of the drug.  The bleed-out is caused because the blood

9    is thinned, and that is what the drug is designed to do.  The

10   plaintiffs' position, as I understand it, is that they are not

11   claiming that there's any side effect.  They are saying that

12   the treaters should have been better advised so they could have

13   determined how much of the drug was in the plaintiff's body to

14   determine that tipping point where if you get too much of the

15   drug, you bleed out; too little of the drug, you have a stroke.

16   It has to be precariously balanced.

17               They say there should be something that allows a

18   treater to ascertain the level of the drug in the body to

19   determine whether to go forward with it or not go forward or

20   change the dose or not change the dose or operate now or not

21   operate now.  That's the defective thing.  That complicates

22   matters a little bit when you look at other drugs.

23               **MR. IRWIN:**  Your Honor, excuse me.

24               **THE COURT:**  Yes.

25               **MR. IRWIN:**  Your Honor, after lunch you will hear

11:30

1   from Ms. Sharko about the science of that side effect and about

2   the science that they propose with respect to PT testing.  You

3   heard about it earlier this morning from Mr. Newsom as well.

4               What you will hear about from me later on today

5   in the *Orr* case is that all of this was explored with

6   Dr. St. Martin.  That's within the context of a failure-to-warn

7   claim, not a design claim.  All of it was presented to him,

8   which we will go through.  He knew it all, and he said it

9   wouldn't make any difference in his prescribing decision.  I

10  know Your Honor knows that.

11              When you say this is not a matter of a side

12  effect, well, it is.  It is a warned side effect.  It is a

13  well-known side effect.  It's warned of, I think, a hundred

14  times in our labeling.  It is a tough position for a patient to

15  be in, but it's a clear decision that they make because they

16  are told by their doctor that now that you have atrial

17  fibrillation, your chance of having a clot and a stroke is

18  maybe 1 out of 10.  I'm just going to put a number out there.

19  We are going to put you on this medicine if you agree.  It's a

20  tough spot because your chance of having a brain bleed may be 1

21  out of 30 or 1 out of 40.  So it's clearly a risk that you

22  take, but it's a lesser risk.  Both of these patients,

23  Mr. Boudreaux and Mrs. Orr, knowingly were informed of that and

24  took that risk, and their doctors knew of that.

25              So the question that you're asking I do believe

1  will be addressed by Ms. Sharko.  As it relates to

2  Mr. Boudreaux, it will be addressed by Rick Sarver; and as it

3  relates to Mrs. Orr, by yours truly.

4          **THE COURT:**  Well, how do the other drugs come into

5  play with this?

6          **MR. IRWIN:**  They come into play, Judge, because these

7  two patients, Mrs. Orr and Mr. Boudreaux, had to be on these

8  other drugs.  They had to be.  If we were just making judgments

9  about Xarelto in the abstract, which is what they would like to

10  do -- it's bad this way, it's bad that way, should have had

11  this test, should have had this assay -- that would be one

12  thing.  But you can't make that judgment in connection with the

13  *Boudreaux* and *Orr* cases because both Mr. Boudreaux and Mrs. Orr

14  had to be on an anticoagulant.

15          So what they have to prove is that had they been

16  on some other anticoagulant, this would not have happened.  To

17  turn it the other way around, your jury charge is that their

18  burden to prove causation is a substantial factor test.  They

19  have to prove that this event would not have happened without

20  Xarelto.  But the only thing that they have to do in that

21  regard is to recognize that the patients that they are talking

22  about had to be on an anticoagulant.  They had to be.  If these

23  patients were not on an anticoagulant, then you could just look

24  at Xarelto.  But if you are going to make the test and ask the

25  jury to decide if this event would have happened, could have

1    happened -- or would not have happened, pardon me, without

2    Xarelto, you have got to decide that in Mrs. Orr's case,

3    because Mrs. Orr either had to be on warfarin, she had to be on

4    Pradaxa, she had to be on Eliquis, and there's no proof that

5    the event that Mrs. Orr sustained or Mr. Boudreaux sustained

6    would not have happened the exact same way the exact same day.

7    That was a question I asked, I think, of Dr. Bui, and he said,

8    I can't tell you it would not have happened the exact same way

9    the exact same day.

10           THE COURT:  They are saying the problem with Orr is

11   that the doctor decided that he had to wait a certain period of

12   time to allow Xarelto to get out of the body and that had he

13   had a test available or had he utilized a test, he would have

14   found that she metabolized and excreted that drug out of her

15   body a long time before that.  It's metabolized two-thirds by

16   the liver, one-third by the kidneys, I think it is.  Her

17   kidneys were working very well, so it was out of her body.  Had

18   the doctor known that, he would have operated sooner; and had

19   he operated sooner, she would not have died.  That's their

20   theory.

21           MR. IRWIN:  Does Your Honor recall what Dr. Bui -- he

22   is the surgeon.  Does Your Honor recall what Dr. Bui said about

23   that that's in our brief?

24           THE COURT:  Whether or not it would have clogged or

25   not clogged.

11:35

1    **MR. IRWIN:**  He said -- and I will show you the

2    quotes.  I can pull it up now, if you would like to see it, off

3    of my *Orr* slide deck.  I'm happy to do it.

4              Dr. Bui said, yes, he waited about 12 hours.  He

5    waited about 12 hours because he just didn't know one way or

6    the other if she was still anticoagulated or not.  But when he

7    was asked, Did that 12-hour delay make any difference, he said,

8    It's uncertain.  He said, I can't tell you that the outcome

9    would have been any different at all.

10             That's their burden.  That's not my burden.

11    That's not Janssen's burden.  That's not Bayer's burden.  They

12    have to prove from that witness stand that that delay caused

13    Mrs. Orr damage.  The best person in the world to answer that

14    question is the surgeon himself, Dr. Bui; and he said, I can't

15    tell you that.

16             **THE COURT:**  How do you relate that to the other

17    drugs?

18             **MR. IRWIN:**  Here is how, Judge.  Can I go through it

19    quickly, please, sir?

20             **THE COURT:**  Yes.

21             **MR. IRWIN:**  These are the complaints, their

22    complaints.  Every paragraph that's mentioned there is a

23    paragraph where they have compared the safety of Xarelto to

24    warfarin or other anticoagulants.  This is an example of some

25    of the allegations that they have made.

11:36

1        Here in the *Boudreaux* case there's no antidote

2   to Xarelto, unlike warfarin.  There's a twofold increased risk

3   with Xarelto compared to warfarin.  The risks of adverse events

4   with Xarelto were higher than other forms of treatment.  They

5   are making these allegations in their complaint because they

6   know they have to prove that.

7        The same thing with Orr.  Xarelto is not better

8   than warfarin for safety.  Xarelto has no known antidote,

9   unlike warfarin, and the other two paragraphs.

10        Their expert reports say that.  Dr. Leissinger,

11   their hematologist:  Xarelto is known to have a higher risk of

12   GI bleeding in the *Boudreaux* case.

13        Dr. Winstead, another GI expert they hired:  a

14   significantly increased risk of gastrointestinal hemorrhage

15   compared to warfarin and NOACs.

16        Or Dr. Cerri, their emergency room expert:  In

17   my professional experience, patients with Xarelto have worse

18   outcomes than people using warfarin.

19        Dr. Liechty, their neurosurgery expert:

20   Mrs. Orr was at an increased risk of intracranial hemorrhage

21   because she was taking Xarelto, as compared to other NOAC

22   agents, Pradaxa and Eliquis.

23        Their experts knew they had to establish this.

24   I went back about 13 years, Judge, and pulled up your jury

25   charge in *Propulsid*.  I have an elision there or two, but I

1    think it's fair.  It says:  "An injury is caused by a product

2    when the product constitutes a substantial factor in causing

3    harm.  Such product is a substantial factor if the harm would

4    not have occurred without the product's use, *i.e.*, but for."

5              Your Honor may remember this from Science Day.

6    There is a tool that cardiologists and prescribers use to

7    determine whether or not a person should be on an

8    anticoagulant.  It's called a CHADS score.  It's an acronym

9    that captures the risk factors like, for example, congestive

10   heart failure, with a C; hypertension, with an H; age;

11   diabetes, with a D.  There you have CHADS.

12             For Mr. Boudreaux, he had a 4 as you add these

13   points up over here.  That gave him an annual stroke rate risk

14   of 8 1/2 percent.  The guidelines are that if you are 2 or

15   over, you should be on an anticoagulant.

16             Mrs. Orr, sadly, was even in worse shape.  She

17   was a 5, with congestive heart failure, hypertension, diabetes,

18   her age, and her female gender.  Her annual risk rate for a

19   stroke was 12.5 percent.  The plaintiffs' experts and

20   treaters -- there's no debate about this, Judge.

21             The hospitalist, the prescriber, their

22   hematology expert, they all say that Mr. Boudreaux here should

23   have been on an anticoagulant.  The same thing with Mrs. Orr --

24   their emergency room expert; Dr. Bui, the neurosurgeon;

25   Dr. Liechty, their neurosurgery expert -- she had to be on an

11:39

1    anticoagulant.  Once that is accepted as a fact, then you have

2    to prove that Xarelto would have caused something that these

3    other anticoagulants did not cause.  You have to prove that

4    this event would not have happened without Xarelto, and they

5    can't prove it.

6               Dr. Timothy, who is Mr. Boudreaux's

7    cardiologist, said it could have happened exactly the same

8    outcome had he been on another anticoagulant.  Dr. Wong, the

9    prescriber, said he would have been at just as high a risk of

10   bleeding.  Dr. Leissinger, their hematology expert, said she

11   would not comment on whether he may or may not have bled on any

12   other drug.

13              In the *Orr* case, Dr. Bui, the neurosurgeon, said

14   clearly he could not establish that the outcome would have been

15   any different had Mrs. Orr been on warfarin.  He couldn't say

16   it would have been any different had she been on any other

17   novel oral anticoagulant.  The vascular neurologist agreed.

18   The team leader agreed.

19              Dr. Liechty, their expert, said this, Judge, at

20   his deposition (as read):

21        **"QUESTION:**  So you could not say to a reasonable

22        degree of medical certainty that Mrs. Orr's hemorrhage

23        would have been avoided or that her outcome would have

24        been any different on Pradaxa or Eliquis rather than

25        Xarelto, could you?  That's the acid test.

11:41  1          "**ANSWER:**  I could not, no."

2                 What's so remarkable about that, and I think why

3     I'm standing up here today, Judge, is what he said below in his

4     expert report.  In his expert report he said Mrs. Orr was at an

5     increased risk of intracranial hemorrhage because she was

6     taking Xarelto, as compared to other NOAC agents, Pradaxa and

7     Eliquis.

8                 When it came time for him to defend that opinion

9     at his deposition, he did an about-face, and he said, I cannot.

10                That's their predicament, Judge.  They have to

11    prove that this event would not have happened without Xarelto,

12    and these patients had to be anticoagulated.  That's the

13    question and the answer.

14          **THE COURT:**  Any response?

15          **MR. LONGER:**  Your Honor, I sort of feel like I just

16    entered into a *Kubla Khan* kind of dream world here where we are

17    talking about an alternative universe we don't even have to

18    address.

19                This is a trial about Xarelto.  We don't need to

20    go down the rabbit trails the defendants are telling us to go

21    burrowing through.  We have our burden of proof because our

22    clients took Xarelto.  They didn't take Pradaxa; they didn't

23    take Eliquis.

24          **THE COURT:**  He said your experts say that it wouldn't

25    have happened on any other drug, and it happened on Xarelto.

11:43

1  Then the depositions, his experts will say it will happen on

2  other drugs.

3       **MR. LONGER:**  The question is:  Was Xarelto a

4  substantial factor in causing these people's injury?  Not was

5  Pradaxa or Eliquis a substantial factor.  They weren't taking

6  those drugs.  That is a diversion and an irrelevant question.

7            We filed this motion under *Daubert* because it

8  doesn't fit the facts of the case.  I heard Mr. Irwin say a

9  couple times -- it's just astounding to me -- that

10  Mr. Boudreaux and Mrs. Orr had to be on other anticoagulant

11  therapy.  Well, the facts of the case are Mr. Boudreaux was

12  taken off Xarelto, and he was off all anticoagulants.

13            The very issue that he just said he had to be

14  on, the very drug that he said Mr. Boudreaux had to be on, he

15  was off the drug for 15 months before he had his Lariat

16  procedure.  So there's no proof to what he is saying.

17            The same with Mrs. Orr, but the fact is, with

18  Mrs. Orr, she was on Xarelto when she presented to the ER.

19  That is just how it is.

20            I just fundamentally disagree that we have a

21  burden of proving some hypothetical counterfactual statement

22  that really has no bearing in reality.  The Fifth Circuit says

23  in the *Sweeney v. Chertoff* case, Your Honor -- I just leave it

24  at that.

25       **THE COURT:**  All right.

11:45

1          **MR. LONGER:**  It's just irrelevant.

2          **THE COURT:**  I understand everybody's argument.  Let's

3    go to the next one.  We are on the defendants' *Daubert* motions

4    on dosing.  5113 and, what is it, 5114?  Let's see if we can

5    get through with this one by 12:15 or 12:30.  Then we will take

6    a break for lunch and come back.

7               Are you okay with that, Jim?

8          **MR. IRWIN:**  Yes, sir.  Thank you.

9          **MS. SHARKO:**  Good morning.

10         **THE COURT:**  Good morning, Ms. Sharko.

11         **MS. SHARKO:**  Susan Sharko for Janssen and Bayer.

12              This motion is about whether you can take an

13   observation about the behavior of a medicine from a nonspecific

14   lab test and translate it to the standard of care for real

15   patients in real time when we don't have studies and scientific

16   evidence that look directly at the lab value and correlate it

17   with the outcome.  There's three parts to my argument.

18              Number one, I'm going to talk about what's in

19   dispute and what's not.  Number two, I'm going to talk about PT

20   and assays.  Number three, I'm going to talk about why the

21   plaintiffs' hypotheses do not pass the *Daubert* test.

22              The issue before the Court is the hypothesis

23   that with a Neoplastin PT test, a physician can reliably

24   evaluate a Xarelto patient's risk of bleeding, assess the risk,

25   and counsel the patient on whether to take the medicine or not.

11:46

1    I submit that's not admissible under *Daubert*.

2              Then we go to the hypothesis that patients with

3    a Neoplastin PT of 20 or greater should not take Xarelto.  We

4    submit that's not admissible either.  Your Honor spoke this

5    morning about what is the tipping point.  There is no

6    scientifically sound evidence that tells us what the tipping

7    point is.  You can do a PT test, you can do all manner of

8    laboratory tests, but there is no scientific evidence to link

9    up that lab value with when a patient is at excess risk.

10             Likewise, there is no evidence for the atrial

11   fibrillation indication that a higher dose or a lower dose

12   would be both safe and efficacious.  So the idea that Xarelto

13   would, in fact, be safer at a lower dose is an issue the

14   plaintiffs have litigated hard and then abandoned.

15             For that reason we request that the order be

16   entered we submitted as Exhibit 47.  The specific issue is

17   addressed in paragraph 4 of the order.  Likewise, what is not

18   at issue here is whether Xarelto would be safer if dosed twice

19   a day instead of once a day.  That's in paragraph 3 of the

20   order.  That's important because we have expert testimony on

21   this.  We briefed it as to why it was (a) preempted and

22   (b) inadmissible under *Daubert*.  The plaintiffs said no, they

23   abandoned it.  That's not the issue.  But then other places in

24   their briefs and even here today at the podium they say, Well,

25   we are going to talk about it.  We can't talk about it if it's

11:48

1    inadmissible under *Daubert*.

2              And then the last issue -- that appears to be

3    abandoned, and so I won't address it -- is that laboratory

4    assays, including PT, can be used to dose-adjust or monitor

5    patients.  That's in paragraphs 5 and 6 of Exhibit 47.

6              So with that, we go to PT.  Now, there's been

7    talk about an anti-factor X assay and PT in the briefs and here

8    in the courtroom this morning.  The reality is there is no

9    commercially available, FDA-approved factor X assay in the

10   United States of America.  One company, Stago, has been trying

11   to get an assay approved by the FDA for something like five

12   years.  They have not been successful.  So you can talk about

13   an assay, but there is none.

14             What there is are PT tests, and so I will focus

15   my remarks this morning on that.  There's all manner of PT

16   tests available on the market.  PT is a nonspecific test.  It

17   measures the prothrombin time, that is, how fast does your

18   blood clot, but it doesn't tell you why your blood is clotting

19   too fast or too slow.

20             There's a couple reasons for that.  One -- and

21   this is the clotting cascade.  Your Honor saw that on

22   Science Day.  The clotting cascade involves many different

23   factors or proteins.  Xarelto is very specific.  It acts on

24   factor X, Roman numeral X, and only Roman numeral X.  That's

25   true for Eliquis and Savaysa.  By contrast -- and there was a

11:50

1    discussion here about Arixtra and Pradaxa -- they act on

2    different parts of the clotting cascade.  Pradaxa is an

3    antithrombin iii inhibitor.  It has nothing to do with

4    factor X.

5              So the PT tests that we are talking about look

6    at factors II, V, VII, and X.  They are not specific to

7    factor X.  What does this mean?  If you get a PT test that's

8    high or low, you don't know if it's because you have too much

9    or too little factor X on board.  Your result could be what it

10   is because of factor II or factor V or factor VII, or because

11   you have liver disease or liver injury, or because you are

12   taking medicines, supplements, or herbal remedies that affect

13   the PT.  There are many medicines that affect PT:

14   barbiturates, oral contraceptives, hormone therapy.  Severe

15   diarrhea and vomiting that cause dehydration can affect the PT.

16   Alcohol and food.  It's a nonspecific test.

17             While there is a rough linear correlation

18   between the drug concentration of Xarelto in the body and the

19   PT test, that correlation depends on the PT test that is used.

20   It depends very much on when the blood is drawn.  That's really

21   important because, as you recall from Science Day, Xarelto

22   passes through the body really quickly.  And so if you draw the

23   blood and do a PT test two to four hours after dose, many

24   people will have a high PT.  They will be over 20.  If you draw

25   it closer to the 24-hour mark, the levels will be very low.

11:52

1   This presumes that you know when the patient took the medicine.

2   When they come into the lab, they can tell you, I took it at

3   this particular time.

4           We also learned at Science Day -- and I don't

5   think it's in dispute -- that patients don't bleed simply

6   because they have too much of a medicine in their body.  There

7   has to be some pathology, and the anticoagulation medicines

8   then exacerbate, but they don't cause the bleed itself.

9           So the science isn't there.  The tests haven't

10   been done.  There's no scientific basis to say if you have a PT

11   of X, then you are at Y risk of having a bleeding event.  Or

12   even that this medicine is just too dangerous for you to take.

13   There's too large an analytical gap between the use of this

14   nonspecific test and how to interpret it and how to use it in

15   the real world.  That's what brings us here today.

16           **THE COURT:**  Do any PTs tell you the amount of

17   factor X?

18           **MS. SHARKO:**  No, they do not.

19           Now, as the Fifth Circuit said in the *Guillory*

20   case, *Daubert* teaches us that the Court's responsibilities as

21   the gatekeeper are to ensure the testimony rests on a reliable

22   foundation, that the evidence is reliable and relevant, and to

23   exclude evidence where the probative value is substantially

24   outweighed by the danger of unfair prejudice.  The theory that

25   you can use these tests to get lab values that you can then act

1    on fails each of those points.  The theory is unreliable,

2    untested, it's not generally accepted, and it doesn't fit.

3                So for today's argument I want to focus on the

4    empirical data and what the plaintiffs' experts say about it.

5    This is from one opinion where the court said the question is:

6    Does the proponents' empirical data establish that this expert

7    can accurately draw the inference that he or she is prepared to

8    testify to?  The answer here is no.  The answer no comes from

9    the mouths of the plaintiffs' experts themselves.

10                Dr. Gosselin agrees that the use of the

11    Neoplastin PT test -- and that's a specific brand of PT

12    testing -- with Xarelto "has not been validated, verified, or

13    harmonized by any laboratory organization."  He says -- and

14    this is the plaintiffs' expert -- that "PT should not be used

15    to quantify or estimate" the concentration of Xarelto,

16    especially given that physicians, to his knowledge, don't

17    really know what method they have in the laboratory.

18                Dr. Rinder, plaintiffs' expert, has "not seen

19    data developed that would . . . enable him to make a

20    knowledgeable decision" about whether, "to a reasonable degree

21    of medical certainty," he believes that "as a Xarelto patient's

22    PT increases, he or she is at a greater risk of a fatal bleed."

23                Dr. Backes, another one of plaintiffs' experts:

24    "A particular prothrombin time has not been established" to

25    measure the level of Xarelto in the blood or the degree of

11:56

1    anticoagulation, much less bleeding risk.

2              Dr. Cuculich, another plaintiffs' expert, he

3    cannot "draw a line in the sand" for a PT value at which he

4    "would tell doctors in the label to discontinue Xarelto."

5              Dr. Leissinger, another plaintiffs' expert:  "We

6    don't know . . . what the risks of bleeding and clotting are

7    for patients" at different concentrations.  "We just don't know

8    that."

9              Dr. Maggio:  We do not "have any data that shows

10   that, in fact, patient safety would be improved . . . through

11   monitoring of rivaroxaban."  "The question of whether or not

12   Xarelto should be monitored can't be addressed because of a

13   lack of information."

14             It's not just the plaintiffs' experts who say

15   this.  It's the FDA, regulatory authorities in Europe, and all

16   the major scientific organizations who look at this issue and

17   who have published guidelines.

18             In addition to those organizations -- well, let

19   me say it this way.  The plaintiffs' experts agree that it is

20   not generally accepted.  Mr. Bussey, a plaintiffs' expert, does

21   not know of any professional organization that has recommended

22   the use of PT testing with Xarelto patients.

23             Dr. Cuculich:  Not aware of any professional

24   medical society that has issued medical practice guidelines

25   that recommend or require PT testing for Xarelto.

11:57

1           Dr. Leissinger has not seen any professional
2   medical societies that have issued practice guidelines
3   recommending this.
4           And Dr. Rinder (as read):
5           **"QUESTION:**  Do you agree that there's no public
6       health organization or regulatory body who has recommended
7       a specific reasonable and conservative cut-off point for
8       which Xarelto should be discontinued?
9           **"ANSWER:**  They have not reached that conclusion as
10      yet."
11          Now, there was a lot of talk this morning about
12  Canada, and so I want to show you a section of the Canadian
13  label that nobody talked about.  Different parts of the
14  Canadian label were shown to Your Honor, but not this.
15          The Canadian label for Xarelto says:  Although
16  various clotting parameter tests -- PT, aPTT, HepTest -- are
17  affected by the mode of action of Xarelto, none of these
18  clotting tests have been demonstrated to reliably assess the
19  anticoagulant activity of rivaroxaban following Xarelto
20  administration.
21          None have been demonstrated to reliably assess.
22  It seems like the Canadian regulatory authorities knew the
23  *Daubert* standard.
24          Now, that's the general argument.  Then we have
25  a specific argument.  Even if Your Honor was inclined to let

1    these untested opinions into evidence, the reality is they

2    don't fit the facts of this case.  We do not have Neoplastin PT

3    test results for either Mr. Boudreaux or Mrs. Orr.  All we have

4    are Innovin test results.  Their PTs were measured using

5    Innovin when they were admitted to the hospital.  Do you know

6    what?  Mrs. Orr's PT test was normal, and Mr. Boudreaux's PT

7    test was just slightly elevated.  Many doctors would not say it

8    was abnormal.

9            How do you get from those results to a

10   hypothetical Neoplastin result?  Well, plaintiffs' expert,

11   Dr. Rinder, and Dr. Rinder alone -- he is the only one, I

12   think, in the world who says this.  He has an idea, a

13   hypothesis.  He says, Well, I have a conversion formula.  You

14   do this math.  If you have an Innovin PT of this, that

15   translates to a Neoplastin PT of that.  It's sort of like

16   inches to centimeters or Fahrenheit to Centigrade.

17           But there's one problem.  There's no science to

18   support that.  I ask that you look at his testimony about this

19   specific issue.  He is asked (as read):

20           "QUESTION:  Did you write your calculations out?

21           "ANSWER:  No.

22           "QUESTION:  Did you make any notes?  It's not in your

23       report.  Where can we find your data?

24           "ANSWER:  Oh, it's in my head.  I looked at the data,

25       I looked at some figures, and then I figured out what it

might be.

"QUESTION:  Well, tell us the source of these graphs you looked at.

"ANSWER:  Oh, it's the Douxfils paper."

So let's look at what the Douxfils paper said. The Douxfils paper studied blood in a laboratory.  It was an in vivo test as opposed to -- it was an in vitro test as opposed to an in vivo test.  It used spiked plasma.  They said:

The results of our study need to be validated in patients using Xarelto.  Moreover, it is currently unknown how coagulation assays are predictive for the bleeding risk.

It is currently unknown, and this is the paper that the plaintiffs' expert relies on.

You go further down, and this whole thing is described as a hypothesis.  Well, a hypothesis isn't good enough.  As Your Honor said in the *Propulsid* opinion, a trial court must function in the present, assessing evidence that presently exists.

At best, the plaintiffs' experts presently have untested hypotheses.  So where does that take us?  Application of their theories is just rank speculation here.  The plaintiffs seem to want the jurors to believe that Mrs. Orr and Mr. Boudreaux were what they call, quote/unquote, super responders, a phrase you won't find in the scientific literature.  It was made up for the litigation.

As I mentioned, Mrs. Orr had a normal PT lab value.  Mr. Boudreaux's was slightly elevated.  So they want the jurors to assume that if the FDA had cleared PT or another assay for this type of testing -- which the FDA has not -- and if the prescribers believed that the PT test would have been beneficial back when the medicine was started -- and there's no evidence of that -- and if Neoplastin was available and used -- there's no evidence of that -- and if then the PT on neoplastin was over 20 -- there's no evidence of that -- then under those circumstances Dr. St. Martin and Dr. Wong, the prescribers, would have made the decision that the risk of a bleed for those patients outweighed the benefit of Xarelto.  There's no evidence of that either.  But then what would they do?  They would have to put them on another anticoagulation medicine.

There's been questions this morning about the label, what does the Pradaxa label and the Arixtra label say about testing.  I submit that if we are going to do a label-by-label comparison, the appropriate comparison is to the other factor X inhibitors, Eliquis and Savaysa, not to Pradaxa and Arixtra.  Arixtra is a low molecular weight heparin.  It's like a type of Lovenox.

No one can say, as Mr. Irwin just argued, that the result would have been any different for these people had they been on Pradaxa or had they been on Eliquis.  So that's just too big an analytical gap.

1          As you said in the *Vioxx* case, scientific

2    evidence is only relevant if the experts' reasoning or

3    methodology can be properly applied to the facts at issue,

4    meaning that there has to be an appropriate fit between

5    scientific testimony and specific facts.  Scientific evidence

6    is irrelevant when there's too great an analytical gap between

7    the data and the opinion proffered.

8          The Supreme Court in *Daubert* said that

9    scientific methodology today is based on generating hypotheses

10   and testing them to see if they can be falsified.  Indeed, this

11   methodology is what distinguishes science from other fields of

12   human inquiry.  We have here an absence of tested hypotheses

13   and, therefore, a failure of methodology.  The gate-keeping

14   function imposed by *Daubert* is an important balance between

15   science and the law.  It's now the rules of our road.  It

16   ensures that we operate safely and we operate fairly.

17          About 14 years ago I stood before Your Honor and

18   talked about this in the *Propulsid* litigation.  I think I

19   mentioned that my sons at the time were studying the scientific

20   method in school and writing lab reports.  You know, we still

21   talk about this.  My oldest son is now a combat helicopter

22   pilot in the U.S. Navy.  What they have for their scientific

23   method is a preflight checklist.  No helicopter leaves the deck

24   of a destroyer, whether it's in the South China Sea or the Gulf

25   of Oman, until you go through this preflight checklist.  It's

12:06

1    followed each and every time.

2              Our preflight checklist is *Daubert* and the

3    requirements of *Daubert*, and the off-label use of a test to

4    assess risk and derive important treatment decisions does not

5    pass the preflight checklist.  It does not meet the *Daubert*

6    standard.

7              Now, why is that so important on these facts?

8    If we are going to expose patients to a test, we need to ensure

9    that the test results can be used with reasonable certainty to

10   help the patient.  To do that, you need data, and we don't have

11   the data.

12             Dr. Peacock talked about this rather eloquently.

13   Just because you know a number that's X, a PT value, say, for

14   example, if you don't know what to do with X, you don't have

15   any information.  The simple presence of a test doesn't

16   guarantee a beneficial result.  That's the problem here, is the

17   supposed test tells you the patient has an anticoagulant level

18   of X.  None of these tests can do that.  But now what?  Do you

19   change the drug?  Now what happens, you can hurt the patient.

20   Until you prove the consequence of what you suggest, it's

21   irresponsible.

22             Unlike Propulsid and Vioxx, the plaintiffs here

23   admit that Xarelto is a safe and effective medicine.  It's an

24   important medicine that's taken by millions of patients every

25   day.

1          Instructions on testing and what to do with a

2    test result need to be grounded in science.  As the

3    Eleventh Circuit said, hypotheses are verified by testing, not

4    submitting them to a lay jury for a vote.

5          As Your Honor said and as the Seventh Circuit

6    has said, the courtroom is not the place for scientific

7    guesswork, even of the inspired sort.  Law lags science; it

8    does not meet it.

9          **THE COURT:**  Before you leave, they take the position

10   this is not appropriate under *Daubert*, that it's not a *Daubert*

11   issue, it's something else.  How do you see that?

12         **MS. SHARKO:**  I don't understand that position at all.

13   This is scientific evidence.  They want the jury to decide what

14   should happen to a patient when they are taking a medicine,

15   what tests should be employed, and how those results should be

16   interpreted.  That's science, and science means *Daubert*.

17         **THE COURT:**  Okay.  Let me hear from your opponent.

18         **MS. SHARKO:**  Thank you.

19         **MR. DENTON:**  Good afternoon, Your Honor.  I'll try to

20   be brief.  Roger Denton on behalf of plaintiffs.

21         As you said earlier this morning, it's like two

22   ships passing in the night.  We are still there, Your Honor.

23   They have in this argument actually reframed even what they put

24   in their papers.

25         I want to restate as clearly as I can what our

12:10

1    case is.  Every anticoagulant on the market at the time Xarelto

2    was approved had some laboratory test available for the

3    physicians to assess the effect.  Why?  Because not enough of

4    an anticoagulant leaves you exposed to stroke in this

5    indication; too much causes you to bleed or be exposed to

6    risks.  They do it for warfarin.  They do it for heparins.

7    They do it for Lovenox.

8              This idea that we are talking about regular

9    monitoring -- all those quotes from those experts that

10   Ms. Sharko just referred to are related to monitoring,

11   warfarin-like monitoring, which is every three or four weeks,

12   and you adjust dose forever.

13             We are not saying that, Judge.  We are saying

14   basically one test at initiation or maybe once every year

15   thereafter, or if there's a clinical change in the condition,

16   you test to see where the patient is at, and you make a

17   decision -- in the United States not to adjust dose, but to

18   make a decision on the risk/benefit.  Is the risk of bleeding

19   too high for the stroke benefit?

20             Mr. Boudreaux, for example -- and Mr. Barr will

21   get into it in his specific case -- once he had his GI bleed on

22   Xarelto, he still had AFib, and the doctors made the decision

23   that the risk was too high to continue him on an anticoagulant,

24   and he went 15 months without any.  So this idea that anybody

25   has to be on an anticoagulant if they have AFib is just wrong.

12:11

1      **THE COURT:**  But they take the position that the PT

2    test doesn't tell anything about Xarelto; that Xarelto targets

3    the factor X, and the test evaluates II, III, IV, and X or

4    whatever.

5      **MR. DENTON:**  Well, if that's true, Your Honor, then

6    Bayer is telling every regulatory agency in the world just the

7    opposite.  They also told -- Janssen also told the FDA the

8    opposite.

9              Let's move on to some of these slides.  Let's go

10   to Slide 11, if you could, please.  This gets into -- one more,

11   please.  So this -- first of all, you have to understand,

12   Judge, why we say this really isn't *Daubert*.  They didn't

13   challenge any particular expert opinion.  They didn't go

14   through a methodology issue.  They don't challenge methodology.

15   They don't challenge expertise.  All the experts rely on the

16   same data.  What do our experts rely on?  The clinical trial

17   data, the ROCKET data, the same data that the FDA looked at.

18              To answer your specific question about PT, let's

19   not forget, in every clinical trial Bayer used PT to assess the

20   effect, ROCKET and in their Phase II trials.

21              Next slide, please.  So what we have, the FDA

22   looked at this data on PD relationship, which they are

23   referring to the PT test, and they asked four questions.  Let's

24   look at the answers to the FDA's evaluation of whether or not

25   PT can measure Xarelto effects.

12:13

1          Next slide, please.  They ask this very

2    question, the FDA, reviewing the ROCKET data:  Can PT be used

3    as a surrogate marker for PK?  The answer is yes.  There is a

4    correlation between plasma concentrations and PT.  When they

5    say PT here, it's Neoplastin PT because that is what was done

6    and what was used in all of their studies.

7          The important slide is the next slide.  The next

8    question:  "Is there a PT-bleeding relationship?"

9          The FDA's answer is:  "PT data from 7,008

10   patients in ROCKET" -- that's all the Xarelto patients --

11   "demonstrates that the risk of major bleeds increases with PT."

12         The FDA is analyzing this data.  But it's not

13   just FDA -- and let's look at what the chart shows.

14         Next page.  Ms. Sharko points out, well, we

15   don't know what a PT time means on the rate of bleeding.  Well,

16   look at this chart, Your Honor.  PT is on the X axis.  As PT

17   goes up from 6 all the way out to about 26, it's increasing, as

18   you see.  The bleeding risk on the Y axis goes up all the way

19   up to 8.  What you see is the line goes up like this,

20   Your Honor.  So what that means is we know if you have a PT of

21   20 seconds, you're going to have a bleeding risk of about 5.

22         That's what clinical physicians do when they

23   deal with making these decisions.  So the idea to say there's

24   no data to tell us what 20 seconds or any PT time means in

25   bleed risk is just flat not accurate.  Their own data, the

1    ROCKET data, shows that, Your Honor.

2                   Let's go to the final -- next slide, please.

3    This is -- the next slide, please.  This is an important

4    document, Your Honor.  This is the summary review.  This is the

5    FDA looking at the ROCKET data in November of 2011, at the time

6    of approval.  Let's see what they say, looking at their data.

7    They talk about the prothrombin time.  This demonstrates there

8    is a correlation between PT and risk of bleeding.

9                   "This applicant has chosen not to utilize this

10   information."  In other words, they are not putting it in the

11   label.  They have chosen not to tell the doctors to do it.

12                  The FDA also goes down here at the bottom,

13   highlighted:  "However, infrequent monitoring (perhaps at

14   initiation and yearly thereafter) to assure appropriate dosing

15   of drugs that prevent stroke and causes bleeding may improve

16   outcomes and be acceptable to the patients."

17                  That's our theory of the case.  The FDA said it

18   in November of 2011.  All of our experts have said it.  The

19   defendants have known that from the beginning.  They somehow

20   wanted to act like they don't know what we are talking about.

21                  Let's move forward to the Janssen analysis.

22   Janssen also did an analysis, their own analysis separate from

23   the FDA, on the PT bleed risk, of documents out of ROCKET.  So

24   Janssen does their own and submits it to the FDA.  Let's see

25   what that shows.

1    Next slide, please.  This is Janssen's crunching

2  of their own numbers from ROCKET with PT and major bleeds.  So

3  these are the quartile analysis.  These are PT levels,

4  Your Honor, Neoplastin PTs.  As those go up in the quartile

5  analysis, you can see the percent of major bleeding goes up.

6  Not only does it go up, which is consistent with our theory of

7  the case and what the FDA says, we know exactly what the rate

8  is.  This is Janssen's own assessment, their experts looking at

9  the same data as our experts, drawing the same conclusions.

10    Now, next slide, please.  FDA told -- or Janssen

11  told FDA that they didn't think that this data they looked at

12  supported the PT evaluation, but -- next slide -- as we will

13  see, Troy Sarich, one of the top Xarelto physicians [sic] at

14  Janssen, was asked this question about these documents.  This

15  is important (as read):

16      **"QUESTION:**  So at the end of the day, the FDA and

17      Janssen didn't reach an agreement on the relationship

18      between PT and bleed risk?

19      **"ANSWER:**  That's correct."

20    So at the end of the day, the FDA was of the

21  opinion that there was a correlation between PT and bleed risk,

22  and he obviously has to admit that.

23    So the point here, why this really isn't

24  *Daubert* -- they cite to your *Vioxx* order where you referred to

25  these *Daubert*-like motions.  One of them was -- there was a

12:18

1  dispute in that case whether long-term use was necessary to

2  increase cardiovascular risk, the short-term risk.  What you

3  said was, very clearly, everybody is looking at the same data.

4  Everybody is qualified.  They are coming to different

5  conclusions.  That's not the gatekeeper role.  That's what's

6  going on here.

7           More importantly -- next slide, please --

8  Bayer -- this is Dr. Berkowitz.  This is the head guy from

9  Bayer on Xarelto.  He was asked in his deposition (as read):

10           "QUESTION:  But they do establish, you note, that PT

11      is predictive of bleeding risk?"

12           What did he say?

13           "ANSWER:  Yeah."

14           Mr. Barr was talking to him about it all

15  morning, that PT is predictive of bleeding, which is something

16  we have said over and over the last couple hours.  So Bayer

17  agrees with plaintiffs' theory of the case.

18           Some of these other things Ms. Sharko brought up

19  I think I have answered, Your Honor.

20           Let's go to Slide 24, I think it is.  She said

21  in addition to the data I have showed you -- one back, please.

22  One more forward.  I'm sorry.  Dr. Rinder.  One more forward.

23  There he is.

24           She said there's no opinion as to what the

25  clinical significance is.  Dr. Rinder, a hematologist from

1   Yale, he spoke at Science Day.  He says very clearly in his

2   opinion, looking at the same data the Bayer and Janssen experts

3   are looking at, that Xarelto therapy should be discontinued

4   with a PT of greater than 20 seconds as measured with the

5   appropriate reagent, Neoplastin, at an appropriate time, to

6   avoid excessive risk of major bleeding.  So there is evidence

7   to support this.  It's not just our experts.

8            Next slide, please.  International labels say

9   this -- Bayer's labels, by the way:  Prothrombin time is

10  influenced by a dose-dependent manner with Neoplastin.  In

11  cases of excessive doses, the PT is expected to be outside of

12  the range.

13           They say the same thing in Health Canada:

14  Prothrombin time.  Neoplastin reagent.  Measuring the PT using

15  the Neoplastin reagent may be useful.  Remember that.  That's

16  what the U.S. regulatory requirement is, that this test is

17  useful to determine the excess of anticoagulant activity.

18           So you have got a situation where they are

19  arguing in here completely different than what they say in

20  their label.  But it's not just them.  They say there's no

21  professional societies that support our theory of the case.

22           Next slide, please.  Actually, they are wrong

23  about that, Your Honor.  We put this in our response, and they

24  didn't deal with it in the reply.  They didn't deal with it

25  here today in the argument.  There are societies.  PT is a

1  useful and available method to determine the degree of

2  anticoagulant effect.

3           International Society on Thrombosis:  PT is

4  useful and readily available.

5       THE COURT:  Was this a question of fact?  You're

6  telling me they say one thing and you say another?

7       MR. DENTON:  What I'm basically saying, Your Honor,

8  is what you said in *Vioxx*, you've got it, that we are all

9  looking at the same data.  We are crunching the same data.

10  Everybody is qualified.  Everybody is using the same

11  methodology.  They are coming to different conclusions.  That

12  is not a proper -- if they submit that as a *Daubert* kind of

13  issue-type argument, you have been very clear -- of the six

14  such arguments made in *Vioxx*, you denied every one on both

15  sides.  You essentially said that if you have qualified experts

16  looking at the same data, making evaluations in the same way,

17  and simply drawing different conclusions, then you can't keep

18  it away from the jury.

19           Here we have the FDA supporting us.  Plaintiffs'

20  experts support us.  Peer-reviewed literature supports us.

21  Practice societies support us.  Bayer's labeling in other parts

22  of the world support us.  Really, the only persons that tend to

23  disagree are Janssen.  Janssen and Bayer are kind of on two

24  different alternative universes on PT Neoplastin as well.

25           Then the other thing -- I do have to show you

12:22

1    this.  This is a Janssen document, although it's marked

2    confidential.

3                 Can you go to Slide 30, please.  There you go.

4                 They produced this to us, a document that

5    apparently is available -- if a doctor asks for it, they will

6    mail it to them -- on whether or not PT can be used as an

7    appropriate coagulation test.  Janssen tells them -- not in the

8    labeling, by the way -- there that, yes, you can use

9    Neoplastin PT.

10               There's also this discussion, well, how do we

11   know that Mr. -- well, there's one other point I want to make,

12   and then I will move on to Mrs. Orr and Mr. Boudreaux.  This is

13   important, Your Honor.

14               Let's go to the peer-review slide.

15   Defendants -- think about this -- have not cited a single

16   peer-reviewed article that states that Neoplastin PT cannot be

17   used to evaluate bleed risk in a Xarelto-treated patient.  If

18   anybody is coming up with testimony solely for litigation, it's

19   the defendants, because their own data supports our theory of

20   the case.  There's not a single article they have cited and can

21   cite to that supports their position.  Even if they did, it

22   would still be a question of a battling of experts on the same

23   data for the jury to decide.

24               There's also this discussion -- which I don't

25   understand, since they have used it in all their clinical

12:24

1   trials and have said in their clinical trials, Dr. Kubitza and

2   Mr. Mueck, their head pharmacology people at Bayer, that you

3   can use Neoplastin PT to assess the fact.  They published that

4   as early as 2005.  So this idea that PT isn't approved to test

5   is just again not accurate.

6            Let's go to the slide with Dr. Kessler's

7   testimony on that very issue, because they ask him about that.

8            Now, we have Dr. Kessler, former commissioner of

9   the FDA, as our expert.  He was appointed by two different

10  presidents, the first Bush and President Clinton.  He was with

11  the FDA a long time.

12           They were asking about this guidance document in

13  some of the testimony you've heard here today.  What did he

14  say?  "Neoplastin is available to measure PT.  It is approved

15  to assess bleeding risks and can monitor bleeding risks."  So I

16  don't understand their argument at all.  They are just wrong.

17           There's one other thing.  They said our experts

18  haven't changed their prescribing practices.  We didn't hear

19  that from Ms. Sharko, I guess, because they realized they were

20  wrong.

21           Dr. Smart, chief of cardiology right here at

22  LSU, plaintiffs' expert, has very clearly said in reviewing

23  these materials, in treating patients, "I have completely

24  abandoned the use of Xarelto . . . I continue to advise my

25  students and residents and other physicians" -- it goes on to

1    say -- "not to use Xarelto in the AFib indication."

2                    So moving on now, they briefly mentioned

3    Mr. Boudreaux and Mrs. Orr, well, you can't prove anything

4    because they didn't have a Neoplastin PT before their event.

5    Well, first of all, the label doesn't tell the doctors to do

6    the test.  So of course these patients didn't have that test.

7    In fact, you will hear from Dr. Wong and Dr. St. Martin they

8    didn't know a test was available.  So the plaintiffs are not

9    going to have a test before the bleed.

10                   Next slide, please.  What we do know -- keep

11   going, please -- is that these patients had a major bleeding

12   event on Xarelto.  We know from their own data that as PT goes

13   up, bleeding risk goes up.  It is more likely than not both of

14   these patients, if they would have been evaluated, would have

15   had an elevated PT.  As the Court mentioned earlier, we also

16   know that reduced kidney function increases Xarelto exposure.

17   Mrs. Orr had severe kidney dysfunction and likely to have a

18   higher, elevated PT.

19            **THE COURT:**  She says that the PT tests were normal or

20   not problematic, at least, in one of them.

21            **MR. DENTON:**  Let me explain that, Your Honor.  This

22   is where this combination of patchwork of quotes and confusion

23   and, frankly, scientifically inaccurate arguments are that I

24   have to clear up.  Every reagent for PT will give you a

25   different result.

12:27

1    Go to the last slide.  This will be the last

2  slide.  Keep going all the way to my last slide.  There you go.

3    This is the Douxfils article.  What this expert

4  did and published -- peer-reviewed, and it's in all of our

5  reports.  What he did, Your Honor, he took samples of blood and

6  put known quantities of rivaroxaban in it and used different

7  level -- used these different reagents.  Okay.  What you found

8  is -- this is the PT time over here.  This is the

9  concentration.  It's what you find -- I'm sorry this isn't

10  blown up, but it's in our brief.  As you see these different

11  reagents up here, Your Honor, with PT you are going to get a

12  different slope and a different absolute number.  Okay.

13    So an Innovin PT of 13.6 is not the same as a

14  Neoplastin of greater than 20.  Mr. Boudreaux, in the emergency

15  room at least 12 hours after his last dose and maybe 36 hours

16  after his last dose -- there's some factual dispute there -- he

17  still has an Innovin PT of 13.6.  When you look at this -- you

18  can't see it here, but what Dr. Rinder did in his deposition --

19  when you just read this chart and you go to an Innovin of 13.6,

20  you can see he is way over 20 on the Neoplastin PT.

21    So it's not some calculation or some magical

22  mystery here.  You look at a peer-reviewed article that shows

23  the variations.  So for them to come in and say that

24  Mr. Boudreaux only had a 13.6 PT, you have got to say it wasn't

25  Neoplastin; it was Innovin.  Innovin 13.6 is still highly

12:29

1   elevated, as the evidence shows, outside of the reference range
2   way after his last dose, which clearly shows he had an elevated
3   anticoagulant effect by Xarelto and would have clearly had an
4   over-20 PT.  We have direct evidence in his case.
5           As to Mrs. Orr, let's not forget, in the
6   emergency room a normal PT was what she should have had.  She
7   hadn't taken the dose probably for 36 hours.  It's a tragic
8   case.  She'd been taking Xarelto.  She goes to dinner right
9   over here at Ruth's Chris, has a horrible headache, goes home
10  thinking she is going to be sick.  She doesn't even finish her
11  meal.  She goes home, has a headache.  Her family is called
12  after several hours.  She's vomiting, becomes comatose, goes to
13  the hospital, and she has a massive brain hemorrhage.  Very
14  tragic.
15          They do a PT Innovin at the time and find out
16  it's normal.  Well, if that would have been in the label and
17  told these doctors that that means Xarelto is no longer on
18  board -- a normal Innovin would tell them at least it's not
19  on board, and they could have done immediate surgery.  But they
20  couldn't.  Why?  Because the label says wait 24 hours because
21  there's no way to test.  That's what happened in the 12-hour
22  delay, a tragic consequence.  She suffered for 10 days with her
23  family before she ultimately passed away.  The point there is
24  that PT should have been low.  It shouldn't have been over 20.
25          So with that, Your Honor, I will finish, unless

1    there's any particular questions.

2         **THE COURT:**  No.  Thank you.

3         **MR. DENTON:**  Thank you.

4         **MS. SHARKO:**  The documents that Mr. Denton refers to,

5    the things that he showed the Court, those relate to the

6    conclusion that there's a rough linear correlation between the

7    PT test result and the concentration of the medicine.  There is

8    and remains no evidence, no sound scientific evidence from

9    which you can make scientific conclusions about how to assess

10   risk and treat patients based on a PT lab value.

11        **THE COURT:**  Do you feel that there's some evidence

12   that he puts up that supports the view that certain PT tests

13   can show levels of Xarelto in the body?

14        **MS. SHARKO:**  No.  The best that can be said is that

15   there is a rough correlation, but the PT tests could be

16   elevated for any number of reasons.

17             This is in the medical literature.  There's a

18   recent study from Italy of 635 patients.  I know the plaintiffs

19   are aware of it.  I'm happy to supply Your Honor with a copy of

20   it.  They look at these issues, and they conclude the use of PT

21   or aPT in clinical practice to evaluate NOAC anticoagulant

22   activity could cause dangerous misinterpretations.  Why?

23   Because we don't have the science.  We don't have the science.

24   It should be inadmissible.

25        **THE COURT:**  Let's stop here and come back in an hour

12:33

1   and 15 minutes, so a quarter to 2:00.  1:45.

2               **THE DEPUTY CLERK:**  All rise.

3          (Lunch recess.)

4                          * * *

1          <u>**AFTERNOON SESSION**</u>

2           **(March 23, 2017)**

3           **THE COURT:**  Be seated, please.

4               We are resuming our motions.  We have two left,

5    the defendants' motion on Boudreaux and defendants' motion on

6    Orr.  Okay.

7               **MR. SARVER:**  Good afternoon, Your Honor.  Rick Sarver

8    for Janssen and Bayer.  It's Janssen's and Bayer's motion for

9    summary judgment on the learned intermediary theory on

10   causation in Boudreaux.

11              **THE COURT:**  Uh-huh.

12              **MR. SARVER:**  I'm not going to go into the law,

13   because you wrote most of it.  We are looking at the *Allgood*

14   case that you authored in 2009, I believe, and the *Whitener*

15   case that you did just a couple years ago.

16                  It turns on the testimony of the treating

17   doctor.  The treating doctor here is a Dr. Kenneth Wong.  He

18   was deposed.  We know what he said.  Kind of cutting to the

19   chase, what he said at the end of the day, after all the

20   deposition, after all the woodshedding with the plaintiff

21   lawyers, "Medically appropriate to prescribe Xarelto to

22   Mr. Boudreaux?" specifically, and he said yes at the end of the

23   day.

24                  Now, plaintiffs have honed their theory from a

25   failure-to-warn theory to a failure-to-instruct theory.  So I

01:45

1    think it's useful for us to go through the Boudreaux and Wong

2    deposition and look at this failure-to-instruct theory in the

3    way the plaintiffs have articulated it.

4              I think what we understand it to be -- and I'm

5    sure Mr. Barr will correct me if I get it wrong.  I think they

6    are saying we should have said these two things in the label:

7    We should have told doctors to perform a Neoplastin PT about

8    four days out after the initiation of treatment so it all gets

9    flowing through the system, at about 14 hours into the dose --

10   so, you know, you're getting kind of a middle dose -- and if

11   that PT test using Neoplastin PT was over 20, then the doctor

12   should do something.

13             I don't believe the plaintiffs are saying that

14   they should tell or we should tell the doctor what to do at

15   that point because that would be an invasion of his clinical

16   judgment.  I think that's what their theory is.

17             Now, Dr. Wong was given this theory and told

18   about this theory before he was deposed by us and by the

19   plaintiff lawyers.  He was appropriately woodshedded like you

20   do when you have the opportunity, and the theory about the PT

21   was given to him.

22             He talked about that.  He said they were talking

23   about a specific reagent or PT with Xarelto and monitoring.  So

24   he got it, he was given their theory.  Then they talked

25   about -- they actually gave him some documents to support the

1   arguments that they are making.  Still, at the end of the day,

2   Dr. Wong said (as read):

3            "QUESTION:  Knowing what you know today, would you

4        still prescribe Xarelto to Mr. Boudreaux?

5            "ANSWER:  Yes."

6            That really takes us where we need to go under

7   both *Allgood* and *Whitener*, your decisions.  You indicated when

8   you wrote -- I think it was *Allgood* you said, for better or for

9   worse, these decisions kind of turn on the testimony of the

10  treating doctor, sometimes involving speculative answers to

11  hypothetical questions.  Well, that is where we are.

12           But we have to take a look at what the doctor

13  actually said because he told us the answer to these questions

14  in *Boudreaux*.  I think all of us want to go to trial.  I know

15  you are excited to.  I would like to try this case.  This case

16  isn't one that should go to trial, because Dr. Wong really

17  takes it out of our hands under the learned intermediary

18  theory.

19           So looking at -- oh, this is the other point.

20  The subgroup data really has no place at all.  There's simply

21  no argument on subgroup data.  That's the U.S. data,

22  Your Honor, that shows a 1.5 hazard ratio for Xarelto on major

23  bleed risks.

24           Well, Dr. Wong was asked specifically about

25  that.  He couldn't have been more clear.  We don't have to

1    speculate here about what he would have done.  He talked about
2    the subgroup data.  He was shown the subgroup data (as read):
3              "QUESTION:  It would not have altered your
4         prescribing decision?
5              "ANSWER:  No.
6              "QUESTION:  If this information had been available to
7         you at the time you prescribed it to Mr. Boudreaux, it
8         would not have altered your discussion with Mr. Boudreaux
9         about Xarelto?
10             "ANSWER:  No.
11             "QUESTION:  And your risk/benefit analysis would not
12        have changed."
13             So the subgroup analysis, at least for the
14   *Boudreaux* case, is out of the picture.  There's just nothing
15   left.
16             Now, we have got to get to the whole question of
17   causation.  That's what the learned intermediary theory is.
18   They have to show that had we put the instruction they want in
19   the label, Mr. Boudreaux would not have had his bleed.  The
20   evidence shows there is no way they can meet that burden.
21   There are so many gaps in their causation chain -- I will go
22   through a few of them -- that it's just clear they can't prove
23   this case.  Maybe some other case, but not this one.
24             Now, first they ask him about this PT test, the
25   Neoplastin PT test, and they give him the theory.  You know,

01:49

1    it's the usual and really well-done plaintiff question, Well,
2    wouldn't you have wanted to know that there was a way to
3    identify high dose responders?
4                    Dr. Wong, like most doctors, will say, Well, of
5    course I want to know that.
6                    But he is pushing back.  He says, I would like
7    to know if it's going to affect the therapeutic range and how
8    we are going to monitor it before I give a definite answer to
9    that.
10                   Now, it's that last part that kind of takes the
11   plaintiffs' case away from them, because he has to give a
12   definite answer to that or they don't have their causation
13   chain.
14                   He says, I can't tell you what you want me to
15   tell you, Mr. Plaintiff Lawyer.  And once he says, I can't give
16   you a definite answer to that, game is over.
17                   Again, he goes through -- this is a well-done
18   plaintiff deposition.  I think Mr. Birchfield did it.  He goes
19   through the classic "If the company knew, wouldn't you want to
20   know?  Shouldn't they have told you?"
21                   Dr. Wong says, Of course.
22                   If the company knew this, would that be
23   troubling?
24                   Well, it might be.
25                   He is pushing him to say, I would want to know

01:51

1   that, and if the company didn't tell me, that would be a very

2   bad thing.

3              But he never says that.  And he never says, more

4   importantly, what he would have done with Mr. Boudreaux had the

5   information plaintiffs say he should have had been provided to

6   him.

7              He goes down to the bottom, and looking at this

8   test, this Neoplastin PT test, there's no way that the

9   plaintiffs are able to establish that had Dr. Wong been

10  provided this information, he would have followed it.

11             He says, Look, if the FDA has not approved it,

12  I'm not likely to use it.

13             Again I'm repeating myself, but this is where we

14  end up.

15             Dr. Wong started prescribing Xarelto shortly

16  after it came out in 2011.  He was prescribing at the time of

17  the Boudreaux deposition in 2016, he is prescribing it today,

18  and nothing about what the plaintiff lawyers have said ought to

19  change his mind has done that.

20             Now, I would like to at least, before Mr. Barr

21  stands up, articulate what I think the chain of causation has

22  to be.  I'll reserve some time for rebuttal.  Because what they

23  have to prove is that had we put that instruction in the label,

24  Dr. Wong would have followed it.  That's the first step.

25             Well, Dr. Wong, in his deposition -- I know you

01:52

1    have read the whole thing -- said very clearly, If the FDA
2    hasn't approved that test, I'm not likely to use it.
3                    So that's the first element of their causation
4    chain, and it's iffy at best.
5                    The second one is, okay, he does that, performs
6    the test.  Now they have to assume that Mr. Boudreaux would
7    have had a number that would have caused Dr. Wong to do
8    something.  The number that they picked out from Dr. Rinder is
9    20 seconds.  There's no evidence in this case that
10   Mr. Boudreaux had a 20-second number.  It's another failure of
11   their chain.  They have to show that would have happened.
12   Because once that fails, well, he wouldn't have done a thing
13   differently.
14                    So let's assume with them, without evidence.
15   The PT test that was done was 13.6, and Dr. Wong has testified,
16   That's not particularly elevated to me.  That's not
17   particularly impressive.
18                    So the notion that he would have done something
19   had a different test been run is wild speculation.  There's
20   certainly no evidence.
21                    Let's just assume he has a 20, and let's call
22   that the "yikes moment."  Dr. Wong says, Yikes.  He is at 20.
23   Now what do I do?
24                    This gets us back to what Ms. Sharko was talking
25   about, because there is no scientific evidence that a PT of 20

01:54

1    is an instruction from the FDA, from the EMA, from the medical
2    societies.  Nobody says that you ought to use 20 seconds as a
3    basis to make a clinical decision for any patient on the
4    planet.  Okay.  So there's no reason to think Dr. Wong is going
5    to do something.
6                    But let's just say Dr. Wong considers it.
7    What's he going to do?  We have got Mr. Boudreaux at 4 on a
8    CHADS score, meaning he is at a 500 percent increased
9    likelihood of having a stroke.  Dr. Wong, being a good doctor,
10   is not likely to say, I'm just going to leave you unprotected.
11                   If he were going to do something -- say, Oh, all
12   right.  He's high on Xarelto.  Let me give him Eliquis --
13   that's where Mr. Irwin's argument on relevance is hugely
14   important because they have to prove that but for Xarelto, he
15   would not have had the bleed.
16                   Well, if Dr. Wong at the 20-second "yikes
17   moment" says, Well, I'm going to put him on warfarin, there's
18   no evidence that he wouldn't have bled; on Eliquis, no evidence
19   he wouldn't have bled; or any other anticoagulant.  Because on
20   anticoagulants, with everyone known on the planet there is an
21   increased risk of bleeding.  The ROCKET study shows that the
22   increased risk of bleeding between Xarelto and warfarin, pretty
23   close.  There is an increased risk of gastric bleeding with
24   Xarelto, but an increased risk of brain bleeds with warfarin.
25   So doctors take that into account too.

1        So you have to make this leap at the 20-second

2   "yikes moment" that Dr. Wong would have done something that

3   would have prevented Mr. Boudreaux from having a bleed, and

4   there is no evidence to support that.  The causal chain based

5   on the only important testimony in this case, the treater, just

6   leaves the plaintiffs without the evidence they need to prove

7   their case, and there's nothing they can do to satisfy it.

8        Thank you, Your Honor.

9        THE COURT:  Thank you very much.

10       Let me hear a response.

11       MR. BARR:  Good afternoon, Your Honor.  May I

12  proceed?

13       THE COURT:  Yes.

14       MR. BARR:  Let me be the first to congratulate

15  Mr. Sarver as what appeared to be the first person on the

16  defense side that accurately stated our theory.

17       Congratulations.  I think you get it, at least.

18       THE COURT:  I don't know whether that's a good thing

19  for you.

20       MR. BARR:  He annunciated what the theory is, so he

21  has been studying.

22       Next slide.  Mr. Boudreaux has brought a

23  failure-to-warn claim under the LPLA.  That's what we are

24  talking about here when we talk about learned intermediary.  We

25  are talking about his failure to warn.

1    The original motion that was brought by the

2    defendants sought summary judgment based upon Dr. Wong's

3    testimony that given everything he was shown in the

4    deposition -- which, of course, is not the full record -- he

5    was aware of the bleed risk and still would have prescribed

6    Xarelto.  As we explained in our opposition, that's irrelevant.

7    The Louisiana Products Liability Act allows for

8    a claim for the failure to provide adequate instructions for

9    safe use.  That is precisely, as Mr. Sarver pointed out, our

10   cause of action.  The adequate warnings language of the LPLA in

11   the *Stahl* case expressly allowed for a failure to provide

12   instructions for safe use under the failure-to-warn claim.

13   So defendants made some efforts.  Mr. Sarver

14   didn't spend a lot of time trying to address this or any time

15   trying to distinguish *Stahl*, but *Stahl* establishes the basic

16   tenet of Louisiana law that it is appropriate to bring a

17   failure-to-provide instructions for safe use case under failure

18   to warn.

19   Now, as has been set out repeatedly at this

20   point during this hearing, Mr. Boudreaux alleges that Xarelto

21   is unreasonably dangerous because they did not provide

22   instructions informing doctors that Neoplastin PT was available

23   to assess bleed risk and then parameters on what the meaning of

24   those test results would be once you did that.  That's the

25   case.  This is not a newly articulated claim, as I talked about

01:59

1   this morning; this has been our core theory throughout the

2   case.  The issue of Neoplastin PT has been litigated throughout

3   this entire case.

4               Next slide.  The sole focus of the defendants --

5   and we heard about it again with the clips that were shown with

6   Dr. Wong about he still would have prescribed Xarelto.  That's

7   been their focus in trying to apply the learned intermediary

8   doctrine in this case.  But, again, that's the wrong question.

9   The correct question is whether Dr. Wong would have changed his

10  use of the drug.

11              Our theory requires the use of the drug.  You

12  cannot test Neoplastin PT to determine if Xarelto causes

13  somebody to be at high risk for bleeding if you never give them

14  the drug.  That's the point of our other anticoagulant motion.

15  You can't test whether another anticoagulant would cause

16  somebody to be at high bleed risk if you don't have any data to

17  look at to determine what their risk would be.

18              We have that with Xarelto.  We have a data point

19  that our expert -- I don't want to reargue the *Daubert* motions

20  right here.  I think Susan and Roger did an effective job with

21  that.  Our expert has submitted an expert report and intends to

22  provide testimony showing Mr. Boudreaux's Innovin PT, taken

23  when he went into the emergency room, how that equals a PT of

24  greater than 20 seconds under Neoplastin.  So that evidence is

25  there.  That link has been made.

02:00

 1              Now, when you look at the record, particularly
 2    in a summary judgment setting when you are construing all
 3    inferences in favor of the nonmovant, the plaintiff, the
 4    evidence shows that Dr. Wong would have followed the
 5    instruction in the label.  This is a licensed physician in the
 6    state of Louisiana.  He is not going to ignore statements in a
 7    label and say, Yes, I know that label is telling me to do that,
 8    but I'm not going to do it.
 9              He is not going to do that.  That's what the
10    heeding presumption is for, and I will talk about that.  But
11    his testimony makes it clear that he would have done it because
12    it's something he would want to know.
13              When you look at that and you look at how the
14    defendants are construing his testimony, it makes clear one
15    thing:  There's a dispute in fact.  How do you infer what his
16    testimony is?  You have got what we believe it says; you have
17    got what they believe it says.  There's clearly a dispute in
18    what we believe it says.  So given that scenario, summary
19    judgment is not proper.
20              Now, I will note that while Dr. Wong, for
21    purposes of this motion, is the prescriber of Xarelto when we
22    are looking at the learned intermediary doctrine, he did not
23    initially prescribe Xarelto.  He prescribed generally a NOAC.
24    That was his instruction.  He said, Put Mr. Boudreaux on a
25    NOAC.

02:02

1        He did not weigh the specific risks and benefits

2    of Xarelto, only general with a NOAC because he thought they

3    were all the same.  They are not all the same.  There's going

4    to be a lot of evidence about that.

5        For the learned intermediary question, the more

6    important role that Dr. Wong plays is the follow-up.  He saw

7    Mr. Boudreaux three times after he left the hospital, following

8    up.

9        Now, you are going to hear in the trial the

10   defendants are going to dispute whether or not Mr. Boudreaux

11   was taking his medicine.  That's going to be something they are

12   going to argue.  But Dr. Wong is going to tell you, I saw him

13   three times.

14       Each one of those three times he could have

15   tested his PT if he had been instructed.  He could have tested

16   his PT consistent with the way we are saying it should have

17   been recommended in the label.  In each one of those times

18   Dr. Wong saw Mr. Boudreaux, he confirmed he was taking the

19   drug.

20       Because the label didn't say anything about

21   Neoplastin PT and a recommendation, the fact is Dr. Wong didn't

22   do it.  He can't do something he is not aware of.

23       Next slide.  Next slide.  You should be on 4.

24   Back one more.

25       This testimony about he wouldn't use a device

02:04    1    that wasn't FDA approved, he wouldn't use it off-label, of
         2    course that's what he said because there is nothing in the
         3    Xarelto label that tells him to do Neoplastin PT.  If it were
         4    in the label, he wouldn't view it as off-label.  He would do
         5    it.  He would view it as, This has been approved by the FDA.
         6    It's a recommendation from the people that know more about this
         7    drug than anyone in the world.  They are telling me I need to
         8    do this.
         9            Now, Neoplastin PT is an accepted method to
        10    assess coagulation.  I don't need to get into all that again.
        11    We have talked about that already.
        12            But the regulation -- next slide -- that exists,
        13    as we talked about this morning, requires them to disclose
        14    helpful laboratory tests.  This is a helpful laboratory test,
        15    as we have talked about all day so far today.  That is the
        16    point of our claims, not routine anticoagulation monitoring
        17    like they talked about.  We are not asking for routine
        18    anticoagulation monitoring.  This is a simple, one-time blood
        19    test to assess the risk.
        20            Next slide.  Next slide.  Okay.  So let's talk
        21    about what Dr. Wong testified to because that's the important
        22    point.  Dr. Wong clearly testified he was unaware of the
        23    usefulness of Neoplastin PT.  You can see the question and
        24    answer here (as read):
        25            "QUESTION:  Could you order laboratory testing for

02:06

1    one of your patients on Xarelto now?

2        **"ANSWER:**  I don't know if it's available, to be

3    honest."

4            He didn't know it was available because it's not

5    in the label.  So he was provided no information on this.

6            Go to the next slide, please.  And it's actually

7    told in the label -- why it's in the risk of pregnancy section,

8    I will never be able to understand, but it's in there that the

9    anticoagulation effect of Xarelto cannot be monitored with

10   standard laboratory testing nor readily reversed.  So that is

11   what Dr. Wong understands.  That is what's in the label, that

12   this cannot be done.  That's what he is told, and he believed

13   that.  He testified consistent with that because the

14   information he needed to be told wasn't in the label.

15           Next slide.  So it follows that Dr. Wong has

16   read the label.  He testified consistent with it.  It follows

17   that if the appropriate instruction had been given in the

18   label, he would have followed that instruction.  We prove this

19   fact in two ways.

20           The first is, under Louisiana law it can be

21   presumed that the user of a product, or in this case a learned

22   intermediary, would have heeded an appropriate instruction.

23   Defendants are arguing that there's no case that specifically

24   applies the learned intermediary in the context of a

25   pharmaceutical case and that there's no reason that any court

02:07

1  in Louisiana would rule differently.  They cite the only case

2  they could find, which is *Hartzo v. Bard*, a case in the

3  transvaginal mesh MDL litigation in the Southern District of

4  West Virginia that is interpreting Louisiana law.  *Hartzo* is

5  completely distinguishable from the facts we are dealing with.

6  In nearly all pharmaceutical cases, as you have talked about

7  today, the failure-to-warn claim is about identifying a risk,

8  warning about a risk that was unknown.  There's no actual

9  instruction to follow.  They are not talking about an

10  instruction.

11         They are putting Vioxx causes heart attacks and

12  you are asking the doctor, Would you still have prescribed this

13  drug if you had known Vioxx caused a heart attack?  That's not

14  our case.  That was *Hartzo*.  *Hartzo*, they are asking the

15  doctors, Would you have still implanted this transvaginal mesh

16  if you had known about the problems with the type of mesh they

17  were using in this product that could lead to these injuries?

18  So the doctor is having to make a "would or would not use"

19  decision.

20         That's not what we are saying.  That's not the

21  test of this case.  Here the failure-to-warn claim is an

22  instruction.  The test is:  Would the doctor have followed the

23  instruction -- not would he have not used the drug -- would he

24  have followed the instruction; that is, asking the doctor to

25  take an affirmative act for which the heeding presumption is

02:09

1    applicable.  Whenever you are instructing somebody to do

2    something and you are actually making an affirmative "you

3    should do this," that's when the heeding presumption applies,

4    and it applies here as it applies in cases all throughout the

5    state of Louisiana.

6                Now, given that the defendants -- the way the

7    heeding presumption works is it's up to the defendants to come

8    forward with evidence that Dr. Wong would have ignored the

9    instruction.  They have not done that.  They have not put

10   forward evidence that says he would have read a Neoplastin PT

11   instruction and said, I'm not going to do that.  I know better.

12   I know different.  I'm going to exercise my physician

13   discretion.  Whatever his reason is.  They haven't done that.

14               The only evidence defendants have presented is

15   that Dr. Wong was not aware that Neoplastin PT could be used to

16   assess bleed risk.  That was his knowledge.  His testimony

17   clearly shows, though, he would have conducted such a test had

18   he been told it was available.

19               This is the other way of proving.  This is the

20   second way.  We don't even need the heeding presumption, given

21   what he said.  He is asked -- with apparently brilliant

22   questions by Mr. Birchfield, so hats off to you -- "If such a

23   one-time blood test were available, would you use it for

24   patients that you were putting on Xarelto?"  That's the

25   original question.

1    Then they have a little back-and-forth, trying

2  to clarify what the question is, but his ultimate answer:  "Or

3  proven bleeding, that they are clearly higher risk?  Yes, of

4  course I would want to know that."

5    Well, there's only one way he can figure that

6  out:  Follow the instruction and use Neoplastin PT.  If he had

7  been instructed to do that, plaintiffs submit that the evidence

8  is that he would have followed that instruction; he would not

9  have ignored it.  That is a clear inference in his testimony

10  that must be construed in favor of the plaintiffs for purposes

11  of this motion.

12    Now, defendants are also critical because --

13  I'll strike that.  No reason to get into that.

14    Next slide.  So then the next thing we have to

15  look into that Mr. Sarver talked about is, okay, he follows the

16  instruction.  He does Neoplastin PT.  What now?  What would

17  happen?  Because ultimately he has to be taken off the drug.

18  What we believe the evidence shows is that if Neoplastin PT had

19  been conducted, according to Dr. Rinder, looking at his Innovin

20  PT at the time he was admitted to the hospital, that that

21  Neoplastin PT would have been above 20 and would have put

22  Mr. Boudreaux in the upper quartile of bleed risk, comparing

23  him to other patients taking Xarelto.  So he would have been a

24  person at high risk of bleeding.  That's what that test means.

25    We believe that if that test had been done --

1    and we believe Dr. Wong has shown this with his actions, that

2    if that test had been done and it had identified Mr. Boudreaux

3    as having a PT Neoplastin greater than 20, showing him at high

4    bleed risk, the evidence actually shows that Dr. Wong would

5    have taken him off Xarelto at that time.

6                    Now, they talk about would he have put him on

7    something else, would he have done something different?  This

8    is a case about Mr. Boudreaux's bleed caused by Xarelto.  It's

9    not a case about some other drug possibly causing some other

10   bleed at some other time.

11                   Both the foundation of Mr. Sarver's argument and

12   Mr. Irwin's argument is that Mr. Boudreaux was required to be

13   anticoagulated.  That's what they are saying.  As soon as you

14   get a CHADS score that he had, it is a mandate that he has to

15   be anticoagulated.  That is not what happened.  Dr. Wong's

16   actions show you can be at a higher bleed risk and you can look

17   at the bleed risk and compare it to the stroke benefit and say,

18   The risk is higher than the benefit, so I'm not going to

19   anticoagulate.

20                   That is exactly what Dr. Wong did.  The only

21   real difference is Dr. Wong did not learn that Mr. Boudreaux

22   had a high risk of bleeding until he bled and spent five days

23   in the ICU and had to take units of blood.  At the point he did

24   that, he removed him from all anticoagulant therapy.  He went

25   for 15 months -- this person, his CHADS score didn't change.

02:14

1    He still had AFib, but Dr. Wong decided that he is a high risk

2    of major bleeding, and that risk exceeds the benefit of

3    coagulation.  So I'm going to forego anticoagulation and have

4    him take this risk for 15 months while they waited for

5    formulary procedure.  That shows that when you identify

6    somebody as high risk, these doctors understand you can be at

7    too high a risk of bleeding.  That happens.  That happened in

8    Mr. Boudreaux's case, and Dr. Wong shows that.

9              At the very least, his actions create a material

10    dispute in the record, and inferring all facts in favor of the

11    plaintiff, summary judgment is not proper.

12         **MR. SARVER:**  Thank you, Your Honor.  I would like to

13    start right at the end where Mr. Barr finished because he makes

14    a really nice point.  Why was Mr. Boudreaux taken off

15    anticoagulants?  Because he had a bleed.  It wasn't because of

16    any kind of a test result.  He had a bleed on Xarelto.  Well,

17    if Xarelto was the problem, why not try him on warfarin, on

18    Eliquis, on Pradaxa, on Savaysa?  Because the risk of bleeding

19    is present with every anticoagulant that is currently known in

20    the world.  That's the way it is.

21              I would like to walk through that daisy chain

22    again because, if you listen to Mr. Barr's very well-done

23    argument, how many times did he say the word "if"?  Remembering

24    that plaintiffs have the burden of proof, all those ifs mean

25    this case has to be disposed of on summary judgment.

1        I have lost my slide.  I'm sorry, Your Honor.

2        **THE COURT:**  He will fix it.

3        **MR. SARVER:**  Thank you, Your Honor.  I apologize for

4    the interruption.

5                At page 3 of the plaintiffs' response, they set

6    out their causation daisy chain, I think, pretty well.  They

7    say "establishes that Dr. Wong would have followed such an

8    instruction."  That's the first part of the daisy chain.  They

9    talked about the heeding presumption.  That's well-briefed, I

10   think.

11               But the issue is not all that clear.  The one

12   case interpreting the LPLA went the other way and said the

13   heeding presumption wouldn't be issued.  It particularly is

14   unlikely to be issued in a case where you are asking a doctor

15   to make an off-label use.  To presume that a doctor would make

16   an off-label use under the heeding presumption doesn't follow.

17               But Dr. Wong went farther than that, and I think

18   it's important to take a look at his testimony, because what he

19   clearly said is if the test is not FDA-approved, he is very

20   unlikely to use it.  That's the first part.

21               He would have followed the instruction.  Let's

22   assume on their daisy chain he follows the instruction and does

23   the test.  Then it says he would have withdrawn Mr. Boudreaux

24   from Xarelto therapy.  Based on what evidence?  What evidence

25   is in the record that shows Dr. Wong would have taken

1   Mr. Boudreaux off the therapy?  He never said that.  That's a

2   crucial point for them.  They can't survive the lack of --

3   remember, they have the burden of proof.  They have to prove

4   each element of their causation chain.  They can't prove that

5   Dr. Wong would have taken Mr. Boudreaux off of Xarelto.

6           **THE COURT:**  He takes the position, though, that since

7   he took him off of all blood thinners towards the end, that's

8   an indication that that's what he would have done.

9           **MR. SARVER:**  Remember why he took him off?  Because

10   he bled, not because of the result of any blood test.

11           Based on Dr. Wong's testimony, he clearly

12   understands the reason and the need for anticoagulation; and

13   but for a bleed, there is no evidence to indicate he would have

14   taken Mr. Boudreaux off of Xarelto.  They are assuming from

15   evidence that doesn't exist in this case.

16           Then they are assuming that Mr. Boudreaux was an

17   individual of excessively high bleed risk.  Based on what

18   evidence?  Again, every anticoagulant known to man puts people

19   at an increased bleed risk.  The fact that someone bleeds isn't

20   evidence that they were some kind of high bleeder or at an

21   excessively high bleed risk.  What they are basing it on is the

22   one PT test taken at the time he went into the hospital, which

23   was a 13.6 Innovin PT on a range that went from 11 to 12.9.

24   Dr. Wong was asked about that.  I would like to see if we can

25   get to that part of it.

02:20

1          This is the part about the FDA.  If it's not
2     regularly approved by the FDA, we generally don't look for it.
3     So to argue he would have gone off label based on an
4     instruction in the Xarelto label is anything but clear.
5          Again, just talking about the FDA test.
6          Here, again, the idea that he actually would
7     have performed the test is not clear at all.
8          Again, Mr. Barr told you that this has been
9     their theory all along.  He says I'm the only one that gets it
10    and everybody else is missing it.  If it was their theory all
11    along, they had to ask the questions at the deposition of
12    Dr. Wong and get the testimony they need to satisfy their
13    burden of proof.  They didn't.
14         They never got Dr. Wong to say that he would
15    have run the test.  They never got Dr. Wong to say what he
16    would have done had the result been what they claim it would
17    have been.  They never got Dr. Wong to say he would have
18    changed his practice based on that instruction.  All of that is
19    an absence of proof that is fatal to the plaintiffs' case.
20    They can't recover from that.
21         Here we go.  This is the PT test.  His PT test
22    was 13.6.  He is asked -- that's just slightly above the normal
23    range.  The normal range, Your Honor, remember, is with people
24    who aren't on an anticoagulant.
25         So the next question:  "So even if PT were an

02:21

appropriate test to use, there is no evidence here that
Mr. Boudreaux's PT was particularly elevated, is there, at the
time of his bleeding event?"

                    Dr. Wong answered pretty clearly there:  "No."

                    They haven't got any evidence for the doctor in
this case that Mr. Boudreaux was some kind of high responder or
that that PT test would have caused Dr. Wong to do what they
say he has to do:  take him off of Xarelto.  It doesn't exist.
It's an absence -- a glaring gap of proof that they simply
can't overcome.

                    They are saying, Well, we can overcome it
through Dr. Rinder.  Well, Dr. Rinder never treated
Mr. Boudreaux.  Dr. Rinder never had the opportunity, the
ability, or the inclination to take Mr. Boudreaux off of
Xarelto.  You have to follow the treater, as you said in
*Allgood* and *Whitener*.

                    Again, this is something I think the plaintiffs
and we agree on.  This is their briefing now.  It's understood
by virtually the entire medical profession that there is a risk
of bleeding with every anticoagulant.

                    Here, this is the point we get the "yikes
moment."  We assume he gets to 20.  He says, Okay, what do you
do now?  Well, Dr. Wong says it's pretty important to have him
on an anticoagulant, and he talks about that a couple times in
the deposition.

02:23

1          This is where he is talking about the risk of

2   blood thinners because he tells that to his patients.  This is

3   important, I think:  They have the risk of bleeding, but I

4   always tell them that the bleeding generally -- 99 percent of

5   the time we can take care of the bleeding; but if you have a

6   stroke, it's permanent.

7          Now, that is Dr. Wong's mindset at the time that

8   he has the "yikes moment" we are assuming happens.  You can't

9   infer from anything in the evidence that he would have stopped

10  the Xarelto at the time Mr. Boudreaux had the hypothetical

11  four-day, 20-second PT time.  He knows how important it is.

12  There's no evidence to indicate he would have stopped the

13  anticoagulation.

14         Without that, Your Honor -- they have missed on

15  so many parts of their daisy chain, so many ifs that Mr. Barr

16  had to articulate.  If this is their theory all along, get the

17  evidence from the treater.  They didn't get it.  That's kind of

18  the end of this case.

19         Thank you, Your Honor.

20       **THE COURT:**  Okay.  I understand your issue.

21         We're down to the last one.  This is the

22  defendants' motion, the same way on *Orr*.

23       **MR. IRWIN:**  Good afternoon, Your Honor.  My name is

24  "Mr. Caboose."  It's the end of the day.  I would like to say,

25  after two years of arm wrestling with my friend Mr. Barr, that

02:25

1   we finally agree on something.

2          MR. BARR:  Oh, Lord.

3          MR. IRWIN:  Where he says all NOACs are not the same,

4   there will be a lot of evidence on that.  Ours is the best.

5          MR. BARR:  I don't think we are going to agree on

6   that.

7          MR. IRWIN:  Your Honor, here is our road map.  You

8   have heard a lot today about design issues, preemption issues,

9   dosing issues, PT issues.  This motion is all about what

10  Dr. St. Martin knew and what he told us he would do or not do

11  as a result of that.

12              As Your Honor has written and many other good

13  judges have written, this turns on the testimony of the

14  prescriber, Dr. St. Martin.  I think we will be able to show

15  you, Your Honor, that Dr. St. Martin's testimony does not get

16  them where they need to go.  It is their burden to prove this

17  two-step process.  It doesn't get them there.  So what they

18  tried to do in a novel argument is to push the duty to warn

19  downstream to someone other than a prescriber.

20              We will show you the cases that we looked at.

21  With the able assistance of my associate Meera, we found

22  86 cases in the state of Louisiana involving the learned

23  intermediary doctrine applied either to a prescribing doctor of

24  a pharmaceutical device or a prescribing doctor of a medical

25  device.  In every one of those 86 cases, it was the prescriber.

02:26

1   There has never been a situation where the law pushed that duty

2   downstream, past the prescriber, to somebody else, yet they

3   seek to do so here.  And I say with respect to my able

4   opponents at that table, they do that because they know they

5   can't get there with Dr. St. Martin.

6            But they have another problem.  Even when they

7   do try to push it down to Dr. Bui -- and we will go through

8   that -- that doesn't get them there either, because the causal

9   link with respect to Dr. Bui is broken.  He said he had never

10  read the label.

11           So we will come back to Dr. St. Martin because

12  that's where this ends, that's where it begins.  Your Honor, I

13  hope this brief timeline will give a little perspective on this

14  discussion.

15           Mrs. Orr was placed on Pradaxa in April of 2011

16  by Dr. Sander at Tulane when she was diagnosed with AFib.

17  That's when the diagnosis was made, and that's when that hard

18  decision was made.  Several months later, in August, her care

19  was taken over by Dr. St. Martin, a cardiologist.  In February

20  of 2014 he converted her to Xarelto.  The reason was because

21  she had an ongoing stomach upset with Pradaxa, something that's

22  known about Pradaxa.  In July of 2014 he switched her down to

23  the 15-milligram dose because of her ongoing kidney problems

24  and her declining kidney function.  The 15-milligram dose is

25  called the renal dose.

02:28

1              Sadly, on April 24, 2015, she had that horrific

2    hemorrhage.  She went home.  Later they called 911 and took her

3    to Baptist Hospital on Napoleon Avenue.  That's where she was

4    used to going.  That's where the family thought she should be

5    treated.  That's understandable.  Unfortunately, however, there

6    was no stroke unit on Napoleon Avenue, so they had to transfer

7    her over to the main campus on Jefferson Highway.  It was at

8    that time -- and we will get to this -- that Dr. Bui said he

9    wasn't sure whether or not Mrs. Orr was anticoagulated, so he

10   decided to wait about 12 hours to later do the extraventricular

11   drains.  And then, sadly, Mrs. Orr passed away on May 14, 2015.

12             You have written on this, Judge, better than

13   most.  It's a two-prong test on a failure to warn and instruct.

14   The first prong which the plaintiffs have to prove is that the

15   defendant failed to warn the physician.  The second prong which

16   the plaintiffs have to prove is that that failure to warn was a

17   cause in fact of the injury.

18             As you wrote in *Allgood* -- which was my case,

19   Your Honor.  The only person I like citing better than me is

20   you -- the testimony, as you wrote, turned on the testimony,

21   the issue of the prescribing physician.

22             So let's look at Prong 1.  Dr. St. Martin was

23   asked many times in his deposition -- and this is just one

24   example of that answer, this one on page 162:

25             "**QUESTION:**  Were you satisfied that you knew or were

02:30

1       fully informed, either by the packaging, the labeling,

2       discussions with your colleagues and CME, that you were

3       fully informed of the risks and benefits of Xarelto?

4              "ANSWER:  Yes."

5               Prong 2, looking backwards, hindsight,

6 Dr. St. Martin said he would not change his prescribing

7 decision:

8              "QUESTION:  Is there anything that you have seen or

9       learned either during this deposition or anything that you

10      saw or learned during your interviews with plaintiffs'

11      counsel or anything that you have read since February of

12      2014 when you put Mrs. Orr on Xarelto that makes you think

13      that your decision to put Mrs. Orr on Xarelto was not

14      prudent?

15             "ANSWER:  No.  I have no reason to second-guess it.

16             "QUESTION:  Based on everything that you know now

17      compared to everything that you knew back then, do you

18      think it was the right decision that you made?

19             "ANSWER:  I think so."

20              They made reference to the heeding presumption

21 in their brief in opposition, Your Honor.  There was no

22 analysis of it.  It was just a one-word reference.  Whether it

23 applies to the facts of this case or not, I don't know, but we

24 will take it up.  You and others have written -- and this is

25 the foundation case, the *Bloxom* case -- that the heeding

02:32

1   presumption is rebutted if it is shown that an adequate warning

2   would have been futile.  There's two ways to show that the

3   adequate warning would have been futile:

4           (1)  Where a different warning would not have

5   changed the user or prescriber's decision;

6           That, of course, is Dr. St. Martin.

7           (2)  Where the prescriber testifies that he

8   never read the warning.

9           Putting aside for the moment whether or not

10  there is a duty that flows all the way down to Dr. Bui, that's

11  Prong 2.  That interrupts the causation to Dr. Bui.

12          There was some very skillful questioning at this

13  deposition; not just mine, Your Honor, but Mr. Abney's.  He

14  went through in very technical ways and with detailed exhibits

15  and articles and literature, and they went through all of their

16  theories, all of their hypotheticals.

17          This is just an example, with references to the

18  page numbers of the depositions.  We have heard a lot about PT.

19  So I put that one at the top.  He was asked about PT and shown

20  graphs on PT and literature on PT, and the question was:

21          "QUESTION:  So these are nice tests, I guess, but

22      they don't tell you anything about what the result will be

23      in terms of a bleeding risk to the patient, do they?

24          "ANSWER:  Right."

25          He was asked about the U.S. cohort.  You heard a

02:33

1   good bit about that from Mr. Sarver in the *Boudreaux* case.  "I
2   have no reason to second-guess it, no."  He was shown all the
3   cohort data.
4               Interpatient variability, was Mrs. Orr at a high
5   risk -- an unknown high risk, I would offer:
6          **"QUESTION:**  Do you have any information from any
7       source whatsoever that Mrs. Orr was at that top 5 percent?
8          **"ANSWER:**  No."
9               Twice-a-day dosing, the theory being that
10  twice-a-day dosing will make the peaks lower and the troughs
11  shallower, and it was Dr. St. Martin's answer to say it
12  wouldn't change anything by saying the clinical benefit of
13  twice-daily dosing cannot be derived from the existing data.
14              So here it is again:  "But even with the benefit
15  of hindsight today, you still believe that it was a correct
16  prescribing decision?"
17              You can see, Judge, this is the bottom.  It's at
18  page 300.  We are getting close to the very end of the
19  deposition.  It went on almost till 5:00, if not after, after
20  he has been asked everything.
21              "Right," he says, it was.
22              "You would still make it today.  You would not
23  change it?"
24              "Right" -- and this is a profound statement --
25  like many decisions we make in medicine."

02:35

1            So let's talk a little bit about Dr. Bui.  They

2    say that the learned intermediary duty to warn is not limited

3    to the prescribing physician but extends to nonprescribing

4    health care providers.  This is an essential argument for them

5    because they don't get there with Dr. St. Martin.

6            In support of this, they cite the Restatement of

7    Torts and cases from California, Kentucky, Montana and Oregon.

8    We are here in Louisiana, and this case is governed by the

9    Louisiana Products Liability Act.  We looked and found

10   86 cases.  Of the 86 cases, not a one of them extended that

11   duty past a prescriber.  Not a one.  They cited three cases in

12   support of the proposition that it did.  The reason they cited

13   those cases in that fashion is because those cases use the term

14   *prescriber* or *treater*.

15           So they want to define the term *treater* as

16   broadly as they possibly can, but the word *treater* was used in

17   those cases synonymously with the *prescriber*.  In the first

18   case, *McCarthy v. Danek* -- pedicle screw cases, I remember

19   working on those many years ago here -- Dr. Whitecloud -- I bet

20   you remember him, Your Honor, from Tulane.

21           **THE COURT:**  Uh-huh.

22           **MR. IRWIN:**  Dr. Whitecloud prescribed and implanted

23   the pedicle screw device himself.  He used it.  Dr. Graves from

24   Baton Rouge prescribed the Accutane.  Dr. Claiborne in the

25   *Stahl* case prescribed the Lamisil.  No case has ever pushed it

1  downstream past those prescribers.  Even if they did, it's
2  rebutted because here is what Dr. Bui said in response to the
3  question by Mr. Abney:

4        "QUESTION:  All right.  Are you aware that the label
5     for Xarelto says there's no way to monitor levels in the
6     patient?

7        "ANSWER:  I am not aware of the label.  I am aware of
8     commercials and general medical assumption that there's no
9     need to monitor."

10        He never read the label, Your Honor.  Even if he
11 had -- we will take it one step further -- it would not have
12 made any difference to Dr. Bui.

13        I quote here, Your Honor, directly from their
14 brief.  I had to do this.  They say, quote:

15        Had defendants adequately warned Mrs. Orr's
16 neurosurgeon -- that's Dr. Bui -- Mrs. Orr's treatment would
17 have been accelerated and her death would have been more likely
18 avoided than not.

19        That's from page 21 of their opposition.  They
20 cite no testimony in support of that.  They don't develop it at
21 all.

22        I don't know if you ever followed the
23 Paul McCartney/Heather Mills divorce case, but the English
24 judge in that case said something that I always hoped I could
25 say in court one day, and I'm going to say it now.  That

02:38

1    statement that I have just quoted from the plaintiffs' brief is
2    economical with the facts.  The real rest of the facts are
3    these, page 23 from his deposition:
4                  "Now, as for long-term outcome after such a
5    massive hemorrhage, that's uncertain."
6                  "No one would be able to, in my opinion, say
7    that any early intervention" -- if he had been able to do this
8    surgery, Your Honor, with the EVD drains, he could have done
9    them at 2:00 a.m. or 3:00 a.m., that was the question.  He
10   waited until 2:00 the next afternoon.
11                 "No one would be able to, in my opinion, say
12   that any early intervention may be able to bring her back."
13                 My question was:
14       **"QUESTION:**  It was uncertain that had you been able
15       to do the IVD [sic], the drain, earlier that that would
16       have made a difference in this massive hemorrhage and this
17       unfortunate outcome; is that correct?
18       **"ANSWER:**  Yes, that's correct."
19                 Her other treaters, Your Honor, people who don't
20   have a horse in this race except to support Mrs. Orr and treat
21   Mrs. Orr and do their best to take care of Mrs. Orr -- they
22   have no horse in this race.
23                 Dr. Mahanna was the head of the neurocritical
24   team.  She said she agreed with Dr. Bui.  It was uncertain it
25   would help, had he been able to do his EVDs earlier or had he

02:39

1    decided to do them earlier.

2              Dr. Gropen, the vascular neurologist, did not

3    disagree with Dr. Bui's assessment that earlier would have made

4    no difference.

5              Dean, if we have volume, I'm going to try to see

6    if we can bring it back to Dr. St. Martin.

7              Your Honor, if you look at the time, you can see

8    it's 5:07.  We are at the very end.  Everything has been gone

9    through.  Russ Abney has asked so many scientific questions,

10   every opportunity to establish what they needed to establish

11   here.  Many times during the course of this deposition

12   Dr. St. Martin was presented with their theories, of

13   hypotheticals:  Would you change it?  Would you change it?

14   Would you change it?  He always said this:

15        "QUESTION:  In February of 2014 did you think you

16        knew all the essential information to make a proper risk

17        and benefit decision --

18        "ANSWER:  Yes.

19        "QUESTION:  -- in that regard?

20        "ANSWER:  Yes.

21        "QUESTION:  After you have listened to these -- I'm

22        going to call it minutiae -- maybe there will be an

23        objection to that question -- about time and therapeutic

24        range, about EMA, INRs, about monitoring Xarelto, does any

25        of that change your view --

02:41

1          "**ANSWER:**  No, it doesn't.

2          "**QUESTION:**  -- that your decision, if you had to make

3     it again today, you would still make back in February of

4     2014?

5          "**ANSWER:**  Yes.

6          "**QUESTION:**  As you said earlier, you didn't have a

7     crystal ball back then.

8          "**ANSWER:**  Right.

9          "**QUESTION:**  But even with the benefit of hindsight

10    today, you still believe it was a correct prescribing

11    decision?

12         "**ANSWER:**  Right.

13         "**QUESTION:**  You would still make it today.  You would

14    not change it?

15         "**ANSWER:**  Right, like many decisions we make in

16    medicine."

17         **MR. IRWIN:**  So, Your Honor, that is it.  We believe

18    that says it all.  He said:  Prong 1, I knew the risks;

19    Prong 2, I would not change it, looking back.

20              This is a failure-to-warn argument, Your Honor.

21    It does draw into it some of the other issues that you heard

22    about earlier today, but those do not drive this decision here.

23    What drives this decision is what Dr. St. Martin knew and

24    whether he would change it.

25              Thank you very much.  We think this motion is

02:42

1   good, Your Honor.

2            **THE COURT:**  Thank you.

3            Any response?

4            **MS. JEFFCOTT:**  May it please the Court.  My name is

5   Emily Jeffcott.  I'm here on behalf of the *Orr* plaintiffs.

6            Your Honor, defendants' motion for summary

7   judgment under the learned intermediary doctrine should be

8   denied for three reasons:

9            First, defendants failed to adequately instruct

10  Mrs. Orr's physicians as to the availability and utility of PT

11  testing.

12           Second, had defendants adequately instructed

13  Mrs. Orr's prescribing physician, Dr. St. Martin, the evidence

14  demonstrates that Dr. St. Martin would have followed that

15  instruction such that Mrs. Orr's injuries would have been

16  avoided.

17           Finally, defendants did owe a duty to adequately

18  instruct Dr. Bui.  Had Dr. Bui known of the utility of the PT

19  testing, the evidence demonstrates that Mrs. Orr's outcome

20  would have been avoided.

21           Now, before I go into my first point,

22  Your Honor, I would like to give a bit of background on

23  Mrs. Orr.  Mrs. Orr was a loving, hardworking, 68-year-old

24  woman.  She was a wife, a mother of three, a grandmother of

25  five.  At the time of her death, she had been actively employed

02:43

1    at Tulane as an academic adviser, and she was beloved by her
2    students.
3                    Like many other individuals her age, Mrs. Orr
4    did suffer from some health problems.  She suffered from
5    diabetes, kidney problems, atrial fibrillation, hypertension.
6    However, Mrs. Orr was very careful about her care, very
7    proactive.  She regularly saw her physicians and took great
8    care with her medications.
9                    Now, Dr. St. Martin prescribed Xarelto to
10   Mrs. Orr for her atrial fibrillation at a renally adjusted dose
11   of 15 milligrams.
12                   In the years prior to her death, Mrs. Orr did
13   suffer from blood pressure issues that her physicians were able
14   to manage and control with treatment and with adjustment to her
15   medications.  Just before her death she was again experiencing
16   high blood pressure issues which her physicians, again, are
17   managing with medication.
18                   Now, on the evening of April 24, 2015, which was
19   a Friday, Mrs. Orr and her husband, Joe Orr Jr., decided to go
20   on a date night to Ruth's Chris Steak House in Metairie.
21   Towards the end of dinner she began experiencing a headache and
22   asked her husband to take her home.  When she got home, she
23   deteriorated further, having multiple vomiting episodes and
24   diarrhea as well.  Her husband and her daughter became
25   concerned and decided to call EMS.

02:45

1          She was taken to Ochsner Baptist, arriving

2     sometime around 11:00 p.m.  There she had a full workup,

3     including a PT test that came back normal.  She also received a

4     CT scan that showed a very large intraventricular hemorrhage in

5     her brain.  The decision was made at that time to transfer her

6     to Ochsner main, where she could receive specialized

7     neurocritical care.

8          Immediately after arriving at Ochsner main, she

9     was seen by neurosurgery, and her neurosurgeon, Dr. Bui,

10    immediately focused in on her usage of Xarelto.  That's because

11    Xarelto doesn't have a reversal agent, physicians must

12    determine whether a patient has Xarelto on board in order to

13    assess its anticoagulant value.  Here Mrs. Orr's family did not

14    know if Mrs. Orr had taken the Xarelto earlier or when she had

15    last taken it.  As a result, Dr. Bui had to assume the worst,

16    that Mrs. Orr had taken it just a few hours prior and that she

17    was still subject to the anticoagulant effects of Xarelto.

18         Dr. Bui at this time was not aware that PT could

19    be used to assess Xarelto's anticoagulant effects.  As a

20    result, Dr. Bui delayed Mrs. Orr's surgical intervention for

21    over 12 hours.  The delay in treatment caused Mrs. Orr's brain

22    to continue to swell with increased pressure.  Mrs. Orr,

23    unfortunately, never recovered, and her family remained at her

24    bedside until she passed 11 days later.

25         That brings me to my first point, that

02:47

1    defendants failed to adequately instruct Mrs. Orr's physicians
2    as to the availability and utility of PT testing.  In their
3    reply defendants claim that the inadequate instruction claim is
4    not viable under Louisiana law.  Mr. Irwin didn't address that
5    in his argument, so it appears they have gone away from that
6    claim.  But as Your Honor is aware, the Fifth Circuit in
7    *Stahl v. Novartis* recognized that a drug manufacturer has a
8    duty to adequately instruct to allow for the safe use of a
9    product.
10               Now, in so holding, the *Stahl* court said that
11   this is an accepted tenet of Louisiana products liability law.
12   Your Honor, in fact, recognized that in *Jenkins v.*
13   *Bristol-Myers*, recognized the applicability of *Stahl*.
14        **THE COURT:**  They say he didn't even read the label,
15   the surgeon.  It wouldn't have mattered.
16        **MS. JEFFCOTT:**  Your Honor, the testimony that
17   Mr. Irwin put forth, the question was very specific.  Mr. Abney
18   asked about whether or not the Xarelto label contained
19   information about monitoring.  In response to that very
20   specific question, Dr. Bui stated, I'm not aware of that label.
21               He didn't specifically state that he had not
22   read the label at all.  He was answering a very specific
23   question posed by Mr. Abney.  Furthermore, Mr. Irwin, who was
24   at that deposition, didn't ask whether or not Dr. Bui had read
25   the label.  As such, the evidence is, at best, a question of

02:49

1  fact, whether or not Dr. Bui had considered the evidence in the
2  label.
3          In terms of the adequacy -- or rather inadequacy
4  of defendants' label, defendants claim that an instruction on
5  PT would be inappropriate because it would be considered
6  off-label.  Now, Mr. Newsom, in discussing the preemption
7  motion, referred to the FDA's description of PT testing in
8  support of his claim that it would be considered off-label.
9  But Mr. Newsom failed to state the entire description, which
10  makes clear that it is a general test.  Specifically, the FDA
11  states that PT is a general screening device for the detection
12  of possible clotting factor deficiencies.
13          Even more importantly, Your Honor, the FDA
14  states, when it's providing these descriptions, that they are
15  not precise, and actually instructs manufacturers not to rely
16  on them.  Instead, the FDA recommends that manufacturers who
17  are seeking product equivalency go look at products that are
18  approved.  Here the Neoplastin PT specifically states in its
19  intended use that it is meant as a screening tool to evaluate
20  prothrombin time.
21          That brings me to my second point, Your Honor,
22  that had an adequate instruction been provided to
23  Dr. St. Martin as to the utility of PT testing, a question of
24  fact exists as to whether Dr. St. Martin would have followed it
25  and changed Mrs. Orr's treatment.

02:50

1            Now, Mr. Irwin and the opposition focus in on

2   testimony that Dr. St. Martin stated he would not have changed

3   his decision to prescribe Xarelto to Mrs. Orr.  This is not the

4   correct or applicable test for causation.  In inadequate

5   instruction claims, the Fifth Circuit in *Stahl* provided the

6   appropriate analysis, which is whether the physician would have

7   followed the instruction such as to avoid the patient's

8   injuries.

9            Here Dr. St. Martin testified as to multiple

10   instances in which he would use a test like PT to evaluate a

11   patient's risk of bleeding on Xarelto.  These instances

12   include:  if the FDA, quote, thought it was a good idea; or if

13   the mainstream medical community was using PT to evaluate a

14   bleeding risk; or if the clinical data indicated that PT

15   testing was a good idea.  Here these instances have been met or

16   would have been met if defendants had provided an adequate

17   label.

18            Next slide.

19       **THE COURT:**  But she didn't bleed out, did she?  It

20   was the exact opposite with her.  She didn't have enough in her

21   system.

22       **MS. JEFFCOTT:**  In this case, Your Honor, Mrs. Orr

23   experienced a large intraventricular hemorrhage.  Because of

24   the location of the bleed, you couldn't supplant and replace

25   the blood.  As a result, the external pressure caused her to

02:52

1   pass.

2                 Your Honor, Dr. St. Martin -- and this is

3   important -- also testified that if he were to use bleeding

4   risk, he would adjust treatment based on the PT results.  In

5   fact, he has testified -- in reference to a hypothetical posed

6   by Mr. Abney as to if you were to use PT and the PT results

7   came back such that the patients were out of range, his

8   response was:  I would adjust treatment.

9           **THE COURT:**  To what?

10          **MS. JEFFCOTT:**  Adjust his treatment of the

11  anticoagulant of Xarelto.

12          **THE COURT:**  What would be the adjustment?  Go lower

13  or give a different --

14          **MS. JEFFCOTT:**  That's within the discretion of

15  Dr. St. Martin, whether or not it would be to change the course

16  of treatment and put Mrs. Orr on a different anticoagulant or

17  no anticoagulant or to use Xarelto in a different method.

18                That's what provides and that's actually --

19  plaintiffs' instruction provides doctors with the discretion to

20  determine the proper course of treatment with their patients.

21  In total, the purpose of PT is to provide physicians with the

22  tool in which to evaluate bleeding risk in their patients, to

23  assess, moving forward, the proper course of treatment.

24                Next slide.  Unfortunately, Mrs. Orr did not

25  have any PT test taken in the months prior to her death.

1    However, had PT been taken, the evidence demonstrates that it

2    would have been significantly elevated due to a significant

3    decline in her renal function.  Specifically, in the four or

4    five months before her death, Mrs. Orr's renal function

5    declined to Stage IV severe kidney disease, which is

6    essentially one stage up above kidney failure, requiring

7    dialysis or a kidney transplant.

8              Now, as explained by plaintiffs' expert, he

9    noted that Xarelto has never been tested in Stage IV patients,

10   except for one study that included eight patients who took a

11   single, just one dose of 10-milligram Xarelto.  This is a lower

12   dose than the renally adjusted 15-milligram dose recommended by

13   defendants and prescribed to Mrs. Orr.

14             Now, the results of this study indicate that on

15   these eight patients that received just one 10-milligram dose,

16   they had a 2.44-fold increase in PT prolongation.  Now,

17   according to Dr. Ix, this could lead to the progressive

18   accumulation of Xarelto and much higher exposure to Xarelto in

19   the patient's blood.  As such, this evidence is sufficient to

20   raise a question of fact as to whether or not Mrs. Orr's PT

21   would have been significantly elevated at the time prior to her

22   death.

23             Now, that brings me to my final point,

24   Your Honor, and that's regarding Dr. Bui.

25             **THE COURT:**  Let me ask you this.  Your theory on the

02:55

1    test is that if the test had been administered, Dr. St. Martin

2    would have taken some steps so that she did not have an excess

3    amount of Xarelto in her system.  Then she would not have

4    needed Dr. Bui or she would have needed Dr. Bui anyway?

5         **MS. JEFFCOTT:**  Our position, Your Honor, is if

6    Dr. St. Martin had had the opportunity to evaluate Mrs. Orr's

7    bleeding risk and changed her course of treatment, she would

8    not have suffered her intraventricular hemorrhage and thus

9    would not have needed Dr. Bui.

10        Nonetheless, Dr. Bui was placed in the position

11   to have to treat Mrs. Orr for this intraventricular hemorrhage.

12   Defendants, in fact, did owe a duty to Dr. Bui to adequately

13   instruct him as to the availability of PT.

14        Now, admittedly, the majority of cases involving

15   the learned intermediary doctrine do so in the context of the

16   prescribing physician.  However, under the LPLA, a learned

17   intermediary extends to a treating physician who is charged

18   with handling a patient on a particular prescription drug.

19        The cases speak in terms of prescribing and

20   treating physicians.  If they were meant just to be

21   prescribing, that would have been the language used, but the

22   cases do discuss in terms of both the prescribing and the

23   treating.  In fact, this aligns with the Restatement (Third) of

24   Torts which the *Stahl* court relied upon in coming up and

25   forming the inadequate instruction claim.  It aligns with the

02:57

1   LPLA definition in that the Restatement states that a warning

2   must be provided to a prescribing physician and other health

3   care providers in a position to reduce the risks of harm in

4   accordance with provided instructions and warnings.

5              Now, Dr. Bui fits this role.  As a matter of

6   public policy, Your Honor, a drug manufacturer owes such a duty

7   to a physician who can foreseeably prevent a plaintiff's injury

8   from a drug.  As Mrs. Orr's neurosurgeon, Dr. Bui was

9   responsible for treating Mrs. Orr in accordance with the

10   applicable standard of care.  This included and required that

11   Dr. Bui consider and address Mrs. Orr's bleeding risk on

12   Xarelto.  In doing so, Dr. Bui took on the role of learned

13   intermediary.  As such, defendants owed a duty to adequately

14   instruct him.

15              I want to point out that there was, in fact, a

16   case within, I think, the Louisiana Third Circuit, Your Honor,

17   that extended the learned intermediary doctrine to nurses.  It

18   was a nurse of a prescribing doctor, but the court held that it

19   did, in fact, extend to nurses.  That case was on the prior

20   slide, 10, *Marks v. Ohmeda*.

21              Now, with Dr. Bui taking on that role and

22   defendants owing him a duty, I want to point out an interesting

23   fact, and that is that defendants did actually provide an

24   instruction as to PT testing in late 2015, and that was after

25   Mrs. Orr passed.  Specifically, Bayer sponsored a continuing

02:59

1  medical education seminar in which a Janssen expert, in this

2  case Dr. Peacock, specifically recommended using PT to evaluate

3  a patient's exposure to Xarelto in emergency care situations, a

4  situation exactly that Mrs. Orr was placed.

5          Slide 12.  Here the evidence demonstrates that

6  Dr. Bui would have followed such an instruction.  Multiple

7  times during his deposition Dr. Bui testified that he would

8  find it useful that he could quickly discern whether a patient

9  had Xarelto on board.  Indeed, had defendants provided Dr. Bui

10  an instruction on PT testing, the evidence supports that

11  Dr. Bui would have relied on Mrs. Orr's normal PT to proceed

12  with surgery upon admission at Ochsner main.  Instead, because

13  Dr. Bui did not know about PT, he unnecessarily delayed

14  Mrs. Orr's treatment for over 12 hours.

15          Defendants state that even if earlier

16  intervention had been possible -- Slide 13 -- had earlier

17  intervention been possible, it wouldn't have made a difference.

18  In fact, Dr. Bui testified regarding that, and he said he

19  wouldn't have proceeded with surgery if he didn't have a

20  reasonable belief that recovery could be made.

21          Again, he actually stated that Mrs. Orr would

22  not be where she was before.  She would not be where she was

23  having dinner the night before, but he did believe there was a

24  reasonable chance that Mrs. Orr would have the ability to

25  survive and overcome the intraventricular hemorrhage.

03:01

1          Furthermore, plaintiffs' expert, Dr. Leichty,

2   stated that had Mrs. Orr's surgery been performed upon

3   admission that, more likely than not, she would have made a

4   meaningful recovery.

5          As Your Honor pointed out in the *Allgood*

6   decision, subjective testimony can be enhanced by objective

7   testimony in the form of expert testimony.  So Dr. Leichty's

8   opinion that Mrs. Orr's earlier intervention and Mrs. Orr's

9   surgical care would have provided a meaningful opportunity for

10  her recovery is appropriate in the consideration of whether or

11  not a question of fact exists.

12         Your Honor, one final point.  To the extent that

13  there is conflicting testimony or the perception of conflicting

14  testimony within Dr. St. Martin or Dr. Bui, that is a question

15  of fact that self-contradictory -- that should be determined up

16  to the credibility of the fact finder.

17         As such, Your Honor, because defendants failed

18  to adequately instruct Mrs. Orr's physician as to the

19  availability and utility of PT testing, and because sufficient

20  evidence exists to raise a question of fact as to whether

21  Dr. St. Martin and Dr. Bui would have followed an adequate

22  instruction such as to avoid Mrs. Orr's outcome, defendants'

23  motion for summary judgment should be denied.

24         **THE COURT:**  Thank you.

25         Let me hear rebuttal.  Speak on the issue of

1   whether -- on the two things:  one, the failure to warn the

2   treater, let's see with Dr. St. Martin, and failure to warn

3   caused the injury.

4          She says that with regard to the latter, the

5   question of caused the injury, that is not determined

6   necessarily only by the doctor's view but by other experts.

7   Other experts could say, Yeah, I think that would have done

8   something even if the treater says that wouldn't have mattered.

9          **MR. IRWIN:**  Well, Your Honor, if it gets past the

10  learned intermediary motion, I think that would be a medical

11  causation question.

12         I presented to you the testimony of Dr. Bui that

13  in his mind, at least, it wouldn't have made any difference to

14  show that insofar as Dr. Bui is concerned, if we follow the

15  learned intermediary warning sequence that they are trying to

16  promote, it wouldn't have made any difference to Dr. Bui from a

17  warning standpoint because he says it wouldn't have made any

18  difference, sadly, with this very difficult case.

19         Beyond that, if there is expert testimony --

20  let's say a design claim survives.  If there's expert testimony

21  about the treatment and the delay in the treatment, and one

22  expert says it might have made a difference, like Dr. Leichty,

23  and the treater says it didn't make a difference, that would be

24  a medical causation question.  But that's not the purpose of

25  why we presented it to Your Honor here.  We presented it to

03:05

1    Your Honor here to show that even if you are going to try to
2    extend this learned intermediary doctrine downstream to someone
3    who is not a prescriber, in the case of this particular doctor
4    who is not a prescriber, he is telling us that it wouldn't have
5    made any difference to him because, sadly, at the end of the
6    day, had he been able to do this earlier, it wouldn't have made
7    any difference, as far as he was concerned, for Mrs. Orr.

8            So, yes, Your Honor, I think it's a medical
9    causation question vis-à-vis experts on this.  But with respect
10   to the learned intermediary doctrine, it is clear that Dr. Bui,
11   who they are trying to put this duty to, he says it wouldn't
12   make any difference.

13           Does that answer your question about it,
14   Your Honor?

15           **THE COURT:**  They also take the position that she
16   wouldn't have gotten to Dr. Bui if Dr. St. Martin had been
17   instructed on the proper use.  He would have interrupted the --
18   he would have done something.  I don't know whether they know
19   what he would have done, but they assume that he would have
20   done something.

21           **MR. IRWIN:**  He was asked over and over again,
22   Judge -- and I brought some paper here.  If I can put it on the
23   document camera.  He was asked so many times, Judge, just the
24   exact same things.

25           Here we are.  It's the end of the day, 5:20 p.m.

03:07

1  We have been doing this forever.  Here is Mr. Abney asking a

2  question about this Exhibit 1, the Douxfils study.  That was

3  put up earlier this morning, the Douxfils study, by Brian,

4  saying that this is something that the doctor should have

5  known.  So it's shown to Dr. St. Martin.

6           While I'm doing that, let me just do something

7  here.  I'm going to switch this back real quick.  This is what

8  I wanted to look at.  This is page 9 from the Douxfils study.

9  Blow it up.  It's kind of hard to read, but I will get around

10 to it.

11          This is sort of the debate that Russ Abney and I

12 would have during the day.  He shows him this study, and this

13 study purported to show that if you could do some testing, some

14 PT testing, there could be some development of a linear

15 relationship.  There's some graphs.  We went around and around

16 on this.

17          This is the limitation that Susan was talking

18 about earlier today (as read):  "One limitation of this study

19 is the fact that we used spiked plasma and that the study is

20 monocentric.  The result should therefore be validated in

21 patients receiving Xarelto."

22          But the real debate that Russ Abney and I had

23 that day with Dr. St. Martin, all day long, was the next

24 sentence (as read):  "Moreover, it is currently unknown how

25 these coagulation assays are predictive for bleeding risk."

1                    That's the only thing that matters to somebody
2       like Edward St. Martin.  Assays are nice.  Graphs are nice.
3       What a clinician wants to know is whether or not these assays
4       will tell me anything about any decisions I can make for my
5       patient.  It didn't tell him anything about the bleeding risk.
6                    So we go back to the end of the day, a long day.
7       Here we are, Exhibit 51, a study by Douxfils.  He sends him
8       over to page 3 (as read):
9                **"QUESTION:** You will see some graphs where they were
10               doing some sensitivity testing on different reagents that
11               are used for doing prothrombin times.  Are you familiar
12               with any of these reagents?  Some of them are Triniclot,
13               Neoplastin, Innovin, Neoplastin CI.
14                   **"ANSWER:** I think I'm familiar with the Neoplastin."
15                   He shows him another exhibit.  I can't remember
16      which one this is.
17                   **"QUESTION:** You were shown this exhibit.  Again, I
18               don't remember the number of it, but it was the
19               prothrombin time for Mrs. Orr.
20                   **"ANSWER:** Uh-huh.
21                   **"QUESTION:** And the prothrombin time was 11.4,
22               right?"
23                   And that's what it says.  That's normal,
24      Your Honor.  So Russ keeps going:
25                   **"QUESTION:** So if you do a PT test with Innovin and

03:10

1    you get virtually anything, any PT time, you don't know if

2    the patient has 60 nanograms per milliliter or

3    1,000 nanograms per milliter, because that line is really

4    flat, right?  Do you see that?

5          "ANSWER:  I see that.

6          "QUESTION:  But if it was Neoplastin and it was 11.4,

7    or normal, you would know where they were on the Xarelto

8    line because it's more sensitive, it's more vertical or

9    linear than the flat Innovin, right?

10          "ANSWER:  I see that."  Here Russ asks one question

11   too many.  "From what you are showing me, yes.  We have

12   been doing prothrombin times in jillions of patients for

13   decades.  I know lots of other doctors that do them.  I

14   have never had anybody anywhere ever discuss what the

15   reagent was that was used in the prothrombin time."

16          This is a clinician.  So the debate goes on:

17          "QUESTION:  I would like for you to look at the

18   limitations on page 9" -- which is what I just showed,

19   Your Honor.  "Would you read that sentence out loud for

20   the record that I have highlighted.

21          "ANSWER:  Moreover, it is currently unknown how

22   coagulation assays are predictive for the bleeding risk."

23          I asked my last question again:

24          "QUESTION:  Nothing that he has just asked you in the

25   last few minutes, nothing in this article, Exhibit 51,

03:12

1    changes your opinion, looking back on this, that your

2    prescription for her to change her over to Xarelto was a

3    prudent choice that you would not change today, correct?

4        "ANSWER:  No, I would not.  I feel comfortable with

5    the decision."

6            That's what this issue turns on, Judge.  That's

7    it.

8            One last thing.  There was a reference to a

9    case.  I have it here.  Here it is.  Ms. Jeffcott made a

10   reference to a case, *Marks v. Ohmeda*, suggesting that the duty

11   is extended past the prescriber.  That is not correct on this

12   case.  In this particular case it was a summary judgment

13   against the manufacturer of an anesthesia-administering device

14   where the manufacturer of the device failed to warn the

15   anesthesiologist or the nurse who used the machine.  This was a

16   user, just like Dr. St. Martin used the medicine, followed

17   instructions, and made his clinical decisions.  Dr. Bui did not

18   use the medicine.  Dr. Bui treated the patient.

19           Again, Your Honor, we think this motion is good.

20   Thank you.

21       THE COURT:  Thank you very much.

22           That completes our motions for oral argument.

23   Let me take what you have given to me.  I'll take it into

24   consideration, and I will be ruling as soon as I can.

25       MR. BARR:  Your Honor, would you like copies of the

03:14

1    PowerPoints?

2         **THE COURT:**  Yes, that would be helpful, actually, if

3    you all can give me that.

4         **MR. BARR:**  I think I owe some labels and things that

5    I talked about.  We will get those to you as well.

6         (Proceedings adjourned.)

7                          * * *

8                      <u>**CERTIFICATE**</u>

9         I, Toni Doyle Tusa, CCR, FCRR, Official Court

10   Reporter for the United States District Court, Eastern District

11   of Louisiana, certify that the foregoing is a true and correct

12   transcript, to the best of my ability and understanding, from

13   the record of proceedings in the above-entitled matter.

14

15

16                          <u>*s/ Toni Doyle Tusa*</u>
                            Toni Doyle Tusa, CCR, FCRR
17                          Official Court Reporter

18

19

20

21

22

23

24

25

MR. BARR: [13]  4/9 20/8 20/14 22/3
23/19 25/24 132/10 132/13 132/19
149/1 149/4 177/24 178/3
MR. DENTON: [5]  108/18 110/4 116/6
119/20 122/2
MR. HUDSON: [7]  58/2 63/7 63/18
64/23 68/6 69/4 78/24
MR. IRWIN: [17]  4/10 83/18 85/22
85/24 87/5 88/20 88/25 89/17 89/20
95/7 148/22 149/2 149/6 155/21
159/16 172/8 173/20
MR. LONGER: [11]  70/6 70/11 72/6
74/1 78/4 78/22 81/3 81/24 93/14 94/2
94/25
MR. NEWSOM: [16]  4/17 10/9 11/3
13/2 43/11 43/13 43/16 51/5 51/11
51/14 54/10 54/17 55/1 55/6 57/7
57/23
MR. SARVER: [5]  124/6 124/11
143/11 144/2 145/8
MS. JEFFCOTT: [6]  160/3 163/15
165/21 166/9 166/13 168/4
MS. SHARKO: [7]  95/8 95/10 99/17
108/11 108/17 122/3 122/13
THE COURT: [78]  4/2 4/7 4/12 9/3
11/2 13/1 20/5 20/13 22/1 23/18 25/22
43/9 43/15 51/3 51/8 51/13 54/7 54/14
54/23 55/5 57/3 57/22 57/24 63/6
63/15 64/21 68/4 68/25 70/5 70/10
73/24 78/3 78/21 78/23 80/20 80/25
81/18 83/14 84/25 85/23 87/3 88/9
88/23 89/15 89/19 93/13 93/23 94/24
95/1 95/9 99/15 108/8 108/16 109/25
116/4 119/18 122/1 122/10 122/24
124/2 124/10 132/8 132/12 132/17
144/1 145/5 148/19 155/20 160/1
163/13 165/18 166/8 166/11 167/24
171/23 173/14 177/20 178/1
THE DEPUTY CLERK: [5]  4/5 43/12
72/4 80/23 123/1

0
07932 [1]  2/13

1
1,000 nanograms [1]  176/3
1.5 [1]  126/22
10 [3]  27/16 86/18 169/20
10 days [1]  121/22
10 minute [1]  80/21
10 percent [1]  73/14
10-milligram [2]  167/11 167/15
100 [1]  1/20
11 [4]  67/7 110/10 145/23 162/24
11.4 [2]  175/21 176/6
11527 [1]  32/4
11:00 p.m [1]  162/2
12 [7]  18/25 24/4 24/4 34/20 42/11
120/15 170/5
12 hours [5]  89/4 89/5 151/10 162/21
170/14
12-hour [2]  89/7 121/21
12.2 [2]  35/13 35/13
12.5 percent [1]  91/19
12.9 [1]  145/23
1200 [1]  1/20
12:15 [1]  95/5
12:30 [1]  95/5

13 [1]  170/16
13 years [1]  90/24
13.6 [8]  120/13 120/17 120/19 120/24
120/25 130/15 145/23 146/22
14 [4]  67/15 73/5 106/17 151/11
14 1/2 pills [1]  28/12
14 hours [1]  125/9
14-1/2-fold [1]  28/11
14-1/2-times [1]  28/11
14-MD-2592 [1]  1/4
15 [3]  72/1 72/3 109/24
15 milligrams [1]  161/11
15 minutes [1]  123/1
15 months [3]  94/15 142/25 143/4
15- and [1]  5/4
15-milligram [4]  25/1 150/23 150/24
167/12
151 [1]  77/3
162 [1]  151/24
17 [1]  77/10
1819 [1]  2/7
19 [1]  67/15
19106 [1]  1/18
1:45 [1]  123/1

2
2,081 [1]  77/2
2.44-fold [1]  167/16
20 [14]  96/3 98/24 105/9 120/14
120/20 121/4 121/24 125/11 130/21
130/22 130/25 141/21 142/3 147/22
20 milligrams [1]  28/9
20 seconds [6]  111/21 111/24 115/4
130/9 131/2 134/24
20-milligram [3]  5/4 25/1 26/20
20-second [4]  130/10 131/16 132/1
148/11
2005 [1]  118/4
2009 [1]  124/14
201.57 [5]  16/18 52/17 53/6 53/15
53/20
201.80 [1]  71/12
2011 [30]  22/9 30/25 31/1 32/10 32/14
32/18 33/4 33/18 34/15 36/1 36/17
36/19 38/4 42/9 55/17 55/21 56/1 56/4
56/15 56/17 57/12 57/14 67/4 67/7
67/15 67/20 112/5 112/18 129/16
150/15
2012 [2]  77/2 78/14
2013 [4]  36/19 47/20 77/11 78/14
2014 [9]  36/19 68/9 73/4 78/13 150/20
150/22 152/12 158/15 159/4
2015 [8]  8/13 14/23 28/2 76/23 151/1
151/11 161/18 169/24
2016 [4]  63/8 65/5 73/22 129/17
2017 [4]  1/6 4/2 20/17 124/2
202439 [1]  30/19
20th [1]  2/10
21 [1]  156/19
21 C.F.R [3]  49/21 71/11 76/6
21 C.F.R. 201.57 [1]  16/18
21 C.F.R. 864.7750 [1]  14/12
22406 [1]  30/18
23 [4]  1/6 4/2 124/2 157/3
24 [3]  114/20 151/1 161/18
24 hours [1]  121/20
24-hour [3]  25/4 28/16 98/25
2400 [1]  2/16
2592 [2]  1/4 4/6
26 [2]  28/2 111/17

27 micrograms [1]  28/9
27 minutes [1]  43/25
2700 [1]  2/4
275 [1]  2/19
29 [1]  31/25
2:00 [1]  123/1
2:00 a.m [1]  157/9
2:00 the [1]  157/10

3
3 minutes [1]  43/24
30 [3]  32/19 86/21 117/3
300 [1]  154/18
314.70 [1]  53/12
316 [1]  1/14
32502 [1]  1/15
33 [3]  27/20 27/23 39/18
34 [1]  34/12
35 [2]  34/12 42/7
35203 [1]  2/7
36 hours [2]  120/15 121/7
3:00 a.m [1]  157/9

4
40 [1]  86/21
400 [1]  2/4
43 [1]  33/20
47 [3]  25/12 96/16 97/5

5
5 1/2 [1]  12/17
5 1/2 years [2]  12/16 47/1
5 percent [1]  154/7
5.4 [1]  34/22
5.6 [1]  42/15
50 [1]  2/10
500 [2]  1/17 2/19
500 percent [1]  131/8
504 [1]  2/20
51 [2]  175/7 176/25
510 [1]  1/17
5109 [1]  4/21
5110 [1]  58/1
5113 [1]  95/4
5114 [1]  95/4
5121 [1]  81/8
56 [3]  21/25 24/5 79/11
589-7778 [1]  2/20
5:00 [1]  154/19
5:07 [1]  158/8
5:20 p.m [1]  173/25
5th [3]  2/7 28/10 37/22

6
60 nanograms [1]  176/2
600 [2]  1/14 2/13
63102 [1]  1/21
635 [1]  122/18
68-year-old [1]  160/23

7
7,008 [1]  111/9
701 [1]  1/23
70112 [1]  2/17
70130 [3]  1/24 2/4 2/19
7778 [1]  2/20

8
8 1/2 percent [1]  91/14
85 [1]  3/11

**8**
86 [2] 149/25 155/10
86 cases [2] 149/22 155/10
864.7750 [2] 14/12 49/22
87 [1] 28/11

**9**
909 [1] 2/16
911 [1] 151/2
94105 [1] 2/10
95th [2] 28/10 37/22
99 percent [1] 148/4

**A**
a.m [2] 157/9 157/9
abandoned [9] 5/1 5/12 24/20 58/21 58/22 96/14 96/23 97/3 118/24
ability [6] 25/6 37/25 44/8 147/14 170/24 178/12
able [15] 21/7 51/16 129/9 138/8 149/14 149/21 150/3 157/6 157/7 157/11 157/12 157/14 157/25 161/13 173/6
Abney [8] 156/3 158/9 163/17 163/23 166/6 174/1 174/11 174/22
Abney's [1] 153/13
abnormal [1] 103/8
about [239]
about 5 [1] 111/21
about-face [1] 93/9
above [5] 72/15 141/21 146/22 167/6 178/13
above-entitled [1] 178/13
absence [3] 106/12 146/19 147/9
absent [1] 71/20
absolute [1] 120/12
absolutely [1] 74/24
abstract [1] 87/9
academic [1] 161/1
accelerated [1] 156/17
accept [1] 23/24
acceptable [2] 36/10 112/16
accepted [6] 18/25 92/1 100/2 101/20 137/9 163/11
accident [1] 77/21
accomplished [1] 53/17
accordance [2] 169/4 169/9
according [6] 27/2 27/14 36/7 39/2 141/19 167/17
Accordingly [1] 11/14
account [1] 131/25
accumulation [1] 167/18
accurate [5] 65/24 74/18 75/7 111/25 118/5
accurately [1] 100/7 132/16
Accutane [1] 155/24
acid [1] 92/25
acquired [16] 33/12 36/24 53/14 60/4 60/6 63/12 65/3 66/22 68/3 68/5 69/7 69/12 69/24 71/10 76/10 76/12
acronym [1] 91/8
across [1] 67/6 68/11
act [8] 6/23 21/2 98/1 99/25 112/20 133/7 139/25 155/9
acted [5] 9/2 11/23 15/24 16/25 19/19
action [7] 25/10 25/11 48/22 63/3 74/8 102/17 133/10
actions [5] 41/22 61/21 142/1 142/16 143/9

actively [1] 160/25
activity [4] 97/21 102/19 115/17 122/25
acts [1] 97/23
actual [5] 5/18 7/11 10/16 22/19 33/3 42/10 139/8
actually [24] 22/8 39/16 51/15 61/4 65/10 65/16 69/16 73/17 75/20 76/2 76/4 108/23 115/22 125/25 126/13 138/6 140/2 142/4 146/6 164/15 166/18 169/23 170/21 178/2
Adam [1] 28/1
add [12] 13/25 16/4 19/24 30/8 41/15 41/23 43/1 53/22 67/4 69/2 76/7 91/12
added [2] 16/8 51/19
addition [4] 16/9 16/22 101/18 114/21
additional [9] 7/5 15/4 15/12 44/13 50/14 61/23 67/14 67/16 69/2
address [19] 11/2 12/23 12/24 14/2 17/5 19/9 22/5 44/18 45/10 45/21 49/8 55/8 59/5 59/7 93/18 97/3 133/14 163/4 169/11
addressed [5] 84/2 87/1 87/2 96/17 101/12
addresses [2] 15/6 50/5
addressing [1] 41/3
adequacy [2] 23/3 164/3
adequate [9] 30/3 30/4 133/8 133/10 153/1 153/3 164/22 165/16 171/21
adequately [12] 31/18 31/21 32/13 156/15 160/9 160/12 160/17 163/1 163/8 168/12 169/13 171/18
adjourned [1] 178/6
adjunct [2] 12/8 76/9
adjust [7] 5/6 97/4 109/12 109/17 166/4 166/8 166/10
adjusted [2] 161/10 167/12
adjustment [2] 161/14 166/12
administer [1] 10/8
administered [1] 168/1
administering [1] 177/13
administration [2] 10/2 102/20
admissible [3] 58/24 96/1 96/4
admission [2] 170/12 171/3
admit [2] 107/23 113/22
admitted [2] 103/5 141/20
admittedly [1] 168/14
adopted [1] 48/23
advance [4] 16/10 16/24 52/4 53/17
adverse [9] 7/18 29/9 30/9 76/8 76/17 77/2 77/5 77/7 90/3
advise [2] 9/11 118/24
advised [2] 85/5 85/12
adviser [1] 161/1
AF [2] 55/19 76/14
affect [4] 98/12 98/13 98/15 128/7
affected [2] 64/12 102/17
affirmative [4] 21/12 72/9 139/25 140/2
AFib [19] 18/12 22/12 22/18 30/25 31/1 31/4 31/8 31/12 31/14 32/25 34/8 55/21 56/8 75/12 109/22 109/25 119/1 143/1 150/16
afraid [1] 52/12
after [30] 33/5 34/9 38/3 54/15 56/7 57/13 61/23 63/8 63/13 68/9 68/9 68/18 85/25 98/23 120/15 120/16 121/2 121/12 124/19 124/20 125/8 129/16 136/7 148/25 154/19 154/19 157/4 158/21 162/8 169/24
afternoon [6] 108/19 124/1 124/7 132/11 148/23 157/10

again [48] 7/12 11/8 11/14 11/17 15/2 15/21 15/25 19/8 39/25 45/4 48/9 48/14 48/15 55/9 57/14 62/25 64/2 66/4 66/22 67/1 68/9 68/13 74/16 79/18 81/4 82/23 82/23 118/5 128/17 129/13 134/5 134/8 137/10 143/22 145/18 146/5 146/6 146/8 147/17 154/14 159/3 161/15 161/16 170/21 173/21 175/17 176/23 177/19
against [2] 67/11 177/13
age [3] 91/10 91/18 161/3
agency [5] 57/11 57/18 60/7 76/13 110/6
agency's [1] 76/14
agent [18] 6/2 10/21 10/24 11/7 11/9 11/13 11/19 12/8 12/14 19/24 24/19 25/6 26/25 27/10 44/7 46/22 56/24 162/11
agents [2] 90/22 93/6
aggressive [3] 7/24 45/3 46/15
ago [3] 106/17 124/15 155/19
agree [12] 17/13 23/10 31/7 47/10 75/1 81/11 86/19 101/19 102/5 147/18 149/1 149/5
agreed [4] 32/8 92/17 92/18 157/24
agreement [1] 113/17
agrees [2] 100/10 114/17
aid [1] 20/18
aided [1] 2/23
air [1] 83/10
Alabama [1] 2/7
Alcohol [1] 98/16
Alere [6] 58/10 58/19 59/16 61/9 69/25 79/14
alert [1] 9/8
aligns [2] 168/23 168/25
Alison [2] 33/21 33/22
all [107] 1/6 6/8 7/1 8/25 10/16 13/1 13/15 18/25 19/18 19/19 24/20 25/12 29/25 36/1 36/2 36/24 43/3 45/11 47/8 47/10 48/12 54/22 57/2 57/19 63/14 63/20 70/5 70/9 70/13 71/7 78/22 79/3 79/23 80/24 81/11 82/13 82/24 82/24 83/1 83/2 83/15 84/19 85/2 86/5 86/7 86/8 89/9 91/22 94/12 94/25 96/7 97/15 101/15 103/3 108/12 109/9 110/11 110/15 111/6 111/10 111/17 111/18 112/18 114/14 116/8 117/25 118/16 119/5 120/2 120/4 123/2 124/19 124/20 125/8 126/14 126/20 131/11 135/2 136/3 136/3 137/10 137/15 139/6 140/4 142/24 143/10 143/24 144/11 145/7 146/7 146/9 146/10 146/18 148/16 149/3 149/9 153/10 153/15 153/16 154/2 156/4 156/21 158/16 159/18 163/22 174/23 178/3
allegation [1] 13/5
allegations [7] 25/10 25/13 27/8 49/1 84/12 89/25 90/5
allege [2] 48/13 63/13
alleged [6] 58/7 58/9 58/12 58/15 63/9 80/10
alleges [1] 133/20
Allgood [6] 124/13 126/7 126/8 147/16 151/18 171/5
allow [8] 30/6 30/8 30/13 39/16 54/1 54/2 88/12 163/8
allowed [6] 23/16 23/17 34/5 74/17 75/8 133/11

allows [5]  26/4 26/18 40/14 85/17 133/7
almost [2]  32/6 154/19
alone [2]  36/13 103/11
along [4]  24/21 146/9 146/11 148/16
already [8]  4/20 50/8 68/4 79/12 80/3 80/12 80/18 137/11
also [29]  5/22 7/20 23/9 24/11 30/6 37/21 41/11 48/8 52/2 52/6 52/11 58/12 63/25 68/6 69/14 70/14 75/3 99/4 110/7 110/7 112/12 112/22 117/10 117/24 119/15 141/12 162/3 166/3 173/15
also-ran [1]  5/22
alter [1]  13/21
altered [3]  13/24 127/3 127/8
alternate [1]  81/22
alternative [1]  27/1 39/8 39/10 64/8 82/5 82/8 82/9 82/12 83/7 83/21 93/17 116/24
although [3]  19/8 102/15 117/1
altogether [4]  5/21 8/1 8/8 51/7
always [8]  24/24 48/11 68/20 71/24 80/2 148/4 156/24 158/14
am [4]  43/12 56/20 156/7 156/7
amend [3]  41/6 43/6 51/1
amended [1]  52/2
amending [1]  43/1
amendment [2]  15/16 15/19
America [1]  97/10
American [6]  67/5 67/8 67/9 67/19 75/18 75/20
among [2]  16/19 53/5
amount [3]  10/6 99/16 168/3
analyses [2]  64/11 76/19
analysis [35]  8/3 22/15 23/5 33/10 60/5 60/6 62/15 62/20 62/20 64/24 66/21 67/22 68/6 68/13 68/14 68/16 68/17 69/15 74/19 74/21 76/12 76/18 76/23 76/24 76/25 80/9 112/21 112/22 112/22 113/3 113/5 127/11 127/13 152/22 165/6
analytical [3]  99/13 105/25 106/6
analyzing [2]  30/22 111/12
anesthesia [1]  177/13
anesthesia-administering [1]  177/13
anesthesiologist [1]  177/15
annual [2]  91/13 91/18
annunciated [1]  132/20
another [21]  6/2 9/6 9/17 39/25 40/5 42/5 52/10 82/14 83/12 90/13 92/8 100/23 101/2 101/5 103/5 105/14 116/6 130/10 134/15 150/6 175/15
answer [22]  7/3 7/4 9/1 11/20 15/23 84/16 89/13 93/13 100/8 100/8 110/18 111/3 111/9 126/13 128/8 128/12 128/16 137/24 141/2 151/24 154/11 173/13
answered [2]  114/19 147/4
answering [1]  163/22
answers [3]  47/4 110/24 126/10
antagonists [1]  14/16
anti [23]  5/21 6/6 7/13 8/2 8/11 8/24 10/14 10/21 11/11 13/8 14/20 26/4 26/18 37/8 42/17 42/18 42/23 44/7 47/17 47/19 56/23 82/11 97/7
anti-factor [6]  5/21 6/6 7/13 8/2 8/11 82/11

anti-factor X assay [1]  97/7
anti-factor Xa [7]  10/14 11/11 26/18 37/8 42/17 42/23 47/17
anti-factor Xa assay [8]  8/24 10/21 13/8 26/4 42/18 44/7 47/19 56/23
anti-Xa [1]  14/20
anticipate [1]  21/18
anticoagulant [45]  18/18 25/5 37/20 40/22 56/12 82/15 82/19 82/23 83/4 87/14 87/16 87/22 87/23 91/8 91/15 91/23 92/1 92/8 92/17 94/10 102/19 107/17 109/1 109/4 109/23 109/25 115/17 116/2 121/3 122/21 131/19 134/14 134/15 142/24 143/19 145/18 146/24 147/20 147/24 162/13 162/17 162/19 166/11 166/16 166/17
anticoagulants [13]  39/22 77/14 81/8 84/12 84/13 84/15 84/21 84/22 89/24 92/3 94/12 131/20 143/15
anticoagulate [2]  28/16 142/19
anticoagulated [5]  89/6 93/12 142/13 142/15 151/9
anticoagulation [11]  26/5 84/24 99/7 101/1 105/14 137/16 137/18 138/9 143/3 145/12 148/13
antidote [5]  9/8 11/15 11/15 90/1 90/8
antithrombin [1]  98/3
antithrombin iii [1]  98/3
any [84]  13/25 14/21 15/22 16/6 16/9 16/22 18/15 18/16 18/17 19/1 30/10 35/9 36/25 39/5 39/5 41/18 42/23 45/8 45/9 45/15 46/11 46/18 47/3 47/8 48/10 49/20 53/5 54/6 64/12 71/21 77/8 83/4 83/11 84/24 85/11 86/9 89/7 89/9 92/11 92/15 92/16 92/16 92/24 93/14 93/25 99/16 100/13 101/9 101/21 101/23 102/1 103/22 105/23 107/15 109/24 110/13 111/24 122/1 122/16 131/3 131/19 133/14 134/14 138/25 143/16 145/10 147/5 154/6 154/6 156/12 157/7 157/12 158/24 160/3 166/25 172/13 172/16 172/17 173/5 173/7 173/12 175/4 175/12 176/1
anybody [4]  31/10 109/24 117/18 176/14
anyone [1]  137/7
anything [19]  14/19 26/13 33/13 46/18 76/19 78/16 110/2 119/3 136/20 146/4 148/9 152/8 152/9 152/11 153/22 154/12 175/4 175/5 176/1
anyway [1]  168/4
anywhere [1]  176/14
apologize [1]  144/3
apparently [2]  117/5 140/21
appear [1]  29/19
appearance [1]  4/8
Appearances [2]  1/11 2/1
appeared [1]  132/15
appears [3]  41/5 97/2 163/5
appellate [1]  44/19
applicability [1]  163/13
applicable [4]  39/12 140/1 165/4 169/10
applicant [2]  36/6 112/9
application [2]  46/5 104/20
applied [3]  79/2 106/3 149/23
applies [7]  52/21 65/3 138/24 140/3 140/4 140/4 152/23
apply [6]  6/15 72/13 79/9 134/7

appointed [1]  118/9
approach [9]  12/7 20/13 27/24 39/9 39/11 39/11 47/25
approached [1]  46/23
appropriate [17]  36/8 42/19 73/13 105/18 106/4 108/10 112/14 115/5 115/5 117/7 124/21 133/16 138/17 138/22 147/1 165/6 171/10
appropriately [1]  125/19
approvable [3]  12/9 12/15 46/23
approval [33]  6/23 7/5 8/10 8/20 11/12 11/16 16/10 16/24 20/2 23/15 24/2 26/2 30/10 32/15 35/25 38/24 40/7 44/10 44/13 47/19 50/15 50/23 50/24 51/2 51/5 52/4 52/8 53/4 53/4 59/22 61/22 76/9 112/6
approvals [3]  15/4 15/12 31/1
approve [5]  15/13 15/16 15/18 47/11 48/6
approved [58]  7/15 8/12 8/14 8/17 11/14 14/10 14/22 14/24 18/14 18/15 21/22 24/1 24/11 27/2 27/3 30/24 30/25 32/10 32/24 34/23 35/12 36/12 38/7 38/17 39/20 39/23 40/8 40/10 47/13 47/20 47/22 48/4 50/17 54/15 54/17 54/25 56/8 57/11 57/14 57/19 60/18 60/21 67/20 71/21 72/17 72/21 97/9 97/11 109/2 118/4 118/14 129/11 130/2 137/1 137/5 144/19 146/2 164/18
approves [1]  47/14
approving [1]  12/7
approximation [1]  40/21
April [3]  150/15 151/1 161/18
April 24 [2]  151/1 161/18
aPT [1]  122/21
aPTT [4]  40/9 40/21 42/4 102/16
Arant [1]  2/6
are [271]
aren't [4]  37/4 38/21 40/25 146/24
argue [4]  4/21 18/23 136/12 146/3
argued [4]  13/6 22/23 60/24 105/22
arguing [5]  9/6 9/6 58/23 115/19 138/23
argument [33]  1/9 4/15 22/6 22/24 24/5 24/6 25/20 41/3 41/5 57/5 57/9 60/16 69/12 83/22 95/2 95/17 100/3 102/24 102/25 108/23 115/25 116/13 118/16 126/21 131/13 142/11 142/12 143/23 149/18 155/4 159/20 163/5 177/22
arguments [4]  49/12 116/14 119/23 126/1
arise [1]  72/8
arises [3]  6/13 46/2 68/3
Arixtra [11]  42/5 42/9 42/9 42/11 42/13 42/16 42/17 98/1 105/16 105/20 105/20
arm [1]  148/25
arose [1]  45/23
around [8]  34/15 56/14 73/8 87/17 162/2 174/9 174/15 174/15
arrived [1]  82/11
arriving [2]  162/1 162/8
article [6]  61/6 117/16 117/20 120/3 120/22 176/25
articles [1]  153/15
articulate [2]  129/21 148/16
articulated [4]  5/2 61/18 125/3 133/25
as [222]
ascertain [3]  9/25 62/1 85/18

aside [1] 153/9
ask [11] 6/24 6/25 54/18 87/24 103/18 111/1 118/7 127/24 146/11 163/24 167/25
asked [25] 8/21 44/1 76/23 78/8 88/7 89/7 103/19 110/23 113/14 114/9 126/24 140/21 145/24 146/22 151/23 153/19 153/25 154/20 158/9 161/22 163/18 173/21 173/23 176/23 176/24
asking [10] 18/8 79/19 86/25 118/12 137/17 139/12 139/14 139/24 144/14 174/1
asks [4] 35/2 47/4 117/5 176/10
aspect [2] 54/13 60/12
aspects [2] 46/21 49/16
assay [32] 5/21 6/6 7/13 8/2 8/7 8/11 8/19 8/24 10/14 10/21 10/24 12/8 12/14 13/8 18/7 19/23 26/4 26/5 42/18 44/7 46/22 47/17 47/19 47/23 56/23 82/11 87/11 97/7 97/9 97/11 97/13 105/4
assays [7] 95/20 97/4 104/11 174/25 175/2 175/3 176/22
assemble [1] 77/4
assert [1] 60/25
assertion [1] 83/6
assertions [1] 29/3
assess [20] 6/5 8/16 24/23 39/21 95/24 102/18 102/21 107/4 109/3 110/19 118/3 118/15 122/9 133/23 137/10 137/19 140/16 162/13 162/19 166/23
assessing [3] 6/13 29/14 104/17
assessment [3] 18/4 113/8 158/3
assist [1] 37/20
assistance [5] 6/22 9/1 20/1 44/10 149/21
associate [1] 149/21
associated [3] 32/21 33/7 77/3
association [1] 71/14
assume [9] 47/12 105/3 130/6 130/14 130/21 144/22 147/22 162/15 173/19
assuming [3] 145/14 145/16 148/8
assumption [1] 156/8
assure [2] 36/8 112/14
astounding [1] 94/9
at [243]
atrial [4] 64/8 67/21 86/16 96/10 161/5 161/10
attach [1] 36/1
attached [3] 25/11 34/15 40/15
attack [1] 139/13
attacks [1] 139/11
attempt [1] 20/21
attempted [2] 27/8 29/15
attenuated [1] 24/9
August [9] 32/18 33/4 38/3 56/4 56/15 56/17 57/14 67/4 150/18
August 1 [2] 32/18 38/3
August 2011 [2] 56/4 56/17
author [2] 65/9 65/11
author's [1] 66/5
authored [1] 124/14
authorities [2] 101/15 102/22
authority [1] 41/10
availability [5] 24/23 160/10 163/2 168/13 171/19
available [23] 9/8 12/9 12/15 46/22 50/19 77/17 81/22 88/13 97/9 97/16

105/7 109/2 116/1 116/4 117/5 118/14 119/8 127/6 139/22 1382 1384
140/18 140/23
Avenue [3] 2/7 151/3 151/6
avoid [3] 115/6 165/7 171/22
avoided [5] 82/21 92/23 156/18 160/16 160/20
aware [11] 101/23 122/19 133/5 136/22 140/15 156/4 156/7 156/7 162/18 163/6 163/20
away [6] 82/2 116/18 121/23 128/11 171/11 163/5
axis [2] 111/16 111/18

B

B-275 [1] 2/19
back [28] 8/21 31/15 33/13 34/1 68/8 74/12 80/22 90/24 95/6 105/6 114/21 122/25 128/6 136/24 136/24 141/1 150/11 152/17 157/12 158/6 159/3 159/7 159/19 162/3 166/7 174/7 175/6 177/1
back-and-forth [1] 141/1
Backes [1] 100/23
background [1] 160/22
backwards [1] 152/5
bad [3] 87/10 87/10 129/2
balance [1] 106/14
balanced [1] 85/16
ball [1] 159/7
ban [1] 73/23
Baptist [2] 151/3 162/1
barbiturates [1] 98/14
Bard [1] 139/2
BARR [13] 1/14 4/10 71/5 71/22 82/7 109/20 114/14 125/5 129/20 143/13 146/8 148/15 148/25
Barr's [1] 143/22
Barrasso [1] 2/15
barred [1] 24/3
Bartlett [10] 6/15 11/24 20/3 23/10 45/22 45/24 45/25 54/21 71/2 79/2
based [26] 10/15 10/19 10/25 11/1 47/15 49/1 62/13 63/14 64/15 65/22 66/5 68/23 69/15 73/23 80/18 106/9 122/10 132/4 133/2 144/24 145/11 145/17 146/3 146/18 152/16 166/4
bases [4] 19/10 29/4 49/9 49/13
basic [2] 11/8 133/15
basically [6] 52/21 57/9 83/1 83/2 109/14 116/7
basing [1] 145/21
basis [8] 31/14 38/6 58/22 65/8 66/10 80/4 99/10 131/3
Baton [1] 155/24
Baton Rouge [1] 155/24
batter [1] 4/20
battling [1] 117/22
Bayer [13] 37/12 75/6 95/11 110/6 110/19 114/8 114/9 114/16 115/2 116/23 118/2 124/8 169/25
Bayer's [4] 89/11 115/9 116/21 124/8
Baylen [1] 1/14
be [213]
bearing [1] 94/22
bears [3] 29/24 71/6 72/10
became [3] 12/3 161/24
because [118] 5/23 9/2 11/23 12/14 15/23 16/24 16/25 25/2 25/5 25/8 26/2 26/24 27/7 27/22 28/24 30/14 32/7

33/18 35/16 38/22 38/24 40/24 41/14 41/15 42/2 43/23 44/23 46/14 47/20 48/9 51/21 52/12 55/8 60/14 65/7 73/15 75/21 77/1 81/12 84/16 85/8 85/8 86/15 86/20 87/6 87/13 88/3 89/5 90/5 90/21 93/5 93/21 94/7 96/20 98/8 98/10 98/10 98/11 98/21 99/6 101/12 107/13 109/3 111/5 117/19 118/7 118/19 119/4 121/20 121/20 122/23 124/13 125/15 126/13 126/16 128/11 129/22 130/12 130/25 131/14 131/19 133/21 135/11 136/2 136/20 137/22 137/21 138/4 138/13 141/12 141/17 143/13 143/15 143/15 143/18 143/22 144/18 145/9 145/10 148/2 150/4 150/8 150/11 150/20 150/23 155/5 155/13 156/2 162/10 164/5 165/23 170/12 171/17 171/19 172/17 173/5 176/3 176/8
becomes [2] 50/19 121/12
bedside [1] 162/24
been [127] 4/14 8/12 9/13 11/14 12/9 12/16 14/10 14/22 24/11 24/21 24/24 27/3 29/12 31/18 32/13 32/13 34/23 35/16 35/17 35/25 40/7 40/10 46/25 47/18 47/22 48/12 48/21 50/17 58/21 58/22 60/15 68/4 71/1 71/15 73/10 76/14 78/11 78/12 79/17 79/20 80/10 82/10 85/12 87/15 89/9 91/23 92/8 92/9 92/14 92/15 92/16 92/16 92/23 92/24 97/6 97/10 97/12 99/10 100/12 100/24 102/18 102/21 105/5 105/15 105/23 105/24 105/24 116/13 119/14 121/8 121/16 121/24 121/24 126/25 127/6 129/5 129/9 130/19 132/21 133/19 134/1 134/2 134/7 134/25 136/15 136/17 137/5 138/17 140/18 141/7 141/19 141/21 141/23 141/25 142/2 146/8 146/16 146/17 150/1 152/2 153/3 154/20 156/17 156/17 157/7 157/14 157/25 158/8 160/15 160/20 160/25 164/22 165/15 165/16 167/1 167/2 167/9 167/21 168/1 168/21 170/16 170/17 171/2 173/6 173/16 174/1 176/12
before [29] 1/9 10/7 12/3 12/21 20/10 31/3 46/23 52/9 57/4 69/11 76/6 83/18 85/1 88/15 94/15 95/22 106/17 108/9 119/4 119/9 121/23 125/18 128/8 129/20 160/21 161/15 167/4 170/22 170/23
began [1] 161/21
begin [5] 70/10 70/14 70/20 74/5 81/10
beginning [2] 18/1 112/19
begins [2] 70/13 150/12
behalf [6] 4/19 70/8 70/9 81/5 108/20 160/5
behavior [1] 95/13
behind [3] 22/12 31/2 83/9
being [13] 24/4 24/4 24/4 32/9 41/18 59/25 60/2 66/25 67/23 71/23 76/5 131/9 154/9
belabor [2] 70/15 71/6
belief [1] 170/20
believe [22] 24/13 26/24 31/20 49/19 58/19 64/24 67/15 70/4 86/25 104/22 124/14 125/13 135/16 135/17 135/18 141/18 141/25 142/1 154/15 159/10 159/17 170/23
believed [3] 27/17 105/5 138/12

Case 2:14-md-02592-EEF-MBN   Document 6004   Filed 04/05/17

**B**

believes [2] 41/22 100/21
belong [2] 83/12 83/13
beloved [1] 161/1
below [2] 46/6 93/3
beneficial [2] 105/6 107/16
benefit [13] 26/22 55/23 105/12 109/18
109/19 127/11 142/17 142/18 143/2
154/12 154/14 158/17 159/9
benefit/risk [1] 55/23
benefits [2] 136/1 152/3
Berkowitz [1] 114/8
Berman [1] 1/16
best [8] 89/13 104/19 122/14 130/4
149/4 157/21 163/25 178/12
bet [1] 155/19
better [17] 9/12 45/24 48/12 52/8 75/13
76/1 77/19 77/22 78/1 78/15 82/22
85/12 90/7 126/8 140/11 151/12
151/19
between [27] 10/11 17/16 18/2 18/16
22/16 22/21 31/21 32/3 32/5 36/5
36/18 36/23 56/6 56/22 67/2 73/15
98/18 99/13 106/4 106/6 106/14 111/4
112/8 113/18 113/21 122/6 131/22
Bextra [1] 67/25
Beyond [1] 172/19
Biddle [2] 2/9 2/12
big [1] 105/25
bind [1] 39/6
binding [2] 49/2 50/4
biologic [3] 11/10 11/11 45/7
biological [1] 28/13
Birchfield [2] 128/18 140/22
Birmingham [1] 2/7
bit [8] 22/5 30/14 45/24 70/18 85/22
154/1 155/1 160/22
black [5] 17/20 58/16 58/21 59/2 59/5
blasted [1] 52/13
Blaus [1] 33/22
bled [7] 82/14 83/3 92/11 131/18
131/19 142/22 145/10
bleed [50] 22/16 22/21 25/7 25/8 26/7
29/14 36/19 36/23 38/1 38/4 82/18
83/4 85/7 85/8 85/15 86/20 99/5 99/8
100/22 105/11 109/5 109/21 111/25
112/23 113/18 113/21 117/17 119/9
126/23 127/19 131/15 132/3 133/5
133/23 134/16 140/16 141/22 142/4
142/8 142/10 142/16 142/17 143/15
143/16 145/13 145/17 145/19 145/21
165/19 165/24
bleed-out [2] 85/7 85/8
bleeder [1] 145/20
bleeders [1] 24/23
bleeding [67] 7/18 26/10 31/22 32/4
32/6 32/21 33/6 33/7 33/10 36/5 36/9
37/19 51/18 51/22 56/6 58/8 58/17
67/9 73/13 80/16 90/12 92/10 95/24
99/11 100/11 101/6 104/11 109/18
111/8 111/15 111/18 111/21 112/8
112/15 113/15 114/11 114/15 115/6
118/15 118/15 119/11 119/13 131/21
131/22 131/23 134/13 141/3 141/24
142/22 143/2 143/7 143/18 147/3
147/20 148/3 148/4 148/5 153/23
165/11 165/14 166/3 166/22 168/7
169/11 174/25 175/5 176/22
bleeds [4] 111/11 113/2 131/24 145/19

blessed [1] 24/7
blood [24] 9/20 9/20 9/21 9/21 42/22
63/17 85/8 97/18 97/18 98/20 98/23
100/25 104/6 120/5 137/18 140/23
142/23 145/7 145/10 148/2 161/13
161/16 165/25 167/19
Blow [1] 174/9
blown [1] 120/10
Bloxom [1] 152/25
board [8] 26/8 26/16 80/14 98/9 121/18
121/19 162/12 170/9
body [2] 10/1 10/3 85/13 85/18 88/12
88/15 88/17 98/18 98/22 99/6 102/6
122/13
Boehringer [2] 40/4 40/4
Bogard [1] 1/19
Boniol [1] 82/25
bookends [1] 56/14
bore [1] 51/18
both [26] 12/12 18/11 20/25 21/18 30/3
33/24 44/7 44/17 45/8 45/21 45/24
52/7 55/14 57/2 69/25 79/14 84/14
84/20 86/22 87/13 96/12 116/14
119/13 126/7 142/11 168/22
bottom [4] 35/13 112/12 129/7 154/17
Boudreaux [64] 25/13 70/8 78/12 82/17
83/3 84/18 84/20 86/23 87/2 87/7
87/13 87/13 88/5 90/1 90/12 91/12
91/22 94/10 94/11 94/14 103/3 104/23
109/20 117/12 119/3 120/14 120/24
124/5 124/10 124/22 125/1 126/4
126/14 127/7 127/8 127/14 127/19
129/4 129/17 130/6 130/10 131/7
132/3 132/22 133/20 135/24 136/7
136/10 136/18 141/22 142/2 142/12
142/21 143/14 144/23 145/1 145/5
145/14 145/16 147/6 147/13 147/14
147/10 154/1
Boudreaux's [7] 92/6 103/6 105/2
134/22 142/8 143/8 147/2
Boult [1] 2/6
box [5] 45/4 58/16 58/21 59/3 59/5
Bradley [1] 2/6
brain [5] 86/20 121/13 131/24 162/5
162/21
Branch [1] 82/20
brand [2] 41/8 100/11
brand-new [1] 41/8
branded [3] 70/22 70/25 71/3
break [2] 80/21 95/6
BRIAN [3] 1/14 4/10 174/3
brief [14] 25/16 40/17 55/3 59/12 65/7
78/6 78/24 88/23 108/20 120/10
150/13 152/21 156/14 157/1
briefed [3] 25/15 96/21 144/9
briefing [14] 4/25 7/20 10/13 13/6 20/12
22/24 24/16 27/21 40/16 58/20 60/15
62/14 64/17 147/18
briefly [9] 5/17 12/4 13/15 19/13 50/7
53/10 55/9 59/8 119/2
briefs [4] 15/6 45/11 96/24 97/7
bright [1] 71/25
brilliant [1] 140/21
bring [5] 10/22 23/25 133/16 157/12
158/6
brings [5] 84/19 99/15 162/25 164/21
167/23
Bristol [1] 163/13
Bristol-Myers [1] 163/13
broader [1] 75/21

broadly [1] 155/16
broken [1] 150/9
brought [5] 84/10 114/18 132/22 133/1
173/22
bucket [2] 56/24 56/25
buckets [1] 57/2
Bui [52] 88/7 88/21 88/22 89/4 89/14
91/24 92/13 150/7 150/9 151/8 153/10
153/11 155/1 156/2 156/12 156/16
157/24 160/18 160/18 162/9 162/15
162/18 162/20 163/20 163/24 164/1
167/24 168/4 168/4 168/9 168/10
168/12 169/5 169/8 169/11 169/12
169/21 170/6 170/7 170/9 170/11
170/13 170/18 171/14 171/21 172/12
172/14 172/16 173/10 173/16 177/17
177/18
Bui's [1] 158/3
build [1] 36/23
bullet [2] 55/17 56/4
burden [28] 20/21 20/23 21/13 23/2
29/20 71/18 71/19 72/25 74/20 74/23
75/10 83/23 83/24 84/1 84/2 84/17
87/18 89/10 89/10 89/11 89/11 93/21
94/21 127/20 143/24 145/3 146/13
149/16
burdens [1] 72/10
buried [1] 41/6
burrowing [1] 93/21
Bush [1] 118/10
Bussey [1] 101/20
but [145] 5/24 5/25 6/6 6/11 8/17 10/19
11/11 14/4 17/6 17/8 17/13 17/24 18/8
23/1 23/7 23/12 25/20 28/1 30/14 31/1
31/8 32/23 34/13 35/14 35/19 36/5
36/12 39/9 39/15 39/24 40/3 40/13
40/16 41/6 41/21 42/20 46/4 47/6
47/15 48/17 49/8 49/21 50/4 51/16
51/19 52/6 53/2 53/9 54/20 55/1 58/25
59/3 64/6 65/15 68/22 69/1 69/8 70/14
70/18 71/6 74/11 75/2 75/4 76/15
77/13 77/15 77/22 82/12 84/19 84/24
86/15 86/22 87/12 87/20 87/24 89/6
90/25 91/4 94/17 96/8 96/23 97/13
97/18 99/8 102/14 103/17 105/13
107/18 109/17 110/1 111/12 113/12
114/10 115/20 120/10 120/18 121/19
122/15 126/12 127/23 128/6 129/3
129/13 131/6 131/14 131/24 133/15
134/8 135/8 135/10 136/12 137/12
138/8 141/2 143/1 144/11 144/17
145/13 146/4 148/3 148/5 150/6
152/23 153/13 153/21 154/14 155/3
155/16 156/23 159/9 159/22 163/6
164/9 165/19 168/21 169/18 170/23
172/6 172/24 173/9 173/19 174/9
174/22 175/18 176/6
by 12:15 [1] 95/5
bypass [1] 48/5

**C**

C.F.R [3] 49/21 71/11 76/6
C.F.R. [2] 14/12 16/18
Caboose [1] 148/24
calculation [1] 120/21
calculations [1] 103/20
calibrated [1] 26/4
calibrator [1] 42/19
California [2] 2/10 155/7
call [9] 4/5 5/15 7/21 24/17 40/6 104/23

call... [3]  130/21 158/22 161/25
called [11]  5/18 5/22 5/23 10/15 16/5
34/14 47/17 91/8 121/11 150/25 151/2
calls [1]  28/12
came [12]  20/12 20/16 31/15 32/1 32/2
36/1 74/21 77/10 93/8 129/16 162/3
166/7
camera [1]  173/23
campus [2]  2/13 151/7
can [83]  10/1 16/13 28/19 29/1 30/11
30/17 38/3 39/8 39/10 40/20 41/21
42/18 42/25 43/1 43/21 45/23 47/5
47/6 47/9 48/5 48/11 51/4 51/10 53/17
54/22 80/2 81/11 89/2 89/18 95/4
95/12 95/23 96/7 96/7 97/4 97/12
98/15 99/2 99/25 99/25 100/7 103/23
105/22 106/3 106/10 107/9 107/18
107/19 108/25 110/25 111/2 113/5
117/3 117/6 117/8 117/20 118/3
118/15 120/20 122/9 122/13 122/14
127/20 132/7 137/23 138/20 141/5
142/16 142/16 143/6 145/24 147/11
148/5 154/17 155/16 158/6 158/7
169/7 171/6 173/22 175/4 177/24
178/3
can't [36]  6/20 26/13 30/1 36/20 38/23
41/14 42/17 47/11 54/8 54/16 56/19
64/18 79/11 79/12 87/12 88/8 89/8
89/14 92/5 96/25 101/12 116/17 119/3
120/18 127/22 128/14 128/15 134/15
136/22 145/2 145/4 146/20 147/10
148/8 150/5 175/15
Canada [8]  35/5 35/5 37/13 37/15
37/16 37/22 102/12 115/13
Canadian [4]  102/12 102/14 102/15
102/22
cancer [1]  61/5
cannot [20]  6/23 18/19 19/17 29/17
36/16 36/17 39/7 54/6 54/13 56/13
57/16 78/7 84/22 93/9 101/3 117/16
134/12 138/9 138/12 154/13
captured [1]  82/1
captures [1]  91/9
cardiologist [2]  92/7 150/19
cardiologists [1]  91/6
cardiology [1]  118/21
cardiorenal [11]  22/11 31/10 31/11
31/15 32/23 33/4 33/24 34/5 35/12
35/13 57/6
cardiorenal's [1]  35/17
cardiovascular [1]  114/2
care [12]  95/14 148/5 150/18 155/4
157/21 161/6 161/8 162/7 169/3
169/10 170/3 171/9
careful [1]  161/6
carried [1]  21/13
carve [1]  53/20
carve-out [1]  53/20
carved [1]  16/11
cascade [3]  97/21 97/22 98/2
case [105]  4/5 5/1 6/21 10/12 16/13
16/17 17/15 17/16 17/16 18/22 19/8
20/15 22/5 22/10 23/17 23/18 26/23
38/23 46/2 46/10 49/6 61/12 61/25
63/9 64/21 67/25 67/25 69/22 85/2
86/5 88/2 90/1 90/12 92/13 94/8 94/11
94/23 99/20 103/2 106/1 109/1 109/21
112/17 113/7 114/1 114/17 115/21
117/20 121/4 121/8 121/14 124/15
126/15 126/15 127/14 127/23 127/23
128/11 130/9 132/5 132/7 133/11
133/17 133/25 134/2 134/3 134/8
138/21 138/23 138/25 139/1 139/2
139/14 139/21 142/8 142/9 143/8
143/25 144/12 144/14 145/15 146/19
147/6 148/18 151/18 152/23 152/25
152/25 154/1 155/8 155/18 155/25
155/25 156/23 156/24 165/22 169/16
169/19 170/2 172/18 173/3 177/9
177/10 177/12 177/12
cases [33]  1/6 6/14 6/15 9/13 18/6
45/23 46/3 61/2 63/11 67/24 70/25
71/2 79/3 81/18 85/2 87/13 115/11
139/6 140/4 140/20 149/22 149/25
155/7 155/10 155/10 155/11 155/13
155/13 155/17 155/18 168/14 168/19
168/22
catastrophic [1]  12/10
causal [3]  71/14 132/4 150/8
causation [16]  83/23 84/9 87/18 124/10
127/17 127/21 128/12 129/21 130/3
144/6 145/4 153/11 165/4 172/11
172/24 173/9
cause [8]  36/9 92/3 98/15 99/8 122/22
133/10 134/15 151/17
caused [14]  78/20 81/15 85/8 89/12
91/1 92/2 130/7 139/13 142/8 147/7
162/21 165/25 172/3 172/5
causes [7]  9/17 25/10 25/11 109/5
112/15 134/12 139/11
causing [3]  91/2 94/4 142/9
CBE [16]  16/12 41/15 51/8 51/16 51/7
51/19 53/10 53/21 53/24 54/4 60/25
61/17 62/19 69/8 69/16 76/6
CCR [3]  2/18 178/9 178/16
cede [2]  19/13 56/20
Celexa [1]  67/25
center [1]  81/17
Centigrade [1]  103/16
centimeters [1]  103/16
central [2]  29/18 29/23
Cerri [1]  90/16
certain [14]  5/6 14/20 17/18 48/24
51/15 53/17 67/5 67/11 68/10 68/19
68/21 68/22 88/11 122/12
certainly [6]  11/1 36/13 48/11 60/24
78/14 130/20
certainty [4]  21/19 92/22 100/21 107/9
CERTIFICATE [1]  178/8
certify [1]  178/11
CHADS [5]  91/8 91/11 131/8 142/14
142/25
chain [12]  127/21 128/13 129/21 130/4
130/11 132/4 143/21 144/6 144/8
144/22 145/4 148/15
challenge [3]  110/13 110/14 110/15
chance [3]  86/17 86/20 170/24
change [63]  16/14 23/11 32/11 33/11
35/14 35/14 38/9 41/19 41/20 53/6
54/1 54/2 54/4 54/6 54/8 54/16 56/14
59/22 60/10 60/19 60/21 61/13 62/2
62/23 63/1 63/13 65/5 65/12 65/14
65/17 65/22 66/12 69/2 71/21 72/17
74/13 75/17 78/7 79/6 79/18 79/20
79/21 79/25 80/16 85/20 85/20 107/19
109/15 129/19 142/25 152/6 154/12
154/23 158/13 158/13 158/14 158/25
159/14 159/19 159/24 166/15 177/2
changed [19]  54/13 63/18 18/18
127/12 134/9 146/18 153/5 164/25
165/2 168/7
changes [17]  30/1 41/18 53/3 53/13
53/14 53/19 54/3 59/25 60/2 60/3 63/1
63/24 64/4 69/8 74/6 76/5 177/1
chapter [1]  53/15
characteristics [4]  26/24 27/5 27/7 27/9
charge [2]  87/17 90/25
charged [2]  30/3 168/17
chart [4]  37/22 111/13 111/16 120/19
chase [1]  43/20 124/19
chastened [1]  52/14
checklist [4]  106/23 106/25 107/2
107/5
chemical [1]  45/1
Chertoff [1]  94/23
chief [1]  118/21
China [1]  106/24
choice [2]  36/7 177/3
chosen [3]  36/6 112/9 112/11
Chris [2]  121/9 161/20
chronology [3]  22/8 36/16 55/11
CI [1]  175/13
circuit [13]  17/11 23/20 23/22 71/23
71/24 79/8 94/22 99/19 108/3 108/5
163/6 165/5 169/16
circumstance [2]  15/6 69/9
circumstances [7]  5/6 17/19 45/23 46/3
51/16 53/18 105/10
citation [3]  49/21 53/8 53/9
cite [9]  23/20 39/19 63/11 72/2 113/24
117/21 139/1 155/6 156/20
cited [12]  38/23 38/25 41/10 49/20 61/2
67/24 69/23 78/5 117/15 117/20
155/11 155/12
citing [1]  151/19
citizen [1]  17/24
Claiborne [1]  155/24
claim [87]  5/16 5/19 5/23 6/4 7/10 7/12
7/14 7/19 7/21 7/24 8/4 8/4 9/3 10/14
10/15 10/15 10/16 10/19 11/1 11/7
13/4 13/13 13/16 13/17 15/24 16/3
17/1 17/4 19/11 21/8 23/9 24/1 25/25
26/1 29/3 29/4 43/25 44/24 44/25
46/15 48/9 48/15 48/18 49/2 49/10
49/13 51/20 51/23 56/23 56/24 56/25
58/22 59/3 59/14 60/10 60/22 62/9
62/11 62/22 64/12 65/15 66/2 66/5
66/9 66/14 66/17 66/18 79/6 80/7
80/19 82/7 86/7 86/7 132/23 133/8
133/12 133/25 139/7 139/21 146/16
163/3 163/3 163/6 164/4 164/8 168/25
172/20
claiming [2]  81/14 85/11
claims [58]  4/24 5/2 5/11 5/14 5/15 6/9
6/13 6/25 7/3 7/6 7/8 7/9 8/22 10/20
10/22 10/25 11/21 11/22 11/24 11/25
12/3 12/5 19/16 20/3 20/7 20/20 20/22
25/19 43/8 43/22 43/23 43/24 45/3
46/13 46/16 48/19 48/21 48/21 48/25
56/23 57/2 58/6 58/8 58/21 59/2 59/4
59/21 60/11 60/19 61/7 62/5 62/6
66/11 70/4 80/5 80/10 137/16 165/5
clarifies [1]  6/20
clarify [3]  59/11 59/12 141/2
class [1]  68/12
classic [1]  128/19
classification [1]  49/22

classified [1] 49/23
classifies [1] 52/6
clear [72] 7/14 8/17 9/1 10/12 11/20
14/3 14/9 15/23 16/4 17/7 17/11 17/14
17/23 18/22 19/8 19/9 20/2 20/23 21/7
21/14 23/3 23/23 29/17 29/22 34/5
35/24 36/13 38/8 39/7 41/1 43/5 49/7
49/7 49/11 49/14 55/8 55/10 56/22
59/2 59/13 60/13 60/14 60/18 61/1
61/15 61/20 62/5 63/5 64/20 66/23
69/15 69/18 69/25 71/20 72/15 74/17
74/24 75/16 79/9 86/15 116/13 119/24
126/25 127/22 135/11 135/14 141/9
144/11 146/4 146/7 164/10 173/10
clearance [4] 14/13 38/10 38/24 50/23
cleared [7] 15/14 26/12 39/23 40/7
40/25 50/17 105/3
clearly [26] 31/1 32/7 40/14 42/25
43/22 51/22 64/4 65/25 66/14 78/7
86/21 92/14 108/25 114/3 115/1
118/22 121/2 121/3 130/1 135/17
137/22 140/17 141/3 144/19 145/11
147/4
clients [1] 93/22
clinical [21] 32/20 37/10 38/18 38/21
56/5 64/11 68/1 76/16 109/15 110/16
110/19 111/22 114/25 117/25 118/1
122/21 125/15 131/3 154/12 165/14
177/17
clinician [2] 175/3 176/16
clinicians [2] 40/13 77/20
Clinton [1] 118/10
clips [1] 134/5
clogged [2] 88/24 88/25
close [5] 30/23 37/18 50/1 131/23
154/18
closely [2] 18/3 66/16
closer [1] 98/25
clot [2] 86/17 97/18
clotting [9] 40/11 97/18 97/21 97/22
98/2 101/6 102/16 102/18 164/12
CME [1] 152/2
co [1] 52/14
co-counsel [1] 52/14
coagulants [1] 81/3
coagulation [12] 6/5 31/18 32/12 35/16
38/15 55/24 104/11 117/7 137/10
143/3 174/25 176/22
cobble [1] 17/17
Code [1] 14/13
cohort [2] 153/25 154/3
collaborators [1] 35/20
colleague [1] 75/19
colleagues [4] 65/10 66/6 79/19 152/2
columns [1] 10/20
comatose [1] 121/12
combat [1] 106/21
combination [15] 5/15 5/20 6/1 7/13
7/25 8/24 10/23 11/19 19/22 19/23
44/11 45/5 46/16 46/21 119/22
come [29] 22/22 28/21 29/16 33/2 34/4
35/22 36/16 38/19 44/4 44/5 48/11
68/20 71/10 73/25 75/6 75/13 76/25
77/24 78/19 80/2 80/22 87/4 87/6 95/6
99/2 120/23 122/25 140/7 150/11
comes [5] 63/13 68/8 68/8 74/2 100/8
comfortable [1] 177/4
coming [6] 36/24 41/4 114/4 116/11

117/18 168/24
comment [3] 48/23 80/6 92/11
comment k [1] 48/23
comments [2] 58/18 84/7
commercially [1] 97/9
commercials [1] 156/8
commissioner [1] 118/8
Common [1] 33/23
commonly [1] 14/16
commonsensical [1] 44/14
communicating [1] 65/10
communication [1] 65/25
community [2] 77/18 165/13
companion [3] 50/10 50/16 50/22
company [5] 47/16 97/10 128/19
128/22 129/1
compare [3] 84/23 142/17
compared [9] 84/12 84/13 84/15 89/23
90/3 90/15 90/21 93/6 152/17
comparing [1] 141/22
comparison [3] 73/15 105/18 105/18
competitor [4] 34/23 34/25 40/5 40/24
complain [1] 9/15
complaint [3] 25/13 27/8 90/5
complaints [2] 89/21 89/22
complete [2] 42/22 65/18
completely [5] 41/17 80/9 115/19
118/23 139/5
completes [1] 177/22
complicates [1] 85/21
comply [1] 20/25
components [1] 44/11
composition [1] 7/22
compound [2] 7/22 45/1
comprehensive [2] 62/15 66/16
computer [1] 2/23
computer-aided [1] 2/23
concede [3] 7/3 8/10 11/12
concentration [13] 8/16 14/25 18/3
18/17 26/21 27/17 28/23 39/22 56/6
98/18 100/15 120/9 122/7
concentrations [2] 101/7 111/4
concept [5] 27/12 27/19 28/14 30/12
41/13
concerned [3] 161/25 172/14 173/7
concerns [1] 11/2
concise [2] 74/14 74/17
conclude [4] 21/21 21/23 64/11 122/20
concluded [4] 22/15 61/5 65/13 79/12
concludes [1] 64/7
concluding [2] 63/23 69/20
conclusion [8] 32/1 32/2 33/2 36/16
63/22 80/4 102/9 122/6
conclusions [9] 21/18 61/25 62/25
62/25 113/9 114/5 116/11 116/17
122/9
condition [1] 109/15
conducted [2] 140/17 141/19
confer [1] 39/5
confess [1] 50/3
confidential [1] 117/2
confirmed [1] 136/18
confirming [1] 59/1
conflict [1] 61/11
conflicting [2] 171/13 171/13
confuse [1] 74/15
confusion [2] 60/15 119/22
congestive [1] 91/9 91/17
congratulate [1] 132/14
Congratulations [1] 132/17

conjunction [1] 15/8
connected [1] 6/18
connection [7] 18/11 18/12 50/11 55/14
55/22 64/1 87/12
consent [1] 40/18
consequence [2] 107/20 121/22
conservative [1] 102/7
consider [12] 6/24 8/22 13/18 25/15
25/18 47/16 50/12 59/24 65/12 66/21
79/10 169/11
consideration [2] 171/10 177/24
considerations [1] 72/8
considered [12] 18/5 60/9 61/3 61/10
63/15 64/19 75/7 79/25 80/18 164/1
164/5 164/8
considering [2] 67/7 67/10
considers [2] 68/2 131/6
consistent [6] 33/9 57/20 113/6 136/16
138/13 138/16
conspicuously [1] 57/14
constituent [1] 57/19
constitutes [1] 91/2
construed [1] 141/10
construing [2] 135/2 135/14
consumers [1] 47/9
contained [1] 163/18
contend [2] 8/5 50/21
content [1] 29/24
contention [5] 5/8 5/25 7/16 7/22 75/15
contents [1] 71/7
context [7] 24/12 61/3 62/25 72/9 86/6
138/24 168/15
contingency [2] 34/14 42/8
continue [3] 109/23 118/24 162/22
continuing [2] 36/23 169/25
contraceptives [1] 98/14
contradictory [1] 171/15
contraindication [2] 30/9 76/7
contrast [1] 97/25
control [1] 161/14
controlled [1] 75/25
conversion [1] 103/13
converted [1] 150/20
convince [1] 6/8
copies [2] 41/25 177/25
copy [1] 122/19
core [2] 24/24 134/1
correct [13] 54/11 54/18 113/19 125/5
134/9 154/15 157/17 157/18 159/10
165/4 177/3 177/11 178/11
correlate [1] 95/16
correlated [1] 18/4
correlation [10] 22/20 36/5 37/18 98/17
98/19 111/4 112/8 113/21 122/6
122/15
corresponded [1] 54/3
Correspondingly [1] 15/18
could [64] 6/18 6/25 8/22 9/2 11/17
11/18 11/23 13/24 14/7 15/21 15/24
16/25 19/18 19/19 22/25 23/25 25/20
26/16 26/17 26/20 26/20 29/21 41/20
45/1 49/17 51/19 55/23 59/21 68/20
72/21 72/22 74/4 76/11 76/18 79/17
85/12 87/23 87/25 92/7 92/14 92/21
92/25 93/1 98/9 110/10 121/19 122/15
122/22 136/14 136/15 137/25 139/2
139/17 140/15 156/24 157/8 162/6
162/18 167/17 170/8 170/20 172/7
174/17 174/19
couldn't [8] 13/20 51/21 61/17 84/4

Case 2:14-md-02592-EEF-MBL Document 5848 Filed 04/05/17 Page 1 of 1

## C

couldn't... [4]  92/15 121/20 126/25 165/24
Coumadin [2]  14/18 49/24
coumarin [2]  14/11 49/24
counsel [13]  4/8 20/11 44/3 47/12 49/19 52/14 53/23 55/3 55/8 55/10 56/4 95/25 152/11
count [1]  18/9
counterfactual [4]  17/17 21/16 75/8 94/21
country [1]  47/8
counts [1]  42/22
couple [7]  27/5 79/1 94/9 97/20 114/16 124/15 147/24
course [20]  27/3 31/19 47/6 47/12 48/4 50/3 51/20 54/21 119/6 128/5 128/21 133/4 137/2 141/4 153/6 158/11 166/15 166/20 166/23 168/7
court [42]  1/1 2/18 4/19 6/19 20/11 21/5 21/17 27/5 34/4 38/19 45/18 45/20 45/21 45/25 46/7 47/4 48/5 49/3 59/7 60/20 61/7 61/10 61/18 78/7 80/22 83/13 83/13 95/22 100/5 104/17 106/8 119/15 122/5 138/25 156/25 160/4 163/10 168/24 169/18 178/9 178/10 178/17
Court's [2]  6/14 99/20
courtroom [2]  97/8 108/6
cover [3]  16/17 59/8 59/15
covered [1]  70/14
crafting [1]  30/3
create [4]  39/5 46/9 79/12 143/9
created [1]  68/17
credibility [1]  171/16
critical [2]  16/16 141/12
cross [1]  77/1
crucial [1]  145/2
Crucially [1]  72/11
crunching [2]  113/1 116/9
cry [1]  77/18
crystal [3]  60/14 64/19 159/7
CT [1]  162/4
CT scan [1]  162/4
Cuculich [2]  101/2 101/23
Cuker [2]  28/1 28/6
Cummings [1]  2/6
current [3]  39/4 52/7 54/5
currently [11]  7/14 8/15 8/17 11/13 39/20 39/23 104/10 104/12 143/19 174/24 176/21
cut [2]  26/20 102/7
cut-off [1]  102/7
cutting [1]  124/18

## D

daily [3]  5/4 28/9 154/13
daisy [5]  143/21 144/6 144/8 144/22 148/15
damage [1]  89/13
damaged [1]  85/4
damaging [1]  84/9
Danek [1]  155/18
danger [1]  99/24
dangerous [6]  5/5 21/3 26/2 99/12 122/22 133/21
data [77]  28/18 28/19 51/18 51/18 56/2 58/14 58/19 59/18 60/6 66/20 66/24 66/25 67/10 67/11 67/19 67/23 68/2

68/6 68/18 68/21 68/22 68/23 69/1 70/1 75/18 75/18 79/4 75/20 75/23 76/12 76/16 76/18 80/8 80/19 100/4 100/6 100/19 101/9 103/23 103/24 106/7 107/10 107/11 110/16 110/17 110/17 110/17 110/22 111/2 111/9 111/12 111/24 111/25 112/1 112/5 112/6 113/9 113/11 114/3 114/21 115/2 116/9 116/9 116/16 117/19 117/23 119/12 126/20 126/21 126/21 127/2 127/2 134/16 134/18 154/3 154/13 165/14
date [1]  161/20
Daubert [24]  11/6 83/8 84/9 94/7 95/3 95/21 96/1 96/22 97/1 99/20 102/23 106/8 106/14 107/2 107/3 107/5 108/10 108/10 108/16 110/12 113/24 113/25 116/12 134/19
Daubert-like [1]  113/25
daughter [1]  161/24
day [43]  24/11 24/18 24/25 24/25 25/3 25/4 26/25 27/10 27/12 28/14 28/15 28/20 28/21 38/16 65/14 88/6 88/9 91/5 96/19 96/19 97/22 98/21 99/4 107/25 113/16 113/20 115/1 124/19 124/23 126/1 137/15 148/11 148/24 154/9 154/10 156/25 173/6 173/25 174/12 174/23 174/23 175/6 175/6
days [4]  121/22 125/8 142/22 162/24
deadly [1]  12/19
deal [9]  7/10 10/1 13/1 54/24 63/16 76/5 111/23 115/24 115/24
dealing [6]  22/11 31/12 61/4 61/9 72/9 139/5
dealt [2]  45/12 85/2
Dean [1]  158/5
death [7]  156/17 160/25 161/12 161/15 166/25 167/4 167/22
deaths [2]  77/3 77/7
debate [6]  80/2 84/22 91/20 174/11 174/22 176/16
debilitating [1]  12/19
decades [1]  176/13
December 2014 [1]  73/4
December [1]  73/4
decide [7]  17/14 35/1 64/18 87/25 88/2 108/13 117/23
decided [13]  32/8 37/13 45/15 61/24 65/4 65/20 66/1 88/11 143/1 151/10 158/1 161/19 161/25
decides [3]  30/1 67/11 68/2
decision [41]  12/23 17/11 22/19 23/15 34/21 35/9 36/17 44/25 63/12 67/13 68/10 68/14 68/15 68/23 69/17 79/8 86/9 86/15 100/20 105/11 109/17 109/18 109/22 127/4 131/3 139/19 150/18 152/7 152/13 152/18 153/5 154/16 158/17 159/2 159/11 159/22 159/23 162/5 165/3 171/6 177/17
deck [2]  89/3 106/23
decline [1]  167/3
declined [2]  69/18 167/5
declining [1]  150/24
deemed [1]  12/12
deep [1]  46/4
defeat [2]  21/25 44/14
defeats [2]  36/13 78/3

defect [31]  5/15 5/19 5/23 7/9 7/11 7/21 7/24 9/13 10/18 13/6 20/22 22/5 23/9 24/1 24/3 24/12 25/23 25/25 26/1 26/23 27/4 43/8 44/24 46/13 46/14 46/16 48/9 48/15 48/18 48/19 48/21 48/21
defective [3]  44/2 73/5 85/21
defectively [1]  81/20
defend [2]  35/9 93/8
defendant [7]  6/17 17/15 47/5 47/6 79/5 83/16 151/15
defendants [100]  2/2 2/6 2/9 2/12 2/15 4/12 4/19 5/19 5/25 6/25 7/4 7/12 7/24 8/22 10/22 11/17 11/23 12/6 13/7 13/9 13/20 13/24 14/6 15/21 15/24 16/25 17/16 19/17 19/19 21/7 26/2 29/16 31/5 31/9 32/2 32/5 32/16 32/19 34/3 34/18 41/3 41/10 43/5 44/3 44/12 46/13 46/20 49/17 58/4 59/21 62/19 65/17 65/21 65/25 66/3 66/19 68/21 69/13 71/1 71/4 71/17 74/10 75/10 75/13 77/4 77/16 77/23 79/18 81/19 93/20 112/19 117/15 117/19 133/2 133/13 134/4 135/14 136/10 138/23 140/6 140/7 140/14 141/12 156/15 160/9 160/12 160/17 163/1 163/3 164/4 165/16 167/13 168/12 169/13 169/22 169/23 170/9 170/15 171/17
defendants' [19]  4/17 4/21 20/19 20/22 22/22 27/21 27/22 29/3 33/20 39/17 44/8 72/25 95/3 124/5 124/5 148/22 160/6 164/4 171/22
defense [6]  21/5 21/12 21/14 71/17 72/10 132/16
deficiencies [1]  164/12
define [2]  60/5 155/15
definite [3]  128/8 128/12 128/16
definition [2]  76/10 169/1
degree [4]  92/22 100/20 100/25 116/1
dehydration [1]  98/15
delay [5]  89/7 89/12 121/22 162/21 172/21
delayed [3]  78/19 162/20 170/13
deleted [1]  67/8
demanded [1]  73/23
demanding [5]  8/23 19/20 21/5 21/15 71/17
demands [1]  19/17
demonstrate [2]  60/25 74/22
demonstrated [4]  33/7 36/4 102/18 102/21
demonstrates [6]  111/11 112/7 160/14 160/19 167/1 170/5
demonstration [1]  74/6
denied [3]  116/14 160/8 171/23
Denton [4]  1/19 1/20 108/20 122/4
depend [2]  24/6
dependent [3]  35/6 37/18 115/10
depends [2]  98/19 98/20
deposed [2]  124/18 125/18
deposition [20]  92/20 93/9 114/9 120/18 124/20 125/2 128/18 129/17 129/25 133/4 146/11 147/25 151/23 152/9 153/13 154/19 157/3 158/11 163/24 170/7
depositions [3]  84/4 94/1 153/18
derive [1]  107/4
derived [3]  69/13 76/16 154/13
describe [1]  74/13
described [3]  80/11 80/17 104/15
description [4]  74/18 75/7 164/7 164/9

D

descriptions [1] 164/14
design [72] 4/23 5/15 5/19 5/23 7/9
7/11 7/21 7/24 7/25 10/13 10/15 10/16
11/21 11/24 12/5 13/6 19/16 20/22
22/5 23/9 23/11 23/14 23/25 24/3
24/10 24/10 24/12 25/3 25/8 25/23
25/25 26/1 26/2 26/3 26/23 26/25 27/1
27/2 27/4 43/8 43/22 43/23 43/24 44/1
44/3 44/5 44/6 44/24 45/3 46/12 46/14
46/16 47/5 47/6 48/9 48/12 48/15
48/17 48/19 48/21 48/25 49/2 56/23
81/22 82/5 82/8 82/9 82/12 83/7 86/7
149/8 172/20
designed [6] 7/14 9/16 14/10 25/3
81/20 85/9
designing [1] 47/7
designs [1] 83/21
despite [2] 30/6 45/22
destroyer [1] 106/24
detail [1] 15/5
detailed [1] 153/14
detection [1] 164/11
deteriorated [1] 161/23
determination [1] 45/14
determine [11] 26/7 37/11 85/14 85/19
91/7 115/17 116/1 134/12 134/17
162/12 166/20
determined [3] 85/13 171/15 172/5
determining [2] 26/6 37/20
develop [4] 5/20 6/1 26/3 156/20
developed [5] 5/24 100/19
developing [2] 8/16 39/21
development [1] 174/14
device [46] 8/9 11/11 15/7 15/9 15/14
38/16 40/7 45/7 50/7 50/9 50/9 50/10
50/13 50/14 50/17 50/20 50/22 51/24
51/25 52/9 62/8 62/10 63/2 63/23
64/12 64/14 66/12 73/3 73/5 73/8
73/21 73/22 73/23 73/24 74/8 74/18
74/19 74/22 75/14 136/25 149/24
149/25 155/23 164/11 177/13 177/14
devices [7] 8/16 8/18 39/21 39/23
40/24 52/8 73/9
devoted [1] 69/21
diabetes [3] 91/11 91/17 161/5
diagnosed [1] 150/16
diagnosis [1] 150/17
diagnostic [7] 28/3 50/7 50/9 50/10
50/13 50/17 50/22
Diagnostica [1] 47/17
dialysis [1] 167/7
diarrhea [2] 98/15 161/24
did [58] 14/4 17/8 17/20 23/6 26/15
33/12 33/17 33/24 34/11 50/2 61/13
66/7 66/12 69/10 78/17 79/13 79/23
81/15 89/7 92/3 93/9 103/20 103/22
112/22 114/12 117/21 118/13 120/4
120/5 120/18 124/15 128/18 133/21
133/24 134/20 135/22 136/1 142/20
142/21 142/23 143/23 155/12 156/1
158/2 158/15 160/17 161/4 161/12
162/13 165/19 166/24 168/2 168/12
169/19 169/23 170/13 170/23 177/17
didn't [47] 18/15 18/17 26/14 30/2 34/7
35/3 39/25 40/16 45/2 62/19 65/23
68/21 68/21 73/25 75/12 78/16 89/5
93/22 93/22 110/12 110/13 113/11
113/17 115/24 115/24 118/18 119/4

119/6 119/8 129/1 133/14 136/20
136/24 138/4 142/25 146/15 148/17
159/6 163/4 163/14 163/21 163/24
165/19 165/20 170/19 172/23 175/5
died [2] 54/4 88/19
difference [21] 17/15 27/17 28/11 28/12
57/7 79/3 86/9 89/7 142/21 156/12
157/16 158/4 170/17 172/13 172/16
172/18 172/22 172/23 173/5 173/7
173/12
different [69] 6/6 9/24 10/5 10/6 13/10
13/11 15/10 18/15 18/24 22/10 23/5
23/6 23/6 24/10 30/18 30/20 30/20
30/21 33/1 33/8 36/2 42/12 45/6 46/14
47/5 47/6 50/21 51/7 51/25 55/14
63/20 68/15 69/6 69/10 70/18 76/20
80/9 82/5 82/18 82/22 89/9 92/15
92/16 92/24 97/22 98/2 101/7 102/13
105/23 114/4 115/19 116/11 116/17
116/24 118/9 119/25 120/6 120/7
120/10 120/12 120/12 130/19 140/12
142/7 153/4 166/13 166/16 166/17
175/10
different-looking [1] 46/14
differently [5] 9/24 80/11 80/18 130/13
139/1
difficult [2] 74/14 172/18
difficulty [1] 56/7
dilute [1] 40/10
dinner [3] 121/8 161/21 170/23
direct [2] 39/22 121/4
directed [1] 65/17
directly [2] 95/16 156/13
director [1] 36/4
disagree [5] 6/11 17/14 94/20 116/23
158/3
disagreed [1] 17/5
disagreement [1] 6/12
disarmed [1] 37/24
discern [1] 170/8
disclaimer [1] 39/6
disclose [2] 58/7 137/13
discontinue [1] 101/4
discontinued [2] 102/8 115/3
discretion [3] 140/13 166/14 166/19
discuss [8] 11/5 13/14 13/19 13/23
61/8 73/2 168/22 176/14
discussed [4] 15/5 57/12 59/25 72/15
discussing [1] 164/6
discussion [9] 34/8 34/18 67/1 79/7
98/1 117/10 117/24 127/8 150/14
discussions [1] 152/2
disease [2] 98/1 167/5
dismiss [5] 25/9 25/10 25/11 25/21
27/8
dismissal [1] 24/17
dismissing [2] 5/11 25/12
disposed [1] 143/25
disproved [1] 42/25
dispute [11] 44/10 76/15 79/11 95/19
99/5 114/1 120/16 135/15 135/17
136/10 143/10
disputed [2] 8/7 79/12
distinction [1] 56/22
distinguish [3] 10/11 13/15 133/15
distinguishable [3] 44/17 44/22 139/5
distinguishes [1] 106/11
DISTRICT [7] 1/1 1/2 1/10 20/16 139/3
178/10 178/10
diversion [1] 94/6

division [5] 22/11 22/13 22/14 31/10
31/11 31/19 31/23 32/1 32/16
33/20 33/25 36/4 57/13 73/22
divisions [2] 30/20 57/19
divisions' [1] 23/5
divorce [1] 156/23
do [149] 5/8 6/18 7/5 10/7 12/2 19/17
19/17 19/20 20/10 22/25 24/8 24/11
25/17 25/22 26/13 26/17 29/11 29/17
30/1 30/2 30/11 32/11 33/13 33/16
33/17 37/21 38/19 39/10 39/10 39/15
41/7 41/15 43/17 43/21 44/8 46/3 47/7
47/25 48/13 51/4 51/10 51/10 54/22
54/24 55/4 56/21 58/25 63/16 64/22
65/23 69/3 78/16 79/4 80/10 81/21
82/9 85/9 86/25 87/4 87/10 87/20 89/3
89/16 95/21 96/7 96/7 98/3 98/23
99/16 99/18 101/9 102/5 103/2 103/5
103/9 103/14 105/13 105/17 107/10
107/14 107/18 107/18 108/1 108/11
109/6 109/6 109/7 110/16 111/22
112/11 114/10 116/25 117/10 119/5
119/10 121/15 122/11 125/12 125/14
125/20 130/7 130/23 130/23 131/5
131/7 131/11 132/7 135/7 135/8 135/9
135/15 136/22 136/22 137/3 137/4
137/8 140/1 140/3 140/11 141/7 147/7
147/8 147/22 147/23 149/10 149/10
149/18 150/3 150/4 150/7 151/10
152/17 153/23 154/6 156/14 157/7
157/15 157/21 157/25 158/1 159/22
168/15 168/22 173/6 174/6 174/13
175/25 176/4 176/13
DOAC [4] 8/14 14/25 39/19 40/5
DOACs [2] 28/3 28/4
doctor [26] 26/10 28/7 77/8 86/16
88/11 88/18 117/5 124/17 124/17
125/11 125/14 126/10 126/12 131/9
139/12 139/18 139/22 139/24 144/14
144/15 147/5 149/23 149/24 169/18
173/3 174/4
doctor's [1] 172/6
doctors [28] 5/5 6/5 13/10 14/7 24/21
24/22 25/6 26/4 31/23 37/21 37/24
38/21 82/25 86/24 101/4 103/7 109/22
112/11 119/5 121/17 125/7 128/4
131/25 133/22 139/15 143/6 166/19
176/13
doctrine [8] 134/8 135/22 149/23 160/7
168/15 169/17 173/2 173/23
document [23] 4/21 15/5 34/14 39/1
39/3 42/8 50/3 65/18 65/19 65/24 72/3
74/11 74/12 75/1 75/3 77/12 80/3 81/8
112/4 117/1 117/4 118/12 173/23
Document 5121 [1] 81/8
documents [5] 9/4 112/23 113/14 122/4
125/25
does [33] 16/17 16/25 26/5 34/24 39/4
39/5 40/8 46/1 49/3 59/12 68/7 72/4
84/23 88/21 88/22 97/17 98/7 100/6
101/20 104/20 105/16 107/4 107/5
108/8 112/24 113/6 130/5 141/16
144/22 149/15 158/24 159/21 173/13
doesn't [27] 24/5 24/5 29/25 34/25 42/3
44/20 47/7 55/12 57/10 68/5 74/1
83/12 83/13 94/8 97/18 100/2 107/15
110/2 119/5 121/10 144/16 145/15
147/8 149/17 150/8 159/1 162/11
doing [10] 9/7 20/8 37/4 57/10 169/12
174/1 174/6 175/10 175/11 176/12

**D**

domain [1]  77/16
don't [78]  6/11 12/24 17/5 17/13 17/13
17/19 19/1 19/9 19/12 24/13 25/5 25/9
25/17 33/13 34/1 39/9 40/3 47/14
48/17 49/13 49/14 49/20 53/9 55/9
63/10 64/2 64/16 69/8 69/11 69/15
69/24 70/15 71/5 76/15 81/9 93/17
93/19 95/15 98/8 99/4 99/5 99/8
100/16 101/6 101/7 103/2 107/10
107/14 107/14 108/12 110/14 110/15
111/15 112/20 117/24 118/16 122/23
122/23 125/13 126/25 128/12 132/18
134/16 134/19 137/10 138/2 140/20
146/2 149/5 152/23 153/22 155/5
156/20 156/22 157/19 173/18 175/18
176/1
done [38]  7/1 8/23 11/17 15/21 17/18
19/18 22/25 36/24 42/25 64/24 83/12
99/10 111/5 121/19 127/1 128/1
128/17 129/4 129/19 130/12 130/15
130/18 132/2 135/11 138/12 140/9
140/13 141/25 142/2 142/7 143/22
145/8 146/16 157/8 172/7 173/18
173/19 173/20
dosage [1]  69/3
dose [35]  24/18 25/4 26/19 26/20 27/18
28/17 35/6 37/18 52/24 52/24 85/20
85/20 96/11 96/11 96/13 97/4 98/23
109/12 109/17 115/10 120/15 120/16
121/2 121/7 125/9 125/10 128/3
150/23 150/24 150/25 161/10 167/11
167/12 167/12 167/15
dose-adjust [1]  97/4
dose-dependent [3]  35/6 37/18 115/10
dosed [1]  96/18
doses [6]  5/4 5/7 27/16 35/7 73/12
115/11
dosing [18]  4/23 5/5 24/18 24/25 25/1
27/10 28/15 28/20 36/8 52/23 69/6
69/21 95/4 112/14 149/9 154/9 154/10
154/13
Douxfils [8]  104/4 104/5 104/6 120/3
174/2 174/3 174/8 175/7
down [15]  12/25 17/3 26/20 28/21
43/20 44/4 49/7 93/20 104/14 112/12
129/7 148/21 150/7 150/22 153/10
downstream [4]  149/19 150/2 156/1
173/2
Doyle [4]  2/18 178/9 178/16 178/16
Dr [1]  155/19
Dr. [205]
Dr. Adam [1]  28/1
Dr. Backes [1]  100/23
Dr. Berkowitz [1]  114/8
Dr. Boniol [1]  82/25
Dr. Branch [1]  82/20
Dr. Bui [52]  88/7 88/21 88/22 89/4
89/14 91/24 92/13 150/7 150/9 151/8
153/10 153/11 155/1 156/2 156/12
156/16 157/24 160/18 160/18 162/9
162/15 162/18 162/20 163/20 163/24
164/1 167/24 168/4 168/4 168/9
168/10 168/12 169/5 169/8 169/11
169/12 169/21 170/6 170/7 170/9
170/11 170/13 170/18 171/14 171/21
172/12 172/14 172/16 173/10 173/16
177/17 177/18
Dr. Bui's [1]  158/3

**Dr.** (continued)
Dr. Cerri [1]  90/16
Dr. Ciaborne [1]  155/24
Dr. Cuculich [2]  101/2 101/23
Dr. Cuker [1]  28/6
Dr. Eiswirth [1]  83/1
Dr. Gosselin [1]  100/10
Dr. Grant [1]  36/3
Dr. Graves [1]  155/23
Dr. Gropen [1]  158/2
Dr. Ix [1]  167/17
Dr. Johnson [1]  82/25
Dr. Kahn [1]  82/25
Dr. Kenneth [1]  124/17
Dr. Kessler [1]  118/8
Dr. Kessler's [1]  118/6
Dr. Khatib [1]  83/2
Dr. Kubitza [1]  118/1
Dr. Leichty [2]  171/1 172/22
Dr. Leichty's [1]  171/7
Dr. Leissinger [4]  90/10 92/10 101/5
102/1
Dr. Liechty [3]  90/19 91/25 92/19
Dr. Maggio [1]  101/9
Dr. Mahanna [1]  157/23
Dr. Peacock [3]  83/1 107/12 170/2
Dr. Piazza [1]  82/16
Dr. Reilly [3]  40/2 40/3 40/8
Dr. Rinder [12]  100/18 102/4 103/11
103/11 114/22 114/25 120/18 130/8
141/19 147/12 147/12 147/13
Dr. Sander [1]  150/16
Dr. Smart [1]  118/21
Dr. Smith [1]  82/25
Dr. St. Martin [33]  86/6 105/10 119/7
149/10 149/14 150/5 150/11 150/19
151/22 152/6 153/6 155/5 158/6
158/12 159/23 160/13 160/14 161/9
164/23 164/24 165/2 165/9 166/2
166/15 168/1 168/6 171/14 171/21
172/2 173/16 174/5 174/23 177/16
Dr. St. Martin's [2]  149/15 154/11
Dr. Timothy [1]  92/6
Dr. Whitecloud [1]  155/22
Dr. Winstead [1]  90/13
Dr. Wong [53]  92/8 105/10 119/7
125/17 126/2 126/16 126/24 128/4
128/21 129/9 129/15 129/24 129/25
130/7 130/15 130/22 131/4 131/6
131/9 131/16 132/2 134/6 134/9 135/4
135/20 136/6 136/12 136/18 136/21
137/21 137/22 138/11 138/15 140/8
140/15 142/1 142/4 142/20 142/21
143/1 143/8 144/7 144/17 144/25
145/5 145/24 146/12 146/14 146/15
146/17 147/4 147/7 147/23
Dr. Wong's [4]  133/2 142/15 145/11
148/7
drain [1]  157/15
drains [2]  151/11 157/8
draw [5]  98/22 98/24 100/7 101/3
159/21
drawing [2]  113/9 116/17
drawn [1]  98/20
dream [1]  93/16
Drinker [2]  2/9 2/12
drive [2]  2/13 159/22
drives [1]  159/23
drug [68]  6/17 9/13 9/16 9/16 9/25 10/2
10/3 14/18 15/8 15/10 24/1 25/3 25/3
25/8 25/24 26/13 26/8 26/16 26/24 27/6

29/13 29/23 30/4 35/21 40/6 42/5
51/25 52/2 62/22 63/20 70/22 70/23
71/4 71/8 71/14 78/13 81/16 81/17
82/10 83/12 85/2 85/3 85/8 85/9 85/13
85/15 85/15 85/18 88/14 92/12 93/25
94/14 94/15 98/18 107/19 134/10
134/11 134/14 136/19 137/7 139/13
139/23 141/17 142/9 163/7 168/18
169/6 169/8
drug's [2]  72/18 76/8
drugs [17]  8/14 8/17 15/1 28/5 36/9
39/19 52/8 54/24 70/24 81/15 85/22
87/4 87/8 89/17 94/2 94/6 112/15
due [3]  19/1 38/9 167/2
during [7]  61/22 133/20 152/9 152/10
158/11 170/7 174/12
duties [2]  6/20 21/1
duty [16]  13/9 44/3 44/4 149/18 150/1
153/10 155/2 155/11 160/17 163/8
168/12 169/6 169/13 169/22 173/11
177/10
dysfunction [1]  119/17

**E**

e-mail [1]  34/15
each [9]  18/13 50/6 61/11 63/20 100/1
107/1 136/14 136/17 145/4
earlier [28]  14/23 28/15 29/19 56/11
60/16 60/24 67/24 69/10 69/14 69/19
71/5 71/22 86/3 108/21 119/15 157/15
157/25 158/1 158/3 159/6 159/22
162/14 170/15 170/16 171/8 173/6
174/3 174/18
early [4]  66/25 118/4 157/7 157/12
EASTERN [1]  1/2 178/10
ecarin [1]  40/11
economical [1]  157/2
edify [1]  74/15
editors [1]  80/14
education [1]  170/1
Edward [1]  175/2
effect [31]  8/16 9/16 9/25 13/22 14/25
16/23 18/5 18/18 19/18 25/5 39/14
39/21 40/22 42/13 56/12 77/21 83/17
85/3 85/4 85/5 85/7 85/11 86/1 86/12
86/12 86/13 109/3 110/20 116/2 121/3
138/9
effected [4]  41/18 59/25 60/2 76/5
effective [9]  7/15 12/12 26/6 26/7 26/22
50/20 64/8 107/23 134/20
effectively [1]  46/25
effects [3]  110/25 162/17 162/19
efficacious [1]  96/12
efficacy [1]  47/15
efficiency [1]  5/10
effort [1]  53/25
efforts [1]  133/13
eight [2]  167/10 167/15
Eiswirth [1]  83/1
either [12]  37/23 44/6 67/19 77/21 88/3
96/4 103/3 105/13 149/23 150/8 152/1
152/9
ELDON [1]  1/9
element [2]  130/3 145/4
elevated [11]  103/7 105/2 119/15
119/18 121/1 121/2 122/16 130/16
147/2 167/2 167/21
Eleventh [1]  108/3
Eleventh Circuit [1]  108/3

**E**

Eliquis [13]  28/4 88/4 90/22 92/24 93/7
  93/23 94/5 97/25 105/19 105/24
  131/12 131/18 143/18
elision [1]  90/25
ellipses [1]  70/17
ellipsis [1]  74/2
ELMO [4]  43/15 49/21 53/9 72/4
eloquently [1]  107/12
else [6]  5/8 54/25 108/11 142/7 146/10
  150/2
EMA [2]  131/1 158/24
emergency [7]  26/10 90/16 91/24
  120/14 121/6 134/23 170/3
EMILY [2]  1/23 160/5
emphasize [1]  56/22
empirical [2]  100/4 100/6
employed [2]  108/15 160/25
EMS [1]  161/25
enable [1]  100/19
encompass [1]  68/6
end [19]  31/16 35/11 65/14 113/16
  113/20 124/19 124/22 126/1 129/14
  143/13 145/7 148/18 148/24 154/18
  158/8 161/21 173/5 173/25 175/6
endeavor [1]  9/25
ends [2]  32/9 150/12
English [1]  156/23
enhance [1]  5/9
enhanced [1]  171/6
enough [5]  21/25 45/19 104/16 109/3
  165/20
ensure [2]  99/21 107/8
ensures [1]  106/16
ensuring [1]  30/4
enter [1]  5/11
entered [1]  59/1 93/16 96/16
entire [5]  36/15 41/17 134/3 147/19
  164/9
entirely [3]  8/19 11/16 45/6
entitled [3]  21/13 62/16 178/13
episodes [1]  161/23
equals [1]  134/23
equivalency [1]  164/17
equivalent [1]  27/15
ER [1]  94/18
especially [1]  100/16
ESQ [10]  1/14 1/17 1/20 1/23 2/3 2/6
  2/9 2/12 2/16 3/11
essence [2]  12/6 47/21
essential [3]  50/20 155/4 158/16
essentially [5]  6/16 41/19 44/10 116/15
  167/6
establish [7]  90/23 92/14 100/6 114/10
  129/9 158/10 158/17
established [4]  20/25 32/13 35/16
  100/24
establishes [2]  133/15 144/7
estimate [1]  100/15
Europe [2]  47/17 101/15
evaluate [9]  95/24 117/17 122/21
  164/19 165/10 165/13 166/22 168/6
  170/2
evaluated [1]  119/14
evaluates [1]  110/3
evaluation [2]  110/24 113/12
evaluations [1]  116/16
EVD [1]  157/8
EVDs [1]  157/25

even [35]  7/21 12/7 16/1 17/5 29/15
  32/7 39/9 46/24 47/24 48/16 48/17
  49/14 73/19 80/13 91/16 93/17 96/24
  99/12 102/25 108/7 108/23 117/21
  121/10 140/20 146/25 150/6 154/14
  156/1 156/10 159/9 163/14 164/13
  170/15 172/8 173/1
evening [1]  161/18
event [18]  7/18 45/8 45/9 46/11 46/18
  47/3 77/2 77/5 84/25 87/19 87/25 88/5
  92/4 93/11 99/11 119/4 119/12 147/3
events [2]  36/16 51/13 73/14 76/17
  76/19 77/7 84/18 90/3
ever [9]  14/22 19/7 23/15 23/25 31/11
  31/13 155/25 156/22 176/14
every [20]  19/15 19/21 24/11 38/16
  48/17 89/22 107/1 107/24 109/1
  109/11 109/14 110/6 110/19 116/14
  119/24 143/19 145/18 147/20 149/25
  158/10
everybody [5]  114/3 114/4 116/10
  116/10 146/10
everybody's [1]  95/2
everyone [1]  131/20
everything [7]  17/6 82/1 133/3 152/16
  152/17 154/20 158/8
evidence [128]  14/3 16/13 17/7 17/11
  17/15 18/22 19/8 19/9 20/23 21/7
  21/14 21/20 23/4 24/10 29/17 30/1
  31/9 31/9 33/11 34/5 36/14 36/22
  36/24 38/8 39/7 39/16 41/1 43/5 49/7
  49/7 49/12 49/14 50/19 55/8 55/10
  58/23 59/13 59/16 60/8 60/9 60/9
  60/13 60/18 60/21 61/1 61/20 62/4
  62/5 62/13 62/22 63/14 64/20 64/20
  66/23 69/11 69/15 69/18 69/25 71/13
  71/20 72/15 74/24 75/16 79/9 81/22
  82/13 83/6 84/10 95/16 96/6 96/8
  96/10 99/22 99/23 103/1 104/17 105/7
  105/8 105/9 105/13 106/2 106/5
  108/13 115/6 121/1 121/4 122/8 122/8
  122/11 127/20 130/9 130/14 130/20
  130/25 131/18 131/18 132/4 132/6
  134/24 135/4 136/4 140/8 140/10
  140/14 141/7 141/18 142/4 144/24
  144/24 145/13 145/15 145/18 145/20
  147/1 147/5 148/9 148/12 148/17
  149/4 160/13 160/19 163/25 164/1
  167/1 167/19 170/5 170/10 171/20
evidentiary [1]  72/13
evokes [1]  46/4
exacerbate [1]  46/8
exact [6]  88/6 88/6 88/8 88/9 165/20
  173/24
exactly [6]  66/7 68/7 92/7 113/7 142/20
  170/4
example [6]  89/24 91/9 107/14 109/20
  151/24 153/17
exceeds [1]  143/2
except [4]  53/14 53/19 157/20 167/10
excess [4]  37/20 96/9 115/17 168/2
excessive [3]  35/7 115/6 115/11
excessively [2]  145/17 145/21
exchange [1]  67/2
exchanges [1]  67/14
excited [1]  126/15
exclude [2]  84/9 99/23
excreted [1]  88/14
excuse [1]  85/23
exempted [1]  41/13

exercise [1]  140/12
exercises [1]  67/12
exhibit [18]  25/12 27/20 27/23 31/25
  32/19 33/20 34/12 39/18 42/7 62/13
  73/5 96/16 97/5 174/2 175/7 175/15
  175/17 176/25
Exhibit 1 [1]  174/2
Exhibit 14 [1]  73/5
Exhibit 29 [1]  31/25
Exhibit 30 [1]  32/19
Exhibit 33 [3]  27/20 27/23 39/18
Exhibit 35 [1]  42/7
Exhibit 43 [1]  33/20
Exhibit 47 [3]  25/12 96/16 97/5
Exhibit 51 [2]  175/7 176/25
Exhibit E [1]  62/13
exhibits [1]  153/14
exist [3]  59/12 145/15 147/8
existed [1]  64/20
existing [3]  15/8 52/9 154/13
exists [5]  104/18 137/12 164/24 171/11
  171/20
expanded [1]  50/23
expected [2]  35/7 115/11
experience [1]  90/17
experienced [3]  47/18 82/18 165/23
experiencing [2]  161/15 161/21
expert [41]  28/6 28/7 81/7 84/1 84/2
  84/13 84/14 90/10 90/13 90/16 90/19
  91/22 91/24 91/25 92/10 92/19 93/4
  93/4 96/20 100/6 100/14 100/18 101/2
  101/5 101/20 103/10 104/13 110/13
  118/9 118/22 120/3 134/19 134/21
  134/21 167/8 170/1 171/1 171/7
  172/19 172/20 172/22
expertise [1]  110/15
experts [28]  80/14 84/3 84/14 90/23
  91/19 93/24 94/1 100/4 100/9 100/23
  101/14 101/19 104/19 109/9 110/15
  110/16 112/18 113/8 113/9 115/2
  115/7 116/15 116/20 117/22 118/17
  172/6 172/7 173/9
experts' [1]  106/2
explain [2]  30/7 119/21
explained [5]  44/6 44/17 45/11 133/6
  167/8
explicit [1]  61/14
explored [1]  86/5
expose [1]  107/8
exposed [2]  109/4 109/5
exposing [1]  28/22
exposure [3]  119/16 167/18 170/3
express [1]  53/20
expressly [5]  5/1 16/11 50/5 63/21
  133/11
extend [1]  169/19 173/2
extended [3]  155/10 169/17 177/11
extends [2]  155/3 168/17
extensive [1]  62/14
extent [3]  9/5 14/19 171/12
external [1]  165/25
extract [1]  27/23
extraordinarily [1]  37/11
extraventricular [1]  151/10

**F**

face [1]  93/9
fact [52]  14/4 17/8 17/12 17/20 21/6
  21/15 21/15 26/15 49/1 54/1 55/12
  55/13 56/8 61/14 61/23 62/2 63/14

## F

fact... [35]  63/16 68/9 68/18 68/25
75/11 75/24 79/13 92/1 94/17 96/13
101/10 116/5 118/3 119/7 135/15
136/21 138/19 145/19 151/17 163/12
164/1 164/24 166/5 167/20 168/12
168/23 169/15 169/19 169/23 170/18
171/11 171/15 171/16 171/20 174/19
fact-sensitive [1]  21/15
factor [41]  5/21 6/6 7/13 8/2 8/11 8/24
10/14 10/21 11/11 13/8 14/17 26/4
26/18 37/8 42/17 42/18 42/23 44/7
47/17 47/19 56/23 82/11 84/17 87/18
91/2 91/3 94/4 94/5 97/7 97/9 97/24
98/4 98/7 98/9 98/10 98/10 98/10
99/17 105/19 110/3 164/12
factor II [1]  98/10
factor V [1]  98/10
factor VII [1]  98/10
factor X [7]  97/24 98/4 98/7 98/9 99/17
105/19 110/3
factor X assay [1]  97/9
factors [3]  91/9 97/23 98/6
facts [20]  18/21 23/25 24/6 24/17 25/2
25/19 69/24 73/20 81/10 94/8 94/11
103/2 106/3 106/5 107/7 139/5 143/10
152/23 157/2 157/2
factual [1]  120/16
Fahrenheit [1]  103/16
fail [1]  30/5
failed [10]  9/11 26/3 58/7 58/9 151/15
160/9 163/1 164/9 171/17 177/14
fails [4]  7/18 11/8 100/1 130/12
failure [38]  5/16 6/4 7/10 12/3 13/4
13/16 13/17 20/20 29/2 29/4 43/23
43/25 49/10 56/25 62/7 86/6 91/10
91/17 106/13 124/25 124/25 125/2
130/10 132/23 132/25 133/8 133/11
133/12 133/17 133/17 139/7 139/21
151/13 151/16 159/20 167/6 172/1
172/2
failure-to-instruct [2]  124/25 125/2
failure-to-provide [1]  133/17
failure-to-warn [20]  5/16 6/4 7/10 12/3
13/4 13/16 13/17 29/2 29/4 43/23
43/25 49/10 56/25 86/6 124/25 132/23
133/12 139/7 139/21 159/20
fair [2]  65/23 91/1
fairly [1]  106/16
fairness [1]  5/10
FALLON [1]  1/9
falsified [1]  106/10
familiar [2]  175/11 175/14
family [5]  121/11 121/23 151/4 162/13
162/23
far [4]  24/9 48/3 137/15 173/7
farther [1]  144/17
fashion [1]  155/13
fashioned [1]  43/17
fast [2]  97/17 97/19
fatal [2]  100/22 146/19
faulty [2]  64/12 64/14
favor [3]  135/3 141/10 143/10
FCRR [3]  2/18 178/9 178/16
FDA [262]
FDA's [26]  6/21 6/22 8/25 11/19 15/22
20/1 20/1 39/4 44/9 50/4 51/2 52/4
52/7 56/5 59/17 61/21 61/22 62/24
66/3 66/6 68/17 76/24 77/23 110/24

1/11/8 164/7
FDA-approval [2]  9/9 144/19
FDA-speak [1]  52/3
February [5]  20/17 150/19 152/11
158/15 159/3
February 2017 [1]  20/17
federal [8]  4/22 6/9 6/19 6/21 14/13
20/24 20/25 29/23
feel [3]  93/15 122/11 177/4
Feldman's [1]  12/23
female [1]  91/18
few [6]  38/5 77/24 84/7 127/22 162/16
176/25
fibrillation [6]  64/9 67/21 86/17 96/11
161/5 161/10
fields [1]  106/11
Fifth [4]  94/22 99/19 163/6 165/5
Fifth Circuit [4]  94/22 99/19 163/6
165/5
figure [1]  141/5
figured [1]  103/25
figures [1]  103/25
file [1]  25/19
filed [3]  4/14 83/25 94/7
final [6]  17/2 32/9 41/3 112/2 167/23
171/12
finalized [1]  31/3
finally [6]  6/3 14/2 30/24 73/7 78/17
80/6 149/1 160/17
find [17]  14/2 44/2 45/10 49/14 51/10
51/12 54/15 61/20 72/21 72/22 77/25
103/23 104/24 120/9 121/15 139/2
170/8
finder [2]  21/15 171/16
finding [6]  19/10 22/19 31/24 37/1 49/9
49/13
findings [4]  33/9 65/20 66/7 66/8
finish [3]  43/4 121/10 121/25
finished [1]  143/13
Firm [1]  1/22
first [42]  4/16 5/17 6/10 7/9 7/11 10/20
10/20 11/21 14/6 15/13 18/1 22/6 41/8
42/4 44/1 44/22 45/13 49/16 51/4 59/9
59/19 60/1 62/7 63/19 73/3 83/18
110/11 118/10 119/5 127/24 129/24
130/3 132/14 132/15 138/20 144/8
144/20 151/14 155/17 160/9 160/21
162/25
fit [4]  94/8 100/2 103/2 106/4
fits [2]  51/17 169/5
five [6]  18/11 55/13 97/11 142/22
160/25 167/4
fix [1]  144/2
flagged [2]  5/24 55/21
flat [3]  111/25 176/4 176/9
flatly [1]  40/23
flip [4]  46/12 46/19 48/8 71/16
Floor [1]  2/10
Florham [1]  2/13
Florida [1]  1/15
flowing [1]  125/9
flows [1]  153/10
focus [7]  58/18 59/4 97/14 100/3 134/4
134/7 165/1
focused [3]  58/6 66/22 162/10
fold [3]  27/17 28/11 167/16
folks [3]  22/14 31/15 35/5
follow [10]  23/21 34/3 39/9 39/10 136/6
139/9 141/6 144/16 147/15 172/14
follow-up [1]  136/6

followed [17]  107/1 129/10 129/24
135/4 138/16 139/22 139/24 141/8
144/7 144/21 156/22 160/14 164/24
165/7 170/6 171/21 177/16
following [6]  17/25 29/8 46/2 53/13
102/19 136/7
follows [4]  138/15 138/16 141/15
144/22
food [1]  98/16
footnote [1]  41/5
forced [1]  53/2
forego [1]  143/3
foregoing [1]  178/11
foreseeably [1]  169/7
forever [3]  24/3 109/12 174/1
forget [3]  47/14 110/19 121/5
form [1]  171/7
format [1]  52/20
former [2]  57/1 118/8
forming [1]  168/25
forms [2]  80/4 90/4
formula [1]  103/13
formulary [1]  143/5
forth [2]  141/1 163/17
forward [21]  22/10 22/23 30/23 35/22
44/4 44/5 71/10 74/21 75/6 75/13
76/11 78/19 81/23 85/19 85/19 112/21
114/22 114/22 140/8 140/10 166/23
Fosamax [4]  20/12 21/5 21/10 79/8
found [5]  33/14 88/14 120/7 149/21
155/9
foundation [3]  99/22 142/11 152/25
four [7]  31/1 98/23 109/11 110/23
125/8 148/11 167/3
four-day [1]  148/11
Fourth [1]  1/20
fractures [1]  21/23
Francisco [1]  2/10
frankly [4]  5/10 17/4 75/11 119/23
Fred [2]  70/7 81/4
FREDERICK [1]  1/17
Freeman [1]  2/15
Fremont [1]  2/10
frequency [1]  76/20
Friday [1]  161/19
friend [1]  148/25
friends [1]  84/8
Fritchie [2]  2/2
front [1]  81/17
full [3]  55/18 133/4 162/2
fully [2]  152/1 152/3
function [6]  104/17 106/14 119/16
150/24 167/3 167/4
functions [1]  10/5
fundamental [3]  6/11 33/11 83/23
fundamentally [5]  6/15 8/7 10/25 54/12
94/20
funneled [1]  48/25
further [7]  6/22 14/15 20/2 64/6 104/14
156/11 161/23
Furthermore [2]  163/23 171/1
futile [2]  153/2 153/3

## G

game [1]  128/16
gap [4]  99/13 105/25 106/6 147/9
gaps [1]  127/21
gastric [1]  131/23
gastrointestinal [1]  90/14
gate [1]  106/13

**G**

gate-keeping [1]  106/13
gatekeeper [2]  99/21 114/5
gave [7]  23/6 27/23 27/25 35/3 35/19
91/13 125/25
gender [1]  91/18
general [6]  38/14 102/24 136/2 156/8
164/10 164/11
generally [8]  21/6 38/17 75/25 100/2
101/20 135/23 146/2 148/4
generating [1]  106/9
generic [2]  42/18 70/23
generics [1]  70/25
gentlemen [1]  4/4
geographic [1]  75/21
get [57]  7/5 10/19 10/25 20/10 22/4
22/6 23/8 30/12 32/11 34/9 35/14
44/11 45/9 47/8 47/10 48/25 49/14
51/1 51/4 52/4 52/8 55/10 55/15 72/5
77/4 77/25 79/16 83/18 85/14 88/12
95/5 97/11 98/7 99/25 103/9 109/21
120/11 125/5 127/16 132/17 137/10
141/13 142/14 145/25 146/12 147/21
148/16 148/17 149/15 149/17 150/5
150/8 151/8 155/5 174/9 176/1 178/5
gets [7]  73/8 110/10 125/8 130/24
146/9 147/22 172/9
getting [5]  26/22 27/15 54/16 125/10
154/18
GI [4]  82/18 90/12 90/13 109/21
give [24]  25/4 25/6 27/13 28/17 30/14
34/7 34/12 37/14 37/21 49/21 81/23
81/23 84/6 119/24 127/25 128/8
128/11 128/15 131/12 134/13 150/13
160/22 166/13 178/3
given [17]  4/15 18/21 27/22 40/16
80/12 85/3 85/6 100/16 125/17 125/21
125/24 133/3 135/18 138/17 140/6
140/20 177/23
gives [1]  37/22
giving [7]  27/7 27/13 36/11 37/24
glaring [1]  147/9
go [59]  16/15 28/20 33/13 34/1 35/2
39/2 40/19 41/14 41/19 41/24 42/20
45/9 49/2 54/18 64/10 70/12 72/6 74/4
74/12 82/7 85/19 85/19 86/8 89/18
93/20 93/20 95/3 96/2 97/6 104/14
106/25 110/9 110/13 112/2 113/4
113/6 114/20 117/3 117/3 117/14
118/6 120/1 120/2 120/19 124/12
125/1 126/6 126/14 126/16 127/21
138/6 146/21 149/16 150/7 160/21
161/19 164/17 166/12 175/6
goes [18]  39/8 64/6 111/17 111/18
111/19 112/12 115/5 118/25 119/12
119/13 121/8 121/9 121/11 121/12
128/17 128/18 129/7 176/16
going [66]  7/8 10/12 22/4 22/5 30/7
31/4 31/20 31/22 34/24 35/1 37/14
38/5 38/21 45/8 47/25 53/10 56/20
75/1 81/10 81/17 82/2 86/18 86/19
87/24 95/18 95/19 95/20 96/25 105/17
107/8 111/21 114/6 119/9 119/11
120/2 120/11 121/10 124/12 128/7
128/8 131/4 131/7 131/10 131/11
131/17 135/6 135/8 135/9 136/3 136/9
136/10 136/11 136/12 136/12 140/11
140/12 142/18 143/3 149/5 151/4
156/25 158/5 158/22 173/1 174/7

175/24
gone [3]  11/18 26/9 146/3 158/8 163/5
good [25]  4/3 4/11 4/18 6/10 45/19
47/8 58/3 70/7 72/7 73/18 95/9 95/10
104/15 108/19 124/7 131/9 132/11
132/18 148/23 149/12 154/1 160/1
162/12 165/15 177/19
Gosselin [1]  100/10
got [17]  73/12 78/4 78/14 88/2 115/18
116/8 120/24 125/24 127/16 131/7
135/16 135/17 146/14 146/15 146/7
147/5 161/22
gotten [1]  173/16
governed [3]  70/21 71/4 155/8
government [1]  6/21
grandmother [1]  160/24
grant [2]  36/3 54/19
graphs [5]  104/2 153/20 174/15 175/2
175/9
Graves [1]  155/23
great [2]  106/6 161/7
greater [7]  76/20 96/3 100/22 115/4
120/14 134/24 142/3
Gropen [1]  158/2
ground [2]  4/22 70/15
grounded [1]  108/2
group [9]  17/24 25/22 27/13 56/21 57/5
57/5 57/6 73/14 77/5 77/18
growing [2]  77/6 77/18
guarantee [1]  107/16
guess [6]  64/2 70/8 118/19 152/15
153/21 154/2
guesswork [1]  108/7
guidance [10]  15/5 38/25 39/3 39/3
39/9 39/14 43/7 50/3 52/7 118/12
guided [1]  70/25
guidelines [4]  91/14 101/17 101/24
102/2
Guidry [20]  12/23 12/24 13/1 23/16
23/23 24/3 24/8 24/8 27/3 43/7 44/15
44/16 44/22 44/23 45/8 45/9 45/13
46/14 47/3 47/5
Guillory [1]  99/19
Gulf [1]  106/24
gut [2]  41/17 53/23
guy [1]  114/8
guys [2]  40/17 71/25

**H**

had [153]  5/2 5/19 5/25 7/5 7/24 10/22
12/6 13/7 13/9 18/23 19/3 22/15 26/16
30/18 31/6 33/18 34/23 41/7 44/3
44/12 44/12 44/23 46/20 52/8 55/13
58/15 65/4 67/4 68/15 69/11 75/6 75/6
76/14 76/24 77/17 79/20 79/23 82/22
82/22 84/20 87/7 87/8 87/10 87/11
87/14 87/15 87/22 87/22 88/3 88/3
88/4 88/11 88/12 88/13 88/13 88/17
88/18 90/23 91/12 91/25 92/8 92/15
92/16 93/12 94/10 94/13 94/14 94/15
105/1 105/3 105/23 105/24 109/2
109/21 109/22 119/11 119/15 119/17
120/24 121/2 121/3 121/6 127/6
127/18 127/19 129/4 129/5 129/9
129/23 130/7 130/10 130/19 131/15
136/15 138/17 139/13 139/16 140/17
141/6 141/18 141/25 142/2 142/2
142/14 142/22 142/23 143/1 143/15
143/16 146/11 146/16 147/13 148/10
146/19 150/9 150/21 151/1 151/6

156/11 156/15 156/15 157/7 157/14
157/25 157/25 159/2 166/12 160/18
160/25 162/2 162/14 162/14 162/15
162/16 163/21 163/24 164/1 164/22
165/16 167/1 167/16 168/1 168/6
168/6 170/9 170/9 170/16 170/16
171/2 173/6 173/16 174/22 176/14
hadn't [2]  49/20 121/7
hand [6]  19/4 20/10 27/21 41/25 57/10
57/10
handed [3]  23/18 71/22 72/2
handle [2]  71/9 55/16
handling [1]  168/18
happen [5]  34/11 55/16 94/1 108/14
141/17
happened [19]  22/8 35/11 84/25 87/16
87/19 87/25 88/1 88/1 88/6 88/8 92/4
92/7 93/11 93/25 93/25 121/21 130/11
142/15 143/7
happening [3]  9/15 30/16 30/17
happens [6]  40/14 65/6 76/2 107/19
143/7 148/8
happy [3]  55/4 89/3 122/19
hard [5]  30/16 75/4 96/14 150/17 174/9
hardly [1]  48/18
hardworking [1]  160/23
harm [3]  91/3 91/3 169/3
harmonize [1]  68/11
harmonized [1]  100/13
Hartzo [4]  139/2 139/4 139/14 139/14
Hartzo v [1]  139/2
has [125]  4/20 8/12 11/13 12/2 12/12
12/17 14/10 14/21 16/15 16/16 21/13
24/21 24/24 25/15 26/8 26/9 26/12
26/25 27/6 27/8 29/12 31/18 32/12
32/13 32/24 35/16 35/17 36/4 36/6
38/7 39/14 40/7 40/20 41/14 42/24
44/24 45/18 45/20 46/25 47/16 47/18
47/18 50/17 50/18 52/19 55/3 56/15
58/22 60/9 61/3 63/18 64/19 65/8
66/10 68/1 71/8 72/1 79/4 79/12 80/3
80/10 80/19 82/8 83/8 85/16 90/8
94/22 97/10 98/3 99/7 100/12 100/18
100/24 101/21 101/24 102/1 102/6
103/12 105/4 106/4 107/17 108/6
109/25 112/9 113/22 118/22 120/17
121/9 121/11 121/13 126/20 128/11
129/11 129/19 129/21 130/15 130/21
132/21 132/22 133/19 134/1 134/2
134/21 134/25 137/5 138/15 141/17
142/1 142/14 143/25 146/8 147/8
148/8 149/12 150/1 154/20 155/25
158/8 158/9 162/12 163/7 166/5 167/9
176/2 176/24
hasn't [1]  130/2
hats [1]  140/22
haul [3]  8/23 52/9 54/22
have [554]
haven't [12]  5/24 25/10 36/21 36/25
37/1 37/1 39/13 45/12 99/9 118/18
140/13 147/5
having [14]  13/6 34/18 35/9 68/9 84/5
86/17 86/20 99/11 131/9 132/3 139/18
142/3 161/23 170/23
hazard [2]  71/14 126/22
he [286]
He's [1]  131/12
head [4]  103/24 114/8 118/2 157/23

headache [3]  121/9 121/11 161/21
health [6]  47/7 102/6 115/13 155/4
161/4 169/2
hear [14]  12/22 17/3 20/7 61/16 78/24
83/15 85/25 86/4 108/17 118/18 119/7
132/10 136/9 171/25
heard [24]  29/20 37/7 43/24 46/18 49/6
57/1 58/20 59/10 59/20 59/25 60/13
70/12 75/19 76/22 79/7 82/7 86/3 94/8
118/13 134/5 149/8 153/18 153/25
159/21
hearing [2]  43/4 133/20
heart [4]  91/10 91/17 139/11 139/13
Heather [1]  156/23
heavy [1]  71/18
heeded [1]  138/22
heeding [10]  135/10 139/25 140/3
140/7 140/20 144/9 144/13 144/16
152/20 152/25
held [2]  61/7 169/18
helicopter [2]  106/21 106/23
Hello [1]  81/4
help [4]  44/19 44/19 107/10 157/25
helpful [9]  29/7 29/8 29/13 38/12 41/11
51/10 137/14 137/14 178/2
hematologist [2]  90/11 114/25
hematology [18]  22/12 22/14 31/10
31/25 32/1 32/8 32/16 32/24 32/24
33/19 33/20 33/23 34/8 34/17 35/12
57/5 91/22 92/10
hemorrhage [13]  90/14 90/20 92/22
93/5 121/13 151/2 157/5 157/16 162/4
165/23 168/8 168/11 170/25
hemorrhages [1]  77/20
heparin [1]  105/20
heparins [1]  109/6
HepTest [1]  102/16
her [58]  26/10 82/21 88/14 88/16 88/17
91/18 91/18 91/18 92/23 121/10
121/11 121/22 150/18 150/20 150/22
150/23 150/24 151/2 151/7 156/17
157/12 157/19 160/25 161/1 161/3
161/6 161/7 161/8 161/10 161/12
161/13 161/14 161/15 161/16 161/19
161/22 161/22 161/24 161/24 162/5
162/5 162/9 162/10 162/23 162/23
165/20 165/20 165/25 166/25 167/3
167/4 167/21 168/3 168/7 168/8
171/10 177/2 177/2
herbal [1]  98/12
here [141]  4/13 8/18 8/23 9/18 9/19
10/20 11/22 13/17 15/10 16/24 17/9
17/19 17/19 18/8 20/8 21/20 25/25
30/17 32/8 40/20 41/25 43/21 45/3
46/13 46/16 47/12 47/18 47/19 48/2
51/6 51/20 51/23 51/24 52/1 52/5 53/9
53/11 54/12 54/19 55/17 60/5 60/11
61/2 61/4 61/9 62/3 62/5 62/9 62/18
62/24 63/13 63/21 64/10 65/2 66/21
66/23 67/23 69/9 70/21 71/19 73/16
73/18 74/23 75/1 75/20 76/3 77/9
77/19 77/22 80/7 80/21 81/11 82/16
85/7 89/18 90/1 91/13 91/22 93/3
93/16 96/18 96/24 97/7 98/1 99/15
100/8 104/21 106/12 107/16 107/22
111/5 112/12 113/23 114/6 115/19
115/25 116/19 118/13 118/21 120/8
120/11 120/18 120/22 121/9 122/25

124/17 127/1 132/21 134/20 137/24
139/2 140/9 146/8 146/21 147/4
147/21 149/7 150/3 154/14 155/8
155/19 156/2 156/13 158/11 159/22
160/5 162/13 164/18 165/9 165/15
170/5 172/25 173/1 173/22 173/25
174/1 174/7 175/7 176/10 177/9 177/9
here's [4]  33/3 37/16 41/21 42/15
high [31]  5/4 25/7 25/7 26/7 27/9 28/23
28/25 37/3 38/1 92/9 98/8 98/24
109/19 109/23 128/3 131/12 134/13
134/16 141/24 142/3 142/22 143/1
143/6 143/7 145/17 145/20 145/21
147/6 154/4 154/5 161/16
higher [15]  24/18 25/4 28/17 28/20
28/22 67/9 73/12 90/4 90/11 96/11
119/18 141/3 142/16 142/18 167/18
highlight [1]  58/16
highlighted [3]  77/19 112/13 176/20
highlights [26]  16/7 16/10 16/15 16/17
16/19 30/7 41/3 41/6 41/12 41/14
41/16 41/20 41/24 42/2 42/3 42/20
43/2 52/11 52/18 52/19 52/23 53/21
54/3 54/7 54/9 55/1
highlights-required [1]  53/21
highly [7]  21/16 21/24 72/17 72/23 73/1
74/16 120/25
Highway [1]  151/7
him [37]  86/7 91/13 93/8 100/19 109/23
114/14 118/7 125/21 125/25 127/24
127/25 128/25 129/6 131/12 131/17
136/12 137/3 141/23 142/3 142/5
142/6 142/24 143/4 143/17 145/7
145/9 147/8 147/23 155/20 168/13
169/14 169/22 173/5 174/12 175/5
175/7 175/15
himself [2]  89/14 155/23
hindsight [3]  152/5 154/15 159/9
hired [1]  90/13
his [59]  48/10 66/6 86/9 92/20 93/3
93/4 93/9 94/1 94/15 100/16 103/18
109/21 109/21 114/9 115/1 120/15
120/16 120/18 121/2 121/4 125/15
127/19 129/19 129/25 132/25 134/9
135/11 135/14 135/15 135/24 136/11
136/15 136/16 140/13 140/16 140/16
141/2 141/9 141/19 142/1 142/25
143/9 144/18 146/18 146/21 147/3
148/2 151/23 152/6 157/3 157/25
163/5 164/8 165/3 166/7 166/10 170/7
172/13 177/17
holder [2]  17/24 35/21
holding [1]  163/10
home [5]  121/9 121/11 151/2 161/22
161/22
honed [2]  13/5 124/24
honest [1]  138/3
Honor [230]
Honor's [1]  11/2
HONORABLE [1]  1/9
hope [2]  6/8 150/13
hoped [1]  156/24
hormone [1]  98/14
horrible [1]  121/9
horrific [1]  151/1
horse [2]  157/20 157/22
hospital [6]  103/5 121/13 136/7 141/20
145/22 151/3
hospitalist [1]  91/21
hospitals [1]  38/15

hour [6]  25/4 28/16 89/7 98/25 121/21
122/25
hours [14]  89/4 89/5 98/23 114/16
120/15 120/15 121/7 121/12 121/20
125/9 151/10 162/16 162/21 170/14
House [1]  161/20
how [35]  9/25 45/17 45/20 54/24 63/16
68/2 68/10 72/4 76/5 77/20 82/1 82/11
83/11 85/13 87/4 89/16 89/18 94/19
97/17 99/14 99/14 103/9 104/10
108/11 108/15 117/10 122/9 128/7
134/23 135/13 135/15 143/23 148/11
174/24 176/21
however [6]  7/4 112/13 151/5 161/6
167/1 168/16
HUDSON [5]  2/9 58/3 70/12 76/4 76/22
Hudson's [1]  70/16
hugely [1]  131/13
huh [3]  124/11 155/21 175/20
human [1]  106/12
hundred [2]  80/16 86/13
hurt [1]  107/19
husband [3]  161/19 161/22 161/24
hypertension [3]  91/10 91/17 161/5
hypotheses [5]  95/21 104/20 106/9
106/12 108/3
hypothesis [5]  95/22 96/2 103/13
104/15 104/15
hypothetical [11]  24/12 48/11 64/16
64/18 64/19 70/2 94/21 103/10 126/11
148/10 166/5
hypotheticals [2]  153/16 158/13

I

I'll [8]  34/12 41/25 45/13 72/5 108/19
129/22 141/13 177/23
I'm [48]  4/19 7/8 22/4 22/5 27/7 30/7
38/5 40/3 52/12 52/19 53/10 54/19
74/18 77/16 77/16 81/9 86/18 89/3
93/3 95/18 95/19 95/20 114/22 116/7
120/9 122/19 124/12 125/4 129/12
129/13 130/2 131/10 131/17 135/8
140/11 140/12 142/18 143/3 144/1
146/9 156/25 158/5 158/21 160/5
163/20 174/6 174/7 175/14
I've [1]  78/4
i.e [1]  91/4
ICU [1]  142/23
idea [15]  24/16 24/18 36/13 38/7 40/22
41/7 96/12 103/12 109/8 109/24
111/23 118/4 146/6 165/12 165/15
ideas [1]  67/18
identified [1]  142/2
identify [7]  25/6 28/25 37/4 37/25 38/12
128/3 143/5
identifying [1]  29/9 139/7
if [194]
iffy [1]  130/4
ifs [2]  143/24 148/15
ignore [1]  33/13 135/6
ignored [2]  140/8 141/9
II [4]  98/6 98/10 110/3 110/20
iii [3]  53/12 98/3 110/3
imbalance [2]  73/17 73/21
immediate [1]  121/19
immediately [3]  26/17 162/8 162/10
impact [12]  58/10 59/16 62/10 62/15
63/2 63/22 64/25 66/13 74/7 74/19
74/22 79/22
impacted [1]  62/11

implanted [2] 139/15 155/22
implement [1] 65/17
implemented [3] 69/8 78/8 79/21
implicates [1] 72/12
implications [1] 12/5
important [35] 10/11 27/18 31/4 31/16
41/21 52/12 52/22 58/25 59/9 59/24
60/1 60/4 62/18 66/20 68/1 79/22
96/20 98/21 106/14 107/4 107/7
107/24 111/7 112/3 113/15 117/13
131/14 132/5 136/6 137/21 144/18
147/23 148/3 148/11 166/3
importantly [8] 13/15 16/10 53/1 55/21
63/25 114/7 129/4 164/13
imposed [1] 106/14
impossibility [4] 6/16 21/4 70/24 72/9
impossible [7] 20/24 38/9 42/25 43/6
75/4 79/5 82/21
impressive [1] 130/17
improve [2] 36/9 112/15
improved [2] 55/24 101/10
in [620]
in limine [1] 25/20
In Re [1] 4/6
in vitro [2] 28/3 104/7
in vivo [2] 104/7 104/8
inaccuracies [1] 73/24
inaccurate [1] 119/23
inactions [1] 61/21
inadequacy [1] 164/3
inadequate [3] 163/3 165/4 168/25
inadmissible [3] 96/22 97/1 122/24
inappropriate [1] 164/5
inches [1] 103/16
incidence [1] 73/13
inclination [1] 147/14
inclined [2] 25/14 102/25
include [13] 17/25 19/2 43/6 50/25
57/21 58/9 67/13 67/19 69/17 69/18
71/13 76/15 165/12
included [11] 16/7 16/19 40/9 58/13
58/16 62/9 66/19 76/21 80/8 167/10
169/10
includes [3] 42/9 42/12 76/19
including [6] 5/2 16/13 52/23 53/7 97/4
162/3
inclusion [1] 67/15
incompetent [1] 57/9
inconceivable [1] 19/3
incorporate [1] 26/3
incorporated [1] 44/6
incorporates [2] 45/6 75/21
increase [3] 33/6 114/2 167/16
increased [12] 33/6 90/2 90/14 90/20
93/5 131/8 131/21 131/22 131/23
131/24 145/19 162/22
increases [3] 100/22 111/11 119/16
increasing [1] 111/17
indeed [6] 7/6 11/9 16/17 18/9 106/10
170/9
independent [7] 13/14 28/7 44/8 49/9
49/13 77/15 79/6
independently [10] 6/18 6/23 7/2 9/2
13/21 13/24 15/22 49/17 59/22 69/13
INDEX [1] 3/1
indicate [3] 145/13 148/12 167/14
indicated [4] 64/4 71/11 126/7 165/14
indication [17] 22/12 22/13 30/19 30/24

30/25 31/8 32/15 32/25 32/25 36/11
36/9 37/12 67/21 86/14 109/3 119/2
145/8
indications [1] 33/24
individual [3] 18/6 40/12 145/17
individuals [1] 161/3
infer [2] 135/15 148/9
inference [2] 100/7 141/9
inferences [1] 135/3
inferring [1] 143/10
influenced [3] 35/6 37/17 115/10
information [66] 16/11 33/12 35/25 36/6
40/13 53/6 53/14 53/14 53/19 53/21
54/3 54/7 58/9 58/13 60/4 60/6 60/7
61/23 62/10 63/12 65/4 65/4 66/22
67/5 67/6 67/13 67/16 68/3 68/5 68/10
69/2 69/7 69/12 69/17 69/19 69/24
71/9 76/10 76/12 76/13 77/4 77/17
77/19 77/23 78/1 78/2 78/9 78/14
78/14 78/15 79/23 79/24 80/8 80/12
80/15 101/13 107/15 112/10 127/6
129/5 129/10 138/5 138/14 154/6
158/16 163/19
informed [3] 86/23 152/1 152/3
informing [1] 133/22
infrequent [2] 36/8 112/13
ingesting [1] 78/13
inhibitor [1] 98/3
inhibitors [4] 14/17 14/19 37/8 105/19
initially [4] 13/6 47/21 58/8 135/23
initiation [3] 109/14 112/14 125/8
initiative [1] 61/24
injuries [5] 81/12 81/15 139/17 160/15
165/8
injury [9] 78/20 82/21 91/1 94/4 98/11
151/17 169/7 172/3 172/5
Innovin [16] 103/4 103/5 103/14 120/13
120/17 120/19 120/25 120/25 121/15
121/18 134/22 141/19 145/23 175/13
175/25 176/9
inquiry [3] 61/11 72/11 106/12
INRatio [8] 62/8 63/2 73/3 73/8 73/21
74/7 74/19 75/14
INRs [1] 158/24
insensitive [1] 14/20 37/8
insofar [1] 172/14
inspired [1] 108/7
instance [6] 44/22 45/14 45/25 51/17
63/10 80/1
instances [5] 73/13 80/17 165/10
165/11 165/15
instead [14] 6/6 7/23 13/12 16/9 18/14
18/18 56/11 57/16 96/19 164/16
170/12
instruct [12] 13/10 14/7 124/25 125/2
151/13 160/9 160/18 163/1 163/8
168/13 169/14 171/18
instructed [6] 5/6 6/5 136/15 141/7
160/12 173/17
instructing [1] 140/1
instruction [40] 15/3 16/2 16/23 17/9
69/3 127/18 129/23 131/1 135/5
135/24 138/17 138/18 138/22 139/9
139/10 139/22 139/23 139/24 140/9
140/11 141/6 141/8 141/16 144/8
144/21 144/22 146/4 146/18 160/15
163/3 164/4 164/22 165/5 165/7
166/19 168/25 169/24 170/6 170/10
171/22
instructions [8] 43/7 108/1 133/8

133/12 133/17 133/22 169/4 177/17
instructs [1] 164/15
intended [3] 65/16 65/25 164/19
intends [2] 50/9 134/21
intention [1] 15/9
inter [1] 27/9
inter-patient [1] 27/9
interested [1] 12/25
interesting [4] 12/1 37/6 85/1 169/22
intermediary [20] 124/9 126/17 127/17
132/24 134/7 135/22 136/5 138/22
138/24 149/23 155/2 160/7 168/15
168/17 169/13 169/17 172/10 172/15
173/2 173/10
internal [6] 34/18 65/9 66/1 66/4 66/5
79/19
internally [1] 65/19
International [2] 115/8 116/3
Interpatient [1] 154/4
interpret [1] 99/14
interpreted [1] 108/16
interpreting [2] 139/4 144/12
interrupted [1] 173/17
interruption [1] 144/4
interrupts [1] 153/11
intervention [6] 157/7 157/12 162/20
170/16 170/17 171/8
interviews [1] 152/10
into [36] 22/4 22/6 23/8 25/22 26/3
26/10 30/12 34/4 34/10 38/20 41/14
41/20 49/1 49/14 55/10 68/8 71/11
78/1 87/4 87/6 93/16 99/2 103/1
109/21 110/10 124/12 125/9 131/25
134/23 137/10 141/13 141/15 145/22
159/21 160/21 177/23
intracranial [2] 90/20 93/5
intraventricular [5] 162/4 165/23 168/8
168/11 170/25
introduce [2] 5/17 13/18
invasion [1] 125/15
Invokana [1] 44/25
Invokana's [1] 44/25
involved [5] 9/14 62/20 62/21 72/11
73/9
involvement [3] 7/2 11/20 15/23
involves [1] 97/22
involving [3] 126/10 149/22 168/14
irrelevant [4] 94/6 95/1 106/6 133/6
irresponsible [1] 107/21
Irwin [10] 2/2 2/3 3/11 4/11 94/8 105/22
163/4 163/17 163/23 165/1
Irwin's [2] 131/13 142/12
is [761]
isn't [16] 24/13 29/9 38/16 50/3 65/24
68/13 80/1 84/8 99/9 104/15 110/12
113/23 118/4 120/9 126/16 145/19
isolating [1] 67/16
issue [43] 9/22 10/9 12/25 13/16 15/11
44/18 50/5 52/11 56/2 56/3 59/9 59/17
61/5 61/8 61/11 61/14 61/16 61/24
61/25 66/16 69/16 79/12 80/4 94/13
95/22 96/13 96/16 96/18 96/23 97/2
101/16 103/19 106/3 108/11 110/14
116/13 118/7 134/2 144/11 148/20
151/21 171/25 177/6
issue-type [1] 116/13
issued [7] 17/11 64/1 64/3 101/24
102/2 144/13 144/14
issues [16] 49/6 52/23 59/7 59/24
64/18 67/23 70/24 73/2 122/20 149/8

**I**

issues... [6] 149/8 149/9 149/9 159/21
161/13 161/16
it [490]
it's [151] 7/16 8/6 8/13 9/21 9/23 9/25
10/11 14/24 17/4 19/3 22/21 23/16
25/12 25/17 25/20 26/7 27/13 27/18
28/18 29/10 29/10 30/16 33/12 33/22
34/12 34/13 34/24 35/1 36/12 37/11
40/22 40/23 42/13 43/6 43/14 45/12
45/20 48/3 51/9 52/20 54/16 57/9
58/25 59/2 59/4 63/13 64/19 64/20
68/17 69/6 71/19 72/1 72/2 74/23 75/4
76/6 77/16 77/23 78/2 78/10 78/18
79/8 81/8 81/20 83/10 83/17 85/7 85/7
86/13 86/15 86/19 86/21 86/22 87/10
87/10 88/15 89/8 91/1 91/8 91/8 94/9
95/1 96/25 98/8 98/16 99/5 100/2
101/14 101/15 103/15 103/22 103/24
104/4 105/20 106/15 106/24 106/25
107/20 107/23 108/10 108/11 108/21
111/5 111/12 111/17 115/7 115/20
117/1 117/18 120/4 120/9 120/10
120/21 121/7 121/16 121/18 124/8
125/1 127/22 128/1 128/7 128/10
130/4 130/10 135/12 137/6 138/2
138/4 138/6 138/7 138/8 140/7 142/8
144/18 146/1 147/9 147/18 147/23
148/6 148/24 151/13 154/17 156/1
158/8 164/14 173/8 173/25 174/5
174/9 176/8 176/8
Italy [1] 122/18
item [1] 16/7
items [1] 16/19
its [26] 6/20 8/9 21/13 30/4 37/7 38/24
45/8 47/25 50/9 57/19 57/20 58/10
59/16 61/6 61/24 62/10 64/1 65/20
66/8 66/8 67/12 71/7 71/12 74/19
162/13 164/18
itself [11] 34/9 39/3 40/19 54/23 57/11
57/18 62/20 66/7 67/7 75/1 99/8
IV [3] 110/3 167/5 167/9
IVD [10] 15/4 15/7 50/2 50/7 50/8
50/10 50/12 50/16 50/22 157/15
Ix [1] 167/17

**J**

JAMES [2] 2/3 3/11
Janssen [33] 17/23 17/24 18/10 18/23
19/3 35/19 35/20 35/21 37/13 38/9
55/18 67/2 67/4 67/14 68/9 73/4 73/7
75/6 95/11 110/7 112/21 112/22
112/24 113/10 113/14 113/17 115/2
116/23 116/23 117/1 117/7 124/8
170/1
Janssen's [7] 17/22 57/20 68/13 89/11
113/1 113/8 124/8
January [1] 55/17
JEFFCOTT [3] 1/23 160/5 177/9
Jefferson [1] 151/7
Jenkins [1] 163/12
Jenkins v [1] 163/12
Jersey [1] 2/13
Jessica [1] 76/11
jillions [1] 176/12
Jim [2] 4/11 95/7
job [2] 77/23 134/20
Joe [1] 161/19
Johnson [1] 82/25

**K**

k [1] 161/19
judge [22] 1/16 1/23 43/15 43/18
43/21 78/6 84/11 87/6 89/18 90/24
91/20 92/19 93/3 93/10 109/13 110/12
151/12 154/17 156/24 173/22 173/23
177/6
Judge Feldman's [1] 12/23
judges [2] 71/24 149/13
judgment [21] 4/22 21/17 22/1 46/6
67/12 68/24 71/25 72/12 72/18 72/20
87/12 124/9 125/16 133/2 135/2
135/19 143/11 143/25 160/7 171/23
177/12
judgments [1] 87/8
July [5] 30/25 32/10 32/14 33/18
150/22
July 1 [1] 32/14
July 2011 [1] 30/25
June [5] 22/9 34/15 36/17 42/9 73/22
June 1 [1] 34/15
June 2016 [1] 73/22
jurisprudence [1] 46/9
juror [4] 21/19 21/19 72/21 72/22
jurors [3] 24/11 104/22 105/3
jury [10] 17/12 21/6 21/21 87/17 87/25
90/24 108/4 108/13 116/18 117/23
just [83] 5/17 10/7 12/3 13/18 17/10
17/21 19/4 27/23 27/25 40/19 40/23
42/1 43/3 43/14 43/15 50/6 56/21
57/12 69/20 72/20 77/12 77/12 79/1
79/1 81/10 82/1 82/24 83/10 83/12
86/18 87/8 87/23 89/5 92/9 93/15 94/9
94/13 94/19 94/20 94/23 95/1 99/12
101/7 101/14 103/7 104/21 105/22
105/25 107/13 109/10 109/25 110/6
111/13 111/25 115/7 115/20 118/5
118/16 120/19 124/15 127/14 127/22
130/21 131/6 131/10 132/5 146/5
146/22 151/23 152/22 153/13 153/17
157/1 161/15 162/16 167/11 167/15
168/20 173/23 174/6 176/18 176/24
177/16

**K**

Kahn [1] 82/25
keep [4] 48/16 116/17 119/10 120/2
keeping [1] 106/13
keeps [1] 175/24
Kenneth [1] 124/17
Kentucky [1] 155/7
Kessler [1] 118/8
Kessler's [1] 118/6
KEVIN [2] 2/6 4/19
key [3] 17/15 17/22 19/15
keys [1] 55/17
Khan [1] 93/16
Khatib [1] 83/2
kidney [8] 119/16 119/17 150/23
150/24 161/5 167/5 167/6 167/7
kidneys [5] 10/4 10/5 45/2 88/16 88/17
kind [14] 30/16 30/17 93/16 116/12
116/23 124/18 125/10 126/9 128/10
143/16 145/20 147/6 148/17 174/9
knew [19] 26/19 33/18 35/8 78/13
83/24 83/25 84/1 86/8 86/24 90/23
102/22 128/19 128/22 149/10 151/25
152/17 158/16 159/18 159/23
know [77] 9/14 12/2 17/10 26/14 26/21
36/19 40/3 57/10 62/14 64/3 65/13
66/10 69/16 69/21 70/3 71/17 73/4

**L**

77/8 78/2 79/13 82/14 83/24 86/10
90/5 90/6 90/8 99/1 100/17 101/6
101/7 101/21 103/5 106/20 107/13
107/14 111/15 111/20 112/20 113/7
117/11 119/8 119/10 119/12 119/16
122/18 124/18 125/10 126/3 126/14
127/25 128/2 128/5 128/7 128/20
128/25 129/25 132/18 135/7 135/12
137/6 138/2 138/4 140/11 140/12
141/4 150/4 152/16 152/23 156/22
162/14 170/13 173/18 173/18 175/3
176/1 176/7 176/13
knowing [2] 40/12 126/3
knowingly [1] 86/23
knowledge [2] 100/16 140/16
knowledgeable [1] 100/20
known [15] 61/7 86/13 88/18 90/8
90/11 112/19 120/6 131/20 139/13
139/16 143/19 145/18 150/22 160/18
174/5
knows [6] 4/25 26/10 48/20 64/3 86/10
148/11
Kubitza [1] 118/1
Kubla [1] 93/16
Kubla Khan [1] 93/16
Kupperman [1] 2/15

**L**

lab [8] 95/14 95/16 96/9 99/2 99/25
105/1 106/20 122/10
label [181]
label-by-label [1] 105/18
labeling [23] 38/9 50/22 52/1 52/20
53/13 55/21 58/5 60/3 61/13 62/9
62/25 63/2 67/21 68/11 69/5 69/6 69/7
74/7 74/13 86/14 116/21 117/8 152/1
labels [5] 42/8 55/14 115/8 115/9 178/4
laboratories [1] 38/15
laboratory [22] 18/19 29/7 29/13 34/22
35/9 38/12 41/11 42/12 42/16 56/13
56/19 57/17 96/8 97/3 100/13 100/17
104/6 109/2 137/14 137/14 137/25
138/10
lack [4] 24/18 27/10 101/13 145/2
ladies [1] 4/3
lagged [1] 31/1
lagging [1] 22/12
lags [1] 108/7
laid [3] 21/5 21/5 23/2
Lambert [1] 1/22
Lamisil [1] 155/25
language [51] 17/21 17/22 18/1 18/9
18/10 18/24 19/2 22/3 22/9 22/17
22/23 23/4 23/7 30/13 31/6 31/8 31/11
31/12 31/17 32/7 33/5 33/15 34/6
34/10 34/16 34/19 36/12 36/15 36/20
36/25 37/2 37/14 38/4 39/17 40/20
40/20 40/24 42/2 42/12 52/15 55/13
55/19 55/20 56/16 57/22 60/20 66/24
67/7 67/8 133/10 168/21
large [4] 20/24 99/13 162/4 165/23
largely [1] 48/22
Lariat [1] 94/15
last [23] 12/15 12/16 32/11 40/9 48/7
51/3 52/1 55/7 78/5 97/2 114/16 120/1
120/1 120/2 120/15 120/16 121/2
120/10 148/21 162/15 176/23 176/25
177/8
late [1] 169/24
later [13] 32/18 33/4 56/17 65/19 66/1

**L**

later... [8] 73/7 74/11 77/24 86/4
150/18 151/2 151/10 162/24
latter [2] 57/1 172/4
law [25] 4/22 5/19 5/25 6/9 6/19 6/19
20/25 21/1 21/14 46/2 46/5 46/8 49/20
54/5 59/3 79/10 106/15 108/7 124/12
133/16 138/20 139/4 150/1 163/4
163/11
laws [1] 71/9
lawsuits [2] 83/25 84/10
lawyer [3] 44/20 48/10 128/15
lawyers [3] 124/21 125/19 129/18
lay [2] 22/7 108/4
lead [2] 139/17 167/17
leader [1] 92/18
leadoff [1] 4/20
leap [1] 132/1
learn [1] 142/21
learned [24] 73/4 99/4 124/9 126/17
127/17 132/24 134/7 135/22 136/5
138/21 138/24 149/22 152/9 152/10
155/2 160/7 168/15 168/16 169/12
169/17 172/10 172/15 173/2 173/10
least [14] 9/14 10/8 15/11 21/23 60/5
76/1 119/20 120/15 121/18 127/13
129/20 132/17 143/9 172/13
leave [6] 48/18 49/3 57/4 94/23 108/9
131/10
leaves [3] 106/23 109/4 132/6
leaving [1] 10/1
left [6] 17/12 18/22 57/10 124/4 127/15
136/7
legal [3] 65/8 66/10 70/12
legally [1] 50/8
Leichty [2] 171/1 172/22
Leichty's [1] 171/7
Leissinger [4] 90/10 92/10 101/5 102/1
lengthy [1] 62/16
less [3] 21/24 69/21 101/1
lesser [1] 86/22
let [20] 12/3 17/21 20/7 27/21 31/20
31/22 43/3 78/24 83/15 101/18 102/25
108/17 119/21 131/12 132/10 132/14
167/25 171/25 174/6 177/23
let's [46] 7/8 13/3 13/18 14/6 27/11
30/12 33/15 39/2 43/11 43/16 43/17
44/1 45/18 45/23 49/5 49/16 50/6
52/11 80/21 95/2 95/4 104/5 110/9
110/9 110/18 110/23 111/13 112/2
112/6 112/21 112/24 114/20 117/14
118/6 121/5 122/25 130/14 130/21
130/21 131/6 137/20 144/21 151/22
155/1 172/2 172/20
letter [1] 65/23
level [5] 28/9 85/18 100/25 107/17
120/7
levels [6] 14/20 32/3 98/25 113/3
122/13 156/5
Levin [2] 1/13 1/16
Levine [10] 6/14 11/24 13/18 20/2 21/4
29/22 54/20 61/12 70/21 71/4
Levine's [1] 6/18
liability [6] 1/4 4/7 21/2 133/7 155/9
163/11
liaison [2] 4/8 33/21
liberty [1] 46/8
licensed [1] 135/5
Liechty [3] 90/19 91/25 92/19

like [53] 8/14 13/14 14/17 15/1 15/7
15/8 24/25 26/22 27/13 34/2 37/8
39/6 41/19 43/21 67/3 70/14 70/20
71/24 82/6 87/9 89/2 91/9 93/15 97/11
102/22 103/15 105/21 108/21 109/11
111/19 112/20 113/25 125/19 126/15
128/4 128/6 129/20 137/17 143/12
143/21 145/24 148/24 151/19 154/25
159/15 160/22 161/3 165/10 172/22
175/2 176/17 177/16 177/25
likelihood [1] 131/9
likely [11] 11/10 11/11 50/12 74/15
119/13 119/17 129/12 130/2 131/10
156/17 171/3
Likewise [2] 96/10 96/17
limine [1] 25/20
limitation [2] 174/17 174/18
limitations [1] 176/18
limited [2] 76/16 155/2
line [5] 28/20 101/3 111/19 176/3 176/8
linear [1] 18/3 18/16 22/20 55/20 56/9
56/18 57/15 98/17 122/6 174/14 176/9
link [3] 96/8 134/25 150/9
list [2] 4/15 33/8
listed [1] 4/21
listen [1] 143/22
listened [1] 158/21
literally [1] 37/24
literature [5] 104/25 116/20 122/17
153/15 153/20
litigated [2] 96/14 134/2
litigation [8] 1/4 4/7 48/22 53/12 104/25
106/18 117/18 139/3
little [15] 22/5 23/8 30/14 44/7 45/24
49/8 52/15 70/18 79/17 85/15 85/22
98/9 141/1 150/13 155/1
liver [5] 10/4 10/5 88/16 98/11 98/11
LLC [2] 2/3 2/15
LLP [4] 1/19 2/6 2/9 2/12
location [1] 165/24
locations [1] 75/21
long [8] 30/4 71/8 88/15 114/1 118/11
157/4 174/23 175/6
long-term [2] 114/1 157/4
longer [4] 17/7 70/1 81/4 121/17
look [56] 26/11 32/23 34/1 36/15 37/2
42/1 50/1 50/6 56/7 56/8 60/8 61/19
61/21 61/21 61/25 62/4 62/24 65/2
66/23 67/3 67/23 67/24 68/21 68/22
69/22 69/22 73/18 85/22 87/23 95/16
98/5 101/16 103/18 104/5 110/24
111/13 111/16 120/17 120/22 122/20
125/2 126/12 129/11 134/17 135/1
135/13 135/13 141/15 142/16 144/18
146/2 151/22 158/7 164/17 174/8
176/17
looked [14] 42/8 61/4 61/5 62/22 66/16
69/16 103/24 103/25 104/3 110/17
110/22 113/11 149/20 155/9
looking [23] 24/12 30/21 30/21 40/23
46/14 63/21 73/18 112/5 112/6 113/8
114/3 115/2 115/3 116/9 116/16
124/13 126/19 129/7 135/22 141/19
152/5 159/19 177/1
looks [1] 61/19
Lord [1] 149/2
lost [1] 144/1
lot [12] 28/13 28/20 30/15 49/6 57/1
59/10 102/11 133/14 136/4 149/4
149/8 153/18

lots [1] 176/13
loud [1] 178/9
Louis [1] 1/21
LOUISIANA [21] 1/2 1/24 2/4 2/17 2/19
21/1 23/25 133/7 133/16 135/6 138/20
139/1 139/4 140/5 149/22 155/8 155/9
163/4 163/11 169/16 178/11
Lovenox [3] 34/22 105/21 109/7
loving [1] 160/23
low [4] 98/8 98/25 105/20 121/24
lower [6] 28/21 96/11 96/13 154/10
162/12 167/11
LPLA [5] 132/23 133/10 144/12 168/16
169/1
LSU [1] 118/22
lunch [3] 85/25 95/6 123/3

**M**

machine [1] 177/15
made [47] 8/4 10/12 22/18 28/2 35/8
35/14 35/14 35/23 35/24 36/17 51/20
51/23 53/15 53/17 59/22 61/6 61/22
68/10 68/14 68/15 69/17 89/25 104/25
105/11 109/22 116/14 133/13 134/25
150/17 150/18 152/18 152/20 156/12
157/16 158/3 162/5 170/17 170/20
171/3 172/13 172/16 172/17 172/22
173/5 173/6 177/9 177/17
Magazine [1] 1/23
Maggio [1] 101/9
magical [1] 120/21
Mahanna [1] 157/23
mail [2] 115/11 117/6
main [5] 18/2 151/7 162/6 162/8 170/12
mainstream [1] 165/13
maintain [1] 23/2
major [14] 32/4 33/6 33/10 41/18 63/3
74/8 101/16 111/11 113/2 113/5 115/6
119/11 126/22 143/2
majority [1] 168/14
make [40] 4/8 7/17 16/3 18/15 18/17
34/21 35/2 43/14 54/2 54/6 67/12 76/3
79/5 86/9 86/15 87/12 87/24 89/7
100/19 103/22 109/16 109/18 117/11
122/9 131/3 132/1 139/18 144/15
144/15 154/10 154/22 154/25 158/16
159/2 159/3 159/13 159/15 172/23
173/12 175/4
makes [14] 19/1 20/9 23/23 27/18
29/22 32/6 63/12 68/23 73/17 135/11
135/14 143/13 152/12 164/10
making [9] 23/15 63/22 83/6 87/8 90/5
111/23 116/16 126/1 140/2
man [1] 145/18
manage [3] 26/5 77/20 161/14
managed [1] 32/11
managing [1] 161/17
mandate [3] 29/11 38/12 142/14
manner [5] 48/25 74/14 96/7 97/15
115/10
manufacturer [18] 6/17 16/4 29/24 30/8
40/5 50/9 54/6 54/22 71/6 71/8 71/10
71/12 72/16 76/7 163/7 169/6 177/13
177/14
manufacturers [11] 8/15 16/13 39/16
39/21 52/7 54/2 54/2 81/13 81/16
164/15 164/16
many [22] 44/21 44/21 48/23 84/11
97/22 98/13 98/23 103/7 127/21
143/23 148/15 148/15 149/12 151/23

M

many... [8] 154/25 155/19 158/9 158/11
159/15 161/3 173/23 176/11
map [2] 84/6 149/7
march [7] 1/6 4/2 8/22 53/2 55/21 56/1
124/2
March 2011 [2] 55/21 56/1
mark [1] 98/25
marked [1] 117/1
marker [2] 13/11 111/3
market [25] 5/20 6/1 7/12 7/16 7/25
8/24 9/9 10/23 11/18 12/13 12/16 13/7
15/7 30/5 44/12 45/5 46/25 47/2 47/9
47/10 50/9 51/9 71/8 97/16 109/1
marketed [2] 47/17 50/8
marketplace [1] 78/1
Marks [2] 169/20 177/10
Marks v. Ohmeda [2] 169/20 177/10
Martin [34] 86/6 105/10 119/7 149/10
149/14 150/5 150/11 150/19 151/22
152/6 153/6 155/5 158/6 158/12
159/23 160/13 160/14 161/9 164/23
164/24 165/2 165/9 166/2 166/15
168/1 168/6 171/14 171/21 172/2
173/16 174/5 174/23 175/2 177/16
Martin's [2] 149/15 154/11
massive [3] 121/13 157/5 157/16
material [1] 143/9
materials [1] 118/23
math [1] 103/14
mathematical [1] 62/21
matter [9] 13/6 21/14 24/5 59/3 64/18
74/1 86/11 169/5 178/13
mattered [2] 163/15 172/8
matters [3] 5/13 85/22 175/1
may [34] 4/18 14/20 16/4 16/8 17/10
20/13 23/1 23/1 27/11 27/23 36/9
37/19 46/16 49/2 51/15 56/6 58/23
67/17 69/8 70/10 75/7 76/7 76/15
83/20 86/20 91/5 92/11 92/11 112/15
115/15 132/11 151/11 157/12 160/4
May 14 [1] 151/11
maybe [8] 34/6 63/12 68/20 86/18
109/14 120/15 127/23 158/22
McCarthy [1] 155/18
McCarthy v. Danek [1] 155/18
McCartney [1] 156/23
MD [1] 1/4
MDL [2] 4/6 139/3
MDL 2592 [1] 4/6
me [42] 4/15 9/1 12/3 17/21 20/7 20/9
27/21 43/3 43/4 44/19 55/2 78/24
83/15 85/23 86/4 88/1 94/9 101/19
108/17 116/6 119/21 125/5 128/14
129/1 130/16 131/12 132/10 132/14
135/7 137/7 151/19 162/25 164/21
167/23 167/25 171/25 174/6 175/4
176/11 177/23 177/23 178/3
meal [1] 121/11
mean [6] 23/17 38/19 46/24 67/17 98/7
143/24
meaning [3] 106/4 131/8 133/23
meaningful [2] 171/4 171/9
means [9] 8/18 15/2 20/3 108/16
111/15 111/20 111/24 121/17 141/24
meant [2] 164/19 168/20
Meantime [1] 78/2
measure [5] 8/18 39/23 100/25 110/25
118/14

measured [4] 37/17 42/18 103/4 115/4
measurement [2] 41/23 73/21
measurements [2] 32/22 33/8
measures [3] 13/11 13/12 97/17
measuring [4] 14/25 33/9 37/19 115/14
mechanical [1] 2/23
median [1] 28/9
medical [18] 8/9 36/2 77/18 92/22
100/21 101/24 101/24 102/22 122/17
131/1 147/19 149/24 156/8 165/13
170/1 172/10 172/24 173/8
Medically [1] 124/21
medication [1] 161/17
medications [3] 63/17 161/8 161/15
medicine [18] 9/23 86/19 95/13 95/25
99/1 99/6 99/12 105/6 105/14 107/23
107/24 108/14 122/7 136/11 154/25
159/16 177/16 177/18
medicines [3] 98/12 98/13 99/7
Meera [1] 149/21
meet [3] 107/5 108/8 127/20
meeting [6] 28/3 28/5 28/7 33/18 37/5
40/4
meets [1] 29/14
memo [7] 34/9 65/9 65/9 66/1 66/4
66/9 79/18
men [1] 48/10
Mensing [5] 6/14 11/24 20/3 45/22
45/25 46/7 54/20 71/2 79/2
mention [2] 58/20 59/21
mentioned [6] 4/21 89/22 105/1 106/19
119/2 119/15
mentions [2] 14/18 80/16
Merck [2] 21/12 72/10
merely [1] 47/7
merit [1] 80/19
merits [1] 72/14
mesh [3] 139/3 139/15 139/16
met [2] 165/15 165/16
metabolized [2] 88/14 88/15
Metairie [1] 161/20
method [8] 9/11 9/12 100/17 106/20
106/23 116/1 137/9 166/17
methodology [7] 106/3 106/9 106/11
106/13 110/14 110/14 116/11
micrograms [1] 28/9
middle [1] 101/22
might [14] 7/21 8/3 17/18 17/18 21/19
37/8 46/15 65/12 74/14 75/3 75/7
104/1 128/24 172/22
mightily [1] 12/20
milligram [9] 5/4 25/1 25/1 26/20
150/23 150/24 167/11 167/12 167/15
milligrams [2] 28/9 161/11
milliliter [2] 120/10 176/2
millions [1] 107/24
milliter [1] 176/3
Mills [1] 156/23
mind [3] 48/16 129/19 172/13
mindset [1] 148/7
mine [1] 153/13
minute [3] 61/8 72/5 80/21
minutes [5] 43/24 43/25 84/7 123/1
176/25
minutiae [1] 158/22
misinterpretations [1] 122/22
misreading [1] 65/18
missed [1] 148/14
missing [1] 146/10
Mississippi [2] 20/16 78/6

Missouri [1] 1/21
Mitchell [1] 9/13
mode [2] 9/11 102/17
modeling [2] 62/21 74/13
molecular [1] 105/20
molecule [3] 45/1 82/4 82/5
moment [8] 10/19 13/23 130/22 131/17
132/2 147/22 148/8 153/9
monitor [9] 37/10 38/20 42/13 64/12
97/4 118/15 128/8 156/5 156/9
monitored [7] 18/19 56/13 56/19 57/17
77/5 101/12 138/9
monitoring [41] 4/23 5/16 6/3 8/15
13/25 14/11 14/16 16/5 16/18 16/22
19/16 19/25 35/10 36/8 39/20 41/7
41/13 41/14 42/15 42/24 43/1 43/23
47/23 48/1 49/23 52/24 53/7 54/12
55/24 56/2 56/3 101/11 109/9 109/10
109/11 112/13 125/23 137/16 137/18
158/24 163/19
monitoring-related [3] 6/3 19/16 43/23
monocentric [1] 174/20
Montana [1] 155/7
months [16] 31/1 32/18 33/4 33/5
56/17 57/13 57/21 73/7 77/24 94/15
109/24 142/25 143/4 150/18 166/25
167/4
Moore [1] 2/3
more [30] 7/24 11/5 12/1 16/1 23/8
26/5 45/3 45/4 46/15 61/2 74/15 77/19
77/22 78/15 80/16 110/10 114/7
114/22 114/22 119/13 126/25 129/3
136/5 136/24 137/6 156/17 164/13
171/3 176/8 176/8
Moreover [3] 104/10 174/24 176/21
morning [22] 4/3 4/11 4/18 6/8 24/16
24/22 29/21 58/3 70/7 86/3 95/9 95/10
96/5 97/8 97/15 102/11 105/15 108/21
114/15 134/1 137/13 174/3
most [6] 9/13 52/21 53/11 124/13
128/4 151/13
mother [1] 160/24
motion [42] 4/17 4/22 5/3 5/14 20/19
25/20 33/20 58/5 58/6 59/6 59/23 60/1
60/1 60/16 61/20 65/3 69/21 69/22
72/12 81/2 81/2 81/6 84/5 84/9 84/9
94/7 95/12 124/5 124/5 124/8 133/1
134/14 135/21 141/11 148/22 149/9
159/25 160/6 164/7 171/23 172/10
177/19
motions [6] 4/13 4/14 4/16 5/9 95/3
113/25 124/4 134/19 177/22
mouths [1] 100/9
move [7] 12/3 24/7 29/1 38/5 110/9
112/21 117/12
moved [3] 25/10 32/24 42/11
moving [5] 12/21 52/14 71/19 119/2
166/23
Mr [2] 92/6 117/11 153/13
Mr. [106] 58/20 59/20 70/8 70/12 70/16
71/5 71/22 76/4 76/22 78/12 82/7
82/17 83/3 84/18 84/20 86/3 86/23
87/2 87/7 87/13 88/5 91/12 91/22 94/8
94/10 94/11 94/14 101/20 103/3 103/6
104/23 105/2 105/22 109/20 109/20
114/14 117/12 118/2 119/3 120/14
124/4 129/20 130/6 130/10 131/7
131/13 132/3 132/15 132/22 133/9

Case 2:14-md-02592-EEF-MBN Document 6001-1 Filed 04/05/17 Page 197 of 211

Mr.... [46] 133/13 133/20 134/22
135/24 136/7 136/10 136/18 140/22
141/15 141/22 142/2 142/8 142/11
142/12 142/12 142/21 143/8 143/13
143/14 143/22 144/23 145/1 145/5
145/14 145/16 146/8 147/2 147/6
147/13 147/14 148/10 148/15 148/24
148/25 154/1 156/3 163/4 163/17
163/17 163/23 163/23 164/6 164/9
165/1 166/6 174/1
Mr. Abney [5]  156/3 163/17 163/23
166/6 174/1
Mr. Barr [11]  71/5 71/22 82/7 109/20
114/14 125/5 129/20 143/13 146/8
148/15 148/25
Mr. Barr's [1]  143/22
Mr. Birchfield [2]  128/18 140/22
Mr. Boudreaux [53]  70/8 78/12 82/17
83/3 84/18 84/20 86/23 87/2 87/7
87/13 88/5 91/12 91/22 94/10 94/11
94/14 103/3 104/23 109/20 117/12
119/3 120/14 120/24 124/22 126/4
127/7 127/8 127/19 129/4 130/6
130/10 131/7 132/3 132/22 133/20
135/24 136/7 136/10 136/18 141/22
142/2 142/12 142/21 143/14 144/23
145/1 145/5 145/14 145/16 147/6
147/13 147/14 148/10
Mr. Boudreaux's [6]  103/6 105/2
134/22 142/8 143/8 147/2
Mr. Bussey [1]  101/20
Mr. Caboose [1]  148/24
Mr. Denton [1]  122/4
Mr. Hudson [3]  70/12 76/4 76/22
Mr. Hudson's [1]  70/16
Mr. Irwin [6]  94/8 105/22 163/4 163/17
163/23 165/1
Mr. Irwin's [2]  131/13 142/12
Mr. Mueck [1]  118/2
Mr. Newsom [5]  58/20 59/20 86/3
164/6 164/9
Mr. Plaintiff [1]  128/15
Mr. Sarver [3]  132/15 133/13 154/1
Mr. Sarver pointed [1]  133/9
Mr. Sarver talked [1]  141/15
Mr. Sarver's [1]  142/11
Mrs. [88]  26/9 70/8 78/13 82/21 83/4
84/18 84/20 86/23 87/3 87/7 87/13
88/2 88/3 88/5 89/13 90/20 91/16
91/23 92/15 92/22 93/4 94/10 94/17
94/18 103/3 103/6 104/22 105/1
117/12 119/3 119/17 121/5 150/15
151/9 151/11 152/12 152/13 154/4
154/7 156/15 156/16 157/20 157/21
157/21 160/10 160/13 160/15 160/19
160/23 160/23 161/3 161/6 161/10
161/12 161/19 162/13 162/14 162/16
162/20 162/21 162/22 163/1 164/25
165/3 165/22 166/16 166/24 167/4
167/13 167/20 168/6 168/11 169/8
169/9 169/11 169/25 170/4 170/11
170/14 170/21 170/24 171/2 171/8
171/8 171/18 171/22 173/7 175/19
Mrs. Orr [62]  26/9 70/8 78/13 82/21
83/4 84/18 84/20 86/23 87/3 87/7
87/13 88/3 88/5 89/13 90/20 91/16
91/23 92/15 93/4 94/10 94/17 94/18
103/3 104/22 105/1 117/12 119/3

119/17 121/5 150/15 151/9 151/11
152/12 152/13 154/4 154/7 157/20
157/21 157/21 160/23 160/23 161/3
161/6 161/10 161/12 161/19 162/14
162/16 162/22 165/3 165/22 166/16
166/24 167/13 168/11 169/9 169/25
170/4 170/21 170/24 173/7 175/19
Mrs. Orr's [26]  88/2 92/22 103/6 156/15
156/16 160/10 160/13 160/15 160/19
162/13 162/20 162/21 163/1 164/25
167/4 167/20 168/6 169/8 169/11
170/11 170/14 171/2 171/8 171/8
171/18 171/22
Ms. [10]  11/4 86/1 87/1 95/10 109/10
111/14 114/18 118/19 130/24 177/9
Ms. Jeffcott [1]  177/9
Ms. Sharko [9]  11/4 86/1 87/1 95/10
109/10 111/14 114/18 118/19 130/24
much [26]  7/23 8/12 11/5 26/19 28/22
43/19 45/3 45/4 46/15 55/8 57/1 57/24
70/6 75/20 81/9 85/13 85/14 98/8
98/20 99/6 101/1 109/5 132/9 159/25
167/18 177/21
Mueck [1]  118/2
multiple [4]  15/4 161/23 165/9 170/6
must [18]  8/10 11/13 15/11 15/13
15/16 15/18 16/19 29/11 41/11 47/10
47/11 53/5 53/15 53/16 104/17 141/10
162/11 169/2
my [46]  4/20 5/3 13/1 18/9 19/14 20/5
20/18 28/6 34/13 52/5 52/13 52/14
54/22 58/18 71/24 75/5 75/19 84/8
89/3 89/10 90/17 95/17 97/15 103/24
106/19 106/21 118/24 120/2 140/12
144/1 148/23 148/25 149/21 150/3
151/18 157/6 157/11 157/13 160/4
160/21 162/25 164/21 167/23 175/4
177/8 177/12
Myers [1]  163/13
myself [2]  20/9 129/13
mystery [1]  120/22

**N**

naive [1]  84/23
name [3]  42/18 148/23 160/4
namely [4]  5/3 5/21 8/1 10/24
nanograms [2]  176/2 176/3
Napoleon [2]  151/3 151/6
Navy [1]  106/22
NDA [4]  17/24 30/18 30/19 35/21
NDA 202439 [1]  30/19
NDAs [1]  22/10
NDAs: [1]  30/18
NDAs: NDA 22406 [1]  30/18
nearly [1]  139/6
necessarily [4]  17/13 40/12 72/12
172/6
necessary [13]  18/5 25/9 45/10 63/24
64/5 65/5 65/12 65/14 66/12 77/23
78/16 83/6 114/1
need [31]  14/2 17/5 17/14 19/9 33/24
34/1 35/22 37/2 44/20 45/9 47/23
49/15 55/9 69/3 71/15 74/23 77/25
93/19 104/9 107/8 107/10 108/2 126/6
132/6 137/7 137/10 140/20 145/12
146/12 149/16 156/9
needed [7]  26/25 77/20 138/14 158/10
168/4 168/4 168/9
needs [3]  52/18 59/7 71/10
negotiated [1]  31/2

negotiating [1]  31/3
neither [2]  92/14 174/2
neoplastin [100]  6/7 10/18 11/1 13/3
13/11 13/16 13/23 14/1 14/7 14/9
14/15 14/20 14/21 15/3 15/7 15/11
15/14 15/20 16/23 17/23 18/7 18/17
19/24 20/20 22/21 24/23 26/6 26/6
26/15 26/17 29/5 29/13 36/15 36/18
37/7 37/9 37/19 38/7 38/10 38/14
41/15 43/7 49/9 49/19 49/23 50/8
50/18 51/24 55/20 56/10 56/19 56/25
57/16 95/23 96/3 100/11 103/2 103/10
103/15 105/7 105/8 111/5 113/4 115/5
115/10 115/14 115/15 116/24 117/9
117/16 118/3 118/14 119/4 120/14
120/20 120/25 125/7 125/11 127/25
129/8 133/22 134/2 134/12 134/24
136/21 137/3 137/9 137/23 140/10
140/15 141/6 141/16 141/18 141/21
142/3 164/18 175/13 175/13 175/14
176/6
Neoplastin CI [1]  175/13
Neoplastin PT [56]  10/18 11/1 13/3
13/11 13/16 13/23 14/1 14/7 17/23
18/7 18/17 20/20 22/21 24/23 26/6
26/6 26/15 26/17 29/5 29/13 36/15
36/18 37/7 37/9 38/7 38/10 38/14 43/7
95/23 96/3 100/11 103/2 103/15 111/5
117/9 117/16 118/3 119/4 120/20
125/7 125/11 127/25 129/8 133/22
134/2 134/12 136/21 137/3 137/9
137/23 140/10 140/15 141/6 141/16
141/18 164/18
Neoplastin PT-related [1]  16/23
Neoplastin PTs [1]  113/4
Neoplastin's [6]  14/13 14/15 14/17
15/7 51/1 52/6
Neoplastin-PT [1]  41/15
Neoplastin-related [4]  15/3 19/24 49/9
56/25
neurocritical [2]  157/23 162/7
neurologist [2]  92/17 158/2
neurosurgeon [5]  91/24 92/13 156/16
162/9 169/8
neurosurgery [3]  90/19 91/25 162/9
never [32]  19/18 22/18 31/15 33/13
33/15 34/8 35/3 35/19 35/23 41/20
48/9 48/13 48/15 48/21 74/21 129/3
129/13 134/13 138/8 145/1 146/14
146/15 146/17 147/12 147/13 150/1
150/9 153/8 156/10 162/23 167/9
176/14
never-again [1]  48/15
new [37]  1/24 2/4 2/13 2/17 2/19 8/19
11/16 15/13 15/14 19/22 19/23 22/23
23/7 34/1 41/4 41/8 50/10 50/12 50/13
50/23 50/25 51/18 52/20 68/6 68/13
68/16 68/17 68/20 69/1 71/9 76/16
76/17 76/23 76/25 79/24 80/2 80/15
newly [16]  33/12 36/23 53/13 60/3 60/6
63/12 65/3 66/22 68/3 68/5 69/7 69/12
69/24 76/10 76/12 133/25
newly acquired [1]  60/6
news [2]  6/10 55/2
NEWSOM [7]  2/6 4/19 58/20 59/20
86/3 164/6 164/9
next [67]  27/4 27/11 27/20 28/14 28/24
29/6 29/16 29/18 31/5 31/24 32/9
32/18 33/3 33/17 34/11 35/11 35/24
46/22 37/6 38/2 38/5 39/2 39/15 40/2

**N**

next... [43]  41/2 42/5 42/15 42/20 53/1
56/21 58/1 65/6 71/16 74/4 75/15 84/7
95/3 110/21 111/1 111/7 111/7 111/14
112/2 112/3 113/1 113/10 113/12
114/7 115/8 115/22 119/10 132/22
134/4 136/23 136/23 137/12 137/20
137/20 138/6 138/15 141/14 141/14
146/25 157/10 165/18 166/24 174/23
nice [4]  143/14 153/21 175/2 175/2
night [4]  9/5 108/22 161/20 170/23
no [130]  7/4 8/11 8/17 9/1 11/13 11/20
14/24 15/23 22/3 23/7 23/24 26/16
26/25 31/9 31/9 32/2 32/5 32/8 32/17
36/18 38/2 38/8 38/23 38/24 39/14
39/23 40/7 41/1 41/10 44/10 46/12
51/6 56/11 63/1 63/3 63/23 64/4 64/19
65/3 65/5 65/7 65/7 65/13 66/10 66/11
68/3 68/18 74/6 74/8 75/8 76/24 79/21
80/19 82/17 84/21 84/21 88/4 90/1
90/8 91/20 93/1 94/16 94/22 96/5 96/8
96/10 96/22 97/8 99/10 99/18 100/8
100/8 102/5 103/17 103/21 105/6
105/8 105/9 105/12 105/22 106/23
111/24 114/24 115/20 121/17 121/21
122/2 122/8 122/8 122/14 126/20
126/21 127/5 127/10 127/20 129/8
130/9 130/20 130/25 131/4 131/18
131/18 132/4 138/5 138/23 138/25
139/8 141/13 145/13 147/1 147/4
148/12 151/6 152/15 152/15 152/21
154/2 154/2 154/8 155/25 156/5 156/8
156/20 157/6 157/11 157/22 158/4
159/1 166/17 177/4
No. [1]  8/18
No. 3 [1]  8/18
NOAC [7]  40/6 90/21 93/6 122/21
135/23 135/25 136/2
NOACs [3]  28/4 90/15 149/3
nobody [2]  102/13 131/2
none [4]  97/13 102/17 102/21 107/18
Nonetheless [1]  168/10
noninferiority [2]  73/16 73/19
nonmovant [1]  135/3
nonprescribing [1]  155/3
nonspecific [4]  95/13 97/16 98/16
99/14
nor [4]  12/14 13/24 14/21 138/10
normal [12]  103/6 105/1 119/19 121/6
121/16 121/18 146/22 146/23 162/3
170/11 175/23 176/7
North [6]  67/5 67/8 67/9 67/19 75/18
75/20
Northern [1]  20/16
northward [1]  19/5
not [360]
Notably [1]  71/14
note [2]  114/10 135/20
noted [1]  167/9
notes [2]  66/5 103/22
nothing [24]  23/6 33/12 36/25 41/7 42/2
42/21 42/23 56/9 56/9 56/18 56/18
57/15 57/15 75/2 80/10 82/8 83/9 98/3
127/14 129/18 132/7 137/2 176/24
176/25
noticed [1]  70/16
notion [4]  49/17 66/8 80/17 130/18
notwithstanding [1]  55/13
Novartis [1]  163/7

novel [4]  50/10 50/13 82/17 149/18
November [8]  30/23 36/7 36/15 56/11
57/12 67/20 112/5 112/18
November 4 [2]  36/1 67/20
now [98]  5/1 5/13 8/3 8/13 12/1 13/8
14/24 16/1 17/2 17/10 19/2 19/17 23/9
24/15 25/11 25/17 29/2 29/18 30/12
31/5 31/7 32/25 37/6 41/4 42/10 44/11
44/14 45/17 52/11 53/1 55/10 56/4
58/1 62/8 63/25 65/6 74/16 75/1 75/2
75/23 76/22 79/16 80/22 82/13 83/13
85/20 85/21 86/16 89/2 97/6 99/19
102/11 102/24 106/15 106/21 107/7
107/18 107/19 113/10 118/8 119/2
124/24 125/17 127/16 127/24 128/10
129/20 130/6 130/23 133/19 135/1
135/20 136/9 137/9 138/1 140/6
141/12 141/16 142/6 147/18 147/23
148/7 152/16 156/25 157/4 160/21
161/9 161/18 163/10 164/6 165/1
167/8 167/14 167/16 167/23 168/14
169/5 169/21
now-combination [1]  44/11
nowhere [2]  37/23 54/5
number [26]  4/13 5/1 16/6 38/11 38/14
41/17 43/20 45/17 47/14 52/23 57/8
58/12 59/15 63/11 77/7 86/18 95/18
95/19 95/20 107/13 120/12 122/16
130/7 130/8 130/10 175/18
numbers [2]  113/2 153/18
numeral [2]  97/24 97/24
numeral X [2]  97/24 97/24
numerous [1]  77/11
nurse [2]  169/18 177/15
nurses [2]  169/17 169/19

**O**

oar [1]  48/19
obey [1]  71/8
objection [2]  81/24 158/23
objective [1]  171/6
obligated [1]  20/23
obligation [17]  5/20 6/1 7/12 7/25 10/22
12/7 13/7 22/22 24/21 24/22 35/21
37/5 45/4 46/20 68/18 76/25 77/6
obligations [1]  34/4
observation [1]  95/13
observed [1]  61/10
obviously [2]  76/14 113/22
occasion [1]  18/13
occasions [1]  18/11
occur [1]  77/20
occurred [3]  84/18 84/19 91/4
Ochsner [4]  162/1 162/6 162/8 170/12
October [7]  8/12 14/23 28/2 67/7 67/15
67/15 77/10
October 11 [1]  67/7
October 14 [1]  67/15
October 17 [1]  77/10
October 19 [1]  67/15
October 2015 [1]  14/23
October 26 [1]  28/2
oddity [1]  46/19
odds [1]  21/23
off [30]  8/24 13/22 14/9 49/18 52/9
54/22 89/2 94/12 94/12 94/15 102/7
107/3 137/1 137/4 140/22 141/17
142/5 143/14 144/15 144/16 145/1
145/5 145/7 145/9 145/14 146/3 147/8
147/14 164/6 164/8

off-label [10]  13/22 14/9 49/18 107/3
137/1 137/4 144/15 144/16 164/6
164/8
offer [1]  154/5
offered [1]  55/3
office [1]  32/20
officers [1]  36/2
Official [3]  2/18 178/9 178/17
often [1]  70/17
oh [5]  103/24 104/4 126/19 131/11
149/2
Ohmeda [2]  169/20 177/10
okay [16]  11/3 33/14 43/10 57/23 70/6
95/7 108/17 120/7 120/12 124/6 130/5
131/4 137/20 141/15 147/22 148/20
old [3]  34/1 43/17 160/23
old-fashioned [1]  43/17
oldest [1]  106/21
Oman [1]  106/25
on [326]
on 4 [1]  136/23
on board [6]  26/8 26/16 98/9 121/19
162/12 170/9
once [24]  5/3 5/4 23/8 24/2 24/18
24/25 25/3 25/3 26/24 27/10 28/14
28/20 28/21 51/9 68/1 68/23 84/22
92/1 96/19 109/14 109/21 128/15
130/12 133/24
once-a-day [5]  24/18 24/25 27/10
28/14 28/20
once-daily [1]  5/4
one [107]  4/16 5/16 7/21 9/6 9/17 10/4
10/8 16/6 19/15 19/21 20/12 24/15
27/13 27/14 27/25 28/12 28/17 29/1
36/2 37/6 38/11 39/13 39/18 41/17
42/6 42/8 45/17 45/24 47/14 50/17
52/14 56/24 57/5 57/8 57/13 58/1 58/9
59/24 61/2 65/12 70/17 73/3 80/13
80/22 83/5 87/11 88/16 89/5 95/3 95/5
95/18 97/10 97/20 100/5 100/23
103/11 103/17 105/22 109/14 110/10
113/13 113/25 114/21 114/22 114/22
116/6 116/14 117/11 118/17 119/20
126/16 127/23 130/5 135/14 136/14
136/17 136/24 137/18 138/1 140/23
141/5 144/11 145/22 146/9 148/21
149/25 151/23 151/24 152/22 153/19
155/10 155/11 156/11 156/25 157/6
157/11 167/6 167/10 167/11 167/15
171/12 172/1 172/21 174/18 175/16
176/10 177/8
one-third [2]  10/4 88/16
one-time [2]  137/18 140/23
one-word [1]  152/22
ongoing [2]  150/21 150/23
only [37]  4/14 5/14 14/4 17/7 18/23
23/17 31/12 33/25 35/1 35/1 37/21
38/25 42/21 51/16 52/5 52/5 54/5
73/18 81/16 81/17 87/20 97/24 103/11
106/2 113/6 116/22 120/24 132/5
136/2 139/1 140/14 141/5 142/20
146/9 151/19 172/6 175/1
onto [2]  56/1 56/3
opening [1]  52/13
operate [5]  39/6 85/20 85/21 106/16
106/16
operated [3]  26/16 88/18 88/19
operation [3]  16/11 53/21 53/24
opinion [17]  20/12 21/10 21/11 56/15
71/23 93/8 100/5 104/16 106/7 110/13

Q

opinion... [7]  113/21 114/24 115/2
157/6 157/11 171/8 177/1
opinions [4]  20/11 84/2 84/14 103/1
opponent [1]  108/17
opponents [1]  150/4
opportunity [8]  34/7 55/3 75/12 125/20
147/13 158/10 168/6 171/9
oppose [1]  20/19
opposed [2]  104/7 104/8
opposing [1]  20/11
opposite [4]  75/19 110/7 110/8 165/20
opposition [7]  10/13 41/6 59/5 133/6
152/21 156/19 165/1
or [201]
oral [8]  1/9 4/14 22/24 39/22 60/16
92/17 98/14 177/22
order [15]  4/16 5/9 5/11 17/14 25/12
44/11 47/9 59/1 60/25 96/15 96/17
96/20 113/24 137/25 162/12
Oregon [1]  155/7
organization [3]  100/13 101/21 102/6
organizations [2]  101/16 101/18
original [2]  133/1 140/25
originally [1]  5/2
Orleans [4]  1/24 2/4 2/17 2/19
Orr [73]  25/13 26/9 70/8 78/13 82/21
83/4 84/18 84/20 86/5 86/23 87/3 87/7
87/13 87/13 88/3 88/5 88/10 89/3
89/13 90/7 90/20 91/16 91/23 92/13
92/15 93/4 94/10 94/17 94/18 103/3
104/22 105/1 117/12 119/3 119/17
121/5 124/6 148/22 150/15 151/9
151/11 152/12 152/13 154/4 154/7
157/20 157/21 157/21 160/5 160/23
160/23 161/3 161/6 161/10 161/12
161/19 161/19 162/14 162/16 162/22
165/3 165/22 166/16 166/24 167/13
168/11 169/9 169/25 170/4 170/21
170/24 173/7 175/19
Orr Jr [1]  161/19
Orr's [26]  88/2 92/22 103/6 156/15
156/16 160/10 160/13 160/15 160/19
162/13 162/20 162/21 163/1 164/25
167/4 167/20 168/6 169/8 169/11
170/11 170/14 171/2 171/8 171/8
171/18 171/22
orthopedic [10]  18/12 22/13 30/19
30/24 31/2 31/3 31/7 31/13 32/15
32/25
other [81]  4/23 10/23 14/21 19/10
27/14 42/24 45/15 48/1 48/1 48/11
49/9 49/16 53/5 56/24 58/24 59/4 60/6
60/12 63/3 63/17 63/17 65/11 65/16
74/8 75/21 76/13 81/3 81/8 82/9 83/4
84/12 84/13 84/15 85/2 85/22 87/4
87/8 87/16 87/17 89/6 89/16 89/24
90/4 90/9 90/21 92/3 92/12 92/16 93/6
93/25 94/2 94/10 96/23 105/19 106/11
112/10 114/18 116/21 116/25 117/11
118/17 118/25 126/19 127/23 131/19
134/14 140/19 141/23 142/9 142/9
142/10 144/12 149/12 149/19 157/17
159/21 161/3 169/2 172/6 172/7
176/13
others [1]  152/24
otherwise [2]  12/18 14/1
ought [2]  129/18 131/2
our [75]  5/8 20/20 20/22 22/10 22/21

24/20 24/24 25/2 25/19 25/25 27/1
27/8 29/4 33/8 35/13 37/4 37/25 38/21
38/22 52/8 58/6 58/7 62/13 68/17
71/19 73/5 73/9 74/22 75/13 78/6
79/8 81/2 81/25 82/1 82/7 82/8 83/5
83/14 86/14 88/23 93/21 93/21 104/9
106/15 107/2 108/25 110/16 112/17
112/18 113/6 113/9 115/7 115/21
115/23 117/19 118/9 118/17 120/4
120/10 124/4 126/17 132/16 133/6
133/9 134/1 134/11 134/14 134/19
134/21 137/16 139/14 149/7 168/5
177/22
Ours [1]  149/4
out [66]  6/13 12/24 16/11 18/2 19/4
20/12 20/15 20/16 21/5 21/6 22/7 23/2
31/5 34/21 34/22 35/4 35/18 36/1
36/24 37/1 39/24 41/13 41/25 46/2
47/3 53/20 63/14 68/4 73/25 76/17
77/10 77/25 82/17 83/3 83/10 85/7
85/8 85/15 86/18 86/18 86/21 86/21
88/12 88/14 88/17 103/20 103/25
111/14 111/17 112/23 121/15 125/8
126/17 127/14 129/16 130/8 133/9
133/19 141/6 144/6 165/19 166/7
169/15 169/22 171/5 176/19
outcome [11]  21/16 82/22 89/8 92/8
92/14 92/23 95/17 157/4 157/17
160/19 171/22
outcomes [4]  36/10 81/7 90/18 112/16
outset [1]  49/11
outside [4]  35/7 45/4 115/11 121/1
outweighed [2]  99/24 105/12
over [24]  57/21 57/21 70/12 91/13
91/15 98/24 105/9 114/16 114/16
120/8 120/20 121/4 121/9 121/24
125/11 128/16 150/19 151/7 162/21
171/23 173/17 173/21 175/8 177/2
over 20 [1]  121/24
over-20 [1]  121/4
Overall [1]  33/6
overcome [3]  147/10 147/11 170/25
overview [2]  27/7 84/6
owe [1]  160/17 168/12 178/4
owed [1]  169/6
owes [1]  169/6
owing [1]  169/22
own [13]  8/9 33/20 45/8 61/24 68/18
71/24 111/25 112/22 112/24 113/2
113/8 117/19 119/12
owned [3]  33/19 70/22 70/23
owner [4]  33/21 33/23 78/17 78/18

P

.P.A [1]  1/13
p.m [2]  162/2 173/25
package [1]  36/1
packaging [1]  152/1
page [17]  3/2 16/8 27/25 30/15 52/20
72/1 72/3 111/14 144/5 151/24 153/18
154/18 156/19 157/3 174/8 175/8
176/18
page 1 [2]  16/8 52/20
page 15 [2]  72/1 72/3
page 162 [1]  151/24
page 21 [1]  156/19
page 23 [1]  157/3
page 3 [2]  144/5 175/8
page 300 [1]  154/18
page 9 [2]  174/8 176/18

painfully [1]  51/22
pancreatic [1]  6/19
Papantonio [1]  1/13
paper [5]  104/4 104/5 104/6 104/12
173/22
papers [2]  5/24 108/24
paragraph [6]  21/11 53/16 89/22 89/23
96/17 96/19
paragraph 3 [1]  96/19
paragraph 4 [1]  96/17
paragraphs [2]  90/9 97/5
paragraphs 5 [1]  97/5
parallel [1]  30/23
parameter [1]  102/16
parameters [7]  31/18 32/12 35/16
37/10 55/25 57/16 133/23
pardon [1]  88/1
Park [1]  2/13
parsing [2]  66/9 67/10
part [15]  11/9 27/22 35/25 39/24 39/25
41/8 58/20 60/4 71/18 83/11 128/10
144/8 144/20 145/25 146/1
particular [11]  46/10 54/13 71/21 83/11
99/3 100/24 110/13 122/1 168/18
173/3 177/12
particularly [7]  25/18 25/21 130/16
130/17 135/1 144/13 147/2
parties [4]  4/15 6/10 25/16 71/19
parts [5]  95/17 98/2 102/13 116/21
148/15
party [2]  6/20 17/24
pass [3]  95/21 107/5 166/1
passed [4]  121/23 151/11 162/24
169/25
passes [1]  98/22
passing [3]  9/5 44/9 108/22
past [5]  150/2 155/11 156/1 172/9
177/11
patchwork [1]  119/22
pathology [1]  99/7
paths [1]  77/1
patient [26]  10/6 26/5 27/9 40/13 83/11
84/23 86/14 95/25 96/9 99/1 101/10
107/10 107/17 107/19 108/14 109/16
117/17 131/3 153/23 156/6 162/12
168/18 170/8 175/5 176/2 177/18
patient's [7]  29/8 95/24 100/21 165/7
165/11 167/19 170/9
patients [51]  12/18 14/11 27/13 28/8
32/3 36/10 37/3 37/19 37/25 46/25
49/23 64/8 73/11 83/3 86/22 87/7
87/21 87/23 90/17 93/12 95/15 96/2
97/5 99/5 99/5 101/7 101/22 104/10 105/2
107/8 107/24 111/10 111/10 112/16
118/23 119/6 119/11 119/14 122/10
122/18 138/1 140/24 141/23 148/2
166/7 166/20 166/22 167/9 167/10
167/15 174/21 176/12
patients' [2]  5/7 6/5
Paul [1]  156/23
Paul McCartney/Heather [1]  156/23
pause [1]  12/4
PD [3]  32/22 33/8 110/22
Peacock [3]  83/1 107/12 170/2
peaks [1]  154/10
pedicle [2]  155/18 155/23
peer [5]  116/20 117/14 117/16 120/4
120/22
peer-review [1]  117/14
peer-reviewed [4]  116/20 117/16 120/4

**P**

peer-reviewed... [1] 120/22
Pennsylvania [2] 1/18 28/2
Pensacola [1] 1/15
people [24] 9/21 9/24 10/5 12/19 22/18
25/7 25/7 26/7 26/18 27/15 28/22
28/23 38/20 47/1 65/1 65/16 90/18
98/24 105/23 118/2 137/6 145/18
146/23 157/19
people's [1] 94/4
per [4] 28/10 51/19 176/2 176/3
percent [7] 73/14 91/14 91/19 113/5
131/8 148/4 154/7
percentage [1] 28/10
percentile [1] 37/23
perception [1] 171/13
Perfect [1] 43/19
perfectly [1] 16/4
perform [1] 125/7
performance [1] 84/15
performed [2] 146/7 171/2
performs [1] 130/5
perhaps [7] 16/1 19/5 51/18 53/25
60/16 79/17 112/13
period [2] 28/16 88/11
periodic [1] 42/22
permanent [2] 73/23 148/6
permission [6] 6/22 8/25 20/1 44/9
54/19 54/20
permit [1] 55/5
permitted [2] 74/24 75/11
person [8] 39/5 39/19 89/13 91/7
132/15 141/24 142/25 151/19
persons [1] 116/22
perspective [2] 68/14 150/13
persuasion [1] 72/11
perversity [1] 46/19
pharmaceutical [8] 7/17 16/12 48/22
48/24 53/12 138/25 139/6 149/24
pharmacodynamic [1] 18/5
pharmacology [3] 32/20 56/5 118/2
pharmacovigilance [1] 77/6
Phase [1] 110/20
Philadelphia [1] 1/18 71/23
phrase [1] 104/24
physician [13] 95/23 135/5 140/12
151/15 151/21 155/3 160/13 165/6
168/16 168/17 169/2 169/7 171/18
physicians [13] 100/16 109/3 111/22
113/13 118/25 160/10 161/7 161/13
161/16 162/11 163/1 166/21 168/20
Piazza [1] 82/16
picked [1] 130/8
picture [2] 76/1 127/14
piece [2] 52/12 79/24
pill [8] 10/8 25/1 25/1 26/20 27/14
27/15 28/12 28/17
pills [1] 28/12
pilot [1] 106/22
pivot [1] 48/20
PK [1] 111/3
place [2] 108/6 126/20
placed [3] 150/15 168/10 170/4
places [1] 96/23
plaintiff [13] 24/9 46/1 46/9 82/14 85/4
124/20 125/19 128/1 128/15 128/18
129/18 135/3 143/11
plaintiff's [3] 46/3 85/13 169/7
plaintiffs [94] 1/13 1/16 1/19 1/22 4/10

5/1 5/12 5/14 5/18 5/23 7/1 7/6 7/17
7/19 8/4 8/6 8/7 8/10 8/23 9/15 11/10
11/12 12/22 13/5 15/10 16/12 17/3
17/9 18/8 18/22 19/2 19/20 20/19
21/20 21/25 23/10 44/15 45/9 45/12
45/15 46/19 48/2 48/18 49/3 50/21
50/20 51/23 53/11 53/11 58/7 58/23
59/11 60/10 60/23 61/16 62/3 62/9
62/19 62/22 63/11 64/17 65/15 66/2
68/19 69/23 70/2 70/9 79/11 79/16
80/2 81/5 81/11 81/14 82/4 96/14
96/22 104/22 107/22 108/20 119/8
122/18 124/24 125/3 125/13 129/5
129/9 132/6 141/7 141/10 143/24
147/17 151/14 151/16 160/5
plaintiffs' [52] 4/23 7/8 8/19 9/22 11/15
12/5 12/6 12/11 16/23 16/19 19/21
31/25 32/19 34/12 46/20 47/2 47/11
48/8 48/10 49/19 65/6 72/21 80/13
81/2 81/6 85/10 91/19 95/21 100/4
100/9 100/14 100/18 100/23 101/2
101/5 101/14 101/19 101/20 103/10
104/13 104/19 114/17 116/19 118/22
128/11 144/5 146/19 152/10 157/1
166/19 167/8 171/1
plan [1] 55/22
planet [2] 131/4 131/20
plasma [4] 18/3 104/8 111/4 174/19
play [3] 68/8 87/5 87/6
plays [1] 136/6
please [24] 4/3 4/5 4/9 4/18 81/1 89/19
110/10 110/11 110/21 111/1 112/2
112/3 113/1 113/10 114/7 114/21
115/8 115/22 117/3 119/10 119/11
124/3 138/6 160/4
pled [1] 58/8
plenty [2] 6/11 12/22
PLIVA [1] 71/1
PMA [1] 50/24
podium [3] 19/13 56/21 96/24
point [64] 10/17 16/12 17/6 22/8 22/22
23/4 23/5 23/14 24/3 29/22 29/25
34/21 34/22 34/23 35/4 35/17 39/24
41/21 41/21 43/5 52/5 59/1 70/20 71/6
74/10 74/20 74/22 75/5 75/15 76/3
77/7 77/22 78/3 79/22 79/24 81/25
82/1 82/3 83/5 85/14 96/5 96/7 102/7
113/23 117/11 121/23 125/15 126/19
133/20 134/14 134/18 137/16 137/22
142/23 143/14 145/2 147/21 160/21
162/25 164/21 167/23 169/15 169/22
171/12
pointed [9] 31/5 37/1 39/13 41/13 47/3
56/4 76/17 133/9 171/5
points [5] 70/16 79/1 91/13 100/1
111/14
poison [1] 27/18
policy [4] 45/14 67/12 68/24 169/6
population [1] 79/15
portion [1] 21/9
posed [2] 163/23 166/5
posit [1] 70/2
posited [1] 12/2
position [32] 9/7 9/9 9/10 9/18 9/19
9/22 12/6 22/2 31/19 41/11 46/20 47/2
48/8 54/10 59/12 60/23 69/10 75/14
79/8 81/19 83/14 85/10 86/14 108/9
108/12 110/1 117/21 145/6 168/5
168/10 169/3 173/15
positions [1] 12/5

positive [1] 11/15
possible [5] 29/9 42/24 164/12 170/16
170/17
possibly [3] 39/7 142/9 155/16
postapproval [1] 23/11
postmarket [2] 51/9 51/12
potential [1] 81/7
PowerPoints [1] 178/1
Poydras [3] 2/4 2/16 2/19
practice [8] 67/16 67/17 67/20 101/24
102/2 116/21 122/21 146/18
practices [1] 118/18
Pradaxa [26] 28/4 34/23 40/5 40/10
40/19 40/25 42/1 54/25 77/13 82/6
82/9 88/4 90/22 92/24 93/6 93/22 94/5
98/1 98/2 105/16 105/19 105/24
143/18 150/15 150/21 150/22
Pradaxa's [1] 40/21
preapproval [3] 23/9 43/8 48/14
precariously [1] 85/16
precaution [2] 30/9 76/8
precautions [1] 42/22
precedent [2] 48/6 49/3
precise [2] 80/4 164/15
precisely [5] 17/8 45/17 45/20 74/20
133/9
preclude [2] 75/12 81/6
predicament [1] 93/10
predict [1] 21/16
predictive [8] 31/17 32/12 35/15 104/11
114/11 114/15 174/25 176/22
preempt [1] 20/20
preempted [45] 6/9 7/4 7/7 8/5 8/5 9/3
11/8 11/22 11/25 13/13 15/25 16/3
17/1 17/4 19/11 20/3 20/8 20/22 21/8
23/10 23/12 24/14 29/5 43/8 46/17
48/18 49/10 49/13 57/3 59/3 59/14
59/21 60/11 60/19 60/22 61/7 62/6
64/14 66/14 66/17 70/4 78/21 79/6
80/20 96/21
preemption [31] 4/17 6/13 8/3 10/10
13/17 21/4 21/12 45/21 46/5 46/8 48/9
48/13 48/15 58/2 58/5 59/10 59/20
60/12 60/25 61/3 61/11 67/22 68/23
71/17 71/18 72/9 72/9 75/9 78/3 149/8
164/6
preempts [1] 4/23
prefer [1] 43/15
preferred [1] 11/15
preflight [4] 106/23 106/25 107/2 107/5
pregnancy [1] 138/7
prejudice [2] 5/11 99/24
premarket [4] 50/14 50/24 51/6 53/4
premise [2] 29/18 29/23
premised [1] 45/14
prepared [3] 65/9 83/25 100/7
prescribe [4] 124/21 126/4 135/23
165/3
prescribed [10] 127/7 133/5 134/6
135/23 139/12 155/22 155/24 155/25
161/9 167/13
prescriber [14] 91/21 92/9 135/21
149/14 149/19 149/25 150/2 153/7
155/11 155/14 155/17 173/3 173/4
177/11
prescriber's [1] 153/5
prescribers [5] 76/1 91/6 105/5 105/10
156/1
prescribing [20] 86/9 118/18 127/4
129/16 129/18 129/17 149/23 149/24

**P**

prescribing... [12] 151/21 152/6 154/16 155/3 159/10 160/13 168/16 168/19 168/21 168/22 169/2 169/18
prescription [4] 70/22 70/22 168/18 177/2
presence [1] 107/15
present [4] 8/11 61/20 104/17 143/19
presentation [3] 70/16 81/9 82/24
presented [11] 31/9 68/2 70/24 74/5 86/7 94/18 140/14 158/12 172/12 172/25 172/25
presenters [1] 56/21
presently [2] 104/18 104/19
President [1] 118/10
presidents [1] 118/10
press [2] 64/1 64/7
pressure [4] 161/13 161/16 162/22 165/25
presumably [1] 57/19
presume [1] 144/15
presumed [1] 138/21
presumes [1] 99/1
presumption [10] 135/10 139/25 140/3 140/7 140/20 144/9 144/13 144/16 152/20 153/1
pretend [1] 8/3
pretty [6] 71/25 73/18 131/22 144/6 147/4 147/23
prevailed [1] 46/13
prevent [4] 12/13 36/9 112/15 169/7
prevented [1] 132/3
previously [10] 15/14 60/7 68/6 68/15 71/1 76/5 76/13 76/18 76/21 76/23
primarily [1] 22/11
primary [2] 33/10 40/23
principal [2] 5/18 7/11
prior [10] 23/15 26/2 59/22 76/9 78/12 161/12 162/16 166/25 167/21 169/19
prism [1] 62/4
proactive [1] 161/7
probability [2] 32/21 33/5
probable [6] 21/16 21/24 72/17 72/23 73/1 74/17
probably [2] 43/4 121/7
probative [1] 99/23
problem [7] 9/14 84/3 88/10 103/17 107/16 143/17 150/6
problematic [2] 54/16 119/20
problems [4] 139/16 150/23 161/4 161/5
procedure [5] 51/8 51/16 51/17 94/16 143/5
proceed [3] 22/1 132/12 170/11
proceeded [1] 170/19
proceeding [2] 22/10 30/23
proceedings [5] 2/23 4/1 5/10 178/6 178/13
process [3] 23/13 61/22 149/17
Proctor [1] 1/13
produced [2] 21/20 117/4
product [42] 5/15 5/21 6/2 8/1 8/8 10/23 11/10 13/22 14/8 15/8 15/10 32/10 44/12 45/5 45/5 46/16 46/21 47/5 47/6 47/7 47/9 47/10 47/11 47/20 48/4 50/11 50/13 50/18 50/21 50/25 52/2 52/10 61/6 73/18 79/14 91/1 91/2 91/3 138/21 139/17 163/9 164/17
product's [1] 91/4

production [1] 72/10
products [14] 7/4 49 10/23 28 21/1 21/2 45/7 47/15 47/22 48/24 133/7 155/9 163/11 164/17
profession [1] 147/19
professional [5] 90/17 101/21 101/23 102/1 115/21
proffered [1] 106/7
profiles [1] 40/11
profound [1] 154/24
progressive [1] 167/17
prolongation [1] 167/16
promote [1] 172/16
promoted [1] 19/5
prong [8] 151/13 151/14 151/15 151/22 152/5 153/11 159/18 159/19
Prong 1 [2] 151/22 159/18
Prong 2 [3] 152/5 153/11 159/19
proof [10] 72/13 72/16 88/4 93/21 94/16 143/24 145/3 146/13 146/19 147/9
proper [9] 25/18 25/21 116/12 135/19 143/11 158/16 166/20 166/23 173/17
properly [2] 21/22 166/3
proponents' [1] 100/6
proportion [1] 32/3
proposal [3] 14/4 35/2 67/1
proposals [1] 57/21
propose [4] 8/8 15/10 34/9 86/2
proposed [21] 8/19 15/2 17/22 17/25 18/10 18/23 19/3 23/7 25/12 31/7 31/8 31/12 31/17 36/25 55/19 60/18 61/13 62/2 67/4 72/22 78/11
proposing [1] 19/2
proposition [3] 23/23 44/14 155/12
Propulsid [4] 90/25 104/16 106/18 107/22
proteins [1] 97/23
prothrombin [16] 6/7 13/12 14/10 35/5 37/16 97/17 100/24 112/7 115/9 115/14 164/20 175/11 175/19 175/21 176/12 176/15
prove [29] 20/21 21/13 36/20 71/18 72/16 73/16 84/17 84/24 87/15 87/18 87/19 89/12 90/6 92/2 92/3 92/5 93/11 107/20 119/3 127/22 129/23 131/14 132/6 138/18 145/3 145/4 149/16 151/14 151/16
proved [2] 37/11 71/15
proven [4] 29/12 36/14 36/21 141/3
provide [8] 53/8 133/8 133/11 133/17 133/21 134/22 166/21 169/23
provided [13] 55/18 73/6 76/1 129/5 129/10 138/5 164/22 165/5 165/16 169/2 169/4 170/9 171/9
providers [1] 155/4 169/3
provides [3] 40/21 166/18 166/19
providing [1] 164/14
proving [3] 83/23 94/21 140/19
provision [6] 16/14 18/2 51/19 53/10 53/22 53/24
prudent [2] 152/14 177/3
PT [231]
PT-bleeding [1] 111/8
PT-related [4] 16/2 17/4 17/9 43/22
PTs [3] 99/16 103/4 113/4
public [6] 39/6 45/14 47/7 77/16 102/5 169/6
publish [3] 65/20 66/1 66/6
published [6] 61/6 65/15 66/3 66/4 66/8

1/01/17 118/3 120/4
pull [1] 89/5
pulled [2] 7/16 90/24
pulling [1] 83/10
pure [6] 7/9 10/13 11/24 43/22 56/23 79/10
purely [2] 24/6 25/8
purported [1] 174/13
purpose [4] 41/18 85/3 166/21 172/24
purposely [1] 40/9
purposes [9] 5/13 6/17 10/10 58/24 61/20 69/12 72/20 135/21 141/10
pursuing [2] 5/14 82/12
push [2] 149/18 150/7
pushed [2] 150/1 155/25
pushing [2] 128/6 128/25
put [42] 16/21 29/15 31/6 31/17 31/20 32/7 33/15 34/10 34/25 35/22 37/2 37/14 38/20 39/16 41/12 41/24 45/2 51/11 53/2 71/10 81/23 86/18 86/19 105/14 108/23 115/23 120/6 127/18 129/23 131/17 135/24 140/9 141/21 142/6 152/12 152/13 153/19 163/17 166/16 173/11 173/22 174/3
puts [3] 24/2 122/12 145/18
putting [11] 25/7 28/23 28/24 37/3 37/25 54/9 55/1 112/10 139/11 140/24 153/9
puzzle [1] 52/12

**Q**

qualified [3] 114/4 116/10 116/15
quantify [1] 100/15
quantities [1] 120/6
quarter [1] 123/1
QuarterWatch [4] 77/9 78/15 80/6 80/14
quartile [3] 113/3 113/4 141/22
question [58] 6/16 8/21 12/1 15/21 16/16 17/12 21/6 47/4 59/19 69/6 72/19 79/10 84/21 86/25 88/7 89/14 93/13 94/3 94/6 100/5 101/11 110/18 111/2 111/8 113/14 116/5 117/22 127/16 128/1 134/8 134/9 136/5 137/23 140/25 141/2 146/25 153/20 156/3 157/9 157/13 158/23 163/17 163/20 163/23 163/25 164/24 167/20 171/11 171/14 171/20 172/5 172/11 172/24 173/9 173/13 174/2 176/10 176/23
questioning [1] 153/12
questions [9] 45/21 105/15 110/23 122/1 126/11 126/13 140/22 146/11 158/9
quick [1] 174/7
quickly [7] 38/6 52/13 52/15 55/4 89/19 98/22 170/8
quintessential [1] 18/22
quotation [3] 50/16 52/1 52/17
quotations [1] 50/6
quote [9] 14/23 18/18 51/3 63/1 78/6 104/23 156/13 156/14 165/12
quote/unquote [1] 104/23
quoted [1] 157/1
quotes [3] 89/2 109/9 119/22

**R**

rabbit [1] 93/20
rabbits [1] 43/20
race [2] 157/20 157/22

Rafferty [1] 1/13
raise [2] 167/20 171/20
raised [2] 59/4 76/4
ran [1] 5/22
range [11] 21/18 35/8 52/24 115/12
121/1 128/7 145/23 146/23 146/23
158/24 166/7
ranges [2] 28/10 37/22
rank [2] 83/10 104/21
rate [4] 91/13 91/18 111/15 113/7
rates [1] 67/9
rather [9] 18/24 19/4 19/21 25/1 32/13
38/6 92/24 107/12 164/3
ratio [1] 126/22
RE [2] 1/4 4/6
reach [4] 17/14 21/19 21/20 113/17
reached [3] 62/1 80/3 102/9
reaction [2] 30/10 76/8
reactions [1] 29/9
read [31] 9/4 21/9 44/24 45/24 53/10
55/11 71/5 92/20 102/4 103/19 113/15
114/9 120/19 126/2 127/2 130/1
137/24 138/16 140/10 150/10 152/11
153/8 156/10 163/14 163/22 163/24
174/9 174/18 174/24 175/8 176/19
readily [2] 116/4 138/10
reading [2] 65/23 65/24
ready [3] 12/9 12/15 46/22
reagent [7] 6/8 115/5 115/14 115/15
119/24 125/23 176/15
reagents [4] 120/7 120/11 175/10
175/12
real [10] 41/22 47/16 48/22 95/14
95/15 99/15 142/21 157/2 174/7
174/22
real-world [2] 41/22 47/16
reality [3] 94/22 97/8 103/1
realized [1] 118/19
really [37] 5/14 5/24 18/23 19/1 24/5
28/12 37/3 38/19 41/4 45/12 49/14
55/17 59/7 59/23 61/8 66/10 66/15
69/9 69/22 69/24 77/25 80/19 81/9
84/8 94/22 98/20 98/22 100/17 110/12
113/23 116/22 126/6 126/16 126/20
128/1 143/14 176/3
Reanalysis [1] 62/16
reargue [1] 134/19
reason [21] 8/6 8/6 11/22 12/14 14/6
16/2 17/2 17/4 48/1 48/1 67/12 96/15
131/4 138/25 140/13 141/13 145/12
150/20 152/15 154/2 155/12
reasonable [14] 21/18 21/21 23/14 27/1
44/5 71/13 72/20 72/22 92/21 100/20
102/7 107/9 170/20 170/24
reasoning [4] 12/11 23/21 27/3 106/2
reasons [8] 11/8 13/14 13/15 45/11
47/13 97/20 122/16 160/8
Reath [2] 2/9 2/12
rebuttal [8] 13/1 43/11 82/3 82/13 83/7
83/22 129/22 171/25
rebutted [2] 153/1 156/2
recall [16] 58/10 58/19 59/16 61/9 62/8
62/10 62/15 63/22 64/13 64/25 66/12
69/25 79/14 88/21 88/22 98/21
recalled [1] 73/10
recap [1] 13/4
receive [1] 162/6
received [3] 32/19 162/3 167/15

receiving [3] 14/11 49/24 174/21
recent [3] 122/16 172/12 172/18
recently [4] 14/23 47/24 53/23 53/25
recess [3] 80/23 80/25 123/3
recognition [1] 54/1
recognize [1] 87/21
recognized [3] 163/7 163/12 163/13
recognizes [1] 14/13
recommend [3] 13/21 15/19 101/25
recommendation [10] 13/25 16/5 16/22
19/25 29/10 38/13 54/12 66/6 136/21
137/6
recommendations [4] 16/18 52/25 53/7
74/5
recommended [8] 18/6 42/23 49/18
101/21 102/6 136/17 167/12 170/2
recommending [1] 102/3
recommends [1] 164/16
reconfigured [1] 7/23
record [15] 4/9 14/3 17/6 22/15 32/1
32/4 33/1 79/2 81/8 133/4 135/1
143/10 144/25 176/20 178/13
recorded [1] 2/23
recover [1] 146/20
recovered [1] 162/23
recovery [3] 170/20 171/4 171/10
red [1] 28/20
reduce [1] 169/3
reduced [1] 119/16
refashioned [1] 45/1
reference [8] 18/16 18/17 121/1 152/20
152/22 166/5 177/8 177/10
references [1] 153/17
referred [4] 15/3 109/10 113/24 164/7
referring [1] 110/23
refers [1] 122/4
reflect [4] 53/13 60/3 63/2 74/7
reflected [1] 68/16
refocusing [1] 50/2
reframed [1] 108/23
refused [1] 18/13
regard [3] 87/21 158/19 172/4
regarding [2] 167/24 170/18
regardless [2] 23/25 66/11
regime [2] 5/5 48/14
regimen [1] 52/24
regular [1] 109/8
regularly [2] 146/2 161/7
regulated [5] 8/1 8/8 11/10 14/8 45/6
regulation [16] 16/6 29/23 38/23 41/18
49/20 49/22 52/6 52/16 53/1 53/3
53/11 54/4 59/25 76/6 79/4 137/12
regulations [11] 14/13 16/3 29/6 30/6
30/8 38/11 39/12 39/13 60/3 60/5 71/9
regulatory [11] 34/4 37/5 50/4 55/11
63/3 74/8 101/15 102/6 102/22 110/6
115/16 109/10
Reilly [3] 40/2 40/3 40/8
reiterate [1] 19/9
reject [1] 14/4 17/8 36/20
rejected [16] 14/4 17/8 19/10 36/14
38/4 40/23 55/12 55/13 56/15 61/13
62/2 72/23 73/2 75/17 78/7 78/11
rejection [4] 21/24 57/20 61/14 67/18
relate [2] 89/16 122/5
related [19] 4/24 5/16 6/3 13/4 15/3
16/2 16/23 17/4 17/9 19/16 19/24
20/20 29/5 43/22 43/23 49/9 56/25
57/16 109/10
relates [1] 1/6 62/4 87/1 87/3

relationship [24] 18/2 18/16 22/16
22/20 31/20 32/3 32/8 32/8 32/17 33/2
33/10 33/14 36/18 36/22 55/20 56/6
56/9 56/18 57/15 71/15 110/22 111/8
113/17 174/15
release [2] 64/1 64/7
relevance [2] 83/20 131/13
relevant [9] 21/10 32/6 61/11 63/20
83/17 83/18 83/23 99/22 106/2
reliable [2] 99/21 99/22
reliably [6] 18/19 56/13 57/17 95/23
102/18 102/21
relied [2] 168/24 170/11
relief [1] 58/22
relies [1] 104/13
relieve [1] 46/1
rely [4] 53/12 110/15 110/16 164/15
relying [1] 44/15
remain [1] 30/4
remainder [2] 19/14 20/5
remained [1] 162/23
remaining [1] 19/16
remains [1] 122/8
remake [1] 46/8
remarkable [1] 93/2
remarks [1] 97/15
remedies [1] 98/12
remedy [3] 45/16 46/9 49/4
remember [14] 27/12 37/13 38/11 42/7
49/11 91/5 115/15 145/3 145/9 146/23
155/18 155/20 175/15 175/18
Remembering [1] 143/23
remind [1] 27/4
removed [1] 142/24
renal [3] 150/25 167/3 167/4
renally [2] 161/10 167/12
repeatedly [2] 56/15 133/19
repeating [1] 129/13
replace [1] 165/24
reply [4] 25/16 41/9 115/24 163/3
report [8] 32/20 33/3 62/16 64/4 93/4
93/4 103/23 134/21
reported [1] 77/3
Reporter [3] 2/18 178/10 178/17
reports [10] 76/16 77/2 77/5 82/16
82/24 84/1 84/13 90/10 106/20 120/5
represented [1] 68/11
represents [1] 39/4
reproposed [1] 18/10
repurpose [2] 15/9 52/9
repurposed [1] 51/25
request [1] 96/15
requested [2] 22/3 35/1
requesting [2] 7/1 7/6
requests [1] 19/21
require [6] 8/9 8/19 11/16 50/14 84/24
101/25
required [19] 15/4 16/7 16/10 20/1 29/7
29/16 29/21 38/12 50/15 52/22 53/6
53/15 53/19 53/21 54/7 54/19 60/24
142/12 169/10
requirement [6] 8/15 39/20 47/22 48/5
61/17 115/16
requirements [2] 39/11 107/3
requires [10] 6/19 16/9 16/24 21/15
21/17 46/5 71/12 72/16 134/11 137/13
requiring [2] 53/3 167/6
rereview [1] 33/25
reserve [3] 19/13 20/4 129/22
resident [1] 23/24

**R**

residents [1] 118/25
residual [1] 10/6
respect [16] 10/18 11/2 11/7 13/16
16/15 17/22 19/1 50/18 59/23 63/4
66/24 74/9 86/2 150/3 150/9 173/9
respectfully [1] 84/7
respectively [1] 45/7
respond [1] 29/3
responder [1] 147/6
responders [2] 104/24 128/3
response [18] 5/9 20/7 29/8 56/11 57/4
64/23 65/7 65/7 78/24 83/15 93/14
115/23 132/10 144/5 156/2 160/3
163/19 166/8
responses [1] 57/8
responsibilities [1] 99/20
responsibility [5] 29/24 30/2 46/2 71/7
78/19
responsible [1] 169/9
rest [1] 157/2
restate [1] 108/25
Restatement [3] 155/6 168/23 169/1
restricted [1] 64/22
rests [1] 99/21
result [24] 12/10 22/15 23/6 49/2 73/11
73/15 73/21 77/21 98/9 102/19 105/23
107/16 108/2 119/25 122/7 143/16
145/10 146/16 149/11 153/22 162/15
162/20 165/25 174/20
results [21] 33/7 33/9 55/19 62/11
64/11 65/15 66/3 66/13 67/17 74/11
85/4 103/3 103/4 103/9 104/9 107/9
108/15 133/24 166/4 166/6 167/14
resuming [1] 124/4
retool [1] 47/25
reveal [1] 76/19
revelation [2] 56/16 57/13
reversal [18] 6/2 10/21 10/24 11/7 11/9
11/13 11/19 12/8 12/14 19/24 24/19
25/5 26/25 27/10 44/7 46/22 56/24
162/11
reversed [2] 46/6 138/10
review [10] 8/20 11/16 36/3 55/23 56/5
61/22 61/24 62/17 112/4 117/14
reviewed [4] 116/20 117/16 120/4
120/22
reviewers [3] 30/20 33/1 62/21
reviewing [6] 32/1 33/1 57/6 57/6 111/2
118/22
reviews [2] 36/2 36/3
revise [1] 71/12
RICHARD [1] 2/16
Rick [2] 87/2 124/7
rid [1] 35/15
right [27] 13/1 42/13 42/19 46/13 51/14
57/10 64/3 78/22 83/13 83/15 94/25
118/21 121/8 131/12 134/20 143/13
152/18 153/24 154/21 154/24 156/4
159/8 159/12 159/15 175/22 176/4
176/9
rights [1] 39/5
Rinder [12] 100/18 102/4 103/11
103/11 114/22 114/25 120/18 130/8
141/19 147/12 147/12 147/13
rise [2] 80/24 123/2
risk [112] 9/16 21/22 22/17 22/21 25/7
25/8 26/7 28/23 28/25 29/14 31/22
32/6 33/7 36/5 36/19 36/23 37/3 38/4

51/22 55/23 56/7 58/7 58/16 61/5
76/19 86/21 88/22 88/24 90/2 90/11
90/14 90/20 91/9 91/13 91/18 92/9
93/5 95/24 95/24 96/9 99/11 100/22
101/1 104/11 105/11 107/4 109/18
109/18 109/23 111/11 111/18 111/21
111/25 112/8 112/23 113/18 113/21
114/2 114/2 114/11 115/6 117/17
119/13 122/10 127/11 131/21 131/22
131/23 131/24 133/5 133/23 134/13
134/16 134/17 137/19 138/7 139/7
139/8 140/16 141/3 141/22 141/24
142/4 142/16 142/17 142/18 142/22
143/1 143/2 143/4 143/6 143/7 143/18
145/17 145/19 145/21 147/19 148/1
148/3 153/23 154/5 154/5 158/16
165/11 165/14 166/4 166/22 168/7
169/11 174/25 175/5 176/22
risk/benefit [2] 109/18 127/11
risks [12] 38/1 51/18 90/3 101/6 109/6
118/15 118/15 126/23 136/1 152/3
159/18 169/3
rivaroxaban [16] 1/4 14/18 18/3 18/5
28/8 49/25 55/23 63/1 63/4 73/15 74/6
74/9 77/13 101/11 102/19 120/6
road [3] 84/6 106/15 149/7
ROCKET [44] 23/5 33/1 37/1 55/19
58/10 58/14 59/16 62/8 62/11 62/16
62/16 63/3 63/21 64/23 65/1 65/22
66/13 66/25 67/18 67/23 73/5 73/9
73/9 73/11 73/15 73/20 73/24 74/18
74/19 74/2 76/14 79/22 80/8 80/9
80/11 110/17 110/20 111/2 111/10
112/1 112/5 112/23 113/2 131/21
ROCKET AF [2] 55/19 76/14
RODNEY [2] 2/9 58/3
ROGER [3] 1/20 108/20 134/20
role [5] 114/5 136/6 169/5 169/12
169/21
Roman [2] 97/24 97/24
room [8] 2/19 26/10 44/20 90/16 91/24
120/15 121/6 134/23
Rouge [1] 155/24
rough [3] 98/17 122/6 122/15
round [2] 8/20 11/16
routine [4] 42/22 55/24 137/16 137/17
rule [8] 16/12 21/25 24/4 24/4 24/5
79/11 82/17 139/1
Rule 12 [2] 24/4 24/4
Rule 56 [3] 21/25 24/5 79/11
rules [1] 106/15
ruling [3] 59/6 72/11 177/24
run [3] 12/24 130/19 146/15
Russ [5] 158/9 174/11 174/22 175/24
176/10
Ruth's [2] 121/9 161/20

**S**

sadly [5] 91/16 151/1 151/11 172/18
173/5
safe [10] 7/15 12/12 50/20 64/7 96/12
107/23 133/9 133/12 133/17 163/8
safely [1] 106/16
safer [7] 9/12 24/10 27/1 47/13 48/12
96/13 96/18
safety [6] 47/15 47/15 75/18 89/23 90/8
101/10
said [103] 8/12 12/12 14/23 17/6 18/18
22/3 24/22 32/5 37/2 44/3 45/20 45/22
46/23 47/21 47/24 49/11 49/19 56/11

57/15 57/16 61/11 63/1 64/13 65/11
71/25 75/1 75/12 77/15 79/14 79/21
85/1 86/8 88/7 88/22 89/1 89/4 89/7
89/8 89/14 92/7 92/9 92/10 92/13
92/19 93/3 93/4 93/9 93/24 94/13
94/14 96/22 99/19 100/5 104/5 104/8
104/16 106/1 106/8 108/3 108/5 108/6
108/21 112/17 112/18 114/3 114/16
114/20 114/24 116/8 116/15 118/1
118/17 118/22 122/14 124/18 124/19
124/22 125/6 125/22 126/2 126/8
126/13 129/18 130/1 135/24 137/2
140/11 140/21 144/12 144/19 145/1
147/15 150/9 151/8 152/6 156/2
156/24 157/24 158/14 159/6 159/18
163/10 170/18
salt [1] 48/10
same [49] 6/15 11/8 22/10 27/15 30/22
32/2 34/16 37/9 37/9 40/6 41/15 50/20
55/19 64/20 69/11 75/2 75/3 78/2 79/3
82/18 82/20 83/4 88/6 88/6 88/8 88/9
90/7 91/23 92/7 94/17 110/16 110/17
113/9 113/9 114/3 115/2 115/13 116/9
116/9 116/10 116/16 116/16 117/22
120/13 136/3 136/3 148/22 149/3
173/24
samples [1] 120/5
San [1] 2/10
sand [1] 101/3
Sander [1] 150/16
Sarich [1] 113/13
Sarver [9] 2/15 2/16 87/2 124/7 132/15
133/9 133/13 141/15 154/1
Sarver's [1] 142/11
sat [1] 78/16
satisfied [1] 151/25
satisfies [1] 39/11
satisfy [5] 6/20 132/7 146/12
Savaysa [3] 97/25 105/19 143/18
save [1] 66/9
saving [1] 47/1
saw [7] 14/22 97/21 136/6 136/12
136/18 152/10 161/7
say [95] 17/3 23/20 26/13 33/14 34/4
35/4 35/22 36/17 37/16 38/20 39/8
40/8 42/3 42/17 48/4 48/7 48/12 54/8
55/7 60/3 61/16 62/19 63/17 63/20
70/9 73/25 74/12 77/11 77/23 78/7
79/13 79/16 82/12 82/21 83/6 85/17
86/11 90/10 91/22 92/15 92/21 93/24
94/1 94/8 96/24 99/10 100/4 101/14
101/19 103/7 105/16 105/22 107/13
110/12 111/5 111/23 112/6 114/12
115/8 115/13 115/19 115/20 116/6
116/6 118/14 119/1 120/23 120/24
128/4 128/25 129/5 131/6 131/10
131/11 135/7 136/20 142/17 143/23
144/7 146/14 146/15 146/17 147/8
148/24 150/3 154/11 155/2 156/14
156/25 156/25 157/6 157/11 163/14
172/7 172/20
saying [33] 9/9 13/8 24/2 24/17 29/4
41/19 51/24 60/20 75/4 78/12 79/13
82/3 82/4 82/5 82/10 82/13 83/2 83/3
83/10 85/11 88/10 94/16 109/13
109/13 116/7 125/6 125/13 136/16
139/20 142/13 147/11 154/12 174/4
says [83] 14/19 14/19 15/6 16/14 16/18
18/7 20/7 21/11 23/24 24/8 24/8 26/11
28/8 28/13 37/7 38/23 39/3 39/19

S

says... [65] 42/21 45/13 45/25 46/7
47/5 51/6 52/1 52/8 52/21 52/22 53/3
53/12 56/1 56/18 64/6 71/5 74/6 75/1
75/2 75/3 76/6 76/24 76/24 77/25
82/20 83/17 91/1 94/22 100/13 102/15
103/12 103/13 113/7 115/1 119/19
121/20 128/6 128/14 128/15 128/21
129/3 129/3 129/11 130/22 131/2
131/17 135/16 135/17 135/18 140/10
144/23 146/9 147/22 147/23 149/3
154/21 156/5 159/18 172/4 172/8
172/17 172/22 172/23 173/11 175/23
scan [1] 162/4
scenario [3] 64/16 70/2 135/18
Schlichter [1] 1/19
school [1] 106/20
science [20] 11/5 11/5 27/12 86/1 86/2
91/5 97/22 98/21 99/4 99/9 103/17
106/11 106/15 108/2 108/7 108/16
108/16 115/1 122/23 122/23
Science Day [5] 91/5 97/22 98/21 99/4
115/1
scientific [17] 95/15 96/8 99/10 101/16
104/24 106/1 106/5 106/5 106/9
106/19 106/22 108/6 108/13 122/8
122/9 130/25 158/9
scientifically [2] 96/6 119/23
scientist [1] 40/3
score [4] 91/8 131/8 142/14 142/25
screen [1] 31/6
screening [2] 164/11 164/19
screw [2] 155/18 155/23
Sea [1] 106/24
seal [1] 24/2
seated [5] 4/3 81/1 124/3
second [24] 5/22 15/16 16/1 18/4 20/15
38/6 45/18 50/1 50/16 55/17 64/10
66/2 66/18 130/5 130/10 131/16 132/1
140/20 148/11 151/15 152/15 154/2
160/12 164/21
second-guess [2] 152/15 154/2
seconds [7] 37/17 111/21 111/24 115/4
130/9 131/2 134/24
secreted [1] 10/4
section [30] 1/5 16/7 16/9 16/15 16/17
16/20 18/24 18/24 18/25 30/7 34/20
34/20 34/20 34/20 34/22 34/24 35/13
42/3 42/10 42/10 42/21 52/19 52/19
52/20 52/23 53/16 54/7 54/9 102/12
138/7
Section 12 [2] 18/25 34/20
Section 12.2 [1] 35/13
Section 5 [4] 18/24 34/20 34/20 42/10
sections [3] 19/5 33/23 42/11
Sedran [1] 1/16
see [42] 9/4 9/5 10/20 18/1 22/7 22/19
25/23 28/19 30/15 30/17 41/22 45/12
45/23 53/2 60/8 77/9 77/12 82/23 89/2
95/4 106/10 108/11 109/16 111/18
111/19 112/6 112/24 113/5 113/13
120/10 120/18 120/20 137/23 145/24
154/17 158/5 158/7 172/2 175/9 176/4
176/5 176/10
seeing [1] 41/8
seek [1] 150/3
seeking [4] 44/9 47/18 62/3 164/17
seem [1] 104/22
seems [2] 9/1 102/22

seen [7] 28/18 31/9 52/19 100/18 102/1
152/8 162/9
self [1] 171/15
self-contradictory [1] 171/15
sell [3] 19/22 19/23 21/2
seminar [1] 170/1
sends [1] 175/7
sense [2] 19/1 50/4
sensitive [3] 21/15 37/11 176/8
sensitivity [1] 175/10
sent [3] 37/1 65/19 65/22
sentence [5] 18/1 18/4 32/11 174/24
176/19
separate [12] 5/21 6/2 8/1 8/8 8/9 11/9
11/12 14/8 18/11 43/21 58/22 112/22
separately [5] 8/1 8/8 11/9 14/8 45/6
September [3] 63/8 65/5 73/7
September 2015, months [1] 73/7
September 2016 [1] 65/5
sequence [1] 172/15
serious [1] 71/14
served [1] 12/17
serving [1] 46/25
SESSION [1] 124/1
set [3] 69/23 133/19 144/5
setting [1] 135/2
Seufert [1] 64/21
seven [2] 19/5 42/11
Seventh [1] 108/5
several [4] 4/14 5/2 121/12 150/18
severe [3] 98/14 119/17 167/5
severity [1] 76/20
shallower [1] 154/11
shape [1] 91/16
SHARKO [11] 2/12 11/4 86/1 87/1
95/10 95/11 109/10 111/14 114/18
118/19 130/24
she [71] 26/9 26/10 26/11 26/16 33/22
82/22 88/3 88/4 88/14 88/19 89/6
90/21 91/16 91/25 92/10 92/16 93/5
94/18 94/18 100/7 100/22 114/20
114/24 119/19 121/6 121/6 121/8
121/10 121/10 121/11 121/13 121/22
121/23 150/16 150/21 151/1 151/2
151/3 151/4 157/24 157/24 160/24
160/25 161/1 161/4 161/7 161/15
161/21 161/22 161/22 162/1 162/2
162/3 162/6 162/8 162/14 162/16
162/24 165/19 165/19 165/20 168/2
168/3 168/4 168/7 170/22 170/22
170/22 171/3 172/4 173/15
She'd [1] 121/8
She's [1] 121/12
shift [1] 29/20
ships [1] 108/22
short [1] 114/2
short-term [1] 114/2
shortly [1] 55/4 129/15
should [83] 5/6 5/11 6/4 6/12 7/15 7/23
9/9 9/20 9/24 10/7 12/2 14/2 17/12
23/14 23/21 25/17 34/6 34/13 34/19
34/21 35/25 45/10 50/5 50/23 51/25
52/2 53/22 55/8 58/13 58/16 60/10
62/9 63/3 64/13 66/3 66/6 66/19 67/3
68/2 68/10 68/16 74/9 78/12 78/20
80/7 80/11 80/17 82/10 85/5 85/12
85/17 87/10 87/11 91/7 91/15 91/22
96/3 100/14 101/12 102/8 108/14
108/15 108/15 115/3 121/6 121/24
122/24 125/6 125/7 125/12 125/14

125/14 126/16 129/5 136/16 136/23
140/3 151/16 166/7 171/1 171/23
174/4 174/20
shouldn't [2] 121/24 128/20
show [33] 17/21 20/23 21/7 28/19 38/3
39/25 40/16 40/20 52/15 54/25 55/15
59/14 71/20 73/1 74/16 74/21 74/23
75/10 81/21 84/10 89/1 102/12 116/25
122/13 127/18 130/11 142/16 149/14
149/20 153/2 172/14 173/1 174/13
showed [5] 42/2 114/21 122/5 162/4
176/18
showing [3] 134/22 142/3 176/11
shown [13] 38/3 43/5 80/7 102/14
127/2 133/3 134/5 142/1 153/1 153/19
154/2 174/5 175/17
shows [20] 23/4 101/9 111/13 112/1
112/25 120/22 121/1 121/2 126/22
127/20 131/21 135/4 140/17 141/18
142/4 143/5 143/8 144/25 174/12
175/15
shrink [1] 44/21
sic [2] 113/13 157/15
sick [1] 121/10
side [23] 9/16 13/9 22/18 39/2 46/12
46/19 48/8 49/6 67/19 69/5 69/7 73/17
77/21 85/3 85/4 85/5 85/7 85/11 86/1
86/11 86/12 86/13 132/16
sides [1] 116/15
significance [1] 114/25
significant [5] 28/13 73/19 77/7 77/10
167/2
significantly [3] 90/14 167/2 167/21
silent [1] 35/8
similar [2] 31/8 61/3
simple [3] 8/5 107/15 137/18
simplistic [1] 48/3
simply [14] 9/10 11/18 46/9 47/12 48/3
48/5 61/1 64/14 99/5 116/17 126/20
147/9
simulated [1] 28/18
simultaneously [1] 41/12
since [7] 33/14 47/20 61/12 70/14
117/25 145/6 152/11
single [4] 79/24 117/15 117/20 167/11
sir [3] 51/6 89/19 95/8
sit [2] 17/2 33/16
sits [1] 80/14
sitting [1] 21/17
situation [12] 24/13 26/9 46/4 47/8
47/16 66/15 68/20 70/3 71/3 115/18
150/1 170/4
situations [1] 170/3
six [3] 4/15 55/14 116/13
Sixth [2] 23/20 23/22
Sixth Circuit [2] 23/20 23/22
skewed [3] 62/11 73/14 75/25
skillful [1] 153/12
skip [2] 42/5 76/11
slice [1] 68/19
slicing [1] 67/10
slide [71] 11/22 19/12 27/4 27/11 27/12
27/20 28/14 28/24 29/6 29/16 29/18
31/5 31/24 32/9 32/18 33/3 33/17
34/11 34/13 35/11 35/24 36/22 37/6
38/2 39/15 40/2 41/2 41/5 42/5 42/15
71/16 74/4 82/23 89/3 110/10 110/21
111/1 111/7 111/7 112/2 112/3 113/1
113/10 113/12 114/7 114/20 115/8
115/22 117/3 117/14 118/6 119/10

Case 2:14-md-02592-EEF-MBN Document 6004 Filed 04/04/17 Page 205 of 211

slide... [19] 120/1 120/2 120/2 132/22 134/4 136/23 136/23 137/12 137/20 137/20 138/6 138/15 141/14 144/1 165/18 166/24 169/20 170/5 170/16
Slide 11 [1] 110/10
Slide 12 [1] 170/5
Slide 13 [1] 170/16
Slide 24 [1] 114/20
Slide 30 [1] 117/3
slides [1] 110/9
slightly [3] 103/7 105/2 146/22
sliver [1] 80/18
slope [1] 120/12
slow [1] 97/19
Smart [1] 118/21
Smith [1] 82/25
snapshot [1] 84/11
so [217]
so-called [1] 5/23
societies [5] 102/2 115/21 115/25 116/21 131/2
society [2] 101/24 116/3
software [1] 2/23
sold [1] 7/15
sole [1] 134/4
solely [2] 47/15 117/18
some [61] 6/10 7/23 9/5 15/5 17/23 18/10 27/6 29/25 38/16 40/13 45/2 48/1 48/11 49/8 57/7 58/20 59/1 60/15 70/15 73/13 77/25 80/18 81/10 82/9 83/8 83/20 87/16 89/24 94/21 99/7 103/25 109/2 110/9 114/18 118/13 120/16 120/21 120/21 122/11 125/25 127/23 129/22 133/13 142/9 142/9 142/10 145/20 147/6 153/12 159/21 161/4 168/2 173/22 174/13 174/13 174/14 174/15 175/9 175/10 175/12 178/4
somebody [12] 25/4 26/8 26/19 28/16 44/19 44/19 134/13 134/16 140/1 143/6 150/2 175/1
somehow [1] 112/19
someone [3] 145/19 149/19 173/2
something [41] 9/14 9/15 10/7 22/25 25/15 30/1 34/25 51/7 51/10 54/25 64/13 68/17 78/11 78/17 83/18 85/17 92/2 97/11 108/11 114/15 125/12 130/8 130/18 131/5 131/11 132/2 135/12 136/11 136/22 140/2 142/7 142/7 147/17 149/1 150/21 156/24 172/8 173/18 173/20 174/4 174/6
sometime [1] 162/2
sometimes [2] 20/9 126/10
son [1] 106/21
sons [1] 106/19
soon [4] 20/18 71/13 142/13 177/24
sooner [2] 88/18 88/19
sorry [4] 74/18 114/22 120/9 144/1
sort [9] 13/25 17/8 47/24 55/16 82/2 93/15 103/15 108/7 174/11
sought [1] 133/2
sound [2] 96/6 122/8
source [2] 104/2 154/7
South [2] 1/14 106/24
southern [1] 54/22 139/3
southern-speak [1] 54/22
speak [4] 52/3 54/22 168/19 171/25
speaking [2] 48/25 75/25

special [2] 6/22 72/8
specialized [1] 162/6
specific [20] 4/20 8/11 13/5 25/13 61/24 96/16 97/23 98/6 100/11 102/7 102/25 103/19 106/5 109/21 110/18 125/23 136/1 163/17 163/20 163/22
specifically [22] 6/7 14/12 14/18 15/6 17/25 18/6 18/9 23/16 23/16 40/25 44/2 55/22 64/25 124/22 126/24 138/23 163/21 164/10 164/18 167/3 169/25 170/2
specified [1] 16/6
specifies [1] 14/15
specify [3] 15/17 15/19 51/1
speculate [2] 17/19 127/1
speculation [3] 83/11 104/21 130/19
speculative [2] 81/7 126/10
spend [1] 133/14
spent [2] 55/8 142/22
spiked [2] 104/8 174/19
spoke [5] 57/18 96/4 115/1
sponsored [1] 169/25
spot [1] 86/20
St [1] 1/21
St. [36] 86/6 105/10 119/7 149/10 149/14 149/15 150/5 150/11 150/19 151/22 152/6 153/6 154/11 155/5 158/6 158/12 159/23 160/13 160/14 161/9 164/23 164/24 165/2 165/9 166/2 166/15 168/1 168/6 171/14 171/21 172/2 173/16 174/5 174/23 175/2 177/16
St. Martin [1] 175/2
stage [3] 167/5 167/6 167/9
Stage IV [2] 167/5 167/9
Stago [4] 47/18 47/18 47/24 97/10
Stahl [9] 133/11 133/15 133/15 155/25 163/7 163/10 163/13 165/5 168/24
Stahl v [1] 163/7
stand [4] 5/13 12/25 80/22 89/12
standard [36] 6/12 6/13 6/15 18/19 20/24 21/14 23/2 29/8 29/14 39/12 56/13 56/19 57/17 59/10 59/11 59/13 59/24 60/13 60/14 61/18 65/3 66/23 68/22 72/1 72/13 72/16 79/2 79/3 79/4 79/9 80/1 95/14 102/23 107/6 138/10 169/10
standards [5] 20/25 59/20 69/15 70/13 79/11
standing [1] 93/3
standpoint [1] 172/17
stands [1] 129/21
start [3] 20/18 25/18 143/13
started [3] 20/10 105/6 129/15
starting [1] 52/24
state [12] 5/19 5/25 6/19 6/20 21/1 23/24 135/6 140/5 149/22 163/21 164/9 170/15
stated [6] 61/12 132/16 163/20 165/2 170/21 171/2
statement [9] 35/10 35/15 56/12 63/6 64/10 65/16 94/21 154/24 157/1
statements [5] 28/2 43/1 64/15 83/9 135/6
states [20] 1/1 1/10 37/24 38/16 38/22 48/23 75/17 75/22 75/23 75/24 76/2 78/20 97/10 109/17 117/16 164/11 164/14 164/18 169/1 178/10
stating [1] 67/9
status [1] 6/5 38/10 38/24

statutes [2] 39/12 39/13
stay [1] 43/6
stayed [1] 35/8
staying [1] 10/1
Steak [1] 161/20
steeped [1] 11/5
stenography [1] 2/23
step [4] 64/6 129/24 149/17 156/11
steps [2] 77/11 168/2
still [24] 12/13 46/24 47/1 47/20 89/6 106/20 108/22 109/22 117/22 120/17 120/25 126/1 126/4 133/5 134/6 139/12 139/15 143/1 154/15 154/22 159/3 159/10 159/13 162/17
stomach [1] 150/21
stood [2] 84/3 106/17
stop [3] 19/12 29/25 122/25
stopped [2] 148/9 148/12
story [3] 17/17 70/18 75/13
straightforward [3] 8/6 16/2 46/5
strain [1] 45/2
Street [8] 1/14 1/17 1/20 1/23 2/4 2/10 2/16 2/19
strengthen [3] 30/9 69/3 76/7
strike [2] 18/2 141/13
strike-out [1] 18/2
strikes [1] 31/16
striking [1] 34/16
stroke [12] 36/9 85/15 86/17 91/13 91/19 109/4 109/19 112/15 131/9 142/17 148/6 151/6
strokes [3] 12/13 12/19 47/1
struck [9] 18/9 19/4 22/9 22/17 23/4 30/13 31/11 31/13 33/5
students [2] 118/25 161/2
studied [4] 31/19 31/21 32/14 104/6
studies [10] 22/16 27/14 28/18 28/19 30/21 30/22 37/2 76/16 95/15 111/6
study [33] 23/6 29/12 32/4 32/4 33/1 33/15 55/19 62/12 63/21 63/23 64/1 66/16 68/1 68/4 73/9 73/10 73/20 76/14 80/11 80/17 104/9 122/18 131/21 167/10 167/14 174/2 174/3 174/8 174/12 174/13 174/18 174/19 175/7
studying [2] 106/19 132/21
stuff [4] 16/15 34/1 34/2 52/22
subgroup [19] 54/18 58/19 59/17 66/20 66/24 67/5 67/6 67/8 67/19 69/17 69/18 70/1 79/15 80/8 126/20 126/21 127/2 127/2 127/13
subgroups [1] 67/6
subject [4] 5/3 11/12 50/5 162/17
subjective [1] 171/6
subjects [1] 67/9
submission [7] 35/23 50/15 50/24 51/7 52/3 53/4 56/2
submissions [1] 76/21
submit [17] 13/13 19/7 24/9 45/10 46/11 57/2 60/25 61/17 62/19 68/19 69/16 79/18 96/1 96/4 105/17 116/12 141/7
submits [1] 112/24
submitted [14] 23/14 34/6 36/12 53/5 60/7 66/25 67/24 68/4 68/6 68/18 76/13 76/18 96/16 134/21
submitting [1] 108/4
substantial [6] 84/17 87/18 91/2 91/3 94/4 94/5
substantially [2] 55/24 99/23

**S**

substantive [1] 72/13
successful [1] 97/12
such [19] 44/8 45/2 74/21 91/3 116/14
 140/17 140/22 144/7 157/4 160/15
 163/25 165/7 166/7 167/19 169/6
 169/13 170/6 171/17 171/22
sued [3] 81/12 81/12 81/16
suffer [2] 161/4 161/13
suffered [6] 7/19 12/18 12/20 121/22
 161/4 168/8
sufficient [3] 21/20 167/19 171/19
suggest [6] 19/4 25/14 54/19 55/12
 84/8 107/20
suggested [6] 17/9 25/17 47/12 48/2
 53/23 64/17
suggesting [4] 17/11 51/21 55/10
 177/10
suggestion [3] 29/10 38/13 46/12
suggests [2] 13/9 56/5
Suite [5] 1/14 1/17 1/20 2/4 2/16
sum [1] 43/3
summarize [1] 19/13
summary [18] 4/22 21/17 21/25 36/3
 71/25 72/12 72/18 72/20 112/4 124/9
 133/2 135/2 135/18 143/11 143/25
 160/6 171/23 177/12
super [1] 104/23
superiority [1] 73/19
supplant [1] 165/24
supplement [3] 50/25 52/3 52/3
supplemental [1] 53/3
supplements [1] 98/12
supply [1] 122/19
support [15] 25/2 25/19 103/18 115/7
 115/21 116/20 116/21 116/22 125/25
 132/4 155/6 155/12 156/20 157/20
 164/8
supported [3] 79/25 80/15 113/12
supporting [1] 116/19
supports [5] 116/20 117/19 117/21
 122/12 170/10
suppose [1] 70/13
supposed [4] 56/14 56/16 57/13 107/17
Supreme [11] 6/14 45/18 45/20 45/21
 45/25 46/7 48/5 49/3 60/20 61/18
 106/8
Supreme Court [10] 45/18 45/20 45/21
 45/25 46/7 48/5 49/3 60/20 61/18
 106/8
Supreme Court's [1] 6/14
sure [11] 10/21 13/2 40/3 43/14 52/19
 55/6 69/8 77/16 77/16 125/5 151/9
surely [1] 18/25
surgeon [3] 88/22 89/14 163/15
surgery [6] 22/13 121/19 157/8 170/12
 170/19 171/2
surgical [2] 162/20 171/9
surprisingly [1] 44/15
surrogate [1] 111/3
survive [3] 46/15 145/2 170/25
survived [1] 13/17
survives [1] 172/20
SUSAN [4] 2/12 95/11 134/20 174/17
suspect [1] 12/21
sustain [1] 84/4
sustained [2] 88/5 88/5
Sweeney [1] 94/23
Sweeney v [1] 94/23

swell [1] 162/22
switch [1] 174/7
switched [1] 150/22
sympathy [2] 46/1 46/4
synonymously [1] 155/17
system [4] 26/12 125/9 165/21 168/3

**T**

table [2] 84/8 150/4
tackle [1] 7/8
tailor [1] 26/18
take [41] 4/16 9/6 9/21 9/22 22/2 27/15
 27/16 45/4 50/1 52/9 65/8 80/21 81/15
 81/19 86/22 93/22 93/23 95/5 95/12
 95/25 96/3 99/12 104/20 108/9 110/1
 126/12 131/25 139/25 142/23 143/4
 144/18 147/8 147/14 148/5 152/24
 156/11 157/21 161/22 173/15 177/23
 177/23
taken [24] 63/4 74/9 77/14 82/2 82/22
 94/12 107/24 121/7 134/22 141/17
 142/5 143/14 144/25 145/5 145/14
 145/22 150/19 162/1 162/14 162/15
 162/16 166/25 167/1 168/2
takes [5] 72/5 126/6 126/17 128/10
 145/6
taking [16] 9/10 26/11 28/8 60/17 69/10
 82/18 90/21 93/6 94/5 98/12 108/14
 121/8 136/11 136/18 141/23 169/21
talk [29] 12/22 13/3 14/6 23/7 27/11
 29/2 39/18 44/1 48/20 49/5 49/16
 52/11 61/15 76/22 95/18 95/19 95/20
 96/25 96/25 97/7 97/12 102/11 106/21
 112/7 132/24 135/10 137/20 142/6
 155/1
talked [21] 24/15 24/16 27/6 29/1 30/13
 41/6 102/13 106/18 107/12 125/22
 125/24 127/1 133/25 137/11 137/13
 137/15 137/17 139/6 141/15 144/9
 178/5
talking [39] 10/16 11/6 23/11 23/12
 23/13 28/4 28/5 28/7 28/15 29/19 38/6
 40/4 47/21 54/11 70/23 71/1 75/18
 75/19 75/20 75/23 77/11 77/12 77/13
 77/14 78/9 87/21 93/17 98/5 109/8
 112/20 114/14 125/22 130/24 132/24
 132/25 139/9 146/5 148/1 174/17
talks [2] 42/16 147/24
targets [1] 110/2
task [1] 4/20
teaches [1] 99/20
teaching [1] 20/2
team [3] 62/21 92/18 157/24
technical [1] 153/14
tell [29] 26/15 30/6 31/22 38/21 45/13
 73/8 88/8 89/8 89/15 97/18 99/2 99/16
 101/4 104/2 110/2 111/24 112/11
 119/5 121/18 125/14 125/14 128/14
 128/15 129/1 136/12 148/4 153/22
 175/4 175/5
telling [8] 33/22 35/5 93/20 110/6 116/6
 135/7 137/7 173/4
tells [8] 16/21 32/21 52/18 96/6 107/17
 117/7 137/3 148/2
ten [1] 27/17
ten-fold [1] 27/17
tend [1] 116/22
tenet [2] 133/16 163/11
term [5] 114/1 114/2 155/13 155/15
 157/4

terms [7] 6/18 45/8 77/8 153/23 164/3
 168/19 168/22
test [111] 6/6 6/7 13/10 13/11 14/11
 14/21 14/25 19/19 25/9 29/7 29/13
 34/22 37/9 38/15 38/20 38/24 40/21
 41/11 49/23 54/20 54/21 84/17 87/11
 87/18 87/24 88/13 88/13 92/25 95/14
 95/21 95/23 96/7 97/16 98/7 98/16
 98/19 98/19 98/23 99/14 100/11 103/3
 103/4 103/6 103/7 104/7 104/7 104/8
 105/5 107/3 107/8 107/9 107/15
 107/17 108/2 109/2 109/14 109/16
 110/2 110/3 110/23 115/16 117/7
 118/4 119/6 119/6 119/8 119/9 121/21
 122/7 125/11 127/24 127/25 129/8
 129/8 130/2 130/6 130/15 130/19
 133/24 134/12 134/15 137/14 137/19
 139/21 139/22 140/17 140/23 141/24
 141/25 142/2 143/16 144/19 144/23
 145/10 145/22 146/5 146/7 146/15
 146/21 146/21 147/1 147/7 151/13
 162/3 164/10 165/4 165/10 166/25
 168/1 168/1 175/25
tested [4] 106/12 136/15 136/15 167/9
testified [10] 130/15 137/21 137/22
 138/13 138/16 165/9 166/3 166/5
 170/7 170/18
testifies [1] 153/7
testify [2] 84/4 100/8
testimony [37] 81/7 96/20 99/21 103/18
 106/5 117/18 118/7 118/13 124/16
 126/9 132/5 133/3 134/22 135/11
 135/14 135/16 136/25 140/16 141/9
 144/18 145/11 146/12 149/13 149/15
 151/20 151/20 156/20 163/16 165/2
 171/6 171/7 171/7 171/13 171/14
 172/12 172/19 172/20
testing [30] 18/20 38/17 39/17 40/24
 56/14 56/19 57/17 86/2 100/12 101/22
 101/25 105/4 105/17 106/10 108/1
 108/3 137/25 138/10 160/11 160/19
 163/2 164/7 164/23 165/15 169/24
 170/10 171/19 174/13 174/14 175/10
tests [20] 38/12 40/14 41/23 42/12
 42/16 96/8 97/14 97/16 98/5 99/9
 99/25 102/16 102/18 107/18 108/15
 119/19 122/12 125/15 137/14 153/21
than [37] 11/5 18/24 19/4 21/24 25/1
 26/5 27/2 32/13 48/1 48/1 69/10 69/21
 73/12 74/15 75/21 76/20 80/16 90/4
 90/8 90/18 92/24 115/4 115/19 119/13
 120/14 134/24 137/7 142/3 142/18
 144/17 149/19 151/12 151/19 156/18
 167/12 171/3 176/9
thank [25] 20/4 20/6 43/9 43/10 43/19
 50/2 57/24 57/25 70/5 78/23 80/20
 95/8 108/18 122/2 122/3 132/8 132/9
 143/12 144/3 148/19 159/25 160/2
 171/24 177/20 177/21
thanks [3] 44/21 44/21 70/6
that [1172]
that's [175] 9/17 10/8 10/14 10/15
 10/16 13/1 14/12 18/8 20/24 22/11
 23/1 23/12 23/21 24/1 24/8 24/13
 24/20 25/8 25/9 26/17 26/23 27/1
 27/18 29/7 31/4 31/16 32/14 32/22
 37/9 37/23 39/12 39/24 40/9 42/10
 42/17 45/19 48/14 50/7 50/15 50/24
 51/10 51/20 51/23 52/17 53/20 54/20
 55/18 59/9 60/4 61/1 61/17 63/14

T

that's... [123]  63/20 64/22 66/12 68/4
68/22 68/24 69/9 70/3 70/5 70/13
70/25 71/11 73/5 74/2 74/9 74/22 75/5
75/15 77/1 79/22 80/9 81/22 82/7
83/14 84/5 85/21 86/6 88/19 88/23
89/10 89/10 89/11 89/11 89/22 92/25
93/10 93/12 96/1 96/4 96/19 96/20
96/23 97/5 97/24 98/7 98/20 99/15
100/11 102/24 105/24 107/13 107/16
107/24 108/16 110/5 111/10 111/22
112/17 113/19 114/5 114/5 115/15
121/21 125/16 126/21 127/17 129/24
130/3 130/16 130/16 131/13 132/18
132/23 133/6 133/24 134/6 134/8
134/14 135/9 136/11 137/2 137/21
138/12 139/13 139/20 139/20 140/3
140/24 141/24 142/13 143/20 144/8
144/9 144/20 145/1 145/7 145/8
146/22 148/17 150/12 150/12 150/17
150/17 150/21 151/3 151/4 151/5
153/10 156/16 156/19 157/5 157/18
162/10 166/14 166/18 166/18 167/24
172/24 175/1 175/23 175/23 177/6
177/6

their [137]  5/6 9/7 10/9 10/13 10/16
13/5 20/21 20/21 21/1 22/15 22/19
23/2 24/2 24/5 24/6 24/16 24/21 24/22
25/16 26/21 27/14 28/6 28/18 28/19
31/19 33/16 33/21 34/3 34/23 35/21
36/7 37/5 37/10 38/6 38/9 38/17 39/17
40/5 40/12 40/23 59/12 64/17 71/18
74/20 74/23 78/16 78/18 81/12 81/14
81/22 82/3 83/7 83/11 83/23 83/24
84/1 84/1 84/1 84/3 84/4 84/10 84/11
84/12 84/13 84/17 86/16 86/24 87/17
88/19 89/10 89/21 90/5 90/10 90/11
90/16 90/19 90/23 91/21 91/24 91/25
92/10 92/19 93/10 96/24 99/6 103/4
104/21 106/22 108/24 110/20 111/6
111/25 112/6 112/22 112/24 113/2
113/8 115/20 117/19 117/21 117/25
118/1 118/2 118/16 118/18 119/4
119/12 124/24 125/16 125/24 127/21
128/12 130/3 130/11 132/7 134/7
134/17 144/6 144/22 145/4 146/9
146/10 146/12 147/18 148/15 148/16
149/16 152/21 153/15 153/16 156/13
156/19 157/21 158/12 163/2 166/20
166/22

them [57]  4/16 5/17 13/19 13/19 21/20
25/21 26/15 26/15 27/14 28/17 28/24
28/25 31/20 32/21 33/22 33/25 34/7
35/3 35/19 37/4 37/25 40/6 41/25
41/25 43/6 44/16 65/22 77/17 77/24
79/19 105/14 106/10 108/4 113/25
115/20 117/6 117/7 119/20 120/23
121/18 127/22 128/11 130/14 134/13
137/13 145/2 148/4 149/16 149/17
150/8 155/4 155/10 157/9 158/1
164/16 175/12 176/13

themselves [5]  7/1 8/25 19/18 19/19
100/9

then [62]  6/19 6/23 7/3 7/6 7/9 8/13
11/4 14/24 17/2 18/6 19/3 19/13 22/6
27/14 44/5 45/5 48/20 50/22 51/4
51/10 51/15 51/18 56/17 65/8 67/11
67/14 67/18 69/14 73/25 75/7 81/21
87/23 92/1 94/1 95/5 96/2 96/14 96/23

97/2 99/8 99/11 99/25 102/21 103/25
105/8 105/9 105/14 111/5 116/9
116/25 117/12 125/11 125/24 133/23
141/1 141/14 144/23 145/16 151/11
152/17 159/7 168/3

theories [4]  80/2 104/21 153/16 158/12

theory [36]  24/20 24/24 25/2 81/20
82/8 85/5 88/20 99/24 100/1 112/17
113/6 114/17 115/21 117/19 124/9
124/24 124/25 124/25 125/2 125/16
125/17 125/18 125/20 125/24 126/18
127/17 127/25 132/16 132/20 134/1
134/11 146/9 146/10 148/16 154/9
167/25

therapeutic [7]  50/11 50/13 50/18 50/21
50/25 128/7 158/23

therapy [8]  14/11 49/24 94/11 98/14
115/3 142/24 144/24 145/1

there [151]  5/22 6/3 6/11 8/11 8/17 9/8
10/18 11/13 14/3 14/24 15/7 15/9 16/1
17/6 19/7 22/9 22/16 22/20 22/20
27/17 30/20 31/7 32/2 32/5 32/7 34/8
36/5 36/13 36/18 39/22 40/7 40/24
41/5 42/13 42/19 44/10 44/25 46/12
46/15 48/8 48/13 51/12 51/17 53/2
53/22 53/25 55/10 55/18 56/5 56/5
56/16 57/7 60/17 60/19 60/20 61/1
62/5 63/14 65/7 66/11 67/8 67/10
68/18 69/7 70/15 70/17 71/13 71/24
72/6 74/23 75/8 77/2 77/3 77/17 79/17
79/21 82/10 83/8 83/8 83/9 83/9 84/21
85/17 86/18 89/22 90/25 91/6 91/11
96/5 96/8 96/10 97/8 97/13 97/14
97/25 98/13 98/17 99/6 99/9 102/11
106/4 108/22 111/3 111/8 112/7
113/21 113/25 114/23 115/6 115/25
117/3 117/8 120/2 120/16 121/23
122/7 122/15 127/20 127/21 128/2
130/25 131/20 131/23 132/4 134/25
137/2 138/8 145/13 147/1 147/2 147/4
147/19 149/4 149/17 150/1 150/5
150/8 151/5 152/8 152/21 153/10
153/12 155/5 158/22 162/2 169/15
170/23 171/13 172/19 174/14 177/8

there's [81]  10/6 32/8 32/17 33/2 34/5
37/18 38/2 38/8 39/25 41/1 42/2 49/8
57/7 59/7 59/23 60/15 63/17 65/3 68/3
75/16 81/21 82/17 84/21 85/3 85/11
88/4 90/1 90/2 91/20 94/16 95/17 97/6
97/15 97/20 99/10 99/13 102/5 103/17
103/17 105/6 105/8 105/9 105/12
105/15 106/6 109/15 111/23 114/24
115/20 117/10 117/11 117/20 117/24
118/17 120/16 121/21 122/1 122/6
122/11 122/17 126/20 127/14 129/8
130/9 130/19 131/4 131/17 132/7
135/15 135/17 136/3 138/23 138/25
139/8 141/5 148/12 153/2 156/5 156/8
172/20 174/15

thereafter [2]  109/15 112/14

therefore [10]  9/24 10/7 21/17 48/25
60/11 72/18 72/19 81/16 106/13
174/20

these [92]  5/9 6/13 6/24 8/14 8/17 8/22
12/8 13/15 14/25 25/12 25/19 27/9
28/2 30/15 30/21 31/18 32/12 34/3
35/15 36/1 36/2 37/2 37/10 38/5 40/14
42/23 44/20 45/15 46/3 46/21 47/22
48/10 50/6 55/16 57/16 59/1 66/11
69/23 71/4 77/14 81/16 81/18 83/9

83/25 84/17 86/22 87/6 87/7 87/22
89/21 90/3 91/2 92/2 93/12 94/4
99/25 102/17 103/1 104/2 105/23
107/7 107/18 110/9 111/23 113/3
113/3 113/14 113/25 114/18 118/23
119/6 119/11 119/14 120/7 120/10
121/17 122/20 125/6 126/9 126/13
139/17 143/6 153/21 157/3 158/21
164/14 165/11 165/15 167/15 174/25
175/3 175/12

they [447]

they've [2]  10/15 27/7

thigh [1]  21/22

thing [30]  9/6 9/17 9/17 38/25 42/3
42/21 44/9 48/7 55/7 70/18 78/5 85/1
85/21 87/12 87/20 90/7 91/23 104/14
115/13 116/6 116/25 118/17 129/2
130/1 130/12 132/18 135/15 141/14
175/1 177/8

things [21]  10/11 19/17 24/15 24/19
24/19 24/25 27/5 30/15 30/22 37/7
42/24 44/20 53/5 53/5 55/16 114/18
122/5 125/6 172/1 173/24 178/4

think [93]  6/10 6/11 8/6 10/10 17/13
19/1 19/9 21/10 22/7 23/10 25/12
25/17 30/15 30/17 34/12 45/7 48/3
48/17 50/1 55/3 55/9 58/21 58/25 59/2
59/6 59/9 59/11 60/1 60/15 60/23 61/2
62/5 63/11 63/19 64/17 64/22 65/11
66/19 66/20 68/8 69/6 69/9 69/14
69/22 74/13 75/3 77/10 79/7 80/13
81/10 83/12 86/13 88/7 88/16 91/1
93/2 99/5 103/12 106/18 113/11
114/19 114/20 117/15 125/1 125/4
125/5 125/16 126/8 126/14 128/18
129/21 131/4 132/17 134/20 144/6
144/10 144/17 147/17 148/3 149/5
149/14 152/12 152/18 152/19 158/15
159/25 169/16 172/7 172/10 173/8
175/14 177/19 178/4

thinking [3]  39/4 70/1 121/10

thinks [4]  64/2 66/10 66/11 70/4

thinned [1]  85/9

thinner [4]  9/20 9/20 9/21 9/22

thinners [3]  63/17 145/7 148/2

third [15]  10/4 15/18 17/11 17/24 21/11
49/12 49/12 58/15 71/23 79/8 80/22
81/2 88/16 168/23 169/16

Third Circuit [4]  17/11 71/23 79/8
169/16

third-party [1]  17/24

thirds [2]  10/4 88/15

this [517]

Thomas [1]  1/13

those [48]  6/9 6/15 10/21 10/24 11/21
11/24 12/19 13/18 16/19 16/21 18/21
20/3 24/19 25/2 28/5 36/3 44/1 45/23
51/18 53/5 58/8 59/8 65/15 67/18 79/3
94/6 100/1 101/18 103/9 105/9 105/11
108/15 109/9 109/9 113/4 122/5
133/24 136/14 136/17 143/24 149/25
155/13 155/13 155/17 155/19 156/1
159/22 178/5

though [7]  9/4 44/16 70/16 73/22 81/20
140/17 145/6

thought [4]  36/18 136/2 151/4 165/12

thousands [3]  12/17 12/17 12/18

three [21]  5/14 6/8 13/14 15/11 29/4
33/8 49/12 49/12 56/17 57/2 57/13
59/7 95/17 95/20 109/11 136/7 136/13

**T**

three... [4] 136/14 155/11 160/8 160/24
thrombin [2] 40/10 40/11
Thrombosis [1] 116/3
through [33] 8/22 34/1 38/5 42/6 44/9 50/23 52/3 52/13 52/14 53/2 56/13 62/3 66/9 82/8 86/8 89/18 93/21 95/5 98/22 101/10 106/25 110/14 125/1 125/9 127/22 128/17 128/19 143/21 147/12 150/7 153/14 153/15 158/9
throughout [6] 22/23 29/12 38/15 134/1 134/2 140/4
throwing [1] 25/22
thrown [1] 25/16
thus [1] 168/8
tied [1] 38/22
till [1] 154/19
time [71] 6/7 12/24 13/12 14/10 19/14 20/5 22/10 22/22 27/16 28/3 30/10 34/16 35/6 36/24 37/17 40/10 40/11 40/11 41/8 41/15 55/9 69/21 75/2 88/12 88/15 93/8 95/15 97/17 99/3 100/24 106/19 107/1 109/1 111/15 111/24 112/5 112/7 115/5 115/9 115/14 118/11 120/8 121/15 127/7 129/16 129/22 133/14 133/14 137/18 140/23 141/20 142/5 142/10 145/22 147/3 148/5 148/7 148/10 148/11 151/8 158/7 158/23 160/25 162/5 162/18 164/20 167/21 175/19 175/21 176/1 176/15
timeline [4] 55/15 66/21 66/23 150/13
times [18] 28/11 29/25 55/14 71/7 86/14 94/9 136/7 136/13 136/14 136/17 143/23 147/24 151/23 158/11 170/7 173/23 175/11 176/12
Timothy [1] 92/6
tipping [3] 85/14 96/5 96/6
tired [1] 43/4
to give [1] 25/6
today [36] 4/13 22/24 23/18 31/6 36/20 47/12 55/2 58/18 59/4 60/13 60/16 60/24 73/2 78/10 83/13 84/5 86/4 93/3 96/24 99/15 106/9 115/25 118/13 126/3 129/17 137/15 139/7 149/8 154/15 154/22 159/3 159/10 159/13 159/22 174/18 177/3
today's [1] 100/3
together [3] 16/21 17/17 84/19
told [21] 26/14 26/15 33/19 45/18 70/17 86/16 110/7 110/7 113/10 113/11 121/17 125/7 125/17 126/13 128/20 138/7 138/12 138/14 140/18 146/8 149/10
Toni [4] 2/18 178/9 178/16 178/16
too [28] 5/4 11/8 13/4 13/13 24/9 26/19 44/16 46/7 48/3 52/13 52/15 85/14 85/15 97/19 97/19 98/8 98/9 99/6 99/12 99/13 105/25 106/6 109/5 109/19 109/23 131/25 154/9 154/11
took [16] 26/19 35/17 59/11 60/23 77/4 86/24 93/22 99/2 99/2 120/5 145/7 145/9 151/2 161/7 167/10 169/12
tool [3] 91/6 164/19 166/22
top [8] 16/8 35/13 50/7 52/18 74/5 113/13 153/19 154/7
topic [1] 39/4
Torts [2] 155/7 168/24
total [1] 166/21

tough [4] 34/24 45/12 86/14 86/20
tout [1] 168/24
towards [3] 74/12 157/7 161/21
track [2] 30/16 30/23
traditional [2] 7/21 44/24
tragic [6] 45/22 46/3 46/4 121/7 121/14 121/22
trails [1] 93/20
transcript [4] 2/1 39/24 39/25 178/12
transcription [1] 2/23
transfer [2] 151/6 162/5
translate [1] 95/14
translates [1] 103/15
transplant [1] 167/7
transvaginal [2] 139/3 139/15
trauma [1] 77/21
treat [4] 9/17 122/10 157/20 168/11
treated [5] 73/12 117/17 147/12 151/5 177/18
treater [12] 10/7 85/6 85/18 132/5 147/15 148/17 155/14 155/15 155/16 172/2 172/8 172/23
treaters [8] 9/8 9/11 9/24 76/1 84/14 85/12 91/20 157/19
treaters/prescribers [1] 76/1
treating [10] 9/12 77/8 118/23 124/16 124/17 126/10 168/17 168/20 168/23 169/9
treatment [18] 84/23 90/4 107/4 125/8 156/16 161/14 162/21 164/25 166/4 166/8 166/10 166/16 166/20 166/23 168/7 170/14 172/21 172/21
trial [17] 5/10 22/1 58/11 58/14 62/16 64/11 65/11 67/18 72/14 79/22 93/19 104/16 110/16 110/19 126/14 126/16 136/9
trials [6] 37/10 38/18 38/21 110/20 118/1 118/1
tried [4] 32/7 34/9 44/4 149/18
trilogy [1] 6/14
Triniclot [1] 175/12
troubling [1] 128/23
trough [2] 28/9 28/21
troughs [1] 154/10
Troy [1] 113/13
true [11] 8/13 14/24 23/1 24/20 48/8 48/16 48/17 61/1 97/25 110/5 178/11
truly [1] 87/3
try [11] 38/5 43/15 43/20 47/25 74/21 108/19 126/15 143/17 150/7 158/5 173/1
trying [12] 17/17 25/21 29/20 43/14 47/24 97/10 133/14 133/15 134/7 141/1 172/15 173/11
Tulane [3] 150/16 155/20 161/1
turn [7] 6/25 13/18 59/19 62/7 66/18 87/17 126/9
turned [1] 151/20
turns [3] 124/16 149/13 177/6
Tusa [4] 2/18 178/9 178/16 178/16
tweaked [1] 45/1
twice [6] 24/25 28/15 96/18 154/9 154/10 154/13
twice-a-day [4] 24/25 28/15 154/9 154/10
twice-daily [1] 154/13
two [49] 5/14 10/4 10/11 10/20 10/20 11/21 11/21 16/21 19/10 20/11 22/9 30/18 30/20 32/18 33/4 33/4 38/14 47/13 49/9 49/16 54/24 56/22 57/8

58/12 59/4 59/15 59/23 62/5 72/6 73/2 83/8 84/11 84/7 88/19 96/9 90/25 95/19 98/23 108/21 116/23 118/9 124/4 125/6 138/19 148/25 149/17 151/13 153/2 172/1
two-prong [1] 151/13
two-step [1] 149/17
two-thirds [2] 10/4 88/15
twofold [1] 90/2
type [8] 23/13 40/6 64/20 76/20 105/4 105/21 116/13 139/16
types [1] 24/19
typically [3] 7/17 16/12 17/12

**U**

U.S [18] 47/18 47/19 58/14 58/19 59/17 66/19 66/24 67/16 67/17 67/20 70/1 75/19 79/15 80/8 106/22 115/16 126/21 153/25
Uh [3] 124/11 155/21 175/20
Uh-huh [3] 124/11 155/21 175/20
ultimate [1] 141/2
ultimately [4] 45/5 78/9 121/23 141/17
unaffiliated [1] 17/23
unambiguous [2] 63/5 66/15
unapproved [6] 13/22 14/9 19/22 19/24 39/17 49/18
unavoidably [1] 48/24
unaware [1] 137/22
uncertain [4] 89/8 157/5 157/14 157/24
uncommon [1] 24/13
under [41] 6/19 11/23 17/18 20/2 20/24 21/1 21/24 23/16 23/17 29/6 38/11 42/21 43/7 46/14 47/2 48/5 48/8 53/15 54/20 61/17 69/8 71/16 79/10 83/8 94/7 96/1 96/22 97/1 105/9 108/10 126/6 126/17 132/23 133/12 133/17 134/24 138/20 144/16 160/7 163/4 168/16
underlying [1] 79/4
underscores [1] 54/5
understand [21] 9/10 9/19 9/23 10/3 10/8 12/4 26/21 58/23 74/10 78/4 82/1 85/10 95/2 108/12 110/11 117/25 118/16 125/4 138/8 143/6 148/20
understandable [1] 151/5
understanding [1] 178/12
understands [3] 64/3 138/11 145/12
understood [1] 147/18
undertook [2] 62/14 62/20
undoubtedly [1] 11/25
unfair [1] 99/24
unfortunate [1] 157/17
unfortunately [3] 151/5 162/23 166/24
unilateral [2] 44/8 54/6
unilaterally [17] 6/18 7/2 9/3 11/18 11/23 13/20 14/7 15/22 15/24 16/4 16/8 16/14 16/25 49/18 53/18 54/4 54/14
unique [7] 18/21 27/6 27/9 38/16 66/15 69/23 82/4
uniquely [2] 14/3 17/7
unit [1] 151/6
UNITED [14] 1/1 1/10 37/24 38/16 38/22 75/17 75/22 75/23 75/24 76/2 78/20 97/10 109/17 178/10
United States [11] 37/24 38/16 38/22 75/17 75/22 75/23 75/24 76/2 78/20 97/10 109/17
units [1] 142/23

universal [1] 81/10
universe [1] 93/17
universes [1] 116/24
University [1] 28/1
unknown [6] 104/10 104/12 139/8
154/5 174/24 176/21
unless [4] 17/5 19/10 21/7 121/25
unlike [3] 90/2 90/9 107/22
unlikely [2] 144/14 144/20
unnecessarily [1] 170/13
unprecedented [1] 46/16
unprotected [1] 131/10
unquote [1] 104/23
unreasonably [4] 5/5 21/2 26/1 133/21
unreliable [1] 100/1
unsafe [1] 48/24
untested [3] 100/2 103/1 104/20
until [9] 12/8 26/12 46/21 78/17 106/25
107/20 142/22 157/10 162/24
up [50] 31/6 31/16 32/9 35/11 41/2
42/11 43/3 48/11 68/20 71/22 72/2
76/25 77/24 79/16 80/2 81/23 81/23
84/3 89/2 90/24 91/13 93/3 96/9
104/25 111/17 111/18 111/19 111/19
113/4 113/5 113/6 114/18 117/18
119/13 119/13 119/24 120/10 120/11
122/12 129/14 129/21 136/6 136/8
140/7 152/24 167/6 168/24 171/15
174/3 174/9
update [1] 30/2
updating [1] 33/24
upon [9] 12/17 12/17 24/6 53/11 81/11
133/2 168/24 170/12 171/2
upper [1] 141/22
upset [1] 150/21
Urquhart [1] 2/2
us [29] 34/6 34/24 36/12 40/10 45/18
46/1 55/3 85/5 93/20 96/6 99/15 99/20
104/2 104/20 111/24 116/19 116/20
116/20 116/21 116/22 117/4 125/1
125/18 126/6 126/13 126/14 130/24
149/10 173/4
usage [1] 162/10
Usdin [1] 2/15
use [76] 6/12 11/14 13/10 13/22 14/7
14/9 14/11 14/22 15/9 15/13 15/14
15/14 15/17 15/19 34/6 38/7 39/8
40/10 42/12 44/20 47/9 49/18 49/19
50/10 50/11 50/12 50/14 50/17 50/19
50/20 51/1 51/16 52/16 57/18 63/2 74/7
91/4 91/6 99/13 99/14 99/25 100/10
101/22 107/3 114/1 117/8 118/3
118/24 119/1 122/20 129/12 130/2
131/2 133/9 133/12 133/17 134/10
134/11 136/25 137/1 139/18 140/23
141/6 144/15 144/16 144/20 147/1
155/13 163/8 164/19 165/10 166/3
166/6 166/17 173/17 177/18
used [38] 14/16 15/8 15/15 34/7 37/10
38/15 38/17 38/20 62/8 73/5 73/8
73/24 97/4 98/19 100/14 104/8 105/7
107/9 110/19 111/2 111/6 117/6
117/17 117/25 120/6 120/7 139/23
140/15 151/4 151/16 155/23 162/19
168/21 174/19 175/11 176/15 177/15
177/16
useful [7] 37/20 115/15 115/17 116/1
116/4 125/1 170/8

usefulness [1] 137/23
user [3] 48/21 155/3 177/16
uses [1] 63/9
usher [1] 48/14
using [15] 2/23 6/5 6/7 37/19 42/18
57/17 90/18 103/4 104/10 115/14
116/10 125/11 139/17 165/13 170/2
usual [1] 128/1
utility [5] 160/10 160/18 163/2 164/23
171/19
utilize [3] 36/6 36/7 112/9
utilized [2] 35/25 88/13

V
v. [5] 70/21 71/4 155/18 169/20 177/10
validated [3] 100/12 104/9 174/20
value [12] 31/18 32/12 35/15 40/12
95/16 96/9 99/23 101/3 105/2 107/13
122/10 162/13
values [1] 99/25
variability [3] 27/9 28/13 154/4
variable [1] 9/23
variation [1] 18/10
variations [2] 28/22 120/23
various [2] 55/16 102/16
vascular [2] 92/17 158/2
verified [2] 100/12 108/3
versus [2] 24/25 28/14
vertical [1] 176/8
very [63] 10/12 13/4 15/6 18/14 18/14
21/23 22/3 22/3 23/23 26/6 26/7 29/22 31/4
37/10 38/20 43/22 44/7 44/23 46/14
49/8 50/5 55/4 55/4 55/9 57/24 59/2
59/8 60/4 70/6 71/18 74/5 74/14 88/17
94/13 94/14 97/23 98/20 98/25 111/1
114/3 115/1 116/13 118/7 118/22
121/13 129/1 130/1 132/9 143/9
143/22 144/19 153/12 153/14 154/18
158/8 159/25 161/6 161/6 162/4
163/17 163/19 163/22 172/18 177/21
viable [2] 59/2 163/4
view [11] 22/21 32/15 32/16 35/17 50/4
79/20 122/12 137/4 137/5 158/25
172/6
views [2] 59/17 61/7
VII [2] 98/6 98/10
vine [1] 54/4
Vioxx [7] 106/1 107/22 113/24 116/8
116/14 139/11 139/13
Virginia [1] 139/4
virtually [3] 76/18 147/19 176/1
virtue [1] 48/22
vis [2] 173/9 173/9
vis-à-vis [1] 173/9
visual [3] 20/18 30/14 30/16
vitamin [1] 14/16
vitamin K [1] 14/16
vitro [2] 28/3 104/7
vivo [2] 104/7 104/8
volume [1] 158/5
vomiting [3] 98/15 121/12 161/23
vote [1] 108/4

W
wait [10] 12/7 26/11 26/12 45/18 46/20
46/21 46/21 88/11 121/20 151/10
waited [2] 78/19 89/4 89/5 143/4
157/10
waiting [2] 43/12 77/24
wake [1] 7/20

walk [1] 143/21
Walnut [1] 2/7
want [45] 11/2 12/23 20/10 21/9 22/3
24/3 25/19 27/4 28/16 29/2 40/6 40/17
43/14 52/15 53/8 55/15 56/21 58/18
59/8 59/10 59/15 60/14 61/15 70/15
71/6 76/3 100/3 102/12 104/22 105/2
108/13 108/25 117/11 126/14 127/18
128/5 128/14 128/19 128/25 134/19
135/12 141/4 155/15 169/15 169/22
wanted [9] 19/2 22/25 29/21 30/14 34/3
65/21 112/20 128/2 174/8
wanting [1] 33/25
wants [2] 68/11 175/3
warfarin [25] 15/8 15/15 49/24 50/19
64/8 73/12 73/12 73/16 73/17 75/24
88/3 89/24 90/2 90/3 90/8 90/9 90/15
90/18 92/15 109/6 109/11 131/17
131/22 131/24 143/17
warfarin-like [1] 109/11
warn [36] 5/16 6/4 7/10 7/18 12/3 13/4
13/16 13/17 20/21 24/21 24/22 29/2
29/4 38/24 43/23 43/25 49/10 56/25
62/7 86/6 124/25 132/23 132/25
133/12 133/18 139/7 139/21 149/18
151/13 151/15 151/16 155/2 159/20
172/1 172/2 177/14
warned [3] 86/12 86/13 156/15
warning [19] 16/2 21/22 29/6 30/9
48/21 58/16 59/3 71/13 72/22 72/24
76/8 139/8 153/1 153/3 153/4 153/8
169/1 172/15 172/17
warnings [17] 10/15 10/19 10/25 11/1
12/24 13/8 30/4 34/20 41/20 42/10
42/21 49/1 49/5 49/6 58/2 133/10
169/4
warnings-based [5] 10/15 10/19 10/25
11/1 49/1
warns [2] 37/12 51/22
warranted [6] 60/10 62/22 63/3 74/8
74/15 75/2
was [267]
wasn't [7] 40/15 61/6 120/24 137/1
138/14 143/15 151/9
water [1] 48/19
way [50] 7/23 25/21 28/25 35/6 37/4
37/18 38/2 43/17 45/2 45/15 49/7
55/11 55/11 57/16 67/11 68/10 68/19
68/21 68/22 82/17 87/10 87/10 87/17
88/6 88/8 89/5 101/19 111/7 111/18
115/9 116/16 117/8 120/2 120/20
121/2 121/21 125/3 127/20 128/2
129/8 136/16 140/6 140/19 140/20
141/5 143/20 144/12 148/22 153/10
156/5
ways [5] 33/8 66/15 138/19 153/2
153/14
we [331]
we're [2] 61/4 148/21
website [1] 66/8
weeds [1] 49/7
week [1] 40/9
weeks [1] 109/11
weigh [1] 136/1
weight [1] 105/20
well [77] 22/24 23/21 23/23 24/20
33/14 33/17 37/9 38/8 47/6 47/12
53/23 59/17 62/19 62/19 63/19 64/17
65/11 65/13 65/17 66/2 66/4 71/2
71/11 72/2 73/9 73/20 74/2 75/25 77/5

well... [48]  79/14 79/16 81/19 83/2
84/14 86/3 86/12 86/13 87/4 88/17
94/11 96/24 101/18 103/10 103/13
104/2 104/15 110/5 111/14 111/15
116/24 117/10 117/11 119/3 119/5
121/16 126/11 126/24 128/1 128/1
128/4 128/17 128/24 129/25 130/12
131/16 131/17 141/5 143/16 143/22
144/6 144/9 147/11 147/12 147/23
161/24 172/9 178/5
well-briefed [1]  144/9
well-controlled [1]  75/25
well-done [3]  128/1 128/17 143/22
well-known [1]  86/13
went [15]  54/5 79/19 90/24 109/24
134/23 142/24 144/12 144/17 145/22
145/23 151/2 153/14 153/15 154/19
174/15
were [74]  5/3 8/14 10/16 12/9 17/17
21/24 22/9 23/11 26/21 30/19 30/20
30/21 33/9 33/19 39/19 44/16 46/22
48/16 48/17 48/18 51/17 60/24 63/24
64/4 64/11 70/17 70/24 70/25 73/11
73/12 73/14 74/5 77/2 77/3 77/11
77/13 77/14 77/14 79/10 81/15 86/23
87/8 87/23 88/17 90/4 102/14 103/4
103/5 104/23 106/19 118/12 118/19
119/19 125/22 131/11 134/5 136/3
137/3 139/17 140/23 140/24 145/20
146/25 151/25 151/25 152/2 161/13
166/3 166/6 166/7 168/20 175/9
175/17 176/7
weren't [3]  26/14 30/22 94/5
West [1]  139/4
West Virginia [1]  139/4
Westlaw [1]  72/2
what [243]
what's [13]  30/16 30/17 57/4 60/1
62/18 66/20 80/3 93/2 95/18 95/19
114/5 131/7 138/11
whatever [8]  5/8 8/3 40/6 40/17 67/12
68/24 110/4 140/13
whatsoever [1]  154/7
when [69]  10/25 11/6 12/17 12/21 15/7
16/21 22/7 25/18 27/16 27/16 29/25
36/15 36/17 50/16 55/16 55/18 57/11
57/18 61/10 61/15 61/16 63/7 68/8
68/15 73/16 79/16 80/3 81/21 83/24
83/25 84/3 94/10 85/22 86/11 89/6
91/2 93/8 94/18 95/15 96/9 98/20 99/1
99/2 103/5 105/6 106/6 108/14 111/4
111/22 120/17 120/19 125/20 126/7
132/24 134/23 135/1 135/2 135/13
135/21 140/3 143/5 150/6 150/16
150/17 150/17 152/12 161/22 162/14
164/14
Whenever [1]  140/1
where [68]  6/20 23/13 26/21 28/19
29/19 30/5 32/14 34/9 39/19 45/9
48/21 51/6 54/25 56/5 56/15 58/1
60/17 60/20 61/4 61/19 63/11 63/11
63/18 64/16 66/15 68/8 68/20 69/7
70/2 70/13 70/17 74/2 77/1 79/5 82/2
85/14 89/23 93/16 99/23 100/5 103/23
104/20 109/16 113/24 115/18 119/22
126/6 126/11 129/13 131/13 143/13
144/14 148/1 149/3 149/16 150/1
150/12 150/12 151/3 151/4 153/4

whereas [2]  11/10 46/15
whether [50]  6/17 12/2 34/19 41/23
54/21 55/23 61/12 61/13 61/23 62/1
72/20 72/22 75/16 79/19 79/20 85/19
88/24 91/7 92/11 95/12 95/25 96/18
100/20 101/11 106/24 110/24 114/1
117/6 132/18 134/9 134/15 136/10
151/9 152/22 153/9 159/24 162/12
163/18 163/24 164/1 164/24 165/6
166/15 167/20 170/8 171/10 171/20
172/1 173/18 175/3
which [62]  10/14 10/19 12/11 13/12
14/8 16/22 20/21 21/19 22/13 28/3
40/7 44/5 45/23 48/23 49/22 52/6
53/11 53/15 53/16 59/19 65/19 66/19
70/21 71/12 72/10 73/5 74/20 76/14
76/15 77/9 81/11 82/2 86/8 87/9 101/3
102/8 105/4 109/11 110/22 113/6
114/15 117/24 121/2 122/9 133/4
139/2 139/25 145/22 151/14 151/15
151/18 161/16 161/18 164/9 165/6
165/10 166/22 167/5 168/24 170/1
175/16 176/18
while [4]  98/17 135/20 143/4 174/6
white [1]  17/20
Whitecloud [2]  155/19 155/22
Whitener [3]  124/14 126/7 147/16
who [28]  11/4 12/18 22/14 33/22 36/3
37/19 40/4 44/20 70/25 73/11 84/23
92/6 101/14 101/16 101/17 102/6
103/12 146/24 157/19 163/23 164/16
167/10 168/17 169/7 173/3 173/4
173/11 177/15
whoever [1]  50/2
whole [6]  70/18 77/4 83/14 104/14
127/16 130/1
why [26]  19/12 25/9 25/9 32/6 33/17
34/11 47/23 74/10 78/10 84/5 84/16
93/2 95/20 96/21 97/18 107/7 109/3
110/12 113/23 121/20 122/22 138/7
143/24 143/24 145/9 172/25
wife [1]  160/24
wild [1]  130/19
will [90]  4/14 4/16 5/15 5/17 6/24 7/9
10/19 11/4 12/4 12/22 12/25 13/18
13/23 17/2 18/1 19/8 19/12 20/4 20/18
22/7 22/19 23/7 24/17 31/7 39/16 41/2
48/9 48/13 48/20 49/1 49/8 49/21 55/7
55/15 59/4 59/5 59/12 60/9 61/8 70/8
77/12 80/22 81/23 84/6 84/10 85/25
86/4 86/8 87/1 87/2 89/1 94/1 94/1
95/5 97/14 98/24 98/24 98/25 109/20
113/12 117/5 117/12 119/7 119/24
120/1 121/25 125/5 127/21 128/4
135/10 135/20 138/8 144/2 149/4
149/14 149/20 150/7 150/11 150/13
151/8 152/24 153/22 154/10 156/11
158/22 174/9 175/4 175/9 177/24
178/5
window [1]  79/17
Winstead [1]  90/13
withdrawn [1]  144/23
within [69]  30/19 51/17 65/10 65/11
65/16 86/6 166/14 169/16 171/14
without [27]  6/21 7/2 8/15 22/5 21/19
15/22 30/10 39/20 43/1 44/9 45/15
47/22 48/19 49/3 54/9 54/16 59/22
76/9 87/19 88/1 91/4 92/4 93/11

woman [1]  160/24
women [1]  48/10
won't [3]  53/2 97/3 104/24
wonder [2]  20/9 32/6
wonders [1]  20/8
Wong [55]  92/8 105/10 119/7 124/17
125/1 125/17 126/2 126/16 126/24
128/4 128/21 129/9 129/15 129/24
129/25 130/7 130/15 130/22 131/4
131/6 131/9 131/16 132/2 134/6 134/9
135/4 135/20 136/6 136/12 136/18
136/21 137/21 137/22 138/11 138/15
140/8 140/15 142/1 142/4 142/20
142/21 143/1 143/8 144/7 144/17
144/25 145/5 145/24 146/12 146/16
146/15 146/17 147/4 147/7 147/23
Wong's [4]  133/2 142/15 145/11 148/7
woodshedded [1]  125/19
woodshedding [1]  124/20
word [3]  143/23 152/22 155/16
worded [1]  21/22
words [4]  30/15 60/2 60/17 112/10
work [1]  72/4
working [2]  88/17 155/19
works [4]  9/20 9/21 9/23 140/7
workup [1]  72/4
world [12]  21/16 41/22 47/16 75/8
89/13 93/16 99/15 103/12 110/6
116/22 137/7 143/20
worse [3]  90/17 91/16 126/9
worst [1]  162/15
worth [1]  48/10
would [287]
wouldn't [31]  12/13 12/16 30/13 37/13
47/1 54/19 63/20 85/6 86/9 93/24
128/2 128/19 130/12 131/18 131/19
136/25 137/1 137/4 144/13 154/12
163/15 170/17 170/19 172/8 172/13
172/16 172/17 173/4 173/6 173/11
173/16
wrap [1]  41/2
wrestling [1]  148/25
write [5]  44/4 74/14 75/4 75/5 103/20
writes [1]  36/4
writing [1]  106/20
written [4]  149/12 149/13 151/12
152/24
wrong [8]  45/10 47/4 109/25 115/22
118/16 118/20 125/5 134/8
wrote [4]  124/13 126/8 151/18 151/20
Wyeth [12]  21/4 21/14 21/24 23/2
29/22 60/17 70/21 70/23 71/4 71/5
71/16 79/3
Wyeth v [1]  29/22
Wyeth v. Levine [2]  70/21 71/4
Wyeth's [1]  72/15

## X

Xa [24]  5/21 6/6 7/13 8/2 8/11 8/24
10/14 10/21 11/11 13/8 14/17 14/19
14/20 26/4 26/18 37/8 42/17 42/18
42/23 44/7 47/17 47/19 56/23 82/11
Xa assay [6]  5/21 6/6 7/13 8/2 8/11
82/11
XARELTO [193]
Xarelto's [10]  5/3 6/4 7/17 7/22 13/21
13/25 15/19 19/25 84/23 162/19
Xarelto-calibrated [1]  26/4

X

Xarelto-specific [1]  8/11
Xarelto-treated [1]  117/17

Y

y'all [1]  9/5
Yale [1]  115/1
Yates [4]  23/17 23/17 23/24 24/4
Yeah [3]  77/25 114/13 172/7
year [3]  77/4 109/14 160/23
yearly [1]  112/14
years [15]  12/16 12/17 47/1 57/21
 67/24 68/9 69/10 69/19 90/24 97/12
 106/17 124/15 148/25 155/19 161/12
yes [28]  7/3 20/14 23/19 43/13 43/16
 68/7 70/11 78/25 83/19 85/24 89/4
 89/20 95/8 111/3 117/8 124/22 126/5
 132/13 135/7 141/3 152/4 157/18
 158/18 158/20 159/5 173/8 176/11
 178/2
yesterday [3]  17/10 20/12 21/6
yesterday's [1]  71/22
yet [5]  12/15 19/22 19/23 102/10 150/2
yikes [6]  130/22 130/22 131/16 132/2
 147/21 148/8
you [483]
you're [6]  43/4 82/4 86/25 111/21 116/5
 125/10
you've [2]  116/8 118/13
Young [4]  20/15 23/17 24/4 43/8
your [272]
your Honor [225]
Your Honor's [1]  11/2
yours [1]  87/3
yourself [1]  6/25