UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: *Boudreaux v. Bayer Corp., et al.* Case No. 2:14-cv-02720 | * * * | JUDGE ELDON E. FALLON |
| | * | MAGISTRATE JUDGE NORTH |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE AND
ARGUMENT REGARDING MARKETING, ADVERTISING, OR PROMOTIONAL
MATERIALS NOT RELIED ON BY PLAINTIFF'S PRESCRIBING PHYSICIAN**

**I.    INTRODUCTION**

Defendants base their motion *in limine* No. 2 (Rec. Doc. 5933) on a faulty premise – that Mr. Boudreaux's prescribing physician had not "read or relied on *any* marketing, advertising, or promotional materials in deciding to prescribe Xarelto"[1] – and fail to recognize the pervasive effect of their marketing on many other means of obtaining information about Xarelto.  As discussed in further detail below, Defendants' motion should be denied.

**II.   ARGUMENT**

**A.    Dr. Wong was directly exposed to and influenced by Defendants' marketing, advertising, or promotional materials.**

Dr. Wong never listed the materials on which he relied in deciding to prescribe Xarelto. He instead answered yes or no in response to questions asking if he relied on particular types of information.  For example, Dr. Wong was asked if he became familiar with Xarelto from detail

---

[1] *See* Defendants' Joint Motion in Limine No. 2 to Exclude Evidence and Argument Regarding Marketing, Advertising, or Promotional Materials Not Relied on by Plaintiff's Prescribing Physician, at 4.

1

representatives, and he said yes.[2]  He was asked if he obtained information from or relied on pre-approval regulatory documents, updated regulatory documents, the label, and the fact of FDA approval, and he said yes.[3]  He was asked if he relied on published medical literature, what he learned at CME conferences, information from his colleagues, and his own experience and judgment, and he said yes.[4]

Dr. Wong, however, was never asked if he relied on *Defendants'* marketing, advertising, or promotional materials.  He was asked only if his prescribing decisions have been impacted by *lawyer* advertising, and he said no.[5]  However, the available record, based on Defendants' own intent and research, demonstrates that Dr. Wong must have relied on, or, at a minimum, been influenced by – consciously or unconsciously – Defendants' advertising.

Janssen's Product Director for rivaroxaban/Xarelto, Paul Herman, who was involved with consumer and patient marketing,[6] testified that Janssen's research showed that its consumer marketing also was reaching healthcare providers.[7]  Its research further showed that healthcare providers were recalling the key messages that Xarelto was a once-a-day drug that did not require blood monitoring, and Janssen felt this was a positive thing.[8] Specifically, Mr. Herman testified as follows:

---

[2] *See* Exhibit 1, Deposition of Kenneth Wong, MD ("Wong Dep."), at 17:20-18:8.  Dr. Wong clarified that he views what he is told by detail representatives in combination with his own independent medical judgment and assessment of the risks and benefits.  *Id.* at 142:20-144:23.

[3] *Id.* at 32:17-18, 37:12-18, 64:22-65:12, 96:12-18.

[4] *Id.* at 96:24-97:16, 145:2-5.

[5] *Id.* at 145:6-11.

[6] *See* Exhibit 2, Deposition of Paul Herman, at 73:14-16, 74:1-9.

[7] *Id.* at 647:14-648:7.

[8] *Id.* at 648:8-649:12.

Q: And you knew – you know, also, do you not, that physicians are exposed to your direct-to-consumer advertising, correct?

A. Yes, we believe that to be true.

Q. You actually did market research to make sure that they see and what messages physicians were getting from your direct-to-consumer marketing, right?

A. At some point in time, I believe we did that. I don't recall if that was under my leadership or that was under someone else's leadership on the team. But I do believe we asked that question in some research that was going to healthcare providers, yes.

Q. And the result of that research was that physicians were also recalling from your marketing, your advertising to consumers, that the key message is that Xarelto was a once-a-day drug, right?

A. Yes.

Q. And that you didn't need blood monitoring, there was no blood monitoring with Xarelto, correct?

A. Again, I'd need to see the research. But I do believe off the top of my head that physicians – physicians, who are consumers as well, and viewers of television, I believe they took away those messages as well.

Q. All right. I'll get to that research in a moment.

A. Okay.

Q. But physicians are consumers, and they're exposed to their ads – and your ads have some influence over them, correct?

A. We know – we were pretty sure that physicians were aware of our advertising as they were viewing it in their own homes. And so, yes, and we were – we felt that was a positive – that was a positive thing.[9]

Therefore, based on the Defendants' own evidence, it is fair and reasonable to assume that Dr. Wong had been directly exposed to and influenced by Defendants' marketing and advertising.

---

[9] *Id.* at 647:14-649:12.

