UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: *Boudreaux v. Bayer Corp., et al.* Case No. 2:14-cv-02720 | * * * | JUDGE ELDON E. FALLON |
| | * | MAGISTRATE JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION IN LIMINE NO. 8 TO EXCLUDE
EVIDENCE AND ARGUMENT REGARDING THE SEPTEMBER 2015
XARELTO LABEL AND/OR RELATED CORRESPONDENCE**

**I.   INTRODUCTION**

Defendants have overreached in their motion *in limine* No. 8 (Rec. Doc. 5935) regarding the testimony of Mr. Boudreaux's prescribing physician, the prior label language considered and rejected by the FDA, and their citations to allegedly supportive case law. Contrary to what Defendants have claimed, it is *not* clear whether Dr. Wong would have changed his prescribing decision if he had been presented with information about U.S. data from the September 2015 label; the FDA did *not* consider and reject the inclusion of information about U.S. data in the pre-approval label; and the cases cited by Defendants did *not* reject the presentation of post-injury labels at trial to establish something other than causation. As discussed in further detail below, Defendants' motion should be denied.

1

## II. ARGUMENT

### A. Dr. Wong might have changed his prescribing decision if he had been presented with information about U.S. data from the September 2015 label.

Defendants contend that Dr. Wong "clearly testified that subgroup information was a statistic that would not have affected his decision to prescribe Xarelto to Mr. Boudreaux."[1] It is true that in one area of his deposition, after being asked leading questions about the alleged lack of statistical significance of the U.S. data, Dr. Wong agreed with defense counsel's assumption that he would not have altered his prescribing decision if he had been presented with that information. He provided this testimony in response to additional leading questions:

> Q. If you go down to the note that's right underneath this figure, it reads: The 95 percent confidence limits that are shown do not take into account how many comparisons were made nor do they reflect the effect of a particular factor after adjustment for all other factors. Did I read that right?
>
> A. Yes.
>
> Q. And what does that mean in your own words?
>
> A. It's just a purely statistic number.
>
> Q. Right.
>
> A. Yes.
>
> Q. So you understand that when you break a set of data into subgroups like this, there could be results that are a function of chance due to the fact that you are doing multiple comparisons, right?
>
>     MR. BIRCHFIELD:
>     Object to form.
>
> THE WITNESS: Yes.

---

[1] *See* Defendants' Joint Motion *in Limine* No. 8 to Exclude Evidence and Argument Regarding the September 2015 Xarelto Label and/or Related Correspondence ("Def. Motion"), at 2; *see also id.* at 3-4.

EXAMINATION BY Ms. DuPONT:
Q. And this subgroup data that is in the label in September of 2015, it doesn't alter your fundamental understanding that there was a risk of serious and fatal bleeding from Xarelto, does it?

A. No.

Q. If this subgroup data had been available to you at the time you prescribed Xarelto to Mr. Boudreaux, it would not have altered your prescribing decision, would it?

MR. BIRCHFIELD:
Object to form.

A. THE WITNESS: Yes.

EXAMINATION BY MS. DuPONT:
Q. It would not have altered your prescribing decision, correct?

A. No.

Q. If this had been available to you at the time you prescribed it to Mr. Boudreaux, it would not have altered your discussion with Mr. Boudreaux about Xarelto?

A. No.

Q. And have your risk benefit discussions changed as a result of this subgroup data in the label for any of your patients?

A. No.[2]

However, when he was later asked non-leading questions by Plaintiffs' counsel,[3] Dr. Wong acknowledged the importance of the U.S. data that was included in the September 2015 label:

Q. Doctor, if you look at for U.S., the difference in the major bleeds is what percentage? 1.5, do you see that, 1.50?

A. Yes.

---

[2] *See* Exhibit 1, Deposition of Kenneth Wong, MD ("Wong Dep"), at 110:19-112:19.

[3] Another attorney for Plaintiffs had met with Dr. Wong for about 45 minutes prior to his deposition. *Id.* at 61:6-15. By contrast, through their detail representatives, Defendants had met with Dr. Wong an average of three times per month over a three-and-a-half-year period *See* Exhibit 2, Janssen Amended Defendant Fact Sheet (06/01/2016), at p.4 and XARELTO_JANSSEN_BOUJOS000000004-000000159 (showing Dr. Wong had received at least 126 communications about Xarelto from four detail representatives between November 14, 2011 and April 29, 2015).

> Q. And, Doctor, is the 1.50, that would represent a 50% increase from major bleeds in the Xarelto arm versus the Warfarin arm; is that correct?
>
> A. Yes.
>
> Q. And can you tell from this label whether that is statistically significant or not?
>
> A. I would have to ask the statistician for me to tell me that, because it's part of a subset of a study. But just, if you look at just the one line like this, yes.
>
> Q. Doctor, that information that pertains to the U.S., the patients from the U.S. in the ROCKET study, that was not included in the label that was in effect when you prescribed this or when – in January of 2014; do you recall that?
>
> A. I don't know.
>
> Q. If there is a 50 percent increase in risk for major bleeds on Xarelto versus Warfarin, would that be important information for you to consider in prescribing Xarelto?
>
>> MS. DuPONT:
>> Objection.
>
> THE WITNESS: Yes.[4]

Thus, genuine issues of material fact persist regarding whether this information that Dr. Wong believes is important would have affected his prescribing decision, especially when cumulatively considered along with the other information that was not disclosed about the advisability of measuring, and the ability to measure, the anticoagulant effect of Xarelto in a particular patient using Neoplastin PT, and about the INRatio recall.

