UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| ***Boudreaux v. Bayer Corp., et al.*** | * | JUDGE ELDON E. FALLON |
| **Case No. 2:14-cv-02720** | * | |
| | * | MAGISTRATE JUDGE NORTH |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' OMNIBUS MOTION IN LIMINE NO. 1**

---

## I.      INTRODUCTION

Defendants' Omnibus Motion *In Limine* No. 1 (Record Doc. 5955) overreaches by asking this Court to exclude an abundance of evidence that is unquestionably relevant to this litigation, highly probative of Plaintiffs' claims, and not unduly prejudicial.  The evidence is admissible for a variety of reasons, including to demonstrate notice, knowledge, bias, financial motives, duties under the Louisiana Products Liability Act ("LPLA"), § 9:2800.51, *et seq*., and breaches of those duties.  Additionally, Defendants' motion overstates what are, at most, minimal prejudicial effects that might result, which could be effectively prevented through the use of limiting instructions. Accordingly, and as discussed in further detail below, Defendants' motion should be denied.

## II.     LEGAL STANDARD

While neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure "explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."[1]

---

[1] *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

Per stipulation and order,[2] Plaintiffs are pursuing two claims under the LPLA: design defect and failure to warn. To establish those claims, it must be shown by a preponderance of the evidence that "the product is unreasonably dangerous in design as provided in R.S. 9:2800.56," and/or that "the product is unreasonably dangerous because an adequate warning about the product has not be provided as provided in R.S. 9:2800.57."[3] Both theories, while supplanting negligence as a direct cause of action, are nonetheless predicated on a negligence standard.[4] Thus, Plaintiffs' case depends on, among other things, evidence that demonstrates that Defendants did not act reasonably to prevent foreseeable harm.[5] Much of the evidence in the categories at issue in this motion is admissible for this purpose alone, as well as for the other reasons discussed herein.

## III.    ARGUMENT

### A.    Evidence and argument concerning Defendants' actual or anticipated profits from the sale of Xarelto

Plaintiffs intend to present evidence relating to Defendants' *anticipated* or projected profits from Xarelto, but not evidence relating to their actual profits from the sale of Xarelto. Defendants' desire to realize their projected sales numbers drove their decisions on whether to pursue lines of scientific inquiry about the safety of the product, and ultimately led to their decision to rush Xarelto to market. In fact, several of Defendants' employees have testified that Xarelto was a critical product for Defendants, with upcoming expirations of other important drug patents forecasted to

---

[2] *See* Stipulation and Order (Doc. No. 5340), at 1.

[3] La. Rev. Stat. Ann. § 9:2800.54(B)(2), (3); *see also Stahl v. Novartis Pharms. Corp.*, 283 F. 3d 254, 261 (5th Circ. 2002).

[4] *See* Kennedy, John, *A Primer on the Louisiana Products Liability Act*, 49 La. Law Rev. 565, 588-90 (Jan. 1989) ("[T]wo of the four ways – defective design and inadequate warning – are predicated on a negligence standard… Consequently, negligence is still an integral part of Louisiana products liability law, but it now exists as a component of the LPLA cause of action rather than as an independent theory of liability").

[5] *See id.* at 589 n.125 ("Negligence in Louisiana is the creation, maintenance, or failure to guard against an unreasonable risk of foreseeable harm").

cost billions of dollars.[6]  Defendants were literally "racing" against Xarelto's competitors to get their product to market first.[7]   At the same time, Defendants were aware: (1) that Xarelto's anticoagulant effect could not be reversed; (2) that significant scientific data existed, showing that Xarelto carried a risk of serious bleeding events that was not sufficiently captured in the labeling; (3) that because of the serious bleeding risks, there was a need to monitor Xarelto patients using Neoplastin PT to identify patients who were at a higher risk of bleeding; and (4) that the INRatio device used in the ROCKET AF clinical trials was defective.

Nevertheless, in an effort to achieve maximum profitability from Xarelto, Defendants placed marketing and promotion ahead of safety concerns, failing to either update their labeling or expend resources in pursuit of a reversal agent.  In so doing, Defendants breached their legal duties under the LPLA to Plaintiffs and other consumers.  Evidence concerning Defendants' projected profits is relevant to demonstrate the unreasonableness of these actions.  It is also admissible to demonstrate bias and financial motive on the part of Defendants, who steadfastly pushed Xarelto to market in spite of its deficient design and labeling.

Other courts have agreed that such evidence is admissible to demonstrate breach of duty. As one Third Circuit court noted:

> Excessive concern with the image and marketing of the diet drugs at the expense of making efforts toward determining whether they are safe could be probative as to whether [Defendant] breached a duty of care towards the plaintiffs.[8]

---

[6] *See, e.g.,* Exhibit 1, Deposition of Susan Geiger ("Geiger Dep."), at 594:1-5, 602:4-603:5; Exhibit 2, Deposition of Nauman Shah, at 97:16-98:7.

