**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al. Case No. 2:14-cv-02720 | MAGISTRATE NORTH |

**DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS'**
**MOTION *IN LIMINE* NO. 8 REGARDING PLAINTIFFS' COUNSELS' ADVERTISING**
**AND MOTION IN LIMINE NO. 10 REGARDING AN ALLEGED "LITIGATION**
**CRISIS," "LAWSUIT CRISIS," "LAWSUIT ABUSE,"**
**OR "LAWYER DRIVEN LITIGATION"**

**INTRODUCTION**

Defendants oppose Plaintiffs' Motion *in Limine* No. 8 to exclude "testimony or evidence about . . . Plaintiffs' counsels' advertisements" (Pls.' MIL 8 at 1) and Plaintiffs' Motion *in Limine* No. 10 to exclude arguments or evidence about "Lawyer Driven Litigation."  (Pls. MIL 10 at 1).  Plaintiffs' motions should denied because this evidence is relevant to the specific claims alleged by Plaintiffs and the probative value of this evidence outweighs any perceived prejudice.

Plaintiffs and their experts have placed attorney advertising front and center by relying on adverse event reports that they claim show Xarelto is an unreasonably dangerous medicine.[1] Evidence of adverse events should be excluded for the reasons set forth in Defendants' Omnibus Motion *in Limine* No. 1 (Doc. 5955-1, at 11) but if evidence of adverse events are admitted or relied upon by Plaintiffs' experts, then Defendants are entitled to introduce evidence of lawyer

---

[1] As set forth in Defendants' opposition to Plaintiffs' Motion *in Limine* No. 4, attorney advertising is relevant for the separate reason that Joseph Boudreaux, Jr. testified that he decided to file this lawsuit because he saw attorney advertising.

advertising.   As set forth in opposition to Plaintiffs' *Daubert* motions to exclude the opinion testimony of Drs. Reiffel and Boniol, a review of adverse event reports for Xarelto demonstrates that adverse event reports have been driven by pervasive and aggressive attorney advertising. The effect of attorney advertising on these reports has been the subject of published papers and is an issue that is relevant to Plaintiffs' claims.   The jury should not hear only half of the story—if Plaintiffs are permitted to tell the jury that there were adverse event reports other than Mr. Boudreaux's, fairness demands that Defendants be allowed to show the jury evidence that many of these reports were due to attorney advertising, and in some cases, that individuals stopped using Xarelto and sustained serious injuries.

For these and the reasons set forth below, Plaintiffs' motions should be denied.

## ARGUMENT

Plaintiffs' overly expansive preclusion request should be rejected because Plaintiffs have not satisfied their burden of establishing that there is no possible relevance of the evidence they seek to preclude at trial.   "In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on *all* potential grounds." *Ariza v. Loomis Armored US, LLC*, No. 3:13-00419-JWD-EWD, 2016 U.S. Dist. LEXIS 7588, at*4 (M.D. La. Jan. 22, 2016) (quoting *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010)) (emphasis in original).   "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground.   Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Gonzalez*, 718 F. Supp. 2d at 1345 (internal citation and quotation omitted).

**A.      Evidence of attorney advertising is relevant and should be admitted if Plaintiffs are permitted to introduce evidence regarding Xarelto adverse event reports.**

Attorney advertising is relevant to several aspects of Plaintiffs' claims, including as evidence in response to Plaintiffs' reliance on adverse event reports and (as set forth in opposition to Plaintiffs' Motion *in Limine* No. 4) to show the circumstances in which Plaintiffs decided to file this lawsuit.  Plaintiffs have specifically placed attorney advertising at issue because they have relied extensively on adverse event reports and QuarterWatch reports to assert that Xarelto has higher reported rates of adverse events than other anticoagulant medicines, and therefore is an unreasonably dangerous medicine under the Louisiana Product Liability Act. *See e.g.*, Leissinger Rpt. at 17 (Exh. A); Plunkett Rpt. at Exh. C, p. 6 (ISMP NOAC rpt. 2014Q4, ISMP NOAC Survey 2014.Q4; ISMP Xarelto 2015Q4) (Exh. B); Backes Rpt. at Exh. B (Exh. C).  The QuarterWatch reports, a publication that gathers data from the FDA's MedWatch system, state as follows:

> QuarterWatch™ is an independent publication of the Institute for Safe Medication Practices (ISMP) that monitors all adverse drug event reports submitted to the U.S. Food and Drug Administration. We analyze computer excerpts from the FDA Adverse Event Reporting System (FAERS). These reports (best known as MedWatch reports) are a cornerstone of the nation's system for monitoring the safety of prescription drugs after FDA marketing approval.

ISMP, QuarterWatch Q4 2015 (Exh. D).

