# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * | MDL NO. 2592 |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| ************************************************ | * | |

**THIS DOCUMENT RELATES TO:**
*All Cases*

## ORDER & REASONS

Before the Court are several motions to exclude certain areas of anticipated testimony of various expert witnesses for the Boudreaux and Orr bellwether trials. Having considered the parties arguments and the applicable law, the Court now issues this order and reasons.

**I.      *DAUBERT* LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id*. at 589.

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id*. Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id*. at 592–93. In making this assessment, the trial court need not take the expert's word for it. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

1

Instead, when expert testimony is speculative or lacks scientific validity, trial courts are encouraged to exclude it. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998).

In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and will not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is a determination to be made by the fact finder after the *Daubert* analysis.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 509 U.S. at 592–93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id*. at 593–95. In the context of the present case, these factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id*. Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors to assess the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). These factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has

adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g.*, *id.* at 313; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278–79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts at issue, meaning there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275–76. The requirement of reliability does not strictly bind an expert within the proffered field of expertise; an expert may also testify concerning related applications of his or her background. *Slatten, LLC v. Royal Caribbean Cruises Ltd.*, No. 13-673, 2014 WL 5393341, at *2 (E.D. La. Oct. 23, 2014) (citing *Wheeler v. John Deere Co.*, 935 F. 2d 1090, 1100 (10th Cir. 1991). The focus is not on the result or conclusion, but on the methodology. *Moore*, 151 F.3d at 275–76. The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the expert's methodology was proper. *Id*. Both the Plaintiffs and Defendants have various experts in this case. The Court will address each of the motions in turn.

    **A.**    **Defendants' Motion to Exclude Certain Opinions of Dr. Laura Plunkett**

Before the Court is Defendant's Motion to Exclude Certain opinions of Dr. Laura M. Plunkett, Ph.D., DABT (R. Doc. 5108). Defendants seek to limit Dr. Plunkett's testimony regarding Xarelto labeling and the state of mind or knowledge of both Defendants and the FDA.

Plaintiffs disagree, arguing that Dr. Plunkett's testimony is well within her expertise and pointing out that most courts which have considered her qualifications and methodology have found her "eminently qualified to testify about drug pharmacology, general causation, regulatory matters and the adequacy of labels for both prescription and non-prescription drugs." Plaintiffs contend that in arguing that Dr. Plunkett is not qualified in regulatory or labeling, Defendants are arguing that she is not qualified to do exactly what she does when consulting for pharmaceutical companies.

Dr. Plunkett is a pharmacologist and toxicologist who has substantial experience as an expert witness. She is a Diplomate of the American Board of Toxicology and a registered patent agent. She is neither a medical doctor nor a regulatory agent for the FDA, but has extensive experience consulting and advising as to regulatory matters, including label content. The Defendants do not dispute Dr. Plunkett's qualifications, and this Court finds she is well-qualified by her experience and education.

The Court further finds that Dr. Plunkett's opinions are based on her review of Defendants' and the FDA's statements and documents,, as well as medical journals and reports. Defendants' arguments go to the witness's conclusions, not her methodology or qualifications, and accordingly may be dealt with by cross-examination at trial.

Accordingly, Defendants' Motion (R. Doc. 5108) is **DENIED**.

**B.  Defendants' Motion to Exclude Certain Opinions of Dr. David Kessler**

Before the Court is Defendants' Motion to exclude portions of Dr. David Kessler's expert report that lack a reliable foundation and that are inappropriate testimony for an expert witness. (R. Doc. 5111). Plaintiffs oppose the Motion, arguing that Defendants take pieces of Dr. Kessler's opinion out of context in making their failing arguments. Plaintiffs further contend Dr. Kessler is uniquely qualified to offer opinions on the conduct of pharmaceutical companies.

