Iboudreaux v. b.    xarelto tmax db
Deposition Designations for Shah N 20160803, Shah N 20160804

04/23/17 18:52

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**15:14 - 16:5**

| | | |
|---|---|---|
| 15 14 | Shah, Nauman 2016-08-03 | |
| 15 15 | Q. Could you state your name | |
| 15 16 | for the record. | |
| 15 17 | A. Nauman Shah. | |
| 15 18 | Q. And where do you currently | |
| 15 19 | reside? | |
| 15 20 | A. I live in Flemington, New | |
| 15 21 | Jersey. | |
| 15 22 | Q. And are you currently | |
| 15 23 | employed? | |
| 15 24 | A. I am. | |
| 16 1 | Q. And what -- who are you | |
| 16 2 | employed with? | |
| 16 3 | A. I'm employed by Janssen | |
| 16 4 | Pharmaceuticals, which is the -- the | |
| 16 5 | pharmaceutical division of Johnson & | |
| | Johnson. | 0:15 |

**16:16 - 16:18**

| | | |
|---|---|---|
| 16 16 | Shah, Nauman 2016-08-03 | |
| 16 17 | Q. Do you no longer have any | |
| 16 18 | responsibilities for Xarelto? | |
| | A. That is correct. | 0:03 |

**16:19 - 16:24**

| | | |
|---|---|---|
| 16 19 | Shah, Nauman 2016-08-03 | |
| 16 20 | Q. Okay. And how long have you | |
| 16 20 | worked for Janssen or a Johnson & Johnson | |
| 16 21 | company? | |
| 16 22 | A. I have worked for Janssen or | |
| 16 23 | Johnson & Johnson since 2000 -- January | |
| 16 24 | of 2003. So 13 years. | 0:12 |

**17:12 - 17:15**

| | | |
|---|---|---|
| 17 12 | Shah, Nauman 2016-08-03 | |
| 17 13 | Q. Okay. So you've worked for | |
| 17 14 | the drug industries for about 20 years? | |
| 17 15 | A. Yes, over 20 years. | |
| | 23 years. | 0:06 |

**20:6 - 20:13**

| | | |
|---|---|---|
| 20 6 | Shah, Nauman 2016-08-03 | |
| 20 7 | Q. In your 20-plus years of | |
| 20 8 | working for a pharmaceutical company, I | |
| 20 9 | understand that you've led or played a | |
| 20 10 | major role in marketing multiple | |
| 20 11 | blockbuster drugs, correct? | |
| 20 12 | A. I have played a role in | |
| 20 13 | multiple drugs that have been successful, | |
| | yes. | 0:12 |

1

04/23/17 18:52

| Line | Testimony | Objection In | Responses In | Rulings |
|---|---|---|---|---|
| 54:16 - 55:13 | **Shah, Nauman 2016-08-03**<br>54 16 Q. Okay. Now, in that position<br>54 17 when you were leading the marketing<br>54 18 strategy and launch -- launch plan<br>54 19 execution, did you have responsibility<br>54 20 for both the professional side and the<br>54 21 consumer side?<br>54 22 A. I did.<br>54 23 Q. And professional side, just<br>54 24 so that the jury knows, is marketing and<br>55 1 advertising efforts to healthcare<br>55 2 professionals like doctors, nurses,<br>55 3 right?<br>55 4 A. That is correct.<br>55 5 Q. And on the consumer side,<br>55 6 it's marketing and advertising efforts to<br>55 7 the end consumer, the patient, who is<br>55 8 going to actually take the drug Xarelto<br>55 9 as prescribed?<br>55 10 A. That is correct, yeah.<br>55 11 Q. Did you have responsibility<br>55 12 for a marketing budget?<br>55 13 A. I did. | | | 0:39 |
| 96:20 - 97:15 | **Shah, Nauman 2016-08-03**<br>96 20 Q. Mr. Shah, would you agree<br>96 21 with me that Xarelto competes in the<br>96 22 anticoagulant market, correct?<br>96 23 A. Yes, I do.<br>96 24 Q. And I've seen in numerous<br>97 1 documents that you all at the time<br>97 2 described it as fiercely competitive?<br>97 3 A. I would agree.<br>97 4 Q. And that market in --<br>97 5 includes your competition warfarin,<br>97 6 right?<br>97 7 A. Yes.<br>97 8 Q. Pradaxa?<br>97 9 A. Yes.<br>97 10 Q. Eliquis?<br>97 11 A. Yes.<br>97 12 Q. In the orthopedic segment,<br>97 13 Lovenox?<br>97 14 A. Yes. And there are -- there<br>97 15 are others. | Re: [96:20-97:15]<br>**Def Obj** Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [96:20-97:15]<br>Pltf Resp In light of the Court''s rulings on the designated testimony of Ms. Geiger, these are no longer valid objections and Plaintiffs suggest should be withdrawn. Further, given that Mr. Shah's role as Janssen's Vice President of Sales and Marketing, Plaintiffs suggest that Defendants'' objections should be overruled on the same bases. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, preojections, profit or market share. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, projections, profit or market share. | Pending |
| 97:16 - 97:16 | **Shah, Nauman 2016-08-03**<br>97 16 Q. And there are others. Okay. | Re: [97:16-97:16]<br>Pltf Obj This is not a question and should not be | | 0:02<br>Pending |
| 97:17 - 98:7 | **Shah, Nauman 2016-08-03**<br>97 17 And would you also agree<br>97 18 with me from a commercial standpoint it<br>97 19 was critical for Xarelto to get to market<br>97 20 first, ahead of its competition? | Re: [97:17-98:7]<br>**Def Obj** Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 | Re: [97:17-98:7]<br>Pltf Resp The designated testimony is not about marketing pieces that would have been used to promote prescription of Xarelto by prescribing physicians, but instead is relevant to the overall | 0:30<br>Pending |

llings

04/23/17 18:52

| Lines | Deposition Testimony | Objections In | Responses In | |
|---|---|---|---|---|
| 97 21 97 22 97 23 97 24 98 1 98 2 98 3 98 4 98 5 98 6 98 7 | A. That was certainly our desire and our wish. Any time in the pharmaceutical industry, and I would say in markets generally, if you're first, you usually have an advantage, assuming products are either equal or yours is better. Obviously there are situations where products may come second and if they are better they become the leaders. Q. So the answer is -- is yes? A. Yes. Sorry. | related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | commercial and business plan of the company to market an anti-coagulant that did not require any type of measurement or monitoring of plasma blood levels, and how that commercial plan was probative of the company''s reasoning for rejecting the scientific evidence that PT could be used to measure the drug exposure levels, anticoagulant activity, and bleeding risk for patients. The testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies''' overall value, revenues, or market share. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, projections, profit or market share. | Pending |
| 98:19 – 99:2 0:14 98 19 98 20 98 21 98 22 98 23 98 24 99 1 99 2 | Shah, Nauman 2016-08-03 MR. WEINKOWITZ: And for the record, Shah-3 is Document 1478312, Bates Xarelto-Janssen 8749745 BY MR. WEINKOWITZ: Q. Have you had an opportunity to review that? A. I have. | Re: [98:19-99:2] Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [98:19-99:2] Pltf Resp See Pl, response to 96:20-97:15 and 97:17-98:7. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, projections, profit or market share. | Pending |
| 99:14 – 99:14 0:02 99 14 | Shah, Nauman 2016-08-03 Q. And the title of the | | | |
| 99:15 – 99:19 0:11 99 15 99 16 99 17 99 18 99 19 | Shah, Nauman 2016-08-03 PowerPoint slide is "Ortho-McNeil Cardiovascular Franchise. Critical Issues and Opportunities, 2009 to 2016." Did I read that correctly? A. That is correct. | Re: [99:15-99:19] Def Obj This testimony falls within the evidence covered by the Court's ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, | Re: [99:15-99:19] Pltf Resp See Pl, response to 15:14-16:5. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, | Pending |

| | | Objections In | Responses In | ...ulings |
|---|---|---|---|---|
| | | both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | projections, profit or market share. | |

**100:8 – 101:9** Shah, Nauman 2016-08-03

0:41

| | | |
|---|---|---|

```
100  8     At the top of it it says,
100  9     "Rivaroxaban and Critical Issues, 2009 to
100  10    2016."
100  11        Did I read that correctly?
100  12    A.  That is correct, yes.
100  13    Q.  Rivaroxaban is Xarelto,
100  14    correct?
100  15    A.  Yes, it is.
100  16    Q.  And the fourth bullet point
100  17    down says, "Speed to market of
100  18    development program is critical to
100  19    capitalize on first-mover advantage when
100  20    possible, as market continues to increase
100  21    in competitive intensity over time."
100  22        Did I read that correctly?
100  23    A.  You did.
100  24    Q.  All right. And it does say,
101  1     "Speed to market of development program,"
101  2     correct?
101  3     A.  It does.
101  4     Q.  And that's in reference to
101  5     Xarelto's development program, right?
101  6     A.  I believe it is.
101  7     Q.  And it says that it is
101  8     critical, correct?
101  9     A.  Yes, when possible.
```

**Re: [100:8-101:9]**
**Def Obj** Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Re: [100:8-101:9]**
**Pltf Resp** See Pl, response to 15:14-16:5. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, projections, profit or market share.

Pending

**101:18 – 101:23** Shah, Nauman 2016-08-03

0:17

```
101  18    Q.  All right. So that's
101  19    consistent with what you testified
101  20    earlier when I asked you whether it is
101  21    critical, what is critical for Xarelto to
101  22    get to market before its competition?
101  23    A.  That was always our wish.
```

**Re: [101:18-101:23]**
**Def Obj** Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share

**Re: [101:18-101:23]**
**Pltf Resp** See Pl, response to 15:14-16:5. Mr. Shah is testifying about the anticoagulant market generally, the fierce competition that Xarelto faced in that market and the importance of being first to market. There is no testimony about specific sales numbers, projections, profit or market share.

Pending

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

**105:16 - 106:3    Shah, Nauman 2016-08-03    0:23**

| | |
|---|---|
| 105 16 | Q. Okay. So I've handed you |
| 105 17 | what's been marked as Shah-4 and asked |
| 105 18 | you to review it. Have you had a chance |
| 105 19 | to review it? |
| 105 20 | A. I have. |
| 105 21 | Q. All right. And this is -- |
| 105 22 | was this a PowerPoint slide that you |
| 105 23 | prepared? |
| 105 24 | A. I'm going back all the way |
| 106 1 | to 2008 here. So I -- it looks -- my |
| 106 2 | name is on it, so I'm assuming I prepared |
| 106 3 | it, yes. |

**Objections In:** and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Re: [105:16-106:3]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing and the Court's ruling on Defendants' Omnibus Mil. No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Responses In:**
**Re: [105:16-106:3]**
**Pltf Resp** See Pl. response to 96:20-97:15 and 97:17-98:7. Mr. Shah is testifying about the an analysis that he did for J&J leadership regarding how "critical" Xarelto was for the J&J pharmaceutical segment and that it was a "must-do" product and that a successful on-time launch was the goal. There is no testimony about specific sales numbers, projections, profit or market share.

**Rulings:** Pending

---

**110:7 - 110:16    Shah, Nauman 2016-08-03    0:18**

| | |
|---|---|
| 110 7 | Q. Okay. Now, if you look to |
| 110 8 | page -- look at the next page, Page 19. |
| 110 9 | A. Okay. |
| 110 10 | Q. You will see that the title |
| 110 11 | of the slide is "Compound Priorities"? |
| 110 12 | A. Yes. |
| 110 13 | Q. And there is a lot of |
| 110 14 | redacted compounds that have nothing to |
| 110 15 | do with this case. Do you see that? |
| 110 16 | A. I do. |

**Objections In:**
**Re: [110:7-110:16]**
**Def Obj** The testimony at 110:13-110:16 regarding other products is not relevant, and there are unnecessary and confusing references to redactions as part of discovery. Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing and the Court's ruling on Defendants' Omnibus Mil. No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Responses In:**
**Re: [110:7-110:16]**
**Pltf Resp** See response to 105:16-106:3 above. The other products are not mentioned and the references to redactions are minimal and insignificant and non prejudicial.

**Rulings:** Pending

---

**111:20 - 112:17    Shah, Nauman 2016-08-03    0:32**

| | |
|---|---|
| 111 20 | Q. Okay. And so if we look -- |
| 111 21 | basically this slide says that |
| 111 22 | rivaroxaban is a must-do for the company? |
| 111 23 | A. Yes. |
| 111 24 | Q. And if we look back at the |
| 112 1 | definition of must do, this is -- you can |

**Objections In:**
**Re: [111:20-112:17]**
**Def Obj** Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing and the Court's ruling on Defendants' Omnibus Mil. No. 1 regarding market share

**Responses In:**
**Re: [111:20-112:17]**
**Pltf Resp** See response to 105:16-106:3 above. Ms. Shah testified that he received the email from Chairman of the Pharmaceutical group. He testified to how critical Xarelto with no monitoring was to J&J that it was accelerated to market while at the same time defendants were aware that Xarelto's anticoagulant effect could

**Rulings:** Pending

...llings

04/23/17 18:52

| | | Objections In | Responses In |
|---|---|---|---|
| 112 2<br>112 3<br>112 4<br>112 5<br>112 6<br>112 7<br>112 8<br>112 9<br>112 10<br>112 11<br>112 12<br>112 13<br>112 14<br>112 15<br>112 16<br>112 17 | basically conclude one thing -- a couple<br>of things. One, Xarelto was critical to<br>Johnson & Johnson's success based on the<br>first bullet point, right?<br>A. That is correct.<br>Q. Xarelto offered high<br>financial value?<br>A. It did.<br>Q. All right. And that means<br>you can make a lot of money off of it,<br>correct?<br>A. Correct.<br>Q. Xarelto had no major<br>development hurdles identified at least<br>as of the date of this slide, correct?<br>A. That is correct. | and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | not be reversed and that there was a need to monitor the drug by using Neoplastin PT. This is relevant to Plaintiff's failure to warn claim. |
| 117:14 - 0:18 | 117:24 Shah, Nauman 2016-08-03 | | |
| 117 14<br>117 15<br>117 16<br>117 17<br>117 18<br>117 19<br>117 20<br>117 21<br>117 22<br>117 23<br>117 24 | Q. Okay. Mr. Shah, I've handed<br>you what I've marked as Shah-4 -- I'm<br>sorry -- Shah-5, and given you an<br>opportunity to read that.<br>Have you read the document?<br>A. I have.<br>Q. All right. And you see that<br>this is an e-mail to the pharmaceutical<br>group -- from pharmaceutical<br>group communications dated March 5, 2010.<br>Do you see that? | Re: [117:14-117:24]<br>Def Obj This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [117:14-117:24]<br>Pltf Resp See response to 105:16-106:3 above. Ms. Shah testified that she received the email from Chairman of the Pharmaceutical group. He testified to how critical Xarelto with no monitoring was to J&J that it was accelerated to market while at the same time defendants were aware that Xarelto's anticoagulant effect could not be reversed and that there was a need to monitor the drug by using Neoplastin PT. This is relevant to Plaintiff's failure to warn claim. |
| 118:7 - 0:12 | 118:17 Shah, Nauman 2016-08-03 | | |
| 118 7<br>118 8<br>118 9<br>118 10<br>118 11<br>118 12<br>118 13<br>118 14<br>118 15<br>118 16<br>118 17 | Q. All right. And if you -- if<br>you look, the e-mail is from Sherri<br>McCoy, worldwide chairman<br>pharmaceuticals?<br>A. Yes.<br>Q. Do you see that?<br>A. I do.<br>Q. She was sort of the top of<br>the chain for pharmaceutical business?<br>A. She headed up<br>pharmaceuticals globally, yes. | Re: [118:7-118:17]<br>Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [118:7-118:17]<br>Pltf Resp See response to 105:16-106:3 above. Ms. Shah testified that she received the email from Chairman of the Pharmaceutical group. He testified to how critical Xarelto with no monitoring was to J&J that it was accelerated to market while at the same time defendants were aware that Xarelto's anticoagulant effect could not be reversed and that there was a need to monitor the drug by using Neoplastin PT. This is relevant to Plaintiff's failure to warn claim. |
| 120:1 - 0:35 | 120:22 Shah, Nauman 2016-08-03 | | |
| 120 1<br>120 2<br>120 3<br>120 4 | Q. All right. So if you look<br>at this e-mail, it's -- it's talking<br>about 2010 strategic objectives for the<br>pharmaceutical group. Do you see that in | Re: [120:1-120:22]<br>Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 | Re: [120:1-120:22]<br>Pltf Resp See response to 105:16-106:3 above. Ms. Shah testified that she received the email from Chairman of the Pharmaceutical group. He testified to how critical Xarelto with no monitoring was |

