*Patricia Torr*
*V.P. of marketing for*
*Janssen*

!boudreaux v. bayer-xarelto tmax db
Deposition Designations for Torr P 20161018

| | | | | Objections | Responses In |
|---|---|---|---|---|---|

*Overruled credibility*
*Motive / 401, 602, 607*
*801(d)(2)*

| 7:9 | - | 7:11 | Torr, Patricia 2016-10-18 | 0:03 | | |
|---|---|---|---|---|---|---|

7 9   Q.   Could you state your name for the
7 10  record.
7 11  A.   Patricia Torr.

| 9:1 | - | 9:8 | Torr, Patricia 2016-10-18 | | | |

9 1   Are you currently employed?  Are you
9 2   currently employed?
9 3   A.   Yes.
9 4   Q.   And who are you employed for?
9 5   A.   Janssen Pharmaceuticals.
9 6   Q.   And how long have you been employed for
9 7   Janssen Pharmaceuticals?
9 8   A.   I began working at Janssen May of 2011.

| 10:19 | - | 10:24 | Torr, Patricia 2016-10-18 | | | |

10 19  Q.   As I understand it, since May of 2011,
10 20  you have been at the vice president's level reporting
10 21  directly to the president of the company?
10 22  A.   Of the therapeutic area, yes.
10 23  Q.   Okay. And is the therapeutic area CV
10 24  and metabolic?

| 12:5 | - | 12:8 | Torr, Patricia 2016-10-18 | | | |

12 5   Q.   Would you say in your role as vice
12 6   president of marketing that you had overall
12 7   responsibility for the sales and marketing of Xarelto?
12 8   A.   Yes, as part of my responsibility, yes.

| 13:3 | - | 14:15 | Torr, Patricia 2016-10-18 | 1:24 | | |

13 3   Q.   Okay. As part of your responsibility at
13 4   the vice president's level for the sales and marketing
13 5   of Xarelto, were you responsible for both the consumer
13 6   marketing and the professional marketing?
13 7   A.   Yes, as part of -- yes.
13 8   Q.   Okay. And so that we understand,
13 9   consumer marketing is marketing to the patient and
13 10  creating marketing materials for patients, that you
13 11  were ultimately responsible for that, correct?
13 12  A.   Educational materials for patients, yes.
13 13  Q.   How about -- how about television
13 14  commercials?
13 15  A.   Yes, that would be in the scope.
13 16  Q.   So the television commercials with
13 17  Arnold Palmer and Kevin Nealon, you were ultimately
13 18  responsible for those within the organization?
13 19  A.   Yes.
13 20  Q.   And then on the professional side,
13 21  that's creating marketing materials for doctors,
13 22  correct?
13 23  A.   Correct.
13 24  Q.   All right. And so you had ultimate
14 1   responsibility for the creation of marketing materials
14 2   for professionals, doctors and healthcare providers,
14 3   correct?
14 4   A.   Yeah, we described them as educational
14 5   materials to healthcare providers.
14 6   Q.   Well, your title is vice president of
14 7   marketing, correct?
14 8   A.   Right.

Objections column (0:17 / 0:17 / 0:10):

**Re: [7:9-7:11]**
**Def Obj** Objection to all designated testimony: All of the designated testimony for Ms. Torr relates to dosing, whether a lower dose should have been studied after the medicine was approved by the FDA, and a group of informal e-mails from Dr. Robert Califf of Duke, who wanted his institution to conduct such a study. The designated testimony has nothing to do with the narrow issues in this case–whether there should have been a warning about PT testing. Plaintiffs specifically abandoned all claims about a lower dose in the face of preemption and Daubert challenges. See Pls.' Opp'n to Defs.' Dosing, Monitoring and Design Preemption MSJ [Doc. 5652] at 2 ("Plaintiffs are not asserting that the Defendants should unilaterally lower the approved dose of Xarelto to provide a different dosing regimen without FDA approval . . . ."); Pls.' Opp'n to Defs.' LPLA Design Defect MSJ [R. Doc. 5606] at 10 n.30 ("[T]he failure to test theory is not being presented by Mr. Boudreaux or Mrs. Orr."). This testimony should not be allowed. FRE 403; Cologne v. Shell Oil Co., No. 12-735, 2013 WL 5781705 (E.D. La. Oct. 25, 2013) (Fallon, J.); accord Overpeck v. Roger's Supermarket, LLC, No. 12-124, 2013 WL 4500469, At *4 (N.D. Miss. Aug. 21, 2013).

Responses In column:

**Re: [7:9-7:11]**
Pltf Resp Response to general objection to all designated testimony: Ruling reserved on ROCKET 2 issue. The evidence is relevant to Plaintiff's failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. This evidence is also relevant to plaintiffs' claim that competitive interests took precedence over patient safety and defendants were on notice that dose was too high for some patients who were at heightened bleeding risk.

| | Objections In | Responses In |
|---|---|---|

```
14  9    Q.  So they are marketing materials,
14 10        correct?
14 11    A.  Well, we refer to them as educational
14 12        materials.
14 13    Q.  Okay. You're not vice president of
14 14        education of professionals, correct?
14 15    A.  That's correct.

36:4 - 37:14  Torr, Patricia 2016-10-18                1:22
36  4    Q.  Okay, ma'am. I've given you an
36  5        opportunity to review Exhibit 3 and Exhibit 4.
36  6        Are you comfortable to testify to
36  7        those -- about those now?
36  8    A.  Yes.
36  9    Q.  Okay. If you would look at Exhibit 3,
36 10        this appears to be an e-mail from Hartwig Beate or
36 11        Beate Hartwig to a group of people, including yourself,
36 12        correct?
36 13    A.  Correct.
36 14    Q.  And the subject is Xarelto JSC, June 26,
36 15        2012: final minutes.
36 16        Do you see that?
36 17    A.  I do.
36 18    Q.  And the date of the e-mail is
36 19        August 7th, 2012, correct?
36 20    A.  I have -- yes.
36 21    Q.  You see August 7, 2012?
36 22    A.  Yes.
36 23    Q.  And it says, "Dear all, please find
36 24        attached the final minutes of the Joint Steering
37  1        Committee meeting for Xarelto held on June 26th, 2012."
37  2        There's a German word I can't pronounce, "best
37  3        regards," and she has her name, correct?
37  4    A.  Correct.
37  5    Q.  Now, would you have received this if
37  6        you -- strike that.
37  7        Did you receive this e-mail in the
37  8        regular course of your business at Janssen?
37  9    A.  Yes.
37 10    Q.  Would you have reviewed both the e-mail
37 11        and the meeting minutes attached?
37 12    A.  I may or may not have reviewed the
37 13        minutes, but I would have, it looks like, received
37 14        them.

38:12 - 38:22  Torr, Patricia 2016-10-18               0:21
38 12    Q.  Okay. And did you routinely receive
38 13        meeting minutes from the joint steering committee?
38 14    A.  If I was an attendant, I would have
38 15        received the minutes.
38 16    Q.  Let's take a look at the meeting
38 17        minutes, which are Exhibit Number 4.
38 18    A.  Sure.
38 19    Q.  Do you see that these are -- can you
38 20        confirm that these are the meeting minutes for the
38 21        joint steering committee meeting on June 26, 2012?
38 22    A.  They appear to be.

42:4 - 44:6  Torr, Patricia 2016-10-18                 1:58
42  4    Q.  So if you look here it says, "Further
42  5        strengthening the competitive position in SPAF is
42  6        important as the competitive war most likely will be
42  7        decided in the SPAF field."
42  8        Do you see that?
42  9    A.  I do.
42 10    Q.  And can you explain -- did I read that
42 11        correctly first?
```

Objections column:

Re: [36:4-37:14]
Def Obj See exhibit objections.

