UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen et al.* Case No. 2:14-cv-02720 | MAGISTRATE NORTH |

### DEFENDANTS' OFFER OF PROOF TO ALLOW EVIDENCE OF LAWYER ADVERTISING

During the examination of Dr. Peters, Plaintiffs referred to the fact that there are tens of thousands of lawsuits filed by plaintiffs alleging injuries from use of Xarelto.  The jury is now left with the misimpression that because of the number of lawsuits, Xarelto is an unreasonably dangerous medicine.  Such an inference is highly prejudicial to the Defendants for a multitude of reasons and should have been excluded.  In an effort to cure the clear prejudice from this evidence, Defendants sought to level the playing field and offer into evidence (1) the lawyer advertising that caused Mr. Boudreaux to file this lawsuit, and (2) evidence that lawyer advertising has created fear in patients using Xarelto, some of whom have filed lawsuits and have sustained adverse events from stopping use of Xarelto.

The jury should not hear only half of the story—if Plaintiffs are permitted to tell the jury that there are other lawsuits, fairness demands that Defendants be allowed to show the jury evidence that Mr. Boudreaux filed this lawsuit because of lawyer advertising and that those same advertisements created a spike in lawsuits and has further resulted in some patients sustaining injuries by discontinuing Xarelto – without consulting a physician. .  In addition, while Plaintiffs'

counsel claimed and the Court agreed that the "door" had been opened by asking the witness how many patients had used Xarelto[1], there was never any ruling by the Court that the number of patients who have used the medicine was inadmissible, nor was there any objection to the question that was asked.

Defendants make the following offer of proof setting forth the evidence that would have been presented to the jury had the Court allowed it into evidence.

1. Mr. Boudreaux explicitly testified that he only filed his lawsuit after he saw attorney advertising. *See* Boudreaux Dep. 181:25–182:3 ("Q. What prompted you to call an attorney? A. I just had seen an ad on TV that they put out, that if I had had any bleeding from the use of Xarelto to—one call.")(Ex. A).

2. The authors of *Heart Rhythm Case Reports* clearly explained the pervasiveness of attorney advertising which has had an impact on patients using the medicine:

---

[1]
```
 5        MR. BARR:  Your Honor, we didn't open this door.
 6   This is not where we wanted to go with it.  He asked him the
 7   question, and we opened the door.  This is not a tit for tat.
 8   We had to respond to what they said about this drug and all the
 9   people they've saved.  They opened that.
10        MR. SARVER:  Once you go down that path, we have to
11   respond.

12        THE COURT:  Well, the problem is is that you went
13   down the path of how many people have taken the drug and that
14   sort of thing, and I would not have allowed them to go into it,

15   but the fact that you brought that up, they have a right to get
16   the other side of the nickel.  Now it's the other side of that
17   nickel.
18        MR. SARVER:  It's a three-sided nickel.
```

> Described here are a series of serious medical events reported in 28 submissions of 31 individual patients to Medwatch (The FDA Safety Information and Adverse Event Reporting System; http://www.fda.gov/ Safety/MedWatch/default.htm).
>
> . . . .
>
> Overall, based on the available data, the mean age of the patients was 72 (range, 45–90), and 13 patients were male. All were prescribed rivaroxaban and subsequently discontinued their anticoagulant without consulting their physician after viewing negative rivaroxaban legal advertising. In the majority of these cases (23/31,75%), patients experienced a stroke or a transient ischemic neurologic event; 2 patients had persistent residual paralysis. One patient, a 45-year-old man receiving rivaroxaban for treatment of a deep vein thrombosis, stopped the drug and died of a subsequent pulmonary embolism, and 1 female patient, receiving rivaroxaban for stroke prevention, stopped the drug and died of a massive stroke (Table). All these cases were considered to be serious medical events by the health care professionals that submitted the reports.

Burton, P. and Peacock, W.P., *Heart Rhythm Case Reports* 2016; 2:248-49 (Ex. B). The authors conclude:

> [I]t is clear that some patients are intimidated enough by the ongoing legal campaign to stop their anticoagulant, and thus suffer an adverse event. These cases serve to highlight the importance of following anticoagulant prescribing information, and that physicians should emphasize that patients should not stop anticoagulants without medical consultation. Continued partnership between drug manufacturers, physicians, regulators, and patients is necessary to provide sufficient education to ensure that these important medical events do not occur.

*Id.*

3. In an article published in the *Journal of Atrial Fibrillation*, Dr. Reiffel explained attorney advertising and its effect on the practice of medicine:

> Consequent to such advertisements, many patients have discontinued NOAC therapy or have refused to start it. I have encountered such a patient on more than one occasion, mostly atrial fibrillation (AF) patients with an increased risk profile for stroke and systemic embolism (CHA2DS2-VASc score of 2 or higher). It takes considerable effort to make them understand both the benefits and the risks of NOAC therapy and in particular, the overall antithrombotic and mortality benefits to them of being on NOAC therapy despite the risks of a bleed.
>
> Part of such discussions with patients should involve the concepts of fair balance and of net clinical benefit. Using data from the 4 major NOAC vs warfarin pivotal

>AF trials 2-5 and historical data from AF warfarin vs placebo trials, several calculations can be made to help them understand both what they are not being told in the advertisements they see and the consequences that may arise based upon the non-use of the NOAC.
>
>. . . .
>
>Based on the pivotal NOAC versus warfarin trials, assuming increased risk of AF patients changed from NOAC to warfarin therapy: embolic events would increase by 1.1 to 2.1%/yr; major bleeds would increase by 2.1 to 3.4%/yr, total mortality would increase by 3.5 to 4.9%/yr, but fatal bleeds would increase by only 0.06 to 0.5%/yr.

