Lee Jackson (SBN 216970)
ljackson@majfw.com
Jonathan P. Staffeldt (SBN 252326)
jstaffeldt@majfw.com
**MILSTEIN ADELMAN JACKSON**
**FAIRCHILD & WADE, LLP**
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Telephone: (310) 396-9600
Facsimile: (310) 396-9635

*Attorneys for Plaintiff,*
*Edward Davidson*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 0 6 2017

Sherri R. Carter, Executive Officer/Clerk
By: _____, Deputy
Moses Soto

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

EDWARD DAVIDSON

        Plaintiffs,

v.

JANSSEN RESEARCH & DEVELOPMENT,
LLC F/K/A JOHNSON AND JOHNSON
PHARMACEUTICAL RESEARCH AND
DEVELOPMENT LLC; JOHNSON &
JOHNSON COMPANY; JANSSEN ORTHO,
LLC; JANSSEN PHARMACEUTICALS, INC.
F/K/A JANSSEN PHARMACEUTICA INC.,
F/K/A ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.; BAYER
CORPORATION; BAYER HEALTHCARE
LLC; AND BAYER HEALTHCARE
PHARMACEUTICALS INC.; BAYER
PHARMA AG; BAYER HEALTHCARE AG;
BAYER AG; MCKESSON CORPORATION;
AND JOHN DOES 1-100; INCLUSIVE,

        Defendants.

CASE NO. _____

BC 6 4 9 4 8 0

**COMPLAINT FOR DAMAGES**

1. Strict Products Liability
2. Negligence (*Civ. Code § 1714*)
3. Negligence - Failure to Warn
4. Negligence - Misrepresentation
5. Express Breach of Warranty
6. Breach of Implied Warranty
7. Fraud
8. Violations of Cal. Bus. & Prof. Code § 17200
9. Violations of Cal. Bus. & Prof. Code § 17500
10. Violations of Cal. Civ. Code § 1750
11. Damages-Compensatory and Punitive

**JURY TRIAL DEMANDED**

By Fax

COME NOW the Plaintiffs, by and through the undersigned counsel, hereby bring this Complaint for damages and Demand for Jury against the Defendants, and allege the following:

**INTRODUCTION**

1. This is an action for damages relating to the Defendants' design, manufacture, sale, marketing, advertising, promotion and distribution of Xarelto®.

2. The use of Xarelto® can increase the risk of life-threatening hemorrhaging including stroke, internal bleeding and other serious health conditions.

3. Plaintiffs ingested Xarelto® and as a result of their use of Xarelto® suffered injuries and/or died.

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Edward Davidson at all times relevant hereto, was, and currently is, a resident and citizen of Los Angeles County, located in the State of California. Plaintiff Edward Davidson suffered damages as a direct result of ingestion of the pharmaceutical product Xarelto®.

2. Defendant, JANSSEN RESEARCH & DEVELOPMENT, LLC (hereinafter "Janssen R & D"), f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC is a limited liability company organized, under the laws of New Jersey, with its principal place of business located at 920 U.S. Route 202, Raritan, New Jersey. Janssen R & D's sole principal or member is Centocor Research Development, Inc., (hereinafter "Centocor") a Pennsylvania corporation with its principal place of business and nerve center located at 200 Great Valley Parkway, Malvern, Pennsylvania. Centocor is a subsidiary or division of Johnson & Johnson, and has locations involved in the research, design, marketing, sale, and distribution of Xarelto in Horsham, Malvern, Radner and Ambler, Pennsylvania.

3. Defendant JOHNSON & JOHNSON (hereinafter "J&J"), is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JOHNSON & JOHNSON was engaged in the business of designing, developing,

manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto. Johnson & Johnson does business in the California and other states by, among other things, designing, developing, testing, manufacturing, labeling, packaging, distributing, marketing, selling and/or profiting from Xarelto® in California and throughout the United States.

4.   Defendant, JANSSEN ORTHO, LLC ("Ortho") is a Delaware limited liability company with a principal place of business in Puerto Rico.  Ortho is a subsidiary of Johnson & Johnson. At all times relevant hereto, Defendant Ortho manufactures, and continues to manufacture Xarelto®. At all times relevant hereto, Defendant Ortho derived, and continues to derives, substantial revenue from goods and products developed, marketed, sold, distributed and disseminated and used in the California.

5.   Defendant,   JANSSEN   PHARMACEUTICALS,   INC.   f/k/a   JANSSEN PHARMACEUTICA INC., f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. ("Janssen"), at all relevant times at the time suit was commenced, a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.  At all times relevant and material hereto, Janssen was, and still is, a pharmaceutical company involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Xarelto®, in Los Angeles County, California and throughout the United States.

6.   Defendant BAYER CORPORATION ("Bayer Corp") is, and at all times relevant was and remains, an Indiana corporation with its nerve center, headquarters and principal place of business at 100 Bayer Road Pittsburgh, Pennsylvania.  Bayer Corp. transacts substantial business within the California and within the City of Los Angeles, California, including the research, manufacture, sale, distribution and marketing of Xarelto®, as set forth herein.

