08:47:55

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3    ***********************************************************

     IN RE:  XARELTO (RIVAROXABAN)
4    PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                          Section "L"
5                                         New Orleans, Louisiana
     THIS DOCUMENT RELATES TO:            Monday, April 24, 2017
6    Joseph J. Boudreaux, Jr.
     v. Janssen Research &
7    Development, et. al.,
     Case No. 14-CV-2720
8

9    ***********************************************************

10                  TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
11                   UNITED STATES DISTRICT JUDGE
                     VOLUME I - MORNING SESSION
12

13   APPEARANCES:

14   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:              LEVIN PAPANTONIO
15                                 BRIAN H. BARR, ESQ.
                                   316 Baylen Street, Suite 600
16                                 Pensacola, FL 32502

17                                 BEASLEY ALLEN
                                   BY:  ANDY BIRCHFIELD, ESQ.
18                                 P.O. Box 4160
                                   Montgomery, AL 36103
19
                                   GAINSBURGH BENJAMIN DAVID
20                                 MEUNIER & WARSHAUER
                                   BY:  GERALD E. MEUNIER, ESQ.
21                                 2800 Energy Centre
                                   1100 Poydras Street
22                                 New Orleans, LA 70163

23                                 SCHLICHTER, BOGARD & DENTON
                                   BY:  ROGER C. DENTON, ESQ.
24                                 100 South 4th Street
                                   Saint Louis, MO 63102
25
```

```
 1                                    LAMBERT FIRM
                                      BY:  EMILY JEFFCOTT, ESQ.
 2                                    701 Magazine Street
                                      New Orleans, Louisiana 70130
 3

 4       FOR THE DEFENDANT BAYER
         HEALTHCARE PHARMACEUTICALS
 5       INC. and BAYER PHARMA AG:     WILKINSON WALSH & ESKOVITZ, LLP
                                       BY:  BETH A. WILKINSON, ESQ.
 6                                     1900 M Street NW, Suite 800
                                       Washington, DC 20036
 7
                                       Nelson Mullins Riley
 8                                     & Scarborough, LLP
                                       BY:  DAVID E. DUKES, ESQ.
 9                                     Meridian, 17th Floor
                                       1320 Main Street
10                                     Columbia, SC 29201

11

12       FOR JANSSEN PHARMACEUTICALS,
         INC. AND JANSSEN RESEARCH &
         DEVELOPMENT, LLC:             BARRASSO USDIN KUPPERMAN FREEMAN
13                                     & SARVER, LLC
                                       BY:  RICHARD E. SARVER, ESQ.
14                                     909 Poydras Street, 24th Floor
                                       New Orleans, LA 70112
15

16
         Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
17                                     500 Poydras Street, B-275
                                       New Orleans, Louisiana 70130
18                                     (504) 589-7776

19
            Proceedings recorded by mechanical stenography, transcript
20       produced by computer.

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>.

(MONDAY, APRIL 24, 2017)

(MORNING SESSION)

08:48:22   5    (OPEN COURT.)

08:48:22   6        THE COURT:  Be seated, please.  Good morning, ladies and

08:48:26   7   gentlemen.

08:48:30   8        THE DEPUTY CLERK:  Shall I call the case?

08:48:32   9        THE COURT:  Let's call the case, please.

08:48:33 10        THE DEPUTY CLERK:  This is MDL No. 2952, *In Re:  Xarelto*

08:48:36 11 *Products Liability Litigation*, and this is in reference to Case

08:48:39 12 No. 14-2720, *Joseph J. Boudreaux, Jr., et al v. Janssen Research*

08:48:46 13 *and Development, LLC, et al.*

08:48:49 14        THE COURT:  Counsel make their appearance for the record,

08:48:51 15 please, and indicate whether you're ready to proceed.

08:48:53 16        MR. BIRCHFIELD:  Andy Birchfield for the plaintiffs.

08:48:55 17 We're ready, your Honor.

08:48:55 18        MR. MEUNIER:  Jerry Meunier for the plaintiffs.

08:48:58 19        MR. BARR:  Brian Barr for the plaintiffs, your Honor.

08:49:00 20        MR. DENTON:  And Roger Denton, good morning, your Honor,

08:49:02 21 for the plaintiffs.

08:49:03 22        MS. WILKINSON:  Good morning, your Honor.  Beth Wilkinson

08:49:04 23 for the defendants.  We are ready.

08:49:07 24        MR. DUKES:  David Dukes for the defendants.

08:49:10 25        MR. SARVER:  Good morning, your Honor, Richard Sarver for

08:49:13  1    the defendants.

08:49:14  2             THE COURT:  Ladies and gentlemen.  My name is Eldon

08:49:17  3    Fallon and I am the judge who will preside over this case.  I first

08:49:22  4    want to -- before I tell you about the case, I want to welcome each

08:49:25  5    of you to the federal court.  I know and all of the attorneys know

08:49:29  6    that you would like to be probably some other place.  You have

08:49:33  7    things to do, families to be with, friends to visit, jobs to have.

08:49:42  8             But I remind you that our country is the oldest republic

08:49:49  9    on the face of the earth, and one of the reasons is that our juries

08:49:55 10    participate very much in the governing process.  You make the

08:49:59 11    judicial branch work.  The judicial branch is one of three branches

08:50:05 12    of your government.  So some in our society -- some citizens serve

08:50:10 13    in the military.  That's very important to us.  But equally

08:50:14 14    important is your service as a juror.  I recognize that and I thank

08:50:19 15    you for coming to Court.

08:50:22 16             Ladies and gentlemen, this is a civil case.  The

08:50:26 17    plaintiffs who have brought this suit, Mr. Joseph J. Boudreaux,

08:50:31 18    Jr., and his wife, Loretta Boudreaux who live in Lockport,

08:50:36 19    Louisiana.  The defendants, the parties sued by the plaintiffs, are

08:50:40 20    Janssen Research and Development, LLC, Janssen Pharmaceuticals,

08:50:46 21    Inc., Bayer Healthcare Pharmaceuticals, Inc., and Bayer Pharma AG.

08:50:53 22             The Bayer and Janssen defendants manufacture a medicine

08:50:58 23    called Xarelto.  Xarelto is on the market today and has been on the

08:51:03 24    market since 2011.  Xarelto is a prescription anticoagulant,

08:51:11 25    sometimes called a blood thinner, that is used to reduce the risk

08:51:18   1   of stroke in people with atrial fibrillation, which is a heart

08:51:21   2   problem.  The lawsuit is based upon injuries that Mr. Boudreaux

08:51:25   3   claims to have sustained due to inadequate warnings and

08:51:29   4   instructions on the drug's label.

08:51:33   5          In January of 2014, Mr. Boudreaux was hospitalized with

08:51:39   6   heart problems diagnosed as atrial fibrillation and congestive

08:51:45   7   heart failure.  Atrial fibrillation, or you'll hear "AFib" it's

08:51:49   8   sometimes called, is a condition that can result in blood clots

08:51:53   9   forming in your heart that can travel to your brain and cause a

08:51:58  10   stroke.  Because of his AFib diagnosis, Mr. Boudreaux's doctor gave

08:52:04  11   him a prescription for Xarelto.

08:52:07  12          In February of 2014, Mr. Boudreaux was hospitalized

08:52:13  13   again.  This time for anemia associated with a gastrointestinal,

08:52:20  14   GI, bleed.  The plaintiffs claim that because Xarelto was sold with

08:52:24  15   inadequate warnings and instructions to physicians, this caused

08:52:29  16   Mr. Boudreaux's GI bleed.  The plaintiffs claim this GI bleed was

08:52:34  17   preventable and there were -- had there been adequate warnings and

08:52:39  18   instructions provided with the drug.  The defendants deny the

08:52:44  19   allegations and claim that Xarelto's label adequately warned about

08:52:49  20   the risks of Xarelto.  This raises a question of fact which must be

08:52:55  21   resolved by a jury.

08:52:57  22          Each of the parties in this case has a right to have a --

08:53:02  23   its case tried by a qualified, fair, and impartial jury.  A

08:53:06  24   qualified and impartial jury is one which is responsible and

08:53:12  25   capable and which will hear and decide the issues to be tried

objectively, and one which will render its verdict based solely on the evidence presented at this trial and the law applicable to the case as given to you by the Court.

It is the law, ladies and gentlemen, that a juror's qualifications or impartiality may not be assumed without some inquiry. This inquiry, which is about to be made, is known as the voir dire examination. It is a time-honored process by which the qualifications and impartiality of perspective jurors may be determined. Its purpose and its only purpose is to develop the whole truth concerning the competency of each prospective juror, his or her frame of mind, and ability to do his or sworn duty in accordance with the juror's oath.

The answers to the questions to be put to you by the Court will not only enable the Court to determine whether any of you should be excused for cause, either on the Court's own motion or when challenged for cause by any party, but will allow counsel for the parties to make intelligent use of preempt -- or preemptory challenges. This is a challenge which the law gives each party that may be used without stating any reason for it, as long as it is a legal reason.

You should understand, therefore, that it is expected of each of you that your answers to the questions propounded shall be complete and truthful. Each juror is under a compulsion to disclose upon a general question any matters which might tend to disqualify him or her for any reason from sitting on this case. I

08:55:05  1   remind you that false and misleading answers may well result in the

08:55:08  2   seating of a juror who might have been stricken for cause or

08:55:14  3   discharged by the Court.

08:55:16  4        Now, in this case, you have previously answered rather

08:55:20  5   extensive jury interrogatories.  All of us in this courtroom

08:55:25  6   appreciates that.  I have reviewed the interrogatories and the

08:55:30  7   attorneys have also reviewed them.  They and I thank you for the

08:55:35  8   time and the effort that you expended in answering the

08:55:40  9   questionnaire.  This was very helpful and will greatly assist the

08:55:45 10   Court and counsel in making the voir dire process shorter so that

08:55:49 11   we can move on to the trial.

08:55:53 12        I just have a few questions to ask you.  And if you

08:55:57 13   should answer any of the following questions yes, please raise your

08:56:02 14   hand, state your number and name, and I will discuss it further

08:56:07 15   with you.  I require that your answers be given under oath, so at

08:56:12 16   this time I'll direct my courtroom deputy to administer the oath to

08:56:15 17   you.

08:56:16 18        THE DEPUTY CLERK:  Members of the jury, would you please

08:56:18 19   rise and raise your right hands.

08:56:21 20     (WHEREUPON, THE JURY PANEL WAS SWORN IN.)

08:56:41 21        THE DEPUTY CLERK:  Please have a seat.

08:56:45 22        THE COURT:  Ladies and gentlemen, first, as I have said

08:56:48 23   before, this is a civil law case.  In a civil law case, the

08:56:53 24   plaintiff has the burden of proving his case by what is called a

08:56:57 25   preponderance of the evidence.  That means the plaintiff has to

08:57:05  1    produce evidence which, considered in the light of all of the

08:57:07  2    facts, leads you, the jury, to believe that what he claims is more

08:57:13  3    likely true than not true.  If the plaintiff fails to meet this

08:57:19  4    burden, the verdict must be for the defendant.

08:57:22  5         Those of you who have sat on criminal cases will have

08:57:26  6    heard proof beyond a reasonable doubt.  That requirement does not

08:57:31  7    apply in a civil case, and you should, therefore, put it out of

08:57:35  8    your mind.  Is there anyone who is unwilling or unable to follow

08:57:40  9    this time honored rule of law?

08:57:43 10         Would you be unable to or unwilling to firmly put aside

08:57:49 11    any feelings of sympathy or compassion for the plaintiff or the

08:57:54 12    defendant and decide this case solely on the merits and according

08:57:59 13    to the law that I will explain to you?

08:58:03 14         I'll let counsel stand up and introduce themselves.  I

08:58:06 15    went through that in the questionnaire, but seeing them might be

08:58:11 16    another issue.  So please, for the plaintiff.

08:58:14 17         MR. BIRCHFIELD:  Yes, your Honor.  Andy Birchfield on

08:58:16 18    behalf of the plaintiff.  Your Honor, would you like for me to

08:58:21 19    introduce the Boudreauxes?

08:58:22 20         THE COURT:  Sure.

08:58:23 21         MR. BIRCHFIELD:  We represent Mr. Johnny Boudreaux and

08:58:26 22    his wife Loretta Boudreaux who are seated right here.

08:58:29 23         THE COURT:  Would you stand Mr. and Mrs. Boudreaux,

08:58:31 24    please.  My question to you:  Looking at these individuals, do you

08:58:36 25    know any of them, have they represented you, have you heard of

08:58:40  1   them?

08:58:42  2          Be seated, please.  How about the other plaintiff

08:58:45  3   lawyers?

08:58:46  4          MR. MEUNIER:  Good morning.  I'm Jerry Meunier with the

08:58:50  5   law firm of Gainsburgh, Benjamin, David, Meunier & Warshauer in New

08:58:54  6   Orleans representing the Boudreauxes.

08:58:55  7          MR. BARR:  Good morning.  My name is Brian Barr also on

08:58:58  8   behalf of the Boudreauxes.

08:59:00  9          MR. DENTON:  Good morning, all.  My name is Roger Denton

08:59:03 10   also on behalf of the Boudreauxes.

08:59:05 11          THE COURT:  My question to you:  Do you know any of these

08:59:07 12   folks?  You've looked at them now, do you recognize any of them?

08:59:12 13          MR. BIRCHFIELD:  Your Honor, if I may, Emily Jeffcott is

08:59:15 14   also a member of the trial team, but she is meeting with a witness

08:59:19 15   that we expect this afternoon.  But Emily Jeffcott is a lawyer on

08:59:23 16   the trial team.  She is a lawyer here in New Orleans.

08:59:25 17          THE COURT:  Does that name ring any bell to you?

08:59:28 18          All right.  How about from the defendants?

08:59:30 19          MS. WILKINSON:  Good morning.  I am Beth Wilkinson from

08:59:33 20   Wilkinson Walsh on I am here on behalf of Bayer and Janssen.

08:59:37 21          MR. DUKES:  Good morning.  I am David Dukes from Nelson

08:59:39 22   Mullins firm here on behalf of the defendants.

08:59:42 23          MR. SARVER:  Good morning.  I am Richard Sarver from

08:59:45 24   Barrasso, Usdin, Kupperman, Freeman & Sarver here in New Orleans.

08:59:48 25   Good morning.

08:59:48  1          THE COURT:  Anyone know any of these individuals?

08:59:57  2          Do we have a Bayer representative here?

09:00:00  3          MS. WILKINSON:  We don't, your Honor.

09:00:02  4          THE COURT:  All right.  I've asked you this on the

09:00:08  5     questionnaire, but I'll do it again.  Does anyone feel any

09:00:12  6     prejudice against someone coming to Court seeking monetary damages?

09:00:16  7     You know, back in biblical days we heard of an eye for an eye and a

09:00:22  8     tooth for tooth, but society has found that that simply makes a lot

09:00:25  9     of toothless and blind people in the world, so we don't do that

09:00:28 10     anymore.  This is a civilized way of handling disputes.  We don't

09:00:34 11     go out in the street and fight.  We bring it to a court with a jury

09:00:38 12     deciding our fate.  Anybody have any problem with that?

09:00:43 13          Anybody presently taking any medication which will in any

09:00:48 14     way interfere with your hearing, seeing, understanding the case

09:00:53 15     here today?

09:00:56 16          Now, if you were one of the parties in the case -- if you

09:00:59 17     were one of the parties in the case, whether it's defendant or

09:01:02 18     plaintiff, do you know of any reason why you would not be

09:01:06 19     comfortable having someone on the case, try the case in the jury?

