```
09:12:03   1                 UNITED STATES DISTRICT COURT
                             EASTERN DISTRICT OF LOUISIANA
           2

           3    ***********************************************************

                IN RE:  XARELTO (RIVAROXABAN)
           4    PRODUCTS LIABILITY LITIGATION      Docket No. 14-MD-2592
                                                   Section "L"
           5                                       New Orleans, Louisiana
                THIS DOCUMENT RELATES TO:          Wednesday, April 26, 2017
           6    Joseph J. Boudreaux, Jr.
                v. Janssen Research &
           7    Development, et. al.,
                Case No. 14-CV-2720
           8

           9    ***********************************************************

           10                TRANSCRIPT OF TRIAL PROCEEDINGS
                       HEARD BEFORE THE HONORABLE ELDON E. FALLON
           11                  UNITED STATES DISTRICT JUDGE
                              VOLUME III - MORNING SESSION
           12

                APPEARANCES:
           13

                FOR THE PLAINTIFFS'
           14   LIAISON COUNSEL:              LEVIN PAPANTONIO
                                              BRIAN H. BARR, ESQ.
           15                                 316 Baylen Street, Suite 600
                                              Pensacola, FL 32502
           16
                                              BEASLEY ALLEN
           17                                 BY:  ANDY BIRCHFIELD, ESQ.
                                              P.O. Box 4160
           18                                 Montgomery, AL 36103

           19                                 GAINSBURGH BENJAMIN DAVID
                                              MEUNIER & WARSHAUER
           20                                 BY:  GERALD E. MEUNIER, ESQ.
                                              2800 Energy Centre
           21                                 1100 Poydras Street
                                              New Orleans, LA 70163
           22
                                              SCHLICHTER, BOGARD & DENTON
           23                                 BY:  ROGER C. DENTON, ESQ.
                                              100 South 4th Street
           24                                 Saint Louis, MO 63102

           25
```

```
1                                    LAMBERT FIRM
                                     BY:  EMILY JEFFCOTT, ESQ.
2                                    701 Magazine Street
                                     New Orleans, Louisiana 70130
3

4    FOR THE DEFENDANT BAYER
     HEALTHCARE PHARMACEUTICALS
5    INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
                                     BY:  BETH A. WILKINSON, ESQ.
6                                    1900 M Street NW, Suite 800
                                     Washington, DC 20036
7
                                     NELSON MULLINS RILEY
8                                    & SCARBOROUGH, LLP
                                     BY:  DAVID E. DUKES, ESQ.
9                                    Meridian, 17th Floor
                                     1320 Main Street
10                                   Columbia, SC 29201

11                                   BRADLEY ARANT BOULT CUMMINGS
                                     BY:  KEVIN C. NEWSOM, ESQ.
12                                   One Federal Place
                                     1819 5th Avenue N
13                                   Birmingham, AL 35203

14
     FOR JANSSEN PHARMACEUTICALS,
15   INC. AND JANSSEN RESEARCH &
     DEVELOPMENT, LLC:               BARRASSO USDIN KUPPERMAN FREEMAN
16                                   & SARVER, LLC
                                     BY:  RICHARD E. SARVER, ESQ.
17                                   909 Poydras Street, 24th Floor
                                     New Orleans, LA 70112
18

19
     Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR, RMR
20                                   500 Poydras Street, B-275
                                     New Orleans, Louisiana 70130
21                                   (504) 589-7776

22
       Proceedings recorded by mechanical stenography, transcript
23   produced by computer.

24

25
```

1

2                          I N D E X

3

4

5   WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

6

7

8   JOSEPH J. BOUDREAUX

9

10    Direct Examination by Mr. Birchfield          521/17

11

12

13  LORETTA BOUDREAUX

14

15    Direct Examination by Mr. Birchfield          567/1

16

17

18  VIDEOTAPED DEPOSITION OF DR. SCOTT BERKOWITZ    579/20

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>.

(WEDNESDAY, APRIL 26, 2017)

(MORNING SESSION)

09:45:22  (OPEN COURT.)

09:45:22       THE COURT:  The jury is out of the room.  We have some

09:45:22  housekeeping matters.  First from the defendant.

09:45:22       MR. NEWSOM:  Good morning, your Honor.  Kevin Newsom.  I

09:45:22  will try to be quick.  I have one motion that I previewed for your

09:45:23  Honor, and another that I'll be very brief about.

09:45:23       The one that I provided for your Honor is a motion,

09:45:23  respectfully, to strike the testimony of Dr. Kessler yesterday that

09:45:23  it, perhaps, was not FDA that struck the language in Defendant's

09:45:23  5548.  Our submission is that we have all, in this litigation, been

09:45:23  operating under the impression and the fact that it was FDA that

09:45:23  struck the language.  We have said so in our briefs.  The

09:45:23  plaintiffs have said so repeatedly in their briefs.  Your Honor, I

09:45:23  think, has been operating under that impression in your orders.

09:45:23       We have debated to be sure of the significance of that

09:45:23  striking, but not the fact of FDA striking, and even the ambiguity

09:45:23  that was created during yesterday's proceeding contradicts the

09:45:23  earlier judicial admissions in plaintiff's papers and arguments

09:45:23  that FDA struck the language.

09:45:23       And just a few examples for the record, your Honor.  In

09:45:23  the plaintiff's design preemption response brief at Page 17, "while

09:45:23  1    the FDA did strike the language"; at page 20, "the FDA struck PT

09:45:23  2    related language"; at Page 21, "upon returning its suggested edits,

09:45:23  3    FDA did this and such."  In the oral argument of the same motion at

09:45:23  4    Page 22 of the transcript, "at the point that FDA struck the PT

09:45:23  5    language in June of 2011."  At Page 31, "what you end up with is

09:45:23  6    the FDA strikes the proposed language."  At Page 34, "this is

09:45:23  7    around the time that FDA is striking the PT language."

09:45:23  8             Now, again, each of those sentences in plaintiff's

09:45:23  9    submissions goes on, again, to dispute the significance of FDA

09:45:23 10    striking, but not the fact of FDA striking.  Yesterday was the

09:45:23 11    first time, so far as I am aware, that anyone in this entire

09:45:23 12    litigation had any doubt about that prospect.

09:45:23 13             And there is a doctrine, as your Honor knows, of judicial

09:45:23 14    admissions which the Fifth Circuit has recognized and enforced.

09:45:23 15    I'll provide your Honor with a few case citations.  They will also

09:45:23 16    be in your written submission which we will make later today.

09:45:23 17    *Martinez v. Bally's*, which is 244 F.3d 474.  *Davis v. AG Edwards,*

09:45:23 18    823 F.2d 105.  *City National v. United States,* 907 F.2d 536.

09:45:23 19             So we respectfully, and not lightly but respectfully,

09:45:24 20    move to strike Dr. Kessler's testimony, or in the alternative to

09:45:24 21    provide a curative instruction in recognition of the jury's now

09:45:24 22    confusion about a subtle fact.

09:45:24 23             THE COURT:  Let me hear the other side.

09:45:24 24             MR. MEUNIER:  May it please the Court, Jerry Meunier for

09:45:24 25    plaintiffs.

09:45:24  1          Judge, first, we submit there's no basis whatsoever for

09:45:24  2    striking any of Dr. Kessler's testimony.  He testified that he

09:45:24  3    simply could not say one way or the other whether the FDA had

09:45:24  4    struck certain language.  That's truthful.  It's uncontradicted.

09:45:24  5    It's their burden to get into evidence through a competent witness

09:45:24  6    testifying.  They failed to do so yesterday in our view.  And

09:45:24  7    there's no reason to strike what was truthful testimony that he

09:45:24  8    simply could not say one way or the other.

09:45:24  9          Insofar as the Judicial Admission Doctrine, Judge, we,

09:45:24  10   obviously, look forward to the opportunity to brief that to the

09:45:24  11   Court.  We do think, though, that it's fair to say that in whatever

09:45:24  12   briefing occurred on this, we took their position to be that the

09:45:24  13   FDA had struck and responded to that in argument.  That's a lot

09:45:24  14   different than an interrogatory answer or an answer to request for

09:45:24  15   admission that we may be bound by.  So we simply submit that we

09:45:24  16   would like to brief that part to the Court.  Otherwise, we'll stand

09:45:25  17   on it.

09:45:25  18          THE COURT:  Let's brief that part of it.  Let me just say

09:45:25  19   that I don't know what impression the jury had, whether it was the

09:45:25  20   FDA's language or not.  There's a split side of that.  It might

09:45:25  21   well be that the jury was offended that the witness didn't agree,

09:45:25  22   because it looked like that that was what the letters and the other

09:45:25  23   documents -- it looked like at least an argument could be made that

09:45:25  24   it was obvious.

09:45:25  25          But the witness didn't deny it.  The witness simply said,

09:45:25  1    "I don't know.  I see it stricken through.  I don't know who did
09:45:25  2    it."  And that's all the witness said.  I didn't take it as a
09:45:25  3    denial.  I didn't feel that that was something that he was saying
09:45:25  4    that it was definitely not the -- he said he just didn't know.  It
09:45:25  5    was obvious that it was stricken.  It's obvious that it was a
09:45:25  6    letter from the FDA in response and so forth.

09:45:25  7           So I am not going -- I'll deny the motion to do it.  But
09:45:25  8    I'll admit the briefing and I'll take the question of admission.

09:45:25  9           MR. NEWSOM:  Yes, sir, and just very briefly.  I'm sorry,
09:45:25  10   I mentioned a second motion that I just wanted to put on the record
09:45:25  11   for your Honor.  We will also be filing today a motion to strike
09:45:25  12   the testimony because Dr. Kessler did not offer an opinion within a
09:45:25  13   reasonable degree of medical certainty.  We'll put that paper on
09:45:25  14   the docket today as well.

09:45:25  15          THE COURT:  That's fine.

09:45:25  16          MR. NEWSOM:  Thank you, your Honor.

09:45:25  17          THE COURT:  Thank you very much.  There's also an issue
09:45:25  18   that came up on a question of depositions, use of depositions, and
09:45:25  19   use of highlighting of portions of the deposition.  We all know
09:45:25  20   personal experience the middle of last century when I was on your
09:45:25  21   side of the thing, we used to do it by -- early on in my career
09:45:25  22   we'd present things to the jury and have the witness testify and
09:45:25  23   have the jury look at them.

09:45:25  24          Then we got more sophisticated and put these big ole big
09:45:25  25   charts that we used to carry to court every day, and show the jury

1 and the witness, and question the witness as the jury was looking

2 at the charts.  If we didn't get a bad rainstorm or bad wind, our

3 charts made it.  Sometimes they didn't.

4 　　　　Now, what we do is use computers to highlight various

5 things.  And we show the witness and put it on the screen and ask

6 the witness while the witness is looking at it and the jury is

7 looking at it, and they're able to deal with it.

8 　　　　In this case, during the deposition, of course that

9 wasn't done.  What was done, I suspect, the witness was given a

10 document and the questioner was calling his attention to Paragraph

11 4 or Paragraph 5, first of second sentence, asking him about that

12 sentence, and the witness was looking at it and questioning and

13 answering that particular sentence.

14 　　　　Now, when the deposition is being played, what is done is

15 that witness then goes to the side with a small box that the

16 witness is testifying to, and then the big box is the highlighted

17 portion that he is speaking on.  When he is finished speaking, then

18 his image pops up into the main screen and it goes that way.

19 　　　　The defendants take the position that the witness didn't

20 do it at the time and, therefore, it's not appropriate to do it

21 now.

22 　　　　The depositions, what we try to do, particularly with

23 video depositions, is to bring to the jury what they would see

24 during the trial.  Make every effort to do that, and this is one

25 effort that mimics what would be done during trial, so I don't

09:45:26  1    think it's prejudicial and I'll allow it.

09:45:26  2              Thank you very much.  I'll be back as soon as the jury

09:45:26  3    gets here.

09:45:26  4              THE DEPUTY CLERK:  All rise.

09:45:26  5         (WHEREUPON, A RECESS WAS TAKEN.)

09:45:26  6              THE DEPUTY CLERK:  All rise for the jurors, please.

09:45:26  7         (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:45:26  8         (OPEN COURT.)

09:45:26  9              THE COURT:  Be seated, please.  Good morning, ladies and

09:45:26 10    gentlemen.

09:45:26 11              Members of the jury, the attorneys asked me to thank you

09:45:27 12    for all of the work that you have been doing in the case, and I

09:45:27 13    also want to thank you.  We all know that you've been paying

09:45:27 14    attention and that you've spent a lot of time and effort in

09:45:27 15    listening to this matter.

09:45:27 16              I hope you find it interesting, because it's some

09:45:27 17    interesting issues.  And those of you who may have not sat on a

09:45:27 18    jury, you're seeing this matter unfold to you, and the best lawyers

09:45:27 19    in the country are presenting evidence to you, and hopefully you

09:45:27 20    see how the process works.

09:45:27 21              As I say, it's one of the reasons we are what we are now

09:45:27 22    because of the jury and because of the way that you all are able to

09:45:27 23    process it in the way that you take it seriously and the way that

09:45:27 24    you're timely in coming to Court, and all of us appreciate that.

09:45:27 25              Let's call your next witness, please.

09:45:27 1          MR. BIRCHFIELD:  Your Honor, at this time the plaintiffs

09:45:27 2   call Mr. Joseph Boudreaux, the plaintiff in this case.

09:45:27 3          THE COURT:  Come forward, please.

09:45:27 4          THE DEPUTY CLERK:  Before you sit down, would you raise

09:45:27 5   your right hand.

09:45:27 6      (WHEREUPON, JOSEPH J. BOUDREAUX, WAS SWORN IN AND TESTIFIED AS

09:45:27 7       FOLLOWS:)

09:45:27 8          THE DEPUTY CLERK:  Please have a seat and state and spell

09:45:27 9   your name for the record.

09:45:27 10         THE WITNESS:  My name is Joseph Boudreaux, J-O-S ---

09:45:27 11         THE COURT:  Wait, wait.  Just a moment.  We can't hear

09:45:27 12  you.  Pull the microphone a little closer to you, please.  Okay.

09:45:27 13  Let's try again.

09:45:27 14         THE WITNESS:  My name is Joseph Boudreaux, J-O-S-E-P-H

09:45:27 15  B-O-U-D-R-E-A-U-X.

09:45:27 16                    DIRECT EXAMINATION

09:45:27 17  BY MR. BIRCHFIELD:

09:45:27 18  Q.  Good morning, Mr. Boudreaux.

09:45:27 19  A.  Good morning.

09:45:27 20  Q.  Would you introduce yourself to the jury, please.  Tell them

09:45:27 21  your name.  You go by Johnny; is that right?

09:45:27 22  A.  Yes.  Most people call me Johnny.  That's my middle name.

09:45:27 23  Q.  And where do you live, Mr. Boudreaux?

09:45:27 24  A.  I'm from Lockport, Louisiana, and it's about 50 miles from

09:45:27 25  here.

09:45:27  1    Q.  Where were you born and raised, sir?

09:45:27  2    A.  I was born and raised in Lockport.

09:45:28  3    Q.  And how old are you?  When were you born?

09:45:28  4    A.  I am 75 years old.  I was born in 1942.

09:45:28  5    Q.  And the house that you live in now there in Lockport, how long

09:45:28  6    have you been living in that house?

09:45:28  7    A.  I was raised and brought up in that house.  And then after my

09:45:28  8    parents died, I was able to buy the house, and I am living there

09:45:28  9    now for about 22 years.

09:45:28  10   Q.  So the same house you grew up in as a boy?

09:45:28  11   A.  Yes, it is.

09:45:28  12   Q.  Mr. Boudreaux, what type of work did your dad do and your mom?

09:45:28  13   A.  My dad worked for a trucking company.  He was a truck driver

09:45:28  14   for several years.  And my mom was a dental assistant for a local

09:45:28  15   dentist in Lockport.

09:45:28  16   Q.  Do you have any siblings, any brothers and sisters?

09:45:28  17   A.  Yes, I have three sisters.

09:45:28  18   Q.  Do they live nearby?

09:45:28  19   A.  One lives in Lockport and then one lives down in Cut Off, which

09:45:28  20   is about maybe 20 miles.  And one lives in Thibodaux, north, which

09:45:28  21   is about 25 miles.

09:45:28  22   Q.  Still close family?

09:45:28  23   A.  Yes.

09:45:28  24   Q.  Let's talk about your immediate family for a minute.  The

09:45:28  25   jury's met Ms. Loretta.  That's your wife; is that right?

09:45:28 1   A.  Yes, my wife of 52 years.

09:45:28 2   Q.  So when were you married?  I am going to put you on the spot.

09:45:29 3   Do you remember when you were married?

09:45:29 4   A.  Yes.  In 1964.

09:45:29 5   Q.  So you're going on 53 years?

09:45:29 6   A.  Yes, it will be 53 years.

09:45:29 7   Q.  And how did you and Ms. Loretta meet?

09:45:29 8   A.  Well, I was going into the Army, and the night before we were

09:45:29 9   to leave, one of the friends that I was going in the Army with and

09:45:29 10   a couple of other friends, we decided to go out to this local dance

09:45:29 11   down in Cut Off, which was about 10, 15 miles away.  And at that

09:45:29 12   dance is where I met my wife for the first time.

09:45:29 13   Q.  Ms. Loretta, is she retired now?

09:45:29 14   A.  Yes, she is.  She was a school teacher.

09:45:29 15   Q.  And how long did she teach school?

09:45:29 16   A.  She taught for 20 years.

09:45:29 17   Q.  And do y'all have any children?

09:45:29 18   A.  Yes, we have three boys.

09:45:29 19   Q.  And where do your boys live?

09:45:29 20   A.  Two of my boys live in the Memphis area, Northern Mississippi,

09:45:29 21   and one of my sons lives in Houma, which is about 20-something

09:45:29 22   miles from Lockport.

09:45:29 23   Q.  How often do you get to see your boys?

09:45:29 24   A.  Well, the one that lives locally, we get to see him just about

09:45:29 25   every other week or sometime every week.  And the two that live up

09:45:30  1    in the Memphis area, whenever they're able to come down; usually,

09:45:30  2    three or four times a year.

09:45:30  3    Q.  Do you ever go see them in Memphis?

09:45:30  4    A.  We used to go quite a bit, but lately, I think I've only gone

09:45:30  5    one time in the last three years.

09:45:30  6    Q.  Do you have any grandchildren, Mr. Boudreaux?

09:45:30  7    A.  Yes, I have three grandchildren, and I also have three great

09:45:30  8    grandchildren.

09:45:30  9    Q.  Let's go back.  Let's talk about your education for just a

09:45:30 10    minute.  Where did you go to high school?

09:45:30 11    A.  I went to high school in Lockport.  It was Lockport High School

09:45:30 12    at the time.

09:45:30 13    Q.  Did you graduate?

09:45:30 14    A.  Yes, I did.

09:45:30 15    Q.  While you were in high school, what did you do outside of

09:45:30 16    class?  Did you participate in any sports or anything?

09:45:30 17    A.  Yes, I played a little football.  I wasn't no professional, but

09:45:30 18    I did play a couple of years.

09:45:30 19    Q.  You still a sports fan?

09:45:30 20    A.  Oh, yeah, big Saints and big Tiger fan.

09:45:30 21    Q.  Tell us what you did after you graduated from high school.

09:45:30 22    What was next?

09:45:30 23    A.  Well, the first year out I went to Nicholls State University

09:45:30 24    for one year, and then I decided I wasn't going to stay in college,

09:45:30 25    so I decided to go in the military, and I went in the Army for

1    three years.

2    Q.  And so when you joined the Army, where were you stationed, sir?

3    A.  I was first stationed in Columbia, South Carolina, for my basic

4    training and the schooling that I went to.  And then I was

5    transferred to El Paso, Texas.

6    Q.  And while you were in the Army in this three-year stint, what

7    was your job?  What were your responsibilities?

8    A.  Well, I guess you could say I was like a company clerk for a

9    field hospital.

10   Q.  And then while you were stationed in El Paso, Texas, was that

11   during the time of the Cuban Missile Crisis?

12   A.  Yes, it was.

13   Q.  And what was your unit doing during the time of the crisis?

14   A.  Well, we were put on high alert and we had to pack our hospital

15   up and get it ready to move at any time.  And nobody was able to go

16   on any type of leave or anything until something was decided.

17   Q.  Was that a fairly tense time, Mr. Boudreaux?

18   A.  Yes, it was.

19   Q.  So you said that you served three years in the military, right?

20   A.  Yes.

21   Q.  And that was your commitment, a three-year commitment?

22   A.  Yes, it was.

23   Q.  So what did you do after your discharge from the military?

24   A.  After I was discharged, I came back and I went to Nicholls

25   State again for another year.

09:45:31  1    Q.  And that was an honorable discharge from the military?

