UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

************************************************************

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          Docket No. 14-MD-2592
                                       Section "L"
                                       New Orleans, Louisiana
THIS DOCUMENT RELATES TO:              Thursday, April 27, 2017
Joseph J. Boudreaux, Jr.
v. Janssen Research &
Development, et. al.,
Case No. 14-CV-2720

************************************************************

                  TRANSCRIPT OF TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE
                         VOLUME IV


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:                 LEVIN PAPANTONIO
                                 BRIAN H. BARR, ESQ.
                                 316 Baylen Street, Suite 600
                                 Pensacola, FL 32502

                                 BEASLEY ALLEN
                                 BY:  ANDY BIRCHFIELD, ESQ.
                                 P.O. Box 4160
                                 Montgomery, AL 36103

                                 GAINSBURGH BENJAMIN DAVID
                                 MEUNIER & WARSHAUER
                                 BY:  GERALD E. MEUNIER, ESQ.
                                 2800 Energy Centre
                                 1100 Poydras Street
                                 New Orleans, LA 70163

                                 SCHLICHTER, BOGARD & DENTON
                                 BY:  ROGER C. DENTON, ESQ.
                                 100 South 4th Street
                                 Saint Louis, MO 63102

─────────────────── OFFICIAL TRANSCRIPT ───────────────────

```
 1                                  LAMBERT FIRM
                                    BY:  EMILY JEFFCOTT, ESQ.
 2                                  701 Magazine Street
                                    New Orleans, Louisiana 70130
 3

 4     FOR THE DEFENDANT BAYER
       HEALTHCARE PHARMACEUTICALS
 5     INC. and BAYER PHARMA AG:    WILKINSON WALSH & ESKOVITZ, LLP
                                    BY:  BETH A. WILKINSON, ESQ.
 6                                  1900 M Street NW, Suite 800
                                    Washington, DC 20036
 7
                                    NELSON MULLINS RILEY
 8                                  & SCARBOROUGH, LLP
                                    BY:  DAVID E. DUKES, ESQ.
 9                                  Meridian, 17th Floor
                                    1320 Main Street
10                                  Columbia, SC 29201

11                                  BRADLEY ARANT BOULT CUMMINGS
                                    BY:  KEVIN C. NEWSOM, ESQ.
12                                  One Federal Place
                                    1819 5th Avenue N
13                                  Birmingham, AL 35203

14     FOR JANSSEN PHARMACEUTICALS,
       INC. AND JANSSEN RESEARCH &
15     DEVELOPMENT, LLC:            BARRASSO USDIN KUPPERMAN FREEMAN
                                    & SARVER, LLC
16                                  BY:  RICHARD E. SARVER, ESQ.
                                    909 Poydras Street, 24th Floor
17                                  New Orleans, LA 70112

18

19     Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR, RMR
20                                  500 Poydras Street, B-275
                                    New Orleans, Louisiana 70130
21                                  (504) 589-7776

22
         Proceedings recorded by mechanical stenography, transcript
23     produced by computer.

24

25
```

1

2                          I N D E X

3

4

5   WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

6

7

8   VIDEOTAPED DEPOSITION OF DR. THEODORE SPIRO      817/23

9

10  VIDEOTAPED DEPOSITION OF NAUMAN SHAH             874/16

11

12  VIDEOTAPED DEPOSITION OF PATRICIA TORR           895/6

13

14

15

16

17

18

19

20

21

22

23

24

25

—OFFICIAL TRANSCRIPT—

<u>P R O C E E D I N G S</u>.

(THURSDAY, APRIL 27, 2017)

(MORNING SESSION)

(OPEN COURT.)

08:49:02    THE MARSHAL:  All rise.

08:49:53    (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

08:49:53    THE COURT:  Be seated, please.  Good morning, ladies and

08:49:55    gentlemen.

08:49:56    Members of the jury, a couple of things, just logistics I

08:50:00    want to mention to you.  Today we will have mostly, if not all, TV

08:50:09    depositions, and they'll end sometime early in the afternoon.  So

08:50:12    I'll give you an alibi for being with me the whole day, but we'll

08:50:18    be discharging you in the early afternoon.

08:50:21    And then tomorrow, one of the witnesses will be live, but

08:50:25    they will be live by way of video.  They will be in Philadelphia

08:50:33    and you will see them being questioned here live.  Rather than have

08:50:38    the person here, he will be on television, so you will watch him

08:50:43    live like seeing in the past with news and things of that sort.

08:50:47    So I think things will work out pretty well and we're on

08:50:52    track to hopefully finish in two weeks, so we'll get you out of

08:50:56    here.

08:50:57    Yesterday was a hard day for you.  You worked hard and

08:51:01    all of us appreciate that.  We'll get you out early today

08:51:06    hopefully.  Let's call your next witness, please.  MR. BARR:  Your

08:51:14  1   Honor, plaintiffs call -- we're now going to present the video

08:51:19  2   testimony of Dr. Theodore Spiro taken on May 10th and 11th, 2016,

08:51:25  3   in New York City.

08:51:26  4   Dr. Spiro began his role as a Bayer global clinical leader in 2006,

08:51:30  5   and his present role is senior director clinician.

08:51:32  6   The deposition starts with questioning from Mr. and

08:51:36  7   Mrs. Boudreaux's lawyers, followed by questions by defendant's

08:51:39  8   lawyer, which is then, in turn, followed by questioning by Mr. and

08:51:43  9   Mrs. Boudreaux's lawyers.  Thank you.

08:52:01  10        One second.  We have an audio issue.  We will have to

08:52:18  11   switch computers real quick.

08:57:17  12        THE COURT:  Members of the jury, looks like we have some

08:57:20  13   technical difficulties, so we'll take a break here and straighten

08:57:23  14   it up and then get you back.  Let's bring them back, Marshal.

08:57:23  15        THE MARSHAL:  All rise.

08:57:23  16   (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

08:57:23  17   TAKEN.)

08:57:23  18   (OPEN COURT.)

09:12:51  19   (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:12:51  20        THE COURT:  Be seated, please.  Let's try again.

09:12:55  21        MR. BARR:  I believe we're ready to proceed, your Honor.

09:12:57  22        THE COURT:  Okay.

09:12:59  23   (WHEREUPON, THE VIDEO DEPOSITION OF DR. THEODORE SPIRO WAS

09:13:02  24   PLAYED AS FOLLOWS:)

09:13:04  25   Q.  Where do you currently work Dr. Spiro?

09:13:06 1    A.   I work in New Jersey.

09:13:11 2    Q.   What company?

09:13:12 3    A.   For Bayer Healthcare Pharmaceutical.

09:13:15 4    Q.   What is your current position with Bayer?

09:13:17 5    A.   My current position is senior director clinician.

09:13:20 6    Q.   Do you have any particular either drugs or areas of focus that

09:13:26 7    you're currently assigned to?

09:13:28 8    A.   I worked in the cardiology and coagulation therapeutic area in

09:13:35 9    the thrombosis group.   And I work primarily on rivaroxaban.

09:13:39 10   Q.   Since you joined Bayer -- I think we'll figure out it was

09:13:43 11   sometime in early 2006 or the 2006 time frame -- has rivaroxaban

09:13:51 12   been the primary drug you've worked on?

09:13:53 13   A.   Yes, it has.

09:13:54 14   Q.   And was one of your responsibilities to interact and to be a

09:14:00 15   liaison with the people at J&J on the development of Xarelto?

09:14:05 16   A.   Yes, it was -- it was.

09:14:07 17   Q.   Now, at some point did you also take on some responsibilities

09:14:13 18   related to the life cycle management of Xarelto?

09:14:17 19   A.   Yes.   I worked on the life cycle management, the program during

09:14:25 20   its initial development.

09:14:27 21   Q.   Now, whenever you talk -- we use the term "life cycle

09:14:31 22   management," it's not talking about the life of patients, right?

09:14:34 23   A.   No, it's not talking about the life of patients.

09:14:36 24   Q.   It's talking about the life of the drug?

09:14:38 25   A.   Correct.

09:14:38   1   Q.   Okay.   And by "life of the drug," does that mean how long it

09:14:43   2   can stay on patent?

09:14:46   3   A.   Yes, the --  a life cycle management program is a program that

09:14:53   4   takes place during the -- the time that a -- a product is covered

09:15:00   5   by a patent and not yet available in a generic form.

09:15:07   6   Q.   And obtaining other indications for a drug beyond the primary

09:15:10   7   indication is one way of extending the life of the drug, is that

09:15:14   8   correct?

09:15:15   9   A.   Yes, it is.

09:15:16   10   Q.   Do you recall learning at Bayer that the ACS indication was a

09:15:22   11   high priority for them?

09:15:24   12   A.   Yes, I did.

09:15:24   13   Q.   And was the acute coronary syndrome indication program part of

09:15:30   14   the life cycle management activities for Xarelto?

09:15:33   15   A.   Yes, it was.

09:15:35   16   Q.   Now -- so we talked about some of the different projects that

09:15:38   17   you were involved with at your time at Bayer.  And we're going to

09:15:42   18   talk more specifically about some of those as the day goes on, but

09:15:45   19   one of the things that we didn't talk about was you worked with --

09:15:56   20   on the issue of assay development for determining exposure levels

09:15:59   21   to Xarelto?

09:16:02   22   A.   To measure concentration -- plasma concentrations.

09:16:06   23   Q.   And was that work specific to any particular indication or was

09:16:12   24   it an across the board drug-based project?

09:16:16   25   A.   It was a development -- assay development that would be

09:16:28 1    applicable to all indications under development.

09:16:33 2    Q.  And was that something that you began working on very soon

09:16:38 3    after you started with Bayer?

09:16:40 4    A.  Within the first year, yes.

09:16:41 5    Q.  Okay.  And how did you come --

09:16:44 6    A.  Within the second year.

09:16:45 7    Q.  And your work on the assay development began, you said, a few

09:16:49 8    months after you started with the company.  And how long did you

09:16:53 9    continue to be involved in that project?

09:16:54 10   A.  Our first -- our completion of the project took place in 2012.

09:17:07 11   So from 2006 when I joined the company and became aware of the

09:17:12 12   assay development activities that were already ongoing and that

09:17:19 13   intensified over the years with the approval of -- first approvals

09:17:24 14   of indications and requirements from the European Medicine Agency

09:17:31 15   to support assay development.

09:17:33 16   Q.  Was there a team or committee that was assigned to working on

09:17:38 17   this assay development project at Bayer?

09:17:39 18   A.  Yes, there was.

09:17:40 19   Q.  Okay.  Was there some pushback within Bayer on doing assay

09:17:44 20   development?

09:17:45 21   A.  Of course, we had already developed an assay for the drug,

09:17:48 22   because in order to develop a drug, we have to have methods --

09:17:54 23   method or methods to measure its concentrations for our Phase I

09:17:59 24   program.

09:18:00 25           So we have -- we had a gold standard assay that was

09:18:06   1   available and published at some point in time in the literature as

09:18:14   2   a method.  And we were looking at additional assay development in

09:18:26   3   order to have assays more available at the level of the routine

09:18:30   4   clinical laboratory.

09:18:31   5   Q.  Dr. Spiro, earlier you told me about a meeting that you put

09:18:42   6   together to look at assay development with respect to measuring

09:18:49   7   Xarelto plasma concentration in patients.  Do you recall that?

09:18:53   8   A.  Yes, I do.

09:18:53   9   Q.  We're referring to the meeting that you put together in Paris

09:18:57  10   in December of 2006?

09:18:59  11   A.  Yes, it was.

09:19:00  12   Q.  And what was the purpose of that meeting in December of 2006?

09:19:08  13   A.  It was to discuss laboratory methods that could be used to

09:19:15  14   measure rivaroxaban pharmacodynamic effects and potentially might

09:19:23  15   be used to measure rivaroxaban concentrations in biological fluids,

09:19:29  16   such as plasma or urine.

09:19:30  17   Q.  Okay.  Was one of the considerations for this meeting to

09:19:35  18   determine whether or not assays could be used for measuring plasma

09:19:40  19   concentrations that could be used for monitoring patients who would

09:19:43  20   be taking Xarelto?

09:19:44  21   A.  Our development program for rivaroxaban proceeded on the basis

09:19:53  22   of an unmonitored approach to anticoagulant administration.  We had

09:20:04  23   a very well-studied anticoagulant available for use in the clinics,

09:20:11  24   but it required routine monitoring and dosage adjustment.

09:20:18  25   Q.  Warfarin?

822

09:20:19  1    A.  Vitamin K antagonist -- Vitamin K antagonist class of drugs,

09:20:24  2    including warfarin, which is used very commonly here in the United

09:20:27  3    States and elsewhere.

09:20:28  4    Q.  Okay.  And so these new oral anticoagulant like Xarelto, the

09:20:37  5    development plan for Xarelto was to create an unmonitored drug.

09:20:44  6    That was your understanding of the development program?

09:20:47  7    A.  Yes.  The -- the clinical community together was looking for

09:20:59  8    novel oral anticoagulants, as they were called then, that would not

09:21:04  9    require a dosage adjustment and would be effective in the group of

09:21:09 10    indications for which the Vitamin K antagonist, including warfarin,

09:21:17 11    were reduced.

09:21:19 12    Q.  Let me show you what we'll mark as Exhibit No. 6.  This is

09:21:25 13    record No. 932284.  And it its Bates No. BPAG 01855345.  And it's

09:21:44 14    labeled "Final Agenda" at the top.  And on the second page it has a

09:21:47 15    date of 19 December 2006.  Do you see that?

09:21:51 16    A.  Yes.

09:21:53 17    Q.  And does this look like to you the agenda for the Paris meeting

09:21:58 18    that you put together with respect to assay development and

09:22:01 19    measurement of plasma concentration of Xarelto?

09:22:08 20    A.  Yes, it does.

09:22:09 21    Q.  Okay.  And if you look with me, there is a list of the

09:22:11 22    consultants in the middle of the page.  Do you see that?

09:22:14 23    A.  Yes.

09:22:14 24    Q.  The first one is Michael Meyer Samama.  Do you see that?

09:22:19 25    A.  Yes.

09:22:19  1  Q.  And did you, in fact, work with Dr. Samama in assay development

09:22:24  2  with respect to your job at Bayer with Xarelto?

09:22:27  3  A.  Yes, I did.

09:22:27  4  Q.  And how did you come about consulting with Dr. Samama on this

09:22:34  5  assay development issue?

09:22:41  6  A.  Professor Samama was a -- a -- a well-known hematologist in the

09:22:47  7  world of anti-thrombotic drugs.  And I have been working with him

09:22:52  8  since 1988.  So we knew each other over a long period of time, up

09:23:01  9  to -- to his demise this past year.  He was already, when I joined

09:23:10 10  Bayer, involved with the company in looking at different types of

09:23:20 11  coagulation testing that could be used for helping determine the

09:23:28 12  degree of anticoagulation present in -- in -- in patients being

09:23:33 13  treated with the non-Vitamin K or the novel oral anticoagulants.

09:23:39 14  Q.  So Bayer was already working with Dr. Samama.  But you had a

09:23:44 15  relationship with Dr. Samama from your past work?

09:23:47 16  A.  Correct.

09:23:47 17  Q.  All right.  And let's look at the second page and see who

09:23:49 18  attended from Bayer.  And it looks like the planned attendees were

09:23:58 19  Elizabeth Perzborn.  She worked in the preclinical development part

09:24:03 20  of Bayer with Xarelto?

09:24:04 21  A.  Yes, she did.

09:24:06 22  Q.  Okay.  Yourself as planned attendee.  Dr. Misselwitz, correct?

09:24:11 23  A.  Correct.

09:24:12 24  Q.  And Scott Berkowitz?

09:24:12 25  A.  Yes.

OFFICIAL TRANSCRIPT

09:24:14  1    Q.  And Dagmar Kubitza?

09:24:17  2    A.  Yes.

09:24:18  3    Q.  Let's take a look at the final agenda on the first page.  And

09:24:21  4    there are several different items listed there.  Do you see that?

09:24:24  5    A.  Yes.

09:24:25  6    Q.  And under Item No. 3, listed prothrombin time.  Do you see

09:24:33  7    that?

09:24:33  8    A.  Yes.

09:24:34  9    Q.  Prothrombin time is sometimes abbreviated PT, correct?

09:24:40 10    A.  Correct.

09:24:41 11    Q.  So you learned that Bayer in their development program up to

09:24:46 12    this point in time had used a specific prothrombin time, PT

09:24:50 13    reagent, in their testing, correct?

09:24:52 14    A.  Correct.

09:24:53 15    Q.  Was that the Neoplastin reagent?

09:24:56 16    A.  Yes, it was.

09:24:58 17    Q.  Okay.  And using that Neoplastine reagent, did you learn that

09:25:06 18    the people at Bayer that had been involved in the development

09:25:10 19    believed there were a strong correlation between PT and drug

09:25:14 20    exposure levels?

09:25:15 21    A.  There was -- there was a correlation between the prothrombin

09:25:18 22    time prolongation in seconds and the concentration of rivaroxaban

09:25:23 23    present in the -- in the patient plasma.

09:25:28 24    Q.  So you understood from the people at Bayer that had worked on

09:25:35 25    this development, that using the Neoplastin PT, there was a

09:25:39  1   correlation between the PT using that reagent and plasma

09:25:46  2   concentration of Xarelto; is that fair?

09:25:49  3   A.  Yes, it is.

09:25:50  4   Q.  Okay.  And who did you learn that information specifically

09:25:54  5   at Bayer?

09:25:55  6   A.  I think it would have been in discussions certainly with the

09:25:57  7   clinical pharmacologists involved in the program.  That would have

09:26:03  8   been Dr. Dagmar Kubitza and Dr. Wolfgang Mueck.  And certainly Dr.

09:26:10  9   Frank Misselwitz would have also been -- communicated to me that

09:26:16 10   information.

09:26:17 11   Q.  And then No. 5, a Factor Xa inhibitory assay.  Do you see that?

09:26:22 12   A.  Yes.

09:26:22 13   Q.  Okay.  And you were aware that there were actually Factor Xa

09:26:28 14   inhibitory assays available in the market at this time, correct?

09:26:30 15   A.  Yes, there were.

09:26:31 16   Q.  Did you understand whether or not they would work in evaluating

09:26:36 17   the activity of Xarelto in patients that were taking Xarelto?

09:26:40 18   A.  These are -- these assays were very specialized assay.  As I

09:26:47 19   remember, they were research-use-only assays and they were not

09:26:50 20   widely used in clinical -- in the clinical settings.

09:26:56 21           The -- we did discuss them at the meeting.  And our

09:27:04 22   conclusion was that they were not generalizable to a broad -- a

09:27:10 23   broad community of practitioners and laboraticians.

09:27:15 24   Q.  PT would be considered a wildly available test?

09:27:19 25   A.  Global coagulation tests being used for the past 60, 70 years.

09:27:26  1    Q.  You see there's a conclusion section?

09:27:28  2    A.  Yes.

09:27:28  3    Q.  Okay.  And then there's a second bullet point, "Recommendations

09:27:30  4    for monitoring."  Do you see that?

09:27:31  5    A.  Yes.

09:27:32  6    Q.  And there's two options there, short-term and long-term?

09:27:34  7    A.  Yes.

09:27:35  8    Q.  Okay.  So as of December of 2006, leading this meeting, ideas

09:27:42  9    for short-term or long-term monitoring recommendations were part of

09:27:47 10    the discussion at Bayer.  Do you agree?

09:27:49 11    A.  Yes, they were.

09:27:51 12    Q.  Let's look at what we'll mark as Exhibit No. 7.  The record

09:27:57 13    number is 449266, Exhibit 7.  The Bates is BPAG 1277713 --

09:28:10 14    01277713.

09:28:15 15            This is a document.  It's labeled "Laboratory Methods

09:28:18 16    Advisory Board Meeting Minutes Held December 19, 2006, in the Paris

09:28:24 17    Meridien Etoile Hotel."  It has the agenda as well as -- it looks

09:28:33 18    to be meeting minutes.  Do you see that?

09:28:36 19    A.  Yes, I do.

09:28:36 20    Q.  Okay.  And this is in regard to the Paris meeting that we've

09:28:39 21    been talking about, correct?

09:28:40 22    A.  Correct.

09:28:40 23    Q.  You were attending from Bayer along with Elizabeth Perzborn,

09:28:44 24    Frank Misselwitz, Scott Berkowitz, Dagmar Kubitza.  Wolfgang Mueck

09:28:51 25    also was added as an attendee.  Do you see that?

09:28:52  1    A.  Yes.

09:28:52  2    Q.  And Harald Kallabis, do you see at the bottom?

09:28:55  3    A.  Yes.

09:28:55  4    Q.  Who was Harold Kallabis?

09:28:57  5    A.  Harold Kallabis is -- was -- is a global project manager in the

09:29:01  6    Bayer organization, clinical development organization.

09:29:04  7    Q.  And he had Xarelto responsibility?

09:29:06  8    A.  Yes.

09:29:07  9    Q.  And then it says that Gary Peters from J&J attended?

09:29:11 10    A.  Yes.

09:29:12 11    Q.  It says, "What is the purpose of testing plasma samples?

09:29:15 12    Identification of overdoses, achievable.  Assessment of compliance,

09:29:20 13    achievable.  Correlation with clinical outcomes, difficult to

09:29:26 14    achieve?"  Do you see that?

09:29:28 15    A.  Yes, I do.

09:29:29 16    Q.  Do you know what it meant by "correlation with clinical

09:29:40 17    outcomes"?

09:29:41 18    A.  The development program for the -- for these non-Vitamin K oral

09:29:54 19    anticoagulants, as we now refer to them, was predicated on using

09:29:59 20    a -- a non monitored approach.  So without dosage -- dosage

09:30:04 21    adaptations to -- to -- to achieve clinical -- the desired clinical

09:30:16 22    outcomes.

09:30:18 23            So we were -- since our -- our strategy was to not use

09:30:24 24    the dosage adjustments that we, for instances, used with warfarin

09:30:29 25    in later programs, we were specifically testing whether it was

09:30:34  1   possible with a -- an anticoagulant, to have a fixed dose across a

09:30:41  2   broad range of patients within specific indications.

09:30:49  3        And the whole program was predicated on the need for not

09:30:54  4   having a second generation of drug, such as the Vitamin K

09:31:00  5   antagonist, that required monitoring and dose adaptation.

