09:12:03

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          Docket No. 14-MD-2592
                                       Section "L"
                                       New Orleans, Louisiana
THIS DOCUMENT RELATES TO:              Friday, April 28, 2017
Joseph J. Boudreaux, Jr.
v. Janssen Research &
Development, et. al.,
Case No. 14-CV-2720

*********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
                       UNITED STATES DISTRICT JUDGE
                       VOLUME V - MORNING SESSION


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:                    LEVIN PAPANTONIO
                                    BRIAN H. BARR, ESQ.
                                    316 Baylen Street, Suite 600
                                    Pensacola, FL 32502

                                    BEASLEY ALLEN
                                    BY:  ANDY BIRCHFIELD, ESQ.
                                    P.O. Box 4160
                                    Montgomery, AL 36103

                                    GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
                                    BY:  GERALD E. MEUNIER, ESQ.
                                    2800 Energy Centre
                                    1100 Poydras Street
                                    New Orleans, LA 70163

                                    SCHLICHTER, BOGARD & DENTON
                                    BY:  ROGER C. DENTON, ESQ.
                                    100 South 4th Street
                                    Saint Louis, MO 63102

```
 1                                    LAMBERT FIRM
                                      BY:  EMILY JEFFCOTT, ESQ.
 2                                    701 Magazine Street
                                      New Orleans, Louisiana 70130
 3

 4      FOR THE DEFENDANT BAYER
        HEALTHCARE PHARMACEUTICALS
 5      INC. and BAYER PHARMA AG:     WILKINSON WALSH & ESKOVITZ, LLP
                                      BY:  BETH A. WILKINSON, ESQ.
 6                                    1900 M Street NW, Suite 800
                                      Washington, DC 20036
 7
                                      NELSON MULLINS RILEY
 8                                    & SCARBOROUGH, LLP
                                      BY:  DAVID E. DUKES, ESQ.
 9                                    Meridian, 17th Floor
                                      1320 Main Street
10                                    Columbia, SC 29201

11
        FOR JANSSEN PHARMACEUTICALS,
12      INC. AND JANSSEN RESEARCH &
        DEVELOPMENT, LLC:             BARRASSO USDIN KUPPERMAN FREEMAN
13                                    & SARVER, LLC
                                      BY:  RICHARD E. SARVER, ESQ.
14                                    909 Poydras Street, 24th Floor
                                      New Orleans, LA 70112
15

16
        Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
17                                    500 Poydras Street, B-275
                                      New Orleans, Louisiana 70130
18                                    (504) 589-7776

19
           Proceedings recorded by mechanical stenography, transcript
20      produced by computer.

21

22

23

24

25
```

1

2                                      I N D E X

3

4

5     WITNESSES FOR THE PLAINTIFF:                           PAGE/LINE:

6

7

8     DR. KENNETH WONG

9

10       Direct Examination by Mr. Birchfield              956/22

11       Cross-Examination by Ms. Wilkinson               979/18

12       Redirect Examination by Mr. Birchfield           994/13

13

14

15    DR. PETER FAIL

16

17       Direct Examination by Mr. Birchfield             1000/23

18       Cross-Examination by Mr. Sarver                  1027/21

19       Redirect Examination by Mr. Birchfield           1058/23

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>.

(FRIDAY, APRIL 28, 2017)

(MORNING SESSION)

08:28:33  (OPEN COURT.)

08:28:33      THE MARSHAL:  All rise.

08:29:28  (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

08:29:28      THE COURT:  Be seated, please.  Good morning, ladies and

08:29:32  gentlemen.  Call your first witness, please.

08:29:34      MR. BIRCHFIELD:  Good morning, your Honor.  At this time

08:29:36  we would call Dr. Kenneth Wong.

08:29:39      THE COURT:  Marshal, would you -- come forward, Dr. Wong,

08:29:44  please.

08:29:55      THE DEPUTY CLERK:  Would you raise your right hand,

08:29:57  please.

08:29:57  (WHEREUPON, KENNETH E. WONG, WAS SWORN IN AND TESTIFIED AS

08:30:02      FOLLOWS:)

08:30:02      THE DEPUTY CLERK:  Please have a seat, Doctor, and state

08:30:04  and spell your name for the record.

08:30:07      THE WITNESS:  Name is Kenneth Edward Wong.

08:30:11                  DIRECT EXAMINATION

08:30:12  BY MR. BIRCHFIELD:

08:30:13  Q.  Would you spell your last name?

08:30:16  A.  W-O-N-G.

08:30:17  Q.  Good morning, Dr. Wong.  Would you tell the jury what type of

08:30:25  1  doctor you are and where you're currently employed?

08:30:28  2  A.  I am a cardiologist, and I take care of patients with heart

08:30:33  3  disease and the prevention and treatment generally.

08:30:37  4  Q.  And where are you employed?

08:30:39  5  A.  I was born?

08:30:40  6  Q.  No, where are you employed?

08:30:43  7  A.  Oh.  I am employed with Cardiovascular Institute of the South

08:30:48  8  and I go to Thibodaux Regional Medical Center and St. Anne

08:30:53  9  Hospital.

08:30:53 10  Q.  Dr. Wong, I am Andy Birchfield and we met at your deposition

08:30:59 11  last July; is that correct?

08:31:00 12  A.  Correct.

08:31:00 13  Q.  And you understand that I represent Mr. Joseph -- Johnny

08:31:07 14  Boudreaux and Mrs. Loretta Boudreaux, you understand that?

08:31:09 15  A.  Yes.

08:31:10 16  Q.  And we also met back in February along with an attorney for

08:31:17 17  Cardiovascular Institute of the South; is that right?

08:31:19 18  A.  Yes.

08:31:20 19  Q.  And we discussed Mr. Boudreaux's care and we discussed Xarelto;

08:31:26 20  is that right?

08:31:27 21  A.  Yes.

08:31:27 22  Q.  Dr. Wong, you've never seen any internal confidential Bayer or

08:31:34 23  Janssen documents related to Xarelto, have you?

08:31:35 24  A.  No.

08:31:36 25  Q.  And you understand that the Boudreauxes are not making any

08:31:41  1    claims against you in this lawsuit, you understand that?

08:31:45  2    A.  Yes.

08:31:45  3    Q.  In fact, Mr. Boudreaux continues to be a patient of CIS; is

08:31:53  4    that correct?

08:31:53  5    A.  Yes.

08:31:54  6    Q.  Doctor, if you would, would you take just a few minutes and

08:32:00  7    tell the jury about your education and your experience that led you

08:32:06  8    to be a practicing cardiologist with Cardiovascular Institute of

08:32:11  9    the South?

08:32:11 10    A.  I went to medical school at University College Dublin in

08:32:18 11    Ireland, and went to do post graduate training in Cleveland at Case

08:32:21 12    Western Reserve University program for my internal medicine

08:32:24 13    residency and followed by a fellowship there, too.

08:32:27 14    Q.  And then, how did you come to practice here in Louisiana?

08:32:31 15    A.  I was recruited, yes, to come.

08:32:37 16    Q.  When did you move here?

08:32:38 17    A.  1995.

08:32:40 18    Q.  And you've been practicing in this area since 1995; is that

08:32:44 19    right?

08:32:45 20    A.  Yes.

08:32:45 21    Q.  Dr. Wong, would you describe for us what you do on a regular

08:32:52 22    basis.  What type of patients do you ordinarily see?

08:32:55 23    A.  I practice with mostly general cardiology, and I see patients

08:33:00 24    with all kind of problems; breathing problems, heart failure, heart

08:33:05 25    attacks.

08:33:06 1          MR. BIRCHFIELD:  Your Honor, for Court's convenience and

08:33:09 2  the witness to move this along, I would like to provide the defense

08:33:12 3  counsel and Dr. Wong a copy of the exhibits that I intend to work

08:33:16 4  through.

08:33:16 5          THE COURT:  Okay.

08:33:43 6  BY MR. BIRCHFIELD:

08:33:44 7  Q.  Dr. Wong, you came to treat Mr. Joseph Boudreaux on January the

08:33:51 8  7th of 2014; is that right?

08:33:53 9  A.  Yes.

08:33:54 10  Q.  And you have there a document, a consult report, for that visit

08:34:03 11  on January the 7th, 2014?

08:34:05 12  A.  Yes.

08:34:06 13  Q.  If you would, if you'll take a look at that.

08:34:09 14          MR. BIRCHFIELD:  Your Honor, at this time I offer

08:34:10 15  Plaintiff's Exhibit 52.

08:34:14 16          THE COURT:  Any objection?

08:34:15 17          MS. WILKINSON:  No objection, your Honor.

08:34:16 18          THE COURT:  Let it be admitted.

08:34:17 19  BY MR. BIRCHFIELD:

08:34:18 20  Q.  And, Dr. Wong, if we can, put this document up on the screen.

08:34:25 21  Let's go to the second page of the document.  And we see that this

08:34:31 22  is a consult report by you; is that right?  You see in the middle

08:34:38 23  of the document where it says, "consult notes"?

08:34:41 24  A.  Yes.

08:34:42 25  Q.  And would you describe for us what a consult report is?  How

08:34:48  1    did you come to be involved in the care of Mr. Boudreaux?

08:34:51  2    A.  When the patient comes in, is admitted to the hospital, and if

08:34:57  3    they are found to have a heart problem, they would call for a

08:35:00  4    cardiologist, which is me, in the hospital.

08:35:02  5    Q.  And you went to the hospital.  Is that Ochsner St. Anne?

08:35:08  6    A.  Yes.

08:35:09  7    Q.  And did you see Mr. Boudreaux on January the 7th there at the

08:35:15  8    hospital?

08:35:16  9    A.  Yes.

08:35:16 10    Q.  And would you describe for us what you did?  How did you assess

08:35:22 11    his condition?  What did you find?

08:35:23 12    A.  We go through the usual history and physical exam, and we found

08:35:28 13    that he was having a nuance atrial fibrillation resulting in some

08:35:33 14    heart failure, which made him short of breath.

08:35:37 15    Q.  So he was short of breath, some heart failure, but in atrial

08:35:42 16    fibrillation; is that right?

08:35:43 17    A.  Yes.

08:35:44 18    Q.  Dr. Wong, would you describe for the jury how you describe AFib

08:35:52 19    to a patient?

08:35:54 20    A.  It's an irregular rhythm of the upper part of the heart called

08:35:59 21    the atrium when the beating of the heart becomes chaotic and fast.

08:36:08 22    Q.  And do you talk to your patient about the severity of that

08:36:14 23    condition and the risks that are involved?

08:36:16 24    A.  Yes, I generally explain the condition and what it involves,

08:36:21 25    the risks, treating it and the plans.

08:36:26  1    Q.  Did you do that with Mr. Boudreaux?

08:36:29  2    A.  Yes.

08:36:30  3    Q.  And what was your course of treatment?  What did you recommend

08:36:35  4    to Mr. Boudreaux about his treatment for AFib?

08:36:39  5    A.  First, we have to control the heart rate, and then started him

08:36:44  6    on some anti-rhythmic medications, which means medications to

08:36:50  7    control his rhythm as well as his rate.  And then recommend

08:36:55  8    anticoagulation.

08:36:55  9    Q.  And so for Mr. Boudreaux you prescribed Xarelto; is that

08:37:01 10    correct?

08:37:01 11    A.  Well, I prescribe -- I would recommend an anticoagulation and

08:37:05 12    Xarelto was, I think, best, yes.

08:37:08 13    Q.  And so you -- you know that Mr. Boudreaux started on Xarelto?

08:37:15 14    A.  Yes.

08:37:16 15    Q.  The very next morning there in the hospital?

08:37:18 16    A.  Yes.

08:37:18 17    Q.  On January the 8th; is that right?

08:37:20 18    A.  Yes.

08:37:20 19    Q.  And did you see Mr. Boudreaux, again, in the hospital?

08:37:28 20    A.  I believe the next day, yes.

08:37:30 21    Q.  I want to stop.  You told us that he was prescribed Xarelto,

08:37:37 22    correct?

08:37:37 23    A.  Yes.

08:37:38 24    Q.  I want to back up.  Before -- before Xarelto came on the

08:37:45 25    market, before the other NOACs came on the market, did you ever

08:37:50  1    prescribe warfarin or Coumadin?

08:37:51  2    A.  Yes.

08:37:52  3    Q.  And do you still prescribe those from time to time?

08:37:55  4    A.  Occasionally, yes.

08:37:57  5    Q.  And, Dr. Wong, when you began prescribing Coumadin or warfarin,

08:38:05  6    you were familiar with the product label for that drug, right?

08:38:10  7    A.  Yes.  Yes.

08:38:11  8    Q.  And the warfarin label, it provides instructions about testing

08:38:17  9    and monitoring of the blood levels; is that right?

08:38:20  10   A.  Yes.

08:38:20  11   Q.  And when you prescribe Coumadin or warfarin, do you follow

08:38:26  12   those instructions about the blood tests?

08:38:30  13   A.  Yes.  Yes.

08:38:30  14   Q.  Is that important?

08:38:32  15   A.  Yes.

08:38:32  16   Q.  Dr. Wong, would you describe for the jury why it's important to

08:38:41  17   have the anticoagulation level for a warfarin patient properly

08:38:46  18   monitored?

08:38:47  19   A.  Well, just like any drug, there is something called a

08:38:50  20   therapeutic level.  If you go over that, then you may be overdosing

08:38:54  21   of a medication; and if you're not achieving that level, then

08:38:57  22   you're under treating the problem.

08:38:59  23          So in this case, if the blood was too thin, you would run

08:39:05  24   a risk of bleeding; and if your blood was not therapeutic, then you

08:39:09  25   run the risk of clot, which is why we start people on

08:39:14  1    anticoagulation in patients with atrial fibrillation.

08:39:19  2    Q.  If it's -- the anticoagulation is too high, there's a risk for

08:39:23  3    a bleed?

08:39:24  4    A.  Yes.

08:39:24  5    Q.  And if it is too low, then there's a risk for a stroke, right?

08:39:29  6    A.  Of clot and strokes, yes.

08:39:32  7    Q.  So, Dr. Wong, I want to -- on this occasion you prescribed

08:39:40  8    Xarelto for Mr. Boudreaux, right?

08:39:42  9    A.  Yes.

08:39:43  10   Q.  And before you ever prescribed Xarelto, were you familiar with

08:39:49  11   the Xarelto label?

08:39:50  12   A.  Yes.

08:39:51  13   Q.  And you told us in your deposition that the product label, that

08:39:56  14   that's an important piece of information that you use in making

08:40:00  15   prescribing decisions; is that correct?

08:40:03  16   A.  Yes.

08:40:04  17   Q.  I want to show you what's marked as Plaintiff's Exhibit 53.  It

08:40:12  18   is the label -- the Xarelto label from November of 2011.

08:40:23  19           MR. BIRCHFIELD:  Your Honor, at this time, I would offer

08:40:25  20   Plaintiff's Exhibit 53, the product label for Xarelto, November of

08:40:31  21   2011.

08:40:50  22           MS. WILKINSON:  No objection, your Honor.

08:40:52  23           THE COURT:  Let be admitted.

08:40:54  24   BY MR. BIRCHFIELD:

08:40:54  25   Q.  So, Dr. Wong, if you look at the middle of that first page on

08:41:00  1   the right-hand side it says, "Revised November 2011."  Do you see

08:41:05  2   that, Dr. Wong?

08:41:08  3   A.  Yes.

08:41:09  4   Q.  And that's the time when Xarelto was approved for the AFib

08:41:18  5   indication; is that correct?

08:41:19  6   A.  Yes.

08:41:20  7   Q.  And I want to go to the Section 5.4 of this label, Page 7.  Are

08:41:34  8   you with me, Dr. Wong?  The Section 5.4?

08:41:44  9           And here in the middle it says, "The anticoagulant effect

08:41:48 10   of Xarelto cannot be monitored with standard laboratory testing nor

08:41:52 11   readily reversed."

08:41:53 12   A.  Yes.

08:41:54 13   Q.  And was that consistent with your understanding of Xarelto when

08:41:59 14   you --

08:42:00 15   A.  Yes.

08:42:00 16   Q.  -- first started prescribing it?

08:42:02 17   A.  Yes.

08:42:03 18   Q.  And then, I want to go to Plaintiff's Exhibit 54, which is the

08:42:12 19   label for Xarelto in August of 2013.  Dr. Wong, this would be the

08:42:22 20   label that would be in effect at the time you prescribed Xarelto to

08:42:25 21   Mr. Boudreaux.

08:42:26 22   A.  Okay.

08:42:30 23           MS. WILKINSON:  No objection, your Honor.

08:42:31 24           THE COURT:  Let it be admitted.

08:42:33 25   BY MR. BIRCHFIELD:

08:42:33  1    Q.  And, Dr. Wong, again, if you'll look at the first page, you see

08:42:38  2    in the middle -- again, this is August of 2013, and you prescribed

08:42:47  3    Xarelto to Mr. Boudreaux in January of 2014, correct?

08:42:51  4    A.  Yes.

08:42:52  5    Q.  So let's turn to Page 7, if we can.  And you see the section --

08:43:01  6    Section 5 where it says, "Warnings and Precautions".  Let's look

08:43:16  7    at five -- that's fine.  Let's go to 5.7.

08:43:19  8          Again, we see on 5.7 we see, again, the section where it

08:43:24  9    states that, "The anticoagulant effect of Xarelto cannot be

08:43:28 10    monitored with standard laboratory testing nor readily reversed."?

08:43:32 11    A.  Yes.

08:43:33 12    Q.  And was that your understanding in January of 2014 regarding

08:43:40 13    Xarelto?

08:43:40 14    A.  Yes.

08:43:41 15    Q.  Dr. Wong, if the product label -- if the Xarelto product label

08:43:53 16    provided instructions, important safety information about a simple

08:43:59 17    lab test that would identify patients at high risk of a bleed on

08:44:04 18    Xarelto, would you have followed those instructions?

08:44:07 19    A.  Yes.

08:44:08 20    Q.  Dr. Wong, if the results of those -- that test identified a

08:44:19 21    patient at high risk for a bleeding or major bleeding event on

08:44:25 22    Xarelto, would you have discussed those results with your patient?

08:44:28 23    A.  Yes.

08:44:29 24    Q.  And if the patient chose not to accept those risks but to

08:44:36 25    follow a different course of treatment, would you have honored your

08:44:42  1    patient's request?

08:44:43  2    A.  Yes.

08:44:43  3    Q.  Let's go back to -- well -- yeah, let's go back to January the

08:44:54  4    8th of 2014.  You're treating Mr. Boudreaux in the hospital there

08:45:02  5    at St. Anne; is that right?

08:45:04  6    A.  Yes.

08:45:05  7    Q.  So let's take a look at Plaintiff's Exhibit 54 --

08:45:14  8            THE DEPUTY CLERK:  Next one is 55.

08:45:18  9            MR. BIRCHFIELD:  Fifty-five, I'm sorry.

08:45:19 10    BY MR. BIRCHFIELD:

08:45:20 11    Q.  And this is the record from January the 9th, 2014.  Do you see

08:45:24 12    that in your book, Dr. Wong?

08:45:32 13            MR. BIRCHFIELD:  Your Honor, at this time, we offer

08:45:33 14    Plaintiff's Exhibit 55.

08:45:36 15            THE COURT:  Let it be admitted.

08:45:38 16            MS. WILKINSON:  Excuse me.  Would you just mind reading

08:45:41 17    in the plaintiff exhibit when you do that so we can match them up.

08:45:45 18            MR. BIRCHFIELD:  Sure.  Plaintiff's Exhibit 55, the

08:45:48 19    identification number is 5768088.153.

08:45:56 20    BY MR. BIRCHFIELD:

08:45:56 21    Q.  And, Dr. Wong, you can see on your screen that under the

08:46:01 22    scheduled meds there in the middle it says, "Rivaroxaban

08:46:07 23    20 milligrams daily."  Is that right?

08:46:10 24    A.  Yes.

08:46:11 25    Q.  And that is -- that's consistent with your prescribing Xarelto

08:46:17  1   to Mr. Boudreaux, right?

08:46:18  2   A.  Yes.

08:46:19  3   Q.  He was taking it there in the hospital?

08:46:22  4   A.  Yes.

08:46:22  5   Q.  And then, if you will, Dr. Wong, turn to the last page, and

08:46:34  6   down at the bottom of the last page it gives the -- gives your plan

08:46:40  7   for Mr. Boudreaux's care.  Do you see that?

08:46:43  8   A.  Yes.

08:46:43  9   Q.  And would you explain to the jury what the plan was for

08:46:49 10   Mr. Boudreaux's care at this point?

08:46:51 11   A.  The plan was to send him home and see him in the clinic and

08:46:59 12   see -- he was still in atrial fibrillation as outpatient.

08:47:03 13   Eventually, we would plan for a trial of cardioversion, which is to

08:47:08 14   shock the heart back to normal rhythm.

08:47:10 15   Q.  And you say there to do a stress test?

08:47:17 16   A.  Yeah, do a stress test as well, yes.

08:47:20 17   Q.  Is that something that you would do there in your office,

08:47:24 18   Dr. Wong?

