1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  XARELTO                *
    (RIVAROXABAN) PRODUCTS         *
6   LIABILITY LITIGATION           *

7   THIS DOCUMENT RELATES TO:      *   Docket No.: 14-MD-2592
                                   *   Section "L"
8   *Joseph J. Boudreaux, Jr.*     *   New Orleans, Louisiana
    *v. Janssen Research &*        *   April 28, 2017
9   *Development, et. al.,*        *
    Case No.: 14-CV-2720           *
10  * * * * * * * * * * * * * * * *

11          VOLUME IV - AFTERNOON SESSION
        TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE ELDON E. FALLON
            UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15
    For the Plaintiffs':
16  Liaison Counsel:            Levin Papantonio
                                BY:  BRIAN H. BARR, ESQ.
17                              316 South Baylen Street, Suite 600
                                Pensacola, Florida  32502

18

19                              Beasley Allen
                                BY:  ANDY BIRCHFIELD, ESQ.
20                              P.O. Box 4160
                                Montgomery, Alabama 36103

21

22                              Gainsburg Benjamin David
                                  Meunier & Warshauer
23                              BY:  GERALD E. MEUNIER, ESQ.
                                2800 Energy Centre
24                              1100 Poydras Street
                                New Orleans, Louisiana 70163

25

OFFICIAL TRANSCRIPT

```
 1   APPEARANCES:

 2                              Schlichter Bogard & Denton, LLP
                               BY:  ROGER DENTON, ESQ.
 3                              100 South Fourth Street
                               St. Louis, Missouri 63102
 4

 5                              The Lambert Firm
                               BY:  EMILY JEFFCOTT, ESQ.
 6                              701 Magazine Street
                               New Orleans, Louisiana 70130
 7

 8   For the Defendant Bayer
     HealthCare Pharmaceuticals
 9   Inc. and Bayer Pharma AG:   Wilkinson Walsh & Eskovitz, LLP
                               BY:  BETH A. WILKINSON, ESQ.
10                              1900 M Street NW, Suite 800
                               Washington, DC 20036
11

12                              Nelson Mullins Riley &
                                 Scarborough, LLP
13                              BY:  DAVID E. DUKES, ESQ.
                               Meridian, 17th Floor
14                              1320 Main Street
                               Columbia, South Carolina 29201
15

16   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
17   Development, LLC:           Barrasso Usdin Kupperman Freeman &
                                 Sarver, LLC
18                              BY:  RICHARD E. SARVER, ESQ.
                               909 Poydras Street, 24th Floor
19                              New Orleans, Louisiana 70112

20
     Official Court Reporter:    Jodi Simcox, RMR, FCRR
21                              500 Poydras Street
                               Room HB-406
22                              New Orleans, Louisiana 70130
                               (504) 589-7780
23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.
```

OFFICIAL TRANSCRIPT

1    **I N D E X**

2                                                                    Page

3
DR. GARY PETERS

4        Direct Examination By Mr. Barr:            1069
         Cross-Examination By Mr. Sarver:           1096
5        Redirect Examination By Mr. Barr:          1123

6    RULE 50 MOTION                                 1130

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

|   |   |
|---|---|
| 1 | <u>**PROCEEDINGS**</u> |
| 2 | **(April 28, 2017)** |
| 3 | **(AFTERNOON SESSION)** |
| 4 | ****** |
| 5 | |
| 6 | (COURT CALLED TO ORDER) |
| 7 | **THE DEPUTY CLERK:**  All rise. |
| 8 | (WHEREUPON, the jury entered the courtroom.) |
| 9 | **THE COURT:**  Okay.  Be seated, please. |
| 10 | Call your next witness, please. |
| 11 | **MR. BARR:**  Your Honor, the plaintiffs call Dr. Gary |
| 12 | Peters. |
| 13 | **THE COURT:**  Would you swear in Dr. Peters, please. |
| 14 | (WHEREUPON, **DR. GARY PETERS**, having been duly sworn, |
| 15 | testified as follows**:)** |
| 16 | **THE COURT:**  Be seated, please.  You may proceed. |
| 17 | **MR. BARR:**  May I proceed, Your Honor? |
| 18 | **DIRECT EXAMINATION** |
| 19 | **BY MR. BARR:** |
| 20 | **Q.**  Good afternoon, Dr. Peters.  How are you? |
| 21 | **A.**  I'm fine. |
| 22 | **Q.**  As I told you previously -- now, we've never met before |
| 23 | this afternoon, but as I told you previously and just so the |
| 24 | jury understands, I have to stand here with my back to |
| 25 | Dr. Peters.  It's no disrespect to him.  It's just the way the |

```
 1   logistics are set up.  And so I don't intend to be
 2   disrespectful by that.  You understand that, don't you?
 3              We'll move on.  Maybe?  Okay.
 4              So as I understand it, you started in Janssen in May
 5   of 2006 when you moved over from another pharmaceutical
 6   company, AstraZeneca; is that correct?
 7   A.   Yes, that's correct.
 8   Q.   And you came into Janssen specifically in 2006 to work on
 9   Xarelto; right?
10   A.   That was the project, yes, that I was hired to work on.
11   Q.   Okay.  And you were hired as the franchise medical leader
12   at Janssen for the development program on Xarelto; correct?
13   A.   Yes, that's correct.
14   Q.   And you would agree with me that you had significant
15   responsibility in the development of Xarelto for the use of
16   people with atrial fibrillation; correct?
17   A.   I was part of the team that worked on Xarelto, yes.
18   Q.   You were heavily involved in the clinical development of
19   that indication; correct?
20   A.   I couldn't quite hear the first part of that question.  It
21   is a bit echoey.
22   Q.   Okay.  You were heavily involved in the clinical
23   development of the AFib indication; correct?
24   A.   Yes, I was.  That was one of my responsibilities.
25   Q.   Okay.  And you ultimately became the vice president of the
```

OFFICIAL TRANSCRIPT

1    cardiovascular department and a senior medical person at

2    Janssen regarding Xarelto and AFib; correct?

3    **A.**    My position as the CV development head was a little bit

4    broader than just Xarelto.  It was not just Xarelto.

5    **Q.**    Okay.  All right.  But you would agree with me that you --

6    a substantial portion of your responsibilities were the drug

7    Xarelto; correct?

8    **A.**    Yes.  From 2006 until about the end of 2012 -- when I --

9    **Q.**    When you what?  You cut off there.  I didn't hear you.

10   **A.**    My -- end of 2012, I actually moved on and started working

11   other projects.  So Xarelto, when it was my primary

12   responsibility, was from May of 2006 until about the end of

13   2012, although I've had some ongoing activities with Xarelto

14   since 2012.

15   **Q.**    Okay.  Okay.  Now, prior to the approval of Xarelto, you

16   would agree with me that, from a commercial strategy

17   standpoint, Janssen did not want to encourage the use of any

18   measurement with Xarelto; correct?

19   **A.**    No, I would not agree with that.

20   **Q.**    Okay.  Let me hand you what I'm going to mark as the

21   plaintiffs' next exhibit.  It's Plaintiffs' 255705.

22           **MR. BARR:**  And we will offer this into the record.  I

23   don't believe there's an objection, Your Honor.  It's

24   Exhibit 72.

25           **MR. SARVER:**  No objection.

1         **THE COURT:** Let it be admitted.  Show it to the

2    witness.

3    **BY MR. BARR:**

4    **Q.** Okay.  Do you have that exhibit in front of you,

5    Dr. Peters?

6    **A.** I don't.  I do now.  Just handed to me.

7    **Q.** Okay.  Can you also see it on the screen?

8    **A.** Yes, I can.  It's a little blurry on the screen.  It will

9    be easier to look at the hard copy.

10   **Q.** What I want to focus on -- you see that there's an e-mail

11   that starts from Nauman Shah on June 15, 2010.  It's the second

12   e-mail on the page; correct?

13   **A.** Give me a minute here just to look at the document.

14   **Q.** And you can look at it as much as you want, but I'm just

15   focusing on this one e-mail.  And it's up on the screen for

16   you.

17   **A.** Okay.  Yes, I do see it's on the screen.  Yes.

18   **Q.** All right.  And what this e-mail -- you received this

19   e-mail on June 15th, 2010; correct?  You see your name there in

20   the "to" line?

21   **A.** I do, yes.

22   **Q.** Okay.  What this says is, "Thanks for forwarding this on.

23   From a commercial strategy standpoint, we do not want to

24   recommend or encourage use of any measurements for

25   rivaroxaban."

1    Do you see that?

2  **A.**   I do see that statement, yes.

3  **Q.**   And so that was -- from the commercial strategy

4  standpoint, you would agree, Nauman Shah was informing you

5  that, from a commercial strategy standpoint, measurements was

6  not something that Janssen wanted to encourage; correct?

7  **A.**   The context of this e-mail is that -- I work in research

8  and development, and so I'm not really aware of what the

9  commercial strategy is.  I work from a medical scientific

10  standpoint.

11    So it appears this note is from Nauman and I was

12  copied on it.  I don't know the full context of this e-mail

13  without reading it in more detail.  But, certainly, this --

14  Nauman is entitled to his opinion.  But this, from my

15  scientific standpoint, you know, wouldn't -- wasn't the

16  scientific medical strategy for the development of Xarelto.

17  **Q.**   Okay.  But Nauman Shah is with the marketing group, and

18  he's informing all the people that this e-mail is sent to,

19  which are both regulatory people and science people, that

20  Janssen did not want to encourage measurements when it came to

21  Xarelto; correct?

22  **A.**   So this looks like, from the submission line, it's in

23  relation to a paper that was published about using various

24  assays to measure Xarelto levels.  Certainly, scientifically,

25  medically, we would evaluate that; and if it was appropriate to

1  do that from a medical scientific standpoint, we would support

2  that.

3        Again, I don't work in the commercial organization;

4  I'm in the research and development organization.

5  **Q.**   Okay.  We can move on.

6  **A.**   People are entitled -- go ahead.

7  **Q.**   You would agree that the Xarelto label that you're aware

8  of does not tell doctors in any place in the label that PT can

9  predict bleed risk; correct?

10  **A.**   That is correct.  It does not say that because there's no

11  predictive ability for the PT to predict bleed in a clinically

12  meaningful way.

13  **Q.**   And you would agree that there's nothing in the U.S. label

14  instructing doctors that PT levels can predict bleed risk;

15  correct?

16  **A.**   I'm thinking about what's in the label.  There is a

17  section that describes the pharmacodynamics of the drug, and it

18  does the PT -- it does mention PT assay in that section.  But

19  because the data from our studies showed that it wouldn't be

20  predictive in a meaningful way for bleeding risk, there's no

21  statement, as you're indicating, about it being able to predict

22  bleeding risk.

23  **Q.**   So that's not in the label, correct, that PT can predict

24  bleed risk?

25  **A.**   That is my understanding, yes.

