# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          Docket No. 14-MD-2592
                                       Section "L"
                                       New Orleans, Louisiana
THIS DOCUMENT RELATES TO:              Thursday, April 27, 2017
Joseph J. Boudreaux, Jr.
v. Janssen Research &
Development, et. al.,
Case No. 14-CV-2720


*********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
                             VOLUME IV


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:                   LEVIN PAPANTONIO
                                   BRIAN H. BARR, ESQ.
                                   316 Baylen Street, Suite 600
                                   Pensacola, FL 32502

                                   BEASLEY ALLEN
                                   BY:  ANDY BIRCHFIELD, ESQ.
                                   P.O. Box 4160
                                   Montgomery, AL 36103
                                   GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
                                   BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
                                   1100 Poydras Street
                                   New Orleans, LA 70163

                                   SCHLICHTER, BOGARD & DENTON
                                   BY:  ROGER C. DENTON, ESQ.
                                   100 South 4th Street
                                   Saint Louis, MO 63102

Page 886

1    A. It was approximately -- sorry.  It's getting late in the day.
2    Approximately nine months prior to the launch, correct.
3    Q. And would it be fair to say that based on the reading of this
4    fourth bullet point, that your company knew that health authorities
5    and physicians had expressed a keen interest in having effective
6    antidotes to anticoagulant drugs and that there was a clear desire
7    for such a product before you launched Xarelto?
8    A. We were aware of all of that but did not have a viable
9    opportunity at that time to bring one to the market, especially
10   prior to launch or at the same time as launch.
11   Q. Right.  And we saw in 2009 a decision was made not to pursue the
12   Portola antidote at that point in time, correct?
13   A. I believe that that is correct, for whatever reason the team
14   decided.
15   Q. Right.  So there was an -- an opportunity to develop the Portola
16   antidote in 2009 which would have been two years before launch.
17   The team decided not to do that, correct?
18   A. Well, Portola would have actually been the one developing, and I
19   think the opportunity was should we invest in it at that time or
20   should we invest in it later as it gains more data to give us
21   confidence that it was real.
22   Q. And you made the decision that you would defer investing in the
23   Portola antidote in 2009, correct?
24   A. That is a very fair assessment, yes.
25   Q. From a regulatory standpoint, was there anything that stopped

Page 887

1    the company from saying, you know what, let's develop an antidote
2    before we launch this drug so that we -- if somebody bleeds while
3    on the drug, we can reverse it?
4    A. The regulatory pathway, again I would defer to our regulatory
5    colleagues because an antidote pathway, I don't know if it was
6    clear at that time because nothing had been approved as an antidote
7    on the market.
8    Q. Okay.  And was there anything that prohibited Janssen in 2009
9    from deciding, you know what, we'll collaborate with Portola and
10   we'll get an -- on -- on what they are looking at, we'll give them
11   money and we'll work with get them to get an antidote going?  There
12   was nothing that prohibited the company from doing that in 2009,
13   correct?
14   A. I would say that the thing that would have inhibited us would
15   have been the lack of confidence into whether that was real or not.
16   But other than that, nothing.
17   Q. The company was aware of the Portola option in 2009, correct?
18   A. We knew it was an option.  We just didn't know how confident we
19   could be in that option as to whether it was viable or not.
20   Q. And the commercial -- we saw documents where the commercial
21   folks recommended that they not -- that the company not pursue that
22   from a commercial standpoint, correct?
23   A. We saw documents where somebody in the CDT, some commercial
24   folks recommended that.  I just don't know which antidote they were
25   talking about.

Page 888

1    Q. I'm handing you Shah-62.  For the record, Shah-62 is 119-111,
2    Bates Number Xarelto-Janssen 00114696.  Take a minute and let me
3    know when you're ready.
4    A. (WITNESS REVIEWS DOCUMENT.)  Okay.
5    Q. Okay.  This is an e-mail 20 - from Nancy -- am I pronouncing
6    this
7    right?  Ondovik?
8    A. Good guess.
9    Q. We'll keep it at that.
10   A. Okay.
11   Q. E-mail from Nancy Ondovik to several people on the Xarelto team,
12   including yourself?
13   A. Yes.
14   Q. This is -- the e-mail was December sent 19, 2011?
15   A. Yes, that's correct.
16   Q. Okay.  So it's one and a half months after Xarelto was approved
17   and on the market for Afib, correct?
18   A. About six months after the approval for the orthopedic
19   indication, and about a month and a half after the AF indication.
20   Q. Correct.  And Xarelto was launched without an antidote, correct,
21   and that is a discussion that was happening about an antidote after
22   that time, correct?
23   A. That is correct.
24   Q. And she says in the first paragraph, "Hello, everyone.  Just
25   wanted to let you know that Bob and I communicated our decision not

