1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  XARELTO                *
     (RIVAROXABAN) PRODUCTS         *
6    LIABILITY LITIGATION           *
                                    *
7    THIS DOCUMENT RELATES TO:      *    Docket No.: 14-MD-2592
                                    *    Section "L"
8    *Joseph J. Boudreaux, Jr.*     *    New Orleans, Louisiana
     *v. Janssen Research &*        *    May 1, 2017
9    *Development, et. al.,*         *
     Case No.: 14-CV-2720           *
10   * * * * * * * * * * * * * * * * *

11                  DAY 6, MORNING SESSION
          TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14

15   For the Plaintiffs':
     Liaison Counsel:              Levin Papantonio
16                                 BY:  BRIAN H. BARR, ESQ.
                                   316 South Baylen Street, Suite 600
17                                 Pensacola, Florida  32502

18                                 Herman, Herman & Katz, LLC
                                   BY:  LEONARD A. DAVIS, ESQ.
19                                 820 O'Keefe Avenue
                                   New Orleans, LA  70113
20
                                   Beasley Allen
21                                 BY:  ANDY BIRCHFIELD, ESQ.
                                   P.O. Box 4160
22                                 Montgomery, Alabama 36103

23                                 Gainsburg Benjamin David
                                     Meunier & Warshauer
24                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
25                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163

1    APPEARANCES:

2                                 Schlichter Bogard & Denton, LLP
                                  BY:  ROGER DENTON, ESQ.
3                                 100 South Fourth Street
                                  St. Louis, Missouri 63102
4

5                                 The Lambert Firm
                                  BY:  EMILY JEFFCOTT, ESQ.
6                                 701 Magazine Street
                                  New Orleans, Louisiana 70130
7

8    For the Defendant Bayer
     HealthCare Pharmaceuticals
9    Inc. and Bayer Pharma AG:    Wilkinson Walsh & Eskovitz, LLP
                                  BY:  BETH A. WILKINSON, ESQ.
10                                1900 M Street NW, Suite 800
                                  Washington, DC 20036
11

12                                Nelson Mullins Riley &
                                     Scarborough, LLP
13                                BY:  DAVID E. DUKES, ESQ.
                                  Meridian, 17th Floor
14                                1320 Main Street
                                  Columbia, South Carolina 29201
15

16   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
17   Development, LLC:            Barrasso Usdin Kupperman Freeman &
                                     Sarver, LLC
18                                BY:  RICHARD E. SARVER, ESQ.
                                  909 Poydras Street, 24th Floor
19                                New Orleans, Louisiana 70112

20
     Official Court Reporter:     Tana J. Hess, RMR, FCRR
21                                500 Poydras Street
                                  Room B275
22                                New Orleans, Louisiana 70130
                                  (504) 589-7781
23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

OFFICIAL TRANSCRIPT

```
 1              INDEX OF WITNESSES

 2   NAME                                    PAGE

 3   Colleen Johnson, M.D.

 4        Direct Examination by Ms. Wilkinson      1155

 5

 6

 7

 8

 9              INDEX OF EXHIBITS

10                                    IDENTIFIED

11   Defense Exhibit Number JB18              1209

12   Defense Exhibit Number 49                1259

13   Defense Exhibit Number JB165             1191

14   Defense Exhibit Number JB173             1184

15   Defense Exhibit Number JB219             1212

16   Defense Exhibit Number JB257             1245

17   Defense Exhibit Number JB269             1216

18   Defense Exhibit Number 5264              1256

19   Defense Exhibit Number 5792              1232

20

21

22

23

24

25
```

1   (whereupon the following proceedings were held in

2   chambers:)

3   **THE COURT:**  Two things that concern me, and I want to

4   share them with you and get your input on them.  It has to do

5   with the last witness that we had.  Rick got into a question of

6   specifics with that witness that I thought presented a bit of a

7   problem.  I didn't think it was intentional; just the way it

8   is.  But when you ask a witness like that, "Is it true how many

9   hundreds of thousands of people took the drug," you imply that

10   everything went okay or at least you give the -- maybe he

11   didn't imply.  Maybe he didn't imply that, Rick, but I think

12   it's fair for a jury to infer from what you said that that many

13   people took it, and therefore they were okay with it.

14         So then the plaintiffs put on something which

15   concerns me, too; that 18,000 or 17,000 people have filed

16   claims, but that's the flip side of what you say.  Once you

17   open the door about people have taken the drug, you either

18   imply or you allow the jury to infer that everything went okay.

19   So they then have the opportunity to put in the suits.

20         That concerns me both, and the -- I think both

21   of you-all are right.  You're right that hundreds of thousands

22   of people took it, and you're right that 17, 18,000 people have

23   done it.  So it's a fact.  Facts are admissible in evidence if

24   they're relevant.  I don't think they were relevant, and if

25   they do pass the smell test of relevancy, I think both of them

1    present some problems on 403.

2              I think that the way to -- from your standpoint

3    to have handled that would have been, "How long was the drug on

4    the market?"  That I think is both relevant and not problematic

5    under 403.  From that, you can hope that a hidden persuader

6    comes in that's everything's okay, and that's what you really

7    were trying to give to the jury.  But once you say hundreds of

8    thousands of people took it, then you open the door to the

9    other side.  So my instinct is to tell the jury disregard both

10   situations, both comments and explain to them that it's not

11   relevant; that we're looking at this particular case here, and

12   I could do my best.

13             When both sides make the point, it's better to

14   be able to unring the bell than if one side makes it and the

15   other side can't make it.  That -- that's what my -- that's why

16   I allowed him to do it.  I just I felt that if they did it and

17   it was a problem, and it concerns me, and so I think the best

18   thing to do is to just tell them disregard both comments.

19             MR. BARR:  And, Your Honor, from our perspective, I

20   mean, I think overall that that would be okay with us going

21   forward.  I mean, I can say that we weren't planning on

22   referencing again, wasn't going to make a big deal out of it in

23   closing, not going to highlight it again.  You know, to some

24   degree if we go out there and tell them to ignore both sides of

25   it, we're just raising it again.

```
1            THE COURT:  Well, that's the other side of it, and I
2    understand that.  It's just that I have to assume the jury will
3    do what I tell them to do, and I'm just concerned that if it's
4    the way it is now, people may be able to argue the case and
5    reinforce things, and that's -- that's a problem that gets
6    worse.  Rick?
7            MR. SARVER:  I think our view is a bit similar to
8    Brian's.  We are afraid once you've got the skunk in the jury
9    room, it's hard to get the smell out.
10           THE COURT:  Yeah, I know, and if it were only one
11   side of it, I would think that that's a problem from your
12   standpoint because you tell them not to do it, you reinforce
13   it.  But when both does it, if I reinforce it, then it's like
14   it is now.  It's not one side or the other.  I mean, you know,
15   I'd be telling them to disregard both.  So it seems like the
16   right thing to do on it.  You know, unless you-all feel
17   strongly differently, I certainly will listen to you.
18           MR. DUKES:  Your Honor, we understand the
19   perspective.  I think our concern, and it's as you would
20   expect, trying to figure out does it overly emphasize it --
21           THE COURT:  Yeah, I agree.
22           MR. DUKES:  -- on a Monday morning when it was the
23   Friday testimony.
24           THE COURT:  And it's a problem, but --
25           MR. MEUNIER:  Your Honor, the other thing is
```

1    information came out on their side from a witness that goes

2    into evidence on our side.  It was Brian's questioning, so I

3    think it would be better to make the comment to disregard both,

4    because one is in evidence.  The other is questioned by lawyer,

5    and they may treat those differently and give credence to the

6    evidence, but not to what the lawyer said, so --

7            THE COURT:  Well, I think the witness said both of

8    them in a sense.  I mean, the witness when Rick asked him, he

9    said yeah, but -- yeah, he didn't know how many people.  I

10   mean, you know, it's like millions of people do that, and then

11   you say, "Name one," and then it's a problem.

12           MR. MEUNIER:  I will say both sides have been good.

13   The lawyers have been really good at testifying on both sides.

14           THE COURT:  Okay.  Any issues that I can help one of

15   you-all with?

16           MR. BARR:  The only issue I think that I foresee may

17   come up that I know of is in the Boniol -- Doctor Boniol when

18   he testifies.  You know, we've been -- they've been providing

19   us the exhibits that they're intending on using in direct, and

20   there are a number of exhibits that are nowhere in Doctor

21   Boniol's report.  They're not on his list.  What we've been

22   doing is if there's medical literature that has come out

23   post-report that's relevant to one of the opinions, neither

24   side has had a problem with that.  But there are a number of

25   these exhibits that predated the report, and from looking at

 1  them, I can't tell the relevance to the report.  So I'm just

 2  keying you that there may be some objections on that kind of

 3  stuff, if it's outside the framework of the report.

 4          MR. SARVER:  Brian gave me a heads up on that, Your

 5  Honor.  We'll be prepared to make sure we let him know what's

 6  going before it goes up on the screen.

 7          THE COURT:  That sounds fair.  Any problems that

 8  you-all have with logistics that I can weigh in on?

 9          MR. MEUNIER:  I think everything is going smoothly.

10          MR. NEWSOM:  Could I ask you one question on the

11  instructions?

12          THE COURT:  Sure.

13          MR. NEWSOM:  When are you anticipating holding your

14  charge conference?

15          THE COURT:  Well, what I'd do with the instructions

16  is I'll give you today -- I've got them in some sort of draft

17  form as of yesterday, and I'll give them to you today sometime,

18  and we'll meet and talk about them.  It's in draft form.  I'm

19  really at this stage interested in your input, and then I'll

20  take that input, and I'll give you another one.  So somewhere

21  before you-all rest I should have a jury charge to you that I'm

22  pretty firm on, but then we'll meet and talk about the final

23  one, and then I'll give you an opportunity after -- when I tell

24  you, "This is what I'm going to do," then we'll go out before

25  closing argument, and you can make your objections to it.

1    **MR. NEWSOM:**  Okay.

2    **THE COURT:**  That sort of thing.

3    **MR. NEWSOM:**  And without ruining the suspense, do you

4    yet know whether you're intending to charge the jury on the

5    clear evidence preemption issue?  Neither party proposed the

6    instruction initially, and I think the plaintiffs have now

7    supplemented.  We're happy to provide you with supplemental as

8    well if you think it's going down that road.

9    **THE COURT:**  I really hadn't planned on going down

10   that road.

11   **MR. BARR:**  And ours was only in the event the Court

12   felt it was for the jury.

13   **MR. NEWSOM:**  Of course.

14   **THE COURT:**  I think that's a question of law, not for

15   the jury.  I'm not even sure they know what preemption is.

16   **MR. NEWSOM:**  Nor do I for that matter.

17   **MS. WILKINSON:**  Your Honor, it might help the Court

18   if we tell you our schedule.

19   **THE COURT:**  I thought they did.

20   **MS. WILKINSON:**  We may finish early today, Your

21   Honor, because we only have two physicians, and the other one

22   is coming tomorrow, so --

23   **THE COURT:**  So we'll do the best we can.

24   **MR. MEUNIER:**  Your Honor, we do need the court

25   reporter back out to finish reading exhibits into the record

1  before the jury.

2          **THE COURT:**  Sure.

3          **MR. MEUNIER:**  Sure.

4          **THE COURT:**  Let's finish up.  Go out there with them,

5  and then we'll call it.  Okay.  We'll see what -- I can't give

6  you much on the jury.  They seem to be getting along pretty

7  well.  I gather from what I -- what I'm gathering, one of them

8  is staying in a hotel next to the court.  I don't know whether

9  they all want to stay there now.  You know, the unfortunate

10  thing is that this lady didn't need to stay in a hotel.  She

11  just needed to get payment early, so she wanted to get it

12  sometime Wednesday or Thursday.  That apparently is a big deal

13  now with the feds, so they said, "We can't pay you early, but

14  we can put you up at the hotel, and then we'll buy you dinner

15  and lunch and everything else."  So --

16          **MR. MEUNIER:**  That may be even better than --

17          **MR. NEWSOM:**  That sounds like a decision the federal

18  government would make.

19          **THE COURT:**  It's crazy.

20          **MR. DUKES:**  That is.

21          **THE COURT:**  All right.

22          (whereupon the following proceedings were held in

23          open court:)

24          **MR. DAVIS:**  I want to clean up some exhibits from

25  this past Friday, specifically Exhibit 77, Plaintiffs' Exhibit

1  77 and 78.  I want to the clear that the record reflects that

2  Plaintiff 3074632 is Exhibit 78.  And that document is an

3  attachment to Exhibit 77.  Okay?

4              And then we need to add Plaintiff Exhibit 314779

5  is Exhibit 79, and it was not already in the record.  It was

6  referenced as being in the record, but it was not, and it is

7  supposed to be in the record.  So that's Exhibit 79.  Okay?

8          MR. OVERHOLTZ:  I think Sam Geisler now is going to

9  introduce the Plaintiffs' exhibits.

10          MR. GEISLER:  All right.  Before we move the Geiger,

11  Shah and Torr deposition exhibits into the record, there are

12  two brief cleanup matters.

13              First, Plaintiffs' Exhibit 26 appears in the

14  record as 10979767 and should instead appear as 1097767.

15              Second, there remains one exhibit played in the

16  Berkowitz video deposition which has not yet been moved into

17  evidence.  Plaintiffs' now move 80333 into evidence as Exhibit

18  80.

19          MS. COCO-EWING:  Celeste Coco-Ewing for the defense.

20  We would like to have an opportunity to take a look at that

21  exhibit before you move, if you could just hold onto that for a

22  moment.

23          MR. GEISLER:  Sure.  And I showed it to counsel for

24  Bayer.  Just heads up on that.

25              The parties have reached an agreement related to

1   the exhibits to the deposition videos played to the jury and

2   ruled on by the Court for the depositions of Susan Geiger,

3   Nauman Shah, and Patricia Torr.  The parties have collaborated

4   and reached agreement on proposed redactions by Janssen for

5   several documents.  Most of these redactions dealt specifically

6   with sales figures for Xarelto, so at this time Plaintiffs

7   would introduce into evidence Plaintiffs' exhibits already

8   ruled on by the Court as follows:

9            Plaintiffs' move 1356534 into evidence as

10  Plaintiffs' Exhibit 81 and Geiger 66.

11           Plaintiffs move 1426816 --

12       MR. OVERHOLTZ:  Which was Deposition Exhibit Geiger

13  34.

14       MR. GEISLER:  Into evidence as Plaintiffs' Exhibit

15  82.

16           Plaintiffs move 3017856, which was Plaintiffs'

17  Deposition Exhibit Geiger 35, which will be moved into evidence

18  as Exhibit 83.

19           Plaintiffs move 3038234, which is Geiger 38,

20  into evidence as Plaintiffs' Exhibit 84.

21           Plaintiffs move 3041252, which is Geiger 2, into

22  evidence as Plaintiffs' Exhibit 85.

23           Plaintiffs move 3041264, which is Geiger 37,

24  into evidence as Plaintiffs' Exhibit 86.

25           Plaintiffs move 3043970 into evidence, which is

```
1    Geiger 40, and move that into evidence as Plaintiffs' Exhibit
2    87.
3                   Plaintiffs move 3043971, which Geiger 39, into
4    evidence as Plaintiffs' Exhibit 88.
5                   Plaintiffs move 3045666, which is Geiger 58,
6    into evidence as Plaintiffs' Exhibit 89.
7                   Plaintiffs move 3052864, which is Geiger 14,
8    into evidence as Plaintiffs' Exhibit 90.
9                   Plaintiffs move 3054065, which is Geiger 42,
10   into evidence as Plaintiffs' Exhibit 91.
11                  Plaintiffs move 3058417, which is Geiger 43,
12   into evidence, which is Plaintiffs' Exhibit 92.
13                  Plaintiffs move 7741, which is Geiger 5, into
14   evidence as Plaintiffs' Exhibit 93.
15                  Plaintiffs move 1055561, which is Shah 54, into
16   evidence as Plaintiffs' Exhibit 94.
17                  Plaintiffs move 119111, which is Shah 62, into
18   evidence as Plaintiffs' Exhibit 95.
19                  Plaintiffs move 119114, which is Shah 58, into
20   evidence as Plaintiffs' Exhibit 96.
21                  Plaintiffs move 119115, which is Shah 59, into
22   evidence, which is -- as Plaintiffs' Exhibit 97.
23                  Plaintiffs move 1471269, which is Shah 25, into
24   evidence as Plaintiffs' Exhibit 98.
25                  Plaintiffs move 303724, which is Shah 60, into
```

1    evidence as Plaintiffs' Exhibit 99.

2              Plaintiffs move 5767449, which is Shah 47, into

3    evidence as Plaintiffs' Exhibit 100.

4              Plaintiffs move 1428185, which is Torr 9, into

5    evidence as Plaintiffs' Exhibit 101.

6              Plaintiffs move 1482662, which is Torr 5, into

7    evidence as Plaintiffs' Exhibit 102.

8              Plaintiffs move 1482663, which is Torr 6, into

9    evidence as Plaintiffs' Exhibit 103.

10             Plaintiffs' move 2501312, which is Torr 8, into

11   evidence as Plaintiffs' Exhibit 104.

12             Plaintiffs move 2564466, which is Torr 16, into

13   evidence as Plaintiffs' Exhibit 105.

14             Plaintiffs move 2564467, which is Torr 17, into

15   evidence as Plaintiffs' Exhibit 106.

16             Plaintiffs move 2579936, which is Torr 11, into

17   evidence as Plaintiffs' Exhibit 107.

18             Plaintiffs move 259501 into evidence, which is

19   Torr 10 -- excuse me, let me restate that.  Plaintiffs move

20   259501, which is Torr 10, into evidence as Plaintiffs' Exhibit

21   108.

22             Plaintiffs move 307611, which is Torr 3, into

23   evidence as Plaintiffs' Exhibit 109.

24             Plaintiffs move 307612, which is Torr 4, into

25   evidence as Plaintiffs' Exhibit 110.

1    Plaintiffs move 311045, which is Torr 7 into

2 evidence, as Plaintiffs' Exhibit 111.

3    **MS. COCO-EWING:**  And we wanted to make clear on the

4 record that the parties have agreed to redactions, and the

5 exhibits that follow will be admitted only in their redacted

6 state as agreed to by the parties consistent with the Court's

7 Motion in Limine ruling.

8    Plaintiffs' 93, which is Geiger 5.  Plaintiffs'

9 90, which is Geiger 14.  Plaintiffs' 82, which is Geiger 34.

