1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  XARELTO                    *
     (RIVAROXABAN) PRODUCTS             *
6    LIABILITY LITIGATION               *
                                        *
7    THIS DOCUMENT RELATES TO:          *   Docket No.: 14-MD-2592
                                        *   Section "L"
8    Joseph J. Boudreaux, Jr.           *   New Orleans, Louisiana
     v. Janssen Research &              *   May 2, 2017
9    Development, et. al.,              *
     Case No.: 14-CV-2720               *
10   * * * * * * * * * * * * * * * *

11             DAY 7, MORNING SESSION
       TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
12        BEFORE THE HONORABLE ELDON E. FALLON
             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15
     For the Plaintiffs':
16   Liaison Counsel:              Levin Papantonio
                                   BY:  BRIAN H. BARR, ESQ.
17                                 316 South Baylen Street, Suite 600
                                   Pensacola, Florida  32502
18

19                                 Beasley Allen
                                   BY:  ANDY BIRCHFIELD, ESQ.
20                                 P.O. Box 4160
                                   Montgomery, Alabama 36103
21

22                                 Gainsburg Benjamin David
                                     Meunier & Warshauer
23                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
24                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163
25

OFFICIAL TRANSCRIPT

```
 1   APPEARANCES:

 2                              Schlichter Bogard & Denton, LLP
                                BY:  ROGER DENTON, ESQ.
 3                              100 South Fourth Street
                                St. Louis, Missouri 63102
 4

 5                              The Lambert Firm
                                BY:  EMILY JEFFCOTT, ESQ.
 6                              701 Magazine Street
                                New Orleans, Louisiana 70130
 7

 8   For the Defendant Bayer
     HealthCare Pharmaceuticals
 9   Inc. and Bayer Pharma AG:  Wilkinson Walsh & Eskovitz, LLP
                                BY:  BETH A. WILKINSON, ESQ.
10                              1900 M Street NW, Suite 800
                                Washington, DC 20036
11

12                              Nelson Mullins Riley &
                                  Scarborough, LLP
13                              BY:  DAVID E. DUKES, ESQ.
                                Meridian, 17th Floor
14                              1320 Main Street
                                Columbia, South Carolina 29201
15

16   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
17   Development, LLC:          Barrasso Usdin Kupperman Freeman &
                                  Sarver, LLC
18                              BY:  RICHARD E. SARVER, ESQ.
                                909 Poydras Street, 24th Floor
19                              New Orleans, Louisiana 70112

20
     Official Court Reporter:   Tana Hess, RMR, FCRR
21                              500 Poydras Street
                                Room B275
22                              New Orleans, Louisiana 70130
                                (504) 589-7780
23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.
```

OFFICIAL TRANSCRIPT

1    **INDEX OF WITNESSES**

2    <u>NAME</u>                                                    <u>PAGE</u>

3    Veronica Theriot

4         Direct Examination by Ms. Wilkinson            1470

5         Cross-Examination by Mr. Birchfield            1504

6    **INDEX OF EXHIBITS**

7                                                      <u>IDENTIFIED</u>

8    Defense Exhibit Number JB18                        1483

9    Defense Exhibit Number JB153                       1490

10

11   Plaintiff's Exhibit Number 114                     1514

12   Plaintiffs' Exhibit Number 5768112                 1492

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

<u>PROCEEDINGS</u>

9:53AM   (Whereupon the jury entered the courtroom.)

9:54AM   **(Open court.)**

9:54AM   **THE COURT:**  Be seated, please.  Good morning, ladies
9:54AM   and gentlemen.

9:54AM          Members of the jury, let me give you some idea
9:55AM   about the scheduling.  I understand we have one witness today.
9:55AM   Is that correct?

9:55AM          **MS. WILKINSON:**  Yes, our final witness, Your Honor.

9:55AM          **THE COURT:**  And no rebuttal?

9:55AM          **MR. BIRCHFIELD:**  Right.

9:55AM          **THE COURT:**  Okay.  So we'll finish early today, and
9:55AM   I'll discharge you.  I'll be meeting with the lawyers because
9:55AM   we have something called the jury charge, as I mentioned to
9:55AM   you.  They give me proposed charges of law, and I look them
9:55AM   over and go back and forth, and then I get what I believe is my
9:55AM   final charge and I let them know it, and then -- and then we
9:55AM   proceed with summation.

9:55AM          Rather than try to get summation in today --
9:55AM   we'd have to keep you overnight and that sort of thing -- I
9:55AM   think it's easier to do it tomorrow.  So I'll work with them
9:55AM   through the afternoon and night, if necessary, and get a final
9:55AM   charge together for you.  And then they will then deliver
9:55AM   summation in the morning at 9:00.

9:55AM          It's important that we start at 9:00, so I can

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 9:56AM | 1 |
| 9:56AM | 2 |
| 9:56AM | 3 |
| 9:56AM | 4 |
| 9:56AM | 5 |
| 9:56AM | 6 |

9:56AM 1    get to you -- get it all to you by lunchtime.  We'll provide

9:56AM 2    lunch for tomorrow, so Dean will give you menus to pick from.

9:56AM 3    And we'll try to schedule it so that the lawyers will make

9:56AM 4    their closing arguments, then I'll deliver the charge to you,

9:56AM 5    and then we'll take a break for lunch and then you'll have it,

9:56AM 6    you'll have the case.  So that's -- that's the plan.

9:56AM 7              With the cooperation of the lawyers, and

9:56AM 8    primarily because of them, we're able to get the case to you

9:56AM 9    sooner than was -- I expected.  I told you it may take three

9:56AM 10   weeks in this case.  We haven't taken two because they very

9:56AM 11   efficiently put it in.  So we're ahead of schedule.  So we'll

9:56AM 12   get you to Jazz Fest maybe this weekend.

9:56AM 13             Okay.  Let's call your next witness, please.

9:56AM 14        MS. WILKINSON:  Yes, Your Honor.  We'd call Nurse

9:57AM 15   Veronica Theriot.

9:57AM 16        THE COURT:  Come forward, ma'am.

9:57AM 17        THE CASE MANAGER:  Before you have a seat, would you

9:57AM 18   raise your right hand?

9:57AM 19        THE WITNESS:  Sure.

9:57AM 20             (Witness sworn.)

9:57AM 21        THE CASE MANAGER:  Please have a seat.

9:57AM 22             State and spell your name for the record, ma'am.

9:57AM 23        THE WITNESS:  My name is Veronica Theriot, spelled

9:57AM 24   V-e-r --

9:57AM 25        THE COURT:  Dean, would you fix that?  Wait just a

| | | |
|---|---|---|
| 9:57AM | 1 | moment, ma'am. |
| 9:57AM | 2 | THE CASE MANAGER:  Get a little closer. |
| 9:57AM | 3 | THE WITNESS:  My name is Veronica Theriot, spelled |
| 9:57AM | 4 | V-e-r-o-n-i-c-a, Theriot, T-h-e-r-i-o-t. |
| 9:57AM | 5 | VERONICA THERIOT, |
| 9:57AM | 6 | a witness called on behalf of the defendants, being first duly |
| 9:57AM | 7 | sworn, was examined and testified as follows: |
| 9:57AM | 8 | DIRECT EXAMINATION |
| 9:57AM | 9 | BY MS. WILKINSON: |
| 9:57AM | 10 | Q.   Good morning, Ms. Theriot. |
| 9:57AM | 11 | A.   Good morning. |
| 9:57AM | 12 | Q.   Thank you for being here.  I think you understand that we |
| 9:58AM | 13 | have called you to testify in this case just to explain to the |
| 9:58AM | 14 | jury some of the medical care that Mr. Boudreaux received. |
| 9:58AM | 15 | Are you prepared to do that? |
| 9:58AM | 16 | A.   I am. |
| 9:58AM | 17 | Q.   I think we all would be interested in understanding a |
| 9:58AM | 18 | little bit about your background if we could.  And if you don't |
| 9:58AM | 19 | mind leaning into the microphone a little bit so the jurors can |
| 9:58AM | 20 | hear you and so the court reporter can take down what you're |
| 9:58AM | 21 | saying for us. |
| 9:58AM | 22 | So let's start with a little bit about your |
| 9:58AM | 23 | background.  Where do you live? |
| 9:58AM | 24 | A.   I live in Lockport, Louisiana. |
| 9:58AM | 25 | Q.   How long have you lived there? |

*OFFICIAL TRANSCRIPT*

9:58AM 1    **A.**   I have lived at that current residence since 1996.

9:58AM 2    **Q.**   Are you married?

9:58AM 3    **A.**   I am.

9:58AM 4    **Q.**   Do you have children?

9:58AM 5    **A.**   I do.

9:58AM 6    **Q.**   How old?

9:58AM 7    **A.**   So I have three children.  My oldest is 27, my second is

9:58AM 8    soon to be 25, and my last is 20.

9:58AM 9    **Q.**   Did you go to high school here in the area?

