1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3
****************************************************************
4
IN RE:  XARELTO
5     (RIVAROXABAN) PRODUCTS
LIABILITY LITIGATION
6
CIVIL ACTION NO. 14-MD-2592
7                                    SECTION "L"
NEW ORLEANS, LOUISIANA
07:41:16    8                          WEDNESDAY, MAY 3, 2017

9     THIS DOCUMENT RELATES TO:
*Joseph J. Boudreaux, Jr.*
10    *V. Janssen Research &*
*Development, et. al.,*
11    Case No.:  14-CV-2720

12
****************************************************************
13
VOLUME VIII - MORNING AND AFTERNOON SESSION
14        TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                 UNITED STATES DISTRICT JUDGE

16
APPEARANCES:
17

18    FOR THE PLAINTIFFS'
LIAISON COUNSEL:              LEVIN PAPANTONIO THOMAS MITCHELL
19                                  RAFFERTY & PROCTOR
BY:  BRIAN H. BARR, ESQ.
20                                  316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FLORIDA 32502
21

22
BEASLEY ALLEN CROW METHVIN
23                                  PORTIS & MILES
BY:  ANTHONY BIRCHFIELD JR., ESQ.
24                                  POST OFFICE BOX 4160
MONTGOMERY, ALABAMA  36103
25

***OFFICIAL TRANSCRIPT***

1   APPEARANCES CONTINUED:

2

3                                    GAINSBURGH BENJAMIN DAVID
                                     MEUNIER AND WARSHAUER
4                                    BY:  GERALD E. MEUNIER, ESQ.
                                     2800 ENERGY CENTRE
5                                    1100 POYDRAS STREET, SUITE 2800
                                     NEW ORLEANS, LOUISIANA  70163
6

7                                    SCHLICHTER BOGARD & DENTON
8                                    BY:  ROGER DENTON, ESQ.
                                     100 S. 4TH STREET, SUITE 1200
9                                    ST. LOUIS, MISSOURI  63102

10

11                                   LAMBERT FIRM
                                     BY:  EMILY JEFFCOTT, ESQ.
12                                   701 MAGAZINE STREET
                                     NEW ORLEANS, LOUISIANA  70130
13

14
    FOR THE DEFENDANT BAYER
15  HEALTHCARE PHARMACEUTICALS
    INC. And BAYER PHARMA AG:   WILKINSON WALSH & ESKOVITZ, LLP
16                                   BY:  BETH A. WILKINSON, ESQ.
                                     1900 M STREET NW, SUITE 800
17                                   WASHINGTON, DC  20036

18

19                                   NELSON MULLINS RILEY
                                     & SCARBOROUGH, LLP
20                                   BY:  DAVID E. DUKES, ESQ.
                                     MERIDIAN, 17TH FLOOR
21                                   1320 MAIN STREET
                                     COLUMBIA, SOUTH CAROLINA  29201
22

23                                   BRADLEY ARANT BOULT CUMMINGS
24                                   BY:  KEVIN C. NEWSOM, ESQ.
                                     ONE FEDERAL PLACE
25                                   1819 5TH AVENUE N
                                     BIRMINGHAM, ALABAMA  35203

                        *OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3    FOR JANSSEN PHARMACEUTICALS,
     INC. AND JANSSEN RESEARCH &
4    DEVELOPMENT, LLC:          BARRASSO USDIN KUPPERMAN FREEMAN
                                & SARVER, LLC
5                               BY:  RICHARD E. SARVER, ESQ.
                                909 POYDRAS STREET, 24TH FLOOR
6                               NEW ORLEANS, LOUISIANA  70112

7

8    OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
9                               REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB-275
10                              NEW ORLEANS, LOUISIANA  70130
                                (504) 589-7779
11                              Cathy_Pepper@laed.uscourts.gov

12

13   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

1      **I N D E X**

2

3                                                            <u>PAGE</u>

4

5    PLAINTIFFS' CLOSING ARGUMENTS BY MR. BARR............1552

6    DEFENDANTS' CLOSING ARGUMENTS BY MS. WILKINSON.......1583

7    PLAINTIFFS' REBUTTAL CLOSING ARGUMENTS BY

8    MR. BIRCHFIELD.......................................1618

9    JURY INSTRUCTIONS BY THE COURT......................1630

10   JURY DELIBERATES....................................1657

11   LUNCHEON RECESS.....................................1658

12   VERDICT.............................................1659

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, MAY 3, 2017

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)



THE DEPUTY CLERK:  All rise.

THE COURT:  Be seated, please.

The jury is outside of the courtroom.  The
parties have had an opportunity to see the jury charges.  I
received suggestions from the attorneys from each side.  I had
several meetings with them, gave them several drafts of the
jury charge.

Finally, last night, I gave them the final jury
charge.  They've had an opportunity to look it over.  I'll be
hearing objections to that.

Before we do that, I'll hear any objections to
the case, Rule 50.

MR. NEWSOM:  Thank you, Your Honor.  May it please the
Court.  Kevin Newsom, on behalf of the defendants.

I rise at the close of the evidence and before
the case is submitted to jury to respectfully request
Your Honor to enter judgment as a matter of law for the
defendants under Rule 50(a) of the Federal Rules of Civil
Procedure.

*OFFICIAL TRANSCRIPT*

08:01:11  1          We have filed this morning on the docket a
08:01:13  2   written motion, with supporting arguments that are spelled out
08:01:16  3   in greater detail there.  Without waiver of any of those
08:01:19  4   arguments, I'd like to summarize a few of them briefly for
08:01:22  5   Your Honor this morning.
08:01:23  6          Plaintiffs have, as you know, only one remaining
08:01:26  7   cause of action in this case for failure to warn under section
08:01:30  8   2800.57.
08:01:32  9          In fact, plaintiffs have only a single theory
08:01:34 10   underlying that sole remaining claim, namely that Xarelto's
08:01:38 11   label failed to warn or instruct doctors to use Neoplastin PT
08:01:43 12   tests to assess whether their patients were at a heightened
08:01:46 13   risk of bleeding such that they should not be on Xarelto.
08:01:49 14          Defendants are entitled to judgment as a matter
08:01:51 15   of law for three independent reasons:
08:01:53 16          Number one, there is legally insufficient
08:01:57 17   evidence either that defendants failed to provide an adequate
08:02:01 18   warning or instruction to Mr. Boudreaux's physician, Dr. Wong,
08:02:04 19   or that any allegedly inadequate instruction proximately caused
08:02:10 20   Mr. Boudreaux's injuries;
08:02:11 21          Number two, federal law preempts plaintiffs'
08:02:14 22   Neoplastin based failure to warn claim; and,
08:02:17 23          Number three, to the extent that plaintiffs' sole
08:02:21 24   remaining claim depends in any respect on any of the numerous
08:02:25 25   abandoned theories of liability, there is no legally sufficient

*OFFICIAL TRANSCRIPT*

08:02:29  1    evidence to support it.

08:02:29  2              First, and most fundamentally, insufficient

08:02:33  3    evidence is a matter of state law.  There are two key elements

08:02:36  4    to plaintiffs' failure to warn claim, that the warning or

08:02:39  5    instruction was legally inadequate, and that the allegedly

08:02:42  6    inadequate warning proximately caused Mr. Boudreaux's injury.

08:02:46  7              The simplest and most straightforward way to

08:02:49  8    resolve this case as a matter of law is on the proximate cause

08:02:54  9    element.

08:02:54 10              Because this is a warnings case, Your Honor, to

08:02:56 11    prove proximate cause, plaintiffs must prove both warnings

08:02:59 12    causation and medical causation.  With respect, they have

08:03:03 13    proved neither.

08:03:04 14              There has been some dispute about what the

08:03:05 15    warnings causation standard is that governs the inquiry here,

08:03:11 16    but let me be clear by quoting the Fifth Circuit's decision in

08:03:14 17    *Willett v. Baxter*.  "The plaintiff must show that a proper

08:03:18 18    warning would have changed the decision of the treating

08:03:22 19    physician; that is, that but for the inadequate warning, the

08:03:23 20    treating physician would not have used or prescribed the

08:03:26 21    product."

08:03:27 22              That's the same standard that Your Honor enforced

08:03:30 23    and applied in the *Allgood* and *Whitener* decisions.  On that

08:03:34 24    standard, this case begins and ends with Dr. Wong's testimony.

08:03:37 25              The proof is now in, and there simply is no

**OFFICIAL TRANSCRIPT**

08:03:40 1    legally sufficient evidence that Dr. Wong would have changed
08:03:42 2    his prescribing decision.  The evidence, in fact, is clearly to
08:03:46 3    the contrary.
08:03:48 4          Dr. Wong testified first that there is no
08:03:51 5    reliable test, let alone any FDA approved test, to determine
08:03:56 6    whether a particular patient is at an increased risk of
08:03:59 7    bleeding such that he or she should not be on Xarelto.
08:04:03 8          Dr. Wong also clearly testified that he would
08:04:05 9    not, under any circumstances, use any test unless it was FDA
08:04:11 10   approved specifically for use with Xarelto, which Neoplastin PT
08:04:16 11   indisputably is not.
08:04:19 12         Finally, and most fundamentally, Dr. Wong
08:04:21 13   testified that, even knowing everything he does today about
08:04:24 14   plaintiffs' failure to instruct theory, he "still would
08:04:29 15   prescribe Xarelto to Mr. Boudreaux."  That evidence is
08:04:32 16   conclusive that Dr. Wong would not have changed his prescribing
08:04:36 17   decision as required under the Fifth Circuit's decision in
08:04:40 18   *Willett*.
08:04:40 19         In light of Dr. Wong's clear testimony,
08:04:43 20   plaintiffs' claim fails for lack of warnings causation.
08:04:46 21         The claim separately fails for lack of medical
08:04:49 22   causation.  There is no legally sufficient evidence that
08:04:51 23   Mr. Boudreaux was ever administered plaintiff's preferred
08:04:56 24   Neoplastin PT test, nor is there any legally sufficient
08:04:58 25   evidence that the quote unquote "slightly elevated Innovin PT

*OFFICIAL TRANSCRIPT*

08:05:02  1   test would have generated or did generate any clinically

08:05:06  2   significant information that could be reliably converted to a

08:05:09  3   Neoplastin PT reading."

08:05:11  4        Dr. Leissinger's opinion to the contrary, that

08:05:13  5   the Neoplastin PT test likely would have been higher, is pure

08:05:19  6   speculation excludable under *Daubert*.

08:05:22  7        In any event, the warnings or instructions

08:05:26  8   provided by defendants were legally sufficiently, and thus

08:05:30  9   adequate as a matter of law.  That's so for several reasons.

08:05:31 10        First, there is no evidence, as Louisiana law

08:05:34 11   requires under the *Stahl* decision, that defendants failed to

08:05:37 12   disclose any clinically meaningful information that was "not

08:05:41 13   otherwise known" to Dr. Wong.

08:05:43 14        Second, likewise under *Stahl*, the instructions

08:05:48 15   and warnings that defendants provided were adequate is a matter

08:05:53 16   of law.

08:05:54 17        The court in *Stahl* said this:  "When a particular

08:05:55 18   adverse effect is clearly and unambiguously mentioned in a

08:05:59 19   warning label," as the risk of bleeding clearly is here, "and

08:06:01 20   the prescribing physician unequivocally states that he or she

08:06:08 21   was adequately informed of that risk by the warning," as

08:06:09 22   Dr. Wong clearly testified here that he was, "the manufacturer

08:06:14 23   has satisfied its duty to warn under the learned intermediary

08:06:20 24   doctrine."  That standard plainly is satisfied on this

08:06:22 25   evidence.

*OFFICIAL TRANSCRIPT*

08:06:22  1        Finally, plaintiffs' claim of inadequacy is not

08:06:26  2   supported by reliable expert testimony.  Dr. Kessler testified

08:06:29  3   only that a PT test would have provided quote unquote "helpful

08:06:34  4   information to physicians."  He offered no opinion that any

08:06:37  5   unapproved off-label use of Neoplastin PT would have provided

08:06:41  6   clinically useful information that would have allowed

08:06:44  7   physicians to make treatment decisions.

08:06:47  8        For these reasons, we respectfully submit that

08:06:48  9   plaintiffs' failure to warn claim fails as a matter of

08:06:52 10   Louisiana state law.

08:06:53 11        Second, as Your Honor knows, our position is that

08:06:55 12   plaintiffs' claim is preempted by federal law.  As Your Honor

08:06:58 13   has now repeatedly held and stated, preemption is a question of

08:07:02 14   law for the court.  We have debated preemption in the summary

08:07:08 15   judgment papers.  We have renewed those arguments in our motion

08:07:12 16   filed today on the docket.  We renew and incorporate the

08:07:13 17   summary judgment motions into that paper.

08:07:16 18        For the reasons stated in the summary judgment

08:07:18 19   motions and in today's filing, we reiterate our position that

08:07:23 20   defendants are entitled to judgment as a matter of law on the

08:07:24 21   ground that federal law preempts plaintiffs' failure to warn

08:07:26 22   claim.

08:07:29 23        Finally, Your Honor, as you know, the plaintiffs

08:07:31 24   began this case with a whole host of theories of liability.

08:07:35 25   They have since expressly abandoned all but one of them.

*OFFICIAL TRANSCRIPT*

08:07:39  1          To the extent that the failure to warn claim that
08:07:40  2  remains is predicated on any of those abandoned theories, there
08:07:45  3  is insufficient evidence to support it.
08:07:46  4          You heard a bit about a black box warning, but
08:07:50  5  plaintiffs swore that claim off before the trial began:
08:07:53  6  "Plaintiffs do not intend to advance a black box argument at
08:07:56  7  trial."  They have also provided no expert testimony in support
08:08:00  8  of that claim.  It is due to be dismissed.
08:08:03  9          You also heard a bit about a reversal agent.
08:08:05 10  That is a design defect theory that was dismissed with
08:08:07 11  prejudice pretrial by stipulation.  Plaintiffs have provided no
08:08:10 12  expert testimony to support that.  It is due to be dismissed.
08:08:14 13          There is also no evidence to support any of the
08:08:16 14  remaining abandoned theories that plaintiffs articulated
08:08:20 15  pretrial but have since abandoned, for instance, that
08:08:23 16  defendants failed to test alternative designs; that the label
08:08:27 17  should have instructed doctors to engage in routine monitoring;
08:08:33 18  that the label should have warned about the U.S. subgroup data
08:08:33 19  from the ROCKET trial; that the label should have referenced
08:08:37 20  problems with the INRatio device; that Xarelto's once daily
08:08:40 21  dosing regimen is unreasonably dangerous; that Xarelto's 15 or
08:08:44 22  20 milligram cumulative dose is too high; or, that the label
08:08:47 23  should have instructed doctors to monitor their patients'
08:08:50 24  coagulation status for dose adjustment purposes.
08:08:53 25          Your Honor, for all of these reasons that are

*OFFICIAL TRANSCRIPT*

08:08:55 1   more fully and, I'm sure, more artfully stated in the written

08:08:59 2   motion filed on the docket today, we respectfully move

08:09:02 3   Your Honor for judgment as a matter of law pursuant to Rule

08:09:07 4   50(a) of the Federal Rules of Civil Procedure.

08:09:08 5        THE COURT:  I've heard the argument.  I don't need any

08:09:11 6   response.

08:09:11 7             With regard to the federal preemption, I agree

08:09:17 8   with the *Guidry* case and also the *Law Review* articles and

08:09:22 9   discussions subsequent to *Levigne*.

08:09:25 10            The courts conclude that *Levigne* concluded that

08:09:29 11  the drug label may be inadequate under state tort law, even if

08:09:34 12  it has been approved by the FDA.

08:09:36 13            As the court, in *Guidry*, says, this is strong

08:09:40 14  evidence that the FDA is not the end-all, be-all of it.

08:09:44 15            As I see the law developing, there is a

08:09:46 16  difference between the brand name drugs and the other drugs.

08:09:49 17  The other drugs have to put on their label what the brand name

08:09:56 18  has; and, if they don't, then they are violating federal law.

08:10:02 19  But the brand name drugs, the manufacturer has a continuing

08:10:08 20  duty.  They are the captain of the label.  They have a

08:10:14 21  continuing duty to keep it up and put on the label the things

08:10:19 22  that they know, particularly if it's going to be helpful.

08:10:22 23            If it's going to be helpful, they don't even need

08:10:25 24  to run it past the FDA.  They can put it on the label even

08:10:29 25  without that.

**OFFICIAL TRANSCRIPT**

08:10:31 1           So federal preemption I don't think is applicable
08:10:37 2  here.  This is a brand name drug, and I don't think federal
08:10:44 3  preemption plays a part.  So I'll deny that aspect of the
08:10:46 4  motion.
08:10:46 5           With regard to the other, I think there is enough
08:10:49 6  evidence that it creates a fact question.  What the defendants
08:10:52 7  knew, what they told the FDA, or what they should have told the
08:10:56 8  FDA, what would have happened had they told the FDA are all
08:11:03 9  questions of fact.
08:11:03 10          With regard to the witness, Dr. Wong, Dr. Wong
08:11:06 11  testified in several areas.  One area may be supportive of the
08:11:12 12  defendants' position, but another area he said he would have
08:11:16 13  followed the label.  What's on the label, he's aware of.  Had
08:11:25 14  he been advised of a test, he would have followed the label.
08:11:27 15  Now, whether the jury believes him or not, that's a question
08:11:29 16  for the jury, and not for the Court.
08:11:31 17          So, for all of those reasons, questions of
08:11:34 18  preemption, questions of fact, I'll deny the motion.
08:11:34 19          Let me hear anything else.
08:11:34 20      MR. NEWSOM:  Thank you, Your Honor.
08:11:42 21        If I may just provide a courtesy copy to your law
08:11:47 22  clerk of the motion that's been filed this morning.
08:11:47 23      THE COURT:  Yes, please do.
08:11:53 24      MR. LONGER:  Good morning, Your Honor.  Now, you get to
08:11:56 25  hear it from the plaintiffs' side.  Fred Longer, on behalf of

**OFFICIAL TRANSCRIPT**

1528

08:12:01 1    the Boudreauxs.

08:12:01 2              Your Honor, I rise at the close of evidence as
08:12:05 3    well to present plaintiffs' Rule 50 motion.  Our motion, which
08:12:13 4    is being filed as we speak, I understand, is related to two
08:12:20 5    points of the defendants' affirmative defenses.

08:12:24 6              They have raised an affirmative defense of
08:12:27 7    comparative fault.  They have also, as you just heard, raised
08:12:32 8    an affirmative defense of preemption.

08:12:36 9              I understand Your Honor's ruling, so I don't know
08:12:38 10   that I need to belabor the last.

08:12:40 11             But, as to the defense of comparative fault, the
08:12:46 12   defendants have presented no evidence whatsoever about the
08:12:48 13   Boudreauxs' comparative fault.  As you saw during the trial,
08:12:52 14   there was no cross-examination of either Mr. or Mrs. Boudreaux.
08:12:57 15   There was no proposal for a jury instruction.  There was
08:13:03 16   nothing on the verdict sheet presented by the defendants
08:13:06 17   regarding comparative fault.

08:13:09 18             To our knowledge, they have waived any chance to
08:13:15 19   preserve that issue, and, as such, no reasonable jury would
08:13:19 20   have a legally sufficient evidentiary basis to find for the
08:13:23 21   defendants on comparative fault.

08:13:24 22             So, we respectfully request that a judgment be
08:13:30 23   entered against the defendants on this defense and in favor of
08:13:33 24   the plaintiffs.

08:13:35 25             As to preemption, Your Honor, it's a demanding

**OFFICIAL TRANSCRIPT**

08:13:41  1   defense.  The defendants have to prove by clear evidence, it's

08:13:44  2   their burden to prove by clear evidence that the FDA would not

08:13:51  3   have approved a warning or instruction in the manner and of the

08:13:59  4   type that the plaintiffs have proposed throughout this

08:14:03  5   litigation regarding the PT testing.

08:14:09  6            They were obliged to show that it was not

08:14:14  7   probable, but highly probable and reasonably certain that the

08:14:17  8   FDA would not have included that language.  That's in the

08:14:22  9   *Fosamax* opinion at the Third Circuit.

08:14:23 10            Here, the plaintiffs have produced more than

08:14:25 11   sufficient evidence for a reasonable jury to conclude that the

08:14:28 12   FDA would have approved a properly worded warning about an

08:14:33 13   instruction for the safe use of Xarelto, or, at the very least,

08:14:38 14   to conclude that the odds of FDA rejection were less than

08:14:41 15   highly probable.

08:14:42 16            So, the only testimony that the defendants have

08:14:46 17   regarding any matter regarding FDA warning was that of

08:14:52 18   Dr. Peters.  He had presented -- but his testimony was

08:14:58 19   limited -- on pages 1103 through 1104 of the trial record, his

08:15:09 20   testimony was only limited to the fact, the fact of an FDA

08:15:14 21   strikethrough, not the reasoning behind it, and not any

08:15:18 22   reasoning as to whether or not FDA would have found it

08:15:21 23   impossible to approve a different label.

08:15:24 24            That's the one point.

08:15:27 25            They have presented no expert testimony on this

*OFFICIAL TRANSCRIPT*

08:15:32  1    point.  The defendants had Dr. Hixon -- a report of Dr. Hixon,

08:15:37  2    but she did not testify at trial, and so there is nothing

08:15:41  3    competent presented to Your Honor.

08:15:44  4         As a result, without any competent evidence that

08:15:50  5    the FDA would act one way or the other, we respectfully submit

08:15:56  6    that the defendants have failed to meet their burden of proving

08:16:00  7    their affirmative defense, and that no reasonable jury could

08:16:06  8    have legally found a sufficient evidentiary basis to find for

08:16:11  9    the defendants, and that judgment should be entered as a matter

08:16:13  10   of law on the preemption defense.

08:16:17  11        THE COURT:  Thank you very much.

08:16:18  12        MR. LONGER:  Thank you.

08:16:20  13        THE COURT:  With regard to comparative fault,

08:16:22  14   comparative fault is not an issue in the case, and age is not

08:16:27  15   an issue in the case, and race is not an issue in the case, and

08:16:31  16   ethnic background is not an issue in the case.

08:16:35  17        I don't want to tell the jury all of those things

08:16:37  18   that are not an issue in the case.  That's not necessary.

08:16:41  19        With regard to the whether or not FDA would

08:16:45  20   approve the warning, you'll see in my jury charges, the jury

08:16:51  21   charges mimic the law that it doesn't matter what the FDA would

08:16:56  22   or would not have done from the standpoint of the law in the

08:17:04  23   case.  It may have something to do with intent of the parties,

08:17:08  24   it may have something to do with motive of the parties, but

08:17:11  25   it's a question of fact or evidence.  So I'll deny the

**OFFICIAL TRANSCRIPT**

08:17:20  1       plaintiffs' motion.

08:17:23  2             MR. NEWSOM:  If I may, Your Honor, just briefly for the

08:17:31  3       record.  If you're finished.

08:17:31  4             MR. LONGER:  I'm done on that.  I have one more.

08:17:32  5             MR. NEWSOM:  Just, Your Honor, for the record, to be

08:17:32  6       clear, the preemption-based Rule 50 motion is improper for

08:17:37  7       another reason.

08:17:37  8                 I think, at this point, as Your Honor has

08:17:39  9       reiterated time and time again, preemption is a question of law

08:17:44 10       for the Court, as we have briefed in summary judgment and on

08:17:47 11       our JML motion.  To even entertain a motion at this stage of

08:17:53 12       the case that there are insufficient facts to demonstrate

08:17:55 13       preemption would be changing the rules after the game has

08:17:59 14       begun.

08:17:59 15             THE COURT:  Right.  Yes.

08:17:59 16             MR. NEWSOM:  So we object even to the entertainment of

08:18:04 17       the motion, let alone granting of the motion.

08:18:04 18             THE COURT:  Okay.

08:18:04 19             MR. NEWSOM:  Thank you, Your Honor.

08:18:04 20             THE COURT:  I agree with that.

08:18:05 21             MR. NEWSOM:  Yes, sir.  Thank you.

08:18:05 22             THE COURT:  Let's go to the --

08:18:05 23             MR. LONGER:  Your Honor --

08:18:05 24             THE COURT:  Yes.

08:18:09 25             MR. LONGER:  -- if I may, Fred Longer again.

                                *OFFICIAL TRANSCRIPT*

08:18:10  1          Plaintiffs have just filed this morning a Motion

08:18:13  2   to Strike the FDA Redline Documents, or, in the Alternative, to

08:18:17  3   Instruct the Jury to Disregard the Documents and Preclude

08:18:21  4   Argument Regarding FDA Actions.

08:18:23  5          This is a motion addressing two documents in

08:18:27  6   evidence.  It's DX-5548 and DX-6009.  These are the two redline

08:18:37  7   documents that Dr. Kessler was interrogated about, as well as

08:18:43  8   Dr. Peters.

08:18:45  9          It is our position, Your Honor, that these

08:18:48 10   documents were improperly admitted, and that their probative

08:18:56 11   value is far outweighed by their prejudicial value.

08:19:01 12          I raise this -- I understand Your Honor's rulings

08:19:04 13   on the jury instructions, as well as what we've just heard in

08:19:08 14   regard to the Rule 50 motions.  I raise this as a formality,

08:19:12 15   Your Honor, that we would appreciate those documents being

08:19:17 16   stricken from the record.

08:19:19 17        THE COURT:  Kevin, what's your view of that?

08:19:19 18        MR. LONGER:  Excuse me one second.

08:19:26 19          Your Honor, in the alternative, if they are not

08:19:30 20   stricken from the record, we ask that Your Honor give an

08:19:34 21   instruction that the defendants are not permitted to address

08:19:38 22   these matters in regards to the FDA strikethrough and the

08:19:45 23   import of that information, and the jury not be permitted to

08:19:50 24   hear the same.

08:19:50 25          Thank you.

                          *OFFICIAL TRANSCRIPT*

08:19:59 1          MR. NEWSOM:  Your Honor, we discussed this yesterday

08:20:01 2     with Your Honor in chambers.  The FDA striking document, while

08:20:05 3     to be sure, at this stage of the proceedings, is not a

08:20:08 4     preemption related issue, it is certainly relevant.

08:20:12 5          The interaction with the FDA, as Your Honor's

08:20:16 6     jury charges will instruct the jury, are certainly relevant to

08:20:19 7     the defendants' course of conduct, the reasonableness of that

08:20:23 8     course of conduct.

08:20:23 9          It is a pertinent piece of evidence.  Your Honor

08:20:26 10    instructed the jury mid-trial that with respect to the

08:20:30 11    relevance of that particular piece of evidence, like all

08:20:33 12    evidence, they are the finders of fact, and they can consider

08:20:36 13    to what extent they find that document relevant.

08:20:38 14          So I think there is no basis to strike that

08:20:40 15    document, or to instruct the jury that they are not to consider

08:20:42 16    it, or to instruct the lawyers that they are not to discuss it.

08:20:45 17          THE COURT:  Okay.  Thank you.

08:20:45 18          MR. NEWSOM:  Thank you, Your Honor.

08:20:48 19          THE COURT:  The plaintiffs make an argument on both

08:20:52 20    sides of that issue.  At one time, they take the position that

08:20:55 21    the FDA would not have approved any warning, and therefore

08:21:00 22    there is no evidence to support that they would or would not

08:21:04 23    have approved the warning.

08:21:10 24          Well, if the evidence is that they were asked to

08:21:13 25    do it, then there's an argument that they would have approved

**OFFICIAL TRANSCRIPT**

08:21:16   1   it.  Whether or not they would have, there's another issue of

08:21:22   2   what the intent of the defendant was, whether they had intent

08:21:28   3   to try to do something.  That can cut both ways.

08:21:32   4          I'm not going to strike the evidence, but I will,

08:21:36   5   just as I did before, if that's brought up, I would interrupt

08:21:40   6   whoever brings it up, and instruct the jury that this is a

08:21:44   7   question of relevance, that it's determinative, and it's up to

08:21:49   8   them to give whatever weight they wish to give to it.

08:21:51   9          But I'm not going to strike the evidence, and I'm

08:21:54  10   not going to tell anybody not to argue, but I do give everybody

08:21:57  11   a heads-up that I will be at least instructing the jury if that

08:22:05  12   comes up.

08:22:08  13          MR. NEWSOM:  Your Honor, if I may, briefly.

