**EXHIBIT 1**

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA


IN RE:   XARELTO                *
(RIVAROXABAN) PRODUCTS          *
LIABILITY LITIGATION            *
                                *
THIS DOCUMENT RELATES TO:       *   Docket No.: 14-MD-2592
                                *   Section "L"
Joseph J. Boudreaux, Jr.        *   New Orleans, Louisiana
v. Janssen Research &           *   April 24, 2017
Development, et. al.,           *
Case No.: 14-CV-2720            *
* * * * * * * * * * * * * * * *
                VOLUME I - AFTERNOON SESSION
        TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Plaintiffs':
Liaison Counsel:                Levin Papantonio
                                BY:  BRIAN H. BARR, ESQ.
                                316 South Baylen Street, Suite 600
                                Pensacola, Florida  32502

                                Beasley Allen
                                BY:  ANDY BIRCHFIELD, ESQ.
                                P.O. Box 4160
                                Montgomery, Alabama 36103

                                Gainsburg Benjamin David
                                  Meunier & Warshauer
                                BY:  GERALD E. MEUNIER, ESQ.
                                2800 Energy Centre
                                1100 Poydras Street
                                New Orleans, Louisiana 70163

                       OFFICIAL TRANSCRIPT

1  That's this case. That's Mr. Boudreaux. He had
2  atrial fibrillation. And they're saying today it's no secret
3  about the PT test. They didn't -- that wasn't kept secret from
4  them in 2016. And they said in October of 2016 that, as the
5  drug is marketed, as it is today, with the label that contains
6  all kinds of warnings that you all will see -- it doesn't say
7  do this PT test -- that it is a safe and effective alternative
8  to warfarin. And that's why you'll hear from Dr. Wong and
9  Dr. Johnson and others that they choose Xarelto when it's
10 appropriate for their patients and they choose other NOACs or
11 warfarin when that's appropriate.
12     What's not in dispute in this case is as
13 important, because we have all kinds of warnings that this drug
14 has a bleeding risk because of how it works; right? It's
15 trying to stop you from clotting, and so that means you're more
16 likely to continue bleeding or not stop a bleed. And
17 plaintiffs don't dispute that we do a good job with that
18 bleeding warning. It's all over. You're going to see.
19     They don't dispute that, because we chose
20 once-a-day dosing that you only have to take it once a day.
21 They don't have an expert that's going to come in and say
22 somehow that's, you know, not as safe and twice a day is safer.
23     In fact, just show you this board. I'll use it
24 again. This I use as another cheat sheet. These are the drugs
25 that we're going to talk about during this trial.

OFFICIAL TRANSCRIPT

1  This is warfarin that came out in 19 --
2  That may be a little low. Can you all see that?
3  1954, warfarin came out, and it's a once-a-day
4  drug.
5      Pradaxa was the next one out on the market. So
6  we -- I think I heard something -- maybe plaintiffs' lawyers
7  didn't mean to say this, but they suggested that people had no
8  other choice other than warfarin. That's just not true. The
9  folks that make Pradaxa came out before we did, in 2010. And
10 they have a drug that goes twice a day, has no monitoring.
11     Xarelto, we came out in 2011 with once a day.
12     Eliquis, twice a day, in 2012.
13     And the most recent one is like ours, once a
14 day, and it's called Savaysa.
15     So these are the options that doctors have.
16 They don't just have can you take Xarelto or prescribe warfarin
17 for people that have atrial fibrillation. They have all these
18 different choices. And they decide -- not us; we're not in the
19 examination room with them. Obviously, we want people to use
20 our drug because we think it's good, but we're not in the
21 examination room with them saying, "Pick us over these folks."
22 And you heard this morning the woman who had a mother who had a
23 problem; her doctor picked Pradaxa. He didn't pick Xarelto and
24 didn't pick warfarin.
25     Now, perhaps the most troubling part of the

OFFICIAL TRANSCRIPT

1  allegation that plaintiffs make about this PT test, that it's a
2  safety test that we purposely didn't tell anyone about, it
3  suggests to you that it was hidden and that no one else studies
4  it. That's just not true.
5      There are scientists all around the world,
6  because of the problem of AFib, because it's so common and
7  because these drugs are important for many other conditions as
8  well, they've been studied by people that have nothing to do
9  with us. We've done our studying too by independent
10 scientists. There's been articles in published literature.
11 And, in fact, even the issue of how to use the PT test has been
12 studied and published.
13     And there's folks -- this is another term. We
14 often call medical associations and all the different kinds of
15 doctors the public health community. So those are, you know,
16 groups of doctors -- let's say the people who are -- all the
17 doctors who belong to certain societies in their specialty or
18 the FDA, the CDC. And the public health community looks at
19 this because they don't just trust the companies. Right? You
20 wouldn't want them to do. You would want independent people to
21 look at this.
22     And just last year, in a journal that has
23 nothing to do with us, the Journal of Thrombosis and Hemostatis
24 wrote on this very subject. Here's what they say. It was in
25 2016. "Consequently, the use of PT -- APTT is another test,

OFFICIAL TRANSCRIPT

1  but -- "PT in a clinical practice" -- meaning when you're
2  prescribing to patients -- "to evaluate NOACs" -- all the --
3  all of these including Xarelto -- "could cause dangerous
4  misinterpretations."
5      It certainly doesn't call it a safety test, does
6  it? It says if you use it this way, the way plaintiffs want
7  you to use it, which is you put someone on Xarelto and then you
8  run this test right away, that you could misinterpret it
9  because you could see this number that they think shows you
10 and, you know, predicts exactly what will happen, and it
11 doesn't. It doesn't.
12     So it's not us telling you that this is not the
13 right test to put in a label for doctors. These are folks who
14 specialize in this area, and they say it's not the right test.
15     And if it was the right test, don't you think
16 plaintiffs' own experts would use it on their patients? Right?
17 If they thought it was a safety test, these folks care about
18 their patients. Outside this courtroom, you want to know -- I
19 agree with the plaintiffs' counsel. What do people say outside
20 the courtroom? I care more what they do. And what do these
21 doctors do outside?
22     Dr. Leissinger, that they say is their doctor
23 that's going to come in and say this is great? She's going to
24 tell you she doesn't use the test and she's never tested it
25 herself to see if it's even a reliable test.

