# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          MDL No. 2592
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~         SECTION L

THIS DOCUMENT RELATES TO ALL           Judge Eldon E. Fallon
CASES                                  Mag. Judge North

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -

THURSDAY, DECEMBER 8, 2016

SUZANNE PARISIAN, M.D.

       Videotaped deposition of SUZANNE PARISIAN, M.D., held at the law offices of Burg Simpson, 2398 East Camelback Road, Suite 1010, Phoenix, Arizona, commencing at 9:13 a.m., on the above date, before Sommer E. Greene, a Certified Court Reporter and Certified Realtime Reporter.

Page 218

1  regulations are either stronger to pull the product off
2  the market, but in terms of a drug, all the burden falls
3  on the FDA to show that no label can be written, and it's
4  unreasonably safe -- unreasonably dangerous.
5      Q.  I don't think that answered my question.
6          Xarelto meets the requirements for approval
7  for all indications for which it's approved to this day.
8  Correct?
9      A.  As -- as we stand, it's still approved on the
10 market for those indications, yes.
11     Q.  And you agree that it should be.  Correct?
12     A.  Not --
13         MR. WEINKOWITZ:  Objection to the form.
14         THE WITNESS:  I don't understand the
15 question.  You might want to restate the question.
16     Q.  BY MR. MURDICA:  You agree that Xarelto should
17 continue to be approved for the indications for which
18 it's approved.  Correct?
19     A.  Not with the inadequate labels that I have
20 based on the information that I've seen.  That would be
21 my opinion 11 as to what should be in an adequate label
22 and based on the information the company has to ensure
23 that the product's safe.
24     Q.  Is it your opinion that Xarelto should no
25 longer be marketed?

Page 219

1          MR. WEINKOWITZ:  Objection to the form.
2          THE WITNESS:  My opinion is all I want is
3  Xarelto to be marketed with an adequate label and let the
4  physician decide if they want to prescribe it for a
5  patient.
6      Q.  BY MR. MURDICA:  All right.  Are you -- do you
7  remain in touch with anyone at FDA?
8      A.  No, I find it very difficult in terms of the
9  litigation -- no, I don't.
10     Q.  In terms of litigation because they don't like
11 what you're doing.  Correct?
12     A.  No, no, that's not --
13         MS. BRITTAIN-LANDERS:  Objection.
14         MR. WEINKOWITZ:  Objection.
15         THE WITNESS:  That's not it at all.  It's
16 just -- it's just I find it cleaner to not be involved
17 with members of the FDA in terms of just -- I don't -- I
18 mean, I don't -- I don't mingle with the FDA on purpose.
19         I'm a member of the FDA alumni society,
20 which is a group.  So I get things sent to me.  I can
21 interact with FDA.  I'm in the regulatory affairs
22 professional group.  I can interact there, but to
23 physically go, I find it awkward to sit with members of
24 the FDA, and sometimes I was representing manufacturers.
25 Sometimes I'm in litigation.

Page 220

1          I just feel that it's safer to be away from
2  the FDA and not have any -- any evidence that there's
3  something that should not have occurred occur.
4      Q.  BY MR. MURDICA:  Have you conveyed to FDA your
5  concerns about Xarelto?
6      A.  No, and I would look at that as privileged
7  information.  Any time I'm involved in litigation, I sign
8  a confidentiality agreement.  This is privileged.  I
9  wouldn't be under the ability just to go into the FDA and
10 tell information to the FDA.
11     Q.  There's plenty of information -- plenty of your
12 opinions are not confidential.  You haven't made --
13 you're so concerned about patients and you made no
14 effort?
15         MR. WEINKOWITZ:  Objection to the form.
16     Q.  BY MR. MURDICA:  Dr. Parisian, have you made no
17 effort to inform FDA about your concerns?
18     A.  I would not because the information that I'm
19 using is confidential information that I received from
20 discovery.  It's not available information.  It's not the
21 FDA's.  So I would look at it as I'm precluded from
22 providing confidential information that I have from your
23 files to the FDA.
24         Now, if we go to court, the FDA may receive
25 these documents in terms of litigation.  That's

Page 221

1  different.  They can have them, and I know that there are
2  cases where the FDA has gotten documents that have been
3  made public.  But at this time, I look at this as all
4  confidential, that I'm discussing this with you today,
5  what I'm saying, what my opinions are are confidential.
6      Q.  All of your opinions about Xarelto are based on
7  confidential information is your testimony.  Correct?
8      A.  That's right.
9          MR. WEINKOWITZ:  Counsel, will you actually
10 stipulate that the protective order doesn't apply to her
11 report and the underlying documents?
12         MR. MURDICA:  I -- I appreciate the snark
13 and the wasting of my time.
14         MR. WEINKOWITZ:  So, no, you're not going to
15 stipulate to that?
16         MR. MURDICA:  Why -- why are you wasting our
17 time on this?  There's plenty of things she's reviewed
18 that are publicly available, and many of her opinions do
19 not involve confidential information.  So it has nothing
20 to do with the protective order.  It has to do with what
21 she's reviewing.
22         I mean, is that like -- is that your big
23 moment?  Is that what you just waited to do to waste our
24 time this afternoon?
25         MR. WEINKOWITZ:  I assume that was a no, you

