# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO                )
(RIVAROXABAN) PRODUCTS          )
LIABILITY LITIGATION            )   MDL No.:  2592
                                )   Section:  L
                                )   Judge Eldon E. Fallon
                                )   Mag. Judge North
                                )
THIS DOCUMENT RELATES           )
TO ALL CASES                    )

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
VOLUME I

   Videotaped Deposition of LAURA M. PLUNKETT, Ph.D., taken on Tuesday, December 6, 2016, in the office of The Lambert Firm, A.P.L.C., 701 Magazine Street, New Orleans, Louisiana 70130, commencing at 8:02 a.m.

Reported by:
AURORA M. PERRIEN
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

Page 158

1    A. Well, it gave me context. I mean, I don't
2 know if it helped me. I was already familiar with
3 the -- when I read the label, I wasn't surprised
4 at some of the things I saw. I was not doing an
5 in-depth comparison, though, of the labeling to
6 see whether or not I thought there was something
7 inadequate about it. That -- I already told you.
8 I didn't do that. I would have had to have looked
9 beyond and done a much more in-depth evaluation
10 like I do when I develop opinions like I -- I did
11 to prepare my report.
12    Q. So is it fair to say that when you looked
13 at the label three or four or five years ago in
14 the context of having a conversation with your
15 mother-in-law's doctor, you did not form an
16 opinion that the label was inadequate in any way?
17    MR. DENTON:
18       Object to the form.
19    THE WITNESS:
20       I -- I did not because I was not
21 attempting to do that. I was attempting
22 to put the published literature in context
23 with what was in the label. And again, I
24 was concerned about off-label use. So I
25 wanted to make sure that there wasn't

Page 159

1 something in the label that was actually
2 reported that was relevant to my
3 mother-in-law that would -- that the
4 doctor should be considering that he may
5 not have been. He was not familiar with
6 the labels. That was sure when I -- when
7 I talked to him.
8    COURT REPORTER:
9       (Indicating.)
10    THE WITNESS:
11       Sorry. Okay.
12 BY MR. HOROWITZ:
13    Q. So it's fair to say that when you first
14 looked at the Xarelto label you didn't deem it to
15 be inadequate?
16    MR. DENTON:
17       I --
18 BY MR. HOROWITZ:
19    Q. Is that fair?
20    MR. DENTON:
21       I object to the form. Asked and
22 answered.
23    THE WITNESS:
24       I did not do an assessment of whether
25 it was adequate or inadequate. I assume

Page 160

1 that the -- that the label had accurate
2 information that had been developed from
3 the NDA, and that's -- that was my
4 assumption. So I was looking at what was
5 said in the label as a starting point and
6 what I had seen in the published
7 literature to compare that.
8 BY MR. HOROWITZ:
9    Q. Is it fair to say that the first time you
10 developed an opinion as to the adequacy of the
11 Xarelto label was after you were retained by
12 Mr. McWilliams to provide your views in this
13 litigation?
14    MR. DENTON:
15       I object to the form of the question.
16    THE WITNESS:
17       I certainly -- certainly the first
18 time I did an in-depth analysis and looked
19 at specific adequacy language would have
20 been when I saw the documents that I had
21 access to in this litigation. That is
22 true.
23 BY MR. HOROWITZ:
24    Q. So the answer to my question is the first
25 time you formed the opinions about the adequacy of

Page 161

1 the label was not until you were retained to
2 provide your views in this litigation?
3    MR. DENTON:
4       I object to the form of the question
5 and repetitive nature. This is the last
6 time you're going to get to ask it.
7    THE WITNESS:
8       I tried to answer that for you. I
9 said that certainly this is the first time
10 as we sit here today that I'm absolutely
11 telling you my opinions. But I also would
12 have formed the in-depth opinions only
13 after the complete review I did as part of
14 my work in this case. That is true.
15 BY MR. HOROWITZ:
16    Q. Have you ever published your opinions that
17 are set forth in your report?
18    A. No.
19    Q. Have you ever subjected these opinions to
20 peer review?
21    A. As in submitting a publication? No. I
22 have not.
23    Q. Have you ever advised the FDA of your
24 opinions?
25    A. No. I have not.

