# EXHIBIT 8

```
     0001
01:          IN THE UNITED STATES DISTRICT COURT
02:       FOR THE EASTERN DISTRICT OF LOUISIANA
03:                    -   -   -
04:
          IN RE:  XARELTO       :  MDL NO. 2592
05:       (RIVAROXABAN) PRODUCTS :
          LITIGATION            :  SECTION L
06:                             :
          THIS DOCUMENT RELATES  :  JUDGE ELDON
07:       TO ALL CASES          :  E. FALLON
                                :
08:                             :
                                :  MAG. JUDGE
09:                             :  NORTH
10:
                       -   -   -
11:
                    December 14, 2016
12:
                       -   -   -
13:
                    - PROTECTED -
14:
        - SUBJECT TO FURTHER PROTECTIVE REVIEW -
15:
16:              Videotaped deposition of
          HENRY MICHAEL RINDER, M.D., taken
17:       pursuant to notice, was held at the law
          offices of Douglas & London, 59 Maiden
18:       Lane, New York, New York, beginning at
          8:09 a.m., on the above date, before
19:       Michelle L. Gray, a Registered
          Professional Reporter, Certified
20:       Shorthand Reporter,  Certified Realtime
          Reporter and Notary Public.
21:
                       -   -   -
22:
                GOLKOW TECHNOLOGIES, INC.
23:       877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24:
```

0029

01:         Q.    And sitting here today, is

02:    it fair to say that you can't point to

03:    anything else that you're relying upon to

04:    offer the opinion in the paragraph we're

05:    talking about on Page 14?

06:         A.    As long as it's within one

07:    of those references, then yes.

08:         Q.    Okay.  Now, have you ever

09:    published in a peer-reviewed article

10:    your -- the opinion that you offer about

11:    the 20-second reasonable and conservative

12:    cutoff point at which the risks outweigh

13:    any benefit in any scientific journal?

14:         A.    I have not published on this

15:    cutoff point, no.

16:         Q.    Have you even drafted an

17:    article for submission on this cutoff

18:    point?

19:         A.    We have several -- we have

20:    several manuscripts that our trainees and

21:    residents are working on related to new

22:    oral anticoagulants, but I do not believe

23:    this is included, that this cutoff point

24:    right now is included in those drafts.

0030

01:          Q.     In other words, you are not

02:     in the process of drafting a peer -- a

03:     proposed peer-reviewed article that

04:     specifically says that for Xarelto, there

05:     should be a 20-second cutoff, reasonable

06:     and conservative -- conservative cutoff

07:     at which the risks outweigh the benefits?

08:          A.     Well, I don't think there

09:     would be -- well, I don't know that -- I

10:     don't know that a journal would want an

11:     article that was completely -- a

12:     manuscript that was completely focused on

13:     that point.  So no, we're not using --

14:     we're not planning a manuscript that is

15:     focused on that particular point.

16:          Q.     And you'd agree that FDA has

17:     never come out and said that there should

18:     be a 20-second reasonable and

19:     conservative cutoff point at which the

20:     risks outweigh the benefits for Xarelto?

21:               MR. DENTON:  Object to form.

22:               THE WITNESS:  I have seen --

23:          I've seen the data that the FDA

24:          has that shows the increased

0047

01:                 monitoring for them.

02:         BY MR. STEKLOFF:

03:                 Q.    We'll come back to

04:         monitoring therapeutic range.  I want to

05:         go back to the 20-second cutoff.

06:                 A.    Okay.  In the report.

07:                       MR. DENTON:  Are you done

08:                 with this article?

09:                       MR. STEKLOFF:  For now, yes.

10:                       THE WITNESS:  Want me to

11:                 just hold it -- hold it to the

12:                 side?

13:         BY MR. STEKLOFF:

14:                 Q.    The court reporter will want

15:         it anyways, so hold it to the side and we

16:         may come back to it.

17:                 A.    Okay.  Thank you.

18:                 Q.    Going back to Page 14 of

19:         your report.  Have you ever presented at

20:         any sort of conference your opinion

21:         offered here in the first paragraph on

22:         Page 14 with regard to the 20-second

23:         cutoff?

