UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| THIS DOCUMENT RELATES TO: | * * | SECTION L |
| *Joseph Orr, Jr., et al. v. Janssen et al.* Case No. 2:15-cv-03708 | * * * | JUDGE ELDON E. FALLON MAG. JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' MOTION IN LIMINE NO. 35 TO ADMIT EVIDENCE OF DEFENDANTS' STATEMENTS OUTSIDE THE UNITED STATES THAT DIRECTLY CONTRADICT THEIR POSITION THAT PT NEOPLASTIN IS NOT USEFUL AND DOES NOT WORK TO DETERMINE THE ANTICOAGULANT ACTIVITY OF XARELTO**

**I.    INTRODUCTION**

In the initial bellwether trial of *Boudreaux v. Janssen*, the exclusion of foreign regulatory evidence deprived the jury from hearing truthful, accurate and admissible evidence about what Bayer communicates about the usefulness of PT Neoplastin as a test to measure Xarelto blood concentration outside of the United States.[1] The jury was repeatedly told by defense experts and Janssen corporate witnesses that PT Neoplastin was not only not useful, but that it did not work. This false narrative was successfully reprised by defense counsel at summation:

> … outside of this courtroom, <u>nobody thinks this test works</u>. They don't think
> it helps. They want you to second-guess all the scientists out there, all the

---

[1] In *Boudreaux*, the Defendants filed Motion in Limine No. 3 (Rec. Doc. 5954), regarding foreign labeling and regulatory actions which the Plaintiff's opposed. (Exhibit "1," incorporated herein) (Rec. Doc. 6169). The Court reserved its ruling on the issue because "context or rebuttal may have to be considered." (Rec. Doc. 6524). At trial, Plaintiffs were precluded from using this important evidence for either context or rebuttal.

1

doctors you've heard, all the medical associations, all the medical literature, and they want you to believe that they're the only ones that understand this test and they're the only ones that want it in the label because nobody else understands what the company does.[2]

Allowing these half-truths to permeate the *Boudreaux* trial, permitted a falsehood to germinate and spread. Consequently, the Plaintiffs were severely prejudiced because they were unable to rebut this testimony by cross-examining defense witnesses with the Defendants' own contradictory statements (which are party admissions) in foreign regulatory labels and other documents that reveal the Defendants' state of knowledge and understanding, in direct contradiction to what the jury was being told. This prejudice was compounded during the cross-examination of defense expert Dr. Colleen Johnson who repeatedly told the jury that PT Neoplastin was not a helpful test.[3] During her cross-examination, the Court sustained the Defendants' objection and prohibited Plaintiff from questioning Dr. Johnson about her failure to have considered and reviewed an article published in a peer reviewed journal about the numerous international medical societies that in fact <u>recommend PT</u> in their medical guidelines as a reliable screening test in patients taking an anti-Factor Xa inhibitor, including Xarelto.[4]

To avoid this prejudice from being repeated, Plaintiffs move in limine to have this Court revisit its rulings in *Boudreaux* regarding the use of foreign labels, and permit the Plaintiffs to rebut the half-truths told by the Defendants. Defense counsel should be prohibited from arguing that there is no evidence that anyone finds PT Neoplastin useful when her own client (Bayer) says

---

[2] *Boudreaux* Tr. 5/3/17 at 1600:9-1600:16 (emphasis added). The relevant pages cited from the *Boudreaux* trial transcript are attached as Exhibit 2.

[3] Ex. 2, *Boudreaux* Tr. 5/1/17 at 1210:7-1210:23; 1240:3-1240:7; 1255:4-1255:115-1-17; 1263:25-1264:1; 1264:16 to 1264:18.

[4] Ex. 2, *Boudreaux* Tr. 5/2/17 at 1289:19-1294:17. Lippi, et al, *Recent Guidelines and recommendations for laboratory assessment of direct oral anticoagulants (DOACs): is there consensus?,* Clin Chem Lab Med (2014)(Plaintiffs' Exhibit 5767884) ("Lippi article") (Exhibit 3).

the exact opposite in its Xarelto label outside the United States. The so-called difference in "regulatory requirements" is absolutely irrelevant. Defense counsel should be prohibited from eliciting false testimony about PT Neoplastin that is contradicted by Bayer's own party admissions. When Defendants stand-up in court and tell the jury that PT Neoplastin is not useful – they are being less than honest with the jury, and, by extension, dishonest to physicians in the United States or to doctors in other countries. Plaintiffs should not be unfairly prohibited from challenging the credibility of this false statement.

