# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO                  *
(RIVAROXABAN) PRODUCTS           *
LIABILITY LITIGATION             *
                                 *
THIS DOCUMENT RELATES TO:        *   Docket No.: 14-MD-2592
                                 *   Section "L"
Joseph J. Boudreaux, Jr.         *   New Orleans, Louisiana
v. Janssen Research &            *   May 1, 2017
Development, et. Al.,            *
Case No.: 14-CV-2720             *
* * * * * * * * * * * * * * *

                    DAY 6, MORNING SESSION
           TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs':
Liaison Counsel:                 Levin Papantonio
                                 BY:  BRIAN H. BARR, ESQ.
                                 316 South Baylen Street, Suite 600
                                 Pensacola, Florida  32502
                                 Herman, Herman & Katz, LLC
                                 BY:  LEONARD A. DAVIS, ESQ.
                                 820 O'Keefe Avenue
                                 New Orleans, LA  70113

                                 Beasley Allen
                                 BY:  ANDY BIRCHFIELD, ESQ.
                                 P.O. Box 4160
                                 Montgomery, Alabama 36103
                                 Gainsburg Benjamin David
                                   Meunier & Warshauer
                                 BY:  GERALD E. MEUNIER, ESQ.
                                 2800 Energy Centre
                                 1100 Poydras Street
                                 New Orleans, Louisiana 70163

1    50 milliliters per minute, that's -- that's close to normal.
2    Normal is about 60, but 50 is close to normal.
3          If you're between 15 and 50, then you have a lower
4    filtering capability through your kidney.  And since Xarelto is
5    filtered through your kidney, then you would have to change the
6    dose because, otherwise, you're not getting rid of it through
7    the filter as fast.
8    Q.  And down at 5.4, what does that tell a physician about
9    whether certain patients can't tolerate or shouldn't be
10   prescribed Xarelto?
11   A.  All right.  So patients that have creatinine clearance,
12   again that's CrCl, less than 15 milliliters per minute should
13   not even be on the drug.  So that excludes anyone on
14   hemodialysis.  If we have a hemodialysis patient, they
15   cannot go on this medication.
16   Q.  Did Doctor Wong ensure that those tests were done on
17   Mr. Boudreaux?
18   A.  He did.
19   Q.  On multiple occasions?
20   A.  He did.
21   Q.  Did you review those medical records?
22   A.  I did.
23   Q.  And are they summarized on a summary chart you made to
24   show the jury --
25   A.  Yes.

1    Q.  -- the results?
2          MS. WILKINSON:  All right.  Your Honor, we would move
3    in DX JB18, which is the basis for this.
4          MR. DENTON:  No objection to that.
5          THE COURT:  Let it be admitted.
6          (Whereupon Defense Exhibit Number JB18 was
7          admitted into evidence.)
8    BY MS. WILKINSON:
9    Q.  Let's take a look at that.  Tell the jury what this shows.
10   A.  So if you remember, Mr. -- all of this started in early
11   January of 2014, so you can see he has a creatinine function
12   done the first day he comes to the hospital, and that's greater
13   than 60.  So that's normal.
14         He has another one done the second day.  Again,
15   normal.  He's been started on Xarelto.
16         He comes back to the clinic.  He has another one done
17   when he goes to the hospital, and it's 54.  So it's still
18   greater than 50.  And so all of those combined would tell you
19   that you want to be on the 20-milligram dose a day.
20   Q.  Was that the dose that Doctor Wong prescribed for
21   Mr. Boudreaux?
22   A.  It is.
23   Q.  In your opinion, is the creatinine clearance test that's
24   clearly stated in the label helpful to you as a practicing and
25   prescribing physician?

1    A.  Yes, it's necessary.
2    Q.  Does it provide you real information that you can use to
3    make determinations about what's appropriate for a particular
4    patient?
5    A.  Yes.
6    Q.  And we'll get to this in more detail, but in contrast, is
7    the Neoplastin PT test that Doctor Leissinger and plaintiffs
8    are advocating for, is that a helpful test that would provide
9    you any meaningful or useful information as a practicing or
10   prescribing physician?
11         MR. DENTON:  Your Honor, we're getting into
12   substance, and this is leading testimony -- or leading
13   question, testimony of counsel.  I object.
14         THE COURT:  An expert can comment on other people's
15   testimony; other witnesses cannot.  But in giving an opinion,
16   an expert witness can do so.  Let's get to a point, and we'll
17   take a break now.
18         MS. WILKINSON:  Yes, Your Honor.
19         THE WITNESS:  So I do not feel that the Neoplastin PT
20   test is necessary or needed in order to start a patient safely
21   on Xarelto.
22         MS. WILKINSON:  And after the break, can you explain
23   that in more detail to the jury?
24         THE WITNESS:  I can.
25         THE COURT:  Let's take a 15-minute break.

1          (Whereupon the jury was excused from the courtroom.)
2                 (Recess.)
3          (Whereupon the jury entered the courtroom.)
4          THE COURT:  Okay.  Be seated, please.
5            You're still under oath, Doctor.
6            You may proceed, Counsel.
7          MS. WILKINSON:  Thank you, Your Honor.
8    BY MS. WILKINSON:
9    Q.  Welcome back.
10   A.  Thank you.
11   Q.  You were telling the jury about this specific test that's
12   in the label that was performed on Mr. Boudreaux; right?
13   A.  Yes.
14   Q.  Before we get into some of the details about PT tests and
15   your feelings -- your opinion as you were describing earlier
16   that it's not helpful, can we just finish talking about what
17   happened to Mr. Boudreaux in this particular case?
18   A.  Sure.
19   Q.  Okay.  After Mr. Boudreaux was on Xarelto in February
20   2014, did he report to his physician that he had signs that
21   were later determined to be a gastrointestinal bleed?
22   A.  Yes.
23   Q.  After that happened, he was taken off some of his
24   medications; right?
25   A.  Yes.

