# Exhibit 2

Page 1156

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
IN RE: VIOXX PRODUCTS             *
LIABILITY LITIGATION              *  MDL DOCKET NO. 1657
                                  *
                                  *
THIS DOCUMENT RELATES TO          *  HOUSTON, TEXAS
CASE NO. 05-4046:                 *
                                  *
EVELYN IRVIN PLUNKETT, ET AL      *  DECEMBER 5, 2005
                                  *
VERSUS                            *
                                  *  8:30 A.M.
MERCK & CO., INC.                 *
* * * * * * * * * * * * * * * * *
```

VOLUME VI
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
                                PORTIS & MILES
                              BY:  JERE LOCKE BEASLEY, ESQ.
                                   ANDY D. BIRCHFELD, JR., ESQ.
                                   LEIGH O'DELL, ESQ.
                                   J. PAUL SIZEMORE, ESQ.
                                   FRANK WOODSON, ESQ.
                              234 COMMERCE STREET
                              POST OFFICE BOX 4160
                              MONTGOMERY, ALABAMA 36103


FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
                              BY:  MARK P. ROBINSON, JR., ESQ.
                              620 NEWPORT CENTER DRIVE
                              NEWPORT BEACH, CALIFORNIA 92660

Draft Copy

DAILY COPY

Page 1181

1  Q  RIGHT.  WE'RE LOOKING HERE AT AN OCTOBER 20, 1998, E-MAIL
2  FROM YOU FORWARDING AN ANALYST REPORT, CORRECT?
3  A  YES, I THINK SO.
4  Q  THE ANALYST REPORT IS DATED THE SAME DAY, OCTOBER 20,
5  RIGHT?
6  A  YES, IT IS.
7  Q  SO IT IS, IN FACT, ACCURATE TO STATE THAT IN 1998 MERCK
8  HAD DECLINING SALES IN SEVERAL OF ITS KEY FRANCHISES, CORRECT?
9  A  I'VE ANSWERED YOUR QUESTION.
10 Q  I WOULD LIKE YOU TO ANSWER THAT QUESTION, PLEASE.
11 A  SOME OF ITS FRANCHISES HAD DECLINING SALES.
12 Q  THEY WERE KEY FRANCHISES?
13 A  SOME OF THEM WERE KEY.
14 Q  OKAY.  YOU ALSO HAD SEVERAL DRUGS GOING OFF PATENT IN THE
15 NEAR FUTURE, RIGHT?
16 A  CORRECT.
17 Q  YOU THOUGHT IT WAS IMPORTANT TO TELL YOUR EMPLOYEES THAT
18 MERCK'S BASE BUSINESS WAS ERODING?
19 A  YES.
20 Q  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT MERCK HAD
21 SEVERAL PRODUCTS GOING OFF PATENT?
22 A  THEY KNEW THAT.  THIS WAS TO REEMPHASIZE THAT.
23 Q  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF
24 THE RECENTLY LAUNCHED PRODUCTS HAD NOT BEEN AS SUCCESSFUL AS
25 ANTICIPATED?

Page 1182

