# Exhibit 5

Page  78

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO            *
(RIVAROXABAN) PRODUCTS     *
LIABILITY LITIGATION       *
                           *
THIS DOCUMENT RELATES TO:  *   Docket No.: 14-MD-2592
                           *   Section "L"
Joseph J. Boudreaux, Jr.   *   New Orleans, Louisiana
v. Janssen Research &      *   April 24, 2017
Development, et. al.,      *
Case No.: 14-CV-2720       *
* * * * * * * * * * * * * * *

VOLUME I - AFTERNOON SESSION
TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs':
Liaison Counsel:                Levin Papantonio
                                BY:  BRIAN H. BARR, ESQ.
                                316 South Baylen Street, Suite 600
                                Pensacola, Florida  32502


                                Beasley Allen
                                BY:  ANDY BIRCHFIELD, ESQ.
                                P.O. Box 4160
                                Montgomery, Alabama 36103


                                Gainsburg Benjamin David
                                  Meunier & Warshauer
                                BY:  GERALD E. MEUNIER, ESQ.
                                2800 Energy Centre
                                1100 Poydras Street
                                New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

## Page 82

1    Good afternoon. Welcome back from lunch. We're
2 proud you're here. My name is Brian Barr. I didn't get a
3 chance to talk to you this morning, but I'm proud to be here
4 representing Mr. Boudreaux.
5    We're going to split our opening today. I'm
6 going to talk to you for a little bit, and then Mr. Birchfield
7 is going to get back. And he's going to talk to you for a
8 little bit more.
9    I'm going to spend my time talking to you today
10 about what the plaintiffs are going to prove about Xarelto and
11 the actions of these defendants, Bayer and Janssen, and how
12 they failed to instruct doctors on the safe use of Xarelto by
13 refusing to inform them about a simple safety test that would
14 allow people to minimize risks on that drug.
15    I'm going to explain to you why that safety test
16 is needed and how these defendants went about designing Xarelto
17 around a business plan rather than a drug designed on good
18 science.
19    Now, there are simple warnings and devices
20 everywhere in our lives, devices designed to help keep people
21 safe, to avoid unnecessary dangers, simple warning lights on
22 alarms designed to tell people they're in a danger zone.
23    A good example of such a device -- most people
24 are familiar with it -- is one of these backup alarms on
25 construction trucks. We've all heard them. I probably can't

OFFICIAL TRANSCRIPT

## Page 83

1 mimic the sound very well, but we all know that beeping noise
2 when we hear it.
3    That device was created because people were
4 being injured. People were walking through a danger zone, and
5 they didn't know that they were in a danger zone and the truck
6 would back them over. So that's why they created that device.
7 So now when we hear that, we know to immediately look around
8 and see, are we in danger?
9    Well, what you're going to hear during this
10 trial is that prescription drugs are no different. If a drug
11 company knows that their drug puts some people at significantly
12 higher risk than others and they know of a way to identify
13 those people and tell them how to avoid that injury, they need
14 to tell doctors about it. If they don't tell the doctors about
15 it, people like Mr. Boudreaux, you're going to hear, get
16 injured.
17    Now, Janssen and Bayer make and sell a drug
18 called Xarelto. As the judge already talked to you about
19 today, Xarelto, it's a blood thinner. It's given to people
20 with atrial fibrillation, and it's designed to reduce the risk
21 of stroke for people with atrial fibrillation.
22    Now, atrial fibrillation is a condition of the
23 heart. It causes the heart to have an irregular heartbeat.
24 And that can allow blood to pool in the heart. And if blood
25 pools, it can clot. And if that clot is pushed from the heart,

OFFICIAL TRANSCRIPT

## Page 84

1 it can go up into the brain and cause a stroke to happen.
2    And what you're going to hear in this case is
3 that Mr. Boudreaux was diagnosed with atrial fibrillation. And
4 at that point of that diagnosis, he had about a 6 percent risk
5 of stroke. So that's where he was.
6    Now, a blood thinner like Xarelto is designed to
7 make it harder for the blood to clot. And this works well to
8 reduce the risk of stroke. But, like most things we all deal
9 with in life, there's a trade-off. And by making it more
10 difficult for the blood to clot, you increase the risk of
11 significant or even fatal bleeding. That's how the drug is
12 designed to work.
13    And doctors that use this drug or anticoagulant
14 are trying to balance this trade-off between the risk of stroke
15 and the risk of bleeding, and they're trying get that balance
16 right for their patient.
17    Now, you're going to hear from Dr. Cindy
18 Leissinger in this trial. She's going to explain to you how
19 this balance works. Dr. Leissinger is a hematologist. She
20 practices right here in New Orleans at Tulane University
21 Medical Center. Now, hematologist is a doctor that specializes
22 in blood. That's what she does.
23    She's going to come testify for you. And she's
24 going to explain that there's a fine line between thinning the
25 blood enough to reduce the risk of stroke and not thinning the

OFFICIAL TRANSCRIPT

## Page 85

1 blood so much that you put someone at such a high bleed risk
2 that the risk of bleeding exceeds the benefit you're getting
3 from stroke protection. It's the trade-off that we're talking
4 about. That's what these anticoagulants are for.
5    And because these defendants refused to tell
6 doctors about a simple safety test that would identify people
7 at high risk of bleeding, you're going to hear that the doctors
8 who use Xarelto have to perform this balancing blindfolded.
9 They can't -- they don't know whether or not their patient is
10 at high risk of bleeding.
11    Now, the evidence in this case will be that
12 there is a simple test that can identify those people at high
13 risk of bleeding. It's a test called prothrombin time. We're
14 going to refer to it a lot in the case, I would guess, as a PT
15 test. You're going to hear a lot about PT test in this trial.
16 And a PT test is just a short for prothrombin.
17    And all that test is doing is measuring the
18 amount of time it takes for blood to clot. That's what it's
19 designed to do. But a PT test is used by doctors in their
20 medical practices today. They know what it is, and they've
21 been using it to identify patients in danger zones for a long
22 time.
23    But what you will hear is doctors have to be
24 told that that PT test has application to the drug they're
25 using. And what doctors were told here was that PT cannot be

OFFICIAL TRANSCRIPT

Page 86

1   used with Xarelto.
2        So doctors were told there is no test. That's
3   what you're going to see. This is the label for Xarelto. And
4   what it tells doctors is that the anticoagulant effect, how
5   much it reduces the risk of bleeding, how thin it makes the
6   blood, cannot be monitored with standard laboratory testing.
7   So there is no way to do it, according to what the -- what
8   these defendants tell doctors. Okay?
9        And so doctors don't know that they can use this
10  normal PT test to identify the patients on Xarelto that they're
11  treating. They don't know that they can use that test with
12  their drug. They believe that no test exists and none is
13  available.
14       Now, why didn't these companies want to tell
15  doctors about the use of this simple test to identify people at
16  high risk?
17       Well, what you're going to see is that Xarelto
18  was designed around a business plan. The business plan came
19  first. There was -- there was work done to determine the
20  requirements of Xarelto and how that drug could be used in the
21  marketplace. And they needed three requirements, but the most
22  important was the testing. And to concede that a test would be
23  able to identify people at high risk would have been completely
24  inconsistent with the marketing plan that they came up with.
25       So what were the three components? We're going
         OFFICIAL TRANSCRIPT

Page 87

1   to spend some time talking about these during this trial.
2        Well, the three components are one size fits
3   all. So everybody can take the same dose pill, the same size
4   pill, whether you are an 80-year-old, 90-pound woman or a
5   50-year-old, 245-pound man. You can all take the same size
6   pill.
7        The other part of the plan, once-a-day dosing.
8   You take the pill once a day, and it's going to provide you
9   enough drug to provide you stroke protection for the 24-hour
10  period and not put you at such a high bleed risk that you're at
11  too high of a bleed risk during that period. Once-a-day
12  dosing.
13       And the third part, that I already said, is the
14  most important part: No testing needed.
15       Now, why was that important? It's important
16  because Xarelto was being developed as an alternative to the
17  drug warfarin. Some of you all may have heard of warfarin.
18  People know it as a Coumadin. Warfarin was the drug of choice
19  for doctors to use to reduce the risk of stroke with people
20  with atrial fibrillation, for decades. It had been the drug of
21  choice since 1954.
22       Warfarin works well to reduce the risk of stoke.
23  What you're going to hear is that warfarin reduces the risk of
24  stroke by about 60 percent.
25       Now, what you'll also hear is that Xarelto
         OFFICIAL TRANSCRIPT

