# EXHIBIT 1

08:47:55

```
 1                      UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
 2

 3    ****************************************************************

      IN RE:  XARELTO (RIVAROXABAN)
 4    PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                           Section "L"
 5                                         New Orleans, Louisiana
      THIS DOCUMENT RELATES TO:           Monday, April 24, 2017
 6    Joseph J. Boudreaux, Jr.
      v. Janssen Research &
 7    Development, et. al.,
      Case No. 14-CV-2720
 8

 9    ****************************************************************

                          TRANSCRIPT OF TRIAL PROCEEDINGS
10              HEARD BEFORE THE HONORABLE ELDON E. FALLON
                         UNITED STATES DISTRICT JUDGE
11                      VOLUME I - MORNING SESSION

12

      APPEARANCES:
13

      FOR THE PLAINTIFFS'
14    LIAISON COUNSEL:               LEVIN PAPANTONIO
                                     BRIAN H. BARR, ESQ.
15                                   316 Baylen Street, Suite 600
                                     Pensacola, FL 32502
16
                                     BEASLEY ALLEN
17                                   BY:  ANDY BIRCHFIELD, ESQ.
                                     P.O. Box 4160
18                                   Montgomery, AL 36103

19                                   GAINSBURGH BENJAMIN DAVID
                                     MEUNIER & WARSHAUER
20                                   BY:  GERALD E. MEUNIER, ESQ.
                                     2800 Energy Centre
21                                   1100 Poydras Street
                                     New Orleans, LA 70163
22
                                     SCHLICHTER, BOGARD & DENTON
23                                   BY:  ROGER C. DENTON, ESQ.
                                     100 South 4th Street
24                                   Saint Louis, MO 63102

25
```

```
 1                                   LAMBERT FIRM
                                     BY:  EMILY JEFFCOTT, ESQ.
 2                                   701 Magazine Street
                                     New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:      WILKINSON WALSH & ESKOVITZ, LLP
                                     BY:  BETH A. WILKINSON, ESQ.
 6                                   1900 M Street NW, Suite 800
                                     Washington, DC 20036
 7
                                     Nelson Mullins Riley
 8                                   & Scarborough, LLP
                                     BY:  DAVID E. DUKES, ESQ.
 9                                   Meridian, 17th Floor
                                     1320 Main Street
10                                   Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:              BARRASSO USDIN KUPPERMAN FREEMAN
13                                   & SARVER, LLC
                                     BY:  RICHARD E. SARVER, ESQ.
14                                   909 Poydras Street, 24th Floor
                                     New Orleans, LA 70112
15

16
      Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
17                                  500 Poydras Street, B-275
                                    New Orleans, Louisiana 70130
18                                  (504) 589-7776

19
         Proceedings recorded by mechanical stenography, transcript
20    produced by computer.

21

22

23

24

25
```

DR. DAVID KESSLER - CROSS

14:58  1    **THE COURT:**  I understand.  Wait.

14:58  2              Why don't you finish your answer.  Go ahead.

14:58  3    **THE WITNESS:**  So let me just read you back in 2000

14:58  4    and -- from the clinical review at this time, you know, around

14:58  5    this time of labeling.  It says -- what FDA is saying back at

14:58  6    this time, "It appears that there is no significant difference

14:58  7    in PT values in subjects experiencing bleeding events compared

14:58  8    with subjects who are not experiencing bleeding events."

14:58  9              And FDA, basically -- I'm not very proud of

14:58  10   this, just personally -- copied and pasted what the company was

14:59  11   saying.

14:59  12             So FDA believed, back at this time, based on

14:59  13   what the company was saying, no association between PT and

14:59  14   bleeding risk.  They knew about this, but that was the state of

14:59  15   knowledge back in 2008.  It wasn't until late 2011 that FDA

14:59  16   figured out the correlation between PT and bleeding risk.

14:59  17             So that's when FDA knew about that.  It didn't

14:59  18   know about bleeding risk back then.

14:59  19   **BY MR. DUKES:**

14:59  20   **Q.**   Did I ask anything about bleeding risk in my question --

14:59  21   **A.**   You're asking me what the company knew.

14:59  22   **Q.**   No.  I asked did -- because we're going to go through the

14:59  23   whole timeline.  I mean, I'll get there.

14:59  24             Did FDA know about what's on the screen?

14:59  25   **A.**   Well, it was submitted to -- this was submitted to FDA,

OFFICIAL TRANSCRIPT

DR. DAVID KESSLER - CROSS

15:38  1  concerns regarding Xarelto use in the setting of obstetric

15:38  2  hemorrhage remain, additional language has been added to the

15:38  3  warnings and precautions section of the labeling.  See 5.3."

