# EXHIBIT 1

Protected - Subject to Further Protective Review

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF LOUISIANA
2                 MDL No. 2592, Section L

3

       **********************************************
4               IN RE:  XARELTO (RIVAROXABAN)
              PRODUCTS LIABILITY LITIGATION
5           THIS DOCUMENT RELATES TO ALL CASES
       **********************************************
6                     - PROTECTED -
7         - SUBJECT TO FURTHER PROTECTIVE REVIEW -
                          – – –
8

                 TUESDAY, NOVEMBER 8, 2016
9

              FRANK W. SMART, MD, FACC, FACP
10

                          – – –
11

12

13

14

15

16

17        Videotaped / Realtimed Deposition of FRANK W.
18  SMART, MD, FACC, FACP, held at the Lambert Law Firm,
19  701 Magazine Street, New Orleans, Louisiana,
20  commencing at 9:05 a.m., on the above date, before
21  Pat English-Arredondo, CSR, RMR, CRR, CCR.
22                        – – –
23            GOLKOW TECHNOLOGIES, INC.
24       877.370.3377 ph | 917.591.5672 fax
25             Deps@golkow.com
```

```
 1   A P P E A R A N C E S:

 2        SCHLICHTER BOGARD & DENTON LLP

 3             BY:  ROGER C. DENTON, ESQUIRE

 4                  Rdenton@uselaws.com

 5                  100 South Fourth Street, Suite 900

 6                  St. Louis, Missouri 63102

 7                  (314) 621-6115

 8                  Counsel for Plaintiffs

 9        LEVIN PAPANTONIO THOMAS MITCHELL

10        RAFFERTY & PROCTOR PA

11             BY:  NED McWILLIAMS, ESQUIRE

12                  nmcwilliams@levinlaw.com

13                  316 South Baylen Street, Suite 600

14                  Pensacola, Florida 32502-5996

15                  (850) 435-7000

16                  Counsel for Plaintiffs

17        KAYE SCHOLER LLP

18             BY:  JULIE DU PONT, ESQUIRE

19                  Julie.dupont@kayescholer.com

20                  250 West 55th Street

21                  New York, New York 10019-9710

22                  (212) 836-8572

23                  Counsel for Defendant Bayer

24                  Pharmaceuticals

25
```

Protected - Subject to Further Protective Review

```
 1   A P P E A R A N C E S:

