UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| THIS DOCUMENT RELATES TO: | * * | SECTION L |
| *Joseph Orr, Jr., et al. v. Janssen et al.* Case No. 2:15-cv-03708 | * * * | JUDGE ELDON E. FALLON MAG. JUDGE NORTH |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN RESPONSE AND OPPOSITION TO DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE REFERENCE TO DR. ROBERT CALIFF AS FDA COMMISSIONER UNDER FEDERAL RULE OF EVIDENCE 402 AND 403**

## INTRODUCTION

Plaintiffs oppose *Defendants' Joint Motion In Limine to Exclude Reference to Dr. Robert Califf as FDA Commissioner Under Federal Rule of Evidence 402* and *403* (Rec. Doc. 6491-1). Plaintiffs have no intention to argue or otherwise infer that the views expressed by Dr. Robert Califf, while he was at Duke Clinical Research Institute (DCRI) and was the lead investigator and co-chairman of the steering committee of the ROCKET-AF, are the views of the FDA.[1] Notwithstanding, Dr. Califf's professional background is relevant to his credibility, particularly because the Defendants have attacked Dr. Califf and his motives. There is no possibility for unfair prejudice or jury confusion and to the extent the Court deems it necessary, Plaintiffs would not

---

[1] Defendants argue that they anticipate that Plaintiffs will attempt to introduce emails and other documents that Dr. Califf wrote to infer that those emails represent the views of the FDA "as was done in the *Boudreaux* trial." (Def. brief at 1). Conspicuously absent is any citation in the *Boudreaux* trial transcript where such an event occurred. This is so because Plaintiffs in *Boudreaux* never implied such a reference that Dr. Califf's opinions were those of the FDA.

object to an appropriate limiting instruction explaining that Dr. Califf's views are not those of the FDA.

## FACTUAL BACKGROUND

The Defendants selected Dr. Robert Califf of DCRI to be the lead investigator and the co-chairman of the steering committee of the ROCKET-AF trial. In emails from 2008 and again in 2011, Dr. Califf strongly advocated for additional testing based on his concerns about Xarelto safety. This is clear from testimony provided by Dr. Peter DiBattiste, Janssen's Global Development Head for Cardiovascular, responsible for all cardiovascular research and development programs.[2]

Dr. DiBattiste had multiple communications about dosage testing with Dr. Califf.[3] In June 2008 – more than three years before the a-fib indication for Xarelto had been approved – Dr. Califf personally told Dr. DiBattiste that he felt the doses being tested in ROCKET were too high, so they needed more contingency planning.[4] Dr. DiBattiste shared his concern, and agreed there might be a more favorable risk/benefit profile at 10 mg.[5]

Three years later, in September 2011, Dr. Califf continued to advocate for testing multiple doses, asking Dr. DiBattiste to "push hard for a very simple head-to-head. This could start with two doses of riva and morph into a competitive trial when the best dose emerges as a winner."[6] Dr. Califf persisted, noting in December 2011 that he would submit a proposal for the head-to-

---

[2]*See* Deposition of Peter DiBattiste ("Exhibit 1"), at 18:6-16.

[3]*Id.* at 246:5-12, 247:1-4.

[4]*Id.* at 247:19, 248:7-21, 249:4-19; *see also* 06/24/08 Califf E-mail ("Exhibit 2").

[5]*See* Exhibit 1 at 251:12-20; *see also* 06/24/08 DiBattiste E-mail ("Exhibit 3").

