# EXHIBIT 1

```
   IN THE UNITED STATES DISTRICT COURT
 FOR THE EASTERN DISTRICT OF LOUISIANA
                  - - -
```

 IN RE:  XARELTO          :   MDL NO. 2592
 (RIVAROXABAN) PRODUCTS   :
 LITIGATION               :   SECTION L
                          :
 THIS DOCUMENT RELATES    :   JUDGE ELDON
 TO ALL CASES             :   E. FALLON
                          :
                          :
                          :   MAG. JUDGE
                          :   NORTH

                VOLUME I
                  - - -
            April 12, 2016
                  - - -
             - PROTECTED -
 - SUBJECT TO FURTHER PROTECTIVE REVIEW -
          Videotaped deposition of
PETER M. DiBATTISTE, M.D., taken pursuant
to notice, was held at the law offices of
Drinker, Biddle & Reath, 105 College Road
East, Princeton, New Jersey, beginning at
8:58 a.m., on the above date, before
Michelle L. Gray, a Registered
Professional Reporter, Certified
Shorthand Reporter and Notary Public.
                  - - -
        GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

Page 18

1    Q.   And you are -- you are a
2  medical doctor; is that correct?
3    A.   Yes.
4    Q.   And where are you presently
5  employed?
6    A.   I work for Janssen
7  Research & Development, LLC.
8    Q.   And can you briefly tell the
9  jury that might be watching this video
10 what it is you -- you do for Janssen and
11 what you've done for Janssen.
12   A.   Sure.  I am the global
13 development head for cardiovascular,
14 which means I'm responsible for all of
15 our cardiovascular research and
16 development programs.  The large
17 majority, right now in 2016, are related
18 to rivaroxaban or Xarelto.
19   Q.   And how long have you worked
20 for Janssen?
21   A.   About ten and a half years.
22   Q.   And what other drugs, if
23 any, do you have responsibility for?
24   A.   At Janssen?

Page 19

1    Q.   Yes, sir.
2    A.   I worked at different times
3  for and had varying degrees of
4  responsibility for dapoxetine or Priligy,
5  for nesiritide or Natrecor, and for some
6  earlier programs, one that we have that's
7  preclinical right now before -- it hasn't
8  made it to unit trials yet.
9    Q.   Would it be fair to
10 characterize you as a high-ranking
11 executive within Janssen?
12       MS. SHARKO:  Object to the
13    form of the question.  You can
14    answer.
15       THE WITNESS:  I am a vice
16    president level.  I -- I don't
17    know how that qualifies in terms
18    of high-ranking or medium-ranking.
19 BY MR. McWILLIAMS:
20   Q.   You make an excess of a
21 million dollars a year in total
22 compensation; some years you've made more
23 than $2 million; is that correct?
24       MS. SHARKO:  Objection.  You

Page 20

1    can answer.
2        THE WITNESS:  I believe
3    that's correct.
4  BY MR. McWILLIAMS:
5    Q.   Have you ever made more than
6  $2 million in any one particular calendar
7  year?
8        MS. SHARKO:  Objection.
9        THE WITNESS:  I don't know.
10   I know salary.  I don't know how
11   the -- the other pieces come in.
12   So you probably have a better
13   understanding of that than I do.
14 BY MR. McWILLIAMS:
15   Q.   So part of your compensation
16 comes in the form of stocks?
17   A.   That's correct.
18   Q.   And part of your
19 compensation, what determines your
20 compensation, either bonus or the amount
21 of stock, is the performance of the
22 company and the performance of the drugs
23 which you have responsibility for; is
24 that fair?

