UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| *Joseph Orr, Jr., et al.* | * | JUDGE ELDON E. FALLON |
| *v. Janssen, et al.* | * | |
| *Case No. 2:15-cv-03708* | * | MAG. JUDGE NORTH |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE
DR. CUONG BUI'S TESTIMONY REGARDING THE XARELTO LABEL**

**I.   INTRODUCTION**

Plaintiffs submit this memorandum in opposition to Defendants' motion *in limine* to exclude Dr. Cuong Bui's testimony regarding the Xarelto label. [Rec. No. 6482] According to Defendants, their duty to warn Plaintiff Sharyn Orr's treating physicians about Xarelto does not extend to Dr. Bui. Defendants further contend that Dr. Bui has no familiarity with the Xarelto label, making any testimony by him confusing to the jury.[1] Defendants are wrong, and their mischaracterizations of the law of this case and Dr. Bui's testimony should be rejected.

Not only is Dr. Bui familiar with Xarelto, but he has considerable experience treating patients (several times a week) with intracranial bleeds who are taking various types of anticoagulants, including Xarelto. As one of Mrs. Orr's treating physicians, he is permitted to testify about what effect the use of Xarelto had on his treatment of Ms. Orr. Indeed, as this Court previously held in denying Defendants' Motions for Partial Summary Judgment based on the

---

[1] *See* Defs.' Supp. Mem. at 1.

Learned Intermediary Doctrine, Plaintiffs' failure-to-warn claims in this litigation are based on showing that Mrs. Orr's doctors would have acted differently had they been adequately instructed on Xarelto, and that her injuries could have then been avoided.[2] Because Dr. Bui's testimony is not only relevant but will aid the jury in deciding the viability of Plaintiffs' failure to warn claim in this regard, Defendants' motion *in limine* to preclude Dr. Bui's testimony about the Xarelto label should be denied.

## II.      BACKGROUND

On April 24, 2015, Sharyn Orr suffered an intracranial hemorrhage.[3] Symptoms of Mrs. Orr's hemorrhage began to manifest during an early evening dinner date with her husband at Ruth Chris Steakhouse in Metairie, Louisiana.[4] These symptoms, which began at approximately 6:45 PM, initially included headache and vomiting but progressed to diarrhea, physical instability, and lethargy over the next few hours.[5] Although Mrs. Orr normally took her daily dosage of Xarelto in the evening as prescribed, it is unknown whether she took her Xarelto on the evening of April 24, 2015.[6] Even if Mrs. Orr had taken Xarelto as per her routine, it is most probable that she expelled the drug during a vomiting episode.[7]

Ultimately, EMS transported Mrs. Orr to Ochsner Baptist Hospital, where the attending ER physician ordered laboratory tests and CT brain imaging.[8] The CT scan revealed an intracranial

---

[2] *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 U.S. Dist. LEXIS 58056, *8 (E.D. La. April 17, 2017).

[3] Exhibit 1, Deposition of Joseph Orr, Jr., at 238:18-20.

[4] *Id*. at 241:20-242:05.

[5] *Id*. at 243:11-17, 250:13-21.

[6] *Id*. at 92:02-05, 267:15-268:15.

[7] Exhibit 2, Deposition of Cuong Bui, MD ("Ex. 2"), at 107:09-18.

[8] Exhibit 3, Ochsner Baptist Medical Records ("Ex. 3"), at SOrr-OMC-MD-000463-464.

hemorrhage likely originating from the brain's ventricular space.[9] As a result, the attending ER physician at Ochsner Baptist requested the transfer of Mrs. Orr to Ochsner Main Campus for neurosurgical evaluation.[10] Unlike Ochsner Baptist, Ochsner Main Campus has a unit dedicated to neurocritical care and neurosurgery and is a certified stroke center.[11] In submitting the transfer request, the attending ER physician highlighted Mrs. Orr's history of Xarelto use.[12]

