# EXHIBIT 4

# Gropen, Toby MD

Volume 1 - 09/16/2016

Condensed Transcript

Printed 05/22/2017 03:18PM EDT

CONFIDENTIAL

```
0001
01: UNITED STATES DISTRICT COURT
02: EASTERN DISTRICT OF LOUISIANA
03: IN RE: XARELTO
04: (RIVAROXABAN)            MDL NO. 2592
05: PRODUCTS LIABILITY LITIGATION    SECTION L
    JUDGE ELDON E. FALLON
06: _____   MAG. JUDGE NORTH
07: THIS DOCUMENT RELATES TO:    Case No:
08: JOSEPH ORR, JR., as lawful    2:15-cv-03708
09: Surviving spouse of SHARYN ORR
10: PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
11: VIDEOTAPED DEPOSITION OF TOBY I. GROPEN, M.D.
12:
13: S T I P U L A T I O N S
14: IT IS STIPULATED AND AGREED, by and
15: Between the parties through their respective
16: counsel, that the deposition of:
17: TOBY I. GROPEN, M.D.
18: may be taken before Lisa Bailey, Commissioner and
19: Notary Public, State at Large, at the UAB
20: Comprehensive Stroke Research Center, 1813 6th
21: Avenue South, Birmingham, Alabama, on the 16th day
22: of September 2016, commencing at approximately
23: 1:00 p.m.
24:
```
p. 00001

```
0002
01: IT IS FURTHER STIPULATED AND AGREED that
02: the signature to and reading of the deposition by
03: the witness is waived, the deposition to have the
04: same force and effect as if full compliance had
05: been had with all laws and rules of Court relating
06: to the taking of depositions.
07: IT IS FURTHER STIPULATED AND AGREED that
08: it shall not be necessary for any objections to be
09: made by counsel to any questions, except as to form
10: or leading questions, and that counsel for the
11: parties may make objections and assign grounds at
12: the time of the trial, or at the time said
13: deposition is offered in evidence, or prior
14: thereto.
15: * * *
16:
17:
18:
19:
20:
21:
22:
23:
24:
```
p. 00002

```
0003
01: A P P E A R A N C E S
02: FOR THE PLAINTIFF:
03: BRADLEY D. HONNOLD, ESQ.
    Attorneys at Law
04: Goza & Honnold
    11181 Overbrook Road
05: Suite 200
    Leawood, Kansas  66211
06: bhonnold@gohonlaw.com
    -AND-
07: EMILY C. JEFFCOTT, ESQ.
    Attorney at Law
08: The Lambert Firm
    701 Magazine Street
09: New Orleans, Louisiana 70130
    ejeffcott@thelambertfirm.com
10: -AND-
    VICTOR ODOM, ESQ. (via telephone)
11: Attorney at Law
    Capitelli & Wicker
12: 1100 Poydras St., Ste 2950
    New Orleans, LA 70163
13:
14: FOR DEFENDANT JANSSEN:
15: JAMES B. IRWIN, ESQ.
    Attorney at Law
16: Irwin, Fritchie, Urquhart & Moore
    400 Poydras Street
17: Suite 2700
    New Orleans,  Louisiana  70130
18: jirwin@irwinllc.com
19:
    FOR DEFENDANT BAYER:
20: ERIC C. PAINE, ESQ.
    Attorney at Law
21: Nelson, Mullins, Riley & Scarborough, LLP
    1320 Main Street, 17th Floor
22: Columbia, South Carolina  29201
    eric.paine@nelsonmullins.com
23:
24: ALSO PRESENT:  KAREN KELLEY, Videographer
```
p. 00003a

0119
01: not Xarelto was involved, correct?
02: A.    I was not.
03: Q.    Going back to Exhibit 2 just briefly
04: which again is the same report I think or same
05: progress note.  A CT report from April 24th 2015,
06: the piece that was posted into your progress note
07: and Nurse Practitioner Liscum's progress note, it
08: referred to that initial CT.  CT is one of the
09: first imaging studies done when a patient presents
10: to a hospital or emergency department with
11: suspected stroke, right?
12: A.    Correct.
13: Q.    And it's usually very, very early in the
14: treatment and evaluation process?
15: A.    Correct.
16: Q.    In that pasted portion there's reference
17: to -- and I'll mess this up -- significant right to
18: left subfalcine midline shift and also reference to
19: uncal herniation.  Could you tell us what those
20: are, please?
21: A.    They are -- herniation generally refers
22: to something being where it shouldn't.  And the --
23: in this case -- this is exactly what -- it was a
24: herniation of the subthalamus -- it just means that

p. 00119

0120
01: the thalamus which is the -- which divides the
02: cerebral hemispheres there was pressure on it
03: pushing it towards the left side.  And the uncus is
04: the part of the temporal lobe that's in the medial
05: part facing the midline.  And if there is -- it can
06: be -- if it crosses the edge of the tentorium which
07: divides the brain stem from the part of the brain
08: or both -- that's uncal herniation.  So that's what
09: that refers to.
10: Q.    When a physician like you who
11: specializes in stroke neurology reads a CT report
12: or sees on a CT report uncal herniation and
13: significant midline shift like that, are those bad
14: prognostic signs generally?
15: A.    Yes.
16: MR. PAINE:  Those are all the questions
17: I have.  Thank you, Doctor.
18: RE-EXAMINATION
19: BY MR. HONNOLD:
20: Q.    Doctor, I have a few follow-up.  In the
21: world of neurology are there drugs that you're
22: aware of that if you want to know how much drug is
23: in the -- in the patient's bloodstream you can do a
24: test for it or a level?

