```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2    ***********************************************************

 3    IN RE:  XARELTO (RIVAROXABAN)
      PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
 4    PRODUCTS LIABILITY LITIGATION        Section "L"
                                           New Orleans, Louisiana
 5    THIS DOCUMENT RELATES TO:            Friday, April 21, 2017
      Joseph J. Boudreaux, Jr.
 6    v. Janssen Research &
      Development, et. al.,
 7    Case No. 14-CV-2720

 8    ***********************************************************

 9                     TRANSCRIPT OF PROCEEDINGS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
10                UNITED STATES DISTRICT JUDGE - IN CHAMBERS

11

      APPEARANCES:
12
      FOR THE PLAINTIFFS'
13    LIAISON COUNSEL:                     LEVIN PAPANTONIO
                                           BRIAN H. BARR, ESQ.
14                                         316 Baylen Street, Suite 600
                                           Pensacola, FL 32502
15
                                           BEASLEY ALLEN
16                                         BY:  ANDY BIRCHFIELD, ESQ.
                                           P.O. Box 4160
17                                         Montgomery, AL 36103

18                                         HERMAN HERMAN & KATZ
                                           BY:  LEONARD A. DAVIS, ESQ.
19                                         820 O'Keefe Avenue
                                           New Orleans, LA 70113
20
                                           GAINSBURGH BENJAMIN DAVID
21                                         MEUNIER & WARSHAUER
                                           BY:  GERALD E. MEUNIER, ESQ.
22                                         2800 Energy Centre
                                           1100 Poydras Street
23                                         New Orleans, LA 70163

24                                         SCHLICHTER, BOGARD & DENTON
                                           BY:  ROGER C. DENTON, ESQ.
25                                         100 South 4th Street
                                           Saint Louis, MO 63102
```

```
 1                                    AYLSTOCK, WITKIN, KREIS &
                                      OVERHOLTZ, PLLC
 2                                    BY:  NEIL D. OVERHOLTZ, ESQ.
                                      17 East Main Street, Suite 200
 3                                    Pensacola, FL 32502-5998

 4
      FOR THE DEFENDANT BAYER
 5    HEALTHCARE PHARMACEUTICALS
      INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
 6                                    BY:  BETH A. WILKINSON, ESQ.
                                      1900 M Street NW, Suite 800
 7                                    Washington, DC 20036

 8                                    Nelson Mullins Riley
                                      & Scarborough, LLP
 9                                    BY:  DAVID E. DUKES, ESQ.
                                      Meridian, 17th Floor
10                                    1320 Main Street
                                      Columbia, SC 29201
11

12    FOR JANSSEN PHARMACEUTICALS,
      INC. AND JANSSEN RESEARCH &
13    DEVELOPMENT, LLC:               BARRASSO USDIN KUPPERMAN FREEMAN
                                      & SARVER, LLC
14                                    BY:  RICHARD E. SARVER, ESQ.
                                           CELESTE R. COCO-EWING, ESQ.
15                                    909 Poydras Street, 24th Floor
                                      New Orleans, LA 70112
16
                                      CHAFFE McCALL, LLP
17                                    BY:  John F. Olinde, ESQ.
                                      1100 Poydras Street, Suite 2300
18                                    New Orleans, LA 70163

19
      Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR, RMR
20                                    500 Poydras Street, B-275
                                      New Orleans, Louisiana 70130
21                                    (504) 589-7776

22
         Proceedings recorded by mechanical stenography, transcript
23    produced by computer.

24

25
```

<u>P R O C E E D I N G S</u>

(FRIDAY, APRIL 21, 2017)

(PROCEEDINGS)

13:58:58   5    (OPEN COURT.)

13:58:58   6         THE COURT:  I tried to get you on the phone because it's

13:59:02   7    easier for you all, no sense in coming to court.  And also I've got

13:59:07   8    a thing or two else that I am working on at the time.

13:59:10   9         Let's first of all do the jury charges, if you will.

13:59:18  10    We're meeting again to discuss the jury charges of counsel in

13:59:22  11    chambers.  I've gotten seven additional questionnaires from jurors

13:59:30  12    who came in last week on Wednesday, I forwarded them immediately to

13:59:36  13    counsel, we've all had an opportunity to look at them.

13:59:40  14         I am afraid I don't see but about two of them that I

13:59:46  15    think are able to join our elite group.  I think the first one

13:59:51  16    Deborah Ann Beavers is okay.  I don't see an issue with her.  I

13:59:56  17    call your attention to the answer on Question 46, she apparently

14:00:15  18    says if something gives you cancer, so that should be dealt with.

14:00:21  19         MR. BARR:  Not just the product, the entire company.  I

14:00:24  20    think she's 100 percent correct.

14:00:28  21         THE COURT:  The next one Dana Colombo, I didn't see any

14:00:33  22    problem with him.  Although, I'll call your attention to 39,

14:00:37  23    Question 39 -- I'm sorry, 37, "Do you have an opinion of FDA?

14:00:48  24    Don't have much trust in FDA."  So that's something that you'll

14:00:52  25    want to talk about.

14:00:54  1          The next one, this guy Edward Durette.  Question 61, I

14:01:09  2  have a standard truck, only transportation, my wife doesn't drive a

14:01:14  3  standard.  I don't know what that means, but --

14:01:17  4          MS. WILKINSON:  He also has pinched nerve.

14:01:24  5          THE COURT:  Religious beliefs.

14:01:27  6          MS. WILKINSON:  We'll move to dismiss him, your Honor.

14:01:29  7          THE COURT:  I'll dismiss him for cause.

14:01:32  8          The next one also is an issue, Question 42 caught my eye.

14:01:42  9  Thousands of side effects.  Sixty-one is also an issue.

14:01:50  10         MR. BIRCHFIELD:  This is Robert Gonsoulin?

14:01:54  11         THE COURT:  Yes.

14:01:56  12         MS. WILKINSON:  And he claims a business hardship as

14:01:58  13  well.

14:01:59  14         MR. BIRCHFIELD:  We're fine letting him go.

14:02:01  15         THE COURT:  Okay.  I'll excuse him for cause.

14:02:05  16         Kevin Turner, the same one, 61 --

14:02:12  17         MR. BIRCHFIELD:  Kelvin Johnson?

14:02:13  18         THE COURT:  I'm sorry, Kelvin Johnson.  He has a vacation

14:02:19  19  planned.  You know, they get these tickets now that are

14:02:22  20  non-refundable tickets and that's an issue.  It's during the trial,

14:02:27  21  I don't know how we can deal with that.

14:02:29  22         MR. BIRCHFIELD:  Your Honor, we should be done by then,

14:02:31  23  but we're okay, I mean, just to let him go.

14:02:36  24         MS. WILKINSON:  He should be excused, it's too close.

14:02:38  25         THE COURT:  Yes, I agree, it's just too close, that's my

14:02:40 1  feeling, I'll excuse him for cause.

14:02:43 2          Joseph Lafaso, 60 and 61 gave me a little pause.

14:02:58 3          MS. WILKINSON:  Hearing, vision, inability to remain

14:03:00 4  awake, medication, all of the above.

14:03:02 5          THE COURT:  And also a hardship.  I'll excuse him for

14:03:08 6  cause.

14:03:10 7          MR. BIRCHFIELD:  So out of this group we have --

14:03:15 8          THE COURT:  Thomas is the last one.

14:03:17 9          MS. WILKINSON:  You're ahead of him, you already want her

14:03:20 10  out.  We all agree.

14:03:21 11          THE COURT:  So we really only have two from these.

14:03:25 12          MS. WILKINSON:  So she is excused?

14:03:26 13          THE COURT:  Excused for cause.  So the only one that will

14:03:29 14  join the group is Deborah Ann Beavers and Dana Angelo Colombo.

14:03:46 15          All right.  I know we have an issue on a subpoena.  I can

14:03:57 16  talk with you about that now.

14:04:00 17          MR. BARR:  Fred will address that.

14:04:02 18          MR. LONGER:  It's the defendant's motion, I am happy to

14:04:04 19  start on it.

