# Bui, Cuong MD

Volume 1 - 07/07/2016

Condensed Transcript

Printed 05/26/2017 04:59AM CDT

CONFIDENTIAL

0001
01: UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF LOUISIANA
02:
03:
04:
    IN RE: XARELTO (RIVAROXABAN)  MDL No. 2592
05: PRODUCTS LIABILITY LITIGATION   SECTION: L
06: THIS DOCUMENT RELATES TO:     JUDGE FALLON
    JOSEPH ORR, JR., ET AL. v.
07: JANSSEN RESEARCH &        MAG. JUDGE NORTH
    DEVELOPMENT, LLC, ET AL;
08: CASE No. 2:14-cv-03708
09:
10: PROTECTED -
    SUBJECT TO FURTHER PROTECTIVE REVIEW
11:
    Videotaped deposition of CUONG BUI, MD,
12: taken at Ochsner, 1514 Jefferson Highway,
    Orthopedic Conference Room, Fifth Floor, New
13: Orleans, Louisiana 70121, on Thursday, the 7th
    of July, 2016.
14:
15:
16: APPEARANCES:
17: FERRER, POIROT & WANSBROUGH
    (By: Russell T. Abney, Esq.)
18: 2100 RiverEdge Parkway
    Suite 720
19: Atlanta, Georgia 30328
20: ATTORNEYS FOR PLAINTIFFS
21:
22:

p. 00001

0002
01: APPEARANCES CONTINUED:
02: NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
    (By: Michael W. Hogue, Esq.)
03: Meridian/17th Floor
    1320 Main Street
04: Columbia, South Carolina 29201
05: ATTORNEYS FOR BAYER DEFENDANTS
06:
    IRWIN, FRITCHIE, URQUHART & MOORE, LLC
07: (By: James B. Irwin, Esq. and
    Meera U. Sossamon, Esq.)
08: 400 Poydras Street
    Suite 2700
09: New Orleans, Louisiana 70130
10: ATTORNEYS FOR JANSSEN DEFENDANTS
11:
12:
13: REPORTED BY:
14: GRETCHEN ALEXANDER, CCR, RPR
    PROFESSIONAL SHORTHAND REPORTERS, INC.
15: (504) 529-5255
16: VIDEOGRAPHER:
17: MELISSA BARDWELL
    GOLKOW TECHNOLOGIES
18: (877)370-3377
19:
20:
21:
22:
23:
24:
25:

p. 00002

23:
24:
25:

p. 00001a

0003
01: *  *  *
02: EXAMINATION INDEX
03: Page
04: EXAMINATION BY MR. ABNEY ..............8
    EXAMINATION BY MR. HOGUE ............36
05: EXAMINATION BY MR. IRWIN ...........147
    EXAMINATION BY MR. ABNEY ...........187
06: EXAMINATION BY MR. IRWIN ...........225
    EXAMINATION BY MR. ABNEY ...........230
07: EXAMINATION BY MR. HOGUE ...........234
08:
09:
10: *  *  *
11: INDEX OF EXHIBITS
12: Page
13: Exhibit No. 1  .......................9
14: Dr. Bui's curriculum vitae
15: Exhibit No. 2  .......................9
16: Folder of documents provided by Dr. Bui
17: Exhibit No. 2A  ...................144
18: Dr. Bui's operative note
19: Exhibit No. 3  ......................16
20: NOMH Neuroscience Critical Care record labeled
21: SOrr-OMC-MD-000236
22: Exhibit No. 4  ......................41
23: Medical records labeled SOrr-OMC-MD-000006
24: through SOrr-OMC-MD-000214
25:

p. 00003

Page 1

0004
01: INDEX OF EXHIBITS (CONTINUED)
02:
03: Exhibit No. 5 .......................41
04: Notice of Deposition of Treating Physician,
05: Cuong J. Bui, MD
06: Exhibit No. 6 .......................49
07: Disclosure of Plaintiffs' Ex parte
08: Communication(s) with Cuong Bui, MD
09: Exhibit No. 7 .......................80
10: NOMH Neuroscience Critical Care records labeled
11: SOrr-OMC-MD-000232 through SOrr-OMC-MD-000235
12: Exhibit No. 8 .......................85
13: NOMH Neuroscience Critical Care records labeled
14: SOrr-OMC-MD-000459 through SOrr-OMC-MD-000464
15: Exhibit No. 9 .......................110
16: NOMH Neuroscience Critical Care records labeled
17: SOrr-OMC-MD-000325 through SOrr-OMC-MD-000327
18: Exhibit No. 10 .....................112
19: NOMH Neuroscience Critical Care records labeled
20: SOrr-OMC-MD-000408 through SOrr-OMC-MD-000418
21: Exhibit No. 11 .....................130
22: Medical records labeled SOrr-FCruz-000101 and
23: SOrr-FCruz-000102
24:
25:

0005
01: INDEX OF EXHIBITS (CONTINUED)
02:
03: Exhibit No. 12 .....................143
04: NOMH Neuroscience Critical Care record labeled
05: SOrr-OMC-MD-000241 and SOrr-OMC-MD-000242
06: Exhibit No. 13 .....................158
07: "Sharyn Orr, Weight/Blood Pressure Fluctuation
08: Chronology" document prepared by counsel
09: Exhibit No. 14 .....................163
10: "Sharyn Orr Event Timeline" document prepared by
11: counsel
12: Exhibit No. 15 .....................197
13: Center for Drug Evaluation and Research,
14: Application Number: 202439Orig1s000, Summary
15: Review
16: Exhibit No. 16 .....................209
17: Article entitled "Clinical Pharmacokinetic and
18: Pharmacodynamic Profile of Rivaroxaban."
19:
20:
21:
22:
23:
24:
25:

0006
01: S T I P U L A T I O N
02:
03: It is stipulated and agreed by and
04: between counsel for the parties hereto that
05: the deposition of the aforementioned witness
06: is hereby being taken for all purposes
07: allowed under the Federal Rules of Civil
08: Procedure, in accordance with law, pursuant
09: to notice;
10: That the formalities of reading and
11: signing are specifically not waived;
12: That the formalities of sealing,
13: certification and filing are specifically
14: waived;
15: That all objections, save those as
16: to the form of the question and the
17: responsiveness of the answer, are hereby
18: reserved until such time as this deposition,
19: or any part thereof, may be used or sought
20: to be used in evidence.
21: *   *   *   *
22: GRETCHEN ALEXANDER, Certified
23: Court Reporter in and for the State of
24: Louisiana, officiated in administering the
25: oath to the witness.

0007
01: *  *  *  *
02: THE VIDEOGRAPHER:
03: We are now on the record. My
04: name is Melissa Bardwell, videographer
05: here for Golkow Technologies. Date today
06: is July 7, 2016. Time now is
07: approximately 10:17 a.m. This videotaped
08: deposition is being held in New Orleans,
09: Louisiana, taken in reference to the
10: Xarelto (rivaroxaban) Products Liability
11: Litigation. The deponent today is Cuong
12: Bui, MD.
13: Would counsel present please
14: introduce themselves and state their
15: affiliations for the record?
16: MR. ABNEY:
17: Russ Abney for the plaintiff.
18: MR. HOGUE:
19: Michael Hogue for Bayer.
20: MR. IRWIN:
21: Jim Irwin for Janssen.
22: MS. SOSSAMON:
23: Meera Sossamon for Janssen.
24: THE VIDEOGRAPHER:
25: The court reporter is Gretchen

0008
01: Alexander, and she will now swear in the
02: witness.
03: CUONG BUI, MD,
04: after having been first duly sworn by the
05: above-mentioned court reporter, did
06: testify as follows:
07: EXAMINATION BY MR. ABNEY:
08: Q    Dr. Bui, you understand who --
09: A    Can I grab some of that back?
10: Q    Some of what back?
11: A    The folder, because --
12: Q    Oh.  These are --
13: MR. HOGUE:
14: There you go.
15: THE WITNESS:
16: Okay.  I'm sorry.  Go ahead.
17: EXAMINATION BY MR. ABNEY:
18: Q    You understand who the parties are
19: here, who they represent, correct?
20: A    Yes.
21: Q    And you understand that we're here to
22: ask you some questions about your care and
23: treatment of Ms. Orr?
24: A    Yes.
25: Q    Have you been deposed before?

0009
01: A    Yes.
02: Q    Okay.  You're doing great.  Do you
03: understand you need to give verbal responses to
04: our questions?
05: A    Yes.
06: Q    And if someone asks a question that
07: you don't understand, can you just let us know
08: you don't understand it?  We're not doctors, so
09: we may use some terms incorrectly.
10: A    Yes.
11: Q    You -- I'm not sure you've actually
12: seen it, but there was a notice for your
13: deposition that asked you to bring along some
14: documents.  Have you seen that notice?
15: A    Yes.
16: Q    Okay.  And you brought a folder of
17: documents, one of which we've taken out and
18: marked as Exhibit 1; and that's your curriculum
19: vitae, correct?
20: A    Yes, that's correct.
21: Q    Is it pretty much up to date and
22: reflect your training, education, and
23: experience?
24: A    Yes.
25: Q    The other documents you brought

0010
01: remain in a folder that you brought with you,
02: and we've marked that as Exhibit 2, correct?
03: A    Yes, correct.
04: Q    Can you briefly describe what the
05: contents of that folder are?
06: A    So the content of the folder includes
07: just some of the e-mail correspondence about the
08: deposition between my secretary and the
09: med-legal department here.  The other components
10: include some of the relevant medical records
11: that was printed out by myself from our records.
12: It includes primarily the initial consult note
13: that was done by my team, then several of the
14: subsequent follow-up notes in the ICU, also the
15: final discharge and death note done by the neuro
16: ICU team.
17: It also includes some printouts based
18: on basic research found from drug.com on just
19: the general prescribing information, side
20: effects, and FDA information on Xarelto, and
21: basic background information from Wikipedia on
22: Xarelto.  And that's it.
23: Q    Would the -- I think you referred to
24: it as a death note or discharge note.
25: A    Uh-huh.

0011
01: Q    Would that provide kind of a big
02: picture, overall summary of what happened with
03: respect to your care and treatment of Ms. Orr
04: here at Ochsner?
05: A    Yeah.  So that is the summary note
06: done by the neurocritical care team, which she
07: was primarily under here.  So it doesn't reflect
08: specifically all the neurosurgical care, but it
09: reflects sort of the general ICU care and a
10: brief synopsis of the events leading up to --
11: from the beginning to the end.
12: Q    Okay.  As I told you before we
13: started the deposition, Dr. Bui, you're welcome
14: to look at your EMR or any of the printouts you
15: have.
16: A    Okay.
17: Q    Whatever you need to answer
18: questions --
19: A    Okay.
20: Q    -- feel free to refer to it, and take
21: your time.  We're not in any great hurry.
22: So can you tell us, when you first
23: saw Ms. Orr, what your initial contact was with
24: her?
25: A    So myself and my team was initially

0012
01: consulted on Ms. Orr by the -- actually,
02: initially received a call from the transfer
03: center, Baptist, the night of April 24th, 25th.
04: I don't exactly remember when the transfer call
05: came in, but they called me to notify me a
06: 67-year-old female that presented to the Baptist
07: emergency room with a large intracerebral and
08: intraventricular hemorrhage that required a
09: higher level of neurosurgical care.
10: So I accepted the transfer for the
11: patient to come from the ER at Baptist to the
12: emergency room at Ochsner main campus here at
13: Jefferson Highway.
14: Then, upon arrival, our team was
15: consulted. The first on the scene was my
16: resident, Dr. Jonathan Riffle; later followed by
17: myself. This was around 1:00 in the morning on
18: the night of -- I guess it's now April 25th,
19: 2015.
20: Q      So was your first contact around
21: 1:00 a.m. on April 25th, 2015, with Ms. Orr?
22: A      Approximately.
23: Q      Okay. And what was the assessment at
24: that point?
25: A      The story, according to the family

p. 00012

0013
01: and the emergency room records, was that, in
02: synopsis, this was a 67-year-old female with a
03: past medical history of hypertension, atrial
04: fibrillation, diabetes, congestive heart
05: failure; that had been on Xarelto for the atrial
06: fibrillation.
07: Family stated that the patient
08: complained of a headache earlier in the evening
09: while at dinner. I believe they were out at
10: dinner. On the way home she vomited once, then
11: went home and had a second episode of emesis,
12: then went to bed.
13: She awoke later on in the night -- I
14: don't think we had a specific time -- which she
15: had an episode of bowel incontinence, and then
16: became progressively more disoriented and had a
17: neurologic decline; hence, was taken to the
18: Baptist emergency room. At the time that she
19: presents at Baptist emergency room, they got a
20: CAT scan; and then, hence, transferred her over
21: to us.
22: When we saw her, her blood pressure
23: was recorded as 136 over 64. Her pulse rate was
24: 140. Her respiration was 15. She was already
25: intubated, which is having an artificial airway

p. 00013

0014
01: placed to -- in order to protect her airway and
02: to assist in breathing.
03: We had assessed her Glasgow coma
04: score, which is the general -- I guess one of
05: the quick scoring systems to assess someone's
06: mental status or coma status -- as a GCS of 5T.
07: She had a motor score of 4; her verbal score of
08: T, which is for the intubation; and the eye
09: score of 1. We felt her pupils were slightly
10: asymmetric. She had all the brainstem reflexes.
11: She withdrew all four extremities, right greater
12: than left. Her reflexes were still intact.
13: Her laboratory data was significant
14: for a slightly elevated white count. Hematocrit
15: was 35. Platelet was 467. The other relevant
16: labs at that time was a sodium of 140, albumin
17: of 2.5, creatinine of 1.7, and a BUN of 51. The
18: basic normal anticoagulation tests were done.
19: INR was noted to be 1.1. The PTT was noted to
20: be 26.6.
21: CAT scan, which I reviewed, showed a
22: large right-sided intracerebral and
23: intraventricular hemorrhage located primarily in
24: the right frontal lobe, but extending in the
25: casting -- which is a neurosurgical term for

p. 00014

0015
01: essentially filling up the entire right lateral
02: ventricle -- with about a 1 1/2 centimeter right
03: to left subfalcine herniation, or what's
04: commonly referred to as midline shift.
05: We thought that the left lateral
06: ventricles were enlarged, all indicative of
07: increased intracranial pressure and possibly
08: hydrocephalus.
09: Q      Okay. Do you know Dr. Toby Gropen?
10: A      Yes.
11: Q      What type of physician is he?
12: A      He is a neurologist that
13: subspecializes in vascular neurology. So he
14: typically would handle most of the stroke or the
15: vascular-related neurologic issues, such as
16: ischemic infarct, or in this case, a hemorrhagic
17: stroke.
18: Q      Are you aware that he was one of the
19: physicians that provided care for Ms. Orr?
20: A      Yes.
21: Q      Dr. Gropen, in his notes, says,
22: "Patient with IVH likely secondary to Xarelto
23: for A-fib."
24: A      Which note are you --
25: MR. HOGUE:

p. 00015

0016
01: Objection.
02: THE WITNESS:
03: -- referring to?
04: EXAMINATION BY MR. ABNEY:
05: Q    Let's see if I can find it. It's on
06: page -- well, I may have a copy of it. Let me
07: look just a second.
08: A    Is this the emergency room note?
09: Q    Probably.
10: A    One second.
11: Q    Let me show you what I'm marking
12: as --
13: A    Okay.
14: Q    -- Exhibit 3 to your deposition,
15: Doctor. This is --
16: MR. HOGUE:
17: Mr. Abney, do you have a copy for
18: me?
19: MR. ABNEY:
20: I think I do.
21: MR. HOGUE:
22: All right. Thank you.
23: EXAMINATION BY MR. ABNEY:
24: Q    And I'm referring to the top of the
25: page that --

p. 00016

0017
01: A    Yeah. Okay. I see it. Yeah. So
02: this is his initial consult note --
03: Q    Right.
04: A    -- by the vascular neurology team.
05: Yes. Okay.
06: Q    And when he refers to an "IVH," is he
07: referring to an intraventricular hemorrhage?
08: A    Yes.
09: Q    And is it your understanding that
10: intraventricular hemorrhages are a known
11: complication from taking Xarelto?
12: A    Yeah. It's my understanding that
13: intraventricular and intracerebral hemorrhages
14: are known complications of all of
15: anticoagulation therapies.
16: Q    And you --
17: A    Xarelto is one of them.
18: Q    In rendering care and treatment for
19: Ms. Orr, did you have any reason to suspect or
20: disagree with Dr. Gropen's assessment?
21: MR. HOGUE:
22: Objection.
23: THE WITNESS:
24: So ask that question -- I
25: guess --

p. 00017

0018
01: EXAMINATION BY MR. ABNEY:
02: Q    Sure.
03: A    -- are you asking me if I agree with
04: his -- the cause or are you asking me -- I
05: guess, what's --
06: Q    Let me try it again.
07: A    Sure.
08: Q    You see Dr. Gropen's assessment there
09: on Exhibit 3, correct?
10: A    Yes.
11: Q    When you were providing care and
12: treatment for Ms. Orr, did you have any opinions
13: that contradicted Dr. Gropen's?
14: MR. HOGUE:
15: Objection.
16: THE WITNESS:
17: No, I do not.
18: EXAMINATION BY MR. ABNEY:
19: Q    Okay. I'd like to continue walking
20: through the care and treatment. I believe we
21: left off after your initial assessment. Let me
22: follow up with -- you had just gone through kind
23: of your overview of the labs and the CAT scan,
24: correct?
25: A    That's correct.

p. 00018

0019
01: Q    And was it your assessment that
02: Ms. Orr was suffering from increased
03: intracranial pressure as a result of the bleed?
04: A    I think my assessment was that the
05: patient had a massive bleed and was suffering
06: from damage associated with the hemorrhage, as
07: well as likely increased intracranial pressure,
08: and from the excess amount of blood, but also
09: possibly from the fluid spaces within the brain
10: not being able to drain appropriately.
11: The evidence of the midline shift
12: means that the right hemisphere was
13: significantly more swollen and is now pushing
14: into the left hemisphere; also a sign of
15: increased intracranial pressure.
16: Q    And from a neurosurgery standpoint,
17: when you have a patient like this, is your
18: primary objective -- your initial primary
19: objective to reduce the -- strike that. Let me
20: try it again.
21: Dr. Bui, had Ms. Orr not been on any
22: type of anticoagulant, would your immediate goal
23: in her treatment have been to reduce the
24: intracranial pressure and try to use tPA or some
25: other clot-busting agent to try to break up any

p. 00019

0020

01: clots?
02: A    Well, the very initial intervention
03: is often medical, which is what was initially
04: done here, which was to give a diuretic --
05: mannitol, Lasix -- and 3 percent normal saline
06: to drive up the osmotic pressure -- I mean the
07: osmotic pressure, and to sort of dry out or
08: shrink the brain as much as you can.
09: That being said, with this much mass
10: effect and the fact that the fluid space was
11: also enlarged, it was pretty clear early on that
12: that alone was probably not going to be enough.
13: I think that, at minimum, she would have needed
14: a ventriculostomy, which is a catheter that's
15: placed through a small burr hole that goes into
16: the fluid space to try to drain the CSF, or
17: cerebral spinal fluid, in order to try to bring
18: down the ICP, as well as able to track and
19: monitor the pressure as we treat.
20: I think tPA for intraventricular
21: hemorrhage is an option, and that's something
22: that can -- and is often done at this
23: institution, and common, like with trying to
24: bring down the ICV with a ventriculostomy, which
25: would be to try to inject a clot-busting agent

0021

01: to try to break up the clot within the
02: ventricle.  The idea is that then you would be
03: able to drain both the blood and the spinal
04: fluid at the same time.
05: Q    And when you refer to "ICP," does
06: that mean intracranial pressure?
07: A    Yes, ICP is intracranial pressure.
08: Q    Okay.  And I believe you did
09: eventually administer tPA for Ms. Orr; is that
10: right?
11: A    Yeah.  So we did ultimately place a
12: ventriculostomy.  We actually placed two
13: ventriculostomies about 12 hours or so later
14: with the intention of draining, as well as --
15: with the intention of draining the spinal fluid,
16: as well as administering some tPA or some
17: medication to try to break up the
18: intraventricular part of the clot.
19: Q    Do your notes from that time period
20: indicate that you, in fact, waited for Ms. Orr's
21: Xarelto dose to clear before offering the family
22: the option of the ventriculostomy?
23: A    Yes.  I think we -- because she was
24: on Xarelto and at that time we did not have a
25: way to be able to track the anticoagulation

0022

01: effect of Xarelto, and also did not have a
02: reversal agent, my initial thought process was
03: not to drill a hole in her brain and place a
04: catheter for fear of making the hemorrhage worse
05: if she still had an anticoagulation effect
06: on board.
07: So we opted to just go with the
08: medical therapy and with a guesstimate of the
09: half-life, given her age and also her impaired
10: creatinine, that we felt that 12 hours, given
11: the fact that we -- she probably had not had or
12: had not absorbed some of it with the -- at
13: dinner the night before -- that around 12 hours
14: or so, we felt that it was reasonable to discuss
15: placing the catheter, with emphasis on -- to the
16: family that we did not really know her true
17: anticoagulation status and that there was
18: increased risk, potentially, for doing the
19: procedure.
20: They wanted to proceed, and so we
21: placed a catheter around midday the next day.
22: Q    In general, in a patient suffering
23: from a stroke like Ms. Orr did, is it desirable
24: to provide those treatments earlier rather than
25: later?

0023

01: A    So, I guess -- in general, yes, I
02: guess, in general, the sooner you're able to
03: bring down the ICP, the better.  But again, each
04: case is different, so we always have to taper
05: that with the risk-benefit profile.
06: Q    Let me ask it a different way,
07: Doctor.  If there were a reversal agent for
08: Xarelto that you could have administered
09: immediately when she came in, would it have been
10: desirable in your opinion to do the
11: ventriculostomy earlier rather than when it was
12: done hours later?
13: MR. HOGUE:
14: Objection.
15: THE WITNESS:
16: If we had a reversal agent and if
17: we had a way to monitor or know what the
18: anticoagulation status was, then, in her
19: case, I would have probably done it
20: earlier.
21: EXAMINATION BY MR. ABNEY:
22: Q    And would doing it earlier have given
23: her a better chance of having a favorable
24: outcome?
25: A    I think that's a difficult

0024

01: assessment. I think that, in general, bringing
02: down ICP earlier is always better. Now, as for
03: long-term outcome after such a massive
04: hemorrhage, that's uncertain.
05: Q   I think I may have gotten you a
06: little ahead of your records. Can you tell us
07: when your next consult or activity with respect
08: to Ms. Orr was after the initial assessment?
09: A   So we saw her the next day. So I
10: guess -- so I guess you're talking about after
11: the placement of the ventriculostomy --
12: Q   No.
13: A   -- or before the --
14: Q   I think it was before.
15: A   Okay.
16: Q   I think we talked about it, but I
17: don't think you had identified that event in
18: your record.
19: A   I know we rounded her on the very
20: next morning, probably around 7:00 or 8:00 in
21: the morning. Her neurologic exam was relatively
22: stable in the sense that she was still
23: withdrawing, that her pupils were still slightly
24: unequal, but that her vital signs had remained
25: relatively stable, and -- see what else is in

0025

01: here.
02: At that time the sodium was heading
03: in the right direction, so we felt that she was
04: reaching sort of the -- close to maximum medical
05: therapy. We had -- I believe the ER had already
06: given her some FFP, just, I guess, to try to
07: enhance her coagulation pathway as much as
08: possible. She's gotten the mannitol, and she's
09: gotten the Lasix, and the 3 percent.
10: At this stage we felt that
11: neurologically she was -- had not declined, was
12: not brain-dead, although not great, and that the
13: medical therapy had sort of gone as much as it
14: can go.
15: So I did have a discussion with her
16: family about the pros and cons of doing an
17: invasive procedure, which is the placement of
18: the bilateral ventriculostomy. They understood
19: that this was a procedure that was meant to try
20: to bring down the ICP as much as we can, but
21: that it was uncertain whether I would be able to
22: make a significant long-term neurologic impact;
23: but the idea was to try to prevent her from
24: herniating or having the pressure go high enough
25: that the brain would be squeezed out of the

0026

01: skull.
02: They agreed; and hence, we placed the
03: ventriculostomy.
04: Q   And approximately when -- do you have
05: an idea of when that conversation took place?
06: A   I don't have the exact time. It was
07: sometime after lunch on the morning -- I mean on
08: the 25th -- sometime around lunchtime on the
09: 25th.
10: I believe this time would be around
11: 12:30 here.
12: Q   That's when the conversation took
13: place or that's when the procedure took place?
14: A   That's when I documented the
15: conversation. The procedure took place around
16: 2:10 p.m. This is where ...
17: Q   And the note that you've just shown
18: me is a note that you entered electronically, it
19: looks like, at 12:29 p.m. on April 25th; is that
20: right?
21: A   That's correct.
22: Q   And this is actually the note I was
23: referring to. In the note you state, "Now that
24: her Xarelto has had a chance to clear, I offer
25: family option for bilateral EVDs with possible

0027

01: tPA"; is that right?
02: A   That's correct.
03: Q   And you placed those -- can we refer
04: to those as drains --
05: A   That's fine.
06: Q   -- shunts; what's the --
07: A   Drains are fine.
08: Q   So you placed those drains around
09: 2:00 in the afternoon, and the procedure went
10: well, as reported, correct?
11: A   Yes.
12: Q   What was your next encounter with
13: Ms. Orr?
14: A   My next encounter would have been the
15: next morning on the 26th. We saw her. She was
16: stable overnight. Her neurologic exam did not
17: change much. She was still withdrawing. Had a
18: GCS of 5T, but her pupils became more symmetric.
19: So, as before, she was a little anisocoric,
20: which is one pupil is larger than the other
21: pupil. Now the pupils are equal and reactive,
22: which is an indication that there is likely less
23: compression on the third nerve on the right
24: side. So I think that's also a good indicator
25: that some pressure had been relieved.

