UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | |
| | JUDGE ELDON E. FALLON |

*Joseph Orr, Jr., et al. v. Janssen et al.*
Case No. 2:15-cv-03708

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO EXCLUDE CERTAIN DOSING-RELATED OPINIONS OF
DR. SMART MD, FACC, FACP [Doc. 6673]**

---

## INTRODUCTION

Defendants' Renewed Motion To Exclude Certain Dosing-Related Opinions of Dr. Smart MD, FACC, FACP ("Renewed Motion") [Doc. 6673] filed *at the eleventh hour* is a disguised attempt to "get the last word" by filing an unpermitted motion, and was done in such a way as to maximize prejudice to Plaintiffs and their counsel on the eve of the second day of trial when Dr. Smart is scheduled to testify. Defendants' motion is nothing more than an inappropriate request for reconsideration of previously-resolved matters. Not only did Defendants fail to seek leave to file such a motion, but, even if considered, Defendants' notion is inconsistent with this Court's prior rulings on this issue (Doc. 6196). Simply put, Defendants should not be permitted a second bite at the apple. In accordance with this Court's role as gatekeeper for expert testimony under *Daubert*[1] and its progeny, the Plaintiffs request that the motion be denied.[2]

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

Defendants begin their motion with a half-truth. Specifically, they argue that "Plaintiffs expressly disclaimed the dosing-regimen opinion—representing that "no expert will offer an opinion at trial that twice daily dosing is safer and/or more effective than once daily dosing." *See* Pls. Opp. to Defs.' *Daubert* Mot. (Doc. 5527), at 26.[3] Defendants' assertion is not only untrue, but takes Plaintiffs' statement out of context. In Plaintiffs' opposition to Defendants' *Daubert* motion, on the very page that Defendants' cite, Plaintiffs state: "Plaintiffs represent that no expert will offer an opinion at trial that once-daily dosing is safer and/or more effective than twice-daily dosing, *but Plaintiffs do intend to highlight the pharmacological profile and controversy surrounding the choice of the dosing regimen as further evidence of the need to evaluate the bleeding risks in the Xarelto-treated population.*" (*Id.*) (emphasis added).

Clearly, Plaintiffs have never disclaimed opinions of expert witnesses, including Dr. Smart, regarding the dose of Xarelto. Dr. Smart will offer expert testimony that Xarelto's dose and dosing regimen result in a narrow therapeutic index, which means slight variations in the dose or patient characteristics can have significant results in whether the patient is over or under anticoagulated (variability). This variability results in a broad spectrum of patients, particularly those with advancing age and declining renal function, to excessive bleeding risk. Such testimony is not only consistent with Plaintiffs' statements in prior briefing, but is clearly admissible pursuant to the Court's prior rulings on this issue (Doc. 6196). For the reasons set forth below, Defendants' Renewed Motion should be denied.

---

[2]The Plaintiffs incorporates herein the arguments set forth in their response to Defendants expressly incorporate herein Defendants' *Daubert* Motion to Exclude Expert Opinions and Testimony  Regarding Unapproved Dosing and Monitoring Regimens Defendants' Consolidated Reply In Support of Their *Daubert* Motions to Exclude Expert Opinions and Testimony Regarding (1) Unapproved Dosing and Monitoring Regimens and (2) the Experts' 20-Second PT Cut-Off Guideline in the *Orr* and *Boudreaux* Cases and Defendants' Joint Motion for An Order (1) Dismissing with Prejudice Claims Based on Allegations That Plaintiffs Have Abandoned and (2) Barring Scientific Evidence Based on Waiver of *Daubert* Arguments.

[3]Def. Brief at 1.

## **LEGAL STANDARD**

Defendants' so-called "Renewed Motion," which ***does not*** move the Court to reconsider its prior rulings on this issue, cites absolutely no legal authority allowing this type of filing, nor is Defendants' motion accompanied by any motion for leave to file. Defendants' motion is nothing more than a procedurally improper and untimely pleading operating as an inappropriate request for reconsideration of this Court's previously-resolved matters.

In any event, Dr. Smart's opinions are clearly admissible under *Daubert* and its progeny. Rule 702 of the Federal Rules of Evidence permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Rule 702 imposes a "basic gatekeeping obligation" on the trial court to ensure that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152; *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 310–11 (5th Cir. 1999). Admissibility is determined by whether the witness's opinion "rests on a reliable foundation," *i.e.,* "whether the reasoning or methodology underlying the testimony is scientifically valid"—and whether the opinion is "relevant to the task at hand." *Daubert*, 509 U.S. at 592–93, 597 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274–75 (5th Cir. 1998). The proponent of expert testimony must demonstrate that the testimony satisfies these requirements. *Moore*, 151 F.3d at 276.

