**!orr v bayer video tmax db**
**Deposition Designations for Nessel C 20160216, Nessel C 20160217**

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**18:6   -   18:18   Nessel, Christopher 2016-02-16**                                    0:15

    18   6    Q.   Good morning, Dr. Nessel.
    18   7    A.   Good morning.
    18   8    Q.   Would you please state your
    18   9    full name for the record.
    18  10    A.   Yes.  Christopher C. Nessel.
    18  11    Q.   And where are you employed,
    18  12    Dr. Nessel?
    18  13    A.   I'm employed by Janssen
    18  14    Research & Development.
    18  15    Q.   And how long have you worked
    18  16    there?
    18  17    A.   In April it will be ten
    18  18    years.

**19:12   -   19:22   Nessel, Christopher 2016-02-16**                                    0:13

    19  12    Q.   Okay.  And is it true you're
    19  13    a medical doctor?  Is that fair?
    19  14    A.   Yes.
    19  15    Q.   And where did you go to
    19  16    medical school?
    19  17    A.   Temple University.
    19  18    Q.   Okay.  And do you still see
    19  19    patients?
    19  20    A.   While I retain a -- an
    19  21    active medical license, I don't have an
    19  22    office practice, no.

**19:23   -   20:10   Nessel, Christopher 2016-02-16**                                    0:26

    19  23    Q.   Okay.  When was the last
    19  24    time you -- if ever, you actually treated
    20   1    a patient?
    20   2    A.   Well, I will occasionally
    20   3    treat family and friends as a -- as a
    20   4    courtesy.  My last formal, if you will,
    20   5    seeing of patients was in maybe 2005 or
    20   6    2006 in connection with my service in the
    20   7    United States Navy.
    20   8    Q.   Okay.  Is it fair to say,
    20   9    sir, that you were intimately involved in
    20  10    the ROCKET trial?

**20:13   -   22:6   Nessel, Christopher 2016-02-16**                                    1:15

    20  13        THE WITNESS:  I was the
    20  14    study-responsible physician for
    20  15    the ROCKET trial.
    20  16    BY MR. McWILLIAMS:
    20  17    Q.   Can you briefly describe
    20  18    what your roles and responsibilities were
    20  19    for the ROCKET trial?
    20  20    A.   Certainly.  Along with the
    20  21    study team at Janssen, I was responsible
    20  22    for the study design and conduct.  I
    20  23    served as a member of the ROCKET-AF
    20  24    executive committee.  And I -- I think

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 21 | 1 | that about describes it. |
| 21 | 2 | Q.   Is it fair to say that you |
| 21 | 3 | were also involved in interaction with |
| 21 | 4 | regulatory bodies about the ROCKET |
| 21 | 5 | design, conduct, and results? |
| 21 | 6 | A.   Yes. |
| 21 | 7 | Q.   And you also spoke at the |
| 21 | 8 | advisory committee in 2011, prior to the |
| 21 | 9 | approval for the Afib indication; is that |
| 21 | 10 | correct? |
| 21 | 11 | A.   Yes. |
| 21 | 12 | Q.   And you spoke on behalf of |
| 21 | 13 | the company; is that correct? |
| 21 | 14 | A.   Yes. |
| 21 | 15 | Q.   Okay.  Could you briefly |
| 21 | 16 | describe ROCKET, the trial -- or let |
| 21 | 17 | me -- let me try to briefly describe it |
| 21 | 18 | and see if you'll generally agree with |
| 21 | 19 | me. |
| 21 | 20 | My understanding is that |
| 21 | 21 | ROCKET was a trial designed to test |
| 21 | 22 | Xarelto to see if it was safe and |
| 21 | 23 | effective for the prevention of strokes |
| 21 | 24 | in patients with nonvalvular atrial |
| 22 | 1 | fibrillation, and essentially what you |
| 22 | 2 | did was you followed about 14,000 |
| 22 | 3 | patients over approximately two years and |
| 22 | 4 | at the end counted up the number of |
| 22 | 5 | strokes and bleeds. |
| 22 | 6 | Is that a fair summation -- |

**22:9 - 22:19   Nessel, Christopher 2016-02-16**                                    0:13

| | | |
|---|---|---|
| 22 | 9 | BY MR. MCWILLIAMS: |
| 22 | 10 | Q.   -- of -- |
| 22 | 11 | A.   It is.  The -- the only |
| 22 | 12 | thing I would add, there -- there are |
| 22 | 13 | many -- it is a very large trial, and |
| 22 | 14 | there are many things that we could -- we |
| 22 | 15 | could discuss.  But one important thing, |
| 22 | 16 | I think, is -- to include is that |
| 22 | 17 | warfarin was the comparative.  It was not |
| 22 | 18 | a placebo-controlled trial.  Warfarin was |
| 22 | 19 | the comparator. |

**482:13 - 483:12   Nessel, Christopher 2016-02-17**                                  1:01

| | | |
|---|---|---|
| 482 | 13 | Q.   Okay.  And are any of these |
| 482 | 14 | bonuses tied into the performance of the |
| 482 | 15 | drugs on the marketplace that you have |
| 482 | 16 | worked in developing, like Xarelto, for |
| 482 | 17 | example? |
| 482 | 18 | A.   No, sir. |
| 482 | 19 | Q.   Do -- or perhaps, do you get |
| 482 | 20 | a bonus if a drug that you're developing, |
| 482 | 21 | like Xarelto, is approved by FDA or EMA? |
| 482 | 22 | A.   No, sir. |
| 482 | 23 | Q.   Tied into anything like |
| 482 | 24 | that? |
| 483 | 1 | A.   It is my understanding that |
| 483 | 2 | the bonus, if it is awarded, is based on |
| 483 | 3 | the associate's performance relative to |
| 483 | 4 | their goals, their deliverables, et |
| 483 | 5 | cetera. |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

483  6   Q.  Okay.  Now, other than
483  7   Xarelto, what other drugs have you worked
483  8   on at Janssen over the ten years?
483  9   A.  None other directly.
483  10   Q.  Okay.  So Xarelto has been
483  11   what you worked on primarily?
483  12   A.  Yes, sir.

484:16 -   484:16 Nessel, Christopher 2016-02-17          0:01
484  16   Q.  I'm not sure any of this was

484:17 -   485:6 Nessel, Christopher 2016-02-17          0:26
484  17   discussed yesterday.  I just want to get
484  18   some background on the mechanism of
484  19   Xarelto.  If you'll indulge me for just a
484  20   few minutes.
484  21       And I understand that
484  22   Xarelto is what's considered a direct
484  23   oral anticoagulant.  Is that correct,
484  24   sir?
485  1   A.  Yes, sir.
485  2   Q.  And that's unlike, for
485  3   example, warfarin, which is an
485  4   anticoagulant but is not considered a
485  5   direct oral anticoagulant, correct?
485  6   A.  Yes, sir.

487:20 -   487:22 Nessel, Christopher 2016-02-17          0:05
487  20   Q.  Now, we are talking about
487  21   blood clots in humans.  They can be
487  22   harmful, agree?

488:3  -   488:6 Nessel, Christopher 2016-02-17          0:05
488  3       THE WITNESS:  Well, they --
488  4   blood clots can serve -- yes, they
488  5   can be both harmful and helpful.
488  6       Yes, sir.

488:8  -   488:22 Nessel, Christopher 2016-02-17          0:27
488  8   Q.  And let's talk about
488  9   harmful.  For example, if there's a clot
488  10   in a person's heart, it could travel up
488  11   through the blood vessel and get into the
488  12   brain and cause a stroke, right?
488  13   A.  Yes, sir, that's correct.
488  14   Q.  Or if there's a clot in a
488  15   leg, it can travel up a vein and get into
488  16   the lung and cause a pulmonary embolism?
488  17   A.  Yes, that is my
488  18   understanding.
488  19   Q.  Both of those are very bad
488  20   outcomes for a person, usually?
488  21   A.  Yes.  I think that is
488  22   generally correct.

488:23 -   489:17 Nessel, Christopher 2016-02-17          0:34
488  23   Q.  Okay.  And Xarelto was
488  24   approved for the prevention -- was
489  1   approved for the prevention of clots in
489  2   patients with atrial fibrillation; is
489  3   that correct?
489  4   A.  Yes, sir.

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

489   5   Q.   Okay.  And just a little bit
489   6   about atrial fibrillation --
489   7   A.   May I please
489   8   recharacterize --
489   9   Q.   Sure.
489  10   A.   -- my testimony?
489  11          It's for the prevention of
489  12   stroke and non-CNS systemic embolism.
489  13   And you -- what you said was correct, but
489  14   the clot is more specific.  It's for
489  15   stroke or non-CNS systemic embolism.
489  16   Q.   Thank you for that
489  17   clarification.

489:19 -   490:11 Nessel, Christopher 2016-02-17          0:27
489  19          patients with atrial fibrillation have an
489  20   increased risk of suffering a stroke,
489  21   correct?
489  22   A.   Yes, sir.
489  23   Q.   An ischemic stroke?
489  24   A.   Yes, sir.
490   1   Q.   And by ischemic, we're
490   2   talking about a blood clot type of
490   3   stroke, right?
490   4   A.   Yes, sir.
490   5   Q.   A clot that gets into a
490   6   blood vessel in the brain and cuts off
490   7   circulation and, therefore, results in
490   8   ischemia and death of brain cells, and
490   9   that's what a stroke would be?
490  10   A.   Yes.  Unfortunately that is
490  11   correct.

490:12 -   491:23 Nessel, Christopher 2016-02-17          1:23
490  12   Q.   So an atrial fibrillation,
490  13   is it -- is, to just boil it down, an
490  14   oversimplified -- I hope you forgive me
490  15   for that -- it's an irregular heartbeat?
490  16   A.   It is, in fact, the most
490  17   common irregular heartbeat, yes, sir.
490  18   Q.   And it's characterized by an
490  19   inefficiently -- the heart inefficiently
490  20   pumps blood?  Would that be fair to say?
490  21   A.   It does, in fact, do that.
490  22   The two chambers on the top of the heart,
490  23   what is called fibrillate, instead of
490  24   rhythmic contraction, they kind of -- I
491   1   sometimes liken it to Jell-O a little
491   2   bit.  There is no rhythmic contraction.
491   3   They fibrillate.
491   4          And as a result of that, the
491   5   efficiency of the heart, as you described
491   6   it, is diminished, yes, sir.
491   7   Q.   And that's -- and when blood
491   8   is pumped inefficiently by the heart, it
491   9   can -- it can potentially pool; and if it
491  10   pools, it can potentially coagulate,
491  11   right?
491  12   A.   Yes, sir.
491  13   Q.   And if it coagulates, it can
491  14   form a clot, and the clot can then travel
491  15   up the blood vessel to the brain and, lo

4

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

491 16    and behold, a stroke.
491 17    A.   Yes, sir. If indeed the
491 18    clot, which is fixed, a thrombus, then
491 19    travels, it becomes an embolus. You've
491 20    described it as is my understanding, sir.
491 21    Q.   Okay. And Xarelto was
491 22    approved to prevent that type of blood
491 23    clot from forming and causing a stroke?

**492:3 - 492:7 Nessel, Christopher 2016-02-17**    0:08
492 3    Q.   Right?
492 4    A.   Xarelto was approved for the
492 5    prevention of stroke and non-CNS systemic
492 6    embolism as would have been brought on by
492 7    a clot that you just described.

**492:18 - 492:21 Nessel, Christopher 2016-02-17**    0:05
492 18    It's approved to prevent
492 19    strokes in patients with atrial
492 20    fibrillation?
492 21    A.   Yes, sir.

**492:22 - 493:18 Nessel, Christopher 2016-02-17**    0:48
492 22    Q.   Okay. One of the side
492 23    effects, however, are that it increases
492 24    the risk of major bleeding and sometimes
493 1    fatal bleeding in patients who take
493 2    Xarelto, correct?
493 3    A.   Xarelto or any anticoagulant
493 4    relative to placebo, yes, sir.
493 5    Q.   All right. And so -- and
493 6    you just mentioned this. So its side
493 7    effects are increased risk of bleeding,
493 8    sometimes fatal bleeding, just like
493 9    warfarin, which is also an anticoagulant?
493 10    A.   Yes, sir. That is correct.
493 11    Q.   They both carry those risks,
493 12    warfarin and Xarelto?
493 13    A.   Yes, sir.
493 14    Q.   So, and for decades, would
493 15    it be fair to say that warfarin was used
493 16    for the prevention of stroke in patients
493 17    with atrial fibrillation?
493 18    A.   That is correct, yes.

**493:19 - 493:24 Nessel, Christopher 2016-02-17**    0:14
493 19    Q.   And it was considered for
493 20    many, many, many years to be the gold
493 21    standard, correct?
493 22    A.   It was, in fact, the
493 23    standard. There was literally nothing
493 24    else, unfortunately.

**507:14 - 509:12 Nessel, Christopher 2016-02-17**    2:00
507 14    You spent a good deal of
507 15    yesterday speaking with Mr. McWilliams
507 16    about warfarin and INR. Let's just go
507 17    over some of the basics of that if you
507 18    don't mind.
507 19    What is INR?
507 20    A.   INR stands for international
507 21    normalized ratio.

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

507 22   Q.   And what is that?
507 23   A.   The international normalized
507 24   ratio is a -- an effort to normalize or
508  1   standardize what the laboratory test that
508  2   had been used for many decades for
508  3   warfarin called the prothrombin time.
508  4   Q.   And, so patients on warfarin
508  5   are -- regularly go to the doctor to have
508  6   their INR -- INR measured, right?
508  7   A.   Yes, sir.
508  8   Q.   And there are -- and there
508  9   are standards out there as to what --
508 10   what INR values patients should be --
508 11   should be maintained at, right,
508 12   guidances, guidelines?
508 13   A.   Yes, sir.  Depending upon
508 14   the condition for which they are
508 15   receiving warfarin, that's right.
508 16   Q.   And what is it with respect
508 17   to atrial fibrillation?  What is the --
508 18   what is the guideline with respect to the
508 19   appropriate INR range, or target?
508 20   A.   Sure.  The professional
508 21   society guidelines recommend a range of
508 22   2.0 to 3.0 with a target of 2.5.
508 23   Q.   Okay.  And when they are
508 24   over 3, 3 1/2, 4, they're just -- those
509  1   persons are generally considered to be at
509  2   a higher risk of potential bleeding,
509  3   generally speaking?
509  4   A.   Generally, as the INR climbs
509  5   over 3.5, there -- there can be an
509  6   increased risk of bleeding, yes, sir.
509  7   Q.   Okay.  It's sort of like
509  8   a -- and then the same would be true on
509  9   the opposite side.  If you're too low, it
509 10   may increase your risk of stroke because
509 11   the anticoagulant effect isn't
509 12   efficacious enough?

