**lorr v bayer video tmax db**

**Deposition Designations for Glombitza B 20160913, Glombitza B 20160914**

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

**8:6 - 9:13 Glombitza, Bernhard 2016-09-13** 4:01

Q. Good morning, Dr. Glombitza. Will you please state your full name for the record here?
A. Bernhard Glombitza.
Q. And, Dr. Glombitza, you currently work for Bayer, is that correct?
A. That is correct.
Q. And, Dr. Glombitza, your native language is German, is that correct?
A. Yes, that is correct.
Q. You speak English?
A. Yes.
Q. Do you speak English well?
A. I speak English well, but not as well as my mother language.
Q. And do you speak English in your job at Bayer?
A. Most of the time, yes.
Q. Now, when did you first go to work for Bayer?
A. In 1994.
Q. And at some point you began working on the Xarelto project, correct?
A. That is correct.
Q. When did you start working on Xarelto?
A. I started working as global project head or leader and/or project manager for Xarelto in September, 2005.
Q. Did you work on Xarelto before that September time frame in any other role?
A. I worked in connection with logistics for due diligence, but not as a part of my job description, but I accompanied the organization of logistics.

**10:23 - 11:11 Glombitza, Bernhard 2016-09-13** 2:36

Q. Sure. And so it's obviously in 2013.
At some point after this date, did you leave -- did your responsibilities change with respect to Xarelto?
A. My responsibilities with respect to Xarelto changed in 2012. I left the Xarelto project in October, 2012.
Q. What was your new job that you changed to in October of 2012?
A. I changed from research and development to a marketing and sales function, and my new responsibility was the market launch of a new aesthetic product that was called ATX-101.

**14:9 - 14:17 Glombitza, Bernhard 2016-09-13** 1:07

Q. According to the draft CV that you sent yourself, as you called it, you were the Director, Global Project Leader, Xarelto, 2005-2007 for Bayer HealthCare, Germany, is that

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

accurate?
A. Independent of this draft document, it is correct that I was the global project leader, global project manager for Xarelto from 2005 to 2007

**16:2 - 16:12 Glombitza, Bernhard 2016-09-13** 2:12

But sometime in 2007, were you promoted to vice president with the title senior global program head Xarelto?
A. Independent of the accuracy of the document, and here I repeat again, I sent this from my private e-mail to myself, so it is not my official CV. But independent of that, it is correct that I was promoted to vice president, program management for Xarelto in 2007, the title being senior global program leader or program manager Xarelto.

**17:4 - 17:8 Glombitza, Bernhard 2016-09-13** 0:11

(Whereupon, Glombitza Exhibit Number 2, Document titled Resume of Dr. Bernhard Glombitza, Bates XARELTO_BPAG_33603622 through 3627, was marked for identification.)

Sustained 403

**22:19 - 23:7 Glombitza, Bernhard 2016-09-13** 1:08

Do you see that?
A. I see that.
Q. The next bullet point says "Managed the large clinical program (greater than 75,000 patients)."
Do you see that?
A. I see that.
Q. Next says "Managed yearly project budget of greater than 100 million Euros, total project, greater than 2 billion Euros." Is that right?
MR. DERRINGER: Object to form.
A. I can read what it says there, but I cannot state whether or not this is correct.

| Objections In | Responses In | Rulings |
|---|---|---|
| **Re: [22:19-23:7]** **Def Obj** Relevance/403 - introduction of this testimony on sales/profits/revenue violates the Court's rulings on the Omnibus MIL No. 1 (Dkt. Nos. 5955, 6254) | Re: [22:19-23:7] Pltf Resp Highly probative to establishing witness' stature to the jury, contextualizing his later testimony. This is especially important given the witness' repeated attempts to minimize his role in the development and commercialization of Xarelto. Testimony relates budget and not to profits--whether anticipated or actual. | Pending |

Sustained 403

**23:25 - 24:23 Glombitza, Bernhard 2016-09-13** 2:27

Q. So let's look at the next bullet point. It says "Increased project value by entering into new indications, leading to a market potential greater than 3 billion Euros."
Do you see that?
A. I can see what is written here.
Q. And the next bullet point says "Selection of a co-development partner for Rivaroxaban." That's Xarelto, right?
A. Rivaroxaban is the INN name for Xarelto.
Q. And it says "cooperation and licensing

| Objections In | Responses In | Rulings |
|---|---|---|
| **Re: [23:25-24:23]** **Def Obj** Relevance/403 - introduction of this testimony on sales/profits/revenue violates the Court's rulings on the Omnibus MIL No. 1 (Dkt. Nos. 5955, 6254) | Re: [23:25-24:23] Pltf Resp Highly probative to establishing witness' stature to the jury, contextualizing his later testimony. This is especially important given the witness' repeated attempts to minimize his role in the | Pending |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

agreement with J&J (2005), team lead of due diligence."

Do you see that?

A. I can see that it is written here.

Q. And that was talking about you, right, you were the team lead of the due diligence with J&J?

MR. DERRINGER: Object to form.

A. I was responsible for due diligence in organizing the logistics frameworks for this, so I was the project manager responsible for implementing due diligence.

[Handwritten annotation: overruled 401 not excluded by 403]

Responses In: development and commercialization of Xarelto. Objection appears to be directed only at 23:25-24:5, yet it should be overruled since testimony lends not to profitability but to Bayer's prospects of expanding the compound to numerous indications.

**25:14 - 25:25 Glombitza, Bernhard 2016-09-13** 1:16

Q. And you were, in fact, the secretary of the joint steering committee, right?

A. Right. As I already said, I was the one to organize the logistics frameworks for these committees and also of this committee. I was the one to compile the agenda together with the team. I also attended the meetings, and then afterwards wrote the minutes. So this is the role of a secretary.

Q. And you were -- these committees were joint committees between Bayer and J&J, correct?

A. This is correct.

**26:10 - 27:11 Glombitza, Bernhard 2016-09-13** 3:03

Q. Let's look back at Exhibit 1 for a moment. And if we can look on Page 2, there's a -- under your titles related to being the Senior Global Project Program Head Xarelto and Director, Global Project Leader from that 2005 time period forward, I want to look in the "Major achievements" section. And if you can look with me at bullet point number 1, it says "Developed Xarelto R&D strategy."

Do you see that?

A. That's what it says here, yes.

Q. And if we look at the next bullet point, that's the one about preserving the situation to be the first oral Factor Xa inhibitor on the market, and it says "Met all project milestones over the past six years. Kept project on track for approval and launch in 2008 in the short-term indication. Kept project on track for approval and launch in 2011 for the long-term indications." Those are all listed as your major achievements, correct?

A. Let me point out that there's an incongruency here in this document between the date and the list, which means that it is a draft version. These are not my personal achievements. I believe that I can recall that the team that I managed achieved these things.

**28:13 - 28:22 Glombitza, Bernhard 2016-09-13** 1:20

Q. Delays in the development program and ultimately an approval for sale can have negative financial implications on the company, right?

A. Delays can have negative consequences for the patients that might not get valuable

| | Objections In | Responses In | Rulings |
|---|---|---|---|

medication on time, but they can also have an influence on the finances of the company developing the medication, but that is always the case.

**30:9 - 31:6 Glombitza, Bernhard 2016-09-13** 3:03

Q. It was very important that Bayer and J&J outperform their competitors with respect to the timelines of getting approval of their Factor Xa inhibitor, correct?
MR. DERRINGER: Object to form.
A. It was important to get the medication out to market speedily in order for patients to be able to benefit from the new standard of care, and in order for the health system as a whole to benefit from it.
BY MR. OVERHOLTZ:
Q. And in order to increase profitability for Bayer, Bayer was in a race with their competitors to get to market, correct?
A. At the time I was the project manager of the R&D team, I was not involved in market observations or observations of our competitors. That was the responsibility of the marketing department. So it is difficult for me to go into details on this. All I know is that there were competing products, but they had other profiles. Their safety and efficacy profiles were different from Xarelto.

**35:22 - 36:18 Glombitza, Bernhard 2016-09-13** 2:14

(Whereupon, Glombitza Exhibit Number 4, E-mail chain, Bates XARELTO_BPAG_33740158, was marked for identification.)
BY MR. OVERHOLTZ:
Q. If you can look with me at what we'll mark as Exhibit Number 4, which is record 4627314, and it is Bates BPAG_33740158. It's an e-mail chain from August, 2013 between yourself and Kemal Malik.
And can you tell us who Kemal Malik was?
A. He was one of Bayer's employees.
Q. Was he a top executive at Bayer?
MR. DERRINGER: Object to the form.
A. What time frame are you talking about?
BY MR. OVERHOLTZ:
Q. In this 2013 time frame.
A. Well, 2013, I'm not entirely sure what your definition of a top executive is, but as far as I can remember, Kemal Malik was part of the management of Bayer.

**36:24 - 37:11 Glombitza, Bernhard 2016-09-13** 1:18

Q. And so if you look with me at the bottom of the page, Kemal Malik e-mailed you on August 29th of 2013, and the subject was the "OD decision," and says "Dear Bernhard, Do you know when we made the OD decision for Xarelto," right?
A. That's what it says here.
Q. Okay. And "OD decision," that's

Objections In | Responses In | Rulings

referring to the once-daily dosing decision, correct?
A. OD means once-daily, but I'm not entirely certain what "decision" means in this context.

**37:18 - 39:1 Glombitza, Bernhard 2016-09-13** 3:25

Q. Okay. And so in 2013 when Kemal Malik wanted to know when the decision had been made related to once-daily for Xarelto, he e-mailed you, correct?
A. That's what I read here.
Q. And you were able to respond to Kemal Malik, and you told him that the decision was taken on the pharma management committee on 16 June, 2005, and you attached a presentation, and were even able to reference specific slides related to OD/BID for P.VTE, evidence slide 14, and recommendation slide 31, and then you corrected your date as a mistyping and said it was 16 June, 2004, not 2005, correct?
MR. DERRINGER: Object to form.
A. I would like to -- that's what it says here.
And I would like to point out that this was before my time as the project manager for rivaroxaban. As I already mentioned, it was in 2005 that I took on this position, so 2004, it was before my time.
BY MR. OVERHOLTZ:
Q. But you were able to provide this information to Kemal Malik, correct, in 2013?
A. I had the presentation from 2004, and I sent it to him.
Q. And Kemal Malik responded to you at the top of the page regarding the OD decision and said "Perfect. One of the best decisions we ever made...and one of the bravest."
Do you see that?
A. I see that. I see that's what it says here.

**39:16 - 39:18 Glombitza, Bernhard 2016-09-13** 0:37

Q. I want to show you what we'll mark as Exhibit Number 5, which was the e-mail that you sent to Mr. Malik that had the attachment to it.

**39:25 - 40:7 Glombitza, Bernhard 2016-09-13** 0:43

Q. You see this is the e-mail, it's 4627316, Bates BPAG_33740160, this was your initial response in which you told him that the decision was taken by the Pharma management committee on 16 June, 2005, and you have the presentation attached to it. And you later changed that date to 2004, correct?
A. That's what I read.

**41:5 - 41:16 Glombitza, Bernhard 2016-09-13** 1:47

Q. Do you agree that the Afib indication had the biggest market potential, as you understood it, back in 2005 for the development of Xarelto for Bayer?
MR. DERRINGER: Object to form.

| Designation | Testimony | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| | A. The Afib indication is a chronic indication that involves benefits for a large number of patients, and was expected to improve the standard of care for these patients. This was 11 years back, and I cannot remember precisely whether it was the biggest indication. I remember there were other big indications. | | | | |
| 41:18 - 42:5 | **Glombitza, Bernhard 2016-09-13**<br>**Q. So whether Afib was the biggest -- had the biggest market potential, you just don't remember?**<br>**A. Afib is one of the indications with a large patient potential. There is a potential to contribute to benefits to a large number of patients. It's mostly the case that if a drug is on the market and helps many patients, then it is usually sold more frequently, that is, has an increased sales potential compared to drugs that are used for -- contribute to the benefit of a smaller number of patients, that is, a smaller patient population.** | 1:59 | | | Overruled 401; 602 & 901; 607 EF |
| 48:20 - 49:7 | Glombitza, Bernhard 2016-09-13<br>Q. Let's look at, I think, what we've marked as Exhibit Number 6, which was the attachment to your e-mail to Kemal Malik, and it's the "Follow-up Factor Xa Discussion" PowerPoint.<br>And let me put it on the screen for you, and that's Exhibit 6. You have it in front of you. And if you'll turn with me to the second page?<br>(Whereupon, Glombitza Exhibit Number 6, Follow-up Factor Xa Discussion, Bates XARELTO_BPAG_33740161 through 191, was marked for identification.) | 0:34 | **Re: [48:20-49:7]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 53:17-20). See objections to Ex. 6 | Re: [48:20-49:7]<br>Pltf Resp Testimony is clear the slide deck was an attachment forwarded by the witness to his boss. Whether he had a roll in creating the PowerPoint or not is beside the point. The witness is clear that the file was sent from him and came from his predecessor's archives and pertains to his responsiblity, as such. Mr. Glombitza consistently minimized his role in any and all aspects of Xarelto, which the jury can consider when evaluating the witness' credibility. See Plaintiff's response to exhibit objection. | Pending |
| 50:10 - 50:17 | **Glombitza, Bernhard 2016-09-13**<br>**Q. Did you help prepare this PowerPoint that you sent to...**<br>**A. The PowerPoint date is the 16th of June, 2004, so that was more than one year before I took on my role.**<br>**Q. Okay.**<br>**A. And that means I have not helped in compiling this presentation.** | 0:38 | | | |
| 50:18 - 52:18 | **Glombitza, Bernhard 2016-09-13**<br>Q. Was it a PowerPoint presentation that was made available to you and that's how you were able to provide it to Mr. Malik?<br>A. I took over the archives of my predecessor, and this presentation was part of the historical archive of my predecessor.<br>Q. Now, if we can turn to Page 4, there's | 6:11 | **Re: [50:18-52:18]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to | Re: [50:18-52:18]<br>Pltf Resp Testimony is clear the slide deck was an attachment forwarded by the witness to his boss. Whether he had a | Overruled see above EF<br>Pending |

