Page 155

there is not a neurosurgery unit there, that's why they had to transfer to Main, she was -- those brain cells were dying by the second.

The first time she was able to even have neurosurgery was when she went to Main, but the folks at Baptist did what they were supposed to do. They did a CAT scan. And take a look at that. Look at the size. That's the hemorrhage right there. It's deep in her brain and it's massive, you will see in the records the doctors say. That's what they saw at 11:44 that evening.

Every neurosurgeon will tell you that there was no way to reverse what had happened at that point, no way to have those brain cells come back, no way to remove the blood. They could drain the fluid, but that blood was actually coagulated. You'll hear it wasn't like liquid blood. It was a coagulated hemorrhage. It wasn't going to move.

By midnight, right after that CAT scan, they said she was even less responsive, and that's why they decided to transfer her to Ochsner main.

Now, when they transferred her at about 1:15 in the morning, she didn't respond to anything except for really painful stimuli. I don't know if you have ever seen that, but it's awful when they are in a coma and they engage in more painful attempts to see if they can get any response from the patient.

Page 156

By 1:15 in the morning, she had had this massive damage to her brain. It was only then that she was even at a place where any of the drains could have been put in. The doctors will all tell you that nobody can say if the drains had been put in at that point, it would have made any difference to her. It wouldn't have changed the hemorrhage; it wouldn't have brought back any of the brain tissue. The treaters who you are going to hear from all agree on that.

Dr. Bui was her neurosurgeon. Dr. Mahanna was in charge of her case. Dr. Gropen was also one of the physicians who treated her. They all agree that her bleed, her hemorrhage was massive and hard to reach. They all agree that with earlier surgery, you can't say what the outcome could be. So to stand up and say you know that it would have saved her life, no doctor is going to tell you that.

Of course the doctors want to give the family every hope that they can, but this was a massive, monumentally damaging hemorrhage. No one can say that if that intervention had been done at 1:15 p.m. [sic] instead of at 2:00 in the afternoon, that that would have brought back Mrs. Orr and given her any normal neurological function.

Now, plaintiffs I think say that some of the records say Xarelto caused the hemorrhage. Well, there are some records, when people didn't know her full condition; but in the end, the person who was in charge of her case,

Page 157

Dr. Mahanna, filled out her death certificate.

In trials we talk about what evidence are you going to see that was put in place before the lawyers got involved, right? This is not by a paid expert. This is a treating physician who was there at the time, writing down what she honestly thought. We call it a contemporaneous record. What did people do before we got involved, before they decided to file the lawsuit? Dr. Mahanna says the cause of death was this hemorrhage from hypertension, from her high blood pressure, not from Xarelto.

Now, Xarelto doesn't even cause hemorrhages. Even Dr. Smart, their cardiologist, and Dr. Khatib, who will be our cardiologist who has the specialty of electrophysiology, they both tell you that Xarelto doesn't cause a bleed. If someone has an underlying bleed, it makes it difficult to stop. You bleed more. It slows down the coagulation. But both sides agree that Xarelto doesn't initiate -- doesn't initiate that brain hemorrhage.

Now, one of the saving graces of this case is you are going to meet some of the most fantastic doctors you have ever seen, doctors who have spent their lives devoted to patients, doctors who practice in this area every day. Dr. Smart I think is going to be the first witness tomorrow. He is not, like Dr. Khatib, an electrophysiologist. Dr. Khatib spends every day dealing with the wiring of the heart; as we

Page 158

say, the electrician of the heart. That's why he is a specialist in electrophysiology.

He works at Ochsner himself. He is the vice chairman of cardiology, and he's the director of the clinical cardiac electrophysiology fellowship. Why am I telling you that? Well, he is going to tell you that both of his parents are doctors, and his father started a fellowship to train people in his specialty many, many years ago. When Dr. Khatib got to become a doctor, he decided he wanted to do the same. And around this country, and especially in this area, there weren't a lot of electrophysiologists. There weren't a lot of people who had this very important specialty. So he started in Ochsner that specialty to train others.

