UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| THIS DOCUMENT RELATES TO: | SECTION L |
| Dora Mingo, et al. v. Janssen Research & Development, et al.<br>Case No. 2:15-cv-03469 | JUDGE ELDON E. FALLON<br><br>MAGISTRATE NORTH |
| William Henry v. Janssen Research & Development,<br>LLC f/k/a Johnson & Johnson Pharmaceutical Research and Development, LLC, et al.<br>Case No. 2:15-cv-0224 | |

**DEFENDANTS' RENEWED JOINT *DAUBERT* MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY REGARDING <u>UNAPPROVED DOSING AND MONITORING REGIMENS</u>**

Leading up to the *Boudreaux* and *Orr* trials, Defendants moved under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to preclude several of Plaintiffs' experts from offering three opinions related to the dosing and monitoring of Xarelto: (1) that patients should be monitored with prothrombin time (PT) tests or anti-Factor Xa assays; (2) that twice-daily dosing would be safer than the FDA-approved once-daily dosing regimen; and (3) that unapproved lower doses of Xarelto would be safer than the FDA-approved doses. Defendants demonstrated that the methodology relied upon by each of the pertinent experts to reach those opinions was untested and unreliable under *Daubert* and its progeny.

In their response brief, Plaintiffs did not attempt to defend these opinions. Rather, they disclaimed them, promising they would not be offered at trial. Doc. 5641 at 21, 26–27 (Exh. 4). With respect to monitoring, Plaintiffs narrowed their theory and represented that their experts would testify only that physicians should give patients a Neoplastin PT test shortly after initiation of Xarelto to help determine whether to continue the medication. *Id.* at 11, 13.

To the extent that Plaintiffs intend to offer any expert testimony related to monitoring or dosing in the *Mingo* and *Henry* trials, Defendants renew their *Daubert* motion and the arguments made in the related briefing.[1] With respect to the three initially challenged opinions, Plaintiffs have conceded, by failing to defend the opinions in response to Defendants' motion, that they do not pass muster under *Daubert*.[2] And all four opinions—the initial three plus the narrowed Neoplastin PT opinion—fail *Daubert*'s reliability criteria. The opinions accordingly must be excluded.

## ARGUMENT

**I.     Monitoring-Related Theories and Opinions Regarding the Utility of PT Tests and the Anti-Factor Xa Assay Remain Inadmissible.**

Plaintiffs' experts have offered several different opinions about how Xarelto might be made safer through some type of patient monitoring. Certain generic experts theorize that patients should have their Xarelto dose titrated based on the results of such monitoring; others say that a Neoplastin PT test should be given once at initiation of treatment to determine whether Xarelto should be discontinued; and some opine that Xarelto is defective because it's not accompanied by an unapproved anti-Factor Xa assay to measure the pharmacokinetic activity of Xarelto.[3] The experts who have been retained to provide case-specific opinions in *Mingo* and *Henry* (Drs. Emory,

---

[1] The legal principles and citations to the evidentiary record that mandate exclusion of the dosing and monitoring opinions under *Daubert* are set forth in Defendants' Joint *Daubert* Motion Regarding Unapproved Dosing & Monitoring Regimens and Memorandum in Support (Docs. 5113 & 5113-1) and in Defendants' Reply Brief in Support (Doc. 5688) (Exhs. 1–3), which Defendants expressly incorporate herein.

[2] Regarding the waiver of certain expert opinions, see also Defendants' Joint Motion for an Order Barring Scientific Evidence Based on Waiver (Doc. 6485) and Memorandum in Support (Doc. 6485-1) at 3, 7–8.

[3] The following generic experts offer monitoring-related opinions: Backes, Bussey, Cuculich, Gertsman, Gosselin, Ix, Kessler, Leissinger, Maggio, Parisian, Plunkett, Rinder, Rosing. *See* Backes Rep. at 12; Bussey Rep. at 1, 4; Cuculich Rep. at 4, 20, 22; Gertsman Rep. at 60–61; Gosselin Rep. at 33; Ix Rep. at 4, 14; Kessler Rep. at 17, 19, 21; Leissinger Generic Rep. at 2, 4, 10; Maggio Rep. at 2, 45; Parisian Rep. at 11; Plunkett Rep. at 6–7; Rinder Rep. at 3; Rosing Rep. at 5, 21. Copies of the pertinent reports were provided to the Court as exhibits to Defendants' *Daubert* motion (Doc. 5113).

