# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  XARELTO (RIVAROXABAN)              MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                          SECTION L

THIS DOCUMENT RELATES TO:                 JUDGE ELDON E. FALLON

Joseph J. Boudreaux, Jr., et al. v. Janssen et al.    MAGISTRATE NORTH
Case No. 2:14-cv-02720

Joseph Orr, Jr., et al. v. Janssen et al.
Case No. 2:15-cv-03708


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**JOINT *DAUBERT* MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY**
**REGARDING UNAPPROVED DOSING AND MONITORING REGIMENS**

2845591-1

# TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................................1

LEGAL STANDARD .......................................................................................................4

ARGUMENT ....................................................................................................................7

I.     The Court should exclude testimony that some sort of monitoring regimen would improve patient outcomes. ...................................................................................7

    A.     Plaintiffs' experts concede that PT tests cannot be reliably used to monitor Xarelto concentration or activity. ............................................................9

    B.     The *Daubert* factors demonstrate that Plaintiffs' monitoring opinions are not reliable. ..................................................................................................12

        1.     Plaintiffs' monitoring opinions are untested and lack any supporting data. ............................................................................................13

        2.     Plaintiffs' monitoring opinions have not been accepted in the scientific community. ..................................................................16

        3.     Plaintiffs' monitoring opinions were developed exclusively for litigation and have not been subject to peer review and publication. ........17

II.    The Court should exclude testimony that it would be safer to dose Xarelto twice-daily rather than once, as indicated. ..............................................................20

III.   The Court should exclude testimony that a lower total daily dose would be safer than the approved dose to prevent stroke in atrial fibrillation patients. ............................24

    A.     Plaintiffs' experts cannot identify an appropriate alternative Xarelto dose. ..........26

    B.     Lower doses have not been tested for the stroke risk reduction indication, and there are no data on how a lower dose would affect stroke protection. ..........27

CONCLUSION ...............................................................................................................28

2845591-1

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Raymond Corp.*,
    432 F.3d 640 (6th Cir. 2005)...................................................................... 27

*Conklin v. Novartis Pharmaceuticals Corporation*,
    No. 9:11-CV-178, 2012 WL 4127295
    (E.D. Tex. Sept. 18, 2012) ........................................................................ 25

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..................................................................... 18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................................. passim

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................... 5

*Guillory v. Domtar Indus. Inc.*,
    95 F.3d 1320 (5th Cir. 1996)................................................................... 5, 6

*Guy v. Crown Equip. Corp.*,
    394 F.3d 320 (5th Cir. 2004)................................................................. 26, 27

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007)................................................................... 6, 8

*Hickey v. Gusman*,
    No. 10-CV-4410, 2011 WL 6180050 (E.D. La. Dec. 13, 2011) ................ 5

*In re Bextra & Celebrex*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................. 6, 7, 21

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    166 F. Supp. 3d 654 (E.D. La. 2016) ........................................................ 18

*In re Propulsid Prods. Liab. Litig.*,
    261 F. Supp. 2d 603 (E.D. La. 2003) .................................................. passim

*Kelley v. Am. Heyer-Schulte Corp.*,
    957 F. Supp. 873 (W.D. Tex. 1997) ......................................................... 15

*Kruszka v. Novartis Pharms. Corp.*,
    19 F. Supp. 3d 875 (D. Minn. 2014) ........................................................ 28

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................... 5

*Moore v. Ashland Chem., Inc.*,
    151 F.3d 269 (5th Cir. 1998)....................................................................... 5

*Peitzmeier v. Hennessy Indus., Inc.*,
    97 F.3d 293 (8th Cir. 1996) ........................................................... 2, 14, 23

*Rhodes v. Bayer Healthcare Pharm., Inc.*,
  No. 10–1695, 2013 WL 1289050 (W.D. La. Mar. 26, 2013) ............................................. 15, 16

*Rosen v. Ciba-Geigy Corp.*,
  78 F.3d 316 (7th Cir. 1996) ................................................................................................... 1, 9

*Tassin v. Sears Roebuck*,
  946 F. Supp. 1241 (M.D. La. 1996) .................................................................................... 24, 28

*Watkins v. Telsmith, Inc.*,
  121 F.3d 984 (5th Cir. 1997) .............................................................................................. passim

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) .............................................................................................. passim

*Winters v. Fru-Con Inc.*,
  498 F.3d 734 (7th Cir. 2007) ................................................................................................... 16

**Rules**

Fed. R. Evid. 702 ...................................................................................................................... 5, 28

iii

2845591-1

Plaintiffs' experts would make this Courtroom a laboratory to hypothesize about medical theories that they admit have never been tested, peer-reviewed, or confirmed through research. Such theories do not meet *Daubert*'s reliability requirement.  "The courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science, it does not lead it."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).  With this motion, Defendants seek to exclude all opinions by Plaintiffs' experts that Xarelto® (rivaroxaban) would be safer with some sort of monitoring regimen and that Xarelto should be dosed twice-daily or at a lower total daily dosage for atrial fibrillation patients.  Those opinions are not grounded in sound science as required by *Daubert* and should be excluded.

## STATEMENT OF FACTS

Patients with atrial fibrillation—such as Sharyn Orr and Joseph Boudreaux—have irregular heartbeats that can cause blood to pool in a portion of the heart.  This pooling can lead to the formation of blood clots, which can travel from the heart to the brain and cause an ischemic stroke. Xarelto, an anticoagulant, reduces the risk of stroke by preventing the formation of blood clots. Like all anticoagulants, Xarelto can increase the risk of bleeding. Despite that known risk, doctors prescribe Xarelto and other anticoagulants to atrial fibrillation patients to reduce the risk of debilitating and life-threatening strokes.

The FDA-approved dosage of Xarelto for the stroke risk reduction indication in atrial fibrillation patients is 20 mg (15 mg for patients with renal impairment) taken once per day.  Unlike with warfarin, FDA has not recommended that physicians monitor the concentration or anticoagulant effect of Xarelto to determine the extent to which a patient is anticoagulated.

Plaintiffs challenge the FDA-approved design of Xarelto.  Their experts opine that the risk of bleeding could be reduced if (1) physicians monitored the concentration or anticoagulant effect of Xarelto, and (2) the approved dose were changed.  These opinions should be excluded based on

1

Plaintiffs' own experts' sworn deposition testimony that their theories are untested, not peer-reviewed, not generally accepted, and espoused only in this litigation (not in their clinical or academic practices).  Because they concede that the theories are untested, the opinions also fail the remaining *Daubert* reliability factor—evaluation of a known or potential rate of error.  *E.g.,* *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 298 (8th Cir. 1996).  The Court need not consider the countervailing science or the credibility of the experts; here, the experts *admit* that their opinions do not meet *Daubert*'s criteria.

In admittedly failing to test their unapproved monitoring and dosing regimens in practice, the experts also ignore the real danger of exposing atrial fibrillation patients—like Mr. Boudreaux and Mrs. Orr, who were already at an increased clotting risk—to catastrophic strokes.  Plaintiffs' experts' theories, set forth below, are nothing but untested hypotheses that must be excluded under *Daubert*.[1]

*(1) Monitoring Opinions*.  Several of Plaintiffs' experts opine that it may be theoretically possible for monitoring or individualized dose-finding to reduce bleeding rates.  By "monitoring," the experts refer to regular clinic visits, or at least an assessment when treatment begins, to measure pharmacological parameters to assess either (1) the pharmacokinetic ("PK") response of the drug, *i.e.*, the concentration of Xarelto in a patient's blood, or (2) the pharmacodynamic ("PD") effect of Xarelto on the patient, *i.e.*, the extent to which the patient is anticoagulated.  The experts opine that this sort of monitoring is needed to keep patients within Xarelto's "therapeutic range," which refers to the spread of concentration values in which a medicine is both safe and efficacious.

