# Exhibit 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)          MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                       SECTION L

THIS DOCUMENT RELATES TO:              JUDGE ELDON E. FALLON

Joseph J. Boudreaux, Jr., et al. v. Janssen et al.   MAGISTRATE NORTH
Case No. 2:14-cv-02720

Joseph Orr, Jr., et al. v. Janssen Research &
Development, LLC et al.
Case No. 2:15-cv-03708


### DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR *DAUBERT* MOTIONS TO EXCLUDE EXPERT OPINIONS AND TESTIMONY REGARDING (1) UNAPPROVED DOSING AND MONITORING REGIMENS AND (2) THE EXPERTS' 20-SECOND PT CUT-OFF GUIDELINE IN THE *ORR* AND *BOUDREAUX* CASES


### [FILED UNDER SEAL]

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.     The Court Should Grant Defendants' Motion To Exclude The Three Dosing and Monitoring Opinions That Plaintiffs Have Declined To Defend. ....................................... 2

II.     Defendants' *Daubert* Motions Are Procedurally Proper. ...................................... 3

III.     Plaintiffs' Theory That Neoplastin Should Be Used To Assess Bleeding Risk To Determine If A Patient Should Take Xarelto Is Inadmissible Under *Daubert*. .................. 5

      A.     Plaintiffs' Abstract PT Opinion Is Not Helpful To Jurors And Therefore Not Relevant Under *Daubert*. ....................................................................................... 7

      B.     Plaintiffs' Theories About The Use Of PT Tests To Improve Patient Care Are Untested, Not Peer-Reviewed, Not Generally Accepted, And Unworkable. .......... 9

           1.     No clinical trial or study has examined whether PT testing can be used to improve patient outcomes. ............................................................................ 9

           2.     The theory that PT results should be used to determine whether a patient's bleeding risk warrants Xarelto discontinuation has never been published or subject to peer review. ............................................................................... 10

           3.     The theory that PT results can be used to improve patient outcomes is not generally accepted. ...................................................................................... 11

           4.     Using a PT test to improve patient care remains infeasible due to the conceded variation in Neoplastin PT results across labs and batches. ..... 11

IV.     Plaintiffs' PT Opinion Is Inadmissible In The *Orr* And *Boudreaux* Cases. ...................... 12

      A.     The PT Opinion Cannot Be Applied To The Facts Of The *Orr* And *Boudreaux* Cases. ................................................................................................................. 13

      B.     Dr. Rinder's Opinion Regarding Mr. Boudreaux's Equivalent Neoplastin PT Value Is Unreliable. .................................................................................................... 14

CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Bradley v. Cooper Tire & Rubber Company*,
   4:03-cv-94 LN, 2005 WL 5989799 (S.D. Miss. Oct. 25, 2005) .................................................. 5

*Cain v. Transocean Offshore Deep Water Drilling, Inc.*,
   No. 03-1372, 2008 WL 4360881 (W.D. La. Sept. 24, 2008) ...................................................... 2

*Centerpoint Energy Houston Elec. LLC v. Harris Cnty. Toll Rd. Auth.*,
   246 F. App'x 286 (5th Cir. 2007) ............................................................................................. 2

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .................................................................................................. 11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .................................................................................................... 9, 10, 13

*Guy v. Crown Equip. Corp.*,
   394 F.3d 320 (5th Cir. 2004) .................................................................................................... 7

*Hill v. Koppers Indus.*,
   No. 3:03-CV-60-P-D, 2009 WL 3246630 (N.D. Miss. Sept. 30, 2009) ................................... 14

*In re Bextra & Celebrex*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) .................................................................................... 9

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*,
   2004 WL 315148 (S.D. Ind. Jan. 1, 2004) ................................................................................ 5

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
   767 F. Supp. 2d 649 (E.D. La. 2011) ........................................................................................ 3

*In re Nuvaring Prod. Liab. Litig.*,
   No. 4:08-MD-1964 RWS, 2013 WL 856218 (E.D. Mo. Mar. 5, 2013) ..................................... 5

*In re Vioxx Prod. Liab. Litig.*,
   401 F. Supp. 2d 565 (E.D. La. 2005) ........................................................................................ 4

*In re Vioxx Prods. Liab. Litig.*,
   414 F. Supp. 2d 574 (E.D. La. 2006) ...................................................................................... 13

*Jenkins v. Slidella LLC*,
   No. 05-370, 2008 WL 2649510 (E.D. La. June 27, 2008) .......................................................... 2

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) ........................................................................ 9

*Sobrino-Barrera v. Anderson Shipping Co.*,
  495 F. App'x 430 (5th Cir. 2012) ................................................................ 15

*United States v. Hoang*,
  891 F. Supp. 2d 1355 (M.D. Ga. 2012) ........................................................ 7

