# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:14-cv-02720* | * | MAG. JUDGE NORTH |
| | * | |
| *Joseph Orr, Jr., et al. v. Janssen et al.* | * | |
| *Case No.  2:15-cv-03708* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT *DAUBERT*
MOTIONS TO EXCLUDE EXPERT OPINIONS AND TESTIMONY REGARDING:
(1) UNAPPROVED DOSING AND MONITORING REGIMENS [REC. DOC. 5113];
AND (2) THE EXPERTS' 20-SECOND PT CUT-OFF GUIDELINE
IN THE *ORR* AND *BOUDREAUX* CASES [REC. DOC. 5114]**

---

# FILED UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT……............................................................................................................... 7

I.     Defendants' "Umbrella" Motions Are Procedurally Defective
Because *Daubert* Must Be Applied on a Case-by-Case Basis ……...…………... 7

II.    There Is Sufficient Evidence to Support Plaintiffs' Experts'
Opinions that a Physician Is Able to Evaluate a Xarelto-Treated
Patient's Risk of Bleeding with Neoplastin PT …................................................ 10

       A.    Defendants Have Mischaracterized the Opinions of Plaintiffs'
Experts ……………………………………………………………...…….. 10

       B.    Defendants' Own Clinical Trial Supports the Opinions of
Plaintiffs' Experts ……………………………………………………….. 11

       C.    The Opinions of Plaintiffs' Experts are Consistent With the
Opinions of the Scientific and Regulatory Community ………………… 14

       D.    The Use of Neoplastin PT for Assessing Xarelto Exposure is a
Generally Accepted and Reliable Methodology ………………………... 17

       E.    Plaintiffs' Experts Confirm that the Use of Neoplastin PT to Assess
the Anticoagulant Effect of Xarelto is a Generally Accepted and
Reliable Methodology …………………………………………………... 20

III.    Defendants Incorrectly Characterize the Opinions of Plaintiffs'
Expert Witnesses Regarding Dosing ……………………………………………. 26

IV.    Plaintiffs' Expert Testimony and Opinions Regarding the Increased
Risk of Bleeding Posed to Mrs. Orr and Mr. Boudreaux are Sufficiently
Reliable Under Daubert …………………………………………………………. 27

CONCLUSION .................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Cases**

*Bradley v. Cooper Tire & Rubber Co.,*
    No. 4:03-cv-94, 2005 WL 5989799 (S.D. Miss. Oct. 25, 2005) …………………………… 9

*Burst v. Shell Oil Co.,*
    120 F. Supp. 3d 547 (E.D. La. 2015) ……………………………………………………….. 4

*Calder v. Blitz U.S.A.,*
    No. 2:07-cv-00387, 2010 WL 4442730 (D. Utah Nov. 1, 2010) ……………………….. 26

*Cooper v. Brown,*
    565 F.3d 581 (9th Cir. 2009) …………………………………………………………….. 6

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ……………………………………………………………………….. *passim*

*Gen. Elec. v. Joiner,*
    522 U.S. 136 (1997) …………………………………………………………………….. 2

*Huss v. Gayden,*
    571 F.3d 442 (5th Cir. 2009) ……..………………………………………………………... 3

*In re Actos Prods. Liab. Litig.,*
    No. 12-cv-00064, 2013 WL 6796461 (W.D. La. Dec. 19, 2013) ……..……..………….... 22

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,*
    MDL No. 1373, 2004 WL 315148 (S.D. Ind. Jan. 23, 2004) …………………………… 8

*In re Chantix (Varenicline) Prods. Liab. Litig.,*
    889 F. Supp. 2d 1272 (N.D. Ala. 2012) …………………………………………………… 22

*In re Fosamax Prods. Liab. Litig.,*
    645 F. Supp. 2d 164 (S.D.N.Y. 2009) …………………………………………………... 22

*In re Levaquin Prods. Liab. Litig.,*
    MDL No. 08-1943, 2010 WL 8399942 (D. Minn. Nov. 4, 2010) ………………………… 26

*In re NuvaRing Prods. Liab. Litig.,*
    No. 4:08-MD-1964, 2013 WL 856218 (E.D. Mo. Mar. 5, 2013) ………………………... 9

*In re Propulsid Prods. Liab Litig.*,

    261 F. Supp. 2d 603 (E.D. La. 2003) …………………………………………………… 21

*In re Tylenol (Acetaminophen) Mktg. Sales Practices and Prods. Liab. Litig.*,

    No. 2:12-cv-07263, 2016 WL 3997046 (E.D. Pa. July 26, 2016) ……………………… 22

*In re Vioxx Prods. Liab. Litig.*,

    401 F. Supp. 2d 565 (E.D. La. 2005) ………………………………………… 2, 4, 5, 6, 13

*Johnson v. Samsung Elecs. Am., Inc.*,

    277 F.R.D. 161 (E.D. La. 2011) ………………………………………………….. 6

*Kelly v. Paschall*,

    No. W-03-CA-179, 2005 WL 5988648 (W.D. Tex. Apr. 19, 2005) …………………….. 3

*Kirk v. Schaeffler Grp., U.S.A., Inc.*,

    No. 3:13-cv-5032, 2015 WL 12426834 (W.D. Mo. Sept. 29, 2015) …………………… 26

*Kumho Tire Co. v. Carmichael*,

    526 U.S. 137 (1999) …………………………………………………… 2, 4, 5, 6, 8, 10, 20

*McLain v. TuLane Fleeting*,

    No. 93-2165, 1995 WL 2272 (E.D. La. Jan. 3, 1995) …………………………………... 22

*Moore v. Ashland Chem., Inc.*,

    151 F.3d 269 (5th Cir. 1998) ………………………………………………….. 6, 29, 30

*Newman v. Sikeston Dep't of Public Safety*,

    No. 1:00-CV-74, 2002 WL 34365839 (E.D. Miss. Mar. 14, 2002) …………………….. 22

*Pipitone v. Biomatrix, Inc.*,

    288 F.3d 239 (5th Cir. 2002) …………………………………………………………. 3, 6

*Schwab v. Philip Morris USA, Inc.*,

    No. 04-cv-1945, 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005) ………………………… 8

*Silverman v. Watson Pharms., Inc.*,

    No. H-10-1952, 2013 WL 1413782 (S.D. Tex. Apr. 8, 2013) …………………………… 29

*Smith v. Pfizer, Inc.*,

    688 F. Supp. 2d 735 (M.D. Tenn. 2010) …………………………………………… 21

*United States v. 14.38 Acres of Land*,

    80 F.3d 1074 (5th Cir. 2012) …………………………………………………….. 7

*United States v. Brown,*

    415 F.3d 1257 (11th Cir. 2005) ……………………………………………….. 8

*United States v. Hicks,*

    389 F.3d 514 (5th Cir. 2004) ……………………………………………….. 6

*Viterbo v. Dow Chems. Co.,*

    826 F.2d 420 (5th Cir.1987) ……………………………………………….. 6

*Wagoner v. Exxon Mobil Corp.,*

    813 F. Supp. 2d 771 (E.D. La. 2011) ……………………………………….. 3

*Wells v. SmithKline Beecham Corp.,*

    601 F.3d 375 (5th Cir. 2010) ……………………………………………….. 4

**Rules**

Federal Rule of Evidence 702 …………………………………………………… *passim*

**Other**

Fed. R. Evid. 702 Advisory Committee Notes...…………………………………… 3

4 J. McLaughlin, Weinstein's Federal Evidence 702.05[1] (2d ed. 1998) ……………………… 8

**TABLE OF EXHIBITS**

Exhibit 1      Expert Report of Wayne L. Backes, Ph.D.

Exhibit 2      Expert Report of Henry I. Bussey, Pharm.D., FCCP

Exhibit 3      Expert Report of Phillip S. Cuculich, M.D.

Exhibit 4      Expert Report of B. Burt Gerstman, Ph.D.

Exhibit 5      Expert Report of Robert Charles Gosselin

Exhibit 6      Expert Report of Joachim H. Ix, M.D., MAS

Exhibit 7      Expert Report of David A. Kessler, M.D.

Exhibit 8      Expert Report of Cindy A. Leissinger, M.D. (Generic)

Exhibit 9      Expert Report of Cindy A. Leissinger, M.D. (*Boudreaux*)

Exhibit 10     Expert Report of John E. Maggio, Ph.D.

Exhibit 11     Expert Report of Suzanne Parisian, M.D.

Exhibit 12     Expert Report of Laura M. Plunkett, Ph.D., D.A.B.T.

Exhibit 13     Expert Report of Henry Michael Rinder, M.D. (Generic)

Exhibit 14     Expert Report of Henry Michael Rinder, M.D. (*Boudreaux*)

Exhibit 15     Expert Report of Jan Rosing, Ph.D.

