# Exhibit 8

Protected - Subject to Further Protective Review

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3     *********************************************************
 4    IN RE:  XARELTO                )   MDL 2592
 5    (RIVAROXABAN)                  )   SECTION L
 6    PRODUCTS LIABILITY             )   JUDGE ELDON E.
 7    LITIGATION                     )   FALLON
 8    THIS DOCUMENT RELATES TO:      )   MAG. JUDGE NORTH
 9    JAMES HENRY                    )
10    CASE NO. 2:15-CV-00224         )
11     *********************************************************
12
13
14     PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
15
16               The complete videotaped deposition
17   testimony upon oral examination of THERESA EMORY,
18   M.D., taken on behalf of the Defendants, in Newport
19   News, Virginia, on April 17, 2017.
20
21
22
23              GOLKOW TECHNOLOGIES, INC.
              877.370.3377 ph | 917.591.5672 fax
24                     deps@golkow.com
25
```

Protected - Subject to Further Protective Review

```
 1   APPEARANCES:
 2        On behalf of the Plaintiffs:
 3              MARK A. HOFFMAN, ESQUIRE
 4              Ross Feller Casey, LLP
 5              One Liberty Place
 6              1650 Market Street, Suite 3450
 7              Philadelphia, Pennsylvania 19103
 8              (215) 574-2000
                Mhoffman@rossfellercasey.com
 9
10        On behalf of the Defendant Bayer:
11              JOHN S. PHILLIPS, ESQUIRE
12              Bartlit Beck Herman Palenchar & Scott LLP
13              1899 Wynkoop Street, 8th Floor
14              Denver, Colorado 80202
15              (303) 592-3100
                John.phillips@bartlit-beck.com
16
17        On behalf of the Defendant Janssen:
18              JOHN A. MCCAULEY, ESQUIRE
19              MELISSA M. O'TOOLE-LOUREIRO, ESQUIRE
20              Venable LLP
21              750 E. Pratt Street, Suite 900
22              Baltimore, Maryland 21202
23              (210) 244-7616
                Mmloureiro@venable.com
24
25        Also Present:  Alex Powers, Videographer
```

 1          A.      I agree.
 2          Q.      And it is your opinion that twice-a-day
 3   dosing produces lower peak blood levels?
 4          A.      Yes.  That was what the FDA-simulated
 5   model showed, which makes sense.
 6          Q.      Are you aware of any study that says
 7   bleeding risks correspond to peak levels?
 8          A.      Not a study that is just about the peak
 9   levels.  No.
10          Q.      Are you aware of any study that indicates
11   that bleeding risks corresponds to a person's peak
12   levels of Xarelto?
13          A.      A study that shows it directly that the
14   peak levels show it?  Well, there were studies that
15   showed that the Xarelto patients had a higher risk of
16   gastrointestinal bleeding and their peaks were going
17   to be higher, I guess, because -- so I would have to
18   pull the literature.
19          Q.      Sitting here right now, can you identify
20   for me any study that says bleeding risks corresponds
21   to peak levels of Xarelto?
22          A.      Not off the top of my head.
23          Q.      Have you considered whether bleeding risk
24   is more correlated to trough levels?
25          A.      Trough is an area of concern.

1    Q.    Have you made an inquiry into the extent
2  to which bleeding risk is correlated to trough levels
3  rather than peak levels?
4    A.    Troughs are what people have measured in
5  the studies that I reviewed.
6    Q.    If trough concentrations are the
7  strongest predictor of bleeding risks, do you agree
8  that twice-a-day dosing could lead to a greater
9  bleeding risk than once-a-day dosing?
10           MR. HOFFMAN:  Objection.
11           THE WITNESS:  Not necessarily.  Unless
12  that study has been done, I can't agree to that.
13  BY MR. PHILLIPS:
14    Q.    You are not aware of any study that
15  looked at that question, is that fair?
16    A.    Not off the top of my head.  I don't have
17  my literature in front of me.
18    Q.    But sitting here right now, you can't
19  identify for us any study that looked at that
20  question?
21           MR. HOFFMAN:  Objection.
22           THE WITNESS:  Say it again, the question.
23  BY MR. PHILLIPS:
24    Q.    Sitting here today, you can't identify
25  for us -- let me back up.  Sitting here today, do you

1   have a view as to whether peak concentrations or
2   trough concentrations are the strongest predictor of
3   bleeding risk in a person taking Xarelto?
4        A.   I don't have an opinion.
5        Q.   In Opinion E, on Page 6, you talk about
6   dose-adjustment testing for Xarelto.
7        A.   Yes.
8        Q.   Do you agree that if the dose of an
9   anticoagulant is reduced, not only might that reduce
10  the risk of a bleed but it would also increase the
11  risk of a stroke?
12            MR. HOFFMAN:  Objection.
13            THE WITNESS:  Well, that is quite
14  interesting that you ask that because in the studies
15  that were done, the efficacy curve was almost flat.
16  So there came a point where you got the PT up to 12 or
17  14 and that would be a good dose to be on, maybe 14;
18  but once it went over 19, you didn't experience the
19  benefit of the drug, you just experienced an increased
20  risk of a bleed.  And I think that that was in the
21  mock article.  I am not 100 percent sure.  But the
22  efficacy, the improvement of -- or the decreasing the
23  risk of stroke was not improved at a higher and higher
24  PT.  So the lower the dose you were on of that drug
25  the better after you would be.

