## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo, et al. v. Janssen Research & Development, LLC et al. | MAGISTRATE NORTH |
| Case No. 2:15-cv-03469 | |

### DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' DESIGN-DEFECT CLAIM

Defendants hereby move for summary judgment on Ms. Mingo's design-defect claim on the ground that federal law preempts such a claim.[1]

### INTRODUCTION

Plaintiffs' liability theories have shifted and morphed as this litigation has progressed.  *See* Order (Doc. 6640), at 7 ("After a year of discovery, dozens of depositions, and multiple motions, Plaintiffs have narrowed their theory and have entered stipulations saying the same.").  Their initial design-defect theory—and their experts' opinions—focused on Xarelto's FDA-approved dosages and the absence of a recommendation that doctors monitor their patients' Xarelto-related coagulation parameters for dose-adjustment purposes.  But in response to Defendants' dispositive-motion briefing in the *Boudreaux* and *Orr* cases, Plaintiffs dramatically changed course, abandoning those

---

[1] The Court has addressed Defendants' preemption arguments before, in the context of the first two Xarelto® bell-wether trials.  In the interest of efficiency and judicial economy, Defendants hereby expressly incorporate all of the earlier briefing and argument from the *Boudreaux* and *Orr* cases regarding their argument that federal law preempts Plaintiffs' design-defect claims.  Defendants ask that the Court consider that earlier briefing also to have been filed in this case.  In particular, Defendants direct the Court to the following briefs related to Plaintiffs' design-defect claims in the *Boudreaux* and *Orr* cases: Docs. 5109-1, 5678, 5904, and 5988.  Defendants also incorporate the March 23, 2017 oral argument related to Defendants' argument that federal law preempts Plaintiffs' design-defect claims.

theories to focus instead on Xarelto's lack of an anti-Factor Xa assay or a reversal agent.  On the eve of those trials, after argument and a ruling upon the dispositive motions, Plaintiffs changed course again by dismissing their design-defect claims, narrowing the case to be considered by the jury to only failure-to-warn claims.  *See* Stipulation & Order (Doc. 6298); *see also* Stipulation & Order (Doc. 5340).  But then in the course of the *Orr* trial, Plaintiffs once again pressed theories about Xarelto's dose and dosing regimen, arguing that such evidence is "relevant to and a predicate for" their failure-to-warn case because it shows "characteristics which pose the risk of harm."  *Orr* Trial Tr. at 512:14–513:2.

It is unclear what form Plaintiffs' theories will take here, but however Plaintiffs frame their case, federal law preempts their design-defect claim.

1.    **Dosing.**   At the outset of this litigation, Plaintiffs and their experts asserted that Xarelto is defectively designed because the particular dosages and dosing regimen approved by FDA render the medicine unreasonably dangerous.  Those opinions do not expressly apply to a case like this one, where the plaintiff used Xarelto to treat her deep vein thrombosis (DVT).  Nonetheless, Plaintiffs contended (a) that the cumulative daily dose should be lower than that approved by FDA and that Xarelto should be dosed twice daily—as opposed to once daily—throughout treatment, and (b) that doctors should be instructed to adjust the agency-approved doses according to the results of coagulation-monitoring tests.  These dosing-related claims—all of which challenge Xarelto's FDA-approved design—are preempted by federal law.

Defendants previously explained in their *Boudreaux/Orr* motion for summary judgment that Plaintiffs' dosing-related arguments are both contrary to law and dangerous to public health.  In those cases, Plaintiffs responded by renouncing their dosing-related theories.[2]  Should Plaintiffs

---

[2] *See* Doc. 5531, at 2 ("Plaintiffs are *not* asserting that the Defendants should unilaterally lower the approved dose of Xarelto to provide a different dosing regimen without FDA approval."); *id.* at 3 (noting that claims "ha[ve] nothing to

renew those claims here, federal law preempts them.  The governing law is clear.  Under applicable

FDA regulations—and for that matter binding Supreme Court precedent—**no** manufacturer,

"whether generic or brand-name," can change an approved medicine's design unilaterally, *i.e.*,

without prior FDA approval.  *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013).  Were it

to do so, "the altered chemical would be a new drug" requiring new FDA approval.  *Id.* at 2475.

And yet that is *precisely* what Plaintiffs would have Defendants do—in particular, by altering the

dosages that FDA approved for Xarelto.  Because Defendants cannot "independently" change

agency-approved dosages—and indeed are flatly prohibited from doing so—Plaintiffs' dosing-

related claims are preempted.  *Id.* at 2470.

> **2.     Anti-Factor Xa assay and reversal agent.**  In response to Defendants' *Bou-*
*dreaux*/*Orr* dispositive motions, Plaintiffs asserted that their "actual design defect claim" is that

Xarelto is defectively designed and unreasonably dangerous because Defendants did not develop

or design, at the time that FDA initially approved Xarelto, two "adjunct" products—namely, "an

anti-Factor Xa assay specifically calibrated to Xarelto" or an antidote/reversal agent.  Doc. 5531,

---

do with altering approved dosage strength, dosing intervals, or dose titration"); *id.* at 4, 26; Doc. 5641, at 11 ("Plaintiffs' experts do not 'opine that the risk of bleeding could be reduced if . . . the approved dose were changed' or state that they are in favor of 'individualized dose-finding.'").

Assuming that Plaintiffs are again abandoning those theories here, the Court should enter an order dismissing with prejudice any claims that are based on those theories.  *See* Doc. 5678, Exh. 47.  As Defendants have noted, in *Orr*, Plaintiffs abandoned their dosing-related claims in response to Defendants' dispositive motions.  *See, e.g.*, Pls.' Opp. to Defs.' Dosing, Monitoring and Design Preemption MSJ (Doc. 5531) at 2 ("Plaintiffs are not asserting that the Defendants should unilaterally lower the approved dose of Xarelto to provide a different dosing regimen without FDA approval . . . .").  Furthermore, they expressly represented that "no expert will offer an opinion at trial that twice daily dosing is safer and/or more effective than once daily dosing."  *See* Pls. Opp. to Defs.' *Daubert* Mot. (Doc. 5527), at 26.  Despite this abandonment—and despite their representations—they nonetheless introduced dosing-related evidence and argued that (a) Xarelto would be safer if dosed twice daily instead of once daily and (b) the 20mg dose is too high.  Plaintiffs should not be allowed to avoid a ruling on these issues and subject Defendants to unfair surprise at trial.  *Cf. Jones v. Wells Fargo Bank*, No. 16-10042, 2017 WL 2367978, at *3 (5th Cir. June 1, 2017) (noting that "basic fairness entitles a defendant to notice, before trial, of . . . the nature of the claims being asserted against it").

at 3, 11 n.34.[3]  That claim, like Plaintiffs' contention that Xarelto should have been designed for use in conjunction with a PT-monitoring assay, is preempted for the simple reason that Defendants cannot "independently" develop and market (or alter Xarelto's design to incorporate) these adjunct products, which require separate FDA pre-approval.  Plaintiffs ultimately dismissed with prejudice their design-defect claims in both *Boudreaux* and *Orr*.  *See* Docs. 6298, 6601.

