# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Dora Mingo, et al. v. Janssen Research &
Development, LLC et al.
Case No. 2:15-cv-03469

MDL No. 2592

SECTION L

JUDGE ELDON E. FALLON

MAGISTRATE NORTH

## DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS'
## FAILURE-TO-WARN CLAIM

Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Janssen

Pharmaceuticals, Inc., and Janssen Research & Development LLC (collectively, "Defendants")

respectfully move for partial summary judgment on the ground that federal law preempts Plaintiffs'

failure-to-warn claim.[1]

## INTRODUCTION

As the Court knows, Plaintiffs' liability theory has evolved as this litigation has progressed.

In their complaint, Plaintiffs alleged a failure-to-warn claim focused on a purported failure to

include in the Xarelto label a "black-box" warning about the risk of excessive bleeding.  *See Mingo*

Compl. ¶¶ 75, 90.  Plaintiffs shifted course in their expert reports, which featured, among other

things, a new theory that doctors should be instructed conduct prothrombin time ("PT") monitoring

---

[1] The Court has addressed Defendants' preemption arguments before, in the context of the first two Xarelto®
bellwether trials.  In the interest of efficiency and judicial economy, Defendants hereby expressly incorporate all of
the earlier briefing and argument from the *Boudreaux* and *Orr* cases regarding their argument that federal law preempts
Plaintiffs' failure-to-warn claims.  Defendants ask that the Court consider that earlier briefing also to have been filed
in this case.  In particular, Defendants direct the Court to the following briefs related to Plaintiffs' failure-to-warn
claims in the *Boudreaux* and *Orr* cases: Docs. 5109-1, 5110-1, 5678, 5689, 5904, and 5988.  Defendants also
incorporate the March 23, 2017 oral argument related to Defendants' arguments that federal law preempts Plaintiffs'
failure-to-warn and design-defect claims.

tests.  *See, e.g.*, Rinder Rep. at 4 (Doc. 5113 Exh. 15) ("The Rivaroxaban label is inadequate [because it] fails to inform physicians, like myself, of . . . the utility of using a PT measurement to identify those patients at highest risk of bleeding."); Parisian Rep. at 13 (Doc. 5113 Exh. 12) (same); Kessler Rep. at 82 (Doc. 5113 Exh. 9) (same); Cuculich Rep. at 3 (Doc. 5113 Exh. 5) (same); Leissinger Rep. at 2 (Doc. 5113 Exh. 10) (same).  In response to Defendants' dispositive-motion briefing, Plaintiffs stated that "the crux of [their] claim" is that doctors "should be instructed to conduct a simple blood test, Prothrombin Time with the Neoplastin reagent" in order "to identify patients at unreasonably high risk of bleeding and remove them from Xarelto if the risk, in consultation with the patient, is determined to be too high."  Pls.' Opp. to Defs' Dosing & Monitoring Preemption MSJ (Doc. 5531) at 1.  During the *Boudreaux* and *Orr* trials, Plaintiffs continued to focus on PT testing, albeit for different purposes.  In *Boudreaux*, Plaintiffs characterized PT as a "safety test that would identify people at high risk of bleeding."  *Boudreaux* Tr. at 85:6–7 (Exh. 1) (Plaintiffs' opening statement).  In *Orr*, Plaintiffs characterized PT as an "indicator test that a doctor can order to indicate whether it's safe to proceed to emergency surgery."  *Orr* Tr. at 127:4–6 (Exh. 2) (Plaintiffs' opening statement).

But, however Plaintiffs attempt to re-characterize the use of PT testing with Xarelto in the *Mingo* case, their failure-to-warn claim is preempted.  As an initial matter, the MDL court in *In re Eliquis (Apixaban) Prod. Liab. Litig.* recently held, in a case involving Eliquis, which is a Novel Oral Anticoagulant (NOAC) like Xarelto, that any claims based on the failure to warn about bleeding risks—or on failure to instruct about monitoring—were preempted as a matter of law because the defendants could not have independently changed the Eliquis label without prior FDA approval.  *See Utts v. Bristol-Myers Squibb Co.*, __ F. Supp. 3d __, MDL No. 2754, 2017 WL

1906875 (S.D.N.Y. May 8, 2017).  Plaintiffs' claims here likewise are preempted, for a host of reasons.

*First*, Defendants could not independently or unilaterally change Xarelto's label to instruct doctors to conduct PT testing because (a) Defendants could not recommend in Xarelto's label an off-label use of Neoplastin—which was designed (and cleared by FDA) explicitly for use with warfarin, not Xarelto, and must receive a separate "safety and efficacy" clearance for use with companion therapeutic products such as Xarelto; and (2) Plaintiffs' proposed Neoplastin-related instruction is a "monitoring recommendation" that cannot be added to the Xarelto label without prior FDA approval, pursuant to FDA regulations and guidances.

*Second*, and separately, there is "clear evidence" that FDA would have rejected Plaintiffs' proposed instruction regarding PT.  In fact, prior to Xarelto's approval, Janssen specifically proposed the very PT-related language that Plaintiffs now say Xarelto's labeling should have included, but FDA struck that language.  In *Boudreaux* and *Orr*, Plaintiffs attempted to minimize the significance of FDA's deletion of the language, arguing that the strikethrough was made by FDA's Hematology Division—which reviewed the New Drug Application (NDA) for the orthopedic surgery indication and the Supplemental New Drug Application (sNDA) for the indication regarding treatment of deep vein thrombosis (DVT)—not the Cardio-Renal Division, which reviewed the NDA for the AFib indication at issue in those cases.  But Plaintiffs have *conceded* that FDA's strikethrough of that language indisputably is relevant in a case like this one involving the DVT indication.  *See Boudreaux* Tr. at 288:22–24 ("There could be a case later in which DVT is an indicated use, which would make the document relevant.").  The fact that FDA (through the indisputably relevant division) struck from the label the very language that Plaintiffs now say should be included more than satisfies the "clear evidence" standard.  And because this

Court has already made clear that preemption is a question of law that is not appropriate for the jury, this issue may—and should—be decided at the summary-judgment stage.  *See* Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury"); *id.* at 1531:5–20.

