UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo v. Janssen Research & Development, LLC et al.<br>Case No. 2:15-cv-03469 | MAGISTRATE NORTH |

## DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON STATE-LAW GROUNDS AS TO PLAINTIFFS' DESIGN-DEFECT CLAIM

Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Janssen Pharmaceuticals, Inc., and Janssen Research & Development LLC (collectively, "Defendants") move for summary judgment on Plaintiff's design-defect claim. That claim fails as a matter of law because Plaintiff has not put forward a feasible alternative design to Xarelto® as required by Mississippi law, which governs here.

Plaintiffs in the first two bellwether cases initially asserted, under Louisiana law, design-defect claims similar to the claim asserted here, but abandoned those claims before trial. *See* Docs. 6298, 6601. To the extent Plaintiff intends to continue to pursue a design-defect claim here, such a claim fails under Mississippi law for at least three independent reasons. *First*, Plaintiff has not proposed any feasible alternative design. Instead, she merely suggests that Xarelto should have been marketed with separate, adjunct products that did not exist at the time of her alleged injury. *Second*, Plaintiff cannot meet her burden of showing that any purported alternative design would have, "to a reasonable probability prevented" the alleged injury. *Third*, Plaintiff cannot show that any of her purported alternatives would not impair the "utility, usefulness, practicality, or

1

desirability" of Xarelto, as required by Mississippi law.[1]  Accordingly, Defendants are entitled to summary judgment as to Plaintiff's design-defect claim.

## BACKGROUND

Plaintiff Dora Mingo alleges that she experienced gastrointestinal bleeding as a result of taking Xarelto.  Compl. (Doc. 1) ¶ 10, No. 2:15-cv-03367.  She was prescribed Xarelto to treat a blood clot (deep vein thrombosis or "DVT") in her leg, which developed while she was on Lovenox and then aspirin for anticoagulation after she underwent hip replacement surgery.

Xarelto is part of a class of medicines known as novel oral anticoagulants (NOACs).  As a class, these medicines—as compared to warfarin—have fewer interactions with food and other medications, have a rapid onset and faster clearance rate, and do not require routine blood monitoring.  By comparison, warfarin's anticoagulation effect must be carefully monitored, may require dose adjustments, requires a reversal agent because of its long half-life, and has hundreds of food and drug interactions.  Because their purpose is to impede blood clotting, all anticoagulation medicines—NOACs and warfarin—carry a risk of bleeding.  Plaintiffs argue that Xarelto was defectively designed because (a) it did not have a range of doses, (b) there was no separate product that could be used to measure blood levels, and (c) there was no reversal agent that could be used in the event of a bleeding event (which is an unavoidable side effect of Xarelto,

---

[1] Like the plaintiffs in the first two bellwether trials (*Boudreaux* and *Orr*), Ms. Mingo has alleged that Xarelto was defectively designed.  *See* Compl. ¶¶ 72–73, 76, 84, 87–88, 92, 95–97, 99, 100, 102, 146.  Also like the plaintiffs in *Boudreaux* and *Orr*, Ms. Mingo must prove the existence of a "feasible alternative design."  *See* Miss. Code Ann. § 11-1-63(f).  Before summary judgment briefing in *Boudreaux* and *Orr*, Plaintiffs' counsel put forward two alternative designs for Xarelto: (1) warfarin or (2) a NOAC with Xarelto's formulation, but that had a lower cumulative daily dose or twice-daily (BID) dosing regimen, and/or included a monitoring regimen similar to that used for warfarin.  Plaintiffs then retreated from this position in summary-judgment briefing.  *See* Pls.' Opp. to Defs.' LPLA MSJ (Doc. 5115-1) at 5 ("Plaintiffs are not asserting that the alternative design of Xarelto was warfarin or some other . . . NOAC.").  Instead of pointing to warfarin (or something like it), counsel argued that Xarelto's design could remain as-is, and that the "alternative designs" were two adjunct products that should have been marketed alongside Xarelto: (1) an anti-Factor Xa assay to identify patients at a high risk of bleeding, and (2) a reversal agent.  Plaintiffs ultimately dismissed their design-defect claims with prejudice on the eve of trial, after dispositive motions had been argued and rules upon.  *See* Docs. 6298, 6601.  To the extent Ms. Mingo intends to pursue her design-defect claim, it fails as a matter of law under the Mississippi Products Liability Act (MPLA).

