## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph Orr, Jr., et al. v. Janssen et al. Case No. 2:15-cv-03708 | MAGISTRATE NORTH |

### DEFENDANTS' FURTHER MEMORANDUM (REGARDING PREEMPTION) IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF PLAINTIFFS' CASE

Pursuant to Rule 50(a), Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Bayer HealthCare Pharmaceuticals Inc., and Bayer Pharma AG (collectively, "Defendants"), hereby move the Court, at the close of Plaintiffs' case-in-chief, for judgment as a matter of law on Plaintiffs' sole remaining failure to warn cause of action on grounds that the claim is preempted by federal law.[1]

Plaintiffs have pursued various failure-to-warn theories over the course of this case.  In opposing Defendants' Motions for Partial Summary Judgment, Plaintiffs asserted that the Xarelto

---

[1] Defendants have filed an additional memorandum in support of their Rule 50(a) motion for judgment as a matter of law, addressing issues other than preemption.  Defendants make this motion at the close of Plaintiffs' case-in-chief without waiver of their right to move for judgment as a matter of law more broadly—including but not limited to the arguments in this motion—at the close of all evidence.  *See, e.g.*, *Gonzales v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 750–52 (5th Cir. 1993) (holding that defendant may move for judgment as a matter of law on fewer than all issues at the close of plaintiffs' case, and then move more broadly at the close of all evidence).

Defendants hereby expressly incorporate all of the earlier briefing and argument regarding their argument that federal law preempts Plaintiffs' failure-to-warn claim.  In particular, Defendants direct the Court to the following briefs related to Plaintiffs' failure-to-warn claims in the *Boudreaux* and *Orr* cases: Docs. 5109-1, 5110-1, 5678, 5689, 5904, and 5988.  Defendants also incorporate the March 23, 2017 oral argument related to Defendants' arguments that federal law preempts Plaintiffs' failure-to-warn and design-defect claims.  Plaintiffs' theory of liability at trial has been that Xarelto's label is inadequate because it allegedly failed to instruct physicians to conduct a PT test to determine whether emergency surgery would be appropriate.  Defendants' arguments in this brief are made without prejudice to, and without waiving, additional arguments contained in the summary-judgment briefing, which Defendants expressly incorporate here, that explain additional reasons why federal law preempts Plaintiffs' failure-to-warn claim, including liability theories that Plaintiffs have now abandoned (either in the briefing or at trial).

label should have instructed physicians to perform a PT test to determine whether an individual should be taken off Xarelto.[2]   But at trial, Plaintiffs shifted their strategy (again)—pursuing a different claim that the Xarelto label should have instructed physicians to use a prothrombin time test ("PT") to detect whether Xarelto was "on board" in an emergent care setting.  In other words, according to Plaintiffs, Defendants failed to adequately instruct Dr. Cuong Bui, Sharyn Orr's emergency room neurosurgeon, to use a prothrombin time test "off label" for an unapproved use to determine whether Mrs. Orr had recently taken Xarelto so that he could decide whether to conduct surgery earlier.  Setting aside (for now) the fundamental unfairness of having to litigate against theories that Plaintiffs have raised for the first time at trial, Plaintiffs' new failure-to-warn claim—as with their earlier failure-to-warn theories—is preempted by federal law for many of the same reasons recently articulated by the MDL Court in *In re Eliquis (Apixaban) Prod. Liab. Litig.* There, the Court held, in a case involving Eliquis, which is a Novel Oral Anticoagulant (NOAC) like Xarelto, that any claims based on the failure to warn about bleeding risks—or on failure to instruct about monitoring—were preempted as a matter of law because the defendants could not have independently changed the Eliquis label without prior FDA approval.  *See Utts v. Bristol-Myers Squibb Co.*, __ F. Supp. 3d __, MDL No. 2754, 2017 WL 1906875 (S.D.N.Y. May 8, 2017). Plaintiffs' claims here are preempted for a host of reasons.[3]

  *First*, the PT test that Plaintiffs propose the label should have instructed Dr. Bui to use was not (and has not been) cleared by FDA for use with Xarelto, and therefore Defendants could not

---

[2] This Court's prior orders (Docs. 6196, 6197), denying Defendants' motions for partial summary judgment stated that "Defendants could have added a warning about the test's availability either pre-market or through CBE."  Doc. 6197, at 8.  Defendants respectfully disagree, as explained in the prior briefing and at oral argument.

