## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)                    MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                                 SECTION L

THIS DOCUMENT RELATES TO:                        JUDGE ELDON E. FALLON

Joseph Orr, Jr., et al. v. Janssen et al.        MAGISTRATE NORTH
Case No. 2:15-cv-03708

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF EVIDENCE

Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Bayer HealthCare Pharmaceuticals, Inc., and Bayer Pharma AG (collectively, "Defendants"), pursuant to Rule 50(a), hereby move the Court, at the close of all evidence, for judgment as a matter of law on Plaintiffs' sole remaining cause of action—namely, that Xarelto was unreasonably dangerous because of inadequate warning or instruction, under La. Rev. Stat. Ann. § 2800.57.  In this motion, Defendants highlight eight grounds in particular[1]:

*First*, Defendants are entitled to judgment as a matter of law because Plaintiffs cannot demonstrate medical causation—*i.e.*, they have not introduced any evidence that it is more probable than not that Xarelto caused Mrs. Orr's hemorrhage.  Accordingly, there is not a legally sufficient evidentiary basis for a jury to find in Plaintiffs' favor on their claim that Xarelto caused Mrs. Orr's hemorrhage.  *See* Part I *infra*.

*Second*, Defendants are due judgment as a matter of law on the basis of the learned intermediary doctrine.  There is not a legally sufficient evidentiary basis for a reasonable jury to find that any allegedly inadequate warning proximately caused Mrs. Orr's injuries because Dr. St.

---

[1] Defendants have filed a separate brief explaining why Plaintiffs' failure-to-warn claim is preempted by federal law.

Martin, her prescribing physician, testified unequivocally that nothing would have changed his prescribing decision. Accordingly, Plaintiffs cannot demonstrate causation as a matter of law. *See* Part II *infra*.

**Third**, the learned intermediary doctrine similarly bars Plaintiffs' claim that Defendants failed to adequately warn or instruct Dr. Bui, Mrs. Orr's treating physician. Because Dr. Bui does not prescribe or use Xarelto in his practice—and, of course, did not prescribe Xarelto to Mrs. Orr—Defendants owed him no duty to warn. In any event, Dr. Bui *never read* the Xarelto label, and Plaintiffs thus cannot demonstrate that any alleged failure to warn or instruct Dr. Bui proximately caused Mrs. Orr's injuries. *See* Part III *infra*.

**Fourth**, as explained in a separate brief in support of Defendants' Rule 50(a) motion for judgment as a matter of law at the end of Plaintiffs' case, Plaintiffs' failure-to-warn claim is preempted by federal law, which is a separate question of law to be decided by the court. *See* Part IV *infra*.

**Fifth**, the jury cannot award damages for Mrs. Orr's alleged lost chance of survival. No Louisiana court has ever recognized the lost-chance doctrine in an LPLA action, and, as a substantive matter, the doctrine does not apply to a product-liability claim. But even if the lost-chance doctrine were extended to product-liability claims, Plaintiffs have not introduced sufficient evidence for a jury to award lost-chance damages here. *See* Part V *infra*.

**Sixth**, Defendants are entitled to judgment as a matter of law on Plaintiffs' failure-to-warn claim because Plaintiffs failed to introduce expert testimony that meets *Daubert*. As Defendants have previously explained, expert testimony that using PT to monitor or assess Xarelto concentration for clinical purposes—*e.g.*, to assess bleeding risk or in emergent situations—is unreliable under *Daubert*. Furthermore, Plaintiffs abandoned Xarelto's cumulative daily dose or

once-daily dosing regimen as the bases of their failure-to-warn claim.   As a result of this abandonment, Plaintiffs have never demonstrated that these dosing-related opinions satisfy *Daubert*.  *See* Part VI *infra*.

**Seventh**, the Court should grant Defendants judgment as a matter of law to the extent that Plaintiffs claim that Xarelto's label should have included a black-box warning or that Xarelto's label failed to warn about the lack of an "antidote" or reversal agent.  As the Court recognized in instructing the jury, "[a] black box or testimony about a black box has no part and should play no part in this trial or your deliberations.  So please disregard anything about a black box."  6/1/17 AM Trial Tr. 526:11–14.   And evidence about a reversal agent is not part of Plaintiffs' failure-to-warn claim—as all agree, Xarelto's label has always advised that "[a] specific antidote for rivaroxaban is not available."   USPI § 5.2; *see also* Pls.' Opp. to Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5531), at 3 ("Plaintiffs also claim that the failure to design a reversal agent renders the drug unreasonably dangerous as well.").   In any event, Plaintiffs have expressly abandoned these alleged bases for liability, which also fail for lack of expert testimony.  *See* Part VII *infra*.

**Finally**, the Court should grant Defendants judgment as a matter of law on Plaintiffs' abandoned theories of liability, as Defendants have explained before.  *See* Doc. 6485.  *See* Part VIII *infra*.

## LEGAL STANDARD

A motion for judgment as a matter of law should be granted if, after a party has been fully heard by the jury on an issue, "'a reasonable jury would not have a legally sufficient evidentiary basis to find for [the non-moving] party on that issue.'" *Seibert v. Jackson Cty., Miss.*, 851 F.3d 430, 434 (5th Cir. 2017) (quoting Fed. R. Civ. P. 50(a)). "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA, Inc.*, 391 F.3d 607, 610 (5th Cir. 2004). At that time, the court may "grant a motion or judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris Cty.*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* "The decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997) (omission in original) (citation omitted).

## ARGUMENT

Having dismissed their design-defect claim with prejudice, Plaintiffs have only one remaining cause of action—namely, that Xarelto is unreasonably dangerous because of inadequate warning or instruction, under La. Rev. Stat. Ann. § 2800.57. *See* Stipulation and Order (Doc. 6601). Plaintiffs' sole theory is that Xarelto's label should have informed healthcare providers that a PT test result could be used to assess the amount of Xarelto in a patient's system to allow the provider to determine if surgery is appropriate. *See, e.g.*, 5/30/17 AM Trial Tr. 118:5–13, 126:8–127:10.

## I.      Plaintiffs cannot establish specific medical causation.

Defendants are entitled to judgment as a matter of law because Plaintiffs cannot demonstrate, as they must, that Xarelto specifically caused Mrs. Orr's hemorrhage.

Any claim under the Louisiana Product Liability Act (LPLA) requires the plaintiff to "prov[e] by a preponderance of the evidence a causal relationship between [the] injury and . . . the use of the product." *Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2004 WL 2095618, at *5 (E.D. La. Sept. 13, 2004). Furthermore, an LPLA claim "require[s] proof of medical causation." *Brandner v. Abbott Labs., Inc.*, No. 10-3242, 2012 WL 195540, at *4 (E.D. La. Jan. 23, 2012); *accord Ridgeway v. Pfizer, Inc.*, No. 09-2794, 2010 WL 1729187, at *2 (E.D. La. Apr. 27, 2010).

Accordingly, to prevail on their claim that Xarelto caused Mrs. Orr's hemorrhage, Plaintiffs must "prov[e] by a preponderance of the evidence a causal relationship between [Mrs. Orr's] injury and . . . [her] use of the product." *Kemp*, 2004 WL 2095618, at *5. This requires Plaintiffs to show "through medical testimony that it is more probable than not that the subsequent injuries were caused by the [product]."[2] *Id.*; *see also Ridgeway*, 2010 WL 1729187, at *2 ("The test for determining the causal relationship between the [product] and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the [product]." (quoting *Maranto v. Goodyear Tire & Rubber Co.*, 650 So. 2d 757, 759 (La. 1995)). Plaintiffs must prove both general causation and specific causation. *Id.* Specific causation "focuses upon whether the substance caused a particular injury to a particular individual," and the failure to prove specific causation "is fatal" to the plaintiff's claim. *Id.* As

---

[2] *See also, e.g., Frischhertz, v. SmithKline Beecham Corp.*, No. 10-2125, 2012 WL 6697124, at *6 (E.D. La. Dec. 21, 2012) (holding that plaintiff must "prove[] through medical testimony that it is more probable than not that the subsequent injuries were caused by the [product]"); *Autery v. SmithKline Beecham Corp.*, No. 05-0982, 2011 WL 1812793, at *6 (W.D. La. Apr. 12, 2011) (same); *Smith v. Glaxosmithkline Corp.*, No. 05-2728, 2008 WL 4938426, at *2 (E.D. La. Nov. 17, 2008) (same).

this Court has noted, specific causation is a "highly individualized inquiry" focusing on the plaintiff's "medical history, family history, other risk factors, and use of the drug." *See In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 462 (E.D. La. 2006).

Plaintiffs have not introduced legally sufficient evidence for a jury to find specific causation here—*i.e.*, that Xarelto caused Mrs. Orr's hemorrhage.  In fact, Plaintiffs' expert Dr. Liechty expressly conceded that he could not testify that it was more probable than not that Xarelto was the cause of Mrs. Orr's hemorrhage:

> Q:   Knowing what you know about Mrs. Orr's history, can you state more probably than not or to a reasonable degree of medical certainty that this hemorrhage would not have happened without Xarelto?
>
> A.   No.

6/5/17 PM Trial Tr. 1143:25–1144:4.