**B.     Dr. Wong was indirectly exposed to and influenced by Defendants' marketing, advertising, or promotional materials.**

As noted above, Dr. Wong also obtained information about Xarelto from Defendants' detail representatives.  In fact, Dr. Wong was targeted quite aggressively, receiving at least 126 communications about Xarelto from four detail representatives between November 14, 2011 and April 29, 2015, which averages about three communications every single month for a three-and-a-half-year period.[10]

Those communications were based on company-approved materials,[11] and highlighted Xarelto's efficacy, safety/tolerability, and patient friendliness, the latter of which encompasses once-daily oral dosing, no routine monitoring or coagulation parameters, and no dose adjustments.[12]  These three messages are consistent with the key marketing plan that has been in place for Xarelto from the start, and are emphasized when detail representatives try to distinguish Xarelto.[13]  One representative who detailed Dr. Wong, Brent Futrell, confirmed that he would have communicated that there is no routine laboratory study to test for Xarelto, because the company told him there is no ability to measure.[14]  In fact, as of his deposition, Mr. Futrell still was not aware of a way to obtain a measurement, or of any efforts to develop a way to obtain a measurement.[15]

---

[10] *See* Exhibit 3, Janssen Amended Defendant Fact Sheet (06/01/2016), at p.4 and XARELTO_JANSSEN_ BOUJOS000000004-000000159.

[11] *See* Exhibit 4, Deposition of Brent Futrell, at 33:3-34:21, 36:19-37:7, 53:5-8.

[12] *Id.* at 42:12-43:11, 46:13-47:1.

[13] *Id.* at 43:12-25.

[14] *Id.* at 47:2-9, 152:8-15, 163:14-25

[15] *Id.* at 152:16-19, 164:1-14, 190:25-191:8.

Additionally, as also noted above, Dr. Wong obtained information about Xarelto from his colleagues and CME conferences. It is fair and reasonable to assume that at least some of those colleagues or presenters, the latter of whom would have been trained by Defendants and would have used company-provided materials, must have been exposed to or influenced by Defendants' marketing materials, and passed on information obtained through those marketing materials.

In light of this, even if Dr. Wong was not directly exposed to Defendants' marketing materials, he likely would have been indirectly exposed to the information from them through at least some of the 126 communications he had with Defendants' detail representatives, his interactions with his colleagues, and/or his attendance at CME events. The cumulative, and intended, effects of this marketing on a physician who prescribes Xarelto is clear; and, whether he realizes it or not at this point, it is fair and reasonable to infer from the evidence that Dr. Wong, like other prescribers exposed to this marketing, took home the takeaway message, as reflected in his sworn testimony that "[t]here was no increased risk that the dose they were recommending had – was safe. That's the studies. That's what was presented to us. That is – so the doses were pretty standard and that there was no need to monitor those levels because they were safe."[16] Thus, Defendants' marketing materials are relevant and should be admitted.

C.     **Rule 403 does not justify exclusion of Defendants' marketing, advertising, or promotional materials.**

"'Unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party." *Dollar v. Long Mfg.*, 561 F.2d 613, 618 (5th Cir. 1977). "Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *Id.* "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See* Fed. R. Evid. 403, Notes of Advisory Committee

---

[16] *See* Exhibit 1, Wong Dep., at 47:1-6.

on Rules. "[B]ecause Rule 403 operates to exclude relevant evidence, application of the rule must be cautious and sparing." *Brady v. Fort Bend County,* 145 F.3d 691, 715 (5th Cir. 1998) (citations and internal quotations omitted).

It is true that evidence about Defendants' marketing may be prejudicial against Defendants because it will show that Defendants failed to instruct about the advisability of measuring, and the ability to measure, the anticoagulant effect of Xarelto in a particular patient using Neoplastin PT. In fact, it will show that Defendants took this one step further and said there was no need or ability to take such measurements, even though they knew otherwise. But whether evidence is unfavorable or prejudicial to Defendants is not the question. The question is whether it is *unfairly* prejudicial to an extent that outweighs its probative value, i.e., its tendency to establish the inadequacy of Defendants' instructions for safely using Xarelto. This evidence is more probative than unfairly prejudicial. Indeed, the prejudice is not unfair at all. This evidence is material, not collateral, and will cause no confusion, distractions, or delays. It should be admitted.

Defendants have cited a handful of opinions in which marketing evidence not directly seen was precluded; however, only the last three of those cited cases involved learned intermediaries, and all of those three are non-binding decisions from other district courts. District courts can, and have, come to different conclusions.[17] Additionally, it should be noted that after filing a similar motion in a past case, Bayer withdrew the motion.[18]

---

[17] *See, e.g.,* Exhibit 5, *In re: Vioxx Prods. Liab. Litig. (Dedrick v. Merck & Co., Inc.*), No. 05-cv-2524, slip op., at ¶ 9(h) (E.D. La. Nov. 22, 2006) (Judge Fallon) (denying motion to preclude "[m]arketing and promotional materials unrelated to Mr. Dedrick or his prescribers").

[18] *See In re Yasmin & Yaz (Drospirenone) Mktg.,* No.09-md-2100, 2011 U.S. Dist. LEXIS 147935, at *18 (S.D. Ill. Dec. 22, 2011) (noting withdrawal by Bayer of Sealed Motion in Limine No. 15 to Exclude Evidence and Argument Regarding Irrelevant Marketing and Related Materials).

### III. CONCLUSION

For the reasons set forth above, Defendants' motion should be denied.

Dated: April 12, 2017

Respectfully submitted,

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
*HERMAN, HERMAN & KATZ, LLC*
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
*GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC*
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

/s/ Leonard A. Davis
**LEONARD A. DAVIS**