---

[4] *See* Exhibit 1, Wong Dep., at 181:15-182:20.

### B. The information about U.S. data from the September 2015 label is admissible for the purpose of establishing the feasibility of precautionary measures.

Defendants claim multiple times throughout their brief that they could not have included the U.S. data from the September 2015 label in their pre-approval label because the FDA already had considered, and rejected, that inclusion prior to approving the initial label for Xarelto. This is simply not true. Defendants only proposed information about North American patients in ROCKET – data that, while less favorable to Xarelto from a safety perspective, still showed non-inferiority to warfarin. It is the U.S.-only data that shows Xarelto is inferior to warfarin for U.S. patients in ROCKET, and there is no evidence that anyone from the FDA considered, much less rejected, any proposal to include that U.S.-specific bleeding data in the Xarelto label until on or about January 2014, when the FDA asked Defendants to include it in the label. In fact, at least one FDA reviewer suggested back in October 2011 that the U.S. data should be included in the label.[5]

Additionally, it is doubtful that the September 2015 label and its related correspondence constitute evidence of subsequent remedial measures, since Defendants had not initiated the label change.[6] Even if this evidence were considered to reflect a subsequent remedial measure, however, Federal Rule of Evidence 407 considers such evidence admissible for purposes other than

---

[5] *See* Exhibit 3, Cross Discipline Team Leader Review, at 16, 21. For a more detailed discussion of this point, see Exhibit 4, Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn Claims, at 6-8, 13-18.

[6] *See In re Yasmin & Yaz (Drospirenone) Mktg.*, No. 09-md-2100, 2011 U.S. Dist. LEXIS 147935, at *21-22 (S.D. Ill. Dec. 22, 2011) (allowing evidence of corrective action taken after being asked by the FDA to take that action, noting that "[t]his distinguishes the Rule 407 procedure where a party, of its own accord, seeks to eliminate a harmful situation, once it learns of its existence, in order to prevent further harm"); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978) (holding that invoking Rule 407 to exclude evidence of subsequent steps is inappropriate where the steps are taken as a result of requirements from a superior authority, explaining that such steps are taken "not out of a sense of social responsibility but because the remedial measure was to be required in any event by a superior authority," and that "the rule of exclusion is based on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of adding safety").

establishing causation, such as for the purpose of establishing the feasibility of precautionary measures.[7] That is precisely the purpose for which the evidence of the September 2015 label and related correspondence would be submitted. That also is why none of the cases cited by Defendants in support of excluding subsequent label changes is applicable, since the evidence in those cases had not been offered to support disputed feasibility, but instead had been presented to support causation.[8]

      **C.**    **Rule 403 does not justify exclusion of information about U.S. data from the September 2015 label and its related correspondence.**

"'Unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party." *Dollar v. Long Mfg.,* 561 F.2d 613, 618 (5th Cir. 1977). "Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *Id.* "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See* Fed. R. Evid. 403, Notes of Advisory Committee on Rules. "[B]ecause Rule 403 operates to exclude relevant evidence, application of the rule must be cautious and sparing." *Brady v. Fort Bend County,* 145 F.3d 691, 715 (5th Cir. 1998) (citations and internal quotations omitted).

It is true that evidence about the September 2015 label may be prejudicial against Defendants because it will show that it was feasible to include information about the U.S. data from ROCKET in the label. While this evidence is unfavorable to and prejudicial against

---

[7] *See, e.g., Terry v. McNeil-PPC, Inc. (In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.,* 181 F. Supp. 3d 278, 301-302 (E.D. Pa. 2016) (allowing presentation of post-death label changes to support the claim that an earlier label change had been possible).

[8] *See Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 270 n.10 (5th Cir. 2002) (offered as evidence of inadequacy); *Guilbeau v. W.W. Henry Co.,* 85 F.3d 1148, 1171 (5th Cir. 1996) (offered for purposes unrelated to feasibility or impeachment); *Werner v. Upjohn Co., Inc.,* 628 F.2d 848, 853 (4th Cir. 1980) (offered as evidence of negligence); *DeLuryea v. Winthrop Labs.,* 697 F.2d 222, 229 (offered to establish liability).

Defendants, it is not unfairly so.  None of Defendants' alleged bases for confusion[9] will exist because: (1) as shown above, the FDA had not previously considered and rejected inclusion of this U.S. data; (2) Defendants can present the FDA request for inclusion of the data, to show that neither the FDA nor Defendants had said the prior label was inadequate; and (3) context can readily and efficiently be presented.  In sum, this evidence is relevant and probative, not collateral.  It will cause no confusion or delays, and should be admitted.

Defendants have cited a handful of opinions in which subsequent measure evidence was deemed inadmissible under Rule 403; however, as with the cases barring evidence under Rule 407, none of those cases involve evidence offered to support disputed feasibility.[10]

### III.    CONCLUSION

For the reasons set forth above, Defendants' motion should be denied.

Dated:  April 12, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

---

[9] *See* Def. Mem. at 9-10.

[10] *See Curtis v. M&S Petroleum, Inc.,* 174 F.3d 661, 672 (5th Cir. 1999) (offered as evidence of negligence); *Mills v. Beech Aircraft Corp.,* 886 F.2d 758, 763 (5th Cir. 1989) (offered as admission of a design defect); *Grenada Steel Indus., Inc. v. Alabama Oxygen Co.,* 695 F.2d 883, 889 (5th Cir. 1983) (offered in relation to actions taken by a third-party where feasibility was not in dispute); *Randle v. Tregre,* 147 F. Supp. 3d 581, 598 (investigative conclusions offered on the merits).

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER**
**& WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**