[7] *See* Exhibit 1, Geiger Dep., at 642:5-24, 649:10-652:17.

[8] *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.,* 369 F.3d 293, 314 (3d Circ. 2004).

Defendants claim that even if this evidence is relevant, it is inadmissible under Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  The evidence of projected profits that Plaintiffs intend to present is not cumulative, and it is certainly not confusing or misleading; the jury will have no issues understanding the nature and significance of Defendants' projected sales figures.  Nor is this evidence a waste of time.  Defendants' suggestion that admitting this evidence will create a "mini-trial" on economic principles is fallacious, and distorts the purpose for which this evidence will be offered.  Indeed, if Defendants intend to countervail the evidence by refining the projections of profit, their objection underestimates the jury's ability to understand the validity as well as the limitations of the figures presented.

Defendants' argument appears, at bottom, to be that Plaintiffs' evidence would be *unfairly* prejudicial.  But there is nothing *unfair* in the argument that Xarelto sales were driven by a desire for profit, which overrode concerns about the safety of the drug, assuming the argument is supportable by competent evidence; and Defendants are free to present evidence-supported argument to the contrary.  In this sense, it is the specificity of the supporting evidence which matters, not whether the impact is adverse to Defendants.  Thus, Plaintiffs' citation of numerical data is not only helpful, but nearly indispensable to their claim that Defendants engaged in a pattern of conduct that prioritized profits over safety.  "A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it."[9]  Any concerns that this evidence will induce the jury to decide the case based on emotion can be

---

[9] *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

adequately addressed with a limiting instruction.  Accordingly, the Rule 403 balancing test clearly weighs in favor of admission of this evidence, and Defendants' motion should be denied.

   **B.**   **Evidence and argument concerning Defendants' overall sales, profitability, and market share**

   Like Defendants' projected sales, Defendants' overall sales, profitability, and market share are critical pieces of evidence in demonstrating that the Xarelto label was unreasonably dangerous, as required by the LPLA.  Evidence concerning Defendants' financial statuses is relevant because it establishes that they had the financial means to improve the Xarelto product or label, but instead opted to prioritize the maximization of sales over their duties.[10]

   Because of their financial means, Defendants had the full capability to focus their efforts on creating an anti-Factor Xa assay or reversal agent that would have rendered Xarelto reasonably safe in design.  Similarly, Defendants could have used their resources to craft a safer label that properly instructed physicians and patients regarding the use of Neoplastin PT tests, the available U.S. data from the ROCKET AF studies, and the defective INRatio device that was used in the ROCKET AF clinical trials[11]  This is true even if it meant spending time and resources on additional scientific studies, engaging in a dialogue with the FDA regarding the content of the label, or even unilaterally affecting a label change via the Changes Being Effected ("CBE") provision of the federal drug labeling regulations.[12]

---

[10] *See CDX Liquidating Trust v. Venrock Assocs.*, 411 B.R. 591, 604-605 (N.D. Ill. 2009) (allowing testimony regarding size, wealth, and resources to show reasonableness, and not to suggest that defendants had "deep pockets"); *Sturm v. Davlyn Invs., Inc.*, No. 12-cv-7305, 2013 WL 8604661, at *6 (C.D. Cal. Nov. 6, 2013) (admitting evidence of defendants' resources if defendant raised claim during trial that accommodation would be an "undue burden"); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, No. 92-cv-978, 1995 WL 151850, at *2-3 (N.D. Ill. Apr. 3, 1995) (admitting evidence of party's prior transactions and financial history prior to the event at issue).

[11] In fact, Defendants utilized the anti-Factor Xa assay test to evaluate patients' bleeding risks in their internal Xarelto clinical studies.  Further, these assays are commercially available in Europe.  *See* Exhibit 3, Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of single doses of BAY 59-7939, an oral, direct factor Xa inhibitor,* 78 Clinical Pharmacology & Therapeutics 412 (2005).

[12] *See* 21 C.F.R. § 314.70(c).

Seventy years ago, in 1947, Judge Learned Hand presented his famous "sliding scale" of negligence when he noted that a defendant's duty to take precautions depends on three distinct factors: the likelihood of injury; its severity; and the burden of taking precautions.[13]   Judge Hand explained that, in assessing whether a defendant reasonably owes a duty, these three factors are best viewed as an algebraic equation, where the likelihood of injuries multiplied by the severity of these injuries are weighed against the cost of taking reasonable precautions.  A duty exists when the first two factors outweigh the third.[14]   Judge Hand's test is now captured in the LPLA, as follows:

> A product is unreasonably dangerous in design if, at any time the product left its manufacturer's control:
>
> > (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
> >
> > (2) *The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.*[15]

In this case, Defendants' financial resources are highly relevant because they demonstrate that the burden for Defendants to change Xarelto's design did not outweigh the probability and consequences of serious bleeding events.  Risk-utility analysis has been interpreted by Fifth Circuit courts to be a question of fact, or alternatively a question of mixed fact and policy, which is to be gauged by the jury based on all the evidence and circumstances surrounding a particular case.[16]   In

---

[13] *See United States v. Carroll Towing*, 159 F.2d 169, 173 (2d Cir. 1947).