From the QuarterWatch analysis, Plaintiffs' expert Dr. Leissinger relies on reports from QuarterWatch, a publication that gathers data from the FDA's MedWatch system and is connected to one of Plaintiffs' experts, to offer the following opinions:





Leissinger Rpt. at 17 (Exh. A).  Dr. Leissinger's opinions, however, do not tell the full story and

if Plaintiffs' experts are permitted to rely on adverse event reports regarding patients other than

Mr. Boudreaux, then evidence of lawyer advertising is clearly admissible.   The MedWatch

reports were extensively reviewed in *Heart Rhythm Case Reports*—one of articles that Plaintiffs

seek to preclude Dr. Reiffel from citing. In reviewing these reports, those authors discuss the

risks of stopping the medication without medical supervision, and note the pervasiveness of

attorney advertising which has led to such "self-treatment":

> Described here are a series of serious medical events reported in 28 submissions
> of 31 individual patients to Medwatch (The FDA Safety Information and Adverse
> Event Reporting System; http://www.fda.gov/ Safety/MedWatch/default.htm).
>
> . . . .
>
> Overall, based on the available data, the mean age of the patients was 72 (range,
> 45–90), and 13 patients were male. All were prescribed rivaroxaban and
> subsequently discontinued their anticoagulant without consulting their physician
> after viewing negative rivaroxaban legal advertising. In the majority of these
> cases (23/31,75%), patients experienced a stroke or a transient ischemic
> neurologic event; 2 patients had persistent residual paralysis. One patient, a 45-
> year-old man receiving rivaroxaban for treatment of a deep vein thrombosis,
> stopped the drug and died of a subsequent pulmonary embolism, and 1 female
> patient, receiving rivaroxaban for stroke prevention, stopped the drug and died of
> a massive stroke (Table). All these cases were considered to be serious medical
> events by the health care professionals that submitted the reports.

Burton, P. and Peacock, W.P., *Heart Rhythm Case Reports* 2016; 2:248-49 (Exh. E).

> The authors conclude:
>
> [I]t is clear that some patients are intimidated enough by the ongoing legal
> campaign to stop their anticoagulant, and thus suffer an adverse event. These
> cases serve to highlight the importance of following anticoagulant prescribing
> information, and that physicians should emphasize that patients should not stop

anticoagulants without medical consultation. Continued partnership between drug manufacturers, physicians, regulators, and patients is necessary to provide sufficient education to ensure that these important medical events do not occur.

*Id.*

In an article published in the *Journal of Atrial Fibrillation*, Dr. Reiffel relies on this same article, explaining attorney advertising and their effect on the practice of medicine:

> Consequent to such advertisements, many patients have discontinued NOAC therapy or have refused to start it. I have encountered such a patient on more than one occasion, mostly atrial fibrillation (AF) patients with an increased risk profile for stroke and systemic embolism (CHA2DS2-VASc score of 2 or higher). It takes considerable effort to make them understand both the benefits and the risks of NOAC therapy and in particular, the overall antithrombotic and mortality benefits to them of being on NOAC therapy despite the risks of a bleed.

> Part of such discussions with patients should involve the concepts of fair balance and of net clinical benefit. Using data from the 4 major NOAC vs warfarin pivotal AF trials 2-5 and historical data from AF warfarin vs placebo trials, several calculations can be made to help them understand both what they are not being told in the advertisements they see and the consequences that may arise based upon the non-use of the NOAC.

> . . . .

> Based on the pivotal NOAC versus warfarin trails, assuming increased risk of AF patients changed from NOAC to warfarin therapy: embolic events would increase by 1.1 to 2.1%/yr; major bleeds would increase by 2.1 to 3.4%/yr, total mortality would increase by 3.5 to 4.9%/yr, but fatal bleeds would increase by only 0.06 to 0.5%/yr.

Reiffel, J.A., *Journal of Atrial Fibrillation* 2016; 8(5) (Exh. F).

Dr. Reiffel's opinions and these articles about the effect of attorney advertising on adverse-event reporting and public health are relevant to the issues in this case because Plaintiffs have chosen to pursue arguments based on an increase in adverse-event reporting through MedWatch (as reported in QuarterWatch) and in recent observational studies. The jury should not be limited to hearing only Plaintiffs' side of the story, without the benefit of expert testimony regarding the impact of attorney advertising, including reference to the published literature,

5

particularly a paper published by the expert himself.[2] Allowing Plaintiffs' evidence and argument about increased adverse events but excluding this evidence would be highly prejudicial to Defendants. *See also* David N. Juurlink M.D., Ph.D., et al, *The effect of publication on Internet-based solicitation of personal-injury litigants*, CMAJ 2007; 177(11):1369, 1369 (Nov. 20, 2007).