Dr. David Kessler, M.D., is a medical doctor, the former Commissioner of the Food and Drug Administration, a professor of food and drug law, and an advisor to pharmaceutical companies. He has testified before Congress on multiple occasions and has published numerous articles in legal, medical, and scientific journals on the federal regulation of drugs and medical devises as well as the intersection of federal regulation and state law. Currently, Dr. Kessler is a senior advisor to a global private equity firm that owns pharmaceutical and biomedical companies and serves on the boards of two pharmaceutical companies. He advises corporates on the proper standard of care under both state and federal law.

The Court finds Dr. Kessler is well qualified by virtue of his education and prior positions to render expert opinions. He bases his opinions on medical literature, federal regulations, and his experience. He uses appropriate methodology in forming his opinions. The objections Defendants argue in their motion are better reserved for cross-examination at trial. Accordingly, Defendants' Motion (R. Doc. 5111) is **DENIED**.

    **C.**    **Defendants' Motion to Exclude Certain Opinions of Dr. Suzanne Parisian**

Before the Court is Defendants' Motion to exclude certain portions of Dr. Suzanne Parisian's expert report. (R. Doc. 5112). Specifically, they argue her recitation of Xarelto's regulatory history is not proper expert witness testimony, and that she is unqualified and uses poor methodology in giving her opinions on medical or regulatory causation, foreign regulatory issues, and what information is important to patients or doctors. Plaintiffs oppose the motion, arguing Dr. Parisian is highly qualified and is one of the few people who specializes in the complexities of FDA regulation. They aver Dr. Parisian will assist the jury in understanding the regulatory requirements applicable to pharmaceutical manufacturers and drug labeling within the context of the FDA.

The Court finds that Dr. Parisian is qualified by virtue of education and experience and she uses sound methodology in reaching her conclusions. The thrust of the Defendants' objections seems to be that they are concerned the witness may assume an advocate role at trial. If Dr. Parisian assumes an advocate role at trial, the Court will address it at that time. For the time being, however, Defendants' Motion (R. Doc. 5112) is **DENIED**.

### D. Defendants' Motions Regarding Unapproved Dosage and Monitoring Regimens and the 20-second PT cutoff guideline

Before the Court are Defendants' Motions to Exclude Expert Opinions and Testimony Regarding Unapproved Dosage and Monitoring Regimens (R. Doc. 5113) and to Preclude Opinions and Testimony Regarding Plaintiffs' Experts' 20-second PT cutoff guideline. (R. Doc. 5114).

#### 1. Dosage and Monitoring Regimens

Defendants aver that Plaintiffs expert witnesses opine that patients' risk of bleeding could be reduced if doctors monitored the concentration or anticoagulant effect of Xarelto, and if the FDA-approved dosages were changed. In approving Xarelto, the FDA approved a fixed-dose regimen of 20 milligrams once a day. Plaintiffs oppose Defendants' motion, arguing that the motion is procedurally improper. FRE 702 is meant to exclude or allow particular witnesses based on their qualifications and methodology; it is not meant to exclude or allow entire issues. Daubert motions are meant to address methodology and qualifications; this motion does not do so. The Defendants do not question any particular expert's specialized knowledge or methodology, preventing the court from meaningfully evaluating the issues and experts. Further, Plaintiffs contend that Defendants take quotes and opinions entirely out of context, making Plaintiffs' experts appear to say or testify to something different than that to which they are actually testifying.

## 2. 20-second PT cutoff guideline

Several of Plaintiffs' Expert Witnesses opine that if physicians monitored the concentration of anticoagulation effect of Xarelto in their patients – particularly by using prothrombin time ("PT") using a Neoplastin reagent – bleeding risk would be reduced. PT is a non-specific method to measure the amount of time it takes a person on an anticoagulant to clot. Defendants seek to preclude any expert testimony regarding the 20-second PT cutoff discussed by several of Plaintiffs' experts. They construe Plaintiffs' argument as: any patient with a PT level higher than a certain point should be switched to an alternate anticoagulant or be prescribed a lower, non-FDA approved dose of Xarelto. This argument, Defendants aver, is not reliable and does not fit the facts of the Orr and Boudreaux bellwether cases and is therefore not relevant to the litigation.