Pending

Pending

Pending

| | Testimony | Objects. In | Responses In | |
|---|---|---|---|---|
| 120 5 | the middle paragraph? It says, | related to marketing and the Court's ruling on | to J&J that it was accelerated to market while at the same time | |
| 120 6 | "Following are our 2010 strategic | Defendants' Omnibus MIL No. 1 regarding market share | defendants were aware that Xarelto's anticoagulant effect could | |
| 120 7 | objectives"? | and profits, both of which the Court sustained. The | not be reversed and that there was a need to monitor the drug by | |
| 120 8 | A. I do. | evidence is not relevant and is more prejudicial than | using Neoplastin PT. This is relevant to Plaintiff's failure to warn | |
| 120 9 | Q. All right. And then | probative under Rule 403. | claim. | |
| 120 10 | underneath it it says, "Pharmaceutical | | | |
| 120 11 | group." Do you see that? | | | |
| 120 12 | A. Yes, it does. | | | |
| 120 13 | Q. And -- and then if you look | | | |
| 120 14 | at the second bullet point down it says, | | | |
| 120 15 | "Accelerate time to market and increase | | | |
| 120 16 | value for key compounds." | | | |
| 120 17 | And then there's a couple of | | | Pending |
| 120 18 | redactions, right? | | | |
| 120 19 | A. Yes, there are. | | | |
| 120 20 | Q. And then rivaroxaban is | | | |
| 120 21 | listed under that? | | | |
| 120 22 | A. It is. | | | |
| | | | | 0:32 |
| **121:9 - 121:24 Shah, Nauman 2016-08-03** | | | | |
| 121 9 | Q. This indicates that the top | **Re: [121:9-121:24]** | **Re: [121:9-121:24]** | |
| 121 10 | of the company was saying that one of | **Def Obj** Defendants' objections maintained for | Pltf Resp See response to 105:16-106:3 above. Ms. Shah testified | |
| 121 11 | your strategic objectives was to | preservation. This testimony falls within the evidence | that he received the email from Chairman of the Pharmaceutical | |
| 121 12 | accelerate Xarelto's time to market, | covered by the Court's Ruling on Defendants' MIL No. 2 | group. He testified to how critical Xarelto with no monitoring was | |
| 121 13 | correct? | related to marketing and the Court's ruling on | to J&J that it was accelerated to market while at the same time | |
| 121 14 | A. I would agree that that's | Defendants' Omnibus MIL No. 1 regarding market share | defendants were aware that Xarelto's anticoagulant effect could | |
| 121 15 | what it says, yes. | and profits, both of which the Court sustained. The | not be reversed and that there was a need to monitor the drug by | |
| 121 16 | Q. Okay. And -- and the reason | evidence is not relevant and is more prejudicial than | using Neoplastin PT. This is relevant to Plaintiff's failure to warn | |
| 121 17 | they're -- that's given for that is to | probative under Rule 403. | claim. | |
| 121 18 | increase value for key components, | | | |
| 121 19 | correct? | | | |
| 121 20 | A. Yes. I mean, clearly the | | | |
| 121 21 | earlier you get to a market, the more | | | |
| 121 22 | value you can create. | | | |
| 121 23 | Q. And -- and increase value to | | | |
| 121 24 | the company means make more money, | | | |
| | | | | 0:15 |
| **123:22 - 124:6 Shah, Nauman 2016-08-03** | | | | |
| 123 22 | Q. And can we also conclude | **Re: [123:22-124:6]** | **Re: [123:22-124:6]** | |
| 123 23 | from the prior document we looked at that | **Def Obj** Defendants' objections maintained for | Pltf Resp See response to 105:16-106:3 above. Ms. Shah testified | |
| 123 24 | Xarelto was a must-do product for Johnson | preservation. This testimony falls within the evidence | that he received the email from Chairman of the Pharmaceutical | |
| 124 1 | & Johnson? | covered by the Court's Ruling on Defendants' MIL No. 2 | group. He testified to how critical Xarelto with no monitoring was | |
| 124 2 | A. It was a must-do. | related to marketing and the Court's ruling on | to J&J that it was accelerated to market while at the same time | |
| 124 3 | Q. And it was a critical | Defendants' Omnibus MIL No. 1 regarding market share | defendants were aware that Xarelto's anticoagulant effect could | |
| 124 4 | product for Johnson & Johnson's success? | and profits, both of which the Court sustained. The | not be reversed and that there was a need to monitor the drug by | Pending |
| 124 5 | A. It -- it -- it was | evidence is not relevant and is more prejudicial than | using Neoplastin PT. This is relevant to Plaintiff's failure to warn | |
| 124 6 | definitely one of the key ones, yes. | probative under Rule 403. | claim. | |



04/23/17 18:52

| | Objections In | Responses In | Rulings |
|---|---|---|---|

124:7 - 124:8   Shah, Nauman 2016-08-03

| 124 | 7 | Q. Okay. All right. We're |
| 124 | 8 | done with that document. |

Re: [124:7-124:8]
Pltf Obj Attorney commentary not part of the question that starts on the next page.

0:09

Pending

124:9 - 125:12   Shah, Nauman 2016-08-03

| 124 | 9 | Now, would you agree in or |
| 124 | 10 | around the time period of 2009 -- let -- |
| 124 | 11 | let's talk about 2009. |
| 124 | 12 | 2009, Xarelto is not on the |
| 124 | 13 | market yet in any indication, correct? |
| 124 | 14 | A. That is correct. |
| 124 | 15 | Q. And in 2009 you are director |
| 124 | 16 | of marketing for Xarelto, correct? |
| 124 | 17 | A. I am. |
| 124 | 18 | Q. All right. And would you |
| 124 | 19 | agree with me that one of the critical |
| 124 | 20 | success factors for the Janssen |
| 124 | 21 | cardiovascular franchise was an on-time |
| 124 | 22 | successful launch for Xarelto in the |
| 124 | 23 | orthopedic indications? |
| 124 | 24 | A. We had certainly hoped for |
| 125 | 1 | that, yes. |
| 125 | 2 | Q. Okay. And the reason you |
| 125 | 3 | wanted to have an on-time launch in the |
| 125 | 4 | orthopedic indication for Xarelto was to |
| 125 | 5 | set the stage for the additional |
| 125 | 6 | indications that were to come for |
| 125 | 7 | Xarelto, correct? |
| 125 | 8 | A. Yes. And if I may, setting |
| 125 | 9 | the stage in this context would mean |
| 125 | 10 | enabling people to use it in the real |
| 125 | 11 | world, obviously, getting access into |
| 125 | 12 | formularies, things like that. |

Re: [124:9-125:12]
Def Obj Defendants' objections maintained for preservation. Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under rule 403.

Re: [124:9-125:12]
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarleto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies™ overall value, revenues, or market share.

0:58

Pending

126:11 - 127:10   Shah, Nauman 2016-08-03

| 126 | 11 | Q. Okay. And overall would you |
| 126 | 12 | agree with me that the company that's |

0:48

8



...tings

Responses In

Pending

**Objectn. In**

| 126 | 13 | competing -- the companies that are |
| 126 | 14 | competing in such a fiercely competitive |
| 126 | 15 | market, the company that gets to market |
| 126 | 16 | first has a commercial advantage over the |
| 126 | 17 | other companies? |
| 126 | 18 | A.  So this is -- generally I |
| 126 | 19 | would say that that is true; however, in |
| 126 | 20 | this case, each indication getting to the |
| 126 | 21 | market first would have its own distinct |
| 126 | 22 | advantage, because there are different |
| 126 | 23 | stakeholders, different patients. So |
| 126 | 24 | just because you launch first for |
| 127 | 1 | orthopedic surgery or VTE post hip and |
| 127 | 2 | knee replacement doesn't necessarily give |
| 127 | 3 | you a huge advantage in atrial |
| 127 | 4 | fibrillation. |
| 127 | 5 | Q.  Okay.  So it's your |
| 127 | 6 | testimony -- I just want to make sure |
| 127 | 7 | you're clear then. There is no advantage |
| 127 | 8 | in the Afib indication to launching the |
| 127 | 9 | orthopedic indication for Xarelto before |
| 127 | 10 | your competition? |

127:16  -  128:18 Shah, Nauman 2016-08-03

0:42

Re: [127:16-128:18]
Pltf Obj Motion to strike non responsive. Counter
designaiton not for completeness.

| 127 | 16 | THE WITNESS:  Okay.  So what |
| 127 | 17 | I'm stating is that atrial |
| 127 | 18 | fibrillation is treated by |
| 127 | 19 | cardiologists and primary care |
| 127 | 20 | doctors. Orthopedic -- the |
| 127 | 21 | orthopedic indication, which I'm |
| 127 | 22 | just stating for shortness, by the |
| 127 | 23 | way, is treated by orthopedic |
| 127 | 24 | surgeons. They are distinct |
| 128 | 1 | audiences.  So I would not say |
| 128 | 2 | that they -- I would agree that |
| 128 | 3 | there's not a huge benefit of |
| 128 | 4 | launching the orthopedic |
| 128 | 5 | indication first to atrial |
| 128 | 6 | fibrillation.  Having said that, |
| 128 | 7 | the only advantage that I do see |
| 128 | 8 | is you get the drug on the market. |
| 128 | 9 | There are -- you know, |
| 128 | 10 | there -- you start building some |
| 128 | 11 | real world safety information. |
| 128 | 12 | Certainly the insurance companies |
| 128 | 13 | start covering the drug |
| 128 | 14 | potentially.  So your job then |
| 128 | 15 | when you get the atrial |
| 128 | 16 | fibrillation indication, your |
| 128 | 17 | ability to get it reviewed becomes |
| 128 | 18 | a little bit easier. |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 128:20 - | 129:15 Shah, Nauman 2016-08-03 | 0:40 | | Pending |
| 128  20 | Q.  Okay.  Now, in 2009 | **Re: [128:20-129:15]** | Re: [128:20-129:15] | |
| 128  21 | commercially the plan for Xarelto was to | **Def Obj** Defendants' objections maintained for | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies | |
| 128  22 | launch Xarelto for the prevention of | preservation. This testimony falls within the evidence | based on the commercial plan about how it was important for | |
| 128  23 | blood clots with hip and knee surgery. | covered by the Court's Ruling on Defendants' Mil. No. 2 | Xarelto to be first to market. Mr. Shah is testifying about the delay | |
| 128  24 | A.  That is correct. | related to marketing and the Court's ruling on | caused by the clinical trial problems with the Record trial and how | |
| 129  1 | Q.  And then to launch for Afib, | Defendants' Omnibus Mil. No. 1 regarding market share | that delayed the Afib launch.  Again the testimony is relevant to | |
| 129  2 | correct? | and profits, both of which the Court sustained. The | motive, and credibility for why the company failed to warn about | |
| | | evidence is not relevant and is more prejudicial than | the usefulness of a PT test.  Further the testimony is not regarding | |
| | | probative under Rule 403. The testimony regarding | profits from Xarelto, or the companies'" overall value, revenues, or | |
| | | RECORD/RECORD 4/DVT/PE is not relevant and is more | market share. | |
| | | prejudicial than probative under Rule 403. | | |
| 129  3 | A.  Yes, that is correct. | **Re: [129:4-129:15]** | Re: [129:4-129:15] | |
| 129  4 | Q.  And Afib -- Afib is -- the | **Def Obj** Defendants' objections maintained for | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies | |
| 129  5 | Afib indication for Xarelto is a bigger | preservation. This testimony falls within the evidence | based on the commercial plan about how it was important for | |
| 129  6 | moneymaker than orthopedic surgery | covered by the Court's Ruling on Defendants' Mil. No. 2 | Xarelto to be first to market. Mr. Shah is testifying about the delay | |
| 129  7 | because Afib patients take Xarelto | related to marketing and the Court's ruling on | caused by the clinical trial problems with the Record trial and how | |
| 129  8 | chronically, correct? | Defendants' Omnibus Mil. No. 1 regarding market share | that delayed the Afib launch.  Again the testimony is relevant to | |
| 129  9 | A.  Yes, that's correct. | and profits, both of which the Court sustained.  The | motive, and credibility for why the company failed to warn about | |
| 129  10 | Q.  All right.  So there -- so | evidence is not relevant and is more prejudicial than | the usefulness of a PT test.  Further the testimony is not regarding | |
| 129  11 | there's more potential upside for the | probative under Rule 403. The testimony regarding | profits from Xarelto, or the companies'" overall value, revenues, or | |
| 129  12 | Afib indication commercially because | RECORD/RECORD 4/DVT/PE is not relevant and is more | market share. | |
| 129  13 | patients are taking it all the time, | prejudicial than probative under Rule 403. | | |
| 129  14 | correct? | **Re: [129:4-129:15]** | | |
| 129  15 | A.  I would agree. | **Def Obj** Defendants' objections maintained for | | |
| 129:4 - | 129:15 Shah, Nauman 2016-08-03 | 0:24 | | Pending |
| 129  4 | Q.  And Afib -- Afib is -- the | **Re: [128:20-129:15]** | Re: [129:4-129:15] | |
| 129  5 | Afib indication for Xarelto is a bigger | **Def Obj** Defendants' objections maintained for | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies | |
| 129  6 | moneymaker than orthopedic surgery | preservation. This testimony falls within the evidence | based on the commercial plan about how it was important for | |
| 129  7 | because Afib patients take Xarelto | covered by the Court's Ruling on Defendants' Mil. No. 2 | Xarelto to be first to market. Mr. Shah is testifying about the delay | |
| 129  8 | chronically, correct? | related to marketing and the Court's ruling on | caused by the clinical trial problems with the Record trial and how | |
| 129  9 | A.  Yes, that's correct. | Defendants' Omnibus Mil. No. 1 regarding market share | that delayed the Afib launch.  Again the testimony is relevant to | |
| 129  10 | Q.  All right.  So there -- so | and profits, both of which the Court sustained. The | motive, and credibility for why the company failed to warn about | |
| 129  11 | there's more potential upside for the | evidence is not relevant and is more prejudicial than | the usefulness of a PT test.  Further the testimony is not regarding | |
| 129  12 | Afib indication commercially because | probative under Rule 403. The testimony regarding | profits from Xarelto, or the companies'" overall value, revenues, or | |
| 129  13 | patients are taking it all the time, | RECORD/RECORD 4/DVT/PE is not relevant and is more | market share. | |
| 129  14 | correct? | prejudicial than probative under Rule 403. | | |
| 129  15 | A.  I would agree. | **Re: [129:4-129:15]** | | |
| | | **Def Obj** Defendants' objections maintained for | | |
| 129:16 - | 130:13 Shah, Nauman 2016-08-03 | 0:50 | | Pending |
| 129  16 | Q.  All right.  And do you | **Re: [129:16-130:13]** | Re: [129:16-130:13] | |
| 129  17 | recall that the plan was to launch in the | **Def Obj** This testimony falls within the evidence covered | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies | |
| 129  18 | orthopedic surgery indication, to launch | by the Court's Ruling on Defendants' Mil. No. 2 related | based on the commercial plan about how it was important for | |

04/23/17 18:52

04/23/17 18:52

| | | | Objecti. In | Responses In |
|---|---|---|---|---|

129  19   Xarelto in the second quarter of 2009?
129  20   A.  If my memory is correct, it
129  21   was towards the end of Q2, yes.  I
129  22   believe that's right.
129  23   Q.  Okay.  And do you recall
129  24   that the plan was to file the NDA for the
130  1    Afib indication by the end of 2010 so it
130  2    was launched the first quarter of 2012?
130  3    At least that was the plan.
130  4    A.  That may have been the
130  5    timing at that point.  I will -- if
130  6    that's a document that you have, I --
130  7    I -- I believe you.
130  8    I know we eventually didn't
130  9    launch atrial fibrillation until the end
130  10   of 2011.  But at some point there may
130  11   have been -- the timing that enabled it
130  12   to get to the market as early as 2000 --
130  13   early 2011.

**Objecti. In:** to marketing and the Court's ruling on Defendants' Omnibus Mil. No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Responses In:** Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies™ overall value, revenues, or market share.

Pending

130:14  -  131:8   Shah, Nauman 2016-08-03       0:33

130  14   Q.  We're -- we're going to --
130  15   we're going to get there.
130  16   A.  Okay.  Good.
130  17   Q.  But from what I said, which
130  18   was that the plan was to file the NDA in
130  19   Afib by the end of 2010 so that Afib was
130  20   launched by the first quarter of 2011,
130  21   that doesn't sound wrong?
130  22   A.  No, it does sound wrong,
130  23   because -- and that's why I was confused
130  24   about this -- sorry -- about the question
131  1    there.
131  2    A review time, standard
131  3    review time by the -- for the FDA for any
131  4    new indication is ten months at a minimum
131  5    at that time.
131  6    So you couldn't file at the
131  7    end of 2010 and have early 2011 approval.
131  8    It just would have been too fast.

Re: [130.14-131.8]
Pltf Obj Not for completeness.  Would be overly confusing to the jury.

131:17  -  132:2   Shah, Nauman 2016-08-03       0:23

131  17   Q.  All right.  So -- but one
131  18   thing we can agree on is, is that in
131  19   order to maximize the commercial value of
131  20   Xarelto, it was important to be first to
131  21   market and then that would help you to
131  22   stay ahead of the competition across all
131  23   your indications?
131  24   A.  That was certainly our wish.
132  1    It certainly didn't happen in atrial
132  2    fibrillation.

Re: [131:17-132:2]
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil No. 2 related to marketing and the Court's ruling on Defendants' Omnibus Mil. No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [131:17-132:2]
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies™ overall value, revenues, or market share.

Pending

11

| | Responses In | Objecti in | | Pending |
|---|---|---|---|---|

**144:18 - 145:17  Shah, Nauman 2016-08-03**

0:47

| 144 18 | Q.  I'd like to just jump back |
| 144 19 | to the 2008 time period that we were |
| 144 20 | talking about and the indications for |
| 144 21 | the -- the orthopedic indication for |
| 144 22 | Xarelto. |
| 144 23 | A.  Okay. |
| 144 24 | Q.  I think you testified that |
| 145 1 | the company filed for priority review, |
| 145 2 | correct? |
| 145 3 | A.  Mm-hmm, yes. |
| 145 4 | Q.  And that would shorten the |
| 145 5 | time period for approval, correct? |
| 145 6 | A.  Yes.  The review period |
| 145 7 | would be shortened by approximately four |
| 145 8 | months. |
| 145 9 | Q.  And around the time that you |
| 145 10 | filed the NDA for the orthopedic |
| 145 11 | indication, the ROCKET study was going |
| 145 12 | on, correct? |
| 145 13 | A.  It was still going on, yes. |
| 145 14 | Q.  Okay.  And the ROCKET study, |
| 145 15 | for the jury, is the study -- the Afib |
| 145 16 | study, right? |
| 145 17 | A.  Yes. |

**Re: [144:18-145:17]**

Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [144:18-145:17]**

Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the  commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share.