Overruled
401, 602
Knowledge,
Material,
803(6)

Responses column:

Re: [36:4-37:14]
Pltf Resp Testimony and exhibits relate to the competitiveness of the anticoagulant market and concerns about how the non-superiority statements in the product label left Defendants at a competitive disadvantage. This does not reference marketing spend or profit figures, which if present, could easily be redacted. Document is a business record received by witness in the ordinary courts of business and contains party admissions.

| | | Objections In | Responses In |
|---|---|---|---|
| 42 12 | A. Yes. | | |
| 42 13 | Q. And SPAF, can you read what that is? | | |
| 42 14 | A. SPAF, stroke prevention in atrial | | |
| 42 15 | fibrillation. | | |
| 42 16 | Q. As part -- you were at these meeting | | |
| 42 17 | minutes -- you were at this meeting, correct? | | |
| 42 18 | A. I was. | | |
| 42 19 | Q. Do you recall discussion about the | | |
| 42 20 | competitive war most likely being decided in the stroke | | |
| 42 21 | prevention in afib field? | | |
| 42 22 | A. I generally recall, this is a few years | | |
| 42 23 | back, the discussion, that it was -- there was going to | | |
| 42 24 | be several novel oral anticoagulants on the market, and | | |
| 43 1 | it will be very competitive. | | |
| 43 2 | Q. All right. So in terms of a competitive | | |
| 43 3 | war, what this is referring to is that in the market | | |
| 43 4 | that Xarelto is competing, there's competition and that | | |
| 43 5 | the competition was going to be like a war, correct; is | | |
| 43 6 | that correct? | | |
| 43 7 | A. Yeah, I'm not sure I would use those | | |
| 43 8 | terms, but, yes, that's what's -- | | |
| 43 9 | Q. They actually -- those terms | | |
| 43 10 | "competitive war" actually appear in the official joint | | |
| 43 11 | steering committee meeting minute notes, correct? | | |
| 43 12 | A. They do. | | |
| 43 13 | Q. All right. So that must have been | | |
| 43 14 | discussed at this meeting, correct? | | |
| 43 15 | A. Yeah, I don't remember war, but, fine. | | |
| 43 16 | Q. When you got these meeting minutes, did | | |
| 43 17 | you write anybody back and say, look, I wouldn't call | | |
| 43 18 | it a competitive war, we should change this? | | |
| 43 19 | A. No. Typically, I wouldn't, unless there | | |
| 43 20 | was a factual issue. | | |
| 43 21 | Q. Okay. So that wasn't a factual issue, | | |
| 43 22 | correct? | | |
| 43 23 | A. It's an interpretation. | | |
| 43 24 | Q. But it's an official interpretation that | | |
| 44 1 | ended up in the meeting minutes, correct? | | |
| 44 2 | A. I guess. | | |
| 44 3 | Q. Okay. The next is before initiating the | | |
| 44 4 | major Phase III trials, the JSC asked the JMC -- what | | |
| 44 5 | is JMC? | | |
| 44 6 | A. Joint marketing committee. | | |
| **44:23 - 46:3** | **Torr, Patricia 2016-10-18** | 1:14 | |
| 44 23 | Q. Let me start with the sentence. It | | |
| 44 24 | says, "Before initiating the next major Phase III | | |
| 45 1 | trials, the JSC asked the JMC/GDC to reevaluate the LCM | | |
| 45 2 | opportunities with focus on strengthening SPAF with | | |
| 45 3 | supportive population studies." | | |
| 45 4 | Did I read that correctly? | | |
| 45 5 | A. Yes. | | |
| 45 6 | Q. And JMC is I think you said joint | | |
| 45 7 | marketing committee? | | |
| 45 8 | A. Correct. | | |
| 45 9 | Q. And is GDC the -- tell me what GDC is. | | |
| 45 10 | A. Global development committee. | | |
| 45 11 | Q. Are those committees that report in to | | |
| 45 12 | the joint steering committee? | | |
| 45 13 | A. Yes. | | |
| 45 14 | Q. Okay. And LCM opportunities, is that | | |
| 45 15 | referring to Xarelto? | | |
| 45 16 | A. Yes. | | |
| 45 17 | Q. Next sentence says, "The evaluation | | |
| 45 18 | should go along the following strategic imperatives: | | |
| 45 19 | achieve a superiority claim in SPAF or closely related | | |
| 45 20 | setting, do not jeopardize OD, do not jeopardize | | |

|  |  | Objections In | Responses In |
|---|---|---|---|
| 45 21 | bleeding profile." | | |
| 45 22 | Do you see that? | | |
| 45 23 | A. Mm-hmm. | | |
| 45 24 | Q. And I think a little bit earlier you | | |
| 46 1 | said that one of the things that the joint steering | | |
| 46 2 | committee did was it set strategy for Xarelto, correct? | | |
| 46 3 | A. Yes. | | |

| 46:18 - 47:3 | Torr, Patricia 2016-10-18 | 0:32 |
|---|---|---|
| 46 18 | Q. Do I understand this sentence, is it | |
| 46 19 | accurate to say that in evaluating what additional | |
| 46 20 | studies to do for Xarelto, there are three important | |
| 46 21 | strategic imperatives? | |
| 46 22 | A. I believe that's what was intended by | |
| 46 23 | the minutes. | |
| 46 24 | Q. Okay. And the first one is achieve a | |
| 47 1 | superiority claim in SPAF. That's -- is that achieving | |
| 47 2 | a superiority claim in the afib indication? | |
| 47 3 | A. Or a closely related setting. | |