Reiffel, J.A., *Journal of Atrial Fibrillation* 2016; 8(5)(Ex. C).

    3.     Dr. Kenneth Wong, the physician who prescribed Xarelto to Mr. Boudreaux, also testified that he saw attorney advertising. Dr. Wong testified as follows:

>Q. What have some of your patients come in, what are some of their concerns as a result of the advertisement?
>
>A. Well, they see all this: If you have taken Xarelto before, contact us.
>
>Q. And what do you tell your patients when they come in with those concerns?
>
>A. That it's misleading. It makes it sound like, you know, it's a terrible drug. But Coumadin is just as -- you know. Everything – it's an anticoagulant. It's going to have an increased risk of bleeding, but serves its purpose and protects you from stroke. That's what I tell them.
>
>Q. Do you counsel your patients not to just stop taking their medications because they are seeing these lawyer ads?
>
>A. That's the worst part. We have had cases where people stroke out because they saw those commercials and stop taking them. We have had cases like that. And you wonder whether there should be a law that goes back and says you can't -- you know, it's negligent advertising sometimes. You wonder if there is such a thing --
>
>Deposition of Dr. Kenneth Wong, at 145:15-146:14 (Ex. D).

    4.     Courts recognize the relationship between lawyer advertising and the number of cases and have held that either both subjects are inadmissible or both are admissible. For example, in In

4

re Welding Fume Prod. Liab. Litig., No. 1:03-CV-17000, 2010 WL 7699456, at *66 (N.D. Ohio June 4, 2010) the Court held:

> Defendants also assert that, if evidence of other *Welding Fume* lawsuits is allowed, then defendants should be permitted to introduce: (1) evidence that, beginning in 2002, the plaintiffs' bar engaged in heavy advertising to obtain clients for *Welding Fume* lawsuits; and (2) expert evidence on the efficacy of this type of advertising. Defendants assert this evidence would tend to show an alternative reason for the many thousands of *Welding Fume* lawsuits filed by other welders. Plaintiffs respond that evidence of lawyer advertising is itself excessively prejudicial compared to its limited relevance under Fed.R.Civ.P. 403.
>
> The Court has ruled as follows on these motions. Except as noted below, evidence of lawsuits brought by other welders, and also evidence of lawyer advertising, must be excluded pursuant to both Fed.R.Evid. 403 and 611(a)(2). While plaintiffs are correct that a multiplicity of injury claims by welders is inconsistent with the notion that no harm can flow from exposure to welding fumes, defendants are also correct that the spark leading to the great number of recent *Welding Fume* lawsuits is the combination of the advertising and screening processes used by plaintiffs' counsel to identify potential claimants. As defendants point out, moreover, the validity of the claims asserted in those cases remains mostly untested.

And here, in contrast to the *Welding Litigation* the Defendants do not dispute the association between the use of anti-coagulation medicine and bleeding as a recognized but unfortunate side effect. At this point, having admitted the number of pending lawsuits, the Defendants submit that fundamental fairness requires the admission of information about lawyer advertising. Plaintiffs' reference to the number of lawsuits has resulted in substantial and incurable prejudice to the defendants.

5. Further, after the witness testified that he did not know the number of lawsuits that had been filed, T 1123:20 to 22, it was totally improper for Plaintiffs to then tell the witness and the jury the number, T 1123:23. It must also be noted that the testimony as to the number of patients who have taken Xarelto ("hundreds of thousands" T 1123:2 to 3) is clearly in error, as the Plaintiffs know. The real number is over 28 million worldwide. If the Court does not permit the

5

introduction of attorney advertising as outlined above, it is requested that the Court instruct the jury that the number of patients who have used Xarelto worldwide is over 28 million in order to put the number of lawsuits in perspective.

Respectfully submitted,

BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.

By: /s/ *Richard E. Sarver*
Richard E. Sarver
Celeste R. Coco-Ewing
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
rsarver@barrassousdin.com
ccoco-ewing@barrassousdin.com

WILKINSON WALSH + ESKOVITZ LLP

By: /s/ *Beth A. Wilkinson*
Beth A. Wilkinson
Jennifer L. Saulino
Jeremy Barber
WILKINSON WALSH + ESKOVITZ LLP
1900 M. Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonwalsh.com
jsaulino@wilkinsonwalsh.com
jbarber@wilkinsonwalsh.com

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Chanda.Miller@dbr.com

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ David E. Dukes*
David E. Dukes
J. Mark Jones
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: (803) 799-2000
David.Dukes@nelsonmullins.com
Mark.Jones@nelsonmullins.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Andrew K. Solow*
Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

6

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC*

William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 30, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

/s/James B. Irwin
**James B. Irwin**