7.   Defendant, BAYER HEALTHCARE LLC ("Bayer HC") is a Delaware limited liability Company with its principal place of business located at 100 Bayer Road, Pittsburgh, PA 15205 and

100 Global View Drive, Warrendale, Pennsylvania.   Bayer HC's sole member is Defendant Bayer

Corporation.  Bayer HC's members, as of July 1, 2015, are Bayer Medical Care Inc., NippoNex Inc.,

Bayer West Coast Corporation, Bayer Essure Inc., Bayer Consumer Care Holdings LLC, Dr. Scholl's

LLC, Coppertone LLC, MiraLAX LLC and Bayer Healthcare US Funding LLC and as such, Bayer

HealthCare LLC is owned by those entities.

    a.   Bayer West Coast Corporation is a Delaware corporation with its principal place of business in California and, therefore, is a citizen of Delaware and California for purposes of determining diversity of citizenship.  *See* 28 U.S.C. Section 1332(c).

    b.   Bayer Essure Inc. is a Delaware corporation with its principal place of business in California and, therefore, is a citizen of Delaware and California for purposes of determining diversity of citizenship.  *See id.*

    c.   The California citizenship of Bayer HC through Bayer West Coast Corporation and Bayer Essure Inc. is evident in a Notice of Removal filed by counsel for Bayer HC on August 5, 2015, and a letter from counsel for Bayer HC to the Honorable Eldon E. Fallon on January 11, 2016.  (Attached as Exhibits A and B respectively).

    8.   Bayer HC is a subsidiary of Bayer AG and jointly developed Xarelto® with J&J and

Janssen R & D.  Bayer AG's cooperation partner, J&J and Janssen R & D, submitted the new drug

application for Xarelto® to the FDA.  Bayer HC is a resident of California and transacts substantial

business within the California, including the research, manufacture, sale, distribution and marketing

of Xarelto®, as set forth herein.

    9.   Defendant, BAYER HEALTHCARE PHARMACEUTICALS INC. ("Bayer Pharma") is

a corporation organized and existing under the laws of the State of Delaware, with its principal place

of business in Montville, New Jersey.  Bayer Pharma is the U.S.-based pharmaceuticals operation of

Bayer HC, a division of Bayer. Bayer Pharma is a subsidiary of Bayer and jointly developed,

marketed and distributed Xarelto® with J&J and Janssen R & D.  At all times relevant and material

hereto, Bayer Pharma was, and still is, a pharmaceutical company involved in the manufacturing,

distribution, sale, and release for use to the general public of pharmaceuticals, including Xarelto® in

California and throughout the United States.

10. Defendant, BAYER PHARMA AG ("Bayer Pharma AG") is a corporation organized in Germany.

11. Bayer Pharma AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG.  Bayer Schering Pharma AG is formerly known as Shering AH and is the same corporate entity as Schering AG.  Bayer HC transacts substantial business within the California, including the research, manufacture, sale, distribution and marketing of Xarelto®, as set forth herein.

12. Defendant, BAYER HEALTHCARE AG ("Bayer HC AG") is a corporation organized in Germany and is the parent/holding company of Defendants Bayer Corp, Bayer HC, Bayer Healthcare Pharmaceuticals, Inc., and Bayer Pharma AG.

13. Bayer HC AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of California, and derived substantial revenue from that commerce.

14. Bayer AG is a corporation organized in Leversuken, North Rhine-Westphalia, Germany.

15. Bayer AG is the third largest pharmaceutical company in the world.  Bayer AG is the parent/holding company of all other named Bayer Defendants.  Bayer AG has transacted and conducted business in the State of California, and derived substantial revenue from that commerce.

16. Bayer AG's cooperating partner J&J and Janssen R & D submitted the new drug application to the FDA for Xarelto®.

17. Defendant McKesson Corporation (hereinafter "McKesson") is a California Corporation with its principal place of business at One Post Street, San Francisco, California 941041.  At all relevant times, McKesson was in the business of manufacturing, promoting, labeling, selling, marketing, packaging, re-packaging and distributing Xarelto® used by Plaintiffs.  Defendant does business throughout the United States and in the State of California and regularly and continuously did business within this judicial district including manufacturing, marketing, advertising, selling and

distributing Xarelto®.

18.   Defendants Janssen R & D, J&J, Ortho, Janssen, Bayer Corp, Bayer HC, Bayer Pharma and McKesson shall be referred to herein individually by name or jointly as "Defendants."

19.   At all times alleged herein, Defendants shall include any and all named or un-named parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

20.   At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein.

21.   At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants thereby  operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

22.   At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or introducing into interstate commerce throughout the United States, and in California, either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant pharmaceutical Xarelto®.

23.   This case is one that involves both a California Plaintiffs and two California defendants, therefore making California State Court the proper jurisdiction for this litigation.

## GENERAL ALLEGATIONS

24.   Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto® as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism

in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and or PE.

25.   Defendants applied for an initial NDA for Xarelto® in July of 2008.

26.   Xarelto® was approved by the Food and Drug Administration ("FDA") on July 1, 2011 reduces risk of blood clots, DVT, and PE following knee and hip replacement surgery.  On November 4, 2011 Xarelto was approved as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation  On November 2, 2012 the FDA expanded to the of Xarelto to the treatment of patients with DVT and PE as well as long-term treatment to prevent recurrence of the same.

27.   According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, "Xarelto® is the first and only once-a day prescription blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke – without routine blood monitoring."[1]

28.   As the Defendants state on their website, "XARELTO® has been proven to lower the chance of having a stroke if you have atrial fibrillation (AFib), not caused by a heart valve problem. XARELTO® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming."  The Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots" and that it "begins working a few hours after you start taking it, and keeps working for as long as take it."[2]

29.   Defendants further declare that "XARELTO® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots [from] happening again."[3]

---

[1] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833.pdf
[2] http://www.xarelto-us.com/how-xarelto-works
[3] http://www.xarelto-us.com/dvt-pe/treatment-of-dvt

30.  Defendants claim that patients with AFib, DVT, or PE taking Xarelto® do not need regular blood monitoring and there are no known dietary restrictions.  In addition, patients with AFib only need to take Xarelto® once a day with an evening meal.[1]

31.  Defendants claim that patients with AFib are 5 times more likely than a person without AFib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up." [2]

32.  Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex. It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi. Rivaroxaban does not inhibit thrombin (activated Factor II).