09:01:14 20     If you would swap positions with them, do you know of any reason

09:01:17 21     why you would feel that you wouldn't want anybody with your frame

09:01:20 22     of mind sitting in the jury?

09:01:24 23          Do you know anything about this case, ladies and

09:01:27 24     gentlemen?  Read anything about it in the paper?  Heard anything

09:01:30 25     about it?  Anyone talked to you about this case other than me at

09:01:34  1    this point?

09:01:37  2            Have any of the answers which you've given in the

09:01:40  3    questionnaire changed in any way?

09:01:45  4            Do you know any other juror looking around the courtroom?

09:01:53  5    Do you know anybody, see anybody that you know?

09:01:57  6            I tried some cases in Texas recently and I asked that

09:02:03  7    question and everybody put up their hand.  Everybody knew

09:02:06  8    everybody.  It's a small town in Texas, so it wasn't unusual.

09:02:11  9            Anyone have anything else on their mind that ought to be

09:02:15 10    brought to the Court's attention, either at the bench here or in

09:02:18 11    open court?

09:02:21 12            As you know from the questionnaire, this case is expected

09:02:25 13    to last about two weeks, maybe three weeks.  Each of you have

09:02:30 14    indicated that you would be able to serve as a juror for that

09:02:34 15    length of time.  Now, our schedule will be as follows:  We'll start

09:02:37 16    about 8:30 or nine o'clock in the morning.  We will recess at 5:00

09:02:43 17    or 5:30.  We will take a 15-minute recess before noon, we'll take

09:02:48 18    another one after noon, and we'll take a break between 12:00, 12:30

09:02:53 19    for about an hour, hour-and-a-half.

09:02:59 20            I'll ask each of you at this point, starting with Juror

09:03:03 21    No. 1, to stand up and give us your name, what parish you live in,

09:03:08 22    where you work, and a little bit about your duties and

09:03:12 23    responsibilities on a day-to-day basis.

09:03:16 24            THE JUROR:  Juror 1, Jay Fullerton.  Tangipahoa Parish.

09:03:33 25    Currently unemployed.  Hopefully that'll change soon.

09:03:38  1                THE COURT:  What did you do before then, sir?

09:03:40  2                THE JUROR:  Before that, I was an industrial steel sales

09:03:44  3    manager for Quality Iron of Louisiana, which recently closed here.

09:03:51  4    So basically, I was responsible for sales of structural steel

09:03:56  5    erection and things like that going into all sorts of plants.

09:04:00  6                THE COURT:  Are you married, widowed, divorced?

09:04:04  7                THE JUROR:  Married, three children.  Youngest two are

09:04:07  8    deceased.  Just me and my wife home now.

09:04:12  9                THE COURT:  Does your spouse work outside -- does she

09:04:14 10    work outside of the home?

09:04:15 11                THE JUROR:  She works outside of the home.  Sterling

09:04:18 12    Properties as a property asset manager.

09:04:20 13                THE COURT:  Okay.  Thank you very much.

09:04:22 14                THE JUROR:  You're welcome.

09:04:23 15                THE COURT:  Yes, sir.

09:04:24 16                THE JUROR:  Juror No. 2, Willie Mackey, III.  Reside in

09:04:31 17    Orleans Parish.  I currently work at Crystal Hot Sauce, and

09:04:37 18    unfortunately, I didn't bring any.  And I am married with two kids.

09:04:42 19                THE COURT:  What do you do on a day-to-day basis?

09:04:45 20                THE JUROR:  Day-to-day basis, I am just ripping and

09:04:48 21    running.  That's it.

09:04:49 22                THE COURT:  Are you married, widowed, single?

09:04:51 23                THE JUROR:  Married with two kids.

09:04:53 24                THE COURT:  Does your spouse work outside of the home?

09:04:57 25                THE JUROR:  No, she is on disability.

09:04:59  1                THE COURT:  Thank you very much.

09:05:00  2                THE JUROR:  Ross Steele, Juror No. 3, and I live in

09:05:05  3   Orleans Parish.  I manage condo buildings downtown, and I am single

09:05:10  4   with no children.

09:05:12  5                THE COURT:  What do you do on a day-to-day basis?

09:05:15  6                THE JUROR:  I oversee my employees and all of my

09:05:18  7   different owners and tenants and everything like that.

09:05:20  8                THE COURT:  Do you supervise anyone?

09:05:22  9                THE JUROR:  Yes.

09:05:23 10                THE COURT:  How many under you?

09:05:25 11                THE JUROR:  Thirteen.

09:05:26 12                THE COURT:  And what do you do in carrying out that duty?

09:05:31 13   Do you hire and fire people?

09:05:32 14                THE JUROR:  I do.  I collect condo dues.  I pay the bills

09:05:37 15   and make sure everybody kind of stays in line as best I can.

09:05:43 16                THE COURT:  Okay.  Are you married, widowed, single, or

09:05:47 17   divorced?

09:05:48 18                THE JUROR:  Single, not ever been married.

09:05:50 19                THE COURT:  All right.  Thank you very much.

09:05:53 20                THE JUROR:  Good morning.  I'm Juror No. 4, Lynette

09:05:57 21   Johnson.  I live in Orleans Parish.  I work at Family Dollar.  I am

09:06:00 22   assistant manager.  I oversee two or three employees a day.  My

09:06:08 23   duties include really stocking the shelves and making sure the

09:06:10 24   store ran right.  I'm divorced with two kids.

09:06:14 25                THE COURT:  And do you do the stocking of the shelves

09:06:15  1    yourself, ma'am?

09:06:16  2                THE JUROR:  Yes, I do.

09:06:18  3                THE COURT:  Where is the store?

09:06:19  4                THE JUROR:  Franklin Avenue.

09:06:20  5                THE COURT:  Are you married, widowed, singled, or

09:06:22  6    divorced?

09:06:23  7                THE JUROR:  Divorced.

09:06:24  8                THE COURT:  Thank you, ma'am.

09:06:25  9                THE JUROR:  You're welcome.

09:06:27 10                THE JUROR:  Juror No. 5, Deborah Beavers.  I work at the

09:06:32 11    United States Postal Service, and I sort the mail over there.

09:06:37 12                THE COURT:  Do you do that by hand or do they do it by

09:06:41 13    machines now?

09:06:42 14                THE JUROR:  Machines now.

09:06:43 15                THE COURT:  How many pieces of mail do you all sort in a

09:06:46 16    day?

09:06:47 17                THE JUROR:  Everyday I do, like, 140,000 pieces a day.

09:06:50 18    Each machine does that.

09:06:52 19                THE COURT:  I see.

09:06:53 20                THE JUROR:  And we got, like, four machines running a

09:06:55 21    day.

09:06:55 22                THE COURT:  And where are you stationed?

09:06:57 23                THE JUROR:  Downtown, 701 Loyola.

09:07:00 24                THE COURT:  Are you married, widowed, single, or

09:07:02 25    divorced?

09:07:02  1              THE JUROR:  Married.

09:07:03  2              THE COURT:  Does your spouse work outside of the home?

09:07:06  3              THE JUROR:  He did, but he just quit.  He was working at

09:07:10  4     the post office.  He retired there.  Then he got a job at Rouses

09:07:15  5     and he just quit there.

09:07:16  6              THE COURT:  All right.  Thank you very much.

09:07:18  7              THE JUROR:  All right.  And I live in Jefferson Parish.

09:07:20  8              THE COURT:  Okay.

09:07:21  9              THE JUROR:  I'm Juror No. 6, my name is Tiffani Jackson.

09:07:26 10     I live in Washington Parish.  I work for the Bogalusa city school

09:07:31 11     system as a disciplinarian.

09:07:32 12              THE COURT:  What does a disciplinarian do?

09:07:36 13              THE JUROR:  Administer consequences to students who have

09:07:39 14     disruptive behaviors.

09:07:42 15              THE COURT:  Do you do any physical restraint?

09:07:45 16              THE JUROR:  Yes.

09:07:47 17              THE COURT:  Okay.  Are you married, widowed, single, or

09:07:50 18     divorced?

09:07:50 19              THE JUROR:  I am married with two kids.

09:07:53 20              THE COURT:  Does your spouse work outside of the home?

09:07:55 21              THE JUROR:  Yes, he does.

09:07:56 22              THE COURT:  What does he do?

09:07:57 23              THE JUROR:  He is a plant manager at New Orleans Cold

09:08:01 24     Storage.

09:08:01 25              THE COURT:  Where?

09:08:04  1          THE JUROR:  New Orleans Cold Storage.

09:08:05  2          THE COURT:  Thank you very much.  Appreciate it.

09:08:07  3          THE JUROR:  Hi, I'm No. 7, Tina Dudek.  I am a retired

09:08:11  4   teacher from Lafourche Parish, but I live in Terrebonne Parish.

09:08:16  5   Worked with special needs kids.  I am married.  I have two kids.  I

09:08:21  6   do have the joy of keeping my two-month-old grandson now.  Love

09:08:27  7   every minute of it.

09:08:28  8          THE COURT:  I bet you do.  Where were you teaching?

09:08:33  9          THE JUROR:  Raceland Upper Elementary.

09:08:35 10          THE COURT:  Which grades did you teach?

09:08:37 11          THE JUROR:  Third, fourth, and fifth.  So I taught kids

09:08:42 12   like her, that she deals with.

09:08:44 13          THE COURT:  And do you give them to her when you needed?

09:08:49 14          THE JUROR:  Right.

09:08:49 15          THE COURT:  Okay.  And how long were you doing that?

09:08:51 16          THE JUROR:  Twenty years.

09:08:53 17          THE COURT:  Twenty years.

09:08:53 18          THE JUROR:  Yes, sir.

09:08:54 19          THE COURT:  Good.  Thank you for your service there.

09:08:58 20          THE JUROR:  Hello.  I am No. 8.  My name is Kristina

09:09:01 21   McAvoy.  I live in Jefferson Parish.  I am a full-time dog groomer

09:09:06 22   as I take online classes on the side.  Single, no kids.

09:09:10 23          THE COURT:  I'm sorry.  Where do you work?

09:09:12 24          THE JUROR:  Independently out of my mom's house or at

09:09:14 25   people's houses.  Kind of like mobile grooming.

09:09:19  1          THE COURT:  All right.  Are you married, widowed,

09:09:20  2     single --

09:09:21  3          THE JUROR:  Single, no kids.

09:09:23  4          THE COURT:  Thank you very much.

09:09:33  5          THE JUROR:  Juror No. 9.  Nelson Capote.  Live in

09:09:37  6     Jefferson Parish.  I'm a civil engineer with the Louisiana

09:09:40  7     Department of Transportation.  I am the West Bank area engineer in

09:09:43  8     charge of all construction and maintenance on state routes.  I am

09:09:47  9     married.  My wife works as an office manager for a surgeon's

09:09:53 10     office.

09:09:54 11          THE COURT:  You take care of the potholes for us?

09:09:58 12          THE JUROR:  On state routes.

09:10:00 13          THE COURT:  We don't have many of those, do we, on state

09:10:04 14     routes.  Okay.  And how long have you done that?

09:10:07 15          THE JUROR:  Twenty-two, 23 years.

09:10:10 16          THE COURT:  And you do it just for Jefferson Parish, the

09:10:13 17     state that goes through -- the state routes that go through

09:10:17 18     Jefferson?

09:10:18 19          THE JUROR:  It's everything on the West Bank,

09:10:20 20     St. Charles, Plaquemines, Orleans, Jefferson.

09:10:22 21          THE COURT:  And what do you do on a day-to-day basis?

09:10:25 22     You don't fill them yourself, do you?

09:10:28 23          THE JUROR:  No, sir.  I oversee a staff of about 45

09:10:31 24     individuals and visit construction sites, problem solving.

09:10:39 25          THE COURT:  Okay.  All right.  Thank you very much.

09:10:42  1              THE JUROR:  Juror No. 10, Richard Griffin.  I live in

09:10:47  2       Tangipahoa Parish.  Currently a superintendent and junior project

09:10:53  3       manager.

09:10:53  4              THE COURT:  In what?

09:10:54  5              THE JUROR:  Construction field, commercial.

09:10:56  6              THE COURT:  Who do you work for?

09:10:58  7              THE JUROR:  Brownlow Plastering.

09:11:01  8              THE COURT:  What's your job?  What do you do on a

09:11:03  9       day-to-day basis?

09:11:05 10              THE JUROR:  Oversee multiple jobs, about a half million

09:11:09 11       dollar jobs roughly.

09:11:09 12              THE COURT:  What are you doing right now?  What are you

09:11:11 13       building?

09:11:11 14              THE JUROR:  Doing a lot of Ochsner buildings.  Hospitals.

09:11:15 15              THE COURT:  Throughout the state or --

09:11:17 16              THE JUROR:  Mostly in New Orleans and Baton Rouge.

09:11:20 17              THE COURT:  How many people under you basically?

09:11:23 18              THE JUROR:  Probably between 35 and 40.

09:11:26 19              THE COURT:  And you have supervisors for those on site?

09:11:29 20              THE JUROR:  Yes, sir.

09:11:30 21              THE COURT:  And you're over the whole group?

09:11:32 22              THE JUROR:  Yes, sir.

09:11:33 23              THE COURT:  All right.  Are you married, widowed, single

09:11:35 24       or divorced?

09:11:36 25              THE JUROR:  Married and have two kids.

09:11:37  1          THE COURT:  Does your spouse work outside of the home?

09:11:40  2          THE JUROR:  She works in Tangipahoa Parish school system.

09:11:43  3          THE COURT:  Is she assigned to a particular school?

09:11:46  4          THE JUROR:  Loranger Elementary.

09:11:50  5          THE COURT:  Thank you very much.

09:11:50  6          THE JUROR:  I'm juror No. 11, Janet Davis Graves.  I am a

09:11:53  7  retired bookkeeper from Hammond nursing home.  I was there nine

09:11:57  8  years and I've gone back several times and back there again

09:12:01  9  part-time, so it's 11 years.  I am married.  My husband is a marine

09:12:06 10  surveyor.  We have eight kids, one who is deceased.  We have 11

09:12:11 11  grands, and a snowball stand seasonal from April through September.

09:12:15 12  So we are a little busy most of the time, and this is going to be

09:12:20 13  relaxing for me.  Thank you.

09:12:23 14          THE COURT:  Okay.  All right.

09:12:25 15          THE JUROR:  Good morning, your Honor.  Counselors,

09:12:27 16  plaintiffs, fellow jurors, Juror No. 12.  My name is Felipe Santos.

09:12:34 17  I am separated.  I live with my daughter.  I have two jobs, I have

09:12:37 18  a small trading company, and I work in Home Depot.

09:12:42 19          THE COURT:  What do you do with your first job?

09:12:44 20          THE JUROR:  My company?

09:12:46 21          THE COURT:  Yes.

09:12:46 22          THE JUROR:  I buy and sell equipment, supplies,

09:12:49 23  merchandise and add a markup and ship it to Central America,

09:12:54 24  customers in Central America.

09:12:56 25          THE COURT:  Do you fix them up or anything before you

09:12:58  1    send them?

09:12:58  2          THE JUROR:  When I know how to, yes.  Yes, I kind of

09:13:03  3    clean them and check.

09:13:04  4          THE COURT:  How about your second job?

09:13:06  5          THE JUROR:  I work in the paint department in the Home

09:13:08  6    Depot in Harahan.

09:13:10  7          THE COURT:  What do you do there?

09:13:12  8          THE JUROR:  I fix up paint.  When you go and you choose a

09:13:16  9    color, I work with the equipment there, and, you know, I produce

09:13:20  10   the color you need.