09:45:31  2    A.  Yes, it was.  Yes.

09:45:31  3    Q.  Were you on reserve for a couple of years?

09:45:31  4    A.  Yes, I was put on inactive reserve, which -- for the next three

09:45:31  5    years, which made a total of six years, with the active and

09:45:31  6    inactive.

09:45:31  7    Q.  So you came back and you went to Nicholls State, right?

09:45:31  8    A.  Yes.

09:45:31  9    Q.  And was Ms. Loretta, was she attending Nicholls State at that

09:45:31 10    time?

09:45:31 11    A.  Yes, she was.

09:45:31 12    Q.  And y'all were dating?  Y'all started dating then?

09:45:31 13    A.  Well, not right away.  I had come in on leave a couple of times

09:45:31 14    and we had met at dances.  And same thing when I got out and went

09:45:31 15    back to school, we started to see each other a little more, and

09:45:31 16    eventually we started dating regular.

09:45:31 17    Q.  Y'all got married after about two years; is that right?

09:45:31 18    A.  Well, we got married in '64.  I got out of the service in '63,

09:45:31 19    so I guess about a year-and-a-half.

09:45:31 20    Q.  And then, Mr. Johnny, you had a couple of jobs before you went

09:45:31 21    to work in the insurance industry; is that right?

09:45:31 22    A.  Yes, I did, yeah.

09:45:31 23    Q.  So tell us about your job -- was it with Lafourche Life; is

09:45:31 24    that right?

09:45:32 25    A.  Yes, Lafourche Life is an insurance company from Raceland and

it's affiliated with a funeral home.  And most of the insurance

that we sold and collected was a burial type insurance, and we sold

that large life insurance policies, but mostly policies to be used

for burial purposes.

Q.  And then you worked for them for 32 years; is that right?

A.  Yes, I did.

Q.  So how old were you when you retired from Lafourche Life?

A.  I was 62.

Q.  Why did you retire?

A.  Well, I reached the age where I could start drawing Social

Security and I had worked for 32 years, and I was -- just felt as

though I was ready to retire.

Q.  So what did you and Ms. Loretta do after you retired from

Lafourche Life?

A.  Well, that's when we used to travel quite a bit.  We used to go

up to Memphis every chance we had because our first grandchild was

born about that time.  And we used to try to get up there as often

as we could.

Q.  You didn't stay retired too long, did you?

A.  I stayed retired for about four years, and I guess I got a

little restless and decided to go back to work.

Q.  And so where did you go to work then?

A.  I went and applied for a job as a security guard.

Q.  Where were you working -- when you started as a security guard,

where were you working?

09:45:32  1    A.  I worked at Bollinger shipyard, which is probably about five

09:45:32  2    minutes away from my house, and I been working for them for ten

09:45:32  3    years.

09:45:32  4    Q.  So there at Bollinger you've been working there ten years?

09:45:33  5    A.  About, yes.

09:45:33  6    Q.  And tell us, Mr. Boudreaux, what's your work schedule now?

09:45:33  7    What's your typical schedule?

09:45:33  8    A.  Now I work five days on and nine days off.  And the five days

09:45:33  9    that I work, I work from five in the morning to five in the

09:45:33 10    afternoon.

09:45:33 11    Q.  So you work five 12-hour days and then you're off for nine

09:45:33 12    days?

09:45:33 13    A.  Yes.

09:45:33 14    Q.  Mr. Boudreaux, have you ever been on disability?

09:45:33 15    A.  No, I have not.

09:45:33 16    Q.  And other than this lawsuit involving Xarelto, have you ever

09:45:33 17    filed any other lawsuit?

09:45:33 18    A.  No, I have not.

09:45:33 19    Q.  I want to come to the facts of this lawsuit, if we can.  So

09:45:33 20    tell us, let's start with the AFib.  You were diagnosed with atrial

09:45:33 21    fibrillation; is that right?

09:45:33 22    A.  Yes, I was.

09:45:33 23    Q.  Do you remember when that was, sir?

09:45:33 24    A.  That was in January of -- January the 7th of 2014.

09:45:33 25    Q.  And if you would, sir, tell the jury how you came to be

09:45:33   1   diagnosed.  What was going on with you physically that led to you

09:45:33   2   going to a doctor.

09:45:33   3   A.  Well, I had gotten to the point where I was starting to have a

09:45:33   4   lot of trouble with my breathing and, like, a congested chest,

09:45:33   5   and -- and it just got to the point where I couldn't lay down in

09:45:33   6   bed anymore at night.  I had to sleep in a recliner in a sort of

09:45:33   7   sitting up position.  And that just continued to get worse.  And

09:45:33   8   that's when I decided to go to my local family doctor who was a

09:45:33   9   nurse practitioner.

09:45:33  10   Q.  And is that nurse practitioner Angelique Torres; is that right?

09:45:34  11   A.  Yes, it was.

09:45:34  12   Q.  So you went to see her because you were having trouble

09:45:34  13   breathing, chest discomfort; is that right?

09:45:34  14   A.  Yes.

09:45:34  15   Q.  So tell us what happened when you went to see --

09:45:34  16   A.  Well, when I went in, she saw that I was not doing too well, so

09:45:34  17   the first thing she did was she gave me an EKG.  And when she got

09:45:34  18   the results of that, she could see that I was having some kind of

09:45:34  19   difficulties with my heart.  So she told me that I had to go into

09:45:34  20   the emergency room at the hospital in Raceland, which was about

09:45:34  21   seven miles away.  And so I said, Okay.  I would go up that way.

09:45:34  22   And she wouldn't let me drive, I had to go in an ambulance.  So she

09:45:34  23   put me in an ambulance and brought me up to the emergency room at

09:45:34  24   Raceland.

09:45:34  25   Q.  So we'll pick up there in the emergency room in Raceland in

09:45:34  1    just a minute.  But I want to focus for just a second on your

09:45:34  2    medical history, your condition before, before you were diagnosed

09:45:34  3    with AFib, before you had AFib.

09:45:34  4           Tell the jury, Mr. Boudreaux, what type of medical issues

09:45:34  5    you had had prior to that time.

09:45:34  6    A.  Well, prior to that, I had started out years ago I had had

09:45:34  7    kidney stones, and I've had probably three or four attacks from a

09:45:35  8    kidney stone.  And I was also diagnosed with high blood pressure,

09:45:35  9    and I had a couple of bouts of gout, which is a painful foot

09:45:35 10    irritation.

09:45:35 11    Q.  So you had some hypertension, some high blood pressure?

09:45:35 12    A.  Yes, I did.

09:45:35 13    Q.  And you were taking medicine for that?

09:45:35 14    A.  Yes, I was put on medication for that.

09:45:35 15    Q.  And you had an enlarged prostate; is that right?

09:45:35 16    A.  Yes, I had an enlarged prostate.  And they thought maybe I

09:45:35 17    might have prostate cancer.  So they brought me in to the VA

09:45:35 18    hospital and they did a biopsy and, fortunately, it was not cancer,

09:45:35 19    but I do have an enlarged prostate, and I'll be on medication the

09:45:35 20    rest of my life for that.

09:45:35 21    Q.  And so -- and you also had kidney stones, right?

09:45:35 22    A.  Yes, I had kidney stones.

09:45:35 23    Q.  Did you ever have to be in the hospital for kidney stones?

09:45:35 24    A.  For the first kidney stone, I did go into the hospital and I

09:45:35 25    spent a couple of days there, and they were trying to see if they

09:45:35 1   could flush it out, I guess you might say, giving me a lot of

09:45:35 2   fluids and stuff.

09:45:35 3   Q.  Before you went to the hospital with the AFib, you had been in

09:45:35 4   the hospital only for the kidney stones?

09:45:35 5   A.  Yes.

09:45:35 6   Q.  Never a heart attack or stroke or anything like that?

09:45:35 7   A.  No, nothing like that.

09:45:35 8   Q.  You had never had any type of GI bleeding issue before?

09:45:35 9   A.  No, I did not.

09:45:35 10  Q.  And prior to that point, had you -- had you ever had any doctor

09:45:35 11  or nurse or nurse practitioner talk to you about having a

09:45:35 12  complicated medical history or anything, Mr. Boudreaux?

09:45:35 13  A.  No.

09:45:35 14  Q.  I want to show you --

09:45:35 15          MR. BIRCHFIELD:  Your Honor, we have a stipulation on the

09:45:36 16  medical records.  But if I can --

09:45:36 17          MR. SARVER:  Your Honor, we don't have any objection.

09:45:36 18          THE COURT:  Okay.  Thank you.

09:45:36 19  BY MR. BIRCHFIELD:

09:45:36 20  Q.  So, Mr. Boudreaux, it's going to come up there on the screen

09:45:36 21  for you.  I want to show you what's marked as Plaintiff's

09:45:36 22  Exhibit 5.  Do you see this, Mr. Boudreaux?

09:45:36 23          MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

09:45:36 24  Exhibit 5.

09:45:36 25          THE COURT:  Admitted without objection.

BY MR. BIRCHFIELD:

Q.  Mr. Boudreaux, this is a medical record from your visit there at St. Anne on January the 7th of 2014.  Do you see that?

A.  Yes.

Q.  I want us to take a look at the next page.  And down at the bottom of that second page, it has the medications that you were on and this is -- giving a history of the medicines that you were on when you were in the ER; is that right?

A.  Yes.

Q.  So if you could, just very briefly, Mr. Boudreaux, walk us through these medicines and tell us why you were taking them.

A.  The allopurinol, the first one, is something that I take every day to prevent having another gout attack.  The next one is a blood pressure pill that I am on.  Then I take a small dose baby aspirin. The finasteride is a pill that I take for enlarged prostate.  The fish oil is something that both me and my wife take as a vitamin supplement.  And I have some more I think.

Q.  And then, if we go to the next page, that you have a couple more up there, a few more up there.  Do you see that?

A.  Yes.  The lisinopril, that's another blood pressure pill.  The metformin, that's for diabetes.  Terazosin is another pill that I take for the enlarged prostate.  The hydrocodone pain pill was given to me to take as needed whenever I would have a gout attack. And the Indocin is also a pill that was given to me once I had a gout attack to help eliminate the gout itself.

09:45:37  1    Q.  So those last couple of pills, those were only ones that --
09:45:37  2    those were pills that you would only take when you were having a
09:45:37  3    gout attack?
09:45:37  4    A.  Yes, as needed.
09:45:37  5    Q.  And you would take those for the pain then, right?
09:45:37  6    A.  Yes.
09:45:37  7    Q.  How long had it been since you had had a gout attack?
09:45:37  8    A.  It's been several years.  Probably -- from now, probably four
09:45:37  9    or five years since I've had one.
09:45:37 10    Q.  So a couple of years before you were in the hospital in January
09:45:37 11    of 2014; is that right?
09:45:37 12    A.  Yes, that's right.
09:45:37 13    Q.  And had you had any type of bleeding event on any of these
09:45:37 14    medicines?
09:45:37 15    A.  No, I did not.
09:45:37 16    Q.  So let's go back.  Let's go back to January the 7th of 2014.
09:45:37 17    And you've told us that Nurse Practitioner Torres had you taken by
09:45:37 18    ambulance to St. Anne, Ochsner St. Anne; is that right?
09:45:37 19    A.  Yes.
09:45:37 20    Q.  So tell us what happened once you arrived at Ochsner St. Anne.
09:45:37 21    A.  Well, I was brought in to the emergency room and they started
09:45:37 22    to run test and try to figure out what I had.  And I don't remember
09:45:37 23    if it was emergency room doctor or who it was that diagnosed that I
09:45:37 24    had AFib and congestive heart failure.
09:45:37 25    Q.  He said -- or you were told either by Dr. Wolford, the

09:45:37  1    emergency room doctor, or Dr. Wong that you had congestive heart

09:45:37  2    failure and atrial fibrillation?

09:45:37  3    A.  Yes.

09:45:37  4    Q.  Had you ever heard of congestive heart failure before?

09:45:37  5    A.  I had.  My wife had had problems with it before.  It's fluid

09:45:37  6    buildup throughout your body that causes the heart to have to work

09:45:37  7    harder.

09:45:37  8    Q.  And what about AFib, had you heard anything about AFib before?

09:45:37  9    A.  No, I had never heard anything about AFib.

09:45:37  10   Q.  Mr. Boudreaux, did it scare you?  Did it alarm you?

09:45:38  11   A.  Yes, it did.  When I found out that AFib could cause you to

09:45:38  12   have blood clots that could lead to a stroke, it really did bother

09:45:38  13   me.  Because my mother had a stroke and lived seven years, and she

09:45:38  14   was completely paralyzed and she could not speak, or move, or

09:45:38  15   anything, so I know what it's like to have had a stroke.  And

09:45:38  16   that's something that I didn't want to have to deal with.

09:45:38  17   Q.  So Dr. Wong, at some point he saw you there in the hospital at

09:45:38  18   St. Anne; is that right?

09:45:38  19   A.  Yes, he did.

09:45:38  20   Q.  On that first day?

09:45:38  21   A.  Yes.

09:45:38  22   Q.  And tell us about what -- about that discussion, conversation

09:45:38  23   that you had with Dr. Wong best you remember.

09:45:38  24   A.  He came in and he talked about the AFib and that he suggested

09:45:38  25   that I be put on Xarelto to help thin the blood so that it would --

1  wouldn't be able to clot and go to the brain and cause a stroke.

2  Q.  So after you had that conversation with Dr. Wong, were you

3  relieved a bit about the stroke risk?

4  A.  Yes.  I was glad that there was something that they could --

5  that I could take that would help prevent this.

6  Q.  So you told us that Dr. Wong was going to start you on Xarelto;

7  is that right?

8  A.  Yes.

9  Q.  So when did you take your first Xarelto pill?

10  A.  I took my first pill -- it was on January the 8th when I was in

11  the hospital.

12  Q.  When?  What time of the day were you given that?

13  A.  It was given to me in the morning.

14  Q.  Is that after your breakfast?

15  A.  Yes.

16  Q.  Did you stay in the hospital the night of January the 8th as

17  well?

18  A.  Yes, I did.

19  Q.  What happened that next morning?

20  A.  Well, I was given another Xarelto, just like I had the previous

21  day.

22  Q.  Were they doing anything to treat your congestive heart

23  failure?

24  A.  Yes, they had me on a lot of fluid medication to relieve -- try

25  to get as much fluid as they could out of my body.

09:45:39  1    Q.  And then were you discharged from the hospital on January the

09:45:39  2    9th of '14?

09:45:39  3    A.  Yes, I was.

09:45:39  4    Q.  So tell us what happened as you were getting ready to be

09:45:39  5    discharged.  Were you given -- have any discussions about Xarelto?

09:45:39  6    A.  Yes.  Dr. Wong's nurse came in and she explained to me what

09:45:39  7    Xarelto was and that I would be taking it.  And she went through a

09:45:39  8    list of side effects that I could expect, and she explained that if

09:45:39  9    I had any kind of bleed, nick or cut or when I was shaving if I

09:45:39  10   would nick myself, that I would bleed a lot more and have a hard

09:45:39  11   time to stop it, but to expect something like that.

09:45:39  12   Q.  Was it clear that you were to take it every day?

09:45:40  13   A.  Yes, it was.

09:45:40  14   Q.  And it was clear that there was a bleeding risk with it; is

09:45:40  15   that right?

09:45:40  16   A.  Yes.

09:45:40  17   Q.  And, Mr. Boudreaux, did Nurse Theriot -- Veronica Theriot; is

09:45:40  18   that right?

09:45:40  19   A.  Yes, I think so.

09:45:40  20   Q.  Did she go over a checklist with you for being on a blood

09:45:40  21   thinner or anticoagulant?

09:45:40  22   A.  Yes, she did.

09:45:40  23   Q.  And you went through this in your deposition; is that right?

09:45:40  24   A.  Yes.

09:45:40  25          MR. BIRCHFIELD:  Your Honor, I want to offer Plaintiff's

09:45:40 1    Exhibit 6, the anticoagulation checklist.

09:45:40 2              MR. SARVER:  No objection, your Honor.

09:45:40 3              THE COURT:  Let it be admitted.

09:45:40 4    BY MR. BIRCHFIELD:

09:45:40 5    Q.  So, Mr. Boudreaux, I want to take a look at this for just a

09:45:40 6    second.  What's the date?  What's the date on this document, sir?

09:45:40 7    A.  It's January the 9th, 2014.

09:45:40 8    Q.  So this is the day you were discharged; is that right?

09:45:40 9    A.  Yes.

09:45:40 10   Q.  And it's talking about Xarelto 20 milligrams daily.  Do you see

09:45:40 11   that?

09:45:40 12   A.  Yes.

09:45:40 13   Q.  And then, down at the bottom there are two signatures.  Do you

09:45:40 14   see that?

09:45:40 15   A.  Yes.

09:45:40 16   Q.  And that bottom signature, is that yours?

09:45:40 17   A.  That's my signature.

09:45:40 18   Q.  And the one above it, that's Nurse Theriot?

09:45:40 19   A.  That's Nurse Theriot.

09:45:40 20   Q.  And so she had this discussion.  Do you remember going over all

09:45:40 21   of these individually?

09:45:40 22   A.  I do remember that she was explaining things as we went over

09:45:40 23   the list, but I am not sure what everyone said.  I guess I was just

09:45:40 24   more interested in the one about the bleeding.

09:45:40 25   Q.  You don't dispute that y'all went through all of this, do you?

09:45:40  1    A.  What's that?

09:45:40  2    Q.  You don't deny that y'all through it?

09:45:40  3    A.  No, we did go through the list.

09:45:41  4    Q.  And you understood the importance of taking your Xarelto,

09:45:41  5    right?

09:45:41  6    A.  Yes, I did.

09:45:41  7    Q.  When you were discharged from the hospital and you had met with

09:45:41  8    Nurse Theriot, you were told, "you got to take it every day."  Were

09:45:41  9    you given a prescription?

09:45:41 10    A.  Well, they called in the prescription for me.  I have a mail-in

09:45:41 11    pharmacy that I deal with that I get a 90-day supply, so they

09:45:41 12    called in for me that I would be getting the whole prescription,

09:45:41 13    but that wouldn't be for usually seven to ten days before that

09:45:41 14    would come in.

09:45:41 15    Q.  Ok.  So the prescription was called in by the hospital?

09:45:41 16    A.  Yes, it was.

09:45:41 17    Q.  And so you knew that you would be getting a 90-day supply in

09:45:41 18    the mail?

09:45:41 19    A.  Yes.

09:45:41 20    Q.  And do you get other medicines in the same way?

09:45:41 21    A.  I get all of my medicines that way.  I order them, a

09:45:41 22    three-months supply.

09:45:41 23    Q.  So if you were to take it every day and your prescription is

09:45:41 24    going to be coming in the mail, how did you take your medicine when

09:45:41 25    you were discharged from the hospital?  How did you have pills?

09:45:41 1   A.  I was given samples until -- to have enough until my medication

09:45:41 2   would come in.

09:45:41 3   Q.  So tell us, Mr. Boudreaux, about how did you get the samples?

09:45:41 4   Who gave you the samples?

09:45:41 5   A.  Nurse Theriot gave me the samples before I was discharged.

09:45:42 6   Q.  And how did she give them to you?

09:45:42 7   A.  They were in a bag.  I don't remember if it was a paper bag or

09:45:42 8   plastic bag, but it was a little white bag, and there were several

09:45:42 9   boxes in there with samples.

09:45:42 10  Q.  So when you say, "there were boxes," were there boxes that had

09:45:42 11  bottles of pills in it?

09:45:42 12  A.  Yeah, each box had a little bottle inside with the pills in it.

09:45:42 13  Q.  In those pill boxes, did they have, like, a sheet of paper to

09:45:42 14  tell you about Xarelto?

09:45:42 15  A.  I think they probably did.  I don't recall.

09:45:42 16  Q.  Do you remember how many boxes or bottles of pills were in that

09:45:42 17  bag?

09:45:42 18  A.  I don't remember exactly how many there was, but I know that

09:45:42 19  there was more than two for sure.

09:45:42 20  Q.  So you were discharged from the hospital the afternoon of

09:45:42 21  January the 9th?

09:45:42 22  A.  Yes.

09:45:42 23  Q.  And you were sent home with a bag of sample bottles; is that

09:45:42 24  right?

09:45:42 25  A.  Yes.

09:45:42  1   Q.  And so on the next morning, January the 10th, did you take your

09:45:42  2   Xarelto then?

09:45:42  3   A.  Yes, I did.