09:31:05  6   Q.  Let me -- let me ask you this and be a little more clear maybe.

09:31:09  7   Whenever it talks about correlation of clinical outcomes, in

09:31:17  8   testing of Xarelto in the Phase II and Phase III programs, they

09:31:22  9   were both efficacy outcomes and safety outcomes, correct?

09:31:26  10  A.  Yes, there were.

09:31:27  11  Q.  So one of the discussions that took place in your meeting in

09:31:30  12  December of 2006 in Paris is whether or not measurement of, or

09:31:37  13  monitoring of, either PT or drug plasma concentration could be

09:31:47  14  correlated to these efficacy or safety outcomes, correct?

09:31:52  15  A.  Yes, that was -- that was the -- part of the conversation, yes.

09:32:03  16  Q.  Okay.  In fact, if you look with me on the next page, there are

09:32:14  17  several bullet points.  The first bullet point on that page, first

09:32:20  18  full bullet point, says, "Arixtra no monitoring option had a

09:32:25  19  negative impact on drug acceptance in the clinic."  That was a

09:32:29  20  different anticoagulant drug?

09:32:31  21  A.  Yes, it was -- is.

09:32:33  22  Q.  And then it says, "A small" -- "a smaller rather than a larger

09:32:39  23  objective in rivaroxaban monitoring should be targeted."  Do you

09:32:42  24  see that?

09:32:42  25  A.  Yes.

09:32:43  1    Q.  And then, if you look with me down -- one, two, three, four --

09:32:49  2    the fourth bullet point down says, "will the manufacture provide

09:32:53  3    information about correlation of plasma concentrations and

09:32:57  4    preclinical and clinical outcomes."  Do you see that?

09:32:59  5    A.  Yes.

09:33:00  6    Q.  That was a question that these physician consultants that had

09:33:06  7    been invited to this advisory board meeting has as to whether or

09:33:09  8    not the company was going to be able to provide this correlation

09:33:11  9    between either safety or efficacy events and how those correlated

09:33:19 10    with the plasma concentration of the drug, correct?

09:33:27 11    A.  Yes, the question was asked in that regard.

09:33:32 12    Q.  The two main types of assays that we're discussing seem to be

09:33:37 13    both use of some type of PT assay or potential use of a Factor Xa

09:33:45 14    assay, which was clearly not as wildly available or widely used in

09:33:49 15    the clinical practice at this point in time, correct?

09:33:52 16    A.  Correct.

09:33:54 17    Q.  The Factor Xa inhibitory assays were discussed.  One was

09:33:56 18    presented by Dagmar Kubitza that used a certain way of measuring

09:34:02 19    Factor Xa inhibition, correct?

09:34:02 20    A.  Yes.

09:34:02 21    Q.  The other look at a different type of assay, Factor Xa

09:34:07 22    inhibition assay, that had been used for the monitoring of

09:34:13 23    low-molecular-weight heparin in a clinic, is that fair?

09:34:16 24    A.  Yes, that's fair.

09:34:17 25    Q.  And it says -- the next point says, "Rivaroxaban standards

09:34:20  1  could be prepared as calibration reagents and tests used to

09:34:24  2  quantitate rivaroxaban plasma levels which could then be correlated

09:34:28  3  to the pharmacokinetic of the dose being administered to see

09:34:32  4  whether the patient was within -- within the expected concentration

09:34:37  5  ranges given the timing of the sample draw."  Do you see that?

09:34:39  6  A.  Yes.

09:34:40  7  Q.  So it was discussed at this meeting that these Factor Xa

09:34:48  8  inhibition assays that used added Factor Xa bovine source could be

09:34:56  9  calibrated to be used to measure rivaroxaban plasma levels and then

09:35:02 10  correlate that to see whether the patient was in the level that you

09:35:05 11  expect them to be considering when they took the dose of the drug,

09:35:09 12  right?

09:35:09 13  A.  Yes, that is -- that is correct.

09:35:11 14  Q.  First bullet point, it just says that "PT is global clotting

09:35:16 15  test used for workup thrombosis and more particularly bleeds."

09:35:19 16  That was -- that was what was described in the meeting on -- in

09:35:22 17  Paris in 2006, correct?

09:35:23 18  A.  Yes.

09:35:23 19  Q.  If you look with me down one, two, three, four, the fifth

09:35:28 20  bullet point it says PT calibration with the drug itself may be

09:35:31 21  possible.  Do you see that?

09:35:34 22  A.  Yes.

09:35:34 23  Q.  Okay.  And then the next bullet point says, "Prothrombin time

09:35:38 24  correlates well with rivaroxaban plasma concentrations, but slope

09:35:43 25  of correlation varies substantially between reagent systems."  Do

09:35:47  1    you see that?

09:35:47  2    A.  Yes.

09:35:48  3    Q.  The next section is "Activated Partial Thromboplastin Time,"

09:35:54  4    aPTT.  Do you see that?

09:35:56  5    A.  Yes.

09:35:56  6    Q.  And did you come to understand that there was also some testing

09:35:59  7    that had been done that had correlated aPTT with Xarelto plasma

09:36:06  8    concentrations?

09:36:07  9    A.  Yes.

09:36:08  10   Q.  So in 2006 this advisory board meeting that you put together in

09:36:12  11   Paris and the -- the meeting minutes that you wrote, concluded that

09:36:19  12   Xarelto could be monitored very well by several options, correct?

09:36:22  13   A.  Yes.  But let me clarify one -- one word.  When we said

09:36:26  14   "monitoring," we meant measuring the plasma concentrations.  And we

09:36:32  15   did not have in mind a -- a monitoring with -- with -- with the

09:36:37  16   purpose of dosage adaptation based on the results of the measured

09:36:42  17   concentrations.

09:36:43  18   Q.  Well, what would you do if you measured someone's plasma

09:36:47  19   concentrations and they were way too high?

09:36:53  20   A.  Interesting question.  I think the -- the clinical context of

09:37:00  21   the -- the clinical context would have to be looked at.  If the

09:37:04  22   patient was a patient with renal failure and you had deteriorating

09:37:08  23   renal function, you probably would withhold the dose.

09:37:14  24   Q.  What if they didn't have renal failure, would you withhold the

09:37:18  25   dose as well?

832

A.  It -- as I said, it's a hypothetical question.  The information we had from our Phase I and Phase II programs is that these types of observations would not be routine.  We did not have available strategies to -- to address this type of specific condition.

In -- in a clinical practice, you might want to hold one day's dose of medication, but that is not something that is recommended in our -- our prescribing information provided to physicians.

Q.  The next -- the next sentence says, "This is a clear advantage of the substance" -- talking about the fact that the drug can be monitored very well by several options.

"This is a clear advantage of the substance comparing other anticoagulants.  The aspect that Bayer is open to monitoring and supports physicians that want to monitor their patients should facilitate the market introduction of rivaroxaban."  Do you see that?

A.  Yes.

Q.  Were you guys telling these consultants at this Paris meeting that Bayer was open to monitoring?

A.  We were using the term "monitoring" in the context of measurement of concentrations of drug, so that in specific patients, the amount of drug in the plasma could be determined.

But we did not mean by this monitoring, the type of monitoring that was -- that had been conducted for the Vitamin K antagonist, which was monitoring to obtain a specific intensity of

09:39:11   1   pharmaco -- of anticoagulation -- of coagulation inhibition.

09:39:17   2          So it was a different type of approach.

09:39:18   3   Q.  All right.  So in the meeting minutes, under conclusion, you

09:39:20   4   wrote that, "The aspect that Bayer is open to monitoring and

5   supports physicians that want to monitor their patients should

6   facilitate the market introduction of rivaroxaban."  Do you see

7   that?

8   A.  Yes.

9   Q.  Were you guys telling these consultants at this Paris meeting

10   that Bayer was open to monitoring?

11   A. We were using the term "monitoring" in the context of

12   measurement of concentrations of drug, so that in specific

13   patients, the amount of drug in the plasma could be determined.

14   But we did not mean by this monitoring, the type of monitoring that

15   was -- that had been conducted for the vitamin K antagonists, which

16   was monitoring to obtain a specific intensity of pharmaco -- of

17   anticoagulation -- of coagulation inhibition.  So it was a

18   different type of approach.

19   Q.  All right.  So in the meeting minutes, under conclusion, you

20   wrote that, "The aspect that Bayer is open to monitoring and

21   supports physicians that want to monitor their patients should

22   facilitate the market introduction of rivaroxaban," correct?

23   A. Yeah, it said that.

24   Q.  Okay.  And it specifically talks about that Bayer supports

25   physicians that want to monitor their patients.  Do you see that?

1    A.  Yes, I see that.

2    Q.  And so when you wrote that Bayer would support physicians that

3    want to monitor their patients, that aspect, what type of

4    monitoring the patients were you talking about?

5    A.  We -- well, when we had this meeting we were -- we were

6    exploring what -- what might be done in specific clinical

7    situations.  Situations that were being discussed included the --

8    included the, as I previously mentioned, the very small patient,

9    such as a child.  It included patients with renal failure where we

10   were concerned about accumulation of drug.  It included issues

11   related to compliance, liver -- patients with impaired liver

12   function, so specific clinical settings where we knew there were --

13   there could be increased exposures to rivaroxaban, and when the

14   drug became available clinically, in the clinic, when physicians

15   might require tools to measure its concentration.

16   Q.  Let me show you what we'll mark as Exhibit Number 9, which is

17   Bates Number 11 -- I'm sorry -- Record Number 1160715, Bates Number

18   BHCP 02678338.  And this is an e-mail chain -- and I believe we're

19   looking in November of 2006 -- between Frank Misselwitz and

20   yourself as well as Elisabeth Perzborn is involved.  Do you see

21   that?

22   A.  Yes.

23   Q.  And it starts with an e-mail that Frank Misselwitz sent to you

24   on November 6th of 2006.  Do you see that?  Down here.  "Dear

25   Theo."

1        He says, "I'd like to make sure that you organize a prep

2   meeting, ideally in Wuppertal, before the ASH in order to fully

3   align our presentations but also the agenda and the goals of this

4   meeting," right?

5   A.  Yes.

6   Q.  ASH was the -- is it Society of Hematology -- is that the

7   American 162:14 Society of Hematology?

8   A.  Yes, it is.

9   Q.  And the next thing he told you was that, "The external

10  communication shall always be" -- in quotes -- "'rivaroxaban does

11  not require regular coagulation monitoring, but due to its

12  predictable PK/PD profile it can be monitored if necessary (in

13  subpopulation, in case of overdose...)."  That's what he told you,

14  right?

15  A.  That is what he wrote.

16  Q.  He said, "We do not intend to develop methods for

17  routine/regular coag monitoring of rivaroxaban."  That's the next

18  thing he told you, correct?

19  A.  Correct.

20  Q.  It says, "There was some irritation among the invited

21  colleagues around the question, what are our main goals for this

22  meeting?"  Do you recall hearing that there was irritation amongst

23  the invited colleagues about the goals for the meeting?

24  A.  I don't recall the specific meeting that he's referring to

25  because it was over ten years ago.  But this is what is written in

1    his memoranda.

2    Q.   This is an e-mail chain from it looks like -- I want to get the

3    date right -- August of 2007, between Dr. Samama and Elisabeth

4    Perzborn, and then Elisabeth Perzborn forwards the information to a

5    large group at Bayer, including yourself.

6           So first Dr. Samama e-mails Dr. Perzborn and describes

7    two protocols for studies that he would like to do with respect to

8    Xarelto.  Is that a fair statement?

9    A.   Yes.

10   Q.   Okay.  And then Dr. Perzborn forwards Dr. Samama's e-mail where

11   he lays out the two protocols for studies to Dr. Misselwitz,

12   yourself, as well as several other people at Bayer, including Dr.

13   Kubitza, Dr. Mueck, Dr. Berkowitz, as well as Harald Kallabis and

14   Bernhard Glombitza.  Do you see that?

15   A.   Yes.

16   Q.   What about Martina Evertz?  Do you know who she was?

17   A.   Yes.  She would have been in the marketing organization.

18   Q.   So she was in marketing, right?

19   A.   Right.

20   Q.   Okay.  And you say, "Dear all" -- and you drafted -- you

21   received this e-mail from Dr. Perzborn, right?

22   A.   Right.

23   Q.   And she says, "Dear all.  As you know, Professor Samama is very

24   interested in the question, what is the best way to monitor

25   Xarelto, if necessary?"  Do you see that?

1  A.  Yes.

2  Q.  Let me ask you this.  As part of the review process for a study

3  related to laboratory assays, did that require the approval of

4  marketing at Bayer?

5  A.  To the best of my knowledge, no, marketing would not have been

6  involved in that.

7  Q.  So earlier you and I talked about the fact that if you measured

8  someone and their drug plasma concentrations were too high, one of

9  the things that you could do in the clinical setting is miss a

10  dose, correct?

11  A.  Yes.  That would be an option.

12  Q.  Okay.  What would you do next for that patient?  Would you put

13  them back on the exact same dose when they've already demonstrated

14  that they are -- have high plasma concentrations of the drug?

15  A.  It's a difficult -- difficult question.  It -- it would have to

16  be viewed in the context of -- of an individual patient as to what

17  might be -- what might be done.  What always was an alternative for

18  certain types of patients would be treat -- treatments with

19  standard of care.

20  Q.  So don't put them back on Xarelto?

21  A.  That's an option.

22  Q.  And instead switch them over to a -- a warfarin therapy,

23  perhaps?

24  A.  Perhaps.

25  Q.  Let me show you what we'll mark as Exhibit Number 18.  Okay.

1   So this is Record 1690921, Bates BHCP 05104216.  And there is an

2   e-mail chain that goes several pages.  It starts with an e-mail

3   from Yong-Ling Liu at Chameleon to several people at Bayer.

4            So if we can start on the bottom of the first page, you

5   can see at the very bottom there's an e-mail from Nancy Cook-Bruns

6   to yourself on June 17, 2009, copying Elisabeth Perzborn, where she

7   says, "Dear Theo."  At the top of the second page, "Can you please

8   get in touch with Garreth"?

9   A.  Yes.

10  Q.  And she says, "Dear Theo?  Can you please get in touch with

11  Garreth at Chameleon regarding the poster from Dr. Samama for

12  ISTH?"  Do you see that?

13  A.  Yes.

14  Q.  Okay.  So you see where she forwards the Samama poster related

15  to the effects of rivaroxaban, a novel oral direct Factor Xa

16  inhibitor on coagulation assays for your review.

17  A.  Yes.

18  Q.  In response to that, Warren Cowell at Bayer responds.  Do you

19  see that?

20  A.  Yes.

21  Q.  Just above?

22  A.  Mm-hmm.

23  Q.  Warren Cowell is listed as global project leader, global health

24  economics outcomes and reimbursement.  Do you see that?

25  A.  Yes.

1    Q.  And he says, "Dear Yong-Ling.  Please see some comments from a

2    nonspecialist perspective."  And if we can look at the top of the

3    next page, there's two bullet points.  He says, the first bullet

4    point, "There is an assumption explicitly stated that riva does not

5    require routine monitoring which is presented within this poster as

6    contextual information, but also positioned as one of the

7    'communication objectives.'"  Do you see that?

8    A.  Yes, I do.

9    Q.  He says, "Perhaps we should explain or reference this claim, as

10   I am not sure how this claim is currently supported, or even in

11   its" -- "if it is defensible."

12   Do you see that?

13   A.  Yes, I do.

14   Q.  Did you ever talk to Dr. Cowell about his concerns about the

15   claim for no routine monitoring may not even be defensible?

16   A.  No, I did not have any -- I do not remember having

17   conversations with Warren Cowell, no, in this regard.

18   Q.  Okay.  He says, "Dear Sue As I review the poster there are at

19   least two issues extant.  The first is to appropriately caution

20   clinicians against monitoring the pharmacological activity 254:3 of

21   rivaroxaban.  I recommend strengthening the introduction as

22   follows:

23          "Change 'There is no requirement for routine coagulation

24   monitoring,' to, there is no clinical value or utility in routine

25   coagulation monitoring.  "The absence of a requirement does not

1  adequately convey the matter.  The trials were performed without

2  any coagulation monitoring, not even if it was desired."  Did I

3  read that correctly?

4  A.  Yes, you did.

5  Q.  He says, "Moreover, I disagree that monitoring may be valuable

6  in certain instances."  Do you see that?

7  A.  Yes, I do.

8  Q.  He says, "It may be desired, but that is distinctly different

9  from the presence of clinical value."  Do you see that?

10  A.  Yes.

11  Q.  And so you have had a chance to review Exhibit 19, familiarize

12  yourself with it a little bit?

13  A.  Yes, I have.

14  Q.  So let's look at -- let's turn our attention to that e-mail

15  from July 3rd of 2009 at 4:00 p.m.  And you e-mail Dr. Eby and you

16  copy several other people, including Dr. Samama as well as some of

17  the folks at Stago, correct?

18  A.  Yes.

19  Q.  Okay.  And Dr. Eby is 268:14 Charles Eby, and he was a

20  laboratory genomic medicine -- division of the laboratory of

21  genomic medicine at Washington University School of Medicine in St.

22  Louis, Missouri, correct?

23  A.  Yes, that's correct.

24  Q.  The subject of the e-mail is "Rivaroxaban Xarelto Laboratory

25  Monitoring Assay Development Field Trial," correct?

1    A.   Correct.

2    Q.   And you say, "Dear Dr. Eby I'm contacting you on behalf of

3    Professor Samama, Laboratory Biomnis, and Dr. Martinoli,

4    Diagnostica Stago, to invite you to participate to a program in

5    which we are assessing methods to develop monitoring procedures for

6    novel anticoagulants, in specific a direct Factor Xa inhibitor

7    rivaroxaban," correct?

8    A.   Yes, that is correct.

9    Q.   Okay.  And you ask him to let you know if he was interested in

10   participating in the program.  Do you see that?

11   A.   Yes.

12   Q.   Okay.  So Dr. Eby responded to you, if you'll flip with me to

13   the next page, on July 7th of '09.  And says, "Hello, Dr. Spiro."

14   Do you see that?

15   A.   Yes, I do.

16   Q.   He says, "I am very interested in this important topic.  There

17   will definitely be situations where laboratory monitoring of the

18   anticoagulant activity of oral direct Xa and IIa inhibitors will be

19   necessary."  Do you see that?

20   A.   Yes, I do.

21   Q.   He says, "I am on the faculty of Washington University School

22   of Medicine, Department of Pathology."

23   That's in St. Louis, correct?

24   A.   Right, that is in St. Louis.

25   Q.   He says, "My department has a contract to provide laboratory

1   director services to Barnes Jewish Hospital, which is where all

2   Washington University faculty practice medicine.  I cannot direct

3   laboratory employees to conduct tests to support a commercial

4   project, no matter how modest the time, reagent, and equipment

5   requirements without external financial support.  "This would

6   require a contract between Washington University and Bayer/Stago,

7   legal review, and an overhead charge of approximately 26 percent,"

8   correct?

9   A.  Yes, that is what it says.

10  Q.  Okay.  And then he wants you to let him know if you would be

11  interested in pursuing the collaboration, right?

12  A.  Correct, that is what it said.

13  Q.  Okay.  And you respond to him later that day, and you copy Dr.

14  Martinoli and Dr. Samama on July 7th at 11:12 a.m.  Do you see

15  that?

16  A.  Yes.

17  Q.  You let him know that these issues regarding compensation

18  funding by Bayer has been -- arisen before, right?

19  A.  Yes.

20  Q.  You say, "This trial and its protocol are a hybrid project.

21  While Bayer is the sponsor in terms of financial support, the

22  program falls closer to an investigator-initiated study, IIS, than

23  to a company-sponsored study.  However, as we, Bayer, are more

24  involved in this program than is the case for the usual IIS, Bayer

25  'sponsorship' is cited."  Do you see that?

1   A.  Yes.

2   Q.  Okay.  You then let him know that based on the discussions with

3   Dr. Samama and Dr. Martinoli at Stago that, "We have decided not to

4   offer compensation and apply this decision to all participating.

5   The actual logistics behind securing additional corporate funding

6   for this study and the logistics behind negotiating new contracts

7   with 15 laboratories would engender many months of delay in the

8   startup and completion of the field trial of calibrators and

9   controls platformed in the PT assay as described in the protocol."

10  Did I read that correctly?

11  A.  Yes.  And that answers also your question of which -- which

12  assay we were talking about in this e-mail string.

13  Q.  So this would be talking about the PT assay field trial test?

14  A.  The prothrombin time assay.

15  Q.  Okay.  And the purpose of this study is to assess clinically

16  practicable tools for measuring rivaroxaban blood concentrations.

17  Did I read that correctly?

18  A.  Yes, you did.

19  Q.  "For Bayer, no financial incentive exists in the development of

20  such tools, as Bayer has no longer a clinical laboratory business,

21  sold to Siemens two years ago."  Do you see that?  Siemens.

22  A.  Yes.

23  Q.  That was your explanation of why Bayer was not interested in

24  funding his laboratory's participation, correct?

25  A.  We did not have a budget to fund individual laboratories for

1    this program.  The collaboration that was in place was between

2    Bayer -- I think we were Bayer Schering AG at that time --

3    Diagnostica Stago, and Professor Samama, Biomnis.  We were

4    supporting in particular Diagnostica Stago's interest in having the

5    rivaroxaban measurement assay available as one of their tests in

6    order for them to stay current with the contemporary evolution of

7    coagulation treatments being used in the clinic.

8    Q.  So what you told Dr. Eby was, even though the purpose of the

9    study was to assess clinically practicable tools for measuring

10   rivaroxaban blood concentrations, Bayer didn't have any financial

11   incentive to develop such tools because they didn't have a

12   laboratory business anymore, right?

13   A.  Oh, yes, we didn't have specific incentive, ourselves, to

14   further develop assays, which we might have done if we had

15   maintained our laboratory division.  But it was gone.