08:47:24 19   A.  Yes.

08:47:25 20   Q.  Would you describe -- would you describe for us what type of

08:47:28 21   stress test you're referring to and what that involved?

08:47:32 22   A.  I don't recall exactly what he did, a stress test, but it's

08:47:37 23   basically to stress the heart and see if he has any potential

08:47:41 24   coronary artery disease before we shock him.

08:47:44 25   Q.  And, Dr. Wong, right before it says, "stress test tomorrow," it

08:47:50  1  says -- that means "anticoagulant educated," is that right?

08:47:54  2  A.  Yes.

08:47:55  3  Q.  And that means -- does that mean that you talked to them about

08:48:00  4  the importance of taking their medication?

08:48:02  5  A.  Yes.

08:48:02  6  Q.  As well as the risks that are associated with the medication?

08:48:05  7  A.  Yes.  Yes.

08:48:07  8  Q.  And with anticoagulants or blood thinners, what are the risks

08:48:12  9  that you discuss with your patients?

08:48:16 10  A.  That there is a risk of bleeding with taking this medication

08:48:19 11  and to watch for it.

08:48:22 12  Q.  And that's something -- and that's something you would have

08:48:25 13  discussed with Mr. Boudreaux, right?

08:48:26 14  A.  Yes.

08:48:27 15  Q.  And I think you have -- you've told us, Dr. Wong, and

08:48:33 16  Mr. Boudreaux has told us about Nurse Theriot discussing --

08:48:36 17  A.  Yes.  Yes, exactly.  I don't remember, obviously, the specifics

08:48:42 18  about who discussed what, but we have protocol, a list my nurses

08:48:46 19  would go through, yes.

08:48:49 20  Q.  And, Dr. Wong, I want to move to the next day.  So January the

08:48:55 21  9th you discuss the plan.  Mr. Boudreaux is to show up in your

08:49:00 22  office the next day; is that correct?

08:49:01 23  A.  Yes.  Yes.

08:49:02 24  Q.  And when he is discharged from the hospital, a prescription is

08:49:11 25  written for Xarelto; is that right?

08:49:13 1    A.  Yes.

08:49:14 2    Q.  I want to move to your -- the office visit on January the 10th,

08:49:21 3    Plaintiff's Exhibit 56.  The identification number is 5768236.129.

08:49:31 4              MS. WILKINSON:  No objection, your Honor.

08:49:32 5              THE COURT:  Let it be admitted.

08:49:36 6    BY MR. BIRCHFIELD:

08:49:37 7    Q.  Dr. Wong, if you'll take a look at the top of that second page

08:49:42 8    and we see the date, January the 10th; is that right?

08:49:48 9    A.  Yes.

08:49:48 10   Q.  And Mr. Boudreaux showed up at your office as he was instructed

08:49:54 11   to do; is that right?

08:49:55 12   A.  Yes.

08:49:56 13   Q.  And then if you'll look at the middle of the page, it shows the

08:50:02 14   medications that he is currently taking; is that right?

08:50:04 15   A.  Yes.

08:50:05 16   Q.  And it shows that he is taking Xarelto as you prescribed,

08:50:08 17   right?

08:50:08 18   A.  Yes.

08:50:09 19   Q.  And then if you'll go to the next page, Dr. Wong, and then down

08:50:21 20   at the bottom we see -- the very bottom, your handwritten note it

08:50:27 21   says January the 13th.  Do you see that?

08:50:32 22   A.  Yes.

08:50:32 23   Q.  Was Mr. Boudreaux scheduled to be back in your office on

08:50:39 24   January the 13th?

08:50:41 25   A.  Yes.

08:50:42  1   Q.  If you would, tell us what happened in your office on January

08:50:47  2   the 10th?  What did you --

08:50:49  3   A.  January the 10th not unusual when you put them on medications

08:50:53  4   to control the heart rate and rhythm that eventually their

08:50:58  5   rhythm -- their heart rate goes a little slower than usual and they

08:51:02  6   feel weak and tired.  So we adjusted his medications a little bit.

08:51:06  7   Q.  So you saw him, Mr. Boudreaux, on the 10th and you told him to

08:51:13  8   come back for an appointment on January the 13th?

08:51:16  9   A.  Yes.

08:51:16  10  Q.  Is that right?

08:51:17  11  A.  Yes.

08:51:17  12  Q.  Dr. Wong, I would like for you to take a look at what we'll

08:51:27  13  mark as Plaintiff's Exhibit 57.  The identification number is

08:51:31  14  5768236.117.

08:51:36  15          MS. WILKINSON:  No objection.

08:51:38  16          THE COURT:  Let it be admitted.

08:51:39  17          MR. BIRCHFIELD:  Your Honor, we would offer Plaintiff's

08:51:41  18  Exhibit 57.

08:51:42  19  BY MR. BIRCHFIELD:

08:51:43  20  Q.  Dr. Wong, if you'll go to the third page of the document, and

08:51:49  21  up at the top you see the date, January the 13th; is that right?

08:51:56  22  A.  Yes.

08:51:57  23  Q.  And this indicates that Mr. Boudreaux appeared for his

08:52:03  24  appointment as he was instructed to do; is that right?

08:52:05  25  A.  Yes.

08:52:05  1   Q.  And would you describe for us what you did on this visit?

08:52:12  2   A.  At that point he was feeling better and we gave him a release

08:52:21  3   to go to work.

08:52:23  4   Q.  So you had done the stress test?

08:52:26  5   A.  Yes.

08:52:27  6   Q.  And determined that he was okay to go back to work?

08:52:30  7   A.  Right.

08:52:30  8   Q.  And if you'll look at the next page, Dr. Wong, it lists the

08:52:38  9   current medications.  It indicates that he is taking Xarelto; is

08:52:42 10   that right?

08:52:43 11   A.  Yes.

08:52:43 12   Q.  By mouth once a day?

08:52:45 13   A.  Yes.

08:52:45 14   Q.  Dr. Wong, if you will, if you'll turn to two pages over where

08:52:58 15   it has the lab work that was done.  Did you draw blood?  Did you do

08:53:09 16   some blood work for Mr. Boudreaux on January the 13th?

08:53:14 17   A.  Yes.

08:53:15 18   Q.  And if instructions had been given to do a simple blood test to

08:53:26 19   determine the anticoagulation level of Mr. Boudreaux, you could

08:53:31 20   have done it with this blood work; is that right?

08:53:33 21   A.  Yes.

08:53:34 22   Q.  And then, Dr. Wong, did you schedule a follow-up visit for

08:53:46 23   Mr. Boudreaux on January the 24th?

08:53:48 24   A.  Yes.

08:53:53 25          MR. BIRCHFIELD:  Your Honor, we would offer Plaintiff's

08:53:55  1   Exhibit 58, Identification No. 5768290.110.

08:54:04  2            MS. WILKINSON:  No objection.

08:54:05  3            THE COURT:  Let it be admitted.

08:54:06  4   BY MR. BIRCHFIELD:

08:54:06  5   Q.  Dr. Wong, if you'll take a look at that next page, up at the

08:54:11  6   top we see the date January the 24th; is that right?

08:54:15  7   A.  Yes.

08:54:16  8   Q.  Mr. Boudreaux showed up for his appointment as he was

08:54:21  9   instructed to do, correct?

08:54:22  10  A.  Yes, uh-huh.

08:54:23  11  Q.  And it indicates that he is taking his Xarelto once a day as he

08:54:30  12  is supposed to do, right?

08:54:32  13  A.  Yes.

08:54:32  14  Q.  And then down at the bottom where you have other instructions

08:54:39  15  and it says, "Schedule a TEE/CV at St. Anne's on February the 5th

08:54:46  16  of 2014."

08:54:49  17  A.  Yes.

08:54:49  18  Q.  Would you tell us, Dr. Wong, what were you scheduling at that

08:54:54  19  point?

08:54:55  20  A.  TEE is short for transesophageal echocardiogram.  And CV means

08:55:03  21  cardioversion.  In other words, what we do is we get the patient to

08:55:07  22  swallow a probe.  That's why it's called transesophageal.  And we

08:55:12  23  do an ultrasound of the heart from the back of the heart and the

08:55:17  24  esophagus to identify any possible clot in the heart.  And if

08:55:20  25  there's no clot, then we cardiovert them.

08:55:23   1   Q.   The TEE, that's transesophageal echocardiogram?

08:55:29   2   A.   Yes.

08:55:29   3   Q.   That's looking at a picture of the heart in motion; is that

08:55:32   4   right?

08:55:32   5   A.   Yes.  Yes.

08:55:33   6   Q.   And you're looking --

08:55:34   7   A.   For clots.

08:55:35   8   Q.   -- for clots?  Okay.

08:55:39   9            And the cardioversion, tell us, again, what the

08:55:41  10   cardioversion part of that procedure is.

08:55:43  11   A.   We put pads on the chest and we shock them.  We sedate them, of

08:55:48  12   course, before that, and we shock them.

08:55:50  13   Q.   And what's the purpose?  What's the objective of the

08:55:55  14   cardioversion?

08:55:55  15   A.   To re-establish normal rhythm of the heart which makes the

08:56:00  16   heart more efficient.

08:56:02  17   Q.   So at this point Mr. Boudreaux is in AFib; is that right?

08:56:08  18   A.   Yes.

08:56:09  19   Q.   He has an irregular heart rhythm?

08:56:11  20   A.   Yes.

08:56:11  21   Q.   And the cardioversion is scheduled to correct it to put him

08:56:15  22   back into a normal rhythm; is that right?

08:56:17  23   A.   Yes.

08:56:18  24   Q.   And so that's scheduled for February the 5th of 2014?

08:56:24  25   A.   Yes.

08:56:32  1          MR. BIRCHFIELD:  Your Honor, I am going to offer

08:56:35  2   Plaintiff's Exhibit 59, which is the next appointment with

08:56:40  3   Dr. Wong's office.  Plaintiff's Identification No. 5768236.96.

08:56:49  4          THE COURT:  What's the exhibit number?

08:56:50  5          MS. WILKINSON:  No objection.

08:56:51  6          MR. BIRCHFIELD:  Exhibit 59, your Honor.

08:56:53  7          THE COURT:  Let it be admitted.

08:56:54  8   BY MR. BIRCHFIELD:

08:56:55  9   Q.  Dr. Wong, I would like -- ask you to take a look at the chart

08:57:00 10   note on February the 3rd.  And this is a chart note from your

08:57:05 11   office; is that correct?

08:57:08 12   A.  Correct.

08:57:08 13   Q.  And this is a note that shows the patient's wife,

08:57:16 14   Ms. Boudreaux, was calling and complaining that the patient cannot

08:57:20 15   get out of bed or go to work; is that right?

08:57:23 16   A.  Yes.

08:57:23 17   Q.  And feels extremely weak and is vomiting when he tries to do

08:57:28 18   any activity?

08:57:29 19   A.  Yes.

08:57:29 20   Q.  States there that the -- instructed patient not to take any

08:57:37 21   meds until we call back with recommendations and instructed to take

08:57:42 22   a lot of fluids; is that right?

08:57:44 23   A.  Yes.

08:57:44 24   Q.  If you'll turn over two more pages, where you see at the

08:57:59 25   top it's, again, February the 3rd and it has down at the bottom

08:58:05  1   other instructions.  And it says, "No Indocin.  Hold ASA."  That's

08:58:12  2   aspirin; is that correct?

08:58:13  3   A.  Correct.

08:58:14  4   Q.  And Lasix, lisinopril, and Xarelto; is that correct?

08:58:21  5   A.  Right.

08:58:21  6   Q.  Dr. Wong, did you see Mr. Boudreaux, he come into your office

08:58:25  7   on that day?  Did you see him?

08:58:27  8   A.  Yes.

08:58:27  9   Q.  And then if you'll turn the page, what is this?  Tell us what

08:58:32 10   you did for Mr. Boudreaux.

08:58:34 11   A.  Well, we did an EKG to identify his rhythm and he was still in

08:58:39 12   atrial flutter.

08:58:41 13   Q.  And then if you'll turn to the next page.  Again, this is still

08:58:49 14   on February the 3rd, that same visit, right?

08:58:52 15   A.  Yes.

08:58:53 16   Q.  And where it says, "Present illness/symptoms," would you

08:58:58 17   describe how Mr. Boudreaux, how he presented, what was going on

08:59:02 18   with Mr. Boudreaux --

08:59:03 19   A.  He was very weak and he was very pale.

08:59:07 20   Q.  And where he -- it says, "His stool is very black," is that

08:59:13 21   right?

08:59:13 22   A.  Yes.

08:59:14 23   Q.  And, Dr. Wong, this is February 3rd.  This is two days before

08:59:23 24   the scheduled cardioversion that we just discussed; is that right?

08:59:27 25   A.  Yes.  Yes.

08:59:28  1    Q.  Before Mr. Boudreaux appeared in your office on February the

08:59:35  2    3rd, you were planning to do that cardioversion on the 5th; is that

08:59:40  3    right?

08:59:40  4    A.  Yes.

08:59:40  5    Q.  Dr. Wong, if you're going to do a cardioversion, is it

08:59:45  6    important for the patient to be anticoagulated for a period of time

08:59:50  7    leading up to that cardioversion?

08:59:52  8    A.  Yes.

08:59:52  9    Q.  Would you describe for us why that's important, sir?

08:59:55 10    A.  Well, so they don't have a potential stroke.  If you cardiovert

09:00:02 11    them and they have a clot in their heart, then the clot can just go

09:00:06 12    to the brain.

09:00:07 13    Q.  So that's something that's very important for them to be

09:00:10 14    anti-coagulated?

09:00:10 15    A.  Yes.  They should be anti-coagulated at least a few weeks

09:00:15 16    before and after the procedure.

09:00:18 17    Q.  So, Dr. Wong, you've seen -- since the hospital, you have --

09:00:24 18    you had seen three regularly scheduled follow-up visits --

09:00:27 19    A.  Yes.

09:00:27 20    Q.  -- for Mr. Boudreaux; is that right?

09:00:29 21    A.  Yes.

09:00:29 22    Q.  And then you were proceeding with the cardioversion plan; is

09:00:33 23    that right?

09:00:33 24    A.  Yes.

09:00:35 25    Q.  And you had asked about his medications and whether he was

09:00:38  1  taking Xarelto?

09:00:39  2  A.  Yes.

09:00:39  3  Q.  And were you confident that he was taking his Xarelto as

09:00:44  4  directed?

09:00:45  5  A.  Yes.

09:00:45  6  Q.  And so, Dr. Wong, if you'll turn -- down at the bottom, the

09:00:57  7  last three numbers on the Bates number has 103.  Do you see that?

09:01:08  8  A.  Yes.

09:01:08  9  Q.  And if you'll take a look there where it says RBC, HGB and

09:01:18  10  hematocrit.

09:01:19  11  A.  Yes.

09:01:20  12  Q.  Would you tell us what's the significance of those lab

09:01:26  13  readings?

09:01:27  14  A.  Hematocrit had dropped significantly, very low.

09:01:31  15  Twenty-one percent hematocrit is about half of the normal

09:01:37  16  hematocrit in a normal person.

09:01:39  17  Q.  And what does that suggest to you, Dr. Wong?

09:01:43  18  A.  Suggests that he was losing blood.

09:01:47  19  Q.  And what were your instructions?  What did you do at that

09:01:53  20  point?

09:01:54  21  A.  We call him to be admitted to the hospital to receive blood

09:01:59  22  transfusion, and to hold the medication, the blood thinners and

09:02:06  23  everything, yes.

09:02:06  24  Q.  Did that end your care with Mr. Boudreaux?

09:02:11  25  A.  Yes.

09:02:15  1    Q.   So he was admitted at the ER as you instructed.   He was

09:02:21  2    admitted for the gastrointestinal bleed; is that right?

09:02:24  3    A.   Yes.

09:02:25  4    Q.   And at this point he continued to have AFib; is that right?

09:02:31  5    A.   Yes.

09:02:32  6    Q.   And then, Mr. Boudreaux continued to be followed by CIS; is

09:02:39  7    that right?

09:02:40  8    A.   Yes.

09:02:40  9    Q.   But was he seeing other cardiologists in your group?

09:02:45 10    A.   I believe he followed up with one of my colleagues after that

09:02:49 11    in Thibodaux.

09:02:50 12    Q.   CIS has several different locations?

09:02:53 13    A.   Yes.

09:02:53 14    Q.   Which location?   Where are you?

09:02:55 15    A.   I'm at Raceland and Thibodaux, yes.

09:02:57 16    Q.   Raceland and Thibodaux?

09:03:01 17    A.   Yes.

09:03:02 18    Q.   And he followed with Dr. Timothy and then with Dr. Fail?

09:03:07 19    A.   Yes.

09:03:07 20    Q.   Is that right?

09:03:07 21    A.   Yes.

09:03:08 22    Q.   Dr. Wong, when you gave your deposition, you were asked if

09:03:20 23    you -- at that point if you continued to prescribe Xarelto; is that

09:03:23 24    right?

09:03:23 25    A.   Yes.

09:03:23   1    Q.  And you answered you did; is that correct?

09:03:26   2    A.  Yes.

09:03:26   3    Q.  And you were asked, looking back, if you would have still

09:03:36   4    prescribed Xarelto to Mr. Boudreaux; is that right?

09:03:38   5    A.  Yes.

09:03:38   6    Q.  And you were asked if knowing what you knew at that point,

09:03:43   7    would you have still prescribed Xarelto, right?  Do you remember

09:03:45   8    that?

09:03:45   9    A.  Yes.

09:03:46  10    Q.  Dr. Wong, to your knowledge, has the Xarelto label even today

09:03:56  11    been changed to provide instructions for a simple blood test or

09:04:02  12    important safety information about Xarelto?

09:04:04  13    A.  Not to my knowledge.

09:04:14  14              MR. BIRCHFIELD:  Your Honor, at this time I'll pass

09:04:17  15    Dr. Wong.

09:04:17  16              THE COURT:  Okay.  Cross.

09:04:22  17                        CROSS-EXAMINATION

09:04:23  18    BY MS. WILKINSON:

09:04:27  19    Q.  Good morning, Dr. Wong.

09:04:28  20    A.  Good morning.

09:04:30  21    Q.  We just met out in the hallway, correct?

09:04:32  22    A.  Correct.

09:04:32  23    Q.  Now, you agree that Xarelto is a useful and beneficial

09:04:36  24    medication for atrial fibrillation patients because it reduces

09:04:41  25    their risk of stroke, right?

09:04:42  1    A.  Yes.

09:04:43  2    Q.  That's why you've been prescribing it for all of these years?

09:04:46  3    A.  Yes.

09:04:47  4    Q.  Could you tell the jury a little bit about why you are so

09:04:50  5    concerned when someone like Mr. Boudreaux comes to see you and you

09:04:53  6    diagnose them with atrial fibulation?  Why do you want to treat him

09:04:57  7    right away?

09:04:58  8    A.  Because the formation of clot can be spontaneous and he will

09:05:06  9    reduce their risk of stroke significantly.

09:05:08  10   Q.  Can you tell the ladies and gentlemen of the jury what happens

09:05:11  11   if that clot that's formed when someone has AFib does break off and

09:05:16  12   travel to the brain?

09:05:17  13   A.  If it breaks off and goes to the brain, it causes a stroke.

09:05:20  14   That's the number one problem with the clots, yes.

09:05:24  15   Q.  You prescribed Xarelto and other novel oral anticoagulants in

09:05:29  16   your practice?

09:05:29  17   A.  Yes.

09:05:29  18   Q.  And to become familiar with those when they came on the market,

09:05:35  19   did you read peer-reviewed articles that talked about those drugs?

09:05:39  20   A.  Yes.

09:05:40  21   Q.  Do you talk to your colleagues that you work with and other

09:05:43  22   cardiologists about those drugs?

09:05:45  23   A.  Yes.

09:05:45  24   Q.  Where else do you get your information about those types of

09:05:48  25   drugs?

09:05:48  1   A.  Magazines, conferences.

09:05:52  2   Q.  And you've had clinical practice for over ten years?

09:05:55  3   A.  Yes -- 22 years.

09:05:58  4   Q.  Twenty-two years.  And when Xarelto and some of the other NOACs

09:06:05  5   came onto the market, did you see some benefits to prescribing

09:06:10  6   those type of drugs in contrast to warfarin?

09:06:13  7   A.  Yes.

09:06:14  8   Q.  Can you tell the ladies and gentlemen of the jury why it is

09:06:17  9   that you often favor prescribing Xarelto or another NOAC for a

09:06:21  10  patient like Mr. Boudreaux?

09:06:22  11  A.  Well, Xarelto offered mostly four big advantages over Coumadin;

09:06:31  12  No. 1, the patient could eat -- did not have to have a very

09:06:35  13  restricted diet in terms of green vegetables, the amount of Vitamin

09:06:42  14  K that they have to eat.  That's one of them.

09:06:45  15         The other thing is Xarelto you don't have to monitor the

09:06:51  16  levels of blood thinner, so spares the patient having to get stuck

09:06:56  17  and have blood tests very frequently initially, and then regularly

09:07:01  18  after that.