1  **Q.**   Okay.  Now, you're aware that Janssen has conducted
2  internal analyses on the issue of PT and bleed risk from the
3  ROCKET study; correct?
4  **A.**   It's a little bit -- I missed the first part of the
5  question.  Sorry.
6  **Q.**   It was a really good one.
7          You're aware that Janssen has not -- has conducted
8  internal analyses on the issue of the relationship between PT
9  and bleed risk, looking at the ROCKET data; correct?
10 **A.**   Yes, we have done that.
11 **Q.**   And you're aware that that analysis shows that PT has a
12 relationship to bleed risk; correct?
13 **A.**   It has no relationship in terms of being causal for
14 bleeding or predicting bleeding risk in the proper analyses.
15 **Q.**   Okay.  Let me ask that again because that wasn't an answer
16 to my question.
17         **MR. SARVER:**  Objection to the argument, Your Honor.
18 **BY MR. BARR:**
19 **Q.**   My question -- my question was you are aware that the
20 internal analysis conducted by Janssen, looking at the ROCKET
21 data, confirms that there is a correlation between PT and bleed
22 risk; correct?
23 **A.**   If you're asking that question if there's an association,
24 I'm aware of those analyses.  But other analyses show that
25 there's not a causal relationship between the PT and the

OFFICIAL TRANSCRIPT

1  bleeding risk.  So it would not be predictive of bleeding risk.

2  **Q.**   You've reviewed this analysis, and you've come to the same

3  conclusion; correct?  That PT has a relationship to bleed risk;

4  correct?

5  **A.**   It has no clinically meaningful predictive relationship

6  with bleeding risk.

7  **Q.**   Let me show you what I'm going to mark as my next exhibit.

8          **MR. BARR:**  Before you put that up on the screen,

9  Carl, this is Plaintiffs' 3673146.

10          **MR. SARVER:**  No objection, Your Honor.

11          **THE COURT:**  Okay.  Let it be admitted.

12          **MR. BARR:**  We'll offer this as Exhibit 73.

13             Carl, can we get that up on the screen?

14             Somebody hand this to Dr. Peters.

15  **BY MR. BARR:**

16  **Q.**   Do you have it?  Dr. Peters, do you have 3673146?

17  **A.**   Yes.

18  **Q.**   Okay.  You see that this is an e-mail from you sent to

19  Scott Berkowitz, Peter D. DiBattiste, and Sanjay Jalota.

20             Do you see that?

21  **A.**   The slide went blank here, but I have the hard copy.

22  **Q.**   It's back up there for you.  Do you see that?

23  **A.**   It's back on now.  Yes, I do.

24  **Q.**   And this is dated October 22nd, 2015; correct?

25  **A.**   Yes, October 22nd, 2015.

1  **Q.**   Okay.  And the subject -- this has an attachment to it,
2  and the attachment is "ROCKET PT and bleeding analyses."
3        Do you see that?
4  **A.**   Yes, I do.
5  **Q.**   And you looked at that analyses; correct?
6  **A.**   Yes, I have.
7  **Q.**   And then you wrote, "Here are some slides from a Janssen
8  ROCKET report."  Correct?  So you're looking at a Janssen
9  report on ROCKET; correct?
10  **A.**   Yes, that's correct.
11  **Q.**   Okay.  And this Janssen ROCKET report is looking at
12  bleeding by PT quartiles.  Do you see that?
13  **A.**   I do.
14  **Q.**   And you go on to say, "I don't think enough data at peak,
15  but post-dose, the 4- to 16-hour window, and trough, 16- to
16  32-hour window, show a pretty clear relationship."  Correct?
17  **A.**   Yes.  And "relationship" doesn't mean "causal
18  relationship."  It can just be an association.
19  **Q.**   Okay.  But you found, in reviewing this data, that there
20  was a clear relationship between PT and bleeding; correct?
21  **A.**   Right.  There was an association across the quartiles.
22  That doesn't prove that it's the prothrombin time that's
23  causing the bleeding events.
24  **Q.**   Did you write any of that in your e-mail, or did you just
25  write that there was a clear relationship?

OFFICIAL TRANSCRIPT

1   **A.**   I just wrote that there was a clear relationship.  This
2   was a very short e-mail.  We were working with Portola to
3   provide them some information that they needed in their
4   interactions with FDA.
5   **Q.**   Right.  Because in 2015 Janssen was working on Portola to
6   design -- or help Portola design an antidote for Xarelto;
7   correct?
8   **A.**   Yes.  I think you said antidote?
9   **Q.**   Yes.
10  **A.**   Again, the wording.  It echoes a bit.
11         Yes, we were working with Portola to develop a
12  reversal agent for Xarelto.
13  **Q.**   That's the same thing as what some people call an
14  antidote; right?
15  **A.**   Yes.
16  **Q.**   It's a separate product that's designed to stop bleeding
17  if somebody's actively bleeding; correct?
18  **A.**   That would be the desired effect.  What it actually does
19  is it's a mimic of Factor Xa that would bind to rivaroxaban so
20  rivaroxaban levels would essentially decline to close to zero.
21  **Q.**   Okay.  You really faded out there, so I think everybody in
22  the courtroom is leaning in, trying to hear what you were
23  saying.  Just try to speak into the microphone a little
24  clearer.
25  **A.**   Okay.

OFFICIAL TRANSCRIPT

1  **Q.**   And so Portola had come to Janssen in 2015, and they were

2  asking for data that Janssen had on the relationship between PT

3  and bleeding so that they could use that data to help develop

4  this antidote; correct?

5  **A.**   They were looking for data primarily for what we have with

6  Xarelto concentrations related to bleeding, not for PT data

7  specifically.  So this was something I was discussing back and

8  forth with Dr. Berkowitz in terms of what we could provide

9  them.

10  **Q.**   Okay.  And you were one of the people involved in trying

11  to obtain that data and provide it to Portola; correct?

12  **A.**   Yes, I was one of those people.

13  **Q.**   And you actually asked people internally at Janssen

14  whether or not Janssen had conducted its own analysis of the

15  ROCKET data to verify the FDA's PT bleed risk quartile

16  analysis; correct?

17  **A.**   I'm not sure I recall that specific statement.  If you

18  could show that to me, that would be good.

19  **Q.**   Sure.  This will be Plaintiffs' 3668409.

20           **MR. SARVER:**  No objection.

21           **THE COURT:**  Let it be admitted.

22           **MR. BARR:**  This will be Exhibit No. 74.

23  BY MR. BARR:

24  **Q.**   Do you see that this is an e-mail from you, is the one I'm

25  focusing on at the bottom of the page, dated October 13th,

1    2015.
2              Do you see that?
3    **A.**   Yes, I do.
4    **Q.**   And you send this to James Pan; correct?
5    **A.**   Yes, I did.
6    **Q.**   The jury's heard a lot of names during this trial.  I
7    don't think they've heard the name James Pan.  Who is that?
8    **A.**   James Pan was one of our statisticians, and he was the
9    lead statistician for the ROCKET study.
10   **Q.**   And your subject line was "ROCKET PT analyses"; correct?
11   **A.**   Yes, it is.
12   **Q.**   It wasn't concentration.  It wasn't anything else.  It was
13   PT; correct?
14   **A.**   Right.  It doesn't talk about concentration.  But from
15   verbal communications with Portola, conversations, they were
16   looking primarily for concentration data related to bleeding
17   risk.  And in the ROCKET study, we only had measured
18   concentrations, actual drug levels, of Xarelto in 161 people.
19   So we did not have a lot of concentration data to provide.
20   **Q.**   Okay.  So you went looking for PT data; right?
21   **A.**   We were exploring that possibility, yes.  So I was asking
22   James to look and refresh my memory for what kind of data
23   related to PT that we had.
24   **Q.**   And what you write -- is it Dr. Pan or Mr. Pan?
25   **A.**   Dr. Pan.

OFFICIAL TRANSCRIPT

1    **Q.**   Okay.  So you write to Dr. Pan and you say, "Another

2    semi-emergency.  We're working with Portola on the antidote and

3    need to track down any analyses we did relating PT measurements

4    with bleeding outcomes.  No need to look at efficacy."  Right?

5    **A.**   That's what I wrote, and that's what -- Portola was only

6    interested in the safety side, the bleeding side.  That's

7    correct.

8    **Q.**   Right.  And so you're specifically asking for analyses

9    that Janssen did regarding PT measurement and bleeding; right?

10   **A.**   Yes, I was asking that.

11   **Q.**   Okay.  And if you go to the next page, you finish with "I

12   know we did PT quartiles?"  Right?

13   **A.**   Yes.

14   **Q.**   And then you ask, "Did we do additional analyses for the

15   AdCom or to verify the FDA quartile analyses?"  Correct?

16   **A.**   Yes, I asked that.

17   **Q.**   Okay.  So you didn't know at this point in time.  Would

18   that be fair to say?

19   **A.**   I knew we did the PT by quartiles, and I was looking for

20   what other additional analyses we had done.  Again, this was

21   2015.  The advisory committee was in 2011.  So it was four

22   years later.

23   **Q.**   Right.  So you're looking at this issue about PT and

24   bleeding four years after the drug's been put on the market?

25   **A.**   No.  We had done the analyses, and they were part of the

OFFICIAL TRANSCRIPT

1  original NDA when we filed in January 2011.  Four years later,
2  I wasn't remembering exactly what we had done.
3  **Q.**    Okay.
4  **A.**    So I was asking Dr. Pan to -- to help me to find what we
5  had done back four years ago.
6  **Q.**    Okay.  And Dr. Pan ultimately sent you what was done;
7  correct?
8  **A.**    It looks like he sent some of what we had done.  I'm not
9  sure if he sent me everything we had done.
10 **Q.**    Okay.  The next document I want you to look at is
11 Plaintiffs' 3673132.
12         **MR. SARVER:**  No objection, Your Honor.
13         **THE COURT:**  Let it be admitted.
14         **MR. BARR:**  So this will be Exhibit No. 74.
15         **THE DEPUTY CLERK:**  75.
16         **MR. BARR:**  75.  I'll keep track one day.
17 **BY MR. BARR:**
18 **Q.**    So you see this e-mail.  What I want you to do is flip
19 into the third page of this.  And there's an e-mail from
20 Dr. Pan on October 20th, 2015, to you and a handful of other
21 people; correct?
22 **A.**    Well, let me just look at this overall.
23         Okay.  Okay.  So it looks like James sent me -- on
24 this, what's on the screen, James sent me a report.
25 **Q.**    Right.  He sent you the FDA rivaroxaban PT outcome

1  analysis report from the office of clinical pharmacology;

2  correct?

3  **A.**    Yes.  That would appear to be correct, yes.

4  **Q.**    And you're aware that that report found that there was a

5  relationship between PT and bleeding; correct?

6  **A.**    Again, there was an association, looking at the quartile

7  analyses, between PT and bleeding.  FDA did other analyses

8  where they adjusted for clinical risk factors, and that

9  association was almost nonexistent anymore.

10  **Q.**    Okay.  So you're taking the position that the FDA

11  ultimately found that there was very little relationship

12  between PT and bleeding.  Is that what you're telling this

13  jury?

14  **A.**    Yes.  Looking at their analyses, they did a number of

15  analyses, as we did.  And when you adjust for clinical risk

16  factors, there's a very shallow relationship between PT and

17  bleeding events.  I would have to look at FDA documents again

18  to see what they actually concluded about their analyses.

19  **Q.**    Okay.  Well, I'll give you a chance to look at this report

20  in just a minute, but you also attached -- what Dr. Pan sent to

21  you were three files, and it says Ihab.  What is that?

22  **A.**    Three -- I didn't follow that.

23  **Q.**    You see that there are three attachments.  Do you see the

24  name Ihab?

25  **A.**    Right.