Page 889

1    to move to diligence or pursue the riva antidote opportunity any
2    further with Bayer late last week."  Did I read that correctly?
3    A. You did.
4    Q. And, "Bayer was understandably disappointed by this decision and
5    hoped to share more details on the program and their rationale and
6    reasons for moving forward with this antidote as part of the
7    diligence process," correct?
8    A. Yes.
9    Q. "They were quite surprised that we decided to stop prior to
10   completing diligence."  Did I read that correctly?
11   A. You did.
12   Q. Okay.  The main -- next paragraph.  "The main messages
13   communicated to Bayer were that after careful consideration and
14   additional analytic work, there was limited clinical need for a
15   riva-specific antidote as well as limited potential for the
16   antidote to generate incremental revenue to the riva program,
17   either through sales of the antidote or increased sales of riva,
18   based on our current understanding of the riva TPP and the U.S.
19   regulatory landscape."  Did I read that correctly?
20   A. You did.
21   Q. Would you agree with me that as long as there's a chance of
22   somebody bleeding on Xarelto from a clinical standpoint, from a
23   patient's perspective, that there would always be a need for an
24   antidote?
25   A. There would be a need for modalities to manage that bleeding.  I

Page 890

1  would agree with that. My own mother, you know, took it once and
2  so I would 100 percent agree with that. But if I may finish my
3  thought for a minute, since we didn't move to the next question.
4  By modality, to be clear for the jury and everyone else, what I
5  mean is there needs to be options, whether it's a precise antidote
6  or whether it's, like, the things that people do with warfarin
7  where they apply vitamin K and it seems to help. That's, in
8  essence, what I mean by modalities. There need to identified some
9  modalities to control a very serious bleeding should one ever
10  occur.
11  Q. Mr. Shah, and for members of the jury, it's David Covey sitting
12  next to you for two days. I don't think the camera was on me at
13  all. Now it's my turn to ask you some questions. Let's start.
14  Can you tell the jury where you were born.
15  A. Yes, I was born in the Lahore, Pakistan.
16  Q. When was that?
17  A. It was 1971.
18  Q. And when did your family move to the United States?
19  A. My family immigrated to the United States in 1980.
20  Q. And are you married?
21  A. I am married.
22  Q. Do you have children?
23  A. I do.
24  Q. How many children do you have?
25  A. I am the proud father of three daughters and two step-daughters.

Page 891

1  My twins are Morgan and Lea. They're 13 years old. And my younger
2  one is Amira. She is only 20 months.
3  Q. Where did you go to college?
4  A. I went to Penn.
5  Q. University of Pennsylvania?
6  A. I did.
7  Q. What year did you graduate?
8  A. I graduated in 1993.
9  Q. What did you major in?
10  A. Biological basis of behavior.
11  Q. And did you do any work during hours when you weren't in school
12  or summer that was medically related?
13  A. I did a number of roles that were medically related. I worked
14  -- in the summers prior to my senior year, I worked in a healthcare
15  company, in an insurance company, in a couple of different
16  capacities.
17      But my most important role, for a year I did research in
18  urology at the Penn Medical School.
19  Q. At University of Pennsylvania Medical School?
20  A. Yes. Correct.
21  Q. What did you do after college?
22  A. When I graduated college, I was actually recruited to the
23  pharmaceutical industry. I also had opportunities to continue to
24  do medical research at the Penn Medical School. Medical school was
25  a potential option as well.

Page 892

1      Something about the industry just fascinated me, the
2  opportunity to follow in my father's footsteps, and I wanted to
3  learn. So I initially joined the industry as I was recruited by
4  Upjohn while I was still an undergrad. The job was waiting for me
5  when I graduated.
6      And I decided to give it a couple of years and then
7  probably head back to medical school. But that was my idea to
8  evaluate the industry at that point.
9  Q. So something about working in the industry got in the way of
10  going back to medical school. What was -- why do you have a
11  continuing interest in this industry as opposed to perhaps an
12  earlier thought that maybe you would go to medical school?
13  A. Yeah, it's -- Okay. I love the field of medicine. I absolutely
14  love, love healthcare. You know, even in my interviews, that was
15  all I wanted to do, be in the healthcare field. The reason I
16  joined the industry or at least stayed in the industry and didn't
17  go back to medical school was very simple. I fell in love with the
18  work that the industry does. I didn't realize that I would
19  appreciate and have the opportunity to basically have impact on a
20  business as well as obviously on healthcare. And I thought this
21  would provide the best combination.
22      But the real big reason I stayed was because I realized
23  that the industry would give me a chance to impact lives on a
24  massive scale.
25      Individual physicians do phenomenal work. I have the