10 Plaintiffs' 88, which is Geiger 39.  Plaintiffs' 91 which is

11 Geiger 42.  Plaintiffs' 92, which is Geiger 43.

12    Torr -- I'm sorry.  Excuse me.  Plaintiffs' 110,

13 which is Torr 4.

14    Plaintiffs' 99, which is Shah 60.  Plaintiffs'

15 100, which is Shah 47.  And Plaintiffs' 97, which is Shah 59.

16 Thank you.

17    **MR. GEISLER:**  And just planning to reserve the right

18 to review those, as I'm sure defense did, before they go to the

19 jury.  Thank you.

20    (whereupon the jury entered the courtroom.)

21    **(Open court.)**

22    **THE COURT:**  Be seated, please.

23    Good morning, ladies and gentlemen.  I hope

24 nobody had a problem with the storm yesterday.  Went okay?

25 Okay.

1    Members of the jury, you will recall that I said
2 at the outset that sometimes matters come in that I have to ask
3 you to disregard.  There are two things that came in on -- with
4 the last witness that I want to talk with you about.

5    One of them, the witness was asked about the --
6 he was testifying about the -- about the Xarelto, and he was
7 asked something about numbers of people that were taking
8 Xarelto.  And -- but then the other side brought up an issue
9 about numbers of lawsuits that resulted.

10    Both of those things are really irrelevant to
11 you all.  We're talking about this case here, not other cases.
12 We don't know how many people.  We don't know what they took,
13 why they took it.  We don't know what they were told.  We don't
14 know anything about them.  And from the lawsuits, we don't know
15 why the lawsuits came about.  We don't know anything about
16 lawsuits.

17    So both of those things are irrelevant to your
18 decisions today.  We're looking at this particular case, and
19 that's what you need to concentrate on.

20    Thank you very much.

21    Let's call your next witness.

22    **MS. WILKINSON:**  Your Honor, we call Doctor Colleen
23 Johnson.

24    **THE CASE MANAGER:**  Please step all the way up,
25 Doctor.

```
 1              THE WITNESS:  Okay.
 2              THE CASE MANAGER:  Step on up, and I'll swear you in.
 3                   Would you raise your right hand, please?
 4              THE WITNESS:  Yes, sir.
 5                        (Witness sworn.)
 6              THE CASE MANAGER:  Please have a seat.  State and
 7    spell your name for the record, please.
 8              THE WITNESS:  My name is Colleen Johnson.  It's
 9    C-o-l-l-e-e-n, J-o-h-n-s-o-n.
10                     COLLEEN JOHNSON, M.D.,
11    a witness called on behalf of the Defendants, being first duly
12    sworn, was examined and testified as follows:
13                       DIRECT EXAMINATION
14                      BY MS. WILKINSON:
15    Q.   Doctor Johnson, could you lean into the microphone a
16    little bit just to make sure everyone hears you?  Most
17    importantly, the court reporter because she's trying to take
18    down every word that we say.
19    A.   Okay.
20    Q.   Is this your first time ever testifying in a -- as an
21    expert?
22    A.   Yes, it is.
23    Q.   Are you a little nervous?
24    A.   Yes, I am.
25    Q.   Let's start if we could by just having you introduce
```

1    yourself to the jury, just give them your basic background,

2    please.

3    A.   So I -- my name is Colleen Johnson.  I'm a physician at

4    Tulane University Hospital.  I'm both a cardiologist and what's

5    called a cardiac electrophysiologist, so I'm like the

6    electrician of your heart.  And I work here at Tulane

7    University Hospital, also at the University Medical Center, New

8    Orleans, New Charity, and as well as at the VA Medical Center.

9    Q.   Do you live here in New Orleans, Doctor?

10   A.   I do.

11   Q.   How long have you lived here?

12   A.   So I was born here and raised here, and then I moved back

13   here about six years ago, six, seven years ago.

14   Q.   Do you have children?

15   A.   I do.

16   Q.   How many?

17   A.   I have two children.  They're three and five.

18   Q.   You're a little busy?

19   A.   You could say.  We have tee-ball tonight, so yes.

20   Q.   Let's, if we could, go back and tell the jury a little bit

21   about your education and your training so you can explain your

22   specialties.

23            Are you prepared to do that?

24   A.   Yes, I am.

25   Q.   All right.  Did you ask us to put together some slides

1    that will help summarize some of this so we can explain it to

2    the jury?

3    A.    Yeah.  I thought it might be easier.

4    Q.    All right.  Let's start with the first one, if we could.

5    All right.  Let's talk a little bit about your schooling.

6    Where did you go to undergraduate?

7    A.    So I went to M.I.T., Massachusetts Institute of

8    Technology.  And there I got my degrees in bachelor's science

9    in electrical engineering and a master's of science in

10   electrical engineering as well.

11   Q.    After you did that, did you go straight to medical school

12   or did you do something else?

13   A.    I didn't.  I actually worked in electrical engineering for

14   Intel Corporation for about five years.

15   Q.    What did you do for Intel?

16   A.    So at Intel, I worked on laptop computers.  And I might be

17   dating myself, but I actually worked on the first Bluetooth

18   antenna in a laptop computer.  So it was right when Bluetooth

19   was coming out.

20   Q.    Why did you decide to leave Intel?

21   A.    So both of my parents are physicians, and I had seen how

22   much their work meant to them.  And I love working with people,

23   and you don't really get to do that when you're working on

24   computers.  And I really wanted to kind of follow that path,

25   because it -- I got to see through my parents how much you can

1  give back to people.

2  **Q.**   What type of physicians are your parents?

3  **A.**   My father's passed, but my father was a pediatric

4  neurosurgeon, and my mother is now retired, but she was a

5  pediatrician.

6  **Q.**   Where did they do their training?

7  **A.**   So both my parents went to L.S.U. undergraduate; then they

8  went to L.S.U. Medical School.  And they did all their training

9  at Charity Hospital, except they didn't have pediatric

10  neurosurgery back then, so my dad went to Toronto Children's

11  before that, before coming back here to work as a pediatric

12  neurosurgeon.

13  **Q.**   So did you go off and leave New Orleans for a while to do

14  some of your medical training?

15  **A.**   I did.

16  **Q.**   Where did you go to medical school?

17  **A.**   So I went to medical school at Johns Hopkins in Baltimore,

18  Maryland.

19  **Q.**   Now, we've heard that medical school is four years.  Is

20  that right?

21  **A.**   That's correct.

22  **Q.**   Did there come a time during your medical school training

23  where you decided you were going to start focusing on a

24  particular field of medicine?

25  **A.**   Yeah.  Well, in medical school your biggest decision, not

1    your only, but biggest for us, is really medicine versus

2    surgery, and then adults versus children.  And I kind of

3    decided that I wanted to focus in medicine and adult medicine

4    at that time.

5    **Q.**    After you graduated from medical school, what did you do

6    next?

7    **A.**    So after medical school, you start your internship and

8    your residencies, and I did mine at University of California,

9    San Francisco, in medicine.

10   **Q.**    Now, I'll be teasing you about this.  Right?  You have

11   trained for quite a few years before you actually practiced

12   medicine?

13   **A.**    Yes.

14   **Q.**    Give the jury the total number of years that you've

15   trained, and then we'll go back to talk about how you spent

16   those years.

17   **A.**    So it's four years of medical school.  Then it's three

18   years of residency.  Then it's three years of fellowship.  And

19   then another two years of another fellowship before I started

20   practicing.

21   **Q.**    So you went to 12 additional years of school and training

22   to become the doctor that you are today?

23   **A.**    I did.

24   **Q.**    All right.  So when you went to your residency, what was

25   your first focus?

1   **A.**   So in residency was where I first kind of started loving
2   cardiology and got really enamored of cardiology and
3   understanding how the heart works.  And that was kind of my
4   first introduction to what I thought I was going to do long
5   term.
6   **Q.**   How many years did you do your cardiology residency?
7   **A.**   So I did my cardiology fellowship for three years, also at
8   UCSF.
9   **Q.**   What did you do next?
10  **A.**   So then it was within cardiology fellowship that I was
11  introduced to what's called electrophysiology.  And a lot of
12  the people I worked with felt that it was maybe obvious that I
13  would go into that, given my electrical engineering background,
14  so kind of I'm already an electrician.  Why not be the
15  electrician of the heart?  And I really enjoyed it.  It has a
16  procedural focus as well as a medicine focus, so I really
17  enjoyed that.  So I decided to pursue electrophysiology.
18  **Q.**   Can you tell the jury a little bit more about what
19  electrophysiology is?
20  **A.**   Yes.  So as you do your training and as we talk of
21  specialties, we kind of in medicine, you know, we start broad.
22  So if you're an internist -- and that's what you can become
23  after you become a residency in medicine -- you hear a lot
24  about all diseases, all of the organ systems, everything you
25  have to learn.  And then you start kind of narrowing your

1  focus.

2          So if you want to think about it, an internists kind

3  of know this much, but about that many things.  And then you go

4  into cardiology, and you narrow it down.  So now you know this

5  much about this amount.  And then you go into

6  electrophysiology, and now you know this much in your topic,

7  but you know it this deep.

8          So it's kind of just focusing, focusing, focusing

9  down.  And in electrophysiology it's really the management of

10  heartbeats, which is controlled by your electrical system of

11  your heart.

12  Q.   What type of procedures did you learn when you were doing

13  your fellowship and what type of procedures do you do today in

14  your area of specialty?

15  A.   So we do -- cardiac electrophysiologists do a wide range

16  of procedures, all the way from doing what's tilt table testing

17  for people that pass out, cardioversion-s.  And then we start

18  getting a little more invasive, and we're talking about putting

19  in -- if you've ever heard of defibrillators or pacemakers, I'm

20  the person that puts those in and decides who those need to go

21  in.  And then I also do what's called ablations, probably the

22  hardest part of what we do to understand.  But it's basically

23  going into the heart and changing the electrical system so it

24  goes back into a normal heartbeat.  And I do those as well.

25  Q.    Later we will talk about Mr. Boudreaux's condition and the

1  procedures under which he went.

2          Are you prepared to discuss those with the jury?

3  A.   Yes.

4  Q.   Are you board-certified in cardiology?

5  A.   I am.

6  Q.   Any other board certifications?

7  A.   In cardiac electrophysiology as well.

8  Q.   I believe the jury has heard what board-certified means

9  but if you can just give them a brief explanation.

10  A.   So in the United States, we have testing that's done to

11  make sure that you have adequate foundation of knowledge in

12  order to perform the field of practice that you want to do, and

13  that's known as board certification.

14  Q.   Doctor, how many board-certified cardio -- cardiac

15  electrophysiologists are there in the New Orleans area?

16  A.   So in the New Orleans area there's about 12 of us.

17  Q.   All right.  And at the hospitals where you work, are you

18  sometimes the only cardiac electrophysiologist on staff?

19  A.   Yeah.  I'm the only cardiac electrophysiologist right now

20  at Tulane and at the VA.

21  Q.   Is it important to you, as a doctor in a specialty area,

22  to talk to other physicians who share your expertise?

23  A.   Absolutely.

24  Q.   Do you belong to any societies where you talk to your

25  other fellow experts in this area?

1   **A.**   I do.  I belong to both what's called the Gulf Coast EP.

2   So we shorten it because nobody likes to say electrophysiology

3   five times in a row, so we shorten it to EP.  So we have a Gulf

4   Coast EP Society, that's kind of all on the gulf south, and we

5   get together about once a year to twice a year.

6             And then I also belong to what's known as the Heart

7   Rhythm Society, which is the national society of EPs, and I go

8   once a year to their main conference, which is actually next

9   week.

10  **Q.**   Do you keep up with the training on new procedures that

11  are developed in your area of EP?

12  **A.**   I do.

13  **Q.**   Where are you headed off to tomorrow?

14  **A.**   So tonight I actually head to Houston for further training

15  in -- in left atrial appendage closure device.

16  **Q.**   And is this the first time you will receive training in

17  that procedure?

18  **A.**   So I did some training in my fellowship on this procedure,

19  but when I came to Tulane, they didn't have the technology

20  established here yet.  And it's taken us a few years to get the

21  technology established here, and so now we're bringing it to

22  Tulane.

23  **Q.**   Are there any other cardio electrophysiologists in the

24  area who have this training?

25  **A.**   Yes, there are.  There's one at Ochsner who has this

1    training.

2    Q.    Before you completed all the training you've just

3    discussed, where did you first practice medicine?

4    A.    So I first practiced medicine here at Tulane University.

5    Q.    When was that?

6    A.    That was back in 2011.

7    Q.    Let's go through, if we could, your titles at the various

8    hospitals.

9          First of all, tell us again the places where you

10   currently practice medicine.

11   A.    So I practice medicine at Tulane Hospital just down on

12   Tulane Avenue.  And then -- now that we call it the hospital

13   corridor, if you keep heading down Tulane Avenue, you hit the

14   brand-new University Medical Center.  So I practice there.  And

15   now right across the street from that is our new VA, because we

16   moved from over on Poydras by the Superdome, so now we've moved

17   over to along that same corridor, and they build the new VA

18   Medical Center, and I work there as well.

19   Q.    You mentioned you're the director of cardiac

20   electrophysiology at Tulane.  What does that mean?

21   A.    So the director has to deal with all the -- bringing in

22   new technology, developing technology, working with the

23   hospital administration to make sure that what we're doing is

24   according to certain protocols and certain guidelines, and also

25   managing how we train our future doctors on how to do electric

1  physiology.

2  Q.   Doctor, how do you split up your time among the different

3  health care facilities in which you work?

4  A.   I would say right now that I'm about 40 percent Tulane,

5  about 40 to 50 percent at the VA, and then the other 10 to 20

6  percent is at University Medical Center.

7  Q.   How does it aid your clinical experience to be working at

8  these different hospitals and seeing different patients?

9  A.   It -- so do you mean how do I -- how do I enjoy doing it

10  or --

11  Q.   Do you enjoy it?

12  A.   I love it.  I love working with the different populations

13  at all three of those hospitals.  Everybody brings a different

14  thing.  Every patient brings a different scenario.  No one is

15  the same as anyone else.  And so it's wonderful to work in all

16  three situations.

17  Q.   As a practicing clinician, as someone who treats patients,

18  is it helpful when you see that next patient that you're seeing

19  all of these patients from different areas with different

20  problems?

21  A.   Yes.  I mean, the more we experience, the more we'll be

22  able to see the rare.  And that's wonderful, because the rare,

23  although rare, right, you want to know those.  And, you know,

24  if you'll meet sometimes the person that's been training and

25  they're now in their 80s, they're the person that can say,

1  "Well, I've seen that three times in my career."  Well, they've
2  practiced for 50 years and they've only seen it three times.
3  So having further population, more people to see, you might be
4  able to experience the rare and then know it the next time you
5  see it.
6  Q.   Let's talk, if we can, for a bit about your professional
7  life.
8       Start with do you often treat patients who have
9  atrial fibrillation, AFib?
10  A.   Yes.  Atrial fibrillation is really the cornerstone of
11  electrophysiology.  It's probably the most common cardiac
12  rhythm, heartbeat rhythm abnormality that we treat.
13  Q.   So it's not rare in your practice?
14  A.   No.
15  Q.   What percentage of your patients that you see on a weekly
16  basis have some form of AFib?
17  A.   I would say upwards of 60 to 80 percent of the people I
18  see have atrial fibrillation.
19  Q.   So let's talk a little bit about your week.  How many
20  patients do you think you see on a weekly basis?
21  A.   I probably see around -- around a hundred patients, maybe
22  100 to 120 patients a week average.
23  Q.   And 50 to 80 percent have some form of AFib; is that
24  right?
25  A.   Yes.

1  **Q.**   When you see these patients with AFib, is one of your
2  responsibilities to prescribed anticoagulants?
3  **A.**   It is.
4  **Q.**   Do you do that on a regular basis?
5  **A.**   I do.
6  **Q.**   Does it happen every day during your practice?
7  **A.**   Just about.
8  **Q.**   All right.  Are you very familiar with the medications
9  that we're talking about in this case, including Xarelto?
10  **A.**   I am.
11  **Q.**   Are you familiar with the other novel anticoagulants?
12  **A.**   I am.
13  **Q.**   What about warfarin?
14  **A.**   Yes.
15  **Q.**   Do you have patients who you have -- who are on all of the
16  novel oral anticoagulants NOACs and on warfarin?
17  **A.**   I do.
18  **Q.**   In becoming familiar with these drugs, are you also
19  familiar with the label of Xarelto?
20  **A.**   I am.
21  **Q.**   And are you prepared to give your medical and scientific
22  opinion about the adequacy of the Xarelto label?
23  **A.**   I am.
24  **Q.**   And are you also prepared to give your opinion about the
25  treatment of Mr. Boudreaux and the use of Xarelto to address

1  his risk of stroke?

2  **A.**   I am.

3  **Q.**   Have you made yourself familiar with all of the records,

4  medical records, that Mr. Boudreaux had and some of the

5  depositions and expert reports in this case?

6  **A.**   I have.

7  **Q.**   Have we asked you to study those?

8  **A.**   Yes.

9  **Q.**   Do you also keep up with peer-reviewed scientific

10  literature in your field?

11  **A.**   Yes, I do.

12  **Q.**   Why is that important to you as a clinician?

13  **A.**   So all physicians try to achieve what we call equable

14  scientific-based medicine, which means we all may have concepts

15  of what should work, but people are unique.  You're -- we're

16  beautiful.  We're individuals.  And so a lot of times, although

17  you may think, well, this will work, you don't know if it will

18  work until you try it in a large number of people to make sure

19  that your assumptions of how something is going to work will do

20  so in the human body.

21  **Q.**   Are you familiar with the literature regarding NOACs and

22  warfarin?

23  **A.**   I am.

24  **Q.**   And have you kept up with the literature regarding Xarelto

25  and other NOACs since they have become available on the market?

1    **A.**    I am.

2    **Q.**    And are there things called postmarketing studies that you

3    have reviewed and studied?

4    **A.**    Yes.

5    **Q.**    Why are those important, Doctor?

6    **A.**    So whenever we do something in a clinical trial, in a way

7    it's a false setting.  Right?  We select people to be part of

8    the trial.  So number one, we select, right, people have to,

9    one, be willing to be part of the trial.  So it's not the

10   general population.  So we've already subselected only people

11   who want to be part of a trial.

12        Then we put you in a scenario that is very

13   controlled.  So you're given exactly how things are going to

14   go, and people are very closely monitored to try to stay along

15   the track of how we're trying to treat you.

16        We also exclude certain patients from being in a

17   trial, and we have inclusion criteria.  So not every patient is

18   even offered to be part of a trial.  So once we finish a

19   clinical trial, which is our strongest evidence, a randomized

20   clinical controlled trial for whether something works, we

21   then -- it gets approved.  We then apply it to the general

22   population.