9:58AM 10   **A.**   I went to high school in -- at South Lafourche, Galliano,

9:58AM 11   Louisiana.

9:58AM 12   **Q.**   All right.  Then did you go on to college?

9:58AM 13   **A.**   I did.

9:58AM 14   **Q.**   Tell the jury a little bit about that.

9:58AM 15   **A.**   So I first went to Northeastern Monroe to study pharmacy,

9:59AM 16   and then I changed to nursing and moved to New Orleans and

9:59AM 17   finished my nursing degree here in New Orleans.

9:59AM 18   **Q.**   Have you been a nurse ever since?

9:59AM 19   **A.**   Ever since.

9:59AM 20   **Q.**   How many years have been a practicing nurse?

9:59AM 21   **A.**   32 years.

9:59AM 22   **Q.**   And was there a time -- give us more of the details --

9:59AM 23   when you worked with Doctor Wong and assisted him with

9:59AM 24   Mr. Boudreaux when he came in and had some troubles, including

9:59AM 25   a diagnosis of AFib?

|---|---|---|

9:59AM  2    Was there a time that you worked with Doctor Wong?

9:59AM  3  A.   Yes.

9:59AM  4  Q.   And where was that?

9:59AM  5  A.   In Raceland.

9:59AM  6  Q.   And what was the name of the --

9:59AM  7  A.   Cardiovascular Institute of the South.

9:59AM  8  Q.   And at some point in 2014, did you and Doctor Wong treat

9:59AM  9  Mr. Boudreaux for his atrial fibrillation and other diseases?

9:59AM  10  A.   Yes.

9:59AM  11  Q.   Now, let's, if we could, explain to the jury your work

10:00AM  12  history.  So where did you start as a nurse?

10:00AM  13  A.   So I started as a nurse at -- at the time it was Baptist

10:00AM  14  Hospital here in New Orleans.  I worked on the telemetry unit,

10:00AM  15  which is a cardiac unit.  I was a charge nurse there.  And then

10:00AM  16  I married and we moved to the Bayou.  And when we moved there,

10:00AM  17  I stayed at Baptist for a year, and then went on to Terrebonne

10:00AM  18  General as the head nurse of a cardiac unit.

10:00AM  19  Q.   Is it true that you like being in the hospital and being

10:00AM  20  around patients who really need your help?

10:00AM  21  A.   I love what I do, yes.

10:00AM  22  Q.   And then tell us the next place you worked.

10:00AM  23  A.   So from Terrebonne General I went to CIS in 1992.  I

10:00AM  24  started with CIS.  And at that time CIS had a division of

10:00AM  25  nephrology, so I did both cardiology and nephrology.

10:00AM 1          In the latter years of that time span, I did mostly
10:00AM 2    nephrology but was in the hospital setting as a rounds nurse.
10:00AM 3    So I was the liaison between the patient and the physician,
10:01AM 4    transitioning them to home with whatever they needed.
10:01AM 5          Then my father became sick in 2003, and I moved to
10:01AM 6    the clinic, the Cardiovascular Institute of the South clinic in
10:01AM 7    Raceland.
10:01AM 8    Q.   Tell us what a rounds nurse does.
10:01AM 9    A.   So a rounds nurse is seen as a physician extender.  So I
10:01AM 10   guess you do anything they ask you to do.  So my role as a
10:01AM 11   rounds nurse is I rounded with family doctor clinic and
10:01AM 12   cardiology.  They were all underneath the cap of Cardiovascular
10:01AM 13   Institute of the South.  You saw all the patients in the
10:01AM 14   morning that they would see in the hospital, you know, ask the
10:01AM 15   patient how they spent the night, just review their chart,
10:01AM 16   spoke to the physicians who also were involved in their care,
10:01AM 17   as well as any nurse practitioner or nurses.  And then we met
10:02AM 18   with the doctor and formulated a plan of care for that patient.
10:02AM 19   Q.   Let's talk a little bit about your training.  When you
10:02AM 20   were in nursing school, what type of general courses did you
10:02AM 21   take?
10:02AM 22   A.   Basic biology as well as chemistries.  Of course, the
10:02AM 23   Englishes, and then nursing courses in the senior years.
10:02AM 24   Q.   Did you end up specializing in the areas, like cardiology
10:02AM 25   as you were discussing, nephrology?

10:02AM   1   A.   Most of my continuing education hours were all in

10:02AM   2   cardiology.

10:02AM   3   Q.   Explain that to the jury.  What type of requirements do

10:02AM   4   you have as a nurse to keep current?

10:02AM   5   A.   So to maintain a nursing license in the state of

10:02AM   6   Louisiana, if you work 2,000 hours a year, you have to maintain

10:02AM   7   so many continuing education hours, and that's mandatory to

10:02AM   8   renew your license.

10:02AM   9   Q.   You are licensed as an RN; correct?

10:02AM  10   A.   Yes.

10:02AM  11   Q.   And you maintain that license?

10:02AM  12   A.   I exceeded the hours of CEUs that I needed, sure.

10:02AM  13   Q.   Now, when you went to the Cardiovascular Institute, what

10:03AM  14   type of duties and responsibilities did you have there?

10:03AM  15   A.   So I went -- so as a rounds nurse?

10:03AM  16   Q.   No, I meant once you went to the clinic.

10:03AM  17   A.   Oh, to the clinic.  So the clinic mostly employs LPNs, and

10:03AM  18   I was the only RN employed by the Cardiovascular Institute in

10:03AM  19   Raceland.  I would round in the hospital and see that patient

10:03AM  20   through his -- the transition of care from the hospital setting

10:03AM  21   on to the clinic.

10:03AM  22         So in the clinic, I oversaw the LPNs' work as well as

10:03AM  23   saw most new patients that came in and did education on the

10:03AM  24   patients as well.

10:03AM  25   Q.   Tell the jury what you mean by "education on patients."

10:03AM  1   A.   So there's many diagnoses that come into the clinic.

10:03AM  2   Could be cardiac-related, high blood pressure, could be

10:03AM  3   irregular heartbeat.  Patients need to understand their disease

10:04AM  4   process so that they can be compliant to their medical therapy,

10:04AM  5   whatever that entailed for that particular patient.  We tried

10:04AM  6   to individualize the patient's education to their diagnosis.

10:04AM  7          It also included preventive measures as well, so

10:04AM  8   smoking cessation.  If patients had tobacco addiction, I was

10:04AM  9   the nurse to educate them on smoking cessation.  Anything that

10:04AM  10  would help the patient be compliant in their care.

10:04AM  11  Q.   Did that include educating patients on medications and the

10:04AM  12  risk and benefits associated with those prescription

10:04AM  13  medications?

10:04AM  14  A.   Absolutely.

10:04AM  15  Q.   Would it be fair to say that when a patient came to the

10:04AM  16  clinic and saw one of the physicians, you were there normally

10:04AM  17  while the physician was examining and speaking to the patient?

10:04AM  18  A.   In the clinic?

10:04AM  19  Q.   Yes.

10:04AM  20  A.   Yes.

10:04AM  21  Q.   And then afterward, did you have a separate session with

10:04AM  22  the patient normally to explain in more detail their diagnosis

10:04AM  23  or their medications that they were to take?

10:05AM  24  A.   Yes.

10:05AM  25  Q.   And so, no disrespect to the doctors, did you give more

10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM

1    time to the patients to give more detailed explanations of some

2    of these medications and conditions?

3    A.    Yes.  I had more times than the doctors do, right.

4    Q.    In certain circumstances, did you have literally a

5    checklist, a written checklist, to make sure you educated

6    patients about the specifics with regard to certain

7    medications?

8    A.    Both in the hospital and the clinic we did have a guide --

9    sometimes it was a checklist; sometimes it was pamphlets --

10   yes.

11   Q.    And over the years some of the medications for certain

12   diagnoses have changed, and we're focused here on atrial

13   fibrillation, as you know, with regard to Mr. Boudreaux.

14            Before 2000, were you familiar with a medication

15   called warfarin or Coumadin?

16   A.    Yes, very familiar.

17   Q.    And was that a medication that the physicians you worked

18   with prescribed at times to patients with atrial fibrillation.