08:22:09  14          A proposal for closings.  Rather than Your Honor

08:22:12  15   interrupting closings, if that document is to be discussed,

08:22:14  16   would it be sufficient if the lawyer discussing it prefaces the

08:22:18  17   discussion of it; there will be no discussion of preemption or

08:22:22  18   a conclusive nature of that document, but simply that this is a

08:22:27  19   relevant piece of evidence for the jury to consider, rather

08:22:30  20   than interrupting the flow of the closing?

08:22:31  21          THE COURT:  If it time comes in, I'll have to make that

08:22:35  22   decision on what I hear.

08:22:40  23          MR. NEWSOM:  Yes, sir.  Thank you.

08:22:40  24          THE COURT:  Let's go to the jury charges at this time

08:22:41  25   then.

*OFFICIAL TRANSCRIPT*

08:22:42 1        As I mentioned, I gave the parties an opportunity
08:22:46 2   to give me input on it.  They did give me input that was very
08:22:49 3   helpful.  We had several meetings, and then I gave them my
08:22:52 4   final charge.  I'll hear any objections to it at this time.
08:22:54 5        MR. MEUNIER:  May it please the Court.  Good morning,
08:22:57 6   Your Honor.  Jerry Meunier, for the plaintiffs, Joseph and
08:23:00 7   Loretta Boudreaux.
08:23:01 8        Pursuant to Rule 51 of the Federal Rules of Civil
08:23:04 9   Procedure, we do take this opportunity to make a record of the
08:23:07 10  plaintiffs' objections to the Court's not having included in
08:23:10 11  its final version of the jury charge the following portions of
08:23:15 12  the plaintiffs' proposed jury instructions numbered 1 through
08:23:17 13  30, which were filed on April 30, 2017, as Record
08:23:25 14  Document 6348.
08:23:25 15       In the section of Your Honor's charge dealing
08:23:29 16  with the manufacturer's continuing duty to provide adequate
08:23:33 17  instructions to prescribing doctors after a drug product is on
08:23:37 18  the market -- this is beginning at page 21 of your charge -- we
08:23:40 19  respectfully object to the failure to refer not only to the
08:23:44 20  post-FDA approval knowledge about a drug that the manufacturer
08:23:50 21  actually acquires, but also to the knowledge that the
08:23:54 22  manufacturer should have acquire had it acted as a reasonably
08:23:59 23  prudent manufacturer.
08:24:01 24       The authority for this language is cited in
08:24:04 25  plaintiffs' proposed Jury Instruction Number 12, including

**OFFICIAL TRANSCRIPT**

08:24:07  1   citation to a provision in the LPLA itself.  We believe it's

08:24:11  2   relevant law under the evidence presented in this case.

08:24:14  3           THE COURT:  With regard to that, let me just speak on

08:24:17  4   it.  I've touched on that.  I think the jury charge that I've

08:24:22  5   given is sufficient to cover those aspects of the case.  I'll

08:24:27  6   deny the motion.

08:24:28  7           MR. MEUNIER:  Thank you, Judge.

08:24:29  8               In the section of Your Honor's charge dealing

08:24:32  9   with FDA approval and federal regulatory standards -- this

08:24:36 10   begins at page 22 and through page 23 of your charge -- we

08:24:40 11   respectfully object to the failure to include the plaintiffs'

08:24:43 12   proposed jury instruction 18, which is supported both by the by

08:24:50 13   *Wyeth* and by the Code of Federal Regulations, which is imposing

08:24:53 14   a duty on the manufacturer both for the initial drafting of the

08:24:56 15   label and for assuring that labeling continues after the

08:25:00 16   initial draft to reflect current knowledge regarding the risks

08:25:05 17   of a product.

08:25:05 18               We also respectfully object to the failure to

08:25:08 19   include plaintiffs' proposed jury charge number 19, again

08:25:12 20   citing to the CFR provision that instructive information

08:25:16 21   regarding, quote, "any laboratory tests helpful," close quote,

08:25:21 22   in addressing, quote, "possible adverse reactions must" -- and

08:25:28 23   it is mandatory -- "be provided in the warning section of the

08:25:32 24   prescription drug label."

08:25:33 25               In fact, this is a regulation which the jury was

*OFFICIAL TRANSCRIPT*

08:25:40 1   shown during Dr. Kessler's testimony.

08:25:43 2            Finally, we object to the failure to include

08:25:46 3   plaintiffs' proposed jury charge Number 20, which, pursuant to

08:25:48 4   the authorities cited in our instruction, provides that a

08:25:52 5   manufacturer's violation of one or more relevant federal

08:25:55 6   regulations may be considered as relevant in determining

08:25:58 7   whether adequate instructions have been provided by the

08:26:01 8   manufacturer to prescribing physicians.

08:26:03 9            So, Your Honor, in your section dealing generally

08:26:06 10  with the FDA and federal regulations, we have cited to our jury

08:26:11 11  charges 18, 19, and 20, and we respectfully object to those not

08:26:17 12  being included in that section of your charge.

08:26:19 13        THE COURT:  I've taken that up.  22 and 23 of the

08:26:23 14  charge deal with the fact that the FDA approval may be

08:26:28 15  relevant, but it's not, in itself, dispositive of liability.

08:26:34 16            I also take up the fact that whether the FDA did

08:26:36 17  or did not do anything, that that's not sufficient and it's not

08:26:50 18  conclusive.

08:26:52 19            With regard to dealing with specific items of

08:26:55 20  evidence that should be in, I don't think the jury charge

08:26:59 21  should focus on specific items of evidence.  I chose not to do

08:27:03 22  that, but instead speak the law generally and let the jury

08:27:07 23  decide on it.  So I'll deny that motion.

08:27:09 24        MR. MEUNIER:  Your Honor, in this same section of the

08:27:12 25  Court's charge on the FDA and federal regulations, again,

*OFFICIAL TRANSCRIPT*

08:27:15 1   pages 22 and 23, we respectfully object to the failure to

08:27:19 2   include plaintiffs' proposed jury instruction number 22, which

08:27:23 3   also was plaintiffs' proffered number one when it was proposed

08:27:26 4   during the trial as a limiting instruction.

08:27:28 5            This is the charge which would instruct the jury

08:27:30 6   as to the limited relevance of the defendant exhibit you've

08:27:34 7   just heard about reflecting a draft label for Xarelto with

08:27:39 8   certain language purportedly struck through or redlined out by

08:27:43 9   the FDA.

08:27:43 10           Your Honor, notwithstanding your appropriate

08:27:46 11  instructions to this jury that the FDA's approval of Xarelto is

08:27:50 12  not conclusive and does not foreclose the LPLA claims in this

08:27:55 13  case, the only possible probative value of the jury being

08:27:59 14  advised that the FDA struck certain language proposed by the

08:28:03 15  manufacturer for the label, the only probative value of that

08:28:06 16  would be, we believe, to invite the jury to consider that as

08:28:11 17  being a foreclosing event or a closing of a chapter with

08:28:16 18  respect to language that has been recommended by the plaintiffs

08:28:19 19  to be in the label.

08:28:20 20           You have considered this document more than once.

08:28:25 21  We're aware of that, Judge.  You've weighed, under 403, the

08:28:31 22  relevance and the probative value.

08:28:34 23           Our view is that the relevance is on the side of

08:28:37 24  what the manufacturer knew, didn't know, should have done, did,

08:28:40 25  and that's fine; but, on the side of the transaction which

*OFFICIAL TRANSCRIPT*

08:28:43  1    reflects FDA action -- this is not manufacturer action, which

08:28:47  2    may be relevant, this is FDA action -- there is, to us, nothing

08:28:51  3    but prejudice.  There is no relevance -- preemption is not for

08:28:56  4    the jury to consider.  There is no relevance to what the FDA

08:29:01  5    chose to do with the language.

08:29:02  6            So the strikethrough, when you look at that side

08:29:05  7    of the transaction, is wholly prejudicial with no probative

08:29:08  8    value.

08:29:09  9            We recognize it's in evidence.  We hear the Court

08:29:11 10    on that.  We only have urged you, and we again urge you with

08:29:14 11    our proposed charge 22, to tell the jury that, with respect to

08:29:18 12    that document, they are -- and this is from my proposed

08:29:23 13    charge -- not to consider that as either -- as proof that the

08:29:26 14    FDA either refused to approve or would not have approved

08:29:31 15    language for the Xarelto label that the plaintiffs claim was

08:29:35 16    needed to properly instruct Mr. Boudreaux's prescribing doctor

08:29:38 17    about the dangers or safe use of Xarelto.

08:29:41 18            It doesn't deny the relevance of the document.

08:29:46 19    It simply, in our view, appropriately limits the relevance and

08:29:49 20    forecloses potential prejudice on what we consider to be still

08:29:51 21    an indirect appeal of the issue of preemption.

08:29:56 22            I'm happy to hear that Your Honor will be alert

08:29:57 23    to what the defendants say at argument about that document.

08:30:00 24        THE COURT:  I understand the issue.  The issue is not

08:30:03 25    relevance.  I think everybody agrees that it passes the 401

**OFFICIAL TRANSCRIPT**

1540

08:30:06  1    situation.

08:30:06  2            The question is the 403.  That's a balancing act.

08:30:11  3    One of the things in the jury charge is that I added the

08:30:15  4    sentence, "in fact, any action or inaction on the part of the

08:30:19  5    FDA, though relevant, does not foreclose a claim under

08:30:24  6    Louisiana law."

08:30:24  7            That gives the plaintiffs an opportunity to argue

08:30:34  8    that it's irrelevant -- or the relevant doesn't foreclose the

08:30:37  9    claim.  I think that that's sufficient to balance the 403.

08:30:41 10            I'll deny the motion.

08:30:43 11        MR. MEUNIER:  Thank you, Judge.

08:30:45 12            The final matter we address has to do with one of

08:30:48 13    the quieter elements in this case, the claim for damages of

08:30:50 14    Loretta Boudreaux.

08:30:52 15            With this, we have an objection to both the

08:30:54 16    Court's charges and the Court's verdict form, since both now

08:30:57 17    fail to include reference to the plaintiff Loretta Boudreaux's

08:31:01 18    claim under Louisiana law for mental anguish and emotional

08:31:05 19    distress in having been present at the time of her husband's

08:31:09 20    emergency GI bleed.

08:31:11 21            More specifically, we object to the Court's

08:31:14 22    failure in the section of your charges on damages, which begins

08:31:18 23    at page 29, to include the portion of plaintiffs' proposed

08:31:21 24    charge number 27, which cites Louisiana Code, Article 2315.6,

08:31:26 25    and sets forth the elements of this claim for damages.

*OFFICIAL TRANSCRIPT*

08:31:31  1          We likewise object to the Court's failure in

08:31:36  2     Question 4 of the verdict form to set forth a separate line for

08:31:38  3     the recovery of these damages, in addition to the line that's

08:31:40  4     there for the recovery of Mrs. Boudreaux's loss of consortium.

08:31:45  5          Judge, the uncontradicted testimony of Loretta

08:31:49  6     Boudreaux we think clearly provides a factual basis for this

08:31:51  7     claim of mental change under 2315.6.  We submit that the

08:31:56  8     failure of the LPLA to expressly sanction such recovery is no

08:32:01  9     more fatal to her claim than the statute's silence as to her

08:32:06 10     derivative claim for the loss of consortium, a claim which the

08:32:10 11     defendants have not opposed and which is clearly proper.

08:32:13 12          Moreover, there is nothing in the exclusive

08:32:16 13     remedy provision of the LPLA that serves to limit the scope of

08:32:21 14     damages recoverable in the pursuit of the remedy.  There is no

08:32:26 15     logic in saying that because it's an exclusive remedy as to

08:32:29 16     fault, it somehow limits the scope of damages based on that

08:32:33 17     fault.

08:32:33 18          Mrs. Boudreaux's claim under 2315.6 proceeds

08:32:38 19     against the defendant manufacturers under the theory of product

08:32:42 20     liability fault of the LPLA in the same way that

08:32:44 21     Mr. Boudreaux's claim does.

08:32:46 22          The defendants have cited decisions.  We have

08:32:50 23     read those decisions.  Your Honor, I would say two things about

08:32:54 24     them:  Number one, I think the decisions incorrectly conflate a

08:33:01 25     2315.6 claim for mental anguish with a stand-alone, independent

*OFFICIAL TRANSCRIPT*

08:33:06  1   tort for the infliction of emotional distress.

08:33:09  2           If this were a case in which Mrs. Boudreaux was

08:33:13  3   proceeding for negligence based on the infliction of emotional

08:33:16  4   distress, we would understand that that runs afoul of the

08:33:19  5   exclusive remedy language in the LPLA, but that's not the case

08:33:25  6   here.

08:33:26  7           It is associated with her husband's injury in a

08:33:29  8   very direct way, and it proceeds on the exclusive remedy fault

08:33:32  9   theory of the LPLA.

08:33:33 10           The other thing about those decisions I would

08:33:35 11   simply mention, Judge, is that if you read them, the courts

08:33:38 12   were careful to proceed to say that the plaintiffs had not

08:33:41 13   established the elements of recovery under 2315.6, which is a

08:33:46 14   different issue.  That's a different issue.

08:33:49 15           I would cite the Court to the case of *McNeely v.*

08:33:53 16   *Ford*, 763 So.2d 659.  It's a Louisiana First Circuit decision,

08:34:05 17   1999.  It was raised on redhibition and product fault.

08:34:09 18           In that case, the 2315.6 claim based on bystander

08:34:16 19   mental anguish was rejected not because it wasn't cognizable as

08:34:20 20   a matter of law, but because the elements of proof were not

08:34:23 21   sufficient to establish the claim.

08:34:25 22           So, to the extent there may be conflicting law,

08:34:30 23   Your Honor, in this series of bellwether trials, since this

08:34:33 24   issue may arise again, we invite the Court to take an educated

08:34:39 25   *Erie* guess as to what prevailing Louisiana law on this subject

**OFFICIAL TRANSCRIPT**

08:34:40  1  should be.  We don't pretend to say that it's well settled, but

08:34:44  2  we think this is a good case for there to be a finding by this

08:34:47  3  Court that the claim exists.  It's been factually established.

08:34:50  4  There is simply no reason, under the exclusive remedy language

08:34:53  5  of the LPLA, to limit a plaintiff's element of damage recovery,

08:34:58  6  as long as it's based on the remedies set forth in the statute.

08:35:02  7          Thank you, Judge.

08:35:02  8      THE COURT:  Thank you very much.

08:35:04  9          There is not much on this particular issue.  It's

08:35:08 10  not a *res nova* issue, but it's fair to say that there's very

08:35:16 11  limited authority on it.

08:35:17 12          I checked the literature.  I don't see any

08:35:20 13  particular *Law Review* articles or discussions on this

08:35:22 14  particular issue.  There really are just three cases, the

08:35:26 15  *Maurice* case, the *Ivory* case and the *McNeely* case, that even

08:35:30 16  touches on this.

08:35:31 17          There is no question that it's really factual

08:35:36 18  dependent on each other, the *Lilly* case and the *Ivory* case

08:35:44 19  emphasizes the facts.  They may or may not be facts in this

08:35:48 20  particular case.

08:35:48 21          But what happens in these factual discussions is

08:35:52 22  that this is a particularly difficult area to allow that aspect

08:36:01 23  of the damage to come in, because not only does a person have

08:36:06 24  to know the problem or see the problem, but also it needs to

08:36:12 25  understand the problem, understand the negligence, understand

*OFFICIAL TRANSCRIPT*

08:36:16  1    the lability at the time they see it.  Oftentimes, they not

08:36:21  2    aware of the situation, and it's hard for them to actually

08:36:28  3    appreciate the whole thing.

08:36:29  4              But regardless of the facts of the case, the part

08:36:35  5    that both the *Ivory* and the *Maurice* case bring out is that they

08:36:40  6    focus on the LPLA, the Louisiana Products Liability Act.  There

08:36:50  7    are legions of cases that say that that's the exclusive remedy

08:36:54  8    under products liability.  It's the exclusive remedy.  You

08:36:58  9    can't go outside of that.  The Legislature has spoken and said

08:37:02 10    with regard to products, that's the law, and that's all of the

08:37:05 11    law.

08:37:06 12              The act itself talks about damages.  It says

08:37:11 13    damages under this act means all damages caused by a product,

08:37:16 14    including survival and so forth.  It cites the various aspects

08:37:21 15    of 2315, and 2315.6 is not included in that.

08:37:25 16              So, I think that, to me, is conclusive.  I didn't

08:37:33 17    give it because I don't think that the LPLA includes that

08:37:37 18    aspect of the damage within it.  So I'll deny the motion for

08:37:42 19    those reasons.

08:37:43 20              MR. MEUNIER:  Thank you, Judge.

08:37:45 21              THE COURT:  Thank you very much.

08:37:45 22              Let me hear from the defendants.

08:37:50 23              MR. NEWSOM:  Yes, sir.  Thank you very much.  Kevin

08:37:51 24    Newsom, for the defendants.

08:37:52 25              I can be brief.  We have filed this morning on

*OFFICIAL TRANSCRIPT*

08:37:56  1    the record our objections to the Court's charge.  We appreciate

08:37:59  2    the care with which you've taken in putting the charge

08:38:01  3    together.

08:38:01  4            For the record, objections to charges that are

08:38:04  5    included in Your Honor's instructions:

08:38:06  6            First, with respect to the LPLA, at page 14 of

08:38:10  7    Your Honor's instructions, beginning at line 21, then, again,

08:38:14  8    at 15 at line 11, and, again, at page 17, lines 8 to 16, we

08:38:19  9    object on the grounds that the instruction does not incorporate

08:38:23 10    fully the warnings causation standard expressed in the case

08:38:27 11    law, including the requirement that the defendants must provide

08:38:31 12    an adequate warning, quote, that was not otherwise known to the

08:38:35 13    physician.

08:38:36 14            We have asked that that be included in the

08:38:38 15    instruction.  It has not been.  So we object to its omission.

08:38:43 16        THE COURT:  Okay.  I've given the instructions.  I

08:38:45 17    think that my instructions are adequate and appropriate under

08:38:49 18    the law.  I'll deny that motion.

08:38:53 19        MR. NEWSOM:  Yes, sir.  Thank you.

08:38:54 20            With respect to the labeling and federal

08:38:55 21    regulations portion of Your Honor's instruction, at page 22,

08:38:59 22    beginning at line 15, we object on the ground that the

08:39:04 23    instruction gives insufficient attention to and obscures the

08:39:09 24    relevance of the FDA's approval of Xarelto and defendants'

08:39:14 25    compliance with regulatory standards, which, while not

08:39:17 1    conclusive, do bear on the non-defectiveness of the product,

08:39:19 2    the adequacy of the product's label, and the reasonableness of

08:39:21 3    defendants' conduct.

08:39:23 4         THE COURT:  I think the law is clear that it's relevant

08:39:25 5    but not conclusive.  I've mentioned that in several statements

08:39:32 6    there.  Deny the motion.

08:39:35 7         MR. NEWSOM:  Yes, sir, Your Honor.  Thank you.

08:39:36 8              With respect to the foreseeability paragraph of

08:39:38 9    Your Honor's instruction, page 24, line 17, we object to the

08:39:43 10   instruction and request that it be stricken, simply because

08:39:45 11   foreseeability has not been an issue in the case, and that the

08:39:48 12   instruction could therefore confuse the jurors.

08:39:50 13        THE COURT:  I think it is part of the case.  I'll deny

08:39:53 14   that motion.

08:39:55 15        MR. NEWSOM:  Yes, sir.  Thank you.

08:39:57 16             With respect to the warnings causation

08:39:59 17   instruction and the learned intermediary portion of the charge

08:40:02 18   beginning at page 22, lines 1 to nine, and then, again, at

08:40:05 19   page 26, lines 7 to 16, we object on the ground that the

08:40:10 20   instruction does not fully state the warnings causation

08:40:15 21   standard, in as much as it states that plaintiffs need to prove

08:40:19 22   only that Mr. Boudreaux's prescribing physician would have

08:40:23 23   altered his prescribing behavior; whereas, the *Willett*

08:40:27 24   decision, which I quoted to Your Honor earlier, states that *the*

08:40:29 25   *plaintiff must show that a proper warning would have changed*

*OFFICIAL TRANSCRIPT*

08:40:32  1    *the decision of the treating physician*; that is, that but for

08:40:35  2    the inadequate warning, the treating physician would not have

08:40:40  3    used or prescribed the product.

08:40:42  4         THE COURT:  I think altered behavior gives both sides

08:40:45  5    an opportunity to argue the case, and both of them are within

08:40:48  6    that altering behavior.

08:40:51  7              Denied.

08:40:52  8         MR. NEWSOM:  Yes, sir.  Thank you.

08:40:53  9              One more on instructions that are in the charge.

08:40:56 10    The substantial factor portion of the charge at page 25, line 8

08:41:00 11    and thereafter, we object simply on the ground that Louisiana

08:41:04 12    law does not provide for a substantial factor instruction in a

08:41:08 13    case like this.

08:41:08 14              Louisiana law -- under Louisiana law the

08:41:11 15    substantial factor test replaces the but-for test but only

08:41:14 16    where an injury is caused by two sufficient defects.  Our

08:41:18 17    position is that substantial factor, as a replacement for the

08:41:24 18    but-for test, does not apply here because this is not a case in

08:41:27 19    which there are two independently sufficient causes.

08:41:30 20         THE COURT:  The reason I put it in is there has been

08:41:34 21    some issue as to his age, some issue as to his physical

08:41:37 22    condition as being related in some way.  And I think that this

08:41:40 23    adequately states it.  There is also some evidence that -- of

08:41:44 24    cause, whether or not this caused it or did not cause it, and

08:41:49 25    under the law it's if played they part in it, that's sufficient

*OFFICIAL TRANSCRIPT*

08:41:53  1    and I wanted to state that.

08:41:55  2         So I will deny the motion.

08:41:57  3         MR. NEWSOM:  Yes, sir.  Thank you.

08:41:58  4         And just very briefly, three objections to

08:42:00  5    instructions that were not included in Your Honor's charge.

08:42:03  6         First, as to proximate cause on warnings,

08:42:07  7    defendants request Number 23.  This is related to an issue we

08:42:10  8    discussed earlier.

08:42:10  9         That charge would have stated that:

08:42:14 10         "To recover for failure to warn, plaintiffs must

08:42:16 11    prove by a preponderance of the evidence that an inadequate

08:42:20 12    warning itself, in addition to the medication was the proximate

08:42:23 13    cause of Mr. Boudreaux's alleged injury.  When I say *proximate*

08:42:26 14    *cause*, I mean that plaintiffs must prove by a preponderance of

08:42:29 15    the evidence that if a different warning had accompanied

08:42:31 16    Xarelto, then Dr. Wong would have changed his prescribing

08:42:34 17    decision and Mr. Boudreaux would not have suffered his alleged

08:42:38 18    injury.

08:42:38 19         "If the doctor was already aware of the risk,

08:42:41 20    then you must find the defendants not liable for failure to

08:42:44 21    warn."

08:42:44 22         THE COURT:  Okay.  I've seen that.  I've put part of

08:42:47 23    that into the jury charge.  I think it's sufficient.

08:42:50 24         I deny the motion.

08:42:51 25         MR. NEWSOM:  Yes, sir.  Thank you.

*OFFICIAL TRANSCRIPT*

08:42:54  1          With respect to FDA approval, defendants' request

08:42:57  2   was Number 16.  We object to the Court's failure to provide the

08:43:00  3   following instruction:

08:43:01  4          "Before a prescription medicine may be sold, its

08:43:04  5   design and label must be approved by the Federal Food and Drug

08:43:07  6   Administration, or the FDA.  In approving medicines for sale,

08:43:11  7   the FDA takes into consideration the fact that a medicine has

08:43:14  8   some risks, including some unknown risks, and balances that

08:43:18  9   fact against the medicine's beneficial uses.

08:43:20 10          "The FDA approved Xarelto's design in its label.

08:43:24 11   You may consider the FDA's approval as evidence that defendants

08:43:27 12   exercised the ordinary care" --

08:43:27 13          THE REPORTER:  Wait.  You're talking very fast.  You

08:43:27 14   may consider --

08:43:32 15          MR. NEWSOM:  "You may" -- and I'm from Alabama.

08:43:36 16          "You may consider the FDA's approval as evidence

08:43:39 17   that defendants exercised the ordinary care that a reasonable

08:43:43 18   manufacturer would have under the circumstances and as evidence

08:43:47 19   that the warnings given by defendants in connection with

08:43:50 20   Xarelto were adequate."

08:43:52 21          THE COURT:  I think the essence of that is in the jury

08:43:55 22   charge.  I think the way that it was pitched really was a

08:44:00 23   closing argument rather than stating it in the jury charge, so

08:44:03 24   I didn't put that in for that reason.

08:44:05 25          Denied.

                         *OFFICIAL TRANSCRIPT*

08:44:06  1           MR. NEWSOM:  Yes, sir.  Thank you.

08:44:08  2                One more.  And then we're done.  We respectfully

08:44:11  3   object to omission from the final charge of our proposal, which

08:44:15  4   was made in response to your first draft of the jury

08:44:20  5   instructions with respect to off-label use.  The proposal was

08:44:22  6   as follows:

08:44:23  7                "You also have heard evidence that the test that

08:44:26  8   plaintiffs believe should have been used with Xarelto was not

08:44:29  9   approved by FDA for use with Xarelto.  The lack of FDA approval

08:44:32 10   for use of the test with Xarelto is not a basis for finding

08:44:37 11   liability against the defendants."

08:44:38 12           THE COURT:  I think the essence of that is in the jury

08:44:40 13   charge as a whole.  The way that it was spoken was that -- I

08:44:45 14   think it's too advocacy oriented.

08:44:49 15                So I deny the motion.

08:44:51 16           MR. NEWSOM:  Yes, sir.  Thank you very much, sir.

08:44:52 17           THE COURT:  Okay.  Thank you very much.

08:44:52 18           MR. MEUNIER:  Your Honor, may I just quickly --

08:44:52 19           THE COURT:  Sure.

08:44:55 20           MR. MEUNIER:  Under Rule 51(c)(1), we believe it's

08:45:01 21   sufficient for a party to make these objections to charges on

08:45:04 22   the record.  I just see that the defendants have filed their

08:45:07 23   written objections into the record.  We don't propose to do so.

08:45:11 24   I think there is enough that has been filed and enough trees

08:45:15 25   killed, so we're going to stand on 51(c)(1), unless the Court

*OFFICIAL TRANSCRIPT*

08:45:18 1    would like us to file something.

08:45:19 2         THE COURT:  No, I don't need it.  Thank you very much.

08:45:21 3         MR. MEUNIER:  Thank you, Judge.

08:45:23 4         THE COURT:  Okay.  I'll see the litigators in the room.

08:45:28 5    Court will stand in recess.

08:45:30 6         THE DEPUTY CLERK:  All rise.

08:45:52 7         (WHEREUPON, at 8:45 a.m. the Court took a recess.)

08:59:54 8         THE DEPUTY CLERK:  All rise for the jury, please.

08:59:56 9         (WHEREUPON, at 8:59 a.m. the jury panel enters the

09:00:41 10   courtroom.)

09:00:41 11        THE COURT:  Be seated, please.  Good morning, ladies

09:00:44 12   and gentlemen.

09:00:45 13             Members of the Jury, as I mentioned to you,

09:00:46 14   this -- the case now, all of the evidence is in, and the

09:00:52 15   attorneys will have an opportunity to make what we call

09:00:55 16   summation or closing argument.

09:00:57 17             As I told you at the outset, the opening

09:01:00 18   statement is not evidence in the case and the closing argument

09:01:03 19   is not evidence in the case.  It's only an attempt by the

09:01:08 20   parties during oral argument to call your attention to the

09:01:11 21   various items of evidence or what they feel you should draw

09:01:17 22   from those items of evidence.  It's given to you to help you

09:01:21 23   process their aspect of the case, their side of the case.

09:01:23 24             Before I give them an opportunity to do that, let

09:01:27 25   me tell you that the plaintiffs will have an hour and the

*OFFICIAL TRANSCRIPT*

1552

09:01:30  1    defendants will have an hour.  My jury charge to you will be

09:01:34  2    about 40 minutes or so, so we should be finished and get it to

09:01:38  3    you by some time around 12:00, 12:30.  We'll be ordering lunch

09:01:46  4    for you, and you can take an opportunity to relax, eat lunch

09:01:50  5    and then begin your deliberations.