OFFICIAL TRANSCRIPT

 1  (WHEREUPON, the video clip was played as follows:)
 2  "Q. Your opinions that PT is a readily available
 3  test for identifying Xarelto-treated patients, have you
 4  published that opinion?
 5  "A. I have not.
 6  "Q. Have you tested where it's reliable?
 7  "A. I have not."
 8  MS. WILKINSON: So if you thought there was a test
 9  and you're a doctor who cares about your patients, which I'm
10  sure she does, if you thought that test would help you
11  determine -- and more importantly, help other doctors determine
12  whether someone could be injured on a medication, wouldn't you
13  be yelling about it from the rooftops? Wouldn't you be
14  publishing it and going to doctor conventions and talking to
15  the folks who just wrote that other article and saying, "No,
16  you're wrong"?
17      Not only does she not publish it, not only has
18  she put it a peer-reviewed journal --
19  MR. BARR: Your Honor, can we approach the bench?
20  THE COURT: Okay.
21  (WHEREUPON, the following proceedings were held at
22  the bench.)
23  MR. BARR: She can't publish it. She's subject to a
24  confidentiality order. If she would have published what she
25  knows about this case, they would say she was violating the

OFFICIAL TRANSCRIPT

 1  order.
 2  THE COURT: Okay. Yeah. Next time we're not using
 3  anything in our opening statement. It's gotten out of hand. I
 4  asked you all to check with each other, and --
 5  MS. WILKINSON: We did, your Honor.
 6  MR. BIRCHFIELD: It's not the transcript; it's the
 7  argument that she's making. That she -- if she can she would
 8  have published it. She would have shouted it from the
 9  rooftops. She can't because her hands are tied by the
10  confidentiality --
11  THE COURT: Yeah, and opening statement is not
12  argument. You both are arguing your case. It's not argument.
13  It's what the evidence is going to show, not what your argument
14  is.
15  MS. WILKINSON: Your Honor, can we take up later this
16  idea because she talks about the PT test outside of this case.
17  So she's not forbidden from publishing about the PT test. She
18  can't use the information in this case, but she can publish --
19  THE COURT: That's argument.
20  MS. WILKINSON: I won't go into it now, but . . .
21  THE COURT: Okay.
22  MR. BARR: Your Honor, at this point, she's rung the
23  bell.
24  MR. MEUNIER: You're going to have --
25  THE COURT: We'll just have to tell the jury to

OFFICIAL TRANSCRIPT

 1  disregard that last statement regarding this witness, and watch
 2  them during her testimony. I mean, it's argument. Let's not
 3  get into -- you know, you say what it is, and now you're
 4  arguing what -- why she didn't do it, and why she -- that's
 5  argument. That's what it is.
 6  MS. WILKINSON: Your Honor, I'll move on, but I
 7  ask -- I didn't say anything improper, and if you suggest that
 8  I did, that's all I'm worried about.
 9  THE COURT: Okay.
10  MS. WILKINSON: Thank you.
11  THE COURT: Thank you.
12  (WHEREUPON, the following proceedings were held in
13  open court.)
14  THE COURT: Okay. Members of the jury, opening
15  statement is what the evidence is to show, not what the
16  attorney thinks it's going to show or why things are not going
17  to show. So the latter part of the observation is really
18  argument. That may come in, but it may come in at another
19  stage in the case, in closing argument, not in opening
20  statement.
21      I'll ask counsel to continue on with that, and
22  I'll ask you to disregard that -- those comments by counsel.
23  Not improper. It's just misplaced at this time.
24  MS. WILKINSON: Thank you, Your Honor.
25      So Dr. Leissinger is going to tell you that she

OFFICIAL TRANSCRIPT

 1  doesn't criticize Dr. Wong for prescribing Xarelto.
 2      Why is that? You're going to see that Dr. Wong
 3  is a very qualified cardiologist. He's a specialist in
 4  internal medicine, nuclear cardiology, and adult
 5  echocardiograph.
 6      He treats patients with atrial fibrillation, or
 7  AFib, all the time. And this is what AFib is. And they'll --
 8  the doctors will explain it to you better than I can. But the
 9  central way that I understand is in a normal heart, your
10  electrical system fires and it makes your heart pump. And it
11  starts up at the top, and it pumps the blood through.
12      With AFib, we don't know why it happens, but
13  your electrical system kind of goes haywire. And that's why
14  people can feel -- feels off and they have a fast heartbeat.
15  So it doesn't make the heart pump at the right time regularly
16  and routinely, and blood pools up there normally at the top of
17  the heart.
18      That is very dangerous, because when blood pools
19  and you don't have any medication that deals with this, when
20  blood pools, it clots. Right? Just like if you cut yourself,
21  you know eventually your blood clots when it sits there.
22      With AFib the danger is not just that you have
23  an irregular heartbeat, but that these clots will travel from
24  the heart up to the head, cutting off blood flow to the brain,
25  and someone will have a debilitating stroke. That's why

OFFICIAL TRANSCRIPT