Page 222

1  won't stipulate to that?
2          MR. MURDICA: Well, I'd like you to be quiet
3  and let me take the deposition.
4          MR. WEINKOWITZ: Okay. Go ahead.
5      Q.  BY MR. MURDICA: Dr. Parisian, it's your
6  opinion that every concern you have about the safety of
7  Xarelto is based on confidential information. Correct?
8      A.  Yes, sir.
9      Q.  And that you've been precluded to go tell FDA
10  about your views. Correct?
11     A.  Right. And there are cases where the report
12  has been made public, and they've been put on the
13  internet by the -- by the people who are the attorneys
14  and stuff. So there are cases like that. I don't know
15  of this being one.
16     Q.  Okay. And it's also your view that none of
17  your opinions here are things -- are -- are views that
18  are public that are -- that have been debated regarding
19  Xarelto. Correct?
20     A.  You know, I'm not going -- I just find it --
21  just like not going to the FDA and sitting down with
22  members of the FDA where it may be suggested that I said
23  something or that something occurred. I find it just
24  cleaner to sit here, and this is the bulk of the
25  documents I reviewed. Some of them are classified,

Page 223

1  confidential. Some are not. I'm not going to sit there
2  and parse which one is which.
3          I -- I look at it as I am not given liberty
4  to go and provide this information to the FDA. Unless
5  I'm released by some order of the Court or the attorneys
6  or told that I can talk to someone else, you know, at the
7  FDA, I'm not going to do that.
8          And that was what I got trained to do at the
9  FDA. You don't give information about a record to
10  anybody else unless you've been given the authority to
11  provide that information.
12         It was like I was talking about the FDA's
13  precluded from talking about things that have not been
14  successful. The same holds the way I've been trained
15  from the FDA in terms of litigation.
16     Q.  Doctor, these 16 opinions, none of them
17  reference a confidential document in the consolidated 16
18  opinions.
19     A.  Oh, those opinions are not referencing the only
20  document that went into the opinions. I'm -- in those 16
21  opinions, I'm providing sometimes a document, but it is
22  the bulk of the 400 pages of this report that go into
23  those 16 opinions. I've tried to synthesize what I've
24  reviewed into 16 discrete opinions that we can discuss
25  today as to what are your opinions, Dr. Parisian, as to

Page 224

1  the review of the documents?
2          And so that's a methodology I first learned
3  at the FDA. Look at the documents, then try to put them
4  in a useable format as to what your summary of your
5  opinions are.
6      Q.  Okay.
7      A.  The opinions don't reference every document
8  that fits with the opinion, but they do reference the
9  applicable regulations that I'm thinking about, and some
10  of them have an example of what I'm talking about, but --
11     Q.  Okay.
12     A.  -- there -- this is a boiling down of all of
13  these pages into those 16 opinions.
14     Q.  You, Dr. Parisian, believe -- you're concerned
15  the Xarelto label is inadequate as -- as currently
16  stated. Correct?
17     A.  Yes, sir.
18     Q.  Okay. But you're not concerned enough to
19  either publish your opinions or go to the FDA with your
20  views without regard to confidential documents. Correct?
21         MR. WEINKOWITZ: Objection.
22         THE WITNESS: I would be precluded from
23  doing that. I mean, you're the company that in some ways
24  that I'm saving from doing that. I don't -- I don't
25  really think that I could go and speak about your things

Page 225

1  to the FDA any more than I could any other company I've
2  been involved with litigation until I'm told by some
3  source that I can do that. So I'm not going to talk
4  about what I know and the documents that support it.
5      Q.  BY MR. MURDICA: Not talking about documents,
6  Dr. Parisian.
7      A.  Well, I am, because the documents are the basis
8  of my opinions in terms of the regulations.
9      Q.  Okay.
10     A.  So they have to be supported factually. And so
11  I'm not going to go and discuss the facts of the case
12  with the FDA unless I'm given permission by either you or
13  someone but definitely not me to just go and talk and
14  engage with the FDA.
15     Q.  And that would be the same excuse for why you
16  haven't tried to publish your opinion in a scientific
17  journal. Correct?
18         MR. WEINKOWITZ: Object to the form.
19         THE WITNESS: It's not an excuse. It's the
20  reality as a regulatory expert. I don't know of
21  regulatory experts involved in litigation that would take
22  confidential documents to support their opinions and
23  publish them. I don't believe that's -- I don't think I
24  know of any regulatory expert that would do that.
25     Q.  BY MR. MURDICA: I would agree you would