Page 506

1  A. I can give you an estimate based upon that
2  quartile analysis the FDA did, where it shows a
3  doubling of the event rate. But I -- I have not
4  calculated an odds ratio. So I can't -- I can't
5  give you an odds ratio. And I -- I don't believe
6  anybody else has done that either.
7  **Q. Which quartile analysis are you referring**
8  **to?**
9  A. That one we went over, the -- we've talked
10 about it two or three times.
11 **Q. So the one that you and I went over that**
12 **showed that --**
13 A. When you get --
14 **Q. -- that fourth --**
15 A. -- above 20 seconds, you get a --
16 **Q. Right.**
17 A. -- an event rate that's double what it is
18 at the lower -- at the -- at the -- at the lower
19 quartiles.
20 **Q. Well, I thought what we showed was for**
21 **major risk of bleeding and risk of dying from**
22 **bleeding. The second quartile was actually higher**
23 **than the fourth quartile.**
24 A. Wasn't your question a minute ago. I --
25 we're talking about bleeding. And bleeding

Page 507

1  includes --
2  **Q. Okay.**
3  A. -- all types of bleeding.
4  **Q. Ah, okay.**
5  A. And so again, you know -- I mean, it --
6  and we did go over this by looking -- and I agreed
7  with you. Those numbers were the way those
8  numbers fell out. But I would -- I would argue
9  that that data is useful to help you quantify.
10 But it is not an odds ratio. It's not the
11 definitive answer about what the risk ratio would
12 be. And I don't know that the company or anyone
13 else has done a study to -- to show me what that
14 actual risk would be other than there is an
15 increased risk shown.
16 **Q. So in other words, you can't give us an**
17 **actual number? You can just give us some sort of**
18 **guesstimate by looking at that quartile --**
19     MR. DENTON:
20        I object --
21 BY MR. HOROWITZ:
22 **Q. -- analysis?**
23     MR. DENTON:
24        -- to the form.
25     THE WITNESS:

Page 508

1        I'm not going to guesstimate. I can
2     point you to that, where there is data on
3     the risk of bleeding at -- in that study
4     based on the data that -- that is
5     available to me.
6  BY MR. HOROWITZ:
7  **Q. Have you published that analysis or**
8  **subjected it to peer review, that you're saying**
9  **you can look at the quartile analysis and come up**
10 **with a risk of bleeding? Have you -- have you**
11 **published that anywhere?**
12     MR. DENTON:
13        Object to the form.
14     THE WITNESS:
15        I haven't published it. But I would
16     say to you that's consistent with FDA's
17     statement about that analysis, if you go
18     to their summary medical review. So I
19     don't --
20 BY MR. HOROWITZ:
21 **Q. Which --**
22 A. -- think what I'm saying -- I don't my --
23 my looking at that table and coming to that
24 conclusion would be controversial. I would agree
25 -- but I would -- would not try to tell you that

Page 509

1  that is the definitive odds ratio. Absolutely
2  not.
3  **Q. Okay.**
4  A. I haven't -- I haven't done that analysis.
5  **Q. Other than whatever the summary review of**
6  **FDA, which is a document that you're just quoting**
7  **from, says, you don't have your own sort of**
8  **independent view of that?**
9      MR. DENTON:
10        Object to the form.
11     THE WITNESS:
12        No. I have my independent view based
13     on the information I've seen. And that's
14     part of the information I've seen. And
15     I'm trying to define for you what I would
16     point you to. And I thought that's where
17     we started on this, what would --
18 BY MR. HOROWITZ:
19 **Q. What -- what --**
20 A. -- I point to.
21 **Q. -- statement in the summary review are you**
22 **talking about?**
23 A. I'm -- I'm talking about the relationship
24 between bleeding risk -- and I believe that they
25 have a statement about -- that this would be