24:                 A.    Not at a national

0048

01:     conference.  In some of our teaching and

02:     case and patient management conferences,

03:     as part of our routine clinical care, we

04:     have discussed Xarelto and, of course,

05:     all the oral anticoagulants.  And we have

06:     discussed monitoring and the questions of

07:     monitoring, how to monitor, and risk.

08:                 So that has been a subject

09:     of what we've discussed, but not -- but

10:     we have not presented -- it hasn't

11:     reached a level where we've presented it

12:     at a national meeting or a -- a formal

13:     type of meeting where there's an abstract

14:     submitted and things like that.

15:          Q.     All right.  Let me break

16:     that down a little bit.

17:                 Can we agree that you have

18:     not presented the opinion that Xarelto

19:     should be discontinued in patients whose

20:     PT is greater than 20 seconds, which you

21:     believe is a reasonable and conservative

22:     cut-off point at which the risks outweigh

23:     any benefit at any formal type of meeting

24:     or national conference?

0049

01:                    MR. DENTON:  Object to the

02:           form.  Asked and answered.

03:                    THE WITNESS:  I would say --

04:           I would say the latter at a

05:           national conference.  But we -- we

06:           have had formal -- I mean, these

07:           are formal meetings.  There are --

08:           they are scheduled.  They are

09:           regularly attended by clinical

10:           staff and other interested

11:           individuals.

12:      BY MR. STEKLOFF:

13:           Q.    Bad question.  I didn't

14:      break it down enough.

15:           A.    That's all right.

16:           Q.    I'm going to break it down

17:      again.

18:                    Can we agree that you have

19:      not presented the opinion that Xarelto

20:      should be discontinued in patients whose

21:      PT is greater than 20 seconds at any

22:      national conference?

23:                    MR. DENTON:  Objection to

24:           form.

0050

01:                    THE WITNESS:  We have not

02:              yet presented that data or opinion

03:              at a national conference.

04:    BY MR. STEKLOFF:

05:         Q.    Now, my understanding is

06:    that your testimony a moment ago was that

07:    you have discussed all NOACs and

08:    monitoring and therapeutic ranges within

09:    Yale and amongst colleagues.  Is that

10:    fair?

11:         A.    As part of our normal

12:    clinical management, these -- we have

13:    patients on all NOACs, warfarin, and all

14:    oral -- other oral anticoagulants.

15:              And so it is a constant part

16:    of our practice.  So we are always

17:    discussing management, monitoring, and

18:    trying to figure out the best patient

19:    care possible.

20:         Q.    I'm not trying to trick you

21:    here.  The answer to my question was

22:    simply a yes, right?

23:                   MR. DENTON:  Object to the

24:              form.

0051

01:                    THE WITNESS:  I'm sorry.

02:                    MR. DENTON:  What's the

03:        question?

04:  BY MR. STEKLOFF:

05:        Q.    My question -- my question

06:  that I asked, it -- the answer was yes,

07:  right?  I'll read you the question again.

08:        A.    Okay.  I'm sorry.

09:        Q.    My question was, my

10:  understanding is that your testimony a

11:  moment ago was that you have discussed

12:  all NOACs and monitoring and therapeutic

13:  ranges within Yale and amongst

14:  colleagues.  Is that fair?  The answer to

15:  that is yes, right?

16:        A.    As I said before, we've --

17:  as part of our clinical care, we discuss

18:  NOACs, we discuss monitoring, we discuss

19:  all aspects of that.

20:        Q.    Yes.  Now, you agree,

21:  though, that you have never told your

22:  colleagues at Yale in a clinical context

23:  or any sort of meeting within -- of the

24:  physicians at Yale that they should

0052

01: discontinue or even consider

02: discontinuing their patients who are

03: taking Xarelto specifically if their

04: patients have a PT of 20 or greater?

05:                 MR. DENTON:  Object to the

06:       form.

07:                 THE WITNESS:  So the answer

08:       to that is I don't tell my

09:       colleagues what to do.  We are --

10:       we are a collegial group.  We work

11:       together.

12:                 I will present data to them.

13:                 If we have data that

14:       indicates that someone is a -- has

15:       a high level of Xarelto on board

16:       or is a high responder, I would

17:       certainly present that as

18:       information that would be of use

19:       to the -- for the group to

20:       consider in this patient's care.