## II.   FACTUAL BACKGROUND

For over a decade, Defendants have known that laboratory tests measuring PT or anti-Factor Xa activity can assess a Xarelto patient's anticoagulant activity. In clinical trials used to obtain foreign regulatory approval of Xarelto, scientists employed by Defendants found that the anticoagulation effect of Xarelto could be evaluated using PT or anti-Factor Xa testing.[5] Additional clinical studies and analysis published in peer-reviewed articles have similarly confirmed that such testing can be used to screen for Xarelto exposure.[6] As such, foreign medical associations recommend PT or anti-Factor Xa testing of patients taking Xarelto.[7] Indeed, Bayer

---

[5] Kubitza, D., et al. *Safety, pharmacodynamics and pharmacokinetics of single doses of BAY 59-7939, an oral, direct factor Xa inhibitor*. 61 Eur J Clin Pharmacol 873–880 (2005) (Exhibit 4).

[6] Lippi, G., et al. *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation; a tentative approach based on routine laboratory tests*. DOI 10.1007 Journal of Thrombosis and Thrombolysis 11239-014-1082-5 (2014) (Exhibit 5).

[7] *See* Trevor Baglin, et al., *Effects of routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology,* 159 British Journal of Haematology 427 (2012), at 429 (Exhibit 6) (British Committee for Standards in Haematology finding: "The **PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**, if a reagent with known sensitivity is used, but it cannot be used to determine the drug level.") (emphasis added); Trevor Baglin, et al., *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific and Standardization Committee of the International Society on Thrombosis and Haemostasis*, 11 Journal of Thrombosis and Haemostasis 756 (2013), at 758 (Exhibit 6A) (International Society on Thrombosis and Haemostasis finding: "When a Quick-type PT reagent with known sensitivity

expressly informed doctors in Canada, in the warning section of the Defendants' label, about the value of testing PT to determine anticoagulant activity in Xarelto patients.[8]

Despite the findings and the instructions provided in that foreign label, for the United States label, Defendants purposefully avoided language concerning proposed laboratory correlation of PT measurements with the anticoagulant effect of Xarelto for clear business reasons. For example, in a working internal memorandum updated and attached to a June 1, 2011 E-mail, Defendant Janssen discussed whether to propose PT language in the *Warnings and Precautions* (Section 5.4) of the United States label for the orthopedic indication then being sought. Janssen clearly assessed its competitive position, noting that Xarelto's primary competitor, Pradaxa, did not include such language in the *Warnings and Precautions* section of its label. Janssen then concluded that no such language would be proposed in the warnings section voluntarily, but instead would be proposed "[o]nly if the section is requested" by FDA.[9] According to the same memo, language pertaining to PT measurement would only be proposed after "modifying significantly" the language that Bayer already had put into the Xarelto label in Canada.[10] Ultimately, this language was never proposed in

---

is used, the **PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**.") (emphasis added).

[8]*See* Canadian Xarelto Product Monograph Label (Exhibit 7).

> [I]n certain infrequent situations such as overdosage, acute bleeding, urgent surgery, in cases of suspected non-compliance, or in other unusual circumstances, assessment of the anticoagulant effect of rivaroxaban may be appropriate. Accordingly, measuring PT using the Neoplastin reagent, or Factor-Xa assay using rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.

[9]June 1, 2011 E-mail of Sanjay Jalota RE: XARELTO LWG and attached Xarelto (rivaroxaban) USPI Labeling Contingency Document (XARELTO_JANSSEN_14140830) (Exhibit 8)[FILED UNDER SEAL].

[10]*Id*.; May 3, 2011 E-mail of Kemal Malik Re: Xarelto – DVT and SPAF List of Questions (Day 120) – Strategy of Response (Exhibit 9)[FILED UNDER SEAL]. April 23, 2009 E-mail of Judy Kinaszczuk to Paul Burton and Mehul Desai of Janssen RE: MTG: XARELTO USPI LWG Labeling Negotiation Contingencies 24-Apr-09; Post LRC actions" and described the proposed changes for the XARELTO label: "The second thing we needed to do, was to offer more pointed guidance to the physician about correlation (or lack) of PT measurement with bleeding risks and dosing. But, **we were not to be as specific as the**

the United States. Rather, the Defendants chose to "[d]efend not having *any* laboratory monitoring statement."[11]

Despite Defendants' determination not to include the needed language in the United States label, the use of PT (Neoplastin) to assess the anticoagulant effect and risk of bleeding associated with Xarelto use has been recommended by the following foreign regulatory authorities:

- New Zealand Medicines and Medical Devices Safety Authority: "Xarelto at recommended doses prolongs the global clotting tests **prothrombin time (PT)**, activated partial thromboplastin time (aPTT), HepTest®, as well as the specific clotting test, anti-Factor Xa activity. **PT is influenced by Xarelto in a dose-dependent manner if Neoplastin® is used for the assay**. The 5/95 percentiles of PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e. at the time of maximum effect) is described in Table 1 (see Pharmacodynamic effects). In case of excessive doses, the PT is expected to be outside of this range."[12]

- Health Canada: "The **prothrombin time (PT)**, measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation to plasma concentration if the **Neoplastin® reagent** is used. In patients who are bleeding, **measuring the PT using the Neoplastin® reagent may be useful to assist in determining an excess of anticoagulant activity**."[13]

- The European Medicines Agency ("EMA") included laboratory testing information to be used by physicians within the European Union label to help with management and monitoring of patients' rivaroxaban plasma concentration when clinically indicated and with the goal to reduce bleeding risk and improve anticoagulation efficacy.[14]

---

**Canadian label**. I have a draft suggestion, but obviously need your edits on the topic as well." (Exhibit 10)[FILED UNDER SEAL] (emphasis added).

[11]*See* June 1, 2011 E-mail of Sanjay Jalota (Exhibit 8)[FILED UNDER SEAL].

[12]New Zealand Data Sheet, at 7 (Exhibit 11) (emphasis added).

[13]Canadian Monograph, at 9 (Exhibit 7) (emphasis added).

[14]CHMP Assessment Report for the Post-Authorisation Measure LEG 036, at 13 (XARELTO_JANSSEN_15368523) (Exhibit 12); EU Product Information for Xarelto (June 2016) (http://www.ema.europa.eu/docs/en_GB/document_library/EPAR__Product_Information/human/000944/WC500057108.pdf).

The FDA itself found the European label germane to its investigation, and requested a copy of the European label on August 7, 2008, with a European Final Summary of Product Characteristics on August 11, 2008, and Defendants Foreign Labeling Questions on November 9, 2010.[15]

Truthful and accurate evidence of the Defendants' knowledge about PT Neoplastin testing is admissible to reveal the Defendants' state of mind, and their knowledge about the usefulness of the test. While the same evidence reflects foreign regulatory agency or action, the material is not being introduced to have one regulatory action compete against another. Rather, the evidence demonstrates notice and reveals the breadth of Defendants' knowledge regarding the usefulness of PT Neoplastin to determine anticoagulant activity in Xarelto patients.

### III.   ARGUMENT

In its Order and Reasons of April 18, 2017 (Rec. Doc. 6254), this Court held in reserve its ruling on Defendants' Motion in Limine to Exclude Evidence of Foreign Labeling and Regulatory Actions filed in the *Boudreaux* matter.[16] At trial, however, the Court sustained objections by the Defendants when Plaintiffs sought to introduce evidence demonstrating the Defendants' knowledge about the use of PT Neoplastin.[17] That ruling should not be applied here.

In this case, the evidence of foreign labeling and foreign regulatory actions that Plaintiffs intend to introduce at trial are intended to prove that the Defendants knew how to instruct prescribers about Neoplastin PT testing to evaluate the anticoagulant effect of Xarelto in patients. Such state-of-mind evidence is admissible even if it embraces the ultimate question at issue. *See,*

---

[15] Brief Description of Significant Activities Undertaken by Applicant during the Regulatory Review Period. XARELTO_JANSSEN_06628658 (Exhibit 13).

[16] Plaintiffs incorporate by reference the argument set forth in Plaintiff *Boudreaux's* response to Defendants' Motion in Limine No. 3 (Rec. Doc. 6169).

[17] Ex. 2, *Boudreaux* Tr. 5/3/17 at 1600:9-1600:16.

6

*e.g., United States v. Dozier*, 672 F.2d 531, 542-43 (5th Cir. 1982). Moreover, district courts routinely permit the admission into evidence of foreign regulatory materials.

For example, Judge Herndon in *Yaz* denied a similar in limine motion filed by Bayer to preclude foreign regulatory materials explaining that:

> [w]hile the regulatory actions of European Medical regulators are not binding on the FDA . . . <u>the full body of knowledge including the foreign regulatory process that came to bear on the drugs at issue and which were well within the notice and knowledge of Bayer is admissible</u> as part of the fabric of how these drugs came to the United States market and whether all the information which should have been utilized in doing so was utilized. Such evidence is clearly probative and that value outweighs the prejudice to Bayer.

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *2 (S.D. Ill., Dec. 22, 2011) (emphasis added).