Page 1240

1   A.  Yes.
2   Q.  Do you agree or disagree with that?
3   A.  I disagree with that.
4   Q.  She said that it could provide useful or helpful
5   information to doctors for individual patients.
6        Do you agree or disagree with that?
7   A.  I don't agree with that.
8   Q.  All right.  In your opinion, did Doctor Leissinger provide
9   any specific information that you, as a prescribing physician,
10  would need to make the test helpful for your treatment of an
11  individual patient?
12  A.  No.  I -- I do not use this test in order to dose any form
13  of anticoagulant other than Coumadin.
14  Q.  Have you seen any information in Doctor Leissinger's
15  report or her testimony that suggests how you would actually
16  use this with a particular patient?
17  A.  No.
18  Q.  Did she give you any cutoff levels for example?
19  A.  No.
20  Q.  So tell the jury what you mean.  I mean, if someone came
21  in and they had a PT score of 12 and another one had a 20, did
22  Doctor Leissinger tell you which one of those patients you
23  should take off Xarelto?
24  A.  No.
25  Q.  Do you have any idea what -- if there's any significance

Page 1241

1   to those particular numbers?
2   A.  No.  Because if you think about it, the person at 12 may
3   be older, heavier, on aspirin, and not taking something to
4   protect them from an ulcer.  All things that increase your risk
5   of bleeding.
6        And the person that has the PT level around 16 or 18
7   may be younger, may not be on aspirin, may have a lower BMI or
8   lower weight, and may be on an ulcer-protective medicine.  So
9   their risk goes down.
10       So this test actually doesn't help me with helping a
11  patient let them know what I think their risk factor is for a
12  bleeding.
13  Q.  Did Doctor Leissinger suggest when you should administer
14  this PT test for a Xarelto patient so that the test would be
15  useful or helpful?
16  A.  No.
17  Q.  Would it matter when you administer the test?
18  A.  Yes, it would matter a great deal.
19  Q.  Why?
20  A.  So the reason this test is so useful in patients on
21  Coumadin is because the effect of Coumadin lasts for days.
22  Okay?  So if I test you, let's say you take -- you've been
23  taking Coumadin and let's say you come in and we need to do a
24  procedure.  And I test you on day 1, and I get an INR.  I do
25  nothing to you.  I don't give you vitamin K.  I don't give you

Page 1242

1   anything to reverse the warfarin.  I do nothing.  I just let
2   your body work on its own.
3        In 24 hours I take it again.  It's going to be the
4   very same thing because Coumadin's effects last for days, lasts
5   for about three days.  So it doesn't matter to us as much when
6   we test it because there's not that much difference over the
7   course of 12 hours, 24 hours.
8        But unfortunately as I'm sure you have seen, these
9   novel oral anticoagulants start -- they peak around two to four
10  hours.  That's when you have your highest level.  And then over
11  the next 24 hours they start going down.  So this test, you
12  have to know where you are on that curve.
13       And then in addition to that, you have to -- like the
14  test almost takes -- I mean, I hate to say in most hospitals
15  this test takes about an hour to come back.  Sometimes it can
16  take longer.
17       So by the time you get the test back, it's not even
18  the level it is now because now another hour or two hours has
19  gone by.  So it's not a great test to use in a drug that is
20  gotten out of your body quicker than something like warfarin.
21  Q.  In your opinion, if you relied on a Neoplastin PT test
22  with a new Xarelto patient, could it provide misleading
23  information to a physician?
24  A.  Yes.
25  Q.  How?

Page 1243

1   A.  So one of the things that's been well-established is that
2   as you get lower doses of Xarelto in your system, meaning a
3   lower concentration of your drug, the PT test is -- does not
4   correlate.
5        So what that means is you could have a 100 percent
6   normal measurement and you still have active drug in your
7   system.  The test cannot help you with that.
8        So that means if you're trying to say, oh, you know,
9   I don't remember the last time I took the drug.  So I think
10  okay.  Let me check the PT.  So I check the PT and it's normal.
11  And I say, "Oh, you're fine to go to surgery," and you go to
12  surgery and the surgeon is calling me going, "This person is
13  bleeding all over the place" and I'm like -- because this does
14  not reflect concentrations when you're at the lower end of the
15  scale.  So you can't use this test in that way.  So you could
16  maybe hurt someone if you went off of that.
17  Q.  Do you use this Neoplastin PT test with any of your
18  Xarelto patients?
19  A.  No.
20  Q.  Are you aware of any cardiologist who uses this
21  Neoplastin PT test with Xarelto patients?
22  A.  Not in my group, no, not in Tulane.
23  Q.  Are you aware of any specific medical literature that
24  recommends using this test, Neoplastin PT test, upon initiation
25  of Xarelto with that patient?