1  A  I WANTED TO PROVIDE THEM THE INFORMATION IN THIS DOCUMENT,
2  YES, THAT'S CORRECT.
3  Q  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF
4  THE RECENTLY LAUNCHED PRODUCTS WEREN'T AS SUCCESSFUL AS YOU
5  ANTICIPATED THEY'D BE, RIGHT?
6  A  THAT'S WHAT'S IN HERE, AND I WANTED TO PROVIDE THEM THAT
7  INFORMATION.
8  Q  AT THIS POINT IN TIME IN OCTOBER OF 1998, WHERE WAS VIOXX
9  IN THE DEVELOPMENT PROCESS?
10 A  I DON'T RECALL.  I'M SORRY.
11 Q  HAD THE NDA BE FILED YET?
12       THE COURT:  WE HAVE TO STOP, PLEASE.  WE HAVE TO TAKE
13 A 10-MINUTE BREAK.  THE COURT WILL STAND IN RECESS FOR 10
14 MINUTES.
15       THE MARSHAL:  ALL RISE.
16       (WHEREUPON, THE COURT TOOK A BRIEF RECESS, AFTER
17 WHICH THE FOLLOWING PROCEEDINGS WERE HELD AT THE BENCH.)
18       MR. BECK:  YOUR HONOR, I HAD RAISED, BECAUSE WE'RE IN
19 THE MIDDLE OF DR. SCOLNICK'S VIDEOTAPED DEPOSITION, THERE IS A
20 CLIP LATER ON THAT WE WOULD WANT TO PLAY THAT HE TALKS ABOUT
21 HOW HE USES VIOXX.  THERE WAS IN LIMINE RULING ON THIS THAT
22 WE'RE NOT ALLOWED TO DO THAT WITHOUT APPROACHING THE COURT, AND
23 I ASKED, AS I DID LAST WEEK, THAT WE BE ALLOWED TO PRESENT
24 EVIDENCE THAT OUR WITNESSES USED VIOXX.
25       THE PLAINTIFFS, HAVING SECURED THE IN LIMINE

Page 1183

1  RULING THEN INTRODUCED EVIDENCE FROM MR. AYCOCK THAT HE USED
2  VIOXX, AND THEY INTRODUCED EVIDENCE THAT IT DIDN'T WORK.  THEN
3  THEY HAD THEIR -- THE DAUGHTER ALLESHA, COME ON AND THEY
4  ELICITED TESTIMONY FROM HER ON THE STAND THAT SHE USED VIOXX
5  AND THAT IT DIDN'T WORK.
6       THEN OVER THE WEEKEND WHEN WE HEARD FROM
7  DR. TOPOL, THERE WAS EVIDENCE -- SOME WAS DESIGNATED BY US,
8  SOME BY THEM -- THAT HE USED VIOXX, BUT THEN THEY DESIGNATED
9  EVIDENCE ABOUT HOW, YEAH, BUT HE HAD DETERMINED THAT HE WAS AT
10 LOW RISK FOR HEART ATTACK AND SO IT WAS OKAY FOR HIM TO USE
11 VIOXX.
12      SO WE'VE GOT A WHOLE BUNCH OF EVIDENCE FROM THE
13 PLAINTIFF'S WITNESSES ON THEIR USE OF VIOXX, WHETHER IT WORKED
14 OR NOT, AND WHETHER THEY WERE CONCERNED ABOUT HEART ATTACK
15 RISKS WHEN THEY USED IT.  WE'RE ENTITLED TO PUT IN EVIDENCE
16 FROM OUR WITNESSES ON THE SAME ISSUE.
17      I THINK IT'S MORE RELEVANT FROM OUR WITNESSES
18 BECAUSE DR. SCOLNICK, FOR EXAMPLE, IS BEING CHARGED WITH --
19 WITH BASICALLY SELLING VIOXX WHILE HE KNEW THAT IT CAUSED HEART
20 ATTACKS EVEN WITH INTERMITTENT USE.  AND THE FACT THAT HE USED
21 VIOXX AT THE TIME IS -- IS RELEVANT TO REFUTE THAT, THOSE
22 ALLEGATIONS ABOUT HIS STATE OF MIND, SO WE WOULD ASK THAT YOU
23 LIFT THAT RULING AND ALLOW US TO INTRODUCE THE EVIDENCE.
24      MR. BIRCHFIELD:  YOUR HONOR, FIRST OF ALL, WHETHER
25 VIOXX IS EFFECTIVE IN TREATING PAIN IS NOT AT ISSUE IN THIS

Page 1184