Page 88

1   doesn't do any better. There's a fancy word for this that
2   you're going -- that people are going to talk about. It's
3   called noninferior. Xarelto is noninferior to warfarin.
4        Well, what's that mean? That means that Xarelto
5   is no worse than warfarin. So it doesn't do any better at
6   protecting people from stroke than warfarin does.
7        But warfarin requires regular, routine,
8   once-a-month blood testing. You have to go to your doctor once
9   a month, get your blood tested. They send that to a lab. They
10  get a result. The doctors know what that result is, and they
11  can adjust the dose to appropriately balance you, balance you
12  between the risk of bleeding and stroke protection.
13       Well, these defendants, in order to create a
14  drug that doctors would use, needed to create a drug that did
15  not require any blood testing; because, otherwise, if they
16  couldn't distinguish themselves from warfarin, why would
17  anybody use their new drug? And so that was very important to
18  them.
19       And because of this importance, like I said,
20  you're going to see that the drug was designed around a
21  business plan, not by following scientific study.
22       Now, some of you may be wondering why these two
23  defendants are here together, Bayer and Janssen.
24       Well, what happened here is Bayer created
25  Xarelto. They invented the molecule. And in 2005 Bayer wanted
         OFFICIAL TRANSCRIPT

Page 89

1   a partner. They wanted to go find somebody to help them
2   develop the drug, help them market.
3        And what you're going to see in October of 2005,
4   they entered a contract with a company called Ortho-McNeil.
5   Ortho-McNeil became Janssen. And that's why Janssen is here.
6   Janssen had the right to sell this drug in the United States.
7   So that was one of the terms of contract. Bayer made the drug;
8   Janssen sold it here in the United States.
9        And one of the terms of the contract -- this is
10  in 2005. And what you're going to hear is that in 2005, not a
11  single patient with atrial fibrillation, like Mr. Boudreaux
12  has, not a single patient had ever been studied.
13       And in 2005 these companies, in their contract
14  together on how they are going to develop and license Xarelto,
15  agreed that the drug shall not require monitoring. So it's
16  very important.
17       Now, some of you may be looking at that and
18  wondering what monitoring is. And what you're going to see is
19  that there are all types of different ways of talking about
20  what monitoring is.
21       But from what you'll see in the evidence, these
22  defendants, not only did they not want a drug that required
23  monitoring, because of the stigma of monitoring from warfarin,
24  they would not even tell doctors about a simple one-time blood
25  test that could be used to identify people at high risk, people
         OFFICIAL TRANSCRIPT

3 (Pages 86 to 89)

OFFICIAL TRANSCRIPT

Page 98

1   variability in exposure, and that increase in exposure more
2   than doubles people's bleed risk.
3           Think about that. 100 people take the same size
4   pill. Some of those people are absorbed -- are exposed to ten
5   times more Xarelto than others. We just don't know who they
6   are. Without a test, we have no way to identify those people.
7   And these defendants knew of a test and didn't tell anybody
8   about it. That's the reason why the ability to test is so
9   important.
10          Now, none of this information is in the label,
11  not even charts like this that let doctors know there is
12  variability. Doctors don't -- aren't told in the label that
13  there is a danger zone, much less how to test for it.
14          Now, next you'll see that it's not just one or
15  two people at risk we're talking about here, but as many as
16  25 percent of people studied in ROCKET were shown to be at
17  significantly higher bleed risk in the danger zone.
18          Now, the defense will tell you it's okay not to
19  run a test because we've proven in the ROCKET study that you
20  can take this drug safely without a blood test. We're just as
21  good as warfarin. That's what we proved in the ROCKET study
22  without the use of a blood test.
23          Now, our evidence will be that that is not
24  enough. If you know that as many as 25 percent of the people
25  that take your drug are at significantly higher bleed risk than

OFFICIAL TRANSCRIPT

Page 99

1   others and you know how to identify those people just by
2   telling doctors to run a test, then you have a responsibility
3   to get that information out and put it into the label.
4           You will see that all the defendants had to do
5   was tell doctors that PT predicts bleed risk and tell doctors
6   that as many as 25 percent of the people exposed to this drug
7   are at significantly higher bleed risk. That would have made
8   instructions adequate.
9           THE COURT: You've used half an hour, Counsel.
10          MR. BARR: Okay. But these companies did not provide
11  this information or recommend this simple test, because of
12  their business plan.
13          Now, I want to talk to you now about when basic
14  safety laboratory tests are required to be in a drug company.
15  You're going to hear that there's a regulation on this.
16  There's a lot of regulations. We talked about that today. But
17  there's a regulation on when you have to put helpful laboratory
18  tests into a drug label.
19          And I put it up on the board for you here. And
20  what it says is that you must identify -- and when it says this
21  section, it's talking about in the warnings. You must identify
22  any laboratory tests helpful in following the patient's
23  response or in identifying possible adverse reactions.
24          Well, major gastrointestinal bleeds are adverse
25  reactions.

OFFICIAL TRANSCRIPT

Page 100

1           So keep this regulation in our mind throughout
2   this trial. And when you're looking at the evidence and you're
3   listening to witnesses and seeing the evidence, ask yourself,
4   would this information be helpful to doctors prescribing
5   Xarelto? If the answer to that question is yes, then, as
6   Dr. Kessler will explain to you, that information must be in
7   the label.
8           Now, how are we going to show that evidence of
9   PT would be helpful to be in the label?
10          Well, first you're going to hear from
11  Dr. Kessler and Dr. Leissinger. They're going to explain to
12  you that PT was proven to predict bleed risks in the
13  defendants' own study, ROCKET. They're going to explain that
14  to you and why that that information would be helpful to be in
15  the label.
16          But you don't have to accept their word for it.
17  You're also going to hear that the FDA itself, reviewing
18  ROCKET, came to the conclusion that the risk for major bleeding
19  is dependent upon PT.
20          That was in August of 2011, three months before
21  this drug was approved for the use in atrial fibrillation. It
22  had already been approved for a different use. But for the use
23  of atrial fibrillation, August of 2011, the FDA says PT
24  predicts bleed risk.
25          And in November of 2011, when Xarelto was

OFFICIAL TRANSCRIPT

Page 101

1   approved for people with atrial fibrillation, the FDA wrote
2   again that it is demonstrated in ROCKET that there is a
3   correlation between PT and the risk of bleeding. So that's the
4   FDA.
5           But beyond our experts and the FDA, you're going
6   to hear testimony from Bayer witnesses. Most of this is
7   probably going to come in through a deposition. We're going to
8   play for you videos of depositions. And if you've never
9   experienced a deposition, it's just a more informal setting
10  than this where we sit across the table from the witness,
11  they're sworn in, everything is under oath, and it's videotaped
12  with a court reporter sitting there taking down everything
13  we're saying. We're going to play some of that for you.
14          And we talked to witnesses for Bayer. And
15  you're going to hear from Dr. Scott Berkowitz. Now,
16  Dr. Berkowitz is a scientist at Bayer. He was the local
17  clinical leader at Bayer. And there is probably not another
18  person at Bayer that knows more about this drug than
19  Dr. Berkowitz. And Dr. Berkowitz testified, as PT goes up,
20  there's an increased risk of bleeding. And he said that as PT
21  is predictive of bleeding, something we've talked about over
22  and over and over the last couple of hours.
23          And you're also going to hear from Dr. Spiro,
24  another scientist at Bayer. And Dr. Spiro agreed that there's
25  a correlation between prothrombin time prolongation -- that's