15:38  4       That's what they said?

15:39  5  A.   That's exactly what that says, again, not about bleeding

15:39  6  risk and PT.

15:39  7  Q.   Let's take a look at 5373-A.9.1.

15:39  8       So the maternal health team recommended that the

15:39  9  anticoagulant effect of Xarelto can neither be monitored with

15:39 10  standard laboratory testing nor readily reversed; correct?

15:39 11  A.   That's what it says.  And that's showing you that, at this

15:39 12  point in time, right -- it's not until later that FDA figures

15:39 13  it out.  They're clueless here.

15:39 14  Q.   All right.  Let's take a look at DX 5373-A.9.2.  And the

15:39 15  maternal health team also recommended adding to the label "The

15:39 16  anticoagulant effect of Xarelto cannot be reliably monitored

15:39 17  with laboratory testing."

15:39 18       That's what they said; right?

15:39 19  A.   That's exactly what they say.  What's interesting is

15:40 20  there's no citation to their correlation.  It's absolutely

15:40 21  absent from this.  So how this is even said, it just shows that

15:40 22  that -- all that -- those findings come in later after this.

15:40 23  This is earlier on.

15:40 24  Q.   All right.  Let's pull up Slide 47, and I've added here

15:40 25  the June 7th, 2011, letter that we just covered where they

DR. DAVID KESSLER - CROSS

1   here.

2   Q.   I understand that's your argument.

3        MR. MEUNIER:  That's his testimony, Your Honor, not

4   his argument.

5        MR. DUKES:  I understand.

6        THE COURT:  He's answering the question.  It's not an

7   argument.

8   BY MR. DUKES:

9   Q.   If we call up DX 5357.22.1.

10       So we're looking back at Section 12.2 again, and I

11  think, as you pointed out, that line's not a strikeout but a

12  copier issue.

13       It does not include a recommendation to use PT to

14  measure the pharmacodynamics effect of Xarelto on the label,

15  does it?

16  A.   Doesn't recommend -- doesn't recommended use of PT for

17  concentration or for bleeding risk.  It's absent here.

18  Q.   Right.  There's no recommendation to use a PT test in this

19  label; correct?

20  A.   Right.

21  Q.   And in July of 2011, FDA approved Xarelto?

22  A.   But just -- it does contain -- the date of this, again, is

23  what?  Just help me.

24  Q.   July 2011.

25  A.   Right.  And so on this date, just so -- when you fix your

DR. DAVID KESSLER - CROSS

16:24 1    timeline, it should be clear that this date is before the
16:24 2    August 10th date or the November 4th date, when FDA -- because
16:24 3    you see that last sentence here, "The particular value of these
16:24 4    anticoagulation parameters for bleeding risk or efficacy" --
16:24 5    let's stay with bleeding risk -- "has not been established."
16:24 6            Again, my sort of position, if you want.  If you go
16:24 7    look at the ROCKET data, it's all there.  FDA didn't figure it
16:24 8    out until the next month after that because that's why that is
16:24 9    in there.
16:24 10   Q.   But you agree that FDA at this time, in July of 2011,
16:24 11   said, "The predictive value of these anticoagulation parameters
16:25 12   for bleeding risk or efficacy has not been established."
16:25 13   Correct?
16:25 14   A.   No, sir.  Remember -- and, again, I don't want to be the
16:25 15   one testifying.  But I think you at one point said that FDA had
16:25 16   said this had not been adequately studied.  I think then you
16:25 17   also said and showed documents where you said Janssen came back
16:25 18   and said it's not been established.
16:25 19           FDA was saying it's not been studied; Janssen is
16:25 20   saying it's not been established.  This is Janssen's label.
16:25 21   You can't say this is FDA.  Clearly, those words are likely to
16:25 22   be are those -- you know, their -- this is Janssen's label.
16:25 23   Q.   Label approved by FDA.
16:25 24   A.   Agreed-upon, I think, is the language you showed me in
16:25 25   that -- it was an approved drug with the agreed-upon language

OFFICIAL TRANSCRIPT

1  committee?

2  **A.**   Yes.  That was a senior committee that had to approve the

3  language in all of our labels before we would be able to submit

4  them to FDA.

5  **Q.**   Were you involved with that committee?

6  **A.**   I was not a member of that committee, but I was involved

7  in preparing documents that they would review and addressing

8  any comments or suggestions that they might have with the team.

9  **Q.**   I'd like to get right to the crux of it.