 2        IRWIN FRITCHIE URQUHART & MOORE, LLC

 3             BY:  MS. KIM E. MOORE, ESQUIRE

 4                  kmoore@irwinllc.com

 5                  400 Poydras Street, Suite 2700

 6                  New Orleans, Louisiana 70130

 7                  (504) 310.2108

 8                  Counsel for Janssen Pharmaceuticals

 9   ALSO PRESENT:

10        Ms. Claire Noonan

11        Ms. Jennifer Alexander

12   VIDEOGRAPHER:

13        Mr. Mark Ancalade

14   COURT REPORTER:

15        Ms. Pat English-Arredondo, CSR, RMR, CRR, CLR

16

17

18

19

20

21

22

23

24

25
```

Protected - Subject to Further Protective Review

1    investigator and I think I was listed as a

2    subinvestigator on factor Xa reversal agent.  I don't

3    think we enrolled any patients in that.

4         Q.   Yeah, I saw that.  It didn't look like any of

5    your patients were enrolled.  Thank you.

6              All right.  So the only research that

7    you've done on Xarelto has been the PubMed search that

8    you did after you were retained in the litigation,

9    correct?

10        A.   And before I was retained in the litigation,

11   yes, ma'am.

12        Q.   Tell me about before you were retained in the

13   litigation.  What type of research did you do on

14   Xarelto?

15        A.   Trying to look at the utilization of the

16   agent in patients that were, if you would, marginal for

17   inclusion with taking the drug.

18        Q.   When you say "marginal," what do you mean by

19   that, sir?

20        A.   The package insert gives doctors guidelines

21   about the use of the agent and it's helpful.  But,

22   unfortunately, it has cut points in it.  And

23   occasionally people are not quite as easy to dose and

24   to give drugs.  And so that's what I looked at.

25        Q.   And what did you find when you looked into

1    that type of research?  What were your findings?

2         A.   That the -- my opinion was that the patients

3    that I was giving Xarelto, that had bleeding problems,

4    were having them likely because of the fact that the

5    dose of the drug was excessive.

6         Q.   And that opinion was based on a PubMed search

7    and your clinical experience with your patients?

8         A.   I knew that I was having a challenge in a few

9    patients that were -- where I thought that I had done

10   as good a job as I could possibly do with giving them

11   the drug and ended up with them having a GI bleed.

12        Q.   You said a few patients.  How many is a few?

13        A.   I think three or four.

14        Q.   Three or four.  And you said they ended up

15   with a GI bleed?

16        A.   Yes, ma'am.

17        Q.   GI bleeds are something you were aware of

18   that could happen with any anticoagulant, correct?

19        A.   Yes, ma'am.

20        Q.   Including Xarelto, correct?

21        A.   Yes, ma'am.

22        Q.   And that information -- you said you looked

23   at the package insert that was in the warnings of the

24   package insert, correct?

25        A.   I'm sorry.  Your question was sort of fast

Protected - Subject to Further Protective Review

1    there.  I wasn't paying attention.  Say it again.

2        Q.    No problem.  Any time I get going with that

3    (indicating) coffee, slow me down.  And I'm from the

4    south.  I'm from New Orleans, too, so...

5              But my question was, the fact that some

6    of your patients who may have been on -- or who were on

7    Xarelto had GI bleeds was something -- a risk that you

8    were aware of before you prescribed it, correct?

9        A.    Yes, ma'am.

10       Q.    And that information is in the package

11   insert?

12       A.    That is correct.

13       Q.    But, nonetheless, you wanted to look into

14   what was happening with these three or four patients,

15   correct?

16       A.    I wanted to get a better feeling for why the

17   GI bleeds occurred in these three or four patients

18   because these were, I thought, people that should have

19   been fine.

20       Q.    And what did you do to -- to look into that?

21   You did a PubMed search?

22       A.    Yes, ma'am.

23       Q.    And what -- what exactly was your search?

24       A.    I'm sorry.  "Exactly" is challenging because

25   it was a long time ago.  But it was basically the

 1    dosing of the agent, the renal function and the

 2    alterations in the renal function.

 3        Q.    Okay.  Dosing agent, renal functions,

 4    alterations.

 5                    And what did you learn from that PubMed

 6    search?

 7        A.    I concluded that at a once-a-day dosing of

 8    20 milligrams, people were overanticoagulated for about

 9    12 hours out of the day.

10        Q.    Okay.  And that was based on what articles?

11        A.    The Kim article was the one that really drove

12    it home for me more than any other.

13        Q.    Were there any others aside from the Kim

14    article?

15        A.    No, really.

16        Q.    So the -- so the main article or the only

17    article is the Kim article?

18        A.    Before I had -- that's when you asked me when

19    I did my own PubMed search.

20        Q.    Yes, sir.  And I want to stay there, to make

21    it clear, before we moved into when you got involved in

22    the litigation.

23                    So when did this take place?  That's a

24    good point.  When were you looking into what was going

25    on with these three or four patients?  What time frame?

1      A.    2015.

2      Q.    Was this after you were approached by

3  Mr. Whitehead?

4      A.    No, ma'am.

5      Q.    So it would have been before Mr. Whitehead?

6      A.    Correct.

7      Q.    Was this after there were advertisements

8  about lawsuits with Xarelto?

9      A.    I --

10     Q.    Hard to say?

11     A.    I saw the lawsuits with -- I mean, the call

12  1-800 bad drug, I've seen that for a while.  I couldn't

13  tell you how long that's been going on because I really

14  try not to pay attention to mess like that.

15     Q.    Why not?

16     A.    I don't find it very savoring.

17     Q.    Why not?

18     A.    Because I don't like -- well, I don't like

19  the legal system in any of its avenues.

20     Q.    Have you ever had patients come in to you and

21  ask questions about medications that they have seen or

22  advertised on TV or on billboards?

23     A.    All the time.

24     Q.    And what do you tell them?

25           MR. DENTON:  Object to the form.  It's a