[6]*See* Exhibit 1 at 252:19-20, 253:10-17; *see also* 09/26/11 Califf E-mail ("Exhibit 4").

head testing.[7] Dr. Califf then took his concerns to others within Janssen, including Gary Peters (Janssen Senior Director, Cardiovascular), Troy Sarich (Janssen Vice-President of Real-World Evidence), Paul Burton (Janssen, Vice-President, Head of Medical Affairs for Cardiovascular & Metabolic Products), and Christopher Nessel (responsible for the ROCKET study design and conduct).[8]

Dr. Califf's proposal, which he submitted to Dr. DiBattiste and Dr. Peters,[9] unequivocally stated his concerns about the dose and the need to address those concerns with a study:

> The major comparative advantage of rivaroxaban is its once a day dosing, but the failure of ROCKET AF to provide superiority, even in the face of lower than expected TTR in the trial, has raised major questions about whether the ROCKET AF dosing regimen is indeed the best dose. When ROCKET AF was designed, the difficulty (or near impossibility) of doing a proper Phase 2 trial in AF led to the use of simulations to estimate the best dose and a decision was made that a 3 arm Phase 3 Trial would be too costly. All of these factors have led to a situation in which the available clinical trial data are being compared indirectly; these indirect comparisons are exemplified by CADTH, which concluded that rivaroxaban is not a preferred treatment for any subgroup with AF, while dabigatran and apixaban both had significant areas of dominance as a treatment (more effective with less total cost).
>
> The comparison of apixaban and rivaroxaban development leads to another element of conventional wisdom: rivaroxaban may have found the right dose in ACS while apixaban found the right dose in AF. There is little reason to believe that there is a major difference in clinical effectiveness with either molecule, but the dosing may need to be optimized to provide the optimal benefit risk balance for rivaroxaban in AF, and the same may be the case for apixaban in ACS.
>
> Finally, it is likely that indirect comparisons will continue and a very high likelihood that a public agency will launch a head to head comparative effectiveness trial.

---

[7] *See* Exhibit 1 at 269:19-271:2; *see also* 12/19/11 Califf E-mail ("Exhibit 5").

[8] *See* 02/22/12 Peters E-mail ("Exhibit 6").

[9] *See* 02/27/12 Califf E-mail and attachment ("Exhibit 7").

**In summary the tremendous potential of rivaroxaban to reduce death and disability from atrial fibrillation is jeopardized by uncertainty regarding the dosing regimen.**[10]

Janssen ultimately did not heed Dr. Califf's warnings, and moved forward with claims that its 20 mg dose was supported.[11] This angered Dr. Califf, who labeled his treatment "corporate BS," and said that "[e]very single person involved has told me that privately they agree that there is probably a better dose!!!!!!"[12] He asked that his name not be associated with the 20 mg dose.[13] Dr. DiBattiste acknowledged at his deposition that using a single dose in the study provided a competitive advantage because they could finish the study and possibly get approval and enter the marketplace more quickly; plus, it cost one-third less.[14] He also acknowledged that studying a second dose would have presented risks, because if a higher dose showed a greater incidence of adverse events than a lower dose, it may raise questions about whether there is a dose-response relationship between the drug and the adverse event.[15]

The motivation for rejecting additional testing – marketing – was outlined by Patricia Torr, Janssen Vice-President, Therapeutic, Cardiovascular & Metabolic.[16] Ms. Torr said Janssen "[w]ould not support doing a Rocket 2 study and unwinding everything we invested and are actively selling today. It would say to the market, the competition is right, we are a bad drug …

---

[10] *Id.* at XARELTO_JANSSEN_04060304 (emphasis in original).

[11] *See* 04/03/12 Califf E-mail ("Exhibit 8").

[12] *Id.*

[13] *See* 08/06/12 Califf E-mail ("Exhibit 9").

[14] *See* Exhibit 1 at 410:18-411:11.

[15] *Id.* at 426:12-427:4.

[16] *See* Deposition of Patricia Torr at 10:19-11:1 ("Exhibit 10").

would kill us in the market today. By the time the study was done, the market would have moved on."[17]

## ARGUMENT

### I. DR. CALIFF'S PROFESSIONAL HISTORY IS RELEVANT TO CREDIBILITY

"Relevancy is the threshold determination in any decision regarding the admissibility of evidence." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1139 (5th Cir. 1991) (internal quotation omitted). Evidence is relevant if it has a tendency to make a fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. Fed. R. Evid. 401; *McGonigal v. Gearhart Indus., Inc.*, 851 F.2d 774, 778 (5th Cir. 1988); *Kennedy v. Magnolia Marine Transp. Co.*, 189 F. Supp. 3d 610, 619 (E.D. La. May 17, 2016). Dr. Califf's curriculum vitae, including his appointment as the FDA Commissioner, is relevant to his credibility particularly since the Defendants have attacked Dr. Califf calling into question his motives for advocating for additional testing suggesting that one of his primary reason was not patient safety but to gin-up business and to generate funding for DCRI. For instance, when questioned about Dr. Califf's concerns and proposal, Dr. DiBatisste testified:

> And, of course, the other potential motive is to have another study, which is what DCRI is in the business of doing. So it -- it is interesting to me that you see -- you have shown me e-mails with repeated kind of doom scenarios about what is going to happen.[18]

Additionally, Mr. Nauman Shah, Janssen's Director of Marketing, similarly questioned Dr. Califf's motives for proposing a ROCKET-2 follow-up trial: "I would say that that's probably one

---

[17]*See* 01/10/12 Torr E-mail ("Exhibit 11").

[18]Exhibit 1 at 283:6-283:9.

of his motives, was to conduct another trial, because it was part of the way that DCRI made money.[19]

## II. DR. CALIFF'S PROFESSIONAL HISTORY WILL NOT CAUSE UNFAIR PREJUDICE OR JURY CONFUSION

"'Unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party." *Dollar v. Long Mfg.*, 561 F.2d 613, 618 (5th Cir. 1977). "Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *Id.* "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See* Fed. R. Evid. 403, Notes of Advisory Committee on Rules. "[B]ecause Rule 403 operates to exclude relevant evidence, application of the rule must be cautious and sparing." *Brady v. Fort Bend County*, 145 F.3d 691, 715 (5th Cir. 1998) (citations and internal quotations omitted). The confusion and the prejudice that the Defendants anticipate is that the jury attribute Dr. Califf's opinions to the FDA. In support of their argument, the Defendants rely on the testimony that Nauman Shah. However, Mr. Shah's testimony does not support their argument that jury confusion is inevitable but makes it abundantly clear that in 2008 and 2011, when Dr. Califf was expressing his concerns about the safety of Xarelto's dose and aggressively encouraging Janssen to do additional testing -- he was **NOT** at the FDA.[20] There is no possibility for unfair prejudice or jury confusion, and, to the extent the Court deems it necessary, Plaintiffs would not object to an appropriate limiting instruction explaining that Dr. Califf's views are not those of the FDA.[21]

---

[19] Shah dep. at 363:2-363:18 ("Exhibit 12").

[20] Def. brief at 2 citing Shah dep. at 363:2-18 attached to Defendants' motion as Exhibit A where Mr. Shah makes it clear that at the time Dr. Califf was not at the FDA.

[21] *See Greenwell v. Raytheon Aerospace, Inc.*, CIV. A. 95-2138, 1996 WL 518081, at *1 (E.D. La. Aug. 26, 1996); *Mooney v. Aramco Services* Co., 54 F.3d 1207 (5th Cir.1995).

## **CONCLUSION**

       For the foregoing reasons, the Court should deny Defendants' motion.

Dated:  May 23, 2017                            Respectfully submitted,

                                                       */s/ Leonard A. Davis*
                                                       Leonard A. Davis, Esq. (Bar No. 14190)
                                                       **HERMAN, HERMAN & KATZ, LLC**
                                                       820 O'Keefe Avenue
                                                     New Orleans, Louisiana 70113
                                                     Telephone: (504) 581-4892
                                                     Facsimile: (504) 561-6024
                                                     Email: ldavis@hhklawfirm.com

                                                     Gerald E. Meunier (Bar No. 9471)
                                                     **GAINSBURGH BENJAMIN DAVID MEUNIER**
                                                     **& WARSHAUER, LLC**
                                                     2800 Energy Centre, 1100 Poydras Street
                                                     New Orleans, LA  70163-2800
                                                     Telephone: (504) 522-2304
                                                     Facsimile: (504) 528-9973
                                                     Email:   gmeunier@gainsben.com

                                                     ***Plaintiffs' Liaison Counsel***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 23 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**