Page 21

1    A.   I would say not -- not the
2  latter.  I would say the compensation is
3  based on individual performance as well
4  as company performance.
5    Q.   And you understand that
6  Xarelto is a blockbuster drug for
7  Janssen, generating more than a billion
8  dollars in sales?
9    A.   I do.
10   Q.   And it's one of the most
11 profitable drugs currently in the
12 company's portfolio?
13   A.   I am not saying this to be
14 evasive.  I -- I don't understand.  I'm
15 really not a business person.  So in
16 terms of profitability versus revenue,
17 I'm not good at that.  So I can't comment
18 on that piece.  It may be true.  I'm just
19 not sure.
20   Q.   What, if anything, did you
21 do to prepare for your deposition today?
22   A.   I met with my attorneys.  I
23 did review the package insert, the -- the
24 prescribing information.  And I had a

Page 246

1    Q.   Okay.  I appreciate that.
2    All right.  You can put that away.  I'm
3    going to shift topics for a second.
4         A.   Okay.
5         Q.   Sir, you testified a little
6    bit ago about Dr. Califf.  And I believe
7    he was the co-principal investigator in
8    ROCKET, is that accurate, under
9    Dr. Patel?
10        A.   I thought he was --
11        Q.   The principal?
12        A.   -- at the head of the chain.
13        Q.   Okay.  I think they shared
14   titles.  But I agree with you.
15        A.   Not with -- not with Patel.
16   Maybe with Fox.  So it was kind of a
17   hierarchy.
18             So I think -- I think you
19   will find that Califf's the chair.  Keith
20   is the co-chair.  And then Ken Mahaffey
21   was -- played a role on the executive
22   committee.  And Manesh Patel at the time
23   played a subordinate role to Ken, I
24   believe.

Page 247

1         Q.   So Califf was the
2    highest-ranking person in the hierarchy
3    for the ROCKET leadership?
4         A.   That is my impression.
5    Maybe by title, he and Keith Fox shared
6    that.  I think Rob Califf was at the top
7    of the list.
8         Q.   And do you think he was
9    deserving of that title in terms of his
10   knowledge, expertise, abilities?
11        A.   Yeah.
12        Q.   Is it true, sir, that
13   Dr. Califf told you personally that he
14   felt the doses tested in ROCKET were too
15   high?
16        A.   After we got the results, he
17   made clear his opinion that maybe other
18   doses would have -- would be of value to
19   explore.
20        Q.   Well, he told you he thought
21   you guys were using the wrong dose before
22   you got the data as well.  Do you
23   remember that?
24        A.   I don't remember that.

Page 248

1         Q.   Okay.  Let's see if I can
2    refresh your memory.
3              (Document marked for
4              identification as Exhibit
5              DiBattiste-25.)
6    BY MR. McWILLIAMS:
7         Q.   I'm handing you what's been
8    marked as DiBattiste-25.
9         A.   Okay.
10        Q.   This is a confidential
11   e-mail from Bob Califf, who is now the
12   commissioner of the FDA, correct?
13        A.   Yes.
14        Q.   Okay.  And this is an e-mail
15   to you dated June 24, 2008?
16        A.   Yes.
17        Q.   And so at this point in
18   time, patients were enrolling in ROCKET,
19   but the clinical trial is very much still
20   ongoing; is that fair?
21        A.   Yes.
22        Q.   The subject line is
23   "Confidential," correct?
24        A.   Correct.

Page 249

1         Q.   And have you seen this
2    e-mail in the last six months?
3         A.   No.
4         Q.   Okay.  He writes to you,
5    "Pete, overall the riva review was very
6    positive.  My main concern after seeing
7    the rest of the data is that our dose is
8    too high.  I don't want to upset people,
9    but feel that we need more contingency
10   planning."
11             Did I read that correctly?
12        A.   Yes.
13        Q.   Does that refresh your
14   recollection as to whether or not
15   Dr. Califf told you, prior to getting the
16   results from ROCKET, that he felt the
17   doses being tested in ROCKET were too
18   high?
19        A.   Yes.
20        Q.   Okay.
21        A.   Do you have the rest of our
22   discussion?  Because my --
23        Q.   Yes, sir.
24        A.   -- recollection is that