Immediately after arriving at Ochsner Main Campus, physicians specializing in neurocritical care and neurosurgery evaluated Mrs. Orr. They concluded that Mrs. Orr required urgent surgical intervention to alleviate pressure on her brain and remove pooled blood from the ventricular space.[13] As such, Mrs. Orr's usage of Xarelto became a focus among her assigned physicians.[14] Because Xarelto has no reversal agent, physicians must determine whether a patient is still subject to its anticoagulant effects prior to surgical intervention.[15] At the time of Mrs. Orr's surgery, her physicians were unaware that a widely available laboratory test, Prothrombin Time ("PT"), could be used to evaluate her anticoagulant status and whether she had an anticoagulant in her blood.[16]

The Xarelto product label informs doctors like Mrs. Orr's on-call neurosurgeon, Dr. Cuong Bui, that "[t]he anticoagulant effect of Xarelto cannot be monitored with standard laboratory

---

[9] *Id.*

[10] *Id.* at SOrr-OMC-MD-000483.

[11] Ex. 2 at 156:12-157:09.

[12] Ex. 3 at SOrr-OMC-MD-000483.

[13] Ex. 2 at 20:02-23:20.

[14] *Id.*; Ex. 3 at SOrr-OMC-MD-000483; Ex. 3 at SOrr-OMC-MD-000030.

[15] Ex. 2 at 20:02-23:20.

[16] Ex. 2 at 45:19-46:03; Exhibit 4, Deposition of Toby Gropen, MD, at 121:24-123:12.

testing nor readily reversed."[17] The label goes on to instruct that "[i]f anticoagulation must be discontinued to reduce the risk of bleeding with surgical or other procedures, Xarelto should be stopped at least 24 hours before the procedure."[18] Because Dr. Bui was not informed by Defendants that Mrs. Orr's PT would indicate it was safe to proceed to surgery, he delayed surgical treatment of Mrs. Orr for over 12 hours.[19] Once "the Xarelto [] had a chance to clear," Dr. Bui performed double ventriculostomies at 1:30 PM on April 25, 2015, placing two external ventricular drains ("EVDs") into Mrs. Orr's brain.[20] Had Dr. Bui known that Mrs. Orr was not anticoagulated, Dr. Bui would have performed the ventriculostomies much earlier.[21]

As a result of the delay, the blood in Mrs. Orr's ventricular space clotted and caused increasing edema and prolonged pressure on the surrounding brain.[22] The clotted blood blocked the EVDs, and despite attempts to lyse the clots using targeted enzymes known as tissue plasminogen activators ("tPA"), the blood in Mrs. Orr's ventricular space did not break down.[23] As a result, Mrs. Orr's edema and brain compression worsened, with the clotted blood likewise preventing circulation of cerebral spinal fluid to the brain.[24] Because of these conditions, Mrs. Orr continued to decline, and her family implemented a do-not-resuscitate order.[25] Mrs. Orr expired on May 4, 2015.[26]

---

[17] Exhibit 5, Xarelto Label (January 2015) ("Ex. 5") at § 5.7.

[18] Ex. 5 at § 2.6.

[19] Ex. 2 at 22:07-21.

[20] Ex. 3 at SOrr-OMC-MD-000030; Ex. 3 at SOrr-OMC-MD-002914-02915.

[21] Ex. 2 at 23:06-20.

[22] Exhibit 6, Deposition of Elizabeth B. Mahanna, MD ("Ex. 6") at 59:16-61:08.

[23] Ex. 2 at 29:20-24, 31:02-13.

[24] Ex. 6 at 59:16-61:08; Ex. 3 at SOrr-OMC-MD-000033-34.

[25] Ex. 3 at SOrr-OMC-MD-000033-34.