p. 00120

0121
01: A.    Sure.  Yes.
02: Q.    And drugs that come to mind where you
03: can do that?
04: A.    Anticonvulsants would be a good example
05: of a class where you generally can check the level.
06: Q.    And in that situation why is it
07: important to know how much medication is in the
08: patient's bloodstream?
09: A.    Because all drugs have -- or drugs
10: generally have a therapeutic index so toxicity and
11: lack of efficacy could result from high or low
12: levels respectively.
13: Q.    And in that explanation are you -- one
14: thing that you're pointing out is that with some
15: drugs if there's too much in the bloodstream that
16: may increase the risk of a side effect related to
17: the drug?
18: A.    Correct.
19: Q.    And is that why you and other doctors
20: might have interest in the name of the patient's
21: safety and well being to know when those situations
22: are occurring?
23: A.    Correct.
24: Q.    Now, have you -- has there ever been any

p. 00121

0122
01: information promulgated when you were at Ochsner in
02: the system about how or whether for Xarelto if a
03: physician or a team of physicians had a patient
04: come in with an intracranial hemorrhage with a
05: history that they had been on Xarelto to be able to
06: figure out what the -- really what the blood level
07: is in the patient's bloodstream?
08: A.    There's an inaccurate and imprecise
09: relationship between the novel -- the anticoagulant
10: effect of the newer anticoagulants in general and
11: the -- and blood test in the --
12: Q.    Which ones?
13: A.    The prothrombin time, thrombin time, INR
14: --
15: Q.    All right.
16: A.    -- so forth.
17: Q.    Now, are you aware of the different
18: reagents that are out there for performing a
19: prothrombin test?
20: A.    There are -- I know there are different
21: thromboplastin that are used, but I -- you know, I
22: think that's out of my purview as far as any
23: specifics that were used.
24: Q.    Did you as a member of the stroke team

p. 00122

Page 31

```
0123
01: that included doctors who took care of intracranial
02: bleeding events at Ochsner, did you have an
03: understanding back in April of 2015 as to whether
04: Ochsner had available the type of PT test that was
05: sensitive for the presence of Xarelto in a
06: patient's bloodstream?
07: A.   You know, I think -- not that -- that I
08: was aware of.  I think generally we just acted on
09: the premise that in the appropriate clinical
10: scenario we would act if we felt that there was
11: still a factor related to hemorrhage that we would
12: try to reverse.
13: Q.   If there was a blood level test, an
14: accurate assay, to determine the level of Xarelto
15: in a patient's bloodstream that came with
16: instructions or guidelines as to how to use it,
17: would you have implemented that in your practice?
18: MR. IRWIN:  Objection, speculation.
19: A.   Perhaps.
20: Q.   Okay.  Did you ever -- have you ever
21: talked about a patient -- other patients on
22: anticoagulants on this issue of needing to
23: intervene in some way, either surgically or with
24: ventriculostomy on patients that are on
```

p. 00123

```
0124
01: anticoagulants?  Does the issue come up at the
02: outset?  Are they really anticoagulated right now?
03: Do we need to figure that out?
04: A.   Yes.
05: Q.   Okay.  And so why is it important to
06: figure out whether the patient is anticoagulated or
07: not?
08: A.   Because the -- generally try to reverse
09: the anticoagulation.
10: Q.   And to know whether to reverse the
11: anticoagulation can it be helpful to know whether
12: the patient is really anticoagulated beforehand?
13: A.   Yes.
14: Q.   And for warfarin can that be done?
15: A.   Yes.
16: Q.   Are there other anticoagulants that
17: you're aware of where that can be done?
18: A.   Yes.  Yes.
19: Q.   And if -- are there products that if you
20: use to reverse the anticoagulant effect that they
21: also have potentially side effects?
22: A.   Yes.
23: Q.   And what are those side effects?
24: A.   Thrombotic effects, factor VII,
```

p. 00124

```
0125
01: activated factor VII.
02: Q.   And are those situations where those
03: medications can actually then cause clots in the
04: patient?
05: A.   Correct.
06: Q.   And could actually cause a secondary
07: stroke or other clotting event in the body?
08: A.   Yes.  Just to clarify, it would be
09: useful to -- a test would be useful in the acute
10: situation.  I think I had interested you to ask
11: whether or not I would use such a test as part of a
12: routine adjustment of medications like I would do
13: for an anticonvulsant which may or may not be
14: appropriate for this medication.  So I just wanted
15: to clarify.
16: Q.   Thank you.  And I'm not suggesting that
17: whatsoever.  I'm talking about using of -- a test
18: that can be used to provide information urgently or
19: quickly to give you information about a patient's
20: anticoagulant status.  Would you use that type of
21: test?
22: A.   Yes.
23: MR. PAINE:  Object to the form.
24: Q.   And explain to us why you would use that
```

p. 00125

```
0126
01: type of test.
02: A.   To decide whether or not it was
03: appropriate to rapidly reverse the anticoagulation
04: effect.
05: Q.   And is it true that if you -- if a test
06: like that were used in addition to the issue of
07: reversal, could that test information also be
08: helpful on the issue of surgical intervention?
09: A.   Yes.
10: Q.   How so?
11: A.   I think the -- in a variety of
12: circumstances I think people are -- don't coagulate
13: normally, surgical --
14: Q.   Is it true then that if a rapid test is
15: available to determine the blood level then that
16: might allow intervention, surgical intervention, to
17: take place immediately rather than waiting many,
18: many hours?
19: A.   In a general sense, yes.
20: Q.   Yes.  Okay.  Now, did you ever have any
21: discussions with Dr. Bui about the issue of whether
22: the decision had to be made in Ms. Orr's situation
23: that for a significant period of time all that
24: could be done for Ms. Orr was to wait until
```

p. 00126