14:04:06 20          THE COURT:  Let me just tell you the way I see it and

14:04:08 21  then I'll ask you all to tell me about it.  The plaintiffs in this

14:04:13 22  case seek to take the deposition of a witness who resides and works

14:04:23 23  in Pennsylvania or within 100 miles of Pennsylvania.  They want to

14:04:28 24  take his testimony within 100 miles from his work or where he

14:04:42 25  lives, but then they stream his testimony to the trial during the

14:04:46 1    trial.

14:04:49 2          The rules of civil procedure deal with that to some

14:04:54 3    extent; first is Rule 45, which talks about the area of service and

14:05:04 4    it says:  A subpoena may command a person to attend a trial,

14:05:08 5    hearing, or deposition only as follows: (A) within 100 miles of

14:05:14 6    where the person resides, is employed, or regularly transacts

14:05:17 7    business in person; or (B) within the state the person resides, is

14:05:23 8    employed, or regularly transacts business in person, if the

14:05:31 9    person is a party or party's officer, or who is commanded to attend

14:05:39 10   trial and would not incur substantial expense.

14:05:43 11         The only other rule that is relevant to this issue is

14:05:47 12   Rule 43, which says in 43(a) that the preferred testimony, of

14:05:55 13   course, is in-person testimony at trial.  But it's added a sentence

14:06:01 14   now which provides:  For good cause in compelling circumstances and

14:06:09 15   with appropriate safeguards, the court may permit testimony in open

14:06:14 16   court by contemporaneous transmission from a different location.

14:06:23 17         There's no appellate court discussion on this, but there

14:06:28 18   are several district courts.  I've had a crack at it early on with

14:06:33 19   Vioxx, but the rules have changed so I don't think that that case

14:06:38 20   is helpful; although I might say that some of the district courts

14:06:44 21   do at least put a parenthesis in their opinions that at least

14:06:49 22   leaves open the power of the court sitting as an MDL transferee

14:06:59 23   court, I noticed that in several opinions.

14:07:01 24         There are some opinions that seem to say that to

14:07:06 25   interpret -- to allow something that the plaintiff wants would in

14:07:15 1    effect negate Rule 45.  I really don't see any conflict between

14:07:22 2    Rule 43 and 45.  I think that they're in a harmony.  I think that

14:07:27 3    the fact that you take a deposition of a person doesn't stop that

14:07:32 4    person from testifying at the trial.  We all know that sometimes we

14:07:38 5    don't like what a deposition is and we fly the person in, and you

14:07:42 6    can't say, well, he already gave his deposition, he can't testify

14:07:45 7    at trial.

14:07:47 8         Also within the jurisdiction of the Court, you really

14:07:52 9    can't use a deposition of a person if he is available for trial and

14:07:58 10   there's no reason for not subpoenaing him.

14:08:01 11        So I don't see it as a conflict.  But I think the issue

14:08:07 12   here is really the first clause of Rule 43, "for good cause in

14:08:14 13   compelling circumstances and with appropriate safeguards."

14:08:19 14        Now, in this case, as I understand, this witness has

14:08:22 15   given a deposition, a video deposition beforehand.  I understand

14:08:30 16   the plaintiffs take the position that was done a year or so ago and

14:08:36 17   that things have changed and that they would not have a problem if

14:08:46 18   the defendant would call a witness who is on the witness list, I am

14:08:51 19   not quite sure whether it's may or will call witness list, they

14:08:56 20   would need him.  But at this point the defendants haven't heard any

14:08:59 21   of the testimony so they don't know who they're going to put on.

14:09:02 22        But they've listed the witness, a witness that if they

14:09:08 23   call that witness, the plaintiffs will not have to subpoena the

14:09:14 24   other witnesses.  I understand the defendants won't commit to that

14:09:21 25   because they don't know what the plaintiffs are going to put on and

14:09:25   1    they just don't know at this point.

14:09:28   2            The issue to me is what's the good cause part and why is

14:09:36   3    it good cause.  As I say, I don't see any conflict because I really

14:09:40   4    think that the purpose of 45 is convenience and expense of the

14:09:46   5    witness.  I think the focus is on the witness.  We don't want a

14:09:49   6    witness to have to get on a plane and come down to some other

14:09:53   7    place; it's not fair to the witness and, therefore, it's

14:10:00   8    unreasonable to make the witness just drop what they're doing and

14:10:04   9    respond to a subpoena within a certain period, certain geographic

14:10:09   10   area.

14:10:10   11           But I don't think it's for the purpose of stopping the

14:10:13   12   deposition or the testimony from being used because you can take a

14:10:18   13   deposition and use it, even though somebody's out of the subpoena

14:10:23   14   power.  And as I say, you can take the deposition and then fly that

14:10:27   15   person in and use it.  So I think it's really for convenience and

14:10:33   16   this satisfies convenience.

14:10:36   17           But it's the only -- 43 is allowed for extreme

14:10:44   18   circumstances and that's really what I need you all to talk to me

14:10:50   19   about, extreme circumstances.  What are they, Fred?

14:10:55   20           MR. LONGER:  May I begin, your Honor?

14:10:57   21           THE COURT:  Yes, either one of you all.

14:10:59   22           MS. WILKINSON:  Go ahead.

14:11:01   23           MR. LONGER:  Sure.  So to begin, your Honor, I'd like to

14:11:05   24   draw your attention to the fact that you and I have been down this

14:11:10   25   road before, and you mentioned the Vioxx case earlier, when we were

14:11:15  1   trying to get David Anstice to come down here.  As your Honor will
14:11:20  2   recall, Mr. -- or Dr. Anstice was a trial witness in Huntington, I
14:11:26  3   think, he was also a trial witness in several of the New Jersey
14:11:29  4   Vioxx trials, and he was also deposed many times.
14:11:34  5        So the concerns that you had and just raised with regard
14:11:40  6   to Dr. Peters being deposed before were certainly present at the
14:11:46  7   time that Dr. Anstice was at issue.  And back then your Honor ruled
14:11:52  8   that we could contemporaneously stream Anstice into the courtroom.
14:12:00  9        And I have that order here, your Honor, I am not sure if
14:12:05 10   you have it, but everyone can have a copy.  And --
14:12:11 11        THE COURT:  Of course there have been some change in the
14:12:13 12   rules since then.
14:12:16 13        MR. LONGER:  Well, yes and no.  The same matters that you
14:12:19 14   just raised with regard to Rule 43, good cause and exceptional
14:12:23 15   circumstances, existed in Rule 43 at the time.  And back then your
14:12:29 16   Honor ruled that we, because this was an MDL proceeding and the
14:12:34 17   fact that this was the premier bellwether trial, that it was
14:12:41 18   significant enough -- and I am talking about *Barnett*, that was the
14:12:44 19   *Barnett* trial -- it was significant enough back then that the
14:12:48 20   exceptional circumstances were met that we wanted to bring
14:12:52 21   Dr. Anstice in.
14:12:53 22        Now, the thing that I think is most significant is that
14:13:00 23   the rules have been amended.  We did too good a job between you and
14:13:05 24   me, your Honor, in regard to David Anstice that they amended the
14:13:10 25   rules in 2013.

14:13:11  1          THE COURT:  Right.

14:13:12  2          MR. LONGER:  And I would say the large print giveth and

14:13:16  3     the small print taketh away.  But here, believe it or not, it's

14:13:20  4     just the opposite.  If you, your Honor, were to look at Rule 45 --

14:13:24  5     and this is not mentioned in the defendant's briefs but we put it

14:13:28  6     into our brief -- in that book that you have, it was on page 233 of

14:13:34  7     my book, but I am not sure if we have the exact same book, but it

14:13:38  8     is the notes to the 2013 amendment to Rule 45.  And it talked about

14:13:47  9     subdivision C.  And it's the second paragraph of the note regarding

14:13:59 10     subdivision C.  And I could tell you, it talks about Rule 45(c)(1).