0028

01: So at that time we elected to inject
02: tPA into one of the catheters on the right side,
03: which is the catheter that was in the blood
04: clot.  She'd also had a postoperative scan, and
05: we were happy with the position of the
06: catheters.  There was no significant increase in
07: hemorrhage at the initial bleed site or a new
08: hemorrhage along the new catheter track.
09: Q    What was the date of that note,
10: Doctor?
11: A    That was 4/26/2015.
12: It's this one right here, if you want
13: to see it.
14: Q    Did the tPA injection seem to have
15: any positive effect?
16: A    So you're asking me that based on
17: this --
18: Q    I would say probably based on your
19: next note.
20: A    Yes.  So based on the next note, we
21: felt that, based on the follow-up CAT scan, that
22: there was definitely less -- let me see here.
23: Let me pull up the CAT scan here.
24: So the CAT scan on 4/27, I felt that
25: there was slightly less blood in the frontal

p. 00028

0029

01: horns, but there was still a fair amount of
02: blood in the system; there's still a lot of
03: swelling -- and, if anything, slightly more
04: swelling on the right hemisphere now -- but that
05: the left lateral ventricle was a little bit
06: smaller.  So all in all, maybe a little bit
07: better, but still a lot of swelling, a lot of
08: signs of mass effect.
09: Q    I'm not sure if you ever saw it, but
10: the CT scan from Baptist, the report from
11: Baptist, it referred to there being a slightly
12: heterogeneous hyperattenuation material noted
13: throughout the right ventricle and third
14: ventricle.
15: A    Uh-huh.
16: Q    Do you have any idea what that would
17: be referring to?
18: A    I think it's referring to the blood,
19: or, sometime, hyperacute blood.
20: Q    So would it be fair to say that the
21: tPA administration may have been of some
22: benefit, but Ms. Orr was still not making a
23: dramatic recovery?
24: A    Yes, that's fair to say.
25: Q    Okay.  What was your next assessment

p. 00029

0030

01: of Ms. Orr?
02: A    And we saw her the 27th, so -- we saw
03: her the morning of the 28th.
04: Q    What was her status at that time?
05: A    Status at that time, we thought that
06: neurologically she was actually a little bit
07: worse, that her motor scores dropped from a 4 to
08: a 3, which is more in line of posturing versus
09: localizing, or to be more specific, decorticate
10: versus withdrawing.
11: The ICP, though, had remained
12: relatively low, so ranging between 2 to 11.
13: There was increased drainage from both of the
14: drains.  One was putting out 28, and the other
15: one put out 80 cc's.  Her sodium was already in
16: the 147s, but her BUN and her creatinine were --
17: renal function had gotten -- had also declined.
18: So I felt that the --
19: radiographically, things were relatively stable,
20: if not slightly improved; but clinically, she
21: was worse.  We continued to drain the
22: ventriculostomy.  We lowered it to a level of 10
23: from 15 to try to drain more fluid, and that we
24: gave another dose of tPA.  I believe we ended up
25: doing three total doses of tPA to the right

p. 00030

0031

01: side.
02: Q    Okay.  When was your next observation
03: of Ms. Orr?
04: A    So that would be the next morning,
05: the 29th.  So we saw her the next morning on the
06: 29th.  Again, we felt that there was another
07: slippage in her neurologic status.  She was now
08: having some extensor posturing, which dropped
09: her motor scores from a 3 now down to a 2.  ICPs
10: remained 2 to 13 at this point.  The EVDs were
11: still working, but I felt the right one might
12: have been clogged.  The left one was still
13: putting out about 113 cc's of her spinal fluid.
14: Her renal status was also worse, and
15: so at this point we did repeat a CAT scan.  It
16: did show increased swelling or increased midline
17: shift.  So I thought that the prognosis at this
18: point was extremely grim.  We briefly discussed
19: doing very aggressive procedures, which would
20: have been a hemi craniectomy, or a surgical
21: removal of half of the skull in order to give
22: the brain more room.  That was really discussed
23: in context of, quote/unquote, a Hail Mary type
24: of approach for her --
25: (Interruption in proceedings.)

p. 00031

0032
01: MR. ABNEY:
02: Maybe we should take a break?
03: (Announcement on hospital speaker system.)
04: THE WITNESS:
05: So we should make sure we end
06: before 5:30.  You guys can get down there.
07: So we were talking about offering
08: her an aggressive surgical intervention of
09: removing half the skull in a last-ditch
10: attempt to try to potentially save her
11: from herniation.
12: But I did preface to the family
13: this was just an extremely aggressive
14: intervention; that the prognosis
15: neurologically, even if she lived through
16: it, would still remain very poor.  And the
17: family declined for that intervention,
18: which I thought was not unreasonable.  And
19: that was when, I guess, the family and --
20: when I started thinking more toward
21: withdrawal of care.
22: EXAMINATION BY MR. ABNEY:
23: Q    At that point, Doctor, had you pretty
24: much given up any hope for Ms. Orr making a
25: recovery?

0033
01: A    I think that at that point it was
02: safe to say that, I mean, there was still some
03: hope of her living, but any sort of meaningful
04: neurologic recovery was pretty much nonexistent.
05: Q    Are there any procedures that could
06: have been considered in an event like hers to go
07: in and evacuate or remove part of the fluid or
08: the blood in there?
09: A    Yeah, I think that's an age-old
10: debate in neurosurgery about the utility of
11: removing massive intraventricular or
12: intracerebral hemorrhage.  I think that the --
13: the trend of care -- I wouldn't say standard of
14: care -- the trend of care has waxed and waned.
15: In the early days of neurosurgery, we
16: were very much more aggressive about removing
17: big clots; and at that point we found that the
18: patient just may have lived, but really was so
19: decimated that they were not -- did not have the
20: functional outcome that was worth being as
21: aggressive.  So then we had stopped going after
22: these deep-seated clots.
23: Now there are a growing body of data
24: that seem to say, well, if we're able to do it
25: through less or more minimally invasive

0034
01: approaches with some better tools and
02: technology, that there's a hint of increase --
03: or better outcome.
04: So I think, overall, it's still
05: debatable.  I think in her case, some may have
06: considered a more aggressive evacuation of the
07: clot.  I personally had not considered an
08: aggressive -- going in and removing the blood
09: clot in her.
10: Q    Did her anticoagulation status play
11: any role in that evaluation?
12: A    Yes.  So certainly, anticoagulation
13: status plays a role in all invasive
14: considerations, so -- so yes, so ...
15: Q    Had she not been on anticoagulation,
16: do you think you would have recommended more
17: aggressive earlier treatment?
18: A    I think if she had not been on
19: anticoagulation, I think the only thing I would
20: have done differently have -- probably
21: would have been place the ventricular catheters
22: earlier upon admission rather than waiting to
23: the next morning or the next day.
24: Q    And would you have wanted to place
25: those catheters earlier because that would have

0035
01: given her a greater chance of having a positive
02: outcome?
03: A    I think that once we identify a
04: problem such as an increased intracranial
05: pressure, we certainly would have wanted to
06: intervene earlier and --
07: Q    I guess my question is:  Why do you
08: want to intervene earlier?
09: A    Well, I think, in general, with
10: strokes and with increased pressure from
11: hemorrhage, time is brain, in the sense that the
12: longer the brain is under pressure and the
13: longer the brain is ischemic, then the more
14: cells will likely die or be impaired from the --
15: Q    So in those situations, generally
16: speaking, earlier treatment equals better chance
17: of positive outcome?
18: A    So, generally speaking, yes.  But
19: again, sort of long-term neurologic outcome
20: would vary based on individual cases and
21: patient's comorbidities, age.
22: Q    Sure.  Okay.
23: MR. ABNEY:
24: I think that's all the questions
25: I have for now, Doctor.  Thank you.

0036
01: THE WITNESS:
02: Okay.
03: MR. HOGUE:
04: All right. Why don't we take a
05: short break and go off the record.
06: THE VIDEOGRAPHER:
07: Time now is 11:06 a.m. We are
08: off the record.
09: (Recess taken.)
10: THE VIDEOGRAPHER:
11: This begins Disk 2 of today's
12: deposition. Time now is 11:18 a.m. We
13: are back on the record.
14: EXAMINATION BY MR. HOGUE:
15: Q    Dr. Bui --
16: A    Yes.
17: Q    -- did I say that right?
18: A    That's correct.
19: Q    I am -- my name is Michael Hogue. I
20: am here representing Bayer. I just wanted to
21: introduce myself. We haven't had the chance to
22: talk; is that correct?
23: A    That's correct.
24: Q    We've never met before this
25: deposition started a little over an hour ago,

0037
01: correct?
02: A    Yes, that's right.
03: Q    You understand that you are here
04: because Mrs. Orr's family has sued Bayer and
05: Janssen and alleges that Xarelto caused her
06: injury; do you understand that?
07: A    Yes.
08: Q    You understand that Bayer and Janssen
09: are not saying that you did anything wrong; you
10: understand that?
11: A    Yes.
12: Q    And you understand that you're not
13: being sued in this case in any way?
14: A    Yes.
15: Q    Doctor, when Mr. Abney, plaintiffs'
16: counsel, was asking you some questions, I think
17: that you referred to Mrs. Orr's bleed at the
18: time she came to the Ochsner ER as a massive
19: bleed; is that correct?
20: MR. ABNEY:
21: Object to form.
22: THE WITNESS:
23: Yes.
24: EXAMINATION BY MR. HOGUE:
25: Q    And you also said that it was

0038
01: uncertain whether any different procedure at any
02: time would have made any difference in her
03: outcome; is that correct?
04: MR. ABNEY:
05: Object to form.
06: THE WITNESS:
07: Yes, sir. I said that I think
08: that I'm uncertain that any intervention
09: would have made a long-term difference
10: neurologically, yes --
11: EXAMINATION BY MR. HOGUE:
12: Q    Okay. And --
13: A    -- outcome.
14: Q    You cannot medically say, to a
15: medical degree of probability, that if an
16: intraventricular drain had been done hours
17: earlier it would have made any difference in her
18: ultimate outcome; is that correct?
19: MR. ABNEY:
20: Object to form.
21: THE WITNESS:
22: I can't say with any certainty
23: about -- so I guess there's two -- let's
24: be clear here. So --
25: EXAMINATION BY MR. HOGUE:

0039
01: Q    Sure.
02: A    -- are we talking about her ultimate
03: outcome, which is the death, or -- I guess
04: because before, when I talked about outcome, I
05: was talking about whether it would have made any
06: difference in her neurologic outcome in terms of
07: whether she'd have been a, quote/unquote,
08: vegetable or in a persistent coma for a very
09: long time versus death. You see what I'm
10: saying? So I think --
11: Q    I think I'm talking about the
12: neurological outcome of being comatose for an --
13: A    Yeah.
14: Q    -- extended long period of time --
15: A    Yeah. So I think it is fair to say
16: that given the amount of hemorrhage and the poor
17: neurologic state that she presented with, that
18: no one would be able to, in my opinion, say that
19: any early intervention may be able to bring her
20: back to where she was before as she had dinner
21: that day. Yes, that's fair to say.
22: Q    And she -- based upon the history
23: that you heard, or you received at the hospital,
24: that she started having headaches and feeling
25: bad and threw up at the hospital, and then on

0040

01: the way home, went to bed for several hours,
02: threw up --
03: A    At dinner.
04: Q     -- several times --
05: A    At dinner.
06: Q    Yes, at dinner.
07: A    Okay.  You said "at the hospital."
08: That's why I --
09: Q    I'm sorry.  Let me start over again.
10: The history that was told by the
11: family to the doctors at the hospital was that
12: she was at dinner with her husband, and she had
13: an acute event, she felt bad, she threw up, she
14: threw up on the way home, she threw up at
15: home --
16: A    Yes.
17: Q     -- went to bed for several hours, got
18: worse, came to the hospital.
19: Based upon that history, is it your
20: opinion that she started having the hemorrhage
21: on the -- at the time of the dinner?
22: A    Most likely, yes.
23: Q    Okay.  And so for approximately, I
24: think, according to the history, five or six
25: hours before she got to the first Baptist ER,

p. 00040

0041

01: she had been bleeding at that point in time,
02: right?
03: A    Yeah, presumably.
04: Q    And so when she came in with her
05: first CT, it was a massive bleed at that point
06: in time?
07: A    Yes, it was a very large bleed.
08: Q    You did some basic research -- I
09: think is the word you referred to -- about
10: Xarelto.  You did a -- you looked on Wikipedia,
11: correct?
12: A    I'm sorry?
13: Q    You looked on Wikipedia for Xarelto?
14: A    Yeah, no -- well, this is just a
15: refresher, so I'm -- we deal with
16: anticoagulation all the time.  So I'm fairly
17: familiar with Xarelto and most of the other
18: anticoagulation agents.
19: Q    Okay.  And do you consider yourself
20: an expert with respect to Xarelto?
21: A    No, I do not.
22: Q    Doctor, I'm going to, just for the
23: record, mark the deposition notice in this case.
24: There were two.  I think the plaintiffs' counsel
25: noticed the deposition.  I think we've already

p. 00041

0042

01: marked this.  I'll give Exhibit -- what I've
02: marked Exhibit 4 -- let me make this Exhibit 5.
03: Dr. Bui, we requested a number of
04: different documents, and I think that you've
05: provided us with your CV, which was request
06: No. 1.  You provided us with -- you brought some
07: medical records with you that we have marked as
08: Exhibit 2 in your file, and we've also received
09: medical records from the hospital.  Are you
10: aware of any other medical records related to
11: Ms. Xarelto [sic] that are in your possession?
12: A    No.
13: Q    Okay.  And looking at this list
14: that's 1 through 12 on this attachment, do you
15: have any other documents that would be
16: responsive to these requests, or is everything
17: in Exhibits 1 and 2?
18: A    I mean, I think all the bills and
19: statements for medical services you'd have to
20: get through the hospital.  No, no --
21: Q    Okay.  And do you have any other
22: communications in writing with plaintiffs'
23: counsel?
24: A    No, I don't have any other
25: communication in writing.  The plaintiffs'

p. 00042

0043

01: counsel had asked for two previous attorney
02: conferences.  I met briefly for about ten
03: minutes, before I had to go to emergency
04: surgery, with -- it wasn't an attorney.  It was
05: a physician that worked -- I forgot the name of
06: the gentleman, but it was a physician that was
07: working with the plaintiffs' team that wanted to
08: know -- or wanted to discuss if I was aware of
09: any methods to test of anticoagulation for
10: Xarelto, whether we did any of those testings
11: here at the hospital; and the answer was no.
12: And then that meeting was cut short by the
13: emergency surgery.
14: There was a 30-minute attorney
15: conference with the plaintiffs' attorney the
16: other day where he'd asked for some additional
17: copies of the medical records, which he had
18: here, and then wanted to understand my scope of
19: care with the patient, which is essentially what
20: was testified to earlier today.
21: Q    Okay.
22: A    There's no written records or
23: electronic records other than the verbal
24: accounts I just gave.
25: Q    So other than the two meetings that

0044
01: you referred to -- one was this brief meeting,
02: about ten minutes, with somebody that identified
03: as a physician with the plaintiffs' counsel --
04: and today's meeting for about 30 minutes with
05: Mr. Abney, plaintiffs' counsel, have you had any
06: other communications with plaintiffs' counsel?
07: A    I have not.
08: Q    Okay.  The first meeting, the person,
09: do you know if his last name was Whitehead?
10: A    No, it was not Whitehead.  I think
11: that was an attorney.  Is that correct?
12: This was, I believe, a medical
13: expert.  We can get the records from medicolegal
14: about the exact name, but he was supposed to be
15: an ER physician that sort of wanted to discuss
16: and find out how much we knew about the ability
17: to test anti -- you know, the test for presence
18: of Xarelto and reversal agents.
19: Q    Okay.  And --
20: A    But, again, I think part of this was
21: I had just gotten an emergency page right before
22: that, so I gave him the courtesy of a quick
23: meeting, and then I ran out.  So I don't recall
24: his name, unfortunately.  Sorry.
25: Q    Okay.  Was he an emergency physician

0045
01: from Ochsner?
02: A    No.
03: Q    So he did identify himself as a
04: medical expert working on behalf of the
05: plaintiffs' counsel?
06: A    Yes, correct.
07: Q    Do you know whether he was a doctor
08: who ever treated or saw Mrs. Orr?
09: A    I believe he had not treated or saw
10: Mrs. Orr.
11: Q    And the only thing that you remember
12: the doctor that works with the plaintiffs
13: raising with you was whether you had methods to
14: test for Xarelto?
15: A    Yes, correct.  And whether we had --
16: what was our reversal protocol, if any.
17: Q    And what did you tell him about the
18: reversal protocol?
19: A    Well, we did not have any specific
20: reversal protocol here.  We still give FFP to
21: all patients with anticoagulation, but knowing
22: that it's not an accepted or established
23: reversal agent, as far as I was aware, there
24: wasn't any known or established standard of care
25: for reversal for Xarelto.  And our institution,

0046
01: Ochsner Health System, at that time, did not
02: have any way to test for Xarelto.  I don't know
03: what it is currently.
04: Q    Okay.  At the time that Mrs. Orr came
05: to the Ochsner Medical Center, there wasn't a
06: known reversal agent for any of the newer oral
07: anticoagulants; not just Xarelto, but also
08: Pradaxa and Eliquis and any other of the newer
09: ones, correct?
10: A    Yes, that's correct.
11: Q    Okay.  You mentioned that patients on
12: anticoagulation get fresh frozen plasma; is that
13: correct?
14: A    Yes.
15: Q    We'll go through a little bit of it.
16: In her specific case, it looks like she was
17: tested for what type of fresh frozen plasma to
18: give her based upon her blood type, but I didn't
19: see where it was actually ever administered.
20: And my question is:  Do you know if it was
21: administered?
22: A    I don't know.
23: Q    Okay.
24: A    I don't know.
25: Q    Maybe I can give a document that will

0047
01: be clear whether, one way or the other.
02: A    You'd have to find the nursing notes,
03: for sure.
04: Q    Did either the medical doctor that
05: works with the plaintiffs or Mr. Abney show you
06: any documents in either of these two meetings?
07: A    No.
08: Q    Did either the medical doctor working
09: with plaintiffs or Mr. Abney talk to you about
10: any of the FDA documents or Bayer documents or
11: any documents produced in the case other than
12: the medical records?
13: A    No.  There was discussion that -- he
14: said that there was a method to test for it, but
15: we didn't have time to go into it.
16: Q    Okay.  And so the best of your
17: recollection, at that meeting, he didn't show
18: you some document to talk about the testing?
19: A    I know he had a folder.  I think he
20: wanted to show me some graphs about the assay --
21: that he wanted to, but I don't -- I don't have
22: any of that.
23: Q    Okay.  Do you know whether he went
24: over that graph with you or not?
25: A    Did not.

0048
01: MR. ABNEY:
02: Object to form.
03: THE WITNESS:
04: Did not.
05: A correction: He did show it to
06: me, but again, he didn't go into detail.
07: There was a -- as I recall, he was, I
08: believe, trying to show me some assay
09: graph about testing for PTT for Xarelto.
10: But I don't have that graph.
11: Actually, I see it there.
12: EXAMINATION BY MR. HOGUE:
13: Q    Okay. Let's mark this as --
14: A    That might have been --
15: Q    -- Exhibit --
16: A    -- the graph that he showed me there.
17: Q    -- 6.
18: First, before I mark this, did
19: plaintiffs' counsel or anybody with them ever
20: ask you to sign a protective order?
21: A    No.
22: Q    You're looking across over at me, and
23: I just wanted to find out if this is something
24: that plaintiffs' counsel showed to you.
25: A    Yes, that was.

0049
01: Q    Okay. Well, let's mark it.
02: MR. ABNEY:
03: Object to form.
04: MR. HOGUE:
05: I'll mark the entire disclosure.
06: MR. IRWIN:
07: What's the exhibit number?
08: MR. HOGUE:
09: 6.
10: EXAMINATION BY MR. HOGUE:
11: Q    Doctor, what I've handed you as
12: Exhibit 6 is a disclosure from plaintiffs'
13: counsel to us about the meeting that was
14: described as approximately 15 minutes on
15: June 24, which is required by the court in this
16: case, and any documents they showed to you. And
17: it says "FDA Afib AdComm Brief page 8" in the --
18: "38" -- in the bottom corner, and it says
19: "Prothrombin Time (PT)/Dose Response."
20: Do you see that?
21: A    Yes, correct.
22: Q    And what did the medical doctor
23: working with the plaintiffs tell you about this
24: document?
25: MR. ABNEY:

0050
01: Object to form.
02: THE WITNESS:
03: So I think -- and the brief
04: explanation was -- I believe the point he
05: was trying to make was that there was a
06: known method to test for anticoagulation
07: effect of Xarelto based on a special way
08: to run a PT test.
09: EXAMINATION BY MR. HOGUE:
10: Q    Okay. Did he tell you anything else?
11: A    The implication was that this was a
12: known way that had not been disclosed to medical
13: centers like Ochsner who would be taking care of
14: these patients. So the implication was that
15: Xarelto, I guess -- or knew of a way to test for
16: anticoagulation effect, but did not make that
17: readily available to the medical public.
18: Q    And that was all information that was
19: only told to you by this --
20: A    Yes.
21: Q    -- person that was working with
22: plaintiffs' counsel?
23: A    Yes, correct.
24: Q    And you never saw the entire document
25: from which this document comes from, correct?

0051
01: A    Not at all, no.
02: Q    And you wouldn't rely upon one page
03: from a document that you don't even know where
04: it came from, correct?
05: A    That's correct.
06: Q    That's true; you don't have any idea
07: where this page came from, correct?
08: A    Yeah. I assume it was from where it
09: was marked from, which is an FDA brief of some
10: sort. But, again, I did make it known to the
11: medical expert or the physician there that this
12: is out of my area of expertise. I'm not a
13: hematologist, and I do not run the labs; so that
14: the graph makes medical sense, but not something
15: that I would be able to take a position as a
16: neurosurgeon.
17: Q    So documents from FDA reviews of a
18: medicine is not something that you routinely
19: rely upon for your treatment of patients; is
20: that correct?
21: A    No, I think that would be incorrect.
22: Q    Okay.
23: A    I think that, depending on what the
24: relevant things are -- and so if it's
25: medications as -- that pertains directly to

0052
01: things I treat, such as brain tumors and things
02: like that, yes, I would be relying on FDA --
03: Q    Certainly, FDA-approved labeling
04: information?
05: A    Yes.
06: Q    Okay.  Doctor, have you done anything
07: else in preparation for the deposition today?
08: A    No.  Just reviewed the medical
09: records that we reviewed, some basic public
10: information about Xarelto, and reviewed her
11: medical scans.
12: Q    In today's meeting with Mr. Abney,
13: did he discuss with you anything particular
14: about Xarelto?
15: MR. ABNEY:
16: Object to form.
17: THE WITNESS:
18: The meeting centered around,
19: again, sort of some of the things that was
20: brought up before at the other meeting --
21: was whether I knew there was a way to test
22: for it, whether -- if we employed any
23: reversal agents; and specifically, whether
24: I felt that Xarelto -- or the fact that
25: the patient was on Xarelto had changed or

p. 00052

0053
01: altered my medical and surgical treatment
02: of this patient in any way.
03: EXAMINATION BY MR. HOGUE:
04: Q    And did Mr. Abney tell you anything
05: else in this meeting?
06: A    No.  I mean --
07: Q    Other than discussing this -- strike
08: that.
09: Other than Mr. Abney asking you if
10: you know how to test for it, did he give you any
11: other theories or claims that the plaintiffs
12: have made in this litigation?
13: A    I don't understand the question.  I'm
14: sorry.
15: Q    Okay.  Other than talking about
16: potentially testing for Xarelto's
17: anticoagulation effects, that, did he --
18: A    Right.
19: Q    -- talk about any other lines of
20: inquiry like that?
21: A    So he made plain his position, or
22: plaintiffs' position, is that the inability to
23: test for anticoagulation and the irreversibility
24: of it potentially slowed surgical intervention, and
25: which would have been the ventriculostomy, and

p. 00053

0054
01: they feel that may have increased her chance of
02: a poor outcome.
03: Q    Okay.  Did he discuss any other
04: position or belief by plaintiffs or plaintiffs'
05: counsel?
06: A    No.
07: Q    Have you had any other communications
08: at all with plaintiffs' counsel related to
09: Mrs. Orr's care?
10: A    No.  The only other would have been a
11: quick two-minute phone call yesterday, because I
12: got a message from Mr. Whitehead that -- they
13: were trying to set up a meeting yesterday that
14: fell through.  So I was given a message by my
15: secretary to call, and that's when I
16: was informed that the meeting was rescheduled,
17: that they'd switched attorneys who would be
18: deposing me, and just letting me know that it
19: would not be Mr. Whitehead -- is it Whitehead?
20: Yeah.
21: Q    Okay.
22: A    That's it.
23: Q    Doctor, before you saw Mrs. Orr and
24: her family at the hospital, I think, on about
25: April 24th, April 25th of 2015, had you had any

p. 00054

0055
01: interaction with them before?
02: A    No.
03: Q    Do you know them in any other way
04: other than through your treatment at that point
05: in time?
06: A    No.
07: Q    Do you know -- I'm blanking.  I'm
08: sorry.
09: Do you know plaintiff's prescribing
10: physician, the cardiologist, named
11: Dr. St. Martin?
12: A    I do not.  I mean, I may have seen
13: patients -- I mean, again, I don't recall
14: anything specific.  I mean, whether he may
15: have -- he or she may have referred patients to
16: me or I've seen a patient of his or her, and
17: given medical correspondence, I don't recall.
18: But that name doesn't ring me a bell, and I
19: don't specifically have any personal or close
20: professional relationship with that physician.
21: Q    Doctor, let's talk a little bit about
22: your background.  Where are we located now, here
23: where you -- where is your practice now?
24: A    So my practice is here at the main
25: campus; but also, I cover the other Ochsner

p. 00055

0056

01: facilities: Baptist, which is down the street,
02: and the Westbank Ochsner.
03: Q    That's here in New Orleans?
04: A    That's here in New Orleans.
05: Q    Let's talk a little bit about your
06: area of expertise. Can you tell us what you
07: believe is your area of expertise?
08: A    So I'm a board-certified neurosurgeon
09: with additional background and training in
10: pediatrics. So my area of expertise would be
11: the neurosurgical care for both adults and kids.
12: The realm of care there ranges from all disease
13: processes, involving any of the central and
14: peripheral nervous system, which would include
15: the brain and spine, as well as the peripheral
16: nerves.
17: Q    How much of your time is spent on
18: pediatric neurosurgery versus adults?
19: A    I spend about a quarter of my time on
20: pediatrics.
21: Q    How much of your practice is doing
22: surgeries or consultations in the hospital
23: setting, emergency settings?
24: MR. ABNEY:
25: Object to form.