## ARGUMENT

### I. DR. SMART IS A QUALIFIED EXPERT

Dr. Smart is a board certified cardiologist who has been practicing medicine for over 25 years. He is the Chief of Cardiology and a Professor at the LSU School of Medicine. Dr. Smart has been treating patients with atrial fibrillation since 1991, and is active in clinical research. Dr. Smart not only uses blood thinning medications in his practice as a cardiologist, but he also teaches medical students, residents, and cardiology fellows about such medications as part of his responsibilities as a Professor at the Louisiana State University School of Medicine.

In addition to his role at the Louisiana State University School of Medicine, Dr. Smart serves as the President of the Louisiana Chapter of The American College of Cardiology, Vice-Chairman for Clinical Affairs at the Louisiana State University School of Medicine, and Director of The Heart and Vascular Service Line at the University Medical Center in New Orleans. He is also a member of various professional societies, including the American College of Cardiology (Fellow and Board of Governors) and the American College of Physicians.

Dr. Smart has been consistently named as one of the *Best Doctors in America* and one of *New Orleans' Top Doctors*. He has also most recently received the esteemed recognition of America's Most Honored Professionals (Top 1%). Dr. Smart has authored over 130 peer-reviewed articles. In addition, he serves as a reviewer for several journals, including the *American Journal of Cardiology* and the *American Heart Journal*.

### II. DR. SMART'S DOSING RELATED OPINIONS CLEARLY SATISFY *DAUBERT* AND ARE THUS ADMISSIBLE, PURSUANT TO THE PRIOR BRIEFING SUBMITTED BY PLAINTIFFS

Plaintiffs' response to Defendants' *omnibus* motion established that opinions regarding the dose of Xarelto held by Plainitiffs' experts, including Dr. Smart, are reliable and permissible

under *Daubert*.[4] As set forth above, Plaintiffs' did not expressly disclaim any of Dr. Smart's opinions, nor did Plaintiff fail to acknowledge Defendants' challenge to such opinions.

In any event, each of the Defendants' three arguments set forth in their motion are without merit and rest on the assertion that there is no clinical data showing that twice-daily dosing, rather than once-daily dosing, would improve Xarelto's safety and efficacy, or that a lower dose would be safer.[5] However, this type of argument is circular since the lack of such "clinical data" is a point of contention in this trial because it was Defendants who neglected to test additional doses in the ROCKET clinical trial, as confirmed by the FDA. Specifically, the FDA Medical Reviewers stated as follows:

> ***There was no rational basis for the applicant's choice of the dose tested in ROCKET, 20 mg once a day. The pharmacokinetic/pharmacodynamics properties of rivaroxaban suggest the drug should be administered twice a day.***
>
> *\* \* \**
>
> ***The Division concurs with all reviewers of this NDA that data adequate to select a dose to be tested in ROCKET were not available when the trial was designed.*** *The applicant chose the dose to be tested in ROCKET based on two small dose-ranging studies…. The interpretation of the data from these studies was not obvious and the applicant stated interpretation lacked adequate rationale. When the applicant inquired if the Division concurred with their dose selection, we said that we did not concur…. **Given the limitations in available information at the time dose(s) to be tested in ROCKET were selected, an additional dose (i.e., in addition to 20 mg once a day) should have been tested. Nonetheless, the Division allowed ROCKET to proceed. We did so because we lack authority to put trials on clinical hold for inadequate dose selection.***[6]

The bottom-line is that no "clinical data" exists because when the FDA asked Defendants to perform such dosing studies – they refused to do so. Moreover, Defendants similarly rejected the

---

[4]*See* Pl. Response to Defendants' *Daubert* Memo which is incorporated herein.

[5]Def. brief at 2-4.