509:15 -   511:4   Nessel, Christopher 2016-02-17          1:25
509 15         THE WITNESS:  Yes, if the
509 16   INR is less than, say, 1.8, and I
509 17   would say that not just stroke,
509 18   but also non-CNS systemic
509 19   embolism.  A thrombotic event in
509 20   general.
509 21   BY MR. DOUGLAS:
509 22   Q.   Okay.  And so the -- and
509 23   with respect to patients on warfarin,
509 24   let's just limit this for now in terms of
510  1   AFib patients.
510  2         Warfarin is considered to
510  3   have what is called a wide inter-patient
510  4   variability?
510  5   A.   Can you describe that.  I'm
510  6   not certain I've seen that.
510  7   Q.   Okay.  Do you -- are you
510  8   familiar with the concept of patient
510  9   variability, inter-patient variability?
510 10   A.   And is that I-N-T-E-R or
510 11   I-N-T-R-A?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

510 12    Q.   Inter.  I-N-T-E-R.
510 13    A.   Yes.
510 14    Q.   And -- and by -- while we
510 15    are on the subject, you say you are
510 16    familiar with inter-subject variability?
510 17    A.   Yes.
510 18    Q.   What is that?
510 19    A.   That is if you have -- if
510 20    you have ten subjects, instead of -- and,
510 21    say, for a given dose, say, for aspirin,
510 22    you might give those ten subjects
510 23    81 milligrams of aspirin.  But for other
510 24    medications, say, digoxin or warfarin,
511  1    one patient might require 2 milligrams;
511  2    one patient might require 7 milligrams;
511  3    one patient might require 7 milligrams
511  4    every other day.

**512:10 -   512:13 Nessel, Christopher 2016-02-17**    0:06
512 10    Q.   You would agree that it's
512 11    important to identify those patients
512 12    whose INR is high and, therefore, at a
512 13    higher risk of bleeding?

**512:17 -   513:15 Nessel, Christopher 2016-02-17**    0:42
512 17    THE WITNESS:  Let me -- let
512 18    me see if I understand your
512 19    question.  I -- I would state it
512 20    as, it is important to
512 21    regularly -- regularly monitor the
512 22    INR to ensure that it is within
512 23    the therapeutic range.
512 24    Did that answer your
513  1    question?
513  2    BY MR. DOUGLAS:
513  3    Q.   Sure.  And that's because
513  4    those patients who have an INR, let's
513  5    say, of 3-1/2 or 4 would be at an
513  6    increased risk, and you'd want to learn
513  7    that so you could adjust their dose and
513  8    bring them back down within the target
513  9    range?
513 10    A.   They may be.  And yes, a
513 11    dose adjustment may be necessary, yes,
513 12    sir.
513 13    Q.   So I want to talk to you
513 14    about Xarelto and this concept of
513 15    inter-patient variability.  And first,

**Re: [512:17-513:15] Def Obj** Incomplete designation. Designation ends part way through a question.

**Re: [512:17-513:15]** Pending
**Pltf Resp** The selected portion serves to introduce the jury to the topic to be discussed: intrapatient variability of Xarelto, which starts at 519:24.  For clarity, Plaintiffs are willing to excise the phrase "And first," from 512:15.

**519:24 -   520:2 Nessel, Christopher 2016-02-17**    0:06
519 24    Q.   Inter-patient variability is
520  1    something that you know and found to be
520  2    the case with respect to Xarelto, right?

**520:5 -   521:5 Nessel, Christopher 2016-02-17**    0:48
520  5    THE WITNESS:  Well, I can't
520  6    answer that without some
520  7    qualification of inter-patient
520  8    variability.
520  9    I mean, it would seem
520 10    important that there's an
520 11    adjective in front of

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | |
|---|---|---|
| 520 12 | inter-patient variability. Low, | |
| 520 13 | extreme, high, medium, something | |
| 520 14 | like that. | |
| 520 15 | And so I can't answer that | |
| 520 16 | question without -- without | |
| 520 17 | further quantifying it. And | |
| 520 18 | again, I'm not a clinical | |
| 520 19 | pharmacologist. I'm not best | |
| 520 20 | suited to answer these questions. | |
| 520 21 | BY MR. DOUGLAS: | |
| 520 22 | Q. Okay. But, I mean, you have | |
| 520 23 | read the published -- the Patel New | |
| 520 24 | England Journal of Medicine article with | |
| 521 1 | respect to the ROCKET study? | |
| 521 2 | A. Which paper, sir? | |
| 521 3 | MR. DOUGLAS: Okay. Let's | |
| 521 4 | use Mueck first. Let me see if I | |
| 521 5 | can help you out. | |

**521:9 - 525:24 Nessel, Christopher 2016-02-17**    4:42

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 521 9 | BY MR. DOUGLAS: | | Re: [521:9-525:24] | Re: [521:9-525:24]    Pending | |
| 521 10 | Q. So this will be Nessel-55. | | Def Obj Lack of | Pltf Resp His | |
| 521 11 | And I'm going to hand you an article | | foundation; witness says | testimony, as the | |
| 521 12 | called "Clinical Pharmacokinetic and | | he is not familiar with | physician responsible | |
| 521 13 | Pharmacodynamic Profile of Rivaroxaban." | | the document. See Tr. | for the design and | |
| 521 14 | Do you know the lead author, | | 521:22-24. See also | conduct of ROCKET, | |
| 521 15 | Wolfgang Mueck? I hope I'm pronouncing | | exhibit objections to C. | provides crucial | |
| 521 16 | that right. Please feel free to correct | | Nessel 55. | context to how the | |
| 521 17 | me. | | | study was conducted | |
| 521 18 | A. I know of him, sir. But I | | | as well as | |
| 521 19 | don't know him personally. I do know | | | contextualizing a | |
| 521 20 | Dr. Kubitza, but I don't know Dr. -- | | | data pool upon | |
| 521 21 | appears to be Stampfuss and Becka. | | | which Defendants' | |
| 521 22 | Q. Okay. Are you familiar with | | | defenses are largely | |
| 521 23 | this article? | | | based. His | |
| 521 24 | A. No, sir. | | | awareness [or lack | |
| 522 1 | Q. Okay. I'm just going to | | | thereof] of the | |
| 522 2 | direct your attention to a table in there | | | information | |
| 522 3 | and ask you if you're familiar with the | | | contained within the | |
| 522 4 | data at least. I'll ask you to turn to | | | article publishing the | |
| 522 5 | Table 3, which is on Page 7. | | | results of ROCKET is | |
| 522 6 | If we can blow up the table. | | | in itself probative to | |
| 522 7 | Do you see that the Table 3 | | | how the ROCKET trial | |
| 522 8 | is called "Plasma concentrations of | | | was conducted. See | |
| 522 9 | rivaroxaban in patient populations | | | Plaintiffs' responses | |
| 522 10 | studied"? | | | to exhibit objections. | |
| 522 11 | Do you see that? | | | | |
| 522 12 | A. Yes, sir. | | | | |
| 522 13 | Q. Okay. Now, correct me if | | | | |
| 522 14 | I'm wrong, but there was a subset of | | | | |
| 522 15 | subjects in the ROCKET study from whom | | | | |
| 522 16 | blood plasma concentrations of Xarelto | | | | |
| 522 17 | were measured? | | | | |
| 522 18 | A. Yes, sir. | | | | |
| 522 19 | Q. And it's about -- was it | | | | |
| 522 20 | 126? What's the number? | | | | |
| 522 21 | A. 161, sir. | | | | |
| 522 22 | Q. 161. Okay. | | | | |
| 522 23 | So -- and do you see there, | | | | |
| 522 24 | this is -- these are some of the results | | | | |
| 523 1 | of that subset, because it refers to | | | | |
| 523 2 | plasma concentrations of rivaroxaban. | | | | |

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

523  3   Right?  Does that make sense?
523  4   A.   According to -- are you
523  5   looking at Table 3 or Figure 3, sir?
523  6   Q.   Table 3.
523  7   A.   Oh, I'm sorry.  Yes, sir.  I
523  8   see that.
523  9   Q.   Okay.  So let's -- so on
523  10   this subject of inter-patient
523  11   variability, hopefully you can enlighten
523  12   us.  If not, that's fine, if you feel
523  13   it's outside the scope of your expertise.
523  14           But do you see where it
523  15   says -- let's look at stroke prevention
523  16   in patients with AF.  That's the third
523  17   line.  That's atrial fibrillation?
523  18   A.   Yes.
523  19   Q.   Presumably?
523  20   A.   Yes, sir.
523  21   Q.   And 20 milligrams once a
523  22   day, right?
523  23   A.   Yes, sir.
523  24   Q.   Okay.  And do you see then
524  1   it has AUC, which is the area under the
524  2   curve?
524  3   A.   Yes, sir.
524  4   Q.   All right.  And then it has
524  5   the C trough, is the next column?
524  6   A.   Yes, sir.
524  7   Q.   And you see that the C
524  8   trough is 44, right?
524  9   A.   Yes, sir.  That's what the
524  10   table says.
524  11   Q.   Okay.  But in parentheses,
524  12   do you know how to read that?  Do you
524  13   know what the numbers are in the
524  14   parentheses?
524  15   A.   According to -- there's a
524  16   superscript.  Oh, gosh.  I could use an
524  17   optometrist.  It's either a C or an E.
524  18   And it says, "The median estimated values
524  19   are the paren, and in the paren are the
524  20   percentile range.  The fifth percentile
524  21   is represented by the first number, and
524  22   the 95th percentile is represented by the
524  23   second number after the hyphen.
524  24   Q.   Okay.  So the fifth
525  1   percentile -- let me just back up a
525  2   second.
525  3           So the C trough, the amount
525  4   of drug in the plasma -- plasma
525  5   concentration, in other words, at C
525  6   trough for 20-milligram is 44; and ug per
525  7   liter, that's --
525  8   A.   Micrograms.
525  9   Q.   Micrograms.  So the number
525  10   is 44 micrograms per liter, but when you
525  11   look in the parentheses, the fifth
525  12   percentile, which would be the lower end
525  13   of the spectrum, is 12 micrograms per
525  14   liter?
525  15   A.   Yes, sir.
525  16   Q.   And the 95th, or the higher

9

| | Objections In | Responses In | Rulings |
|---|---|---|---|

525 17   end, would be 137 micrograms per liter?
525 18   A.   Correct, sir.
525 19   Q.   So that patients at the 5th
525 20   percentile are 12 and the 95th percentile
525 21   are 137?
525 22   A.   Yes, sir.
525 23   Q.   That's a significant
525 24   difference, would you say?

**526:3 - 527:5** Nessel, Christopher 2016-02-17

526 3   THE WITNESS:  These are
526 4   pharmacokinetic parameters.  And
526 5   they are beyond my area of
526 6   expertise.  I don't want to
526 7   comment.
526 8   BY MR. DOUGLAS:
526 9   Q.   So let's just do the math.
526 10   That's about a tenfold difference right
526 11   there, right, from the 5th percentile to
526 12   the 95th percentile?  Just doing the
526 13   math.
526 14   A.   Just, the arithmetical
526 15   difference is tenfold, yes, sir.
526 16   Q.   And, you know, just on this
526 17   subject of variability, and what -- you
526 18   know, and how variable is Xarelto, I want
526 19   to ask you to take a look at -- at
526 20   Nessel-56.
526 21   A.   Thank you.  Thank you.
526 22   Q.   And I know that you have
526 23   been devoted, almost all of your time, in
526 24   your years at Janssen to Xarelto.  So I
527 1   hope you'll be able to answer this
527 2   question.
527 3   How does Xarelto compare to
527 4   other direct oral anticoagulants in terms
527 5   of variability, if you know?

**527:13 - 527:19** Nessel, Christopher 2016-02-17

527 13   A.   Oh.  I'm sorry.  I do not
527 14   know.  I've never studied it, sir.
527 15   Q.   Okay.  Let me ask you to
527 16   take a look then at Dugi, what is it, 56?
527 17   MS. SHARKO:  Nessel-56.
527 18   MR. DOUGLAS:  I mean,
527 19   Nessel-56.

**1:08**

*Sustained*

**Re: [526:3-527:5]**
**Def Obj** Lack of foundation; witness says he is not familiar with the document. See Tr. 521:22-24. See also exhibit objections to C. Nessel 55.

**0:15**

*Sustained*

**Re: [527:13-527:19]**
**Def Obj** Lack of foundation; witness says he had not studied the article and cannot comment on it. See Tr. 529:19-21. Calls for

Re: [526:3-527:5]   Pending
Pltf Resp His testimony, as the physician responsible for the design and conduct of ROCKET, provides crucial context to how the study was conducted as well as contextualizing a data pool upon which Defendants' defenses are largely based.  His awareness [or lack thereof] of the information contained within the article publishing the results of ROCKET is in itself probative to how the ROCKET trial was conducted. See Plaintiffs' responses to exhibit objections.

Re: [527:13-527:19]   Pending
Pltf Resp As the physician responsible for the design and conduct of the ROCKET trial, his awareness [or lack

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | speculation. See also exhibit objections to C. Nessel 56. | thereof] of the information contained within the article publishing the results of ROCKET is in itself probative to how the ROCKET trial was conducted. The witness is not being asked about the veracity or other particularls of the aritlce, per se, but instead is being asked about a specific finding reported by the article and testify whether or not he was aware of this. Owing to his responsibilities as | |

Sustained

527:24 – 529:16 Nessel, Christopher 2016-02-17                    1:39

| | | Re: [527:24-529:16] | Re: [527:24-529:16]   Pending |
|---|---|---|---|
| 527 | 24 | Q.  Yeah.  But this is -- you'll | **Def Obj** Lack of foundation; witness says he had not studied the article and cannot comment on it. See Tr. 529:19-21. Calls for speculation. See also exhibit objections to C. Nessel 56. | Pltf Resp As the physician responsible for the design and conduct of the ROCKET trial, his awareness [or lack thereof] of the information contained within the article publishing the results of ROCKET is in itself probative to how the ROCKET trial was conducted. The witness is not being asked about the veracity or other particularls of the article, per se, but instead is being asked about a specific finding reported by the article and testify whether or not he was aware of this. Owing to his responsibilities as the physician reponsible for ROCKET, there is |
| 528 | 1 | see this is a letter to the editor, | | |
| 528 | 2 | and -- to JAMA -- | | |
| 528 | 3 | A.  Yes. | | |
| 528 | 4 | Q.  -- dated June 2015, from a | | |
| 528 | 5 | Dr. Jvrg Kreuzer and Klaus Dugi? | | |
| 528 | 6 | A.  Yes, sir. | | |
| 528 | 7 | Q.  Do you see that? | | |
| 528 | 8 | A.  Yeah. | | |
| 528 | 9 | Q.  Do you know either of those | | |
| 528 | 10 | gentlemen? | | |
| 528 | 11 | A.  No, sir. | | |
| 528 | 12 | Q.  Dr. Dugi is a very, very | | |
| 528 | 13 | pleasant gentleman.  And he wrote this | | |
| 528 | 14 | letter to the editor.  And I want to | | |
| 528 | 15 | direct your attention to a particular | | |
| 528 | 16 | part of it, a statement of fact, and ask | | |
| 528 | 17 | you if you agree or if you know, if | | |
| 528 | 18 | you're familiar with it or not. | | |
| 528 | 19 |     If you go to the | | |
| 528 | 20 | paragraph -- second paragraph from the | | |
| 528 | 21 | bottom, right above their names.  Yep. | | |
| 528 | 22 | And you'll see about -- a little more | | |
| 528 | 23 | than halfway down, there is a sentence | | |
| 528 | 24 | that starts, "In RE-LY, the 10th through | | |
| 529 | 1 | 90th percentile trough concentrations | | |
| 529 | 2 | varied 5.5-fold irrespective of dose." | | |
| 529 | 3 |     Do you see where I'm reading | | |
| 529 | 4 | from? | | |
| 529 | 5 | A.  Yes, sir. | | |
| 529 | 6 | Q.  And then it goes on to say, | | |
| 529 | 7 | "The plasma level variability of | | |
| 529 | 8 | dabigatran is similar in magnitude to | | |
| 529 | 9 | that reported of apixaban and even lower | | |
| 529 | 10 | than rivaroxaban." | | |
| 529 | 11 |     Do you see that? | | |
| 529 | 12 | A.  Yes, sir. | | |
| 529 | 13 | Q.  Okay.  Is this information | | |
| 529 | 14 | coming as news to you that Pradaxa, | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

529 15    another direct oral anticoagulant, has
529 16    less variability than Xarelto?