05/21/17 19:09

| | Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | a page that's titled "Decisions to be Taken." And you see the "Program Decisions," "The First Decision - Today's Decision. Do we want to investigate the OD opportunity?"<br>Do you see that?<br>A. This is what is written here.<br>Q. And then the second decision is listed as September, 2005, "Do we go for DVT prevention, and if, OD or BID?"<br>Do you see that?<br>A. This is what it says here.<br>Q. And the third decision asks the same question related to the DVT treatment indication, correct?<br>A. This is what it says, yes.<br>Q. And then if we look down, the fourth decision, it asks "Do we go for Afib, and if, OD or BID?" Right?<br>A. This is what it says here, yes.<br>Q. And then the last section is called "Partnering Decision."<br>Do you see that?<br>A. Yes, it says "Partnering Decision."<br>Q. Okay. And it says in italics, "The current base case program requires a partner for the development of DVT treatment and Afib."<br>Do you see that?<br>A. Yes, this is what it says, yes.<br>Q. Now let's look at the slide that you pointed Mr. Malik to, slide 8. And this slide 8 is regarding the DVT prevention decision, "The Second Decision," "and if, OD or BID?"<br>Do you see that?<br>A. What I can see is that this is what is written here, and the title is "Do we go for DVT Prevention, and if, OD or BID?" But this per se is not a decision yet.<br>Q. And so then if we look -- the next slide that you pointed Mr. Malik to was slide 14, and it's titled "Probability of Success for OD. What is the Evidence for Once-Daily Dosing?"<br>Do you see that?<br>A. This is what it says here, yes. | which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 53:17-20). See objections to Ex. 6 | roll in creating the PowerPoint or not is beside the point. The witness is clear that the file was sent from him and came from his predecessor's archives and pertains to his responsiblity, as such. Defense counter testimony (54:15-24), for example, cites Ex. 5, the email sending Ex. 6, in which Mr. Glombitza forwards the PowerPoint. See Plaintiff's response to exhibit objection. | Overruled 401, 602, 607, 901<br>Witness is the global project manager for the drug. He is aware of the historical development of the drug. He sends some of this material to his boss with occasional comments. Seems, that material is authentic under 901 & relevant under 401 |
| 54:2 - 54:14 Glombitza, Bernhard 2016-09-13 (1:11) | Q. So then let's look at the next slide you recommended to Mr. Malik in your e-mail which was slide 31. The "Recommendation" slide.<br>Do you see this?<br>A. Yes, I can see the headline of "Recommendation."<br>Q. And it says, number one, "Investigate the OD opportunity." Right?<br>A. This is what it says here, yes.<br>Q. The second point says "Do not prepare for early BID program."<br>Do you see that?<br>A. This is what it says here. | **Re: [54:2-54:14]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are | Re: [54:2-54:14]<br>Pltf Resp Testimony is clear the slide deck was an attachment forwarded by the witness to his boss. Whether he had a roll in creating the PowerPoint or not is beside the point. The witness is clear that the file was sent from him and came | Pending |

| Designation | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | | outside his purview (see e.g., 53:17-20). See objections to Ex. 6 | from his predecessor's archives and pertains to his responsiblity, as such. Defense counter testimony (54:15-24), for example, cites Ex. 5, the email sending Ex. 6, in which Mr. Glombitza forwards the PowerPoint. See Plaintiff's response to exhibit objection. | Overruled 401 |
| 54:15 - 54:17 Glombitza, Bernhard 2016-09-13<br>Q. And this was the decision that you were telling Mr. Malik about in your 2013 e-mail, right? | 0:19 | Re: [54:15-54:17]<br>Pltf Obj Objection as non responsive, testimony starting at 54:20 with "But allow me¦" and ending at 54:24. | | Pending<br>Overruled 401, 602, 901 |
| 54:19 - 54:24 Glombitza, Bernhard 2016-09-13<br>A. This is the document I referred him to. But allow me to point out that if you take a look at the chart with the timelines, then you can see that both OD and BID studies and also phase II studies were planned and were then implemented during my time. | 0:17 | | | |
| 55:18 - 56:1 Glombitza, Bernhard 2016-09-13<br>Q. And the first bullet point says "Continued planning for phase III BID dilutes our already limited resources." Correct?<br>A. Correct.<br>Q. And the fourth bullet point says "Focus on decision on OD dose regimen and do not prepare for early BID program."<br>Do you see that?<br>A. Yes, I do. | 0:38 | Re: [55:18-56:1]<br>Def Obj Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 53:17-20). See objections to Ex. 6 | Re: [55:18-56:1]<br>Pltf Resp Testimony is clear the slide deck was an attachment forwarded by the witness to his boss. Whether he had a roll in creating the PowerPoint or not is beside the point. The witness is clear that the file was sent from him and came from his predecessor's archives and pertains to his responsiblity, as such. Defense counter testimony (54:15-24), for example, cites Ex. 5, the email sending Ex. 6, in which Mr. Glombitza forwards the PowerPoint. See Plaintiff's response to exhibit objection. | Pending |
| 56:2 - 56:4 Glombitza, Bernhard 2016-09-13<br>Q. Basically Bayer determined that further work on a BID dose was a waste of time, correct? | 0:16 | | | |
| 56:6 - 56:7 Glombitza, Bernhard 2016-09-13<br>A. This is not correct. And after June, 2004 BID studies were implemented. | 0:06 | | | |
| 64:25 - 65:22 Glombitza, Bernhard 2016-09-13<br>Q. Let me show you what we'll mark as Exhibit Number 7, which is 3789131.<br>(Whereupon, Glombitza Exhibit Number 7, 11/2/2014 e-mail, Bates XARELTO_BHCP_08835977, was marked for identification.)<br>BY MR. OVERHOLTZ:<br>Q. This is an e-mail from you to Scott Berkowitz on 2014, either on November 2nd or February 11th titled "history docs."<br>And then we'll mark as Exhibit Number 8 the attachment, which is 3789132. | 1:49 | | | |

05/21/17 19:09

| Designation | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

(Whereupon, Glombitza Exhibit Number 8, PowerPoint, Bates XARELTO_BHCP_08835978 through 6005, was marked for identification.)
BY MR. OVERHOLTZ:
Q. And then Exhibit Number 9, which is 3789134
(Whereupon, Glombitza Exhibit Number 9, PowerPoint, Bates XARELTO_BHCP_08836007 through 6044, was marked for identification.)

**66:20 - 67:1 Glombitza, Bernhard 2016-09-13** 0:49

Q. But you have no recollection of Scott Berkowitz, or e-mailing him what you described in the subject line as history docs in November of 2014?
A. I do remember Scott Berkowitz, but I do not recall specifically that I sent him these documents on the 2nd of November, 2014. And

**68:24 - 70:1 Glombitza, Bernhard 2016-09-13** 2:21

Q. If you can turn with me to the next page, it's labeled "Target labeling."
And BAY 59-7939, that's Xarelto, right?
A. That is rivaroxaban, and it is sold under the trade name of Xarelto.
Q. And if you can look with me, the fourth one down is "Once-daily administration," and under the "Xarelto" column there's a question mark, right?
A. Yes, I see the question mark.
Q. And if you look two down, it says "No coagulation monitoring."
Do you see that? And there's a checkmark for that, right?
A. Yes, I see the checkmark.
Q. For "Fixed dose" just above that is a checkmark, correct?
A. I also see that.
Q. Then there was checkmarks for target labeling for no liver toxicity, no contraindication in severely renally impaired patients, no warning/precaution in moderate renally impaired patients, no warning/precaution in low/heavy weight patients, no warning/precaution in geriatric patients.
Do you see all of those?
A. Yes, I see the checkmarks.

Objections In: **Re: [68:24-70:1]** **Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 74:15-24). See objections to Ex. 8

Responses In: Re: [68:24-70:1] Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether the document is within his "purview" is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which leaves little question that the document falls within his direct purview. See Plaintiff's response to exhibit objection.

Rulings: Pending

**72:13 - 73:13 Glombitza, Bernhard 2016-09-13** 1:56

Q. The second bullet point on this "Factor Xa inhibitor Partnering: Main Objectives" slide is number 2, "Reduce money at risk in development. Share risks and costs with a strong partner."
Do you see that?
A. Yes, that's what I read there.
Q. Number 3 says "Benefit from partner's development resources and expertise."
A. Yes, that's what I read.

Objections In: **Re: [72:13-73:13]** **Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he

Responses In: Re: [72:13-73:13] Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether the

Rulings: Pending

| Designation | Testimony | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| | Q. And number 4 says "Build our Specialty Business. Obtain promising quids in exchange for Factor Xa inhibitor US rights."<br>Do you see that?<br>A. I see that.<br>Q. Now, if we can turn to the next page, it says the "Intended Deal Frame."<br>Do you see that?<br>A. That's what it says.<br>Q. It says "Rights and obligations for partner," and it's to "worldwide co-develop the factor Xa until all indications according to the Development Plan have been launched; minimum cost participation partner 50 percent."<br>Do you see that?<br>A. I see that. | | ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 74:15-24). See objections to Ex. 8 | document is within his "purview" is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which leaves little question that the document falls within his direct purview. See Plaintiff's response to exhibit objection. | Overruled 401, 901, 607 |
| 74:2 - 74:11 Glombitza, Bernhard 2016-09-13 | Q. And if you'll look with me on the next page, there's "Status of Negotiations," and there are two companies listed, J&J and Takeda.<br>Do you see that?<br>A. That's what it says.<br>Q. And according to this, both boards of J&J and Takeda had approved terms of an agreement, is that right?<br>MR. DERRINGER: Object to form.<br>A. I cannot confirm that in this way. | 0:54 | Re: [74:2-74:11]<br>Def Obj Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; he also testifies that its contents are outside his purview (see e.g., 74:15-24). See objections to Ex. 8 | Re: [74:2-74:11]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether the document is within his "purview" is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which leaves little question that the document falls within his direct purview. See Plaintiff's response to exhibit objection. | Pending<br>Overruled 401, 901, 607 |
| 74:12 - 74:13 Glombitza, Bernhard 2016-09-13 | **BY MR. OVERHOLTZ:**<br>**Q. This was your PowerPoint, right?** | 0:14 | | | |
| 74:14 - 74:24 Glombitza, Bernhard 2016-09-13 | **MR. DERRINGER: Object to form.**<br>**A. No, this is not my PowerPoint. This is a PowerPoint that was in my archive, and the date spanned to the time before my time as -- my responsibility regarding this project as project manager.**<br>**And I would like to repeat again, in my work in due diligence, I was responsible for due diligence logistics, so there were documents in my files, but I did not have the expert knowledge or creating them.** | 1:13 | | | |
| 75:14 - 76:2 Glombitza, Bernhard 2016-09-13 | Q. Let's look at Exhibit Number 9, if we can. And if we look at the first page, it talks about "Agenda. Results of decision analysis.<br>"Introduction.<br>"Results of the Decision Analysis regarding dosing scheme and Japan development strategies based on a competitive set of indications for market entrance.<br>"Current view on partnering."<br>And "Results of the Strategic Analysis to fully exploit the value of the asset based on extended set of indications." | 0:58 | Re: [75:14-76:2]<br>Def Obj Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team; Relevance - this | Re: [75:14-76:2]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an | Pending<br>Overruled as mentioned Witness is the global project manager since 2005. He is in charge of file including historical material on Xarelto. He sends some of this material to colleagues & occasionally comments on it. He's not being forced to say it. |

05/21/17 19:09

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| Do you see that?<br>A. Yes, I can see that. | testimony relates to Xarelto as developed and used in Japan. See objections to Ex. 9. | obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. The single reference to Japan is not one incorporating foreign regulatory statements or concerns. The testimony centers on dose strategy fully exploiting the value of Xarelto. See Plaintiff's response to exhibit objection. | [handwritten:] Would says what it says. 90 is really only authenticating the documents & his comments when they occur. This is proper under 90! & the material is relevant under 401! not excluded by 403 |

**76:23 - 80:9 Glombitza, Bernhard 2016-09-13** 9:12

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| Q. If you can turn with me over to Page 4 in this slide presentation that you sent over to Mr. Berkowitz in 2014, it says "A basic set of indications regarded as competitive was used for evaluating the dosing scheme strategy."<br>Do you see that?<br>A. I see what it says here.<br>Q. Okay. And then the first section here is called the "Basic program," and it lists VTE1, 3 and 4 with high PTS, fast, usual entrance indication, fast, highest value VTE, and fast development.<br>Do you see that?<br>MR. DERRINGER: Object to form.<br>A. That's what it says.<br>BY MR. OVERHOLTZ:<br>Q. And it says -- Afib is the next bullet point. "Afib: Value driver."<br>Do you see that?<br>A. This is what I also read there.<br>Q. It says "high medical need, but longer development time than VTE, lower PTS (18 percent)."<br>Do you see that?<br>A. That's what it says.<br>Q. PTS is probability of technical success, correct?<br>A. This is the general used term I remember.<br>Q. Then it says "VTE treatment: Needed for timely Afib development, lower PTS (18 percent), same development time as Afib, low-medium value."<br>Do you see that?<br>A. I see that.<br>Q. And so remember earlier when I asked | **Re: [76:23-80:9]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team (see e.g., 81:20-24). See objections to Ex. 9. | Re: [76:23-80:9]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. See Plaintiff's response to exhibit objection. | Pending<br>[handwritten:] Overruled |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

you about whether or not you learned in the 2004-2005 time frame that Bayer believed there was a lower probability of success for Afib than VTE, and you said you didn't remember that, and that you remember -- do you remember those questions?

A. I remember saying that the probability of success of a project depends on the development status, and it changes with the development status.

Q. But according to this PowerPoint that you e-mailed to Scott Berkowitz in November of 2014, Bayer back in 2004 believed that Afib had a lower probability of success than VTE, right?

MR. DERRINGER: Object to form.

A. This is not correct. The document was created in 2004, that was before the time I took over my responsibility, so I can only make limited statements regarding this content.

But when it says -- or when you say Bayer here, this is not correct. The author was a colleague from marketing, and what he writes does not represent the opinion of Bayer.

Q. You recall I asked you whether or not Afib had the biggest market potential and was the most important to Bayer. According to this PowerPoint that you sent to Scott Berkowitz, Afib was the value driver, correct?

MR. DERRINGER: Object to form.

A. This document, this PowerPoint was created in 2004, that is more than 12 years ago, and what we read here is what a marketing colleague believed, that he believed that Afib was a value driver. It doesn't say that there couldn't be or weren't other indications that were value drivers or could become value drivers.

BY MR. OVERHOLTZ:

Q. Do you recall I also asked you whether or not you agreed that the VTE treatment indication was necessary for Afib? Do you recall that?

MR. DERRINGER: Object to form.

A. I do not recall the question in exactly this form.

BY MR. OVERHOLTZ:

Q. And according to this PowerPoint, it says "VTE treatment: Needed for timely Afib development."

Do you see that?

A. This is what it says here.

Overruled (see above)

**82:22 - 83:8 Glombitza, Bernhard 2016-09-13** 1:18

Q. And do you recall learning, when you became one of the program directors for Xarelto, that Bayer's belief was that the marketplace for oral anticoagulants was going to be driven by once-daily?

MR. DERRINGER: Object to form.