He is going to come in and tell you that Xarelto is a lifesaving drug, that it stops strokes, that he prescribes it to patients every day, along with other NOACs, and that it was the right decision for Dr. St. Martin to prescribe Xarelto. He is also going to tell you that Xarelto doesn't cause brain hemorrhages and did not cause Mrs. Orr's brain hemorrhage.

Most importantly for what you just heard, he is going to tell you this theory that PT tests could actually tell you how much Xarelto was in someone's system when they are having this emergency is wrong. So you don't have to believe us. We are going to show you documents on what we really thought, but you don't have to rely on what the companies say.

Page 159

1  You are going to hear from real doctors in this community who
2  make that decision every day.
3          He is going to say he is very familiar with the
4  PT test. He has read about this. This is no secret. There's
5  all kinds of literature. There's not a piece of literature
6  that says you should use the PT test to test in an emergency
7  situation before you do surgery so that you will know whether
8  the person has Xarelto in their system. In fact, you are going
9  to see the opposite.
10         You are going to see articles that say you
11  shouldn't use that test, because the PT test isn't sensitive to
12  measure low amounts, and so you might see a normal number like
13  she had. It doesn't mean she didn't have lots still in her
14  system. So the doctors will tell you they would never use that
15  test; it would not be helpful; it would not be clinically
16  helpful. And they certainly would never have relied on it in
17  Mrs. Orr's case.
18         So everyone who walks into this courtroom that
19  is a physician is going to tell you they cannot eliminate the
20  possibility that the hemorrhage was caused by her high blood
21  pressure. No one can say they are sure it was Xarelto and her
22  high blood pressure had nothing to do with her hemorrhage.
23         Now, what are you going to hear about Xarelto?
24  Xarelto was not just approved in 2011, when it first came out
25  on the market. It was just reviewed last October, just six

Page 160

1  months ago, by the FDA. You heard they don't do any testing.
2  Well, actually, in this case they did a lot of their own
3  analysis. They took all the studies we did and they did their
4  own analysis.
5          You are going to see the FDA review. They
6  actually did some of their own charts and predictions, and they
7  had all the data from the other NOACs, from Pradaxa and
8  Eliquis, and they have looked at this over and over again. And
9  just six months ago they came out and said the opposite of what
10  you just heard. They said the FDA concludes that Xarelto is
11  safe and effective alternative to warfarin in patients with
12  AFib.
13         So I don't know what Dr. Smart -- he is entitled
14  to his opinion, but every other doctor who comes into this
15  courtroom is going to tell you that they agree that it's safe
16  and effective as an alternative to warfarin.
17         Now, why, if she had all these other conditions,
18  was it important to treat the AFib separately? Well, we said
19  that if you have those blood clots, you are not going to have
20  the normal heartbeat like you see on the left, where the blood
21  pumps around and around, and you are going to hear that when
22  you have AFib, those signals go haywire and that blood starts
23  to clot.
24         In her case they actually then needed to deal
25  with the AFib. We talked about ablation during the jury

Page 161

1  selection. Ultimately you have to deal with the AFib, which is
2  how do you get that heart rhythm back into the normal rhythm,
3  but doctors can't do that until they make sure you don't have
4  any clots. So that's why she had to be on that medication, and
5  they couldn't get her AFib back under control.
6          When she came into the doctors way back in 2011,
7  they discovered that AFib and they discovered that she had
8  cardiovascular disease. That's when she was prescribed
9  Pradaxa, one of the other NOACs. She was prescribed it because
10  she had an incredibly high score that they use to determine how
11  serious your AFib is.
12         And as you can see from this chart, part of the
13  reason that it was so serious, her risk of stroke, was because
14  she had all the other conditions that we're talking about.
15  That's exactly how they calculate what drug she should use.
16  She had congestive heart failure, high blood pressure,
17  diabetes, she was between 65 and 74, and she was female. So
18  that's why all the doctors are going to come in and tell you
19  she needed this drug.
20         And she did fine on these drugs. She was on
21  Pradaxa for 34 months until it started to bother her stomach,
22  and you'll hear from doctors that is one of the effects of
23  Pradaxa. And then she was put on Xarelto in a higher dose, the
24  20 milligrams, and the 15 milligrams for 14 months; and during
25  that entire time, she was fine.