Polukoff, and Rinder) also offer general monitoring-related opinions in their case-specific reports. *See* Emory Rep. at 4, 6 (Exh. 5) (PT reagents can adequately assess the relative intensity of Xarelto anticoagulation; dose-adjustment testing for Xarelto levels would have prevented or reduced the risk of Mr. Henry suffering a bleed); Polukoff Rep. at 7 (Exh. 6) (prudent and informed cardiologists would maintain Xarelto patients with a Neoplastin PT under 20 seconds by prescribing an appropriate dose or selecting an alternative anticoagulant); Rinder (Mingo) Rep. at 2 (Exh. 7) ("Had [Mingo's] physicians known to [test with] the PT (Neoplastin) at the onset of Xarelto treatment, her excessive exposure and unnecessary high risk of major bleeding would have been identified, and she could have been (a) titrated to a lower dose, or (b) had Xarelto discontinued[.]").

### A. Plaintiffs' Experts' General Monitoring Theories

The shortcomings of the methodologies underlying the monitoring opinions were the subject of extensive argument in Defendants' prior *Daubert* briefing and fail for the substantive reasons articulated in those briefs. *See* Doc. 5113-1 at 2–3, 7–20 (Exh. 2).

Additionally, in response to Defendants' motion, Plaintiffs only defended the theory that a Neoplastin PT test after initiation of treatment should be used to weigh the risks and benefits of Xarelto for individual patients. *See* Doc. 5641 at 21 (Exh. 4) (explaining that by monitoring, Plaintiffs mean using Neoplastin PT "early in the course of treatment [to decide] whether Xarelto is putting a patient at too high of a bleeding risk."). Accordingly, any testimony going beyond this opinion should be excluded due to Plaintiffs' failure to respond to Defendants' *Daubert* arguments. Plaintiffs have waived their opposition to Defendants' arguments, as "failure to address an issue in response or opposition to a pending motion" waives that issue. *E.g.*, *McZeal v. J.P. Morgan Chase Bank, NA*, No. 13-6754, 2014 WL 3166715, at *8, n.23 (E.D. La. July 7, 2014) (collecting cases).

3

Beyond that, Plaintiffs' refusal to defend the expert opinions—but nonetheless pursue them later at trial—would be highly prejudicial and improper. Before the jury may hear expert testimony, the Court must determine whether the testimony meets *Daubert*'s requirements; that means that "[a]t a minimum, a district court must create a record of its *Daubert* inquiry and articulate a basis for admitting expert testimony." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016) (citations and quotations omitted). The Court cannot perform its gatekeeping function if Plaintiffs don't identify the expert testimony that they intend to offer at trial and the basis for its admissibility, particularly in the face of Defendants' arguments that certain opinions are unreliable. *See id.* (district court "disregarded its gatekeeping function to determine the admissibility of [expert] evidence outside the presence of the jury" where "no *Daubert* inquiry took place"); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (en banc) (district court abused its discretion by admitting expert testimony "without first finding it to be relevant and reliable under *Daubert*"). That would amount to trial by ambush and would deprive Defendants and the Court of the opportunity to evaluate the expert witness testimony before the jury hears it.

    **B.**    **One-Time PT Test at Initiation of Xarelto Treatment**

With respect to Plaintiffs' narrowed opinion regarding a one-time Neoplastin PT test, that opinion also is inadmissible for the reasons explained in Defendants' opening *Daubert* brief and reply. Doc. 5113-1 at 7–20 (Exh. 2); Doc. 5688 at 5–12 (Exh. 3). The theory has never been tested and no scientific evidence supports using a Neoplastin PT result to make prescribing decisions—a point highlighted by the fact that Plaintiffs' experts cannot say what a physician should do with a particular PT value or which values advise for or against continuing a patient on Xarelto. Nor can Plaintiffs' experts point to any studies validating the use of PT test results to make clinical

4

decisions, including which alternative therapy to recommend if a patient is to be taken off Xarelto based on a PT value or whether any alternative therapy would even be any safer.

For example, Dr. Theresa Emory, a medical doctor and board certified pathologist retained by Plaintiffs in *Henry*, testified that she doesn't know how to interpret PT results to determine the risk/benefit profile of Xarelto in a particular patient.[4] Plaintiffs' cardiologist, Dr. Phillip Cuculich, who has been retained as a generic expert, similarly said that he couldn't "draw a line in the sand" when asked for a PT value at which he "would tell doctors in the label to discontinue Xarelto." Cuculich Dep. 224:5–225:14 (Exh. 9). And meaningfully, the doctors retained by Plaintiffs to provide expert opinions in both *Mingo* and *Henry* cannot say whether a different anticoagulant would have made a difference in those cases.[5] This means that even if a patient's PT indicated a high bleeding risk, there is no alternative that should have been substituted for Xarelto.