The experts primarily propose using prothrombin time ("PT") as the means to measure

---

[1] Defendants' arguments apply to the experts who have offered opinions with respect to atrial fibrillation patients taking Xarelto for the stroke risk reduction indication.  Defendants preserve, and do not waive, a similar *Daubert* motion that may apply to expert opinions in cases brought by plaintiffs who took Xarelto for other indications.

Xarelto activity in patients.  PT is a generic coagulation test that measures how quickly a patient's blood clots.  The result is expressed in seconds in relation to a particular time range (or "reference range"), which depends on the particular agent used in the test to react with the patient's blood or plasma, called the "reagent."  Plaintiffs' experts propose that doctors use PT tests to identify those Xarelto patients who are at a high bleeding risk.  Some go one step farther and recommend clinical decisions—including prescribing lower, unapproved "off label" doses or taking the patient off Xarelto altogether—if PT surpasses 20 seconds, when measured at a particular time after dosing with a PT reagent called Neoplastin®.

But Plaintiffs' experts agree that they do *not* "have *any data* that shows that in fact patient safety would be improved . . . through monitoring of rivaroxaban," and they state that the "question of whether or not [Xarelto] should be monitored *can't be addressed* because of a lack of information."  Maggio Dep. 21:12–16, 55:21–23 (Exh. 1) (emphasis added to both).  Without any data on how monitoring would affect patient safety in practice, the monitoring opinions are unreliable and should be excluded.[2]

*(2) Twice Daily Dosing Opinions.*  No expert has offered any case-specific opinion that twice-daily (or "BID") dosing would have resulted in a better outcome for Mrs. Orr or Mr. Boudreaux.  Plaintiffs' experts opine that it would theoretically be safer to dose Xarelto twice-daily rather than once-daily (or "OD") as indicated to prevent stroke in patients suffering from atrial fibrillation.  Those experts concede, however, that there are no patient data comparing those

---

[2] In their Motion to Exclude Opinions and Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the Orr and Boudreaux Cases, Defendants also demonstrate that—even if the Court were to determine that the monitoring opinions are generally reliable—any such testimony should be excluded in the cases brought by the Orr and Boudreaux plaintiffs.  The monitoring theories do not "fit" the particular facts of those two cases, as separately required under *Daubert*.  In particular, there is no basis for concluding, even on Plaintiffs' experts' own theories, that either Mrs. Orr's or Mr. Boudreaux's clinical course would have been changed as a result of any proposed monitoring regimen.

alternatives.  And they agree that "to determine whether or not twice daily dosing . . . would improve safety and/or efficacy, *you would have to conduct large studies* in patients and perform the statistical analyses and see the comparison."  Backes Dep. 206:19–25 (Exh. 2) (emphasis added).  There are, accordingly, insufficient data to draw any conclusions about the relative safety and efficacy of once-daily versus twice-daily dosing for Xarelto generally, or, with respect to Mrs. Orr and Mr. Boudreaux.

*(3) Lower Total Daily Dose Opinions.*  Some of Plaintiffs' experts also offer general opinions that substituting an unspecified lower total daily dose for the approved 15 and 20 mg doses would theoretically make Xarelto safer.  But they again concede that "*[w]e don't have data to address . . . experimentally*" whether "an alternative dose . . . would reduce bleeds without increasing stroke."  Maggio Dep. 49:13–20 (Exh. 1) (emphasis added).  Aside from the lack of testing, the experts never offer a view, even in theory, on what a lower effective dose might be, rendering the opinions unhelpful to the jury.

For these and the reasons set forth below, the Court should exclude Plaintiffs' experts' monitoring and dosing opinions.[3]

## LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, an expert may give opinion testimony only if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on

---

[3] As set forth in Defendants' Motion for Summary Judgment, the experts' inability to reliably opine that any of the proposed alternative designs—the use of Xarelto with monitoring, BID dosing, or a lower total daily dose—would have prevented Mr. Boudreaux's or Mrs. Orr's injuries also compels summary judgment on Plaintiffs' LPLA design defect claims.  *See* Defs.' Joint Motion for Summary Judgment as to Pls.' Design Defect Claims.  Additionally, those claims are preempted.  *See* Defs.' Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Pls.' Dosing, Monitoring & Other Design-Related Claims.

sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "*Daubert* requires admissible expert testimony to be both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

The following nonexclusive list of factors may be considered in evaluating the reliability of expert testimony: "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance" in the relevant scientific community. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)). Plaintiffs bear the burden of proving the proffered testimony's reliability and relevance. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 615 (E.D. La. 2003) (citing *Moore*, 151 F.3d at 276).

*Daubert* empowers the trial court to "act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards." *Hickey v. Gusman*, No. 10-CV-4410, 2011 WL 6180050, at *3 (E.D. La. Dec. 13, 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 592–93). To clear the reliability bar, a party's experts must employ "the same level of intellectual rigor that characterizes the practice of [the] expert[s] in the[ir] relevant field[s]." *Kumho Tire Co.*, 526 U.S. at 152. The opinions must be based on "scientifically valid" methodology and "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 592–93.

Speculative opinions not based on sufficient data must be excluded. *See, e.g.*, *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). The court's gatekeeping role is "designed

to extract evidence tainted by farce or fiction" so that an expert's "pure speculation" is excluded. *Id.* "[T]he existence of sufficient facts [to support the opinion] and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).  The Fifth Circuit "frown[s] on . . . conclusions bereft of statistically significant epidemiological support." *Wells*, 601 F.3d at 380.

In particular, untested hypotheses cannot be admitted as expert opinions.  "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593 (internal quotation marks omitted).  Accordingly, to determine scientific validity, a "key question to be answered . . . is whether [the opinion] can be (and has been) tested." *Id.*

In evaluating the reliability of an expert's opinion, "[a] trial court must function in the present assessing evidence that presently exists." *Propulsid*, 261 F. Supp. 2d at 615.  Plaintiffs here thus "carry the burden of proving *today based on currently available* scientifically valid evidence" that Xarelto would be safer with the proposed dosing and monitoring regimens. *In re Bextra & Celebrex*, 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) (emphasis added).  The fact that it might not be feasible for the experts to conduct the necessary trials to test monitoring or other doses also does not lower *Daubert*'s reliability bar.

For example, in *Propulsid*, this Court rejected the plaintiff's argument that the experts "should not be penalized for failing to conduct their own studies" where the drug "was removed from the market," thereby making it "probably impossible and certainly unethical for the experts to have attempted their own trials." 261 F. Supp. 2d at 615.  The Court recognized "the difficulties facing the plaintiff's experts in conducting their own tests and compiling data," but nonetheless

excluded the testimony because there was "too great an analytical gap between the data and the opinion proferred." *Id.* at 616.  And, the fact that *Defendants* did not run clinical trials to test *Plaintiffs'* dosing and monitoring theories does not alter *Daubert*'s standard.  *See Bextra & Celebrex*, 524 F. Supp. 2d at 1181 ("[P]laintiffs complain that the evidence of harm at 200 mg/d does not exist because Pfizer did not initiate long term randomized trials at such dose. . . . Plaintiffs cite no case, however, that suggests that they can satisfy their burden of proof based on a lack of evidence.").