*Watkins v. Telsmith, Inc.*,
  121 F.3d 984 (5th Cir. 1997) ...................................................................... 10

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) ...................................................................... 10

**Statutes**

28 U.S.C. § 1407 ............................................................................................. 3

**Rules**

Federal Rule of Evidence 702 ...................................................................... 2, 4

## INTRODUCTION

Defendants' generic *Daubert* motion (Dkt. No. 5113) demonstrated that there is no sound scientific basis for the following opinions offered by numerous Plaintiffs' experts:

(1) that laboratory assays that measure pharmacological parameters, including prothrombin time ("PT"), could be used for dose adjustment in Xarelto patients or as a means to monitor patients throughout the duration of treatment;

(2) that Xarelto may be safer if dosed twice-daily rather than once-daily, as approved by FDA; and

(3) that Xarelto might be safer at a lower total daily dose than those approved by FDA. Rather than defend those positions, Plaintiffs' opposition abandons them.[1]  As such, Defendants' motion should be granted and the Court should rule that the experts may not offer testimony as outlined above.

Plaintiffs now say that the *only* challenged opinion that any expert will offer related to dosing or monitoring is that Neoplastin PT results (measured 14 hours after dosing) should be used by physicians to assess the potential bleeding risk in patients new to Xarelto "and thereby decide, along with the patient, whether to accept that risk" or discontinue Xarelto.  Pls.' Br. (Dkt. No. 5641) at 11; *see also*, *e.g.*, *id.* at 13 ("Neoplastin PT can be used to evaluate that risk in order for a physician to make a clinical judgment whether to accept any of that risk or to discontinue therapy with Xarelto").

This reformulated opinion fares no better than the old ones.  To start with, Plaintiffs' new articulation of their PT theory is too vague to be helpful to the jury, as required by *Daubert* and

---

[1] As an exhibit to Defendants' Reply in Support of Their Joint Motion for Partial Summary Judgment on the Ground That Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design-Related Claims, Defendants have provided the Court a proposed order dismissing each of the various claims and theories that Plaintiffs have now expressly renounced or abandoned.

1

Federal Rule of Evidence 702.  Further, for the same reasons explained in Defendants' opening

brief, the hypothesis that early PT testing could be used to determine which patients should take

Xarelto is untested, lacks a known error rate, has not been peer-reviewed, and is not generally

accepted in the relevant scientific community.  Lacking a sound scientific basis, it cannot pass the

*Daubert* reliability bar.

With respect to Defendants' case-specific *Daubert* motion to exclude opinions about a 20-

second PT cut-off in the *Orr* and *Boudreaux* cases (Dkt. No. 5114), Plaintiffs' response does not

explain how the proposed cut-off, measured 14 hours after dosing and only with the Neoplastin

reagent, "fits" the facts of those two cases.  There is no evidence that either Mrs. Orr or Mr.

Boudreaux ever had a PT test under the required conditions (let alone a 20-second result).

## ARGUMENT

**I.     The Court Should Grant Defendants' Motion To Exclude The Three Dosing and Monitoring Opinions That Plaintiffs Have Declined To Defend.**

Plaintiffs' failure to argue for the admissibility of the challenged dosing and monitoring

opinions amounts to a concession that they do not meet *Daubert*'s admissibility standards.  The

Court should accordingly grant Defendants' motion as to those opinions.[2]

Plaintiffs' representation that they will not offer the opinions at trial does not render

Defendants' motion moot.  Contrary to what Plaintiffs say in their brief, the three abandoned

opinions outlined above are disclosed in numerous Rule 26 expert reports that provide generic

disclosures for purposes of every case in the MDL and the state court jurisdictions in which they

---

[2] *See, e.g.*, *Centerpoint Energy Houston Elec. LLC v. Harris Cnty. Toll Rd. Auth.*, 246 F. App'x 286, 289 (5th Cir. 2007) (district court correctly awarded prejudgment interest "based on its view that [plaintiff's] request was 'unopposed' and 'undisputed'" when defendant failed to respond to plaintiff's argument); *Cain v. Transocean Offshore Deep Water Drilling, Inc.*, No. 03-1372, 2008 WL 4360881, at *6 n.3 (W.D. La. Sept. 24, 2008) (plaintiff "concede[d] the point" when he failed to respond); *see also Jenkins v. Slidella LLC*, No. 05-370, 2008 WL 2649510, at *6 (E.D. La. June 27, 2008) (excluding testimony under *Daubert* when party failed to respond to arguments).

will be adopted.[3]   Absent a ruling by the Court, these disclosures could permit any MDL or state court plaintiff to seek the introduction of the disclaimed opinions before any number of other courts, necessitating duplicative motion practice and rulings.