Exhibit 16     Neoplastine Label

Exhibit 17     Wolfgang Mueck, et al., *Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban,* 53 Clinical Pharmacokinetics 1 (2014)

Exhibit 18     FDA Draft Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), 09/08/11

Exhibit 19     (Record No. 1054510) "Exploratory Analyses Of Pharmacodynamic Coagulation Measurements in Subjects with Non-Valvular Atrial Fibrillation Treated With Rivaroxaban For The Prevention of Stroke and Non-Central Nervous System Systemic Embolism Based on Data from the Study 39039039AFL3001" (XARELTO_JANSSEN_00002044)

Exhibit 20    Deposition of Dr. David A. Kessler

Exhibit 21    Center for Drug Evaluation and Research Summary Review, 11/04/11

Exhibit 22    Deposition of Henry M. Rinder, M.D. (*Mingo*)

Exhibit 23    European Medicines Agency Programme Agenda, 11/23/15

Exhibit 24    Correlation of Drug Levels and Outcomes in Phase III New Oral Anticoagulant (NOAC Trials), 10/26/15

Exhibit 25    New Zealand Xarelto Data Sheet

Exhibit 26    Canadian Xarelto Product Monograph

Exhibit 27    Trevor Baglin, et al., *Effects of routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology,* 159 British Journal of Haematology 427 (2012)

Exhibit 28    Trevor Baglin, et al., *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific and Standardization Committee of the International Society on Thrombosis and Haemostasis*, 11 Journal of Thrombosis and Haemostasis 756 (2013)

Exhibit 29    Giuseppe Lippi, et al., *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation: A tentative approach based on routine laboratory tests,* 38 Journal of Thrombosis and Thrombolysis 269 (2014)

Exhibit 30    Yuanyuan Zhang, et al., *Laboratory monitoring of rivaroxaban and assessment of its bleeding risk,* 73 British Journal of Biomedical Science 134 (2016)

Exhibit 31    Yoshihisa Nakano, et al., *Clinical usefulness of measuring prothrombin time and soluble fibrin levels in Japanese patients with atrial fibrillation receiving rivaroxaban,* 65 Journal of Cardiology 185 (2015)

Exhibit 32    Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 – an oral, direct Factor Xa inhibitor – after multiple dosing in healthy male subjects*. 61 European Journal of Clinical Pharmacology 873 (2005)

Exhibit 33    Wolfgang Mueck, et al., *Rivaroxaban and other novel oral anticoagulants: pharmacokinetics in healthy subjects, specific patient populations and relevance of coagulation monitorin*g, 11 Thrombosis Journal 10 (2013)

Exhibit 34    (Record No. 5486139) Xarelto Coagulation Monitoring
              (XARELTO_JANSSEN_24478012)

Exhibit 35    Deposition of Jan Rosing, Ph.D.

Exhibit 36    Deposition of Robert C. Gosselin

Exhibit 37    Deposition of Phillip Cuculich, M.D.

Exhibit 38    Deposition of Cindy A. Leissinger, M.D. (Boudreaux)

Exhibit 39    Deposition of Laura M. Plunkett, Ph.D.

Exhibit 40    Deposition of Cindy A. Leissinger, M.D. (Generic)

Exhibit 41    Deposition of Henry Michael Rinder, M.D. (Generic)

Exhibit 42    Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of
              single doses of BAY 59-7939, an oral, direct factor Xa inhibitor,* 78 Clinical
              Pharmacology & Therapeutics 412 (2005)

Exhibit 43    Bengt Eriksson, et al., *Oral, direct Factor Xa inhibition with BAY 59-7939 for the
              prevention of venous thromboembolism after total hip replacement,* 4 Journal of
              Thrombosis and Haemostasis 121 (2006)

Exhibit 44    Jochen Graff, et al., *Effects of the Oral, Direct Factor Xa Inhibitor Rivaroxaban
              on Platelet-Induced Thrombin Generation and Prothrombinase Activity,* 47
              Journal of Clinical Pharmacology 1398 (2007)

Exhibit 45    Volker Laux, et al., *Preclinical and Clinical Characteristics of Rivaroxaban: A
              Novel, Oral, Direct Factor Xa Inhibitor, 33 Seminars in Thrombosis and
              Hemostatis* 515 (2007)

Exhibit 46    Elisabeth Perzborn, *The discovery and development of rivaroxaban, an oral,
              direct factor Xa inhibitor,* 10 Drug Discovery 61 (2011)

Exhibit 47    Wolfgang Mueck, et al., *Population Pharmacokinetic Analyses in Patients
              Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients
              with Atrial Fibrillation Treated for Stroke Preventio*n, 50 Clinical
              Pharmacokinetics 675 (2011)

Exhibit 48    Transcript for FDA CDER Cardiovascular & Renal Drugs Advisory Committee
              Meeting, 09/08/11

Exhibit 49    Deposition of Henry Michael Rinder, M.D. (*Boudreaux*)

# INTRODUCTION

First and foremost, Defendants label their motions as purporting to apply to particular "topics," rather than to testimony of individual experts. In particular, Defendants present two "umbrella" motions[1] seeking to exclude ***any testimony and opinions*** of several Plaintiffs' experts[2] regarding "unapproved dosing," "monitoring regimens," and a "20-second PT cut-off guideline." Rather than address the qualifications or specific opinions of any particular expert in depth, Defendants offer a few testimonial statements stripped of all context. Defendants' failure to review each expert's opinions in favor of arguing that the experts' opinions share a critical flaw is impermissible. Indeed, Federal Rule of Evidence 702 governs whether a particular "witness" has offered admissible expert testimony, and not whether a given issue is the proper subject of expert witness testimony. Thus, Defendants' attempt to globally exclude expert testimony without regard to case-specific facts should be rejected as procedurally improper.

Notwithstanding this procedural defect, Defendants' arguments are substantively without merit. In particular, Defendants seek to exclude the opinions and testimony of thirteen expert witnesses[3] who will educate the jury that exposure to Xarelto increases a patient's risk of bleeding,

---

[1] Defendants filed two separate motions asking this Court to universally exclude the opinions and testimony of any expert, at any time during the course of this litigation, relating to the topics outlined above. *See* Defendants' Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens ("D&M Br.") [Rec. Doc. 5113]; Defendants' Motion to Exclude Expert Opinions and Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the Orr and Boudreaux Cases ("PT Br.") [Rec. Doc. 5114].

[2] By means of footnotes, Defendants contend that the following Plaintiffs' expert witnesses are examples of experts offering the type of testimony and opinions at issue: Backes; Bussey; Cuculich; Gerstman; Gosselin; Ix; Kessler; Leissinger; Maggio; Parisian; Plunkett; Rinder; Rosing. *See* D&M Br. at 7 n.4; PT Br. at 1 n.1.

[3] *See supra* note 2. As Defendants have failed to describe the qualifications or opinions of any of the thirteen expert witnesses at issue in any detail, for purposes of introduction to this Court, they are as follows: Wayne L. Backes, Ph.D. (a pharmacologist whose research focuses on drug metabolism and pharmacokinetics); Henry I. Bussey, Pharm.D, FCCP (former clinical director of Anticoagulation Clinics of North America); Phillip S. Cuculich, M.D. (board-certified cardiologist); B. Burt Gerstman, Ph.D. (former Epidemiology Fellow at the U.S. Public Health Service and former Epidemiologist at the U.S. Food and Drug Administration ("FDA"), Center for Drug Evaluation and Research); Robert Charles Gosselin (licensed clinical laboratory scientist with more than 30 years of experience in the field of technical hemostasis); Joachim H. Ix, M.D., MAS (board-certified physician and Chief of the Division of Nephrology at the University of California-San Diego); David A. Kessler, M.D. (former Commissioner of the FDA); Cindy A. Leissinger, M.D. (board-certified physician and Director of the Louisiana Center for Bleeding and Clotting Disorders);

and/or that a physician can reliably evaluate a Xarelto-treated patient's risk of bleeding with Neoplastin PT (approximately 14 hours after the last dose of Xarelto),[4] and thereby decide, along with the patient, whether to accept that risk. However, there is no sound basis for excluding the testimony of Plaintiffs' expert witnesses because their testimony is based on substantial evidence, including but not limited to published literature, Defendants' own clinical studies, Defendants' own internal documents, and testimony of Defendants' own employees and scientists.[5]

In addition, Defendants assert that the opinions of Plaintiffs' experts do not "fit" the facts of the *Boudreaux* and *Orr* cases, but, as shown below, this is a red herring based on distorted interpretations of Plaintiffs' experts' reports and relevant scientific literature. Defendants' criticisms, particularly through the use of selective deposition excerpts, *often taken out of context*, are not true *Daubert* challenges as they do not – nor can they – attack the methodology or the experts' qualifications. Indeed, Plaintiffs' experts' opinions and testimony are relevant, methodologically-sound, and reliable, and fully satisfy the standards set forth in Federal Rule of Evidence 702, as well as *Daubert* and its progeny,[6] and therefore Defendants' motions should be denied in their entirety.

---

John E. Maggio, Ph.D. (certified clinical pharmacologist); Suzanne Parisian, M.D. (former Medical Officer at the FDA); Laura M. Plunkett, Ph.D., D.A.B.T. (pharmacologist and board-certified as a Diplomate of the American Board of Toxicology); Henry Michael Rinder, M.D. (board-certified hematologist and internal medicine physician whose research focuses on the science of blood clotting and bleeding); and Jan Rosing, Ph.D. (a biochemist with immense research experience in thrombosis and hemostasis).

[4] A patient's bleeding risk also can be assessed using Innovin PT; however, measurements with that reagent are not as accurate as measurements with Neoplastin PT.

[5] *See In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 599 (E.D. La. 2005) (denying motion to exclude expert's testimony that Vioxx 25 mg causes an increased risk of thrombotic cardiovascular events, where the parties relied on the same material but simply interpreted it differently and reached contrary conclusions).