```
 1        A.      That is right.
 2        Q.      You are not testifying as of today that
 3   you know of a different dose he should have been on?
 4        A.      Correct.
 5        Q.      And you don't have any opinion as of
 6   today about how much lower his dose should have been
 7   below 20 milligrams once a day?
 8        A.      Correct.
 9        Q.      Do you agree that one would need clinical
10   studies and data to conclude that a different dose
11   would have been appropriate for Mr. Henry?
12               MR. HOFFMAN:  Objection.
13               THE WITNESS:  No.  I think, when you look
14   at labels that are outside of the United States, you
15   actually have it in there already that PT can be
16   monitored.  So the clinical studies were done in
17   bringing this drug to market to allow for that
18   evaluation to be done without an additional clinical
19   study.  They have been done.
20   BY MR. PHILLIPS:
21        Q.      Is there a specific PT number that you
22   believe warrants a discontinuation of an
23   anticoagulant?
24               MR. HOFFMAN:  Objection.
25               THE WITNESS:  A specific number, no;
```

1   to not monitor an anticoagulant. That is so

2   preposterous in my way of thinking.

3   BY MR. MCCAULEY:

4         Q.    So what I am trying to understand is you

5   said all laboratories or most laboratories, or

6   something like that, consider PT of 20 too high for

7   Rivaroxaban.

8         A.    I am sorry. I misspoke. That is

9   incorrect.

10        Q.    Okay. So that is not true.

11        A.    That is not what I meant to say.

12        Q.    Okay. Do any laboratories consider 20 or

13  above too high?

14        A.    I have absolutely no idea on Rivaroxaban

15  because it is not being monitored. And, as a matter

16  of fact, we wanted to be able to monitor these drugs

17  but no one wants it because it is not recommended by

18  the company to monitor these drugs.

19        Q.    All right. So now -- so now back to my

20  question. If you are a clinician and you get a PT

21  value of 20, how do you know that the risk of bleeding

22  has exceeded the benefit of stroke prevention in that

23  particular patient?

24        A.    I don't know.

25        Q.    Okay. Now, if you -- if you,

Protected - Subject to Further Protective Review

```
 1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2           I, Rebecca L. Braley, RMR, CRR, a Notary Public
 3    for the Commonwealth of Virginia at Large, of
 4    qualification in the Circuit Court of the City of
 5    Virginia Beach, Virginia, and whose commission expires
 6    April 30, 2019, do hereby certify that the within
 7    deponent, THERESA EMORY, M.D., appeared before me at
 8    Newport News, Virginia, as hereinbefore set forth; and
 9    after being first duly sworn by me, was thereupon
10    examined upon her oath by counsel; that her
11    examination was recorded in Stenotype by me and
12    reduced to typescript under my direction; and that the
13    foregoing transcript constitutes a true, accurate, and
14    complete transcript.
15           I further certify that I am not related to nor
16    otherwise associated with any party or counsel to this
17    proceeding, nor otherwise interested in the event
18    thereof.
19           Given under my hand and notarial seal at
20    Virginia Beach, Virginia, this _____ day of
21    _____, 2017.
22                               _____
23                               Rebecca L. Braley, RMR, CRR
24                               Notary Public, 7097551
25
```