     **3.**     This Court denied Defendants' *Boudreaux/Orr* design-defect preemption motion (*see* Order and Reasons on Defs.' Dosing & Monitoring Preemption MSJ (Doc. 6196)), rejecting the proposition that the Supreme Court's decision in *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466 (2013), applies to manufacturers of brand-name prescription drugs (like Defendants). *See id.* at 5–6 (holding that Defendants' invocation of *Bartlett* "stretch[es] the law beyond its current bounds" because *Bartlett*'s analysis "relate[s] to generic drug manufacturers").  Moreover, the Court adopted Plaintiffs' related argument that they could avoid impossibility preemption by arguing that Xarelto could have been more safely designed "pre-approval"—*i.e.*, that Defendants could have brought a differently designed drug to market in the first instance.  *See id.*  In so holding, the Court followed *Guidry v. Janssen Pharmaceuticals, Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016).  *See id.*

     **4.**     It is unclear what tack Plaintiffs will take in this case, which involves a plaintiff who used Xarelto for a different indication and arises under different state law than the first two bellwether cases.  That is particularly true in light of the fact that Mississippi law has never imposed a duty of care on a pharmaceutical manufacturer before the product is approved for use.  But however Plaintiffs frame their design-defect claims here, those claims are preempted.  For several

---

[3] *See also id.* at 3 ("Defendants should have … designed and incorporated as part of the dosing regimen of Xarelto an Anti-Factor Xa assay specifically calibrated to Xarelto"); *id.* at 6 (Defendants had a duty to "design a Xarelto specific anti-factor Xa assay"); *id.* at 11 (Defendants "should have provided a Xarelto specific anti-Factor Xa assay").

reasons, this Court should not follow its previous order.  *First*, by Defendants' count, at least a dozen courts have, contrary to the Court's previous ruling, held that *Bartlett*'s reasoning applies to generic and brand-name prescription-drug manufacturers alike.  *See infra* n.5.  *Second*, the *Guidry* decision—like the recent decision in *Young v. Bristol-Myers Squibb*, No. 4:16-cv-00108, 2017 WL 706320 (N.D. Miss. Feb. 22, 2017), which followed *Guidry*—is both distinguishable and wrongly decided.  Indeed, the Sixth Circuit has come to the exact opposite conclusion as those decisions, holding in *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015), that federal law preempts both so-called "pre-approval" and "post-approval" design-defect claims.  *Finally*— and perhaps most importantly—this case is distinguishable from the earlier, Louisiana-law *Boudreaux* and *Orr* cases because this case is governed by Mississippi law, and *no court has ever recognized that Mississippi law imposes a "pre-approval" duty on manufacturers*.  The *Young* court declined to reach that issue because the parties had not briefed it.  *See id.* at *8.  There is no basis for this Court, sitting in diversity, to expand Mississippi law to impose such a duty.  Accordingly, any "pre-approval" design-defect claim here fails on state-law grounds for that reason alone, but even if such a claim arguably exists under Mississippi law, it is preempted for the reasons explained below.

\* \* \*

The Court should grant Defendants summary judgment on Plaintiffs' design-defect claim because federal law preempts it.

## BACKGROUND

As reflected in the operative label, FDA has approved Xarelto for multiple indications, each time at a specific dose, and without a monitoring requirement or recommendation:

| Indication | Dosage | |
|---|---|---|
| Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation (2.3) | CrCl >50 mL/min: | 20 mg once daily **with the evening meal** |
| | CrCl 15 to 50 mL/min: | 15 mg once daily **with the evening meal** |
| Treatment of DVT (2.4) Treatment of PE (2.4) | 15 mg <u>twice daily</u> with food, for first 21 days | |
| | ▼ **after 21 days, transition to** ▼ | |
| | 20 mg once daily with food, for remaining treatment | |
| Reduction in the Risk of Recurrence of DVT and of PE (2.4) | 20 mg once daily with food | |
| Prophylaxis of DVT Following Hip or Knee Replacement Surgery (2.5) | Hip replacement: | 10 mg once daily for 35 days |
| | Knee replacement: | 10 mg once daily for 12 days |

Jan. 2015 USPI § 2 (Exh. 1).[4]

As particularly relevant to this case, in November 2012, FDA approved Xarelto for the "treatment of deep vein thrombosis, the treatment of pulmonary embolism, the reduction in risk for deep vein thrombosis and the reduction in risk for pulmonary embolism."  Plaintiff Dora Mingo used Xarelto to treat her DVT, which she developed after the anticoagulation therapy that she was using (Lovenox and then aspirin) following her hip replacement surgery failed.  DVT occurs when a blood clot forms in one or more of the deep veins in the body—for Ms. Mingo, the blood clot was in her leg.  As shown in the table above, for patients like Ms. Mingo who use Xarelto to treat DVT, FDA specified Xarelto's dosage as "15 mg twice daily with food, for [the] first 21 days" and followed by "20 mg once daily with food, for remaining treatment."

This motion addresses the following dosing, monitoring, and other design-related claims and theories, as articulated in the *Mingo* complaint and elaborated in Plaintiffs' expert reports:

1.      Xarelto is defectively designed on the grounds that—

a.      the approved total daily dose for DVT/PE patients is too high;

---

[4] Indeed, Xarelto's label states that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing …."  Jan. 2015 USPI §§ 5.7, 8.1.  The January 2015 label was in effect when Ms. Mingo was prescribed and began to use Xarelto.

      b.      the medicine should be dosed twice daily throughout the treatment period rather than once daily after the first 21 days of treatment, as indicated; and

      c.      doctors should be instructed to adjust patients' doses according to the results of blood-monitoring tests aimed at determining the concentration of Xarelto in patients' blood or their Xarelto-related coagulation parameters.

      d.      the medicine does not specifically incorporate the use of a test or assay to monitor patients' prothrombin time ("PT") as a means of measuring their Xarelto-related coagulation parameters.