**Third**, Janssen could not have independently added PT information to Xarelto's labeling because there was no "newly acquired information" that would justify a change under the CBE procedure, as demonstrated by the recent decision from the *In re Eliquis* MDL.  In *Utts*, the plaintiffs asserted that the labeling for Eliquis—which is in the same drug class as Xarelto and has a substantially similar label—was inadequate.  The court held that the plaintiffs' failure-to-warn claim was preempted because the information that allegedly supported the label change, including data compiled from adverse event reports, was not "newly acquired information," but instead was "evident to the FDA when it approved the label."  *Id.* at *13–14.

**Finally**, to the extent that Plaintiffs are still asserting that Xarelto's label is inadequate because it does not contain a "black box" warning—a claim they abandoned in *Boudreaux* and *Orr*, and on which the Court appropriately excluded expert opinion and evidence in *Orr*—that claim is also preempted, as Plaintiffs' own experts have conceded that a pharmaceutical company cannot unilaterally add a black-box warning to a label.  For these reasons, and those stated in Defendants' earlier briefing, Plaintiffs' failure-to-warn claim is preempted.[2]

---

[2] Plaintiffs at one time asserted failure-to-warn theories that Defendants should have added to Xarelto's label (1) language advising of problems with a medical device used to measure warfarin patients' coagulation parameters in ROCKET AF, the clinical trial that supported FDA's approval of Xarelto's atrial fibrillation (AFib) indication, and (2) a chart quantifying bleeding rates specifically among U.S. participants in the 14,000-patient ROCKET AF study before September 2015.  *See, e.g.*, Doc. 5110-1, at 1–2.  Plaintiffs have not pursued those theories in the *Boudreaux* and *Orr* trials, but those theories are not relevant to a DVT case like this one in any event because both go to the AFib indication and the ROCKET AF clinical trial.  The relevant clinical trial here is EINSTEIN, which did not use warfarin as a comparator.  But if Plaintiffs were to pursue those theories here, they would be preempted in any event, for the

## STATEMENT OF THE CASE

As reflected in the operative label, FDA has approved Xarelto for multiple indications, each time at a specific dose, and without a monitoring requirement or recommendation:

| Indication | Dosage | |
|---|---|---|
| Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation (2.3) | CrCl >50 mL/min: | 20 mg once daily **with the evening meal** |
| | CrCl 15 to 50 mL/min: | 15 mg once daily **with the evening meal** |
| Treatment of DVT (2.4) Treatment of PE (2.4) | 15 mg twice daily with food, for first 21 days | |
| | **▼after 21 days, transition to ▼** | |
| | 20 mg once daily with food, for remaining treatment | |
| Reduction in the Risk of Recurrence of DVT and of PE (2.4) | 20 mg once daily with food | |
| Prophylaxis of DVT Following Hip or Knee Replacement Surgery (2.5) | Hip replacement: | 10 mg once daily for 35 days |
| | Knee replacement: | 10 mg once daily for 12 days |

Jan. 2015 USPI § 2 (Exh. 3).[3]

As particularly relevant to this case, in November 2012, FDA approved Xarelto for the "the treatment of deep vein thrombosis, the treatment of pulmonary embolism, the reduction in risk for deep vein thrombosis and the reduction in risk for pulmonary embolism." Plaintiff Dora Mingo used Xarelto to treat her deep vein thrombosis (DVT), which she developed after the anticoagulation therapy that she was using (Lovenox and then aspirin) following her hip replacement surgery failed. DVT occurs when a blood clot forms in one or more of the deep veins in the body—for Ms. Mingo, the blood clot was in her leg. As shown in the table above, for patients like Ms. Mingo who use Xarelto to treat DVT, FDA specified Xarelto's dosage as "15 mg twice daily with food, for [the] first 21 days" and followed by "20 mg once daily with food, for

---

reasons explained in Defendants' earlier briefing, which Defendants expressly incorporate here. *See* Docs. 5110, 5689.

[3] Indeed, Xarelto's label states that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing …." Jan. 2015 USPI §§ 5.7, 8.1. The January 2015 label was in effect when Ms. Mingo was prescribed and began to use Xarelto.

remaining treatment."  Jan. 2015 USPI § 2.

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI cl. 2.  "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'"  *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).  It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption.  *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, "state and federal law conflict"—and state law is preempted—"where it is 'impossible for a private party to comply with both state and federal requirements.'"  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).  The Supreme Court has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions:  *Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013).  These decisions explain that "[t]he question for 'impossibility' is whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it."  *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*).  And by "independently," the Supreme Court has made clear it means "unilaterally."  *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required").  Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."  *Mensing*, 564 U.S. at 623–24.

Under *Levine*, *Mensing*, and *Bartlett*, it is "impossible" for a pharmaceutical manufacturer

to comply with both federal and state law—and preemption attaches—in either of two instances. *First*, because "[t]he question for 'impossibility' is whether the [manufacturer] could *independently* do under federal law what state law requires of it," preemption attaches "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Mensing*, 564 U.S. at 620, 623–24; *see also Bartlett*, 133 S. Ct. at 2478 (citing *Mensing*). *Second*, and separately, even where a manufacturer *can* act independently—for instance, to change its label under the Changes Being Effected ("CBE") regulation at issue in *Levine*—the Supreme Court has held that the claims are still preempted if there is "clear evidence" that FDA would not have approved a label change. *See Levine*, 555 U.S. at 571.[4]

## ARGUMENT

**I.   Federal law preempts Plaintiffs' claim that Xarelto's label is inadequate because it does not instruct physicians to screen Xarelto patients through the use of a PT test.**

Plaintiffs contend that Xarelto's label should have instructed physicians to use a Neoplastin PT test to determine whether particular patients should (or should not) take Xarelto.[5] Federal law