like all other anticoagulants).  As explained below, there is no evidence that any of these alternative designs—even if they existed, were tested, or were approved by FDA—would have made a difference in the care and treatment of Plaintiff and prevented her alleged injury.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  The moving party need not negate the elements of the opposing party's case; it is enough to show that the opposing party cannot satisfy an element of his or her claim.  *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).

A fact is material only if its resolution would affect the outcome of the action.  *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).  Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is required if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his or her case on which he or she bears the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## ARGUMENT

To prevail on her design-defect claim, Plaintiff must prove that the product was defective under the MPLA, which is the exclusive remedy under Mississippi law for "any action for damages caused by a product."  Miss. Code. Ann. § 11-1-63.  To establish a design-defect claim under the MPLA, Plaintiff first must prove the existence of a "feasible alternative design," meaning a design

3

"that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." *Id.* § 11-1-63(f). Plaintiff cannot satisfy her burden under the MPLA because she cannot present sufficient evidence (1) that a "feasible alternative design" existed, (2) that any proposed alternative design "would have to a reasonable probability prevented" her injury, and (3) that any proposed alternative design "would avoid impairing the utility, usefulness, practicality, or desirability" of Xarelto.

**I.    Plaintiff cannot meet her burden of proving that a feasible alternative design existed.**

Mississippi law forecloses, for a host of reasons, any claim that an adjunct product—here, Plaintiffs contend those adjunct products are an anti-Factor Xa assay or a reversal agent—can be an alternative design. *First*, an entirely separate, adjunct product is not a "feasible alternative design" under the MPLA. *Second*, a product that did not exist at the time of Plaintiff's injury is not a "feasible alternative design." *Finally*, Defendants had no duty to design Xarelto differently before bringing it to market.

**A.    Plaintiff cannot meet her burden of proving a feasible alternative design by pointing to entirely different "adjunct" products.**

A feasible alternative design under Mississippi law *must* be a re-design of the actual product at issue, *not* the use of other adjunct products. *See, e.g.*, *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) ("'An alternative design is by definition a different method of configuring the product.'" (quoting *Tassin v. Sears, Roebuck and Co.*, 946 F. Supp. 1241, 1247 (M.D. La. 1996))); *Elliott v. El Paso Corp.*, 181 So. 3d 263, 272–73 (Miss. 2015).

In *Elliott*, the plaintiffs sued the manufacturer and seller of a natural gas odorant on a design-defect theory, following a house fire allegedly caused by a gas leak. *See* 181 So. 3d at 265–67. The plaintiffs did not detect the leak before the fire, allegedly because the natural-gas odorant had faded. For their feasible alternative design, the plaintiffs did not propose a re-design of the

4

odorant itself, but instead theorized that natural gas customers should have "gas detectors" in addition to odorized gas. *Id*. at 271–72. The Mississippi Supreme Court rejected that argument, holding that a gas detector is not an "alternative design for odorant," but rather "an additional warning system." *Id*. at 272. The Mississippi Supreme Court made clear that "[r]equiring an entirely different warning system, or requiring the affected public to use gas detectors in their homes, is not a feasible alternative design for natural-gas odorant." *Id*. at 273; *see also Clark v. Brass Eagle*, 866 So. 2d 456, 461–62 (Miss. 2004) (holding that the plaintiffs "offered no feasible design alternative" to an allegedly defective paint gun simply by claiming that the manufacturer should have provided protective goggles).