[3] This Court has made abundantly clear that preemption is a question of law that is not appropriate for the jury.  *See* Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury"); *id.* at 1531:5–20.

have unilaterally instructed physicians to use a PT test "off label" under FDA regulations and guidance without prior FDA approval. The Changes Being Effected ("CBE") regulation does not allow a manufacturer to unilaterally change the "intended" use of a diagnostic device such as a PT test. Rather, FDA restricts when a manufacturer may be permitted to disseminate information about "off label" uses of FDA-approved products, such as diagnostic testing devices, which must receive a separate "safety and efficacy" clearance for use with compendium therapeutic products such as Xarelto. *See* Part I *infra*.

*Second*, Defendants could not have unilaterally altered the Xarelto label to add Plaintiffs' proposed instruction using the CBE regulation because Plaintiffs have not identified any "newly acquired information" that was available prior to Mrs. Orr's surgery as required by the regulation or that the FDA had not already considered. *See* Part II *infra*.

*Third*, there is "clear evidence" that FDA would not have approved Plaintiffs' proposed label change because FDA previously rejected language that would have recommended use of PT with Xarelto. *See* Part III *infra*.

*Fourth*, FDA regulations prohibited Defendants from adding Plaintiffs' proposed "monitoring" instruction. *See* Part IV *infra*.

*Fifth*, Defendants could not have unilaterally instructed physicians about available (or in Plaintiffs' words, "helpful") laboratory tests under federal regulations. FDA guidance requires a separate showing of safety and efficacy to "reclassify" the "intended use" of companion diagnostic testing devices, such as a PT test, for use with Xarelto. *See* Part V *infra*.

For these and the reasons set forth below, Defendants are entitled to judgment as a matter of law.

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land . . . any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2. "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013). It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, "state and federal law conflict"—and state law is preempted—"where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). The Supreme Court has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions: *Wyeth v. Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013). These decisions explain that "[t]he question for 'impossibility' is whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*). And by "independently," the Supreme Court has made clear, it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required"). Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 564 U.S. at 623–24.

Under *Levine*, *Mensing*, and *Bartlett*, it is "impossible" for a pharmaceutical manufacturer to comply with both federal and state law—and preemption attaches—in either of two instances. *First*, because "[t]he question for 'impossibility' is whether the [manufacturer] could

*independently* do under federal law what state law requires of it," preemption attaches "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Mensing*, 564 U.S. at 620, 623–24; *see also Bartlett*, 133 S. Ct. at 2478 (citing *Mensing*). *Second*, and separately, even where a manufacturer *can* act independently—for instance, to change its label under the Changes Being Effected ("CBE") regulation at issue in *Levine*—the Supreme Court has held that the claims are still preempted if there is "clear evidence" that FDA would not have approved a label change. *See Levine*, 555 U.S. at 571.[4]

## ARGUMENT

### I.     Defendants could not have unilaterally changed Xarelto's label to recommend the use of a diagnostic medical device "off label" with Xarelto without prior FDA approval

As Defendants have explained, neither Neoplastin nor any other PT test has been approved by FDA under federal regulations for use with Xarelto.[5] Plaintiffs have asserted that the Neoplastin PT assay *is* FDA-approved as a general coagulation test and is commercially available in the United States (*see* Doc. 5531, at 29), but FDA's own review and the labeling for Neoplastin PT

---

[4] Since *Levine*, *Mensing* and *Bartlett*, courts have overwhelmingly concluded that the "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Development LLC*, Civ. A. No. 4:15-CV-0204-HLM, 2016 WL 3748771 (N.D. Ga. July 11, 2016); *Fleming v. Janssen Pharmaceuticals, Inc.*, No. 2:15-cv-02799-JPM-DKV, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709-MHH, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296 (D. Conn. 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014). Indeed, as a recent Third Circuit case makes clear, the fundamental principles recognized in *Mensing* and *Bartlett* apply even outside the pharmaceutical context. *See Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 703–04 (3d Cir. 2016) (applying *Mensing* and *Bartlett*, in aviation context, for the proposition that "where manufacturers are unable to simultaneously comply with both federal and state requirements, state law design defect claims are conflict preempted"). *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

[5] Defendants expressly incorporate their prior briefing on this point. *See* Doc. 5109-1, at 23–25; Doc. 5678, at 9–10; Docs. 5904, 5988.

state that it is available for use only with warfarin.  What matters—and what Plaintiffs cannot

deny—is that Neoplastin is *not* approved by FDA for use with Xarelto or any other NOAC.  *See*

(6/1/2017 PM Trs. at 696:18-24 (Ted Spiro) "**Q.** There's no recommendation in the U.S. label for

monitoring rivaroxaban plasma concentration levels in elderly people, correct?  **A. . . .** We do not

have an assay approved in the United States."); *see also* Neoplastin USPI (Doc. 6492 Exh. 4).  To

the contrary, FDA cleared Neoplastin as a Class II medical device for use as a "general screening

procedure . . . to monitor patients receiving *coumarin* [*i.e.*, warfarin] therapy."  21 C.F.R.