Plaintiffs thus cannot rely on Dr. Liechty's testimony to show medical causation—as is their burden.  And without expert testimony, they cannot—as a matter of law—establish medical causation.  *See Autery v. SmithKline Beecham Corp.*, No. 05-0982, 2011 WL 1812793, at *6 (W.D. La. Apr. 12, 2011) ("In cases . . . involving complex issues of medical causation that are beyond the realm of knowledge and experience of the ordinary juror, expert testimony must be presented by the plaintiff to prove specific causation."); *Smith v. Glaxosmithkline Corp.*, No. 05-2728, 2008 WL 4938426, at *2 (E.D. La. Nov. 17, 2008) ("Without medical expert testimony Plaintiffs cannot establish that [the] product . . . was more likely than not the cause of [the plaintiff's] unfortunate death.").  Moreover, Dr. Bui's testimony is insufficient to present a jury question on this issue.  Dr. Bui agreed that Xarelto was a "substantial contributing cause" to Mrs. Orr's bleed, *see* 6/2/17 AM Trial Tr. 797:20–22, but indicated that he "could not rule out" that it was a hypertensive bleed, *see id.* 820:22–24.  Plaintiffs' causation burden under Louisiana law is more stringent than that.  Rather, as courts have recognized, the plaintiff must show that it is "more likely than not" that the

6

injury resulted from the use of the product.  *See, e.g.*, *Smith*, 2008 WL 4938426, at *2 ("Plaintiffs will also be required to prove that [the decedent] committed suicide more likely than not because he was ingesting [the product] (specific causation).").  Plaintiffs have not done so here.

Although "[t]he burden of proof at trial is squarely on the plaintiff to prove . . . medical causation," *Hebert v. Miles Pharms.,* No. 92-4290, 1994 WL 10184, at *3 (E.D. La. Jan. 13, 1994), Plaintiffs have not introduced "medical testimony [showing] that it is more probable than not that [Mrs. Orr's] injuries were caused by" her use of Xarelto.  *See Ridgeway*, 2010 WL 1729187, at *2.  Accordingly, there is not a legally sufficient evidentiary basis for a jury to find specific causation.  *See, e.g.*, *Kemp*, 2004 WL 2095618, at *5–6 (finding that plaintiff could not satisfy specific causation and granting summary judgment where the evidence did "not demonstrate . . . that [the product] more probably than not caused injury to [the plaintiff]").

## II.     There is not a legally sufficient evidentiary basis for a reasonable jury to find that any alleged failure to adequately warn or instruct Dr. St. Martin altered Dr. St. Martin's prescribing decision or otherwise proximately caused Mrs. Orr's injuries.

To prove a failure-to-warn claim under the LPLA in a case involving a prescription medicine, a plaintiff must prove: (1) that the defendant failed to use reasonable care (a) to provide an adequate warning to the prescribing physician of a product characteristic that might cause damage that was not otherwise known to the physician, or (b) to adequately instruct the prescribing physician on how to safely use the product, and (2) that the failure to warn or instruct the prescribing physician proximately caused the plaintiff's injury.  *See* La. Rev. Stat. Ann. § 9:2800.54(A) & (D); *id.* § 9:2800.57; *see also Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265–66 (5th Cir. 2002).  If a plaintiff fails to come forward with sufficient evidence to permit a reasonable jury to find in his or her favor on both of these elements, then judgment as a matter of law is appropriate.  *See* Fed. R. Civ. P. 50(a); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999).

The proximate-cause element of a failure-to-warn claim requires Plaintiffs to prove that an allegedly inadequate warning itself—in addition to the medication—proximately caused his injury.  *See Stahl*, 283 F.3d at 260–61.  In particular, under Louisiana's learned intermediary doctrine, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, *i.e.*, that but for the inadequate warning, the treating physician would not have used or prescribed the product."  *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098–99 (5th Cir. 1991).  If the plaintiff fails to sustain this burden of proving causation, then his claim fails as a matter of law.  *See id.* at 1099.

### A.    Plaintiffs have disclaimed their previously-asserted theory that Defendants should have instructed Dr. St. Martin to conduct PT tests.

The Court previously denied Defendants' learned-intermediary motion for summary judgment, reasoning that the Court must "presume[] that Plaintiffs' doctors would have followed the label's instructions and administered a PT test if so instructed, and [that] Defendants fail to overcome that presumption *at this juncture*."  Doc. 6232, at 5 (emphasis added).  The Court added that the question whether Mrs. Orr's prescribing physician, Dr. St. Martin, "would have administered PT tests if the label so instructed . . . is factually pregnant and will be addressed by the jury at trial."  *Id.* at 5–6.  But as the Court acknowledged, Plaintiffs did "not contend that prescribing physicians never should have prescribed Xarelto."  *Id.* at 5.

Plaintiffs again shifted theories at trial, disclaiming the theory that they used to avoid summary judgment—namely, that prescribing physicians, *i.e.*, cardiologists like Dr. St. Martin[3], should have been instructed to administer PT tests to their patients.  And although Plaintiffs bear "the burden of proving the elements of [their] LPLA claim," *Moyer v. Siemens Vai Servs., LLC*, No. 11-3185, 2013 WL 3293668, at *6 (E.D. La. June, 28 2013), they did not even call Dr. St.

---

[3] "Q. You actually are the person who prescribed Xarelto to Mrs. Orr?  A. Yes."  6/7/17 PM Trial Tr. 1695:11–12.

Martin during their case-in-chief.  Furthermore, Plaintiffs' counsel has expressly acknowledged that "in this case we're not talking about a cardiologist's use of PT" and that "the issues in this case are about a neurosurgeon's use of PT."  6/8/17 PM Trial Tr. 1921:14–16; 1922:8–15; *see also* 6/7/17 AM Trial Tr. 1525:1–5 ("Your Honor, she has extensive opinions about PT in her report and about how it can be used to assess the anticoagulant effect. That is written throughout her report. *And the emergency room use of that is part and parcel of the entire thing. That's the whole point of what this case is about.*" (emphasis added)).

In other words, Plaintiffs—by their own admissions—have acknowledged that their case does not relate to Dr. St. Martin, to the adequacy of the warnings to Dr. St. Martin, or to Dr. St. Martin's prescribing decision. Their claim based on Dr. St. Martin thus fails on this basis alone.

> **B.**     **Because Dr. St. Martin testified unequivocally that Plaintiffs' proposed warning or instruction would not alter his prescribing decision, they cannot demonstrate causation as a matter of law.**

Furthermore, and critically, Plaintiffs cannot demonstrate, as they must, that their proposed warning or instruction would have altered Dr. St. Martin's prescribing decision.  Dr. St. Martin testified unequivocally—and repeatedly—at trial that nothing would change his prescribing decision:

> Q.     Doctor, remembering that at your deposition you were asked many questions by Mrs. Orr's lawyers and remembering when Mrs. Orr's lawyer-doctor came to meet with you and asked you many questions about things like PT testing and what have you, looking back on your prescription that you gave to Mrs. Orr to use Xarelto for her atrial fibrillation, and knowing what you know today, would you change that prescription decision?
>
> A.     No, I wouldn't, because atrial fibrillation carries such a higher risk of stroke than the risk of bleeding from the medication, for any anticoagulant.

6/7/17 PM Trial Tr. 1730:15–24.

> Q.     But are you comfortable that the prescribing decision you made for Mrs. Orr for Xarelto was the right decision, and with the benefit of all of the hindsight, would you still believe that that was the proper decision to make?
>
> A.     Yes, I do.

Q. And, as we sit here today, would you change that decision for any reason?
A. No.

*Id.* 1731:1–8.

Q.     You've heard Mr. Birchfield's questions; you've heard my questions. My question is this: Has anything you've heard today, either from Jim Irwin or Andy Birchfield changed your impression and your judgment that the prescribing decision that you made for Mrs. Orr of Xarelto was the correct decision?

A.     No. I believe sitting here right now having seen all of this it was the correct decision, yes.

*Id.* 1770:6–12.

Dr. St. Martin's unequivocal testimony forecloses a showing of causation here, and Plaintiffs' claim fails as a matter of law.  As this Court has recognized, "cases governed by the learned-intermediary doctrine often turn on the testimony of the prescribing physician, and on his or her speculation as to what may have been done differently in various hypothetical situations." *Allgood v. GlaxoSmithKline PLC*, No. 06-3506, 2008 WL 483574, at *6 n.6 (E.D. La. Feb. 20, 2008) (Fallon, J.).  In fact, the prescriber's testimony is critical because it is necessary to show that a different warning would have altered the physician's conduct.  *See, e.g.*, *Rhodes v. Bayer Healthcare Pharm., Inc.*, No. 10-1695, 2013 WL 1282450, at *3 (W.D. La. Mar. 28, 2013) (observing that "the record contains no affirmative evidence that [plaintiff's] treating physician would have changed his decision to prescribe [the drug] . . . had a different warning been given" and explaining that this "utter lack of evidence" rendered summary judgment appropriate); *Hebert*, 1994 WL 10184, at *4 (where "[t]here is an utter lack of evidence" that "a different warning would have changed plaintiff's mother's physician [decision] to prescribe [the drug]," summary judgment is appropriate).

And where the prescriber testifies that a stronger or different warning would not have altered his prescribing decision—as Dr. St. Martin has here—a failure-to-warn claim necessarily

fails under the LPLA.[4] *See, e.g.*, *Allgood*, 2008 WL 483574, at *6 (granting summary judgment where "even knowing everything he knows today, [the physician] still would have prescribed Paxil to [the plaintiff]"); *Eschete ex rel. Eschete v. Roy*, 554 F. Supp. 2d 628, 634–35 (E.D. La. 2008) (the physician "testified that even if a different warning had been supplied, he would not have changed his decision to prescribed the drug," and "[t]his attestation by [the physician] defeats Plaintiffs' inadequate warning products liability claim"); *Stahl v. Novartis Pharm. Corp.*, No. Civ. A. 99-1048, 2000 WL 33915848, at *5 (E.D. La. Nov. 29, 2000) (evidence "indicate[d] that [physician's] decision to prescribe Lamisil for [plaintiff] would not have been altered," and the manufacturer's "obligation under the learned intermediary doctrine therefore was satisfied"), *aff'd*, 283 F.3d 254.