[14] *Id.*

[15] La. Rev. Stat. Ann. § 9:2800.56 (emphasis added).

[16] *See, e.g., Ellis v. Weasler Eng'g, Inc.,* 258 F.3d 326, 331-32 (5th Cir. 2001).

this case, the jury should have access to evidence regarding Defendants' financial means in considering this balance.

Further, the balancing test mandated by Federal Rule of Evidence 403 weighs in favor of the admission of this evidence. On the one hand, the probative value of this evidence is significant because it demonstrates the extent of Defendants' financial means and their capability to create a safer product. On the other hand, the prejudicial effect of admission of this evidence is minimal. Much of the information that Plaintiffs seek to introduce is publicly available information, easily obtainable from Defendants' Security and Exchange Commission ("SEC") filings or even a quick internet search. Jurors, like anyone else, already know that large corporations such as Defendants typically report significant profits from yearly sales, and they will not be confused by evidence quantifying this fact. Similarly, Defendants' argument that admission of this evidence might improperly suggest to jurors that Defendants' sales affect their liability is misguided. As explained above, Defendants' financial statuses *do* bear on their duty and ability to take adequate precautions to mitigate risks from their products.

Finally, as with Defendants' argument regarding their projected profits from the sale of Xarelto, their claim that the introduction of this evidence would result in "mini-trials" to explain the significance of their financial positions is disingenuous. The argument not only overstates the time and challenges required for consideration of the evidence, but also discounts the jury's capability to contextualize Defendants' financial and market data.

### C. Evidence and argument relating to prescription medicine pricing

Defendants request the exclusion of an exceptionally broad category of evidence concerning "the price of Xarelto, how Defendants priced Xarelto, the price of other prescription medicines generally, and how pharmaceutical companies price medicines generally," as well as

any evidence "suggesting that pharmaceutical companies generally, or Defendants specifically, have made prescription medicines too expensive for consumers."[17]  Defendants argue that such evidence is not relevant and is unduly prejudicial, intended to "shock or anger jurors."[18]

As a preliminary matter, Plaintiffs cannot ascertain the degree to which Defendants' request would exclude relevant evidence because Defendants' request is vague and overbroad, failing to identify any particular event as warranting exclusion.  Instead, Defendants provide only three phrases as examples – "big pharma," "drug costs are too high," and "cost of medication crisis"– from which Defendants ask this Court and Plaintiffs to extract a definition by proposing a comprehensive ban on "phrases related to those concepts."[19]  As presented, Defendants' request aims to prohibit, in any form, the use of phrases that have well-defined meanings within the pharmaceutical industry.  If granted, this request would exclude not only specific verbiage, but also entire concepts that are important to Plaintiffs' arguments.  Without the ability to reference these concepts in any way, Plaintiffs will be significantly hindered in their attempt to describe Defendants' actions so as to satisfy the elements of his claims.

Moreover, evidence concerning prescription drug pricing is relevant to material issues in this case, including the bias, knowledge, and motives of Defendants.  Defendants' decisions to act to maximize profits through strategic pricing and their actions in this regard – in spite of their knowledge of the scientific data demonstrating a significant bleeding risk associated with Xarelto, their awareness of the existence of an alternative design[20] and their ability to provide better

---

[17] *See* Defendants' Memorandum in Support of Defendants' Omnibus Motion *in Limine* No. 1 ("Def. Mem."), at 8-9.

[18] *Id.* at 9.

[19] *Id.* at 8.

[20] *See* Kennedy, John, *A Primer on the Louisiana Product Liability Act*, at 49 La. Law Rev. at 596 ("'Existed' does not mean that the alternative design must have been … feasible, i.e., could have been employed even if it was not, at that time.  But 'existed' does mean that the alternative design must at least have been conceived at the time the product left its manufacturer's control.") (*citing* Schwartz, *Foreword, Understanding Products Liability,* 67 Calif. Law Rev.

warnings, and their knowledge that the alternative design and additional warnings would reduce the risk of bleeding – are important to the ultimate determination of whether Xarelto was unreasonably dangerous in its design and labeling.