Further, federal courts have held that evidence of lawyer advertising may be admissible when it goes to a specific issue before the court. *See, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *67 (N.D. Ohio June 4, 2010) (holding that defendants may refer to lawyer advertising where the evidence shows the plaintiff saw an advertisement or letter from a plaintiff's attorney that lists the condition about which he complains before he ever presented to a physician with the complaint). As set forth in opposition to Plaintiffs' Motion *in Limine* No. 4, Mr. Boudreaux explicitly testified that he only filed his lawsuit after he saw attorney advertising. *See* Exh. G, Boudreaux Dep. 181:25–182:3 ██████████

████████████████████████████████████████████████████

████████████████████████████████████████.

Dr. Kenneth Wong, the physician who prescribed Xarelto to Mr. Boudreaux, also testified that he saw attorney advertising. Dr. Wong testified as follows:



---

[2] These same articles are relevant to explain the alleged reported rates of adverse events in recent observational studies relied upon by plaintiffs, such as, Graham, D. et al., "Stroke, Bleeding and Mortality Risks in Elderly Beneficiaries Treated with Dabigtran or Rivaroxaban for Nonvalvular Afib," JAMA Int. Med. doi:10.1001/jamaintermed.2016.5964. The study looked at 118,891 patients who were treated between November 4, 2011 and June 30, 2014 and the data analysis was performed between May 7, 2015 and June 30, 2016 from Medicare claims databases.



Deposition of Kenneth Wong, at 145:15-146:14 (Exh. H).

Lawyer advertising is directly relevant to the claims alleged here both because of its effect on the amount of advert event reports and because it affected Mr. Boudreaux and his physician's practices.  Plaintiffs cite to generic case law and orders where evidence of attorney advertising has been excluded as irrelevant, but in none of those cases had the plaintiff chosen to place attorney advertising at issue by reference to adverse event reports.  And none of those plaintiffs had testified that they only filed the lawsuit because of an attorney's advertising.  As such, Plaintiffs have failed to meet their burden of demonstrating that evidence of attorney advertising is irrelevant.

**B.      Evidence of (and argument) about "lawyer-driven litigation" is relevant.**

The same is true for Plaintiffs' request that the Court exclude arguments about this case being "lawyer driven litigation."  Plaintiffs cite only one case that offers any reasoning for excluding evidence of lawyer-driven litigation.  In *Bufford v. Rowan Companies, Inc.*, 994 F.2d 155 (5th Cir. 1993), the court concluded: "That a personal injury claim is fabricated or exaggerated is a perfectly legitimate and valid defense. The proof of such may be by direct or circumstantial evidence; defendants are afforded a broad latitude to attempt to prove this defense. What is not permitted is an unsupported, irresponsible attack on the integrity of opposing

counsel." *Id.* at 157. Plaintiffs are using the latter as an excuse to exclude relevant, admissible evidence such as the former, even though Defendants have not and will not attack the integrity of Plaintiffs' counsel.

The overbreadth of Plaintiffs' motion is further underscored by the fact that every order cited by Plaintiffs that excludes references to "litigation crisis," "lawsuit crisis" or "lawsuit abuse" specifically excludes only "*[t]erms or phrases*" such as those—not all evidence which may refer to lawyer-driven litigation. Plaintiffs should not be permitted to rely on relatively narrow rulings in furtherance of their own motion which is far greater in scope, ignores their claims, and would exclude admissible evidence of attorney-driven litigation.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion *in Limine* No. 8 and 10.

Respectfully submitted,

| | |
|---|---|
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | WILKINSON WALSH + ESKOVITZ LLP |
| By: /s/ *Richard E. Sarver* | By: /s/ *Beth A. Wilkinson* |
| Richard E. Sarver | Beth A. Wilkinson |
| Celeste R. Coco-Ewing | Jennifer L. Saulino |
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | Jeremy Barber |
| 909 Poydras Street, 24th Floor | WILKINSON WALSH + ESKOVITZ LLP |
| New Orleans, Louisiana 70112 | 1900 M. Street NW, Suite 800 |
| Telephone: (504) 589-9700 | Washington, DC 20036 |
| rsarver@barrassousdin.com | Telephone: (202) 847-4000 |
| ccoco-ewing@barrassousdin.com | bwilkinson@wilkinsonwalsh.com |
| | jsaulino@wilkinsonwalsh.com |
| | jbarber@wilkinsonwalsh.com |

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


*Attorneys for Defendants Janssen
Pharmaceuticals, Inc., Janssen Research &
Development, LLC, and Janssen Ortho LLC*

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ *David E. Dukes*
David E. Dukes
J. Mark Jones
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: (803) 799-2000
David.Dukes@nelsonmullins.com
Mark.Jones@nelsonmullins.com


ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Andrew K. Solow*
Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com
BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com
lboney@bradley.com

9

CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com


*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 12, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**

00407193