Plaintiffs contend that the PT tests are factually significant to this case. They aver that the Bellwether Plaintiffs must have had a high Neoplastin PT result because they had a significant bleeding episode. Relying on FDA and Defendant-supported data, a high Neoplastin PT result and a bleeding episode are correlated. The possible use of a Neoplastin PT test to these Bellwether Plaintiffs should not be disputed. Further, Plaintiffs contend that Dr. Rinder relied on peer-reviewed literature to compare PT values. His report was neither late nor unscientific, and he produced the chart he used in his determination. Plaintiffs argue Dr. Rinder never claims to be converting the PT numbers, just making an indirect comparison and approximation based on the chart. His methods, Plaintiffs contend, are sound.

## 3. Analysis

The Court finds that the opinions Defendants seek to exclude go to the crux of Plaintiffs' theory of the case. Dosing and monitoring (including the 20-second PT cutoff) are relevant to Plaintiffs' theory that Xarelto was defectively designed and its label lacked relevant information

or directions regarding its safe use. Because of Xarelto's short half-life and the variability in patients, some patients will retain more Xarelto in their system and will be subject to a greater bleeding risk. Xarelto's dosing scheme and the availability of monitoring bear on the individual risk to each plaintiff taking Xarelto. Plaintiffs contend that proper usage requires testing or monitoring to ascertain the appropriate dosage. They argue that this was known or should have been known to Defendants and the label should contain information and instructions or directions as to proper use. Plaintiffs point to various journals and studies supporting their position. Without judging the accuracy of this conclusion, the methodology supporting the Plaintiffs' argument is appropriate. Defendants' quarrel is with the witnesses' conclusions and not their methodology. Accordingly, Defendants' Motions (R. Docs. 5113, 5114) are **DENIED**.

E. **Plaintiffs' Motion to Exclude Certain Opinions of Dr. James Reiffel**

Before the Court is Plaintiffs' Motion to Preclude Dr. James A. Reiffel, M.D., from testifying regarding attorney advertising and earlier cancer detection from anticoagulant-elated bleeds. (R. Doc. 5116). Defendants oppose, arguing his testimony is reliable and relevant. Further, they contend that limiting their ability to make arguments about attorney advertising would be prejudicial because Plaintiffs plan to discuss Defendants' Xarelto advertisements. Further, the statements regarding early detection of diseases such as cancer are relevant and reliable as part of the entire risk-benefit analysis of Xarelto. The entire analysis, they aver, must be weighed by a jury when ascertaining whether or not Xarelto was defectively designed.

This Court finds that Dr. Reiffel's testimony regarding the effect of attorney advertising is not relevant or reliable and is therefore excluded. However, such testimony may be offered as rebuttal testimony if the issue is raised on direct examination at trial. For example, if there is evidence that the patient in question avoided taking Xarelto or abruptly stopped taking Xarelto due to attorney advertising, then this ruling may have to be modified.

This Court also finds Dr. Reiffel's testimony regarding early cancer detection to be irrelevant in this case, as cancer was not an issue for either Plaintiff. Further, there is no evidence that Xarelto is routinely prescribed to screen for cancer. Accordingly, such testimony is also excluded. If this becomes an issue during the trial, then this ruling will be modified.

For the aforementioned reasons, **IT IS ORDERED** that Plaintiffs' Motion (R. Doc. 5116) is **GRANTED**.