**145:5 - 150:6  Shah, Nauman 2016-08-03**

3:14

| 146 5 | Q.  The clinical studies that |
| 146 6 | were submitted to the FDA to support the |
| 146 7 | orthopedic indication were called the |
| 146 8 | RECORD trials, correct? |
| 146 9 | A.  They were called the RECORD |
| 146 10 | trials, yes. |
| 146 11 | Q.  And do you recall that when |
| 146 12 | the FDA denied priority review and |
| 146 13 | granted only standard review for the |
| 146 14 | orthopedic indication?  Do you recall |
| 146 15 | that? |
| 146 16 | A.  I do recall that, yes. |
| 146 17 | Q.  All right. |
| 146 18 | MR. WEINKOWITZ:  And let's |
| 146 19 | mark as Shah-9 Record Number |
| 146 20 | 113-423, Bates number |
| 146 21 | Xarelto-Janssen_0085580. |
| 146 22 | (Document marked for |
| 146 23 | identification as Exhibit |
| 146 24 | Shah-9.) |

**Re: [146:5-150:6]**

Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [146:5-150:6]**

Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the  commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share.

Pending

04/23/17 18:52

Responses In

Objecti.
In

| 147 | 1 | THE WITNESS: Okay. |
| 147 | 2 | BY MR. WEINKOWITZ: |
| 147 | 3 | Q. Mr. Shah, I've handed you |
| 147 | 4 | a -- what appears to be an e-mail dated |
| 147 | 5 | September 10, 2008. Do you see that? |
| 147 | 6 | A. I do. |
| 147 | 7 | Q. And do you see that you |
| 147 | 8 | are -- it's to you among many, many |
| 147 | 9 | others? |
| 147 | 10 | A. Yes, I'm on it. |
| 147 | 11 | Q. And it's from Andrea |
| 147 | 12 | Kollath, correct? |
| 147 | 13 | A. Yes, it is. |
| 147 | 14 | Q. And do you know what Andrea |
| 147 | 15 | Kollath's title was? |
| 147 | 16 | A. Director of regulatory |
| 147 | 17 | affairs. |
| 147 | 18 | Q. And it's right there on the |
| 147 | 19 | e-mail, correct? |
| 147 | 20 | A. Yes. |
| 147 | 21 | Q. And she's reporting to you |
| 147 | 22 | and your colleagues that the FDA review |
| 147 | 23 | of the new drug application for the |
| 147 | 24 | orthopedic indication would be standard |
| 148 | 1 | and not priority review, correct? |
| 148 | 2 | A. That is correct. |
| 148 | 3 | Q. And she reports that the |
| 148 | 4 | reason, and -- and if we just read it, |
| 148 | 5 | it says, "Dear all, I have" -- "I had an |
| 148 | 6 | informal telecon with the FDA project |
| 148 | 7 | manager and then she informed me that the |
| 148 | 8 | NDA has received a standard review." |
| 148 | 9 | A. Yes. |
| 148 | 10 | Q. Did I read that correctly? |
| 148 | 11 | A. You did. |
| 148 | 12 | Q. Okay. And -- and that |
| 148 | 13 | actually, if you had gotten priority |
| 148 | 14 | review, you would have gotten four months |
| 148 | 15 | more time -- you would have gotten on the |
| 148 | 16 | market four months quicker with the |
| 148 | 17 | orthopedic indication? |
| 148 | 18 | A. Yes, that is correct. |
| 148 | 19 | Q. She continues, "The reasons |
| 148 | 20 | she cited were the availability of other |
| 148 | 21 | Factor Xa drugs as well as Coumadin, and |
| 148 | 22 | there are products currently on the |
| 148 | 23 | market with the same indication we are |
| 148 | 24 | filing for." |
| 149 | 1 | A. Yes. |
| 149 | 2 | Q. Did I read that correctly? |
| 149 | 3 | A. You did. |
| 149 | 4 | Q. She also cited "potential |
| 149 | 5 | safety issues with rivaroxaban." Did I |
| 149 | 6 | read that correctly? |

13

| Lines | Testimony | Objections in | Responses in | |
|---|---|---|---|---|
| 149 7<br>149 8<br>149 9<br>149 10<br>149 11<br>149 12<br>149 13<br>149 14<br>149 15<br>149 16<br>149 17<br>149 18<br>149 19<br>149 20<br>149 21<br>149 22<br>149 23<br>149 24<br>150 1<br>150 2<br>150 3<br>150 4<br>150 5<br>150 6 | A. You did.<br>Q. All right. So she is telling you and the rest of the group of people in that last sentence that the FDA indicated the reason they did not give priority review to the orthopedic indication -- one reason is there were safety issues with the drug?<br>A. Potential safety issues with the drug.<br>Q. Okay. She -- she finishes, "We will receive formal notification in writing in the 74-day letter, October 13th, so until then please do not disseminate broadly." Do you see that?<br>A. Yes, I do.<br>Q. All right. So she's telling everybody that you didn't get priority review, that you got standard review, she's giving the FDA's reasons including potential safety issues, and she's telling you not to forward the e-mail, right? | | | |
| 150:7 - 150:7<br>150 7 | Shah, Nauman 2016-08-03<br>A. That is correct. | Re: [150:7-150:7]<br>Def Obj Defendants' objections maintained for | Re: [150:7-150:7]<br>Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies | Pending<br>0:05 |
| 150:8 - 150:14 | Shah, Nauman 2016-08-03 | | | 0:17 |
| 150 8<br>150 9<br>150 10<br>150 11<br>150 12<br>150 13<br>150 14 | Q. Now, despite the plan -- your plan, for the orthopedic indication and its launch, isn't it true that Xarelto was not approved for the first indication in orthopedic surgery until July of 2011?<br>A. That is correct. | Re: [150:8-150:14]<br>Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | Re: [150:8-150:14]<br>Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share. | Pending |
| 160:22 - 161:15 Shah, Nauman 2016-08-03 | | | | 0:28 |
| 160 22<br>160 23<br>160 24<br>161 1<br>161 2<br>161 3<br>161 4<br>161 5<br>161 6 | Q. Okay. Now, Xarelto was ultimately not launched until -- in the orthopedic indication until June of 2011, correct?<br>A. July.<br>Q. July 2011?<br>A. Yes, that's correct.<br>Q. And as a result of the delay, Pradaxa ended up being first to | Re: [160:22-161:15]<br>Def Obj Defendants' objections maintained for preservation. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | Re: [160:22-161:15]<br>Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or | Pending |

Responses In

| | | | | Rulings |
|---|---|---|---|---|

market share.

| 161 | 7 | market, beating Xarelto to market with |
| 161 | 8 | Afib, correct? |
| 161 | 9 | A. Yes. They launched with AF |
| 161 | 10 | earlier that year. Prior year. I'm |
| 161 | 11 | sorry. |
| 161 | 12 | Q. I'm sorry. The answer was |
| 161 | 13 | yes? |
| 161 | 14 | A. They launched before us, |
| 161 | 15 | yes. |

**173:9  -  173:16  Shah, Nauman 2016-08-03**

| 173 | 9 | Q. Okay. Do you recall that |
| 173 | 10 | Janssen did an analysis projecting how |
| 173 | 11 | much that delay in launching Xarelto for |
| 173 | 12 | oral -- strike that -- for orthopedic |
| 173 | 13 | surgery, how much that would cost as a |
| 173 | 14 | result of the problems? |
| 173 | 15 | A. I do recall that an analysis |
| 173 | 16 | was done, yes. |

0:19

**Re: [173:9-173:16]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [173:9-173:16]**
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share.

Pending

**175:1  -  175:8  Shah, Nauman 2016-08-03**

| 175 | 1 | Q. All right. So the president |
| 175 | 2 | of internal medicine asked that an |
| 175 | 3 | analysis be done to, I guess, calculate |
| 175 | 4 | how much money the -- the destruction in |
| 175 | 5 | value to the product as a result of the |
| 175 | 6 | orthopedic indication being delayed? |
| 175 | 7 | A. That was the analysis |
| 175 | 8 | requested. |

0:17

**Re: [175:1-175:8]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [175:1-175:8]**
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share.

Pending

**176:16  -  176:21  Shah, Nauman 2016-08-03**

| 176 | 16 | Q. Okay. And let me hand you |
| 176 | 17 | what's been marked -- what I'm marking as |
| 176 | 18 | Shah-13. |
| 176 | 19 | (Document marked for |
| 176 | 20 | identification as Exhibit |
| 176 | 21 | Shah-13.) |

0:05

**Re: [176:16-176:21]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding

**Re: [176:16-176:21]**
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to

Pending

15

04/23/17 18:52

...lings

**Objection In** | **Responses In** | **Pending**

---

**178:10 – 179:1**

Objection In:
RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

0:30

Responses In:
motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is relevant to Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share.

Pending

**179:1** — Shah, Nauman 2016-08-03

| | |
|---|---|
| 178 10 | Q.  Okay.  I've handed you |
| 178 11 | marked -- a set of PowerPoint slides |
| 178 12 | marked Shah-13.  These were slides that |
| 178 13 | were produced as part of your file. |
| 178 14 | Do you see that it says -- |
| 178 15 | the front page says, "Xarelto update, |
| 178 16 | February 24, 2012?" |
| 178 17 | A.  Yes, it does. |
| 178 18 | Q.  Do these slides look |
| 178 19 | familiar to you? |
| 178 20 | A.  They generally look |
| 178 21 | familiar, yes. |
| 178 22 | Q.  Would -- would they have |
| 178 23 | been prepared, reviewed or contributed to |
| 178 24 | by you in the regular course of your job? |
| 179 1 | A.  I would imagine so, yes. |

Re: [178:10-179:1]
Def Obj This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [178:10-179:1]
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share.

---

**179:5 – 179:8**

0:12

**179:8** — Shah, Nauman 2016-08-03

| | |
|---|---|
| 179 5 | Q.  Okay.  Let's take a look at |
| 179 6 | Page 3 which at the top says, "ORS |
| 179 7 | situation analysis:  Key points." |
| 179 8 | A.  Okay. |

Re: [179:5-179:8]
Def Obj This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [179:5-179:8]
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'" overall value, revenues, or market share.

Pending

---

**179:22 – 180:5**

0:16

**180:5** — Shah, Nauman 2016-08-03

| | |
|---|---|
| 179 22 | Q.  And this is a PowerPoint |
| 179 23 | slide giving an update on the -- on the |
| 179 24 | orthopedic situation, correct? |
| 180 1 | A.  Yes, it is. |
| 180 2 | Q.  Now, first bullet point |
| 180 3 | says, "ORS delayed by 25 months in U.S." |
| 180 4 | Did I read that correctly? |
| 180 5 | A.  You did. |

Re: [179:22-180:5]
Def Obj This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [179:22-180:5]
Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding

Pending

| | | | Object. In | Responses In | ...ulings |
|---|---|---|---|---|---|

| 186 | 7 | Q.   So this is basically saying | 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | profits from Xarelto, or the companies'™ overall value, revenues, or market share. | |
| 186 | 8 | that Johnson & Johnson has spent a | | | |
| 186 | 9 | million -- I'm sorry -- a billion for the | | | |
| 186 | 10 | program and has -- has no product on the | | | |
| 186 | 11 | market, correct? | | | |
| 186 | 12 | A.   That is correct. | | | |
| 186 | 13 | Q.   And if it has no product on | | | |
| 186 | 14 | the market, it's not making any money on | | | |
| 186 | 15 | the product, right? | | | |
| 186 | 16 | A.   That is correct. | | | |

**190:24  -  192:4  Shah, Nauman 2016-08-03**                                                                                 1:02                                                                                                     Pending

| 190 | 24 | Q.   Okay.  If you look at the | Re: [190:24-192:4] | Re: [190:24-192:4] | |
| 191 | 1 | next page. | **Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share. | |
| 191 | 2 | A.   Okay. | | | |
| 191 | 3 | Q.   It says, "Xarelto cumulative | | | |
| 191 | 4 | NTS destruction through 2023." | | | |
| 191 | 5 | Do you see that? | | | |
| 191 | 6 | A.   I do. | | | |
| 191 | 7 | Q.   And NTS is net trade sales? | | | |
| 191 | 8 | A.   It is. | | | |
| 191 | 9 | Q.   And so is this -- does this | | | |
| 191 | 10 | slide reflect the analysis -- the results | | | |
| 191 | 11 | of the analysis that Vanessa Broadhurst | | | |
| 191 | 12 | requested? | | | |
| 191 | 13 | A.   It appears to show the -- | | | |
| 191 | 14 | two different scenarios and two different | | | |
| 191 | 15 | analyses that was requested, yes. | | | |
| 191 | 16 | Q.   And if you look at the | | | |
| 191 | 17 | second bullet point, it says, "Range of | | | |
| 191 | 18 | value destruction due to isolation of ORS | | | |
| 191 | 19 | delay is between minus $891 million and | | | |
| 191 | 20 | minus 3 billion 63 in NTS," which is net | | | |
| 191 | 21 | trade sale? | | | |
| 191 | 22 | A.   Yes, that's what it says. | | | |
| 191 | 23 | Q.   And is that your | | | |
| 191 | 24 | recollection as to what the analysis | | | |
| 192 | 1 | showed? | | | |
| 192 | 2 | A.   I take the slide for its | | | |
| 192 | 3 | word, but it appears that that is the | | | |
| 192 | 4 | range that was estimated. | | | |

**282:10  -  282:14  Shah, Nauman 2016-08-03**                                                                                0:40                                                                                                     Pending

| 282 | 10 | Q.   I am handing you what's been | Re: [282:10-282:14] | Re: [282:10-282:14] | |
| 282 | 11 | marked as Shah-23.  For the record, it is | **Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than | Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or | |
| 282 | 12 | Record Number 147-4913.  Bates number | | | |
| 282 | 13 | Xarelto_Janssen 087347990. | | | |
| 282 | 14 | A.   Okay. | | | |

**282:15  -  282:23  Shah, Nauman 2016-08-03**

| 282 | 15 | Q.   Okay.  These were -- this is | | | |

| | | Object. in | Responses In | |
|---|---|---|---|---|

| | | | | ...lings |
|---|---|---|---|---|

04/23/17 18:52

| 282 | 16 | a set of PowerPoint slides that were |
| 282 | 17 | produced from your file by the |
| 282 | 18 | defendants. Have you had an opportunity |
| 282 | 19 | to review them? |
| 282 | 20 | A.  I am flipping through them. |
| 282 | 21 | I didn't create this deck, because it's |
| 282 | 22 | not my file. So I know it's not mine. |
| 282 | 23 | But I may have had it in my files. |

probative under Rule 403.

market share.

283:14 – 286:11 Shah, Nauman 2016-08-03

1:59

| 283 | 14 | Q.  So just to go back, does |
| 283 | 15 | this appear to be a document that was |
| 283 | 16 | prepared in the regular course of |
| 283 | 17 | Janssen's business? |
| 283 | 18 | A.  I would say so. |
| 283 | 19 | Q.  All right. And if you would |
| 283 | 20 | have received it, would you have reviewed |
| 283 | 21 | it? |
| 283 | 22 | A.  If I had received it; yes. |
| 283 | 23 | Q.  Okay. Well, it's in your |
| 283 | 24 | file, I assume you would have reviewed |
| 284 | 1 | it, right? |
| 284 | 2 | A.  Okay. |
| 284 | 3 | Q.  It says, "Xarelto What-If |
| 284 | 4 | Scenario.  Opportunity Value Associated |
| 284 | 5 | With a Shift in Launch Timing." |
| 284 | 6 | That's the title of the |
| 284 | 7 | deck, right? |
| 284 | 8 | A.  Yes, it is. |
| 284 | 9 | Q.  And "opportunity value," |
| 284 | 10 | what does value mean? |
| 284 | 11 | A.  I'm assuming it means net |
| 284 | 12 | trade sales. |
| 284 | 13 | Q.  That's dollars, right? |
| 284 | 14 | A.  Yes, it is. |
| 284 | 15 | Q.  Associated with a shift in |
| 284 | 16 | launch timing.  Would that be a shift in |
| 284 | 17 | the timing of the launch of Xarelto for |
| 284 | 18 | the orthopedic and Afib indication? |
| 284 | 19 | A.  It could be all indications |
| 284 | 20 | or it could be any one of them. |
| 284 | 21 | Q.  Let's go to Slide 2.  It |
| 284 | 22 | looks like this. |
| 284 | 23 | A.  Yep. |
| 284 | 24 | Q.  This is an overview.  The |
| 285 | 1 | title of the slide is "Overview Xarelto." |
| 285 | 2 | Do you see that? |
| 285 | 3 | A.  I do. |
| 285 | 4 | Q.  All right. And first bullet |
| 285 | 5 | point, "Xarelto is responsible for |
| 285 | 6 | approximately 10 percent of near-term J&J |
| 285 | 7 | revenue." |
| 285 | 8 | Do you see that? |

**Re: [283:14-286:11]**

**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [283:14-286:11]**

**Pltf Resp** See response to 105:16-106:3 above.  Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share.

Pending

19

04/23/17 18:52

| | | Object. In | Responses In | ulings |
|---|---|---|---|---|

**285:9–286:11  Shah, Nauman 2016-08-03**

```
285  9    A.  Yes, I do.
285 10    Q.  So as I understand this,
285 11  this is saying that of all of Johnson &
285 12  Johnson's revenues for everything it
285 13  makes, baby powder, Tylenol, all of its
285 14  drugs --
285 15    A.  Yep.
285 16    Q.  -- Band-Aids, that Xarelto
285 17  is actually 10 percent of the near-term
285 18  revenue for J&J?
285 19    A.  Yep.
285 20    Q.  And does that sound
285 21  accurate?
285 22    A.  It seems reasonable.
285 23    Q.  "Okay.  And next item is,
285 24  "Lifetime revenue for Xarelto is expected
286  1  to be 18 billion, or approximately
286  2  6 billion present value terms before loss
286  3  of exclusivity in 2023."
286  4    A.  At that moment in time, the
286  5  forecast probably stated that.  I don't
286  6  believe that's accurate anymore.
286  7    Q.  Okay.  You don't believe --
286  8  this was accurate at the time, though,
286  9  correct?
286 10    A.  This was the forecast at the
286 11  time.
```

---

**288:10 – 288:24  Shah, Nauman 2016-08-03**       0:32

```
288 10    Q.  All right.  Now, if we go to
288 11  the next slide.  It says, "Impact of
288 12  one-month delay for VTE Px ORS."
288 13    Do you see that?
288 14    A.  Yep.
288 15    Q.  And is VTE Px ORS the
288 16  orthopedics indication that we have been
288 17  talking about?
288 18    A.  Yes.
288 19    Q.  And so this slide is
288 20  communicating how much an impact of a
288 21  one-month delay would be, correct?
288 22    A.  Delay to launch.  Yes, the
288 23  title says that.  So I believe that's
288 24  probably right.
```

**Re: [288:10–288:24]**
**Def Obj** The designation is incomplete. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [288:10–288:24]**
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the  commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test.  Further the testimony is not regarding profits from Xarelto, or the companies™ overall value, revenues, or market share.