| 47:13 - 49:16 | Torr, Patricia 2016-10-18 | 2:11 |
|---|---|---|
| 47 13 | Q. All right. So what you're saying is | |
| 47 14 | first let's establish when Xarelto was improved -- was | |
| 47 15 | approved, it was not approved with the superiority | |
| 47 16 | claim versus warfarin, correct? | |
| 47 17 | A. In the US we did not get a superiority | |
| 47 18 | claim. Outside the US they are permitted to speak | |
| 47 19 | about superiority claims. | |
| 47 20 | Q. So inside the US you can't market | |
| 47 21 | Xarelto as being superior to warfarin in reducing the | |
| 47 22 | risk of stroke in afib patients, correct? | |
| 47 23 | A. It's not in our label, right. | |
| 47 24 | Q. Okay. And one of the things that you | |
| 48 1 | wanted to do in looking at doing other studies was you | |
| 48 2 | wanted to achieve a superiority claim in the afib | |
| 48 3 | indication because you didn't have one, correct? | |
| 48 4 | A. It was a -- I think a part of the | |
| 48 5 | consideration when we're looking at other | |
| 48 6 | opportunities, that was part of the consideration. | |
| 48 7 | Q. And it was a very important | |
| 48 8 | consideration because it was one of the main strategic | |
| 48 9 | imperatives, correct? | |
| 48 10 | A. It says that, yes. | |
| 48 11 | Q. Okay. And the next strategic imperative | |
| 48 12 | in looking at what other studies to do and how to | |
| 48 13 | expand Xarelto's use was not the jeopardize OD. | |
| 48 14 | What does that mean? | |
| 48 15 | A. Not to jeopardize once daily is the way | |
| 48 16 | I read it. | |
| 48 17 | Q. And Xarelto was -- Xarelto is dosed in | |
| 48 18 | afib patients once a day, correct? | |
| 48 19 | A. Yeah. | |
| 48 20 | Q. And that was an important | |
| 48 21 | differentiating characteristic of Xarelto versus its | |
| 48 22 | competition in the marketplace, correct? | |
| 48 23 | A. That was one of a couple. | |
| 48 24 | Q. And it was an important one, it was so | |
| 49 1 | important that one of the strategic imperatives in | |
| 49 2 | looking at what studies to do was not to jeopardize | |
| 49 3 | that in any way, correct? | |
| 49 4 | A. It says do not jeopardize once daily. | |
| 49 5 | Q. Right, and the next one is do not | |
| 49 6 | jeopardize bleeding profile, correct? | |
| 49 7 | A. Correct. | |
| 49 8 | Q. So those three strategic imperatives, | |
| 49 9 | which is achieving a superiority claim, not | |
| 49 10 | jeopardizing the once daily dosing and not jeopardizing | |

|  |  | Objections In | Responses In |
|---|---|---|---|
| 49 11 | the bleeding profile were the overall strategic | | |
| 49 12 | imperatives that were to be followed and taken into | | |
| 49 13 | consideration when looking at what studies to do in | | |
| 49 14 | Xarelto going forward, correct? | | |
| 49 15 | A.   I believe they were listed as the | | |
| 49 16 | strategic imperatives. | | |

**50:13 - 51:19   Torr, Patricia 2016-10-18**   1:17

| | | | |
|---|---|---|---|
| 50 13 | Q.   Okay, Ms. Torr, I was asking you | | |
| 50 14 | questions about this joint steering committee meeting | | |
| 50 15 | minute notes. We're on Page 6 of 9. We're under LCM, | | |
| 50 16 | and I was asking you about "3.1 Discussion on how to | | |
| 50 17 | strengthen the SPAF label," and I think my question was | | |
| 50 18 | do you recall these discussions? You asked me to read | | |
| 50 19 | the section, which I've given you the opportunity, | | |
| 50 20 | correct? | | |
| 50 21 | A.   Correct. | | |
| 50 22 | Q.   All right. Do you recall these | | |
| 50 23 | discussions? | | |
| 50 24 | A.   I do. | | |
| 51  1 | Q.   Let's read the first sentence. It says, | | |
| 51  2 | "The JSC discussed how to strengthen the Xarelto | | |
| 51  3 | position in SPAF," which is the afib indication, "as we | | |
| 51  4 | cannot provide a superiority claim in many countries | | |
| 51  5 | and the only substantial differentiator is OD." | | |
| 51  6 | Did I read that correctly? | | |
| 51  7 | A.   Yes. | | |
| 51  8 | Q.   All right. So is this -- so do you | | |
| 51  9 | recall the discussions, these discussions being that | | |
| 51 10 | one of the issues was the only substantial | | |
| 51 11 | differentiator for Xarelto in the United States and | | |
| 51 12 | some other countries was its once a day dosing. | | |
| 51 13 | Do you recall that? | | |
| 51 14 | A.   I recall that discussion. | | |
| 51 15 | Q.   And it says, the JSC emphasized that the | | |
| 51 16 | competitive war was most likely to be decided in the | | |
| 51 17 | SPAF field. | | |
| 51 18 | Do you recall that? | | |
| 51 19 | A.   I do. | | |

**52:11 - 54:14   Torr, Patricia 2016-10-18**   2:16

| | | | |
|---|---|---|---|
| 52 11 | studies or 4 -- which I'm not sure what that means. | | |
| 52 12 | Did I read that correctly? | | |
| 52 13 | MR. COVEY: You're saying the "or 4"? | | |
| 52 14 | BY MR. WEINKOWITZ: | | |
| 52 15 | Q.   Yeah, do you know what the "or 4" means | | |
| 52 16 | in that sentence? | | |
| 52 17 | A.   Supportive populations or -- no. | | |
| 52 18 | Q.   Maybe it's a typo. | | |
| 52 19 | A.   It could be a typo. It could mean Phase | | |
| 52 20 | IV. | | |
| 52 21 | Q.   Did I read that correctly? | | |
| 52 22 | A.   Yes. | | |
| 52 23 | Q.   And it says, "The evaluation should go | | |
| 52 24 | along the following strategic imperatives: achieve a | | |
| 53  1 | superiority claim in SPAF or closely related setting, | | |
| 53  2 | do not jeopardize OD, do not jeopardize bleeding | | |
| 53  3 | profile," correct? | | |
| 53  4 | A.   Correct. | | |
| 53  5 | Q.   And if we look to the very last -- | | |
| 53  6 | A.   If I may, though, I think it's important | | |
| 53  7 | to call out superiority claim in SPAF or closely | | |
| 53  8 | related settings, and I think the next paragraph gets | | |
| 53  9 | into some of those closely related settings. | | |
| 53 10 | Q.   I appreciate that, okay. | | |
| 53 11 | Now, if we go to the next page, which is | | |
| 53 12 | Page 8 of 9, under Number 6, "Critical Issues." What | | |