33.  Defendants routinely marketed Xarelto® as a "one size fits all" drug; In their fervent marketing of Xarelto, Defendants' misinformed patients, and their healthcare providers, as to the necessity to routinely monitor any patient requiring a blood thinning agent.  In essence, the Defendants have created a new drug, Xarelto®, that is not better than warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer.   The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignores patient safety.

34.  The Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

35.  Defendants' boxed warning  did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants state that in comparison to warfarin, patients taking Xarelto®

---

[1] http://www.xarelto-us.com/dvt-pe/xarelto-difference# and http://www.xarelto-us.com/how-xarelto-is-different
[2] http://www.xarelto-us.com/knowing-your-stroke-risk

have more gastrointestinal bleeds and need more transfusions.  In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label.[1]

36.   According to Institute for Safe Medication Practices, QuarterWatch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use "was not the well-understood risk of hemorrhage.  Instead, the largest identifiable category was serious blood-clot-related injury—most frequently pulmonary embolism—the very events rivaroxaban is intended to prevent." This lack of efficacy for short term users of Xarelto® post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

37.   FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®".[2]  However, this information was not portrayed in the warning section on the warning label.  The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and physicians prescribing Xarelto® without sufficient information to make an accurate decision.

38.   Defendants fervently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

39.   In the January/February 2013 issue of *WebMD* magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) to send an untitled letter stating that their print advertisement was "false or misleading because it minimizes the risks associated with Xarelto® and makes a misleading claim." Furthermore, the advertisement states "there are **no dosage adjustments**" in conflict with the product

---

[1] http://www.xareltohcp.com/reducing-stroke-risk/safety.html
[2] http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

labeling approved by the FDA.[1]

40.  As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012" resulting in large profits as Xarelto® costs approximately $3,000 a year versus $200 for generic warfarin.[2]

41.  As a result of Defendant's extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto®, more than three times as much as during the same period last year.[3]

42.  Due to the defective nature of Xarelto®, persons who were prescribed and ingested Xarelto®, for even a brief period of time, including the Plaintiffs herein, were at increased risk for developing life-threatening bleeds.  Due to the flawed formulation of Xarelto®, which according to Defendants does not require regular blood monitoring or frequent doctor follow-up, raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function.  In addition, "[p]rominent U.S. [cardiologists and health care professionals] stress that neither new drug [Xarelto] has a known antidote for a bleeding emergency, as warfarin does."[4]

43.  Defendants' pharmaceutical Xarelto led to 968 suspected undesirable side-effects including 72 cases of death in Germany in just the first eight months of 2013.[5]

44.  In addition, The Institute for Safe Medication Practices reported that:

---

[1] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833.pdf, June 6, 2013 FDA Untitled Warning Letter

[2] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living.*  14th June 2012.

[3] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

[4] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living.*  14th June 2012.

[5] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

A clinical trial with 14,000 patients had shown that rivaroxaban was no worse than warfarin. [40] But reviewers noted that warfarin had not been optimally used. If rivaroxaban were really inferior to optimally used warfarin—but this was not proven, only suspected—its use could lead to increased death and injury. [41] Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing. … As with other anticoagulants, the rate of clinically relevant bleeding in clinical studies was high—15% per year of treatment. [1]

In other words, the insufficient testing conducted and the deadly consequences of Xarelto® did not go unnoticed.

45. Even more significantly, in the first quarter of 2012, The Institute for Safe Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug. The report more than doubled from the previous quarter total of 128 cases."[2] However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[3] Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

46. Defendants concealed their knowledge that Xarelto® can cause life threatening, irreversible bleeds from the Plaintiffs, other consumers, the general public, and the medical community. Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto® in the "Warnings and Precautions" section of the products warning label. The only warnings provided by Defendants were as follows:

------------------------------WARNINGS AND PRECAUTIONS------------------------------
- Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)
- Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)
- Prosthetic heart valves: XARELTO use not recommended (5.8)

[1] Institute for Safe Medication Practices, QuarterWatch Report, October 3, 2012
[2] *Id.*
[3] *Id.*

Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

47.   As seen in the "Full Prescribing Information" provided by Defendants, Defendants reveal that they did not test for all the possible reversal agents for this dangerous drug since "[a] specific antidote for rivaroxaban is not available" and "[u]se of procoagulant reversal agents such as prothrombin complex concentrate (PCC), activated prothrombin complex concentrate (APCC), or recombinant factorVlla (rFVllA) may be considered but has not been evaluated in clinical trials." However, this is buried in small print.