09:13:21  11         THE COURT:  I see.  Do you supervise any folks in either

09:13:24  12   job?

09:13:25  13         THE JUROR:  No, sir.  My company is small, like I said,

09:13:28  14   and I am the only employee.  I do everything.  And the Home Depot I

09:13:34  15   don't supervise anyone.

09:13:34  16         THE COURT:  Okay.  Thank you very much.

09:13:36  17         THE JUROR:  Thank you so much.  Honor to be here.

09:13:40  18         THE COURT:  Appreciate your presence.

09:13:41  19         THE JUROR:  Good morning.  I am No. 13.  My name is Mary

09:13:45  20   Johnson.  I live in Thibodaux, Louisiana.  I am a DSW.  I work with

09:13:52  21   the disabled.

09:13:56  22         THE COURT:  What do you do for them, Ms. Johnson?

09:13:59  23         THE JUROR:  I take them to the doctor, bring them to make

09:14:02  24   their groceries.

09:14:03  25         THE COURT:  I see.  Okay.  And how long have you been

09:14:06  1    doing that?

09:14:07  2              THE JUROR:  Nine years.

09:14:08  3              THE COURT:  Anybody work with you there?

09:14:10  4              THE JUROR:  No, I work by myself.

09:14:12  5              THE COURT:  You work by yourself?

09:14:13  6              THE JUROR:  Uh-huh.

09:14:14  7              THE COURT:  And you handle the whole Thibodaux area or

09:14:18  8    just a portion of it?

09:14:19  9              THE JUROR:  Just a portion.  I just have one client.

09:14:21 10              THE COURT:  How many people that you have to take care

09:14:23 11    of?

09:14:23 12              THE JUROR:  I take care of one.

09:14:25 13              THE COURT:  One.

09:14:26 14              THE JUROR:  Yeah.  But sometimes I take care of more than

09:14:29 15    one.  If I have to go back in the morning, I'll go in the morning.

09:14:33 16    But I mainly work at night.

09:14:35 17              THE COURT:  Okay.  Are you married?

09:14:37 18              THE JUROR:  I'm married, uh-huh.

09:14:38 19              THE COURT:  Does your spouse work outside of the home?

09:14:41 20              THE JUROR:  Yes, he is an insurance man.

09:14:43 21              THE COURT:  And what does he do?  He sells insurance?

09:14:46 22              THE JUROR:  Yes.

09:14:47 23              THE COURT:  I see.  Okay.  All right.  Thank you very

09:14:49 24    much.

09:14:49 25              THE JUROR:  Sure.

09:14:51  1          THE JUROR:  Hi, I am Juror No. 14.  My name is Shaney

09:14:56  2   Ferrell and I am a registered nurse at West Jefferson Medical

09:15:00  3   Center for over 25 years.  And married.  Live on the West Bank,

09:15:06  4   Jefferson, and have two children and two grandbabies.

09:15:11  5          THE COURT:  Does your spouse work outside of the home?

09:15:13  6          THE JUROR:  He does.  He is a fireman in Kenner.

09:15:16  7          THE COURT:  Are you assigned to a particular unit as a

09:15:18  8   nurse?

09:15:18  9          THE JUROR:  I work in the operating room.

09:15:20 10          THE COURT:  And what does that involve?

09:15:23 11          THE JUROR:  I am the nurse in the operating room.  We

09:15:25 12   take patients into surgery, and we just monitor sterility and

09:15:31 13   making sure they get appropriate care there, and then getting them

09:15:36 14   out.  I used on work in the main operating room, we did a lot of

09:15:40 15   really big surgeries.  I recently moved to the ambulatory surgery,

09:15:44 16   so we deal with a lot of children and more minor surgeries, like,

09:15:47 17   tubes and tonsils and things like that.

09:15:49 18          THE COURT:  Okay.  Thank you very much.

09:15:53 19          THE JUROR:  Good morning.  I am Juror No. 15, Kristin

09:15:56 20   Ripley.  I live in Tangipahoa Parish.  I am a chemistry teacher at

09:16:00 21   Albany High School.

09:16:01 22          THE COURT:  What's the grades that you teach?

09:16:04 23          THE JUROR:  Eleventh and twelfth.

09:16:06 24          THE COURT:  How long have you been doing that?

09:16:08 25          THE JUROR:  This is my fifth year.

09:16:10   1          THE COURT:  Are you married, widowed, single, or

09:16:11   2   divorced?

09:16:12   3          THE JUROR:  I'm married.

09:16:14   4          THE COURT:  Does your spouse work outside of the home?

09:16:16   5          THE JUROR:  He does, he manages material control at

09:16:20   6   Chicago Bridge & Iron in Walker, Louisiana.

09:16:23   7          THE COURT:  What do you do on a day-to-day basis with

09:16:25   8   your students?

09:16:26   9          THE JUROR:  So I have two courses I teach, Chemistry I

09:16:30  10   and II.  And so Chemistry I is a pretty basic diploma course that

09:16:36  11   they required, so it's specifically for TOPS, so we go through the

09:16:43  12   state curriculum for that.  Chemistry II is aimed at seniors who

09:16:48  13   want to take the CLEP test and receive college credits for

09:16:53  14   chemistry, so that will give them credit for their first year of

09:16:57  15   freshman chemistry in college.

09:16:59  16          THE COURT:  Okay.  Fine.  Thank you very much.

09:17:01  17          THE JUROR:  You're welcome.

09:17:02  18          THE JUROR:  Hi, Juror No. 16, Robert Terrell.  I actually

09:17:06  19   live in St. Tammany and I work for Rockwell Automation.  Married

09:17:10  20   with two kids and three grandkids.

09:17:12  21          THE COURT:  What do you do on a day-to-day basis in your

09:17:15  22   job?

09:17:15  23          THE JUROR:  Sure.  My customers are all of the plants and

09:17:18  24   industrial facilities up and down the river from Baton Rouge to New

09:17:22  25   Orleans in South Louisiana.

09:17:23  1          THE COURT:  What do you sell them and what do you do?

09:17:25  2          THE JUROR:  I guess the best way to explain it is if

09:17:28  3   anybody has ever been in a car wash, one of those automated ones,

09:17:31  4   we provide all of the controls that make those things do what they

09:17:34  5   do on a much larger scale for plants and chemicals.

09:17:38  6          THE COURT:  I see.  Thank you very much.

09:17:49  7          THE JUROR:  Good morning.  I am Juror No. 17, Stephen

09:17:51  8   Triola.  I live in Orleans Parish.  I am currently work as a

09:17:55  9   full-time registered nurse at University Medical Center in the

09:17:58 10   operating room.  I moved down here from Akron, Ohio.  It will be

09:18:01 11   two years in August.  In Ohio I worked as a registered nurse in the

09:18:06 12   pediatric burn ICU.

09:18:08 13          THE COURT:  How long have you been a nurse?

09:18:10 14          THE JUROR:  Three years in July.

09:18:12 15          THE COURT:  And have you been in any other hospitals

09:18:16 16   around here other than the one you're working in now?

09:18:19 17          THE JUROR:  I have not.

09:18:20 18          THE COURT:  What do you do on a day-to-day basis?

09:18:22 19          THE JUROR:  Well, I work in the operating room as well.

09:18:25 20   Like she said, we bring patients into the OR, check consents,

09:18:27 21   maintain sterility, opening medications on the sterile field, and

09:18:31 22   do all of the charting in the case.

09:18:33 23          THE COURT:  And you don't specialize in a particular

09:18:36 24   operation?

09:18:38 25          THE JUROR:  I do not, no.

09:18:40  1            THE COURT:  Thank you very much.  Appreciate it.

09:18:42  2            THE JUROR:  Good morning.  I'm Juror No. 18, Jessica

09:18:45  3    Russo.  I'm in Jefferson Parish.  Currently work for Boh Brothers

09:18:50  4    Construction doing administrative work.  Single with no kids.

09:18:53  5            THE COURT:  Okay.  Thank you very much.

09:18:56  6            THE JUROR:  Good morning.  I am Juror No. 19.  My name is

09:18:59  7    Traci Coss, and I live in St. Charles Parish.  I work at ADM Grain

09:19:05  8    which is a grain elevator.  I strictly do office work.  And I am

09:19:10  9    married and have two children.

09:19:12  10            THE COURT:  Does your spouse work outside of the home?

09:19:14  11            THE JUROR:  He does.  He works at Waterford 3 nuclear

09:19:17  12    power plant.  He is in charge of security operations.

09:19:21  13            THE COURT:  Thank you very much.

09:19:24  14            THE JUROR:  Good morning.  Dana Colombo, Juror 20.  I

09:19:28  15    work for National ITC in Metairie.  Live in St. Tammany Parish,

09:19:33  16    Covington.  I am a welding inspector.  Plumber by trade, but I work

09:19:39  17    in the pipe trades.

09:19:40  18            THE COURT:  What do you do?

09:19:42  19            THE JUROR:  I inspect welds specifically for people that

09:19:44  20    do industrial work, and also do the -- my company certifies people

09:19:54  21    that do medical gas installations around the country.

09:19:58  22            THE COURT:  Do you do that just eyeballing it or do

09:20:01  23    you --

09:20:01  24            THE JUROR:  Yes, sir.  There's a criteria you have to

09:20:03  25    follow, brazing procedures and welding procedures that you have to

09:20:06  1    follow.

09:20:06  2              THE COURT:  You watch them do it or just test them after?

09:20:09  3              THE JUROR:  On occasion, but mostly they ship them to me

09:20:12  4    from around the country, myself and another gentlemen.  I have

09:20:16  5    three people in my office.  I am the office manager.  But another

09:20:19  6    gentleman, we're CWI certified welding inspectors.

09:20:21  7              THE COURT:  All right.  Thank you very much.

09:20:24  8              THE JUROR:  Juror No. 21, Mike Chauffe from St. Charles

09:20:30  9    Parish.  Fifteen years experience in audio/visual field and

09:20:32 10    presently looking for work.

09:20:34 11              THE COURT:  Are you married, widowed --

09:20:36 12              THE JUROR:  Divorced, four children.

09:20:37 13              THE COURT:  Okay.  How long have you been doing your job?

09:20:40 14              THE JUROR:  Over 20 years in the audio/visual experience.

09:20:43 15              THE COURT:  And what do you do on a day-to-day basis?

09:20:46 16              THE JUROR:  When I was in the field, I would -- I ran the

09:20:50 17    department at the Marriott here, two years at the Hilton -- hire,

09:20:55 18    fire, make sure everything is working in the department, budget

09:20:58 19    forecast, P&L.

09:21:00 20              THE COURT:  You do budgets also?

09:21:03 21              THE JUROR:  I did.

09:21:05 22              THE COURT:  Thank you very much.

09:21:07 23              THE JUROR:  Juror 22, Joseph Bragg, Orleans Parish.

09:21:12 24    Currently working as an operator at Entergy Nine Mile Point

09:21:17 25    facility.  Was a chemist eight years before that.

09:21:21  1          THE COURT:  What do you do on a day-to-day basis at Nine

09:21:25  2  Mile?

09:21:25  3          THE JUROR:  Responsible for heavy machinery and also

09:21:28  4  auxiliary machinery that we use to use the steam operation to

09:21:34  5  produce power off a generator.

09:21:36  6          THE COURT:  Is this a power plant that you're dealing

09:21:38  7  with?

09:21:38  8          THE JUROR:  Yes.  Yes.

09:21:39  9          THE COURT:  And do you participate in repairing it or

09:21:42 10  just monitor --

09:21:44 11          THE JUROR:  We're responsible for repairs, if we can do

09:21:47 12  it.  If not, we have a mechanic.

09:21:53 13          THE COURT:  And you monitor the gauges?

09:21:55 14          THE JUROR:  Uh-huh.

09:21:55 15          THE COURT:  All right.  Thank you very much.

09:21:57 16          THE JUROR:  All right.  Thank you.

09:21:59 17          THE JUROR:  Hi.  I am Juror No. 23, Martha Noel.  I am

09:22:04 18  from St. Tammany Parish.  I am a stay-at-home mom, three children,

09:22:09 19  one just left for college.  And I am married; been married 21 years

09:22:15 20  and --

09:22:17 21          THE COURT:  Where are they going to college?

09:22:19 22          THE JUROR:  My oldest just started LSU.  Go Tigers.  And

09:22:24 23  I have a third grader -- a third-grade son and 14-year old

09:22:29 24  daughter.

09:22:29 25          THE COURT:  That's a full-time job I know.

09:22:32  1              THE JUROR:  It really is.

09:22:33  2              THE COURT:  And I won't ask you what you do because you

09:22:36  3      do everything.

09:22:36  4              THE JUROR:  I do.

09:22:38  5              THE COURT:  Okay.  Thank you very much.

09:22:41  6              THE JUROR:  Juror 24, Janice Hopton.  Work for Mac Papers

09:22:47  7      as a purchasing agent.  Married with two children.  My husband is

09:22:51  8      self-employed as a contractor.

09:22:53  9              THE COURT:  And what do you do on a day-to-day basis in

09:22:57 10      your job?

09:22:58 11              THE JUROR:  Order paper, receive, and help out in the

09:23:01 12      office as needed.

09:23:02 13              THE COURT:  Okay.  Do you supervise anyone?

09:23:04 14              THE JUROR:  No.

09:23:04 15              THE COURT:  Thank you very much.

09:23:06 16              THE JUROR:  You're welcome.

09:23:09 17              THE COURT:  Let's see where we are at this point.  I'll

09:23:12 18      get the rest.  Let me see counsel at the bench first.

09:23:34 19           (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

09:23:34 20              THE COURT:  Before I let you all go, any question that

09:23:38 21      you want me to ask anybody, a hot potato that you don't want to

09:23:42 22      deal with that you want me to take care of?  Otherwise, I'll let

09:23:45 23      you go.

09:23:46 24              MR. BIRCHFIELD:  Only thing I will ask is Mr. Terrell,

09:23:48 25      the gentleman in the top right on the far end of the box.  Ask

09:23:52  1  about his wife.  You didn't ask and she is a nurse and just get a

09:23:56  2  little bit of background.

09:23:58  3          THE COURT:  Do you want me to get him up here?

09:23:59  4          MR. BIRCHFIELD:  No.

09:24:00  5          MS. WILKINSON:  Judge, if there's anything that we want

09:24:03  6  to discuss with you in private, because some people did say that.

09:24:06  7  You should ask if anyone has anything that they don't want to say

09:24:10  8  that they're allowed to ask, because I think there may be some

09:24:14  9  people.

09:24:14  10         THE COURT:  Sure.

09:24:15  11         MR. BIRCHFIELD:  I was planing to tell them that, but if

09:24:17  12  there's anything that I bring up.  But Ms. Ripley said that there

09:24:23  13  was -- there is one had some, I am sure, your Honor, but she was a

09:24:27  14  hardship and didn't say.

09:24:29  15         THE COURT:  Okay.  Okay.  I'll do both of them.

09:24:46  16     (OPEN COURT.)

09:24:46  17         THE COURT:  Mr. Terrell, you mentioned something about

09:24:46  18  your wife was a nurse?

09:24:48  19         THE JUROR:  My daughter.

09:24:49  20         THE COURT:  Would you tell us a little bit about where?

09:24:53  21         THE JUROR:  She's actually a nurse practitioner.  She

09:24:55  22  works at North Oaks by Hammond.  Also, at St. Tammany Hospital in

09:25:00  23  Covington as well.

09:25:01  24         THE COURT:  Do you know what she does?

09:25:04  25         THE JUROR:  She works in the ER.  And she worked in ER

09:25:07 1   since she's a been a nurse, which is probably five years or so now.