09:45:42  4   Q.  And when you were discharged from the hospital, were you told

09:45:42  5   anything about following up with Dr. Wong?

09:45:42  6   A.  Yes.  I was to see him.  I had an appointment to see him the

09:45:42  7   next day.

09:45:42  8   Q.  I tell you what, let's go back.  There's a note in the medical

09:45:43  9   records I want us to take a look at, Plaintiff's Exhibit No. 7, the

09:45:43 10   St. Anne records.

09:45:43 11           MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's Exhibit

09:45:43 12   No. 7.

09:45:43 13           MR. SARVER:  No objection, your Honor.

09:45:43 14           THE COURT:  Let it be admitted.

09:45:43 15   BY MR. BIRCHFIELD:

09:45:43 16   Q.  And you say this is a record from St. Anne Hospital, sir?

09:45:43 17   A.  Yes.

09:45:43 18   Q.  If you look at the next page there in the middle, it's the

09:45:43 19   discharge summary.

09:45:43 20   A.  Yes.

09:45:43 21   Q.  And it says right under the discharge summary it's by Casie L.

09:45:43 22   Trosclair, NP.  That's nurse practitioner, right?

09:45:43 23   A.  Yes.

09:45:43 24   Q.  And in the body of the section there, it says, "Samples given

09:45:43 25   per Veronica, RN."  Veronica, that's -- you understand that to be

09:45:43  1    Nurse Theriot, Veronica Theriot?

09:45:43  2    A.  Nurse Theriot, yeah.

09:45:43  3    Q.  So Veronica Theriot is the one who gave you the samples, that's

09:45:43  4    what you remember, right?

09:45:43  5    A.  Yes.

09:45:43  6    Q.  And where were you when she gave you those samples?

09:45:43  7    A.  I was still in the hospital in my room.

09:45:43  8    Q.  You were still in your room at the hospital?

09:45:43  9    A.  Yes.

09:45:43 10    Q.  And was Nurse Practitioner Trosclair, was she there --

09:45:43 11    A.  I don't remember ever seeing Nurse Practitioner Trosclair.

09:45:43 12    Q.  She wasn't in the room with you --

09:45:43 13    A.  No.

09:45:43 14    Q.  -- when Ms. Theriot gave you the samples?

09:45:43 15    A.  No.

09:45:43 16    Q.  So you were discharged, you were given the samples of Xarelto,

09:45:43 17    and you were told to follow-up with Dr. Wong the next day; is that

09:45:43 18    right?

09:45:43 19    A.  Yes.

09:45:43 20    Q.  So did you see Dr. Wong the next day?

09:45:43 21    A.  Yes, I did.

09:45:43 22         MR. BIRCHFIELD:  I want to offer Plaintiff's Exhibit

09:45:43 23    No. 8, which is a record from Dr. Wong's office.

09:45:43 24         MR. SARVER:  No objection, your Honor.

09:45:43 25         THE COURT:  Admitted.

BY MR. BIRCHFIELD:

Q.  So, Mr. Boudreaux, will you take a look at Plaintiff's Exhibit No, 8.  Do you see that this is a record from Cardiovascular Institute of the South.  That's Dr. Wong's office; is that right?

A.  Yes.

Q.  If you'll go to the third page, we see a progress note.  Do you see that?

A.  Yes.

Q.  And the date on that, is that January the 10th?  Do you see that up at the top?

A.  Oh, yeah.

Q.  January the 10th.  So if you'll turn to the next page, Mr. Boudreaux, there is a list of your current medications.  Do you see that?

A.  Yes, I do.

Q.  And it indicates that you were currently taking Xarelto 20 milligrams; is that right?

A.  Yes.

Q.  And that's what you were doing, you were taking --

A.  I was taking it every morning.

Q.  You had taken it that morning; is that right?

A.  Yes.

Q.  And then, when you had that visit with Dr. Wong, that follow-up visit, were you told to -- were you scheduled for another follow-up visit?

09:45:44  1   A.  Yes, I was.  It was three days later on the 13th.

09:45:44  2          MR. BIRCHFIELD:  I am going to offer Plaintiff's Exhibit

09:45:44  3   No. 9, which is a record from that January 13th.

09:45:44  4          MR. SARVER:  No objection.

09:45:44  5          THE COURT:  Admitted.

09:45:44  6   BY MR. BIRCHFIELD:

09:45:44  7   Q.  Let's take a look at Exhibit 9, if you would, Mr. Boudreaux.

09:45:44  8   So you were told to come back on January the 13th, three days

09:45:44  9   later?

09:45:44  10  A.  Yes.

09:45:44  11  Q.  And you did?

09:45:44  12  A.  Yes.

09:45:44  13  Q.  And then on that visit, did they ask you about the medicines

09:45:44  14  that you were taking again?

09:45:44  15  A.  Yes, they did.

09:45:44  16  Q.  So we'll go to the third page.  We see the progress note

09:45:44  17  showing January the 13th; is that right?

09:45:44  18  A.  Yes.

09:45:44  19  Q.  And then we'll take a look at the next page.  Again, it asks

09:45:45  20  you about your current medicines.  Do you see that, Mr. Boudreaux?

09:45:45  21  A.  Yes.

09:45:45  22  Q.  And it shows that you were taking Xarelto 20 milligrams; is

09:45:45  23  that right?

09:45:45  24  A.  Yes, it is.

09:45:45  25  Q.  And so had you taken your Xarelto that morning?

09:45:45 1   A.  Yes, I did.

09:45:45 2   Q.  Had you taken it each morning after you had gotten out of the

09:45:45 3   hospital up until that time?

09:45:45 4   A.  Yes, I had.

09:45:45 5   Q.  And then, after that visit or on that visit, were you scheduled

09:45:45 6   for another follow-up visit with Dr. Wong?

09:45:45 7   A.  Yes.  I was scheduled to come back on the 24th of January.

09:45:45 8   Q.  And did you show up on the 24th?

09:45:45 9   A.  Yes, I did.

09:45:45 10          MR. BIRCHFIELD:  I want to offer Plaintiff's Exhibit 10.

09:45:45 11          MR. SARVER:  No objection, your Honor.

09:45:45 12          THE COURT:  Let it be admitted.

09:45:45 13   BY MR. BIRCHFIELD:

09:45:45 14   Q.  And again, Mr. Boudreaux, if you'll take a look at this record.

09:45:45 15   There at the top, it shows that this is the date is January the

09:45:45 16   24th like you described, right?

09:45:45 17   A.  Yes.

09:45:45 18   Q.  And then there's -- right underneath it says, "chief complaint

09:45:45 19   palpitations."  Do you see that little section?

09:45:45 20   A.  Yes.

09:45:45 21   Q.  Says, "Patient is a 71-year-old white male."  Do you see that?

09:45:45 22   A.  Yes.

09:45:45 23   Q.  There at the last part of that it says that "he remains in AFib

09:45:45 24   and will be admitted for cardioversion/TEE."  Do you see that?

09:45:45 25   A.  Yes, I do.

545

Q.  Tell us, sir, what was scheduled -- what was scheduled for cardioversion?  When was that scheduled?

A.  Well, I was to come back and be admitted to the hospital, and they were going to try to shock my heart back into the right rhythm again.

Q.  And was that scheduled for -- do you remember when that was scheduled?

A.  That was scheduled for February the 5th.

Q.  When you were with Dr. Wong and his staff on that occasion, did they talk to you about the cardioversion and what would happen?

A.  Yes.

Q.  And was there any discussion about the importance of being on Xarelto for that procedure?

A.  Yes.  I was told that I had to continue taking it until they were able to do the cardioversion.

Q.  Mr. Boudreaux, you understood clearly the importance of taking your Xarelto every day; is that right?

A.  Yes, I did.

Q.  So I want to drop back for just a second.  So you were given the samples and then the prescription for the 90-day supply was called in from the hospital, right?

A.  Yes.

Q.  Did you receive the 90-day supply?

A.  Yes, I did.

Q.  So when that came in, what did you do with your pills?  Tell

09:45:46  1    us, you know, did it come in one bottle or multiple bottles from

09:45:46  2    RightSource, the 90-day supply?  How did that come in?

09:45:46  3    A.  I am not really sure.  I think it came -- the 90-day supply

09:45:46  4    came in one bottle.

09:45:46  5    Q.  And did you still have some samples?  You think you had some

09:45:46  6    samples when it came in?

09:45:46  7    A.  Yes, I had samples left.

09:45:46  8    Q.  What did you do with those samples when the 90-day supply came

09:45:46  9    in?

09:45:46 10    A.  I put everything together in one bottle so that when I would

09:45:46 11    fix my pills, it would all be available to make sure I had, you

09:45:46 12    know, the right ones.

09:45:46 13    Q.  When you say when you "fix your pills," what was your habit?

09:45:46 14    What was your -- what did you do to "fix your pills"?

09:45:46 15    A.  Well, every Saturday morning I have my little pill box that I

09:45:46 16    use.

09:45:46 17    Q.  Something like this (INDICATING)?

09:45:46 18    A.  Yes, like that.

09:45:46 19    Q.  It has little compartments for the morning and afternoon?

09:45:46 20    A.  Yes, it does.  And I put everything for the morning for seven

09:45:46 21    days, and then everything for the evening for seven days, and then

09:45:46 22    I have it ready for every morning to get up and take my pills.

09:45:46 23    Q.  So you do that every Saturday?

09:45:46 24    A.  Every Saturday.

09:45:46 25    Q.  And so you met with Dr. Wong on the 24th, January the 24th, and

09:45:46  1  you were scheduled for cardioversion on February the 5th; is that
09:45:47  2  right?
09:45:47  3  A.  Yes, it is.
09:45:47  4  Q.  So tell us what happened in the few days leading up -- we all
09:45:47  5  know you had a GI bleed on February the 3rd; is that right?
09:45:47  6  A.  Yes.
09:45:47  7  Q.  So tell us what happened leading up to that event.
09:45:47  8  A.  Well, I had been back to work and I was on my week on.  And
09:45:47  9  during that period, I just started feeling myself getting weak.
09:45:47  10  And it got to the point later on in that week where I had had a
09:45:47  11  bowel movement and my stool was very black and my blood pressure
09:45:47  12  kept dropping.  I have my own monitor and I was monitoring it every
09:45:47  13  day, and every day it looked like it would be a little bit lower.
09:45:47  14          And then, it was on the Saturday while I was at work, I
09:45:47  15  got so weak that I just couldn't go anymore.  My job was to get out
09:45:47  16  and make rounds on the weekend and go into buildings and climb
09:45:47  17  stairs, and I just couldn't even get out and go start any of that.
09:45:47  18  I came back to the office and told the others there that I just
09:45:47  19  couldn't go anymore, that I had to go home.
09:45:47  20  Q.  Mr. Boudreaux, if my math's right, you'd been working there
09:45:47  21  about seven years at that point, roughly, right?
09:45:47  22  A.  Roughly, yes.
09:45:47  23  Q.  Had you ever had to leave work because of health problems?
09:45:47  24  Have you ever had to leave work early?
09:45:47  25  A.  No.

Q.  What did you do?  You went home?

A.  Yes.  I went home that afternoon, and I got home and I just sat in my chair and I just couldn't go anymore.

Q.  Had you ever had dark or black stools before this time?

A.  No, I did not.

Q.  You had an appointment scheduled with Dr. Wong for that Monday; is that right?

A.  Yes.

Q.  So you were resting up hoping to make it to that appointment?

A.  Yes, right.

Q.  Tell us about that Monday morning.  Monday morning, on February the 3rd, you had an appointment scheduled.  What was going on with you on that morning?

A.  Well, that whole weekend I just kept getting weaker and weaker, and then, the Monday I even started to vomit and I couldn't eat.  I couldn't get up at all.  So my wife had been after me to go to the emergency room, and I just told her that I would wait till my appointment for Monday and go see my doctor.

        But early Monday morning she called the doctor's office to report what was going on, see if I could go in earlier.

Q.  And so how sick were you?

A.  I was as sick as I could be.

Q.  Did you eat breakfast that morning?

A.  No, I couldn't eat anything.  In fact, I threw up whatever I had from the day before, I guess.

09:45:48 1    Q.  And so you know that Ms. Loretta called Dr. Wong's office,

09:45:48 2    right?

09:45:48 3    A.  Yes, she did.

09:45:48 4    Q.  And what were you told?  What were you to do then?

09:45:48 5    A.  I was told not to take any medication at all that day and they

09:45:48 6    wanted me to come in to see them, I guess.  I don't remember if it

09:45:48 7    was at my regular scheduled time or what.

09:45:48 8    Q.  So, Mr. Boudreaux, you didn't take your Xarelto the morning

09:45:48 9    of --

09:45:48 10   A.  No, I didn't take any of my pills that morning.

09:45:48 11   Q.  Had you taken your Xarelto the day before that Sunday?

09:45:48 12   A.  Yes, I did.

09:45:48 13   Q.  Had you taken your Xarelto every day from the time that you

09:45:48 14   were discharged from the hospital up until that and through Sunday,

09:45:48 15   February the 2nd?

09:45:48 16   A.  Yes, I did.

09:45:48 17   Q.  So did you -- you were told to not take any medicines and then

09:45:53 18   go to Dr. Wong's office, right?

09:45:55 19   A.  Yes.

09:45:55 20   Q.  Did you go to Dr. Wong's office then?

09:45:57 21   A.  Yes, I did.

09:45:58 22   Q.  How did you get there?

09:46:00 23   A.  My wife drove me.  I wasn't able to drive.

09:46:03 24   Q.  Ms. Loretta, does she drive very much?

09:46:07 25   A.  No, she don't like to drive if she don't have to; but for an

09:46:11  1   emergency, she didn't hesitate.

09:46:12  2   Q.  So tell us what happened when you got to Dr. Wong's office.

09:46:20  3   What did they do at Dr. Wong's office for you?

09:46:24  4   A.  Well, when I got to the office, they examined me and -- I don't

09:46:28  5   know how they found out that my blood count was very low and that I

09:46:33  6   was anemic, but after they did whatever test they had to do, I was

09:46:38  7   told to go straight to the emergency room.

09:46:43  8   Q.  Did you go to the emergency room there at Ochsner St. Anne

09:46:46  9   right there in Raceland?

09:46:47  10  A.  Yes, it was right across the street, yeah.

09:46:49  11  Q.  Right across the street from Dr. Wong's office?

09:46:52  12  A.  Right across the street from Dr. Wong's office.

09:46:56  13  Q.  Tell us what happened when you got to the emergency room.

09:46:59  14  A.  Well, when I got to the emergency room, I was seen by the

09:47:03  15  emergency room doctor, which was Dr. Wolford, and he examined me

09:47:12  16  and he told me that he would have to do a GI exam to see if I was

09:47:17  17  possibly having a bleed.

09:47:19  18          And he did the examine, and he said that I was bleeding

09:47:22  19  internally, and that I would have to be given a blood transfusion

09:47:26  20  right away.  So they gave me blood.

09:47:29  21  Q.  So Dr. Wolford gave you blood -- they started a blood

09:47:33  22  transfusion --

09:47:34  23  A.  Yes, he did.

09:47:35  24  Q.  -- there in the emergency room there at St. Anne?

09:47:37  25  A.  Right there, yes.

09:47:38 1   Q.  Were you admitted to the hospital there at St. Anne?

09:47:42 2   A.  No.  I wasn't admitted there because he said that they weren't

09:47:47 3   equipped to handle my condition and that I would have to be sent to

09:47:52 4   Ochsner's in New Orleans, the main hospital.  But they did not have

09:47:58 5   a room available in ICU, so I was sent to Ochsner's in Kenner,

09:48:04 6   which is on this end also.  And I was brought there and put in ICU.

09:48:09 7   Q.  Did Ms. Loretta ride with you in the ambulance to --

09:48:17 8   A.  No, she was not able to ride in the ambulance.

09:48:19 9   Q.  Did she come to the hospital there?

09:48:20 10  A.  Yes, she did.  My son brought her to the hospital.

09:48:23 11  Q.  So tell us what happened once you got to Ochsner Kenner.  Were

09:48:28 12  you admitted to a regular room?

09:48:31 13  A.  I was brought up to ICU and they were still giving me blood.

09:48:38 14  And then I stayed in there -- this was late at night when I got

09:48:43 15  there, so I stayed in the whole night and they -- once the first

09:48:49 16  blood was done, they gave me another blood transfusion until the

09:48:53 17  next morning.

09:48:54 18  Q.  So, Mr. Boudreaux, I just want to make sure we're clear on

09:48:57 19  this.  They started a blood transfusion at Ochsner St. Anne there

09:49:03 20  in Raceland, right?

09:49:05 21  A.  Yes.  They gave it to me the whole way in the ambulance, all

09:49:06 22  the way till I got to Ochsner's.

09:49:08 23  Q.  And then, early the next morning, on February the 4th, they

09:49:11 24  gave you another blood transfusion?

09:49:13 25  A.  I don't remember if it was during the night or in the morning

09:49:17  1    or what, but I did have another one right after the first one.

09:49:19  2    Q.  All right.  And then what type of symptoms, what were you

09:49:24  3    feeling like at that point when you got to Ochsner Kenner?

09:49:29  4    A.  When I got to the hospital, I was still concerned because I

09:49:36  5    knew I had something very seriously that I had never had before,

09:49:41  6    and every time I looked up at that blood transfusion, I was

09:49:45  7    wondering if I was bleeding to death or what was going on.  And it

09:49:51  8    was very scary.

09:49:54  9    Q.  Mr. Boudreaux, how long were you in the hospital there at

09:49:57 10    Ochsner Kenner?

09:49:59 11    A.  I was there five days.

09:50:02 12    Q.  So you got there late Monday and then you were discharged late

09:50:06 13    on Friday; is that right?

09:50:06 14    A.  Late on Friday, yes.

09:50:08 15    Q.  Were you in the intensive care unit that entire time?

09:50:12 16    A.  No.  I spent -- I think it was three days I was in ICU and then

09:50:17 17    I was put into a regular room.

09:50:22 18    Q.  Were there any tests or procedures done to check out your GI

09:50:27 19    bleeding?

09:50:27 20    A.  Yes, there were.  It was the first test I had done was where

09:50:31 21    they go down with the light and they check the upper part of the

09:50:37 22    body.  And after that, they wanted to do a colonoscopy, but they

09:50:44 23    were unable to do it because of all of the blood I had in the

09:50:47 24    colon.  It was not clear.  They couldn't go in and see if there was

09:50:51 25    anything wrong like that until it was cleared out.

09:50:54 1    Q.  And I think when you get a colonoscopy, you get to drink a lot

09:50:59 2    of this really good tasting stuff, is that right, to prep?

09:51:00 3    A.  Yes, you do.  You have to drink a gallon to try to see if it'll

09:51:06 4    clear it out.

09:51:06 5    Q.  Did you have to do that a few times?

09:51:08 6    A.  I drank my first gallon and they came by to check it out, and

09:51:14 7    then the nurse came in and said she was sorry to give me the news,

09:51:18 8    but I would have to drink another gallon because it hadn't cleared

09:51:22 9    up yet.  So I started on another one and I completed that one.

09:51:28 10   Q.  When you say, "it hadn't cleared up yet," what was the issue?

09:51:31 11   A.  I was told that there was so much blood and everything that was

09:51:37 12   just too dark in there, that they couldn't see.  If they went in

09:51:41 13   with the light, they wouldn't be able to see anything.

09:51:44 14   Q.  Mr. Boudreaux, while you were there in the hospital, you told

09:51:49 15   us that Ms. Loretta, she couldn't ride in the ambulance, but she

09:51:53 16   came, right?

09:51:53 17   A.  Yes.

09:51:54 18   Q.  And what about your boys?  Did your boys come to the hospital?

09:51:58 19   A.  Yes.  My middle son is the one that brought my wife to the

09:52:02 20   hospital.  And then, the next day when we contacted the other two

09:52:08 21   and when they found out what I was going through, they both came

09:52:12 22   down from the Memphis area.

09:52:13 23   Q.  And you described for us the colonoscopy and you talked about

09:52:20 24   going down the throat with the camera, is that right?

09:52:22 25   A.  Yes.

09:52:22   1   Q.  Endoscopy, does that sound right?

09:52:28   2   A.  Yes.

09:52:28   3   Q.  When they did those tests, did they find any source of the

09:52:32   4   bleeding for you?

09:52:32   5   A.  No, they did not.

09:52:33   6   Q.  And then, you remember seeing Dr. Joshi?

09:52:39   7   A.  Yes.

09:52:40   8   Q.  And what -- was he the one that did those tests?

09:52:44   9   A.  He's the one that did the tests, yes.