16   Q.  I'm going to show you Exhibit 22, which is Record Number

17   1145884.  And that's Bates 02485568.  This is an e-mail from the

18   next day from Yong-Ling Liu at Chameleon, the medical writing

19   company we were talking about, to yourself, Garreth Tucker at

20   Chameleon, as well as also -- as well as also Anja Alpers at Bayer.

21   Do you see that?

22   A.  Yes.

23   Q.  And this is on June 18, 2009, a day later.  It refers to Dr.

24   Samama's ISTH poster.  Do you see that?

25   A.  Yes.

1   Q.  And Yong-Ling Liu thanks yourself and Anja for taking the time

2   to discuss Dr. Samama's ISTH poster with us today.  "As mentioned

3   some concerns were raised during the GEST review process regarding

4   the messages around the aims of these studies and the conclusions

5   about the potential use of some of these assay for measuring

6   pharmacodynamics of rivaroxaban."  Do you see that?

7           Okay.  And we're talking about Dr. Samama's paper, right?

8   A.  Yes.  Dr. Samama's poster.

9   Q.  And this is the paper that he's listed as the lead author on at

10  the top of the page, right, this poster?

11  A.  Yes.

12  Q.  And he ended up being the lead author in this -- in this

13  published paper as well, correct?

14  A.  Yes.

15  Q.  The next paragraph says, "In light of the discussion we had

16  yesterday with the A-GEST members, we have modified the

17  introduction to reflect that although routine coagulation

18  monitoring is not required, some assays may be of value in certain

19  rare circumstances.  In addition, it was suggested that a potential

20  utility of PiCt, Hep test, or PT for the measurement of rivaroxaban

21  should be deleted from the conclusion.  We have, therefore,

22  modified the conclusion to give a more general statement about the

23  potential of these assays."  Do you see that?

24  A.  Yes, I do.

25  Q.  Okay.  And then the next paragraph says, "In addition, it was

```
 1    agreed that a therapeutic plasma concentration range of rivaroxaban
 2    should be given in the objective.  Your input on this would be very
 3    much appreciated.  Please see the comments in the attached draft
 4    poster for detail.  Please also find attached for your reference
 5    the accepted abstract."  Do you see -- do you see that?
 6    A.  Yes, I do.
 7    Q.  If we can mark as the next Exhibit 23.
 8        (Document marked for identification as Exhibit
 9    Spiro-23.)
10            MR. OVERHOLTZ:  This is Record Number 1145885.
11        (Document marked for identification as Exhibit
12    Spiro-24.)
13            MR. OVERHOLTZ:  And then we'll -- we can also mark as
14    Exhibit 24, 1145886.  So 23 is Bates 02485571, and 24 is Bates
15    02485586.
16    BY MR. OVERHOLTZ:
17    Q.  And these are the attachments of the e-mails from Yong-Ling
18    Liu, the writer at Chameleon.  And you see the first is similar to
19    the draft that we saw before of the poster.  It's the draft for
20    GEST on the front page.  Do you see that?
21    A.  Yes, I do.
22    Q.  Okay.  So if you recall, when we looked at 1701567, which I
23    think was Exhibit 22, that conclusion -- or actually 21, that
24    conclusion, the first bullet point said, "Although there was no
25    requirement for routine coagulation monitoring with rivaroxaban,
```

1    appropriate assays may be useful in certain circumstances."  And

2    now if we look at the conclusion in Exhibit 23, as indicated in the

3    e-mail, the conclusion has been changed to say that "the

4    appropriate assay may be useful in rare circumstances."  Correct?

5    A.  Yes, that is correct.

6    Q.  So the third bullet point in Exhibit 21 that had been

7    circulated around and comments had been received from people like

8    Christopher Nessel and Warren Cowell, indicated that there was a

9    linear relationship between prothrombin time and Xarelto

10   concentrations.  And that those prothrombin time measurements could

11   be expressed as Xarelto plasma concentrations.  Do you recall that,

12   in Point Number 3 we talked about?

13   A.  Yes.

14   Q.  Okay.  Now, if we look at the conclusions in Exhibit 23, after

15   the call with Chameleon, the medical writing company, that -- that

16   paragraph is not there anymore, correct?

17   A.  Correct, it is no longer there.

18   Q.  Yeah.  And that's consistent with the e-mail from Yong-Ling Liu

19   that, during the discussion with the A-GEST members, it was

20   suggested that the potential utility for PT for the measurement of

21   rivaroxaban should be deleted from the conclusion.  "We have,

22   therefore, modified the conclusion to give a more general statement

23   about the potential of these assays."  And that's what's been done

24   in this new draft of the poster, correct?

25   A.  Yes, that appears to be the case.

1    Q.  So the conclusion that we saw from Dr. Samama's poster that was

2    circulated around to Chris Nessel and others had a fourth bullet

3    point that says, "Prothrombin time assay calibrated to rivaroxaban

4    concentrations appears to be a simple and valuable assay for

5    measuring the pharmacodynamic effects of Xarelto in a standardized

6    manner."  Do you see that?

7    A.  Yes, I do.

8    Q.  Okay.  And then the -- the bullet point on the -- the new

9    version of the poster after this call with Chameleon says, "Further

10   development will" -- "will be required to establish one of these

11   assays as a simple, reliable, and accurate test for rivaroxaban

12   plasma concentration."  Do you see that?

13   A.  Yes, I do see that.

14   Q.  And these were all changes that Chameleon made on behalf of the

15   discussion that was had with the Bayer A-GEST publication

16   committee, correct?

17   A.  Yes, that appears to be the case.

18   Q.  My simple question was, did you provide information or were you

19   able to provide information to Yong-Ling Liu related to a

20   therapeutic plasma concentration range that could be given in the

21   objective of Dr. Samama's paper for ISTH?

22   A.  I don't remember if I gave it or not.  Would it have been

23   possible to give a therapeutic concentration range for the one

24   approved indication?  Yes, it would have been.

25   Q.  Okay.  And you don't believe the company has ever provided to

1   clinicians a therapeutic plasma concentration range in any of their

2   labeling or studies for the product, correct:

3   A.  In the prescribing information in the United States, I do not

4   believe there is a table showing estimated or measured plasma

5   concentrations for the three approved doses available to the

6   clinicians.

7           In publications in the medical literature, we have

8   provided that information, and it is present in those publications.

9   Q.  It's Exhibit Number 30.  And the Record Number is 1160578, and

10  the Bates is BHCP 02677981.  It's an e-mail chain between yourself

11  and Scott Berkowitz at Bayer.

12          Earlier in the e-mail chain it includes some others in

13  the company, including some folks from J&J as well.  I'll give you

14  a second to look at it.

15          So you asked the question, "Is the 20/15 approach the

16  best one in AF?"  Afib.  "I can provide you with all

17  The reassurance that a strong maybe allows."  Do you see that?

18  A.  Yes, I see that.

19  Q.  "Is a BID 10-milligram" -- BID, twice daily -- "strategy

20  possibly safer and similar and more effective than a 20-milligram

21  QD" -- once daily -- "strategy?"  That's the next question you ask,

22  correct?

23  A.  Correct.

24  Q.  If the only confidence you have that you selected a dose for

25  the Phase III trial is a strong maybe, wouldn't it be prudent to

1    perhaps consider testing a different dosing regimen in the Phase

2    III trial to determine whether or not you might be able to come up

3    with a safer and more effective dose for the patients that are

4    going to be treated:

5    A.  I guess my answer would stay the same.  Possibly, but we did

6    not see this with the low-molecular-weight heparins when we

7    compared once-daily and twice-daily regimens in venous

8    thromboembolism treatment.

9    Q.  Okay.  The next thing you say is, "The future of Bayer

10   Healthcare AG of course rides on this decision, and the OS element

11   of this puzzle impacts the entire game."  That's what you said to

12   Ted Spiro back in January of 2007, correct?

13   A.  Yes.  That's what Theodore Spiro send to Scott Berkowitz in

14   2007.  I understand what you said.

15   Q.  Okay.  And because of the many types of situations in which

16   monitoring of rivaroxaban exposure levels as measured by plasma

17   concentration might be important, that's the reason why you were

18   working on these potential assays that could be used for

19   monitoring?

20   A.  Yes, that is correct.

21   Q.  Let me show you what we'll mark as Exhibit 35, which is Record

22   411373, Bates BPAG 01136560.

23          Okay.  And this is an e-mail chain between Corinne

24   Debroye, Elisabeth Perzborn, and yourself back in 2008.  We can

25   start with the first e-mail if we can which is an e-mail from

1    Corinne Debroye to Elisabeth Perzborn.  And the subject line is

2    "Monitoring with rivaroxaban."  Do you see that?

3    A.  Yes, I do.

4    Q.  And Corinne Debroye was a medical advisor, hematology, with

5    Bayer in Belgium, correct?

6    A.  Yes, she was.

7    Q.  Okay.  And Corinne Debroye forwards this e-mail to you, if you

8    can look with me on the first page of this e-mail that ends in 560,

9    copies Martine Debecker and several others.  And then she -- and

10   then Corinne Debroye -- Elisabeth Perzborn forwards this to you,

11   and then Corinne Debroye responds.  Do you see that?

12   A.  Yes, I see that.

13   Q.  Okay.  So what Elisabeth Perzborn says in the e-mail that she

14   forwarded to you on April 23rd of 2008 at 15:46, if you flip with

15   me to the next page, says, "Dear Corinne.  Thank you very much for

16   letting me know the suggestions from Walter Wijns."  Are you with

17   me?

18   A.  Yes.

19   Q.  Okay.  "What I learned from you and various colleagues from the

20   different countries is the demand of having the possibility to

21   monitor rivaroxaban if required."  Do you see that?

22   A.  Yes, I do.

23   Q.  Okay.  And what Elisabeth Perzborn is recognizing, based on her

24   communication with Corinne Debroye in Belgium, is that the

25   colleagues that were from different countries were wanting to have

1    the possibility to monitor Xarelto, correct?

2    A.  They're looking for the ability to, I think, measure

3    rivaroxaban plasma concentrations.  They know that we do not have

4    an adjusted dose program that would be an adjusted dose -- dosing

5    regimen that would be amenable to traditional drug monitoring, as

6    the drug was developed to not require monitoring and dosage

7    adaptation.

8    Q.  Okay.  So then Corinne Debroye responds to Dr. Perzborn and

9    copies you on April 28 of 2008, on the first page.  Do you have

10   that e-mail?

11   A.  Yes, I do.

12   Q.  Okay.  It says, "Dear Elisabeth.  Thank you very much for your

13   feedback.  Meanwhile, I contacted Dr. Arnouts from the hemostasis

14   lab from the University Hospital Leuven, and he agreed that

15   monitoring needs to be possible, preferably with the anti-Xa, and

16   that calibration should be done with Xarelto," correct?

17   A.  Yes, that is what is written here.

18   Q.  Okay.  So this advisory board that was being held in Brussels

19   in June of 2008, the main topic was going to be monitoring of

20   rivaroxaban, Xarelto, correct?

21   A.  Yes, it was.  As indicated here.

22   Q.  I'll show you what we'll mark as Exhibit Number 36, which is

23   Record Number 1158771.  And this is Bates BHCP 02644383.  And if

24   you look with me on the first page, just so we're clear what you're

25   looking at.  There is -- this file was produced to us as a -- as a

1    PowerPoint file.  The file name was described as "TES Edits

2    Advisory Board 19 June 2008 Agenda and Presentations

3    bis.PowerPoint."  Do you see that?

4    A.  Yes.

5    Q.  Okay.  And if we look at the 469:9 screen, it talks about the

6    TES edits advisory board.  The TES, that would be yourself?

7    A.  Correct.

8    Q.  Okay.  And so if we look at the first page of the PowerPoint

9    presentation, this is the agenda of the advisory board, June 19th.

10           Okay.  And then the next section is "Xarelto and

11    Monitoring," correct?

12    A.  Yes, it is.

13    Q.  And you are listed as the presenter there and described as the

14    global clinical leader, correct?

15    A.  Yes.

16    Q.  Okay.  So if we can flip over to Page 25, there is a

17    description of the new anticoagulants, correct?

18    A.  Yes, there is.

19    Q.  And on the left side you see rivaroxaban listed at the top,

20    correct?

21    A.  Correct.

22    Q.  And the arrow points, the -- the Xa circle, which means

23    rivaroxaban is one of the Factor Xa inhibitors and the other Factor

24    Xa inhibitors drugs are listed there, correct?

25    A.  Yes, that is the case.

1  Q.  Okay.  Now, let's flip to page 26.  And there's a slide that

2  you had in your presentation called 473:5 "Monitoring."  Do you see

3  that?

4  A.  Yes.

5  Q.  And it says, "How to monitor this plurality of substances."  Do

6  you see that?

7  A.  Yes.

8  Q.  Okay.  And you describe specific anti-Xa or anti-IIa methods in

9  every lab.  And that refers to the problem that if you try to have

10 one -- a -- a test for every single drug, there would be a lot of

11 tests for a lab to have to run and keep track of, correct?

12 A.  Yes, that is one of the considerations.

13 Q.  Okay.  And you basically describe you'd have to have 20

14 different sets of calibrators and controls, correct?

15 A.  Some -- some number here.  It says 20.

16 Q.  Okay.  So then you say, "The good news."  Do you see that?

17 A.  Yes.

18 Q.  Okay.  It says, "Good news?  Routine monitoring required only."

19 And you have a picture of Coumadin and a picture of heparin,

20 correct?

21 A.  Yes.

22 Q.  Okay.  And then in a yellow box you say, "All the other

23 substances require monitoring only in special situations," correct?

24 A.  Correct.

25 Q.  You and I discussed the fact that it was Bayer's position with

1    respect to this assay development that there were special

2    situations that would require monitoring?

3    A.  There are situations in which measurements of the plasma

4    concentration of the drug are -- are important.

5    Q.  You and I certainly discussed that it was your position that

6    there were special situations that made monitoring of Xarelto

7    plasma concentration levels necessary, correct?

8    A.  Again, measurement because of the confusion between monitoring

9    and dose adaptation and measurement to understand where a patient

10   is at a specific point in time.

11   Q.  You did -- you did hold the opinion that it was necessary in

12   certain situations?

13   A.  Yes.  And I hold the opinion that it is necessary in certain

14   situations.

15   Q.  So you say, "The good news was that routine monitoring was

16   required only in coumadin/heparin and all the other substances

17   require monitoring only in special situations."  And then you

18   present the next slide.  If we can look at Page 27.  And there,

19   this slide is labeled "The Bad News," correct?

20   A.  That is correct.

21   Q.  Okay.  And if you look with me over in the top right corner,

22   your presentation said, "There are many special situations,"

23   correct?

24   A.  That is what it is written here, yes.

25   Q.  And "many" is bolded in dark black, correct?

1    A.  Correct.

2    Q.  Okay.  And we see on the left an example of very low weight,

3    correct?

4    A.  Yes.

5    Q.  Okay.  The next example, elderly people, do you see that?

6    A.  Yes.

7    Q.  Do you agree that elderly are a special situation that could

8    require monitoring, correct?

9    A.  They may require measurement, yes.

10   Q.  Okay.  We see a pregnant woman, correct?

11   A.  Yes.

12   Q.  Okay.  Critically ill patients, and there's a picture of

13   someone in a hospital setting, correct?

14   A.  Correct.

15   Q.  Children is listed.  There's a picture of a cute baby looking

16   at the camera, right?

17   A.  That is correct.

18   Q.  Okay.  Obesity, also a special situation that you describe,

19   correct?

20   A.  The large body weight patients may require measurements, yes.

21   Q.  Okay.  What happens in large body weight patients that might

22   require monitoring?

23   A.  There may be malabsorption in some patients who have had

24   surgical interventions to attempt weight loss.  There may be

25   inadequate amounts of drug for plasma volumes in extreme body

1    weight situations.

2    Q.  Are there situations in which obese patients have accumulation

3    as a result of their absorption issues?

4    A.  I don't have specific information in that regard.  I don't know

5    how to answer that question.

6    Q.  You haven't seen any information that certain obese patients

7    may end up accumulating the drug because simply they're able to

8    absorb more than another patient?

9    A.  No, I have not seen that.

10   Q.  Bleeding under anticoagulation in the middle under elderly

11   people, do you see that one?

12   A.  Yes, I do.

13   Q.  So that's a special situation you identified that could require

14   monitoring, correct?

15   A.  Could require measurement of plasma concentrations, yes.

16   Q.  Now, if we could look at Page 49.  And this is a slide called

17   "Prolongation of PT, multiple doses of 5, 10, 20, 30 milligrams

18   twice daily for five days."  Do you see that?

19   A.  Yes, I do.

20   Q.  What you see is, for example, is that after the dose you see

21   the graph shoot up indicating a peak bout -- a peak prothrombin

22   time after dosing, and then that number comes down before the

23   second dose during a one-day period on the left side of the graph,

24   correct?

25   A.  Yes, that is correct.

1  Q.  Okay.  And what we see from here is that the higher the dose,

2  the greater change in prothrombin time during this short study

3  related to prolongation of PT, correct?

4  A.  Yes, that is correct.

5  Q.  And that's not surprising.  Higher doses will result in more

6  prolongation of PT, correct?

7  A.  Yes, that is correct.

8  Q.  Okay.  And the reason why higher doses result in a prolongation

9  of PT is because higher doses result in higher exposures of the

10  drug in plasma concentration, correct?

11  A.  Well, higher concentrations of the drug in the plasma and the

12  impact on -- the resulting impact on the coagulation test.

13  Q.  Okay.  So let's look at Slide 50 which is labeled "Correlation

14  of PT with PK."  So this is another one of those correlation

15  charts.  And it again comes from -- you cite the Kubitza article in

16  your presentation, correct?

17  A.  Yes.  This is Dr. Kubitza's slide.

18  Q.  Okay.  And you use this slide in your presentation to the

19  Belgium advisory board, correct?

20  A.  Yes, it appears to be the case.

21  Q.  Okay.  And so on the bottom is, again, plasma concentration of

22  Xarelto, right?

23  A.  Yes.

24  Q.  Okay.  As expressed by micrograms per liter, correct?

25  A.  Yes, that is correct.

1   Q.  Okay.  And then on the left is the prothrombin time as

2   expressed in seconds, correct?

3   A.  Correct.

4   Q.  Okay.  You see it starts at around that 12 mark, which I think

5   is a normal level that you see.  And as -- as the plasma

6   concentration increases generally the prothrombin time increases as

7   well, correct?

8   A.  That is the case within -- with this reagent system, the

9   Neoplastin reagent system likely used in this study.

10   Q.  Okay.  And there's a correlation factor given there on the

11   right as well, correct?

12   A.  Yes, it is.

13   Q.  And that .958 correlation factor generally reflects that there

14   is a strong correlation between prothrombin time, PT, and the

15   plasma concentrations of Xarelto as demonstrated by Kubitza's study

16   that was published in 2005, correct?

17   A.  Yes, that is correct.

18   Q.  Okay.  There is a second study on the next page you cited which

19   is Study 10847.  Do you see that?

20   A.  Yes, I do.

21   Q.  Okay.  And this -- this is another study showing the

22   correlation between PT and plasma levels of Xarelto, correct?

23   A.  Yes, this is correct.

24   Q.  And PT is expressed in seconds on the left, the prothrombin

25   time, and then exposure of -- plasma concentration is measured by

1    micrograms per liter on the bottom, correct?

2    A.  Yes, that is correct.

3    Q.  Okay.  This is again showing the strong correlation between PT

4    and Xarelto, correct?

5    A.  Yes, that is correct.

6    Q.  So were you worried about these patients that had these high

7    PTs --

8            -- than compared to the other patients who had lower PTs

9    at the same concentration level?

10   A.  The -- one likely explanation for these elevated PTs,

11   particularly the ones which are not measured, which are the 60s, is

12   that they are contaminated samples.  Frequently in our clinical

13   trials we do find some samples which are drawn through lines with

14   heparin in them.  And this is a common finding when we do these

15   types of studies.

16   Q.  Do you think it was worth investigating each of those patients

17   to determine whether or not there were potential patients who had

18   various reactions related to their PT that were different than what

19   you would see to the norm with respect to the same exposure levels?

20   A.  I would have to defer for these specific studies to the

21   individuals who conducted these Phase II -- II trials.  I'm not

22   even sure who they -- who they might have been in that time frame,

23   such as Frank Misselwitz might have been involved with these, these

24   studies.  But they are so -- these are highly technical plots and

25   -- from dose-finding studies --

1   Q.  But they -- sorry?

2   A.  -- patient population studies.

3   Q.  Let me ask you this:  If -- if you believe that a patient's --

4   a single patient's general pharmacological, pharmacodynamic

5   response to the drug is going to be consistent once they start

6   taking Xarelto, you wouldn't need to necessarily routinely every

7   day monitor that patient's Xarelto levels.  But wouldn't it be

8   reasonable to at least give an initial test and maybe some test

9   later down the road to make sure that their exposure levels with

10  respect to plasma concentration or their PT numbers are within what

11  you would consider to be the expected range of someone on Xarelto?

12  A.  I don't agree with that.  I think the way we developed the

13  compound is reasonable.  We studied it very carefully with

14  pharmacokinetic and pharmacodynamic data in Phase II.  In our Phase

15  III programs, we continued to look at least at pharmacodynamic

16  data.  And based on the -- on the aggregate data that was presented

17  to regulatory agencies, we received approvals for these major

18  indications after -- after review and response to the questions

19  raised by the agencies.  The -- there was -- there is no

20  requirement for serial monitoring or intermittent testing of drug

21  concentrations in these patients, and there is no scientific

22  rationale at least to so do.

23  Q.  Let me ask you a question about Slide 27 on the screen.  This

24  is a slide where you said the bad news is there are many special

25  situations.  Does the labeling for the product in the United States

```
 1   tell doctors that these are special situations that require

 2   monitoring?

 3   A.  To the best of my recollection, the prescribing information in

 4   the United States does not include a measurement of rivaroxaban

 5   concentrations, and assays for rivaroxaban concentration

 6   measurement are not approved by the Food and Drug Administration.

 7   Q.  Would you agree that if a patient had more than one of these

 8   special situations ongoing, such as an elderly person with a very

 9   low weight, that could exaggerate their situation with respect to

10   their potential increased exposures in terms of plasma

11   concentration and potentially the increased concern for those

12   patients?

13   A.  As we become elderly and fall into the category of elderly

14   patients, we develop a variety of frailties and sensitivities to

15   all the medications that we take.  And rivaroxaban is no different.

16   And in treating with a patient with an anticoagulant, be it

17   warfarin, be it rivaroxaban, be it heparin, the specific underlying

18   conditions in that patient, and as an elderly patient we become

19   what we call complex or sometimes interesting.  It makes our

20   management quite -- more challenging than in the case of a

21   healthier younger individual.

22   Q.  There's no recommendation in the U.S. label for monitoring

23   rivaroxaban plasma concentration levels in elderly people, correct?

24   A.  There is no -- that I remember, there is no recommendation for

25   measuring rivaroxaban concentrations in elderly patients.  We do
```

1    not have an assay approved in the United States as an in vitro

2    diagnostic test for this purpose.