09:07:04  19         The third thing is Xarelto has at some -- generally, the

09:07:13  20  oral anticoagulants beneficial, at least has been beneficial in

09:07:18  21  preventing stroke, and their risk of bleeding is comparable to

09:07:23  22  Coumadin.  So those are the four reasons why we -- because of that,

09:07:30  23  it intend to improve compliance.

09:07:32  24  Q.  Explain to the jury what you mean by "compliance"?

09:07:35  25  A.  Compliance is that the patient will abide by the treatment.

09:07:39  1    Q.  So let's talk about that for a minute, if we could, using the

09:07:43  2    label.  I believe --

09:07:44  3            MS. WILKINSON:  Mr. Birchfield, from 2013 label, did you

09:07:48  4    say that was 54?

09:07:48  5    BY MS. WILKINSON:

09:07:51  6    Q.  So we're going to take a look at Plaintiff's Exhibit 54.  And

09:07:55  7    you were mentioning compliance.  Let me put this up here.

09:08:00  8            Do you have a concern, and as a concern expressed in the

09:08:04  9    label, about what might happen if someone goes off of Xarelto when

09:08:07 10    they've been prescribed by it by someone like you?

09:08:11 11    A.  They have a risk of having a clot in their heart and, hence, be

09:08:17 12    at risk for a stroke.

09:08:18 13    Q.  Can that happen even if they miss one dose?

09:08:21 14    A.  Yes.  But, obviously, the more doses you miss, the higher your

09:08:26 15    risk.

09:08:27 16    Q.  Let's take a look at the first page of the label here.  You're

09:08:30 17    familiar with this label, right?

09:08:32 18    A.  Yes.

09:08:35 19    Q.  And does it say right here that, "Premature discontinuation of

09:08:40 20    Xarelto increases the risk of thrombotic events."?

09:08:43 21    A.  Yes.

09:08:43 22    Q.  Just remind us what thrombotic events are.

09:08:46 23    A.  Clot formation.

09:08:47 24    Q.  Let's go down here on the first page.  Does the company give

09:08:53 25    you kind of a summary of the facts about Xarelto?

09:08:56  1    A.  Yes.

09:08:57  2    Q.  And what does it say here about Xarelto?

09:09:00  3    A.  That it's a Factor Xa inhibitor, which is the mechanism how it

09:09:08  4    works to prevent clot formation.  And in doing this, it reduces the

09:09:14  5    risk of stroke and systemic embolism.  Embolism just means the

09:09:19  6    travel of clot down in any artery causing problems like strokes.

09:09:26  7    Q.  We've heard a little bit about Factor Xa, but that makes it

09:09:30  8    operate differently on the body than warfarin, right?

09:09:32  9    A.  Yes.

09:09:33  10   Q.  And is that part of the reason why you don't need to routinely

09:09:37  11   monitor patients on Xarelto because it's only affecting that one

09:09:41  12   factor?

09:09:42  13   A.  Yes.

09:09:43  14   Q.  You see that as a benefit?

09:09:45  15   A.  Yes.

09:09:49  16   Q.  Now, let's go up here, if we could.  Does the label provide for

09:09:56  17   a test to determine whether a 20-milligram dose or 15-milligram

09:10:01  18   dose is appropriate for a patient?

09:10:03  19   A.  Yes.

09:10:03  20   Q.  What is that test?

09:10:04  21   A.  This test basically checks for the kidney function.  It's

09:10:10  22   called a creatinine clearance; checks if the kidneys are working.

09:10:15  23   Then the specific dose reduction is used in people who have kidneys

09:10:23  24   that don't work a certain degree.

09:10:26  25   Q.  So if someone's kidney function is slower, then you don't want

09:10:29  1    too much build up, so you would give them a lower dose; is that

09:10:33  2    right?

09:10:33  3    A.  Yes.

09:10:34  4    Q.  Do you recall that you checked Mr. Boudreaux's kidney function

09:10:38  5    several times --

09:10:38  6    A.  Yes.

09:10:39  7    Q.  -- upon prescription?

09:10:39  8    A.  Yes.

09:10:39  9    Q.  Do you follow that as your normal course when you prescribe

09:10:42 10    Xarelto?

09:10:42 11    A.  Yes.

09:10:43 12    Q.  Is that useful information in the label for you?

09:10:45 13    A.  Yes.

09:10:46 14    Q.  And if someone has a level lower, as indicated here below 15,

09:10:53 15    does that mean you would not prescribe Xarelto for that patient?

09:10:56 16    A.  Yes.

09:10:56 17    Q.  Now, down here it lays out the different portions of the label,

09:11:05 18    right, just giving you a summary?

09:11:08 19    A.  Yes.

09:11:08 20    Q.  And if we look over here, it talks about warnings and

09:11:13 21    precautions, right?

09:11:14 22    A.  Yes.

09:11:14 23    Q.  And I think you were read the risk of pregnancy related to

09:11:19 24    hemorrhage, right?

09:11:20 25    A.  Yes.

09:11:20  1    Q.  Is that normal on a label that there are specific instructions

09:11:24  2    about how to use or prescribe this drug for pregnant women?

09:11:31  3    A.  Yes.

09:11:32  4    Q.  Is that in most drugs --

09:11:34  5    A.  Yes.

09:11:34  6    Q.  -- a special category?

09:11:36  7    A.  Yes.

09:11:36  8    Q.  And in the Xarelto label here, does the label give you

09:11:42  9    instructions for different specific populations and how you should

09:11:46  10   adjust your dosing or your treatment of the patient based on some

09:11:49  11   of these characteristics?

09:11:51  12   A.  Yes.

09:11:51  13   Q.  And is that useful to you in prescribing Xarelto?

09:11:55  14   A.  Yes.

09:11:56  15   Q.  I just want to talk to you a bit about the risks and benefits.

09:12:06  16   It's no secret to you, of course, that the benefit of the drug,

09:12:09  17   that it stops the clotting, is also what causes the risk, right?

09:12:14  18   A.  Yes.

09:12:14  19   Q.  So tell the jury why is it when you know you're going to put a

09:12:18  20   patient on a drug like this that increases their risk of bleeding,

09:12:23  21   why is that beneficial and why do you do that?

09:12:24  22   A.  Because the risk of bleeding is relatively low compared to the

09:12:28  23   risk of getting a stroke.

09:12:30  24   Q.  And how do you explain that to your patients?  How do you tell

09:12:33  25   them, when you're explaining the risks of bleeding, why it's worth

09:12:37  1    it for them and why you recommend the drug?

09:12:40  2    A.  Well, generally, exactly what I said, that the risk of stroke

09:12:46  3    is fairly high, and the risk of bleeding is there of course.  But

09:12:51  4    one of the things I say is that bleeding can be reversed, but the

09:12:55  5    stroke is very hard to reverse, so.

09:12:58  6    Q.  And have you seen that in your 22 years of practice?

09:13:01  7    A.  Yes.

09:13:02  8    Q.  Have you had patients that go off their anticoagulants and have

09:13:08  9    strokes?

09:13:09  10   A.  Yes.

09:13:10  11   Q.  Now, you were also asked by counsel, I believe, about

09:13:17  12   whether -- if there were some kind of test that could tell you

09:13:21  13   specifically that a specific patient was at a higher risk of

09:13:25  14   bleeding, you would want to know about that test, right?

09:13:27  15   A.  Yes.

09:13:28  16   Q.  And you keep up with the literature, right?

09:13:29  17   A.  Yes.

09:13:30  18   Q.  And you haven't seen any literature that suggests there's a

09:13:33  19   specific test that does that, right?

09:13:34  20   A.  No.

09:13:35  21   Q.  And if there was a test that just told you generally someone

09:13:38  22   could be at a higher risk, would there be a way to use that in your

09:13:42  23   clinical practice?

09:13:43  24   A.  Yes.

09:13:43  25   Q.  How would you use it?

09:13:44  1   A.  I would do the test and identify those that were high risk of

09:13:49  2   bleeding, yes.

09:13:49  3   Q.  Would you need to know some number or cut off or way to know

09:13:56  4   that what that test shows you to make it meaningful?

09:13:58  5   A.  Right.  The test, obviously, will have to come with specific

09:14:01  6   recommendations.

09:14:02  7   Q.  And are you aware of any FDA approved tests that allows you to

09:14:08  8   test a patient who is on Xarelto to determine --

09:14:11  9   A.  No.

09:14:11  10  Q.  -- whether they're at an increased risk?

09:14:13  11  A.  No.

09:14:13  12  Q.  Are you aware of any FDA approved test for any of the Factor Xa

09:14:20  13  anticoagulants that can tell you that a particular patient would be

09:14:23  14  at higher risk?

09:14:24  15  A.  No.

09:14:24  16  Q.  If there's not an FDA approved test, would you use it with a

09:14:27  17  patient?

09:14:28  18  A.  No.

09:14:28  19  Q.  Why is that?

09:14:29  20  A.  Well, it has to be -- it's not going to be available.

09:14:36  21  Q.  And are you familiar with Neoplastin PT?

09:14:43  22  A.  Not really.

09:14:44  23  Q.  You aren't the person at the hospital that determines which

09:14:52  24  reagent is used with PT, right?

09:14:54  25  A.  Correct.

09:14:57  1    Q.  In this case, you did test Mr. Boudreaux, or there was a set of

09:15:02  2    tests that showed his PT time, right, after he came in --

09:15:06  3    A.  Yes.

09:15:07  4    Q.  -- and had his bleed.

09:15:08  5        Let's take a look at that, if we could.

09:15:12  6        MS. WILKINSON:  Hold on one second.  Put up Slide 16,

09:15:26  7    which is part of the medical records that have already been

09:15:29  8    introduced.  Can I switch over to Slide 16?  We can use that, but

09:15:41  9    maybe I have the wrong numbers.  The one that says what was

09:15:45 10    Mr. Boudreaux's PT score.  Maybe that's 17 or 15?  I'm sorry.

09:15:55 11    There you go.  Sorry about that.  Thank you.

09:15:55 12    BY MS. WILKINSON:

09:15:58 13    Q.  You recognize this medical record?

09:15:59 14    A.  Yes.

09:16:01 15    Q.  And let's walk through it, if we could, with the ladies and

09:16:05 16    gentlemen of the jury.  This was taken after Mr. Boudreaux came in

09:16:09 17    to the hospital and it was a -- diagnosed with having a

09:16:12 18    gastrointestinal bleed, right?

09:16:13 19    A.  Yes.

09:16:14 20    Q.  At that time.  And right under the PT time it says,

09:16:18 21    "Comment" -- well, it says, "INR," right?

09:16:20 22    A.  Yes.

09:16:21 23    Q.  What is INR?

09:16:22 24    A.  INR is short for international normalized ratio.

09:16:27 25    Q.  And are you familiar with how you, as a physician, read a PT

09:16:32  1  score with an INR?

09:16:33  2  A.  Yes.

09:16:34  3  Q.  Do you use that with any of the novel oral anticoagulants?

09:16:39  4  A.  No.

09:16:40  5  Q.  What is it used for?

09:16:41  6  A.  It's used for Coumadin.

09:16:43  7  Q.  So Coumadin meaning warfarin?

09:16:45  8  A.  Yes.

09:16:46  9  Q.  So when you see those numbers and you know you have a patient

09:16:49 10  who is on Xarelto, do those numbers mean anything to you?

09:16:53 11  A.  No.

09:16:53 12  Q.  And they don't tell you anything about what risk this

09:16:57 13  particular patient is?

09:16:59 14  A.  No.

09:17:00 15  Q.  Now, do you need to have that test when you have a patient on

09:17:03 16  warfarin?

09:17:04 17  A.  On warfarin, yes.

09:17:05 18  Q.  So that's an additional -- this is what you were telling us

09:17:08 19  about the additional monitoring that has to be done?

09:17:10 20  A.  Right.

09:17:10 21  Q.  And why is it that warfarin needs that test and Xarelto and

09:17:16 22  Savaysa and the others do not?

09:17:17 23  A.  It affects multiple other factors, and this -- that would

09:17:22 24  reflect how it's affecting the overall blood.

09:17:28 25  Q.  Now, you told us that you spoke to Mr. Boudreaux about the

09:17:34  1   risks associated with taking Xarelto, but you also have a nurse who

09:17:38  2   does the same, right?

09:17:39  3   A.  Yes.

09:17:39  4   Q.  Tell us what you think of Nurse Theriot.

09:17:43  5   A.  She is extremely reliable, very thorough.

09:17:46  6   Q.  Did you say she is one of the top -- in the top one percent of

09:17:51  7   nurses you've ever worked with?

09:17:53  8   A.  I would say that, yes.

09:17:53  9   Q.  Is she knowledgeable about Xarelto and the other

09:17:56 10   anticoagulants?

09:17:57 11   A.  Yes.

09:17:57 12   Q.  Do you allow her to review in detail with patients all of the

09:18:03 13   risks associated with Xarelto and what they need to look for when

09:18:06 14   they go home in case there's an issue?

09:18:09 15   A.  Yes.  In fact, I rely on her to go through the details, yes.

09:18:12 16   Q.  And you kept this, a record in the file for Mr. Boudreaux

09:18:17 17   showing that Nurse Theriot had gone through those warnings, right?

09:18:21 18   A.  Yes.

09:18:22 19   Q.  Let's take a look again, if we can.  I think that's the one you

09:18:25 20   had up, if you don't mind.  Maybe that's 16.  Is that the document

09:18:29 21   you're talking about?

09:18:30 22   A.  Yes.

09:18:31 23   Q.  And we just pulled out some of these over on the left.  Is

09:18:35 24   there a whole list of warnings and issues that you have raised with

09:18:40 25   your patients to ensure they understand?

09:18:43   1   A.  Yes.

09:18:43   2   Q.  Do you believe that the label adequately warns you about the

09:18:48   3   risks associated with Xarelto?

09:18:50   4   A.  Yes.

09:18:51   5   Q.  You understood the bleeding risks?

09:18:53   6   A.  Yes.

09:18:54   7   Q.  You understood that there was a slightly increased risk of

09:18:57   8   gastrointestinal bleeds versus warfarin?

09:18:59   9   A.  Yes.

09:19:00  10   Q.  But did you understand, also, that there was a decreased risk

09:19:05  11   in fatal bleeding and intracranial bleeding on Xarelto?

09:19:09  12   A.  Yes.

09:19:10  13   Q.  Does that matter to you?

09:19:11  14   A.  Yes.

09:19:12  15   Q.  Why is it that you would pick a drug where the gastrointestinal

09:19:16  16   bleeds are of a higher risk but the fatal and cranial bleeds are

09:19:21  17   lower?  Why would you make that decision?

09:19:24  18   A.  Well, these numbers were very marginal.  Generally, an

09:19:29  19   intracranial bleed is lot more serious than a gastrointestinal

09:19:33  20   bleed, yes.

09:19:33  21   Q.  If you had a test that generally told you whether someone was

09:19:44  22   at a higher risk, would you want to understand whether measuring

09:19:48  23   that could show you how -- monitoring that patient could decrease

09:19:52  24   the risk of bleed?

09:19:53  25   A.  Yes.

09:19:53  1    Q.  And are you aware of any test that allows you to do that

09:19:58  2    associated with Xarelto?

09:19:59  3    A.  No.

09:20:00  4    Q.  How about with Pradaxa?

09:20:03  5    A.  No.

09:20:04  6    Q.  Savaysa?

09:20:05  7    A.  No.

09:20:06  8    Q.  Or Eliquis?

09:20:06  9    A.  No.

09:20:07  10   Q.  And in your practice when you speak to other physicians and you

09:20:13  11   read articles, have you come across any data that suggests that

09:20:18  12   there's a reliable test that would be useful to you as a physician

09:20:21  13   that would help you understand if a particular patient is at an

09:20:25  14   increased risk?

09:20:26  15   A.  No.

09:20:26  16   Q.  So knowing all of that, would you still -- understanding what

09:20:31  17   you saw, the facts of Mr. Boudreaux's case, would you still

09:20:35  18   prescribe Xarelto for him today?

09:20:36  19   A.  Yes.

09:20:37  20   Q.  And would different information that didn't provide clinically

09:20:44  21   useful testing information, would that change your prescribing

09:20:48  22   decision if it didn't provide clinically useful information?

09:20:52  23   A.  No.

09:20:57  24   Q.  Dr. Wong, today when you leave here, which hopefully will be in

09:21:03  25   just a few minutes, will you go back to seeing patients who have

09:21:08  1    atrial fibrillation?

09:21:09  2    A.  Yes.

09:21:09  3    Q.  And will you choose, depending on the patient, to prescribe

09:21:12  4    Xarelto for them?

09:21:13  5    A.  Probably.

09:21:14  6    Q.  And if a different drug is appropriate, would you choose to

09:21:19  7    prescribe Eliquis?

09:21:20  8    A.  Yes.

09:21:21  9    Q.  And Savaysa and the others?

09:21:24  10   A.  Yes.

09:21:25  11   Q.  I want to ask you one question about a journal, and this is a

09:21:39  12   brand new article.  But are you familiar with the journal *JAMA*

09:21:45  13   *Cardiology*?

09:21:45  14   A.  I am not sure.

09:21:46  15   Q.  Okay.  Do you belong to or do you participate ever in what's

09:21:50  16   called a journal club?

09:21:52  17   A.  No.

09:21:53  18   Q.  So how are you able to keep up with the literature regarding

09:21:59  19   anticoagulants?

09:22:00  20   A.  Various articles and now days on the internet we can always get

09:22:07  21   on my e-mail I constantly get literature and conferences.  I

09:22:15  22   usually take CME hours and review board topics and stuff like that.

09:22:20  23   Q.  In your area of expertise, do you have specific guidelines or

09:22:25  24   standards of care that tell you and give you help in determining

09:22:29  25   how to treat patients with atrial fibrillation?

09:22:33 1   A.  Yes.

09:22:33 2   Q.  And is it the standard of care to prescribe Xarelto as well as

09:22:38 3   other anticoagulants?

09:22:39 4   A.  Yes.

09:22:39 5   Q.  And is one of the benefits that your fellow practitioners see

09:22:45 6   is because you don't have to monitor those patients on a regular

09:22:49 7   basis?

09:22:49 8   A.  Yes.

09:22:50 9           MS. WILKINSON:  Thank you very much, Dr. Wong.

09:22:54 10          THE COURT:  Any redirect?

09:22:55 11          MR. BIRCHFIELD:  Yes, your Honor.

09:22:56 12                      REDIRECT EXAMINATION

09:22:57 13  BY MR. BIRCHFIELD:

09:22:58 14  Q.  Dr. Wong, Ms. Wilkinson asked you if you had -- if you had

09:23:03 15  looked at literature and found any specific test to identify high

09:23:08 16  risk patients on Xarelto, and you said you have not seen any such

09:23:13 17  literature.  Is that correct?

09:23:14 18  A.  Yes.

09:23:15 19  Q.  We know that there is no, no information about such a test like

09:23:21 20  a Neoplastin PT test in the Xarelto label, correct?

09:23:25 21  A.  Yes.

09:23:26 22  Q.  Dr. Wong, would you find it troubling if there were such a test

09:23:34 23  to identify high risk patients on Xarelto that you were not

09:23:39 24  informed about in the product label?

09:23:41 25  A.  Yes.

09:23:42  1                MS. WILKINSON:  Objection, calls for speculation.

09:23:45  2                THE COURT:  Overrule the objection.

09:23:46  3                MR. BIRCHFIELD:  I'm sorry?

09:23:46  4     BY MR. BIRCHFIELD:

09:23:48  5     Q.  I'm sorry, I didn't hear your answer.  Would you find that

09:23:51  6     troubling?

09:23:52  7     A.  Yes.

09:23:54  8     Q.  And, Dr. Wong, if you were asked about whether the test result

09:24:00  9     would need to be clinically useful, do you recall that, that

09:24:05 10     question, sir?

09:24:06 11     A.  Yes.

09:24:06 12     Q.  And would you find a test that is predictive of bleeding risk

09:24:11 13     to be useful?

09:24:12 14     A.  Yes.

09:24:16 15                MR. BIRCHFIELD:  Your Honor, if I can, may I approach the

09:24:19 16     board here?

09:24:20 17                THE COURT:  Yes.

09:24:25 18     BY MR. BIRCHFIELD:

09:24:26 19     Q.  Dr. Wong, if you would, just describe for us, if you would, I

09:24:30 20     want to make a list of conditions, types of conditions that you

09:24:35 21     treat as a cardiologist.  Will you do that for us?  We know you

09:24:40 22     treat AFib, AFib patients, right?

09:24:43 23     A.  Atrial fibrillation.  There are about dozens of rhythm

09:24:47 24     problems.  I mean, do you really want to go through all the rhythm

09:24:51 25     problems?

09:24:52  1    Q.  All right.  You're going to test my spelling here now.  Rhythm

09:24:57  2    problems.  Okay.  What else?

09:25:01  3    A.  Coronary artery disease.

09:25:04  4    Q.  Abbreviate that CAD?