OFFICIAL TRANSCRIPT

1    **Q.**    What is that so the jury understands?

2    **A.**    That would be Dr. Girgis, Ihab Girgis.

3    **Q.**    So these are internal FDA -- internal Janssen analysis;

4    correct?

5    **A.**    Yes, they would be.

6    **Q.**    And then Dr. Pan also sent you a logistic regression;

7    correct?

8    **A.**    Right.  That would be from the FDA analysis.

9    **Q.**    Oh, you think that logistic regression is from the FDA?

10   **A.**    That was in the FDA, the office of clinical pharmacology

11   report that you mentioned earlier.

12   **Q.**    All right.

13   **A.**    I know that logistic regressions in our internal sparse PD

14   report that's listed there.

15   **Q.**    Just to confirm what the FDA found -- the jury, I believe,

16   has seen this, but this is the office of clinical pharmacology

17   report.  It's Plaintiffs' 314779.

18              **MR. SARVER:**  No objection.  It's already in evidence.

19              **THE COURT:**  It's already in evidence.

20   BY MR. BARR:

21   **Q.**    So you see that this is the FDA clinical pharmacology

22   technical report.  Do you see that?

23   **A.**    I'm looking through it for a second.

24   **Q.**    Right now I'm just asking if you have it.

25              Just -- Dr. Peters, for the record, can you just say

1    you have it?

2    **A.**   Yes.  Yes, I do have it.

3    **Q.**   Okay.  Thank you.

4    **A.**   Okay.  Now, I'm not sure exactly what this is.  I just see

5    the title is the Clin Pharm technical report.  It's from the

6    FDA.  I can confirm that.  I'm not sure which part of the file

7    this might have been in.

8    **Q.**   Okay.  So let's go back to the second page.  And you see

9    that there's a Section B that says "Prothrombin time major

10   bleeding relationship."  Right?

11   **A.**   I do see that, yes.

12   **Q.**   Okay.  And the last two sentences of that paragraph say

13   that "Overall, the results demonstrated that the risk of

14   bleeding was associated with PD measurements, PT, Factor Xa, or

15   PiCT."  Right?

16   **A.**   Yes, it does say that.  It says "associated," not

17   "causal."

18   **Q.**   And then it says, "The results were consistent with the

19   findings from our primary analysis of PT major bleeding

20   relationship."  Right?

21   **A.**   Yes, that is what the FDA document says.

22   **Q.**   And then we go to the next page.  And I want you to look

23   at these graphs.  Do you see that there's a logistic regression

24   slide.  That's Model A?

25   **A.**   I do.

1    Q.    And that says, "Major bleeding events are dependent of PT
2    levels over the observed range."  Right?
3    A.    I do see that, yes.  And that's the association they're
4    referring to, and the four dots are the quartiles.  And if you
5    look at the right, when you adjust for clinical risk factors in
6    the Cox regression model, it's a much shallower slope, which
7    wasn't, I don't believe, statistically significant anymore.
8    Q.    Okay.  But if you're looking at the logistic regression,
9    it clearly shows that, as PT goes up, as the blood is slower
10   and slower to clot, the bleed risk more than doubles; correct?
11   A.    That is an association.  But you have to look -- those
12   four quartiles are not the same people.  The people in the
13   upper quartile are older and sicker and more fragile, and that
14   analysis does not separate out their clinical risk factors from
15   the prothrombin time.
16   Q.    Okay.  My question --
17   A.    This on the right does separate that out, and it becomes
18   much shallower and really not clinically meaningful in terms of
19   being able to use PT levels to really predict for bleeding
20   risk.
21   Q.    My question was much different.  It was simply, as PT gets
22   longer, as the blood gets slower and slower to clot, that this
23   logistic regression shows that bleed risk more than doubles;
24   correct?
25   A.    It shows there is an association.  It does not prove

1     causality, that the prothrombin time is causing -- is

2     responsible for the increased bleeding risk according to the --

3     **Q.**    With all due respect, I didn't ask you anything about

4     that.   I asked whether or not bleed risk more than doubles.

5            Can I get an answer to that question?

6            **MR. SARVER:**   Object to the argument, Your Honor.

7            **THE COURT:**   Overrule the objection.

8     **BY MR. BARR:**

9     **Q.**    Can I get an answer?

10    **A.**    I heard object. I don't --

11    **Q.**    The judge overruled it. Can I get an answer?

12    **A.**    Okay. So that curve does show an increase in the bleeding

13    risk across the four quartiles. That's the observed data.

14    **Q.**    It more than doubles.

15    **A.**    But I don't believe that indicates that you can use

16    prothrombin time to assess bleeding risk. I don't agree with

17    that at all.

18    **Q.**    I didn't ask you that. I asked you if the bleed risk more

19    than doubles. Is that correct?

20    **A.**    Yes.

21    **Q.**    Now, Dr. Pan also sent you this internal logistic

22    regression.

23           Do you remember seeing that in his e-mail?

24    **A.**    I don't have anything on the screen. Are we referring to

25    the previous exhibit?

1  **Q.**   Sir, the one where Dr. Pan forwarded you all the

2  attachments.

3  **A.**   Right.  There wasn't a logistic regression analysis that I

4  recall in our internal report from 2010.

5  **Q.**   Okay.  So let me show you what I'm going -- the next

6  exhibit will be 3671042.

7  **A.**   Okay.  So there was -- okay.  So it looks like there was

8  an --

9  **Q.**   One second.  One second.  Let me ask the question.

10        **THE COURT:**  It will be admitted.

11        **MR. BARR:**  This is Exhibit No. -- hold one second.

12             Your Honor, for purposes of the record, there

13  might be some confusion.  Is there an objection on the clinical

14  pharm report?  Just to make sure we move it in.

15        **MR. SARVER:**  I understood it was already in evidence.

16        **MR. BARR:**  I was told it was.  So just for clarity.

17        **MR. SARVER:**  We will object to it based on not having

18  really thought it through, so I better object.

19        **MR. BARR:**  Do you want a side bar on this real quick?

20        **MR. SARVER:**  I don't mind you going through and

21  finishing it up and taking it up later.

22        **MR. BARR:**  So this will be --

23        **THE WITNESS:**  Did I miss a question or not?

24        **MR. BARR:**  This is Exhibit 76, Your Honor, the one on

25  the screen.

1  **BY MR. BARR:**

2  **Q.**   Do you have that, Dr. Peters?

3  **A.**   I have the document from -- yes.  I have one from Alla

4  Rhoge, and this one on the screen says Liping Zhang.  So I

5  don't think I have the same document that you have on the

6  screen.

7  **Q.**   No.  They should have handed you 3671042.

8         Do you have that in front of you now, sir?

9  **A.**   I do.

10 **Q.**   Okay.  And so what I want to look at is, if you go to the

11 tenth page of this, there's an e-mail from you on October 20th,

12 2015, subject line, "Assessing the PT bleeding response

13 relationship in AFL 3001."

14        Do you see that?

15 **A.**   This is getting to be a longer document now, but looking

16 at the -- okay.  I see this document.  Yes.

17        What was the question --

18 **Q.**   Okay.  I'm just --

19 **A.**   -- that section.

20 **Q.**   So this is an e-mail from you to Dr. Pan and

21 Dr. DiBattiste, a handful of other people on October 20th,

22 2015; correct?

23 **A.**   Yes.

24 **Q.**   And what you write is you write, "Looking at the logistic

25 regressions."  So you're looking at this logistic regressions

1    document that Dr. Pan has sent to you; correct?

2    **A.**    Yes.

3    **Q.**    And you write that "Looking at the logistic regression, it

4    does seem to confirm the FDA analysis and not make too much

5    difference which window is picked as long as it has sufficient

6    data."  Correct?

7    **A.**    That is -- yes, that's correct.  That's what the statement

8    says.

9    **Q.**    Okay.  So you looked at Bayer -- Janssen's internal

10    logistic regression and came to the conclusion that it

11    confirmed the FDA's logistic regression of the ROCKET data;

12    correct?

13    **A.**    Yes, that there is an association between the prothrombin

14    time quartiles and increased bleeding.  But those logistic

15    regression analyses do not sort out the impact of clinical risk

16    factors at all.

17    **Q.**    Okay.  Do you know -- you would agree with me that this

18    internal logistic regression was not disclosed to the FDA in

19    2010, was not disclosed to the FDA in 2015; correct?

20    **A.**    I can't -- I don't know that I can really answer that

21    question.  I know there were not logistic regression analyses

22    in the prothrombin time analyses we submitted to FDA.  We did

23    quartile analyses.  We did box and whisker analyses.  We did

24    other cumulative function analysis, but I don't believe there

25    were logistic regression analyses in that initial report.

OFFICIAL TRANSCRIPT

1  **Q.**   Okay.  When you saw this logistic regression analyses, you
2  actually decided that you shouldn't even send this to Portola;
3  right?
4  **A.**   No.  We didn't decide that at all.  Portola was interested
5  in concentration bleeding relationships.  And since PT is not
6  concentration data, they decided that they weren't interested
7  in seeing the prothrombin time analyses.
8  **Q.**   Okay.  Let's look at what you actually wrote.  If we can
9  go three pages over, so it starts on page 7.  It's on the
10  bottom of the screen.
11         Do you see it?  There's an e-mail from you, Gary
12  Peters, on October 22nd, 2015.  This is two days later;
13  correct?
14  **A.**   Yes, I do.
15  **Q.**   Okay.  And you write -- if you go to the next page, you
16  write, "On another note, I'm wondering if we really need to do
17  the Phase II of the ROCKET PT work.  I think Portola may be
18  okay with the FDA analyses."  Correct?
19  **A.**   Yes.  We sent them the Portola analyses.  And in the end,
20  they were not interested in PT bleeding relationships; they
21  wanted to see concentration bleeding relationships, which we
22  didn't have from the ROCKET study.
23  **Q.**   Okay.  Let me try that question again.
24         You write here that you actually think Portola would
25  be okay with the FDA's bleed risk analysis; correct?  That's

1    what you write.

2    **A.**   Yes.  The FDA logistic regression analyses were, I'm sure,

3    technically correct.

4    **Q.**   And you don't think that they will start asking too many

5    questions; right?

6    **A.**   Yes, I wrote that.  And I don't know if that's referring

7    to Portola.  And, again, in further conversation with them,

8    they were interested in concentration bleeding time data, which

9    we only had from Phase II studies.  They were not that -- they

10   were not interested, in the end, in prothrombin time bleeding

11   relationships.

12   **Q.**   Okay.  But this logistic regression that Janssen has done

13   internally, that confirms the FDA's PT bleed risk quartile

14   analysis, you know, as you sit here today, has not been

15   provided to the FDA; correct?

16   **A.**   As I sit here today, I -- I do not remember seeing

17   logistic regression analyses that we did.  We may have done

18   them in this time frame, but that's over almost two years ago,

19   a year and a half ago.

20           I think the talking about the Phase II was maybe to

21   do, but I would have to check these e-mails and look at them in

22   detail.  Was it to maybe go to the Phase II and repeat some of

23   the FDA analyses?  So I don't remember looking at logistic

24   regression analyses that we have done, but they may be out

25   there.