Page 893

1  utmost respect for them. They obviously get to treat one patient
2  at a time, and over the course of a day treat, let's say, 20
3  patients on average.
4      Drugs that I've worked on directly from a marketing
5  standpoint, drugs that I've had a chance to lead from a marketing
6  standpoint have been used by millions and millions of patients.
7  And feel like I've had a role to play in patients having access to
8  those medications and being made aware of those medications.
9  Q. Do you have any degrees after you graduated college and your
10  degree from the University of Pennsylvania?
11  A. Yes. When I -- I decided a few years ago, once I decided to
12  stay in the industry, to return to graduate school. And I received
13  an MBA in finance.
14  Q. Okay. From what institution?
15  A. That was from Temple University.
16  Q. In Philadelphia?
17  A. In Philadelphia.
18  Q. Could you define marketing in the context of working for a
19  pharmaceutical company like Janssen?
20  A. Yes. I mean, first of all, you know, it's interesting. It is
21  very different than marketing in some other aspects. I've been
22  asked this question multiple times, even in internal meetings, as
23  to -- you know, what do you -- what is it that marketing does. And
24  I think it's very different than working in an industry like
25  consumer products or the car industry where you are focused on

Page 1066

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO               *
(RIVAROXABAN) PRODUCTS        *
LIABILITY LITIGATION          *
                              *
THIS DOCUMENT RELATES TO:     *   Docket No.: 14-MD-2592
                              *   Section "L"
Joseph J. Boudreaux, Jr.      *   New Orleans, Louisiana
v. Janssen Research &         *   April 28, 2017
Development, et. al.,         *
Case No.: 14-CV-2720          *
* * * * * * * * * * * * * * *

VOLUME IV - AFTERNOON SESSION
TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs':
Liaison Counsel:              Levin Papantonio
                              BY:  BRIAN H. BARR, ESQ.
                              316 South Baylen Street, Suite 600
                              Pensacola, Florida  32502

                              Beasley Allen
                              BY:  ANDY BIRCHFIELD, ESQ.
                              P.O. Box 4160
                              Montgomery, Alabama 36103

                              Gainsburg Benjamin David
                                Meunier & Warshauer
                              BY:  GERALD E. MEUNIER, ESQ.
                              2800 Energy Centre
                              1100 Poydras Street
                              New Orleans, Louisiana 70163

1  convene to help them with questions they have for them.  In
2  this case it was questions around the ROCKET study and if
3  rivaroxaban should be approved or not.  That was the main
4  question for the advisory committee.  It's a panel convened by
5  FDA.  They are their experts.  And the sponsor, myself and
6  others, were there to present to that FDA committee.
7  **Q.  Did you learn what happened after the FDA heard the**
8  **presentations from FDA scientists, from outside scientists, and**
9  **had studied the ROCKET data, what did the advisory committee**
10 **do?**
11 A.  The advisory committee recommended, by a vote of nine to
12 two, that rivaroxaban should be approved in the United States.
13 **Q.  Dr. Peters, do you think that Xarelto is a safe and**
14 **effective medicine?**
15 A.  Yes, I do.
16 **Q.  Is it effective at preventing strokes?**
17 A.  Yes, it's very effective.  As we mentioned, versus
18 warfarin, it's very effective, and we were at least equal if
19 not better.  So it's a very effective medicine for preventing
20 strokes.
21 **Q.  And you told us about your wife early on.  You've been**
22 **married 39 years.  I assume you like her.**
23        MR. BARR:  Your Honor, if this is going where I think
24 it's going, I have an objection.
25        MR. SARVER:  Well, it is.  Let's go up to the bench.