23        Well, now all of a sudden we're dealing with people.

24   Right?  People that wouldn't maybe want to be in a trial,

25   people that maybe have something a little bit different than

1170

1    the inclusion criteria or a little bit different than the
2    exclusion criteria.
3              And so we use postmarketing data to find out, if you
4    take what's true in a clinical trial, is it true when you apply
5    it across a broad population of people?  So it's just used as
6    further support or not support for a clinical trial.
7    Q.   Have those types of reviews and studies and observational
8    studies been done since 2011 when Xarelto was on the market?
9    A.   Yes.
10   Q.   Are you familiar with those tests?
11   A.   Yes.
12   Q.   And do they inform your clinical practice when you're
13   actually treating patients outside the courtroom?
14   A.   Yes.
15   Q.   Is the information that we've asked you to look at, the
16   studies and all that data, is that information that you knew
17   about and were familiar with before we asked you to be an
18   expert in this case?
19   A.   Yes, much of it was.
20   Q.   Did you use it in your clinical practice before you ever
21   heard about this case?
22   A.   Yes.
23   Q.   So are any of the opinions that are coming to you today
24   opinions that you didn't have before we asked you to join this
25   case?

**A.**   No.

**Q.**   Are you going to -- are you prepared to tell us your opinions, all of your opinions, to a reasonable degree of scientific certainty?

**A.**   Yes.

**Q.**   And probably more important, Doctor, are things that you're going to tell us inside this courtroom consistent with how you practice medicine outside of this courtroom?

**A.**   Yes.

**Q.**   And how you treat your own patients every day?

**A.**   Yes.

**Q.**   In addition to treating patients, do you do research?

**A.**   I do.

**Q.**   Do you write journal articles yourself?

**A.**   I do.

**Q.**   What do your journal articles focus on?

**A.**   I'm very interested in -- I was interested in a rare disease called arrhythmogenic right ventricular dysplasia. It's very rare, but I've done a lot of research on that disease.

        I'm also very interested in what's called cardiac resynchronization therapy, which is ways we use pacemakers to try to help people with heart failure.

**Q.**   Doctor, have you ever written a peer-reviewed article on AFib or anticoagulants?

1    A.    Not on novel oral anticoagulants.

2    Q.    Are you getting paid in this matter to do the work that

3    you've done before you came to court and for being in court

4    today?

5    A.    Yes.

6    Q.    Doctor Johnson, are you prepared to testify about

7    Mr. Boudreaux's AFib condition?

8    A.    Yes.

9    Q.    Are you prepared to testify about whether the Xarelto

10   label was safe and effective or provided enough information to

11   doctors to determine the safe and effective use of Xarelto and,

12   in this case, for Mr. Boudreaux?

13   A.    Yes.

14   Q.    All right.  Are you prepared to testify about whether a

15   Neoplastin PT test would provide you helpful information in

16   treating a particular patient?

17   A.    I'm ready to testify on that.

18   Q.    Okay.  And are you prepared to testify generally about the

19   Xarelto label and the warnings and the risks and benefits that

20   are described in that label?

21   A.    Yes.

22         MS. WILKINSON:  Your Honor, at this point we offer

23   Doctor Johnson as an expert in cardiology, cardiac

24   electrophysiology, labeling, and the clinical treatment of AFib

25   patients.

1       **MR. DENTON:**  Your Honor, we're supposed to be trading

2   demonstrative slides before the witnesses get on, so I'd like

3   to have that.

4       **MS. WILKINSON:**  Of course.

5       **MR. DENTON:**  But I have no objection to

6   Doctor Johnson testifying today.

7       **THE COURT:**  All right.  The Court will accept her as

8   an expert in those fields.

9       **MS. WILKINSON:**  Thank you, Your Honor.

10  BY MS. WILKINSON:

11  **Q.**   All right.  Doctor, let's start with why we're here and

12  talk about how the heart works -- can we do that? -- and then

13  how AFib enters that process.

14          Explain to us how the heart is supposed to work,

15  if you could.

16  **A.**   So if you look on the one that says "normal," that's

17  showing you a heart kind of cut down the middle.  Right?  And

18  it's showing you -- first of all, there's four chambers in the

19  heart -- and forgive me if you've heard this already, but there

20  are four chambers in a heart.  There are two top chambers.

21  Those are like your gas tank.  They're like the fill tank.  And

22  then the bottom two chambers are the pumps.  They're the

23  engine.  They're the pump.  Okay?

24          So what happens is blood flows into the top chambers,

25  and then, a little different from a gas tank, your top chambers

1   actually squeeze and squeeze blood down into the bottom and
2   then the bottom chambers squeeze, and that sends blood out to
3   the rest of the body.
4           Now, you may think, oh, okay.  It's a pump.  It just
5   works like that.  Right?  But, no, it's actually the electrical
6   signals, the heartbeat, that controls when everything squeezes.
7   Okay?
8           So if you look at the one that says "normal," the
9   heartbeat actually starts in a little area called the
10  sinoatrial node; okay?  It's a little bit of tissue.  Do you
11  remember those old metronomes that went click, click, click,
12  right, when people would practice pianos?  So it's like that.
13  It's your own metronome.  It goes click, click, click, and it
14  sends out a heartbeat every time.  And it can change when you
15  sleep, click, click.  When you exercise, click, click, click,
16  click.  Right?  So it responds to you.
17          And that signal, then, that electrical signal, gets
18  sent out through the rest of those top chambers, spreads out;
19  and as it spreads, that's what causes that part of the heart to
20  squeeze.  So then it squeezes.
21          Well, the electrical signals, they move like that.
22  You flip a light switch, the electrical signal comes on.  So
23  there has to be a pause, right, a pause button while the top
24  part squeezes.  And that's what's called the atrioventricular
25  node.  It's just a pause button.  It says to the electrical

1    signal, hang on.  You can't go down to the bottom yet.  We've
2    got to wait for the squeeze to happen.
3              So then, after the top squeeze happens, the
4    electrical signal then goes and disperses throughout the bottom
5    part of the heart, and then that causes the bottom part of the
6    heart to squeeze.  And that is called -- because it's the
7    sinoatrial node, we call that heartbeat normal sinus rhythm.
8              So that's how the normal heartbeat happens.
9    Q.   Do you and other cardiologists refer to that in medical
10   records as SR?
11   A.   We can refer it to as either NSR, normal sinus rhythm, or
12   SR, sinus rhythm.
13   Q.   Will you point that out to us in some of Mr. Boudreaux's
14   medical records?
15   A.   Yes.
16   Q.   And just to finish off how it's supposed to work, what is
17   this printout that you have here under the normal heartbeat?
18   A.   So if you've ever gotten an EKG, an electrocardiogram,
19   they put the stickers all along your chest and along your body
20   and hook it up to a machine, and a piece of paper runs out and
21   records.  That's recording the electrical signal that I just
22   talked about.
23              So the first bump is the electrical signal of the top
24   chamber, the -- no, the small one.  That's the first.  That's
25   the upper part, the top part, the gas tank.

1176

The next one is the bottom part.  Notice it's much bigger because there's a lot more muscle in the pump because it's a bigger electrical signal.

And then the third one, believe it or not, you actually see an electrical signal, also relaxation of the ventricle.  So the last one is the electrical signal going through, and then it relaxes.

So that's why you have three.

Q.   So, Doctor, if you did an electrocardiogram of a patient and they were -- their heart was working normally, they were in sinus rhythm, would you see this repetitive pattern on their EKG?

A.   You would.  That's why we call it a rhythm.  Nice and normal, nice and normal across the page.

Q.   Now, the jury has heard a little bit about AFib, but tell us what's going on here and why it's not working properly.

A.   So in atrial fibrillation, which is caused by a multitude of things, what happens is the upper chamber of the heart has remodeled, meaning the tissue itself has changed; and because of that, it now can just excite on its own, and a signal just starts going -- electrical signals go everywhere.  It's kind of like it's haywired.  So you get this electrical signal that runs all over the top part of the heart.

And remember, the electrical signal triggers the beat, the squeeze.  So what happens is, as that electrical

1  signal, the top part, is going like this -- because every time

2  the electrical signal hits an area, it thinks it's supposed to

3  squeeze.  So it literally sits there and just almost vibrates.

4  It looks like it vibrates.  And that's what atrial fibrillation

5  is.

6            So if you look at that EKG again at the bottom and

7  you look at the baseline, do you see how it's always waving,

8  it's always moving?  That the top part.  It's always moving.

9  It's always getting an electrical signal.  It's just running

10 around like it's crazy.

11           And then what happens is that electrical signal still

12 has to go to the bottom part of the heart, but now it goes to

13 the bottom part of the heart.  Thank goodness we still have the

14 pause.  Right?  But it can still -- it overwhelms and it can

15 make the bottom part of your heart also beat very quickly and

16 also erratically.  So not in a normal rhythm, kind of a

17 (indicating).  Right?  A different -- like an out-of-beat

18 rhythm.

19 Q.   So over here on the left side under "normal," you showed

20 us that the EKG was very smooth.  Is that what you're referring

21 to over here under AFib?  You have this indication of a --

22 A.   That squiggle, uh-huh, and that's the atrial fibrillation,

23 the top chamber fibrillating.

24 Q.   All right.  We'll get into this a little bit more, but

25 eventually when Mr. Boudreaux presented to his nurse

1    practitioner with his symptoms, she gave him an EKG; right?

2    A.   She did.

3    Q.   You think that was, of course, the right thing to do?

4    A.   Absolutely.

5    Q.   And what did you see or what did she see and Doctor Wong

6    see when they did the EKG?

7    A.   So they could see atrial fibrillation, just like you can

8    see on that bottom one right there.  So you can see it on the

9    EKG.

10   Q.   So tell us, when you see a patient like Mr. Boudreaux with

11   that condition, what is your first concern?

12   A.   So my first concern when I see people with atrial

13   fibrillation is stroke and then symptoms.

14   Q.   And tell us, if you could -- excuse me.  Tell us why you

15   are so concerned about stroke first before you are about

16   dealing with the underlying AFib.

17   A.   So, unfortunately, the atrial fibrillation can lead to

18   strokes.  And, you know, we're housed up here.  Right?  This

19   is -- this is who you are.  This is -- this is how you move

20   your body.  It's how you speak to your family and friends.

21   It's how you listen.  It's how you see.  It's how you move your

22   arms.

23            So anything that happens to damage the brain -- which

24   is an organ that does not recover very well.  Once it's gone,

25   it rarely is going -- that function is rarely going to come

1179

back.  So most physicians, the first thing we're going to worry

about is whether or not we're protecting your brain.

Q.   Let's take a look, if we could, at your next diagram.

Can you explain to the jury why AFib raises the risk

of stroke?

A.   So when that top chamber is vibrating and just sitting

there like that -- remember we talked there's a gas tank that

pumps.  So it pushes blood.  It makes blood flow and move.

Well, when blood sits in a -- sits and doesn't move,

like if you cut your arm and you bleed, the blood is sitting

there.  Right?  It pools right there.  And our natural response

to pooling is to clot.  That's how your body controls bleeding

when you cut yourself.  It clots.

Well, unfortunately, when you're in atrial

fibrillation, the blood pools inside your heart, because you've

lost that squeeze, that motion that keeps the blood flowing

through the atrium.  And if blood sits in a location too long,

it can form clots because it doesn't know.  It doesn't know

it's not -- it's not -- it doesn't have a mind of its own.  It

doesn't know it's outside of your body.  So it says, "Well, I

should clot," so the clotting starts.

And then if you clot and that clot leaves the heart,

it can go anywhere in your body.  Right?  Your blood pumps

heart [verbatim] to every single piece of you.  And to us, the

worst, the absolute worst place it could go is to your brain.

1  And so that's the stroke, is when the clot goes up the arteries

2  into your brain.

3  Q.   Doctor Johnson, did you bring an animation with you that

4  you can narrate for the jury and explain to them exactly what

5  you're describing?

6  A.   I did.

7  Q.   All right.  And would you mind?

8       You just tell us when you want to stop.  You can

9  start.

10 A.   Sure.  Pause here.  Okay.  So I want you to watch, if

11 you'll help me, and point out --

12 Q.   Would you rather point or would you like me to?

13 A.   Whatever you'd like.

14 Q.   Okay.  I'll try.

15 A.   Okay.  So if you go to the back and keep -- right there.

16 That is the atria.  Okay?  So when I start the movie again,

17 notice it's going like this.  It's vibrating.  You'll be able

18 to see the vibration.

19      The red arrows are showing blood flow out of the

20 atria to the rest of the heart.

21 Q.   Sorry about that.  I might have clicked out.

22 A.   So you see it vibrating back there.  Okay.

23      And now we're going to zoom into the blood inside and

24 then pause here.  Okay.

25      So this is blood.  Okay?  Blood is liquid that

1   includes red blood cells, clotting factors, other proteins and
2   platelets.  Okay?  So you're seeing big red blood cells and
3   platelets and everything inside the blood.  Okay?
4   Q.   Why -- Doctor, why don't I give you the pointer so you're
5   in control.
6   A.   Oh, sure.
7   Q.   Just push that little button and you can explain to the
8   jury.
9   A.   So this is the blood with red blood cells, platelets, and
10  fluid, blood made up of water primarily.
11          And so if you go ahead and play again, you'll watch
12  as it kind of sits there.  This is a clot forming.  Do you see
13  it?  So pause -- that's okay.
14          So there's your clot, a collection of platelets and
15  other proteins that knit together, right, to form a plug,
16  because if you cut your arm, you want to plug up the bleeding.
17  Right?  But this is happening inside the heart.
18          And so if you keep going, it'll show you what happens
19  to that clot.  It sits in the left atrium, but it can go out
20  and go now into the ventricle, the bottom chamber, the pump;
21  and it can leave the pump and go up the arteries, into the
22  middle cerebral artery, into your brain.
23          And then as it goes in your brain, it's going to get
24  into smaller and smaller arteries until it hit one that it
25  clogs.  And you'll see that happen here.  It's going to go into

1    that smaller branch, and bam, it's going to clog.

2              And now you've blocked off blood flow, which means

3    oxygen and energy to those cells.  And you can see those cells

4    are dying.  And then what happens, as we zoom out -- it's going

5    to start zooming out in a minute.  So it starts, obviously,

6    very localized right there.  And then as we zoom out, you can

7    see, there it is.  And the brain tissue is actually dying.  And

8    as you can see, it gets bigger and bigger.  It will go over --

9    you can pause here.

10             It goes over the entire area that was provided blood

11   flow by that one artery it clogged.  So it completely cuts that

12   off.  And you have to realize that when we lose this brain

13   tissue -- so the worst thing or -- I would actually say my

14   patients say it's not the worst thing.  Most of my patients

15   say, "You know, Doc, I'm not afraid of death.  I'm afraid of

16   being a burden on my loved ones."

17             And so they'll say to me, you know, "If I knew I was

18   going to die of a stroke, I'd be okay with that.  But what I

19   don't want is I don't want to be able to not talk, not eat, not

20   move, not be able to go to the bathroom by myself, not be able

21   to get out of bed by myself."

22             That is what -- I mean, I think I'm afraid of that

23   too.  I think that's what more people are afraid of.  We're

24   afraid of being a burden and not being able to live our quality

25   of life.  And so that is what a stroke can do.

1   **Q.**   Doctor, when you are treating a patient with AFib and you

2   decide to recommend to them that they take an anticoagulant,

3   how do you explain the risks and benefits of that drug with

4   regard to dealing with stroke and with regard to dealing with

5   bleeding?

6   **A.**   Right.  So all physicians will -- that are dealing with

7   this will first figure out what your risk of stroke is with

8   atrial fibrillation, and we're going it talk about how to do

9   that in a little bit.

10           Given that you have a certain risk of having a

11   stroke, we are then going to recommend that we anticoagulate

12   you, which is kind of -- in laymen's terms, people often call

13   that a blood thinner.  Right?  We are going to try and make it

14   so your blood cannot form clots that quickly.  And by doing

15   that, we're going to decrease the number of clots that can form

16   inside your heart and thereby decrease your risk of stroke.

17           But I also tell my patients, if you remember, the way

18   your body clots off, that cut is the same mechanism.  So

19   part -- the way anticoagulation works means that you will

20   bruise easier.  Right?  Because, again, a bruise is just a

21   little bitty bleed under your skin, but now it will take longer

22   for you to clot off that little bleed, so your bruises will be

23   bigger.  Right?

24           It also means that you're going to -- if you have a

25   bleed, if you cut yourself, have a bloody nose, you are going

1   to bleed more than if you were not on an anticoagulant, because
2   we have purposely traded -- we've made a trade.  We've looked
3   at the risks and benefits.  We've traded that risk of increased
4   bleeding in order to protect you from strokes.
5   Q.   Let's turn to Mr. Boudreaux's records, if you could, so
6   you could explain to the jury what you saw in this particular
7   case.
8            Let's start with DX JB173.
9            MS. WILKINSON:  Your Honor, some of these medical
10  records are in parts of others, so we were hoping we could
11  introduce these portions just so there's no problem with that?
12           MR. DENTON:  That's fine, your Honor.  Whatever is
13  simpler.
14           MS. WILKINSON:  So we'd move that into evidence.
15           THE COURT:  Okay.  Let it be admitted.
16           (whereupon Defense Exhibit Number JB173 was
17           admitted into evidence.)
18  BY MS. WILKINSON:
19  Q.   Doctor, did you highlight -- some of these are the initial
20  symptoms that Mr. Boudreaux presented?
21  A.   Yes.
22  Q.   All right.  Let's take a look at that, if we could.  There
23  you go.  And tell us why this record is important to you.
24  A.   So this is when Mr. Boudreaux presented to his nurse
25  practitioner, Ms. Torres.  And as she lets you know, he

1    complains of -- the first thing he comes in and tells her about
2    is heaviness, chest pressure on his chest, and then also
3    trouble breathing.
4         So those are the things, as soon as we're keying in
5    on that, we are starting to think what causes chest pain and
6    trouble breathing.
7    Q.   As a cardiologist, what does that make you think of in
8    terms of what's happening to your patient?  What is your
9    concern?  I guess I should say.
10   A.   Right.  So we look at patient's other risk facts.  We look
11   at others, as Ms. Torres, you'll see, looked also at
12   Mr. Boudreaux's, and we try to say what would be the more
13   likely thing.  And probably the highest on any of our lists at
14   that time is going to be to make sure he's not having a heart
15   attack at that time.  That's going to be our first thought.
16   Q.   Why is it that, when you hear symptoms like this from
17   Mr. Boudreaux, that you would think of a heart attack and not
18   AFib?
19   A.   So Mr. Boudreaux has the right medical conditions, as many
20   people in their 70s do, age being one of them, but also other
21   medical conditions that put you at both a higher risk of having
22   AFib but also a higher risk of having a heart attack.  So you
23   definitely want to rule out whether he's having a heart attack
24   at this time.
25   Q.   Would performing an EKG be the next step in making that

1   determination, if you have the ability to do that?