19   A.    Yes.

20   Q.    Did you become familiar with that medication?

21   A.    I did.

22   Q.    How did you become familiar with it?

23   A.    How did I become familiar with Coumadin?  Well, through

24   the use of Coumadin, we -- actually, there's great education on

25   Coumadin.  We actually had very -- we had booklets.  We had

10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:06AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM
10:07AM

1   pamphlets through the education of the physician on what
2   Coumadin does, how to use it, from dieticians to tell us the
3   food choices that they could have if they used it.  Definitely
4   monitoring the prothrombin time as well as having patient
5   involved in that to keep track of their PT and what could make
6   it prolonged or what can hinder it from being within
7   therapeutic range, so --
8   Q.   Did the clinic and the hospital have a checklist so that,
9   when someone was prescribed with Coumadin or warfarin, you
10  could go over the risks, benefits, restrictions, and the other
11  things that you've mentioned?
12  A.   Yeah, it was a standard.  It was the standard of care
13  that, if someone was on blood thinner, that we provided
14  education to them.
15  Q.   And do you recall when the new novel oral anticoagulants
16  came onto the market and started to be used at your clinic?
17  A.   I do.
18  Q.   And did you talk to patients about those NOACs?
19  A.   So I do remember that very well, because when they came, I
20  think that it was a perception of the general public that it
21  wasn't a blood thinner, you know, because it was so -- they
22  were very popular.  They came out.  You didn't have to have
23  dietary restrictions.  You didn't have to have a lot of the
24  restraints that you had with Coumadin.  So we had, as a medical
25  community, had to make sure that we educated patients that it

10:07AM 1   was -- it was a blood thinner, yes.
10:07AM 2   Q.   Did you and other folks at the clinic develop a separate
10:07AM 3   checklist for those oral anticoagulants?
10:08AM 4   A.   I did have a part in that.
10:08AM 5   Q.   And did you use that checklist with patients like
10:08AM 6   Mr. Boudreaux when they were prescribed an oral anticoagulant
10:08AM 7   by Doctor Wong or other physicians at your facility?
10:08AM 8   A.   If I was the nurse educating the patient on any
10:08AM 9   anticoagulant, yes.
10:08AM 10  Q.   And what was your normal practice and procedure?  If
10:08AM 11  someone came into the office and they were prescribed with
10:08AM 12  that -- well, first, if they had atrial fibrillation and the
10:08AM 13  physician decided to prescribe one of the NOACs, what was your
10:08AM 14  role in terms of educating the patient about the risks and
10:08AM 15  benefits?
10:08AM 16  A.   So let me see if I understand the question.  Just in the
10:08AM 17  clinics when a patient came in?
10:08AM 18  Q.   Why don't you do both.  Let's start maybe in the hospital
10:08AM 19  is easier, since that is more applicable in this situation.
10:08AM 20  A.   So it was a practice at CIS -- and I believe it is still
10:08AM 21  the practice at CIS -- if a patient is started on a new
10:08AM 22  medication, that education be given and it be documented and
10:09AM 23  preferably that the patient, you know, verbalizes to you or
10:09AM 24  signs a paper that says that they understand the education that
10:09AM 25  they received.

| | | |
|---|---|---|
| 10:09AM | 1 | **Q.**   And is that a practice you followed regularly with |
| 10:09AM | 2 | patients? |
| 10:09AM | 3 | **A.**   Yes. |
| 10:09AM | 4 | **Q.**   And would you sit with them and talk to them directly |
| 10:09AM | 5 | about the risk and benefits of the medication -- |
| 10:09AM | 6 | **A.**   Yes. |
| 10:09AM | 7 | **Q.**   -- and any warning signs if there was going to be any side |
| 10:09AM | 8 | effects or any other issues? |
| 10:09AM | 9 | **A.**   Yes. |
| 10:09AM | 10 | **Q.**   All right.  And was it your normal practice to ensure the |
| 10:09AM | 11 | patient understood the information that you were giving them? |
| 10:09AM | 12 | **A.**   It was my normal practice to make sure that they |
| 10:09AM | 13 | understand, even if I have to bring it down to, you know, |
| 10:09AM | 14 | layman's terms, whatever it takes, yes. |
| 10:09AM | 15 | **Q.**   And if there was a form where you had checked off this |
| 10:09AM | 16 | list and signed it, what would that indicate to you when you |
| 10:09AM | 17 | looked back on the record in terms of what information you |
| 10:09AM | 18 | provided to the patient? |
| 10:09AM | 19 |         Maybe -- let me ask:  If you checked it off, would |
| 10:09AM | 20 | that be your way of recording that you had actually spoken to |
| 10:10AM | 21 | the patient about these specific issues? |
| 10:10AM | 22 | **A.**   Yes. |
| 10:10AM | 23 | **Q.**   And would it also let you know, from looking at the |
| 10:10AM | 24 | record, that the patient had acknowledged that they understood |
| 10:10AM | 25 | what you were discussing with them? |

*OFFICIAL TRANSCRIPT*

1480

A.   Yes.  No different if I received a consent or anything
from a patient.  If they signed, I would validate or witness
that they understood the instructions.

Q.   And have you had situations in your career where you went
through that checklist and talked about the risks and benefits
associated with a novel oral anticoagulant and the patient
said, "No, I don't want to take that medication"?

A.   Yes.

Q.   And how would you indicate that?  Would that mean there
wasn't a signature at the bottom of that --

A.   Or I would document.  Or that if it was that the patient
didn't understand, I would find a family member that did, so --
yeah, it would be documented.

Q.   Great.  We're going to turn to the medical records in just
a moment in this particular case.  I just want to ask you a few
other follow-up questions.

      Do you belong to any nursing or medical
organizations?

A.   I do.

Q.   What are they?

A.   So my alumni association.  And now I'm actually into
executive.  So I've kind of stepped away from the clinical
area, but I do belong to the Louisiana Association of Nurse
Executives.  I also belong to our local chapter of nurse
executives.

10:11AM  1    **Q.**   So let's talk about -- perhaps that relates to why you
10:11AM  2    ended up -- or your leaving CIS.  You left CIS in 2014?
10:11AM  3    **A.**   That's correct.
10:11AM  4    **Q.**   And can you tell the ladies and gentlemen of the jury why
10:11AM  5    you left CIS?
10:11AM  6    **A.**   Well, because -- so I left -- I have never had -- I loved
10:11AM  7    all my jobs because they deal with patient care, but when I
10:11AM  8    worked with CIS, in conjunction with that job, I actually
10:11AM  9    rounded in the hospital on all the patients.  And so a position
10:11AM  10   became available as a manager of a med-surge unit, the
10:11AM  11   med-surge/telemetry, so cardiac monitoring, as well as the ICU.
10:11AM  12   So I now manage young nurses and hopefully set a great example
10:11AM  13   for them.
10:12AM  14   **Q.**   How many direct reports do you have?
10:12AM  15   **A.**   Over 40.
10:12AM  16   **Q.**   And what are your full responsibilities as the director of
10:12AM  17   medical-surgery?
10:12AM  18   **A.**   So I -- my responsibilities as a director is to make sure
10:12AM  19   that we provide safe care to your patients, that we are staffed
10:12AM  20   appropriately.  A big -- a big part of my job is patient
10:12AM  21   satisfaction, making sure that I round on all my patients every
10:12AM  22   day and that they are receiving the best care that we can
10:12AM  23   provide.
10:12AM  24          I also do payroll.  I also am, you know, responsible
10:12AM  25   for any leave, medical leave, that they take; attending, you

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:12AM | 1 | know, meetings; keeping up my CEUs. |
| 10:12AM | 2 | Q.   You run the place? |
| 10:12AM | 3 | A.   Sure. |
| 10:12AM | 4 | Q.   All right.  Before you left to take over that job, do you |
| 10:12AM | 5 | recall, from reviewing the records and from your deposition, |
| 10:13AM | 6 | that you participated in the treatment of Mr. Boudreaux back in |
| 10:13AM | 7 | January of 2014? |
| 10:13AM | 8 | A.   After reviewing the records. |
| 10:13AM | 9 | Q.   Yes.  And I put some records up in front of you that we're |
| 10:13AM | 10 | going to go through with the jury. |
| 10:13AM | 11 |         Is part of the reason that you keep these records is |
| 10:13AM | 12 | so that you do know what type of symptoms you see in a patient |
| 10:13AM | 13 | and what type of treatments you and the doctor give the |
| 10:13AM | 14 | patient? |
| 10:13AM | 15 | A.   As part of keeping these records? |
| 10:13AM | 16 | Q.   Yes. |
| 10:13AM | 17 | A.   Yes. |
| 10:13AM | 18 | Q.   And do you also record in certain places that you actually |
| 10:13AM | 19 | were the nurse present and the doctor who was present for some |
| 10:13AM | 20 | of these consults and conversations? |
| 10:13AM | 21 | A.   Yes.  Well, during my period at CIS, we went -- of course, |
| 10:13AM | 22 | it was always -- when I started there, it was paper-generated, |
| 10:13AM | 23 | but during my tenure there, we became electronically -- have |
| 10:13AM | 24 | electronic medical records.  So just signing in to the |
| 10:13AM | 25 | electronic medical records would tell you who saw a patient. |

Q.   Okay.  Now, over the years, have you seen a lot of patients who had the diagnosis of atrial fibrillation?

A.   Yes.

Q.   And do you have a specific recollection of dealing with Mr. Boudreaux?

A.   I don't.

Q.   Okay.  So let's go through the medical records, if we could, to help the jury understand the type of treatment that he received.  And I want to start first with JB18.175, which is just our marking.  But if you look at it, should be the first record on your pile, and it should show over at the right the consult is January 7th, 2014.

     Do you see that?