09:01:51  6           I want to first take the opportunity, again, to

09:01:55  7    thank each of you for your service here today.  It's very

09:01:57  8    significant to your country that you act as jurors, and each of

09:02:01  9    you have risen up to that particular responsibility.  You've

09:02:10 10    been attentive.  The lawyers appreciate it.  And you need to

09:02:15 11    know that your Court appreciates it.

09:02:17 12           It's a very, very significant part of the

09:02:20 13    country, our citizens, in a very meaningful way, participate in

09:02:24 14    that aspect of the justice system.  And each of you should be

09:02:29 15    proud of your duty, because I'm proud of each of you.

09:02:33 16           So now I'll let the lawyers talk to you.  Thank

09:02:33 17    you very much.

09:02:36 18           Let's hear from the plaintiff.

09:02:39 19                   PLAINTIFFS' CLOSING ARGUMENTS

09:02:39 20    BY MR. BARR:

09:02:45 21       May it please the Court.  I would like to follow up on

09:02:49 22    what the judge just said, and thank all of y'all for your

09:02:52 23    attentiveness in the trial.  You've had the eyes of this

09:02:56 24    courtroom on you.  You might not have noticed it, maybe you

09:02:59 25    felt it, but all of us have seen how much attention y'all have

**OFFICIAL TRANSCRIPT**

09:03:04 1    paid during this and we appreciate it very much.

09:03:06 2          Laboratory tests helpful to identify adverse

09:03:13 3    events, major bleeds, must be put into the product label.

09:03:17 4          When this trial started, I told you to keep this

09:03:25 5    regulation in mind about helpful laboratory tests when you were

09:03:28 6    listen to the evidence.  I hope you did that.  This warning is

09:03:31 7    not optional.  It's a requirement that the company must meet.

09:03:39 8    If a laboratory test is helpful to doctors to identify adverse

09:03:45 9    events, it has to be put into the product label.

09:03:47 10         And this case really comes down to that question,

09:03:51 11   does a helpful laboratory test exist?  The answer, as you've

09:03:58 12   seen in the evidence and as we've proven, is definitive.  The

09:04:03 13   greater weight of the evidence proves that Neoplastin PT

09:04:07 14   predicts bleed risk and is helpful to identify patients at risk

09:04:12 15   for major bleeding.

09:04:14 16         Nearly every witness that testified during this

09:04:16 17   trial said that a laboratory test that can predict bleed risk

09:04:21 18   would be helpful; testified that such a helpful test would need

09:04:25 19   to be in the label; would help to protect patients.

09:04:32 20         In the words of Dr. Cindy Leissinger, the only

09:04:36 21   way that she can identify patients on Xarelto at significant

09:04:41 22   increased risk is to use Neoplastin PT.  That's Dr. Cindy

09:04:48 23   Leissinger, the section head at Tulane University Medical

09:04:51 24   School for the hematology and oncology department.

09:04:56 25         Dr. Kessler explained to you, the former head of

*OFFICIAL TRANSCRIPT*

09:05:01 1    the FDA, that every doctor, every doctor would want to use

09:05:07 2    Neoplastin PT to get somebody's bleed risk down as far as

09:05:11 3    possible.  And if you can get people from that highest quartile

09:05:14 4    to the lowest quartile, you'll save thousands of lives.  That's

09:05:18 5    what he talked to you about.  And that the Neoplastin PT test

09:05:21 6    can do that.

09:05:23 7         And because the test is helpful, it must be put

09:05:27 8    into the label, and that it is not in the label.  As the

09:05:33 9    defendants recognize, it's not in the label.  That means that

09:05:36 10   they failed to provide adequate instructions to Dr. Wong.  It

09:05:40 11   really is that simple.  They knew how to identify people at

09:05:48 12   high risk and refused to instruct doctors.

09:05:50 13        Now, you heard Dr. Wong testify that of course he

09:05:54 14   would use such a test if it was available and he would inform

09:05:58 15   Mr. Boudreaux of the result and the level of risk that

09:06:03 16   Mr. Johnny faced on Xarelto.  And he would -- and if Mr. Johnny

09:06:08 17   told him, like he said he would, that that risk was too much

09:06:12 18   for him, that he would follow that instruction and take him off

09:06:13 19   the drug.

09:06:14 20        Dr. Wong would have informed Mr. Johnny, and he

09:06:19 21   would have told Dr. Wong the risk was too high.  And that means

09:06:23 22   that the bleed that happened for Mr. Johnny would have never

09:06:26 23   occurred, because he would not have been on Xarelto.

09:06:28 24        The delay in his cardioversion, scheduled just

09:06:34 25   three days later, would not have happened.  He would not have

*OFFICIAL TRANSCRIPT*

09:06:39 1   been taken off his anticoagulants.

09:06:40 2        The LARIAT procedure that he had to undergo, an

09:06:43 3   invasive medical procedure, completely unnecessary.  And he had

09:06:48 4   to walk around for 15 months, 462 days without stroke

09:06:57 5   protection.  And you heard Dr. Johnson talk about how

09:07:03 6   devastating that is.  He had to walk around with that fear that

09:07:08 7   he could have that stroke for 462 days all because these

09:07:13 8   defendants refused to inform his doctor, Dr. Wong, about what

09:07:18 9   he needs to know about Xarelto.

09:07:20 10       Now, I have the verdict form for you up here in

09:07:24 11  front.  This is the form that you're going to have to fill out

09:07:28 12  collectively as a jury, come to a unanimous decision to answer

09:07:33 13  these questions.

09:07:33 14       Judge Fallon is going to instruct you that it is

09:07:39 15  our burden, the Boudreaux's burden, to answer -- to prove by a

09:07:45 16  preponderance of the evidence, the greater weight of the

09:07:46 17  evidence.  Think about a scale.  Just a feather more than

09:07:51 18  50 percent, that's the preponderance of the evidence.  That we

09:07:54 19  have to prove that the answer to each of these questions is

09:07:57 20  yes.

09:07:58 21       Now, I want to start with Question Number 1.  You

09:08:02 22  can see it on board there.  Your answer to Question Number 1 is

09:08:07 23  really driven by one factual question.  And that question is,

09:08:13 24  does Neoplastin PT predict bleed risk?  That is the question

09:08:18 25  that you have to be thinking about factually to answer the

*OFFICIAL TRANSCRIPT*

09:08:22  1      Question Number 1.

09:08:23  2           If the answer is yes, it must be in the label,

09:08:29  3      and based upon the evidence you have heard, the only answer is

09:08:33  4      yes, it has to be in the label.  That's what the greater weight

09:08:37  5      of the evidence shows.  We proved that the defendants failed to

09:08:41  6      provide Dr. Wong with adequate instructions for safe use of

09:08:45  7      Xarelto.

09:08:45  8           These instructions were necessary, because like

09:08:50  9      Dr. Leissinger told you, they were necessary because Xarelto

09:08:55 10      possessed a characteristic that might cause harm to patients.

09:08:59 11      We talked about that.  That characteristic was variability.  Do

09:09:01 12      you remember that?  Tenfold variability in exposure.  Different

09:09:05 13      people take the same pill.  Some were exposed to more than ten

09:09:08 14      times the amount of Xarelto taking the same size pill.

09:09:12 15           The evidence that Neoplastin PT predicts bleed

09:09:15 16      risks is overwhelming.  The FDA stated it as clearly as it can

09:09:20 17      be stated starting back in August of 2011.  This is Plaintiff's

09:09:24 18      Exhibit 2.  You can see we talked about this with Dr. Boniol.

09:09:28 19           The FDA asks the question, is there a PT bleeding

09:09:31 20      relationship?  And definitively answers it, yes.  As it

09:09:37 21      demonstrates, the risk of major bleeds increases with PT.

09:09:40 22      That's what the FDA found based upon the defendants' own data.

09:09:45 23      The question was asked and answered.

09:09:49 24           You go to next one.  Primary medical reviewers.

09:09:52 25      Because, remember, we talked about this with Dr. Boniol.  He

*OFFICIAL TRANSCRIPT*

09:09:54 1   was saying, well, they were just asking the question.  Well,

09:09:57 2   they came to a conclusion, and the conclusion was the risk for

09:10:02 3   major bleeding is dependent upon PT.  That's the FDA.  That's

09:10:07 4   not the plaintiffs.  That's the FDA.

09:10:09 5          And again, in November of 2011, when Xarelto was

09:10:13 6   approved for use on people with atrial fibrillation, what does

09:10:17 7   the FDA say, they demonstrated a correlation between PT and the

09:10:23 8   risk of bleeding.  The FDA is saying this over and over and

09:10:28 9   over again.  And these defendants chose not to use it, chose

09:10:33 10  not to use it.  That's what the FDA said.

09:10:36 11         All of this based upon data from the defendants'

09:10:38 12  own study, ROCKET.  And this finding of the FDA, this wasn't

09:10:44 13  some chance finding.  It's not invalid data like Dr. Boniol

09:10:50 14  liked to talk about.  It's all been confirmed by employees

09:10:53 15  within Bayer and Janssen.

09:10:56 16         Dr. Berkowitz, you remember you saw his

09:10:57 17  deposition.  He testified from the TV screen on video

09:11:02 18  deposition.  And he said definitively, PT is predictive of

09:11:09 19  bleeding.  That's what he said.  This man who has been studying

09:11:13 20  this drug since 2006, an internal scientist at Bayer, PT is

09:11:19 21  predictive of bleeding.  That's what he testified to.

09:11:23 22         And you've seen that Janssen has confirmed this

09:11:27 23  analysis.  Do you remember Dr. Peters, he testified on the TV

09:11:31 24  screen from Philadelphia?  We showed him these studies from

09:11:37 25  2015 where internally Janssen confirmed the analysis of the

**OFFICIAL TRANSCRIPT**

09:11:40 1   FDA, random logistic regression.

09:11:45 2          I mean, there was talk about Cox regression and

09:11:47 3   logistics regression and people tried to explain things and say

09:11:52 4   one thing means something and it doesn't mean something else.

09:11:54 5          Well, when Janssen needed to confirm it, what did

09:11:56 6   they run?  Logistics regression, and confirmed what the FDA

09:12:00 7   found.  Did not send it to the FDA.  You remember that.

09:12:03 8          And all of this is again confirmed in 2016 in

09:12:10 9   what appeared to be everybody's piece of medical literature,

09:12:12 10  the Eikelboom study.  2016, all four agents, PT predicted the

09:12:20 11  risk of bleeding over and over and over and over again.

09:12:24 12         It's not really questionable.  The overwhelming

09:12:31 13  majority of the evidence, this isn't just regular weight, it's

09:12:34 14  the overwhelming majority of the evidence shows that PT

09:12:40 15  Neoplastin predicts bleed risks.

09:12:43 16         Now, you may have noticed that Bayer and Janssen

09:12:47 17  did not bring a single company scientist to come testify to

09:12:51 18  you.

09:12:53 19         MS. WILKINSON:  Your Honor, I'm going to object in

09:12:55 20  light of your Motion in *Limine* ruling, the company

09:12:59 21  representatives.

09:13:00 22         THE COURT:  Well --

09:13:02 23         MR. BARR:  Your Honor, it's fair commentary.

09:13:04 24         THE COURT:  They can comment on it.  I overrule the

09:13:06 25  objection.

**OFFICIAL TRANSCRIPT**

09:13:07  1      MR. BARR:  Everyone from the company you heard was

09:13:12  2  brought here by the plaintiffs.  We played the depositions.  We

09:13:18  3  forced Dr. Peters to come testify.  They brought you no one.  I

09:13:25  4  don't know why Bayer and Janssen did not bring a single witness

09:13:29  5  to testify?  Maybe they can explain that.

09:13:32  6      MS. WILKINSON:  Your Honor, I'm going to object again

09:13:33  7  in light of your ruling on the video -- live video testimony as

09:13:37  8  well.

09:13:39  9      THE COURT:  Well, it's a question of whether or not

09:13:42  10  they testified by video or by in person.  Let's go on to

09:13:49  11  something else.

09:13:50  12      MR. BARR:  I'll move on, Your Honor.

09:13:57  13          The only witness you heard testify live about PT

09:14:01  14  test that have seen all of the evidence, everything, including

09:14:04  15  the internal company documents, including what these companies

09:14:08  16  knew were Dr. Kessler and Dr. Leissinger.  Both Dr. Kessler and

09:14:15  17  Dr. Leissinger have reviewed all of the evidence, studied and

09:14:19  18  came to you and sat in that chair and proved it, subjecting

09:14:25  19  themselves to cross-examination by Ms. Wilkinson and Mr. Dukes.

09:14:28  20          They didn't have to do that.  They both have a

09:14:31  21  lot of things they could be doing.  Dr. Kessler talked about at

09:14:34  22  that.  But they have reviewed all of the evidence and wanted to

09:14:39  23  provide you their opinions.

09:14:40  24          Now, it's been proven that Neoplastin PT is a

09:14:46  25  helpful laboratory test in ROCKET, the defendants' own study.

*OFFICIAL TRANSCRIPT*

09:14:51  1   And it should be in the label.

09:14:55  2        When you go back to the jury room, just line up

09:14:57  3   the evidence when you're back there.  Line it up.  Stack it up

09:15:02  4   on opposite sides of the room and see where the greater weight

09:15:04  5   lies, because that's what your charge is.  That's what you have

09:15:09  6   to do, to determine the facts based upon the greater weight of

09:15:12  7   the evidence, more likely than not likely.

09:15:15  8        If you do that, if you stack the evidence up, the

09:15:19  9   only conclusion you can come to is that we have proven that PT,

09:15:26 10   Neoplastin PT, can predict bleed risks, protect patients.

09:15:30 11   These defendants knew it.  They proved it themselves.  And it

09:15:34 12   has to be in the label, and they haven't done that.

09:15:37 13        Stack up the evidence.  Go through it.  Look at

09:15:40 14   Defendants' Exhibit 12, Plaintiffs 2, 3, 4, 77, 133.  Remember

09:15:47 15   the testimony of Dr. Spiro, Dr. Berkowitz, Dr. Leissinger,

09:15:52 16   Dr. Kessler.  Look at it.  Remember it.  Stack the evidence up.

09:15:56 17        Now, I told you in opening statements that the

09:15:59 18   defense was going to try to confuse and misdirect on this issue

09:16:03 19   about a simple blood test and they were going to talk to you

09:16:07 20   about monitoring, and I was right.  That's what they did.  They

09:16:11 21   do that because that's all they have.

09:16:14 22        They can't really fight the evidence that PT

09:16:18 23   predicts bleed risks.  They can't fight it because the FDA says

09:16:24 24   it's true.  Dr. Berkowitz at Bayer says it's true.  Even

09:16:27 25   Janssen has an internal report that says it's true.

*OFFICIAL TRANSCRIPT*

09:16:30 1          So they go with confusion.  They point to

09:16:32 2   articles that talk about monitoring.  It's almost like they are

09:16:37 3   intentionally not listening to what we're saying.  They don't

09:16:40 4   want to hear the evidence that PT predicts bleed risks.  They

09:16:46 5   would rather talk about something else.  I'm not sure how many

09:16:49 6   different times we can say it.

09:16:51 7          We tried to point it out during the evidence, but

09:16:53 8   they bring it up so constantly that you can't keep up with

09:16:56 9   them.  Constantly showing you articles.  They say PT can't be

09:17:00 10  used with monitoring.  Well, you know what?  We agree with

09:17:04 11  that.  We've made it clear throughout this case that we've

09:17:08 12  agreed with that.  It can't be used to monitor and adjust dose.

09:17:14 13  We know that.

09:17:14 14         It can't work for the reason the FDA said,

09:17:17 15  because they didn't study it.  The FDA wanted it to be looked

09:17:22 16  at.  The FDA said, we can't do it due to a lack of information.

09:17:26 17  Well, who provides the information?  The company does.  And the

09:17:31 18  FDA said they couldn't do it because they only studied a single

09:17:35 19  dose.

09:17:36 20         Do you remember there was talk about, you know,

09:17:38 21  oh, it's not -- it's not a one-size-fits-all pill.  We've have

09:17:41 22  a different pill for people with renal failure.  Well, look

09:17:44 23  what the FDA said, only a single dose was tested in ROCKET.

09:17:48 24  That's not us.  That's the FDA.

09:17:50 25         We're not seeking monitoring.  We are seeking a

*OFFICIAL TRANSCRIPT*

09:18:02 1   one-time Neoplastin PT blood test to assess bleed risk, not

09:18:09 2   monitoring.

09:18:10 3           What should be in the label is that you can use

09:18:13 4   Neoplastin PT to identify people at high risk so that doctors

09:18:17 5   like Dr. Wong can appropriately take care of their patients, so

09:18:22 6   they don't cause unnecessary harm to people like

09:18:26 7   Johnny Boudreaux.

09:18:27 8           These are the companies -- remember, you've seen

09:18:31 9   this in the depositions that we played on video.  These are the

09:18:35 10  companies that refuse to do follow-up scientific studies

09:18:41 11  because of a fear of just doing the study -- not even the

09:18:44 12  result, the result doesn't matter -- just doing the study would

09:18:50 13  hurt them in the market.

09:18:52 14          The market is their number one priority, not

09:18:56 15  patient safety.  They put their marketing needs over patient

09:19:00 16  safety.  Patricia Torr, her testimony, made that crystal clear.

09:19:06 17          Now, they want to argue that other NOACs don't

09:19:10 18  require blood testing like we talked about.  Ms. Wilkinson has

09:19:16 19  made a big deal about that this whole trial.  She keeps putting

09:19:19 20  up this board that has all these different NOACs on it, and

09:19:23 21  says, none of these require blood testing.  Putting up charts

09:19:27 22  with Eliquis, Xarelto, Savaysa, Pradaxa.  Well, so what?

09:19:32 23          This case isn't about other drugs.  It's about

09:19:35 24  Xarelto.  That's why we're here.  It doesn't matter if other

09:19:40 25  drugs require blood testing or not.  You've seen no evidence on

*OFFICIAL TRANSCRIPT*

09:19:43 1    that.  The only evidence you've seen relates to Xarelto.  I

09:19:47 2    don't know why we're talking about other NOACs.

09:19:49 3              But the argument that other drugs don't require

09:19:54 4    testing, what does that actually show?  It actually shows how

09:19:59 5    conscious these companies are about other drugs.  They

09:20:03 6    know they can't -- they have to be -- they can't be different

09:20:06 7    than those drugs and require blood testing when those drugs

09:20:10 8    don't because they won't be able to sell it.  They are really

09:20:14 9    conscious of that and they constantly berate and put that in

09:20:17 10   front of you.

09:20:17 11             And one of these drugs that they keep talk to you

09:20:20 12   about, Savaysa, it wasn't even on the market when Mr. Boudreaux

09:20:25 13   was put on Xarelto.  Why are we talking about that?  It wasn't

09:20:29 14   even an option for him.  It's an effort to create confusion.

09:20:35 15   That's what you saw.

09:20:36 16             This need to avoid any blood testing was

09:20:42 17   determined before they ever tested the drug in people with

09:20:46 18   atrial fibrillation.  You saw that from Ms. Geiger.  They

09:20:50 19   predetermined the marketing need and let the marketing direct

09:20:54 20   the conclusions from the science.  They only accept the science

09:20:59 21   they like and discredit and ignore the science they don't like

09:21:04 22   that says there is a safer way to use Xarelto.

09:21:07 23             They didn't even want to encourage the use of

09:21:12 24   measurement, said they didn't want to do that, and tried to

09:21:16 25   justify that, well, we can't do that because it doesn't

*OFFICIAL TRANSCRIPT*

09:21:19  1   correlate to bleed risk.  But they knew it could.  You've seen

09:21:22  2   that.  Proved it could.  Multiple times.  And never asked the

09:21:28  3   FDA to put anything on the label that says PT can predict bleed

09:21:34  4   risk.  They never asked that.  They've never even proposed it.

09:21:38  5           Dr. Peters told you they would never do that do.

09:21:41  6   Do you remember that?  He said, we would never do something

09:21:44  7   like that.

09:21:48  8           They've never proposed language asking for an

09:21:51  9   instruction to use Neoplastin PT to assess bleed risks, because

09:21:56 10   they know if they require a blood test, they are terrified that

09:22:04 11   doctors will just use another drug.  That's their fear.  Or

09:22:10 12   doctors will just use the drug they've been using for decades,

09:22:14 13   1954, they'll just use warfarin.  They are terrified about

09:22:19 14   that, and that's why they won't tell doctors.

09:22:22 15           And their marketing fears led to the Boudreaux's

09:22:28 16   being subjected to months of torment, worried about whether or

09:22:34 17   not Johnny was going to a stroke without his anticoagulants.

09:22:38 18           And they come in here and they try to tell you

09:22:41 19   that they proposed label language about the use of PT.  Do you

09:22:45 20   remember those documents?  But go back and look at the

09:22:49 21   language.  You're going have it in evidence.  Look at it.  Look

09:22:52 22   at the document.  Look at what it says.  It isn't based on

09:22:55 23   ROCKET.  It doesn't tell doctors that PT can predict bleed

09:23:01 24   risks.  It doesn't instruct doctors about anything.

09:23:04 25           And they never tried to add label language about

**OFFICIAL TRANSCRIPT**

09:23:09  1   a relationship between PT and bleeding.  They never tried to

09:23:13  2   put that in the label, once it was proven in ROCKET, never did

09:23:18  3   that.  Dr. Peters, remember, testified they would never do

09:23:22  4   that.

09:23:22  5            Now, it seems to me Janssen and Bayer are in a

09:23:28  6   little bit of a dilemma here.  They are talking out of both

09:23:33  7   sides of their mouth.  Is PT a terrible, terrible, terrible

09:23:38  8   test, like Dr. Boniol said that could never be used for this

09:23:42  9   purpose, or is it information that needs to be in the atrial

09:23:47 10   fibrillation label?

09:23:50 11            Their story makes no sense.  You can can't have

09:23:53 12   it both ways, which is what they are trying to do.  They are

09:23:56 13   trying to have it both ways with you, and you can't do that.

09:24:00 14            What you saw is the FDA said that these companies

09:24:05 15   chose not to utilize that information.  That's the definitive

09:24:09 16   statement made after all of this discussion in November of

09:24:13 17   2011, that it was their choice.

09:24:17 18            It's their label.  They are responsible for it.

09:24:21 19   As Dr. Kessler said, the company is the master of the label,

09:24:28 20   not the FDA.  And they didn't bring a single expert or witness

09:24:34 21   to contradict him.  They didn't bring a single regulatory

09:24:40 22   expert to offer anything different than what Dr. Kessler said.

09:24:45 23            It is the company's job to make sure the

09:24:49 24   necessary safety information makes it into the label.  It's

09:24:53 25   their job, not the FDA's.  And the FDA pointed out that it was

*OFFICIAL TRANSCRIPT*

09:24:58  1   their choice not to warn.  They chose not to tell doctors.

09:25:05  2            While we're talking about the FDA, defendants

09:25:09  3   have argued in this trial that Xarelto and its label was

09:25:13  4   approved by the FDA.  They've made a big point of that.  But

09:25:17  5   this doesn't mean that the label is adequate.

09:25:22  6            As Judge Fallon is going to instruct you, FDA

09:25:25  7   approval is a minimum standard.  That's all it is.  It does not

09:25:30  8   mean that that label is adequate.  That label can always be

09:25:34  9   changed.  It can always be strengthen, and the law requires

09:25:40 10   that it be strengthened when they have information, necessary

09:25:43 11   safety information, to protect patients.

09:25:44 12            They completely failed to do that.  Completely

09:25:52 13   failed.

09:25:55 14            Now, you also have to look at the evidence that

09:25:58 15   defendants have on whether PT can predict bleed risks when

09:26:02 16   you're stacking evidence in the room.  You have to look at what

09:26:04 17   they have.  They have the testimony of two doctors that haven't

09:26:09 18   even looked at all of the evidence.  They both testified that

09:26:14 19   neither one of them are aware of what these companies know

09:26:20 20   within their four walls.  They hadn't looked at any of that.

09:26:24 21   They have no idea what this company knows.

09:26:27 22            Doctors that have looked at all of the evidence

09:26:31 23   agree with us, that PT predicts bleed risks and should be in

09:26:37 24   the label as a helpful laboratory test, Dr. Kessler,

09:26:41 25   Dr. Leissinger, Dr. Berkowitz.  You on the jury now know more

*OFFICIAL TRANSCRIPT*

09:26:45  1    about what these companies know than Dr. Boniol and

09:26:49  2    Dr. Johnson, because you've seen it.  They hadn't seen it.

09:26:53  3           You have heard more about the ability of PT to

09:26:58  4    predict bleed risks than the witnesses defendants brought to

09:27:03  5    you, and you now know that PT, Neoplastin PT, predicts bleed

09:27:08  6    risks.  They bring Dr. Boniol and Dr. Johnson in here to

09:27:12  7    testify about the usefulness of Neoplastin PT.  They get these

09:27:16  8    two doctors to say that based on what they have seen,

09:27:21  9    Neoplastin PT cannot be used to predict bleed risks.

09:27:26 10           Of course they believe that.  Of course they do.

09:27:29 11    They've not been shown what the company knows and are brought

09:27:34 12    to you into this courtroom to testify without all the evidence.

09:27:38 13    They are Exhibits A and B that these two companies refuse to

09:27:44 14    instruct doctors that use Xarelto.  You can look at them as

09:27:48 15    some of our best evidence.

09:27:50 16           It's simply not possible for these two doctors to

09:27:54 17    inform you about the greater weight of the evidence when they

09:27:58 18    haven't seen the evidence.  They don't have the knowledge that

09:28:02 19    Dr. Kessler, Dr. Leissinger have, and now you have.

09:28:05 20           They don't know that Janssen and Bayer in 2009

09:28:11 21    talked about conducting a study to specifically prove that PT

09:28:16 22    can be used for monitoring.  They don't know that.  They don't

09:28:19 23    know that Bayer decided, that's not in our budget.  We don't

09:28:23 24    have our own diagnostics division.  We can't profit off that,

09:28:27 25    so we're not going to do those tests.  They don't know that.

*OFFICIAL TRANSCRIPT*

09:28:30  1          Now, I don't know why Bayer or Janssen didn't
09:28:35  2    show them what the companies know.  I can't begin to explain
09:28:39  3    that to you.  But the defendants' experts only testified to you
09:28:42  4    about one half of the hand.  They can't describe the whole hand
09:28:48  5    because they haven't seen it.  It's not their fault.  They
09:28:53  6    weren't shown the other side.  That was kept from them.
09:28:58  7          Now, Dr. Johnson, I will say, for a person that
09:29:02  8    testified for the first time in her life, gave a very
09:29:06  9    compelling narrative.  She sounds like a conscientious doctor
09:29:10 10    that cares about her patients and wants to provide the best
09:29:13 11    care possible.  I believed that when I listened to her.
09:29:17 12          She testified, though, that some patients on
09:29:19 13    Xarelto are going to bleed.  She just doesn't know which ones,
09:29:25 14    and that's the whole point.  Neoplastin PT can identify those
09:29:31 15    patients.
09:29:31 16          But then she did something that was completely
09:29:35 17    inconsistent with the way drugs are studied to be proven as
09:29:41 18    useful in humans.  She said that even though PT has proven to
09:29:47 19    be related to bleed risks across populations -- do you remember
09:29:51 20    that, she kept saying *across populations* -- that it can't be
09:29:55 21    used in individual patients because that hasn't been proven.
09:30:00 22          She wants individualized proof on a
09:30:06 23    patient-by-patient basis before using Neoplastin PT to predict
09:30:13 24    bleed risk.  That's not how medical studies work.  That's not
09:30:17 25    how they are done.  That is the reason why when you go see your

                          *OFFICIAL TRANSCRIPT*

09:30:21  1    doctor and he hands you a drug, gives you a prescription, he

09:30:24  2    can't promise you it's going to work.  He can't do that.

09:30:27  3         The only thing he has is studies done across

09:30:32  4    populations.  He doesn't have studies on you, like Dr. Johnson

09:30:39  5    appears to want.  And it makes no sense that we would hold

09:30:44  6    Neoplastin PT to a higher level than the studies they used to

09:30:49  7    get the drug approved in the first place.  That makes no sense.