Page 226

1  violate the protective order to take confidential
2  documents --
3      A.  Thank you.
4      Q.  -- Dr. Parisian, but that's not what we're
5  talking about.
6      A.  Yes, we are.  These opinions are based on
7  confidential documents.
8      Q.  Okay.  All right.  Opinion number 1 on page 9.
9  All right.  Are you there?
10     A.  Yes, sir.
11     Q.  Now, if you look at the sentence beginning
12 "Without" -- "Without providing monitoring
13 recommendations" --
14     A.  Uh-huh.
15     Q.  You see this?
16     A.  Yes, sir.
17     Q.  -- "or the ability for a physician to adjust a
18 patient's dose, certain patients were placed at increased
19 risk of major bleeding without additional benefit."
20         Do you see that sentence?
21     A.  Yes, sir.
22     Q.  You don't know which patients are the certain
23 patients that were placed at additional risk of bleeding.
24 Correct?
25     A.  Well, it -- it goes into the sentence before

Page 227

1  that internally the company knew that the 20 milligrams,
2  15 milligrams per day was too high, too high for some
3  patients.  Why is it too high?  You have an increased
4  risk of bleeding.
5          So without providing any monitoring
6  recommendations so that a physician would be able to
7  identify which patients were too high and to adjust the
8  dose which was the FDA suggestion of the 5 milligrams,
9  then certain patients who are too high particularly in PT
10 values are placed at increased risk of bleeding.
11         Do I know of a specific patient?  No, but
12 does -- do the documents support that the company knew
13 the dose was too high, and there was certain patients
14 that the value is too high and can be identified with the
15 PT test in terms of prolongation of clotting time.  So
16 that's what that's coming from.
17         And then there's a discussion throughout the
18 report talking about what the company knew internally
19 when they developed it, describing the consensus,
20 describing what needed to be in the label.  So that was
21 based on confidential documents.
22     Q.  Do you remember the question?
23     A.  Yeah, you're asking me specifically about that
24 sentence.  You took out one sentence out of my opinion,
25 without providing monitoring.  What was that?  And it

Page 228

1  needs to be explained in the context of what was written
2  before it, that the company knew internally there was an
3  increased risk for certain patients, and they had been
4  monitoring internally.  So it's all built.  It's not just
5  one sentence all by itself.
6      Q.  You don't remember the question, do you?
7      A.  I do.  You asked specifically about that
8  sentence, and I answered it.  But you can't take it
9  isolated from that.  And so it would be 400 pages here
10 describing what that means.
11         And then it would say the applicable
12 regulations, and, again, it would be adequate warnings,
13 label and an adequate label, the adequate NDA process,
14 and then it's prohibited to sell a drug that isn't
15 fulfilling those requirements.  So it's a well-written
16 opinion.
17     Q.  I'm glad you're so self-congratulatory.  Are
18 you ready for another question?
19     A.  Well, okay.  Go ahead.  Ask another question.
20     Q.  Let's -- let's try it again.
21         You have no way to identify which patients
22 are the certain patients who are at an increased risk of
23 bleeding according to you.  Correct?
24     A.  No, that's not correct.  According to the
25 internal documents, if you had a PT greater than 20

Page 229

1  seconds, you're at increased risk of bleeding.  That was
2  in the upper 95 percentile of the patients given Xarelto.
3  So that would put a patient in the increased risk of
4  bleeding by their own documents internally.  It's not in
5  the label, but it is internally in their documents.
6          So we can identify using PT -- neoplastin PT
7  as to which patients are at increased risk based on
8  increased plasma concentration and increased
9  anticoagulant effect, which is measured with your PT.
10     Q.  What is the plasma concentration of Xarelto?
11 What unit is it measured in in the human body?
12     A.  It depends.  Some of them have it in different
13 units.  Actually, it's discussed in my report where I
14 give the 11572 values.
15     Q.  Doctor, are you able to answer that question
16 without looking at your report?
17     A.  No, I --
18     Q.  You don't even know what -- how to measure what
19 units are used?
20     A.  You know, I can look at my report, and I put it
21 in my report very carefully, and so let me look at it --
22     Q.  Yes, but, Doctor --
23     A.  -- rather than guess.
24     Q.  -- this is very basic information, and you're
25 trying to offer wide-ranging reports.  You don't even