21: BY MR. STEKLOFF:

22:       Q.   Have you ever presented to

23: your colleagues a recommendation that as

24: a general matter they should consider

0053

01:     discontinuing their patients who are

02:     taking Xarelto if their PT is 20 seconds

03:     or greater?

04:                 MR. DENTON:  Object to form.

05:             Asked and answered.

06:                 THE WITNESS:  I don't

07:             present to them in general

08:             matters.

09:                 I present to them in

10:             specific case management, patient

11:             management aspects, and that data

12:             would be included in our

13:             discussion of that patient.  But

14:             I'm not going to say that they

15:             should generalize that to all of

16:             their care.  I'm saying that I've

17:             brought that up and that they

18:             consider that in the specific

19:             management of that specific

20:             patient.

21:     BY MR. STEKLOFF:

22:                 Q.   So you've never presented

23:     the opinion offered on Page 14, which is

24:     an opinion as a general matter, to your

0054

01:     colleagues at Yale; is that right?

02:                  MR. DENTON:  I object to the

03:          form.  Asked and answered.

04:                  THE WITNESS:  So I'm a

05:          little confused.  So I don't --

06:          the writing of this report has a

07:          different purpose.

08:                  I have spoken with my

09:          colleagues in case management of

10:          patients about what I know about

11:          Xarelto and other oral

12:          anticoagulants and their effect on

13:          clotting times and the data that I

14:          have summarized.

15:                  I've not -- I've not stood

16:          up and put on the board, this is

17:          the general rule.

18:                  I've simply discussed with

19:          them what the data shows and let

20:          them then apply that to the

21:          individual patient.  And that

22:          oftentimes turns into an involved

23:          discussion about that patient.

24:          But, again, I'm not dictating to

0055

01:          them.

02:     BY MR. STEKLOFF:

03:          Q.    So you never, at a meeting

04:     of your colleagues, have presented all of

05:     the data that you believe supports your

06:     opinion and said, as a general

07:     consideration, as you treat your patients

08:     who are taking Xarelto, you should

09:     consider discontinuing them if their PT

10:     is 20 seconds or greater; is that

11:     correct?

12:               MR. DENTON:  Object to the

13:          form.  Asked and answered.  This

14:          is the last time he's going to

15:          answer it, and we're moving on.

16:     BY MR. STEKLOFF:

17:          Q.    Yes or no?  Is that correct?

18:               MR. DENTON:  No, no, there's

19:          no yes or no.  He can answer the

20:          question appropriately.

21:               MR. STEKLOFF:  Well, I would

22:          like a yes or no answer.

23:               MR. DENTON:  Well, he's

24:          going to give an accurate answer.

0056

01:                    THE WITNESS:  With all due

02:           respect, I don't believe that

03:           physicians are -- in a case

04:           management setting should ever

05:           have presentations of data that

06:           they feel is an absolute or a

07:           general rule.  I don't think

08:           that's appropriate.  I think it

09:           stifles discussion.  I think it's

10:           medically and scientifically

11:           misleading and against the best

12:           practice of a patient.

13:                    So presenting the data and

14:           allowing for a meaningful

15:           discussion is what's done.  But

16:           somehow presenting it as an

17:           absolute is just not -- that's

18:           just not, I think, appropriate.

19:    BY MR. STEKLOFF:

20:              Q.    And for that reason, because

21:    you don't think it's appropriate, you

22:    have never presented the opinion offered

23:    here on Page 14 as a general matter to

24:    your colleagues at Yale.  Fair?

0057

01:              MR. DENTON:  No.  Objection.

02:          Move on.  I'm going to instruct

03:          him not to answer.  You've asked

04:          it eight or ten different ways.

05:          We're done with this topic.  Move

06:          on.

07:     BY MR. STEKLOFF:

08:          Q.   Are you following your

09:     counsel's instruction?

10:          A.   Yes.

11:              MR. STEKLOFF:  He's not

12:          answering the question.  I'm going

13:          to continue to ask him.

14:              MR. DENTON:  I'm going to

15:          continue telling him not to.

16:          Anybody -- any reasonable reading

17:          of this transcript would agree

18:          with me.  So that's why I'm taking

19:          the position.

20:     BY MR. STEKLOFF:

21:          Q.   Have you ever personally

22:     told a patient whose PT was 20 or

23:     greater, 20 seconds or greater, based on

24:     Neoplastine taken between 13 and