Similarly, in *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 318 (W.D. Ky. 2011) and *In re Levaquin Prod. Liab. Litig.,* No. 08-1943 JRT, 2010 WL 4676973, at *5 (D. Minn. Nov. 9, 2010), the courts recognized that foreign regulatory materials are relevant to demonstrate the drug manufacturer's knowledge, notice and/or motive. *See also In re Tylenol (Acetaminophen) Mktg., Sales Practices & Products Liab. Litig.*, 181 F.Supp.3d 278, 307 (E.D. Pa. 2016) (agreeing with plaintiff that foreign labels on the defendants' products, warning of the risk of "severe or possibly fatal liver damage" before the decedent's death are evidence of the defendants' knowledge of potential risks related to their products).

Most recently, and after the *Boudreaux* trial concluded, the court in *In re Testosterone Replacement Therapy Prod. Liab. Litig.* No. 14 C 1748, MDL 2545, at 30-31 (N.D. Ill., May 8, 2017), refused to disregard an analysis by Health Canada rejecting the AbbVie's argument that the analysis was based on "a different label, under a different regulatory regime, in a different country." *Id.* at 30. The court recognized that "the analysis is not being used to dispute the

adequacy of AbbVie's FDA-approved labels. Plaintiffs offer the analysis to show only that the scientific community agreed that more testing was required to determine whether drugs such as AndroGel increased the risk of cardiovascular injury." *Id.* at 31.

Plaintiff Orr's objective in introducing the Canadian Monograph label is to show Defendants' knowledge of, and prior instructions regarding, the utility of PT in evaluating a Xarelto patient's anticoagulant activity. This evidence tends to establish that Defendants not only knew that such an assessment of anticoagulation may be appropriate, but that they also made a conscious choice to deprive United States patients and physicians of the instructions they needed to safely use Xarelto, even as such information was being provided to patients in Canada and elsewhere. This evidence is relevant and admissible to establish Defendants' knowledge, state of mind and conscious disregard of an adequate label, all of which are directly related to Plaintiffs' claims.

The evidence will also be useful to rebut Defendants' arguments that "no government or medical association has concluded that monitoring should be used in the normal course of Xarelto therapy,"[18] and that "Plaintiffs' monitoring opinions have not been accepted in the scientific community,"[19] and "have not been subject to peer review and publication."[20] Although Plaintiffs

---

[18]Rec. Doc. 5113 at 9. Ex. 2, *Boudreaux* Tr. 5/13/17 at 1600:5-1600:10 (defense during summation "… Medical associations, you didn't hear them cite a single medical association that says this test should be used, or a peer-reviewed publication that says this test should be used. Now, why is that? Because in the outside --outside of this courtroom, nobody thinks this test works.").

[19]*Id.* and Rec. Doc. 5113 at 16.

[20]Rec. Doc. 5113 at 17. During summation, defense counsel attacked plaintiff's expert Dr. Lessinger:

> She writes lots of articles. She speaks at lots of conferences, right? I mean, this is a woman who is accomplished in her own right. She is an advocate for her patients. If she thought this worked, why do they have no evidence of her doing anything about it outside the courtroom? I submit to you because the test -- if she went and talked to fellow doctors, like Dr. Johnson and Dr. Boniol, they would say, no, it doesn't work. She would have to be subject to **peer review**, right? That actually matters in the medical community. The reason you have **peer review** is your peers -- not us, but scientists and doctors -- are

dispute the notion that the one-time use of a PT Neoplastin test constitutes monitoring, in rebuttal, Plaintiffs plan to introduce the New Zealand and Canadian labels discussing the use of Neoplastin PT to controvert these contentions. In fact, Bayer even admits Neoplastin PT is "useful to assist in determining an excess of anticoagulant activity" in its Canadian label.

Plaintiffs also plan to rebut Defendants' defense against Plaintiffs' design defect claim that the anti-factor Xa assay is "hypothetical conceptual suggestions,"[21] by presenting evidence that Bayer's Canadian Monograph for Xarelto suggests using anti-Factor Xa assays. Plaintiffs' proposed alternative designs are "reasonably specific" and not based on mere speculation. Anti-factor Xa assays exist and proof of which is in the foreign labels, specifically the Canadian Monograph label states that in certain circumstances, it may be desirable to assess the anticoagulant effect of rivaroxaban.[22] The Monograph suggests that using anti-factor Xa assays, with rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.

Lastly, as stated above, during the cross-examination of defense expert Dr. Johnson, the Court sustained the Defendants' objection and prohibited Plaintiff from questioning her about not considering or reviewing an article published in a peer reviewed journal about the numerous international medical societies that in fact <u>recommend PT</u> as a reliable screening test in patients taking an anti-Factor Xa inhibitor, including Xarelto.[23]

---

    going to look at that article and see does it hold up. Dr. Leissinger hasn't submitted her
    theory to any of the other experts. If she did, other doctors outside this courtroom would
    say what they've been saying in here, it doesn't work.