1    DOAC is another word for novel -- it's a direct or novel oral
2    anticoagulant -- plasma concentrations and the PT prothrombin
3    test or an -- that's another test they looked at, another
4    plotting test -- highlighting that a normal test result is not
5    always associated with the absence or minimal residual
6    concentration of the drugs.
7    Q.  And then what do they say about whether this is a useful
8    test or a harmful test at this point?
9    A.  So their feeling on doing this study was -- they say,
10   "This aspect represents a clinical problem" -- so a problem for
11   doctors -- "because of the risk of misinterpretation, which may
12   endanger patients."
13          Because we may say you have a normal PT, you're free
14   and clear of Xarelto, and that's just not true.  So that's why
15   it can be a danger to misrepresent what the relationship is.
16   Q.  Do they give an example similar to the one that you gave
17   the jury about you could be wrong about putting a patient into
18   surgery because they might be on an anticoagulant and they
19   could --
20   A.  Yeah.
21   Q.  -- bleed?
22   A.  Yeah.  They gave two examples.  They gave one.  They said,
23   as an example, a patient presents with a normal test, could be
24   wrongly, erroneously considered to be safe for surgery.  That's
25   the one I talked about.

1          And then they gave the contrasting one, which is that
2    surgery, a necessary surgery, could be postponed or
3    contraindication in a patient showing a prolonged PT, when, if
4    we look at this, you can see that patients that have known no
5    drug in their system can have a prolonged PT.  So it works in
6    both ways.
7    Q.  Is this the only article that you've come across that says
8    that doing this type of PT test could be misinterpreted or
9    harmful to patients?
10   A.  No.
11   Q.  I believe we already talked about this with the jury, but
12   generally, the Eikelboom journal article that came out more
13   recently, does that come to a similar conclusion?
14   A.  It does.
15   Q.  In the Xarelto label, is there a mention of the PT test?
16   A.  Yes.
17   Q.  And are you familiar with that section of the label?
18   A.  Yes.
19   Q.  Let's take a look at Slide Number 34, if we could,
20   Section 12.2 of the label.  What's this titled?
21   A.  It's called pharmacodynamics or, as we've abbreviated
22   before, PD.
23   Q.  Okay.  Let me read this, and then maybe you can explain to
24   us what this says.
25         "Dose-dependent inhibition of Factor Xa activity was

1    observed in humans and the neoplastic prothrombin time" --
2    let's stop there.
3          What does that mean to you as a physician?
4    A.  So just exactly what that chart showed you was that on
5    average -- not per individual, on average -- if you had a
6    higher concentration of Xarelto in your system, on average your
7    PT was higher.
8          Remember that line?  So it does mean that.  That's
9    exactly what it means.
10   Q.  So did the companies tell physicians in the label what
11   they believed about the Neoplastin PT test and what it showed?
12   A.  Yes.
13   Q.  Go on to the next sentence.  It says, "The activated
14   partial thromboplastin time, aPTT, and HepTest, are prolonged
15   dose-dependently."
16          What does that mean?
17   A.  So those are two other clotting tests that we can do, and
18   it's saying really the same thing for those, that if we show
19   you the research on that, they also have that same kind of, you
20   know, look where it gets higher as you have a higher
21   concentration on average.
22   Q.  "Finally, anti-Factor Xa activity is also influenced by
23   rivaroxaban."
24          What does that mean?
25   A.  So Factor Xa is the protein that rivaroxaban and Eliquis

1    and Savaysa blocks in the formation of a clot.  So it's saying
2    that the activity of that protein is influenced by the drug, as
3    you would think that's how the drug works.
4    Q.  Doctor, in your expert opinion, does the Xarelto label
5    accurately reflect what is known about the Neoplastin PT test?
6    A.  Yes.
7    Q.  In your opinion, would it be appropriate to include a
8    recommendation to doctors to use a PT thrombo-- excuse me -- a
9    Neoplastin PT test to try to determine the risk for a
10   particular patient?
11   A.  No, it should not be used.
12   Q.  Now, did you take a look at Doctor Leissinger's testimony
13   where she said the 13.6 PT test used with Innovin was useful
14   information for Mr. Boudreaux and his treatment?
15   A.  I did see that.
16   Q.  Did you see Doctor Wong's testimony where he said he did
17   not believe it was useful?
18   A.  I did see that.
19   Q.  Who do you agree with?
20   A.  I agree with Doctor Wong.
21   Q.  All right.  Did you go back and take a look at some of the
22   ROCKET data to see if the calculation Doctor Leissinger told
23   the jury about, how you could -- I don't even know what you
24   call it -- look back and determine the concentration, did you
25   try to see if that could be done even if you believed the PT

1  Q. All right. The label print is quite small; right?
2  A. Yes.
3  Q. You asked us to blow it up. And walk us through here the
4  summary and explanation, what it says to you as a physician,
5  that the Neoplastin PT test should be used for?
6  A. So, as we stated it -- I'm sure Doctor Leissinger stated
7  very well as well -- that it's used for the ones that are
8  congenital or acquired. Those are the ones you're born with,
9  those are genetic conditions, so you don't produce those
10 factors.
11       There's the next one saying if your liver doesn't
12 work as well, it can help us with that.
13       And then the third one is treatment with a vitamin K
14 antagonist. That's Coumadin. That's warfarin.
15       And then the next one, of course, vitamin deficiency
16 because some people don't actually eat enough vitamin K and
17 they can have poor clotting because of that.
18       And then the last two are -- so fibrinolysis is
19 another type of medicine we give to people to break up a clot.
20 You already have the clot, and we give it to you, and it forces
21 the clot apart.
22       And then DIC is disseminated coagulopathy. So it's
23 actually a state where your coagulation is going completely out
24 of whack, and it's usually in extremely ill patients, usually
25 patients who are having an overwhelming infection that ends up