1  CASE.  I MEAN, WE'LL STIPULATE THAT IT'S EFFECTIVE; IT'S
2  EFFECTIVE IN TREATING PAIN.  THE FACT THAT DR. TOPOL, IN FACT,
3  HE SAID, I TOOK IT, BUT I HAD A FULL HEART CHECKUP.  I HAD A
4  STRESS CHEST AND I TOOK IT INTERMITTENTLY.  THAT IS TESTIMONY
5  THAT MERCK INTRODUCED, NOT US.
6       THERE IS A BIG DISTINCTION BETWEEN, YOU KNOW,
7  WHEN MERCK IS OFFERING IT FOR, AND THEY ARE OFFERING IT TO SHOW
8  THAT THERE WAS -- THERE WAS A LACK OF KNOWLEDGE.  THAT'S NOT --
9  THAT DIDN'T HAVE ANYTHING TO DO WITH THE TESTIMONY THAT HAS
10 BEEN ELICITED, YOU KNOW, SO FAR.
11      A KEY DISTINCTION IS THAT WE TO NOT HAVE, YOU
12 KNOW, THE MEDICAL RECORDS OF THE MERCK EMPLOYEES IN ORDER TO
13 CROSS-EXAMINE HIM.  IF THEY HAD A FULL HEART, YOU KNOW, HEART
14 CHECKUP AND KNEW THAT THEY WERE CLEAN AND THEY TOOK IT
15 INTERMITTENTLY, THAT'S A COMPLETELY DIFFERENT STORY.  BUT WE
16 DON'T HAVE, WE DON'T HAVE ANY OF THAT INFORMATION TO -- TO
17 CROSS-EXAMINE THEM ON.  WE HAVEN'T GOTTEN INTO ANY AREAS THAT
18 WE OPENED THE DOOR FOR.
19      MR. BECK:  YOUR HONOR, JUST TO REPLY BRIEFLY.  THE
20 REASON THAT THEY ELICITED FROM THEIR WITNESSES THAT VIOXX
21 DIDN'T WORK IS BECAUSE THERE IS A QUESTION OF COST/BENEFIT
22 ANALYSIS HERE, AND SO THEY ARE THE ONES WHO CALL A WITNESS TO
23 THE STAND, ALLESHA, AND SAY THAT VIOXX DOES NOT WORK.
24      MOREOVER, YOUR HONOR, WHAT MR. BEASLEY DID,
25 WHICH THEY PLAYED, THEY DESIGNATED WITH DR. SCHIRMER, IS TO

Page 1185

1  SAY, DO YOU KNOW THAT MERCK IS NOW SAYING THAT VIOXX ISN'T ANY
2  BETTER THAN ALEVE OR ADVIL? IF YOU HAD KNOWN THAT VIOXX WAS
3  SAYING OR MERCK WAS SAYING THAT VIOXX WASN'T ANY BETTER THAN
4  ALEVE OR ADVIL, SO THEY PUT THE ISSUE WHETHER VIOXX IS A GOOD
5  PAIN RELIEVER IN, AND IT'S IRRELEVANT TO THE COST/BENEFIT
6  ANALYSIS
7       THE COURT:  I UNDERSTAND THE ISSUE.  AT FIRST WHEN I
8  SAW THIS SITUATION, I FELT THAT IT WAS ADMISSIBLE FROM THE
9  STANDPOINT OF CROSS-EXAMINATION.  IF SOMEONE SAYS THAT VIOXX IS
10 A TERRIBLE DRUG AND A DANGEROUS DRUG, THEN I THOUGHT IT WAS
11 APPROPRIATE TO INTRODUCE EVIDENCE TO THE FACT THAT THAT
12 INDIVIDUAL TOOK THE DRUG.  IT GOES TO CREDIBILITY AND CAN BE
13 INTRODUCED IN THAT REGARD.
14      BUT THE DEFENSE IS CORRECT IN THE SENSE THAT
15 SOME TESTIMONY OF PEOPLE WHO DON'T LIKE VIOXX HAVE ALSO
16 INDICATED THAT THEY TOOK IT, BUT THEY DIDN'T EXPLAIN THE WAY
17 THEIR REASON FOR TAKING IT.  AND THAT ASPECT OF IT INTRODUCES A
18 QUESTION THAT BEARS, TO SOME EXTENT, ON PLAINTIFF'S CLAIM OF
19 WARRANTY WHETHER OR NOT THE DEFENDANT WARRANTED THE DRUG FOR
20 ITS INTENDED PURPOSE OR WHETHER THE DRUG WAS APPROPRIATE FOR
21 ITS INTENDED PURPOSE, WHICH THEY NOW HAVE AN OPPORTUNITY TO
22 REBUT.
23      I'M GOING TO ALLOW SCOLNICK TO TESTIFY AS TO
24 WHETHER OR NOT HE TOOK THE DRUG, BUT I'M NOT GOING TO MAKE A
25 BLANKET RULING AT THIS TIME.  AND I DON'T THINK THAT IT'S

Page 1186