OFFICIAL TRANSCRIPT

09:12:03

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          Docket No. 14-MD-2592
                                       Section "L"
                                       New Orleans, Louisiana
THIS DOCUMENT RELATES TO:              Thursday, April 27, 2017
Joseph J. Boudreaux, Jr.
v. Janssen Research &
Development, et. al.,
Case No. 14-CV-2720

*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME IV


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:                 LEVIN PAPANTONIO
                                 BRIAN H. BARR, ESQ.
                                 316 Baylen Street, Suite 600
                                 Pensacola, FL 32502

                                 BEASLEY ALLEN
                                 BY:  ANDY BIRCHFIELD, ESQ.
                                 P.O. Box 4160
                                 Montgomery, AL 36103

                                 GAINSBURGH BENJAMIN DAVID
                                 MEUNIER & WARSHAUER
                                 BY:  GERALD E. MEUNIER, ESQ.
                                 2800 Energy Centre
                                 1100 Poydras Street
                                 New Orleans, LA 70163

                                 SCHLICHTER, BOGARD & DENTON
                                 BY:  ROGER C. DENTON, ESQ.
                                 100 South 4th Street
                                 Saint Louis, MO 63102

1  A.  Correct.

2  Q.  And you say, "Dear Dr. Eby I'm contacting you on behalf of

3  Professor Samama, Laboratory Biomnis, and Dr. Martinoli,

4  Diagnostica Stago, to invite you to participate in a program in

5  which we are assessing methods to develop monitoring procedures for

6  novel anticoagulants, in specific a direct Factor Xa inhibitor

7  rivaroxaban," correct?

8  A.  Yes, that is correct.

9  Q.  Okay.  And you ask him to let you know if he was interested in

10  participating in the program.  Do you see that?

11  A.  Yes.

12  Q.  Okay.  So Dr. Eby responded to you, if you'll flip with me to

13  the next page, on July 7th of '09.  And says, "Hello, Dr. Spiro."

14  Do you see that?

15  A.  Yes, I do.

16  Q.  He says, "I am very interested in this important topic.  There

17  will definitely be situations where laboratory monitoring of the

18  anticoagulant activity of oral direct Xa and IIa inhibitors will be

19  necessary."  Do you see that?

20  A.  Yes, I do.

21  Q.  He says, "I am on the faculty of Washington University School

22  of Medicine, Department of Pathology."

23  That's in St. Louis, correct?

24  A.  Right, that is in St. Louis.

25  Q.  He says, "My department has a contract to provide laboratory

1  director services to Barnes Jewish Hospital, which is where all

2  Washington University faculty practice medicine.  I cannot direct

3  laboratory employees to conduct tests to support a commercial

4  project, no matter how modest the time, reagent, and equipment

5  requirements without external financial support.  "This would

6  require a contract between Washington University and Bayer/Stago,

7  legal review, and an overhead charge of approximately 26 percent,"

8  correct?

9  A.  Yes, that is what it says.

10  Q.  Okay.  And then he wants you to let him know if you would be

11  interested in pursuing the collaboration, right?

12  A.  Correct, that is what it said.

13  Q.  Okay.  And you respond to him later that day, and you copy Dr.

14  Martinoli and Dr. Samama on July 7th at 11:12 a.m.  Do you see

15  that?

16  A.  Yes.

17  Q.  You let him know that these issues regarding compensation

18  funding by Bayer has been -- arisen before, right?

19  A.  Yes.

20  Q.  You say, "This trial and its protocol are a hybrid project.

21  While Bayer is the sponsor in terms of financial support, the

22  program falls closer to an investigator-initiated study, IIS, than

23  to a company-sponsored study.  However, as we, Bayer, are more

24  involved in this program than is the case for the usual IIS, Bayer

25  'sponsorship' is cited."  Do you see that?

1  A.  Yes.

2  Q.  Okay.  You then let him know that based on the discussions with

3  Dr. Samama and Dr. Martinoli at Stago that, "We have decided not to

4  offer compensation and apply this decision to all participating.

5  The actual logistics behind securing additional corporate funding

6  for this study and the logistics behind negotiating new contracts

7  with 15 laboratories would engender many months of delay in the

8  startup and completion of the field trial of calibrators and

9  controls platformed in the PT assay as described in the protocol."

10  Did I read that correctly?

11  A.  Yes.  And that answers also your question of which -- which

12  assay we were talking about in this e-mail string.

13  Q.  So this would be talking about the PT assay field trial test?

14  A.  The prothrombin time assay.

15  Q.  Okay.  And the purpose of this study is to assess clinically

16  practicable tools for measuring rivaroxaban blood concentrations.

17  Did I read that correctly?

18  A.  Yes, you did.

19  Q.  "For Bayer, no financial incentive exists in the development of

20  such tools, as Bayer has no longer a clinical laboratory business,

21  sold to Siemens two years ago."  Do you see that?  Siemens.

22  A.  Yes.

23  Q.  That was your explanation of why Bayer was not interested in

24  funding his laboratory's participation, correct?

25  A.  We did not have a budget to fund individual laboratories for

1  this program.  The collaboration that was in place was between

2  Bayer -- I think we were Bayer Schering AG at that time --

3  Diagnostica Stago, and Professor Samama, Biomnis.  We were

4  supporting in particular Diagnostica Stago's interest in having the

5  rivaroxaban measurement assay available as one of their tests in

6  order for them to stay current with the contemporary evolution of

7  coagulation treatments being used in the clinic.

8  Q.  So what you told Dr. Eby was, even though the purpose of the

9  study was to assess clinically practicable tools for measuring

10  rivaroxaban blood concentrations, Bayer didn't have any financial

11  incentive to develop such tools because they didn't have a

12  laboratory business anymore, right?

13  A.  Oh, yes, we didn't have specific incentive, ourselves, to

14  further develop assays, which we might have done if we had

15  maintained our laboratory division.  But it was gone.

16  Q.  I'm going to show you Exhibit 22, which is Record Number

17  1145884.  And that's Bates 02485568.  This is an e-mail from the

18  next day from Yong-Ling Liu at Chameleon, the medical writing

19  company we were talking about, to yourself, Gareth Tucker at

20  Chameleon, as well as also -- as well as also Anja Alpers at Bayer.

21  Do you see that?

22  A.  Yes.

23  Q.  And this is on June 18, 2009, a day later.  It refers to Dr.

24  Samama's ISTH poster.  Do you see that?

25  A.  Yes.

865

1 Q. Have you yourself ever taken rivaroxaban?

2 A. Yes, I have taken rivaroxaban. I had a total hip replacement

3 procedure two years ago, and I -- I used rivaroxaban for

4 thromboprophylaxis after that procedure.

5 Q. How did it work out for you?

6 A. Excellent. I -- I used the drug for 35 days and experienced

7 no -- no -- no hemorrhagic complications. And I did not experience

8 a thromboembolic event.

9 Q. And the purpose of the work that you were doing to develop this

10 assay, what -- what was the purpose?

11 A. The European Medicines Agency asked us to collaborate with

12 diagnostic companies to assure that there was an assay available to

13 measure rivaroxaban concentrations. In particular, they wanted to

14 have an assay available when the chronic treatment indications with

15 the higher dosing regimens became available to member states.

16 Q. There was a lot of discussion with plaintiffs' counsel about

17 use of the word "monitoring" versus "measured." Do you recall

18 that?

19 A. Yes.

20 Q. What -- what you were developing, did you consider that to be

21 measure or monitor?

22 A. We realized during the course of the development that the --

23 the use of the term "monitoring" engendered the -- the association

24 of monitoring with dosage adaptation. And we understood that given

25 that our development program in Phase II and Phase III to date had

866

1 been a fixed-dose approach, that we needed to be clear that we were

2 not developing monitoring regimens that required dose adjustments

3 but were -- were, rather, developing testing systems that allowed

4 point estimates, point measurements of drug concentration in -- in

5 plasma.

6 Q. What's the -- what are the circumstances under which one might

7 want to be able to measure how much rivaroxaban is in a patient's

8 blood?