10          Was there a time when Janssen submitted to the FDA

11  language in the Xarelto label that contained some information

12  about a PT test?

13  **A.**   Yes.  There was information in both of our initial labels

14  about the results that we had from our clinical studies with

15  the PT Neoplastin test.

16  **Q.**   And did you -- were you a recipient of FDA's response to

17  Janssen's label request?

18  **A.**   Yes, I was copied on that response.

19  **Q.**   I'd like to show now Defense Exhibit 6009.

20          Please provide a copy to --

21          Do you have a copy with you, Dr. Peters?

22  **A.**   Yes.  I have that in front of me now.

23  **Q.**   Are you, in fact, a recipient of this e-mail?

24  **A.**   I don't see it on the screen.  It might be --

25  **Q.**   If you go down the page.

OFFICIAL TRANSCRIPT

1  **A.**   I do see my name.

2  **Q.**   Do you see your name, Gary Peters -- Peters, Gary.  Is

3  that you?

4  **A.**   Yes, it is.

5  **Q.**   Do you see the subject line?  Could you read it for us?

6  **A.**   The screen went blank, but I can read it off the hard

7  copy.

8  **Q.**   Go off the hard copy.

9  **A.**   Subject line says, "FDA marked-up version of ORS" -- which

10  is orthopedic surgery -- "USPI" -- which is U.S. package

11  insert -- (NDA22406CR)."

12  **Q.**   Dr. Peters, did you receive this e-mail in the course and

13  scope of your work at Janssen?

14  **A.**   Yes, I did.

15       **MR. SARVER:**  Your Honor, we would offer Defense

16  Exhibit 6009.

17       **THE COURT:**  Admitted.

18  **BY MR. SARVER:**

19  **Q.**   Now, Dr. Peters, could you turn to the actual text of the

20  e-mail at -- I believe it's page 33.

21       Do you see that?

22  **A.**   The e-mail is the first.  I don't --

23  **Q.**   Let's go to the e-mail text where it says, "Dear all."

24  **A.**   Okay.

25  **Q.**   Do you see that, Dr. Peters?

1  A.   Yes, I see that.  Yes, that's up on screen now.  Yes.

2  Q.   "Dear all, We received the FDA revisions to our proposed

3  USPI" --

4            Is that U.S. package insert?

5  A.   Yes, that would be those initials.

6  Q.   -- "and container carton and blister pack labels for our

7  review and comments."

8            Do you see that?

9  A.   Yes, I do.

10  Q.   Does this e-mail actually provide, as part of it, what the

11  FDA did to Janssen's suggested language?

12  A.   Yes.  The e-mail in the attachment, it says, "See all four

13  attached."

14            This was -- we had submitted our labels, and FDA had

15  provided their comments.  They have some comment boxes and they

16  have some changes.  And then we need to -- going on from what's

17  not highlighted, we need to accept the changes we agree to; and

18  for changes we do not, keep in track changes.  Because this

19  goes back and forth between the company and FDA at this point

20  until the approval and the final label is actually determined.

21  Q.   Okay.  Let's turn to page 33 of the attachment, if we

22  could.  Are you able to see that, Dr. Peters?  Take your time.

23  A.   I -- yes, I can see that.

24  Q.   All right.  Do you see the Section 12.2,

25  "Pharmacodynamics"?

OFFICIAL TRANSCRIPT

1    **A.**   Yes, I do.

2    **Q.**   And there appears to be a strike-through on some of the

3    language.

4              Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   Where did that strike-through come from?

7    **A.**   That strike-through came from FDA.

8    **Q.**   Let's take a look at the language, then, that the FDA

9    struck out of the label that Janssen proposed.  Read along with

10   me.

11            Now, the language the FDA chose to strike out says,

12   "The relationship between PT and riva plasma concentration is

13   linear and closely correlated.  If assessment of the

14   pharmacodynamics effect of rivaroxaban is considered necessary,

15   in individual cases PT (measured in seconds) is recommended."

16            Is that what the FDA chose to strike out of the

17   Janssen label?

18   **A.**   Yes, they -- they struck out that part and the parts that

19   follow.

20   **Q.**   All right.  So is there any question in your mind,

21   Dr. Peters, that Janssen proposed language to the FDA about the

22   label about PT and the FDA struck it out?

23   **A.**   No doubt in my mind at all, no.

24   **Q.**   I'd like to go to another issue that we need to clear up.

25            Did you attend any meetings with the FDA about

1    in the current labeling review."

2            Did I read that correctly?

3    **A.**    Yes, you did.