```
 1        Q.   When you were trying to understand what was
 2   happening with the three or four patients, the Xarelto
 3   patients that you described for us earlier --
 4        A.   Yes, ma'am.
 5        Q.   -- you told us that you did a PubMed search
 6   and you looked at dosing of agent, renal functions, and
 7   alteration of renal functions, and you found the Kim
 8   article.
 9        A.   Yes, ma'am.
10        Q.   Did you find any other articles?
11        A.   I looked at others, I'm sure.  I did not hone
12   in on them because the Kim article seemed to be a very
13   good synopsis of what I was trying to find.
14        Q.   And other than the Kim article, what else did
15   you RE-LY on in trying to understand what was happening
16   with those three or four Xarelto patients that you were
17   looking at in 2015?
18        A.   I don't believe anything else.
19        Q.   And what was your conclusion?
20        A.   That the dose was too high --
21        Q.   The dose was too high.
22        A.   -- of Xarelto.
23        Q.   So going back to Exhibit A -- I'm just going
24   to ask you questions.  I'm not going to ask you to go
25   through and read all that.
```

Protected — Subject to Further Protective Review

1    A.    Again, I think an observational study is

2  helpful but not as definitive as a randomized

3  controlled clinical trial; and I think a meta-analysis

4  of multiple randomized controlled clinical trials is

5  more helpful than a small or smaller randomized

6  controlled clinical trial.

7    Q.    In your report you cite the ROCKET trial as

8  the pivotal randomized controlled trial for the AFib

9  indication to support your opinion, correct?

10    A.    Yes, ma'am.

11    Q.    And then you also cite the AFib trial

12  for Eliquis --

13    A.    I'm sorry, let me go back and clarify that,

14  if you would.  Ask the question again.

15    Q.    Sure.  You are relying on ROCKET, the ROCKET

16  study, as support for the -- your opinion with respect

17  to your rivaroxaban opinions, correct?

18    A.    No, ma'am.

19    Q.    Oh, you're not?

20    A.    So the ROCKET-AF study, I said, was the

21  pivotal study for the approval of rivaroxaban.

22        My -- my opinion is based off of the Kim

23  article and the Graham article and some of the others

24  that I've cited.

25    Q.    We'll get to that.

Protected — Subject to Further Protective Review

1              So you cite the ROCKET opinion.  You also

2    cite the ARISTOTLE opinion?

3              MR. DENTON:  Object to form.  What is a

4    ROCKET opinion?

5         A.   So I don't have an opinion on ROCKET-AF nor

6    do I offer an opinion on ARISTOTLE in my report.

7         Q.   (By Ms. Moore)  But you cite the AFib

8    clinical trial for Eliquis, the ARISTOTLE study,

9    correct?

10        A.   I don't cite it.  I used the ARISTOTLE --

11   again, the -- I have looked at ARISTOTLE just like I've

12   looked at RE-LY and I've looked at ROCKET-AF, yes,

13   ma'am.

14             But, again, my -- the opinion, those were

15   those trials, the pivotal trials that had those drugs

16   approved.

17             My opinion is not based solely on

18   ROCKET-AF.  As a matter of fact, my opinion is based on

19   some of the surrounding articles about ROCKET-AF and

20   its lack of -- lack of breakdown of the US data, lack

21   of adequate control in the time to -- the therapeutic

22   time and therapeutic range and things like that.

23        Q.   We are going to get there.

24             Doesn't the peer-reviewed literature

25   establish that head-to-head randomized trials are

Protected – Subject to Further Protective Review

```
 1    required to demonstrate a reliable comparison between

 2    different NOACs?

 3                  MR. DENTON:  Again, I object to the

 4    form.

 5         A.   I'm sorry.  Ask the question again.

 6         Q.   (By Ms. Moore)  Sure.

 7                  Doesn't the peer-reviewed literature

 8    establish that head-to-head randomized trials are

 9    required to demonstrate a reliable comparison between

10    the different NOACs?

11         A.   I'm not aware of that in the peer-reviewed

12    literature.

13         Q.   And you would disagree with that?

14         A.   I -- again, a head-to-head comparison would

15    certainly be the best.  However, if you took the

16    published data from one and the published data from

17    another and those parameters were similar, I think that

18    you can use those -- that information to judge the

19    comparison of agents.

20         Q.   Why would a head-to-head be best?

21         A.   Why would a head-to-head be best?

22         Q.   Uh-huh.

23         A.   Because then you have the absolute comparison

24    of the drugs in the population that you're trying to

25    study.
```

Protected — Subject to Further Protective Review

1    studies that indicate that direct comparisons, direct

2    head-to-head studies are needed in order to effectively

3    establish the comparative effectiveness and safety of

4    NOACs?

5         A.   I concur with the statement that we would be

6    better off if we had direct head-to-head comparisons of

7    the NOACs, yes, ma'am.

8         Q.   And you didn't mention what those authors

9    said in your report, correct?

10        A.   I did not mention in either.

11        Q.   Well, you did not mention.  It's not in

12   there, sir.

13        A.   Well, maybe because I -- it -- I think it's

14   an intuitive consideration.  Again, my report doesn't

15   necessarily talk about all of the science surrounding

16   everything in this.  It is --

17        Q.   This is an important conclusion, sir.

18        A.   Okay.  Well, then, I answered the question.

19   What else should I answer for you in that regard?

20        Q.   You also cite Yao -- and, again, it's a -- at

21   the conclusion.  Let's go back to the Larsen

22   conclusion.  Look at it for me, please.

23             You want to read that into the record.

24   You agree?

25        A.   "All NOACs are generally safe and effective

1    alternatives to warfarin in a clinical care setting.

2    For ischemic stroke, our weighted analysis suggests

3    no ... differences between NOACs and warfarin."

4         Q.   You failed to mention that in your report,

5    sir?

6         A.   Because I don't agree with it.

7         Q.   So you cherry-picked what you wanted out of

8    that study?

9         A.   I'm sorry, I don't agree with it based on

10   later information.  So the Graham article, I think,

11   completely offsets some of this.

12        Q.   My question to you is, you picked some

13   information out to support your opinion, but you did

14   not rely on the author's conclusion --

15        A.   Because I don't agree with it.

16        Q.   Fine.  Let's go to the Yao study that you

17   also cited.  Well, take a look at it.  I'm focused on

18   Page 16.  There you go.

19                  (Marked was Exhibit Smart-8.)

20                  MS. MOORE:  There you, Counsel.

21                  MR. DENTON:  8?  What happened to 7?

22                  MS. MOORE:  7 is Larsen.

23                  MR. DENTON:  Okay.  Thank you.  Hold on.

24   Hold on.  I'm not quite as fast as you are.

25        A.   Okay.

Protected – Subject to Further Protective Review

```
1    I said I thought there should be.