Page 250

1  we -- so since --
2      Q.  Well, go ahead and tell me
3  your recollection, and I'll give you
4  whatever e-mails I find about it.
5      A.  So my recollection,
6  although, obviously, I got the date
7  wrong, is that as we had the discussions,
8  we -- well, at this point in time, would
9  have said, "Well, let's wait and see what
10  the outcomes are."  And then, afterwards,
11  we talked about potential, but again went
12  back to the outcomes.  We have a result
13  where we've proven an advantage to the
14  current standard of care.  So I think
15  that's what the discussions entailed, but
16  I have a feeling you are about to confirm
17  that for me.
18      Q.  Well, actually, I -- well, I
19  mean, isn't it true, sir, that you told
20  Dr. Califf you agreed with him; you felt
21  that the doses could be improved upon
22  than those being tested in ROCKET --
23      A.  I would be surprised --
24      Q.  -- at this point in time?

Page 251

1      A.  -- if I said at this point
2  in time that I agree, I -- if I said
3  anything, I would expect that I said it
4  in a hypothetical way.  But, well, let's
5  see what I had to say.
6      Q.  Well, let's see -- let's see
7  if I can refresh your recollection.
8          (Document marked for
9          identification as Exhibit
10         DiBattiste-26.)
11  BY MR. McWILLIAMS:
12     Q.  This I'm handing you is
13  DiBattiste-26.  And this is your reply to
14  that prior e-mail.  And you wrote, "Rob,
15  thanks" -- "thanks for your note.  I
16  share your concern somewhat, though still
17  believe that 20 milligrams once daily is
18  likely to have a favorable risk/benefit
19  profile, perhaps just not quite as good
20  as 10."
21         And you are talking about
22  10 milligrams once a day, or were you
23  talking 10 milligrams twice a day?
24     A.  I suspect, once a day.  But

Page 252

1  I am encouraged that my recollection
2  was -- you know, look at the caveats in
3  there.  Somewhat.  Though still believe.
4  Proven to be correct two years later.
5  And 20 milligrams is likely to have a
6  favorable risk/benefit profile.
7      Q.  But not quite as good as 10?
8      A.  Speculating, because we
9  never studied 10.
10     Q.  Okay.  But still you're --
11  you're agreeing with his concerns
12  somewhat?  Caveat.
13     A.  Somewhat.  Yes.
14     Q.  Okay.  And even after the
15  data came out for ROCKET, so once
16  Dr. Califf saw the outcomes, once he saw
17  the number of strokes and bleeds, he was
18  still of the opinion that better doses
19  could be tested and would -- would create
20  better outcomes?
21     A.  He was -- he was of that
22  opinion, yes.
23     Q.  Do you know if he still is
24  of that opinion?

Page 253

1      A.  I don't know.
2      Q.  Okay.
3      A.  I don't know.
4          (Document marked for
5          identification as Exhibit
6          DiBattiste-27.)
7  BY MR. McWILLIAMS:
8      Q.  Let me hand you what's being
9  marked as DiBattiste-27.
10         Now, this is -- this is an
11  e-mail chain.  This is fast-forwarding a
12  couple years.  This is after the data for
13  ROCKET had come out; is that correct?
14     A.  Yes.
15     Q.  October 2011?
16     A.  Right.  This is --
17     Q.  Let's go to the very last --
18  the second page, last e-mail, first
19  e-mail in time.  Dr. Califf writes to you
20  personally on September 26, 2011.
21         That's -- that's just after
22  the AdCom brief -- or AdCom meeting,
23  right?
24     A.  Right, one month after.

Page 266

1  reliable is the test? How available is
2  the test?
3      If you have more false
4  positives than true positives, are you
5  doing benefit, or are you doing harm?
6  All those questions need to be answered.
7      In the meantime, what do we
8  know? We know that a fixed dose,
9  according to the way it was prescribed,
10 achieves an outcome that is pretty darn
11 good and -- and better than warfarin on
12 at least a key -- couple of key safety
13 elements. Arguably on efficacy as well.
14 BY MR. McWILLIAMS:
15     Q. Okay. But you agree that
16 there's -- if there's data that indicates
17 an ability to improve and to reduce the
18 number of thousands of Americans going to
19 the hospital as a result of taking this
20 drug, that would be a good thing?
21     A. That was an interesting
22 distillation of what I just said. I
23 think in the context of what I said, I
24 can agree with what you said.