[26] *Id.*

**III.    ARGUMENT**

    **A.    Defendants' Duty to Adequately Instruct Mrs. Orr's Neurosurgeon, Dr. Bui, about Xarelto Is Relevant to Plaintiff's Failure to Warn Claim.**

In Louisiana, "[t]he obligation to the consumer is fulfilled when the prescribing <u>or treating physician</u> is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[27] Accordingly, "[t]he treating physician's knowledge is thus the focus of the inquiry."[28] In this context, the "treating physician" is not limited to the plaintiff's prescribing physician but extends to non-prescribing healthcare providers "who are in positions to act on such information so as to reduce or prevent injuries to patients."[29]

Applying this analysis in this case, Defendants' duty to provide adequate instructions extended to Mrs. Orr's treating physicians who could have reduced the risks associated with Xarelto. This included Mrs. Orr's neurosurgeon, Dr. Bui, who delayed Mrs. Orr's surgery because he could not determine with certainty when she took her last dose of Xarelto, and he was unable to assess her anti-coagulation status while Mrs. Orr was in a serious medical condition.  The delay

---

[27] *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999) (emphasis added), *citing Mikell v. Hoffman-Laroche, Inc.*, 649 So. 2d 75, 79 (La. App. 1st Cir. 1994).

[28] *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 280 (5th Cir. 2002).

[29] Restatement (Third) of Torts: Product Liability § 6(d) (1997); *see also Stahl*, 283 F.3d at 267, 269-70, *citing* Restatement (Third) of Tort §§ 6(b), 6(d) (applying learned intermediary doctrine); *Georges v. Novartis Pharm. Corp.*, No. CV 06-05207, 2013 WL 5217198, at *9 (C.D. Cal. Apr. 4, 2013) (finding that dentist "may be in the class of learned intermediaries 'in a position to reduce the risks of harm' to whom Defendant owed a duty to warn"); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 307-308 (W.D. Ky. 2011) (extending learned intermediary status to plaintiff's non-prescribing physicians noting that "[i]t is impossible to read the learned intermediary rule through [defendant's] proposed lens given the interplay between multiple physicians, numerous procedures, and countless drugs to which cancer patients are subjected."); *Stevens v. Novartis Pharm. Corp.*, 247 P.3d 244, 260 (Mont. 2010) (describing scope of learned intermediary doctrine as applying to any healthcare professional responsible for making decisions regarding the patient's case); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Ore. 1974) ("Although the ethical drug manufacturer's duty to warn has been discussed most often with reference to the prescribing physician, the [doctrine's] reasoning applies with equal force to the treating physician … [who] may be more likely to observe the actual symptoms of the drug's untoward consequences.").

and the increased risk could have been avoided if Defendants had provided an instruction about PT testing, which they failed to do.[30]

Accordingly, in denying Defendants' Partial Summary Judgment Motion on Plaintiffs' failure-to-warn claim based on the Learned Intermediary Doctrine, this Court held that the issue of whether Mrs. Orr's doctors would have administered a PT test, if so instructed, remained an issue for the jury to decide:

> Louisiana law contains a presumption that if adequate warning is provided, that warning would have been followed, or "heeded. *See Bloxom v. Bloxom*, 512 So.2d 839, 850 (La. 1987); *Exxon Mobil Wagoner v. Exxon Mobil Corp.*, 813 F. Supp.2d 771, 797 (E.D. La. Aug. 24, 2011). This presumption can be rebutted by showing that a warning would have been futile. In this case, the Court presumes that Plaintiffs' doctors would have followed the label's instructions and administered a PT test if so instructed and Defendants fail to overcome that presumption at this juncture. Both doctors testified in their depositions that they would have administered PT tests if the label so instructed. This issue, however, is factually pregnant and will be addressed by the jury at trial.[31]

In doing so, the court recognized that Plaintiffs' failure to warn claim alleges that Defendants not only had a duty to warn about the risks of Xarelto, but also a duty to provide adequate instructions for its safe use.

> Plaintiffs point to evidence that both doctors would have used PT tests had they been adequately instructed to do so, and therefore would have been equipped to adjust treatment to avoid injury. Specifically for Plaintiff Orr, Dr. Bui, her neurosurgeon, would have known Ms. Orr was not anticoagulated and would have proceeded

---

[30] In this regard, Bui testified that because Mrs. Orr was on Xarelto and at that time there was no way to be able to track the anticoagulation effect of Xarelto and there was no reversal agent, the initial thought process was not to drill a hole in her brain and place a catheter for fear of making the hemorrhage worse if she still had an anticoagulation effect on board -- so they initially opted to just go with the medical therapy and with a guesstimate of the half-life. *See* Bui Tr. at 21-22.