14:14:07 11          But the bottom line is the last sentence of that

14:14:10 12     paragraph, your Honor, it says:  When an order under Rule 43(a)

14:14:15 13     authorizes testimony from a remote location, the witness can be

14:14:20 14     commanded to testify from any place described in Rule 45(c)(1);

14:14:27 15     meaning that a subpoena can issue to Dr. Peters commanding him to

14:14:34 16     appear in Philadelphia and give testimony there under your Honor's

14:14:40 17     authority under Rule 45, and it marries Rule 43 with Rule 45.

14:14:49 18          And it's very clear from that that the two are to be read

14:14:53 19     in harmony, as your Honor suggests, and it is very clear from your

14:14:59 20     Honor's prior ruling back in June 29, 2006, that good cause and

14:15:06 21     exceptional circumstances are met when an MDL proceeding tries to

14:15:13 22     bring in an important witness as important Dr. Anstice and

14:15:19 23     Dr. Peters I would say are near equivalence in terms of their

14:15:22 24     importance to this trial and these proceedings.

14:15:26 25          And I think from that, we are intending -- well, let me

14:15:32 1  just say, Dr. Peters was directly involved in the development of

14:15:36 2  Xarelto, he had a lot of involvement in the studies that took place

14:15:42 3  regarding the drug.  He is on a lot of exhibits.

14:15:46 4       THE COURT:  Why can't you use his deposition is what I

14:15:49 5  want to know?

14:15:51 6       MR. LONGER:  Because, as your Honor said in this opinion,

14:15:55 7  it's a secondhand use.

14:15:58 8       THE COURT:  Yeah, but it would be the same.  Instead of

14:16:00 9  having him live, you would have him streamed in in a deposition

14:16:05 10 format and now you have him in deposition format canned.  What's

14:16:09 11 the difference?

14:16:10 12      MR. LONGER:  Well, I think it's the difference between

14:16:11 13 canned and live.  People react differently and the jury can observe

14:16:16 14 the man reacting at the time.  And that's the whole point of

14:16:22 15 Rule 43.  The one thing that I would say in that connection is that

14:16:29 16 we have confirmed with the Eastern District of Pennsylvania that

14:16:33 17 all of the procedural safeguards are there.  They have a courtroom

14:16:38 18 available with high tech streaming capabilities and the jury can

14:16:42 19 observe the man live under whoever counsel is here and under

14:16:50 20 questioning by our counsel as well.  And they will see those

14:16:56 21 rulings and we can get live rulings from your Honor in terms of any

14:17:00 22 objections that get raised at the time, and it is a contemporaneous

14:17:05 23 moment, it is not canned.

14:17:08 24      And the whole point that your Honor cited to *Napier v.*

14:17:14 25 *Bossard*, Judge Learned Hand --

14:17:17  1          THE COURT:  But didn't we get that guy in live?  I

14:17:20  2   thought they flew him in live?

14:17:21  3          MR. BIRCHFIELD:  He did come live, your Honor.

14:17:23  4          THE COURT:  He was live, that's a different thing.  If

14:17:25  5   you're going to have somebody live, I understand that that is

14:17:29  6   better than a video deposition of a person.  But you're going to

14:17:32  7   pull him in by deposition, streamed deposition as opposed to a

14:17:40  8   deposition, a video deposition.  You know, even in non-judicial

14:17:50  9   things, when you look at the news whether it's live or they're

14:17:54 10   taking it an hour or so ago.

14:17:57 11          MR. BARR:  Your Honor, and just I guess we're going to

14:18:01 12   start tag teaming not, but --

14:18:02 13          MR. LONGER:  So I am getting whispered in my ear by smart

14:18:07 14   people, and the smart people are telling me, your Honor, that a lot

14:18:10 15   of water has gone under the damn.  You raised it before.  We have

14:18:14 16   new information that's come in since he was deposed over a year

14:18:17 17   ago, and it makes a whole lot more sense for us to be able to

14:18:21 18   question him on our knowledge as of today as of our locked-in

14:18:26 19   knowledge as of way back when.

14:18:30 20          MR. BARR:  And, your Honor, just for the procedural of

14:18:34 21   how we envision this going.  It would not be a live stream of the

14:18:39 22   deposition.  This would be set up where Mr. Peters is essentially

14:18:43 23   in the witness chair, the witness chair is his screen, and he is

14:18:47 24   getting questioned by counsel in this courtroom to him.  So it is a

14:18:51 25   live interaction between witness and counsel.

14:18:55  1              THE COURT:  Yes.

14:18:58  2              MS. WILKINSON:  Your Honor, Mr. Sarver, it's his motion,

14:19:01  3    but if I could just as an interested party say one thing?

14:19:03  4              THE COURT:  Yes.

14:19:04  5              MS. WILKINSON:  Just to address the more general point.

14:19:06  6    The compelling circumstances here are not there.  We've heard

14:19:11  7    nothing -- there are, as you know better than I do, 60 percent of

14:19:15  8    the federal docket is MDL.  Our companies both have MDL's going on

14:19:19  9    around the country, and these depositions occur every day, early in

14:19:22  10   a case where information develops.

14:19:25  11             So from just a process standpoint, unless there's

14:19:29  12   something unusual, and as we understand that's what 43(a) provides

14:19:32  13   some unusual circumstances, this is not unusual, sadly for our

14:19:36  14   clients.

14:19:39  15             MR. SARVER:  I don't want to interrupt.  Fred, are you

14:19:44  16   done?

14:19:44  17             MR. LONGER:  Well, I can rest and respond to whatever you

14:19:46  18   say.

14:19:46  19             THE COURT:  Let me hear what you have to say.

14:19:48  20             MR. SARVER:  Dr. Peters was deposed for nine hours,

14:19:53  21   Judge.  And from looking at the transcript last night, it was

14:19:56  22   pretty clear it was done as a trial deposition.  There were at

14:19:59  23   least 51 times where the Judge and the jury were referenced.

14:20:03  24   "Dr. Peters, are you saying this to the jury?"  So it was done as a

14:20:07  25   trial deposition.  It was videotaped, the plaintiff had the

14:20:11  1  opportunity to ask all of the questions they wanted.

14:20:13  2          And in terms of new information, Dr. Peters hasn't had

14:20:18  3  any involvement in the ROCKET study or really with Xarelto, with a

14:20:24  4  couple of exceptions involving the EMA, since 2012.  So there's

14:20:29  5  nothing in particular that is newly developed information as to

14:20:33  6  Dr. Peters.

14:20:35  7          You know, as a company, we're looking at 18,000 lawsuits,

14:20:40  8  only one Dr. Peters.  And if the plaintiffs are really looking at

14:20:45  9  information about the ROCKET study, there are a lot of people with

14:20:48 10  more information and knowledge than Dr. Peters.  He's a research

14:20:52 11  and development guy, he is not a clinical trials guy, and there

14:20:56 12  just isn't a whole lot more -- and they did add a good deal of his

14:21:01 13  deposition transcript to their designations for this trial.

14:21:05 14          And I think your point is a good one that it doesn't look

14:21:09 15  a whole lot different for someone testifying in Philadelphia live

14:21:12 16  as opposed to someone testifying on videotape who did it five

14:21:16 17  months ago.

14:21:19 18          One other point, I'm sorry.  We do have a bit of a

14:21:23 19  different view on the interplay between Rule 45 and Rule 43.

14:21:27 20          THE COURT:  I understand.

14:21:28 21          MR. SARVER:  It's our view that taking this

14:21:30 22  interpretation would allow 43 to supersede Rule 45 and turn this

14:21:36 23  court into a one with a nationwide service of power and

14:21:40 24  jurisdiction, and we don't think that's what the rules anticipate.

14:21:46 25          We had one kind of hint from one of our Fifth Circuit

14:21:51  1    judges from Judge Jolly in the *DePuy* trial where he said that one

14:21:57  2    of the judges in Dallas had misinterpreted the rule to include the

14:22:03  3    ability to do what is being suggested.  Thank you.