p. 00056

0057

01: THE WITNESS:
02: What do you mean -- I guess, I
03: mean, pretty much all of my practice is in
04: the hospital setting.
05: EXAMINATION BY MR. HOGUE:
06: Q    Okay. You don't have a clinical
07: practice of seeing patients outside of the
08: hospital?
09: A    Yeah, so we see --
10: MR. ABNEY:
11: Object to form.
12: THE WITNESS:
13: -- patients in clinic, but
14: they're all here. So I guess --
15: EXAMINATION BY MR. HOGUE:
16: Q    Why don't you describe for me what
17: you do in a normal week.
18: A    So, in general, I operate on Mondays
19: and Thursdays, occasionally on Fridays. I round
20: and see patients in the hospital pretty much
21: every day, including the weekends. I have
22: clinics on Tuesdays and Wednesdays, which
23: alternate --
24: (Announcement on hospital speaker system.)
25: THE WITNESS:

p. 00057

0058

01: I see patients in clinic on
02: Tuesdays and Wednesdays; and that varies
03: between which weeks, between different
04: types of specialties, pediatrics versus
05: adults. I take call one week at a time,
06: and that has varied from every other week
07: to every fifth week, depending on when in
08: my career you're talking about.
09: EXAMINATION BY MR. HOGUE:
10: Q    So currently, how much are you on
11: call?
12: A    One in five, for adults. For
13: pediatrics, I'm on all the time.
14: Q    And was that the type of service that
15: you were providing when Mrs. -- you got a call
16: for Mrs. Orr's care?
17: A    Yes, correct.
18: Q    Okay. Is there any other aspects of
19: your medical care that we haven't covered so
20: far?
21: MR. ABNEY:
22: Object to form.
23: THE WITNESS:
24: I mean --
25: EXAMINATION BY MR. HOGUE:

p. 00058

0059

01: Q    Do you teach residents?
02: A    Yes, we do.
03: Q    Okay. And do you do any other
04: teaching here at the hospital?
05: A    We have medical students. We have
06: fellows. We have residents. We have high
07: school students that come to shadow. We have
08: college students interested in medicine that
09: will occasionally come to shadow.
10: Q    Okay. Have you ever authored
11: anything on the topic of atrial fibrillation?
12: A    I have not authored anything on the
13: topic of atrial fibrillation.
14: Q    And have you authored anything on the
15: topic of any anticoagulants?
16: A    I have not.
17: Q    Have you -- you have not, then,
18: authored anything about either warfarin or any
19: of the newer oral anticoagulants, correct?
20: A    I have not.
21: Q    Okay. Do you regularly subscribe to
22: any medical journals?
23: A    We have a lot of medical journals
24: that we subscribe to, yes.
25: Q    Do you read any specific ones that

p. 00059

Page 15

0060

01: you look for?
02: A    So we have -- I subscribe to a
03: service.  I don't recall the name.  But that
04: essentially will pick out high yield and
05: relevant articles in neurosurgery, sort of like
06: a filter program that will filter me articles
07: that -- based on the things that I filter for,
08: and it will pass it my way, yes.
09: Q    Okay.  And what are the types of
10: things you filter for?
11: A    That -- pretty much
12: neurosurgical-oriented papers.  I look for any
13: new Class 1 data for neurosurgical-related
14: things, major review articles on brain tumors,
15: brain hemorrhages, hydrocephalus, spina bifida,
16: spine, and neurocritical care.  Those are the
17: general filters.
18: Q    Okay.  Now, a little bit about
19: Ms. Orr's condition before she came in.  You
20: understood that Mrs. Orr was prescribed the
21: anticoagulant Xarelto for her heart condition
22: called atrial fibrillation; is that correct?
23: A    That's correct.
24: Q    What is atrial fibrillation?
25: A    Again, I'm not a cardiologist, so I

p. 00060

0061

01: think, depending on how you want to define it,
02: electrophysiologically, you would have to depose
03: a cardiologist.
04: But the basic idea is that the atrium
05: is not able to contract in a meaningful way,
06: leading to essentially a poor gradient blood
07: flow from the atrium and the ventricle, which
08: leaves the patient at risk for a stasis of blood
09: in that chamber, and hence, potential to form
10: clots that could then dislodge.  And from a
11: neurology and neurosurgical perspective, that
12: leads to risk of either -- of ischemic or of
13: hemorrhagic strokes, based on how the clot
14: impacts the vasculature of the brain and its
15: response to it.
16: Q    And you understand patients with
17: atrial fibrillation have a four to five times
18: increased risk of having a stroke; are you aware
19: of that?
20: A    Yes.
21: Q    And that's one of the reasons that
22: patients are given anticoagulants, is to help
23: prevent them from having ischemic strokes; is
24: that correct?
25: A    Yes, that's correct.

p. 00061

0062

01: Q    Are you familiar with the CHADS
02: factors that relate to patients with atrial
03: fibrillation?
04: A    No.  I mean, not in any kind of
05: details, no.
06: Q    Okay.  Let me just make sure I run
07: through some -- I think you've said before, but
08: I want to go through them -- that Mrs. Orr had a
09: history of congestive heart failure before she
10: came in in 2015; is that correct?
11: A    Yes, correct.
12: Q    And I've marked -- let me go ahead
13: and tell you what I did.  I've marked the
14: records that we received from Ochsner.  It's not
15: all of them, but it's starting at the admission
16: going through the progress notes.
17: A    Okay.
18: Q    So instead of marking a lot of
19: different ones, I just thought we could go to
20: this.  And when I refer to them, I'll refer to
21: it -- in the bottom right-hand corner there's a
22: number --
23: A    Okay.
24: Q    -- that starts with -- I'll say 6 --
25: it's SOrr-OMC-MD-000006, and it goes to 214.  So

p. 00062

0063

01: that's Exhibit 4.
02: A    Okay.
03: Q    And I was asking you a little bit
04: about past medical history; and if you flip over
05: to, the bottom right-hand corner, 11 through 12,
06: it gives these things that were reported as past
07: medical history.  One was congestive heart
08: failure; another was hypertension, correct?
09: A    That's correct.
10: Q    And another was diabetes, correct?
11: A    Yes, correct.
12: Q    And she also had atrial fibrillation;
13: is that right?
14: A    That's correct.
15: Q    And she also had chronic kidney
16: disease?
17: A    That's correct.
18: Q    And what does Stage 3 chronic kidney
19: disease mean?
20: A    Again, I'm not a nephrologist, so
21: you'd have to depose a nephrologist, but it's --
22: on the spectrum of chronic kidney disease
23: failures, I believe Stage 3 is at the point
24: where they're -- the renal function's clearly
25: impaired, but they're definitely not dialysis

p. 00063

0064
01: dependent.
02: Q    Okay.  Does hypertension increase a
03: person's risk for stroke?
04: A    Yes, it does.  Yes.  If uncontrolled,
05: it does.
06: Q    And if a person has uncontrolled
07: long-term hypertension, is that a risk factor
08: for intracranial bleeds?
09: A    Yes, that is.
10: Q    Okay.  And is diabetes mellitus a
11: risk factor for stroke?
12: A    It is, but more often as a
13: concomitant factor; but again, more often for
14: ischemic stroke, and not, at least in my
15: literature, known significant contributors here
16: to hemorrhagic stroke, other than the fact that
17: it's concomitant with high blood pressure or
18: uncontrolled hypertension.
19: Q    Okay.  And uncontrolled hypertension
20: is one of the big risk factors for intracranial
21: bleeding, is it not?
22: A    Yes, correct.
23: Q    All right.  Do you know whether
24: congestive heart failure has an increased risk
25: of stroke?

0065
01: MR. ABNEY:
02: Object to form.
03: THE WITNESS:
04: Again, you'd have to talk to a
05: cardiologist.  But the basic premise is,
06: is that any time -- any pathology that
07: impairs your circulatory ability to move
08: blood effectively or efficiently across
09: the system can lead to potential areas of
10: low flow or sludge states that -- again,
11: that would or could potentially promote
12: additional clotting.
13: EXAMINATION BY MR. HOGUE:
14: Q    And would chronic kidney disease
15: increase a patient's risk for stroke?
16: MR. ABNEY:
17: Object to form.
18: THE WITNESS:
19: That I don't know for sure.
20: EXAMINATION BY MR. HOGUE:
21: Q    Okay.  Do anticoagulants increase a
22: risk for a patient of having hemorrhagic
23: strokes?
24: A    Yes, it does.
25: Q    And do anticoagulants also decrease

0066
01: the patient's risk for ischemic strokes?
02: MR. ABNEY:
03: Object to form.
04: THE WITNESS:
05: If administered properly, then
06: yes.  And again, in general.
07: EXAMINATION BY MR. HOGUE:
08: Q    Okay.  And I think you said this
09: before, but all anticoagulants have an increased
10: risk of bleeding events; is that correct?
11: A    Yes, that's correct.
12: Q    And that would include Pradaxa and
13: Eliquis and warfarin as well, correct?
14: A    Yes, correct.
15: Q    Dr. St. Martin was Mrs. Orr's
16: treating cardiologist, and looking at your
17: records, you don't have any criticism of his
18: prescribing Xarelto to Mrs. Orr; is that
19: correct?
20: A    That's correct.
21: Q    Have you seen patients who had atrial
22: fibrillation who come into the hospital who've
23: had an ischemic stroke?
24: A    Yes, I have.
25: Q    And how often does that happen?

0067
01: A    I mean --
02: MR. ABNEY:
03: Object to form.
04: THE WITNESS:
05: -- how often -- I guess, what's
06: your question?  How often have I seen them
07: or how often does a patient with
08: anticoagulation present with ischemic
09: stroke?
10: EXAMINATION BY MR. HOGUE:
11: Q    Well, my question is:  How often do
12: patients with atrial fibrillation, whether
13: they're on an anticoagulant or not, show up with
14: an ischemic stroke?
15: A    Yeah, so --
16: MR. ABNEY:
17: Object to form.
18: THE WITNESS:
19: -- that would be something that
20: would be better, I guess, with expert
21: opinion from a vascular neurologist.
22: EXAMINATION BY MR. HOGUE:
23: Q    Okay.
24: A    From a neurosurgical perspective, I
25: only see them when the stroke is large enough --

0068

01: the ischemic stroke is large enough to cause
02: significant cerebral edema for which I may have
03: to intervene and do something like a craniectomy
04: or a lobectomy or place an ICP monitor.
05: Q    Okay.  Have you seen patients in the
06: emergency setting who've had intracranial bleeds
07: when taking the various different types of
08: anticoagulants?
09: A    Yes.
10: Q    And how often do you see that?
11: A    I mean, on our service, we see it
12: almost every day.
13: Q    And do you see patients who have
14: hypertension who come in who have bleeds that
15: have never taken an anticoagulant?
16: A    Yes.
17: Q    And how often do you see that?
18: A    Again, here, very often.  Once a day
19: we'll -- at least several times a week.
20: I will say that the -- for purely
21: hypertensive hemorrhages, they do tend to adhere
22: more traditionally to certain locations of
23: hemorrhages that are pretty well established for
24: hypertension.  So they tend to be more basal
25: ganglia, or sort of the deep white matter areas.

0069

01: That's considered the basal ganglia.  They tend
02: to be cerebellar hemorrhages.
03: So there are certain established
04: locations that, either anatomically or
05: physiologically, uncontrolled hypertensive tend
06: to have -- more likelier than not, tend to be in
07: those locations.
08: In my experience, the patient on
09: anticoagulations don't typically adhere to those
10: locations, and could be almost anywhere.
11: Q    Okay.  So there's no specific
12: location within the brain where you would look
13: at that location and say that looks like
14: anticoagulation had an effect on it?
15: A    No.  But there are certain locations
16: which you can say how that's likely hypertensive
17: versus other causes, yes.
18: Q    Okay.  And where in Mrs. Orr's brain
19: was her hemorrhage?  Do you know?
20: A    Well, most of it was
21: intraventricular, and so it was hard to
22: delineate where it -- but it definitely wasn't
23: the more classic basal ganglia of hemorrhages.
24: That being said, it could have come from the
25: thalamus or the head of the caudate, which is

0070

01: potentially part of the basal ganglia pathway,
02: but -- and most of the hypertension hemorrhages
03: tend to be more intracerebral.
04: Her case, it was intracerebral, but
05: obviously it ruptured more into the ventricle
06: and was casting most of the right ventricle.
07: Q    So if the thalamus area is part of
08: the basal ganglia, if there's a bleed that comes
09: out of that, it can go into the ventricles like
10: what she had here; is that correct?
11: A    It could, yes.
12: Q    And the thalamus is one of those
13: areas that's -- hypertension is something that's
14: a major cause of bleeds in that area?
15: MR. ABNEY:
16: Object to form.
17: THE WITNESS:
18: Yes.  But again, more often than
19: not, they tend to be in the more
20: peripheral side, because that's where the
21: smaller -- the lima-striate [phonetic] or
22: the smaller blood vessels coming off of
23: the middle cerebral arteries tend to go.
24: Those tend to be the blood vessels that
25: tend to break more easily with

0071

01: uncontrolled hypertension.
02: This is a medial bleed, which is
03: typically going to be the larger, more
04: robust blood vessels.  So most people who
05: look at this wouldn't instinctively say,
06: "Uh-huh, that's a hypertensive
07: hemorrhage," basically, is what I'm
08: saying.
09: EXAMINATION BY MR. HOGUE:
10: Q    Okay.  And are you familiar with
11: warfarin?
12: A    Yes.
13: Q    And warfarin's a medicine used to
14: prevent blood clots from forming; is that
15: correct?
16: A    That's correct.
17: Q    And warfarin has an increased risk of
18: intracranial bleeding, correct?
19: A    Yes, correct.
20: Q    And do you have any background
21: information from the studies related to the
22: rates of intracranial bleeding in patients on
23: Xarelto versus warfarin?
24: A    Yeah, I mean, I think that the --
25: initially, when the FDA came out and approved

0072

01: all this, there was the -- the risk-benefit
02: profile for Xarelto compared to Coumadin was
03: slightly better, and hence, the FDA approval.
04: The thing that has thrown -- I think
05: the thing that has cast a shadow on Xarelto was
06: the issue with the Duke group and whether there
07: was any -- I guess whether the data for testing
08: for Xarelto was as clean and whether the
09: discussion about whether the INR tester for that
10: Duke group was working properly.
11: So I think that's the one thing
12: that's been -- at least in the medical
13: community, kind of offset some of the -- but in
14: general, the profile was supposed to be better
15: than Coumadin, both from an ischemic and a
16: hemorrhagic component.
17: Q    In your understanding, the number of
18: intracranial bleeding, bleeding in the brain,
19: was lower in the Xarelto arm of the study
20: than --
21: A    I believe it was slightly lower.  I
22: don't recall exactly.  But yeah, I believe it
23: was slightly lower.
24: Yes, from my recollection, yes.
25: Q    Is one of the problems with treating

0073

01: patients with warfarin trying to keep them in a
02: narrow range for their INRs?
03: MR. ABNEY:
04: Object to form.
05: THE WITNESS:
06: Again, I think you'd have to talk
07: to a cardiologist or a vascular
08: neurologist, because I don't manage
09: Coumadin.  But in a general medical sense,
10: one of the challenges of warfarin had been
11: to be able to consistently keep a narrow
12: range of anticoagulation across a wide
13: range of a patient population as it
14: pertains to age, weight, and also the
15: diet.
16: EXAMINATION BY MR. HOGUE:
17: Q    Okay.  And so I know that you
18: don't -- let me strike it and say it this way:
19: So the questions about how to go about
20: individualizing the care for warfarin for
21: patients, that's not something that you do; is
22: that correct?
23: A    That's correct.
24: Q    And that's not something -- although
25: you have general information about it, it's not

0074

01: something you're specialized in; is that
02: correct?
03: A    Yes, that's correct.
04: Q    Doctor, I'm going to go back to
05: Exhibit 4, which are the medical records, a
06: large part of them.  If you look at the first
07: page, 06, in the right-hand corner, it looks
08: like this is when Mrs. Orr first came in to the
09: Baptist side of the ER, was on April 24th, 2015,
10: at 10:46 p.m.  Do you see that?
11: A    That's correct.
12: Q    All right.  And if you skip over
13: to -- two pages to page 8, this appears to be a
14: chart of the timing of her being moved
15: various -- from the original hospital to your
16: hospital and --
17: A    That's correct.
18: Q    -- then from -- to inpatient and ER
19: and surgery.  Is that what this is?
20: A    Yes.
21: Q    Okay.  So is this helpful in giving
22: information about the timing of when she was at
23: various places?
24: A    I mean, again, because my team and I
25: did not enter this, and so, again, I guess

0075

01: assuming that nursing had entered it at the
02: appropriate time, then it gives me a general
03: flow.  But I guess I wouldn't be able to testify
04: to how accurate, you know, if it was at 1:05 or
05: 1:30 or -- yes, this is -- this is helpful in
06: understanding the general flow.  I would not be
07: able to certify that the exact times were all
08: completely accurate.
09: Q    And you recognize this group of
10: documents that I've provided to you as medical
11: records coming from Ochsner related to Mrs. Orr?
12: A    Yes.
13: Q    Okay.  And when you're seeing a
14: patient, are the medical records available to
15: you online?  Can you tell me how you go about
16: getting progress notes and seeing CT reports and
17: things of that nature?
18: A    Yeah, so it's multifactorial.  I
19: mean, most of the medical documentations are
20: done through the medical record system.  For us,
21: we use the Epic system.  Radiology can be seen
22: through Epic, but also through iPACS, or the
23: radiology online system.
24: There's, I guess, a slightly
25: different viewing mechanism when you do it in

0076

01: the hospital through the hospital computers
02: versus on your phone versus on your laptop. But
03: yes, in general, it's all electronic, with some
04: handwritten documents, such as medical consents
05: and things like that.
06: Q    If you go to page 11, on the bottom
07: side, there's a history that appears to have
08: been taken around 11:31 p.m. Do you see that?
09: A    11 -- I'm sorry -- okay.
10: Q    And --
11: A    Okay.
12: Q    This is a note from Dr. Ann Azcuy.
13: Do you know Dr. Azcuy?
14: A    I don't know her directly. I think
15: she's one of the ER physicians, I believe.
16: Q    All right. It talks about the
17: patient being a 60-year-old female who presents
18: with complaint of altered mental status
19: worsening over the last five hours, and then it
20: says "as per husband," and it gives the history.
21: Do you see that?
22: A    Yes.
23: Q    And was it your understanding that
24: Mrs. Orr had this acute hemorrhagic event
25: sometime at the dinner five hours before she got

0077

01: to the hospital?
02: A    So it's my understanding that she had
03: some sort of neurologic symptoms at that time.
04: Again, there's no way to confirm the exact
05: timing of the hemorrhage, but the assumption is
06: that there was some vascular event or neurologic
07: event at the onset of the headache, yes.
08: Q    Okay. If you go to page 7 -- excuse
09: me -- page 12 --
10: A    Yeah.
11: Q    Page 12, the bottom right hand, talks
12: about, under "Review of Systems," kind of toward
13: the bottom -- says "Unable to perform ROS."
14: Do you know what that means?
15: A    That means that she was unable to
16: verify directly with the patient her review of
17: systems, which is typically a series of
18: questions you ask the patient; if they've had,
19: quote/unquote, these symptoms.
20: Q    So by the time Mrs. Orr got to the
21: hospital, as you said, with this massive stroke,
22: she was already unable to give them any answers
23: to these basic questions?
24: MR. ABNEY:
25: Object to form.

0078

01: THE WITNESS:
02: Yes.
03: EXAMINATION BY MR. HOGUE:
04: Q    Okay. And there are other records
05: that talk about -- if you go to page 21 through
06: 22, on the 21, on the left-hand column, the "ED
07: Notes by Melissa Schmidt, RN," right in the
08: middle, it says, "Patient unable to give history
09: at this time, waiting for family to arrive, will
10: speak with the family about the situation."
11: And that's consistent with your
12: understanding?
13: A    Yes.
14: Q    And then if you look at page 22, on
15: the -- toward the right, it says, "Per family
16: and patient husband, the patient reported" --
17: and it gives the history, correct?
18: A    Yes, correct.
19: Q    So it's your understanding, by the
20: time Mrs. Orr presented to Baptist Hospital, she
21: was already having a poor clinical status at
22: that point and not able to answer questions
23: about her history?
24: A    So repeat that again.
25: Q    Okay.

0079

01: A    By the time she got --
02: Q    By the time she got to Baptist
03: Hospital, she was unable to give an accurate
04: history at that point, and they had to get the
05: information from the family?
06: A    Yes, that's correct.
07: Q    And by the time you or Dr. Riffle saw
08: Ms. Orr, I believe it was about 1:54 a.m. --
09: A    We saw her a little bit earlier. I
10: think that was just when the note was written.
11: Q    Okay. Let me go to -- let me get a
12: document, I think, is the one I'm referring to.
13: A    Can we pause for a second? I've got
14: to answer --
15: Q    Sure.
16: A    I've got to take care of this real
17: quick here.
18: THE VIDEOGRAPHER:
19: Time now is 12:15 p.m. We are
20: off the record.
21: (Recess taken.)
22: THE VIDEOGRAPHER:
23: This begins Disk 3 of today's
24: deposition. Time now is 12:23 p.m. We
25: are back on the record.

0080

01: THE WITNESS:
02: Okay.
03: EXAMINATION BY MR. HOGUE:
04: Q    Doctor, before we had a break, I was
05: just marking a new exhibit, and I've marked it
06: now Exhibit 7.  And do you recognize this
07: document?
08: A    Yes.
09: Q    And what is this?
10: A    This was the neurosurgery consult
11: note.
12: Q    Okay.  And I had asked about the
13: 1:54 a.m., and that's what's identified on the
14: document.  Can you tell me what that means --
15: A    Sure.
16: Q    -- 1:54?
17: A    So the 1:54 was when my resident
18: began the electronic medical record note.
19: Q    And what is it you looked at to say
20: it was a little bit earlier before 1:54 a.m.
21: when you first saw Mrs. --
22: A    Well, because --
23: Q    -- Orr?
24: A    Well, because we always see the
25: patient before we actually have time to sit down

0081

01: and write the note, so -- and would have been
02: our -- already had seen the scan and seen the
03: patient in the ER before the note was done.
04: Q    Okay.  So did you personally look at
05: the CT scan at the time?
06: A    Yes.
07: Q    Okay.  And did you make note of what
08: you saw on the CT scan at the time?
09: A    I'm sorry?
10: Q    Did you make note of what you saw on
11: the scan at the time?
12: A    Yes.
13: Q    What is that?
14: A    That there was a large right
15: intraventricular hemorrhage with extension to
16: the third ventricle with a centimeter and a half
17: midline shift and hydrocephalus.
18: Q    And you'd also mentioned that she
19: was -- "neurologically, the patient is
20: semi-purposeful."  What does that mean?
21: A    That meant she was moving, but not
22: with any kind of purpose or to command.
23: Q    And can you tell me who Dr. Riffle
24: is?
25: A    He was one of our neurosurgery

0082

01: residents.
02: Q    And what's a resident?
03: A    A physician in training.  So he has
04: graduated from medical school, has a full
05: medical license, and has embarked on the
06: seven-year training process to be a
07: board-certified neurosurgeon.
08: Q    Okay.  And by the time you first saw
09: Ms. Orr and Dr. Riffle saw Ms. Orr, she was
10: intubated at that point, correct?
11: A    That's correct.
12: Q    She was not able to communicate with
13: you at any point, correct?
14: A    That's correct.
15: Q    And she was -- at all times, from the
16: first time you saw her, through her
17: hospitalization, she was unconscious?
18: A    That's correct.  Well, she was
19: unresponsive, yes.
20: Q    Did you review any other of
21: Mrs. Orr's CT scans as you treated her?
22: A    I reviewed all of the CAT scans of
23: the head, yes.
24: Q    If you go to the bottom of page
25: 235 -- excuse me -- page 235, the bottom, it's

0083

01: kind of the last page?
02: A    Yes.
03: Q    There's a reference to an ICH score
04: of 3.  What is that?
05: A    I --
06: Q    What's that reference?
07: A    ICH -- that is the -- I guess, the --
08: one of the stroke intracerebral hemorrhage
09: scores that a resident did.
10: Q    Okay.
11: A    I didn't use that score, so I think
12: it was just documenting -- I don't really use
13: that score for a decision-making process.
14: Q    Okay.  And it also indicated a large
15: right intraventricular hemorrhage with extension
16: into third ventricle, correct?
17: A    That's correct.
18: Q    And you agreed with that?
19: A    Yes, correct.
20: Q    All right.  At the top there's an
21: indication of an INR, and this is a coagulation
22: lab, and it says INR of 1.1.  Is that in the
23: normal range?
24: A    Yes.
25: Q    Okay.  And what is an INR?