[6]*See* FDA Summary Review at 3, 8 attached as Exhibit 1.

request of Dr. Robert Califf, Lead Investigator and Co-Chairman of the Steering Committee of the ROCKET-AF Trial, who strongly advocated for additional testing based on his concerns about the dosing and safety of Xarelto.[7]

In addition to relying on the FDA and the company's own internal documents,[8] in forming his opinions, Dr. Smart reviewed scientific literature pertaining to the pharmacology of Xarelto and other anticoagulants.[9] Further, Dr. Smart relied on his experience with Xarelto and his numerous years of practice as a cardiologist to arrive at his opinions regarding dosing and the pharmacological profile of Xarelto, and in turn, the increased bleeding risk posed to patients. As a result, the opinions that Dr. Smart holds in this regard are in no way speculative. Instead, he clearly states that the rationale for his opinions in his Report as follows:[10]

> Of all the currently available new oral anticoagulants, Rivaroxaban has the narrowest therapeutic index, which means slight variations in the dose or patient characteristics can have significant results in whether the patient is over or under anticoagulated. This is because of multiple characteristics of Rivaroxaban and its metabolism, but particularly because of the high dose required to attain a once daily dosing schedule. The FDA made a similar observation in the November 2011 FDA Summary Review (approving the SPAF indication), by stating: "The half-life of rivaroxaban is less than 12 hours (resulting in trough serum concentrations less than 25% of peak concentrations when administered once a day) so we suggested that administering XARELTO twice a day might result in better outcomes." (FDA Summary Review, NDA 202439) The figure below from the Canadian Journal of Cardiology Vol. 29 Issue 7 Supplement; July 2013 demonstrates the excessive amount of anticoagulation that results from higher doses of Rivaroxaban to attain a once daily dosing regimen. The shaded area of each graph is the $C_{trough}$ which is the

---

[7] *See* Expert Report of Dr. Frank Smart at 5-6, attached as Exhibit 2.

[8] *See, e.g., Sanchez v. Boston Scientific Corp.* Civil Action No. 2:12–cv–05762, 2014 WL 4851989, at *4 (S.D. W.V. Sept. 29, 2014) (noting that "an expert may testify about his or her review of internal documents solely for the purpose of explaining the basis for his or her opinions*); In re Flonase Antitrust Litig*., 884 F. Supp. 2d 184, 192-93 (E.D. Pa. 2012) (permitting expert to use internal documents to opine on information that was available to manufacturer regarding FDA practice and policy as to approval of drug application); *In re Fosamax*, 645 F. Supp. 2d at 192 (permitting expert to comment on documents and exhibits in the context of "explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge").

[9] *See* Expert Report of Frank Smart at 2-3, as well as the list of materials he relied on, reviewed, and/or considered.

[10] *See* Expert Report of Frank Smart at 2-3, 5-7.

range of anticoagulation that will reduce thromboembolic stroke but is not associated with increased bleeding.



Graph A and C have smaller humps since Dabigatran and Apixaban are dosed twice daily. Rivaroxaban has one large hump since the marketed and approved dosing schedule is once daily. The graphic represntation of the concentration of each drug in the blood sream is proportional and the distance above the shaded $C_{trough}$ is also proportional.[11]

Xarelto is marketed to physicians and patients as a once daily drug, and this dosing schedule is heralded as superior to other NOACs because of improved compliance with the medication and ease of administration. However, Xarelto is a highly variable drug with respect to liver and kidney breakdown.

\* \* \*

The dose of Xarelto currently marketed for atrial fibrillation is too high. In an effort to improve compliance and market the drug as a once daily oral anticoagulant, the manufacturer selected 15/20 mg daily dose. This dose is

---

[11]Exhibit 3, Gong, I., Importance of Pharmacokinetic Profile and Variability as Determinants of Dose and Response to Dabigatran, Rivaroxaban, and Apixaban, Canadian Journal of Cardiology 29 (2013).

7

excessive and results in very high plasma concentrations of XArelto in everyone and in a broad spectrum of patients, particularly those with advancing age and declining renal function, exposes them to excessive bleeding risk.

My opinion that the dose is too high is shared by Dr. Califf, who stated: "My main concern after seeing the rest of the data is that our dose is too high. I don't want to upset people, but feel that we need more conteingency planning." (XARELTO_JANSSEN_03927493) Dr. Califf further stated: "This is corpraote BS. Every single person involved has told me that privately they agree that there is probably a better dose!!!!!"… Moreover, documents I've been provided indicate Dr. Califf voiced a similar opinion, stating "don't put my mom on 20mg!" (DCRI0002794)

* * *

After seeing multiple patients with life-threatening gastrointestinal bleeding due to Xarelto and may review of the literature and the materials provided for my consideration, I have completely abandoned the use of Xarelto in my own practice. It is my opinion that the use of Xarelto in patients with non-valvular atrial fibrillation is not reasonably safe for the reasons set forth in this report.