**529:19 -   529:21** Nessel, Christopher 2016-02-17
529 19    THE WITNESS:  As I said,
529 20    sir, I haven't studied it.  I
529 21    couldn't comment on it.

*Sustained* 0:09

**Re: [529:19-529:21]**
**Def Obj** Lack of foundation; witness says he had not studied the article and cannot comment on it. See Tr. 529:19-21. Calls for speculation. See also exhibit objections to C. Nessel 56.

Re: [529:19-529:21]   Pending
Pltf Resp As the physician responsible for the design and conduct of the ROCKET trial, his awareness [or lack thereof] of the information contained within the article publishing the results of ROCKET is in itself probative to how the ROCKET trial was conducted.  The witness is not being asked about the veracity or other particularls of the article, per se, but instead is being asked about a specific finding reported by the article and testify whether or not he was aware of this.  Owing to his responsibilities as the physician

**530:6 -   530:16** Nessel, Christopher 2016-02-17
530 6    Q.  Okay.  And we just talked a
530 7    few minutes ago about the 161 patients
530 8    whose plasma concentrations were measured
530 9    with respect to rivaroxaban levels?
530 10    A.  In the ROCKET-AF study.
530 11    Q.  In the ROCKET.
530 12    A.  Yes, sir.
530 13    Q.  I'm going to ask you to take
530 14    a look at a slide that we prepared, a
530 15    box-and-whiskers.  We've marked it as 57,
530 16    Nessel-57.

0:10

**530:24 -   531:2** Nessel, Christopher 2016-02-17
530 24    Q.  And what we did was plot on
531 1    this box and whiskers the values for the
531 2    various persons, amongst the 161.

*Sustained*

**Re: [530:24-531:2]**
**Def Obj** Lack of foundation for document that witness had never seen.  Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57.

Re: [530:24-531:2]   Pending
Pltf Resp This is a demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in that fashion.  Plaintiffs would agree to not having it admitted into evidence, but only published.  The witness was able to offer corroborating testimony on the subject matter of the demonstrative.

0:21

**532:10 -   532:20** Nessel, Christopher 2016-02-17
532 10    Q.  So here we have taken the
532 11    data from ROCKET on the blood
532 12    concentration and put it on a box and
532 13    whiskers.

**Re: [532:10-532:20]**
**Def Obj** Lack of foundation for document that witness

Re: [532:10-532:20]   Pending
Pltf Resp This is a demonstrative exhibit based on data

12

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | |
|---|---|---|
| 532 14      Are you familiar with how to | had never seen. | from the ROCKET |
| 532 15  read box-and-whiskers, sir? | Counsel's homemade | study, for which the |
| 532 16  A.  In general, yes, sir. | exhibit could not be | witness had |
| 532 17  Q.  Okay. So you can see that | authenticated pursuant | enormous |
| 532 18  the -- and each of these dots represents | to FRE 901. See Tr. 531:5- | responsibility, and is |
| 532 19  an actual subject.  That's the concept of | 10. Witness was not able | fair to use as a |
| 532 20  a box and whiskers, right? | to confirm the source of | demonstrative in |
| | the data used to create | that fashion. |
| | the exhibit or the | Plaintiffs would |
| | underlying analysis for | agree to not having it |
| | the exhibit. See also | admitted into |
| | exhibit objections to C. | evidence, but only |
| | Nessel 57. | published.  The |
| | | witness was able to |
| | | offer corroborating |
| | | testimony on the |
| | | subject matter of the |
| | | demonstrative. |

**532:23 -   533:15 Nessel, Christopher 2016-02-17**    0:28

| | | |
|---|---|---|
| 532 23    THE WITNESS:  I'm sorry. | **Re: [532:23-533:15]** | Re: [532:23-533:15]   Pending |
| 532 24  Please ask the question. | **Def Obj** Lack of | Pltf Resp This is a |
| 533 1  BY MR. DOUGLAS: | foundation for | demonstrative |
| 533 2  Q.  Do you understand what the | document that witness | exhibit based on data |
| 533 3  dots represent in the box and whiskers? | had never seen. | from the ROCKET |
| 533 4  A.  In general, they should | Counsel's homemade | study, for which the |
| 533 5  represent a -- a specific time point or a | exhibit could not be | witness had |
| 533 6  blood measure. | authenticated pursuant | enormous |
| 533 7  Q.  Right. So you can see that | to FRE 901. See Tr. 531:5- | responsibility, and is |
| 533 8  the highest -- let's look at the highest | 10. Witness was not able | fair to use as a |
| 533 9  and the lowest, this -- on this subject | to confirm the source of | demonstrative in |
| 533 10  of inter-patient variability, blood | the data used to create | that fashion. |
| 533 11  plasma concentrations.  You can -- you | the exhibit or the | Plaintiffs would |
| 533 12  can see, sir, that the highest is over | underlying analysis for | agree to not having it |
| 533 13  that 600 mark. | the exhibit. See also | admitted into |
| 533 14    Do you see that? | exhibit objections to C. | evidence, but only |
| 533 15  A.  Yes, sir. | Nessel 57. | published.  The |
| | | witness was able to |
| | | offer corroborating |
| | | testimony on the |
| | | subject matter of the |
| | | demonstrative. |

**535:8 -   535:13 Nessel, Christopher 2016-02-17**    0:16

| | | |
|---|---|---|
| 535 8  Q.  Did you know that the data | **Re: [535:8-535:13]** | Re: [535:8-535:13]   Pending |
| 535 9  set with respect to the blood plasma | **Def Obj** Lack of | Pltf Resp This is a |
| 535 10  concentrations of these 161 indicate that | foundation for | demonstrative |
| 535 11  the highest was -- the highest blood | document that witness | exhibit based on data |
| 535 12  plasma concentration was 671 micrograms | had never seen. | from the ROCKET |
| 535 13  per liter? | Counsel's homemade | study, for which the |



| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57. | witness had enormous responsibility, and is fair to use as a demonstrative in that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published.  The witness was able to offer corroborating testimony on the subject matter of the demonstrative. | *Sustained* |

535:20 -   536:6   Nessel, Christopher 2016-02-17
535  20          I'm sorry.  Are you asking
535  21          me if I recalled that from the
535  22          data set?
535  23      BY MR. DOUGLAS:
535  24      Q.   Yes.
536   1      A.   No, sir, I don't have
536   2          recollection about that.
536   3      Q.   Do you have a recollection
536   4          that the lowest value was .6?
536   5      A.   I have no direct
536   6          recollection of that, sir.

0:14

| Re: [535:20-536:6] Def Obj Lack of foundation for document that witness had never seen. Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57. | Re: [535:20-536:6] Pltf Resp This is a demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published.  The witness was able to offer corroborating testimony on the subject matter of the demonstrative. | Pending |

538:19 -   539:5   Nessel, Christopher 2016-02-17
538  19      Q.   Sure.  So assuming it's true
538  20          that their --- one of the patients had a
538  21          plasma level of 671 micrograms per
538  22          liter --
538  23      A.   Yes, sir.
538  24      Q.   -- and another patient had a
539   1          plasma level at a point in time of .6,
539   2          the person with the 671 micrograms per
539   3          liter had a thousand times more drug in
539   4          their blood plasma than the other person
539   5          with the .6?

0:23

| Re: [538:19-539:5] Def Obj Lack of foundation for document that witness had never seen. Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of | Re: [538:19-539:5] Pltf Resp This is a demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in | Pending |

*Overruled*



| | Objections In | Responses in | Rulings |
|---|---|---|---|
| | the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57. | that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published. The witness was able to offer corroborating testimony on the subject matter of the demonstrative. | |

539:9 - 539:10 Nessel, Christopher 2016-02-17
539  9       THE WITNESS: The difference
539 10       is a thousandfold.

0:00

Re: [539:9-539:10] **Def Obj** Lack of foundation for document that witness had never seen. Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57.

Re: [539:9-539:10] Pltf Resp This is a demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published. The witness was able to offer corroborating testimony on the subject matter of the demonstrative.

Pending

*Overruled*

539:19 - 540:2 Nessel, Christopher 2016-02-17
539 19    Q.   Okay.  And assuming that
539 20       those are accurate and actual blood
539 21       values -- blood plasma concentration
539 22       values taken at the ROCKET trial, then
539 23       one patient would have had 1,000 times
539 24       more Xarelto, rivaroxaban, in their blood
540  1       plasma than somebody else who had taken
540  2       the same pill?

0:18

Re: [539:19-540:2] **Def Obj** Lack of foundation for document that witness had never seen. Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57.

Re: [539:19-540:2] Pltf Resp This is a demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published. The witness was able to offer corroborating testimony on the subject matter of the demonstrative.

Pending

540:5 - 540:12 Nessel, Christopher 2016-02-17
540  5       BY MR. DOUGLAS:
540  6       Q.   Right?

0:06

15

Re: [540:5-540:12] **Def Obj** Lack of

Re: [540:5-540:12] Pltf Resp This is a

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 540 | 7 | A.  Sir, these are parameters of |
| 540 | 8 | clinical pharmacology.  I'm not an |
| 540 | 9 | expert -- |
| 540 | 10 | Q.  You can't answer? |
| 540 | 11 | A.  -- in clinical pharmacology. |
| 540 | 12 | I can't answer it. |

**Objections In:** foundation for document that witness had never seen. Counsel's homemade exhibit could not be authenticated pursuant to FRE 901. See Tr. 531:5-10. Witness was not able to confirm the source of the data used to create the exhibit or the underlying analysis for the exhibit. See also exhibit objections to C. Nessel 57.

**Responses In:** demonstrative exhibit based on data from the ROCKET study, for which the witness had enormous responsibility, and is fair to use as a demonstrative in that fashion. Plaintiffs would agree to not having it admitted into evidence, but only published.  The witness was able to offer corroborating testimony on the subject matter of the demonstrative.

*Sustained*

---

543:2  -  543:8   Nessel, Christopher 2016-02-17

| 543 | 2 | Q.  Okay.  And generally |
| 543 | 3 | speaking, the more Xarelto, rivaroxaban, |
| 543 | 4 | that's absorbed, the greater the effect |
| 543 | 5 | of the drug and, therefore, the greater |
| 543 | 6 | the risk of bleeding, correct? |
| 543 | 7 | A.  No, sir.  I would not agree |
| 543 | 8 | with that. |

0:17   *overruled*

Re: [543:2-543:8] **Pltf Obj** Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

---

543:23  -  544:4   Nessel, Christopher 2016-02-17

| 543 | 23 | Q.  Would you agree, sir, that |
| 543 | 24 | the greater the rivaroxaban exposure, the |
| 544 | 1 | greater the potential for increased risk |
| 544 | 2 | of bleeding?  I'm just asking a general |
| 544 | 3 | question, independent of the label. |
| 544 | 4 | We'll get to that in a second. |

0:20

Re: [543:23-544:4] **Pltf Obj** Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

---

544:7  -  544:9   Nessel, Christopher 2016-02-17

| 544 | 7 | THE WITNESS:  No, I'm not |
| 544 | 8 | certain I can agree with that, |
| 544 | 9 | sir. |

0:02

Re: [544:7-544:9] **Pltf Obj** Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

---

544:24  -  545:2   Nessel, Christopher 2016-02-17

| 544 | 24 | Q.  Would you agree significant |
| 545 | 1 | increases of rivaroxaban exposure may |
| 545 | 2 | increase the risk of bleeding? |

0:05

Re: [544:24-545:2] **Pltf Obj** Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

---

545:5  -  545:16   Nessel, Christopher 2016-02-17

| 545 | 5 | THE WITNESS:  It would |
| 545 | 6 | depend. |

0:28

Re: [545:5-545:16] **Pltf Obj** Foundation,

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

545  7      BY MR. DOUGLAS:
545  8      Q.   On what?
545  9      A.   Well, if the drug increased
545 10      but was within a prespecified range, it
545 11      may not -- there may not be a proclivity
545 12      towards bleeding.  It's based on many
545 13      different individual as well as dosage
545 14      characteristics.  Drug characteristics
545 15      and patient characteristics, I guess is
545 16      what I mean.

*Overruled 106*

unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

545:21 -   545:24 Nessel, Christopher 2016-02-17
545 21      Q.   Is there a prespecified
545 22      range in which drug concentration can
545 23      increase but would not in turn increase
545 24      risk of bleeding --

0:07

Re: [545:21-545:24]
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

546:2  -   546:3 Nessel, Christopher 2016-02-17
546  2      BY MR. DOUGLAS:
546  3      Q.   -- with respect to Xarelto?

0:01

Re: [546:2-546:3]
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

546:6  -   546:15 Nessel, Christopher 2016-02-17
546  6      THE WITNESS:  Not to my
546  7      knowledge.
546  8      BY MR. DOUGLAS:
546  9      Q.   Okay.  Would you agree,
546 10      therefore -- now that we've established
546 11      that the idea of a prespecified range
546 12      wouldn't apply to Xarelto, would you
546 13      agree, therefore, that significant
546 14      increases in rivaroxaban exposure may
546 15      increase the bleeding risk?

0:14

Re: [546:6-546:15]
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

546:18 -   547:1 Nessel, Christopher 2016-02-17
546 18      THE WITNESS:  Again,
546 19      "significant" is not in any way
546 20      quantified.  And it would depend
546 21      upon the nature in which the
546 22      patient was receiving the
546 23      medication, their individual
546 24      characteristics, et cetera, their
547  1      other concomitant medications.

0:11

Re: [546:18-547:1]
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

592:4  -   592:8 Nessel, Christopher 2016-02-17
592  4      So would you agree that
592  5      given the variability between patients
592  6      and the pharmacokinetics of Xarelto, that
592  7      the idea of one dose and no monitoring is
592  8      not necessarily the best use of Xarelto?

0:13

Re: [592:4-592:8]
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony

Pending

592:11 -   592:12 Nessel, Christopher 2016-02-17

0:03
17

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | | | Pending |

592 11
592 12

THE WITNESS: I disagree with that.

**Re: [592:11-592:12]**
Pltf Obj Foundation, unqualified expert testimony, improper counter-designation, falls far outside of the scope of other designated testimony.