A. I do remember that there were discussions regarding the fact that OD offered benefits for patients and that it also increased patient compliance and patient safety as to

| Objections In | Responses In | Rulings |
|---|---|---|
| **Re: [82:22-83:8]** **Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he | Re: [82:22-83:8] Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was | **Pending** |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | their concern getting the right -- about getting the right treatment. | ever joined the Xarelto team (see e.g., 81:20-24). See objections to Ex. 9. | creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. See Plaintiff's response to exhibit objection. | Overruled |
| 85:11 - 86:7 | Glombitza, Bernhard 2016-09-13 2:13<br>Q. If you look with me over at slide 11, it's "Strategy B."<br>And Strategy B says "all indications OD - delivers the highest value and is therefore recommended by the team."<br>Do you see that?<br>A. Yes, this is what it says here.<br>Q. And if you look below there, it says Strategy A is "All indications BID," and the peak sales are listed, 343 to 651.<br>Do you see that?<br>A. I see that. But I do not see any indication of currency. And for me, it's not quite clear what the comment or the point means, because there are differences in that between United States and Europe.<br>But I do see that it says 1.07 to 2.496, and it says "peak sales" over it.<br>Q. Do you think that's talking about billions?<br>A. This is an assumption that I cannot derive from this slide. | **Re: [85:11-86:7]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team (see e.g., 81:20-24). Relevance/403 - introduction of this testimony on sales/profits violates the Court's rulings on the Omnibus MIL No. 1 (Dkt. Nos. 5955, 6254). See objections to Ex. 9.<br>Sustained 403, 602 | Re: [85:11-86:7]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. The testimony relates to development strategies for Xarelto. See Plaintiff's response to exhibit objection. | Pending<br>Overruled |
| 86:8 - 86:10 | **Glombitza, Bernhard 2016-09-13** 0:09<br>**Q. So the truth was that development of Xarelto for BID use simply wasn't an option for Bayer, right?** | | | |
| 86:12 - 86:18 | **Glombitza, Bernhard 2016-09-13** 0:28<br>**A. This is wrong. Bayer completed several BID studies following 2004, and the selection of OD over BID was data-driven on the basis of clinical data.**<br>**I would like to add something. And there are indications out there in the market that are BID for Xarelto.** | Re: [86:12-86:18]<br>Pltf Obj Objection as non-responsive, testimony starting at 86:16-18.<br>Overruled | | Pending |
| 87:14 - 87:17 | **Glombitza, Bernhard 2016-09-13** 0:16<br>**Q. And so developing Xarelto for BID use for VTE and Afib was not an option for Bayer** | | | |

 05/21/17 19:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| because BID was not going to be profitable, according to Bayer's market research, correct? | | | | |
| **87:19 - 88:3 Glombitza, Bernhard 2016-09-13**<br>A. This is wrong. Bayer has got BID indications out there in the market for some indications --<br>THE INTERPRETER: Sorry, correction. Translator's correction.<br>A. Bayer has got some BID dosages out there in the market for some indications. And the decision as to whether or not to go for BID or OD was based on clinical data and the science. | 0:33 | | | Overruled 901, 401 |
| **88:5 - 88:13 Glombitza, Bernhard 2016-09-13**<br>Q. Let's look at slide number 12, if we can.<br>It says "In a future OD driven market BID drugs will not be competitive."<br>A. This is what I can read here.<br>Q. It says "Strategy A - all indications BID - is not an option."<br>Do you see that?<br>A. Yes, this is what it says here. | 1:09 | **Re: [88:5-88:13]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team (see e.g., 81:20-24). See objections to Ex. 9. | Re: [88:5-88:13]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. See Plaintiff's response to exhibit objection. | Pending<br>Overruled 901, 401 |
| **88:22 - 89:14 Glombitza, Bernhard 2016-09-13**<br>The first bullet point says "US: BID drug will capture only minimal shares in OD driven market," right?<br>A. I can read what you also read. But you failed to read out the colon.<br>Q. Right. I did, I left out the colon.<br>The next one says "Europe: BID is not profitable despite optimistic market shares," right?<br>A. This is what it says here in the text.<br>Q. And it says "Japan: BID is not profitable, even with little competition is expected," right?<br>A. Yes. "Japan, colon," and then I can read what you read out.<br>Q. The fourth bullet point says "Global: BID is not profitable," right?<br>A. This is what it says here. | 2:41 | **Re: [88:22-89:14]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team (see e.g., 81:20-24). See objections to Ex. 9. Reference to foreign markets is irrelevant and prejudicial under Rule 403. Additionally - introduction of this | Re: [88:22-89:14]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, | Pending |

| Testimony | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | | testimony on sales/profits benchmarks violates the Court's rulings on the Omnibus MIL No. 1 (Dkt. Nos. 5955, 6254) | understanding the development history of the compound is a part of his job. Brief references to BID viability in a few foreign markets contextualises that the same was expected of the domestic market, providing a financial motive to pursue OD dosing exclusively. Further, these relate not to explicit expected profits, rather to an overall commercial business plan. See Plaintiff's response to exhibit objection. | Overruled 401, 901 |
| **100:2 - 100:14 Glombitza, Bernhard 2016-09-13**<br>Q. So let's turn to the last page of the PowerPoint and see how the recommendations in May of 2004 turned out.<br>It says "New Recommendation May 2004: Focus on once daily development and indications with highest impact of our product profile (oral and unmonitored)."<br>Do you see that?<br>A. This is what it says here, yes.<br>Q. The first bullet point is "Focus on once daily development."<br>That's what it says, correct?<br>A. That's what it says. | 1:08 | **Re: [100:2-100:14]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occassions that he had no role in the creation of the presentation to which this testimony refers, and explains it was created before he ever joined the Xarelto team (see e.g., 81:20-24). See objections to Ex. 9. | Re: [100:2-100:14]<br>Pltf Resp Here again, the testimony relates to a document the witness emailed to Bayer colleagues about Xarelto. Whether he created the document or whether it was creating during his tenure is hardly an obstacle to establishing its foundation. Mr. Glombitza was the Global Project Manager for Xarelto, understanding the development history of the compound is a part of his job. See Plaintiff's response to exhibit objection. | Pending |
| **100:15 - 100:19 Glombitza, Bernhard 2016-09-13**<br>Q. So in May of 2004, the company has only just begun phase II studies, still in the middle of phase II of the study program, and they have decided to focus on a once-daily oral drug that was unmonitored, is that right? | 1:05 | | | |
| **100:21 - 101:3 Glombitza, Bernhard 2016-09-13**<br>A. That is not correct. Please let me reiterate that this document is 12 years old. It's from before I took over the responsibilities for the project. It was written by a colleague from marketing. And it does not represent the company's position. As I read the document, it's more of a reflection on strategy than a decision document. | 0:24 | | | |
| **101:5 - 101:12 Glombitza, Bernhard 2016-09-13**<br>Q. Why was marketing -- why were marketing colleagues making recommendations about the drug development strategy for the dose and whether coagulation status should be monitored and whether the dose should be given | 0:20 | | | |

| Designation | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| once daily or twice daily in 2004 when the company has just started the phase II study program? | | | | |
| **101:14 - 102:17 Glombitza, Bernhard 2016-09-13** | 2:55 | | | |
| A. The marketing department is a department that provides market forecasts. That does not mean that they have the decision-making power when it comes to clinical studies and clinical treatment regimes. The decision as to whether OD or BID should be chosen was driven by available data that came in after 2004 and the scientific evaluation of this data.<br>Let me repeat, it was not a marketing decision, it was an R&D decision.<br>BY MR. OVERHOLTZ:<br>Q. This PowerPoint that you claim was written by a marketing colleague was making recommendations about dose and coagulation monitoring back in May of 2004 for Xarelto, correct?<br>A. That is correct. The marketing people adopt their own wish list at a very early stage. As with any other drug development, the marketing people start, at an early stage, to compile their wish list, but it doesn't mean that this wish list will be turned into reality.<br>As we know, there are certain BID indications for Xarelto just as there are OD indications. And the decision whether it's going to be BID or OD is always data-driven and based on the scientific analysis of this data. It is not a decision taken by marketing, it's taken by R&D. | | | | |
| **111:1 - 111:4 Glombitza, Bernhard 2016-09-13** | 0:40 | | | |
| (Whereupon, Glombitza Exhibit Number 11, 59-7939_IPDC May 2004 Wehling.ppt, Bates XARELTO_BPAG_03643733, was marked for identification.) | | | | |
| **111:7 - 111:21 Glombitza, Bernhard 2016-09-13** | 1:27 | | | |
| Q. So if we look at this PowerPoint, the one titled "IPDC May 2004 Wehling," that was attached to Stephan Wirtz's e-mail that, then, Klaus Wehling forwarded to you. If we look at the first slide, there's a list of team members.<br>Do you see that?<br>A. I see that.<br>Q. And here it looks like Stephan Wirtz was a member of a large team of people, including Klaus Wehling, that included marketing, clinical, pharmacology, Japan, regulatory, health, economics, outcome, research, several departments within Bayer, correct?<br>A. That's what it says. | | **Re: [111:7-111:21]**<br>**Def Obj** Lacks foundation - the witness testifies that he had no role in the creation of the presentation to which this testimony refers (see e.g., 115:5-7). See objections to Ex. 11. | Re: [111:7-111:21]<br>Pltf Resp The testimony relates to a document Bayer colleagues emailed Mr. Glombitza about Xarelto. Whether he created the document is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, | Pending |

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | | which establishes amble foundation together with the fact he received it in that capacity. See Plaintiff's response to exhibit objection. | |
| **112:6 - 112:15 Glombitza, Bernhard 2016-09-13** 0:39<br>Q. Okay. So then if we turn to the next slide, it describes the team's recommendation in March of 2003, it says "Recommendation March 03: Focus on indications with highest impact of our product profile," right?<br>A. That's what it says.<br>Q. In parenthesis it says "oral & unmonitored."<br>Do you see that?<br>A. That's what it says. | **Re: [112:6-112:15]**<br>**Def Obj** Lacks foundation - the witness testifies that he had no role in the creation of the presentation to which this testimony refers (see e.g., 115:5-7). See objections to Ex. 11. | Re: [112:6-112:15]<br>Pltf Resp The testimony relates to a document Bayer colleagues emailed Mr. Glombitza about Xarelto. Whether he created the document is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation together with the fact he received it in that capacity. See Plaintiff's response to exhibit objection. | Pending |
| **114:3 - 114:22 Glombitza, Bernhard 2016-09-13** 1:37<br>Q. Then if we turn over to slide 7, it says "New Recommendations." "New recommendation May 2004."<br>Do you see that at the top of the page?<br>A. Yes, this is what it says.<br>Q. And it says "Focus on once daily development and indications with highest impact on our product profile (oral & unmonitored)," right?<br>A. Yes, I see that.<br>Q. So, then, if we look at these bullet points, it talks about "Extended use of Prevention of Venous Thromboembolism, Prevention of Stroke in Afib."<br>And the fourth bullet point is "Pursue development for VTE treatment to facilitate Afib."<br>Do you see that?<br>A. That's what it says. | **Re: [114:3-114:22]**<br>**Def Obj** Lacks foundation - the witness testifies that he had no role in the creation of the presentation to which this testimony refers (see e.g., 115:5-7). See objections to Ex. 11. | Re: [114:3-114:22]<br>Pltf Resp The testimony relates to a document Bayer colleagues emailed Mr. Glombitza about Xarelto. Whether he created the document is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation together with the fact he received it in that capacity. See Plaintiff's response to exhibit objection. | Pending |
| **115:9 - 116:12 Glombitza, Bernhard 2016-09-13** 3:05<br>Q. The next bullet point was "Focus on | **Re: [115:9-116:12]** | Re: [115:9-116:12] | Pending |

| Designation | Objections In | Responses In | Rulings |
|---|---|---|---|
| once daily development and start phase IIb OD studies," right?<br>A. That's what it says.<br>Q. Now, this was -- represented a shift from BID development to OD development in May of 2004 for the company, correct?<br>MR. DERRINGER: Object to form.<br>A. I cannot confirm that.<br>BY MR. OVERHOLTZ:<br>Q. If you can look with me on slide 10, it says "Projected OD timelines are shifted by 7-8 months versus BID."<br>Do you see that?<br>A. That's what it says.<br>Q. Okay. If we look on slide 11, it says "Current view on options to reduce the BID/OD shift - VTE."<br>Do you see that?<br>A. That's what it says.<br>Q. And at the bottom it concluded that there was "No option available that we can recommend (risk, regulatory hurdle, cost/capacity)."<br>They're talking about reducing the delay because of the shift to OD development, right?<br>MR. DERRINGER: Object to form.<br>A. I cannot confirm that. | **Def Obj** Lacks foundation - the witness testifies that he had no role in the creation of the presentation to which this testimony refers (see e.g., 115:5-7). See objections to Ex. 11. | Pltf Resp The testimony relates to a document Bayer colleagues emailed Mr. Glombitza about Xarelto. Whether he created the document is hardly an obstacle to establishing its foundation. Even so, Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation together with the fact he received it in that capacity. See Plaintiff's response to exhibit objection. | Sustained witness doesn't know what it means / is asked what it represents. |
| **118:8 - 118:19 Glombitza, Bernhard 2016-09-13** (0:44)<br>Q. Okay. So let's mark as Exhibit 14 record number 123 --<br>MR. GEISLER: 13.<br>BY MR. OVERHOLTZ:<br>Q. I'm sorry.<br>-- Exhibit 13 record number 1231089, which is the attachment to your e-mail. And it's Bates BPAG_02660439.<br>(Whereupon, Glombitza Exhibit Number 13, PowerPoint, Bates XARELTO_BPAG_02660439, was marked for identification.) | | | Overruled 901, 401 |
| **124:1 - 124:17 Glombitza, Bernhard 2016-09-13** (2:19)<br>slide 37, this is "Brand Vision & Goals need to guide the Phase III Design in VTE/SPAF."<br>Do you agree that commercial brand visions and goals should guide phase III study design for pharmaceutical drugs?<br>A. The dosage decision and the design of clinical studies at Bayer is driven by scientific data and scientific state of the art.<br>Q. The first bullet point says "Our vision is to create the new gold standard for the prevention and treatment of thromboembolic disease."<br>And the second point say "Our goal is to improve the lives of patients and create a multi-billion dollar antithrombotic franchise."<br>Do you see that?<br>A. Yes, this is what it says here. | **Re: [124:1-124:17]**<br>**Def Obj** Relevance/403 - introduction of this testimony on sales/profits benchmarks violates the Court's rulings on the Omnibus MIL No. 1 (Dkt. Nos. 5955, 6254) | Re: [124:1-124:17]<br>Pltf Resp [Plaintiffs would designate 123:25 for clarity]. The testimony relates to the overall commercial and business plan of the company to market Xarelto. This testimony is relevant to motive and credibility for commercializing and developing Xarelto as it was brought to market. | Pending |
| **172:2 - 172:6 Glombitza, Bernhard 2016-09-14** (0:22) | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

Q. So yesterday we talked a little bit about the fact that you first became involved in Xarelto with respect to the due diligence program, is that right?
A. Yes, we talked about this.

**175:15 - 176:15 Glombitza, Bernhard 2016-09-14** 3:09

Q. Let's look at the slide in this PowerPoint presentation regarding the Factor Xa partnering. And it says that "BHC will seek a partner who will license Xarelto for the US territory, will codevelop Xarelto and will assume at least 50 percent of future development costs."
Do you see that?
A. No, this is not what it says here.
Q. What does it say that's different? It uses the acronym BAY 59-7939 instead of Xarelto?
A. The difference between what you read out and what it says here on paper is BAY 59-7939.
Q. And you understand that BAY 59-7939 is Xarelto?
A. BAY 59-7939 is rivaroxaban, and this is the INN substance. So Xarelto is the formulated rivaroxaban, it's a trade name, and it's not a substance name.
Q. You understand that whenever I call Xarelto -- when I call BAY 59-7939 that I'm talking about Xarelto, you understand that?
A. If you define it this way now, then I'm going to understand it this way in the future.