Page 162

1          She was fine, and that's why doctors and
2  Dr. St. Martin decided that even though there is no antidote or
3  reversal agent, it was worth the risk and the benefits to her
4  to take this drug. You are going to hear from Dr. St. Martin
5  himself, and he is going to tell you that. He's going to tell
6  you he knew all of these things. He knew all of her
7  conditions. No one knew better.
8          He knew about her high blood pressure. He knew
9  about her diabetes. He still believed Xarelto was the right
10  choice for her and he still believes it today. So when you get
11  to that question -- Would a different warning have made a
12  difference? -- the answer will be no.
13         Part of the reason that Dr. St. Martin and
14  others feel like this is a good drug is because it has been so
15  thoroughly tested. Not only tested before it was approved, but
16  it's still tested and reviewed today. There are many what they
17  call post-marketing studies, where they did all these tests.
18  It took 14 years to develop, and they did clinical studies,
19  which means to get it approved. But then there's been so many
20  more people who have used it that there have been study after
21  study looking at that. And all of those studies show that
22  Xarelto, without any monitoring, unlike warfarin, which
23  requires all that monitoring, produces just as good results.
24  So that's why doctors like it. Doctors like it because it's
25  easier for patients, that they don't have to constantly go in

Page 163

1  and get monitored and have all these issues.
2          All of these drugs that operate the way Xarelto
3  does -- and we will get into that what that is.  It's called a
4  factor Xa.  That's how it works on your body -- they all have
5  these same risks.  This is what Xarelto tells -- the label
6  tells every doctor:  You have a risk of bleeding.  So that's
7  not hidden.  There's no secret.  It has a risk of bleeding.
8  That you can have different doses depending on kidney issues,
9  that there's no reversal agent, and there's no ability to
10 monitor.
11         So I think it will be interesting during this
12 trial how plaintiffs can claim that there is a lack of a
13 warning and instruction when all these things are right in the
14 label.
15         The other drugs have the same issues.  Xarelto
16 and Eliquis work on factor Xa.  Warfarin and Pradaxa all are
17 blood thinners, and they all have the same warning about bleed
18 risk, and that's because of what you heard.  If you are trying
19 to thin the blood and not clot, that means you are at a higher
20 risk of bleeding if you have -- think of if you cut yourself,
21 you are going to bleed more because your blood is not clotting
22 as much.  So it wouldn't matter which one of these drugs she
23 was on, she is at the same risk of bleeding.
24         The reason, though, that doctors don't like
25 warfarin, the gold standard, is because it has all these other

Page 164

1  complications.  You all may know -- some of us are a little
2  older.  This drug has been around since 1954, warfarin -- or
3  Coumadin, as it's called.  It was literally, for almost
4  50 years, the only drug doctors had to treat AFib and blood
5  clotting.
6          You are going to hear from their own expert,
7  Dr. Smart, he said warfarin is a very difficult drug to use.
8  It actually started out as rat poison.  It goes into the body
9  and works through the liver, and it works on vitamin K.  So
10 what happens is when they give you a dose, if you have eaten
11 certain kinds of food with vitamin K or you have individual
12 differences or you take drugs, it interacts and changes those
13 levels, and so you constantly have to be monitored and you
14 constantly have to have blood tests.
15         Xarelto and Eliquis and Pradaxa don't have those
16 problems.  You don't have to worry about what you eat, very few
17 drug interactions.  You don't have to go in to have your blood
18 tested, and you don't have to change your dose.  Those are
19 important things to doctors.  You are going to hear doctors say
20 that these drugs, the NOACs, were game-changers in their
21 practice, and that if they can, they would much rather
22 prescribe these NOACs than they would warfarin.
23         Listening to the case and seeing the risks, they
24 are incredibly serious; but in the vast, vast majority of
25 cases, someone taking Xarelto or one of the other NOACs has a