### C. Use of an Anti-Factor Xa Assay

Finally, in the context of their design-defect claim, Plaintiffs contend that Xarelto is unsafe because it's not accompanied by an approved anti-Factor Xa assay that doctors might use to specifically measure Xarelto activity in patients.[6] Again, for the same reasons explained in Defendants' *Daubert* briefing, this opinion should be excluded.

---

[4] Emory Dep. 145:20–24 (Exh. 8) ("Q. If you are a clinician and you get a PT value of 20, how do you know that the risk of bleeding has exceeded the benefit of stroke prevention in that particular patient? A. I don't know.").

[5] Polukoff Dep. 115:25–116:3 (Exh. 10) ("Q. Do you agree that Mr. Henry could have had the same bleed that he had in December of 2012 if he had been on another anticoagulant besides Xarelto? A. Yes."); Rinder Dep. 115:24–116:6 (Exh. 11) ("Q. And is it fair to say that you are not critical of Dr. Jordan's decision to prescribe Xarelto to [Ms. Mingo] at 15 milligrams twice a day for the first 21 days for the treatment of that DVT? . . . A. As I said, I do not have any specific criticisms of Dr. Jordan.").

[6] *See, e.g.*, Gosselin Rep. at 32, 33 (Exh. 12) (anti-Factor Xa measurements should be considered for estimating drug concentration in emergent situations; quantifying Xarelto levels could be helpful in trying to assess whether a patient is at an increased risk from high exposure); Parisian Rep. at 331, ¶ 999 (Exh. 13) (Janssen does not mention commercial rivaroxaban laboratory assays including the anti-Factor Xa assay, unlike in Europe); Polukoff Rep. at 5–6 (Exh. 6) (a prudent cardiologist would recommend calibrated

To begin, as Plaintiffs' laboratory assay expert Robert Gosselin explains, there are no commercially available, FDA-approved assays in the U.S. to measure Xarelto concentration:

> Q. But no assay to date has been FDA approved or consistent enough to validate rivaroxaban concentration or associate concentrations with hemorrhagic or thrombotic events; correct?
>
> . . .
>
> A. . . . There are no commercial kits that are FDA approved . . . for measuring [direct oral anticoagulants].

Gosselin Dep. 306:10–307:9 (Exh. 16).

Without even an FDA-approved assay to point to that supposedly would make Xarelto safer, Plaintiffs cannot meet their burden of demonstrating the reliability of this opinion. A "trial court must function in the *present* assessing evidence that *presently exists*." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 615 (E.D. La. 2003) (emphasis added). Speculation that at some time in the future an anti-Factor Xa assay might be approved in the U.S. for use with Xarelto is insufficient to demonstrate reliability. *See id.*; *see also In re Bextra & Celebrex*, 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) ("plaintiffs carry the burden of proving *today based on currently available* scientifically valid evidence" the admissibility of their expert's testimony) (emphasis added).

Further, using anti-Factor Xa assay results on a routine basis to make prescribing decisions or give patients alternative, unapproved Xarelto doses, as Plaintiffs' experts recommend, has not been tested or studied in clinical practice. When evaluating scientific reliability under *Daubert*, however, a key question to be answered is "whether [the opinion] can be (and has been) tested."

---

anti-Factor Xa test to stratify a patient's risk of significant bleeding and would repeat the test as needed for change in patient status and as patient ages to determine safest and most efficacious treatment strategy); Rinder (Generic) Rep. at 3 (Exh. 14) (the safe and effective use of Xarelto requires measuring drug concentration levels with PT or anti-Factor Xa); Rosing Rep. at 20 (Exh. 15) (dosing on the basis of Xarelto levels can be done with anti-Factor Xa assays).

6

*Daubert*, 509 U.S. at 593. Accordingly, "the existence of sufficient facts [to support an expert opinion] and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). Without the necessary tests or data to guide the experts' proposed use of an anti-Factor Xa assay, testimony that Xarelto is defective without it is inadmissible. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) (affirming expert's exclusion where "district court appropriately noted the lack of testing of any of the proposed [design] alternatives"); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (district court appropriately found proposed experts unreliable, in part, because the experts "failed to test their alternative designs"); *Propulsid*, 261 F. Supp. 2d at 615 (excluding opinions that were "[a]t best" only "untested hypotheses").