## ARGUMENT

I.  **The Court should exclude testimony that some sort of monitoring regimen would improve patient outcomes.**

The vast majority of medicines require no monitoring; the FDA-approved dose is considered safe and effective for all appropriate patients without the need for further individualized assessments.  The anticoagulant warfarin (or Coumadin) is an exception.  It requires frequent monitoring with PT tests—and corresponding dose adjustments—to keep patients within the therapeutic range.  That requirement is due to significant variation in how patients respond to the same dose of the medicine.  Xarelto has a different mechanism of action and none of warfarin's monitoring requirements.  In the pivotal ROCKET AF trial that led to FDA's approval of Xarelto in patients with atrial fibrillation, Xarelto was shown to be safe and effective with a fixed-dose regimen and no monitoring or dose adjustments.

Plaintiffs' experts speculate that monitoring for the purpose of adjusting a patient's clinical course based on PT tests would make Xarelto safer and reduce bleeding risk.[4]  Such testimony

---

[4] *See, e.g.*, Backes Rep. at 12 (Exh. 3); Bussey Rep. at 1, 4 (Exh. 4); Cuculich Rep. at 4, 20, 22 (Exh. 5); Gertsman Rep. at 60–61 (Exh. 6); Gosselin Rep. at 33 (Exh. 7); Ix Rep. at 4, 14 (Exh. 8); Kessler Rep. at 17, 19, 21 (Exh. 9); Leissinger Generic Rep. at 2, 4, 10 (Exh. 10); Maggio Rep. at 2, 45 (Exh. 11); Parisian Rep. at 11 (Exh. 12); Plunkett Rep. at 6–7 (Exh. 13); Rinder Rep. at 3 (Exh. 14); Rosing Rep. at 5, 21 (Exh. 15).

should be excluded because the experts cannot point to any data that demonstrate how monitoring would affect patient outcomes compared to the approved fixed-dose design.  Because "the existence of sufficient facts" to support an expert's opinion "is in all instances mandatory," *Hathaway*, 507 F.3d at 318, the experts' inability to support their conclusions with actual data renders the opinions inadmissible.

Indeed, the scientific community's on-going discussion about the *possibility* of monitoring shows that, at this point, PT tests cannot guide anticoagulant therapy with Xarelto or any of the other new oral anticoagulants ("NOACs").  In 2015, for example, the Cardiac Safety Research Consortium held a conference where scientists discussed the current research on whether NOAC dosing should be guided by PK or PD patient data.[5]  The European Medicines Agency ("EMA") held a similar conference to discuss "the role of pharmacokinetic and pharmacodynamic measurements in the use of direct oral anticoagulants."[6]

Nor has FDA approved an assay to monitor Xarelto or any other NOAC.  At an FDA meeting held in October 2015 to consider NOAC monitoring, FDA stated: "Importantly, the [direct oral anticoagulant] drugs were approved without a requirement for monitoring.  So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants.  *There are currently no cleared or approved devices that measure that*."  FDA: Center for Devices and Radiological Health, Tr., *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* at 9 (Oct. 26, 2015) (Lea Carrington, Director, Division of Immunology and

---

[5]  Presentations are available at http://cardiac-safety.org/is-there-a-role-for-pharmacokineticpharmacodynamics-guided-dosing-for-novel-anticoagulants/.  The conference was held on December 3, 2015, and was titled, "Is There a Role for Pharmacokinetic/Pharmacodynamic Guided Dosing For Novel Anticoagulants?"

[6]  Details on the November 23, 2015 EMA workshop are available at
http://www.ema.europa.eu/ema/index.jsp?curl=pages/news_and_events/events/2015/08/event_detail_001181.jsp&mid=WC0b01ac058004d5c3.

Hematology, Immunology Devices) (Exh. 31) (emphasis added).

As Plaintiffs' experts admit, to this day, no government agency or medical association has concluded that monitoring should be used in the normal course of Xarelto therapy, let alone recommended how to do so in practice. The experts thus acknowledge that "it's an *unanswered question* what the role is for laboratory monitoring with . . . anticoagulants." Bussey Dep. 225:1–5 (Exh. 16) (emphasis added). It is well established that *Daubert* prohibits Plaintiffs from using a jury trial to resolve the unanswered scientific question whether monitoring would be advisable for Xarelto patients. As this Court recognized in *Propulsid*, the judge's gatekeeping role requires "assessing evidence that *presently* exists." 261 F. Supp. 2d at 615 (emphasis added). "[U]ntested hypotheses" must be excluded *even if* "the future may shed more light on th[e] matter." *Id.* The law necessarily must "lag[] science; it does not lead it." *Rosen*, 78 F.3d at 319.

### A.    Plaintiffs' experts concede that PT tests cannot be reliably used to monitor Xarelto concentration or activity.

Plaintiffs' monitoring opinions depend on the premise that the PT assay can both measure Xarelto in a particular patient *and* generate uniform results to guide clinical decisions. Although there is a relationship between PT and the concentration of Xarelto in the blood, there is "too great an analytical gap," *Propulsid*, 261 F. Supp. 2d at 616, between, on the one hand, using PT to qualitatively assess whether Xarelto is on board (which is possible, particularly when sensitive PT reagents, including Neoplastin,[7] are used), and, on the other, using PT to *uniformly guide clinical decisions*, as the experts propose. As explained below, Plaintiffs' experts acknowledge that PT is not a reliable quantitative measure of Xarelto—and, in any event, that no PT test has been cleared

---

[7] Neoplastin is a type of PT reagent that is "prolonged dose-dependently" by Xarelto. *See* § 12.2, Xarelto USPI (Exh. 30). Defendants address the experts' proposed monitoring regimens based on the use of Neoplastin in their Motion to Exclude Opinions and Testimony Regarding the Experts' 20-Section PT Cut-Off Guideline in the Orr and Boudreaux Cases.

or approved by FDA for use in conjunction with Xarelto.

*First*, PT assays lack sensitivity at certain Xarelto concentrations. Consistent with his 2014 publication in *Thrombosis and Haemostasis*, Plaintiffs' laboratory assay expert, Robert Gosselin, agrees that "PT . . . [is] often prolonged at peak on-therapy rivaroxaban levels, but correlate[s] poorly with drug levels. Thus [PT] can provide a *rough estimate* that rivaroxaban is circulating, but *not provide meaningful information on absolute drug levels*." Gosselin Dep. 140:21–141:9 (Exh. 17) (emphasis added) (quoting Francart et al., Rivaroxaban and coagulation testing, *Thrombosis and Haemostasis* 111.6/2014 at 1139–40). *See also id.* at 133:14–134:2 (agreeing that studies show that "global assays [including PT] cannot reliably provide drug concentration, especially throughout the expected broad range of concentrations observed when collected at peak or trough times") (quoting Gosselin et al., Tests to Measure Rivaroxaban Concentration, *Arch Pathol Lab Med*, Vol 138, Dec. 2014 at 1682). Plaintiffs' expert Dr. Jan Rosing, a professor emeritus of biochemistry, thrombosis, and hemostasis in Europe, further explains that "PT assays lack sensitivity at *low* rivaroxaban concentration levels." Rosing Dep. 197:24–198:1 (Exh. 18) (emphasis added). Mr. Gosselin says the same. Gosselin Dep. 137:11–21 (Exh. 17) (agreeing that "data demonstrated" that "PT . . . [was] insensitive to trough rivaroxaban.") (quoting Francart 2014 at 1133). Sensitivity to Xarelto also differs depending on the reagent used. Accordingly, Mr. Gosselin agrees, "as a global statement," that "PT should *not be used* to quantify or estimate drug concentration" of Xarelto, especially given that "physicians, to [his] knowledge, don't really know what method they have in the laboratory." *Id.* at 153:20–154:17 (emphasis added).