The role of the MDL court, however, is to decide motions on common topics, including the admissibility of generic expert opinions, to provide a single, consistent ruling for the benefit of every case in the MDL.  *See In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 672 (E.D. La. 2011) (resolving claims in a "consistent and efficient fashion," including by "prevent[ing] duplicative and inconsistent rulings" is the "very basis of 28 U.S.C. § 1407" allowing consolidated actions managed by the MDL judge).  Accordingly, in order to resolve the common issue now and prevent changes in later MDL cases, the Court should enter an order excluding the three dosing and monitoring opinions that Plaintiffs have abandoned.

## II.      Defendants' *Daubert* Motions Are Procedurally Proper.

Plaintiffs cannot avoid a ruling on their experts' opinions with a "procedural" argument that Defendants should have filed more than a dozen separate briefs all making the same arguments.  *See* Pls.' Br. 7–10.  Defendants' opening brief in support of the generic *Daubert* motion demonstrated that Plaintiffs' three key dosing and monitoring opinions are unreliable and inadmissible no matter which expert serves as the mouthpiece.  Defendants' case-specific *Daubert*

---

[3] Defendants' opening brief includes comprehensive citations to the pages of each expert's report that contain the three theories that Plaintiffs have now dropped.  *See* Defs.' Br. at 7 n.4 (periodic monitoring with PT tests or using PT to adjust doses), 21 n.14 (twice-daily dosing), 24 n.15 (lower total daily dose).  To give just a few examples, Dr. Rosing opined that for "patients with PT values > 19.8 sec[onds], determined ~ 14 hours after rivaroxaban administration, either the dose of rivaroxaban has to be reduced . . . or the rivaroxaban must be discontinued."  Rosing Rep. at 21 (Exh. 15 to Dkt. No. 5113).  Dr. Cuculich wrote: "Rivaroxaban is . . . better twice-daily" because "a twice-daily dosing strategy intuitively provides a more consistent drug effect without risks of 'overshoot.'"  Cuculich Rep. at 13 (Exh. 5 to Dkt. No. 5113).  Dr. Backes opined that Xarelto would be safer with "either multiple dosing . . . or development of a time-released formulation of Xarelto."  Backes Rep. at 12 (Exh. 3 to Dkt. No. 5113).  Dr. Parisian expressly stated that a "safer alternative design" for Xarelto would be "primarily, a lower dose pill with periodic laboratory testing that would reduce the risk of bleeding."  Parisian Rep. at 14 (Exh. 12 to Dkt. No. 5113). Dr. Smart's opinion was that the "dose of Xarelto currently marketed for atrial fibrillation is too high."  Smart Rep. at 5 (Exh. 29 to Dkt. No. 5113).

brief similarly showed that testimony by some of the same experts regarding a proposed 20-second PT cut-off does not "fit" the facts of the *Orr* and *Boudreaux* cases, regardless of which expert sponsors the theory.  Defendants specifically cited the relevant pages of *every* expert report or deposition transcript disclosing the opinions at issue.  *See* Defs.' Br. (Dkt. No. 5113-8) at 7 n.4, 21 n.14, 24 n.15; Defs.' Case-Specific Br. (Dkt. No. 5114-6) at 2.

Defendants' motions do not rely on Plaintiffs' experts' lack of qualifications.  And with the exception of Dr. Rinder's supposed PT conversion method, addressed in the case-specific *Daubert* brief on pages 5 through 8, Defendants do not contest in these motions the specific methodology that any particular expert employed.  Rather the opinions at issue all fail for exactly the same reasons: the generic opinions do not meet *Daubert*'s reliability criteria (*i.e.*, testing, publication, general acceptability, and a known error rate) and amount to nothing but raw speculation about how patient outcomes might be improved by unapproved dosing and monitoring regimens, and the 20-second PT cutoff opinion simply has no relevance to the facts of the *Boudreaux* and *Orr* cases.

In light of these common defects and Defendants' decision not to make arguments unique to particular experts, it was simply more efficient to present the Court with just two motions.  Nothing in Rule 702 or *Daubert* requires, as Plaintiffs seem to suggest, 14 separate briefs making the same arguments over and over.  Indeed, this Court has previously permitted Defendants' approach to *Daubert* issues.  *See In re Vioxx Prod. Liab. Litig.*, 401 F. Supp. 2d 565, 596–99 (E.D. La. 2005) (analyzing whether opinions satisfied *Daubert*'s reliability requirement without regard to which expert would offer them at trial).