[6] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Gen. Elec. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As this Court has recognized, "[t]he threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual has the qualifications to do so."[7] "Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert."[8] "Under Rule 702, 'the expert is viewed, not in a narrow sense, but as a person qualified by knowledge, skill, experience, training or education.'"[9]

A proposed expert does not have to be "highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[10] Differences in conclusions likewise should be assessed by the factfinder at trial.[11]

---

[7] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011) (J. Fallon), *citing* Fed. R. Evid. 702.

[8] *Id.* (citation omitted).

[9] *Id., quoting* Fed. R. Evid. 702 Advisory Committee Notes.

[10] *See Huss v. Gayden*, 571 F.3d 442, 452, 455 (5th Cir. 2009) (stating the above, and ruling that a board-certified internist was qualified by education and knowledge to opine that a drug administered by the medical malpractice defendants did not cause or contribute to the patient's cardiomyopathy).

[11] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002), *quoting* Fed. R. Evid. 702 Advisory Committee Notes ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."); *Kelly v. Paschall*, No. W-03-CA-179, 2005 WL 5988648, at *3 (W.D. Tex. Apr. 19, 2005) ("When there are disputes between conflicting expert opinions on each side of the case, then the Court should defer to the jury for a determination.").

The Supreme Court mandates that the district court exercise its responsibility in acting as the "gatekeeper" for all types of expert testimony.[12] In exercising this responsibility, the district court is required to ensure that expert testimony is not only relevant, but also reliable.[13] With respect to the relevancy inquiry, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence.'"[14] "Expert testimony which does not relate to any issue in the case is not relevant and ergo, nonhelpful."[15] In other words, there must be a "fit" between the proposed testimony and the questions presented by the case.[16]

With respect to the reliability inquiry, this Court's focus "must be solely on principles and methodology, not on the conclusions that they generate."[17] "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation."[18] The court's role is "to make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[19] "Scientific testimony is reliable only if 'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known."[20] "The proponent need not prove that the expert's testimony is correct, but

---

[12] *See Daubert*, 509 U.S. at 597; *Kumho Tire,* 526 U.S. at 141.

[13] *Daubert*, 509 U.S. at 589; *Kumho Tire,* 526 U.S. at 141; *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

[14] *Daubert,* 509 U.S. at 591, *quoting* Fed. R. Evid. 702.

[15] *Id.* (citation omitted).

[16] *Id*.

[17] *Id.* at 595.

[18] *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (J. Vance), *citing Daubert,* 509 U.S. at 590.

[19] *Kumho Tire*, 526 U.S. at 152.

[20] *Vioxx,* 401 F. Supp. 2d at 573, *quoting Daubert,* 509 U.S. at 592-93.

must prove by a preponderance of the evidence that the methodology used by the expert was proper."[21]

Consistent with these requirements, *Daubert* provides a two-prong test for assessing the admissibility of expert testimony. In particular, the court "must determine at the outset … whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[22] "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[23]

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) the general acceptance of the methodology in the scientific community.[24] This is not a "definitive checklist or test;" rather, whether some or all these factors apply in a particular case depends on the nature of the issue, the expert's particular expertise, and the subject of his testimony.[25] The test of reliability is "flexible."[26] "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[27] "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures

---

[21] *Id.* (citation omitted).

[22] *Daubert*, 509 U.S. at 592.

[23] *Id.* at 592-93.

[24] *Id.* at 593-94.

[25] *Kumho Tire*, 526 U.S. at 150 (citations omitted).

[26] *Daubert*, 509 U.S. at 594.

[27] *Id.* at 141 (emphasis in original).

of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[28]

The "gatekeeper" role, while essential, is not intended to serve as a replacement for the adversary system.[29] Rather, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion by the jury, rather than its admissibility.[30] It would be unreasonable to require the subject of scientific testimony to "be 'known' to a certainty" because science is an evolving process which arguably has "no certainties."[31] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[32]

"Wholesale exclusion" is not an appropriate safeguard.[33] Rather, "[t]he validity or the correctness of the conclusion is for the fact finder."[34] "It is hornbook law that evidence is admissible under *Daubert* if there is an accepted scientific method for making a reliable measurement, even if the evidentiary significance of the measurement can be disputed."[35] A review of case law after *Daubert* shows that rejection of expert testimony is the exception rather than the rule.[36] As recognized by the Fifth Circuit, *Daubert* "did not otherwise work a sea change over

---

[28] *Id.* at 153; *see also United States v. Hicks,* 389 F.3d 514, 525 (5th Cir. 2004), *quoting Kumho Tire,* 526 U.S. at 141, 153.

[29] *Pipitone,* 288 F.3d at 250.

[30] *Johnson v. Samsung Elecs. Am., Inc.,* 277 F.R.D. 161, 165 (E.D. La. 2011) (J. Duval); *Viterbo v. Dow Chems. Co.,* 826 F.2d 420, 422 (5th Cir.1987).

[31] *Daubert*, 509 U.S. at 590.

[32] *Id.* at 596.

[33] *Id.*

[34] *Vioxx,* 401 F. Supp. 2d at 574; *see also Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (finding need to prove only reliability, and not correctness).

[35] *Cooper v. Brown*, 565 F.3d 581, 596 (9th Cir. 2009); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

[36] *Johnson,* 277 F.R.D. at 165 ("Notwithstanding *Daubert*, the Court remains cognizant that the rejection of expert testimony is the exception and not the rule.").

federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[37] Rather, deference should be given to the jury's role as the proper arbiter of disputes between conflicting opinions,[38] and evidence is "presumptively admissible unless excludable on some other ground."[39]

Accordingly, and as demonstrated below, Defendants' attempt to displace the jury's role in this case by mischaracterizing the proffered opinions of Plaintiffs' experts as "scientific guesswork"[40] should be rejected.

## ARGUMENT

### I.    Defendants' "Umbrella" Motions Are Procedurally Defective Because *Daubert* Must Be Applied on a Case-by-Case Basis.

Defendants are attempting to exclude ***any testimony and opinions*** offered by Plaintiffs' expert witnesses regarding "unapproved dosing," "monitoring regimens," and a "20-second PT cut-off guideline." By means of two "umbrella" motions, Defendants purport to apply *Daubert* to particular "topics," rather than to testimony of individual experts. As such, Defendants' motions are procedurally improper because Rule 702 governs whether a particular ***witness*** has offered admissible expert testimony – <u>not</u> whether a given ***issue*** is the proper subject of expert witness testimony.[41]

---

[37] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 2012).

[38] *Id.* at 1077,

[39] *Id.* at 1078.

[40] *See* D&M Br. at 1.

[41] *See* Fed. R. Evid. 702 ("***A witness*** who is qualified as an expert" may testify if "***the expert's*** … specialized knowledge will help the trier of fact" and "***the expert*** has reliably applied" a proper methodology based on sufficient facts.) (emphasis added).

In particular, the Supreme Court has concluded that a trial judge must determine, pursuant to Rule 702, "whether particular expert testimony is reliable."[42] The Court rejected the argument that a trial court's exclusion of expert witness testimony applied broadly to the methodology at issue, reasoning that "the question before the trial court was specific, not general."[43] The Court concluded that "[t]he trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'"[44] In accordance with these principles, courts apply Rule 702 on a case-by-case basis, analyzing case-specific facts and the specific testimony offered by a particular expert.[45]

Here, Defendants have improperly directed their two "umbrella" motions toward testimony and opinions regarding broad issues, rather than provide the required "detailed analysis of each challenged expert's background and opinion" on those topics.[46] In footnotes, Defendants list thirteen experts as *examples* of those who apparently provided challenged testimony on the issues of dosing, monitoring, and/or PT testing,[47] and then repeatedly cite one or two snipped portions of deposition testimony, *usually taken out of context*, and argue that this somehow represents the testimony of **all** of Plaintiffs' experts. Defendants follow this pattern throughout their brief; however, citing to only a few experts on general topics does not allow this Court to meaningfully evaluate Defendants' objections to the testimony of all Plaintiffs' experts on those issues.

---

[42] *Kumho Tire,* 526 U.S. at 152.

[43] *Id.* at 156.

[44] *Id.* at 156, *quoting* 4 J. McLaughlin, Weinstein's Federal Evidence 702.05[1], at 702-33 (2d ed. 1998).

[45] *See, e.g., United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) ("The rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization."); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, MDL No. 1373, 2004 WL 315148, at *3 (S.D. Ind. Jan. 23, 2004) ("We cannot apply the *Daubert* factors in a vacuum; again, whether the expert testimony comports to the *Daubert* standard must be determined according to the facts and law of each case.").

[46] *See Schwab v. Philip Morris USA, Inc.*, No. 04-cv-1945, 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005) (rejecting *Daubert* motion seeking to exclude testimony from a number of experts on the issue of cigarette safety).

[47] *See supra* note 2.

Defendants wrongly assume, in contending Plaintiffs' experts' opinions share a critical flaw, that they can somehow bypass a review of each expert's qualifications, methodology, and opinions. The defendants in the *NuvaRing* MDL similarly presented an "umbrella" motion seeking to exclude opinions of several plaintiffs' experts without addressing the qualifications of any particular expert in depth or reviewing the precise opinions under attack. The court in *NuvaRing* said that those arguments were cursory at best, and that the defendants' act of relying on the testimony of one expert to attribute a deficiency to the methods of the remaining experts was improper.[48] As in *NuvaRing*, this Court likewise should reject Defendants' similar challenge to the expert testimony and opinions at issue herein.