2.      Xarelto is defectively designed on the ground that it does not specifically incorporate the use of a Xarelto-specific anti-Factor Xa assay or an antidote/reversal agent.

Because federal law preempts Plaintiffs' dosing, monitoring, and other design-related claims, Defendants are entitled to summary judgment on those claims.

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2. "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'" *Bartlett*, 133 S. Ct. at 2473. It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, "state and federal law conflict"—and state law is preempted—"where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). The Supreme Court has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions: *Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013).

These decisions explain that "[t]he question for 'impossibility' is whether the [defendant

drug manufacturer] could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*). And by "independently," the Supreme Court has made clear it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required"). Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 564 U.S. at 623–24.

Under the *Levine-Mensing-Bartlett* trilogy, if the defendant manufacturer cannot "independently" and "unilaterally" do what a plaintiff's state-law claim would require—*i.e.*, take remedial action without obtaining FDA's prior approval or seeking FDA's help—the claim is preempted.[5]

## ARGUMENT

Federal law preempts Plaintiffs' design-defect claims because those claims, however framed, would require Defendants to take actions that they cannot lawfully take "independently." Because preemption presents a pure question of law that is appropriately decided on summary judgment, *see, e.g.*, *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 375 (5th Cir.

---

[5] Since *Bartlett* was decided in 2013, courts have overwhelmingly concluded that the *Levine-Mensing-Bartlett* "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Dev. LLC*, Civ. A. No. 4:15-CV-0204, 2016 WL 3748771 (N.D. Ga. July 11, 2016); *Fleming v. Janssen Pharm., Inc.*, No. 2:15-cv-02799, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal*, 2016 WL 1086028; *Batoh v. McNeil-PPC, Inc.*, No. 3:14-cv-01462, 2016 WL 922779 (D. Conn. Mar. 10, 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014). *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

2012), this Court should grant Defendants' motion.[6]

## I.  Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous because the medicine's FDA-approved dosages are too high or should be reduced.

Following careful deliberation about the safety and efficacy of different dosages, FDA approved Xarelto in particular strengths and doses for particular indications.  As relevant to this particular case, FDA approved Xarelto for the "the treatment of deep vein thrombosis, the treatment of pulmonary embolism, the reduction in risk for deep vein thrombosis and the reduction in risk for pulmonary embolism" and specified Xarelto's dosage for those patients (like Ms. Mingo) as "15 mg twice daily with food, for [the] first 21 days" and followed by "20 mg once daily with food, for remaining treatment."  Jan. 2015 USPI.  That supplemental approval was based on the EINSTEIN clinical trial.

Plaintiffs' complaint and their experts' opinions nonetheless challenge Xarelto's design on three grounds, all of which relate to the medicine's FDA-approved dosages:

- **First**, Plaintiffs assert that the approved 20 mg daily dose for Xarelto is "too high."  *See, e.g.*, Smart Rep. at 5 (Doc. 5109, Exh. 9) ("The dose of Xarelto . . . is too high."); *id*. at 6 ("[The] 15/20 mg daily dose … is excessive."); Rosing Rep. at 21 (Doc. 5109, Exh. 10) (advocating "a reduction in the total daily dose"); Backes Rep. at 11 (Doc. 5109, Exh. 11) ("too high"); Parisian Rep. at 9, 10, 159, 365 (Doc. 5109, Exh. 12) ("too high").[7]

- **Second**, Plaintiffs contend that Xarelto should be dosed twice daily throughout the entire treatment period.  *See, e.g.*, Backes Rep. at 12 (advocating "multiple dosing (e.g. twice per day at 10 mg vs. OD at 20 mg), or development of a time-released formulation of Xarelto"); Cuculich Rep. at 14 (Doc. 5109, Exh. 13) ("twice-daily smaller dose" in place of approved "once-daily larger dose"); Rosing Rep. at 5 ("twice daily dosing" rather than "once daily

---

[6] This Court has repeatedly concluded, in the context of this litigation, that preemption is a question of law that is to be decided by the Court. *See, e.g.*, *Boudreaux* Tr. at 1147:3–15, 1531:5–20; Order & Reasons (Doc. 6254; Apr. 18, 2017), at 5 (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact").

[7] All of these dose opinions are based on ROCKET AF.  Plaintiffs designated only one expert, Dr. Curt Furberg, to offer opinions regarding the EINSTEIN clinical trial, but after Dr. Furberg's deposition, Plaintiffs withdrew him as an expert in this or any other MDL bellwether case.

dosing"); Gerstman Rep. at 64 (Doc. 5109, Exh. 14) (advocating "10 mg twice-daily riva-roxaban" dosing).[8]

- **Third**, Plaintiffs assert that doctors should be instructed to adjust patients' doses according to the results of PT-monitoring tests designed to measure Xarelto-related coagulation parameters. *See, e.g.*, Cuculich Rep. at 4 (advocating "a way to measure the plasma concentration or anticoagulant effect of the medication in a patient-specific way" for purpose of "dosing adjustment to tailor the perfect amount of anticoagulant effect while avoiding unnecessary bleeding"); Backes Rep. at 12 (similar); Bussey Rep. at 5 (Doc. 5109, Exh. 15) (similar); Gerstman Rep. at 60 (similar); Parisian Rep. at 9 (similar); Plunkett Rep. at 32 (Doc. 5109, Exh. 16) (similar); Rinder Rep. at 14 (Doc. 5109, Exh. 17) (advocating that "Xarelto should be discontinued in patients whose PT … is greater than 20 seconds"); Kessler Rep. at 80 (Doc. 5109, Exh. 18) (similar).

Plaintiffs' dosing-related claims challenge the FDA-approved design of Xarelto and are preempted by federal law, which strictly forbids Defendants to change Xarelto's design—including by altering or adjusting approved dosages—without FDA's prior authorization.[9]

### A.      Plaintiffs' dosing-related theories challenge Xarelto's FDA-approved design.

As an initial matter, all of Plaintiffs' claims—that Xarelto's cumulative daily dosages are too high, that the medicine should be dosed twice daily rather than once, and that doses should be adjusted according to the results of coagulation-monitoring measurements—challenge Xarelto's design, as approved by FDA to treat specific indications.  Courts have recognized that such challenges to the "formulation" of a prescription drug are design-defect claims.  *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298–99 (6th Cir. 2015) (under New York law, claim that defendants should have "changed the dosage level" of the drug was a design-defect claim); *Kruszka v. Novartis Pharm. Corp.*, 19 F. Supp. 3d 875, 897–98 (D. Minn. 2014) (under

---

[8] *See supra* n.7.