---

[4] Since *Levine*, *Mensing* and *Bartlett*, courts have overwhelmingly concluded that the "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Development LLC*, Civ. A. No. 4:15-CV-0204-HLM, 2016 WL 3748771 (N.D. Ga. June 11, 2016); *Fleming v. Janssen Pharmaceuticals, Inc.*, No. 2:15-cv-02799-JPM-DKV, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709-MHH, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296 (D. Conn. 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014). Indeed, as a recent Third Circuit case makes clear, the fundamental principles recognized in *Mensing* and *Bartlett* apply even outside the pharmaceutical context. *See Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 703–04 (3d Cir. 2016) (applying *Mensing* and *Bartlett*, in aviation context, for the proposition that "where manufacturers are unable to simultaneously comply with both federal and state requirements, state law design defect claims are conflict preempted"). *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

[5] *See, e.g.*, Cuculich Rep. at 4; Rinder Rep. at 14; Kessler Rep. at 11; Gosselin Rep. at 22 (Doc. 5113 Exh. 7); Leissinger Rep. at 10. To the extent that Plaintiffs contend that Xarelto is unreasonably dangerous because it should have been *designed* for use in conjunction with Neoplastin or any other PT-monitoring assay, that claim is preempted

preempts that claim for at least four reasons. **First**, Defendants could not "independently" under the CBE regulation recommend in Xarelto's label an off-label use of Neoplastin, which was designed and cleared by FDA for use with warfarin, not Xarelto. **Second**, Plaintiffs' proposed Neoplastin-related instruction is a "monitoring recommendation" that must (but cannot, absent prior FDA approval) be included in the "Highlights" section of Xarelto's label. **Third**, there is "clear evidence" that FDA would have rejected Plaintiffs' proposed Neoplastin-related instruction because FDA did in fact reject Janssen's repeated proposals to include very similar language in Xarelto's label. **Fourth**, and finally, after FDA struck the PT language in Xarelto's approved label, Janssen could not have independently or unilaterally added it because no "newly acquired information" allowed for the use of the CBE procedure.

### A. Because Defendants could not "independently" alter Xarelto's labeling to require coagulation monitoring through an "off-label" use of Neoplastin, Plaintiffs' claim based on their failure to do so is preempted.

As Defendants have explained, neither Neoplastin nor any other PT test has been approved by FDA for use with Xarelto.[6] Plaintiffs have asserted that the Neoplastin PT assay *is* FDA-approved as a general coagulation test and is commercially available in the United States (*see* Doc. 5531, at 29), but that is not quite right, as evidenced by FDA's own review and the labeling for Neoplastin, both of which state that it is available for use with *warfarin*. What matters—and what Plaintiffs cannot deny—is that Neoplastin is *not* approved by FDA for use with Xarelto or any other NOAC. *See* Neoplastin USPI (Doc. 6492 Exh. 4). To the contrary, FDA cleared Neoplastin as a Class II medical device for use as a "general screening procedure . . . to monitor patients

---

for reasons explained in Defendants' separate, contemporaneously-filed motion for summary judgment on Plaintiffs' design-defect claim.

[6] Defendants expressly incorporate their prior briefing on this point. *See* Doc. 5109-1, at 23–25; Doc. 5678, at 9–10.

receiving *coumarin* [*i.e.*, warfarin] therapy."   21 C.F.R. § 864.7750(a) (emphasis added).[7]

Neoplastin is not designed or approved to monitor anticoagulation attributable to Xarelto or any other Factor Xa inhibitor.  Indeed, consistent with FDA's classification regulation, Neoplastin's label makes clear that the device was designed and cleared for use in "monitoring vitamin K antagonist therapy" with "coumadin."   Neoplastin USPI § 2.  Xarelto, in contrast to coumadin (warfarin), is not a vitamin K antagonist, but rather a direct Factor Xa inhibitor.  Importantly, the Neoplastin label explains in its "Limitations" section that the PT test is "insensitive" to certain "anti-Xa" levels.  *Id.* § 11.  Not surprisingly, Plaintiffs experts have uniformly conceded—as they must—that FDA has not approved (or recommended) *any* PT test for use with Xarelto.  *See, e.g.*, Backes Dep. at 199 (Exh. 4); Gosselin Dep. at 203 (Exh. 5); Leissinger Generic Dep (Nov. 15, 2016) at 184–85 (Doc. 5109, Exh. 29); Bussey Dep. at 257 (Doc. 5109, Exh. 31); Rinder Dep. at 247–49 (Doc. 5109 Exh. 27); Plunkett Dep. 403–04 (Doc. 5109 Exh. 28); *see also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 9 (Oct. 26, 2015) (Lea Carrington, Director, Division of Immunology and Hematology Devices) (Doc. 5109 Exh.16) ("Importantly, the DOAC drugs were approved without a requirement for monitoring. So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants. *There are currently no cleared or approved devices that measure that.*" (emphasis added)).

Contrary to Plaintiffs' arguments, Defendants cannot simply point doctors to the general

---

[7] The parties have debated the particulars of this FDA classification regulation for Neoplastin.  At oral argument on the summary judgment motions in *Boudreaux* and *Orr*, one of Plaintiffs' counsel accused Defendants of misquoting the regulation: "Mr. Newsom failed to state the entire description which makes clear that [Neoplastin PT] is a general test.  Specifically the FDA states that PT is a general screening device for the detection of possible clotting factor deficiencies."  OA Tr. 164:9–12.  But, as Defendants subsequently explained—and Plaintiffs have never disputed—Plaintiffs' counsel truncated her quotation.  The regulation continues: ". . . in the extrinsic coagulation pathway, *which involves the reaction between coagulation factors III and VII, and to monitor patients receiving coumarin therapy . . . .*"  21 C.F.R. § 864.7750(a) (emphasis added); *see also* Defs.' Post-Hearing Br. (Doc. 5904), at 2.

availability of PT tests, as a means of evaluating and measuring a patient's Xarelto levels.  *First*, because neither Neoplastin nor any other PT test has been cleared by FDA for use in conjunction with Xarelto, any recommendation would be for the "off label" use of a medical device under federal law and would first require additional—and likely multiple—agency approvals.  As an initial matter, if Neoplastin's manufacturer sought to "repurpose" the device for use with Xarelto, it would have to obtain FDA clearance for that new use.  *See* 21 C.F.R. § 807.81(a)(3)(ii) (requiring new marketing clearance for any new "intended use" of FDA-cleared device); *id*. § 814.39(a) (same, for approval of a supplement for a new indication for previously approved device); *see also* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices (Aug. 6, 2014) ("IVD Guidance"), at 10 (Doc. 6561 Exh. 2) ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket submission.").