*Elliott* controls here and rules out adjunct products as "feasible alternative designs" to Xarelto. A reversal agent and an anti-Factor Xa assay are different products than Xarelto, both as a matter of common sense and as a matter of FDA classification. The only possible reversal agent Plaintiff's counsel have ever suggested (currently being investigated by Portola Pharmaceuticals) is a biologic (21 C.F.R. part 601), and an anti-Factor Xa assay would be considered a medical device (21 C.F.R. part 809). Both of these products would be subject to a different FDA regulatory regime than prescription medicines (21 C.F.R. part 314). That such adjunct products—likely designed, manufactured, and sold by third parties—could theoretically be marketed alongside a prescription medicine is unremarkable and has no legal significance under Mississippi law. Reversal agents and assays are "additional" to Xarelto, just as a gas detector was "additional" to gas in *Elliott*. 181 So. 3d at 272–73. The addition of a reversal agent or an anti-Factor Xa assay is not an alternative design of Xarelto itself, and therefore—as a matter of law—Plaintiff's theory does not satisfy the MPLA's alternative-design requirement. Because Plaintiff cannot prove a

5

feasible alternative design using adjunct products, Defendants are entitled to summary judgment on Plaintiff's design-defect claim.

> **B. Plaintiff cannot meet her burden of proving a feasible alternative design by pointing to products that did not exist at the time of her alleged injury.**

Separately, Plaintiff's proposed feasible alternative design must be one that "could have been practically adopted at the time of sale." *Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) (citing *Restatement (Third) of Torts: Prod. Liab.* § 2 (1998)); *see also Grant v. Ford Motor Co.*, 89 So. 3d 655, 668 (Miss. Ct. App. 2012) (rejecting alternative seatbelt designs that were not in use when the vehicle in question was manufactured and sold). In other words, the proposed feasible alternative design must be one that existed at the time of the alleged injury. That is because the MPLA requires any plaintiff to prove that the product in question was defective and unreasonably dangerous "at the time the product left the control of the manufacturer or seller." Miss. Code Ann. § 11-1-63(a).

Because neither of the proposed adjunct products—an anti-factor Xa assay or reversal agent—could have been adopted at the time Plaintiff used Xarelto, they are not "feasible alternative designs" under the MPLA. There is presently no reversal agent for Xarelto, and FDA approved Xarelto without any reversal agent. Xarelto's label clearly warns: "A specific antidote . . . is not available." Jan. 2015 Xarelto USPI (Exh. 1) ¶¶ 5.2, 10.[2] Likewise, there is no FDA-approved anti-Factor Xa assay for Xarelto—or any other NOAC, for that matter. *See* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 9 (Oct. 26, 2015) (Lea Carrington, Director, Division of Immunology and Hematology Devices) ("Importantly, the DOAC drugs were approved without a requirement for

---

[2] The January 2015 label is the label that was in effect when Plaintiff took Xarelto.

monitoring. So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants. *There are currently no cleared or approved devices that measure that.*" (emphasis added)) (Doc. 5109 Exh. 33).[3] Diagnostica Stago, Inc. has submitted a preliminary application to FDA for a Xarelto-specific anti-Factor Xa assay, but FDA has not granted that company permission to proceed.

Accordingly, this is not a case in which FDA has not considered supposed alternative products. Rather, FDA has considered and declined to approve the very adjunct products for use with Xarelto that Plaintiffs propose. Those products could not have been "practically adopted" at the time Plaintiff took Xarelto, which is the relevant time under the MPLA. Nor could they be "practically adopted" now. For this additional reason, Plaintiff's design-defect claim does not satisfy the MPLA.