§ 864.7750(a) (emphasis added).    Neoplastin is not designed or approved to monitor

anticoagulation attributable to Xarelto or any other Factor Xa inhibitor.[6]  Indeed, consistent with

FDA's classification regulation, Neoplastin's label makes clear that the device was designed and

cleared for use in "monitoring vitamin K antagonist therapy" with "coumadin."  Neoplastin USPI

§ 2.  Xarelto, in contrast to coumadin (warfarin), is not a vitamin K antagonist, but rather a direct

Factor Xa inhibitor.  Importantly, the Neoplastin label explains in its "Limitations" section that the

PT test is "insensitive" to certain "anti-Xa" levels.  *Id.* § 11.   FDA has not approved (or

recommended) *any* PT test for use with Xarelto.  *See*  FDA: Center for Devices and Radiological

Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 9 (Oct. 26, 2015)

(Lea Carrington, Director, Division of Immunology and Hematology Devices) (Doc. 5109 Exh.16)

("Importantly, the DOAC drugs were approved without a requirement for monitoring. So

currently, manufacturers are developing devices to assess the effect or concentration of direct oral

anticoagulants. *There are currently no cleared or approved devices that measure that.*" (emphasis

added)).

---

[6] Federal, not state, law defines the "intended use" (or "on label" use) of a Class II medical device, such as Neoplastin PT.  Use of Neoplastin by a physician for an unapproved purpose is considered "off label" under federal law.  21 U.S.C §§ 355(a), (d) ; *Gavin v. Medtronic*, No. 12-0851, 2013 WL 3791612, at *17 (E.D. La. 2013) ("the very concept of 'off label' use. . . is derived from the regulatory system imposed" by the federal Food, Drug and Cosmetic Act).

Contrary to Plaintiffs' arguments, Defendants cannot simply refer doctors to the general availability of PT tests, as a means of evaluating and measuring a patient's Xarelto levels.  *First*, because neither Neoplastin nor any other PT test has been cleared by FDA for use in conjunction with Xarelto, any recommendation would be for the "off label" use of a medical device under federal law and would first require additional—and likely multiple—agency approvals changing their "intended use."  As an initial matter, if Neoplastin's manufacturer sought to "repurpose" the device for use with Xarelto, it would have to obtain FDA clearance for that new use.  *See* 21 C.F.R. § 807.81(a)(3)(ii) (requiring new marketing clearance for any new "intended use" of FDA-cleared device); *id*. § 814.39(a) (same, for approval of a supplement for a new indication for previously approved device); *see also* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices (Aug. 6, 2014) ("IVD Guidance"), at 10 (Doc. 6561 Exh. 2) ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket submission.").

*Second*, both Neoplastin's manufacturer and Janssen would have to obtain FDA approval to amend their product's labels to provide for Neoplastin's use with Xarelto.  FDA has addressed this issue specifically:  "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—here, Neoplastin for use with warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs here claim for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket

submission (PMA or 510(k) as appropriate) or PMA supplement . . . to include the new therapeutic product."  IVD Guidance at 12.  So too, "[l]abeling of the therapeutic product should also be amended through submission of a supplement."  *Id.*[7]

Plaintiffs' PT-related failure-to-warn claim boils down to an assertion that Defendants had a state-law *duty* to recommend an unapproved, "off-label" use of Neoplastin in conjunction with Xarelto.  But federal law governing recommendations to use a product "off label" precludes state law from imposing such a duty.[8]  As FDA has stated, "[a] new intended use without FDA approval or clearance would . . . generally violate the law."  Guidance for Industry Distributing Scientific and Medical Publications on Unapproved New Uses—Recommended Practices (Dec. 11, 2011), at 2.  In the case of diagnostic devices, "it is important that the approved labeling for an IVD companion diagnostic device and its corresponding therapeutic product be complete and consistent."  IVD Guidance at 11.  Moreover, the CBE regulation that Plaintiffs assert would have supported a label change here does not permit a manufacturer to unilaterally change the "intended use" of a product.  *See* 21 C.F.R. § 314.70.  Because Defendants cannot "independently" alter Xarelto's labeling to recommend coagulation measurements using Neoplastin or any other PT-related test—because such a change would be prohibited without advance FDA approval—any claim based on their failure to do so is preempted.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

---

[7] To be clear, Defendants do not concede that there is evidence that "use of" Neoplastin PT or other PT test "is essential for the safe and effective us of" Xarelto.  IVD Guidance at 12.  Indeed, there is no such evidence.  The point here is simply that *even if* Plaintiffs could present such evidence—they have not—a separate labeling supplement would be necessary for both Neoplastin PT (or any other PT test) and Xarelto.