Because Dr. St. Martin testified unequivocally that he would still make the same prescribing decision today, Plaintiffs cannot establish that their proposed warning would have altered Dr. St. Martin's treatment decision with respect to Mrs. Orr. *See, e.g.*, *Allgood*, 2008 WL 483574, at *6; *Eschete*, 554 F. Supp. 2d at 634–35. Accordingly, there is not a legally sufficient evidentiary basis for a reasonable jury to find that any allegedly inadequate warning proximately caused Mrs. Orr's injuries, and judgment in Defendants' favor is appropriate. *See Cook v. Livingston Par. Deputy Denny Perkins*, No. 12-258-SCR, 2014 WL 11515610, at *1 (M.D. La. Jan. 6, 2014) ("If the plaintiff fails to introduce admissible evidence to establish every element of his claims, the court may enter a judgment for the defendants, as provided by Rule 50(a).").

---

[4] Notably, although Plaintiffs asked Dr. St. Martin about the U.S. subgroup data that was added to the label in 2015, (*see* 6/7/17 PM Trial Tr. 1748), they elicited no expert testimony that the absence of this data before 2015 rendered the label inadequate. In any event, Dr. St. Martin specifically testified that this information would not cause him to change his prescribing decision. *See id.* 1768:1–5.

III.  **Plaintiffs cannot substitute Dr. Bui to satisfy their claim, but, in any event, there is not a legally sufficient evidentiary basis for a reasonable jury to find that any alleged failure to adequately warn or instruct Dr. Bui proximately caused Mrs. Orr's injuries because Dr. Bui did not read—much less rely on—Xarelto's label.**

As explained above, Plaintiffs' failure-to-warn claim requires proof that "the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician" and that "this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury." *Stahl*, 283 F.3d at 265–66 (citations omitted). Plaintiffs cannot meet this burden with respect to Dr. Bui because Defendants had no duty to warn Dr. Bui, and in any event, the allegedly inadequate warning or instruction to Dr. Bui was not a proximate cause of Plaintiffs' injuries because the record shows that Dr. Bui never read the Xarelto label.

A.  **Under Louisiana law, Defendants had no duty to warn treating physicians like Dr. Bui.**

Under Louisiana's learned intermediary doctrine, a drug manufacturer's duty to warn in a prescription drug product-liability case runs *only* to the prescribing physician. *See Stahl*, 283 F.3d at 265 ("Under [the learned intermediary] doctrine, a drug manufacturer discharges its duty to consumers by reasonably informing *prescribing physicians* of the dangers of harm from a drug." (emphasis added)). The LPLA states that a manufacturer's duty to warn applies to "users and handlers of the product," *i.e.*, to the persons who make the decisions about whether and how to use the product. La. Rev. Stat. Ann. § 9:2800.57(A). Accordingly, in the context of prescription medicines, only the decision-making of the physician who decided to prescribe or use the product based on the risks and benefits is relevant to a failure-to-warn claim.[5]  *See Willett*, 929 F.2d at

---

[5] *See also, e.g., Frischhertz v. Smithkline Beecham Corp.*, No. 10-2125, 2012 WL 2952427, at *3 (E.D. La. July 19, 2012) ("Under the learned intermediary doctrine, a drug manufacturer discharges its duty to consumers by providing an adequate warning to prescribing physicians."); *Brown v. Glaxo, Inc.*, 790 So. 2d 35, 38–39 (La. Ct. App. 2000) (explaining that the manufacturer's "duty is fulfilled when the *prescribing doctor* is informed of the potential risks

1098–99 ("[T]he plaintiff must show that a proper warning would have changed the decision of the treating physician, *i.e.*, that but for the inadequate warning, the treating physician *would not have used or prescribed the product*." (emphasis added)).  In short, Louisiana law makes clear that the duty to warn runs *only* to prescribers, not to those doctors who may also treat a plaintiff but do not prescribe the medication at issue.

Because Dr. Bui was *not* Mrs. Orr's prescribing physician, (*see* 6/2/17 AM Trial Tr. 800:15–19)—indeed, he has never prescribed Xarelto to any patient, (*see id.* 772:1–12 (explaining that his knowledge of Xarelto came from general sources))—Defendants had no duty to provide Dr. Bui with any warning or instruction.  Although Plaintiffs suggest that Defendants should have provided instructions to neurosurgeons like Dr. Bui who neither use nor prescribe Xarelto in their practice, Louisiana has recognized no such duty.  In fact, the causation aspect of the learned intermediary doctrine undermines such a theory—to prevail on a failure-to-warn claim, a plaintiff must prove that "the treating physician would not have *used or prescribed* the product."  *See Willett*, 929 F.2d at 1099 (emphasis added).  With respect to a physician who does not use or prescribe a particular drug, a plaintiff can never meet this burden.

Furthermore, Plaintiffs' theory that manufacturers owe a duty to treating physicians who neither use nor prescribe a prescription drug—as with many of their theories in this litigation— has not been adopted by Louisiana's courts.  It should fail on that basis alone.  *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 317–18 (5th Cir. 2002) (refusing to recognize new state-law duty where plaintiff "d[id] not point to a court decision that indicates that

---

from the drug's reasonably anticipated use so that the physician may intelligently decide on its use with the particular patient" (emphasis added)).

. . . [the state]" would do so, because "[f]ederal courts in *Erie* cases do not 'create or modify' state law" (citation omitted)).

> **B.     In any event, the allegedly inadequate warning or instruction did not proximately cause Mrs. Orr's injuries because Dr. Bui testified unequivocally that he has not read the Xarelto label.**

But even if, contrary to prevailing case law and the requirements of the LPLA, Defendants' duty to warn extended to Dr. Bui, Plaintiffs have still failed to demonstrate that the allegedly inadequate warning or instruction proximately caused Mrs. Orr's injuries for two independent reasons.  *First*, Dr. Bui—by his own admission—did not read the Xarelto label, foreclosing a showing of proximate cause.  *Second*, there is legally insufficient evidence for a reasonable jury to find that Plaintiffs' proposed warning would have altered Dr. Bui's treatment decision.

> **1.     Plaintiffs cannot show proximate cause because Dr. Bui testified unequivocally that he never read the Xarelto label.**

As courts have recognized, a plaintiff's failure-to-warn claim fails as a matter of law if the physician did not read the warning label at issue.  *See, e.g.*, *Hall v. Sinn, Inc.*, 102 F. App'x 846, 849–50 (5th Cir. 2004) (applying Louisiana law) (plaintiffs' warning claim failed as a matter of law where prescribing physician "acknowledge[d] that he never read the warning and that he was aware of the risks of the drug independently of [the defendant's] labels"); *Dykes v. Johnson & Johnson*, Civ. No. 09-5909, 2011 WL 2003407, at *5 (E.D. La. May 20, 2011) (plaintiffs' failure-to-warn claim failed as a matter of law where physician "never read the warning, and thus the warning played no role in the events leading to plaintiff's injury"); *Felice v. Valleylab, Inc.*, 520 So. 2d 920, 926–27 (La. Ct. App. 1987) (holding that an adequate instruction would have been

"futile" where treating physician "admitted that she had never read the warning label on the device itself, and that she had never read the manual").[6]

Dr. Bui testified unequivocally that he did not read the Xarelto label:

Q.    Now let's get this out on the table.  As of April 25th, 2015 [*i.e.*, the date of Mrs. Orr's surgery], had you ever looked at the Xarelto label?
A.    No, I had not.

6/2/17 AM Trial Tr. 772:20–23.  Because Dr. Bui never read the Xarelto label, the addition of the warning or instruction that Plaintiffs propose here would not—and could not—have altered his conduct.

Plaintiffs cannot avoid this result by pointing to Dr. Bui's testimony that he gained knowledge about Xarelto from "[g]eneral medical literature, general medical training, [and] conferences."  6/2/17 AM Trial Tr. 772:1–3.  Such testimony does not demonstrate, as Plaintiffs must, that Defendants' actions or inactions proximately caused Mrs. Orr's alleged injuries.  *See Whitener v. PLIVA, Inc.*, Civ. No. 10-1552, 2014 WL 1276489, at *6 (E.D. La. Mar. 27, 2014) (Fallon, J.) (plaintiffs' claim failed as a matter of law because it was "clear . . . that [the doctor] relied principally on his own experience"—not any alleged conduct of the defendants); *cf. Pustejovksy v. PLIVA, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (where prescribing physician "did not recall ever reading the package insert for the drug," the plaintiff could not avoid summary judgment through "speculat[ion] about other ways an adequate warning might have reached the [doctor]") (applying Texas law).

---

[6] *See also Fernandez v. TAMKO Building Prods., Inc.*, 588 F. App'x 394, 395 (5th Cir. 2014) ("To prevail on their failure-to-warn claim, the plaintiffs must show that the allegedly inadequate warning proximately caused [the] injuries. This they cannot do, for one essential reason: neither [the plaintiff] nor anyone else positioned to prevent [him] from using the [product] read the warning that [the defendant] did provide. This failure means that, because no warning was read before using the product, the warning, inadequate as it might have been, could not have been a cause of the injury suffered by the use of the product.") (LPLA).