The Rule 403 balancing test also weighs in favor of admission of this evidence. Its probative value is significant, because it is important for the jury to understand how drug companies price drugs, including Xarelto, and how this process affects costs for healthcare providers and consumers. Conversely, it does not cause undue prejudice to Defendants; facts are facts, and Defendants cannot complain that this evidence is unfairly prejudicial simply because it potentially damages their strategy.

Under Rule 403, only unfair evidence should be excluded, as "[v]irtually all evidence is prejudicial or it isn't material."[21] The prohibition against "prejudice" is meant to apply only to evidence which "suggest[s] decision on an improper basis,"[22] which this evidence does not do. Defendants may opt to counter the evidence with their own facts and figures, but their portrayal of this as a wasteful "mini-trial" ignores the importance of the evidence to Plaintiffs' case. Nor will this evidence confuse or mislead the jury. Defendants' argument once again assumes without explanation that jurors will not be able to understand and absorb fundamental, and important, financial concepts and data.

---

435, 468 (1979) ("Evidence that the alternative design had been reduced to writing … should be sufficient to satisfy the 'existed' requirement.")).

[21] *Bennett v. R&L Transfer, Inc.*, No. 11-cv-203, 2016 WL 15414, *3 (W.D. Pa. Jan. 12, 2016).

[22] *See* Fed. R. Evid. 403, Notes of Advisory Committee on Rules.

### D.     Evidence and argument concerning executive compensation

The jury is entitled to know the extent to which executives or other employee witnesses hold financial stakes in Defendants' companies, as this information is relevant to possible partiality of those witnesses that could affect their testimony.  As the Supreme Court has stated, "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."[23]  It is beyond dispute that Defendants' executives have profited extensively from Defendants' Xarelto sales.  Certain of Defendants' executives may have compensation packages that include performance-based incentives, implicitly designed to encourage prioritization of sales in decision-making situations.  As such, evidence about compensation is relevant and admissible to evaluate the veracity of Defendants' executive or other employee witnesses.  "The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony."[24]

Defendants claim that evidence regarding executive compensation "has no bearing on any material issue in this case."[25]  To the contrary, data showing the extent to which Defendants' executives and employees were compensated is material information for the jury's evaluation of Defendants' actions – through those of their executives and employees – in relation to their knowledge regarding Xarelto's risks and the deficiency of the product and labeling.  Like other evidence that Defendants seek to exclude, this evidence goes to Defendants' motives, bias, and violation of duties under the LPLA.

---

[23] *See United States v. Abel*, 469 U.S. 45, 52 (1984).

[24] *See Davis v. Alaska*, 415 U.S. 308, 316 (1974) (citation and internal quotations omitted).

[25] *See* Def. Mem. at 10.

E.   **Evidence and argument concerning Adverse Event Reports**

1.   **AERs are relevant.**

Defendants would have this Court believe that Adverse Event Reports ("AERs") are completely useless and utterly unreliable.  To the contrary, the requirement to report AERs is an integral part of the FDA's ability to monitor the safety of pharmaceutical drugs.  The FDA relies heavily upon post-marketing reports, such as AERs, to open tracked safety issues and require labeling changes.  Similarly, pharmaceutical companies such as Defendants utilize AERs to provide "pharmacovigilance" signals of potential and actual reactions to marketed drugs, which should prompt further studies, testing, changes to warnings, and ultimately withdrawal of the product from the market.

Defendants claim that AERs are categorically inadmissible as inherently unreliable "anecdotal reports" that demonstrate correlation but not causation, and cite selected passages from various FDA publications that appear to minimize the significance of AERs as evidence of a causal relationship between a drug and an adverse reaction.  Plaintiffs disagree with Defendants' general assertion that AERs cannot be used for causation without establishing substantially similar facts, as courts have held that AERs "on their own are not reliable evidence of causation, (but) they do contribute to the reliability of a causation determination."[26]  However, neither Plaintiffs nor their experts are offering AERs as proof of causation.  The fact that Xarelto causes major bleeding is not in contention and thus the cases that Defendants' cite are inapplicable.

---

[26] *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp 2d 420, 476 (E.D.N.Y 2011); *see also Tyler v. Sterling Drug,* 19 F. Supp. 2d 1239, 1241 (N.D. Okla. 1998); *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228-30 (9th Cir. 1998); *Kendall v. Hoffmann-La Roche, Inc.,* No. A-2633-08T3, 2010 N.J. Super. Unpub. LEXIS 1904, at *83-84 (N.J. Super. Ct. App. Div. Aug. 5, 2010).

Rather, AERs will be offered by Plaintiffs to show Defendants' knowledge of over-anticoagulation-related major bleeding events, which, along with Defendants' knowledge of the higher dose they had to use for once-daily dosing to be sufficient, and their knowledge that no reversal agent was available if over-anticoagulation would occur, should have triggered an understanding that there might be significant variability and serious, potentially fatal, consequences as a result of that variability.   This knowledge should have triggered pharmacovigilance efforts, including revisions to the label to advise of the availability of Neoplastin PT to measure the anticoagulant effect of Xarelto before and shortly after use is started so adjustments could be made, as well as to advise of the U.S. data from ROCKET AF and the INRatio recall.