F.     **Defendants' Motion to Exclude Certain Opinions of Dr. Nathaniel Winstead**

Before the Court is Defendants' Motion to exclude part of Dr. Nathaniel Winstead's expert report, specifically his opinion that Xarelto can cause internal bleeding absent any underlying pathology because his methodology does not meet the requirement under *Daubert* and its progeny. (R. Doc. 5120). Dr. Winstead is a case-specific expert in the *Boudreaux* bellwether case. Plaintiffs oppose the motion, arguing that Dr. Winstead is qualified to provide expert testimony regarding Xarelto's ability to cause internal bleeding through "systemic toxicity," and point out that Dr. Winstead's main opinion, which Defendants don't oppose, is that Xarelto is the most probable cause of Plaintiff Boudreaux's gastrointestinal bleed. Further, Plaintiffs argue that rather than a mere hypothesis, Dr. Winstead's opinion is supported by his clinical experience, peer-reviewed studies, and other sources including Xarelto's label.

Dr. Nathaniel Winstead, MD, is a general gastroenterologist and hepatologist with clinical experience with Warfarin, and is double-board-certified in gastroenterology and internal medicine. In researching for and writing his expert report, Dr. Winstead attests that he used the same methods he uses to evaluate and treat his patients. From 2008-2013, Dr. Winstead was the Director of Gastroenterology Research and the Medical Director of the Inflammatory Bowel Disease Center at Ochsner. He was the principal investigator or sub-investigator in multiple clinical trials for various drug manufacturers, including Defendant Janssen. As a medical doctor,

Dr. Winstead sees approximately 100-200 GI bleeds a year and has regularly concluded that certain bleeds are a result of anticoagulants themselves, including through systemic toxicity. In preparing for this case, Dr. Winstead reviewed Plaintiff Boudreaux's medical records, depositions of other witnesses, various iterations of Xarelto's label, and numerous Xarelto studies.

The Court finds Dr. Winstead is qualified by virtue of his training and experience. He reaches his conclusion that NOACs, and specifically Xarelto, can cause bleeding without underlying pathology through his experience, the presence of the drug in Plaintiff's stool, peer reviewed literature, and Xarelto's label. Defendants may cross-examine Dr. Winstead on these issues at trial in an attempt to establish the frailty of the basis of his conclusions, but excluding them at this time is inappropriate.

For the aforementioned reasons, **IT IS ORDERED** that Defendants' Motion (R. Doc. 5120) is **DENIED**.

### G. Plaintiffs' Motion to Preclude Speculative Testimony About Potential Outcomes from Other Anticoagulants

Before the Court is Plaintiffs' Motion to Preclude Speculative Testimony About Potential Outcomes from Other Anticoagulants which asks the Court to prevent Drs. Smith, Piazza, and Branch from testifying about what might have happened to the bellwether Plaintiffs if they had taken a different anticoagulant. (R. Doc. 5121). Defendants contend that Plaintiffs misconstrue their experts' testimony, arguing that their opinions are relevant to rebut Plaintiffs' claim that Xarelto is not as reliable as other drugs and that there is a safer alternative. To not allow this testimony, Defendants contend, would be prejudicial to their case and their ability to defend themselves against Plaintiffs' theories.

One of Plaintiffs' theories in this case is that Xarelto was defectively designed. Under the Louisiana Products Liability Act, this requires showing that a safer alternative design existed. The evidence presented here by Defendants' experts, Drs. Smith, Piazza, and Branch, attempts to rebut the claim of a safer alternative design and accordingly is admissible on <u>rebuttal</u> of Plaintiffs' defective design theory. The Doctors' opinions are based on their experience and training, are relevant, and are based on proper methodology. At trial, Plaintiffs may cross-examine these witnesses as to the validity of their conclusions, but excluding their testimony at this stage would be improper. The Court, however, may revisit this issue at trial if the evidence so warrants.

For the aforementioned reasons, **IT IS ORDERED** that Plaintiffs' Motion (R. Doc. 5121) is **DENIED**.