Pending

---

**289:14 – 289:20  Shah, Nauman 2016-08-03**       0:18

```
289 14    Q.  So what this slide is saying
289 15  is that if there is a delay in the
289 16  orthopedic indication, we're going to
289 17  lose some money, but we're going to lose
289 18  much more money because it will impact
289 19  the Afib indication launch, correct?
```

**Re: [289:14–289:20]**
**Def Obj** The designation is incomplete. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the

**Re: [289:14–289:20]**
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah testifies based on the  commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch.  Again the testimony is relevant to

Pending

04/23/17 18:52

| | | Object. In | | Responses In | Rulings |
|---|---|---|---|---|---|
| 289 | 20 | A. That's what this slide says. | | motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share. | |
| 289:21 - | 289:21 Shah, Nauman 2016-08-03 | Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | | | Pending |
| 289 | 21 | It doesn't mean that I agree with it. | | | |
| | | Re: [289:21-289:21] | | | |
| | | Pltf Obj Motion to strike as non-responsive. The witness | 0:02 | | |
| 290:2 - | 290:16 Shah, Nauman 2016-08-03 | | 0:30 | Re: [290:2-290:16] | Pending |
| 290 | 2 | Q. If you go to the next slide. | | **Re: [290:2-290:16]** | |
| 290 | 3 | This says, "Impact of one-month delay for | | **Def Obj** The designation is incomplete. This testimony | |
| 290 | 4 | Afib stroke prevention." | | falls within the evidence covered by the Court's Ruling | |
| 290 | 5 | Do you see that? | | on Defendants' MIL No. 2 related to marketing and the | |
| 290 | 6 | A. I do see that, yes. | | Court's ruling on Defendants' Omnibus MIL No. 1 | Pltf Resp See response to 105:16-106:3 above. Mr. Shah testifies based on the commercial plan about how it was important for Xarelto to be first to market. Mr. Shah is testifying about the delay caused by the clinical trial problems with the Record trial and how that delayed the Afib launch. Again the testimony is relevant to motive, and credibility for why the company failed to warn about the usefulness of a PT test. Further the testimony is not regarding profits from Xarelto, or the companies'™ overall value, revenues, or market share. |
| 290 | 7 | Q. And Afib stroke prevention | | regarding market share and profits, both of which the | |
| 290 | 8 | is the indication -- the Afib indication | | Court sustained. The evidence is not relevant and is | |
| 290 | 9 | for Xarelto, correct? | | more prejudicial than probative under Rule 403. The | |
| 290 | 10 | A. Yeah. | | testimony regarding RECORD/RECORD 4/DVT/PE is not | |
| 290 | 11 | Q. And it says, "A delay to | | relevant and is more prejudicial than probative under | |
| 290 | 12 | Xarelto Afib is so significant that it | | Rule 403. | |
| 290 | 13 | could represent more than $1 million per | | | |
| 290 | 14 | day.'" | | | |
| 290 | 15 | Did I read that correctly? | | | |
| 290 | 16 | A. Yes, you did. | | | |
| 290:17 - | 290:23 Shah, Nauman 2016-08-03 | | 0:14 | | |
| 290 | 17 | Q. And that's what this | | | |
| 290 | 18 | analysis projection came to the | | | |
| 290 | 19 | conclusion -- strike that. | | | |
| 290 | 20 | That's what this projection | | | |
| 290 | 21 | reflects as reflected in this document? | | | |
| 290 | 22 | A. That's what the person | | | |
| 290 | 23 | composing this slide believes. | | | |
| 297:2 - | 297:10 Shah, Nauman 2016-08-03 | | 0:20 | | |
| 297 | 2 | Q. Did the delay in the | | | |
| 297 | 3 | ortho -- in the launch of the orthopedic | | | |
| 297 | 4 | indication because of the problems with | | | |
| 297 | 5 | the RECORD trial impact when you launched | | | |
| 297 | 6 | the Afib indication? | | | |
| 297 | 7 | A. No, it did not. | | | |

| | | Objection. In | Responses In | ...lings |
|---|---|---|---|---|

| 297 | 8 | Q. It – did it impact when you | | |
| 297 | 9 | planned to launch the Afib indication? | | |
| 297 | 10 | A. No. | | |

| 297:20 – | 298:9 | | | 0:21 | Pending |
| 297 | 20 | Q. If you look at Slide 3. | **Re: [297:20–298:9]** | |
| 297 | 21 | A. Same deck as we were looking | **Def Obj** This testimony falls within the evidence covered | |
| 297 | 22 | at? | by the Court's Ruling on Defendants' MIL No. 2 related | |
| 297 | 23 | Q. Yes. Please. | to marketing and the Court's ruling on Defendants' | |
| 297 | 24 | A. Okay. | Omnibus MIL No. 1 regarding market share and profits, | |
| 298 | 1 | Q. This slide and the subtitle | both of which the Court sustained. The evidence is not | |
| 298 | 2 | says, "The financial impact of a delay to | relevant and is more prejudicial than probative under | |
| 298 | 3 | the launch indication for Xarelto would | Rule 403. The testimony regarding RECORD/RECORD | |
| 298 | 4 | be greatly overshadowed by the revenue | 4/DVT/PE is not relevant and is more prejudicial than | |
| 298 | 5 | impact of its dependent indications, | probative under Rule 403. | |
| 298 | 6 | primarily Afib." | | |
| 298 | 7 | A. Yep – | | |
| 298 | 8 | Q. Do you see that? | | |
| 298 | 9 | A. I do see that. | | |

| 303:22 – | 304:3 | Shah, Nauman 2015-08-03 | | 0:16 | Pending |
| 303 | 22 | Q. I'm going to hand you what I | **Re: [303:22–304:3]** | **Re: [303:22–304:3]** |
| 303 | 23 | marked as Shah-125. It is Record Number | **Def Obj** This testimony falls within the evidence covered | Pltf Resp See response to 105:16–106:3 above. Additionally |
| 303 | 24 | 147-1269. | by the Court's Ruling on Defendants' MIL No. 2 related | relevant to plaintiff's claims concerning need for measurement. |
| 304 | 1 | A. Okay. | to marketing, which the Court sustained. The evidence | Mr. Shah isr testifying about the overall commercial and business |
| 304 | 2 | Q. Xarelto_Janssen 08714963. | is not relevant and is more prejudicial than probative | plan for the drug. Plaintiff incorporates herein his response to |
| 304 | 3 | A. Okay. | under Rule 403. | Defendants Joint Motion for an Order dimissing with prejudice |
| | | | | claims etc.. [Doc. No. 61671. Xarelto dosing and its once daily |
| | | | | dosing regimen result in high inter patient variability  making it |
| | | | | important to instruct physicians about the advisability of |
| | | | | measuring, the ability to measure and the anticoagulant effect in a |
| | | | | particular patient using PT Neoplastin. Once a day dosing has not |
| | | | | been abandoned and is highly relevant to plaintiff's failure to |
| | | | | warn and design defect claims. |

| 304:11 – | 304:16 | Shah, Nauman 2015-08-03 | | 0:11 | Pending |
| 304 | 11 | Q. And it appears to be a | **Re: [304:11–304:16]** | **Re: [304:11–304:16]** |
| 304 | 12 | strategic steering committee meeting | **Def Obj** This testimony falls within the evidence covered | Pltf Resp See response to 105:16–106:3 above. Additionally |
| 304 | 13 | executive summary from the meeting | by the Court's Ruling on Defendants' MIL No. 2 related | relevant to plaintiff's claims concerning need for measurement. |
| 304 | 14 | August 15, 2009, in Philadelphia. | to marketing, which the Court sustained. The evidence | Mr. Shah isr testifying about the overall commercial and business |
| 304 | 15 | Do you see that? | is not relevant and is more prejudicial than probative | plan for the drug. Plaintiff incorporates herein his response to |
| 304 | 16 | A. I do. | under Rule 403. | Defendants Joint Motion for an Order dimissing with prejudice |

04/23/17 18:52

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**305:14 - 305:17 Shah, Nauman 2016-08-03**

305 14
305 15
305 16
305 17

Q. Sure. And if you look at the next page, Page 4 of 7, it appears that you gave a market overview?
A. Yep.

0:09

Re: [305:14-305:17]
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

Re: [305:14-305:17]
Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc... [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability making it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Once a day dosing has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

Pending

**306:20 - 306:23 Shah, Nauman 2016-08-03**

306 20
306 21
306 22
306 23

Q. Sorry about that. It says "Key insights" and "Clinical performance."
A. Okay.

0:03

Re: [306:20-306:23]
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence

Re: [306:20-306:23]
Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business

Pending

claims etc... [Doc. No. 6167]. Xarelto dosing and its once-daily dosing regimen result in high inter patient variability making it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Once a day dosing has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

23

04/23/17 18:52

...lings

| | | Object. In | Responses In |
|---|---|---|---|

307:3 - 312:12 Shah, Nauman 2016-08-03

| | | |
|---|---|---|

307  3  Q.  She's putting things -- and
307  4  it says, "If the safety and efficacy
307  5  among agents are similar, the once-daily
307  6  dosing will win."
307  7  Do you see that?
307  8  A.  I do.
307  9  Q.  All right.  And so is it
307  10  your understanding that what the advisors
307  11  were telling you was if you have new
307  12  blood thinners that are coming to market,
307  13  and they're relatively all the same in
307  14  safety, relatively all the same in terms
307  15  of efficacy, how they work, the big thing
307  16  that will distinguish one from the other
307  17  is dosing?
307  18  A.  That is -- that's accurate.
307  19  That's what it's saying.
307  20  Q.  Okay.  And at this point in
307  21  time, you were aware, were you not, that
307  22  when Xarelto was going to come to market,
307  23  it was going to be for the Afib
307  24  indication a once-daily dosing drug?
308  1  A.  Yes, that was our hope as
308  2  the trial was still ongoing at this point
308  3  in time.
308  4  Q.  Okay.  So at least at this
308  5  point in time, these medical -- medical
308  6  folks that you gathered together were
308  7  telling you from a marketing standpoint
308  8  you really, really wanted a once-daily
308  9  dosing drug if all the drugs were going
308  10  to be the same in terms of safety and
308  11  efficacy?
308  12  A.  Yes, I think that's fair to
308  13  say.  They obviously -- at this point in
308  14  time we wouldn't have known the profiles
308  15  for any other drugs.  So I think the

4:19

Re: [307:3-312:12]

Def Obj This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under rule 403.  This testimony relates to Plaintiffs' expressly abandoned theories that Xarelto™'s once-daily dosing regimen is unreasonably dangerous and that Xarelto's label should have instructed physicians to perform routine monitoring of patients' PT levels, and for the reasons set forth in Defendants' joint motion to dismiss the abandoned claims, is not admissible.

is not relevant and is more prejudicial than probative under Rule 403. This testimony relates to Plaintiffs' expressly abandoned theories that Xarelto™'s once-daily dosing regimen is unreasonably dangerous and that Xarelto's label should have instructed physicians to perform routine monitoring of patients' PT levels, and for the reasons set forth in Defendants' joint motion to dismiss the abandoned claims, is not admissible.

plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability  making it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Once a day dosing has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

Re: [307:3-312:12]

Plf Resp See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testyfing about the overall commercial and business plan for the drug. Plaintiff incorporates hereby his response to Defendants Joint Motion for an Order dimssing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability  making it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Once a day dosing has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

Pending

04/23/17 18:52

Responses In

| 308 | 16 | general assertion that if everything else |
| 308 | 17 | is equal and one is once a day and the |
| 308 | 18 | others are more than once a day, then the |
| 308 | 19 | once a day would be preferred. |
| 308 | 20 | Q. If you look at the next |
| 308 | 21 | page, which is Page 3, it says, "Key |
| 308 | 22 | insights," and then under drug |
| 308 | 23 | monitoring -- do you see where it says, |
| 308 | 24 | "Drug monitoring"? |
| 309 | 1 | A. I do. |
| 309 | 2 | Q. "The absence of the need for |
| 309 | 3 | routine coagulation monitoring for novel |
| 309 | 4 | oral agents is an advantage." |
| 309 | 5 | Do you see that? |
| 309 | 6 | A. I do. |
| 309 | 7 | Q. And that's referring to |
| 309 | 8 | going and having blood draws in order to |
| 309 | 9 | determine how much -- how thin or thick |
| 309 | 10 | your blood is, correct? |
| 309 | 11 | A. Yes, that's correct. |
| 309 | 12 | Q. And that's something that |
| 309 | 13 | folks that are on warfarin are required |
| 309 | 14 | to do, correct? |
| 309 | 15 | A. Warfarin requires that, yes. |
| 309 | 16 | Q. All right. And so one of |
| 309 | 17 | the things that your advisors were |
| 309 | 18 | telling you is that the absence of having |
| 309 | 19 | to go take those blood tests is an |
| 309 | 20 | advantage for any new blood thinner |
| 309 | 21 | coming onto the market? |
| 309 | 22 | A. Yes. |
| 309 | 23 | Q. And Xarelto was designed to |
| 309 | 24 | not require new blood -- blood |
| 310 | 1 | monitoring, correct? |
| 310 | 2 | A. Xarelto did not require |
| 310 | 3 | blood monitoring based on its profile, |
| 310 | 4 | yes. |
| 310 | 5 | Q. And that was important in |
| 310 | 6 | order for Xarelto to be competitive in |
| 310 | 7 | the marketplace, correct? |
| 310 | 8 | A. Competitive versus what? |
| 310 | 9 | Q. Competitive versus warfarin. |
| 310 | 10 | A. Versus warfarin, it would be |
| 310 | 11 | one of the advantages versus warfarin. |
| 310 | 12 | It wouldn't be the only one. |
| 310 | 13 | Q. And it would be -- it would |
| 310 | 14 | be an advantage versus Pradaxa, correct? |
| 310 | 15 | A. No. Because Pradaxa, I |
| 310 | 16 | don't believe, was -- also required |
| 310 | 17 | monitoring either. |
| 310 | 18 | Q. But if it -- but if |
| 310 | 19 | monitoring was required for Xarelto, |
| 310 | 20 | Xarelto would be at a disadvantage versus |
| 310 | 21 | Pradaxa, correct? |

...dlings

**Responses In**

**Object. In**

| Line | Testimony |
|---|---|
| 310 22 | A. If Pradaxa required -- |
| 310 23 | didn't require monitoring -- excuse me -- |
| 310 24 | and Xarelto did, then yes. |
| 311 1 | Q. It would be at a |
| 311 2 | disadvantage, correct? |
| 311 3 | A. Yes. |
| 311 4 | Q. Now, the next bullet point |
| 311 5 | says, "However, there is a critically |
| 311 6 | important need for a coagulation |
| 311 7 | assessment assay in a number of |
| 311 8 | situations." |
| 311 9 | You see -- do you see that? |
| 311 10 | A. I do. |
| 311 11 | Q. It says, "One, determine the |
| 311 12 | level of anticoagulation should a patient |
| 311 13 | require a surgical procedure," correct? |
| 311 14 | A. Yes, I see that. |
| 311 15 | Q. And, "Better understand if |
| 311 16 | patients are compliant, especially in the |
| 311 17 | presence of bleeding or therapy failure." |
| 311 18 | A. Yes. |
| 311 19 | Q. And the next bullet point |
| 311 20 | says, "Provide guidance should an HCP |
| 311 21 | decide to titrate the dose even if not |
| 311 22 | recommended." |
| 311 23 | Do you see that? |
| 311 24 | A. I do. |
| 312 1 | Q. So it's fair to say that at |
| 312 2 | this point in time, your expert advisors |
| 312 3 | were telling you that it was critically |
| 312 4 | important to have a coagulation |
| 312 5 | assessment assay, correct? |
| 312 6 | A. That's what their -- their |
| 312 7 | desire was at that point in time, yes. |
| 312 8 | Q. And even as of today, there |
| 312 9 | is no specific blood test, no coagulation |
| 312 10 | assessment assay that goes along with |
| 312 11 | Xarelto, correct? |
| 312 12 | A. That is correct. There is |

**551:20 - 551:24 Shah, Nauman 2016-08-04**

| Line | Testimony |
|---|---|
| 551 20 | Q. I'm handing you a document |
| 551 21 | that I've marked as Shah-44, Record |
| 551 22 | 1479915, Bates Number Xarelto-Janssen |
| 551 23 | 08755819. Let me give you have a chance |
| 551 24 | to review that. |

0:18

**Object. In**

Re: [551:20-551:24]
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Responses In**

Re: [551:20-551:24]
Pltf Resp See response to 105:16-106:3 above. Mr. Shah is describing the disadvantage to the brand of not beating Pradaxa first to market.

Pending

26

04/23/17 18:52

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

552:10 - 553:2   Shah, Nauman 2016-08-04   0:36

552 10  Q.  I've given you an
552 11  opportunity to read that, correct?
552 12  A.  You have.
552 13  Q.  So this is an e-mail that is
552 14  dated February 17, 2012, from Patty Torr,
552 15  who is the vice president of marketing,
552 16  to Vanessa Broadhurst.  Is she the president
552 17  at this time?
552 18  A.  She is.
552 19  Q.  And you are copied on it, as
552 20  well as Gregg Ruppersberger, correct?
552 21  A.  We are.
552 22  Q.  And what is Gregg's position
552 23  at that time?
552 24  A.  Gregg's position at that
553 1  time, I believe, was in the analytical
553 2  department that we have, market research

**Re: [552:10-553:2]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.

Re: [552:10-553:2]
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah is describing the disadvantage to the brand of not beating Pradaxa first to market.