| | | | Objections In | Responses In |
|---|---|---|---|---|
| | 53 13 | do you understand the critical issues section is | | |
| | 53 14 | supposed to be communicating in this joint steering | | |
| | 53 15 | committee meeting notes? | | |
| | 53 16 | A.   I'm sorry. Could you orient me one more | | |
| | 53 17 | time. | | |
| | 53 18 | Q.   Sure. It's Page 8 of 9. I'm sorry I | | |
| | 53 19 | said 6 of 9, 8 of 9, under Number 6. | | |
| | 53 20 | A.   Eight of 9, Number 6, Critical Issues. | | |
| | 53 21 | Q.   Critical issues. What is supposed to | | |
| | 53 22 | be -- what is communicated under critical issues? | | |
| | 53 23 | A.   Opportunity to improve sales in SPAF in | | |
| | 53 24 | US and primary care. | | |
| | 54  1 | Q.   All right. So one -- was one of the | | |
| | 54  2 | critical issues coming out of this meeting that | | |
| | 54  3 | sales -- to improve sales in the afib indication in the | | |
| | 54  4 | US and focus on primary care? | | |
| | 54  5 | A.   I read that to be broadly globally | | |
| | 54  6 | improve sales and stroke prevention in AF globally and | | |
| | 54  7 | then improve sales in the US with particular focus on | | |
| | 54  8 | primary care. | | |
| | 54  9 | Q.   But the point of this is that one of the | | |
| | 54 10 | critical issues coming out of the joint steering | | |
| | 54 11 | committee was there was a need to improve sales, | | |
| | 54 12 | correct? | | |
| | 54 13 | A.   That was -- looks like it was a critical | | |
| | 54 14 | issue. | | |
| 52:23 - 53:4 | | Torr, Patricia 2016-10-18 | 0:14 | |
| | 52 23 | Q.   And it says, "The evaluation should go | | |
| | 52 24 | along the following strategic imperatives: achieve a | | |
| | 53  1 | superiority claim in SPAF or closely related setting, | | |
| | 53  2 | do not jeopardize OD, do not jeopardize bleeding | | |
| | 53  3 | profile," correct? | | |
| | 53  4 | A.   Correct. | | |
| 55:10 - 55:13 | | Torr, Patricia 2016-10-18 | 0:15 | |
| | 55 10 | Q.   All right. So was your job to provide a | | |
| | 55 11 | commercial evaluation of the potential studies or | | |
| | 55 12 | future uses for Xarelto that were being discussed? | | |
| | 55 13 | A.   It was. | | |
| 58:5 - 58:13 | | Torr, Patricia 2016-10-18 | 0:28 | |
| | 58  5 | MR. WEINKOWITZ: For the record, I'm | | |
| | 58  6 | handing you what's been marked as Exhibit 5. | | |
| | 58  7 | (Documents marked for identification as | | |
| | 58  8 | Torr Deposition Exhibit Nos. 5 and 6.) | | |
| | 58  9 | BY MR. WEINKOWITZ: | | |
| | 58 10 | Q.   Exhibit 5 is Record Number 148-2662, | | |
| | 58 11 | Bates Number XARELTO_JANSSEN_08774749. | | |
| | 58 12 | Xarelto Exhibit Number 6 is Record | | |
| | 58 13 | Number 148-2663, Bates Number XARELTO_JANSSEN_08774751. | | |
| 58:17 - 58:22 | | Torr, Patricia 2016-10-18 | 0:15 | |
| | 58 17 | Q.   Let's start with Exhibit 5. Do you see | | Re: [58:17-58:22] | Re: [58:17-58:22] |
| | 58 18 | that this is an e-mail from a Dr. Califf with a -- | Def Obj See exhibit objections | Pltf Resp See general response |
| | 58 19 | attaching a ROCKET booster study that was forwarded to | | above. Also document is a |
| | 58 20 | you and Vanessa Broadhurst, your boss, by Dr. | | business record received in the |
| | 58 21 | DiBattiste? | | ordinary course of business and |
| | 58 22 | A.   I see that. | | contains party admissions. |
| 59:14 - 60:2 | | Torr, Patricia 2016-10-18 | 0:29 | |
| | 59 14 | Dr. Califf is currently, is he not, the | | |
| | 59 15 | FDA commissioner appointed by President Obama? | | |
| | 59 16 | A.   Yeah, Dr. Califf was also the PI for the | | |
| | 59 17 | ROCKET study. | | |
| | 59 18 | Q.   Right. He was co-chair of the Executive | | |
| | 59 19 | Committee that ran the record trial, correct? | | |

Handwritten annotation in Objections column: Overruled  401, 602, 607 knowledge motive credibility

|  | Objections In | Responses In |
|---|---|---|

```
59 20      A.   ROCKET.
59 21      Q.   ROCKET trial, correct?
59 22      A.   Correct.
59 23      Q.   And the ROCKET trial is the trial that
59 24      was run and submitted to the FDA in order to get
60  1      approval for the afib indication for Xarelto, correct?
60  2      A.   Yes.

60:10  -  62:2    Torr, Patricia 2016-10-18                            1:29
60 10      Q.   Are you familiar with his reputation?
60 11      A.   I am.
60 12      Q.   Do you consider him a good scientist?
60 13      A.   I do.
60 14      Q.   Do you consider him -- he's a physician,
60 15      correct?
60 16      A.   He is. He's a cardiologist.
60 17      Q.   Out of Duke, he was out of Duke,
60 18      correct?
60 19      A.   Correct.
60 20      Q.   And do you consider him the type of
60 21      scientist and doctor that puts patients' safety first?
60 22      A.   Yes, I believe he's a -- well respected
60 23      in the community.
60 24      Q.   Would you say that you have the utmost
61  1      respect for Dr. Califf?
61  2      A.   I do.
61  3      Q.   If you take a look at the e-mail that
61  4      was forwarded to you Dr. DiBattiste, the e-mail says,
61  5      "guys," and this is Dr. Califf speaking, "This is a
61  6      simple 2 pager to let you know I'm working on
61  7      something. I think this could be done using the orbit
61  8      template at a fraction of the additional cost that we
61  9      normally attribute to clinical trials. The motivation
61 10      is enclosed on Page 1. I've been skimpy with the
61 11      operational details because I've working through some
61 12      thoughts about endpoints."
61 13             Did I read that correctly?
61 14      A.   Yes.
61 15      Q.   And he continues, "The whole thing is
61 16      based on the 2 premises."
61 17             Do you see that?
61 18      A.   Mm-hmm.
61 19      Q.   And when he's talking about this, he's
61 20      talking about a proposal for a ROCKET booster study,
61 21      correct?
61 22      A.   It appears so.
61 23      Q.   And he says, Number 1, "It's the right
61 24      thing to do for a drug that has a long life and can
62  1      make a huge difference," correct?
62  2      A.   Yes.

62:18  -  62:21   Torr, Patricia 2016-10-18                            0:05
62 18      Q.   And he says, "Here's the proposal from
62 19      Califf we discussed yesterday. Let's discuss."
62 20             Do you see that?
62 21      A.   Yes.

63:13  -  65:21   Torr, Patricia 2016-10-18                            2:18
63 13      Q.   Okay. So the time period that you got
63 14      this, and this e-mail from Dr. Califf is dated
63 15      February 27, 2012.
63 16             Do you see that?
63 17      A.   Mm-hmm.
63 18      Q.   That's about four months after Xarelto
63 19      was on the market for the afib indication, correct?
63 20      A.   Correct.
63 21      Q.   All right. And Dr. DiBattiste forwards
```