48.   Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors know that Xarelto® can cause irreversible bleeds.  In fact, the August 2013 Highlights of Prescribing Information only has a "black box" warning stating the following:

> **WARNING: (A) PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS, and (B) SPINAL/EPIDURAL HEMATOMA**
> *See full prescribing information for complete boxed warning*
>
> **PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS**
> Premature discontinuation of any anticoagulant, including XARELTO, increases the risk of thrombotic events. To reduce this risk, consider coverage with another anticoagulant if XARELTO is discontinued for a reason other than pathological bleeding or completion of a course of therapy (2.2, 2.6, 5.1, 14.1).
>
> **SPINAL/EPIDURAL HEMATOMA**
> Epidural or spinal hematomas have occurred in patients treated with XARELTO who are receiving neuraxial anesthesia or undergoing spinal puncture. These hematomas may result in long-term or permanent paralysis (5.2, 5.3, 6.2).
>
> **Monitor patients frequently for signs and symptoms of neurological impairment and if observed, treat urgently. Consider the benefits and risks before neuraxial intervention in patients who are or who need to be anticoagulated (5.3).**

49.   Even in the "Warnings and Precautions" section of the August 2013 Highlights of Prescribing Information, the irreversible nature of the medication Xarelto® was not revealed to patients or their prescribing doctors.  Defendants merely indicated that there was a risk for bleeding

and side-stepped the important issue of reversing the effects of Xarelto® should a bleed occur as seen below:

------------------------------ **WARNINGS AND PRECAUTIONS** ------------------------------
- **Risk of bleeding**: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)
- **Pregnancy related hemorrhage**: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)
- **Prosthetic heart valves**: XARELTO use not recommended (5.8)

50.    Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto® to a patient.  In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto® should serious and fatal bleeding occur while a patient was taking Xarelto®.

51.    The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiffs herein.

52.    Even if the warnings were sufficient, which Plaintiffs strongly denies, Xarelto® still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug. Xarelto® is quite simply dangerous and defective as formulated.  The Defendants should withdraw Xarelto® from the market.

53.    Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto® to prevent any chances of their product's registrations being delayed or rejected by FDA.

54.    As the manufacturers and distributors of Xarelto®, Defendants knew or should have known that Xarelto® use was associated with irreversible bleeds.

55.    With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or

create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for AFib.

56.  Defendants' "Xarelto®…is estimated to be the 19th-best-selling drug in the world by 2018, according to the report. Worldwide sales of Xarelto® are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[1]

57.  While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto®, they continue to place American citizens at risk of severe bleeds and death.

58.  Consumers, including Plaintiffs who have used Xarelto® to reduce the risk of stroke due to Afib or to reduce the risk of blood clots, DVT and PE following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Xarelto® therapy.

59.  Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Plaintiffs' physicians the true and significant risks associated with Xarelto® use.

60.  As a result of Defendants' actions, Plaintiffs and Plaintiffs' physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiffs would be exposed to the risks identified in this Complaint.  The increased risks and subsequent medical damages associated with Plaintiffs' Xarelto® use were the direct and proximate result of Defendants' conduct.

## FACTUAL ALLEGATIONS

61.  On or around December 15, 2013, Ingesting Plaintiff Edward Davidson, was first prescribed and began taking Xarelto® upon direction of Plaintiff's physician for blood clotting. Subsequently, as a direct result of Edward Davidson's ingestion of Xarelto®, Edward Davidson suffered a gastrointestinal bleed and anemia and was admitted on or around February 5, 2015 to

[1]  http://www.drugwatch.com/2013/07/23/blood-thinner-growth-more-risk/

Cedars-Sinai Medical Center.

62.  As a direct result of being prescribed Xarelto® for this period of time, Plaintiffs have suffered significant injuries and/or death, such as those described above.

63.  As a proximate result of Defendants' acts and omissions, Plaintiffs suffered the injuries and death described hereinabove due to Plaintiffs ingestion of Xarelto®.   Plaintiffs accordingly seek damages associated with these injuries and death.

64.  As a direct and proximate result of the acts and omissions of Defendants, and each of them, Plaintiffs have incurred expenses for the funeral and burial of their deceased, respectively, the exact value and amount of which is presently unknown, but will be established according to proof.

65.  As a further direct and proximate result of the acts and omissions of Defendants, and each of them, Plaintiffs have been damaged in that each has been deprived of the care, comfort, society, protection, support, love, attention, and services of their deceased, respectively, all to damage in a sum according to proof at the time of trial and in excess of the minimum jurisdictional limit of this Court.

66.  As a further direct and proximate result of the acts and omissions of Defendants, and each of them, Plaintiffs have sustained and will in the future sustain loss of financial support from Plaintiffs' deceased, and the value of the services to Plaintiffs, the exact value and amount of which is presently unknown, but will be established according to proof.

67.  Plaintiffs would not have used Xarelto® had Defendants properly disclosed the risks associated with its use.

68.  **WHEREFORE**, Plaintiffs prays for judgment against Defendants, jointly and severally, in an amount, which will compensate the Plaintiffs.

<u>**CAUSE OF ACTION I:**</u>

**STRICT PRODUCTS LIABILITY**

69.  Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

70.  At all times relevant and material hereto, Defendants were engaged in the business of

designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals, including the Xarelto at issue in this lawsuit, for the sale to, and use by, members of the public.  The Xarelto® manufactured by Defendants reached Plaintiffs without substantial change and was ingested as directed.  The Xarelto® was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Plaintiffs.

71.  Defendants, as manufacturers and distributers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Xarelto® were inadequate.

72.  Plaintiffs did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Plaintiffs or to Plaintiffs' treating physicians.

73.  Defendants had a continuing duty to provide consumers, including Plaintiffs, and Plaintiffs' physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Xarelto®, as it became or could have become available to Defendants.

74.  Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Xarelto®, to health care providers empowered to prescribe and dispense Xarelto® to consumers, including Plaintiffs, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Xarelto®, which resulted in injury and death to Plaintiffs.

75.  Despite the f act that Defendants knew or should have known that Xarelto® caused unreasonable and dangerous side effects, they continued to promote and market Xarelto® without stating that there existed safer and more or equally effective alternative drug products and/or providing

adequate clinically relevant information and data.