09:25:11 2   Nurse practitioner field.

09:25:13 3         THE COURT:  All right.  Thank you very much.

09:25:19 4         And as I may have mentioned to you, certainly in the

09:25:24 5   questionnaire I did, but if there's anything that you want to

09:25:29 6   privately talk to the Court about, just come up and talk.  If you

09:25:33 7   put up your hand and I'll recognize you.

09:25:37 8         The questions, as you see from both the questionnaire as

09:25:41 9   well as my questions, it's not intended to uncover any secrets in

09:25:48 10  your life or anything.  It's simply a recognition that everybody

09:25:53 11  comes to everything with some baggage.  "Baggage" meaning their

09:26:00 12  past experiences, their past information, things of that sort.  And

09:26:05 13  if you have certain past experiences, try to let counsel know so

09:26:12 14  they can decide whether or not you're best suited for another case

09:26:15 15  as opposed to this case.  And that's the whole purpose of voir

09:26:15 16  dire.

09:26:20 17        When we first started this 200 years ago, everybody knew

09:26:25 18  everybody, so it wasn't a question of, tell me about yourself.

09:26:29 19  Everybody knew you.  That's why you were there because they knew

09:26:32 20  you.  And society has gotten a little more complex now, and so we

09:26:36 21  have to recognize that we don't know everybody, and so we have some

09:26:45 22  voir dire, seeing and talking to you.  That's the whole purpose of

09:26:47 23  it, not to find anything in your personal life.

09:26:50 24        Now, I'll let counsel ask begin asking you some

09:26:54 25  questions.  And again, they won't have many questions because we've

09:26:57  1   already dealt with so many of them with your help with your

09:27:00  2   questionnaire.  But they do have an opportunity and I'll recognize

09:27:03  3   that.

09:27:04  4          First, the plaintiffs.

09:27:05  5          MR. BIRCHFIELD:  May it please, your Honor.  Good

09:27:09  6   morning.  As Mr. -- as we discussed this already, we're going to

09:27:16  7   ask you some questions, because really what we're looking for, what

09:27:19  8   both sides are looking for here is an impartial jury.  A jury that

09:27:23  9   can start off viewing both sides as even and not one side starting

09:27:28 10   ahead of the other.  And, you know, we tend to think of bias

09:27:32 11   outside -- outside of the courtroom, we tend to think of that as a

09:27:36 12   bad thing, but as far as this process goes, we're looking for that.

09:27:40 13   Because as Judge Fallon described it as baggage.

09:27:43 14          You know, it's life experiences.  That's what we're

09:27:46 15   looking for.  Have you had life experiences that would make it --

09:27:51 16   this probably may not be the best jury for you to sit on.  That's

09:27:55 17   what we're trying to get at through this process.  So if I ask you

09:27:59 18   questions, I don't intend to pry.  I am not really looking for

09:28:03 19   private information.  But if it's -- if the question I ask would

09:28:08 20   require you to say something that's private, if you'll just raise

09:28:12 21   your hand and let us know.  We'll ask Judge Fallon if we can come

09:28:16 22   up and discuss that privately, so it's not everybody hearing.  Do

09:28:20 23   you follow what I am saying?

09:28:21 24          So here you've heard a little bit about the case already

09:28:25 25   and you know that our client, Mr. Boudreaux, goes by Johnny.

09:28:30  1    You'll see papers with Joseph.  He thought his name was Joseph

09:28:34  2    until he enlisted, he saw his official name is Joseph.  He goes by

09:28:38  3    Johnny.  He has brought a lawsuit -- he and his wife have brought a

09:28:42  4    lawsuit against a pharmaceutical company.

09:28:45  5         Is there any of your life experiences that would say,

09:28:48  6    "This is just not the case for me.  I have trouble being --

09:28:53  7    starting off even for both sides."

09:28:55  8         Let me give you an example.  I love dogs.  And if I were

09:29:00  9    called to be a potential juror on a case where, you know, a dog had

09:29:06 10    been abused, that probably wouldn't be the right jury for me to sit

09:29:11 11    on.  So that's what we're looking at.  Has anybody had any life

09:29:15 12    experiences that would say, "Hey, it involves a lawsuit of someone

09:29:20 13    suing a pharmaceutical company, then that's not the best jury."

09:29:24 14    Anybody had experiences along those lines?  Mr. Triola.

09:29:36 15         THE JUROR:  Can you hear me?  My grandfather actually

09:29:39 16    passed about two years ago.  He was mismedicated in an extended

09:29:44 17    care facility.  My family is currently in a lawsuit.  It's in the

09:29:48 18    beginning processes.  It's not against a pharmaceutical company,

09:29:51 19    but against a care facility where my grandfather was at.

09:29:54 20         MR. BIRCHFIELD:  Thank you, Mr. Triola.  That's what

09:29:57 21    we're looking for.  And I think you shared information on your

09:30:00 22    questionnaire about that.

09:30:02 23         THE JUROR:  I did, yes.

09:30:03 24         MR. BIRCHFIELD:  Because of that life experience, do you

09:30:05 25    think it would be difficult for you to start with both sides at an

09:30:08  1    even place?

09:30:09  2           THE JUROR:  Not necessarily, I think as a registered

09:30:12  3    nurse you have to live impartially unbiased when you care for

09:30:17  4    patients.  I would not have a problem.

09:30:19  5           MR. BIRCHFIELD:  Thank you.

09:30:20  6           THE COURT:  Just following up on that.  The whole purpose

09:30:22  7    of it is that whether you would be able to give both sides a fair

09:30:27  8    hearing, that you would put that to one side because that has

09:30:31  9    nothing to do with these individuals, put that to one side and

09:30:35  10   decide this case solely on the basis of the facts that you see and

09:30:39  11   the law that I give to you.  That's really what I need to know.

09:30:45  12          THE JUROR:  Yes.  Yes, I would be able to.

09:30:47  13          MR. BIRCHFIELD:  Thank you, Mr. Triola.  Anyone else have

09:30:50  14   life experiences that would affect your serving on the jury one way

09:30:54  15   or the other?

09:30:54  16          And Judge Fallon asked about could you put that aside,

09:30:59  17   and that's the key question.  Can both sides get a fair -- what

09:31:04  18   we're looking for in evaluating this as we're striking, would you

09:31:09  19   be leaning -- start out leaning one way or the other?  Anybody have

09:31:13  20   any experiences?

09:31:15  21          Mr. Boudreaux, he was in the insurance industry.  He was

09:31:21  22   an agent for 32 years.  So anybody have life experiences with the

09:31:27  23   insurance industry, good or bad, that would have you start out

09:31:31  24   leaning one way or the other?

09:31:38  25          Thank you.  And Ms. Boudreaux, she served as a teacher

09:31:43   1   for 20 years; one year at the high school there in Lockport and

09:31:49   2   19 years at the junior high in Lockport.  Anybody attend the

09:31:53   3   schools there in Lockport or have children in the schools in

09:31:56   4   Lockport?  Okay.

09:32:00   5        There's going to be -- as you can imagine, this being a

09:32:06   6   case about a pharmaceutical, there's going to be significant

09:32:09   7   evidence and testimony about the FDA, the regulatory body, the FDA

09:32:15   8   here.  Is there anyone who has views about a regulatory body or the

09:32:23   9   FDA, you know, particularly that would impact you here starting off

09:32:31   10  even, both sides starting off even?

09:32:34   11       Because we know that, you know, that some folks have the

09:32:38   12  view there's way too much regulation.  There's too much.  And then

09:32:43   13  other folks will have a view there's not enough.  There are issues

09:32:49   14  one way.  Who would lean toward saying, "Hey, there's too much

09:32:53   15  regulation, too much regulation out there"?  Anybody start off that

09:32:57   16  way?  Raise your hand.  Anybody?

09:33:01   17       THE JUROR:  I may.

09:33:02   18       MR. BIRCHFIELD:  Okay.  Mr. Fullerton, would you lean

09:33:04   19  toward saying there's too much regulation out there?

09:33:07   20       THE JUROR:  Uh-huh.

09:33:08   21       MR. BIRCHFIELD:  All right.  Thank you.  So

09:33:10   22  Mr. Fullerton, you heard his view, probably too much regulation, he

09:33:12   23  would lean that way.  Anybody share that view?

09:33:17   24       How about the other side?  Ms. Graves.  Ms. Graves, would

09:33:23   25  tend to think maybe not enough regulation?

09:33:26 1            THE JUROR:  Yes.

09:33:28 2            MR. BIRCHFIELD:  Is that a view that you hold strongly?

09:33:31 3            THE JUROR:  Yes.

09:33:31 4            MR. BIRCHFIELD:  You hold very strongly?

09:33:34 5            THE JUROR:  May I speak?

09:33:35 6            MR. BIRCHFIELD:  Yes, ma'am.

09:33:36 7            THE JUROR:  I thoroughly believe that these medications

09:33:40 8    now days are not tested long enough, and we are seeing the results

09:33:44 9    of them now.

09:33:46 10            MR. BIRCHFIELD:  Okay.  Thank you for sharing that,

09:33:50 11    Ms. Graves.  That's what both sides are looking for here.  Are

09:33:53 12    there views?  Are there experiences that you've had that would have

09:33:56 13    you leaning -- start off leaning one way or the other?  Would you

09:34:01 14    start off leaning one way or the other because of those

09:34:04 15    experiences?

09:34:04 16            THE JUROR:  Yes, I just don't think these things are

09:34:07 17    studied long enough before they're promoted.

09:34:09 18            MR. BIRCHFIELD:  Thank you.  That's important information

09:34:11 19    to share.

09:34:12 20            And let me go back to you, Mr. Fullerton.  The views that

09:34:17 21    you have that there's too much regulation, would that have you

09:34:20 22    starting out leaning one way or the other here?

09:34:23 23            THE JUROR:  I don't think really.  I just think there is

09:34:28 24    a lot of regulation in all sorts of things, not just the drug

09:34:33 25    industry.

09:34:33  1            MR. BIRCHFIELD:  Okay.

09:34:34  2            THE COURT:  Let me just follow-up.  Ms. Graves, from the

09:34:37  3    standpoint of this particular case, would you decide this case

09:34:42  4    solely on the evidence in this case?  I mean, it's really a

09:34:47  5    separate case.  It's a different -- it is what it is, but, I mean,

09:34:55  6    you will be required to decide the case solely on the basis of the

09:34:59  7    evidence and the law applicable to the case.  Will you do that?

09:35:03  8            THE JUROR:  I could do that, but my personal very strong

09:35:09  9    belief is that the current medications, whatever they may be, are

09:35:18 10    promoted.  And this is ten years, 15, 20 years later there's

09:35:23 11    lawsuits everywhere about people are having more and more trouble

09:35:28 12    with them.  There's more -- I don't -- I don't --

09:35:32 13            THE COURT:  Okay.

09:35:33 14            THE JUROR:  -- agree with the promotion of these.  I

09:35:37 15    don't agree with taking them either, so I don't know.

09:35:40 16            THE COURT:  All right.  Well, thank you.  Thank you very

09:35:43 17    much for those comments.

09:35:44 18            MR. BIRCHFIELD:  Thank you, Ms. Graves.  We appreciate

09:35:46 19    you.  That's what we're asking.  We're just asking you to share

09:35:50 20    openly.

09:35:51 21            I asked if anybody had shared Mr. Fullerton's view or

09:35:56 22    feelings in that direction.  Anybody share Ms. Graves' views that

09:36:00 23    there's not enough, not enough testing, not enough checking, not

09:36:04 24    enough regulation?

09:36:08 25            All right.  Thank you.  I want to shift gears just a

09:36:12  1  little bit now.  One of the questions that was asked on the

09:36:16  2  questionnaire had to deal with the -- like, the label or the

09:36:21  3  warnings that come with the drugs -- the prescription drugs here.

09:36:29  4  Ms. Ripley, if I can pick on you just for a second.  One of the

09:36:33  5  things that you said in the questionnaire is that prescription drug

09:36:37  6  companies provide safety information to the extent of their

09:36:41  7  knowledge of the drug.  And so is that -- when you were saying

09:36:46  8  that -- when you put that in your questionnaire, were you saying

09:36:49  9  that that's what they should do or are you saying that's what they

09:36:53  10  actually do?

09:36:54  11           THE JUROR:  What they actually do.

09:36:55  12           MR. BIRCHFIELD:  Is that a view that you feel strongly

09:36:57  13  about?

09:36:58  14           THE JUROR:  Yes, sir.  I actually worked as a pharmacy

09:37:02  15  technician for five years, and so had a lot of experience with

09:37:06  16  reading those drug labels and seeing all of the information that is

09:37:12  17  provided to patients when they receive the medications.

09:37:16  18           MR. BIRCHFIELD:  All right.  Thank you, Ms. Ripley.

09:37:21  19  We've heard Ms. Ripley's view that most of the -- the drug -- the

09:37:25  20  drug labels, the information that's contained there, that that

09:37:28  21  contains the information -- the information to the full extent of

09:37:31  22  the drug company's knowledge about that drug.  Who would share

09:37:35  23  Ms. Ripley's view?

09:37:38  24           If you share Ms. Ripley's view would you raise your hand.

09:37:43  25  If you hold them up just one second.  Mr. Fullerton; Mr. Mackey;

09:37:50  1    Ms. Jackson, Juror No. 6; Ms. Dudek, No. 7.

09:37:57  2              THE JUROR:  Of course.

09:37:59  3              MR. BIRCHFIELD:  Ms. Graves.

09:38:00  4              THE JUROR:  As far as they know.

09:38:01  5              MR. BIRCHFIELD:  And Ms. Johnson, Juror No. 13,

09:38:03  6    Ms. Johnson.  Anyone else in the juror box?  Okay.  How about in

09:38:09  7    the first row?  Mr. Colombo?

09:38:13  8              THE JUROR:  Yes.

09:38:14  9              MR. BIRCHFIELD:  Juror No. 20, Mr. Colombo.  Anyone else

09:38:19  10   in the front row?  We didn't get into the second row there.  I

09:38:26  11   think we're okay.  Your Honor, I think we're okay.  So thank you.

09:38:30  12   I appreciate your participation.  We won't take the time to go

09:38:35  13   through you just right now, so we're trying to do this as quickly

09:38:39  14   as we can.

09:38:39  15             So we know the folks that feel like drug companies should

09:38:44  16   provide the information to the full extent of their knowledge, and

09:38:48  17   we just asked and you think that they do.

09:38:53  18             Does anyone have -- anyone take the opposite view, that

09:38:56  19   the drug companies do not provide the information to the extent

09:39:01  20   that they know about the drug?  Anybody have that view, the

09:39:05  21   opposite view?  Okay, Mr. Brag?

09:39:08  22             THE JUROR:  Yes.  Working as a chemist, I know we dealt

09:39:21  23   with a lot of drugs that were carcinogenics one year, maybe not a

09:39:26  24   couple of years later.  And a lot of the stuff was based off

09:39:28  25   lobbying, it's not so much off of the full extent of what they give

09:39:31 1    to you.  It's off of what's helpful to them.

09:39:36 2         MR. BIRCHFIELD:  All right.  Thank you.  Thank you,

09:39:37 3    Mr. Brag.  Appreciate you sharing.  Anyone share Mr. Brag's view,

09:39:42 4    that there's not enough?  Maybe not all of the information is

09:39:45 5    included in the instructions on the label?

09:39:49 6         Mr. Brag, while you have the floor.  I know you're not

09:39:52 7    working as a chemist now, but you did that past?

09:39:56 8         THE JUROR:  Yes, for eight years.

09:39:59 9         MR. BIRCHFIELD:  Would you tell us a little bit about

09:40:01 10   your work as a chemist.