09:52:46  10   Q.  And you told us you were discharged, you were released from the

09:52:50  11   hospital that Friday; is that right?

09:52:52  12   A.  Yes.

09:52:52  13   Q.  Do you remember around what time, early, late?

09:52:55  14   A.  It was late.  It was about eleven o'clock that night.

09:52:58  15   Q.  Anything special about that next day?

09:53:02  16   A.  Yeah.  The next day was my birthday, and I definitely wanted to

09:53:05  17   get out and get home for my birthday.

09:53:08  18   Q.  So you made it by an hour?

09:53:10  19   A.  Made it by an hour.

09:53:12  20   Q.  So did your boys from the Memphis area, did they spend the

09:53:16  21   weekend with you?

09:53:17  22   A.  They sure did.  They stayed there the whole time and they did

09:53:21  23   anything they could to help us out because they knew I was laid up,

09:53:24  24   so they took care of everything for us.

09:53:26  25   Q.  And then were you to have a follow-up visit with Dr. Joshi?

09:53:34  1    A.  Yes.  It was probably about a week later.  I am not sure of the

09:53:38  2    exact time that I had to come back to his clinic, which was right

09:53:43  3    next to the hospital in Kenner.  And I had to swallow a little

09:53:49  4    capsule, it had a camera in it.  And that went down, and it went

09:53:54  5    into my small intestines and took pictures so they could see if

09:53:59  6    there was anything in there that would have caused the bleeding.

09:54:02  7    Q.  And with that procedure, that tiny capsule, did they find a

09:54:08  8    source of bleeding?

09:54:08  9    A.  No, they did not.

09:54:09  10   Q.  So you were discharged on Friday -- Friday evening, went home,

09:54:16  11   you rested up.  Were you able to go back to work that next week?

09:54:19  12   A.  Yes, I did.

09:54:20  13   Q.  When did you go back to work, do you remember?

09:54:22  14   A.  It was probably on the Monday because that's usually when our

09:54:26  15   shifts change from Monday through Sunday.

09:54:28  16   Q.  And so you went back to work.  Were you back 100 percent then?

09:54:34  17   A.  No, I wasn't.  But the first five days that I am at work, I

09:54:38  18   stay in the office all the time, so I didn't really have too much

09:54:43  19   hard work to do.

09:54:44  20   Q.  Okay.  All right.  So you had a follow-up visit with Dr. Joshi.

09:54:49  21   What about with your cardiologist?  Did you have a follow-up visit

09:54:53  22   with the cardiologist?

09:54:55  23   A.  Yes, but I -- it wasn't with Dr. Wong.  It was with Dr. Timothy

09:55:02  24   in Thibodaux.

09:55:03  25   Q.  Dr. Wong and Dr. Timothy, they're in the same cardiology group,

09:55:08  1    right?

09:55:09  2    A.  Yeah, they're all in the same group.

09:55:11  3    Q.  You went to see Dr. Timothy in that same group, right?

09:55:14  4    A.  Yes.

09:55:15  5    Q.  And you followed with him for a while; is that correct?

09:55:18  6    A.  Yes, I did.  The reason why I went to him because my sister has

09:55:24  7    AFib and that's her doctor, and she recommended that I see him

09:55:29  8    because it was in Thibodaux, and if I had any other problems, I

09:56:14  9    wouldn't have to come back to New Orleans.  I would go to the

09:56:14 10    hospital in Thibodaux, which was a lot closer for my wife.

09:56:14 11    Q.  So when you went to see Dr. Timothy, you still had AFib; is

09:56:14 12    that right?

09:56:14 13    A.  Yes, I did.

09:56:14 14    Q.  And did he say anything about continuing on any blood thinner

09:56:36 15    or any anticoagulant?

09:56:36 16    A.  No, I was told that I would not be able to take blood thinners

09:56:36 17    anymore.

09:56:36 18    Q.  Did that concern you?

09:56:36 19    A.  Yes, it did, because I knew there was still the possibility of

09:56:36 20    blood clots and strokes.

09:56:36 21    Q.  So, Mr. Boudreaux, did you follow-up with Dr. Timothy on a

09:56:36 22    regular basis?

09:56:36 23    A.  Yes.  I don't remember exactly how many visits I had with him,

09:56:36 24    but I did see him on a regular basis.

09:56:36 25    Q.  Roughly once a month, is that about right?

09:56:36  1    A.   Probably, yes.

09:56:36  2    Q.   At some point did Dr. Timothy refer you to a Dr. Peter Fail?

09:56:40  3    A.   Yes, he did.

09:56:41  4    Q.   And is Dr. Fail, is he a cardiologist?

09:56:44  5    A.   Yes, he is.

09:56:45  6    Q.   And is he in the same group with Dr. Timothy and Dr. Wong?

09:56:52  7    A.   Yes, they're all in the CIS group.

09:56:55  8    Q.   Why did Dr. Timothy refer you to Dr. Fail?

09:56:59  9    A.   He thought that I would be a good candidate to have what they

09:57:03 10    call a Lariat procedure done, and Dr. Fail was the only one in the

09:57:09 11    area that does it.  He was a specialist in that field.

09:57:12 12    Q.   And so you went to see Dr. Fail about that Lariat procedure?

09:57:17 13    A.   Yes, I did.

09:57:17 14    Q.   And, like, April of 2015, does that sound about right for your

09:57:23 15    visit with Dr. Fail?

09:57:24 16    A.   I think that's when it was, yes.

09:57:25 17    Q.   And did you -- and y'all discussed the Lariat procedure?

09:57:29 18    A.   Yes, we did.

09:57:31 19    Q.   And what was the purpose of the Lariat procedure?

09:57:34 20    A.   The Lariat procedure was used to go into the heart, and on top

09:57:39 21    of the heart there's a type of a pouch that they have that the

09:57:44 22    blood goes into before it goes throughout the body.  And if the

09:57:49 23    heart is not beating properly, the blood stays in there too long

09:57:53 24    and it clots, and then it can go to the brain and cause a stroke.

09:58:01 25    So this procedure that they do where they go and they close off

09:58:05  1   that pouch and the blood just flows normally without staying in

09:58:10  2   there and clotting.

09:58:12  3   Q.  So the Lariat procedure is to reduce the risk of stroke, it's

09:58:17  4   not to treat -- not to treat the -- not to treat the AFib; is that

09:58:24  5   right?

09:58:24  6   A.  No, it's not.

09:58:25  7   Q.  And so did you have that Lariat procedure?

09:58:30  8   A.  Yes, I did.

09:58:30  9   Q.  And when you -- was that, like, in May of 2015?

09:58:37 10   A.  Yes, it was.

09:58:39 11   Q.  So when you had that Lariat procedure, did you have any

09:58:46 12   understanding about that being because you couldn't be on blood

09:58:51 13   thinner?

09:58:51 14   A.  Yes, that was the reason.

09:58:53 15   Q.  So did Dr. Fail actually do the Lariat procedure?

09:58:57 16   A.  Yes, he did.

09:58:57 17   Q.  And did that go well?

09:59:00 18   A.  Yes, it was successful.

09:59:02 19   Q.  Did you have any complications or problems as a result of the

09:59:07 20   Lariat procedure?

09:59:08 21   A.  Not immediately, but a couple of months -- two or three months

09:59:13 22   later I started having fluid build up from the procedure area.  And

09:59:19 23   fluid built up all around in the sac in my heart.

09:59:23 24   Q.  And then, did you have to have some treatment for that?

09:59:27 25   A.  Yes.  I was -- I had to go back into the emergency room and

09:59:33  1    they went in with a tube into the area where the fluid was and they

09:59:39  2    drained out two liters of fluid.

09:59:42  3    Q.  So for that Lariat procedure, is that an outpatient procedure

09:59:45  4    or is that something you had to be in the hospital?

09:59:46  5    A.  No, I had to stay in the hospital for that.

09:59:49  6    Q.  And you were there for three days, two nights?

09:59:53  7    A.  Yes, two nights.  One night in ICU and one night in a regular

10:00:00  8    room.

10:00:00  9    Q.  So is that a procedure where you have to be under general

10:00:03  10   anesthesia?

10:00:04  11   A.  Yes.

10:00:04  12   Q.  So when you had the buildup around the heart, the pericardial

10:00:10  13   effusion, did you have to be hospitalized for that as well?

10:00:14  14   A.  Yes, I did.

10:00:15  15   Q.  And how long were you in the hospital for that?

10:00:17  16   A.  That one I think it was -- I am not sure if it was two nights

10:00:25  17   or -- I am not really sure.  I don't remember.

10:00:28  18   Q.  About two nights you think?

10:00:30  19   A.  Yes.

10:00:30  20   Q.  And were you in the ICU at Terrebonne?

10:00:39  21   A.  Yes, I was.

10:00:39  22   Q.  So after you had the pericardial effusion, you were doing

10:00:45  23   pretty well as a result of the Lariat procedure; is that right?

10:00:49  24   A.  Yes.

10:00:49  25   Q.  As you continued to follow with your cardiologist, were you

10:00:53 1  later scheduled for a cardioversion?

10:00:55 2  A.  Yes, I was.

10:00:56 3  Q.  And do you remember when that was when you had your

10:01:00 4  cardioversion?

10:01:02 5  A.  I'm not too good on dates, but it was probably about a year

10:01:09 6  ago.

10:01:09 7  Q.  So June 2016, does that sound right?

10:01:12 8  A.  That would sound right.

10:01:14 9  Q.  Okay.  So did you have that cardioversion?

10:01:16 10  A.  Yes, I did.

10:01:17 11  Q.  And did it correct your AFib?

10:01:20 12  A.  Yes, it did.

10:01:21 13  Q.  Mr. Boudreaux, you told us that you were scheduled for a

10:01:29 14  cardioversion on February the 5th, just a couple of days after you

10:01:33 15  actually had your GI bleed, right?

10:01:35 16  A.  Yes, that's when I was scheduled.

10:01:37 17  Q.  So you were unable to have that cardioversion on that date.

10:01:42 18  You were in the hospital with your GI bleed, right?

10:01:45 19  A.  Right.

10:01:45 20  Q.  And you were unable to have that cardioversion until June of

10:01:49 21  2016?

10:01:50 22  A.  That's right.

10:01:51 23  Q.  But since that cardioversion, have you been having any problems

10:01:56 24  with AFib?

10:01:57 25  A.  No, everything's been good.

OFFICIAL TRANSCRIPT

10:01:58  1    Q.  As a result of the procedure, the GI bleed and the treatment

10:02:07  2    that you had there at Ochsner St. Anne and Ochsner Kenner, you

10:02:15  3    received some medical bills, right?

10:02:17  4    A.  Yes, I did.

10:02:18  5    Q.  And then, as a result of the Lariat procedure that you had

10:02:24  6    because you couldn't be on anticoagulant, you had to be in the

10:02:28  7    hospital for that; is that right?

10:02:30  8    A.  Yes.

10:02:30  9    Q.  And then you had to be in the hospital for your pericardial

10:02:36  10   effusion; is that right?

10:02:37  11   A.  Yes.

10:02:37  12   Q.  And you received medical bills for all of these procedures; is

10:02:41  13   that right?

10:02:41  14   A.  Yes, I did.

10:02:42  15       MR. BIRCHFIELD:  Your Honor, we will offer Plaintiff's

10:02:44  16   Exhibit 11, which is a compilation of the medical bills that have

10:02:48  17   been received.  And we have a stipulation on these medical bills to

10:02:57  18   save the jury from walking through all of the math.

10:03:12  19       MR. SARVER:  We've stipulated, your Honor.  No objection.

10:03:12  20       THE COURT:  Okay.  Let them be admitted.

10:03:15  21       MR. BIRCHFIELD:  Your Honor, I have a demonstrative that

10:03:23  22   just outlines this.  I've shared with the defense counsel.  If I

10:03:26  23   could walk through this for just a minute, your Honor.

10:03:29  24   BY MR. BIRCHFIELD:

10:03:29  25   Q.  Mr. Boudreaux, do you see we have Ochsner St. Anne.  That's for

OFFICIAL TRANSCRIPT

10:03:30  1  the GI bleed; is that right?

10:03:32  2  A.  Yes.

10:03:33  3  Q.  And then you had the ambulance.  You were transported by

10:03:35  4  ambulance that you told us about and there was a bill for that?

10:03:38  5  A.  Yes.

10:03:38  6  Q.  $2,800, right?

10:03:39  7  A.  Yes.

10:03:40  8  Q.  And then Ochsner Kenner, you have it's bill of a little over

10:03:46  9  $30,000, nearly 31,000; is that right?

10:03:49  10  A.  Yes.

10:03:49  11  Q.  And Ochsner Kenner, that's where you were given the two units

10:03:54  12  of blood initially, right?

10:03:56  13  A.  Yes.

10:03:56  14  Q.  And then were you given another two units of blood before you

10:04:01  15  were discharged?

10:04:01  16  A.  Yes, I was.

10:04:02  17  Q.  And then we have the Terrebonne General.  That's where you were

10:04:08  18  for the Lariat procedure; is that right?

10:04:10  19  A.  Yes.  Yes.

10:04:11  20  Q.  And that -- actually, there are two bills there, the 2,700 and

10:04:16  21  the 36,000; is that right?

10:04:17  22  A.  Yes.

10:04:18  23  Q.  That's the procedure you told us that Dr. Fail performed,

10:04:23  24  correct?

10:04:23  25  A.  Yes, it was.

10:04:24  1   Q.  And then you had the ambulance transport as part of that as

10:04:30  2   well, right?

10:04:31  3   A.  Yes.

10:04:31  4   Q.  And then you had the pericardial fusion, the complication as a

10:04:37  5   result of the Lariat procedure where you were hospitalized?

10:04:40  6   A.  Yes.

10:04:41  7   Q.  And then -- so you had two bills from Terrebonne General for

10:04:45  8   that; is that right?

10:04:46  9   A.  Yes.

10:04:46  10  Q.  And then Dr. Fail had a bill for performing the Lariat

10:04:53  11  procedure.  And then, Cardiovascular Institute of the South, they

10:04:57  12  did the treatment for the pericardial fusion; is that right?

10:05:00  13  A.  Yes.

10:05:01  14  Q.  So the total of those bills is $118,280 -- I'm sorry,

10:05:09  15  $118,090.39; is that right?

10:05:11  16  A.  Yes.

10:05:12  17  Q.  Mr. Boudreaux, I want to shift for just a second about how you

10:05:19  18  make decisions about the medicines that you take.  Do you do much

10:05:27  19  research on your own?  Go on a computer, research medicines that

10:05:31  20  you're taking?

10:05:32  21  A.  No, I don't.  I usually rely on my doctor's advice, and if he

10:05:37  22  recommends that I take this medicine, I usually take it.

10:05:40  23  Q.  And do you have a computer at home?

10:05:44  24  A.  I did have a computer, yes.

10:05:46  25  Q.  Do you do any research on it?

10:05:47  1   A.  I play games on it.  Not good at computer.

10:05:53  2   Q.  You've told us about your education, your work experience.  You

10:05:59  3   don't have any medical experience, do you?

10:06:00  4   A.  No, I do not.

10:06:02  5   Q.  So you rely on your doctors, their advice?

10:06:05  6   A.  Right.

10:06:06  7   Q.  And then I want to talk about -- I want to talk about the

10:06:16  8   problems that you've had, just make sure that we're clear.  Before

10:06:21  9   you started taking Xarelto, had you ever had a blood transfusion?

10:06:25  10  A.  No, I did not.

10:06:28  11  Q.  Had you ever had any type of GI bleed or internal bleeding?

10:06:31  12  A.  No, I did not.

10:06:35  13  Q.  And then after your GI bleed, after February the 2nd --

10:06:41  14  February 2nd was the last time you ever took a Xarelto pill; is

10:06:45  15  that right?

10:06:45  16  A.  Yes.

10:06:46  17  Q.  And after February 2nd, did you continue on your blood pressure

10:06:50  18  medicines and your gout medicines and your diabetes medicines?

10:06:56  19  A.  I continued on all of my medications except the ones that I

10:06:59  20  would take as needed.

10:07:00  21  Q.  And then did you -- have you had, since that time, since that

10:07:08  22  GI bleed on February the 3rd, 2014, have you ever had another GI

10:07:13  23  bleed or any type of internal bleeding?

10:07:17  24  A.  No, I did not.

10:07:19  25  Q.  Mr. Boudreaux, when Dr. Wong prescribed Xarelto, did he discuss

10:07:30 1   with you any tests -- any blood tests that could be done to

10:07:35 2   identify if you were at high risk of a bleed?

10:07:38 3   A.  No.

10:07:38 4   Q.  If he would have told you that there was a simple test

10:07:44 5   available, is that something that you would have been willing to

10:07:47 6   do?

10:07:47 7   A.  Yes, I would.

10:07:48 8   Q.  If you had known that there was a simple test available, would

10:07:52 9   you have asked Dr. Wong to do that?

10:07:55 10   A.  Yes.

10:07:56 11   Q.  I just want to make sure we're clear on this.  You took Xarelto

10:08:05 12   every morning from the time you were discharged from the hospital

10:08:08 13   through February the 2nd?

10:08:10 14   A.  Yes, I did.

10:08:13 15         MR. BIRCHFIELD:  Okay.  Thank you, Mr. Boudreaux.

10:08:17 16         THE COURT:  Cross.

10:08:21 17         MR. SARVER:  Thank you, your Honor.  May we proceed?

10:08:23 18         THE COURT:  Sure.

10:08:24 19                    CROSS-EXAMINATION

10:08:25 20   BY MR. SARVER:

10:08:26 21   Q.  Good morning, Mr. Boudreaux.

10:08:26 22   A.  Good morning.

10:08:27 23   Q.  My name is Rick Sarver from down the street.

10:08:30 24         MR. SARVER:  Your Honor, we don't have a

10:08:31 25   cross-examination for Mr. Boudreaux.

10:08:32  1          THE COURT:  Okay.  Thank you.  Okay.  You're discharged.
10:08:36  2  Thank you, sir.  You may step down.
10:08:37  3          We'll take a 15-minute break at this time.  The Court
10:08:40  4  will stand in recess 15 minutes.
10:08:42  5          THE DEPUTY CLERK:  All rise.
10:08:42  6      (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS
10:08:42  7      TAKEN.)
10:26:13  8      (OPEN COURT.)
10:26:13  9          THE DEPUTY CLERK:  All rise.
10:26:16  10     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)
10:26:16  11         THE COURT:  Be seated, please.  Everybody comfortable.
10:26:20  12  Everybody okay?
10:26:20  13         THE JURORS:  Yes.
10:26:22  14         MR. BIRCHFIELD:  Your Honor, at this time we call
10:26:24  15  Ms. Loretta Boudreaux.
10:26:25  16         THE COURT:  Ms. Boudreaux, would you come forward,
10:26:28  17  please, ma'am.
10:26:30  18         MR. BIRCHFIELD:  Your Honor, may I assist her to the
10:26:33  19  stand?
10:26:54  20         THE DEPUTY CLERK:  Before you sit down, let me swear you
10:26:56  21  in.  Would you raise your right hand, please.
10:26:58  22     (WHEREUPON, LORETTA BOUDREAUX, WAS SWORN IN AND TESTIFIED AS
10:27:01  23     FOLLOWS:)
10:27:01  24         THE DEPUTY CLERK:  Please have a seat.
10:27:10  25                     DIRECT EXAMINATION

10:27:10  1   BY MR. BIRCHFIELD:

10:27:11  2   Q.  Good morning, Ms. Boudreaux.

10:27:12  3   A.  Good morning.

10:27:13  4   Q.  Can you speak into the microphone there, please.

10:27:23  5   A.  Good morning.

10:27:25  6   Q.  Will you introduce yourself to the jury, please, ma'am.

10:27:27  7   A.  My name is Loretta Boudreaux.

10:27:30  8   Q.  Where do you live, Ms. Boudreaux?

10:27:31  9   A.  We live in Lockport.

10:27:33 10   Q.  Were you born and raised in that area?

10:27:36 11   A.  I was born and raised in Larose, which is a few miles down the

10:27:43 12   bayou.

10:27:44 13   Q.  Where did you go to school?

10:27:47 14   A.  It was called Larose Cut Off.

10:27:50 15   Q.  And you graduated from Larose?

10:27:53 16   A.  Yes, I did.

10:27:54 17   Q.  And then Mr. Johnny told us that you went to Nicholls State; is

10:28:00 18   that right?

10:28:00 19   A.  Yes.

10:28:01 20   Q.  Did you graduate from Nicholls State?

10:28:03 21   A.  Yes, I did.

10:28:04 22   Q.  And what was your study in?  What was your degree?