3    Q.  Is there any recommendation for any dose adaptation in the

4    United States label for elderly patients?

5    A.  There is none -- no recommendation specifically for elderly

6    patients.  Warnings are -- are present in the label for -- in

7    situations of decreased renal function, and elderly patients

8    frequently have decreased renal function, so this has to be taken

9    into consideration when managing these patients.

10   Q.  As the global clinical lead for Xarelto, you are familiar with

11   what is contained in the United States packaging prescribing

12   information, correct?

13   A.  Well, I'm not the global clinical lead for -- for rivaroxaban.

14   I'm one of a number of -- of physicians that have worked on this

15   project over the years.  And -- and my role has been more focused

16   on ex-U.S. situations than the United States as Janssen

17   Pharmaceuticals is responsible for the -- the -- for the activities

18   for Xarelto in the United States -- or rivaroxaban in the United

19   States.

20   Q.  One of the goals of this monitoring program that you were

21   presenting on -- an assay development that you were presenting to

22   these key opinion leaders in Brussels in 2008 was the use of these

23   assays for therapeutic drug monitoring, correct?

24   A.  We -- we were not looking at these in the -- in -- we were not

25   looking at the development of these assays with the intention of

```
 1    dose adaptation based on achieving targeted plasma concentrations.

 2    We were thinking of -- we were working with the development of

 3    these assays to allow measurement of the -- the drug in -- in

 4    patient plasma in -- as you pointed out, these -- these special

 5    situations of which there are a number, a small child, the elderly

 6    patient.  The whole premise of the -- of the development of the

 7    drug was based on a nonmonitored approach and a fixed-dose

 8    approach, with the caveat that there are situations where a patient

 9    is ill, on a ventilator, or a patient's a child and needs other

10    considerations in order to adequately treat the patient.

11    Q.  Okay.  Now, you mentioned a couple minutes ago that there was

12    not an approved assay for measuring plasma concentration levels of

13    Xarelto in the United States.  Do you recall that?

14    A.  Yes.

15    Q.  PT Neoplastin is a widely available assay for measuring PT in

16    the United States, correct?

17    A.  Yes.  The Neoplastin reagent is marketed by Diagnostica Stago

18    in the United States.

19    Q.  You agree it's widely available?

20    A.  I think Innovin is still the -- the primary agent used in

21    American laboratories.  But I think the Neoplastin reagent may be

22    the second most widely used reagent.

23    Q.  Okay.  And that is an existing PT assay available on the

24    market, correct?

25    A.  Correct.
```

```
1    Q.  Have you yourself ever taken rivaroxaban?

2    A.  Yes, I have taken rivaroxaban.  I had a total hip replacement

3    procedure two years ago, and I -- I used rivaroxaban for

4    thromboprophylaxis after that procedure.

5    Q.  How did it work out for you?

6    A.  Excellent.  I -- I used the drug for 35 days and experienced

7    no -- no -- no hemorrhagic complications.  And I did not experience

8    a thromboembolic event.

9    Q.  And the purpose of the work that you were doing to develop this

10   assay, what -- what was the purpose?

11   A.  The European Medicines Agency asked us to collaborate with

12   diagnostic companies to assure that there was an assay available to

13   measure rivaroxaban concentrations.  In particular, they wanted to

14   have an assay available when the chronic treatment indications with

15   the higher dosing regimens became available to member states.

16   Q.  There was a lot of discussion with plaintiffs' counsel about

17   use of the word "monitoring" versus "measured."  Do you recall

18   that?

19   A.  Yes.

20   Q.  What -- what you were developing, did you consider that to be

21   measure or monitor?

22   A.  We realized during the course of the development that the --

23   the use of the term "monitoring" engendered the -- the association

24   of monitoring with dosage adaptation.  And we understood that given

25   that our development program in Phase II and Phase III to date had
```

1   been a fixed-dose approach, that we needed to be clear that we were

2   not developing monitoring regimens that required dose adjustments

3   but were -- were, rather, developing testing systems that allowed

4   point estimates, point measurements of drug concentration in -- in

5   plasma.

6   Q.  What's the -- what are the circumstances under which one might

7   want to be able to measure how much rivaroxaban is in a patient's

8   blood?

9   A.  Well, we saw earlier today a very interesting slide, which I

10  can redirect our attention to.  But basically, we are looking at

11  patients with -- in -- in very special situations, such as the very

12  young patient, pediatric indications, patients with impaired renal

13  function or worsening renal function on-treatment, patients with

14  impaired hepatic function or worsening hepatic function

15  on-treatment, extremes of -- of body weight, emergency settings

16  such as a patient that requires a spinal tap for assessment of a --

17  of a spinal cord infection, this patient being potentially on a --

18  a non-vitamin K oral anticoagulant such as rivaroxaban, patients

19  requiring emergency surgery also in the setting of their being

20  treated otherwise with a non-vitamin K oral antagonist such as

21  rivaroxaban.

22  Q.  How would you characterize these -- these situations?

23  A.  I would character -- characterize these as special situations

24  where we need to understand more specifically what is occurring in

25  an individual patient in order to make certain types of decisions

1    as to what to do next and when to do it.

2    Q.  And what is Spiro-52.  What Spiro 52.1 is -- what is this

3    paper?

4    A.  This is a -- a review Spiro 52.1.2 article that Professor

5    Samama authored with -- in collaboration with -- with colleagues

6    from Bayer Healthcare and -- and Diagnostica Stago where we did a

7    review article on the laboratory assessment of rivaroxaban.

8    Q.  And as a general matter, what -- what is addressed within this

9    article?

10   A.  We provided an overview of the assay developments that had

11   taken place during the preceding several years, probably beginning

12   as early as 2004 and 2005.  We provided some information of --

13   concerning pharmacokinetic parameters associated with rivaroxaban.

14   We provided information about clinical situations in which test --

15   laboratory testing for rivaroxaban might be required.

16   Q.  And did you have many different conversations over the last

17   couple of days about the use of PT as a means to measure plasma

18   concentration in patients who have taken rivaroxaban?

19   A.  Yes, we did.

20   Q.  What do you say in the first Spiro 52.3.1 paragraph with

21   respect to whether or not prothrombin time is suitable for

22   measuring rivaroxaban?  What do you say in your published paper?

23   A.  We point out that the variability and the responses with the

24   different thromboplastin reagent clicks, results in a too large

25   variation in the results when they are expressed in seconds for

1   specific patient samples that are tested.

2   Q.  And what causes that variation?

3   A.  It's caused by the different international sensitivity index of

4   the thromboplastin reagents which are used in the -- the reagent

5   kits.

6   Q.  Is the variability corrected by conversion of PT to INR values?

7   A.  Using the -- the formula that we have established for the --

8   as -- as a anti-vitamin K anticoagulant class of agents, in fact,

9   the variation between the assays has increased.

10  Q.  What -- what is INR used to measure?

11  A.  The international normalized ratio referred to in abbreviation

12  form, the INR, is used to standardize the -- the -- the assessment

13  of the intensity of anticoagulant effect with the vitamin K

14  antagonist class of anticoagulants or blood thinners.  One commonly

15  mentioned type of drug in the United States in particular is

16  warfarin.  But in other countries several other types of drugs are

17  commonly used.

18  Q.  If you go down to the next Spiro 52.3.2 paragraph, about

19  halfway down, there's a discussion that involves the Neoplastin

20  reagent.  Do you see that?

21  A.  Yes.

22  Q.  You were asked a lot of questions, particularly this afternoon

23  about the use of the Neoplastin reagent system to measure PT in

24  patients who have taken rivaroxaban.  Do you recall that?

25  A.  Yes, I do.

1   Q.  What do you tell readers of your published article with respect

2   to PT, even if it's the Neoplastin reagent?

3   A.  Well, the bottom line of the concern about the assay from the

4   laboratician's perspective or the individual that is actually

5   working in the clinical laboratories contained in the last

6   sentence, that it -- so, "The Spiro 52.3.3 assay lacks precision

7   particularly at low rivaroxaban concentrations and is, therefore,

8   not suitable for measuring rivaroxaban levels and blood samples

9   taken near the time of $C_{trough}$.  In addition, specific calibrators,"

10  et cetera.

11  Q.  Well, go ahead and read that.

12  A.  "In addition, specific calibrators for use with the prothrombin

13  time test are not commercially available."

14  Q.  I'd like you to turn to the Spiro 52.4.1 conclusion section of

15  your paper.

16  A.  Yes.

17  Q.  The first couple of Spiro 52.4.2 sentences, what do you tell

18  doctors who are reading your article with respect to whether or not

19  routine coagulation monitoring is used for rivaroxaban?

20  A.  We tell them that the non-vitamin K oral anticoagulants -- or

21  we refer to them as target specific, meaning they target a specific

22  coagulation factor -- that are used -- are used currently in

23  clinical practice Spiro 52.5.1 at fixed doses without the need for

24  routine coagulation monitoring.

25  Q.  Unlike the DKAH, right?

 1    A.  Unlike the vitamin K antagonist, correct.

 2    Q.  And that would include warfarin?

 3    A.  Yes, that would include warfarin.

 4    Q.  Rivaroxaban ain't warfarin, is it?

 5    A.  No, rivaroxaban is not warfarin.

 6    Q.  Dr. Spiro, I have a couple more questions for you.  Counsel for

 7    Bayer asked you some questions regarding the review article that

 8    you were a Spiro 52.1.1 co-author on with Dr. Samama published in

 9    the Thrombosis Journal in 2013, the "Laboratory Assessment of

10    Rivaroxaban:  A Review."  Do you recall that?

11    A.  Yes, I do recall that.

12    Q.  Okay.  And he asked you about the statement, "The concentration

13    Spiro 52.5.2 of target-specific oral anticoagulants may potentially

14    need to be measured in certain clinical situations"?

15    A.  Yes.

16    Q.  And then it gives the examples of urgent surgery, perioperative

17    management, thromboembolic or bleeding events, or in cases of

18    suspected overdose.  Do you recall those questions?

19    A.  Yes, I do.

20    Q.  Okay.  In your review of the labeling for Xarelto in the United

21    States, does it make any recommendation that these groups of

22    patients need to be measured depending on their clinical situation?

23    A.  I would need to look at the U.S. label quickly again.

24    Q.  I think it's 46?

25    A.  I do not find that it does.

```
 1   Q.  Okay.  Now, if I can point your direction to the Page 6 of 7 in
 2   your Spiro 52.6.1 conclusion section -- in your conclusion
 3   section --
 4   A.  Yes.
 5   Q.  Okay.  And that says, "To Spiro 52.6.2 conclude, the choice of
 6   laboratory tests for rivaroxaban will depend on the clinical
 7   situation.  If a qualitative assessment of the presence of
 8   rivaroxaban in the blood is needed, the PT test is suitable
 9   provided that a rivaroxaban-sensitive reagent is used."  Did I read
10   that correctly?
11   A.  Yes, you did.
12   Q.  Okay.  And you agree with that statement, that a PT test is
13   suitable if you want to make a qualitative assessment of the
14   presence of rivaroxaban in the blood?
15   A.  Yes.
16   Q.  And PT has been suitable for Bayer to use regarding their PK/PD
17   measurements in their Phase III study programs, correct?
18   A.  That was used in the Phase III study programs.
19   Q.  Right.  And I want to show you what we'll mark as Exhibit
20   Number 53.
21       (Document marked for identification as Exhibit Number 53.)
22   BY MR. OVERHOLTZ:
23   Q.  So if you'll look with me on the e-mail on the first page,
24   Wolfgang Mueck is responding to Scott Berkowitz, his e-mail, and
25   copies yourself, correct?
```

1    A.  Yes, he does.

2    Q.  Okay.  And this e-mail is from May 28, 2014, and it had to do

3    with the responses that we talked about earlier related to the

4    EMA's request regarding PK/PD information and bleeding risk,

5    correct?

6    A.  Yes.

7    Q.  Okay.  And you've indicated Dr. Mueck was one of the people

8    responsible for pharmacokinetic and pharmacological evaluation of

9    Xarelto, correct?

10   A.  Yes, he was involved in that.

11   Q.  Okay.  And he says, "Hi, Scott.  First of all, let's recall

12   what our strategy has been, planned and executed for all

13   indications, see respective ClinPharm CTD Parts 2.7.2, i.e." --

14   Bullet Point 1 -- "Do a comprehensive ClinPharm program to profile

15   rivaroxaban to the best we can, implement PK/PD components in all

16   Phase II dose-finding trials to characterize PK/PD in the target

17   population," correct?

18   A.  Yes, that is what he wrote.

19   Q.  Okay.  And now I want you to focus on Bullet Point Number 3.

20   He says, "Based on the established linear relationship between

21   rivaroxaban plasma concentration and prothrombin PT, carry PT

22   measured at peak and trough, in all pivotal Phase III programs to

23   use them as a PK surrogate for subsequent exposure/response, mainly

24   bleeding event analyses, all conducted by Biometry/GIA."  Do you

25   see that?

1    A.  Yes, I see that.

2    Q.  Okay.  So the use of PT as a surrogate for exposure response

3    analysis, mainly bleeding events, was acceptable to Bayer for their

4    Phase III trial programs for Xarelto, correct?

5    A.  It was used during the Phase III program in the Bayer

6    indication studies.

7    Q.  You recalled being asked questions by counsel for Bayer related

8    to this back and forth between the term "monitor" and "measure."

9    Do you recall that?

10   A.  Yes.

11   Q.  And you indicated that at some point, based on the fact that

12   there was a development plan for a drug that would be a fixed dose

13   with no dose adaptation needed, that what you were really talking

14   about when you meant monitoring was measuring rivaroxaban plasma

15   concentration levels, correct?

16   A.  Correct.

17   Q.  Okay.  What is the point of measuring Xarelto plasma

18   concentration levels if you aren't going to do anything about it?

19   A.  Measuring Xarelto plasma concentrations allows you -- would

20   allow a clinician to, as we have discussed, know whether a patient

21   was taking Xarelto, if it was not present.  If there were

22   concentrations present would -- to make decisions related to

23   proceeding with an invasive procedure or not proceeding with an

24   invasive procedure.

25           If high levels were present in a specific clinical

1  setting, to stopping the medication until whatever clinical setting

2  that was would resolve.  There could be a number of specific

3  actions taken other than dose adaptation.

4  Q.  So if a patient doesn't absorb the drug, they are not being

5  protected from a thromboembolic event, measuring could help you

6  identify those patients so that you could use a different agent if

7  possible?

8  A.  If possible.

9  Q.  On rechallenge, if you identified such patients, then could it

10  help you identify patients that were not proper candidates for

11  Xarelto?

12  A.  As I said, I -- these specific clinical conditions are already

13  identified.  The use of the rivaroxaban test in these patients

14  would confirm the prudent use of the drug or the nonuse -- use of

15  the drug in a specific clinical situation.

16      (WHEREUPON, THE VIDEO DEPOSITION OF DR. THEODORE SPIRO WAS

17      CONCLUDED.)

11:07:42  18          THE COURT:  Is that it.

11:07:43  19          MR. BARR:  That's it, your Honor.

11:07:44  20          THE COURT:  Okay.  Let's call your next witness then,

11:07:47  21  please.

11:07:48  22          MR. BARR:  Your Honor, at this time the plaintiffs will

11:07:49  23  now present the videotaped testimony of Nauman Shah taken on

11:07:53  24  August 3 and 4 of 2016 in Princeton, New Jersey.  Mr. Shah is

11:07:58  25  employed by Janssen Pharmaceuticals, and his current title is

vice-president of sales and marketing metabolic.

         The deposition starts with questioning from Mr. And

Mrs. Boudreaux's lawyers followed by questioning by defense

lawyers.

         (WHEREUPON, THE VIDEO DEPOSITION OF NAUMAN SHAH WAS PLAYED AS

         FOLLOWS:

Q. Could you state your name for the record.

A. Nauman Shah.

Q. And where do you currently reside?

A. I live in Flemington, New Jersey.

Q. And are you currently employed?

A. I am.

Q. And what -- who are you employed with?

A. I'm employed by Janssen Pharmaceuticals, which is the -- the

pharmaceutical division of Johnson & Johnson.

Q. Do you no longer have any responsibilities for Xarelto?

A. That is correct.

Q. Okay.  And how long have you worked for Janssen or a Johnson &

Johnson company?

A. I have worked for Janssen or Johnson & Johnson since 2000 --

January of 2003.  So 13 years.

Q. Okay.  So you've worked for the drug industries for about 20

years?

A. Yes, over 20 years.  Twenty-three years.

Q. In your 20-plus years of working for a pharmaceutical company, I

1  20:8 understand that you've led or played a major role in marketing

2  multiple blockbuster drugs, correct?

3  A. I have played a role in multiple drugs that have been

4  successful, yes.

5  Q. Okay.  Now, in that position when you were leading the marketing

6  54:18 strategy and launch -- launch plan execution, did you have

7  responsibility for both the professional side and the consumer

8  side?

9  A. I did.

10  Q. I'm going to hand you what I marked as Shah-125.  It is Record

11  Number 147-1269.

12  A. Okay.

13  Q. Xarelto_Janssen 08714963.

14  A. Okay.

15  Q. And it appears to be a strategic steering committee meeting

16  executive summary from the meeting August 15, 2009, in

17  Philadelphia.  Do you see that?

18  A. I do.

19  Q. Sure.  And if you look at the next page, Page 4 of 7, it appears

20  that you gave a market overview?

21  A. Yep?

22  Q. Sorry about that.  It says "Key insights" and "Clinical

23  performance."

24  A. Okay.

25  Q. She's putting things -- and it says, "If the safety and efficacy

```
1    among agents are similar, the once-daily dosing will win."  Do you
2    see that?
3    A. I do.
4    Q. All right.  And so is it your understanding that what the
5    advisors were telling you was if you have new blood thinners that
6    are coming to market, and they're relatively all the same in
7    safety, relatively all the same in terms of efficacy, how they
8    work, the big thing that will distinguish one from the other is
9    dosing?
10   A. That is -- that's accurate.  That's what it's saying.
11   Q. Okay.  And at this point in time, you were aware, were you not,
12   that when Xarelto was going to come to market, it was going to be
13   for the Afib indication a once-daily dosing drug?
14   A. Yes, that was our hope as the trial was still ongoing at this
15   point in time.
16   Q. Okay.  So at least at this point in time, these medical --
17   medical folks that you gathered together were telling you from a
18   marketing standpoint you really, really wanted a once-daily dosing
19   drug if all the drugs were going to be the same in terms of safety
20   and efficacy?
21   A. Yes, I think that's fair to say.  They obviously -- at this
22   point in time we wouldn't have known the profiles for any other
23   drugs.  So I think the general assertion that if everything else is
24   equal and one is once a day and the others are more than once a
25   day, then the once a day would be preferred.
```

1   Q. Okay.  All right.  Thank you.  If you would turn to Page 17.

2   A. Okay.

3   Q. It says, "Deep insights have guided development of highly

4   motivating messages."  Do you see that?

5   A. I do.

6   Q. And "deep insights," is that a reference to market research?

7   A. Yes, it is.

8   Q. And in the right-hand column it says, "Motivating Xarelto

9   messages."  It says, "Once-a-day dose," right?

10  A. Yes, it does.

11  Q. So is this reflecting that once-a-day dose was a effective and

12  605:17 motivating message to the public according to your market

13  research?

14  A. It was one of the messages identified as being important.

15  Q. And the next one is, "No regular dose adjustment."  That was one

16  of the messages that your market research was -- was telling you --

17  giving you feedback that was working, right?

18  A. Yes.  Because warfarin often requires dosage adjustments a lot,

19  and this did not.

20  Q. Okay.  And just going down to the third one.  Your market

21  research was telling you that the message of "No INR blood

22  monitoring was a motivating message to consumers," right?

23  A. Yes.  And that is consistent with the theme we have been talking

24  about, about that being obviously a difficult task for many

25  patients who are -- who are taking warfarin.

1    Q. And also no dietary restrictions, green vegetables, that was a

2    motivating message that your market research was verifying was

3    working, right?

4    A. Yes.  Because, again, that's another area of struggle for

5    warfarin patients.

6    Q. Okay.  Let's jump back in time to 2009.

7    A. Okay.

8    Q. I know we're doing a lot of time travel.  In February 2009, you

9    were director of marketing leading the team responsible for the

10   Xarelto launch, correct?

11   A. Yes.

12   Q. And do you recall in early 2009 discussions about Janssen

13   collaborating with Portola to develop a Factor Xa specific

14   antidote -- Factor Xa specific antidote?

15   A. At a very high level, I remember hearing that there was a

16   potential collaboration.  I wasn't involved in the evaluation or

17   due diligence on it.

18   Q. I've handed you what's been marked as Shah-54.  For the record,

19   it's Record Number 105-5561, Bates Number Xarelto-Janssen 07189114.

20   Mr. Shah, this appears to be another set of meeting minutes of the

21   compound development team for February 19, 2009.  Do you see that?

22   A. I do.

23   Q. I want you to go to Page 3.  This appears to be the meeting

24   minutes from the meeting a month after the meeting that we just

25   talked about in Shah-53, correct?

1  A. Okay.  Yep.

2  Q. "Commercial update."  Do you see where I am?

3  A. Yes, I do.

4  Q. It says, "Final recommendation on antidote.  Commercial" -- and

5  that's marketing, right?

6  A. Yes.

7  Q. -- "has completed the evaluation and recommends not to pursue

8  this opportunity.  Position statement placed in CDT MTG eRoom

9  folder for today's meeting."  Do you see that?

10  A. I do.

11  Q. Okay.  We know that at the time Xarelto was launched in 2011, it

12  was launched without an available antidote to reverse bleeding,

13  correct?

14  A. That is correct.

15  Q. And that was a decision that Janssen made to launch it without

16  an antidote, correct?

17  A. We did not have an option available at that time for an

18  antidote.

19  Q. Do you know that Bayer was considering developing an antidote

20  that worked specifically on Xarelto?