09:25:10  5    A.  CAD.  Heart failure.

09:25:11  6    Q.  Okay.

09:25:13  7    A.  And cardiomyopathies.

09:25:21  8    Q.  And cardiomyopathy?

09:25:25  9    A.  Cardiomyopathies.

09:25:31 10    Q.  Okay.  Any other conditions?

09:25:33 11    A.  Why don't we just keep it at that.

09:25:35 12    Q.  What about diabetes, do you treat patients with diabetes?

09:25:40 13    A.  Rarely.

09:25:40 14    Q.  Are these the main ones that you would treat?

09:25:43 15    A.  Hypertension.

09:25:45 16    Q.  Is that abbreviated HTN sometimes?

09:25:48 17    A.  Uh-huh, yes.

09:25:49 18    Q.  Any other?

09:25:53 19    A.  PAD.

09:25:55 20    Q.  I'm sorry?

09:25:56 21    A.  Peripheral artery disease.

09:26:06 22    Q.  What about ACS?

09:26:09 23    A.  Coronary syndrome, that would be in the broad group of CAD,

09:26:15 24    coronary artery disease.

09:26:17 25    Q.  Any others, main areas?

09:26:19  1   A.  That's pretty much sum it up.

09:26:21  2   Q.  What about patients that have had stents, follow-up for stents?

09:26:26  3   A.  That's part of CAD.

09:26:29  4   Q.  Dr. Wong, if you look at AFib, there are different classes of

09:26:36  5   drugs that treat AFib, right, we've heard about the --

09:26:41  6   A.  Yes.

09:26:42  7   Q.  -- the Vitamin K antagonist Coumadin and others, right?

09:26:42  8   A.  Yes.

09:26:48  9   Q.  And the NOACs?

09:26:49  10  A.  Yes.

09:26:51  11  Q.  So we have -- and so the Vitamin K antagonist, there's more

09:26:58  12  than one drug in that class, right?

09:27:01  13  A.  Yes.

09:27:01  14  Q.  And then you have NOACs, at least four in that category, right,

09:27:05  15  that class of drugs, right?

09:27:07  16  A.  Right.  Right.

09:27:07  17  Q.  What about rhythm problems --

09:27:10  18  A.  I think for the jury, do they know what NOAC means?  Novel oral

09:27:15  19  anticoagulants, which means the four, there are four of them and

09:27:19  20  Xarelto is one of them.

09:27:20  21  Q.  And what about classes of drugs that would treat rhythm

09:27:24  22  problems?

09:27:25  23  A.  There are dozens of them.

09:27:35  24  Q.  What about CAD?

09:27:37  25  A.  Again, there are dozens of them.

09:27:40  1   Q.   Dozens of classes of drugs?

09:27:42  2   A.   Well, yes.

09:27:49  3   Q.   What about heart failure, Dr. Wong?

09:27:51  4   A.   Yes, still.

09:27:52  5   Q.   Dozens?

09:27:53  6   A.   Probably.

09:27:58  7   Q.   Cardiomyopathy?

09:28:01  8   A.   Yes.  They overlap a lot.  There's one more category, broad

09:28:05  9   category, that I should mention is dyslipidemia, cholesterol.

09:28:21 10   Q.   Cardiomyopathy?

09:28:24 11   A.   Yes.  Again, it depends what kind of cardiomyopathy.

09:28:28 12   Q.   A lot of different drugs?

09:28:30 13   A.   Lots of them.

09:28:31 14   Q.   I'm sorry?

09:28:32 15   A.   Lots of them, yes.

09:28:37 16   Q.   Hypertension, many different classes there?

09:28:40 17   A.   Yes.

09:28:41 18   Q.   And in each of those classes there are multiple drugs within

09:28:48 19   that class, right?

09:28:49 20   A.   Yes.

09:28:49 21   Q.   Like beta blockers.  What are some of the classes?

09:28:53 22   A.   Beta blockers, calcium channel blockers, ace inhibitors,

09:28:58 23   Angiotensin receptor blockers, diuretics, vasodilators, Alpha

09:29:05 24   blockers.  A lot of them.

09:29:08 25   Q.   What about PAD, are there different classes?

09:29:11  1   A.  Yes, mostly -- yes, yeah.

09:29:13  2   Q.  Can you tell me, tell us about those?

09:29:16  3   A.  Some anti-platelet medications.  But generally, they overlap

09:29:21  4   with the CAD medications.

09:29:22  5   Q.  So those would overlap, okay.

09:29:28  6           What about cholesterol, are there different classes

09:29:31  7   within the cholesterol medicines?

09:29:33  8   A.  Yes, yes.

09:29:34  9   Q.  So, Dr. Wong, we have -- the jury has heard testimony about the

09:29:42 10   number of articles, big stacks, hundreds of articles on Xarelto

09:29:47 11   that have been written.  And it's only been on the market since

09:29:52 12   2011.  Would each of the drugs that you prescribe, would they have

09:29:58 13   large numbers of articles that are written about those drugs?

09:30:01 14   A.  Yes.

09:30:03 15   Q.  Is it reasonable for a drug company to expect a doctor to know

09:30:12 16   all of the articles, go find the articles instead of putting

09:30:16 17   important safety information in their label?

09:30:18 18           MS. WILKINSON:  Objection to foundation, about what a

09:30:21 19   drug company would.

09:30:23 20           THE COURT:  Well --

09:30:24 21           THE WITNESS:  No.

09:30:25 22           THE COURT:  I'll overrule the objection.

09:30:26 23   BY MR. BIRCHFIELD:

09:30:27 24   Q.  From a doctor's perspective, would you expect a drug company to

09:30:32 25   just put it out in the public domain or in the literature but not

09:30:36  1   provide it for you in their product label?

09:30:39  2   A.  Could you ask the question again because I am not sure.

09:30:43  3   Q.  Let's put it back in the context here.  And Ms. Wilkinson asked

09:30:49  4   you if you found in the literature any specific test that would

09:30:54  5   identify high risk patients on Xarelto, and you said no.  But is it

09:31:02  6   reasonable for a drug company to ask you as a doctor to go out and

09:31:06  7   search all of that literature to find a problem?

09:31:09  8   A.  No.

09:31:13  9           MR. BIRCHFIELD:  Thank you, Dr. Wong.

09:31:14  10          THE COURT:  You're excused.  Thank you, Doctor.  You're

09:31:17  11   excused.

09:31:19  12          Let's call your next witness, please.

09:31:20  13          MR. BIRCHFIELD:  Your Honor, at this time the plaintiff

09:31:22  14   would call Dr. Peter Fail.

09:32:10  15          THE DEPUTY CLERK:  Good morning.  Would you raise your

09:32:13  16   right hand.

09:32:14  17      (WHEREUPON, DR. PETER FAIL, WAS SWORN IN AND TESTIFIED AS

09:32:18  18      FOLLOWS:)

09:32:18  19          THE DEPUTY CLERK:  Sir, would you please state and spell

09:32:20  20   your name for the record.

09:32:22  21          THE WITNESS:  Peter Fail, P-E-T-E-R F-A-I-L.

09:32:29  22                          DIRECT EXAMINATION

09:32:30  23   BY MR. BIRCHFIELD:

09:32:31  24   Q.  Good morning, Dr. Fail.

09:32:33  25   A.  How are you?

09:32:34  1   Q.  Good.  Andy Birchfield.  You and I met previously; is that
09:32:37  2   right?
09:32:37  3   A.  Yes, sir.
09:32:38  4   Q.  And you understand that I represent Mr. Joseph Boudreaux; is
09:32:41  5   that correct?
09:32:41  6   A.  Yes, sir.
09:32:42  7   Q.  And you understand that the Boudreauxes are not making any
09:32:45  8   claim against you in the case, you understand that?
09:32:47  9   A.  Yes, sir.
09:32:48 10   Q.  And you are -- you're here today -- you received a subpoena to
09:32:53 11   appear in court; is that correct?
09:32:54 12   A.  Yes, I did.
09:32:55 13   Q.  And you're here today to provide information about your care
09:33:00 14   and treatment of Mr. Boudreaux?
09:33:03 15   A.  Yes, sir.
09:33:04 16   Q.  And would you tell -- would you tell the jury about your
09:33:08 17   education that led to you becoming a cardiologist?
09:33:12 18   A.  Four years of medical school, three years of residency, four
09:33:19 19   years of cardiology with a year in interventional cardiology.
09:33:24 20   Q.  Where is your practice now, Doctor?
09:33:26 21   A.  It's in Houma, Louisiana.
09:33:27 22   Q.  And are you with Cardiovascular Institute of the South?
09:33:31 23   A.  Yes, I am.
09:33:32 24   Q.  Are you an owner?
09:33:33 25   A.  Yes, I am.

09:33:35  1    Q.  I want to turn your attention to your care of Mr. Boudreaux,

09:33:41  2    and that began in April of 2015; is that correct?

09:33:45  3    A.  I believe that's correct, yes, sir.

09:33:47  4         MR. BIRCHFIELD:  Your Honor, if I could provide the

09:33:50  5    witness and defense counsel and the Court a copy of the exhibits

09:33:52  6    that I plan to use.

09:34:10  7         THE WITNESS:  Thank you.

09:34:15  8    BY MR. BIRCHFIELD:

09:34:17  9    Q.  Dr. Fail, if you'll take a look at the document we're marking

09:34:23 10    it as Plaintiff Exhibit 60, the Identification No. 5768236.32.

09:34:30 11         MR. BIRCHFIELD:  And at this time, your Honor, I would

09:34:32 12    offer Plaintiff's Exhibit 60 into evidence.

09:34:35 13         MR. SARVER:  No objection, your Honor.

09:34:37 14         THE COURT:  Let it be admitted.

09:34:40 15    BY MR. BIRCHFIELD:

09:34:40 16    Q.  And, Dr. Fail, there's a copy, it will appear there on the

09:34:44 17    screen, I have a hard copy for your convenience.  Whichever works

09:34:47 18    best for you.

09:34:48 19         You'll see on the second page of that document up at the

09:34:51 20    top it's dated February -- I mean, April the 27th, 2015.

09:34:56 21    A.  Yes, sir.

09:34:56 22    Q.  Is that correct?

09:34:57 23    A.  Yes, sir.

09:34:57 24    Q.  And that was your initial interaction in providing treatment

09:35:04 25    for Mr. Boudreaux; is that right?

09:35:05  1   A.  Yes, it was.

09:35:06  2   Q.  Would you describe for the jury, please, sir, what you did for

09:35:15  3   Mr. Boudreaux on that day?

09:35:18  4   A.  Dr. Timothy had referred Mr. Boudreaux to me to evaluate him

09:35:24  5   for possible left atrial appendage plication utilizing a Lariat

09:35:29  6   procedure.

09:35:30  7   Q.  So let's stop right there.  Dr. Timothy, is he a cardiologist

09:35:35  8   in your group?

09:35:36  9   A.  Yes, sir, he is.

09:35:37 10   Q.  And he had been providing some care for Mr. Boudreaux; is that

09:35:42 11   right?

09:35:42 12   A.  I believe he has, yes, sir.

09:35:44 13   Q.  And you said that he had recommended Mr. Boudreaux see you for

09:35:49 14   a left --

09:35:50 15   A.  Left atrial appendage plication.

09:35:54 16   Q.  Okay.  Will you describe for us, describe for the jury what

09:35:58 17   that is?

09:35:58 18   A.  Left atrial appendage is a vestigial organ that is on a left

09:36:06 19   atrium that is thought to be very responsible for those people who

09:36:10 20   have strokes in atrial fibrillation as a nidus for clot.

09:36:16 21   Q.  So you met with Mr. Boudreaux to discuss that issue, right?

09:36:20 22   A.  Yes, sir.

09:36:21 23   Q.  If you would, let's walk through that first section.  You see

09:36:28 24   him 73-year old male referred by Dr. Timothy, right?

09:36:31 25   A.  Yes, sir.

09:36:31  1    Q.  And it says that the patient was diagnosed with new onset AFib

09:36:35  2    in January of 2014?

09:36:38  3    A.  That's correct.

09:36:42  4    Q.  And it says that the duration was unknown and associated with

09:36:46  5    some diastolic heart failure.  Will you describe that for us,

09:36:53  6    please, sir?

09:36:54  7    A.  Mr. Boudreaux presented I believe originally to Dr. Wong in

09:36:58  8    2014 with atrial fibrillation, and up until the time it was unknown

09:37:03  9    or unclear how long he had been having that.  The feeling was that

09:37:07  10   because of the atrial fibrillation his heart was becoming very,

09:37:09  11   very inefficient and he was going into diastolic heart failure.

09:37:13  12   Q.  And Mr. Boudreaux was started on Xarelto at that point?

09:37:16  13   A.  That is correct.

09:37:17  14   Q.  And there had been plans for a cardioversion and Dr. Wong has

09:37:24  15   testified about the plans for that that was scheduled on February

09:37:27  16   the 5th of 2014?

09:37:29  17   A.  I believe that's true, yes, sir.

09:37:31  18   Q.  Then is says that he was unable to tolerate anticoagulation due

09:37:37  19   to recurrent GI bleeds.  Do you see that?

09:37:43  20   A.  Yes, sir.

09:37:44  21   Q.  And the jury has heard and you know from your records that

09:37:49  22   Mr. Boudreaux had a -- was hospitalized for a GI bleed in February

09:37:54  23   of 2014, right?

09:37:56  24   A.  I believe that's correct, yes, sir.

09:37:57  25   Q.  And that was before the cardioversion was scheduled?

09:38:01  1    A.  Yes, sir.

09:38:02  2    Q.  And so after that GI bleed was he able to be on an

09:38:09  3    anticoagulant?

09:38:12  4    A.  If I recollect, I believe he was rechallenged but had another

09:38:16  5    bleed and was therefore stopped, if I remember correctly.

09:38:19  6    Q.  I think that may be a different patient, Dr. Fail.

09:38:24  7    A.  So he may not have been rechallenged.

09:38:27  8    Q.  It's noted that he was unable to tolerate an anticoagulant,

09:38:31  9    that would be the experience with the GI bleed?

09:38:33 10    A.  That is correct, sir, yes, sir.

09:38:34 11    Q.  And it says that an outpatient workup revealed nonischemic CMO.

09:38:41 12    What is that?

09:38:42 13    A.  Cardiomyopathy.

09:38:44 14    Q.  And the EF, that's ejection fraction?

09:38:46 15    A.  Ejection fraction.

09:38:47 16    Q.  What's the significance of an ejection fraction at 35 percent?

09:38:51 17    A.  A normal ejection fraction is around 55 to 60 percent and so

09:38:56 18    Mr. Boudreaux's had reduced to about 35 percent based on an echo.

09:39:01 19    Q.  Dr. Fail, if you will turn to the page down at the bottom, the

09:39:08 20    last two numbers 0035.

09:39:11 21    A.  I have it.

09:39:14 22    Q.  And has the admit diagnosis there and atrial fibrillation; is

09:39:21 23    that correct?

09:39:21 24    A.  Yes, sir.

09:39:22 25    Q.  So on this date in April 27th, 2015, Mr. Boudreaux was still in

09:39:34  1   AFib at that point?

09:39:35  2   A.  Yes, he was.

09:39:36  3   Q.  And at that point he was not on any anticoagulant to reduce the

09:39:42  4   risk of stroke due to the AFib; is that correct?

09:39:45  5   A.  That is correct.

09:39:45  6   Q.  And it says the plan here is to arrange for a TEE?

09:39:55  7   A.  That's transesophageal echocardiogram.

09:40:00  8   Q.  And it says looking to schedule that on May 6th of 2015; is

09:40:07  9   that correct?

09:40:07 10   A.  Yes, sir.

09:40:08 11   Q.  And then do -- is that something that you would do in

09:40:13 12   preparation for doing the Lariat procedure?

09:40:15 13   A.  Yes, sir.  Because of the manipulation of the left atrial

09:40:19 14   appendage, you want to ensure that there's no blood clot in the

09:40:22 15   left atrial appendage.

09:40:25 16   Q.  And you discussed all of this with Mr. Boudreaux, right?

09:40:27 17   A.  Yes, sir.

09:40:27 18   Q.  If you will turn to the page down at the bottom 42.

09:40:38 19   A.  Yes, sir.

09:40:39 20   Q.  And there it says present illness/symptoms, and it has

09:40:45 21   handwritten note there on Page 42, one page more.

09:40:57 22   A.  I have that as 43 though.

09:41:00 23   Q.  I'm sorry.  I was talking to get the right one on the screen,

09:41:03 24   you're at right page.

09:41:05 25           Where it says -- the handwritten note, is that your note,

09:41:08  1  Dr. Fail?

09:41:08  2  A.  Yes, sir.

09:41:08  3  Q.  And it says that he is a good -- up at the top, is that -- tell

09:41:13  4  us what that says.

09:41:17  5  A.  It's obviously very clear.  Did very poorly in handwriting in

09:41:23  6  school.  It says he is a good candidate for a Lariat.

09:41:27  7  Q.  So you discussed -- you assessed Mr. Boudreaux and you

09:41:33  8  determined that he was a good candidate for a Lariat procedure; is

09:41:37  9  that correct?

09:41:38  10  A.  That's correct.  He underwent a TEE, as well as a CAT scan to

09:41:42  11  determine if his anatomy was adequate.

09:41:46  12  Q.  And you discussed that procedure with Mr. Boudreaux.  And what

09:41:50  13  would be the objective, what would be the desired outcome for a

09:41:53  14  Lariat procedure?

09:41:54  15  A.  To remove the nidus of a blood clot -- to remove the nidus

09:42:01  16  where blood clots would form and potentially reducing his risk for

09:42:05  17  stroke.

09:42:06  18  Q.  So you said remove a nidus, what is that?

09:42:10  19  A.  Well, just the area that a blood clot would form or has the

09:42:14  20  potential to form in those patients with atrial fibrillation.

09:42:17  21  Q.  So the purpose of this procedure is to reduce the risk of

09:42:21  22  stroke that he experienced because of being in AFib?

09:42:25  23  A.  Yes, sir.

09:42:28  24       MR. BIRCHFIELD:  Your Honor, at this time we have a video

09:42:33  25  animation that Dr. Fail provided during his deposition of the

09:42:37   1    Lariat procedure that we would like to introduce into evidence as

09:42:42   2    Exhibit 61.

09:42:43   3                MR. SARVER:  No objection, your Honor.

09:42:45   4                THE COURT:  Okay.  Admitted.

09:42:46   5    BY MR. BIRCHFIELD:

09:42:46   6    Q.  Dr. Fail, this is a video -- an animation of the Lariat

09:42:52   7    procedure, is that correct, that you provided in your deposition?

09:42:54   8    A.  I believe so, yes, sir.

09:42:56   9    Q.  What I would like for us to do is to play this animation.

09:43:01  10    A.  Yes, sir.

09:43:02  11    Q.  And if you would just -- we'll stop it along the way and let

09:43:05  12    you describe what's taking place, okay.

09:43:05  13         (WHEREUPON, THE ANIMATION WAS PLAYED.)

09:43:05  14    BY MR. BIRCHFIELD:

09:43:07  15    Q.  If you'll just tell us what you see here.

09:43:14  16    A.  So up in the middle of the screen, this is the left atrial

09:43:19  17    appendage you see a blue catheter in the lower part of the screen,

09:43:23  18    that is a catheter that's introduced into the pericardial space.

09:43:26  19    Q.  Let's stop right there because we haven't had a lot of

09:43:29  20    discussion about the anatomy of the heart yet.  So when you say the

09:43:32  21    pericardial space, what are you talking about?

09:43:35  22    A.  So the heart is covered with a skin and that skin is called the

09:43:40  23    pericardium, and so that we have to get into that space, that's

09:43:44  24    where the left atrial appendage is located.

09:43:47  25    Q.  And you said that -- what we see at the bottom here, that is --

09:43:53  1    that's the catheter?

09:43:54  2    A.  That's the catheter that we introduced in the pericardial

09:43:57  3    space, yes, sir.

09:43:57  4    Q.  Okay.  So let's move forward.

09:43:59  5    A.  We then traverse his left atrium from his right atrium.  And

09:44:07  6    this wire is being advanced -- this is actually a very, very small

09:44:10  7    magnet that gets pushed out in the left atrial appendage.

09:44:16  8    Q.  So this is a wire that's actually going into the heart?

09:44:20  9    A.  Yes, sir.  So it goes from his right groin in his vein, goes

09:44:25 10    into the right side of his heart and we take a small needle and we

09:44:28 11    go into the left side of his heart, that's what that white catheter

09:44:32 12    is doing right there.  Through that catheter we pass a small wire

09:44:35 13    that has a magnet on it and that's the magnet that you see at the

09:44:38 14    end the left atrial appendage.

09:44:39 15    Q.  This portion right here, that's a magnet (INDICATING)?

09:44:41 16    A.  Yes, sir, that's a magnet.

09:44:42 17    Q.  What's the purpose of the magnet?

09:44:45 18    A.  If you continue to play the video, you'll see the second magnet

09:44:47 19    that basically comes in through the catheter here.