1  **Q.**   Okay.  But you were looking at one that Janssen did in
2  2015; correct?
3  **A.**   We -- again, I'm not sure what analyses we did a year and
4  a half ago or two years ago on October 15 without pulling up
5  those documents to see what those analyses were.
6  **Q.**   Okay.  Well, let's do that for you.
7            **MR. BARR:**  This will be Plaintiffs' 3074631.
8            **MR. SARVER:**  No objection, Your Honor.
9            **THE COURT:**  Let it be admitted.
10  BY MR. BARR:
11  **Q.**   This will be Exhibit No. 77.  All right.  Now, we see that
12  this is an e-mail from Dr. Pan to you, Dr. DiBattiste, and a
13  handful of other people; correct?
14  **A.**   That is an e-mail from me to Dr. Pan, yes.
15  **Q.**   And the subject line of this is assessing the PT bleeding
16  response relationship in AFL 3001 Phase I; correct?
17  **A.**   That's what it says, yes.
18  **Q.**   Okay.  There's an attachment to this e-mail called
19  "logistic regression.docx."  That's a Microsoft Word document;
20  right?
21  **A.**   Yes, it does say there's an attachment.  I don't remember
22  what's in that attachment to be honest.
23  **Q.**   Okay.  Well, we'll come right back to Exhibit No. 77, but
24  first I want to show you the attachment.
25            **MR. BARR:**  This is Plaintiffs' 3074632.

OFFICIAL TRANSCRIPT

1      **MR. SARVER:**  No objection, Your Honor.

2      **THE COURT:**  Admitted.

3  **BY MR. BARR:**

4  **Q.**    So this will be Exhibit No. 78.

5            And you see that, if you look at these charts,

6  there's four different logistic regressions that have been

7  conducted by Janssen; correct?

8  **A.**    Yes, that's correct.

9  **Q.**    And each one of these logistic regressions shows that if

10  PT goes up, as blood gets thinner and thinner and the blood is

11  lower and slower to clot, bleed risk goes up.  It more than

12  doubles; right?

13  **A.**    This is what these analyses show, but they're not adjusted

14  for clinical risk factors, and the people in the highest

15  quartile at the highest PTs are the sickest people.  So you

16  have to do other analyses to assess whether it's the

17  prothrombin time or the clinical risk factors that are actually

18  causative or responsible for the bleeding events.

19  **Q.**    And Janssen --

20  **A.**    But these analyses are very similar to FDA's, which

21  doesn't surprise me.  I don't -- didn't recall seeing them,

22  actually.  I don't recall this file, but...

23  **Q.**    Okay.  These are the logistic regressions you're looking

24  at when you say that this confirms the FDA analysis; right?

25  **A.**    Yes, that would be correct.

OFFICIAL TRANSCRIPT

1  **Q.**  And you believe that that's what these do; correct?  They

2  confirm the FDA analysis?

3  **A.**  Yes.  These are similar to the FDA analyses in that they

4  don't establish that it's the prothrombin time that's

5  responsible for the increased bleeding in the bleeding events

6  across the quartiles.

7  **Q.**  Now, I want to go back to Plaintiffs' -- Trial Exhibit 77

8  which is Plaintiffs' 3074631.

9          **MR. BARR:**  And, Carl, can you blow up that whole

10  paragraph that says "for SPAF."  The one that starts "for

11  SPAF," second paragraph.

12  **BY MR. BARR:**

13  **Q.**  All right.  And what Dr. Pan writes to you is, "We need to

14  consider the implications of providing some of these analyses

15  to Portola; e.g., a relation to TDM, being these are new

16  analyses, which have not been seen by FDA or other health

17  authorities."

18          Did I read that correctly?

19  **A.**  You did read that correctly, yes.

20  **Q.**  And to this day, this has not been provided to the FDA;

21  correct?

22  **A.**  These analyses were not.  FDA did their own analyses.  We

23  had supplied them with all the data and a number of other

24  analyses without the logistic regression.  We had supplied them

25  with all the quartile analyses without the logistic regression

1    part of it.  So it's essentially the same data, just a

2    different method of analysis.

3    Q.   Right.  Janssen confirmed the FDA analysis in 2015, we

4    think, and did not provide that to the FDA; correct?

5    A.   We did not provide it to FDA.  They had already done their

6    own analyses.  These looked very similar to those.  So I don't

7    see why there would have been any reason for us to provide it

8    to FDA.

9              MR. BARR:  Your Honor, I'd pass the witness.

10             THE WITNESS:  There's no new information here.

11             MR. BARR:  I pass the witness.

12             THE COURT:  Okay.

13             MR. SARVER:  Your Honor, would you like us to proceed

14   now?

15             THE COURT:  Yes.

16                        CROSS-EXAMINATION

17   BY MR. SARVER:

18   Q.   Good afternoon, Dr. Peters.  Can you hear me?

19   A.   We need just a minute to switch people handing me

20   documents, I think.

21   Q.   All right.  We'll wait until you're ready.  You tell us

22   when you're ready.

23   A.   Okay.

24   Q.   Good afternoon, Dr. Peters.  My name is Rick Sarver.  I

25   think we've met before.

**A.**   Good afternoon.

**Q.**   All right.  Could you tell us who you are, your full name
for the record.

**A.**   My full name?  Gary Richard Peters.

**Q.**   All right.  And are you the senior director of
cardiovascular at Janssen?

**A.**   Yes, that's my current position.

**Q.**   Where do you currently live?

**A.**   I live in West Chester, Pennsylvania.

**Q.**   And are you married?

**A.**   Yes, I'm married.  I have a beautiful wife.  We'll have
been married 39 years in June.

**Q.**   How about a family other than your wife?

**A.**   I have three grown daughters.  Two are married.  We have
seven grandchildren -- three boys, four girls, from about ages
2 to 10.

**Q.**   How long have you worked at Janssen?

**A.**   I have worked there since May of 2016.

**Q.**   And I understand you're a medical doctor.  We've been
calling you doctor.  Is it an MD?

**A.**   Yes.  I have a medical degree from UCLA.

**Q.**   And did you complete a residency after your medical
degree?

**A.**   Yes, I did.  I did three years of internal medicine
training, and then I did a year of subspecialty training in

OFFICIAL TRANSCRIPT

1    clinical pharmacology.

2    **Q.**    Did you become board-certified in internal medicine?

3    **A.**    Yes, I did.

4    **Q.**    After your residency, did you do another year in a

5    fellowship?

6    **A.**    Yes.  I did a fellowship in clinical pharmacology.

7    **Q.**    Tell us, what is clinical pharmacology?

8    **A.**    That's a subspecialty under internal medicine, like

9    cardiology or gastroenterology, but it specializes in how

10   medicines work and how best to use them in people.

11   **Q.**    Have you also received training and education in clinical

12   trials and the statistics related to clinical trials?

13   **A.**    Yes.  While I was working at Upjohn, I completed a

14   master's degree in clinical research design and statistical

15   analysis at the University of Michigan.

16   **Q.**    And why is it, Dr. Peters, that you chose to devote your

17   professional career to developing and studying medicines?

18   **A.**    When I did some electives in clinical pharmacology at

19   Stanford in my last year of medicine residency, I really liked

20   the idea of working with medicines.  I really liked the

21   research aspect of things.  So I thought having a career in

22   industry to be able to study new medicines and make them

23   available to people and physicians would be -- would be great.

24   **Q.**    Are you proud of the work you've done at Janssen?

25   **A.**    Yes, I am.

OFFICIAL TRANSCRIPT

1    **Q.**   And can you tell us, about how many clinical trials have

2    you been part of over the years?

3    **A.**   Through all phases, from Phase I to III, probably well

4    over 100 trials.

5    **Q.**   And have you been doing that for about 30 years?

6    **A.**   Yes, since 1984.  I've been in clinical research my entire

7    career.  So over -- over 30 years.

8    **Q.**   For how long have you been studying anticoagulants?

9    **A.**   I couldn't quite hear that one.  Sorry.

10   **Q.**   How long have you been studying anticoagulants?

11   **A.**   I've been studying anticoagulant or antiplatelet drugs for

12   about the last 20 years, since 1997, first at AstraZeneca and

13   now at Janssen.

14   **Q.**   I'd like to take you right to what I think the plaintiffs

15   are saying in this case, and let's see if we can get that

16   established.

17           The plaintiffs are saying we should have -- we,

18   Janssen -- should have put something on the label about PT and

19   the risk of bleeding.

20           Did you understand that's their claim?

21   **A.**   Yes, that's my understanding.

22   **Q.**   Are they right?  Would it have been a good idea to do that

23   on the label for Xarelto?

24   **A.**   No, I don't think it would be a good idea at all.  First,

25   the PT measurement in our clinical studies, the analyses we're

OFFICIAL TRANSCRIPT

talking about, we did with one specific reagent at one specific
laboratory, Duke University.  So it was under very controlled
conditions.

        In the real world, if you were using a number of
different reagents which are out there, a number of different
machines, there would be a great deal of variability in that
measurement.  There would also be variability over time after a
Xarelto dose with it.

        And so even if you could overcome those limitations
of it, it still was not, in other analyses than the logistic
regression, predictive of bleeding risk.  So it's not an easy
test to do, and it wouldn't be predictive of bleeding events.

Q.    If you tell doctors in the label that a test would be
predictive of bleeding events and it's really not, would that
do more harm than any possible good?

A.    Yes, I believe that would be more likely to cause harm
than to help doctors and patients.

Q.    Okay.  Dr. Peters, I'd like to go into something very
quickly that came up with another witness.  And the jury likely
remembers Dr. Kessler.

        Did you help write the label for Xarelto?

A.    Yes, I did.  I was involved in both the orthopedic surgery
label process and for the stroke prevention and atrial
fibrillation label process.

Q.    Is there something at Janssen called the label review

1    committee?

2    **A.**    Yes.  That was a senior committee that had to approve the

3    language in all of our labels before we would be able to submit

4    them to FDA.

5    **Q.**    Were you involved with that committee?

6    **A.**    I was not a member of that committee, but I was involved

7    in preparing documents that they would review and addressing

8    any comments or suggestions that they might have with the team.

9    **Q.**    I'd like to get right to the crux of it.

10              Was there a time when Janssen submitted to the FDA

11   language in the Xarelto label that contained some information

12   about a PT test?

13   **A.**    Yes.  There was information in both of our initial labels

14   about the results that we had from our clinical studies with

15   the PT Neoplastin test.

16   **Q.**    And did you -- were you a recipient of FDA's response to

17   Janssen's label request?

18   **A.**    Yes, I was copied on that response.

19   **Q.**    I'd like to show now Defense Exhibit 6009.

20              Please provide a copy to --

21              Do you have a copy with you, Dr. Peters?

22   **A.**    Yes.  I have that in front of me now.

23   **Q.**    Are you, in fact, a recipient of this e-mail?

24   **A.**    I don't see it on the screen.  It might be --

25   **Q.**    If you go down the page.

OFFICIAL TRANSCRIPT

Case 2:14-md-02592-EEF-MBN   Document 6443   Filed 05/10/17   Page 37 of 73

**A.**   I do see my name.

**Q.**   Do you see your name, Gary Peters -- Peters, Gary.  Is that you?

**A.**   Yes, it is.

**Q.**   Do you see the subject line?  Could you read it for us?

**A.**   The screen went blank, but I can read it off the hard copy.

**Q.**   Go off the hard copy.

**A.**   Subject line says, "FDA marked-up version of ORS" -- which is orthopedic surgery -- "USPI" -- which is U.S. package insert -- (NDA22406CR)."