1        (WHEREUPON, the following proceedings were held at
2  the bench.)
3        THE COURT:  I assume she had --
4        MR. SARVER:  She took it and did fine and all that
5  stuff.
6        MR. MEUNIER:  Your Honor, this was the subject of a
7  motion in limine as to which you reserved a ruling, and you
8  said it would depend on credibility and other issues that may
9  arise at the trial.  There's no need to enhance this man's
10 credibility by saying that his wife took Xarelto, and I think
11 it has a prejudicial effect that outweighs the probative value
12 and so we'd ask that it not be allowed.
13        MR. SARVER:  This testimony has already come in
14 through another witness, Your Honor, as to Dr. Peters' wife,
15 but I believe it was a witness that was by deposition.
16        MR. MEUNIER:  We were not able to properly screen
17 that.  It should have been objected to.
18        MR. SARVER:  Okay.  I thought this was resolved.
19 That's fine.
20        THE COURT:  It may not have been resolved.  The issue
21 really is only significant insofar as credibility is concerned.
22 It has no relevance other than that, but it does have some
23 relevance of credibility.  This witness is testifying as the
24 company representative.
25        The plaintiffs take the position that the

1  company did something -- did not do something that they should
2  have done, and there's also a suggestion that they did it for
3  commercial reasons.  This witness has been involved with the
4  Xarelto, the development and design of Xarelto.  So his
5  credibility is significant to the whole case, it seems to me.
6  The plaintiffs have attempted to take him on cross and to show
7  that his credibility is a problem.  That's obvious.  Certainly,
8  they take the position that the company's credibility is at
9  issue.
10       So I weigh the advantages, disadvantages, and it
11 seems to me that the 403 analysis tips in favor of allowing it.
12       MR. SARVER:  Thank you, Your Honor.
13       THE COURT:  That's my ruling.
14       MR. SARVER:  Yes, sir.
15       (WHEREUPON, the following proceedings were held in
16 open court.)
17       MR. SARVER:  We're back, Dr. Peters.  Are you ready
18 for us?
19       THE WITNESS:  Okay.
20 BY MR. SARVER:
21 **Q.  Okay.  So, Dr. Peters, you told us earlier that you've**
22 **been married for 39 years.**
23 A.  Yes.
24 **Q.  I'm assuming you like your wife.**
25 A.  I didn't hear that --

1  **Q.  I don't know that I've ever asked this question in 35**
2  **years, but do you like your wife?**
3  A.  Yes.  Yes, I do.
4  **Q.  And you want nothing but good things for her.**
5  A.  Her birthday is tomorrow, actually.
6  **Q.  All right.  Do something good for her.**
7        **So knowing that you like your wife, does your wife**
8  **take Xarelto?**
9  A.  Yes, she did.  She had her right knee replaced a couple of
10 months ago.  Her orthopedic surgeon wanted to use aspirin, and
11 I asked him to use Xarelto.  And he agreed to that.
12 **Q.  How has she done?**
13 A.  She's done very well.  She actually had maybe her last
14 therapy session this morning for rehabilitation.
15 **Q.  Great.  Dr. Peters, are you proud of your work for**
16 **Xarelto?**
17 A.  Yes, I am.  I've worked in this industry a long time.
18 I've had opportunity to work on a number of medicines that have
19 made it to the market.  And being able to work on the Xarelto
20 program has been very rewarding.  I have colleagues and a
21 company that maintain the highest standards in terms of ethics
22 and science.  The ROCKET study was really a definitive study.
23 It was really a great opportunity for me to work on that, and
24 I'm really proud of that result.  And we were able to get
25 warfarin -- get rivaroxaban approved in the United States for

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


*****************************************************************

IN RE:  XARELTO
(RIVAROXABAN) PRODUCTS
LIABILITY LITIGATION

                         CIVIL ACTION NO. 14-MD-2592
                         SECTION "L"
                         NEW ORLEANS, LOUISIANA
                         WEDNESDAY, MAY 3, 2017
THIS DOCUMENT RELATES TO:
Joseph J. Boudreaux, Jr.
V. Janssen Research &
Development, et. al.,
Case No.:  14-CV-2720
*****************************************************************

           VOLUME VIII - MORNING AND AFTERNOON SESSION
          TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFFS'
LIAISON COUNSEL:              LEVIN PAPANTONIO THOMAS MITCHELL
                             RAFFERTY & PROCTOR
                             BY:  BRIAN H. BARR, ESQ.
                             316 SOUTH BAYLEN STREET, SUITE 600
                             PENSACOLA, FLORIDA 32502


                             BEASLEY ALLEN CROW METHVIN
                             PORTIS & MILES
                             BY:  ANTHONY BIRCHFIELD JR., ESQ.
                             POST OFFICE BOX 4160
                             MONTGOMERY, ALABAMA  36103