2   A.   Absolutely.

3   Q.   All right.  Let's take a look at the next record, then.

4   And this shows the physical exam that was done by the nurse

5   practitioner and the EKG.

6          And what did the nurse practitioner determine?

7   A.   So when she listened to his heart, because we will do --

8   we listen with our stethoscopes -- she heard that irregular

9   beating.  Then she immediately also got an EKG, the thing that

10  shows you the heartbeat on the electrical -- you know, that

11  little heart beating, and she was able to see at that point

12  that he had atrial fibrillation and that he didn't have what we

13  call -- it's call an ST-elevation heart attack.  It's a type of

14  heart attack, a big heart attack, that you can also see

15  evidence of on an EKG, and she did not see that.

16  Q.   Does that mean at that point -- we know the answer now,

17  but at that point does that mean you know for sure he's not

18  having a heart attack?

19  A.   No.  So there are other types of heart attacks that you

20  can only diagnose by doing blood tests over a set of almost

21  eight hours.  So you have to do them eight hours apart in time

22  to show whether or not someone is having a heart attack.

23  Q.   When Mr. Boudreaux was sent to the hospital, did he have

24  those tests as well to make sure that he wasn't having a heart

25  attack?

1   **A.**   He did.

2   **Q.**   So did you make a list of the initial conditions or

3   characteristics of Mr. Boudreaux that you think are important

4   for the jury to understand about his risk of stroke and heart

5   attack?

6   **A.**   Yes.

7   **Q.**   All right.  Let's take a look at that next slide, if we

8   can here.  There you go.

9          Tell us why these conditions are important to you to

10  understand as a cardiologist working with a patient like

11  Mr. Boudreaux.

12  **A.**   I think we all know that, as we get older, that we are at

13  higher risk for having all of these conditions, including heart

14  attacks, atrial fibrillation, and strokes.  So age is always a

15  factor for us when we're looking at patients.  Most

16  22-year-olds who present with chest pain aren't having a heart

17  attack.

18         Then we look at what's know as the BMI.  It's called

19  a body mass index, and that's the relationship of your height

20  and your weight.  And we do know that BMI also can help us

21  tell -- give us clues that it's correlated with people having

22  these -- a heart attack or atrial fibrillation.

23         Then we also look at what other medical conditions do

24  you already have.  And both diabetes, which is the high sugars,

25  or hypertension, which is high blood pressure, even when

1  they're controlled, they're a still a risk factor for having

2  heart disease, including heart attacks, atrial fibrillation,

3  and strokes.

4  **Q.**   In your opinion, are these the most important risk factors

5  that were part of Mr. Boudreaux's case in terms of assessing

6  his risk of stroke?

7  **A.**   Yes.

8  **Q.**   Did -- we know Mr. Boudreaux was sent to the hospital and

9  he eventually saw Doctor Wong.

10          Did you review those medical records?

11 **A.**   I did.

12 **Q.**   All right.  Let's take a look at the next one, if we

13 could.  And this is the consult on January 4th, 2017 [sic], by

14 Doctor Wong.  What did Doctor Wong identify in this record?

15 **A.**   So Doctor Wong, as you can see, it's under "Assessment and

16 Plan."  He said that there's new atrial fibrillation.  So for

17 Mr. Boudreaux, that means it's a new diagnosis.  No one has

18 ever seen this before for him.  And that he -- and we didn't

19 know how long he had been in it.

20          And then he also showed that he was having what we

21 call CHF, which is called congestive heart failure, which is a

22 symptom of having trouble breathing, because fluid is backing

23 up into your lungs because your heart is not pumping it out as

24 well.  So he also has, as he says, CHF.  And then he also notes

25 his hypertension and diabetes, which are known diagnoses for

1    Mr. Boudreaux.

2    **Q.**   Doctor, in addition to your own person clinical

3    experience, do doctors in your specialty have guidelines that

4    you follow so that you have a standard of care or agreed-upon

5    ways to treat patients like Mr. Boudreaux?

6    **A.**   We do.

7    **Q.**   All right.  Are you familiar with medical guidelines on

8    how to assess the risk of AFib?

9    **A.**   Yes.

10   **Q.**   And did you bring an example of that with you to court

11   today?

12   **A.**   I did.

13   **Q.**   All right.  Let's take a look at that.

14            Tell the jury what this is.

15   **A.**   So both -- all of the things you see there, American Heart

16   Association, the American College of Cardiology -- and that's

17   the one I told you about -- the Hearth Rhythm Society have

18   gotten together and through research, again, that was done, we

19   know that if patients have certain conditions, they have a

20   higher risk of stroke.

21            So what we've done through trials is we basically

22   said if you have the condition on the left, you get a certain

23   number of points for that condition.  And then we add together

24   your points, and we know that if your points are 2 or greater,

25   then we are going to recommend systemic oral anticoagulation.

1    And that scoring system is -- we abbreviate it to the

2    first letter.  So it's called a CHADS2-VASc score, and it's

3    just the first letter of all of those symptoms that you see.

4    Q.    Did Doctor Wong do this calculation for Mr. Boudreaux

5    before determining the plan of treatment?

6    A.    He did.

7    Q.    Let's take a look at the next line.

8          Can you explain to the jury what Mr. Boudreaux's

9    score was based upon?

10   A.    Yes.  So Mr. Boudreaux, as we said, had symptoms of

11   congestive heart failure.  So that gives you a point.  He had

12   high blood pressure.  That gives you a point.  He has diabetes.

13   That gives you a point.  And then his age is 71, which is

14   between 65 and 74, and that gives you a point.

15         So we add all those up to get 4 points on his

16   CHADS2-VASc score.

17   Q.    After this assessment, what was the increased risk of

18   stroke that Mr. Boudreaux faced?

19   A.    So Mr. Boudreaux had four times, or almost 400 percent,

20   increase in his risk of stroke versus somebody with those same

21   conditions that does not have atrial fibrillation.

22   Q.    When someone faces that dire risk, what is the appropriate

23   treatment?

24   A.    The appropriate treatment is systemic oral

25   anticoagulation.

1    Q.    Is that what Doctor Wong ordered in this case?

2    A.    It is.

3    Q.    All right.  Let's take a look at the next record.  It's

4    JB165.  I want to make sure that's the same one we've been

5    using all along.  No.

6              MS. WILKINSON:  Can we move in JB165, Your Honor?

7              MR. DENTON:  No objection.  Sorry, Judge.  No

8    objection.

9              THE COURT:  That will be admitted.

10             (whereupon Defense Exhibit Number JB165 was

11             admitted into evidence.)

12   BY MS. WILKINSON:

13   Q.    Now, this is the plan constructed by Doctor Wong?

14   A.    Yes.

15   Q.    Tell us what it means, if you could.  Walk us through it.

16   A.    So the first line under plan says start Lopressor,

17   25 milligrams.  It's a dose level.  B.i.d. means you take it

18   twice a day.  That's a medicine called a beta blocker, and that

19   medicine is used to slow down your heart rate.

20             Remember I told you the bottom chamber can start

21   beating really fast in response to the atrial fibrillation.  So

22   the beta blocker is used to slow down so your heart rate is not

23   way up in the 150s; it's closer -- 150 is -- it's closer to

24   what is normal, which is 70 to 90.  So that's the -- that's the

25   beta blocker.  And that's what he says for better heart rate

control.

And then he says, "Add amiodarone to see if he'll convert to sinus rhythm."  So there's that SR for sinus rhythm. And amiodarone is a medicine that we call an antiarrhythmic. So the purpose of amiodarone is actually to try to get you back and keep you into a normal heartbeat instead of the atrial fibrillation.

On the next line he says anticoagulate.  So that's the medicine that will thin your blood and protect you from strokes.

And then he talks about doing pictures of your heart. That's what an echo is.  He wants to get some fluid off, because, remember, he's breathing heavy because of that fluid backing up.  So that's what Lasix does.

And then he says to continue his blood pressure medicine.  That's the lisinopril.  And then he says, R/O -- which is our abbreviation for "rule out," so make sure he doesn't have -- MI, which stands for "myocardial ischemia." That's a heart attack.  So we want to rule that out while we're in the hospital, while he's being watched, and make sure he's not having a heart attack.

Q.   Doctor Johnson, do you agree these are the appropriate steps to take in Mr. Boudreaux's condition?

A.   Yes, I do.

Q.   Now let's talk a little bit about the drugs that he was

1    prescribed to try and get his heart rate back to normal.  Did
2    they work?
3    A.   So medicines actually don't have a very good -- our
4    antiarrhythmics, those ones like amiodarone, they don't have a
5    very good effect at getting you back into sinus rhythm.
6           And I try to explain this to people this way.  Let's
7    say you have faulty wiring.  Right?  And you know, like, after
8    a storm, sometimes some of my power will go out.  I have to go
9    to outside and go to my junction box and one of the switches is
10   switched.  Right?  So I pop the switch and pop it back over.
11          Now, I haven't cured the problem because the problem
12   is in the wiring in my house and I've got to pay to get that
13   done.  Right?  But what I've done is, in that instance in time,
14   I've gotten my power back on.  I've gotten myself back on.
15   That is what conversion is.  Okay?
16          Medicines aren't very good at flipping the switch.
17   What we usually end up having to use to flip the switch is
18   what's called a cardioversion, which is an electrical shock to
19   the heart to flip all the switches so you get back into regular
20   heartbeat.
21          The way the medicines are their strongest is, once
22   you're back in regular heartbeat, keeping you in the regular
23   heartbeat.  That's how they work.  That's really their
24   strength.
25   Q.   Is it common for cardiologists to try out medications like

1  this before they determine or use a more invasive procedure?

2  A.   Yes.  And we also want these on board.  If they don't

3  work, we still want them on board when we cardiovert.  Number

4  one, they help the actual electrical cardioversion.  They

5  actually make it so the people respond to that one better, and

6  afterwards they're the one that keeps you in the regular

7  heartbeat.

8  Q.   Because these drugs did not get Mr. Boudreaux back in

9  sinus rhythm, did he have to have the invasive procedure

10  cardioversion?

11  A.   Yes.  If you do not respond to the medicine to get you

12  back into regular rhythm, our next step is a cardioversion.

13  Q.   Did his need for a cardioversion have anything to do with

14  the Xarelto that he was on?

15  A.   No.

16  Q.   Why is that?

17  A.   Anticoagulation medicine, it has no effect on the

18  electrical system of your heart.  So that's why I talked about,

19  I always separate those out for people.  The anticoagulation

20  doesn't affect the heartbeat at all.  They're two separate

21  things.

22          So the anticoagulation, you do that to protect from

23  stroke, and then everything else you do on the other side is to

24  help to get that rhythm back to normal so patients don't have

25  troubling breathing, for example.

1  **Q.**   Can you work on getting that heart rhythm back to normal
2  before you anticoagulate or try to minimize the risk of clots?
3  **A.**   No, you cannot.
4  **Q.**   Why?
5  **A.**   So if you think about it, the highest risk time for you to
6  push that clot outside of the -- of that top chamber, the gas
7  tank chambers -- so when it's doing this, it's not really
8  pushing blood very far.  So sometimes when we see clots in
9  there, they're just sitting there.  They don't move.  They may
10  not move out of that chamber.  But as soon as I put you back
11  into a regular heartbeat, what's going to happen, it's going to
12  do this.  And that's going to push stuff out.

13      So your highest risk time of having that clot, if you
14  have a clot, leave your heart is when I take you from atrial
15  fibrillation back to a regular rhythm.  And then, after I get
16  you back in a regular rhythm, although you're squeezing, we
17  have data that shows it's kind of like you're -- that part of
18  your chamber is a little bit stunned for about a month.  It
19  takes about a month for it really to recover to its full
20  squeeze.

21      So we actually still have to anticoagulate anyone, no
22  matter their CHADS score, for a month after a cardioversion as
23  we let that squeeze get back to full strength.
24  **Q.**   So because of that risk of the cardioversion, you know,
25  shocking the heart and sending a clot up, is that why

1    Doctor Wong had to anticoagulate Mr. Boudreaux first before the
2    cardioversion?
3    A.    Yes.
4    Q.    Now, you told us you're familiar with the different types
5    of anticoagulants, right, that are on the market?
6    A.    Yes.
7    Q.    Take a look at those.  And let's start over on the left.
8    Explain to us what warfarin is and whether you use that in your
9    practice.
10   A.    I use warfarin in my practice.  It's the medication that
11   we've had the most experience with.  We've had over 50 years of
12   experience with warfarin.  It is a medicine that basically --
13   all of the proteins, the molecules that are involved in forming
14   a clot are made in your liver.  And they're actually made
15   through chemical processes that are dependent upon -- many of
16   them dependent upon vitamin K, like the vitamin K you eat.
17         So what warfarin does is it blocks the chemical
18   processes that depend on vitamin K so you don't make those
19   proteins anymore.  And if you don't make them in the liver,
20   then they don't get out into your bloodstream.  And so that's
21   warfarin.
22         The other anticoagulants are called the novel oral
23   anticoagulants, which are Pradaxa, Xarelto, Eliquis, and
24   Savaysa.  Those work in a different manner.  They don't affect
25   your production of these proteins.

1        Once the proteins are out in the bloodstream and you
2   start to clot, form a clot, that's when it -- these medicines
3   go in and block just one of those proteins.  So they block the
4   chain reaction of being able to form a clot by just blocking
5   one protein, but not its production.
6   Q.   Does Pradaxa work in the same way that Xarelto, Eliquis,
7   and Savaysa do?
8   A.   No.  It blocks a different protein than the other three
9   do.  It blocks Factor II, whereas the other ones block a
10  protein called Factor Xa.
11  Q.   Now, if you put a patient on Xarelto versus warfarin, do
12  you have to worry about their diet and what foods they eat
13  affecting their medication?
14  A.   So you don't.  And that's actually one of the things that
15  a lot of my patients, especially in Louisiana where we like our
16  greens, a lot of my patients like, is that they don't have to
17  worry about their diet.  They do have to take Xarelto with a
18  meal.  That's the only thing they have to worry about, is
19  taking it with food.  But other than that, they don't have to
20  worry about what type of food it is.
21  Q.   When a patient is on warfarin, do they have to worry about
22  the food that they eat?
23  A.   Yes.  So, unfortunately, we get most of our vitamin K
24  intake from our foods.  And so if you eat a lot of vitamin K
25  foods, it will overwhelm warfarin and you will no longer be

1    stopping those chemical processes from happening, and so then

2    you can still form clots.

3    Q.   When a patient is on warfarin, do you have to worry about

4    the other drugs that the patient or medicines that the patient

5    might be on?

6    A.   Yes.  So warfarin interacts with -- or a lot of other

7    drugs interact with warfarin, so we have to be very careful.

8    In fact, amiodarone, which Mr. Boudreaux was on, interacts with

9    warfarin.  So you have to be very careful what drugs you start.

10   And common ones, like a lot of antibiotics, actually interact

11   with warfarin.  Over-the-counter medications like that people

12   buy can interact with warfarin.  So we really have to watch out

13   with other medicines when you're on warfarin.

14   Q.   Does alcohol affect how warfarin works in the body?

15   A.   Yeah.  So alcohol, which also affects the liver, will

16   affect also how warfarin works in the body.

17   Q.   So explain for the jury, if you could, if you put a

18   patient on warfarin, you put them on a dose; right?

19   A.   Yes.

20   Q.   Do you know whether that dose is going to work?

21   A.   No, you don't.

22   Q.   So what do you have to do to make sure that that dose

23   works for a particular patient?

24   A.   So standard, what we do is we will start someone on a dose

25   somewhere between 2 milligrams to 5 milligrams of warfarin.

1    And we don't know where you're going to end up.  We have to
2    test your blood to find out.  Some people will end up being on
3    1 milligram a day; some people I've seen end up on 15
4    milligrams a day.
5              That's a huge difference, so there's a lot of
6    variability, according to genetics, according to what you eat,
7    according to the drugs you're on, according to how your liver
8    works, on where you're going to end up on that spectrum as to
9    how much warfarin you're going to need.  And that's why we have
10   to test your blood frequently.
11   Q.   Can that dose change even once you determine on a
12   particular day that that's the right dose for a warfarin
13   patient?
14   A.   Yes.  So like I said, let's say your internist or you go
15   to an urgent care and you have a flu and they give you an
16   antibiotic for that or you have an ear infection or a any eye
17   infection, that could affect your Coumadin.  So we then have to
18   adjust your Coumadin while you're taking that medicine.  So
19   that means you have to come back in for blood tests so we can
20   adjust just your medications.
21   Q.   Does Xarelto require any of those routine drug tests?
22   A.   No.
23   Q.   Is that a good thing or bad thing in your opinion, Doctor?
24   A.   I think it's a good thing.  I think most patients, and
25   myself, would prefer not to have to come in for frequent blood

1    tests, would not have to worry about every single medicine

2    they're on, would not have to worry about what their diet is in

3    order to know that they're on the right dose of the medicine.

4    Q.    Are there studies that you've reviewed that show that

5    Xarelto, 20 milligrams or 15 milligrams, produces a benefit to

6    patients when they take that drug on a daily basis?

7    A.    Yes.

8    Q.    And why are those types of studies important to you?

9    A.    Because, again, we may say, Oh, you know, this will work.

10   Right?  But we don't know until we actually try it in people

11   whether it actually produces the results we think.  So you

12   always have to try new medicines.

13          First, we do it, of course, in animals.  But then at

14   some point, if you're going to use it in human beings, you have

15   to start trying it in human beings.  So first we'll try them in

16   people that are healthy subjects to watch them.  Then we'll try

17   them in people with certain other conditions.  And then we'll

18   try them in people that had atrial fibrillation to make sure

19   that it decreased the risk of stroke and what risk of bleeding

20   it gave.  So you need to prove that.

21   Q.    Are there studies that specifically compare how Xarelto

22   does without any monitoring compared to warfarin when there is

23   monitoring?

24   A.    Yes.

25   Q.    If warfarin is used without monitoring, is it safe and

1   effective for a patient?

2   **A.**    No.

3   **Q.**    So you have to have monitoring to even use it?

4   **A.**    Yes.

5   **Q.**    If you use Xarelto without any monitoring, is it safe and

6   effective for patients?