A.   Yes.

Q.   Do you recognize that record?

A.   I do.

     **MS. WILKINSON:**  Your Honor, we would move in, if it's not already in, JB18.

     **THE COURT:**  Any objection?

     **MR. BIRCHFIELD:**  No objection, Your Honor.

     **THE COURT:**  It will be admitted.

     (Whereupon Defense Exhibit Number JB18 was
     admitted into evidence.)

BY MS. WILKINSON:

Q.   Ms. Theriot, what we're going to do is I'm going to put

| | | |
|---|---|---|
| 10:14AM | 1 | this -- you have a copy of the record right there in front of |
| 10:14AM | 2 | you. |
| 10:14AM | 3 | A.   Yes. |
| 10:14AM | 4 | Q.   But sometimes, to make it easier for you, but especially |
| 10:15AM | 5 | for the jury, we're going to put it up on the screen. |
| 10:15AM | 6 | A.   Because of my glasses. |
| 10:15AM | 7 | Q.   Yes, for all of us at a certain age who need to use |
| 10:15AM | 8 | glasses.  I'm going to try to go through this a bit.  So I'm |
| 10:15AM | 9 | going to show portions of the record. |
| 10:15AM | 10 |         Dean, can you help me get that?  Yeah, there we go. |
| 10:15AM | 11 |         So we can go through it with them.  Okay? |
| 10:15AM | 12 | A.   Okay. |
| 10:15AM | 13 | Q.   So let's start at the top.  Would this have been a |
| 10:15AM | 14 | computer-generated record? |
| 10:15AM | 15 | A.   So that record would be in hospital -- that's not a CIS |
| 10:15AM | 16 | form.  That would be a hospital-generated form. |
| 10:15AM | 17 | Q.   Right.  And was it common that sometimes a patient would |
| 10:15AM | 18 | come into the hospital with, you know, heart issues, and you |
| 10:15AM | 19 | and Doctor Wong would be called in to see that patient? |
| 10:15AM | 20 | A.   Yes. |
| 10:15AM | 21 | Q.   And can we tell here that that's what happened in this |
| 10:15AM | 22 | case?  Tell the jury this information that is entered.  This is |
| 10:15AM | 23 | just routine information about Mr. Boudreaux himself? |
| 10:15AM | 24 | A.   Yes. |
| 10:15AM | 25 | Q.   All right.  And what does this date indicate? |

A.      January 7th, 2014.

Q.      When it's called a "consult," what does that mean?

A.      So a consult is the primary doctor or the emergency room
doctor is asking for our -- so a consult is just your
recommendations.  Whether they take your recommendations or not
is up to the primary doctor, but it's not uncommon that, if it
is a specialty area, that they will consult the specialist.
And so a consult for cardiology would be a specialty consult on
a patient that is probably being seen by either medicine or the
ER doctor.

Q.      So that's why this says the consult cardiology, meaning
you and Doctor Wong, are now providing your expertise?

A.      Correct.

Q.      And this tells us the reason, right, for the consult, the
AFib flutter?

        The jury has seen this particular record quite a bit.
Why is the history of the patient and their symptoms important
to you when you're trying to determine the condition of the
patient?

A.      Oh, because timing is everything.  When you take care of
somebody with atrial fib, if you don't know the chronicity of
the matter, your treatment may be different.  So if it's
somebody who's been in atrial fib for a very long time, we
would definitely treat it different than someone who has
new-onset atrial fib.  So the history of the present illness is

10:17AM  1   probably the most important thing.

10:17AM  2   Q.   And it looks like here also medications were listed.   And

10:17AM  3   I've highlighted one in particular.

10:17AM  4          Can you tell the jury what ASA 81 milligrams daily

10:17AM  5   is?

10:17AM  6   A.   So that is a baby aspirin, if you will, the smallest dose

10:17AM  7   aspirin.

10:17AM  8   Q.   Why is it important for you to know which medications a

10:17AM  9   patient is on when you're dealing with a potential diagnosis of

10:17AM  10  atrial fibrillation?

10:17AM  11  A.   For many reasons.   Sometimes medications may contribute to

10:17AM  12  the disease process if you don't know -- if you're finding out

10:17AM  13  that the patient just went into atrial fib, you may want to

10:17AM  14  know what new meds has been started on the patient or what has

10:17AM  15  been going on recently to see if they could have contributed to

10:18AM  16  atrial fib or if they're on atrial fib and are on other

10:18AM  17  medications, you would need to know if they are compatible with

10:18AM  18  the medications you're needing to add to their therapies.

10:18AM  19  Q.   Go to the next page of that record, or the third page.

10:18AM  20  And this says "Review of Symptoms."

10:18AM  21          Who would review the symptoms with Mr. Boudreaux?

10:18AM  22  A.   Is that on the same -- is that --

10:18AM  23  Q.   That's on the third page.   Do you see it there?

10:18AM  24  A.   Okay.   Who would do the review of systems?

10:18AM  25  Q.   Yes.

*OFFICIAL TRANSCRIPT*

**A.**   The physician.

**Q.**   Okay.  And why is that important in terms of determining the proper treatment?

**A.**   Again, it shows us the stability of the patient.  You know, if they have comorbidities or any other contributing factors, sometimes the answer to the -- the treatment is treating the underlying cause.  So if somebody went into atrial fib because they were in heart failure or somebody went into an arrhythmia because they were having a heart attack, you wouldn't just treat the arrhythmia; you would have to treat the underlying disease process.  So you need to know the symptoms that are associated with that.

**Q.**   With atrial fibrillation, is it common or the standard of care that you must treat the potential for stroke and the atrial fibrillation?

**A.**   Well -- so I'm not -- I mean, I'm not an expert, but for atrial fib, if you're going to have an arrhythmia, it's the kind of arrhythmia to have, because it happens at the top part of your heart.  So it's probably more aggravating than it is life-threatening.  But it does.  Because the heart is just quivering in the atrial chambers, you are at high risk for a stroke.

**Q.**   Now, this record -- I just want to show you quickly to get to the next point.  And this is another record from January 7th, as you can see, 2014, and it just says -- from

10:19AM 1    this other doctor that cardiology recommendation Xarelto.

10:20AM 2           Do you see that?

10:20AM 3    **A.**   I do.

10:20AM 4    **Q.**   Would that indicate that Doctor Wong had recommended a

10:20AM 5    prescription of Xarelto for Mr. Boudreaux?

10:20AM 6    **A.**   Yes, cardiology.

10:20AM 7    **Q.**   Now, let's take a look about -- at a record from the

10:20AM 8    following day, January 8th.

10:20AM 9           Would it be common with a patient like Mr. Boudreaux

10:20AM 10   that you and Doctor Wong would ask Mr. Boudreaux to come back

10:20AM 11   or come to your offices the next day for a follow-up?

10:20AM 12   **A.**   He's still in the hospital the next day?

10:20AM 13   **Q.**   Yes.  This is the hospital record.

10:20AM 14   **A.**   Is it common that we ask him to come back to the office

10:20AM 15   the next day?

10:20AM 16   **Q.**   Yes, after they're out of the hospital.

10:20AM 17   **A.**   Oh, after the hospital.  Well, depending on the course of

10:20AM 18   action during his hospital stay.  So there are some CMS

10:20AM 19   guidelines that, if a patient -- you know, if a patient had

10:20AM 20   a -- I see it says CHF acute.  So more so than for the atrial

10:20AM 21   fib, we are required to see a patient within 72 hours of their

10:21AM 22   admission for CHF, and, you know, depending if the admission is

10:21AM 23   on a Friday, we would see them on the Monday, but it could be

10:21AM 24   as soon as 24 hours as well.  So not uncommon.

10:21AM 25   **Q.**   So this record indicates that Mr. Boudreaux was still in

*OFFICIAL TRANSCRIPT*

10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:22AM
10:22AM
10:22AM
10:22AM
10:22AM
10:22AM
10:22AM

1   the hospital on January 8th, 2014.  Is that what you're telling

2   us?

3   A.   Well, it says admit date 1/7/2014.  So I don't see the

4   date on that note.

5   Q.   See over there, progress note 1/8?

6   A.   Sorry. I don't.  Oh, here.  Yes.

7   Q.   And so would that indicate to you that he was still in the

8   hospital on that date?

9   A.   Yes.

10  Q.   And now, if we look at the medications, it still says

11  aspirin, but it also says rivaroxaban was added; right?

12  A.   Uh-huh.

13  Q.   And rivaroxaban is known as Xarelto?

14  A.   Yes.

15  Q.   Now, a series of tests were run at the hospital, blood

16  tests.  Is that common for a patient like Mr. Boudreaux?

17  A.   Yes.

18  Q.   I'm going to turn over the record and show you one

19  particular number that we just heard about yesterday, the

20  hemoglobin number.