09:30:53  8         Now, it was obvious during the examination of

09:30:56  9    Dr. Boniol that he and I don't see eye to eye on a lot of

09:31:02 10    things.  I think that was clear.  But here is the difference.

09:31:07 11    You have the full story.  He doesn't.  But still he comes into

09:31:13 12    this court and he tells you that he relies on data.  Remember,

09:31:18 13    that's what he said, "I rely on data.  That's what I care

09:31:21 14    about."

09:31:23 15         But then he has to agree that a lot of it is not

09:31:27 16    even valid data.  He went on and on and on about five deaths

09:31:31 17    and one death and made this huge deal out of that.  And then

09:31:36 18    said, "Oh, well, I didn't ever say it was valid."  Well, then

09:31:38 19    why did you talk about it for as long as you did?

09:31:40 20         Well, you have to decide how credible that

09:31:43 21    opinion is.  I can't do that.  Is it credible to say that PT is

09:31:49 22    a terrible, terrible, terrible test when you don't even have

09:31:53 23    all the information?

09:31:56 24         Is it credible to say that Dr. Berkowitz's

09:31:58 25    statement saying that it would be misleading to inform anyone

***OFFICIAL TRANSCRIPT***

09:32:03 1   that there is no relationship between blood plasma

09:32:06 2   concentration of Xarelto and bleeding is just an opinion?  Is

09:32:11 3   that credible?  The man that has studied this drug since 2006?

09:32:15 4   Is it credible to suggest that Dr. Boniol knows more about the

09:32:20 5   drug Xarelto than Dr. Berkowitz?  Is that credible?

09:32:24 6           Is it credible to come in here and try to

09:32:27 7   convince you that Pepto-Bismol is just as dangerous as Xarelto,

09:32:34 8   a drug that Dr. Berkowitz said is a potent medicine?  Is that

09:32:40 9   credible?  You have to decide that.  You have to decide if all

09:32:45 10  of the opinions he offered from that stand were credible.

09:32:47 11          But I can tell you that if Dr. Berkowitz had been

09:32:51 12  in this courtroom watching Dr. Boniol testify, he would have to

09:32:57 13  agree that Dr. Boniol was misleading.  That's what

09:33:05 14  Dr. Berkowitz says.  Dr. Berkowitz testified clearly that it

09:33:10 15  would be misleading to tell people that there is no

09:33:14 16  relationship between Xarelto exposure and bleed risks.  That's

09:33:19 17  what he said, clear as day.  And Dr. Boniol came in here and

09:33:23 18  said, that's not true.  That would be misleading, according to

09:33:27 19  Dr. Berkowitz.

09:33:27 20          And these companies bring witnesses into this

09:33:32 21  courtroom to mislead you by testifying in a way that

09:33:37 22  Dr. Berkowitz would say is misleading.  No wonder they didn't

09:33:41 23  call any of their own company scientists.

09:33:43 24      MS. WILKINSON:  Your Honor, I'm going to object again.

09:33:45 25  We don't have a burden of proof, and it's improper for him to

*OFFICIAL TRANSCRIPT*

09:33:49  1   continually comment on the defendants not bringing certain

09:33:52  2   witnesses to trial.

09:33:52  3       THE COURT:  Well, it's argumentative -- it's argument

09:33:57  4   that somebody can take the position that -- witnesses are not

09:34:03  5   required -- the parties are not required to bring all the

09:34:06  6   witnesses into the courtroom.  You'll hear me say that.

09:34:11  7           Let's go on, Counsel.

09:34:13  8       MR. BARR:  The defense went so far as to suggest to

09:34:19  9   Dr. Wong that he could go out in medical literature and study

09:34:23 10   PT and find articles that says PT predicts bleed risks.  Or he

09:34:29 11   can go digging through the FDA website, I guess on his off time

09:34:29 12   from taking care of patients, to see if he really wanted to

09:34:32 13   find this information.  You heard Dr. Wong, that's not

09:34:36 14   reasonable.  It's not reasonable.  He shouldn't have to go

09:34:39 15   plundering through the FDA website.  It should be in the label.

09:34:43 16   That's where the information is supposed to be.

09:34:45 17           In the label, what Dr. Kessler called the

09:34:53 18   *Holy Grail*.  It's really that simple.  Don't make doctors go

09:34:56 19   find the hidden ball.  If it's important, tell them.  Point it

09:35:01 20   out to them, this is information you need to know to protect

09:35:04 21   your patients.  Tell them the truth.  Don't mislead them.  Tell

09:35:08 22   them a significant number of people on Xarelto are at high risk

09:35:12 23   of bleeding.

09:35:14 24           Yet they don't know it.  Tell them that they are

09:35:17 25   exposed to ten times more Xarelto than others.  Tell them that

*OFFICIAL TRANSCRIPT*

09:35:21  1   a simple safety test would tell doctors their patient is in a

09:35:27  2   danger zone and you can identify them.

09:35:29  3          We have clearly proven this by the greater weight

09:35:33  4   of the evidence.

09:35:34  5          Now, I thought what you saw play out in the

09:35:37  6   courtroom was a sad reflection of the values of these two

09:35:40  7   companies.  Clearly doctors want this information.  That was

09:35:45  8   clear.  They want to protect their patients.  But these

09:35:48  9   defendants won't instruct them.  They won't even show the truth

09:35:52 10   to their own experts.  They come into this trial and viciously

09:35:57 11   attack a man like Dr. Kessler, former head of the FDA.  A man

09:36:02 12   who has dedicated his life to protecting the public from

09:36:06 13   dangerous products.

09:36:07 14          We spent most of his testimony talking about a

09:36:10 15   form he's not even required to fill out.  Why not spend the

09:36:15 16   time with him questioning him about his actual opinions,

09:36:21 17   opinions that prove that Neoplastin PT predicts bleed risks?

09:36:27 18   Well, I know why, because they can't attack his actual

09:36:30 19   opinions.  They can't do that.  The evidence shows that

09:36:33 20   Dr. Kessler is correct.  Even Janssen's own analysis says that.

09:36:38 21   They can't attack what he said so they attack him.

09:36:42 22          We all saw what happened when Dr. Kessler was

09:36:46 23   actually questioned about some of his opinions.  That didn't

09:36:49 24   work out so well.  So they decided the best way forward was to

09:36:54 25   try to smear him, to try to discredit him.

*OFFICIAL TRANSCRIPT*

09:36:57  1          At this point it's clear, Janssen and Bayer are

09:37:02  2  not going to voluntarily tell doctors what they need to be

09:37:07  3  told, that Xarelto creates a high-risk of bleeding in some

09:37:12  4  patients, and we know how to identify those people.  They are

09:37:14  5  not going to say that.

09:37:16  6          And at this point only you can correct this

09:37:19  7  wrong.  They are not going to do it.  They are going to

09:37:22  8  continue selling their drug, telling doctors that it can be

09:37:26  9  used safely with all their patients, not telling doctors, good

09:37:29 10  doctors like Dr. Wong that care about their patients, that some

09:37:33 11  of their patients are at high risk.

09:37:36 12          Only you, at this point, can stand up to them and

09:37:39 13  say, enough already.  Live up to your responsibilities.  Tell

09:37:42 14  doctors what they need to know.  Make this stop so people don't

09:37:45 15  have to continue to have to face needless preventable injury.

09:37:49 16  Follow the rules.

09:37:52 17          Now, that brings us to Question 2.  The other

09:38:06 18  question you have to deal with relates to Dr. Wong.  Now,

09:38:10 19  Ms. Wilkinson told you in opening that Dr. Wong is really the

09:38:14 20  crucial piece of evidence in this case.  And I agree with her,

09:38:17 21  he's a very, very -- he's a very crucial piece of evidence.

09:38:20 22          Would Dr. Wong have followed an instruction to

09:38:25 23  use Neoplastin PT to assess bleed risks?  He testified yes.

09:38:31 24  Would that test have caused him to change his prescribing

09:38:36 25  practices?  He testified yes.  He would inform Mr. Boudreaux

*OFFICIAL TRANSCRIPT*

09:38:42  1    and follow Mr. Boudreaux's instructions to remove him from
09:38:46  2    Xarelto as the risk was too high.
09:38:48  3         So the answer to Question No. 2?  Just like
09:38:51  4    Question Number 1, yes.
09:39:00  5         The failure to properly instruct Dr. Wong was a
09:39:07  6    proximate cause of all of Johnny's injuries.  Now, *proximate*
09:39:11  7    *cause* that's a legal word.  A lot of people don't know what it
09:39:14  8    means.  But Judge Fallon is going to tell you that what that
09:39:17  9    means is that but for the defendants' failure to provide
09:39:20 10    adequate instructions to Dr. Wong, Mr. Boudreaux's injuries on
09:39:24 11    Xarelto would not have occurred.  And that this failure to
09:39:28 12    provide adequate instructions was a substantial contributing
09:39:32 13    factor to Mr. Boudreaux's injuries.  That's what proximate
09:39:34 14    cause is.
09:39:35 15         And again, the answer?  Without a doubt, yes.
09:39:39 16         Dr. Wong testified he would have done PT if
09:39:44 17    instructed to do so.  Dr. Leissinger showed you that that PT
09:39:48 18    test that was done proved that he would have been identified as
09:39:51 19    somebody at high risk.  Dr. Wong would have conveyed this risk
09:39:55 20    to Mr. Boudreaux, and he would have been taken off of Xarelto.
09:39:58 21    His GI bleed from Xarelto would never have happened.
09:40:03 22         We proved to you everything we said we would,
09:40:07 23    everything we said we would show.  That Xarelto puts some
09:40:12 24    patients at significantly high bleed risks, that a safety test
09:40:16 25    exists.

*OFFICIAL TRANSCRIPT*

09:40:16 1          Now, safety test, they made a big deal out of

09:40:20 2   that.  Safety test is my word.  That's my word.  I'm calling it

09:40:23 3   a safety test because that's what it's designed to do, keep

09:40:27 4   patients safe.

09:40:29 5          The Neoplastin PT is a safety test and can be

09:40:32 6   used to identify patients in the danger zone.  We proved every

09:40:37 7   bit of it by a greater weight of the evidence.

09:40:39 8          Now, remember, the defendants made some promises

09:40:43 9   to you as well during their opening.  They promised that

09:40:47 10  Dr. Leissinger would come into this courtroom and would say

09:40:50 11  that Mr. Boudreaux's 13.6 PT was clinically irrelevant.  You

09:40:55 12  remember, they made that promise?  That didn't happen.  She

09:40:58 13  didn't say that.

09:40:59 14         They promised to show that Dr. Wong would not

09:41:03 15  have changed anything had he been properly instructed.  That

09:41:07 16  didn't happen.  Dr. Wong actually said the opposite of that.

09:41:12 17         Dr. Boniol went so far as to try to assert that

09:41:15 18  Mr. Boudreaux would have bled on any other anticoagulant.

09:41:21 19  Remember that?  He has no proof of that.  There is no evidence.

09:41:25 20         This isn't story time.  You've got to have

09:41:28 21  evidence.  It's a court of law.  He had no evidence.

09:41:33 22         Mr. Boudreaux has never taken another

09:41:35 23  anticoagulant.  How can he say that?  He's guessing.  It's pure

09:41:39 24  speculation.  It's a good story.  That's all it is.  There is

09:41:44 25  no evidence to support it.

*OFFICIAL TRANSCRIPT*

09:41:45  1          But what we do know is that the studies comparing

09:41:51  2    Xarelto, Pradaxa and Eliquis, the actual options for

09:41:56  3    Mr. Boudreaux, all of those studies show and prove that Xarelto

09:41:59  4    has the highest risk of bleeding of all of them.  That's the

09:42:03  5    evidence you have.

09:42:04  6          So that brings us to the damages.  Now,

09:42:12  7    Ms. Loretta painted a very powerful picture of the harm that

09:42:17  8    was caused to Mr. Boudreaux, very compelling witness.  You

09:42:20  9    heard her talk about, in real terms, the ordeal that this

09:42:23 10    family went through, terrified that Mr. Johnny was not going to

09:42:27 11    survive his injuries, sitting at his hospital bed wondering if

09:42:31 12    he was going to make it.

09:42:33 13          Mr. Johnny was a lot more stoic about it, no

09:42:37 14    question about that.  But she explained to you how he was a

09:42:41 15    changed man.  His mother suffered a stroke.  He knows what that

09:42:47 16    means.  He knows the devastation of a stroke.

09:42:52 17          Because of what these companies did, not telling

09:42:56 18    Dr. Wong about a test that would have identified Mr. Boudreaux

09:43:00 19    as high risk, he had to go 462 days without stroke protection.

09:43:09 20          THE DEPUTY CLERK:  You have five minutes left.

09:43:11 21          MR. BARR:  Thank you.

09:43:12 22          You heard Dr. Johnson talk about how devastating

09:43:15 23    a stroke could be.  He had to go live in that Superdome that

09:43:19 24    nobody wants to be in.  He was scheduled to have a

09:43:22 25    cardioversion done three days later, on February 5th, a

**OFFICIAL TRANSCRIPT**

09:43:27  1   cardioversion that would shock his heart back into rhythm, so

09:43:29  2   he no longer had this stroke risk from AFib.

09:43:33  3          But what happened?  He suffered a major

09:43:36  4   gastrointestinal bleed, a bleed that every doctor that treated

09:43:39  5   him said was due to his Xarelto.  But his doctors didn't know

09:43:45  6   that his bleed was because of the unique characteristics of

09:43:48  7   Xarelto, its variability.  They didn't know what that 13.6 PT

09:43:56  8   meant because these defendants never told them, never told them

09:43:59  9   on the label.

09:44:00 10          They didn't know that they could have put him on

09:44:02 11   another anticoagulant to get to that cardioversion.  They

09:44:06 12   didn't know that.  Because they were not told, he went 462 days

09:44:15 13   between being taken off Xarelto and when he could have his

09:44:18 14   LARIAT procedure done, so that he could have that

09:44:21 15   cardioversion, 15 months, 462 days, terrified that his next

09:44:28 16   step he could suffer a massive stroke.

09:44:33 17          It's unimaginable.  It's like walking around with

09:44:37 18   a gun to your head, not knowing or having any control of

09:44:41 19   whether it's going to go off or what the injury is going to be

09:44:45 20   when it happens, if it happens, if you're going to survive, or

09:44:48 21   if you're going to be permanently disabled.  That's all he had

09:44:52 22   to walk around with, that fear.

09:44:53 23          I have a wife and two young children.  I can't

09:44:56 24   begin to imagine what that was like.

09:44:59 25          I haven't been married nearly as long as this

*OFFICIAL TRANSCRIPT*

09:45:02  1    couple, 50 years together.  For 462 days, having to walk around

09:45:12  2    with that gnawing fear in the pit of your stomach, constantly

09:45:17  3    worried your life companion is going to be ripped away from

09:45:21  4    you, how devastating.  None of that, none of it had to happen

09:45:27  5    here.  All that had to happen is instruct doctors about the use

09:45:32  6    of Neoplastin PT to predict bleed risks.

09:45:36  7            This is a simple example of all the label had to

09:45:41  8    say.  That's it.  A little bit of language in the label so

09:45:46  9    doctors would understand what this means.  If this had been

09:45:52 10    done, Mr. Johnny wouldn't have been harmed.

09:45:54 11            So how do you go about deciding the amount of

09:45:57 12    damages to make Mr. Johnny and Ms. Johnny whole?  Now, some of

09:46:02 13    them are easy, some of them are more difficult.

09:46:05 14            The law allows us to ask for compensatory

09:46:09 15    damages.  Judge Fallon will instruct you that those are damages

09:46:13 16    to make this family whole.  It's not just for their medical

09:46:17 17    expenses.  It's for the entire event, the pain, the anguish,

09:46:22 18    his pain and suffering, his mental anguish dealing with this,

09:46:25 19    not just his medical bills.

09:46:29 20            Then you also have Ms. Loretta's loss of

09:46:32 21    consortium, compensation for the struggles they had together

09:46:36 22    during that 462 days terrified he was going to have a stroke.

09:46:41 23            Now, the medical bills are easy.  It's been

09:46:44 24    stipulated in this case that the Boudreauxs suffered medical

09:46:48 25    damages of $118,091.39.  That's stipulated.  So if you find for

*OFFICIAL TRANSCRIPT*

09:46:55  1    the plaintiffs, you don't have to discuss that.  That was

09:47:00  2    stipulated.

09:47:01  3              THE DEPUTY CLERK:  You have a minute.

09:47:03  4              MR. BARR:  The next two components are more difficult

09:47:05  5    to quantify.  The Boudreauxs really leave it to you to decide

09:47:09  6    what that fair compensation is.

09:47:12  7              Judge Fallon is going to give you some

09:47:13  8    instructions on things you can consider to do that.  But just

09:47:17  9    remember, Mr. Johnny had to walk around with the equivalent of

09:47:22 10    a gun to his head for 462 days, had to walk around like that,

09:47:30 11    no control of whether that was going to go off, living in fear

09:47:34 12    that at any moment it could, everything he built with

09:47:39 13    Ms. Loretta ripped away and becoming a burden to his family.

09:47:43 14    That's what he had to live with.

09:47:45 15              What's that worth?  A million?  Two million?

09:47:48 16    Three million?  I don't know.  That's for you to decide.  But

09:47:53 17    whatever you decide, they will have to live with it for the

09:47:57 18    rest of their lives.

09:47:59 19              This is their one chance to come before a jury

09:48:03 20    and tell their story and explain what this ordeal did to them,

09:48:09 21    how it affected their lives, and why it was all completely

09:48:13 22    preventable.  Explain how their basic freedom to live as they

09:48:18 23    choose was ripped away because these companies refused to tell

09:48:24 24    doctors about how to protect people with a simple test, these

09:48:29 25    companies putting their bottom line before the Boudreauxs'

**OFFICIAL TRANSCRIPT**

09:48:32  1    basic right to life, liberty and happiness.  They don't get to

09:48:37  2    come back.  This is their one chance.  They put it in your

09:48:42  3    hands.

09:48:44  4            Now, I'm about to sit down.  I'm going to run

09:48:48  5    over a minute or so, but I'm about to sit down.  Just remember

09:48:53  6    what I told you about confusion.  Look at what the defendants

09:48:58  7    are saying and showing to you in their closing argument.  Are

09:49:02  8    they talking about PT generally, or are they talking about

09:49:06  9    Neoplastin PT?  Are they talking about monitoring or a simple

09:49:11 10    blood test to assess bleed risk?  Are they talking about the

09:49:14 11    risk of bleeding, or why we're actually here, the failure to

09:49:19 12    safely instruct doctors?  Pay attention to what they are trying

09:49:23 13    to do.

09:49:23 14            This has been a complex trial, a lot of

09:49:28 15    scientific information.  We've joked about it.  Some of y'all

09:49:32 16    deserve an honorary degree for what you've been through, and

09:49:37 17    each of you are to be commended for your attention.

09:49:39 18            I know we appreciate what you've done, to give

09:49:41 19    this family their chance to level the playing field against

09:49:45 20    these pharmaceutical companies, because that's what this is.

09:49:51 21    This is a level playing field, where a normal American family

09:49:54 22    can come before their jury of peers and have these companies

09:49:58 23    conduct judged.

09:49:59 24            Let the evidence be your guide, and it will be

09:50:03 25    bring you to a just verdict.  Thank you.

                            ***OFFICIAL TRANSCRIPT***

09:50:05  1          THE COURT:  Thank you, Counsel.

09:50:06  2               We'll take a break at this time and come back at

09:50:09  3     ten o'clock.  Court will stand in recess.

09:50:11  4          THE DEPUTY CLERK:  All rise.

09:50:13  5          (WHEREUPON, at 9:50 a.m., the jury panel leaves the

09:51:15  6     courtroom, and the Court took a recess.)

09:51:15  7          THE DEPUTY CLERK:  All rise.

09:59:12  8          THE COURT:  Be seated, please.

09:59:13  9               I understand we have a motion from the

09:59:14 10     defendants.

09:59:14 11          MS. WILKINSON:  Yes, Your Honor.

09:59:15 12               Defense moves for a mistrial based on the

09:59:18 13     intentional violation of the Court's orders.

09:59:21 14               As the Court, I'm sure, recalls, there were

09:59:24 15     specific Motions in Limine and discussions with the Court about

09:59:27 16     the issues to which I had to object repeatedly when plaintiffs

09:59:31 17     violated your Orders.

09:59:32 18               The first was the absence of a company witness.

09:59:36 19     We moved under a Motion in Limine to exclude any evidence or

09:59:42 20     argument or references to the presence, absence, identity of a

09:59:47 21     corporate representative at trial.  You sustained that Motion

09:59:51 22     in Limine at Document 6254, yet plaintiff said on numerous

09:59:55 23     occasions in closing argument that we failed to bring anyone to

09:59:59 24     this courtroom from either company.

10:00:01 25               Second, you ruled on Dr. Peters' live video

                              *OFFICIAL TRANSCRIPT*

testimony.  You said that he was going to be in courtroom, and you said no party shall make reference to the location of Dr. Peters or his absence from New Orleans during cross-examination or otherwise during the course of this trial. That's at Document 6299.  Plaintiffs flagrantly violated that Court Order.

Third, Your Honor, the cornerstone of a trial is that the defendants have no burden to bring any evidence.  We certainly don't have a burden to bring particular witnesses. It is error for the plaintiffs' lawyers to comment on our failure to present evidence.

Based on your rulings, Your Honor, and that fundamental understanding that occurred, we relied on your rulings.  We relied on what you told plaintiffs' lawyers in presenting our case, in calling witnesses or not calling certain witnesses.  So now, I had to object three times in a closing, which I don't think I have ever done before, and I'm going to have to address these issues, even though the Court made rulings before.

So for all those reasons, Your Honor, we'd move for a mistrial.

THE COURT:  All right.  I'll deny the motion.

I can correct that.  I've mentioned it to the jury before, but when they come in, I'll tell them again.

All rise as the jury comes in.

**_OFFICIAL TRANSCRIPT_**

```
10:01:37  1          (WHEREUPON, at 10:01 a.m., the jury panel enters the
10:02:01  2   courtroom.)
10:02:01  3          THE COURT:  Be seated, please.
10:02:02  4          We'll hear from the defendant in moment, but,
10:02:04  5   before I do so, there was some comment about the defendant
10:02:07  6   didn't bring witnesses.
10:02:09  7          As I'll tell you in the closing instructions, the
10:02:13  8   defendant doesn't have to bring witnesses.  It's the
10:02:15  9   plaintiffs' duty.  The burden is always on the plaintiff to
10:02:19 10   prove the case.  The defendant doesn't have to prove anything;
10:02:23 11   Plaintiff has to prove it.
10:02:25 12          With regard to presence or absence of a witness,
10:02:27 13   whether they are by deposition or not by deposition, is really
10:02:32 14   before you.  You've heard me say that before.  Depositions are
10:02:35 15   the same as a person coming to court.  So I want you to note
10:02:43 16   both of those things.
10:02:44 17          Let's hear from the defendant.
10:02:45 18          MS. WILKINSON:  Thank you, Your Honor.
10:02:48 19          Good morning, everyone.
10:02:48 20          VOICES:  Good morning.
10:02:49 21          MS. WILKINSON:  Good morning, counsel, Mr. and Mrs.
10:02:47 22   Boudreaux, Your Honor.
10:02:47 23                DEFENDANTS' CLOSING ARGUMENTS
10:02:47 24   BY MS. WILKINSON:
10:02:53 25          I am very lucky every day to walk through those doors,
```

*OFFICIAL TRANSCRIPT*

10:02:58  1   and come through those flip doors, and be able to participate

10:03:01  2   in this process, because we have waited a very long time for

10:03:04  3   this trial.

10:03:05  4              You have seen all those depositions.  You have

10:03:07  5   seen all those exhibits marked.  We have been waiting to get

10:03:11  6   this issue in front of you.

10:03:13  7              We knew that when you were selected, you swore

10:03:18  8   under your oath, and His Honor will refer to it, that you would

10:03:22  9   decide this case based only on the evidence; not on sympathy,

10:03:24 10   which, of course, we all know we feel sorry and can relate to

10:03:28 11   what happened to Mr. and Mrs. Boudreaux, but that you all would

10:03:32 12   focus, as you did, on the evidence that you saw and the

10:03:35 13   witnesses that you heard, either from the witness stand or from

10:03:38 14   video.  It doesn't matter.  They were here to give you the

10:03:41 15   evidence.

10:03:42 16              So, I want to spend my time with you talking

10:03:45 17   about what you have to decide and what the evidence actually

10:03:48 18   showed.  It's tempting, though, sometimes, when you hear

10:03:53 19   counsel make negative comments on your client or on you or your

10:04:01 20   witnesses, to kind of go down low, but I think you all know,

10:04:06 21   when somebody goes low, we go high.

10:04:08 22              So I'm not going to address a lot of those

10:04:11 23   comments because they are inappropriate in this courtroom.

10:04:14 24   What's important for you and for me, my responsibility to you

10:04:17 25   and to my clients is to discuss the evidence.  So let's get to

*OFFICIAL TRANSCRIPT*

it.

There are two questions in the case, right?
Hopefully, that's what I told you at the beginning; hopefully,
that's what we've used your time effectively on.  This is what
you all are going to have to decide, because when we're done,
it's going to be your job now.  You're going to have to come
together and decide what did the evidence show.

The first question you're going to have to answer
is, did the Xarelto label provide an adequate warning and
instructions to Dr. Wong?  That's the question.  Not a perfect
warning, not every detail, but did it provide Dr. Wong the
information he needed so that he could prescribe Xarelto safely
and effectively to Mr. Boudreaux.

The second is would the plaintiffs' proposed
PT test have changed Dr. Wong's prescribing decision.  So if
there was this PT test in the label, would it have made a
difference to Dr. Wong?

I submit to you, you have the answers to those
questions because Dr. Wong came in and talked to you.  He
testified -- and this is a man, ladies and gentlemen, he has no
interest in the outcome of this case, right?  He wasn't paid.
He made all of these decisions for Mr. Boudreaux with
Mr. Boudreaux's best interests at heart.  He decided all these
issues before there ever was a trial.

So all those medical records where he decides

*OFFICIAL TRANSCRIPT*

10:05:45 1   Xarelto is the right drug, or he decides he should be on

10:05:47 2   Xarelto and aspirin, Dr. Wong did that because he thought it

10:05:52 3   was best for Mr. Boudreaux.

10:05:54 4            He's not a paid expert.  He's what we call a

10:05:57 5   treater, right?  His only interest is Mr. and Mrs. Boudreaux.

10:06:03 6            He told you he was warned.  He understands.  He's

10:06:05 7   a cardiologist.  This is what he does every day.  He deals with

10:06:09 8   AFib and these drugs 50 percent of the time in his practice.

10:06:14 9   He said he would never use a test that wasn't approved by the

10:06:17 10  FDA.

10:06:19 11           It matters to him that these tests are proven.

10:06:22 12  Why?  Because there needs to be a medical consensus, right?

10:06:25 13  They don't get to do what they did in this courtroom.  You

10:06:28 14  don't get to bring in one doctor that practices medicine in

10:06:32 15  these areas -- that's Dr. Leissinger, because we know

10:06:35 16  Dr. Kessler is a pediatrician, he doesn't even treat patients

10:06:38 17  regularly anymore -- you don't get to bring in one doctor and

10:06:41 18  say, this is the medical consensus, this should be in the

10:06:45 19  label.

10:06:45 20           This has been discussed by doctors all around, in

10:06:48 21  the literature, you've heard from doctors, and we'll go through

10:06:52 22  that evidence.  Doctors like Dr. Wong want to know that this

10:06:55 23  issue has been studied, tested and approved by the FDA.  The

10:06:58 24  one thing that's clear in this case -- and they don't dispute

10:07:02 25  it -- is the Neoplastin PT test that they asked for is not

**OFFICIAL TRANSCRIPT**

10:07:06 1   approved by the FDA.

10:07:08 2          Now, why is that?  Don't you think the company

10:07:11 3   that makes the Neoplastin PT -- you saw their label, and we'll

10:07:15 4   look at it -- if they thought they could do more tests, make

10:07:19 5   more money, help people, you don't think they would have tried

10:07:23 6   to go to the FDA and get it approved?  Of course, they would.