Ex. 2, *Boudreaux* Tr. 5/13/17 at 1613:8-1613:24, emphasis added. *See also* Ex. 2*, Boudreaux* Tr. 5/13/17 at 1600:5-1600:10, n. 18 *supra.* ("…or a peer-reviewed publication that says this test should be used.").

[21]Rec. Doc 5115 at 16.

[22]*See* Ex. 7, Canadian Monograph Label, at 11.

[23]*See* n.4 *supra.*

At side-bar, defense counsel misleadingly argued that the exclusion of this evidence was justified because the international medical societies that recommend PT are somehow using "different standards" based on "foreign regulatory rules."[24] This is simply untrue. The Lippi article and the clinical practice guidelines and recommendations of the various international medical societies that are the subject of the Lippi article have nothing to do with foreign regulatory rules or foreign labels. They are all based solely on the current state of the scientific evidence about laboratory assessment of direct oral anticoagulants, regardless of foreign regulatory rules.

For example, one of the six medical associations that recommend PT as a screening tool identified in Table 3 of the Lippi article is the European Society of Cardiology (ESC). The preamble of the ECS Guidelines make clear that the guidelines summarize and evaluate the current scientific / medical evidence "with the aim of assisting physicians in selecting the best management strategy for an individual patient suffering from a given condition, taking into account the impact on outcome, as well as the risk–benefit ratio of particular diagnostic or therapeutic means."[25] The ECS specifically describes itself as being "independent non-governmental organization."[26]

At side-bar defense counsel falsely argued that the "British Committee" from Table 3 of the Lippi article was another example of a "standard that would relate to regulatory rules."[27] The "British Committee" may sound like a government body and it may sound like it involves foreign

---

[24]Ex 2, *Boudreaux* Tr. 5/2/117 at 1294:8-1294:10.

[25]*See* page 2721 of the 2012 focused update of the ESC Guidelines for the management of atrial fibrillation https://www.escardio.org/Guidelines/Clinical-Practice-Guidelines/Atrial-Fibrillation-Management.

[26]*See* page 3 of the ESC's Brochure available on the ECS website at https://www.escardio.org/static_file/Escardio/Web/About/Documents/ESC-Corporate-Brochure-2017.pdf.

[27]Ex 2, *Boudreaux* Tr. 5/2/117 at 1294:8-1294:10.

regulatory rules but it does not. Like the ESC, the British Committee for Standards in Haematology (BSH) is an association of scientists and medical professionals that publish clinical practice guidelines which are "[w]ritten by expert consultants and clinical scientists currently practising in the UK, the BSH Guidelines provide up-to-date evidence-based guidance on the diagnosis and treatment of haematological diseases."[28] Like the ESC Guidelines, the BSH Guidelines that recommend PT have nothing to do with foreign regulations or labels.[29]

Similarly, defense counsel pointed to the "Italian Committee for Standardization of Hematological and Laboratory Method" ("CISMEL") to argue that the jury would be confused because the CISMEL used "different standards" based on "foreign regulatory rules." Again, that is simply untrue. Like the other examples, the CISMEL is a medical and professional organization of scientists that considers the current state of the science and makes recommendations to clinicians in practice guidelines and scientific position papers regardless of foreign regulatory rules.[30] No jury confusion is possible when the duplicity of the Defendants' argument is stripped away.

---

[28] http://www.b-s-h.org.uk/guidelines/

[29] Baglin T, et al. *Effects on routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology*, British Journal of Haematology, 2012, 159, 427–429 (Exhibit 14).

[30] Tripodi A, Di Iorio G, Lippi G, Testa S, Manotti C., *Position paper on laboratory testing for patients taking new oral anticoagulants. Consensus document of FCSA, SIMeL, SIBioC and CISMEL.* Clin Chem Lab Med 2012; 50:2137-4. (Exhibit 15).

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs should be permitted to introduce evidence of Defendants' knowledge about the usefulness of PT Neoplastin as expressed in their own otherwise admissible documents and medical literature.[31]

Dated:  May 12, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
PH:  (504) 581-4892
FAX:  (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email:  gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

---

[31] If the Court is inclined prohibit the introduction of relevant evidence of international guidelines, foreign labeling and/or foreign medical associations, then on balance Defendants should similarly be prohibited from introducing evidence from any medical associations, foreign or domestic. The prejudice of this evidence to the plaintiffs far outweighs its probity.  See Fed.R.Evid. 403.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 12, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**