1  with the disease called DIC.
2       So those are the things the PT test -- the Neoplastin
3  PT test is used to measure.
4  Q. Does the label tell you specifically what the PT test is
5  used for in a monitoring context?
6  A. Yes.
7  Q. What does it say?
8  A. So the PT test, which is the basis for what you might have
9  heard is called the INR, is used for monitoring vitamin K
10 antagonist therapy. So that's your Coumadin therapy. It is
11 the standard of how we measure Coumadin.
12 Q. You can take that down. Thank you.
13       Doctor Johnson, I just want to finish up with a few
14 questions, if I could.
15       You told us that you had never testified as an expert
16 in a case before today; is that right?
17 A. That's correct.
18 Q. Why are you here today?
19 A. It is -- for me, it is very hard to have a patient come in
20 to see me who has atrial fibrillation, who says that they're
21 not going to take a recommended therapy -- and I don't mean
22 Xarelto; I mean any systemic oral anticoagulant -- because
23 they've seen a commercial on TV.
24 Q. Doctor -- Doctor, can I stop you there?
25 A. Oh, yes.

1  Q. Let's talk specifically about the drug, if we could.
2  A. Sure. So --
3  Q. Is -- is there a problem if someone goes off the drug?
4       MR. MEUNIER: May we approach the bench, Your Honor?
5       THE COURT: Okay.
6       (Whereupon the following proceedings were held at the
7       bench out of the hearing of the jury:)
8       MR. MEUNIER: Your Honor, I would submit that that
9  testimony was one that was intended in response to the
10 question, but the testimony needs to be disregarded by the
11 jury; that she's seen patients that come in and say they don't
12 want Xarelto because of lawyer advertising.
13       THE COURT: She didn't say Xarelto. She said
14 something I saw on TV.
15       MS. WILKINSON: And I tried to stop her. I'll --
16 I'll move on to the next point so we don't even have to go back
17 over that.
18       MR. MEUNIER: We'd just ask the Court to --
19       THE COURT: I can tell them.
20       MR. MEUNIER: -- tell the jury to disregard it.
21       THE COURT: I can tell them to do that.
22       MS. WILKINSON: Sure.
23       (Whereupon the following proceedings were held in
24       open court in the presence and hearing of the jury:)
25       THE COURT: Okay. Members of the jury, just -- so

1  that -- disregard any comment about TV. That's not an issue
2  here. Okay?
3  BY MS. WILKINSON:
4  Q. Doctor Johnson, that's okay. We just want to talk about
5  you and your patients. Okay?
6       So is there a concern if patients go off their
7  medication like Xarelto or another anticoagulant?
8  A. Yes.
9  Q. What is the concern?
10 A. So in -- in the past, and I -- I like to use patient
11 examples, because it makes it very real to me. I've had
12 patients that have gone off their anticoagulant and then
13 suffered a disabling stroke.
14 Q. Now, would you want to know, as a prescribing physician,
15 if there was a test that you could do with a Xarelto patient
16 that would show you whether that person, that particular
17 person, was at a higher risk of bleeding?
18 A. Yes.
19 Q. You've read all these materials. You've read all this --
20 you've heard all this testimony or read all this testimony.
21       Do you believe, in your expert opinion, that the
22 Neoplastin PT test that plaintiffs have described for the jury
23 is an appropriate and useful test for physicians to prescribe
24 Xarelto for AFib?
25 A. I do not feel like the Neoplastin PT test is useful for

Page 1264

1    physicians prescribing Xarelto.
2    **Q.  Do you use it in your own practice?**
3    A.  I do not.
4    **Q.  Did you see where Doctor Leissinger used it in her own**
5    **practice?**
6    A.  She did not say so, no.
7    **Q.  And from all the testimony that you read, is there**
8    **anything that has caused you to change your opinion that the**
9    **Neoplastin PT test is not a helpful test for prescribers who**
10   **are treating patients with AFib?**
11   A.  So say that one more time.
12   **Q.  Is there anything that you've heard or read, came out**
13   **through the plaintiffs' case or their experts, that causes you**
14   **to change your opinion about the PT test?**
15   A.  No, there has not been.
16   **Q.  Finally, then, in your opinion, should the Neoplastin PT**
17   **test be included in the Xarelto label?**
18   A.  Not beyond what is already stated in the label.
19        MS. WILKINSON:  Thank you very much, Doctor.
20        THE COURT:  Okay.  Let's stop here.  We'll come back
21   at 1:15.  Court will stand in recess until then.
22        THE CASE MANAGER:  All rise.
23        (Whereupon the jury was excused from the courtroom.)
24            (Lunch Recess.)
25

Page 1266

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1265

1            CERTIFICATE
2        I, Tana J. Hess, CCR, FCRR, Official Court Reporter
3    for the United States District Court, Eastern District of
4    Louisiana, certify that the foregoing is a true and correct
5    transcript, to the best of my ability and understanding, from
6    the record of proceedings in the above-entitled matter.
7
8
9        _____
10        Tana J. Hess, CCR, FCRR, RMR
            Official Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