1  APPROPRIATE TO GO INTO SPECIFICS OF TAKING THE DRUG.  I THINK
2  IT'S -- HE TOOK IT BECAUSE IT WAS HELPFUL.  HE TOOK IT BECAUSE
3  HE FELT IT WAS SAFE.  I CAN SEE THAT.  BUT THE PLAINTIFFS HAVE
4  A POINT THAT WE DON'T KNOW AT THIS POINT THE BACKGROUND OR THE
5  MEDICAL BACKGROUND OF THOSE INDIVIDUALS.  AND I DON'T WANT TO
6  TRY ANOTHER CASE OTHER THAN THIS PARTICULAR CASE.
7       SO I'LL GRANT THE DEFENDANT'S MOTION, AT LEAST
8  WITH REGARD TO SCOLNICK, AND I'LL HAVE TO TAKE A LOOK AT IT
9  OTHERWISE.
10      MR. BIRCHFIELD:  YOUR HONOR, WILL YOU ORDER THE
11 PRODUCTION OF HIS MEDICAL RECORDS TO US?
12      THE COURT:  NO, I'M NOT GOING TO DO THAT.  I'LL DENY
13 THAT.
14      MR. BECK:  THANK YOU.
15      THE COURT:  THANK YOU VERY MUCH.
16      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
17 OPEN COURT.)
18      THE MARSHAL:  ALL RISE.
19      THE COURT:  BE SEATED, PLEASE.  LET'S CONTINUE,
20 COUNSEL.
21      (WHEREUPON, THE VIDEOTAPED DEPOSITION OF DR. EDWARD
22 SCOLNICK CONTINUED AS FOLLOWS:)
23 A    I THINK SO, BUT I DON'T RECALL, I'M SORRY.  IT'S BEEN A
24 LONG TIME.
25 Q    WELL, YOU HAD A BUNCH OF REGULATORY PEOPLE COPIED ON THIS

Page 1187

1  PARTICULAR E-MAIL, RIGHT?
2  A    YES, I DID.
3  Q    THEY ARE THE PEOPLE WHO DEAL WITH THE FDA?
4  A    YES.
5  Q    THEY ARE THE PEOPLE WHO WOULD LIAISE OR COMMUNICATE WITH
6  THE FDA CONCERNING AN NDA?
7  A    YES.
8  Q    THEY'RE THE PEOPLE WHO WOULD MAKE SURE THAT AN NDA MOVES
9  THROUGH THE REGULATORY PROCESS SMOOTHLY?
10 A    THAT IS PART OF THEIR RESPONSIBILITY.
11 Q    THEY ARE THE PEOPLE WHO YOU WOULD HOPE WOULD BE ABLE TO
12 FACILITATE THE SPEEDY APPROVAL OF YOUR DRUG, CORRECT?
13 A    THAT IS PART OF THEIR RESPONSIBILITY, PART OF THEIR JOBS,
14 YES.
15 Q    AND THAT'S PART OF WHY YOU PROVIDED THIS E-MAIL TO THEM,
16 RIGHT?
17 A    YES.
18 Q    YOU WANTED THEM TO KNOW HOW IMPORTANT IT WAS THAT THIS
19 DRUG PROCEED QUICKLY THROUGH THE REGULATORY APPROVAL PROCESS,
20 RIGHT?
21 A    YES.
22 Q    IT WAS ESSENTIAL TO THE FINANCIAL SUCCESS OF YOUR FIRM?
23 A    YES.  IT WAS ESSENTIAL TO WORK.  IT WAS IMPORTANT TO
24 MERCK, YES.
25 Q    AND IN FACT, IT WAS NOT ONLY ESSENTIAL, BUT VIOXX'S

Page 1188

1  SUCCESS WAS NECESSARY TO PRESERVE MERCK AND MERCK RESEARCH LABS
2  PERIOD, CORRECT?
3  A    THAT IS WHAT I SAID IN MY E-MAIL.
4  Q    MERCK GOT VIOXX APPROVED?
5  A    YES, IT DID.
6  Q    THESE FOLKS ON THIS E-MAIL WERE INVOLVED IN THE APPROVAL
7  OF VIOXX?
8  A    YES.
9  Q    SO THESE SCIENTISTS WERE INVOLVED IN THE DEVELOPMENT
10 PROCESS FOR VIOXX?
11 A    YES.
12 Q    HAD ACCESS TO THE GOOD THINGS ABOUT VIOXX THAT CAME OUT OF
13 THAT DEVELOPMENT PROCESS?
14 A    THEY HAD ACCESS TO ALL OF THE DATA THAT CAME OUT OF THE
15 VIOXX DEVELOPMENT PROCESS.
16 Q    THE GOOD AND THE BAD?
17 A    YES.
18 Q    AND THEY KNEW, THOUGH, THAT NOT WITHSTANDING THAT BAD
19 INFORMATION, NOTHING COULD STAND IN THE WAY OF THIS DRUG OR
20 MERCK OR MERCK RESEARCH LABS WOULD NOT FLOURISH AS IT HAD
21 TRADITIONALLY FLOURISHED, TRUE?
22 A    THEY WOULD NOT HAVE AGREED WITH THAT STATEMENT.  THEY
23 KNEW, BASED ON THE BASIC VALUES OF THE LABORATORY, IF THERE WAS
24 SOMETHING BAD ABOUT THE DRUG, THAT THEIR RESPONSIBILITY WAS TO
25 MAKE THAT INFORMATION AVAILABLE TO THE AGENCY, TO ANYONE ELSE,

9 (Pages 1185 to 1188)

DAILY COPY