9 A. Well, we saw earlier today a very interesting slide, which I

10 can redirect our attention to. But basically, we are looking at

11 patients with -- in -- in very special situations, such as the very

12 young patient, pediatric indications, patients with impaired renal

13 function or worsening renal function on-treatment, patients with

14 impaired hepatic function or worsening hepatic function

15 on-treatment, extremes of -- of body weight, emergency settings

16 such as a patient that requires a spinal tap for assessment of a --

17 of a spinal cord infection, this patient being potentially on a --

18 a non-vitamin K oral anticoagulant such as rivaroxaban, patients

19 requiring emergency surgery also in the setting of their being

20 treated otherwise with a non-vitamin K oral antagonist such as

21 rivaroxaban.

22 Q. How would you characterize these -- these situations?

23 A. I would character -- characterize these as special situations

24 where we need to understand more specifically what is occurring in

25 an individual patient in order to make certain types of decisions

867

1 as to what to do next and when to do it.

2 Q. And what is Spiro-52. What Spiro 52.1 is -- what is this

3 paper?

4 A. This is a -- a review Spiro 52.1.2 article that Professor

5 Samama authored with -- in collaboration with -- with colleagues

6 from Bayer Healthcare and -- and Diagnostica Stago where we did a

7 review article on the laboratory assessment of rivaroxaban.

8 Q. And as a general matter, what -- what is addressed within this

9 article?

10 A. We provided an overview of the assay developments that had

11 taken place during the preceding several years, probably beginning

12 as early as 2004 and 2005. We provided some information of --

13 concerning pharmacokinetic parameters associated with rivaroxaban.

14 We provided information about clinical situations in which test --

15 laboratory testing for rivaroxaban might be required.

16 Q. And did you have many different conversations over the last

17 couple of days about the use of PT as a means to measure plasma

18 concentration in patients who have taken rivaroxaban?

19 A. Yes, we did.

20 Q. What do you say in the first Spiro 52.3.1 paragraph with

21 respect to whether or not prothrombin time is suitable for

22 measuring rivaroxaban? What do you say in your published paper?

23 A. We point out that the variability and the responses with the

24 different thromboplastin reagent clicks, results in a too large

25 variation in the results when they are expressed in seconds for

868

1 specific patient samples that are tested.

2 Q. And what causes that variation?

3 A. It's caused by the different international sensitivity index of

4 the thromboplastin reagents which are used in the -- the reagent

5 kits.

6 Q. Is the variability corrected by conversion of PT to INR values?

7 A. Using the -- the formula that we have established for the --

8 as -- as a anti-vitamin K anticoagulant class of agents, in fact,

9 the variation between the assays has increased.

10 Q. What -- what is INR used to measure?

11 A. The international normalized ratio referred to in abbreviation

12 form, the INR, is used to standardize the -- the -- the assessment

13 of the intensity of anticoagulant effect with the vitamin K

14 antagonist class of anticoagulants or blood thinners. One commonly

15 mentioned type of drug in the United States in particular is

16 warfarin. But in other countries several other types of drugs are

17 commonly used.

18 Q. If you go down to the next Spiro 52.3.2 paragraph, about

19 halfway down, there's a discussion that involves the Neoplastin

20 reagent. Do you see that?

21 A. Yes.

22 Q. You were asked a lot of questions, particularly this afternoon

23 about the use of the Neoplastin reagent system to measure PT in

24 patients who have taken rivaroxaban. Do you recall that?

25 A. Yes, I do.

877

1   among agents are similar, the once-daily dosing will win."  Do you

2   see that?

3   A.  I do.

4   Q.  All right.  And so is it your understanding that what the

5   advisors were telling you was if you have new blood thinners that

6   are coming to market, and they're relatively all the same in

7   safety, relatively all the same in terms of efficacy, how they

8   work, the big thing that will distinguish one from the other is

9   dosing?

10  A.  That is -- that's accurate.  That's what it's saying.

11  Q.  Okay.  And at this point in time, you were aware, were you not,

12  that when Xarelto was going to come to market, it was going to be

13  for the Afib indication a once-daily dosing drug?

14  A.  Yes, that was our hope as the trial was still ongoing at this

15  point in time.

16  Q.  Okay.  So at least at this point in time, these medical --

17  medical folks that you gathered together were telling you from a

18  marketing standpoint you really, really wanted a once-daily dosing

19  drug if all the drugs were going to be the same in terms of safety

20  and efficacy?

21  A.  Yes, I think that's fair to say.  They obviously -- at this

22  point in time we wouldn't have known the profiles for any other

23  drugs.  So I think the general assertion that if everything else is

24  equal and one is once a day and the others are more than once a

25  day, then the once a day would be preferred.

878

1   Q.  Okay.  All right.  Thank you.  If you would turn to Page 17.

2   A.  Okay.

3   Q.  It says, "Deep insights have guided development of highly

4   motivating messages."  Do you see that?

5   A.  I do.

6   Q.  And "deep insights," is that a reference to market research?

7   A.  Yes, it is.

8   Q.  And in the right-hand column it says, "Motivating Xarelto

9   messages."  It says, "Once-a-day dose," right?

10  A.  Yes, it does.

11  Q.  So is this reflecting that once-a-day dose was a effective and

605:17  motivating message to the public according to your market

13  research?

14  A.  It was one of the messages identified as being important.

15  Q.  And the next one is, "No regular dose adjustment."  That was one

16  of the messages that your market research was -- was telling you --

17  giving you feedback that was working, right?

18  A.  Yes.  Because warfarin often requires dosage adjustments a lot,

19  and this did not.

20  Q.  Okay.  And just going down to the third one.  Your market

21  research was telling you that the message of "No INR blood

22  monitoring was a motivating message to consumers," right?

23  A.  Yes.  And that is consistent with the theme we have been talking

24  about, about that being obviously a difficult task for many

25  patients who are -- who are taking warfarin.

879

1   Q.  And also no dietary restrictions, green vegetables, that was a

2   motivating message that your market research was verifying was

3   working, right?

4   A.  Yes.  Because, again, that's another area of struggle for

5   warfarin patients.

6   Q.  Okay.  Let's jump back in time to 2009.

7   A.  Okay.

8   Q.  I know we're doing a lot of time travel.  In February 2009, you

9   were director of marketing leading the team responsible for the

10  Xarelto launch, correct?

11  A.  Yes.

12  Q.  And do you recall in early 2009 discussions about Janssen

13  collaborating with Portola to develop a Factor Xa specific

14  antidote -- Factor Xa specific antidote?

15  A.  At a very high level, I remember hearing that there was a

16  potential collaboration.  I wasn't involved in the evaluation or

17  due diligence on it.

18  Q.  I've handed you what's been marked as Shah-54.  For the record,

19  it's Record Number 105-5561, Bates Number Xarelto-Janssen 07189114.

20  Mr. Shah, this appears to be another set of meeting minutes of the

21  compound development team for February 19, 2009.  Do you see that?

22  A.  Yes.

23  Q.  I want you to go to Page 3.  This appears to be the meeting

24  minutes from the meeting a month after the meeting that we just

25  talked about in Shah-53, correct?

880

1   A.  Okay.  Yep.

2   Q.  "Commercial update."  Do you see where I am?

3   A.  Yes, I do.

4   Q.  It says, "Final recommendation on antidote.  Commercial" -- and

5   that's marketing, right?

6   A.  Yes.

7   Q.  -- "has completed the evaluation and recommends not to pursue

8   this opportunity.  Position statement placed in CDT MTG eRoom

9   folder for today's meeting."  Do you see that?

10  A.  Yes.

11  Q.  Okay.  We know that at the time Xarelto was launched in 2011, it

12  was launched without an available antidote to reverse bleeding,

13  correct?

14  A.  That is correct.

15  Q.  And that was a decision that Janssen made to launch it without

16  an antidote, correct?

17  A.  We did not have an option available at that time for an

18  antidote.

19  Q.  Do you know that Bayer was considering developing an antidote

20  that worked specifically on Xarelto?