4    **Q.**    Dr. Peters, there's been some suggestion in this case that

5    the Cardio-Renal division was not involved in the label review.

6            Is that true?

7    **A.**    No.  We had -- both NDAs for orthopedic surgery and for

8    the stroke prevention and atrial fibrillation were both under

9    review at this time, and so we were concerned that Cardio-Renal

10   be involved with the hematology division as they were getting

11   close to the final label.  So that's why we raised that

12   concern.  And the division -- you know, their answer here is

13   that they were working -- hematology and Cardio-Renal were

14   working together to approve our initial label, which was for

15   orthopedic surgery in July of 2011.

16   **Q.**    Dr. Peters, at the beginning of the week, the jury was

17   told by one of the lawyers for Mr. Boudreaux that Xarelto was

18   designed based on a business plan.

19            Is there any truth to that?

20   **A.**    No.  Xarelto was developed and studied within the research

21   and development group.  We designed all the studies, we

22   conducted all the studies.  We analyzed them.  We sent them to

23   FDA.  We do have commercial people that are part of our team,

24   but in research, it is the scientific medical group that makes

25   the decisions, and we developed Xarelto as an improvement over

1  are related to bleeding risks.  And unfortunately Xarelto is

2  very effective and benefits many, many people more than that

3  for preventing strokes.  But, unfortunately, I wish we had

4  anticoagulants that didn't have bleeding risks, but we don't.

5            **THE COURT:**  Okay.  Let's move on.

6            **MR. BARR:**  I'll move on, Your Honor.

7  BY MR. BARR:

8  **Q.**   Now, I don't want to spend a lot of time talking about

9  your wife, but your wife was on the drug for -- post knee and

10 hip surgery; right?

11 **A.**   That is correct.

12 **Q.**   That's the low dose of Xarelto; correct?

13 **A.**   That is the 10-milligram dose, yes.

14 **Q.**   It is not the 20-milligram dose that Mr. Boudreaux was on;

15 correct?

16 **A.**   It was not, no.

17 **Q.**   Okay.

18            Can I get on the board Defendants' 6009?

19            Do you remember being shown this document by

20 Mr. Sarver about the FDA removing certain language?

21 **A.**   Yes.  Can I go back and find that one just so I have it?

22 What number is it?

23 **Q.**   It's Defendants' 6009.

24 **A.**   Okay.

25 **Q.**   Do you have that, sir?

OFFICIAL TRANSCRIPT

1125

1    **A.**    I believe I have that one now, yes.

2              Okay.

3    **Q.**    Do you see that this is dated June 13th, 2011; correct?

4    **A.**    That is the date of this memo, yes.

5    **Q.**    So this is two months before the FDA found a relationship

6    between PT and bleed risk; correct?

7    **A.**    Say that again?

8    **Q.**    This is -- you realize the FDA found a relationship

9    between PT and bleed risk in August of 2011; correct?

10   **A.**    I don't recall what the date of that note was.  The

11   Cardio-Renal division review was underway at this point.  We

12   had provided FDA data on PT from the orthopedic surgery

13   studies.  So we would have to go back and look at those

14   analyses to see if they had done similar ones for that file.

15   **Q.**    I think the jury knows the answer to that.

16              **MR. SARVER:**  I object to the --

17              **THE COURT:**  I sustain.  Strike that.

18   BY MR. BARR:

19   **Q.**    Let's go to page 33.  This is the redline language that

20   you were talking about; correct?

21   **A.**    Yes, it is.

22   **Q.**    Where in that redline is the statement that PT predicts

23   bleed risk?

24   **A.**    There is no statement there that it predicts bleeding

25   risk.

OFFICIAL TRANSCRIPT

1      **MR. NEWSOM:**  Okay.

2      **THE COURT:**  That sort of thing.

3      **MR. NEWSOM:**  And without ruining the suspense, do you

4  yet know whether you're intending to charge the jury on the

5  clear evidence preemption issue?  Neither party proposed the

6  instruction initially, and I think the plaintiffs have now

7  supplemented.  We're happy to provide you with supplemental as

8  well if you think it's going down that road.

9      **THE COURT:**  I really hadn't planned on going down

10 that road.

11     **MR. BARR:**  And ours was only in the event the Court

12 felt it was for the jury.

13     **MR. NEWSOM:**  Of course.

14     **THE COURT:**  I think that's a question of law, not for

15 the jury.  I'm not even sure they know what preemption is.

16     **MR. NEWSOM:**  Nor do I for that matter.

17     **MS. WILKINSON:**  Your Honor, it might help the Court

18 if we tell you our schedule.