2         Q.   Who has more expertise in the area of

3    labeling and black box warnings, the FDA or you?

4              MR. DENTON:  Object to the form.

5         A.   Okay.  The FDA certainly has more expertise

6    in black box warnings.

7         Q.   (By Ms. Moore)  And you would defer to them,

8    correct?

9              MR. DENTON:  No, he would not.  He has

10   got an opinion.

11             MS. MOORE:  Wait.  Counsel.

12             MR. DENTON:  He has an opinion.

13             I object to the form.

14             MS. MOORE:  Counsel, I object.  I've

15   been really nice today.

16             MR. DENTON:  Really?  Okay.

17        Q.   (By Ms. Moore) Counsel [sic] --

18        A.   I'm not a counsel, but that's all right.

19        Q.   (By Ms. Moore)  You can call me "Doctor."

20        A.   I think that a black box warning is

21   indicated.  I wrote that in my report, and I wrote why.

22        Q.   With respect to the INR device, the FDA has

23   concluded that no labeling changes were needed,

24   correct?

25             MR. DENTON:  Object to the form.
```

```
 1        A.   Yes, ma'am.

 2        Q.   (By Ms. Moore)  You claim in your report that

 3   doctors have been adequately informed as to overall

 4   risk because of the lack of a black box, right?

 5        A.   I don't think you said that correctly.  If

 6   you did, the answer is no.

 7        Q.   Do you believe a black box should be on

 8   Xarelto?

 9        A.   Yes, ma'am.

10        Q.   What do you think -- specifically what do you

11   think should be stated in that black box?

12        A.   That there is in ROCKET-AF -- because of

13   irregularities, whatever, there is no study right now

14   that says that there is increased safety in bleeding.

15             If warfarin has a black box warning for

16   bleeding, as I stated, I believe Xarelto should have a

17   black box warning for bleeding.

18        Q.   Any other reasons?

19        A.   No, ma'am.

20        Q.   Sir, anyone who reads the Xarelto label

21   understands that Xarelto can result in a serious bleed

22   and death, correct?

23        A.   Yes, ma'am.

24        Q.   And that's something you know to -- from your

25   experience with all anticoagulants, especially with
```

Protected - Subject to Further Protective Review

```
 1    Xarelto, correct?

 2         A.   I like the way you said that, "especially

 3    with Xarelto."  Yes, ma'am, I believe that especially

 4    with Xarelto.  I -- I would agree with that.

 5         Q.   So you have experience with Xarelto and you

 6    are aware that there is a risk of serious bleeding and

 7    death?

 8         A.   Yes, ma'am.  That's why I don't use it

 9    anymore.

10         Q.   Let's turn to Exhibit 16.  This is the label.

11              (Marked was Exhibit Smart-16.)

12              MR. DENTON:  Which one?

13         A.   This is the 2011 label you gave me.

14         Q.   (By Ms. Moore)  Let's go through a few of

15    these, I think -- you kind of -- it's something that

16    you referenced earlier.  Let's look in the -- when

17    you're ready, sir.  This is --

18         A.   I'm ready.

19         Q.   -- the Xarelto prescribing information.  You

20    look under "Warnings and Precautions."

21         A.   Would you give me a page?

22         Q.   Yes.  It should be on the very first page

23    under "Warnings and Precautions."

24         A.   I see "Warnings."  I'm looking for

25    "Precautions."
```

Protected — Subject to Further Protective Review

```
 1                    MR. DENTON:  Object to the form.

 2        A.    Again -- well, I was not aware that it was to

 3   harmonize, but it certainly -- if that's what you say

 4   that's what prompted it, yeah.

 5        Q.    (By Ms. Moore)  You're not aware of a safety

 6   issue specific to Xarelto that would have prompted the

 7   September 2015 labeling change?

 8                    MR. DENTON:  Object to the form.

 9        A.    I don't know that there was something with

10   Xarelto that prompted the labeling change.  I -- again,

11   I'm -- continued to be surprised that there has not

12   been a labeling change after multiple papers have shown

13   the 20 milligram dose is excessive.

14        Q.    (By Ms. Moore)  Are you aware of any peer

15   review -- you said multiple papers.  What papers are

16   you referencing?

17        A.    The Canadian paper, the Kim paper, and the

18   Graham paper.

19        Q.    The Canadian paper, did you ever recall the

20   name of that paper?