Page 267

1      Q. Okay. And that's why Bob
2  Temple, who is aware of all those caveats
3  that you just mentioned, that's why he's
4  still aggressively pushing for this,
5  correct?
6      MS. SHARKO: Object to the
7      form. Asked and answered.
8      THE WITNESS: I -- again,
9      aggressively pushing for this to
10     be considered as a potential path.
11 BY MR. McWILLIAMS:
12     Q. Okay.
13     A. I don't think he's answered
14 all those. So I guess the point that I'm
15 trying to make is, I don't think Bob
16 Temple has analyzed and thought about the
17 answers to all those questions and
18 concluded that even with all that
19 information it's still okay. I think
20 he's saying, "Let's understand that and
21 explore it."
22     And I think that's part of
23 the exercise that's happening in Europe
24 as well.

Page 268

1      Q. Now, you mentioned a narrow
2  distribution of exposure. You understand
3  that the ROCKET -- the 161 patients in
4  the ROCKET PK substudy demonstrated
5  inter-patient variability, more than a
6  thousandfold from minimum to max?
7      A. I suppose it depends on how
8  one defines variability. But I would
9  say -- so maybe I'll offer this caveat
10 again. I'm not the PK expert. But our
11 drug, as I understand it, is very well
12 behaved from a PK perspective. Its
13 absorption is pretty tight. And we have
14 arguably -- well, I think we clearly have
15 a better PK profile than a drug like
16 warfarin.
17     But I think our PK profile
18 would yield a relatively narrow curve.
19 I'm not talking about the
20 99.9th percentile and the .1 percentile.
21 But I'm saying, if you draw that
22 distribution curve, we have a pretty --
23 pretty well-behaved distribution.
24     Q. You know that you have the

Page 269

1  exact same distribution as dabigatran in
2  terms of 5th to 95th, and 10th to 90th?
3      A. I don't know that. I
4  struggle with that, honestly, knowing
5  about their bioavailability.
6      Q. I promise you it's true, for
7  what it's worth.
8      A. I would propose that you
9  have that discussion with a
10 pharmacokinesticist. That's different
11 from my understanding.
12     Q. All right. So let's get
13 back to the topic of Dr. Califf wanting a
14 lower dose.
15     (Document marked for
16     identification as Exhibit
17     DiBattiste-28.)
18 BY MR. McWILLIAMS:
19     Q. Let me hand you what's been
20 marked as DiBattiste-28. This is an
21 e-mail from Dr. Califf to just you dated
22 December 19, 2011; is that correct?
23     A. Yes.
24     Q. The subject line is "Are you

Page 270

1  off or working this weekend?" This was
2  right before Christmas, right?
3     A.  Yes.
4     Q.  So even on Christmas, he's
5  got this on his mind.  He's saying, "I've
6  had a number of encounters with people
7  regarding riva Afib dosing.  I have a
8  proposal that would, one, get the right
9  answer very efficiently; two, demonstrate
10  the ability of J&J to be innovative,
11  simple, pragmatic, adaptive design;
12  three, please the FDA; four, help or at
13  least not hurt your marketing; five,
14  would put you in a much better position
15  when comparative effectiveness
16  researchers do the head-to-head.  You
17  don't want to have the wrong dose then.
18  Would like to discuss."
19     Did I read that correctly?
20     A.  Yes, you read it correctly.
21     Q.  Is this an e-mail that you
22  would receive in the ordinary course of
23  business?
24     A.  I would suspect that that's