[31] *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 U.S. Dist. LEXIS 58056, *8 (E.D. La. April 17, 2017).

with her surgery much sooner. Because of the delay, however, Ms. Orr experienced significant medical issues.[32]

Thus, in denying Defendants' Partial Summary Judgment motion, this Court recognized that Defendants owed a duty to adequately instruct Mrs. Orr's neurosurgeon, Dr. Bui.[33]

### B. Dr. Bui's knowledge about Xarelto is relevant and probative.

According to Defendants, Dr. Bui's testimony regarding what he knew or didn't know about the Xarelto label also is irrelevant because he is a neurosurgeon who does not prescribe Xarelto or rely on the Xarelto label in his practice, and because he was not at all familiar with the label.[34] Again, Defendants are wrong.

At his deposition, Dr. Bui explained the following:

1. He deals with anticoagulation all the time, so he is fairly familiar with Xarelto and most of the other anticoagulation agents.[35]

2. Depending on what the drugs are – if it is medications that pertain directly to things he treats, Bui would rely on FDA labeling information.[36]

3. Dr. Bui sees patients several times a week in the emergency setting who have had intracranial bleeds when taking the various different types of anticoagulants almost every day, as well as patients with hypertension who have bleeds but have never taken an anticoagulant.[37]

4. Dr. Bui has some background knowledge of warfarin and Xarelto from studies related to the rates of intracranial bleeding in patients on one versus the other.[38]

---

[32] *Id.* at *5-6.

[33] *See generally Phillips v. Occidental Chem. Corp.*, 2000 U.S. Dist. LEXIS 14148, *18-19 (E.D. La. Sept. 19, 2000) (denying motion *in limine* to preclude testimony of treating physicians based on previous Order entered by the Court as to the scope of testimony which may be elicited).

[34] Defs.' Mem. Supp. Mot. *In Limine* at 1-2.

[35] *See* Bui Tr. (Ex. 2) at 41.

[36] *Id.* at 51-52.

[37] *Id.* at 68.

[38] *Id.* at 71-72.

7

5. As a surgeon who may have to intervene surgically for patients on various anticoagulation regiments, if he had the choice of having a test to be able to determine how impaired a patient's coagulation pathway was or whether the medication was still in a patient's system, he would prefer to know and have that option.[39]

6. Dr. Bui would prefer to have a test like an INR test or some other test that would quickly give him an answer about whether patients had Xarelto in their systems and how much.[40]

7. Dr. Bui was not aware in April 2015 that, in an emergent situation, a certain PT reagent blood test could be used to determine Xarelto levels.[41]

8. Dr. Bui's basic understanding of Xarelto at the time of Mrs. Orr's treatment was that it was shown to have some advantages over warfarin, but was not clinically superior. It was a new class of drug approved by the FDA, which had the advantage of less frequent, once-a-day dosing, and a similar risk profile, but a slightly better benefit profile as it relates to ischemic strokes, and it was given an on-label approval for treatment of atrial fibrillation. His understanding today is that the FDA still permits Xarelto administration for on-label treatment of A-fib, but that there is some question about the ROCKET trial relating to whether the INR monitoring device used in the trial was functioning properly.[42]

9. Dr. Bui understands that there is a specific reversal agent that has been developed and is used in some places.[43]

So, even though Dr. Bui's specialty did not make him an expert on the Xarelto label, his everyday practice provided him with a working knowledge of anticoagulants, like Xarelto, and how it affects the patients he treats, including Mrs. Orr. Similar factual testimony has been held by courts as admissible when challenged at the pretrial stage.[44]

Defendants cannot credibly argue that Dr. Bui's treatment of Mrs. Orr would not have been affected by the warning on the Xarelto label, especially given Dr. Bui's testimony that he would

---

[39] *Id.* at 188.