14:22:06  4          THE COURT:  No, I understand.  The thing that convinces

14:22:12  5    me, the other side, is the fact that you take a deposition doesn't

14:22:16  6    mean that you have to use that deposition.  You can bring that

14:22:20  7    person in live.  So then the only reason for restricting the

14:22:27  8    subpoena power is really for the convenience and expense of the

14:22:31  9    witness, not for the use of the deposition.  But I do think that 43

14:22:37 10    is a lot different than 45 in that it's a very unusual

14:22:42 11    circumstance.  You don't do it just every day, it's got to be some

14:22:47 12    reason.

14:22:47 13          MR. LONGER:  Your Honor, Judge Doherty was doing that in

14:22:53 14    the *Actos* litigation and your Honors both cited to that opinion in

14:22:57 15    your Honor's ruling.

14:22:59 16          From my perspective, your Honor, this is an important

14:23:05 17    proceeding for all of us.  And what is troubling is that if we're

14:23:11 18    restricted in this way, then there's -- because of the nature of

14:23:18 19    the will call list that the defendants have proposed, we can't --

14:23:22 20    we're not going to have any live witnesses from the defendant's

14:23:26 21    side because of the way that they've structured their will call

14:23:30 22    list and may call list.  So it's very possible that this is a

14:23:34 23    bellwether case without any live witness.

14:23:37 24          And I don't think that the rules are that inflexible that

14:23:44 25    this is not as important a case as Dr. Anstice was in Vioxx, and

14:23:51   1   your Honor in that situation found that the exceptional

14:23:54   2   circumstance was met.  And the amendments to the rule don't affect

14:24:00   3   that particular ruling that your Honor made 11 years ago.

14:24:03   4         THE COURT:  Well, you know, in that rule just two things:

14:24:07   5   I had the person, I required the person to come live.  And there's

14:24:11   6   a big difference between live and video or live and reading.  I

14:24:14   7   really think also there's a big difference between video and

14:24:18   8   reading.  If you had taken a reading deposition or transcript, that

14:24:23   9   would be a significant thing.

14:24:25  10         MR. LONGER:  Well, here, your Honor, to Brian's point,

14:24:29  11   because I want to be sure we are apples and apples here, because

14:24:32  12   I'm not sure that we are.  We are talking about live,

14:24:34  13   contemporaneous streaming.  The witness will be in the witness seat

14:24:40  14   in a courtroom in Philadelphia, or some other location if that's

14:24:43  15   what we end up doing, and counsel can be present here asking the

14:24:49  16   witness and answer the question.

14:24:55  17         Your Honor said to the *Washington Public Service*, the

14:24:57  18   *Wilkes* case, it happened in the *Whoops* case, it happened in the

14:25:02  19   San Juan fire case, the DuPont fire cases.  This is a permissible

14:25:09  20   matter.  I know there are some cases that we cited to where

14:25:13  21   witnesses were in Hong Kong and they appeared at trial by

14:25:17  22   telephone.  There is nothing really exceptional other than you have

14:25:20  23   to fly them halfway around the world.  Here it's even shorter to

14:25:24  24   fly from New Jersey to Louisiana.  I would think that that actually

14:25:30  25   supports the reason that --

14:25:32  1          THE COURT:  Tell me about this, what's this other witness

14:25:35  2    that would make this one moot?

14:25:37  3          MR. BARR:  They listed Dr. Peter DiBattiste on their will

14:25:42  4    call or expect to call, sorry if I am phrasing it that way.  And to

14:25:47  5    some degree we're relying upon that.  And now they have moved him

14:25:52  6    off of their expect to call list and put him on their may call

14:25:56  7    list.  So right now we have a list from them of I think it's six

14:26:00  8    live witnesses, not a single corporate witness.  The only corporate

14:26:06  9    witnesses the jury is going to hear is going to be depo clips.

14:26:12  10          And I could understand some degree how you could see that

14:26:16  11   there's no compelling circumstances, no good cause, if we were

14:26:20  12   trying to abuse this and we had sent subpoenas out to a whole host

14:26:24  13   of witnesses; but we put Dr. Peters and we had Mr. Shah on our will

14:26:30  14   call list as well, we've since withdrawn Mr. Shah, and we're

14:26:33  15   talking about one corporate witness.  And if they're not calling

14:26:36  16   Dr. Peter DiBattiste -- which we tried to structure an agreement on

14:26:41  17   that -- they work in the same area so they would be able to testify

14:26:44  18   in a lot of the same manners.

14:26:47  19          But since they won't commit to calling him, we think that

14:26:50  20   this is the way we have to go to be able to present our case so

14:26:53  21   that we can get all of the evidence in that we need to get in on

14:26:57  22   these issues.

14:26:57  23          THE COURT:  That's the only thing that concerns me from

14:27:00  24   that standpoint, it just seems like a bit of gamesmanship there.

14:27:06  25   If you're going to call a person, then I don't need to exercise my

14:27:13  1   time on it.  And if you are not going to call a person, then it's

14:27:18  2   just -- I mean, I don't want to be in a situation where we're

14:27:26  3   playing games, that's not what you all are used to doing.  You

14:27:34  4   don't deal in that way.  It just seems to me you ought to let him

14:27:38  5   know whether or not you're going to call a witness.  If you're

14:27:40  6   going to call them, that's it; if you're not going to call them,

14:27:44  7   then I have to deal with it.

14:27:45  8           MS. WILKINSON:  Your Honor, I think we can honestly say,

14:27:48  9   because we are working together, as you know the verdict form

14:27:51 10   doesn't distinguish between the companies, we honestly don't know.

14:27:54 11   If you asked us, we're leaning against calling him because we think

14:27:58 12   the way to win the cases are to focus on the physician experts.

14:28:02 13   But we don't know what they're going to do.  And so we are not

14:28:06 14   playing games, we're really not.  And I think you understand that

14:28:09 15   as the defense, it depends on how the case comes in through the

14:28:12 16   plaintiff.

14:28:12 17           THE COURT:  The witness list was submitted.  What's that

14:28:16 18   situation?

14:28:17 19           MR. BARR:  Those were submitted several weeks ago, and

14:28:21 20   we've each done some tweaking of that, and out in the hall we

14:28:26 21   agreed that we're going to continue to work through the may call so

14:28:32 22   people can get a sense of that.  But hopefully we're getting that

14:28:37 23   tailored.

14:28:38 24           But we were, like I said, when you get that first list,

14:28:41 25   you start making decisions on how you're going to present things.

14:28:44  1   And we had two corporate witnesses, one from Bayer, one from

14:28:49  2   Janssen, the Bayer person was somebody they were going to fly in

14:28:53  3   from Germany.  And we had two of those on the list, so we thought

14:28:56  4   that this wouldn't become an issue.  Now, we knew we would have to

14:29:00  5   keep pushing this issue with Dr. Peters just in case they decided

14:29:04  6   they weren't going to call those witnesses.  And like we have said,

14:29:08  7   if they would commit to it, we could not have this issue.

14:29:11  8         And I understand their position, I am not accusing them

14:29:15  9   of playing games, I understand that they have to make decisions as

14:29:18 10   the trial goes on.  But we are trying to make decisions, too, and

14:29:22 11   there is evidence that we have to decide how we're going to try to

14:29:26 12   get in, and Dr. Peters is somebody on our will call list that we

14:29:30 13   believe under the rules is appropriate to be called to testify.

14:29:37 14         MR. BIRCHFIELD:  Your Honor, you noted that there is a

14:29:41 15   difference between live testimony and deposition testimony and

14:29:44 16   there is a difference between reading a deposition and a video.  If

14:29:48 17   you look at that from an academician standpoint, maybe not.  But we

14:29:52 18   all know that there is a big difference, and there is a big

14:29:56 19   difference between a deposition that's taken early in a case and

14:30:00 20   live trial testimony.

14:30:03 21         And, in fact, one of the issues that we fought very early

14:30:08 22   on in this case was were -- was there going to be a waiver of

14:30:14 23   Lexicon and the position was, no, we want the treating doctors live

14:30:18 24   so we have to be here to subpoena them.  They still took their

14:30:22 25   depositions, they have their depositions, but there is a difference

14:30:25  1    between a deposition and live trial testimony.