0084

01: A    Again, I think you would have to
02: depose a hematologist to sort of discuss the --
03: I guess, the chemical reactions and how that
04: number is derived.
05: But in general sense, an INR is a --
06: I guess an assay or a test of the coagulation
07: pathways in which it quantifies the ability or
08: inability of the clotting pathways to be working
09: properly or not properly.  The actual range can
10: vary from lab to lab, but in general, anything
11: less than 1.5 is considered to be indicative
12: that the pathway that's tested by the INR, which
13: is the same or kind of the similar pathway
14: that's tested by the PTT, is functioning as
15: relates to that assay.
16: So it doesn't mean that -- I guess it
17: doesn't mean that the patient's anticoagulation
18: pathway is completely normal.  It just means
19: that for that area which it's testing, it
20: appears to be normal.
21: There are other agents, and depending
22: on whether it's intrinsic or extrinsic pathways
23: that impact other things, you may see an
24: elevation in the PTT and not elevation in INR.
25: But then for agents like with Xarelto and other

0085

01: ones where we're really -- kind of factor Xa,
02: that might not -- it's not picked up by that
03: testing pathway.
04: So that is one of the coagulation
05: pathways, tests or assays, and for this one it
06: is within normal range.
07: Q    Okay.  And what is an APTT?
08: A    Again, that is the -- another pathway
09: that tests the PTT or the -- I guess, the -- I
10: forgot which one.  It's intrinsic or extrinsic.
11: But this tests the other pathway as compared to
12: the PT, which is what the INR tests for.  And
13: this is also within the normal limits set by the
14: lab here at Ochsner.
15: Q    So on those two coagulation tests,
16: Mrs. Orr, at the time she presented to the
17: hospital, had normal levels of coagulation based
18: upon those two tests; is that correct?
19: A    Yes.
20: Q    There's one other test.  I'll go
21: ahead and mark as Exhibit 8 some documents
22: related to the lab values and some of the CTs.
23: And you can keep Exhibit 7, because I'm going to
24: come back to that.
25: If you go on this document to -- the

0086

01: bottom right-hand corner is 461.  On the bottom
02: component, bottom part of the page, there's a
03: "Collected By," and there's an RN.  It says
04: April 24 at 2316.  That's 11:16 p.m., when she
05: got to Ochsner Baptist, correct?
06: A    That's correct.
07: Q    So that's right when she got in?
08: A    That's correct.
09: Q    And so the blood was collected at
10: that point, and they did a prothrombin time with
11: respect to her blood coagulation as well,
12: correct?
13: A    That's correct.
14: Q    And what is a prothrombin time?
15: A    Again, that is testing -- I guess the
16: INR and the prothrombin time go hand in hand,
17: and that tests one of the cascade pathways to
18: forming anticoagulation.
19: Q    And her prothrombin time for testing
20: of coagulation was in the normal range as well?
21: A    That's correct.
22: Q    And if you look at the next page,
23: you'll see that the test is also consistent with
24: what you put in your report, that her APTT is a
25: 26.6, and has it identified in the reference

0087

01: range as in the normal range for patients,
02: correct?
03: A    That's correct.
04: Q    And the normal range was 21.0 to
05: 32.0 seconds, correct?
06: A    That's correct.
07: Q    So on all of the testing that they
08: did on the blood that came back at Ochsner's
09: labs for how quickly her blood clots, they
10: showed it to be normal for Mrs. Orr at that
11: point in time?
12: A    So the lab work that tested that came
13: back within normal parameters.  That is not to
14: say that her -- that is not, I guess, very
15: specific in relation to saying that her true
16: coagulation pathway is normal, because of the
17: fact that she's been on Xarelto, and some
18: patients that are considered, quote/unquote,
19: therapeutic on Xarelto can have normal PT/INR
20: and PTT time.
21: So, yes, I guess the -- to answer
22: your question, would be those values are normal;
23: but at least in my eyes, at that time, I did not
24: feel that that was enough assurance to say that
25: her actual ability to clot blood appropriately

0088
01: was normal, based on the fact that she'd been on
02: Xarelto.
03: Q    None of the blood factors that were
04: tested showed anything abnormal about her
05: coagulation at the point in time when she came
06: to the hospital?
07: A    That's correct.
08: Q    Okay.  If you will go over to the
09: page 463, this is the CT read by the
10: radiologist.
11: A    Four sixty -- uh-huh.
12: Q    And do you know Dr. Brian Ogden?
13: A    I know of him, but I don't know him,
14: anything beyond the fact that he's a radiologist
15: that works at Ochsner.
16: Q    And as a radiologist at Ochsner, he's
17: an expert in reading these types of films; is
18: that correct?
19: A    So, yes, in the sense that he is a
20: general radiologist.  So he's not a
21: neuroradiologist, which is someone who, I guess,
22: spends more training and time reading
23: neuroimaging.  I think at Baptist most of the
24: CAT scans are read by general radiologists,
25: particularly on that night.  But I don't have

p. 00088

0089
01: any reason to say that he's not qualified to
02: read them.  Just the remark is that, yes, he is
03: a general radiologist and not a
04: neuroradiologist.
05: Q    If you look at the next page, there's
06: the second CT --
07: A    Uh-huh.
08: Q    -- do you see that?
09: And on the second CT -- which it was
10: performed between 4:25 and 4:29 a.m.; is that
11: correct?
12: A    Yes.
13: Q    It says on the top, "Resulted," and
14: then it's got a time of 8:23.  Do you know what
15: the difference of those times are?
16: A    I believe one is when the CAT scan
17: was done, and the other one is when the
18: radiologist officially signs off on their
19: reading.
20: Q    Okay.  If you look at the
21: "Impression," the radiologist says that there is
22: "stable right lateral ventricle hemorrhage with
23: "similar leftward midline shift and possible
24: "right -- mild right uncal herniation."
25: Do you see that?

p. 00089

0090
01: A    Yes.
02: Q    Okay.  And the radiologist is saying
03: that her film was stable, the same looking as
04: the film as compared to the one that she
05: originally came into the hospital; is that your
06: understanding?
07: A    Yes.  That's what the radiologist was
08: saying.
09: Q    And the radiologist didn't record any
10: growth in the hemorrhage over the past four and
11: a half hours for Mrs. Orr; is that correct?
12: A    Correct.
13: Q    And is that consistent with your
14: recollection?
15: A    Yes, correct.
16: Q    So between --
17: A    But --
18: Q    Go ahead.
19: A    But I think -- I thought she had
20: slightly more swelling, from my recollection.
21: Q    Do you have any note to that effect?
22: A    No, I don't have any note to that
23: effect.  But let me look at it again here, real
24: quick here.  I'll tell you if that was true or
25: not.  The CAT scan on the 26th -- yes, I do

p. 00090

0091
01: recall it correctly.
02: Yeah, so if you compare -- if you
03: compare -- if you compare the side-by-side scans
04: here, the -- sorry -- the white is the blood.
05: Okay.  The darker here, that there, okay, around
06: the blood -- see what I'm saying -- that's
07: edema.  And the gray around there, that's brain.
08: So this is the one at 4:20.  This is
09: the one at 11:39 p.m.  Okay.  So the cuts are
10: slightly different.  Okay.  But as you can see,
11: the rim of edema here -- you see that, compared
12: to that -- see -- it's thicker, it's more --
13: which is in keeping with what you expect, which
14: is, as the cells get damaged, they tend to begin
15: to swell in the first 24 to 48 hours.
16: And so this is not inconsistent, but
17: I would disagree with the exact reading that
18: it's exactly the same from 11:00 to 4:00.  So I
19: think the blood is roughly about the same, but
20: that there's definitely more cerebral edema.
21: And if you measured the shift, I'd probably say
22: it's a little bit worse, just looking at it.
23: MR. IRWIN:
24: I'm sorry.  What was that,
25: Doctor?

p. 00091

0092

01: THE WITNESS:
02: Sorry. The shift or the amount
03: of -- the degree in which the right side
04: of the brain was pushed over to the left
05: side of the brain.
06: MR. IRWIN:
07: Did you say that was still about
08: the same?
09: THE WITNESS:
10: I thought it was slightly worse.
11: MR. IRWIN:
12: Okay. Sorry for interrupting. I
13: couldn't --
14: THE WITNESS:
15: That's okay. And it's --
16: MR. IRWIN:
17: -- hear you down here.
18: THE WITNESS:
19: And that's a little more
20: subjective in the sense that the gantry,
21: or the angle in which the cuts were done,
22: is not exactly aligned. But again, I can
23: grossly see that the amount -- if that's
24: the midline there --
25: MR. ABNEY:

0093

01: Doctor, would it be possible for
02: you to turn that so the camera can see it?
03: You can get up if you need to walk
04: around --
05: THE WITNESS:
06: So you can roughly see that the
07: amount of this space being over here is --
08: THE VIDEOGRAPHER:
09: Mr. Abney, can you move --
10: THE WITNESS:
11: -- is at least visually a little
12: bit more.
13: Now, there's no standard way to
14: measure midline shift. Everyone measures
15: it a little bit differently, but -- so
16: again, I'm not a radiologist, but from a
17: neurosurgical perspective, we often read
18: pretty much all our own films and rarely
19: rely on a radiology reading for clinical
20: decision-making from a neurosurgical
21: perspective.
22: EXAMINATION BY MR. HOGUE:
23: Q    Doctor, between, I guess, midnight
24: and the 4:30 scan, she was not bleeding any
25: further?

0094

01: A    No, no, it did not appear that she
02: was grossly bleeding any further.
03: Q    And so whatever blood was there when
04: she got to the hospital, it wasn't going into --
05: getting larger and continuing to bleed out; it
06: was either -- it was clotting by that time; is
07: that fair?
08: MR. ABNEY:
09: Object to form.
10: THE WITNESS:
11: I think that some of it had
12: clotted, yes. But if you look at the scan
13: here again -- so when blood clots, forms
14: clot, radiographically, it -- the density
15: changes. And so a CAT scan is just a
16: fancy X-ray, which things that are more
17: dense will show up whiter, just like bones
18: and things like that on a chest X-ray; and
19: things that are less dense show up less
20: white.
21: So when you look at a clot, okay,
22: an acute clot that is clotted, you
23: typically would see it being homogeneously
24: white, or the same density of clot
25: throughout the whole thing, would be the

0095

01: same, and so you would see it as being
02: homogeneously white. So most acute clots
03: that are clotted that I see are white.
04: Okay?
05: Now, in situations where the
06: blood is not fully clotted, which means
07: that you have a gradient of difference
08: between what's formed into a crease of gel
09: and what's still liquified, then you see a
10: change in that, which is -- for example,
11: here you see, in the middle of this clot
12: here, okay, an area that is less white,
13: right, that is in the middle of the
14: clot -- so here, here, and here as well.
15: So at least to my eyes, my
16: interpretation of it is that there was
17: more unclotted blood here, there's less
18: unclotted blood here. So from this -- for
19: example, this area went from being less
20: white to more white, but this area here
21: still likely, my interpretation,
22: represented unclotted blood or slower
23: clotting blood, because it's having the
24: same density as fluid, which is what you
25: see here in the ventricle here.

Bui, Cuong MD - Volume 1 - 07/07/2016

0096

01: Okay.  So the blood, as you know,
02: goes from a liquid state to a solid state
03: based on the clotting pathways.  And so I
04: still felt that there was some unclotted
05: blood in that scan, which is, for
06: example -- I'll show you this scan here.
07: If you look at the scan from the
08: 27th, which was a couple days later, you
09: no longer see that area as much anymore.
10: So the blood is much whiter, in general,
11: across.  So you no longer see that, other
12: than at the catheter tip -- sorry, this
13: computer is very slow -- other than at the
14: catheter tip of where the -- sorry, it's
15: not going -- other than at the catheter
16: tip of where the catheter is, which you
17: see some air.
18: And then where we injected the
19: tPA, right at the tip there, you also see
20: some areas that aren't as clear.  And then
21: you can see it lowering out here, which is
22: the tPA breaking down this product and
23: having it be, I guess, less solid.  So you
24: see a less white fluid that's lowering
25: down the gravity.

p. 00096

0097

01: EXAMINATION BY MR. HOGUE:
02: Q    Okay.  So looking at the initial
03: scan, did you see clotting on that as well?
04: A    Yes.
05: Q    And you saw clotting at the 4:00 a.m.
06: scan?
07: A    Yes.  I saw more clotting at the
08: 4:00 a.m. --
09: Q    And then you saw other clotting on
10: the 27th; was that right?
11: A    Yes, correct.
12: Q    And then, as you discussed, you were
13: having tPA, a clot buster, put into the
14: ventricles to break down the clot that was there
15: at that point, correct?
16: A    Yes.
17: Q    All right.  If you could go back to
18: the CT scan read by the radiologist, the
19: reference in the report of Dr. Erica Broussard
20: was that there is a 1.3-centimeter leftward --
21: can you say what that next word is?
22: A    Subfalcine herniation.
23: Q    Okay.  And what is that?
24: A    So that is her measurement of how
25: much things are supposed to -- so the brain is

p. 00097

0098

01: fairly symmetric, and down the middle of the two
02: hemispheres is -- you have the -- a band called
03: the falx or the -- it's a thickened dura, which
04: is the lining of the brain that sort of sits
05: down the anterior part of the middle of the
06: brain which separates -- separates the two
07: lobes.  And it's contiguous up top, and then
08: there's an opening at the bottom that allows for
09: the connection between the two hemispheres.
10: And so if you have swelling on one
11: side of the brain that's significant enough, it
12: pushes and squeezes the brain across this wall,
13: I guess.  So picture, I guess, a wall that's --
14: it's open on top, but has an opening at the
15: bottom.  And so the brain gets squeezed sort of
16: across this firm membrane, across the bottom
17: like this.  So that's why it's called the
18: subfalcine, going beneath the falx, and then --
19: but because this membrane is pretty rigid, that
20: it will cut or compress the brain as it goes
21: across.
22: So that is the indirect indicator of
23: increased intracranial pressure, because it
24: takes a lot of force to be able to force the
25: brain across this opening.

p. 00098

0099

01: Q    Is that the same thing as the midline
02: shift or is that --
03: A    Yeah.
04: Q    -- something different?
05: A    That's the same thing as the midline
06: shift.  So that's the -- the falx is a midline
07: structure.
08: Q    Okay.
09: A    And so --
10: Q    The original reading of the CT said
11: that there was a 1.6-centimeter right-to-left
12: midline shift, and the second reading said that
13: there was slightly smaller 1.3-centimeter
14: leftward shift?
15: A    Yeah.  So, again, I'm not a
16: radiologist, so I'm not going to contest a
17: radiologist's measurements of it, but part of
18: what I had discussed earlier is that -- one is
19: you've got two different radiologists measuring
20: it, which means that it's hard to quantify where
21: they actually -- what they used to measure, from
22: what to where.  Most of the time it's a rough
23: estimate of where they think midline structure
24: should be to where -- how far it goes across to
25: the other side.

p. 00099

Page 25

0100

01: So in my opinion, I would disagree
02: with the impression that this radiologist seems
03: to think that there was less mass effect than
04: before; and that, again, because I can't
05: quantify what she actually measured as midline,
06: I can only say that when I look at this, I
07: certainly don't see a decrease in the midline
08: shift.  If anything, I thought that it was
09: slightly more.
10: Q    But the blood/bleeding part hadn't
11: changed in any way?
12: A    No.  I thought there was --
13: Q    When I say "changed in any way," it
14: hadn't increased in size?
15: A    That's correct.
16: Q    But it had clotted?
17: MR. ABNEY:
18: Object to form.
19: THE WITNESS:
20: Yeah, so I think most of it
21: clotted.  Not all --
22: EXAMINATION BY MR. HOGUE:
23: Q    Right.
24: A    -- of it looked like it clotted.
25: Q    Okay.  Going back to Exhibit 7, which

0101

01: was your consultation note, I believe --
02: A    Okay.
03: Q    -- if you look at page 234, there was
04: a couple of other findings.
05: You did a physical exam, and it says
06: "E1."  What is that?
07: A    Yeah, so that is part of the Glasgow
08: coma scores.  So Glasgow coma score is a quick,
09: not a -- a quick, non-refined way of
10: communicating a patient's general neurologic
11: status across the specialties and a way that
12: helps communicate the general level of
13: consciousness of a patient.  So there's three
14: components of the score:  There's the eyes, the
15: verbal score, and the motor score.
16: So you're asking about the E score,
17: so that is the score testing for the patient's
18: ability to open their eyes.  And that's on a
19: scale of 1 to 4, in which 4 means that
20: they're -- you walk in and their eyes will open
21: spontaneously.
22: A 3 means that their eyes are closed,
23: but as soon as you give a verbal stimulus, you
24: say "open your eyes" or say "hello," or through
25: just the ability to hear noises, they open their

0102

01: eyes to the noise or to verbal commands.
02: 2 is that, despite yelling at them or
03: asking them to open their eyes, they don't open
04: their eyes, and the only time they open their
05: eyes is if you actually give them painful
06: stimulus by pinching them, or something to that
07: effect.
08: And so her score was a 1, which meant
09: that her eyes were closed despite a painful
10: stimulus.
11: Q    So, Doctor, she never had any eye
12: opening; is that correct?
13: A    That's correct.
14: Q    And she was intubated when you saw
15: her, correct?
16: A    That's correct.
17: Q    And she had this motor score of 4?
18: A    That's correct.
19: Q    All right.  And is anything for a
20: total of less than 8 categorized as being in a
21: coma?
22: A    Yeah, so that's sort of the -- the
23: word "coma" is really a nonspecific definition.
24: It's kind of out there in the general medical
25: field to denote that the patient's not

0103

01: meaningfully able to process information to
02: commands.  So, basically, GCS of 8 simply means
03: that the patient's level of consciousness is
04: depressed enough that they're not able to follow
05: commands.
06: Now, I guess the general definition
07: of coma is really not well established.  But in
08: general, the Glasgow coma score implies that the
09: lower the score, the worse the prognosis could
10: be.  That was mainly developed as a prognostic
11: scale.
12: Q    Mrs. Orr's prognosis when she came in
13: with a large right intraventricular hemorrhage
14: was poor from the beginning; is that correct?
15: A    Yes, that's correct.
16: Q    And you've seen similar hemorrhages
17: to that with patients that are not on any
18: anticoagulants that have that type of hemorrhage
19: with that same type of poor prognosis?
20: A    Ask that question again.
21: Q    Have you seen other patients come in
22: with intraventricular hemorrhages with the same
23: midline shifts that were not taking
24: anticoagulants?
25: A    Yes.  But I've seen much more on

0104
01: anticoagulation than on not of this type of
02: hemorrhage.
03: Q    Okay.  And would that be on all --
04: A    Yes.
05: Q    -- anticoagulants?
06: A    That's correct, yes.
07: Q    Have you seen --
08: A    Coumadin and everything else, yes.
09: Q    Coumadin is warfarin?
10: A    Yes.
11: Q    You've seen a lot of patients with
12: intracerebral bleeds who are on Coumadin who
13: come in with poor prognosis?
14: A    Yes, that's correct.
15: Q    If you go down on your report, you
16: have a glucose, you have a reading of 305; and
17: that's an abnormal finding, correct?
18: A    Yes, it's an abnormal finding.
19: Q    That's extremely high, is it not?
20: A    That's high, but not extremely high.
21: But again, I'm not an endocrinologist, so I
22: won't be able to -- but if you also look at her
23: WBC count, it's also elevated --
24: (Announcement on hospital speaker system.)
25: THE WITNESS:

p. 00104

0105
01: Her platelet count was also
02: elevated.
03: So in an acute setting like this,
04: it may not necessarily represent a
05: diabetic issue but rather than the body's
06: acute response to a major physiologic
07: assault, which means that your body has an
08: acute injury or acute -- something that
09: drives it significantly out of normal
10: physiologic hemostasis.  Then your body
11: kicks into a fight-or-flight mode, which
12: is it starts to mobilize the glucose, it
13: starts to increase the white blood cells,
14: and it tries to increase platelets.
15: So this is the body's general
16: response to stress.  So I'd have to see
17: what her baseline glucose is in the
18: last -- before this hemorrhage to be able
19: to sort of see how that fits from a
20: diabetic standpoint.  But just looking at
21: a spot lab in an acute trauma setting or
22: acute hemorrhagic setting, I wouldn't be
23: able to tell you if that's due to a
24: physiologic response to that or not.
25: EXAMINATION BY MR. HOGUE:

p. 00105

0106
01: Q    Doctor, if you go to the first page
02: of Exhibit 7, we talk about it being a right
03: intraventricular hemorrhage, an ICH, when she
04: initially came in, with a significant midline
05: shift, and that was immediately upon her getting
06: to the hospital.
07: The next sentence says, "Now that her
08: Xarelto has had a chance to clear, I offer
09: family to option for bilateral EVDs with
10: possible tPA."
11: Do you see that?
12: A    Yes.
13: Q    And do you recall, when you were
14: writing this, what was your assumption as to
15: when she had last taken Xarelto?
16: A    Well, so we did not know when her
17: last, for sure, was.  My assumption was that she
18: had taken the dosage on the 24th.  The family
19: was unclear and unable to verify the exact
20: timing, dosage.
21: So my general guesstimate at that
22: point in time was that I just had to assume that
23: she had -- since there was no way for me to
24: exactly test at that point in time whether
25: Xarelto was still on board, how much was still

p. 00106

0107
01: on board, I had to basically do a best clinical
02: guess judgment, which is assuming that she took
03: it on the evening of the 24th, with the general
04: layman -- general medical understanding of
05: half-life between anywhere from five to nine
06: hours, but then have to factor in the fact that
07: her creatinine at the time she presented was
08: elevated.
09: So that was a rough estimate assuming
10: the worst-case scenario, which is she had taken
11: it that evening, that I wanted at least 12 to
12: 18 hours between dosing for that to clear.  So I
13: think my gross math at that time was that she
14: had dinner at 9:00-something -- so hard to know
15: when exactly during the day, but let's just
16: assume it was at 9:00.  And again, having to
17: factor in the nausea, vomiting, but also
18: decrease -- there's no way for me to know.
19: So I just assumed around that time
20: period, and so I wanted to give it 12 to
21: 18 hours.  Ideally, it would be 24.  But at that
22: point, given the fact that she was -- I thought
23: there was more swelling; that despite the
24: radiology, I thought there was more shift; and
25: so that's why I offered to -- to offer them that

p. 00107

Page 27

0108

01: option.
02: Q    So you were thinking that it was
03: about 18 hours by the time you did this surgery
04: since she had taken the last dose of Xarelto?
05: A    That was the worst-case scenario
06: guesstimate, which is, I didn't want to be
07: overly optimistic on the other side and be wrong
08: and then place a catheter, but at minimum --
09: Q    And if Mrs. Orr didn't actually take
10: her Xarelto on the 24th but last took it on the
11: 23rd, it would have cleared within 24 hours of
12: the time she took it on the 23rd; is that your
13: understanding?
14: MR. ABNEY:
15: Object to form.
16: THE WITNESS:
17: So in a normal healthy patient
18: with normal renal clearance, but I had to
19: factor in the fact that she'd just had an
20: acute hemorrhage and that not all of the
21: blood looked like it clotted on that
22: hemorrhage.  So those were all of the
23: factors that impacted my clinical estimate
24: of whether her anticoagulation pathways
25: were impaired or not.

p. 00108

0109

01: EXAMINATION BY MR. HOGUE:
02: Q    Okay.  Before -- go back to Exhibit
03: No. 4, and go to page 23.  Before, I asked you a
04: question about the FFP, that fresh frozen
05: plasma, being typed --
06: A    Okay.
07: Q    -- and it says H-M-E -- H-E-M-E.  I
08: don't know if that means home on Xarelto,
09: unknown last dose?
10: A    No, so that's -- again, this is not
11: my team's note, and I'm not Dr. -- is it --
12: Q    Khursheed?
13: A    -- Khursheed -- so this is his
14: writing -- no, actually, this is -- this is
15: actually Dr. Elizabeth Mahanna's writing,
16: neurocritical care staff.  This is her
17: attestment to the resident.  So I'm assuming
18: that the "heme" is an abbreviation for
19: hematology --
20: Q    Okay.
21: A    -- which is the category for which
22: the Xarelto and FFP were followed and the
23: systematic approach that the ICU team would have
24: labeled this, yes.
25: Q    Okay.  And so the FFP was typed for

p. 00109

0110

01: the EVD placement, correct?
02: A    That's according to her note.
03: Q    And what does "typed" mean?
04: A    Well, with all blood products -- and
05: FFP would be a blood product -- they would have
06: done special testing to make sure that the blood
07: product in question would match with the blood
08: antibody profile of the patient so that there
09: isn't a reaction to -- like a mismatch; same as
10: Type A, B, C -- I mean Type A, B, O for blood
11: transfusions.
12: Q    Let me hand you another exhibit,
13: just --
14: MR. HOGUE:
15: 9?  9?
16: EXAMINATION BY MR. HOGUE:
17: Q    Doctor, I've handed you Exhibit 9
18: because I had raised the question before as to
19: whether the patient was given fresh frozen
20: plasma, and I know it was typed.  And if you
21: look at this page, 325, at the bottom it says
22: "fresh frozen plasma 4 units."  And then on the
23: next page it says the "fresh frozen plasma 4
24: units," and it says "discontinued."
25: Do you know whether they ever

p. 00110

0111

01: actually entered an order to give Mrs. -- or
02: transfuse Mrs. Orr with the fresh frozen plasma?
03: A    I know there was order entered.  I
04: can't verify whether they were given.  To the
05: best of my recollection, from my treatment
06: perspective, I was going on the assumption that
07: they were given.
08: Q    When you say the order was given, you
09: said the order was to prepare it, right?
10: A    So again, so I gave the -- so I had
11: asked my team and Dr. Riffle to order and give
12: FFP.
13: Q    Okay.
14: A    And I was working on the assumption
15: that it was given, and I was not told otherwise
16: at that point in time.
17: Q    Right.
18: A    But I can't verify that it was
19: actually given.
20: Q    Mark Exhibit --
21: A    Do you want to know for sure?  I can
22: find out how we --
23: Q    Yeah, I'm just trying to -- actually,
24: that's one of the questions I'm trying to find
25: out.  I'll give you the records --

p. 00111

0112

01: A    One second.
02: Q    Sure.
03: A    That's one of the painful things
04: about the electronic medical records these days.
05: MR. IRWIN:
06: That's what number, 10?
07: MR. HOGUE:
08: 10.
09: MR. IRWIN:
10: Thank you.
11: THE WITNESS:
12: (Speaking to person on phone)
13: Hey, Steve.  Listen, in Epic, what is the
14: best tab to look at to confirm whether FFP
15: or any medication was given --
16: MR. ABNEY:
17: Go off the record while he's
18: doing this?
19: MR. HOGUE:
20: Sure.
21: THE VIDEOGRAPHER:
22: Time now is 1:09 p.m.  We are off
23: the record.
24: (Recess taken.)
25: THE VIDEOGRAPHER:

0113

01: Time now is 1:19 p.m.  We are
02: back on the record.
03: THE WITNESS:
04: Okay.
05: EXAMINATION BY MR. HOGUE:
06: Q    Doctor, before we had a break, you
07: were looking into whether there was confirmation
08: of whether or not Mrs. Orr was given fresh
09: frozen plasma.  Were you able to determine that?
10: A    I was not able to determine that.
11: Q    Okay.  I've handed you Exhibit 10,
12: and on page 417 there's a reference to four
13: units of fresh frozen plasma with an indication
14: in the middle of the page that says "dispense,"
15: and then it says "returned."  So there are four
16: dispenses and four returns?
17: A    That's correct.
18: Q    Do you know what that means?
19: A    With this record, these four units
20: were typed and then returned.
21: Q    Is that an indication that they were
22: not actually used with Mrs. Orr?  Do you know?
23: A    I don't.  So that means that these
24: four units were not given to Mrs. Orr.  I don't
25: know if other units were.  I think the issue at

0114

01: hand was that multiple people had ordered it;
02: that Dr. Riffle might have ordered it, Dr. Tran
03: looked like he'd ordered it, and maybe someone
04: in the neurocritical care team might have
05: ordered it too.
06: So what I don't know is -- once each
07: order is entered, then that mobilizes a certain
08: number of units.  And so that's pretty common
09: now with electronic medical records, which is
10: once an individual is ordered, a certain unit is
11: tagged to that order, and so multiple units can
12: be sent down, and then it's -- so, for example,
13: if three people order two units of blood, then
14: six units could have been typed; but then if we
15: only end up giving the two that was ordered,
16: then the four would have been returned.
17: So I don't know.  We'd have to
18: clarify with blood bank whether only four were
19: typed and returned or six or more were typed and
20: only four were returned.
21: Q    Okay.  And what's the purpose of
22: fresh frozen plasma?
23: A    So fresh frozen plasma is -- I guess,
24: again, I'm not a hematologist, so you'd have
25: to -- I'm not an expert on blood products.  But

0115

01: the basic general medical is that these are
02: products that are spun out of your normal blood.
03: So you have whole blood, and then you have
04: packed blood cells, which are the way that blood
05: is processed and a way that allows it to
06: maximally use the component that's needed.
07: So sometimes the blood cells -- the
08: red blood cells are spun out, and then the fresh
09: frozen is the plasma component, which contains
10: most of the anticoagulation elements, except for
11: platelets, and that is transfused back into the
12: system, oftentimes to try to reverse an
13: anticoagulation problem.
14: Q    Okay.  Who is Dr. Khursheed?
15: A    I think that was a neurocritical care
16: resident.
17: Q    Okay.  And was that the resident that
18: reported underneath Dr. Mahanna?
19: A    Yes, correct.
20: Q    Okay.  If you go to page 30 --
21: A    On what exhibit?
22: Q    In Exhibit 4.  I'm sorry.  Exhibit --
23: it's the Bates stamp number, on the right
24: bottom, 30.
25: A    Okay.