For these reasons, Dr. Smart's opinions, as explained above, are sufficiently reliable, and thus admissible under *Daubert*.

## III. DR. SMART'S OPINIONS REGARDING THE DOSE AND SAFETY OF XARELTO ARE RELEVANT AND "FIT" THIS CASE

Defendants argue that dosing goes to the design and since Plaintiffs have dismissed their design defect claim, Dr. Smart's dosing opinion do not fit the case. Defendants fail, *once again*, to understand that Dr. Smart's opinions fit squarely within Plaintiff's failure to warn claim. In denying Defendants' motion for partial summary judgment on the grounds of preemption, this Court correctly summarized Plaintiffs' claims as follows:

Xarelto markets itself as a one-size-fits-all anticoagulant. Patients take one 20-milligram dose of Xarelto once a day and do not need to undergo routine monitoring. Plaintiffs contend that, because each person processes and metabolizes Xarelto at a highly-individualized rate, each patient's reaction to the drug is decidedly variable, causing some patients to experience major bleeding events. Plaintiffs acknowledge that the Food and Drug Administration (the "FDA") approved Xarelto's dosing and monitoring scheme. However, they claim that, given the high inter-patient variability, Xarelto is unreasonably dangerous in design because (1) Defendants should have

8

designed, but failed to design, a Xarelto-specific Anti-Factor Xa assay so doctors could monitor Xarelto's anticoagulation effect on each patient and could, along with the patient, weigh the risks and determine whether to continue taking Xarelto; (2) because Defendants have not designed and marketed an antidote to counteract a major bleeding event; and (3) in the absence of a Xarelto-specific Anti-Factor Xa assay, Xarelto's label should have warned doctors about the availability of the Neoplastin PT test to measure patient's anticoagulation. Because Defendants did not take any of the above three actions, Plaintiffs claim Xarelto is unreasonably dangerous under the LPLA.[12]

The testimony that Dr. Smart intends to offer at trial, including that Xarelto's dose once a day dosing regimen results in a highly variable drug, which exposes a broad spectrum of patients, particularly those with advancing age and declining renal function, to excessive bleeding risk, is just one piece of the overall evidence that Plaintiffs will proffer in their failure to warn case. Plaintiff's other expert witnesses will testify that in light of Xarelto's high dose and dosing regimen, the label should instruct physicians to use a simple blood test (PT) to measure the anticoagulant effect of Xarelto in a patient's blood for the safety of the patient, and that without such an instruction to test, Xarelto is too dangerous. Plaintiffs are not asserting that doctors should be instructed to adjust dose based upon the result of the PT test, rather the crux of Plaintiffs' claim is that doctors should be informed that PT is an important test to measure the anticoagulant activity of Xarelto, particularly in an emergency situation. Thus, Dr. Smart's opinions regarding the dose of Xarelto fit squarely into Plaintiff's claim that Defendants' failure to include this instruction on safe use is a failure to warn claim under the Louisiana Products Liability Act R.S. § 9:2800.54 ("LPLA").

## **CONCLUSION**

For the forgoing reasons, and those more fully explained in Plaintiffs' previous responses to Defendants' *Daubert* motions and briefing, which Plaintiffs expressly incorporate here, and in

---

[12]Doc. 6196.

response to Defendants' motion regarding Plaintiff's abandoned theories, this Court should not exclude Dr. Smart's dosing-related opinions.

                                                              Respectfully submitted,

Dated:  May 31, 2017                     */s/ Leonard A. Davis*
                                                Leonard A. Davis, Esq. (Bar No. 14190)
                                                ***HERMAN, HERMAN & KATZ, LLC***
                                                820 O'Keefe Avenue
                                                New Orleans, LA  70113
                                                Phone: (504) 581-4892
                                                Fax: (504) 561-6024
                                                Email: ldavis@hhklawfirm.com

                                                Gerald E. Meunier (Bar No. 9471)
                                                ***GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC***
                                                2800 Energy Centre, 1100 Poydras Street
                                                New Orleans, LA  70163-2800
                                                Phone: (504) 522-2304
                                                Fax: (504) 528-9973
                                                Email: gmeunier@gainsben.com

                                                ***Plaintiffs' Liaison Counsel***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 31, 2017, the foregoing memorandum of law was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Gerald E. Meunier*
**LEONARD A. DAVIS**