---

624:3 - 625:9 Nessel, Christopher 2016-02-17                1:04

624 3  Q.  Okay.  Was there a time when
624 4  the company considered a follow-up study
624 5  to ROCKET, sometimes referred to as
624 6  ROCKET II?
624 7  A.  I vaguely recall ROCKET II,
624 8  yes, sir.
624 9  Q.  Okay.  Would you recall
624 10  that, in fact, you had participated in --
624 11  in outlining a design for such a study
624 12  where it would be potentially a
624 13  head-to-head study against other NOACs?
624 14  A.  I don't recall the precise
624 15  specifications of ROCKET II.
624 16  Q.  Well, you do know who Rob
624 17  Califf is?  Dr. Califf?
624 18  A.  Yes, sir.
624 19  Q.  Okay.  You talked about him
624 20  yesterday.  In fact, you published
624 21  articles with Dr. Califf, right?
624 22  A.  I have, sir, yes.
624 23  Q.  Okay.  And would he be
624 24  another person like Dr. Temple whose
625 1  opinion you hold in high regard?
625 2  A.  I have a -- a profound and
625 3  abiding respect for Dr. Califf, yes.
625 4  Q.  And Dr. Califf suggested a
625 5  follow-up to ROCKET because he felt that
625 6  the dose, 15- and 20-milligram for
625 7  renal-impaired and -- and
625 8  nonrenal-impaired, he felt that the dose
625 9  was too high; is that right?

**Re: [624:3-625:9]**
Def Obj FRE 401 and 403. Testimony related to ROCKET2 also is not relevant or admissible for the reasons set forth in Defendants™ Joint MIL 24 [Rec. Doc. 5950]. Testimony related to whether the dose of Xarelto is too high, once a day dosing, or failure to test Xarelto is not relevant or admissible as Plaintiffs have abandoned these claims. [Rec. Doc. 5652 at 2; Rec. Doc. 5606 at 10 n.30.]

Re: [624:3-625:9]            Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto. This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

---

625:12 - 625:24 Nessel, Christopher 2016-02-17              0:19

625 12  BY MR. DOUGLAS:
625 13  Q.  Dr. Califf?
625 14  A.  I don't know what
625 15  Dr. Califf's opinion is on the dose.  Is
625 16  there a document that you'd like me to
625 17  look at?
625 18  Q.  I'm just asking you.  You
625 19  can take a look at some documents.  But
625 20  my question is, irrespective of any
625 21  documents, as you sit here right now,
625 22  is -- isn't it true that Dr. Califf felt
625 23  that the dose, the 15 and 20 milligrams,
625 24  was too high?

**Re: [625:12-625:24]**
Def Obj Lack of foundation and lack of personal knowledge; witness testifies that he did not know the opinions of Dr. Califf. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [625:12-625:24]          Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto.

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | | This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination. | |

626:3  -  626:18 Nessel, Christopher 2016-02-17

| | |
|---|---|
| 626  3 | THE WITNESS:  My |
| 626  4 | recollection of discussions that I |
| 626  5 | had with Dr. Califf about the dose |
| 626  6 | of the drug occurred in -- this |
| 626  7 | would be late summer, early fall |
| 626  8 | of 2011 while we were preparing |
| 626  9 | for the U.S. FDA advisory |
| 626 10 | committee.  And he stated when -- |
| 626 11 | when we were -- we -- in |
| 626 12 | recognition of the contents of the |
| 626 13 | FDA advisory, the FDA briefing |
| 626 14 | book, he stated -- we studied a |
| 626 15 | dose -- it's actually a dosage |
| 626 16 | form.  It's 20 and 15 -- in |
| 626 17 | ROCKET-AF, and the drug was found |
| 626 18 | to be safe and efficacious. |

0:35

Re: [626:3-626:18]
**Def Obj** Lack of foundation and lack of personal knowledge; witness testifies that he did not know the opinions of Dr. Califf. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [626:3-626:18]         Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto. This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

626:20  -  626:24 Nessel, Christopher 2016-02-17

| | |
|---|---|
| 626 20 | Q.  Okay.  Sir, I'm just simply |
| 626 21 | asking you whether or not you recall |
| 626 22 | Dr. Califf expressing the view that the |
| 626 23 | dose, the Xarelto dose at 15 and 20 was |
| 626 24 | too high. |

0:09

627:3  -  627:10 Nessel, Christopher 2016-02-17

| | |
|---|---|
| 627  3 | THE WITNESS:  And that's why |
| 627  4 | I was answering.  My recollection |
| 627  5 | of -- of any dose discussion I had |
| 627  6 | with Dr. Califf was that he said |
| 627  7 | the dose of 20 and 15, it's |
| 627  8 | actually the same dosage, you know |
| 627  9 | what I mean, was both safe and |
| 627 10 | efficacious. |

0:11

627:12  -  627:24 Nessel, Christopher 2016-02-17

| | |
|---|---|
| 627 12 | Q.  Okay.  So you don't recall |
| 627 13 | him specifically saying that the dose |
| 627 14 | was too high? |
| 627 15 | A.  I do not, sir, as I sit |
| 627 16 | here. |
| 627 17 | Q.  Okay.  Fair enough. |
| 627 18 | And when it -- and if the |
| 627 19 | dose -- you would agree, we don't need to |
| 627 20 | ask a pharmacologist; that if a dose is |
| 627 21 | too high, it could over-anticoagulate a |
| 627 22 | patient and they'd have a greater risk -- |
| 627 23 | and unnecessary risk of bleeding if the |
| 627 24 | dose was too high, right? |

0:23

Re: [627:12-627:24]
**Def Obj** Lack of foundation and lack of personal knowledge; witness testifies that he did not know the opinions of Dr. Califf. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [627:12-627:24]         Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto.

| | Objections In | Responses In | Rulings |
|---|---|---|---|



This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

**628:3 - 628:19** Nessel, Christopher 2016-02-17

628  3      THE WITNESS:  Well, now
628  4      you're asking me to speculate,
628  5      sir.  And there are many factors
628  6      that go into --
628  7   BY MR. DOUGLAS:
628  8      Q.  Don't speculate.  I don't
628  9      want you to speculate.
628 10          But, in general, the concept
628 11      of over-anticoagulation -- we talked
628 12      about this before.  The
628 13      over-anticoagulated patient, they have a
628 14      higher risk of bleeding, right?
628 15      A.  For an individual patient,
628 16      there are many factors to consider.
628 17      Q.  So you don't agree with
628 18      that?
628 19      A.  I --

0:20

**Re: [628:3-628:19]**
**Def Obj** Lack of foundation and lack of personal knowledge; witness testifies that he did not know the opinions of Dr. Califf. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [628:3-628:19]        Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto. This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

**628:22 - 629:1** Nessel, Christopher 2016-02-17

628 22      THE WITNESS:  I'm trying to
628 23      answer it precisely.  For any
628 24      individual patient, there are many
629  1      factors to consider.

**629:3 - 629:7** Nessel, Christopher 2016-02-17

629  3      Q.  So if -- but do you agree
629  4      with the basic fundamental principle that
629  5      if you give somebody too much
629  6      anticoagulant, they are going to bleed?
629  7      A.  Again, that's a --

**629:10 - 629:18** Nessel, Christopher 2016-02-17

629 10      BY MR. DOUGLAS:
629 11      Q.  Well, and if you don't think
629 12      so, that's fair enough.
629 13          If Dr. Nessel, from Janssen,
629 14      who has worked on an anticoagulant for
629 15      about -- about ten years now, doesn't --
629 16      disagrees that too much anticoagulant
629 17      could cause somebody to bleed, then
629 18      that's fine too.

**631:16 - 631:23** Nessel, Christopher 2016-02-17

631 16      Q.  I'm asking you about a
631 17      general principle.  The more you
631 18      anticoagulate somebody, the greater their

0:04

0:07

0:17

0:16

**Re: [628:22-629:1]**
**Def Obj** Lack of foundation and lack of personal knowledge; witness testifies that he did not know the opinions of Dr. Califf. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [628:22-629:1]        Pending
Pltf Resp This testimony is not limited to ROCKET2 and dosing, but rather the witness's awareness, or lack thereof, of statementd by Dr. Califf and other authorities regarding safety concerns related to Xarelto. This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

20

| | Objections In | Responses In | Rulings |
|---|---|---|---|

631 19   risk of bleeding; isn't that true,
631 20   generally speaking?  And if you don't
631 21   agree, then fine.  Then we'll have you on
631 22   record as disagreeing with that basic
631 23   principle of science.

**632:2 - 632:22 Nessel, Christopher 2016-02-17**
632 2   THE WITNESS:  I believe I've
632 3   answered or tried to accurately
632 4   answer the question.
632 5   BY MR. DOUGLAS:
632 6   Q.  Okay.  So --
632 7   A.  Precisely, there are many
632 8   things to consider for an individual
632 9   patient.
632 10   Q.  Okay.  So is it true,
632 11   generally speaking, that the more you
632 12   anticoagulate a patient, the greater
632 13   their risk of bleeding?
632 14   A.  There are many things to
632 15   consider for a given patient, relative to
632 16   how much anticoagulant they need.
632 17   Q.  Okay.  I appreciate there
632 18   are many things to consider.  But
632 19   generally speaking, the more
632 20   anticoagulant, the greater the risk of
632 21   bleeding, generally speaking.  Yes or no?
632 22   And if you can't answer, that's fine.

**633:1 - 633:3 Nessel, Christopher 2016-02-17**
633 1   THE WITNESS:  I believe I've
633 2   answered.  I don't have a
633 3   different answer for you, sir.

**635:12 - 635:15 Nessel, Christopher 2016-02-17**
635 12   Q.  Okay.  But do you recall
635 13   discussing with Dr. Califf doing a
635 14   ROCKET II study where you'd look at lower
635 15   doses?

0:30

0:01

0:13

*Sustained in part* 80?

Re: [635:12-635:15]
**Def Obj** Lack of foundation; witness was not copied on the e-mail that is C. Nessel Exhibit 67 and that forms the basis for this testimony. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing. See also exhibit objections to C. Nessel 67.

Re: [635:12-635:15]
Pltf Resp "Although the witness is not copied on the email, he is being asked whether the document refreshes his recollection about discussions with Dr. Califf.  ""Q. Okay. But do you recall discussing with Dr. Califf doing a ROCKET II study where you'd look at lowerdoses?

Pending

**635:18 - 635:19 Nessel, Christopher 2016-02-17**
635 18   Q.  Where you would study lower
635 19   doses, lower than 15 or 20?

0:03

Re: [635:18-635:19]
**Def Obj** Lack of

Re: [635:18-635:19]
Pltf Resp "Although

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | foundation; witness was not copied on the e-mail that is C. Nessel Exhibit 67 and that forms the basis for this testimony. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing. See also exhibit objections to C. Nessel 67. | the witness is not copied on the email, he is being asked whether the document refreshes his recollection about discussions with Dr. Califf.  ""Q. Okay. But do you recall discussing with Dr. Califf doing a ROCKET II study where you'd look at lowerdoses? | |

**635:21 -   636:1** Nessel, Christopher 2016-02-17

635 21    THE WITNESS:  That is a
635 22    general recollection, yes, sir.
635 23    BY MR. DOUGLAS:
635 24    Q.   Okay.  So let's go to the
636  1    next.

**0:25**

**Re: [635:21-636:1]**
**Def Obj** Lack of foundation; witness was not copied on the e-mail that is C. Nessel Exhibit 67 and that forms the basis for this testimony. Calls for speculation. See also objections to 624:3-625:9 regarding ROCKET2 and dosing. See also exhibit objections to C. Nessel 67. Objection to colloquy at 635:23-636:1.

Re: [635:21-636:1]
Pltf Resp "Although the witness is not copied on the email, he is being asked whether the document refreshes his recollection about discussions with Dr. Califf.  ""Q. Okay. But do you recall discussing with Dr. Califf doing a ROCKET II study where you'd look at lowerdoses?

Pending

**640:21 -   640:22** Nessel, Christopher 2016-02-17

640 21    MS. SAY:  This is
640 22    Exhibit 132656, or Nessel-69.

**0:03**

**Re: [640:21-640:22]**
**Def Obj** See exhibit objections to C. Nessel 69.

Re: [640:21-640:22]
Pltf Resp Defendants have not objected to C. Nessel 69.

Pending

**641:3 -   642:12** Nessel, Christopher 2016-02-17

**1:10**

641  3    BY MR. DOUGLAS:
641  4    Q.   You'll see this is an e-mail
641  5    chain.  The top part of that chain
641  6    reflects that you were a recipient;
641  7    therefore, we can assume that you
641  8    received the e-mail chain below, right?
641  9    A.   Yes, sir.
641 10    Q.   Okay.  You're actually on
641 11    all of them, actually, I believe.  Yep.
641 12    So do you see where it says,
641 13    from Peter DiBattiste, the middle
641 14    section, from Peter DiBattiste to Gary
641 15    Peters?
641 16    A.   Dated Monday, December 19,
641 17    2011, at 11:24.
641 18    Q.   Exactly.  Okay.  And you're
641 19    a recipient of this e-mail.
641 20    Do you see that?
641 21    A.   Yes.
641 22    Q.   And it said --
641 23    Dr. DiBattiste writes, "Rob" -- I presume
641 24    that is a reference to Dr. Califf?
642  1    A.   Well, since the e-mail below
642  2    is from Dr. Califf, yes, sir, I would
642  3    agree with that.

**22**

| | Objections In | Responses In | Rulings |



| 642 | 4 | Q. "Rob persists in his |
| 642 | 5 | interest in exploring other doses." |
| 642 | 6 | Do you see where I'm reading |
| 642 | 7 | from? |
| 642 | 8 | A. Yes, sir. |
| 642 | 9 | Q. Do you recall that |
| 642 | 10 | Dr. Califf, presently nominated to be the |
| 642 | 11 | head of the FDA, had insisted that the |
| 642 | 12 | company explore other doses? |

**642:15 - 643:4 Nessel, Christopher 2016-02-17**

| 642 | 15 | THE WITNESS: With the |
| 642 | 16 | e-mail that I read, I guess I |
| 642 | 17 | would disagree with your |
| 642 | 18 | characterization of "insisted." |
| 642 | 19 | As I wasn't included in the |
| 642 | 20 | e-mails -- but as I've read the |
| 642 | 21 | e-mails, it appears to be a |
| 642 | 22 | scientific discussion between |
| 642 | 23 | Dr. DiBattiste and Califf. |
| 642 | 24 | BY MR. DOUGLAS: |
| 643 | 1 | Q. Do you recall that Rob |
| 643 | 2 | Califf persisted -- persisted in an |
| 643 | 3 | interest in exploring other doses with |
| 643 | 4 | respect to Xarelto? |

0:22

**Re: [642:15-643:4]**
**Def Obj** Hearsay. Lack of foundation as witness was not an original recipient or sender of e-mail subject to this testimony. Misstates facts; Dr. Califf was not head of the FDA when he made the statements in December 2011. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [642:15-643:4]    Pending
Pltf Resp this document is either non-hearsay, as it goes to notice or the lack of notice by the company of important safety information. Alternatively, it is an exception to hearsay as a business record. The witness agrees that he was a recipient of these emails, œQ. You'll see this is an e-mail chain. The top part of that chain reflects that you were a recipient; therefore, we can assume that you received the e-mail chain below, right? A. Yes, sir. Q. Okay. You're actually on all of them, actually, I believe. Yep. So do you see where it says, from

**643:7 - 643:24 Nessel, Christopher 2016-02-17**

| 643 | 7 | THE WITNESS: And as I -- |
| 643 | 8 | the e-mail that Dr. DiBattiste |
| 643 | 9 | wrote states, "Rob persists in his |
| 643 | 10 | interest." |
| 643 | 11 | But my -- again, I wasn't |
| 643 | 12 | involved with the discussions, |
| 643 | 13 | with these particular discussions |
| 643 | 14 | with Rob. So as I read these |
| 643 | 15 | e-mails, it appears that two |
| 643 | 16 | scientists were talking about a |
| 643 | 17 | potential clinical study. |
| 643 | 18 | BY MR. DOUGLAS: |
| 643 | 19 | Q. Looking at other doses? |
| 643 | 20 | A. Yes, sir. |
| 643 | 21 | MR. DOUGLAS: Let's move on |
| 643 | 22 | to... |
| 643 | 23 | MS. SAY: This is |
| 643 | 24 | Exhibit 271862, or Nessel-70. |

0:50

**Re: [643:7-643:24]**
**Def Obj** Hearsay. Lack of foundation as witness was not an original recipient or sender of e-mail subject to this testimony. Misstates facts; Dr. Califf was not head of the FDA when he made the statements in December 2011. See also objections to 624:3-625:9 regarding ROCKET2 and dosing.