**178:5 - 178:25 Glombitza, Bernhard 2016-09-14** 1:41

Q. And if we can turn over to the fifth slide. It says "Companies we intend to contact."
Do you see that?
A. This is what it says here, yes.
Q. And there were three groups of companies, and the first group included Novartis, Pfizer, and Abbott, right?
A. This is what it says here, yes.
Q. The second group was J&J, GSK, AstraZeneca, Lilly, and it says the "portfolio conflict given to our knowledge which needs clarification and discussion. However, these companies are still attractive due to their capabilities in marketing and development."
Do you see that?
A. This is what it says here, yes.
Q. And the third group was Schering Plough and Wyeth.
Do you see that?
A. This is what it says here, yes.

**179:17 - 179:23 Glombitza, Bernhard 2016-09-14** 0:43

Q. And this due diligence effort was so that -- this due diligence effort was so that Bayer could find a partner for the co-development and marketing of Xarelto, correct?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

A. Due diligence was designed to find a partner for Xarelto.

**180:17 - 181:10 Glombitza, Bernhard 2016-09-14** 1:33

Q. And then it lists the first steps, and it says "First steps: Identification of a responsible person within each department who will support the partnering and the expert discussion and the due diligence to be named to J. Schvneseiffen, B. Glombitza and A. Brandes shortly after this meeting."
Do you see that?
A. This is what it says here, yes.
Q. And if we turn to the next page, it says "Next steps for preparation of a due diligence," and it says "First steps: Identification of a project manager being responsible for internal organization of due diligence and internal support of partnering process from TA perspective (done - B. Glombitza)."
Do you see that?
A. Yes, this is what it says here.

**181:11 - 181:23 Glombitza, Bernhard 2016-09-14** 1:40

**Q. And were you, in fact, the project manager responsible for the organization of the due diligence?**
**A. I was the person that was responsible for the logistical aspects of due diligence, which means I was the one to organize meetings and to organize the document flow and to organize those things that you do as an organizer, for example. Also organize events.**
**Q. That was your responsibility?**
**A. That was one of my responsibilities. In parallel, I continued to be the project manager for other development projects.**

**181:24 - 182:3 Glombitza, Bernhard 2016-09-14** 0:26

Q. You, in fact, actually attended and participated in the due diligence meetings, correct?
A. This is correct. But I cannot confirm that I attended all due diligence meetings.

**194:6 - 194:9 Glombitza, Bernhard 2016-09-14** 0:42

Q. Let's look at what we'll mark as Exhibit Number 23 and 24, which is 1285633 and 1285634, Bates BPAG_03655684, and then for 24, 3655685

**194:20 - 194:25 Glombitza, Bernhard 2016-09-14** 1:01

Q. Okay. And so the e-mail that attaches the draft minutes from the Novartis meeting is from Dagmar Kubitza to Harald Kallabis, and you're CC'd at the top, on March 10th, 2005.
Do you see that?
A. Yes, I see that this is what it says.

**196:12 - 197:11 Glombitza, Bernhard 2016-09-14** 2:03

Q. Now let's look at Exhibit 24, and it's titled "BAY 59-7939 Due Diligence March 1st and

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 196:12 - 197:11 | **Re: [196:12-197:11]** **Def Obj** Lacks | Re: [196:12-197:11] Pltf Resp Mr. | Pending |

05/21/17 19:09

| Designation | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 2nd, 2005, Draft."<br>Do you see that?<br>A. I see that.<br>Q. And you would have been e-mailed these draft minutes as part of your responsibilities as the project manager on due diligence back in 2005, correct?<br>A. It looks as if I received this e-mail.<br>Q. So then it says "Questions raised by Novartis and additional information given verbally by Bayer during group discussions/presentations. The Novartis questions were answered mainly by Elisabeth Perzborn, Volker Geiss, Corinna Weinz, Dagmar Kubitza, Son-Mi Park, Frank Misselwitz, Klaus Wehling. These minutes are based on the questions posted electronically by Novartis and on notes made by Harald Kallabis during the two days of due diligence. Comments in brackets are for clarification purposes and were made upon writing these minutes."<br>Do you see that?<br>A. That's what it says. | | foundation - the witness makes clear at 208:7-15 that he played merely a logistical role with respect to these meetings and the substance of the presention is outside his purview at the time. | Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Whether or not the substance of the meetings fell in his "purview," Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Overruled 901 |
| **198:7 - 198:25 Glombitza, Bernhard 2016-09-14**<br>Q. Let's look at Page 2, and there's a section called "Clinical Development."<br>Do you see that?<br>A. Yes, I see that.<br>Q. And the question from Novartis, the first question is "Why is the OD and BID regimen not combined in all clinical studies?"<br>Do you see that?<br>A. That's what it says.<br>Q. And so Novartis is trying to understand why Bayer is not studying OD and BID regimens together in the same clinical studies, right?<br>MR. DERRINGER: Object to form.<br>A. I cannot say what Novartis wanted or didn't want or proposed 11 years ago. I can only see what is here written in the draft minutes, and that is "Why is the OD and the BID regimen not combined in all clinical studies." | 2:09 | **Re: [198:7-198:25]**<br>**Def Obj** Lacks foundation - the witness makes clear at 208:7-15 that he played merely a logistical role with respect to these meetings and the substance of the presention is outside his purview at the time. | Re: [198:7-198:25]<br>Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Whether or not the substance of the meetings fell in his "purview," Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Pending<br>Sustained witness can't opine on what it means. 602 |
| **199:11 - 199:15 Glombitza, Bernhard 2016-09-14**<br>Q. Let's go down a couple questions. And | 0:26 | **Re: [199:11-199:15]** | Re: [199:11-199:15] | Pending |

| Designation | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| the next question asked by Novartis is "Is there any plan to explore lower doses?"<br>Do you see that?<br>A. That's what it says. | | Def Obj Lacks foundation - the witness makes clear at 208:7-15 that he played merely a logistical role with respect to these meetings and the substance of the presention is outside his purview at the time. | Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Whether or not the substance of the meetings fell in his "purview," Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | |
| 201:2 - 201:19 Glombitza, Bernhard 2016-09-14<br>Q. If you go down a little bit further, for the second day, Wednesday, March 2nd, there's a question by Novartis, "Why has the first ER formulation failed?"<br>Do you see that?<br>A. That's what it says.<br>Q. And the ER would be extended-release?<br>A. The expression ER is used in different contexts. I cannot remember precisely, but it could be like that.<br>Q. And Dagmar Kubitza, DK, has a comment there, and it says "Due to a food effect, three further ER prototypes will have been evaluated by summer. The Bayer strategy is to go with BID administration of the IR tablet should the OD studies have an unexpected outcome."<br>Do you see that?<br>A. That's what it says. | 1:46 | Re: [201:2-201:19]<br>Def Obj Relevance - the extended release prototype does not form the basis of any claim in this case; Lacks foundation - the witness states at 201:20-25 and 217:6-18 that he has no understanding of decisions associated with the extended release prototype, as that occurred before his time. | Re: [201:2-201:19]<br>Pltf Resp The failed extended-release formulation exhibits an attempt to limit the peaks and troughs seen with OD formulation. It represents a tacit admission that Bayer had concerns with this aspect of OD formulation. Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Pending<br>Overruled<br>Just asked to authenticate & he can because he was in his capacity as global project head<br>901, 401 |
| 201:20 - 201:25 Glombitza, Bernhard 2016-09-14<br>**Q. Did you understand why Bayer was trying to develop an extended-release version of Xarelto?**<br>**A. No, I do not understand that. It was before my time as project manager for Xarelto. It was during my time as coordinator for due** | 0:45 | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 207:14 - 215:5 Glombitza, Bernhard 2016-09-14 22:40 | **Re: [207:14-215:5]** **Def Obj** Lacks foundation - the witness makes clear at 208:7-15 and 218:24-219:4 that he played merely a logistical role with respect to these meetings and the substance of the presention is outside his purview at the time. Furthermore, 211:7-212:17 is argumentative. | Re: [207:14-215:5] Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes ample foundation for testimony on these meetings, together with the fact he attended them in that capacity. Whether or not the substance of the meetings fell in his "purview," Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. He is an adverse witness under cross examination whose responses were evasive [here, he is simply asked if the document said what it said] | Pending<br>Sustained asked to agree on what it said since it was before his time can't say i.e. goes beyond 901. Excluded by 602 |

Q. So, Dr. Glombitza, we've been going through this draft from the meeting with Novartis. I just wanted to ask you -- I'll get my screen to pop up. Okay. So if we -- as we went through this due diligence draft for the meeting with Novartis, would you agree that Novartis raised each of these issues during the due diligence process, OD and BID in clinical studies, whether Bayer was going to explore a lower dose, dose adaptation in people with lower body weights, increased bleeding in patients with low BMI, phase III, whether more than one dose would be studied, how the food effect would be labeled, and that PT had wide acceptance and availability? Do you agree that all of those issues were raised in the Novartis due diligence?

MR. DERRINGER: Object to form.

A. I do not agree, because at the time I was responsible for the logistical aspects of the due diligence process, and since it was not my task to comment on the content of individual questions, I cannot really tell you whether this is right or wrong. Besides, this is outside my purview or the role I had at the time. And on top, it's more than 11 years ago, so I have no recollection of this.

BY MR. OVERHOLTZ:

Q. We just read through the document together, didn't we?

MR. DERRINGER: Object to form.

A. We read a document that is referred to as draft minutes Novartis.

BY MR. OVERHOLTZ:

Q. So let's look -- if we look at Exhibit 24, we saw where Novartis asked "Why is the OD and the BID regimen not combined in all clinical studies?" Right? That was one question?

A. Well, this is what is written in the draft minutes for Novartis, and this is what it says there, "Why is the OD and the BID regimen not combined in all clinical studies?" But that's all I can say about that. I cannot tell you any more about this, and I cannot tell you about the background of the Novartis question. I do not know which data was available at the time, and I cannot give you an interpretation of this.

Q. So that was in Exhibit Number 24. Now let's look at number 2, lower dose exploration. Novartis asks right there "Is there any plan to explore lower doses?" Number 2, right?

A. I just have to find not number 2, but the actual paragraph in my exhibit.

Q. It's on the second page. We're on the second page.

A. Yes, this is what I can read here now. Is there any plan to explore lower doses, et cetera. Well, I do not know against which background Novartis asked this question, and I do not remember which data this was based on and

| | Objections In | Responses In | Rulings |
|---|---|---|---|

in which context this question was raised.
Q. It was in the document, right?
A. The draft minutes which represent the notes taken by the keeper of the minutes say "Novartis: Is there any plan to explore lower doses?"
Q. Let's look at number 3, "Dose adaptation - body weight." "Is there a need for a dose adaptation due to body weight?" That's what it says in Exhibit 24, right?
A. Well, the draft minutes of the due diligence meeting say "Novartis: Is there a need for dose adaptation due to body weight?" I do not know against which context this question was raised and which data this was based on. My task back then was to provide for the logistical organization of the due diligence process and manage the due diligence process.
MR. OVERHOLTZ: Objection to the answer.
Q. I didn't ask you any of those questions, Dr. Glombitza. And if we have any intention of being finished with this deposition today so you can go to work tomorrow, then we're going to need for you to answer my questions and not make extraneous comments. Okay?
MR. DERRINGER: Object to form.
A. Your questions cannot be answered with a simple yes or no, and for me it is important to answer those questions within the context.
BY MR. OVERHOLTZ:
Q. I'm going to ask you a simple question that you should be able to answer yes or no, and if you can't, then we have a serious problem.
Does Exhibit 24 reflect that Novartis asked "Is there a need for dose adaptation due to body weight?"
MR. DERRINGER: Objection. Asked and answered, argumentative.
A. Exhibit Number 24 says "Novartis: Is there a need for dose adaptation due to body weight?" And the Exhibit 24 are the draft minutes of the due diligence meeting with Novartis.
BY MR. OVERHOLTZ:
Q. So yes?
A. A yes to what?
Q. Your last answer meant yes?
A. So what was the question that you believe I said yes to?
Q. The question I asked you.
A. I answered your question saying that the draft minutes include this sentence.
Q. So the answer was yes?
MR. DERRINGER: Objection. Asked and answered.
A. Well, you worded your question differently, because you were referring to Novartis more or less believing this. But that was 11 years ago, and I cannot say yes to whether or not Novartis believed this or not. So I can only say that this is included in the draft minutes as a question raised by Novartis.

| Objections In | Responses In | Rulings |
|---|---|---|

BY MR. OVERHOLTZ:
Q. Well, the jury will just get to hear what the question I asked you and how you answered it.
Let's look at number 4, "Increased bleeding in low BMI." Do you see the next comment from Novartis? They said, according to these draft meeting minutes in Exhibit 24, "A subgroup analysis showed increased bleeding (all bleedings) in a low BMI group. Can you comment?"
Did I read that correctly?
A. This is what it says here.
Q. Let's see what else it says. Let's look at the next page, and let's look for number 5. And it says -- number 5 is "Phase III - more than one dose." About halfway down the page, "Novartis: Is phase III planned with more than one dose?"
Did I read that correctly?
A. Yes, this is what it says here.
Q. Who was the second company that you met with for due diligence?
A. That is more than 11 years ago. I do not recall that. But there was a second company.
Q. Let's look at what we'll mark as Exhibit Number 25.
(Whereupon, Glombitza Exhibit Number 25, 5/3/05 e-mail, Bates XARELTO_BPAG_02661816, was marked for identification.)
BY MR. OVERHOLTZ:
Q. And this is 1231133, and it's Bates BPAG_0261816. And then we'll mark as Exhibit Number 26 the attachment to this e-mail, and this is 1231134, Bates BPAG_0261817.
(Whereupon, Glombitza Exhibit Number 26, Document titled BAY 59-7939 Due Diligence March 10 and 11, 2005, Bates XARELTO_BPAG_02661817 through 1830, was marked for identification.)
BY MR. OVERHOLTZ:
Q. And we'll look at Exhibit 25 first, which is the e-mail from Harald Kallabis on which you were copied.
(Witness reviewing document.)
BY MR. OVERHOLTZ:
Q. You received this e-mail from Harald Kallabis on March 5th, 2005? Or it says May 3rd, 2005, I'm sorry.
A. This is what it looks like, because I'm CC'd on this e-mail.
Q. Okay. And Mr. Kallabis is e-mailing you and your colleagues the final minutes of the due diligence March 10th and 11th meeting with Scios/J&J, correct?
A. Yes, this is what it looks like.
Q. Okay. So then if we can look at Exhibit 26, which is the attachment to this e-mail, it says "BAY 59-7939 Due Diligence March 10th and 11th, 2005. Questions raised by Scios/J&J and additional information given