Page 165

1  very small risk of a brain hemorrhage.  That doesn't mean that
2  it won't happen, but 99.5 percent of the people who take
3  Xarelto don't have any kind of brain hemorrhage.  That's part
4  of the reason that doctors say there's always some risk.  I
5  think somebody said that every drug has risks and benefits.
6  And, yes, the risks actually of fatal bleeds and brain bleeds
7  are lower on the NOACs than they are on warfarin, but there is
8  a risk there and there's a risk of bleeding and that's in the
9  label.
10         Now, the fact that that risk is in the label
11 doesn't mean that someone taking that drug won't have a
12 hemorrhage.  It also doesn't mean that people like Mrs. Orr who
13 don't take the drug still have brain hemorrhages.  The question
14 is:  What can you do when that happens?
15         Plaintiffs have suggested to you that there is
16 actually a test that we wouldn't put in the label.  Think about
17 what they are saying.  They are saying we know about a test and
18 we lied about it because we didn't want to save people's lives.
19 That's what they are asking you to believe in this case.
20         Well, first of all, they didn't share with you
21 we do talk about PT in the label.  That is the Xarelto label.
22 We do say what we believe we can say.  We tried, as you will
23 see in evidence, to say more and we submitted it to the FDA.
24 And guess what the FDA said?  They crossed it out of the label.
25 And you are going to see that strikeout.  You didn't hear about

Page 166

1  that, but you are going to see that document yourself.
2          What happens in the labeling process is -- and
3  somebody alluded to this -- we are responsible for our label.
4  That's absolutely our responsibility, and we take it seriously.
5  We write up a label.  We have to send it in with all of the
6  study data to the FDA.  They can send it back and mark it up
7  and say yes or no, make suggestions.  We can go back and forth,
8  but ultimately we cannot sell the drug unless it is approved.
9          This approval goes not just to the drug itself,
10 but actually approving the label.  So it's our responsibility,
11 but we can't send it out if they don't approve it.  They have
12 approved this label in 2011 and it's still approved today.
13         So you're going to hear that while our
14 scientists wanted PT to be able to be a test that could do
15 more, we have never been able to prove that it would be
16 helpful, and doctors have told us that it is not a helpful
17 test.  Independent studies that have nothing to do with us say
18 it's not a helpful test, and we are going to show you those.
19         This is one of the most recent articles.  I want
20 you to, if you could, look at it carefully.  This is the
21 Journal of Thrombosis and Haemostasis, nothing to do with the
22 companies.  These are hematologists who deal with blood
23 disease.  This is what they said last year:  "Consequently, the
24 use of PT or APTT" -- that's a different test -- "in clinical
25 practice" -- meaning treating patients -- "to evaluate

Page 167

1  anticoagulant activity could cause dangerous
2  misinterpretations."
3          That's what I mean.  You are going to hear
4  doctors say if we looked at that test for Mrs. Orr and it said
5  she was normal, it doesn't mean that she didn't have a lot in
6  her system.  So if we went in there and did surgery, thinking
7  that that test said it was normal, that would be dangerous.
8          That's why doctors don't do it, the reason we
9  don't put it in the label.  But guess what?  The doctors don't
10 always care what we say.  They do read the studies.  And you're
11 going to hear these doctors that come in here, they read the
12 studies.  They talk to each other.  Outside of this courtroom
13 they don't say that that PT test is useful.  None of them say
14 that.  They say that it could cause danger to their patients
15 and they are certainly not going to use it unless it is helpful
16 and proven helpful.  And article after article that you are
17 going to see in this case is going to tell you that there's no
18 proven benefit.
19         Dr. Bui, who was the surgeon, doesn't even read
20 the Xarelto label.  So whether he was aware or not if we had a
21 different label, in this case, under the law it won't matter
22 because he didn't read it, so any different label wouldn't make
23 a difference to him.  Who matters in this case with the label
24 is the doctor who prescribed it.  That's Dr. St. Martin.
25         Dr. St. Martin, at the end of the day, in our