Last, without the requisite testing or data, no expert can reliability conclude that Ms. Mingo's or Mr. Henry's injuries would have been avoided if an anti-Factor Xa assay had been available. *Daubert* requires that opinion testimony, in some concrete way, "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244–45 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591) (affirming district court's exclusion of expert testimony because it was "not helpful to the fact-finder"). Abstract testimony about the utility of an unapproved anti-Factor Xa assay is vague, unhelpful, and therefore inadmissible. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326–27 (5th Cir. 2004) (affirming district court's exclusion of expert where he only presented "conceptual suggestions" based on "unscientific conceptual sketches and broad ideas"); *United States v. Hoang*, 891 F. Supp. 2d 1355, 1358 (M.D. Ga. 2012) (noting that "courts regularly exclude vague and imprecise opinions because they will not assist the trier of fact").

\* \* \*

For these reasons, Defendants renew their *Daubert* motion and request that the Court reconsider its prior ruling. Expert testimony that some sort of monitoring would improve patient outcomes or that PT tests or anti-Factor Xa assays should guide the care of Xarelto patients in the manner that the experts recommend should be excluded.

## II.   Expert Opinions Regarding the Xarelto Dosing Regimen Remain Inadmissible.

Several generic experts offer opinions that Xarelto should be dosed twice-daily rather than once-daily as approved by FDA.[7] Based on the admissions of those very experts, Defendants demonstrated that such an opinion is impermissibly speculative and therefore unreliable and inadmissible. Doc. 5113-1 at 20–24 (Exh. 2). Plaintiffs' failure to respond to that argument constitutes waiver and precludes the Court from fully evaluating the reliability of the opinion, thus requiring exclusion. *Supra* at 3–4; *see also* Defs.' Renewed Mot. to Exclude Certain Dosing-Related Ops. of Dr. Smart (Doc. 6673 filed in *Orr*) at 1, 4 (Exh. 17). To the extent that the Court finds that Plaintiffs have not waived their opposition to Defendants' arguments, Defendants renew them and request that the Court grant Defendants' *Daubert* motion with respect to the dosing regimen opinions.

Drs. Emory and Polukoff also provide case-specific opinions in *Henry* about the safety of twice-daily dosing compared to once-daily. Emory Rep. at 6 (Exh. 5) (twice-daily dosing would have been a safer alternative for Mr. Henry); Polukoff Rep. at 7 (Exh. 6) (prescribing information did not warn to administer Xarelto twice-daily for older multimorbid patients like Mr. Henry). But

---

[7] Those experts include: Backes, Cuculich, Gertsman, Leissinger, Parisian, and Rosing. Defendants' dosing arguments also apply to Backes' assertions about the safety of a time-released formulation of Xarelto. *See* Backes Rep. at 2, 12; Cuculich Rep. at 13–14; Gertsman Rep. at 7; Leissinger Generic Dep. 84:8–14; Parisian Rep. at 14; Rosing Rep. at 5, 21. Copies of the pertinent reports and transcripts were provided to the Court as exhibits to Defendants' *Daubert* motion (Doc. 5113).

they too admit that there is insufficient data to back that opinion. Polukoff Dep. at 125:8–15 (Exh. 10) ("Q. Am I correct that there is no scientific data that shows a lower bleeding risk from twice-a-day dosing than once-a-day dosing? . . . A. There's not been a clinical trial that I'm aware of that tests that hypothesis."); Emory Dep. 102:19–22; 103:25–104:4 (Exh. 8) (no study says that bleeding risk corresponds to peak Xarelto levels; no opinion as to whether peak or trough Xarelto concentrations are the strongest predictor of bleeding risk).

Accordingly, and for the same reasons set forth in Defendants' prior *Daubert* briefing, any case-specific opinions about the safety of twice-daily dose are unreliable and inadmissible.

### III.    Expert Opinions Regarding an Alternative Xarelto Dose Remain Inadmissible.

Finally, several of Plaintiffs' generic experts proffer opinions that Xarelto should be provided to patients at some unspecified dose lower than the FDA-approved dose.[8] Defendants' prior briefing established the numerous flaws that make this theory inadmissible. *See, e.g.*, Doc. 5113-1 at 24–28 (Exh. 2). Plaintiffs' lack of response concedes those flaws, waives any argument in favor of admissibility, and denies the Court the opportunity to properly determine the admissibility of the opinion, thus requiring exclusion. *Supra* at 3–4; *see also* Doc. 6673 at 1, 4 (Exh. 17). If the Court does address the merits of the opinion, Defendants renew their prior motion and request that the Court exclude the alternative dose opinions.