*Second*, PT results are widely variable and cannot be standardized across patients. Three variables lead to differing results: (1) the type of PT reagent, (2) the batch or lot of the reagent, and (3) the laboratory instrument that is used to perform the test. *See* Gosselin Dep. 122:25–125:6

(Exh. 17) (agreeing that "the sensitivity of the PT . . . varies considerably based on reagents used . . . [and that PT results] in seconds in the presence of a given concentration of DOAC *cannot be standardized across laboratories.*") (emphasis added) (quoting D.M. Adcock & R. Gosselin, Direct Oral Anticoagulants (DOACs) in the Laboratory: 2015 Review, *Thrombosis Research* 136 (2015) 7–12 at 8).  Reagent variation is particularly significant because "many different PT reagents are used by laboratories across the country."  *See id.* at 127:20–24.  And, Mr. Gosselin explains, even when two laboratories use the same reagent, variations still exist:

> Q:  So you'd agree that with PT testing in a Xarelto patient, you could have the same sample using the same reagent but tested in a different laboratory and the results could be different?
>
> A:  Oh, absolutely.

*Id.* at 119:1–5.  Dr. Rosing likewise says that PT "can differ depending on which thromboplastin reagent you use" and that "when you compare different batches of Neoplastin, there can be batch-to-batch variation."  Rosing Dep. 193:15–24 (Exh. 18).

Because the variability in PT results *has not been standardized*, any clinical recommendation that would correspond to a particular PT cut-off cannot be applied across either PT reagents or laboratories.  Plaintiffs' cardiology expert Dr. Phillip Cuculich observes that unlike warfarin, where there is a "universal result" that can be reached for "different reagents"—namely, the International Normalized Ratio, or INR—"[w]e don't have that kind of universal result with rivaroxaban."  Cuculich Dep. 196:25–197:5 (Exh. 19).  *See also* Gosselin Dep. 117:5–8 (Exh. 17) ("Q: Do you agree that for Xarelto . . . standardization of PT results has not been achieved?  A: I would agree with that statement.").  Mr. Gosselin therefore agrees that PT is "*not a reliable measurement of DOAC anticoagulant effect . . .* because the sensitivity of the PT . . . varies considerably based on reagents used[.]"  *Id.* at 122:11–125:6 (emphasis added) (quoting Adcock

& Gosselin 2015 at 8).

Notably, other Plaintiff experts outright reject the possibility of PT monitoring for Xarelto patients. Plaintiff Orr's expert, Dr. Gianluca Cerri, an emergency medicine doctor in Walker and Baton Rouge, Louisiana, says: "There's not an order I can enter which allows me to measure, monitor, and evaluate the coagulation status for the patient . . . [or] the drug." Cerri Dep. 24:12–20 (Exh. 20); *see also id.* at 147:12–15 ("There's no lab assay that tells me when the patient took [Xarelto], [or] how much of the medication is in the system."). Likewise, Plaintiffs' generic and Boudreaux-specific expert Cindy Leissinger, a Tulane hemostasis and thrombosis disorder specialist, states that doctors "cannot accurately monitor patients on Xarelto" and agrees that, "with our current knowledge and lack of validation studies," she "could not have used PT to monitor" Mr. Boudreaux. Leissinger Case-Specific Dep. 214:21–215:5 (Exh. 21); *see also id.* at 215:15–216:4 ("Q: So in 2014, when Mr. Boudreaux was prescribed Xarelto, you could not have used PT to monitor him? . . . A: I agree with that.").

In sum, Plaintiffs' own experts, including Mr. Gosselin—the expert they retained specifically for his laboratory assay expertise—acknowledge that PT cannot reliably and uniformly measure Xarelto. The Court thus cannot admit opinions premised on PT because "the reasoning or methodology underlying the testimony" is not "scientifically valid," as required under *Daubert*. *Wells*, 601 F.3d at 378 (quoting *Daubert*, 509 U.S. at 592–93); *see also Propulsid*, 261 F. Supp. 2d at 616 (excluding testimony where there was "too great an analytical gap between the data and the opinion proffered").

    **B.**    **The *Daubert* factors demonstrate that Plaintiffs' monitoring opinions are not reliable.**

The Supreme Court and the Fifth Circuit have deemed several factors relevant to the *Daubert* reliability inquiry: "whether [a theory or technique] can be (and has been) tested," whether

it "has been subjected to peer review and publication," the "known or potential rate of error," and "general acceptance" in the relevant scientific community.  *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 593–94); *see also Propulsid*, 261 F. Supp. 2d at 617 (recognizing same factors as indicia of reliability of expert opinion).  Those factors show that Plaintiffs' monitoring opinions are inadmissible.

### 1.       Plaintiffs' monitoring opinions are untested and lack any supporting data.

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry."  *Daubert*, 509 U.S. at 593 (internal quotation marks omitted).  Thus, to determine scientific validity, a "key question to be answered . . . is whether [the opinion] can be (and has been) tested."  *Id.*

It is undisputed that the proposed monitoring regimens—including using PT to identify patients for unapproved downward dose titration or discontinuation of Xarelto—have not been tested in clinical trials,[8] and that the efficacy and safety of monitoring therefore lacks a known or potential rate of error.[9]  Without any testing, Plaintiffs' experts cannot say how monitoring could, would, or should affect patient outcomes.  Dr. John Maggio, Plaintiffs' PK/PD expert, explains that the "trial that it would take to absolutely establish" that patient safety would in fact be

---

[8] *E.g.*, Plunkett Dep. 382:22–383:1 (Exh. 22) ("Q: Has there ever been any clinical trial comparing safety outcomes in a group that used rivaroxaban without monitoring to a group that used rivaroxaban with monitoring?  A: I don't believe I am aware of one.  No."); Rosing Dep. 48:2–5 (Exh. 18) (Q: "It has not been tested whether patient outcomes would, in fact, be improved through individualized dosing of rivaroxaban, has it?  A: I'm not aware of studies."); *id.* at 49:3–7 (Q: "There have been no clinical trials in which patients had their dose of Xarelto adjusted based on the results of a PT test or other monitor---  A: I'm not aware of that.").

[9] *E.g.*, Leissinger Generic Dep. 180:16–21 (Exh. 23) ("Q: Have you tested whether [your opinion that PT is a readily available test for identifying Xarelto-treated patients is] reliable?  A: I have not. . . . Q: So you don't know your error rate?  A: That's correct.").  *See also e.g., Peitzmeier*, 97 F.3d at 298 (affirming exclusion of expert testimony and observing that "there cannot be a known rate of error for . . . results" where expert "has not conducted any experiments or testing of any kind").

improved by monitoring Xarelto "has not yet been done."  Maggio Dep. 20:17–19 (Exh. 1).  As such, he admits that he doesn't "have any data that shows that in fact patient safety would be improved . . . through monitoring of rivaroxaban."  *Id.* at 21:12–16.  Likewise, Laura Plunkett, Ph.D., Plaintiffs' pharmacologist and toxicologist, says that she has *not* "formed the opinion that we have the data to prove that [patient safety would be improved through monitoring of rivaroxaban], because [Defendants] ha[ve]n't done the study."  Plunkett Dep. 374:16–24 (Exh. 22).  The same is true for Plaintiffs' expert Dr. Henry Rinder, a hematologist, who conceded that he has "*not* seen data developed that would . . . [enable him] to make a knowledgeable decision" about whether, "to a reasonable degree of medical certainty," he believes "that as a Xarelto patient's PT increases, he or she is at a greater risk of a fatal bleed."  Rinder Generic Dep. 253:11–22 (Exh. 24) (emphasis added).