Plaintiffs' cited authority does not disallow the approach that Defendants have taken and that the Court permitted in *Vioxx*.  The *NuvaRing* court was critical of a so-called "umbrella"

*Daubert* motion that did not "set forth the precise opinions" at issue. *In re Nuvaring Prod. Liab. Litig.*, No. 4:08-MD-1964 RWS, 2013 WL 856218, at *3 (E.D. Mo. Mar. 5, 2013). Here, as explained above, Defendants' opening briefs precisely describe the opinions at issue and cite the relevant pages of each expert's report or deposition testimony. Moreover, the *Nuvaring* court's criticisms were largely aimed at an "umbrella" challenge to multiple experts' qualifications that did not examine each expert's actual background, training, and experience. *See id.* at *3–4. Defendants' arguments here do not implicate the expertise of Plaintiffs' witnesses—who range from PhDs with university appointments (Rosing) to a pharmacist (Bussey).

The other case that Plaintiffs cite, *Bradley v. Cooper Tire & Rubber Company*, 4:03-cv-94 LN, 2005 WL 5989799 (S.D. Miss. Oct. 25, 2005), does not bear on the issue whether *Daubert* and Rule 702 permit a consolidated motion directed at multiple experts. That case simply noted that in an unrelated MDL, *case-specific* design defect opinions were reviewed individually when the experts used different methodologies and had varying amounts of evidence available to support their opinions. *Id.* at *4–5 (citing *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 2004 WL 315148 (S.D. Ind. Jan. 1, 2004)). Here, Defendants challenge generic opinions on grounds that are common to all.

### III.   Plaintiffs' Theory That Neoplastin Should Be Used To Assess Bleeding Risk To Determine If A Patient Should Take Xarelto Is Inadmissible Under *Daubert*.

Plaintiffs' proposed use of Neoplastin PT—as a tool for weighing bleeding risk against stroke risk to make treatment decisions—is not scientifically sound. Plaintiffs' own physician experts candidly admit this. Dr. Cindy Leissinger, a hemostasis and thrombosis disorder specialist, explained that Mr. Boudreaux's PT reading didn't "indicate a degree of anticoagulation" (much less bleeding risk), just that he had "an anticoagulant in his system." Leissinger Boudreaux Dep. 148:7–21 (Exh. 22 to Dkt. No. 5114) (emphasis added). Dr. Gianluca Cerri, an emergency

medicine doctor, likewise disclaimed the utility of PT tests, saying "[t]here's no lab assay that tells me when the patient took [Xarelto] [or] how much of the medication is in the system."  Cerri Dep. 147:12–16 (Exh. 20 to Dkt. No. 5113).

As explained in Defendants' opening brief, there is a relationship between PT, Xarelto exposure, and its anticoagulant effect.  This was evidenced in Defendants' clinical trials, published and presented to FDA, and is described in the label.  *See* § 12.2 Xarelto USPI (Exh. 30 to Dkt. No. 5113).[4]

But that pharmacokinetic/pharmacodynamic relationship does *not* translate into Plaintiffs' proposed *clinical* application: using Neoplastin to guide treatment decisions.  That is because— without knowing how to interpret PT tests—doctors cannot use them to make treating decisions.

> [T]he simple presence of a test does not guarantee a beneficial result.  And that's the problem here, is the presence of a test that tells you the patient has an anticoagulant level of X.  And so what do you do?  You change the drug.  And now what happens?  You hurt the patient.  Until you prove the consequence of what you suggest, it's irresponsible.

Peacock Dep. 122:1–9 (Exh. 4).  Plaintiffs' experts' point to no researchers or clinicians who agree with the PT theory that they advocate in this litigation.

---

[4] With respect to bleeding risk, although FDA in its Summary Review referred to a "correlation between PT and risk of bleeding," Pls.' Exh. 21 at 9, the scientific evidence does not support Plaintiffs' proposed use of PT to predict bleeds. For example, in its Clinical Pharmacology Review, in which the reviewers took aspirin use into account, FDA found little apparent association between PT and bleeding rates when patients taking aspirin were removed.  *See* Aug. 10, 2011 Clin. Pharm. Rev. at 38, Fig. 12 (Exh. 1).  In addition, Defendants' expert David Taft, Ph.D. reviewed statistical analyses presented by Defendants of the PT data from the ROCKET AF trial (and other Xarelto studies). He explained that "PT values widely overlapped for patients with major bleeding, patients with nonmajor clinically relevant bleeding, patients with either type of bleeding, and patients with no bleeding."  *See* Taft Rep. at 94–97 (Exh. 2) (citing Figures 148, 157, 151 in Exploratory Analyses of Pharmacodynamic Coagulation Measurements in Subjects with Non-Valvular Atrial Fibrillation Treated with Rivaroxaban for the Prevention of Stroke and Non-Central Nervous System Systemic Embolism Based on Data from the Study 39039039AFL3001 [ROCKET AF], XARELTO_JANSSEN_00002044 (Exh. 3)).  Dr. Taft concluded that the "distribution of PT readings for those who had bleeding events was very similar to that for patients who had no bleeding events, such that PT was not shown to be a good predictor of bleeding risk."  *Id.* at 97.  Plaintiffs do not account for any of this data.