In fact, the absence of any attempt by Defendants to directly challenge any of Plaintiffs' experts' qualifications, or to discuss any of their *particular* opinions as they purportedly apply to the general topics Defendants contend are unreliable, is quite telling. Plaintiffs' thirteen expert witnesses are undoubtedly well-qualified, and provide scientifically valid, reliable opinions on scientific and medical issues that would undoubtedly help the jury.[49] Consequently, Defendants have made a backdoor attempt to distract this Court by seeking a "general" determination as to the admissibility of testimony of all of Plaintiffs' experts' on broad issues, as opposed to a specific

---

[48] *In re NuvaRing Prods. Liab. Litig.*, No. 4:08-MD-1964, 2013 WL 856218, at *3 (E.D. Mo. Mar. 5, 2013); *see also Bradley v. Cooper Tire & Rubber Co.*, No. 4:03-cv-94, 2005 WL 5989799, at *4-5 (S.D. Miss. Oct. 25, 2005) (observing that whether expert testimony as to defect and causation was admissible could not be determined on a global basis within an MDL, but rather required a case-specific inquiry to address the sufficiency of each plaintiff's expert's proof).

[49] As evidenced by the reports (and accompanying materials) of Plaintiffs' expert witnesses, each is sufficiently qualified based on his or her knowledge, education, training, and experience. Their opinions are reliable and based on sound methodology, and were formed after reviewing countless materials in combination with their knowledge, education, training, and years of experience. Finally, their testimony regarding complex scientific and medical issues undoubtedly would be helpful to and would assist the jury. *See* Exhibit 1, Backes Report; Exhibit 2, Bussey Report; Exhibit 3, Cuculich Report; Exhibit 4, Gerstman Report; Exhibit 5, Gosselin Report; Exhibit 6, Ix Report; Exhibit 7, Kessler Report; Exhibit 8, Leissinger Generic Report; Exhibit 9, Leissinger *Boudreaux* Report; Exhibit 10, Maggio Report; Exhibit 11, Parisian Report; Exhibit 12, Plunkett Report; Exhibit 13, Rinder Generic Report; Exhibit 14, Rinder *Boudreaux* Report; Exhibit 15, Rosing Report.

determination regarding the qualifications and testimony of each particular expert witness. Such a tactic should be rejected as an inappropriate basis of a motion filed under *Daubert* or Rule 702.[50] Therefore, Defendants' improper "umbrella" motions should be denied.

## II.   There Is Sufficient Evidence to Support Plaintiffs' Experts' Opinions that a Physician Is Able to Evaluate a Xarelto-Treated Patient's Risk of Bleeding with <u>Neoplastin PT.</u>

### A.   <u>Defendants Have Mischaracterized the Opinions of Plaintiffs' Experts.</u>

Plaintiffs agree with many of the statements in Defendants' briefs. Specifically, Plaintiffs agree with the following statements:

- "Like all anticoagulants, Xarelto can increase the risk of bleeding."[51]

- "The experts acknowledge, as they must, that their proposed 20-second PT cutoff requires two conditions: (1) the use of a specific PT reagent (meaning the particular agent used in the PT test to react with the patient's plasma sample), and (2) testing at a particular time after the last dose of Xarelto."[52]

- "PT is a generic coagulation test that measures how quickly a patient's blood clots. The result is expressed in seconds in relation to a particular time range (or 'reference range'), which depends on the particular agent used in the test to react with the patient's blood or plasma, called the 'reagent.'"[53]

---

[50] *See Kumho Tire,* 526 U.S. at 156 (as to *Daubert* motions, "the question before the trial court was specific, not general.").

[51] *See* D&M Br. at 1.

[52] *See* PT Br. at 2. The importance of these distinctions cannot be overstated. Plaintiffs' experts specifically advocate the use of the Neoplastin reagent to measure PT in a Xarelto-treated patient at steady state approximately 14 hours post-dose. These specific instructions are based on the data from Defendants' own Phase III clinical trial (as discussed further herein). To reiterate, Plaintiffs are not advocating a 20-second cut-off for PT in general, but for PT measured with the Neoplastin reagent. Thus, any attempts by Defendants to infer that measuring Xarelto with PT generally is representative of Plaintiffs' case are disingenuous and misleading.

[53] *See* D&M Br. at 3. Indeed, the Neoplastine label (attached as Exhibit 16) states that the "prothrombin time is a coagulation screening test. It **measures**, as a whole, the **activity** of the coagulation **factors** II, V, VII, *X* and I."

- "Plaintiffs' experts propose that doctors use PT tests to identify those Xarelto patients who are at a high bleeding risk."[54]

These statements make clear that Defendants fully understood Plaintiffs' experts' opinions. However, Defendants then proceeded to mischaracterize the opinions of Plaintiffs' experts, and Plaintiffs' vehemently disagree with those contentions. Plaintiffs' experts do not "opine that the risk of bleeding could be reduced if … the approved dose were changed"[55] or state that they are in favor of "individualized dose-finding."[56] These statements misrepresent Plaintiffs' experts' core opinions, namely that exposure to Xarelto is highly variable among patients, that exposure to Xarelto increases a patient's risk of bleeding, and that a physician can reliably evaluate a Xarelto-treated patient's risk of bleeding with Neoplastin PT (approximately 14 hours after the last dose of Xarelto) and thereby decide, along with the patient, whether to accept that risk. In order to fully evaluate the level at which Defendants misrepresent Plaintiffs' experts' opinions, the bases and ultimate conclusions of the relevant experts' opinions at issue will be reiterated and clarified below.

## B.    Defendants' Own Clinical Trial Supports the Opinions of Plaintiffs' Experts.

The opinions proffered by Plaintiffs' experts are supported *completely* by Defendants' own Phase III robust, multi-center, double-blinded, and randomized clinical trial: Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation ("ROCKET"). Specifically, the ROCKET trial established the following regarding the use of Xarelto:

---

(emphasis added). (The trade names Neoplastin and Neoplastine are interchangeable; the slight difference in name is attributable to international spelling conventions.)

[54] *See* D&M Br. at 3.

[55] *See* D&M Br. at 1.

[56] *See* D&M Br. at 2.

- Exposure to "Xarelto can increase the risk of bleeding."[57]

- Exposure to Xarelto is highly variable.[58]

- There is a linear relationship between Xarelto exposure and Neoplastin PT (as measured in seconds).[59]

- There is a correlation between Neoplastin PT and bleeding risk.[60]

- Xarelto-treated patients in the top quartile (of Neoplastin PT values) had a greater than doubling of the risk of a major bleed compared to the rest of the ROCKET population with lower PT values.[61]

Thus, the ROCKET trial, in and of itself, has *proven* that Xarelto increases a patient's risk of bleeding, that this risk of bleeding is variable among patients, and that Neoplastin PT can be used to evaluate the risk of bleeding in an individual Xarelto-treated patient. The only deviation from appropriate scientific and medical conduct is on the part of Defendants in that they have failed to properly and adequately communicate these important scientific findings to the medical community. This same opinion was expressed by the FDA, as discussed in the Summary Review memorandum for the atrial fibrillation indication:

> The clinical pharmacology and clinical reviewers demonstrated that there is a linear correlation between rivaroxaban levels and prothrombin time (PT). They also demonstrated that there is also a

---

[57] *See* D&M Br. at 1.

[58] Even though all Xarelto-treated patients in ROCKET took the same 20 mg pill, the top 5% had Xarelto-plasma concentrations eleven times higher than the lowest 5% of patients, thus demonstrating the high degree of variability in exposure with Xarelto use. *See* Exhibit 17, Mueck Article (2014).

[59] Analysis of the ROCKET data by the FDA revealed a linear correlation between Neoplastin PT and Xarelto plasma concentration: "The PK data from 161 ROCKET patients confirms the linear relationship between the plasma concentration of rivaroxaban, and the PT." *See* Exhibit 18, FDA Draft Briefing Document, at 38.

[60] The FDA analysis of ROCKET data also found a corresponding relationship between Neoplastin PT and bleeding risk in Xarelto-treated patients: "PT data from the 7008 patients in the ROCKET per protocol analysis dataset demonstrates that **the risk of major bleeds increases with PT**, regardless of whether major bleeding defined as ISTH major bleeding per the ROCKET protocol, or as TIMI major bleeding." *Id.* at 39 (emphasis added). This analysis thereby proved not only the relationship between Neoplastin PT and Xarelto, but also the fact that increasing Xarelto exposure leads to an increasing risk of bleeding.