[9] Some of Plaintiffs' experts fault Defendants for failing to "test" different doses during Xarelto's research-and-approval process.  *See, e.g.*, Parisian Rep. at 13–14; Plunkett Rep. at 6.  There is no such claim under Mississippi law. *See, e.g.*, *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835, 847–48 (S.D. Miss. 2010) (holding that a "claim for failure to conduct adequate testing would . . . be subsumed by the MPLA").  In fact, Plaintiffs renounced any failure-to-test theory in *Boudreaux* and *Orr.  See* Doc. 5606, at 10 n.30 ("[T]he failure to test theory is not being presented by Mr. Boudreaux or Mrs. Orr.").

Minnesota law, claims regarding "duration and dose" were design-defect claims); *Harris v. Merck & Co., Inc.*, Civ. A. No. 12-1446, 2012 WL 5384720, at *3 (W.D. La. Nov. 1, 2012) (under Louisiana law, claim that "80 milligram dose [of prescription medication Zocor®] was the cause of [plaintiff's] injuries and that other, smaller doses would have prevented the injuries" challenged the medication's "dosage design" and thus a "design defect" claim).

The sole question (for purposes of this motion) is whether Defendants could have "independently" changed Xarelto's FDA-approved dosages in the way that Plaintiffs' state-law claims would require. Because the answer to that question is no, Plaintiffs' dosing-related claims are preempted.

**B.** **Plaintiffs' dosing-related theories are preempted by federal law, which categorically forbids Defendants to "independently" change Xarelto's design, including its FDA-approved dosages.**

As already explained, under *Levine*, *Mensing*, and *Bartlett*, preemption depends on whether the defendant manufacturer can "independently" (or "unilaterally") take the action that a plaintiff's claim would require. Here—as explained in short below and more fully in the *Boudreaux* and *Orr* briefing, which Defendants expressly incorporate here—the governing regulations make clear that Defendants may *not* independently change Xarelto's FDA-approved dosages, and analogous decisions hold that, in that circumstance, claims like those here are preempted. *See* Doc. 5109-1, at 12–22.

**1.** **Applicable FDA regulations prevent Defendants from independently changing Xarelto's FDA-approved dosage.**

Under governing FDA regulations, a pharmaceutical company may not independently—*i.e.*, without prior FDA approval—alter a medicine's approved dosages. Indeed, the parties apparently agree about this uncontroversial regulatory fact. *See, e.g.*, Parisian Dep. at 57–59 (Doc. 5109, Exh. 19) (testifying that, whatever a manufacturer may be able to do to strengthen its warnings, it

*cannot* unilaterally change "the dose itself" or "the approved dosage").

    **a.**    FDA regulations make clear that any change to a drug's approved dosages renders an existing drug a "new" product, requiring fresh agency approval. *See* 21 U.S.C. § 355(a); 21 C.F.R. § 310.3(h)(5); *see also U.S. v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1411 (7th Cir. 1990) (Section 310.3 "addresses the factors that may make a substance a 'new drug' subject to approval under 21 U.S.C. § 355").

    **b.**    To the same effect, the regulations specify that any "major change" to a medicine's approved application requires FDA's prior approval; a manufacturer may not effectuate such a change independently. 21 C.F.R. § 314.70(b). The changes that Plaintiffs advocate—reducing the once-daily dose, requiring per-dose pills with half the approved amount of the active ingredient, or dose-adjusting pursuant to the results of coagulation-monitoring tests—are "major" changes that require prior FDA approval because they directly affect Xarelto's FDA-approved "strength" for particular patients and the "quantitative formulation of the drug product." *Id.* § 314.70(b)(i), (b)(2)(i); *see also id.* § 320.21(c) (requiring "supplemental application to FDA," supported by "evidence," for any "propose[d]" change "in product formulation or dosage strength, beyond the variations provided for in the approved application").

    Accordingly, the governing regulations make clear that Defendants cannot "independently" change Xarelto's FDA-approved dosages, as Plaintiffs' claims would require. *See* Doc. 5109-1, at 13–15.

        **2.**    **Analogous cases make clear that because Defendants cannot independently change Xarelto's FDA-approved dosage, Plaintiffs' dosing-related theories are preempted.**

    In *Bartlett*, the Supreme Court dealt specifically with the preemption of state design-defect claims. Although the case before it involved a generic company, the Court emphasized that the governing regulation (quoted above)—and thus the operative legal rule—applies to both brand-

name and generic manufacturers: "Once a drug—*whether generic or brand-name*—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product … or in the specifications provided in the approved application.'" 133 S. Ct. at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added). That rule applies here precisely. Defendants were "prohibited from making" the very sorts of design changes that Plaintiffs advocate. Accordingly, Plaintiffs' dosing-related claims are preempted under *Bartlett*.[10]

The Sixth Circuit's post-*Bartlett* decision in *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015), is on point. The court there found that federal law preempted (just like here) a *dosing-related* design-defect claim against a *brand-name drug manufacturer*. The plaintiff in *Yates* claimed that the manufacturer should have designed its birth-control patch with .6 mg rather than .75 mg of estrogen. The Sixth Circuit rejected two separate design-defect theories.

*First*, as to the plaintiff's claim that the manufacturer should have reduced the dosage *after* the FDA had approved the .75 mg patch, the Sixth Circuit held (echoing *Bartlett*) that the claim was "clearly preempted by federal law" because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application.'" *Id.* at 298 (quoting 21 C.F.R. § 314.70(b)(2)(i)). "Based on the plain meaning of the regulation," the court wrote, the manufacturer "could not have altered the dosage of estrogen in [the patch] without submission to the FDA and the agency's 'approval *prior to* distribution of the product made using the change.'"

---

[10] Defendants recognize that this Court has previously rejected the argument that *Bartlett* applies here, holding instead that the decision "relate[s] to generic drug manufacturers," and not to brand-name manufacturers like Defendants. Doc. 6196, at 5. The Court further ruled that Plaintiffs' design-defect claim was not preempted because it was akin to the so-called "pre-approval" design-defect claim that was held to be not preempted in *Guidry*, 206 F. Supp. 3d 1187. *See* Doc. 6196, at 2–3, 5–6. Defendants respectfully disagree, for the reasons explained here and more fully in the *Boudreaux/Orr* briefing incorporated here.