*Second*, both Neoplastin's manufacturer and Janssen would have to obtain FDA approval to amend their product's labels to provide for Neoplastin's use with Xarelto.  FDA has addressed this issue specifically:  "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—here, Neoplastin for use with warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs here claim for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket submission (PMA or 510(k) as appropriate) or PMA supplement . . . to include the new therapeutic product."  IVD Guidance at 12.  So too, "[l]abeling of the therapeutic product should also be

amended through submission of a supplement." *Id*.[8]

Plaintiffs' PT-related failure-to-warn claim boils down to an assertion that Defendants had a state-law *duty* to recommend an unapproved, "off-label" use of Neoplastin in conjunction with Xarelto. But federal law governing recommendations to use a product "off label" precludes state law from imposing such a duty.[9] As FDA has stated, "[a] new intended use without FDA approval or clearance would . . . generally violate the law." Guidance for Industry Distributing Scientific and Medical Publications on Unapproved New Uses—Recommended Practices (Dec. 11, 2011), at 2. In the case of diagnostic devices, "it is important that the approved labeling for an IVD companion diagnostic device and its corresponding therapeutic product be complete and consistent." IVD Guidance at 11. Moreover, the CBE regulation that Plaintiffs assert would have supported a label change here does not permit a manufacturer to unilaterally change the "intended use" of a product.

Because Defendants cannot "independently" alter Xarelto's labeling to recommend coagulation measurements using Neoplastin or any other PT-related test—such a change would be prohibited without advance FDA approval—any claim based on their failure to do so is preempted. *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

**B.     Because Defendants could not "independently" add any "monitoring recommendations" to Xarelto's label—regarding Neoplastin, PT, or otherwise—Plaintiffs' claim based on their failure to do so is preempted.**

More generally, FDA regulations make clear that Defendants were prohibited from

---

[8] To be clear, Defendants do not concede that there is evidence that "use of" Neoplastin PT or other PT test "is essential for the safe and effective us of" Xarelto. IVD Guidance at 12. Indeed, there is no such evidence. The point here is simply that *even if* Plaintiffs could present such evidence—they have not—a separate labeling supplement would be necessary for both Neoplastin PT (or any other PT test) and Xarelto.

[9] To the contrary, FDA has long interpreted 21 U.S.C. §§ 331(a) and 352(f), together with 21 C.F.R. §§ 201.5 and 201.128, to *prohibit* off-label promotion. *See also Gavin v. Medtronic*, 2013 U.S. Dist. LEXIS 101216, at *55 (E.D. La. 2013) ("the very concept of 'off label' use and promotion is derived exclusively from the regulatory system imposed" by the Food, Drug and Cosmetic Act); *cf. Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001).

independently altering Xarelto's label to make *any* "monitoring recommendations."[10]

As Defendants have explained (*see* Doc. 5904), and as Plaintiffs concede, a pharmaceutical manufacturer cannot unilaterally change any aspect of the "Highlights" section of a medicine's FDA-approved label; rather, *any* change to that particular section requires advance agency authorization.  *See* Doc. 5966, at 5 ("The Defendants are correct that they are prohibited from changing the Highlights portion of the label without prior FDA approval.").  The FDA regulation governing "[c]hanges to an approved application" unambiguously states that "[a]ny change to the information required by § 201.57(a)"—*i.e.*, information required to be included in the Highlights section—constitutes a "major change" that "require[s a] supplement submission and approval prior to distribution of the product." 21 C.F.R. § 314.70(b)(2)(v)(C).  And notably, the CBE provision— which Plaintiffs cite for the proposition that "manufacturers have always been permitted to alter warnings and labels without prior FDA approval" (Pls.' Opp. 13)—*expressly excludes from its scope information that, under § 201.57(a), must go in the Highlights section*.  *See* 21 C.F.R. § 314.70(c)(6)(iii) (permitting unilateral labeling changes to accomplish specified purposes, "except for changes to the information required in § 201.57(a)").  In light of these regulations, it not surprising that Plaintiffs and their regulatory expert, Dr. Suzanne Parisian, concede that "the regulation says that the highlights section should stay the same and get FDA approval" and that "the highlights cannot be changed without prior approval."  Parisian Dep. at 50, 56 (Doc. 5109 Exh. 19); *see also* Doc. 5966, at 5.

Critically here, section 201.57(a) clearly provides that, among other information, "monitoring recommendations" *must* be included in the Highlights section of product labeling.  21

---

[10]  Defendants expressly incorporate their prior briefing on this point.  *See* Doc. 5109-1, at 22 n.7; Doc. 5678, at 11–12; *see also* Docs. 5904, 5988.

C.F.R. § 201.57(a)(7).  Plaintiffs concede that their failure-to-warn claim—*i.e.*, that Xarelto's label fails to adequately instruct doctors to use the Neoplastin PT assay to assess patients' rivaroxaban-related coagulation parameters—would require Defendants to add a "monitoring recommendation" to the label.  *See* Doc. 5966, at 3–4.  Because any such recommendation would have to be included in the Highlights section of the label, and because Defendants cannot "independently" make that change, Plaintiffs' claim is preempted.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

### C. Plaintiffs' monitoring-related theories are further preempted because "clear evidence" demonstrates that FDA would have rejected—and in fact did reject—a proposal to add PT-monitoring language to Xarelto's label.

Plaintiffs' failure-to-warn claim is preempted for an additional (and independent) reason: Even if Defendants could have independently added a PT-related instruction, "clear evidence" demonstrates that FDA would have rejected—and did indeed reject—it.[11]  Because this Court has already made clear that preemption is a question of law that is not appropriate for the jury, this issue may—and should—be decided at the summary-judgment stage.  *See* Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury"); *id.* at 1531:5–20.