### C. Defendants had no duty to design Xarelto differently before bringing it to market.

To the extent Plaintiff claims that Defendants should have designed Xarelto differently *before* seeking FDA approval, their claim fails because the MPLA does not impose any such duty on the manufacturer. Rather, as noted above, a manufacturer may be liable under a design-defect theory only if, "*when the product left the manufacturer's control*, there existed a feasible alternative design that would have to a reasonable probability prevented the harm." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324 (5th Cir. 2004) (quoting Miss. Code Ann. § 11-1-63(f)) (emphasis added); *accord Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 756 (Miss. 2011) (explaining that a "feasible design alternative must have existed" when the product left the manufacturer's control). Accordingly, a manufacturer has no duty to create, test, or propose some alternative

---

[3] Plaintiff's experts have uniformly acknowledged this fact. *See, e.g.*, Rinder Dep. at 247–49; Plunkett Dep. at 403–04; Leissinger Generic Dep. (Nov. 15, 2016) at 184–85; Gosselin Dep. at 305–07; Cerri Dep. at 147, 268; Bussey Dep. at 257; Ix Dep. at 316.

design that did not already exist. Other courts have similarly rejected the existence of such a pre-approval duty—indeed, as the Sixth Circuit recognized in construing New York law, in the context of a pre-approval design-defect claim, it is difficult, if not impossible, "to conceive of any coherent pre-approval duty that [a manufacturer] would have owed to [the plaintiff] when designing [a prescription drug]." *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281, 300 (6th Cir. 2015).

But any pre-approval design-defect theory should be rejected for an additional reason—no Mississippi court has adopted it. As the Fifth Circuit has recognized, federal courts sitting in diversity "do not 'adopt innovative theories of recovery under state law.'" *EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 555 (5th Cir. 2016) (concluding that party's argument that would effectively expand Mississippi law was a "nonstarter"). Plaintiff's claim that Defendants should have re-designed Xarelto prior to FDA approval is just such an innovation, unrecognized in any Mississippi state court. This Court should not reach out and "expand" Mississippi law "beyond its presently existing boundaries"—"[t]hat is solely the prerogative of the courts of Mississippi." *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 742 (5th Cir. 2005).

Plaintiff's "pre-approval" claim "run[s] afoul of [the Fifth Circuit's] longstanding rule against front-running the state courts by adopting innovative theories of state law," *Hux v. S. Methodist Univ.*, 819 F.3d 776, 783 (5th Cir. 2016), and should therefore be rejected.

## II. Plaintiff cannot meet her burden of showing that any of her purported alternative designs would have prevented her gastrointestinal bleeding.

To survive summary judgment, Plaintiff must also show that one of her proposed alternative designs would have "to a reasonable probability prevented the harm" she experienced. Miss. Code. Ann. § 11-1-63(f)(ii); *see also Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP, 2016 WL 6652750, at *3 (S.D. Miss. Nov. 10, 2016) (granting summary judgment where the plaintiff failed to present "any technical analysis" as to how the alternative design affected the "safety" of

8

Case 2:14-md-02592-EEF-MBN Document 6753 Filed 06/07/17 Page 9 of 17

the product); *Johnson v. Davidson Ladders, Inc.*, 403 F. Supp. 2d 544, 550 (N.D. Miss. 2005) (granting summary judgment where the plaintiff "offered no evidence relative to the effectiveness of the alternative design in reducing the severity or frequency of accidents"); *Singley v. Trinity Highway Prod., LLC*, 180 So. 3d 708, 716 (Miss. Ct. App. 2015) (granting summary judgment where the plaintiff's expert testified "there was a possibility" that the proposed alternative design "would have prevented the incident, [but] she had done no testing to make that determination"). Plaintiff's asserted harm is a gastrointestinal bleed. Therefore, to present a prima facie case for design defect, she must have admissible evidence that her proposed alternative design would, "to a reasonable probability," have prevented the gastrointestinal bleeding she experienced. She cannot satisfy that burden.