[8] To the contrary, FDA has long interpreted 21 U.S.C. §§ 331(a) and 352(f), together with 21 C.F.R. §§ 201.5 and 201.128, to *prohibit* off-label promotion.  *See also Gavin v. Medtronic*, 2013 U.S. Dist. LEXIS 101216, at *55 (E.D. La. 2013) ("the very concept of 'off label' use and promotion is derived exclusively from the regulatory system imposed" by the Food, Drug and Cosmetic Act); *cf. Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001).

II.     **Because Defendants could not "independently" add any "monitoring recommendations" to Xarelto's label—regarding Neoplastin, PT, or otherwise— Plaintiffs' claim based on their failure to do so is preempted.**

FDA regulations make clear that Defendants were prohibited from independently altering Xarelto's label to make *any* "monitoring recommendations."[9]  As Defendants have explained (*see* Doc. 5904), and as Plaintiffs concede, a pharmaceutical manufacturer cannot unilaterally change any aspect of the "Highlights" section of a medicine's FDA-approved label; rather, *any* change to that particular section requires advance agency authorization.  *See* Doc. 5966, at 5 ("The Defendants are correct that they are prohibited from changing the Highlights portion of the label without prior FDA approval.").  The FDA regulation governing "[c]hanges to an approved application" unambiguously states that "[a]ny change to the information required by § 201.57(a)"—*i.e.*, information required to be included in the Highlights section—constitutes a "major change" that "require[s a] supplement submission and approval prior to distribution of the product." 21 C.F.R. § 314.70(b)(2)(v)(C).  And notably, the CBE provision—which Plaintiffs cite for the proposition that "manufacturers have always been permitted to alter warnings and labels without prior FDA approval" (Pls.' Opp. 13)—*expressly excludes from its scope information that, under § 201.57(a), must go in the Highlights section*. *See* 21 C.F.R. § 314.70(c)(6)(iii) (permitting unilateral labeling changes to accomplish specified purposes, "except for changes to the information required in § 201.57(a)").  In light of these regulations, it not surprising that Plaintiffs and their regulatory expert, Dr. Suzanne Parisian, concede that "the regulation says that the highlights section should stay the same and get FDA approval" and that "the highlights cannot be changed without prior approval."  Parisian Dep. at 50, 56 (Doc. 5109 Exh. 19); *see also* Doc. 5966,

---

[9]  Defendants expressly incorporate their prior briefing on this point.  *See* Doc. 5109-1, at 22 n.7; Doc. 5678, at 11–12; *see also* Docs. 5904, 5988.

at 5.

Critically here, section 201.57(a) clearly provides that, among other information, "monitoring recommendations" *must* be included in the Highlights section of product labeling. 21 C.F.R. § 201.57(a)(7). Plaintiffs concede that their failure-to-warn claim—*i.e.*, that Xarelto's label fails to adequately instruct doctors to use the Neoplastin PT assay to assess patients' rivaroxaban-related coagulation parameters—would require Defendants to add a "monitoring recommendation" to the label. *See* Doc. 5966, at 3–4. Because any such recommendation would have to be included in the Highlights section of the label, and because Defendants cannot "independently" make that change, Plaintiffs' claim is preempted. *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## III. Plaintiffs' claim is preempted because there is no "newly acquired information" that would have allowed Defendants to unilaterally change the Xarelto label to recommend a PT test.

By its express terms, the CBE provision permits "moderate changes" to a label and applies only to labeling changes that are made "to reflect newly acquired information." 21 C.F.R. § 314.70(c)(6)(iii).[10] "[N]ewly acquired information" is defined as "data, analyses, or other information *not previously submitted to the agency*, which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (*e.g.*, meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b) (emphasis added).