Nor can Plaintiffs rely on evidence of what a "reasonable physician" would have done to overcome Dr. Bui's unequivocal testimony.  As this Court has previously acknowledged, it "appear[s] . . . a plaintiff may be able *to supplement* [prescriber] testimony with 'objective evidence of how a reasonable physician would have responded to an adequate warning,'" *Allgood*, 2008 WL 483574, at \*6 n.6 (citing *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992)) (emphasis added).  But evidence of what a "reasonable physician" would have done may not be considered to *contradict* the testimony of the plaintiff's treating physician in an effort to establish causation.  Rather, as the Fifth Circuit made clear in *Thomas*, "to create a jury question, the evidence introduced must be of sufficient weight to establish, by the preponderance of the evidence, *at least some reasonable likelihood that an adequate warning would have prevented the plaintiff from receiving the drug*." 949 F.2d at 812 (emphasis added).  In other words, Plaintiffs cannot rebut Dr. Bui's testimony that he never read the label through "objective evidence" of what a "reasonable physician" in his position would have done.

This is unsurprising: the ultimate inquiry under Louisiana law is whether the plaintiff's physician would have acted differently.  *See Willett*, 929 F.2d at 1099–1100.  Where the physician's testimony shows that a different warning would not or could not have altered his treatment decisions—as Dr. Bui's testimony here does—"objective" evidence simply cannot show causation.  *Cf. Thomas*, 949 F.2d at 817–18 (recognizing that, ultimately, "[t]he plaintiff must show that an adequate warning would have convinced the prescribing physician not to prescribe the drug for the plaintiff" and concluding that "[n]o reasonable jury could conclude that [the physician] would not have prescribed [the drug] for [the plaintiff]")

**2.      Plaintiffs cannot otherwise prove that their proposed warning would have altered Dr. Bui's treatment decision.**

Nor can Plaintiffs otherwise show that the addition of their proposed warning would have altered Dr. Bui's treatment decision.  Dr. Bui testified that the fact that Mrs. Orr was on Xarelto was only a single factor in his decision not to perform surgery, explaining that "that it would be fair to say that the fact that [Mrs. Orr] was on the blood thinner Xarelto played into the complicated decision-making process for the timing of the placement of the catheter."  6/2/17 AM Trial Tr. 769:20–770:11.

In fact, Dr. Bui further explained that "[o]ne of the factors to proceed with surgery is whether she has responded to medical therapy or not. So one of the factors that played into my decision was the fact that she had not responded to medical therapy."  *Id.* Accordingly, Dr. Bui's "complicated decision-making process" necessarily included medical therapy.  *See id.* (describing Mrs. Orr's being on Xarelto and her lack of response to medical therapy as being "concomitant factors" in his decision making).  And importantly, Dr. Bui testified only that Plaintiffs' proposed PT instruction "would have certainly added to the amount of information that I had to make a decision."  *Id.* 786:16–787:24.

Because Dr. Bui never read the Xarelto label, the information contained (or omitted, as Plaintiffs claim) in the label had absolutely no bearing on his treatment decision.  Plaintiffs cannot demonstrate warnings causation, and their claim fails as a matter of law.  *See Hall*, 102 F. App'x at 849–50.

**IV.   Defendants are entitled to judgment as a matter of law because Plaintiffs' failure-to-warn claim is preempted by federal law.**

As explained in Defendants' summary judgment papers and in a separate brief in support of Defendants' Rule 50(a) motion for judgment as a matter of law at the end of Plaintiffs' case,

Plaintiffs' failure-to-warn claim is preempted by federal law, which is a question of law to be decided by the Court, not the jury.

V.     **A plaintiff may not recover lost-chance damages in an LPLA action, and in any event, there is not a legally sufficient evidentiary basis for a reasonable jury to award damages based on Mrs. Orr's alleged lost chance of survival.**

Although Plaintiffs assert that the jury is entitled to award damages if Defendants' alleged failure to instruct physicians regarding the use of a PT test lessened Mrs. Orr's chances of survival, their assertion is incorrect. *First*, as a procedural matter, the Fifth Circuit has made clear that federal courts are "not free to fashion new theories of recovery under Louisiana law." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). Because Louisiana state courts have never allowed a plaintiff to recover for a lost chance of survival under the LPLA, this Court may not do so either. *Second*, putting aside the Fifth Circuit's *Erie* command, the LPLA should not be interpreted to allow damages for lost chance of survival because the lost-chance doctrine applies only to the rendition of services. In fact, courts have uniformly rejected extending the lost-chance doctrine to product-liability cases. *Third*, lost-chance damages may not be recovered in a case where the plaintiff alleges that the defendant is responsible for the initial injury. *Fourth*, even if lost-chance damages were recoverable under the LPLA, Plaintiffs have not introduced legally sufficient evidence for a jury to award damages on this basis. *Finally*, Plaintiffs' late assertion of this theory of damages—only weeks before trial—was untimely and unfairly prejudicial to Defendants.

A.     **No Louisiana court has allowed a plaintiff to recover lost-chance damages in an LPLA action, and this Court should not do so under *Erie*.**

Although Plaintiffs have stipulated that their claims are governed exclusively by the LPLA, (*see* Docs. 6601 & 5341), they have not cited a single case that has applied the lost-chance doctrine to an LPLA claim. Plaintiffs thus ask the Court to accept a theory that no Louisiana court has

recognized—*i.e.*, that damages for a lost chance of survival are cognizable in a product-liability action. *Erie* prohibits this radical expansion of Louisiana law. Although a "federal court . . . determine[s] as best it can, what the highest court of the state would decide," *Barfield v. Madison Cty.*, 212 F.3d 269, 271–72 (5th Cir. 2000), the Fifth Circuit has explained that an *Erie* guess may "not expand state law beyond its presently existing boundaries," *id.* (citation omitted). Plaintiffs' request would do just that. The Louisiana Supreme Court has most commonly applied the lost-chance doctrine to medical malpractice claims, and most importantly, has never applied the doctrine to an LPLA claim. This absence of authority alone is a sufficient basis to reject Plaintiffs' lost-chance theory.

As the Fifth Circuit has explained, federal courts sitting in diversity are not state-law "pioneers" and therefore must "simply apply state law as it exists" without "adopt[ing] innovative theories of recovery." *See Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1178 n.8 (5th Cir. 1988); *see also Looney Ricks Kiss Architects, Inc. v. State Farm Fire & Cas. Co.*, 677 F.3d 250, 256 (5th Cir. 2012) (explaining that federal courts sitting in diversity are charged "to predict state law, not to create or modify it"). Plaintiffs insist that the Louisiana Supreme Court has simply "left for another day"—rather than foreclosed—the decision whether lost-chance damages are recoverable in the product-liability context (*see* Doc. 6730, at 3), but that does not make such damages recoverable in an LPLA action. In fact, the Fifth Circuit recently reaffirmed this rule, explaining that a federal court cannot allow a theory "to go forward on the ground that [the state's] highest civil court has not rejected [the] specific claim" because it "would run afoul of [the Fifth Circuit's] longstanding rule against front-running the state courts by adopting innovative theories of state law." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 783 (5th Cir. 2016). Accordingly, a federal court may neither impose new state-law duties nor permit recovery

on unrecognized state-law theories.

Importantly, the Fifth Circuit has previously relied on these limiting principles of federal jurisdiction to refuse to extend state law to recover damages in a new context.  *See David v. World Marine, L.L.C.*, 647 F. App'x 461, 468 (5th Cir. 2016).  In *World Marine*, the Fifth Circuit refused to "read Mississippi law as recognizing reputational harm as a basis for damages" in a fraud action. *See David v. World Marine, L.L.C.*, 647 F. App'x 461, 468 (5th Cir. 2016).  The court explained that it was unaware of—and had not been directed to—any "Mississippi caselaw recognizing or discussing damages based on reputational harm."  *Id.*  "Given this lack of caselaw," the Fifth Circuit declined to extend Mississippi law to allow for recovery of damages where Mississippi's own state courts had not.[7]  *Id.*

So too here.  Plaintiffs do not identify any Louisiana authority providing for lost-chance damages in a product-liability action, and under *World Marine*, *Erie*'s restriction on a federal court's ability to recognize a new category of state-law damages forecloses Plaintiffs' request. This Court should not extend Louisiana law.

Nor can Plaintiffs rely on the general LPLA provisions to avoid this required *Erie* outcome. The LPLA allows a plaintiff to seek "survival and wrongful death damages for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery."  La. Rev. Stat. § 9:2800.53(5).  Article 2315.1 provides that a plaintiff in a survival action has the "right to recover all damages for injury to [the deceased] person, his property or otherwise."  Reading these provisions together, Plaintiffs insist,

---

[7] Notably, the Fifth Circuit declined to extend the lost-chance doctrine in circumstances similar to this case.  *See Phillips ex rel. Phillips v. Monroe Cty., Miss.*, 311 F.3d 369 (5th Cir. 2002).  In *Phillips*, the plaintiff brought a 42 U.S.C. § 1983 claim against the defendants, arguing that the defendants' failure to provide the necessary medical care resulted in her son's death from testicular cancer.  *Id.* at 369.  The plaintiff in *Phillips*, similar to Plaintiffs here, asserted that she "need only prove the defendants' actions increased the Decedent's risk of death" and did not have to prove that their actions caused the death.  *Id.* at 375.  The court quickly rejected this argument, explaining that the lost-chance doctrine is "often applied in medical malpractice contexts."  *Id.*  In fact, the court found that the plaintiff's "supporting cases," which "relate[d] to medical malpractice suits" were simply "not relevant."  *Id.*

shows that lost-chance damages are recoverable in an LPLA action. They are not. The survival action is simply "special legislation providing for the survival of a right of action in favor of named classes of survivors." *Watkins v. Exxon Mobil Corp.*, 117 So. 3d 548, 552 (La. Ct. App. 2013) (quoting *Levy v. State Through Charity Hosp. of La. at New Orleans Bd. of Adm'rs*, 216 So. 2d 818, 819 (La. 1968)). And although a plaintiff may recover "damages for injury to [the deceased] person," this ability to recover damages does not exist in the abstract. Rather, the statute allows "designated beneficiaries . . . to recover the damages that a person suffered *and would have been entitled to recover* from the tortfeasor, if the person had lived." *In re Brewer*, 934 So. 2d 823, 826 (La. Ct. App. 2006). No Louisiana law supports the conclusion that a plaintiff is "entitled to recover" damages for an allegedly lost chance of survival in an LPLA action.