To underscore the importance of AERs (published and unpublished) in pharmacovigilance risk analysis and risk mitigation, the FDA collects them in a dedicated database it shares with manufacturers ("the AERs database").   The FDA uses the AERs database for risk mitigation ranging from new product labeling to outright withdrawal.  As the FDA stated:

> The Adverse Event Reporting System (AERS) is a computerized information database designed to support the FDA's post-marketing safety surveillance program for all approved drug and therapeutic biologic products. The FDA uses AERS to monitor for new adverse events and medication errors that might occur with these marketed products.
>
> *   *   *
>
> AERS is a useful tool for FDA, which uses it for activities such as looking for new safety concerns that might be related to a marketed product, evaluating a manufacturer's compliance with reporting regulations and responding to outside requests for information. The reports in AERS are evaluated by clinical reviewers in the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) to monitor the safety of products after they are approved by FDA. If a potential safety concern is identified in AERS, further evaluation might include

epidemiological studies. **Based on an evaluation of the potential safety concern, FDA may take regulatory action(s) to improve product safety and protect the public health, such as updating a product's labeling information, restricting the use of the drug, communicating new safety information to the public, or, in rare cases, removing a product from the market.**[27]

Of course, the AERs database is not the only source for AERs, as they can also be derived from published reports by doctors and scientists.

While Defendants do not dispute the relevancy of pharmacovigilance to the issues in this case, they claim that AERs should be excluded.  Despite Defendants' blatantly disingenuous assertions, AERs are commonly utilized by experts in rendering scientific opinions on new and emerging risks and the adequacy of the warnings on a drug product's labeling.  It is entirely proper to use AERs to show that a drug manufacturer had notice of adverse events of the type suffered by Plaintiffs in failure-to-warn claims.[28]

### 2.  <u>AERs are not inadmissible hearsay.</u>

Plaintiffs intend to introduce AERs to demonstrate that Defendants had notice that raw statistical numbers for bleeding events were very high, which should have bolstered the need for

---

[27]"FDA Adverse Event Reporting System (FAERS) (Formerly AERS)," available at www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm (emphasis added).

[28]*See, e.g., Bellew v. Ethicon, Inc.*, 13-cv-22473, 2014 WL 6680356 (S.D.W. Va. Nov. 25, 2014); *Wise v. C.R. Bard, Inc.,* 12-cv-01378, 2015 WL 541933, at *8 (S.D.W. Va. Feb. 10, 2015); *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.,* 956 F. Supp. 2d 809, 815 (N.D. Ohio 2013), *aff'd,* 770 F.3d 378 (6th Cir 2014); *In re Fosamax Prods. Liab. Litig.,* No. 06-md-1789, 2013 WL 174416, at *4 (S.D.N.Y. Jan. 15, 2013); *In re Fosamax Prods. Liab. Litig.,* No. 06–MD–1789–JFK, 2010 WL 4242708, at *3 (S.D.N.Y. Oct. 27, 2010)*; Wolfe v. McNeil-PPC, Inc.,* No. 07-cv-348, 2012 WL 38694, at *2 (E.D. Pa. Jan. 9, 2012); *Schedin v. Ortho-McNeil-Janssen Pharms., Inc.,* 808 F. Supp. 2d 1125, 1139 (D. Minn. 2011); *Hogan v. Novartis Pharms. Corp.,* No. 06–cv–0260, 2011 WL 1533467, at *13 (E.D.N.Y. Apr. 24, 2011); *In re Levaquin Prods. Liab. Litig.,* 08-cv-1943, 2010 WL 4676973 at *4 (D. Minn. Nov. 9, 2010)*; In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.,* 817 F.Supp.2d 535, 550 n.4 (E.D. Pa. 2011); *In re Viagra Prod. Liab. Litig.,* 658 F.Supp.2d 950, 961–62 (D. Minn. 2009); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig,* 289 F. Supp. 2d 1230, 1242 (W.D. Wash. 2003); *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 972 (6th Cir.1994); In *re Heparin Prods. Liab. Litig.,* 803 F.Supp.2d 712, 727 (N.D. Ohio 2011), *aff'd sub nom Rodrigues v. Baxter Healthcare Corp.,* 567 Fed. Appx. 359 (6th Cir. 2014); *Rider v. Sandoz Pharms. Corp.,* 295 F.3d 1194, 1202 (11th Cir. 2002); *Benedi v. McNeil-P.P.C., Inc.,* 66 F.3d 1378, 1385-86 (4th Cir. 1995).