### H. Plaintiffs' Motion to Exclude Certain Opinions of Dr. J. Michael Gaziano

Before the Court is Plaintiffs' Motion to preclude certain testimony from Dr. J. Michael Gaziano, MD, MPH, regarding the adequacy of Xarelto's label, Xarelto's dosing scheme, and the Time in Therapeutic Range (TTR) for warfarin as compared to Xarelto. (R. Doc. 5127). Defendants disagree, arguing that Plaintiffs mischaracterize Dr. Gaziano's opinions and aver that he is more than qualified to offer this testimony based on his extensive experience, training as a cardiologist and epidemiologist, his clinical trial experience, his research, and his review of medical literature on Xarelto and other anticoagulants.

Dr. J. Michael Gaziano, MD, MPH, has been a physician for 30 years. He received his MD from Yale and his MPH with a concentration in cardio-epidemiology from Harvard. He is a cardiologist in Boston where he teaches and sees patients including those who require anticoagulant therapy. Dr. Gaziano is a professor at Harvard Medical School and an adjunct professor at Boston University Medical School, and is board certified in cardiovascular disease.

Throughout his career he has participated in and directed clinical trials and has also published various books and articles focusing on cardiology.

The Court finds Dr. Gaziano is well qualified by his education and experience, and that his opinions are based on his experience and his review of test data and literature. Dr. Gaziano's opinions are based on proper methodology and are relevant to the issues in dispute in this case. Further, the thrust of Plaintiffs' concerns lie in Dr. Gaziano's conclusions, not his methodology or qualifications. Accordingly, Plaintiffs concerns are better dealt with on cross-examination at trial.

For the aforementioned reasons, **IT IS ORDERED** that Plaintiffs' Motion (R. Doc. 5127) is **DENIED**.

I. **Plaintiffs' Motion to Preclude Speculative Testimony About Potential Outcomes from Other Anticoagulants**

Before the Court is Plaintiffs' second Motion to Preclude Speculative Testimony About Potential Outcomes from Other Anticoagulants, which asks the Court to prevent Drs. Boniol, Johnson, Kahn, Eiswirth, and Peacock from testifying about what might have happened to the bellwether Plaintiffs if they had taken a different anticoagulant. (R. Doc. 5399). They argue these opinions were not subject to peer review or tested, are without standards controlling their opinion, and are not generally accepted within the scientific community. They also argue such opinions are irrelevant and run a high risk of undue prejudice. Adopting their opposition to the first motion to exclude speculative testimony, Defendants contend that Plaintiffs misconstrue their experts' testimony, arguing that their opinions are relevant to rebut Plaintiffs' claim that Xarelto is not as reliable as other drugs and that there is a safer alternative. To not allow this testimony, Defendants contend, would be prejudicial to their case and their ability to defend themselves against Plaintiffs' theories. Defendants further argue that Plaintiffs own expert

12

witnesses agree that they cannot rule out the possibility of a bleeding event on another anticoagulant. Further, Defendants contend that all of the doctors base their opinions on their education, training and expertise and on extensive review of relevant studies, literature, and medical records.

One of Plaintiffs' arguments is that there is a safer alternative to Xarelto. The testimony of these expert witnesses seeks to rebut that theory. Further, the testimony goes toward Defendants' theory that Xarelto was an appropriate drug for Plaintiffs to take. This Court finds the testimony is proper as the experts are well-qualified and their testimony is relevant and based on proper methodology. Accordingly, Plaintiffs' Motion (R. Doc. 5399) is **DENIED**.

### J. Plaintiffs' Motion to Exclude Certain Opinions of Drs. Scott Boniol and William Franklin Peacock IV

Before the Court is Plaintiffs' Motion to exclude the section of Dr. Scott Boniol's and Dr. William Franklin Peacock IV's expert reports that opine on the earlier detection of cancer and other diseases due to anticoagulant-related bleeding events. (R. Doc. 5401). Defendants oppose the motion, arguing the statements regarding early detection of diseases such as cancer are relevant and reliable as part of the entire risk-benefit analysis of Xarelto. The entire analysis, they aver, must be weighed by a jury when ascertaining whether or not Xarelto was defectively designed.