Pending

---

554:15 - 554:20   Shah, Nauman 2016-08-04   0:15

554 15  Pradaxa getting to market
554 16  before Xarelto in the Afib indication
554 17  created a commercial disadvantage for
554 18  Xarelto.  Can we agree on that?
554 19  A.  I would say that it created
554 20  a more difficult challenge for us.

**Re: [554:15-554:20]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [554:15-554:20]
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah is describing the disadvantage to the brand of not beating Pradaxa first to market.

Pending

---

555:3 - 555:6   Shah, Nauman 2016-08-04   0:10

555 3  Q.  And this was a discussion
555 4  between, I guess, executives about the
555 5  market dynamics, Afib market dynamics?
555 6  A.  Yes, it was.

**Re: [555:3-555:6]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

Re: [555:3-555:6]
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah is describing the disadvantage to the brand of not beating Pradaxa first to market.

Pending

---

555:11 - 556:9   Shah, Nauman 2016-08-04   0:53

555 11  Q.  First, the second bullet
555 12  point.  It says, "The bolus of

**Re: [555:11-556:9]**
**Def Obj** This testimony falls within the evidence covered

Re: [555:11-556:9]
Pltf Resp See response to 105:16-106:3 above.  Mr. Shah is

Pending

04/23/17 18:52

| | | Object In | Responses In | Rulings |
|---|---|---|---|---|
| 555 13 | dissatisfied patients was depleted by | by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403. | | describing the disadvantage to the brand of not beating Pradaxa first to market. |
| 555 14 | Pradaxa five months postlaunch, given its | | | |
| 555 15 | first-to-market status, represents over | | | |
| 555 16 | one-third of the total Afib population. | | | |
| 555 17 | Majority of Pradaxa's TRx come from | | | |
| 555 18 | refills, 85 percent." | | | |
| 555 19 | TRx stands for? | | | |
| 555 20 | A.  Total prescriptions. | | | |
| 555 21 | Q.  And did I read that | | | |
| 555 22 | correctly? | | | |
| 555 23 | A.  You read it correctly. | | | |
| 555 24 | Q.  And so is basically what | | | |
| 556 1 | that's saying is that Pradaxa came to | | | |
| 556 2 | market, and there were a lot of patients | | | |
| 556 3 | that were dissatisfied with what they | | | |
| 556 4 | were currently being anticoagulated with, | | | |
| 556 5 | their current blood thinners, and Pradaxa | | | |
| 556 6 | basically ate those patients up first and | | | |
| 556 7 | got a bolus of new patients? | | | |
| 556 8 | A.  Yes.  It's referring to the | | | |
| 556 9 | people taking warfarin specifically, yes. | | | |
| | | | | |
| 556:23 - 558:13  Shah, Nauman 2016-08-04 | 1:17 | | | Pending |
| | | | | |
| 556 23 | Q.  Yeah.  So what this is | Re: [556:23-558:13] | Re: [556:23-558:13]  Pltf Resp See response to 105:16-106:3 above. "Mr. Shah is | |
| 556 24 | referring to is Pradaxa got to market | Def Obj This testimony falls within the evidence covered | describing the disadvantage to the brand of not beating Pradaxa | |
| 557 1 | first.  There was a population of | by the Court's Ruling on Defendants' MIL No. 2 related | first to market. | |
| 557 2 | patients on warfarin who were unsatisfied | to marketing and the Court's ruling on Defendants' | | |
| 557 3 | with taking warfarin, and because Pradaxa | Omnibus MIL No. 1 regarding market share and profits, | | |
| 557 4 | got to market first, they captured those | both of which the Court sustained.  The evidence is not | | |
| 557 5 | folks, right? | relevant and is more prejudicial than probative under | | |
| 557 6 | A.  Yes.  As well as some | Rule 403.  This testimony regarding RECORD/RECORD | | |
| 557 7 | patients who may have discontinued | 4/DVT/PE is not relevant and is more prejudicial than | | |
| 557 8 | warfarin because they couldn't take it | probative under Rule 403. | | |
| 557 9 | for whatever reason. | | | |
| 557 10 | Q.  So that is an example of the | | | |
| 557 11 | advantage of a drug getting to market | | | |
| 557 12 | first before and ahead of its competitors | | | |
| 557 13 | in terms of sales, correct? | | | |
| 557 14 | A.  It is one of the advantages | | | |
| 557 15 | that being first to market creates in | | | |
| 557 16 | that you're able to capture a bunch of | | | |
| 557 17 | people who are waiting for something new | | | |
| 557 18 | to come. | | | |
| 557 19 | Q.  Okay.  And because Pradaxa | | | |
| 557 20 | got there first and Xarelto got there | | | |
| 557 21 | second, you weren't able to capture those | | | |
| 557 22 | folks? | | | |
| 557 23 | A.  So specifically we were not | | | |
| 557 24 | able to capture folks as fast as Pradaxa. | | | |
| 558 1 | So that's exactly what she is | | | |
| 558 2 | contextualizing here. | | | |
| 558 3 | Q.  Okay.  Let's go to the | | | |
| 558 4 | second bullet point. | | | |

04/23/17 18:52

| | | Object. In | Responses In | Rulings |
|---|---|---|---|---|

| | | | | Pending |
| | | | | Pending |

| 558 | 5 | A. Okay. |
| 558 | 6 | Q. It says, "Future growth must |
| 558 | 7 | now come from new patients, about |
| 558 | 8 | 3 percent growth per year, and from |
| 558 | 9 | switching of patients doing 'fine or |
| 558 | 10 | stable' on warfarin, over one-third of |
| 558 | 11 | the total Afib population." |
| 558 | 12 | Did I read that correctly? |
| 558 | 13 | A. You did. |

**564:14  -  564:14  Shah, Nauman 2016-08-04**   0:07

| 564 | 10 | Q. So you were -- you were |
| 564 | 11 | predicting that your competitor would be |
| 564 | 12 | the number one within the Afib market, |
| 564 | 13 | correct? |
| 564 | 14 | A. We were. |

**Re: [564:10-564:14]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [564:10-564:14]** Pltf Resp 556:23-558:13 above

**564:15  -  566:1  Shah, Nauman 2016-08-04**   1:12

| 564 | 15 | Q. And you were -- if you look |
| 564 | 16 | at the second bullet point, it says, |
| 564 | 17 | "Internal only" again, correct? |
| 564 | 18 | A. Yes. |
| 564 | 19 | Q. It says, "Apixaban |
| 564 | 20 | anticipates" -- strike that. |
| 564 | 21 | "Apixaban's anticipated |
| 564 | 22 | label differentiation (better efficacy |
| 564 | 23 | and better safety) is the rationale |
| 564 | 24 | behind the market share projection." |
| 565 | 1 | Do you see that? |
| 565 | 2 | A. I do. |
| 565 | 3 | Q. And is that saying the |
| 565 | 4 | reason you believe that Eliquis will |
| 565 | 5 | surpass Xarelto in the Afib market is |
| 565 | 6 | because its label allowed it to say that |
| 565 | 7 | it was more efficacious than warfarin and |
| 565 | 8 | safer than warfarin and that you guys |
| 565 | 9 | were unable to say that? |
| 565 | 10 | A. It is implying, in |
| 565 | 11 | referencing exactly that, that the label |
| 565 | 12 | enabled apixaban to claim superiority, or |
| 565 | 13 | Eliquis, and we did not have that -- that |

**Re: [564:15-566:1]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. The testimony regarding RECORD/RECORD 4/DVT/PE is not relevant and is more prejudicial than probative under Rule 403.

**Re: [564:15-566:1]** Pltf Resp See response to 105:16-106:3 above.

29

| | Object. In | Responses In | Rulings |
|---|---|---|---|

04/23/17 1852

| | | |
|---|---|---|
| 565 14   claim. It's certainly not insinuating | | |
| 565 15   that apixaban was a better drug than | | |
| 565 16   Xarelto. | | |
| 565 17   Q.  Right.  Was it insinuating | | |
| 565 18   that the market was going to think that | | |
| 565 19   it was a better drug than Xarelto, | | |
| 565 20   because you were anticipating projecting | | |
| 565 21   that it would become the number one and | | |
| 565 22   surpass Xarelto in the marketplace? | | |
| 565 23   A.  I think she is stating that | | |
| 565 24   the marketplace may perceive apixaban to | | |
| 566 1   be better. | | |

591:4 - 591:12  Shah, Nauman 2016-08-04

0:23

| 591 4   Q.  I've handed you what's been | **Re: [591:4-591:12]** | Re: [591:4-591:12] | Pending |
| 591 5   marked Shah-47.  And this was a – found | **Def Obj** This testimony is not relevant because the | Pltf Resp See response to 105-16-106:3 above. | |
| 591 6   in your custodial file, and it appears to | Plaintiff was not a warfarin patient and is more | | |
| 591 7   be similar, at least on its cover page, | prejudicial than probative under Rule 403. This | | |
| 591 8   to the document that we just looked at. | testimony falls within the evidence covered by the | | |
| 591 9   It says "Xarelto 2012 business plan, | Court's Ruling on Defendants' MIL No. 2 related to | | |
| 591 10   driving growth." | marketing, which the Court sustained.  The evidence is | | |
| 591 11   Do you see that? | not relevant and is more prejudicial than probative | | |
| 591 12   A.  I do. | under Rule 403. | | |

592:6 - 592:12  Shah, Nauman 2016-08-04

0:12

| 592 6   Q.  Would this be a document | **Re: [592:6-592:12]** | | Pending |
| 592 7   that would have been prepared in the | **Def Obj** This testimony is not relevant because the | | |
| 592 8   regular course of Janssen's business? | Plaintiff was not a warfarin patient and is more | | |
| 592 9   A.  Yes. | prejudicial than probative under Rule 403. This | | |
| 592 10   Q.  And would you have prepared | testimony falls within the evidence covered by the | | |
| 592 11   or contributed and/or reviewed it? | Court's Ruling on Defendants' MIL No. 2 related to | | |
| 592 12   A.  Yes. | marketing, which the Court sustained.  The evidence is | | |
| | not relevant and is more prejudicial than probative | | |
| | under Rule 403. | | |

597:4 - 597:14  Shah, Nauman 2016-08-04

0:27

| 597 4   Q.  Okay.  All right.  Thank | **Re: [597:4-597:14]** | Re: [597:4-597:14] | Pending |
| 597 5   you.  If you would turn to Page 17. | **Def Obj** This testimony falls within the evidence covered | Pltf Resp See response to 105-116-106:3 above.  Additionally | |
| 597 6   Q.  Okay. | by the Court's Ruling on Defendants' MIL No. 2 related | relevant to plaintiff's claims concerning need for measurement. | |
| 597 7   Q.  It says, "Deep insights have | to marketing, which the Court sustained.  The evidence | Mr. Shah is testifying about the overall commercial and business | |
| 597 8   guided development of highly motivating | is not relevant and is more prejudicial than probative | plan for the drug. Plaintiff incorporates herein his response to | |
| 597 9   messages." | under Rule 403. This testimony relates to Plaintiffs' | Defendants joint Motion for an Order dimissing with prejudice | |
| 597 10   Do you see that? | expressly abandoned theory that that Xarelto™'s once- | claims etc... [Doc. No. 6167].  Xarelto dosing and its once daily | |
| 597 11   A.  I do. | daily dosing regimen is unreasonably dangerous, and for | dosing regimen result in high inter patient variability  making it | |
| 597 12   Q.  And "deep insights," is that | the reasons set forth in Defendants' joint motion to | important to instruct physicians about the advisability of | |
| 597 13   a reference to market research? | dismiss the abandoned claims, is not admissible. | measuring, the ability to measure and the anticoagulant effect in a | |
| 597 14   A.  Yes, it is. | | particular patient using PT Neoplastin.  Once a day dosing has not | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**605:11 - 606:14 Shah, Nauman 2016-08-04**   0:55

605  11   Q.  And in the right-hand column
605  12   It says, "Motivating Xarelto messages."
605  13   It says, "Once-a-day dose," right?
605  14   A.  Yes, it does.
605  15   Q.  So is this reflecting that
605  16   once-a-day dose was a effective and
605  17   motivating message to the public
605  18   according to your market research?
605  19   A.  It was one of the messages
605  20   identified as being important.
605  21   Q.  And the next one is, "No
605  22   regular dose adjustment."  That was one
605  23   of the messages that your market research
605  24   was -- was telling you -- giving you
606  1   feedback that was working, right?
606  2   A.  Yes.  Because warfarin often
606  3   requires dosage adjustments a lot, and
606  4   this did not.
606  5   Q.  Okay.  And just going down
606  6   to the third one.  Your market research
606  7   was telling you that the message of "No
606  8   INR blood monitoring was a motivating
606  9   message to consumers," right?
606  10   A.  Yes.  And that is consistent
606  11   with the theme we have been talking
606  12   about, about that being obviously a
606  13   difficult task for many patients who
606  14   are -- who are taking warfarin.

**Objections In — Re: [605:11-606:14]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.  This testimony relates to Plaintiffs' expressly abandoned theory that that Xarelto®'s once-daily dosing regimen is unreasonably dangerous, and for the reasons set forth in Defendants' joint motion to dismiss the abandoned claims, is not admissible.

**Responses In — Re: [605:11-606:14]**
**Pltf Resp** See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement.  Mr. Shah isr testyfing about the overall commercial and business plan for the drug.  Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167].  Xarelto dosing and its once daily dosing regimen result in high inter patient variability making it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin.  Once a day dosing has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

**Rulings** Pending

---

**606:15 - 606:22 Shah, Nauman 2016-08-04**   0:13

606  15   Q.  And also no dietary
606  16   restrictions, green vegetables, that was
606  17   a motivating message that your market
606  18   research was verifying was working,
606  19   right?
606  20   A.  Yes.  Because, again, that's
606  21   another area of struggle for warfarin
606  22   patients.

**Objections In — Re: [614:16-615:19]**
**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing, which the Court sustained.  The evidence

**Responses In — Re: [614:16-615:19]**
**Pltf Resp** See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement.  Mr. Shah isr testyfing about the overall commercial and business

**Rulings** Pending

---

**614:16 - 615:19 Shah, Nauman 2016-08-04**   0:50

614  16   Q.  So I think you and I have
614  17   talked about on a couple of occasions
614  18   that from a marketing standpoint in the
614  19   Afib indication, one important

**Responses In (top)** been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

31

04/23/17 18:52

...ulings

04/23/17 18:52

| | Object. In | Responses in |
|---|---|---|
| 614 20 differentiator for Xarelto versus Eliquis<br>614 21 and Pradaxa was the the fact that it was<br>614 22 taken once daily, correct?<br>614 23 A. Yes. That was one of the<br>614 24 advantages.<br>615 1 Q. And because Pradaxa and<br>615 2 Eliquis, your competitors, were<br>615 3 twice-a-day drugs, correct?<br>615 4 A. Correct.<br>615 5 Q. And Pradaxa and Eliquis had<br>615 6 a label that allowed them to be<br>615 7 advertised and promoted as having<br>615 8 superior efficacy and safety to warfarin,<br>615 9 correct?<br>615 10 A. Superior efficacy on stroke<br>615 11 risk reduction was common for both of<br>615 12 them. Not superior bleeding.<br>615 13 Q. Eliquis couldn't market<br>615 14 itself or advertise itself as having<br>615 15 superior efficacy to warfarin, correct?<br>615 16 A. Eliquis could market itself<br>615 17 as having superior efficacy to warfarin.<br>615 18 Q. Xarelto could not, right?<br>615 19 A. Xarelto could not. | is not relevant and is more prejudicial than probative under Rule 403. This testimony relates to Plaintiffs' expressly abandoned theory that that Xarelto"s once-daily dosing regimen is unreasonably dangerous, and for the reasons set forth in Defendants' joint motion to dismiss these abandoned claims, is not admissible. | plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc... [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of anticpte and how financial considerations overide safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not beeh abandoned and is highly relevant to plaintiff"s failure to warn and design defect claims. |
| 623:6 - 623:8 Shah, Nauman 2016-08-04<br>623 6 Q. I'm handing you Shah-49.<br>623 7 49? Yes.<br>623 8 A. Okay. | 0:24 | |
| 634:16 - 635:7 Shah, Nauman 2016-08-04<br>634 16 This does not say, I'd like<br>634 17 to have further discussion, right?<br>634 18 A. I don't get to be the<br>634 19 decisionmaker on this label, anyway.<br>634 20 Q. Okay. You know that the<br>634 21 label that -- the final label does not<br>634 22 include twice-daily dosing in this<br>634 23 section, correct?<br>634 24 A. I believe that's -- that's<br>635 1 correct, if that's what the label is as<br>635 2 of today.<br>635 3 Q. Okay. And you do write,<br>635 4 "Given that what the division is focusing<br>635 5 on, I think recommending twice-daily<br>635 6 dosing may not be optimal right now."<br>635 7 A. I do write that. | 0:27<br><br>**Re: [634:16-635:7]**<br>Def Obj The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | **Re: [634:16-635:7]**<br>Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testfying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc... [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of anticpte and how financial considerations overide safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |
| 635:8 - 635:22 Shah, Nauman 2016-08-04<br>635 8 Q. And you write that without<br>635 9 any scientific background to be able to<br>635 10 make that determination, correct? | 0:36 | |