| | | | Objections In | Responses In |
|---|---|---|---|---|
| 63 | 22 | the e-mail to Vanessa Broadhurst, and you in turn | | |
| 63 | 23 | forward it to Mr. Shah, correct? | | |
| 63 | 24 | A. I did. | | |
| 64 | 1 | Q. And you say, "need a swift and strong | | |
| 64 | 2 | response to me pls..." | | |
| 64 | 3 | Do you see that? | | |
| 64 | 4 | A. Yes. | | |
| 64 | 5 | Q. What did you mean by that? | | |
| 64 | 6 | A. I needed him to evaluate the proposal | | |
| 64 | 7 | and have a recommendation that I could take to Vanessa. | | |
| 64 | 8 | Q. So is it that you saw that the proposal | | |
| 64 | 9 | was also sent to Vanessa and you were asking Mr. Shah, | | |
| 64 | 10 | who reported to you at the time, to take a look and to | | |
| 64 | 11 | give you an assessment so that you could speak to | | |
| 64 | 12 | Ms. Broadhurst about it? | | |
| 64 | 13 | A. That's what I recall. | | |
| 64 | 14 | Q. All right. Now, let's take a look at | | |
| 64 | 15 | the proposal itself. | | |
| 64 | 16 | Now, if you look at the proposal, the | | |
| 64 | 17 | title of the proposal is "Rivaroxaban and Atrial | | |
| 64 | 18 | Fibrillation: The Need for ROCKET AF Booster." | | |
| 64 | 19 | Do you see that? | | |
| 64 | 20 | A. Mm-hmm. | | |
| 64 | 21 | Q. And rivaroxaban is Xarelto, correct? | | |
| 64 | 22 | A. Correct. | | |
| 64 | 23 | Q. And if you go under -- the first page is | | |
| 64 | 24 | a background that Dr. Califf is giving, correct? | | |
| 65 | 1 | A. Yes. | | |
| 65 | 2 | Q. And if you go to the second page -- I | | |
| 65 | 3 | mean, I'm sorry, the second paragraph, it says, The | | |
| 65 | 4 | major comparative advantage of rivaroxaban is its | | |
| 65 | 5 | once-a-day dosing, but the failure of ROCKET AF to | | |
| 65 | 6 | prove superiority, even in the face of lower than | | |
| 65 | 7 | expected TTR in the trial, has raised major questions | | |
| 65 | 8 | about whether the ROCKET AF dosing regimen is needed -- | | |
| 65 | 9 | is indeed the best dose. | | |
| 65 | 10 | Did I read that correctly? | | |
| 65 | 11 | A. Yes. | | |
| 65 | 12 | Q. All right. And so here Dr. Califf is | | |
| 65 | 13 | referring to the major advantage for Xarelto as being | | |
| 65 | 14 | its once-a-day dosing, correct? | | |
| 65 | 15 | A. That's what I believe Dr. Califf is | | |
| 65 | 16 | saying. | | |
| 65 | 17 | Q. And that's consistent with what we saw | | |
| 65 | 18 | in the joint steering committee meetings as being one | | |
| 65 | 19 | of the strategic imperatives to keep in mind in terms | | |
| 65 | 20 | of doing lifecycle management, correct? | | |
| 65 | 21 | A. Correct. | | |

| 70:21 - 72:13 | Torr, Patricia 2016-10-18 | 1:57 | | |
|---|---|---|---|---|
| 70 | 21 | You see that after the background, | | |
| 70 | 22 | Dr. Califf writes, in summary, the tremendous -- we're | | |
| 70 | 23 | at the last paragraph -- potential of rivaroxaban to | | |
| 70 | 24 | reduce death and disability from atrial fibrillation is | | |
| 71 | 1 | jeopardized by uncertainty regarding the dosing | | |
| 71 | 2 | regimen. | | |
| 71 | 3 | Do you see that? | | |
| 71 | 4 | A. Yes, I see that. | | |
| 71 | 5 | Q. Was this the first time that you learned | | |
| 71 | 6 | that Dr. Califf, who was the lead on the ROCKET study, | | |
| 71 | 7 | thought that there was uncertainty with the dosing | | |
| 71 | 8 | regimen for Xarelto? | | |
| 71 | 9 | A. I knew that he and Dr. DiBattiste were | | |
| 71 | 10 | having discussions. I wasn't privy to the details | | |
| 71 | 11 | about this. | | |
| 71 | 12 | Q. All right. Well, when you saw this | | |
| 71 | 13 | document, was this the first time that you learned that | | |

| | Objections In | Responses In |
|---|---|---|

| | | |
|---|---|---|
| 71 14  Dr. Califf thought that there was uncertainty regarding | | |
| 71 15  the dosing regimen, or had you heard that before? | | |
| 71 16  A.   I hadn't heard that before. I knew that | | |
| 71 17  he and Dr. DiBattiste were in discussions about the | | |
| 71 18  topic, generally. | | |
| 71 19  Q.   Okay. And if you go back up to the | | |
| 71 20  paragraph we were talking about, the last phrase says, | | |
| 71 21  it says, "has raised major questions about whether | | |
| 71 22  ROCKET AF dosing regimen is indeed the best dose." | | |
| 71 23       Was this the first time you ever learned | | |
| 71 24  that Dr. Califf thought that the ROCKET-AF dosing | | |
| 72  1  regimen may not indeed be the best dose? | | |
| 72  2  A.   I don't recall any specifics of any | | |
| 72  3  correspondence that I would have been made aware of or | | |
| 72  4  communications from the team. I know that he -- I know | | |
| 72  5  that he had opinions about this, but I had never seen | | |
| 72  6  it expressed in this way. | | |
| 72  7  Q.   Are you saying that before receiving | | |
| 72  8  this proposal, you knew that Dr. Califf had opinions | | |
| 72  9  about ROCKET -- the ROCKET-AF dose in Xarelto not | | |
| 72 10  necessarily being the best dose or the safest dose? | | |
| 72 11  A.   No, I'm not sure about those details. I | | |
| 72 12  know that he generally was asking those questions to | | |
| 72 13  our scientists. | | |

74:17 - 76:11  Torr, Patricia 2016-10-18                                                  1:48

| | | |
|---|---|---|
| 74 17  Q.   And is proposing that the company do a | | |
| 74 18  study testing different doses, correct? | | |
| 74 19  A.   That is my understanding. | | |
| 74 20  Q.   And if you look at the second page, he | | |
| 74 21  actually at the very bottom of the page, he proposes | | |
| 74 22  potential doses to be tested, correct? | | |
| 74 23  A.   It appears so. | | |
| 74 24  Q.   And that includes lower doses than | | |
| 75  1  20 milligrams once daily, correct? | | |
| 75  2  A.   Fifteen -- let's see, 10 milligrams BID, | | |
| 75  3  15 milligrams once per day, 10 milligrams per day for | | |
| 75  4  renal, 7.5 BID, 5 for renal. | | |
| 75  5  Q.   So yes? | | |
| 75  6  A.   Yes. | | |
| 75  7  Q.   So he's proposing a lower dose in terms | | |
| 75  8  of milligrams, correct? | | |
| 75  9  A.   Yes. | | |
| 75 10  Q.   And he's proposing a different dosing | | |
| 75 11  regimen other than once daily, correct? | | |
| 75 12  A.   It looks like he's got four different | | |
| 75 13  regimens. | | |
| 75 14  Q.   Correct, including not just once daily | | |
| 75 15  dosing but also twice daily dosing, correct? | | |
| 75 16  A.   Looks like both. | | |
| 75 17  Q.   All right. So the doctor, the scientist | | |
| 75 18  that ran the ROCKET study has come to Janssen and said | | |
| 75 19  I think that you might not have the safest dose in afib | | |
| 75 20  patients, I propose that you do a study, I propose that | | |
| 75 21  you look at a lower dose, I propose that you look at a | | |
| 75 22  different dosing regimen, correct? | | |
| 75 23  A.   Correct, and at this point in time, | | |
| 75 24  Dr. Califf was head of the Duke Clinical Research | | |
| 76  1  Organization, which was in business to run clinical | | |
| 76  2  trials. | | |
| 76  3  Q.   And the Duke research organization was | | |
| 76  4  the organization that your company, Janssen, hired to | | |
| 76  5  run the ROCKET clinical trial, correct? | | |
| 76  6  A.   Correct. | | |
| 76  7  Q.   And on March 1st you became aware that | | |
| 76  8  Dr. Califf was making a proposal to do this study in | | |
| 76  9  afib patients at lower doses and at a twice daily | | |