76. Defendants knew or should have known that consumers, Plaintiffs specifically, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

77. Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Plaintiffs and to Plaintiffs' intermediary physicians, in the following ways:

    a. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiffs and Plaintiffs' physicians to the dangerous risks of Xarelto® including, among other things, irreversible bleeds;

    b. Defendants failed to provide adequate post-marketing warnings andinstructions after the Defendants knew or should have known of the significant risks of, among other things, irreversible bleeds;

    c. Defendants continued to aggressively promote and sell Xarelto®, even after they knew or should have known of the unreasonable risks of irreversible bleeds from this drug.

78. Defendants had an obligation to provide Plaintiffs and Plaintiffs' physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products.

79. By failing to provide Plaintiffs and Plaintiffs' physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

80. Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiffs and the general public.

81. As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiffs were exposed to Xarelto® and suffered the injuries and death and Plaintiffs suffered damages set forth hereinabove.

82. As to **Cause of action I- Strict Products Liability**, Plaintiffs reserve their rights to amend this cause of action.

<u>**CAUSE OF ACTOIN II:**</u>

**NEGLIGENCE (*Civ. Code § 1714*)**

83. Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

84. Defendants owed a duty to the general public, and specifically to the Plaintiffs, to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit. Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Plaintiffs during foreseeable use. Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Plaintiffs during foreseeable use.

85. Defendants breached their duty and were negligent in, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiffs:

    a. Failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to individuals when Xarelto® was being used for treatment;

    b. Failing to accompany their product with proper or adequate warnings, or labeling regarding adverse side effects and health risks associated with the use of Xarelto® and the comparative severity and duration of such adverse effects;

    c. In disseminating information to Plaintiffs and Plaintiffs' physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiffs;

    d. Failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e.  Failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f.  Failing to conduct adequate pre-clinical and clinical testing and post- marketing surveillance to determine the safety of Xarelto®;

g.  Failing to warn Plaintiffs, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiffs and other consumers;

h.  Failing to provide adequate training or information to medical care providers for appropriate use and handling of Xarelto® and patients taking Xarelto®;

i.  Failing to adequately test and/or warn about the use of Xarelto®, including, without limitations, the possible adverse side effects and health risks caused by the use of Xarelto®;

j.  Failing to design and/or manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k.  In designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant knew or should have known could cause injury to Plaintiffs;

l.  Failing to remove Xarelto® from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

m.  Failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

n.  Representing to physicians, including but not limited to Plaintiffs' prescribing physicians, that this drug was safe and effective for use.

86.  The Xarelto® that injured Plaintiffs was in substantially the same condition when Plaintiffs ingested it as it was in when it left the control of Defendants.  Defendants' Xarelto®'s ability to cause serious personal injuries and damages, such as those suffered by Plaintiffs, was not due to any voluntary action or contributory negligence of Plaintiffs.  Plaintiffs consumed the Xarelto® as directed and without change in its form or substance.

87.  Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Plaintiffs' injuries

and death and Plaintiffs' damages.

88.  Plaintiffs seek all damages to which Plaintiffs may be justly entitled.

89.  The Plaintiffs' injuries and damages are severe and permanent, and will continue into the future.  As a result, the Plaintiffs seek actual and punitive damages from the Defendants.

90.  As to **Cause of action II-Negligence**, Plaintiffs reserve their rights to amend this cause of action.

## CAUSE OF ACTION III:

## NEGLIGENCE- FAILURE TO WARN

91.  Plaintiffs  incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

92.  Xarelto® was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert patients and prescribing physicians of the dangerous risks and reactions associated with Xarelto®, including but not limited to the prevalence of irreversible bleeding, and other serious injuries and side effects despite the Defendant's knowledge of the increased risk of these injuries over other anticoagulation therapies available.

93. Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants knew or should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto® but failed to provide an adequate warning to patients and prescribing physicians of the product, knowing the product could cause serious injury and or death.

94.  Plaintiffs were prescribed and used Xarelto® for its intended purpose.

95.  Plaintiffs could not have known about the dangers and hazards presented by Xarelto®.

96.  The warnings that were given by the Defendants were not accurate, clear, compete, and/or were ambiguous.

97.  The warnings, or lack thereof,  that were given by the Defendants failed to properly warn prescribing physicians of the risk of irreversible bleeding and other serious injuries and side effects,

and failed to instruct prescribing physicians to test and monitor for the presence of the injuries for which Plaintiffs and others had been placed at risk.

98.  The warnings that were given by the Defendants failed to properly warn Plaintiffs and prescribing physicians of the prevalence of irreversible bleeds.

99.  The Plaintiffs, individually and through their prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.  The Defendants had a continuing duty to warn the Plaintiffs and prescribing physicians of the dangers associated with Xarelto®.  Had Plaintiffs received adequate warnings regarding the risks of Xarelto®, they would not have used Xarelto®.

100.  As a direct and proximate result of Xarelto®'s defective and inappropriate warnings, Plaintiffs have suffered severe physical injuries and damages as described above.

101.  As a direct and proximate result of the wrongful acts of the Defendants, Plaintiffs suffered severe and irreparable bodily injury; suffered great pain of body and mind; suffered great embarrassment and humiliation; Plaintiffs suffered and will continue to suffer permanent impairment to Plaintiffs' financial support; incurred expenses for medical treatment of Plaintiffs' injuries; incurred expenses for Plaintiffs' funeral and burial expenses; suffered and will continue to suffer the loss of enjoyment of life and have been otherwise damaged to be further shown by the evidence.

102.  For the above reasons, the Defendants are strictly liable under Pennsylvania and/or Texas product liability law without regard to proof of negligence or gross negligence

103.  As to **Cause of action III-Negligence- Failure to Warn**, Plaintiffs reserve their rights to amend this cause of action.