09:40:02 11        THE JUROR:  The majority of the chemist work I did was

09:40:05 12   based in manufacturing and also with pharmaceutical companies also.

09:40:09 13   But I made things from what they used to calibrate breathalyzers,

09:40:15 14   stuff they used for NASCAR tires, stuff that the military needed to

09:40:20 15   detect chemical leaks, all types of stuff.

09:40:23 16        MR. BIRCHFIELD:  All right.  Very good.  Thank you,

09:40:26 17   Mr. Brag.

09:40:27 18        I want to shift gears for just one more minute on to a

09:40:34 19   different topic.  We know that when you're given a prescription

09:40:39 20   medication, you are -- you're given that prescription by a doctor

09:40:44 21   and you're also given information in the label about that.  Who

09:40:50 22   would put more importance on what's written in the label versus

09:40:55 23   what the doctor says?  Who would lean more toward putting more

09:41:01 24   priority on the label versus the doctor?  Who would go toward the

09:41:06 25   label?

09:41:07  1          All right.  Mr. Fullerton, that would be your view.

09:41:10  2    Mr. Mackey, Ms. Graves.  Anyone else in the jury box?  Okay.

09:41:19  3          How about on the front row?  Anyone on the front row who

09:41:23  4    take the view that what goes on the label, that would take priority

09:41:27  5    over what the doctor says?

09:41:31  6          Okay.  So let me go back.  Who would put more priority,

09:41:37  7    greater priority on what their doctor says?  Who would take that,

09:41:43  8    what their doctor says versus what's in the label?  Okay.  All

09:41:48  9    right.  Mr. Brag, that would be your view.  Mr. Colombo.  I'm

09:41:55 10    sorry.  Help me with your name.

09:41:55 11          THE JUROR:  Traci Coss.

09:41:57 12          MR. BIRCHFIELD:  Traci Coss.  And Ms. Russo, is that

09:42:01 13    right?

09:42:02 14          THE JUROR:  Yes.

09:42:02 15          MR. BIRCHFIELD:  Tell me why.  Why would you put more

09:42:05 16    stock in what the doctor says versus what's on the label?

09:42:12 17    Mr. Bragg.

09:42:12 18          THE JUROR:  Your doctor has a better representation of

09:42:15 19    you, whereas, the label has a reputation of a mass group in

09:42:19 20    general.

09:42:21 21          MR. BIRCHFIELD:  All right.  Thank you, Mr. Brag.

09:42:26 22    Mr. Colombo?

09:42:27 23          THE JUROR:  Basically the same.  I trust the doctor if he

09:42:30 24    knows me.

09:42:32 25          MR. BIRCHFIELD:  Okay.  All right.  Thank you.

09:42:33  1          THE JUROR:  I was going to say the doctor is more

09:42:36  2  personal with him, than just a -- the label is -- like he said,

09:42:40  3  it's a mass production.

09:42:41  4          MR. BIRCHFIELD:  Okay.  All right.

09:42:43  5          THE JUROR:  I agree as well.  The doctor has seen side

09:42:47  6  effects with certain people.  They will know each person

09:42:50  7  individually based off their past records.

09:42:53  8          MR. BIRCHFIELD:  All right.  Thank you.  Thank you.  I

09:42:55  9  appreciate you sharing that.

09:42:57 10          So after hearing the thoughts both ways, anybody have a

09:43:03 11  change of their view?  Still leaning toward the label?  All right.

09:43:11 12  Very good.

09:43:12 13          One more topic.  So we know that when we go to the

09:43:17 14  doctor's office, we go to the hospital, that records -- records are

09:43:21 15  generated.  Has anybody here gotten your own medical records?  Just

09:43:27 16  gone, for whatever reason, gotten copies of your own medical

09:43:30 17  records?  Ms. Graves.  That doesn't surprise me, Ms. Graves.

09:43:34 18  Mr. Fullerton.

09:43:36 19          THE JUROR:  I've traveled a lot, lived a lot of different

09:43:38 20  places, so I've had to have them.

09:43:42 21          MR. BIRCHFIELD:  So Mr. Fullerton, Ms. Graves.  Anyone

09:43:45 22  else?  Okay.  Ms. Beavers?

09:43:48 23          THE JUROR:  Yes.

09:43:49 24          MR. BIRCHFIELD:  Ms. Beavers.  You've gotten copies of

09:43:51 25  your own medical records?

THE JUROR:  Yes.

MR. BIRCHFIELD:  If you've gotten copies of your own medical records, if you've gone through, did you find any mistakes or errors in your medical records?  Any information that wasn't accurate?

THE JUROR:  No.

MR. BIRCHFIELD:  Would anybody be surprised to find errors in medical records?  Any information that's recorded there, the statistics, any information about -- Ms. Graves?

THE JUROR:  I would -- excuse me, Juror No. 11.  I dealt a lot with medical records at the nursing home, and in doing so, we had to look through them.  There's -- we had a nurse in place that went over records before they actually went into records, so -- to find an error was an -- and we're very much under state scrutiny -- very rare, very rare.  Depends on the facility.

MR. BIRCHFIELD:  All right.  Thank you, Ms. Graves.  I appreciate you sharing.  So hearing the discussion, who would be surprised to learn that there are maybe errors in medical -- in some medical records?  Anybody surprised?  Mr. Triola.

THE JUROR:  I agree kind of what she said as well.  A lot of electronic records are used now and there's a system of check s and balances within those electronic records that would catch errors, so I would be surprised if one did come about.

MR. BIRCHFIELD:  All right.  Thank you.  Anybody else have views?  Medical records, they got to be right?  Everybody

09:45:25 1  holds that view that there wouldn't be any mistakes or errors in

09:45:29 2  medical records?

09:45:34 3       Just a couple more topics here I would like to discuss.

09:45:41 4  Some folks today take the view that -- and I think we've heard it

09:45:46 5  expressed a bit already, that folks are just too quick -- too many

09:45:50 6  lawsuits.  Folks are too quick to file a lawsuit.  Who would share

09:45:55 7  that view that there are too many lawsuits today?  Mr. Fullerton.

09:46:01 8       THE JUROR:  Yes.

09:46:02 9       MR. BIRCHFIELD:  Anyone else on the front row?

09:46:04 10 Mr. Capote.

09:46:05 11      THE JUROR:  Yes, sir.

09:46:06 12      MR. BIRCHFIELD:  Mr. Capote, Juror No. 9; Ms. Graves;

09:46:11 13 Mr. Santos, Juror No. 12.  Anyone else in the box?  Just too many

09:46:22 14 lawsuits?  Okay.

09:46:24 15      How about on the front row over here?  Mr. Bragg.  And

09:46:30 16 Ms. Noel; is that right?

09:46:32 17      THE JUROR:  Yes.

09:46:33 18      MR. BIRCHFIELD:  All right.  So let me shift gears just a

09:46:37 19 second.  Stay in that same type of category.  Do you think that

09:46:45 20 folks would -- that there shouldn't be or there should be -- let me

09:46:50 21 back up.  That there should be limits, there should be caps on what

09:46:54 22 a jury can award in damages?  Who would say that -- hold the view

09:46:58 23 that there should be limits?  There should be caps on what a jury

09:47:02 24 can award?  If you'll just raise your hand.  Anyone?  No one in the

09:47:07 25 box.  Front row?  Okay.

09:47:12  1          THE COURT:  Anything further, Counsel?

09:47:14  2          MR. BIRCHFIELD:  Your Honor, if I could, I have a few

09:47:17  3   questions about individuals, if I could.

09:47:22  4          Let's see.  In the questionnaire there was some folks

09:47:25  5   that said it may be difficult for you to serve on the jury.

09:47:32  6   Mr. Cole, I think you expressed that view, but you didn't give a

09:47:37  7   reason.  It may be difficult for you to serve on the jury?

09:47:41  8          THE JUROR:  I don't know why I would have put that.

09:47:44  9          MR. BIRCHFIELD:  All right.  It may have been a mistake.

09:47:47 10   But you would be okay to serve?

09:47:49 11          THE JUROR:  I'm fine.

09:47:50 12          MR. BIRCHFIELD:  And Ms. Dudek, did you say you're the

09:47:56 13   only caregiver for your grandson?

09:47:58 14          THE JUROR:  Yes, I do baby-sit.  My daughter just went

09:48:01 15   back to work Friday, so I am the caregiver of my two-month-old

09:48:07 16   grandson.

09:48:08 17          MR. BIRCHFIELD:  So with that, do you have other

09:48:11 18   arrangements?

09:48:13 19          THE JUROR:  We do not have other arrangements.  Everybody

09:48:15 20   works.

09:48:16 21          MR. BIRCHFIELD:  All right.  Ms. Falls, I think you're a

09:48:21 22   teacher.  We had a couple of teachers.  Teacher -- anybody have

09:48:26 23   difficulty, with it being the end of school, being able to work

09:48:30 24   things out?

09:48:34 25          And Mr. Fullerton, you mentioned about being out of work

09:48:39  1    for 11 months and that if you got a job, you would need -- so would

09:48:44  2    that pose a difficulty?  Do you have a lot of prospects right now

09:48:48  3    or what's your take on it?

09:48:50  4         THE JUROR:  Depending on if I get a call in the next

09:48:55  5    couple of days, which, based on conversations last week, I could

09:49:00  6    have a job offer pending in Houston, which would require me to be

09:49:06  7    at an interview.  So I would -- I don't know if it would be this

09:49:14  8    week or next week.  I can't say for sure, but, yeah, I would really

09:49:23  9    like to get back to work.

09:49:25 10         MR. BIRCHFIELD:  Been waiting 11 months, you're ready.  I

09:49:28 11    hear you.

09:49:29 12         Mr. Griffin, I think you told us that you watch your

09:49:33 13    grandson from, like, 3:15 to 4:30.

09:49:36 14         THE JUROR:  Yes.

09:49:37 15         MR. BIRCHFIELD:  Would that present a hardship?  Would

09:49:39 16    that make it difficult?  Do you have other arrangements?

09:49:41 17         THE JUROR:  I don't have any other arrangements.  We

09:49:43 18    live, like, in a rural area.  My wife works in the school, my

09:49:47 19    daughter works in the hospital, and he catches the bus home.

09:49:51 20         MR. BIRCHFIELD:  All right.  And Judge Fallon mentioned

09:49:55 21    that the Court will be going to 5:00 or 5:30 every day.  Would that

09:49:59 22    make it really hard for you to serve on the jury in this case?

09:50:02 23         THE JUROR:  Kind of, yeah.  I mean, yeah.  I mean --

09:50:08 24         MR. BIRCHFIELD:  How old is your grandson, sir?

09:50:10 25         THE JUROR:  He is seven.

09:50:12 1            MR. BIRCHFIELD:  Seven, okay.  And, Ms. Russo, you

09:50:16 2    mentioned -- and this is -- if you would like to approach about the

09:50:21 3    situation with your grandfather.  You said that he was in hospice.

09:50:23 4            THE JUROR:  He is currently in hospice care, so at any

09:50:27 5    given time I might have to leave and go to hospice.  We are

09:50:31 6    currently making arrangements for him.  So we e-mail all day back

09:50:35 7    and forth on arrangements for him.

09:50:38 8            MR. BIRCHFIELD:  I'm very sorry --

09:50:40 9            THE JUROR:  Thank you.

09:50:40 10           MR. BIRCHFIELD:  -- your grandfather is facing that

09:50:42 11   situation.  Let me ask you.  I don't mean to pry, but I just -- if

09:50:48 12   it's a situation where you could get called, is that something that

09:50:54 13   is a real possibility in the next couple of weeks?

09:50:56 14           THE JUROR:  Yes.

09:50:57 15           MR. BIRCHFIELD:  It is.

09:50:58 16           THE JUROR:  Yes.

09:51:02 17           MR. BIRCHFIELD:  All right.  Thank you.

09:51:03 18           THE JUROR:  Thank you.

09:51:05 19           MR. BIRCHFIELD:  Anyone else?  Since the questionnaire,

09:51:07 20   anybody had circumstances to come up where -- make it hard for you

09:51:13 21   to serve on a jury in this case?

09:51:19 22           THE JUROR:  I do, Juror No. 14.  I do have a question

09:51:23 23   about the length of the trial, estimated length I guess.  My son

09:51:28 24   was diagnosed with a congenital heart disease, and he gets

09:51:32 25   treatment at the Mayo Clinic in Rochester, Minnesota.  So he is

09:51:37 1    scheduled to have a procedure on May 20th, which is longer than

09:51:41 2    three weeks, so I am assuming that it will be over by then, but I

09:51:46 3    don't know.

09:51:46 4         MR. BIRCHFIELD:  I assure you Judge Fallon will not let

09:51:50 5    us go that long.

09:51:51 6         THE JUROR:  That's the only concern that I have that I

09:51:54 7    can't miss this appointment that he has.

09:51:56 8         MR. BIRCHFIELD:  I did want to ask you about that.  So as

09:51:59 9    long as you're able to make that trip, it's not a situation where

09:52:02 10   you need to be there for your son.

09:52:05 11        THE JUROR:  No.  He is doing very well.

09:52:06 12        MR. BIRCHFIELD:  Okay.  We should be fine by May 20th.

09:52:10 13        All right.  Any others?  Any other hardships or

09:52:14 14   difficulties?

09:52:18 15        Your Honor, could I have ten seconds?

09:52:21 16        THE COURT:  Sure.

09:52:42 17        MR. BIRCHFIELD:  Your Honor, just one more follow-up, if

09:52:44 18   I could.

09:52:45 19        Ms. Noel.  From the questionnaire you mentioned about

09:52:50 20   your dad may be switching from one blood thinner to another.  After

09:52:57 21   the questionnaire, did you do any -- did you talk to your dad about

09:53:01 22   that?

09:53:01 23        THE JUROR:  No, I didn't.  He doesn't have time -- he

09:53:05 24   just takes whatever the doctor tells him.  So I don't even know

09:53:08 25   what blood thinner he is on.  I have no idea.  And he doesn't, you

09:53:12  1    know, he hasn't had any issues.  It's just he has a heart problem,

09:53:16  2    so.

09:53:17  3              MR. BIRCHFIELD:  Okay.  All right.  Thank you.  One last

09:53:22  4    question, your Honor.

09:53:25  5              THE COURT:  That's what they always say, don't they.

09:53:27  6              MR. BIRCHFIELD:  I know.  So after the discussion that

09:53:34  7    we've had now -- and this goes back to the question that Judge

09:53:39  8    Fallon asked -- we know that everybody has past experiences, but

09:53:43  9    you know what this case is about a little bit.  You know it's

09:53:47 10    Mr. Boudreaux, he's on a blood thinner, and he had a GI bleed, and

09:53:52 11    he's brought this lawsuit against a pharmaceutical company.  Has

09:53:56 12    there been any discussion that if you were in our place, you're

09:54:00 13    representing Mr. Boudreaux, that you think, oh, I would want to

09:54:05 14    know this about myself, and it hasn't come out?  Is there anybody

09:54:09 15    have anything that you want to share that you feel like you ought

09:54:12 16    to share, so both sides will know, hey, I am leaning one side or

09:54:17 17    the other out of the box?  That's what we're both looking for, both

09:54:22 18    of us at the start.  Anybody?

09:54:24 19              THE COURT:  Okay.  Thank you, Counsel.

09:54:25 20              MR. BIRCHFIELD:  Thank you very much.

09:54:27 21              THE COURT:  Let me hear from the defendant.  Anything?