10:28:10 23   A.  Can you --

10:28:11 24   Q.  What was your degree?  What did you study at Nicholls State?

10:28:14 25   A.  I received a BA in secondary education in English and Social

10:28:21  1    Studies.

10:28:21  2    Q.  And after you graduated from Nicholls State, you and Mr. Johnny

10:28:25  3    got married; is that right?

10:28:26  4    A.  Yes.

10:28:27  5    Q.  And did you teach?

10:28:30  6    A.  Yes, sir.

10:28:31  7    Q.  And tell the jury about your teaching experience, please,

10:28:35  8    ma'am.

10:28:36  9    A.  I taught English and Literature, World History, Louisiana

10:28:44 10    History and Civics.

10:28:46 11    Q.  And how long did you teach?

10:28:48 12    A.  Twenty years.

10:28:49 13    Q.  What grades?

10:28:51 14    A.  Let's see, seventh, eighth, ninth, tenth, and twelfth.

10:28:59 15    Q.  You skipped eleventh.  You didn't teach eleventh grade?

10:29:03 16    A.  No, missed that one.

10:29:06 17    Q.  I'm not sure how you missed that, Ms. Loretta.

10:29:09 18    A.  Yes, I missed it.

10:29:10 19    Q.  Ms. Loretta, I want to ask you:  You have some health issues,

10:29:14 20    right?  You have diabetes -- you take some medicines for diabetes

10:29:19 21    and other health conditions; is that right?

10:29:21 22    A.  Yes, I do.

10:29:21 23    Q.  Tell the jury how you keep track of your medicines.

10:29:25 24    A.  My husband keeps track of my medicine.

10:29:29 25    Q.  He told us about he would put all of his pills in one of those

OFFICIAL TRANSCRIPT

10:29:36  1  little pill bottles, those organizers for each week.

10:29:39  2  A.  Yes, that's correct.

10:29:40  3  Q.  Does he do the same for you?

10:29:42  4  A.  Yes, he does.

10:29:44  5  Q.  Has he been doing that for awhile?

10:29:47  6  A.  Oh, yes, he been doing it quite awhile.

10:29:51  7  Q.  Does he do a good job with that?

10:29:53  8  A.  Yeah, very much.

10:29:54  9  Q.  Has he ever mixed up your pills or let you miss a day?

10:29:58  10  A.  No.  He is precise.

10:30:01  11  Q.  He is precise, okay.  I want to talk for just a minute about

10:30:10  12  what your life has been like and what's your life was like, your

10:30:15  13  marriage and your family, prior to the time that Mr. Boudreaux was

10:30:18  14  diagnosed with AFib.  Okay.  Do you remember when he went to the

10:30:23  15  hospital for AFib?

10:30:24  16  A.  Yes, sir.

10:30:26  17  Q.  So let's -- tell us, the jury, a little bit about your family,

10:30:31  18  about your life with Mr. Johnny before he was diagnosed with AFib.

10:30:35  19  A.  I think we had a very good life.  We used to like to dance.  We

10:30:42  20  went to dances.  We visited our -- we have three sons and we

10:30:48  21  visited them quite regularly, because at that time our first little

10:30:54  22  granddaughter had been born.  So we went sometimes two time --

10:31:00  23  sometimes one week after another to see the little girl.

10:31:05  24  Q.  All right.  And then, what was Mr. Johnny's activity level?

10:31:11  25  Was he working?  Was he fairly active before he was diagnosed with

10:31:14  1    AFib?

10:31:14  2    A.  Yes, he was.  He did his own work, did his gardening, was

10:31:22  3    good -- he did well, was good.

10:31:24  4    Q.  And then January the 7th of 2014, he went to the hospital for

10:31:32  5    the AFib.  Do you remember that?

10:31:34  6    A.  Yes.

10:31:35  7    Q.  And were you there at the hospital?  Did you meet him there at

10:31:38  8    the hospital at Ochsner St. Anne?

10:31:41  9    A.  Yes.

10:31:41  10   Q.  And did you stay with him on that occasion?

10:31:45  11   A.  Yes, I did.

10:31:47  12   Q.  Mr. Johnny told us that he knew that it was a serious

10:31:54  13   condition.  He knew it was important for him to take his medicines;

10:31:57  14   is that right?

10:31:58  15   A.  Yes.

10:31:59  16   Q.  Is that -- did you see that?  Did you see any change in

10:32:05  17   Mr. Johnny after he was diagnosed with AFib?

10:32:07  18   A.  Yes, he took his medicine.

10:32:10  19   Q.  And did you see any concern that Mr. Johnny had about the risk

10:32:17  20   of stroke?

10:32:19  21   A.  Yes, he was very worried about that.

10:32:22  22   Q.  And then, after he was on Xarelto and had been taking Xarelto

10:32:32  23   for 24 days, on February the 3rd -- I want to go to February the

10:32:36  24   3rd, okay?

10:32:38  25   A.  Yes.

10:32:38 1   Q.  And he had -- Mr. Johnny had been home that weekend.  He had

10:32:42 2   been weak.  He had come home early from work; is that right?

10:32:45 3   A.  Yes, it was.

10:32:47 4   Q.  You tell us about that Monday morning when Mr. Johnny had an

10:32:53 5   appointment with Dr. Wong's office.  Tell us what you remember

10:32:56 6   about that Monday morning.

10:32:58 7   A.  Well, he was very sick.  He could barely move around and he was

10:33:06 8   not himself.  His blood pressure was so low, and I was extremely

10:33:12 9   concerned.

10:33:14 10  Q.  And did you call Dr. Wong's office that morning?

10:33:19 11  A.  Yes, I did.

10:33:23 12          MR. BIRCHFIELD:  Your Honor, I want to offer Plaintiff's

10:33:26 13  Exhibit 12, which is a note from Dr. Wong's office on that day.

10:33:29 14          MS. WILKINSON:  No objection, your Honor.

10:33:30 15          THE COURT:  Admitted.

10:33:38 16  BY MR. BIRCHFIELD:

10:33:39 17  Q.  And we see that this is a record from Dr. Wong's office on

10:33:46 18  February the 3rd.  Do you see that, Ms. Loretta?

10:33:51 19  A.  I don't see.

10:33:54 20  Q.  Up in the right-hand corner we see February the 3rd.  On the

10:33:59 21  second page, I'm sorry.  Let's go to the second page.

10:34:00 22  A.  I'm at the first page.

10:34:02 23  Q.  There we go.  That helps, doesn't it?

10:34:04 24  A.  Now I have it.

10:34:08 25  Q.  All right.  So on February the 3rd, it says, "Patient's wife

10:34:12   1   calling."  That would be you, right?

10:34:15   2   A.  That's me.

10:34:15   3   Q.  You called Dr. Wong's office and you described for them what

10:34:19   4   was going on with Mr. Johnny?

10:34:22   5   A.  Yes, rather panicky I did describe what was happening.

10:34:27   6   Q.  And he was -- was he so weak he couldn't get out of bed that

10:34:34   7   morning?

10:34:34   8   A.  He couldn't get out.  He threw up.  He was vomiting, all kinds

10:34:40   9   of things.  He was just really, really weak.

10:34:43  10   Q.  And then, did you tell -- did you relay the message to

10:34:50  11   Mr. Johnny that he wasn't supposed to take his medicines that

10:34:53  12   morning and that he needed to get to Dr. Wong's office?

10:34:56  13   A.  Yes, I certainly did.  I told him not to, that they said not

10:35:01  14   to.

10:35:01  15   Q.  Did you drive Mr. Johnny to Dr. Wong's office?

10:35:04  16   A.  Yes, I did.

10:35:06  17   Q.  Do you drive very much, Ms. Loretta?

10:35:09  18   A.  No.  I don't drive very much anymore.

10:35:12  19   Q.  Anymore?

10:35:13  20   A.  Yeah.

10:35:13  21   Q.  You used to drive?

10:35:15  22   A.  I could drive, but I don't drive very much anymore.

10:35:19  23   Q.  But it was -- was Mr. Johnny in a position to drive himself?

10:35:24  24   A.  No, he wasn't.  This was an emergency and I drove.

10:35:29  25   Q.  So tell us what you remember about that day when you got to

10:35:36  1   Dr. Wong's office.

10:35:39  2   A.  Johnny went into Dr. Wong's office and he -- excuse me.  He

10:35:53  3   went into Dr. Wong's office and they gave him a test and they saw

10:36:01  4   how sick he was.  And he told him he had to go to the emergency

10:36:06  5   room.

10:36:09  6   Q.  And so you went to the emergency room.  Did you go with

10:36:13  7   Mr. Johnny?

10:36:13  8   A.  Yes, I did.

10:36:15  9   Q.  Mr. Johnny told us that when he went there, they started a

10:36:20 10   blood transfusion, but they had to transfer him to Ochsner Kenner.

10:36:24 11   Do you remember that?

10:36:25 12   A.  Yes, I do.

10:36:25 13   Q.  And did you go to Ochsner Kenner?

10:36:29 14   A.  Yes, I did.

10:36:30 15   Q.  And how did you get to Ochsner Kenner?

10:36:34 16   A.  Since I don't drive in New Orleans, I called David to bring me

10:36:42 17   and he came and he brought me to Ochsner Kenner.

10:36:45 18   Q.  And David is your son; is that right?

10:36:47 19   A.  Yes, David is our middle son.

10:36:49 20   Q.  And he lives nearby Houma?  He lives in Houma?

10:36:54 21   A.  He lives in Houma, right.

10:36:56 22   Q.  And so David came and got you and took you to Ochsner Kenner?

10:37:00 23   A.  Yes, he did.

10:37:01 24   Q.  When you got to Ochsner Kenner, was Mr. Johnny -- was he

10:37:06 25   already there?

10:37:07 1    A.  Yes, he was already there.

10:37:10 2    Q.  And describe for us what happened, what you saw when you got to

10:37:16 3    Ochsner Kenner.

10:37:17 4    A.  When I got there, I was carrying bags.  And I got in there and

10:37:23 5    I looked in the room, and he was lying there.  It was very quiet in

10:37:29 6    there.  And he had blood, he had a blood transfusion.  And I went

10:37:37 7    in there and I -- it was intensive care that he was in, so I

10:37:44 8    thought I probably couldn't stay there.  So I asked the nurse,

10:37:48 9    there was a nurse with him, how long I could stay.  And she said,

10:37:53 10   "As long as you want to."  I was so relieved.  And she said, "I'll

10:38:00 11   go get you a more comfortable chair."  And she came out with what

10:38:05 12   was almost a lounge chair.  So I put that next -- right next to his

10:38:12 13   bed, and I could -- I could see him there and make sure he was

10:38:17 14   okay.  It's okay.

10:38:24 15   Q.  Ms. Loretta, so when you were there in the ICU with Mr. Johnny,

10:38:29 16   did you talk to Mr. Johnny that night?

10:38:32 17   A.  A little that night I talked to him, yeah.

10:38:38 18   Q.  Did you try to talk to Mr. Johnny that night?

10:38:43 19   A.  Yes.

10:38:44 20   Q.  And then did you go home while he was there in the hospital?

10:38:50 21   A.  No, not at all.

10:38:52 22   Q.  What were you thinking while you were there in the hospital,

10:38:58 23   Ms. Loretta?

10:38:59 24   A.  I didn't know if he was going to make it.  I just really didn't

10:39:08 25   know.  I was very worried about it.  I really had no idea what

10:39:14 1    exactly was wrong.

10:39:17 2    Q.  And your boys came in from Memphis; is that right?

10:39:20 3    A.  Yes, they did.

10:39:22 4    Q.  Mike and Kevin?

10:39:23 5    A.  Mike and Kevin, yes, they did.

10:39:25 6    Q.  And Mr. Johnny told us that he was in the ICU for three days

10:39:33 7    and then he was put in a regular room; is that right?

10:39:36 8    A.  Yes, it is.

10:39:37 9    Q.  And then he was discharged that Friday, late Friday evening on

10:39:45 10   February 7th, the day before his birthday; is that right?

10:39:48 11   A.  Yes.  Yes.

10:39:49 12   Q.  So tell us what happened that weekend after you got home.

10:39:54 13   A.  Well, it was his birthday, and he was really wanting to get

10:40:00 14   home before his birthday.

10:40:03 15   Q.  And your boys came and spent the weekend with you?

10:40:06 16   A.  Yes.  Yes, the boys came and they were wonderful.  They did

10:40:12 17   everything.  They shopped for groceries, cooked, and everything for

10:40:15 18   me.

10:40:17 19   Q.  Mr. Johnny -- you were in the courtroom and you heard

10:40:23 20   Mr. Johnny talk about he followed up with his cardiologist after he

10:40:28 21   was released from Ochsner Kenner; is that right?

10:40:32 22   A.  Yes.

10:40:32 23   Q.  Dr. Timothy and then Dr. Fail?

10:40:36 24   A.  Right, yes.

10:40:37 25   Q.  After he was discharged from the hospital Ochsner Kenner, he

10:40:45  1   wasn't able to -- he wasn't put on any other blood thinner or

10:40:51  2   anticoagulant; is that right?

10:40:51  3   A.  That's right.

10:40:52  4   Q.  Ms. Loretta, did you see any concern on Mr. Johnny about or any

10:41:04  5   changes in him after he was -- after he had that bleeding event and

10:41:09  6   was not able to be on a blood thinner?

10:41:13  7   A.  He was even quieter and he didn't talk, you know.  I couldn't

10:41:19  8   really talk to him.  I could tell that he was extremely worried

10:41:23  9   about the situation.  And I was worried, too.  And I think it was

10:41:32 10   trauma -- a traumatic situation.  So I knew that he was nervous and

10:41:37 11   I knew that he was worried, but I could sense that he did not want

10:41:42 12   to talk about it.  So we -- we didn't talk very much, and it was a

10:41:48 13   very lonely time.

10:41:51 14   Q.  When you say you "didn't talk very much," was that different

10:41:55 15   than it used to be in your marriage?  Was that different than it

10:41:58 16   was before he had this GI bleed?

10:42:00 17   A.  Yes, it was very different.

10:42:02 18   Q.  Mr. Johnny told us that he had a cardioversion.  He had a

10:42:10 19   cardioversion in June of 2016; is that right?

10:42:14 20   A.  Oh, yes.

10:42:16 21   Q.  And that cardioversion, it helped him with his AFib, right?

10:42:21 22   A.  It certainly did.  It certainly did.

10:42:22 23   Q.  And reduced the stroke risk that he has?

10:42:27 24   A.  It -- yes.

10:42:29 25   Q.  Have you noticed a change in Mr. Johnny since that, since that

10:42:34  1  cardioversion?

10:42:35  2  A.  Yes.  He's certainly changed.  He's almost back to himself.

10:42:43  3  Q.  So you told us that during that time, after his GI bleed and

10:42:51  4  before his cardioversion in June of 2016, that he was really quiet

10:42:58  5  and really wouldn't talk to you very much.  What about his activity

10:43:02  6  level?  What would he do around the house?  Is there any difference

10:43:06  7  during those times?

10:43:07  8  A.  Yes.  It was very different.  He didn't really try to help

10:43:11  9  around the house or anything.  He just came in and went and sit in

10:43:15 10  his chair.  He used to tell me what was going on at work, but he

10:43:22 11  wouldn't tell me that.  He would just sit down there and that's it.

10:43:29 12  Q.  So now, since the cardioversion and the help with the AFib, is

10:43:35 13  he back to talking to you again?

10:43:37 14  A.  Yes.  Yes, he does.

10:43:40 15  Q.  Tell you what's going on at work?  Is it back to normal for

10:43:45 16  y'all?

10:43:45 17  A.  Yes.

10:43:46 18  Q.  So what are some of the hobbies that y'all do now?

10:43:54 19  A.  Well, we do some gardening, flowers and things like that.  And

10:44:04 20  we go out and eat more.  We even got to go to Memphis one time

10:44:10 21  since all of this began, we got to go to Memphis one time.

10:44:15 22  Q.  Ms. Loretta, I know you're a little bit nervous, you're tapping

10:44:21 23  that's picking up on the microphone.

10:44:24 24  A.  I'm sorry.

10:44:25 25  Q.  That's okay.  Ms. Loretta, just if you would, just tell the

10:44:29  1    jury how the bleeding event impacted you and Mr. Johnny.

10:44:36  2    A.   We had to wait to go -- I waited to call that morning and I was

10:44:44  3    so panicked.   I spent the weekend, you know, worrying about him,

10:44:49  4    worrying.   And I called that morning and I was hoping that he would

10:44:54  5    go into the hospital very quickly -- to his doctors very quickly,

10:45:00  6    and they told me to tell him not to take his medicine and I told

10:45:05  7    him all of that.   And I was worried, he was worried.

10:45:15  8         And when I saw that they were putting blood, I was -- I

10:45:19  9    couldn't imagine what was going on.   And when they said he had to

10:45:25 10    be taken to a hospital in New Orleans, I was so worried because I

10:45:30 11    couldn't drive over there.   But anyway, so that concerned me.

10:45:37 12         But he went to Kenner, Ochsner's in Kenner, and I went in

10:45:45 13    there and it was really quiet, and I did talk to the nurse and I

10:45:55 14    got to spend time with him.   The whole time he was in there I got

10:45:59 15    to spend with him.   So I was happy about that.

10:46:05 16    Q.   I just want to make sure, you're thankful that things are back

10:46:09 17    to almost normal now?

10:46:11 18    A.   Oh, I sure am.

10:46:14 19         MR. BIRCHFIELD:   All right.   Thank you, Ms. Loretta.

10:46:16 20         THE WITNESS:   Thank you.

10:46:17 21         MR. BIRCHFIELD:   Pass the witness, your Honor.

10:46:18 22         THE COURT:   Cross.

10:46:19 23         MS. WILKINSON:   Thank you, Ms. Boudreaux.   We don't have

10:46:21 24    any questions, your Honor.

10:46:22 25         THE COURT:   Okay.   You're excused.   Thank you,

10:46:25  1    Ms. Boudreaux.  Thank you, ma'am, you can step down.

10:46:27  2                THE WITNESS:  Thank you.

10:46:51  3                THE COURT:  Call your next witness, please.

10:46:54  4                MR. BARR:  Your Honor, at this time the plaintiffs are

10:46:59  5    calling and presenting the videotaped deposition of Dr. Scott

10:47:04  6    Berkowitz, which was taken on October 19 and 20, 2016 in New York

10:47:08  7    City.

10:47:09  8                Since 2007, Dr. Berkowitz has been a vice-president of

10:47:14  9    Bayer Healthcare Pharmaceuticals, Inc. and the head of thrombosis

10:47:17 10    group for clinical research and development within the

10:47:20 11    cardiovascular therapeutic area.

10:47:23 12                The deposition starts with questioning from Mr. and

10:47:26 13    Mr. Boudreaux's lawyers, followed by questioning by defendant's

10:47:29 14    lawyer, which in turn is followed by each side's follow-up

10:47:33 15    questions.

10:47:35 16                I think it runs about two hours, your Honor, so we may

10:47:38 17    want to break at lunch.

10:47:40 18                THE COURT:  Okay.  Sure.

10:47:42 19       (WHEREUPON, THE VIDEO DEPOSITION WAS PLAYED AS FOLLOWS:)

         20    EXAMINATION BY MR. BARR:

         21    Q. Sir, could I get you to state your name and full title for the

         22    record.

         23    A. Scott Darrell Berkowitz.  I'm a vice president at Bayer

         24    Pharmaceutical.  I oversee the group called thrombosis group in

         25    development.

1    Q. Okay.  And you've held that title for how long?

2    A. Since 2007.

3    Q. Just from a 30,000-foot view, can you give me a thumbnail sketch

4    of your work in Xarelto.

5    A. Well, I joined the company in 2006 as a -- in a position that we

6    call global clinical leader.  This is in essence a physician who

7    oversees an -- either an indication of a drug and provides strategy

8    as well as operation expertise to the team.

9    Q. So you came in in 2006 --

10   A. '6.

11   Q. -- so that was roughly between the time of Phase II and Phase

12   III?

13   A. Correct, yes.

14   Q. And so you had more involvement in Phase III obviously than you

15   did in Phase II?

16   A. Correct.

17   Q. I've handed you Exhibit 12.  Is this your PowerPoint

18   presentation that you gave at the CSRC symposium?

19   A. It appears to be.

20   Q. Okay.  And this is a PowerPoint you put together for a symposium

21   that was titled "Is there a role for

22   pharmacokinetic/pharmacodynamics dosing for novel anticoagulants,"

23   right?

24   A. Yes.  That's part of the second session on precision dosing.

25   Q. And yours is, "Counterpoint:  PK dosing strategy is impractical

1   and may not add value," right?