21  A. I heard about that.

22  Q. Okay.  And do you recall that you attended compound development

23  team meetings in or around early 2011 where that was discussed?

24  A. That topic was brought to the CDT for us to be aware of it, yes.

25  Q. I'm handing you Shah-58 and Shah-59, which are another e-mail

 1  and attachment.  If you look at the first slide, it says, "Xarelto

 2  rivaroxaban specific antidote BAY 1110262," correct?

 3  A. Yes.

 4  Q. Now, would this have been a set of slides that somebody would

 5  have presented at the global development committee meeting?

 6  A. Based on the e-mail, I assume it looks like, yes.

 7  Q. Do you know who presented them?

 8  A. I would have no idea.

 9  Q. And you recall -- I think you testified, that generally you have

10  a recollection of Bayer -- Bayer developing an antidote back around

11  this period of time?

12  A. Yes.  And it looks like this document was from Bayer because

13  they're the only one that would have put Xarelto in quotes.

14  Q. Okay.  And you're pointing to the first page of the slide?

15  A. Yes, I am.

16  Q. And actually, if you look at the first page of the slide, on the

17  right-hand side, it's got the Bayer --

18  A. It's actually got the Bayer logo.  There you go.  Okay.

19  Q. All right.  So if we go to Page 2.

20  A. Yes.

21  Q. It says "Project rationale."

22  A. Yeah.

23  Q. And it says, "Anticoagulants are associated with bleeding risk."

24  You agree with that?

25  A. Yes, all anticoagulants are.

1  Q. And, "There is an unmet medical need for effective antidotes for

2  anticoagulants in general."  Did I read that correctly?

3  A. You did.

4  Q. And do you agree with that?

5  A. There is, yes.

6  Q. And next bullet point, it says, "No specific antidotes are

7  available for the new anticoagulants."  Did I read that correctly?

8  A. You did.

9  Q. And is that accurate as of this time?

10  A. Thank you.  That's what I was going to say.  Yes, at that time

11  it was.

12  Q. And if you look at the second bullet point down, it says,

13  "Life-threatening bleeds can be expected in 1 to 3 percent of

14  Xarelto patients."  Do you see that?

15  A. Yes, I do.

16  Q. Next bullet point, it says, "Physicians report significant

17  interest in an antidote 'security blanket,'" correct?

18  A. Yes.  That's how I would describe it as well.

19  Q. Right.  And we saw it in that prior PowerPoint slide that one of

20  the barriers to prescribing Xarelto after launch of the Afib

21  indication, you knew that doctors were talking about it not having

22  an antidote, correct?

23  A. Yes.  And that's what we found in our market research was

24  basically they wanted a security blanket in case -- in case

25  something ever happened.

1    Q. I've given you what's marked as Shah-60, Mr. Shah.  Let me just

2    read for the record.  It's Record Number 303724, Xarelto-Janssen

3    01429151.  This appears to be a set of meeting minutes from the

4    compound development team meeting of February 15, 2009.  Does it

5    look like that?

6    A. Yes, it does.

7    Q. All right.  And your name appears as a core CDT member?

8    A. It does.

9    Q. And it's highlighted.  Does that mean that you were at the

10   meeting?

11   A. Attendees in bold, then, yes, I -- I think that's what it means.

12   Q. Okay.  And you are listed as the commercial leader, correct?

13   A. I am.

14   Q. If you could turn to the second page.

15   A. Mm-hmm.

16   Q. And if you -- I'm sorry.  If you go back to the first page.  It

17   is, "Compound Development Team Meeting, Recommendation on Pursuing

18   Bayer Developed Rivaroxaban Antidote."  Do you see that?

19   A. I do.

20   Q. Okay.  Going to the second page.

21   A. Okay.

22   Q. First, the bullet point there says as a -- strike that.

23           "As a lifesaving product, it may command the necessary

24   price to justify high COGs and development."  What is COGs?

25   A. COG stands for cost of goods.

1   Q. Okay.  And so if I understand what this is saying is that, is

2   that an antidote if it's developed, because it's a lifesaving

3   product you might be able to charge a lot more for it?

4   A. No, actually -- well, it's saying, I guess, command the

5   necessary -- can it command the necessary price, because the -- the

6   production cost here is very high, apparently, for this Bayer

7   specific -- Bayer antidote.

8   Q. Okay.  And so one of the things that's being considered and

9   factored as to whether or not to pursue the Bayer antidote is what

10  price can be commanded for the antidote itself, correct?

11  A. It appears that the team is stating or the information is

12  stating that the development and -- or the production cost is high,

13  and obviously, there would need to be a price that could be high

14  enough to justify supporting that.

15  Q. Okay.

16  A. And the belief, to your point, is that because it would be

17  lifesaving, that hopefully that would be possible.

18  Q. Third bullet point down.  It says, "Dabigatran developing

19  specific antibody.  Lack of antidote could become a competitive

20  disadvantage for riva."  And dabigatran is Pradaxa, correct?

21  A. It is.

22  Q. And did I read that sentence correctly?

23  A. You did.

24  Q. And so one of the things that's being considered here as to

25  whether or not to pursue the Bayer antidote is the fact that

1    Pradaxa is developing a specific antidote, correct?

2    A. It is one of the factors, yes.

3    Q. And we saw that -- we saw that actually Pradaxa has successfully

4    completed that and they do have an antidote and they are

5    advertising that, correct?

6    A. Yes, they recently launched one.

7    Q. And it says, "Lack of an antidote could become a competitive

8    709:11 disadvantage for riva."  Do you see that?

9    A. I do.

10   Q. And does that mean that not having an antidote could decrease

11   sales versus Pradaxa if it did develop an antidote?

12   A. Yes, potentially.

13   Q. And that was one of the things that was being considered at the

14   time?

15   A. That was one of the considerations.

16   Q. All right.  Next bullet point down.  "Health authorities and

17   physicians have expressed a keen interest in having effective

18   antidotes to anticoagulant drugs.  Clear desire for such a

19   product."  Did I read that correctly?

20   A. Yes, you did.

21   Q. All right.  And that was verified and consistent with -- with

22   your market research shortly after Xarelto launched, correct?

23   A. It was.

24   Q. And this was in -- this meeting was in February of 2011, months

25   before the launch in Afib, correct?

1  A. It was approximately -- sorry.  It's getting late in the day.

2  Approximately nine months prior to the launch, correct.

3  Q. And would it be fair to say that based on the reading of this

4  fourth bullet point, that your company knew that health authorities

5  and physicians had expressed a keen interest in having effective

6  antidotes to anticoagulant drugs and that there was a clear desire

7  for such a product before you launched Xarelto?

8  A. We were aware of all of that but did not have a viable

9  opportunity at that time to bring one to the market, especially

10 prior to launch or at the same time as launch.

11 Q. Right.  And we saw in 2009 a decision was made not to pursue the

12 Portola antidote at that point in time, correct?

13 A. I believe that that is correct, for whatever reason the team

14 decided.

15 Q. Right.  So there was an -- an opportunity to develop the Portola

16 antidote in 2009 which would have been two years before launch.

17 The team decided not to do that, correct?

18 A. Well, Portola would have actually been the one developing, and I

19 think the opportunity was should we invest in it at that time or

20 should we invest in it later as it gains more data to give us

21 confidence that it was real.

22 Q. And you made the decision that you would defer investing in the

23 Portola antidote in 2009, correct?

24 A. That is a very fair assessment, yes.

25 Q. From a regulatory standpoint, was there anything that stopped

1    the company from saying, you know what, let's develop an antidote

2    before we launch this drug so that we -- if somebody bleeds while

3    on the drug, we can reverse it?

4    A. The regulatory pathway, again I would defer to our regulatory

5    colleagues because an antidote pathway, I don't know if it was

6    clear at that time because nothing had been approved as an antidote

7    on the market.

8    Q. Okay.  And was there anything that prohibited Janssen in 2009

9    from deciding, you know what, we'll collaborate with Portola and

10   we'll get an -- on -- on what they are looking at, we'll give them

11   money and we'll work with get them to get an antidote going?  There

12   was nothing that prohibited the company from doing that in 2009,

13   correct?

14   A. I would say that the thing that would have inhibited us would

15   have been the lack of confidence into whether that was real or not.

16   But other than that, nothing.

17   Q. The company was aware of the Portola option in 2009, correct?

18   A. We knew it was an option.  We just didn't know how confident we

19   could be in that option as to whether it was viable or not.

20   Q. And the commercial -- we saw documents where the commercial

21   folks recommended that they not -- that the company not pursue that

22   from a commercial standpoint, correct?

23   A. We saw documents where somebody in the CDT, some commercial

24   folks recommended that.  I just don't know which antidote they were

25   talking about.

1   Q. I'm handing you Shah-62.  For the record, Shah-62 is 119-111,

2   Bates Number Xarelto-Janssen 00114696.  Take a minute and let me

3   know when you're ready.

4   A. (WITNESS REVIEWS DOCUMENT.)  Okay.

5   Q. Okay.  This is an e-mail 20 - from Nancy -- am I pronouncing

6   this

7   right?  Ondovik?

8   A. Good guess.

9   Q. We'll keep it at that.

10  A. Okay.

11  Q. E-mail from Nancy Ondovik to several people on the Xarelto team,

12  including yourself?

13  A. Yes.

14  Q. This is -- the e-mail was December sent 19, 2011?

15  A. Yes, that's correct.

16  Q. Okay.  So it's one and a half months after Xarelto was approved

17  and on the market for Afib, correct?

18  A. About six months after the approval for the orthopedic

19  indication, and about a month and a half after the AF indication.

20  Q. Correct.  And Xarelto was launched without an antidote, correct,

21  and that is a discussion that was happening about an antidote after

22  that time, correct?

23  A. That is correct.

24  Q. And she says in the first paragraph, "Hello, everyone.  Just

25  wanted to let you know that Bob and I communicated our decision not

1   to move to diligence or pursue the riva antidote opportunity any

2   further with Bayer late last week."  Did I read that correctly?

3   A. You did.

4   Q. And, "Bayer was understandably disappointed by this decision and

5   hoped to share more details on the program and their rationale and

6   reasons for moving forward with this antidote as part of the

7   diligence process," correct?

8   A. Yes.

9   Q. "They were quite surprised that we decided to stop prior to

10  completing diligence."  Did I read that correctly?

11  A. You did.

12  Q. Okay.  The main -- next paragraph.  "The main messages

13  communicated to Bayer were that after careful consideration and

14  additional analytic work, there was limited clinical need for a

15  riva-specific antidote as well as limited potential for the

16  antidote to generate incremental revenue to the riva program,

17  either through sales of the antidote or increased sales of riva,

18  based on our current understanding of the riva TPP and the U.S.

19  regulatory landscape."  Did I read that correctly?

20  A. You did.

21  Q. Would you agree with me that as long as there's a chance of

22  somebody bleeding on Xarelto from a clinical standpoint, from a

23  patient's perspective, that there would always be a need for an

24  antidote?

25  A. There would be a need for modalities to manage that bleeding.  I

1    would agree with that.  My own mother, you know, took it once and

2    so I would 100 percent agree with that.  But if I may finish my

3    thought for a minute, since we didn't move to the next question.

4    By modality, to be clear for the jury and everyone else, what I

5    mean is there needs to be options, whether it's a precise antidote

6    or whether it's, like, the things that people do with warfarin

7    where they apply vitamin K and it seems to help.  That's, in

8    essence, what I mean by modalities.  There need to identified some

9    modalities to control a very serious bleeding should one ever

10   occur.

11   Q. Mr. Shah, and for members of the jury, it's David Covey sitting

12   next to you for two days.  I don't think the camera was on me at

13   all.  Now it's my turn to ask you some questions.  Let's start.

14   Can you tell the jury where you were born.

15   A. Yes, I was born in the Lahore, Pakistan.

16   Q. When was that?

17   A. It was 1971.

18   Q. And when did your family move to the United States?

19   A. My family immigrated to the United States in 1980.

20   Q. And are you married?

21   A. I am married.

22   Q. Do you have children?

23   A. I do.

24   Q. How many children do you have?

25   A. I am the proud father of three daughters and two step-daughters.

```
 1    My twins are Morgan and Lea.  They're 13 years old.  And my younger
 2    one is Amira.  She is only 20 months.
 3    Q. Where did you go to college?
 4    A. I went to Penn.
 5    Q. University of Pennsylvania?
 6    A. I did.
 7    Q. What year did you graduate?
 8    A. I graduated in 1993.
 9    Q. What did you major in?
10    A. Biological basis of behavior.
11    Q. And did you do any work during hours when you weren't in school
12    or summer that was medically related?
13    A. I did a number of roles that were medically related.  I worked
14    -- in the summers prior to my senior year, I worked in a healthcare
15    company, in an insurance company, in a couple of different
16    capacities.
17         But my most important role, for a year I did research in
18    urology at the Penn Medical School.
19    Q. At University of Pennsylvania Medical School?
20    A. Yes.  Correct.
21    Q. What did you do after college?
22    A. When I graduated college, I was actually recruited to the
23    pharmaceutical industry.  I also had opportunities to continue to
24    do medical research at the Penn Medical School.  Medical school was
25    a potential option as well.
```

1          Something about the industry just fascinated me, the

2     opportunity to follow in my father's footsteps, and I wanted to

3     learn.  So I initially joined the industry as I was recruited by

4     Upjohn while I was still an undergrad.  The job was waiting for me

5     when I graduated.

6          And I decided to give it a couple of years and then

7     probably head back to medical school.  But that was my idea to

8     evaluate the industry at that point.

9     Q. So something about working in the industry got in the way of

10    going back to medical school.  What was -- why do you have a

11    continuing interest in this industry as opposed to perhaps an

12    earlier thought that maybe you would go to medical school?

13    A. Yeah, it's -- Okay.  I love the field of medicine.  I absolutely

14    love, love healthcare.  You know, even in my interviews, that was

15    all I wanted to do, be in the healthcare field.  The reason I

16    joined the industry or at least stayed in the industry and didn't

17    go back to medical school was very simple.  I fell in love with the

18    work that the industry does.  I didn't realize that I would

19    appreciate and have the opportunity to basically have impact on a

20    business as well as obviously on healthcare.  And I thought this

21    would provide the best combination.

22          But the real big reason I stayed was because I realized

23    that the industry would give me a chance to impact lives on a

24    massive scale.

25          Individual physicians do phenomenal work.  I have the

1    utmost respect for them.  They obviously get to treat one patient

2    at a time, and over the course of a day treat, let's say, 20

3    patients on average.

4              Drugs that I've worked on directly from a marketing

5    standpoint, drugs that I've had a chance to lead from a marketing

6    standpoint have been used by millions and millions of patients.

7    And feel like I've had a role to play in patients having access to

8    those medications and being made aware of those medications.

9    Q. Do you have any degrees after you graduated college and your

10   degree from the University of Pennsylvania?

11   A. Yes.  When I -- I decided a few years ago, once I decided to

12   stay in the industry, to return to graduate school.  And I received

13   an MBA in finance.

14   Q. Okay.  From what institution?

15   A. That was from Temple University.

16   Q. In Philadelphia?

17   A. In Philadelphia.

18   Q. Could you define marketing in the context of working for a

19   pharmaceutical company like Janssen?

20   A. Yes.  I mean, first of all, you know, it's interesting.  It is

21   very different than marketing in some other aspects.  I've been

22   asked this question multiple times, even in internal meetings, as

23   to -- you know, what do you -- what is it that marketing does.  And

24   I think it's very different than working in an industry like

25   consumer products or the car industry where you are focused on

```
1    creating brochures and simply advertising.

2            I think in our -- in our case we have -- and you can do

3    all that without any regulation.  We're obviously a regulated

4    industry --

5    Q. By that you mean -- let me interrupt you.

6    A. Yep.

7    Q. Regulated by the Food and Drug Administration?

8    A. That is correct.  By the Food and Drug Administration based on

9    laws that the federal government has created and in some cases

10   state governments have created.

11           Obviously, it's a different aspect in that we are working

12   to communicate information about products but also educate both the

13   healthcare provider community as well as patients.  And -- and I

14   think that that makes it a lot different.

15   Q. In terms of checks and balances on marketers for pharmaceutical

16   companies, there's the FDA on one hand; is that correct?

17   A. That is correct.

18   Q. FDA plays a role in reviewing -- has the ability to review

19   marketing materials from pharmaceutical companies?

20   A. Yes, that's absolutely true.  So every material that we create

21   that is used in promotion or advertising is submitted to the FDA by

22   our regulatory department.  FDA keeps those things on file.  They

23   proactively review either some or all.  Obviously, it varies by

24   individual -- product individual situation.  There are a number of

25   materials or -- or campaigns that we may submit for proactive
```

1   review at times.

2           DTC ads, for example, our television ads have to be, by

3   Janssen policy and by the Pharma guidelines, submitted for review

4   by the FDA and have to be approved by the FDA prior to us launching

5   those on television.

6           (WHEREUPON, THE VIDEO DEPOSITION OF NAUMAN SHAH WAS

7           CONCLUDED.)

11:33:15  8           MR. BARR:  Your Honor, that concludes Mr. Shah's

11:33:18  9   deposition testimony.

11:33:19  10          THE COURT:  Do we have another?

11:33:21  11          MR. BARR:  There is one more.  It's an hour long, so I

11:33:24  12  don't know if you want to take a break now.

11:33:25  13          THE COURT:  Why don't we take a break here, we'll stop

11:33:29  14  for lunch, earlier lunch, and we'll come back at, what is it,

11:33:35  15  quarter to one.

11:33:36  16          MR. BARR:  Thank you, your Honor.

11:33:38  17          THE MARSHAL:  All rise.

18          (WHEREUPON, THE JURY EXITED THE COURTROOM AND A LUNCH RECESS

19          WAS TAKEN.)

20

21                      P R O C E E D I N G S

22              (AFTERNOON SESSION)

23

24   (OPEN COURT.)

12:47:35  25  (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

12:47:35  1          THE COURT:  Call your next witness, please.

12:47:37  2          MR. BARR:  Last video of the day, your Honor.

12:47:39  3          THE COURT:  Okay.

12:47:40  4          MR. BARR:  We can quit watching TV.  The plaintiff will

12:47:43  5   now present the video -- no, that's the wrong one.

12:48:21  6          We're going to be presenting to you the video deposition

12:48:21  7   of Patty Torr.  I can't remember what day it was taken on, but she

12:48:24  8   works in the marketing department for Janssen.  She is going to

12:48:28  9   talk to you about her role in the drug.

12:48:30 10          There will be questioning, as you've seen in all of

12:48:32 11   these, from plaintiff counsel followed by defense counsel.

12          (WHEREUPON, THE VIDEO DEPOSITION OF PATRICIA TORR WAS PLAYED

13           AS FOLLOWS:)

14   Q. Could you state your name for the record.

15   A. Patricia Torr.

16   Q. Are you currently employed?

17   A. Yes.

18   Q. And who are you employed for?

19   A. Janssen Pharmaceuticals.

20   Q. And how long have you been employed for Janssen Pharmaceuticals?

21   A. I began working at Janssen May of 2011.

22   Q. Okay.  Would it be fair to say that you have over 20 years'

23   experience in marketing and sales in the pharmaceutical industry?

24   A. Yes.

25   Q. Is your highest degree of education a Master's of business

1  administration and marketing from Saint Joseph's University?

2  A. Yes.

3  Q. And you're not a physician?

4  A. That's correct.

5  Q. You're not a scientist?

6  A. No.

7  Q. Do you consider yourself a marketing and business person,

8  businesswoman?

9  A. Yes.

10  Q. Do you have any expertise in any scientific field?

11  A. No.

12  Q. Do you have any expertise in cardiology?

13  A. No.

14  Q. Do you have any expertise in hematology?

15  A. No.

16  Q. Do you have any expertise in pharmacology?

17  A. No.

18  Q. Do you have any formal education in cardiology, hematology or

19  pharmacology?

20  A. No.

21  Q. As I understand it, since May of 2011, you have been at the vice

22  president's level reporting directly to the president of the

23  company?

24  A. Of the therapeutic area, yes.

25  Q. Okay.  And is the therapeutic area CV and metabolic?

1        Would you say in your role as vice president of marketing

2   that you had overall responsibility for the sales and marketing of

3   Xarelto?

4   A. Yes, as part of my responsibility, yes.

5   Q. Okay.  As part of your responsibility at the vice president's

6   level for the sales and marketing of Xarelto, were you responsible

7   for both the consumer marketing and the professional marketing?

8   A. Yes, as part of -- yes.

9   Q. Okay.  And so that we understand, consumer marketing is

10  marketing to the patient and creating marketing materials for

11  patients, that you were ultimately responsible for that, correct?

12  A. Educational materials for patients, yes.

13  Q. How about -- how about television commercials?

14  A. Yes, that would be in the scope.

15  Q. So the television commercials with Arnold Palmer and Kevin

16  Nealon, you were ultimately responsible for those within the

17  organization?

18  A. Yes.

19  Q. And then on the professional side, that's creating marketing

20  materials for doctors, correct?

21  A. Correct.

22  Q. All right.  And so you had ultimate responsibility for the

23  creation of marketing materials for professionals, doctors and

24  healthcare providers, correct?

25  A. Yeah, we described them as educational materials to healthcare

1   providers.

2   Q. Well, your title is vice president of marketing, correct?

3   A. Right.

4   Q. So they are marketing materials, correct?

5   A. Well, we refer to them as educational materials.

6   Q. Okay.  You're not vice president of education of professionals,

7   correct?

8   A. That's correct.

9   Q. Okay, ma'am.  I've given you an opportunity to review Exhibit 3

10  and Exhibit 4.  Are you comfortable to testify to those -- about

11  those now?

12  A. Yes.

13  Q. Okay.  If you would look at Exhibit 3, this appears to be an

14  e-mail from Hartwig Beate or Beate Hartwig to a group of people,

15  including yourself, correct?

16  A. Correct.

17  Q. And the subject is Xarelto JSC, June 26, 2012:  Final minutes.

18  Do you see that?

19  A. I do.

20  Q. And the date of the e-mail is August 7th, 2012, correct?

21  A. I have -- yes.

22  Q. You see August 7, 2012?

23  A. Yes.

24  Q. And it says, "Dear all, please find attached the final minutes

25  of the Joint Steering Committee meeting for Xarelto held on June

1   26th, 2012."  There's a German word I can't pronounce, "best

2   regards," and she has her name, correct?