09:44:51 20         So this is actually a balloon and this is just a

09:44:54 21    reference of what we look for because you cannot see the left

09:44:57 22    atrial appendage clearly or the wire clearly on echocardiogram.

09:45:01 23    The balloon gives us much more area and so we're able to assess

09:45:06 24    where the ostium of the left atrial appendage is, that's what the

09:45:12 25    balloon is for.

09:45:12  1    Q.  So the ostium, what are you talking --

09:45:13  2    A.  It's the very beginning, the mouth or the origin of where the

09:45:18  3    changes from the left atrium to the left atrial -- the entrance.

09:45:23  4    Q.  Okay.  So this left atrial appendage, is that this portion

09:45:26  5    (INDICATING)?

09:45:27  6    A.  Yes, sir.

09:45:27  7    Q.  And what's the purpose of this appendage?

09:45:30  8    A.  It's like the appendix.  Not really known what it does.  It

09:45:34  9    doesn't do anything.  But it's there.

09:45:38  10   Q.  So let's move forward.  So you have the balloon has expanded to

09:45:43  11   open up?

09:45:44  12   A.  The balloon does nothing other than showing position, it

09:45:47  13   doesn't expand anything.

09:45:48  14         This is a second magnificent that actually comes through

09:45:50  15   the catheter and you'll see they click together; and that allows us

09:45:55  16   to form a rail.  And this is the Lariat that comes out from that

09:45:59  17   catheter and then it's slid over that rail so we use that as a

09:46:04  18   positioning.

09:46:04  19         We then push it to the end and where we use the balloon

09:46:07  20   as positioning, we make sure that we're at the correct position.

09:46:10  21   And once we like that, we can actually snare or close the left

09:46:14  22   atrium, the Lariat itself.

09:46:16  23   Q.  So the ring that you have inserted there, the lasso or the

09:46:21  24   Lariat?

09:46:21  25   A.  It's a Lariat, yes, sir.

09:46:24  1   Q.  That has encircled that appendage and is squeezing it together

09:46:28  2   now?

09:46:29  3   A.  Yes, sir.  It's basically what we call purse-stringing or

09:46:32  4   closing the left atrial appendage.

09:46:34  5   Q.  All right.  Let's move forward.  So it closes that area down?

09:46:39  6   A.  Yes, sir.

09:46:39  7   Q.  And then what are you doing here?

09:46:43  8   A.  Now we're going to remove the balloon and what's called the EPI

09:46:48  9   wire, which is that wire that was inside the heart.  We're going to

09:46:50 10   remove that and then we're going to completely close it.

09:46:54 11   Q.  Okay.  And then when that's completely closed, what do you do

09:46:59 12   then?

09:46:59 13   A.  So now we're going to remove the catheter and the sutures and

09:47:03 14   place a catheter into that space that we were just on and send

09:47:08 15   Mr. Boudreaux to CCU.

09:47:09 16   Q.  The critical care unit?

09:47:12 17   A.  Yes, sir.

09:47:12 18   Q.  So this procedure, this is done under general anesthesia?

09:47:17 19   A.  Yes, sir.

09:47:19 20   Q.  And so he is hospitalized overnight?

09:47:20 21   A.  Two nights.

09:47:21 22   Q.  Two nights?

09:47:22 23   A.  Yes, sir.

09:47:23 24   Q.  And then why do you close off that appendage?

09:47:30 25   A.  That sac that you saw is -- in studies has been shown that

09:47:34  1  those patients who have a stroke who have had atrial fibrillation

09:47:39  2  that if you do TEE that greater than 90 percent of the time there

09:47:44  3  will be evidence of a blood clot in that sac.  And so it's thought

09:47:48  4  that that sac represents the area where blood clots will form and

09:47:53  5  patients with atrial fibrillation will have a stroke because of a

09:47:57  6  blood clot in that area.  So that if we can do something about

09:48:00  7  that, whether plug it or ligate it, as we did here, that we may

09:48:04  8  potentiate or remove that risk of stroke.

09:48:08  9  Q.  So, Dr. Fail, to make sure we have the timing in order here.

09:48:16 10  Mr. Boudreaux had a GI bleed on February the 3rd of 2014.

09:48:23 11  A.  I believe that's correct, yes, sir.

09:48:24 12  Q.  And then he was scheduled for a cardioversion on February the

09:48:29 13  5th --

09:48:30 14  A.  Yes, sir.

09:48:30 15  Q.  -- correct?

09:48:32 16         And the objective of the cardioversion is to alleviate

09:48:36 17  the AFib, right?

09:48:37 18  A.  To restore normal rhythm, yes, sir.

09:48:40 19  Q.  So Mr. Boudreaux was unable to undergo that cardioversion

09:48:45 20  because of his GI bleed; is that true?

09:48:48 21  A.  He was unable to undergo the cardioversion because he was not

09:48:53 22  going to be anticoagulated.

09:48:53 23  Q.  And because he was unable to be anticoagulated due to his GI

09:49:00 24  bleed, he continued in atrial fibrillation even in April of 2015,

09:49:06 25  right?

09:49:07 1   A.  Yes, sir, I believe so.

09:49:08 2   Q.  So he continued for that period of time to be under the same

09:49:13 3   stroke risk that he had been prescribed Xarelto for, right?

09:49:17 4   A.  That is correct.

09:49:17 5   Q.  And so the Lariat procedure, did you actually perform that on

09:49:24 6   Mr. Boudreaux?

09:49:24 7   A.  Yes, I did.

09:49:28 8           MR. BIRCHFIELD:  I want to offer Plaintiff's

09:49:32 9   Exhibit 61 -- I'm sorry, 62, Identification No. 5768236.21, it's

09:49:43 10  the op report for the Lariat procedure.

09:49:45 11          MR. SARVER:  No objection, your Honor.

09:49:47 12          THE COURT:  Let it be admitted.

09:49:49 13  BY MR. BIRCHFIELD:

09:49:50 14  Q.  Dr. Fail, we see the operative report.  Did you actually do the

09:49:56 15  Lariat procedure?

09:49:57 16  A.  I did.

09:49:58 17  Q.  And, Dr. Fail, the Lariat procedure, is that a fairly new -- at

09:50:06 18  this point was this a fairly new, innovative procedure?

09:50:09 19  A.  Yes, sir.

09:50:10 20  Q.  And were you one of the first cardiologists in this entire

09:50:15 21  region to do the Lariat procedure?

09:50:17 22  A.  One of the few, yes, sir.

09:50:21 23  Q.  Will you describe for us, walk us through your -- the operative

09:50:26 24  report and what's significant here.

09:50:27 25  A.  This basically details what you had seen on the screen here.

It is the gentleman was brought to the cardiac cath lab, he was placed under general anesthesia with a TEE probe, that's the echocardiographic probe, by Dr. Adams, a cardiac anesthesiologist that I work with.  We then took a micro needle, we accessed the pericardial space.  We then used a series of wires and dilators to upsize that to get the what's called the soft sheath in that area. We then took a Brockenbrough, which is the name of the catheter that gets from the right atrium into the left atrium, catheter and needle, got access into it.

We then put a wire into the left atrium appendage.  We then click the two wires together, as you saw in the video.  We were -- we needed to give him some anticoagulant period because we have a lot of hardware in his heart and we don't want him to develop a clot while we're there.

We then went through the Lariat procedure, as you saw, lassoing his heart, closed off his left atrial appendage. We had a team evaluation that noted everything was closed.  We then removed the Lariat device and put in a catheter into his heart, a drain if you will, and then we sent him to CCU.

Q.  The critical care unit there?

A.  Yes, sir.

Q.  And which hospital?

A.  Terrebonne General.

Q.  And then, Dr. Fail, did you have a follow-up visit --

A.  Yes, sir.

09:52:01  1    Q.  -- with Mr. Boudreaux?

09:52:02  2    A.  Yes, sir.

09:52:08  3            MR. BIRCHFIELD:  Your Honor, plaintiff's would offer

09:52:11  4    Exhibit 63, Plaintiff's Exhibit 63, it's identified --

09:52:15  5    Identification No. 5768213.656, it's the follow-up visit.

09:52:23  6            MR. SARVER:  No objection, your Honor.

09:52:24  7            THE COURT:  Let it be admitted.

09:52:26  8    BY MR. BIRCHFIELD:

09:52:29  9    Q.  Dr. Fail, if you would take a look at the page here.  This is a

09:52:35 10    follow-up visit that you had with Mr. Boudreaux; is that right?

09:52:47 11    I'm sorry, it's actually -- the follow-up visit in the hospital.

09:52:51 12    A.  Oh, yes, yes.  I'm sorry, yes.

09:52:54 13    Q.  And would you describe for us your observations on that

09:53:00 14    encounter?  What was Mr. Boudreaux's condition at this point?

09:53:04 15    A.  So this is in September of '15?

09:53:08 16    Q.  Okay.  All right.  I'm sorry.  Back up.  So when you have a

09:53:14 17    Lariat procedure --

09:53:15 18    A.  Yes, sir.

09:53:16 19    Q.  -- are there complications that are fairly common with that

09:53:23 20    procedure?

09:53:24 21    A.  There are complications that do occur, yes, sir.

09:53:27 22    Q.  And do you know if Mr. Boudreaux had pericardial effusion?

09:53:35 23    A.  He did.

09:53:36 24    Q.  And is that a reasonably expected complication from the Lariat

09:53:43 25    procedure?

09:53:43 1   A.  It's something that does occur.  We do a few things to try to

09:53:48 2   prevent it, but it does occur.

09:53:49 3   Q.  And if you will look at the HPI comments, is that history and

09:53:58 4   physical; is that right?

09:54:01 5   A.  Yes, sir.

09:54:02 6   Q.  Reviewed cath scan?

09:54:03 7   A.  So he had a cath scan I believe that said that he had very

09:54:08 8   large pericardial effusion.

09:54:15 9   Q.  And then it says a possible early cardiac tamponade?

09:54:22 10  A.  Tamponade, yes, sir.

09:54:24 11  Q.  And what is that, sir?

09:54:25 12  A.  Because of the fluid around the heart, the sac, the pericardial

09:54:30 13  sac does not allow anymore motion, if you will.  And it basically

09:54:36 14  strangles the heart, and by echo it was showing that the heart was

09:54:41 15  becoming inefficient and it's just sort of wave forms that they

09:54:46 16  saw.  They said there was too much fluid.

09:54:48 17  Q.  And what do you do to treat that condition?

09:54:52 18  A.  You put a needle and drain it.

09:54:55 19  Q.  I want to show you what's marked as Plaintiff's Exhibit 64.

09:55:07 20  And Plaintiff's Identification No. 5768236.280.  And this is a

09:55:14 21  consult with Cardiovascular Institute cardiologist Dr. Wong.  Are

09:55:21 22  you familiar with this?

09:55:22 23  A.  Yes, sir.

09:55:23 24  Q.  You continue --

09:55:24 25          MR. SARVER:  No objection.

09:55:25  1           THE COURT:  Let it be admitted.

09:55:26  2           MR. BIRCHFIELD:  Thank you.

09:55:27  3  BY MR. BIRCHFIELD:

09:55:27  4  Q.  You continued to treat Mr. Boudreaux even now as his

09:55:32  5  cardiologist, right?

09:55:33  6  A.  Yes, sir.

09:55:34  7  Q.  If you would describe -- what's the significance of the history

09:55:40  8  of the present illness here?

09:55:42  9  A.  So Mr. Boudreaux was admitted to Raceland Hospital and Dr. Wong

09:55:47 10  was consulted after the cath scan.

09:55:50 11  Q.  And if you'll turn to Page 282.  You see the assessment, the

09:56:00 12  assessment/plan?

09:56:01 13  A.  Yes, sir.

09:56:02 14  Q.  And so what's the plan, what needs to be done for Mr. Boudreaux

09:56:05 15  here?

09:56:06 16  A.  So Dr. Wong evaluated him, did a stat echo.

09:56:10 17  Q.  What is that, Dr. Fail?

09:56:12 18  A.  That is an ultrasound of the heart that he wanted to do very

09:56:16 19  quickly.  And then he arranged for transfer to -- from his hospital

09:56:22 20  to our hospital.

09:56:23 21  Q.  Transfer to ICU and then Terrebonne General; is that right?

09:56:31 22  A.  Yes, sir.

09:56:32 23  Q.  And he was transferred -- that transfer took place, right,

09:56:39 24  Dr. Fail?

09:56:39 25  A.  Yes, sir.

09:56:41  1    Q.  Sixty-five.  I want to ask you to take a look at a cardiac

09:56:53  2    diagnostic report, it's Plaintiff's Exhibit 65, 5768236.264.

09:56:59  3            MR. BIRCHFIELD:  We would offer that into evidence, your

09:57:01  4    Honor.

09:57:01  5            MR. SARVER:  No objection, your Honor.

09:57:02  6            THE COURT:  Let it be admitted.

09:57:06  7    BY MR. BIRCHFIELD:

09:57:06  8    Q.  Dr. Fail, do you see the cardiac diagnostic report here?

09:57:11  9    A.  Yes, sir.

09:57:11 10    Q.  And here in the center it talks about the procedure that was

09:57:21 11    done, a pericardiocentesis; is that right?

09:57:24 12    A.  Yes, sir.

09:57:24 13    Q.  The pericardiocentesis, this was done on Mr. Boudreaux because

09:57:29 14    of the pericardial effusion; is that right?

09:57:31 15    A.  That's correct.

09:57:31 16    Q.  Will you describe for us what a pericardiocentesis is?

09:57:37 17    A.  It is literally a technical term for draining the pericardium

09:57:41 18    with a needle.

09:57:42 19    Q.  That fluid buildup around the sac of the heart; is that right?

09:57:46 20    A.  That is correct.

09:57:46 21    Q.  And when you're -- when a patient is experiencing pericardial

09:57:53 22    effusion, what's going on, what are they experiencing, what are

09:57:56 23    their symptoms?

09:57:57 24    A.  Usually, usually extreme fatigue and difficulty in breathing,

09:58:01 25    inability to lay down, sometimes there's some chest discomfort.

09:58:04  1    Q.  And so the idea is to go in with a needle and remove that fluid

09:58:09  2    from around the heart?

09:58:10  3    A.  That is correct.

09:58:11  4    Q.  And does that typically provide fairly dramatic and immediate

09:58:17  5    relief?

09:58:17  6    A.  Yes, sir, it does.

09:58:19  7    Q.  And then Dr. Fail, you had a follow-up visit with Mr. Boudreaux

09:58:28  8    in September of 2015?

09:58:31  9    A.  I believe that's correct, yes, sir.

09:58:34 10    Q.  Show you --

09:58:36 11    A.  Yes, sir.

09:58:38 12          MR. BIRCHFIELD:  Your Honor, I would offer Plaintiff's

09:58:40 13    Exhibit 66, Identification No. 578236.212.

09:58:47 14          MR. SARVER:  No objection.

09:58:48 15          THE COURT:  Let it be admitted.

09:58:49 16    BY MR. BIRCHFIELD:

09:58:51 17    Q.  And, Dr. Fail, here the history of the present illness it says

09:58:58 18    that Mr. Boudreaux -- referring to him returning for a follow-up

09:59:02 19    visit with you; is that right?

09:59:03 20    A.  That is correct.

09:59:04 21    Q.  Would you walk through this visit with us, sir?

09:59:07 22    A.  So he returns today in follow-up.  He underwent a Lariat

09:59:10 23    procedure in May of 2015.  He did originally well but returned with

09:59:14 24    increasing shortness of breath and found to have a large

09:59:16 25    pericardial effusion.  He underwent a pericardiocentesis removing

09:59:22  1    two liters of effusion.  He returned to the clinic today.

09:59:25  2    Performed a follow-up echo which showed very small pericardial

09:59:29  3    effusion.  He feels well with no further shortness of breath.  He

09:59:33  4    is currently taking his Colchicine.

09:59:36  5    Q.  What is that?

09:59:37  6    A.  Colchicine is a medicine that's originally used for gout, but

09:59:40  7    it works in reducing pericardial effusion, pericarditis, other

09:59:46  8    disease processes.

09:59:47  9    Q.  So, Dr. Fail, the Lariat procedure that you had performed was

09:59:56 10    successful, right?

09:59:57 11    A.  Yes, sir.

09:59:57 12    Q.  As a result of that procedure his risk of stroke from the AFib

10:00:01 13    was reduce, right?

10:00:03 14    A.  That is our supposition, yes, sir.

10:00:06 15    Q.  And as a result of that procedure he developed pericardial

10:00:10 16    effusion, the buildup around the heart?

10:00:10 17    A.  Correct.

10:00:11 18    Q.  And to undergo the pericardiocentesis; is that right?

10:00:17 19    A.  Yes, sir.

10:00:17 20    Q.  Did you have a subsequent follow-up visit -- have you had

10:00:21 21    follow-up visits from Mr. Boudreaux?

10:00:23 22    A.  Yes, sir.

10:00:24 23          MR. BIRCHFIELD:  I want to offer plaintiff's Exhibit 67,

10:00:35 24    Identification No. 5768154.355.

10:00:42 25          MR. SARVER:  No objection, your Honor.

10:00:43  1          THE COURT:  Let it be admitted.

10:00:44  2  BY MR. BIRCHFIELD:

10:00:45  3  Q.  Dr. Fail, this is a visit with Mr. Boudreaux on March the 24th

10:00:53  4  of 2016; is that right?

10:00:55  5  A.  That is correct.

10:00:56  6  Q.  And how is he presenting, what's the symptoms he is

10:01:01  7  experiencing?

10:01:01  8  A.  He comes in with shortness of breath and chest discomfort.

10:01:06  9  Q.  And that had been going on for several days?

10:01:11 10  A.  Yes, sir.

10:01:12 11  Q.  And did you have a plan of action as a result of this visit,

10:01:18 12  sir?

10:01:18 13  A.  Yes, sir.  My concern because of his previous history of

10:01:25 14  pericardial effusion accumulation that this may have been another

10:01:30 15  attempt at that, so we asked for echocardiogram to look for fluid

10:01:34 16  accumulation.  We also did what's called inflammatory markers using

10:01:39 17  an ESR and follow-up on visit.

10:01:41 18  Q.  And you had a follow-up visit a couple of months later,

10:01:49 19  May 24th of 2016; is that right?

10:01:51 20  A.  Yes, sir.

10:01:55 21          MR. BIRCHFIELD:  Your Honor, offer Plaintiff's

10:01:58 22  Exhibit 68, Identification No. 5768237.365.

10:02:04 23          MR. SARVER:  No objection, your Honor.

10:02:05 24          THE COURT:  Let it be admitted.

10:02:06 25  BY MR. BIRCHFIELD:

10:02:07  1   Q.  Dr. Fail, is this the follow-up visit on May 24th, 2016?

10:02:12  2   A.  Yes, sir, it is.

10:02:14  3   Q.  And there in the history of present illness section does it

10:02:22  4   indicate anything in regards to his atrial fibrillation?

10:02:26  5   A.  Just that he remains in AFib.

10:02:30  6   Q.  And he remained in AFib consistently since you began seeing

10:02:34  7   him; is that correct?

10:02:35  8   A.  That is correct.

10:02:35  9   Q.  And then, Dr. Fail, if you will turn to Page 369.  And again,

10:02:52 10   you discussed his history of your treatment there with him; is that

10:02:55 11   correct?

10:02:55 12   A.  Yes, sir.

10:02:56 13   Q.  Including the Lariat procedure?

10:02:57 14   A.  Yes, sir.

10:02:58 15   Q.  And then if you'll turn to Page 371.  We see your assessment

10:03:10 16   and plan down at the bottom of the page, do you see that?

10:03:15 17   A.  That is correct, yes, sir.

10:03:16 18   Q.  It says set up for DCCV on June 7th, 2016?

10:03:21 19   A.  Yes, sir.

10:03:22 20   Q.  What is a DCCV?

10:03:25 21   A.  Called direct current cardioversion.

10:03:28 22   Q.  And, Dr. Fail, is that a cardioversion like he had been

10:03:34 23   originally scheduled to have on February the 5th of 2014?

10:03:38 24   A.  Yes, sir.

10:03:38 25   Q.  So has he now reached a place where he can undergo the

1023

10:03:48  1    cardioversion in your opinion?

10:03:50  2    A.  Yes, sir.

10:03:51  3    Q.  And was a cardioversion scheduled, sir?

10:03:55  4    A.  Yes, it was.

10:03:56  5    Q.  I want to show you what's marked as Plaintiff's Exhibit 69.

10:04:07  6    And it's Identification No. 5768242.1206.

10:04:16  7              MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

10:04:18  8    Exhibit 69.

10:04:19  9              MR. SARVER:  No objection.

10:04:20  10             THE COURT:  It's admitted.

10:04:21  11   BY MR. BIRCHFIELD:

10:04:21  12   Q.  Dr. Fail, if you'll turn to Page 1207.  And the discussion

10:04:33  13   there of the procedure types and has cath procedure.  Will you

10:04:37  14   describe for us what was the significance of the cath procedure

10:04:41  15   what's happening?

10:04:43  16   A.  This is his cardioversion here.