**Q.**   Dr. Peters, did you receive this e-mail in the course and scope of your work at Janssen?

**A.**   Yes, I did.

        **MR. SARVER:**  Your Honor, we would offer Defense Exhibit 6009.

        **THE COURT:**  Admitted.

**BY MR. SARVER:**

**Q.**   Now, Dr. Peters, could you turn to the actual text of the e-mail at -- I believe it's page 33.

        Do you see that?

**A.**   The e-mail is the first.  I don't --

**Q.**   Let's go to the e-mail text where it says, "Dear all."

**A.**   Okay.

**Q.**   Do you see that, Dr. Peters?

A.    Yes, I see that.  Yes, that's up on screen now.  Yes.

Q.    "Dear all, We received the FDA revisions to our proposed

USPI" --

          Is that U.S. package insert?

A.    Yes, that would be those initials.

Q.    -- "and container carton and blister pack labels for our

review and comments."

          Do you see that?

A.    Yes, I do.

Q.    Does this e-mail actually provide, as part of it, what the

FDA did to Janssen's suggested language?

A.    Yes.  The e-mail in the attachment, it says, "See all four

attached."

          This was -- we had submitted our labels, and FDA had

provided their comments.  They have some comment boxes and they

have some changes.  And then we need to -- going on from what's

not highlighted, we need to accept the changes we agree to; and

for changes we do not, keep in track changes.  Because this

goes back and forth between the company and FDA at this point

until the approval and the final label is actually determined.

Q.    Okay.  Let's turn to page 33 of the attachment, if we

could.  Are you able to see that, Dr. Peters?  Take your time.

A.    I -- yes, I can see that.

Q.    All right.  Do you see the Section 12.2,

"Pharmacodynamics"?

1  A.   Yes, I do.

2  Q.   And there appears to be a strike-through on some of the

3  language.

4        Do you see that?

5  A.   Yes, I do.

6  Q.   Where did that strike-through come from?

7  A.   That strike-through came from FDA.

8  Q.   Let's take a look at the language, then, that the FDA

9  struck out of the label that Janssen proposed.  Read along with

10  me.

11        Now, the language the FDA chose to strike out says,

12  "The relationship between PT and riva plasma concentration is

13  linear and closely correlated.  If assessment of the

14  pharmacodynamics effect of rivaroxaban is considered necessary,

15  in individual cases PT (measured in seconds) is recommended."

16        Is that what the FDA chose to strike out of the

17  Janssen label?

18  A.   Yes, they -- they struck out that part and the parts that

19  follow.

20  Q.   All right.  So is there any question in your mind,

21  Dr. Peters, that Janssen proposed language to the FDA about the

22  label about PT and the FDA struck it out?

23  A.   No doubt in my mind at all, no.

24  Q.   I'd like to go to another issue that we need to clear up.

25        Did you attend any meetings with the FDA about

OFFICIAL TRANSCRIPT

1  Xarelto, about the Xarelto warning label?

2  **A.**   Yes, I've been involved with meetings with FDA.

3  **Q.**   Were some of them by telephone?

4  **A.**   Yes.  Often we'll have teleconferences -- well, not often.

5  We will have teleconferences with FDA, yes.

6  **Q.**   I'd like counsel to provide you a copy of Defense

7  Exhibit 5352.

8          Do you have that in front of you, Dr. Peters?

9  **A.**   Yes, I do.

10 **Q.**   And what is Defendants' Exhibit 5352?

11 **A.**   I missed that a little bit.  Could you say that again?

12 **Q.**   I asked what is the document you have in front of you?

13 **A.**   The document here is an e-mail from one of our regulatory

14 people, Andrea Kollath.  It's basically forward that's from

15 FDA, project manager at FDA, Tyree Newman, which has a summary

16 of a teleconference we had with FDA.

17 **Q.**   And before we go on, are you -- did you participate in

18 that teleconference?

19 **A.**   Yes, I did.

20 **Q.**   All right.

21 **A.**   I don't know if you need to know the screen is blank

22 again, but I do have the hard copy.

23 **Q.**   It's actually blank here too.

24         **MR. SARVER:**   Jim, is there a way to put that up?

25         **THE WITNESS:**   I don't know what the jury is seeing,

OFFICIAL TRANSCRIPT

1    if they're seeing the documents.

2              MR. SARVER:  I think they're seeing it now.

3                   Your Honor, we'd offer Defense 5352 into

4    evidence.

5              THE COURT:  Admitted.

6    BY MR. SARVER:

7    Q.   Now, Dr. Peters, can you confirm that you are an attendee?

8    If you look at the second page.

9              MR. SARVER:  Jim, go to the second page.

10             THE WITNESS:  Yes, I think it's on the first page in

11   the hard copy, but I was an attendee, yes.

12   BY MR. SARVER:

13   Q.   And is that you at the top line?

14   A.   Yes, it is.

15   Q.   Okay.  Now, if -- I'd like to go to page 3, the first

16   bullet point, if you wouldn't mind.

17             Now, I'm going to read this.  It's a little long, but

18   I'm going to ask you to read along and confirm that I get it

19   right.

20             "The division clarified its rationale for including

21   all of the in vivo drug interaction information in Section 7 of

22   the draft labeling rather than splitting between Sections 7 and

23   12.  The sponsor was concerned that there may be changes as

24   they were working with the Cardio-Renal Division on the label.

25   The division confirmed that the Cardio-Renal has been involved

1    in the current labeling review."

2             Did I read that correctly?

3    A.    Yes, you did.

4    Q.    Dr. Peters, there's been some suggestion in this case that

5    the Cardio-Renal division was not involved in the label review.

6             Is that true?

7    A.    No.   We had -- both NDAs for orthopedic surgery and for

8    the stroke prevention and atrial fibrillation were both under

9    review at this time, and so we were concerned that Cardio-Renal

10   be involved with the hematology division as they were getting

11   close to the final label.  So that's why we raised that

12   concern.   And the division -- you know, their answer here is

13   that they were working -- hematology and Cardio-Renal were

14   working together to approve our initial label, which was for

15   orthopedic surgery in July of 2011.

16   Q.    Dr. Peters, at the beginning of the week, the jury was

17   told by one of the lawyers for Mr. Boudreaux that Xarelto was

18   designed based on a business plan.

19             Is there any truth to that?

20   A.    No.   Xarelto was developed and studied within the research

21   and development group.  We designed all the studies, we

22   conducted all the studies.  We analyzed them.  We sent them to

23   FDA.  We do have commercial people that are part of our team,

24   but in research, it is the scientific medical group that makes

25   the decisions, and we developed Xarelto as an improvement over

1  warfarin to offer, you know, a better alternative to warfarin.

2  **Q.**   And, Dr. Peters --

3         **MR. SARVER:**  Jim, you can take down the current

4  document.  Thank you.

5  **BY MR. SARVER:**

6  **Q.**   Dr. Peters, the very first document that Mr. Barr showed

7  you was Plaintiffs' Exhibit 255705.  I'm going to try to use

8  the ELMO to show it to you, but it's the very first document.

9  If you can pull it up.

10         Do you have that in front of you, Dr. Peters?

11  **A.**   Yes, I do.

12  **Q.**   And if you go down to the last part of the document, you

13  weren't asked about this paragraph or this sentence in the

14  paragraph you were discussing.

15         Do you see the last sentence in the paragraph you

16  were discussing with Mr. Barr?

17  **A.**   Yes, I do.

18  **Q.**   Could you read for us, beginning with "finally."

19  **A.**   Finally, it's my understanding that, while the

20  measurements may indicate current rivaroxaban levels in the

21  body, they don't correlate to risks of bleeding or other

22  outcomes.

23  **Q.**   Now, Dr. Peters, is that the correct statement of the

24  science as it is today?

25  **A.**   Yes.  I agree with that statement.

OFFICIAL TRANSCRIPT

1  **Q.**   All right.  Dr. Peters, you were board-certified as an

2  internal medicine doctor; is that correct?

3  **A.**   Yes.

4  **Q.**   And in the course of your work, did you have occasion to

5  treat patients who were on warfarin?

6  **A.**   Yes.  I would have taken care of patients on warfarin

7  during my residency training.

8  **Q.**   Do you know how warfarin works in the body?

9  **A.**   Yes.  Warfarin works by interfering with -- in the liver

10  with vitamin K so that you aren't able to synthesize clotting

11  factors properly, specifically Factors II, VII, IX, and X, so

12  with abnormal clotting factors, when you're on warfarin

13  therapy.

14  **Q.**   And is it correct, then, that warfarin affects the liver

15  in the human body so that it's not able to produce four

16  different clotting factors?

17  **A.**   Yes.  It produces abnormal versions of those clotting

18  factors that don't work as well as the normal versions.

19  **Q.**   And is Xarelto different than warfarin?

20  **A.**   Yes, it's very different.  It affects only Factor X and

21  specifically only the activated form of Factor X.

22  **Q.**   Now, Dr. Peters, we've heard that warfarin actually works

23  very well to prevent strokes.

24       Do you agree?

25  **A.**   Yes, I do.  If you look at the original studies done a

OFFICIAL TRANSCRIPT

1  number of years ago comparing warfarin to either a sugar pill

2  or no treatment, and it works at least by preventing 60 to 70

3  percent of the strokes.  And some of the literature would say

4  that if you're actually in the therapeutic range, it's about

5  90 percent effective for preventing strokes.  And with that

6  comes some increase in bleeding risk, but it's very modest

7  compared to the number of strokes that are being prevented.

8  **Q.**   So if warfarin works well, why was there a need for

9  something different?

10 **A.**   Warfarin does work very well, but it's a very difficult

11 medicine to use.  It's a classic example of what's known as a

12 narrow therapeutic index drug where you have to stay within a

13 very tight range between an INR of 2 to 3.  If you're below

14 that range, your risk of stroke goes up pretty dramatically.

15 If you're above that range, your risk of bleeding goes up very

16 dramatically.

17          And it's very difficult to keep people in that range

18 because there are a lot of interactions with your food, with

19 your diet.  If you take more or less vitamin K than you

20 normally do, it can change it.  It interacts with many, many

21 drugs, so it's a very difficult drug to use in the real world.

22          And, actually, there are a number of literature

23 papers that bleeding risk in the real world are often double or

24 triple compared to what they were in the clinical studies.

25 But, still, even with that, it was recommended in all the

1    guidelines for the stroke prevention.  The benefit from that

2    does outweigh the risks of bleeding events.  So it should be

3    prescribed for people that are at high risk of stroke with

4    atrial fibrillation.

5    **Q.**    And were the NOACs -- rivaroxaban, dabigatran, Pradaxa,

6    apixaban, Savaysa -- were they designed to overcome some of the

7    difficulties with warfarin?

8    **A.**    Yes.  They were designed because those drugs have more

9    predictable pharmacokinetics and more targeted action, a wider

10   therapeutic range than warfarin.  They were targeted to be at

11   least as effective and safe as warfarin and then would have

12   advantages with not being so difficult to use.

13   **Q.**    I'd like to talk with you about one other thing.  I

14   believe you're familiar with it.  Were you involved in

15   something called the ROCKET study?

16   **A.**    Yes, I was.  That was our primary study for comparing

17   rivaroxaban with warfarin for stroke prevention in atrial

18   fibrillation patients.