1  particular circumstances, because of what he had experienced
2  personally with his family, he certainly thought avoiding
3  stroke was a much more important thing than a risk of a bleed.
4      That doesn't mean that this wasn't a bad thing
5  that happened to Mr. Boudreaux. We said that to you at the
6  beginning, right? We said, bad things happen to good folks,
7  and that we weren't going to challenge any of that. And did
8  you see us, did we cross-examine the Boudreauxs? No. Did we
9  say one thing about their damages? No. And we're not going to
10 today. We have no issue with Mr. and Mrs. Boudreaux. The
11 issue is about the science and what should be in the label, and
12 what is supported by the folks who actually know and understand
13 how this drug works.
14      Plaintiffs said to you at the beginning that this
15 was a safety test. Again, why did he say that? Because he
16 wanted you to think we were terrible people. We're actually
17 the big pharmaceutical companies I think he called us, and we
18 don't want to do a simple safety test. Think about what that
19 said. That all of the doctors who work on our companies who
20 told you they were on Xarelto themselves or prescribe it for
21 their mother, that they don't care about safety. They don't
22 care. That's what he wants you to believe. That we actually
23 have something hidden in documents, which still, I don't know
24 what documents he's saying there is something hidden in there.
25 But he's saying there is something hidden in there. And all of

1  these doctors who testified in front of you from our companies
2  and all the doctors who took the stand, that they don't care
3  about patient safety because there's a simple test.
4      Well, these guys didn't present one witness or
5  one document that said this was a safety test. And there's a
6  reason for that, because no one believes that it is. And part
7  of it is, there is not really a test.
8      Plaintiffs didn't tell you a test. What they
9  did, was they took that FDA graph, remember, and you saw it
10 during their presentation, and said, oh, if you take this
11 graph -- which, by the way, when they showed you the label,
12 they used what was the unadjusted graph. Remember, Dr. Johnson
13 explained to you how you need to take out all of those other
14 factors. They didn't use that when they put up their label.
15      And what did they tell you you're supposed to do?
16 I keep saying in the case, okay, let's say they are right.
17 There is a PT test. What is a doctor supposed to do? Did one
18 witness tell you when they were supposed to take the
19 Neoplastin PT? No. And remember, Dr. Johnson told you,
20 depending on what time of day, because of the short half-life
21 of Xarelto, you could get a totally different score.
22      Did they tell you what cutoff is too much risk?
23 They did not. Did they tell you what action a doctor should
24 take afterward? If this test had happened and Mr. Boudreaux
25 had some score, which we don't even know which score would be

1  where they said it's too much risk, what was a doctor supposed
2  to do?
3      Was Dr. Wong supposed to not give him any other
4  anticoagulants? They don't say. Was he supposed to put him on
5  a different anticoagulant? Well, the other doctors would tell
6  you and the medical records would suggest, that if you think
7  there is a risk with one anticoagulant, you shouldn't use any
8  other.
9      Remember when counsel said, well, there is no
10 evidence that he would have bled from another anticoagulant.
11 Really? What did the doctors who treat him do? What did they
12 do before this case ever happened? He had a GI bleed. They
13 took him off aspirin. They took him off Xarelto. And did they
14 ever put him on a different anticoagulant? They didn't.
15 That's the evidence.
16      The doctors who treated Mr. Boudreaux, who care
17 about him, who have no interest in this case, they thought
18 there was a risk if he was on any anticoagulant. And that's
19 why they didn't put him on any.
20      So what is it that plaintiffs would want real
21 doctors who treat patients to do with this test? They didn't
22 suggest to you and they certainly didn't suggest to these
23 witnesses, because they knew if they actually showed them their
24 proposal, Dr. Johnson, Dr. Boniol, Dr. Fail, Dr. Wong would
25 tell them why that wouldn't have been helpful. But they didn't

1  give them the opportunity to do that.
2      Because when they got on the stand, the witnesses
3  said, the doctors, the cardiologists who prescribed this drug
4  and who developed it said, PT test could actually harm
5  patients, because you could get misleading information.
6  Remember, you could think someone has a low level, and
7  therefore, they didn't have any Xarelto in their system and
8  they did. Or you could think someone had a high level and that
9  they would have too much, and they would be perfectly fine.
10      Nobody came into this courtroom, despite
11 plaintiff's burden, and said that this test would actually
12 increase safety for a particular patient. And that's because
13 they can't, because the overwhelming literature and practice
14 and all the public health agencies, all the medical
15 associations, not a single one support what plaintiffs are
16 asking for.
17      Who recommends it? Did you hear a single
18 prescribing cardiologist? Do you want to talk about failure to
19 call a witness? Plaintiffs do have a burden, right? You all
20 know that. You know that's what you're going to. Did they
21 bring you one prescribing cardiologist? They didn't. They
22 didn't.
23      If cardiologists really thought this test worked
24 and helped their patients, don't you think they could find
25 somebody to come in, like Dr. Johnson did, and tell you, I