7   **A.**    Yes.

8   **Q.**    And you told us you are familiar with literature.  Have

9   you become familiar with a new article by a group of authors

10  starting with Mr. -- or Doctor Eikelboom that just came out in

11  March of this year?

12  **A.**    Yes.

13  **Q.**    All right.  Can I have that, please?  This is going to be

14  Plaintiffs' Exhibit 5769104.

15          Could we switch to the ELMO, please?

16          All right.  Doctor, are you familiar with this

17  article?

18  **A.**    I am.

19  **Q.**    I'm going to put it up on the screen.  See if I can pull

20  it down to make it a little -- what is the title of this

21  article?

22  **A.**    So it's "Laboratory Monitoring," so like blood tests, "of

23  Non-Vitamin K Antagonist."  So that means not Coumadin.  Right?

24  Coumadin uses vitamin K.

25  **Q.**    And Coumadin, you mean warfarin?

1  **A.**   Warfarin, yes.  Those are the same thing.

2          "Oral Anticoagulation Use in Patients with Atrial

3  Fibrillation," and this is from a review of trials that have

4  happened in the past, review of all trials.

5  **Q.**   Is this one of the most recent articles you found on the

6  issues that we're dealing with in this case?

7  **A.**   It is.

8  **Q.**   All right.  And this group of authors, what is the journal

9  in which this is published?

10  **A.**   It's in *JAMA Cardiology*.

11  **Q.**   Is that a well-regarded journal?

12  **A.**   It is.

13  **Q.**   Now look down here the first thing I underlined here.  It

14  says, "Randomized trials show that unmonitored NOAC therapy is

15  at least as effective as and safer than dose-adjusted warfarin

16  for stroke prevention in patients with nonvalvular atrial

17  fibrillation."

18          Do you agree with that?

19  **A.**   I do.

20  **Q.**   Is that a commonly understood belief in your field?

21  **A.**   It is.

22  **Q.**   And why does that matter when you're deciding whether to

23  prescribe warfarin or Xarelto or some other NOAC for a patient

24  like Mr. Boudreaux?

25  **A.**   So as I said, for 50 years -- over 50 years we've been

1   using warfarin.  That's been our drug.  Right?  That's all

2   we've had to treat strokes for patients with atrial

3   fibrillation.

4           So if you're going to compare a new drug, you want to

5   know that it is at least as good as the drug you're already

6   using.  Because if it's not as good as the drug you're using,

7   you wouldn't use it.  Right?

8           So it needs to be at least as good as that.  So you

9   don't test it against no drug.  Right?  That would not be

10  right.  You test it against the drug you currently are using.

11  Q.   And we'll get into this later, but does this article

12  specifically look at whether you can use any kind of routine

13  laboratory monitoring with Xarelto and other NOACs?

14  A.   Yes.

15  Q.   And I'm just going to go down to Number 3 here when

16  summarizing the conclusion.

17          Can you read us this last sentence, please?

18  A.   Sure.  It says, "Until such data are available, clinicians

19  should continue to prescribe novel oral anticoagulants in fixed

20  doses without routine monitoring."

21  Q.   In your opinion, is that the appropriate way to prescribe

22  Xarelto, without any monitoring?

23  A.   Yes, it is.

24  Q.   I should say without routine monitoring.  Right?

25          Let's go back, if we could, to Mr. Boudreaux's

1    records and look at the medications that he was on.

2              Why was it important for Doctor Wong to understand

3    all the medications that Mr. Boudreaux was taking at the time

4    he was dealing with his AFib?

5    A.   So one of the things we talked about is, number one, we

6    always want to look at what other medications you're taking,

7    because if we do prescribe Coumadin for you, they can interact

8    with that medication.

9              Number two, we do know that certain medications and

10   combinations with any oral anticoagulants can increase the risk

11   of bleeding.

12             And number three, we're always going to review these

13   medications, because it also helps us with, you know, what kind

14   of medical conditions and kind of how well are they being

15   treated currently.  So like your hypertension, your high blood

16   pressure being well-treated and with what medicines.

17   Q.   Is it important to you that Mr. Boudreaux was -- knowing

18   that Mr. Boudreaux was on aspirin?

19   A.   It is.

20   Q.   All right.  And we'll get to the label for Xarelto, but is

21   there a specific warning about using aspirin and Xarelto

22   together?

23   A.   There is.

24   Q.   Now, let's go to the next medical record.  And does this

25   reflect Doctor Wong's decision to prescribe Xarelto for

1    Mr. Boudreaux?

2    **A.**    It does.

3    **Q.**    In your opinion, was that an appropriate decision to

4    prescribe Xarelto for Mr. Boudreaux's AFib?

5    **A.**    Yes.

6    **Q.**    Why?

7    **A.**    So oftentimes when I'm asked to talk to patients like

8    Mr. Boudreaux about systemic oral anticoagulants, I -- so we've

9    already gone through your risk score, so we've already gone

10   through, Do you need it?  Right.  So, yes, we've decided you do

11   need it.

12           Then we're going to go through, what are your risks

13   of bleeding?  And I talk to my patients about their risks of

14   bleeding.

15           Then we're going to go through the different types of

16   drugs you can take.  And I do work at three different hospital

17   systems, so people with very different insurances.  And it

18   often depends upon what your insurance is, what your kidney

19   function is, what -- and really how -- how well you can take a

20   medicine in order to help the patient.  And I decide which one

21   is right for that particular patient, because every patient has

22   a unique situation.  You can't just do a one rule fits all.

23           So the nice thing is is it used to be people would

24   come in, and I would just say, Well, we're going to start

25   Coumadin.  We didn't really have a discussion about what drug

1  you wanted to start.  You were starting Coumadin.  That's all
2  we had.
3          Now we have a discussion.  My patients and I sit and
4  talk about here are the types of drugs.  Let's talk about the
5  pros and cons of each drug and decide what's right with you.
6  Q.   In preparation for your testimony today, did you review
7  Mr. Boudreaux's testimony?
8  A.   Yes.
9  Q.   Did you see where he told the jury where he said he was
10  very concerned about having a stroke in particular because of
11  family history?
12  A.   Very appropriately, yes.
13  Q.   Is that typical of patients that you deal with?
14  A.   Yes.
15  Q.   And do you understand why somebody like Mr. Boudreaux
16  would be so fearful of having a stroke?
17  A.   Absolutely.
18  Q.   Before a patient actually stays on Xarelto, is there
19  something specific in the label that tells you how to assess
20  which dosage is appropriate per patient?
21  A.   Yes.
22  Q.   So if someone suggests that Xarelto is a one-size-fits-all
23  dose, would that be true or false?
24  A.   That's not true.
25  Q.   Are there multiple doses available?

1    **A.**    There are.

2    **Q.**    Now, let's take a look, if we can, at the label.  And that

3    is PX T1 that's already in evidence.

4            And is there a specific test that is in the label

5    that allows doctors to determine the appropriate dosage for a

6    particular patient?

7    **A.**    Yes.

8    **Q.**    What section or what test is that?

9    **A.**    So we have to take a look at your kidney function, because

10   Xarelto is, in part, gotten out of your body through your

11   kidneys.

12   **Q.**    Let's take a look at that portion of the label.

13           Are you familiar with this, Doctor?

14   **A.**    Yes.

15   **Q.**    And explain to the jury, starting up at the top, what does

16   that tell you, as a doctor, in terms of trying to determine

17   which dose is appropriate for a particular patient?

18   **A.**    So we look to see what CrCl means, is creatinine

19   clearance.  And it's our way of doing a blood test to estimate

20   how well your kidneys are functioning.  So what that tells you

21   is it's telling you how quickly are my kidneys getting this

22   molecule called creatinine out of my body.  Right?  And that

23   gives us an idea.

24           The kidneys are a filter.  That's what they do.

25   We're asking, How well do you filter?  If you can filter over

1  50 milliliters per minute, that's -- that's close to normal.

2  Normal is about 60, but 50 is close to normal.

3          If you're between 15 and 50, then you have a lower

4  filtering capability through your kidney.  And since Xarelto is

5  filtered through your kidney, then you would have to change the

6  dose because, otherwise, you're not getting rid of it through

7  the filter as fast.

8  Q.   And down at 5.4, what does that tell a physician about

9  whether certain patients can't tolerate or shouldn't be

10  prescribed Xarelto?

11  A.   All right.  So patients that have creatinine clearance,

12  again that's CrCl, less than 15 milliliters per minute should

13  not even be on the drug.  So that excludes anyone on

14  hemodialysis.  So if we have a hemodialysis patient, they

15  cannot go on this medication.

16  Q.   Did Doctor Wong ensure that those tests were done on

17  Mr. Boudreaux?

18  A.   He did.

19  Q.   On multiple occasions?

20  A.   He did.

21  Q.   Did you review those medical records?

22  A.   I did.

23  Q.   And are they summarized on a summary chart you made to

24  show the jury --

25  A.   Yes.

1   **Q.**   -- the results?

2          **MS. WILKINSON:**   All right.   Your Honor, we would move

3   in DX JB18, which is the basis for this.

4          **MR. DENTON:**   No objection to that.

5          **THE COURT:**   Let it be admitted.

6          (Whereupon Defense Exhibit Number JB18 was

7          admitted into evidence.)

8   **BY MS. WILKINSON:**

9   **Q.**   Let's take a look at that.   Tell the jury what this shows.

10  **A.**   So if you remember, Mr. -- all of this started in early

11  January of 2014, so you can see he has a creatinine function

12  done the first day he comes to the hospital, and that's greater

13  than 60.   So that's normal.

14          He has another one done the second day.   Again,

15  normal.   He's been started on Xarelto.

16          He comes back to the clinic.   He has another one done

17  when he goes to the hospital, and it's 54.   So it's still

18  greater than 50.   And so all of those combined would tell you

19  that you want to be on the 20-milligram dose a day.

20  **Q.**   Was that the dose that Doctor Wong prescribed for

21  Mr. Boudreaux?

22  **A.**   It is.

23  **Q.**   In your opinion, is the creatinine clearance test that's

24  clearly stated in the label helpful to you as a practicing and

25  prescribing physician?

**A.**   Yes, it's necessary.

**Q.**   Does it provide you real information that you can use to make determinations about what's appropriate for a particular patient?

**A.**   Yes.

**Q.**   And we'll get to this in more detail, but in contrast, is the Neoplastin PT test that Doctor Leissinger and plaintiffs are advocating for, is that a helpful test that would provide you any meaningful or useful information as a practicing or prescribing physician?

          **MR. DENTON:**  Your Honor, we're getting into substance, and this is leading testimony -- or leading question, testimony of counsel.  I object.

          **THE COURT:**  An expert can comment on other people's testimony; other witnesses cannot.  But in giving an opinion, an expert witness can do so.  Let's get to a point, and we'll take a break now.

          **MS. WILKINSON:**  Yes, Your Honor.

          **THE WITNESS:**  So I do not feel that the Neoplastin PT test is necessary or needed in order to start a patient safely on Xarelto.

          **MS. WILKINSON:**  And after the break, can you explain that in more detail to the jury?

          **THE WITNESS:**  I can.

          **THE COURT:**  Let's take a 15-minute break.

```
 1              (Whereupon the jury was excused from the courtroom.)
 2                           (Recess.)
 3              (Whereupon the jury entered the courtroom.)
 4         THE COURT:  Okay.  Be seated, please.
 5                   You're still under oath, Doctor.
 6                   You may proceed, Counsel.
 7         MS. WILKINSON:  Thank you, Your Honor.
 8    BY MS. WILKINSON:
 9    Q.   Welcome back.
10    A.   Thank you.
11    Q.   You were telling the jury about this specific test that's
12    in the label that was performed on Mr. Boudreaux; right?
13    A.   Yes.
14    Q.   Before we get into some of the details about PT tests and
15    your feelings -- or your opinion as you were describing earlier
16    that it's not helpful, can we just finish talking about what
17    happened to Mr. Boudreaux in this particular case?
18    A.   Sure.
19    Q.   Okay.  After Mr. Boudreaux was on Xarelto in February
20    2014, did he report to his physician that he had signs that
21    were later determined to be a gastrointestinal bleed?
22    A.   Yes.
23    Q.   After that happened, he was taken off some of his
24    medications; right?
25    A.   Yes.
```

1   **Q.**   Do you recall which medications?

2   **A.**   So at the time that that happened, the Xarelto was

3   stopped, as well as some of his blood pressure and heart rate

4   control medicines.

5   **Q.**   Did his physicians have to determine another way to deal

6   with his stroke risk before they got his heartbeat back into

7   the regular rhythm?

8   **A.**   Yes.

9   **Q.**   All right.  Did you take a look at those medical records?

10  **A.**   Yes.

11  **Q.**   All right.  Let's take a look at JB219.

12         **MS. WILKINSON:**  I move that into evidence if it's not

13  in already, Your Honor.

14         **MR. DENTON:**  No objection, Your Honor.

15         **THE COURT:**  It will be admitted.

16         (whereupon Defense Exhibit Number JB219 was

17         admitted into evidence.)

18  **BY MS. WILKINSON:**

19  **Q.**   What is this, Doctor?

20  **A.**   So this is the operative note, the postoperative note by

21  Doctor Fail.

22  **Q.**   And what does it say?

23  **A.**   So he lets you know that his preoperative diagnosis is --

24  that Mr. Boudreaux has atrial fibrillation with -- not a high

25  CHAT score, but a high CHADS, that one we talked about, stroke

1    risk score, but he's also now had a GI bleeding event.

2    Q.    Are you familiar with this procedure, the LARIAT

3    procedure?

4    A.    I am.

5    Q.    Have you performed that procedure yourself?

6    A.    So the LARIAT procedure was actually developed by Doctor

7    Randy Lee at USCF, where I trained.  So I did the LARIAT

8    procedure while it was still in research with Doctor Lee at

9    UCSF.

10   Q.    Did you bring a diagram of that procedure?

11   A.    Yes.

12   Q.    Let's take a look at that.

13         Now, the jury heard from Doctor Fail.  Did you review

14   his testimony as well?

15   A.    I did.

16   Q.    And just -- we don't need to go through the whole thing

17   again because we heard it, but could you explain why this

18   procedure is done this way to mitigate the risk of stroke for

19   Mr. Boudreaux?

20   A.    So most strokes, most clots we have found -- so that's

21   about 80 percent -- actually are formed in the small part of

22   the upper chamber called the appendage.  And if you want to

23   think about the appendage, there's one on the right and one on

24   the left.  They're like little dog ear flaps that come off of

25   the top chamber of the heart.

1    And the blood goes in there.  And because it's a

2  smaller structure, the blood does not move as fast in there.

3  Clots in the left atrium are formed there.

4    So research has been done to show that, if you can

5  get rid of the left atrial appendage, you can get rid of

6  approximately 80 percent of where clots are formed.  So you can

7  decrease someone's risk of a stroke because now you've

8  decreased them forming clots in this way.

9  Q.   Do you agree or disagree with Doctor Fail that

10  Mr. Boudreaux's use of Xarelto did not cause him to need the

11  LARIAT procedure?

12  A.   No.

13  Q.   It did or it did not?

14  A.   It did not cause it.

15  Q.   Why is that?

16  A.   So as I said before, all anticoagulants work by decreasing

17  your ability to clot.  Like, that's how they work.  So they all

18  increase your risk of bleeding.

19    So no matter your anticoagulant, if you've had a

20  bleeding risk on that anticoagulant, on any of them, we know

21  that your risk of bleeding again on any of the anticoagulants

22  is higher.  So it doesn't matter which one.  What matters is

23  that for your body, your body had a bleeding event.

24  Q.   After Mr. Boudreaux stopped taking Xarelto but before the

25  LARIAT, was he still at an increased risk of stroke?

1  A.    Yes.

2  Q.    After Doctor Fail performed this procedure, how did that

3  affect Mr. Boudreaux's risk of stroke?

4  A.    So the LARIAT procedure has been shown to be as effective

5  as Coumadin.  Because again, remember Coumadin is our drug.

6  It's been around for 50 to 60 years.  So the LARIAT procedure

7  was compared to Coumadin and was shown to be as effective as

8  the Coumadin.

9  Q.    Doctor, why is it that cardiologists like yourself don't

10  just avoid the medications, the anticoagulants, and go straight

11  to a procedure like the LARIAT when you are helping a patient

12  like Mr. Boudreaux who faces an AFib diagnosis?

13  A.    So we are always going to choose the thing that has least

14  risk and most benefit.  And this is an invasive surgery, and

15  surgeries have risks to them.

16          So we are always going to start and try something

17  that is less risk than more risk, and medications are actually

18  less risk than any invasive procedure.

19  Q.    After Doctor Fail performed the LARIAT, did Doctor Wong

20  and Mr. Boudreaux's other physicians still have to deal with

21  his AFib?

22  A.    Yes.

23  Q.    Why is that?

24  A.    It goes back to the whole thing.  The clotting part of

25  atrial fibrillation and the heartbeat part of atrial

1216

1    fibrillation are two different things, meaning how we treat
2    them.
3              So you take care of the stroke risk.  That's over
4    here.  But getting rid of your left atrial appendage, the heart
5    is still fibrillating.  That chamber is still doing this; it's
6    not squeezing.  And so you still have to take care of the
7    atrial fibrillation and just the symptoms that are caused by
8    the fact that the top part of the heart isn't squeezing.
9    Q.   Was the cardioversion always part of the treatment plan
10   for Mr. Boudreaux?
11   A.   Well, if he did not respond, which Mr. Boudreaux didn't,
12   to the amiodarone and not converting him, then our next step is
13   always the cardioversion.
14   Q.   So regardless of whether he stayed on the anticoagulant or
15   he had the LARIAT procedure, after that worked and reduced the
16   risk, did he still have to have the cardioversion?
17   A.   Yes.
18   Q.   Did he have that in this case?
19   A.   Yes.
20             MS. WILKINSON:  All right.  Let's take a look at
21   DX JB269, which we offer into evidence.
22             MR. DENTON:  No objection, Your Honor.
23             THE COURT:  That will be admitted.
24             (Whereupon Defense Exhibit Number JB269 was
25             admitted into evidence.)

```
 1   BY MS. WILKINSON:
 2   Q.   This is dated January 24th, 2014; right?
 3   A.   Yes.
 4   Q.   Was that before or after Mr. Boudreaux had his
 5   gastrointestinal bleed?
 6   A.   This is before.  So he had gone into the hospital for his
 7   new diagnosis of atrial fibrillation.  He was started on the
 8   anticoagulant and the amiodarone.  He then came back for
 9   follow-up.  He wasn't in sinus rhythm, that regular heartbeat.
10   So at that point we know we have to do a cardioversion to get
11   him back into the regular heartbeat.
12   Q.   So did Xarelto or the bleed that Mr. Boudreaux suffered
13   cause the need for the cardioversion?
14   A.   No.
15   Q.   Was the cardioversion eventually performed?
16   A.   Yes.
17   Q.   Did it work for Mr. Boudreaux?
18   A.   It did.
19   Q.   Let's turn to the label, if you could.  This is PX T1.
20            When you prescribe Xarelto or other anticoagulants
21   for the patients, do you read through the label to determine
22   what the information is that the companies who manufacture and
23   sell the drug are providing to you?
24   A.   So when I first go to look at drugs in using them, I
25   actually don't read the label first.  I read the clinical trial
```

1    first.  So I go back, and I want to know how the clinical trial

2    was performed, whether I agree with it being performed well and

3    agree with the results that came out of the clinical trial.