21       Do you see that there?

22  A.   Uh-huh.

23  Q.   And what is the value that's reported for Mr. Boudreaux?

24  A.   13.8.

25  Q.   And what is the range?

| | | |
|---|---|---|
| 10:22AM | 1 | **A.**   14 to 18. |
| 10:22AM | 2 | **Q.**   So does that mean he was just below the range of normal? |
| 10:22AM | 3 | **A.**   I think that's normal.  13.8 isn't a good hemoglobin, but, |
| 10:22AM | 4 | yes, the standard is 14 to 18.  I guess 13.8 would be a little |
| 10:22AM | 5 | lower. |
| 10:22AM | 6 | **Q.**   And now, let's look at, if we could, a record from the |
| 10:22AM | 7 | 19th, and tell us if this -- this is JB153 and Plaintiffs' |
| 10:22AM | 8 | Exhibit 5768088. |
| 10:22AM | 9 | **MS. WILKINSON:**  And, Your Honor, we would move that |
| 10:22AM | 10 | in.  I think we have some question about which medical records |
| 10:22AM | 11 | are in.  Maybe we could work it out afterwards, but I don't |
| 10:23AM | 12 | think there's any question -- |
| 10:23AM | 13 | **MR. BIRCHFIELD:**  No objection. |
| 10:23AM | 14 | **THE COURT:**  All right.  Let's put it in.  Admitted. |
| 10:14AM | 15 | (Whereupon Defense Exhibit Number JB153 was |
| 10:14AM | 16 | admitted into evidence.) |
| 10:23AM | 17 | **BY MS. WILKINSON:** |
| 10:23AM | 18 | **Q.**   Now, tell us the date of this record, please. |
| 10:23AM | 19 | **A.**   1/9/2014 at 12:18 p.m. |
| 10:23AM | 20 | **Q.**   And when it says "progress note" instead of "consult," |
| 10:23AM | 21 | what is a progress note? |
| 10:23AM | 22 | **A.**   So that's a follow-up -- a progress note is a follow-up |
| 10:23AM | 23 | after your initial consultation. |
| 10:23AM | 24 | **Q.**   So this is two days after Mr. Boudreaux has reported his |
| 10:23AM | 25 | symptoms, and it shows he's taking aspirin; right? |

*OFFICIAL TRANSCRIPT*

10:23AM   1    **A.**    Uh-huh.

10:23AM   2    **Q.**    And rivaroxaban again?

10:23AM   3    **A.**    Yes.

10:23AM   4    **Q.**    And now, this is just -- what did you say? -- a day later

10:23AM   5    from when the hemoglobin was measured?

10:23AM   6    **A.**    Uh-huh.

10:23AM   7    **Q.**    Right?  At 13.8.  What does this show his hemoglobin is

10:23AM   8    just a day later?

10:23AM   9    **A.**    13.

10:23AM  10    **Q.**    So that's a reduction; right?

10:23AM  11    **A.**    Uh-huh.

10:23AM  12    **Q.**    And this is on what date?  January 9th, 2014?

10:23AM  13    **A.**    Uh-huh.

10:23AM  14    **Q.**    And --

10:23AM  15    **A.**    Yes.

10:23AM  16    **Q.**    Let's go down to the bottom here, and it says,

10:24AM  17    "Assessment/Plan:  AFib rate controlled."

10:24AM  18            What does that indicate to you?

10:24AM  19    **A.**    That he remains in an irregular rhythm but the rate is

10:24AM  20    controlled.

10:24AM  21    **Q.**    And here we talk about the plan.  It says, "Anticoag

10:24AM  22    educated."

10:24AM  23            What does that indicate to you?

10:24AM  24    **A.**    That indicates to me that the patient was on anticoagulant

10:24AM  25    and that education was given to him while he was in the

*OFFICIAL TRANSCRIPT*

1   hospital.

2   Q.   And would that be consistent with your regular practice

3   and Doctor Wong's, that you would educate the patient about the

4   anticoagulant?

5   A.   Myself and probably the nurses in the hospital as well.

6   Q.   Okay.  We talked earlier about the checklist.  We have

7   seen one in this case for Mr. Boudreaux, and I'm going to show

8   it to you.  It's Plaintiffs' Exhibit 5768112.

9        MS. WILKINSON:   And, again, I believe this is in

10  evidence, Your Honor, but if it's not, we would ask to move it

11  in.

12  BY MS. WILKINSON:

13  Q.   And, Nurse Theriot, we'd like you to spend a little time

14  with us on this, if we could.  Do you see that in your packet?

15  A.   I do.

16  Q.   At the top, what does it say this is?

17  A.   At the top, "Oral Anticoagulation Therapy Education

18  Checklist."

19  Q.   Do you recognize this checklist?

20  A.   I do.

21  Q.   Is this your checklist?

22  A.   It is CIS's checklist.

23  Q.   All right.  And down here at the bottom, does this

24  indicate whether you were the person who --

25  A.   Yes.

10:25AM   1   **Q.**   -- informed Mr. Boudreaux?

10:25AM   2   **A.**   That is my signature, yes.

10:25AM   3   **Q.**   All right.  And let's go back up at the top.  And what is

10:25AM   4   the date of education?

10:25AM   5   **A.**   1/9/14.

10:25AM   6   **Q.**   It says he's a new anticoagulation patient.

10:25AM   7          Does that matter to you in terms of educating him?

10:25AM   8   **A.**   It does.

10:25AM   9   **Q.**   Why?

10:25AM  10   **A.**   Because I would be sure -- well, so, again, it's the

10:25AM  11   standard practice that anyone who starts on a new medication,

10:25AM  12   especially anticoagulation, that we spend time on that first

10:25AM  13   office visit when they come back providing education, making

10:26AM  14   sure that they understand not only about the medication, but

10:26AM  15   the processes that you should do --

10:26AM  16   **Q.**   You want to go through it?  Maybe that's easier.

10:26AM  17   **A.**   I don't know if I should go through it, but you know --

10:26AM  18   **Q.**   Sure.  Go ahead.

10:26AM  19   **A.**   -- definitely it's the --

10:26AM  20   **Q.**   So why don't you walk us through with the diagnosis

10:26AM  21   information?  How do you start talking about Xarelto to a

10:26AM  22   patient like Mr. Boudreaux?

10:26AM  23   **A.**   Okay.  So diagnosis information should have been started

10:26AM  24   at the time of admission to the hospital, but, you know, when

10:26AM  25   you're in the hospital, if it's -- if it's a new diagnosis for

10:26AM   1   you, you may have been overwhelmed with information or just
10:26AM   2   being overwhelmed being in the hospital.
10:26AM   3          So that is a time on their first visit that they come
10:26AM   4   back that you gather from the patient what they do understand
10:26AM   5   about their hospitalization and put that puzzle together if
10:26AM   6   it's not already there.  Sometimes it's an opportunity for the
10:26AM   7   family.  Sometimes it's an opportunity for children to come in
10:26AM   8   with the patient.  But it is -- we go over the diagnosis all
10:27AM   9   over again and, actually, the plan of care moving forward as
10:27AM  10   well.
10:27AM  11   Q.   At that point, is it common for patients to ask you
10:27AM  12   questions now?  As you said, once they've kind of gotten used
10:27AM  13   to this idea that they've been diagnosed with a serious
10:27AM  14   condition, do you find that patients will ask you questions
10:27AM  15   about their diagnosis and treatment?
10:27AM  16   A.   Sure.  I'd like to think that all my patients are
10:27AM  17   compliant and very interested in what's going on with them, so
10:27AM  18   absolutely.  We provide that opportunity if they had questions.
10:27AM  19   Q.   Okay.  Next you have checked here "Action of
10:27AM  20   anticoagulant."
10:27AM  21          What would you explain to describe the action of an
10:27AM  22   anticoagulant?
10:27AM  23   A.   So probably by this time, we also have an idea, you know,
10:27AM  24   to be able to individualize it to the patient about -- I don't
10:27AM  25   want to use the word "educational level," but understanding

*OFFICIAL TRANSCRIPT*

maybe of what's going on.

So, you know, sometimes it could be as simple as that, you know, this is a blood thinner, so it will thin your blood, but it will, you know, prevent you from having -- well, hopefully prevent you from the risk of strokes.  You may bleed longer when you're shaving, you know.  We give them suggestions about using an electric razor versus a straight blade.

We also definitely go into detail about, you know, if you're on oxygen at home, just even if your nose would start bleeding, if you cough up blood, if your stool is changing color, if you are using sharp knives in the house, if -- we also try to go into detail about what their work history is, because, you know, especially in our area, a lot of people work on -- you know, in the oil industry, on trawl boats.  So if they have any sharp objects or heavy equipment, it may not be the job for them anymore.

Just to make them aware that it is -- I don't want to use the word "dangerous," but anything you prescribe in medicine, you always hope that the benefits outweigh the risk, but it's -- you have to explain the risk and let them make the determination after that is explained.

Q.   So you were focusing in this case when you're taking about Xarelto or another NOAC on the risk of bleeding, all the different ways someone might --

A.   Right.  Or any anticoagulant, whether it was Xarelto or

1  any of the others that we used, yes.

2  **Q.**   All right.  And then current dosage of medication, it says

3  up here 20-milligram dose.