10:07:26 7   But there is no science that this test is helpful and helps

10:07:32 8   doctors, and that's what you heard Dr. Wong say.  So he would

10:07:34 9   still prescribe Xarelto today for Mr. Boudreaux if the

10:07:37 10  circumstances were the same.

10:07:40 11         At the end of the closing argument, you saw for

10:07:43 12  the very first time plaintiffs' proposed label.  Did you see

10:07:47 13  that?  You never saw that during the trial.  That's not

10:07:49 14  evidence.

10:07:51 15         Why didn't they show that to Dr. Wong, right?

10:07:54 16  They asked him the hypothetical question, well, if there was a

10:07:57 17  test that helped you tell whether your patient had a higher

10:08:00 18  bleeding risk, would you use it?  He said yes -- don't you hope

10:08:03 19  he would say yes.  I hope every doctor would say yes.  That's

10:08:07 20  not the question in the case.

10:08:08 21         The question is would this specific test that

10:08:10 22  they say is so useful, would he use that test?  They had that

10:08:15 23  label, they put it up for you, and they didn't show it to any

10:08:19 24  of the witnesses.

10:08:20 25         Well, I bet Dr. Wong would have some good answers

**OFFICIAL TRANSCRIPT**

10:08:23 1    for them if he actually saw what the label said.

10:08:28 2            There is a reason they didn't show it to one

10:08:30 3    witness, and it's certainly not evidence when a lawyer puts it

10:08:32 4    up.

10:08:33 5            The evidence, as we know, in this case focuses

10:08:38 6    around this devastating and debilitating medical tragedy.

10:08:44 7    Mr. Boudreaux, I think, put it best.  He was so honest.  He

10:08:50 8    said, I was afraid of having a stroke, because he had seen it.

10:08:52 9    He had seen his own mother and what it did.

10:08:55 10           You know what, he loves his wife.  They have been

10:08:58 11   married 52 years.  He didn't want to be a burden to her.  He

10:09:02 12   wanted to be able to enjoy his time with her.

10:09:05 13           Dr. Wong knew that.  Dr. Wong knew the

10:09:10 14   devastation a stroke can cause.  So it wasn't even a close call

10:09:13 15   to put Mr. Boudreaux on an anticoagulant to try and reduce and

10:09:18 16   prevent a stroke.  That is why we are here.

10:09:22 17           Mr. Boudreaux wanted that protection.  Dr. Wong

10:09:27 18   decided, because of what can happen to anyone who has a stroke,

10:09:31 19   that that was the right medication.

10:09:33 20           The medication was designed by the people at

10:09:39 21   Bayer and Janssen to do exactly what Dr. Wong needed for

10:09:45 22   Mr. Boudreaux.  It was designed to prevent strokes.  It was

10:09:49 23   designed only to work on Factor Xa.  Why?  Because that was a

10:09:53 24   new innovation, right?  It didn't have to affect your body the

10:09:56 25   same way warfarin did.  You don't have dietary restrictions

*OFFICIAL TRANSCRIPT*

10:10:00  1   when you use it, you only have to take it once a day, and you

10:10:03  2   don't have to have any routine monitoring.

10:10:06  3            That's why Dr. Wong told you what these companies

10:10:09  4   did was useful.  It was a step forward because it's easier for

10:10:13  5   most patients to take this drug once a day, not have to worry

10:10:16  6   about their diet, not to have regular blood tests, and know

10:10:20  7   that they are protected from the risk of stroke.

10:10:22  8            That protection is based on science, not argument

10:10:27  9   by lawyers, but on science, rigorous science.  You heard the

10:10:33 10   ROCKET trial, which was the double-blind placebo clinical

10:10:40 11   trial, was the best kind of trial you could do.  That was the

10:10:43 12   one that the FDA relied on and the companies relied on as the

10:10:48 13   basis for getting the approval to use this drug with AFib.

10:10:51 14            14,000 people were studied.  In our particular

10:10:56 15   study, older and sicker patients, just like Mr. Boudreaux.  It

10:11:00 16   was reviewed by the FDA, and most importantly, it was put in

10:11:03 17   the label and published in journals so everyone could see that

10:11:07 18   data.

10:11:09 19            Excuse me.  I'm sorry, I've been coughing during

10:11:13 20   this trial.

10:11:14 21            That is the science that allowed Dr. Johnson,

10:11:19 22   Dr. Fail, Dr. Wong, Dr. Boniol, every physician who treats

10:11:28 23   patients with AFib to come in and tell you the same thing,

10:11:31 24   Xarelto is a safe, effective drug, and they would use it with

10:11:34 25   their patients today.

                              *OFFICIAL TRANSCRIPT*

10:11:35  1           The company did what you would hope they would

10:11:39  2      do.  They studied this drug before and after it was on the

10:11:42  3      market.  There were clinical studies.  And they even tested the

10:11:46  4      PT, right?  The PT was part of the ROCKET trial, the

10:11:50  5      Neoplastin PT.

10:11:51  6           And what did they find?  They found a

10:11:54  7      correlation, but they found that it wouldn't predict in an

10:11:59  8      individual patient.  But they certainly didn't keep that

10:12:01  9      information secret.

10:12:03  10          The FDA had it.  The FDA published all of their

10:12:06  11     information.  And studies were going to take a look at it --

10:12:10  12     look at, published it.  All of those studies, ladies and

10:12:13  13     gentlemen, to this day, proved what was proven in 2011, that

10:12:19  14     this is a safe and effective drug to prevent strokes.  And the

10:12:23  15     FDA just reaffirmed that in October of 2016, just a few months

10:12:27  16     ago.

10:12:29  17          Are plaintiffs really claiming to you that this

10:12:34  18     PT test is still totally unknown to doctors, unknown to the

10:12:37  19     FDA, and somehow six months ago the FDA approved it even though

10:12:42  20     there is no PT test and they had no idea?  This case has been

10:12:47  21     going on for years.  This information is not secret from

10:12:51  22     anyone.

10:12:52  23          This drug has benefits and this drug today is

10:12:59  24     seen as just as safe and effective with all those extra

10:13:04  25     benefits and none of the downsides of warfarin.

                                  *OFFICIAL TRANSCRIPT*

10:13:08  1          This is one of the articles we've looked at over

10:13:10  2   and over again from the Journal of -- the *JAMA Cardiology*

10:13:14  3   journal.  Let's remember, cardiology.  That's the folks who

10:13:17  4   deal with this issue.

10:13:19  5          And what does it say?  It says, "Based on many,

10:13:22  6   many trials, and over 71,000 patients, the fixed dose of an

10:13:26  7   unmonitored therapy" -- right, that's our -- the drugs we're

10:13:30  8   dealing with, NOACs and Xarelto, and you see it right there,

10:13:33  9   rivaroxaban -- "they are at least as effective as the dose

10:13:37 10   adjusted warfarin for what they are supposed to do, prevent

10:13:41 11   stroke, and they are associated with less serious bleeding."

10:13:47 12          Why the doctors use Xarelto and use the other

10:13:52 13   NOACs, because they are easier on the patients and there is

10:13:54 14   less risk of serious bleeding.  That seems to be pretty

10:13:58 15   obvious.  An excellent reason why doctors continue to choose to

10:14:03 16   use this drug.

10:14:06 17          The drug, though, informs doctors of all the

10:14:09 18   risks and how to use the drug effectively.  What does it do?

10:14:13 19   First of all, it talks about the most important thing, which is

10:14:16 20   what the drug is for, the benefit, it prevent strokes.

10:14:20 21          It does provide a test.  Remember, you saw that.

10:14:21 22   The creatinine clearance test, that is a safety test.  Unlike

10:14:27 23   what the plaintiffs are talking about, that is a test.  And

10:14:29 24   guess what?  It's in the label.  And it helps doctors decide

10:14:31 25   whether they are going to prescribe 20 milligrams or 15 or not

*OFFICIAL TRANSCRIPT*

10:14:35 1   any if their score is too low.

10:14:37 2        It certainly talks about the bleeding risks and

10:14:39 3   it even talks about specific elevated bleeding risks.  One that

10:14:44 4   is applicable in the case, if you take aspirin and you take

10:14:47 5   Xarelto, that increases the risk even further.

10:14:51 6        And I would submit to you that Dr. Wong has

10:14:53 7   already made the decision they've talked about, because

10:14:57 8   Mr. Boudreaux was at an elevated risk because he was on aspirin

10:15:01 9   and he was on Xarelto.  And what did Dr. Wong decide to do?

10:15:05 10  Even at that extra risk?  He decided to keep him on Xarelto.

10:15:10 11       So why are plaintiffs claiming somehow that if

10:15:13 12  there was some general PT test, that would have changed

10:15:16 13  Dr. Wong's decision?  It wouldn't.  He knew what was best for

10:15:21 14  Mr. Boudreaux, and even at these increased risks, he thought

10:15:25 15  this drug was the best one to prevent stroke.

10:15:27 16       Now, plaintiffs want you to believe that this --

10:15:34 17  the risks of this drug are enormous.  Remember, they talked

10:15:39 18  about the three Superdomes and all of the folks in there?  Why

10:15:44 19  do you think they say that to you?  To try and scare you,

10:15:47 20  right?  Think of all the people that are dying.

10:15:49 21       Well, 97 percent of the people on the drug don't

10:15:54 22  ever have a GI bleed.  But it's unfair even to just talk about

10:15:59 23  that, because think of all of the strokes that are prevented by

10:16:02 24  people taking these drugs.

10:16:03 25       So, you know, we're not here to get your emotions

***OFFICIAL TRANSCRIPT***

10:16:07  1    up and angry.  We're here to talk about the evidence, and the

10:16:11  2    evidence is here that Dr. Wong knew and the other doctors knew,

10:16:14  3    that they put these folks on these drugs because 97 percent of

10:16:19  4    the people don't have an incident like Mr. Boudreaux did.  And

10:16:23  5    they also know that the risk doctors care about most, they're

10:16:29  6    better or lower on Xarelto than they are on warfarin.

10:16:34  7            Remember, Dr. Wong told you, and so did

10:16:36  8    Dr. Johnson, what's the worst thing that can happen?  It seems

10:16:40  9    almost obvious, doesn't it?  The risk of fatal bleeding, of

10:16:43 10    dying from a bleed.

10:16:44 11            There is no dispute in this case that warfarin

10:16:46 12    has a higher risk.  So why wouldn't a doctor, as Dr. Wong says,

10:16:52 13    pick a drug that has a lower risk of fatal bleeding or of

10:16:57 14    intracranial bleeding?  I think Dr. Johnson did an eloquent job

10:17:01 15    of explaining to you why, right, an intracranial bleed is so

10:17:05 16    frightening even to doctors.

10:17:07 17            So that's all of the information that the doctors

10:17:10 18    consider, all of the risks about the drug, but plaintiffs, for

10:17:17 19    some reason, didn't even point out to you that the label does

10:17:22 20    talk about PT.  This from the pharmacodynamic section of the

10:17:30 21    label.  Remember, Dr. Johnson talked about it.

10:17:31 22            Now, why in the world would we put this in the

10:17:35 23    label if we were trying to hide the PT test?  Why would we put

10:17:42 24    it in there?  We put it in there because this is what we know

10:17:45 25    is science based, and that's what the FDA approved and that's

*OFFICIAL TRANSCRIPT*

10:17:49  1    what is still in the label today about PT.

10:17:53  2           And Dr. Johnson explained to you, that it

10:17:55  3    generally talks about the more you have in your system, right,

10:17:58  4    the more it correlates to the bigger concentrations and risks.

10:18:01  5    But that's all that's science based.  And it's certainly would

10:18:06  6    be a ridiculous conspiracy to put this into the label and

10:18:11  7    somehow think no one is going to think about PT if we put it in

10:18:16  8    the pharmacodynamic section and not put it in the PT test that

10:18:20  9    plaintiffs want.

10:18:21 10           The reason we would never present that language,

10:18:25 11    as Dr. Peters told you, is because they don't believe it's

10:18:28 12    helpful.  They are doctors and scientists, and like every other

10:18:34 13    doctor and scientist that came here, other than Dr. Leissinger,

10:18:35 14    that actually prescribes this medication, none of them believe

10:18:40 15    it would be helpful.  The test they know is helpful is right in

10:18:45 16    the label.

10:18:45 17           Now, again, if their story were true, that we're

10:18:49 18    actually afraid, I think it said *fearful*, right, of putting a

10:18:53 19    one-time test in there, why do have we have a one-time test in

10:18:56 20    there?

10:18:58 21           I mean, it's ridiculous.  Really, we put in this

10:19:02 22    test.  That doesn't hurt our business.  But if we put in their

10:19:06 23    test, the test that they've come up with that no one supports,

10:19:10 24    that's really going to hurt our business.  That is an insult to

10:19:13 25    the scientists and doctors who work at our companies.  And it's

*OFFICIAL TRANSCRIPT*

10:19:18  1  stupid.  It makes no sense.  Why in the world would we put a

10:19:22  2  test in like this?

10:19:23  3          We put it in the measurements.  We tell the

10:19:25  4  doctors what dose they should use.  We give them concrete

10:19:29  5  helpful instructions.  And you know what?  Dr. Wong followed

10:19:32  6  these instructions and Mr. Boudreaux, for that reason, received

10:19:37  7  the 20 milligram based on a helpful test that was used and is

10:19:41  8  still used by physicians who prescribe this drug.

10:19:43  9          When all of those decisions were made,

10:19:51 10  Mr. Boudreaux was lucky to have Nurse Theriot.  You saw her

10:19:55 11  yesterday.  One of the most experienced nurses you could have.

10:20:00 12  Dr. Wong says she's one of the top 1 percent.  You can tell,

10:20:03 13  can't you, how much she loved her job?

10:20:05 14          She sat with Mr. Boudreaux and talked about all

10:20:08 15  of these risks.  She told him that he could bleed.  She even

10:20:12 16  said, "Look what you should do if you see any signs of

10:20:15 17  bleeding," which is certainly a very concrete warning saying

10:20:17 18  you could have this problem.

10:20:19 19          And what did Mr. Boudreaux do?  He did what I

10:20:23 20  think most of us would do, he said, "I'll take that drug."

10:20:26 21          Now, you heard Nurse Theriot say some people

10:20:30 22  don't.  We are certainly not criticizing him for taking

10:20:34 23  Xarelto.  We agree.  But the warnings are there for the

10:20:39 24  doctors.  And in this case, it wasn't just Dr. Wong who got

10:20:43 25  warned, it was Mr. Boudreaux himself.  And because of his

**OFFICIAL TRANSCRIPT**

10:20:47 1     particular circumstances, because of what he had experienced

10:20:50 2     personally with his family, he certainly thought avoiding

10:20:59 3     stroke was a much more important thing than a risk of a bleed.

10:21:02 4           That doesn't mean that this wasn't a bad thing

10:21:05 5     that happened to Mr. Boudreaux. We said that to you at the

10:21:07 6     beginning, right? We said, bad things happen to good folks,

10:21:10 7     and that we weren't going to challenge any of that. And did

10:21:13 8     you see us, did we cross-examine the Boudreauxs? No. Did we

10:21:17 9     say one thing about their damages? No. And we're not going to

10:21:22 10     today. We have no issue with Mr. and Mrs. Boudreaux. The

10:21:23 11     issue is about the science and what should be in the label, and

10:21:27 12     what is supported by the folks who actually know and understand

10:21:31 13     how this drug works.

10:21:33 14           Plaintiffs said to you at the beginning that this

10:21:37 15     was a safety test. Again, why did he say that? Because he

10:21:41 16     wanted you to think we were terrible people. We're actually

10:21:43 17     the big pharmaceutical companies I think he called us, and we

10:21:50 18     don't want to do a simple safety test. Think about what that

10:21:54 19     said. That all of the doctors who work on our companies who

10:21:57 20     told you they were on Xarelto themselves or prescribe it for

10:22:00 21     their mother, that they don't care about safety. They don't

10:22:03 22     care. That's what he wants you to believe. That we actually

10:22:06 23     have something hidden in documents, which still, I don't know

10:22:09 24     what documents he's saying there is something hidden in there.

10:22:13 25     But he's saying there is something hidden in there. And all of

*OFFICIAL TRANSCRIPT*

10:22:17  1    these doctors who testified in front of you from our companies

10:22:20  2    and all the doctors who took the stand, that they don't care

10:22:23  3    about patient safety because there's a simple test.

10:22:27  4            Well, these guys didn't present one witness or

10:22:30  5    one document that said this was a safety test.  And there's a

10:22:32  6    reason for that, because no one believes that it is.  And part

10:22:34  7    of it is, there is not really a test.

10:22:34  8            Plaintiffs didn't tell you a test.  What they

10:22:38  9    did, was they took that FDA graph, remember, and you saw it

10:22:41 10    during their presentation, and said, oh, if you take this

10:22:43 11    graph -- which, by the way, when they showed you the label,

10:22:46 12    they used what was the unadjusted graph.  Remember, Dr. Johnson

10:22:51 13    explained to you how you need to take out all of those other

10:22:54 14    factors.  They didn't use that when they put up their label.

10:22:57 15            And what did they tell you you're supposed to do?

10:23:00 16    I keep saying in the case, okay, let's say they are right.

10:23:03 17    There is a PT test.  What is a doctor supposed to do?  Did one

10:23:08 18    witness tell you when they were supposed to take the

10:23:11 19    Neoplastin PT?  No.  And remember, Dr. Johnson told you,

10:23:14 20    depending on what time of day, because of the short half-life

10:23:17 21    of Xarelto, you could get a totally different score.

10:23:21 22            Did they tell you what cutoff is too much risk?

10:23:24 23    They did not.  Did they tell you what action a doctor should

10:23:27 24    take afterward?  If this test had happened and Mr. Boudreaux

10:23:32 25    had some score, which we don't even know which score would be

*OFFICIAL TRANSCRIPT*

10:23:36  1    where they said it's too much risk, what was a doctor supposed

10:23:40  2    to do?

10:23:41  3             Was Dr. Wong supposed to not give him any other

10:23:44  4    anticoagulants?  They don't say.  Was he supposed to put him on

10:23:47  5    a different anticoagulant?  Well, the other doctors would tell

10:23:50  6    you and the medical records would suggest, that if you think

10:23:52  7    there is a risk with one anticoagulant, you shouldn't use any

10:23:56  8    other.

10:23:57  9             Remember when counsel said, well, there is no

10:23:59 10    evidence that he would have bled from another anticoagulant.

10:24:03 11    Really?  What did the doctors who treat him do?  What did they

10:24:10 12    do before this case ever happened?  He had a GI bleed.  They

10:24:12 13    took him off aspirin.  They took him off Xarelto.  And did they

10:24:16 14    ever put him on a different anticoagulant.  They didn't.

10:24:18 15    That's the evidence.

10:24:19 16             The doctors who treated Mr. Boudreaux, who care

10:24:21 17    about him, who have no interest in this case, they thought

10:24:24 18    there was a risk if he was on any anticoagulant.  And that's

10:24:27 19    why they didn't put him on any.

10:24:29 20             So what is it that plaintiffs would want real

10:24:34 21    doctors who treat patients to do with this test?  They didn't

10:24:39 22    suggest to you and they certainly didn't suggest to these

10:24:42 23    witnesses, because they knew if they actually showed them their

10:24:45 24    proposal, Dr. Johnson, Dr. Boniol, Dr. Fail, Dr. Wong would

10:24:51 25    tell them why that wouldn't have been helpful.  But they didn't

*OFFICIAL TRANSCRIPT*

10:24:54  1   give them the opportunity to do that.

10:24:55  2          Because when they got on the stand, the witnesses

10:25:01  3   said, the doctors, the cardiologists who prescribed this drug

10:25:05  4   and who developed it said, PT test could actually harm

10:25:09  5   patients, because you could get misleading information.

10:25:12  6   Remember, you could think someone has a low level, and

10:25:14  7   therefore, they didn't have any Xarelto in their system and

10:25:16  8   they did.  Or you could think someone had a high level and that

10:25:21  9   they would have too much, and they would be perfectly fine.

10:25:25 10          Nobody came into this courtroom, despite

10:25:29 11   plaintiff's burden, and said that this test would actually

10:25:32 12   increase safety for a particular patient.  And that's because

10:25:36 13   they can't, because the overwhelming literature and practice

10:25:39 14   and all the public health agencies, all the medical

10:25:45 15   associations, not a single one support what plaintiffs are

10:25:50 16   asking for.

10:25:51 17          Who recommends it?  Did you hear a single

10:25:55 18   prescribing cardiologist?  Do you want to talk about failure to

10:25:59 19   call a witness?  Plaintiffs do have a burden, right?  You all

10:26:02 20   know that.  You know that's what you're going to.  Did they

10:26:05 21   bring you one prescribing cardiologist?  They didn't.  They

10:26:08 22   didn't.

10:26:08 23          If cardiologists really thought this test worked

10:26:15 24   and helped their patients, don't you think they could find

10:26:18 25   somebody to come in, like Dr. Johnson did, and tell you, I

**OFFICIAL TRANSCRIPT**

10:26:21 1    treat patients every day in this town.  I go to all these

10:26:25 2    hospitals.  See all kinds of patients.  And I think this test

10:26:28 3    is useless and not helpful.

10:26:30 4         The FDA, there is no evidence that the FDA thinks

10:26:34 5    this is a test that should be in the label.  Medical

10:26:37 6    associations, you didn't hear them cite a single medical

10:26:42 7    association that says this test should be used, or a

10:26:45 8    peer-reviewed publication that says this test should be used.

10:26:49 9         Now, why is that?  Because in the outside --

10:26:51 10   outside of this courtroom, nobody thinks this test works.  They

10:26:56 11   don't think it helps.  They want you to second-guess all the

10:27:02 12   scientists out there, all the doctors you've heard, all the

10:27:06 13   medical associations, all the medical literature, and they want

10:27:08 14   you to believe that they're the only ones that understand this

10:27:12 15   test and they're the only ones that want it in the label

10:27:17 16   because nobody else understands what the company does.

10:27:24 17        Well, Dr. Johnson certainly understands.  And she

10:27:30 18   was -- as Dr. Kessler even said, talk to a cardiologist if you

10:27:33 19   want to talk about AFib, because he knew he wasn't.  Well, you

10:27:36 20   did.  You heard from Dr. Johnson.

10:27:38 21        And there is a lot of things that were said, and

10:27:40 22   I will take one moment to address one.  I heard counsel say

10:27:43 23   that Dr. Johnson seemed like a very nice doctor.  She cares

10:27:47 24   about her patients.  But she wants specific evidence for

10:27:53 25   specific patients, and he said -- I wrote it down -- "That's

*OFFICIAL TRANSCRIPT*

10:27:56  1    not how medical studies work."  Really?  He knows better than

10:28:01  2    Dr. Johnson how medical studies work?  I'm sorry, that is

10:28:05  3    condescending and insulting.

10:28:09  4              Dr. Johnson took time out of her practice, came

10:28:11  5    in here and told you all that she looked at the evidence.  She

10:28:16  6    looked at the FDA analysis.  She doesn't care what we think.

10:28:20  7    She doesn't make her medical decisions based on some internal

10:28:23  8    e-mail from a company, nor would you want her to if she were

10:28:27  9    your doctor.

10:28:28 10              She said, "I looked at all the science myself and

10:28:30 11    I knew about it before this case ever happened, and I do not

10:28:34 12    believe that this test is useful."  And she knows what she's

10:28:39 13    talking about.  She certainly knows how studies work.  She

10:28:42 14    reads them every day.  She relies on them when she treats

10:28:46 15    patients.

10:28:46 16              She has an incredible education.  Right?  Maybe

10:28:54 17    you all have met somebody like this.  I've never met somebody

10:28:58 18    who was an electrical engineering major, a Master's, and then a

10:29:01 19    doctor.  And she comes back here as the director of cardio -- I

10:29:07 20    can't every say it right -- electrophysiology, one of the few

10:29:13 21    specialists in the area and helps patients with their heart

10:29:18 22    rhythm.  Could there be anyone more qualified to talk to you

10:29:21 23    all about this particular issue?  I don't think so.  And we

10:29:24 24    brought her to you.

10:29:24 25              And she said, along with the other cardiologists

*OFFICIAL TRANSCRIPT*

10:29:26  1   in this case, Xarelto is safe and effective.  Dr. Wong said it,

10:29:31  2   Dr. Fail, and Dr. Johnson.  So what's the difference?  Dr. Wong

10:29:34  3   and Dr. Fail, remember, were the treating physicians.  They are

10:29:37  4   not paid experts, but they are both cardiologists and they

10:29:41  5   think it's safe and effective today.  Dr. Johnson was our

10:29:44  6   expert, looked at all the evidence and said, Xarelto is safe

10:29:48  7   and effective and you do not need -- or you should not use a

10:29:52  8   PT test.

10:29:52  9           Why?  She said it doesn't predict bleeding risk

10:29:57 10   in individual patients.  Now, when you hear plaintiffs, they

10:30:01 11   just keep saying, well, it predicts bleeding risks.  Her point

10:30:04 12   is, "I have to know that it's going to be predictive of a

10:30:08 13   patient, of an individual patient."  She said it wouldn't be

10:30:12 14   helpful for her to treat patients using that and it could lead

10:30:15 15   to harmful circumstances, and she wasn't the only one who said

10:30:19 16   it.

10:30:19 17           Dr. Boniol explained why it doesn't even work,

10:30:22 18   because remember the factors we talked about from the beginning

10:30:24 19   of the case, that warfarin works on several factors, and that's

10:30:28 20   how the PT test is designed, to measure all of those factors?

10:30:31 21   And that Xarelto and the other Xa inhibitors, as they're call,

10:30:38 22   they don't work on anything but one factor.

10:30:40 23           So he says that test measures four different

10:30:44 24   variables and it doesn't predict who will bleed, and that's

10:30:47 25   what doctors want to know.  They want to know if someone

*OFFICIAL TRANSCRIPT*

10:30:51 1    individually is at an increased risk.

10:30:54 2            And people who prescribe this drug every day and

10:30:57 3    help doctors who do, every one of them says that the PT won't

10:31:03 4    work for patients.  Who's under Dr. Leissinger?  Is there the

10:31:09 5    *Journal of Cardiology*, the American College of Cardiology

10:31:14 6    Foundation, the American Heart Association, the Heart Rhythm

10:31:18 7    Society?  None of those organizations, none of those people

10:31:23 8    support what plaintiffs are trying to tell you.

10:31:27 9            But I think of all the things that can make you

10:31:35 10   feel like what plaintiffs are saying is not proven, is even

10:31:39 11   their own expert, Dr. Leissinger.  She didn't come in and say

10:31:44 12   she uses the test herself.

10:31:46 13           So counsel said, well, she knows what's this the

10:31:50 14   company document.  She knows everything.  She's telling you

10:31:53 15   this.  I asked her, she does not use the test herself today.

10:31:56 16   It's a simple test.  It's available, as plaintiffs say.

10:32:00 17           Now, do I think Dr. Leissinger doesn't care about

10:32:02 18   her patients?  No.  Of course she cares.  Of course she cares.

10:32:07 19   She happens to think warfarin is the best drug.  She's used it

10:32:11 20   for a long time.  She's allowed to do that.  But if she thought

10:32:14 21   outside this courtroom that this test would really save lives

10:32:17 22   and help patients, why isn't she using it with her own

10:32:21 23   patients?  It doesn't make any sense.

10:32:23 24           You know, I don't usually have any big fancy

10:32:29 25   quotes.  But I like music and I like to dance and I like old

**OFFICIAL TRANSCRIPT**

10:32:33 1    music, so some of you may not know my reference, but my

10:32:37 2    favorite one is -- in a courtroom like this is, do you remember

10:32:40 3    the group C&C Music Factory?  Yeah, they weren't around for too

10:32:48 4    long.  Some of us are old enough.  And their song, *Things That*

10:32:50 5    *Make You Go Hmm*.  And that's what I say when I look at that

10:32:54 6    slide and I think, why is that, hmm?  Why is it that

10:32:57 7    Dr. Leissinger came in and got on that stand and started to

10:33:02 8    tell you that this PT test is so useful and she doesn't use it

10:33:06 9    herself?

10:33:07 10          No one else says what she says because this

10:33:15 11   information wasn't hidden.  It was studied, it was evaluated,

10:33:19 12   and it's been written about.  You've seen it all of that.