*****************************************************************

IN RE:  XARELTO
(RIVAROXABAN) PRODUCTS
LIABILITY LITIGATION

                              CIVIL ACTION NO. 14-MD-2592
                              SECTION "L"
                              NEW ORLEANS, LOUISIANA
                              MONDAY, MAY 1, 2017
THIS DOCUMENT RELATES TO:
Joseph J. Boudreaux, Jr.
V. Janssen Research &
Development, et. al.,
Case No.:  14-CV-2720
*****************************************************************

VOLUME VI - AFTERNOON SESSION
TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:              LEVIN PAPANTONIO THOMAS MITCHELL
                              RAFFERTY & PROCTOR
                              BY:  BRIAN H. BARR, ESQ.
                              316 SOUTH BAYLEN STREET, SUITE 600
                              PENSACOLA, FLORIDA 32502



                              BEASLEY ALLEN CROW METHVIN
                              PORTIS & MILES
                              BY:  ANTHONY BIRCHFIELD JR., ESQ.
                              POST OFFICE BOX 4160
                              MONTGOMERY, ALABAMA  36103

Page 1287

1    MR. DENTON:  I'm just trying to see if she's fighting
2  me on causation.
3    THE COURT:  Do you agree with that?
4    THE WITNESS:  I do, Your Honor.
5    THE COURT:  She agrees.
6    MR. DENTON:  Good.  Then we can move on from that.
7  EXAMINATION BY MR. DENTON:
8  Q.  So let's talk about your literature search about Xarelto.
9  Tell us what you did.
10  A.  So when I was tasked with looking into this, I went myself
11  and performed a literature search.  So we have search engines
12  that we as physicians commonly use.  The most common one is
13  called PubMed, and it's by the National Heart, Lung and
14  Bleeding Institute.  It's a government research -- a big
15  research for medicine.  And they have a way of searching the
16  medical literature in order for us to find studies and even
17  reviews, commentaries, anything on a certain topic.
18  Q.  Okay.  And that's what you did here?
19  A.  That is, and used, of course, things that I had read just
20  in my normal day-to-day practice of medicine.
21  Q.  You went out and did a medical literature search?
22  A.  I did, sir.
23  Q.  You said you've never done this before.  So how is it that
24  the lawyers for these companies found you?
25  A.  Well, like any -- I would say like most practicing

Page 1288

1  physicians, I had received some calls from lawyers asking to
2  meet with me, and I ignored those calls because I enjoy the
3  practice of medicine, not law.  And it wasn't until the general
4  counsel of Tulane called me, so that's like the head lawyer for
5  Tulane University, called me and asked me to meet with these
6  lawyers that I did, because I don't typically prefer -- I
7  prefer to take care of patients.
8  Q.  And the lawyers that the general counsel at Tulane asked
9  you to work with were the lawyers representing Bayer and
10  Janssen in this case?
11  A.  They just asked me to meet with them.  That's all they
12  asked me to do.
13  Q.  But then you found out that those lawyers represented the
14  drug companies?
15  A.  Well, I didn't know even then.  I met with the lawyers and
16  they asked me a lot of questions about my clinical practice,
17  which I answered, and then it was after that when they
18  contacted me again to say they would like to talk with me more
19  that they explained what they were doing and who they were
20  representing.
21  Q.  Okay.  So -- but the general counsel of the university
22  told you to meet with the company lawyers -- the drug company
23  lawyers and you did that?  That's how this all started?
24  A.  She asked me to give them a call back, to respond to their
25  phone calls.

Page 1289

1  Q.  How many of the Bayer lawyers have you met and Janssen
2  lawyers have you met?
3  A.  I don't know, sir.
4  Q.  Well, there was three or four at your first deposition,
5  correct?
6  A.  It was in November.  I don't remember how many were there.
7  I'm sorry.
8  Q.  Okay.  But it was more than one or two.
9  A.  Okay.
10  Q.  And then in your January deposition about Mr. Boudreaux,
11  there was more than that, right?
12  A.  Again, I don't remember.  I'm sorry.
13  Q.  Don't be sorry.  I'm just trying to get the facts.
14    So let's go back to your literature search.  I want
15  to show you an article, record 5767884.  I'll provide you a
16  copy.
17  A.  Thank you, sir.
18  Q.  You're welcome.
19    I'm interested about this article based on your last
20  answer.  Let's go to page 7.
21    Can we call that up, please?
22    Down here at the bottom, it's talking about Recent
23  guidelines and recommendations for laboratory assessment of
24  DOACs, right?  That would include Xarelto.
25  A.  Yes, sir.

Page 1290

1  Q.  And what they report in this article:
2    "To provide a comprehensive picture of national and
3  international guidelines on...routine measurement of DOACs, we
4  performed a systematic search using...three mostly accessed
5  scientific databases, MEDLINE, Scopus, and Web of Science...."
6    Right?
7  A.  Yes, sir.
8  Q.  That's what you did?
9  A.  Yes, sir.
10  Q.  Something like that, right?
11  A.  Yeah.  I mostly used MEDLINE, which is the PubMed.
12  Q.  Okay.  So you used MEDLINE, right?
13  A.  Uh-huh (affirmative response).
14  Q.  Let's go to the next page.  And they even tell us some key
15  words they used, for guidelines, recommendations, etcetera.
16  It's kind of like a Google search, right, only it's in medical
17  literature?
18  A.  Yes.
19  Q.  All right.  And then they go on to say they retrieved
20  125...total number of the 135 were excluded for a lot of
21  different reasons, and they finally selected what they thought
22  was representative in Table 3, correct?
23  A.  Correct.
24  Q.  And let's go down to Table 3.  It says, Summary of
25  national and international recommendations regarding urgent and