21  A.  I heard about it.

22  Q.  Okay.  And do you recall that you attended compound development

23  team meetings in or around early 2011 where that was discussed?

24  A.  That topic was brought to the CDT for us to be aware of it, yes.

25  Q.  I'm handing you Shah-58 and Shah-59, which are another e-mail

889

1   to move to diligence or pursue the riva antidote opportunity any
2   further with Bayer late last week." Did I read that correctly?
3   A. You did.
4   Q. And, "Bayer was understandably disappointed by this decision and
5   hoped to share more details on the program and their rationale and
6   reasons for moving forward with this antidote as part of the
7   diligence process," correct?
8   A. Yes.
9   Q. "They were quite surprised that we decided to stop prior to
10  completing diligence." Did I read that correctly?
11  A. You did.
12  Q. Okay. The main -- next paragraph. "The main messages
13  communicated to Bayer were that after careful consideration and
14  additional analytic work, there was limited clinical need for a
15  riva-specific antidote as well as limited potential for the
16  antidote to generate incremental revenue to the riva program,
17  either through sales of the antidote or increased sales of riva,
18  based on our current understanding of the riva TPP and the U.S.
19  regulatory landscape." Did I read that correctly?
20  A. You did.
21  Q. Would you agree with me that as long as there's a chance of
22  somebody bleeding on Xarelto from a clinical standpoint, from a
23  patient's perspective, that there would always be a need for an
24  antidote?
25  A. There would be a need for modalities to manage that bleeding. I

890

1   would agree with that. My own mother, you know, took it once and
2   so I would 100 percent agree with that. But if I may finish my
3   thought for a minute, since we didn't move to the next question.
4   By modality, to be clear for the jury and everyone else, what I
5   mean is there needs to be options, whether it's a precise antidote
6   or whether it's, like, the things that people do with warfarin
7   where they apply vitamin K and it seems to help. That's, in
8   essence, what I mean by modalities. There need to identified some
9   modalities to control a very serious bleeding should one ever
10  occur.
11  Q. Mr. Shah, and for members of the jury, it's David Covey sitting
12  next to you for two days. I don't think the camera was on me at
13  all. Now it's my turn to ask you some questions. Let's start.
14  Can you tell the jury where you were born.
15  A. Yes, I was born in the Lahore, Pakistan.
16  Q. When was that?
17  A. It was 1971.
18  Q. And when did your family move to the United States?
19  A. My family immigrated to the United States in 1980.
20  Q. And are you married?
21  A. I am married.
22  Q. Do you have children?
23  A. I do.
24  Q. How many children do you have?
25  A. I am the proud father of three daughters and two step-daughters.

891

1   My twins are Morgan and Lea. They're 13 years old. And my younger
2   one is Amira. She is only 20 months.
3   Q. Where did you go to college?
4   A. I went to Penn.
5   Q. University of Pennsylvania?
6   A. I did.
7   Q. What year did you graduate?
8   A. I graduated in 1993.
9   Q. What did you major in?
10  A. Biological basis of behavior.
11  Q. And did you do any work during hours when you weren't in school
12  or summer that was medically related?
13  A. I did a number of roles that were medically related. I worked
14  -- in the summers prior to my senior year, I worked in a healthcare
15  company, in an insurance company, in a couple of different
16  capacities.
17        But my most important role, for a year I did research in
18  urology at the Penn Medical School.
19  Q. At University of Pennsylvania Medical School?
20  A. Yes. Correct.
21  Q. What did you do after college?
22  A. When I graduated college, I was actually recruited to the
23  pharmaceutical industry. I also had opportunities to continue to
24  do medical research at the Penn Medical School. Medical school was
25  a potential option as well.

892

1         Something about the industry just fascinated me, the
2   opportunity to follow in my father's footsteps, and I wanted to
3   learn. So I initially joined the industry as I was recruited by
4   Upjohn while I was still an undergrad. The job was waiting for me
5   when I graduated.
6         And I decided to give it a couple of years and then
7   probably head back to medical school. But that was my idea to
8   evaluate the industry at that point.
9   Q. So something about working in the industry got in the way of
10  going back to medical school. What was -- why do you have a
11  continuing interest in this industry as opposed to perhaps an
12  earlier thought that maybe you would go to medical school?
13  A. Yeah, it's -- Okay. I love the field of medicine. I absolutely
14  love, love healthcare. You know, even in my interviews, that was
15  all I wanted to do, be in the healthcare field. The reason I
16  joined the industry or at least stayed in the industry and didn't
17  go back to medical school was very simple. I fell in love with the
18  work that the industry does. I didn't realize that I would
19  appreciate and have the opportunity to basically have impact on a
20  business as well as obviously on healthcare. And I thought this
21  would provide the best combination.
22        But the real big reason I stayed was because I realized
23  that the industry would give me a chance to impact lives on a
24  massive scale.
25        Individual physicians do phenomenal work. I have the

925

1 considered by the scientists and had been rejected as a potential

2 going forward and that now with Dr. Califf banging the drum again

3 or sending a proposal, that it now is going to go back on the

4 agenda to discuss with Bayer, correct?

5 A. No, I think it was more that it was a heads-up that he's going

6 to be sending a proposal. I don't believe it was a rediscussion of

7 the R&D decision not to move forward with the ROCKET 2 proposal.

8 Q. Okay. So when it says, "team thinks ROCKET 2 needs to be on

9 agenda for Bayer meeting this week - just so everyone knows Califf

10 is making noise about it," the decision at this point in time had

11 been made. You weren't going to do a ROCKET study. You were just

12 going to inform Bayer that Califf is still banging the drum about a

13 dose finding study?

14 A. That's my interpretation.

15 Q. Okay. So there was not really going to be a decision point by

16 putting it on the agenda. It was just to notify?

17 A. Right, and keep in mind, this LCM meeting is not a

18 decision-making meeting. Decision-making meeting about fundings of

19 trials and comparators and doses would be determined by the senior

20 leadership team of Dr. DiBattiste.

21 Q. Okay. And so the ROCKET 2 trial that would look at twice daily

22 dosing in afib patients was not consistent with the strategic

23 imperative that we saw in those joint steering committee meeting

24 notes, correct?

25 A. Correct, I think and timing is important at this point of when

926

1 we were having this LCM meeting. We hadn't been in receipt of the

2 Califf proposal and, importantly, our research and development

3 colleagues already made a determination that we were not going to

4 107:19 press forward in that regard.

5 Q. Okay. I've handed you what I've marked as Exhibit 10. It is

6 Record Number 259501, Bates Number XARELTO_JANSSEN_01203314. I

7 gave you an opportunity off the record to read the e-mail. Are you

8 ready to answer questions?

9 A. Yes.

10 Q. Okay. Do you see that this is part of the same e-mail chain

11 that we were talking about with Dr. Peters' e-mail on January 10,

12 2012. Do you see that?

13 A. I do.

14 Q. You write, "would not support doing a ROCKET 2 study and

15 unwinding everything we invested and are actively selling today."

16 Did I read that correctly?

17 A. Correct.

18 Q. And the ROCKET 2 study you're referencing is the ROCKET 2 study

19 that we talked about a little bit earlier that Dr. Califf sent,

20 correct?

21 A. Well, I would just say that we hadn't at this point in time --

22 this is January and we hadn't received Dr. Califf's proposal at

23 this point in time, specifically.

24 Q. So you didn't receive Dr. Califf's proposal at this point in

25 time, but you did have a sense that it was going -- about a dose

927

1 finding study, correct, for Xarelto patients in afib?

2 A. I didn't know that. I thought it was an afib PCI study that

3 Dr. Califf at the time was going to be putting forward.

4 Q. So you didn't know what the details were, correct?

5 A. Correct.

6 Q. But you were objecting to it, correct, notwithstanding not

7 knowing the details?

8 A. Well, I was -- for context, I was -- the ROCKET 2 study was not

9 part of the agenda for this LCM meeting because our R&D committee

10 led by Dr. DiBattiste had already made the decision that we weren't

11 moving forward in ROCKET, that we had other high

12 unmet need areas that we were going to focusing on.