19     **THE COURT:**  I thought they did.

20     **MS. WILKINSON:**  We may finish early today, Your

21 Honor, because we only have two physicians, and the other one

22 is coming tomorrow, so --

23     **THE COURT:**  So we'll do the best we can.

24     **MR. MEUNIER:**  Your Honor, we do need the court

25 reporter back out to finish reading exhibits into the record

08:13:41 1    defense.  The defendants have to prove by clear evidence, it's
08:13:44 2    their burden to prove by clear evidence that the FDA would not
08:13:51 3    have approved a warning or instruction in the manner and of the
08:13:59 4    type that the plaintiffs have proposed throughout this
08:14:03 5    litigation regarding the PT testing.
08:14:09 6              They were obliged to show that it was not
08:14:14 7    probable, but highly probable and reasonably certain that the
08:14:17 8    FDA would not have included that language.  That's in the
08:14:22 9    *Fosamax* opinion at the Third Circuit.
08:14:23 10             Here, the plaintiffs have produced more than
08:14:25 11   sufficient evidence for a reasonable jury to conclude that the
08:14:28 12   FDA would have approved a properly worded warning about an
08:14:33 13   instruction for the safe use of Xarelto, or, at the very least,
08:14:38 14   to conclude that the odds of FDA rejection were less than
08:14:41 15   highly probable.
08:14:42 16             So, the only testimony that the defendants have
08:14:46 17   regarding any matter regarding FDA warning was that of
08:14:52 18   Dr. Peters.  He had presented -- but his testimony was
08:14:58 19   limited -- on pages 1103 through 1104 of the trial record, his
08:15:09 20   testimony was only limited to the fact, the fact of an FDA
08:15:14 21   strikethrough, not the reasoning behind it, and not any
08:15:18 22   reasoning as to whether or not FDA would have found it
08:15:21 23   impossible to approve a different label.
08:15:24 24             That's the one point.
08:15:27 25             They have presented no expert testimony on this

*OFFICIAL TRANSCRIPT*

08:15:32  1    point.  The defendants had Dr. Hixon -- a report of Dr. Hixon,

08:15:37  2    but she did not testify at trial, and so there is nothing

08:15:41  3    competent presented to Your Honor.

08:15:44  4             As a result, without any competent evidence that

08:15:50  5    the FDA would act one way or the other, we respectfully submit

08:15:56  6    that the defendants have failed to meet their burden of proving

08:16:00  7    their affirmative defense, and that no reasonable jury could

08:16:06  8    have legally found a sufficient evidentiary basis to find for

08:16:11  9    the defendants, and that judgment should be entered as a matter

08:16:13 10    of law on the preemption defense.

08:16:17 11             THE COURT:  Thank you very much.

08:16:18 12             MR. LONGER:  Thank you.

08:16:20 13             THE COURT:  With regard to comparative fault,

08:16:22 14    comparative fault is not an issue in the case, and age is not

08:16:27 15    an issue in the case, and race is not an issue in the case, and

08:16:31 16    ethnic background is not an issue in the case.

08:16:35 17             I don't want to tell the jury all of those things

08:16:37 18    that are not an issue in the case.  That's not necessary.

08:16:41 19             With regard to the whether or not FDA would

08:16:45 20    approve the warning, you'll see in my jury charges, the jury

08:16:51 21    charges mimic the law that it doesn't matter what the FDA would

08:16:56 22    or would not have done from the standpoint of the law in the

08:17:04 23    case.  It may have something to do with intent of the parties,

08:17:08 24    it may have something to do with motive of the parties, but

08:17:11 25    it's a question of fact or evidence.  So I'll deny the

*OFFICIAL TRANSCRIPT*

08:19:59  1      MR. NEWSOM:  Your Honor, we discussed this yesterday
08:20:01  2  with Your Honor in chambers.  The FDA striking document, while
08:20:05  3  to be sure, at this stage of the proceedings, is not a
08:20:08  4  preemption related issue, it is certainly relevant.
08:20:12  5      The interaction with the FDA, as Your Honor's
08:20:16  6  jury charges will instruct the jury, are certainly relevant to
08:20:19  7  the defendants' course of conduct, the reasonableness of that
08:20:23  8  course of conduct.
08:20:23  9      It is a pertinent piece of evidence.  Your Honor
08:20:26 10  instructed the jury mid-trial that with respect to the
08:20:30 11  relevance of that particular piece of evidence, like all
08:20:33 12  evidence, they are the finders of fact, and they can consider
08:20:36 13  to what extent they find that document relevant.
08:20:38 14      So I think there is no basis to strike that
08:20:40 15  document, or to instruct the jury that they are not to consider
08:20:42 16  it, or to instruct the lawyers that they are not to discuss it.
08:20:45 17      THE COURT:  Okay.  Thank you.
08:20:45 18      MR. NEWSOM:  Thank you, Your Honor.
08:20:48 19      THE COURT:  The plaintiffs make an argument on both
08:20:52 20  sides of that issue.  At one time, they take the position that
08:20:55 21  the FDA would not have approved any warning, and therefore
08:21:00 22  there is no evidence to support that they would or would not
08:21:04 23  have approved the warning.
08:21:10 24      Well, if the evidence is that they were asked to
08:21:13 25  do it, then there's an argument that they would have approved