21        A.    It was in the Canadian Journal of Cardiology.

22   The Kim paper is what it is.

23        Q.    The Kim paper?

24        A.    Yes, ma'am.

25        Q.    And then the Graham paper?
```

Protected — Subject to Further Protective Review

```
1       A.   Yes, ma'am.

2       Q.   Any other papers?

3       A.   No, ma'am.

4       Q.   What is your -- you believe those papers say

5   exactly what?  I want to make sure I understand your --

6       A.   Well, I believe the Graham paper concluded

7   that the rivaroxaban had an increased risk of

8   intracranial hemorrhage and had an increased risk of

9   gastrointestinal bleeding in Medicare recipients.  I

10  should clarify that.

11      Q.   And the Kim paper we've talked about, and we

12  will talk more about in a few minutes.

13      A.   I hope.

14      Q.   With respect to your opinions on the US

15  subpopulation data --

16      A.   Yes, ma'am.

17      Q.   -- you're aware that the FDA analyzed that

18  data and concluded it to be a chance finding in a small

19  subset, correct?

20           MR. DENTON:  Object to the form.  Unless

21  you're going to show him something.

22      A.   I certainly -- am I aware that the FDA

23  analyzed that data and said that?  I am not aware that

24  they said those particular things.

25           What I am aware of is that there was an
```

Protected - Subject to Further Protective Review

```
 1    predictable pharmacokinetics, pharmacodynamics and wide

 2    therapeutic range, routine laboratory measurement of

 3    the drug's anticoagulant effect is usually not

 4    required."

 5                    Did I read that correctly?

 6        A.   You did.

 7        Q.   So do you disagree again with --

 8        A.   Yes, ma'am, I do.

 9        Q.   -- Gosselin?

10        A.   Yes, ma'am.

11        Q.   And let me just get my full question out.

12                    Do you disagree that Xarelto has a wide

13    therapeutic range?

14        A.   I agree with all of those statements.

15                    So I disagree that it has a wide

16    therapeutic range.  I disagree that routine laboratory

17    monitoring at the current dose is -- is not required.

18                    I think that -- and, again, I'm going to

19    go back to the Graham article.  I think that there is

20    an increased risk in the Medicare population of both

21    intracranial hemorrhage and gastrointestinal bleeding.

22                    I think that short of changing the dose

23    of the drug and changing the dose interval of the drug,

24    that there should be some type of monitoring considered

25    so that we would know if patients were
```

 1    overanticoagulated.

 2         Q.    I'm -- what peer-reviewed article are you

 3    citing for the fact that Xarelto has a narrow

 4    therapeutic window, other than the Gong article that we

 5    already discussed?

 6         A.    The Kim article is what I call it.  That's --

 7    that's where that came from.

 8         Q.    Okay.  Now, you also say that Xarelto, on

 9    Page 3 of your report, is a highly variable drug with

10    respect to liver and kidney breakdown.

11              Did I read that right?

12         A.    Yes, ma'am.

13         Q.    And what was your methodology for reaching

14    that conclusion that Xarelto was a highly variable

15    drug?

16         A.    The package insert.

17         Q.    So you rely on the package insert?

18         A.    Yes, ma'am.

19         Q.    Okay.  Anything else that you're relying on

20    that Xarelto is a highly variable drug, other than the

21    package insert?

22         A.    No, ma'am.

23         Q.    Okay.  And how are you defining "highly

24    variable drug"?

25         A.    People are going to, with varying renal

Protected — Subject to Further Protective Review

```
1       Q.   So if it's not actually 20, it's 15 that's

2   the cutoff?

3       A.   15.  Correct.  And, again, my -- I was

4   looking at my number that I wrote here, 20, as an

5   example.

6                But, again, my point in what I'm trying

7   to say is that varying -- those fringe patients I

8   alluded to before, those people that are just right on

9   the cusp of being able to get the drug and get it at

10  15 milligrams, I believe the dose is high.

11               I also believe that the dose of

12  20 milligrams is high.  And that's what I go into.  So

13  I believe the dose is too high.

14      Q.   And what sources are you relying on for your

15  opinion that the dose is too high?

16      A.   Again, the Kim article, the -- the Kim

17  article is the biggest one that supports the dose being

18  too high.  So, again, back to that dotted line above

19  the therapeutic index of the drug.

20      Q.   But the Kim -- Dr. Kim and Dr. Gong do not

21  conclude in that article that the Xarelto dose is too

22  high, correct?

23      A.   It's not concluded in that article the

24  Xarelto dose is too high.

25      Q.   That's your interpretation?
```

Protected -- Subject to Further Protective Review

```
 1        A.    That is also correct.

 2        Q.    And you're not saying, Doctor, that the

 3   makers of Xarelto should reduce the bleeding risk to

 4   zero, correct?

 5        A.    No, ma'am, I don't think that's possible.

 6        Q.    But there is always going to be patients that

 7   are going to bleed on Xarelto, correct?