Page 271

1  in the ordinary course of business even
2  though it's on a weekend.
3     Q.  I understand.  And this
4  is -- is that on a -- yeah.  And again,
5  this is within the rubric of the larger
6  discussion of Dr. Califf pushing for you
7  guys to consider a lower dose for riva,
8  correct?
9         MS. SHARKO:  Object to the
10     form.
11         THE WITNESS:  I'm not sure
12     if it's that or in the context of
13     the head-to-head.  But probably
14     one -- probably at least one of
15     those and possibly both.
16  BY MR. McWILLIAMS:
17     Q.  Well, let me see if this
18  next e-mail refreshes your recollection.
19     A.  Actually, I take it back.
20  He says "dosing" in that first line.
21     Q.  Let's still see if this
22  refresh -- if this confirms your
23  recollection.
24         (Document marked for

Page 272

1     identification as Exhibit
2     DiBattiste-29.)
3  BY MR. McWILLIAMS:
4     Q.  This is DiBattiste-29.
5     A.  Okay.
6     Q.  This is that same e-mail
7  that you forwarded on to your colleagues
8  at Janssen: Dr. Peters, Troy Sarich,
9  Paul Burton, Dr. Nessel, correct?
10     A.  Mm-hmm.
11     Q.  And you write, "Rob persists
12  in his interest in exploring other
13  doses."
14     Did I read that correctly?
15     A.  You forgot the ellipsis.
16     Q.  And the dot, dot, dot.  I
17  stand corrected.
18     And then Paul Burton
19  responds, "Perhaps a call with Rob and
20  this group would be a good way to
21  proceed."
22     And then Dr. Peters replies,
23  "All, I have a call set up with Rob for
24  8:00 to 9:00 on Thursday, the 22nd, to

Page 273

1  discuss a few things that won't take an
2  hour." "Are you guys available during
3  this time?" essentially.
4     And again, it's Bob -- it's
5  Bob Califf persisting in his interest to
6  explore other doses.
7     A.  Yes.
8     Q.  And again, specifically, his
9  interest is reducing bleed risk while
10  still maintaining efficacy.  He doesn't
11  say that.  But you know that's what he
12  was going after, right?  He wouldn't give
13  up efficacy to reduce a few bleeds, would
14  he?
15     A.  I think you should probably
16  ask that --
17         MS. SHARKO:  Wait, wait,
18     wait.
19  BY MR. McWILLIAMS:
20     Q.  And we will.  But is it --
21  do I have a fair --
22     A.  That would make sense.  But
23  it makes more sense to ask him.
24     Q.  And one thing at a time.

Page 282

1   Q. Correct?
2       MS. SHARKO: I object to the
3   form and compound nature of that
4   question. What do you want him to
5   answer?
6   BY MR. McWILLIAMS:
7   Q. You understand that one of
8   the concerns that Dr. Califf had was that
9   the apixaban data appeared to be so much
10  better than Xarelto, specifically the
11  fact that apixaban was able to establish
12  superiority in its intention-to-treat
13  analysis with respect to ischemic stroke
14  and major bleeds?
15      MS. SHARKO: Same objection.
16  BY MR. McWILLIAMS:
17  Q. Unlike ROCKET, correct?
18  A. I'm not sure that that was
19  his position, especially when you say "so
20  much better." That's not a
21  conversation --
22  Q. Remove the word "so."
23      MS. SHARKO: Wait. Let him
24  finish his answer.

Page 283

1   Go on. "That's not a
2   conversation" --
3       THE WITNESS: That's not a
4   conversation that I remember
5   having with him.
6       And, of course, the other
7   potential motive is to have
8   another study, which is what DCRI
9   is in the business of doing.
10      So it -- it is interesting
11  to me that you see -- you have
12  shown me e-mails with repeated
13  kind of doom scenarios about what
14  is going to happen. Here's --
15  here is an e-mail where dabigatran
16  is strongly favored in Canada, and
17  you better do a study, or there --
18  there will be a number of
19  real-world studies done.
20      And -- and, in fact, there
21  appears to be a continued
22  significant demand for
23  rivaroxaban. And so -- so I
24  don't -- I don't know if seeing