[40] *Id.* at 189-190.

[41] *Id.* at 191-192.

[42] *Id.* at 197-198.

[43] *Id.* at 199.

[44] *See*, *e.g.*, *Robertson v. Richard*, 2003 U.S. Dist. LEXIS 22083, *2-3 (E.D. La. Dec. 8, 2003) (denying motion *in limine* where the evidence that the defendants sought to exclude was factual in nature); *Dekerlegand v. Wal-Mart Stores, Inc.*, 2000 U.S. Dist. LEXIS 17386, *3 (E.D. La. Dec. 1, 2000) (same).

rely on FDA labeling information regarding medications that pertain directly to conditions he treats.[45]  Moreover, Dr. Bui testified that he is familiar with Xarelto and sees patients in the emergency setting almost every day who have had intracranial bleeds when taking various different types of anticoagulants.[46]

Finally, Defendants conveniently argue that Dr. Bui's testimony would somehow confuse or mislead the jury, but the cases relied on by Defendants are fact-specific – where courts simply analyzed the treating physician's testimony as to what extent the doctor may have relied on warning label at issue.  In contrast, as outlined above, Dr. Bui testified in the instant action that while he does not consider himself an expert on Xarelto, he deals with anticoagulants all the time, he relies on FDA labeling for conditions he regularly treats, he sees patients in the emergency setting with intracranial bleeds who have taken various different types of anticoagulants almost every day, he has some background knowledge of warfarin and Xarelto from studies examining the relative rates of intracranial bleeding for these two drugs, and, as a surgeon who may have to intervene surgically for patients on anticoagulation regiments, if he had the choice of having a test to determine the level of impairment of a patient's coagulation pathway or whether medication is still on board, he would prefer to know and have that option.[47]

---

[45] *See* Bui Tr. (Ex. 2) at 51-52.

[46] *Id.* at 41, 68.  *Cf. Eubanks v. St Tammany Parish Hosp.*, 2004 U.S. Dist. LEXIS 11524, *7 (E.D. La. June 22, 2004) (holding that an oncologist who has experience and deals everyday with cancer patients and the types of emotional distress they suffer and is in a position to distinguish typical and atypical mental distress and stressors in cancer patients).

[47] *See* Bui Tr. (Ex. 2) at 51-52, 68, 71-72, 188-190.

## IV. CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that this Court deny Defendants' *motion in limine* to preclude Dr. Bui's testimony regarding the Xarelto label.

                                                 Respectfully submitted,

Dated: May 23, 2017　　　　　　　　　　*/s/ Leonard A. Davis*
　　　　　　　　　　　　　　　　　　　Leonard A. Davis, Esq. (Bar No. 14190)
　　　　　　　　　　　　　　　　　　　***HERMAN, HERMAN & KATZ, LLC***
　　　　　　　　　　　　　　　　　　　820 O'Keefe Avenue
　　　　　　　　　　　　　　　　　　　New Orleans, LA 70113
　　　　　　　　　　　　　　　　　　　Phone: (504) 581-4892
　　　　　　　　　　　　　　　　　　　Fax: (504) 561-6024
　　　　　　　　　　　　　　　　　　　Email: ldavis@hhklawfirm.com

　　　　　　　　　　　　　　　　　　　Gerald E. Meunier (Bar No. 9471)
　　　　　　　　　　　　　　　　　　　***GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC***
　　　　　　　　　　　　　　　　　　　2800 Energy Centre, 1100 Poydras Street
　　　　　　　　　　　　　　　　　　　New Orleans, LA 70163-2800
　　　　　　　　　　　　　　　　　　　Phone: (504) 522-2304
　　　　　　　　　　　　　　　　　　　Fax: (504) 528-9973
　　　　　　　　　　　　　　　　　　　Email: gmeunier@gainsben.com

　　　　　　　　　　　　　　　　　　　***Plaintiffs' Liaison Counsel***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 23, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

>*/s/ Leonard A. Davis*
>**LEONARD A. DAVIS**