14:30:30  2           And, you know, so this is the only corporate witness that

14:30:35  3    we can have at trial.  And, yes, we would prefer to have him live

14:30:42  4    and sitting in the witness stand, but the rules don't provide that,

14:30:46  5    but the rules do provide a way for him to give trial testimony and

14:30:50  6    still accommodate his convenience.

14:30:52  7           It's one witness in the lead bellwether case in this MDL,

14:30:59  8    and you've got 17,000 cases, as Rick pointed out, plaintiffs that

14:31:05  9    are looking to this case for the value of this MDL.  So we are

14:31:08 10    asking that we be given the opportunity to have one corporate

14:31:12 11    witness provide live testimony, even if it's via satellite.

14:31:17 12           THE COURT:  You have the last words.

14:31:19 13           MR. SARVER:  Not a whole lot.  I mean, your Honor, you

14:31:22 14    understand the rules and the back and forth.  Frankly, I don't know

14:31:25 15    who is right.  Like you say, the appellate court hasn't ruled.

14:31:30 16           But one of the things, you structured this MDL in a way

14:31:34 17    that was different than what Judge Doherty did in the *Actos* case.

14:31:39 18    She specifically said that she was not going to rely upon

14:31:44 19    deposition testimony, and there were very few depositions that were

14:31:47 20    taken by the time of the trial; and Judge Doherty said, I am not

14:31:51 21    even sure I have time to get through them all and rule on them, so

14:31:54 22    I need live witnesses.

14:31:56 23           That's not how this was done.  There's been just a

14:31:59 24    tremendous effort at deposing company witnesses.  We've provided

14:32:03 25    all of the company witness they've asked for, some we provided for

14:32:06  1   two days of testimony.  Dr. Peters was one of those.  They deposed

14:32:11  2   the heck out of him.  It's a good strong deposition on all of the

14:32:18  3   issues.  He hasn't done any work that's particularly relevant since

14:32:22  4   2012, certainly governed by the deposition, and it's our view that

14:32:25  5   the rules don't really provide for these circumstances.  There just

14:32:28  6   isn't the kind of enhanced good cause that would demand him to

14:32:33  7   come.

14:32:33  8           THE COURT:  What about the time frame that the witness

14:32:37  9   was taken?

14:32:38  10          MR. SARVER:  I don't think it was that far back, I'm

14:32:41  11  sorry I don't recall the exact date.  Someone else might.

14:32:44  12          THE COURT:  Roger, do you remember?

14:32:48  13          MR. BARR:  Your Honor, time frame, if you recall, and

14:32:53  14  this issue has since changed, but if you remember there was a huge

14:32:57  15  issue of the defective device recall and this was before the FDA

14:33:03  16  came out with the findings.  Well, I think what you'll see if

14:33:06  17  anybody were to look at that deposition, maybe 75, 80 percent of it

14:33:10  18  is about that defective device recall, which is not really an issue

14:33:14  19  at this trial.  So that's another reason for why the live testimony

14:33:19  20  is important and why the facts are different and the purpose for

14:33:25  21  his testimony.

14:33:26  22          THE COURT:  Okay.  I've heard the parties, they've had an

14:33:31  23  opportunity to explain it to me, and I appreciate their views.

14:33:35  24          As I said the two areas, the two rules that I am dealing

14:33:39  25  with are Rule 43 and Rule 45 of the Federal Rules of Civil

14:33:44  1    Procedure.  Forty-five gives some geographical restriction to a

14:33:49  2    witness; forty-three allows the streaming of a witness within that

14:33:56  3    period of that geographic limit.  Forty-three, however, unlike 45,

14:34:02  4    puts on it a very restricted view; namely, on requiring that for

14:34:10  5    good cause in compelling circumstances and with appropriate

14:34:14  6    safeguards.

14:34:15  7         The issue here, as I see it, is whether or not that

14:34:19  8    aspect of Rule 43 has been resolved or is present.  The factors

14:34:29  9    that have to be considered is when this individual's deposition was

14:34:37 10    taken, what happened since then, the expense, the cost involved,

14:34:48 11    who the witness is, what part the witness plays, whether there's

14:34:53 12    any other witness that can be used in place of that particular

14:34:59 13    witness.

14:35:01 14         With regard to the latter, there was a witness placed on

14:35:04 15    a witness list.  Expected to be called witness list.  The witness

14:35:13 16    is still on that list.  If he appears then this matter may not be

14:35:20 17    an issue any longer.  It seems to me that in view of the gravity of

14:35:28 18    the witness, in view of the fact that there was another witness on

14:35:33 19    the witness list that was listed by the parties, and in view of the

14:35:41 20    fact that there has been some time since this witness has

14:35:45 21    testified, I think that for all of those reasons I think good cause

14:35:50 22    has been shown in this particular case, and I'll require that he

14:35:54 23    proceed, not in person, but he proceed to a place within 100 miles

14:36:03 24    of his state to be submitted and be available for testifying, which

14:36:12 25    can be streamed to this court.

14:36:15  1          Okay.  Let's see.  What else do we have?  You all wanted

14:36:19  2  to talk anymore about this motions in limine?

14:36:23  3          MR. BARR:  And, your Honor, I can handle that.  The big

14:36:26  4  picture of it, I don't know where you're at, I think both sides had

14:36:30  5  submitted to you the Geiger deposition which I think kind of frames

14:36:33  6  this whole discussion.  But what we're really looking for is some

14:36:37  7  clarity on your order.

14:36:41  8          I understood your order, and don't necessarily -- well, I

14:36:46  9  am not going to say I agree with your order, but I understand where

14:36:49  10  you were going as far as we can't talk about money.  We can't talk

14:36:53  11  about advertisements that doctors didn't see.  But there's an

14:36:59  12  extremer view of the order that we're looking for clarity on.

14:37:03  13          As your Honor knows, one of the bases of our case is that

14:37:11  14  Xarelto was designed as a drug to compete in the anticoagulant

14:37:19  15  marketplace, and there were specific features of the drug that were

14:37:23  16  necessary in view of the company to be competitive in the

14:37:26  17  marketplace.  And that is an important aspect of our case, and I

14:37:31  18  believe what we have learned in the exchange of deposition

14:37:36  19  designations and objections is that the defendants are taking the

14:37:39  20  view that we're not allowed to talk about that, that basically if

14:37:43  21  we mention competitiveness, market, anything like that, that that's

14:37:49  22  been excluded by your order.

14:37:50  23          That's not how we read your order because we believe it

14:37:54  24  would be really a fantasy to suggest that this drug wasn't

14:38:00  25  developed to compete in the marketplace and if there weren't

14:38:04  1    necessary features that were necessary for it, that's relevant

14:38:06  2    evidence.  It's not overly prejudicial it's just how the drug was

14:38:10  3    designed.  And that's what we have offered to you and we're trying

14:38:13  4    to work our way through, but I think we all need some guidance from

14:38:17  5    you on that.

14:38:18  6            THE COURT:  In the first place, it shouldn't come up in

14:38:20  7    opening statements.  I don't see that as an opening statement

14:38:24  8    issue.  I really think the jury ought to be concerned about what

14:38:29  9    the case is about, what you intend to prove.

14:38:36  10           I do think that there's some relevance to the sale.  I

14:38:42  11   don't know how it gets in, but I don't think that it's fair to just

14:38:49  12   say that the only reason for the drug is to make money.  I mean, if

14:38:54  13   you say that, then they're going to come back and show every other

14:38:58  14   reason for it; and they would be right about that, they would have

14:39:03  15   a right to rebut what you just said.

14:39:05  16           So it just doesn't seem to me to be -- I can see

14:39:10  17   something maybe on cross-examination, I can see how it can be

14:39:13  18   developed; and maybe, if it is developed, use it in closing

14:39:21  19   argument in some way.  But I don't see that as an opening

14:39:26  20   statement.