0116

01: Q    This is the note of the resident you
02: referred to, Khursheed.
03: A    Uh-huh.
04: Q    And it references in neuro -- as
05: what's neurocritical care; is that --
06: A    Yes.
07: Q    -- her division?
08: A    Yes.
09: Q    And is that different than neurology?
10: A    So neurocritical care is a
11: subspeciality that sort of crosses neurology and
12: neurosurgery in which either a neurologist or
13: anesthesiologist or neurosurgeons, who spend
14: extra time training in critical care medicine as
15: relates to neurological problems, can then staff
16: and manage neuro ICU patients.
17: Q    Okay.  Doctor, Dr. Khursheed writes
18: that in the note "CT head in a.m.," and "no good
19: strategy available for Xarelto reversal; however
20: will consider 4-factor PCC if neurosurgery
21: decide to intervene."
22: What is a 4-factor PCC?
23: A    Again, I'm not that physician; but
24: PCC, in general, is an abbreviation for
25: prothrombin complex concentrate, which is a

0117

01: commercially available product.  I think it's a
02: different trade name.  It goes by different
03: trade names, but it's -- again, it's a
04: combination of concentrated blood clotting
05: products, namely -- again, I'm not a
06: hematologist.  I believe it's namely factors II,
07: VII, IX, X, and then as well as protein C and
08: protein S.
09: Again, certain components of the
10: overall coagulate pathway, except that I think
11: it's much more concentrated than for FFP; but
12: it's taken from fresh frozen, and it's used as a
13: faster, more rapid way of reversing extremely
14: high INRs, typically the patients on warfarin or
15: Coumadin with extremely protracted or prolonged
16: prothrombin time.  But it's been -- and overly
17: reported and used for, typically, non-reverse
18: agents like Xarelto.
19: Q    So was a 4-factor PCC ever given to
20: Mrs. Orr?
21: A    I don't know.
22: Q    Okay.  Doctor, with -- you talked
23: about it's a medication given to patients that
24: have extremely high INRs.  Mrs. Orr, when she
25: first presented to the hospital, had a normal

0118

01: INR, correct?
02: A    That's correct.
03: Q    The next thing Dr. Khursheed, the
04: resident, indicates is gave "grave prognosis
05: considering the size of hematoma, mass effect
06: and midline shift and anticoagulation status."
07: Do you see that?
08: A    Yes.
09: Q    And Ms. Orr had a grave prognosis at
10: the time she presented; and you agree with that,
11: right?
12: A    Yeah, so, I guess, again, this is
13: semantics in terms of -- again, I'm not going to
14: comment on someone else's interpretation of
15: prognosis, because, I mean, I guess there's no
16: clear guidelines of what's the difference
17: between grave versus horrible versus shitty
18: versus poor.
19: So I think my general consensus is,
20: is that she had a poor prognosis coming in; it
21: was not so poor that I would not have done
22: anything, so that's -- I guess that's, in my --
23: you know, I guess in my personal use of the word
24: "grave," would have been someone who's so bad
25: off that I would not have done anything.

0119

01: I thought it was poor, but I thought
02: that there was some potential, reasonable
03: benefit of actually intervening and doing an
04: invasive procedure, because from a neurosurgical
05: perspective, I'm fairly conservative, so I
06: don't -- I'm not so cavalier that I would do
07: invasive procedure on anyone who hits the door.
08: So at that point I thought it was
09: very poor, but would I use the term "grave?"  I
10: would have not used "grave," or else I would not
11: have intervened.
12: Q    So by the time Mrs. Orr got to the
13: hospital and got to neurosurgery, she had a poor
14: prognosis --
15: A    Yes.
16: Q    -- you'd agree with that?
17: A    Yes, correct.
18: Q    And she had a poor prognosis whether
19: she was taking Xarelto or any other
20: anticoagulant?
21: MR. ABNEY:
22: Object to form.
23: EXAMINATION BY MR. HOGUE:
24: Q    Would you agree with that?
25: A    Yes.  I think the -- I mean, once she

0120

01: had the hemorrhage -- again, I guess that's the
02: issue, is whether we or anyone feels Xarelto has
03: any part in that hemorrhage -- but once she got
04: to us with that hemorrhage, the prognosis was
05: poor.
06: Q    And you don't know, to a reasonable
07: degree of medical probability, whether the
08: Xarelto had anything to do with her hemorrhage?
09: A    Define "medical probability."
10: Q    More likely than not.
11: A    So I guess this is where we get to
12: the meat of it, I guess.  So I guess, in my
13: professional opinion, by the time she got to me,
14: there was no definitive way for me to know what
15: actually caused the hemorrhage or not.  Based on
16: my personal experience, that -- and the
17: characteristics of the hemorrhage, the fact that
18: she was on an anticoagulation agent, the fact
19: that it wasn't in your typical antihypertensive
20: areas, that she didn't have any other trauma or
21: any other obvious vascular malformation or
22: tumors or things like that, I think that being
23: on Xarelto contributed to the effect.
24: Now, whether it's the only cause or
25: not, there's no way for me to know.

p. 00120

0121

01: Q    Xarelto doesn't cause any damage to
02: the vessels themselves, correct?
03: MR. ABNEY:
04: Object to form.
05: THE WITNESS:
06: Not that we know.  I don't think
07: there's any -- I don't think there's
08: any -- again, I don't think there's been
09: any scientific data, and you would have to
10: do postmortem resections of vascular -- I
11: don't think -- I don't think anyone's
12: looked at it, and that's not the mechanism
13: of injury, and in its current known side
14: effect profile, no.
15: EXAMINATION BY MR. HOGUE:
16: Q    And the anticoagulants, basically
17: they thin out the blood; is that correct?
18: MR. ABNEY:
19: Object to form.
20: THE WITNESS:
21: Yeah, so the anticoagulant -- I
22: mean, it's not technically -- it's not
23: technically like thinning out or diluting
24: the blood.  I guess it impairs the normal
25: clotting pathways and the clotting

p. 00121

0122

01: response of the body's general -- it
02: impairs the body's abilities to clot blood
03: normally to any -- any bleeding issues.
04: EXAMINATION BY MR. HOGUE:
05: Q    So that's the clotting, that --
06: A    Yeah.
07: Q    -- it -- the reason that
08: anticoagulants are given is so they don't clot
09: as much, as quickly --
10: A    That's correct.
11: Q    -- to help prevent an ischemic
12: stroke, correct?
13: A    Yes.  But that's -- yeah.
14: Q    And by --
15: A    That's the indication for --
16: Q    And by reducing the clotting time in
17: the blood, that increases the risk of bleeds,
18: correct?
19: A    That's correct.
20: Q    And that's for all anticoagulants?
21: A    That's correct.
22: Q    And there's no known mechanism,
23: though, by which Xarelto would cause an artery
24: to rupture; is that correct?
25: A    Yes.  So there's no known mechanism

p. 00122

0123

01: for any of the anticoagulations to cause an
02: artery to rupture.
03: Q    Okay.  And when you say Xarelto may
04: have contributed, are you saying that it may
05: have had some effect on how much of the bleed
06: had occurred at the time, or can you tell me
07: what you mean by "contributed"?
08: A    So I think it's sort of in the same
09: vein as, kind of, the natural history, which is
10: it's well established that anticoagulation
11: contributes to an increase of bleeding disorder,
12: and particularly from a neuro -- from a
13: neurologic perspective, it statistically
14: increases an average person's risk for an
15: intracerebral hemorrhage.
16: So I guess what I'm saying is, is
17: that, absent of any other obvious predisposition
18: or risk factors to hemorrhage, such as
19: aneurysms, vascular malformation, tumors,
20: structural things, absent of it being in the
21: prototypical location for hypertensive
22: hemorrhage, and at least -- I seem to recall or
23: know that her hypertension was poorly
24: controlled -- that most patients that comes in
25: to my ER now being on anticoagulation with a

p. 00123

0124

01: spontaneous hemorrhage and this type of thing, I
02: would professionally make the assumption that
03: it -- that there's a contributing factor to it
04: versus saying that, hey, that's just bad luck.
05: Q    And that would be the case whether a
06: patient like Ms. Orr was on Xarelto, whether she
07: was taking warfarin, correct?
08: A    Yes, absolutely, correct.
09: Q    And in your medical opinion, you
10: couldn't say that Mrs. Orr would have had any
11: different type of bleed or timing of the bleed
12: or onset of the bleed or result from the bleed
13: if she were on warfarin instead of Xarelto,
14: correct?
15: A    That --
16: MR. ABNEY:
17: Object to form.
18: THE WITNESS:
19: Yes, that's absolutely correct.
20: EXAMINATION BY MR. HOGUE:
21: Q    If you go to page 35 -- and that's
22: Exhibit --
23: A    Still on Exhibit 4 still?
24: Q    Yeah, in Exhibit 4.  And this is
25: where there's a note from a Nurse Sutton at --

p. 00124

0125

01: on 4/25 at 7:51 p.m.
02: A    Okay.
03: Q    It says, "Dr. Garces at bedside to
04: inject tPA into right EVD" --
05: A    That's correct.
06: Q    -- correct?
07: A    That's correct.
08: Q    And is that about the timing that you
09: recall having the tPA introduced into the
10: ventricular drain?
11: A    Yes.
12: Q    Okay.  And what's the purpose, then,
13: of putting the tPA in?
14: A    So the purpose of putting in the tPA
15: would be to help -- so once the blood is
16: hemorrhaged out of the vasculature and is
17: actually in the brain or the fluid spaces, it
18: becomes -- and once it clots, it expands to some
19: degree.  And also, it becomes a strong irritant,
20: so it causes both mass effect and swelling,
21: which increases the mass effect, as well as acts
22: as a structural barrier to normal flow of the
23: spinal fluid.
24: So the idea of injecting now a
25: different anticoagulant agent into that blood

p. 00125

0126

01: now is to actually break up that clot, so that
02: would allow us to then drain more of that clot
03: out through the drain and hopefully reduce the
04: mass effect or the swelling that's caused by
05: that -- by that clot.
06: Q    And if there were no clot in the
07: brain there, you wouldn't administer tPA into
08: it, correct?
09: A    That's correct.
10: Q    And that's the known effect of tPA,
11: is to break up clots?
12: A    That's correct.
13: Q    So at the time that you're
14: introducing the tPA, that was -- at that point
15: in time you knew that she had a clotting in her
16: brain, correct?
17: A    That's correct.
18: Q    All right.  And if you go to page 195
19: in this, I'm going to ask you some questions
20: about the ventricular drainage.  If you look at
21: the bottom part, it says, "ventricular drainage,
22: clear" at 6:00 p.m.
23: Do you see that?
24: A    Uh-huh.
25: Q    And can you tell me what that means?

p. 00126

0127

01: A    So I guess it depends -- I don't know
02: if that was talking about the right catheter or
03: the left catheter.  One catheter is in clot; one
04: catheter is in the left lateral ventricle, which
05: did not have clot.
06: Q    Okay.
07: A    So --
08: Q    And which one had a clot?
09: A    I'm sorry?
10: Q    In which one do you see a clot?
11: A    So the right catheter was the one
12: that's actually sitting in the clot.  So if it's
13: clear, I'm assuming that she was referring to
14: the CSF from the left catheter.
15: Q    Okay.  And that means that there
16: was -- does that mean that there was no spinal
17: fluid coming out?
18: A    No.  It means that there was spinal
19: fluid coming out.
20: Q    Okay.  That's --
21: A    Spinal fluid is more clear.
22: Q    Okay.  And how much of fluid was able
23: to be removed from these two drains?
24: A    Over the whole course of the stay
25: or --

p. 00127

0128

01: Q    Based upon these notes. Can you tell
02: me what these mean?
03: A    Again, these recorded various
04: outputs, but I don't know over what time course.
05: So on here it noted to be 5 cc's, the other one
06: to be zero, but I don't know if that was while
07: we had noted to clamp it or not.
08: Yeah, so according to these notes,
09: they were minimal output at that period of time.
10: Q    Okay. So this is from, I guess, the
11: 6:00 p.m. to the following day, the morning
12: of -- at 6:00 a.m. -- is that correct -- there
13: had been minimal --
14: A    Yes, correct.
15: Q    -- drainage?
16: A    That's correct.
17: Q    All right. If you go to page 197,
18: there's a note --
19: A    One second, one second.
20: Q    Sure.
21: A    Trying to see -- again, this is
22: nursing notes. Let me see what our notes
23: documented.
24: Okay. Go ahead.
25: Q    Okay. Looking at page 197, there's a

0129

01: reference to Dr. Mahanna's note. Do you see
02: that progress note?
03: A    Yes, yeah.
04: Q    And under "Imaging," it's a review of
05: the imaging. And this is on, I guess, the
06: morning of 4/26, so the next day after the
07: procedure. It says, "Stable intraventricular
08: hemorrhage with similar leftward midline shift;
09: no detrimental interval change identified on
10: today's examination."
11: Do you see that?
12: A    Yes.
13: Q    So is it indicating that she's stable
14: at that point in time with no changes?
15: A    Again, there's no way for me to
16: comment on someone else's interpretation of the
17: scan. Let me review my notes on this.
18: Q    What was your --
19: A    So, yeah, so I thought that there was
20: slightly less blood in the frontal horn, based
21: on where the catheter was. I thought the
22: catheter was in good position, but I would agree
23: that there's been no worsening of the midline
24: shift and no increase in the hemorrhage.
25: Q    For several days, Mrs. Orr never had

0130

01: any more hemorrhaging after her initial CT,
02: correct?
03: A    Yes, correct.
04: Q    Okay. And if you go down to the
05: bottom of Dr. Mahanna's note, she says, "Neuro:
06: Large intraparenchymal hemorrhage and
07: intraventricular hemorrhage most likely
08: hypertensive in nature."
09: Do you see that?
10: A    That's correct.
11: Q    And that she's talking about the
12: hemorrhages being due to her hypertension that
13: she had had over the years, correct?
14: A    That's correct.
15: Q    Do you know what her last measurement
16: of her blood pressure was before she got to the
17: hospital?
18: A    I do not.
19: Q    I have a record that indicates that
20: her blood pressure on 4/16/2015 was 200 over 90.
21: I'm not sure if you have that in the hospital
22: records at any place, but --
23: A    That was when?
24: Q    I'll mark it. Exhibit 11.
25: A    Okay.

0131

01: Q    So this is April 16, 2015. So about
02: eight days before she comes to the hospital her
03: blood pressure was 200 over 90. Do you see
04: that?
05: A    Yes, I see it.
06: Q    And a 200 systolic blood pressure is
07: a significantly elevated high blood pressure,
08: correct?
09: A    It is, correct.
10: Q    And blood pressures that are in that
11: level also give concern for intracerebral
12: hemorrhages, correct?
13: MR. ABNEY:
14: Object to form.
15: THE WITNESS:
16: Yes. So sustained un -- again,
17: sustained uncontrolled blood pressure like
18: this would -- do you have any other -- I
19: mean, do you have like her primary care --
20: do you have any other one besides the one
21: time spot?
22: EXAMINATION BY MR. HOGUE:
23: Q    I know there are a number of them. I
24: didn't bring all the records in the case, but
25: it's my understanding she did have hypertension

0132
01: for some period of time.
02: MR. ABNEY:
03: Object to the sidebar.
04: EXAMINATION BY MR. HOGUE:
05: Q    Do you have any different
06: understanding?
07: A    No, no. Like I said, I think -- it's
08: just hard for me to make a -- I guess, I'm not
09: in a position to be able to say whether her
10: blood pressure is controlled or uncontrolled
11: just based on one --
12: Q    Sure.
13: A    -- one hospital visit.
14: But, yes, I would definitely say that
15: 200 over 90 is abnormally high; and if that has
16: been uncontrolled, then that would leave her at
17: increased risk, yes.
18: Q    And do you know, Doctor, that in the
19: hospital, her past medical history had listed
20: hypertension as an issue, correct?
21: A    That's correct.
22: Q    And if you go to page 198, it's
23: under -- the middle of the page, in
24: hematologic -- hematology, I think you've made
25: reference to -- and it says "Xarelto at home, no

0133
01: signs of" -- I think it's "continued
02: catastrophic bleeding."
03: Do you see that?
04: A    Yes, correct.
05: Q    And would you agree, as of the
06: morning of April 26th, at around 7:00 a.m., that
07: there was no evidence that she was having
08: continued catastrophic bleeding?
09: A    Yes, that's correct.
10: Q    And, in fact, based upon her CTs,
11: there wasn't any evidence of continued bleeding
12: after her initial CT in the hospital for the
13: next several days?
14: A    That's correct.
15: Q    All right. If you go to 38 -- there
16: was questions before about Dr. Gropen. You said
17: he was a neurologist, correct?
18: A    Yes.
19: Q    And are you with me on page 38?
20: A    Yes.
21: Q    Dr. Gropen reports that -- toward the
22: end of his assessment it says, "Exam unchanged;
23: comatose with left-side posturing; brainstem
24: reflexes are intact; CT unchanged; agree with
25: EVDs and IT tPA."

0134
01: Do you see that?
02: A    Uh-huh.
03: Q    So he's in agreement with your
04: placement of the intraventricular drains and the
05: use of the clot buster, tPA, right?
06: A    That's correct.
07: Q    And he also says her CT is unchanged
08: as of April 27th; is that correct?
09: A    That's correct.
10: Q    And you certainly agree that there
11: had been no bleeding as of the 27th, right?
12: A    That's correct.
13: MR. ABNEY:
14: Object to form.
15: THE WITNESS:
16: No additional bleeding.
17: EXAMINATION BY MR. HOGUE:
18: Q    No additional bleeding.
19: So her hemorrhage had not gotten any
20: bigger or hadn't continued to bleed at any point
21: up through at least the 27th, correct?
22: MR. ABNEY:
23: Object to form.
24: THE WITNESS:
25: Yes, correct.

0135
01: EXAMINATION BY MR. HOGUE:
02: Q    If you go to 72, this is a medical
03: record from Dr. Harold McGrade. Do you know
04: him?
05: A    Yes.
06: Q    And who is he?
07: A    He is a neurocritical care staff, so
08: he probably took over from Elizabeth.
09: Q    And this is a reference to April 29th
10: at 1:00, so about four and a half days after
11: Mrs. Orr came into the hospital. It says, "CT
12: head -- collapse of left lateral ventricle,
13: anterior horn of right lateral ventricle
14: collapsed, increased midline shift."
15: Do you see that?
16: A    Yes.
17: Q    And what is that referencing to?
18: A    I think that's referring to a CAT
19: scan done on the 29th, which shows that a fair
20: amount of the blood had actually cleared from
21: the right frontal horn and that the
22: ventriculostomy was working and draining and
23: that the fluid spaces were more collapsed, which
24: is the ventricle, but there is more swelling.
25: Q    Okay. And you see under "Plan" it

0136

01: says, "Neuro:  Worsening conversely associated
02: with success of tPA treatment, needs drainage or
03: removal or residual IVH/ICH on right, repeat CT
04: at 3:00 p.m."?
05: Do you see that?
06: A    Where is it again?
07: Q    On page 72, under "Plan."
08: A    On 72 --
09: MR. ABNEY:
10: The Bates No. 72, not the record
11: number.  It's at the very bottom of the
12: page.
13: THE WITNESS:
14: Yeah, this one, right?
15: EXAMINATION BY MR. HOGUE:
16: Q    Yes.  And if you look at "Plan,"
17: "Neuro," first sentence.
18: A    Okay.  So, okay -- "worsening --
19: tPA -- needs drainage or removal of residual --
20: on right" -- okay.
21: Q    Okay.  And so this is four and a half
22: days after Mrs. Orr is in the hospital, and the
23: tPA is working, and he says "worsening
24: associated with success of tPA treatment."
25: What do you understand that to be?

0137

01: A    I guess I don't understand --
02: Q    Okay.
03: A    -- what he means by that.
04: Q    Okay.  Under -- at the bottom it
05: says, "hold off on further treatment with tPA
06: administration due to concerns with
07: coagulopathy."
08: Do you have any idea what that's
09: referring to?
10: A    No.
11: Q    There wasn't any bleeding that was
12: occurring at this point in time that had
13: anything to do with Xarelto from four and a half
14: days ago; is that correct?
15: A    That's correct.
16: Q    Do you know whether the tPA had any
17: effect on the bleeding at that point?
18: A    In the sense -- I mean, I think the
19: tPA cleared some of the blood clot in the
20: frontal area.  So if you look at the scan --
21: this is the scan you're referring to on the
22: 29th.
23: So as you recall earlier, there was a
24: bigger white area here.  So where the catheter
25: is, as you can see, there's less of that blood.

0138

01: There's still the blood back here, but the ones
02: out front here is essentially gone.
03: But you can also recall earlier that
04: the fluid space -- just bring it up for
05: comparison, much easier for you to see.
06: So compared to the scan on the 24th,
07: you see how this fluid space here is much
08: larger?
09: Q    Yes.
10: A    So now it's essentially gone.  You
11: see this clot here?  That's not there anymore,
12: but this is still there.
13: So what this means is that the tPA
14: and the ventriculostomy has done all it's able
15: to do, which is remove as much of the clot
16: that's around the catheter, drain out as much of
17: the internal cerebral fluid as much as possible,
18: so there isn't much more to do.  And her brain
19: is still swelling even more.
20: So I think at that point Harold, his
21: opinion thought that there's no point in
22: injecting any more tPA because there's not much
23: more blood around to clear, and I agreed with
24: that.  And he thought that perhaps trying to
25: remove the blood clot might be of some benefit,

0139

01: which -- or trying to remove the rest of the
02: blood clot surgically, which I disagreed with.
03: Q    Okay.  Dr. Bui, if you go to page 149
04: through 156, I believe this is a progress note
05: of Dr. Kahn, and I believe you reviewed it?
06: A    Correct.
07: Q    Is that correct?
08: A    That is correct.
09: Q    And who is Dr. Kahn?
10: A    Another neurosurgery resident.
11: Q    Okay.  And this was on 4/29/2015, so
12: about -- at 4:50 a.m., so about four and a half
13: days after she came into the hospital?
14: A    Uh-huh.
15: Q    And what did you observe with Ms. Orr
16: at that point in time?
17: A    I think by the 29th I thought that
18: her neurologic exam was worse than it had been
19: when we first started.  At that point we noted
20: that the -- she was now extensor posturing.  So
21: her GCS score had dropped down to a 4, as
22: opposed to a 5 -- as opposed to a 6 when we
23: first started, I believe; and that her CAT scan
24: showed that the tPA was -- and the EVD was --
25: had done as much for the -- for the patient as

0140

01: could possibly be.  So I thought the prognosis
02: at that point was significantly worse.
03: I think, I believe, at the end there
04: I noted that the CAT scan had showed no increase
05: in midline shift and mass effect, and that's
06: when I discussed the possibility of an
07: aggressive decompressive craniectomy with the
08: patient's family.
09: Q     And so the -- her deterioration
10: between the 27th, say, and the 29th in the
11: morning didn't have anything to do with Xarelto;
12: is that correct?
13: MR. ABNEY:
14: Object to form.
15: THE WITNESS:
16: I mean, I think that the
17: deterioration is in line with what the
18: usual course of these big hemorrhages are.
19: EXAMINATION BY MR. HOGUE:
20: Q     So any patient that comes in with a
21: big hemorrhage, her course is consistent with
22: that?
23: MR. ABNEY:
24: Object to form.
25: THE WITNESS:

p. 00140

0141

01: Yes.
02: EXAMINATION BY MR. HOGUE:
03: Q     Okay.  So I'm just going to go over
04: this a little bit.  Mrs. Orr came in with a
05: large ventricular bleed around 11:30 on
06: April 24th at -- 2015 -- at your hospital,
07: correct?
08: A     That's correct.
09: Q     And a CT was run, which showed it to
10: be a large one, correct?
11: A     Correct.
12: Q     And when her blood work was done and
13: all the available blood work showed her
14: coagulation, that she could look at -- that you
15: could look at, to be normal, correct?
16: A     That's correct.
17: Q     And you looked at her situation, and
18: you put in -- did a surgical procedure to put in
19: ventricle drainage, correct?
20: A     That's correct.
21: Q     And worked using medication called
22: tPA to kind of bust up that clot to get out the
23: fluid?
24: A     That's correct.
25: Q     And that seemed to work, correct?

p. 00141

0142

01: A     Yes.
02: Q     It got the fluid out?
03: A     Yes.
04: Q     And everyone at Ochsner did all they
05: could do to help Mrs. Orr, but by the time she
06: had arrived at the hospital, she already had a
07: massive bleed; is that correct?
08: MR. ABNEY:
09: Object to form.
10: THE WITNESS:
11: Yes, that's correct.
12: EXAMINATION BY MR. HOGUE:
13: Q     And at that point you guys did
14: everything possible to help her, but patients
15: with that type of massive bleeding, it's not
16: uncommon for them to have this result; is that
17: true?
18: A     Yes, that's true.
19: MR. HOGUE:
20: Why don't we go off the record
21: for a minute, and I think the tape's about
22: to run out.
23: THE VIDEOGRAPHER:
24: Time now is 11:59 p.m. -- a.m.
25: [sic].  We are off the record.

p. 00142

0143

01: (Recess taken.)
02: THE VIDEOGRAPHER:
03: This begins Disk 4 of today's
04: deposition.  Time now is 2:06 p.m.  We are
05: back on the record.
06: THE WITNESS:
07: Okay.
08: EXAMINATION BY MR. HOGUE:
09: Q     Dr. Bui, I've marked as Exhibit 12
10: what appears to be the operative note related to
11: your ventriculostomy; is that correct?
12: A     That's correct.
13: Q     And can you tell us -- I think you
14: already said -- but you said what time you
15: started this procedure?
16: A     It was around like 2:00-something in
17: the afternoon, but this is -- so this is
18: actually -- this is the resident's note and not
19: the -- actually not my operative note.
20: Q     Okay.
21: A     There's a separate note that's
22: actually my note, but --
23: Q     This is the operative note of your
24: resident?
25: A     Yeah.

p. 00143

Page 36

0144
01: Q    And you believe you have a separate
02: operative note.  Do you have a copy of that?
03: A    That's my note.  The time
04: documentation is incorrect.  The true time would
05: be in the anesthesia records, which we can pull
06: up.  It's around 2:00-something in the
07: afternoon.
08: MR. HOGUE:
09: Okay.  Mr. Abney, since he pulled
10: this out of the file that we have marked
11: the entire file, is it okay if we mark
12: this as a separate exhibit?
13: MR. ABNEY:
14: Mark it as 2A?
15: MR. HOGUE:
16: 2A, that would be great.
17: EXAMINATION BY MR. HOGUE:
18: Q    Doctor, I just wanted to make sure we
19: were talking about the same document, and I
20: don't recall this being in the larger exhibit,
21: but it may be somewhere and I just missed it.
22: So Exhibit 2A is your operative report when you
23: put in the ventricular drain; is that correct?
24: A    Yes, correct.
25: MR. ABNEY:

p. 00144

0146
01: into the ventricle system to actually drain
02: fluid, which would, by default, help to bring
03: down intracranial pressure.
04: The placement of the right catheter
05: was to try to get it into the clot to put it in
06: position to be able to inject tPA into the blood
07: clot, again hoping to be able to reduce the mass
08: effect of the clot and drain more clot out.
09: Ultimately, the goal is the same, which is to
10: reduce the intracranial pressure.
11: Q    Okay.  And there was nothing out of
12: the ordinary with her surgery, correct?
13: A    That's correct.
14: Q    All right.  And when you did the
15: surgery about 2:00 that day, there wasn't any
16: problem with bleeding that occurred at that
17: point in time, right?
18: A    That's correct.
19: Q    Doctor, quickly, you're not a
20: cardiologist; we went through that before.  Do
21: you prescribe anticoagulants yourself?
22: A    I do not.
23: Q    And so you've never prescribed
24: Xarelto, correct?
25: A    I have not.