Re: [643:7-643:24]    Pending
Pltf Resp this document is either non-hearsay, as it goes to notice or the lack of notice by the company of important safety information. Alternatively, it is an exception to hearsay as a business record. The witness agrees that he was a recipient of these emails, œQ. You'll see this is an e-mail chain. The top part

| | Objections In | Responses In | Rulings |
|---|---|---|---|

of that chain reflects that you were a recipient; therefore, we can assume that you received the e-mail chain below, right? A. Yes, sir. Q. Okay. You're actually on all of them, actually, I believe. Yep. So do you see where it says, from

**644:4 - 645:4** Nessel, Christopher 2016-02-17

2:09

644  4    THE WITNESS:  Thank you.
644  5    BY MR. DOUGLAS:
644  6    Q.   You see this is an e-mail
644  7    chain that ends with your e-mail of
644  8    January 3rd, 2012.  That's at the top of
644  9    the first page.
644  10          Do you see that, between you
644  11   and Gary Peters?
644  12   A.   Yes, sir.  If I could just
644  13   have one minute.
644  14   Q.   Sure.  Take your time.
644  15   A.   Okay, sir.
644  16   Q.   Okay.  So is it true that
644  17   you designed the ROCKET II trial?
644  18   A.   That's what it says in this
644  19   e-mail, yes.
644  20   Q.   That's what you wrote in
644  21   that e-mail, right?
644  22   A.   Yes, sir.
644  23   Q.   Okay.  Because before I
644  24   asked you if you had ever heard of
645  1    ROCKET II, and I appreciate it was some
645  2    years ago, and you had some hesitancy
645  3    about that.  But now are -- we're clear
645  4    that you do know what ROCKET II is?

**Re: [644:4-645:4]**
**Def Obj** See objections to 624:3-625:9 regarding ROCKET2 and dosing. See also exhibit objections to C. Nessel 70.

**Re: [644:4-645:4]**
**Pltf Resp** This statement is not hearsay and involves statements made by the witness.  Further, the witness is being asked to testify to his independant understanding of the contents of these statements, falling far outside any hearsay considerations.  This testimony is not limited to ROCKET2 and dosing, but rather the witness's recollection of statements that he made regarding safety concerns related to Xarelto. This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of

Pending

**645:8 - 646:19** Nessel, Christopher 2016-02-17

1:12

645  8    THE WITNESS:  Again, this is
645  9    going back to 2000 -- this is
645  10   January of 2012.  So more than
645  11   four years ago.  And I can get the
645  12   gist of it from the paragraph at
645  13   the top of the e-mail, sir.
645  14   BY MR. DOUGLAS:
645  15   Q.   Okay.  So you designed the
645  16   ROCKET II -- this goes on to say, "I
645  17   designed the ROCKET II trial for the
645  18   comparison with apixaban, but fully
645  19   support the concept of a dose-finding
645  20   study in advance."
645  21          Did I read that correctly?
645  22   A.   Yes, sir.
645  23   Q.   And what you are talking
645  24   about is a -- is looking at other doses

**Re: [645:8-646:19]**
**Def Obj** See objections to 624:3-625:9 regarding ROCKET2 and dosing. Calls for speculation as to 646:17-19.

**Re: [645:8-646:19]**
**Pltf Resp** This statement is not hearsay and involves statements made by the witness.  Further, the witness is being asked to testify to his independant understanding of the contents of these statements, falling far outside any hearsay considerations.  This testimony is not limited to ROCKET2

Pending

24

| | Objections In | Responses In | Rulings |
|---|---|---|---|

646  1   of Xarelto and going head-to-head with
646  2   those Xarelto doses and finding the
646  3   optimal dose and then doing a
646  4   head-to-head with apixaban, right?
646  5   A.   That is what the sentence
646  6   means, sir.
646  7   Q.   Okay.  So, first of all --
646  8   then you go on to say, "I agree that the
646  9   bleeding should be lower compared to the
646  10   20/15 regimen."
646  11   Did I read that correctly?
646  12   "But therein lies the
646  13   challenge."
646  14   Finish the sentence.  Did I
646  15   read that correctly?
646  16   A.   You did, sir.
646  17   Q.   So you would agree that the
646  18   lower the dose, the lower the bleeding
646  19   risk, right?

**646:23 -   647:17** Nessel, Christopher 2016-02-17
646  23   THE WITNESS:  Well, sir, I
646  24   was -- in this e-mail, we're --
647  1   I'm speculating.
647  2   BY MR. DOUGLAS:
647  3   Q.   Okay.
647  4   A.   I agree that the bleeding
647  5   should be lower, meaning -- what I meant
647  6   by that, it had never been tested.  We
647  7   had no data upon which to rely.
647  8   Q.   Okay.  But the lowering of
647  9   the bleeding risk would be a good thing,
647  10   right?
647  11   A.   Yes, but --
647  12   Q.   Have you ever had a patient
647  13   bleed to death?
647  14   A.   Yes, sir, I have seen a
647  15   patient bleed to death.
647  16   Q.   It's very -- it -- it --
647  17   it's very ugly, isn't it?

**647:20 -   648:13** Nessel, Christopher 2016-02-17
647  20   THE WITNESS:  It is -- it is
647  21   a very unfortunate event, yes,
647  22   sir.
647  23   BY MR. DOUGLAS:
647  24   Q.   Okay.  So lowering the
648  1   bleeding risk would be a good thing,
648  2   right?
648  3   A.   Well, sir, lowering -- one
648  4   could theoretically lower the bleeding
648  5   risk to zero by administering placebo.
648  6   But that's only half of the story, right.
648  7   So the bleeding risk has
648  8   been lowered, but now the stroke risk is
648  9   extraordinary.
648  10   Q.   Let's look -- there's two
648  11   parts of that equation.  Bleeding risk
648  12   and you have stroke risk.
648  13   A.   Yes, sir.

**648:14 -   648:16** Nessel, Christopher 2016-02-17

**Objections In column:**

0:31

Re: [646:23-647:17]
**Def Obj** See objections
to 624:3-625:9 regarding
ROCKET2 and dosing.
Calls for speculation as
to 646:23-647:1.

0:28

0:05
25

**Responses In column:**

and dosing, but
rather the witness's
recollection of
statements that he
made regarding
safety concerns
related to Xarelto.
This testimony in no
way runs afoul of
Rule 403 or the
Court's MIL rulings
and this is an
important and
proper area of
examination.

Re: [646:23-647:17]
Pltf Resp This
statement is not
hearsay and involves
statements made by
the witness.  Further,
the witness is being
asked to testify to his
independant
understanding of the
contents of these
statements, falling
far outside any
hearsay
considerations.  This
testimony is not
limited to ROCKET2
and dosing, but
rather the witness's
recollection of
statements that he
made regarding
safety concerns
related to Xarelto.
This testimony in no
way runs afoul of
Rule 403 or the
Court's MIL rulings
and this is an
important and
proper area of
examination.

**Rulings column:**

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

648 14   Q.  Let's look at the idea of
648 15   lowering bleeding risk, though, is a good
648 16   thing, right?

648:20 -   649:4 Nessel, Christopher 2016-02-17
648 20        THE WITNESS: Okay.  As I
648 21   said, the -- that's only half of
648 22   the story.
648 23   BY MR. DOUGLAS:
648 24   Q.  The other half is, if you
649  1   lower the bleed risk, what does that do
649  2   to the stroke risk, right?
649  3   A.  Right.  There is a balance;
649  4   that's right.

649:8  -   649:18 Nessel, Christopher 2016-02-17
649  8   Q.  Okay.  And it would be good
649  9   to find a better balance where you could
649 10   lower the risk of bleeding but maintain
649 11   the efficacy and maintain status quo, so
649 12   to speak, of the stroke risk, right?
649 13   That would be a good thing?
649 14   A.  We have that.
649 15   Q.  Sir, I'm just saying, if you
649 16   could lower the bleeding risk, maintain
649 17   the stroke risk, that would be a good
649 18   thing?

649:21 -   649:22 Nessel, Christopher 2016-02-17
649 21        THE WITNESS:  If that is
649 22   achievable.

649:24 -   650:9 Nessel, Christopher 2016-02-17
649 24   Q.  Okay.  If it's achievable.
650  1        And one of the ideas behind
650  2   this study that you folks were
650  3   contemplating, ROCKET II, was to test
650  4   that hypothesis.  Whether you can --
650  5   that's what you mean by "therein lies the
650  6   challenge," right?
650  7        Let's -- the lower dose, you
650  8   agree, would lower the bleeding risk,
650  9   right?

**Re: [649:24-650:9]** — Re: [649:24-650:9] — Pending
**Def Obj** See objections — Pltf Resp This
to 624:3-625:9 regarding — testimony is not
ROCKET2 and dosing. — limited to ROCKET2
and dosing, but
rather the witness's
awareness, or lack
thereof, of important
safety concerns
related to Xarelto.
This testimony in no
way runs afoul of
Rule 403 or the
Court's MIL rulings
and this is an
important and
proper area of
examination.

650:13 -   650:21 Nessel, Christopher 2016-02-17
650 13   Q.  But you don't know if it
650 14   would have an effect on the stroke?
650 15   A.  That is what I meant by that
650 16   sentence, sir, yes.
650 17   Q.  Okay.  But you've never
650 18   tested it; you never -- you never went
650 19   forward with this -- with this study,
650 20   right?
650 21   A.  No, sir.

**Re: [650:13-650:21]** — Re: [650:13-650:21] — Pending
**Def Obj** See objections — Pltf Resp This
to 624:3-625:9 regarding — testimony is not
ROCKET2 and dosing. — limited to ROCKET2
and dosing, but
rather the witness's
awareness, or lack
thereof, of important
safety concerns
related to Xarelto.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

668:22 - 669:1  Nessel, Christopher 2016-02-17

668 22     MR. DOUGLAS:  This is
668 23   Nessel-73?
668 24     MS. SAY:  Also Exhibit
669  1

0:18

277764

This testimony in no way runs afoul of Rule 403 or the Court's MIL rulings and this is an important and proper area of examination.

669:4 - 669:10  Nessel, Christopher 2016-02-17

669  4   Q.   So apropos of your comment
669  5   that there was a scientific discussion
669  6   about looking at lower doses and a study
669  7   looking at lower doses, I want to ask you
669  8   to take a look at an e-mail from Patricia
669  9   Torr, who we discussed is in sales and
669 10   marketing, on the second page.

0:21

**Re: [669:4-669:10]**
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

Re: [669:4-669:10]   Pending
Pltf Resp There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty

669:13 - 670:12  Nessel, Christopher 2016-02-17

669 13   Q.   Before we do that, by the
669 14   way, so ROCKET II was never done; is that
669 15   correct?
669 16   A.   Yes, sir.  That's correct.
669 17   Q.   And was there a formal
669 18   decision made at some point to not do
669 19   ROCKET II, or is it still something that
669 20   is being contemplated today?
669 21   A.   I no longer have the
669 22   perspective about what is being
669 23   contemplated.  I guess that term is
669 24   generally called lifecycle management.
670  1   And so Dr. Anne Vosatka, as the compound
670  2   development team leader, could offer an
670  3   opinion about that.
670  4   Q.   Okay.  So as far as you are
670  5   aware, there is no current plan to go
670  6   forward with ROCKET II, as far as you
670  7   know?
670  8   A.   That is correct.
670  9   Q.   Okay.  So -- and what is
670 10   your understanding of why not, why the

0:48

**Re: [669:13-670:12]**
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

Re: [669:13-670:12]   Pending
Pltf Resp There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| 670 11 | study was not done to this point in time |
| 670 12 | anyway? |

asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty Torr, a marketing executive.

1:04

670:14 - 671:23 Nessel, Christopher 2016-02-17

| 670 14 | form of the question. |
| 670 15 | THE WITNESS: I don't have a |
| 670 16 | particular understanding, sir. |
| 670 17 | BY MR. DOUGLAS: |
| 670 18 | Q. Okay. So take a look at |
| 670 19 | what Patricia Torr had to say. And then |
| 670 20 | I'll have some questions for you about |
| 670 21 | it. And you'll see that it states on the |
| 670 22 | second page -- I'm looking at her e-mail, |
| 670 23 | January 10, 2012, at 6:34 p.m., to |
| 670 24 | Dr. Chang, Dr. Peters. |
| 671 1 | Do you see where I'm reading |
| 671 2 | from? |
| 671 3 | A. Yes, sir. |
| 671 4 | Q. And who is Dr. Chang? |
| 671 5 | A. Paul Chang is an associate |
| 671 6 | at Janssen. I believe he works in global |
| 671 7 | safety. |
| 671 8 | Q. And Dr. Peters? |
| 671 9 | A. Dr. Gary Peters is at |
| 671 10 | present also an associate at Janssen in |
| 671 11 | the cardiovascular department. |
| 671 12 | Q. Okay. And she -- the person |
| 671 13 | from sales and marketing is writing to |
| 671 14 | these two doctors and others, "Hi, |
| 671 15 | everyone. A few comments from my end to |
| 671 16 | consider." |
| 671 17 | And I just want to go down |
| 671 18 | to the -- one, two -- third paragraph |
| 671 19 | below that starts "Would not support." |
| 671 20 | Do you see that? |
| 671 21 | A. Yes, sir. |
| 671 22 | Q. It says, "Would not support |
| 671 23 | doing a ROCKET II study" -- |

672:3 - 672:5 Nessel, Christopher 2016-02-17

| 672 3 | Q. -- "and unwinding everything |
| 672 4 | that we invested and are actively selling |
| 672 5 | today. It would say to the market" -- |

673:4 - 673:19 Nessel, Christopher 2016-02-17

| 673 4 | Q. So she's talking about |
| 673 5 | ROCKET II, the ROCKET II study, and says, |
| 673 6 | "It would not say to the market" -- "It |
| 673 7 | would say to the market the" -- "the |
| 673 8 | competition is right, we are a |
| 673 9 | twice-a-day drug, and would kill us in |

**Re: [670:14-671:23]**
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73. Objection to inclusion of counsel comment at 670:14.

**Re: [670:14-671:23]**  Pending
**Pltf Resp** There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty Torr, a marketing executive. Plaintiffs agree to remove the

0:06

**Re: [672:3-672:5]**
**Def Obj** Inappropriate designation; counsel asked a question but did not wait for an answer and then rephrased the question.

**Re: [672:3-672:5]**  Pending
**Pltf Resp** This is an appropriate designation. Mr. Douglas's question was interrupted by Ms. Moore sneezing and waited for her to recover.