| Designation | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| verbally by Bayer during group discussions/presentations."<br>Do you see that?<br>A. Yes, this is what it says here. | | | | |
| **216:11 - 217:4 Glombitza, Bernhard 2016-09-14**<br>Q. Okay. J&J a couple questions down asks about the strategy for the ER formulation.<br>Do you see that?<br>A. Yes, this is what it says.<br>Q. And Dagmar Kubitza once again tells J&J, who actually told Novartis, that "The first ER prototype failed due to a food effect."<br>Do you see that?<br>MR. DERRINGER: Object to form.<br>A. I can see what it says here.<br>BY MR. OVERHOLTZ:<br>Q. Klaus Wehling, KW, comment says "Our basic assumption is that our IR tablet works OD. The ER tablet is a backup. Doing the development with the ER tablet would lead to a different timeline."<br>Do you see that?<br>A. Yes, this is what it says here.<br>Q. Let's look over -- let me ask you | 1:46 | **Re: [216:11-217:4]**<br>**Def Obj** Relevance - the extended release prototype does not form the basis of any claim in this case; Lacks foundation - the witness states at 201:20-25 and 217:6-18 that he has no understanding of decisions associated with the extended release prototype, as that occurred before his time. The witness makes clear at 218:24-219:4 that he merely provided logistical support by coordinating meetings - he "did not have any content-related task." | Re: [216:11-217:4]<br>Pltf Resp The failed extended-release formulation exhibits an attempt to limit the peaks and troughs seen with OD formulation. It represents a tacit admission that Bayer had concerns with this aspect of OD formulation. Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Pending<br>Overruled (it was min. of meeting for which attendees were asked to send him in capacity as global project manager of Xarelto! |
| **217:5 - 217:11 Glombitza, Bernhard 2016-09-14**<br>**this.**<br>**In your role as a project manager for Xarelto, was it your understanding that the development of an extended-release tablet was being conducted as a backup plan if OD could not get approved as opposed to doing BID development?** | 0:27 | | | |
| **217:13 - 217:18 Glombitza, Bernhard 2016-09-14**<br>**A. At that point in time I was not the project manager for Xarelto, I was rather responsible for the logistical organization of the due diligence process, and in this role it was not my task to know anything about the ER formulation, or even think about it.** | 0:24 | | | |
| **218:7 - 219:21 Glombitza, Bernhard 2016-09-14**<br>Q. Let's look at Page 4, if we can, for a minute. And I'm going to ask you about the second question raised by Scios/J&J. Do you see it says "Do you expect the high peak to trough ratio to be a problem in Afib?"<br>Do you see that?<br>A. Yes, this is what I can read here.<br>Q. And so according to these meeting minutes of the due diligence with J&J in March of 2005, J&J was raising an issue as to whether or not a high peak to trough ratio would be a problem in Afib, right?<br>MR. DERRINGER: Object to form.<br>MR. KENNEDY: Object to form.<br>A. I see in the minute that back then at that point in time they included the question raised by J&J, "Do you expect the high peak to trough ratio to be a problem in Afib?" I cannot | 5:39 | **Re: [218:7-219:21]**<br>**Def Obj** Lacks foundation - The witness makes clear at 218:24-219:4 that he merely provided logistical support by coordinating meetings - he "did not have any content-related task." | Re: [218:7-219:21]<br>Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these | Pending<br>Sustained asked to comment on it or explain it. i.e. goes more than authentication of cannot because he has no info or knowledge to answer this Q. 602 |

05/21/17 19:09

Objections In | Responses In | Rulings

comment on the context of the question nor on
the database available for that question because
I had the role of providing logistical support
for the due diligence process, and I did not
have any content-related task.
BY MR. OVERHOLTZ:
Q. Let's look at Page 8, the top of
Page 8. And if we look at the top of Page 8,
the Scios/J&J question that's presented in these
meeting minutes is "Is it possible that you will
do a BID development in Afib?" Right?
A. That's what it says, yes.
Q. And Frank Misselwitz responds to this
question and says "This is possible. We plan
for an OD development, however." Right?
A. That's what it says.
Q. Okay. If you look at Page 9, look at
the top, it says -- Scios/J&J says "Elderly
women have an AUC increase of 52 percent
compared to younger women."
Do you see that?
A. That's what it says, yes.

Responses In: due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate.

220:10 - 221:14 Glombitza, Bernhard 2016-09-14 2:55

Q. It also says "Women over 75 years have
a 20 percent AUC increase compared to elderly
men. What is the implication, if any, on dosing
in elderly women? Do elderly women have a
different bleeding profile or a higher frequency
of bleeding in completed or ongoing trials?"
Do you see those questions?
A. Yes, I see that.
Q. So based on this AUC increase, J&J
questioned whether or not there were any dose
implications or higher frequency of bleeding?
MR. DERRINGER: Object to form.
MR. KENNEDY: Object to form.
A. I'm not aware of the context in which
J&J asked these questions, nor do I know what
kind of data was available at the time, and what
the conclusions were that were drawn from it.
All I can do is read what it says here, and I
can draw no further conclusions from this,
especially because I'm not an expert.
BY MR. OVERHOLTZ:
Q. If you look with me down further on
the page near the bottom, it says right here
"Scios/J&J: You plan to use one dose in phase
III. Have you considered using two doses? What
about having both a BID and an OD study arm?"
Do you see those questions?
A. That is what it says here, yes.
Q. So J&J was asking about using more
than one dose in phase III, right?

Objections In: Re: [220:10-221:14] **Def Obj** Lacks foundation - The witness makes clear at 218:24-219:4 that he merely provided logistical support by coordinating meetings - he "did not have any content-related task."

Responses In: Re: [220:10-221:14] Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate.

Rulings: Pending

Sustained asked more than ~~authentication~~ — asked to explain. Says not aware of context in which Q. asked etc.

221:17 - 222:1 Glombitza, Bernhard 2016-09-14 0:37

A. I can only confirm what it says here.
I can make no statement on what J&J wanted or
wants, what the context of their questions were,
and what kind of data these questions were based
upon. I simply do not know this, and I can no
longer recall. Plus, I'm not an expert on these
issues. My task was to provide logistical

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| support for the due diligence. I was not called upon to make any comments on the content or any comments -- any scientific comments. | | | |
| **222:3 - 222:15 Glombitza, Bernhard 2016-09-14** (1:15)<br>Q. The -- according to these minutes, J&J asked the question regarding "What about having both a BID and an OD study arm?" Right?<br>MR. DERRINGER: Object to form.<br>MR. KENNEDY: Join.<br>A. What I can read is what it says here, "You plan to use one dose in phase III. Have you considered using two doses? What about having both a BID and an OD study arm?" That's what I can read. And there seems to be a question that J&J asked on the basis of the context abiding at the time and the data that was available. | Re: [222:3-222:15]<br>Def Obj Lacks foundation - The witness makes clear at 218:24-219:4 that he merely provided logistical support by coordinating meetings - he "did not have any content-related task." | Re: [222:3-222:15]<br>Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Pending<br>Overruled. Q. asked to authenticate & he can be asked for the minutes b/c he was present at meeting. 401 |
| **222:17 - 223:12 Glombitza, Bernhard 2016-09-14** (2:56)<br>Q. Now, in your role as a project manager for Xarelto and managing finances and timelines, did you have an understanding that testing more than one dose in phase III would be more expensive for Bayer and their partner than testing just one dose in phase III?<br>A. Clinical study design is extremely complex, but there's not always a 1-to-1 connection between the number of doses and the expense. So if you have two dosage arms, it doesn't necessarily mean that the study is going to be more expensive. The cost depends on the general setting on the condition that is supposed to be studied, and on the general study design. This determines whether a study will be more expensive or not.<br>Nevertheless, you can say that two dosage arms in a phase III study will mostly but not always require more patients and can therefore become more expensive, but they don't have to be. | Re: [222:17-223:12]<br>Pltf Obj Objection as non responsive, starting at 222:23-223:12. | | Pending<br>Overruled. asked to "explain" what is that & he is doing |
| **223:15 - 224:15 Glombitza, Bernhard 2016-09-14** (2:47)<br>Q. Specifically in your role as project manager for Xarelto, would a study in phase III for Afib cost more money if more than one dose was tested?<br>A. I don't recall exactly, because it's a long time ago. But if we had kept the number of | Re: [223:15-224:15]<br>Def Obj Lacks foundation - The witness makes clear at 218:24-219:4 that he merely provided logistical | Re: [223:15-224:15]<br>Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes | Pending<br>Overruled. asked on his capacity as project mgr? for Xarelto. 401 & 607 |

05/21/17 19:09

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| patients per arm constant and increased the number of centers, then a combined BID/OD study would have become more expensive. There was some kind of evaluation back then, but I do not recall exactly what it was.<br>Q. If you can turn with me over to Page 12. In the middle J&J asked a question that says "Comparison of dose strength, study 10989 food effect study, study 10646, 2 food effect studies, although both with low N (8 and 10 completed, respectively), seem consistent in terms of the effect on AUC (approximately 25 to 30 percent). However, one study (with 20-milligram) shows a 40 percent increase on Cmax, the other study (with 10-milligram) shows a 70 percent increase of Cmax. Can you discuss this difference?"<br>Do you see that?<br>MR. DERRINGER: Object to form.<br>A. Yes, I see that. | support by coordinating meetings - he "did not have any content-related task." | amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | |

**224:23 - 227:17 Glombitza, Bernhard 2016-09-14** 7:19

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| So when J&J raised the question about the food effect, Dagmar Kubitza responded and said "The bioavailability decreases in doses above 30 milligrams when given with food, so this is no issue at 5 milligrams. At 20 milligrams we see a 70 percent increase, which is not huge."<br>Do you see that?<br>MR. DERRINGER: Object to form.<br>A. That's what it says here, yes.<br>BY MR. OVERHOLTZ:<br>Q. Do you know whether or not the marketing plan for Xarelto included telling patients and doctors that there were no dietary restrictions when taking Xarelto?<br>A. It's difficult for me to make a statement on this, because I was not responsible for the marketing plan. It is also difficult to define the marketing plan because different stages of the plan exist at different points in time, and the marketing plan has to fit in with the results of the clinical trials. So I am unable to respond because I do not remember what the marketing plan could have contained, and I wasn't responsible.<br>Q. If you can look with me on Page 14, there's a question from J&J, and it says "Are you developing an antidote?" And the response from SP is "The FDA asked us for a countermeasure in cases of overdose."<br>Do you see that?<br>MR. KENNEDY: Object to form.<br>A. This is what it says here, yes.<br>BY MR. OVERHOLTZ:<br>Q. And then if you look a little further down, according to these minutes, J&J asked, or makes the comment "For the chronic indications an antidote may be useful." Right? | Re: [224:23-227:17] **Def Obj** Lacks foundation - The witness makes clear at 218:24-219:4 that he merely provided logistical support by coordinating meetings - he "did not have any content-related task." | Re: [224:23-227:17] Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | Pending<br>Overruled - in his prior capacity as project mgr / was also at the meeting. He can authenticate 901 |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| MR. KENNEDY: Object to form.<br>A. That's what it says here, yes.<br>BY MR. OVERHOLTZ:<br>Q. Was Afib a chronic indication that was being sought for Xarelto?<br>A. Yes, you could define it this way.<br>Q. So based on these meeting minutes from way back in 2005, J&J in the due diligence process raised issues regarding a high peak to trough ratio being a problem in Afib, BID development, and whether it was going to be developed BID, AUC increases in elderly women and potential dose implications or higher frequency of bleeding, whether more than one dose or a BID and OD study arm would be used in phase III, the food effect of Xarelto and increases in exposure at certain doses, and whether Bayer was going to develop an antidote, right?<br>MR. DERRINGER: Object to form.<br>MR. KENNEDY: Object to form.<br>A. That was a rather long list, and I cannot say whether the individual points that you raised are right or not. We would have to compare what you just said to the minutes that we are looking at.<br>But generally, you could say that 11 years ago J&J somehow touched upon these questions on the basis of a limited amount of data available. But I am unable to agree with what you just read out, these issues raised by J&J, in their totality. | | | | |
| 227:19 - 228:2 Glombitza, Bernhard 2016-09-14<br>**Q. During the due diligence process, there were second confirmatory due diligence visits later on.**<br>**Do you recall that?**<br>**A. I don't recall the exact process, nor what happened in the individual instances, but I do recall that there were sometimes second rounds, but I don't remember what companies were concerned and what the content was.** | 1:20 | | | |
| 228:3 - 228:9 Glombitza, Bernhard 2016-09-14<br>Q. Let me show you -- it's going to be the first document. While he gets it, it is going to be record number 777972, Bates JANSSEN_05236862, and then the attachments to that e-mail are record number -- so that will be Exhibit Number 27. And then the attachments to that e-mail will be the next exhibits. | 1:18 | | | |
| 228:16 - 229:4 Glombitza, Bernhard 2016-09-14<br>September 8th, 2005, and the first e-mail at the bottom is from you, Bernhard Glombitza, to two people at sciosinc.com, Barrett and Fu at sciosinc.com, and the subject was "Presentations of todays."<br>Do you see that?<br>A. Yes, I see that.<br>Q. And you see that the attached file below there, you attached the J&J_Confidential | 2:18 | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

DD clinical presentation_final.pdf, as well as the J&J_Factor Xa BAY 59-7939 Bayer presentation September 8 through 9, 2005_final.pdf.
Do you see that?
A. Yes, I see that.

**229:12 - 229:16 Glombitza, Bernhard 2016-09-14** 0:12

Q. Okay. So let me then show you what we'll mark as Exhibit Number 28, which is going to be record number 2420139.
(Whereupon, Glombitza Exhibit Number 28, E-mail chain, Bates

**229:23 - 230:25 Glombitza, Bernhard 2016-09-14** 4:14

Q. You see the e-mail on the last page from you is the same e-mail we just looked at, Exhibit 27, from September 8, 2005 when you sent the two attached presentations to the two people at Scios, Inc., correct?
A. Yes, it looks like that my e-mail was then forwarded within J&J. So everything after my e-mail from the 8th of September or 9th August then is internal communication within J&J without CC to Bayer colleague.
Q. But you agree your e-mail is the same e-mail we just looked at in Exhibit 27, right?
A. I agree that the last paragraph here in this exhibit that goes "Dear Tao, Dear Mark, Please find enclosed the presentations of the group session of today, regards, Bernhard," is identical in its wording with that in Exhibit 27, and also the attached file seems to be the same.
But there is a discongruence here regarding the two exhibits when it comes to my e-mail. In the original there is no blank line between "Regards" and "Bernhard," whereas in the forwarded e-mail, all of a sudden there is this blank line. So there must have been some kind of manipulation.
Q. Okay. Same words?
A. I read the same words.