Page 168

1  case, is going to tell you he knew about all of her medical
2  conditions.  He weighed the risks and benefits for her; because
3  remember, we are not allowed, and we shouldn't be in that
4  examination room.  We provide the information to the doctors,
5  and the law says that's our duty to warn the doctors and the
6  nurses.  And they talk to the patients and they make the
7  decision by warning the patient and talking about the risks and
8  benefits, and then the patient decides.
9          You are going to hear in this case that Mrs. Orr
10 trusted her physicians implicitly.  She believed they were
11 trying to help her, which they were.  Dr. St. Martin was trying
12 to help her.  He knew there was no reversal agent.  He knew
13 that the PT test was not clinically useful.  He still chose and
14 will tell you from that witness stand that he would still
15 prescribe Xarelto again for her.
16         So at the end of the day, after plaintiffs
17 present their case and we cross-examine their witnesses and we
18 present theirs, the case will be in your hands.  As important
19 as this case is to our clients and to doctors who prescribe
20 this medication around the country, we are honored that you
21 were selected to make this decision for us.
22         We will spend our time focusing on this medicine
23 and Mrs. Orr's condition so that when you go back into that
24 jury room, you have all the evidence you need to make your
25 decision.  Thank you very much.

Page 169

1          THE COURT:  Thank you, Counsel.
2          You have heard the opening statements.  As I
3  said in the beginning, opening statements are not evidence.
4  They are simply what the lawyers feel the evidence will show.
5  We will now hear the evidence from the plaintiffs.
6          Call your first witness, please.
7          MR. BIRCHFIELD:  Your Honor, at this time the
8  plaintiffs call Sharyn Orr's daughter, Ms. Kimberly DeAgano.
9          THE COURT:  Would you come forward, please, ma'am.
10             KIMBERLY ORR DEAGANO,
11 having been duly sworn, testified as follows:
12         THE DEPUTY CLERK:  State your full name and correct
13 spelling for the record, please.
14         THE WITNESS:  It's Kimberly Orr DeAgano,
15 D-E-A-G-A-N-O.  I go by Kim for short.
16             DIRECT EXAMINATION
17 BY MR. BIRCHFIELD:
18 Q.  Kim, would you take just a moment and introduce yourself
19 to the jury.  They know your name.  Tell them a little bit
20 about yourself.
21 A.  Sure.  I'm married for 18 years.  We have one son
22 together.  His name is Dereck.  He is 14.  I live in Kenner, so
23 I have lived there actually my entire life.  Family person.  I
24 love sports.
25 Q.  So you were born and raised in Kenner; is that right?

Page 170

1  A.  That's correct.
2  Q.  The jury has heard already, but Sharyn Orr is your mom; is
3  that right?
4  A.  Correct.
5  Q.  Where did you attend high school?
6  A.  I went to St. Mary's Dominican High School Uptown.
7  Q.  What type of extracurricular activities were you involved
8  in?
9  A.  So basically, most of the sports that they offered I was
10 involved in.  I ran cross-country.  Took stats for volleyball.
11 Played basketball, played cabbage ball.  I was also in the
12 science club.  They have also had a Christian club, which we
13 did outreach kind of things to the community.
14 Q.  When did you graduate?  And then tell us what you did
15 after.
16 A.  I graduated from high school in 1992, and then thanks to
17 Mom, working at Tulane University for so many years, was able
18 to get a partial track scholarship for the athletics and then
19 tuition waiver for Mom's years of working at Tulane.  So I
20 attended Tulane University and graduated from there in 1996.
21 Q.  So you graduated from Tulane in 1996.  What was your
22 degree?
23 A.  My degree was in political science.
24 Q.  So tell us what you did, Kim, after you graduated from
25 college.

Page 770

1  A.  I think that it would be fair to say that the fact that
2  she was on the blood thinner Xarelto played into the
3  complicated decision-making process for the timing of the
4  placement of the catheter.
5      One of the factors to proceed with surgery is whether she
6  has responded to medical therapy or not.  So one of the factors
7  that played into my decision was the fact that she had not
8  responded to medical therapy.
9      The other factor was to be conservative and make sure that
10 the Xarelto -- or the potential of Xarelto being on board had
11 cleared.  So they were sort of concomitant factors.
12 Q.  I just want to make sure we're clear.  There was no doubt
13 that the fact -- that you had the history of Mrs. Orr that she
14 had been taking Xarelto, right?
15 A.  Yes.  Correct.
16 Q.  You learned at some point that there was uncertainty as to
17 whether she had taken her evening dose around suppertime on the
18 evening of the 24th, right?
19 A.  Yes.  There was debate on that.
20 Q.  You had to assume, however, that she took it and was
21 therapeutically anticoagulated on Xarelto when she hit the door
22 at Ochsner main, right?
23 A.  Yes.  I had to make that assumption.
24 Q.  And that is at least one of the primary reasons why that
25 procedure to give Mrs. Orr a chance in the world of chance