In *Henry*, Drs. Emory and Polukoff also offer opinions about the safety of a lower total daily dose. Emory Rep. at 5, 6 (Exh. 5) (agreeing that there was no rational basis for the 20 mg

---

[8] Those experts include: Backes, Parisian, Plunkett, Rosing, and Smart. *See* Backes Rep. at 11; Parisian Rep. at 9, 14; Plunkett Dep. 599:22–601:4; Rosing Rep. at 5, 21; Smart Rep. at 5–6. Copies of the pertinent reports and transcripts were provided to the Court as exhibits to Defendants' opening *Daubert* motion (Doc. 5113).

Afib dose; opining that package insert did not adequately instruct physicians how to properly dose patients like Mr. Henry); Polukoff Rep. at 7 (Exh. 6) (prescribing information failed to warn physicians to use lower dose; Mr. Henry would have been at reduced bleeding risk had he been on a lower dose). Likewise, in *Mingo*, Dr. Rinder writes that PT testing would have allowed Ms. Mingo's physicians to downward titrate her Xarelto dose. Rinder (Mingo) Rep. at 2 (Exh. 7).

Their own sworn testimony, however, demonstrates that the alternative dose opinions are not reliable for the same reasons explained in Defendants' *Daubert* brief. For example, despite recommending dose titration, Dr. Rinder says that he does *not* disagree with Ms. Mingo's physician's decision to prescribe Xarelto at 15 mg twice daily for the first 21 days of Ms. Mingo's treatment for deep vein thrombosis (which is the FDA-approved dosing regimen for DVT treatment). Rinder Dep. 115:24–116:6 (Exh. 11) ("Q. . . . you are not critical of Dr. Jordan's decision to prescribe Xarelto to [Ms. Mingo] at 15 milligrams twice a day for the first 21 days for the treatment of that DVT? . . . A. As I said, I do not have any specific criticisms of Dr. Jordan."). Nor could he recommend a particular alternative (or FDA-approved) dose that should have been prescribed.[9] And Dr. Emory testified that she can't identify a different dose that would have reduced Mr. Henry's bleeding risk:

> Q. You are not testifying as of today that you know of a different dose [Mr. Henry] should have been on?
>
> A. Correct.
>
> Q. And you don't have any opinion as of today about how much lower his dose should have been below 20 milligrams once a day?
>
> A. Correct.

---

[9] *Id.* at 96:12–97:12 ("Q. . . . What lower dose of Xarelto would you say [Ms. Mingo] should have been titrated to? . . . A. . . . They could have considered titrating her to a lower dose. That's within their purview. They do not have to follow FDA guidelines. They can choose dosing that they feel is safer for the patient even though it is not necessarily following specific FDA guidelines. I don't know how they would do that.").

10

Emory Dep. 108:2–8 (Exh. 8). Accordingly, and for the same reasons set forth in Defendants' *Daubert* briefing, any additional opinions about the safety of an alternative Xarelto dose should be excluded.

## CONCLUSION

For all of the reasons stated above, pursuant to Federal Rule of Evidence 702 and *Daubert*, the Court should exclude any expert testimony and opinions regarding: (1) the monitoring of Xarelto patients or the use of PT tests or anti-Factor Xa assays with Xarelto patients; (2) the alleged improved safety of Xarelto with twice-daily dosing; and (3) the alleged improved safety of Xarelto with an unapproved, alternative dose.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119

| | |
|---|---|
| James B. Irwin<br>Kim E. Moore<br>Irwin Fritchie Urquhart & Moore LLC<br>400 Poydras Street, Suite 2700<br>New Orleans, LA 70130<br>Telephone: (504) 310-2100<br>jirwin@irwinllc.com<br><br>*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC* | Telephone: (205) 521-8803<br>knewsom@bradley.com<br><br>CHAFFE MCCALL L.L.P.<br><br>By: /s/ *John F. Olinde*<br>John F. Olinde<br>Chaffe McCall L.L.P.<br>1100 Poydras Street, Suite 2300<br>New Orleans, LA 70163<br>Telephone: (504) 585-7241<br>olinde@chaffe.com<br><br>*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG* |

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 7th day of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

                                                                 */s/ John F. Olinde*