Plaintiffs' expert opinions are even more unreliable where they recommend downward dose adjustments (based on PT results) to new doses not approved by FDA.  One of Plaintiffs' primary experts, Dr. Leissinger, flatly rejects such individualized dose adjustments:

> Q:  And based on the science and what we know now, in fact, you would not dose adjust down [based on PT]?
>
> A:  No I – as I said, I would not, because *I don't have enough information that would reliably tell me what to do.*

Leissinger Generic Dep. 168:23–169:2 (Exh. 23) (emphasis added).  In fact, in reference to whether she could "dose adjust [an] atrial fibrillation patient down" if she was "concerned about the elevated PT level," Dr. Leissinger recognizes "[t]hat would be very difficult to do, because I . . . don't know how to adjust Xarelto."  *Id.* at 166:2–6.  Similarly, Plaintiffs' regulatory expert Dr. David Kessler, testified that a PT measurement "does not allow a physician to titrate the dose in sequential the way that warfarin is used in sequential doses."  Kessler Dep. 317:4–7 (Exh. 25).

14

Moreover, dosing down to an unapproved level raises the grave concern of exposing atrial fibrillation patients to higher stroke risk.  Plaintiffs' experts admit that there are no data on how lower, unapproved doses affect stroke rates.  For instance, Dr. Rosing (who is not a medical doctor), says that if a patient presented with a PT of 21 seconds—a time above his proposed 20-second PT benchmark—he would recommend halving the patient's dose to 10 mg per day.  Rosing Dep. 230:6–232:23 (Exh. 18).  But he admits that there's "no scientific evidence" that 10 mg would provide sufficient stroke protection:

> Q: . . . And I don't want that high risk of bleeding, but I do want to prevent stroke.  So . . . can you show me, Doctor, that if I take 10 milligrams, that's going to be enough?
>
> A: Well, as long as it is not tested in atrial fibrillation patients, *there is no scientific evidence.*

*Id.* at 240:6–11 (emphasis added).

These admissions require the exclusion of Plaintiffs' experts' monitoring opinions.  "The hallmark of acceptable testimony turns on whether the scientific conclusion is testable and has been tested."  *Rhodes v. Bayer Healthcare Pharm., Inc.*, No. 10–1695, 2013 WL 1289050, at *3 (W.D. La. Mar. 26, 2013) (quoting *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 876 (W.D. Tex. 1997)).  As such, the Fifth Circuit "frown[s] on . . . conclusions bereft of statistically significant epidemiological support."  *Wells*, 601 F.3d at 380.  In the absence of any testing that establishes how monitoring—much less monitoring to give patients unapproved (and untested) doses of Xarelto—would affect patient outcomes, any testimony that monitoring would make Xarelto safer should be excluded.  *See Watkins*, 121 F.3d at 992 (affirming exclusion of expert because the "district court appropriately noted the lack of testing of any of the proposed [design] alternatives"); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (holding that district court appropriately found proposed experts unreliable, in part, because the experts "failed to test

15

their alternative designs"); *Propulsid*, 261 F. Supp. 2d at 615 (excluding opinions that were "[a]t best" only "untested hypotheses"); *Rhodes*, 2013 WL 1289050, at *4 (excluding opinion that prescription drug can cause peripheral neuropathy because expert "ha[d] never tested his theory" thereby rendering it "nothing more than a hypothesis").

> **2.      Plaintiffs' monitoring opinions have not been accepted in the scientific community.**

Plaintiffs' experts also admit that monitoring is not accepted in the relevant scientific, medical, or regulatory communities.  Indeed, they concede that they are unaware of any medical professional organization or society that has recommended using PT measurements to guide Xarelto patient therapy.[10]

Nor has FDA or any other U.S. government agency recommended monitoring—another fact that Plaintiffs' experts readily acknowledge.[11]  In fact, the FDA clinical reviewers for Xarelto expressly wrote the contrary: "Monitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes *cannot be recommended*."  Aug. 10, 2011 Clinical Review at 44 (Exh.

---

[10] Cuculich Dep. 230:25–231:5 (Exh. 19) ("Q: No professional medical societies have issued medical practice guidelines that recommend or require PT testing for Xarelto, correct?  A: That's correct.  None that I know of."); Parisian Dep. 617:1–9 (Exh. 27) ("Q: Do you know of any medical organization that agrees with your criticism of the Xarelto label and believes that PT information should be in the Xarelto label?  A: . . . in terms of PT, no, sir, I don't."); Bussey Dep. 259:10–13 (Exh. 16) ("Q: Do you know of any medical professional organization that has recommended using a PT test with rivaroxaban patients?  A: No."); Ix Dep. 299:10–14 (Exh. 28) ("Q: Now, is any medical society that you're aware of endorsed a monitoring plan or protocol for patients taking Xarelto who have decreased renal function?  A: No.  Not that I'm aware of."); Leissinger Generic Dep. 185:12–18 (Exh. 23) ("Q: You agree that there are no professional medical societies that have issued medical practice guidelines that recommend or require PT testing for Xarelto, correct?  A: . . . as far as I know, I have not seen it.").

[11] Cuculich Dep. 231:22–25 (Exh. 19) ("Q: . . . You're not aware of any regulatory authority that has recommended the use of PT to monitor Xarelto, correct?  A: Correct."); Rinder Generic Dep. 33:6–13 (Exh. 24) (Q: . . . [Y]ou agree that there's no public health organization or regulatory body who has recommended a specific reasonable and conservative cutoff point . . . for which Xarelto should be discontinued using PT, right?  . . . A: They have not yet reached that conclusion as yet."); Bussey Dep. 257:15–20 (Exh. 16) ("Q: . . . [T]here's no government agency, at least in the United States, who's ever recommended to physicians using a PT test to help them care for rivaroxaban patients, is there?  A: Not that I'm aware of."); Leissinger Generic Dep. 185:3–5 (Exh. 23) ("Q: You agree that the FDA does not recommend or require PT testing for Xarelto, correct?  A: Correct.").

16

26) (emphasis added).[12]

Finally, Plaintiffs' experts correctly admit that there is no FDA-approved laboratory

assay—be it PT or another test—to measure Xarelto's anticoagulant effects:

> Q: And you know that currently there is no FDA-approved standardized test or
> device that can measure the drug level of Xarelto in a patient's blood or a surrogate
> blood test that can assess the degree of anticoagulation with Xarelto use, correct?
>          . . .
> A: I know that there is no recommended FDA-approved test to do that.

Leissinger Generic Dep. 184:6–13 (Exh. 23); *see also, e.g.*, Ix Dep. 316:2–6 (Exh. 28) (admitting

a lack of awareness of such FDA-approved tests); Kessler Dep. 310:12–311:2 (Exh. 25)

(explaining that although tests are available to measure PT, it's true that there are no approved

devices to measure the effect or concentration of direct oral anticoagulants).

### 3. Plaintiffs' monitoring opinions were developed exclusively for litigation and have not been subject to peer review and publication.