Thus, as set forth below, Plaintiffs' PT opinion does not meet *Daubert*'s admissibility requirements. First, the PT theory lacks relevance, as Plaintiffs offer no opinion on what degree of bleeding risk corresponds to particular Neoplastin results and how that information could be used to improve patient outcomes. An abstract opinion that Neoplastin PT values correlate to bleeding risk, without more, simply does not provide information useful to a physician or a patient—let alone a juror. Second, all of the problems that made Plaintiffs' original dosing and monitoring opinions unreliable and inadmissible apply with equal force to the newly proposed PT opinion.

### A.    Plaintiffs' Abstract PT Opinion Is Not Helpful To Jurors And Therefore Not Relevant Under *Daubert*.

To begin, there is no basis for how doctors should use Neoplastin results in real patients or how a jury might use them to evaluate any particular plaintiff's case.

For example, what Neoplastin PT levels correspond to which level of bleeding risk? At what point does the bleeding risk become so great that a patient should discontinue Xarelto? And, most importantly for present purposes, on what basis could a juror ever conclude, based on Plaintiffs' new PT opinion, that an individual plaintiff's doctor would have taken him or her off Xarelto, avoiding the bleed on which the lawsuit is based? Plaintiffs must do more than offer mere "conceptual suggestions" about how to use a Neoplastin PT test in the care of patients. *See Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326–27 (5th Cir. 2004) (affirming district court's exclusion of expert where he only presented "conceptual suggestions" based on "unscientific conceptual sketches and broad ideas," particularly given that expert hadn't "reached any concrete conclusions" as trial approached); *United States v. Hoang*, 891 F. Supp. 2d 1355, 1358 (M.D. Ga. 2012) (explaining that "vague opinions don't help a jury . . . [and] may mislead them," and noting

that "courts regularly exclude vague and imprecise opinions because they will not assist the trier of fact").

Plaintiffs' experts admit that they cannot do better than vague suggestions. For instance, Dr. Backes acknowledged that "a particular prothrombin time has not been established" to measure the level of Xarelto in the blood or the degree of anticoagulation (much less bleeding risk). Backes Dep. 199:11–22 (Exh. 5). Dr. Cuculich similarly said that he couldn't "draw a line in the sand" when asked for a PT value at which he "would tell doctors in the label to discontinue Xarelto." Cuculich Dep. 224:5–225:14 (Exh. 6). Far from identifying any PT cut-offs for bleeding risk, he only could speculate that a "PT of 20 [seconds] is lower risk of bleeding than 30 is lower risk [than] 40." *Id.* at 224:15–17. These shortcomings are further confirmed by Plaintiffs' experts' inability to quantify an association between the risk of a bleed and a measured Xarelto blood *concentration* (let alone a PT result). Dr. Leissinger, for example, explained, "we don't know . . . what the risks of bleeding and clotting are for patients at the . . . concentration 40 [µg/L] versus 240 [µg/L]. We – we just don't know that." Leissinger Generic Dep. 157:6–10 (Exh. 7).

Without being able to quantify bleeding risk from Neoplastin results, obtaining a patient's PT reading has no applicability in medical practice. *E.g.,* St. Martin Dep. 316:24–317:10 (Exh. 8) ("Q: So [coagulation assays] are nice tests, I guess, but they don't tell you anything about what the result will be in terms of a bleeding risk to the patient, do they? A: Right. . . . Q: To you that's what counts, right? A: Yes. Right."); Peacock Dep. 115:17–21 (Exh. 4) (just "because [you] know a number . . . that's X, if you don't know what to do with X, you don't have any information."). Plaintiffs' PT opinion merely identifies a test but, by their experts' own admissions, they don't know how to apply the results to improve patient care.

8

The bottom line is that Plaintiffs' opinions may be of academic and scientific interest, but they have no place in this litigation. *Daubert* requires that opinion testimony, in some concrete way, "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244–45 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)) (affirming district court's exclusion of expert testimony because it was "not helpful to the fact-finder").

### B.    Plaintiffs' Theories About The Use Of PT Tests To Improve Patient Care Are Untested, Not Peer-Reviewed, Not Generally Accepted, And Unworkable.

Whether articulated as the vague recommendation set forth in their brief or as the 20-second cut-off proposed by some of Plaintiffs' experts, Plaintiffs' PT theory does not meet *Daubert*'s reliability standard. As Defendants explained in their opening brief, the opinion that doctors can use PT values (as a supposed marker of bleeding risk) to make a clinical decision remains untested, unpublished, not generally accepted or peer-reviewed, and unworkable.