[61] *See, e.g.*, Exhibit 19, Exploratory Analyses, at Tables 568, 571, 574, 577, 580, and 583; *see also* Exhibit 20, Kessler Dep., at 176:10-179:22.

correlation between PT and risk of bleeding. ***This applicant has not chosen to utilize this information*** … [I]nfrequent monitoring (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding may improve outcomes and be acceptable to patients.[62]

Thus, Defendants have not, and cannot, dispute these critically important scientific observations: patients on Xarelto have a higher risk of bleeding than patients not on Xarelto (as stated in their own memorandum),[63] not all Xarelto-treated patients have the same risk of bleeding, and PT (using the Neoplastin reagent) can be used to evaluate the risk of major bleeding in an individual Xarelto-treated patient. Contrary to Defendants' assertions, these facts are neither untested nor theoretical, and are in fact proven in Defendants' own clinical trial. Indeed, it seems the only controversy is what a physician should do with that information.[64]

Based on the data and analyses from Defendants' own study, some of Plaintiffs' experts opine that, for some patients, the risk of bleeding will outweigh the benefit of stroke reduction, and those patients could then choose to simply discontinue Xarelto. In other words, the risk of bleeding is different in every Xarelto-treated patient, and Neoplastin PT can be used to evaluate that risk in order for a physician to make a clinical judgment whether to accept any of that risk or to discontinue therapy with Xarelto.

---

[62] *See* Exhibit 21, FDA Summary Review, at 9 (emphasis added). Defendants did not present the FDA Summary Review to this Court. They instead suggested a conclusion at odds with the statements in the FDA Summary Review: that the FDA's "clinical reviewers wrote that monitoring could not be recommended 'due to a lack of information regarding'" variability and what action to recommend. *See* D&M Br. at 17 n.12, *quoting* FDA Advisory Committee Brief. However, when the omitted portion of that quote from the FDA Advisory Committee Brief is added, so the quoted portion of the statement is put in context, it is clear that the FDA was speaking only about dose adjustments: "Monitoring rivaroxaban therapy with ***sequential prothrombin times to optimize safety outcomes*** cannot be recommended." *See* Exhibit 18, FDA Draft Briefing Document, at 44. As stated throughout this memorandum, Plaintiffs do not contend that Xarelto's labeling should contain dose-adjustment recommendations based on PT measurements.

[63] *See* D&M Br. at 1.

[64] *Cf. Vioxx*, 401 F. Supp. 2d at 597 (denying motion to exclude expert testimony based on data from the same APPROVe study, where the parties' experts disagreed only as to their respective conclusions).

It is important to note that Plaintiffs' experts advocate the use of PT as measured with the Neoplastin reagent for the purposes of evaluating a Xarelto-treated patient's risk of bleeding, and in fact, Defendants confirm this position.[65] Notwithstanding that Defendants clearly acknowledge this aspect of Plaintiffs' case, Defendants, *whether intentionally or unintentionally*, obfuscate this distinction by incorrectly suggesting to this Court that Plaintiffs' experts advocate the use of PT generically (e.g, not Neoplastin PT) for the purpose of identifying Xarelto users at a high risk of bleeding and therefore are at odds with the scientific and regulatory community.

In short, PT is the terminology for a test to measure coagulation time. The result is expressed in the number of seconds. Depending on the laboratory conducting the test, a number of different reagents may be used to cause the blood to clot and measure the time it takes to do so. Neoplastin is one such reagent. Innovin is another such reagent, but there are numerous others. The interpretation of the test depends upon the reagent used, because each reagent is more or less sensitive to the pharmacodynamics effects caused by different drugs, and as each reagent has a different range of normal. As was proven during the Xarelto clinical trials, Neoplastin PT is highly sensitive to Xarelto and, for this reason, Plaintiffs' experts advocate for the use of only Neoplastin PT – and no other PT reagent – as the blood test to identify Xarelto patients at a high bleeding risk.

**C.   The Opinions of Plaintiffs' Experts Are Consistent With the Opinions of the Scientific and Regulatory Community.**

In an attempt to identify conflicts, Defendants cite to conferences held by the Cardiac Safety Research Consortium ("CSRC"), the European Medicines Agency ("EMA"), and the FDA, and their corresponding presentations, as evidence that the scientific community has concluded that the "PT tests cannot guide anticoagulant therapy with Xarelto or any of the other new oral

---

[65] *See* PT Br. at 2.

anticoagulants ('NOACs')."[66] However, Defendants fail to provide a clear context for these conferences, and instead mislead this Court by equating them to Plaintiffs' experts' opinions regarding PT.

In fact, these conferences discussed the possibility of *tailored dosing* based on pharmacokinetic/pharmacodynamic measurements with NOACs – in other words, whether to use such measurements to recommend regulatory-approved dosing adjustments. This concept, which stems from the routine monitoring process associated with warfarin use involving consecutive INR measurements (based on a general PT test) to adjust doses incrementally, must be distinguished from the measurement of Neoplastin PT to determine the risk of bleeding. To be clear, Plaintiffs' experts do not intend to offer opinions regarding repeated and incremental dose-adjustment (titration) based on general PT measurements, but will instead simply advocate that Neoplastin PT can be used to evaluate a Xarelto-treated patient's risk of bleeding.[67]

A closer examination of the materials presented at these meetings confirms that dose adjustment – not an evaluation of bleeding risk – was being discussed at these meetings:

- The CSRC conference was officially titled: "Is There a Role for Pharmacokinetic/Pharmacodynamics *Guided Dosing* for Novel Anticoagulants?"[68]

- A general objective of the EMA workshop was to "improve the understanding of … [the] [n]eed to further guide clinical decision-making on *dose adjustment* during routine use, when

---

[66] *See* D&M Br. at 8.

[67] In this context, some of Plaintiffs' experts have noted that in the clinical management of a particular patient with an excessive bleeding risk based upon a Neoplastine PT measurement, clinicians are not limited to the labeled doses. *See, e.g.*, Exhibit 22, Rinder *Mingo* Dep., at 98:11-15 ("I want to give the physicians the leeway to be able to use medications in a way that they feel is the most appropriate, including off-label use of the anticoagulants."). This clinical judgment could include the decision, in consultation with the patient, to lower the dose or withdraw therapy. The instructions for use that should have been included in the label pertaining to Neoplastin PT simply would have advised clinicians how to identify patients with a high risk of bleeding on Xarelto, which would have provided them with additional information they could use to improve patient care. Such statements are wholly appropriate, scientifically sound, and helpful to the jury in understanding how medicine is practiced.

[68] *See* D&M Br. at 8 n.5 (emphasis added).

major bleedings occur, or when the need for acute surgery emerges."[69]

- At the FDA workshop, FDA officers Drs. Jeffry Florian and Martin Rose presented "Correlation of Drug Levels and Outcomes in Phase III New Oral Anticoagulant (NOAC) Trials," which specifically discussed "Population **dose adjustment** for patient factors" and "**Dose adjustments** based on concentration or pharmacodynamic measurements."[70]

Defendants similarly attempt to obfuscate the state of the science by quoting the following statement by the FDA: "There are currently no cleared or approved devices that measure [the effect or concentration of direct oral anticoagulants]."[71] While it is an accurate statement, it is nonetheless *misleading*. Although it is true that there have been no *specific assays* particularly approved or cleared for the sole purpose of monitoring Xarelto, that in no way undermines Plaintiffs' contention that Neoplastin PT has been used, but more importantly, can be used, to evaluate the degree of anticoagulation in a Xarelto-treated patient.

Defendants even acknowledge that PT is a generic coagulation test not cleared for use with any particular drug.[72] As a result, Defendants' argument rests on nothing more than the false premise that a laboratory test must be specifically approved for use with a particular drug. However, and to the contrary, laboratory tests, like Neoplastin PT, are commonly employed to measure specific biological activities in the body. As the Neoplastine label makes clear, "[t]he prothrombin time is a coagulation screening test. It *measures*, as a whole, the *activity* of the coagulation *factors* II, V, VII, *X* and I."[73] As such, it is entirely appropriate to use this generic

---

[69] *See* Exhibit 23, Programme Agenda, at 1.

[70] *See* Exhibit 24, PowerPoint, at 20 (emphasis added).

[71] *See* D&M Br. at 8.

[72] *See* D&M Br. at 3, 9-10.

[73] *See* Ex. 16.

coagulation test to measure the activity of factor X in a patient on a drug that acts on factor X, such as Xarelto.

### D. The Use of Neoplastin PT for Assessing Xarelto Exposure is a Generally Accepted and Reliable Methodology.

Defendants contend that "no government agency or medical association has concluded that monitoring should be used in the normal course of Xarelto therapy,"[74] and that "Plaintiffs' monitoring opinions have not been accepted in the scientific community"[75] and "have not been subject to peer review and publication."[76] Defendants are wrong.

In fact, the use of PT (Neoplastin) to assess the anticoagulant effect and risk of bleeding associated with Xarelto use has been recommended by the following organizations:

- New Zealand Medicines and Medical Devices Safety Authority: "Xarelto at recommended doses prolongs the global clotting tests **prothrombin time (PT)**, activated partial thromboplastin time (aPTT), HepTest®, as well as the specific clotting test, anti-Factor Xa activity. **PT is influenced by Xarelto in a dose-dependent manner if Neoplastin® is used for the assay**. The 5/95 percentiles of PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e. at the time of maximum effect) is described in Table 1 (see Pharmacodynamic effects). In case of excessive doses, the PT is expected to be outside of this range."[77]

- Health Canada: "The **prothrombin time (PT)**, measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation to plasma concentration if the **Neoplastin® reagent** is used. In patients who are bleeding, **measuring the PT using the Neoplastin® reagent may be useful to assist in determining an excess of anticoagulant activity**."[78]

- FDA: "The clinical pharmacology and clinical reviewers demonstrated that there is a **linear correlation between**

---

[74] *See* D&M Br. at 9.