*Id*. (quoting 21 C.F.R. § 314.70(b)(2)(i) (emphasis in *Yates*)).   The court found it "clear" that "changing the dosage level of the active ingredient [in the patch] constitute[d] a 'major change,' such that prior FDA approval is necessary."   *Id*. (quoting 21 C.F.R. § 314.70(b)(2)(i)'s statement that "'major changes' include 'changes in the qualitative or *quantitative formulation* of the drug product'") (emphasis in *Yates*).   "Quite simply," the Sixth Circuit concluded, "federal law prohibited defendants from decreasing the dosage of estrogen post-approval."   *Id*.

*Second*, the *Yates* court rejected on several grounds the plaintiff's alternative claim that the brand-name manufacturer should have altered the patch's estrogen dosage *before* FDA approval—*i.e.*, should have brought a lower-dose product to market in the first instance.   As an initial matter, the Sixth Circuit found the claim "too attenuated."   *Id*.   While it is true that nothing in federal law prevented the manufacturers from designing a lower-dose patch, the court said it would still "have to speculate" (1) that "the FDA would have approved the alternate design," which controls "the ultimate availability" of the drug for use; (2) that the plaintiff "would have selected" it; and (3) that "this alternate design would not have caused [the plaintiff] to suffer" an injury.   *Id*. at 299. This, the court said, was "several steps too far."   *Id*.   Separately, because "the ultimate availability" of any differently designed drug would be "contingent upon whether the FDA would approve the alternate design," the Sixth Circuit held the plaintiff's claim foreclosed under the rationale of *Mensing* that preemption attaches where a manufacturer could not act unilaterally, but rather only "ask for the FDA's help."   *Id*. at 299–300 (quoting *Mensing*, 564 U.S. at 619).   Finally, the court ruled that the plaintiff's "pre-approval" theory was incompatible with *Bartlett*, which rejected the contention that a manufacturer could comply with its state and federal law duties by "pull[ing the drug] from the market."   133 S. Ct. at 2470.   The Sixth Circuit held: "In contending that defendants' pre-approval duty would have resulted in a birth control patch with a different formulation,

[plaintiff] essentially argues that defendants should never have sold the FDA-approved formulation of [the patch] in the first place.  We reject this never-start-selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale ….”  808 F.3d at 300.

Even more recently, and more closely on point, the court in *Utts v. Bristol-Myers Squibb Co.*, No. 1:16-cv-02899-DLC, 2016 WL 7429449 (S.D.N.Y. Dec. 23, 2016), held that federal law preempted bleeding-based design-defect claims concerning Eliquis®, a brand-name medication in the same NOAC class as Xarelto.  Echoing *Bartlett* and *Yates*, the *Utts* court held that federal law clearly preempted any contention that the manufacturers should have changed Eliquis’ agency-approved design because under 21 C.F.R. § 314.70(b)(2)(i), “[t]he defendants had no ability to alter [the drug’s] composition without prior approval of the FDA.”  2016 WL 7429449, at *12.  The *Utts* court likewise rejected the plaintiffs’ assertion “that the defendants had a *pre-approval* duty to submit a differently designed drug for FDA approval” in the first instance.  *Id.* (emphasis added).  Just like the Sixth Circuit in *Yates*, the *Utts* court held that the plaintiffs’ alleged “pre-approval duty” impermissibly required it to “speculate” that “FDA would have approved the alternate design; that [the patient] would have been prescribed this alternately designed Eliquis; and that this alternate design would not have caused [the patient] to suffer severe internal bleeding.”  *Id.*  And as in *Yates*, the court further rejected the plaintiffs’ pre-approval claim as inconsistent with *Mensing*’s rejection of “Mouse Trap” causal theories and *Bartlett*’s condemnation of the “stop selling” (and by extension, “should never have sold”) rationale.  *Id.*[11]

As all of these cases show, federal law preempts any claim that challenges the FDA-approved dose or dosing regimen of a prescription medication, whether brand-name or generic.

---

[11] *Yates*, *Utts*, and *Thompson* reflect a larger consensus.  A number of other post-*Bartlett* decisions have likewise held that federal law preempts design-defect claims against brand-name manufacturers.  *See* Doc. 5109-1, at 18 (citing cases).

**3.     This Court's *Boudreaux/Orr* decision, the *Guidry* decision, and the recent *Young* decision—all of which hold that federal law does not preempt a so-called "pre-approval" design-defect claim—are both distinguishable and contrary to Supreme Court precedent.**

This Court rejected Defendants' preemption arguments in *Boudreaux/Orr*, holding that federal law does not preempt a so-called "pre-approval" design-defect claim.  *See* Doc. 6196.  The Court followed *Guidry*, 2016 WL 4508342, finding that case supported the sort of "pre-approval" claim that *Yates* and *Utts* flatly rejected.  But *Guidry* and the recent *Young* decision, which followed *Guidry*, are distinguishable.  Unlike *Yates* and this case, *Guidry* and *Young* were decided on the pleadings rather than on summary judgment.  *Compare Utts*, 2016 WL 7429449, at *12 (dismissing design-defect claims, even on the pleadings, "with prejudice, and without leave to amend").  Moreover, again unlike *Yates* and this case, *Guidry* and *Young* did not involve dosing-related claims, which go to the very heart of the medicine's design.

Most importantly for this case, *Young* notes that Mississippi law may not even "recognize[] a pre-approval claim."  2017 WL 706320, at *8.  There, "the parties ha[d] not argued" that question, and the court "d[id] not reach the issue."  *Id.*  Instead, the court simply concluded that it was "sufficient to say that there is no conflict between Young's pre-approval theory and the defendants' federal law duties."  *Id.*  But Mississippi law imposes no such "pre-approval" duty on Defendants to propose an alternative design of Xarelto before seeking FDA approval—indeed, no Mississippi case has recognized the viability of a pre-approval design-defect claim in this context—and there is no reason to impose such a duty here.  As the Fifth Circuit has recognized, federal courts sitting in diversity "do not 'adopt innovative theories of recovery under state law.'"  *EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 555 (5th Cir. 2016) (concluding that party's argument that would effectively expand Mississippi law was a "nonstarter").  Plaintiffs' claim that Defendants should have re-designed Xarelto prior to FDA approval is just such an innovation, unrecognized in any

16

Mississippi state court.  This Court should not reach out and "expand" Mississippi law "beyond its presently existing boundaries"—"[t]hat is solely the prerogative of the courts of Mississippi." *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 742 (5th Cir. 2005).  Plaintiffs' "pre-approval" claim should fail here on that basis alone.