In *Levine*, the Supreme Court held that the claim before it was not preempted because the CBE regulation "permitted Wyeth to unilaterally strengthen its warning" to add a statement about the risk of the injury that the plaintiff there had suffered.  555 U.S. at 573.  The Court also observed, however, that even where a manufacturer can independently change its label without prior FDA approval, federal law will preempt any state-law claim based on the manufacturer's failure to do

---

[11] Defendants expressly incorporate their prior briefing on this point.  *See* Doc. 5109-1, at 26–28; Doc. 5677, at 12–15.

so if there is "clear evidence that the FDA would not have approved [the] change." *Id.* at 571.

Post-*Levine* cases have explained the "clear evidence" standard. As particularly relevant here, those cases demonstrate that the standard is met, and preemption applies, where FDA rejects a specific proposal to add a warning that is substantially similar to the warning that a plaintiff advocates. *See, e.g.*, *Christison v. Biogen Idec Inc.*, __ F. Supp. 3d __, 2016 WL 4223956, at *27–28 (D. Utah Aug. 5, 2016) (emphasizing the FDA's rejection of manufacturer's proposed labeling change); *Rheinfrank v. Abbott Labs.*, 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (emphasizing that manufacturer attempted to strengthen its warning label and the FDA twice denied the request); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (same); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274–75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels); *see also Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1105 (10th Cir. 2017) (FDA's rejection of a citizen petition, which presented "claims and data virtually identical to those submitted by" the plaintiffs "constitutes clear evidence that the FDA would not have approved the [plaintiffs'] desired warning"). *But see In re Fosamax Prods. Liab. Litig.*, 852 F.3d 268 (3d Cir. 2017).[12]

To be clear, it is not necessary that FDA reject the precise phraseology that a plaintiff advocates in litigation; rather, it is sufficient that FDA rejected the substance of a plaintiff's proposed warning. *See, e.g.*, *Levine*, 555 U.S. at 572 (relevant question whether FDA considered the "kind of warning" that plaintiff seeks); *Mensing*, 564 U.S. at 637 (Sotomayor, J., dissenting) (observing that clear-evidence standard is met when FDA has "considered whether to request

---

[12] In *Fosamax*, the Third Circuit reversed the district court's holding that federal law preempted the plaintiff's claim because the manufacturer "submitted a label change and the FDA rejected it." *In re Fosamax*, 951 F. Supp. 2d 695, 703–04 (D.N.J. 2013). The Third Circuit reversed on the ground that "whether the FDA would have approved a plaintiff's proposed warning is a question of fact for the jury." 852 F.3d at 293. At oral argument on the dispositive motions filed in the *Boudreaux* and *Orr* cases, Plaintiffs presented the Court with the Third Circuit's *Fosamax* decision in support of their argument that preemption is a question of fact for the jury, but as explained above, this Court has already concluded that preemption is a question of law and should follow that earlier holding here.

warnings in light of the evidence on which a plaintiff's claim rests but … decided to leave the warnings as is"); *Seufert v. Merck Sharp & Dohme Corp.*, __ F. Supp. 3d __, 2016 WL 3369512, at *6–7 (S.D. Cal. May 11, 2016) (rejecting plaintiff's argument that FDA must reject "specific proposed warning language"); *Newman v. McNeil Consumer Healthcare*, No. 10-CV-01541, 2012 WL 39793, at *7–8 & n.8 (N.D. Ill. Jan. 9, 2012) ("FDA should not have to reject every possible formulation of a particular warning in order for there to be clear evidence of rejection.").

Here, there is overwhelmingly "clear evidence" that FDA would have rejected any attempt to change Xarelto's label to instruct doctors to measure PT as a means of monitoring patients' coagulation levels. Indeed, Janssen, as the company vested with U.S. regulatory responsibility for Xarelto, specifically (and repeatedly) proposed to include the very PT-related language that Plaintiffs say Xarelto's labeling should have included, ***but FDA expressly rejected it***.

- In July 2008, Janssen included the following language in section 12.2 of the proposed label for NDA 022406, Xarelto's orthopedic-surgery indication (Doc. 5109 Exh. 37):

  > The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended. The Neoplastin® PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) ranged from 13 to 26 seconds.

- In December 2010, Janssen again included this same language recommending the use of PT if assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases. (*See Orr* Trial, Defs.' Exhs. 13–14).

- In January 2011, Janssen provided FDA with the ROCKET AF study results in conjunction with NDA 202439 for the AFib indication. In its proposed labeling, Janssen included the same PT-related language. (Doc. 5109 Exh. 39).

- In March 2011, FDA informed Janssen—in connection with the AFib NDA—that it "plan[ned] to review whether the benefit/risk of rivaroxaban could be substantially improved by routine measurement of coagulation parameters." (Exh. 6).

- In April 2011 and again in May 2011, Janssen provided proposed labeling to FDA for the AFib indication that included language recommending the use of PT "if assessment of the pharmacodynamic effect is considered necessary in individual cases." (*See Orr* Trial, Defs.' Exhs. 17–20).

- Several months later, in June 2011, FDA responded with a revised label for NDA 022406 that struck the PT language in section 12.2 and replaced it with, "The predictive value of these coagulation parameters for bleeding risk or efficacy has not been adequately studied."  FDA also added a warning regarding the "Risk of Pregnancy Related Hemorrhage" in section 5.3, that "The anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing nor readily reversed." Also, in section 8.1 (Pregnancy), FDA added a statement that "The anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing." (Doc. 5109 Exhs. 40, 41).

- Janssen responded that it would accept FDA's proposal, with the exception that "has not been adequately studied" should be changed to "has not been established." (Doc. 5677 Exhs. 54, 55). Janssen also "propose[d] to add the statement 'the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamics effect' (although [Janssen] does not recommend it … )." (Doc. 5677 Exh. 56).