      **A.    Plaintiff lacks evidence that either warfarin or a version of Xarelto with a lower dose, different dosing regimen, or routine monitoring requirement would have prevented her gastrointestinal bleeding.**

As noted above, in *Boudreaux* and *Orr*, Plaintiffs seized on warfarin's lower cumulative daily dose or different dosing regimen, and its monitoring regimen, and argued—at least for a time—that these features constitute design alternatives, although they later abandoned those theories. *Compare Orr* Compl. ¶ 78 ("Xarelto . . . is not better than warfarin from a safety perspective . . . ."), *and Boudreaux* Compl. ¶ 82 ("[T]here is no antidote to Xarelto, unlike warfarin."), *with* Pls.' Opp. to Defs.' LPLA MSJ (Doc. 5115-1), at 5 ("Plaintiffs are not asserting that the alternative design of Xarelto was warfarin or some other New Oral Anticoagulant (NOAC)."); *see also Mingo* Compl. ¶ 44 ("Importantly, there is no antidote to Xarelto, unlike warfarin or coumadin."); *id.* ¶¶ 56–59 (comparing adverse event data for anticoagulants). To the extent Plaintiff seeks to reassert that argument here, it fails because Plaintiff lacks admissible evidence to create a fact dispute as to whether a different dosing or monitoring regimen would have "to a reasonable probability" prevented her bleeding.

9

### 1. Plaintiff's experts have no reliable evidence to demonstrate that a lower dose or different dosing regimen would have prevented her gastrointestinal bleeding.

Plaintiff has not offered any reliable evidence that any purported alternative design of Xarelto with a different dosing regimen would have, to a "reasonable probability," prevented her injury. At the outset, it is important to note that Ms. Mingo is unlike the other bellwether plaintiffs, in that she took Xarelto to treat her DVT, not for stroke prevention incident to AFib. Plaintiffs in this litigation have offered numerous experts who offer opinions on Xarelto's dose and dosing regimen *for AFib* but not for DVT, the indication at issue in this case.[4] *See, e.g.*, Defs.' Joint *Daubert* Motion To Exclude Expert Opinions And Testimony Regarding Unapproved Dosing And Monitoring Regimens (Doc. 5113).[5]

Moreover, "'the proper methodology for proposing alternative designs includes more than just conceptualizing possibilities.'" *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 327 (5th Cir. 2004) (quoting *Watkins*, 121 F.3d at 992). "[T]he mere mention of a design alternative . . . comes well-short of lending evidentiary guidance to a court." *Williams*, 921 So. 2d at 1275. Here, Plaintiff lacks data-supported expert testimony with respect to all of her potential alternative-design theories. Plaintiff's generic experts concede that they lack the data necessary to conclude that a lower dose or different dosing regimen reduces major bleeding incidents. *See* Doc. 5113-1, at 20–28. None of Plaintiff's witnesses relied on or presented the data-driven technical analysis the MPLA requires. *See, e.g.*, *Johnson*, 403 F. Supp. 2d at 550. Accordingly, Plaintiff does not have admissible evidence that a different dose would have, to a reasonable probability, prevented the bleeding from the ulcer in her upper GI tract.

---

[4] Plaintiff's case-specific expert Dr. Rinder testified that he is "not making a specific recommendation on which drug and/or which dosage" should have been used for Plaintiff. Rinder Dep. 109:13–110:10 (Feb. 7, 2016) (Exh. 2).

[5] Defendants have renewed their omnibus *Daubert* motion in this case, in a motion filed contemporaneously herewith.

> **2. Plaintiff's experts have no reliable evidence to demonstrate that a monitoring regimen would have prevented her gastrointestinal bleeding.**

Nor has Plaintiff offered any reliable evidence that any purported alternative design of Xarelto with a routine monitoring regimen would have, to a "reasonable probability," prevented her injury. Plaintiff's experts have conceded a complete lack of data to supporting any claim that a monitoring regimen—specifically a regimen involving a Neoplastin PT test—would have prevented Plaintiff's injury. *See* Doc. 5113-1, at 7–20.