Plaintiffs have not identified any "newly acquired information" that relates to "risks of a different type or greater severity or frequency than previously included in submissions to FDA"

---

[10] This mandate does not apply to changes that must be made pursuant to § 201.57(a), which is not at issue here.

that FDA has not already reviewed and considered.  The First Circuit's decision in *In re Celexa*, 779 F.3d 34, illustrates why federal law preempts Plaintiffs' claim regarding the addition of PT information.  There, the plaintiffs alleged that FDA had initially approved Lexapro based on "questionable" data from clinical studies available at the time, and that two articles published post-approval constituted "newly acquired information" warranting a label change.  *Id*. at 38, 42.  The First Circuit rejected the plaintiffs' argument and held that, although the CBE regulation applies in "virtually all situations in which new information indicates new or greater risks, or misleading claims of efficacy," a failure-to-warn claim must be premised on the failure of a pharmaceutical manufacturer "to respond to information *not considered by the FDA*."  *Id.* at 41 (emphasis added); *see also id.* at 43 (holding the claims were preempted because the plaintiffs "ma[de] no claim . . . that this information was unknown to the FDA prior to label approval").  Under the circumstances presented, there was "no precedent . . . that would have allowed [the defendant manufacturer] to use the CBE procedure to alter the FDA label in the manner that plaintiffs allege is necessary so as to render it not 'misleading.'"  *Id.* at 43.

The court in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F. Supp. 3d 761 (D. S.C. 2016), recently applied *Celexa* to find that state-law claims based on clinical-study data already submitted and considered by FDA were not based on "newly acquired information" under the CBE regulation, and thus were preempted in circumstances nearly identical to those here.  *See id.* at 769 ("[A]ny claim that a drug label should be changed based on information previously submitted to the FDA is preempted because the CBE regulation cannot be used to make a label change based on such information.").  There, the plaintiffs alleged that the Lipitor label did not accurately describe the product's efficacy for use in women based on a particular clinical study—called ASCOT—that had been submitted to and

considered by FDA during the approval process.  *See id.* at 769 ("[T]he FDA approved the Lipitor label based on the ASCOT trial and data.").  The court held that the plaintiffs' claim that "Lipitor's label should have included different statements about Lipitor[] . . . based on the ASCOT data" was preempted because "neither Plaintiffs nor their experts have identified any . . . 'new analyses' of the ASCOT data that should have caused Defendant to change its label."  *Id.* at 769–70 ("The only 'new analysis' of ASCOT efficacy data mentioned by Plaintiffs' experts is Dr. Wells' analysis, which was conducted as part of this litigation.").[11]

Even more recently, the court in *Utts*, 2017 WL 1906875, held that federal law preempted failure-to-warn claims concerning Eliquis, a brand-name medication in the same NOAC class as Xarelto.  The plaintiffs there—like here—"focus[ed] on three categories of warnings: (1) monitoring; (2) advice regarding bleeding reversal strategies; and (3) dosage recommendations."  *Id.* at *11.  The plaintiffs relied on "nine reports, studies, and articles as the bases for [the] assertion that the Eliquis labeling was inadequate in failing to give these warnings."  *Id.*  The court concluded that none of the information to which Plaintiffs pointed—including statements in the Institute for Safe Medical Practices QuarterWatch Report, which is based on adverse drug event data—constituted "newly acquired information."  *Id.* at *11–20.  For example, as to the QuarterWatch Report, the court noted that some of the statements to which Plaintiffs pointed merely "speculate[d] whether [Eliquis] safety could be further improved," or "was evident to the FDA when it approved the label."  *Id.* at *13–14.  Accordingly, the Court granted the defendants' motion to dismiss the plaintiffs' failure-to-warn claim.  *Id.*

The reasoning of those cases applies equally here, because Plaintiffs have pointed to no

---

[11] When FDA has already considered a particular safety issue based on the same studies that were subject to the FDA's decision to approve the product and its labeling, the Agency's decision is not "new" information and cannot form the basis of a claim for relief.  *Cf. In re Incretin*, 142 F. Supp. 3d at 1131 ("A reevaluation of scientific data or a judicial challenge to the accuracy of the FDA's conclusions would disrupt the 'delicate balance of statutory objectives.'").

"newly acquired" data about a risk that would justify any labeling change under the CBE regulation. Plaintiffs have previously pointed to data from ROCKET AF and FDA's Clinical Pharmacology Review to suggest that FDA first learned in August 2011 of a supposed correlation between PT and bleeding risk (*see* Doc. 5531, at 18), but by November 2012, FDA had already reviewed that information. This Court has previously suggested that "Defendants may have been permitted to update their label pursuant to the CBE after they became aware of the number of its consumers claiming they experienced a major bleeding event while taking Xarelto" (Doc. 6196, at 7–8), but the *Utts* court recently held just the opposite, that adverse event data cannot be considered "newly acquired information" because it was already known by FDA and there is no "newly acquired information" as defined in the CBE. *See Utts*, 2017 WL 1906875, at *13–14. The *Utts* court's reasoning makes sense because adverse event reports regarding bleeding that post-date approval would have been only "cumulative of information previously submitted to FDA"—and in that case, "a CBE supplement would not be appropriate." 73 Fed. Reg. 2848, 2850 (Jan. 16, 2008); *see also id.* ("[I]f the reports of adverse events are consistent in type, severity, and frequency with information previously provided to FDA, such reports may not constitute newly acquired information appropriate for a CBE supplement.").