**B.      The lost-chance doctrine does not apply to product-liability claims.**

Even if this Court were to consider extending Louisiana law, the lost-chance doctrine is nonetheless inapplicable here. This is so because the doctrine applies to the rendition of services, rather than products, and therefore cannot apply in a product-liability case governed by the LPLA.

The lost-chance doctrine applies only to cases involving *the rendition of services* (e.g., medical malpractice cases)—it has never been applied in a case governed by the LPLA. Section 323(a) of the *Restatement (Second) of Torts* is the "conceptual foundation" for the lost-chance doctrine, and it provides that "[o]ne who undertakes . . . to *render services* to another" may be liable "for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if . . . his failure to exercise such care increases the risk of such harm." *Restatement (Second) of Torts* § 323(a) (emphasis added); *see also Pelas v. Golden Rule Ins. Co.*, No. Civ. A. 97-3779, 1999 WL 438478 (E.D. La. June 28, 1999), at *2; *Smith v. State, Dept. of Health & Human Res. Admin.*, 676 So. 2d 543, 547 (La. 1996).

The manufacture and sale of a product is distinct from the provision of services, like medical services.  Although no Louisiana court has ever addressed whether lost chance could apply to a product-liability case, other courts have explained that a product-liability claim "do[es] not involve the rendition of services directly to a person, and attempting to apply the theory in such a case stretches Section 323 beyond its plain meaning."  *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2502, __ F. Supp. 3d __, 2017 WL 83509, at *12 n.12 (D.S.C. Jan. 3, 2017) (citation and internal quotation marks omitted). Accordingly, numerous courts outside of Louisiana have refused to extend the lost-chance doctrine to product-liability claims.  *See, e.g.*, *Hill v. Novartis Pharm.*, 944 F. Supp. 2d 943 (E.D. Cal. 2013).

In *Hill*, for example, the plaintiff claimed that Novartis's failure to warn of the risks inherent in the use of Zometa, an FDA-approved drug developed and manufactured by Novartis for the treatment of cancer, caused her to suffer osteonecrosis of the jaw.  *Id.* at 959.  Novartis moved to exclude any evidence "suggesting that, as a result of [Novartis's] alleged failure to provide adequate warnings, Plaintiff lost a chance to avoid [her injuries] or otherwise have a more favorable outcome with regard to her jaw problems." *Id*.  The court granted the motion, explaining that "[t]he lost chance doctrine, even when recognized, has been limited to medical malpractice cases."  *Id.*  Furthermore, the court observed that the plaintiff "provided no authority—and the Court's research reveal[ed] no authority—to suggest that the doctrine could conceivably apply in a products liability case where, as here, the plaintiff alleges that a pharmaceutical manufacturer's failure to warn of risks associated with a prescription drug caused the plaintiff to develop a

condition she would not otherwise have developed had she not taken the drug." *Id*. at 960 (internal quotation marks omitted).[8]

Plaintiffs' attempts to distinguish these cases—all of which found the lost-chance doctrine inapplicable to a product claim—are unavailing. *See* Doc. 6730, at 8–9. At bottom, each of these cases reiterates the principle that the lost-chance doctrine simply does not apply in product-liability cases. Plaintiffs suggest that these cases "have no application" here because they involve "'the increased risk of harm' standard, rather than a claim for damages based on a lost chance of survival." *Id*. But, as *Pelas* itself—on which Plaintiffs rely—recognizes, that is the very foundation of section 323. *See* 1999 WL 438478, at *2 ("Section 323 says nothing about loss of chance of survival, but rather addresses the liability of one who fails to exercise reasonable care 'to render services to another which he should recognize as necessary for the protection of the other's person or things . . . if . . . his failure to exercise such care *increases the risk* of such harm . . . .'" (emphasis added)).

Because *Restatement (Second)* section 323(a) relates to the rendition of services, there is no support in the *Pelas* decision for extending the lost-chance doctrine to product-liability claims. In *Pelas*, the court denied a motion *in limine* seeking to exclude evidence relating to the plaintiff's

---

[8] *Accord Lempke v. Osmose Utils. Servs., Inc.*, No. 11-1236, 2012 WL 94497, at *4 (W.D. Pa. Jan. 11, 2012) ("Courts in Pennsylvania have invoked Section 323 in a variety of factual settings, but never in the context of a negligence-based products liability case."); *Moretti v. Wyeth, Inc.*, No. 2:08-cv-00396-JCM-(GWF), 2009 WL 749532, at *3 (D. Nev. Mar. 20, 2009) (noting that "Nevada courts have explicitly rejected [the] application [of Section 323] in product liability cases"); *Cipollone v. Liggett Grp., Inc.*, 683 F. Supp. 1487, 1494 (D.N.J. 1988) (suggesting that rationale of lost chance doctrine could apply but explaining that "New Jersey courts have failed to apply the 'lost chance' rule in product liability cases"); *Lowmack v. Gen. Motors Corp.*, 967 F. Supp. 874, 881–82 (E.D. Va. 1997) (declining to apply lost chance doctrine in case arising out of defective car seat), *aff'd*, No. 97-1957, 139 F.3d 890, at *1 (4th Cir. Mar. 3, 1998) ("[T]he district court correctly determined that the Virginia courts would not relax the ordinary requirements of proximate causation outside the medical malpractice context."); *see also Grant v. Am. Nat'l Red Cross*, 745 A.2d 316, 322 (D.C. 2000) ("[Plaintiff's] claim that the Red Cross negligently supplied hepatitis-carrying blood is not easy to distinguish from a claim that any provider of supplies or equipment used in medical treatment was negligent in manufacturing or processing the supplies, thereby causing a patient injury. To apply the loss of chance theory to cases such as these would virtually collapse the limitations that our decisions have set to the reach of proximate causation.").

loss-of-chance theory arising from an insurer's refusal to cover a bone marrow transplant.  *Id.*
Even though the court concluded that the Louisiana Supreme Court "would not strictly limit the
loss of chance of survival doctrine to medical malpractice cases," that conclusion derived from the
court's reasoning that section 323(a) applies to "*any* undertaking to render services," not just
medical services.  *Id.* at *2–3 (emphasis added).  So, although *Pelas* (improperly) extended
Louisiana law,[9] the underlying claim in that case involved the rendition of services, which forms
the "conceptual foundation" of a loss-of-chance theory.  *Id.*   Here, there is no "rendition of
services" at issue, and therefore, the lost-chance doctrine simply does not—and indeed, cannot—
apply.

### C.   The lost-chance doctrine does not apply where the plaintiff alleges that the defendant caused the initial injury.

Even if the lost-chance doctrine could apply to a product-liability claim, Plaintiffs cannot
rely on the doctrine here.  Plaintiffs here allege a wrongful-death claim based both on the theory
that Xarelto caused Mrs. Orr's hemorrhage, resulting in her death, and that Defendants' failure to
properly instruct Dr. Bui lowered Mrs. Orr's chances of survival.  *See, e.g.*, 5/30/17 AM Trial Tr.
141:12–25; 6/2/17 AM Trial Tr. 797:20–22.  But Louisiana law does not apply the lost-chance
doctrine in such a situation—*i.e.*, where the defendant is alleged to be both the cause of the initial
injury and the cause of the "lost chance."  Rather, lost chance is relevant where "the tort victim
had a *chance of survival at the time* of the professional negligence."  *Smith*, 676 So. 2d at 547
(emphasis added).  In other words, the lost-chance doctrine applies where the plaintiff has suffered
an injury before the defendant's alleged conduct is ever at issue.

---

[9] *See Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 343 (5th Cir. 1988) (criticizing a district court's expansion of
Louisiana law and explaining that "the district court should have hesitated . . . to extend Louisiana law beyond the
boundaries currently established in the state's own courts").

In fact, in those few contexts in which the Louisiana Supreme Court has recognized the lost-chance doctrine, it has been applied where the defendant's conduct is not alleged to have caused the plaintiff's initial injury.  *See, e.g.*, *Smith*, 676 So. 2d at 547 (applying loss of chance doctrine to "negligent treatment of a *pre-existing* condition" (emphasis added)); *Hastings*, 498 So. 2d at 720 ("Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury." (emphasis added)); *Weber*, 635 So. 2d at 192 (lost chance relevant where "a second and separate incident . . . caused a separate injury").  And "based on these pronouncements from the Supreme Court," the Louisiana Court of Appeals recently reaffirmed that "the loss of a chance of survival doctrine is relevant" only in cases where the plaintiff dies as the "result of a pre-existing condition (*i.e.*, a condition of the patient in existence at the time of the alleged malpractice of the defendant, *which condition is unrelated to any conduct of the defendant*)."  *Deykin v. Ochsner Clinic Found.*, No. 16-CA-488, --- So. 3d ---, ---, 2017 WL 1488855, at *4 & n.3 (La. Ct. App. Apr. 26, 2017) (emphasis added).