Defendants to strengthen their warnings to include information about Neoplastin PT measurements, the U.S. data from ROCKET AF, and the INRatio recall.  Importantly, the offer of out-of-court statements such as these to prove notice rather than the truth of the matter asserted is not hearsay.[29]

Also, even if they were hearsay, to the extent that the AERs at issue were maintained by Defendants in their internal database and were sent directly to the FDA pursuant to Defendants' obligations under federal law, they are admissible under the business records exception to the hearsay rule.[30]  Defendants kept the AERs in the course of a regularly conducted business activity, and it was their regular practice pursuant to federal regulations to keep such records.

### 3.     AERs do not carry a risk of undue prejudice.

Further, preclusion under Rule 403 is not warranted because the probative value of the AERs substantially outweighs any prejudicial effect to Defendants, and their admission will not tend to confuse the jury.  In fact, preclusion would serve only to prejudice Plaintiffs by preventing the jury from hearing an entire body of evidence which was important to both the FDA and Defendants in monitoring drug safety.[31]

---

[29] *See Thomas v. Dragovich,* 142 Fed. Appx. 33, 37-38 (3d Cir. 2005) (prisoner's grievances admissible to show that officials had knowledge of inmate's need for care); *United States v. Matthies,* 319 Fed. Appx. 554, 557 (9th Cir. 2009) (transcript from prior lawsuit admissible to show defendant's knowledge of tax laws); *Ahlberg v. Chrysler Corp.,* 481 F.3d 630, 637 (8th Cir. 2007) (prior customer complaints can be offered for non-hearsay notice purposes); *United States v. Wade,* 203 Fed. Appx. 920, 925 (10th Cir. 2006) (statement to defendant by another that "you are going to get me put in jail over this" was non-hearsay and offered for notice to defendant that his actions were illegal); *United States v. Lee,* 427 F.3d 881, 896-97 (11th Cir. 2005) (emails were admissible to show the defendants had been notified that the financial transactions at issue were unlawful); *Townsend v. Gasvoda,* 65 Fed. Appx. 95 (7th Cir. 2003), *citing Cook v. Navistar Int'l Trans. Corp.,* 940 F2d 207, 213 (7th Cir. 1991) (holding that out-of-court statements may be admissible to show actual or constructive knowledge or notice); *see also United States v. Linwood,* 142 F.3d 418, 425 (7th Cir. 1998) (whether an out-of-court statement is hearsay depends primarily on how the statement is used).

[30] *See* Fed. R. Evid. P 801(c)(6).

[31] *See In re Yasmin & Yaz (Drospirenone) Mktg.,* No. 09-md-2100, 2011 WL 6740391, at *5 (S.D. Ill. Dec. 22, 2011) (denying Defendant's Motion to Exclude Adverse Event Reports and stating "the probative value of this evidence far outweighs any prejudice to Bayer").

Additionally, evidence related to AERs would not cause undue delay or waste time.  AERs are but one component of Plaintiffs' case, and Plaintiffs do not expect to spend an inordinate amount of time on them.  In fact, none of Plaintiffs' experts rely on AERs when discussing issues of causation and liability, so there will be no conceivable need for the Court to conduct "trials within trials" on each AER.

Furthermore, any perceived prejudicial effect can be cured by testimony offered by Defendants rebutting the significance of the AERs and Defendants' pharmacovigilance actions in response to them.  In light of their high probative value, several courts have declined to exclude such evidence on the basis that it prejudices the Defendants.[32]  Also, the question under Rule 403 is not whether the evidence is prejudicial, but whether it is *unfairly* prejudicial.[33]  There is nothing unfairly prejudicial about the AERs evidence that Defendants seek to preclude.  If necessary, a cautioning instruction from the Court also can prevent undue prejudice by suggesting the relevance of this evidence, as well as the jurors' right to assign to it the weight they believe it deserves.

### F.  References to the presence, absence, or identity of a corporate representative at trial

Defendants argue that references to the presence or absence of corporative representatives, including the potential absence of senior executives as those representatives, should be excluded because such references are irrelevant and overly prejudicial.[34]  Neither claim is well-founded.

First, it is important to note that Plaintiffs do not intend to present evidence regarding the *cost* of Defendants' attendance at trial.  At most, Plaintiffs simply intend to comment on the fact

---

[32] *See, e.g., Worsham v. A.H. Robins Co.,* 734 F.2d 676, 686-87 (11th Cir. 1984); *Benedi,* 66 F.3d at 1386; *Tyler,* 19 F. Supp. 2d at 1241.

[33] *See United States v. Sprick,* 233 F.3d 845, 856 (5th Cir. 2000).

[34] *See* Def. Mem. at 17.

of Defendants' attendance (or absence), and identify Defendants' representatives to the jury.  If Plaintiffs are identified for the jury, why should an attending corporate representative *not* be identified?