Dr. Scott Boniol, MD, is a hematologist and oncologist. Dr. William Franklin Peacock IV, MD, FACEP, is a board-certified emergency medicine physician and a fellow of the American Colleges of Emergency Physicians and Cardiology. Plaintiffs do not dispute either doctor's expert credentials, and the Court finds they are qualified by virtue of their education and experience to offer expert testimony.

The Court finds the testimony of Drs. Boniol and Peacock regarding early cancer detection to be irrelevant in this case, as cancer was not an issue for either Plaintiff. Further, there is no evidence that Xarelto is routinely prescribed to screen for cancer. Accordingly, such testimony is excluded. If this becomes an issue during the trial, then this ruling will be modified). Accordingly, Plaintiffs' motion (R. Doc. 5401) is **GRANTED**.

**K.     Plaintiffs' Motion to Exclude Certain Opinions of Dr. Scott Boniol**

Before the Court is Plaintiffs' Motion to exclude the section of Dr. Scott Boniol's expert report that gives his opinion about the effects of attorney advertising because they are subjective, unscientific, unreliable, and unduly prejudicial. (R. Doc. 5404). Defendants oppose, arguing his testimony is reliable and relevant. Further, they contend that limiting their ability to make arguments about attorney advertising would be prejudicial because Plaintiffs plan to discuss Defendants' Xarelto advertisements.

Dr. Scott Boniol, MD, is a hematologist and oncologist. Plaintiffs do not dispute his expert credentials, and the Court finds he is qualified by nature of his education and experience to offer expert testimony. Further, his opinions regarding Xarelto are based on experience, data, and on medical journals. However, the Court finds Dr. Boniol's commentary on attorney advertising and the effect of that advertising on patients is argumentative and are excluded under F.R.E. 401 and 403. Dr. Boniol may discuss the danger to patients who prematurely stop taking Xarelto, but may not relate that danger to attorney advertising. However, testimony regarding attorney advertising may be offered as rebuttal testimony if the issue is raised on direct examination at trial. If there is evidence that the patient in question avoided taking Xarelto or abruptly stopped taking Xarelto due to attorney advertising, then this ruling may have to be modified.

Consistent with the aforementioned reasons, **IT IS ORDERED** that Plaintiffs' Motion (R. Doc. 5404) is **DENIED IN PART** and **GRANTED IN PART**.

II. CONCLUSION

For the aforementioned reasons, **IT IS ORDERED** that Defendants' Motion to exclude certain opinions of Dr. Laura Plunkett (R. Doc. 5108) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to exclude certain opinions of Dr. David Kessler (R. Doc. 5111) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to exclude certain opinions of Dr. Suzanne Parisian (R. Doc. 5112) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to exclude expert opinions and testimony regarding unapproved dosage and monitoring regimens (R. Doc. 5113) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to preclude opinions and testimony regarding Plaintiffs' experts' 20-second PT cutoff guideline (R. Doc. 5114) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to exclude certain opinions of Dr. James Reiffel (R. Doc. 5116) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to exclude certain opinions of Dr. Nathaniel Winstead (R. Doc. 5120) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to preclude speculative testimony about potential outcomes from other anticoagulants (R. Doc. 5121) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to exclude certain opinions of Dr. J. Michael Gaziano (R. Doc. 5127) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to preclude speculative testimony about potential outcomes from other anticoagulants (R. Doc. 5399) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to exclude certain opinions of Drs. Scott Boniol and William Franklin Peacock IV (R. Doc. 5401) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to exclude certain opinions of Dr. Scott Boniol (R. Doc. 5404) is **GRANTED IN PART** and **DENIED IN PART**.

New Orleans, Louisiana, 12th day of April, 2017.

_____
UNITED STATES DISTRICT JUDGE