Pending

...ulings

Pending

Pending

04/23/17 18:52

| | Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 635  11<br>635  12<br>635  13<br>635  14<br>635  15<br>635  16<br>635  17<br>635  18<br>635  19<br>635  20<br>635  21<br>635  22 | A. I wouldn't say without any scientific background. I think I had a pretty good knowledge of the medicine at that point. But, no, I'm not a scientist.<br>Q. And you're also not an expert in pharmacodynamics, correct?<br>A. I'm definitely not an expert in pharmacology, but I knew the Xarelto data pretty darn well. And obviously, ultimately the FDA would determine what ended up in the label or not. | | | |
| 658:10  - | Shah, Nauman 2016-08-04 | | | |
| 658  10<br>658  11<br>658  12<br>658  13<br>658  14<br>658  15<br>658  16<br>658  17<br>658  18<br>658  19<br>658  20<br>658  21<br>658  22<br>658  23<br>658  24<br>659  1<br>659  2<br>659  3<br>659  4 | 659:4 Q. Okay. Let's jump back in time to 2009.<br>A. Okay.<br>Q. I know we're doing a lot of time travel. In February 2009, you were director of marketing leading the team responsible for the Xarelto launch, correct?<br>A. Yes.<br>Q. And do you recall in early 2009 discussions about Janssen collaborating with Portola to develop a Factor Xa specific antidote -- Factor Xa specific antidote?<br>A. At a very high level, I remember hearing that there was a potential collaboration. I wasn't involved in the evaluation or due diligence on it. | 0:40<br><br>Re: [658:10-659:4]<br>Def Obj The testimony lacks personal knowledge of the matters addressed in the questions. The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [658:10-659:4]<br>Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. | |
| 666:8  - | Shah, Nauman 2016-08-04 | | | |
| 666  8<br>666  9<br>666  10<br>666  11<br>666  12<br>666  13<br>666  14<br>666  15<br>666  16<br>666  17<br>666  18<br>666  19<br>666  20<br>666  21<br>666  22<br>666  23<br>666  24<br>667  1 | 668:2 Q. I've handed you what's been marked as Shah-54. For the record, it's Record Number 105-5561, Bates Number Xarelto-Janssen 07189114.<br>Mr. Shah, this appears to be another set of meeting minutes of the compound development team for February 19, 2009.<br>Do you see that?<br>A. I do.<br>Q. Any reason to believe that this is not the team -- compound development team meeting minutes prepared in the normal course of Janssen's business?<br>A. No.<br>Q. And the same commercial members, Vanessa Broadhurst, Kate Feeney, | 1:15<br><br>Re: [666:8-668:2]<br>Def Obj There is no foundation for the witness to discuss this document, which relates to a meeting there is no evidence he attended. The witness lacks personal knowledge of the matters addressed in the questions. The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [666:8-668:2]<br>Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. | |

| | | Object. In | Responses In | Rulings |
|---|---|---|---|---|
| | | | | Pending |

| | | |
|---|---|---|
| 667 | 2 | Justine Donnelly, Joe Toscano, and Judy |
| 667 | 3 | Wicklum are the same members at the CDT |
| 667 | 4 | at this meeting, correct? |
| 667 | 5 | A. Yes, that appears to be. |
| 667 | 6 | Q. I want you to go to Page 3. |
| 667 | 7 | This appears to be the meeting minutes |
| 667 | 8 | from the meeting a month after the |
| 667 | 9 | meeting that we just talked about in |
| 667 | 10 | Shah-53, correct? |
| 667 | 11 | A. Okay. Yep. |
| 667 | 12 | Q. "Commercial update." Do you |
| 667 | 13 | see where I am? |
| 667 | 14 | A. Yes, I do. |
| 667 | 15 | Q. It says, "Final |
| 667 | 16 | recommendation on antidote. |
| 667 | 17 | Commercial" -- and that's marketing, |
| 667 | 18 | right? |
| 667 | 19 | A. Yes. |
| 667 | 20 | Q. -- "has completed the |
| 667 | 21 | evaluation and recommends not to pursue |
| 667 | 22 | this opportunity. Position statement |
| 667 | 23 | placed in CDT MTG eRoom folder for |
| 667 | 24 | today's meeting." |
| 668 | 1 | Do you see that? |
| 668 | 2 | A. I do. |

**670:13  -  670:17 Shah, Nauman 2016-08-04**

0:09

| | | |
|---|---|---|
| 670 | 13 | Q. Okay. We know that at the |
| 670 | 14 | time Xarelto was launched in 2011, it was |
| 670 | 15 | launched without an available antidote to |
| 670 | 16 | reverse bleeding, correct? |
| 670 | 17 | A. That is correct. |

Re: [670:13-670:17]

**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

Re: [670:13-670:17]

Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff''s failure to warn and design defect claims.

**670:18  -  670:22 Shah, Nauman 2016-08-04**

0:12

| | | |
|---|---|---|
| **670** | **18** | **Q. And that was a decision that** |
| **670** | **19** | **Janssen made to launch it without an** |
| **670** | **20** | **antidote, correct?** |
| **670** | **21** | **A. We did not have an option** |
| **670** | **22** | **available at time for an antidote.** |

34

04/23/17 18:52

| | Objection In | Responses In | Rulings |
|---|---|---|---|

**683:12 - 683:21 Shah, Nauman 2016-08-04**  0:19

| 683 | 12 | Q. Do you know that Bayer was |
| 683 | 13 | considering developing an antidote that |
| 683 | 14 | worked specifically on Xarelto? |
| 683 | 15 | A. I heard about that. |
| 683 | 16 | Q. Okay. And do you recall |
| 683 | 17 | that you attended compound development |
| 683 | 18 | team meetings in or around early 2011 |
| 683 | 19 | where that was discussed? |
| 683 | 20 | A. That topic was brought to |
| 683 | 21 | the CDT for us to be aware of it, yes. |

**Objection In:**
Re: [683:12-683:21]
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Responses In:**
Re: [683:12-683:21]
**Pltf Resp** See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antciprte and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

**Rulings:** Pending

---

**686:1 - 686:11 Shah, Nauman 2016-08-04**  0:36

| 686 | 1 | Q. I'm handing you Shah-58 and |
| 686 | 2 | Shah-59, which are another e-mail and |
| 686 | 3 | attachment. |
| 686 | 4 | (Document marked for |
| 686 | 5 | identification as Exhibit |
| 686 | 6 | Shah-59.) |
| 686 | 7 | MR. WEINKOWITZ: 58 is |
| 686 | 8 | 119114, Xarelto-Janssen 0114700. |
| 686 | 9 | Shah-59 is Record Number |
| 686 | 10 | 119115, Bates Number |
| 686 | 11 | Xarelto-Janssen 0114701. |

**Objection In:**
Re: [686:1-686:11]
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Responses In:**
Re: [686:1-686:11]
**Pltf Resp** See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antciprte and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

**Rulings:** Pending

---

**689:18 - 690:7 Shah, Nauman 2016-08-04**  0:28

| 689 | 18 | Q. And looking at both sets of |
| 689 | 19 | e-mails that I gave you and attachments, |
| 689 | 20 | Shah-58, 59, and the set Shah-56 and 57, |
| 689 | 21 | do these appear to be business documents |
| 689 | 22 | that were prepared in the regular course |

**Objection In:**
Re: [689:18-690:7]
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the

**Responses In:**
Re: [689:18-690:7]
**Pltf Resp** See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to

**Rulings:** Pending

| Lines | Testimony | Objections In | Responses In |
|---|---|---|---|
| 689 23<br>689 24<br>690 1<br>690 2<br>690 3<br>690 4<br>690 5<br>690 6<br>690 7 | of Janssen's business?<br>A. Yes.<br>Q. And these e-mails, you would<br>have received and reviewed?<br>A. I believe so, yes.<br>Q. And would you have received<br>and reviewed the attachments?<br>A. I would have reviewed the<br>attachment, yes. | Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |

**690:18 - 690:21 Shah, Nauman 2016-08-04**   0:11   Pending

| Lines | Testimony | Objections In | Responses In |
|---|---|---|---|
| 690 18<br>690 19<br>690 20<br>690 21 | Q. If you look at the first<br>slide, it says, "Xarelto rivaroxaban<br>specific antidote BAY 1110262," correct?<br>A. Yes. | Re: [690:18-690:21]<br>Def Obj The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [690:18-690:21]<br>Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |

**691:2 - 691:10 Shah, Nauman 2016-08-04**   0:15

| Lines | Testimony |
|---|---|
| 691 2<br>691 3<br>691 4<br>691 5<br>691 6<br>691 7<br>691 8<br>691 9<br>691 10 | Q. Now, would this have been a<br>set of slides that somebody would have<br>presented at the global development<br>committee meeting?<br>A. Based on the e-mail, I<br>assume it looks like, yes.<br>Q. Do you know who presented<br>them?<br>A. I would have no idea. |

**691:11 - 693:11 Shah, Nauman 2016-08-04**   1:13   Pending

| Lines | Testimony | Objections In | Responses In |
|---|---|---|---|
| 691 11<br>691 12<br>691 13<br>691 14<br>691 15<br>691 16<br>691 17<br>691 18 | Q. And you recall -- I think<br>you testified, that generally you have a<br>recollection of Bayer -- Bayer developing<br>an antidote back around this period of<br>time?<br>A. Yes. And it looks like this<br>document was from Bayer because they're<br>the only one that would have put Xarelto | Re: [691:11-693:11]<br>Def Obj The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [691:11-693:11]<br>Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack |



| | | Objection In | Responses In | ...dings |
|---|---|---|---|---|
| 691 19 | in quotes. | under Rule 403. | of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. | |
| 691 20 | Q. Okay. And you're pointing | | | |
| 691 21 | to the first page of the slide? | | | |
| 691 22 | A. Yes, I am. | | | |
| 691 23 | Q. And actually, if you look at | | | |
| 691 24 | the first page of the slide, on the | | | |
| 692 1 | right-hand side, it's got the Bayer -- | | | |
| 692 2 | A. It's actually got the Bayer | | | |
| 692 3 | logo. There you go. Okay. | | | |
| 692 4 | Q. All right. So if we go to | | | |
| 692 5 | Page 2. | | | |
| 692 6 | A. Yes. | | | |
| 692 7 | Q. It says "Project rationale." | | | |
| 692 8 | A. Yeah. | | | |
| 692 9 | Q. And it says, "Anticoagulants | | | |
| 692 10 | are associated with bleeding risk." | | | |
| 692 11 | You agree with that? | | | |
| 692 12 | A. Yes, all anticoagulants are. | | | |
| 692 13 | Q. And, "There is an unmet | | | |
| 692 14 | medical need for effective antidotes for | | | |
| 692 15 | anticoagulants in general." | | | |
| 692 16 | Did I read that correctly? | | | |
| 692 17 | A. You did. | | | |
| 692 18 | Q. And do you agree with that? | | | |
| 692 19 | A. There is, yes. | | | |
| 692 20 | Q. And next bullet point, it | | | |
| 692 21 | says, "No specific antidotes are | | | |
| 692 22 | available for the new anticoagulants." | | | |
| 692 23 | Did I read that correctly? | | | |
| 692 24 | A. You did. | | | |
| 693 1 | Q. And is that accurate as of | | | |
| 693 2 | this time? | | | |
| 693 3 | A. Thank you. That's what I | | | |
| 693 4 | was going to say. Yes, at that time it | | | |
| 693 5 | was. | | | |
| 693 6 | Q. And if you look at the | | | |
| 693 7 | second bullet point down, it says, | | | |
| 693 8 | "Life-threatening bleeds can be expected | | | |
| 693 9 | in 1 to 3 percent of Xarelto patients." | | | |
| 693 10 | Do you see that? | | | |
| 693 11 | A. Yes, I do. | | | |
| 694:2 - 694:18 Shah, Nauman 2015-08-04 | | 0:30 | | Pending |
| 694 2 | Q. Next bullet point, it says, | Re: [694:2-694:18] | Re: [694:2-694:18] | 04/23/17 18:52 |
| 694 3 | "Physicians report significant interest | **Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Pltf Resp See response to 105:15-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testfying about the overall commercial and business plan for the drug. Plaintiff incorporates herein its response to Defendants.Joint Motion for an Order dimissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to | |
| 694 4 | in an antidote 'security blanket,'" | | | |
| 694 5 | correct? | | | |
| 694 6 | A. Yes. That's how I would | | | |
| 694 7 | describe it as well. | | | |
| 694 8 | Q. Right. And we saw it in | | | |
| 694 9 | that prior PowerPoint slide that one of | | | |
| 694 10 | the barriers to prescribing Xarelto after | | | |
| 694 11 | launch of the Afib indication, you knew | | | |

37

...lings

Pending

| | Objections In | Responses In |
|---|---|---|
| 694  12<br>694  13<br>694  14<br>694  15<br>694  16<br>694  17<br>694  18 | that doctors were talking about it not having an antidote, correct?<br>A.  Yes.  And that's what we found in our market research was basically they wanted a security blanket in case -- in case something ever happened. | measure and the anticoagulant effect in a particular patient using PT Neoplastin.  Mr. Shah testifies about mareting's role is the decison making regarding the launching Xareto without a lack of anticpte and how financial considerations overode safety considerations....As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |
| 705:3  -  711:16 Shah, Nauman 2016-08-04 | | |
| | 4:55 | |
| 705  3<br>705  4<br>705  5<br>705  6<br>705  7<br>705  8<br>705  9<br>705  10<br>705  11<br>705  12<br>705  13<br>705  14<br>705  15<br>705  16<br>705  17<br>705  18<br>705  19<br>705  20<br>705  21<br>705  22<br>705  23<br>705  24<br>706  1<br>706  2<br>706  3<br>706  4<br>706  5<br>706  6<br>706  7<br>706  8<br>706  9<br>706  10<br>706  11<br>706  12<br>706  13<br>706  14<br>706  15<br>706  16<br>706  17 | Q.  I've given you what's marked as Shah-60, Mr. Shah.  Let me just read for the record.  It's Record Number 303724, Xarelto-Janssen 01429151.<br>This appears to be a set of meeting minutes from the compound development team meeting of February 15, 2009.  Does it look like that?<br>A.  Yes, it does.<br>Q.  All right.  And your name appears as a CDT member?<br>A.  It does.<br>Q.  And it's highlighted.  Does that mean that you were at the meeting?<br>A.  Attendees in bold, then, yes, I -- I think that's what it means.<br>Q.  Okay.  And you are listed as the commercial leader, correct?<br>A.  I am.<br>Q.  If you could turn to the second page.<br>A.  Mm-hmm.<br>Q.  And if you -- I'm sorry.  If you go back to the first page.  It is, "Compound Development Team Meeting, Recommendation on Pursuing Bayer Developed Rivaroxaban Antidote."<br>Do you see that?<br>A.  I do.<br>Q.  And is this the ad hoc meeting that was talked about in the prior e-mail for considering the Bayer antidote around this time?<br>A.  I don't know if it was an ad -- the ad hoc meeting.  But it's certainly a meeting that looks like it was focused on that topic.<br>Q.  Okay.  Going to the second page. | Re: [705:3-711:16]<br>**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed.  This testimony fails within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [705:3-711:16]<br>Pltf Resp See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement.  Mr. Shah isr testyfing about the overall commercial and business plan for the drug.  Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167].  Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin.  Mr. Shah testifies about mareting's role is the decison making regarding the launching Xareto without a lack of antcpte and how financial considerations overode safety considerations.  As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote  has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |

38

Responses In

Objecti. In

| | | |
|---|---|---|
| 706 | 18 | A. Okay. |
| 706 | 19 | Q. First, the bullet point |
| 706 | 20 | there says as a -- strike that. |
| 706 | 21 | "As a lifesaving product, it |
| 706 | 22 | may command the necessary price to |
| 706 | 23 | justify high COGs and development." |
| 706 | 24 | What is COGs? |
| 707 | 1 | A. COG stands for cost of |
| 707 | 2 | goods. |
| 707 | 3 | Q. Okay. And so if I |
| 707 | 4 | understand what this is saying is that, |
| 707 | 5 | is that an antidote if it's developed, |
| 707 | 6 | because it's a lifesaving product you |
| 707 | 7 | might be able to charge a lot more for |
| 707 | 8 | it? |
| 707 | 9 | A. No, actually -- well, it's |
| 707 | 10 | saying, I guess, command the necessary -- |
| 707 | 11 | can it command the necessary price, |
| 707 | 12 | because the -- the production cost here |
| 707 | 13 | is very high, apparently, for this Bayer |
| 707 | 14 | specific -- Bayer antidote. |
| 707 | 15 | Q. Okay. And so one of the |
| 707 | 16 | things that's being considered and |
| 707 | 17 | factored as to whether or not to pursue |
| 707 | 18 | the Bayer antidote is what price can be |
| 707 | 19 | commanded for the antidote itself, |
| 707 | 20 | correct? |
| 707 | 21 | A. It appears that the team is |
| 707 | 22 | stating or the information is stating |
| 707 | 23 | that the development and -- or the |
| 707 | 24 | production cost is high, and obviously, |
| 708 | 1 | there would need to be a price that could |
| 708 | 2 | be high enough to justify supporting |
| 708 | 3 | that. |
| 708 | 4 | Q. Okay. |
| 708 | 5 | A. And the belief, to your |
| 708 | 6 | point, is that because it would be |
| 708 | 7 | lifesaving, that hopefully that would be |
| 708 | 8 | possible. |
| 708 | 9 | Q. Third bullet point down. It |
| 708 | 10 | says, "Dabigatran developing specific |
| 708 | 11 | antibody. Lack of antidote could become |
| 708 | 12 | a competitive disadvantage for riva." |
| 708 | 13 | And dabigatran is Pradaxa, |
| 708 | 14 | correct? |
| 708 | 15 | A. It is. |
| 708 | 16 | Q. And did I read that sentence |
| 708 | 17 | correctly? |
| 708 | 18 | A. You did. |
| 708 | 19 | Q. And so one of the things |
| 708 | 20 | that's being considered here as to |
| 708 | 21 | whether or not to pursue the Bayer |
| 708 | 22 | antidote is the fact that Pradaxa is |
| 708 | 23 | developing a specific antidote, correct? |