|   |   | Objections In | Responses In |
|---|---|---|---|

|   |   |   |
|---|---|---|
| 76 10   dosing regimen, correct?<br>76 11   A.  It seemed to be his opinion, yes. | | |
| :9 - 77:17   Torr, Patricia 2016-10-18<br>77 9   Q.  And then you forward it on to Mr. Shah,<br>77 10  and it says -- and you write, need a swift and strong<br>77 11  response to me, please.<br>77 12      Did Mr. Shah ever get back to you?<br>77 13  A.  I don't recall any e-mail exchanges.<br>77 14  I'm sure we probably had a conversation.<br>77 15  Q.  Do you have a recollection of the<br>77 16  conversation?<br>77 17  A.  I don't. | 0:25 | |
| 81:4 - 81:8   Torr, Patricia 2016-10-18<br>81 4   Q.  Handing you what's been marked as<br>81 5   Torr-7. I'm going to give you an opportunity to review<br>81 6   this. Do you see -- before you do that, do you see<br>81 7   that this is an e-mail that you appear on dated<br>81 8   January 10th, 2012 from Gary Peters, correct? | 0:23   Re: [81:4-81:8]<br>Def Obj See exhibit objections.<br><br>*Overruled*<br>*401, not*<br>*403* | Re: [81:4-81:8]<br>Pltf Resp See general response above. Also document is a business record received in the ordinary course of business and contains party admissions. |
| 81:15 - 81:21   Torr, Patricia 2016-10-18<br>81 15  A.  (Witness reviews document.) Okay.<br>81 16  Q.  Okay. Do you see that this is an e-mail<br>81 17  that's started -- an e-mail chain that's started by<br>81 18  Mr. Sigmond Johnson on January 5th, 2012?<br>81 19  A.  Yes.<br>81 20  Q.  And you're on this e-mail, correct?<br>81 21  A.  Correct. | 0:16 | |
| 84:1 - 84:23   Torr, Patricia 2016-10-18<br>84 1   Q.  And who is Gary Peters?<br>84 2   A.  Dr. Peters would be one of Dr. Dr.<br>84 3   DiBattiste's medical physicians on his staff.<br>84 4   Q.  So he's one of the scientists --<br>84 5   A.  Yes.<br>84 6   Q.  -- that worked on Xarelto, correct?<br>84 7   A.  Correct.<br>84 8   Q.  How about Paul Chang, who was he?<br>84 9   A.  Paul Chang would be the head of our<br>84 10  medical affairs unit.<br>84 11  Q.  Another scientist that worked on<br>84 12  Xarelto, correct?<br>84 13  A.  Yes.<br>84 14  Q.  And Dr. Paul Burton, who is he?<br>84 15  A.  Dr. Burton at the time would have been<br>84 16  another physician that reported in to Dr. DiBattiste.<br>84 17  Q.  Now, if we go back to the first page,<br>84 18  one of the scientists, Dr. Peters responds, correct?<br>84 19  A.  Yes.<br>84 20  Q.  And he says, "Hi all, just reviewed this<br>84 21  quickly a few thoughts from my perspective."<br>84 22      Do you see that?<br>84 23  A.  I do. | 0:47 | |
| 85:22 - 86:21   Torr, Patricia 2016-10-18<br>85 22  Q.  "Rob Califf," that's what it says here,<br>85 23  correct?<br>85 24  A.  Yes.<br>86 1   Q.  "Is supposed to be sending us a proposal<br>86 2   for such a study... Basis for this is that he says<br>86 3   that comparative studies vs. apixaban will be done and<br>86 4   since likely we will not fare optimally with our<br>86 5   current dosing regimen we need to explore others."<br>86 6       And then he says, "I fully agree with<br>86 7   this and would like to see ROCKET2 discussed again in<br>86 8   this context." | 0:48 | |

| | | | Objections In | Responses In |
|---|---|---|---|---|
| 86 9 | Did I read that correctly? | | | |
| 86 10 | A. Yes. | | | |
| 86 11 | Q. All right. And you are on this e-mail, | | | |
| 86 12 | correct? | | | |
| 86 13 | A. Yes. | | | |
| 86 14 | Q. And so Dr. Gary Peters, one of the | | | |
| 86 15 | scientists, is anticipating that Dr. Califf is going to | | | |
| 86 16 | send the proposal that we looked at, correct? | | | |
| 86 17 | A. Correct. | | | |
| 86 18 | Q. And he says, "I fully agree with this | | | |
| 86 19 | and would like to see ROCKET2 discussed again in this | | | |
| 86 20 | context," correct? | | | |
| 86 21 | A. Correct. | | | |

92:1 - 92:14 Torr, Patricia 2016-10-18    0:43

| 92 1 | BY MR. WEINKOWITZ: |
| 92 2 | Q. Handing you what's been marked as |
| 92 3 | Exhibit 8. For the record, it is Record Number |
| 92 4 | 250-1312, XARELTO_JANSSEN_11775788. |
| 92 5 | Do you see, ma'am, that this is the same |
| 92 6 | e-mail from Dr. Peters that you forwarded on to |
| 92 7 | Mr. Moye after taking all the scientists off the |
| 92 8 | e-mail? |
| 92 9 | A. Yes. |
| 92 10 | Q. And it's dated January 10th, 2012? |
| 92 11 | A. Yes. |
| 92 12 | Q. And you say to Mr. Moye, "need to get |
| 92 13 | ahead of Califf proposal." |
| 92 14 | A. Yeah. |

Re: [92:1-92:14]
Def Obj See exhibit objections.

Re: [92:1-92:14]
Pltf Resp See general response above. Also document is a business record received in the ordinary course of business and contains party admissions.

93:12 - 93:15 Torr, Patricia 2016-10-18    0:05

| 93 12 | Q. Thank you. When you say "need to get |
| 93 13 | ahead of the Califf proposal," you hadn't even seen the |
| 93 14 | Califf proposal, correct? |
| 93 15 | A. That's right. |

94:14 - 95:21 Torr, Patricia 2016-10-18    1:29

| 94 14 | Q. Do you know if Mr. Moye ever replied to |
| 94 15 | you? |
| 94 16 | A. I do not recall. |
| 94 17 | (Document marked for identification as |
| 94 18 | Torr Deposition Exhibit No. 9.) |
| 94 19 | BY MR. WEINKOWITZ: |
| 94 20 | Q. Handing you what's been marked as |
| 94 21 | Exhibit 9, it is Document Number 142-8185, |
| 94 22 | XARELTO_JANSSEN_08583165. |
| 94 23 | If you take a look, it's another e-mail |
| 94 24 | in the same chain, and it appears as though at |
| 95 1 | 4:31 p.m. on the same day as the January 10, 2012, |
| 95 2 | Mr. Moye replies. |
| 95 3 | Do you see that? |
| 95 4 | A. I do. |
| 95 5 | Q. And he said, "brought up in CDT a few |
| 95 6 | minutes ago." |
| 95 7 | What is CDT? |
| 95 8 | A. Clinical development team. |
| 95 9 | Q. And what is the clinical development |
| 95 10 | team? |
| 95 11 | A. It would be the team of folks who are |
| 95 12 | working on the current ongoing clinical trials to |
| 95 13 | support the program. |
| 95 14 | Q. And does it appear that Mr. Moye, a |
| 95 15 | marketer, was at that meeting? |
| 95 16 | A. Yes, typically marketing attends those |
| 95 17 | meetings. |
| 95 18 | Q. It says, "Califf banging this drum for |
| 95 19 | some time." |

Re: [94:14-95:21]
Def Obj See exhibit objections.