## CAUSE OF ACTION  IV

## NEGLIGENT MISREPRESENTATION

104.  Plaintiffs  incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

105.  Defendants owed a duty to the general public, and specifically to the Plaintiffs, to not

introduce a drug into the market, or continue a previous tender of a drug, including the Xarelto® at issue in this lawsuit, that was unreasonably dangerous for any person to use it and was capable of causing serious personal injuries such as those suffered by Plaintiffs during foreseeable use.

106. Defendants breached their duty of care and were negligent by, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiffs:

a. Failing to exercise reasonable and ordinary care in that the drug Xarelto® was so unreasonably dangerous and defective in design that it never should have been on the market or taken by anyone;

b. Failing to exercise reasonable and ordinary care in the design, research, development, manufacture, sale, testing and or distribution of the drug Xarelto®.

c. Tendering into the market a drug which Defendants knew or should have known was so dangerous that it shouldn't have been taken by anyone.

d. Violating its duty of care in design by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

e. Violating its duty of care in design in marketing by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

f. Violating its duty of care in design by placing an unsuitable product into the market for public consumption.

107. The Xarelto® that injured Plaintiffs was in substantially the same condition when Plaintiffs ingested it as it was in when it left the control of Defendants. Xarelto®'s ability to cause serious personal injuries and damages such as those suffered by Plaintiffs was not due to any voluntary action or contributory negligence of Plaintiffs. Plaintiffs consumed the Xarelto® as directed and without change in its form or substance.

108. Defendants' violation of its duty of care resulted in an untenably dangerous product being placed into the marketplace which was a proximate cause of Plaintiffs' injuries and death.

109. Plaintiffs seek all damages to which Plaintiffs may be justly entitled.

110. The Plaintiffs' injuries and damages are severe and permanent, and will continue into the

future.  As a result, the Plaintiffs seek actual and punitive damages from the Defendants.

111.  As to **Cause of action IV- NEGLIGENT MISREPRESENTATION**, Plaintiffs reserve their rights to amend this cause of action.

<u>**CAUSE OF ACTION V**</u>

**EXPRESS BREACH OF WARRANTY**

112.  Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

113.  Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, healthcare professionals and consumers, including Plaintiffs, or persons responsible for consumers.

114.  Xarelto® materially failed to conform to those representations made by Defendants in package inserts, and otherwise, concerning the properties and effects of Xarelto®, respectively manufactured and/or distributed and sold by Defendants, and which Plaintiffs purchased and ingested in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiffs concerning Xarelto® sold to Plaintiffs.

115.  As a direct, foreseeable, and proximate result of Defendants' breaches of express warranties, Plaintiffs suffered grievous bodily injury and death and Plaintiffs suffered consequent economic and other loss, as described above, when Plaintiffs' physician, in reasonable reliance upon such express warranties, prescribed for Plaintiffs the use of Xarelto®.  Plaintiffs purchased and ingested Xarelto® as prescribed and instructed by Plaintiffs' physician, leading to Plaintiffs injuries and death.

116.  The Plaintiffs injuries and damages are severe and permanent, and will continue into the future.  As a result, the Plaintiffs seek actual and punitive damages from the Defendants.

117.  As to **Cause of action V- Express Breach of Warranty**, Plaintiffs reserve their rights to amend this cause of action.

## CAUSE OF ACTION VI

## BREACH OF WARRANTY – BREACH OF IMPLIED WARRANTY

118.  Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

119.  Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Plaintiffs, or persons responsible for consumer.

120.  Defendants impliedly warranted their Xarelto® product, which they manufactured and/or distributed and sold, and which Plaintiffs purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

121.  Defendants breached their implied warranties of the Xarelto® product sold to Plaintiffs because this product was not fit for its common, ordinary, and intended use.

122.  As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Plaintiffs suffered grievous bodily injury and death and Plaintiffs suffered consequential economic and other losses, as described above, when Plaintiffs ingested Xarelto®, in reasonable reliance upon the implied warranties, leading to Plaintiffs' injuries and death.

123.  The Plaintiffs' injuries and damages are severe and permanent, and will continue into the future.  As a result, the Plaintiffs seek actual and punitive damages from the Defendants.

124.  As to **Cause of action VI- Breach of Warranty, Breach of Implied Warranty**, Plaintiffs reserve their rights to amend this cause of action.

## CAUSE OF ACTION VII

## FRAUD

---

COMPLAINT FOR DAMAGES; JURY TRIAL DEMAND

125.  Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

126.  Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto® described herein, owed a duty to provide accurate and complete information regarding these products.

127.  The Defendants knew or should have known, that Xarelto® was unreasonably dangerous and defective, and caused serious, at times fatal, irreversible bleeds.

128.  Despite their knowledge, the Defendants omitted material facts in the disclosures they made to the public, the medical community and to consumers, including the Plaintiffs and prescribing physicians, concerning the use and safety of Xarelto®.

129.  The Defendants made untrue, deceptive, and/or misleading representations of material facts, and omitted and/or concealed material facts from the public, including the Plaintiffs and prescribing physicians, concerning the use and safety of Xarelto®.

130.  The Defendants' practices relating to their promotion of Xarelto® created and/or reinforced a false impression as to its safety.

131.  The Defendants' practice of promoting Xarelto® placed and continues to place all consumers of Xarelto® at risk for serious injury resulting from its potentially lethal side effects.

132.  The Defendants' statements and omissions were made with the intent that the Plaintiffs, and Plaintiffs' prescribing physician, would rely on them.