09:54:29 22              MS. WILKINSON:  Thank you, your Honor.  Good morning,

09:54:32 23    everyone.  As I said earlier, my name is Beth Wilkinson.  And I

09:54:37 24    know you're thinking, what else can she ask?  I go last because we

09:54:41 25    represent Bayer and Janssen.

1       But as you can imagine, this is a very important case for

2   us.  This is an important medication, and we want to make sure --

3   this is our only chance we have to ask you questions, and I always

4   say, you know, I could look at you and I could think I know what

5   you feel, but you could look at me and I hope you don't know, you

6   know, my background and where I am from.

7       I was in the Army.  I was an ROTC scholarship person, and

8   that Army experience changed my life.  And it affects a lot of how

9   I look at issues.  I don't know those things about you.  I don't

10  know what issues matter most to you, and from your experiences, and

11  that's what I think we're both interested in hearing about.

12      And so I am going to ask you some of the ones more about

13  pharmaceutical companies, because, as you can imagine, if I go home

14  and talk to my parents, and I say, "I am representing a

15  pharmaceutical company" I get an ear full.  They have a lot of

16  opinions about pharmaceutical companies.  And we asked you all some

17  questions and you all have quite a few opinions, so we want to know

18  is this a case where you're going to bring those opinions in and

19  kind of be the lens that you look through all of these issues.

20      So, Ms. Ferrell, I'm going to pick on you first, because

21  you were honest in your questionnaire to say you have quite a few

22  views about this particular drug, or blood thinners, or

23  anticoagulants and that you thought there were a lot of risks

24  associated with those.  Do you recall saying that?  Is that from

25  nursing experience?

09:56:09 1          THE JUROR:  Uh-huh.

09:56:10 2          MS. WILKINSON:  And can you tell me a little bit more

09:56:12 3  about your personal knowledge about the drug?

09:56:14 4          THE JUROR:  Just there are -- Juror No. 14, just it --

09:56:33 5  there's a lot of complications that I've seen with blood thinners.

09:56:38 6  I mean, you know, that's what they do and they have good points and

09:56:41 7  bad points to them.  Like, almost all medications have side

09:56:46 8  effects, but I have seen them.

09:56:47 9          MS. WILKINSON:  When you say, you mean because of how

09:56:50 10 they work?

09:56:51 11         THE JUROR:  Because of how they work, right.  They

09:56:52 12 prevent some things, but they can cause some things.

09:56:55 13         MS. WILKINSON:  There was a question about the warnings

09:56:57 14 and the labels, and you said that you thought pharma companies make

09:57:02 15 little or no effort to ensure the safety of medication, so you can

09:57:05 16 imagine when I read that I was concerned.  Tell me what --

09:57:09 17         THE JUROR:  In the context of the in-package insert, it's

09:57:12 18 extremely tiny.  It's extremely wordy.  I am a registered nurse,

09:57:16 19 and I have trouble following where this packet is taking me when I

09:57:20 20 tried to read and understand what it's telling me.  So I think the

09:57:23 21 general public probably has a difficult time trying to understand

09:57:27 22 what those pages and pages are telling them.

09:57:29 23         MS. WILKINSON:  And are you aware of the FDA's role in

09:57:32 24 approving those labels, even the font size and exactly what's in

09:57:38 25 them.

09:57:40 1          THE JUROR:  No, I didn't know the FDA approved the font

09:57:42 2   size.

09:57:42 3          MS. WILKINSON:  Do you think you come into this case kind

09:57:45 4   of thinking that we're starting from behind because you have

09:57:49 5   concerns about labels and whether they're really able to give

09:57:53 6   patients and doctors, you know, clear guidance about the

09:57:57 7   medication?

09:57:58 8          THE JUROR:  I really think I can approach this case with

09:58:00 9   an open mind, but I do think that -- you know, I can see both

09:58:07 10  sides.  I understand you have to -- you're giving the information.

09:58:10 11  It's there.  You get your big magnifying glass out and you can read

09:58:16 12  every word, and it's there.  So you are protecting the public and

09:58:18 13  telling them everything they probably need to know.  But, I mean,

09:58:22 14  how many of us read it?

09:58:23 15         MS. WILKINSON:  Right.  That's a different issue.

09:58:25 16         THE JUROR:  Right.

09:58:25 17         MS. WILKINSON:  And what about the view that you think

09:58:30 18  that pharmaceutical companies don't make an effort to provide that

09:58:33 19  information?  Because that's a different view kind of, that you

09:58:36 20  think the companies don't care to provide the right information.

09:58:42 21         THE JUROR:  I think they can do a better job and I was

09:58:45 22  specifically referring to the literature provided.

09:58:49 23         MS. WILKINSON:  If you were in my position, as we were

09:58:51 24  talking about, would you want someone like you who says you don't

09:58:55 25  think pharmaceutical companies care, you know, about giving the

09:58:58  1   information to patients to sit on this jury?

09:59:01  2        THE JUROR:  No, I didn't say they didn't care.  I said

09:59:03  3   they don't make as much an effort as I would like to provide

09:59:07  4   information and education in an easier, I guess, more easily

09:59:12  5   understood, you know, way of dealing with the public, the general

09:59:16  6   public.  It's very formal and a lot of big words in there.  Just,

09:59:22  7   as a nurse, and when you're talking with patients and providing

09:59:27  8   patient education, I know we have to bring it down and make sure

09:59:30  9   everybody understands.  So putting, you know, this package insert

09:59:36 10   in many layers, I don't know how much effort is involved in that.

09:59:41 11        MS. WILKINSON:  And you deal with real patients because

09:59:43 12   you're the nurse, so you know what it's like for those folks to try

09:59:46 13   and understand.

09:59:47 14        THE JUROR:  We do some education.

09:59:48 15        MS. WILKINSON:  Is there anything else?

09:59:51 16        THE JUROR:  No.

09:59:51 17        MS. WILKINSON:  Thank you.  I appreciate it.

09:59:54 18        Who else has concerns?  I think we heard some already,

09:59:59 19   but other concerns about pharmaceutical companies and whether they

10:00:04 20   do actually try to give the information to doctors and patients

10:00:06 21   that they need.  Sir.

10:00:08 22        THE JUROR:  They do.

10:00:09 23        MS. WILKINSON:  You do believe they do?

10:00:10 24        THE JUROR:  Yeah, they do because I take --

10:00:13 25        MS. WILKINSON:  Can I give you -- pass the microphone,

10:00:16  1    so -- the court reporter is the most important -- excuse me, your

10:00:18  2    Honor -- other than his honor, it's a tie.  She is the most

10:00:21  3    important person because she writes down and keeps the record and

10:00:24  4    types it, so we need to speak up.

10:00:26  5            THE JUROR:  I am on high blood pressure pills and they

10:00:29  6    give you a long sheet with the prescription of the medicine, and it

10:00:34  7    just got to take time and read it.

10:00:36  8            MS. WILKINSON:  You do that yourself?

10:00:38  9            THE JUROR:  I do that for me and my wife.

10:00:40  10           MS. WILKINSON:  You and your wife?

10:00:42  11           THE JUROR:  Yes.

10:00:43  12           MS. WILKINSON:  Do you talk to your doctor when you're

10:00:45  13   put on a new medication?

10:00:46  14           THE JUROR:  Yes, she explains it and tells us we are

10:00:49  15   going to get a copy of it and we sit down and read it.

10:00:52  16           MS. WILKINSON:  When you get those medications, do you

10:00:54  17   see that they have benefits treating your blood pressure, but also

10:00:57  18   risks?

10:00:58  19           THE JUROR:  Yes, they do.  They have it on the label.

10:01:01  20           MS. WILKINSON:  Great.  Thank you very much.

10:01:03  21           THE COURT:  Now, both of you all, just to follow-up on

10:01:05  22   that, will you decide this case, though, this case on the facts of

10:01:11  23   this case and the law applicable to this particular case?  That's

10:01:17  24   what both sides need to know.  Every case is different and you will

10:01:21  25   be hearing evidence in this particular case.  Will you decide --

10:01:26  1    will you take that evidence into consideration in making your

10:01:29  2    decision and not something outside of this courtroom?

10:01:34  3                 THE JUROR:  I'm good.

10:01:35  4                 THE COURT:  Both of you all understand that?

10:01:37  5                 THE JUROR:  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

10:01:39  6                 THE COURT:  Everybody does?

10:01:41  7                 MS. WILKINSON:  In some of your questionnaires as well

10:01:43  8    there were specific comments about the companies.  I think you'll

10:01:47  9    hear that Janssen, in this case, and Bayer, we made this medication

10:01:52 10    together, submitted it for approval to the FDA, and sold it and

10:01:57 11    still sell it today.  But Janssen is owned by a company called

10:02:02 12    Johnson & Johnson, and some people wrote down some views about

10:02:05 13    Johnson & Johnson.

10:02:06 14                 So, Mr. Mackey, I want to go back to you.  Do you

10:02:10 15    remember saying that you had some views about them?

10:02:12 16                 THE JUROR:  No, I don't remember.

10:02:13 17                 MS. WILKINSON:  No, sir?

10:02:14 18                 THE JUROR:  No.

10:02:15 19                 MS. WILKINSON:  Anybody else have any specific views

10:02:17 20    about either Bayer or Janssen or Johnson & Johnson?

10:02:22 21                 Yes, ma'am, Ms. Dudek.

10:02:25 22                 THE JUROR:  I'm Juror No. 5.  Johnson & Johnson, that's

10:02:32 23    all I heard about, it just gives you cancer, ovarian cancer.

10:02:37 24                 MS. WILKINSON:  You're not talking about --

10:02:39 25                 THE JUROR:  No.

10:02:40  1            MS. WILKINSON:  -- Xarelto, the drug in this case, you're

10:02:41  2    talking about something else?

10:02:43  3            THE JUROR:  Something else, yeah.

10:02:44  4            MS. WILKINSON:  And would that affect you, since you know

10:02:46  5    that Janssen is owned by Johnson & Johnson, thinking that they

10:02:49  6    might be doing something wrong here since you think they've done

10:02:52  7    something wrong with another medication?

10:02:54  8            THE JUROR:  No.

10:02:55  9            MS. WILKINSON:  Wouldn't have any impact?

10:02:57 10            THE JUROR:  No.

10:02:57 11            MS. WILKINSON:  Okay.  Great.  Thank you very much.

10:02:59 12    Anybody else have any views like that?

10:03:13 13            Some of you -- many of you, really, have folks who are

10:03:16 14    either on a blood thinner or have had atrial fibrillation.  You're

10:03:21 15    going to hear it referred to as AFib.  And sometimes people in

10:03:26 16    their personal experience when they have something like that and

10:03:29 17    hear a case like this, their personal feelings come into it because

10:03:32 18    they know, right.  They have a family member who has gone through

10:03:36 19    it.

10:03:36 20            So is there anyone here who has had a family member who

10:03:40 21    has either had atrial fibrillation or been on one of the blood

10:03:45 22    thinners like warfarin or they call it Coumadin as well.  Or

10:03:50 23    Xarelto or Pradaxa or Eliquis?  Anyone have any family member who

10:03:53 24    is on those drugs right now?  Yes, ma'am.

10:03:58 25            THE JUROR:  Yes, Juror No. 7.  My mother was on Pradaxa,

10:04:09  1    and after being on it for a week, she had a GI bleed and two days

10:04:17  2    later she died.

10:04:19  3              MS. WILKINSON:  I'm so sorry.

10:04:22  4              THE JUROR:  I mean, she had other health issues, but I

10:04:25  5    know it caused the GI bleed.  And that was one of the things that

10:04:28  6    the doctor had said, that she might have a GI bleed from being on

10:04:35  7    Pradaxa, so.

10:04:37  8              MS. WILKINSON:  I'm very sorry about that.  I'm sorry to

10:04:39  9    have to ask you followup questions, but in this case, as you heard,

10:04:44 10    what the plaintiffs are going to claim is that Mr. Boudreaux needed

10:04:50 11    a blood thinner.  They don't dispute that.  And he was put on

10:04:53 12    Xarelto by his doctor, and then a couple of weeks later he had a GI

10:04:58 13    bleed.  He was able to have a blood transfusion and be out of the

10:05:01 14    hospital in a couple of days, thank goodness.

10:05:04 15              But since you suffered through something so similar,

10:05:08 16    but far worse, do you think that would impact your ability to hear

10:05:10 17    this case?

10:05:11 18              THE JUROR:  Possibly.  I can't say 100 percent, but I

10:05:14 19    would definitely have to hear the whole -- everything.

10:05:18 20              MS. WILKINSON:  Do you think you would be -- I mean,

10:05:21 21    everyone is sympathetic to what Mr. Boudreaux went through, that's

10:05:24 22    not an issue in this case.  Do you think that kind of sympathy you

10:05:28 23    would relate a little bit more?

10:05:30 24              THE JUROR:  Definitely.  Definitely.

10:05:31 25              MS. WILKINSON:  Do you think we would kind of be starting

10:05:33 1   behind a little bit?

10:05:35 2           THE JUROR:  Possibly.

10:05:35 3           MS. WILKINSON:  You can say it.  We won't get our

10:05:37 4   feelings hurt.  Do you think so?

10:05:41 5           THE JUROR:  Possibly, yes.

10:05:42 6           MS. WILKINSON:  Anyone else have a family situation where

10:05:45 7   their family members have been on warfarin, or Xarelto, Pradaxa,

10:05:49 8   any of those drugs?

10:05:50 9           Yes, sir.  Mr. Fullerton.

10:05:56 10          THE JUROR:  No. 1, Jay Fullerton.  Both my parents were

10:06:04 11  on blood thinners.  They've both since passed.  And my dad had

10:06:13 12  bronchial stuff and heart problems.  My mom had heart valves, she

10:06:19 13  was on blood thinners.  She went in the hospital for a stroke

10:06:24 14  caused by the blood thinners.  As they were checking her out of the

10:06:27 15  hospital, she had another stroke and passed before they could do

10:06:31 16  anything.  She was even at the hospital.  So.

10:06:35 17          MS. WILKINSON:  I'm sorry to hear about that.

10:06:39 18          THE JUROR:  It's fine.

10:06:40 19          MS. WILKINSON:  Is it your belief that the blood thinner

10:06:42 20  caused her stroke?

10:06:45 21          THE JUROR:  Not really.  She had to be on a blood thinner

10:06:50 22  having artificial heart valves.

10:06:54 23          MS. WILKINSON:  She had a complicated medical situation?

10:06:56 24          THE JUROR:  Yeah.  Both my parents both had complicated

10:06:59 25  medical history and you've got to treat the one or both, and it's

10:07:05  1    just part of what happened.  So.

10:07:08  2            MS. WILKINSON:  And do you think that would have an

10:07:10  3    impact if you were asked to sit in this particular case?  I mean,

10:07:13  4    nobody wants to say they're not fair, generally, but would this

10:07:17  5    be -- I know you have other issues.

10:07:19  6            THE JUROR:  I would say not.  If anything, it probably

10:07:24  7    made me less biased in any one way or the other.

10:07:29  8            MS. WILKINSON:  Great.  Thank you very much.

10:07:35  9            Is there anybody else who believes that there's something

10:07:38 10    about this case as they've heard about it -- and one of our

10:07:41 11    concerns is, of course, you really haven't heard any evidence,

10:07:44 12    right?  So I don't really want to ask you, "Do you think there's

10:07:49 13    something about this case that makes it difficult for you," because

10:07:52 14    you don't know the case yet.

10:07:54 15            What I want to end my questioning on is:  Do you think

10:07:57 16    that knowing what you know, which this is a case about a family,

10:08:00 17    Mr. and Mrs. Boudreaux, nice folks, saying that a drug company

10:08:04 18    didn't give enough information to their doctor and, therefore,

10:08:08 19    caused this GI bleed, that if he didn't prove his case -- we're in

10:08:14 20    the courtroom, they bring the case, and it's their burden, as the

10:08:18 21    judge told you.  It's their burden to prove the case, not ours.