2   A. Correct.

3   Q. And Mr. Temple gave the point to the counterpoint?

4   A. Dr. Temple.

5   Q. Then you list, "When is it valuable to measure," correct?

6   A. Yes.

7   Q. And you say, "When we need to know drug levels, PK, or

8   coagulation effect, PD," right?

9   A. Yes.

10  Q. And with Xarelto, the main coagulation effect that you were

11  looking at was PT, correct?

12  A. Well, PT is not a very good measure.  It's the best of the

13  routine tests that are available in hospitals.  But even then, it's

14  not good, because not all the hospitals use the same

15  112:8 thromboplastin reagent.

16  Q. Well, in your clinical trials, the decision was made that PT was

17  good enough to serve as a PK surrogate, correct?

18  A. It matches depending on the timing with the concentration.  But

19  it's not what you would use in practice to take care of patients.

20  Q. It's linear --

21  A. When tested, as you said.

22  Q. It's linear correlated to -- PT has a linear correlation to the

23  drug plasma concentration with Xarelto, correct?

24          THE WITNESS:  Depending on the time that it's taken.

25  BY MR. BARR:

1  Q. Okay.  And also the reagent used?

2  A. Definitely the reagent, because there are some that are --

3  there's one in particular that's very sensitive.  There are others

4  that are sensitive; some that are insensitive.

5  Q. Let's talk about that for a clear second.

6  A. Sure.

7  Q. As I understand it, the one that's really sensitive is

8  Neoplastin?

9  A. Well, we tested a few.  I don't know exactly how many, six or

10  so.  But there are a number more.  But of the ones that are were

11  tested and used in the clinical trials that were easier to obtain,

12  there is the Neoplastin Plus that was used.  And that seemed to

13  match the best.

14  Q. So the Neoplastin Plus, in your view, is the best match for the

15  reagent, correct?

16  A.  Of the few reagents that were tested.  You have to remember

17  these agents are designed to test warfarin.  They were refined over

18  years to test warfarin, so not for rivaroxaban or any of the NOACs.

19  They're not for that purpose.

20  Q. Okay.  But in your clinical trials, you used PT Neoplastin as a

21  surrogate rather than taking actual PK samples and getting blood

22  plasma concentrations, correct?

23  A. That's not correct.

24  Q. I'm sorry.  In your Phase III -- in ROCKET.

25  A. In Phase III.  We usually do our PK work in our Phase II,

1  because that's where you can -- you really have better control of

2  the sampling and stuff so it's more accurate.  It's very difficult

3  to do in Phase III.  So we did do PT testing, to have something to

4  match up with.  But that wasn't to try to show whether it would be

5  of value or not.

6  Q. So you go on and you list several bullet points on when you may

7  115:10 need to know drug levels and coagulation levels under the,

8  "When is it valuable to measure?"

9  A. When is it valuable.

10  Q. You list, "Assess adherence," right?

11  A. Could be used there.  If there's no drug on board, then you're

12  going to be suspicious.

13  Q. Right.

14  A. Not taking the medicine.

15  Q. Or they could just be at trough, right?

16  A. Well, it depends on the sensitivity.  If you did a PT at trough,

17  you might not be able to detect it because it's insensitive down

18  there.

19  Q. Detect overdose?

20  A. If you thought someone took an overdose and you thought they

21  might be at a high level, you could use it for them.

22  Q. Do you know, as you sit here today, what a high level PT would

23  be to tell somebody whether or not they were overdosed on

24  rivaroxaban?

25  A.  We don't have a level, and we have the issue with the PT that

1    in different labs they have different ranges.  I mean, they are not

2    markedly different, but they are different.  So there's no cutoff

3    that we're aware of.

4    Q. Are you aware of a blood plasma concentration that would

5    indicate overdose?

6    A. No, I'm not.

7    Q. Okay.  So even though you're saying when is it valuable to

8    measure and one of those things is detect overdose, you have no

9    information that you can provide the doctor as to what an overdose

10   is, correct?

11   A. Well, I guess it depends on how you term "overdose."  Overdose

12   meaning people take too much medicine, maybe a suicide attempt or

13   something like that.  That's what I meant by overdose.

14   Q. But you still -- if you're going to test, if you're going to

15   measure, that measurement has to mean something, right?

16   A. Absolutely.

17   Q. And if you've given doctors no data as to what that measurement

18   means, how is the doctor going to do anything with this test?  What

19   is he going to look to that tells him this patient is overdosed?

20   A. Well, I think we have to understand that the PT is just a

21   semi-quantitative measure.  It's a high or low, on board or not,

22   maybe higher than you might expect.  We have ranges in some of the

23   clinical pharmacology pages -- papers of.  So something could be

24   used, but I don't know of a, you know, across the board level that

25   if it's above that then that's a problem.  I mean, any of us could

1  guess by looking at those numbers that something much higher than

2  that, of course.  I mean, I think doctors can understand that.

3  Q. Okay.  We'll come back to that.  You also have, "Evaluate

4  potential drug interactions," right?

5  A. These are just -- these are general for all drugs.

6  Q. Right.

7  A. Yes.

8  Q. "Disease of the metabolizing organs," right?

9  A. Sure.

10  Q. "Plan timing of urgent surgery," right?

11  A. That's a convenience thing of wanting to know if there's drug on

12  board before you do a procedure.

13  Q. It would certainly be beneficial to a doctor in that situation

14  to be told, "Run a PT, find out what their drug level is, and then

15  you know whether or not there's drug on board and whether or not

16  you can proceed to surgery or if you have to wait 24 hours,"

17  correct?

18  A. No. I'm sorry.  I have to disagree.  I mean, if the prothrombin

19  time is prolonged, it's possible that there's drug on board.  There

20  could be other reasons that the prothrombin time is prolonged.  If

21  you're looking for a magic number for when to go in for surgery,

22  that doesn't exist.  But you have drug on board, and that's what

23  the doctors need to know.  I mean, it's not okay to have a level at

24  say 50 or 100, but not okay to do surgery at some other number.

25  It's on board or not.  And then you have to understand when the

1    possibility of when they took the drug, what the metabolism might

2    be.  But if it's urgent surgery, you just got to go.

3    Q. So you think they just need to ignore the warning?

4    A. No one is saying to ignore the warning.  And I'm not saying

5    that.  I'm just simply saying when you're faced with that

6    situation, then having just some number come back and tell you,

7    that's not the whole story.  You have to know the whole patient.

8    You have to know

9    the drugs they're taking and the one that you are concerned about.

10   Q. All right.  Dr. Berkowitz, we're continuing with Exhibit 12 in

11   front of you.

12           And I have moved to the next page, which is titled "When

13   it is not valuable to monitor or measure," correct?

14   A. Yes.

15   Q. Okay.  So the point of this slide, as I understand it, is to say

16   when these conditions exist, there's no value in either routine

17   monitoring or measuring, correct?

18   A. In essence.  I mean, in essence, yes.

19   Q. Do each -- you say when.  And you list -- one, two, three, four,

20   five, six, seven -- eight different factors.  Do you see that?

21   A. I do.

22   Q. What you're meaning by this, do all eight of these have to be

23   true for monitoring not to be valuable or does just one of these

24   have to be true for monitoring not to be valuable?

25   A. Probably depends on which one.  But you don't have to have all

1    eight.  These are just conditions that talk about -- you have to

2    remember we're giving a 15-minute talk.  So you're basically just

3    trying to give the lay of the land.

4    Q. So for the indications in which you're giving 20 milligrams

5    once-a-day, okay?

6    A. Okay.

7    Q. It's your position that it is not valuable to monitor or measure

8    those patients, correct?

9    A. In general, there's not a need to routinely monitor in those

10   patients.

11   Q. When you say "in general," that means there could be situations

12   where it may be valuable to monitor those patients.  Are you

13   talking about purely the instances you listed on the page before

14   when you said when is it valuable to measure?

15   A. This is a general statement that talks about monitor and

16   measure.

17          Remember, that's what you mentioned.  And that's an

18   opportunity -- so it's a conglomerate.  And we talked about just

19   130:18 very recently conditions where you might want to measure.

20   So that's why I said it would depend.

21   Q. Okay.  Let's go two pages over.  You have --

22   A. Page number?

23   Q. It's Page 12.

24   A. Thank you.

25   Q. "What we should do rather than monitor/measure a level."  Do you

1 see that?

2 A. I do.

3 Q. And you have monitor the patient, right?

4 A. Yes.

5 Q. That's what we talked about this morning, correct?

6 A. Yes, when we were defining the terms.  Right.

7 Q. Okay.  The PowerPoint that we just talked about was your

8 position on whether or not there is value in monitoring or

9 measuring, correct?

10 A. Yes, it says that in the document that it's the opinion of mine.

11 Not necessarily the opinions of others in the company or outside.

12 Q. The only position the company has put out that you know of is

13 the position in the label that says no routine monitoring is

14 necessary, right?

15 A. Right.  That's the -- the message to the physicians, that they

16 don't need to be looking for some test to check every so often on

17 patients routinely.

18 Q. Now let's go to Exhibit 16, which is one of those attachments.

19 And this is Plaintiffs' 372322.  You see that this is "Bayer

20 Healthcare AG Xarelto 15-milligram film-coated tablets and

21 20-milligram film-coated tablets response to list of questions,

22 clinical aspects."  Do you see that?

23 A. I do.

24 Q. Do you know where these questions came from?

25 A. It sounds like they came from the European authorities.

1   Q. And it's list of questions, Day 60.  Draft due by end of March.

2   Do you see that?

3   A. Yes.

4   Q. And it's specifically for the Afib indication, right?

5   A. Correct.

6   Q. And the author is listed as John Paolini and Dagmar Kubitza,

7   right?

8   A. Yes.

9   Q. Are those both Bayer employees?

10  A. Yes.

11  Q. It says, Question 17, "Monitoring of coagulation parameters may

12  be considered in situations of bleedings or perceived increased

13  bleeding risk.  More firm recommendations on how this can be

14  performed in clinical routine are requested to be implemented in

15  the SPC."  And can you just tell people what the SPC is?

16  A. That's a summary of product characteristics.  That's the -- what

17  we call the USPI in the U.S. That's for Europe.

18  Q. Okay.  And then it goes on to say, "Monitoring of coagulation

19  parameters may be considered in situations of bleedings or

20  perceived increased bleeding risk.  More firm recommendations on

21  how this can be performed in clinical routine are requested to be

22  implemented in the SPC.  The applicant should ensure that such

23  reliable biological tests are available before granting of the new

24  indication as such monitoring is of importance in this extended

25  target population of rivaroxaban-treated patients."  Did I read

1    that correctly?

2    A. Yes.

3    Q. Okay.  So according to the EMA in this new indication,

4    monitoring was of importance, correct?

5    A. Their question is posing it as being important, and they are

6    asking our response on it.

7    Q. Okay.  And your response is, "The applicant has investigated

8    several laboratory assays throughout the clinical development

9    program in order to assess the appropriateness of laboratory

10   assays.  Inhibition of Factor Xa, PT, aPTT, and HepTest were

11   measured in nearly all studies and correlations with plasma

12   concentrations were established.  Except for PT, the tests were not

13   considered suitable for following the pharmacodynamic effects of

14   rivaroxaban because of a curvilinear relationship or a low

15   sensitivity of a PK/PD relationship."  Did I read that right?

16   A. Yeah.

17   Q. Okay.  So according to your response, PT was considered suitable

18   for following the pharmacodynamic effects of rivaroxaban, correct?

19   A. Well, that's just a very small portion of the whole thorough

20   response.  So of the tests that are available, PT would be one for

21   consideration.

22   Q. Well, your sentence is, except for PT, all of the others are not

23   considered to be suitable, right?

24   A. The PT was considered suitable.  The others were not considered

25   suitable.  It doesn't mean that it would be reliable, validated, et

1    cetera.  Certainly going forward, we'd look at it.

2    Q. Okay.  So according to your response PT is suitable?

3    A. Certainly should be looked at going forward.

4    Q. Who is Dr. Califf?

5    A. Dr. Califf was the head of the Duke Clinical Research Institute

6    at Duke University, and he is now the FDA commissioner.

7    Q. Has he ever told you that he has concerns about the GI bleed

8    risk with Xarelto?

9    A. Well, I believe there was discussion about all the bleeding that

10   we see with the antithrombotic.  If there's something specific, I

11   mean, obviously GI bleeding and the -- where we saw increases were

12   of concern to all of us.

13           MR. BARR:  Let me hand you Exhibit 29.  And this is

14   Plaintiffs' 3673723.

15        (DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT BERKOWITZ-29.)

16   Q. Okay.  In general, this is a series of e-mails about a -- a

17   draft ROCKET-AF bleeding event manuscript that eventually turns

18   into a discussion about GI mucosal bleeding with Xarelto, correct?

19   A. Right.  Trying to understand the GI bleeding signal.  As you

20   probably know, there was a -- something new found with the Factor

21   Xa inhibitors that there seemed to be a little more GI bleeding and

22   there was less intracranial hemorrhage and critical organ bleeding.

23   And that was a new pattern to us as physicians with anticoagulants.

24   Q. You offer a theory on May 2, 2012, as to why there may be higher

25   GI bleeds with Xarelto, right?

```
 1    A. Well, it was first focused, I think, on a statement about some
 2    of the things that were said, and I had to go back to my clinical
 3    pharmacology colleagues to -- to brush up on what had been learned
 4    in their studies.
 5    Q. Right.
 6    A. So, yes, we were trying to address that issue and try to have
 7    some understanding about -- about it.
 8    Q. Dr. Califf writes on May 8, 2012 --
 9    A. Yeah.
10    Q. "This sounds fine" --
11    A. Mm-hmm.
12    Q. -- "but somewhere down the line we need to really explore the GI
13    bleeding issue."
14    A. Yeah.
15    Q. "It's the only real liability in helping people avoid it, deal
16    with it, would be great."  Did I read that right?
17    A. Yes.
18    Q. What has Bayer done since this e-mail from Dr. Califf to really
19    explore the GI bleeding issue, to help people either avoid it or
20    deal with it?
21    A.  Well, when he says "exploring," what I believe he meant was
22    looking into our databases and trying to understand what was going
23    on.  What we've learned since that time is that patients who have
24    issues with their GI tract are more likely to bleed, as we talked
25    about before.
```

1          So, I mean, that --what's been done is to look at the

2    ongoing trials and the future trials.  This is an area of interest

3    for our GPV, our global pharmacovigilance area, where they look at

4    adverse events that come in. We look at sub-groups in the trials.

5    And that's how we try to evaluate it.

6          So it's sort of --it's something that we look at going

7    forward.

8    Q.  Has Bayer put out any information to help people avoid this

9    increased risk of GI bleeding?

10   A. Well, the label and the discussions with doctors, the education

11   of doctors and patients, patients who have susceptibility to

12   bleeding have to be watched carefully.

13   BY MR. BARR:

14

15   Q.  What in the United States label helps doctors in the United

16   States avoid GI bleeding with Xarelto?

17   A.  Again, the doctors have to look at the patient's

18   characteristics and make a determination whether anticoagulation is

19   right for them.

20   Q.  So what you're saying as I understand it is they --certain

21   patients that are at risk of these GI bleeds, it just may be

22   inappropriate to anticoagulate them with anything?

23   A.  That's true.  If we have, for example, a patient with a history

24   of duodenal ulcer, we have to be very careful about anticoagulating

25   him.  For patients that have a --a AV malformation in the

1  intestine, we have to be careful about that.

2  Q.  Are these contraindications listed in the United States label?

3  A.  They're not contraindications necessarily.  Again, we talked a

4  lot today about bleeding, but not at all about the thrombotic risk

5  that these patients suffer, which is manyfold higher.  And that's

6  the balance.  It's a benefit-risk that we have to deal with.  And

7  that's what the doctors do.

8  Q.  I understand that.

9  A.  Good.

10  Q.  But are any of these clinical issues that you've described that

11  put somebody at a higher risk of a GI bleed, are any of those

12  issues described in the United States label as things doctors need

13  to take account of to determine whether or not somebody should be

14  put on Xarelto?

15  A.  Well, again, I'm not the expert on the USPI label.  We would

16  have to talk with other colleagues who may know it more or spend

17  more time looking at the label as we did before.  So I'm not aware.

18  Q.  I want to look at one more of your e-mails in this chain.  It's

19  your e-mail on May 8, 2012.  It's on Bates 2811.  You've written an

20  e-mail to Shaun Goodman, Graeme Hankey, Robert Califf, and you've

21  cc'd a group of people, correct?

22  A.  Yes.  They're the co-authors and members of the ROCKET-AF

23  steering committee.

24  Q.  What you write is, "For the clinical development for the two

25  Factor Xa inhibitors furthest along, the exposure target accepted

1    has been different.  The doses of rivaroxaban appear slightly on

2    the high end of what is needed for efficacy in the various

3    indications, and apixaban doses appear more on the lower end

4    excluding ACS, my 20 opinion."  Did I read that right?

5    A.  Yes.  In 2012.

6    Q.  So it's your opinion in 2012, that the dose of rivaroxaban is

7    on the high end of what's needed for efficacy, right?

8    A.  Well, at that time looking at the data that we have and the

9    information that we have that's not here, we know that the apixaban

10   dose is set lower.  We know it's set lower because the scientists

11   have told us it was set lower.  It's set lower because they were

12   second to market and they wanted to get there faster.  So looking

13   at their data and seeing that they failed in an orthopedic study

14   and failed in an ACS study, we find them to be on the lower end.

15   Q.  Okay.  But you actually write Xarelto is slightly on the high

16   end of what's needed for efficacy, right?

17   A.  I don't know that I'm right.  All I know is that our goal, we

18   always try to balance the efficacy with the safety.  And we would

19   like to, especially four years ago, and maybe it's not possible

20   with any of the Xa inhibitors because now we have edoxaban out and

21   we have apixaban out there in a lot more patients so we can see the

22   bleeding profile.  We are unable to uncouple the bleeding from the

23   efficacy.  If we could adjust that, that would be a great thing.

24   Q.  Okay.  But --

25   A.  So one can make the assumption, looking at that, that we're --

1    compared to apixaban, we dose a little higher than they do.

2    Whether they would be successful or not, that's a different story.

3    Q.  So your opinion in 2012 was that the dose of rivaroxaban given

4    was higher than necessary for efficacy, right?  That's what it

5    says?

6    A.  Incorrect.

7    Q.  How else can you interpret that?

8    A.  It says doses of rivaroxaban are appear -- and I don't know

9    what that means --slightly on the high end --

10   Q.  You wrote --

11   A.  --of efficacy.

12   Q.  These are your words?

13   A.  This is an e-mail.  E-mails can have flaws in them.  They're

14   not 100 percent accurate, and they're not like us talking back and

15   forth, are they?  They don't have the depth.  They don't have the

16   context.  They don't have any of that.  They're just communication

17   in a quick form.

18   So I don't think it's appropriate to take any of these e-mails and

19   just say that's the gospel, especially as research is going on in

20   time.  So you're just seeing us at work.  And what we think on one

21   day could be a little bit different the next day.

22   Q.  Your opinion in 2012 was that the dose of rivaroxaban was

23   slightly on the high end of what is needed for efficacy?

24   A.  I'm sorry.

25   Q.  Right?

1    A.  No, not right.  That's why I'm interjecting.  Sorry.  Go ahead.

2    Q.  So what you wrote isn't what you meant?

3    A.  Well, it may not be, but -- it may not be, it may be, because I

4    don't know exactly what I was thinking at that moment.  We only

5    know the words on the page.  But there's a lot going on at this

6    time.  During the time that we developed rivaroxaban, which was

7    ahead of apixaban, you have to understand that the guidelines for

8    atrial fibrillation allowed aspirin for CHADS2 patients.  That's a

9    weak anticoagulant being used -- or antiplatelet being used.  And

10   we all were concerned about using these novel anticoagulants in

11   patients who were at high risk.  We only wanted patients to receive

12   them that could tolerate the possibility of the side effects.  We

13   didn't know what the profile would be.  So we target to be

14   efficacious.  Apixaban targeted to be safe, already knowing that

15   the Xa's were effective.  So in wording it in a general term, I

16   don't have values there.  I don't know exactly what I'm trying to

17   express.  I believe it's just that our interest is efficacy.  That

18   is the FDA's interest, efficacy.  Bleeding has become more

19   important over the years.  Not that it wasn't important to us, but

20   you have to understand we were facing the issue of trying to

21   improve on warfarin.  So as I look at it, when I look at the

22   agents, then I see for rivaroxaban, is it possible that a lower

23   dose could be better, as you were saying, is it possible?  Could

24   be.  But we think that the work that's been done shows that

25   rivaroxaban at 20 milligrams is appropriate, and 15 for patients

1    with renal failure is appropriate.