3   A. Correct.

4   Q. Did you receive this e-mail in the regular course of your

5   business at Janssen?

6   A. Yes.

7   Q. Would you have reviewed both the e-mail and the meeting minutes

8   attached?

9   A. I may or may not have reviewed the minutes, but I would have, it

10  looks like, received them.

11  Q. Okay.  And the meeting minutes for the joint steering committee

12  were not only sent to you but they were also sent to Dr. Peter

13  DiBattiste.  Do you know who that is?

14  A. Yes, I do.

15  Q. And can you tell the jury who he is?

16  A. He would be our therapeutic area lead for our research and

17  development organization.

18  Q. Okay.  Was he the therapeutic lead for Xarelto?

19  A. He was the lead.  I'm not sure of the structure, but he was the

20  most senior person.

21  Q. Okay.  And Vanessa Broadhurst, I think you mentioned her, was

22  she the president of the division at this time?

23  A. She was.

24  Q. And the person that you reported to?

25  A. Yes.

1  Q. And Paul Chang, who was he?

2  A. Paul Chang would have been the head of medical affairs at that

3  time.

4  Q. Okay.  And did you routinely receive meeting minutes from the

5  joint steering committee?

6  A. If I was an attendant, I would have received the minutes.

7  38:16 Q. Let's take a look at the meeting minutes, which are

8  Exhibit Number 4.

9  A. Sure.

10  Q. Do you see that these are -- can you confirm that these are the

11  meeting minutes for the joint steering committee meeting on June

12  26, 2012?

13  A. They appear to be.

14  Q. Okay.  And Peter DiBattiste he's also a member of the joint

15  steering committee, correct?

16  A. Correct.

17  Q. Okay.  So you have a drug like Xarelto, and as part of LCM, is

18  it planning and strategies for how you're going to expand the use

19  of Xarelto in the market, where there are unmet needs?

20  A. I would position lifecycle management as understanding how your

21  product or medicine could best attempt to improve areas where

22  there's big unmet medical needs and then making a determination on

23  whether to pursue those opportunities or not.

24  Q. Okay.  So you sort of figure out where in the market there's a

25  need or -- for the medication that is under consideration, and do

1   you determine what studies you are and are not going to do as part

2   of that process?

3   A. Marketing wouldn't make those determinations.  Our role would be

4   to understand what the gaps were in the areas in terms of unmet

5   medical need, what were the treatment gaps, what were the gaps that

6   physicians were struggling with, what were the opportunities with

7   improvements for patients and in terms of payors, in terms of is

8   there opportunity to enhance the triple aims in terms of patient

9   outcomes, patient experiences.  We would be looking at that from a

10  market insight standpoint.

11  Q. Okay.  So I'm just trying to get -- I'm trying to get an

12  understanding of the lifecycle management function so that the jury

13  understands what that is, okay.

14         Is part of -- is part of that determining what additional

15  studies to do for a drug like Xarelto, even once it's on the

16  market?

17  A. I think broadly I would say yes, my role in that is different

18  than what our R&D colleagues' role in that process.

19  Q. So if you look here it says, "Further strengthening the

20  competitive position in SPAF is important as the competitive war

21  most likely will be decided in the SPAF field."  Do you see that?

22  A. I do.

23  Q. And can you explain -- did I read that correctly first?

24  A. Yes.

25  Q. And SPAF, can you read what that is?

1    A. SPAF, stroke prevention in atrial fibrillation.

2    Q. As part -- you were at these meeting minutes -- you were at this

3    meeting, correct?

4    A. I was.

5    Q. Do you recall discussion about the competitive war most likely

6    being decided in the stroke prevention in afib field?

7    A. I generally recall, this is a few years back, the discussion,

8    that it was -- there was going to be several novel oral

9    anticoagulants on the market, and it will be very competitive.

10   Q. All right.  So in terms of a competitive war, what this is

11   referring to is that in the market that Xarelto is competing,

12   there's competition and that the competition was going to be like a

13   war, correct; is that correct?

14   A. Yeah, I'm not sure I would use those terms, but, yes, that's

15   what's --

16   Q. They actually -- those terms "competitive war" actually appear

17   in the official joint steering committee meeting minute notes,

18   correct?

19   A. They do.

20   Q. All right.  So that must have been discussed at this meeting,

21   correct?

22   A. Yeah, I don't remember war, but, fine.

23   Q. When you got these meeting minutes, did you write anybody back

24   and say, look, I wouldn't call it a competitive war, we should

25   change this?

1    A. No. Typically, I wouldn't, unless there was a factual issue.

2    Q. Okay.  So that wasn't a factual issue, correct?

3    A. It's an interpretation.

4    Q. But it's an official interpretation that ended up in the meeting

5    minutes, correct?

6    A. I guess.

7    Q. Okay.  The next is before initiating the major Phase III trials,

8    the JSC asked the JMC -- what is JMC?

9    A. Joint marketing committee.

10   Q. Let me start with the sentence.  It says, "Before initiating the

11   next major Phase III trials, the JSC asked the JMC/GDC to

12   reevaluate the LCM opportunities with focus on strengthening SPAF

13   with supportive population studies."  Did I read that correctly?

14   A. Yes.

15   Q. And JMC is I think you said joint marketing committee?

16   A. Correct.

17   Q. And is GDC the -- tell me what GDC is.

18   A. Global development committee.

19   Q. Are those committees that report in to the joint steering

20   committee?

21   A. Yes.

22   Q. Okay.  And LCM opportunities, is that referring to Xarelto?

23   A. Yes.

24   Q. Next sentence says, "The evaluation should go along the

25   following strategic imperatives:  Achieve a superiority claim in

1  SPAF or closely related setting, do not jeopardize OD, do not

2  jeopardize bleeding profile."  Do you see that?

3  A. Mm-hmm.

4  Q. And I think a little bit earlier you said that one of the things

5  that the joint steering committee did was it set strategy for

6  Xarelto, correct?

7  A. Yes.

8  Q. Do I understand this sentence, is it accurate to say that in

9  evaluating what additional studies to do for Xarelto, there are

10  three important strategic imperatives?

11  A. I believe that's what was intended by the minutes.

12  Q. Okay.  And the first one is achieve a superiority claim in SPAF.

13  That's -- is that achieving a superiority claim in the afib

14  indication?

15  A. Or a closely related setting.

16  Q. All right.  So what you're saying is first let's establish when

17  Xarelto was improved -- was approved, it was not approved with the

18  superiority claim versus warfarin, correct?

19  A. In the US we did not get a superiority claim.  Outside the US

20  they are permitted to speak about superiority claims.

21  Q. So inside the US you can't market Xarelto as being superior to

22  warfarin in reducing the risk of stroke in afib patients, correct?

23  A. It's not in our label, right.

24  Q. Okay.  And one of the things that you wanted to do in looking at

25  doing other studies was you wanted to achieve a superiority claim

1   in the afib indication because you didn't have one, correct?

2   A. It was a -- I think a part of the consideration when we're

3   looking at other opportunities, that was part of the consideration.

4   Q. And it was a very important consideration because it was one of

5   the main strategic imperatives, correct?

6   A. It says that, yes.

7   Q. Okay.  And the next strategic imperative in looking at what

8   other studies to do and how to expand Xarelto's use was not the

9   jeopardize OD.  What does that mean?

10  A. Not to jeopardize once daily is the way I read it.

11  Q. And Xarelto was -- Xarelto is dosed in afib patients once a day,

12  correct?

13  A. Yeah.

14  Q. And that was an important differentiating characteristic of

15  Xarelto versus its competition in the marketplace, correct?

16  A. That was one of a couple.

17  Q. And it was an important one, it was so important that one of the

18  strategic imperatives in looking at what studies to do was not to

19  jeopardize that in any way, correct?

20  A. It says do not jeopardize once daily.

21  Q. Right, and the next one is do not jeopardize bleeding profile,

22  correct?

23  A. Correct.

24  Q. So those three strategic imperatives, which is achieving a

25  superiority claim, not jeopardizing the once daily dosing and not

1  jeopardizing the bleeding profile were the overall strategic

2  imperatives that were to be followed and taken into consideration

3  when looking at what studies to do in Xarelto going forward,

4  correct?

5  A. I believe they were listed as the strategic imperatives.

6  Q. Okay, Ms. Torr, I was asking you questions about this joint

7  steering committee meeting minute notes.  We're on Page 6 of 9.

8  We're under LCM, and I was asking you about "3.1 Discussion on how

9  to strengthen the SPAF label," and I think my question was do you

10  recall these discussions?  You asked me to read the section, which

11  I've given you the opportunity, correct?

12  A. Correct.

13  Q. All right.  Do you recall these discussions?

14  A. I do.

15  Q. Let's read the first sentence.  It says, "The JSC discussed how

16  to strengthen the Xarelto position in SPAF," which is the afib

17  indication, "as we cannot provide a superiority claim in many

18  countries and the only substantial differentiator is OD."  Did I

19  read that correctly?

20  A. Yes.

21  Q. All right.  So is this -- so do you recall the discussions,

22  these discussions being that one of the issues was the only

23  substantial

24  51:11 differentiator for Xarelto in the United States and some

25  other countries was its once a day dosing.  Do you recall that?

1    A. I recall that discussion.

2    Q. And it says, the JSC emphasized that the competitive war was

3    most likely to be decided in the SPAF field.  Do you recall that?

4    A. I do.

5    Q. Do you recall actually the phrase "competitive war" being used?

6    A. I don't.

7    Q. And that's a marketing or a commercial assessment.  Were you

8    involved in that specific discussion about what the -- where the

9    competitive war would be?

10   A. I knew it was going to be highly competitive.  I don't recall

11   using the terminology.

12   Q. Did someone else use that terminology?

13   A. Perhaps.

14   Q. Next sentence says, before entering into the next Phase III the

15   JSC asked the JMC/GDC to re-evaluate the LCM opportunities with

16   focus on strengthening SPAF with the supportive population

17   52:11 studies or 4 -- which I'm not sure what that means.  Did I

18   read that correctly?

19            MR. COVEY:  You're saying the "or 4"?

20   BY MR. WEINKOWITZ:

21   Q. Yeah, do you know what the "or 4" means in that sentence?

22   A. Supportive populations or -- no.

23   Q. Maybe it's a typo.

24   A. It could be a typo.  It could mean Phase IV.

25   Q. Did I read that correctly?

1    A. Yes.

2    Q. And it says, "The evaluation should go along the following

3    strategic imperatives:  Achieve a superiority claim in SPAF or

4    closely related setting, do not jeopardize OD, do not jeopardize

5    bleeding profile," correct?

6    A. Correct.

7    Q. And if we look to the very last --

8    A. If I may, though, I think it's important to call out superiority

9    claim in SPAF or closely related settings, and I think the next

10   paragraph gets into some of those closely related settings.

11   Q. I appreciate that, okay.

12          Now, if we go to the next page, which is Page 8 of 9,

13   under Number 6, "Critical Issues."  What do you understand the

14   critical issues section is supposed to be communicating in this

15   joint steering committee meeting notes?

16   A. I'm sorry.  Could you orient me one more time.

17   Q. Sure.  It's Page 8 of 9.  I'm sorry I said 6 of 9, 8 of 9, under

18   Number 6.

19   A. Eight of 9, Number 6, Critical Issues.

20   Q. Critical Issues.  What is supposed to be -- what is communicated

21   under critical issues?

22   A. Opportunity to improve sales in SPAF in US and primary care.

23   Q. All right.  So one -- was one of the critical issues coming out

24   of this meeting that sales -- to improve sales in the afib

25   indication in the US and focus on primary care?

 1   A. I read that to be broadly globally improve sales and stroke

 2   prevention in AF globally and then improve sales in the US with

 3   particular focus on primary care.

 4   Q. But the point of this is that one of the critical issues coming

 5   out of the joint steering committee was there was a need to improve

 6   sales, correct?

 7   A. That was -- looks like it was a critical issue.

 8   Q. All right.  So was your job to provide a commercial evaluation

 9   of the potential studies or future uses for Xarelto that were being

10   discussed?

11   A. It was.

12   Q. Okay.  And when it says including a commercial evaluation, what

13   is a commercial evaluation of a lifecycle management opportunity

14   for Xarelto?  What does that mean?

15   A. So you would understand from the scientists what the potential

16   areas of study would be.  You would assess the size of the patient

17   population, you would conduct some market research to understand

18   what the unmet needs, the gaps in therapies were, and you would

19   learn from the researchers, the clinical scientists what the

20   hypothesis was around how the medicine was going to improve those

21   gaps, and then we would make what we would call target product

22   profiles, and then we would test them in the market with

23   prescribing physicians to determine whether or not that

24   hypothetical result would be meaningful for their patients and

25   their practice.

1          MR. WEINKOWITZ:  For the record, I'm handing you what's

2     been marked as Exhibit 5.

3          (Documents marked for identification as Torr Deposition

4          Exhibit Nos. 5 and 6.)

5          MR. WEINKOWITZ:  Exhibit 5 is Record Number 148-2662,

6     Bates Number XARELTO_JANSSEN_08774749.  Xarelto Exhibit Number 6 is

7     Record Number 148-2663, Bates Number XARELTO_JANSSEN_08774751.

8     BY MR. WEINKOWITZ:

9     Q. Let's start with Exhibit 5.  Do you see that this is an e-mail

10    from a Dr. Califf with a -- attaching a ROCKET booster study that

11    was forwarded to you and Vanessa Broadhurst, your boss, by

12    Dr. DiBattiste?

13    A. I see that.

14    Q. Dr. Califf is currently, is he not, the FDA commissioner

15    appointed by President Obama?

16    A. Yeah, Dr. Califf was also the PI for the ROCKET study.

17    Q. Right.  He was co-chair of the Executive Committee that ran the

18    record trial, correct?

19    A. ROCKET.

20    Q. ROCKET trial, correct?

21    A. Correct.

22    Q. And the ROCKET trial is the trial that was run and submitted to

23    the FDA in order to get approval for the afib indication for

24    Xarelto, correct?

25    A. Yes.

1  Q. Have you met with Dr. Califf?

2  A. I have not as part of Janssen, my Janssen experience.

3  Q. You have not met with him?

4  A. Not as part of -- I've met with him as part my work at

5  AstraZeneca previously, but not part of Janssen.

6  Q. Are you familiar with his reputation?

7  A. I am.

8  Q. Do you consider him a good scientist?

9  A. I do.

10  Q. Do you consider him -- he's a physician, correct?

11  A. He is.  He's a cardiologist.

12  Q. Out of Duke, he was out of Duke, correct?

13  A. Correct.

14  Q. And do you consider him the type of scientist and doctor that

15  puts patients' safety first?

16  A. Yes, I believe he's a -- well respected in the community.

17  Q. Would you say that you have the utmost respect for Dr. Califf?

18  A. I do.

19  Q. If you take a look at the e-mail that was forwarded to you

20  Dr. DiBattiste, the e-mail says, "guys," and this is Dr. Califf

21  speaking, "This is a simple 2 pager to let you know I'm working on

22  something.  I think this could be done using the orbit template at

23  a fraction of the additional cost that we normally attribute to

24  clinical trials.  The motivation is enclosed on Page 1.  I've been

25  skimpy with the operational details because I've working through

1  some thoughts about endpoints."  Did I read that correctly?

2  A. Yes.

3  Q. And he continues, "The whole thing is based on the 2 premises."

4  Do you see that?

5  A. Mm-hmm.

6  Q. And when he's talking about this, he's talking about a proposal

7  for a ROCKET booster study, correct?

8  A. It appears so.

9  Q. And he says, Number 1, "It's the right thing to do for a drug

10  that has a long life and can make a huge difference," correct?

11  A. Yes.

12  Q. And he says, "Here's the proposal from Califf we discussed

13  yesterday.  Let's discuss."  Do you see that?

14  A. Yes.

15  Q. And do you have a recollection of having a discussion with Dr.

16  DiBattiste about Dr. Califf's proposal?

17  A. I believe my boss did.

18  Q. So that would be Vanessa Broadhurst?

19  A. Yes.

20  Q. Do you -- do you know what your boss and Dr. DiBattiste spoke

21  about?

22  A. I was not part of that discussion.

23  Q. Okay.  Well, what makes you recall that Ms. Broadhurst and

24  Dr. DiBattiste had a discussion?

25  A. Because I remember getting this e-mail asking Nauman to look at

1   the details, and I recall that Vanessa had already picked up the

2   phone and had a conversation with Dr. DiBattiste.

3   Q. Okay.  So the time period that you got this, and this e-mail

4   from Dr. Califf is dated February 27, 2012.  Do you see that?

5   A. Mm-hmm.

6   Q. That's about four months after Xarelto was on the market for the

7   afib indication, correct?

8   A. Correct.

9   Q. All right.  And Dr. DiBattiste forwards the e-mail to Vanessa

10  Broadhurst, and you in turn forward it to Mr. Shah, correct?

11  A. I did.

12  Q. And you say, "need a swift and strong response to me pls..."  Do

13  you see that?

14  A. Yes.

15  Q. What did you mean by that?

16  A. I needed him to evaluate the proposal and have a recommendation

17  that I could take to Vanessa.

18  Q. So is it that you saw that the proposal was also sent to Vanessa

19  and you were asking Mr. Shah, who reported to you at the time, to

20  take a look and to give you an assessment so that you could speak

21  to Ms. Broadhurst about it?

22  A. That's what I recall.

23  Q. All right.  Now, let's take a look at the proposal itself.

24          Now, if you look at the proposal, the title of the

25  proposal is "Rivaroxaban and Atrial Fibrillation:  The Need for

1  ROCKET AF Booster."  Do you see that?

2  A. Mm-hmm.

3  Q. And rivaroxaban is Xarelto, correct?

4  A. Correct.

5  Q. And if you go under -- the first page is a background that

6  Dr. Califf is giving, correct?

7  A. Yes.

8  Q. And if you go to the second page -- I mean, I'm sorry, the

9  second paragraph, it says, "The major comparative advantage of

10  rivaroxaban is its once-a-day dosing, but the failure of ROCKET AF

11  to prove superiority, even in the face of lower than expected TTR

12  in the trial, has raised major questions about whether the ROCKET

13  AF dosing regimen is needed -- is indeed the best dose."  Did I

14  read that correctly?

15  A. Yes.

16  Q. All right.  And so here Dr. Califf is referring to the major

17  advantage for Xarelto as being its once-a-day dosing, correct?

18  A. That's what I believe Dr. Califf is saying.

19  Q. And that's consistent with what we saw in the joint steering

20  committee meetings as being one of the strategic imperatives to

21  keep in mind in terms of doing lifecycle management, correct?

22  A. Correct.

23  Q. So going back to the paragraph that we just read, where

24  Dr. Califf is talking about the major advantage for Xarelto is its

25  once a day dosing, do you disagree with that?

1    A. I believe one of the -- based on the research that we have about

2    the results of the ROCKET trial that we studied patients at a much

3    higher risk than our competition did, and that's an important

4    differentiator in the market, as well as we have the most real

5    world evidence published both on safety and efficacy, which is

6    different than our competition, as well as we are -- have the

7    highest access in terms of formulary and reimbursement and the

8    lowest out of patient cost.  Those are all material differentiators

9    68:18 in the market as we -- back then and today.

10           You see that after the background, Dr. Califf writes, in

11   summary, the tremendous -- we're at the last paragraph -- potential

12   of rivaroxaban to reduce death and disability from atrial

13   fibrillation is jeopardized by uncertainty regarding the dosing

14   regimen.  Do you see that?

15   A. Yes, I see that.

16   Q. Was this the first time that you learned that Dr. Califf, who

17   was the lead on the ROCKET study, thought that there was

18   uncertainty with the dosing regimen for Xarelto?

19   A. I knew that he and Dr. DiBattiste were having discussions.  I

20   wasn't privy to the details about this.

21   Q. All right.  Well, when you saw this document, was this the first

22   time that you learned that Dr. Califf thought that there was

23   uncertainty regarding the dosing regimen, or had you heard that

24   before?

25   A. I hadn't heard that before.  I knew that he and Dr. DiBattiste

1    were in discussions about the topic, generally.

2    71:19 Q. Okay.  And if you go back up to the

3    paragraph we were talking about, the last phrase says, it says,

4    "has raised major questions about whether ROCKET AF dosing regimen

5    is indeed the best dose."  Was this the first time you ever learned

6    that Dr. Califf thought that the ROCKET-AF dosing regimen may not

7    indeed be the best dose?

8    A. I don't recall any specifics of any correspondence that I would

9    have been made aware of or communications from the team.  I know

10   that he -- I know that he had opinions about this, but I had never

11   seen it expressed in this way.

12   Q. Are you saying that before receiving this proposal, you knew

13   that Dr. Califf had opinions about ROCKET -- the ROCKET-AF dose in

14   Xarelto not necessarily being the best dose or the safest dose?

15   A. No, I'm not sure about those details.  I know that he generally

16   was asking those questions to our scientists.

17   Q. And is proposing that the company do a study testing different

18   doses, correct?

19   A. That is my understanding.

20   Q. And if you look at the second page, he actually at the very

21   bottom of the page, he proposes potential doses to be tested,

22   correct?

23   A. It appears so.

24   Q. And that includes lower doses than 20 milligrams once daily,

25   correct?

1    A. Fifteen -- let's see, 10 milligrams BID, 15 milligrams once per

2    day, 10 milligrams per day for renal, 7.5 BID, 5 for renal.

3    Q. So yes?

4    A. Yes.

5    Q. So he's proposing a lower dose in terms of milligrams, correct?

6    A. Yes.

7    Q. And he's proposing a different dosing regimen other than once

8    daily, correct?

9    A. It looks like he's got four different regimens.

10   Q. Correct, including not just once daily dosing but also twice

11   daily dosing, correct?

12   A. Looks like both.

13   Q. All right.  So the doctor, the scientist that ran the ROCKET

14   study has come to Janssen and said I think that you might not have

15   the safest dose in afib patients, I propose that you do a study, I

16   propose that you look at a lower dose, I propose that you look at a

17   different dosing regimen, correct?

18   A. Correct, and at this point in time, Dr. Califf was head of the

19   Duke Clinical Research Organization, which was in business to run

20   clinical trials.