10:04:44  17   Q.  And what's the objective, again, of the cardioversion?

10:04:48  18   A.  To restore him to normal sinus rhythm.

10:04:53  19   Q.  To take him out of atrial fibrillation into a sinus rhythm or

10:04:58  20   normal heart rhythm; is that right?

10:04:59  21   A.  That is correct.

10:05:00  22   Q.  And did you do that procedure, sir?

10:05:02  23   A.  I did.

10:05:03  24   Q.  If you'll turn to Page 1211.  And we see that this is a log of

10:05:15  25   what's actually taking place during this cardioversion; is that

10:05:19   1   correct?

10:05:19   2   A.   That is correct.

10:05:20   3   Q.   Let's go -- if you'll look where it says 7:05 and one second,

10:05:26   4   do you see that?

10:05:27   5   A.   Yes, sir.

10:05:27   6   Q.   So tell us what's the significance here.  When it says

10:05:31   7   cardioverted at 200 joules, walk us through this, sir, please.

10:05:38   8   A.   If you look up above that it says he was given some sedation.

10:05:42   9   Once we felt he was adequately sedated, we actually cardioverted

10:05:46  10   him with joules.  Joules is a unit of electricity.

10:05:48  11   Q.   So you're shocking his heart?

10:05:50  12   A.   Yes, sir.

10:05:50  13   Q.   To shock is back into rhythm; is that right?

10:05:53  14   A.   Yes, sir.

10:05:54  15   Q.   He is under general anesthesia?

10:05:56  16   A.   He is under conscious sedation.

10:06:02  17   Q.   So that first shock, was it successful?

10:06:04  18   A.   No, sir, it was not.

10:06:05  19   Q.   So you do it again a couple of minutes later; is that right?

10:06:08  20   A.   That is correct.

10:06:08  21   Q.   And what happens then?

10:06:11  22   A.   He eventually does convert back to sinus rhythm, sinus

10:06:16  23   bradycardia.

10:06:16  24   Q.   So the cardioversion was successful?

10:06:19  25   A.   Yes, sir.

10:06:19  1   Q.  And his atrial fibrillation was relieved and he was in a normal

10:06:26  2   sinus rhythm after that?

10:06:27  3   A.  That is correct.

10:06:28  4   Q.  And then, Dr. Fail, you had a follow-up visit with

10:06:36  5   Mr. Boudreaux on June the 22nd of 2016; is that correct?

10:06:41  6   A.  Yes, sir.

10:06:42  7   Q.  Let me show you what is offered as Plaintiff's Exhibit 70, it's

10:06:50  8   Identification No. 5768239.502.

10:06:57  9           MR. BIRCHFIELD:  Offer this into evidence.

10:06:59 10           MR. SARVER:  No objection.

10:07:00 11           THE COURT:  Admitted.

10:07:01 12   BY MR. BIRCHFIELD:

10:07:02 13   Q.  And, Dr. Fail, you see where under the history of present

10:07:07 14   illness?  Describe for us what you found on this visit?

10:07:11 15   A.  So returns following successful cardioversion from atrial

10:07:16 16   fibrillation.  Underwent Lariat procedure -- so dictating and my

10:07:20 17   handwriting are just as bad -- about a month ago for GI bleeding

10:07:28 18   recurrent echocardiogram showed decreased ejection fraction which

10:07:32 19   was felt to be related to the atrial fibrillation.  He continued to

10:07:34 20   do well with blood pressure slightly lower than usual.  Otherwise

10:07:38 21   he is asymptomatic.

10:07:39 22   Q.  So he is free from the atrial fibrillation at this point,

10:07:42 23   right?

10:07:42 24   A.  Yes, sir.

10:07:43 25   Q.  And then one more visit.  You had a follow-up visit in December

OFFICIAL TRANSCRIPT

10:07:50 1   of 2016; is that right?

10:07:57 2   A.  Yes, sir.

10:08:00 3          MR. BIRCHFIELD:  Your Honor, Plaintiff's offer

10:08:02 4   Plaintiff's Exhibit 71, the Identification No. 5769122.573.

10:08:09 5          MR. SARVER:  No objection, your Honor.

10:08:10 6          THE COURT:  Admitted.

10:08:11 7   BY MR. BIRCHFIELD:

10:08:11 8   Q.  Dr. Fail, you saw Mr. Boudreaux again December the 21st of

10:08:17 9   2016; is that right?

10:08:19 10  A.  Yes, sir.

10:08:19 11  Q.  And will you walk us through your findings of the history of

10:08:25 12  the present illness?

10:08:26 13  A.  So this is a -- we saw him just after a cardiocatheterization

10:08:31 14  that was done because of his heart being a little on the weaker

10:08:35 15  side, and we wanted to be sure that it wasn't related to coronary

10:08:39 16  artery disease.  And it noted that his coronary anatomy was

10:08:42 17  relatively unremarkable.

10:08:43 18  Q.  And if you will turn to the next Page 574.  Under the physical

10:08:54 19  exam, the cardiovascular section there.

10:08:56 20  A.  Yes, sir.

10:08:56 21  Q.  Says that he is in -- rhythm is regular, right?

10:08:59 22  A.  Yes, sir.

10:09:01 23  Q.  And describe for us the significance S1 and S2.

10:09:05 24  A.  Those would be the sounds that the heart makes when the valves

10:09:09 25  close, but would indicate he is in normal sinus rhythm.

10:09:13  1    Q.  So is that a good thing for Mr. Boudreaux?

10:09:18  2    A.  I believe it is.

10:09:19  3    Q.  And did you just schedule -- is he now on a six-month follow-up

10:09:25  4    plan with you?

10:09:25  5    A.  Yes, he is.

10:09:31  6            MR. BIRCHFIELD:  Your Honor, at this time we'll pass

10:09:33  7    Dr. Fail.

10:09:34  8            THE COURT:  Okay.  You may cross -- let's take a break

10:09:37  9    here.  We'll take a 15-minute break and come back.  The Court had

10:09:39  10   stand in recess.

10:09:40  11           THE MARSHAL:  All rise.

10:09:40  12     (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

10:09:40  13      TAKEN.)

10:24:49  14     (OPEN COURT.)

10:24:50  15           THE COURT:  Be seated, please.  You're still under oath,

10:24:53  16   Doctor.

10:24:53  17           THE WITNESS:  Thank you.

10:24:54  18           THE COURT:  You may proceed, Counsel.

10:24:55  19           MR. SARVER:  Thank you, your Honor.

10:24:57  20                          CROSS-EXAMINATION

10:24:57  21   BY MR. SARVER:

10:24:58  22   Q.  Good morning, Dr. Fail.  Good morning ladies and gentlemen.  My

10:25:03  23   name is Rick Sarver, I represent the defendants.  And at the outset

10:25:04  24   I would like to tell you that neither Bayer or Janssen have any

10:25:06  25   criticism whatsoever of your care or the other doctor's care of

10:25:09  1    Mr. Boudreaux.  Do you understand that?

10:25:11  2    A.  Yes, sir.

10:25:12  3    Q.  Have we met so?

10:25:13  4    A.  I don't believe so.

10:25:13  5    Q.  No, sir.  Now, you've actually had the opportunity to meet

10:25:18  6    privately with the plaintiff's lawyers in this case?

10:25:20  7    A.  I have.

10:25:21  8    Q.  On a number of occasions?

10:25:22  9    A.  Yes, sir.

10:25:22 10    Q.  I would like to talk with you about your care of Mr. Boudreaux

10:25:25 11    and some of the things that you've talked about with Mr. Birchfield

10:25:29 12    and some you haven't, all right?

10:25:31 13    A.  All right.

10:25:32 14    Q.  When you first saw Mr. Boudreaux in April of 2015, he had

10:25:37 15    already been diagnosed with atrial fibrillation; is that correct?

10:25:40 16    A.  That is correct.

10:25:41 17    Q.  Do you recall what his CHAD score was?

10:25:46 18    A.  Not off the top of my head I don't.

10:25:49 19    Q.  A CHAD score is a number that you in your field of cardiology

10:25:57 20    can figure out a patient's risk of stroke to some degree of

10:26:01 21    certainty, correct?

10:26:02 22    A.  That is correct.

10:26:03 23    Q.  And if I tell you that Mr. Boudreaux's CHAD score was four,

10:26:07 24    does that refresh your recollection?

10:26:09 25    A.  Yes, sir.

10:26:09  1    Q.  Is that a very high risk of stroke?

10:26:12  2    A.  Moderate to high, yes, sir.

10:26:14  3    Q.  With someone with a CHAD score of four and atrial fibrillation,

10:26:20  4    they are at serious risk of having a stroke?

10:26:23  5    A.  That is correct.

10:26:23  6    Q.  Do you recall the other issues that Mr. Boudreaux had that made

10:26:36  7    him at higher risk of stroke?  He had atrial fibrillation, he also

10:26:40  8    had hypertension?

10:26:41  9    A.  Correct.

10:26:41 10    Q.  Would that add a point on the CHAD score?

10:26:43 11    A.  Yes, it would.

10:26:44 12    Q.  And he had congestive heart failure?

10:26:48 13    A.  Correct.

10:26:48 14    Q.  And that is when the heart is not pumping efficiently, correct?

10:26:51 15    A.  Correct.

10:26:52 16    Q.  Would that add a point?

10:26:53 17    A.  Yes, it would.

10:26:53 18    Q.  And he had cardiomyopathy.  What is that?

10:26:57 19    A.  Yes, sir.

10:26:58 20    Q.  What is that?

10:26:58 21    A.  Just basically a heart beating very inefficient or weak.

10:27:02 22    Q.  Can it be muscle problems with the heart itself?

10:27:05 23    A.  It could be, yes, sir.

10:27:06 24    Q.  Does that add a point to the CHAD score?

10:27:08 25    A.  In correlation with heart failure, yes, sir.

10:27:10  1    Q.  So is it fair to say that Mr. Boudreaux needed something to

10:27:15  2    help prevent his risk of stroke because of his serious risk and

10:27:21  3    high CHAD score?

10:27:22  4    A.  Yes, sir.

10:27:22  5    Q.  And Dr. Wong, is he one of your partners?

10:27:25  6    A.  He is.

10:27:26  7    Q.  Do you have any criticism whatsoever of Dr. Wong for

10:27:29  8    prescribing Xarelto to Mr. Boudreaux to prevent or attempt to

10:27:34  9    prevent his risk of stroke?

10:27:36  10   A.  No, sir.

10:27:36  11   Q.  Now, have you given scientific presentations to your fellow

10:27:42  12   doctors over the course of the years?

10:27:45  13   A.  Yes, sir, I have.

10:27:46  14   Q.  Have you given scientific medical presentations to your fellow

10:27:50  15   doctors on atrial fibrillation?

10:27:51  16   A.  Not specifically AFib but to Lariat procedures in a left atrial

10:28:01  17   appendage plications.

10:28:01  18   Q.  And as part of those discussion of the Lariat, would you talk

10:28:05  19   about atrial fibrillation?

10:28:06  20   A.  I would.

10:28:06  21   Q.  Is that a good thing to do for doctors like yourself who are

10:28:11  22   kind of on the cutting edge of some of the medicine to teach their

10:28:14  23   other doctors about what you know?

10:28:15  24   A.  Yes, sir.

10:28:16  25   Q.  It helps the medicine?

10:28:18  1   A.  Yes, sir.

10:28:19  2   Q.  Does it help patients as well?

10:28:21  3   A.  Absolutely.

10:28:21  4   Q.  And in the course of doing that, are you compensated for your

10:28:25  5   time and your effort?

10:28:26  6   A.  Yes, sir.

10:28:27  7   Q.  And over the course of some years you've made over $100,000

10:28:31  8   doing that?

10:28:31  9   A.  I don't believe I made that much, but I honestly don't know.

10:28:37  10  Q.  If there's a document that says you have -- we won't worry

10:28:37  11  about that.

10:28:37  12  A.  All right.

10:28:40  13  Q.  But you've made some money?

10:28:42  14  A.  Yes, sir.

10:28:42  15  Q.  Is there anything whatsoever wrong with that?

10:28:44  16  A.  I don't believe so, no, sir.

10:28:46  17  Q.  And if another doctor in this case had done similar work on

10:28:50  18  other issues and testified that he had given scientific medical

10:28:55  19  presentations, would you have any criticism of him or her?

10:28:57  20  A.  No, sir.

10:28:58  21  Q.  Now, I would like to take a look at one of your presentations,

10:29:03  22  it's marked as Defense Exhibit JB109.  And once it comes up, you'll

10:29:10  23  be able to tell us what it is.

10:29:12  24  A.  Okay.

10:29:13  25  Q.  So, Jim, could you take us to the first page, please.

10:29:24  1        And you all have heard Jim, it's Jim Hoy, he does the

10:29:28  2    work on the computer; and Carl I think does the work for the

10:29:30  3    plaintiffs.  You've heard their names, but that's who they are.

10:29:34  4        What's this, Dr. Fail?

10:29:35  5    A.  This is a PowerPoint presentation and it's entitled The Other

10:29:39  6    Structural Heart Interventions.

10:29:41  7    Q.  And as part of this, did you present it to other doctors to try

10:29:46  8    to teach them about the Lariat procedure?

10:29:48  9    A.  Yes, sir.

10:29:49 10    Q.  Did you talk about atrial fibrillation?

10:29:51 11    A.  In connection with it, yes, sir.

10:29:53 12    Q.  I would like to take a look at Page 34, if we could.  By the

10:29:56 13    way, Doctor, I can give you a heart copy if you like.

10:29:59 14    A.  I can read it here.

10:30:00 15    Q.  Okay.  Great.  So this is slide that you presented to your

10:30:04 16    fellow doctors?

10:30:05 17    A.  Yes, sir.

10:30:06 18    Q.  Talking about the scope of the problem with atrial

10:30:09 19    fibrillation?

10:30:09 20    A.  Correct.

10:30:09 21    Q.  And it indicates that over 2.3 million persons in the U.S.

10:30:14 22    alone suffer from atrial fibrillation.

10:30:17 23    A.  That's statistics, yes, sir.

10:30:19 24    Q.  And do you have any idea how many of those, those people are

10:30:24 25    not treated for the atrial fibrillation but should be?

10:30:27  1    A.   From an anticoagulation standpoint?

10:30:32  2    Q.   Yes, sir?

10:30:32  3    A.   Unfortunately a substantial number of people.

10:30:34  4    Q.   And have you heard figures as much as half?

10:30:37  5    A.   Yes, sir.

10:30:37  6    Q.   And that's highly unfortunate --

10:30:39  7    A.   Yes, sir.

10:30:39  8    Q.   -- because those patients are at risk?

10:30:42  9    A.   Yes, sir.

10:30:42 10    Q.   Do the NOACs, including Xarelto, help to solve that untreated

10:30:47 11    problem in patients who need treatment?

10:30:49 12    A.   Yes, sir.

10:30:49 13    Q.   Now, I would like you to take a look at the fourth bullet

10:30:54 14    point.   The cornerstone of stroke prevention is oral

10:30:58 15    anticoagulation.   Did you write that?

10:30:59 16    A.   I did.

10:31:00 17    Q.   Why did you write that?

10:31:02 18    A.   As an interventionalist who performs procedures, it's important

10:31:09 19    to make sure that we don't go first to the procedure and then to a

10:31:14 20    medication that may have a lower risk, and therefore that's why we

10:31:17 21    use this as a back drop to say that the first thing you want to try

10:31:22 22    is medication.

10:31:22 23    Q.   And I think you described it with Mr. Birchfield, but the way

10:31:27 24    that atrial fibrillation can lead to a stroke is that the heart

10:31:31 25    instead of pumping properly like it should, does it kind of

10:31:36 1    flutter?

10:31:36 2    A.  The atrium does, yes, sir.

10:31:39 3    Q.  And the atrium flutters and that causes the blood to pool,

10:31:44 4    which can lead to clots forming in the heart; is that right?

10:31:48 5    A.  That is correct.

10:31:48 6    Q.  Then those clots can go out of the heart into a blood vessel

10:31:50 7    and then go to a portion of the blood vessel where the clot is

10:31:54 8    bigger than the size of the vessel, and does that lead to a stroke?

10:31:58 9    A.  That is correct.

10:31:59 10   Q.  And that's what you're trying to prevent?

10:32:01 11   A.  Yes, sir.

10:32:02 12   Q.  And are anticoagulants, warfarin and the NOACs, very effective

10:32:07 13   at preventing those strokes?

10:32:08 14   A.  They are.

10:32:09 15   Q.  But if a patient with atrial fibrillation has a blood clot that

10:32:16 16   leads to a stroke, is it correct those strokes are often more

10:32:19 17   serious than other strokes?

10:32:21 18   A.  They can be devastating, yes, sir.

10:32:23 19   Q.  So I think we can agree atrial fibrillation can be a very

10:32:27 20   dangerous condition?

10:32:28 21   A.  Yes, sir.

10:32:29 22   Q.  Now, if we take a look at -- are you a member of the American

10:32:37 23   Heart Association?

10:32:37 24   A.  I am.

10:32:37 25   Q.  Are you familiar with their guidelines about atrial

10:32:42  1   fibrillation and the treatment for atrial fibrillation?

10:32:45  2   A.  I am.

10:32:45  3   Q.  Are those guidelines something that doctors like yourself look

10:32:49  4   to and rely upon in the course of treating your patients?

10:32:51  5   A.  Yes, sir.

10:32:52  6   Q.  I would like to take a look, if we could, at Defense

10:32:57  7   Exhibit 1605.

10:33:02  8            MR. SARVER:  And, your Honor, we would offer Defense

10:33:05  9   Exhibit 1605 as a demonstrative exhibit for the purposes of

10:33:08 10   examining Dr. Fail.

10:33:09 11            THE COURT:  Any objection?

10:33:10 12            MR. BIRCHFIELD:  No your Honor.

10:33:12 13            THE COURT:  Let it be admitted as a demonstrative.

10:33:14 14   BY MR. SARVER:

10:33:16 15   Q.  Dr. Fail, would you like a hard copy or would be the screen be

10:33:20 16   okay?

10:33:20 17   A.  The screen will be fine.

10:33:21 18   Q.  What is this, Dr. Fail?

10:33:22 19   A.  This is ACCAHA guideline for the management of those patients

10:33:27 20   with atrial fibrillation.

10:33:27 21   Q.  Are you familiar with those in general terms?

10:33:29 22   A.  Yes, sir.

10:33:30 23   Q.  And does the American Heart Association -- tell us the rest of

10:33:35 24   this, it's the American College of Cardiology is the second?

10:33:37 25   A.  Yes, sir.

10:33:37  1    Q.  And what's the third?

10:33:38  2    A.  The Heart Rhythm Society.

10:33:40  3    Q.  Thank you.  Do those societies have guidelines on which

10:33:45  4    patients ought to be anticoagulated in who have atrial

10:33:51  5    fibrillation?

10:33:51  6    A.  They do.

10:33:52  7    Q.  At what point in the CHAD score do the guidelines say

10:33:58  8    anticoagulant?

10:33:58  9    A.  It's two is usually as absolute CHADS 1 is sort of

10:34:03 10    controversial, CHADS 0 is nothing.

10:34:05 11    Q.  So if you're CHADS 0, don't do it?

10:34:09 12    A.  Correct.

10:34:09 13    Q.  If you're CHADS one maybe?

10:34:11 14    A.  Yes, sir.

10:34:11 15    Q.  If you're CHADS 2 do it?

10:34:14 16    A.  Yes, sir.

10:34:14 17    Q.  If you're CHADS 4, absolutely do it?

10:34:16 18    A.  Yes, sir.

10:34:17 19    Q.  So and Mr. Boudreaux was a CHADS 4, so would it be fair to say

10:34:22 20    that these societies recommend anticoagulate him?

10:34:27 21    A.  Yes, sir.

10:34:30 22    Q.  Is that the case that Dr. Wong followed the recommended

10:34:35 23    guidelines in anticoagulating Mr. Boudreaux?

10:34:40 24    A.  Yes, he did.

10:34:41 25    Q.  Do these guidelines specifically recommend the different

10:34:45 1  anticoagulants?  They recommend warfarin, they recommend all of the

10:34:48 2  NOACs, including rivaroxaban.

10:34:49 3  A.  Yes, sir.

10:34:52 4  Q.  If we could take a look, Jim, at defense Exhibit 1605, E4.

10:35:02 5  Help us out here, Jim, I can't read that at least.

10:35:06 6          What do you see here?

10:35:07 7  A.  So this is a risk table and it gives you various classes,

10:35:12 8  what's called Class I, Class IIa, Class IIb and Class III.

10:35:18 9  Q.  And if you see Class I, that says that the benefit is much

10:35:22 10 greater than the risk?

10:35:22 11 A.  That is true.

10:35:23 12 Q.  And it says for Class I, the procedure or treatment should be

10:35:28 13 performed or administered.

10:35:30 14 A.  Yes, sir.

10:35:30 15 Q.  Now, let's take a step back to Page E16.  And if we could look

10:35:39 16 at the Section 5 for nonvalvular AFib -- is that atrial

10:35:49 17 fibrillation?