19   **Q.**    And could you tell the jury what kind of a study was

20   ROCKET?  I've heard the term.  It's a randomized double-blind,

21   double-dummy prospective clinical trial.

22            What does all that mean?

23   **A.**    Well, so it was all of those things.  It was the most

24   rigorous kinds of trial you can do, really, the gold standard

25   for generating evidence.

OFFICIAL TRANSCRIPT

1       So "prospective" means we identified patients at the

2   beginning and then followed them forward.

3       The randomization means that we assigned people to

4   rivaroxaban or warfarin by, like, the flip of a coin.  It was

5   by chance.  We assigned them to the two treatment groups, and

6   that balances all the risk factors across the group.

7       It was double-blind in that the patients didn't know

8   which active drug they were receiving, their physicians didn't.

9   At the company, we didn't know which medication people were

10  receiving.  We did have -- the only people who knew were an

11  independent safety committee that we had to look out for

12  patient safety while the study was being conducted.

13  **Q.**   And is it important to do a clinical trial to make it

14  double-blind in that way?  Does that add to the validity of the

15  trial?

16  **A.**   Yes.  Blinding reduces your chance of introducing any

17  biases.  So, again, it's the most rigorous, the gold standard

18  methodology for assessing effectiveness and safety.

19  **Q.**   Could you tell us a little bit more about the details of

20  ROCKET.  How many patients were involved?  How many countries?

21  That kind of thing.

22  **A.**   Yes.  It enrolled over 14,000 patients, over 7,000 in each

23  of the groups on rivaroxaban and warfarin.  We studied it in 45

24  countries in over 1,000 investigator sites.

25  **Q.**   And this morning we were talking with a Dr. Peter Fail

1  from Houma.  And he told us that ROCKET was studied in some of

2  the sickest patient populations.

3          Did he get that right?

4  **A.**   Yes, that's true.  We restricted the enrollment to people

5  at very high risk of stroke.  They had to have at least -- at

6  least two, and most people had three or four, risk factors for

7  stroke to be eligible to get into the study.

8  **Q.**   And we've heard that -- something called a CHADS score.

9  Are you familiar with that term?

10 **A.**   Yes, I am.  That's the scoring system that was in use at

11 the time that ROCKET was conducted.  And you get points.

12          The C is for congestive heart failure; H is for

13 hypertension; A is for age over 75; D is for diabetes; and the

14 S is for stroke, gets two points.

15          So ranges from zero with no risk factors to 6 as the

16 maximum score if you're at the highest risk of stroke.

17 **Q.**   And is it correct that, in the ROCKET trial, the average

18 CHADS score for ROCKET patients was 3.5?

19 **A.**   Yes, that's correct.  Most of the patients we had were

20 either a CHADS score of 3 or 4, and then there were some that

21 were higher, but not as many.

22 **Q.**   And was that higher than the CHADS score average for any

23 of the other NOAC trials?

24 **A.**   Yes, it was.  The other drugs required just CHADS 1 or

25 higher.  So, typically, those studies showed about a third of

OFFICIAL TRANSCRIPT

1    people at CHADS 1, about a third CHADS 2, and about a third of
2    the people CHADS 3 and higher.  We had 87 percent, almost
3    90 percent, were CHADS 3 and higher.
4    **Q.**    Now, do those risk factors that elevate the CHADS score
5    also increase the risk of a patient's bleeding?
6    **A.**    Yes.  That's very well established.  It's designed as a
7    stroke risk score, but it's also very clear that those risk
8    factors increase your risk for bleeding.  It's also bleeding
9    risk score.
10   **Q.**    And when you were talking with Mr. Barr about the
11   association between PT and bleeding, if you don't take into
12   account and factor out the clinical risk factors, does that --
13   any association with PT have any clinical meaning?
14   **A.**    I don't believe so, no.  I think you have to account for
15   the clinical factors to be able to interpret the PT
16   contribution to the bleeding risk.
17   **Q.**    Now, the jury's heard that Mr. Boudreaux had a number of
18   risk factors.  He had diabetes, hypertension, congestive heart
19   failure, he's over 70 years old.
20            Was he the type of patient that the ROCKET study
21   studied?
22   **A.**    Yes.  He sounds like a very typical patient that would
23   have been included in ROCKET.
24   **Q.**    How does the -- you've talked about this.  How many
25   different doses of Xarelto were studied in the ROCKET trial?

1  **A.**   The primary dose was 20 milligrams for people who had

2  kidney function above a certain cutoff.  We also studied a

3  15-milligram dose in people who had poorer kidney function.

4  **Q.**   And to decide which dose a patient would be on, was blood

5  tests taken of all the patients?

6  **A.**   Yes.  We measured their creatinine level, and then there

7  was a formula that was used to calculate that into how the

8  kidneys were functioning called the creatinine clearance, is

9  what the measure that was used.

10  **Q.**   How long did the ROCKET study last?

11  **A.**   We started in December 2006, and our last patient visit

12  was in September 2010.  So it was about a three-and-a-half

13  year -- little over three and a half years.

14  **Q.**   And is it correct that you studied over 14,000 patients?

15  **A.**   Yes, we did.

16  **Q.**   Once the ROCKET study was completed, you had the results,

17  did you publish those results to the world?

18  **A.**   Yes, we did.  There was a paper published in *The New*

19  *England Journal* in September of 2011.

20  **Q.**   Is *The New England Journal of Medicine* perhaps the

21  premiere medical journal in this country?

22  **A.**   Yes.  When people look at journals, it is at the top of

23  the list in terms of the prestige, usually measured by the

24  number of citations that articles in *The New England Journal*

25  would get, which means it gets a very wide readership.

1    **Q.**    I would like to take a look at Defense Exhibit 1970.

2              Do you have a copy, Dr. Peters?

3    **A.**    Yes, I do.

4    **Q.**    And --

5              **MR. SARVER:**  Your Honor, we would offer Defense

6    Exhibit 1970 as a demonstrative exhibit.

7              **MR. BARR:**  No objection.

8              **THE COURT:**  It's demonstrative.

9              **MR. SARVER:**  Jim, if you could pull that up for us.

10   BY MR. SARVER:

11   **Q.**    Is this *The New England Journal* article that was telling

12   the world about the rivaroxaban trial, ROCKET?

13   **A.**    Yes, it was.  This was the first publication of the study

14   results by Dr. Patel as the lead author from Duke University.

15   **Q.**    And Dr. Patel and Duke -- was the Duke University involved

16   in the entire ROCKET study?

17   **A.**    Yes, they were.  They had several members on our executive

18   committee.  Dr. Kollath cochaired that committee.  That was a

19   committee of external experts that we form to help us design,

20   conduct, and analyze the study.

21              Duke also had a role.  Dr. Mahaffey is the second

22   author here, was in charge of the central adjudication of all

23   the stroke and bleeding events.  His group did that.

24              And then there was also some support from Duke in

25   terms of logistics of the trial, of monitoring some of the

1    sites.

2    Q.   I think the only author that the jury has heard from is a

3    Dr. Scott Berkowitz on the last line.

4         Was Dr. Berkowitz involved?

5    A.   Yes, he was.  He was the -- yes, he was involved.

6    Q.   Now, I don't want to go into all the details -- this is a

7    three-and-a-half-year study -- but could you tell the jury what

8    the conclusions were from the ROCKET study?

9    A.   Yeah.  I mean, the conclusions were -- our primary

10   objective in the study was to show that rivaroxaban was at

11   least as good as warfarin.  We did that very convincingly with

12   a non-inferiority analyses.  On the safety side, the bleeding

13   rates were very comparable to warfarin overall.

14        But, importantly, the two most severe or serious

15   categories of bleeding events were actually less frequent with

16   rivaroxaban compared to warfarin, and those were intracranial

17   bleeding events, which are bleeding into the brain or around

18   the brain which are often fatal and often cause permanent

19   damage.  And also bleeding events that led to death that were

20   fatal were reduced by about 50 percent.  Intracranial

21   hemorrhage events by about a third, 33 percent; and the fatal

22   bleedings were about half in the rivaroxaban group compared to

23   the warfarin group.

24   Q.   Is it correct that the intracranial hemorrhage and the

25   fatal bleeding were both significantly lower on rivaroxaban

1   than on warfarin?

2   A.   Yes, they were.

3   Q.   Did the ROCKET study -- I'm sorry.  Did I cut you off,

4   Dr. Peters?

5   A.   No.  I was just going to say, one of the major -- we were

6   looking -- we would have been happy with equal efficacy and

7   equal safety given the problems with warfarin we had mentioned

8   earlier.  So this was very -- at this time a little bit

9   surprising that we had reductions in these serious bleeds.  And

10  it's actually been a common finding across all of the new

11  drugs, that they all seemed to have fewer of these most serious

12  bleeds compared to warfarin.

13  Q.   Did the ROCKET study also prove that Xarelto was highly

14  effective at preventing stroke?

15  A.   Yes, it did.  Again, if warfarin is at least 70 percent

16  effective for preventing strokes, we showed very convincingly

17  we were at least as good as warfarin and, at least numerically,

18  we were actually showing fewer strokes than warfarin, but not

19  statistically fewer in the ITT analyses.

20  Q.   And, Dr. Peters, did you participate in the FDA advisory

21  committee hearing to discuss ROCKET and the findings of the

22  study?

23  A.   Yes, I did.

24  Q.   What is the FDA advisory committee?

25  A.   That's a group of outside-the-FDA experts that they

OFFICIAL TRANSCRIPT

1   convene to help them with questions they have for them.  In

2   this case it was questions around the ROCKET study and if

3   rivaroxaban should be approved or not.  That was the main

4   question for the advisory committee.  It's a panel convened by

5   FDA.  They are their experts.  And the sponsor, myself and

6   others, were there to present to that FDA committee.

7   **Q.**   Did you learn what happened after the FDA heard the

8   presentations from FDA scientists, from outside scientists, and

9   had studied the ROCKET data, what did the advisory committee

10  do?

11  **A.**   The advisory committee recommended, by a vote of nine to

12  two, that rivaroxaban should be approved in the United States.

13  **Q.**   Dr. Peters, do you think that Xarelto is a safe and

14  effective medicine?

15  **A.**   Yes, I do.

16  **Q.**   Is it effective at preventing strokes?

17  **A.**   Yes, it's very effective.  As we mentioned, versus

18  warfarin, it's very effective, and we were at least equal if

19  not better.  So it's a very effective medicine for preventing

20  strokes.

21  **Q.**   And you told us about your wife early on.  You've been

22  married 39 years.  I assume you like her.

23          **MR. BARR:**  Your Honor, if this is going where I think

24  it's going, I have an objection.

25          **MR. SARVER:**  Well, it is.  Let's go up to the bench.

OFFICIAL TRANSCRIPT

1    (WHEREUPON, the following proceedings were held at

2  the bench.)

3    **THE COURT:**  I assume she had --

4    **MR. SARVER:**  She took it and did fine and all that

5  stuff.

6    **MR. MEUNIER:**  Your Honor, this was the subject of a

7  motion in limine as to which you reserved a ruling, and you

8  said it would depend on credibility and other issues that may

9  arise at the trial.  There's no need to enhance this man's

10  credibility by saying that his wife took Xarelto, and I think

11  it has a prejudicial effect that outweighs the probative value

12  and so we'd ask that it not be allowed.