4            Then once the FDA has approved the drug and I go to

5    use the drug in patients, oftentimes there are questions,

6    little questions that come up that I need to refer to the label

7    in order to answer those questions while I'm prescribing the

8    drug.

9            And so that's usually the order in which I review

10   drugs coming out.

11   Q.   We've seen -- and I'm sure you're going to show us again

12   in the label -- the data from the ROCKET trial; right?

13   A.   Yes.

14   Q.   Did you read that trial and the publications about that

15   yourself to determine whether you thought that was sufficient

16   data --

17   A.   Yes.

18   Q.   -- to support the use and prescription of Xarelto?

19   A.   Yes.

20   Q.   Now, do other anticoagulants have the risk of bleeding

21   associated with them as well as Xarelto?

22   A.   All anticoagulants have a risk of bleeding.

23   Q.   Let's take a look at the next demonstrative here.

24   Savaysa, which one is the most recent anticoagulant that came

25   out on the market.

1    **A.**   So Savaysa is the last one that just came out on the
2    market about a year ago.
3    **Q.**   All right.  And if -- you've looked through the labels of
4    all of these?
5    **A.**   Yes.
6    **Q.**   And what -- what does this demonstrative tell you or are
7    you trying to show the jury about those risks associated with
8    all of the anticoagulants?
9    **A.**   So for physicians, we know the way an anticoagulant works
10   is it makes you prolong your bleeding if you bleed.  So it is
11   clearly stated in every single anticoagulant that it can --
12   that, by taking this medicine, it can make it so that if you
13   have a bleed, it is worse than what it would be if you were not
14   on this anticoagulant.
15   **Q.**   Let's turn to the specific label for Xarelto.  And have
16   you highlighted some of the places that you think are important
17   where the risks of bleedings are discussed?
18   **A.**   Yes.
19   **Q.**   Okay.  Let's go to that.  Start at the top.  Why is it
20   that you highlighted for the jury the warnings and precautions
21   section?
22   **A.**   So again and again throughout the Xarelto label as well as
23   the others, they tell you that the risk of bleeding is there.
24   It's one of the first things you read on the first page under
25   warnings and precautions.

1          You then read it again under adverse reactions.  You
2    then read it again, if you go further into the label, telling
3    you that this increases -- it's the last one.  I like that one
4    the best.
5          "Xarelto increases the risk of bleeding and can cause
6    serious or fatal bleeding," just like any systemic oral
7    anticoagulant does, because that's how they work.
8    **Q.**    And you've highlighted adverse reactions and the risks of
9    bleeding as well?
10   **A.**    Yes.
11   **Q.**    Is there a section in the label on the ROCKET data?
12   **A.**    Yes.
13   **Q.**    Are you prepared to describe that for the jury?
14   **A.**    Sure.
15   **Q.**    Let's take a look at that.  First of all, it says,
16   "Table 1, Bleeding events in ROCKET AF."
17          What is this table showing you?
18   **A.**    So in ROCKET AF, that's the trial that was done comparing
19   Xarelto to warfarin.  They, of course, looked at strokes.
20   That's what we're trying to prevent.  So that was their primary
21   outcome.  So that means what is the benefit?  Right?
22          But then every trial is going to have a harm section.
23   So it says, "Okay.  Now I'm getting these numbers for benefit.
24   But then how much harm is happening while I'm getting that
25   benefit?"  So this is the results from the harms analysis in

1  that trial.

2  **Q.**   Was -- you've reviewed the FDA documents that were

3  reviewed by the FDA and submitted by the companies before

4  Xarelto was approved?

5  **A.**   Yes.

6  **Q.**   And was the ROCKET data submitted to the FDA before they

7  approved Xarelto?

8  **A.**   Yes.

9  **Q.**   Was that data also published on the FDA website?

10  **A.**   Yes.

11  **Q.**   Was that data published in the *New England Journal of*

12  *Medicine* in 2011?

13  **A.**   Yes.

14  **Q.**   Did doctors like yourself read those type of publications?

15  **A.**   Yes.

16  **Q.**   Did you, in fact, read that article?

17  **A.**   Yes.

18  **Q.**   Here.  Walk us through the label and what's important to

19  you as a prescriber of Xarelto in terms of weighing the risks

20  and benefits.

21  **A.**   So, as I said before, clinical trials are set up very

22  strictly.  So everything is defined in a clinical trial.  So

23  the first thing you'll see is the top part, it says "major

24  bleeding," and then it has a little kind of a cross next to it.

25  And I think you can see that right next to "major bleeding."And

1    that means that in that trial, they're going to give you what

2    their definition is of major bleeding.

3            So their definition of major bleeding included

4    bleeding into a critical organ, fatal bleeding, bleeding that

5    results in a transfusion, as well as bleeding that results in a

6    drop in a blood test of your blood level.  That's called your

7    hemoglobin.  So a drop in that as well.  And it looked at all

8    of those types of bleeding as a form of major bleeding.

9    Q.   When the data is broken out like this, are there certain

10   ways you prioritize the different bleeds in terms of weighing

11   the risks and benefits?

12   A.   So we are always going to look -- physicians are always

13   going to look at the greatest harm, and the greatest harm in

14   these bleeding risks is death.  So that is going to be the

15   first -- one of the first things we look at.

16           And they actually -- that's why I highlighted that

17   one.  They pulled out for you how many of these major bleeding

18   events resulted in death.  That's what "fatal bleeding" means.

19   And what it shows is in the 7,000 patients with Xarelto, very

20   fortunately, fatal bleeding is very rare, but that it happened

21   in 0.4 percent or 27 people during this trial.  And in the

22   warfarin arm, it happened to 5.8 percent of the people or 55

23   people.

24           And then so it's showing you that fatal bleeding

25   occurred more frequently in the patients on Coumadin than it

1    did on Xarelto.

2    Q.   Was ROCKET designed to compare Xarelto directly to

3    warfarin?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because as I -- again, you know, that is -- that was our

7    use.  That's all we had before 2011.  Basically all we had was

8    Coumadin.  That was your treatment.  That was my treatment.

9    That was anyone's treatment for stroke.  It was Coumadin or

10   nothing.  So that is what we compare to.

11          Now Coumadin was compared to nothing, right, 60, 70

12   years ago, because we didn't have anything before Coumadin.  It

13   was compared to nothing or it was compared to aspirin.  Those

14   are the only things we had back when Coumadin was tested.  But

15   now we have Coumadin, so everything is going to be tested

16   against the best drug we have at the time.

17   Q.   Let's talk about gastrointestinal bleeding in the Table 1.

18   What does that show?

19   A.   So one of the other things that ROCKET AF saw was it saw

20   that in the Xarelto group, there was 221 people that had GI

21   bleeding, compared to in the warfarin group, only 140 people.

22   So we don't know why.  We don't know the -- you know, the

23   mechanism behind why this happens, but more people get GI

24   bleeding on Xarelto than they do on Coumadin.

25   Q.   So as a prescribing physician reading the label, are you

1    aware of the differences in the risk between warfarin and

2    Xarelto depending on the type of bleed?

3    A.    Yes.

4    Q.    Now, when you look at those numbers, 221 and 148, it

5    sounds like a lot to us.  So have you calculated a way to put

6    that in perspective for the rest of us?

7    A.    Yeah.

8    Q.    Okay.  Let's take a look at the next chart.  Tell us what

9    this is meant to show, Doctor.

10   A.    So oftentimes -- and I find it actually happens more with

11   the procedures I do than with the medicines I prescribe.  But,

12   you know, we're always going to give you first your benefits

13   and then we're going to talk to you about the risks.

14           And sometimes the risks are really scary.  And

15   everyone has a hard time, saying, "Oh, my God.  Like I'm going

16   to undergo this?"  Like this is scary.  Right?

17           And, you know, our point is trying to say to you, we

18   know that these are scary.  We know that they're there.  But

19   you have to realize that the large majority of people do not

20   have these outcomes.  The large majority of people do not end

21   up bleeding.  They end up being 100 percent fine on these

22   drugs.  But there are a few people that are going to have this

23   issue.

24           I don't know up front who that's going to be, and so

25   we just want to -- I just wanted to kind of give that idea.  I

1    try to tell my patients, like, especially when I'm talking

2    about surgeries, yes, there's this 1 percent chance that this

3    could happen.  But, remember, that means 99 people out of 100

4    do not have this happen.

5              So it's just going to be kind of letting you

6    understand that we do know the risk is there, but we're

7    weighing out the risk verses the benefit with you when we do

8    either procedures or prescribe medications.

9    Q.   Specifically, what are the numbers based on the ROCKET AF

10   data of the risk of GI bleed or no GI bleed?

11   A.   So if you took 100 people, 97 of them would not have a GI

12   bleed and 3 of them would.

13   Q.   Have you also looked at the data on intracranial bleeding

14   with regard to Xarelto in comparison to warfarin?

15   A.   Yes.

16   Q.   It may be obvious, but why is what important data for you?

17   A.   So intracranial bleeding is bleeding in your head.  And

18   unfortunately for us, our head is contained inside a box called

19   your skull.  So it has room for your brain; it doesn't have

20   room for something else.

21             So if you start bleeding into your brain, into that

22   box, it can either destroy brain or it can actually push brain

23   out of the skull.  So intracranial bleed is a very serious

24   condition.

25   Q.   Let's take a look at the data from ROCKET.  What does it

1  show?  Oops.

2  A.    So the ROCKET data showed -- luckily, again -- that it's

3  rare in both Coumadin and warfarin, but that it actually

4  happened more frequently in patients on warfarin than it did on

5  Coumadin -- than it did on Xarelto.  And this was statistically

6  significant.

7  Q.    Let's take a look at "fatal bleeding."  What did the

8  ROCKET data show?

9  A.    And as we talked about before, this is dying from your

10 bleed.  And it shows again that, as we talked about, that

11 warfarin causes more people to die from their bleeds than

12 Xarelto does.  And, again, this was also statistically

13 significant, meaning it wasn't just by chance.

14 Q.    The ROCKET study was conducted quite a few years ago; is

15 that right?

16 A.    Yes.

17 Q.    Have there been other studies that have been done since

18 patients have been on Xarelto that look to see whether the

19 results are consistent or inconsistent with ROCKET?

20 A.    Yes.

21 Q.    All right.  Are you familiar with an article by Doctor

22 Sally Tamayo and others that was published in 2015 in *Clinical*

23 *Cardiology*?

24 A.    Yes.

25 Q.    Is that a journal with which you are familiar?

1  A.   Yes.

2  Q.   I've given you the article, Doctor, but have you

3  highlighted some of the specific provisions that you wanted to

4  share with us from this study?

5  A.   I did.

6  Q.   Let's start with the basics.  What's the name of the

7  article?

8  A.   So it's called "Characterizing Major Bleeding in Patients

9  with Nonvalvular Atrial Fibrillation:  A Pharmacovigilance

10  Study of 27,467 Patients Taking Rivaroxaban" or Xarelto.

11  Q.   Does it matter to you that there's 20,467 [verbatim]

12  patients that were part of this review?

13  A.   Yes.

14  Q.   Why?

15  A.   Because the more patients we study, the more proof we have

16  whether or not those -- the results of ROCKET AF apply to the

17  general population.  So the more of the general population we

18  can look at who end up on Xarelto helps us decide if those

19  results, as we talked about, apply to everyone else.

20  Q.   What was the objective of this study?

21  A.   So this study basically used the Department of Defense,

22  our US Department of Defense health care records, and it looked

23  at all the people that were started on Xarelto over a number of

24  years, and then looked at those records to see how many of

25  those people had bleeding events.

1  **Q.**   What were the conclusions that the authors came to?

2  **A.**   So these authors, after looking at these almost 28,000

3  people, found that it was consistent with the results of

4  bleeding in ROCKET AF.

5  **Q.**   Doctor, if you go back to the label, we know that

6  Mr. Boudreaux was on aspirin while he was taking Xarelto; is

7  that right?

8  **A.**   That's right.

9  **Q.**   And if we can turn to the ELMO, can you talk to us about

10 the specific warning about the use of Xarelto and aspirin in

11 the label?

12 **A.**   Yes.

13 **Q.**   All right.  Let's turn to PX T1 and 7.3, and tell us what

14 that title says and what this section means.

15 **A.**   So this is telling us that we know that when you -- when

16 people are on aspirin and on anticoagulants, including

17 Xarelto -- it's actually true of all the anticoagulants -- that

18 their risk of bleeding rises.

19 **Q.**   And when a label tells a doctor that the risk increases

20 for some specific combination of drugs, does that mean that you

21 should not prescribe this drug to a particular patient?

22 **A.**   No.  It means that what you have to look at is -- again,

23 it's all risk/benefit.  If the use of aspirin is of more

24 benefit to you than the increased risk of bleeding, then we're

25 going to keep you on the aspirin.

1229

**Q.**   In your review of studies done before Xarelto was on the

market and afterwards, have you seen any studies that make you

doubt the accuracy of the ROCKET data that is the basis for the

label?

**A.**   No.

**Q.**   In terms of Xarelto itself, does it -- or did it, in

Mr. Boudreaux's case, actually cause his gastrointestinal

bleed?

**A.**   No.

**Q.**   Why do you say that?

**A.**   So it kind of like is saying -- so even in Xarelto

studies, like in our -- in the early studies, where they took

healthy volunteers and they gave them Xarelto, of those healthy

volunteers, none of them bled.  Right?  Because we're taking

healthy 18- to 25-year-olds.  Right?  These are healthy people.

They don't have other conditions.  They couldn't have other

conditions to be part of this.  And none of them bled.

          But when you take all of the rest of us,

unfortunately, as we get older, our risk of bleeding goes up,

and that's because, as we all know, we've got to start getting

our colonoscopies.  We've got to start checking out our

prostates.  We've got to start doing all of these things to

watch out for sources of bleed.

          So we actually bleed because we have a problem

somewhere inside of us.  The issue is is that normally, even

1    though you're bleeding a little from a source, what do you do?

2    You clot it up.  You clot it up.  So your body works for you.

3    It works in the right way.

4           But now I've given you an oral anticoagulant to

5    decrease your risk of stroke.  And what it means is that that

6    little thing that was bleeding, it no longer is going to clot

7    off as fast.  So it's going to start bleeding more.  But if you

8    did not have that little thing, you would not bleed.  So you

9    have to have an underlying reason why you're bleeding.

10   Q.    Do you agree or disagree with Doctor Fail that said

11   Xarelto was not a cause of Mr. Boudreaux's bleed?

12   A.    Yes, I agree with Doctor Fail.

13   Q.    Okay.  Let's turn to the FDA analysis that the jury has

14   heard quite a bit about and the PT test.  Have you gone and

15   looked at the FDA analysis of Xarelto patients and their

16   Neoplastin PT test data?

17   A.    Yes.

18   Q.    All right.  Is that data available publicly on their

19   website?

20   A.    Yes.

21   Q.    Is their actual analysis, charts and graphs and things

22   that they did, is that available on their website?

23   A.    Yes.

24   Q.    Has that information been cited in peer-reviewed articles?

25   A.    Yes.

1   Q.   So last year when the FDA issued a recent statement about
2   the safe and effective use of Xarelto, was that information
3   available to the public as well as the FDA about the ROCKET PT
4   data?
5   A.   Yes.
6   Q.   And what is your understanding of the FDA's most recent
7   statement about the safe and effective use of Xarelto for AFib
8   patients?
9   A.   So the FDA has said that Xarelto -- just like they did in
10  the ROCKET AF trial, that it is as effective and as safe as
11  warfarin in treating patients with nonvalvular atrial
12  fibrillation without routine monitoring.
13  Q.   We heard from plaintiffs' expert, Doctor Leissinger, that
14  she believes a Neoplastin PT test could be helpful or would be
15  helpful to physicians like yourself to prescribe because of
16  data in an FDA analyst.
17            Are you familiar with her opinion?
18  A.   I am.
19  Q.   You read her testimony?
20  A.   I did.
21  Q.   Have you taken a look at those -- the data and the charts
22  themselves so you can explain to the jury your opinions about
23  those issues?
24  A.   I have.
25            MS. WILKINSON:   Let's start, if we could, with

1    Defense Exhibit 5792, which we'd offer into evidence.

2            **MR. DENTON:**  No objection.  It's in evidence, Beth.

3    **BY MS. WILKINSON:**

4    **Q.**   Okay.  And this is the clinical pharmacology --

5            **THE COURT:**  That will be admitted.

6            (Whereupon Defense Exhibit Number 5792 was

7            admitted into evidence.)

8    **BY MS. WILKINSON:**

9    **Q.**   -- review.  And I'm going to give you a copy, Doctor.

10           Tell the jury what DX T12, which was originally

11   marked DX 5792, what is that document?

12   **A.**   So this is a pharmacology review that is done by the FDA

13   looking at Xarelto.

14   **Q.**   And included in this analyst, are there specific charts

15   that you found informative in terms of understanding the PT

16   data for Xarelto?

17   **A.**   Yes.

18   **Q.**   What is this 3.3 figures, what is the title of that

19   section?

20   **A.**   So -- let me look here.  Give me one moment.

21           So the title of that section of the paper is "What

22   Are the Characteristics of the Pharmacodynamics, PD, Outcome

23   Relationship For Safety?"

24   **Q.**   What do you understand the FDA was looking at when they

25   were plotting the prothrombin or PT time with the percent with

1    major bleeds?

2    **A.**    So what they did on the graph on the left-hand side, the

3    one with the little red squares or dots -- can you see those?

4    **Q.**    Yeah.

5    **A.**    So what they did there is they basically -- at two points

6    in time in the ROCKET AF trial, they actually drew blood from a

7    percentage of patients, about -- I think it's around 1200

8    patients, and they took that blood and they measured the PT,

9    which is a measuring test of how fast your blood coagulates,

10   how fast it forms a clot in a test tube.  And what they did is

11   they said, "Okay.  As we take that number, let's divide that

12   number into what we call quartiles," which just means ranges,

13   so like a low range, a middle low, a middle high, and a high.