4         You would have reviewed that with him?

5  **A.**   Yes.

6  **Q.**   The time of day to take the medication?

7  **A.**   Yes.

8  **Q.**   Do you recall --

9  **A.**   I don't recall.  Do I recall if I told him what time --

10  **Q.**   Generally, what would you say for Xarelto?

11  **A.**   Well, usually with a meal.  We prefer it with the evening

12  meal, but with a meal, once a day.

13  **Q.**   And why don't you go through those next few if you could,

14  the need for the health care providers to be aware of

15  medications.  Why is that important?

16  **A.**   All right.  So because, you know, and I'll speak through

17  my years of nursing, but, obviously, due to the education

18  process as well, it's not anything for a patient to go with a

19  list -- or not bring their medications to their next

20  appointment and go in with something totally unrelated to their

21  atrial fib or hypertension, to go get something for arthritis.

22  And so that physician may add a nonsteroidal, which you may not

23  want to add to someone who's already on an anticoagulant or

24  anything that would -- I'm at a loss for words.

25  **Q.**   That would add to the risk of bleeding.  Is that what

10:30AM   1    you're --
10:30AM   2    A.    Risk of bleeding or --
10:30AM   3    Q.    Or some kind of interaction?
10:30AM   4    A.    I'll use the word "interact" with medications that you're
10:30AM   5    already on.
10:30AM   6    Q.    Thank you.  Tell us why it's important for a patient on
10:30AM   7    Xarelto to let you know before they have any kind of surgery.
10:30AM   8    A.    Oh, because there is a greater risk of bleeding if you're
10:30AM   9    going to have a surgical procedure.  So it would require us
10:30AM  10    holding the medication prior to the procedure.
10:31AM  11    Q.    Holding, you mean taking the patient off?
10:31AM  12    A.    Taking the patient off, yes.
10:31AM  13    Q.    Okay.  And then I think the next we've kind of alluded to.
10:31AM  14    The instructions if bleeding should occur.
10:31AM  15          And what do you tell the patients about that?
10:31AM  16    A.    So from the very minor, you know, we have -- like I said,
10:31AM  17    if you blow your nose and you see a spot of blood to if your
10:31AM  18    stools change color to if you cut yourself shaving and you have
10:31AM  19    to hold pressure for an extended period of time, to notify us
10:31AM  20    immediately if any of those signs happen.
10:31AM  21    Q.    And that's consistent with the next two, avoiding
10:31AM  22    activities that pose a high risk or a call for any injuries?
10:31AM  23    A.    Yes.
10:31AM  24    Q.    Why do you have here, "Recommend medic alert tag"?
10:31AM  25    A.    So we do that.  We're in the cardiology business, or I was

*OFFICIAL TRANSCRIPT*

1498

| | |
|---|---|
| 10:31AM | 1 |
| 10:31AM | 2 |
| 10:31AM | 3 |
| 10:32AM | 4 |
| 10:32AM | 5 |

in the cardiology business.  So that way, if somebody passed
out or somebody became unconscious and I responded to an
emergency situation, you would also know that they were on a
high-risk medication, just like a diabetic would do as well.

Q.   And now, just going down to the bottom, you provide the
phone number of your office?

A.   Right.

Q.   And what does it mean that you and Mr. Boudreaux signed --
I mean, signed this page?

A.   So that would signify to me that he understood the
instructions, that I had answered -- I would assume that I had
answered all his questions, and that he agreed with the
education and he would sign it.

Q.   Thank you.  Let's look at a record from the following day.

Now, this is -- excuse me.  I'm sorry.  January 10th,
2014, and over in the right, does this indicate this is a
record from your facility?

A.   Yes.

Q.   Clinic?

A.   So this is an office record.

Q.   All right.  And does this mean that Mr. Boudreaux came
back to see you all again the following day, but this time in
your clinic?

A.   Yes.  On the 10th.

Q.   All right.  And, again, does it indicate that he was

10:33AM 1   taking aspirin and Xarelto at that time?

10:33AM 2   A.   It does.

10:33AM 3   Q.   And down here it says, "Patient education given."

10:33AM 4        What is that indicating?

10:33AM 5   A.   So this box, on this electronically -- electronic medical

10:33AM 6   record, would be checked if any type of education was provided

10:33AM 7   on that particular visit.

10:33AM 8   Q.   And down here, does this indicate you were the nurse and

10:33AM 9   Doctor Wong was the doctor for Mr. Boudreaux that day?

10:33AM 10  A.   Yes.

10:33AM 11  Q.   Now, three days later we have another record.  And does

10:33AM 12  this indicate that Mr. Boudreaux came back to the clinic to see

10:33AM 13  you all again on January 13th?

10:33AM 14  A.   Yes.

10:33AM 15  Q.   And he was taking aspirin and Xarelto, reported that?

10:33AM 16  A.   Yes.

10:33AM 17  Q.   And when I say that, does that mean he's reporting this to

10:33AM 18  you when you're listing the active medications?

10:33AM 19  A.   So the way -- the way that this record works is that, when

10:33AM 20  patient comes in, of course, we ask the patient every visit

10:34AM 21  when they come in to bring their medications.  If they had not

10:34AM 22  brought their medications, we do ask that they bring a list of

10:34AM 23  medications or depending -- you know, some patients bring the

10:34AM 24  list on their phone; some people can recite it without any

10:34AM 25  help.

1500

| 10:34AM | 1 | But we do keep a list on admission to the clinic and |

10:34AM  1      But we do keep a list on admission to the clinic and

10:34AM  2  when they're discharged.  So this would have been patient care

10:34AM  3  summary.  We would have taken this list out, and let's review

10:34AM  4  your medications.  Are you still on allopurinol?  Are you still

10:34AM  5  on amiodarone?  If there's any changes, we would actually put a

10:34AM  6  line through it, and it would be changed in the computer.  And

10:34AM  7  in his after-visit summary or when he leaves, he would leave

10:34AM  8  with a current list to take home.

10:34AM  9      So the majority of the patients in the clinic would

10:34AM  10  just take this list back and forth to us.

10:34AM  11  Q.   And you'd review it each time?

10:34AM  12  A.   And we'd review it each time, and we'd update it each

10:34AM  13  time.  So you'd come in with it.  If the doctor changed

10:34AM  14  something that day or he had changed something via telephone,

10:34AM  15  we would have updated it during his clinic visit, and he would

10:35AM  16  leave with a refreshed list.

10:35AM  17  Q.   Great.  And, again, this indicates that you and

10:35AM  18  Doctor Wong were the care providers that day?

10:35AM  19  A.   Yes.

10:35AM  20  Q.   All right.  We're almost done here.

10:35AM  21  A.   Okay.

10:35AM  22  Q.   January 24th, this is another record from the clinic.

10:35AM  23      Do you recognize this as a record from the

10:35AM  24  Cardiovascular Institute of the South?

10:35AM  25  A.   Yes.

*OFFICIAL TRANSCRIPT*

**Q.** The date of this record?

**A.** January 24th, 2014.

**Q.** Okay. For Mr. Boudreaux. And, again, does it indicate that he's on aspirin and Xarelto on January 24th, 2014?

**A.** It does.

**Q.** And now, I want to ask about this other instruction down here, "Schedule TEE/CV at St. Anne's for February 5, 2014."

What does that indicate?

**A.** So that indicates -- so if somebody is atrial fib, what you try to do is actually chemically cardiovert them. So that means that if somebody has an irregular heart rhythm, you don't want them to be in that rhythm. So you try conservative measures first, which for us would be medication, to get them out of that rhythm, because while they're in that rhythm, like I'd said earlier, you run a higher risk of having a stroke.

So you give medications, and I have since then listed here, like amiodarone. Those would be antiarrhythmics to change them out of that rhythm. And you watch them closely for a couple of weeks. If they do not convert and you do find in your investigation that this is a new -- a new rhythm for the patient, it behooves a patient to be converted out of that rhythm as soon as possible.

So if medication did not do it and they have been on anticoagulation for two weeks, decreasing their risk of clotting, we then move on to more invasive measures. And that

10:36AM  1  for us is cardioversion, which you do a DC countershock where

10:36AM  2  you actually place paddles to a patient's chest and shock them

10:37AM  3  out of the rhythm.  So --

10:37AM  4  Q.   Does this indicate, then, that you and Doctor Wong

10:37AM  5  scheduled this for Mr. Boudreaux on or around January 24th,

10:37AM  6  2014?

10:37AM  7  A.   Yes, that would have been the instructions.

10:37AM  8  Q.   The reason I ask that is does this show that this was

10:37AM  9  scheduled, the cardioversion, before Mr. Boudreaux ever

10:37AM  10  presented with signs of a bleed?  Up to now, there's nothing in

10:37AM  11  the record that shows that he had a GI bleed.

10:37AM  12  A.   Not that I know of, yeah.

10:37AM  13  Q.   So the cardioversion had nothing to do with his subsequent

10:37AM  14  GI bleed; is that right?