10:33:22 13          You've seen articles -- or at least you've seen

10:33:27 14   some articles when plaintiff showed you.  They showed you this

10:33:30 15   article during Dr. Boniol's examination.  And Dr. Boniol kept

10:33:35 16   trying to say to them, show the next year's article.  This

10:33:40 17   fellow, Dr. Douxfils, has been researching on this issue quite

10:33:48 18   a bit.  And they were trying to show you just one article.

10:33:50 19          Mr. Sarver got up, after Mr. Boniol kept

10:33:52 20   saying -- you know, I want to show you that article.  I want to

10:33:54 21   show you 2013.  Because in 2012 they said, let's look at PT.

10:33:58 22   Maybe it's predictable.  2013, what does it say?  "PT time must

10:34:04 23   not be used to estimate Xarelto concentrations in plasma and

10:34:09 24   poorly reflects the intensity of anticoagulation due to

10:34:14 25   Xarelto."  It's pretty straightforward, isn't it?

**OFFICIAL TRANSCRIPT**

10:34:17  1        Now, why is it that Dr. Boniol had to ask counsel

10:34:21  2   to show him the next year's article?  Because they want you to

10:34:24  3   only see part of the story.  Article after article after

10:34:29  4   article says the same thing.

10:34:30  5        You can pull out one quote like counsel did, but

10:34:33  6   here's the end of the test article.  "Consequently, the use of

10:34:37  7   PT in clinical practice" -- clinical practice, right, treating

10:34:42  8   patients -- "to evaluate an anticoagulant activity could cause

10:34:46  9   dangerous misinterpretation."

10:34:48 10        So it's not just that it's not helpful.  These

10:34:51 11   people have nothing to do with the companies.  This is a

10:34:54 12   published article from last year and they say it's not useful

10:34:58 13   and it could be dangerous, and they're not the only ones.  We

10:35:02 14   have the article that says just a month ago that it's not

10:35:06 15   helpful.

10:35:07 16        So our doctors, Dr. Berkowitz, who works at the

10:35:11 17   company who you heard so much about, and Dr. Johnson who came

10:35:13 18   in here, they agree with the research.  What do they say?  They

10:35:17 19   say some patients can have a high PT score and have no bleed,

10:35:24 20   and some could have a low PT score and have a bleed.  So it's

10:35:28 21   not predictive and that's why it could be harmful.

10:35:28 22        Because you could think everything is fine with

10:35:30 23   your patient, let's say they have a low PT score, and you could

10:35:33 24   send them in to surgery.  Right?  You're supposed to be off

10:35:36 25   these medications when you go in surgery because you can bleed

*OFFICIAL TRANSCRIPT*

10:35:38  1   too much.  If you get this wrong, that person can have

10:35:44  2   incredibly devastating consequences going into surgery on a

10:35:50  3   blood thinner.

10:35:50  4          So that's why Dr. Johnson and Dr. Berkowitz say,

10:35:53  5   you know, maybe you can plot out this graph, but you certainly

10:35:57  6   don't want to use this when you're treating patients.  You

10:36:00  7   don't want to get it wrong, because there are real-world

10:36:03  8   consequences to using a test and getting data that can be

10:36:05  9   misinterpreted.

10:36:06 10          And that's why, just a month ago, in the article

10:36:09 11   you just saw plaintiffs cite, they cited one, I think, section

10:36:14 12   in the middle, what does the conclusion say?  "In patients who

10:36:18 13   have high drug levels, they might -- that remain elevated,

10:36:24 14   consideration might be given to lowering the dosage" -- which

10:36:26 15   is not what plaintiffs are asking for, I don't think --

10:36:30 16   "switching to an alternative NOAC or using warfarin.  However,

10:36:34 17   this approach is an unproven benefit and may result in a net

10:36:40 18   harm."  March 2017.  The article came out just weeks before you

10:36:46 19   were called to serve.

10:36:47 20          And the reason that the folks just a month ago

10:36:54 21   could say that is because for years all of this information has

10:36:57 22   been available.  The companies didn't keep anything secret.

10:37:00 23          In fact, plaintiffs use the 2005 article.

10:37:03 24   Remember Dr. Kubitza, she's one of the doctors at Bayer who

10:37:08 25   worked on this drug from the beginning, and she published that

**OFFICIAL TRANSCRIPT**

article that said, well, PT does like it correlates.  Maybe it
will be helpful.  That's not keeping it secret, is it?  2005,
the drug didn't come out until 2011.

What in the world are they saying that things are
secret?  That's what they say we believe.  That's what she put
in the article.  And afterward, the ROCKET data was submitted.
FDA looked at it.  The advisory committee looked at it and they
decided.  The FDA approved it.  There has been articles talking
about it.  Nothing about the PT test and that it may predict
risk or may correlate to the concentration of the drug in your
blood, none of that was kept secret.  It's studied because it
is important.  It is important.  But the medical consensus
outside this courtroom, the people who really know the
evidence, they say it doesn't work.

So who do they bring?  They bring Dr. Kessler,
who was the head of the FDA, and I think he spent most the time
trying to say, no problem with the FDA.  They're not a rubber
stamp.  They do a great job.  Except when the two guys who
wrote they don't want to approve the drug, right, then they say
the FDA was clueless.  There were other people in hematology
who didn't know what the folks -- or in cardiology who didn't
know what hematology or doing, or something like at that.  I
couldn't honestly follow it very well.

In the end, he said the FDA approved the drug.
And what he said is he thought the PT test would be helpful,

*OFFICIAL TRANSCRIPT*

10:38:41  1     right?  What did he base it on?  He based it on that FDA graph.

10:38:46  2     And that graph, there is no dispute in this case, is public.

10:38:51  3     You saw it in the article, cited.

10:38:52  4             So that's what his basis is.  He didn't say it's

10:38:55  5     because of company documents.  He's a scientist too.  He's a

10:39:00  6     doctor.  He said, I want to look at the data.  And his data

10:39:02  7     that he used was the FDA analysis.

10:39:05  8             He, I think, tried to suggest, and so have

10:39:14  9     plaintiffs, that we actually didn't want people to know and we

10:39:20 10     purposely, right, didn't suggest it.  Well, what were the

10:39:24 11     companies thinking?  We put language in the draft label and

10:39:28 12     proposed it to the FDA.  Right.  That's what I want you to look

10:39:31 13     at.  Because they are trying to argue that we were trying to

10:39:34 14     hide something.

10:39:35 15             So how can you understand what our mindset was at

10:39:39 16     the time?  This was 2011.  This was what we proposed in the

10:39:42 17     label.  We said, "The relationship between PT and rivaroxaban

10:39:47 18     plasma concentration is linear and closely correlated."  That's

10:39:51 19     what they say we're hiding.

10:39:55 20         MR. BIRCHFIELD:  Your Honor, at this time we would ask

10:39:56 21     for a jury instruction.

10:39:58 22         THE COURT:  I'll deny that at this time.

10:39:59 23         MS. WILKINSON:  So this was what we were thinking

10:40:03 24     should go in the label.  That's basically what had been in

10:40:06 25     Dr. Kubitza's article, right?  Not a secret, but that's what

                              *OFFICIAL TRANSCRIPT*

10:40:10  1   our data was showing.

10:40:11  2          And then we even said an assessment of the

10:40:14  3   pharmacodynamic effect of Xarelto is considered necessary in

10:40:18  4   individual cases.  PT measured in seconds is recommended.  So

10:40:23  5   we tried to put that in the label.  That's what we were

10:40:26  6   thinking.

10:40:26  7          What did we think the FDA thought of that?  Well,

10:40:29  8   we know, right, because the FDA sent back the language.  You

10:40:35  9   saw that.  Dr. Kessler didn't bring it up.  Mr. Dukes had to

10:40:41 10   bring it up in cross-examination.  He said, isn't this the

10:40:45 11   language that was struck?  What did Dr. Kessler say?  He said,

10:40:47 12   well, I don't know for sure.  I don't know of.

10:40:50 13          Now, he knew everything about the FDA and what

10:40:52 14   the FDA said until this, but you know, because the e-mail was

10:40:56 15   shown to you, and Dr. Peters was there, and he said he received

10:41:00 16   this.

10:41:00 17          What does it show?  It shows an FDA e-mail

10:41:04 18   address.  See that, FDA.HHS.gov.  That's the e-mail that's in

10:41:11 19   evidence.  You can look at it.  It was forwarded around at

10:41:14 20   Janssen, and it came to folks at Janssen.

10:41:16 21          What does it say?  "NDA 22406 FDA label review.

10:41:23 22   Please see the attached redlined version of the label regarding

10:41:28 23   the FDA for your review and comments.  Please accept changes

10:41:31 24   you agree to, and for changes you do not, keep and track

10:41:35 25   changes."

                            *OFFICIAL TRANSCRIPT*

10:41:36  1          So the FDA had crossed out this language.  Why

10:41:40  2    does that matter?  Well, if we get that back, isn't that a way

10:41:44  3    of us thinking the FDA doesn't think that this is necessary?

10:41:48  4          They are right, the label is our responsibility.

10:41:51  5    We take that seriously.  But we certainly listen to other

10:41:55  6    scientists and listen to the FDA.  When they send this back and

10:41:58  7    say, you know, we don't think this belongs in the label, that's

10:42:01  8    a pretty good indicator that other folks don't think it's

10:42:06  9    supported.

10:42:07 10          THE COURT:  Members of the Jury, it's up to you to

10:42:09 11    decide the significance of that, not anybody else.  That's not

10:42:20 12    dispositive of the decision.

10:42:21 13          MS. WILKINSON:  So what else did the FDA have?  The FDA

10:42:25 14    in this case, as you know, did their own analysis, right?  They

10:42:28 15    didn't rely on us.  They took the ROCKET data, and they graphed

10:42:32 16    it on this.  This is what Dr. Kessler said made up his mind,

10:42:32 17    right?

10:42:36 18          Well, Dr. Johnson came in and said, well, you

10:42:38 19    can't just look at this.  It was unadjusted, which, for some of

10:42:47 20    us, a little hard to understand what a regression is, but I

10:42:49 21    think, as I understood what Dr. Johnson was saying, is there is

10:42:51 22    all of these other factors.  Remember her analogy of planting

10:42:55 23    plants in Louisiana, and whether it would grow or not?  You

10:42:58 24    have to take out the other factors, whether you put it in the

10:43:02 25    sun or not.

*OFFICIAL TRANSCRIPT*

10:43:03 1      She said when she went and took out all the other

10:43:06 2  factors -- and this is the same thing the FDA did -- and then

10:43:08 3  she plotted it on a graph to match, look, what does the risk

10:43:13 4  increase show?  If your PT score is 10 to 30 -- which is a huge

10:43:19 5  range -- the risk goes from 2 percent up to 3.  It's, if at

10:43:26 6  all, a 1 percent change.  That's what she said.  The FDA knew

10:43:30 7  that, and that's why the FDA didn't think the test was useful.

10:43:33 8      Plaintiffs want to take out of the FDA documents

10:43:36 9  certain things for you to see to make us look bad.  So what

10:43:39 10 they said is they showed you this FDA summary, and this is the

10:43:42 11 only part they showed you.

10:43:43 12     They also demonstrated that there is also a

10:43:45 13 correlation between PT -- they are talking about us, Xarelto --

10:43:48 14 and risk of bleeding.  "This applicant has chosen not to

10:43:51 15 utilize this information."  They want you to think our

10:43:55 16 choice -- and you know what, they are right.  We don't think

10:43:58 17 the information is useful, and we did choose not to put it in.

10:44:01 18     But what they didn't show you is none of the

10:44:05 19 other manufacturers or sponsors of other oral anticoagulants

10:44:09 20 that inhibit single coagulation factors, right, Xa, have chosen

10:44:15 21 to utilize it either.

10:44:16 22     Why?  Because everyone is looking at this issue,

10:44:19 23 ladies and gentlemen.  You saw that article with all the graphs

10:44:22 24 from all the companies.  None of these companies that have the

10:44:25 25 same mechanism, the Xa inhibitor, none of them have a PT

*OFFICIAL TRANSCRIPT*

10:44:33  1    instruction, because that PT doesn't work.  It's not designed

10:44:35  2    to work on these drugs.  Yet plaintiffs want to convince you

10:44:40  3    that a PT test that was done, that Dr. Wong did see, actually

10:44:45  4    is useful.

10:44:47  5              Now, first of all, ask yourself, if it was

10:44:50  6    useful, Dr. Wong saw it, right?  I asked him, did this mean

10:44:53  7    anything to you?  He said, meaningless.  He wouldn't use this.

10:44:57  8    This is designed basically for Coumadin, like it says below.

10:45:00  9    The fact that there was a prothrombin time of 13.6 didn't mean

10:45:12  10   anything to him about his patient, Mr. Boudreaux.

10:45:13  11             But plaintiffs said, oh, it matters, except it's

10:45:19  12   not even the same test that we're telling you, you must have on

10:45:22  13   the label.  Do you remember that?  Dr. Kessler was very clear.

10:45:24  14   He said, the only kind of PT test that I'm advocating for is a

10:45:29  15   Neoplastin PT test because that's what's in the FDA and ROCKET

10:45:32  16   analysis.  That's what he said.  Very clear.

10:45:36  17             Dr. Leissinger comes in, and she says, oh -- when

10:45:40  18   asked -- you're right, this test here is based on an Innovin

10:45:46  19   PT test, but I still think it's meaningful, even though there

10:45:48  20   is no data to support it.  She didn't point to any graphs.

10:45:54  21             That's why Dr. Johnson says, his score, based on

10:45:58  22   that concentration, that's not what's important.  What's

10:46:02  23   important are his age, his weight, medicines, aspirin, all

10:46:05  24   those other factors.  She said, that test is meaningless.

10:46:09  25             So which way do these guys want it?  Are they

                                *OFFICIAL TRANSCRIPT*

10:46:13  1    saying to you that it was, I think, Neoplastin PT that they

10:46:15  2    want, then how in the world can Dr. Leissinger tell you that

10:46:18  3    that PT score means anything?  Because she, herself, doesn't

10:46:26  4    use it.  She has hasn't published on it.  You didn't see a

10:46:31  5    single article, right, from her on this.  If she thought it

10:46:36  6    worked, why wouldn't she be yelling it from the rooftops to her

10:46:36  7    fellow scientists?

10:46:36  8            She writes lots of articles.  She speaks at lots

10:46:40  9    of conferences, right?  I mean, this is a woman who is

10:46:42 10    accomplished in her own right.  She is an advocate for her

10:46:45 11    patients.  If she thought this worked, why do they have no

10:46:51 12    evidence of her doing anything about it outside the courtroom?

10:46:54 13            I submit to you because the test -- if she went

10:46:59 14    and talked to fellow doctors, like Dr. Johnson and Dr. Boniol,

10:47:01 15    they would say, no, it doesn't work.  She would have to be

10:47:04 16    subject to peer review, right?

10:47:06 17            That actually matters in the medical community.

10:47:09 18    The reason you have peer review is your peers -- not us, but

10:47:13 19    scientists and doctors -- are going to look at that article and

10:47:15 20    see does it hold up.

10:47:17 21            Dr. Leissinger hasn't submitted her theory to any

10:47:20 22    of the other experts.  If she did, other doctors outside this

10:47:26 23    courtroom would say what they've been saying in here, it

10:47:30 24    doesn't work.

10:47:31 25            Xarelto works because it prevents strokes, but

*OFFICIAL TRANSCRIPT*

10:47:37  1    because it works on one factor.  It doesn't cause someone to

10:47:42  2    bleed.  Dr. Johnson told you that.  Dr. Fail told you that.

10:47:49  3    Dr. Boniol told you that.  Even Nurse Theriot told you that all

10:47:54  4    the things that happened to Mr. Boudreaux after he got taken

10:47:58  5    off his Xarelto, those things had nothing to do with the

10:48:03  6    Xarelto.  That LARIAT procedure was not caused by Xarelto.  The

10:48:07  7    cardioversion treatment was planned before he ever got off

10:48:10  8    Xarelto.  None of those medical issues were caused by Xarelto.

10:48:16  9          What Xarelto does, it doesn't cut you, it doesn't

10:48:19 10    open up that wound, but it does stop you from coagulating.  It

10:48:24 11    certainly causes a bleed in that way, right?  It raises your

10:48:28 12    risk of continuing to bleed.  That's what these doctors told

10:48:32 13    you.

10:48:33 14          Again, important for you to note that Dr. Fail is

10:48:36 15    not a paid expert, and he said Xarelto didn't cause the bleed.

10:48:39 16    Dr. Johnson and Dr. Boniol.

10:48:40 17          We get back to where this case started.  It

10:48:47 18    started because Dr. Wong, who knew best, knew that because of

10:48:52 19    Mr. Boudreaux's great risk, he needed an anticoagulant.  He

10:48:56 20    believed that Xarelto, despite the warnings, laid out clearly

10:49:00 21    in the label about the risk of bleeding, the biggest adverse

10:49:00 22    event, right?

10:49:05 23          We say over 5 percent -- which is really bigger

10:49:08 24    than that 97.9 chart that I showed you at 3 percent -- we say

10:49:13 25    the most common adverse reaction on this drug is bleeding.  We

10:49:18  1    say it increases the risk of bleeding and can cause serious and

10:49:22  2    fatal bleeding.

10:49:23  3             Now, again, are they really saying that we are

10:49:26  4    afraid to put a test in, but we'll warn you that the drug can

10:49:30  5    have a serious side effect, including fatalities?  I mean, I

10:49:35  6    don't think there is any more serious warning than this could

10:49:37  7    cause someone to die, and they're really trying to convince you

10:49:44  8    that we don't want to put in one one-time test, even though we

10:49:48  9    tell patients all of these risks.

10:49:49 10             We even tell them that when you add aspirin and

10:49:54 11    Xarelto together, that's a separate independent risk.  As I

10:49:58 12    mentioned to you earlier, that is important because that shows

10:50:02 13    you that Dr. Wong, when he was aware of this, which he told us

10:50:05 14    he was, when he was aware that this raised the risk even

10:50:09 15    higher, he still made that choice because he thought it was

10:50:12 16    right for Mr. Boudreaux.

10:50:13 17             No one is criticizing him, right?  No one came

10:50:16 18    into the courtroom to criticize Dr. Wong.  But if you want to

10:50:20 19    know what would Dr. Wong do, you have the answer.  He took that

10:50:23 20    elevated risk because he thought it was best for Mr. Boudreaux

10:50:27 21    based on all his ailments and physical symptoms and his

10:50:32 22    individual medical plan.

10:50:36 23             We don't go into the examination room with

10:50:39 24    patients.  Our responsibility is to put a warning on there, and

10:50:43 25    doctors get to decide in this country how to practice medicine.

*OFFICIAL TRANSCRIPT*

10:50:46  1    We don't tell them what to do.  We give them the information,

10:50:49  2    and they make the decision.

10:50:51  3              Now, some doctors might look at this and say, I

10:50:54  4    don't want to increase that risk on my patient, right?  But we

10:50:57  5    don't say there, you cannot do it.  That's not how medicine is

10:51:00  6    practiced in this country.  We give the information, and we

10:51:04  7    don't know best about an individual patient.  Dr. Wong knew

10:51:08  8    best, and he made the best decision that he believed was right

10:51:12  9    for his patient.

10:51:12 10              He knew he was on aspirin, and he knew, ladies

10:51:20 11    and gentlemen, that the Neoplastin PT test wasn't useful for

10:51:24 12    Xarelto.

10:51:25 13              The Neoplastin label makes clear the test is

10:51:31 14    designed for warfarin, right, a vitamin K inhibitor -- you guys

10:51:36 15    heard all of that testimony over and over again -- and for

10:51:38 16    those factors.  This test was never designed for Xarelto.  It

10:51:45 17    was designed specifically to measure those factors that are

10:51:49 18    affected by warfarin.

10:51:50 19              That's why, in the end, when you answer these

10:51:55 20    questions, you know that the evidence is overwhelming that

10:51:59 21    Dr. Wong would still prescribe this drug today.

10:52:03 22              So because the plaintiffs have the burden, they

10:52:11 23    go last.  They speak first, we get to speak, and they go last.

10:52:16 24    So I don't get to stand up and say, wait a minute, that's not

10:52:21 25    right.

*OFFICIAL TRANSCRIPT*

10:52:21  1          As you might imagine, that's a little frustrating

10:52:24  2    after waiting this long for a trial.  But I know you all have

10:52:26  3    listened to the evidence, and all I want to ask you is to see

10:52:29  4    what they focus on in the rest of their closing.

10:52:32  5          Because here is what I think they are going to

10:52:34  6    do -- and I have no idea -- what I think they are going to do

10:52:36  7    is talk about correlation and say that we hid PT, right -- they

10:52:40  8    love that word; we're big, bad companies, and we hid

10:52:44  9    something -- their FDA quartile analysis is Xarelto causes

10:52:48 10    bleeding, and Dr. Wong would like a test.  That's what they're

10:52:48 11    going to focus on.

10:52:53 12          What are they not going to address?  I don't

10:52:54 13    think they're going to address that Neoplastin PT is not used

10:52:57 14    by doctors outside this courtroom.

10:52:58 15          I don't think they are going to address that it's

10:53:00 16    not recommended by any medical organization or doctor outside

10:53:04 17    this courtroom.

10:53:06 18          I don't think they are going to say it matters

10:53:08 19    that FDA doesn't approve of that test, the Neoplastin PT, being

10:53:13 20    used for Xarelto.

10:53:15 21          I'm certain they are not going to talk about that

10:53:17 22    Neoplastin PT in the literature is said that it could cause

10:53:21 23    harm.

10:53:22 24          So when you listen to the plaintiffs get up here

10:53:26 25    and finish their argument, please keep these things in mind.

*OFFICIAL TRANSCRIPT*

10:53:30 1    Please remember what the evidence showed.  I know that when you

10:53:34 2    go back, and you work together to come to a verdict that is

10:53:39 3    fair and just based on all of this evidence, that you will see

10:53:42 4    that the plaintiffs haven't proven their case, and that the

10:53:46 5    verdict shall be for the companies.

10:53:49 6              Thank you so much for your patience, and we look

10:53:52 7    forward to your verdict.

10:53:54 8          THE COURT:  Okay.  Thank you.  Do you want to take a

10:53:57 9    break now?  You have 15 minutes for -- you're okay?  Okay.

10:53:57 10              Let's give them 15 minutes.

10:54:06 11          MR. BIRCHFIELD: Thank you, Your Honor.

10:54:08 12          THE COURT:  We'll take a break after.

10:54:08 13          PLAINTIFFS' REBUTTAL CLOSING ARGUMENTS

10:54:08 14    BY MR. BIRCHFIELD:

10:54:10 15              Fear paralyzes, and smoke can be blinding.  My goal

10:54:15 16    in the next 15 minutes, the last 15 minutes that we have with

10:54:19 17    you before Judge Fallon charges you, gives you instructions,

10:54:23 18    and you begin deliberating, my goal is to clear away the

10:54:28 19    confusion and dispel the fear that would stand between you and

10:54:35 20    reaching a right and true verdict in this case.

10:54:40 21              That's a challenge in 15 minutes, but I'm going

10:54:44 22    to give it my best shot, but please hold on.

10:54:47 23              I want to talk first about the discussion about

10:54:49 24    the medical literature.  Ms. Wilkinson walked through it's no

10:54:55 25    secret, it's in all of the literature.  You remember that?  You

*OFFICIAL TRANSCRIPT*

10:54:57 1    remember that discussion?

10:54:58 2            I need you to think with me for just a minute,

10:55:03 3    think about the two experts that the defendants called.  They

10:55:09 4    did not show them any internal documents.  They only had the

10:55:14 5    medical literature to rely on.

10:55:16 6            When they did their search, could they find in

10:55:21 7    the medical literature that Neoplastin PT predicts bleed risks?

10:55:27 8    They couldn't.  So when all of this discussion about saying the

10:55:31 9    FDA website is public, and all of these medical articles are

10:55:36 10   public, and what these associations know, they do not have

10:55:40 11   access to the internal documents, they do not have access to

10:55:45 12   the Bayer and Janssen scientists, who have studied and have

10:55:51 13   said it's indisputable, you cannot deny that PT predicts

10:55:56 14   bleeding risks.  They don't have that.

10:55:58 15           So when Ms. Wilkinson talks about, you know,

10:56:01 16   Dr. Wong saying he would still prescribe it, because he didn't

10:56:04 17   have access.  He's depending on the medical literature, and

10:56:07 18   it's not reasonable to ask a doctor to find that.

10:56:11 19           When she says that it is no secret, that's just

10:56:17 20   finding a needle in a big haystack.  It's not reasonable for

10:56:21 21   doctors to find that.

10:56:22 22           Second, Ms. Wilkinson talked about

10:56:26 23   Dr. Leissinger.  She says that she doesn't use the

10:56:31 24   Neoplastin PT test.  Now, Dr. Leissinger was able -- we were

10:56:34 25   able for her to review the internal documents, everything, both

*OFFICIAL TRANSCRIPT*

sides, the medical literature and inside.

So Ms. Wilkinson says, well, she doesn't use the Neoplastin PT?  Why?  Why doesn't she use it?  Because her patients are on warfarin.  That's why.  That is just an effort to confuse the issue here.

She says -- she says, why, if Dr. Leissinger believes that PT predicts bleeding risks and believes that that should be, that doctors across the country should be advised and given that instruction about using it, why isn't she telling the world?

Do you know why?  The reason that she cannot is because the information that she has, that internal -- those internal documents, she is bound by a court order at their insistence that she not disclose any of that.  That's the reason.

So to suggest that if she really cared, she would be shouting it from the mountain tops, that is disingenuous.  I can't believe that they would take that position because they know, they know why she can't want.

She talked about aspirin.  You've heard a big discussion about the fact that Mr. Boudreaux was on aspirin, and he was on Xarelto at the same time.  You also heard testimony that that's common, that most of the -- most of the patients -- many of the patients that are seeing a cardiologist, they are being treated for atrial fibrillation,

*OFFICIAL TRANSCRIPT*

10:58:16  1    that they are going to be on aspirin at the same time.

10:58:22  2                Ms. Wilkinson also talked about the Cox

10:58:26  3    regression analysis.  Remember that?  Dr. Johnson said that

10:58:31  4    when you take out those variants, those co-variants, then there

10:58:36  5    is not much risk?

10:58:38  6                You have in evidence, and there has been a lot of

10:58:41  7    discussion about Plaintiffs' Exhibit Number 2.  This is the FDA

10:58:50  8    Cardiovascular and Renal Drug Advisory Committee, the big

10:58:53  9    briefing document.  I want us to take a look at what they

10:58:57 10    conclude.

10:59:09 11                It says:  "After adjusting the co-variants," like

10:59:13 12    Dr. Johnson had said, "there is an increased risk of major

10:59:18 13    bleeding with increased PT, and the magnitude of that is larger

10:59:22 14    among subjects who had concomitant use of aspirin with

10:59:26 15    rivaroxaban for ten second increased PT.  There is a 47 percent

10:59:33 16    increased risk of major bleeding among aspirin users compared

10:59:37 17    to 14 percent increase in nonaspirin users."

10:59:43 18                Do you know what that makes very, very clear, is

10:59:46 19    that that's the reason, that's -- for peak patients that are so

10:59:52 20    common to be taking aspirin and Xarelto, that you do the

10:59:59 21    PT test so you can identify those that are in that top

11:00:05 22    quartile, those that are in that increased risk, so you can

11:00:08 23    talk to those patients and say, hey, should we try, should we

11:00:12 24    try a different anticoagulant, should we try Eliquis or Pradaxa

11:00:18 25    that has a lower GI risk.

                                *OFFICIAL TRANSCRIPT*

11:00:20  1        When we look at the aspirin issue, I think that

11:00:25  2   it's -- well, I won't show that -- it's a calendar -- but I

11:00:27  3   think everybody remembers that Mr. Boudreaux was on aspirin for

11:00:31  4   years, years and years, before he ever started taking Xarelto.

11:00:37  5   He took Xarelto for a period of 26 days.  He had a bleed during

11:00:42  6   those 26 days.  He continues on aspirin.  So he didn't have it

11:00:47  7   when he was just on aspirin, he only had it while he was on

11:00:51  8   Xarelto, they stopped the Xarelto, he continues on aspirin, he

11:00:54  9   did not have a GI bleed.  That is an effort at confusing the

11:00:59 10   issue, but it does highlight the importance of using PT

11:01:06 11   Neoplastin test to identify those high-risk patients like

11:01:09 12   Mr. Boudreaux.