1   routine assessment of DOACs.  Do you see that?
2   A.  I do.
3   Q.  And, first of all, there's Screening, right?
4   A.  Uh-huh (affirmative response).
5   Q.  That's what we're talking about in this case, screening
6   out the high-risk patients, right?
7   A.  I would have to look at what their definition of screening
8   was again.
9   Q.  And we're talking about anti-Factor Xa drugs.  That would
10  include Xarelto, right?
11  A.  Yes, it would.
12  Q.  And what the national and international recommendation for
13  screening for Factor Xa drugs was PT.  Do you see that?
14  A.  Well, some are non -- some are not applicable, some are
15  PT.
16  Q.  Right.  And let's go back up to the text.  Let's go back
17  to the main article.  Let's go to this text, "Regarding
18  Factor Xa inhibitors, the PT was proposed as a reliable
19  screening test" --
20       Could you please underline screening test?
21       -- "in patients taking these drugs in six out of
22  seven guidelines...."
23       These are the international and national guidelines,
24  correct?  That's what this article says.
25  A.  Those are mostly international guidelines, so mostly

1   guidelines outside of the United States.
2   Q.  So -- but my point is, did you look at this literature?
3   A.  Did I look at this study?  I would have to review and see
4   if I looked at this -- at this opinion paper.
5   Q.  Right.  Because I didn't see it on your list.
6   A.  It may not have been.  I'm happy to look at it now, if you
7   would like me to.
8   Q.  Okay.  Let's look at some of these organizations that are
9   in Table 3.  That's go back to Table 3.
10       ISTH, you know what that is, don't you?
11  International -- do you know what it is?
12  A.  The ISTH, it's another international society.
13  Q.  On thrombosis and haemostasis.
14       MS. WILKINSON:  Your Honor, I'm going to object to
15  relevance in discussing the international.  I thought we were
16  focused on the United States.  This is irrelevant.
17       MR. DENTON:  Why is this irrelevant?
18  EXAMINATION BY MR. DENTON:
19  Q.  Is Xarelto different in Europe than it is here?
20  A.  There are --
21       MS. WILKINSON:  Your Honor, can we go sidebar because
22  the answer is --
23       THE COURT:  Let me see both of you all.
24       (WHEREUPON, at this point in the proceedings, there was
25  a conference held at the bench.)

1        MS. WILKINSON:  Your Honor, we have not had -- you had
2   ruled generally that the international labels and foreign
3   labels were not admissible subject to some change in the
4   evidence.
5        The problem with introducing international
6   standards is, internationally some countries, their regulatory
7   agents have approved of anti-FXa assays that tend to -- those
8   are not approved here in the United States.  So suggesting that
9   there is a different standard and there is approval would be
10  misleading and prejudicial to the jury.
11       MR. DENTON:  Your Honor, this isn't about labelings.
12  This is about the various societies that Dr. Leissinger
13  testified about, and a lot of the articles that they even cite.
14  They cited foreign articles, too, for the science.  We're
15  talking about the science.  We're not talking about labels.
16       These are professional organizations that have
17  looked at the literature and provided that PT is a reasonable
18  recommendation.  There is also national standards here.  It's
19  just not international.
20       THE COURT:  If it has anything to do with labeling,
21  then it's not going to be admissible because we're talking
22  about labeling in the United States and it's different
23  standards.
24       Now, I don't know, this is the first time I'm
25  seeing this article, but if that is what we're talking about,

1   let's go to something else.
2        MS. WILKINSON:  Your Honor, it does call out on the
3   same page, page 8 of the document, all these international
4   societies, so they would have different standards.
5        As you can see, it talks about, for example, the
6   Australian Society of Thrombosis and Hemostasis, the British
7   Committee, the Italian Committee for Standardization of
8   Hematological and Laboratory Methods.  All those standards
9   would relate to what the regulatory rules are, and that's why
10  it would be confusing and misleading.
11       THE COURT:  I think this would be confusing.  It's a
12  403, not a 401.
13       MR. DENTON:  I'll move on, Your Honor.
14       THE COURT:  Let's move on to something else.
15       (WHEREUPON, at this point in the proceedings, the bench
16  conference concluded.)
17  EXAMINATION BY MR. DENTON:
18  Q.  Doctor, I forgot to ask, how much are you charging here
19  today for you testimony?
20  A.  I charge about a thousand dollars an hour to be here
21  because I'm missing work.
22  Q.  Okay.  In the materials you reviewed, as I understand it,
23  you have looked at no internal company documents from the drug
24  companies?
25  A.  No, I did not.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**************************************************************

IN RE:  XARELTO
(RIVAROXABAN) PRODUCTS
LIABILITY LITIGATION

                       CIVIL ACTION NO. 14-MD-2592
                       SECTION "L"
                       NEW ORLEANS, LOUISIANA
                       WEDNESDAY, MAY 3, 2017
THIS DOCUMENT RELATES TO:
Joseph J. Boudreaux, Jr.
V. Janssen Research &
Development, et. al.,
Case No.:  14-CV-2720

**************************************************************

VOLUME VIII - MORNING AND AFTERNOON SESSION
TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:             LEVIN PAPANTONIO THOMAS MITCHELL
                       RAFFERTY & PROCTOR
                       BY:  BRIAN H. BARR, ESQ.
                       316 SOUTH BAYLEN STREET, SUITE 600
                       PENSACOLA, FLORIDA 32502