13     So my context for my comments here would be that I

14 thought this would be distracting to the team to be discussing in

15 such a forum and that, as Gary mentioned in his -- Dr. Peters

16 mentioned in his e-mail, that he would get his chance at SLT.

17 That's where those ROCKET 2 discussions, given a decision has

18 already been made, would be taking place.

19 Q. You're saying to the jury about this e-mail that the reason

20 ROCKET 2 wasn't on the agenda was because it was distracting to the

21 team, right, that's what you're saying now, but it doesn't say that

22 in this e-mail, correct; it's not what you wrote?

23 A. It's not what I wrote, but it's more important that this

24 decision had already been made by our R&D team, and it wasn't part

25 of the conversation of the LCM meeting that we were going to be

928

1 having with Bayer.

2 Q. And you didn't want it to be part of it because, from your

3 perspective, as you state here, it "would not support doing a

4 ROCKET 2 study and unwinding everything we invested and are

5 actively selling today"; that's what you wrote, correct?

6 A. It is.

7 Q. You also write, it would say to the market that the competition

8 is right, we are a BID drug. BID means what?

9 A. Twice a day.

10 Q. All right. And we saw a little bit earlier that one of the

11 strategic imperatives for looking at what studies to do, what

12 additional studies to do in Xarelto, was to maintain your

13 once-a-day dosing, correct? We saw that in the JC meeting minutes,

14 correct?

15 A. Correct, but as a marketer, I wouldn't have the decision-making

16 power to weigh in on what studies we do or don't do and what doses

17 we study and don't study.

18 Q. But at the time that you're weighing in on this e-mail to not do

19 or consider the ROCKET 2 study, you are vice president of

20 marketing, correct?

21 A. I am. I am one -- I am adding my opinion, and I think I kind of

22 phrased that at the beginning, "a few comments from my end to

23 consider." Keep in mind decision-making meetings about these

24 matters are managed with a different committee of which I am not a

25 part of.

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  XARELTO                  *
     (RIVAROXABAN) PRODUCTS           *
6    LIABILITY LITIGATION             *
                                      *
7    THIS DOCUMENT RELATES TO:        *    Docket No.: 14-MD-2592
                                      *    Section "L"
8    *Joseph J. Boudreaux, Jr.*       *    New Orleans, Louisiana
     *v. Janssen Research &*          *    April 28, 2017
9    *Development, et. al.,*          *
     Case No.: 14-CV-2720             *
10   * * * * * * * * * * * * * * * *

11                VOLUME IV – AFTERNOON SESSION
          TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15

     For the Plaintiffs':
16   Liaison Counsel:              Levin Papantonio
                                   BY:  BRIAN H. BARR, ESQ.
17                                 316 South Baylen Street, Suite 600
                                   Pensacola, Florida  32502
18

19                                 Beasley Allen
                                   BY:  ANDY BIRCHFIELD, ESQ.
20                                 P.O. Box 4160
                                   Montgomery, Alabama 36103
21

22                                 Gainsburg Benjamin David
                                     Meunier & Warshauer
23                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
24                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163
25

OFFICIAL TRANSCRIPT

**Page 1070**

1  logistics are set up.  And so I don't intend to be
2  disrespectful by that.  You understand that, don't you?
3       We'll move on.  Maybe?  Okay.
4       So as I understand it, you started in Janssen in May
5  of 2006 when you moved over from another pharmaceutical
6  company, AstraZeneca; is that correct?
7  A.   Yes, that's correct.
8  Q.   And you came into Janssen specifically in 2006 to work on
9  Xarelto; right?
10 A.   That was the project, yes, that I was hired to work on.
11 Q.   Okay.  And you were hired as the franchise medical leader
12 at Janssen for the development program on Xarelto; correct?
13 A.   Yes, that's correct.
14 Q.   And you would agree with me that you had significant
15 responsibility in the development of Xarelto for the use of
16 people with atrial fibrillation; correct?
17 A.   I was part of the team that worked on Xarelto, yes.
18 Q.   You were heavily involved in the clinical development of
19 that indication; correct?
20 A.   I couldn't quite hear the first part of that question.  It
21 is a bit echoey.
22 Q.   You were heavily involved in the clinical
23 development of the AFib indication; correct?
24 A.   Yes, I was.  That was one of my responsibilities.
25 Q.   Okay.  And you ultimately became the vice president of the

OFFICIAL TRANSCRIPT

**Page 1071**

1  cardiovascular department and a senior medical person at
2  Janssen regarding Xarelto and AFib; correct?
3  A.   My position as the CV development head was a little bit
4  broader than just Xarelto.  It was not just Xarelto.
5  Q.   Okay.  All right.  But you would agree with me that you --
6  a substantial portion of your responsibilities were the drug
7  Xarelto; correct?
8  A.   Yes.  From 2006 until about the end of 2012 -- when I --
9  Q.   When you what?  You cut off there.  I didn't hear you.
10 A.   My -- end of 2012, I actually moved on and started working
11 other projects.  So Xarelto, when it was my primary
12 responsibility, was from May of 2006 until about the end of
13 2012, although I've had some ongoing activities with Xarelto
14 since 2012.
15 Q.   Okay.  Okay.  Now, prior to the approval of Xarelto, you
16 would agree with me that, from a commercial strategy
17 standpoint, Janssen did not want to encourage the use of any
18 measurement with Xarelto; correct?
19 A.   No, I would not agree with that.
20 Q.   Okay.  Let me hand you what I'm going to mark as the
21 plaintiffs' next exhibit.  It's Plaintiffs' 255705.
22       MR. BARR:  And we will offer this into the record.  I
23 don't believe there's an objection, Your Honor.  It's
24 Exhibit 72.
25       MR. SARVER:  No objection.

OFFICIAL TRANSCRIPT

1072   1073

**Page 1072**

1       THE COURT:  Let it be admitted.  Show it to the
2  witness.
3  BY MR. BARR:
4  Q.   Okay.  Do you have that exhibit in front of you,
5  Dr. Peters?
6  A.   I don't.  I do now.  Just handed to me.
7  Q.   Okay.  Can you also see it on the screen?
8  A.   Yes, I can.  It's a little blurry on the screen.  It will
9  be easier to look at the hard copy.
10 Q.   What I want to focus on -- you see that there's an e-mail
11 that starts from Nauman Shah on June 15, 2010.  It's the second
12 e-mail on the page; correct?
13 A.   Give me a minute here just to look at the document.
14 Q.   And you can look at it as much as you want, but I'm just
15 focusing on this one e-mail.  And it's up on the screen for
16 you.
17 A.   Okay.  Yes, I do see it's on the screen.  Yes.
18 Q.   All right.  And what this e-mail -- you received this
19 e-mail on June 15th, 2010; correct?  You see your name there in
20 the "to" line?
21 A.   I do, yes.
22 Q.   Okay.  What this says is, "Thanks for forwarding this on.
23 From a commercial strategy standpoint, we do not want to
24 recommend or encourage use of any measurements for
25 rivaroxaban."