*OFFICIAL TRANSCRIPT*

08:21:16  1   it.  Whether or not they would have, there's another issue of
08:21:22  2   what the intent of the defendant was, whether they had intent
08:21:28  3   to try to do something.  That can cut both ways.
08:21:32  4          I'm not going to strike the evidence, but I will,
08:21:36  5   just as I did before, if that's brought up, I would interrupt
08:21:40  6   whoever brings it up, and instruct the jury that this is a
08:21:44  7   question of relevance, that it's determinative, and it's up to
08:21:49  8   them to give whatever weight they wish to give to it.
08:21:51  9          But I'm not going to strike the evidence, and I'm
08:21:54 10   not going to tell anybody not to argue, but I do give everybody
08:21:57 11   a heads-up that I will be at least instructing the jury if that
08:22:05 12   comes up.
08:22:08 13          MR. NEWSOM:  Your Honor, if I may, briefly.
08:22:09 14          A proposal for closings.  Rather than Your Honor
08:22:12 15   interrupting closings, if that document is to be discussed,
08:22:14 16   would it be sufficient if the lawyer discussing it prefaces the
08:22:18 17   discussion of it; there will be no discussion of preemption or
08:22:22 18   a conclusive nature of that document, but simply that this is a
08:22:27 19   relevant piece of evidence for the jury to consider, rather
08:22:30 20   than interrupting the flow of the closing?
08:22:31 21          THE COURT:  If it time comes in, I'll have to make that
08:22:35 22   decision on what I hear.
08:22:40 23          MR. NEWSOM:  Yes, sir.  Thank you.
08:22:40 24          THE COURT:  Let's go to the jury charges at this time
08:22:41 25   then.

*OFFICIAL  TRANSCRIPT*

08:27:15 1    pages 22 and 23, we respectfully object to the failure to

08:27:19 2    include plaintiffs' proposed jury instruction number 22, which

08:27:23 3    also was plaintiffs' proffered number one when it was proposed

08:27:26 4    during the trial as a limiting instruction.

08:27:28 5          This is the charge which would instruct the jury

08:27:30 6    as to the limited relevance of the defendant exhibit you've

08:27:34 7    just heard about reflecting a draft label for Xarelto with

08:27:39 8    certain language purportedly struck through or redlined out by

08:27:43 9    the FDA.

08:27:43 10         Your Honor, notwithstanding your appropriate

08:27:46 11   instructions to this jury that the FDA's approval of Xarelto is

08:27:50 12   not conclusive and does not foreclose the LPLA claims in this

08:27:55 13   case, the only possible probative value of the jury being

08:27:59 14   advised that the FDA struck certain language proposed by the

08:28:03 15   manufacturer for the label, the only probative value of that

08:28:06 16   would be, we believe, to invite the jury to consider that as

08:28:11 17   being a foreclosing event or a closing of a chapter with

08:28:16 18   respect to language that has been recommended by the plaintiffs

08:28:19 19   to be in the label.

08:28:20 20         You have considered this document more than once.

08:28:25 21   We're aware of that, Judge.  You've weighed, under 403, the

08:28:31 22   relevance and the probative value.