 8        A.    Correct.

 9        Q.    And there's always going to be patients that

10   are going to bleed on warfarin, correct?

11        A.    Yes, ma'am.

12        Q.    And there's always going to be patients that

13   are going to bleed on Pradaxa, correct?

14        A.    Yes, ma'am.

15        Q.    And there's always going to be patients that

16   bleed on Eliquis, correct?

17        A.    Yes.

18        Q.    And that's because --

19        A.    Can I finish that thought, though?

20        Q.    Sure.

21        A.    I believe in all of those cases, the risk and

22   benefit ratio should favor not doing any harm to the

23   patients.

24        Q.    Understood.  And would you agree with me that

25   all anticoagulants -- the reason why there is an
```

Protected - Subject to Further Protective Review

```
 1        A.    I have agreed with that already.  Yes, ma'am.

 2   That's why I said I try to reduce their risk of

 3   bleeding by not overanticoagulating them with a higher

 4   dose of rivaroxaban.

 5              I use the twice-a-day administration of

 6   apixaban so that it stays with a closer tab on the

 7   therapeutic index that we were discussing.

 8        Q.    Let's take a look at Page 5 of your report.

 9   Paragraph 6 you say "The dose of Xarelto currently

10   marketed for atrial fibrillation is too high," right?

11        A.    Yes, ma'am.

12        Q.    And I think you said this earlier, but I just

13   want to make sure.  The study you're relying on for

14   that statement is the Gong article, correct?

15        A.    Yes, ma'am.

16        Q.    And no others?

17        A.    No, ma'am.  Actually, it was nice to see -- I

18   concluded that prior to any Xarelto expert litigation.

19   I was interested when I saw Dr. Califf's comment that

20   it was -- the dose is too high.

21        Q.    So you're also relying on Dr. Califf's

22   comments?

23        A.    No, ma'am, not for my report.  Dr. Califf's

24   comment was an interesting aside to me.

25        Q.    So on Page 6 of your report where you talk
```

1  about that your opinion is shared by Dr. Califf --

2       A.   I think that's on Page 7.

3       Q.   Maybe I'm -- it looks like Page 6.

4       A.   Oh, I'm sorry.  You're right.  It is Page 6.

5  I apologize.  I was on Point 6 and not Page 6.  You're

6  correct.  It is Page 6.  And, yes, that is what I said.

7       Q.   So you've -- you're just -- you're saying

8  that your opinion is shared by Dr. Califf and you're

9  not relying on any of these e-mails to reach your

10 conclusion that the dose is too high?

11      A.   No, that is what I rely on.  I have not

12 spoken to Dr. Califf.  Again, my opinion the dose is

13 too high is shared by Dr. Califf who stated, "My main

14 concern after seeing the rest of the data is that our

15 dose is too high."

16      Q.   So just let me understand.  You're relying on

17 the Gong article and you're also relying on the various

18 e-mails that you've cited here, correct?

19      A.   My conclusion was based on the Gong article

20 and was way before I ever saw the Califf e-mail.

21 Seeing the Califf e-mail validated my feeling that the

22 dose was too high.

23      Q.   Okay.  And just so I'm clear, these Califf

24 e-mails, they were provided to you by plaintiffs'

25 counsel, correct?

1    A.   Yes, ma'am.

2    Q.   And in publishing peer-reviewed literature

3  yourself, have you ever referred to an internal company

4  e-mail as a reference in a published article that

5  you've written?

6    A.   No.  I can't think that in any publication I

7  would refer to anything other than the science of the

8  information.

9    Q.   And did you do a literature search to see

10  whether Dr. Califf had published on the dosing for

11  Xarelto?

12    A.   I did not.

13    Q.   You're aware that Dr. Califf was on the

14  ROCKET-AF executive committee, correct?

15    A.   Yes, ma'am.  He is the senior author of the

16  trial, yes, ma'am.

17    Q.   And he's one of the authors on the Patel 2011

18  paper?

19    A.   The senior author, yes, ma'am.

20    Q.   And hold on one second.  Let me just find

21  that study because I want to ask you questions about it

22  if -- I got it.  I got it.

23        (Marked was Exhibit Smart-21.)

24    Q.   (By Ms. du Pont)  I'm marking as Defense

25  Exhibit 21 the Patel article published in the New

1      A.   I'm saying that the information in the trial

2   is skewed because of the Alere device.  The degree with

3   which the trial is skewed because of the Alere device

4   is anybody's guess.  And that's what I'm saying.  It's

5   anybody's guess.

6              Therefore, I don't believe that a

7   mathematical model substituting for anybody's guess

8   should be sacrosanct as the tacit approval of a

9   clinical trial or any clinical trial.

10             And therefore absent a clinical trial

11   that is conclusive and done well, I think that the

12   black box warning should be on -- for bleeding in

13   rivaroxaban/Xarelto.

14      Q.   Now, the device in the clinical trial for

15   ROCKET, we don't know whether those devices were

16   faulty, correct?

17             MR. DENTON:  Object to the form.

18      A.   Oh, absolutely we know.  I don't know that we

19   know all of them; but we know that at the 12- and

20   24-week mark, that the laboratory studies differed from

21   the monitoring of the home device.

22      Q.   (By Ms. du Pont)  Is your sole reason for

23   suggesting there should be a black box on Xarelto based

24   on the allegedly faulty device?

25      A.   No, ma'am.  My statement -- and I will redo

1   it again.  It's like the fifth time we've talked about

2   it.

3            I believe that the faulty Alere device

4   created a circumstance in which we cannot judge whether

5   ROCKET-AF's conclusions are valid or not.

6            Absent that conclusion, I believe that

7   the warning label of Xarelto should be similar to that

8   of warfarin, which is a black box warning for bleeding.

9       Q.   So you disagree with the FDA who this year

10  has said that the Alere device and any discrepancies

11  that resulted with the Alere device did not require a

12  labeling change, correct?

13      A.   Obviously.

14      Q.   Now, in your report, on the second-to-last

15  page at the bottom of the page --

16            MR. DENTON:  What page number, please?

17            MS. DU PONT:  7.  Sorry.

18            MR. DENTON:  Thank you.

19      Q.   (By Ms. du Pont)  You say, "it is my opinion

20  that the use of Xarelto in patients with nonvalvular

21  atrial fibrillation is not reasonably safe."

22      A.   "When prescribed in a manner suggested by the

23  package insert, exposes patients to excessive bleeding

24  risk.  Furthermore, this risk is increased in older

25  patients and patients who are small and weigh less than

Protected — Subject to Further Protective Review