Page 284

1   what -- what has evolved would
2   have modified Dr. Califf's
3   position.
4       But -- but I do agree that
5   he is calling for additional
6   studies and, in fact, promising --
7   and it looks like he's now calling
8   it ROCKET2 as opposed to ROCKET
9   Booster, promising that proposal.
10  BY MR. McWILLIAMS:
11  Q. Well, you know that -- has
12  Dr. Califf ever told you that his own
13  mother takes apixaban? He had her on
14  rivaroxaban, and he switched her to
15  apixaban once it became available?
16  A. I didn't know that.
17  Q. He used her as a case study.
18  You didn't know that?
19  A. I did not.
20      (Document marked for
21  identification as Exhibit
22  DiBattiste-33.)
23  BY MR. McWILLIAMS:
24  Q. Let me hand you what's being

Page 285

1   marked as DiBattiste-33 and its
2   attachment. We'll do 33 first.
3       (Document marked for
4   identification as Exhibit
5   DiBattiste-34.)
6   BY MR. McWILLIAMS:
7   Q. It's attachment
8   DiBattiste-34.
9       And this is an e-mail that
10  we received from DCRI and its attachment
11  where Dr. Califf sends this around to his
12  colleagues within DCRI, all colleagues
13  that worked on ROCKET, I believe.
14      And he writes, "Please read
15  and send comments. What I'm not saying
16  is that this would help their marketing
17  while also defending against prospective
18  CER trials while they found" -- "why" --
19  "while they find the best dose. That is
20  not our motivation, but it's the only way
21  that they will be able to sell it
22  internally. I believe they will lose out
23  if they don't do this!
24      "Or doomsday."

Page 410

1  think what we're saying is to have only
2  one active arm in the trial. That's
3  my -- that's how I put this together.
4      So if we have confidence in
5  the dose we select and we can use one
6  active arm instead of two, the trial
7  becomes a 14,000-patient trial as opposed
8  to a 21,000-patient trial. Fewer
9  countries, fewer sites, completes more
10 quickly. We get our -- our novel
11 approach and advance to patients quicker.
12     So that -- that's what I
13 think I mean here. Single dose.
14     Q. Okay. That was your e-mail.
15 So let's -- let's take your understanding
16 of the meaning and use it.
17     A. Okay.
18     Q. So you're saying if we use a
19 single dose in the study, if we are
20 talking about that --
21     A. Mm-hmm.
22     Q. -- then this would be of
23 value from a competitive standpoint as
24 one of the items that you mentioned,

Page 411

1  correct?
2      A. Yes.
3      Q. It means you can finish the
4  study quicker, maybe get approval of the
5  drug and enter the marketplace sooner; is
6  that fair?
7      A. Right. Right.
8      Q. Obviously, it also has an
9  advantage from a cost perspective, a lot
10 less patients; is that fair?
11     A. Yeah, a third less.
12     Q. You say, "I understand the
13 modeling people are within your groups.
14 I'd like to request short-term, intensive
15 support allowing for our people to
16 immerse in the Bayer model and data and
17 decide if we should consider it solid
18 enough to go forward with its projected
19 dose. I have already engaged two people
20 in the CPEM group, Erik Mannaert and Juan
21 Jose Perez Ruixo, but I'd be grateful for
22 whatever other support you can identify
23 to allow us to down this down ASAP.
24 Thanks for your help. Pete."

Page 412

1      That's what you said,
2  correct?
3      A. Yes.
4      Q. And so you -- at this point
5  in time, you really wanted more
6  information about the Bayer modeling and
7  whether or not you could rely upon it
8  going forward in ROCKET in one dose?
9      A. Correct. That's how I
10 interpret this.
11     Q. Okay. So you get a response
12 from Scott Reines on the page in front of
13 that. It says, "Do you have any sense of
14 the magnitude of this task? We want to
15 help out, but we're barely able to cover
16 the existing must-dos at this point. I
17 have asked Paul and Dan to assess this
18 situation as well."
19     That's the response you got
20 from Scott, correct?
21     A. Yes.
22     Q. Okay. And you respond to
23 Scott, and you say basically that "What
24 I'm envisioning is an intensive