14:39:26  21           MR. BARR:  And I am not suggesting that we're going to

14:39:30  22   say in opening that the drug was designed -- I mean, clearly

14:39:34  23   there's a profit reason for the drug, that's why all companies

14:39:37  24   exist, but we're not going to say it was only designed for this

14:39:41  25   reason.  The point is, is that the anticoagulant market was

14:39:44  1  dominated by warfarin since 1954 and these drugs were developed as

14:39:49  2  a response to warfarin.  And warfarin requires the regular routine

14:39:53  3  blood testing.  And the whole point of these drugs, they knew they

14:39:58  4  could not require routine regular blood testing with their drug or

14:40:02  5  why would anybody use it, they would just use warfarin.  That's the

14:40:05  6  point of what we're trying to show, and we believe that is

14:40:09  7  important for something like this.

14:40:10  8         THE COURT:  I don't disagree with that.  I mean, it seems

14:40:14  9  to me obvious that the drug is designed -- somebody looked at

14:40:20 10  warfarin and said, "What's the problem with warfarin?"  And the

14:40:24 11  problem with warfarin is really peculiar to the United States, we

14:40:28 12  want to be well but we don't want trouble with -- don't want to

14:40:34 13  have any trouble.  That's just the way we live.  I mean, there's

14:40:37 14  nothing bad about that.  We don't like to go to the doctor, it

14:40:41 15  takes us too long.  We don't like to wait that long.  We like to

14:40:45 16  e-mail them or call them or something.  Why wait, we have other

14:40:50 17  things to do.  That's the way we think.

14:40:53 18         MR. BARR:  I agree.  Okay.

14:40:56 19         THE COURT:  So that comes into the picture, but the other

14:40:59 20  side of it also comes into the picture once you do that.

14:41:03 21         MR. BARR:  I agree.

14:41:08 22         THE COURT:  You got to maybe ask somebody why they

14:41:11 23  developed it.

14:41:13 24         MR. BARR:  There's a lot of testimony on that and a lot

14:41:15 25  of evidence on that.  I just think they had reached a loggerhead on

14:41:20  1   this deposition.

14:41:21  2        THE COURT:  I don't think it's bad, you don't have to go

14:41:23  3   to the doctor and you can take one pill, who wouldn't do that.

14:41:34  4        MR. OVERHOLTZ:  As to the Geiger deposition designation,

14:41:38  5   just so you know, the plaintiffs attempted to cut out anything that

14:41:42  6   was just about the fact the drug was being sold to make a profit in

14:41:45  7   the market.  We believe what was left, or your Honor decided this,

14:41:49  8   is evidence that is probative of why the defendants would not

14:41:54  9   include the scientific information about PT and one time test or

14:41:58 10   the ability to monitor into the labelling for the product because

14:42:02 11   it would be inconsistent with this business plan.  So that's what

14:42:06 12   we believe we left in the Geiger designations that have been

14:42:11 13   presented to your Honor.

14:42:12 14        THE COURT:  This is presented in every drug case, every

14:42:15 15   case that I've seen.  I mean, it's the whole point the plaintiffs

14:42:19 16   make is that you're out to make money and not to help people.  And

14:42:22 17   your point is that's not true.  You're out to make money, sure, but

14:42:26 18   you're out to help people.

14:42:31 19        MS. WILKINSON:  I haven't seen the deposition, folks who

14:42:36 20   work with us are doing that.  But when we were talking about it

14:42:40 21   with plaintiff's counsel, I think you're right, that comes up in

14:42:43 22   every case.  The next step, though, was plaintiffs have said to you

14:42:45 23   in pleadings, and we've relied on that and we told them we have and

14:42:49 24   they haven't disputed it, that they are not challenging monitoring,

14:42:52 25   they're not challenging that it's once a day and not twice a day.

14:42:56  1           So I think it's a little unfair for the jury to hear them

14:42:59  2  say that's a criticism and they're saying there's something wrong

14:43:02  3  with that, that it was just based on money.  But then in the end

14:43:05  4  they're not saying to the jury and that's a bad thing.  It's

14:43:08  5  clearly just about a profit motive.

14:43:10  6           We agree that we advertised the drug without regular

14:43:13  7  monitoring and, you know, that you could take it once a day and

14:43:17  8  that's a good thing, so I don't think it's that exact issue.  I

14:43:22  9  think it's the bigger issue of suggesting that those things are

14:43:25 10  detrimental to people and we only did it because of the marketing.

14:43:29 11           THE COURT:  I think both of that's argument, I don't see

14:43:32 12  any reason why you shouldn't argue that.  It makes sense.  I mean,

14:43:37 13  that's a closing argument.

14:43:38 14           MR. SARVER:  The one glitch, your Honor, is under the

14:43:41 15  LPLA there's no motive requirement.  So I believe I understand

14:43:46 16  their argument is that they're trying to show that taking out the

14:43:51 17  monitoring requirement was done for the motive of selling the

14:43:55 18  product and not for a good motive.  Well, that's irrelevant.  The

14:44:01 19  product was either safe and effective or it wasn't, defective under

14:44:05 20  the LPLA or it wasn't.  Why we did part of it just doesn't have a

14:44:11 21  place under this act.

14:44:13 22           THE COURT:  Well, you know what, that's easy to say.  But

14:44:16 23  you have to explain, I think, why you did it and their position is

14:44:19 24  also that they want to rile the jury up a bit and increase the

14:44:22 25  damages, that's part of the case.

14:44:29  1          MR. SARVER:  Profits over safety, how many times do we

14:44:31  2     hear that?

14:44:42  3          MR. MEUNIER:  That came up in the submission, your Honor,

14:44:44  4     the preliminary statement, and I was communicating with Jennifer

14:44:49  5     and Celeste on this.  But we have decided that in this case we will

14:44:54  6     pursue only the inadequate warnings and instructions theory under

14:44:59  7     the LPLA, not the design defect.  So to the extent we submitted

14:45:03  8     earlier jury charges, at the end of the case, we'll obviously

14:45:06  9     withdraw those; and it reflects in the joint statement that we

14:45:10 10     submitted where we limited what the Court would tell the jury on

14:45:13 11     that theory.

14:45:14 12          It did, when we decided to go in that direction, call on

14:45:19 13     us to make a little bit more clear some of the language that's in

14:45:23 14     here, particularly with respect to the FDA.  So you'll see that

14:45:26 15     there are a few spots that are still not agreed to.  I know from

14:45:31 16     the plaintiff's standpoint, whatever the Court decides is going to

14:45:35 17     be it, and we will not make any objection for the record or

14:45:39 18     otherwise and whatever call you make.

14:45:41 19          But I can, if you like, go through why we still want to

14:45:46 20     keep in some of this language that the defendants are objecting to.

14:45:47 21          THE COURT:  Let me take a look at it, I haven't done it

14:45:50 22     yet; it just came in, so I haven't looked at it.

14:45:55 23          MS. WILKINSON:  We feel the same way, your Honor.  I know

14:45:56 24     you won't say that we waived a jury instruction by agreeing to

14:46:00 25     whatever you decide, and we appreciate the plaintiffs letting us

14:46:03  1   know today because that helps us streamline the case and we're

14:46:07  2   grateful for that.

14:46:08  3         THE COURT:  With the jury charges, what I'll do, probably

14:46:11  4   the second week or so if the plaintiffs finished by then, I'll

14:46:15  5   start on the jury charges.  And I'll give you all a draft of the

14:46:18  6   jury charges -- it's just in rough draft form -- and we'll get in

14:46:22  7   here sometime during the trial and I'll get your input; and I'll

14:46:26  8   give you another draft, and then we'll get your input; and I'll get

14:46:30  9   you another draft.  And then I'll get to the point that I am

14:46:33 10   satisfied that this is what I am going to do and I'll say this is

14:46:36 11   the final form, and then we can go on out and make your objections

14:46:40 12   and I'll make my rulings and we'll do it like that.

14:46:46 13         And also, stuff that you've given to me, that's not

14:46:49 14   frozen, if something comes up and you haven't given it to me, give

14:46:54 15   it to me at that point.  We never know what the evidence is going

14:46:58 16   to be, we think we do but that's not the way life works.