p. 00146

0145
01: Just so we're clear on the
02: record, you referred to the larger
03: exhibit; you're not referring to Exhibit 2
04: that he just took it out of, right?
05: MR. HOGUE:
06: Yes.  Let me put that on the
07: record.
08: EXAMINATION BY MR. HOGUE:
09: Q    Exhibit 2 was the package of
10: materials that you brought, including medical
11: records and the little bit of research that you
12: had done, and out of that package we've made 2A
13: what appears to be a one-page summary of your
14: report of your surgery, correct?
15: A    Yes, correct.
16: Q    All right.  And I think, as you had
17: indicated before, the surgery went as planned
18: with no complications?
19: A    That's correct.
20: Q    And what is it you were attempting to
21: accomplish with the insertion of the ventricular
22: drains?
23: A    So I think we were looking to
24: accomplish two things.  I think the goal of
25: placing the left drain was to actually put it

p. 00145

0147
01: Q    And you don't prescribe warfarin,
02: correct?
03: A    No, I don't.
04: MR. HOGUE:
05: I'm going to pass the witness for
06: questioning now to Mr. Irwin.
07: And if I have some follow-up
08: questions, I will ask them then, but I
09: appreciate you answering my questions.
10: THE WITNESS:
11: Okay.
12: MR. HOGUE:
13: Do you want to go off the record
14: or you --
15: MR. IRWIN:
16: No, we can stay on the record.
17: I'll move my Apple next to Dr. Bui's
18: Apple.  That makes us brothers in some
19: respects.
20: Ready to go?
21: EXAMINATION BY MR. IRWIN:
22: Q    Dr. Bui, you and I have not met
23: before; is that correct, sir?
24: A    Yes, that's correct.
25: Q    I gather from your discussions today

p. 00147

Bui, Cuong MD - Volume 1 - 07/07/2016

0148

01: that your medical practice deals with very
02: serious neurological and brain problems on an
03: everyday basis?
04: A     Yes.
05: Q     I --
06: A     Serious and not serious, I guess.
07: Q     Yes.  I say this with a respectful
08: smile:  I hope we do not meet again.
09: I just have a couple of things to ask
10: you about and a couple of pieces of paper to
11: show you.  As I said, it will not take long.
12: Did I understand you earlier today -- seems like
13: an age ago -- that you deal with brain bleeds
14: like this, associated with anticoagulants,
15: almost on a daily basis?
16: A     They're fairly common here.  We're a
17: regional referral center, so we do see a --
18: probably a higher proportion than your average
19: ER does.
20: Q     I'm willing to bet that when these
21: events occur and the families come in, that it's
22: a crisis?
23: A     Yes.
24: Q     And I understood you to say that your
25: approach to dealing with these very difficult

p. 00148

0149

01: situations is a conservative approach?
02: A     Relatively conservative, yes.
03: Q     Which means you're going to try to
04: deal with the crisis as best as you can within
05: reasonable parameters?
06: A     Yes, correct.
07: Q     One of the first things you do try to
08: understand when someone comes through the door
09: like this is:  Has this individual been
10: anticoagulated?  That's one of the first things
11: you try to get a handle on, correct?
12: A     That's correct.
13: Q     And then you try to understand, well,
14: if the individual was anticoagulated, what's the
15: history, how long ago were they anticoagulated?
16: if it was something like Xarelto, when did they
17: last take their pill, et cetera, right?
18: MR. ABNEY:
19: Object to form.
20: THE WITNESS:
21: Yes, as best as possible, yes.
22: EXAMINATION BY MR. IRWIN:
23: Q     As best as you can.
24: And I understood -- your description
25: here is that, try as you might, you really

p. 00149

0150

01: couldn't get good solid information from the
02: family on Mrs. Orr's Xarelto -- the last time
03: she took a Xarelto pill?
04: A     There was no -- there was no
05: definitive history, no.
06: Q     So the conservative and the smart
07: thing to do was to assume that she took it at
08: her most recent dinner, because that's the time
09: you're usually supposed to take --
10: A     Yes.
11: Q     -- your Xarelto pill; is that right,
12: sir?
13: A     That's correct.
14: Q     And that was the conservative
15: decision that you made because you didn't have
16: really hard data, correct?
17: A     That's correct.
18: Q     Let me ask you about this emergency
19: room doctor that we've talked about, and I don't
20: have a lot of questions about this.  But did
21: he -- was his name Mr. Whitehead or
22: Dr. Whitehead?  I've heard that name mentioned
23: this morning.
24: A     I don't know, so I don't remember.
25: Again, I think it's pretty easy -- we can get it

p. 00150

0151

01: from the Ochsner medicolegal department, but it
02: was a physician.
03: He made himself clear that he wasn't
04: an attorney, would not be deposing or involved,
05: and that his role, according to him, was just
06: for -- that he was a medical advisor and that he
07: wanted to have a better understanding; and also
08: to let me know, from a medical perspective, what
09: his medical position was as it relates to the
10: ability to test for Xarelto or the ability to
11: quantify the effect of Xarelto.
12: Q     And he made it clear to you that he
13: was a physician?
14: A     Yes.
15: Q     And did he make it clear to you that
16: he was not a lawyer?
17: A     I guess he made it clear that he
18: would not be the person deposing me or that
19: would not be involved in the deposition, so I
20: guess by inference, I'm assuming -- I guess I
21: don't recall if he said "I'm a lawyer" or not,
22: but I clearly recall him saying that yes, he's
23: an emergency medicine physician who now does a
24: lot of medicolegal work and advice, and that the
25: context of the meeting was --

p. 00151

Page 38

Bui, Cuong MD  - Volume 1 - 07/07/2016

0152

01: Q    Did he --
02: A    -- a medical one and not a
03: deposition, and that he would not be the one
04: deposing or involved in this scheduled
05: deposition.
06: Q    Pardon me for interrupting.  I --
07: A    Sure.
08: Q    -- didn't mean to.
09: A    Okay.
10: Q    Did he make it clear to you that he
11: was one of the lawyers for the plaintiffs in
12: this litigation?
13: A    I'm unclear about that.  He made it
14: clear that he was on the plaintiffs' side, that
15: he was a medical physician, that this was a
16: medical information-sharing type of meeting.
17: Q    Did you accept or understand that, in
18: the vernacular, he sort of had a case to make
19: with you, he --
20: A    Yes, yes.
21: Q    -- he was going to make arguments on
22: his side --
23: A    Yes.
24: Q    -- in favor of his case; you
25: understood that?

p. 00152

0153

01: A    Yes, yes.  I do this all the time,
02: and --
03: Q    Including --
04: A    -- the meeting always comes with that
05: context.
06: Q    Okay.  And so you then balance that
07: factor when someone comes in and talks to you
08: who has an interest in the outcome of the
09: case --
10: A    Yes.
11: Q    -- and your opinion --
12: A    Yes.
13: Q    -- understood?
14: We agree on that?
15: A    Yes, agree on that.
16: Q    And when he left you or tried to give
17: you -- the word that you used was "implication."
18: He gave you the implication --
19: A    Okay.
20: Q    -- that the manufacturer of this
21: medicine was somehow hiding something.  Remember
22: you --
23: A    Yes.
24: Q    -- mentioned that?
25: A    That's correct.

p. 00153

0154

01: Q    Did he give you any proof of that?
02: A    No, he did not.  The gist of the
03: argument that was laid forth was did I know --
04: did I know or did -- should know that there was
05: various ways to test for Xarelto; and to that
06: effect, I said, "No."
07: And then he proceeded to then show
08: that graph, and make it quick again, a quick
09: argument that this information is available, and
10: said should have been shared with the medical
11: community, and he -- I guess main implication, I
12: suppose, that it wasn't.  But, again, no other
13: facts or no other things were exchanged.
14: That being said, I was rushing down
15: to emergency surgery, so to be fair, I wasn't
16: giving him, kind of, the time or due process.
17: Q    And to be fair, you also mentioned
18: that this was not your area of expertise --
19: A    Absolutely.
20: Q    -- anyway, correct?
21: A    Yes.
22: Q    And where did you -- did he tell you
23: where this document came from?
24: A    I don't recall.  I think he did -- I
25: honestly don't recall.  I think he pulled it

p. 00154

0155

01: from the folder and said that this is part of
02: some greater document.  But again, I don't
03: recall exactly what the reference was.
04: Q    Well, as we sit here today, and you
05: being a medical doctor and a scientist, how much
06: weight can you put in that argument by a lawyer
07: without any proof?
08: A    So like I said, I made it pretty
09: clear that the -- my general approach is to
10: trust but verify, so until I'm able to actually
11: see corroborating and in-depth information, that
12: that's what it is, to me, which is someone
13: trying to make a case from the other side,
14: which --
15: Q    I can tell by your answer that you're
16: a gentleman, and I'm sure you were a gentleman
17: with this individual.  But the fact of the
18: matter is, in plain English, you cannot put any
19: weight in that, can you?
20: A    Again, without having to be able to
21: verify that information, then no.  But again,
22: you'd have to show me that it was trash for me
23: to say that it was trash.  But again, I'd have
24: to -- but the bottom line is, that is not my
25: area of expertise, and the ability or the

p. 00155

0156

01: inability to test for that factor would have to
02: be sort of discussed with the hematologist or
03: the head of the laboratory data here.
04: Q    Dr. Khursheed, he was a resident
05: working under Dr. Mahanna --
06: A    Yes.
07: Q    -- is that right?
08: A    Yes.
09: Q    And I was trying to understand how
10: the team works.  Is it basically you and
11: Dr. Mahanna at the top?
12: A    Yes.  So the way that -- so we handle
13: neurosurgical or neurologic issues here as a
14: neuroscience institute or neuroscience group,
15: which can encompass neurosurgery, neurology,
16: neurocritical care.  So when a patient like
17: Mrs. Orr comes in, she is evaluated and cared
18: for by vascular neurology, which is Dr. Tobin --
19: Toba -- I forget -- Tobin [phonetic] --
20: Q    Yes.
21: A    -- then myself, as the neurosurgeon;
22: but then anyone who has the gravity enough to
23: need ICU care for a neurologic problem would
24: also have the neurocritical care involved.
25: And so, yeah, so I guess ultimately

0157

01: the neurocritical care manages all the
02: ICU-related things, such as the ventilator or
03: the blood pressure medications, all of that.
04: Then I would sort of manage and be the decision
05: maker for -- as it relates to --
06: Q    Surgery?
07: A    -- surgery or ICP or the medical
08: management of the ICP, so not just the surgical
09: side.
10: And then vascular neurology is
11: similarly involved, maybe a little bit more
12: peripheral in the sense of the medical aspect.
13: Q    And what did --
14: A    So --
15: Q    Excuse me.  I didn't mean to
16: interrupt you.
17: A    That's okay.
18: Q    What did Dr. Mahanna's role -- what
19: was her role?
20: A    She was the neuro ICU staff
21: attending.
22: Q    Okay.  And Dr. Khursheed reported to
23: her?
24: A    That's correct.
25: Q    Do you know where he is now and what

0158

01: he's doing?
02: A    I do not.  I do not.
03: Q    At the time Dr. Khursheed was helping
04: with this team effort, would you have recognized
05: him as an expert in anticoagulants?
06: A    No, no.
07: Q    Mr. Hogue showed you a blood pressure
08: reading -- what -- about a week before
09: Mrs. Orr's event.  You remember that?
10: A    Yes, correct.
11: Q    200 over 90.
12: And you asked a question, what's the
13: history of that blood pressure.  I think I've
14: got something that might help you give a -- give
15: you a flavor of that.
16: MR. IRWIN:
17: And if we could mark this as the
18: next exhibit.
19: Thank you, sir.  You've seen this
20: before.  You've seen this before.
21: EXAMINATION BY MR. IRWIN:
22: Q    Doctor, I'm going to give you my
23: highlighted copy.  Okay?
24: A    Okay.
25: Q    Exhibit 13.  What we've basically

0159

01: done here, Doctor, is to go through all the
02: medical records that we could locate for
03: Mrs. Orr.  You can see they go back many years.
04: One column shows the Bates number, which is the
05: source.  One column shows her weight, if you're
06: interested in looking at that.  And you can see,
07: obviously, the blood pressure column.  We have
08: numbers there going back, you can see, to 1996.
09: And as you look through that, I'll
10: tell you that we showed this to Dr. St. Martin
11: at his deposition, who works in cardiology at
12: Ochsner on -- Baptist.
13: A    Okay.
14: Q    And he cared for her for many years,
15: and he described her history as a history of
16: decades of uncontrolled hypertension.
17: A    Okay.
18: Q    Would you agree with that --
19: MR. ABNEY:
20: I object to the --
21: EXAMINATION BY MR. IRWIN:
22: Q    -- looking at that --
23: MR. ABNEY:
24: -- sidebar -- object to the
25: sidebar and to the use of the

0160

01: lawyer-prepared summary that has no
02: foundation.
03: THE WITNESS:
04: So the question would be, now,
05: are these -- so just the question would be
06: that, is this -- is this document showing
07: all of the blood pressure that's ever been
08: recorded on record or is it --
09: EXAMINATION BY MR. IRWIN:
10: Q    All that we could find.
11: A    Okay.  Okay.  It's all that you can
12: find, and there's no other blood pressure
13: readings that were found that is not included in
14: this --
15: Q    We've attempted to include every
16: single blood pressure reading --
17: A    That's fair.
18: Q    -- from I don't know how many --
19: hundreds, if not thousands of pages of medicals.
20: We have nurses who do that.
21: A    Okay.  So --
22: MR. ABNEY:
23: Object to the sidebar.
24: EXAMINATION BY MR. IRWIN:
25: Q    And, Doctor, that column in the

0161

01: middle shows the exact number from the page of
02: the medical record.
03: A    Okay.
04: MR. ABNEY:
05: Object, again, to the sidebar.
06: THE WITNESS:
07: So, again, I'm not a cardiologist
08: or a primary care physician who routinely
09: follows patients' blood pressure and
10: patients' blood pressure parameter, but as
11: a general medical physician, I would, at
12: least looking at this data, say that she's
13: clearly had a waxing/waning course of
14: blood pressure control.  The blood
15: pressure is clearly going very high into
16: the 230s, but also has swung down into the
17: low 100s.
18: And so I would have no reason to
19: not agree with Dr. -- with the
20: cardiologist if he feels that her blood
21: pressure had not been well controlled.
22: EXAMINATION BY MR. IRWIN:
23: Q    He testified that over the last
24: several months before this unfortunate event
25: that he was using as many as four, maybe five

0162

01: blood pressure medicines, and juggling them to
02: try and get things under control.  Would that be
03: inconsistent with your understanding of what
04: might have been a reasonable background to what
05: led up to her event?
06: MR. ABNEY:
07: I object --
08: THE WITNESS:
09: So --
10: MR. ABNEY:
11: I'm going to object to the
12: questions as it misstates his testimony.
13: If you want to show him the transcript and
14: let him see what the testimony was, I
15: think that would be much fairer, because
16: my recollection is he referred her to
17: another physician who had her on two blood
18: pressure medications.
19: MR. IRWIN:
20: I'll stand by my question as
21: correct.
22: EXAMINATION BY MR. IRWIN:
23: Q    Go ahead --
24: A    So --
25: Q    -- Doctor.

0163

01: A    So --
02: MR. ABNEY:
03: Show him the transcript.
04: EXAMINATION BY MR. IRWIN:
05: Q    You may answer the question, Doctor.
06: A    So barring the facts of being able to
07: check, but assuming that the -- what you're
08: saying is true --
09: Q    Yes.
10: A    -- in the sense that Dr. St. Martin
11: had her on four antihypertensives, again, I
12: would have no reason to disagree with her
13: cardiologist if he felt that she was a difficult
14: patient to control, blood-pressure-wise.
15: Q    Thank you very much, Doctor.
16: Doctor, we put together a timeline,
17: again from the medical records, leading up to
18: the event.  You talked a little about it today,
19: your recollection of it.  And, again, we showed
20: this also to Dr. St. Martin.
21: MR. IRWIN:
22: And I'd like to identify this as
23: the next exhibit, please.  I guess the
24: number is 14.
25: MR. ABNEY:

0164

01: Similar objection: This is a
02: lawyer-prepared summary without any
03: foundation.
04: THE WITNESS:
05: Can you hang on one second here?
06: MR. IRWIN:
07: Yes, sir.
08: THE WITNESS:
09: One second.
10: Got to take this phone call real
11: quickly here.
12: MR. IRWIN:
13: Yes, sir.  Take your time.
14: THE VIDEOGRAPHER:
15: Do you want to go off the record?
16: THE WITNESS:
17: It will be literally two minutes.
18: You can go off the record if you want.
19: THE VIDEOGRAPHER:
20: Time now is 2:32 p.m.  We are off
21: the record.
22: (Recess taken.)
23: THE VIDEOGRAPHER:
24: Time is 2:34 p.m.  We are back on
25: the record.

0165

01: EXAMINATION BY MR. IRWIN:
02: Q    Doctor, you want to glance at that
03: for a minute, and then I'll -- when you're
04: finished looking at it, looking it over, I'll
05: ask you some questions.
06: A    (Views document.)
07: Okay.
08: Q    Okay.  Mr. Abney's right, this is a
09: lawyer-prepared document.  We prepared it.  We
10: have put over there on the left-hand side the
11: times.  Those times come from the medical
12: records.  We put time approximate for that first
13: entry, because the medical records sometimes
14: mention 7:45, 5:45, or 6:45.  So that's why we
15: did that.
16: A    Okay.
17: Q    And you recognize the number on the
18: right-hand column is from the medical record
19: itself.  Okay?
20: A    Okay.
21: Q    So let's talk about this 5:45 to
22: 6:45 p.m. time frame --
23: A    Okay.
24: Q    -- where the family reported that she
25: had a headache at dinner.  You did get some

0166

01: history along those lines; is that right, sir?
02: A    That's correct.
03: Q    Let me give you a little more history
04: that we learned from Mr. Orr, her husband.  They
05: were having dinner at Ruth's Chris Steak House
06: on Veterans Highway.  I'm sure you know where
07: that is.
08: A    Yep.
09: Q    Towards the end of the dinner,
10: according to Mr. Orr, she began to have a
11: headache, and so they left pretty promptly after
12: that.  And on the way home they were driving
13: down Veterans Boulevard, heading to Kenner where
14: they live, and she vomited.  She had to ask her
15: husband to stop the car.  I asked Mr. Orr, "How
16: far did you get from Ruth's Chris before you had
17: to pull over," and he said "four to five
18: blocks."  Okay.
19: A    (Nods head.)
20: Q    Then he got her home in Kenner.  And
21: did you understand from your history of the
22: medical records that she also vomited again?
23: A    Yes.
24: Q    Okay.  So let me give you a little
25: more information about that.  He said that while

0167

01: the garage door was opening, she -- I may be
02: missing this a little bit, but she either
03: vomited partially into the car or partially
04: outside of the car, and she may have vomited
05: once or twice.
06: A    Okay.
07: Q    Did you have any information --
08: A    Yes.
09: Q    -- in that detail, or not?
10: A    Yes.  Yes, I did.
11: Q    You did?
12: A    Yes.
13: Q    Okay.  And then she went inside and
14: went almost immediately to bed; is that
15: consistent with your understanding of the
16: history?
17: A    Yes, it is.
18: Q    And that she slept for an hour or two
19: maybe; is that consistent with your
20: understanding?
21: A    Yes.
22: Q    And then she woke up again, and
23: perhaps vomited again; is that consistent with
24: your understanding?
25: A    Yes.

0168

01: Q    And then she was neurologically in
02: much worse shape at this point, maybe slurring
03: her words or having trouble standing maybe; do
04: you have --
05: A    Yes.
06: Q    Is that consistent with your
07: understanding?
08: A    Yes.
09: Q    So an EMS was called, and then we
10: have a very hard number here; at 2246 hours,
11: which is 10:46 p.m., she was delivered by the
12: ambulance to the Ochsner Baptist campus on
13: Napoleon Avenue.
14: A    Yes.
15: Q    And that's consistent with your
16: understanding?
17: A    Yes.
18: Q    And then at 11:43 p.m. is when they
19: did the first CT scan; and is that consistent
20: with your understanding?
21: A    Yes.
22: Q    And then at 1:00 a.m. they got her to
23: the campus here on Jefferson Highway.
24: A    Uh-huh.
25: Q    And is that consistent with your

p. 00168

0169

01: understanding?
02: A    Yes.
03: Q    So if we look at those time frames
04: and the descriptions from 1745 hours to 1845
05: hours, up to 1:00 a.m. in the morning, and the
06: narratives that have been summarized there from
07: the medical records, is that consistent with
08: your understanding?
09: A    Yes.
10: Q    Now, we took Mr. Orr's deposition,
11: and we asked him, just like your team tried to
12: understand, what was -- when was the last time
13: she had a pill.
14: Do you remember, what, if anything,
15: Mr. Orr was able to tell you about that?
16: MR. ABNEY:
17: Object to the sidebar.
18: THE WITNESS:
19: I remember that he was pretty
20: confident that she took it the day before;
21: but he was in pretty significant distress
22: at the time that he was here, so he was
23: uncertain, but thinks that she had taken
24: the pill that day -- or I guess that -- I
25: mean, when I saw him, it was on the 25th.

p. 00169

0170

01: So I guess the question was whether she
02: had taken it the 24th or the 23rd, was the
03: last time.
04: He was -- at least at that time,
05: seemed pretty definitive of the 23rd; was
06: a little unsure about the 24th, which is
07: why we sort of guesstimated.
08: EXAMINATION BY MR. IRWIN:
09: Q    So the best of your recollection, he
10: was pretty definitive that she had taken it on
11: the 23rd, which I recall is a Thursday evening;
12: is that right?
13: A    That's correct.
14: Q    But he wasn't sure whether she had
15: taken that Friday evening when they had dinner
16: at the Ruth's Chris Steak House?
17: A    He thought she did.  He couldn't be
18: 100 percent sure.
19: Q    Did he tell you what her usual
20: routine was in taking her medicines in the
21: evening?
22: A    No, I don't recall.
23: Q    Did --
24: A    I don't recall.
25: Q    Did he tell you where she kept her

p. 00170

0171

01: medicines?
02: A    No.
03: Q    Let me read you something from her --
04: from his deposition.  And this is from -- I
05: don't have the page with me, but I got the line.
06: It starts on Line 14.
07: This is my question:  "Question:  It
08: was your impression that your wife was always
09: very careful to take her medications exactly as
10: instructed?
11: "Answer:  Yes.
12: "Question:  What was her routine that
13: she followed religiously as far as medications
14: in the evening were concerned?"
15: Doctor, it's your understanding that,
16: routinely, a 20-milligram pill of Xarelto is
17: supposed to be taken at or around the evening
18: meal?
19: A    So that's the usual.  I do not know
20: whether her cardiologist had specified or given
21: different instructions.  I'd have to defer to
22: Dr. St. Martin for that.
23: Q    I want you to assume that he did,
24: because that's what he testified to.  Okay?
25: A    Okay.

p. 00171

Page 43

0172

```
01: Q    So I'll repeat the question here.
02: "What was her routine that she followed
03: religiously as far as medications in the evening
04: were concerned?
05: "Answer:  I would say that she took
06: them at about maybe 7:00 at night, 7:30.  I
07: don't know.
08: "Okay.  Here's my question:  So her
09: normal routine would be to take her evening
10: medications in the evening, sitting in the bed
11: while watching television?
12: "Answer:  Correct."
13: He talked about that a little bit
14: earlier in the deposition.
15: Did you get any information like that
16: from him that --
17: A    I did not.
18: Q    I think it would be a fair assumption
19: that when she got back to the home that night
20: after having thrown up, and had this headache
21: and go to bed, that she was not getting in bed
22: and watching TV that evening on the 24th.  Would
23: that be your assumption as a neurosurgeon?
24: A    Again, that's beyond the scope of
25: what I would be able to testify, as to what her
```

p. 00172

0173

```
01: mental or physical health state at that point
02: was.
03: Q    It was a bad question.
04: The best information you have is that
05: she went home and went to sleep; is that right?
06: A    Yes.  The best information I had was
07: that by the time she got home, she felt -- she
08: again -- my recollection was that she -- I think
09: the family had asked if she should be taken to
10: the hospital --
11: Q    Good memory.
12: A    -- and I think that they -- and she
13: said, "No, I think I'm feeling okay, I probably
14: just need to lay down a little bit."
15: And so, again -- so the assumption
16: was that she was not neurologically poor before
17: she went to bed and that she was still -- she
18: felt maybe the throwing up had made her feel
19: better.  So that's my recollection.
20: Q    And here's the next question:  "When
21: was the last time Mrs. Orr had taken a Xarelto
22: pill?
23: "Answer:  I don't know.
24: "Question:  You didn't see her take a
25: Xarelto pill on the night of the intracerebral
```

p. 00173

0174

```
01: hemorrhage, April 24, 2014?
02: "Answer:  No.  Doesn't mean she
03: didn't take it, but I didn't see it.
04: "Question:  Okay.  While you were at
05: dinner that night, you did not see her take a
06: Xarelto pill?
07: "Answer:  She did not take one at
08: dinner.
09: "Question:  Or any other -- any other
10: pill?
11: "Answer:  No pill at dinner.
12: "Question:  While you were at home,
13: did you see her take Xarelto or any other
14: medication?
15: "Answer:  I don't remember.
16: "Question:  That's before going to
17: dinner that night?
18: "Answer:  Right.
19: "Question:  After you left Ruth's
20: Chris, at any point did you see her take Xarelto
21: or any other medication?
22: "No."
23: Is that consistent with your
24: information?
25: A    Yes.  That was consistent in the
```

p. 00174

0175

```
01: sense that he could not -- he was unable to
02: verify with 100 percent certainty when the last
03: time she took it -- other than the day before.
04: But again, this is -- according to our records,
05: my recollection was that he thought she'd taken
06: it that day, but could not verify when and what
07: context, but again --
08: Q    I just read you what he said under
09: oath --
10: A    Yes.
11: Q    -- Doctor.
12: So in any event, the smart move on
13: your part was to assume the most conservative
14: thing; and that was that she had taken her
15: medicine recently, and you would treat her
16: accordingly, not otherwise knowing for sure?
17: A    Yes.
18: Q    Mr. Hogue asked you a couple of
19: questions about the first CT scan that was taken
20: at 11:43 on Friday night and the next CT scan
21: that was taken -- what -- about four and a half
22: hours later at 4:35 a.m., I believe, on Saturday
23: morning?
24: A    That's correct.
25: Q    And you made it clear that there had
```

p. 00175

0176

01: been no bleeding after the first CT scan and
02: between the next CT scan; is that right?
03: A    So I made it clear that there was no
04: significant worsening of the hemorrhage.  Now,
05: CAT scan is quick and inexpensive, but
06: volumetrically not as accurate, because the
07: slices are pretty thick compared to an MRI scan.
08: So, yes, I mean, on a big scale, I
09: didn't see any more -- could there have been a
10: little bit more -- the CAT scans are just not
11: sensitive enough to say.
12: Q    But the CAT scan certainly did not
13: document continued bleeding after 11:43 --
14: A    Yes.
15: Q    -- p.m.; is that right?
16: A    Yes.  That's fair to say, yes.
17: Q    Now, had she just taken a Xarelto
18: pill 6 hours before, or if she had taken a
19: Xarelto pill 30 hours before that 11:45 CT scan,
20: would it have been more consistent, because you
21: actually saw the beginning of clotting in that
22: 11:45 CT scan, that her Xarelto pill was
23: actually taken 30 hours before?
24: MR. ABNEY:
25: Object to form.