0:27

**Re: [673:4-673:19]**
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-

**Re: [673:4-673:19]**  Pending
**Pltf Resp** There is adequate foundation for this testimony. The witness knows and is a colleague of

28

| | Objections In | Responses In | Rulings |
|---|---|---|---|

673 10  the market today.  By the time the study
673 11  was done, the market would have moved
673 12  on."
673 13        Do you see that?
673 14  A.   I do, sir.
673 15  Q.   And do you remember the
673 16  discussions at the company that -- with
673 17  respect to ROCKET II, that doing such a
673 18  study would kill Xarelto in the market?
673 19  A.   I do not, sir.

**Objections In:** 625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

*Sustain* (handwritten)

**Responses In:** Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty Torr, a marketing

*Moot* (handwritten)

673:23 -   673:23  Nessel, Christopher 2016-02-17
673  23              THE WITNESS:  I do not, sir.

0:01

Re: [673:23-673:23]
Pltf Obj Double, unnecessary, and repetitive answer

Pending

674:1 -   674:6  Nessel, Christopher 2016-02-17
674  1  Q.   But you would agree that
674  2  sales and marketing should not dictate
674  3  the science -- the determination based on
674  4  a scientific discussion as to whether or
674  5  not to do ROCKET II, right?  That would
674  6  be inappropriate?

0:14

**Re: [674:1-674:6]**
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

Re: [674:1-674:6] Pltf Resp There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty

Pending

*asked answered* (handwritten)

674:9 -   674:12  Nessel, Christopher 2016-02-17
674  9              THE WITNESS:  Sales and
674  10  marketing do not dictate the

0:03

29

**Re: [674:9-674:12]**
**Def Obj** Lack of

Re: [674:9-674:12] Pltf Resp There is

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

674 11
674 12   science that is conducted at Janssen.

**Objections In:** foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

**Responses In:** adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty

674:14 -   674:19   Nessel, Christopher 2016-02-17
674 14      Q.   That was not my question.
674 15           You would agree that it
674 16      would be inappropriate for sales and
674 17      marketing to dictate whether or not
674 18      ROCKET II was done or not, right?  That
674 19      would be inappropriate?

0:09

**Re: [674:14-674:19] Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

**Re: [674:14-674:19] Pltf Resp** There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty

Pending

674:22 -   675:7   Nessel, Christopher 2016-02-17
674 22      THE WITNESS:  I would say
674 23      that it is indeed appropriate for
674 24      sales and marketing to offer an
675  1      opinion or a perspective.  But as
675  2      I have stated, sales and marketing

0:15

30

**Re: [674:22-675:7] Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also

**Re: [674:22-675:7] Pltf Resp** There is adequate foundation for this testimony. The witness knows

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

675  3   do not dictate the science that's
675  4   performed at Janssen.
675  5   BY MR. DOUGLAS:
675  6   Q.  Because that would be
675  7   inappropriate, right?

objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty Torr, a marketing

675:9  -  675:13 Nessel, Christopher 2016-02-17
675  9   THE WITNESS:  It is not
675  10   done.
675  11   BY MR. DOUGLAS:
675  12   Q.  Because that's
675  13   inappropriate?

0:02

Re: [675:9-675:13]
**Def Obj** Lack of foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73.

Re: [675:9-675:13] **Pltf Resp** There is adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty

Pending

675:15  -  675:16 Nessel, Christopher 2016-02-17
675  15   THE WITNESS:  I believe it
675  16   would be inappropriate, yes, sir.

0:03

Re: [675:15-675:16]
**Def Obj** Lack of

Re: [675:15-675:16] **Pltf Resp** There is

Pending

| Objections In | Responses In | Rulings |
|---|---|---|
| foundation; witness was not author or recipient of C. Nessel 73. See also objections to 624:3-625:9 regarding ROCKET2 and dosing and exhibit objections to C. Nessel 73. | adequate foundation for this testimony. The witness knows and is a colleague of Gary Peters and others mentioned in the document and the testimony, and the topic matter being discussed, namely the decision on whether or not to proceed with ROCKET progeny studies, is well within the witness's area of expertise and responsibility. Importantly, Dr. Nessel is also being asked whether or not marketing directives drive scientific considerations, given the input in the document by Patty | |

711:20 - 713:7    Nessel, Christopher 2016-02-17

| 711 | 20 | Q.  Good afternoon, Mr. Nessel. |
| 711 | 21 | A.  Good afternoon, ma'am. |
| 711 | 22 | Q.  Would you please tell the |
| 711 | 23 | ladies and gentlemen of the jury where |
| 711 | 24 | you were born and raised. |
| 712 | 1 | A.  Sure.  I was born and raised |
| 712 | 2 | in Philadelphia.  If you're familiar with |
| 712 | 3 | the city, you may know of a section of |
| 712 | 4 | the city called the Northeast.  That's |
| 712 | 5 | kind of a colloquial designation. |
| 712 | 6 |           I went to a primary school |
| 712 | 7 | and high school and, in fact, college and |
| 712 | 8 | medical school all in Philadelphia. |
| 712 | 9 | Q.  Now, we all know that you're |
| 712 | 10 | a doctor.  Were your parents doctors as |
| 712 | 11 | well? |
| 712 | 12 | A.  No.  Neither of my -- my |
| 712 | 13 | folks didn't go to college, actually. |
| 712 | 14 | I'm one of six children.  So my mother |
| 712 | 15 | had, I think, the challenging task of |
| 712 | 16 | raising six children, and my father |
| 712 | 17 | worked and mother worked every day. |
| 712 | 18 | Q.  Are you married, sir? |
| 712 | 19 | A.  I am. |
| 712 | 20 | Q.  And you're married to |
| 712 | 21 | Ms. Schwabe? |
| 712 | 22 | A.  I am.  So my -- I have a |
| 712 | 23 | beautiful wife, Kimberly Nessel.  And we |
| 712 | 24 | are blessed with four -- four terrific |
| 713 | 1 | children, three girls -- oh, my gosh -- |
| 713 | 2 | three boys and a girl. |
| 713 | 3 | Q.  I understand three of the |
| 713 | 4 | boys are 16-year-olds? |
| 713 | 5 | A.  We have simultaneously three |
| 713 | 6 | teenagers all preparing to drive, teenage |

1:15

Re: [711:20-713:7]
Pltf Obj Relevance, unnecessary background

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

713    7                boys.

714:22 -    715:3   Nessel, Christopher 2016-02-17
714   22              Q.   Did you serve in the
714   23              military?
714   24              A.   I did, yes.  I had the
715    1              singular privilege -- and I mean that
715    2              with sincerity -- of wearing the uniform
715    3              of an officer in the United States Navy.

0:11

Re: [714:22-715:3]
**Pltf Obj** Relevance, unnecessary background.  Military career is completely irrelevant, falls far outside of the scope of other designated testimony.

Pending

717:16 -    717:23   Nessel, Christopher 2016-02-17
717   16              Q.   Please respond.  How
717   17              often -- how often did you serve?
717   18              A.   Oh, the commitment was one
717   19              weekend a month and two weeks a year.
717   20              And that commitment lasted -- my original
717   21              term was for four years.  I ended up
717   22              serving for, as I recall, just about a
717   23              decade.

0:17

Re: [717:16-717:23]
**Pltf Obj** Relevance, unnecessary background.  Military career is completely irrelevant, falls far outside of the scope of other designated testimony.

Pending

726:17 -    738:17   Nessel, Christopher 2016-02-17
726   17              Q.   And why was it important to
726   18              be a part of the ROCKET study?
726   19              A.   Well, ROCKET was -- it's
726   20              been described in many ways.  Pivotal,
726   21              landmark, groundbreaking.  Seldom, I
726   22              think, in a career -- probably perhaps
726   23              once in a career -- does someone get a
726   24              chance to work on a trial of almost
727    1              15,000 patients.
727    2                    We -- over the course of
727    3              these days, we said those words, "14,000
727    4              patients," "thousands of patients," over
727    5              and over again.  But I think it's
727    6              important to contemplate that each one of
727    7              those was an individual patient.
727    8              Someone's mom or someone's dad who made
727    9              the commitment, who very generously
727   10              agreed to participate in a clinical
727   11              study.  14,000 times over.
727   12                    And so the opportunity to --
727   13              to work on such a large trial for such a
727   14              novel compound -- and then the sugar on
727   15·             the top of it all was -- was the
727   16              committees that I -- I was able to
727   17              interact with.
727   18                    And so earlier today and
727   19              yesterday you heard me talk about the
727   20              ROCKET-AF executive committee.  And these
727   21              were -- it was my opinion in 2006, and it
727   22              remains my opinion today, these are
727   23              giants in the medical community.  There
727   24              are cardiologists, neurologists,
728    1              hematologists that are expert not only in
728    2              medicine but also in clinical trial
728    3              conduct.  And it was, and remains, a
728    4              privilege to be associated with them.
728    5              Q.   What does it mean to be an
728    6              expert in clinical trial conduct?

10:40

Re: [726:17-738:17]
**Pltf Obj** Redundant, unnecessary bolstering and narrative testimony, falls far outside of the scope of other designated testimony.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

728 7  A.  So clinical trials, as you
728 8  can imagine, broadly come with their own
728 9  set of challenges.  It would be difficult
728 10  to say, or be, I think, perhaps less than
728 11  accurate to say, we go to 45
728 12  countries and enroll patients at over a
728 13  thousand sites and it's easy.  It's not
728 14  easy.  There are many things to
728 15  encounter.  And the gentlemen that
728 16  were -- that served on the ROCKET-AF
728 17  executive committee had devoted their
728 18  careers not only to the practice of
728 19  medicine, whether it was cardiology or
728 20  neurology, but also to the practice of
728 21  clinical trials.
728 22       Some of them -- in
728 23  particular, Dr. Robert Califf -- had a
728 24  long and very successful career in
729 1  leading other landmark clinical trials.
729 2  And again, as with the other gentlemen on
729 3  the committee, it was a privilege to be
729 4  associated with them.
729 5  Q.  We heard you talk about
729 6  randomized prospective multi-center,
729 7  double-blinded study.  Explain that for
729 8  the ladies and gentlemen of the jury,
729 9  please.
729 10       What is a prospective
729 11  randomized multi-centered study?
729 12  A.  So there are -- when -- when
729 13  a clinical study is described, usually
729 14  those adjectives are used.  So randomized
729 15  means that patients may be assigned to
729 16  one group or another -- so in the case of
729 17  rivaroxaban or warfarin -- and it is
729 18  completely done at random.  It is
729 19  performed by a computer.  And no one at
729 20  the sponsor, no one at the FDA knows for
729 21  a particular patient whether they will go
729 22  to one group or another.
729 23       Prospective means that we
729 24  are going to do this in the future.
730 1  We're going to enroll patients in the
730 2  future.  We're not going to look at their
730 3  performance in the past.
730 4       And probably the most
730 5  challenging but perhaps, ma'am, the most
730 6  important aspect is what is called
730 7  double-blind.
730 8       What is double-blind?  Well,
730 9  double-blind means that not -- neither
730 10  the patient nor the physician knows what
730 11  the patient is taking.
730 12       Meaning, in this instance,
730 13  knows whether the patient is taking
730 14  rivaroxaban or warfarin therapy.  And
730 15  that is important, because if someone had
730 16  knowledge -- say, someone was
730 17  participating in the clinical trial and
730 18  both the patient and the physician knew
730 19  which medication they were taking -- they
730 20  might, whether consciously or

| | Objections In | Responses In | Rulings |
|---|---|---|---|

730 21 unconsciously, report things, you know,
730 22 certain adverse events or outcome events
730 23 in a different way to -- to minimize
730 24 the -- and that -- that selective
731 1 reporting is something we call bias.
731 2 It's not always intentional. I'm not
731 3 suggesting that it's associated with
731 4 malice.
731 5     But sometimes it happens.
731 6 And so to minimize the occurrence of
731 7 bias, we -- we blinded both the physician
731 8 and the patient.
731 9     But more than that. The --
731 10 the entire study team at Janssen, the
731 11 ROCKET-AF executive committee, were all
731 12 blinded to treatment assignment.
731 13     Now, you may ask, "Well,
731 14 if" -- "if these patients are blinded to
731 15 treatment assignment, how is it that" --
731 16 you know, "how is it that their safety
731 17 is" -- "is" -- "is ensured or is
731 18 optimized?"
731 19     Well, there was a
731 20 committee -- I've spoken frequently about
731 21 the ROCKET-AF executive committee. There
731 22 was another committee called the
731 23 independent data monitoring committee,
731 24 some -- sometimes called the DSMB.
732 1 Again, a committee of -- of not only
732 2 clinical trial experts but composed of a
732 3 statistician, internist, cardiologists,
732 4 and neurologists.
732 5 Q.   Were these people hired --
732 6 were these people employees of Janssen or
732 7 Bayer?
732 8 A.   No, they were not. These --
732 9 these physicians were employees of
732 10 universities from around the world. And
732 11 they looked at the data unblinded.
732 12     And what I mean by that is,
732 13 they could look at any particular
732 14 patient, any particular event, and know
732 15 if that patient was taking rivaroxaban or
732 16 warfarin. They could look across
732 17 thousands of patients or at one
732 18 individual patient completely at their
732 19 discretion.
732 20     And that mechanism is a --
732 21 is a -- a safety mechanism. It ensures
732 22 that while the executive committee and
732 23 the sponsor are blinded, as well as the
732 24 patient and the treating physician, there
733 1 is a committee that's watching out for
733 2 patient safety.
733 3 Q.   Did the FDA, the Food and
733 4 Drug Administration, actually request a
733 5 specific type of study from Janssen and
733 6 Bayer?
733 7 A.   Yes. It was our
733 8 understanding going into the discussions
733 9 with FDA and at the discussions with FDA,
733 10 that a prospective randomized study

| | Objections In | Responses In | Rulings |
|---|---|---|---|

733 11   was -- was necessary, and we didn't find
733 12   that unusual.  We had expected that.
733 13       But it was also stated to us
733 14   that a double-blind study was necessary.
733 15       This is -- that brings the
733 16   trial to a level of rigor such that the
733 17   clinical community and the FDA could be
733 18   certain of -- of the integrity of the
733 19   data by virtue of that blind.
733 20   Q.   Thank you.
733 21       Over the last two days,
733 22   you've used the term "non-inferiority."
733 23   A.   Mm-hmm.
733 24   Q.   Would you explain what that
734   1   means in the term of what is the
734   2   significance of an FDA finding of
734   3   non-inferiority with respect to a
734   4   particular medication?
734   5   A.   Sure.  So --
734   6   Q.   And -- and, for example,
734   7   with rivaroxaban.
734   8   A.   Certainly.  In some cases,
734   9   perhaps the members have heard of
734 10   placebo-controlled trials.  So ROCKET was
734 11   not a placebo-controlled trial.  But say,
734 12   for example --
734 13   Q.   With a sugar pill?
734 14   A.   With a sugar pill.  You're
734 15   going to test your medicine against a
734 16   sugar pill.  Well, if the medicine has
734 17   almost any effect, it will certainly be
734 18   better than a placebo, a sugar pill.
734 19       For patients with atrial
734 20   fibrillation, there was, and I spoke
734 21   about this earlier today, there was a
734 22   standard, and there remains a standard;
734 23   it's an anticoagulant.  And in 2006, the
734 24   standard treatment for patients with
735   1   atrial fibrillation was warfarin.  We
735   2   could not and would not test rivaroxaban
735   3   against a placebo or a sugar pill,
735   4   because there was a standard.  It was
735   5   warfarin therapy.  And, on top of that,
735   6   warfarin therapy was very effective.  It
735   7   reduced the risk of stroke in some
735   8   earlier studies by almost 70 percent, by
735   9   almost 70 percent.
735 10       And as such, the FDA
735 11   understood and the clinical community
735 12   understood and we, the sponsors,
735 13   understood, that warfarin was very
735 14   effective.
735 15       Because warfarin was so
735 16   effective, a new medicine coming along,
735 17   like rivaroxaban, for example, could be
735 18   equivalent to, approximately equivalent
735 19   to, the same as, warfarin therapy and
735 20   still be approved by the U.S. Food and
735 21   Drug Administration.
735 22       So the term
735 23   "non-inferiority" is a technical term
735 24   used in regulatory language.  But what it