Overruled 901

**231:7 - 232:6 Glombitza, Bernhard 2016-09-14** 2:26

A. It looks like it, that parts of my e-mail were forwarded within J&J, and then at the end it's also text by Peter DiBattiste.
BY MR. OVERHOLTZ:
Q. Did you -- do you recall Peter DiBattiste, Dr. DiBattiste, being at the due diligence meeting in September of 2005?
A. I cannot recall whether he was present at this meeting in September, 2005, but I do remember that he participated in meetings, due diligence meetings.
Q. And if we can look at Dr. DiBattiste's comments, it says "Some of the clinical highlights/issues include," and then there's a section called "Dosing."
Do you see that?
A. Yes, I read that.
Q. He says "While the once daily dosing study described in the attached appears to have

| Objections In | Responses In | Rulings |
|---|---|---|
| Re: [231:7-232:6] **Def Obj** Lacks foundation - The witness makes clear at 233:4-8 that he merely provided logistical support by coordinating meetings - he did not deal with clinical questions or evaluate clinical documents. | Re: [231:7-232:6] Pltf Resp Mr. Glombitza was the Global Project Manager for Xarelto, which establishes amble foundation for testimony on these meetings, together with the fact he attended them in that capacity. Bayer thought enough of their Xarelto Global Project Manager to ensure that he attended every single one of these due dilligence | Pending |

05/21/17 19:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | been successful, it is worth noting that this study was done with the same formulation as the BID studies. The PK doesn't clearly support once daily dosing, and the potential hazards of higher peaks and lower troughs raises some potential concern." | | meetings. That he minimizes his role through his testimony is a layer that the jury can fairly evaluate. | |
| 232:17 - 233:1 Glombitza, Bernhard 2016-09-14 | 0:43 | | | |
| | Q. Then if we go down it says "Based on all of the dose issues above, I believe it will be most prudent to take at least two active doses into phase III, and if there's a strong desire to test OD dosing, possibly three. While they have clearly considered this, they seem to be leaning to a single dose, mostly out of concern for feasibility and cost."<br>Do you see that?<br>A. That's what it says. | | | |
| **233:2 - 233:8 Glombitza, Bernhard 2016-09-14** | 0:58 | | | |
| | **Q. Were Dr. DiBattiste's comments ever provided to you?**<br>**A. I cannot recall that. At the time I was a secretary or the logistics manager of due diligence, and there was no reason within my responsibility to ask clinical questions or to evaluate clinical documents.** | | | |
| 233:24 - 234:8 Glombitza, Bernhard 2016-09-14 | 0:58 | | | |
| | Q. It was common for you to be the conduit of information back and forth between the companies involved in the due diligence, your contacts at J&J, and then you would forward the information to your colleagues at Bayer, and vice-versa, correct?<br>MR. KENNEDY: Object to form.<br>A. I was something like an air traffic controller, that is, a lot of documents went through my desk back and forth. | | | |
| 239:1 - 239:17 Glombitza, Bernhard 2016-09-14 | 3:07 | | | |
| | Q. You agree that Bayer's goal was to get Xarelto to market as soon as possible so that the competitor oral anticoagulants would not have a marketing advantage?<br>A. I do not agree.<br>Q. Let me show you what we'll mark as Exhibit Number 30.<br>(Whereupon, Exhibit Number 30, E-mail chain, Bates XARELTO_BPAG_03628480 through 8486, was marked for identification.)<br>BY MR. OVERHOLTZ:<br>Q. And it's record number 1283671, Bates BPAG_03628480. It's an e-mail chain involving yourself and Tao Fu and Arndt Brandes and some others?<br>A. I'd need some time to read it through. | | | |
| 239:21 - 240:9 Glombitza, Bernhard 2016-09-14 | 1:49 | | | |
| | Q. Okay. So you can see that the e-mail starts with an e-mail from Arndt Brandes to Tao Fu where he attached a development plan to go | | | |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

along with the collaborative development license agreement, and then Tao Fu responds, if you look with me on the third page of this document, and if you look with me, he says "Dear Arndt," and if you look with me the second paragraph, he says "I think it will be important for the two clinical teams to have a discussion about the development plan. Our impression is that the timeline in your plan for 2006 is aggressive."

Do you see that?

A. This is what it says, yes.

**241:15 - 242:12 Glombitza, Bernhard 2016-09-14** 1:28

A. Yes, I can see that.

Q. Okay. And Arndt Brandes says "We need to discuss items 1 through 3 with our potential partner Apollo next week."

Apollo was the code name for J&J during this due diligence process?

MR. KENNEDY: Object to form.

A. I cannot remember for sure. Might be, might not have been.

BY MR. OVERHOLTZ:

Q. Think it was since he's forwarding an e-mail from someone at J&J?

MR. KENNEDY: Object to form.

A. If the context is that way, then what you said can be right.

BY MR. OVERHOLTZ:

Q. Okay. Arndt Brandes says to you and your colleagues "It's going back to clinical trial design (minimization of risk) and expectation by us to partner in terms of resources."

Do you see that?

A. Yes, I can see that.

**243:7 - 243:24 Glombitza, Bernhard 2016-09-14** 2:29

Q. Okay. And so then if we go back to the first page of the e-mail chain, and Arndt Brandes's e-mail to you and Frank Misselwitz and Joerg Moeller, when he says "It's going back to clinical trial design (minimization of risk)," he's not talking about minimizing the risk to patients, is he? He's talking about minimizing the risk that the study will not succeed to be able to get Xarelto approved and deciding on a trial design that will make it more likely that Bayer and Janssen will have success, correct?

MR. DERRINGER: Object to form.

A. No, this is not right. I'm not in agreement with what you said. I do not know what Arndt Brandes meant in 2005 with this, and I do not wish to speculate on this. So if you'd like to know what he meant back then, you would have to go back to him and ask him.

**244:9 - 246:15 Glombitza, Bernhard 2016-09-14** 4:45

Q. But you keep Frank Misselwitz and Joerg Moeller in the group, right?

A. Frank Misselwitz is CC'd, and Joerg Moeller together with Josef Schvneseiffen and Kemal Malik are the ones this e-mail is

| | Objections In | Responses In | Rulings |
|---|---|---|---|

addressed to.

Q. You understood that the partnering decision for Bayer was a high priority for Bayer back in 2005, right?

MR. DERRINGER: Object to form.

A. For me, this question is unclear because the term "high priority" needs to be defined to understand what priority meant back then within the right context.

So the partnering decision was an important one for the company, as every partnering decision is when it comes to licensing out a product, and the same applies to the further development of a product, which is just as important for a company.

BY MR. OVERHOLTZ:

Q. So you e-mail your colleague and say "Dear Colleagues, next week the team is involved in further preparations for the FDA type C meeting and the preparational meetings for the OD/BID decision (CDPrc/DP3). Additional next week the CDPrc for the treatment program is scheduled.

"We had this week two 'accidents' on the project. This was the timing of the structured request to the DSMB of the 11223 study (group comparison OD 40 milligrams versus BID 20 milligrams) and the date for 'stat tables available' for the Einstein study. From my point of view these accidents could have been avoided (structured request) or at least brought up earlier ('stat tables available') if the clinical team would have had sufficient time/resources to focus on the operational side of the project.

"It is clear that the request of Apollo is important for the further contract negotiations and potential relationship building, but we have now to be clear that we are cutting resources on the operational side of the project with a high risk that project quality is suffering (...and I see the two 'accidents' as clear prealert for this).

"I assume that we have to give the Apollo request priority (please inform me if this should be wrong), hence I will start organizing to set up the requested meetings for the further Apollo interactions.

"Regards, Bernhard."

That's what you told your colleagues back on September 25, 2005, right?

A. This is what it says here, yes.

**262:17 - 266:3 Glombitza, Bernhard 2016-09-14** 8:10

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| Q. I show you what we'll mark as Exhibit Number 35.<br>(Whereupon, Glombitza Exhibit Number 35, E-mail chain, Bates XARELTO_BPAG_01476445 through 6447, was marked for identification.)<br>BY MR. OVERHOLTZ:<br>Q. It's record 873308, Bates 01476447.<br>And you send an e-mail to several | Re: [262:17-266:3]<br>**Def Obj** Object to the reference to revenues (see 263:14-15), as that is violative of the Court's ruling on Omnibus MIL No. 1 (See Dkt. Dkt. Nos. 5955, 6254). | Re: [262:17-266:3]<br>Pltf Resp Use of the word "revenues" alone is appropriate and not subject to Defendants' Omnibus MIL No. 1 or the Court's ruling in Boudreaux. This | Pending<br>[handwritten:] Overruled. This an e-mail that this witness wrote & sent to his colleagues on his company's global mgmt committee. He was asked @ trial. 901, 801, 613 |

05/21/17 19:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| people at Bayer on April 29th of 2005, the subject being "Due Diligence Pfizer Xa."<br>A. Yes, I see the document, and I need some time to quickly see through it.<br>(Witness reviewing document.)<br>BY MR. OVERHOLTZ:<br>Q. Okay.<br>A. Yes, I briefly read through this.<br>Q. So you tell your colleagues at Bayer on April 29, 2005, "Dear Colleagues, please find enclosed the official feedback of ICL on our Due Diligence with Pfizer. I think this DD was special."<br>Moving to the second page. "The world biggest pharma company (in terms of revenues) challenged the team on their expertise on our Factor Xa inhib, BAY 59-7939. We experienced a situation where several disciplines from the potential partner were represented by a clear numerical majority in respect to us.<br>"We got from Pfizer the feedback that we managed the questions and the process highly professional. You can be proud of this.<br>"I think the learnings for our project triggered by the questions of Pfizer this time did exceed what the DDs before provided us.<br>"Special thanks to those who are currently under 'full steam' in the preparation of the end of Phase II meeting with the FDA, thus bringing forward both the DDs and the EOP2 meeting preparations.<br>"Thanks. Regards, Bernhard Glombitza."<br>That's what you said in your e-mail to your Bayer colleagues, correct?<br>A. This is what it says.<br>Q. And your e-mail that you sent was forwarding an e-mail that you received from Arndt Brandes on April 28, 2005, correct?<br>A. Looks like it, yes.<br>Q. Arndt Brandes's e-mail says "Dear Gentlemen," to you and several others, "this is to inform you that we have finished today due diligence on our Factor Xa with Pfizer. While it is now for the fourth time we did this it is still noteworthy that everything in terms of organization went very well. In comparison to the other DDs we have performed so far it certainly was the most challenging one we experienced. Pfizer sent 21 people being experienced in doing due diligence. To satisfy their needs was challenging but I think again the team made a very good job in convincing them about the promise of our Xa."<br>Do you see that?<br>A. This is what it says.<br>Q. And that was the goal of these DD meetings, right, to convince these potential partners that rivaroxaban had promise for development, right?<br>A. The objective of the due diligence was to find a partner.<br>Q. Mr. Brandes goes on and says "Pfizer | | relates to the overall commercial and business plan with regards to partnering with another company--here, the possible partner being Pfizer, understood by Bayer employees to be the "world biggest pharma company (in terms of revenues)". 263:14-15. | |

| Designation | Testimony | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| (continued) | was not prepared to give us a preliminary feedback on the result of the performed DD as the others were willing to do. However, they promised to officially return to me on that by mid of next week. Offline Bernhard Glombitza and I were told that no show stoppers have been identified, however, some missing pieces of information/studies and unclarities may add risk to the project."<br>Do you see that?<br>A. This is what it says.<br>Q. Can you tell me what Pfizer told you offline were the unclarities that would add risk to the rivaroxaban project?<br>A. I cannot remember that. Neither can I | | | | |
| **266:4 - 266:8** | **Glombitza, Bernhard 2016-09-14**<br>**remember whether or that Pfizer's questions were pointing at a risk of the project. This text was written by Arndt Brandes, and if you have any questions regarding the text you should pose these questions to him.** | 0:23 | **Re: [266:4-266:8]**<br>**Pltf Obj** Objection as non responsive, starting with "Neither can I ¦" [266:3] to 266:8. | | Pending<br>Overruled; completed answer |
| **266:17 - 267:3** | **Glombitza, Bernhard 2016-09-14**<br>Q. At the end of the day, Pfizer did not move forward on due diligence with rivaroxaban and Bayer, and ended up developing and marketing with another company, a competitor Factor Xa inhibitor, apixaban, right?<br>MR. DERRINGER: Object to form.<br>A. I know that Pfizer entered into a cooperation with BMS regarding apixaban. I do not know and cannot say whether this due diligence here is connected to that cooperation. You would have to ask Pfizer. The due diligence is connected with this cooperation on apixaban. | 1:52 | | | |
| **270:16 - 271:3** | **Glombitza, Bernhard 2016-09-14**<br>Q. I'll show you what we'll mark as Exhibit 38 and 39. 38 is an e-mail, record 1751116, BPAG_04357421. And 39 is record 1751117, Bates BPAG_04357422.<br>(Whereupon, Glombitza Exhibit Number 38, 5/26/05 e-mail, Bates XARELTO_BPAG_04357421, and Number 39, Document titled Draft BAY 59-7939 Due Diligence April 27, 2005, Bates XARELTO_BPAG_04357422 through 7428, were marked for identification.)<br>A. Yes, I've got the document in front of me. And allow me to scan it briefly. | 1:26 | | | |
| **272:6 - 275:4** | **Glombitza, Bernhard 2016-09-14**<br>minutes from April 27th, Pfizer also raised several issues for Bayer to comment on. Let's look at a few of those.<br>If you look with me on Page 2, Bayer -- I mean Pfizer, Pfizer asked Bayer under "Clinical Pharmacology" about a food effect, right?<br>A. This is what it says here, yes.<br>Q. Okay. And then they also ask, if you go down with me, the second question says | 9:11 | **Re: [272:6-275:4]**<br>**Def Obj** Lacks foundation - the witness testifies on multiple occasions that he is not a clinical expert. | Re: [272:6-275:4]<br>Pltf Resp [Plaintiffs would also designate 272:5 for clarity]. The witness is not asked to offer an expert opinion, rather to testify as to statements made in due dilligence | Pending<br>Overruled: witness at meeting this is min. of that meeting. Should know what was discussed + whether min. are correct. 901, 401 |

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| "Please comment on the woman with very high plasma concentration of BAY. Do you have a ceiling effect?"<br>A. Yes, this is what it says here.<br>Q. If you look with me on the bottom of Page 2, Pfizer asked "is there an increase of exposure in elderly volunteers when BAY is administered with food?"<br>A. This is what it says, yes.<br>Q. Okay. And then if you can turn with me over to the last page, it says "Have you tried to correlate PK to safety or efficacy?"<br>Do you see that? Maybe next to the last page. I'm sorry. Next to the last page.<br>A. Yes, I can see that.<br>Q. And then if you look with me just under there, Pfizer asks the question "Do you take blood samples when an event occurs?"<br>Do you see that?<br>A. Yes, that's what it says here.<br>Q. And then it also asks "is bleeding an SAE?" Right? The next question.<br>A. Yes, this is what it says here.<br>Q. Okay. And so then if you look a little bit below that, it says "Additional information given verbally during the presentation."<br>Do you see that section?<br>A. Yes, I can read that here.<br>Q. If you'll go with me down, it's -- one, two, three, four, five, six, seven, eight, nine, ten, eleven -- twelve bullet points down, it says "The category of 'clinically relevant non-major bleedings' was invented by Bayer."<br>Do you see that?<br>A. I can see that this is written, yeah.<br>Q. Did you have any understanding of why Bayer invented that category?<br>MR. DERRINGER: Object to form.<br>A. Well, I cannot make a comment on this really because, first of all, this is a suggestion as to the -- as to a category that was invented or said to have been invented by Bayer in minutes, the status of which is not quite clear, in minutes that -- sorry, the status of which is a draft, and I don't know what this meant at that point in time when the minutes were taken.<br>And on top of that, I'm not a clinical expert, so I cannot really say anything about this matter.<br>BY MR. OVERHOLTZ:<br>Q. So if we look -- as we looked at Exhibit, I guess it was 39 -- is that right?<br>As we looked at 39 and the draft minutes of the Pfizer due diligence meeting that Harald Kallabis sent to you, Pfizer raised issues in that meeting related to the food effect, increased exposures in elderly with food, whether Bayer had correlated PK to safety or efficacy, and whether Bayer took blood samples for events.<br>Do you recall that in that document? | | meeting minutes made for meetings that he attended in his capcity as the Global Project Team Manager for Xarelto. | |