Page 771

1  where you, as a neurosurgeon, work -- the Xarelto was at least
2  one of the primary reasons why that chance-giving procedure was
3  delayed until 2:10 P.M., right?
4  A.  That's one of the reasons.
5  Q.  Now, let's go into why it was one of the reasons.  Let's
6  get into your knowledge and how you acquired it about Xarelto
7  at that time.  So let's go back to April 24th, 2015.
8      What was your fund of knowledge as a neuro --
9  board-certified surgeon working at Ochsner main campus?  What
10 did you know about Xarelto that night when you first saw
11 Sharyn Orr?
12 A.  Xarelto was one of several medications in this class of
13 medications that inhibits one of the main -- one of the main
14 steps or factors in the coagulation pathway.
15     So in order for your blood to clot, there is a complicated
16 cascade of things that happen very rapidly.  Again, I'm not a
17 hematologist.  So I'm not going to say that I'm an expert at
18 every step.
19     But the general mechanism for Xarelto was to block one of
20 the factors, Factor X, I believe, or specifically Xa, which is
21 one of the -- the activated form of it, and, hence, it reduces
22 your blood's ability to clot.
23     It's often used in conditions in which patients have
24 increased risk for forming blood clots.  And in Ms. Orr's case,
25 it's for her atrial fibrillation.

Page 772

1  Q.  Where did you get that information?
2  A.  General medical literature, general medical training,
3  conferences.
4  Q.  So fair to say, then, that your fund of knowledge about
5  Xarelto as of April 25th came from you being a participant in
6  the neurosurgical community; is that right?
7  A.  Yes.
8  Q.  It was based upon your general work that you do as a
9  professional, keeping up-to-date with developments in your
10 field by reading literature, right?
11 A.  Yes.  As a surgeon, you do have to understand some basic
12 level about drugs that may increase or decrease bleeding.
13 Q.  Because everything that you do is in a potentially high
14 bleeding risk situation, correct?
15 A.  Yes.
16 Q.  Operations in the brain, on the spinal cord, things of
17 that nature, if there is a bleed that develops, it can have
18 catastrophic consequences, right?
19 A.  Yes.
20 Q.  Now, let's get this out on the table.
21     As of April 25th, 2015, had you ever looked at the Xarelto
22 label?
23 A.  No, I had not.
24 Q.  So is it fair to say, though, even though you yourself had
25 not looked at the label, you had availed yourself or gotten a

Page 773

1  lot of information about Xarelto without looking at the label?
2  A.  Yes.  That's fair to say.
3  Q.  Through the ways that we discussed, professional
4  communication, talking with colleagues, reading literature,
5  right?
6  A.  Yes.  I thought I had enough information about it to be
7  able to treat or manage patients that were on it from a
8  neurosurgical perspective.
9  Q.  Did you think that information or fund of knowledge that
10 you had was derived from -- or flowed from the label itself,
11 even though you had not looked at it?
12     MR. IRWIN:  Objection, Your Honor.  Leading,
13 speculation.
14     THE COURT:  It could be speculation.
15     Why don't you rephrase the question.
16     MR. HONNOLD:  Sure.
17 BY MR. HONNOLD:
18 Q.  Did you have some sense that your understanding did come
19 from a good source?
20 A.  Yes.
21 Q.  And so the situation was that part of the reason there was
22 delay was due to the fact that you had to assume that Mrs. Orr
23 was anticoagulated on Xarelto, right?
24 A.  Yes.
25 Q.  Were you the one that delivered that news to the family or