Finally, Plaintiffs' experts' (1) failure to publish their opinions, (2) failure to implement

monitoring in their medical practices, and (3) unfamiliarity with the issues prior to being contacted

by Plaintiffs' counsel, weigh against admission.

In resolving *Daubert* questions, "[c]ourts have . . . considered whether experts are

'proposing to testify about matters growing naturally and directly out of research they have

conducted independent of the litigation, or whether they have developed their opinions expressly

for purposes of testifying.'" *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654,

661–62 (E.D. La. 2016) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th

Cir. 1995) ("*Daubert II*")).  This Court has previously emphasized the fact that an expert's

---

[12] The clinical reviewers wrote that monitoring could not be recommended "due to a lack of information regarding: within patient-variability of PT measurements on this drug in the setting of a short half-life and rapidly changing PD effects over each 24 hour period, and what action to recommend to the medical provider based on PT results, given that only a single dose was tested in ROCKET."  Aug. 10, 2011 Clinical Review at 44 (Exh. 26).

"theories have not been . . . subjected to peer review and publication" is a factor making testimony unreliable. *Propulsid*, 261 F. Supp. 2d at 617; *see also Wells*, 601 F.3d at 378, 380–81 (affirming district court's exclusion of plaintiff's expert because, among other reasons, the expert's theory "ha[d] not been subjected to peer review and publication"). Publication of a theory boosts reliability because the acceptance of research "for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists" and such "[s]crutiny of the scientific community is a component of good science." *Daubert II*, 43 F.3d at 1318 (internal quotation omitted).

Here, the experts haven't published their monitoring opinions, lack prior familiarity with the issues, and haven't implemented monitoring—or stopped prescribing Xarelto—in their own clinical practices. All of those facts demonstrate that they developed their monitoring opinions solely for this litigation.

To give just a few examples, Plaintiffs' expert Dr. Cuculich says that he is "comfortable with giving [his patients]" Xarelto, once "they've thought about the risks and benefits." Cuculich Dep. 111:11–19 (Exh. 19). He does not recommend against Xarelto. *Id.* at 110:9–15 ("Q: But for those patients that say to you, 'I'm going to choose Xarelto over warfarin,' do you recommend against taking Xarelto? A: No. If we go through the choices and that's the choice that they would like to have, I'm comfortable with that.").

So too, Plaintiffs' expert Dr. Leissinger, who opines that monitoring could improve patient safety, Leissinger Generic Rep. at 2 (Exh. 10), says that she does not monitor any of the Xarelto patients in her own practice using PT or any other test. *See* Leissinger Generic Dep. 193:4–8 (Exh. 23). She further states that before she met with Plaintiffs' counsel, she had never researched the available PK or PD data on Xarelto. *Id.* at 62:10–14. She also has not published her views on

18

monitoring or presented them.  *Id*. at 81:24–82:2.

Similarly, Plaintiffs' expert Dr. Joachim Ix, a nephrologist, testifies that he "first learned about the relationship of rivaroxaban blood concentrations in PT through [his] work in reviewing literature for . . . [his] deposition."  Ix Dep. 296:12–16 (Exh. 28).  He does not know if there are Xarelto patients in his clinical practice who have had elevated PT values, *see id*. at 296:9–20, which is the very thing that the experts say should be monitored.

Likewise, Plaintiffs' expert Dr. Plunkett has never postulated her untested opinions in any other forum.  Plunkett Dep. 166:19–23 (Exh. 22) ("Q: . . . And you've never offered these opinions that you're offering in your report in this litigation anywhere else other than in this litigation.  Is that fair?  A: At this point in time that is true.  Yes.").  Despite offering opinions about whether Xarelto can be monitored, she has never published anything on assays or whether a particular assay could be used to measure an anticoagulant.  *See id*. at 270:12–21 ("Q: [H]ave you ever published a peer-reviewed article on PT assays or any assay related to anticoagulation?  A: No.  I have not done that.  Finally, she formed her opinions only after she was retained by Plaintiffs' counsel.  *See id*. at 168:1–15 (Q: "With respect to your opinion specifically about Xarelto in your opinion section, those were opinions that you formed after you were hired and --- to do your in-depth review by the plaintiffs' lawyers.  Is that fair? . . . A: Certainly they were formed after my in-depth review. . . . Q: And the in-depth review occurred after you spoke to Mr. McWilliams and he retained

19

you for this litigation?  A: Yes, that is true.").[13]

All of the above facts—including lack of publication, unfamiliarity with the issues before retention, and prescribing Xarelto despite the purported concerns—further indicate that the monitoring opinions are unreliable.

* * *

Putting aside the lack of reliability generally, the monitoring opinions also fail *Daubert*'s relevance (or "fit") requirement in the Orr and Boudreaux cases.  As explained in Defendants' case-specific *Daubert* motion, Plaintiffs cannot demonstrate that the proposed monitoring testimony "properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 593, given the PT data in the Orr and Boudreaux cases.  *See* Defs.' Joint *Daubert* Mot. to Exclude Ops. & Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the Orr & Boudreaux Cases.

## II.   The Court should exclude testimony that it would be safer to dose Xarelto twice-daily rather than once, as indicated.

FDA approved Xarelto for stroke prevention with once-daily dosing.  The safety and efficacy of once-daily dosing was scientifically proven in the pivotal Phase III ROCKET AF trial that supported approval of Xarelto's stroke prevention indication.  Twice-daily dosing of Xarelto has never been tested in atrial fibrillation patients to reduce the risk of stroke.

---

[13] *See also, e.g.*, Rinder Generic Dep. 49:18–50:3 (Exh. 24) ("Q: Can we agree that you have not presented the opinion that Xarelto should be discontinued in patients whose PT is greater than 20 seconds at any national conference? . . . A: We have not yet presented that data or opinion at a national conference."); Cuculich Dep. 227:13–17 (Exh. 19) ("Q: The opinion that you have that PT is a reliable test for identifying Xarelto patients at the highest risk of bleeding, you haven't published that opinion, correct?  A: No, that's correct."); Parisian Dep. 580:1–8 (Exh. 27) ("Q: Am I right that everything you learned about the dosing of Xarelto you learned after you had been retained by the plaintiffs in this litigation? . . . A: About the dosing, yes, sir.  And based on the information I'm reading in Bayer's documents by their pharmacokinetics people."); Backes Dep. 26:6–15 (Exh. 2) ("Q: Have you published any scientific articles about Xarelto?  A: No.  Have you given any scientific talks or presentations about Xarelto?  A: No.  Q: And if I could expand that, have you conducted any scientific studies about any anticoagulant medication?  A: No.").

Despite the admitted absence of any clinical data on twice-daily Xarelto dosing, several of Plaintiffs' experts speculate that dosing BID rather than OD, as indicated, would theoretically improve Xarelto's safety generally.[14] With no data on BID dosing, the thrust of Plaintiffs' dosing theory is that Defendants should have assessed twice-daily dosing in their clinical trials. That is not a permissible basis under *Daubert* for admission. *Propulsid*, 261 F. Supp. 2d at 615–16 (recognizing "the difficulties facing the plaintiff's experts in conducting their own tests and compiling data," but nonetheless excluding causality opinions based on lack of testing and insufficient data in support). *See also Bextra & Celebrex*, 524 F. Supp. 2d at 1181. Testimony about the superiority of twice-daily dosing must be excluded because it is completely speculative and unreliable.