### 1.    No clinical trial or study has examined whether PT testing can be used to improve patient outcomes.

To determine the scientific validity of an opinion, a "key question to be answered . . . [is] whether [the opinion] can be (and has been) tested." *Daubert*, 509 U.S. at 593. Plaintiffs "carry the burden of proving" their hypotheses "*today based on currently available* scientifically valid evidence." *In re Bextra & Celebrex*, 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) (emphasis added). Using PT values in actual patient care as Plaintiffs propose has never been tested.

Plaintiffs rely heavily on Neoplastin PT data from the ROCKET AF trial. Pls.' Br. at 12. But it is uncontested that the trial did not examine the use of PT results in clinical decision making, such as whether to take a patient off Xarelto. Nor did the other studies that Plaintiffs cite test any hypothesis about how to use PT results to improve patient outcomes, much less whether outcomes

9

would be improved by Plaintiffs' specific proposal to use PT to determine which patients may take Xarelto.  Most of the excerpts from the literature that Plaintiffs cite do not even discuss the relationship between Neoplastin and bleeding risk, but rather make the uncontroversial point that PT correlates with Xarelto exposure.[5]  And none of the cited studies that actually do concern the relationship between bleeding risk and PT examined whether Neoplastin results can predict actual bleeding risk in individual patients or how that information could be used to make medication decisions, as Plaintiffs now advocate.  *See* Pls.' Br. at 18–19 (citing Lippi 2014 (Pls.' Exh. 29); Zhang 2016 (Pls.' Exh. 30); Nakano 2014 (Pls.' Exh. 31).[6]

> **2.     The theory that PT results should be used to determine whether a patient's bleeding risk warrants Xarelto discontinuation has never been published or subject to peer review.**

An important *Daubert* reliability factor is whether an expert opinion "has been subjected to peer review and publication."  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (quoting *Daubert*, 509 U.S. at 593–94).  The fact that an expert's "theories have not been . . . subjected to peer review and publication" is a factor making testimony unreliable.  *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003); *see also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380–81 (5th Cir. 2010) (affirming exclusion of expert when the expert's theory "ha[d] not been subjected to peer review and publication").

---

[5] *See* Pls.' Br. at 18–25 (citing Kubitza 2005 (Pls.' Exh. 32); Mueck 2013 (Pls.' Exh. 33); Kubitza 2005 (Pls.' Exh. 42); Eriksson 2006 (Pls.' Exh. 43); Graff 2007 (Pls.' Exh. 44); Laux 2007 (Pls.' Exh. 45); Perzborn 2011 (Pls.' Exh. 46); Mueck 2011 (Exh. 47)).

[6] Lippi 2014 discusses the use of PT "as [a] first-line test for urgent screening of rivaroxaban" to help determine "overdosage" or "potential ineffectiveness."  Pls.' Exh. 29 at 5, 6.  Zhang 2016 states that the PT reagent Thrombosis S (not Neoplastin) "could be used as a rough method to monitor the anticoagulation activity of rivaroxaban and evaluate bleeding risk due to rivaroxaban."  Pls.' Exh. 30 at 11.  The authors of the Nakano 2014 study (which used the HemosIL RecombiPlasTin PT reagent) identify limitations inherent in their findings, including that the study was conducted at a single institution, over a short period of time, and in a small number of subjects.  Pls.' Exh. 31 at 6.

Neither Plaintiffs' experts nor anyone else has ever published, much less in a peer-reviewed journal, on whether or how PT results might be used to determine whether particular Xarelto patients should discontinue treatment for stroke risk.  The fact that the PT theory hasn't been "subjected to the usual rigors of peer review" or evaluated by other scientists or medical doctors weighs against admissibility.  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (internal quotation omitted).

### 3. The theory that PT results can be used to improve patient outcomes is not generally accepted.

Defendants' opening brief cited nine admissions from six of Plaintiffs' experts to demonstrate that PT testing in the care of Xarelto patients is not generally accepted in scientific, medical, or regulatory communities.  No medical organization or society, including FDA, has recommended PT tests to guide Xarelto patient therapy in the manner that Plaintiffs suggest.  *See* Defs.' Br. at 16–17 n.10, 11; *see, e.g.*, Bussey Dep. 259:10–13 (Exh. 16 to Dkt. No. 5113) ("Q: Do you know of any medical professional organization that has recommended using a PT test with rivaroxaban patients?  A: No.").  There can be no dispute that Plaintiffs' novel proposal is not generally accepted.[7]

### 4. Using a PT test to improve patient care remains infeasible due to the conceded variation in Neoplastin PT results across labs and batches.

Finally, it would be impossible to provide meaningful and uniform clinical guidance based on Neoplastin PT levels due to the known variability in results—*even within the same reagent*.