[75] *See* D&M Br. at 16.

[76] *See* D&M Br. at 17.

[77] *See* Exhibit 25, New Zealand Data Sheet, at 7 (emphasis added).

[78] *See* Exhibit 26, Canadian Monograph, at 9 (emphasis added).

rivaroxaban levels and [Neoplastin] prothrombin time (PT). They also demonstrated that there is also a **correlation between [Neoplastin] PT and risk of bleeding**. This applicant has not chosen to utilize this information … [I]nfrequent **monitoring** (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding **may improve outcomes** and be acceptable to patients."[79]

- <u>British Committee for Standards in Haematology</u>: "The **PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**, if a reagent with known sensitivity is used, but it cannot be used to determine the drug level."[80]

- <u>International Society on Thrombosis and Haemostasis</u>: "When a Quick-type PT reagent with known sensitivity is used, the **PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**."[81]

Further, there are multiple peer-reviewed publications that discuss the use of PT to evaluate the anticoagulant effect of Xarelto. Plaintiffs offer the following examples:

- "[W]e have hence developed an algorithm based on first-line tests for urgent **screening of the anticoagulant effect of direct oral anticoagulants**, which entails activated partial thromboplastin time (aPTT) for dabigatran and **prothrombin time (PT) for rivaroxaban…** [T]his strategy appears **suitable to reliably define** the thrombotic or **bleeding risk** in an urgent setting, contextually saving precious laboratory resources."[82]

- "The PT reagent (Thrombosis S) could be considered as a rough method to **monitor the anticoagulation activity of rivaroxaban and evaluate bleeding risk caused by rivaroxaban**."[83]

- "In Japanese patients with non-valvular atrial fibrillation receiving **rivaroxaban, a prolonged peak PT (≥20 s) could**

---

[79] *See* Exhibit 21, FDA Summary Review, at 9 (emphasis added).

[80] *See* Exhibit 27, Baglin Article (2012), at 429 (emphasis added).

[81] *See* Exhibit 28, Baglin Article (2013), at 758 (emphasis added).

[82] *See* Exhibit 29, Lippi Article, at 269 (emphasis added).

[83] *See* Exhibit 30, Zhang Article, at 2 (emphasis added).

**indicate increased risk of bleeding,** and both trough and peak
SF levels were reduced relative to baseline. **PT** and SF are both
**valuable measures of coagulation status in patients receiving
rivaroxaban**, regardless of prior anticoagulant history."[84]

Defendants do not offer, nor likely could they find, a single piece of literature indicating

that Neoplastin PT is an unacceptable tool to evaluate the degree of anticoagulation in a Xarelto-

treated patient. The only articles they cite discuss the shortcomings of measuring the concentration

of Xarelto with a generic PT test, inclusive of all available reagents, and not with a specific

Neoplastin PT test.

Additionally, Defendants' own scientists, when operating outside the context of litigation,

repeatedly identified Neoplastin PT as an appropriate tool. For example, Defendant Bayer's

Dagmar Kubitza (Clinical Pharmacology Lead for Xarelto and Head of Clinical

Pharmacodynamics) and Wolfgang Mueck (Head of Clinical Pharmacokinetics, Cardiovascular)

published the following:

- "This suggests that PT [Neoplastin], a routinely used
  coagulation test, could be used clinically to monitor the
  anticoagulant effect of BAY 59-7939[85] [rivaroxaban] if
  necessary."[86]

- "Nevertheless, if used in an emergency and in the absence of any
  other available test, Neoplastine Plus (with results expressed in
  seconds) is the recommended agent for assessing the
  anticoagulant effect of rivaroxaban."[87]

---

[84] *See* Exhibit 31, Nakano Article, at 185 (emphasis added).

[85] The term BAY 59-7939 was used in the early development stages to refer to rivaroxaban, the active ingredient in Xarelto.

[86] *See* Exhibit 32, Kubitza Multiple Dosing Article, at 880.

[87]*See* Exhibit 33, Mueck Article, at 11 of 17 (2013).

Similarly, Defendant Janssen prepared a document entitled "Coagulation Monitoring"[88] to disseminate – outside the context of litigation – in response to specific inquiries from practicing healthcare providers regarding coagulation parameters, which contained the following statements:

- "If assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test. The relationship between PT and rivaroxaban plasma concentration when Neoplastin Plus […] is used as the reagent is linear and closely correlated."[89]

- "In a human plasma study, STA Neoplastin Plus was found to be the most precise method for determination of rivaroxaban."[90]

- "The higher cut-offs of rivaroxaban plasma concentrations correspond to values associated with a significant risk of bleeding."[91]

Thus, even Defendants support the reliability of Neoplastin PT. Defendants claim, *only in the context of this litigation*, that Neoplastin PT is not a reliable method to evaluate the bleeding risk in a Xarelto-treated patient is not only contradictory and without merit, but an opinion that Defendants, *ironically*, created in violation of the law.[92]

### E. Plaintiffs' Experts Confirm that the Use of Neoplastin PT to Assess the Anticoagulant Effect of Xarelto is a Generally Accepted and Reliable Methodology.

In their next effort to confuse and undermine Plaintiffs' experts' opinions relating to Neoplastin PT as a method to identify those at a high risk of bleeding, Defendants contend that "Plaintiffs' experts concede that PT tests cannot be reliably used to monitor Xarelto concentration or activity."[93] In support of this assertion, Defendants cite excerpts from the depositions of

---

[88]*See* Exhibit 34, Xarelto Coagulation Monitoring.

[89] *Id*. at 1.

[90] *Id*. at 2.

[91] *Id*. at 3.

[92] *See Kumho Tire*, 526 U.S. at 152 (demanding that experts employ the same level of intellectual rigor in the courtroom as they do in practice).

[93] *See* D&M Br. at 9.

Plaintiffs' experts that not only are taken out of context, but also once again refer to PT as a generic test – not Neoplastin PT as it relates to Xarelto.[94,95] Any arguments by Defendants not specific to Neoplastin PT (that instead discuss PT generally) are misleading because Plaintiffs' position relates specifically to Neoplastin PT and its use with Xarelto, and not to the use of PT generically with any of the multitude of various reagents.

Defendants also attack the reliability of Plaintiffs' experts' opinions by contending that "Plaintiffs' monitoring opinions are untested and lack any supporting data,"[96] but Defendants' characterization of Plaintiffs' experts' opinions as "monitoring" opinions is not accurate. Plaintiffs do not suggest that Xarelto requires the type of routine clinical "monitoring" that has been implemented with warfarin. Routine "monitoring" is conducted with warfarin to ensure that patients are kept in a therapeutic range, so they are neither put at an excessive bleeding risk by over-anticoagulation nor at an excessive stroke risk by under-anticoagulation. Defendants use the term "monitoring" in their brief in an attempt to convince the Court that this is Plaintiffs' case. It is not. Rather, Plaintiffs' experts opine that Neoplastin PT can be used with Xarelto to identify a patient at a high risk of bleeding. It is not for the purpose of titrating doses to keep patients in a therapeutic range, but for deciding through a test early in the course of treatment whether Xarelto is putting a patient at too high of a bleeding risk.  To that end, Plaintiffs' theories were tested in

---

[94] *See* D&M Br. at 9-12. In making their argument, Defendants rely heavily on *In re Propulsid Prods. Liab Litig.*, 261 F. Supp. 2d 603 (E.D. La. 2003) (J. Fallon), where this Court rejected expert testimony regarding causation because the plaintiff's experts in that case had "fail[ed] to identify the exact mechanism by which" the relevant harm could occur "well after [a] person has ceased taking" the relevant drug. *Id.* at 617. Here, however, the testimony by Plaintiffs' experts sufficiently explains the mechanisms by which Xarelto affects patients. *Cf. Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 744 (M.D. Tenn. 2010) (distinguishing *Propulsid* in decision to admit expert testimony that had explained mechanisms by which Neurontin affects patients).

[95] Notable examples of deposition testimony cited by Defendants *that are clearly taken out of context* include the following: Exhibit 35, Rosing Dep., at 193:15-24, 197:24-198:1; Exhibit 36, Gosselin Dep., at 119:1–5, 122:11-125:6, 127:20–24, 133:14-134:2, 137:11–21, 140:20-141:9, 153:20-154:17; Exhibit 37, Cuculich Dep., at 196:25–197:5; Exhibit 38, Leissinger *Boudreaux* Dep., at 214:21–215:5, 215:15-216:4.

[96] *See* D&M Br. at 13.

Defendants' own clinical trial (ROCKET), which proved that Neoplastin PT can be used to evaluate the risk of bleeding in a Xarelto-treated patient, as detailed above.[97] Thus, there is no need for further testing.[98]

Defendants try to support an alternate conclusion by claiming that six of Plaintiffs' experts – Drs. Maggio, Plunkett, Rinder, Leissinger, Kessler, and Rosing – testified that their measurement opinions were untested and unsupported by data.[99] In doing so, Defendants again cite deposition excerpts that not only are taken out of context, but also refer to matters other than using Neoplastin PT to assess a Xarelto-treated patient's risk of bleeding. For example, the vast majority of Defendants' testimony excerpts on this matter refer to dose titration and/or dose adjustments,[100] which have no bearing on Plaintiffs' cases regarding Neoplastin PT and the evaluation of a patient's risk of bleeding. To be clear, and as stated earlier in this memorandum, Plaintiffs' experts

---

[97] *See* discussion *infra* Argument § II(B).