And even if this Court were to consider adopting Plaintiffs' "innovative theory," it should not do so for a variety of compelling reasons.  The MPLA does not impose any duty on the manufacturer to propose an alternative design for a drug prior to FDA approval.  Rather, a manufacturer can be liable under a design-defect theory only if, "when the product left the manufacturer's control, there existed a feasible alternative design that would have to a reasonable probability prevented the harm."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324 (5th Cir. 2004) (quoting Miss. Code Ann. § 11-1-63(f)) (emphasis omitted); *accord Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 756 (Miss. 2011) (explaining that a "feasible design alternative must have existed" when the product left the manufacturer's control).  Accordingly, a manufacturer has no duty to create, test, or propose some alternative design that did not already exist.  Other courts have similarly rejected the existence of such a pre-approval duty—as the Sixth Circuit recognized in *Yates*, in the context of a pre-approval design-defect claim, it is difficult, if not impossible, "to conceive of any coherent pre-approval duty that [a manufacturer] would have owed to [the plaintiff] when designing [a prescription drug]."  808 F.3d at 300.  Plaintiffs' claim thus fails both procedurally and substantively.

In any event, *Guidry* and *Young* (which simply block quotes *Guidry*'s main holding and adopts it) are wrong on the merits for at least four reasons.  *First*, by the *Guidry* court's own admission, its decision was result-oriented.  The court there said that it viewed the preemption issue as presenting a "fundamental public policy question[]" and that it sought to avoid any "result" whereby "Louisiana plaintiffs will have no remedy against a drug manufacturer for a defect in a

17

drug's design." 2016 WL 4508342, at *14. That result-oriented decision-making was improper—preemption presents a pure question of law, governed by statutory and regulatory language, and the Supreme Court's preemption decisions make clear that public-policy considerations are for the political branches, not courts, to consider. *See, e.g.*, *Bartlett*, 133 S. Ct. at 2480; *Mensing*, 564 U.S. at 625–26.[12]

*Second*, with respect to the governing "impossibility" issue, the *Guidry* court asked and answered the wrong question: "Can a drug manufacturer independently *design* a reasonably safe drug in compliance with its state-law duties before seeking FDA approval? The answer is yes." 2016 WL 4508342, at *15 (emphasis added). But a manufacturer accomplishes no public-health objective by merely "designing" a different medicine; the manufacturer must be able to obtain regulatory *approval* and *market* that medicine for consumer use. And as the *Guidry* court acknowledged, drug manufacturers "cannot independently *sell* pharmaceutical products without FDA approval." *Id.* (emphasis added). The *Guidry* court sought to finesse this problem by "assum[ing] that the FDA would approve a safer, alternative design of a drug that it has already approved." 2016 WL 4508342, at *15. But Supreme Court precedent expressly forbids that assumption, holding that preemption applies where the manufacturer can only "propose[]" a different product and must ultimately seek a federal agency's "permission" or "help" to discharge its state-law duty. *Mensing*, 564 U.S. at 619, 623–24. That is particularly true where, as the Supreme Court recognized, the drug-approval process is so "onerous and lengthy," *Bartlett*, 133 S. Ct. at 2471, and

---

[12] In any event, it is incorrect that design-defect preemption forecloses all remedies against brand-name drug manufacturers. Under *Levine*, where a manufacturer can "unilaterally" change its label pursuant to the "changes being effected" (or "CBE") regulation, failure-to-warn claims are not preempted. *See Brazil*, 2016 WL 3748771, at *10–11 (finding design-defect claims against brand-name manufacturer preempted but failure-to-warn claims viable where CBE procedure available); *Barcal*, 2016 WL 1086028, at *3–5 (same); *Batoh*, 2016 WL 922779, at *17 (same).

agency approval is contingent not (as the *Guidry* court incorrectly assumed) exclusively on a particular medicine's safety profile, but rather on the agency's expert assessment that the drug strikes the proper balance between safety *and* efficacy, *see* 21 C.F.R. § 314.105; *see also* 21 U.S.C. § 355(b). *Cf. Bartlett*, 133 S. Ct. at 2475 ("In the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of danger' would require redesigning the drug ….").

*Third*, the *Guidry* court improperly found "guidance" about preemption of *design-defect* claims in the Supreme Court's statement in *Levine*—declining to find all *failure-to-warn* claims preempted—that FDA's labeling regulations do not "'establish[] both a floor and a ceiling.'" 2016 WL 4508342, at *14 (quoting *Levine*, 555 U.S. at 573–74). The Supreme Court's floor-ceiling metaphor cannot be so wrenched out of context. As an initial matter, the Court's decision makes clear that the metaphor pertains to "obstacle" preemption, not to the separate issue (presented here) of "impossibility" preemption. *Cf. Levine*, 555 U.S. 563–64 (distinguishing impossibility preemption and obstacle preemption as "two separate [conflict] preemption" theories). More importantly, the *reason* that *Levine* held that compliance with FDA's *labeling* regulations does not necessarily preempt failure-to-warn claims is that those regulations *do not even purport to establish a "ceiling."* Rather, as the Supreme Court repeatedly emphasized, in the circumstances presented there the "changes being effected" (or "CBE") regulation—which applies uniquely to labeling changes—expressly "permitted Wyeth to unilaterally strengthen its warning." 555 U.S. at 573. That one fact—the CBE regulation's authorization of independent manufacturer action—dictated the outcome. *See, e.g.*, *id.* at 562, 563, 568, 571, 572 (emphasizing that no-preemption decision turned on CBE's unique unilateral-change authorization). Because "no such process exists for changes to" a drug's design, *Barcal*, 2016 WL 1086028, at *4—put simply, because there is no CBE option for design changes—neither *Levine*'s holding nor its floor-ceiling metaphor applies

in the design-defect context.  *Cf. Bartlett*, 133 S. Ct. at 2471.

*Finally*, *Guidry*'s rationale proves too much.  Not only does it render FDA's approval of a prescription medicine essentially meaningless, but it would eviscerate the Supreme Court's impossibility jurisprudence.  Under the *Guidry* court's reasoning, neither design-defect nor failure-to-warn claims would *ever* be preempted, as a plaintiff can always assert that the manufacturer could have (at least in theory) designed and sought approval of a "safer" medicine.  *See Brazil*, 2016 WL 3748771, at *11 (holding that "pre-approval" design-defect theory "makes little sense in the face of the Supreme Court's precedents," which have "repeatedly characterized the state tort law at issue in this case as a duty to make changes or as a remedial effort"); *see also Fleming v. Janssen Pharm., Inc.*, No. 2:15-cv-02799, 2016 WL 3180299, at *5 (W.D. Tenn. May 6, 2016) (rejecting "pre-approval" theory).[13]

\* \* \*

Because Defendants cannot "independently" make the dosing changes that Plaintiffs contend state law requires—reducing the total daily Xarelto dose, dosing Xarelto twice daily throughout the treatment period, and adjusting doses according to the results of coagulation-monitoring measurements—Plaintiffs' dosing-related design-defect claims are preempted.[14]

---

[13] Similarly, the *Young* court attempts to explain away *Yates* by arguing that the Sixth Circuit "misstate[d]" *Bartlett*'s stop-selling rationale because "[t]he preapproval theory does not argue that a manufacturer should have stopped acting, just that it should have acted *differently*."  2017 WL 706320, at *8.  As in *Guidry*, that reasoning would mean that no claim would *ever* be preempted.