- Shortly thereafter, in July 2011, FDA approved NDA 022406 with the "has not been established" language in section 12.2, but without any language referring to (1) the "relationship between PT and rivaroxaban plasma concentration," (2) the use of the "Neoplastin PT assay" to "measure[] PT" and thus "assess[] the pharmacodynamic effect of rivaroxaban," or (3) "the 5/95 percentiles for PT." (Doc. 5677 Exh. 42).

- The next month, in August 2011, FDA issued its Clinical Pharmacology Review for NDA 202439 suggesting a relationship between PT, concentration, and bleeding risk. (Exh. 7).  FDA's Medical Officer Review later concluded that "[m]onitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes cannot be recommended . . . ." (*Boudreaux* Trial, Pls.' Exh. 2).

- In November 2011, FDA approved NDA 202439 for the AFib indication *without* (1) the previously-stricken PT-related language, (2) recommendation to use Neoplastin, or (3) further evaluation of PT's utility to predict bleeding risk, but *with* the statement that "[t]he anticoagulation effect of XARELTO cannot be reliable monitored with standard laboratory testing." (Exh. 8).

- In May 2012, Janssen submitted a supplement to NDA 022406 for the DVT/PE indication, with a proposed label using language similar to that approved by FDA in the prior indications.  XARELTO_JANSSEN_08668482 (Exh. 9).

- In November 2012, FDA approved sNDA 022406 for the DVT/PE indication, again without any language referring to the "relationship between PT and rivaroxaban plasma concentration." XARELTO_JANSSEN_01989830 (Exh. 10).

In the first two bellwether cases (where the plaintiffs had used Xarelto to prevent strokes incident to their AFib), Plaintiffs advanced three arguments in an effort to explain away this regulatory history, but each fails to save Plaintiffs' claim here.

**1.**     Most critically, in the AFib cases, Plaintiffs and their experts attempted to downplay the significance of FDA's decision to strike the proposed PT language by emphasizing that the strikethrough was made by FDA's Hematology Division, which reviewed the NDA for the orthopedic surgery indication and the sNDA for the DVT indication, instead of the Cardio-Renal Division, which reviewed the NDA for the AFib indication.  *See* Pls' Opp. to Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5531), at 18 ("As a result of the orthopedic surgery medical officers (a different group of medical officers at FDA than those reviewing the atrial fibrillation NDA) review of the RECORD data, FDA agreed with Defendants' representation that there was no correlation between Neoplastin PT and bleeding risk."); *see also Boudreaux* Tr. at 459:23–460:11 (testimony of Dr. Kessler) (testifying that the "back-and-forth" between Janssen and the FDA about PT language "only has to do with DVT"); *id.* at 446:3–11 (testifying that FDA's removal of the proposed PT language was in "the application for DVT"); *id.* at 452:17–453:7 (testifying that FDA's label revisions regarding PT language were made in response to the "hip and knee" proposed labeling, "not AFib").

That distinction, whatever its meaning might be in an AFib case, is irrelevant here—and indeed, only further supports Defendants' position.  Plaintiffs have admitted—as they must—that "[t]here could be a case later in which DVT is an indicated use, which would make the [FDA strikethrough] document relevant."  *Boudreaux* Tr. at 288:22–24.  This is just such a case.  In any event, the evidence is clear that the two FDA divisions reviewing the Xarelto NDAs were "working together" in their review and assessment of the labeling.  *See Orr* Trial, Defs.' Exhs. 26–27; *Orr*

Trial Tr. (Mr. Jalota), at 1393:4–1395:19.  Plaintiffs cannot deny that FDA's decision to strike PT language that they say should have been included in Xarelto's label is highly relevant to the preemption analysis, particularly here, where Xarelto was prescribed for the DVT indication. Indeed, it is quintessentially "clear evidence" that FDA would not have approved Plaintiffs' proposed PT instruction where, as an undisputed factual matter, FDA did in fact strike Janssen's proposed PT language.

**2.**     Plaintiffs also have asserted that "FDA's view about the relationship between PT and bleed risk diametrically changed" once its reviewers in the Cardio-Renal Division "studied the ROCKET data" related to the AFib indication because, Plaintiffs say, FDA in November 2011 struck section 12.2's language that "[t]he predictive value of these coagulation parameters for bleeding risk or efficacy has not been established."  Doc. 5531, at 17–18.  Plaintiffs posit that "[t]he only conclusion that can be drawn from such an action is that the FDA concluded that PT was in fact predictive of bleeding risk." *Id.* at 19.  Again, that explanation is irrelevant here because this case is about Ms. Mingo's use of Xarelto to treat her DVT, which was approved in a separate application based on a different study (known as EINSTEIN).  In any event, Plaintiffs' inferential leap is unsupported and, indeed, is flatly contradicted by the rest of the story: FDA approved the AFib indication—again, months after receiving the ROCKET AF data—*without* either requiring the previously stricken PT-related labeling, providing any recommendation to use the Neoplastin PT assay, or requesting any further evaluation of PT's utility to predict bleeding risk, but tellingly, **with** the statement (which remains in the label today) that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing."  Xarelto USPI §§ 5.7, 8.1; *see also* Doc. 5109-1, at 1 n.1.

**3.**     Finally, Plaintiffs have suggested that FDA would have included the stricken PT-related language if Janssen had proposed to include it in the "Warnings and Precautions" section of the label rather than the "Pharmacodynamics" section.  Doc. 5531, at 19–22.  Plaintiffs cite no support for that proposition, which fails as a matter of both law and logic.  As for law, Defendants have explained—and Plaintiffs have not disputed—that the post-*Levine* cases demonstrate that "clear evidence" applies whenever FDA rejects a proposal to add a warning that is substantially similar to the warning that a plaintiff advocates, even if the proposal is not identical in every jot and tittle.  Doc. 5109-1, at 26–27; *see also* Doc. 5677, at 12–15.  In light of that substance-over-form rule, there is no warrant for a rigid requirement that the proposal be for a particular labeling section.  Moreover, Plaintiffs' formalistic rule does not make logical sense.  Surely, if (as Plaintiffs now say) FDA *wanted* to include Janssen's proposed PT language, the agency would not have categorically rejected it simply because it was proposed in the "wrong" section, but rather would have just instructed Janssen to move it elsewhere.  Plaintiffs' contention requires the Court to assume that FDA was either incompetent or engaged in some sort of cat-and-mouse game, rather than the serious business of ensuring the safety and efficacy of prescription drugs.