In support of her claims, Plaintiff's experts merely suggest that a monitoring regimen might—theoretically—have led Plaintiff's prescriber to give her some other anticoagulant or to reduce her dose. *See* Rinder Dep. 95:16–98:2. These suggestions are entirely speculative and inchoate: Plaintiff does not have a particular dose in mind, or even a particular anticoagulant alternative. *See id.* at 109:13–110:10; *see also id.* at 97:12–15 (testifying, with respect to dosage, "I don't know how they would do that. . . . I don't know that that's possible"); *id.* at 99:18–101:5 (testifying, with respect to alternative drugs, that he had not "rule[d] out other anticoagulant[s]" and that his opinions have "not . . . reached a maturity" that he could suggest how another drug could be administered). As explained above, Plaintiff lacks evidence that the dosing characteristics or other characteristics an alternative anticoagulant might have possessed would have made any difference in this case.

> **B. Plaintiff lacks evidence that an anti-Factor Xa assay would have prevented her gastrointestinal bleeding.**

There is no evidence here that a hypothetical anti-Factor Xa assay would have shown anything clinically relevant to Ms. Mingo, or how the results from such a hypothetical test would have influenced her treatment.

Notably, Plaintiff received a PT test the day after she first took Xarelto, which showed a value that Plaintiff apparently wants to characterize as being high and as revealing her as a high-risk patient. *See* Jordon Dep. 103:24–106:5. Critically, even in light of that value and Plaintiff's reliance on it, Plaintiff's prescribing physician did not take her off Xarelto (nor did Plaintiff's primary care physician), and he by his decision to prescribe Xarelto for her. *Id*. at 195:2–197:6, 209:22–25. Thus, there is no valid basis to conclude that Plaintiff's prescribing physician would have altered his treatment if armed with some *other* test (such as an anti-Factor Xa assay) at the outset of treatment to determine her suitability for taking Xarelto. The most Plaintiff can do is speculate on this point.

### C.  Plaintiff lacks evidence that a reversal agent would have prevented her gastrointestinal bleeding.

There is no evidence that a hypothetical reversal agent would have made any difference. According to the physician who treated Plaintiff for her gastrointestinal bleeding, a reversal agent would not have altered her treatment at all. She was diagnosed with gastrointestinal bleeding on the morning of February 13, 2015, based on blood drawn the day before. *See* Clinic Note (Feb. 13, 2015) (Exh. 4, filed under seal) DMingo-JGholson-113. She went to the emergency room the same day, and Dr. Stephen Keith immediately performed an endoscopy in which he cauterized the source of her bleeding: an oozing (slow bleeding, non-emergency) ulcer in her upper GI tract. Keith Dep. 74:16–76:9, 81:5–83:25 (Aug. 11, 2016) (Exh. 5). After that non-surgical procedure, the bleeding stopped, and Dr. Keith concluded that it was safe for Plaintiff to resume taking Xarelto. *Id*. 94:7–95:4. Plaintiff made a complete recovery. *Id*. 224:15–225:3.

On this record, Plaintiff cannot create a genuine dispute of fact as to whether a reversal agent would have stopped her oozing ulcer any better than Dr. Keith's actual treatment did. And,

12

in any event, Dr. Keith testified unequivocally that he would not have used a reversal agent even if one had been available:

> Q. But the fact that you didn't have a reversal agent didn't alter you by any means. You treated her as if you would have treated her had she been on any other anticoagulant including warfarin –
>
> A. Yes.

*Id*. at 97:12-17; *see also id*. at 89:4-23. Dr. Keith testified that he tries to avoid administering reversal agents, when possible, because of (a) the risk of clotting and (b) the difficulty in re-anticoagulating a person once a bleed resolves. *Id*. at 48:2–49:22. Thus, not only did Dr. Keith not intend to administer a reversal agent to Plaintiff, he stands by his decision to have her resume taking Xarelto after he performed the non-surgical procedure to cauterize her ulcer because of her continued risk of DVT. *Id*. at 206:6–207:7; *see also id*. at 67:12-23, 72:3–73:8.

## III. Plaintiff cannot meet her burden of showing that any purported alternative design would not impair the "utility, usefulness, practicality, or desirability" of Xarelto.