Additionally, the CBE regulation, 21 C.F.R. § 314.70(c)(6)(iii), requires that—at least for CBE supplements that would "add or strengthen a contraindication, warning, precaution or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c)"—"newly acquired information" must satisfy a specific causation standard. 21 C.F.R. § 314.70(A). Correlatively, § 201.57(c)(6)(i) provides, for example, that, "[i]n accordance with [*§ 314.70*], the labeling *must be revised to include a warning* about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a

drug; a causal relationship need not have been definitely established." (Emphasis added.) The FDA has stated that the relevant regulations were amended "to make it clear that a CBE supplement may be used to add or strengthen a contraindication, warning, precaution, or adverse reaction *only if* there is sufficient evidence of a causal association with the drug." 73 Fed. Reg. at 49604 (emphasis added); *id.* ("Expressly requiring that a CBE supplement reflect newly acquired information *and be based on sufficient evidence of a causal association* will help to ensure that scientifically accurate information appears in the approved labeling for such products." (emphasis added)). Federal regulations require pharmaceutical manufacturers to submit adverse event reports to FDA, *see* 21 C.F.R. § 314.80, but, as a regulatory matter, these are simply anecdotal reports of a correlation or *association* between the use of a drug and some adverse event, "*whether or not considered drug related*"—*i.e.*, regardless whether the drug caused the event. *Id.* § 314.80(a) (emphasis added). According to FDA regulations, AERs do not demonstrate "that the drug caused or contributed to an adverse effect." 21 C.F.R. § 314.80(l). To the contrary, FDA has explained that the information in AERs "has not been scientifically or otherwise verified," and that "there is no certainty that the suspected drug caused the reaction," as the "event . . . may have occurred by chance at the same time the suspected drug was taken." FDA, AER System, Office of Pharmacoepidemiology and Statistical Science, *Brief Description with Caveats of System* at 4 (July 18, 2005).

## IV.    There is "clear evidence" that FDA would have rejected a PT-related  instruction  in the Xarelto label.

In *Levine*, the Supreme Court explained that even where a manufacturer can independently change its label without prior FDA approval, federal law will preempt any state-law claim based on the manufacturer's failure to do so if there is "clear evidence that the FDA would not have approved [the] change." 555 U.S. at 571. Under the *Levine* standard, preemption applies where

FDA rejects a specific proposal to add a warning that is substantially similar to the warning that a plaintiff advocates. *See, e.g.*, *Christison v. Biogen Idec Inc.*, __ F. Supp. 3d __, 2016 WL 4223956, at *27–28 (D. Utah Aug. 5, 2016) (emphasizing the FDA's rejection of manufacturer's proposed labeling change); *Rheinfrank v. Abbott Labs.*, 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (emphasizing that manufacturer attempted to strengthen its warning label and the FDA twice denied the request), *aff'd* 2017 WL 680349 (6th Cir. Feb. 21, 2017); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (same); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274–75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels). *But see In re Fosamax Prods. Liab. Litig.*, 852 F.3d 268 (3d Cir. 2017).

Furthermore, FDA need not reject the precise phraseology that a plaintiff advocates in litigation; rather, it is sufficient that FDA rejected the substance of a plaintiff's proposed warning. *See, e.g.*, *Levine*, 555 U.S. at 572 (relevant question whether FDA considered the "kind of warning" that plaintiff seeks); *Mensing*, 564 U.S. at 637 (Sotomayor, J., dissenting) (observing that clear-evidence standard is met when FDA has "considered whether to request warnings in light of the evidence on which a plaintiff's claim rests but … decided to leave the warnings as is"); *Seufert v. Merck Sharp & Dohme Corp.*, __ F. Supp. 3d __, 2016 WL 3369512, at *6–7 (S.D. Cal. May 11, 2016) (rejecting plaintiff's argument that FDA must reject "specific proposed warning language"); *Newman v. McNeil Consumer Healthcare*, No. 10-CV-01541, 2012 WL 39793, at *7–8 & n.8 (N.D. Ill. Jan. 9, 2012) ("FDA should not have to reject every possible formulation of a particular warning in order for there to be clear evidence of rejection.").