Importantly, a lost-chance theory cannot be reconciled with the clear text of the LPLA. Under the Act, Defendants are liable only if "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of *such* characteristic."  La. Rev. Stat. Ann. 9:2800.57(A) (emphasis added); *accord Stahl*, 283 F.3d at 264 (plaintiff must demonstrate that (1) "the product in question has a potentially damage-causing characteristic" and (2) "the manufacturer failed to use reasonable care to provide an adequate warning [or here, instruction] about *this* characteristic" (emphasis added)).  Plaintiffs have alleged that Defendants failed to instruct physicians that a PT test could be used to assess Xarelto concentration to determine if surgery is appropriate in emergency circumstances. And, throughout

this case, Plaintiffs have contended that Xarelto's "characteristic that may cause damage" is its risk of bleeding.[10] *See, e.g.*, 5/30/17 PM Trial Tr. 134:21–25; 6/1/17 AM Trial Tr. 317:15–21.

In other words, to fit the statute, Plaintiffs' claim must be that (1) Xarelto has a "characteristic that may cause damage"—*i.e.*, causes bleeding; and (2) Defendants failed to adequately instruct physicians how to deal with that risk—*i.e.*, use a PT test to see if surgery is safe in a patient that has suffered an emergency bleeding event. And Plaintiffs have confirmed that this is their theory. *See, e.g.*, 5/30/17 PM Trial Tr. 123:4–11 ("Defendants know this and understand that people will suffer potentially fatal bleeding events on their drug; know and understand that doctors in emergency rooms and operating rooms will have to treat these patients with life-threatening bleeding events. What you will hear during this case is that the only instruction these companies give to doctors in the United States trying to save patients' lives is to wait."). This theory is fundamentally inconsistent with the lost-chance doctrine.

Rather, for an LPLA claim to be viable, a plaintiff must show that the product had a damage-causing characteristic that caused an injury, and that the defendants failed to adequately warn or instruct about that characteristic. But under the lost-chance doctrine, the plaintiff's condition must be unrelated to any conduct of the defendant, and Plaintiffs thus cannot allege lost chance in an LPLA case. Here, Plaintiffs must prove that Xarelto caused the bleed for their claim to fall under the LPLA, but that allegation forecloses the application of the lost chance doctrine. *See Deykin*, 2017 WL 1488855, at *4. But if Plaintiffs were to instead assert that Xarelto did not cause Mrs. Orr's bleeding event but simply prevented Dr. Bui from operating, they do not have an

---

[10] *See Stahl*, 283 F.3d at 264 ("[N]either party contests that Lamisil tablets have a potentially damage-causing characteristic (i.e., hepatoxicity)"); *Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 205 (5th Cir. 2001) (to prevail on LPLA failure-to-warn claim, plaintiff must prove "that 'gel bleed' is a potentially damage-causing characteristic of MEC's breast implants"). *See also Jackson v. Johnson & Johnson*, 2012 WL 2428262, at *1 (W.D. La. June 25, 2012) ("potentially damage-causing characteristic[s]" were the "drug's side effects, including angioedema, airway obstruction, and nausea"); *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 609 (W.D. La. 2006) (product "has a potentially damage-causing characteristic (i.e., burns)

LPLA claim at all, because the alleged failure to warn is no longer tied to the damage-causing characteristic. *See* La. Rev. Stat. Ann. § 9:2800.57(A) (creating liability for failure "to provide an adequate warning of [the damage-causing] characteristic").

Because Plaintiffs allege here, as they must for their claim to fall under the LPLA, that Xarelto caused Mrs. Orr's injury, they cannot seek damages under the lost-chance doctrine. The doctrine simply does not apply in this situation—*i.e.*, where the product is alleged to have caused the injury that led to the plaintiff's death.

**D.     Even if the lost-chance doctrine could apply to an LPLA action, Plaintiffs have not presented legally sufficient evidence to support the recovery of lost-chance damages.**

In any event, Plaintiffs have not provided any quantifiable expert testimony, as they must, that Mrs. Orr's chances of survival were less than even. As Louisiana courts have recognized, a lost-chance claim fails if "[t]he jury [is] given no quantitative assessment . . . . as to [the plaintiff's] chance of survival if [the standard of care had not been breached] as soon as the condition was discovered." *See Arant v. St. Francis Med. Ctr., Inc.*, 605 So. 2d 622, 629 (La. Ct. App. 1992). Here, there is no "quantitative assessment" that Mrs. Orr's chances of survival were less than 50%, and Plaintiffs have thus failed to present legally sufficient evidence to support a jury award of lost-chance damages.

**1.     Plaintiffs have not introduced any expert testimony that Mrs. Orr had a less-than-even chance of survival.**

Under Louisiana law, lost-chance damages are recoverable *only* if the plaintiff had "a less-than-even chance [of survival], at the time of the defendant's alleged malpractice." *Deykin*, 2017 WL 1488855, at *4; *see also, e.g.*, *Smith*, 676 So. 2d at 548 ("[T]he loss of a less-than-even chance of survival is a distinct injury compensable as general damages . . . ."); *Hebert v. Parker*, 796 So. 2d 19, 25 (La. Ct. App. 2001) (recognizing claim for "a loss of a chance of survival in cases where

there is a *loss of a less than even chance of survival* because of the alleged negligent treatment of a pre-existing condition" (emphasis added)).

Plaintiffs' theory is that Mrs. Orr had a greater-than-even chance of survival when she presented to Ochsner Hospital, *see Alphonse v. Acadian Ambulance Servs., Inc.*, 844 So. 2d 294, 303 (La. Ct. App. 2002) (considering "chance of survival at the time of the alleged malpractice"), and they have provided no expert testimony to the contrary.  Because Plaintiffs have not presented legally sufficient evidence that Mrs. Orr had a less-than-even chance of survival when she arrived at Ochsner Hospital, lost-chance damages cannot be submitted to the jury.  *See Smith*, 676 So.2d at 549 (suggesting that jury must be allowed to consider "expert medical testimony regarding the percentage chances of survival"); *Smith v. State through Dept. of Health & Human Res. Admin.*, 523 So. 2d 815, 821 (La. 1988) (plaintiff's expert "did not assess in any detail what the quantitative chances of survival would have been"); *see also, e.g.*, *Goudia v. Mann*, 98 So. 3d 364, 374 (La. Ct. App. 2012) (expert "did not assess what the quantitative chances of survival would have been had any of these measures been taken"); *Snia v. United Med. Ctr. of New Orleans*, 637 So. 2d 1290, 1294 (La. Ct. App. 1994) (plaintiff could not show lost chance where, *inter alia*, expert "did not assess in any detail what the quantitative chances of survival would have been"); *Arant*, 605 So. 2d at 629 (same).

## 2.  Plaintiffs have presented no evidence of what Mrs. Orr's chances of survival would have been if Dr. Bui had been able to surgically intervene when he arrived at Ochsner Main.

Only one of Plaintiffs' experts, Dr. Liechty, has offered any testimony about Mrs. Orr's purported chance of survival.  Dr. Liechty testified that Mrs. Orr had "at least a 60 percent chance of reasonably functional outcome."  6/5/17 AM Trial Tr. 1032:1–2.  As explained above, this testimony is insufficient as a matter of law to establish lost-chance damages, a theory that requires a less-than-even chance of survival.  But more fundamentally, Dr. Liechty's testimony confirms

Defendants' concern, expressed in their earlier opposition to Plaintiffs' attempt to inject this theory into the case, that "testimony about Orr's loss of chance of survival currently on the record is speculative at best." See Defs.' Opp. To Pls.' Mot. for Leave to File An Amended Complaint (Doc.6389), at 8.

Dr. Liechty testified that he relied on Mrs. Orr's Glasgow Coma Score and the medical events that evening in arriving at his "60%" calculation and opinion. Dr. Liechty's opinion is inconsistent with the facts in evidence. Dr. Liechty testified that Mrs. Orr had "a GCS 15 at 10:10 pm. with a slight decrease at 11:15" to 13 and then a 6T "at the time she hit Ochsner main" that evening. 6/5/17 AM Trial Tr. 1032:20–23. Dr. Liechty concluded that "[i]t is this window where emergent intervention had to take place" to achieve the 60 percent chance of survival. *Id.* 1032:23-25. But as Dr. Bui testified, Ochsner Baptist "does not have emergency neurosurgery coverage." 6/2/17 AM Trial Tr. 745:20–22. And Dr. Bui did not arrive at Ochsner main until 2:00 a.m. (*id.* 752:1–10), when her GCS was 6T. There is no evidence that it was feasible for anyone to surgically intervene when Mrs. Orr was at Ochsner Baptist and her score when from 13 to a 6T. It is undisputed that Mrs. Orr's condition stabilized after her 6T score upon arrival at Ochsner main, and that "when Mrs. Orr received the procedure, she was still at a 6T at 2:30 p.m." twelve hours later. 6/5/17 AM Trial Tr. 1032:16-18. There is no evidence that her condition got any worse than a 6T prior to surgery the following afternoon. Dr. Liechty's timeline is therefore flawed, and accordingly, Plaintiffs lack sufficient evidence to prove that Xarelto caused Mrs. Orr's death because it prevented earlier intervention. Moreover, Dr. Liechty's "60 percent chance of reasonably functional outcome" opinion does not fit the facts of this case. No reasonable jury could conclude that there was any way for Mrs. Orr to have had surgical intervention in the

10:10pm to 2:00am window when Dr. Liechty contends that Xarelto prevented earlier intervention. There also is no evidence that anyone before Dr. Bui ever considered doing surgery.

Because Dr. Liechty's opinion does not address Mrs. Orr's chances of survival at the time relevant to Plaintiffs' theory—*i.e.*, when Dr. Bui arrived at Ochsner Main—Defendants are entitled to judgment as a matter of law. *See Vance v. Union Planters Corp.*, 209 F.3d 438, 441 (5th Cir. 2000) ("A court should grant a [Rule] 50(a) motion not only when the non-movant presents no evidence, but also when there is not a *sufficient conflict in substantial* evidence to create a jury question.").