Defendants' decision to supply corporate representatives at the time of trial is relevant because it directly reflects on their attitude toward the litigation.  Because Defendants have the ability to compel the attendance of representatives at trial, their decision to act on or forego this opportunity indicates a great deal about their stance on the case.  It potentially indicates their level of confidence regarding the strength of their evidence and defenses.  It could also indicate that they do not wish to interact with Plaintiffs, or that they do not take Plaintiffs' accusations seriously.  As one district court stated, "if no corporate representative is present at counsel table, said absence is fodder for comment by plaintiff since it is customary for such a person to be present.  Certainly, if plaintiff was never present in the court room [the defendant] would feel compelled to comment."[35]

Additionally, it is common practice for jurors to observe a party's reactions to evidence presented during trial, whether to evaluate an expert's credibility or gauge the veracity of a witness's testimony.  Again, the jurors will be free to observe Plaintiffs during trial.  They likewise should be made aware of the identity of Defendants' representatives as the trial proceeds, so the jurors may also observe them.

Regarding the balancing test required under Rule 403, a consideration of factors for and against the evidence strongly favors admission.  Commenting on the presence or absence of Defendants' corporate representatives at trial does not mislead the jury, waste time, or create the danger of unfair prejudice.  It is routine practice to note the presence or absence of a party to the litigation at the time of trial; and it is difficult to fathom how such an observation would mislead

---

[35] *In re Yasmin*, 2011 WL 6740391, at *11.

jurors.  Equally difficult to comprehend is the suggestion that Plaintiffs would "waste time" by making a single observation about the attendance of Defendants' representatives.

Plaintiffs, on the other hand, will undoubtedly be prejudiced if this evidence is not admitted.  Plaintiffs' presence at trial obviously will be pointed out to the jury, perhaps on multiple occasions.  The jury thus will be aware of Plaintiffs' identity and will observe Mr. and Mrs. Boudreaux's demeanors and reactions during trial.  These observations could potentially influence the jury's verdict.  There is no rational basis for exempting Defendants from this same observation by sitting jurors.  Equitable principles dictate that Plaintiffs should be allowed to identify Defendants' corporate representatives so the jury can consider Defendants' demeanor and reactions, as well.

## G.   Evidence and argument concerning the moral and ethical, as opposed to legal, duties of pharmaceutical manufacturers

Defendants ask this Court to exclude testimony by Plaintiffs' experts regarding duties imposed not by law, but by industry standards, which Defendants characterize as impermissible judgments by Plaintiffs' experts regarding "moral or ethical duties."[36]  Defendants claim that the "purpose of Plaintiffs' expert testimony in this regard would be simply to cast Defendants as 'bad' companies – according to some unspecified, personal standard, and not the governing legal standards."[37]

Defendants' interpretation of Plaintiffs' experts' testimony misses the point.  Plaintiffs' experts intend to testify not about an ethical or moral duty *per se*.  Rather, they will offer their professional opinions about typical customs and practices in the pharmaceutical industry.  This is not a subjective inquiry, but rather an informed observation about what should be considered the

---

[36] *See* Def. Mem. at 18.

[37] *Id.* at 20.

applicable standard of care in this case, and Plaintiffs' experts should not be prevented from offering opinions in this regard.  This evidence is critical to both of Plaintiffs' claims under the LPLA, because it establishes that Defendants did not act in accordance with applicable industry safety practices to create a product that was reasonably safe in either its design or its labeling.

As examples of objectionable testimony, Defendants cite several examples of opinions by Plaintiffs' experts Dr. David Kessler and Dr. Suzanne Parisian.  Both of these experts are more than qualified to opine on applicable industry standards, possessing a wealth of firsthand knowledge regarding pharmaceutical regulations, industry custom and practice, and the associated expectations placed on drug companies.

Defendants cite two paragraphs from Dr. Kessler's report.  Far from offering improper personal opinions regarding moral and ethical duties, as Defendants would lead this Court to believe, Dr. Kessler simply states that "in my opinion, nothing in the [Food, Drug and Cosmetic] Act, or in the FDA's implementing regulations, relieves a manufacturer of its duty to act prudently in light of the company's internal knowledge about a product and its potential risks."[38]  He later states that "[m]anufacturers have significant resources that are or should be committed to overseeing the safety of the drugs they market."[39]  As former FDA Commissioner,[40] Dr. Kessler is more than qualified to opine on drug regulations and prevailing industry standards. His opinions will both inform jurors about the pharmaceutical industry and bear on the reasonableness of Xarelto's design and labeling.

---

[38] *See* Exhibit 4, Expert Report of Dr. David Kessler, at ¶ 78.

[39] *Id.* at ¶ 86.

[40] *Id.* at Appendix A.