04/23/17 18:52

...ulings

Responses In

Object. In

40

| 708 | 24 | A.   It is one of the factors, |
| 709 | 1 | yes. |
| 709 | 2 | Q.   And we saw that -- we saw |
| 709 | 3 | that actually Pradaxa has successfully |
| 709 | 4 | completed that and they do have an |
| 709 | 5 | antidote and they are advertising that, |
| 709 | 6 | correct? |
| 709 | 7 | A.   Yes, they recently launched |
| 709 | 8 | one. |
| 709 | 9 | Q.   And it says, "Lack of an |
| 709 | 10 | antidote could become a competitive |
| 709 | 11 | disadvantage for riva." |
| 709 | 12 | Do you see that? |
| 709 | 13 | A.   I do. |
| 709 | 14 | Q.   And does that mean that not |
| 709 | 15 | having an antidote could decrease sales |
| 709 | 16 | versus Pradaxa if it did develop an |
| 709 | 17 | antidote? |
| 709 | 18 | A.   Yes, potentially. |
| 709 | 19 | Q.   And that was one of the |
| 709 | 20 | things that was being considered at the |
| 709 | 21 | time? |
| 709 | 22 | A.   That was one of the |
| 709 | 23 | considerations. |
| 709 | 24 | Q.   All right.  Next bullet |
| 710 | 1 | point down.  "Health authorities and |
| 710 | 2 | physicians have expressed a keen interest |
| 710 | 3 | in having effective antidotes to |
| 710 | 4 | anticoagulant drugs.  Clear desire for |
| 710 | 5 | such a product." |
| 710 | 6 | Did I read that correctly? |
| 710 | 7 | A.   Yes, you did. |
| 710 | 8 | Q.   All right.  And that was |
| 710 | 9 | verified and consistent with -- with your |
| 710 | 10 | market research shortly after Xarelto |
| 710 | 11 | launched, correct? |
| 710 | 12 | A.   It was. |
| 710 | 13 | Q.   And this was in -- this |
| 710 | 14 | meeting was in February of 2011, months |
| 710 | 15 | before the launch in Afib, correct? |
| 710 | 16 | A.   It was approximately -- |
| 710 | 17 | sorry.  It's getting late in the day. |
| 710 | 18 | Approximately nine months prior to the |
| 710 | 19 | launch, correct. |
| 710 | 20 | Q.   And would it be fair to say |
| 710 | 21 | that based on the reading of this fourth |
| 710 | 22 | bullet point, that your company knew that |
| 710 | 23 | health authorities and physicians had |
| 710 | 24 | expressed a keen interest in having |
| 711 | 1 | effective antidotes to anticoagulant |
| 711 | 2 | drugs and that there was a clear desire |
| 711 | 3 | for such a product before you launched |
| 711 | 4 | Xarelto? |
| 711 | 5 | A.   We were aware of all of that |

| | Objecti... In | Responses In | ...llings |
|---|---|---|---|

04/23/'17 18:52



---

| 711 | 6 | but did not have a viable opportunity at |
| 711 | 7 | that time to bring one to the market, |
| 711 | 8 | especially prior to launch or at the same |
| 711 | 9 | time as launch. |
| 711 | 10 | Q.  Right. And we saw in 2009 a |
| 711 | 11 | decision was made not to pursue the |
| 711 | 12 | Portola antidote at that point in time, |
| 711 | 13 | correct? |
| 711 | 14 | A.  I believe that that is |
| 711 | 15 | correct, for whatever reason the team |
| 711 | 16 | decided. |

**711:17 - 712:3   Shah, Nauman: 2016-08-04**     0:19

| 711 | 17 | Q.  Right. So there was an -- |
| 711 | 18 | an opportunity to develop the Portola |
| 711 | 19 | antidote in 2009 which would have been |
| 711 | 20 | two years before launch.  The team |
| 711 | 21 | decided not to do that, correct? |
| 711 | 22 | A.  Well, Portola would have |
| 711 | 23 | actually been the one developing, and I |
| 711 | 24 | think the opportunity was should we |
| 712 | 1 | invest in it at that time or should we |
| 712 | 2 | invest in it later as it gains more data |
| 712 | 3 | to give us confidence that it was real. |

**712:4 - 712:8   Shah, Nauman: 2016-08-04**     0:13

| 712 | 4 | Q.  And you made the decision |
| 712 | 5 | that you would defer investing in the |
| 712 | 6 | Portola antidote in 2009, correct? |
| 712 | 7 | A.  That is a very fair |
| 712 | 8 | assessment, yes. |

**Re: [712:4-712:8]**

**Def Obj** This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403. This testimony relates to Plaintiffs' expressly abandoned theories that that Xarelto"s once-daily dosing regimen is unreasonably dangerous and that Xarelto's label should have instructed physicians to perform routine monitoring of patients' PT levels, and for the reasons set forth in Defendants' Joint motion to dismiss the abandoned claims, is not admissible.

Pending

**721:4 - 722:6   Shah, Nauman: 2016-08-04**     0:48

| 721 | 4 | Q.  From a regulatory |
| 721 | 5 | standpoint, was there anything that |
| 721 | 6 | stopped the company from saying, you know |
| 721 | 7 | what, let's develop an antidote before we |
| 721 | 8 | launch this drug so that we -- if |
| 721 | 9 | somebody bleeds while on the drug, we can |
| 721 | 10 | reverse it? |
| 721 | 11 | A.  The regulatory pathway, |
| 721 | 12 | again I would defer to our regulatory |
| 721 | 13 | colleagues because an antidote pathway, I |

**Re: [721:4-722:6]**

**Def Obj** The witness does not have personal knowledge or the foundation to discuss regulatory matters. The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' Mil. No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403.

41

**Re: [721:4-722:6]**

Pltf Resp See response to 105:15-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167].  Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to

Pending

| Lines | Testimony | Time | Objections | Responses | Rulings |
|---|---|---|---|---|---|
| 721:14 – 722:6 | don't know if it was clear at that time because nothing had been approved as an antidote on the market. Q. Okay. And was there anything that prohibited Janssen in 2009 from deciding, you know what, we'll collaborate with Portola and we'll get an -- on -- on what they are looking at, we'll give them money and we'll work with them to get an antidote going? There was nothing that prohibited the company from doing that in 2009, correct? A. I would say that the thing that would have inhibited us would have been the lack of confidence into whether that was real or not. But other than that, nothing. | | | measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overrode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. | Pending |
| 722:17 – 723:8 Shah, Nauman 2016-08-04 | Q. The company was aware of the Portola option in 2009, correct? A. We knew it was an option. We just didn't know how confident we could be in that option as to whether it was viable or not. Q. And the commercial -- we saw documents where the commercial folks recommended that they not -- that the company not pursue that from a commercial standpoint, correct? A. We saw documents where somebody in the CDT, some commercial folks recommended that. I just don't know which antidote they were talking about. | 0:34 | Re: [722:17-723:8] Def Obj The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [722:17-723:8] Pltf Resp See response 6 105:15-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overrode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. | |
| 750:13 – 751:7 Shah, Nauman 2016-08-04 | Q. I'm handing you Shah-62. For the record, Shah-62 is 119-111, Bates Number Xarelto-Janssen 00114696. Take a minute and let me know when you're ready. A. Okay. Q. Okay. This is an e-mail from Nancy -- am I pronouncing this right? Ondowik? A. Good guess. Q. We'll keep it at that. | 2:22 | Re: [750:13-751:7] Def Obj The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [750:13-751:7] Pltf Resp See response to 105:15-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dismissing with prejudice claims etc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using | Pending |

04/23/17 18:52

| Lines | Testimony | Objection In | Responses In |
|---|---|---|---|
| | | | ...dings |
| | | **Objection In** | **Responses In** |
| 750  24 | A.  Okay. | | PT Neoplastin.  Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations.  As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote  has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims. |
| 751  1 | Q.  E-mail from Nancy Ondovik to | | |
| 751  2 | several people on the Xarelto team, | | |
| 751  3 | including yourself? | | |
| 751  4 | A.  Yes. | | |
| 751  5 | Q.  This is -- the e-mail was | | |
| 751  6 | December sent 19, 2011? | | |
| 751  7 | A.  Yes, that's correct. | | |
| 751:15  -  752:12  Shah, Nauman 2016-08-04 | | | 0:39 |
| 751  15 | Q.  Okay.  So it's one and a | **Re: [751:15-752:12]** | Pending |
| 751  16 | half months after Xarelto was approved | **Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed.  This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative under Rule 403. | Re: [751:15-752:12] |
| 751  17 | and on the market for Afib, correct? | | Pltf Resp Resp See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants joint Motion for an Order dismissing with prejudice claims etc.. (Doc. No. 6167). Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using |
| 751  18 | A.  About six months after the | | |
| 751  19 | approval for the orthopedic indication, | | |
| 751  20 | and about a month and a half after the AF | | |
| 751  21 | indication. | | |
| 751  22 | Q.  Correct.  And Xarelto was | | |
| 751  23 | launched without an antidote, correct, | | |
| 751  24 | and that is a discussion that was | | |
| 752  1 | happening about an antidote after that | | |
| 752  2 | time, correct? | | |
| 752  3 | A.  That is correct. | | |
| 752  4 | Q.  And she says in the first | | |
| 752  5 | paragraph, "Hello, everyone.  Just wanted | | |
| 752  6 | to let you know that Bob and I | | |
| 752  7 | communicated our decision not to move to | | |
| 752  8 | diligence or pursue the riva antidote | | |
| 752  9 | opportunity any further with Bayer late | | |
| 752  10 | last week." | | |
| 752  11 | Did I read that correctly? | | |
| 752  12 | A.  You did. | | |
| 753:13  -  753:20  Shah, Nauman 2016-08-04 | | | 0:12 |
| 753  13 | Q.  And, "Bayer was | **Re: [753:13-753:20]** | Re: [753:13-753:20] |
| 753  14 | understandably disappointed by this | **Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed.  This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2, related to marketing, which the Court sustained.  The evidence is not relevant and is more prejudicial than probative | Pltf Resp See response to 105:16-106:3 above.  Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants joint Motion for an Order dismissing with prejudice claims etc.. (Doc. No. 6167). Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack |
| 753  15 | decision and hoped to share more details | | |
| 753  16 | on the program and their rationale and | | |
| 753  17 | reasons for moving forward with this | | |
| 753  18 | antidote as part of the diligence | | |
| 753  19 | process," correct? | | |
| 753  20 | A.  Yes. | | |

PT Neoplastin.  Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations.  As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote  has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.



...dings

04/23/17 18:52

**Responses In**

of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff''s failure to warn and design defect claims.

Pending

Re: [754:18-754:22] :
Pltf Resp See response to 105:16-106:3 above. Additionally relevant to Plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims atc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variablity and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidote has not been abandoned and is highly relevant to plaintiff''s failure to warn and design defect claims.

Pending

Re: [756:21-757:11]
Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims atc.. [Doc. No. 6167]. Xarelto dosing and its once daily dosing regimen result in high inter patient variablity and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using

**Objectio In**

under Rule 403.

0:08

Re: [754:18-754:22] :
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

0:34

Re: [756:21-757:11]
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing and the Court's ruling on Defendants' Omnibus MIL No. 1 regarding market share and profits, both of which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

754:18  -  754:22  Shah, Nauman 2016-08-04

754  18    Q.    "They were quite surprised
754  19          that we decided to stop prior to
754  20          completing diligence."
754  21          Did I read that correctly?
754  22    A.    You did.

756:21  -  757:11  Shah, Nauman 2016-08-04

756  21    Q.    Okay. The main -- next
756  22          paragraph. "The main messages
756  23          communicated to Bayer were that after
756  24          careful consideration and additional
757  1           analytic work, there was limited clinical
757  2           need for a riva-specific antidote as well
757  3           as limited potential for the antidote to
757  4           generate incremental revenue to the riva
757  5           program, either through sales of the
757  6           antidote or increased sales of riva,
757  7           based on our current understanding of the

44

...ilings

04/23/17 18:52

| | Objections In | Responses In | |
|---|---|---|---|

757:8  riva TPP and the U.S. regulatory
757:9  landscape."
757:10  Did I read that correctly?
757:11  A. You did.

**Responses In:** PT Neoplastin. Mr. Shah testifies about marketing's role is the decision making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

Pending

---

759:21 - 760:4  Shah, Nauman 2016-08-04

0:15

759:21  Q. Would you agree with me that
759:22  as long as there's a chance of somebody
759:23  bleeding on Xarelto from a clinical
759:24  standpoint, from a patient's perspective,
760:1  that there would always be a need for an
760:2  antidote?
760:3  A. There would be a need for
760:4  modalities to manage that bleeding. I

**Re: [759:21-760:4]**
**Def Obj** The testimony regarding the antidote/reversal agent is not admissible because it relates to Plaintiffs' design defect claim, which they have dismissed. This testimony falls within the evidence covered by the Court's Ruling on Defendants' MIL No. 2 related to marketing, which the Court sustained. The evidence is not relevant and is more prejudicial than probative under Rule 403.

**Re: [759:21-760:4]**
Pltf Resp See response to 105:16-106:3 above. Additionally relevant to plaintiff's claims concerning need for measurement. Mr. Shah isr testifying about the overall commercial and business plan for the drug. Plaintiff incorporates herein his response to Defendants Joint Motion for an Order dimissing with prejudice claims etc.. (Doc. No. 6167). Xarelto dosing and its once daily dosing regimen result in high inter patient variability and its lack of an antidote / reversal agent makes it important to instruct physicians about the advisability of measuring, the ability to measure and the anticoagulant effect in a particular patient using PT Neoplastin. Mr. Shah testifies about marketing's role is the decison making regarding the launching Xarelto without a lack of antidote and how financial considerations overode safety considerations. As with once daily dosing and lack of monitoring, a lack of a reversal agent/antidte has not been abandoned and is highly relevant to plaintiff's failure to warn and design defect claims.

Pending

---

760:5 - 760:21  Shah, Nauman 2016-08-04

0:46

760:5  would agree with that. My own mother,
760:6  you know, took it once and so I would
760:7  100 percent agree with that.
760:8  But if I may finish my
760:9  thought for a minute, since we didn't
760:10  move to the next question. By modality,
760:11  to be clear for the jury and everyone
760:12  else, what I mean is there needs to be
760:13  options, whether it's a precise antidote
760:14  or whether it's, like, the things that
760:15  people do with warfarin where they apply
760:16  vitamin K and it seems to help.
760:17  That's, in essence, what I
760:18  mean by modalities. There need to

**Re: [760:5-760:21]**
Pltf Obj Motion to strike everything after "bleeding." The witness testifies about his own mother's medical conditions and personal use of Xarelto. See Plaintiffs' MIL 11 Doc. 5924-1. See, e.g., Dedrick v. Merck & Co., Inc. (In re: Vioxx), No. 2:05-md-01657, slip op., at A¶ 5 (E.D. La. Nov. 22, 2006) (excluding similar testimony). Fed. R. Evid. 401, 402 and 403.

45

| | | | | Objections In | Responses In |
|---|---|---|---|---|---|

| 760 | 19 | identified some modalities to control a |
| 760 | 20 | very serious bleeding should one ever |
| 760 | 21 | occur. |

---

786:17 - 787:7  Shah, Nauman 2016-08-04 ......... 0:28 ......... Pending

| 786 | 17 | Q. Mr. Shah, and for members of |
| 786 | 18 | the jury, it's David Covey sitting next |
| 786 | 19 | to you for two days. I don't think the |
| 786 | 20 | camera was on me at all. Now it's my |
| 786 | 21 | turn to ask you some questions. |
| 786 | 22 | Let's start. Can you tell |
| 786 | 23 | the jury where you were born. |
| 786 | 24 | A. Yes, I was born in the |
| 787 | 1 | Lahore, Pakistan. |
| 787 | 2 | Q. When was that? |
| 787 | 3 | A. It was 1971. |
| 787 | 4 | Q. And when did your family |
| 787 | 5 | move to the United States? |
| 787 | 6 | A. My family immigrated to the |
| 787 | 7 | United States in 1980. |

**Re: [786:17-787:7]**

Pltf Obj The Court should strike Defendants'" counter-designations from page 786 on from being played in plaintiffs case in chief as they are not for completeness or context and thus violate FRE 106. This is more properly played during Defendants' own case. What is clear from Defendants'" counter-designations is that they are seeking to bog-down Plaintiff"s cases-in-chief by attempting to present not only their allowable counter-designations, but also their affirmative designations of these depositions contemporaneously with Plaintiff"s presentations. The effect of doing so will be to muddle the proceedings, potentially confusing the jury by overwhelming it with issues not pertaining to Plaintiff"s evidence, and ultimately cause undue interference with Plaintiff"s presentation of his case. While Fed. R. Civ. P. 32.2 admittedly allows Defendants to play portions necessary to place Plaintiff"s designations in context, it does not allow Defendants to present more than that outside of their own case.