Re: [94:14-95:21]
Pltf Resp See general response above. Also document is a business record received in the ordinary course of business and contains party admissions.



Handwritten annotations: "Overruled 401, 602, knowledge Mature," "401, 602, 803(6), 801(d)(2)"

| | Objections In | Responses In |
|---|---|---|

```
95 20           Do you see that?
95 21       A.  I do.

100:20 - 101:11 Torr, Patricia 2016-10-18                          0:41
100 20       Q.  Okay. Michael continues here, "team
100 21           thinks ROCKET2 needs to be on agenda for Bayer meeting
100 22           this week - just so everyone knows Califf is making
100 23           noise about it."
100 24               Did I read that correctly?
101  1       A.  Yes.
101  2       Q.  And what did you understand that to
101  3           mean?
101  4       A.  That in our discussions about new
101  5           indications for Xarelto, the lifecycle management
101  6           meeting, that the ROCKET2 discussion had already been
101  7           determined that we were not moving forward, and it
101  8           wasn't on the agenda, but Michael thought or the team
101  9           thought that we should include it, given the fact that
101 10           there's a pending Califf proposal coming forward, just
101 11           so everybody is aware.

107:9 - 107:14 Torr, Patricia 2016-10-18                           0:16
107  9       Q.  Okay. And so the ROCKET2 trial that
107 10           would look at twice daily dosing in afib patients was
107 11           not consistent with the strategic imperative that we
107 12           saw in those joint steering committee meeting notes,
107 13           correct?
107 14       A.  Correct, I think and timing is important

108:18 - 109:4 Torr, Patricia 2016-10-18                           0:30
108 18       Q.  Okay. I've handed you what I've marked
108 19           as Exhibit 10. It is Record Number 259501, Bates
108 20           Number XARELTO_JANSSEN_01203314. I gave you an
108 21           opportunity off the record to read the e-mail.
108 22               Are you ready to answer questions?
108 23       A.  Yes.
108 24       Q.  Okay. Do you see that this is part of
109  1           the same e-mail chain that we were talking about with
109  2           Dr. Peters' e-mail on January 10, 2012.
109  3               Do you see that?
109  4       A.  I do.
```

Re: [108:18-109:4]
**Def Obj** See exhibit objections.

Re: [108:18-109:4]
Pltf Resp See general response above. Also document is a business record received in the ordinary course of business and contains party admissions.

```
110:8 - 110:12 Torr, Patricia 2016-10-18                           0:12
110  8       Q.  You write, "would not support doing a
110  9           ROCKET2 study and unwinding everything we invested and
110 10           are actively selling today."
110 11               Did I read that correctly?
110 12       A.  Correct.

117:13 - 117:23 Torr, Patricia 2016-10-18                          0:26
117 13       Q.  You also write, it would say to the
117 14           market that the competition is right, we are a BID
117 15           drug. BID means what?
117 16       A.  Twice a day.
117 17       Q.  All right. And we saw a little bit
117 18           earlier that one of the strategic imperatives for
117 19           looking at what studies to do, what additional studies
117 20           to do in Xarelto, was to maintain your once-a-day
117 21           dosing, correct? We saw that in the JC meeting
117 22           minutes, correct?
117 23       A.  Correct, but as a marketer, I wouldn't

119:8 - 119:10 Torr, Patricia 2016-10-18                           0:06
119  8       Q.  And you continue here, do you not, and
119  9           you write "would kill us in the market today," correct?
119 10       A.  Correct.
```

|  |  |  | Objections In | Responses In |
|---|---|---|---|---|
| 126:8 - | 126:20 Torr, Patricia 2016-10-18 | 0:37 |  |  |
| 126 8 | Despite Dr. Califf, the scientist that |  |  |  |
| 126 9 | ran the ROCKET study telling you and other high level |  |  |  |
| 126 10 | scientists that it was the right thing to do, a ROCKET |  |  |  |
| 126 11 | booster study or a ROCKET2 study or a study looking at |  |  |  |
| 126 12 | different doses of Xarelto or different dosing regimens |  |  |  |
| 126 13 | other than once a day and 20 milligrams has never been |  |  |  |
| 126 14 | done to this day, correct? |  |  |  |
| 126 15 | A.  We have not done that study. |  |  |  |
| 126 16 | Q.  Are there any plans to do that study? |  |  |  |
| 126 17 | A.  Not that I'm aware. |  |  |  |
| 126 18 | Q.  Okay.  Are there any plans for Bayer to |  |  |  |
| 126 19 | do that study? |  |  |  |
| 126 20 | A.  Not that I'm aware. |  |  |  |
| 145:19 - | 146:7  Torr, Patricia 2016-10-18 | 0:57 | Re: [145:19-146:7]<br>Def Obj See exhibit objections. | Re: [145:19-146:7]<br>Pltf Resp See general response above.  Also document is a business record received in the ordinary course of business and contains party admissions. |
| 145 19 | Q.  I'm going to hand you what is marked |  |  |  |
| 145 20 | Plaintiff's Exhibit 11.  Do you see this is an e-mail |  |  |  |
| 145 21 | chain that you're included on dated December 12th, |  |  |  |
| 145 22 | 2013? |  |  |  |
| 145 23 | A.  I see. |  |  |  |
| 145 24 | Q.  This is Record Number 257-9936, Bates |  |  |  |
| 146 1 | Numbers XARELTO_JANSSEN_12325928, and it looks to me as |  |  |  |
| 146 2 | if this is meeting notes that Rudy Sharan provided you |  |  |  |
| 146 3 | from the subject GDC. |  |  |  |
| 146 4 | Do you see that? |  |  |  |
| 146 5 | A.  I do. |  |  |  |
| 146 6 | Q.  And tell us again what GDC is? |  |  |  |
| 146 7 | A.  Global Development Committee. |  |  |  |
| 146:13 - | 146:15 Torr, Patricia 2016-10-18 | 0:05 |  |  |
| 146 13 | Q.  And do you see -- and this is written to |  |  |  |
| 146 14 | you and copied to Mr. Moye; is that right? |  |  |  |
| 146 15 | A.  Yes. |  |  |  |
| 146:19 - | 148:9  Torr, Patricia 2016-10-18 | 1:37 |  |  |
| 146 19 | Q.  And do you see Number 6, can you tell |  |  |  |
| 146 20 | the jury what the title of Number 6 is? |  |  |  |
| 146 21 | A.  "ROCKET2." |  |  |  |
| 146 22 | Q.  And that's the same thing we talked |  |  |  |
| 146 23 | about earlier that was taken off the table, as far as |  |  |  |
| 146 24 | you know, back in 2011, right? |  |  |  |
| 147 1 | A.  I do, yes. |  |  |  |
| 147 2 | Q.  And this is December of 2013, correct? |  |  |  |
| 147 3 | A.  Correct. |  |  |  |
| 147 4 | Q.  And this says "ROCKET2 - more needs to |  |  |  |
| 147 5 | be discussed," correct? |  |  |  |
| 147 6 | A.  Correct. |  |  |  |
| 147 7 | Q.  Do you recall that, that in December of |  |  |  |
| 147 8 | 2013 the GDC had a meeting and it was determined that |  |  |  |
| 147 9 | more needed to be discussed about ROCKET2? |  |  |  |
| 147 10 | A.  I'm generally aware, but it wasn't on my |  |  |  |
| 147 11 | radar screen. |  |  |  |
| 147 12 | Q.  And then Rudy goes on to say, "big |  |  |  |
| 147 13 | concerns raised specially regulatory." |  |  |  |
| 147 14 | Do you see that? |  |  |  |
| 147 15 | A.  Yes. |  |  |  |
| 147 16 | Q.  Do you recall what big concerns were |  |  |  |
| 147 17 | raised in relation to regulatory? |  |  |  |
| 147 18 | A.  I do not. |  |  |  |
| 147 19 | Q.  Do you see it goes on to say, "if we |  |  |  |
| 147 20 | move forward with a low dose trial - puts into question |  |  |  |
| 147 21 | the 20mg dose." |  |  |  |
| 147 22 | Do you see that? |  |  |  |
| 147 23 | A.  Yes. |  |  |  |
| 147 24 | Q.  Do you understand -- what do you |  |  |  |
| 148 1 | understand that to mean? |  |  |  |