133.  The Plaintiffs purchased and used Xarelto® for personal, family or household purposes and suffered ascertainable losses of money as a result of the Defendants' use or employment of the methods, acts, or practices.

134.  As a direct and proximate result of the Defendants' acts of fraud, the Plaintiffs suffered irreparable injuries and death.

135.  Plaintiffs endured substantial pain and suffering.  As a result, the Plaintiffs have incurred

significant expenses for medical care and Plaintiffs will continue to be economically and emotionally harmed in the future.

136.  The Plaintiffs' injuries and damages are severe and permanent, and will continue into the future.  As a result, the Plaintiffs seek actual and punitive damages from the Defendants.

137.  As to **Cause of action VII-Fraud,** Plaintiffs reserve their rights to amend this cause of action.

## CAUSE OF ACTION VIII

### VIOLATIONS OF CAL. BUS. & PROF. CODE §17200
PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-100, AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR VIOLATIONS OF THE BUSINESS & PROFESSIONS CODE §17200 ALLEGE AS FOLLOWS:

138.  Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

139.  California Business & Professions Code§ 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising".

140.  The acts and practices described above were and are likely to mislead the general public and therefore constitute unfair business practices within the meaning of California Business & Professions Code§ 17200. The acts of untrue and misleading advertising set forth in presiding paragraphs are incorporated by reference and are, by definition, violations of California Business & Professions Code§ 17200. This conduct is set forth fully herein, and includes, but is not limited to:

    a.  Representing that Xarelto® is safe, fit, and effective for human use, knowing that said representations were false, and concealing that Xarelto® products had a serious propensity to cause injuries to users;

    b.  Purposely downplaying and understating the health hazards and risks associated with Xarelto®.

    c.  Issuing promotional literature and commercials deceiving potential users of Xarelto® by relaying positive information, including testimonials from satisfied users, and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects and concealing material relevant

information regarding the safety and efficacy of Xarelto®.

  d.  Engaging in a practice undertaking unlawful, unfair or fraudulent acts by refraining from taking any action that would provide prescribing physicians with appropriate information and protect patients who use their products, including Plaintiffs, such as failing to engage in proper pharmacovigilance, signal detection and follow up, review of the literature, regulatory review, updating labels and timely and properly implementing label changes and conducting proper research, tests and studies to ensure the continued safety of their products, and taking appropriate action to disseminate to prescribing physicians and healthcare providers appropriate and permitted product information and labels concerning safety issues and safe prescribing practices for their products.

141.  These practices constitute unlawful, unfair and fraudulent business acts or practices, within the meaning of California Business & Professions Code § 17200.

142.  The unlawful, unfair and fraudulent business practices of Defendants described above present a continuing threat to members of the public in that Defendants continue to engage in the conduct described therein.

143.  As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of millions of dollars in ill-gotten gains from the sale and prescription of Defendants' Xarelto® products in California, sold in large part as a result of the acts and omissions described herein.

144.  Plaintiffs, pursuant to California Business & Professions Code§ 17203, seeks an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

  **WHEREFORE**, said Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## <u>CAUSE OF ACTION IX</u>

### VIOLATIONS OF BUS. & PROF. CODE § 17500
PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-100, AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR VIOLATIONS OF THE BUSINESS & PROFESSIONS CODE §17500 ALLEGE AS FOLLOWS:

145.  Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if

fully set forth herein and further allege as follows:

146. Said Plaintiffs brings this cause of action pursuant to California Business & Professions Code § 17500.

147. California Business & Professions Code§ 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

148. At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Business & Professions Code§ 17500 by engaging in the following acts and practices with intent to induce members of the public to purchase and use Defendants' Xarelto® product:

    a. Representing that Xarelto® is safe, fit, and effective for human use, knowing that said representations were false, and concealing that Xarelto® products had a serious propensity to cause injuries to users;

    b. Purposely downplaying and understating the health hazards and risks associated with Xarelto®.

    c. Issuing promotional literature and commercials deceiving potential users of Xarelto® by relaying positive information, including testimonials from satisfied users, and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects and concealing material relevant information regarding the safety and efficacy of Xarelto®.

    d. Engaging in a practice undertaking unlawful, unfair or fraudulent acts by refraining from taking any action that would provide prescribing physicians with appropriate information and protect patients who use their products, including Plaintiffs, such as failing to engage in proper pharmacovigilance, signal detection and follow up, review of the literature, regulatory review, updating labels and timely and properly implementing label changes and conducting proper research, tests and studies to ensure the continued safety of their products, and taking appropriate action to disseminate to prescribing physicians and healthcare providers appropriate and permitted product information and labels concerning safety issues and safe prescribing practices for their products.

149. The foregoing practices constitute false and misleading advertising within the meaning of

California Business & Professions Code§ 17500.

150.  The acts of untrue and misleading statements by Defendants described herein above present a continuing threat to members of the public in that the acts alleged herein are continuous and ongoing, and the public will continue to suffer the harm alleged herein.

151.  As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of millions of dollars in ill-gotten gains from the sale and prescription of the Xarelto® in California, sold in large part as a result of the acts and omissions described herein.

152.  Pursuant to California Business & Professions Code § 17535, Plaintiffs seeks an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

153.  Said Plaintiffs seeks restitution of the monies collected by Defendants, and each of them, and other injunctive relief to cease such false and misleading advertising in the future.