10:08:20 22            If they don't prove their case, could you actually say,

10:08:24 23    then, Mr. Boudreaux doesn't win?  He doesn't get any money and he

10:08:28 24    doesn't win.  Because we all agree that Mr. Boudreaux suffered a

10:08:32 25    gastrointestinal bleed, there's no dispute.

10:08:34  1          So all I want to know is:  Can you do what your Honor is

10:08:37  2   going to ask you to do, which is apply the law.  If they prove

10:08:41  3   their case, of course, then you would vote for him.  But if they

10:08:45  4   don't, could you actually say, "I wrote not proved," and, you know,

10:08:50  5   had a verdict for Bayer and Janssen or pharmaceutical company.

10:08:55  6   Does anyone have a problem doing that?  Because that's all we can

10:08:59  7   ask.  No one?

10:09:02  8          Okay.  Thank you very much, and I appreciate your time.

10:09:05  9          THE COURT:  Thank you very much.  Let me see counsel,

10:09:08 10   please.

10:09:25 11      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:09:31 12          MS. WILKINSON:  Your Honor, someone just told me I missed

10:09:34 13   someone who had their hand raised, Juror No. 23.  Do you know her

10:09:39 14   name?

10:09:46 15          THE COURT:  Twenty-three.

10:09:53 16          MR. BIRCHFIELD:  What's the issue?

10:10:02 17          MS. WILKINSON:  Ms. Noel had her hand up.

10:10:06 18          THE COURT:  Okay.

10:10:07 19          MS. WILKINSON:  We may not get there, so, on the numbers.

10:10:11 20          THE COURT:  I'll get her up here, if necessary.

10:10:19 21          MS. WILKINSON:  Thank you.

10:10:19 22          THE COURT:  This is the way I see it.  I'm going to

10:10:24 23   excuse No. 7.  She is only caretaker for the child.  Also, her

10:10:30 24   mother died from a GI bleed.  That's Ms. Dudek, D-U-D-E-K, Tina

10:10:40 25   Dudek.  I will excuse her for cause.

10:10:42  1          I am also going to excuse Janet Graves for cause.  Janet

10:10:46  2   Graves has indicated that she can't be fair in my judgment.

10:10:51  3          The ones that I am concerned about -- I'm a little

10:11:14  4   concerned about No. 1.  I don't want him to be walking on us and

10:11:18  5   that's a concern, so if you agree, I'll excuse him.

10:11:23  6          MR. BIRCHFIELD:  I think he should be excused, your

10:11:27  7   Honor.

10:11:27  8          THE COURT:  How about you, Beth?  I can see what the

10:11:34  9   problem is if something comes up in a week, we're going to lose

10:11:37 10   him.

10:11:39 11          MS. WILKINSON:  I mean --

10:11:40 12          THE COURT:  I am not going to excuse him for cause unless

10:11:43 13   you all agree then goes.

10:11:44 14          MS. WILKINSON:  I don't really think we should, your

10:11:47 15   Honor.

10:11:47 16          THE COURT:  Okay.  We don't agree?

10:11:49 17          MS. WILKINSON:  No, your Honor.

10:11:49 18          THE COURT:  Okay.  We won't excuse him for cause.

10:11:55 19          There's another one, No. 10.  I am concerned about him.

10:11:59 20   He says he has a problem with his grandchild.

10:12:03 21          MR. BIRCHFIELD:  Mr. Griffin.

10:12:05 22          THE COURT:  That's an issue.

10:12:06 23          MR. BIRCHFIELD:  Well, okay.  But it's just -- it's the

10:12:09 24   standard.  I mean, Mr. Fullerton doesn't want to be here either

10:12:13 25   because he has live prospects, and I prefer that we have people who

10:12:18 1     want to be here.  I prefer that we let Mr. Fullerton and

10:12:22 2     Mr. Griffin go.  If we're -- we need to apply the same standard.

10:12:26 3          MS. WILKINSON:  Your Honor, I think there is the same

10:12:28 4     standard.  Mr. Griffin has a real conflict, a hardship because he

10:12:31 5     has a grandson, he lives in a rural area, and can't drive.

10:12:37 6     Mr. Full --

10:12:37 7          THE COURT:  I agree with that.  I will excuse him for

10:12:40 8     cause.  That's a problem.  That's one of the reasons we have nine.

10:12:44 9     If somebody has to leave, they have to leave.

10:12:50 10          I am a little concerned about 14, Shaney Ferrell.  I

10:12:55 11     don't know how you all feel about that.

10:12:57 12          MS. WILKINSON:  We would like her excused, your Honor.

10:12:59 13          MR. BIRCHFIELD:  I think she ought to stay there's not a

10:13:03 14     "for cause".

10:13:03 15          THE COURT:  I will keep her on.

10:13:07 16          The one that I am really concerned about is 18, Jessica

10:13:12 17     Russo.  Her grandfather is ill and may die.

10:13:17 18          MS. WILKINSON:  Yes, your Honor, we agree.

10:13:19 19          MR. BIRCHFIELD:  I think she should go.

10:13:20 20          THE COURT:  I'll excuse her.  We can agree with that,

10:13:24 21     Counsel.

10:13:25 22          The last one is Joseph Bragg, 22.  I would like your

10:13:29 23     input on him.

10:13:32 24          MS. WILKINSON:  We agree he should be excused, your

10:13:35 25     Honor.

10:13:36  1          MR. BIRCHFIELD:  I didn't hear anything that said he

10:13:42  2     can't be fair.  Did I miss it?

10:13:45  3          THE COURT:  Okay.  I'll keep him on.

10:13:47  4          All right.  Folks, this is the ones that are excused for

10:13:51  5     cause.  Let me ask you all:  Any problem with anybody that I

10:13:57  6     haven't talked about that you wish to have excused for cause from

10:14:01  7     the plaintiff's standpoint?

10:14:04  8          MR. BIRCHFIELD:  No, your Honor.

10:14:06  9          THE COURT:  All right.  Anybody from the defendant's

10:14:08 10     standpoint for cause?

10:14:09 11          MS. WILKINSON:  Your Honor, we are just trying to review

10:14:12 12     Mr. Bragg's comments so that we can see them.

10:14:17 13          I mean, we would like Mr. Bragg excused for cause.  He

10:14:20 14     was a chemist who said he thought that the drugs were not properly

10:14:24 15     tested.  He thought he knew that companies didn't do enough

10:14:29 16     testing, and they had seen problems himself, and I just think that

10:14:32 17     because that's the exact issue in this case, they're going to say

10:14:36 18     that there wasn't sufficient information that he can't be fair and

10:14:41 19     shouldn't be seated.

10:14:42 20          MR. BIRCHFIELD:  He did testing on tires.

10:14:43 21          THE COURT:  I understand.  I am not going to excuse him

10:14:45 22     for cause.  I think he said that he could be fair and he would

10:14:48 23     decide the case solely on its merits.

10:14:51 24          Okay.  Then these are the ones that will be excused for

10:14:56 25     cause:  No. 7, Tina Dudek; No. 10, Richard Griffin; No. 11, Janet

10:15:05  1    Graves; No. 19, Jessica Russo --

10:15:10  2              THE DEPUTY CLERK:  Eighteen, Judge.

10:15:12  3              THE COURT:  I'm sorry, 18.  Excuse me, 18, Jessica Russo.

10:15:19  4    Those are the ones for cause.  How many do we have, Dean?

10:15:22  5              MS. WILKINSON:  That's four.

10:15:23  6              MR. BIRCHFIELD:  Four excused for cause, yes.

10:15:26  7              THE COURT:  So we have 26.  So we have enough, then, for

10:15:29  8    each of you all three.  Go back to your bench and Dean will come to

10:15:39  9    the defendant first.  Talk with your people.  Decide who you want

10:15:43 10    to excuse.  You put an "X" by the one you want to excuse.  Give it

10:15:48 11    to Dean and he will bring to you Andy and then you will decide.

10:15:52 12              MR. BIRCHFIELD:  Your Honor, it's 10:15, it's time for a

10:15:55 13    morning break.  Would it be okay to let the jurors go to the

10:15:58 14    restroom?

10:15:58 15              MS. WILKINSON:  It would really help us just to talk to

10:16:00 16    our people for just a few minutes, your Honor.

10:16:02 17              THE COURT:  Okay.  We'll do that.

10:16:03 18              MS. WILKINSON:  Thank you.

10:16:16 19         (OPEN COURT.)

10:16:16 20              THE COURT:  Members of the jury, we've done all of our

10:16:19 21    cause challenges.  What we are going to do now is what's called

10:16:26 22    peremptory challenges.

10:16:28 23              With regard to peremptory challenges, each side has a

10:16:33 24    certain number of peremptory challenges.  A peremptory challenge is

10:16:38 25    given to juries in the United States.  They've abolished it

10:16:44   1    England, but it's still with us here in the United States.

10:16:47   2            In addition to cause challenges, the attorneys can excuse

10:16:53   3    anyone that they feel ought to be on another case.  They have each

10:16:58   4    three challenges that way.

10:17:00   5            They can't excuse someone because they're a male or

10:17:03   6    female or whatever, because that's illegal; but they can simply by

10:17:10   7    listening to you, by hearing what you said, feel, well, maybe that

10:17:15   8    person should be in a different case.  And that's what we're going

10:17:18   9    to do now.

10:17:19   10           But before we do that, we will take a quick break and

10:17:22   11   then please come back, and please sit in the same chairs that

10:17:26   12   you're sitting in now.  We're almost there.  It'll take us maybe

10:17:31   13   about another 15 or 20 minutes.

10:17:33   14           The court will stand in recess for ten minutes.

10:17:35   15           THE MARSHAL:  All rise.

10:28:30   16       (WHEREUPON, A RECESS WAS TAKEN.)

10:28:30   17       (OPEN COURT.)

10:28:31   18           THE MARSHAL:  All rise.

10:28:31   19           THE COURT:  Be seated, please.  Dean.

10:28:34   20           THE DEPUTY CLERK:  Yes, sir.

10:29:27   21           THE COURT:  As I said, members of the jury, what's being

10:29:29   22   done now is they're doing their peremptory challenges.  And each of

10:29:38   23   them have three peremptory challenges.

10:29:41   24           I appreciate all of the answers that you've given.  You

10:29:45   25   all have done a great job and I appreciate it.  This is an old

10:29:50 1   institution.  We're going on now 250 years of the jury system for

10:29:56 2   those teachers among you.  It's worked well for a Western

10:30:01 3   civilization by and large, and now with the shake ups around the

10:30:07 4   world, we're getting some inquiries from Japan and China who want

10:30:13 5   to look into the jury system because it's worked so well for us.

10:30:17 6          The interesting thing is that they would like larger

10:30:21 7   groups.  We found that a maximum of 12 works for us in Western

10:30:27 8   civilization.  We have 12 tribes of Israel, 12 apostles, 12 signs

10:30:33 9   of the zodiac, and all of those, 12 months in a year, so 12 has

10:30:38 10  worked pretty well for us.  But they are thinking about different,

10:30:44 11  larger crowds apparently, so I don't know how that's going to work.

10:30:50 12         In this particular case, being a civil case as opposed to

10:30:54 13  a criminal case, a criminal case we still use 12 jurors.  In a

10:30:58 14  civil case, we'll use 9 jurors instead of 12 jurors.  I think the

10:31:07 15  government's probably trying to cut down on expenses because they

10:31:10 16  pay you by the day for doing it, so you know how that is.

10:35:39 17         Let me see counsel for a moment, please.

10:35:51 18     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:35:55 19         THE COURT:  Anybody have any Batson problems, Batson

10:36:00 20  challenges?

10:36:00 21         MR. BIRCHFIELD:  None from the plaintiff.

10:36:01 22         MS. WILKINSON:  No, your Honor.

10:36:03 23         THE COURT:  None for the plaintiff.  None for the

10:36:05 24  defendant.

10:36:06 25          Check your notes, this is what I have.  The first juror

10:36:08  1    is No. 2, the second juror is No. 4, the third juror is No. 6, the

10:36:16  2    fourth juror is No, 8, the fifth juror is No. 9, the sixth juror is

10:36:23  3    No. 12, the seventh juror is No. 13, the eighth juror is No. 15,

10:36:32  4    and the ninth juror is No. 19.  Is that consistent with your notes?

10:36:38  5            MR. BIRCHFIELD:  Yes, your Honor.

10:36:38  6            MS. WILKINSON:  Yes, your Honor.

10:36:39  7            THE COURT:  Okay.  I will tell them that and we'll excuse

10:36:45  8    the other people.  Then I will have a word or two with this jury,

10:36:50  9    logistics, and then give me your input on this.  It's kind of early

10:37:00 10    to leave for lunch, but if we get through at about quarter to

10:37:07 11    ten -- quarter to 11, I guess, then the plaintiffs can take an hour

10:37:17 12    and the defense, how long do you think?

10:37:19 13            MS. WILKINSON:  Forty-five minutes.

10:37:21 14            THE COURT:  Forty-five minutes.

10:37:23 15            MR. MEUNIER:  Take a lunch break?

10:37:25 16            THE COURT:  That's the problem.

10:37:27 17            MR. BARR:  We can take an early lunch and start back at

10:37:30 18    12:30.

10:37:30 19            MS. WILKINSON:  Or we can go and take lunch and then go

10:37:33 20    in the afternoon.

10:37:35 21            THE COURT:  We would have to take an early lunch.  I

10:37:37 22    don't want to break it up.  I don't think it's good for the

10:37:40 23    plaintiff to take it and then go to lunch.  I would like to have

10:37:45 24    you all both, I think it works better that way.  We were able to

10:37:50 25    move it fast, so.  Okay.  We'll talk about it.

10:37:53  1          MR. MEUNIER:  Judge, when are you going to give the
10:37:56  2  preliminary charges?
10:37:57  3          MS. WILKINSON:  What?  I'm sorry.
10:37:59  4          MR. MEUNIER:  The preliminary charges.
10:38:01  5          THE COURT:  I'll do that, but I would like to do that
10:38:04  6  right before you get ready for opening statements.
10:38:08  7          MR. BIRCHFIELD:  Okay.  I mean, your Honor, we will need
10:38:10  8  just a couple of minutes to get set up, of course.
10:38:14  9          THE COURT:  Right.  Okay.
10:38:26 10      (OPEN COURT.)
10:38:26 11          THE COURT:  Okay.  Folks, with your help, we were able to
10:38:28 12  select a jury.  I'll name the jurors.  If I call your name, please
10:38:33 13  remain.  If I do not call your name, you can go back to Room 107
10:38:40 14  for discharge.
10:38:41 15          The first juror is No. 2, Willie Mackey.  The second
10:38:45 16  juror is No. 4, Lynette Johnson.  The third juror is No. 6, Tiffani
10:38:54 17  Jackson.  The fourth juror is No, 8, Kristina McAvoy.  The fifth
10:39:04 18  juror is No. 9, Nelson Capote.  The sixth juror is No. 12, Felipe
10:39:16 19  Santos.  The seventh juror is No. 13, Mary Johnson.  The eighth
10:39:22 20  juror is No. 15, Kristin Ripley.  The ninth juror is No. 19, Traci
10:39:34 21  Coss.
10:39:35 22          If I called your name, please remain.  If I have not
10:39:38 23  called your name, you're to return to Room 107.
10:39:43 24          But before you leave, folks, I want to take the
10:39:46 25  opportunity to thank you very much for your responses, for your

10:39:49  1    presence today.  Even though you have not been called as a juror in

10:39:53  2    this particular case, your presence and your questions have allowed

10:39:59  3    us to select a jury, and we are all grateful to you for that.