2    Q.  Okay.  Then the other question that I wanted to ask was, you

3    know, you were saying that could a 10-milligram dose be better?

4    A.  No. I didn't say that.

5    Q.  You were asking --well, you were asking if a lower dose could

6    be better, right?

7    A.  I was simply saying that you don't get the opportunity to

8    perfect exactly what it is.  You used your Phase II studies,

9    whatever you can do, your modeling.  And then you do the clinical

10   trial.  Once the clinical trial is done, then you have your dose.

11   It either works or it doesn't.  And it worked.

12   Q.  So let me just try to get this right.  You said, is it possible

13   that a lower dose could be better as you were saying, is it --it is

14   possible?  Could be.  Right?  That's what you said?

15   A.  Could, would, should, yeah.

16   Q.  You would agree with me that you never tested that dose, a

17   lower dose, in Phase III patients, right?

18   A.  For atrial fibrillation --

19   Q.  Yes.

20   A.  -- we tested 20 milligrams with 15 milligrams for patients in

21   moderate renal failure.

22   Q.  The reason that you don't know that answer is because you never

23   did the study to find out, right?

24   A.  There's lots of doses we didn't test. But you can't do those

25   kinds of trials by adding two, three, four, five different dosing

1    arms.  That's a Phase II study.

2    Q.  Earlier in the day, in the --in the last session, we talked

3    about Professor Jeff Weitz.  Do you remember that?

4    A.  Yeah.

5    Q.  Are you aware that he disagrees with you as far as whether or

6    not there is a need to measure with Xarelto?

7    A.  I don't know that we have much disagreement.  I know Dr. Weitz

8    personally.

9    Q.  Okay.  Well, let's --let's look at his e-mails and attachments.

10        MR. BARR:  This will be Exhibit 30.  And it's Plaintiffs'

11   107527.

12   BY MR. BARR:

13   Q.  All right.  I want to flip towards the back.  It's the third --

14   third page from the back.  And it's a slide titled, "Monitoring

15   Versus Measuring Anti" -- "Anticoagulant Effect of NOACs."  Do you

16   see that?

17   A.  Yeah.  Monitoring versus measuring?

18   Q.  Yes, sir?

19   A.  Mm-hmm.  Go ahead.

20   Q.  And it says, "We do need to measure.  We don't need to

21   monitor."

22   A.  Okay.

23   Q.  Did I read that right?

24   A.  Yes.

25   Q.  And it says, "When do we need to know drug levels or

1    coagulation effects"?

2    A.  Next slide.

3    Q.  Next slide?

4    A.  Yes.

5    Q.  It's, "Assess adherence.  Detect overdose.  Evaluate potential

6    drug interactions.  Plan timing of urgent surgery.  Diagnose

7    potential causes of stroke or bleeding.  Decide on use of

8    thrombolytics."  Right?

9    A.  Yes, that's what it says.

10   Q.  Those are many of the same special circumstances that we've

11   talked about, correct?

12   A.  Correct.

13   Q.  Then you go to the next page.  It says, "Routine assays can be

14   used to determine anticoagulant effects."  Do you see that?

15   A.  I do.

16   Q.  And for rivaroxaban it has anti-Xa assays and sensitive PT,

17   right?

18   A.  Right.  Meaning the Neoplastin.

19   Q.  Right.  Saying that can be used to determine anticoagulant

20   effect, right?

21   A.  Well, it's talking about what routine assays might be available

22   now in the laboratory around the world.

23   Q.  Let me restate my question to make sure it's clear what I'm

24   talking about.  He says that in the case of rivaroxaban, Xarelto,

25   sensitive PT can be used to determine anticoagulant effects.

1    That's what that checkmarks next to rivaroxaban and sensitive PT

2    means, right?

3    A. No. I'm sorry.  I can't agree to that.  This is a slide showing

4    a table of potential tests that could be used.  For example, look

5    at dabigatran, aPTT is listed.  The thrombin time and the dilute

6    thrombin time and the ETT.  The best would be the ETT.  So it's not

7    saying anything different than what we've been saying.

8    BY MR. BARR:

9    Q.  Well, I thought your testimony was that PT could not be used?

10   A.  No, that was not my testimony.  My testimony is that it's not

11   the best test to use.  It's not very reliable.  It gives you a

12   qualitative or semi-quantitative.  It's not what we would recommend

13   that physicians use because we don't think it's the best test. If

14   you use a test that's not precise and accurate, then you can get

15   results that are not valuable.

16   Q.  The idea of clinicians wanting to be able to measure the

17   anticoagulant effect of any anticoagulant was known to Bayer in the

18   early 2000s, right?

19   A. I can't say what was known to Bayer before I got there?

20          I can say that some of us have been in the field a long

21   time trying to develop antithrombotics, and many of us, like Dr.

22   Weitz and myself, who is not of the company, but those of us who

23   are hematologist, we measure.  We like to measure.  This is how we

24   check things.

25          Doctors like to do that because they're used to heparin

1   and warfarin.  They grew up thinking they had to do that.  It was a

2   big change for low-molecular-weight heparins to come along and not

3   need to be monitored.  It was very hard.

4           And you see the same thing now.  Doctors would like to

5   measure because it makes them feel like it's doing something.  But

6   you have to have a test that allows you, that tells you that it's

7   really doing something, not just treating the doctor, but actually

8   treating the patient.

9   Q. Okay.  But for purposes of a patient in the United States where

10  an anti-Factor Xa assay is not available, the only thing that's

11  available is PT with Neoplastin, correct?

12  A. Sorry.  I have to correct you just a little bit.  There's

13  anti-Factor Xa assays, and there's the rivaroxaban assay that's

14  based on the platform.  If you mean the platform, yes.

15          Unfortunately, not at this time do we have the test, but

16  we're hopeful it will be available.

17  Q. So the only thing that a doctor can use in present practice

18  today is PT Neoplastin, right?

19  A. In practice today, that would be the closest we could get.  This

20  could change.

21  Q. Okay.  I'm going to hand you what I'm going to mark as Exhibit

22  35.  It's Plaintiffs' 1094747.

23      (Document marked for identification as Exhibit Berkowitz-35.)

24  BY MR. BARR:

25  Q. It's my understanding, based upon the way these were produced,

1   and you can confirm this or not, that these are your notes from

2   your custodial file.  Do you recognize these?

3   A. I haven't looked at it in a long time.  It looks like notes that

4   I took in speaking with Dr. Mueck to get some history on what they

5   faced early on with the design of the program.  So it looks like

6   something I might produce.

7           "But we test in prevention and treatment setting a once

8   versus twice-a-day and conclude on clinical data that once-a-day

9   fine and then go to Phase III and confirm."  Did I read that right?

10  A. I think so.

11  Q. "If you just" -- "if you just a PK guy, say half-life of 9 to 11

12  hours, then you should use twice-a-day, but we have done clinical

13  work and then clinical confirmation."  Did I read that one right?

14  A. Yeah.  I think I understand what I was writing here.

15  Q. Okay.  Help me out.

16  A. Well, it was basically the concept we were just speaking about.

17  So the half-life of rivaroxaban for a young healthy volunteer is 5

18  to 9 hours.  The half-life in young elderly patients is 9 to 13

19  hours.  It usually gets said that the half-life is something like 5

20  to 9 hours or something.  But it varies a bit.

21          The problem is that the half-life in the circulation has

22  no -- no important meaning in coagulation, because it's the

23  pharmacodynamic effect that makes the difference.

24          What happened was, we initially started testing the drug

25  as twice-a-day, because the half-life might make you think that.

1    But it turned out that when we did more sophisticated coagulation

2    tests, or more sophisticated than a PT or a PTT, but did like

3    thrombin generation, it turns out that thrombin is inhibited beyond

4    24 hours.  Now, that wasn't realized at first in the program.  So

5    you'll see the first dosing studies were BID.

6              When it was realized that OD might be possible, we did

7    another study.

8              We added on a study.  It actually lengthened the program.

9    It cost us about a year.  But we added on a once-a-day arm in the

10   orthopedic and tested it, and it looked clinically good in Phase

11   II.

12             That's -- that's how it went.  So the important lesson

13   from it to me, although it's miss -- mistaken a lot even today,

14   half-life for an anticoagulant isn't the major important thing.

15   It's the pharmacodynamic effect.

16   Q. Do you remember a time when both Janssen and Bayer were

17   considering conducting a ROCKET2 study?

18   A. Yes.

19   Q. Yet it was not conducted, primarily because it turned out there

20   was no risk to the product in the market, right?

21   A. No, that's not correct.  I think that's not the case.  But what

22   I think ultimately turned the tide on that was the edoxaban data,

23   the -- the fourth, or third Xa inhibitor, when they did look at

24   their BID in lower doses, and there, there was loss of efficacy.

25   And this is our greatest concern and the FDA's greatest concern.

 1   And so at that point then it became clear to us that that's

 2   probably not the best step.

 3   Q. Okay.  We can move on.

 4          Now let's look at some papers that were published by

 5   Dr. Mueck.  I want to start with what I'll mark as Exhibit 48.

 6   This is Plaintiffs' 177639.

 7      (Document marked for identification as Exhibit.)

 8   BY MR. BARR:

 9   Q.  Now, this manuscript is titled "Rivaroxaban and Other Novel

10   Oral Anticoagulants:  Pharmacokinetics in healthy subjects,

11   specific patient populations and relevance of coagulation

12   monitoring."  Correct?

13   A. Yes.

14   Q. And this is written by Dr. Mueck among others, right?

15   A. Yes.

16   Q. It's going to be published in the journal Thrombosis, right?

17   A. That's the target journal.  This is Draft 6.  So I don't know

18   the final paper.

19   Q. And just so the jury understands, can you explain what CMAX and

20   area under the curve are?

21   A. Well, CMAX is the concentration maximum, so it would be the peak

22   value that has a time range somewhere in the order of two to four

23   hours after a dose is given in general?

24          The area under the curve is a calculation of

25   the concentration all during the 24-hour period or whatever period

1    you choose.

2    Q. Okay.  It says, "Top and bottom of the shaded boxes correspond

3    to the upper 75 percent and lower 25 percent percentiles

4    respectively.  The central white bands represent the median.

5                       Whiskers correspond to the lowest and highest

6    data points within in 1-1/2 times interquartile range calculated

7    from the center of the data."  Points beyond this range are

8    possible outliers indicated by horizontal lines," right?

9    A. Yes.

10   Q. And the CMAX ranges from just below 200 --

11   A. Yes.

12   Q. -- to just below 500?

13   A. Yes.

14   Q. Right.  So that's a roughly two-and-a-half-fold difference

15   right?

16   A. Using simple math calculations, yes.

17   Q. Right.  So two -- so people taking the same pill, their blood

18   plasma concentration ranges from just below 200 to somebody else

19   taking the same pill to just below 500, right?

20   A. In this study in these however many patients you said it was,

21   that's the finding that they have here.

22   Q. And do you believe that that is a significant variation in

23   concentration?

24   A. No.

25   Q. No. How would you describe that variation?

1   A. I would call it moderate, but I'm not a clinical pharmacologist.

2   Q. I'm just asking you what your characterization of the

3   variability with Xarelto is.  And I thought I heard you say

4   moderate; is that right?

5   A. What you heard me say is I'm not a clinical pharmacologist, and

6   we should talk to those specialists.  But my understanding is that

7   it's moderate.  From what I've seen from drugs and what I've seen

8   from rivaroxaban, that fits into a more moderate category.

9            So let's go to Exhibit 49.  Plaintiffs' 3261528.

10           I've handed you a -- a paper from Dr. Mueck, Stampfuss,

11   Kubitza and Becka.  And this is titled "Clinical Pharmacokinetic

12   and Pharmacodynamic

13   508:12 Profile of Rivaroxaban."  Do you see that?

14   A. Yes.

15   Q. And this is published in September -- on September 3, 2013,

16   right?

17   A. Yes.  Online.  Mm-hmm.

18   Q. And if you go down about a third of the way through the

19   abstract, do you see the sentence that starts "Variability"?

20   A. A third.  I'm sorry.  Yes.  Got it.

21   Q. Okay.  It says, "Variability in the pharmacokinetic parameters

22   is moderate, coefficient of variation 30 to 40 percent," correct?

23   A. Yes.

24   Q. So, according to this paper, the variation is moderate, correct?

25   A. That's what it's saying here.  For -- now it's taking all the

1   pharmacokinetic parameters together.

2   Q. Which is consistent with what you understand?

3   A. What I understood.

4   Q. Okay.  So now let's go to Table 3.  You understand that Table 3

5   in this paper is data from the ROCKET trial, correct?

6   A. Well, looking at the table, I understand it's data from the

7   various trials that we've done, including the ROCKET trial.

8   Q. Okay.  And I'm looking at the stroke prevention in patients with

9   AF 20 milligrams once a day.  Okay?

10  A. So you're looking at the patients with the creatinine clearance

11  greater or equal to 50?

12  Q. Yes, sir.

13  A. Right?  Okay.

14          Well, the concentration at trough is basically as low as

15  the concentration might be before the next dose.  So the -- the

16  time period could vary unlike the CMAX which has a more narrow

17  range that you would be sampling from.

18  Q. Right.  Okay.  So the concentration trough, the mean is 44,

19  right, 44 micrograms per liter, correct?

20  A. That's what it says for -- for the stroke prevention row.

21  Q. And the 5th to 95th percentile is 12 to 137 micrograms per

22  liter, right?

23  A. Yeah.

24  Q. That's a tenfold difference, correct?

25  A. Well, again, doing simple math, that's a -- well, not quite.

1  Q. It's actually more than 10.

2  A. I'm sorry.  From 18 to 136?

3  Q. No, from 12 to -- you're looking at --

4  A. Oh, I'm sorry.  I'm on the wrong line.  Yep, I lost my place.

5  Yes.  Mm-hmm.

6  Q. Okay.  So it's actually a slightly greater than tenfold

7  increase, right?

8  A. But you can call it tenfold.

9  Q. Okay.  And so that -- that gets back to the original idea that

10  different patients taking the same 20-milligram pill at trough,

11  there is a tenfold variation in their blood plasma concentration at

12  trough, right, across the 5th and 95th percentile?

13  A. Again, I think the -- one has to understand how the samples are

14  drawn, and there's a wide window for trough.  So you are going to

15  get a wider spread.

16  Q. Okay.  But then if you go to CMAX, there is a median of 249,

17  correct?

18  A. Yes.

19  Q. I'm sorry.  It's the geometric mean.  Geometric mean of 249,

20  correct?

21  A. Sorry.  Let me check the footnote.  Yes, geometric mean.

22  Correct.

23  Q. And the variation in the 5th to 95th percentile is 184 to 343

24  micrograms per liter, right?

25  A. Yes.

1   Q. Approximately a twofold difference, right?

2   A. So as we had noted a more narrow, a more narrow range and a more

3   narrow fold.

4   Q. Right.  So according to this data, it's a narrower range at CMAX

5   and a wider range at trough, right?

6   A. Well, according to this data, what I was saying was that the

7   sampling time is wider.  Now as I said, I'm not a clinical

8   pharmacologist, but as a clinician, that's how I understand it.

9   That's how I look at the data.

10  Q. Okay.  Now, I want to show you -- I'm going to show you what I'm

11  514:16 going to mark as 50 and 51.

12          Exhibit 50 is Plaintiffs' 3668403, and Exhibit 51 is

13  Plaintiffs' 3668404.

14  Q. And -- and maybe to try and help you out here, I'm not really

15  going to ask you about the e-mail.  I was showing this to you, to

16  show you that you hadn't seen this before.  That's really the only

17  reason I'm giving you this exhibit.

18  A. Oh okay.

19  Q. I didn't -- I didn't want there to be confusion that this was

20  something that you had seen before.

21  Q. You see this is a PowerPoint from Janssen titled "Rivaroxaban

22  Project 100, Quantitative Sciences," correct?

23  A. Yeah.

24  Q. It was attached to an e-mail, which is Exhibit 50, that was

25  dated October 10, 2015, correct?

1  A. Yes.

2  Q. Okay.  And I'm looking at Page 4 of the PowerPoint, which is

3  titled

4  "Dabigatran."  Do you see that?

5  A. Yes.

6  Q. And there's a blue box on the bottom two-thirds of the page with

7  a bold heading, "A case for routine monitoring?"  Do you see that?

8  A. Yes.

9  Q. And there's a statement right after that that says, "Relatively

10  high intersubject variability in Phase III Afib trial C trough

11  displayed a 420 percent and 450 percent variability."  Did I read

12  that correctly?

13  A. Yeah.

14  Q. Okay.  So at trough, according to this document, dabigatran had

15  a 420 percent variability for the 120 milligrams twice a day, and a

16  450 percent variability at trough for the 150 milligram twice a

17  day, correct?

18  A. Just reading what they say in this slide.  That's what it says.

19  Q. And in this slide, a 420 to percent variability is described as

20  high intersubject variability, correct?

21  A. No. It's described as relatively high.

22  Q. Fair enough.

23  A. That's not the same thing.

24  Q. Fair enough.  Relatively high intersubject variability, correct?

25  A. Yes.

1   Q. Whereas if you look at the Mueck paper that we just looked at,

2   at Trough there is a tenfold difference for patients on 20

3   milligrams, correct?  Do you remember that?

4   Q. That's a thousand percent increase, correct?

5   A. Again, you're doing simple math with clinical pharmacology

6   numbers that I'm not expert in. So I can't really help you here.  I

7   think you need to talk to the people who do the clinical

8   pharmacology.

9   Q. You would agree with me that a tenfold different variability in

10  trough is a thousand percent variability, correct?

11  A. Simple math says that.

12  Q. So the answer to that is yes?

13  A. I don't know what that means in a clinical pharmacology sense.

14  Q. But the answer to my question is yes, that's a thousand percent

15  variability?

16  A.  The question is did you do your math right?

17  Q. Yes.

18  A. It sounds like it.

19       MR. BARR:  I'll show you Exhibit 52.  And this is

20  Plaintiffs' 80333.

21     (Document marked for identification as Exhibit Berkowitz-52.)

22  BY MR. BARR:

23  Q. So you see that this is a series of e-mails that got forwarded

24  to you by Ms. Kubitza.  Do you see that?

25  A. Dr. Kubitza, yes.

1   Q. Right.  And she sent this to you on August 18, 2014, correct?

2   A. Yes.

3   Q. And she writes to you, "Dear both" -- well, you and Dr. Derix.

4   It says, "Dear both.  Some background information for the

5   discussion to come later this week.  Best regards, Dagmar."

6   A. Yeah.

7   Q. Correct?  So what I want to do is I want to start looking at

8   this.  And I'm going to start with the e-mail from Paul Burton that

9   starts on the bottom of the page at 20944.

10  A. Okay.

11  Q. Do you see the e-mail from Paul Burton?

12  A. Yes.

13  Q. And this is August 14, 2014, correct?

14  A. Yes.

15  Q. All right.  And he sends an e-mail to, it looks like a group of

16  people at Janssen primarily, correct?

17  A. Correct.

18  Q. Okay.  And he says, "I think the edits for clarity are valuable.

19  I would keep the information in the middle column that we perform

20  testing for monitoring in early and late stage trials and were able

21  to confidently conclude that monitoring is neither necessary nor

22  required with Xarelto use in routine clinical practice."  Did I

23  read that correctly?

24  A. Yes.

25  Q. Okay.  You agree with me that the label indicates that routine

1   monitoring is not required with Xarelto, correct?

2   A. That's correct.

3   Q. Okay.  According to Dr. Burton here, he believes that the

4   companies tested for monitoring in early and late stage trials and

5   were able to confidently conclude that monitoring is neither

6   necessary nor required with Xarelto use, correct?

7   A. Well, that's what it -- he's writing in his e-mail here.  I'm

8   just reading that.  I don't know what he actually believes.

9   Q. Okay.  Well, that's what he wrote, correct?

10  A. That's what he wrote, yes.

11  Q. Okay.  Do you agree or disagree with that statement?

12  A. Well, my memory of it, I mean, we did a little bit of PK in

13  small samples in the ROCKET trial, 160 or so.

14          But we did our work, as -- as I mentioned, in Phase II

15  where we looked at these connections with bleeding and events the

16  best we could from that work.