21   Q. And the Duke research organization was the organization that

22   your company, Janssen, hired to run the ROCKET clinical trial,

23   correct?

24   A. Correct.

25   Q. And on March 1st you became aware that Dr. Califf was making a

1   proposal to do this study in afib patients at lower doses and at a

2   twice daily dosing regimen, correct?

3   A. It seemed to be his opinion, yes.

4   Q. And then you forward it on to Mr. Shah, and it says -- and you

5   write, need a swift and strong response to me, please.  Did

6   Mr. Shah ever get back to you?

7   A. I don't recall any e-mail exchanges.  I'm sure we probably had a

8   conversation.

9   Q. Do you have a recollection of the conversation?

10   A. I don't.

11   Q. Okay.  Now, would it be fair to say at this point in time, you

12   had already concluded, even before Dr. Califf had sent this

13   proposal, that such a dosing study would kill Xarelto in the

14   market?

15   A. My understanding of the timing of events is that Dr. DiBattiste

16   and the senior leadership team came to a conclusion that the dose

17   that was studied in the ROCKET trial definitively answered the

18   safety and efficacy of Xarelto and, therefore, we weren't moving

19   forward with doing another study, in that we had significant other

20   indications to consider in terms of R&D focus.

21   Q. Ma'am, do you remember what my question was?

22   A. Yeah, it was about the timing.

23   Q. I mean, you answered all about Dr. DiBattiste.  I asked you a

24   question about what you had concluded by this point in time.  My

25   question is by this point in time, you had concluded personally

1  that doing a dosing study would kill Xarelto in the marketplace by

2  the time you got this proposal?

3  A. By the time I got this proposal, our R&D colleagues have told

4  the marketing team that the dose we studied in the ROCKET trial

5  definitively addressed the safety and efficacy of Xarelto and was

6  subsequently approved by the FDA without restriction, and my job as

7  a marketer was to take that information and make sure that we are

8  bringing that value, that potentially life-saving medicine to

9  patients.

10  Q. Handing you what's been marked as Torr-7.  I'm going to give you

11  an opportunity to review this.  Do you see -- before you do that,

12  do you see that this is an e-mail that you appear on dated January

13  10th, 2012 from Gary Peters, correct?

14  A. (WITNESS REVIEWS DOCUMENT.)  Okay.

15  Q. Okay.  Do you see that this is an e-mail that's started -- an

16  e-mail chain that's started by Mr. Sigmond Johnson on January 5th,

17  2012?

18  A. Yes.

19  Q. And you're on this e-mail, correct?

20  A. Correct.

21  Q. And who is Gary Peters?

22  A. Dr. Peters would be one of Dr. DiBattiste's medical physicians

23  on his staff.

24  Q. So he's one of the scientists --

25  A. Yes.

1   Q. -- that worked on Xarelto, correct?

2   A. Correct.

3   Q. How about Paul Chang, who was he?

4   A. Paul Chang would be the head of our medical affairs unit.

5   Q. Another scientist that worked on Xarelto, correct?

6   A. Yes.

7   Q. And Dr. Paul Burton, who is he?

8   A. Dr. Burton at the time would have been another physician that

9   reported in to Dr. DiBattiste.

10  Q. Now, if we go back to the first page, one of the scientists,

11  Dr. Peters responds, correct?

12  A. Yes.

13  Q. And he says, "Hi all, just reviewed this quickly a few thoughts

14  from my perspective."  Do you see that?

15  A. I do.

16  Q. "Rob Califf," that's what it says here, correct?

17  A. Yes.

18  Q. "Is supposed to be sending us a proposal for such a study...

19  Basis for this is that he says that comparative studies vs.

20  Apixaban will be done and since likely we will not fare optimally

21  with our current dosing regimen we need to explore others."

22  86:6 And then he says, "I fully agree with this and would like to

23  see ROCKET 2 discussed again in this context."  Did I read that

24  correctly?

25  A. Yes.

1    Q. All right.  And you are on this e-mail, correct?

2    A. Yes.

3    Q. And so Dr. Gary Peters, one of the scientists, is anticipating

4    that Dr. Califf is going to send the proposal that we looked at,

5    correct?

6    A. Correct.

7    Q. And he says, "I fully agree with this and would like to see

8    ROCKET 2 discussed again in this context," correct?

9    A. Correct.

10   Q. All right.  So one of the scientists is anticipating that

11   Dr. Califf is going to send a dose finding study in afib patients,

12   and he's saying he fully agrees, correct?

13   A. He is, but I think it's really important to call out that I

14   fully agree with this and would like to see ROCKET 2 discussed

15   again in this context.  I think that refers to a prior

16   determination by Dr. DiBattiste and his leadership team that we

17   were not going to be pursuing another ROCKET trial.

18   Q. Okay.  But, basically, Dr. Peters is saying he thinks it may be

19   necessary and he would like to see it discussed, correct?

20   A. He's saying that, and my recollection, ROCKET 2 wasn't even part

21   of the agenda because it was pretty much taken off the table

22   because of our -- Dr. DiBattiste and the senior leadership team had

23   already made the determination that we were not going to pursue,

24   that, in fact, the ROCKET trial was successful, it met its primary

25   endpoint, the FDA approved, and we were going to turn our attention

 1  to other high unmet need areas as part of this meeting.

 2  Q. Handing you what's been marked as Exhibit 8.  For the record, it

 3  is Record Number 250-1312, XARELTO_JANSSEN_11775788.

 4        Do you see, ma'am, that this is the same e-mail from

 5  Dr. Peters that you forwarded on to Mr. Moye after taking all the

 6  scientists off the e-mail?

 7  A. Yes.

 8  Q. And it's dated January 10th, 2012?

 9  A. Yes.

10  Q. And you say to Mr. Moye, "need to get ahead of Califf proposal."

11  A. Yeah.

12  Q. Thank you.  When you say "need to get ahead of the Califf

13  proposal," you hadn't even seen the Califf proposal, correct?

14  A. That's right.

15  Q. Do you know if Mr. Moye ever replied to you?

16  A. I do not recall.

17      (Document marked for identification as Torr Deposition Exhibit

18      No. 9.)

19  BY MR. WEINKOWITZ:

20  Q. Handing you what's been marked as Exhibit 9, it is Document

21  Number 142-8185, 94:22 XARELTO_JANSSEN_08583165.  If you take a

22  look, it's another e-mail in the same chain, and it appears as

23  though at 4:31 p.m. on the same day as the January 10, 2012,

24  Mr. Moye replies.  Do you see that?

25  A. I do.

1    Q. And he said, "brought up in CDT a few 95:6 minutes ago."  What

2    is CDT?

3    A. Clinical development team.

4    Q. And what is the clinical development team?

5    A. It would be the team of folks who are working on the current

6    ongoing clinical trials to support the program.

7    Q. And does it appear that Mr. Moye, a marketer, was at that

8    meeting?

9    A. Yes, typically marketing attends those meetings.

10   Q. It says, "Califf banging this drum for some time."  Do you see

11   that?

12   A. I do.

13   Q. Okay.  Michael continues here, "team thinks ROCKET 2 needs to be

14   on agenda for Bayer meeting this week - just so everyone knows

15   Califf is making noise about it."  Did I read that correctly?

16   A. Yes.

17   Q. And what did you understand that to mean?

18   A. That in our discussions about new indications for Xarelto, the

19   lifecycle management meeting, that the ROCKET 2 discussion had

20   already been determined that we were not moving forward, and it

21   wasn't on the agenda, but Michael thought or the team thought that

22   we should include it, given the fact that there's a pending Califf

23   proposal coming forward, just so everybody is aware.

24   Q. Okay.  So, as I understand what you said in terms of sort of the

25   timing, a ROCKET 2 type dose finding study had been previously

1    considered by the scientists and had been rejected as a potential

2    going forward and that now with Dr. Califf banging the drum again

3    or sending a proposal, that it now is going to go back on the

4    agenda to discuss with Bayer, correct?

5    A. No, I think it was more that it was a heads-up that he's going

6    to be sending a proposal.  I don't believe it was a rediscussion of

7    the R&D decision not to move forward with the ROCKET 2 proposal.

8    Q. Okay.  So when it says, "team thinks ROCKET 2 needs to be on

9    agenda for Bayer meeting this week - just so everyone knows Califf

10   is making noise about it," the decision at this point in time had

11   been made.  You weren't going to do a ROCKET study.  You were just

12   going to inform Bayer that Califf is still banging the drum about a

13   dose finding study?

14   A. That's my interpretation.

15   Q. Okay.  So there was not really going to be a decision point by

16   putting it on the agenda.  It was just to notify?

17   A. Right, and keep in mind, this LCM meeting is not a

18   decision-making meeting.  Decision-making meeting about fundings of

19   trials and comparators and doses would be determined by the senior

20   leadership team of Dr. DiBattiste.

21   Q. Okay.  And so the ROCKET 2 trial that would look at twice daily

22   dosing in afib patients was not consistent with the strategic

23   imperative that we saw in those joint steering committee meeting

24   notes, correct?

25   A. Correct, I think and timing is important at this point of when

1    we were having this LCM meeting.  We hadn't been in receipt of the

2    Califf proposal and, importantly, our research and development

3    colleagues already made a determination that we were not going to

4    107:19 press forward in that regard.

5    Q. Okay.  I've handed you what I've marked as Exhibit 10.  It is

6    Record Number 259501, Bates Number XARELTO_JANSSEN_01203314.  I

7    gave you an opportunity off the record to read the e-mail.  Are you

8    ready to answer questions?

9    A. Yes.

10   Q. Okay.  Do you see that this is part of the same e-mail chain

11   that we were talking about with Dr. Peters' e-mail on January 10,

12   2012.  Do you see that?

13   A. I do.

14   Q. You write, "would not support doing a ROCKET 2 study and

15   unwinding everything we invested and are actively selling today."

16   Did I read that correctly?

17   A. Correct.

18   Q. And the ROCKET 2 study you're referencing is the ROCKET 2 study

19   that we talked about a little bit earlier that Dr. Califf sent,

20   correct?

21   A. Well, I would just say that we hadn't at this point in time --

22   this is January and we hadn't received Dr. Califf's proposal at

23   this point in time, specifically.

24   Q. So you didn't receive Dr. Califf's proposal at this point in

25   time, but you did have a sense that it was going -- about a dose

1    finding study, correct, for Xarelto patients in afib?

2    A. I didn't know that.  I thought it was an afib PCI study that

3    Dr. Califf at the time was going to be putting forward.

4    Q. So you didn't know what the details were, correct?

5    A. Correct.

6    Q. But you were objecting to it, correct, notwithstanding not

7    knowing the details?

8    A. Well, I was -- for context, I was -- the ROCKET 2 study was not

9    part of the agenda for this LCM meeting because our R&D committee

10   led by Dr. DiBattiste had already made the decision that we weren't

11   moving forward with another trial in ROCKET, that we had other high

12   unmet need areas that we were going to focusing on.

13          So my context for my comments here would be that I

14   thought this would be distracting to the team to be discussing in

15   such a forum and that, as Gary mentioned in his -- Dr. Peters

16   mentioned in his e-mail, that he would get his chance at SLT.

17   That's where those ROCKET 2 discussions, given a decision has

18   already been made, would be taking place.

19   Q. You're saying to the jury about this e-mail that the reason

20   ROCKET 2 wasn't on the agenda was because it was distracting to the

21   team, right, that's what you're saying now, but it doesn't say that

22   in this e-mail, correct; it's not what you wrote?

23   A. It's not what I wrote, but it's more important that this

24   decision had already been made by our R&D team, and it wasn't part

25   of the conversation of the LCM meeting that we were going to be

 1   having with Bayer.

 2   Q. And you didn't want it to be part of it because, from your

 3   perspective, as you state here, it "would not support doing a

 4   ROCKET 2 study and unwinding everything we invested and are

 5   actively selling today"; that's what you wrote, correct?

 6   A. It is.

 7   Q. You also write, it would say to the market that the competition

 8   is right, we are a BID drug.  BID means what?

 9   A. Twice a day.

10   Q. All right.  And we saw a little bit earlier that one of the

11   strategic imperatives for looking at what studies to do, what

12   additional studies to do in Xarelto, was to maintain your

13   once-a-day dosing, correct?  We saw that in the JC meeting minutes,

14   correct?

15   A. Correct, but as a marketer, I wouldn't have the decision-making

16   power to weigh in on what studies we do or don't do and what doses

17   we study and don't study.

18   Q. But at the time that you're weighing in on this e-mail to not do

19   or consider the ROCKET 2 study, you are vice president of

20   marketing, correct?

21   A. I am.  I am one -- I am adding my opinion, and I think I kind of

22   phrased that at the beginning, "a few comments from my end to

23   consider."  Keep in mind decision-making meetings about these

24   matters are managed with a different committee of which I am not a

25   part of.

1    Q. You are a vice president of marketing giving your opinion in

2    this e-mail as to whether or not you would support the company

3    doing a ROCKET 2 trial?

4    A. As a marketer, I am weighing in saying that our R&D colleagues

5    have said that our dose for -- our once daily dosing that was

6    studied in the ROCKET trial was definitively addressed, safety and

7    efficacy, was approved by the FDA with no post approval commitments

8    to make any -- to do any other studies or looking at any other

9    doses.

10   Q. And you continue here, do you not, and you write "would kill us

11   in the market today," correct?

12   A. Correct.

13   Q. So this concern that you're now articulating to the jury about

14   what this e-mail says about patients stopping taking their medicine

15   and creating doubt in patients, that doesn't appear anywhere in

16   this e-mail, does it?

17   A. No, but I think the context here is I am a marketer, I don't get

18   to decide on what studies we do and what doses we select.  That is

19   not an area of decision-making that I would have impact in or a

20   decision-making role in.

21   Q. And were you of the opinion at this point in time that a ROCKET

22   2 study would unwind 124:5 everything that the company invested in

23   and were actively selling at this point in time?

24   A. It was my opinion as a marketer that we had an approved dose,

25   approved by the FDA that had definitive results that could actually

1    potentially save people's lives, and we had the full license to

2    move forward in bringing that value to patients.

3            Despite Dr. Califf, the scientist that ran the ROCKET

4    study telling you and other high level scientists that it was the

5    right thing to do, a ROCKET booster study or a ROCKET 2 study or a

6    study looking at different doses of Xarelto or different dosing

7    regimens other than once a day and 20 milligrams has never been

8    done to this day, correct?

9    A. We have not done that study.

10   Q. Are there any plans to do that study?

11   A. Not that I'm aware.

12   Q. Okay.  Are there any plans for Bayer to do that study?

13   A. Not that I'm aware.

14   Q. Is it that type of a study, to your knowledge, completely off

15   the agenda at this point?

16   A. I think our scientists are always open to exploring new

17   information, but I'm not aware it's a topic of conversation.  I

18   think Dr. DiBattiste would be the best person to ask.

19   Q. I'm going to hand you what is marked Plaintiff's Exhibit 11.  Do

20   you see this is an e-mail chain that you're included on dated

21   December 12th, 2013?

22   A. I see.

23   Q. This is Record Number 257-9936, Bates Numbers

24   XARELTO_JANSSEN_12325928, and it looks to me as if this is meeting

25   notes that Rudy Sharan provided you from the subject GDC.  Do you

1  see that?

2  A. I do.

3  Q. And tell us again what GDC is?

4  A. Global Development Committee.

5  Q. And do you see -- and this is written to you and copied to

6  Mr. Moye; is that right?

7  A. Yes.

8  Q. And do you see Number 6, can you tell the jury what the title of

9  Number 6 is?

10  A. "ROCKET 2."

11  Q. And that's the same thing we talked about earlier that was taken

12  off the table, as far as you know, back in 2011, right?

13  A. I do, yes.

14  Q. And this is December of 2013, correct?

15  A. Correct.

16  Q. And this says "ROCKET 2 - more needs to be discussed," correct?

17  A. Correct.

18  Q. Do you recall that, that in December of 2013 the GDC had a

19  meeting and it was determined that more needed to be discussed

20  about ROCKET 2?

21  A. I'm generally aware, but it wasn't on my radar screen.

22  Q. And then Rudy goes on to say, "big concerns raised specially

23  regulatory."  Do you see that?

24  A. Yes.

25  Q. Do you recall what big concerns were raised in relation to

1    regulatory?

2    A. I do not.

3    Q. Do you see it goes on to say, "if we move forward with a low

4    dose trial - puts into question the 20mg dose."  Do you see that?

5    A. Yes.

6    Q. Do you understand -- what do you understand that to mean?

7    A. That we would be taking -- I read that to mean that we'd be

8    taking or that the discussions could have been that we would take

9    the 15-milligram once daily into a trial.

10   Q. And if you did that, that may put the 20-milligram dose into

11   question, correct?

12   A. I believe that's what Rudy is saying here.

13   Q. Do you recall that being the case, that 15-milligram dose had

14   been kicked around by you or other people in the marketing team?

15   A. I do know that -- no, not by the marketing team, by the --

16   during the course of discussion around ROCKET 2, I do believe that

17   the once daily 15-milligram dose for normal renal patients was one

18   of the topics.

19   Q. And, in fact, that would be in line with Dr. Califf's opinion

20   that the dose may be too high at 20 milligrams a day, right?

21   A. It was one of the regimens relative that he had on his sheet

22   from the prior documents, one being the standard dose that was

23   approved, and then it looks like two regimens of BID dosing of

24   different doses as well as the 15-milligram once daily.

25   Q. But that project, I understood you to tell us, had been taken

1   off the table prior to January 10th, 2012?

2   A. That's right.

3   Q. This e-mail is from a meeting that happened with the company in

4   December of 2013?

5   A. Right.

6   Q. Well, if commercial's opinion is irrelevant, why would he even

7   have the option to advocate at a meeting that you do that -- that

8   the company do that trial?

9   A. At Janssen we have a very team based structure, all parts of the

10  organization are permitted to share their opinion, but when it

11  comes to decision-making, we each have our swim lanes, and swim

12  lanes associated with our clinical trials, dosing that we choose,

13  those types of things would not be something that the marketing

14  team would be a decision-maker on.

15  Q. This is an e-mail, and this is again Document Number 256-4466,

16  Bates Number 186:14 XARELTO_JANSSEN_12288446.  This is an e-mail

17  from you to Calvin Schmidt, copied Michael Moye, correct?

18  A. Yes.

19  Q. And it's dated February 24th, 2014, right?

20  A. Yes.

21  Q. And it's about a month and a half after the last document we

22  reviewed, right?

23  A. Mm-hmm.

24  Q. And it's called MARS background.  Do you see that?

25  A. Yes.

1    Q. And it has an attachment called MARS_LCM.pptx, right?

2    A. Yes.

3    Q. Okay.  And so if we look at the actual attachment, the

4    PowerPoint presentation, which is Bates Number

5    XARELTO_JANSSEN_12288447, we see it's a MARS background dated

6    February 24th, 2014, right?

7    A. Mm-hmm.

8    Q. MARS is an acronym that you use at your company, correct?

9    A. It was a acronym for the next wave of indications that we were

10   going to put forward to do.

11   Q. MARS stands for major activities to raise sales, correct?

12   A. Sounds familiar.  I think it was a Bayer acronym that was

13   utilized.

14   Q. The decision has now been made yet again not to do the ROCKET 2

15   study, right?

16   A. That's right.

17   Q. And if we look as to why the bullet points -- the bullet point

18   next to it says, first of all, considerable downside, let's go down

19   one, correct?

20   A. Yes.

21   Q. One of the considerable downsides would be that the 20-milligram

22   dose could be shown to be too high, correct, if you did that trial?

23   A. Yes.  I'm not sure of what the clinical trial determinations

24   would have been, but it could have been -- that could be in the

25   range of possibility.

1  Q. One of the considerable downsides could be that the once-a-day

2  dose could be shown to be less safe or less effective than a twice

3  a day dose, correct?

4  A. It could have been.

5  Q. Ms. Torr, I want to go through a little bit of your personal

6  history.

7  A. Sure.

8  Q. Where were you born?

9  A. Pensacola, Florida.

10  Q. And can you tell me what your life was like growing up, your

11  parents, siblings, what your interests were?

12  A. Sure.  My dad worked for Ford as part of their finance group,

13  and so we were -- every two years we were kind of in a new spot

14  back and forth in and out of Detroit over the years, eventually

15  landing in outside of Philadelphia, and I spent most of my school

16  age in the suburbs of Philadelphia.

17  Q. What were your interests in high school?

18  A. High school, first I had two older brothers and a younger

19  sister, so there's four of us.

20         My dad played for Michigan State, so football was a big

21  195:17 proponent of our household, but sports in general were a big

22  part of our family life.  High school, played field hockey,

23  basketball, softball and sometimes track.

24  Q. And where did you go to college?

25  A. East Carolina University, North Carolina.

1   Q. And what was your major?

2   A. Public health education.

3   Q. And you managed to go to college there and have been born in

4   Florida and yet not have a southern drawl?

5   A. Yes.

6   Q. When you graduated college, what were your plans, what did you

7   want to do?

8   A. Initially, I wanted to -- I knew since I was in sixth grade that

9   I wanted to be in the healthcare industry so --

10  Q. Let me interrupt you, and I would have jumped down my

11  adversary's throats if they interrupted you, but let me just ask

12  you why?

13  196:13 A. You know, as part of the sports background, I had a

14  couple of times where I had some major injuries and had to see

15  various orthopedic physicians and go through some rehab, and I

16  thought that was a great profession, and it really kind of clued me

17  in at least the healthcare at that point, went on to college

18  thinking on various kind of healthcare related studies and ended up

19  in community public health studying epidemiology and incidents of

20  population health challenges.

21  Q. And that was after college or during college?

22  A. College, that was what I studied at college.

23  Q. And as you graduated college, what were your career plans?

24  A. My first career plan was really to assess whether or not I was

25  going to go on to medical school or I was going to go on to

1  business school.  So I took a job with one of my roommates in

2  college in Florida and worked at a cardiac pulmonary rehab center,

3  really kind of a step down unit for patients who were having CT

4  surgery, and from there I came back to the Philadelphia area,

5  worked at the Medical College of Pennsylvania for the department of

6  anesthesiology and CT surgery as a clinical research assistant.  So

7  I kind of got close to determine whether or not I was going to go

8  to medical school or take the business school route, ended up

9  during that couple year experience decided to go on to business

10  school.