10:35:49 18 A.  Yes, sir, it is.

10:35:50 19 Q.  -- with prior stroke, ischemic attack with a CHADS-VAS score of

10:35:56 20 two or greater, which we know Mr. Boudreaux was, correct?

10:35:58 21 A.  Yes, sir.

10:36:00 22 Q.  Oral anticoagulants are recommended.  And then it goes on to

10:36:03 23 list the options, do you see that?

10:36:05 24 A.  Yes, it does.

10:36:06 25 Q.  And the options include warfarin?

10:36:08  1    A.  Yes, sir.

10:36:09  2    Q.  And all of the NOACs?

10:36:10  3    A.  Yes, sir.

10:36:11  4    Q.  Does it include rivaroxaban?

10:36:13  5    A.  It does.

10:36:13  6    Q.  Which is Xarelto?

10:36:14  7    A.  Yes, sir, it is.

10:36:15  8    Q.  We've talked a bit about safety in this case, and one of the

10:36:27  9    things the American Heart Association guidelines look to is a

10:36:31  10   benefit/risk analysis are you familiar with that?

10:36:33  11   A.  Yes, sir.

10:36:34  12   Q.  Do you do that every time you prescribe a medicine to your

10:36:36  13   patients?

10:36:36  14   A.  In my head I do, yes, sir.

10:36:39  15   Q.  And I'm sure after years of practice it becomes easier, but you

10:36:43  16   have to do it, don't you?

10:36:45  17   A.  Yes, sir.

10:36:45  18   Q.  And in terms of an anticoagulant, I know this is basic, we all

10:36:48  19   know it, but do all anticoagulant increase a patient's risk of

10:36:53  20   bleeding?

10:36:53  21   A.  Yes, sir.

10:36:54  22   Q.  And if a doctor were prescribing an anticoagulant as an

10:37:00  23   anti-bleeding medicine, that would be a bad idea?

10:37:03  24   A.  Yes, sir.

10:37:04  25   Q.  Anticoagulants are anti-stroke medicines?

10:37:07  1    A.  Yes, sir.

10:37:08  2    Q.  And for that they're very good; is that correct?

10:37:11  3    A.  That is correct.

10:37:12  4    Q.  Including rivaroxaban?

10:37:13  5    A.  Yes, sir.

10:37:13  6    Q.  I'm sorry, I should probably call it Xarelto.  Is that all

10:37:17  7    right with you?

10:37:17  8    A.  No, either one is fine.

10:37:19  9    Q.  Now, is it fair to say that -- when you look at safety, you not

10:37:24 10    only look at the risk of bleeding, but for a patient at risk of

10:37:29 11    stroke with atrial fibrillation, is there a safety risk of not

10:37:33 12    treating his atrial fibrillation?

10:37:37 13    A.  I am not sure I understand your question.

10:37:40 14    Q.  Yeah, that's a bad question.  Is it a safety problem with a

10:37:44 15    patient who needs to be anticoagulant if they're not?

10:37:49 16    A.  I am not sure I understand what you're -- that's okay.

10:37:54 17    Q.  I'm doing a bad job, my fault, utterly not yours.

10:37:57 18            So you agree that strokes are a very dangerous thing?

10:38:00 19    A.  Yes, sir.

10:38:00 20    Q.  Mr. Boudreaux and others with high CHAD scores are at increased

10:38:04 21    risk of stroke?

10:38:05 22    A.  They are.

10:38:05 23    Q.  If those patients at risk of stroke are not treated for that

10:38:10 24    stroke, that's a safety issue, isn't it?

10:38:13 25    A.  Yes, sir, it is.

10:38:13  1   Q.  So it's not just bleeding that's a safety issue, it's the lack

10:38:17  2   of treatment for stroke?

10:38:18  3   A.  Yes, sir.

10:38:18  4   Q.  Are you familiar with a study called the ROCKET trial for

10:38:25  5   Xarelto?

10:38:25  6   A.  Yes, sir.

10:38:26  7   Q.  And do you understand that the ROCKET trial included patients

10:38:30  8   that were of the sickest patients as compared to the other NOACs

10:38:35  9   and their trials?

10:38:36 10   A.  That's true.

10:38:37 11   Q.  Would Mr. Boudreaux fall into the category of those sickest

10:38:41 12   patients like those that were studied by ROCKET?

10:38:44 13   A.  Yes, sir, he would have.

10:38:44 14   Q.  Is that a good thing for your patients to know that you can

10:38:47 15   prescribe a medicine that has been studied in the sickest group of

10:38:51 16   patients?

10:38:51 17   A.  Yes, sir.

10:38:52 18   Q.  Why is that?

10:38:52 19   A.  I think it gives you an idea that the patients that you're now

10:38:58 20   looking at are very similar to the patients that were studied in

10:39:01 21   the trials.

10:39:01 22   Q.  And is there any question in your mind, do you understand that

10:39:06 23   there is a risk of bleeding with every anticoagulant, including

10:39:10 24   Xarelto?

10:39:10 25   A.  I do.

10:39:11  1    Q.  And is it fair to say that Xarelto warned about that risk of

10:39:16  2    bleeding in the package labelling?

10:39:19  3    A.  I believe it does, yes, sir.

10:39:20  4    Q.  Do you know any cardiologist who doesn't know that

10:39:24  5    anticoagulants have a risk of bleeding?

10:39:26  6    A.  I do not.

10:39:27  7    Q.  When you are treating your patients and they have atrial

10:39:36  8    fibrillation and someone like Mr. Boudreaux comes to see you, what

10:39:41  9    is your primary concern?  Is it preventing the stroke or is it not

10:39:45 10    having them bleed?

10:39:46 11    A.  Preventing the stroke.

10:39:47 12    Q.  Why?

10:39:48 13    A.  In layman's terms, you can walk away from a GI bleed, you can't

10:39:56 14    walk away from a stroke.

10:39:58 15    Q.  In fact, have you talked to your colleague Dr. Wong about his

10:40:02 16    views on this?

10:40:03 17    A.  Not personally, no, sir.

10:40:04 18    Q.  He's told us at other times that he tells his patients that 99

10:40:10 19    times out of 100 we can treat your bleed and you'll be fine.

10:40:14 20    A.  Yes, sir.

10:40:15 21    Q.  But you have a stroke, it's permanent, it's devastating.

10:40:18 22    A.  Yes, sir.  Yes, sir.

10:40:18 23    Q.  Is that right?

10:40:19 24    A.  Yes, sir.

10:40:20 25    Q.  Would you rather treat a patient with a bleed than a patient

10:40:31  1    with a stroke?

10:40:32  2    A.  I'd rather treat a patient with a bleed than a stroke.

10:40:35  3    Q.  I mean, we'd all rather treat a patient that has nothing wrong

10:40:40  4    with them, but in practice you don't see many of those?

10:40:42  5    A.  That's true.

10:40:43  6    Q.  And in your practice and experience you found Xarelto to be a

10:40:49  7    useful and beneficial medicine in preventing strokes?

10:40:53  8    A.  Yes, I have.

10:40:53  9    Q.  Now, when Mr. Boudreaux came to see you, it was about 15 months

10:40:59 10    after his GI bleed, and during that time he had not been on any

10:41:04 11    anticoagulant?

10:41:05 12    A.  I'm not aware of anything, no, sir.

10:41:06 13    Q.  And when you saw him, you didn't prescribe any anticoagulant?

10:41:10 14    A.  No, sir.

10:41:10 15    Q.  Why not?

10:41:13 16    A.  That was not my -- I was not asked to perform that, he had

10:41:17 17    already been treated by his primary care cardiologist who felt that

10:41:21 18    he was not a candidate for anticoagulation.  I was there to perform

10:41:25 19    a procedure, to see if he was a candidate for that procedure.

10:41:28 20    Q.  So Dr. Al Timothy had been his treating cardiologist and

10:41:32 21    Dr. Timothy's evaluation was that Mr. Boudreaux shouldn't be on

10:41:36 22    anticoagulant?

10:41:36 23    A.  I believe that's correct, yes, sir.

10:41:37 24    Q.  And to your knowledge, was Mr. Boudreaux ever tried on any

10:41:42 25    other anticoagulant?

10:41:44  1    A.  I am not aware of any, no, sir.

10:41:45  2    Q.  I think you and Mr. Birchfield were talking earlier and one of

10:41:50  3    the things that you thought, perhaps, was that Mr. Boudreaux had

10:41:53  4    been challenged on another anticoagulant.  What do you mean by

10:41:56  5    that?

10:41:56  6    A.  Sometimes patients will have a gastric ulcer that gets

10:42:05  7    exacerbated or bleeding, gets exacerbated with anticoagulation.

10:42:09  8    The ulcer gets healed and they can be re-challenged with an

10:42:13  9    anticoagulation and not see bleeding again.

10:42:16  10   Q.  And in Mr. Boudreaux's case, are you aware that they looked --

10:42:20  11   by they, the other doctors looked to see whether there was

10:42:24  12   something in his GI tract that was bleeding?

10:42:26  13   A.  I believe they did.

10:42:26  14   Q.  They did an upper endoscopy?

10:42:29  15   A.  Yes, sir.

10:42:30  16   Q.  And they did a coloscopy?

10:42:32  17   A.  Yes, sir.

10:42:33  18   Q.  And then they did a pill cam?

10:42:34  19   A.  Yes, sir.

10:42:35  20   Q.  What's a pill cam?

10:42:36  21   A.  Basically you swallow a small camera and as it tumbles through

10:42:40  22   the intestines, it takes pictures of your small intestines, which

10:42:45  23   cannot be reached endoscopy, or and colonoscopy, and gives you that

10:42:49  24   area of the small intestine to be evaluated.

10:42:51  25        MR. SARVER:  Your Honor, we have a demonstrative exhibit

10:42:53  1   that I would like to present to Dr. Fail.  It's on loan to me from

10:42:58  2   Dr. Smith.  I would like to give it back to him.  May we take a

10:43:02  3   photograph?

10:43:03  4               MR. BIRCHFIELD:  No objection, your Honor.

10:43:04  5               THE COURT:  Okay.

10:43:04  6               MR. SARVER:  May I approach the witness?

10:43:06  7               THE COURT:  Sure.

10:43:08  8               MR. SARVER:  Thank you, your Honor.

10:43:09  9   BY MR. SARVER:

10:43:10 10   Q.  Dr. Fail, I am showing you what says Pill Cam on it.  Could you

10:43:13 11   tell the jury what that is?

10:43:15 12   A.  So this would be a camera that a patient has to swallow, goes

10:43:19 13   through the stomach and the intestines and actually has a small

10:43:22 14   camera, you can see that it has a light on it, and actually takes

10:43:25 15   pictures as it tumbles through.

10:43:27 16   Q.  Would you mind taking it out --

10:43:27 17               THE COURT:  Do you want to show that to the jury?

10:43:29 18   BY MR. SARVER:

10:43:29 19   Q.  -- and show it to the jury.

10:43:30 20               This one has never been used, so don't worry about it.

10:43:33 21   A.  I am a doctor, I don't worry about a lot of things.

10:43:37 22               So this is actually -- you can see it's a tablet, looks

10:43:40 23   like a tablet, and it takes pictures.

10:43:42 24               THE COURT:  Can you all see that, members of the jury?

10:43:47 25               THE WITNESS:  So what it does is this is actually taking

10:43:48  1   pictures right now as it tumbles through the intestines.

10:43:48  2   BY MR. SARVER:

10:43:51  3   Q.  And how do you take?

10:43:52  4   A.  I'm sorry?  You swallow it.

10:43:54  5   Q.  How does it get into the body?

10:43:56  6   A.  You swallow it.

10:43:56  7   Q.  So it looks fairly big, but --

10:43:59  8   A.  It's a horse tablet, yes, sir.

10:44:00  9   Q.  It works its way through the body.  And what part of the body

10:44:03 10   is it primarily looking at?

10:44:05 11   A.  The small intestines.

10:44:06 12   Q.  Is that where you think that Mr. Boudreaux's bleed originated?

10:44:10 13   A.  I am not sure.

10:44:11 14   Q.  Nobody really is?

10:44:12 15   A.  Nobody knew, yes, sir.

10:44:14 16   Q.  But they did this pill cam on Mr. Boudreaux, correct?

10:44:17 17   A.  I believe so, yes, sir.

10:44:18 18   Q.  And it goes through and it does what the body does and eight

10:44:22 19   hours later it comes out?

10:44:23 20   A.  Yes, sir.

10:44:24 21   Q.  And during that time it's taking a photograph along the way?

10:44:29 22   A.  Correct.

10:44:30 23   Q.  Very often?

10:44:32 24   A.  Yes, sir.

10:44:33 25   Q.  And in the course of that are you aware of any indication that

10:44:36  1   there was some damage to Mr. Boudreaux's small intestine?

10:44:41  2   A.  No, sir, I am not.

10:44:42  3   Q.  And did you see any evidence that there was any damage to his

10:44:45  4   colon?

10:44:46  5   A.  No, sir.

10:44:47  6   Q.  Or anywhere in his upper GI tract?

10:44:50  7   A.  No, sir.

10:44:50  8   Q.  Is it fair to say that there is no evidence that Xarelto caused

10:44:54  9   any damage to Mr. Boudreaux's GI tract?

10:44:56  10  A.  I am not aware of any, no, sir.

10:44:59  11  Q.  Now, Dr. Timothy judged Mr. Boudreaux to be a poor candidate

10:45:06  12  for any anticoagulant; is that correct?

10:45:08  13  A.  I believe that's term he used, yes, sir.

10:45:11  14  Q.  And that doesn't mean he is just a poor candidate for Xarelto

10:45:15  15  but any anticoagulant, warfarin, Savaysa, Eliquis or dabigatran?

10:45:21  16  A.  That's correct.

10:45:21  17  Q.  Correct?

10:45:23  18  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

10:45:24  19  Q.  And that's why Mr. Boudreaux came to see you?

10:45:26  20  A.  Yes, sir.

10:45:27  21  Q.  Because a Lariat procedure is an alternative for those patients

10:45:30  22  who can't tolerate any anticoagulant?

10:45:33  23  A.  That is correct.

10:45:33  24  Q.  And has Dr. Timothy referred you other patients for Lariat in

10:45:39  25  the past?

10:45:39  1   A.  He has.

10:45:39  2   Q.  And has he referred you other patients after Mr. Boudreaux?

10:45:43  3   A.  He has.

10:45:43  4   Q.  I think you began performing the Lariat procedure sometime in

10:45:49  5   2013; is that correct?

10:45:52  6   A.  I am going to go to your -- I don't really remember.

10:45:55  7   Q.  I understand.

10:45:56  8   A.  I would say yes.

10:45:57  9   Q.  And you've done the procedure relatively often since then?

10:46:00  10  A.  Yes, sir, I have.

10:46:01  11  Q.  And you're one of the few doctors in south Louisiana that does

10:46:05  12  the Lariat procedure?

10:46:06  13  A.  Yes, I am.

10:46:06  14  Q.  And you showed us on the screen what you do, it's remarkable,

10:46:11  15  isn't it, remarkable technology?

10:46:13  16  A.  It is.

10:46:13  17  Q.  It's something that has developed fairly recently?

10:46:16  18  A.  Yes, sir.

10:46:16  19  Q.  And it's helped you to improve the lives of your patients?

10:46:20  20  A.  I believe it has.

10:46:21  21  Q.  Because what it allows you to do is you've got that little

10:46:24  22  pouch, the left atrium, atrial appendage, and that's where the vast

10:46:29  23  majority of clots form in atrial fibrillation?

10:46:32  24  A.  That is correct.

10:46:33  25  Q.  Is it correct that it's over 90 percent of the clots form in

1048

10:46:38  1  the atrial appendage?

10:46:39  2  A.   That's what the studies say, yes, sir.

10:46:42  3  Q.   And by lassoing it off you have now eliminated over 90 percent

10:46:47  4  of the strokes that a patient with atrial fibrillation might suffer

10:46:50  5  due to atrial fibrillation?

10:46:52  6  A.   Yes, sir.

10:46:52  7  Q.   That's a wonderful thing, isn't it?

10:46:55  8  A.   Yes, sir.

10:46:55  9  Q.   And I think you told us, but the atrial appendage is one of

10:47:02  10  those that's vestigial organs like the appendix, nobody quite knows

10:47:06  11  why they're there?

10:47:06  12  A.   That's correct.

10:47:07  13  Q.   So by lassoing it off you're not doing any harm to the patient?

10:47:11  14  A.   No, sir.

10:47:11  15  Q.   Now, in your experience, are there many patients like

10:47:19  16  Mr. Boudreaux who simply can't tolerate any anticoagulant?

10:47:22  17  A.   There are.

10:47:23  18  Q.   And that can be for a number of reasons, correct?

10:47:25  19  A.   Yes, sir.

10:47:26  20  Q.   One of those reasons is that a patient like Mr. Boudreaux might

10:47:30  21  be prone to bleed on any anticoagulant?

10:47:32  22  A.   Yes, sir.

10:47:33  23  Q.   In your practice and experience you found that the number of

10:47:40  24  patients at the age of Mr. Boudreaux who can't tolerate any

10:47:44  25  anticoagulant is about 10 to 15 percent?

10:47:49  1   A.  Because of what I do, I have a skewed view on that, because I

10:47:54  2   get sent those patients who can not tolerate.  So my patient list

10:47:58  3   will be a lot higher because they're being sent to me for different

10:48:01  4   procedures.

10:48:02  5   Q.  Your patient list might actually be higher than 10 or 15?

10:48:05  6   A.  Yes, sir, yes, sir.

10:48:06  7   Q.  But would 10 to 15 percent in the general population be about

10:48:10  8   right?

10:48:10  9   A.  That would be reasonable, yes, sir.

10:48:11 10   Q.  Now, is it correct to say that anticoagulants -- I know this is

10:48:18 11   a bad term -- but thin the blood?

10:48:21 12   A.  Yes, sir.

10:48:21 13   Q.  No matter how much an anticoagulant thins the blood, it doesn't

10:48:27 14   cause a spontaneous eruption of a bleed without some kind of a

10:48:32 15   defect or an injury or some kind of a place for the blood to come

10:48:37 16   out?

10:48:37 17   A.  That's the supposition, yes, sir.

10:48:39 18   Q.  Is that your opinion?

10:48:40 19   A.  Yes, sir, that's my opinion.

10:48:41 20   Q.  There must be some kind of an underlying pathological condition

10:48:48 21   in order for the bleed to happen?

10:48:49 22   A.  That's true.

10:48:51 23   Q.  And is it common that a GI workup, as thorough as that were

10:48:59 24   done on Mr. Boudreaux, doesn't find a reason for a bleed?

10:49:01 25   A.  That's true.

10:49:02  1   Q.  Because even that great pill camera you have to sit there and

10:49:05  2   watch where it goes, and if you don't see the deviation, the

10:49:10  3   occlusion -- what is it, there's a V something?

10:49:14  4   A.  AVM.

10:49:16  5   Q.  AVM.  If you don't see it, nobody knows?

10:49:19  6   A.  That's correct.

10:49:20  7   Q.  And you understand that the pill cam was done several weeks

10:49:25  8   after Mr. Boudreaux's bleed?

10:49:27  9   A.  Yes, sir.

10:49:28 10   Q.  During that time whatever was there might have healed?

10:49:30 11   A.  That's possible, yes, sir.

10:49:31 12   Q.  But even when you don't find the source, the scar, the hole,

10:49:40 13   even if you don't find it, you know it had to be there at the time

10:49:43 14   of the bleed or he wouldn't have bled?

10:49:45 15   A.  That is correct.

10:49:46 16   Q.  Are you familiar that Mr. Boudreaux was taking aspirin

10:49:53 17   regularly and had been for years?

10:49:55 18   A.  I believe so he was, yes, sir.

10:49:58 19   Q.  Do you know whether or not there was a time period when

10:50:01 20   Mr. Boudreaux was taking Xarelto and not taking aspirin?

10:50:04 21   A.  I am not aware of that specifically, no, sir.

10:50:08 22   Q.  And you understand from the Xarelto label that a patient taking

10:50:14 23   Xarelto and also taking aspirin has an increased risk of bleeding?

10:50:19 24   A.  Yes, sir.

10:50:19 25   Q.  And that's because aspirin has the ability, the propensity to

10:50:24  1  cause those kind of deviations, ulcers, erosions that can lead to a

10:50:29  2  bleed?

10:50:30  3  A.  That is correct.

10:50:30  4  Q.  And that includes even aspirin at a low dose?

10:50:33  5  A.  Yes, sir.

10:50:34  6  Q.  That would include Ecotrin, which is the aspirin Mr. Boudreaux

10:50:41  7  was taking?

10:50:42  8  A.  That is correct.

10:50:42  9  Q.  And even that low dose can cause those erosions and ulcers in

10:50:49 10  the GI tract?

10:50:50 11  A.  Yes, it did.

10:50:51 12  Q.  Can we agree that Xarelto was not the source of the bleeding

10:51:02 13  event for Mr. Boudreaux, it didn't open a hole or cause a scar or

10:51:05 14  an ulcer?