13    **MR. SARVER:**  This testimony has already come in

14  through another witness, Your Honor, not for Dr. Peters' wife,

15  but I believe it was a witness that was by deposition.

16    **MR. MEUNIER:**  We were not able to properly screen

17  that.  It should have been objected to.

18    **MR. SARVER:**  Okay.  I thought this was resolved.

19  That's fine.

20    **THE COURT:**  It may not have been resolved.  The issue

21  really is only significant insofar as credibility is concerned.

22  It has no relevance other than that, but it does have some

23  relevance of credibility.  This witness is testifying as the

24  company representative.

25    The plaintiffs take the position that the

1   company did something -- did not do something that they should

2   have done, and there's also a suggestion that they did it for

3   commercial reasons.  This witness has been involved with the

4   Xarelto, the development and design of Xarelto.  So his

5   credibility is significant to the whole case, it seems to me.

6   The plaintiffs have attempted to take him on cross and to show

7   that his credibility is a problem.  That's obvious.  Certainly,

8   they take the position that the company's credibility is at

9   issue.

10              So I weigh the advantages, disadvantages, and it

11  seems to me that the 403 analysis tips in favor of allowing it.

12          **MR. SARVER:**  Thank you, Your Honor.

13          **THE COURT:**  That's my ruling.

14          **MR. SARVER:**  Yes, sir.

15          (WHEREUPON, the following proceedings were held in

16  open court.)

17          **MR. SARVER:**  We're back, Dr. Peters.  Are you ready

18  for us?

19          **THE WITNESS:**  Okay.

20  BY MR. SARVER:

21  **Q.**   Okay.  So, Dr. Peters, you told us earlier that you've

22  been married for 39 years.

23  **A.**   Yes.

24  **Q.**   I'm assuming you like your wife.

25  **A.**   I didn't hear that --

OFFICIAL TRANSCRIPT

1  **Q.**   I don't know that I've ever asked this question in 35
2  years, but do you like your wife?
3  **A.**   Yes.  Yes, I do.
4  **Q.**   And you want nothing but good things for her?
5  **A.**   Her birthday is tomorrow, actually.
6  **Q.**   All right.  Do something good for her.
7        So knowing that you like your wife, does your wife
8  take Xarelto?
9  **A.**   Yes, she did.  She had her right knee replaced a couple of
10  months ago.  Her orthopedic surgeon wanted to use aspirin, and
11  I asked him to use Xarelto.  And he agreed to that.
12  **Q.**   How has she done?
13  **A.**   She's done very well.  She actually had maybe her last
14  therapy session this morning for rehabilitation.
15  **Q.**   Great.  Dr. Peters, are you proud of your work for
16  Xarelto?
17  **A.**   Yes, I am.  I've worked in this industry a long time.
18  I've had opportunity to work on a number of medicines that have
19  made it to the market.  And being able to work on the Xarelto
20  program has been very rewarding.  I have colleagues and a
21  company that maintain the highest standards in terms of ethics
22  and science.  The ROCKET study was really a definitive study.
23  It was really a great opportunity for me to work on that, and
24  I'm really proud of that result.  And we were able to get
25  warfarin -- get rivaroxaban approved in the United States for

1  use by patients and physicians.

2  Q.   And has it been used by hundreds of thousands of patients

3  as of today?

4  A.   Yes, that's my understanding.  Again, I'm not in the

5  commercial world.  I work in the research world.

6          MR. SARVER:  Thank you very much, Dr. Peters.

7          THE COURT:  Any redirect?

8          MR. BARR:  Briefly, Your Honor.

9                  **REDIRECT EXAMINATION**

10 BY MR. BARR:

11 Q.   Dr. Peters, do you have any idea how many people have

12 filed lawsuits in this courtroom?

13 A.   There's a little noise getting rearranged to the side, so

14 I couldn't quite hear that question.  Sorry.

15          THE COURT:  There's an objection to it.  Ordinarily,

16 it would not be admissible.  But you brought up the numbers of

17 people who are taking it.  I think it's -- at least puts that

18 in perspective.  I'll overrule the objection and allow it.

19 BY MR. BARR:

20 Q.   So do you have any idea how many people have brought

21 lawsuits in your company for bleeds caused by your drug?

22 A.   I don't have any idea, no.

23 Q.   Would the number 18,000 surprise you?

24 A.   It sounds a little surprising, but, again, it depends on

25 how many people have been taking Xarelto, and you assume those

OFFICIAL TRANSCRIPT

1    are related to bleeding risks.  And unfortunately Xarelto is

2    very effective and benefits many, many people more than that

3    for preventing strokes.  But, unfortunately, I wish we had

4    anticoagulants that didn't have bleeding risks, but we don't.

5         **THE COURT:**  Okay.  Let's move on.

6         **MR. BARR:**  I'll move on, Your Honor.

7    BY MR. BARR:

8    Q.   Now, I don't want to spend a lot of time talking about

9    your wife, but your wife was on the drug for -- post knee and

10   hip surgery; right?

11   A.   That is correct.

12   Q.   That's the low dose of Xarelto; correct?

13   A.   That is the 10-milligram dose, yes.

14   Q.   It is not the 20-milligram dose that Mr. Boudreaux was on;

15   correct?

16   A.   It was not, no.

17   Q.   Okay.

18        Can I get on the board Defendants' 6009?

19        Do you remember being shown this document by

20   Mr. Sarver about the FDA removing certain language?

21   A.   Yes.  Can I go back and find that one just so I have it?

22   What number is it?

23   Q.   It's Defendants' 6009.

24   A.   Okay.

25   Q.   Do you have that, sir?

1   A.   I believe I have that one now, yes.

2        Okay.

3   Q.   Do you see that this is dated June 13th, 2011; correct?

4   A.   That is the date of this memo, yes.

5   Q.   So this is two months before the FDA found a relationship

6   between PT and bleed risk; correct?

7   A.   Say that again?

8   Q.   This is -- you realize the FDA found a relationship

9   between PT and bleed risk in August of 2011; correct?

10  A.   I don't recall what the date of that note was.  The

11  Cardio-Renal division review was underway at this point.  We

12  had provided FDA data on PT from the orthopedic surgery

13  studies.  So we would have to go back and look at those

14  analyses to see if they had done similar ones for that file.

15  Q.   I think the jury knows the answer to that.

16           MR. SARVER:  I object to the --

17           THE COURT:  I sustain.  Strike that.

18  BY MR. BARR:

19  Q.   Let's go to page 33.  This is the redline language that

20  you were talking about; correct?

21  A.   Yes, it is.

22  Q.   Where in that redline is the statement that PT predicts

23  bleed risk?

24  A.   There is no statement there that it predicts bleeding

25  risk.

**Q.**   Where in that redline is the word ROCKET?

**A.**   It's not in this document but in the label for ROCKET that was submitted in January of 2011.  This same language with ROCKET data is in that label that that division was reviewing. Again, two divisions.  This was hematology division. Cardio-Renal received the other NDA.  And they were working together to review them.

**Q.**   And you've never seen a single document that showed that language proposed about PT and bleed risk related to ROCKET has ever either been proposed or stricken by the FDA; correct?

**A.**   It would never have been proposed because there's -- there's no relationship between the PT to be able to predict bleeding risk.

**Q.**   That's all --

**A.**   And those logistic regression analyses are not the answer to that question.

          **MR. BARR:**  That's all I have, Your Honor.

          **THE COURT:**  Okay.

          **MR. SARVER:**  Your Honor, may we approach?

          **THE COURT:**  Yes.

          **MR. SARVER:**  Thank you.

          (WHEREUPON, the following proceedings were held at the bench.)

          **MR. SARVER:**  Your Honor, plaintiffs asked about the number of lawsuits.  The number of lawsuits is driven by the

1  heavy lawyer advertising that's been going on.  The only way to

2  respond to that is to bring up the lawyer advertising and all

3  the money that's been spent to generate the number of lawsuits.

4  Two are inextricably linked.

5          MR. BARR:  Your Honor, we didn't open this door.

6  This is not where we wanted to go with it.  He asked him the

7  question, and we opened the door.  This is not a tit for tat.

8  We had to respond to what they said about this drug and all the

9  people they've saved.  They opened that.

10          MR. SARVER:  Once you go down that path, we have to

11  respond.

12          THE COURT:  Well, the problem is is that you went

13  down the path of how many people have taken the drug and that

14  sort of thing, and I would not have allowed them to go into it,

15  but the fact that you brought that up, they have a right to get

16  the other side of the nickel.  Now it's the other side of that

17  nickel.

18          MR. SARVER:  It's a three-sided nickel.

19          MR. MEUNIER:  It is direct consumer advertising.

20          THE COURT:  That may or may not be something that can

21  be orally argued if it's done with finesse, but I don't want to

22  open that door.  I understand the objection, and I understand

23  the request, and I recognize that under 611(c) I could allow

24  redirect, recross, but I think in the interest of fairness

25  that --

OFFICIAL TRANSCRIPT

1    **MR. SARVER:**  Two questions is all it would take, Your

2  Honor.

3    **THE COURT:**  I understand.

4    **MR. SARVER:**  I can do it fast.

5    **THE COURT:**  I understand.  I appreciate it.  Look, I

6  understand the issue.  I've been there, done that.

7    **MR. SARVER:**  May we make an offer of proof later on?

8    **THE COURT:**  Yes.

9    **MR. SARVER:**  Thank you.

10    **THE COURT:**  I'll hold that open for you to make an

11  offer of proof on this situation.

12    **MR. SARVER:**  Thank you, Your Honor.

13    **MR. MEUNIER:**  While we're up here, I just wanted to

14  reurge the Court giving a limiting instruction that we've

15  identified as Proffer No. 1, particularly now that the

16  strike-through language of the label has actually been admitted

17  into evidence.  Just for the record, we'd like to urge the

18  limiting instruction for the reasons earlier discussed.

19    **THE COURT:**  I understand.  I'll deny that.

20    Okay.  Thank you.

21    **MS. WILKINSON:**  May I ask one thing?

22    **THE COURT:**  Sure.

23    **MS. WILKINSON:**  When the jury's dismissed, could we

24  stay for a moment to make our motion?

25    **THE COURT:**  Yes.  That's what I thought we'd do.

OFFICIAL TRANSCRIPT

1       **MS. WILKINSON:**  Thank you.

2       **MR. SARVER:**  Thanks, Your Honor.

3       **THE COURT:**  Thank you.

4       (WHEREUPON, the following proceedings were held in

5  open court.)

6       **THE COURT:**  Again, members of the jury, I remind you

7  that we're not trying to keep anything from you.  I'm just

8  dealing with the logistical matters and dealing with evidence

9  matters.  And you have enough on your plate.  I don't want to

10  give that to you.

11       Okay.  That's the end of the witness, then.

12  Thank you very much, Doctor, for participating by remote.

13       **THE WITNESS:**  Thank you.

14       **THE COURT:**  Okay.

15       **MR. BARR:**  Your Honor, conditionally, upon moving

16  some of the exhibits in that were played with a handful of the

17  depos from yesterday, the plaintiffs rest.

18       **THE COURT:**  Members of the jury, as I mentioned to

19  you at the outset after the opening statements, the plaintiff

20  then puts on evidence, and the plaintiff has put on evidence.

21  And then the defendant may put on evidence.  And then there's

22  potential rebuttal evidence.  And then it comes to you.

23       You've seen one part of the matter.  However,

24  we're going to stop here and come back Monday at 9:00.  Leave

25  your tablets, as you have been doing, in the jury room or have

1   them secured.

2             And again I'll remind you, please don't listen

3   to anything, don't view social media, don't google anything or

4   anything of that sort.  And the reason for that is apparent,

5   the reason I've told you.  This laboratory that we're

6   investigating this matter in has a lot of things available to

7   it.  And one of them is cross-examination.  And you don't have

8   that when you go into the -- into the -- so it's unfair to you

9   and it's unfair to the parties if you do that.  So I really ask

10  you not to do that.

11            All right.  All rise as the jury leaves, please.

12            **THE DEPUTY CLERK:**  All rise.

13            (WHEREUPON, the jury exited the courtroom.)

14            **THE COURT:**  Folks, why don't we take a ten-minute

15  break and then we'll come back.  Court will stand in recess.

16            **THE DEPUTY CLERK:**  All rise.

17            (WHEREUPON, the Court took a recess.)

18            **THE DEPUTY CLERK:**  All rise.

19            **THE COURT:**  Be seated, please.  The jury is outside

20  the courtroom.  The plaintiffs have rested subject to checking

21  on their exhibits.  It's now appropriate to invite any motions

22  that might be brought.  I'll hear any motions.

23            **MS. WILKINSON:**  Good afternoon, Your Honor.

24            We would like, on behalf of the defendants, to

25  make a Rule 50 motion.  I don't know your process, but what we

OFFICIAL TRANSCRIPT

1  would like to do is focus on three key issues.  We would like

2  to file a written motion and have leave to file it tomorrow

3  afternoon, if that's okay with Your Honor.

4          **THE COURT:**  Sure.

5          **MS. WILKINSON:**  And by focusing on these three

6  issues, of course we don't want to waive any other arguments we

7  have.  We will file an even more fulsome motion at the end of

8  our case.  Is that appropriate with the Court, that we don't

9  waive any issues by focusing on these three?

10          Okay.

11          First and foremost, Your Honor, we think

12  Dr. Wong's testimony was consistent with his deposition

13  testimony, where he clearly said that he was adequately warned

14  and that he would not have changed his prescribing decision in

15  this case.  He said, more specifically, that he would not use

16  any type of test that was not FDA approved.  And we know that

17  there is no FDA-approved PT test in this case.

18          So, for those reasons, based on the learned

19  intermediary doctrine, we believe a directed verdict or a Rule

20  50 motion should be granted.

21          The second basis, Your Honor, is the black box

22  warning that came out yesterday for the first time through

23  Dr. Leissinger and my cross-examination of her.  Plaintiffs

24  have not proposed, as part of their failure to warn, a black

25  box.  They do not claim that a black box warning should be

1    added to the Xarelto label.  And if plaintiffs were to claim

2    that, they should have had expert testimony.

3              Dr. Leissinger was not offered to you as an

4    expert -- as a labeling expert, nor is she qualified to be one.

5    She expressed her personal opinion in response to a question.

6    But there is failure of proof, in any event, for including the

7    black box warning.

8              And I would say it's similar to the last -- same

9    basis for the lack of a reversal agent or an antidote.  During

10   some of the depositions, some documents came in about that in a

11   few questions.  But, again, that is a complex scientific and

12   medical question.  There's been not one iota of proof through

13   an expert witness or discussion that would aid a jury in

14   understanding those issues.  And, in fact, I think there's a

15   real prejudicial value to those because it sounds bad to a jury

16   unless you hear some testimony from an expert.

17             So for these three reasons, Your Honor, we think

18   a Rule 50 is appropriate at this time after plaintiffs' case.

19             **THE COURT:**  Okay.

20             Let me hear any response.

21             **MR. LONGER:**  Very briefly, Your Honor.  Good

22   afternoon.  Fred Longer for the plaintiffs.

23             I'd just -- Rule 50 requires that there simply

24   be reasonable evidence that can get to the jury to resolve

25   these questions.  And as Your Honor pointed out in the summary

1  judgment rulings, there's so much facts that are present here
2  that the whole trial is now pregnant with factual questions.
3              What I heard Ms. Wilkinson raise were matters
4  which, quite honestly, I guess I can appreciate that they come
5  from the defendants' perspective, but they quite honestly
6  overlooked the rest of the testimony that Dr. Wong provided.
7              It's very clear that Dr. Wong testified to three
8  questions that were presented to him.  And in each instance, he
9  said that he would modify his prescribing behavior had an
10 adequate label been provided to him.
11             He was asked, "If the Xarelto product label
12 provided instructions -- important safety information about a
13 simple lab test that would identify patients at high risk of a
14 bleed on Xarelto, would you have followed those instructions?"
15             And he answered, yes, unequivocally.
16             He was also asked, "Would you, Dr. Wong, if the
17 results of those tests identified a patient at high risk for a
18 bleeding or major bleeding event on Xarelto, would you have
19 discussed those results with your patient?"
20             And he answered yes.
21             He was finally asked, "And if the patient chose
22 not to accept those risks but to follow a different course of
23 treatment, would you have honored your patient's request?"
24             And, again, he answered yes.
25             Since that is the sine qua non of the matters

OFFICIAL TRANSCRIPT

1  that have to be proved by the plaintiffs to satisfy the LPLA, I

2  suggest to Your Honor that the defendants, while they may want

3  to suggest that FDA approval of the other -- the reagent is

4  necessary, I know that we've cited to Your Honor two cases

5  where that is actually not required in order for us to get to

6  the jury.

7          The one of them that comes to mind is Judge

8  Stengel's opinion in the Tylenol case.  Beyond that, the black

9  box warning that the defendants raise, I think -- I prefer to

10  defer on our briefing and see what they have to say.  But I do

11  note that Dr. Leissinger was just raising an issue at that

12  point in connection with questions that were presented to her.

13  And I don't feel that that's an issue that would be there.

14          Other than that, Your Honor, I think that the

15  defendants failed to prove that there were not sufficient

16  evidence to go forward, especially with Dr. Leissinger's

17  testimony that found that Xarelto was a very major contributing

18  factor to Mr. Boudreaux's bleeding event and that, as a

19  consequence, we have proven through Dr. Kessler's testimony

20  that the label was, in fact, inadequate, that there was an

21  unreasonably dangerous characteristic to Xarelto in the fact

22  that this high variability, moderate variability -- let's just

23  call it variability between patients presented an incredible

24  risk to at least the upper quartile, the upper 25 percent of

25  patients taking the drug, and that, as a consequence of that

1  variability, a simple test involving the PT Neoplastin would

2  have ameliorated that risk.  And we have presented

3  more-than-adequate testimony to satisfy that requirement.

4          And as I said just now, Dr. Wong's testimony

5  gets us beyond any learned intermediary concerns that the

6  defendants have raised.

7          And, with that, I submit, Your Honor, that we

8  have more than carried our burden.  We have slammed the scales

9  down and that the jury should find in our favor.

10         **THE COURT:**  Okay.  As I mentioned, the jury's out of

11  the room.  The plaintiffs have rested their case.  The

12  defendants now, as they have a right to do, they have moved for

13  a judgment as a matter of law pursuant to Rule 50 of the code

14  of civil procedure.

15         Under Rule 50(a), judgment as a matter of law is

16  appropriate when with respect to a given issue, a reasonable

17  jury would not have a legally sufficient evidentiary basis for

18  a finding for the opposing party in this particular issue.

19  This generally occurs where the facts and inferences point so

20  strongly and overwhelmingly in the movant's favor that

21  reasonable jurors would not have such a contrary feeling, that

22  it's clear on its face.  The Fifth Circuit has announced that

23  in *Brennan's v. Dickie Brennan*, 376 F.3d 356.

24         In applying the standard, the Court must review

25  all of the evidence in the record, drawing all reasonable

OFFICIAL TRANSCRIPT

1    inferences in favor of the nonmoving party.  The defendant in

2    this case is the moving party; the plaintiffs are the nonmoving

3    party.  And the court must not make any credibility

4    determinations or even weigh the evidence.  That's for the jury

5    to determine.

6              The plaintiffs' claim in this case, as I

7    understand it, is that Xarelto was unreasonably dangerous

8    because of inadequate warnings or instructions about the

9    potential risks when taken on a recommended dosage schedule

10   without an assessment of the patient's PT time.  They claim

11   that the defendant should have instructed physicians about the

12   availability of the Neoplastin PT test, a one-time test that

13   would help determine whether or not the patient is at risk of

14   bleeding.

15             In this case, I look to the evidence.  And,

16   first, with Dr. Kessler, he says that there's a portion of the

17   label which he calls -- which calls for the inclusion of the

18   lab tests which may be helpful in identifying possible adverse

19   results.  He cited, as my notes indicate, to Section 5 of the

20   label.  In his opinion, a PT test should have been included

21   under that portion, or some information about the PT test, that

22   the plaintiffs apparently feel that the defendants had.  He

23   feels that every treater would -- or, as he put it, every

24   reasonable treater would like to know this for safe treatment.

25             I also see Dr. Leissinger.  In her testimony,

1  she said that the PT level indicates that the plaintiff still

2  had some Xarelto in his blood even though he had not Xarelto

3  for 36 hours.  This means, in her opinion, that 24 hours, he

4  would have had at least four times the amount that he had -- if

5  you backed that out 24 hours, that meant that he would have had

6  four times the amount that he had at 36 hours.  And that the

7  higher the PT risk of bleeding -- the higher the PT reading,

8  the higher the risk of bleeding.  She said any treater that

9  is -- this is something that the treater would like to know.

10             On the other hand, Dr. Wong, who is the

11  treater -- or was the treater, testified clearly that if the

12  results -- that tests would have to be approved by the FDA for

13  him to consider the test.  On the other hand, he says that

14  he -- if there was something on the label, he would have

15  followed the label.  The doctor's not aware of any FDA-approved

16  test, would not use a test if not approved by the FDA.  He

17  believes the label adequately warns him of the test.

18             On the other hand, he says that if a test were

19  available, he would want to know the significance of the test

20  or the reads of the test.  He also said that he finds it

21  troubling if such a test was available or information about

22  such a test and it was not on the label.

23             In short, I really do think that both sides have

24  presented information that would prevent me from granting a

25  directed verdict in either the plaintiffs' or the defendants'

1  favor.  I think the jury will have to make this decision.  So

2  I'll deny the motion.

3          Thank you very much.  Court will stand in recess

4  until Monday at 9:00.  I hope to see you lawyers about 8:30.

5          **MR. SARVER:**  Thank you, Your Honor.

6          **MR. LONGER:**  Thank you, Judge.

7          **THE COURT:**  Have a good weekend.  I hope some of you

8  all may be able to make the Jazz Fest; if not, have a good

9  weekend.

10         (WHEREUPON, the proceedings were concluded.)

11                    *****

12                 <u>**CERTIFICATE**</u>

13         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

14  for the United States District Court, Eastern District of

15  Louisiana, do hereby certify that the foregoing is a true and

16  correct transcript, to the best of my ability and

17  understanding, from the record of the proceedings in the

18  above-entitled and numbered matter.

19

20

21         *<u>s/Jodi Simcox, RMR, FCRR</u>*
           Jodi Simcox, RMR, FCRR
22         Official Court Reporter

23

24

25

OFFICIAL TRANSCRIPT