14   And then they said, "Now let's plot how many patients in each

15   of those regions had a bleed."  And that's what those red dots

16   are.

17        So at the bottom, those 10 to 30, that number, that's

18   a number of that plotting test.  It's done in seconds.  So it's

19   how many seconds does it take you to form this clot in a tube.

20   **Q.**    So, Doctor, if somebody reported their PT test were 14,

21   that's 14 seconds?

22   **A.**    Yes.

23   **Q.**    And that's what this number shows?

24   **A.**    Yes.

25   **Q.**    I'm going to cover up half the chart so you can explain.

1  We heard a little bit about this.  But it's called a logistic
2  regression.
3          And what does this show just as it's calculated here?
4  **A.**   So this is trying to show you, again, is there a
5  correlation between the fact when you measure people's blood
6  and how well they clot, is there a correlation, just looking at
7  the -- all they looked at was this test.  They looked at no
8  other characteristics of the patient.
9  **Q.**   Does that matter?
10  **A.**   It does matter.
11  **Q.**   All right.  We'll get into that.
12          You used the word "correlation"?
13  **A.**   Yes.
14  **Q.**   Can you explain to us what that means?
15  **A.**   Sorry.
16  **Q.**   That's all right.
17  **A.**   Sorry about that.  So that means that -- okay.  So that
18  means there is some -- what it means is that if you plot these
19  things out, it's not random.  It doesn't go all over the board.
20  It means that people in -- with the PT at that level, that you
21  see, without looking at any of their other characteristics,
22  that their percentage of bleeding was at -- the top one is the
23  fourth quartile, that little top box, right there.  Then that's
24  the third quartile, so the middle high.  There's middle low,
25  and there's low.

1          And then what they use is they just use a computer
2     model to draw that line for you.
3     **Q.**   Did they do another analysis and graph another chart to
4     look at some other factors?
5     **A.**   So they did.  So remember I said on this one when they
6     looked at it, all they looked at was that measurement of the
7     clotting time.
8          The problem is there are a lot of other factors that
9     play into whether or not you bleed.  And so what we often need
10    to do is we've got to take out the effect of those other facts
11    to really see if the thing we're looking at has an effect.
12         So if you want to think about it in this way, I'm
13    kind of a gardener.  Let's say that you were going to plant a
14    plant.  We live in Louisiana.  And let's say they asked
15    everyone in Louisiana who planted that plant whether that plant
16    grew well.  Right?  And everyone came back.  The majority of
17    people came back and said, nope, didn't grow well.
18         So your instinct would be to saying, oh, well, then
19    that plant doesn't grow well in Louisiana?
20         But then if you went and looked and you said, well,
21    wait a minute.  Where in their yard did everybody plant this
22    plant?  And you found out that all the people that said the
23    plant didn't grow well planted that plant in the shade and
24    everyone who said it did grow well planted that plant in the
25    sun.

1    So really being in Louisiana had nothing to do with

2  it.  Right?  It had to do with whether or not you planted the

3  plant in the sun or whether you planted the plant in the shade.

4    But you wouldn't see that if you didn't adjust for

5  where someone planted the plant if you just said if you live in

6  Louisiana, does the plant grow well there?

7    So that's why we have to correct for other things.

8  Okay?

9  Q.   Did the FDA do that in this particular case?

10 A.   Yes.

11 Q.   What did they correct for?

12 A.   So they corrected for -- they looked at all of the data,

13 and they looked at it in many different ways, which is

14 described in the appendix.

15    And what they ended up correcting for is they

16 corrected for your age, your weight, whether or not you were on

17 aspirin, and then also whether or not you had taken a medicine

18 that's called a PPI, or a proton pump inhibitor.  You may have

19 seen these.  They're like Prevacid.  They're the ones that

20 control the acid in your stomach, which can protect you from

21 getting ulcers in your stomach.

22    So those four variables they looked at, and they

23 basically said, "Well, wait.  Let's pull out how those affect

24 the results and then look at the measurement of this clotting

25 time."

1  **Q.**   And how did that change the analysis in terms of being

2  able to say anything about the relationship between PT time for

3  Xarelto users and the percentage or the risk of bleeding?

4  **A.**   So that one is the one that's called the Cox regression

5  analysis, and it looks at the probability of major bleed within

6  the first year.

7          And what you can see -- and I was always a little

8  bummed by this, because they put this one 0 to 6 and this one 0

9  to 10.  But as you can see, this is the line that they got

10 taking out all of those other factors that affect whether or

11 not you bleed.

12         And if you look at the difference, this starts at a

13 little bit, you know, above 2.  My hand is shaking a little.

14 And if you notice, it goes up to this level, which may be

15 around 8.  Right?

16         But if you look at this one, it starts a little above

17 2, and it really goes up to only a little above 3, because as

18 you notice, this one also goes 10 to 36.  This one only goes 10

19 to 30.  So you just kind of want to go right out to there.  So

20 it didn't 100 percent get rid of any, you know, correlation.

21 Right?

22         The plant, even if you plant it in the sun, didn't

23 grow as well in Louisiana as maybe it did in California.

24 Right?  But it got rid of a large majority of the risk,

25 because, really, it's those other things that play a very large

1  role in why people bleed.

2  Q.   Let's switch over to the slides, if we could.  Did you

3  then try and -- so we could look at it, make the graphs --

4  we'll start here, similar.  In other words, you said down here

5  on the left the -- the original analysis went from 10 to 30.

6  Right?  On the bottom?

7  A.   Yes.

8  Q.   And the other goes 10 to 36?

9  A.   Yeah.

10  Q.   And on the other side, on Graph A, 0 to 10 --

11  A.   10.

12  Q.   -- and 0 to 6; right?

13  A.   Yeah.

14  Q.   So if I take my eye and I try and compare those, am I

15  really going to be able to say which one is the slopes and be

16  able to compare them directly?

17  A.   They kind of look a little similar looking at them this

18  way, not completely, but they look about the same amounts.

19  Q.   All right.  And did you have them put on similar graphs so

20  you could show the difference?

21  A.   I did.

22  Q.   Let's turn to the next slide, please.  Now tell the jury

23  what they're seeing there.

24  A.   So now I took it and I put it from 0 to 10 so it matched

25  this side and 10 to 30 so it matched down there.  And I think

1    now you can see that if you take out the other factors that
2    affect why people bleed, you can see that that line, not flat,
3    but is much closer to being flat than that line is, which
4    includes -- which doesn't take out all the factors, all the
5    other characteristics of why people bleed.
6    Q.   When you look at that regression, taking out all those
7    factors that you think are important, what does that tell you
8    about the utility of a PT test to predict the risk of bleeding
9    in a particular patient?
10   A.   So the way I use this, the way I think about it is it is
11   more important for me to know what someone's age is, what their
12   weight is, whether or not they're on aspirin, and whether or
13   not they're taking that medicine that protects you from ulcers
14   to know whether they're going to bleed than what their PT
15   measurement is.  Those other things actually tell me more than
16   what the PT tells me.
17   Q.   Were these graphs available to Doctor Leissinger in the
18   materials --
19   A.   Yes.
20   Q.   -- the FDA materials?
21   A.   (Nodding.)
22   Q.   All right.  I'm going to ask you some specific questions
23   based on this information and Doctor Leissinger's testimony.
24        You saw that she said, based on this information, the
25   Neoplastin PT test should be in the Xarelto label; correct?

1  **A.**   Yes.

2  **Q.**   Do you agree or disagree with that?

3  **A.**   I disagree with that.

4  **Q.**   She said that it could provide useful or helpful

5  information to doctors for individual patients.

6          Do you agree or disagree with that?

7  **A.**   I don't agree with that.

8  **Q.**   All right.  In your opinion, did Doctor Leissinger provide

9  any specific information that you, as a prescribing physician,

10  would need to make the test helpful for your treatment of an

11  individual patient?

12  **A.**   NO.  I -- I do not use this test in order to dose any form

13  of anticoagulant other than Coumadin.

14  **Q.**   Have you seen any information in Doctor Leissinger's

15  report or her testimony that suggests how you would actually

16  use this with a particular patient?

17  **A.**   NO.

18  **Q.**   Did she give you any cutoff levels for example?

19  **A.**   NO.

20  **Q.**   So tell the jury what you mean.  I mean, if someone came

21  in and they had a PT score of 12 and another one had a 20, did

22  Doctor Leissinger tell you which one of those patients you

23  should take off Xarelto?

24  **A.**   NO.

25  **Q.**   Do you have any idea what -- if there's any significance

1   to those particular numbers?

2   A.    No.   Because if you think about it, the person at 12 may

3   be older, heavier, on aspirin, and not taking something to

4   protect them from an ulcer.   All things that increase your risk

5   of bleeding.

6          And the person that has the PT level around 16 or 18

7   may be younger, may not be on aspirin, may have a lower BMI or

8   lower weight, and may be on an ulcer-protective medicine.   So

9   their risk goes down.

10          So this test actually doesn't help me with helping a

11  patient let them know what I think their risk factor is for a

12  bleeding.

13  Q.    Did Doctor Leissinger suggest when you should administer

14  this PT test for a Xarelto patient so that the test would be

15  useful or helpful?

16  A.    No.

17  Q.    Would it matter when you administer the test?

18  A.    Yes, it would matter a great deal.

19  Q.    Why?

20  A.    So the reason this test is so useful in patients on

21  Coumadin is because the effect of Coumadin lasts for days.

22  Okay?   So if I test you, let's say you take -- you've been

23  taking Coumadin and let's say you come in and we need to do a

24  procedure.   And I test you on day 1, and I get an INR.   I do

25  nothing to you.   I don't give you vitamin K.   I don't give you

1    anything to reverse the warfarin.  I do nothing.  I just let
2    your body work on its own.
3            In 24 hours I take it again.  It's going to be the
4    very same thing because Coumadin's effects last for days, lasts
5    for about three days.  So it doesn't matter to us as much when
6    we test it because there's not that much difference over the
7    course of 12 hours, 24 hours.
8            But unfortunately as I'm sure you have seen, these
9    novel oral anticoagulants start -- they peak around two to four
10   hours.  That's when you have your highest level.  And then over
11   the next 24 hours they start going down.  So this test, you
12   have to know where you are on that curve.
13           And then in addition to that, you have to -- like the
14   test almost takes -- I mean, I hate to say in most hospitals
15   this test takes about an hour to come back.  Sometimes it can
16   take longer.
17           So by the time you get the test back, it's not even
18   the level it is now because now another hour or two hours has
19   gone by.  So it's not a great test to use in a drug that is
20   gotten out of your body quicker than something like warfarin.
21   Q.   In your opinion, if you relied on a Neoplastin PT test
22   with a new Xarelto patient, could it provide misleading
23   information to a physician?
24   A.   Yes.
25   Q.   How?

A.    So one of the things that's been well-established is that
as you get lower doses of Xarelto in your system, meaning a
lower concentration of your drug, the PT test is -- does not
correlate.

So what that means is you could have a 100 percent
normal measurement and you still have active drug in your
system.  The test cannot help you with that.

So that means if you're trying to say, oh, you know,
I don't remember the last time I took the drug.  So I think
okay.  Let me check the PT.  So I check the PT and it's normal.
And I say, "Oh, you're fine to go to surgery," and you go to
surgery and the surgeon is calling me going, "This person is
bleeding all over the place" and I'm like -- because this does
not reflect concentrations when you're at the lower end of the
scale.  So you can't use this test in that way.  So you could
maybe hurt someone if you went off of that.

Q.    Do you use this Neoplastin PT test with any of your
Xarelto patients?

A.    No.

Q.    Are you aware of any cardiologist who uses this
Neoplastin PT test with Xarelto patients?

A.    Not in my group, no, not in Tulane.

Q.    Are you aware of any specific medical literature that
recommends using this test, Neoplastin PT test, upon initiation
of Xarelto with that patient?

A.    There's nothing that has given any proof that it is
medically useful to use this test on initiation of Xarelto.

Q.    Let's turn to Mr. Boudreaux's record.  We do know that a
PT test was performed on him.  And tell us why that might be.

A.    So oftentimes when a patient -- remember when he came in,
we knew AFib, but we were still looking at heart attack and
everything when he first presented.  And I'm sure an emergency
room physician will tell you when patients come in -- and they
come in under higher degrees of we're worried, so heart
attacks -- we will send off all labs.  Right?  You just draw
blood, you're drawing it quickly, you send off all blood tests.
You just send them off.

        But most importantly for our patients is when you
have a heart attack, we are going to be giving you not these
type of oral anticoagulants; we're going to be giving you other
medicines to decrease the clotting of your blood inside the
arteries that feed your heart.  Okay?  So we want to know, do
you have any baseline conditions that could make giving those
medicines to you risky?

        So other things affect the PT.  And, I mean, I think
Doctor Leissinger even said, you know, there are genetic
conditions.  So people that just -- they don't produce
genetically; they don't produce certain of those proteins
needed for clotting.  There are people that have bad liver
disease.  And so they also do not produce the clotting factors.

1245

1    And we need to know that at baseline before we rush them to,

2    like, the cath lab or, in fact, before we give them an oral

3    anticoagulant.

4    Q.   Was Mr. Boudreaux given a PT test again when he came to

5    the hospital and had his GI bleed?

6    A.   He was.

7         MS. WILKINSON:   All right.   Let's take a look at that

8    medical record, which is JB257, which we offer into evidence.

9         MR. DENTON:   No objection.   I'm sorry.

10         THE COURT:   That will be admitted.

11         (Whereupon Defense Exhibit Number JB257 was

12         admitted into evidence.)

13   BY MS. WILKINSON:

14   Q.   What's the date of this record?

15   A.   It's February 3rd, 2014.

16   Q.   What does the PT time show?

17   A.   So the PT, or prothrombin time, is 13.6 seconds.   And

18   what's always nice in the labs is they give you their reference

19   range, that means what's normal for their test because it

20   varies from reagent to reagent.   So it varies in the way you do

21   the test from hospital to hospital.   So their normal is 9 to

22   12.5.

23   Q.   Does the reagent matter when you're doing a PT test?

24   A.   It does.

25   Q.   Why?

1    A.   So if you take -- for example, if you took my blood and

2    you put if into five different test tubes with five different

3    reagents -- reagents are the things that kick off the

4    coagulation to start when you put my blood in the test tube --

5    you will get five different numbers of PT from those five

6    different forms of reagent.  So knowing which reagent you're

7    using is important.

8    Q.   Did you review Doctor Leissinger's report and see whether

9    she identified what type of reagent was used for the PT test

10   for Mr. Boudreaux on February 3rd, 2014?

11   A.   Yes.

12   Q.   What reagent did she say was used?

13   A.   I'm pretty sure she said it was Innovin reagent.

14   Q.   Is Innovin the reagent that was used in the ROCKET data

15   and in the FDA analysis?

16   A.   No, it wasn't.

17   Q.   What was the reagent that was used there?

18   A.   They used a reagent called Neoplastin.

19   Q.   So even if you believe the Neoplastin PT told you

20   something, could you apply that to a PT test that was done with

21   a different reagent?

22   A.   No.

23   Q.   Why?

24   A.   Because as I said, it's a-- you're going to get different

25   numbers with the different reagents.  So if you've done

1247

1  something to look at the PT measured from this reagent, those
2  numbers do not correlate to the numbers you would get with a
3  different reagent.  So that's difficult to do.  And there's
4  been trials that have shown this.
5  Q.   All right.  Let's -- let's talk about that one right now.
6       There's an article that you've reviewed and relied on
7  by Doctor Testa that was published in 2016, just last year, in
8  the *Journal of Thrombosis and Haemotosis*?
9  A.   Haemostasis.
10 Q.   Haemostasis.  Sorry.
11 A.   That's okay.
12 Q.   Do you recognize that article, Doctor?
13 A.   I do.
14 Q.   Yeah.  Tell us the name of that article.
15 A.   So this one is called "Poor Comparability of Coagulation
16 Screening Test with Specific Measurement in Patients Receiving
17 Direct Oral Anticoagulants:  Results From a
18 Multicenter/Multiplatform Study."
19 Q.   Here we go.  We have it up on the screen.  And it says
20 there the journal name?
21 A.   The journal is the *Journal of Thrombosis and Haemostasis*.
22 Q.   And the publication time period?
23 A.   They'll show you where it was received, January 25th,
24 2016, and then the publication date is -- yeah, that's their
25 final decision that they were going to publish it.

1   Q.   All right.  And what does this article tell you about
2   whether you can use a Neoplastin PT test to predict whether an
3   individual patient has a higher bleeding risk on Xarelto?
4   A.   And it showed you that you cannot use PT -- or another
5   test is called PTT -- to evaluate the activity, the clotting,
6   of a novel oral anticoagulant or its resulting effects.
7   Q.   Does that mean, Doctor, that there's no correlation
8   between rivaroxaban or Xarelto and the PT test?
9   A.   No, that's not what it means.
10  Q.   So help us understand that.  How is it that you can't use
11  it to predict it but there is a correlation or an association?
12  A.   So I think if you go to page -- it's page 2198.  It's the
13  page with the plots.
14          So if you just want to show the bottom too, it's
15  fine.
16  Q.   Do you want me to make that a little smaller?
17  A.   Yeah, whatever is easier.
18  Q.   I'll let Dean.  He's better at it than I am.
19          THE CASE MANAGER:  You want to zoom out or in?
20          MS. WILKINSON:  Yeah, out.  Oh, in.  Yeah.  Sorry.
21          THE WITNESS:  That's good.
22  BY MS. WILKINSON:
23  Q.   Is that good?
24  A.   And I would can show the bottom, too, just so it's easier.
25  I'll move it as you talk.

1             Okay.  So what they did in this study -- was
2    actually performed in Italy -- was they took patients that were
3    on novel oral anticoagulants and they had their blood tested at
4    different times at laboratories.  And the laboratories actually
5    did use different reagents, which is very common throughout the
6    world.  And what they did is they plotted on the side here.
7    That's your concentration of Xarelto in your -- in people's
8    bloodstream.  This was done in people.
9             So they drew people's blood on Xarelto.  They also
10   did for Eliquis and Pradaxa.  And they said, okay, if we drew
11   your blood, we measured how much of Xarelto was in your
12   bloodstream.  Then we took those people and they measured what
13   their prothrombin time is, so what their PT is.  So there's two
14   ways to look at this.
15            So you can look at someone which has the highest
16   amount of Xarelto in their bloodstream.  Right?  The top is --
17   that they have a high concentration of Xarelto in their
18   bloodstream.  And if you look, you can see that those people
19   had anywhere from -- from a PT ratio of about 1.5, 1.7, all the
20   way up to 3.5.
21   Q.   Why does that matter?
22   A.   So why that matters is because I don't know if I draw --
23   so let's say I draw your blood.  The way I personally measure
24   concentration is done through different ways, but the
25   scientific way is called mass spectrometry, which you do not

1    have it at most hospitals.  It is usually just at small -- at

2    research centers or -- like, you'll see it in crime shows.

3    Right?  They want to look and see what materials are in, you

4    know -- oh, I got this sample.  Tell me what materials are in

5    it.  Like they show it on *Bones* all the time.  Okay.  I'm

6    putting it in the mass spec.  It'll come up, and I can see this

7    is in it and this is in it.  So that's what mass spec does.

8              So if that's available to me, if I use the

9    prothrombin time and I say, okay, let's say you have a

10   prothrombin time of 1.7 -- I'm so sorry my hand is shaking --

11   that means that you could have anywhere from this

12   concentration, which is very low, all the way up to the highest

13   concentration of Xarelto in your system.

14   Q.   Doctor, can we just use those numbers?  So you could have

15   it down in the --

16   A.   So you could have it all the way down to like 71 to 90,

17   almost down to 51 to 70.  But I would say 71 to 90.  And then

18   it could take you all the way up to greater than 350.

19   Q.   So, in other words, if I told you -- I was the lab

20   technician and I told you your patient has a PT score of 1.5,

21   what does this chart tell you about how much Xarelto is in

22   their system?

23   A.   It could be anywhere in between.  If you go 1.5, 170 down

24   all the way to -- you could almost have none in your system,

25   and you could have a PT at that level.

1           And, Beth, if you could for one second, if you go

2    down -- I -- you may not care, but I care about this because

3    this one is the Neoplastin one.

4    **Q.**    Meaning C?

5    **A.**    No.  B.

6    **Q.**    B.  Sorry.

7    **A.**    B is Neoplastin.  Okay?  C is a different reagent.  So if

8    you can see on Plot C, do you see how in at least Plot B, it

9    sorts of looks like you could draw a line through that?  That's

10   what we mean by a correlation.  That's all we mean, is that if

11   you take all of that, you could put an average line kind of in

12   the middle, but it doesn't tell you anything about a single

13   patient; right?

14           But if you look at a different reagent, it's much

15   harder to draw a single line through all of that.  So that's

16   why we often say that the other reagents do not have as good of

17   a correlation as Neoplastin does.

18           But, you know, but you can still see that for a

19   single patient, it could still give you a very large range of

20   how much drug you have in your system.

21   **Q.**    All right.  Let's go over after the authors show these

22   charts.  What do they say about the present study?

23   **A.**    So they said the present study carried out on a large

24   number of patients confirmed the poor concordance -- that means

25   how well something one-to-one relates to it -- between a --

1    DOAC is another word for novel -- it's a direct or novel oral

2    anticoagulant -- plasma concentrations and the PT prothrombin

3    test or an -- that's another test they looked at, another

4    plotting test -- highlighting that a normal test result is not

5    always associated with the absence or minimal residual

6    concentration of the drugs.

7    Q.   And then what do they say about whether this is a useful

8    test or a harmful test at this point?

9    A.   So their feeling on doing this study was -- they say,

10   "This aspect represents a clinical problem" -- so a problem for

11   doctors -- "because of the risk of misinterpretation, which may

12   endanger patients."

13            Because we may say you have a normal PT, you're free

14   and clear of Xarelto, and that's just not true.  So that's why

15   it can be a danger to misrepresent what the relationship is.

16   Q.   Do they give an example similar to the one that you gave

17   the jury about you could be wrong about putting a patient into

18   surgery because they might be on an anticoagulant and they

19   could --

20   A.   Yeah.

21   Q.   -- bleed?

22   A.   Yeah.  They gave two examples.  They gave one.  They said,

23   as an example, a patient presents with a normal test, could be

24   wrongly, erroneously considered to be safe for surgery.  That's

25   the one I talked about.

1253

1    And then they gave the contrasting one, which is that
2  surgery, a necessary surgery, could be postponed or
3  contraindication in a patient showing a prolonged PT, when, if
4  we look at this, you can see that patients that have almost no
5  drug in their system can have a prolonged PT.  So it works in
6  both ways.
7  **Q.**  Is this the only article that you've come across that says
8  that doing this type of PT test could be misinterpreted or
9  harmful to patients?
10  **A.**  No.
11  **Q.**  I believe we already talked about this with the jury, but
12  generally, the Eikelboom journal article that came out more
13  recently, does that come to a similar conclusion?
14  **A.**  It does.
15  **Q.**  In the Xarelto label, is there a mention of the PT test?
16  **A.**  Yes.
17  **Q.**  And are you familiar with that section of the label?
18  **A.**  Yes.
19  **Q.**  Let's take a look at Slide Number 34, if we could,
20  Section 12.2 of the label.  What's this titled?
21  **A.**  It's called pharmacodynamics or, as we've abbreviated
22  before, PD.
23  **Q.**  Okay.  Let me read this, and then maybe you can explain to
24  us what this says.
25    "Dose-dependent inhibition of Factor Xa activity was

1   observed in humans and the neoplastic prothrombin time" --
2   let's stop there.
3           What does that mean to you as a physician?
4   A.   So just exactly what that chart showed you was that on
5   average -- not per individual, on average -- if you had a
6   higher concentration of Xarelto in your system, on average your
7   PT was higher.
8           Remember that line?  So it does mean that.  That's
9   exactly what it means.
10  Q.   So did the companies tell physicians in the label what
11  they believed about the Neoplastin PT test and what it showed?
12  A.   Yes.
13  Q.   Go on to the next sentence.  It says, "The activated
14  partial thromboplastin time, aPTT, and HepTest, are prolonged
15  dose-dependently."
16          What does that mean?
17  A.   So those are two other clotting tests that we can do, and
18  it's saying really the same thing for those, that if we show
19  you the research on that, they also have that same kind of, you
20  know, look where it gets higher as you have a higher
21  concentration on average.
22  Q.   "Finally, anti-Factor Xa activity is also influenced by
23  rivaroxaban."
24          What does that mean?
25  A.   So Factor Xa is the protein that rivaroxaban and Eliquis

1   and Savaysa blocks in the formation of a clot.  So it's saying

2   that the activity of that protein is influenced by the drug, as

3   you would think that's how the drug works.

4   **Q.**   Doctor, in your expert opinion, does the Xarelto label

5   accurately reflect what is known about the Neoplastin PT test?

6   **A.**   Yes.

7   **Q.**   In your opinion, would it be appropriate to include a

8   recommendation to doctors to use a PT thrombo-- excuse me -- a

9   Neoplastin PT test to try to determine the risk for a

10  particular patient?

11  **A.**   No, it should not be used.

12  **Q.**   Now, did you take a look at Doctor Leissinger's testimony

13  where she said the 13.6 PT test used with Innovin was useful

14  information for Mr. Boudreaux and his treatment?

15  **A.**   I did see that.

16  **Q.**   Did you see Doctor Wong's testimony where he said he did

17  not believe it was useful?

18  **A.**   I did see that.

19  **Q.**   Who do you agree with?

20  **A.**   I agree with Doctor Wong.

21  **Q.**   All right.  Did you go back and take a look at some of the

22  ROCKET data to see if the calculation Doctor Leissinger told

23  the jury about, how you could -- I don't even know what you

24  call it -- look back and determine the concentration, did you

25  try to see if that could be done even if you believed the PT

1  test with Innovin was appropriate?

2  **A.**   Yes.

3  **Q.**   Okay.  Let's take a look at DX 5264, and tell -- this one

4  says, "ROCKET Definition of Trough."  So we're getting into

5  some detail.

6          So if you could just help us understand first, before

7  we go into -- why is it that you went to this definition to

8  determine whether Doctor Leissinger's analysis of the 13.6 was

9  correct?

10 **A.**   So if you remember, we talked about it's really important

11 when, from your last dose, we know that you took -- we took

12 that PT test.  Because your dose is continually being taken out

13 of your system over the course of hours.

14         So for me, if I'm going to look at something, I want

15 to know -- if it says, okay, here are the PT times used to

16 figure this out, my first question is going to be, "when were

17 they taken?"  That's that we need to know.

18         That tells us how long after the dose you are so we

19 have an idea, oh, my gosh, are you looking at peak, when you

20 have the highest dose, or what we call the trough, when you

21 have your lower concentration in your bloodstream?

22 **Q.**   Did the folks at the companies who did the ROCKET trial,

23 did they define specifically when they were taking these

24 measurements and whether it was trough or peak?

25 **A.**   They did.

1  Q.    Is that important?

2  A.    Yes.

3  Q.    And Doctor Leissinger said that Mr. Boudreaux's PT score

4  of 13.6 was taken approximately 36 hours after his last dose.

5           Did you see that testimony?

6  A.    I did.

7  Q.    And that would tell her that she was dealing with someone

8  who had Xarelto still circulating in their blood.

9           Do you believe, based on that PT test, that you could

10  come to that conclusion?

11  A.    So I would say that based off of that PT test at 36 hours,

12  that you could say that the patient -- you know, if we go back

13  to the test, that article I showed you, that most likely this

14  is someone who's taking their Xarelto, they have some Xarelto

15  in their system.

16  Q.    Could you go further and suggest that Mr. Boudreaux was at

17  a higher risk than other patients, based on that PT score and

18  that concentration?

19  A.    No.

20  Q.    And did you plot that out for us using the ROCKET data and

21  the FDA analysis?

22  A.    I did.

23  Q.    All right.  Let's take a look at the next chart, please.

24  So let's start with just telling the jury what this table is.

25  It says, "Table 583:  Rate of Major Bleeding by PT Quartile."

1        What is that?

2  A.   We've actually kind of looked at this before, except you

3  saw it at the line and kind of the blue area around it, so it's

4  taking that measurement, divide it into, you know, low, medium

5  low, medium high, and high, and it's telling you, if you plot

6  it out without adjustment -- this is unadjusted again, without

7  taking out those other facts, you know, other things that can

8  cause you to bleed -- that these people, if you were --

9  depending on which level you were at, how many of those people

10 bled in the ROCKET AF trial.

11 Q.   So this is the top quartile down to the bottom quartile?

12 A.   Yes.

13 Q.   And, again, I know you don't believe that you can predict

14 using this Innovin PT test or even the Neoplastin, but if you

15 follow Doctor Leissinger's analysis, where did it put

16 Mr. Boudreaux on this correlation line or this, you know,

17 rate-of-bleeding risk line?

18 A.   Right.  So as it says this was based off of measurements

19 taken from 16 to 32 hours.  So we're looking at patients that

20 have taken their last dose of drugs 16 to 32 hours before.

21        Now, most of us, and me included -- I mean, I can't

22 even remember where I parked in a garage half the time -- can't

23 always remember the exact time we take a dose.  So, you know, I

24 always give my patients a couple of hours here or there.  We

25 all take it a little different.

1           So he -- you know, the best we can calculate is that

2   Mr. Boudreaux's was about 36 hours after.  So if you just take

3   that 36 hours one and you plot it on this plot, this graph, we

4   put it down, it would be in that lowest of quartiles.  It's

5   almost right on the border, because 14 was the border between

6   low PT measurement and the low normal.  So he's right at the

7   border.  And that's where, per the ROCKET AF trial, without

8   correcting for other conditions, his -- he falls in risk of

9   bleeding.

10  Q.   Again, this is based on, from what we can tell from Doctor

11  Leissinger's testimony, Innovin as the reagent instead of

12  Neoplastin; right?

13  A.   Right.  There's a lot that was actually done with the

14  Neoplastin reagent, so we really shouldn't be comparing apples

15  and oranges, but we put it on there as an example.

16  Q.   Have you ever reviewed the Neoplastin PT label to see what

17  it is designed for and indicated for?

18  A.   Yes.

19          MS. WILKINSON:  Okay.  Let's take a look at that, if

20  we could.  It's DX 49.  I'd like to offer that into evidence.

21          MR. DENTON:  No objection, Your Honor.

22          THE COURT:  That will be admitted.

23          (Whereupon Defense Exhibit Number 49 was

24          admitted into evidence.)

25  BY MS. WILKINSON:

1  **Q.**   All right.  The label print is quite small; right?

2  **A.**   Yes.

3  **Q.**   You asked us to blow it up.  And walk us through here the

4  summary and explanation, what it says to you as a physician,

5  that the Neoplastin PT test should be used for?

6  **A.**   So, as we stated it -- I'm sure Doctor Leissinger stated

7  very well as well -- that it's used for the ones that are

8  congenital or acquired.  Those are the ones you're born with,

9  those are genetic conditions, so you don't produce those

10  factors.

11          There's the next one saying if your liver doesn't

12  work as well, it can help us with that.

13          And then the third one is treatment with a vitamin K

14  antagonist.  That's Coumadin.  That's warfarin.

15          And then the next one, of course, vitamin deficiency

16  because some people don't actually eat enough vitamin K and

17  they can have poor clotting because of that.

18          And then the last two are -- so fibrinolysis is

19  another type of medicine we give to people to break up a clot.

20  You already have the clot, and we give it to you, and it forces

21  the clot apart.

22          And then DIC is disseminated coagulopathy.  So it's

23  actually a state where your coagulation is going completely out

24  of whack, and it's usually in extremely ill patients, usually

25  patients who are having an overwhelming infection that ends up

 1   with the disease called DIC.

 2          So those are the things the PT test -- the Neoplastin

 3   PT test is used to measure.

 4   Q.   Does the label tell you specifically what the PT test is

 5   used for in a monitoring context?

 6   A.   Yes.

 7   Q.   What does it say?

 8   A.   So the PT test, which is the basis for what you might have

 9   heard is called the INR, is used for monitoring vitamin K

10   antagonist therapy.  So that's your Coumadin therapy.  It is

11   the standard of how we measure Coumadin.

12   Q.   You can take that down.  Thank you.

13          Doctor Johnson, I just want to finish up with a few

14   questions, if I could.

15          You told us that you had never testified as an expert

16   in a case before today; is that right?

17   A.   That's correct.

18   Q.   Why are you here today?

19   A.   It is -- for me, it is very hard to have a patient come in

20   to see me who has atrial fibrillation, who says that they're

21   not going to take a recommended therapy -- and I don't mean

22   Xarelto; I mean any systemic oral anticoagulant -- because

23   they've seen a commercial on TV.

24   Q.   Doctor -- Doctor, can I stop you there?

25   A.   Oh, yes.

1262

1  Q.   Let's talk specifically about the drug, if we could.

2  A.   Sure.  So --

3  Q.   Is -- is there a problem if someone goes off the drug?

4           MR. MEUNIER:  May we approach the bench, Your Honor?

5           THE COURT:  Okay.

6           (Whereupon the following proceedings were held at the

7           bench out of the hearing of the jury:)

8           MR. MEUNIER:  Your Honor, I would submit that that

9  testimony was one that was intended in response to the

10 question, but the testimony needs to be disregarded by the

11 jury; that she's seen patients that come in and say they don't

12 want Xarelto because of lawyer advertising.

13          THE COURT:  She didn't say Xarelto.  She said

14 something I saw on TV.

15          MS. WILKINSON:  And I tried to stop her.  I'll --

16 I'll move on to the next point so we don't even have to go back

17 over that.

18          MR. MEUNIER:  We'd just ask the Court to --

19          THE COURT:  I can tell them.

20          MR. MEUNIER:  -- tell the jury to disregard it.

21          THE COURT:  I can tell them to do that.

22          MS. WILKINSON:  Sure.

23          (Whereupon the following proceedings were held in

24          open court in the presence and hearing of the jury:)

25          THE COURT:  Okay.  Members of the jury, just -- so

1263

1    that -- disregard any comment about TV.  That's not an issue

2    here.  Okay?

3    **BY MS. WILKINSON:**

4    **Q.**   Doctor Johnson, that's okay.  We just want to talk about

5    you and your patients.  Okay?

6              So is there a concern if patients go off their

7    medication like Xarelto or another anticoagulant?

8    **A.**   Yes.

9    **Q.**   What is the concern?

10   **A.**   So in -- in the past, and I -- I like to use patient

11   examples, because it makes it very real to me.  I've had

12   patients that have gone off their anticoagulant and then

13   suffered a disabling stroke.

14   **Q.**   Now, would you want to know, as a prescribing physician,

15   if there was a test that you could do with a Xarelto patient

16   that would show you whether that person, that particular

17   person, was at a higher risk of bleeding?

18   **A.**   Yes.

19   **Q.**   You've read all these materials.  You've read all this --

20   you've heard all this testimony or read all this testimony.

21             Do you believe, in your expert opinion, that the

22   Neoplastin PT test that plaintiffs have described for the jury

23   is an appropriate and useful test for physicians to prescribe

24   Xarelto for AFib?

25   **A.**   I do not feel like the Neoplastin PT test is useful for

1  physicians prescribing Xarelto.

2  **Q.**   Do you use it in your own practice?

3  **A.**   I do not.

4  **Q.**   Did you see where Doctor Leissinger used it in her own

5  practice?

6  **A.**   She did not say so, no.

7  **Q.**   And from all the testimony that you read, is there

8  anything that has caused you to change your opinion that the

9  Neoplastin PT test is not a helpful test for prescribers who

10  are treating patients with AFib?

11  **A.**   So say that one more time.

12  **Q.**   Is there anything that you've heard or read, came out

13  through the plaintiffs' case or their experts, that causes you

14  to change your opinion about the PT test?

15  **A.**   No, there has not been.

16  **Q.**   Finally, then, in your opinion, should the Neoplastin PT

17  test be included in the Xarelto label?

18  **A.**   Not beyond what is already stated in the label.

19              **MS. WILKINSON:**  Thank you very much, Doctor.

20              **THE COURT:**  Okay.  Let's stop here.  We'll come back

21  at 1:15.  Court will stand in recess until then.

22              **THE CASE MANAGER:**  All rise.

23              (Whereupon the jury was excused from the courtroom.)

24                              **(Lunch Recess.)**

25

1  **CERTIFICATE**

2          I, Tana J. Hess, CCR, FCRR, Official Court Reporter

3  for the United States District Court, Eastern District of

4  Louisiana, certify that the foregoing is a true and correct

5  transcript, to the best of my ability and understanding, from

6  the record of proceedings in the above-entitled matter.

7

8

9  _____

10          Tana J. Hess, CCR, FCRR, RMR
          Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25