10:37AM  15  A.   Would the cardioversion contribute to the bleed?

10:37AM  16  Q.   Right.

10:37AM  17  A.   No.

10:37AM  18  Q.   And it wasn't a result of the bleed, I guess, is what

10:37AM  19  we're trying to make clear.

10:37AM  20  A.   Meaning if you cardiovert someone, do they run a chance of

10:37AM  21  bleeding?

10:37AM  22  Q.   No.  I think there's been some suggestion somehow that

10:37AM  23  because Mr. Boudreaux had a bleed, he had to have the

10:37AM  24  cardioversion.

10:37AM  25  A.   No, it has -- no.  The cardioversion is to convert the

1   patient out of an irregular rhythm.

2   Q.   So, now, let's look at the record that was when he came

3   back to the clinic on February 3rd.  Do see that?

4   A.   Uh-huh.

5   Q.   This is your clinic, and it says now he's on aspirin;

6   right?

7   A.   Okay.

8   Q.   But it doesn't say Xarelto there; right?

9   A.   It does not.

10  Q.   So let's look down here.  The jury has seen other records

11  that this is the day when Mr. Boudreaux came in and said he had

12  a dark stool and they determined he had a gastrointestinal

13  bleed.  But here, tell us what it says about the medications.

14  What does that mean down there under "Other instructions"?

15  A.   So it says, "No Indocin," which is a nonsteroidal, so --

16  stop any medications that can contribute to the bleed, I guess,

17  which is a nonsteroidal.  So "No Indocin.  Hold aspirin, Lasix,

18  lisinopril, and Xarelto.  Keep well hydrated."

19  Q.   Does this indicate that you and Doctor Wong were the care

20  providers for Mr. Boudreaux on February 3rd, 2014?

21  A.   Yes.

22  Q.   Thank you very much.  Appreciate it.

23          MS. WILKINSON:  I'll pass the witness, Your Honor.

24          THE COURT:  Any cross?

25          MR. BIRCHFIELD:  Thank you, Your Honor.

*OFFICIAL TRANSCRIPT*

**CROSS-EXAMINATION**

**BY MR. BIRCHFIELD:**

Q.   Good morning, Ms. Theriot.

A.   Good morning.

Q.   You and I have not had the opportunity to meet, but I'm
Andy Birchfield, and I'm one of the lawyers that represents
Mr. Boudreaux.

A.   Okay.

Q.   And I want to ask you just a few follow-up -- follow-up
questions.

         Let's -- I want to go back to the -- to the checklist
that you covered with Miss Wilkinson.  And first off, I want to
make sure that you understand, you gave a deposition in this
case, and you understand that Mr. Boudreaux is not saying that
you didn't talk to him about bleed risk.

         You understand that?

A.   Oh, yes.

Q.   And he's acknowledged that he -- that you went over this
checklist and he signed it.  That's not what we're here about.

         You understand that; right?

A.   Yes.

Q.   I want to -- I want to back up just a minute because I
think you were being quite modest about this checklist.  This
checklist is actually a checklist that you created; is that
right?

1505

| | | |
|---|---|---|
| 10:40AM | 1 | **A.**   No.   Did I create it? |
| 10:40AM | 2 | **Q.**   Yes. |
| 10:40AM | 3 | **A.**   No.  I had input into creating it, but I didn't create it. |
| 10:40AM | 4 | **Q.**   Okay.  And I think you -- you told us, I believe, in your |
| 10:40AM | 5 | deposition that it was largely your idea, but you worked with |
| 10:40AM | 6 | Becky Hutchinson; is that right? |
| 10:40AM | 7 | **A.**   That's correct. |
| 10:40AM | 8 | **Q.**   You all worked together? |
| 10:40AM | 9 | **A.**   Uh-huh. |
| 10:40AM | 10 | **Q.**   And the reason that you put this checklist together is |
| 10:40AM | 11 | because you wanted to make sure that your patients that were |
| 10:40AM | 12 | being anticoagulated understood the important safety |
| 10:40AM | 13 | information about these medicines; is that right? |
| 10:41AM | 14 | **A.**   Yes.  And I wanted to have a form of documentation that |
| 10:41AM | 15 | they did understand. |
| 10:41AM | 16 | **Q.**   Right. |
| 10:41AM | 17 | **A.**   And we -- and we had -- I mean, for Coumadin, we did have |
| 10:41AM | 18 | documentation. |
| 10:41AM | 19 | **Q.**   Right.  So you had that information for Coumadin, but when |
| 10:41AM | 20 | the NOACs came on the market, there was not information |
| 10:41AM | 21 | provided, and you created one; is that right? |
| 10:41AM | 22 | **A.**   So there was information, but you mean a checklist |
| 10:41AM | 23 | specifically for CIS? |
| 10:41AM | 24 | **Q.**   Yes.  You created a checklist to make sure that your |
| 10:41AM | 25 | patients had important safety information about these |

| | |
|---|---|
| 10:41AM | 1 |

medicines; right?

**A.**   Right.

**Q.**   And in preparing this checklist, did you -- did you and Becky Hutchinson or others, did you review the product labels to find important safety information to include on the checklist?

**A.**   When doing the checklist?

**Q.**   Yes.  In preparing it, in coming up with the checklist.

**A.**   Product labels?

**Q.**   Yes.

**A.**   No.

**Q.**   Okay.  So when you were coming up with this checklist, how did you identify the important safety information that you included here?

**A.**   How did we identify?  So from anticoagulation therapy, the general risk and benefits of taking anticoagulation therapy.

**Q.**   Okay.  All right.  I want to -- I want to go back to the -- the progress notes, and it's on several here, that indicate that Mr. Boudreaux was taking aspirin, baby aspirin, and Xarelto; is that correct?

**A.**   According to this, yes.

**Q.**   Okay.  And I think you told us that you -- you care for a large number of patients that are on atrial -- that have atrial fibrillation; is that right?

**A.**   Yes.

10:43AM   1    Q.   And is it -- is it fairly common for a patient on atrial
10:43AM   2    fibrillation to also be on baby aspirin?
10:43AM   3    A.   Yes.
10:43AM   4    Q.   Okay.  I mean, do you have an estimate?  I mean, are we
10:43AM   5    talking about 70 or 80 percent or higher?  Lower?  What
10:43AM   6    percentage of your patients do you think would be on baby
10:43AM   7    aspirin and an anticoagulant?
10:43AM   8    A.   I can't answer that.
10:43AM   9    Q.   Okay.  And baby aspirin is -- it's often taken by a
10:43AM  10    patient to reduce the risk of a heart attack, right, or a
10:43AM  11    myocardial infarction?  Is that --
10:43AM  12    A.   Yes, baby aspirin can be part of -- if you have coronary
10:43AM  13    artery disease, yes.
10:43AM  14    Q.   Okay.  All right.  And then you were asked about the --
10:43AM  15    the hemoglobin reading here.  And you said that that was --
10:44AM  16    that was essentially normal; is that right?
10:44AM  17    A.   Yes.
10:44AM  18    Q.   Okay.  It's not uncommon to see a patient with a
10:44AM  19    hemoglobin of 13 or even 13.8?
10:44AM  20    A.   12.
10:44AM  21    Q.   12?
10:44AM  22    A.   Yeah.
10:44AM  23    Q.   Okay.  You wouldn't place any significance on that?
10:44AM  24    A.   Any significance that it's low -- that it's 13.8 versus
10:44AM  25    14?

*OFFICIAL TRANSCRIPT*

1508

| | | |
|---|---|---|
| 10:44AM | 1 | **Q.**   Right. |
| 10:44AM | 2 | **A.**   No. |
| 10:44AM | 3 | **Q.**   Okay.  And would you -- you wouldn't consider that to |
| 10:44AM | 4 | be -- if Mr. Boudreaux had a 13.8 hemoglobin on this day, you |
| 10:44AM | 5 | wouldn't consider him to be -- that that would be an indicator |
| 10:44AM | 6 | that he had an active bleed at that point; would you? |
| 10:44AM | 7 | **A.**   With a 13.8 hemoglobin -- |
| 10:44AM | 8 | **Q.**   Would it suggest that he had an active bleed? |
| 10:44AM | 9 | **A.**   I would not. |
| 10:44AM | 10 | **Q.**   And if you -- if you had, you would have raised that with |
| 10:44AM | 11 | Doctor Wong if he was going to put him on an anticoagulant, |
| 10:44AM | 12 | wouldn't you?  You wouldn't put a patient on an anticoagulant |
| 10:45AM | 13 | if you had an indication that they were experiencing an active |
| 10:45AM | 14 | bleed at that time; right? |
| 10:45AM | 15 | **A.**   We would not. |
| 10:45AM | 16 | **Q.**   I think, as you walked through the visits with -- that |
| 10:45AM | 17 | Mr. Boudreaux made to CIS once he's discharged, so I think the |
| 10:45AM | 18 | records indicated at the discharge that he was -- he was |
| 10:45AM | 19 | instructed to follow-up with Doctor Wong on the following day, |
| 10:45AM | 20 | on January the 10th.  Is that right? |
| 10:45AM | 21 | **A.**   On the discharge from the hospital? |
| 10:45AM | 22 | **Q.**   Yes. |
| 10:45AM | 23 | **A.**   Do you have that here? |
| 10:45AM | 24 | **Q.**   Yes, we can walk through that. |
| 10:45AM | 25 | **A.**   Okay. |

*OFFICIAL TRANSCRIPT*

10:45AM   1   **Q.**   We can just shorten this.

10:45AM   2          He showed up in Doctor Wong's office on the 10th;

10:45AM   3   right?

10:45AM   4   **A.**   Oh, okay.  Yes, uh-huh.

10:45AM   5   **Q.**   And then he was scheduled for an appointment on the 13th,

10:45AM   6   January the 13th; right?

10:46AM   7   **A.**   (Nodding.)

10:46AM   8   **Q.**   And he showed up for that appointment; correct?

10:46AM   9   **A.**   Yes.

10:46AM  10   **Q.**   And then he had another appointment for January the 24th;

10:46AM  11   correct?

10:46AM  12   **A.**   Yes.

10:46AM  13   **Q.**   And he show up for that appointment.  He didn't miss any

10:46AM  14   of his appointments during that time with CIS or Doctor Wong,

10:46AM  15   did he?

10:46AM  16   **A.**   No.

10:46AM  17   **Q.**   And when you -- when you went through this -- this

10:46AM  18   checklist about the current medications on each of those

10:46AM  19   visits, did you discuss with him the importance of taking his

10:46AM  20   Xarelto?

10:46AM  21   **A.**   He was taking his Xarelto on all the visits.

10:46AM  22   **Q.**   Right.  I mean, it was important for you to make sure that

10:46AM  23   he was taking his anticoagulant because a cardioversion was

10:46AM  24   being scheduled; correct?

10:46AM  25   **A.**   Correct.

*OFFICIAL TRANSCRIPT*

10:46AM 1   **Q.**   And it's very important for a patient who is being

10:46AM 2   prepared or scheduled for a cardioversion to actually be taking

10:46AM 3   their anticoagulant; right?

10:46AM 4   **A.**   Yes.

10:46AM 5   **Q.**   Okay.  And so you would take that very seriously in making

10:47AM 6   sure that your patient understood the importance and was

10:47AM 7   actually taking the meds; right?

10:47AM 8   **A.**   Yes.

10:47AM 9   **Q.**   And you don't have any reason to think that Mr. Boudreaux

10:47AM 10  was not taking his medicine as prescribed?

10:47AM 11  **A.**   I don't.

10:47AM 12  **Q.**   When you discussed the checklist with -- with

10:47AM 13  Mr. Boudreaux and all of the patients that you were educating,

10:47AM 14  the patients that were taking Xarelto, you did not discuss with

10:47AM 15  them a Neoplastin PT test that could identify them as a

10:47AM 16  high-risk patient, did you?

10:47AM 17  **A.**   No.

10:47AM 18          **MR. BIRCHFIELD:**  Thank you, Your Honor.

10:47AM 19          **THE COURT:**  Any redirect?

10:47AM 20          **MS. WILKINSON:**  No, Your Honor.  Thank you.

10:47AM 21          **THE COURT:**  You're excused.  Thank you, ma'am.

10:47AM 22          **THE WITNESS:**  Thank you.

10:47AM 23                  **(Witness excused.)**

10:47AM 24          **THE COURT:**  Any further witnesses from the defendant?

10:48AM 25          **MS. WILKINSON:**  No.  The defense rests, Your Honor,

*OFFICIAL TRANSCRIPT*

|       |    |
|-------|----|
| 10:48AM | 1 |
| 10:48AM | 2 |

subject to the introduction of evidence as agreed upon by the
parties.

THE COURT:  Okay.  How about any rebuttal from the
plaintiffs?  Plaintiffs rest?

MR. BIRCHFIELD:  No, Your Honor.

THE COURT:  The Plaintiff rests.

MR. BIRCHFIELD:  Yes.

THE COURT:  Members of the jury, both the defendant
rests and the plaintiff rests.  So now that the evidence is
in -- and what I will be doing, as I mentioned, is I'll be
meeting with the parties shortly and talking to them about the
instructions.  I've already had several meetings with them, but
we'll finalize the instructions for you, and then we'll begin
tomorrow at 9:00.

So you're discharged until tomorrow at 9:00.
Again, please don't talk to anyone about the case, don't look
or read about anything about the case.  And I'll see you then
in the morning.

We'll stand in recess at this time.

(Whereupon the jury was excused from the courtroom.)

THE COURT:  Be seated, please.  Let's talk first
about logistical matters.  I'd like you both to look over the
exhibits and make sure they're in evidence in the fashion and
the way that you want them into evidence.

Also, as I mentioned to you at the outset, it

10:49AM
10:49AM
10:49AM
10:49AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM

1  would be helpful if you would be able to prepare for the jury

2  an index or some sort of a device so that they can see what

3  exhibit is in and what the number of the exhibit is so that

4  they can readily get it if they need it.  Show it to each other

5  so that we don't have any problems with the verbiage used.  I'd

6  like it to be agreeable to both sides.

7          And with regard to the demonstrative exhibits,

8  there have been a lot of demonstrative exhibits, at least shown

9  to the jury.  You know and I know that under the rules of

10  evidence, the medical articles -- what is it?  803(18) -- can

11  be discussed with the jury but not given to the jury.  So even

12  though that was demonstrative, it doesn't mean that they come

13  in.

14          But there might be some demonstrative exhibits

15  that do come in to the jury for demonstrative purposes.  If so,

16  then make sure they're into evidence and make sure that they're

17  numbered properly as demonstrative.

18          As you know from my charge, if that's the case,

19  then I tell them about a demonstrative exhibit and make sure

20  that they understand the difference.

21          So get with Dean shortly.

22          With regard to the motions, I talked to Kevin

23  and Gerry.  We'll do that tomorrow morning at 8:00, and we'll

24  take the motions.  But just so that we're -- that the record is

25  accurate, let's make sure the motions are made at this time,

10:51AM 1  and then I'll talk with you all about the -- the motions
10:51AM 2  specifically.
10:51AM 3              What I can do is just provide in the record that
10:51AM 4  the motions, when they are made tomorrow, will be considered
10:51AM 5  that they're made at the appropriate time and that the parties
10:51AM 6  are agreeable to that.
10:51AM 7        MS. WILKINSON:  We are, Your Honor.  And, of course,
10:51AM 8  we do make a Rule 50 motion, and we'll --
10:51AM 9        THE COURT:  Right.
10:51AM 10       MS. WILKINSON:  -- describe that tomorrow.
10:51AM 11       MR. MEUNIER:  Just so we're clear, Judge, at 8 a.m.
10:51AM 12 tomorrow you'll entertain motions from both sides under
10:51AM 13 Rule 50 --
10:52AM 14       THE COURT:  Right.
10:52AM 15       MR. MEUNIER:  -- as well as allow us to put on the
10:52AM 16 record our jury charge objections?
10:52AM 17       THE COURT:  Right.  Right.
10:52AM 18       MR. MEUNIER:  Thank you, Judge.
10:52AM 19       THE COURT:  And before today I'll be giving you my
10:52AM 20 final charge so that you'll know it and the final verdict forms
10:52AM 21 so that you'll have all of that information.
10:52AM 22             Okay.  With -- I've got -- I met already with
10:52AM 23 the parties earlier this morning about the jury charge.  I've
10:52AM 24 got their suggestions, and I'll be giving you a -- another
10:52AM 25 draft of the charge about 1:00 or 1:30, and then we'll meet and

| | |
|---|---|
| 10:52AM | 1 |
| 10:52AM | 2 |
| 10:52AM | 3 |
| 10:53AM | 4 |
| 10:53AM | 5 |
| 10:53AM | 6 |
| 10:53AM | 7 |
| 10:53AM | 8 |
| 10:53AM | 9 |

1    talk about that draft.

2             Okay.  We'll stand in recess.

3         **THE CASE MANAGER:**  All rise.

4         **MR. OVERHOLTZ:**  And so the plaintiffs need to

5    introduce into evidence -- it was Plaintiffs' Record

6    Number 5767949, and the plaintiffs would introduce that into

7    evidence as Plaintiffs' Exhibit 114, and defense has no

8    objection to the entry of that exhibit into evidence.

9                    **(Recess.)**

10

11

12

13                    **CERTIFICATE**

14         I, Tana J. Hess, CCR, FCRR, Official Court Reporter

15    for the United States District Court, Eastern District of

16    Louisiana, certify that the foregoing is a true and correct

17    transcript, to the best of my ability and understanding, from

18    the record of proceedings in the above-entitled matter.

19

20

21

22         Tana J. Hess, CCR, FCRR, RMR
          Official Court Reporter

23

24

25

*OFFICIAL TRANSCRIPT*