11:01:17 13        Next, I want to move to the PT Innovin test.

11:01:24 14   Ms. Wilkinson suggested that the 13.6 -- remember this, the

11:01:35 15   13.6 -- that it really has no meaning here.  Well, if you

11:01:40 16   remember, Dr. Leissinger, and she walked through the half-life

11:01:44 17   and how that works, because this 13.6 that's just slightly

11:01:50 18   elevated, well, it was 36 hours after he had taken his last

11:01:57 19   dose of Xarelto.

11:01:59 20        She explained, with a half-life of 12 hours, you

11:02:03 21   walk back 12 hours, that doubles it.  You walk back 12 more

11:02:08 22   hours, to the time you should test, 12 hours after, and it

11:02:12 23   would be four times higher.  That would put him here in this

11:02:17 24   danger zone.

11:02:18 25        Do you know who else, do you know who else agreed

*OFFICIAL TRANSCRIPT*

11:02:19 1    with that half-life walkthrough?  Dr. Johnson, the cardiologist

11:02:26 2    that the defendants called.

11:02:28 3              So to say that the 13.6 would be meaningless,

11:02:32 4    that's disingenuous.  To say, when you -- when you ask Dr. Wong

11:02:37 5    does it have any meaning, she knows, the defendants know that

11:02:43 6    Dr. Wong did not understand, because they did not tell him.

11:02:47 7    They had told him that PT, Neoplastin PT is meaningless.  He

11:02:52 8    believes that.  So it wouldn't -- it wouldn't have meaning to

11:02:55 9    him because the defendants have been telling them, have been

11:02:59 10   telling the doctors that PT is meaningless.

11:03:02 11             I want to very, very quickly, discuss the

11:03:12 12   redlined document.  Remember the FDA redlined document.  I want

11:03:18 13   to -- Ms. Wilkinson showed you this language.  But when she

11:03:29 14   showed you this language, there are a couple of things that we

11:03:35 15   need to point out.

11:03:36 16             First of all, you look at this language, and

11:03:38 17   there is nothing, nothing in there that talks about a bleeding

11:03:43 18   risk.  Nothing.  Nothing whatsoever.  That's so important to

11:03:47 19   remember.

11:03:48 20             Then look at what it says here:  "The predictive

11:03:54 21   value of these coagulation parameters has not been adequately

11:04:01 22   studied."  So remember the timing of this.  So this is in June.

11:04:06 23   This is in June.

11:04:07 24             In August, in August is when they have analyzed

11:04:12 25   the ROCKET data, and they know, and the FDA knows that there is

**OFFICIAL TRANSCRIPT**

11:04:17 1    a correlation.  So it's very important to keep that in mind,

11:04:22 2    the timing; but, more importantly, that they do not even

11:04:26 3    mention the bleeding risks in this.

11:04:31 4         THE DEPUTY CLERK:  You have five minutes.

11:04:40 5         MR. BIRCHFIELD:  I want to move to Dr. Wong.

11:04:41 6              Dr. Wong, when he was testifying, and you heard

11:04:43 7    Ms. Wilkinson talk about the fact that he would still prescribe

11:04:48 8    Xarelto today.  That's because, still today, they have not

11:04:51 9    provided any information in the label about using a PT test.

11:04:57 10             But that's not the issue.  We're not saying that

11:05:00 11   Dr. Wong or any cardiologist should never prescribe it.  We're

11:05:03 12   saying that you should put information in the label,

11:05:08 13   instructions for using the Neoplastin PT, so you can identify

11:05:12 14   the patients at risk, identify the patients at risk.

11:05:19 15             That's what would have happened.  Johnny

11:05:22 16   Boudreaux would have been identified.  Through the half-life,

11:05:26 17   it was clear, he would have been identified in that zone, and

11:05:29 18   he could have walked out.

11:05:30 19             But here is what Dr. Wong said.  He said that if

11:05:35 20   that information, if those instructions were in the label, I

11:05:37 21   would have followed the label.

11:05:39 22             Then Ms. Wilkinson asked, well, what if the --

11:05:43 23   what if it was not FDA approved?  I took very careful notes.

11:05:48 24   He said, no, I wouldn't use it if it wasn't FDA approved.

11:05:53 25             Why?  The answer is it would not be available.

*OFFICIAL TRANSCRIPT*

11:05:57 1   He said that if it's not FDA approved, it would not be

11:06:00 2   available.

11:06:02 3              Is Neoplastin PT available?  Yes, it is

11:06:06 4   available.  You heard Dr. Berkowitz testify and -- I'm sorry,

11:06:12 5   Dr. Spiro.  Dr. Spiro testified -- because when they were

11:06:16 6   looking at their studies, he said that it's widely available in

11:06:22 7   the U.S.  He's asked the question -- do you remember the

11:06:25 8   question, he asked, well, is it available in the U.S.?  He

11:06:29 9   said, well, I think Innovin is the most widely, but

11:06:33 10  Neoplastin PT is second.

11:06:35 11             It is widely available.  It is here.  It is

11:06:37 12  approved in the United States.  Neoplastin is available.  Proof

11:06:44 13  positive of that is in evidence.  You have the Neoplastin

11:06:49 14  label.  You have the label.  That means it's FDA approved.  It

11:06:53 15  is available.  Look at the factors there, and it can test

11:06:58 16  Factor X.

11:06:59 17             Dr. Wong clearly testified he would have followed

11:07:07 18  the instructions; if it were in the label, that's what he would

11:07:10 19  have done.  When Johnny Boudreaux came back, is in the danger

11:07:16 20  zone, he would have had that discussion with him.

11:07:21 21  Mr. Boudreaux would not have stayed on Xarelto, he would have

11:07:24 22  made it three more days to have his cardioversion, and all of

11:07:28 23  this would have been avoided.

11:07:29 24             You have heard -- you have heard powerful

11:07:32 25  evidence that PT predicts bleeding risks.  It would be helpful,

*OFFICIAL TRANSCRIPT*

perhaps the most powerful, most persuasive is what you didn't

hear and who you didn't hear from, the defendants.

The defendants called three witnesses in this

case.  They called Dr. Johnson, the cardiologist, who they did

not show the internal documents, who they did not give access

to the scientists.  She testified.  She was a very good

witness, no question.  Here is what she said, though.

She said that PT, Neoplastin PT, is predictive

across a population.  So think about that.  That is what we use

all the time when we talk about smoking is predictive of lung

cancer, yeah, it is.  That doesn't mean that every person that

smokes is going to get lung cancer.  It doesn't apply like that

for an individual.  That's the point.

But do you want to alleviate that risk?  Do you

want to stop smoking to avoid lung cancer?  Yes.

We do it for prostate cancer.  We have a

screening test, a PSA.  You test.  You screen.  Does that mean

if you have an elevated PSA, you're going to get prostate

cancer?  No, but it's something you want to keep a check on.

We have genetic testing for breast cancer.  If

you come back positive, does that mean you're going to get

breast cancer?  No, but you have that discussion with your

doctor about the right choice.  It is predictive, the same

thing -- that's what it means when we say PT is predictive of

bleeding risks.

*OFFICIAL TRANSCRIPT*

11:09:13 1        But here is the issue.  Why would they bring

11:09:17 2   experts who they do not allow to see internal documents, who

11:09:21 3   they do not allow to talk to their scientists?  Because if they

11:09:26 4   don't have access to that information, they can take positions

11:09:29 5   here that the company could not take itself.  That's the point.

11:09:36 6        The company cannot come in here and say that --

11:09:39 7   like Dr. Boniol.  Dr. Boniol came in here and said that PT,

11:09:45 8   Neoplastin PT is terrible, terrible, terrible.  It is

11:09:51 9   meaningless.  He drew the diagram.  The company could not say

11:09:54 10  that because the company used Neoplastin PT in all of their

11:09:58 11  clinical trials.

11:09:59 12       When they are submitting their evidence to the

11:10:02 13  FDA to try to get this drug approved, they have to study the

11:10:07 14  pharmacodynamics of the drug, the pharmacokinetics of the drug.

11:10:11 15  They have to submit that to the FDA.  What did they use?

11:10:15 16  Neoplastin PT.  They can't come in here and say that

11:10:18 17  Neoplastin PT means nothing, like Dr. Boniol did.

11:10:24 18       Dr. Boniol -- one of the issues is the high

11:10:27 19  variability.  Remember, the high variability?  Well, that's the

11:10:31 20  reason that you need to do a test is because you've got some

11:10:34 21  folks -- they need to be identified.

11:10:37 22       Well, to explain that away, Dr. Boniol offered,

11:10:40 23  hey, maybe some of the pills have more drug in them than

11:10:43 24  others.  The company can't take that position.  That would

11:10:48 25  be -- you would have to pull all of the drugs off the shelf if

*OFFICIAL TRANSCRIPT*

11:10:51  1 that was the case.  Nobody -- nobody believes that, but he was

11:10:54  2 willing to take that position to protect the company.

11:10:59  3    The last witness -- I do give them credit for

11:11:03  4 this -- the last witness that they called, defense called

11:11:04  5 Nurse Theriot.  Nurse Theriot did come in here and clear up one

11:11:11  6 other outlandish position that Dr. Boniol took.  He took the

11:11:13  7 position that Mr. Boudreaux was bleeding at the time he was

11:11:17  8 prescribed Xarelto based on that 13.8 hemoglobin.  Do you

11:11:22  9 remember that?

11:11:23  10    Nurse Theriot came in.  She said, no, no, no.

11:11:27  11 13.8, that doesn't mean you're actively bleeding.  13 wouldn't

11:11:31  12 mean you're actively bleeding, 12 wouldn't mean you're actively

11:11:33  13 bleeding.  So I give them credit for calling Nurse Theriot to

11:11:38  14 clear up that outlandish position.

11:11:40  15    Ladies and gentlemen, tomorrow or soon, you're

11:11:46  16 going to go back to -- you're going to go back to your jobs, as

11:11:51  17 an engineer, working in schools and businesses, important jobs,

11:11:58  18 but you're an individual in those jobs.

11:12:01  19    But today, this moment, you are a jury.  When you

11:12:08  20 walk in, everyone rises out of respect for your office.  This

11:12:15  21 jury box is the one place in America that is free from outside

11:12:22  22 influence from power or money.  This is a sacred place.  This

11:12:30  23 is a place of power.

11:12:32  24    Today, you speak as a jury, with the full force

11:12:35  25 and authority of the United States Government behind you.  It's

11:12:40  1    an important responsibility.  We are thankful that you're in

11:12:47  2    this case.

11:12:48  3           We ask you to take this job seriously, because

11:12:52  4    you have heard what their defense experts didn't get to hear,

11:12:57  5    what doctors all across this country have not been able to

11:13:00  6    hear.  You have heard the company's position that PT is

11:13:04  7    predictive of bleeding, and we ask you to act on that.

11:13:08  8           I want to say that --

11:13:11  9           THE COURT:  You have one minute, Counsel.

11:13:14 10           MR. BIRCHFIELD:  Yes, Your Honor.

11:13:15 11           -- this case has a lot of complex science issues,

11:13:19 12    but when you boil it down, it boils down to a truth that most

11:13:22 13    of us learned on the playground.  If you don't play by the

11:13:27 14    rules, if you don't follow the rules, people get hurt.

11:13:33 15           The rules say, right here, that you must, you

11:13:39 16    must put in Section 5, the precautions and warnings section,

11:13:47 17    any laboratory test that would be helpful.  The PT test is

11:13:51 18    helpful.

11:13:51 19           The defendants did not follow the rules.  They

11:13:57 20    did not follow the rules.  As a result, Mr. Boudreaux got hurt.

11:14:03 21    We ask that you work your way through all of the confusion, and

11:14:10 22    find a just and true verdict, and you return a verdict in favor

11:14:16 23    of the Boudreauxs.

11:14:18 24           On behalf of Boudreauxs and the lawyers that are

11:14:20 25    representing them, we thank you for your time and for your

**OFFICIAL TRANSCRIPT**

11:14:24 1    attention.

11:14:24 2            THE COURT:  Members of the Jury, we'll take a 10-minute

11:14:28 3    break, and I'll come back and talk to you about the law.

11:14:31 4            Court will stand in recess.

11:14:32 5            THE DEPUTY CLERK:  All rise.

11:14:33 6            (WHEREUPON, at 11:14 a.m., the jury panel leaves the

11:27:25 7    courtroom, and then a brief recess was taken.)

11:27:25 8            THE DEPUTY CLERK:  All rise.

11:27:38 9            (WHEREUPON, at 11:27 a.m., the jury panel enters the

11:27:54 10   courtroom.)

11:27:54 11           THE COURT:  Be seated, please.

11:27:58 12                          JURY INSTRUCTIONS

11:27:58 13   BY THE COURT:

11:27:57 14           Members of the Jury:

11:27:59 15           You have now heard all of the evidence in the

11:28:01 16   case, as well as the final argument of both sides.  It becomes

11:28:06 17   my duty, therefore, at this time, to instruct you on the rules

11:28:09 18   of law that you must follow and apply in arriving at your

11:28:13 19   decision.

11:28:14 20           I will first give you the general instructions

11:28:17 21   which apply in most every case, and then I will give you some

11:28:21 22   special instructions which are specific to this case.

11:28:24 23           As I mentioned at the outset, in any jury trial,

11:28:30 24   there are, indeed, two judges.  I am one of the judges, and the

11:28:35 25   other is you, the jury.  It is my duty to preside over the

*OFFICIAL TRANSCRIPT*

11:28:39  1    trial and to determine what testimony and other evidence is

11:28:42  2    admissible under the law for your consideration.  It is also my

11:28:48  3    duty, at the end of the trial, to instruct you on the law

11:28:50  4    applicable to the case.

11:28:52  5             You, as jurors, however, are the judges of the

11:28:56  6    facts; but, in determining what actually happened in this case,

11:29:00  7    that is, in reaching your decision as to the facts, it is your

11:29:04  8    sworn duty to follow the law as I am now in the process of

11:29:09  9    defining for you, and you must follow my instructions as a

11:29:12  10   whole.  You have no right to disregard or give special

11:29:16  11   attention to any one question or instruction or to question the

11:29:22  12   wisdom or correctness of a rule I may state to you, that is,

11:29:27  13   you must not substitute or follow your own notion or opinion as

11:29:30  14   to what the law is or ought to be.  It is your duty to apply

11:29:37  15   the law as I give it to you, regardless of the consequences.

11:29:39  16            By the same token, it is also your duty to base

11:29:43  17   your verdict solely on the testimony and other evidence in the

11:29:46  18   case, without prejudice and without sympathy.  That was the

11:29:50  19   promise that you made and the oath you took before being

11:29:54  20   accepted by the parties as jurors in this case, and they and

11:29:58  21   the Court have a right to expect nothing less from you.

11:30:03  22            Now, this case should be considered and decided

11:30:05  23   by you as an action between persons of equal standing in the

11:30:09  24   community, of equal worth, and holding the same or similar

11:30:13  25   stations in life.  All persons, all corporations or public

*OFFICIAL TRANSCRIPT*

entities stand equal before the law and are to be dealt with as equals in a court of justice.

As I stated earlier, it is your duty to determine the facts, and in so doing, you must consider only the evidence I have admitted in the case.  Now, the term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted into the record.

Remember that any statements, objections or arguments made by the lawyers are not evidence in the case. The function of the lawyer is to point out those things that the lawyer feels are most significant and most helpful to their side of the case, and, in so doing, to call your attention to certain facts or inferences that they are particularly concerned that you recall.  But, in the final analysis, it is your own recollection and interpretation of the evidence that controls.  What the lawyers have said is not binding upon you.

Also, during the course of the trial, I have occasionally made comments to the lawyers or asked a question of a witness or admonished a witness concerning the manner in which he or she should respond to the question of counsel.  Do not assume from anything that I may have said that I have any opinion concerning any of the facts in this particular case. In arriving at your own findings of the facts, you can disregard and should disregard anything I may have said during the trial, except for my instructions on the law.

*OFFICIAL TRANSCRIPT*

11:31:53  1       The law of the United States permits the judge to

11:31:56  2  comment on the evidence presented during the case.  I do not

11:32:01  3  believe that I have made any comments on the evidence in the

11:32:04  4  case; however, if you could be possibly construe any remarks

11:32:07  5  which I have made during the course of the trial as a comment

11:32:11  6  on the evidence, then I instruct you that any comments on my

11:32:15  7  part are only an expression of my opinion as to the facts, and

11:32:20  8  you, the jury, may disregard such comment or comments entirely

11:32:26  9  since, as I remind you again, you, as jurors, are the sole

11:32:33 10  judges of the facts.

11:32:34 11       Now, while you should consider only the evidence

11:32:36 12  in the case, you are permitted to draw such reasonable

11:32:39 13  inferences from the testimony and the exhibits as you feel are

11:32:42 14  justified in the light of common experience.  In other words,

11:32:46 15  you may make deductions and reach conclusions that reason and

11:32:50 16  common sense lead you to draw from the facts that have been

11:32:55 17  established by the testimony and the evidence in this case.

11:32:59 18       Now, you may consider either direct or

11:33:02 19  circumstantial evidence.  Direct evidence is the testimony of

11:33:06 20  one who asserts actual knowledge of a fact, such as an

11:33:11 21  eyewitness.  Circumstantial evidence is proof of a chain of

11:33:15 22  facts and circumstances indicating a fact to be proved.  The

11:33:20 23  law makes no distinction between the weight to be given to

11:33:23 24  either direct or circumstantial evidence.

11:33:26 25       In deciding the case, you're expected to use your

*OFFICIAL TRANSCRIPT*

good sense.  Give the evidence and the testimony of the

witnesses a reasonable and fair interpretation in light of your

knowledge of the natural tendencies of human beings.

        In weighing the evidence and determining the

credibility of a witness, you may consider the conduct of the

witness, his or her bearings on the witness stand, his or her

personal feelings as demonstrated by his or her testimony and

actions, any interest he or she may have in the outcome of the

case, any prejudice or bias he or she may have shown, and any

partiality he or she may have demonstrated.

        If a witness is shown to have testified falsely

concerning any material matter, you, the jury, have a right to

distrust such witnesses' testimony on other matters, and you

may distrust all of the testimony of that particular witness.

        You should keep in mind, of course, that a simple

mistake by a witness does not necessarily mean that a witness

was not telling the truth as he or she remembers it, because

people may forget some things or remember other things

inaccurately.  So if a witness has made a misstatement, you

need to consider whether the misstatement was an intentional

falsehood or simply an innocent lapse of memory; and, the

significance of that may depend on whether it has to do with an

important fact or only an unimportant detail.

        Now, the testimony of a single witness may be

sufficient to prove any fact, even if a greater number of

*OFFICIAL TRANSCRIPT*

11:35:16  1   witnesses may have testified to the contrary, if, after

11:35:19  2   considering all of the other evidence, you, the jury, believe

11:35:23  3   that single witness.

11:35:28  4           Now, when knowledge of technical subject matters

11:35:30  5   may be helpful to the jury, a person who has special training

11:35:34  6   or experience in that technical field may be called as an

11:35:40  7   expert witness and permitted to state his or her opinion of

11:35:45  8   those technical matters.  Such witnesses have testified in this

11:35:49  9   case.  You are not, however, required to accept that opinion.

11:35:54 10   As with any other witness, it is up to you, the jury, to decide

11:36:00 11   whether to rely upon it.

11:36:01 12           If you should decide that the opinion of an

11:36:05 13   expert witness is not based upon sufficient education or

11:36:09 14   experience, or if you should conclude that the facts the expert

11:36:13 15   relied upon are incorrect, that the reasons given in support of

11:36:20 16   the opinion are not sound, or that the opinion is outweighed by

11:36:23 17   other evidence, then you may disregard the opinion entirely.

11:36:27 18           In deciding whether to accept or rely upon the

11:36:31 19   opinion of an expert witness, you may consider any bias of the

11:36:36 20   witness, including any bias you may infer from the evidence

11:36:42 21   that the expert witness has an economic, a philosophical or any

11:36:46 22   other interest in the outcome of the case.

11:36:51 23           Certain testimony has been presented to you by

11:36:56 24   video depositions.  A deposition is sworn recorded answers to

11:37:00 25   the questions asked to a witness in advance of the trial.

*OFFICIAL TRANSCRIPT*

11:37:04  1    Under some circumstances, if the witness cannot be present to

11:37:07  2    testify from the witness stand, that witness' testimony may be

11:37:12  3    presented, under oath, in the form of a deposition.  Some time

11:37:18  4    before the trial, attorneys representing the parties in the

11:37:22  5    case questioned the witness under oath.  A court reporter was

11:37:26  6    present at the recorded testimony.  The questions and answers

11:37:29  7    were presented by video to you.  The deposition testimony is

11:37:35  8    entitled to the same consideration, is to be honored and judged

11:37:39  9    by you as to credibility, and is to be weighed and otherwise

11:37:43  10   considered by you insofar as it is possible in the same way as

11:37:47  11   if the witness had been present and had testified from the

11:37:54  12   witness stand in court.

11:37:54  13            During the course of the trial, you will have

11:37:57  14   heard objections to evidence.  Sometimes these have been argued

11:38:02  15   out of the hearing of you, the jury.

11:38:05  16            It is the duty of the attorneys on each side of

11:38:09  17   the case to object when the other side offers testimony or

11:38:13  18   other evidence which the attorney believes is not properly

11:38:17  19   admissible.  You should not draw any inference against or show

11:38:21  20   any prejudice against a lawyer or his client or her client

11:38:26  21   because of the making of the objection.

11:38:29  22            Upon allowing the testimony or other evidence to

11:38:34  23   be introduced over the objections of counsel, the Court does

11:38:38  24   not, unless expressly stated, indicate any opinion as to the

11:38:43  25   weight or effect of such evidence.  As I've stated several

*OFFICIAL TRANSCRIPT*

11:38:49  1    times now, you, the jury, are indeed the sole judges of the

11:38:54  2    credibility of each witness and the weight and effect of all

11:38:57  3    evidence.

11:39:00  4         When the Court has sustained an objection to the

11:39:03  5    question addressed to a witness, the jury must disregard the

11:39:05  6    question entirely and may draw no inference from the wording of

11:39:08  7    it or speculate as to what the witness would have said if

11:39:14  8    permitted to answer the question.

11:39:15  9         During the course of the trial, I have

11:39:18  10   occasionally asked a question of a witness in order to bring

11:39:20  11   out facts not fully covered by the testimony.  Again, do not

11:39:24  12   assume that I hold any opinion as to the facts to which my

11:39:29  13   question or questions may have been related.  I again tell you

11:39:32  14   that you are the sole judges of the facts of this case.

11:39:35  15        Statements and arguments of lawyers are not

11:39:39  16   evidence in the case, unless made as an admission or a

11:39:43  17   stipulation of fact.  A stipulation is an agreement between

11:39:49  18   both sides that certain facts are true and that a person would

11:39:54  19   have given certain testimony.  When the lawyers on both sides

11:39:58  20   stipulate or agree to the existence of a fact, you must, unless

11:40:05  21   otherwise instructed, accept the stipulation as evidence, and

11:40:08  22   regard that fact as proved.

11:40:12  23        Finally, certain materials have been shown to you

11:40:15  24   solely as an aid to help explain the facts disclosed by

11:40:20  25   evidence, testimony, records and other documents in this case.

*OFFICIAL TRANSCRIPT*

11:40:30  1  We sometimes refer to it as "demonstrative evidence" because it

11:40:33  2  is offered merely to demonstrate or illustrate a point, rather

11:40:38  3  than an actual proof of that pointe.  Demonstrative evidence is

11:40:43  4  not admitted evidence or proof of any fact.  You should

11:40:48  5  determine the facts from the evidence that is admitted.

11:40:52  6      Remember, demonstrative evidence is only as good

11:40:55  7  as the underlying testimony, data, assumptions, and opinions

11:41:00  8  that serve as the basis for it, and the maxim, "garbage in,

11:41:07  9  garbage out," applies.  Like all other evidence in this case,

11:41:10 10  you may accept it or reject it in whole or in part.

11:41:14 11      Now, any notes you may have taken at this trial

11:41:18 12  are only aids to your memory.  If your memory differs from your

11:41:23 13  notes, you should rely upon your memory and not the notes.

11:41:27 14  Notes are not evidence.  If you have not taken notes, you

11:41:31 15  should rely on your independent recollection of the evidence,

11:41:35 16  and should not be unduly influenced by the notes of other

11:41:39 17  jurors.  Notes are not entitled to any greater weight than the

11:41:43 18  recollection or impression of each juror about the testimony.

11:41:47 19      Now, let me give you some specific instructions

11:41:51 20  about this case.  As you know, this action arises out of

11:41:57 21  Joseph Boudreaux's use of Xarelto.  The Janssen and Bayer

11:42:02 22  defendants manufacture Xarelto.  Mr. Boudreaux contends that he

11:42:07 23  suffered a gastrointestinal bleed, or a GI bleed, as a result

11:42:13 24  of his use of Xarelto.  He claims that defendants failed to

11:42:18 25  properly instruct his prescribing doctor, Dr. Kenneth Wong,

11:42:24 1    about the safe use of Xarelto, specifically the availability of

11:42:29 2    a test to determine his bleed risk.

11:42:32 3         Mr. Boudreaux claims that had Dr. Wong been

11:42:36 4    properly instructed, he would have followed that instruction,

11:42:41 5    and Mr. Boudreaux's GI bleed would have been prevented.

11:42:46 6    Mr. Boudreaux and his wife, Loretta Boudreaux, seek monetary

11:42:50 7    damages proximately caused by his injury.

11:42:56 8         The defendants deny all of these allegations.

11:42:58 9    They contend that Xarelto's warnings and instructions were

11:43:01 10   adequate, and that their alleged inadequacy in the instructions

11:43:07 11   did not proximately cause Mr. Boudreaux's injury.

11:43:11 12        Now, the mere fact the plaintiff may have been

11:43:14 13   injured, standing alone, does not permit you, the jury, to draw

11:43:19 14   any inference that such injuries were caused by the defendants.

11:43:22 15        The burden of proof is on the plaintiff in a

11:43:27 16   civil action, such as this one, to prove every essential

11:43:31 17   element of their claims by a preponderance of the evidence.  As

11:43:37 18   I mentioned to you at the outset, a preponderance of the

11:43:40 19   evidence means such evidence as, when considered and compared

11:43:44 20   with that opposed to it, has more convincing force and produces

11:43:49 21   in your minds a belief that what is sought to be proved is more

11:43:54 22   likely true than not true.  In other words, in order to

11:43:59 23   establish a claim by a preponderance of the evidence means to

11:44:04 24   prove that claim is more likely so than not so.

11:44:10 25        In determining whether any fact has been proved

**OFFICIAL TRANSCRIPT**

by a preponderance of the evidence in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have introduced them.

If the plaintiff fails to establish any essential element of their claim by a preponderance of the evidence, you, the jury, should find for the defendant.  The plaintiffs need not produce every possible witness, and they need not prove their claim beyond a reasonable doubt, as is necessary in a criminal prosecution.  But speculation, or mere possibility, or even unsupported probability is not sufficient to support an argument in their favor.

Now, let me discuss the law applicable, the substantive law applicable to this case.

The law applicable to this case is the law of Louisiana.  In Louisiana, a product liability action such as this one is governed by the Louisiana Products Liability Act.  Lawyers sometimes refer to it as the "LPLA."

The LPLA provides that the manufacturer of a product shall be liable to a claimant for damages proximately caused by a characteristic of the product that renders it unreasonably dangerous.

Now, one of the ways in which a drug can be unreasonably dangerous is by failing to include proper

*OFFICIAL TRANSCRIPT*

11:45:55  1    instructions.  In order to recover, the plaintiffs in this case

11:45:58  2    must show that, first, their damages were proximately caused by

11:46:03  3    the defendants' failure to provide adequate instructions about

11:46:07  4    a characteristic of the product that renders it unreasonably

11:46:12  5    dangerous, and, two, that damages arose from a reasonably

11:46:19  6    anticipated use of the product.

11:46:21  7           Now, it has been stipulated and agreed upon in

11:46:25  8    this case, and therefore, you may consider it to be

11:46:29  9    established, that both Janssen and Bayer, defendants in the

11:46:33 10    case, are the manufacturers of Xarelto within the meaning of

11:46:39 11    the LPLA.  Where there a relationship between manufacturers,

11:46:45 12    and a plaintiff is injured by a product that may be deemed

11:46:50 13    manufactured by more than one manufacturer, these manufacturers

11:46:54 14    are collectively responsible to the plaintiff.  Xarelto is the

11:46:59 15    brand name of rivaroxaban.  Xarelto is a prescription drug,

11:47:05 16    that is to say, a medical provider or doctor must prescribe the

11:47:11 17    drug.

11:47:11 18           A "reasonably anticipated use" of a product means

11:47:16 19    a use or handling of a product that the manufacturer should

11:47:20 20    reasonably expect, in this case by a prescribing doctor.

11:47:26 21           I will discuss with you the law governing the

11:47:31 22    plaintiffs' claim for failure to warn and instruct.

11:47:34 23           In order to decide the plaintiffs' failure to

11:47:37 24    warn and instruct claim, you must determine whether the

11:47:41 25    plaintiffs have proven by a preponderance of the evidence that

*OFFICIAL TRANSCRIPT*

11:47:45  1   the defendant failed to adequately warn and/or properly

11:47:49  2   instruct Mr. Boudreaux's treating physician, Dr. Wong, about

11:47:54  3   the proper use of Xarelto, and, if so, whether the defendants'

11:48:02  4   failure to warn or instruct was a proximate cause of the

11:48:05  5   plaintiffs' injuries.

11:48:07  6          Prescription drugs often cause unwanted side

11:48:13  7   effects despite the fact that they have been carefully designed

11:48:17  8   and properly manufactured.  The law deems such products

11:48:22  9   unavoidably unsafe, but they are not defective, nor

11:48:28 10   unreasonably dangerous, if they include adequate instructions

11:48:32 11   for the safe use of the drug.

11:48:33 12          The plaintiffs claim that Xarelto was

11:48:36 13   unreasonably dangerous because of inadequate warnings or

11:48:41 14   instructions about its potential risks when taken on the

11:48:46 15   recommended dosing schedule without an assessment of the

11:48:49 16   patient's "PT" time.

11:48:55 17          In order to be successful, plaintiffs must prove

11:48:58 18   by a preponderance of the evidence that, first, the product had

11:49:00 19   a potentially damage-causing characteristic; second, that the

11:49:05 20   defendant failed to use reasonable care to provide an adequate

11:49:11 21   warning or instruction to the prescribing physician about this

11:49:16 22   characteristic and the associated danger; and, third, that the

11:49:20 23   injury which Mr. Boudreaux suffered was proximately caused by

11:49:27 24   the inadequate warning or instruction.

11:49:31 25          Now, an "adequate warning," under the LPLA, is

*OFFICIAL TRANSCRIPT*

defined as a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product, and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the danger for which the claim is made.  The lack of adequate instructions for safe use of the product may include inadequacies in recommended assessment, testing or screening techniques.

Under the applicable law, a prescription drug manufacturer only has a duty to warn and instruct a learned intermediary, such as a prescribing physician, of the potential risks or damages inherent in the product.  It does not have a duty to warn or instruct the consumer directly.  This is because physicians are generally in a superior position to evaluate the warning and instruct and impart such warning and instructions to the patient, and can provide an independent medical decision as to whether use of the drug is appropriate for a particular patient.

Although a prescription drug manufacturer's duty to warn of and instruct about the potential risks of its product is directed only to the reasonably prudent prescriber and not to the consumer, the manufacturer is directly liable to the patient for a breach of such duty.

When a prescription drug manufacturer provides a warning or instruction, it may reasonably assume that it will

*OFFICIAL TRANSCRIPT*

1  be read and heeded by the prescriber.  It is a physician's duty

2  to remain abreast of drug's characteristics and to take into

3  account the information contained in a prescription drug's

4  label.

5        The drug manufacturer may reasonably assume that

6  the prescriber will apply the same knowledge, professional

7  expertise, and good judgment that a reasonable physician would

8  apply in using the product.  Providing an adequate warning or

9  adequate instructions to the prescribing doctor relieves the

10 manufacturer of its duty to warn the patient, regardless of how

11 or if the prescriber warns the patient.

12       A warning or instruction is inadequate if the

13 manufacturer fails to give a reasonably prudent prescriber

14 warning or instructions about the particular risk that was

15 known or knowable to the manufacturer in light of the

16 generally-recognized and prevailing best scientific and medical

17 knowledge available at the time of the manufacture and

18 distribution.

19       The drug manufacturer has a duty to take

20 reasonable precautions to provide an adequate warning or

21 instruction in its label that would place a prescriber on guard

22 against the harmful consequences that might result from use of

23 the product.  The label must contain language that is adequate

24 to reasonably inform the prescribing physician about how to use

25 the product in such a manner as to avoid the damage for which

*OFFICIAL TRANSCRIPT*

11:53:22 1    the claim is made.

11:53:24 2           The manufacturer may communicate a warning or

11:53:28 3    instructions through a label or package insert or other

11:53:33 4    communications or literature.  In determining the scope of the

11:53:39 5    manufacturer's duty to warn of dangers and to provide

11:53:43 6    instructions associated with the use of its product, the

11:53:47 7    manufacturer is held to the knowledge and skill of an expert in

11:53:52 8    its field.  The manufacturer must keep up with scientific

11:53:57 9    knowledge, discoveries and advances, and is presumed to know

11:54:04 10   what could be learned by doing so.

11:54:07 11          This duty is continuing.  If the manufacturer

11:54:11 12   learns of a characteristic or danger that may cause injury

11:54:14 13   after the product is on the market, the manufacturer has a

11:54:19 14   continuing duty to use reasonable care to provide adequate

11:54:25 15   warning or instructions to prescribers of its product

11:54:32 16   concerning such later discovered matters, that is to say, under

11:54:35 17   the law, including federal regulations applicable to this case,

11:54:39 18   drug manufacturers have the responsibility for drafting the

11:54:44 19   initial label for their product, and for assuring that the

11:54:49 20   label continues to reflect the current knowledge concerning the

11:54:53 21   risks posed by the drug.

11:54:55 22          When the defendants are shown to have failed to

11:55:00 23   adequately warn or instruct a prescribing doctor about the

11:55:04 24   doctor, the learned intermediary doctrine does not relieve the

11:55:10 25   manufacturer of legal responsibility.  In other words, in that

*OFFICIAL TRANSCRIPT*

11:55:13  1    circumstance, the prescribing doctor cannot be said to be a

11:55:23  2    learned intermediary because he was not adequately informed by

11:55:25  3    the defendants.

11:55:28  4            In order to prove their failure to warn or

11:55:31  5    instruct claim, the plaintiffs must not only prove that the

11:55:35  6    defendants' warnings or instructions regarding Xarelto were

11:55:41  7    inadequate, but also that such inadequacy affected the decision

11:55:46  8    or decisions of the prescribing physician with regard to

11:55:52  9    Xarelto.  In other words, you must determine if Dr. Wong would

11:55:57  10   have altered his prescribing behavior and Mr. Boudreaux would

11:56:02  11   not have suffered his injury had the doctor been provided with

11:56:07  12   adequate instructions.

11:56:08  13           If the greater weight of the evidence does not

11:56:11  14   support the plaintiffs' claim, your verdict should be for the

11:56:15  15   defendants.  If the greater weight of the evidence, however,

11:56:20  16   does support the plaintiffs' claim, then your verdict should be

11:56:24  17   for the plaintiffs.

11:56:26  18           Let me say something about labeling and federal

11:56:31  19   regulations.

11:56:31  20           As I previously mentioned, Xarelto is a brand

11:56:35  21   name drug.  The FDA approved both Xarelto and its label.  You

11:56:43  22   may consider this fact in weighing the evidence in this case in

11:56:48  23   determining the liability of the defendants.

11:56:50  24           However, FDA approval, although relevant, does

11:56:58  25   not in and of itself absolve the defendants of all liability,

**OFFICIAL TRANSCRIPT**

11:57:03 1   nor does it establish that the warnings or instructions

11:57:07 2   provided with the drug were adequate under the standards of

11:57:11 3   Louisiana law.

11:57:12 4           Any action or inaction on the part of the FDA,

11:57:19 5   though relevant, does not foreclose a claim under Louisiana

11:57:23 6   law.  Therefore, even if the defendants have met all of the

11:57:27 7   appropriate minimum standards for FDA approval and governmental

11:57:33 8   regulations and requirements to obtain FDA approval, this

11:57:40 9   compliance and approval, though relevant, is not sufficient to

11:57:43 10  conclusively establish that the defendants have taken the steps

11:57:47 11  necessary under the law which applies in this case.

11:57:50 12          More specifically, if you find that the

11:57:54 13  defendants failed to apprise treating physicians of appropriate

11:57:58 14  testing to address risks that they knew or should have known

11:58:03 15  prior to the FDA approval or became known or should have become

11:58:08 16  known after the FDA approved Xarelto's label, then FDA approval

11:58:12 17  of the drug is not conclusive.

11:58:15 18          Causation.  In order for the plaintiffs to

11:58:19 19  prevail in their claim, they must establish that the inadequate

11:58:24 20  instructions or warnings was the proximate cause of

11:58:29 21  Joseph Boudreaux's alleged injuries.

11:58:32 22          Proximate cause means the efficient cause or

11:58:35 23  direct cause.  The law defines proximate cause as something

11:58:40 24  that produces a natural chain of events, which, in the end,

11:58:46 25  brings about an injury.  In other words, proximate cause is a

*OFFICIAL TRANSCRIPT*

cause without which the injury would not have occurred.
Proximate cause requires proof of both causation-in-fact and
legal cause.

Causation-in-fact is proved by establishing that
the plaintiff's injury would not have occurred but for the
defendants' actions.  In order to prove cause-in-fact in this
case, the plaintiffs must show that, to a reasonable degree of
medical probability, both that Xarelto can cause bleeding, and
that the failure to instruct Dr. Wong was the cause of his
injury.

Legal cause is proved by establishing
foreseeability.  The test of foreseeability is whether some
injury to another is the natural and probable consequences of
the complained conduct.  The law requires only reasonable
foresight.  It is not necessary for the plaintiffs to
demonstrate that the defendant should have foreseen the
particular event which occurred, but merely that the defendant
should have foreseen that its actions would probably cause
injury to someone.  The plaintiffs prove legal cause by
establishing that the injury in question occurred as a natural
and probable consequence of the defendant's actions or
inactions.

Proximate cause does not mean the sole cause.
The defendants' conduct can be a proximate cause if it was at
least one of the direct, concurring causes of the alleged

*OFFICIAL TRANSCRIPT*

injury.  However, the plaintiffs must show that the conduct of
the defendants was a substantial contributing factor in
bringing about the result.  In other words, it is not necessary
for the plaintiff to negate all other contributing factors or
causes of the injury, provided they show that the defendants'
failure to provide adequate instructions in the label to
Xarelto substantially contributed to his injuries.  Where two
or more possible causes for an injury are identified, the
plaintiffs must establish with reasonable probability that the
injury resulted from a cause for which the defendants would be
liable.  Moreover, the plaintiffs must proffer a competent
medical expert to testify to the reasonable degree of medical
probability that Xarelto was a proximate cause of the injuries.

Now, to recover for a failure-to-warn-or-instruct
claim, plaintiffs must prove by a preponderance of the evidence
that an inadequate instruction itself -- in addition to the
medication -- was the proximate cause of Mr. Boudreaux's
alleged injury.  When I say a "proximate cause," I mean the
plaintiffs must prove by a preponderance of the evidence that,
if an adequate warning or instruction had accompanied Xarelto,
then Dr. Wong would have altered his prescribing behavior, and
Mr. Boudreaux would not have suffered his alleged injury.

Now, let me talk with you about damages.
"Damages" is a term used to indicate in dollars and cents,
what, if any, monetary losses the plaintiff has sustained.

*OFFICIAL TRANSCRIPT*

12:02:31  1            If you find the plaintiffs have proven their

12:02:35  2   claim against the defendants by a preponderance of the

12:02:37  3   evidence, you must then determine the amount of damages, if

12:02:41  4   any, to which they are entitled.  Now, you should not interpret

12:02:46  5   the fact that I am giving you instructions about plaintiffs'

12:02:50  6   damnation as an indication in any way that I believe that the

12:02:53  7   plaintiffs should or should not win this case.  It is your task

12:03:03  8   to decide whether the plaintiffs suffered damages as a result

12:03:05  9   of the fault of the defendants.

12:03:07 10            I am instructing you on damages only so that you

12:03:07 11   will have guidance in the event that you decided that the

12:03:21 12   plaintiffs have proved that they sustained damages as a result

12:03:23 13   of the fault of the defendants and that they are entitled to

12:03:28 14   recover money from the defendants.  Plaintiffs must prove their

12:03:32 15   damages with reasonable certainty and cannot be awarded on the

12:03:38 16   basis of speculation or conjecture.

12:03:42 17            If you find that the defendants are liable to the

12:03:46 18   plaintiffs, then you must determine an amount that is fair

12:03:50 19   compensation for the plaintiffs' damages.  These damages are

12:03:56 20   called "compensatory damages."  The purpose of compensatory

12:04:00 21   damages is to make the plaintiff whole, that is, to compensate

12:04:04 22   the plaintiff for the damages they suffered.  Under the

12:04:08 23   applicable law, you may not award vindictive, punitive, or

12:04:13 24   exemplary damages in this case.  Only compensatory damages may

12:04:18 25   be awarded.

                        *OFFICIAL TRANSCRIPT*

12:04:18  1        You may award compensatory damages only for

12:04:24  2   injuries that the plaintiffs prove were caused by the

12:04:28  3   defendants' wrongful conduct.  The damages you award must be

12:04:36  4   fair compensation for the plaintiffs' damages, no more and no

12:04:40  5   less.  Compensatory damages are not allowed as punishment and

12:04:45  6   cannot be imposed or increased to penalize the defendants.  You

12:04:50  7   should not award compensatory damages for speculative injuries,

12:04:55  8   but only for those injuries which the plaintiffs actually

12:04:59  9   sustained.

12:05:00 10        If you decide to award compensatory damages, you

12:05:03 11   should be guided by dispassionate common sense.  That is to

12:05:08 12   say, you should not be affected by sympathy, compassion,

12:05:12 13   prejudice, or bias.  Computing damages may well be difficult,

12:05:21 14   but you must not let that difficulty lead you to engage in

12:05:27 15   arbitrary guesswork.

12:05:28 16        On the other hand, you should know that the law

12:05:31 17   does not require that the plaintiffs prove the amount of their

12:05:35 18   damages or losses with mathematical certainty or precision, but

12:05:40 19   only with as much definiteness and accuracy as the

12:05:44 20   circumstances permit.

12:05:46 21        You must use sound discretion in fixing an award

12:05:50 22   of damages, drawing reasonable inferences where you find them

12:05:55 23   appropriate from the facts and circumstances of the evidence.

12:05:58 24        You should consider the following elements of

12:06:00 25   damage to the extent you, the jury, find that the plaintiffs

                        *OFFICIAL TRANSCRIPT*

12:06:05 1   have established them:

12:06:09 2             Mr. Boudreaux's past physical pain, suffering and

12:06:13 3   mental anguish;

12:06:15 4             Mr. Boudreaux's past medical expenses; and

12:06:18 5             Mrs. Boudreaux's loss of consortium.

12:06:20 6             Some of the damages, such as mental or physical

12:06:24 7   pain and suffering, are intangible things about which no

12:06:27 8   evidence or value is required.  In awarding these damages, you

12:06:32 9   are not determining value, but you should award an amount that

12:06:43 10  will fairly compensate the plaintiff for his injuries.  There

12:06:45 11  is no exact standard for fixing the compensation to be awarded

12:06:49 12  for these elements of damage.  Any damage you award must be

12:06:52 13  fair in light of the evidence.

12:06:54 14            Pain and suffering.  You may award damages for

12:06:58 15  any bodily injury sustained as a result of Xarelto and any

12:07:04 16  pain, suffering, disability, inconvenience, and/or loss of

12:07:08 17  capacity for the enjoyment of life that the plaintiff

12:07:14 18  experienced as a result of his injuries.  No evidence of the

12:07:17 19  value of intangible things, such as mental or physical pain and

12:07:21 20  suffering, need be produced.  You are not trying to determine

12:07:26 21  value, but an amount that will fairly compensate the plaintiff

12:07:31 22  for the damage he suffered.  There is no exact standard for

12:07:35 23  fixing compensation to be awarded for these elements of damage.

12:07:40 24  Any award that you make should be fair in light of the

12:07:44 25  evidence.

*OFFICIAL TRANSCRIPT*

12:07:44  1          Under our law, the defendant takes the victim as

12:07:49  2     they find him.  The age and preexisting health of a plaintiff

12:07:57  3     prior to his injury should not discount the amount of

12:08:12  4     compensation he receives for the injury.

12:08:17  5          In the event you find that the plaintiff is

12:08:20  6     entitled to receive an award for mental and/or physical pain

12:08:24  7     and suffering, I instruct you that such an award is not subject

12:08:26  8     to income tax; neither the state nor federal government will

12:08:31  9     tax it.  Therefore, you should determine the amount that the

12:08:35 10     plaintiffs are entitled to receive without any consideration of

12:08:40 11     the effect of taxes on it.

12:08:42 12          Medical expenses.  A plaintiff may recover past

12:08:46 13     expenses if he establishes that he has incurred past medical

12:08:50 14     expenses in good faith as a result of his injury.

12:08:54 15          Mental anguish.  The law recognizes that a

12:08:58 16     plaintiff may suffer mental distress and anguish as a result of

12:09:03 17     an incident, as well as physical pain and suffering.  You are

12:09:16 18     permitted to consider such consequences as part of the general

12:09:18 19     damages which you may award.  By "mental anguish and distress,"

12:09:23 20     I mean substantial worry or concern, grief and the like.

12:09:30 21          Loss of consortium.  Mrs. Boudreaux may recover

12:09:33 22     for the loss of consortium if the evidence demonstrates that

12:09:38 23     Xarelto caused this loss of consortium, which includes loss of

12:09:44 24     love, affection, society, companionship, support, aid and

12:09:51 25     assistance, felicity and the performance of material services,

*OFFICIAL TRANSCRIPT*

12:09:55  1   uncompensated work around the home.  A plaintiff need not prove

12:09:59  2   all of these things to the support an award for loss of

12:10:02  3   consortium.

12:10:03  4            Again, I mentioned to you, that the mere fact

12:10:07  5   that I have given you instructions on the law of damages does

12:10:11  6   not in any way suggest that I believe that any damages are due

12:10:16  7   in this case.  The plaintiffs must prove their damages with

12:10:20  8   reasonable certainty and cannot be awarded damages on the basis

12:10:24  9   of speculation.  Whether or not the plaintiffs are entitled to

12:10:29  10  recover and whether or not they have proven that any damages

12:10:33  11  are due is really for you, the jury, to decide.

12:10:38  12            Now, in conclusion, Members of the Jury, I remind

12:10:42  13  you that it is your sworn duty as jurors to discuss the case

12:10:46  14  with one another in an effort to reach a unanimous agreement,

12:10:55  15  if you can do so.  Each of you must decide the case for

12:10:59  16  yourself, but only after a full discussion of the evidence with

12:11:04  17  the other members of the jury.  While you are discussing this

12:11:09  18  case, ladies and gentlemen, do not hesitate to re-examine your

12:11:14  19  own opinions and change your mind if you became convinced that

12:11:21  20  you are wrong.  But do not, do not give up your honest beliefs

12:11:27  21  solely because others think differently or merely to finish the

12:11:33  22  case.

12:11:33  23            Remember, as I've said several times, in a very

12:11:39  24  real way you are judges, judges of the facts.  Your only

12:11:47  25  interest is to seek the truth from the evidence in this case.

*OFFICIAL TRANSCRIPT*

12:11:52  1          I have prepared a special verdict form for your

12:11:57  2   convenience and to aid you in reaching a unanimous decision.

12:12:02  3   You will take the form with you to the jury room.  Your verdict

12:12:08  4   must represent the considered judgment of each juror.

12:12:12  5          You will note that the form contains several

12:12:16  6   interrogatories or questions.  The answers to each question

12:12:20  7   must be unanimous.  In the space provided below each question,

12:12:28  8   you will find directions and instructions which will instruct

12:12:33  9   you either to answer the next question, or to answer some other

12:12:37 10   question, or to stop and return to the courtroom with your

12:12:43 11   verdict.  You must carefully follow the instructions.

12:12:48 12          Now, the jury verdict says, Question 1:  Do you

12:12:51 13   find by a preponderance of the evidence that the defendant

12:12:56 14   failed to provide to Dr. Kenneth Wong adequate instructions for

12:13:00 15   the safe use of Xarelto?  Yes or no.  You decide which one.

12:13:08 16          If your answer is yes to this question, please

12:13:11 17   proceed to Question 2.  If your answer is no to this question,

12:13:17 18   please skip all the remaining questions, date and sign this

12:13:21 19   verdict, which is on the last page, and inform the marshal that

12:13:30 20   you have reached a verdict.

12:13:31 21          Question 2:  Do you find by a preponderance of

12:13:35 22   the evidence that the defendants' failure to provide adequate

12:13:39 23   instructions to Dr. Wong was a proximate cause of

12:13:44 24   Joseph Boudreaux's injuries?  Yes or no.  You decide.

12:13:52 25          If your answer is yes to the question, please

*OFFICIAL TRANSCRIPT*

12:13:55  1   proceed to Question 3.  If your answer is no to the question,

12:13:58  2   skip all the remaining questions, date and sign the verdict

12:14:03  3   form on the last page, and inform the marshal that you have

12:14:09  4   reached a verdict.

12:14:09  5         Three:  What amount do you find, by a

12:14:15  6   preponderance of the evidence, is appropriate to fairly and

12:14:17  7   adequately compensate Joseph Boudreaux for his injuries?

12:14:22  8   Physical pain and suffering, I provided a line.  Medical

12:14:28  9   expenses, I provided a line.  If you feel it's appropriate,

12:14:31 10   fill it in.

12:14:32 11         Question 4:  What amount do you find, by a

12:14:37 12   preponderance of the evidence, is appropriate to fairly and

12:14:39 13   adequately compensate Loretta Boudreaux for her damages due to

12:14:45 14   her husband's injuries?  Loss of consortium.  You decide.

12:14:51 15         New Orleans, Louisiana, this blank day of blank,

12:14:55 16   2017, to be signed by the jury foreperson.

12:15:02 17         Now, when you retire to the jury room to

12:15:05 18   deliberate on your verdict, you may take this charge with you

12:15:12 19   as well as all of the exhibits which I have admitted into

12:15:15 20   evidence.

12:15:16 21         First thing to do is to select the foreperson and

12:15:21 22   then conduct your deliberations.  If you recess during your

12:15:26 23   deliberations, follow all of the instructions that the Court

12:15:31 24   has given about your conduct during the trial.  After you have

12:15:34 25   reached your unanimous verdict, your foreperson is to fill in

*OFFICIAL TRANSCRIPT*

12:15:39 1   the form, your answers to the questions, and to sign the form.

12:15:44 2          Do not reveal your answers until such time as you

12:15:48 3   are discharged, unless otherwise directed by me.  You are never

12:15:55 4   to disclose to anyone, not even to me, any numerical division

12:15:59 5   on any question, if there be any numerical division.

12:16:02 6          If you want to communicate with me at any time,

12:16:04 7   please give a signed message or question to the United States

12:16:09 8   Marshal, who will bring it to me.  I will then respond as

12:16:15 9   promptly as possible, either in writing or by having you

12:16:19 10  brought into the courtroom so that I can address you in person

12:16:22 11  orally.  I will always first disclose to the attorneys your

12:16:27 12  question and as well as my response before I answer your

12:16:30 13  question.

12:16:31 14         After you have reached a verdict, you are not

12:16:36 15  required to talk with anyone about this case unless I order

12:16:41 16  otherwise.

12:16:43 17         Now, ladies and gentlemen, you may retire to the

12:16:46 18  jury room at this time.  We've ordered lunch for you and it's

12:16:51 19  there.  And so I suggest that you relax first, have a good

12:16:55 20  lunch, and then begin your deliberations.

12:16:58 21         All rise as the jury leaves, please.

12:17:01 22     (WHEREUPON, at 12:17 p.m. the jury panel leaves the

12:17:24 23  courtroom for deliberations.)

12:17:24 24     THE COURT:  Be seated, please.  The jury is outside of

12:17:26 25  the courtroom.

**_OFFICIAL TRANSCRIPT_**

12:17:26  1          I ask counsel to leave your numbers, your

12:17:31  2     cell phone with us.  In the event we have a question, I'll

12:17:34  3     contact you and talk to you about the question.  Hopefully the

12:17:38  4     jury will begin eating first, so that will give you an

12:17:42  5     opportunity to get something to eat and then return to the

12:17:45  6     courtroom.

12:17:47  7          I want to take the opportunity on a personal note

12:17:50  8     to thank the lawyers for all of their work in the case.  The

12:17:53  9     case was well worked up, well argued, well presented and

12:18:00 10     professionally done, and you need to know the Court appreciates

12:18:03 11     that.

12:18:03 12          Also, having done this a time or two in your

12:18:09 13     shoes, I know that not only the people at the tables do the

12:18:12 14     work, there are many others that do the work and support their

12:18:18 15     work, so I recognize those individuals and thank them for all

12:18:24 16     of their work.

12:18:25 17          Court will stand in recess.

12:18:29 18          THE DEPUTY CLERK:  All rise.

12:18:31 19          (WHEREUPON, at 12:18 p.m., the Court was in luncheon

12:35:08 20     recess while the jury deliberates.)

12:35:08 21                         *    *    *

22

23

24

25

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, MAY 3, 2017

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)


            THE DEPUTY CLERK:  All rise.

            (WHEREUPON, at 2:41 p.m., the jury panel enters the
courtroom.)

                         VERDICT

            THE COURT:  Be seated, please.  The jury has returned.
The litigants and the lawyers are in the courtroom.

                 Ladies and gentlemen, have you reached a verdict?

            THE JURORS:  Yes.

            THE COURT:  Would you give the verdict to the courtroom
deputy, please.

            THE DEPUTY CLERK:  MDL 2592, In re:  Xarelto Products
Liability Litigation, and this is related to Boudreaux, et al.
versus Bayer Corporation, et al., 14-cv-2720.

                 Question Number 1 to the jury, do you find by a
preponderance of the evidence that the defendants failed to
provide Dr. Kenneth Wong adequate instructions for the safe use
of Xarelto?  And the answer by the jury was no.

                 Signed by the jury foreperson, May 3, 2017.

                 Members of the Jury, is that your verdict?

                  ***OFFICIAL TRANSCRIPT***

02:42:17  1          THE JURORS:  Yes.

02:42:18  2          THE COURT:  Does anybody wish the jury to be polled?

02:42:21  3          MR. BIRCHFIELD:  No, Your Honor.

02:42:22  4          MS. WILKINSON:  No, Your Honor.

02:42:23  5          THE COURT:  Okay.  Thank you very much.  We'll make the

02:42:24  6   verdict a part of the record in the case and discharge the jury

02:42:29  7   with the Court's thanks.

02:42:31  8              All rise, please, as the jury leaves.

02:42:34  9          (WHEREUPON, at 2:42 p.m., the jury panel leaves the

02:42:57 10   courtroom.)

02:42:57 11          THE COURT:  As I mentioned, I'll make the verdict a

02:43:00 12   part of the record.  I thank everybody.

02:43:02 13              Court will stand in recess.  Thank you very much.

         14          (WHEREUPON, at 2:43 p.m., the proceedings were

         15   concluded.)

         16                       *   *   *

         17

         18                   REPORTER'S CERTIFICATE

         19      I, Cathy Pepper, Certified Realtime Reporter, Registered
              Merit Reporter, Certified Court Reporter in and for the State
         20   of Louisiana, Official Court Reporter for the United States
              District Court, Eastern District of Louisiana, do hereby
         21   certify that the foregoing is a true and correct transcript to
              the best of my ability and understanding from the record of the
              proceedings in the above-entitled and numbered matter.

         22

         23                       s/Cathy Pepper
                                  Cathy Pepper, CRR, RMR, CCR
         24                       Official Court Reporter
                                  United States District Court
         25                       Cathy_Pepper@laed.uscourts.gov


                         *OFFICIAL TRANSCRIPT*