                       BEASLEY ALLEN CROW METHVIN
                       PORTIS & MILES
                       BY:  ANTHONY BIRCHFIELD JR., ESQ.
                       POST OFFICE BOX 4160
                       MONTGOMERY, ALABAMA  36103

Page 1600

1   treat patients every day in this town.  I go to all these
2   hospitals.  See all kinds of patients.  And I think this test
3   is useless and not helpful.
4           The FDA, there is no evidence that the FDA thinks
5   this is a test that should be in the label.  Medical
6   associations, you didn't hear them cite a single medical
7   association that says this test should be used, or a
8   peer-reviewed publication that says this test should be used.
9           Now, why is that?  Because in the outside --
10  outside of this courtroom, nobody thinks this test works.  They
11  don't think it helps.  They want you to second-guess all the
12  scientists out there, all the doctors you've heard, all the
13  medical associations, all the medical literature, and they want
14  you to believe that they're the only ones that understand this
15  test and they're the only ones that want it in the label
16  because nobody else understands what the company does.
17          Well, Dr. Johnson certainly understands.  And she
18  was -- as Dr. Kessler even said, talk to a cardiologist if you
19  want to talk about AFib, because he knew he wasn't.  Well, you
20  did.  You heard from Dr. Johnson.
21          And there is a lot of things that were said, and
22  I will take one moment to address one.  I heard counsel say
23  that Dr. Johnson seemed like a very nice doctor.  She cares
24  about her patients.  But she wants specific evidence for
25  specific patients, and he said -- I wrote it down -- "That's

Page 1601

1   not how medical studies work."  Really?  He knows better than
2   Dr. Johnson how medical studies work?  I'm sorry, that is
3   condescending and insulting.
4           Dr. Johnson took time out of her practice, came
5   in here and told you all that she looked at the evidence.  She
6   looked at the FDA analysis.  She doesn't care what we think.
7   She doesn't make her medical decisions based on some internal
8   e-mail from a company, nor would you want her to if she were
9   your doctor.
10          She said, "I looked at all the science myself and
11  I knew about it before this case ever happened, and I do not
12  believe that this test is useful."  And she knows what she's
13  talking about.  She certainly knows how studies work.  She
14  reads them every day.  She relies on them when she treats
15  patients.
16          She has an incredible education.  Right?  Maybe
17  you all have met somebody like this.  I've never met somebody
18  who was an electrical engineering major, a Master's, and then a
19  doctor.  And she comes back here as the director of cardio -- I
20  can't every say it right -- electrophysiology, one of the few
21  specialists in the area and helps patients with their heart
22  rhythm.  Could there be anyone more qualified to talk to you
23  all about this particular issue?  I don't think so.  And we
24  brought her to you.
25          And she said, along with the other cardiologists

Page 1602

1   in this case, Xarelto is safe and effective.  Dr. Wong said it,
2   Dr. Fail, and Dr. Johnson.  So what's the difference?  Dr. Wong
3   and Dr. Fail, remember, were the treating physicians.  They are
4   not paid experts, but they are both cardiologists and they
5   think it's safe and effective today.  Dr. Johnson was our
6   expert, looked at all the evidence and said, Xarelto is safe
7   and effective and you do not need -- or you should not use a
8   PT test.
9           Why?  She said it doesn't predict bleeding risk
10  in individual patients.  Now, when you hear plaintiffs, they
11  just keep saying, well, it predicts bleeding risks.  Her point
12  is, "I have to know that it's going to be predictive of a
13  patient, of an individual patient."  She said it wouldn't be
14  helpful for her to treat patients using that and it could lead
15  to harmful circumstances, and she wasn't the only one who said
16  it.
17          Dr. Boniol explained why it doesn't even work,
18  because remember the factors we talked about from the beginning
19  of the case, that warfarin works on several factors, and that's
20  how the PT test is designed, to measure all of those factors?
21  And that Xarelto and the other Xa inhibitors, as they're call,
22  they don't work on anything but one factor.
23          So he says that test measures four different
24  variables and it doesn't predict who will bleed, and that's
25  what doctors want to know.  They want to know if someone

Page 1603

1   individually is at an increased risk.
2           And people who prescribe this drug every day and
3   help doctors who do, every one of them says that the PT won't
4   work for patients.  Who's under Dr. Leissinger?  Is there the
5   Journal of Cardiology, the American College of Cardiology
6   Foundation, the American Heart Association, the Heart Rhythm
7   Society?  None of those organizations, none of those people
8   support what plaintiffs are trying to tell you.
9           But I think of all the things that can make you
10  feel like what plaintiffs are saying is not proven, is even
11  their own expert, Dr. Leissinger.  She didn't come in and say
12  she uses the test herself.
13          So counsel said, well, she knows what's this the
14  company document.  She knows everything.  She's telling you
15  this.  I asked her, she does not use the test herself today.
16  It's a simple test.  It's available, as plaintiffs say.
17          Now, do I think Dr. Leissinger doesn't care about
18  her patients?  No.  Of course she cares.  Of course she cares.
19  She happens to think warfarin is the best drug.  She's used it
20  for a long time.  She's allowed to do that.  But if she thought
21  outside this courtroom that this test would really save lives
22  and help patients, why isn't she using it with her own
23  patients?  It doesn't make any sense.
24          You know, I don't usually have any big fancy
25  quotes.  But I like music and I like to dance and I like old

1   instruction, because that PT doesn't work.  It's not designed
2   to work on these drugs.  Yet plaintiffs want to convince you
3   that a PT test that was done, that Dr. Wong did see, actually
4   is useful.
5           Now, first of all, ask yourself, if it was
6   useful, Dr. Wong saw it, right?  I asked him, did this mean
7   anything to you?  He said, meaningless.  He wouldn't use this.
8   This is designed basically for Coumadin, like it says below.
9   The fact that there was a prothrombin time of 13.6 didn't mean
10  anything to him about his patient, Mr. Boudreaux.
11          But plaintiffs said, oh, it matters, except it's
12  not even the same test that we're telling you, you must have on
13  the label.  Do you remember that?  Dr. Kessler was very clear.
14  He said, the only kind of PT test that I'm advocating for is a
15  Neoplastin PT test because that's what's in the FDA and ROCKET
16  analysis.  That's what he said.  Very clear.
17          Dr. Leissinger comes in, and she says, oh -- when
18  asked -- you're right, this test here is based on an Innovin
19  PT test, but I still think it's meaningful, even though there
20  is no data to support it.  She didn't point to any graphs.
21          That's why Dr. Johnson says, his score, based on
22  that concentration, that's not what's important.  What's
23  important are his age, his weight, medicines, aspirin, all
24  those other factors.  She said, that test is meaningless.
25          So which way do these guys want?  Are they

1   saying to you that it was, I think, Neoplastin PT that they
2   want, then how in the world can Dr. Leissinger tell you that
3   that PT score means anything?  Because she, herself, doesn't
4   use it.  She has hasn't published on it.  You didn't see a
5   single article, right, from her on this.  If she thought it
6   worked, why wouldn't she be yelling it from the rooftops to her
7   fellow scientists?
8           She writes lots of articles.  She speaks at lots
9   of conferences, right?  I mean, this is a woman who is
10  accomplished in her own right.  She is an advocate for her
11  patients.  If she thought this worked, why do they have no
12  evidence of her doing anything about it outside the courtroom?
13          I submit to you because the test -- if she went
14  and talked to fellow doctors, like Dr. Johnson and Dr. Boniol,
15  they would say, no, it doesn't work.  She would have to be
16  subject to peer review, right?
17          That actually matters in the medical community.
18  The reason you have peer review is your peers -- not us, but
19  scientists and doctors -- are going to look at that article and
20  see does it hold up.
21          Dr. Leissinger hasn't submitted her theory to any
22  of the other experts.  If she did, other doctors outside this
23  courtroom would say what they've been saying in here, it
24  doesn't work.
25          Xarelto works because it prevents strokes, but

1   because it works on one factor.  It doesn't cause someone to
2   bleed.  Dr. Johnson told you that.  Dr. Fail told you that.
3   Dr. Boniol told you that.  Even Nurse Theriot told you that all
4   the things that happened to Mr. Boudreaux after he got taken
5   off his Xarelto, those things had nothing to do with the
6   Xarelto.  That LARIAT procedure was not caused by Xarelto.  The
7   cardioversion treatment was planned before he ever got off
8   Xarelto.  None of those medical issues were caused by Xarelto.
9           What Xarelto does, it doesn't cut you, it doesn't
10  open up that wound, but it does stop you from coagulating.  It
11  certainly causes a bleed in that way, right?  It raises your
12  risk of continuing to bleed.  That's what these doctors told
13  you.
14          Again, important for you to note that Dr. Fail is
15  not a paid expert, and he said Xarelto didn't cause the bleed.
16  Dr. Johnson and Dr. Boniol.
17          We get back to where this case started.  It
18  started because Dr. Wong, who knew best, knew that because of
19  Mr. Boudreaux's great risk, he needed an anticoagulant.  He
20  believed that Xarelto, despite the warnings, laid out clearly
21  in the label about the risk of bleeding, the biggest adverse
22  event, right?
23          We say over 5 percent -- which is really bigger
24  than that 97.9 chart that I showed you at 3 percent -- we say
25  the most common adverse reaction on this drug is bleeding.  We

1   say it increases the risk of bleeding and can cause serious and
2   fatal bleeding.
3           Now, again, are they really saying that we are
4   afraid to put a test in, but we'll warn you that the drug can
5   have a serious side effect, including fatalities?  I mean, I
6   don't think there is any more serious warning than this could
7   cause someone to die, and they're really trying to convince you
8   that we don't want to put in one one-time test, even though we
9   tell patients all of these risks.
10          We even tell them that when you add aspirin and
11  Xarelto together, that's a separate independent risk.  As I
12  mentioned to you earlier, that is important because that shows
13  you that Dr. Wong, when he was aware of this, which he told us
14  he was, when he was aware that this raised the risk even
15  higher, he still made that choice because he thought it was
16  right for Mr. Boudreaux.
17          No one is criticizing him, right?  No one came
18  into the courtroom to criticize Dr. Wong.  But if you want to
19  know what would Dr. Wong do, you have the answer.  He took that
20  elevated risk because he thought it was best for Mr. Boudreaux
21  based on all his ailments and physical symptoms and his
22  individual medical plan.
23          We don't go into the examination room with
24  patients.  Our responsibility is to put a warning on there, and
25  doctors get to decide in this country how to practice medicine.