OFFICIAL TRANSCRIPT

**Page 1073**

1       Do you see that?
2  A.   I do see that statement, yes.
3  Q.   And so that was -- from the commercial strategy
4  standpoint, you would agree, Nauman Shah was informing you
5  that, from a commercial strategy standpoint, measurements was
6  not something that Janssen wanted to encourage; correct?
7  A.   The context of this e-mail is that -- I work in research
8  and development, and so I'm not really aware of what the
9  commercial strategy is.  I work from a medical scientific
10 standpoint.
11      So it appears this note is from Nauman and I was
12 copied on it.  I don't know the full context of this e-mail
13 without reading it in more detail.  But, certainly, this --
14 Nauman is entitled to his opinion.  But this, from my
15 scientific standpoint, you know, wouldn't -- wasn't the
16 scientific medical strategy for the development of Xarelto.
17 Q.   Okay.  But Nauman Shah is with the marketing group, and
18 he's informing all the people that this e-mail is sent to,
19 which are both regulatory people and science people, that
20 Janssen did not want to encourage measurements when it came to
21 Xarelto; correct?
22 A.   So this looks like, from the submission line, it's in
23 relation to a paper that was published about using various
24 assays to measure Xarelto levels.  Certainly, scientifically,
25 medically, we would evaluate that; and if it was appropriate to

OFFICIAL TRANSCRIPT

1118

```
 1   than on warfarin?
 2   A.   Yes, they were.
 3   Q.   Did the ROCKET study -- I'm sorry.  Did I cut you off,
 4   Dr. Peters?
 5   A.   No.  I was just going to say, of the major -- we were
 6   looking -- we would have been happy with equal efficacy and
 7   equal safety given the problems with warfarin we had mentioned
 8   earlier.  So this was very -- at this time a little bit
 9   surprising that we had reductions in these serious bleeds.  And
10   it's actually been a common finding across all of the new
11   drugs, that they all seemed to have fewer of these most serious
12   bleeds compared to warfarin.
13   Q.   Did the ROCKET study also prove that Xarelto was highly
14   effective at preventing stroke?
15   A.   Yes, it did.  Again, if warfarin is at least 70 percent
16   effective for preventing strokes, we showed very convincingly
17   we were at least as good as warfarin and, at least numerically,
18   we were actually showing fewer strokes than warfarin, but not
19   statistically fewer in the ITT analyses.
20   Q.   And, Dr. Peters, did you participate in the FDA advisory
21   committee hearing to discuss ROCKET and the findings of the
22   study?
23   A.   Yes, I did.
24   Q.   What is the FDA advisory committee?
25   A.   That's a group of outside-the-FDA experts that they
```

1119

```
 1   convene to help them with questions they have for them.  In
 2   this case it was questions around the ROCKET study and if
 3   rivaroxaban should be approved or not.  That was the main
 4   question for the advisory committee.  It's a panel convened by
 5   FDA.  They are their experts.  And the sponsor, myself and
 6   others, were there to present to that FDA committee.
 7   Q.   Did you learn what happened after the FDA heard the
 8   presentations from FDA scientists, from outside scientists, and
 9   had studied the ROCKET data, what did the advisory committee
10   do?
11   A.   The advisory committee recommended, by a vote of nine to
12   two, that rivaroxaban should be approved in the United States.
13   Q.   Dr. Peters, do you think that Xarelto is a safe and
14   effective medicine?
15   A.   Yes, I do.
16   Q.   Is it effective at preventing strokes?
17   A.   Yes, it's very effective.  As we mentioned, versus
18   warfarin, it's very effective, and we were at least equal if
19   not better.  So it's a very effective medicine for preventing
20   strokes.
21   Q.   And you told us about your wife early on.  You've been
22   married 39 years.  I assume you like her.
23        MR. BARR:  Your Honor, if this is going where I think
24   it's going, I have an objection.
25        MR. SARVER:  Well, it is.  Let's go up to the bench.
```

1120

```
 1        (WHEREUPON, the following proceedings were held at
 2   the bench.)
 3        THE COURT:  I assume she had --
 4        MR. SARVER:  She took it and did fine and all that
 5   stuff.
 6        MR. MEUNIER:  Your Honor, this was the subject of a
 7   motion in limine as to which you reserved a ruling, and you
 8   said it would depend on credibility and other issues that may
 9   arise at the trial.  There's no need to enhance this man's
10   credibility by saying that his wife took Xarelto, and I think
11   it has a prejudicial effect that outweighs the probative value
12   and so we'd ask that it not be allowed.
13        MR. SARVER:  This testimony has already come in
14   through another witness, Your Honor, not for Dr. Peters' wife,
15   but I believe it was a witness that was by deposition.
16        MR. MEUNIER:  We were not able to properly screen
17   that.  It should have been objected to.
18        MR. SARVER:  Okay.  I thought this was resolved.
19   That's fine.
20        THE COURT:  It may not have been resolved.  The issue
21   really is only significant insofar as credibility is concerned.
22   It has no relevance other than that, but it does have some
23   relevance of credibility.  This witness is testifying as the
24   company representative.
25        The plaintiffs take the position that the
```

1121

```
 1   company did something -- did not do something that they should
 2   have done, and there's also a suggestion that they did it for
 3   commercial reasons.  This witness has been involved with the
 4   Xarelto, the development and design of Xarelto.  So his
 5   credibility is significant to the whole case, it seems to me.
 6   The plaintiffs have attempted to take him on cross and to show
 7   that his credibility is a problem.  That's obvious.  Certainly,
 8   they take the position that the company's credibility is at
 9   issue.
10        So I weigh the advantages, disadvantages, and it
11   seems to me that the 403 analysis tips in favor of allowing it.
12        MR. SARVER:  Thank you, Your Honor.
13        THE COURT:  That's my ruling.
14        MR. SARVER:  Yes, sir.
15        (WHEREUPON, the following proceedings were held in
16   open court.)
17        MR. SARVER:  We're back, Dr. Peters.  Are you ready
18   for us?
19        THE WITNESS:  Okay.
20   BY MR. SARVER:
21   Q.   Okay.  So, Dr. Peters, you told us earlier that you've
22   been married for 39 years.
23   A.   Yes.
24   Q.   I'm assuming you like your wife.
25   A.   I didn't hear that --
```

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3
        ****************************************************************
 4
        IN RE:  XARELTO
 5      (RIVAROXABAN) PRODUCTS
        LIABILITY LITIGATION
 6
                              CIVIL ACTION NO. 14-MD-2592
 7                            SECTION "L"
                              NEW ORLEANS, LOUISIANA
 8                            WEDNESDAY, MAY 3, 2017

 9      THIS DOCUMENT RELATES TO:
        Joseph J. Boudreaux, Jr.
10      V. Janssen Research &
        Development, et. al.,
11      Case No.:  14-CV-2720

12      ****************************************************************

13
                   VOLUME VIII - MORNING AND AFTERNOON SESSION
14            TRANSCRIPT OF BELLWETHER JURY TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE

16
        APPEARANCES:
17


18      FOR THE PLAINTIFFS'
        LIAISON COUNSEL:           LEVIN PAPANTONIO THOMAS MITCHELL
19                                 RAFFERTY & PROCTOR
                                   BY:  BRIAN H. BARR, ESQ.
20                                 316 SOUTH BAYLEN STREET, SUITE 600
                                   PENSACOLA, FLORIDA 32502
21

22
                                   BEASLEY ALLEN CROW METHVIN
23                                 PORTIS & MILES
                                   BY:  ANTHONY BIRCHFIELD JR., ESQ.
24                                 POST OFFICE BOX 4160
                                   MONTGOMERY, ALABAMA  36103
25


                        OFFICIAL TRANSCRIPT
```

07:41:16

1559

| | |
|---|---|
| 09:13:07 | 1 |
| | MR. BARR:  Everyone from the company you heard was |
| 09:13:12 | 2 |
| | brought here by the plaintiffs.  We played the depositions.  We |
| 09:13:18 | 3 |
| | forced Dr. Peters to come testify.  They brought you no one.  I |
| 09:13:25 | 4 |
| | don't know why Bayer and Janssen did not bring a single witness |
| 09:13:29 | 5 |
| | to testify?  Maybe they can explain that. |
| 09:13:32 | 6 |
| | MS. WILKINSON:  Your Honor, I'm going to object again |
| 09:13:33 | 7 |
| | in light of your ruling on the video -- live video testimony as |
| 09:13:37 | 8 |
| | well. |
| 09:13:39 | 9 |
| | THE COURT:  Well, it's a question of whether or not |
| 09:13:42 | 10 |
| | they testified by video or by in person.  Let's go on to |
| 09:13:49 | 11 |
| | something else. |
| 09:13:50 | 12 |
| | MR. BARR:  I'll move on, Your Honor. |
| 09:13:57 | 13 |
| | The only witness you heard testify live about PT |
| 09:14:01 | 14 |
| | test that have seen all of the evidence, everything, including |
| 09:14:04 | 15 |
| | the internal company documents, including what these companies |
| 09:14:08 | 16 |
| | knew were Dr. Kessler and Dr. Leissinger.  Both Dr. Kessler and |
| 09:14:15 | 17 |
| | Dr. Leissinger have reviewed all of the evidence, studied and |
| 09:14:19 | 18 |
| | came to you and sat in that chair and proved it, subjecting |
| 09:14:25 | 19 |
| | themselves to cross-examination by Ms. Wilkinson and Mr. Dukes. |
| 09:14:28 | 20 |
| | They didn't have to do that.  They both have a |
| 09:14:31 | 21 |
| | lot of things they could be doing.  Dr. Kessler talked about at |
| 09:14:34 | 22 |
| | that.  But they have reviewed all of the evidence and wanted to |
| 09:14:39 | 23 |
| | provide you their opinions. |
| 09:14:40 | 24 |
| | Now, it's been proven that Neoplastin PT is a |
| 09:14:46 | 25 |
| | helpful laboratory test in ROCKET, the defendants' own study. |

**OFFICIAL TRANSCRIPT**

1560

| | |
|---|---|
| 09:14:51 | 1 |
| | And it should be in the label. |
| 09:14:55 | 2 |
| | When you go back to the jury room, just line up |
| 09:14:57 | 3 |
| | the evidence when you're back there.  Line it up.  Stack it up |
| 09:15:02 | 4 |
| | on opposite sides of the room and see where the greater weight |
| 09:15:04 | 5 |
| | lies, because that's what your charge is.  That's what you have |
| 09:15:09 | 6 |
| | to do, to determine the facts based upon the greater weight of |
| 09:15:12 | 7 |
| | the evidence, more likely than not likely. |
| 09:15:15 | 8 |
| | If you do that, if you stack the evidence up, the |
| 09:15:19 | 9 |
| | only conclusion you can come to is that we have proven that PT, |
| 09:15:26 | 10 |
| | Neoplastin PT, can predict bleed risks, protect patients. |
| 09:15:30 | 11 |
| | These defendants knew it.  They proved it themselves.  And it |
| 09:15:34 | 12 |
| | has to be in the label, and they haven't done that. |
| 09:15:37 | 13 |
| | Stack up the evidence.  Go through it.  Look at |
| 09:15:40 | 14 |
| | Defendants' Exhibit 12, Plaintiffs 2, 3, 4, 77, 133.  Remember |
| 09:15:47 | 15 |
| | the testimony of Dr. Spiro, Dr. Berkowitz, Dr. Leissinger, |
| 09:15:52 | 16 |
| | Dr. Kessler.  Look at it.  Remember it.  Stack the evidence up. |
| 09:15:56 | 17 |
| | Now, I told you in opening statements that the |
| 09:15:59 | 18 |
| | defense was going to try to confuse and misdirect on this issue |
| 09:16:03 | 19 |
| | about a simple blood test and they were going to talk to you |
| 09:16:07 | 20 |
| | about monitoring, and I was right.  That's what they did.  They |
| 09:16:11 | 21 |
| | do that because that's all they have. |
| 09:16:14 | 22 |
| | They can't really fight the evidence that PT |
| 09:16:18 | 23 |
| | predicts bleed risks.  They can't fight it because the FDA says |
| 09:16:24 | 24 |
| | it's true.  Dr. Berkowitz at Bayer says it's true.  Even |
| 09:16:27 | 25 |
| | Janssen has an internal report that says it's true. |

**OFFICIAL TRANSCRIPT**

1561

| | |
|---|---|
| 09:16:30 | 1 |
| | So they go with confusion.  They point to |
| 09:16:35 | 2 |
| | articles that talk about monitoring.  It's almost like they are |
| 09:16:37 | 3 |
| | intentionally not listening to what we're saying.  They don't |
| 09:16:40 | 4 |
| | want to hear the evidence that PT predicts bleed risks.  They |
| 09:16:46 | 5 |
| | would rather talk about something else.  I'm not sure how many |
| 09:16:49 | 6 |
| | different times we can say it. |
| 09:16:51 | 7 |
| | We tried to point it out during the evidence, but |
| 09:16:53 | 8 |
| | they bring it up so constantly that you can't keep up with |
| 09:16:56 | 9 |
| | them.  Constantly showing you articles.  They say PT can't be |
| 09:17:00 | 10 |
| | used with monitoring.  Well, you know what?  We agree with |
| 09:17:04 | 11 |
| | that.  We've made it clear throughout this case that we've |
| 09:17:08 | 12 |
| | agreed with that.  It can't be used to monitor and adjust dose. |
| 09:17:14 | 13 |
| | We know that. |
| 09:17:14 | 14 |
| | It can't work for the reason the FDA said, |
| 09:17:17 | 15 |
| | because they didn't study it.  The FDA wanted it to be looked |
| 09:17:22 | 16 |
| | at.  The FDA said, we can't do it due to a lack of information. |
| 09:17:26 | 17 |
| | Well, who provides the information?  The company does.  And the |
| 09:17:31 | 18 |
| | FDA said they couldn't do it because they only studied a single |
| 09:17:35 | 19 |
| | dose. |
| 09:17:36 | 20 |
| | Do you remember there was talk about, you know, |
| 09:17:38 | 21 |
| | oh, it's not -- it's not a one-size-fits-all pill.  We've have |
| 09:17:41 | 22 |
| | a different pill for people with renal failure.  Well, look |
| 09:17:45 | 23 |
| | what the FDA said, only a single dose was tested in ROCKET. |
| 09:17:48 | 24 |
| | That's not us.  That's the FDA. |
| 09:17:50 | 25 |
| | We're not seeking monitoring.  We are seeking a |

**OFFICIAL TRANSCRIPT**

1562

| | |
|---|---|
| 09:18:02 | 1 |
| | one-time Neoplastin PT blood test to assess bleed risk, not |
| 09:18:09 | 2 |
| | monitoring. |
| 09:18:10 | 3 |
| | What should be in the label is that you can use |
| 09:18:13 | 4 |
| | Neoplastin PT to identify people at high risk so that doctors |
| 09:18:17 | 5 |
| | like Dr. Wong can appropriately take care of their patients, so |
| 09:18:22 | 6 |
| | they don't cause unnecessary harm to people like |
| 09:18:26 | 7 |
| | Johnny Boudreaux. |
| 09:18:27 | 8 |
| | These are the companies -- remember, you've seen |
| 09:18:31 | 9 |
| | this in the depositions that we played on video.  These are the |
| 09:18:35 | 10 |
| | companies that refuse to do follow-up scientific studies |
| 09:18:41 | 11 |
| | because of a fear of just doing the study -- not even the |
| 09:18:44 | 12 |
| | result, the result doesn't matter -- just doing the study would |
| 09:18:50 | 13 |
| | hurt them in the market. |
| 09:18:52 | 14 |
| | The market is their number one priority, not |
| 09:18:56 | 15 |
| | patient safety.  They put their marketing needs over patient |
| 09:19:00 | 16 |
| | safety.  Patricia Torr, her testimony, made that crystal clear. |
| 09:19:06 | 17 |
| | Now, they want to argue that other NOACs don't |
| 09:19:10 | 18 |
| | require blood testing like we talked about.  Ms. Wilkinson has |
| 09:19:16 | 19 |
| | made a big deal about that this whole trial.  She keeps putting |
| 09:19:19 | 20 |
| | up this board that has all these different NOACs on it, and |
| 09:19:23 | 21 |
| | says, none of these require blood testing.  Putting up charts |
| 09:19:27 | 22 |
| | with Eliquis, Xarelto, Savaysa, Pradaxa.  Well, so what? |
| 09:19:32 | 23 |
| | This case isn't about other drugs.  It's about |
| 09:19:35 | 24 |
| | Xarelto.  That's why we're here.  It doesn't matter if other |
| 09:19:40 | 25 |
| | drugs require blood testing or not.  You've seen no evidence on |

**OFFICIAL TRANSCRIPT**