08:28:34 23         Our view is that the relevance is on the side of

08:28:37 24   what the manufacturer knew, didn't know, should have done, did,

08:28:40 25   and that's fine; but, on the side of the transaction which

*OFFICIAL TRANSCRIPT*

08:28:43  1   reflects FDA action -- this is not manufacturer action, which
08:28:47  2   may be relevant, this is FDA action -- there is, to us, nothing
08:28:51  3   but prejudice.  There is no relevance -- preemption is not for
08:28:56  4   the jury to consider.  There is no relevance to what the FDA
08:29:01  5   chose to do with the language.
08:29:02  6           So the strikethrough, when you look at that side
08:29:05  7   of the transaction, is wholly prejudicial with no probative
08:29:08  8   value.
08:29:09  9           We recognize it's in evidence.  We hear the Court
08:29:11 10   on that.  We only have urged you, and we again urge you with
08:29:14 11   our proposed charge 22, to tell the jury that, with respect to
08:29:18 12   that document, they are -- and this is from my proposed
08:29:23 13   charge -- not to consider that as either -- as proof that the
08:29:26 14   FDA either refused to approve or would not have approved
08:29:31 15   language for the Xarelto label that the plaintiffs claim was
08:29:35 16   needed to properly instruct Mr. Boudreaux's prescribing doctor
08:29:38 17   about the dangers or safe use of Xarelto.
08:29:41 18           It doesn't deny the relevance of the document.
08:29:46 19   It simply, in our view, appropriately limits the relevance and
08:29:49 20   forecloses potential prejudice on what we consider to be still
08:29:51 21   an indirect appeal of the issue of preemption.
08:29:56 22           I'm happy to hear that Your Honor will be alert
08:29:57 23   to what the defendants say at argument about that document.
08:30:00 24       THE COURT:  I understand the issue.  The issue is not
08:30:03 25   relevance.  I think everybody agrees that it passes the 401

*OFFICIAL TRANSCRIPT*

08:30:06  1    situation.

08:30:06  2            The question is the 403.  That's a balancing act.

08:30:11  3    One of the things in the jury charge is that I added the

08:30:15  4    sentence, "in fact, any action or inaction on the part of the

08:30:19  5    FDA, though relevant, does not foreclose a claim under

08:30:24  6    Louisiana law."

08:30:24  7            That gives the plaintiffs an opportunity to argue

08:30:34  8    that it's irrelevant -- or the relevant doesn't foreclose the

08:30:37  9    claim.  I think that that's sufficient to balance the 403.

08:30:41 10            I'll deny the motion.

08:30:43 11        MR. MEUNIER:  Thank you, Judge.

08:30:45 12            The final matter we address has to do with one of

08:30:48 13    the quieter elements in this case, the claim for damages of

08:30:50 14    Loretta Boudreaux.

08:30:52 15            With this, we have an objection to both the

08:30:54 16    Court's charges and the Court's verdict form, since both now

08:30:57 17    fail to include reference to the plaintiff Loretta Boudreaux's

08:31:01 18    claim under Louisiana law for mental anguish and emotional

08:31:05 19    distress in having been present at the time of her husband's

08:31:09 20    emergency GI bleed.

08:31:11 21            More specifically, we object to the Court's

08:31:14 22    failure in the section of your charges on damages, which begins

08:31:18 23    at page 29, to include the portion of plaintiffs' proposed

08:31:21 24    charge number 27, which cites Louisiana Code, Article 2315.6,

08:31:26 25    and sets forth the elements of this claim for damages.

*OFFICIAL TRANSCRIPT*

10:38:41 1    right?  What did he base it on?  He based it on that FDA graph.

10:38:46 2    And that graph, there is no dispute in this case, is public.

10:38:51 3    You saw it in the article, cited.

10:38:52 4           So that's what his basis is.  He didn't say it's

10:38:55 5    because of company documents.  He's a scientist too.  He's a

10:39:00 6    doctor.  He said, I want to look at the data.  And his data

10:39:02 7    that he used was the FDA analysis.

10:39:05 8           He, I think, tried to suggest, and so have

10:39:14 9    plaintiffs, that we actually didn't want people to know and we

10:39:20 10   purposely, right, didn't suggest it.  Well, what were the

10:39:24 11   companies thinking?  We put language in the draft label and

10:39:28 12   proposed it to the FDA.  Right.  That's what I want you to look

10:39:31 13   at.  Because they are trying to argue that we were trying to

10:39:34 14   hide something.

10:39:35 15          So how can you understand what our mindset was at

10:39:39 16   the time?  This was 2011.  This was what we proposed in the

10:39:42 17   label.  We said, "The relationship between PT and rivaroxaban

10:39:47 18   plasma concentration is linear and closely correlated."  That's

10:39:51 19   what they say we're hiding.

10:39:55 20          MR. BIRCHFIELD:  Your Honor, at this time we would ask

10:39:56 21   for a jury instruction.

10:39:58 22          THE COURT:  I'll deny that at this time.

10:39:59 23          MS. WILKINSON:  So this was what we were thinking

10:40:03 24   should go in the label.  That's basically what had been in

10:40:06 25   Dr. Kubitza's article, right?  Not a secret, but that's what

*OFFICIAL TRANSCRIPT*

10:41:36 So the FDA had crossed out this language. Why does that matter? Well, if we get that back, isn't that a way of us thinking the FDA doesn't think that this is necessary?

10:41:48 They are right, the label is our responsibility. We take that seriously. But we certainly listen to other scientists and listen to the FDA. When they send this back and say, you know, we don't think this belongs in the label, that's a pretty good indicator that other folks don't think it's supported.

10:42:07 THE COURT: Members of the Jury, it's up to you to decide the significance of that, not anybody else. That's not dispositive of the decision.

10:42:21 MS. WILKINSON: So what else did the FDA have? The FDA in this case, as you know, did their own analysis, right? They didn't rely on us. They took the ROCKET data, and they graphed it on this. This is what Dr. Kessler said made up his mind, right?

10:42:36 Well, Dr. Johnson came in and said, well, you can't just look at this. It was unadjusted, which, for some of us, a little hard to understand what a regression is, but I think, as I understood what Dr. Johnson was saying, is there is all of these other factors. Remember her analogy of planting plants in Louisiana, and whether it would grow or not? You have to take out the other factors, whether you put it in the sun or not.

11:02:19  1    with that half-life walkthrough?  Dr. Johnson, the cardiologist

11:02:26  2    that the defendants called.

11:02:28  3              So to say that the 13.6 would be meaningless,

11:02:32  4    that's disingenuous.  To say, when you -- when you ask Dr. Wong

11:02:37  5    does it have any meaning, she knows, the defendants know that

11:02:43  6    Dr. Wong did not understand, because they did not tell him.

11:02:47  7    They had told him that PT, Neoplastin PT is meaningless.  He

11:02:52  8    believes that.  So it wouldn't -- it wouldn't have meaning to

11:02:55  9    him because the defendants have been telling them, have been

11:02:59 10    telling the doctors that PT is meaningless.

11:03:02 11              I want to very, very quickly, discuss the

11:03:12 12    redlined document.  Remember the FDA redlined document.  I want

11:03:18 13    to -- Ms. Wilkinson showed you this language.  But when she

11:03:29 14    showed you this language, there are a couple of things that we

11:03:35 15    need to point out.

11:03:36 16              First of all, you look at this language, and

11:03:38 17    there is nothing, nothing in there that talks about a bleeding

11:03:43 18    risk.  Nothing.  Nothing whatsoever.  That's so important to

11:03:47 19    remember.

11:03:48 20              Then look at what it says here:  "The predictive

11:03:54 21    value of these coagulation parameters has not been adequately

11:04:01 22    studied."  So remember the timing of this.  So this is in June.

11:04:06 23    This is in June.

11:04:07 24              In August, in August is when they have analyzed

11:04:12 25    the ROCKET data, and they know, and the FDA knows that there is

*OFFICIAL TRANSCRIPT*

11:04:17  1    a correlation.  So it's very important to keep that in mind,

11:04:22  2    the timing; but, more importantly, that they do not even

11:04:26  3    mention the bleeding risks in this.

11:04:31  4             THE DEPUTY CLERK:  You have five minutes.

11:04:40  5             MR. BIRCHFIELD:  I want to move to Dr. Wong.

11:04:41  6             Dr. Wong, when he was testifying, and you heard

11:04:43  7    Ms. Wilkinson talk about the fact that he would still prescribe

11:04:48  8    Xarelto today.  That's because, still today, they have not

11:04:51  9    provided any information in the label about using a PT test.

11:04:57 10             But that's not the issue.  We're not saying that

11:05:00 11    Dr. Wong or any cardiologist should never prescribe it.  We're

11:05:03 12    saying that you should put information in the label,

11:05:08 13    instructions for using the Neoplastin PT, so you can identify

11:05:12 14    the patients at risk, identify the patients at risk.

11:05:19 15             That's what would have happened.  Johnny

11:05:22 16    Boudreaux would have been identified.  Through the half-life,

11:05:26 17    it was clear, he would have been identified in that zone, and

11:05:29 18    he could have walked out.

11:05:30 19             But here is what Dr. Wong said.  He said that if

11:05:35 20    that information, if those instructions were in the label, I

11:05:37 21    would have followed the label.

11:05:39 22             Then Ms. Wilkinson asked, well, what if the --

11:05:43 23    what if it was not FDA approved?  I took very careful notes.

11:05:48 24    He said, no, I wouldn't use it if it wasn't FDA approved.

11:05:53 25             Why?  The answer is it would not be available.

                              ***OFFICIAL TRANSCRIPT***