```
 1    on --

 2        A.   My God, I don't think so.  I don't believe

 3    there is anything else that we have not discussed

 4    today.

 5              Everything that I have relied upon, I

 6    have given you as part of my report, and my report is

 7    what it is, so...

 8        Q.   Are you saying that the FDA should remove

 9    Xarelto from the market?

10        A.   Interesting question.  I think that the FDA

11    should at least inform physicians of the risk of

12    Xarelto as compared to other NOACs and as compared to

13    what the published data shows, No. 1.

14              No. 2, I went on record before as saying

15    I don't believe that the compound is the issue.  I

16    believe the dosing is the issue.

17              So I believe the dose interval is too

18    long, and to get that dose interval to have an

19    effective minimal trough, we give too high of an

20    initial dose and patients are overanticoagulated for a

21    good 12 hours out of the course of a day.

22              And I think -- my opinion -- there is no

23    publication, no nothing else -- that this

24    overanticoagulation and this trying to make a

25    twice-a-day drug fit into a once-a-day administration
```

Protected - Subject to Further Protective Review

 1   regimen is what has resulted in the bleeding

 2   complications that I have seen with Xarelto and that's

 3   why I no longer use the drug, and that's why I also

 4   encourage my students and other physicians not to use

 5   the drug.

 6       Q.   Doctor, you disagree with the FDA who has

 7   approved the medication of the 20-milligram and the

 8   15-milligram dose, correct?

 9       A.   Yes, ma'am.

10       Q.   You disagree with the EMA who has approved

11   this medication, correct?

12       A.   I'm sorry.  So I disagree with Xarelto at 20

13   milligrams once a day being an acceptable dose for

14   patients, yes, ma'am.

15       Q.   And you disagree with the EMA who has also

16   recently reaffirmed the safety and efficacy of that

17   level of dosing?

18       A.   Yes, ma'am, I do.  I believe there are safer

19   alternatives, i.e., apixaban.

20       Q.   And you disagree with the 111 countries

21   around the world that have approved this medication,

22   correct?

23       A.   I'm sorry.  So -- I can't say I

24   disagree -- if in fact you're asking me do I believe

25   20 milligrams of Xarelto once a day is too high and

Protected — Subject to Further Protective Review

```
1      Q.   Okay.  And then the time today, assuming we
2  go seven hours --
3      A.   Oh, God, please.  But, yes, whatever it is
4  today.  I guess I'm going to bill them when I got here
5  at 8:00 o'clock this morning to whatever time I leave
6  here this afternoon, so...
7                MR. DENTON:  Actually, we
8  think -- actually, we haven't decided, but we think
9  that's your bill.  You asked for the deposition, but we
10  will deal with that in another setting.  And the length
11  of the deposition is clearly on you guys, not us.
12                MS. MOORE:  Is that on the record?
13                MR. DENTON:  Yes, it was.
14                (Brief off-the-record comment.)
15      Q.   (By Ms. Du Pont)  Okay.  Doctor, we've talked
16  about your opinion about the fact that the Xarelto
17  doses --
18                MS. MOORE:  Strike that.
19      Q.   (By Ms. Du Pont)  Sorry.  Let me start over
20  again.
21                We've talked today about how your opinion
22  is that the Xarelto doses is too high and you referred
23  to both the Kim study as well as the Graham study,
24  correct?
25      A.   The Kim study is what I referred to for the
```

Protected - Subject to Further Protective Review

1    dose being too high.  The Graham study I refer to

2    because of the comparison -- the comparator between

3    NOACs and -- and based on the retrospective analysis of

4    the Medicare population.

5         Q.   So you're not relying on Graham for

6    the -- for your conclusion that the dose is too high?

7         A.   Correct.

8         Q.   Okay.  But you are relying on Graham for the

9    comparative efficacy of Xarelto compared to the other

10   NOACs, correct?

11        A.   Yes, ma'am.

12        Q.   I'm just going to mark Graham -- what did I

13   do with my copy?

14             I'm going to mark as Defendant's

15   Exhibit 22 the Graham article you've been referring to,

16   doctor.

17        A.   Yes, ma'am.

18             (Marked was Exhibit Smart-22.)

19        Q.   (By Ms. du Pont)  And, doctor --

20             MR. DENTON:  Do you have a copy?

21             MS. DU PONT:  I'm so sorry.

22   (Tendering.)

23        Q.   (By Ms. du Pont)  You would agree with me

24   that this was a retrospective cohort study, correct?

25        A.   Yes, ma'am.

```
 1          Q.    And if he had reached the conclusion that the

 2   benefits of Xarelto outweighed the risks for a

 3   particular patient, you would disagree with him?

 4          A.    Yes, ma'am.

 5          Q.    Just back to -- to -- back to Graham.

 6                Dr. Graham doesn't say -- any other

 7   co-authors -- he doesn't say that Xarelto is the worst

 8   in class, does he?  That's not the conclusion that's

 9   reached in his article, is it?

10          A.    Are those words in the article?

11          Q.    Yes.

12          A.    I don't believe so, but it does say

13   "treatment with rivaroxaban 20 milligrams once daily

14   was associated with statistically significant increases

15   in intracranial hemorrhages and major extracranial

16   bleeding."

17                THE WITNESS:  (To Reporter) I'm sorry.

18          A.    I will show you where that came from.

19   "Including major gastrointestinal bleeding compared

20   with dabigatran 150 milligrams twice daily."

21          Q.    And you didn't read the fact that rivaroxaban

22   used was associated with a statistically nonsignificant

23   reduction in thromboembolic stroke, correct?

24          A.    I'm sorry.  I'm just reading the conclusion

25   from the front of the page.  I did not read anything
```

Protected — Subject to Further Protective Review

1  else.  You're correct.

2      Q.   But you would agree with me that nowhere in

3  this article does Dr. Graham say Xarelto is the worst

4  in class, correct?

5      A.   Those words, to my knowledge, do not appear

6  in this article.  It certainly is inferred, but it does

7  not appear.

8      Q.   Doctor, I am going to present you with an

9  authorization to release your employment records in

10  connection with this litigation.  I'm going to ask you

11  to read it over, sign it.

12              MR. DENTON:  Hey, wait a minute.  If you

13  want to -- if you want to give me something, I will

14  take a look at it.  But he's not signing anything here

15  today.  It's outside of the Rules.  So we will take it

16  up at some other time.

17              MS. DU PONT:  Why is it outside of the

18  Rules?

19              MR. DENTON:  Where in the deposition

20  protocol does it say an expert witness has to sign an

21  authorization --

22              MR. McWILLIAMS:  Just send us this

23  authorization and we will take it under advisement, but

24  he's not sign anything today.

25              MR. DENTON:  Correct.

```
 1                        CERTIFICATE

 2         I, Pat English-Arredondo, CSR, RMR, CRR, CCR, do

 3   hereby certify that prior to the commencement of the

 4   examination, FRANK W. SMART, MD, FACC, FACP, was duly

 5   sworn by me to testify to the truth, the whole truth

 6   and nothing but the truth.

 7         I FURTHER CERTIFY that the foregoing is a verbatim

 8   transcript of the testimony as taken stenographically

 9   by and before me at the time, place and on the date

10   hereinbefore set forth, to the best of my ability.

11         I FURTHER CERTIFY that pursuant to FRCP Rule 30,

12   signature of the witness was waived by the witness or

13   other party before the conclusion of the deposition.

14         I FURTHER CERTIFY that I am neither a relative

15   nor employee nor attorney nor counsel of any of the

16   parties to this action, and that I am neither a

17   relative nor employee of such attorney or counsel, and

18   that I am not financially interested in the action.

19         Certified by me on this 12th day of November, 2016.

20

21         _____

               PAT ENGLISH-ARREDONDO, CSR, RMR, CRR, CCR
22             NCRA Registered Merit Reporter

               NCRA Certified Realtime Reporter
23   Golkow Technologies Inc.

     304 La Rue France, Suite 208
24   Lafayette, Louisiana 70508

     Office:  877.370.3377
25   Job No.:  143748
```