Page 413

1  several-day review of the model
2  assumptions and the data as opposed to
3  something long-term. Bayer is prepared
4  to make a dosing recommendation now, and
5  I'd just like to have experienced eyes
6  tell me if what they are proposing is
7  reasonable or not as well as getting some
8  handle on the precision of the model."
9      That's what you said back to
10 Scott, correct?
11     A. Yes.
12     Q. Okay. Now, Paul is -- I
13 think Paul Soons was copied on the e-mail
14 before. He responds but takes you off of
15 the discussion at this point, correct?
16     A. Yes.
17     Q. Okay. It looks like Paul
18 Soons is working for PRD BE. If you look
19 at the initials by his e-mail. Do you
20 know what the PRD BE --
21     A. It means he works in
22 Belgium.
23     Q. Okay.
24     A. It's just a location. Most

Page 426

1  events compared to the lower dose, that
2  might raise questions of whether or not
3  there's a dose-response relationship for
4  that adverse event.
5      A.   There's a question in there?
6      Q.   Yeah.  Is that -- is that a
7  fair statement?
8      A.   So -- I'm sorry.
9      Q.   I can say it again if you
10 want me to.
11     A.   Sure.
12     Q.   One of the risks of studying
13 a second dose in a Phase III trial is
14 that if the higher dose shows a greater
15 incidence of adverse events than the
16 lower dose, that may raise questions as
17 to whether there is a dose-response
18 relationship between the drug and that
19 particular adverse event.
20         MS. SHARKO:  Object to the
21     form.
22         THE WITNESS:  So I think
23     what you're asking is, can you see
24     dose-related adverse events better

Page 427

1      if you study multiple doses?  And
2      I think the answer's -- the answer
3      could be yes.  If they are
4      dose-related, I would expect that.
5         By the same token, you may
6      see dose-related advantages in
7      efficacy.  So -- so that's why I
8      guess I said, "I think the
9      regulatory risk balances out."
10     Because if you study two doses,
11     you give yourself two chances for
12     success on the efficacy side.
13 BY MR. OVERHOLTZ:
14     Q.   One of the regulatory risks
15 for Xarelto moving forward into the
16 Phase III trial program was that if they
17 studied a second lower dose than the
18 20-milligram dose and there were higher
19 bleeding events in the 20-milligram dose
20 than the lower dose given to the same
21 group of patients that are randomized and
22 together, that that might demonstrate
23 that there is a dose-response in bleeding
24 events for Xarelto?

Page 428

1         MS. SHARKO:  Object to the
2     form.  And please indicate what
3     the question is.
4         MR. OVERHOLTZ:  I raised my
5     voice at the very end to make it a
6     question.  Did you hear that?
7         MS. SHARKO:  Well, I
8     don't -- I don't see what the
9     question is.  It sounds like
10     you're just making -- telling us
11     what you think.
12 BY MR. OVERHOLTZ:
13     Q.   Did you understand what I
14 was suggesting?
15     A.   Independent of whether it
16 was a -- a question form, I'm not sure.
17         If it's different than what
18 I thought I answered before --
19     Q.   I'll state it again.  Let's
20 just get it straight.
21     A.   Okay.
22     Q.   One of the risks of Xarelto
23 from a regulatory perspective as far as
24 getting approval in the Afib indication

Page 429

1  was that if you study a lower dose in the
2  same types of patients from a randomized
3  standpoint and there was a difference in
4  the incidence of bleeding events where
5  the higher dose showed greater incidence
6  of bleeding events, that that might raise
7  regulatory questions about whether or not
8  the higher dose is a safe dose.  Is that
9  a fair statement?
10     A.   I don't think that the
11 presence or absence of a second dose
12 would influence the judgment of whether
13 or not a higher dose or a lower dose was
14 a safety risk.  I think they would be
15 judged on their own.  So -- so that --
16 that was the question I heard that time.
17     Q.   Okay.
18     A.   But earlier I think I heard
19 you say two doses permits you to assess a
20 dose-response.
21         And I don't see that as a
22 risk.  If it was a risk, we wouldn't do
23 Phase II trials with multiple doses.  The
24 fact is, we want to understand the