14:47:04 17         MR. BARR:  I think we have a couple more issues.  One is

14:47:10 18   I just wanted to make sure you were okay with the way we were

14:47:13 19   planing on introducing exhibits.  What we were planning on doing

14:47:19 20   is, you know, we'll have our tech guy in the room.  When we ask him

14:47:24 21   to call up an exhibit, we are going to refer to it by our record

14:47:28 22   number so it would be plaintiff's whatever, I don't know what the

14:47:31 23   number is.  But when we introduce it, we would introduce it as

14:47:35 24   Trial Exhibit No. 1, 2, 3, 4, and on down the line, and we wanted

14:47:39 25   to make sure everybody was okay with that type of process.

14:47:43  1          THE COURT:  If we're going to do a CD ROM or visual other

14:47:48  2   than paper in it, let's not show it to the jury before it gets into

14:47:52  3   evidence.

14:47:52  4          MR. BARR:  Understand, your Honor.

14:47:53  5          THE COURT:  So if you're going to do it that way, let's

14:47:56  6   get our tech people to know to block out the jury's thing and I'll

14:48:02  7   have mine on and the witness will have his own, "What is that

14:48:06  8   Mr. Witness?  That's a letter I wrote to the X or so."  Offer,

14:48:11  9   introduce, and file into evidence.  Admitted.  And show it.

14:48:14  10          MR. BARR:  Okay.  That's how we'll handle that.

14:48:16  11          The last issue is an issue that has come up on the

14:48:21  12   exhibit list.  As your Honor knows, we have sent to you -- we've

14:48:26  13   sent 100 and they've sent 100.  There's a particular document that

14:48:29  14   I think you're familiar with, which is the strike redline that was

14:48:35  15   used a lot in the preemption argument where we say that it's

14:48:42  16   irrelevant to the case, the defendants say that means the FDA said

14:48:46  17   we can't do this.  We have that on their list, they objected to

14:48:52  18   ours, and then --

14:48:56  19          We at this point would agree that we don't believe that

14:49:00  20   the FDA strike-through document should come into evidence.  I don't

14:49:06  21   believe anybody -- certainly nobody at the FDA was deposed.  Nobody

14:49:09  22   has laid a foundation that that actual -- those actual

14:49:14  23   strike-throughs were done by the FDA, that is all based upon

14:49:18  24   interrogatory response from Janssen that says this is what

14:49:21  25   happened.

14:49:21  1          This is also one of the documents that you may remember

14:49:24  2   was subject to the document production errors.  So they say they

14:49:28  3   have one on their list that is the correct one, but we have no way

14:49:32  4   of really knowing which one is correct or which one is not correct.

14:49:37  5   And that strike was also done on a completely different study, it

14:49:40  6   was done on the records study, which is a use Mr. Boudreaux did not

14:49:45  7   use on this drug.

14:49:46  8          So we just believe that that issue, given that nobody can

14:49:49  9   lay a foundation for this, nobody should be using that document

14:49:53 10          THE COURT:  How do you see it?

14:49:54 11          MS. WILKINSON:  We only objected to their version, not to

14:49:57 12   the introduction because we had these two versions, and Andy and I

14:50:01 13   were able to speak last night and clarify that for each other.  I

14:50:06 14   think it does go to exactly their claim that we should have had the

14:50:09 15   language in there and that we've used it with witnesses, it was

14:50:13 16   used at the preemption argument, there was no objection that

14:50:16 17   somehow there wasn't a proper foundation for it when you were

14:50:18 18   considering the motions.  I think it goes directly to the issue

14:50:21 19   that they're saying, you know, that it's not dispositive as you

14:50:24 20   will tell us.

14:50:25 21          THE COURT:  It may be relevant, it's just a question of

14:50:27 22   how you admit it.  So just give some thought to how it's going to

14:50:31 23   be admitted.  Just the fact that it's a paper doesn't mean it gets

14:50:35 24   admitted.  If somebody is to testify that, yeah, that's it, that's

14:50:38 25   the document and it passes 901 and it's authenticated or whatever.

14:50:48  1          MS. COCO-EWING:  Your Honor, it's Celeste Coco-Ewing.  If

14:50:50  2   I could just say something on this one objection issue.  If you'll

14:50:54  3   recall, your Honor, there was an issue with the production of

14:50:57  4   documents that came up that caused this trial to be moved, and it

14:51:00  5   was the vendor's error in converting some of the documents to TIFF.

14:51:05  6   So what Mr. Barr is referring to is a document that was part of

14:51:08  7   that production error that ended up on plaintiff's list that was

14:51:11  8   one of these TIFF documents.

14:51:13  9          We then produced the document in native format, so

14:51:17 10   everybody knows exactly what document is the real document.  There

14:51:20 11   is no real question about what the real document is.  And so we

14:51:25 12   have asked plaintiffs if they would remove the documents that were

14:51:29 13   part of this production error, everybody agrees it was a production

14:51:33 14   error, and we have not heard back from them.

14:51:35 15          But the one particular document at issue that we've

14:51:37 16   objected to for authentication grounds has to do with this

14:51:43 17   production error.

14:51:44 18          THE COURT:  Okay.

14:51:46 19          MR. MEUNIER:  Your Honor, can I just add to this?  I

14:51:48 20   mean, with respect to this document, the strike-through of language

14:51:53 21   that Janssen proposed and the FDA rejected.  The elephant in the

14:51:59 22   room is preemption, and you ruled as a matter of law there is no

14:52:02 23   preemption.  And we have to be careful in this case that the jury

14:52:06 24   doesn't get the impression when that document is looked at, argued

14:52:09 25   about, that the effect of the strike through was that plaintiffs

14:52:14   1   lose, they can't -- we can't ask for language that the FDA struck

14:52:18   2   through; which is why you'll see in the preliminary charge part,

14:52:22   3   one of the phrases that seems innocuous enough, but we want and the

14:52:27   4   defendants object to, we want to say the law allows the plaintiffs

14:52:32   5   to still seek the argument that certain language should have been

14:52:36   6   included, even after the FDA's approval without the language.

14:52:40   7        If we don't let the jury know the law allows that, then

14:52:45   8   when they get to that strike-through document it's like, "What are

14:52:48   9   we here for?"  And you've made a ruling on preemption.

14:52:50  10        So I think -- I am just speaking what everybody already

14:52:52  11   knows, but obviously there is a big issue lurking in this document,

14:52:56  12   how it's offered, what it's offered for, what's said by the Court

14:53:00  13   about it.  And just as importantly, what you allow the lawyers to

14:53:06  14   argue about.

14:53:06  15        MS. WILKINSON:  Isn't is correct, your Honor, that it's

14:53:09  16   only a matter of law?  Because I thought, and I may not -- we think

14:53:13  17   we may not understand, I thought you said we didn't present clear

14:53:17  18   factual evidence.  And I'll be honest, we are not quite sure where

14:53:21  19   the law and the fact decision starts and ends and who makes it.

14:53:26  20        So if it's just a matter of law, I think that is a

14:53:29  21   different issue.  But it didn't seem to me in your opinion that you

14:53:32  22   were saying it was just a matter of law.

14:53:34  23        MR. MEUNIER:  I didn't see any jury charges submitted by

14:53:37  24   either side suggesting that preemption is an issue for the jury, so

14:53:41  25   we take the position it isn't.  And while that document may be

14:53:44 1 relevant for other purposes, it shouldn't be seen by the jury as

14:53:48 2 having an preemptive effect.

14:53:51 3     MS. COCO-EWING:  Your Honor, the jury charge issue, which

14:53:52 4 of course we know that you have said we can supplement jury charge

14:53:57 5 issues as they come up.

14:54:00 6     THE COURT:  Okay.  If it comes up, I'll deal with it.  I

14:54:02 7 am not going to be able to just assume certain things and give you

14:54:07 8 a ruling on assumptions, I can't do it that way.

14:54:12 9     MS. WILKINSON:  We will certainly not bring it up in

14:54:15 10 opening, your Honor.

14:54:16 11     MR. MEUNIER:  Thank you, Judge.

14:54:19 12     Your Honor, there's just one other housekeeping point,

14:54:21 13 which is a stipulation, a joint stipulation on motions in limine.

14:54:26 14 You remember we submitted something but then we had a clause in

14:54:28 15 here about "not subject to taxes"?

14:54:28 16     THE COURT:  Right.

14:54:29 17     MR. MEUNIER:  So we've cleaned that up and I've alerted

14:54:31 18 Hanne.  And so this is now agreed on version of the joint

14:54:34 19 stipulation on motions in limine, subjects that were not certified.

14:54:39 20     THE COURT:  That's fine.  It won't come in other than in

14:54:43 21 the jury charges, so keep an eye on the jury charges with that.

14:54:49 22     MR. LONGER:  Your Honor, on the housekeeping matter.

14:54:53 23 Will your Honor issue a ruling, an order today about the

14:54:56 24 deposition -- the motion to quash?  Because I think from my

14:55:01 25 understanding --

14:55:02  1            THE COURT:  I will, it's recorded, so my reasons and I'll

14:55:07  2      just --

14:55:08  3            MR. LONGER:  My concern is that the Philadelphia

14:55:11  4      courthouse would like to see an order.

14:55:14  5            THE COURT:  I will, I'll do it for the reasons.  I'll

14:55:16  6      issue an order, but I am not going to go into the reasons again,

14:55:21  7      I'll say for the reasons orally given.

14:55:24  8            MR. DAVIS:  The issue I think your Honor is letting the

14:55:26  9      courthouse know what's happening.

14:55:26 10            THE COURT:  No, I understand.

14:55:29 11            MR. DAVIS:  Even if the Court sent an e-mail or something

14:55:31 12      so they would know.

14:55:32 13            THE COURT:  I got it.  I understand.  I'll issue an

14:55:37 14      order.

14:55:39 15            MR. DUKES:  Your Honor, David Dukes.  One issue came up

14:55:42 16      yesterday and it's a discovery issue but relates to one of the

14:55:44 17      trial witnesses.  Dr. Kessler, former FDA commissioner, is one of

14:55:48 18      their experts.  In his deposition, because he is a professor at the

14:55:52 19      University of California, he said I am familiar with certain

14:55:55 20      disclosure obligations professors have about expert witness work

14:56:00 21      and other things, but he volunteered that he is excused from that

14:56:03 22      because he has a letter from the president of the University of

14:56:05 23      California where he was recruited.  And we said would you provide

14:56:09 24      us with that letter, and Mr. Denton let me know yesterday that he

14:56:14 25      has the letter.  Happy for you to look at it in camera because it's

14:56:18  1    very confidential, that he doesn't want to provide that.

14:56:21  2          Obviously it's hard for me to argue about a letter I

14:56:24  3    haven't seen, but it certainly seems because it relates to his

14:56:27  4    disclosure of expert work to his employer, so it may be relevant.

14:56:31  5          THE COURT:  I'll look at it first in camera, give it to

14:56:34  6    me in camera I'll look at it.

14:56:36  7          MR. DENTON:  If I may, your Honor, Roger Denton.  To just

14:56:38  8    kind of put this in context, but I am on the back row, just like in

14:56:42  9    law school.

14:56:44 10          I've got two or three pages from Dr. Kessler's deposition

14:56:48 11    where this came up.  And the issue was they were inquiring of

14:56:56 12    Dr. Kessler:  Are you allowed to keep your earnings, your outside

14:56:58 13    earnings, including consulting work yourself as opposed to sharing

14:57:02 14    it with the university?  He clearly said, yes, I am.

14:57:04 15          The next question is, "Well, aren't you familiar with the

14:57:08 16    requirements under California law that you're supposed to share

14:57:11 17    this with the university?  Dr. Kessler said, "I am exempt from

14:57:15 18    that."  The next question -- and I think he volunteered there may

14:57:19 19    be a letter.  The question was, "Would you provide it to me?"  And

14:57:22 20    he said, "Well, I'll think about it."

14:57:24 21          And I've got this transcript for you Judge.  And I got

14:57:27 22    the letter from him.  You can look at the letter.  And, Judge, if

14:57:32 23    you look at it in camera you will see that what Dr. Kessler

14:57:35 24    testified to is absolutely unequivocally accurate.  The problem is

14:57:42 25    this is stamped strictly confidential.  It's in his personnel file.

14:57:46  1          And he's even concerned that I am giving it to you

14:57:49  2    because it could downstream issues at the university, he's afraid

14:57:54  3    that it might be used outside of the litigation.  But it doesn't go

14:57:58  4    to any issue.  If Dr. Kessler testified inconsistent with the

14:58:01  5    letter perhaps it would impeach him, since you get to keep all of

14:58:06  6    the money from testifying and not share it with anyone else, I

14:58:10  7    don't think it's an issue that is even in dispute here, so they

14:58:13  8    don't need the letter once I think you will clearly verify for them

14:58:17  9    that his testimony is absolutely accurate.

14:58:20 10          And he has a concern, he testifies frequently there's no

14:58:23 11    surprises here, that this will then somehow be out in the public

14:58:28 12    domain or used in other litigations.  So if you don't mind, I will

14:58:31 13    give you the four, I think it's three pages --

14:58:33 14          THE COURT:  Give me the transcript and the letter.

14:58:36 15          MR. DENTON:  -- and the copy of the letter.

14:58:37 16          THE COURT:  And tell him it's not you, that I've ordered

14:58:40 17    you to do that, you resisted and you struggled not to do it.

14:58:49 18          MR. DENTLER:  Judge, if I may, this is the four or five

14:58:52 19    pages and here is the letter.

14:58:56 20          MR. DUKES:  Your Honor, our inquiry is broader than that.

14:58:59 21          THE COURT:  Yes, I know it is, it has to do with

14:59:01 22    credibility.

14:59:03 23          MR. DUKES:  That's right.  And there are also reporting

14:59:05 24    requirements, that if he is not exempt from them, relate to the

14:59:08 25    number of hours he spends.  It's not just a matter of whether he

14:59:10  1    can retain the compensation, he has a duty to, and I don't know if

14:59:14  2    he's exempt unless I can see the letter.

14:59:17  3              THE COURT:  Yes, there's a duty to report and he is not

14:59:19  4    reporting then it's a credibility issue, significant issue.

14:59:25  5              MR. DUKES:  Precisely.  And we've seen experts who

14:59:27  6    testify a lot and sometimes under report because they want to keep

14:59:29  7    the professorship.  I have no idea if that's the case here, but the

14:59:32  8    only way to determine that is to see the letter.

14:59:35  9              THE COURT:  Okay.  Anything else?  Anybody?

14:59:39  10             If you have something, give us a call.  I'll be here over

14:59:42  11   the weekend, and I'll be able to deal with it on the phone.

14:59:49  12             Has everybody got the places that they want to be?  You

14:59:53  13   have the third floor?

14:59:54  14             MS. WILKINSON:  Yes, your Honor.

14:59:55  15             MR. MEUNIER:  Thank you, Judge.

14:59:56  16             THE COURT:  You have keys and things of that sort?

15:00:01  17             MR. BIRCHFIELD:  I hope so.

15:00:01  18             MS. WILKINSON:  The people who know what they're doing

15:00:03  19   have them.  Thank you very much.

15:00:06  20             THE COURT:  Thank you.

15:00:08  21             MR. BARR:  Thank you.

15:00:09  22          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

          23

          24                         *  *  *  *  *  *

          25

```
 1
 2
 3
 4                    REPORTER'S CERTIFICATE
 5
 6         I, Karen A. Ibos, CCR, Official Court Reporter, United
 7    States District Court, Eastern District of Louisiana, do hereby
 8    certify that the foregoing is a true and correct transcript, to the
 9    best of my ability and understanding, from the record of the
10    proceedings in the above-entitled and numbered matter.
11
12
13                         /s/ Karen A. Ibos
                          _____
14                       Karen A. Ibos, CCR, RPR, CRR, RMR
15                       Official Court Reporter
16
17
18
19
20
21
22
23
24
25
```