p. 00176

0177

01: THE WITNESS:
02: Phrase that question one more
03: time.
04: EXAMINATION BY MR. IRWIN:
05: Q    Another bad question.
06: What we're trying to figure out here
07: is whether it's more likely or not that she took
08: her last Xarelto pill at Ruth's Chris Steak
09: House about 6 hours before that first CT scan or
10: if she took her last Xarelto pill Thursday
11: night, the evening before, which is about
12: 30 hours before --
13: A    Right.
14: Q    -- right?
15: A    Right.  Yeah, so I think that's an
16: important and valid question.  I think that --
17: I'll answer it in sort of two different ways.
18: Q    Okay.
19: A    Okay.  One is that, historically,
20: okay, looking at repeated CAT scans for big
21: hemorrhages as a correlant of whether
22: something's clotting well or not is not very
23: good.
24: So, for example, I've got lots of --
25: lots of cases where someone comes in with a

p. 00177

0178

01: clearly abnormal INR of 10, in which
02: something -- okay -- and that despite giving FFP
03: and everything else, their clotting factor is
04: going down, but still 8 or 9 at the repeat CAT
05: scan, which means they're still not clotting
06: anywhere near normally and which the clot does
07: not get any bigger.
08: Then I've got situations where
09: patients come in, they're clearly -- were just
10: slightly over anticoagulated, which we were able
11: to correct, and get a confirm INR, it's the
12: normal limits, in which repeat the CAT scan can
13: get bigger.
14: So the change in -- or the -- I guess
15: the change or the stability of hemorrhage on CAT
16: scan is not correlative or indicative of the
17: abilities of the patient to clot or not.
18: If it's gotten bigger, then you would
19: say, hey, that makes sense; but if it doesn't
20: get bigger, it doesn't necessarily mean that
21: she's clotting normally, because a lot of times
22: for a clot this big, just be from the tamponade,
23: which is at a certain volume, because the head
24: is a closed box, and so in that box you have
25: brain, CSF, and blood, so -- and that's kept at

p. 00178

0179

01: a relatively normal pressure.
02: So if you have a breakage in artery,
03: okay -- so small artery or whatever -- there's
04: two ways in which bleeding can stop.  One is by
05: blood clotting, and it clots off; but the other
06: one is just by pure pressure, by tamponade.  So
07: when we do an operation, we sometimes have to
08: actually put pressure or coagulate it.
09: So once the clot gets to a certain
10: size and the pressure goes up, then it can
11: tamponade or stop that bleeding in a way that's
12: not due to normal coagulation.  Okay.
13: So I guess looking at the stability
14: of the CAT scan, it's just not good enough for
15: me to be able to say, hey, because it's stable,
16: that, more likely than not, she's no longer
17: anticoagulated.  So that's one question.
18: I guess the other aspect of it was,
19: clinically, if I had known it was 30 hours
20: versus 6 hours, whether we would have been more
21: aggressive with the EVD at --
22: Q    That's not the implication of my
23: question.  You should have known this.
24: A    Okay.
25: Q    Please know I'm not implying that.

p. 00179

Page 45

0180

01: A    Okay.
02: Q    Okay?
03: A    Okay.
04: Q    Okay?
05: A    Okay.  So I guess the -- I guess the
06: other question was whether, if it's 30 hours or
07: 6 hours, there was no -- there was no way for me
08: to be able to tell you that radiographically or,
09: I guess, medically --
10: Q    Let me see if I can ask it one other
11: way --
12: A    Sure.
13: Q    -- and then I'll move on to another
14: subject.
15: A    Sure.
16: Q    You indicated earlier in response to
17: some of Mr. Hogue's questions that the first CT
18: scan at 11:43 p.m. was showing early signs of
19: clotting?
20: A    Yes.
21: Q    This is my question; probably should
22: have been my first question --
23: A    Okay.
24: Q    -- hopefully it's simpler.  Is the
25: fact that she was showing early signs of

0181

01: clotting at 11:43 p.m. more consistent with her
02: having taken her last Xarelto pill 30 hours
03: before or 6 hours before?
04: MR. ABNEY:
05: Object to form.
06: THE WITNESS:
07: So I guess there's no good way to
08: be able to correlate that, because --
09: because the only -- I guess the only
10: troubling aspect of it is the fact that
11: the clot that was seen early at 4:20 --
12: you know, at 4:30 and one at 11:30, still
13: showed elements of unclotted blood, and
14: that's perhaps because Xarelto and all the
15: other anticoagulation element doesn't --
16: does not prevent you from clotting at all,
17: because if that was the case, she would
18: have never even made it to the hospital.
19: So it interferes with that
20: pathway.  So with enough bleeding, someone
21: will clot.  It's just how fast -- mainly
22: it's impacting how fast and how much.  So
23: even on -- even patients on
24: anticoagulation will have some clotting
25: abilities that isn't -- I guess isn't

0182

01: mediated through the factor X pathway, so
02: you have platelets, you have all the other
03: stuff, so -- so the ability for me to see
04: clotting or -- doesn't -- necessarily able
05: to push me one way or the other way about
06: the status of her clotting ability.
07: Do you understand my --
08: EXAMINATION BY MR. IRWIN:
09: Q    Fair.  I do.  I'll ask --
10: A    -- answer?
11: Q    -- one last question.
12: Has the timeline that I've given you,
13: and Mr. Orr's testimony, raised a fair question
14: about whether the last Xarelto pill she took was
15: 6 hours before or 30 hours before?
16: MR. ABNEY:
17: Object to --
18: THE WITNESS:
19: Yes.
20: MR. ABNEY:
21: -- form.
22: THE WITNESS:
23: I would say --
24: EXAMINATION BY MR. IRWIN:
25: Q    The answer is "yes"?

0183

01: A    -- that is a fair question, yes.
02: Q    I understood you to make it clear to
03: Mr. Hogue that -- the word you used was
04: uncertain -- it was uncertain that, had you been
05: able to do the IVD, the drain, earlier, that
06: that would have made any difference in this
07: massive hemorrhage and this unfortunate outcome;
08: is that correct?
09: A    Yes, that's correct.
10: Q    And I also think I understood you to
11: say that you cannot establish medically that
12: this unfortunate event and its eventual outcome
13: would have been any different had she been on
14: warfarin?
15: A    That is true.
16: Q    And the same question for any other
17: NOACs:  You cannot establish medically or state
18: probably, as a doctor has to state, medically,
19: that the outcome would have been any different
20: had she been on any other novel oral
21: anticoagulant --
22: MR. ABNEY:
23: Objection --
24: EXAMINATION BY MR. IRWIN:
25: Q    -- isn't that correct?

0184
01: MR. ABNEY:
02: -- calls for speculation.
03: THE WITNESS:
04: Yes.
05: EXAMINATION BY MR. IRWIN:
06: Q    Is that correct, sir?
07: A    Yes, that is correct.
08: Q    The fact of the matter is this
09: unfortunate event and this unfortunate outcome
10: could have happened the very same day, the very
11: same way had she been on warfarin; is that
12: correct?
13: A    Yes.  I guess I'm -- there's no way
14: for me to be able to predict -- I guess there's
15: no way for me to be able to say that -- I guess,
16: to be clear, there's no way for me to be able to
17: say that if she'd been on any other
18: anticoagulation that she would have had the same
19: result; but there's no way for me to say vice
20: versa, which is the fact that she's on Xarelto,
21: gave her this, compared to any other one.  So I
22: guess --
23: Q    So --
24: A    -- depending on how medicolegally you
25: want to frame that, yes.

p. 00184

0185
01: Q    I want to frame it as simply as I
02: can, and my simple question is:  There's no way
03: you, as a medical doctor, can say that this
04: would not have happened the very same way, the
05: very same day had she been on warfarin?
06: MR. ABNEY:
07: Object to form.
08: THE WITNESS:
09: Yes, that's fair.
10: EXAMINATION BY MR. IRWIN:
11: Q    That's correct --
12: A    Yes.
13: Q    -- I said that correctly?
14: And I know you're not a cardiologist,
15: but you do know that -- and I think you told
16: this to Mr. Hogue -- you do know that she had to
17: be on an anticoagulant with her multiple
18: diseases, correct?
19: MR. ABNEY:
20: Object to form.
21: THE WITNESS:
22: I would have to defer to her
23: cardiologist as to the indication and the
24: risk-benefit profile that was discussed
25: with the patient as to whether she had to

p. 00185

0186
01: be on it, what agent to be on, and the
02: indications for those agents.
03: EXAMINATION BY MR. IRWIN:
04: Q    So if Dr. St. Martin, her
05: cardiologist from Ochsner Baptist on Napoleon
06: Avenue, felt that her CHADS score and her
07: multiple disease states indicated that she must
08: be -- the risk-benefit equation indicated she
09: should be on an anticoagulant and that he chose
10: and recommended to her that that anticoagulant
11: be Xarelto, you would not quarrel with that,
12: correct?
13: MR. ABNEY:
14: Object to form.
15: THE WITNESS:
16: Yes, that's correct.  I would not
17: quarrel with that.
18: MR. IRWIN:
19: That's all the questions I have.
20: Thank you very much, Doctor.
21: THE WITNESS:
22: Okay.
23: MR. ABNEY:
24: Do you need a break, Doctor, or
25: you're ready to go?

p. 00186

0187
01: THE WITNESS:
02: No, no.  That's fine.
03: EXAMINATION BY MR. ABNEY:
04: Q    So you've been questioned by lawyers
05: for both Janssen and Bayer for about the last
06: three hours or so.  Is it your perception --
07: A    I thought it was five.
08: Q    Just seemed like five.
09: Doctor, is it your perception from
10: the questions you were asked about your meetings
11: with me and with Marc Whitehead that there is no
12: way to test for Xarelto levels in a patient?
13: A    Phrase that question one more time.
14: Q    Did the defense lawyers give you the
15: impression that there is no way to test for
16: Xarelto levels in a patient?
17: A    I don't seem to recall -- I mean, I
18: guess -- I guess my impression is that I don't
19: seem to recall any implications either way, at
20: least from our interactions.  We didn't talk
21: about the methods of testing or availability of
22: method of testing from their perspective.
23: Q    If the manufacturers and distributors
24: of Xarelto had determined early on that there
25: was an inexpensive, easy, quick way to test to

p. 00187

0188

01: determine what levels of Xarelto a patient had
02: in their blood, is that something that you would
03: expect, as a physician dealing with emergent
04: cases like this one, that they would let you and
05: the medical community know?
06: A    So is this a hypothetical question or
07: is this -- I guess what --
08: Q    Well, if you're --
09: A    I guess, in general -- in general --
10: in general, from a surgery -- from a surgeon's
11: perspective, again -- and I'm not a cardiologist
12: and not a vascular neurologist -- so the utility
13: of being able to track and monitor levels and
14: degrees of anticoagulation, I would have to
15: defer to those who are actually using that as a
16: primary treatment modality, whether it's useful
17: to do that or not.
18: As a surgeon who may have to
19: intervene surgically for patients on various --
20: or any type of anticoagulation, if I had the
21: choice of having a test to be able to determine
22: how impaired their coagulation pathway was or
23: whether medication is still on board, I would
24: certainly prefer to know and have that option,
25: yes.

p. 00188

0189

01: Q    All right.  Are you aware that the
02: label for Xarelto says there's no way to monitor
03: Xarelto levels in a patient?
04: MR. IRWIN:
05: Object to the form.
06: THE WITNESS:
07: I'm not aware of the label.  I am
08: aware of commercials and general medical
09: assumption that there is no need to
10: monitor it --
11: EXAMINATION BY MR. ABNEY:
12: Q    Well, in --
13: A    -- the levels, yes.
14: Q    In Ms. Orr's case, you had a need to
15: know whether she had Xarelto on board or not,
16: didn't you?
17: A    It would have been -- yes, so I guess
18: if I had a test like an INR test or some other
19: test that would readily, quickly give me an
20: answer about whether she had it on board and how
21: much, then yes, that would have been useful.
22: Q    And you've treated other patients
23: that were anticoagulated that had bleeds,
24: haven't you?
25: A    Yes.

p. 00189

0190

01: Q    And same thing, if they come in and
02: they're unresponsive, you would prefer to have a
03: simple, easy test to tell if they're on one of
04: these anticoagulants and how much of it they
05: have in their system, right?
06: A    Yes.
07: Q    And if the manufacturers had
08: determined years ago that there was such a
09: simple, easy test to look at how much Xarelto
10: effect a patient had, is that something you
11: think they should share with labs and emergency
12: departments and neurosurgery departments like
13: you have here at Ochsner?
14: MR. IRWIN:
15: Object to form.
16: THE WITNESS:
17: I think that would be dependent
18: on the -- one is the sensitivity and
19: specificity of such test, whether that's
20: been validated and have passed all the
21: regulatory requirement for it to be
22: meaningful without a lot of false
23: positives and false negatives.  And so if
24: that was the case, then I think that would
25: be useful information to know.

p. 00190

0191

01: EXAMINATION BY MR. ABNEY:
02: Q    Are you aware that these same
03: manufacturers, Janssen and Bayer, in other
04: countries like Australia or New Zealand tell
05: physicians in the label that there's a certain
06: PT reagent that they can use to assess the
07: levels of Xarelto in a patient's blood?
08: MR. IRWIN:
09: Object to form.
10: THE WITNESS:
11: Again, I'm not aware; but again,
12: I'm not a primary provider that uses
13: Xarelto, stuff like that, so I'm not -- I
14: guess I wouldn't be the first line of
15: informant for that type of information.
16: That would be probably the cardiologist,
17: the primary care physicians, or the
18: vascular neurologist.  But no, I
19: personally am not aware.
20: EXAMINATION BY MR. ABNEY:
21: Q    And to your knowledge, has anybody at
22: that facility that was responsible for treating
23: Ms. Orr -- was anybody at this facility, to your
24: knowledge, aware of the fact that there was a
25: simple, easy blood test that could have told you

p. 00191

0192
01: what level of Xarelto Ms. Orr had?
02: MR. IRWIN:
03: Object to form.
04: THE WITNESS:
05: I can't answer for the
06: neurocritical care folks, I can't answer
07: for the ER folks, and I can't answer for
08: our lab. But I was not aware, and in the
09: course of treatment, nobody on the
10: other -- nobody on the concurrent treating
11: teams brought up anything to that effect.
12: EXAMINATION BY MR. ABNEY:
13: Q     And my question wasn't asking you to
14: speak for everybody; it was just to your
15: knowledge. Has anybody ever told you from any
16: of these other departments at Ochsner, "Hey,
17: Doc, if you have somebody come in in an emergent
18: situation, we can test for their Xarelto levels
19: and tell you how much they have on board"; has
20: anybody ever told you that?
21: A     So I guess the question is: Up to
22: the point back in April 2015 or up to now as
23: we're sitting here at this table?
24: Q     Good point. Let's answer both of
25: them.

0193
01: At the time you treated Ms. Orr, had
02: anybody told you that?
03: A     No.
04: Q     Sitting here today, has anyone told
05: you that?
06: A     Yeah. So there's been, in the last
07: six months, more recent discussion about
08: reversal agents or about various ways to test
09: it; and then that graph was shown to me by one
10: of your colleagues, Dr. Whitehead about that.
11: Q     And you're referring to the graph --
12: you were asked questions about this -- it was
13: part of Exhibit 6. And does this appear to be
14: the exact graph that was shown to you, to the
15: best of your knowledge?
16: A     Yeah, I think, to the best of my
17: knowledge.
18: Q     Okay. And do you --
19: A     Yes. But if -- I mean, there's no
20: way I'd be able to quantify whether all those
21: points are the same graph or the same points,
22: no.
23: Q     Right. To the best of your
24: knowledge, this is the graph that was shown to
25: you, right?

0194
01: A     That's correct.
02: Q     And you picked it out of a folder
03: when one of the defense lawyers was actually
04: looking at it, right, and said, "Oh, that's the
05: graph?"
06: A     Yes.
07: Q     So this graph says that it's -- the
08: notation on the bottom is "FDA" -- and you know
09: what the FDA is, right?
10: A     Yes. I'm assuming that's --
11: Q     Food and Drug Administration?
12: A     Yes.
13: Q     And it says "Afib AdComm Briefing."
14: So you were asked if you -- you
15: were -- strike that.
16: You indicated you were told this
17: graph came out of a much larger document, right?
18: A     That's correct.
19: Q     And would you agree that the graph
20: indicates that it was page 38 of an FDA Afib
21: AdComm Brief?
22: A     Yes.
23: Q     So do you think Dr. Whitehead was
24: making any attempt to hide where the graph came
25: from?

0195
01: A     No. But the rest of the document was
02: not readily available, and I have not been able
03: to verify or fact check that.
04: Q     Doctor, I'm going to show you -- I'm
05: not going to mark it as an exhibit, but we're
06: all familiar with this. I think it was marked
07: as Exhibit 10 to Dr. St. Martin's deposition.
08: This is the FDA briefing document. It says that
09: it's a draft briefing document, but I'll
10: represent to you that there was never any
11: subsequent -- this was the one that was used at
12: the FDA AdComm briefing.
13: A     Okay.
14: Q     And I'm going to show you page 38 and
15: ask you if it looks like a smaller version of
16: what Dr. Whitehead showed you.
17: A     It does appear so, yes.
18: Q     Would you like to take the time to
19: review the entire FDA AdComm briefing document?
20: A     It depends on what your next
21: questions are going to be.
22: Q     You just said it wasn't available.
23: It's now available. If you want to look at it,
24: I'm more than happy to let you look at it.
25: THE WITNESS:

0196

01: Does the defense have any reason
02: to believe that this is not what the
03: plaintiff is stating it to be?
04: MR. IRWIN:
05: No. That's what it is. I'm the
06: one who produced it at the last deposition
07: so we could see the other 255 pages --
08: THE WITNESS:
09: Okay.
10: MR. IRWIN:
11: -- or whatever. Okay?
12: THE WITNESS:
13: All right. Fair enough.
14: EXAMINATION BY MR. ABNEY:
15: Q    Doctor, is it your understanding that
16: the higher the level of anticoagulant a patient
17: has on board, the greater the risk of having a
18: bleed?
19: A    Again, you'd have to -- I'm not an
20: expert in anticoagulation and hematology. My
21: experience of what you mean by high or low has
22: been mainly in agents that have a test, such as
23: warfarin or Coumadin, and so in my experience,
24: patients with a higher INR have had more
25: catastrophic or devastating hemorrhages. I

p. 00196

0197

01: don't know what the general data is about
02: correlating INR to risk of spontaneous
03: hemorrhage.
04: Q    Doctor, let me show you what's been
05: marked as Exhibit 15 to your deposition.
06: A    Okay.
07: Q    This is an FDA summary review
08: document for Xarelto.
09: A    Okay. Okay.
10: Q    You mentioned earlier when defense
11: counsel was questioning you that it was your
12: understanding that ROCKET showed that Xarelto
13: was superior to warfarin. Do you remember that?
14: MR. IRWIN:
15: Object to the form.
16: THE WITNESS:
17: I -- I think I recall saying
18: that, to the best of my knowledge, that
19: during the FDA approval process that the
20: Xarelto was shown to have some advantages
21: over warfarin. I don't recall
22: acknowledging that it was clinically
23: superior, which is an indication that it's
24: overall better.
25: EXAMINATION BY MR. ABNEY:

p. 00197

0198

01: Q    What was your understanding of the
02: advantages or benefits of Xarelto versus
03: warfarin?
04: A    My -- again, my basic
05: understanding -- I guess, to be fair, my basic
06: understanding at the time of treatment for this
07: patient was less than it is now today, so let's
08: be clear on that.
09: My basic understanding of Xarelto at
10: the time of treatment of this patient was that
11: it was a new class of drug approved by the FDA
12: that had the advantage of less frequent dosing,
13: once-a-day dosing, that it had a similar risk
14: profile, but potentially thought offered a
15: slightly better benefit profile as it relates to
16: ischemic strokes, and that it was given an
17: on-label approval for treatment of atrial
18: fibrillation.
19: Q    And what's your understanding today?
20: A    Well, I think my understanding today
21: is, still, there is -- I mean, as far as I
22: understand it, the FDA still has Xarelto as
23: on-label for use of A-fib. But the only thing
24: was that there was some question about the
25: ROCKET trial as relates to the INR testing

p. 00198

0199

01: monitor as to whether it was functioning
02: properly or not, so that led -- that has cast
03: some doubt --
04: (Cellphone rings.)
05: THE WITNESS:
06: Excuse me one second. I'm sorry.
07: Go off the record one second.
08: THE VIDEOGRAPHER:
09: The time is 3:14 p.m. We are off
10: the record.
11: (Recess taken.)
12: THE VIDEOGRAPHER:
13: The time is 3:15 p.m. We are
14: back on the record.
15: THE WITNESS:
16: So -- and then the only other
17: thing is whether there is a test for it or
18: not, and I also understand that there is a
19: specific reversal agent that's been worked
20: on and is used in some places, but that's
21: about as far as I know.
22: EXAMINATION BY MR. ABNEY:
23: Q    Look at page 2 of Exhibit 15, please.
24: See the first bullet point down there in the
25: bottom?

p. 00199

0200

01: A    Which one?
02: Q    The first dotted bullet point.
03: A    Okay.
04: Q    In this document -- and this section
05: is explaining why the principal medical review
06: officers voted against approving Xarelto, and
07: one of the things that they based their decision
08: to vote against approval was that, the ROCKET
09: study, the time and therapeutic range of the
10: warfarin patients was 55 percent, and that that
11: was lower than attained in all contemporary
12: trials in which warfarin was a competitor.
13: MR. IRWIN:
14: Object to the form.
15: EXAMINATION BY MR. ABNEY:
16: Q    Do you see that?
17: A    Uh-huh.
18: Q    Would you agree that if you're doing
19: a head-to-head comparison of warfarin versus
20: Xarelto, if the warfarin patients are not well
21: controlled, that would make Xarelto look better
22: by comparison?
23: MR. IRWIN:
24: Object to the form.
25: THE WITNESS:

0201

01: Could you ask your question one
02: more time?
03: EXAMINATION BY MR. ABNEY:
04: Q    Sure.  If you're doing a head-to-head
05: comparison, Xarelto versus warfarin in A-fib
06: patients, if the warfarin patients' INR was not
07: well controlled, that would make Xarelto look
08: better by comparison, right?
09: A    I really have no comment on that.
10: Again, I'm not a warfarin or a Xarelto primary
11: end prescriber.  I'm not up to date on the
12: various clinical trials or trial design for
13: anticoagulation and comparative studies, so I
14: think it would be inappropriate for me to
15: comment on that question on record as a
16: professional.
17: Q    Turn over to page 9 of that document,
18: please, Doctor.
19: A    Okay.
20: Q    Under "Additional Issues," you see
21: the first sentence there, it says, "The clinical
22: pharmacology and clinical reviewers demonstrated
23: that there is a linear correlation between
24: rivaroxaban levels and prothrombin time.  They
25: also demonstrated that there is also a

0202

01: correlation between PT and risk of bleeding.
02: This applicant has chosen not to utilize this
03: information."
04: Do you see that?
05: A    Yes.
06: Q    And when they say that "there is a
07: linear correlation between rivaroxaban levels
08: and prothrombin time," do you understand that to
09: be verbally stating what is shown on Exhibit 6
10: in the graph that you were shown?
11: MR. IRWIN:
12: Object.
13: THE WITNESS:
14: Again, without -- I mean, without
15: clear reference of one thing to another,
16: there's no way for me to be able to sort
17: of make strong assumptions.  But this
18: graph does appear to show a linear
19: correlation -- at least this graph hints
20: at a linear correlation between the plasma
21: level of rivaroxaban versus the PTT, which
22: is -- wouldn't be inconsistent with what
23: this sentence is saying.
24: But again, I'm not a clinical
25: trial specialist, and I was not involved

0203

01: in any of this clinical work -- trial
02: work, so I can't draw strong conclusions
03: that way.
04: EXAMINATION BY MR. ABNEY:
05: Q    If someone says that PT and
06: rivaroxaban concentrations exhibit a
07: close-to-linear relationship, would you
08: understand what that means?
09: A    I mean, I think that --
10: Q    I'm sorry.  Let me restate it.
11: If someone told you that prothrombin
12: time versus rivaroxaban concentration for the
13: atrial fibrillation population exhibits a
14: close-to-linear relationship between rivaroxaban
15: plasma concentrations and PT values, would you
16: understand what that meant?
17: A    In theory, yes.
18: Q    What would that mean?
19: A    That they're -- that PT may be used
20: as an indirect correlate or measure of the
21: level -- of the plasma level of Xarelto.  But
22: that being said, there's various different ways
23: to do a PT assay.  So I'd have to know whether
24: this is a PT test that was done in a different
25: way than it's done at Ochsner or a special assay

0204

01: has to be added to it or not.
02: But based on your question, that's my
03: basic interpretation of what that sentence would
04: mean, for me, clinically.
05: Q    You were shown some PT results and
06: INR results and APTT results for Ms. Orr from
07: Ochsner.  Do you remember that?
08: A    Yes.
09: Q    And I think the gist of what I heard
10: you say was those results can't be used in a
11: patient that's on Xarelto; is that fair to say?
12: A    So based on what I said, I think the
13: fair thing to say would be, based on my
14: understanding of Xarelto at the time of
15: treatment and that normal PT, PTT, and INR tests
16: was not the standard of care practice to
17: evaluate anticoagulation levels for these new --
18: newer generation of anticoagulant, particularly
19: the factor X and factor Xa inhibitors.
20: Q    Are you aware that there are
21: different reagents that are used in different PT
22: test kits for looking at prothrombin time?
23: A    Yes.
24: Q    Are you aware of what reagent Ochsner
25: uses to do their PT testing?

0205

01: A    I am not.
02: Q    Are you aware that some reagents are
03: more sensitive for Xarelto than other reagents?
04: MR. IRWIN:
05: Object to the form.
06: THE WITNESS:
07: I am not.
08: EXAMINATION BY MR. ABNEY:
09: Q    I'm going to show you what was marked
10: as St. Martin 18, and I'll just represent to you
11: that -- you can look at it, but I'll represent
12: to you this is an assessment of different types
13: of reagents for different types of NOACs.  And I
14: just want to point your attention to Figure 1,
15: and it's very small print, but you can see the
16: different lines representing the different
17: reagents used and their sensitivity for
18: rivaroxaban.
19: MR. IRWIN:
20: Can you just show me that,
21: because --
22: MR. ABNEY:
23: Sure.
24: MR. IRWIN:
25: I probably have it here, but

0206

01: so --
02: MR. ABNEY:
03: Exhibit 10.
04: MR. IRWIN:
05: Yeah, I've got -- yeah, Douxfils.
06: Yeah, I've got that, yeah.
07: THE WITNESS:
08: Do you guys have any issues that
09: this is -- you know, that this is --
10: MR. HOGUE:
11: Mr. Abney, what is it?
12: THE WITNESS:
13: -- a valid --
14: MR. ABNEY:
15: Douxfils, Exhibit 10 to
16: St. Martin's depo.
17: MR. HOGUE:
18: I don't have his exhibits, so
19: what's the name of it?
20: MR. ABNEY:
21: Douxfils is the article.  Hold
22: on.  I'm pulling it up on my computer.  I
23: only have one copy of it.
24: THE WITNESS:
25: So what's your question about

0207

01: this?
02: EXAMINATION BY MR. ABNEY:
03: Q    And I'm sorry, Doctor, can you
04: confirm, is the title of that one "Assessment of
05: the impact of rivaroxaban on coagulation
06: assays"?
07: A    That's correct.  Yes, it is.
08: Q    And looking at Table 1 or Figure 1,
09: would you agree that different assays tested
10: have different sensitivity levels for
11: rivaroxaban?
12: MR. HOGUE:
13: Objection.
14: THE WITNESS:
15: Again, I'm not a hematologist or
16: an expert in this field, but just reading
17: it based on general medical background, I
18: don't have any reason to refute what
19: you're saying, is that this graph seems to
20: imply that -- and again, the context is
21: that I've not been able to verify these
22: datas; I've not read the paper; I've not
23: read the background -- but just looking at
24: the graph itself, at what it's seeming to
25: show, that I would agree that it's trying

0208
01: to make a point that different reagents
02: have a different impact on it, yes.
03: EXAMINATION BY MR. ABNEY:
04: Q    And would you agree, based on the
05: chart shown, that Innovin was the least
06: sensitive reagent tested with respect to
07: rivaroxaban?
08: MR. HOGUE:
09: Objection.
10: THE WITNESS:
11: Again, based on this graph alone,
12: without any verifying data, reading it,
13: that graph does show that that reagent has
14: a less steep curve than the other
15: reagents.
16: EXAMINATION BY MR. ABNEY:
17: Q    And would you agree that Neoplastin
18: is is the second most sensitive reagent that was
19: tested --
20: MR. HOGUE:
21: Objection.
22: EXAMINATION BY MR. ABNEY:
23: Q    -- based on that graph?
24: A    So on this graph, the graph shows
25: Neoplastin has the second sharpest curve.

p. 00208

0209
01: Q    I'd like to show you Exhibit 16,
02: which is an article by Mueck, "Clinical
03: Pharmacokinetic and Pharmacodynamic Profile of
04: Rivaroxaban."
05: MR. HOGUE:
06: Is that Exhibit 16 to this
07: deposition?
08: MR. ABNEY:
09: It is.
10: MR. IRWIN:
11: Do you have an extra copy of
12: that?  I don't have that one.
13: MR. ABNEY:
14: I do.
15: MR. IRWIN:
16: Thank you.
17: EXAMINATION BY MR. ABNEY:
18: Q    Doctor, I'd like to ask you to first
19: take note that the article is published by
20: someone from Bayer Pharma AG, which is the
21: developer of rivaroxaban.  Do you understand
22: that?
23: A    It seems so, yes.
24: Q    Look briefly, Table 3, which is on
25: page 7.

p. 00209

0210
01: A    Okay.
02: Q    Do you see there where they report
03: the trough levels and peak levels for Xarelto on
04: patients taking 20 milligrams and 15-milligram
05: doses?
06: A    Okay.
07: Q    And it's Footnote C, I think, but the
08: ranges they're giving you are the 5th to the
09: 95th percentile.
10: A    Okay.
11: Q    You see that?
12: A    Yeah.
13: Q    Would you agree that in just looking
14: at the 5th to 95th percentile that there was a
15: pretty large range of exposure for patients
16: taking the same dose of medication from 12 to
17: 137 micrograms per liter?
18: MR. HOGUE:
19: Objection.
20: THE WITNESS:
21: I think that there's no way for
22: me to really give an answer to that,
23: because I'm not a pharmacologist.  So
24: you're talking about micrograms per liter,
25: so I don't have the background to be able

p. 00210

0211
01: to, I guess, professionally be able to
02: judge the range in this level of
03: measurement, whether that is considered a
04: wide or not wide or acceptable or
05: unacceptable range, so --
06: EXAMINATION BY MR. ABNEY:
07: Q    Right.  And I wasn't asking you
08: acceptable or unacceptable, just it's a large
09: variation; it's about 12 times variation, right,
10: or more?
11: MR. IRWIN:
12: Form, objection.
13: THE WITNESS:
14: Yeah, so there is variation seen
15: here.  Now, again, when you're talking
16: about micrograms per liter, I can't give,
17: without truly having an in-depth
18: understanding of the pharmacokinetics of
19: the drug, whether that is a relevant range
20: or not.
21: EXAMINATION BY MR. ABNEY:
22: Q    Fair enough.
23: Turn over to page 9, and if you look
24: on the left-hand column -- easiest way is to
25: look for Footnote 16, the sentence following

p. 00211

0212
01: that.
02: A    Okay.
03: Q    Do you see where this Bayer
04: researcher makes a statement, "Prolongation of
05: the PT (using Neoplastin) was correlated with
06: rivaroxaban plasma concentrations in a linear
07: relationship, see Figure 4"?
08: A    Yeah.
09: MR. HOGUE:
10: Objection.
11: EXAMINATION BY MR. ABNEY:
12: Q    And Figure 4 looks very similar --
13: not identical, but very similar to the figure
14: that you saw before, just with different scale,
15: right?
16: A    Yeah.
17: Q    Okay.  Turn to the next page.  At the
18: top of the page, do you see where the Bayer
19: researcher notes, "In contrast, a number of
20: studies have confirmed the clinical utility of
21: anti-factor Xa chromogenic assays for the
22: quantitative measurements of rivaroxaban plasma
23: levels, when used in conjunction with
24: rivaroxaban calibrators."
25: Do you see that?

0213
01: A    Uh-huh.
02: Q    Does Ochsner use anti-factor Xa
03: chromogenic assays for looking and assessing
04: patients on low molecular weight heparin?
05: A    Yes, I believe so.  But you'd have to
06: confirm with the lab.
07: Q    Right.
08: So it's your understanding that your
09: lab, currently, and at the time you were
10: treating Ms. Orr, had the ability to do factor
11: Xa chromogenic assays for patients on low
12: molecular weight heparin, right?
13: MR. HOGUE:
14: Objection.
15: MR. IRWIN:
16: Object to form.
17: THE WITNESS:
18: So again, that is my basic
19: understanding.  I'm fairly certain that it
20: is now.  I don't know for sure or with any
21: certainty that it was doing that at the
22: time of treatment.  You'd have to confirm
23: that with our lab.
24: EXAMINATION BY MR. ABNEY:
25: Q    Okay.  Does this statement give you

0214
01: any basis for believing that there are assays
02: that can be run in labs -- actually, strike
03: that.
04: The next sentence says, "These assay
05: kits and rivaroxaban calibrators are now
06: commercially available and are suitable for
07: detecting a wide range of rivaroxaban plasma
08: levels covering the therapeutic doses."
09: Do you see that?
10: A    Uh-huh.
11: Q    I mean, does this Bayer researcher in
12: this paragraph give you reason to believe that
13: there is, in fact, a way to test rivaroxaban
14: levels in patients like Ms. Orr?
15: MR. IRWIN:
16: Object to the form.
17: THE WITNESS:
18: So, again, without reading the
19: paper, understanding the pharmacokinetics,
20: and the -- having an in-depth
21: understanding of how all these tests were
22: done, but going through this briefly with
23: you here, looking at the tests, and if
24: this data was correct and verifiable and
25: reproducible, then I've got no reason to

0215
01: not agree with the statement that this
02: researcher has put forth that there
03: appears to be a method to be able to
04: correlate Xarelto plasma levels.
05: EXAMINATION BY MR. ABNEY:
06: Q    All things being equal, if you have a
07: patient come in with an intraventricular
08: hemorrhage, would you rather them be on Xarelto
09: or warfarin?
10: MR. IRWIN:
11: Objection, form.
12: THE WITNESS:
13: I think there's no good way to
14: answer that, because all things aren't
15: equal, so --
16: EXAMINATION BY MR. ABNEY:
17: Q    Let me try it again then.
18: A    Yeah.
19: Q    All things being equal, would you
20: rather have a patient on an anticoagulant that
21: you can reverse or one that is not reversible?
22: MR. IRWIN:
23: Object to form.
24: THE WITNESS:
25: So from a surgical perspective,

0216
01: if -- hypothetically, if all things were
02: equal, then certainly I would prefer to
03: have a reversal agent for an
04: anticoagulation before treatment, yes.
05: EXAMINATION BY MR. ABNEY:
06: Q    Mr. Irwin represented to you that
07: Dr. St. Martin testified in his deposition that
08: in the months leading up to this unfortunate
09: event that he had Ms. Orr on a whole bunch of
10: different medications for blood pressure and
11: found her hard to control.  Do you remember
12: that?
13: A    That was my understanding of that,
14: yes.
15: Q    I'm going to read from you
16: Dr. St. Martin's deposition on page 140 where
17: Mr. Irwin asked her:  "Let me read you
18: something.  You had sent her to Dr. Cruz to help
19: her with her kidney function, right?"
20: And the answer was:  "And her blood
21: pressure too."
22: "And the blood pressure too?"
23: And the answer was:  "Yes."
24: When one physician refers a patient
25: to another for a specific management, do they

0217
01: generally defer to the doctor that they've
02: referred the patient to to manage that issue?
03: A    It all depends.  It's a spectrum, and
04: it's often a discussion between the two
05: referring physicians.  So you may just be asking
06: for advice, you may be asking for an opinion, or
07: he or she may be asking them to take over the
08: whole care.  But just a referral for a specific
09: condition does not usually or normally imply
10: that that referring physician is giving up
11: treatment autonomy or treatment rights for a
12: particular process.  It may, it may not; but
13: just a referral does not automatically imply
14: that.
15: So only Dr. St. Martin would be able
16: to testify or verify that that was his intent
17: when making the referral.
18: Q    Do you have patients that come in
19: with intraventricular hemorrhages that make
20: fairly good recoveries?
21: A    Do I have -- say that again.
22: Q    You were asked about how often you
23: see patients with different kinds of conditions
24: and whether they were on anticoagulants or not,
25: and I think the general gist was you see lots of

0218
01: patients that have intracranial bleeds and some
02: of them are on anticoagulants and some aren't;
03: is that fair to say?
04: A    That's fair to say.
05: Q    And you were asked about do some of
06: them have the same outcomes as Ms. Orr, and you
07: said, "Yeah, it's not uncommon."
08: My question is the opposite:  Do some
09: patients have better recoveries than Ms. Orr?
10: MR. IRWIN:
11: Object to the form.
12: THE WITNESS:
13: So if your question was do some
14: patients with intraventricular hemorrhage
15: have better outcome, yes.  That depends on
16: the size of intraventricular hemorrhage,
17: depends on age, comorbidities, and
18: presenting neurologic status.
19: EXAMINATION BY MR. ABNEY:
20: Q    And you were asked questions when you
21: were looking at the CT scans, and I believe it
22: was your testimony that, in general, if a
23: patient has a bleed caused by hypertension, that
24: you would expect to see them in certain areas of
25: the brain, and I think you referred to the basal

0219
01: ganglia; is that right?
02: A    So I believe I said that, in general,
03: hypertensive hemorrhages tend to lump or clump
04: to certain areas of brain more than other areas
05: of brain, and the basal ganglia is a common
06: location.
07: Q    And I believe you said -- well, my
08: notes indicate you mentioned also cerebellar and
09: thalamus; is that right?
10: A    Yeah.
11: Q    Are those part of the basal ganglia?
12: A    Well, no, the cerebellum is not.  The
13: thalamus is part of it.  But I guess it depends
14: on how strict you are of a neuroanatomist.  So
15: most people would delineate that when they talk
16: about locations for hypertensive hemorrhages to
17: basal ganglia, thalamus, cerebellum, and the
18: brainstem.
19: Q    And the location of Ms. Orr's
20: hemorrhage was not what you would consider to be
21: consistent with the typical hypertensive bleed;
22: is that fair to say?
23: MR. HOGUE:
24: Objection.
25: THE WITNESS:

Bui, Cuong MD  - Volume 1 - 07/07/2016

0220
01: So the location of her hemorrhage
02: would not be described -- typically
03: described as a basal ganglia hemorrhage or
04: a pontine hemorrhage or a cerebellar
05: hemorrhage.  It's mostly intraventricular,
06: but given the size of it, you cannot rule
07: out that it couldn't have come from the
08: thalamus.
09: EXAMINATION BY MR. ABNEY:
10: Q    I believe you said if it was -- if it
11: was a hypertensive type thalamus bleed, you
12: would expect it to be more on the periphery than
13: the medium, right?
14: A    Yes.  It's typically more often
15: intraparenchymal, so yes -- so it's more often,
16: but it's not -- it's not -- that that location
17: is -- this location, as a prognostic or a
18: diagnostic tool, whether an etiology was from
19: hypertensive or not, is not super sensitive.  So
20: even though it's not in the typical location,
21: I'm not saying that just based on the scan that
22: I've ruled it out completely as a possible
23: etiology --
24: Q    Right.  Anything's --
25: A    -- just so we're clear.

p. 00220

0221
01: Q    Anything's possible, right?
02: A    Yeah.
03: Q    But would you say more likely than
04: not that this was not a hypertensive-induced
05: bleed?
06: A    I would not be able to say that.
07: Q    Mr. Irwin asked you, if after
08: reviewing or hearing him review some of
09: Mr. Orr's testimony, if there was a legitimate
10: question as to whether Ms. Orr took her last
11: dose of Xarelto 6 hours or 30 hours before.  Do
12: you remember that?
13: A    Yes.
14: Q    If she had taken it -- well, strike
15: that.
16: Are you aware that patients clear
17: Xarelto at varying rates, depending on a lot of
18: different factors?
19: A    Yes, I am.
20: Q    And is it your understanding
21: creatinine clearance is one of those factors
22: that would determine how fast a patient clears
23: Xarelto?
24: A    Yes, I'm aware that the creatinine
25: clearance is one of the ways; not the only way,

p. 00221

0222
01: but yes.
02: Q    Right.  So if a patient has impaired
03: creatinine clearance, they would clear the drug
04: slower than a patient with normal creatinine
05: clearance; is that your understanding?
06: A    In theory, yes.
07: Q    And I believe it was established
08: early on in the deposition that Ms. Orr suffered
09: from chronic kidney disease, correct?
10: A    That's correct.
11: Q    So when you're assessing 6 hours or
12: 30 hours, you also had to factor in how fast
13: does this patient clear the drug, right?
14: A    In a general sense, yes.  But there's
15: no, that I know of, established way of being
16: able to calculate clearance specifically --
17: Q    Sure.
18: A    -- even if I knew exactly what the
19: creatinine clearance was and the other factors.
20: But yes, in a general, gestalt sense, yes.
21: Q    And you also had to factor in that
22: she had thrown up at least once shortly after
23: dinner, right?
24: A    Yes, correct.
25: Q    And she threw up again later when she

p. 00222

0223
01: was at home, right?
02: A    Yes, correct.
03: Q    So depending on when she took the
04: drug, she may have absorbed more or less based
05: on her throwing up, right?
06: A    Yes.  So I guess not knowing when she
07: took the drug, if she even took the drug that
08: day, the absorption or non-absorption of any
09: oral product will be clearly impacted by the
10: timing of the emesis, how much was thrown up,
11: and the other food factors, as well as how fast
12: or how well her gut moves.
13: Q    So you're faced with a question that
14: you don't have a lot of clear analytical data to
15: determine, right?
16: A    That's correct.
17: Q    And would you agree with me that the
18: simple easy solution would have been to have a
19: blood test available that you could have run on
20: her the first ten minutes she was in the
21: hospital to determine exactly how much
22: rivaroxaban she had on board?
23: A    It would have been --
24: MR. HOGUE:
25: Objection.

p. 00223

0224
01: THE WITNESS:
02: -- nice, yes.
03: MR. IRWIN:
04: Object to the form.
05: EXAMINATION BY MR. ABNEY:
06: Q    Are you familiar with a term in the
07: lay language, "white coat hypertension"?
08: A    Yes.
09: Q    What is your understanding of white
10: coat hypertension?
11: A    The basic idea that patients are
12: clearly more anxious when they see a
13: physician -- the association with disease; and
14: kids, through shots; and so on and so forth --
15: that the vital signs, like blood pressure,
16: sometimes may differ at a clinic visit versus at
17: home watching TV.
18: MR. ABNEY:
19: That's all the questions I have.
20: Thank you, Doctor.
21: MR. IRWIN:
22: Just a couple.
23: MR. ABNEY:
24: I think it's -- do you have any?
25: MR. HOGUE:

0225
01: I'll let him go first.
02: MR. IRWIN:
03: Just a couple.
04: THE WITNESS:
05: So now I know what water boarding
06: feels like.  You can leave that off the
07: record.
08: MR. IRWIN:
09: Fair enough.
10: EXAMINATION BY MR. IRWIN:
11: Q    You were asked questions about this
12: 200-and-whatever-page document, and there's a
13: page open.  If you'd pick that up, please,
14: Doctor, this FDA briefing document.  What page
15: is that, please, sir?
16: A    Page 38.
17: Q    38.
18: And that looks similar to the graph,
19: or whatever you call it, that you were shown by
20: Mr. Whitehead?
21: A    Yes, correct.
22: Q    And I think you told us that you did
23: not feel qualified to render any opinions on
24: something like that?
25: A    Yes.  In specifics, yes.

0226
01: Q    And if you look at the front page of
02: this 200-plus-page document, you can see there's
03: a disclaimer?
04: A    Uh-huh.
05: Q    And among parts of this disclaimer is
06: a clear explanation that this is a draft
07: document?
08: A    That's correct.
09: Q    You were also asked a lot of
10: questions, Doctor, about linear relationships
11: and prothrombin time and various reagents used
12: to do assays; is that right?
13: A    That's correct.
14: Q    But, really, what matters to
15: clinicians and practicing doctors is whether
16: those results have any clinical benefit; isn't
17: that correct?
18: MR. ABNEY:
19: Object to form.
20: THE WITNESS:
21: Say that again.
22: EXAMINATION BY MR. IRWIN:
23: Q    Whether those results can be
24: translated to be used by a clinician in a
25: clinical way to treat patients?

0227
01: A    I mean, so --
02: Q    Let me rephrase it.  Okay?
03: A    Rephrase that.
04: Q    And please don't think I'm trying to
05: be sarcastic --
06: A    Okay.
07: Q    -- with this question.  I'm just
08: trying to drive it down to the ground.
09: A    Okay.
10: Q    Pharmacologists and
11: pharmacokineticists can do lots of tests and do
12: lots of assays and make lots of measurements
13: that can be interesting; but in your world,
14: they're really only of value to you if they
15: translate in such a way that you can use those
16: results clinically?
17: A    Yes.  So -- yes.
18: Q    Yes.
19: So -- and here is my last question:
20: You were shown this Douxfils study.
21: A    Yes.
22: Q    If you can pull that up.  That might
23: have been it right there.  Oh, wait.  Here, I'll
24: let you have my copy, okay, Doctor?
25: A    Yeah.

0228

01: Q    I'll let you have my copy.
02: Good studies always describe the
03: limitations of the study so that you --
04: A    Yes.
05: Q    -- you, who read them, can understand
06: what the authors think are limitations?
07: A    Yes.
08: Q    What's one of the limitations that I
09: have highlighted in yellow in that assay study
10: by Douxfils?
11: A    So it's the author -- or one of the
12: author's opinion of the limitation is that "it's
13: currently unknown how coagulation assays are
14: predictive for the bleeding risk," and he
15: referenced another paper by that.  So I'm not
16: sure if that's their opinion or referencing the
17: opinion of the other paper.  "However, it's not
18: ethically acceptable to expose patients to high
19: risk overdose of Xarelto to study the impact on
20: coagulation test."  Okay.
21: Q    So I'll see if I can summarize that
22: in a way that is down to earth and hopefully
23: you'll agree with.  What they're saying is:
24: Take into account, Dear Doctor, when you read
25: this that we have not been able to establish

p. 00228

0229

01: that this, these assays, produce any clinical
02: results that tell us about bleeding?
03: MR. ABNEY:
04: Object to form.
05: THE WITNESS:
06: So I don't strictly agree with
07: that.  I think what it's saying is, is
08: that the assay -- that the coagulation
09: assays here are not predictive of bleeding
10: risk, which is a little bit different than
11: bleeding itself.
12: MR. IRWIN:
13: I accept your correction, and I'm
14: happy you made it.  Okay.
15: That's all the questions I have.
16: Thank you very much.
17: MR. HOGUE:
18: Off the record.
19: MR. IRWIN:
20: Yeah.
21: MR. HOGUE:
22: We might be done.
23: THE VIDEOGRAPHER:
24: Time now is 3:53 p.m.  We are off
25: the record.

p. 00229

0230

01: (Recess taken.)
02: THE VIDEOGRAPHER:
03: Time is 3:55 p.m.  We are back on
04: the record.
05: EXAMINATION BY MR. ABNEY:
06: Q    Doctor, just briefly following up,
07: you were asked about clinical utility of tests.
08: You remember that just a moment ago?
09: A    Yes.
10: Q    I'd like to point you again to the
11: paragraph that we looked at earlier.  I've
12: highlighted it there in the Mueck article.  And
13: this is, again, by the researchers of Bayer that
14: developed rivaroxaban.  Would you agree with me
15: that the Bayer researchers are suggesting to
16: clinicians that these blood tests we're talking
17: about to determine how much rivaroxaban is
18: on board do, in fact, have clinical utility?
19: MR. IRWIN:
20: Objection, leading.
21: MR. HOGUE:
22: Objection.
23: THE WITNESS:
24: So, again, I can't speak and
25: verify about the relationship with the

p. 00230

0231

01: researcher to Bayer that's listed here,
02: that they worked at Bayer at the time of
03: this publication.  But certainly, I can't
04: say or agree with you that to call this,
05: you know, a Bayer researcher making that
06: statement, other than the fact that, based
07: on this sentence, that the authors of the
08: paper seem to think that there are a
09: number of studies that have -- or at least
10: based on what they say here, is that "In
11: contrast, a number of studies have
12: confirmed the clinical utility of anti --
13: of Xa -- chromogenic assays for the
14: quantitative measurement of the
15: rivaroxaban plasma level, when used in
16: conjunction with the collaborator."
17: So, again, without context of
18: what they mean, "clinical utility," it's a
19: very broad statement, because what's
20: clinical -- what's clinically useful for a
21: pharmacologist may be a little bit
22: different --
23: EXAMINATION BY MR. ABNEY:
24: Q    Well --
25: A    -- to a neurosurgeon, to a

p. 00231

Case 2:14-md-02592-EEF-MBN Document 6648-3 Filed 05/27/17 Page 60 of 61

0232
01: cardiologist, to a hepatologist, yes.
02: Q    Well, would you agree with me that
03: you, as a neurosurgeon, would have found it
04: clinically useful to have a test to determine
05: whether or not Ms. Orr had rivaroxaban on board
06: when she presented to your ER?
07: MR. IRWIN:
08: Objection, leading.
09: THE WITNESS:
10: Yes.  So if I had a -- it would
11: have been useful if I had a readily
12: available, verified test with appropriate
13: sensitivity and specificities already
14: checked and approved by all the regulatory
15: boards; that if that test was available to
16: me to be able to determine if she had
17: Xarelto on board or not, then I would not
18: have necessarily needed to best guess and
19: try to make clinical decisions based on
20: when I thought her last dosing was and
21: what her half-life was and whether her
22: creatinine clearance impacted that or not.
23: MR. ABNEY:
24: That's all I have.  Thank you,
25: Doctor.

0233
01: MR. IRWIN:
02: I only have another hour.
03: Thank you very much.  It's very
04: nice to meet you.
05: MR. HOGUE:
06: Can I have one follow-up on that
07: last question?
08: THE WITNESS:
09: Sure.
10: MR. IRWIN:
11: Okay.  Yeah.
12: THE WITNESS:
13: Take your time, as long as you
14: don't take over 55 minutes.
15: MR. HOGUE:
16: Are we off the record a second?
17: THE VIDEOGRAPHER:
18: No, we're still on.  We can go
19: off if you need.
20: MR. HOGUE:
21: If you can go off a second while
22: I get the --
23: THE VIDEOGRAPHER:
24: Time now is 3:59 p.m.  We are off
25: the record.

0234
01: (Recess taken.)
02: THE VIDEOGRAPHER:
03: Time now is 4:01 p.m.  We are
04: back on the record.
05: EXAMINATION BY MR. HOGUE:
06: Q    Dr. Bui, you were asked some
07: questions by plaintiffs' counsel related to
08: pharmacokinetic modeling and the article, and
09: one of my questions for you would be:  Is it
10: important to know how the drug has an effect on
11: the clinical outcomes, as opposed to just the
12: pharmacokinetics?
13: MR. ABNEY:
14: Object to form.
15: EXAMINATION BY MR. HOGUE:
16: Q    So probably --
17: A    That's a question --
18: Q    -- a bad question, and I'll withdraw
19: it.
20: A    Yes.
21: Q    Doctor, would it be important to you,
22: in knowing the reagents that are looked at for
23: assessing Xarelto's concentration levels, that
24: that be something that has been FDA approved as
25: part of the analysis?

0235
01: A    Yes.
02: MR. HOGUE:
03: That's all I have.
04: MR. ABNEY:
05: No further questions.
06: THE VIDEOGRAPHER:
07: Time now is 4:01 p.m.  Today's
08: deposition of Dr. Bui consisting of four
09: disks is now concluded.
10: (Whereupon, the deposition was concluded.)
11:
12: *   *   *
13:
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:
24:
25:

0236
01:
02:
03:
04: WITNESS' CERTIFICATE
05:
06:
07: I have read or have had the foregoing
08: testimony read to me and hereby certify that it
09: is a true and correct transcription of my
10: testimony with the exception of any attached
11: corrections or changes.
12:
13:
14:
15:
16:
17: _____
18: Cuong Bui, MD
19:
20: PLEASE INDICATE
21: ( ) NO CORRECTIONS
22: ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
23:
24:
25:

p. 00236

indirect, between a court reporting firm and
19: any party litigant in this matter, nor is
   there any such relationship between myself
20: and a party litigant in this matter; that I
   am not related to counsel or the parties
21: herein, nor am I otherwise interested in the
   outcome of this matter.
22:
23: _____
   GRETCHEN ALEXANDER, CCR, RPR
24: CERTIFIED COURT REPORTER
25:

p. 00237a

0237
01: REPORTER'S CERTIFICATE
02:
03: This certification is valid only for a
   transcript accompanied by my original signature
04: and original required seal on this page.
05: I, Gretchen Alexander, Certified
   Court Reporter in and for the State of
06: Louisiana, as the officer before whom this
   testimony was taken, do hereby certify that
07: CUONG BUI, MD, after having been duly sworn
   by me upon authority of R.S. 37:2554, did
08: testify as hereinbefore set forth in the
   foregoing 235 pages; that this testimony was
09: reported by me in the stenotype reporting
   method, was prepared and transcribed by me
10: or under my personal direction and
   supervision, and is a true and correct
11: transcript to the best of my ability and
   understanding; that the transcript has been
12: prepared in compliance with transcript
   format guidelines required by statute or by
13: rules of the board, and that I am informed
   about the complete arrangement, financial or
14: otherwise, with the person or entity making
   arrangements for deposition services; that I
15: have acted in compliance with the
   prohibition on contractual relationships, as
16: defined by Louisiana Code of Civil Procedure
   Article 1434 and in rules and advisory
17: opinions of the board; that I have no actual
   knowledge of any prohibited employment or
18: contractual relationship, direct or

p. 00237

Page 60