36

| | Objections In | Responses In | Rulings |
|---|---|---|---|

736  1  means is there is a standard warfarin
736  2  that is -- that is very, very effective,
736  3  almost 70 percent relative risk
736  4  reduction. And we're going to test
736  5  another medicine against it. And because
736  6  warfarin is so effective, if this
736  7  medicine is as good as warfarin therapy,
736  8  it can be approved.
736  9  Q.  You explained for us who was
736 10  involved in the ROCKET study. You talked
736 11  about the sponsors. It was Janssen and
736 12  Bayer, correct?
736 13  A.  Yes.
736 14  Q.  And so you had internal
736 15  experts from each of the two sponsors?
736 16  A.  Yes. There was a -- at --
736 17  in both companies, there were physicians,
736 18  statisticians, clinical personnel,
736 19  regulatory personnel, operations
736 20  personnel, all who collaborated during
736 21  the conduct of the study.
736 22  Q.  And you had an opportunity
736 23  to work with a clinical research
736 24  institute. What is a clinical research
737  1  institute?
737  2  A.  We did -- actually, we had
737  3  the opportunity to work with both a
737  4  clinical research institute and an
737  5  academic research organization, or an
737  6  clinical research organization and
737  7  academic reorganization.
737  8         Let me explain the latter
737  9  first. The academic research
737 10  organization for ROCKET-AF was the Duke
737 11  Clinical Research Institute. Some may
737 12  have heard of this institute.
737 13         It is based alongside of
737 14  Duke University in Raleigh-Durham, North
737 15  Carolina. And it is one of the most
737 16  highly respected academic research
737 17  organizations in the world. We call it
737 18  the DCRI. The DCRI has conducted likely
737 19  hundreds of clinical trials.
737 20         Because of their track
737 21  record -- I'll use the term -- it was the
737 22  decision of the sponsor along with the
737 23  executive committee to engage the Duke
737 24  Clinical Research Institute to assist us
738  1  in the preparation and conduct of the
738  2  study.
738  3         We also worked with a
738  4  contract research organization. That
738  5  organization was called PAREXEL. That
738  6  organization had offices around the
738  7  world, and they assisted us in terms of
738  8  monitoring the sites, meaning that a
738  9  person would go out to the site and
738 10  review the data that was collected. They
738 11  were able to answer questions for us
738 12  around the world.
738 13         And they, along with the
738 14  study team, the Duke Clinical Research

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

738 15  Institute, and the ROCKET-AF executive
738 16  committee, all combined and collaborated
738 17  to conduct the study.

740:3   -   766:18 Nessel, Christopher 2016-02-17

740  3  Q.   And you've described for us
740  4  kind of the teamwork of entities involved
740  5  in the study.
740  6         How did you, the sponsors,
740  7  and the Duke Clinical Research Institute
740  8  go about ensuring that the study was
740  9  properly conducted?
740 10  A.   So probably the first step
740 11  in all of that was collecting a study
740 12  team and organizations that had years and
740 13  years of experience in conducting large
740 14  clinical trials.
740 15         And I've spoken about the
740 16  track record of the Duke Clinical
740 17  Research Institute, the ROCKET-AF
740 18  executive committee, et cetera.
740 19         At an -- at an individual
740 20  site or patient level -- so throughout
740 21  the study, patients returned to the
740 22  clinic to be seen by their treating
740 23  physician.
740 24         There were literally
741  1  hundreds of thousands of such single
741  2  patient visits conducted during the
741  3  study.
741  4         And each time, the treating
741  5  physician would carefully record what the
741  6  patient told them, whether they -- they
741  7  would say, "Did you have any particular
741  8  adverse events?"  The patient might say,
741  9  "I had a headache, and I started on a new
741 10  vitamin tablet."  And all of that
741 11  information was recorded.
741 12         We -- the Duke Clinical
741 13  Research Institute, along with PAREXEL
741 14  International, would send a
741 15  representative to every site every few
741 16  months.  And those representatives would
741 17  compare what was reported to the study
741 18  team with what was found in the medical
741 19  record.  That process is called source
741 20  data verification.
741 21         And it is, as you can
741 22  imagine, a very time and labor-intensive
741 23  process where page by page different data
741 24  variables are compared.
742  1         So for -- I can say for
742  2  every single patient, there were whole or
742  3  parts of their medical record that were
742  4  reviewed as part of their participation
742  5  in the study.
742  6  Q.   And how many sites were
742  7  involved in this study?
742  8  A.   Over 1,100 sites were
742  9  involved.
742 10  Q.   Would that have necessitated
742 11  the involvement of over 1,000

##### Re: [740:3-766:18]
**Pltf Obj** Redundant,
unnecessary bolstering
and narrative testimony,
falls far outside of the
scope of other
designated testimony.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

742 12 institutional review boards, IRBs?
742 13 A.   Very nearly so.  The reason
742 14 I qualify that is, every -- without
742 15 question, every site needs to have an
742 16 institutional review board review and
742 17 approve the protocol.
742 18         Every physician who chooses
742 19 to -- if they choose to participate in
742 20 the study, must review and approve the
742 21 protocol.
742 22         There are some sites that
742 23 used a regional institutional review
742 24 board.  So that's why the numbers may not
743  1 add up to over 100 -- 1,100.
743  2         However, without -- without
743  3 a doubt, I can tell you that at every
743  4 site in which the ROCKET-AF study was
743  5 conducted, an independent body called an
743  6 institutional review board reviewed the
743  7 protocol and agreed to its performance at
743  8 that site.
743  9 Q.   Were there committees that
743 10 monitored safety events?
743 11 A.   There were.  I spoke earlier
743 12 about the independent data monitoring
743 13 committee.  And at any time, that
743 14 committee could look at any event, and
743 15 did look at data listings, the occurrence
743 16 of bleeding events, safety events, et
743 17 cetera.
743 18         There was another committee
743 19 housed at the Duke Clinical Research
743 20 Institute called the CEC or clinical
743 21 events committee.
743 22         In the study, ROCKET-AF, you
743 23 may recall that we collected both
743 24 efficacy events in terms of strokes or
744  1 non-CNS systemic embolus, and bleeding
744  2 events.  I believe I testified earlier
744  3 that the principle safety endpoint was a
744  4 composite of major and nonmajor
744  5 clinically relevant bleeding.
744  6         The clinical events
744  7 committee at the Duke Clinical Research
744  8 Institute was comprised of cardiologists
744  9 and neurologists specially trained in the
744 10 protocol, but again, blinded to treatment
744 11 assignment.
744 12         And they reviewed thousands
744 13 of events and categorized them according
744 14 to the protocol-specified definitions.
744 15 Every efficacy and bleeding event
744 16 reported in the study was reviewed by two
744 17 independent members of the clinical
744 18 events committee at the Duke Clinical
744 19 Research Institute.
744 20 Q.   You mentioned bleeding
744 21 events.  Did you and the other sponsors
744 22 and the DCRI anticipate bleeding events
744 23 in the study?
744 24 A.   Yes, we did.
745  1 Q.   Why is that?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

745  2  A.   The reason I say that, in
745  3  order to participate in the ROCKET-AF
745  4  study, 100 percent of the patients would
745  5  be receiving an anticoagulant.
745  6        What I mean by that is, I
745  7  spoke earlier about randomization.  The
745  8  patient might be assigned -- would be
745  9  assigned by a computer randomly to
745 10  receive warfarin or rivaroxaban.  Those
745 11  were the only two choices.
745 12        So 100 percent of the
745 13  patients were receiving an anticoagulant.
745 14  Probably the best studied side effect of
745 15  anticoagulants broadly are bleeding
745 16  events.
745 17        And knowing that going into
745 18  this study, the clinical events committee
745 19  and the independent data monitoring
745 20  committee were specifically charged to
745 21  surveil the data or look closely at the
745 22  data for these particular events.
745 23  Q.   Did you look to any
745 24  professional societies for guidelines in
746  1  establishing what type of bleeding events
746  2  to look for?
746  3  A.   We did.  And what I mean by
746  4  that is, before the protocol -- before
746  5  the very first patient was randomized, we
746  6  wanted to ensure that we were reporting
746  7  events in a manner that was useful.
746  8        What I mean by that is, we
746  9  wanted to use a classification system
746 10  that had been used before so that
746 11  clinicians, the U.S. FDA, and others
746 12  could compare the bleeding events that
746 13  might be reported in ROCKET to other data
746 14  sources.
746 15        And so for the principal
746 16  safety endpoint, which I have just
746 17  described, we used the classification
746 18  system of the International Society of
746 19  Thrombosis and Hemostasis.  That society
746 20  set forth this classification system that
746 21  bleeding events should meet -- for
746 22  example, should meet a specific severity.
746 23  They might be associated with elements
746 24  one, two, three, four, et cetera.
747  1        And the clinical events
747  2  committee was given these guidelines and
747  3  this classification system.  And as such,
747  4  any event that came through, they would
747  5  be able to apply the appropriate
747  6  criteria.
747  7  Q.   Thank you.  You've described
747  8  for us the types of monitoring that you
747  9  and the DCRI -- you, the sponsor, and the
747 10  DCRI employed to ensure that the study
747 11  was properly conducted.
747 12        Were there things, any joint
747 13  or cross-study committees, that were also
747 14  used to assist in determining if the
747 15  study was being conducted properly?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

747 16   A.   Yes, ma'am.  So at this
747 17   time -- so I'm thinking of the time
747 18   interval of, say, 2006 to roughly 2010 --
747 19   there were multiple studies of
747 20   rivaroxaban that were ongoing.  ROCKET-AF
747 21   was one of them.
747 22         Because multiple studies
747 23   were ongoing, the sponsors approached
747 24   each of the independent data monitoring
748  1   committees and asked them to form what
748  2   ultimately became known as the
748  3   cross-study DSMB, or cross-study data
748  4   safety monitoring board.
748  5         The rivaroxaban cross-study
748  6   DSMB was comprised of an individual from
748  7   each of the trials that were ongoing.
748  8         And these physicians had a
748  9   very unique perspective.  What I mean by
748 10   that is, there were only a few
748 11   individuals in the world who had access
748 12   to unblinded data about any of the
748 13   individual trials.
748 14         These physicians in the
748 15   aggregate had access to unblinded data
748 16   about all of the ongoing studies.
748 17         The sponsors felt that was
748 18   particularly important because, in one
748 19   study there might be a finding, and the
748 20   independent data monitoring committee
748 21   might think, Hmm, we're not quite sure
748 22   what to make of that.
748 23         Here, we gave -- we offered
748 24   to them a venue, another mechanism to
749  1   share with their colleagues, who also had
749  2   access to unblinded information, the
749  3   information from across all of the
749  4   studies.
749  5         They had perspective -- a
749  6   perspective about thousands and thousands
749  7   of patients who were receiving
749  8   rivaroxaban during that time.
749  9   Q.   How does that differ from
749 10   the global pharmacovigilance monitoring
749 11   board, or does that differ?
749 12   A.   It -- it does.  The
749 13   cross-study data safety monitoring board
749 14   had the specific charge, as the
749 15   individual study data safety monitoring
749 16   boards did, to observe the data and
749 17   ensure the safety of the patients for the
749 18   individual studies.
749 19         Their tenure, if you will,
749 20   was for the conduct of those studies.
749 21   However, during the conduct of those --
749 22   of those studies, and even up until
749 23   today, there is a team both at Bayer and
749 24   at Janssen that performs activities
750  1   called -- broadly called
750  2   pharmacovigilance.
750  3         The term, meaning, to -- to
750  4   look carefully at a drug.
750  5   Pharmacovigilance.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

750   6       And that group, separately
750   7   and together, collect information that is
750   8   reported to either Bayer or Johnson &
750   9   Johnson -- Janssen, rather.  They collect
750   10   information about rivaroxaban here today,
750   11   and they analyze it and consider it
750   12   relative to all of the information that
750   13   we know about rivaroxaban.
750   14       So while the data safety
750   15   monitoring boards were active during the
750   16   conduct of the trials, the
750   17   pharmacovigilance activities started in
750   18   2005 and continue even through today.
750   19   Q.   What measures were put in
750   20   place by the sponsors in the DCRI to
750   21   ensure compliance with a study protocol?
750   22   Were there steps put in place to help the
750   23   investigators who might encounter
750   24   particular problems throughout the course
751   1   of the study?
751   2   A.   Yes.  So the -- once the
751   3   investigator signed the investigator page
751   4   in the clinical study protocol, in that
751   5   they -- and once the institutional review
751   6   board agreed to participate, we began our
751   7   educational efforts.
751   8       And so all of the site
751   9   personnel who were to participate in
751   10   ROCKET-AF were trained, almost all of
751   11   them, at what we call investigator
751   12   meetings.
751   13       So in Boston, for example,
751   14   we brought together several hundred
751   15   investigators, study coordinators, et
751   16   cetera, and for two days taught them
751   17   about the rivaroxaban, the -- the nature
751   18   of atrial fibrillation, the use of
751   19   warfarin, how the study should be
751   20   conducted, the kind of information that
751   21   we were going to collect.
751   22       There was an entire section
751   23   devoted to the HemoSense INR device to
751   24   ensure that the sites use that -- use
752   1   that device properly.
752   2       And as a matter of fact, in
752   3   a -- we called them breakout sessions.
752   4   It was an afternoon where sites could
752   5   visit various -- various rooms to learn
752   6   more.  There were representatives from
752   7   HemoSense who had INR devices so that the
752   8   sites could try them out and use them and
752   9   be educated on their proper use.
752   10       While that, the investigator
752   11   meeting that I just described formed the
752   12   foundation, educational activities
752   13   continued throughout the study.
752   14       The -- there were ROCKET
752   15   newsletters.  There was a study portal
752   16   called DigiScript.  And a study portal is
752   17   a place where doc -- you can think of it
752   18   as a document repository.  So if a -- a
752   19   study site said, "Do you have a copy of

| | Objections In | Responses In | Rulings |
|---|---|---|---|

752 20  the study protocol?" it's on the study
752 21  portal.  All the relevant study documents
752 22  were on the study portal, and every site
752 23  had access to it.
752 24          So along with that, members
753  1  of the executive committee, Dr. Manesh
753  2  Patel in particular, would -- would
753  3  conduct, and it sounds a little corny,
753  4  but what we would call fireside chats.
753  5          And Dr. -- Dr. Patel
753  6  would -- it was reminiscent of -- I
753  7  believe the term came from what President
753  8  Roosevelt did during -- perhaps, during
753  9  the Depression in the second World War.
753 10          Dr. Patel, by region, would
753 11  get on the phone with investigators, the
753 12  study coordinators who wanted to call in.
753 13  He would give them an update on the
753 14  study -- today there are 800 patients
753 15  enrolled, or something like that -- and
753 16  then answer their questions.  And it was
753 17  very freeform.
753 18          And the sites, in a phrase,
753 19  loved this.  And what I mean by that is,
753 20  they had an opportunity to hear about the
753 21  ongoing study, have their questions
753 22  answered, and have them answered by
753 23  either a member of the steering committee
753 24  or someone who was intimately involved
754  1  from the Duke Clinical Research
754  2  Institute.  It was just a terrific
754  3  endeavor on Dr. Patel's part.
754  4  Q.  Was there an opportunity for
754  5  investigators to contact a member of the
754  6  executive committee and have a one-on-one
754  7  phone conversation about a particular
754  8  concern or issue?
754  9  A.  Well, on -- one mechanism
754 10  that we did -- did set up was called the
754 11  DCRI hotline.
754 12          So while it -- it would have
754 13  been possible for an investigator with --
754 14  you know, after e-mail contact, we would
754 15  have set up an appointment with an
754 16  executive committee member.  The DCRI
754 17  hotline allowed any physician or study
754 18  coordinator in these 45 countries to pick
754 19  up the phone 24 hours a day, seven days a
754 20  week, and speak to a physician,
754 21  usually -- usually a cardiologist at Duke
754 22  University, about the conduct of the
754 23  study.
754 24          They might be asked, "I have
755  1  a particular patient.  I'm not sure if
755  2  they are appropriate for the study," or
755  3  "My patient came in, and they are on this
755  4  medication.  Is that okay?"
755  5          The hotline was set up early
755  6  on and was used throughout the study.
755  7          And I believe it gave
755  8  assurance to the enrolling sites that
755  9  24 hours a day, seven days a week, if

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

755 10 they went to the DigiScript portal and
755 11 they had a question and they couldn't
755 12 find an answer, they could pick up the
755 13 phone and have the question answered.
755 14     In addition to the DCRI
755 15 hotline, there were hotlines to medical
755 16 monitors around the world from PAREXEL
755 17 who could, in the local language, speak
755 18 to the study site about their -- about
755 19 their question.
755 20     The sponsor also was
755 21 eminently available to answer questions
755 22 from the sites.
755 23 Q.   Did anyone throughout the
755 24 pendency of the ROCKET-AF study have
756  1 access to any of the unblinded data?
756  2 A.   No.
756  3 Q.   Did you have anyone place a
756  4 monitor, an unblinded monitor, that may
756  5 have had access at any time?
756  6 A.   Well, I -- I thought you
756  7 were asking about --
756  8 Q.   From the sponsor.
756  9 A.   -- unblinded results of --
756 10 results of the study.  And so let me be
756 11 clear.
756 12     So during the conduct of the
756 13 study, no one at the sponsor, the
756 14 executive committee, knew the results of
756 15 the study.  That's very, very important.
756 16 Because there what I'm referring to is
756 17 the -- the integrity of the study blind.
756 18     However, because patients --
756 19 tests were being performed, point-of-care
756 20 INR tests were performed, we had an
756 21 unblinded monitor in place.  What the
756 22 unblinded monitor would do, would look at
756 23 readouts of INR results for patients in
756 24 both treatment groups.
757  1     And that unblinded monitor
757  2 was available to ask questions or advise
757  3 sites about the patients they were
757  4 treating.  Now, importantly, when the
757  5 unblinded monitor spoke to the sites,
757  6 they would never reveal the treatment
757  7 assignment of the patient.  But say, for
757  8 example, if a -- a study had an error
757  9 reading on their INR device, they could
757 10 call the unblinded monitor and say, "This
757 11 is the problem I'm having."  And he might
757 12 say, "Well, you need to change the
757 13 batteries or check the QC code on the
757 14 device" or something like that.
757 15     So this unblinded monitor,
757 16 while he didn't participate in -- in the
757 17 conduct of the study, meaning he never
757 18 enrolled patients or something like that,
757 19 he was available to the study sites to
757 20 answer their questions about the INR
757 21 particularly.
757 22 Q.   You mentioned the HemoSense
757 23 device.  Can you tell us how that

| | Objections In | Responses In | Rulings |
|---|---|---|---|

757 24   HemoSense device was selected?  You --
758 1   you touched a little bit on that
758 2   yesterday, but if you could tell us about
758 3   the individuals or describe for us who
758 4   was involved in the selection of the
758 5   HemoSense device.
758 6   A.   Sure.  So the selection of
758 7   the device was a -- I'll characterize it
758 8   as a collaborative effort between the
758 9   sponsor and the executive committee, as
758 10   well as a consultant to the sponsor, a
758 11   Dr. Jay Horrow.  I believe I may have
758 12   testified about him yesterday.  I'm not
758 13   certain.
758 14         Dr. Horrow and a
758 15   Dr. Jonathan Halperin, who served on the
758 16   ROCKET-AF executive committee, had
758 17   recently completed a study called
758 18   SPORTIF V that was nearly identical to
758 19   what we were thinking of for ROCKET-AF.
758 20   It used a different drug.  It didn't use
758 21   rivaroxaban, but otherwise it was
758 22   identical to ROCKET.
758 23         So in collaboration with
758 24   Dr. Horrow and the executive committee,
759 1   we -- we considered actually several
759 2   devices, three in total.
759 3         The HemoSense device, called
759 4   INRatio, and two other devices, one
759 5   called the ProTime and one called the
759 6   HemoChron, they were from a different
759 7   manufacturer.
759 8         We believed, I think, that
759 9   all three devices could get the job done,
759 10   I'll say.  But for the two devices, the
759 11   ProTime and the HemoChron, they -- there
759 12   was a challenge associated with them.
759 13         And what I mean by that is,
759 14   the testing strip that they used, the
759 15   company called it a cuvette, needed to be
759 16   refrigerated.  Needed to be refrigerated
759 17   constantly between 2 and 8 degrees
759 18   centigrade.  And so that meant that from
759 19   the time that cassette left the -- the
759 20   factory to the time it was used to treat
759 21   a patient, it had to be kept refrigerated
759 22   at a very specific range, 2 to 8 degrees
759 23   centigrade.
759 24   Q.   So you are talking about all
760 1   over the world, these have to remain
760 2   refrigerated?
760 3   A.   All over the world and until
760 4   the time it is about to be used.  And I'm
760 5   very specific about that.  But if the
760 6   cassette -- say a patient was going to
760 7   show up at 3 o'clock in the afternoon and
760 8   the cassette was taken out at 6 o'clock
760 9   in the morning and left on the desktop,
760 10   that cassette would then expire.
760 11         So the executive committee
760 12   and the sponsor together, and I think
760 13   separately, worried that if that -- that

45

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

760 14 refrigeration -- we called it cold chain.
760 15 If that cold chain was broken and the
760 16 cassettes were left out in the sun, they
760 17 were left on -- on a loading dock, in the
760 18 back of a truck, and they expired, two
760 19 things would happen. One, we would never
760 20 know about it. And two, the results that
760 21 were returned would very likely be
760 22 invalid.
760 23      So the HemoSense device was
760 24 unique in that the test strips could be
761  1 stored at room temperature, no need for
761  2 refrigeration. And in my mind, it --
761  3 that was one of the key deciding factors
761  4 in choosing the HemoSense device.
761  5 Q.   Were there any concerns
761  6 about the necessity or the potential need
761  7 to unblind the HemoChron or the ProTime
761  8 device if it was selected?
761  9 A.   So the -- when this
761 10 device -- when any device would have been
761 11 used in the ROCKET-AF study that we were
761 12 contemplating, the actual INR would not
761 13 be returned, the actual value. Because
761 14 if the actual value was returned, the
761 15 patient and the physician might know what
761 16 drug they're taking. Instead, a
761 17 seven-digit code was returned.
761 18      And for patients taking
761 19 rivaroxaban, that code would return a
761 20 value that was likely to mimic what they
761 21 would be taking if they were taking
761 22 warfarin therapy.
761 23      So when the physician
761 24 received that code, they would call in to
762  1 the IVRS, interactive voice response
762  2 system, and it would be decoded for them.
762  3 If the patient was randomly assigned to
762  4 receive warfarin therapy, the -- the
762  5 value returned would be true INR. If the
762  6 patient was assigned to receive
762  7 rivaroxaban therapy, the value returned
762  8 would be something like it would be if
762  9 they were on warfarin. So say an INR of
762 10 2.2 or 2.5, something that we called
762 11 clinically reasonable, a result that
762 12 would be returned called clinically
762 13 reasonable.
762 14 Q.   I believe you testified
762 15 yesterday that you recall having specific
762 16 discussions with Dr. Becker,
762 17 Dr. Halperin, and Dr. Horrow about the
762 18 selection of an appropriate device for
762 19 the ROCKET-AF study.
762 20 A.   That's correct.
762 21 Q.   During the pendency of the
762 22 study, how were any potential concerns
762 23 about the Alere device handled?
762 24 A.   So it would really depend on
763  1 the nature of the concern.
763  2 Q.   What do you mean by that,
763  3 the nature of the concern? Are there

| 763 | 4 | different types of concerns that you |
| 763 | 5 | might have with a device? |
| 763 | 6 | A.  Certainly.  Sometimes sites |
| 763 | 7 | would call us and say, "I'm getting an |
| 763 | 8 | error message."  The screen would read |
| 763 | 9 | "ERR," error.  And the user manual would |
| 763 | 10 | have plausible reasons why an error |
| 763 | 11 | message might come up. |
| 763 | 12 | So some of those reasons |
| 763 | 13 | included if the batteries were worn out |
| 763 | 14 | or if the device was not plugged in, |
| 763 | 15 | conversely. |
| 763 | 16 | If the test strip was -- if |
| 763 | 17 | the code on the test strip was not |
| 763 | 18 | entered into the machine, if there was |
| 763 | 19 | inadequate blood -- so if a tiny little |
| 763 | 20 | drop of blood needed to be put on the |
| 763 | 21 | cassette, if the machine didn't detect |
| 763 | 22 | enough blood, they would get an error |
| 763 | 23 | message. |
| 763 | 24 | So the sponsor sometimes |
| 764 | 1 | received calls, and they said, "This is |
| 764 | 2 | Dr. Smith from Chicago, Illinois.  I've |
| 764 | 3 | received an error message.  Can you help |
| 764 | 4 | me get to the bottom of why I'm receiving |
| 764 | 5 | this?"  So certainly we would address |
| 764 | 6 | those particular concerns. |
| 764 | 7 | If a physician had a concern |
| 764 | 8 | about the device and a value that was |
| 764 | 9 | returned, the sponsor put into place a |
| 764 | 10 | mechanism whereby those values could be |
| 764 | 11 | checked. |
| 764 | 12 | And I think I've |
| 764 | 13 | testified -- I can't remember if it was |
| 764 | 14 | today or perhaps yesterday -- about the |
| 764 | 15 | CoVance recheck. |
| 764 | 16 | And that was a system |
| 764 | 17 | whereby at the same time the blood test |
| 764 | 18 | was performed on the point-of-care |
| 764 | 19 | device, a tube of blood would be sent to |
| 764 | 20 | CoVance, which is a laboratory, a central |
| 764 | 21 | laboratory that we use.  And both |
| 764 | 22 | measures could be determined |
| 764 | 23 | simultaneously. |
| 764 | 24 | The unblinded monitor men |
| 765 | 1 | that you and I discussed a few minutes |
| 765 | 2 | ago would then get those results and |
| 765 | 3 | report them to the study site. |
| 765 | 4 | The unblinded monitor could |
| 765 | 5 | also answer questions about error |
| 765 | 6 | messages or why a particular result might |
| 765 | 7 | be obtained, et cetera. |
| 765 | 8 | Q.  Did you ever offer |
| 765 | 9 | retraining for the investigators if they |
| 765 | 10 | had any concerns about the device? |
| 765 | 11 | A.  I would answer that question |
| 765 | 12 | with two yeses.  What I mean by that |
| 765 | 13 | was -- what I mean by that is, retraining |
| 765 | 14 | happened regularly with or without cause. |
| 765 | 15 | So at the fireside chats, at |
| 765 | 16 | the investigator meetings, on the |
| 765 | 17 | DigiScript portal, et cetera, through the |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

765 18    ROCKET-AF newsletters, and through direct
765 19    communication letters from the sponsor,
765 20    there was ongoing education about the INR
765 21    monitor and about other aspects of study
765 22    conduct as well.
765 23        There were occasions,
765 24    however, that it was brought to the
766 1    sponsor's attention that there were some
766 2    concerns or issues at particular sites.
766 3        And we would dispatch a
766 4    monitor and sometimes even a
766 5    representative from clinical quality
766 6    assurance, who would very rigorously go
766 7    through the data that was collected at
766 8    the site and question the investigator
766 9    and question the study coordinator to
766 10    determine if, in fact, they were
766 11    conducting the study properly.
766 12        That was an added measure,
766 13    if you will, so that the sponsor could
766 14    assure themselves, the clinical
766 15    community, and, in fact, the patients
766 16    that patient safety was the most
766 17    important thing for us and that we were
766 18    ensuring it.

784:10 - 785:20 Nessel, Christopher 2016-02-17      1:38
784 10        You were asked questions
784 11    about, in general speaking, the more you
784 12    anticoagulate a patient, the more risk of
784 13    bleeding. And I'm not sure you had an
784 14    opportunity to fully explain your answer.
784 15        Would you elaborate on the
784 16    concept of the more of an anticoagulant a
784 17    patient receives, the greater risk -- the
784 18    potential greater risk of bleeding?
784 19    A. Certainly. As I -- as I
784 20    tried to express, there -- the -- the
784 21    decision to prescribe any medication, but
784 22    an anticoagulant in particular, is very,
784 23    very complex. Patients vary in their --
784 24    their baseline medical history, in their
785 1    physical examination, in their -- the
785 2    other medications that they might be
785 3    taking, in what they can afford to take,
785 4    and how often they can return to a
785 5    clinic, et cetera.
785 6        So when asked this question,
785 7    I -- I struggled with the concept of more
785 8    is worse simply because the decision is
785 9    very complex and, in fact, for
785 10    warfarin-treated patients in particular,
785 11    prescribing more warfarin, per se, may
785 12    not at all lead to greater bleeding. In
785 13    fact, it -- prescribing more warfarin may
785 14    be appropriate for and necessary for any
785 15    particular patient.
785 16        So in summary, ma'am, what I
785 17    would say is the decision is very complex
785 18    and cannot, you know, as clinical
785 19    judgment be simply reduced to more means
785 20    more bleeding.

**Re: [784:10-785:20]**
**Pltf Obj** Redundant, unnecessary bolstering and narrative testimony, falls far outside of the scope of other designated testimony.

Pending

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

792:5 - 792:9  Nessel, Christopher 2016-02-17

| | | | | |
|---|---|---|---|---|
| 792 | 5 | Q. Doctor, earlier you were | 0:12 | Pending |
| 792 | 6 | asked about compensation. Has your | | |
| 792 | 7 | compensation ever been tied to the | | |
| 792 | 8 | results of the ROCKET-AF study? | | |
| 792 | 9 | A. No. | | |

Re: [792:5-792:9]
**Pltf Obj** Redundant, unnecessary bolstering and narrative testimony, falls far outside of the scope of other designated testimony.