05/21/17 19:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| A. I do remember what we've just read. | | | |
| **276:1 - 281:12 Glombitza, Bernhard 2016-09-14** 14:44<br>Q. Are you aware that regulatory authorities are raising the same issues about Xarelto today in 2016, 11 years later --<br>MR. DERRINGER: Object.<br>BY MR. OVERHOLTZ:<br>Q. -- including asking Bayer can they finally try to correlate PK to safety and efficacy so doctors can understand how to better treat their patients?<br>MR. DERRINGER: Object to form.<br>A. No, I'm not aware of this. I left the project in 2012, and I cannot comment on things going on in relation to Xarelto after that point in time.<br>BY MR. OVERHOLTZ:<br>Q. Dr. Glombitza, at some point Bayer and Johnson & Johnson decided to move forward with pursuing the ACS indication.<br>Do you recall that?<br>MR. KENNEDY: Object to form.<br>A. Yes, I do remember that there was a decision for continuing with the ACS indication, which means developing the ACS indication further.<br>BY MR. OVERHOLTZ:<br>Q. And did you, in fact, work on the ACS indication and the ATLAS TIMI study program as part of your duties at Bayer?<br>A. At that point in time, I was responsible for cost timelines and the facilitation of the team. Clinicians would want to design this study, and the clinicians were also part of my team, the team I facilitated.<br>Q. Let me mark -- show you what we'll mark as Exhibit Number 40, which is record number 4618220, and it's Bates BPAG_33598242.<br>(Whereupon, Glombitza Exhibit Number 40, Document titled DevCo Minutes, Bates XARELTO_BPAG_33598242 through 8245, was marked for identification.)<br>BY MR. OVERHOLTZ:<br>Q. And it's minutes from April 7, 2008 of something called DevCo.<br>A. Yes. I just need a moment to briefly scan the document.<br>(Witness reviewing document.)<br>A. I have now taken a quick look at the document.<br>BY MR. OVERHOLTZ:<br>Q. And if you look with me, according to these DevCo 04/08 meeting minutes you're listed as a guest at the meeting, along with Frank Misselwitz.<br>Do you see that?<br>A. That's not entirely correct. I was a guest along with Frank Misselwitz, Ian Talmage, Stephan Wirtz, Andrea Derix, Harald Kallabis. That's what I read here.<br>Q. Let's turn over to Page 3. And it says at the top "All slides presented are stored | **Re: [276:1-281:12] Def Obj Relevance/403 - Defendants previously moved (see Dkt. 5942) to exclude all evidence and argument related to the use of Xarelto for the treatment of ACS, a non-approved indication with a different dosing regimen designed for a different treatment population. The Court reserved ruling on the motion (see Dkt. No. 6254). This exhibit demonstrates why such evidence should not be admitted – its contents risk confusing the jury and unfairly prejudici+H2117:H2166 ng Defendants. Lacks foundation - the witness has no knowledge of regulatory proceedings after he left the project; he also states clearly he lacks the clinical background to place questions about ACS in context. There are witnesses who have the relevant background, and Plaintiffs have had the opportunity to depose those witnesses. See objection to Ex. 40.** | Re: [276:1-281:12] Pltf Resp ACS indication history and study results are highly probative to notice, bleed risk, and study conduct-- especially considering he attended a meeting wherein it was said "Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding and clinicaly significant bleeding." He is asked of his knowledge of regulatory matters, not asked to offer expert opinions on regulatory matters. He is given every opportunity to qualify his response by indicating his knowledge or lack thereof concerning the subject. See Plaintiff's response to exhibit objection. | **Pending**<br>Overruled 901, 401 |

05/21/17 19:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

in the DevCo Team Room and will be made available in GlobeDoc with the final minutes."

Is that your recollection, that documents related to the development committee meetings were kept in a team room?

A. The documents from the development committee were kept, but I do not recall whether they were kept in the team room or in GlobeDoc. I don't remember the kind of system that was used. But they were kept for sure, that is -- I remember that.

But it was not my task to deal with this, it was the task of those organizing the DevCo.

Q. So according to this, Section 1 is "Rivaroxaban, ACS presentation."

It says "Frank Misselwitz and Bernhard Glombitza presented the status of the project.

"DevCo members were made aware of the fact that the presented data are strictly confidential as they relate to an ongoing, still blinded trial."

If you follow down with me, it says "Main results in terms of safety show that: Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding, and clinically significant bleeding; the risk of bleeding appears to be higher for OD versus BID dosing regimens for any given total daily dose or strata; rivaroxaban total daily dose of 5 milligrams and 10 milligrams appear to be the most suitable for study in Phase III, based on bleeding data. Main efficacy data show that: Considering the 5 milligram total daily dose and 10 milligram total dose panels, the BID dosing regimen continues to outperform OD dosing - this is true in both strata (aspirin only and aspirin plus thienopyridine); enriching for higher-risk patients increases the placebo event rate, and preserves rivaroxaban's effect; both 2.5 milligram BID and 5 milligram BID dosing regimens present a positive net clinical benefit whereas the 10 milligram OD particularly on background treatment with aspirin and thienopyridine did not provide a positive net clinical benefit."

Do you see that?

A. Yes, this is what it says here.

Q. So in April of 2008, was the ROCKET trial still ongoing?

A. I don't recall exactly, but it is possible. But I don't recall.

Q. You understood that the ROCKET study had studied Xarelto for Afib patients with an OD dosing, correct?

A. As far as I remember, this is correct. The ROCKET study had the OD regime.

Q. Did you tell Frank Misselwitz or anyone at that time that, hey, maybe we ought to go do some more phase III studies for our other indications comparing BID to OD based on these results from the TIMI 46 dose finding study in ACS?

Overruled

witness present at meeting + presented at meeting

901, 401

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| A. Dose selection and dose finding were the responsibility of the clinicians and their decision, and it was not my task to tell the clinicians what kinds of doses to use. So I can answer this question very clearly by saying no.<br>Q. You called yourself an air traffic controller earlier. Shouldn't an air traffic controller speak up when they see potential danger?<br>A. I said that I was the project manager, the project leader, and as such responsible for cost, timelines and team facilitation. My task was not to assess -- to scientifically assess clinical data. | | | |
| **281:24 - 282:10 Glombitza, Bernhard 2016-09-14** 1:38<br>Q. Dr. Glombitza, let me show you what we'll mark as Exhibits 41 and 42, which is record number 4622236, BPAG_33708397, and then Exhibit 42 is 4622237, which is Bates 33708398 -- 399, I'm sorry. 399.<br>(Whereupon, Glombitza Exhibit Number 41, E-mail chain, Bates XARELTO_BPAG_33708397 and 8398, and Number 42, PowerPoint titled Xarelto/rivaroxaban ACS Phase III, Bates XARELTO_BPAG_33708399, were marked for identification.) | **Re: [281:24-282:10]**<br>**Def Obj** Relevance/403 - Defendants previously moved (see Dkt. 5942) to exclude all evidence and argument related to the use of Xarelto for the treatment of ACS, a non-approved indication with a different dosing regimen designed for a different treatment population. The Court reserved ruling on the motion (see Dkt. No. 6254). This exhibit demonstrates why such evidence should not be admitted – its contents risk confusing the jury and unfairly prejudicing Defendants. See objection to Ex. 42. Furthermore, the witness states on multiple occasions that he lacks the clinical knowledge to answer the questions associated with the exhibit. There is no foundation for this testimony. | Re: [281:24-282:10]<br>Pltf Resp ACS indication history and study results are highly probative to notice, bleed risk, and study conduct-- especially considering he attended a meeting wherein it was said "Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding and clinicaly significant bleeding." He is asked of his knowledge of clinical matters, not asked to offer expert opinions on clinical matters. He is given every opportunity to qualify his response by indicating his clinical knowledge or lack thereof concerning the subject. See Plaintiff's response to exhibit objection. | Pending |
| **282:19 - 285:20 Glombitza, Bernhard 2016-09-14** 6:49<br>Q. Okay. So in Exhibit 41, you e-mail on March 31, 2008 Stephan Wirtz, along with Frank Misselwitz, Harald Kallabis and Ian Talmage, this ACS board of management PowerPoint that's attached as Exhibit 42, and you make a comment regarding modification of slide number 6 and taking out the 285 -- $280 million case, is that right?<br>A. What I read here is that a presentation was attached that was supposed to be shown at the marketing board of management on | **Re: [282:19-285:20]**<br>**Def Obj** Relevance/403 - Defendants previously moved (see Dkt. 5942) to exclude all evidence and argument related to the use of Xarelto for the treatment of ACS, a non-approved indication with a different dosing regimen designed for a | Re: [282:19-285:20]<br>Pltf Resp ACS indication history and study results are highly probative to notice, bleed risk, and study conduct-- especially considering he attended a meeting wherein it was said | Pending |

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| ACS. And I comment in this e-mail, and this comment isn't entirely clear to me when I look at it now, but I comment on somebody having apparently taken out a case, and I don't know whether this was done deliberately or whether it was just a coincidence.<br>Q. And then the next thing you said in your e-mail was "The rest looks good to me," right?<br>A. That's what it says here, yes.<br>Q. So let's look at Exhibit 42, 4622237, and this is a PowerPoint entitled "Xarelto/rivaroxaban ACS phase III, BSP Board of Management April 2, 2008," and it says "Draft" on the bottom, correct?<br>A. That is what it says, yes.<br>Q. If we turn to the next slide it says "Purpose of Presentation. To gain board of management approval to proceed in preparing Phase III in ACS," correct?<br>A. That's what it says, yes.<br>Q. If we turn to the next slide, it says "ACS Secondary Prevention Strategically Strengthens Our Competitive Position in SPAF," correct?<br>A. That's what it says here, yes.<br>Q. And the first bullet point says "Among all indications that are in development for Xarelto, stroke prevention in atrial fibrillation (SPAF) is the most value creating indication," correct?<br>A. That's what it says, yes.<br>Q. The next bullet point says "ACS Secondary Prevention will be synergistic to SPAF," correct?<br>A. That's what it says, yes.<br>Q. Now if you'll turn with me, that's slide 1, 2, 3, slide 5, the top of this page says "In ACS phase III two BID doses will be tested to optimize the benefit-risk profile."<br>Do you see that?<br>A. Yes, I can read that here.<br>Q. Then if we turn to the backup slides, if we go to slide number 10, the PowerPoint asks the question "Why twice daily dosing regimen?"<br>And the first bullet point says "Data-driven decision: Data from our extensive phase II study demonstrated improved safety profile and superior efficacy of the BID dosing regimen compared to the OD dosing regimen at the same total daily dose."<br>Do you see that?<br>A. I see that, yes.<br>Q. It also says "On top of aspirin or aspirin plus thienopyridine (e.g. Plavix) there is a relatively limited safety margin to add a potent anticoagulant. Therefore, much smaller doses have to be used compared to Xarelto monotherapy in VTE prevention."<br>Do you see that?<br>A. Yes, I see that.<br>Q. Do you think that people that have Afib may take aspirin or Plavix, too? | different treatment population. The Court reserved ruling on the motion (see Dkt. No. 6254). This exhibit demonstrates why such evidence should not be admitted – its contents risk confusing the jury and unfairly prejudicing Defendants. See objection to Ex. 42. Furthermore, the witness states on multiple occasions that he lacks the clinical knowledge to answer the questions associated with the exhibit. There is no foundation for this testimony. | "Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding and clinicaly significant bleeding." He is asked of his knowledge of clinical matters, not asked to offer expert opinions on clinical matters. He is given every opportunity to qualify his response by indicating his clinical knowledge or lack thereof concerning the subject. See Plaintiff's response to exhibit objection. | Overruled witness wrote e-mail in his capacity as project manager 901, 401 |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| A. This is a medical issue. I'm not a medical expert, and therefore cannot make a statement on this. | | | | |
| **286:1 - 286:12 Glombitza, Bernhard 2016-09-14**<br>he said it or he didn't say it.<br>Q. Let's look at the next slide. It says "Why two active arms?"<br>If you look with me at the bottom bullet point, it says "In order to optimize the overall treatment effect while maximizing safety, the ACS ATLAS phase III study shall study two Xarelto doses. This also helps mitigating the risk of a failed trial with unacceptably increased bleeding risk."<br>Do you see that?<br>A. Yes, you read it out correctly. | 0:40 | **Re: [286:1-286:12]**<br>**Def Obj** Relevance/403 - Defendants previously moved (see Dkt. 5942) to exclude all evidence and argument related to the use of Xarelto for the treatment of ACS, a non-approved indication with a different dosing regimen designed for a different treatment population. The Court reserved ruling on the motion (see Dkt. No. 6254). This exhibit demonstrates why such evidence should not be admitted – its contents risk confusing the jury and unfairly prejudicing Defendants. See objection to Ex. 42. Furthermore, the witness states on multiple occasions that he lacks the clinical knowledge to answer the questions associated with the exhibit. There is no foundation for this testimony. | Re: [286:1-286:12]<br>Pltf Resp ACS indication history and study results are highly probative to notice, bleed risk, and study conduct--especially considering he attended a meeting wherein it was said "Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding and clinicaly significant bleeding." He is asked of his knowledge of clinical matters, not asked to offer expert opinions on clinical matters. He is given every opportunity to qualify his response by indicating his clinical knowledge or lack thereof concerning the subject. See Plaintiff's response to exhibit objection. | Pending<br>Sustained 60 d |
| **287:7 - 289:4 Glombitza, Bernhard 2016-09-14**<br>Q. Did you guys ever think that people who have Afib might be diagnosed with acute coronary syndrome, ACS?<br>MR. DERRINGER: Object to form.<br>A. This is a question with medical content, it refers to comorbidity, i.e. additional illnesses. I would not exclude that it was discussed at some point, but I cannot say -- and I cannot say that it wasn't. But this is outside of my limit.<br>BY MR. OVERHOLTZ:<br>Q. Did you ever think about the implications of an Afib patient -- strike that.<br>Do you ever discuss with any of your colleagues the implications for patients who take Xarelto for Afib if they develop acute coronary syndrome, and how they're -- let me just add -- and how they're dosed finding to be adjusted?<br>A. This is a medical question, and it should be discussed by the medical team, and it should be discussed by medical experts. I can | 5:53 | **Re: [287:7-289:4]**<br>**Def Obj** Relevance/403 - Defendants previously moved (see Dkt. 5942) to exclude all evidence and argument related to the use of Xarelto for the treatment of ACS, a non-approved indication with a different dosing regimen designed for a different treatment population. The Court reserved ruling on the motion (see Dkt. No. 6254). This exhibit demonstrates why such evidence should not be admitted – its contents risk confusing the jury and unfairly prejudicing Defendants. See | Re: [287:7-289:4]<br>Pltf Resp ACS indication history and study results are highly probative to notice, bleed risk, and study conduct--especially considering he attended a meeting wherein it was said "Rivaroxaban dose-dependently increases the rates of TIMI major and minor bleeding and clinicaly significant bleeding." He is asked of his knowledge of clinical matters, not asked to offer expert opinions | Pending |

05/21/17 19:09

| Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|
| neither say it was discussed nor can I say it was not discussed, because I lack the technical knowledge. And also I do not recall this.<br>Q. Do you think when it comes to providing physicians information about the safe dose they can give their patients of a drug that drug companies should be forthcoming with information, or is it better to remain silent?<br>MR. DERRINGER: Object to form.<br>A. This is a very hypothetical question, and the wording of that question is also very general. So I cannot answer this question.<br>The information that is provided to patients and doctors is decided by the drug authorities during the final approval of a drug, that is, they decide then what information should be provided to patients and doctors.<br>BY MR. OVERHOLTZ:<br>Q. Let me show you what we'll mark as Exhibit Number 43, which is an e-mail, record number 4629259, Bates BPAG_33752979.<br>(Whereupon, Glombitza Exhibit Number 43, E-mail chain, Bates XARELTO_BPAG_33752979 through 2981, was marked for identification.) | objection to Ex. 42. Furthermore, the witness states on multiple occasions that he lacks the clinical knowledge to answer the questions associated with the exhibit. There is no foundation for this testimony. | on clinical matters. He is given every opportunity to qualify his response by indicating his clinical knowledge or lack thereof concerning the subject. See Plaintiff's response to exhibit objection. | |
| **289:11 - 292:8 Glombitza, Bernhard 2016-09-14** 8:39<br>Q. So this is an e-mail at the top from you to Frank Misselwitz, Scott Berkowitz, Martin van Eickels and Nancy Cook Bruns on December 7, 2011, I think, and it says "Thoughts on how we might handle Xarelto in AF patients who develop an ACS event" is the subject line.<br>And you say "I spoke to Troy. J&J wants to be silent in terms of giving a recommendation in the label. In the medical Q&A they like to refer to guidelines and physicians judgment.....seems to be a fairly pragmatic approach - by sure not ideal but it looks like best way in-between (until we have data).<br>"Regards, Bernhard," correct?<br>A. This is what it says.<br>Q. And you're responding to Frank Misselwitz's e-mail to Scott Berkowitz, on which you're copied, in which he said that he agreed with the statement that the AF strokes are, of course, cardioembolic, unlike most of the strokes in the ACS setting.<br>He says "I actually also agree with a label that remains silent in terms of giving a recommendation. I feel that educational activities are more important. In the absence of data I would not want to make a particular dose recommendation. Even if we intuitively feel that the 2.5-milligram BID dose may be okay in this setting - we have no data to substantiate a firm recommendation. Best regards, Frank."<br>That's what you were responding to, correct?<br>A. Looks like it, yes.<br>Q. And if we look down below, Scott | | | |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| Berkowitz e-mailed Frank Misselwitz and copied you and others, and he said, if you look kind of halfway through, "The safest course is to either recommend discontinuing Xarelto for AFib with appropriate conversion to another anticoagulant (I would expect ACS patients would be put on LMWH)," low molecular weight heparin, "or to be silent, as the approved US package insert for SPAF currently is," right?<br>A. This is what it says, yes.<br>Q. So based on information that you and Frank Misselwitz had presented to the development team on, I think the -- just in April of 2008 regarding the TIMI 46 phase II ACS study that showed that bleeding risks were higher in the people taking a once-daily dose, and that any doses above 10 milligrams total daily dose had excessive bleeding, the folks at J&J and Bayer thought it would be better to just stay silent and let Afib patients just continue to take Xarelto at a 20-milligram total daily dose, when Bayer and J&J know that people taking those high of doses at once daily have excessive risk of bleeding?<br>MR. DERRINGER: Object to form.<br>MR. KENNEDY: Join.<br>A. I'm not a doctor, and I cannot assess this question; that is, I cannot say yes or no because I'm not a technical expert here. But what I see here in the sequence of these documents is that regarding ACS, there must have been additional data between April, 2008 and 2011, and they must have been considered in the clinical assessment.<br>So 2008 and 2011 are only difficult -- are not comparable, it's difficult to compare these two years. But as I said, I'm not a clinical expert here. | | | | |
| **292:10 - 292:11 Glombitza, Bernhard 2016-09-14**<br>**Q. The most important thing for Bayer was to protect the SPAF indication, right?** | **0:45** | | | |
| **292:13 - 292:21 Glombitza, Bernhard 2016-09-14**<br>**A. This is a very general statement, and in this context it has to be defined what you mean by "important." There's also other wordings in this sentence I do not agree with.**<br>**What is correct is that the SPAF indication contributes considerable benefit for a large population of patients, so it also means that it increases the benefit for the healthcare system as a whole.** | **0:34** | Re: [292:13-292:21]<br>Pltf Obj Objection as non-responsive, starting with "There's also other¦" [292:15] to 292:21. | Re: [292:13-292:21]<br>Def Resp Counsel for Plaintiffs asked whether the "most important thing for Bayer was to protect the SPAF indication." The witness responded by explaining why the SPAF indication was important for Bayer. The answer is responsive. | Pending<br>Sustained |
| **292:25 - 293:12 Glombitza, Bernhard 2016-09-14**<br>**Q. You agree that approval for the SPAF indication created the -- laid the groundwork for Xarelto to be a successful brand for Bayer, right?**<br>**A. I'm not a marketing expert for Xarelto, and I left the project in 2012. But one thing is certain, that the SPAF indication is a very important indication, because it** | **2:00** | | | |

05/21/17 19:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

benefits a large number of patients. But other indications are also important because they also benefit a large number of patients. So I cannot subscribe to the statement in such a general term or general way.

**295:2 - 295:6 Glombitza, Bernhard 2016-09-14** 0:37

Q. And as we've seen before from the other exhibits, the ACS indication and the ATLAS study was studying BID dosing for Xarelto in that indication, right, twice daily dosing?
A. That's what I remember, yes.

**Re: [295:2-295:6]**
**Def Obj** Relevance/403
This testimony relates exclusively to a non-approved indication (ACS - which dealt with different doses and a different patient population). It risks confusing the jury and unfairly prejudicing Defendants. See objection to Ex. 42. Furthermore, the witness states on multiple occasions that he lacks the clinical knowledge to answer the questions associated with the exhibit. There is no foundation for this testimony.

Pending

Overruled

**295:7 - 295:10 Glombitza, Bernhard 2016-09-14** 0:33

Q. We also saw in documents that it was the once-daily dosing for Afib that would provide a competitive advantage for Xarelto in the marketplace, right?

**295:12 - 295:18 Glombitza, Bernhard 2016-09-14** 0:22

A. The once-daily dose is a great -- offers a great benefit to patients, and it increases patient compliance, and this leads to a situation that patients are better protected against the disease, and this means more patients take it. And this, then, also leads to a situation where more of the drug is bought.

**295:20 - 296:15 Glombitza, Bernhard 2016-09-14** 1:56

Q. So you were concerned that the BID dosing, the twice-daily dosing issues coming out of the ATLAS ACS program could potentially damage the SPAF indication, weren't you?
A. I cannot confirm this because I cannot remember that I ever issued this concern.
Q. Let me show you what we'll mark as Exhibit Number 45, which is 4628940, Bates BPAG_33751442.
(Whereupon, Glombitza Exhibit Number 45, E-mail chain, Bates XARELTO_BPAG_33751442 and 1443, was marked for identification.)
BY MR. OVERHOLTZ:
Q. 4628940. It's an e-mail from you, Bernhard Glombitza, on November 8, 2011 to several people, with the subject line being "Update: ATLAS Release and Q&A."
Do you see that?
A. Yes, I see that. And I need a moment to read the e-mail.

**296:22 - 297:9 Glombitza, Bernhard 2016-09-14** 1:26

Q. So you e-mail Alex Siedler, and you say "Dear Alex, reads nicely.
"One 'last' observation - I was just reading the SPAF US approval media coverage and then the ATLAS draft release. What did make me stumble is that in the ATLAS release we mention fairly often the 'Twice Daily' (especially in the first paragraph where we don't need it, as it is mentioned in the study section), the SPAF media coverage is 'hammering' the once-daily. The question is how far we want to stress now

| | Objections In | Responses In | Rulings |
|---|---|---|---|

the BID in ATLAS messaging wise," right?
A. This is what it says here, yes.

**305:22 - 307:18 Glombitza, Bernhard 2016-09-14** 4:06

is mere speculation, so I can't remember.
Q. According to Exhibit 49, you e-mailed this PowerPoint to, I think it was Ursula Kroh, is that right?
A. This is what I can read here.
Q. Okay. If you can just look with me at the fourth slide, I want to ask you, this slide says "First VTE indications are pre-marketing indications. Stroke prevention in Afib is the major indication in the planned future."
Down at the bottom it says "A delay of the submission of VTE indications will jeopardize this pre-marketing investment and the second submission of the Afib package," right?
A. This is what it says here.
Q. Let me show you what we'll mark as Exhibit Number 51 and 52.
(Whereupon, Glombitza Exhibit Number 51, E-mail chain, Bates XARELTO_BPAG_01604839 and 4840, and Number 52, PowerPoint titled Factor Xa Strategy Update, Bates XARELTO_BPAG_01604841, were marked for identification.)
BY MR. OVERHOLTZ:
Q. 51 is 887358, and it's an e-mail from you to Joerg Moeller, Frank Misselwitz, and Tiemo-Joerg Bandel on June 15, 2005, and you're forwarding some attachments, including the 5/6/17 MC Factor Xa inhibitor BAY 59-7939 final.ppt file, correct?
A. This is what I can read here, yes.
Q. So then if we look at Exhibit 52, the PowerPoint that was attached, it's titled "Factor Xa Strategy Update."
Do you see that?
A. This is what I can read here.
Q. Okay. Now, if you could just look with me at slide 10. And this slide says "Why Starting with Orthopedic Surgery - A Commercially Less Attractive Indication."
And if you look with me, the bullet points below that say "Regulatory: Paves the way for the commercially important Afib indication."
Do you see that?
A. This is what I can read here.

**305:23 - 306:13 Glombitza, Bernhard 2016-09-14** 1:20

Q. According to Exhibit 49, you e-mailed this PowerPoint to, I think it was Ursula Kroh, is that right?
A. This is what I can read here.
Q. Okay. If you can just look with me at the fourth slide, I want to ask you, this slide says "First VTE indications are pre-marketing indications. Stroke prevention in Afib is the major indication in the planned future."
Down at the bottom it says "A delay of

| | Objections In | Responses In | Rulings |
| --- | --- | --- | --- |

the submission of VTE indications will jeopardize this pre-marketing investment and the second submission of the Afib package," right?
A. This is what it says here.
Q. Let me show you what we'll mark as Exhibit Number 51 and 52.

310:8 - 310:9 Glombitza, Bernhard 2016-09-14 0:05

Q. Good afternoon, Dr. Glombitza.
A. Good afternoon.

310:13 - 311:10 Glombitza, Bernhard 2016-09-14 2:20

Dr. Glombitza, please explain to the jury why it is that you are testifying today in German.
A. I am a native speaker of German. German is my mother tongue. I speak English and I understand it, but it is important for me to be able to understand the nuances of what is being said, and for the jury to understand the nuances of what I say. In my native language I can better hear and express these nuances than in a language I acquired later on.
Q. Dr. Glombitza, are you a pharmacologist?
A. No.
Q. Dr. Glombitza, are you a cardiologist?
A. No.
Q. Dr. Glombitza, are you a toxicologist?
A. No.
Q. Dr. Glombitza, are you a nephrologist?
A. No.
Q. Dr. Glombitza, are you someone who runs and analyzes clinical trials?
A. No.

313:2 - 313:24 Glombitza, Bernhard 2016-09-14 1:51

BY MR. DERRINGER:
Q. Could you take Exhibit 4 out, please?
Dr. Glombitza, Exhibit 4 is an e-mail exchange between you and Kemal Malik.
Do you see that?
A. Yes, I see that.
Q. Dr. Malik, at the bottom of the exhibit, the first e-mail, he asked you whether you knew when the once-daily decision for Xarelto was made.
Do you see that?
A. I see that, yes.
Q. Do you recall Mr. Overholtz asking you a series of questions about that decision?
A. I do recall that, yes.
Q. Do you see in Exhibit 4 that you responded to Dr. Malik by telling him that the once-daily dosing decision was made in June of 2004?
A. Yes, this is what it says here.
Q. Can you explain to the jury what once-daily dosing decision was made in June of 2004?

314:1 - 315:4 Glombitza, Bernhard 2016-09-14 2:07

A. The decision from June, 2005 -- and

| | Objections In | Responses In | Rulings |
|---|---|---|---|

this is something you can see in the presentation that we discussed yesterday and that is part of the exhibit, the decision of June, 2005 about OD was not the decision to submit -- to make a submission for approval, nor was it a decision to start a phase III study with OD.

As you will see from the presentation that is part of the exhibits, this presentation shows that the decision was a decision to test the OD indication in additional studies, to test it in a broader way.

BY MR. DERRINGER:

Q. Dr. Glombitza, in your answer you referred to the decision from June, 2005. Were you intending to say 2005 or 2004?

A. I actually misspoke. I meant to say 16th of June, 2004, just as it is written in this e-mail.

Q. And what was the state of that decision moving into the end of 2004 and in 2005?

We've seen -- during Mr. Overholtz's examination during the questions he was asking you, we've seen other documents that he referred you to in 2004 and 2005 that discussed a once-daily dosing decision. What was the status of that decision in 2004 and 2005?

315:6 - 315:14 Glombitza, Bernhard 2016-09-14 0:54

A. In 2004, the phase II studies had not been finished yet. A decision regarding the start of a new phase II study was imminent, the databases was very limited, and as I've described before, it was the decision to study OD more broadly in additional studies. It was not a decision to submit OD for approval or to launch it. It was the decision to look at BID and OD in a broader manner.

316:23 - 317:15 Glombitza, Bernhard 2016-09-14 2:06

Q. Can you take a look at Exhibits 41 and 42, please? As you'll see, Exhibit 42 is a PowerPoint -- strike that.

Exhibit 42 is a draft PowerPoint presentation on ACS phase III, and Exhibit 41 is an e-mail exchange to which this draft presentation is attached.

Do you see that?

A. I see that, yes.

Q. The first e-mail on the page is from you to Stephan Nicholas Wirtz. It appears that you are giving him a comment or asking him a question about the presentation.

Do you see that?

A. Yes, I see that.

Q. The last sentence of your e-mail says "The rest looks good to me."

Do you see that?

318:4 - 318:8 Glombitza, Bernhard 2016-09-14 0:53

Q. Let me actually ask that as two separate questions.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

Can you explain to the jury what the nature of your review of this PowerPoint presentation, Exhibit 42, was?

318:10 - 319:8 Glombitza, Bernhard 2016-09-14 1:35

A. I was responsible for making sure that the team's input for the presentation was complete. In other words, I reviewed the presentation to see whether what was made in team meetings, in terms of PowerPoint presentations, was in line with the main messages of this final presentation.

In this case, and you can read this here, I noticed that one case was missing that had previously been in one of the team presentations. And I mention here that the rest is in line with these team presentations that were circulated previously.

So let me reiterate. I reviewed the presentations for completeness, not in terms of content, since I'm not an expert and I don't have the necessary expert knowledge to review the individual input for content.

Q. Dr. Glombitza, was that consistent with the general level of review that you applied in your role as project manager for the rivaroxaban team when you were reviewing PowerPoint presentations or other presentations for the team?

319:10 - 319:11 Glombitza, Bernhard 2016-09-14 0:09

A. Yes, that is the case. And this also -- this was also in line with my role.