Plaintiffs' theory primarily rests on the higher "peak" blood concentrations of Xarelto (shortly after taking the pill) and lower "trough" concentrations (immediately before taking the next dose) when a patient takes a 20 mg Xarelto pill once per day, compared (they say) to a hypothetical patient taking an unapproved 10 mg dose twice per day. Plaintiffs' experts acknowledge, however, that it cannot be assumed that lower peak and higher trough concentrations are associated with a lower bleeding risk. Just the opposite; bleeding risk could well be *greater* with BID dosing. The FDA clinical reviewers noted, based on modeling, that "a BID dosing schedule with its *higher trough* values [compared to OD dosing] *might exacerbate . . . bleeding proclivity*." Aug. 10, 2011 Clinical Review at 34 (Exh. 26) (emphasis added). Plaintiffs' expert Dr. Maggio agrees that the FDA reviewers meant "that it's possible that bleeding would be worse

---

[14] *See, e.g.*, Backes Rep. at 2, 12 (Exh. 3); Cuculich Rep. at 13–14 (Exh. 5); Gertsman Rep. at 7 (Exh. 6); Leissinger Generic Dep. 84:8–14 (Exh. 23); Parisian Rep. at 14 (Exh. 12); Rosing Rep. at 5, 21 (Exh. 15). Dr. Backes opines that Xarelto would be safer with "either multiple dosing . . . *or* development of a time-released formulation of Xarelto." Backes Rep. at 12 (Exh. 3) (emphasis added). Defendants' dosing arguments also apply to Backes' assertions about the safety of a time-released formulation of Xarelto.

21

with a twice-daily regimen."   Maggio Dep. 233:18–24 (Exh. 1); *see also id.* at 234:1–24 (discussing scientific literature regarding trough concentrations as the best predictor of bleeding risk and agreeing that, in that case, more bleeding would be expected with BID, than with OD, dosing).

The experts also recognize that patient compliance is poorer with BID dosing, compared to the approved OD regimen.  Dr. Backes, for example, says that there are legitimate "concerns about [patient] compliance with twice daily dosing."  Backes Dep. 204:3–22 (Exh. 2) ("Q: You don't have any clinical outcome evidence that twice daily dosing would improve safety or – efficacy do you? . . . A: I haven't done . . . any of the clinical studies myself. . . . though, you know, . . . it's also my understanding from this one paper that I read that compliance – that there are concerns about compliance with twice daily dosing.").  Dr. Leissinger likewise acknowledges data showing that patients are more likely to take medications that are prescribed once-daily.  *See* Leissinger Generic Dep. 92:9–21 (Exh. 23) ("Q: Doctor, you're familiar with patient compliance, right?  A: Very much so. . . . A: . . . No drug works if it's not taken.  Q: . . . And particularly in medicines that are taken to be long-term . . . there is data out there showing that a once-a-day drug has much better compliance than a twice-a-day drug or three-times-a-day drug, right?  A: There is. I'm sure there's some data on that, yes.").

Plaintiffs' experts thus agree that the proposed superiority of BID dosing is an unconfirmed supposition that requires testing: "In order to determine whether or not twice daily dosing . . . would improve safety and/or efficacy, *you would have to conduct large studies* in patients and perform the statistical analyses and see the comparison."  Backes Dep. 206:19–25 (Exh. 2) (emphasis added).  Because that testing has not been done, opinions and testimony regarding the safety and efficacy of BID dosing must be excluded.  As just a few examples:

22

- Plaintiffs' expert Dr. Cuculich says: "For the indication of stroke prevention in atrial fibrillation, we have no data on twice-daily versus once-daily dosing at this point." Cuculich Dep. 136:22–25 (Exh. 19).

- While agreeing that clinical trial data are necessary, Plaintiffs' expert Dr. Wayne Backes concedes that there are no data on the safety and efficacy of BID dosing. Backes Dep. 207:1–3 (Exh. 2).  He also has no clinical data to support a time-released formulation; he only "put that in [his report] as a suggestion."  *Id.* at 205:19–24.  He further explains that there are "positives and negatives" associated with both BID and OD dosing.  *Id.* at 204:23–25.

- Dr. Rosing acknowledges that the hypothesis that twice-daily dosing might be safer and more effective "has not been proven," but is just "a suggestion."  Rosing Dep. 174:12–25 (Exh. 18).

- Likewise, Plaintiffs' expert Dr. Maggio testifies that "[w]e don't have data to address . . . experimentally" whether an alternative dosing regimen "would reduce bleeds without increasing stroke."  Maggio Dep. 49:13–20 (Exh. 1).

- Plaintiffs' expert Dr. Leissinger says the same:

  Q:  And so the only way for you to have an opinion to a reasonable degree of medical certainty that BID dosing in an atrial fibrillation patient versus OD dosing is safer and more effective would be to actually have that data and make the comparison?

  A:  That's correct.

  Q:  And you're saying that you don't have that data, correct?

  A:  I'm saying that.

Leissinger Generic Dep. 106:21–107:5 (Exh. 23).

In the absence of data on BID dosing of Xarelto in atrial fibrillation patients, it also follows that the BID dosing theory has not been evaluated in light of known or potential rates of error. *E.g., Peitzmeier*, 97 F.3d at 298.  Nor have Plaintiffs' experts published papers concluding that dosing Xarelto BID rather than OD, as indicated, would be safer and more efficacious.  Nor, of course, has FDA approved twice-daily dosing for patients who take Xarelto to prevent stroke.  *See Watkins*, 121 F. 3d at 989 (allowing courts to consider whether a theory has been tested and subjected to peer review and publication as well as the known or potential rate of error and general

23

acceptance).

Finally, Plaintiffs have not offered reliable expert testimony that BID dosing would have made a difference for either Mr. Boudreaux or Mrs. Orr.  *See Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1250 (M.D. La. 1996) (testimony excluded where expert could "not even opine that the use of the device could have prevented the accident.").

For all of these reasons, opinions about the relative safety and efficacy of BID dosing, compared to the approved OD dosing, should be excluded.

**III.    The Court should exclude testimony that a lower total daily dose would be safer than the approved dose to prevent stroke in atrial fibrillation patients.**

The FDA-approved dose of Xarelto to reduce atrial fibrillation stroke risk is 20 mg (or 15 mg for patients with renal impairment).  Several of Plaintiffs' experts speculate that Xarelto would be safer if it were prescribed at some unspecified lower total daily dose.[15]  Any testimony that the approved doses are too high, or that a lower total daily dose would improve bleeding rates or have resulted in a better outcome for either Mrs. Orr or Mr. Boudreaux, is unreliable and should be excluded under *Daubert*.

As Plaintiffs' expert Dr. Rosing explains, lowering a patient's dose of Xarelto is not just a matter of potentially reducing the risk of bleeding but also of *increasing* that patient's risk of a stroke: "[A]t a certain point you come at a dose, and I don't know this dose, *where you've lost your efficacy with respect to stroke prevention*.  And that is actually the meaning of why you give a patient [Xarelto].  You want to protect [against] strokes." Rosing Dep. 109:21–25 (Exh. 18) (emphasis added).  As such, in offering opinions about reducing bleeding risk with a lower dose of Xarelto, Plaintiffs' experts must consider the countervailing effect on stroke risk.

---

[15] *See, e.g.*, Backes Rep. at 11 (Exh. 3); Parisian Rep. at 9, 14 (Exh. 12); Plunkett Dep. 599:22–601:4 (Exh. 22); Rosing Rep. at 5, 21 (Exh. 15); Smart Rep. at 5–6 (Exh. 29).

The court in *Conklin v. Novartis Pharmaceuticals Corporation*, No. 9:11-CV-178, 2012 WL 4127295 (E.D. Tex. Sept. 18, 2012), discussed in detail why any admissible expert opinion regarding alternative dosages must include a factual showing that efficacy will be maintained. That is, experts must demonstrate that the proposed dose will improve the overall risk/benefit profile of a drug, not just its safety; admissible dosage opinions must be supported by an evaluation of how the new dose will affect the therapeutic benefits of the medicine.

In *Conklin*, the court excluded expert testimony about an alternative dosage for a cancer medication because there were no data that the efficacy would remain the same at a lower dose:

> It is not helpful to the finder of fact for [the expert] to state that a drug used to fight cancer-related diseases has a particular negative side effect, and that reducing the dosage and/or frequency of that drug will reduce the occurrence of the negative side effect. Rather, [the expert] must also *provide some factual support* that reducing the dosage and/or frequency of that drug will not only reduce the occurrence of the negative side effect, but will also be effective at fighting cancer-related diseases.

. . . .

> By way of analogy, studies might show that a dose of two aspirin every four hours alleviates a headache, but results in a 20% risk of stomach bleeding. One might hypothesize that a safe alternative design would include reducing the dosage or increasing the interval between doses. But there is a significant analytical gap between this hypothetical alterative [sic] dosage/frequency regime, and actually demonstrating that similar headache relief could be obtained.

*Id.* at *10 (emphasis in original).

Accordingly, the experts must reliably demonstrate that a particular lower dose will reduce bleeding risk *and* provide the same stroke protection. *See id.* The experts cannot do so for at least two reasons.

*First*, Plaintiffs' experts do not identify a proposed lower dose and cannot identify a minimum Xarelto concentration that provides sufficient stroke protection. As such, any testimony about the superiority (or the propriety) of an unspecified, hypothetical lower dose is speculative,

as the experts do not know the boundaries of Xarelto's therapeutic range.  Without a proposed

lower dose—or the data on which to base such an opinion—the experts' alternative dose opinions

are nothing but inadmissible "conceptual suggestions."  *See Guy v. Crown Equip. Corp.*, 394 F.3d

320, 327 (5th Cir. 2004).  *Second*, even if Plaintiffs' experts had identified a proposed lower dose,

their opinions would not be reliable under *Daubert*, because such unapproved doses have not been

tested for stroke prevention in atrial fibrillation patients.

### A.    Plaintiffs' experts cannot identify an appropriate alternative Xarelto dose.

Plaintiffs' expert opinions favoring an alternative, unapproved Xarelto dose are remarkable

for failing to include anything about what they think a better dose would actually be:

> Q: My question, Dr. Rosing, is: Are you offering any opinion on what the alternative
> dose of rivaroxaban should be?
>
> A: Not in numbers.
>
> Q: Your opinion is that it should be lower, but you are not offering an opinion about
> how much lower, correct?
>
> A: We can start a kind of discussion about what I think I would try in a dose-finding
> trial, but this is, let's say, my personal opinion.
>
> Q: It's not based on scientific evidence?
>
> A: *It is not based on scientific evidence*.

Rosing Dep. 40:17–41:3 (Exh. 18) (emphasis added).  *Not one* of Plaintiffs' experts is willing to

opine on what alternative dose they would propose.  Nor could Plaintiffs' experts propose an

alternative dose when they have also disclaimed the ability to identify the therapeutic range for

Xarelto, either in terms of the maximum acceptable concentration (with respect to bleeding risk)

or the minimum effective concentration (for adequate stroke protection).[16]

To "rise to the level of an admissible expert opinion," testimony on an alternative dosage requires more than "conceptual suggestions" about a lower dose; it requires a "specific design" alternative. *See Guy*, 394 F.3d at 327. Here, Plaintiffs' experts' inability to propose a preferred lower dose of Xarelto renders the testimony unhelpful to the jury and inadmissible. *See Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005) (finding that expert's "failure to present and test an alternative design justifies the conclusion of the district court that [the expert's] testimony would not aid the trier of fact").

### B. Lower doses have not been tested for the stroke risk reduction indication, and there are no data on how a lower dose would affect stroke protection.

Even if Plaintiffs' experts had proposed an alternative dosage, it would have to be tested in dose-ranging studies or a full-scale clinical trial to determine whether it would be efficacious. *Watkins*, 121 F.3d at 992 (observing that "district court appropriately noted the lack of testing of any of the proposed alternative[] [designs]").

Plaintiffs' experts admit as much. They agree that "there's good data really on only one dose, the one that was used in the Phase III trial." Maggio Dep. 48:22–24 (Exh. 1). They also agree that "to establish or conclude about a minimum effective dose, *you have to do dose-ranging studies* for the particular disease that you'd like to prevent . . . ." Rosing Dep. 33:14–17 (Exh. 18) (emphasis added). And finally, they agree that "until you do a dose-finding study, it is difficult to draw a definite conclusion what would be the minimal dose that is effective." *Id.* at 40:12–14; *see also* Plunkett Dep. 280:11–13 (Exh. 22) ("We don't have dose-response data in [atrial fibrillation]

---

[16] *See, e.g.*, Backes Dep. 77:6–14 (Exh. 2) ("Q: . . . What number, what magnitude between minimum and maximum concentration for Xarelto would be acceptable, in your opinion? . . . A: It's -- I do not have the data to be able to come up with a number."); Plunkett Dep. 285:12–22 (Exh. 22) ("Q: . . . You are not offering an opinion about the plasma concentrations that define a therapeutic range for rivaroxaban. Is that fair? . . . A: . . . There is no answer to that question because we don't have the data to – to define that.").

patients in order to calculate an exact therapeutic index.").

Critically, Plaintiffs' experts also admit that there are no data establishing that a lower dose would, in fact, be safe and effective for stroke prevention. Plaintiffs' expert Dr. Maggio concedes that "there's no data" on other doses and that "[w]e don't have data to address . . . experimentally" whether "an alternative dose of rivaroxaban . . . would reduce bleeds without increasing stroke." Maggio Dep. 49:1–9, 13–20 (Exh. 1). So too, according to Dr. Rosing, "as long as there is not a dose-finding study in atrial fibrillation patients . . . I cannot tell you what dose – how low the dose can be to get optimal protection of stroke." Rosing Dep. 111:18–23 (Exh. 18). These concessions also mean that Plaintiffs' experts cannot say that a lower dose would have led to a better result in the cases brought by the Orr or Boudreaux plaintiffs. *See Tassin*, 946 F. Supp. at 1250.

For all of these reasons—because Plaintiffs' experts have not even identified what they believe to be an appropriate dose, let alone tested the safety and efficacy of such a dose—testimony about the safety and efficacy of alternative and unapproved doses should be excluded. *See Kruszka v. Novartis Pharms. Corp.*, 19 F. Supp. 3d 875, 887–88 (D. Minn. 2014) (holding that expert could not testify to "the results or efficacy of differing dose and duration," because he did not show the application of valid methodology with respect to testimony about "whether dosage changes impact the efficacy of the drugs at issue").

## CONCLUSION

For all of the reasons stated above, pursuant to Federal Rule of Evidence 702 and *Daubert*, the Court should exclude any expert testimony and opinions regarding (1) the use of monitoring or individualized dosing with Xarelto; (2) the alleged improved safety of Xarelto with twice-daily dosing; and (3) the alleged improved safety of Xarelto with a lower total daily dose than the approved doses.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson*

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163

29

Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 20th day of January, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

*/s/      John F. Olinde*

30

2845591-1