---

[7] The Xarelto labels in New Zealand and Canada cited by Plaintiffs, *see* Pls. Br. at 17, do not say otherwise.  The New Zealand label does not recommend the use of PT testing in Xarelto therapy, but rather provides information about the relationship between Neoplastin PT and Xarelto concentration, *see id.*  The Canadian label says that Neoplastin may be useful to determine "an excess of anticoagulant activity" in "patients who are bleeding" (not to assess bleeding risk).  *Id.*  Likewise, the statements that Plaintiffs quote from the British Committee for Standards in Hematology and the International Society on Thrombosis and Hemostasis simply describe the well-known use of PT to evaluate anticoagulation status—*i.e.*, whether or not a patient is anticoagulated—not bleeding risk.  *See id.* at 18.

*See* Defs.' Br. at 11–12; Defs.' Case-Specific Br. at 6–7.  As Plaintiffs' own experts have agreed, even using just one reagent (like Neoplastin), PT results will vary based on both the laboratory performing the test and the particular batch of the reagent.

For example, Robert Gosselin, Plaintiffs' laboratory assay expert, testified as follows on variation among laboratories:

> Q:  So you'd agree that with PT testing in a Xarelto patient, you could have the same sample using the same reagent but tested in a different laboratory and the results could be different?
>
> A:  Oh, absolutely.

Gosselin Dep. 119:1–5 (Exh. 17 to Dkt. No. 5113).  Plaintiffs' expert Dr. Jan Rosing, a professor emeritus of biochemistry, thrombosis, and hemostasis, explained inter-batch differences, saying that "when you compare *different batches of Neoplastin*, there can be batch-to-batch variation." Rosing Dep. 193:15–24 (Exh. 18 to Dkt. No. 5113) (emphasis added).

What this means is that the same sample of a patient's blood can yield different Neoplastin PT results depending on the lab that performs the test and the batch of the Neoplastin used.  It would, therefore, be impossible to formulate guidance on how to use particular PT levels in making clinical decisions.  *See* Leissinger Boudreaux Dep. 214:24–215:13 (Exh. 9) (explaining that PT results could not have been used to monitor Mr. Boudreaux because "adapt[ing] [PT] for use as a monitoring tool" would require "proper study and proper validation" which "has not been done").

## IV.   Plaintiffs' PT Opinion Is Inadmissible In The *Orr* And *Boudreaux* Cases.

Defendants' case-specific *Daubert* motion addresses the specific opinion that patients with PT values greater than 20 seconds, measured with Neoplastin 14 hours after dosing, should be taken off Xarelto.  Defendants demonstrated that, even if the Court determined that Plaintiffs' PT opinion was reliable as a general matter, it still should be excluded in the *Orr* and *Boudreaux* cases because the opinion does not fit the facts of those two specific cases.

A.     **The PT Opinion Cannot Be Applied To The Facts Of The *Orr* And *Boudreaux* Cases.**

Regardless of whether Plaintiffs pursue the vague recommendation that "Neoplastin PT can be used to evaluate . . . risk of bleeding," Pls.' Br. at 15, or the more specific 20-second cut-off proposed by some of their experts, *see* Defs.' Case-Specific Br. at 2, Plaintiffs' theory is inadmissible in the *Orr* and *Boudreaux* cases.

Plaintiffs bear the burden of proving the relevance of the opinions set forth by their experts. *Propulsid*, 261 F. Supp. 2d at 615.  That includes demonstrating that their experts' proposal that Neoplastin PT be assessed at the outset of treatment, 14 hours after dosing (perhaps using a 20-second cut-off) "fits" the *Orr* and *Boudreaux* cases, meaning that it "properly can be applied to the facts" of those cases.  *Daubert*, 509 U.S. at 593.  *See also*, *e.g.*, *In re Vioxx Prods. Liab. Litig.*, 414 F. Supp. 2d 574, 579 (E.D. La. 2006) (expert testimony "is relevant only if . . . there is an appropriate fit between the scientific testimony and the specific facts of the case") (citing *Daubert*, 509 U.S. at 593).  Plaintiffs cannot do so.

As explained in Defendants' opening brief, neither Mrs. Orr nor Mr. Boudreaux had tests under those circumstances or results above 20 seconds, making the PT opinion irrelevant in those cases.  Defs.' Case-Specific Br. at 4.

Plaintiffs do not dispute that point.  *See* Pls.' Br. at 27–30.  Rather, they offer the mathematical fallacy that, simply because Mrs. Orr and Mr. Boudreaux experienced bleeds "it is a *statistical certainty*" that they "likely" had elevated PT times.  *Id.* at 27 (emphasis in original).  That is demonstrably incorrect, based on the very PT data that Plaintiffs attached to their brief.

In particular, Plaintiffs' experts chose 20 seconds because, they say, it represents the top quartile of PT values among Xarelto users.  *E.g.*, Rosing Report at 21 (Exh. 13 to Dkt. No. 5114) (explaining that his PT cut-off is the "lowest PT value of the last quartile" in ROCKET AF).  The

ROCKET AF data that Plaintiffs rely on (Exhibit 19 to their brief) show that most patients who experienced a major bleed were *not* in the top quartile. Depending on the analysis, between 12.5% and 50% of patients with a major bleed were in the top quarter by PT results.[8] Thus, based on the fact that Mrs. Orr and Mr. Boudreaux experienced bleeds, the only "statistical certainty" is that they more likely did *not* have 20-second Neoplastin PT times.

### B. Dr. Rinder's Opinion Regarding Mr. Boudreaux's Equivalent Neoplastin PT Value Is Unreliable.

Nor can Plaintiffs avoid the irrelevance of their PT theory with Dr. Rinder's conversion "opinion" revealed for the first time at his deposition in the *Boudreaux* matter. As set forth in Defendants' case-specific brief, Dr. Rinder took an observed PT test result in Mr. Boudreaux of 13.6 seconds using the Innovin reagent and, based on eyeballing one chart in one paper, purported to convert the result to a hypothetical PT result between 21 and 25 seconds if Neoplastin had been used instead. Rinder Boudreaux Dep. 160:5–7 (Exh. 19 to Dkt. No. 5114).

Although, as Plaintiffs say, the chart that Dr. Rinder used (from the 2012 Douxfils paper) is included in his generic expert report, the report never discloses Dr. Rinder's unique *use* of the chart to convert PT times between different reagents, much less his specific conversion for Mr. Boudreaux's test result. That opinion was disclosed for the first time at Dr. Rinder's deposition. This alone is sufficient reason to exclude the opinion. *See, e.g.*, *Hill v. Koppers Indus.*, No. 3:03-

---

[8] Plaintiffs cite six tables in Exhibit 19 from Defendants' pharmacodynamic analysis of certain data from the ROCKET AF trial. *See* Pls.' Br. at 12 n.61 (citing Exh. 19 at Tables 568, 571, 574, 577, 580, & 583). The tables break down major bleeding by PT quartile at different points in time. In the first table, only one out of eight patients total with major bleeds (or 12.50%) fall in the fourth PT quartile. *See* Pls.' Exh. 19 at 696 (Table 568, Major Bleeding). In the second table, 34.10% of patients with major bleeds are in the fourth quartile. *See id.* at 699 (Table 571). The percentage of patients with major bleeds in the fourth PT quartile for tables are as follows: 32.14% (Table 574), 50.00% (Table 577), 39.29% (Table 580), and 38.46% (Table 583). *See id.* at 702, 705, 708, 711.

CV-60-P-D, 2009 WL 3246630, at *2–3 (N.D. Miss. Sept. 30, 2009); *see also Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 433 (5th Cir. 2012).

Plaintiffs also fail to dispute *any* of the reasons that Defendants put forth explaining why Dr. Rinder's methodology is unreliable.  Those reasons included:

> (1) Dr. Rinder failed to account for the laboratory and reagent batch that was used to generate Mr. Boudreaux's Innovin PT result.  Plaintiffs' experts knowledgeable in the field explain that variability in PT results occurs based on the reagent, the laboratory, and the batch.  Defs.' Case-Specific Br. at 6–7; Defs.' Br. at 9–12.

> (2) Although Dr. Rinder based his conversion exclusively on the Douxfils paper, he did not account for the stated limitations of the Douxfils data based on the particular laboratory method used by Douxfils.  Defs.' Case-Specific Br. at 7 n.3 (quoting Douxfils 2012 at 9 (Exh. 20 to Dkt. No. 5114)).

> (3) Dr. Rinder's methodology is not generally accepted.  Defendants are aware of no one, including Plaintiffs' other retained experts, who has claimed an ability to convert PT between reagents and labs as Dr. Rinder says he did.  *Id.* at 6.  *See also* Rosing Dep. 220:13–15 (Exh. 10) ("Q: . . . Is it possible to convert a Neoplastin number to an Innovin number without that [international sensitivity index] number?  A: I would not do that.").

> (4) There is no error rate associated with Dr. Rinder's methodology.  Defs.' Case-Specific Br. at 8.

> (5) Dr. Rinder only developed his opinion on the fly exclusively in an effort to support Plaintiffs' PT theory in this litigation.  *Id.*

Plaintiffs' failure to respond to the above points is a concession that they are correct.  *See supra* at n.2.  The Court should therefore exclude Dr. Rinder's unreliable and belated opinion in the *Boudreaux* case regarding a hypothetical PT result above 20 seconds.

## CONCLUSION

For all of the reasons stated above and those set forth in Defendants' opening briefs, the Court should grant Defendants' two *Daubert* motions.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc., Janssen Research &*
*Development, LLC, and Janssen Ortho LLC,*
*and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on the 10th day of March, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

                                  */s/      John F. Olinde*