[98] *See In re Actos Prods. Liab. Litig.*, No. 12-cv-00064, 2013 WL 6796461, at *10 (W.D. La. Dec. 19, 2013) ("Had the Plaintiffs' experts merely relied on their 'education and experience' as did the expert in *Brown*, or completely ignored information in conflict with their opinions, Defendants' argument would be more persuasive, however, that is not the case."); *In re Chantix (Varenicline) Prods. Liab. Litig.*, 889 F. Supp. 2d 1272, 1287-88 (N.D. Ala. 2012) (denying motion to exclude testimony of plaintiff's epidemiology expert because although she had performed no studies, she considered all evidence concerning Chantix, from whatever source, and whatever result, in performing a weight of evidence analysis); *In re Tylenol (Acetaminophen) Mktg. Sales Practices and Prods. Liab. Litig.*, No. 2:12-cv-07263, 2016 WL 3997046, at *5 (E.D. Pa. July 26, 2016) (rejecting motion to exclude expert's opinion about the risk of acetaminophen-induced liver injury at recommended doses without statistically significant clinical evidence, where the opinion was based on weighing the "totality of the evidence" and his own clinical experience); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 176-77 (S.D.N.Y. 2009) ("It is well-settled that an expert on medical causation need not always base his opinion on epidemiological studies. Such a requirement would doom from the outset all cases in which the state of research on the specific ailment or on the alleged causal agent was in the early stages.") (internal quotations and citation omitted); *Newman v. Sikeston Dep't of Public Safety*, No. 1:00-CV-74, 2002 WL 34365839, at *4 (E.D. Miss. Mar. 14, 2002) ("The absence of direct epidemiological, or causation, evidence does not doom plaintiffs' case."); *McLain v. TuLane Fleeting*, No. 93-2165, 1995 WL 2272, at *2 (E.D. La. Jan. 3, 1995) ("[W]hile neither doctor can point to an epidemiological study, the Court is unwilling at this time to exclude this testimony in light of *Daubert*'s lessons.").

[99] *See* D&M Br. at 13-16.

[100] *See, e.g.,* Exhibit 39, Plunkett Dep., at 373:12-374:24; Exhibit 40, Leissinger Generic Dep., at 166:2-6, 168:23-169:2; Exhibit 20, Kessler Dep., at 317:4-7; Exhibit 35, Rosing Dep., at 230:6-232:23, 240:6-11. Moreover, Drs. Maggio and Plunkett, while eminently qualified in their field of pharmacology, are not clinicians, and therefore will not offer opinions on the clinical evaluation of a patient's bleeding risk.

do not intend to tell the jury that the label should include titration instructions based on Neoplastin

PT measurements.[101]

Additionally, the excerpt from Dr. Rinder's testimony related only to the small subgroup of atrial fibrillation patients with exceptionally rare fatal bleeding events. Dr. Rinder appropriately explained that due to the small number of events meeting that criterion, there was insufficient data to form an opinion as to this rare, non-statistically significant subgroup of fatal bleeding events:

> Q. Do you believe to a reasonable degree of medical certainty that as a Xarelto patient's PT increases, he or she is at a greater risk of a fatal bleed?
>
> A. So I – I have not seen data developed that would be able to inform me to make a knowledgeable decision **about that aspect.**[102]

This is why Dr. Rinder and the FDA focused on the larger, more common group of major bleeding events. This testimony does <u>not</u> serve to undermine his opinion that Neoplastin PT can be used to evaluate a patient's bleeding risk, as this single excerpt was based solely on the relationship between Neoplastin PT and *major bleeds*. To be clear, regarding the relationship between Neoplastin PT and bleeding events, Dr. Rinder testified that, in the FDA analysis of the ROCKET data, "with each quartile increase of PT, the hazard ratio for bleeding with Xarelto increased."[103]

As a last attack, Defendants contend that "Plaintiffs' monitoring opinions were developed exclusively for litigation and have not been subject to peer review and publication."[104] However,

---

[101] *See also* discussion *infra* Argument § II(C), § II(D), and note 67.

[102] *See* Exhibit 41, Rinder Generic Dep., at 253:11-22 (objection omitted) (emphasis added).

[103] *Id.* at 221:18-21. Regarding his opinion as it specifically pertains to the implications of measuring Neoplastin PT, Dr. Rinder also testified: "I think that a PT of greater than 20 seconds is, as I say here, a reasonable and conservative cut-off point at which the risks outweigh a benefit. And, therefore, a reasonable physician would consider discontinuing rivaroxaban if that PT level was achieved." *Id.* at 10:5-11:8.

[104] *See* D&M Br. at 17.

Plaintiffs' experts based their opinions in part on multiple published articles discussing the relationship between PT and Xarelto, including those published by Defendants' own representatives often prior to FDA approval and as much as a full decade prior to the filing of the first case in this litigation:[105]

- "This suggests that PT [Neoplastin], a routinely used coagulation test, could be used clinically to monitor the anticoagulant effect of BAY 59-7939 [rivaroxaban] if necessary."[106]

- "Inhibition of factor Xa activity and prolongation of [Neoplastin] prothrombin time correlated well with BAY 59-7939 plasma concentrations ($r$=0.949 and 0.935, respectively)."[107]

- "The availability of both pharmacodynamic and pharmacokinetic data for such a large number of patients enabled us to show a good correlation between these parameters, particularly between BAY 59-7939 concentrations and [Neoplastin] PT and factor Xa activity tests. Therefore tests such as [Neoplastin] PT may be used in future trials for monitoring, if necessary."[108]

- "Furthermore, the pharmacodynamic effects of BAY 59-7939 correlated well with its pharmacokinetic effects; inhibition of FXa activity and prolongation of prothrombin time both correlated strongly with BAY 59-7939 plasma concentrations."[109]

- "Selective FXa inhibitors show varying effects on the commonly used coagulation tests aPTT or [Neoplastin] PT, which use complex mechanisms within the coagulation pathway, such as feedback activation of the intrinsic pathway by thrombin…. Rivaroxaban affected [Neoplastin] PT and aPTT to a similar extent to that observed in previous Phase I studies; at clinically

---

[105] *See also, e.g.,* discussion *infra* Argument § (2)(D).

[106] *See* Exhibit 32, Kubitza Multiple Dosing Article, at 880.

[107] *See* Exhibit 42, Kubitza Single Dose Article, at 412.

[108] *See id.* at 420.

[109] *See* Exhibit 43, Eriksson Article, at 122.

relevant concentrations, rivaroxaban prolongs [Neoplastin] PT more than aPTT."[110]

- "Inhibition of FXa activity and PT both correlated strongly with rivaroxaban plasma concentrations. Inhibition of FXa activity correlated with rivaroxaban plasma concentrations following an $E_{max}^{Q6}$ model, whereas a direct linear relationship was observed between rivaroxaban plasma concentrations and PT."[111]

- "Rivaroxaban demonstrated anticoagulant effects in human plasma, with the prothrombin time being more sensitive than the activated partial thromboplastin time, a finding also observed with other direct factor Xa inhibitors in clinical development. This may be because direct factor Xa inhibitors, including rivaroxaban, are highly effective inhibitors of the prothrombinase complex, although differences in enzyme kinetics may also be responsible. A dose-dependent prolongation of prothrombin time was demonstrated *in vivo* in rat and rabbit models, with a strong correlation observed between prothrombin time and plasma concentrations of rivaroxaban (*r*=0.98)."[112]

- "There were close correlations between pharmacokinetic and pharmacodynamic parameters. Rivaroxaban plasma concentrations correlated closely with prolongation of prothrombin time and inhibition of factor Xa. Plasma concentrations correlated with prothrombin time both in healthy volunteers and in patients undergoing either total hip replacement (THR) or total knee replacement (TKR) in Phase II studies."[113]

- "The slope of the plasma concentration-PT correlation graph reflected the sensitivity of the [Neoplastin] PT to increases in rivaroxaban exposure. The [Neoplastin] PT correlated in an almost linear fashion with rivaroxaban concentrations ≤ 500 mg/L, confirming that the [Neoplastin] PT could be used to assess exposure."[114]

---

[110] *See* Exhibit 44, Graff Article, at 1406.

[111] *See* Exhibit 45, Laux Article, at 518.

[112] *See* Exhibit 46, Perzborn Article, at 67.

[113] *Id.* at 68.

[114] *See* Exhibit 47, Mueck Study (2011), at 684.

This evidence is enough to dispute Defendants' argument, because "expert testimony is excludable if developed only for litigation **if** it is not supported in some way by the expert's research and expertise unrelated to the litigation."[115] Clearly, that is not the situation here, where Plaintiffs' experts have relied not only on their knowledge, skill, experience, training, and education, but also on information gained from Defendants' own clinical trial (ROCKET), Defendants' own scientists, the FDA, other medical agencies around the globe, and peer-reviewed literature.[116] Finally, it is clear that the appropriate method of challenging such testimony is through vigorous cross-examination – rather than exclusion – so the jury may consider all facts.[117]

## III.   Defendants Incorrectly Characterize the Opinions of Plaintiffs' Expert Witnesses Regarding Dosing.

With respect to Defendants' attack on any opinions offered by Plaintiffs' experts regarding the dosing regimen of Xarelto, contrary to Defendants' assertion that Plaintiffs believe once-daily dosing is more dangerous than twice-daily dosing, Plaintiffs are instead simply stating that the pharmacological profile of a fixed once-daily dosing regimen heightens the need to test the anticoagulant effect of Xarelto with PT. As such, Plaintiffs represent that no expert will offer an opinion at trial that once-daily dosing is safer and/or more effective than twice-daily dosing, but Plaintiffs do intend to highlight the pharmacological profile and controversy surrounding the

---

[115] *See In re Levaquin Prods. Liab. Litig.*, MDL No. 08-1943, 2010 WL 8399942, at *10 (D. Minn. Nov. 4, 2010) (emphasis in original).

[116] *See id.* (disregarding that the expert had reviewed records only for the purpose of litigation because the reliability of his opinions was otherwise supported by his extensive experience); *Calder v. Blitz U.S.A.*, No. 2:07-cv-00387, 2010 WL 4442730, at *3 (D. Utah Nov. 1, 2010) ("Although Dr. Armstrong's opinion was developed for litigation, and should therefore be viewed with some caution, Dr. Armstrong testified credibly, and his methodology appears sufficiently reliable to be presented to the jury.") (internal citation omitted)

[117] *See Daubert*, 509 U.S. at 596; *see also Kirk v. Schaeffler Grp., U.S.A., Inc.,* No. 3:13-cv-5032, 2015 WL 12426834, at *3 (W.D. Mo. Sept. 29, 2015) ("Dr. Guzelian's opinion cannot be excluded simply because he has not previously opined, outside of this case, whether TCE has been shown to cause AIH in humans…. The question is whether Dr. Guzelian's *expertise* was developed for litigation or naturally flowed from the expert's research.") (internal quotations and citation omitted) (emphasis in original).

choice of the dosing regimen[118] as further evidence of the need to evaluate the bleeding risks in the Xarelto-treated population.

## IV.   Plaintiffs' Expert Testimony and Opinions Regarding the Increased Risk of Bleeding Posed to Mrs. Orr and Mr. Boudreaux are Sufficiently Reliable Under *Daubert*.

Next, Defendants contend: "There is no evidence that Mrs. Orr or Mr. Boudreaux were at a higher bleeding risk under plaintiffs' experts' theories."[119] Again, Defendants' contention is wrong. First and foremost, ROCKET clearly established that the higher the Neoplastin PT, the higher the risk of bleeding for a Xarelto-treated patient.[120] Therefore, it is a *statistical certainty*, based on the findings of Defendants' own clinical trial, that patients like Mrs. Orr and Mr. Boudreaux who experience a major bleeding event are more likely to have an elevated Neoplastin PT in comparison to patients who do not experience a major bleeding event.

Moreover, Defendants' reliance on the PT measurements observed in Mrs. Orr and Mr. Boudreaux on the day of their bleeding events is misplaced for the very reasons outlined in Defendants' own brief: "Neither Mrs. Orr nor Mr. Boudreaux had a PT test under the circumstances specified by Plaintiffs' experts – using the Neoplastin reagent 14 hours after the last dose of Xarelto."[121] Accordingly, due to the variability in PT reagents, it is inappropriate to compare Mr. Boudreaux's PT of 13.6 seconds using the Innovin reagent to the safety limit of 20

---

[118] *See, e.g.*, Exhibit 21, FDA Summary Review, at 3 ("There was no rational basis for the applicant's choice of the dose tested in ROCKET, 20mg once a day. The pharmacokinetic/pharmacodynamic properties of rivaroxaban suggest the drug should be administered twice a day."); Exhibit 48, Nissen Testimony, at 287:15-18 ("[M]y concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and that was a mistake.").

[119] *See* PT Br. at 4.

[120] Separate and apart from assessing a Xarelto patient's bleeding risk, in "patients who are [already] bleeding, measuring the PT using the Neoplastin reagent may be useful to assist in determining an excess of anticoagulant activity." *See* Exhibit 26, Canadian Monograph, at 9. This is for the purpose of timing safe surgical intervention, like in the case of Mrs. Orr, whose emergency surgery was unnecessarily delayed due to inadequate instructions in the United States label.

[121] *See* PT Br. at 4.

seconds established for the Neoplastin reagent, without accounting for this well-known and understood variability. This is precisely why Dr. Rinder relied upon peer-reviewed literature to determine that Mr. Boudreaux's PT Innovin of 13.6 seconds equated to greater than 20 seconds using PT Neoplastin.

Defendants' assertion that "Dr. Rinder's last-minute opinion regarding Mr. Boudreaux's PT lacks any scientific basis and cannot salvage Plaintiffs' experts' monitoring theories"[122] is false. In his timely-served expert report in Mr. Boudreaux's case, Dr. Rinder specifically and explicitly stated: "I incorporate by reference my general report in its entirety."[123] Dr. Rinder's generic report – incorporated through his case-specific report for Mr. Boudreaux – specifically includes the chart on which he relied to correlate Mr. Boudreaux's Innovin PT and corresponding Neoplastin PT.[124] This chart, as relied on by Dr. Rinder, enables any reader to perform such an exercise with any of the different reagents. Thus, Dr. Rinder's relation of Mr. Boudreaux's Innovin PT to a corresponding Neoplastin PT was neither belated nor unscientific.

Moreover, Defendants misrepresent the crux of Dr. Rinder's opinion. In particular, Dr. Rinder never indicated that he was in fact *converting* the PT value, but instead explained his methodology at his deposition as follows: "[I]t is – it is an indirect comparison, but one could use that graph to show approximately where a prothrombin time value using the Innovin reagent would ***correspond to*** a prothrombin time using a different prothrombin time reagent."[125] Dr. Rinder

---

[122] *See* PT Br. at 5.

[123] *See* Exhibit 14, Rinder *Boudreaux* Report, at 1.

[124] *See* Exhibit 13, Rinder Generic Report, at 11.

[125] *See* Exhibit 49, Rinder *Boudreaux* Dep., at 159:15-21 (emphasis added).

appropriately interpreted a chart contained in his expert report to determine what Mr. Boudreaux's Innovin PT value would have correspondingly been using the Neoplastin PT reagent.[126]

Finally, Defendants take portions of Dr. Leissinger's deposition out of context in an effort to mislead this Court and pit Plaintiffs' experts in the *Boudreaux* case, Drs. Rinder and Leissinger, against each other. In particular, Defendants cite to carefully excerpted portions of Dr. Leissinger's testimony, but completely brush over the fact that she had not been asked the same question as Dr. Rinder, specifically whether one can determine a patient's Neoplastin PT value based upon an Innovin PT result.[127] Further, even a cursory examination of Dr. Leissinger's generic expert report makes clear that she was fully aware of the literature supporting Dr. Rinder's conversion, as Dr. Leissinger cited the *exact same chart* in the body of her report.[128] Accordingly, any reliance on the snippets of Dr. Leissinger's testimony, taken out of context, to undermine Dr. Rinder and his opinions, is misplaced.

Once again, Defendants attempt to recast Plaintiffs' experts' opinions regarding PT by ignoring the context of the reagent variability issue, which Defendants themselves discussed in their own brief. Clearly, Defendants' criticisms of Plaintiffs' experts' opinions and testimony on this issue, particularly through the use of selective portions of deposition transcripts, *often taken*

---

[126] *See Moore,* 126 F.3d at 703 ("Rule 702, as elucidated by *Daubert,* authorizes a qualified expert in a realm outside of hard science to testify to an opinion or inference based on his knowledge, skill, experience, training, or education if it is soundly grounded in the principles and methodology of his discipline and is relevant to a fact in issue or to an understanding of the evidence."). *Cf. Silverman v. Watson Pharms., Inc.*, No. H-10-1952, 2013 WL 1413782, at *2 (S.D. Tex. Apr. 8, 2013) ("Here there is no great analytical gap [between the data and the opinion proffered]. Dr. Motyka explained, based on her years of experience, the function of a Certificate of Analysis. She further opined on the effect of the terms 'reduced frequency testing' and 'process monitoring data' in the context of a Certificate of Analysis. Right or wrong, her opinion is not an enormous leap from the data. And, Capsugel's criticisms of her opinion go the weight of her testimony, not the admissibility, and are proper subjects for vigorous cross-examination.").

[127] *See* Exhibit 38, Leissinger *Boudreaux* Dep., at 147:15-149:4 (testifying solely in terms of the generic PT test that was performed).

[128] *Compare* Exhibit 13, Rinder Generic Report, at 11 *with* Exhibit 8, Leissinger Generic Report, at 11.

*out of context*, are not true *Daubert* challenges. Such matters are better suited for cross-examination and do not in any way provide a valid basis for the exclusion of such opinions.[129]

## **CONCLUSION**

For all of the above reasons, Defendants' Joint *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens [Rec. Doc. 5113], and Defendants' Joint *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the *Orr* and *Boudreaux* Cases [Record Doc. 5114], should be denied in their entirety.

Respectfully submitted,

Dated:  February 27, 2017

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

---

[129] *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Moore*, 151 F.3d at 276 (finding need to prove only reliability, and not correctness).

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 27, 2017, the foregoing memorandum of law was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**