[14] Although *Bartlett* left open the possibility that a manufacturer may in certain circumstances be able to discharge its design-defect obligations by strengthening its warning label,  *see* 133 S. Ct. at 2479, that option is unavailable here for two reasons.  *First*, there is no "warning" that would remedy the dosing-related problems that Plaintiffs allege.  Those are "pure" design-defect claims, in the sense that the only "fix" for the alleged defects is a differently designed drug.  *Second*, and in any event, even if Plaintiffs could re-characterize their dosing-related claims in failure-to-warn (rather than design-defect) terms, they would be preempted because applicable FDA regulations make clear, in multiple respects—as Defendants explain in their separate motion for partial summary judgment, that federal law also preempts Plaintiffs' failure-to-warn claim.  *See also* Doc. 5109-1, at 22 n.7; Docs. 5904, 5988.

II.   **Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous because it does not entail a requirement or recommendation that doctors monitor their patients' Xarelto-related coagulation parameters.**

Several of Plaintiffs' experts opine that Xarelto is unreasonably dangerous either because its design does not incorporate a means for physicians to monitor their patients' prothrombin time ("PT") as a measure of Xarelto-related coagulation parameters or, relatedly, because its label does not instruct physicians to conduct PT monitoring.[15]  *See, e.g.*, Rinder Rep. at 4 ("The Rivaroxaban label is inadequate [because it] fails to inform physicians, like myself, of … the utility of using a PT measurement to identify those patients at highest risk of bleeding."); Parisian Rep. at 13 (same); Kessler Rep. at 82 (same); Cuculich Rep. at 3 (same); Leissinger Rep. at 2 (Doc. 5109, Exh. 24) (same).[16]

For several independent reasons, to the extent that theory is understood as a challenge to Xarelto's design, it is preempted.  *See* Doc. 5109-1, at 22–25.[17]

A.   **Plaintiffs' monitoring-related theories are inextricably intertwined with their dosing arguments, and are preempted for the same reasons.**

As an initial matter, Plaintiffs' PT-monitoring argument does not stand alone, but rather is part and parcel of their dosing claims, for the simple reason that the supposed purpose of measuring PT is to provide information for use in adjusting patients' Xarelto doses.  Because Plaintiffs' PT-related argument serves only to support their dosing-related claims, it is preempted along with (and

---

[15] To be clear, by "monitoring," Plaintiffs' experts refer to regular clinic visits to measure pharmacological parameters to assess either (1) the pharmacodynamic effect of Xarelto on the patient, *i.e.*, the extent to which the patient is anti-coagulated, or (2) the pharmacokinetic response of the drug, *i.e.*, the concentration of Xarelto in a patient's blood. The experts assert that this routine monitoring is necessary to keep patients within Xarelto's "therapeutic range," which refers to the spread of concentration values in which a medicine is both safe and efficacious.

[16] Notably—and inconsistently—other of Plaintiffs' experts believe that there is "*no way* to measure, monitor, evaluate coagulation status" for Xarelto. Cerri Dep. at 30 (Doc. 5109, Exh. 25) (emphasis added).

[17] Federal law also preempts any related failure-to-warn claim, for the reasons explained previously (*see* Doc. 5109-1, at 25–28) and in Defendants' separate motion for summary judgment that is being filed today regarding Plaintiffs' failure-to-warn claims.

for the same reasons as) the dosing claims.

      **B.**    **Plaintiffs' monitoring-related theories are preempted because Defendants cannot "independently" alter Xarelto's design to incorporate PT monitoring, as no PT test or assay has been cleared or approved for use in conjunction with Xarelto and any such use would require prior FDA authorization.**

Although some of Plaintiffs' experts seem to contend that Xarelto is unreasonably dangerous unless used in conjunction with a PT-monitoring test designed to equip doctors to adjust patients' doses, they concede—as they must—that FDA has not approved any PT-monitoring assay for use with Xarelto.  *See* Doc. 5109-1, at 23–24 (citing Plaintiffs' experts).[18]

      **1.**    The Neoplastin PT test that Plaintiffs advocate is an *in vitro* diagnostic ("IVD") product regulated as a Class II medical device, and it is neither designed nor approved to monitor anticoagulation attributable to Xarelto or any other Factor Xa inhibitor.  To the contrary, FDA cleared Neoplastin as a Class II medical device for use as a "general screening procedure . . . to monitor patients receiving *coumarin* [*i.e.*, warfarin] therapy," 21 C.F.R. § 864.7750(a) (emphasis added),[19] and Neoplastin's label states that PT "is commonly used for monitoring vitamin K antagonist therapy," Neoplastin October 2013 USPI § 2 (Doc. 5109, Exh. 35).  Plaintiffs have not pointed to—nor are Defendants aware of—any other PT test that has been approved or cleared by FDA for use in monitoring Xarelto- or Factor-Xa-related coagulation parameters.

---

[18] *See also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* at 9 (Oct. 26, 2015) (Doc. 5109, Exh. 33) ("Importantly, the DOAC drugs were approved without a requirement for monitoring.  So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants.  *There are currently no cleared or approved devices that measure that*.") (Lea Carrington, Director, Division of Immunology and Hematology Devices) (emphasis added); Carrington presentation (Doc. 5109, Exh. 8) at 5 (same).

[19] The parties have debated the particulars of this FDA classification regulation for Neoplastin.  At oral argument on the summary judgment motions in *Boudreaux* and *Orr*, one of Plaintiffs' counsel accused Defendants of misquoting the regulation: "Mr. Newsom failed to state the entire description which makes clear that [Neoplastin PT] is a general test.  Specifically the FDA states that PT is a general screening device for the detection of possible clotting factor deficiencies."  OA Tr. 164:9–12.  But, as Defendants subsequently explained—and Plaintiffs have never disputed— Plaintiffs' counsel truncated her quotation.  The regulation continues: ". . . in the extrinsic coagulation pathway, *which involves the reaction between coagulation factors III and VII, and to monitor patients receiving coumarin therapy . . . .*"  21 C.F.R. § 864.7750(a) (emphasis added); *see also* Defs.' Post-Hearing Br. (Doc. 5904), at 2.

**2.**     To the extent that Plaintiffs contend that Xarelto is unreasonably dangerous because it should have been *designed* for use in conjunction with Neoplastin or any other PT-monitoring assay, that claim is preempted.  Because neither Neoplastin nor any other PT-monitoring assay has been cleared or approved by FDA for use in conjunction with Xarelto, any recommendation for such use would require fresh agency approval.  *See* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices ("IVD Guidance") (Aug. 6, 2014) at 10 (Doc. 5109, Exh. 36); *see also* 21 C.F.R. § 807.81(a)(3)(ii) (requiring new approval for any new "intended use" of FDA-cleared device); *id*. § 814.39(a) (same, for approval of a supplement for a new indication for previously approved device); Doc. 5109-1, at 24–25.  Because Defendants cannot "independently" alter Xarelto's design to require coagulation monitoring through Neoplastin or any other PT-related test or assay—as such a change would require advance FDA approval— any claim based on their failure to do so is preempted.  *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

**III.     Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a Xarelto-specific anti-Factor Xa assay.**

Plaintiffs' design-defect claim that Xarelto was marketed without a companion rivaroxaban-specific anti-Factor Xa monitoring assay also is clearly preempted by federal law because Defendants could not have "independently" marketed an anti-Factor Xa assay, or incorporated such an assay into Xarelto's design.  *See* Doc. 5678, at 3–9.

**1.**     To be clear, the anti-Factor Xa assay that Plaintiffs seem to envision would be an altogether separate product—in particular, a "medical device"—requiring separate FDA pre-approval (indeed, by a different division than the one that considers and approves drug products[20]).

---

[20] Approval of the assay would fall to the Division of Immunology and Hematology Devices, Office of In Vitro Diagnostics and Radiological Health, in FDA's Center for Devices and Radiological Health.

*See* 21 U.S.C. §§ 360e(a), 360(k); 21 C.F.R. Part 809.  As Plaintiffs have conceded—as they must—FDA has not yet cleared *any* anti-Factor Xa assay for *any* purpose.  *See* Doc. 5678, at 4–7.  Before Defendants could have marketed any as-yet-unapproved assay into Xarelto's design for use in the United States, they would have needed FDA's prior authorization, and because Defendants could not have acted "independently," Plaintiffs' anti-Factor-Xa-based claim is preempted.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

> **2.**      To the extent that Plaintiffs argue, as they did in earlier briefing, that this Court should follow *Guidry*, which held that a "pre-approval" design-defect claim was not preempted, *Guidry* is both wrong and inapposite to Plaintiffs' anti-Factor Xa assay theory.  *See* Part I.B.3, *supra*.

> **3.**      Finally, as Defendants have explained, FDA's IVD Guidance makes clear that any use of a new IVD device (like the anti-Factor Xa assay) in conjunction with an existing drug product (like Xarelto) would require FDA's prior approval of *both* (1) the device and its labeling, specifying that it is to be used in conjunction with the drug product, *and* (2) an amendment to the drug's labeling specifying that it is to be used in conjunction with the device.  *See* IVD Guidance at 6, 8–9, 11–12; *see also* Doc. 5678, at 8.

*       *       *

Because Defendants could not have "independently" marketed an anti-Factor Xa assay, or incorporated such an assay into Xarelto's design, Plaintiffs' claim that Xarelto is defective in the absence of such an assay is preempted.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## IV.   Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a reversal agent.

Several of Plaintiffs' experts contend that Xarelto is unreasonably dangerous because it was marketed without an antidote, or reversal agent.  *See* Doc. 5109-1, at 28–29 (citing Plaintiffs'

24

experts).[21] Federal law preempts that claim for the same reason that it preempts Plaintiffs' contention that Xarelto should have been designed for use with a PT-monitoring test or assay—namely, that Defendants cannot "independently" (*i.e.*, without prior FDA approval) develop and market a reversal agent, or change Xarelto's design to incorporate the use of such an agent.

FDA approved Xarelto as safe and effective—and as an important addition to the anticoagulant market—with full knowledge of the absence of a reversal agent, and without any requirement that Xarelto be marketed or used in conjunction with such an agent. Indeed, the FDA-approved labeling explicitly warns that "[a] specific antidote for rivaroxaban is not available." Jan. 2015 USPI § 5.2 (Risk of Bleeding); *see also* § 10 (Overdosage) (same). Although a third party, Portola Pharmaceuticals, is currently working to develop a rivaroxaban-specific reversal agent, Plaintiffs and their experts have acknowledged—as they must—that no such agent has been approved by FDA for use in the United States. *See* Portola Pharmaceuticals, News Release: Portola Pharmaceuticals Receives Complete Response Letter from FDA for Biologics License Application for AndexXa™ (Aug. 18, 2016), *available at* http://investors.portola.com/phoenix.zhtml?c=198136&p=irol-newsroomArticle&ID=2196085 (Doc. 5109, Exh. 46); Parisian Dep. at 480 (noting that the "FDA has not approved any potential [reversal agents]").

Defendants cannot "independently" market a reversal agent, or alter Xarelto's design to incorporate the use of such an agent because, as a separate product, the reversal agent would require separate FDA approval. The particular rivaroxaban-specific reversal agent currently in development qualifies as a "biologic." 42 U.S.C. § 262(j); *see also* Portola News Release. Under federal law, a manufacturer seeking to market a brand-name biologic must first submit to FDA a

---

[21] Notably, Plaintiff's treating physician has testified that he would not have used a reversal agent, even if one had been available. *See* Defs.' Joint Motion For Partial Summary Judgment On State-Law Grounds As To Plaintiffs' Design-Defect Claim (also filed today), at 12–13.

Biologic License Application, which FDA may approve only upon a determination that the product is "safe, pure, and potent." *Id*. § 262(a). Because Defendants cannot "independently" market a reversal agent or change Xarelto's design to incorporate the use of such an agent—as such a change requires advance FDA approval—any claim based on their failure to do so is preempted. *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment on Plaintiffs' design-defect claim.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
chanda.miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North

James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen
Pharmaceuticals, Inc. and Janssen Research
& Development, LLC*

Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuti-
cals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

/s/      *John F. Olinde*

28