\* \* \*

"Clear evidence" preemption plainly applies here.  Plaintiffs now contend that Defendants should have included a PT instruction in Xarelto's label, purposefully ignoring the fact that, during the approval process, Janssen tried to do just that, but FDA refused.  The evidence of impossibility—and thus preemption—could not be much clearer.

**D.    Plaintiffs' monitoring-related theories are further preempted because there is no "newly acquired information" that would have allowed Janssen to use the CBE regulation to "independently" add PT-monitoring language to Xarelto's label.**

Janssen could not have independently added PT information to Xarelto's labeling after FDA struck that language because there was no "newly acquired information" justifying that change through the CBE procedure.

The First Circuit's decision in *In re Celexa*, 779 F.3d 34, illustrates why federal law preempts Plaintiffs' claim regarding the addition of PT information.  There, the plaintiffs alleged that FDA had initially approved Lexapro based on "questionable" data from clinical studies available at the time, and that two articles published post-approval constituted "newly acquired information" warranting a label change.  *Id*. at 38, 42.  The First Circuit rejected the plaintiffs' argument and held that, although the CBE regulation applies in "virtually all situations in which new information indicates new or greater risks, or misleading claims of efficacy," a failure-to-warn claim must be premised on the failure of a pharmaceutical manufacturer "to respond to information *not considered by the FDA*."  *Id.* at 41 (emphasis added); *see also id.* at 43 (holding the claims were preempted because the plaintiffs "ma[de] no claim . . . that this information was unknown to the FDA prior to label approval").  Under the circumstances presented, there was "no precedent . . . that would have allowed [the defendant manufacturer] to use the CBE procedure to alter the FDA label in the manner that plaintiffs allege is necessary so as to render it not 'misleading.'"  *Id.* at 43.

The court in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F. Supp. 3d 761 (D. S.C. 2016), recently applied *Celexa* to find that state-law claims based on clinical-study data already considered by FDA were not based on "newly acquired information" under the CBE regulation, and thus were preempted in circumstances nearly identical to those here.  *See id.* at 769 ("[A]ny claim that a drug label should be changed based on

information previously submitted to the FDA is preempted because the CBE regulation cannot be used to make a label change based on such information."). There, the plaintiffs alleged that the Lipitor label did not accurately describe the product's efficacy for use in women based on a particular clinical study—called ASCOT—that had been submitted to and considered by FDA during the approval process. *See id.* at 769 ("[T]he FDA approved the Lipitor label based on the ASCOT trial and data."). The court held that the plaintiffs' claim that "Lipitor's label should have included different statements about Lipitor[] . . . based on the ASCOT data" was preempted because "neither Plaintiffs nor their experts have identified any . . . 'new analyses' of the ASCOT data that should have caused Defendant to change its label." *Id.* at 769–70 ("The only 'new analysis' of ASCOT efficacy data mentioned by Plaintiffs' experts is Dr. Wells' analysis, which was conducted as part of this litigation.").[13]

Even more recently, the court in *Utts v. Bristol-Myers Squibb Co.*, __ F. Supp. 3d __, No. 1:16-cv-05668-DLC, 2017 WL 1906875 (S.D.N.Y. May 8, 2017), held that federal law preempted failure-to-warn claims concerning Eliquis, a brand-name medication in the same NOAC class as Xarelto. The plaintiffs there—like here—"focus[ed] on three categories of warnings: (1) monitoring; (2) advice regarding bleeding reversal strategies; and (3) dosage recommendations." *Id.* at *11. The plaintiffs relied on "nine reports, studies, and articles as the bases for [the] assertion that the Eliquis labeling was inadequate in failing to give these warnings." *Id.* The court concluded that none of the information to which Plaintiffs pointed—including statements in the Institute for Safe Medical Practices QuarterWatch Report, which is based on adverse drug event data— constituted "newly acquired information." *Id.* at *11–20. For example, as to the QuarterWatch

---

[13] When FDA has already considered a particular safety issue based on the same studies that were subject to the FDA's decision to approve the product and its labeling, the Agency's decision is not "new" information and cannot form the basis of a claim for relief. *Cf. In re Incretin*, 142 F. Supp. 3d at 1131 ("A reevaluation of scientific data or a judicial challenge to the accuracy of the FDA's conclusions would disrupt the 'delicate balance of statutory objectives.'").

Report, the court noted that some of the statements to which Plaintiffs pointed merely "speculate[d] whether [Eliquis] safety could be further improved," or "was evident to the FDA when it approved the label." *Id.* at *13–14. Accordingly, the Court granted the defendants' motion to dismiss the plaintiffs' failure-to-warn claim. *Id.*

The reasoning of those cases applies equally here, because Plaintiffs have pointed to no "newly acquired" data that would justify any labeling change under the CBE regulation. Plaintiffs have previously pointed to data from ROCKET AF and FDA's Clinical Pharmacology Review to suggest that FDA first learned in August 2011 of a supposed correlation between PT and bleeding risk (*see* Doc. 5531, at 18), but by November 2012 when FDA approved the DVT indication, FDA had already reviewed that information. This Court has previously suggested that "Defendants may have been permitted to update their label pursuant to the CBE after they became aware of the number of its consumers claiming they experienced a major bleeding event while taking Xarelto" (Doc. 6196, at 7–8), but the *Utts* court recently held just the opposite, that adverse event data cannot be considered "newly acquired information." *See Utts*, 2017 WL 1906875, at *13–14. The *Utts* court's reasoning makes sense because adverse event reports regarding bleeding that post-date approval, particularly that post-date Xarelto's approval for the DVT indication in November 2012, would have been only "cumulative of information previously submitted to FDA"—and in that case, "a CBE supplement would not be appropriate." 73 Fed. Reg. 2848, 2850 (Jan. 16, 2008); *see also id.* ("[I]f the reports of adverse events are consistent in type, severity, and frequency with information previously provided to FDA, such reports may not constitute newly acquired information appropriate for a CBE supplement.").

Additionally, the CBE regulation, 21 C.F.R. § 314.70(c)(6)(iii), requires that—at least for CBE supplements that would "add or strengthen a contraindication, warning, precaution or adverse

reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c)"—"newly acquired information" must satisfy a specific causation standard.  21 C.F.R. § 314.70(A).  Correlatively, § 201.57(c)(6)(i) provides, for example, that, "[i]n accordance with [*§ 314.70*], the labeling *must be revised to include a warning* about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."  (Emphasis added.)  The FDA has stated that the relevant regulations were amended "to make it clear that a CBE supplement may be used to add or strengthen a contraindication, warning, precaution, or adverse reaction *only if* there is sufficient evidence of a causal association with the drug."  73 Fed. Reg. at 49604 (emphasis added); *id.* ("Expressly requiring that a CBE supplement reflect newly acquired information *and be based on sufficient evidence of a causal association* will help to ensure that scientifically accurate information appears in the approved labeling for such products." (emphasis added)).  Federal regulations require pharmaceutical manufacturers to submit adverse event reports to FDA, *see* 21 C.F.R. § 314.80, but, as a regulatory matter, these are simply anecdotal reports of a correlation or *association* between the use of a drug and some adverse event, "*whether or not considered drug related*"—*i.e.*, regardless whether the drug caused the event.  *Id.* § 314.80(a) (emphasis added).  According to FDA regulations, AERs do not demonstrate "that the drug caused or contributed to an adverse effect." 21 C.F.R. § 314.80(l). To the contrary, FDA has explained that the information in AERs "has not been scientifically or otherwise verified," and that "there is no certainty that the suspected drug caused the reaction," as the "event . . . may have occurred by chance at the same time the suspected drug was taken." FDA, AER System, Office of Pharmacoepidemiology and Statistical Science, *Brief Description with Caveats of System* at 4 (July 18, 2005).

**II.     Federal law preempts Plaintiffs' claim that Xarelto's label is inadequate because it does not contain a "black box" warning.**

Several of Plaintiffs' experts opine that Defendants failed to adequately warn of the bleeding risks associated with Xarelto because the product's label does not include a "black- box" warning.  *See, e.g.*, Bussey Rep. at 1, 8, 15; Cuculich Rep. at 3, 12; Leissinger Rep. at 2, 18; Rinder Rep. at 4, 19; Smart Rep. at 6.  But the same risk of bleeding is mentioned in numerous instances, more than 100 times, elsewhere in the label.  Perhaps in light of that fact, Plaintiffs abandoned this liability theory in *Boudreaux* and *Orr* (*see* Doc. 5650 at 2 n.2), and the Court excluded any such evidence in the *Orr* trial.  *See Orr* Tr. at 518:8–9 ("I am going to tell [the jury] to disregard testimony regarding the black box warning."); *id.* at 526:11–14 (instructing the jury "to disregard any reference to any black box.  A black box or testimony about a black box has no part and should play no part in this trial or your deliberations.  So please disregard anything about a black box.").

Even if Plaintiffs persist in advancing a "black box" warning theory here, federal law preempts such a claim.   As Plaintiffs' regulatory expert, Dr. Parisian, has expressly—and correctly—conceded, a pharmaceutical company is prohibited from unilaterally adding a black-box warning to its product's label.  *See* Parisian Dep. at 57:5–14 (Q: "[W]e have agreement that [a black-box warning] cannot be changed without a prior approval supplement.  Correct?"  A: "It has – that's correct. . . . FDA has to pass on this . . . to remove it or put a new black-box warning."). FDA regulations restrict the addition of a "black box" warning to a pharmaceutical label to *only* those situations where FDA specifically requires such a warning—in particular, the regulations state that "[s]pecial problems, particularly those that may lead to death or serious injury, may be required by the Food and Drug Administration to be placed in a prominently displayed box" and that "[i]f a boxed warning is required, its location will be specified by the Food and Drug Administration."  21 C.F.R. § 201.80(e); *see also* 21 C.F.R. § 201.57(c)(1) ("Certain

contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box." (applying rule to prescription drugs approved after June 30, 2001, pursuant to 21 C.F.R. § 201.56(b))).

Notably, during the notice-and-comment period for this rule, FDA clarified its view that only the Agency can institute black-box warnings. When asked specifically "whether a manufacturer may include a boxed warning without prior FDA approval," the Agency responded with an emphatic "no," explaining that black-box warnings "are permitted only when specifically required by FDA." 44 Fed. Reg. 37434, 37448 (June 26, 1979). The reason for that limitation, FDA said, was "to ensure the significance of boxed warnings in drug labeling." *Id.*; *see also* 51 Fed. Reg. 43900, 43902 (Dec. 5, 1986) ("[T]he agency has the authority to require a 'boxed' warning on prescription drug packages for special problems, particularly those that may lead to death or serious injury. . . . The agency's policy is to use restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect."); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 817 F. Supp. 2d 535, 553 n.97 (E.D. Pa. 2011) (rejecting a claim that the manufacturer should have added a boxed warning because "a boxed warning can be added only with prior FDA approval"). *Cf. Ackerman v. Wyeth Pharms.*, 526 F.3d 203, 211 n.12 (5th Cir. 2008) (noting that "Wyeth was forbidden from providing a 'black box' warning because '[t]o ensure the significance of boxed warnings in drug labeling, they are permitted in labeling only when specifically required by the FDA.'" (alternation in original)).

Because federal law prohibited Defendants from "independently" adding a black-box warning to Xarelto's label without prior FDA approval, and because FDA did not require a black-box warning—for bleeding risk, PT, or otherwise—any claim arising out of their failure to do so is preempted. *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment on Plaintiffs' failure-to-warn claim.


Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com


CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.

1100 Poydras Street, Suite 2300
*Attorneys for Defendants Janssen*   New Orleans, LA 70163
*Pharmaceuticals, Inc. and Janssen Research*   Telephone: (504) 585-7241
*& Development, LLC*   olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/      John F. Olinde*