Plaintiff's claim also fails because she cannot demonstrate that any proposed alternative design would not impair the "utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(f); *see also Brown v. Ford Motor Co.*, 121 F. Supp. 3d 606, 617 (S.D. Miss. 2015); *Betts v. Gen. Motors Corp.*, No. 3:04CV169-M-A, 2008 WL 2789524, at *14 (N.D. Miss. July 16, 2008). Making this showing requires evidence of, among other things, the "burden that switching to the alternative design would have entailed." *Williams*, 921 So. 2d at 1276 (quoting *Lavespere v. Niagara Machine & Toolworks, Inc.*, 910 F.2d 167 (5th Cir.1990)). As before, this showing requires an objective and technical analysis through admissible expert witness testimony. *Guy*, 394 F.3d at 327, 331; *Barnett*, 2016 WL 6652750, at *3.

### A. Warfarin or a version of Xarelto with a lower dose, different dosing regimen, or routine monitoring requirement would have a different utility, usefulness, practicality, and desirability.

To the extent Plaintiff intends to argue that warfarin, or a version of Xarelto with a lower dose, different dosing regimen, or routine monitoring requirement, are alternative designs, that argument fails because none of those proposals have the same "utility, usefulness, practicality or desirability" as Xarelto. Warfarin was available to Plaintiff's prescribing physician, Dr. Jordon, but he chose to prescribe Xarelto instead because he preferred its advantages over warfarin—such as not having a monitoring regimen, not having to hospitalize the patient while determining the appropriate dose of warfarin, and not facing the inconvenience and cost of frequent dose adjustments. *See* Jordon Dep. 18:14–19:16, 32:2–34:4, 185:21–187:24. Substituting warfarin for Xarelto, or requiring Xarelto to have dosing or monitoring features similar to warfarin, undermines that preference based on medical judgment and experience and violates the MPLA's requirement that a feasible alternative design must not impair the "utility, usefulness, practicality or desirability" of the product in question.[6] Rather, it is undisputed that warfarin, or warfarin-like features, would negate the benefits that make Xarelto a desirable product for medical professionals and their patients. The MPLA places the burden on a plaintiff to prove, through admissible expert testimony, that a proposed alternative can be adopted without compromising a product's useful features. As to warfarin or a warfarin-like product, such proof is impossible.

---

[6] Although Mississippi courts have not directly confronted the issue in the prescription-drug context, "courts throughout the country have held that a party may not show a reasonable alternative design by pointing to the availability of a different drug available for the same purpose." *Young*, 2017 WL 706320, at *10–11. At the very least, drugs that utilize a different mechanism or perform a different function to accomplish the same purpose should not be regarded as alternative designs. *Id*. Hence, a drug that inhibits coagulation by working against vitamin K (warfarin) should not be regarded as an alternative design for a drug that works against Factor Xa (Xarelto).

14

### B. An anti-Factor Xa assay or a reversal agent would have a different utility, usefulness, practicality, and desirability.

It is unquestionable that an anti-Factor Xa assay or reversal agent are adjunct products with an entirely different "utility, usefulness, practicality or desirability" than Xarelto itself. As adjunct products, they do not even have the same *ultimate* utility—anticoagulation—as Xarelto. This indisputable fact underscores why these adjunct products cannot be viewed as alternatives to Xarelto, but must instead be viewed as different products.

What is more, Plaintiff does not have admissible expert testimony necessary to demonstrate the burden that introducing these adjunct products would entail (in terms of researching and producing the products, and in terms of administering them in the field), nor any admissible technical, expert analysis regarding their expense. Plaintiff is, therefore, unable to create a prima facie case. Lay jurors cannot draw these conclusions for themselves, and none of Plaintiff's experts has conducted any sort of analysis that satisfies this MPLA requirement.

## CONCLUSION

For the reasons stated above, the Court should grant Defendants summary judgment on Plaintiff's design-defect claim in light of the fact that Plaintiff has no viable claim under the MPLA, the exclusive remedy for alleged personal injuries caused by products allegedly defective in their design.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com


CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com


*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

**CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that on the 7th of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

               */s/  John F. Olinde*