Here, there is overwhelmingly "clear evidence" that FDA would have rejected any attempt to change Xarelto's label to instruct doctors to measure PT as a means of monitoring patients' coagulation levels. Indeed, Janssen, as the company vested with U.S. regulatory responsibility for

Xarelto, specifically (and repeatedly) proposed to include the very PT-related language that

Plaintiffs say Xarelto's labeling should have included, ***but FDA expressly rejected it***.

Dr. Sanjay Jalota, Senior Director of Global Regulatory Affairs at Janssen, testified that

"[w]e proposed PT language very early on.  The agency struck out during the review and approval

process."  6/6/2017 Tr. Transcript. at 1264:18-25.  Mr. Jalota explained:

> Q.      Mr. Jalota, is this the same section in the label that we've looked at earlier
> that was submitted five times by the company?
>
> A. That is correct.
>
> Q. And so would you please read what has been stricken out?
>
> A. The agency struck out the sentence that was highlighted earlier. "The
> relationship between PT and rivaroxaban plasma concentration is linear and
> closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is
> considered necessary in individual cases, PT (measured in seconds) is
> recommended."
>
> Q. And can you keep reading?
>
> A. "The Neoplastin PT assay was measured in the RECORD program and the
> median (with 5-95 percentiles) for PT (Neoplastin) two to four hours after tablet
> intake (that is at the time of maximum effect) was 18 (13 to 26) seconds. The
> International Normalized Ratio (INR) should not be used for measuring
> rivaroxaban pharmacodynamics effect."
>
> Q. And what is the next sentence? Can you tell us what happened there as part of
> these labelling discussions?
>
> A. The agency introduced this -- deleted all of the text I just described and added
> the additional text -- additional sentence below.

*Id.* at 1386:18 1387:14.  The regulatory history of Xarelto as testified to by Dr. Jalota further

demonstrates that FDA would have rejected Plaintiffs' proposed label changes:

- In July 2008, Janssen included the following language in section 12.2 of the
  proposed label for NDA 022406, Xarelto's orthopedic-surgery indication (*See Orr*
  Trial, Defs.' Exhs. 11, 12):

    The relationship between PT and rivaroxaban plasma concentration

is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended. The Neoplastin® PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) ranged from 13 to 26 seconds.

- In December 2010, Janssen again included this same language recommending the use of PT if assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases. (*See Orr* Trial, Defs.' Exhs. 13–14).

- In January 2011, Janssen provided FDA with the ROCKET AF study results in conjunction with NDA 202439 for the AFib indication. In its proposed labeling, Janssen included the same PT-related language. (Doc. 5109 Exh. 39) (*See Orr* Trial, Defs. Exhs. 15, 16).

- In April 2011 and again in May 2011, Janssen provided proposed labeling to FDA for the AFib indication that included language recommending the use of PT "if assessment of the pharmacodynamic effect is considered necessary in individual cases." (*See Orr* Trial, Defs.' Exhs. 17–20).

- Several months later, in June 2011, FDA responded with a revised label for NDA 022406 that struck the PT language in section 12.2 and replaced it with, "The predictive value of these coagulation parameters for bleeding risk or efficacy has not been adequately studied." FDA also added a warning regarding the "Risk of Pregnancy Related Hemorrhage" in section 5.3, that "The anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing nor readily reversed." Also, in section 8.1 (Pregnancy), FDA added a statement that "The anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing." (Doc. 5109 Exhs. 40, 41). (*See Orr* Trial, Defs. Exhs. 21, 22).

- Janssen responded that it would accept FDA's proposal, with the exception that "has not been adequately studied" should be changed to "has not been established." (Doc. 5677 Exhs. 54, 55) (*See Orr* Trial, Defs. Exhs. 21, 22). Janssen also "propose[d] to add the statement 'the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamics effect' (although [Janssen] does not recommend it … )." (*Id.*).

- Shortly thereafter, in July 2011, FDA approved NDA 022406 with the "has not been established" language in section 12.2, but without any language referring to (1) the "relationship between PT and rivaroxaban plasma concentration," (2) the use of the "Neoplastin PT assay" to "measure[] PT" and thus "assess[] the pharmacodynamic effect of rivaroxaban," or (3) "the 5/95 percentiles for PT." (Doc. 5677 Exh. 42). (*See* Orr Trial, Defs. Exhs. 25).

- Janssen also "propose[d] to add the statement 'the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamics effect' (although [Janssen] does not recommend it … )." (*See Orr* Trial, Defs. Exhs. 23, 24).

- Shortly thereafter, in July 2011, FDA approved NDA 022406 with the "has not been established" language in section 12.2, but without any language referring to (1) the "relationship between PT and rivaroxaban plasma concentration," (2) the use of the "Neoplastin PT assay" to "measure[] PT" and thus "assess[] the pharmacodynamic effect of rivaroxaban," or (3) "the 5/95 percentiles for PT." (*See Orr* Trial, Defs. Exhs. 25).

- The next month, in August 2011, FDA issued its Clinical Pharmacology Review for NDA 202439 suggesting a relationship between PT, concentration, and bleeding risk. (Exh. 7). FDA's Medical Officer Review later concluded that "[m]onitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes cannot be recommended . . . ." (*Orr Trial*, Pl. Exhs. 163).

- In November 2011, FDA approved NDA 202439 for the AFib indication *without* (1) the previously-stricken PT-related language, (2) recommendation to use Neoplastin, or (3) further evaluation of PT's utility to predict bleeding risk, but *with* the statement that "[t]he anticoagulation effect of XARELTO cannot be reliable monitored with standard laboratory testing." (*Orr* Trial, Defs. Exhs. 28).

The "clear evidence" in this case is that Plaintiffs' claims are preempted as a matter of law.

Plaintiffs now contend that Defendants should have included a PT instruction in Xarelto's label, purposefully ignoring the fact that, during the approval process, Janssen tried to do just that, but FDA refused. The evidence of impossibility—and thus preemption—is abundantly clear.[12]

## V.    Plaintiffs' claims are preempted because Defendants could not unilaterally alter the Xarelto label to recommend that a PT test would be "helpful."

Nor can Plaintiffs avoid preemption through their assertion that Defendants could have unilaterally implemented a label change under 21 C.F.R. § 201.57(c)(6)(iii). FDA's regulations and guidelines require scientific evidence and proof that a test can reliably be used with a product before recommending a new use. Section 201.57(c)(6)(iii) states as follows:

> *Monitoring: Laboratory tests.* This section must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse

---

[12] Plaintiffs' contentions to the contrary fail, as explained in Doc. 5678, at 12–15, which Defendants expressly incorporate here.

reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy.

But whether a specific laboratory test is "helpful" and can reliably be used with Xarelto is a decision that requires a separate showing to obtain FDA approval and clearance before recommending that physicians rely on the testing in emergency settings or otherwise.   If Neoplastin's manufacturer sought to "reclassify" and extend the "intended uses" of the test for use with Xarelto, it would have to obtain FDA clearance for that new use.   *See* 21 C.F.R. § 807.81(a)(3)(ii) (requiring new marketing clearance for any new "intended use" of FDA-cleared device); *id*. § 814.39(a) (same, for approval of a supplement for a new indication for previously approved device); *see also* IVD Guidance, at 10 ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket submission.").

Moreover, Janssen could not independently – without prior FDA approval – amend the product's labels to provide for Neoplastin's use with Xarelto.  FDA has addressed this issue specifically: "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—here, Neoplastin for use with warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs here claim for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket submission (PMA or 510(k) as appropriate) or PMA supplement . . . to include the new therapeutic product."

IVD Guidance at 12.  So too, "[l]abeling of the therapeutic product should also be amended through submission of a supplement."  *Id.*

## CONCLUSION

For the foregoing reasons, and for the reasons explained more fully in Defendants' summary judgment brief (which Defendants incorporate here), Plaintiffs' failure-to-warn claim is preempted by federal law, and the Court should grant judgment in Defendants' favor.

Respectfully submitted,

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700

WILKINSON WALSH + ESKOVITZ LLP

By: /s/ *Beth A. Wilkinson*
Beth A. Wilkinson
Jennifer L. Saulino
Jeremy Barber
WILKINSON WALSH + ESKOVITZ LLP
1900 M. Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonwalsh.com
jsaulino@wilkinsonwalsh.com
jbarber@wilkinsonwalsh.com

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ *David E. Dukes*
David E. Dukes
J. Mark Jones
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: (803) 799-2000
David.Dukes@nelsonmullins.com
Mark.Jones@nelsonmullins.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Andrew K. Solow*
Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

Chanda.Miller@dbr.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc. and Janssen Research*
*& Development, LLC*

New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: */s/ John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 8th day of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/      John F. Olinde*