E.    **Defendants were prejudiced by Plaintiffs' late-asserted claim for lost-chance damages.**

Finally, on April 7, 2017, a little over one month before trial, Plaintiffs sought leave to amend their complaint in an effort, they say, to "mak[e] explicit Sharyn Orr's right to recover her 'Lost Chance of Survival' damages under Louisiana law." Doc. 6112-1, at 1. But, as demonstrated above, it is not "explicit" that any such right exists. And importantly, Plaintiffs' late assertion of this theory improperly deprived Defendants of the chance to most effectively defend against these allegations. In fact, as this Court recognized in denying Plaintiffs' motion to amend, their "attempt to amend the complaint c[ame] too late." Doc. 6486, at 2.

Even if Plaintiffs' lost-chance theory of damages is not a claim that needs to be specifically pleaded, (*see id.*), this does not make their late assertion of the theory any less prejudicial. As this Court has recognized in the amendment context, an "eve of trial" amendment is prejudicial precisely because "Defendants . . . have no doubt arranged their affairs and prepared their defenses according to the allegations and causes of action contained in the Plaintiff's complaint." *In re Int'l Marine, LLC*, No. 07-6424, 2009 WL 498372, at *2 (E.D. La. Feb. 26, 2009) (Fallon, J.). That rationale applies with equal force to a late-asserted claim for damages. *Cf. Jones v. Wells Fargo*

30

*Bank*, __ F.3d __, __, No. 16-10042, 2017 WL 2367978, at *3 (5th Cir. June 1, 2017) (recognizing that "basic fairness entitles a defendant to notice, before trial, of . . . the nature of the claims being asserted against it"); *WRR Indus., Inc v. Prologis*, No. 3:04-CV-2544-L, 2006 WL 1814126, at *5 (N.D. Tex. June 30, 2006) (prejudice where new theory "fundamentally alter[s] the character of the case . . . and the type of damages that would be allowed").  Consistent with due process and fundamental fairness, Defendants have a right to know the claims being levied against them and should not be subjected to trial by surprise.

Had Plaintiffs raised this lost-chance theory during discovery, Defendants could have retained different or additional experts to challenge these assertions or filed different *Daubert* briefs to challenge the relevance and reliability of Plaintiffs' experts' opinions about Mrs. Orr's loss of chance of survival.  *See Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008) (considering prejudice under Rule 16 and explaining that the defendant "would have been prejudiced if it had been forced to defend against a new claim and basis for recovery so late in the litigation"); *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) (noting the impropriety of "late tendered amendments [that] involve new theories of recovery and impose additional discovery requirements").

Furthermore, Plaintiffs' late-asserted theory drastically altered the trial's course and scope. Plaintiffs' theory pre-trial, consistent with the LPLA, had been that Xarelto caused Mrs. Orr's death.  *See* Complaint, No. 2:15-cv-03708, (Doc. 1), at ¶ 105 ("As a direct result of being prescribed Xarelto® for this period of time, Sharyn Orr suffered significant injuries, including a hemorrhagic stroke and ultimately her death.").  Plaintiffs' contention that Xarelto lessened Orr's chances for survival is in fact, an entirely new theory of recovery.  Under Louisiana law, "[t]he issues in loss of a chance of survival cases are whether the tort victim lost any chance of survival

because of the defendant's negligence and the value of that loss." *Smith v. State, Dep't of Health & Hosps.*, 676 So. 2d 543, 546 (La. 1996). In effect, after asserting throughout this case that Xarelto caused Mrs. Orr's death, Plaintiffs chose a new target, claiming that they need only prove that Xarelto lowered her chances for survival.[11]

Plaintiffs' late-proposed basis for recovery was untimely and prejudicial. *See Home Depot U.S.A., Inc. v. Nat'l Fire Ins. Co.*, 2007 WL 2592353, at *2 (N.D. Tex. Sept. 10, 2007) ("[A] change may be deemed prejudicial 'if the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation.'" (citation omitted)).

## VI. Defendants are entitled to judgment as a matter of law on Plaintiffs' failure-to-warn claim because Plaintiffs have not introduced expert testimony that meets *Daubert*.

Plaintiffs have not demonstrated that their experts' opinions are reliable under *Daubert*. Rather, those opinions should have been excluded for the reasons previously identified by Defendants—including that those theories fail under *Daubert*, that Plaintiffs have abandoned those theories, and that Plaintiffs have waived their opposition to Defendants' *Daubert* motion to exclude those theories.[12] Accordingly, there is not a legally sufficient evidentiary basis for a

---

[11] This is a repeated theme in this litigation, in light of the numerous claims and theories that Plaintiffs have abandoned. *See* Order And Reasons (Doc. 6640), at 7 ("After a year of discovery, dozens of depositions, and multiple motions, Plaintiffs have narrowed their theory and have entered stipulations saying the same."); *see also, e.g.*, Defs.' Mot. For An Order (1) Dismissing With Prejudice Claims Based on Allegations that Plaintiffs Have Abandoned and (2) Barring Scientific Evidence Based on Waiver of *Daubert* Arguments (Doc. 6485); Defs.' Mot. To Vacate April 13, 2017 Order on Preemption of Design-Defect Claims (Doc. 6717).

[12] Defendants incorporate by reference their arguments in support of their *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens (Docs. 5113, 5114, 5688), their Motion For An Order (1) Dismissing With Prejudice Claims Based on Allegations that Plaintiffs Have Abandoned and (2) Barring Scientific Evidence Based on Waiver of *Daubert* Arguments (Doc. 6485), and Defendants' Renewed Motion to Exclude Certain Dosing-Related Opinions of Dr. Smart MD, FACC, FACP (Doc. 6673), and all other arguments to exclude those opinions or related testimony that Defendants have made in these proceedings—whether orally (as reflected in the transcript) or in writing.

reasonable jury to find for Plaintiffs on the issue whether Defendants failed to adequately warn or instruct.

> **A.     The opinions of Plaintiffs' experts, including Dr. Liechty, that PT may be used to measure patients' Xarelto concentrations are inadmissible under *Daubert*.**

The testimony of Dr. Liechty that monitoring or assessing Xarelto concentration through PT testing would improve patient outcomes in emergent situations is inadmissible under *Daubert*. As Defendants previously explained in their omnibus *Daubert* motion, Plaintiffs' experts repeatedly conceded that PT tests cannot be reliably used to measure Xarelto concentration or activity.   *See* Doc. 5113.   More fundamentally, Plaintiffs' experts'—and particularly Dr. Liechty's—monitoring opinions (a) are untested and lack any supporting data, (b) have not been accepted in the scientific community, and (c) have not been subject to peer review and publication. *See id.*  Plaintiffs' expert Dr. Suzanne Parisian did not express opinions in her expert report about the use of PT in emergency room situations, and any such opinion should have been excluded under Rule 37.   *See* Fed. R. Civ. P. 37; *Sobrino-Barrera v. Anderson Shipping Co., Ltd.*, 495 F. App'x 430, 432–33 (5th Cir. 2012).   Furthermore, none of Plaintiffs' experts has ever expressed data or methodology to support that PT can be used to assess the potential for emergency surgery or to detect the presence of the drug to thereby make clinical decisions.   To the extent Plaintiffs assert that PT should be used to assess bleeding risk to inform a physicians' prescribing decision, they have offered no evidence in support of this theory.   Finally, Plaintiffs' shifting theories have not allowed the Court to make a reasoned gatekeeping finding as required by *Daubert* and Fifth Circuit precedent.   *See Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 200–01 (5th Cir. 2016).    Because Plaintiffs failed to introduce reliable expert testimony in support of their failure-to-warn claim, Defendants are due judgment as a matter of law.   *See, e.g.*, *Zachary v. Dow Corning Corp.*, 884 F. Supp. 1061 (M.D. La. 1995).

**B.**   **Plaintiffs have abandoned any claim regarding Xarelto's dosing regimen or cumulative dosage.**

**1.**   Plaintiffs have dismissed with prejudice any design-defect claim in this case. *See* Stipulation & Order (Doc. 6601). Furthermore, Plaintiffs expressly stated that they were "not asserting that the Defendants should unilaterally lower the approved dose of Xarelto to provide a different dosing regimen without FDA approval . . . ." Pls.' Opp. to Defs.' Dosing, Monitoring and Design Preemption MSJ (Doc. 5531) at 2. Accordingly, in light of Plaintiffs' with-prejudice dismissal and their prior representations, the Court should grant Defendants judgment as a matter of law to the extent that Plaintiffs' claim is based in any way on Xarelto's cumulative daily dose or once-daily dosing regimen. *See, e.g.*, *Cologne*, 2013 WL 5781705, at *2–3; *Overpeck*, 2013 WL 4500469, at *4.

**2.**   Defendants previously moved to exclude the dosing-related opinions of Plaintiffs' expert, Dr. Frank Smart, as inadmissible under Federal Rule of Evidence 702 and *Daubert*.[13] As explained before, Plaintiffs' experts' opinions, including Dr. Smart's, are speculative, lack sufficient data, are not based on a reliable methodology, and should have been excluded. Furthermore, the Court was never given a reasonable opportunity to exercise its gatekeeping function to assess whether Dr. Smart's dosing-related opinions satisfy *Daubert*—and, indeed, the Court has never made such a finding. *See Carlson*, 822 F.3d at 200–01. Accordingly, Plaintiffs have not introduced admissible expert testimony regarding Xarelto's once-daily dosing regimen

---

[13] Defendants incorporate by reference their arguments in support of their *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens (Docs. 5113, 5114, 5688), their Motion For An Order (1) Dismissing With Prejudice Claims Based on Allegations that Plaintiffs Have Abandoned and (2) Barring Scientific Evidence Based on Waiver of *Daubert* Arguments (Doc. 6485), and Defendants' Renewed Motion to Exclude Certain Dosing-Related Opinions of Dr. Smart MD, FACC, FACP (Doc. 6673), and all other arguments to exclude those opinions or related testimony that Defendants have made in these proceedings—whether orally (as reflected in the transcript) or in writing.

and cumulative daily dose.  Defendants are due judgment as a matter of law to the extent Plaintiffs'

claim is based in any way on Xarelto's cumulative daily dose or once-daily dosing regimen.

    3.      Evidence regarding Xarelto's cumulative daily dose or once-daily dosing regimen

is irrelevant to this case because Plaintiffs have dismissed their design-defect claims with

prejudice.  Under Louisiana law, "[a] product is unreasonably dangerous because an adequate

warning about the product has not been provided if, at the time the product left its manufacturer's

control, the product possessed *a characteristic that may cause damage* and the manufacturer failed

to use reasonable care to provide an *adequate warning of such characteristic* and its danger to

users and handlers of the product."   La. Rev. Stat. Ann. § 9:2800.57(A) (emphasis added).

Defendants have provided adequate information regarding Xarelto's dosing or dosage strength.

**VII.    There is not a legally sufficient evidentiary basis for a reasonable jury to find that Defendants failed to use reasonable care on the basis (a) that Xarelto's label does not include a black-box warning or (b) that there is no "antidote" or reversal agent for Xarelto.**

      **A.      Plaintiffs have abandoned any black-box warning claim, there is no reliable expert testimony that Xarelto's label is inadequate because it lacks a black-box warning, and such a claim is preempted in any event.**

    1.      Plaintiffs have previously committed to the Court that they "do not intend to

advance [a black-box] argument at trial."  Pls.' Opp. to Defs.' Labeling Preemption MSJ (Doc.

5650) at 2 n.2.  Indeed, Plaintiffs declined to respond to Defendants' argument that federal law

preempts such a claim because—as Plaintiffs' own regulatory expert, Dr. Suzanne Parisian

concedes—a pharmaceutical company is forbidden from unilaterally adding a black-box warning

to its product's label.  *See* Defs.' Labeling Preemption MSJ (Doc. 5110), at 20–21 (citing cases).

And, when Plaintiffs reversed course and offered testimony about a black-box warning through

their expert Dr. Smart, the Court instructed the jury that "[a] black box or testimony about a black

box has no part and should play no part in this trial or your deliberations.  So please disregard

anything about a black box." 6/1/17 AM Trial Tr. 526:11–14. Accordingly, in light of Plaintiffs'
abandonment and the Court's instruction to the jury, the Court should grant Defendants judgment
as a matter of law to the extent that Plaintiffs' failure-to-warn claim is based on Xarelto's lack of
a black-box warning. *See, e.g.*, *Cologne v. Shell Oil Co.*, No. 12-735, 2013 WL 5781705, at *2–3
(E.D. La. Oct. 25, 2013) (Fallon, J.); *Overpeck v. Roger's Supermarket, LLC*, No. 12-124, 2013
WL 4500469, at *4 (N.D. Miss. Aug. 21, 2013).

    **2.**    Moreover, any claim that is premised on Xarelto's lack of a black-box warning is
preempted in any event because the governing regulations prohibit manufacturers from adding
black-box warnings without FDA's prior approval. Defendants previously moved for summary
judgment on this basis—noting as well that one of Plaintiffs' regulatory experts has expressly and
correctly conceded, a pharmaceutical company is forbidden from unilaterally adding a black-box
warning to its product's label (*see* Doc. 5110-1, at 20–21 (quoting Plaintiffs' regulatory expert Dr.
Suzanne Parisian))—but Plaintiffs failed to respond, instead stating that they did "not intend to
advance [a black-box] argument at trial." Doc. 5650, at 2 n.2. Defendants expressly incorporate
by reference here their earlier briefing on the question that federal law preempts any claim for
failure to include a black-box warning. *See* Doc. 5110-1, at 20–21; *see also, e.g.*, 21 C.F.R.
§ 201.80(e); 21 C.F.R. § 201.57(c); 44 Fed. Reg. 37434, 37448 (June 26, 1979); 51 Fed. Reg.
43900, 43902 (Dec. 5, 1986); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 817 F. Supp.
2d 535, 553 n.97 (E.D. Pa. 2011) (rejecting a claim that the manufacturer should have added a
boxed warning because "a boxed warning can be added only with prior FDA approval"); *cf.*
*Ackerman v. Wyeth Pharms.*, 526 F.3d 203, 311 n.12 (5th Cir. 2008). *See also generally See Mut.*
*Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2470 (2013); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620
(2011).

**B.     Plaintiffs have abandoned any claim regarding Xarelto's lack of a reversal agent.**

Plaintiffs questioned Mrs. Orr's treating physician Dr. Bui about the lack of a reversal agent for Xarelto. *See, e.g.*, 6/2/17 AM Trial Tr. 776:25–777:14. Plaintiffs have no reversal-agent-based claim—and the jury should not be entitled to reach a verdict on the basis of Xarelto's lack of a reversal agent—for two reasons.

**1.**     Plaintiffs previously asserted a claim based on Xarelto's lack of an antidote or reversal agent, but the claim was one for design defect. *See* Pls.' Opp. to Defs.' LPLA MSJ (Doc. 5524), at 1 ("Plaintiffs' design defect claims . . . posit that the absence of . . . a reversal agent rendered Xarelto unreasonably dangerous under the LPLA."). Plaintiffs have since dismissed their design-defect claim with prejudice. *See* Stipulation and Order (Doc. 6601). Accordingly, in light of that with-prejudice dismissal, the Court should grant Defendants judgment as a matter of law to the extent that Plaintiffs' claim is based in any way on Xarelto's lack of an antidote or reversal agent. *See, e.g.*, *Cologne*, 2013 WL 5781705, at *2–3; *Overpeck*, 2013 WL 4500469, at *4.

**2.**     The lack of a reversal agent for Xarelto is irrelevant to Plaintiffs' failure-to-warn claim. The Xarelto label has always advised that "[a] specific antidote for rivaroxaban is not available." USPI § 5.2; *see also* La. Rev. Stat. Ann. § 9:2800.57(A) ("[a] product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product"). La. Rev. Stat. Ann. § 9:2800.57(A) (emphasis added). Defendants have provided adequate information regarding this characteristic. Furthermore, Plaintiffs' sole warning claim is that Xarelto's label should have instructed physicians to use a PT test that would have allowed them to determine if Mrs. Orr had

recently used Xarelto, which allegedly would have informed a decision about when to perform surgery. The lack of a reversal agent is not relevant to Plaintiffs' failure-to-instruct theory regarding PT. Accordingly, there is no legally sufficient evidentiary basis on which a jury could find for Plaintiffs on a reversal-agent-based claim.

> **VIII.** **There is not a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on the basis of any of their other abandoned theories of liability, on which Defendants renew their motion to dismiss any such claims with prejudice.**

Defendants previously moved the Court for an order (1) dismissing with prejudice claims based on allegations that Plaintiffs have abandoned and (2) barring scientific evidence based on waiver of *Daubert* arguments. *See* Doc. 6485. Defendants hereby renew their motion and ask that the Court dismiss with prejudice any of Plaintiffs' claims that are based on theories of liability that Plaintiffs have since abandoned:[14]

- That Defendants failed to properly "test" Xarelto before bringing it to market;

- That Xarelto's label should have instructed physicians to perform routine monitoring of patients' PT;

- That Xarelto's label did not adequately warn of the risk of bleeding;

- That Xarelto's label should have included before September 2015 a chart quantifying bleeding rates specifically among U.S. participants in the 14,000-patient ROCKET AF clinical trial, the clinical trial that supported FDA's approval of Xarelto's atrial-fibrillation indication;

- That Xarelto's label should have included language advising of alleged problems with the INRatio device used to measure warfarin patients' coagulation parameters in ROCKET AF;

- That Xarelto's label should have included instructions to physicians to monitor patients' PT for the purpose of adjusting doses.

---

[14] Defendants incorporate by reference their arguments in support of their Motion For An Order (1) Dismissing With Prejudice Claims Based on Allegations that Plaintiffs Have Abandoned and (2) Barring Scientific Evidence Based on Waiver of *Daubert* Arguments (Docs. 5957, 6227), and all other related arguments that Defendants have made in these proceedings—whether orally (as reflected in the transcript) or in writing.

Furthermore, evidence regarding these characteristics is irrelevant under the LPLA. *See* La. Rev. Stat. Ann. § 9:2800.57(A). Defendants are due judgment on any claims based on these abandoned theories, particularly in light of Plaintiffs' decision to dismiss with prejudice their previously asserted design-defect claim. *See* Doc. 6601; *see also, e.g.*, *Cologne*, 2013 WL 5781705, at *2–3; *Overpeck*, 2013 WL 4500469, at *4.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant its motion for judgment as a matter of law.

Respectfully submitted,

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller

WILKINSON WALSH + ESKOVITZ LLP

By: /s/ *Beth A. Wilkinson*
Beth A. Wilkinson
Jennifer L. Saulino
Jeremy Barber
WILKINSON WALSH + ESKOVITZ LLP
1900 M. Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonwalsh.com
jsaulino@wilkinsonwalsh.com
jbarber@wilkinsonwalsh.com


NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ *David E. Dukes*
David E. Dukes
J. Mark Jones
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: (803) 799-2000
David.Dukes@nelsonmullins.com
Mark.Jones@nelsonmullins.com


ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Andrew K. Solow*

Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Chanda.Miller@dbr.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc. and Janssen Research*
*& Development, LLC*

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: */s/ John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 9th day of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/       John F. Olinde*