Defendants incorrectly argue that Dr. Kessler's proffered testimony is not relevant because it does not make any material fact in this case more or less probable.[41]  Dr. Kessler's opinions regard regulations and industry standards define Defendants' obligations as pharmaceutical manufacturers, and are relevant to Plaintiffs' theories because they help explain Defendants' duty to act in accord with these standards.  They are relevant to Plaintiffs' design defect theory because they speak to Defendants' failure to create a reasonably safe product in light of their resources and obligations as drug manufacturers.  They are relevant to Plaintiffs' failure-to-warn theory because they address the significance of Defendants' failure to act on their knowledge about Xarelto's risks and include in the label information about the U.S. data from the ROCKET AF trial, the INRatio recall, and instructions regarding the availability and advisability of using Neoplastin PT testing to identify patients at a higher risk of bleeding.

Similarly, Defendants cite several paragraphs from Dr. Parisian's report as examples of impermissible "moral or ethical" testimony.[42]  However, as with the selected opinions from Dr. Kessler's report, Dr. Parisian's opinions are objective assessments of Defendants' behavior in light of industry standards.

In Defendants' first cited example, Dr. Parisian offers the following opinion:

> Defendants acted unscientifically by persisting in pursuit of a marketing goal from 2002 to sell once-a-day, direct oral anticoagulant (DOAC) tablet, requiring no monitoring or laboratory testing despite the foreseeable risks for bleeding and potential harm for patients…. Defendants continue to make these Xarelto marketing claims as once a day single dose or 'one size fits all' without adequate warnings or dose information and despite the contrary science.[43]

---

[41] *See* Def. Mem. at 19; *see also* Fed. R. Evid 401.

[42] *See* Def. Mem. at 18.

[43] *See* Exhibit 5, Expert Report of Dr. Suzanne Parisian, at 15, § III(P).  The page citations for Dr. Parisian's report differ slightly between Plaintiffs' brief and Defendants' brief.  It appears that Defendants' brief's citations are from an earlier version of Dr. Parisian's report, which was replaced by the version cited here, which was served on 11/22/16.

In Defendants' second cited example, Dr. Parisian states:

    a.    Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosures for ROCKET and adverse events associated by:

- Failing to adequately report, investigate, and document erroneous/discrepant INR readings occurring during ROCKET to the clinical trial database and reports for regulatory agencies, (including the FDA).

- Failing to adequately report erroneous/discrepant INR values and associated adverse events for ROCKET to the IDMC and Executive Committee.

    b.    Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosure about ROCKET and associated adverse events requested of them by FDA:

- Failing to identify and report erroneous/discrepant INR values and associated adverse events (including but not limited to the Covance Recheck Program) in response to the FDA's March 2011 Information Request.

- Failing to report discrepant INR values in response to the January 12, 2016 FDA Information Request.

- Failing to inform FDA about the CoVance Recheck program in response to the January 12, 2016 FDA Information Request.[44]

First, it is important to note that neither of the above statements strays beyond the traditionally permissible bounds of expert testimony.  Dr. Parisian is more than qualified to opine on Defendants' significant failures to update the Xarelto label in light of the available safety data.[45] Dr. Parisian's opinions address Defendants' duty to create a safe product and their breach of that

---

[44] *Id.* at 12-13, § III(J)(a), (b); *see* footnote 43 regarding the slight difference in page citations for Dr. Parisian's report.

[45] *Id.* at Appendix A.

duty. The same opinions speak to Defendants' failure to create an adequate warning label for Xarelto. Like Dr. Kessler, Dr. Parisian intends to offer testimony that is relevant to both of Plaintiffs' claims under the LPLA.

Defendants argue that Rule 403 counsels against admission of evidence concerning prevailing industry standards, and that doing so will unduly prejudice Defendants, confuse the issues, mislead the jury, and waste time. But the probative value of this evidence is high, and the suggestion that pharmaceutical companies should not be accountable for standard industry practices is nothing short of remarkable. The opinions of Plaintiffs' experts regarding pharmaceutical regulations and prevailing industry standards will provide important and credible evidence that supports elements of Plaintiffs' claims under the LPLA. This evidence is not unduly prejudicial; Plaintiffs' experts are presenting informed opinions, which are powerful but certainly admissible. Presentation of this expert testimony will not confuse the issues or mislead the jury; this testimony does not contain any concepts that Defendants do not already plan to counter with their own evidence. Rather, this expert testimony will clarify Plaintiffs' arguments and therefore will be helpful to the jury's understanding of the case. The fact that it may take time to cover these issues does not mean that the time will be wasted. This evidence is relevant to and probative of Plaintiffs' claims. It is not unduly prejudicial, and it should be admitted.

IV.     **CONCLUSION**

For the reasons set forth above, Defendants' motion should be denied in its entirety.

Dated:  April 12, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

22

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 12, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**