---

788:22 - 789:8  Shah, Nauman 2016-08-04 ......... 0:26 ......... Pending

| 788 | 22 | Q. And are you married? |
| 788 | 23 | A. I am married. |
| 788 | 24 | Q. Do you have children? |
| 789 | 1 | A. I do. |
| 789 | 2 | Q. How many children do you |
| 789 | 3 | have? |
| 789 | 4 | A. I am the proud father of |
| 789 | 5 | three daughters and two step-daughters. |
| 789 | 6 | My twins are Morgan and Lea. They're |
| 789 | 7 | 13 years old. And my younger one is |
| 789 | 8 | Amira. She is only 20 months. |

---

790:9 - 792:13  Shah, Nauman 2016-08-04 ......... 1:43 ......... Pending

| 790 | 9 | Q. Where did you go to college? |
| 790 | 10 | A. I went to Penn. |
| 790 | 11 | Q. University of Pennsylvania? |
| 790 | 12 | A. I did. |
| 790 | 13 | Q. What year did you graduate? |
| 790 | 14 | A. I graduated in 1993. |
| 790 | 15 | Q. What did you major in? |
| 790 | 16 | A. Biological basis of |
| 790 | 17 | behavior. |
| 790 | 18 | Q. And did you do any work |
| 790 | 19 | during hours when you weren't in school |
| 790 | 20 | or summer that was medically related? |
| 790 | 21 | A. I did a number of roles that |
| 790 | 22 | were medically related. I worked -- in |
| 790 | 23 | the summers prior to my senior year, I |
| 790 | 24 | worked in a healthcare company, in an |

**Re: [790:9-792:13]**

Pltf Obj 792:6-792:13 Leading

46

...ulings

Responses In

Objects. In

791 1 insurance company, in a couple of
791 2 different capacities.
791 3 But my most important role,
791 4 for a year I did research in urology at
791 5 the Penn Medical School.
791 6 Q. At University of
791 7 Pennsylvania Medical School?
791 8 A. Yes. Correct.
791 9 Q. What did you do after
791 10 college?
791 11 A. When I graduated college, I
791 12 was actually recruited to the
791 13 pharmaceutical industry. I also had
791 14 opportunities to continue to do medical
791 15 research at the Penn Medical School.
791 16 Medical school was a potential option as
791 17 well.
791 18 Something about the industry
791 19 just fascinated me, the opportunity to
791 20 follow in my father's footsteps, and I
791 21 wanted to learn. So I initially joined
791 22 the industry as I was recruited by Upjohn
791 23 while I was still an undergrad. The job
791 24 was waiting for me when I graduated.
792 1 And I decided to give it a
792 2 couple of years and then probably head
792 3 back to medical school. But that was my
792 4 idea to evaluate the industry at that
792 5 point.
792 6 Q. So something about working
792 7 in the industry got in the way of going
792 8 back to medical school. What was -- why
792 9 do you have a continuing interest in this
792 10 industry as opposed to perhaps an earlier
792 11 thought that maybe you would go to
792 12 medical school?
792 13 A. Yeah, it's --

792:21 - 794:7   Shah, Nauman 2016-08-04      1:10

792 21 A. Okay. I love the field of
792 22 medicine. I absolutely love, love
792 23 healthcare. You know, even in my
792 24 interviews, that was all I wanted to do,
793 1 be in the healthcare field.
793 2 The reason I joined the
793 3 industry or at least stayed in the
793 4 industry and didn't go back to medical
793 5 school was very simple. I fell in love
793 6 with the work that the industry does.
793 7 I didn't realize that I
793 8 would appreciate and have the opportunity
793 9 to basically have impact on a business as
793 10 well as obviously on healthcare. And I

47

| | Object. In | Responses In | ...lings |
|---|---|---|---|



793:11 thought this would provide the best
793:12 combination.
793:13   But the real big reason I
793:14 stayed was because I realized that the
793:15 industry would give me a chance to impact
793:16 lives on a massive scale.
793:17   Individual physicians do
793:18 phenomenal work. I have the utmost
793:19 respect for them. They obviously get to
793:20 treat one patient at a time, and over the
793:21 course of a day treat, let's say, 20
793:22 patients on average.
793:23   Drugs that I've worked on
793:24 directly from a marketing standpoint,
794:1 drugs that I've had a chance to lead from
794:2 a marketing standpoint have been used by
794:3 millions and millions of patients. And I
794:4 feel like I've had a role to play in
794:5 patients having access to those
794:6 medications and being made aware of those
794:7 medications.

794:8 - 794:16 Shah, Nauman 2016-08-04          0:18
794:8 Q. Do you have any degrees
794:9 after you graduated college and your
794:10 degree from the University of
794:11 Pennsylvania?
794:12 A. Yes. When I -- I decided a
794:13 few years ago, once I decided to stay in
794:14 the industry, to return to graduate
794:15 school. And I received an MBA in
794:16 finance.

794:17 - 794:22 Shah, Nauman 2016-08-04          0:05
794:17 Q. Okay. From what
794:18 institution?
794:19 A. That was from Temple
794:20 University.
794:21 Q. In Philadelphia?
794:22 A. In Philadelphia.

794:23 - 796:16 Shah, Nauman 2016-08-04          1:19
794:23 Q. Could you define marketing
794:24 in the context of working for a
795:1 pharmaceutical company like Janssen?
795:2 A. Yes. I mean, first of all,
795:3 you know, it's interesting. It is very
795:4 different than marketing in some other
795:5 aspects. I've been asked this question
795:6 multiple times, even in internal
795:7 meetings, as to -- you know, what do

**Object. In (Re: [794:23-796:16]):** Pltf Obj Outside of the scope. Plaintiff followed the court's MIL rulings and did not designate any Xarelto advertisements or other marketing materials. Thus, testimony about pharmaceutical marketing and the role fo the FDA is not relevant, will lead to confusion and is prejudicial per Defendants' own MIL 2 in the context of this case.

**Responses In:** Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**797:24 - 798:20 Shah, Nauman 2015-08-04**

0:49

Re: [797:24-798:20]

Pltf Obj Outside of the scope. Plaintiff followed the court's MIL rulings and did not designate any Xarelto advertisments or other marketing materials. Thus, testimony about pharmaceutical marketing and the role fo the FDA is not relevant, will lead to confusion and is prejudical per Defendants' own MIL 2 in the context of this case.



Pending

49

---

795  8   you -- what is it that marketing does.
795  9   And I think it's very different than
795  10  working in an industry like consumer
795  11  products or the car industry where you
795  12  are focused on creating brochures and
795  13  simply advertising.
795  14      I think in our -- in our
795  15  case we have -- and you can do all that
795  16  without any regulation.
795  17      We're obviously a regulated
795  18  industry --
795  19  Q.   By that you mean -- let me
795  20  interrupt you.
795  21  A.   Yep.
795  22  Q.   Regulated by the Food and
795  23  Drug Administration?
795  24  A.   That is correct.  By the
796  1   Food and Drug Administration based on
796  2   laws that the federal government has
796  3   created and in some cases state
796  4   governments have created.
796  5       Obviously, it's a different
796  6   aspect in that we are working to
796  7   communicate information about products
796  8   but also educate both the healthcare
796  9   provider community as well as patients.
796  10  And -- and I think that that makes it a
796  11  lot different.
796  12  Q.   In terms of checks and
796  13  balances on marketers for pharmaceutical
796  14  companies, there's the FDA on one hand;
796  15  is that correct?
796  16  A.   That is correct.

797  24  Q.   FDA plays a role in
798  1   reviewing -- has the ability to review
798  2   marketing materials from pharmaceutical
798  3   companies?
798  4   A.   Yes, that's absolutely true.
798  5   So every material that we create that is
798  6   used in promotion or advertising is
798  7   submitted to the FDA by our regulatory
798  8   department.  FDA keeps those things on
798  9   file.  They proactively review either
798  10  some or all.  Obviously, it varies by
798  11  individual -- product individual
798  12  situation.  There are a number of
798  13  materials or -- or campaigns that we may
798  14  submit for proactive review at times.
798  15  DTC ads, for example, our television ads
798  16  have to be, by Janssen policy and by the
798  17  Pharma guidelines, submitted for review

| | | | Objectic. In | Responses In | Jlings |
|---|---|---|---|---|---|

04/23/17 18:52

Pending

| | | |
|---|---|---|
| 798 | 18 | by the FDA and have to be approved by the |
| 798 | 19 | FDA prior to us launching those on |
| 798 | 20 | television. |

| 831:13 | – | 832:8 | Shah, Nauman 2016-08-04 | 0:51 | Re: [831:13–832:8]<br>Pltf Obj: Improper attorney colloquy and commentary that mischaracterizes prior questions and answers.<br>Improper attorney testimony. |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 831 | 13 | MR. COVEY:  I'd like our |
| 831 | 14 | technical assistant to get to |
| 831 | 15 | Exhibit 23.  And I think it's the |
| 831 | 16 | page, "Impact of One-Month Delay." |
| 831 | 17 | If you can do that. |
| 831 | 18 | BY MR. COVEY: |
| 831 | 19 | Q.  Mr. Weinkowitz questioned |
| 831 | 20 | you about a particular chart, which is |
| 831 | 21 | going to be brought up.  And just to |
| 831 | 22 | queue you back in, I believe part of the |
| 831 | 23 | questioning was who prepared this.  I |
| 831 | 24 | think it was somebody you identified as |
| 832 | 1 | being junior.  You indicated that you |
| 832 | 2 | disagreed with what this chart was |
| 832 | 3 | showing.  And Mr. Weinkowitz said you can |
| 832 | 4 | explain that when your own counsel asks |
| 832 | 5 | the question. |
| 832 | 6 | So can you take a look at |
| 832 | 7 | the chart and explain what your opinion |
| 832 | 8 | is with respect to it. |

| 832:13 | – | 835:2 | Shah, Nauman 2016-08-04 | 2:14 | |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 832 | 13 | Q.  Take a look at this chart |
| 832 | 14 | and tell me why you indicated that you |
| 832 | 15 | disagreed with what the author of this |
| 832 | 16 | was attempting to demonstrate. |
| 832 | 17 | A.  So when I was having – |
| 832 | 18 | giving that testimony, being questioned |
| 832 | 19 | by the plaintiff attorney, the assertion |
| 832 | 20 | was that a delay in the orthopedic launch |
| 832 | 21 | would have a negative impact on the |
| 832 | 22 | atrial fibrillation indication or our |
| 832 | 23 | performance in the atrial fibrillation |
| 832 | 24 | indication. |
| 833 | 1 | And while I acknowledge that |
| 833 | 2 | someone put this slide together, as a |
| 833 | 3 | director of marketing for this brand for |
| 833 | 4 | four years and with strong knowledge of |
| 833 | 5 | the market, I can tell you that I |
| 833 | 6 | disagreed with that assertion. |
| 833 | 7 | People may have believed |
| 833 | 8 | that, but I did not see a direct |
| 833 | 9 | correlation between orthopedic surgery |
| 833 | 10 | and atrial fibrillation.  There were |
| 833 | 11 | different healthcare providers out there |
| 833 | 12 | that it would be marketed to, certainly a |
| 833 | 13 | different patient population. |

| | | Objections In | Responses In | ...ulings |
|---|---|---|---|---|
| 833 | 14 | | | |
| 833 | 15 | | | |
| 833 | 16 | | | |
| 833 | 17 | The only potential benefit could be, you know, insurance companies would be familiar with the drug. So when you got the atrial fibrillation | | | |
| 833 | 18 | indication, they would be quicker to | | | |
| 833 | 19 | review it. But I did not see a direct | | | |
| 833 | 20 | correlation between orthopedic surgery | | | |
| 833 | 21 | and atrial fibrillation. | | | |
| 833 | 22 | Q. And different healthcare | | | |
| 833 | 23 | providers would prescribe Xarelto for an | | | |
| 833 | 24 | orthopedic indication as opposed to | | | |
| 834 | 1 | atrial fibrillation? | | | |
| 834 | 2 | A. So the decisionmaking | | | |
| 834 | 3 | physician or healthcare provider, in this | | | |
| 834 | 4 | case post a hip and knee replacement | | | |
| 834 | 5 | surgery, would be the orthopedic surgeon | | | |
| 834 | 6 | themselves. | | | |
| 834 | 7 | Their orders may be followed | | | |
| 834 | 8 | in a nursing home by other doctors. | | | |
| 834 | 9 | Their orders may be followed in an | | | |
| 834 | 10 | outpatient setting by the doctors. But | | | |
| 834 | 11 | the orthopedic surgeon decides which | | | |
| 834 | 12 | blood thinner to use to prevent clots and | | | |
| 834 | 13 | for how long. | | | |
| 834 | 14 | When it comes to atrial | | | |
| 834 | 15 | fibrillation, you've got a completely | | | |
| 834 | 16 | different audience, and the primary | | | |
| 834 | 17 | physician audience there is | | | |
| 834 | 18 | cardiologists. So cardiologists decide | | | |
| 834 | 19 | usually how to initiate patients to | | | |
| 834 | 20 | prevent strokes in atrial fibrillation. | | | |
| 834 | 21 | Some primary care doctors, specifically | | | |
| 834 | 22 | internists, may be incredibly astute at | | | |
| 834 | 23 | managing that so they may start. But | | | |
| 834 | 24 | more commonly, it's the cardiologist that | | | |
| 835 | 1 | would start and the primary care would | | | |
| 835 | 2 | maintain. | | | |

846:18 - 849:7   Shah, Nauman 2016-08-04   | 2:25 | Re: [846:18-849:7] Pltf Obj Leading, Outside scope. |  | Pending |

| | | |
|---|---|---|
| 846 | 18 | A. Okay. So critical organs |
| 846 | 19 | would obviously be any organ in a body |
| 846 | 20 | that patients need to have working in |
| 846 | 21 | good working order to be able to live. |
| 846 | 22 | Q. Did the ROCKET study report |
| 846 | 23 | lower critical organ bleeding, mostly |
| 846 | 24 | intracranial hemorrhage, for Xarelto as |
| 847 | 1 | compared to warfarin? |
| 847 | 2 | A. The ROCKET study actually |
| 847 | 3 | demonstrated and the FDA approved in the |
| 847 | 4 | labeling inclusion the fact that Xarelto |
| 847 | 5 | demonstrated not only lower intracranial |
| 847 | 6 | hemorrhage than warfarin, statistically |
| 847 | 7 | significantly lower. It also |



dings

Responses In

Objectic.
In

847    8    demonstrated statistically significantly
847    9    lower critical organ bleeding.
847   10        Later on as the package
847   11    insert was evolved, the FDA also included
847   12    or replaced lower critical organ bleeding
847   13    with fatal bleeding and included the data
847   14    to support that Xarelto was associated
847   15    with significantly lower fatal bleeding.
847   16        The other elements of less
847   17    potential drug interactions, lack of food
847   18    interactions, and simple dosing without
847   19    INR monitoring are included in the label.
847   20        The only type of bleeding
847   21    that I'm aware of that was higher with
847   22    Xarelto and listed in the package insert
847   23    was GI bleeding.
847   24    Q.   Based upon the market
848    1    research you did, how is GI -- that's
848    2    gastrointestinal?
848    3    A.   Yes -- sorry --
848    4    gastrointestinal bleeding.
848    5    Q.   How is that bleeding usually
848    6    manifested?
848    7    A.   So GI bleeding will -- or
848    8    gastrointestinal bleeding will usually
848    9    manifest itself by blood that may be in
848   10    stools of patients. It could be that
848   11    patients are feeling aches in their
848   12    stomach as well, things like that.
848   13    Q.   Intracranial is --
848   14    intracranial hemorrhage is brain
848   15    bleeding?
848   16    A.   Intracranial hemorrhage is
848   17    bleeding inside the head, in the brain
848   18    usually, area, and obviously inside the
848   19    skull. So you've got that closed
848   20    compartment, not a lot of space to
848   21    expand. And so clearly, it's a very
848   22    dangerous thing if you get intracranial
848   23    hemorrhage because you've got a very
848   24    compartmentalized situation that can lead
849    1    to significant issues.
849    2    Q.   Would the market research
849    3    and advisory committee meetings indicate
849    4    to you with respect to how physicians
849    5    rank the severity of bleeding in terms of
849    6    what's the most worrisome versus less
849    7    worrisome?

849:10  -  851:15 Shah, Nauman 2016-08-04

849   10        THE WITNESS: Our market
849   11    research, and not only market
849   12    research, but also advisory boards

1:45

Re: [849:10-851:15]
Pltf Obj Leading, Outside scope.

52

Pending

04/23/17 18:52

...lings

Responses In

Objectu
In

53

| | | |
|---|---|---|
| 849 | 13 | with the most leading experts in |
| 849 | 14 | the field were very consistent in |
| 849 | 15 | saying a bleed is not a bleed is |
| 849 | 16 | not a bleed. |
| 849 | 17 | There were a couple of |
| 849 | 18 | consistent themes.  First of all, |
| 849 | 19 | that strokes are obviously the |
| 849 | 20 | most significant issue that you're |
| 849 | 21 | trying to prevent.  A stroke is |
| 849 | 22 | obviously -- can be much more |
| 849 | 23 | damaging than certain types of |
| 849 | 24 | bleeding. |
| 850 | 1 | Within the bleeding |
| 850 | 2 | category, a cut for example. |
| 850 | 3 | Shaving is going to be less severe |
| 850 | 4 | than a GI bleeding, which will be |
| 850 | 5 | significantly less severe usually, |
| 850 | 6 | depending upon the severity of it, |
| 850 | 7 | than intracranial hemorrhage. |
| 850 | 8 | And, obviously, fatal bleeding is |
| 850 | 9 | the worst type of bleeding that |
| 850 | 10 | you can possibly have because |
| 850 | 11 | clearly there's no future for that |
| 850 | 12 | patient. |
| 850 | 13 | And just one thing to add to |
| 850 | 14 | that.  People felt that when GI, |
| 850 | 15 | when it manifested could be |
| 850 | 16 | something that you could likely |
| 850 | 17 | control to a greater degree and |
| 850 | 18 | more effectively manage, although |
| 850 | 19 | obviously, again, there would be |
| 850 | 20 | different categories of severity. |
| 850 | 21 | Intracranial hemorrhage is |
| 850 | 22 | clearly a much more difficult |
| 850 | 23 | situation because the bleeding is |
| 850 | 24 | inside the head and may even |
| 851 | 1 | require surgery to obviously |
| 851 | 2 | manage to find, first of all, the |
| 851 | 3 | source, and then ultimately to |
| 851 | 4 | treat it. |
| 851 | 5 | It can obviously lead to |
| 851 | 6 | brain damage.  It can lead to |
| 851 | 7 | death.  And, obviously, fatal |
| 851 | 8 | bleeding clearly can occur.  And |
| 851 | 9 | if it occurs with warfarin or any |
| 851 | 10 | blood thinner.  That is the worst |
| 851 | 11 | type of bleeding. |
| 851 | 12 | And Xarelto had lower levels |
| 851 | 13 | of both intracranial hemorrhage as |
| 851 | 14 | well as fatal bleeding to a |
| 851 | 15 | statistically significant degree. |