Handwritten annotations in Objections column: "Overruled", "803(6)", "602", "401"

|  |  | Objections In | Responses In |
|---|---|---|---|
| 148 2<br>148 3<br>148 4<br>148 5<br>148 6<br>148 7<br>148 8<br>148 9 | A. That we would be taking -- I read that<br>to mean that we'd be taking or that the discussions<br>could have been that we would take the 15-milligram<br>once daily into a trial.<br>Q. And if you did that, that may put the<br>20-milligram dose into question, correct?<br>A. I believe that's what Rudy is saying<br>here. |  |  |
| 151:20 - 152:18 Torr, Patricia 2016-10-18     1:09 | | | |
| 151 20<br>151 21<br>151 22<br>151 23<br>151 24<br>152 1<br>152 2<br>152 3<br>152 4<br>152 5<br>152 6<br>152 7<br>152 8<br>152 9<br>152 10<br>152 11<br>152 12<br>152 13<br>152 14<br>152 15<br>152 16<br>152 17<br>152 18 | Q. Do you recall that being the case, that<br>15-milligram dose had been kicked around by you or<br>other people in the marketing team?<br>A. I do know that -- no, not by the<br>marketing team, by the -- during the course of<br>discussion around ROCKET2, I do believe that the once<br>daily 15-milligram dose for normal renal patients was<br>one of the topics.<br>Q. And, in fact, that would be in line with<br>Dr. Califf's opinion that the dose may be too high at<br>20 milligrams a day, right?<br>A. It was one of the regimens relative that<br>he had on his sheet from the prior documents, one being<br>the standard dose that was approved, and then it looks<br>like two regimens of BID dosing of different doses as<br>well as the 15-milligram once daily.<br>Q. But that project, I understood you to<br>tell us, had been taken off the table prior to<br>January 10th, 2012?<br>A. That's right.<br>Q. This e-mail is from a meeting that<br>happened with the company in December of 2013?<br>A. Right. | | |
| 186:12 - 187:5 Torr, Patricia 2016-10-18     0:36 | | | |
| 186 12<br>186 13<br>186 14<br>186 15<br>186 16<br>186 17<br>186 18<br>186 19<br>186 20<br>186 21<br>186 22<br>186 23<br>186 24<br>187 1<br>187 2<br>187 3<br>187 4<br>187 5 | Q. This is an e-mail, and this is again<br>Document Number 256-4466, Bates Number<br>XARELTO_JANSSEN_12288446.<br>    This is an e-mail from you to Calvin<br>Schmidt, copied Michael Moye, correct?<br>A. Yes.<br>Q. And it's dated February 24th, 2014,<br>right?<br>A. Yes.<br>Q. And it's about a month and a half after<br>the last document we reviewed, right?<br>A. Mm-hmm.<br>Q. And it's called MARS background.<br>    Do you see that?<br>A. Yes.<br>Q. And it has an attachment called<br>MARS_LCM.pptx, right?<br>A. Yes. |  |  |
| 187:17 - 188:5 Torr, Patricia 2016-10-18     0:47 | | | |
| 187 17<br>187 18<br>187 19<br>187 20<br>187 21<br>187 22<br>187 23<br>187 24<br>188 1<br>188 2<br>188 3<br>188 4 | Q. Okay. And so if we look at the actual<br>attachment, the PowerPoint presentation, which is Bates<br>Number XARELTO_JANSSEN_12288447, we see it's a MARS<br>background dated February 24th, 2014, right?<br>A. Mm-hmm.<br>Q. MARS is an acronym that you use at your<br>company, correct?<br>A. It was a acronym for the next wave of<br>indications that we were going to put forward to do.<br>Q. MARS stands for major activities to<br>raise sales, correct?<br>A. Sounds familiar. I think it was a Bayer | Re: [187:17-188:5]<br>**Def Obj** See exhibit objections. | Re: [187:17-188:5]<br>Pltf Resp See general response above. Also document is a business record received in the ordinary course of business and contains party admissions. |

Handwritten annotations: "Motive, intent, knowledge", "Order", "600", "401", "803(6)", "801(d)(2)"

|  |  |  | Objections In | Responses In |
|---|---|---|---|---|
| 188 5 | acronym that was utilized. |  |  |  |
| 190:4 - | 190:21 Torr, Patricia 2016-10-18 | 0:58 |  |  |
| 190 4 | Q.   The decision has now been made yet again |  |  |  |
| 190 5 | not to do the ROCKET2 study, right? |  |  |  |
| 190 6 | A.   That's right. |  |  |  |
| 190 7 | Q.   And if we look as to why the bullet |  |  |  |
| 190 8 | points -- the bullet point next to it says, first of |  |  |  |
| 190 9 | all, considerable downside, let's go down one, correct? |  |  |  |
| 190 10 | A.   Yes. |  |  |  |
| 190 11 | Q.   One of the considerable downsides would |  |  |  |
| 190 12 | be that the 20-milligram dose could be shown to be too |  |  |  |
| 190 13 | high, correct, if you did that trial? |  |  |  |
| 190 14 | A.   Yes.  I'm not sure of what the clinical |  |  |  |
| 190 15 | trial determinations would have been, but it could have |  |  |  |
| 190 16 | been -- that could be in the range of possibility. |  |  |  |
| 190 17 | Q.   One of the considerable downsides could |  |  |  |
| 190 18 | be that the once-a-day dose could be shown to be less |  |  |  |
| 190 19 | safe or less effective than a twice a day dose, |  |  |  |
| 190 20 | correct? |  |  |  |
| 190 21 | A.   It could have been. |  |  |  |