**WHEREFORE**, said Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## <u>CAUSE OF ACTION X</u>

### VIOLATIONS OF CAL. CIV. CODE § 1750
PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-100, AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR VIOLATIONS OF CAL. CIVIL CODE §1750 ALLEGE AS FOLLOWS:

154.  Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

155.  Said Plaintiffs is informed and believes and thereon alleges that Defendants, and each of them, by the acts and misconduct alleged herein, violated the Consumers Legal Remedies Act, California Civil Code §§ 1750 et. seq. ("CLRA").

156.  Said Plaintiffs hereby seeks injunctive relief as appropriate against Defendants, and each of them, for their violations of California Civil Code§§ 1750 et. seq. The CLRA applies to Defendants' actions and conduct described herein because it extends to transactions which are intended to result, or

which have resulted, in the sale of goods to consumers.

157.  Plaintiffs are a "consumer" within the meaning of California Civil Code § 176l(d).

158.  Defendants have violated, and continue to violate, the CLRA in representing that goods have characteristics and benefits which they do not have, in violation of California Civil Code § 1770(a)(5).

159.  At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Civil Code § 1770, by engaging in the following acts and practices with intent to induce members of the public to purchase and use Xarelto® :

a.  Representing that Xarelto® is safe, fit, and effective for human use, knowing that said representations were false, and concealing that Xarelto® products had a serious propensity to cause injuries to users;

b.  Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that Xarelto® is safer than other hormonal contraceptives, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true;

c.  Purposely downplaying and understating the health hazards and risks associated with Xarelto®

d.  Issuing promotional literature and commercials deceiving potential users of Xarelto® by relaying positive information, including testimonials from satisfied users, and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects and concealing material relevant information regarding the safety and efficacy of Xarelto®

e.  Engaging in a practice undertaking unlawful, unfair or fraudulent acts by refraining from taking any action that would provide prescribing physicians with appropriate information and protect patients who use their products, including Plaintiffs, such as failing to engage in proper pharmacovigilance, signal detection and follow up, review of the literature, regulatory review, updating labels and timely and properly implementing label changes and conducting proper research, tests and studies to ensure the continued safety of their products, and taking appropriate action to disseminate to prescribing physicians and healthcare providers appropriate and permitted product information and labels concerning safety issues and safe prescribing practices for their products.

The foregoing practices constitute false and misleading advertising and representations within the meaning of California Civil Code § 1770. The acts of untrue and misleading statements by

Defendants described herein present a continuing threat to members of the public and individual consumers in that the acts alleged herein are continuous and ongoing, and the public and individual consumers will continue to suffer harm as alleged herein. Unless Defendants are enjoined from continuing to engage in these violations of the CLRA, Plaintiffs will continue to be harmed by the wrongful actions and conduct of Defendants. Pursuant to California Civil Code § 1780, said Plaintiffs seeks an order of this court for injunctive relief calling for Defendants, and each of them, to cease such deceptive business practices in the future.

## CAUSE OF ACTION XI

### DAMAGES- COMPENSATORY AND PUNITIVE

160.  Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows:

161.  Plaintiffs are entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety.  Defendants mislead both the medical community and the public at large, including Plaintiffs and Plaintiffs' physicians, by making false representation about and concealing pertinent information regarding Xarelto®.  Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Xarelto® despite information demonstration the product was unreasonably dangerous.

162.  As a proximate result of Defendants' acts and omissions, Plaintiffs suffered various injuries as listed above and/or death, all resulting from Plaintiffs' ingestion of Xarelto®.

163.  As a result of Plaintiffs injuries, the Plaintiffs have endured substantial pain and suffering; have incurred significant expenses for medical care, and Plaintiffs will remain economically challenged and emotionally harmed.

164.  Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been emotionally and economically injured.

165.  Defendants' actions were performed willfully, intentionally, and with reckless disregard

for the rights of Plaintiffs and the public.

166. Plaintiffs' injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiffs seek actual and punitive damages from the Defendants.

167. Defendants' conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including the Plaintiffs, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

168. As to **Cause of action XI- Damages, Compensatory and Punitive**, Plaintiffs reserve their rights to amend this cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief against Defendants as follows:

1. For judgment for damages sufficient to compensate for damages, including but not limited to past, present, and future economic expenditures in connection with the injuries sustained by Plaintiffs as a result of ingesting Defendants' Xarelto® drug product;

2. For compensatory damages according to proof, including lost wages, pain, suffering and mental anguish;

3. Physical pain and suffering of the Plaintiffs; and any and all damages allowed under the law and laws or other statues and laws that apply and for loss of consortium;

4. Wrongful death damages pursuant to *Code of Civil Procedure* §§ 377.60 and 377.61, and according to proof at the time of trial;

5. For punitive damages, in an amount to be awarded as provided by law;

6. For reasonable costs, including attorney's fees as permitted by law; and

7. For all other just and proper relief.

Dated: February 3, 2017                    RESPECTFULLY SUBMITTED,

By: _____

Lee Jackson (SBN216970)
ljackson@majfw.com
Jonathan Staffeldt (SBN 252326)
jstaffeldt@majfw.com
**MILSTEIN ADELMAN JACKSON**
**FAIRCHILD & WADE, LLP**
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Telephone: (310) 396-9600
Facsimile: (310) 396-9635
*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a jury trial of all issues presented in this Complaint.

Dated: February 3, 2017                    RESPECTFULLY SUBMITTED,

By: _____
Lee Jackson (SBN216970)
ljackson@majfw.com
Jonathan Staffeldt (SBN 252326)
jstaffeldt@majfw.com
**MILSTEIN ADELMAN JACKSON**
**FAIRCHILD & WADE, LLP**
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Telephone: (310) 396-9600
Facsimile: (310) 396-9635
*Attorneys for Plaintiffs*