10:40:03  4         I would ask everybody to rise out of respect as these

10:40:06  5    jurors leave.

10:40:06  6         (WHEREUPON, JURORS EXITED THE COURTROOM.)

10:41:04  7         THE COURT:  Please swear the jury in, please.

10:41:05  8         THE DEPUTY CLERK:  Jurors, would you raise your right

10:41:06  9    hands one more time.

10:41:08  10        (WHEREUPON, THE JURY WAS SWORN IN.)

10:41:23  11        THE DEPUTY CLERK:  Please have a seat.

10:41:28  12        THE COURT:  Ladies and gentlemen of the jury, you have

10:41:32  13   now been selected to serve as jurors in this case, and I have no

10:41:36  14   doubt that you, as jurors, are mindful of your great

10:41:40  15   responsibility; and, certainly, you are aware that your conduct

10:41:45  16   during the trial will be observed by the Court, your fellow jurors,

10:41:49  17   the parties, the attorneys for all parties, and all other persons

10:41:53  18   both inside and outside of this courtroom.

10:41:56  19        I expect and your responsibility demands that you be

10:42:00  20   extremely careful in the manner in which you conduct yourselves in

10:42:05  21   order that no one has any doubt that this case is being fairly and

10:42:09  22   impartially tried and that, in the end, justice has been done.

10:42:14  23        For the same reason the attorneys in the case, the

10:42:19  24   parties, the witnesses, and all others identified with or connected

10:42:23  25   with this trial or its participants should be equally careful of

10:42:27  1    their conduct.

10:42:28  2         During the course of the trial, the juror shall not

10:42:30  3    engage or even attempt to engage or have any conversation of any

10:42:34  4    kind whatsoever with any of the persons connected with this trial,

10:42:38  5    including the parties, their relatives or families, the attorneys

10:42:43  6    for the parties, the witnesses, or any other person identified with

10:42:47  7    the trial.

10:42:48  8         And the reason for that, members of the jury, is that

10:42:52  9    justice is a strange thing.  It's not only important that it be

10:42:55 10    done, but it's also important that it appear to be done.  And so

10:43:00 11    that if you're talking to a particular side, you may be okay,

10:43:05 12    you're not doing anything improper, but somebody seeing that might

10:43:09 13    feel that justice, it doesn't appear to be done in this particular

10:43:14 14    case.  So I ask that you not do that.

10:43:17 15         The parties, the witnesses, and all other persons

10:43:20 16    identified with this trial shall not engage or even attempt to

10:43:27 17    engage in any conversation whatsoever with a juror.  If this

10:43:31 18    happens, please bring it to my attention and I will deal with it

10:43:35 19    immediately.

10:43:36 20         Further, as jurors, you should avoid placing yourselves

10:43:40 21    in a position where outside of the courtroom where discussions of

10:43:43 22    the case may be conducted by any of the parties of the trial.

10:43:49 23    Further, the attorneys, the parties, the witnesses, and other

10:43:51 24    persons who may be observing the trial, or who are connected with

10:43:57 25    in any way, must particularly be careful not to discuss and shall

10:44:00  1  not discuss the case where there is a possibility that the jurors

10:44:06  2  may hear their remarks.  If such happens, bring it to my attention.

10:44:10  3         Now, all of us are trained, at least in this community,

10:44:14  4  to tell everybody hello when they see them and we oftentimes ask

10:44:20  5  them how they're doing and how did they do with the storm, things

10:44:25  6  of that sort.  Please don't do that this time for the reasons that

10:44:28  7  I just mentioned.  And I am going to ask the attorneys not to greet

10:44:31  8  you as you would expect them to do when they come into court.

10:44:35  9  They're doing it not because they don't want to but because I've

10:44:39 10  asked them and directed them not to do so.  And for the same

10:44:43 11  reason, I don't want anybody to feel that they're trying to cotton

10:44:46 12  up to some juror, that wouldn't be appropriate.

10:44:50 13         I would like to give you some following instructions,

10:44:54 14  specific instructions.  You're not to discuss the case with anyone

10:44:58 15  during the course of this trial.  This includes your spouse, your

10:45:01 16  child, your relatives, friends, and even strangers.  And the reason

10:45:06 17  for this is that oftentimes when we start talking about something,

10:45:10 18  we're forming opinions on it.  And I would ask that you not form

10:45:17 19  any opinions until you see the whole of the evidence, both the

10:45:19 20  plaintiffs and the defendants, and you hear from the Court.

10:45:23 21         It's sort of like if I say, What are you seeing?  And you

10:45:26 22  say you're seeing my hand.  You haven't seen my hand until you've

10:45:30 23  seen both sides of my hand, then you've seen my hand.  So don't

10:45:34 24  form any opinions.  And often times when we start talking about

10:45:38 25  things, we've either formed an opinion or said something and won't

go back on it.  So it's best not to talk to each other even or anyone else about this case.

If any publicity about the case has come to your attention before this moment, you must strike it from your mind and completely disregard anything that's come to your attention.  And this is the point from this moment on, folks, if you see anything on television about this case, avoid it, leave the room.  If you see any headlines in the newspaper, don't read them, leave the room, and have somebody save them all for you so you can look at them later.  Don't look at them at this point.

And the reason for that is that we're going to conduct what I think is sort a search for truth in this laboratory that we call a courtroom, and if you bring any information into this laboratory from outside you're bringing in germs and you're going to hurt our search for justice.  So please don't expose yourself to anything about this case outside of this courtroom.

Finally, as I mentioned, you're not to reach any conclusions in this case until all of the evidence has been presented, the Court has instructed you on the law applicable to the case, and is given to you for deliberation and decision.

In the morning when you arrive and during the day when you're in the building or the court is in recess, you are not required to be in the courtroom, I ask that you go to and remain in the jury room.  I've set aside a jury room and I've assigned a United States Marshal to be of assistance to you.  If you need

10:47:29  1    anything, let him know.  We'll provide drinks and things of that

10:47:34  2    sort to make your stay with us as comfortable as we can.

10:47:37  3            The case will proceed in the following order:  First,

10:47:41  4    counsel for the plaintiff and counsel for the defendant will have

10:47:43  5    an opportunity to make an opening statement.  The plaintiff's

10:47:48  6    counsel shall make the opening statement at the beginning of the

10:47:50  7    case.  Now, this statement is nothing more than a verbal program.

10:47:55  8    It's to give you some idea of what evidence they're going to

10:48:00  9    present and they will give that to you.  It's not evidence itself,

10:48:05 10    it's just what they expect to show you, what they expect the

10:48:09 11    evidence to be.  It's kind of as I say, a verbal program so that

10:48:13 12    you can better follow the evidence as it unfolds.

10:48:18 13            The plaintiff's opening statement will give you a theory

10:48:23 14    of their case and serve merely as an introduction to the evidence,

10:48:26 15    which the defendant (VERBATIM) intends to produce in the course of

10:48:29 16    the trial.  And the defendant at the end of the plaintiff's opening

10:48:33 17    statement may make an opening statement following the opening

10:48:37 18    statement of the plaintiff.  Just like the plaintiff's opening

10:48:40 19    statement, it's a verbal program, it's not evidence in the case.

10:48:43 20    It's what the defendant intends to show you in this particular

10:48:49 21    case.

10:48:50 22            Second, the plaintiffs will then produce evidence in

10:48:54 23    support of the allegations of their case, and that's the evidence

10:49:00 24    that you will then be focused on and listen to.  The defendants

10:49:07 25    will then have an opportunity to introduce evidence and the

10:49:10  1    plaintiffs will have an opportunity to introduce what we call

10:49:13  2    rebuttal evidence if they feel it is important.

10:49:16  3            At the conclusion of the evidence, the parties will have

10:49:19  4    the opportunity to present what we call oral arguments -- sometimes

10:49:23  5    we call it summation or closing argument -- in support of their

10:49:27  6    respective cases.  Again, what is said in closing argument is not

10:49:31  7    evidence, it is just as what is said in opening statement is not

10:49:36  8    evidence.  The arguments are intended to present to you the

10:49:40  9    contentions of the respective parties as to what the evidence, what

10:49:44 10    they believe the evidence has shown and what inferences they feel

10:49:49 11    you should draw from that evidence.

10:49:51 12            Counsel for the plaintiff has the right to open, followed

10:49:56 13    by the defendant, and the plaintiffs have an opportunity to close.

10:50:00 14    And the reason for that is that the plaintiffs have the burden of

10:50:03 15    proof, so the law gives them the opportunity to open summation,

10:50:08 16    followed by the defendants, and they have an opportunity to close

10:50:12 17    summation.

10:50:13 18            It's your duty to determine the facts and to determine

10:50:17 19    them from the evidence.  In so doing you must not indulge in

10:50:21 20    questions work or speculation.  The evidence that you are to

10:50:24 21    consider consists of the testimony of the witnesses and the

10:50:28 22    exhibits admitted into evidence.  In considering the weight and

10:50:32 23    value of the testimony of any witness, you may take into

10:50:35 24    consideration the appearance, the attitude, behavior of the

10:50:40 25    witness, the interest of the witness in the outcome of the lawsuit,

10:50:44 1  the relation of the witness to the parties, the inclination of the

10:50:48 2  witness to speak truthfully or not, and the probability or

10:50:53 3  improbability of the witness's statements.  And all other facts and

10:50:57 4  circumstances in evidence.  Thus, you may give the testimony of any

10:51:02 5  witness just such weight and value as you, the jury, may believe

10:51:08 6  their testimony is entitled to receive.

10:51:11 7          As I said at the outset, in every jury trial there are,

10:51:16 8  in fact, two judges.  I am one of the judge, but you, the jury, is

10:51:20 9  the other judge.  You judge the facts of this case, you and you

10:51:24 10 alone judge the facts of this case.

10:51:27 11         The admission of evidence in court is governed by rules

10:51:30 12 of law, we sometimes refer to them as rules of evidence.  From time

10:51:34 13 to time it may be the duty of the attorneys to make objections to

10:51:39 14 the admissibility of evidence.  It is my duty, as a judge, to rule

10:51:43 15 on those objections.  My rulings may well affect whether you can

10:51:50 16 consider certain evidence.  You must not concern yourselves with

10:51:53 17 the objections or the Court's reasons for its ruling on them.  You

10:51:58 18 must not consider testimony or exhibits to which an objection was

10:52:03 19 sustained or which has been ordered stricken.  If I instruct you

10:52:06 20 not to consider testimony or evidence to which an objection is

10:52:10 21 sustained or which has been ordered stricken, you must completely

10:52:14 22 ignore that testimony or evidence and not take it into

10:52:19 23 consideration in deciding your case.

10:52:21 24         You must not be influenced to any degree by any personal

10:52:27 25 feelings or sympathy, or prejudice for or against any party or

10:52:32 1    their counsel.  No statement or ruling or remark which I may make

10:52:36 2    during the presentation of the testimony or evidence is intended to

10:52:41 3    indicate what my opinion is as to the facts.

10:52:45 4          I remind you again, you and you alone are to determine

10:52:49 5    the facts.  In this determination you alone must decide the

10:52:54 6    believability of the evidence, the weight to give to the evidence.

10:52:58 7          Now, if you would like to take notes during this trial,

10:53:01 8    you may do so.  On the other hand, you are not required to take

10:53:05 9    notes if you prefer not to do so.  I'll supply the tablets and

10:53:10 10   pencils for you if you decide to take notes.

10:53:13 11         If you do decide to take notes, please be careful not to

10:53:18 12   get so involved in note taking that you become distracted from the

10:53:23 13   ongoing proceedings.  Your notes should be used only as memory

10:53:28 14   aids, and you should not give your notes precedence over your

10:53:33 15   independent recollection of the evidence.  Whether or not you take

10:53:37 16   notes, you should rely upon your own independent recollection of

10:53:42 17   the proceedings and should not be unduly influenced by notes from

10:53:47 18   other jurors.

10:53:49 19         I remind you that notes are not entitled to any greater

10:53:52 20   weight than the memory or impression of each juror as to what the

10:53:57 21   testimony may have been.  Whether or not you take notes, each of

10:54:02 22   you must form and express your own opinion as to the facts of this

10:54:06 23   case.

10:54:08 24         Now, ladies and gentlemen, in the last maybe 10 or

10:54:11 25   15 years we've had something called social media that everybody

10:54:15  1   looks at or checks.  I know it's hard but I am going to ask you not

10:54:21  2   to do that in this particular case.  No Googling anybody or

10:54:26  3   searching for any of the facts.  And the reason for that, I talked

10:54:30  4   to you about a laboratory, just as any laboratory we have certain

10:54:35  5   procedures that help us find things, find the truth, and one of

10:54:42  6   those is cross-examination, seeing two sides of the thing.  And

10:54:49  7   oftentimes when you do research or you look at social media, you

10:54:54  8   only see one side of it.  I haven't seen the cross-examination side

10:54:59  9   of it.  And then when you come to court with that information in

10:55:02 10   your mind, you're bringing in the germ to our laboratory and you'll

10:55:12 11   have a great effect on our search for truth.  So please don't use

10:55:16 12   social media and don't tell anybody that you're in trial or out of

10:55:20 13   trial or whatever it is, because that sometimes is used to, we

10:55:26 14   sometimes feel a compulsion to tell people on Facebook or Twitter

10:55:30 15   everything that we do in our lives.  And nobody but our mommas

10:55:36 16   ought to know that sort of thing, we know that from our experience.

10:55:39 17   So I ask that you not do that in this particular case.

10:55:43 18          We'll take a break at this time for the lawyers to get

10:55:47 19   ready for opening statements.  But let me do this, members of the

10:55:52 20   jury.  We're going to break for an early lunch.  I'm afraid that if

10:55:58 21   I start the opening statements you folks are going to be too hungry

10:56:04 22   to listen, because as you know how these lawyers are, they can talk

10:56:07 23   for days, you've seen them in action.

10:56:10 24          And on that subject, I've given them certain deadlines.

10:56:16 25   So I know they can talk for days and they would be willing to do

10:56:19  1    that, but I've asked them to shorten that.  So any deadlines are

10:56:24  2    mine, not theirs.  So I'm sure they have a lot to say.  But if they

10:56:28  3    sit down too soon, it's my doing, not their doing.

10:56:32  4          But we'll take a break here and come back in an hour and

10:56:36  5    15 minutes, let's say 12:15.  Okay.  We'll be here at 12:15.

10:56:43  6          THE MARSHAL:  All rise.

10:56:44  7          THE DEPUTY CLERK:  All rise.  Just follow the security

10:56:46  8    guard right there.

10:56:56  9          THE COURT:  Folks, you might want to call people and tell

10:56:58  10   them you're selected as a juror.

10:57:05  11     (WHEREUPON, THE JURY EXITED THE COURTROOM.)

10:57:05  12         THE COURT:  The court will stand in recess until 12:15.

10:57:09  13     (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

14

15                        *  *  *  *  *  *

16

17                     REPORTER'S CERTIFICATE

18

19          I, Karen A. Ibos, CCR, Official Court Reporter, United
         States District Court, Eastern District of Louisiana, do hereby
20       certify that the foregoing is a true and correct transcript, to the
         best of my ability and understanding, from the record of the
         proceedings in the above-entitled and numbered matter.

21

22              /s/ Karen A. Ibos
         _____
23       Karen A. Ibos, CCR, RPR, CRR, RMR
         Official Court Reporter

24

25