17  Q. So is that an agreement or a disagreement?  I just want to --

18  A. Well, I guess it depends what we talked about, early or late

19  stage trials.  But if it -- I mean, I'm thinking of -- you know,

20  Phase II I think of the middle.  So early I think of as Phase I. So

21  I'm not sure what he means by early or late stage trials.  But to

22  me, the bulk of the work doing the comparisons that you asked about

23  us doing a study, maybe we were missing each other in terms of --

24  of the discussion before the break, but we did that work in Phase

25  II.  And we looked at those connections.

 1   Q. Okay.  Now, I want to look at one of the responses from Todd

 2   Moore.  This is on Page 20943.

 3          You see the e-mail from Todd Moore dated August 15, 2014,

 4   in the middle of the page?

 5   A. I see one August 15th.

 6   Q. I'm sorry.  August 15, 2014, in the middle of the page.

 7   A. Yes.

 8   Q. Okay.  And -- and remind the jury who Todd Moore is again?

 9   A. Todd Moore is a -- a clinical pharmacologist at Johnson &

10   Johnson.

11   Q. Okay.  He says, "Dear Judy.  I'm concerned with the statement in

12   the middle column, 'testing for monitoring was performed in early

13   and late stage trials.'

14          "I don't believe this statement is accurate.  After

15   discussing this with Dagmar this morning, perhaps a better strategy

16   would be to highlight the results from the multiple large

17   postmarketing-type studies that appear to show a consistent

18   bleeding profile as was determined in the pivotal Phase III trials,

19   correct?  I state this because I don't believe we truly tested for

20   monitoring."  Did I read that correctly?

21   A. That's what's written here.

22   Q. So Todd Moore, the clinical pharmacologist at Janssen, is

23   saying, we never truly tested for monitoring, correct?

24   A. I'm not sure I take that completely from what he said.  I think

25   he corrects the version about the early and late stage when he

1    says, I don't believe this statement is correct.  And then as you

2    go on further, then he says, I state this -- that portion about I

3    don't believe we truly tested for monitoring.  But I don't know

4    what -- if he means in one of those programs or at all.  It doesn't

5    say that.

6    Q. Okay.  You agree with him on that statement, don't you?

7    A. I agree with him on the statement about the early and late

8    stage.

9           But as -- as we had spoken about earlier, in the Phase II

10   program we looked at the connection of -- of bleeding and PT and

11   you can find this information in our files.

12          But I'm not sure what exactly he meant by that.

13   Q. Okay.  Well, let's look -- he -- I think he clarifies a little

14   later.

15          If you go to the -- the first page.  This is just to give

16   you the beginning of the e-mail. You see his e-mail starts right

17   there on the bottom, from Todd Moore to Dr. Burton, August 15,

18   2014.  It's right on --

19   A. Oh yeah.  Right.  I do see it.  Mm-hmm.

20   Q. So then, you flip to the next page, and he says, "Thanks for

21   your response.  Perhaps I misunderstood what is meant by testing

22   for monitoring in this regard.  During the Phase I and II clinical

23   development we collected intensive PK and PD to help characterize

24   the drug's profile.  We have a lot of data on this.  However, I

25   don't know if we can consider any of this testing for monitoring"

1   -- "monitoring.  I don't believe Bayer performed or could perform

2   any specific analysis for this."  Did I read that correctly?

3   A. Yes.

4   Q. So he's saying we didn't do any testing for monitoring at all,

5   correct?

6   A. He's saying that there is -- from his memory that no testing --

7   "testing for monitoring" or -- or that we could perform that.

8   Q. Okay.  Then if you go down to the bottom, he says, "Without

9   taking significantly more PK and PD samples in the Phase III

10  studies."  And there was a specific decision not to take PK samples

11  from all patients in the Phase III studies, right?

12  A. We did not take PK samples in all patients in their Phase III,

13  as we did all that work in the Phase II.

14  Q. But you had a small subgroup of patients in the ROCKET trial

15  that you did some PK at Week 12 and Week 24, correct?

16  A. Well, a small subgroup at Week 12 and 24 is a far cry from doing

17  the 360,000 samples that we got during the whole trial.

18          So that you can have a little better control.  And then

19  that's a lot of the issue for us is in Phase II where you can

20  control the setting and control the sampling, have the tubes, get

21  the timing right.  That's a -- that's a more reliable way to do it.

22  And that's how we chose to do it for this program.

23  Q. Okay.  He says, "Without taking significantly more PK and PD

24  samples in the Phase III studies and performing a more rigorous

25  type of analysis, more than observational, perhaps a regression

1   type, et cetera, I don't know if we can truly say we tested the

2   need for monitoring."  Correct?

3   A. That's what he writes.

4   Q. So he -- he reiterates, "Without substantially more data there's

5   no way that we can truly say we tested for monitoring," correct.

6   A.  Just -- just confirming what he says in the document.

7   Q. Well, do you agree with that?

8   A. Well, I'm not an expert on the clinical pharmacology.  So I

9   can't say.  But all I can say is that we did that work in Phase II

10  and we -- we didn't see a need in doing the various indications

11  that we study, because we didn't just study one indication.  We

12  didn't see how that would be of benefit.

13  Q. Okay.  Can you identify which Phase II studies where the

14  companies looked at PK/PD versus outcomes?

15  A. Well, I think you can look at the FDA AdCom briefing document

16  where we list those.  I don't know their numbers offhand.  But if

17  you check that, I think you'll find the comparisons in PK and PD.

18  Q. And you're specifically correlating those to outcomes?

19  A. I know for a fact that they discuss bleeding outcomes.

20  Q. Let me hand you what I'm marking as Exhibit 53, which is

21  Plaintiffs' 3388635.

22      (Document marked for identification as Exhibit Berkowitz-53.)

23  BY MR. BARR:

24  Q. You see this is a series of e-mails between you and your

25  colleagues at Bayer on November 9, 2015, correct?

1    A. Yes.

2    Q. And y'all are discussing the subject difficulties with preparing

3    slide presentation for EMA workshop.  Do you see that?

4    A. Yes.

5    Q. Okay.  And you write to your colleagues on November 9th, and you

6    say, "I'm running into difficulty determining what slides and data

7    should be presented at the EMA workshop, and in terms of a draft

8    slide set, haven't gotten very far.

9           As you know, the ten minutes we are allotted are in the

10   very last section at the end of the meeting entitled "Session 4:

11   Future perspectives.  What could be done?"  Do you remember this?

12   A. Yes.

13   Q. And what was this EMA workshop?

14   A. Well, I don't know the -- all the details about it.  But EMA had

15   a workshop on whether some kind of therapeutic dose monitoring

16   could be useful in improving benefit-risk.  As I understand it,

17   there was a number of companies there.  There were lawyers there.

18   There were journalist there.  It was a broad meeting with the CHMP.

19   Q. And just so the record is clear and people understand, the EMA

20   is the European equivalent of the FDA, correct?

21   A. Yes.  The European Medicines Agency.

22   Q. Okay.  And the therapeutic drug monitoring, there was discussion

23   about whether or not you could monitor either blood plasma

24   concentrations or a PD marker and then have dose adjustments based

25   on whatever the blood testing showed, right?

1    A. Well, that was part of it.  It was mostly about whether you

2    could add benefit to the care.

3    Q. Okay.  And if I recall correctly, Bayer's position was -- is

4    that would not add benefit to the care, correct?

5    A. My understanding of our position then was the very same, that it

6    would not add benefit over and above patient characteristics as

7    we've said or what is in our label.

8    Q. Okay.  So I want to go down to your last paragraph on the first

9    page.  You say, "I need your help in deciding and obtaining slides

10   that will directly address the description provided for our

11   section, which is, 'This session aims to discuss ways to fill the

12   gaps in our knowledge about PK/PD measurements as well as how to

13   better use the available data, future scenarios on how knowledge

14   can be obtained should be depicted,'" correct?

15   A. Mm-hmm.

16   Q. So that is the description for the section that you've been

17   asked -- the company has been asked to present on, correct?

18   A. I think that's a word-for-word lift from the agenda.

19   Q. Okay.  And you say, "It is our position that we do not have

20   gaps.  And other than the modeling and simulation project which is

21   ongoing, we do not have more to suggest."  Did I read that

22   correctly?

23   A. Yes.

24   Q. Okay.  So you certainly said on November 9, 2015, that when it

25   comes to your knowledge and data about PK/PD measurements that it

1   was your position that the company does not have gaps, correct?

2   A. It's my position and this is talking about the position of the

3   group, not just myself, that we don't have gaps.

4   Q. Okay.  So you believe, as you sit here today, that the company

5   does not have gaps in its PK/PD data, correct?

6   A. Well, as I've stated to you, I'm not a PK/PD expert.  I'm

7   talking about some major gap involved that we need to help

8   patients.  Now, there might be things that clinical pharmacologists

9   could come up with or other people could come up with.  But

10  although here I'm representing the group here, that is my view,

11  that there are no major gaps.

12  Q. Okay.  So if there are no gaps in your PK/PD data, no major gaps

13  in your PK/PD data, what is the maximum safe -- maximum safe blood

14  plasma concentration of Xarelto?

15  A. We discussed this yesterday.  We don't have definitive level for

16  that.

17  Q. Okay.  If there are no major gaps in your PK/PD data, what is

18  the absolute minimum blood plasma concentration necessary to

19  successfully reduce stroke risk?

20  A. I'm not aware of having that.  Are these major gaps?

21  Q. Okay.  Are you able to provide the range of concentration needed

22  so that people maintain sufficient stroke benefit without excessive

23  bleed risk?  Can you give that range of concentration?

24  A. I'm not aware of a range, because it hasn't been necessary to

25  have that, once we have the dose tested and the clinical trials.

1    Q. Okay.  So let's make this about Factor Xa inhibition then.  If

2    there are no gaps in your PK/PD data, what is the maximum safe

3    Factor Xa inhibition level?

4    A.  Again, as I said before, it's not no gaps.  It's no major gaps.

5    I don't see this as a major gap when we have the dose for patients.

6    If you need more information on this, then I suggest you talk with

7    our clinical pharmacologists.

8    Q. If there are no major gaps in your PK/PD data, what is the

9    absolute minimum necessary Factor Xa inhibition level to

10   successfully reduce stroke risk?

11   A. As we have the -- I don't have a level for that as we have the

12   clinical trial data which shows the effectiveness of preventing

13   stroke in patients.

14   Q. If there is no major gaps in your PK/PD data, what is the range

15   of Factor Xa inhibition needed to maintain stroke protection

16   without excessive bleed risk?

17   A. I don't have any levels that I can give you because we have the

18   clinical trial data, which I find more important.

19   Q. Okay.  Let's try PT.  If there are no major gaps in your PK/PD

20   data, what is the maximum safe PT prolongation due to Xarelto?

21   A. I don't think that exists.  I don't think that exists.

22   Q. Okay.  If there are no major gaps in your PK/PD data, what is

23   the minimum PT prolongation needed to successfully reduce stroke

24   risk?

25   A. As we've discussed, the PT is not the best test for measuring

1    rivaroxaban.  For that question and the question before, they are

2    not major gaps.

3    Q. If there are no major gaps in your PK/PD data, are you able to

4    provide a range of PT prolongation that shows somebody has

5    effectively -- reducing the risk of stroke without putting them at

6    excessive bleed risk?

7    A.  As noted before, I think the PT is an inappropriate test to be

8    testing for rivaroxaban.  So your questions are not pertinent to

9    the clinician.

10   Q. Do you believe a correlation analysis has been conducted between

11   PT and bleeding events with Xarelto?

12   A. As I mentioned in the FDA AdCom document, you'll find that

13   correlation.

14   Q. Okay.  Then would you agree that it's known within the company

15   as PT goes up, bleed risk goes up?

16   A. I -- I think we understand that as the PT go up, as -- as flawed

17   as the test is for rivaroxaban, that bleeding risk may go up.

18   Q. Okay.  And you -- would you agree that PT has been shown in

19   Phase I and Phase II clinical studies to be a reliable exposure

20   marker for Xarelto plasma concentrations when a sensitive assay is

21   used?

22   A. I would agree that if you use a PT with a Neoplastin plus

23   reagent, which is sensitive, that then you can get some fix, some

24   semi-quantitative fix on the rivaroxaban concentration, but would

25   recommend using the assay that's specific for rivaroxaban.

1    Q. Okay.  Now, PT, was certainly sufficient in the company's view

2    to be used as a biomarker to be carried forward as a PK surrogate

3    in all Phase III trials for an exposure response analysis, correct?

4    A. I believe that's correct.

5    Q. And -- and that's because of the established linear relationship

6    between rivaroxaban blood plasma concentration and PT, right?

7    A. Well, when you use the sensitive reagent for PT, not for all PT.

8    Q. Fair enough.  So when you use the sensitive reagent Neoplastin,

9    PT has an established linear relationship with rivaroxaban blood

10   plasma concentration, correct?

11   A. That's correct.  You can see a linear relationship.

12          MR. BARR:  Let me give you Exhibit 54.  And this is

13   Plaintiffs' 1097767.

14      (Document marked for 549:11 identification as Exhibit

15      Berkowitz-54.)

16   BY MR. BARR:

17   Q. So referring back to Exhibit 45.

18          Okay.  And so we -- we looked at this earlier today, and

19   this is the e-mail from Dr. Mueck to yourself copying multiple

20   other of your colleagues on May 28, 2014, correct?

21   A. Yes.

22   Q. "Based on the established linear relationship between

23   rivaroxaban plasma concentration and prothrombin time, PT, carry PT

24   measured at peak and trough in all pivotal Phase III programs to

25   use them as PT" -- "PK surrogate for subsequent exposure/response,

OFFICIAL TRANSCRIPT

1    mainly bleeding event analyses," right?

2    A. Yes.

3    Q. Do you know if that was ever done, this exposure response

4    dealing mainly with bleeding events?

5    A. It -- it's been done.  I mean it's going on.

6    Q. Okay.  And what that analysis shows is that bleed risk increases

7    with -- as PT goes up, right?

8    A. -- well, we've established that already, right?  As the PT goes

9    up there's an increased risk of bleeding.

10   Q. Okay.  And -- and you certainly agree with that, right, you

11   personally?

12   A. I agree that that's what was found.

13          Do you think it would be misleading to inform anyone that

14   there is no correlation between bleeding events and blood plasma

15   concentration of Xarelto?

16   A. I wouldn't think that that would be a right -- a correct

17   statement.

18   Q. What is it that would not be a correct statement?

19   A. I don't have the benefit of reading it like you do off the

20   screen, but...

21          It sounded like you said the correlation between bleeding

22   risk and increased concentration.  It's well-known and again

23   something -- a topic we talked about yesterday, that

24   anticoagulants, if you increase their -- their blood concentration,

25   there's an increased risk of bleeding.  Unfortunately we're not

1   able to uncouple bleeding from efficacy, meaning decrease in

2   strokes and blood clots to the lung, et cetera.  That's not yet

3   possible.

4   Q. Let me show you Exhibit 55 --

5           MR. DENTON:  54.

6           MR. BARR:  54, as Roger has corrected me, which will be

7   Plaintiffs' 1075492.

8       (Document marked for identification as Exhibit Berkowitz-54.)

9   BY MR. BARR:

10  Q. Now, you see that this is a series of e-mails internal at Bayer,

11  right?

12  A. Yes.

13  Q. Okay.  And in -- the top e-mail is -- is an e-mail from you, but

14  it includes multiple of your colleagues, right?

15  A. Yes.

16  Q. And we've talked about a number of these before.  I don't

17  believe we've talked about Claudia Henn.  Who is she?

18  A. Claudia Henn is a physician in the medical affairs division.

19  Q. Okay.  And you're talking about corrections to Document 1A

20  Version 04181, right?

21  A. That's what the subject line says.

22  Q. And this is April 18, 2015, right?

23  A. Yes.

24  Q. And do you remember specifically what that document was?

25  A. Not exactly.

1    Q. There's an e-mail from Dr. Henn?

2    A. Yes.

3    Q. On April 18, 2015, forwarding Document 1A.  Do you see that?

4    A. Yes.

5    Q. Okay.  And she has -- she says, "I've read the document, and I'm

6    fine with it.  I've only added a subheader, clinical trial program,

7    in the Chapter 2.1.1 analysis of the relationship."  And she goes

8    on, right?

9    A. Okay.

10   Q. And then she has -- one, two, three -- four kind of bullet

11   points within her e-mail, right?

12   A. Yeah.

13   Q. Okay.  If you look right above that, you see your e-mail back to

14   her.  So you see you've responded to Dr. Henn on the page before on

15   April 18, 2015?

16   A. Yes.

17   Q. Okay.  And what you say is, "Thank you for addressing these

18   remaining questions, which I also noted.  My thoughts are in red

19   below," right?

20   A. Right.

21   Q. So you took the text from her e-mail, and you added some

22   comments to it, right?

23   A. That's what it says.

24   Q. Okay.  So what I want to look at is your comments to Point

25   Number 4 in Dr. Henn's e-mail.  Are you with me?

1    A. Yes.

2    Q. Bullet Point 4 is, "In summary no obvious relationship between

3    PT and bleeding events was observed in any of these analyses.

4    There were wide overlaps of the distribution of PT values between

5    patients with bleeding events of different severities and patients

6    without bleeding events within the box plots which did not allow

7    the determination of a threshold of PT to identify patients at

8    higher risk of bleeding for any of the studies."  Did I read that

9    correctly?

10   A. Yes.

11   Q. And then your comment is below.  Do you see that?

12   A. Well, I see the writing below it.  It's not in color.  So I

13   can't tell if it's mine.

14   Q. Okay.  It says, "No, I don't think we can simply state no

15   correlation to plasma concentration."

16   A. Excuse me.  Actually, it's probably not mine, because later it

17   has my initials in the colon, and then my statement.  But if it

18   were in color and as it said in red, we could see better.

19   Q. Okay.  We'll get to that, and maybe we can clear this up.

20   There's a comment below Number 4 that says, "No, I don't think we

21   can simply state no correlation to plasma concentration.

22           This would be too simplified and could be misleading as

23   there are correlations to CMAX, area under the curve, et cetera in

24   dose-finding trials, e.g., this is my understanding.  Am I right?"

25   Do you see that?

1    A. Yes.

2    Q. And then there's an SDB.  That's you, right?

3    A. That's me.

4    Q. You say, "I believe you are correct and this is an appropriate

5    way to state it," right?

6    A. That's what it says.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q. So you agree that you can't simply state there's no correlation

2  to plasma concentration and that that would be too simplified and

3  could be misleading, right?

4  A. Exactly as I had said previously.

5  Q. Right.  Okay.  So if anyone is out there telling people that

6  there's no correlation between plasma concentration and bleeding,

7  they're misleading them, correct?

8  A.  If anyone is out there saying that, it may simply be the lack

9  of understanding as it's been quite complicated.  You've seen the

10  years in which we've been discussing this back and forth.  I don't

11  believe that anybody is intentionally misleading patients.

12  Q. Well, whether they are doing it intentionally or not, it's still

13  misleading, correct?

14  A. It depends on what they are saying.  We would have to see what

15  you're actually talking about.

16  Q. So do you agree that PT is predictive of bleeding with Xarelto?

17  Whether you like the test or not, do you agree that it's predictive

18  of bleeding?

19  A. So in the work that we've discussed in the Phase II, we can see

20  that there's a correlation with it.  What we've also seen with that

21  is that whether patients have a high PT or not, if you look at

22  patients with bleeding outcomes with bleeding events, you can find

23  patients with and without high PT.  So in that sense it's not

24  helpful to me as a physician.

25  A. Simply referring to what we've already talked about before, that

```
 1    it's not about just having an elevated PT level or an elevated

 2    concentration.  Patients bleed because of other clinical factors

 3    and then you have an antithrombotic, whatever it is, on board.

 4        (WHEREUPON, THE VIDEO DEPOSITION WAS PAUSED.)

 5        MR. BARR:  Your Honor, this is probably a good break

 6    point for where we are.

 7        THE COURT:  Let's take a break here and come back at

 8    1:15.  The court will stand in recess until 1:15.

 9        THE DEPUTY CLERK:  All rise.

10        (WHEREUPON, THE JURY EXITED THE COURTROOM AND A LUNCH RECESS

11        WAS TAKEN.)

12

13                    * * * * * *

14

15                REPORTER'S CERTIFICATE

16

17        I, Karen A. Ibos, CCR, Official Court Reporter, United
      States District Court, Eastern District of Louisiana, do hereby
      certify that the foregoing is a true and correct transcript, to the
18    best of my ability and understanding, from the record of the
      proceedings in the above-entitled and numbered matter.

19

20             /s/ Karen A. Ibos
             _____
             Karen A. Ibos, CCR, RPR, CRR, RMR
21           Official Court Reporter

22

23

24

25
```

Timestamps (left margin): 11:56:48 (line 5), 11:56:50 (line 6), 11:56:51 (line 7), 11:56:54 (line 8), 11:56:57 (line 9), 11:56:58 (line 10)