11  Q. And how did you first decide to apply for a job in the

12  pharmaceutical industry?

13  A. I think it was an extension of my role as a clinical research

14  assistant at the Medical College of Pennsylvania.  Part of my job

15  responsibilities there were to -- to identify patients for various

16  clinical trials that the departments had ongoing and make sure that

17  those patients were cared for accordingly to the protocol, both we

18  looked at different pharmaceutical products, as well as different

19  devices that the hospital was undertaking.

20  Q. To get a little personal, can you tell me about your family.

21  A. Sure.  My -- both my parents are currently deceased.  My mom,

22  she was a homemaker.

23         Prior to being a homemaker, she worked in the ad industry

24  before having children.  She -- happy homemaker, about the age of

25  56, she developed melanoma and subsequently passed away right as I

```
 1    was graduating college, right in that time frame.  My father, he
 2    also came -- unfortunately, he had lung cancer, probably about
 3    eight years later after my mom, my dad died, but his death was
 4    actually a PE related to a cancer associated thrombosis.
 5    Q. And your present family?
 6    A. Present family I have -- married with two children, a nine year
 7    old and a seven year old, a fourth grader and a second grader.
 8    Q. Could you tell the jury from a marketing perspective, what
 9    potential benefit once-a-day dosing has compared to medication that
10    might have to be taken two or even three times a day?
11    A. So we know that from decades of cardiovascular medicine, that
12    once daily medicines, patients are more adherent to than BID
13    medicines, and BID medicines patients are more adherent than three
14    times a day medicines, and that's really important because if
15    adherence is tied to outcomes and we want to make sure that people
16    are taking their medicine as directed, so it's really important.
17    Q. So adherence means does somebody take their medication as
18    prescribed?
19    A. Yes.
20    Q. And BID is?
21    A. Two times a day.
22    Q. And then TID would be?
23    A. Three times a day.
24    Q. And if I understand you correctly, the data you're talking about
25    demonstrates that patients are more adherent to take their
```

1    medication as prescribed more often if it's a one-time-a-day

2    medication?

3    A. That's correct.

4    Q. Is there any recent data or studies that you're aware of

5    addressing this topic?

6    A. Yes, I'm aware -- I'm aware of some recent data where some

7    thought leaders in Canada looked at the use of MOAC in particular

8    and looked at once daily anticoagulants versus BID anticoagulants

9    and found that the once daily anticoagulants, that being Xarelto

10   and warfarin, that patients were more statistically significant

11   more adherent with the once daily medicines versus the twice-a-day

12   medicines.

13   Q. The once daily medicines which would be?

14   A. Once a day medicines would be warfarin and Xarelto.  BID would

15   be Pradaxa and Eliquis.

16              Importantly, also for the finding of this result was also

17   that, is interestingly, one in every three apixaban patients took

18   their dose only once a day, even though the drug is prescribed

19   twice a day.

20   Q You can find Exhibit 8, if you will.  It will go up on the board

21   and you can watch it that way.

22   A. Yes.

23   Q. While it's being located and put on the board, the references

24   you were questioned by Mr. Childers this afternoon briefly about

25   whether the original information from Dr. Califf to do a ROCKET 2

1    study involved a head-to-head with apixaban or was a dose related

2    study.  So if you look at Number 4, and in particular, this is a

3    memo from Gary Peters to a bunch of people.  In the center of

4    Number 4 it said, "Rob Califf is supposed to be sending us a

5    proposal for such a study.  Basis for this is that he says that

6    comparative studies vs apixaban will be done and since likely we

7    will not fare optimally with our current dosing regimen we need to

8    explore others."

9           Was it your understanding at this time that Dr. Califf

10   had not made a specific proposal as to what type of study he was

11   suggesting should be done?

12   A. That's correct.

13   Q. And at least from the context of this, it seems like a

14   head-to-head study was a possibility as was a dosing study.  Is

15   that a fair reading of this?

16   A. That's my understanding.

17   Q. And the date of this is January 10th, 2012, and if we then go to

18   some e-mails that you wrote which were in Exhibit 10 if that could

19   be put up, I'd appreciate it.

20          So you're responding to information that you're getting

21   from Gary Peters and others about should we do a ROCKET 2, and the

22   date on this, if it's up in the top under sent, is January 10th,

23   2012.  If we also look very briefly at Exhibit 5 and 6, which I

24   believe is the proposal that was made by Dr. Califf.

25   Q. Dr. Califf's proposal, which is Number 6, relates to this e-mail

1   which was March 1 of 2012; is that correct?

2   A. Yes.

3   Q. Okay.  So you were questioned a lot about your e-mail of January

4   10, 2012, that would be almost three months before Dr. Califf made

5   his proposal for ROCKET 2; is that correct?

6   A. That's correct.

7               MR. CHILDERS:  Two months.

8               MR. COVEY:  Sorry, two months.

9               MR. CHILDERS:  Two months.

10              MR. COVEY:  Sorry, I'll accept that.

11              THE WITNESS:  March.

12              MR. COVEY:  I was doing three minus one is three and I'm

13  not quite sure how I got there.

14  BY MR. COVEY:

15  Q. My question is about your e-mail came about two months before

16  anybody had seen Dr. Califf's proposal; is that fair?

17  A. That's fair.

18  Q. And it was your understanding back in January of 2012 that

19  research and development, Dr. DiBattiste had decided they were not

20  going forward with any further ROCKET studies; is that correct?

21  A. That's correct.

22  Q. Now, who would be the people at Janssen who would evaluate a

23  proposal from somebody like Dr. Califf who had been an investigator

24  for ROCKET 1 when and if such a proposal was made to do a further

25  ROCKET study?

1   A. Primarily that would be Dr. DiBattiste and probably members of

2   his direct leadership team.

3   Q. And do you recall whether, in fact, you ever even saw

4   Dr. Califf's specific proposal in Exhibit 6?

5   A. I believe I -- as I know here today, that I received an e-mail

6   copy of it in March.

7   Q. Okay.  Now, you were then questioned, I believe again it's by

8   Mr. Childers, about Rudy Sharan and a time frame of December 2013,

9   and let me get the precise exhibits there, so we can get one of

10  them put up there.  If you would, Exhibit Number 11.

11          So people on the jury can see that when Rudy Sharan was

12  raising a question about ROCKET 2 from a commercial point of view,

13  this was at the end of 2013, correct?

14  A. Correct.

15  Q. Now, are you aware, were you aware of any information from a

16  safety or efficacy point of view that raised any questions or

17  concerns about whether the 20 milligram dose for afib was working

18  and appropriate?

19  A. No, I'm not aware of any safety or efficacy data that would that

20  would put back questions or would cause the research and

21  development committee to do anything differently or weigh in

22  differently.

23  Q. Based upon your reading of Mr. Sharan's e-mails that were shown

24  to you today and your recollection of the time, were there -- was

25  there safety or efficacy concerns in December of 2013 that

1    Mr. Sharan or anybody was concerned about with respect to the

2    dosage of Xarelto for afib?

3    A. No.

4    Q. From the time that FDA approved marketing of Xarelto for afib

5    until December of 2013 were you aware of any requests or

6    information or concerns from FDA that the dose for afib was not a

7    safe and effective dose?

8              From the time after March or April of 2012, when

9    Dr. Califf made his formal study proposal, were you aware in your

10   role of any further communications from Dr. Califf suggesting that

11   another ROCKET dosing study needed to be done?

12   A. No.

13   Q. From December of 2013 to the present has Dr. Califf, to your

14   knowledge, suggested that the company needs to do another dosing

15   study for afib?

16   A. No.

17   Q. Has the FDA suggested to the company up to the present time that

18   it needs to do another dosing study for afib?

19   A. No.

20   Q. And as a -- research and development, based upon your knowledge

21   of them if someone with the credentials of a Dr. Califf makes a

22   suggestion for a on a marketed drug or drug that's in development,

23   is that something that you would expect research and development to

24   evaluate and take seriously?

25   A. Yes, I would believe that to be the case.

13:57:53   1     (WHEREUPON, THE VIDEO DEPOSITION OF PATRICIA TORR WAS

13:57:53   2     CONCLUDED.)MR. BARR:  Your Honor, that concludes it, your

13:57:55   3     Honor.

13:57:55   4       THE COURT:  Okay.  Members of the jury, that concludes

13:57:58   5 our presentation today.  Hopefully tomorrow we'll finish

13:58:04   6 plaintiff's case and then on Monday we'll start defendant's case.

13:58:11   7       Tomorrow is going to be sort of a full day, it would be

13:58:14   8 helpful if we could start at 8:30 if you can be there.  I know it

13:58:17   9 may be difficult for some of you all, but let's try to start at

13:58:21 10 8:30 tomorrow.  Okay.  The court will stand in recess.

13:58:24 11       THE MARSHAL:  All rise.

13:58:24 12       MS. WILKINSON:  Your Honor, may we have one sidebar

13:58:24 13 before the jury goes?

13:58:43 14       THE COURT:  Sure.

13:58:43 15     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

13:58:52 16       MS. WILKINSON:  Yes, your Honor, when we were listening

13:58:54 17 to the deposition this is morning, there was testimony about the

13:58:57 18 lack of an anti- or reversal agent and it's our understanding that

13:59:02 19 plaintiffs have dropped the design defect claim which is where that

13:59:06 20 ended or reversal would go to.  So we would ask you to give some

13:59:10 21 limiting instruction to the jury.

13:59:12 22       We could do it tomorrow morning, I just wanted to make

13:59:14 23 sure if you were going to do it we would have a jury here because

13:59:17 24 we haven't been able to address that and it's not really a claim

13:59:21 25 related to warning or claim or issue related to the design defect.

13:59:25  1          THE COURT:  What's the other side?

13:59:27  2          MR. MEUNIER:  Whatever instructions you give at the end

13:59:29  3   of the case it will be clear what the plaintiff's theory is and the

13:59:34  4   jury can give whatever weight to what they've heard, you can decide

13:59:38  5   there's no design defect claim at the end but there is no reason to

13:59:42  6   do it now.

13:59:43  7          MS. WILKINSON:  Can I respond?  And you guys are tag

13:59:46  8   teaming?

13:59:47  9          MR. BIRCHFIELD:  Go ahead.

13:59:49 10          MS. WILKINSON:  But they don't understand that an

13:59:51 11   antidote or reversal agent is related to a design defect, they're

13:59:57 12   not lawyers, they just have heard something that inferred was

14:00:01 13   missing.  So I don't know how they would, unless there was a more

14:00:04 14   specific instruction which we could propose a specific instruction,

14:00:07 15   your Honor.  But I don't know how regular people would even know

14:00:11 16   that that's related to a design defect claim versus a failure to

14:00:14 17   warn.

14:00:15 18          MR. BIRCHFIELD:  It's all tied together.

14:00:17 19          MR. MEUNIER:  Your Honor, the fact that there is no

14:00:20 20   reversal, the fact once daily, twice daily, much more extreme

14:00:26 21   curve.  It's more important they design for the safety for the

14:00:30 22   test.

14:00:30 23          THE COURT:  One problem that I've had with some of this,

14:00:34 24   while it's true that there are certain things that are at issue,

14:00:37 25   certain things that are not at issue, there's also credibility

14:00:41 1    cogent in some of these things and it's hard for me to dissect that

14:00:47 2    and say don't consider this if you're considering it for just

14:00:53 3    another reason.

14:00:55 4              MS. WILKINSON:  Can I -- I'm sorry.

14:00:57 5              THE COURT:  Go ahead.

14:00:58 6              MS. WILKINSON:  What I would add there is normally expert

14:01:01 7    testimony issue because they are complicated.  So they haven't

14:01:04 8    presented any expert testimony on reversal and antidote and

14:01:09 9    reversal because it's unfair attack on credibility if something

14:01:13 10   they don't understand is missing I think they would have an

14:01:16 11   obligation to present expert testimony.  These are not things that

14:01:19 12   are understandable to the normal juror and so they're reading too

14:01:23 13   much into it that there's something misting but nobody has been

14:01:28 14   able to explain what these things mean.

14:01:30 15             MR. MEUNIER:  Your Honor, this is precisely what we asked

14:01:32 16   you to do with respect to the strike to the label to step in, make

14:01:35 17   a comment on the weight of that evidence and you chose not to.  To

14:01:39 18   be consistent, no reason for you to step in right now and address

14:01:42 19   the weight or the pertinence or relevance of what the jury is

14:01:46 20   hearing at end of the day there will be charges given on all

14:01:49 21   evidence.

14:01:50 22             THE COURT:  I think both sides will have an opportunity

14:01:52 23   to argue the situation, we will have to do it that like.  I'll be

14:01:56 24   as specific as I can with the jury charges and take that into

14:02:01 25   consideration.  I am not going to give special charge.

14:02:04  1          MS. WILKINSON:  And we can propose a new charge of

14:02:07  2  course?

14:02:07  3          THE COURT:  Yes.

14:02:08  4          MR. MEUNIER:  Thank you, Judge.  I need a few minutes on

14:02:10  5  the record or I can do it up here.

14:02:11  6          THE COURT:  Let's do it here.

14:02:14  7          MR. BARR:  Are we going to let the jury go?

14:02:17  8          MR. MEUNIER:  It doesn't require the jury being here.

14:02:19  9          MR. BARR:  We are ready to move in the Berkowitz, not

14:02:23 10  Geiger, somehow, but the Berkowitz and Spiro exhibits.  I don't

14:02:27 11  know if you want to do that in front of the jury.

14:02:29 12          MR. MEUNIER:   Let's discharge the jury and do that on

14:02:32 13  the record.

14:02:32 14          THE COURT:  Are you okay with that?

14:02:33 15          MS. WILKINSON:  Yes, of course.

14:02:42 16          Members of the jury, we'll take a break -- I mean, we'll

14:02:46 17  be discharged at this time and I'll see you all tomorrow at 8:30.

14:02:49 18          THE MARSHAL:  All rise.

14:02:50 19          THE DEPUTY CLERK:  All rise.

14:02:51 20          THE COURT:  Again, don't talk to anybody about the case

14:02:54 21  or look at television or whatever it is about this case.  Thank you

14:02:57 22  very much.

14:03:17 23      (WHEREUPON, THE JURY EXITED THE COURTROOM.)

14:03:17 24          THE COURT:  Be seated.

14:03:21 25          MR. MEUNIER:  May it please the Court, during

948

14:03:25  1   cross-examination of the plaintiff's expert Dr. David Kessler this

14:03:28  2   past Tuesday April 25th, he was questioned about a letter dated

14:03:33  3   April 6, 2004 from a certain official at the University of

14:03:38  4   California.  And consistent with prior rulings and agreements in

14:03:42  5   the case, that letter was designated to be confidential and not to

14:03:46  6   be published, although it was used for that questioning.

14:03:50  7          And that letter remains confidential not to be publish,

14:03:52  8   and I'll acknowledge that defense counsel was returned the letter

14:03:56  9   to us with that understanding.  But to be consistent with all of

14:03:59 10   that, your Honor, we would respectfully move that the testimony of

14:04:02 11   Dr. Kessler in connection with that letter likewise be deemed

14:04:08 12   confidential and, therefore, sealed and placed under seal in this

14:04:11 13   record.  And that testimony occurred at page 35 line 19, through

14:04:17 14   page 360 line 22 of the April 25th, 2017 trial transcript of these

14:04:25 15   proceedings, and we would so move.

14:04:26 16          THE COURT:  Okay.  Anybody oppose that?

14:04:29 17          MR. DUKES:  Your Honor, I understand that to be

14:04:30 18   consistent with your ruling.

14:04:32 19          THE COURT:  Okay.  I agree there are certain personal

14:04:37 20   information I felt the jury should know, but from the standpoint of

14:04:40 21   the personal information dealing with outside of that, outside of

14:04:45 22   this case or outside of this type of litigation, I felt it was

14:04:50 23   confidential so I'll put it under seal.

14:04:53 24          MR. MEUNIER:  Let me correct something.  I may have given

14:04:55 25   the wrong page number, it's page 355, line 19 through page 360,

OFFICIAL TRANSCRIPT

14:05:01  1   line 22 of the April 25th, 2017, transcript.

14:05:05  2            THE WITNESS:  Okay.  All right.  Let's keep that under

14:05:08  3   seal.

14:05:08  4            All right.  I will see you all tomorrow.  Let's see.

14:05:11  5   Maybe I should see you about 8:15 tomorrow and talk about any

14:05:15  6   logistics that we have.

14:05:19  7            The Court will stand in recess.

14:05:21  8            MR. BARR:  Your Honor, if it's all right to keep the

14:05:24  9   record open and move these in?  I don't think there's an objection,

14:05:26  10  I think it's been worked out.

14:05:27  11           MS. WILKINSON:  That's fine, if he is just going to read

14:05:30  12  it into the record.

14:05:31  13           MR. BARR:  We don't need you for that.  We would love to

14:05:34  14  have you, but...

14:05:35  15           THE COURT:  That's all right.

14:07:04  16           THE DEPUTY CLERK:  These are various dates as well?

14:07:13  17  That's not the most important part, but.

14:07:18  18           MR. GEISMER:  And these are going on the list that we're

14:07:23  19  keeping for you, too, and get that updated.

14:07:37  20           Plaintiffs so move the following exhibits from the

14:07:42  21  Berkowitz deposition that was played before the jury.  Plaintiff's

14:07:48  22  move the following exhibits into evidence beginning with:

14:07:53  23           Plaintiff's Exhibit 21, record number 1070527.

14:08:09  24           Plaintiff's move Exhibit 22 into evidence, which is

14:08:16  25  record number 1070529.

14:08:23  1          Plaintiff's move Exhibit 23 into evidence, which is
14:08:28  2    record number 1075492.

14:08:34  3          Plaintiff's move Exhibit 24 into evidence, which is
14:08:40  4    1094747.

14:08:44  5          Plaintiff's move Exhibit No. 25 into evidence, which is
14:08:49  6    1094903.

14:08:54  7          Plaintiff's move Exhibit 26 into evidence 10979767.

14:09:31  8          Plaintiff's move Exhibit 27 into evidence 177639.

14:09:37  9          Plaintiff's move Exhibit 28 into evidence, 2905274.

14:09:50  10         Plaintiff's move Exhibit 29 into evidence, 3083260.

14:10:00  11         Plaintiff's move 30 into evidence, 3261528.

14:10:33  12         Plaintiff's move Exhibit 31 into evidence, 3388635.

14:10:41  13         Plaintiff's move 32 into evidence, Exhibit 32 into
14:10:46  14    evidence, 3668403.

14:10:51  15         Plaintiff's move Exhibit 33 into evidence 3668404.

14:11:00  16         Plaintiff's move Exhibit 34 into evidence, 3673723.

14:11:11  17         Plaintiff's move Exhibit 35 into evidence, 372322.

14:11:27  18         Plaintiff's move Exhibit 36 into evidence, 5767482.

14:11:51  19         Plaintiff's move Exhibit 37 into evidence, No. 80333 --
14:12:19  20    so plaintiff's withdraw 80333 as Exhibit 37.

14:13:53  21         THE DEPUTY CLERK:  This is for Spiro deposition.

14:13:59  22         MR. GEISMER:  Plaintiff's move the following exhibits
14:14:01  23    into evidence that appeared in the Spiro deposition played before
14:14:06  24    the jury.

14:14:08  25         Plaintiff's move Exhibit 38 into evidence which is

14:14:12  1    1097767 -- I'm sorry, this may be plaintiff's correct the last

14:14:41  2    exhibit, it should be moved in as Plaintiff's 37, which is 1097767.

14:14:53  3              Plaintiff's move Exhibit 38 into evidence, which is

14:14:57  4    1145884.

14:15:02  5              Plaintiff's move Exhibit 39 into evidence, which is

14:15:06  6    1145885.

14:15:12  7              Plaintiff's move Exhibit 40 into evidence, which is

14:15:15  8    1145886.

14:15:20  9              Plaintiff's move Exhibit 41 into evidence, which is

14:15:23 10    1158771.

14:15:27 11              Plaintiff's move Exhibit 42 into evidence, which is

14:15:32 12    1160578.

14:15:39 13              Plaintiff's move Exhibit 43 into evidence, which is

14:15:43 14    1160715.

14:15:50 15              Plaintiff's Exhibit 44 into evidence, which is 1690921.

14:15:59 16              Plaintiff's move Exhibit 45 into evidence which is

14:16:02 17    169945 -- I'm going to make a correction to that.  Plaintiff's move

14:16:24 18    Exhibit 45 into evidence as 1699945.

14:16:36 19              Plaintiff's move Exhibit 46 into evidence, which is

14:16:41 20    1701567.

14:16:53 21              Plaintiff's move Exhibit 46 into evidence, which is

14:16:56 22    411373.

14:17:00 23              Plaintiff's move Exhibit 47 --

14:17:00 24              THE DEPUTY CLERK:  Two 46s?

14:17:06 25              MR. GEISMER:  Plaintiff's make a correction, Plaintiff's

| | | |
|---|---|---|
| 14:17:49 | 1 | move into evidence Exhibit 47, which is 411373. |
| 14:17:55 | 2 | Plaintiff's move Exhibit 48 into evidence, which is |
| 14:18:06 | 3 | 417291. |
| 14:18:09 | 4 | Plaintiff's move Exhibit 49 into evidence, which is |
| 14:18:12 | 5 | 449266. |
| 14:18:15 | 6 | Plaintiff's move Exhibit 50 into evidence, which is |
| 14:18:22 | 7 | 932284. |
| 14:18:24 | 8 | Plaintiff's move Exhibit 51 into evidence, 5767380. |
| 14:18:52 | 9 | Plaintiff's make a correction and move Exhibit 51 into evidence as |
| 14:18:59 | 10 | 5767380. |
| 14:19:11 | 11 | That's it.  Thank you. |
| 14:19:15 | 12 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.) |

14          * * * * * *

16          REPORTER'S CERTIFICATE

18          I, Karen A. Ibos, CCR, Official Court Reporter, United
States District Court, Eastern District of Louisiana, do hereby
19     certify that the foregoing is a true and correct transcript, to the
best of my ability and understanding, from the record of the
proceedings in the above-entitled and numbered matter.

21                    /s/ Karen A. Ibos
                 _____
                 Karen A. Ibos, CCR, RPR, CRR, RMR
22               Official Court Reporter

OFFICIAL TRANSCRIPT