10:51:06 15  A.  Yes, sir.

10:51:06 16  Q.  At the time that you saw Mr. Boudreaux first I believe it was

10:51:15 17  April of 2015, had he completely recovered from his bleeding event?

10:51:20 18  A.  I believe he did.

10:51:22 19  Q.  You saw no lingering effects or limitations due to his bleeding

10:51:28 20  event?

10:51:28 21  A.  No, sir, I did not.

10:51:29 22  Q.  Xarelto did not cause Mr. Boudreaux to somehow become

10:51:39 23  sensitized or oversensitive to any other anticoagulant, did it?

10:51:42 24  A.  Not that I am aware of, no, sir.

10:51:45 25  Q.  It didn't make him allergic to another anticoagulant?

10:51:48 1    A.  No, sir.

10:51:49 2    Q.  It didn't cause any lingering injury or damage to his GI tract

10:51:55 3    that might have made another anticoagulant not work?

10:51:58 4    A.  No, sir.

10:51:58 5    Q.  So Mr. Boudreaux had whatever -- he had a baseline bleeding

10:52:07 6    risk before he was on Xarelto, whatever it was?

10:52:10 7    A.  Yes, sir.

10:52:10 8    Q.  And that baseline bleeding risk, whatever it was for

10:52:14 9    Mr. Boudreaux, was not increased after he was off the Xarelto, it

10:52:19 10   was whenever it was?

10:52:20 11   A.  Correct.

10:52:20 12   Q.  Dr. Timothy's concern and yours was that Mr. Boudreaux couldn't

10:52:28 13   take another anticoagulant and that's why the Lariat was

10:52:31 14   appropriate?

10:52:31 15   A.  Yes, sir.

10:52:33 16   Q.  Mr. Boudreaux never told you that he didn't want to be on an

10:52:37 17   anticoagulant, did he?

10:52:38 18   A.  No, sir.

10:52:38 19   Q.  Did you feel the Lariat was a good option for Mr. Boudreaux?

10:52:45 20   A.  I did.

10:52:45 21   Q.  Did you talk about it with him?

10:52:46 22   A.  We did.

10:52:47 23   Q.  Did you explain the risks and the benefits?

10:52:49 24   A.  We did.

10:52:50 25   Q.  Is that appropriate to do?

10:52:51 1    A.  Yes.

10:52:51 2    Q.  And was Mr. Boudreaux willing to go forward with the Lariat

10:52:55 3    procedure in order to obtain the benefits from it but willing to

10:53:00 4    accept the risks?

10:53:01 5    A.  He was.

10:53:02 6    Q.  One of the things I don't think was clear when you were

10:53:06 7    talking, in order to do the Lariat procedure, you do that through

10:53:10 8    needle sticks; is that correct?

10:53:12 9    A.  Correct.

10:53:12 10   Q.  You're not having to cut an incision in Mr. Boudreaux?

10:53:16 11   A.  No, sir.

10:53:17 12   Q.  So it's a needle stick, very high-tech procedure?

10:53:19 13   A.  Yes, sir.

10:53:20 14   Q.  And the Lariat procedure for Mr. Boudreaux was successful?

10:53:28 15   A.  It was.

10:53:28 16   Q.  You were able to lasso off the atrial appendage and prevent the

10:53:34 17   risk of over 90 percent of the strokes from atrial fibrillation?

10:53:37 18   A.  That is correct.

10:53:38 19   Q.  That's actually higher in terms of benefit than one would get

10:53:43 20   from being on any of the anticoagulants.

10:53:46 21   A.  I would make that argument, yes, sir.

10:53:48 22   Q.  The anticoagulants are great, right?

10:53:50 23   A.  Yes, sir.

10:53:50 24   Q.  They prevent the risk of stroke?

10:53:52 25   A.  Yes, sir.

10:53:53  1   Q.  But it's in the range of 60 to 70 percent of prevention, right?

10:53:58  2   A.  Correct.

10:53:58  3   Q.  But the Lariat prevents 90 percent?

10:54:01  4   A.  That would be supposition, yes, sir.

10:54:02  5   Q.  Supposition is a tough word for the court.

10:54:06  6   A.  It's never been proven.

10:54:07  7   Q.  But it's your opinion?

10:54:09  8   A.  But it's opinion, yes, sir.

10:54:10  9   Q.  When you talked with Mr. Boudreaux about the benefits and the

10:54:21 10   risks, did he understand those benefits and risks?

10:54:24 11   A.  I believe he did.

10:54:25 12   Q.  And one of the things that can happen, no matter how well you

10:54:28 13   perform the Lariat procedure, is that you might cause some

10:54:31 14   irritation of the pericardium that could lead to an effusion?

10:54:38 15   A.  Yes, sir.

10:54:39 16   Q.  And that happened?

10:54:40 17   A.  Yes, sir.

10:54:40 18   Q.  Even though no one, no one is saying you or anyone else did

10:54:46 19   anything wrong, sometimes the risk of a procedure happens?

10:54:50 20   A.  It does.

10:54:50 21   Q.  Is the same true of a medicine, if there's a known risk from a

10:54:55 22   medicine, sometimes that risk happens?

10:54:57 23   A.  That is true.

10:54:58 24   Q.  Nobody wants it but sometimes it does?

10:55:00 25   A.  Correct.

10:55:00  1   Q.  Just life.

10:55:01  2   A.  Yes, sir.

10:55:01  3   Q.  Mr. Boudreaux got the right treatment for his effusion?

10:55:15  4   A.  Yes, he did.

10:55:16  5   Q.  Drained the fluid?

10:55:17  6   A.  Yes, sir.

10:55:17  7   Q.  And has done well since?

10:55:19  8   A.  Yes, sir, he has.

10:55:21  9   Q.  Now, the cardioversion procedure, that's another one, that's a

10:55:27 10   pretty high tech thing, too, isn't it?

10:55:30 11   A.  Yes, sir.

10:55:32 12   Q.  It seems cool to lay people that you are able to take a heart

10:55:37 13   that's fluttering and through electrical impulses you turn it back

10:55:42 14   into a well functioning pumping heart?

10:55:44 15   A.  That's correct.

10:55:44 16   Q.  And that's what you did?

10:55:46 17   A.  Yes, I did.

10:55:47 18   Q.  Did that improve Mr. Boudreaux's cardiac condition enormously?

10:55:51 19   A.  I think it did.

10:55:52 20   Q.  One thing I want to make sure the jury understands.  Before you

10:56:02 21   do cardioversion you have to make sure that a patient is either

10:56:08 22   anticoagulated or has the Lariat procedure, correct?

10:56:11 23   A.  That's correct.

10:56:11 24   Q.  Why is that?

10:56:12 25   A.  The thought being is that there would be a high propensity of

10:56:16  1    having a clot in the left atrial appendage and once that

10:56:20  2    restoration to normal sinus rhythm is the clot would be pushed out

10:56:24  3    into the left atrium and then into the cardiac chambers and the

10:56:28  4    brain and cause a stroke.

10:56:30  5    Q.  And cause a serious stroke?

10:56:31  6    A.  Yes, sir.

10:56:31  7    Q.  So you made sure that you had -- you first looked at the

10:56:36  8    appendage to see if there is a clot there?

10:56:38  9    A.  That's correct.

10:56:38 10    Q.  And there wasn't?

10:56:39 11    A.  There was none.

10:56:41 12    Q.  And then you did the Lariat, and -- so you were able to be

10:56:44 13    confident that you could do the cardioversion without causing a

10:56:47 14    stroke for Mr. Boudreaux?

10:56:49 15    A.  That is correct.

10:56:49 16    Q.  Now, one thing wasn't clear.  Once you do the cardioversion,

10:56:53 17    you're back in normal sinus rhythm, right?

10:56:55 18    A.  Uh-huh.

10:56:56 19    Q.  You want the patient to remain on an anticoagulant if they are

10:57:02 20    anticoagulant?

10:57:03 21    A.  Yes, sir.

10:57:05 22    Q.  So if Mr. Boudreaux was one of the people who can tolerate

10:57:08 23    anticoagulants, he would be on the anticoagulant before

10:57:12 24    cardioversion?

10:57:13 25    A.  Correct.

10:57:14  1   Q.  Yes.  And on the anticoagulant after cardioversion?

10:57:17  2   A.  Correct.

10:57:18  3   Q.  Why is that, why do you keep them on afterwards?

10:57:21  4   A.  Two things.  Number one the mechanical and the electrical

10:57:24  5   function do not coincide with each other.  So although we may see

10:57:29  6   electrical cardioversion, they get back into the normal sinus

10:57:32  7   rhythm.  If we look at them under ultrasound, you will see that the

10:57:36  8   mechanical restoration is inactive for several weeks or sometimes

10:57:40  9   several months.  The other is is that there is a high preponderance

10:57:43 10   of patients going back into atrial fibrillation.

10:57:46 11   Q.  So the practice that you exercise as a cardiologist is to keep

10:57:52 12   your patients on anticoagulants after cardioversion?

10:57:56 13   A.  Yes, sir.

10:57:56 14   Q.  Now, for Mr. Boudreaux he didn't need the anticoagulants after

10:58:01 15   cardioversion because he had had the Lariat?

10:58:03 16   A.  That is correct.

10:58:03 17   Q.  So Mr. Boudreaux, he doesn't have to take anticoagulants for

10:58:08 18   the rest of his life?

10:58:10 19   A.  That's correct.

10:58:12 20   Q.  And at the very least, he's now gained the benefit of not

10:58:16 21   having an increased risk of bleeding that's associated with all

10:58:21 22   anticoagulants because of the Lariat procedure?

10:58:22 23   A.  Correct.

10:58:23 24   Q.  You have kept following up with Mr. Boudreaux, you know his

10:58:32 25   current medical condition?

10:58:33  1    A.  I do.

10:58:34  2    Q.  Is it correct to say that as of the last time you saw

10:58:39  3    Mr. Boudreaux was it 2017 or 2016?

10:58:41  4    A.  I think it was the end of 2016 or beginning of 2017, yes, sir.

10:58:46  5    Q.  From a cardiac standpoint, Mr. Boudreaux was better at the end

10:58:50  6    of 2016 than he was in January of 2014 when he came to the hospital

10:58:57  7    with atrial fibrillation?

10:58:59  8    A.  I believe so, yes, sir.

10:59:00  9    Q.  Currently he is still in sinus rhythm, his heart is beating

10:59:09  10   normal?

10:59:10  11   A.  Last time I evaluated him, yes, sir, he was.

10:59:12  12   Q.  He has no chest discomfort?

10:59:14  13   A.  No further, no, sir.

10:59:15  14   Q.  No shortness of breath?

10:59:16  15   A.  None that I am aware of.

10:59:18  16   Q.  And basically Mr. Boudreaux is doing well from a cardiac point

10:59:21  17   of view?

10:59:21  18   A.  Yes, sir.

10:59:22  19          MR. SARVER:  Thank you, Dr. Fail.  No further questions.

10:59:24  20          THE COURT:  Any redirect?

10:59:26  21          MR. BIRCHFIELD:  Yes, your Honor.

10:59:27  22                    REDIRECT EXAMINATION

10:59:27  23   BY MR. BIRCHFIELD:

10:59:30  24   Q.  Dr. Fail, I want to follow-up, I want to walk through the time

10:59:36  25   line of events.  So that we can make sure we have all of this

OFFICIAL TRANSCRIPT

10:59:49  1   together.

10:59:51  2         So we know from January the 7th of 2014, that's when he's

11:00:00  3   diagnosed with the AFib; is that right?

11:00:02  4   A.  Yes, sir.  Yes, sir.

11:00:04  5   Q.  And you discussed in great detail with Mr. Sarver about the

11:00:10  6   risk, the seriousness of being at risk of a stroke because of being

11:00:15  7   in AFib, right?

11:00:15  8   A.  Yes, sir.

11:00:16  9   Q.  And so that was presented to him by Dr. Wong about the severity

11:00:22 10   of the stroke risk January the 7th, right?

11:00:25 11   A.  I believe it would have been, yes, sir.

11:00:26 12   Q.  And we know that he started Xarelto on January the 8th in the

11:00:34 13   hospital?

11:00:34 14   A.  Yes, sir.

11:00:35 15   Q.  And continued to take Xarelto until February the 2nd?

11:00:44 16   A.  Uh-huh.

11:00:45 17   Q.  And that's his last Xarelto pill.

11:00:55 18         And on February the 3rd, you know from the Cardiovascular

11:00:59 19   Institute from the records that he reported with a GI bleed is that

11:01:03 20   right?

11:01:04 21   A.  Yes, sir.  Yes, sir.

11:01:05 22   Q.  And that's when he was transferred to Ochsner Kenner and

11:01:17 23   treated for the GI bleed; is that right?

11:01:20 24   A.  Yes, sir.

11:01:21 25   Q.  And then, Dr. Fail, you did the Lariat procedure in April,

11:01:30  1    April the 27th of 2015?

11:01:33  2    A.  '15, yes, sir.

11:01:51  3    Q.  And the reason -- I want to come back and talk about

11:01:54  4    Dr. Timothy's decision.  But the reason that this Lariat procedure

11:01:58  5    was done is because of the GI bleed that he suffered on Xarelto

11:02:04  6    that led him to be in a position where he could not be

11:02:08  7    anticoagulated, correct?

11:02:10  8    A.  Correct.

11:02:11  9    Q.  And Dr. Timothy, we walked through those records, but

11:02:16 10    Dr. Timothy made the decision that he could not be anticoagulated,

11:02:21 11    right?

11:02:21 12    A.  Yes, sir.

11:02:22 13    Q.  And, Dr. Fail, I know doctors sometimes talk in terms of just

11:02:29 14    thought, like a gut feeling, right?

11:02:30 15    A.  Yes, sir.

11:02:31 16    Q.  And when a patient that is anticoagulated has suffered a major

11:02:39 17    GI bleed, that presents the doctor with a dilemma, doesn't it?

11:02:45 18    A.  Right.

11:02:45 19    Q.  The doctor must decide, do I try another anticoagulant, which

11:02:52 20    may help or it may cause another GI bleed, right?

11:02:55 21    A.  Correct.

11:02:56 22    Q.  Or do I not take that risk and just -- and have the patient

11:03:01 23    exposed to this increased risk of stroke, right?

11:03:04 24    A.  Correct.

11:03:06 25    Q.  And, Dr. Fail, that's a decision that a cardiologist makes on a

11:03:11  1   patient-by-patient basis, isn't it?

11:03:13  2   A.  Correct.

11:03:14  3   Q.  And it's a difficult decision?

11:03:15  4   A.  It is.

11:03:16  5   Q.  And have you, in your practice, have you gone both ways?

11:03:22  6   A.  Yes, sir.

11:03:22  7   Q.  You've said, no, no, I cannot risk an anticoagulant on this

11:03:26  8   patient?

11:03:26  9   A.  I have.

11:03:27 10   Q.  And then have there been other patients where you said, I am

11:03:30 11   going to try another course of anticoagulation and done that?

11:03:34 12   A.  Yes, I have.

11:03:38 13   Q.  So from February the 2nd to April the 27th, this period here,

11:03:52 14   that is -- that's when Mr. Boudreaux was exposed to this greatly

11:03:58 15   increased risk of stroke without any protection from an

11:04:03 16   anticoagulant or the Lariat procedure, right?

11:04:05 17   A.  Correct.

11:04:06 18   Q.  And that's because of the GI bleed that he suffered on February

11:04:12 19   the 3rd --

11:04:13 20   A.  Yes, sir.

11:04:15 21   Q.  -- is that right?  All right.  Thank you, your Honor.

11:04:20 22          And I want to go through, for just a second, the issue of

11:04:27 23   aspirin.  I want us to take a look at Plaintiff's Exhibit 54.  Your

11:04:46 24   Honor, this has been admitted already.  And this is the Xarelto

11:04:54 25   label for August of 2013.  Do you see that, Dr. Fail?

11:05:00  1    A.  I do.

11:05:00  2    Q.  And in the Xarelto label there is a section that deals with the

11:05:10  3    drug interactions.  Are you familiar with that portion of the

11:05:12  4    label?

11:05:12  5    A.  Yes, sir.

11:05:13  6    Q.  And here is a section that addresses the use of anticoagulants,

11:05:27  7    NSAIDs and aspirin, do you see that?

11:05:29  8    A.  Yes, sir.

11:05:29  9    Q.  And it talks about the "concomitant aspirin use has been

11:05:37  10   identified as an independent risk factor for major bleeding in

11:05:43  11   efficacy trials."

11:05:45  12   A.  Correct.

11:05:45  13   Q.  Do you see that, Dr. Fail?

11:05:47  14   A.  Yes, sir.

11:05:48  15   Q.  Is there any -- is there anything in this section that would

11:05:55  16   instruct doctors not to have a patient on Xarelto and aspirin at

11:06:01  17   the same time?

11:06:01  18   A.  No, sir.

11:06:02  19   Q.  In fact, if you go down to that next, that next paragraph, it

11:06:08  20   says, "avoid concurrent use with other anticoagulants due to

11:06:14  21   increased bleed risk unless the benefit outweighs the risk."  Do

11:06:19  22   you see that?

11:06:20  23   A.  Yes, sir.

11:06:20  24   Q.  And aspirin is not another anticoagulant, it's an antiplatelet

11:06:25  25   agent, right?

11:06:25 1    A.  Yes, sir.

11:06:26 2            MR. SARVER:  Objection, your Honor.  Rule 106, may we see

11:06:29 3    the rest of that statement?

11:06:31 4            THE COURT:  Sure.

11:06:32 5            MR. BIRCHFIELD:  Sure.

11:06:32 6    BY MR. BIRCHFIELD:

11:06:33 7    Q.  "Promptly evaluate any signs or symptoms of blood loss if

11:06:37 8    patients are treated concomitantly --" that means together with

11:06:42 9    aspirin, right?

11:06:42 10   A.  Yes, sir.

11:06:43 11   Q.  "Or other platelet aggregation inhibitors or NSAIDs."  Do you

11:06:48 12   see that?

11:06:49 13   A.  Yes, sir.

11:06:55 14   Q.  Dr. Fail, Mr. Sarver talked to you about the condition that

11:07:02 15   Mr. Boudreaux is in now and that his heart condition is better than

11:07:10 16   it was before.  Is that right?

11:07:13 17   A.  I believe that's true, yes, sir.

11:07:14 18   Q.  You wouldn't say that Mr. Boudreaux's GI bleed and his five

11:07:24 19   days in the hospital and the four units of blood that were

11:07:29 20   transfused, you wouldn't say that that's a good thing for him,

11:07:32 21   would you?

11:07:32 22   A.  I would not.

11:07:33 23   Q.  And Mr. Sarver asked you about whether Xarelto caused a tear or

11:07:42 24   some type of injury in his intestines, and you said, no, there's no

11:07:47 25   evidence of that, right?

11:07:48  1   A.  Correct.

11:07:49  2   Q.  But you told us in your deposition that to a reasonable degree

11:07:54  3   of medical certainty that you believe his GI bleed was caused or

11:08:01  4   contributed by Xarelto; is that correct?

11:08:04  5   A.  Contributed but not caused.

11:08:05  6   Q.  Okay.  Thank you.  Do you still hold that opinion today?

11:08:12  7   A.  Yes, sir.

11:08:12  8   Q.  To a reasonable degree of medical certainty?

11:08:14  9   A.  Yes, sir.

11:08:15  10            MR. BIRCHFIELD:  Thank you.

11:08:15  11            THE COURT:  Okay.  Thank you very much.  You're excused,

11:08:18  12   sir.  Let me see counsel just on logistics.  I don't need this on

11:08:23  13   the record.

11:08:24  14       (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

11:09:48  15       (OPEN COURT.)

11:09:49  16            THE COURT:  Members of the jury, the only witness now

11:09:52  17   will be the person in Philadelphia.  He has been subpoenaed to come

11:09:58  18   to that court, he is there.  Everything is ready but will take us

11:10:02  19   awhile to connect and things of that sort.  So with counsel's

11:10:07  20   agreement, we're going to break here for lunch at this time and

11:10:11  21   come back at 12:15 -- let's make it 12:30.  12:30 and so at 12:30

11:10:20  22   we'll connect with the doctor.

11:10:23  23            Okay.  Thank you very much.  The court will stand in

11:10:25  24   recess until 12:30.

11:10:27  25            THE MARSHAL:  All rise.

1     (WHEREUPON, THE JURY EXITED THE COURTROOM AND A LUNCH RECESS

2     WAS TAKEN.)

3

4                          * * * * * *

5

6                     REPORTER'S CERTIFICATE

7

8          I, Karen A. Ibos, CCR, Official Court Reporter, United

9     States District Court, Eastern District of Louisiana, do hereby

10    certify that the foregoing is a true and correct transcript, to the

11    best of my ability and understanding, from the record of the

12    proceedings in the above-entitled and numbered matter.

13

14

15                     /s/ Karen A. Ibos
                       _____

16                     Karen A. Ibos, CCR, RPR, CRR, RMR

17                     Official Court Reporter

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT