# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)    *       MDL 2592
PRODUCTS LIABILITY LITIGATION   *
                               *        SECTION L
THIS DOCUMENT RELATES TO:     *
     *Orr v. Bayer Corp., et al.*       *        JUDGE ELDON E. FALLON
     Case No. 2:15-cv-03708       *
                               *       MAGISTRATE JUDGE NORTH

* * * * * * * * * * * * * * * * * * * * * * * *

---

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF PLAINTIFFS' CASE

---

Plaintiffs submit this response in opposition to *Defendants' Motion for Judgment as a Matter of Law at the Closes of Plaintiffs' Case.*[1] For the reasons set forth below, the Defendants are not entitled to judgment as a matter of law under Fed. R. Civ. P. 50(a) because there is more than a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff. Defendants' motion should be denied and this case should be submitted to the jury.

## <u>LEGAL STANDARD</u>

As this Court stated when it denied Defendants' Rule 50 motion in *Boudreaux v. Janssen*:

Under Rule 50(a), judgment as a matter of law is appropriate when with respect to a given issue, a reasonable jury would not have a legally sufficient evidentiary basis for a finding for the opposing party in this particular issue. This generally occurs where the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors would not have such a contrary feeling, that it's clear on its face.

In applying the standard, the Court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party. The defendant in this case is the moving party; the plaintiffs are the nonmoving party. And the

---

[1] Rec. Doc. 6770-1.

court must not make any credibility determinations or even weigh the evidence. That's for the jury to determine.[2]

In ruling on a motion for judgment as a matter of law under Rule 50(a), the court should consider the "entire record."[3]

## ARGUMENT

## I.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER RULE 50 ON THE ISSUE OF SPECIFIC MEDICAL CAUSATION

Defendants assert that Plaintiffs have not satisfied their burden under Rule 50 because they have not proven that Xarelto **alone** was the cause of Mrs. Orr's hemorrhage. Defendants' argument assumes that Plaintiffs failed to make an evidentiary showing during their case-in-chief that could reasonably conflict with their specific causation theory that Mrs. Orr's hypertension along caused her hemorrhage. This argument is misguided under the LPLA and Rule 50 itself. First, Plaintiffs are not required to definitively "prove both general causation and specific causation" to survive a Rule 50 motion. *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 6:11-MD-2299, 2014 WL 4364832 (W.D. La. Sept. 2, 2014)(holding that the court does not consider the weight of evidence, credibility of witnesses, or the "better argument" in deciding Rule 50 motions); *Kevin M. Ehringer*

---

[2] *Boudreaux* Tr. at 1135:15-1136:5 citing *Brennan's Inc. v. Dickie Brennan & Co. Inc.,* 376 F.3d 356 (5th Cir. 2004).

[3] *Brown v. Slenker*, 220 F.3d 411, 421 (5th Cir. 2000) citing *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 120 S.Ct. 2097, 2109–10, 147 L.Ed.2d 105 (2000) (stating that a court should grant judgment as a matter of law under Rule 50(a) only when, **reviewing the entire record**, it finds "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party" and adding that "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence") (internal citations omitted).;*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (and the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same."); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (it therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record).

*Enterprises*, 646 F.3d at 325 (citing *Reeves v. Sanderson Plumbing Productions*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); *Brown*, 675 F.3d at 477. Likewise, under the LPLA, evidence that a product was a "substantial contributing cause" to injury is sufficient to establish causation. See *Oddo v. Asbestos Corp.,* 2014-0004 (La. App. 4 Cir. 8/20/15), 173 So. 3d 1192, 1210–11, writ denied, 2015-1712 (La. 11/6/15), 180 So. 3d 308 (finding that the plaintiffs only had the burden to show that exposure to a product was a substantial contributing cause to Plaintiffs' disease, not that exposure to product alone was a cause). Throughout this litigation, Plaintiffs have consistently maintained that Defendants' inadequate warning resulted in the inability of Mrs. Orr's doctors to aggressively intervene, thus causing Mrs. Orr's life-ending injury. Defendants' motion makes no mention of this prong of Plaintiffs' causation claim.

In Louisiana, Defendants' liability for damages is not mitigated by the fact that the Mrs. Orr's pre-existing physical infirmities contributed to the consequences of her injury by the Defendants.  It is well-known that a defendant takes his victim as he finds him and is responsible for ***all natural and probable consequences*** of his tortious conduct. *Bienemann v. State Farm Mut. Auto. Ins. Co.*, 08–1045, p. 4 (La.App. 3 Cir. 2/4/09), 3 So.3d 621, 623 (quoting *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993)). An "eggshell plaintiff" is required only to establish a causal link between the tortious conduct and the aggravation of his pre-existing condition.

Here, Plaintiffs presented expert testimony throughout their case-in-chief which supports a finding that Xarelto ***at the very least*** played a role in Mrs. Orr's ultimate injury. The following is only a small sample of admitted testimony sufficient to create a causation question of fact for the jury:

Dr. Francisco Cruz, Mrs. Orr treating nephrologist doctor treating, could not state the hemorrhage was caused by hypertension:

Q:    Do you know what caused Sharyn's intraventricular hemorrhage?

A:    No.

Q:    Were you surprised to learn that Sharyn had passed?

A:    Yes.

Q:    Why is that?

A:    She was very functional and stable. The last time I saw her, she didn't have any complaints. We had a plan in action. She was pretty typical-type patient that I see. I expected her to continue down this path, maybe be on dialysis one day, but didn't see any reason to think otherwise.[4]

* * *

Q:    And in a patient like Mrs. Orr with these readings, how would you characterize her blood pressure?

A:    Not at goal. I would say they were uncontrolled, but I don't think these numbers put her at a danger for stroke. [5]

Dr. Cuong Bui, Mrs. Orr's treating neurosurgeon testified that:

Q:    You don't have any reason to believe that she had an underlying medical condition that caused intracranial pressure?

A:    No.[6]

* * *

Q:    On the CT scans, I think you told us previously that the CT scan in terms of the hemorrhage, it did not look like the classic hypertension type of brain bleed, right?

A:    It's not in the more common locations for hypertension.[7]

_____

[4]Tr. at 630:4-14.

[5] Tr. At 600:7-10
[6]Tr. 756:19-21.

[7]Tr. at 796: 13-16.

4

* * *

Q:   Doctor, we can agree that in terms of the brain bleed and how Sharyn Orr's bleed looked on the CT scan, did it look like a classic hypertensive bleed in the areas where those normally occur?

A:   It did not to me. It did not look like a classic.[8]

* * *

Q:   So at least you agree that Xarelto is a substantial contributing cause to her bleed?

A:   Yes[9]

* * *

Q:   And with your experience with people having hemorrhages on anticoagulants, not on anticoagulants, on warfarin, on other anti-DOAC, anticoagulants like Xarelto or Pradaxa or whatever, as we sit here today, you cannot say that this hemorrhage would have been any different had she been on any other anticoagulant, can you?

A:   Well, I mean, I think that in general, from the neurosurgical community, we're much more comfortable dealing with anticoagulation such as warfarin because we have the ability to give reversal agents very quickly and would likely give us in general more options upfront.[10]

* * *

Q:   Now, anticoagulants do not actually cause a vessel to rupture; is that right?

A:   ...So what I do know is anticoagulations [sic] have a known risk, an increased risk for hemorrhages. As to the actual-- what triggers the blood vessel breakage, whatever, I simply just don't know.[11]

---

[8]Tr. at 796:24- 797:3

[9] Tr. at 797:20-22.

[10] Tr. at 816: 3-13.

[11]Tr. at 818: 5-11.

* * *

A:    I think that, if she's not been on an anticoagulation, I think the only thing I would have done differently probably would have been to place the ventricular catheters earlier, upon admission, rather than waiting until the next morning or the next day.[12]

* * *

Q:    The reason you wanted to intervene and place these catheters earlier was because that would have given her a greater chance of a positive outcome, right?

A:    That may have relieved the pressure faster. Yes.

Q:    When you see increased intracranial pressure like that that Mrs. Orr had, you want to intervene as soon as possible, right?

A:    Yes.

Q:    The reason that you want to do that is because, when it relates to strokes and increased pressure from hemorrhage, time is brain, right?

A:    Yes. [13]

* * *

Q:    Can you state to a reasonable degree of medical probability, meaning more likely than not, whether the Xarelto had anything to do with her hemorrhage?

A:    I would have to assume that being on anticoagulation contributes to that for sure, yes.

Q:    Okay. So is it fair to say that you think that her being on Xarelto contributed to the bleed, right?

A:    There's no way to know exactly what causes a bleed. We do know that anticoagulation increases the chances for spontaneous hemorrhage. Besides hypertension, I didn't see any other obvious lesions or reasons for her to have a spontaneous hemorrhage.[14]

Dr. Peter Liechty, plaintiff's expert neurosurgeon testified that:

---

[12] Tr. at 788:789:2
[13] Tr. at 789:13-24
[14] Tr. at 796:1-12

Q:   Did this issue, the fact that Mrs. Orr by history had been taking
     Xarelto, become a significant factor to be taken into account as to
     the timing and nature of treatment that could be given to Mrs. Orr
     as the events unfolded?

A:   Yes.[15]

* * *

Q:   …from your perspective as a neurosurgeon that's having to deal
     with patients that may have coagulation disorders and are on
     anticoagulants, what's the significance of those test results in a
     patient like Mrs. Orr?

A:   Well, basically, if a patient isn't on any medication that would
     affect the clotting of the blood, the—it is fairly safe to assume that
     these are normal and the patient is not anticoagulated.[16]

* * *

Q:   Is it fair to state, then, that these numbers, these normal tests of
     coagulation function- there would be no suggestion from that
     information that she was anticoagulated or had a disease of the
     coagulation system?

A:   It would appear as though, yes.[17]

* * *

Q:   There was some discussion with Dr. Bui about the basal
     ganglia as to whether or not the parts of the brain that make
     up the basal ganglia were affected by the bleed or were the
     origin of the bleed. What's your view in the involvement of
     the basal ganglia?

A:   They were basically unscathed.

Q:   When you say "unscathed," do you mean they look relatively
     normal anatomically on this CT?

A:   They do.[18]

* * *

---

[15] Tr. 979:9-13
[16] Tr. at 974: 13-22
[17] Tr. at 975:5-9
[18] Tr. at 993:3-11.

Q:    So, as you look at the CT scan for Mrs. Orr, is there any true intracerebral component or intraparenchymal component, meaning the brain tissue itself is destroyed by hemorrhage?

A:    No.[19]

* * *

Q:    And then, as we'll get into going forward, again, what is the general importance of that for Mrs. Orr in terms of her prognosis and the issue of whether or not treatment, timely treatment, might matter to her?

A:    It basically just offers a much better prognosis if brain tissue itself is not destroyed, especially these deep nuclei that are so important to our function.[20]

* * *

Q:    And Doctor, absent Xarelto, could the intervention, by way of EVD and administration of TPA that was required for her, have been performed as soon as Mrs. Orr arrived at a facility that could perform it?

A:    Yes

Q:    But in Mrs. Orr's situation, was she able to get that surgery in a timely basis in your opinion?

A:    No.[21]

* * *

Q:    In your experience as a neurosurgeon, have you been able to successfully treat patients like Sharyn Orr who have CT scan that look like this through the treatment you just described?

A:    Yes.[22]

* * *

---

[19]Tr. at 994:12-15.

[20] Tr. at 994: 16-22.

[21]Tr. at 1031: 11-18.

[22] Tr. at 999: 14-18

A:     My opinion is that she had at least a 60% chance of a reasonably functional outcome.[23]

\* \* \*

Q:     Doctor, based upon the materials that you reviewed in this case, as well as your training, education, and professional experience, do you have an opinion that you hold to a reasonable degree of medical certainty that Xarelto played a role in Mrs. Orr's primary intraventricular hemorrhage?

A:     Yes.

Q:     And what is that opinion, Doctor?

A:     My opinion is that it essentially contributed to the hemorrhage.[24]

Referring to Mrs. Orr's home blood pressure readings, Dr. St. Martin, plaintiff's treating cardiologist testified:

A:     They look pretty good to me. One or two elevated.[25]

\* \* \*

Dr. St. Martin further testified that:

Q:     You saw in those notes from a treating neurologist that he assessed that Xarelto - that her IVH, her intraventriculat hemmorhage, was secondary to Xarelto, and you agreed with that assessment, right?

A:      It's a likely thing, yes.

Q:     Pardon me?

A:     It's a likely thing. Either that or it was spontaneous and Xarelto could have made it worse.[26]

---

[23]Tr. at 1032:1-2.

[24]Tr. at 1030:6-14.

[25]Tr. at 1760:9-13.

[26]Tr. at 1761: 22-1762:4.

As the testimony above illustrates, causation evidence does not point but one way. *See Thibodeaux v. Wellmate*, No. CV 12-1375, 2016 WL 3144374, at 3 (E.D. La. June 6, 2016). In considering the entirety of the record, not just testimony favorable to Defendants that the jury is not required to believe, it is apparent that reasonable inferences may support Plaintiffs' causation claims. All such inferences must be resolved in Plaintiffs' favor under Rule 50.   As such, Defendants' motion should be denied.

## II.   DEFENDANTS ARE NOT ENTITLED TO A DIRECTED VERDICT UNDER RULE 50 ON THE LEARNED INTERMEDIARY DOCTRINE

In Louisiana, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[27] Accordingly, "[t]he treating physician's knowledge is thus the focus of the inquiry."[28] In this context, the "treating physician" is not limited to the plaintiff's prescribing physician but extends to non-prescribing healthcare providers "who are in positions to act on such information so as to reduce or prevent injuries to patients."[29]

---

[27]*McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999) (emphasis added), *citing Mikell v. Hoffman-Laroche, Inc.*, 649 So. 2d 75, 79 (La. App. 1st Cir. 1994).

[28]*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 280 (5th Cir. 2002).

[29]Restatement (Third) of Torts: Product Liability § 6(d) (1997); *see also Stahl*, 283 F.3d at 267, 269-70, *citing* Restatement (Third) of Tort §§ 6(b), 6(d) (applying learned intermediary doctrine); *Georges v. Novartis Pharm. Corp.*, No. CV 06-05207, 2013 WL 5217198, at *9 (C.D. Cal. Apr. 4, 2013) (finding that dentist "may be in the class of learned intermediaries 'in a position to reduce the risks of harm' to whom Defendant owed a duty to warn"); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 307-308 (W.D. Ky. 2011) (extending learned intermediary status to plaintiff's non-prescribing physicians noting that "[i]t is impossible to read the learned intermediary rule through [defendant's] proposed lens given the interplay between multiple physicians, numerous procedures, and countless drugs to which cancer patients are subjected."); *Stevens v. Novartis Pharm. Corp.*, 247 P.3d 244, 260 (Mont. 2010) (describing scope of learned intermediary doctrine as applying to any healthcare professional responsible for making decisions regarding the patient's case); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Ore. 1974) ("Although the ethical drug manufacturer's duty to warn has been discussed most often with reference to the prescribing physician, the [doctrine's] reasoning applies with equal force to the treating physician … [who] may be more likely to observe the actual symptoms of the drug's untoward consequences.").

A two-pronged test governs the application of the "learned intermediary" doctrine in warnings cases under the LPLA: (1) Plaintiff must show that the Defendant manufacturer failed to communicate to one or more doctors as learned intermediaries, adequate information by way of warnings and instructions about the risks of its drug not otherwise known to the doctor(s); and (2) Plaintiff must show that this failure to warn or instruct was a proximate cause of Plaintiffs' harm. Plaintiffs have urged the Court to instruct the jury that it may consider either "subjective" or "objective" evidence to meet the second prong of learned intermediary causation.[30]

At trial, Dr. Frank Smart, Plaintiff's expert cardiologist, testified that no reasonable physician would prescribe Xarelto for patients with atrial fibrillation, knowing what he knows about Xarelto.[31] As set forth below, Mrs. Orr's prescribing physician, Dr. St. Martin, did not know what Dr. Smart knows. Dr. Smart explained that Xarelto's dose is too high and that its pharmacokinetics and pharmacodynamics makes it a twice-daily drug being marketed unsafely as once-daily drug.[32] Dr. Smart testified that these characteristics make it worst in class.[33] Dr. Smart

---

[30]*See Plaintiffs' Bench Memorandum In Support Of The Inclusion Of The "Objective" Evidence Standard In The Second (Causation) Prong Of The "Learned Intermediary" Doctrine In The Jury Instructions* (Rec. Doc. 6731) which is incorporated herein as if set forth in its entirety; Jury Charge given in *Boudreaux* (R.D. 6393 at pp. 18-22); *Allgood v. GlaxoKline, PLC,* 2008 WL 483574 (2008) [citing the Fifth Circuit decision in *Stahl v. Novartis Pharm Corp.,* 283 F.3d 254 (5th Cir. 2012)]; *Grenier v. Medical Engineering Corp.,* 243 F.3d 200 (5th Cir. 2001); *Calhoun v. Hoffman-LaRoche, Inc.,* 768 So.2d 57 (La. App. 2000).

[31]Tr. at 371:3 to 371:15.

[32]Tr. 334:11 to 334:21 (testifying that when he discovered that the pharmacokinetic, pharmacodynamic properties of Xarelto suggest the drug should be administered twice a day, that "what was eye-opening … was that the [FDA] clinical reviewers concluded the same thing that I did … they arrived at the same conclusion, that this drug would be better administered twice a day); Tr. at 339:18 to 339:23 (testifying that Dr. Califf's recommendation that Defendants undertake a Rocket 2 dose finding study was based on "the pharmacokinetics and pharmacodynamics that we've already discussed, anybody with an eye for those types of scientific studies will quickly conclude that the drug should be administered twice a day").

[33]Tr. at 344:24 to 345:3 (explaining that the clinical trials for Eliquis and Pradaxa and Xarelto –is the basis for the opinion that Xarelto is worst in class); Tr. at 342:24 to 343:9 ("as we said that Xarelto was the worst in the class of these drugs. It was never known to be superior to warfarin for either stroke or bleeding. But Eliquis, or apixaban, was shown to be superior for both. So now, if you were looking at it from a physician's perspective, you've got one drug that you take twice a day, but it's better than warfarin for stroke, better than warfarin for bleeding risk. You've got another drug that you take once a day that is not any better than

testified that the label does not adequately convey the true risk-benefit profile of Xarelto, and therefore, the safety information provided by the companies is not adequate.[34]

Dr. St. Martin testified that he learned about Xarelto from the label, by attending continuing medical education seminars, discussing it with colleagues and reviewing medical literature.[35] He testified that none of those sources, including the Xarelto label in effect at the time of Sharon Orr's death, adequately communicated that there was a 50% increase risk of major bleeds on Xarelto versus warfarin when looking at U.S. population only.[36] He testified that if he knew about such an increased risk versus warfarin for U.S. patients, he would have confirmed the risk and research the reason for the increased risk.[37] However, he did not look into the increased risk do because he did not know about it (as it was not in the label).[38] Dr. St. Martin conceded that had he confirmed that there was a statistically significant 50% increased risk of major bleeds, he would tell his patients about the increased risk and they did not want to take that risk, he would consider other options and would recommend that that his patients at least try Warfarin, Savaysa, Eliquis and Pradaxa before Xarelto.[39]

---

warfarin, and when you compare this drug  with Eliquis directly, it does not hold up either); Tr. at 353:17 to 353:22 (explaining that his opinion that Xarelto is worst in class is supported by the what the FDA documents and opinions about Xarelto); Tr. at 355:4 to 357:7 (explaining that the FDA's and several advisory committee members recommended Xarelto as a second line further supports his opinion that Xarelto is worst in class among  explaining that "it's a four-horse race, and they are the fourth horse."); Tr. at 368:17 to 369:3 (explaining that the use of the recalled defective InRatio point of care device in ROCKET calls into question the results of the trial where the trial a problem in the Warfarin arm because TTR was low compared to other modern trials).

[34] Tr. at 371:3 to 371:15.

[35] Tr. at 1737:17 to 1738:16; 1738:17 to 1738:25 (his understanding that there is no way to measure the anticoagulant effect is based on his understanding from all of these various sources).

[36] Tr. at 1752:1 to 1753:4.

[37] Tr. at 1755:18 to 1755:25.

[38] Tr. at 1756:1 to 1756:2.

[39] Tr. at 1756:14 to 1757:4.

In contrast to Dr. Smart, who explained that he has now learned that Xarelto's dose is too high and that its pharmacokinetics and pharmacodynamics makes it a twice-daily drug being marketed unsafely as once-daily drug,[40] making Xarelto worst in class,[41] Dr. St. Martin testified that, if he knew that Xarelto was worst in class among the NOACs considering safety and efficacy, he would have discussed this with his patients.[42] Unlike Dr. Smart, who testified about the Kim article in the Canadian Journal of Cardiology,[43] Dr. St. Martin testified that he has never seen any real world literature that compares Xarelto, Eliquis and Pradaxa and Defendants did not provide him any such information either through the label or through CMEs or through literature.[44] He testified that if his patients asked to be prescribed the best in class rather than the worst, he would probably put them on a different drug than Xarelto.[45] He conceded that when he was making his

---

[40]Tr. 334:11 to 334:21 (testifying that when he discovered that the pharmacokinetic, pharmacodynamic properties of Xarelto suggest the drug should be administered twice a day, that "what was eye-opening … was that the [FDA] clinical reviewers concluded the same thing that I did … they arrived at the same conclusion, that this drug would be better administered twice a day); Tr. at 339:18 to 339:23 (testifying that Dr. Califf's recommendation that Defendants undertake a Rocket 2 dose finding study was based on "the pharmacokinetics and pharmacodynamics that we've already discussed, anybody with an eye for those types of scientific studies will quickly conclude that the drug should be administered twice a day").

[41]Tr. at 344:24 to 345:3 (explaining that the clinical trials for Eliquis and Pradaxa and Xarelto –is the basis for the opinion that Xarelto is worst in class); Tr. at 342:24 to 343:9 ("as we said that Xarelto was the worst in the class of these drugs. It was never known to be superior to warfarin for either stroke or bleeding. But Eliquis, or apixaban, was shown to be superior for both. So now, if you were looking at it from a physician's perspective, you've got one drug that you take twice a day, but it's better than warfarin for stroke, better than warfarin for bleeding risk. You've got another drug that you take once a day that is not any better than warfarin, and when you compare this drug with Eliquis directly, it does not hold up either); Tr. at 353:17 to 353:22 (explaining that his opinion that Xarelto is worst in class is supported by the what the FDA documents and opinions about Xarelto); Tr. at 355:4 to 357:7 (explaining that the FDA's and several advisory committee members recommended Xarelto as a second line further supports his opinion that Xarelto is worst in class among explaining that "it's a four-horse race, and they are the fourth horse."); Tr. at 368:17 to 369:3 (explaining that the use of the recalled defective InRatio point of care device in ROCKET calls into question the results of the trial where the trial a problem in the Warfarin arm because TTR was low compared to other modern trials).

[42]*Id.*

[43]Tr. at 319:23 et seq. and 343:16 et seq.

[44]Tr. at 1757:1 to 1757:12.

[45]Tr. at 1757:18 to 1757:23.

prescribing decision for Mrs. Orr, he did not know whether Xarelto was worst in class or not.[46] Additionally, had he known Xarelto was worst in class he would not have prescribed Xarelto for Mrs. Orr, considering the fact that she was at risk for a stroke or other type of bleeding event based on her high blood pressure and other medical conditions.[47] Finally, Dr. St. Martin testified that, had he been adequately informed that Eliquis was superior for safety and efficacy, he would have considered recommending it instead of Xarelto.[48]

It is well-settled law in Louisiana that:

> [w]here the Defendants are shown to have failed to adequately warn or instruct a prescribing doctor about a drug, the learned intermediary doctrine does not relieve the manufacturer of legal responsibility. **In other words, in that circumstance the prescribing doctor cannot be a "learned intermediary because he was not adequately warned by Defendants**.[49]

Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, Defendants' Rule 50 motion should be denied. There is more than a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiffs have met the second prong of the learned intermediary doctrine.

Plaintiffs have similarly presented more than adequate evidence for a reasonable jury to conclude that Plaintiffs have met the second prong of the learned intermediary doctrine as it applies to her treating neurosurgeon, Dr. Bui. This physician delayed Mrs. Orr's surgery because he could not determine with certainty when she took her last dose of Xarelto, and thus was unable to assess her anti-coagulation status while she was in a life-or-death serious medical condition for which surgery was needed.

---

[46]Tr. at 1758:2 to 1758:4.

[47]Tr. at 1760:17 to 1761:1.

[48]Tr. at 1758:1 to 1758:13.

[49]Rec. Doc 6393, at 21.

This Court has ruled that Defendants' duty to provide adequate instructions extended to Mrs. Orr's treating physician, Dr. Bui, who could have reduced the risks associated with Xarelto but for the Defendants' failure to warn or instruct.[50] Dr. Parisian, Plaintiff's regulatory expert testified as follows:

> Q.    Does the United States' label for Xarelto recommend PT for assessing the anticoagulant effect of Xarelto?
>
> A.    No.
>
> Q.    Should it?
>
> A.    Yes.
>
> Q.    Why should it?
>
> A.    Because I -- the physicians who are treating patients or nurses, they need to know that it affects -- it is a simple test and it will at least give you a ballpark figure as to the amount of Xarelto on board and the likelihood of this patient to clot or not clot, particularly if you are going to take them to the OR.
>
>        So it is not being used and it needs to be in there so that people can at least give it to the doctors and let them put it in their differential as to how to use this for the patient.
>
> Q.  So, in your opinion, it is helpful information?
>
> A.    If I was in the ER and I had a bleeding patient, I would want to know this. Or if I had an overdose patient, I would want to know this. What can I do to determine what the effect of the Xarelto is on this patient if I have clotting time? Does it mean anything? At this point in time, it's a lot of confusion because it doesn't say that it means something. So you have taken away a laboratory test that's -- an old laboratory test that has been around and added lot of confusion about it.
>
> Q.    And you used to be an emergency room doctor?

---

[50]*See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 U.S. Dist. LEXIS 58056, *8 (E.D. La. April 17, 2017).

A.      Right.  So I would look at this as if I had a bleeding patient.[51]

The surgical delay and the increased risk to Mrs. Orr could have been avoided if Defendants had provided an instruction about PT testing,[52] which they failed to do.

Plaintiff has presented an abundance of testimony at trial about PT as a helpful test; much of it through Bayer's own documents and the testimony of Bayer's own witnesses:

- During the trial, Plaintiffs presented the redacted Canadian Label for Xarelto that is endorsed and supported by Bayer.[53]  This document is dated 2014, and therein Bayer admits to the beneficial uses of PT testing that should have been in the label to help save persons like Mrs. Orr. Bayer, in fact, used PT with a neoplastin reagent in their development program, and was well aware of the correlation between the prothrombin time prolongation in seconds and the concentration of rivaroxaban present in the patient plasma.[54]

- A PT test is suitable if you want to make a qualitative assessment of the presence of rivaroxaban in the blood. PT was used by Bayer for PK/PD measurements in the Phase II Study programs.[55]

- Although monitoring is required for certain groups of patients with very special situations, such as patients with impaired renal function or worsening renal function on treatment, emergency settings, and patients requiring emergency situations, the label does not make any recommendation that those patients need to be measured.[56]

- The point of being able to measure Xarelto plasma concentrations is that it allows clinicians to know whether a patient is taking Xarelto if it was not present.  If there were concentrations present, to make decisions related to proceeding with an invasive procedure or not proceeding with an invasive procedure; if high levels were present in a specific clinical setting, to

---

[51]Tr. at 1546:2 to 1547:2; 1555:10 to 1556:12.

[52]Id at 5-6.

[53]Tr. at 1688:12-20 (the Document states:  "Although there is no need to monitor clinical practice, in certain infrequent situations such as overdosage, acute bleeding, urgent surgery, in cases of suspected noncompliance, or in other unusual circumstances, assessment of the anticoagulant effect of rivaroxaban may be appropriate. Accordingly, measuring PT using the Neoplastin reagent, or Factor Xa assay using rivaroxaban-specific calibrators and controls may be useful to inform clinical decisions in these circumstances.")

[54]Tr. at 651:11 to 652:10 (Spiro).

[55]Tr. at 703:19-25 (Spiro).

[56]Tr. at 698:14-699:1; 703:2-8 (Spiro).

stopping the medication until whatever clinical setting that was resolved. There could be a number of specific actions taken other than dose adaptation.[57]

- The use of a rivaroxaban test in these patients would confirm the prudent use of the drug or the nonuse of the drug in the specific clinical situation.[58]

- Medical literature demonstrates that doctors order laboratory tests such as a PT or a Neoplastin PT or a HepTest or an anti-factor Xa test to determine the patient's level of anticoagulation. With the basis for this being that it is known, among other things, from Phase II studies that there is a correlation between PT and rivaroxaban concentration.[59]

- Rivaroxaban has influence on the prothrombin time, so rivaroxaban fulfills its pharmacodynamic role, which is anticoagulation and that pharmacodynamic role of Xarelto in the process of anticoagulation can be measured through the PT. This has been known for years and it has been part of the very basic understanding of how Xarelto affects the human clotting cascade.[60]

- The various forms of Bayer labeling or company core data sheets specifically state and talk about how the PT is highly or closely correlated with the level of rivaroxaban in a patient's blood. Those various documents specifically state that if a physician is in a clinical situation where he or she wishes to learn that information about the anticoagulation status of a patient taking rivaroxaban or Xarelto, that they can order a PT test to learn that information about the patient. The PT test can be applied in certain situations, but in other situations this doesn't have any particular meaning.[61]

- The company has known for years that in specific urgent situations, for example, overdose or the need for an emergency operation, this could provide some orientation for the doctor.[62]

- When asked why the physician(s) chose to include the patient's PT, the patient's PTT, and the INR as data that wanted to receive on the Xarelto follow up questionnaire, Dr. Horvat Bröcker responds that these are the tests that can be done and that doctors will do in the case of a patient who's suffering from pleading [sic – bleeding]. The global safety leaders took the

---

[57]Tr. at 705:15 to 706:7 (Horvat Bröcker).

[58]Tr. at 706:8 to 706:19 (Horvat Bröcker).

[59]Tr. at 830:18 to 831:6 (Horvat Bröcker).

[60]Tr. at 831:10 to 831:23 (Horvat Bröcker).

[61]Tr. at 831:24 to 832:12 (Horvat Bröcker).

[62]Tr. at 832:13 to 832:17 (Horvat Bröcker).

position that they wanted to know what the anticoagulation status of a Xarelto patient was when they had a bleeding event, if possible.[63]

- If you use Neoplastin Plus as the reagent for PT, you can indirectly measure plasma concentrations of Xarelto.[64]

- I believe in those rare circumstances where you would have a desire to understand if there is drug in your system, for example, for compliance, if there's a patient that goes in for emergency surgery, it would be a benefit to have that information. That information being that fact that PT using the Neoplastin reagent could be used as an indirect measurement of plasma concentration of Xarelto.[65]

- The only thing that was communicated to ClinPharm, as a pharmacology lead, was that PT again, using the proper reagent could be used as an indirect measure of drug concentration. The importance of that is a clinical determination.[66]

- If a physician wanted to indirectly measure rivaroxaban concentrations in plasma, they can use PT with Neoplastin Plus reagent, yes.[67]

- So PT and Anti-factor Xa in my mind would be two reasonably good indirect ways of measuring rivaroxaban concentration in plasma.[68]

- If the doctors at Ochsner Baptist or Ochsner Main knew that a normal PT meant Mrs. Orr was not anticoagulated, then that they could have proceeded in an emergent fashion and they could have been ready for her. The bilateral ventriculostomy procedure only took 16 minutes. While PT is not perfect, it certainly implied that she didn't have meaningful levels of Xarelto on board and they could have proceeded with emergent surgery.[69]

- The American Heart Association published an article in Circulation in March of 2017 that included a table in its official journal that if a physician is concerned about assessing or trying to detect the presence of rivaroxaban, you can use the prothrombin time (PT).[70]

---

[63]Tr. at 838:4 to 832:20 (Horvat Bröcker).

[64]Tr. at 838:23 to 832:25 (Moore).

[65]Tr. at 849:15 to 849:18 (Moore).

[66]Tr. at 850:12 to 850:20 (Moore).

[67]Tr. at 850:16 to 850:18 (Moore).

[68]Tr. at 911:19 to 20 (Moore).

[69]Tr. at 1036:2 to 1037:5 (Liechty).

[70]Tr. at 1153:8-18 (Liechty).

- The American Heart Association, in a section entitled "How to Measure Effect", also says to use a PT test to detect presentation of rivaroxaban.[71]

- The American Society of Hematology also states that commonly available tests to assess for presence of rivaroxaban is PT.[72]

- The PT was considered suitable. The others were not considered to be suitable. But doesn't mean that it would be reliable, validated, et cetera. What's available now in the U.S., because in Europe there is a specific assay for rivaroxaban that is not yet approved in the U.S.  All we have is the prothrombin time.[73]

- If you use a PT with a Neoplastin plus reagent which is sensitive that then you can get some fix, some semi-quantitative fix on the rivaroxaban concentration, but would recommend using the assay that's the specific for rivaroxaban.[74]

At trial, Dr. Peter Liechty, plaintiff's expert neurosurgeon, testified that given Mrs. Orr's clinical presentation upon arrival to Ochsner main in the early morning hours of April 25, 2015, a reasonable neurosurgeon would have surgically intervened sooner if he or she knew if Mrs. Orr had not taken Xarelto the evening before.[75]

Plaintiff's treating neurosurgeon Dr. Cuong Bui testified at trial that:

- He thought that it would have helped to know whether Xarelto was still on board in caring for Mrs. Orr.[76]

- He had no idea that a PT test, like the one that Mrs. Orr had when he was treating her, had any meaning.[77]

- He was put in a position to guestimate whether Ms. Orr was "therapeutic" in terms of having Xarelto on board - "*I think, in this case, you know, things*

---

[71]Tr. at 1154:12-16 (Liechty).

[72]Tr. at 1155:6-11, 1156:1-4 (Liechty).

[73]Tr. at 1173:21 to 1174:25 (Berkowitz).

[74]Tr. at 1207:13 to 24 (Berkowitz).

[75]Tr. at 1037:6 to 1037:111.

[76]Tr. at 780:25 to 781:6; 786:16 to 786:18.

[77]Tr. at 780:25 to 781:6.

> *were relatively urgent, dire. And so I think we made a best-guess estimate that, by 12:00 or 2:00 P.M. the next day that the Xarelto had cleared.*"[78]

- He had to assume that Mrs. Orr had taken Xarelto because "*there was no established test to actually -- a test for that and there was no established medication to reverse that effect.*"[79]

- Having a lab test that would readily and quickly give the answer as to whether Xarelto was on board – "*would have certainly added to the amount of information I had to make a decision.*"[80]   "***Yes.  So, I mean, if I had that test, it would have been helpful***" especially in a patient like Ms. Orr who could not tell you when she had taken her last dose.[81]

- Having such a lab test would have "added value to the whole clinical decision-making process."[82]

Additionally, at trial Dr. Bui explained how Mrs. Orr's medical care was impacted by

Defendants' failure to inform him that there was test (PT) to assess Mrs. Orr's coagulation status:

- the neurosurgical team delayed surgical intervention after examining Ms. Orr upon arrival around 1 am.[83]

- Xarelto:

  o complicated the decision making process for the timing of the surgical placement of the catheters: "*I think that it would be fair to say that the fact that she was on the blood thinner Xarelto played into the  complicated decision-making process for the timing of the placement of the catheter .... The other factor was to be conservative and make sure that the Xarelto -- or the potential of Xarelto being on board had cleared.  So they were sort of concomitant factors.*"[84]

---

[78]Tr. at 775:15 to 775:18.

[79]Tr. at 774:16 to 775:18; 775:3 to 775:5.

[80]Tr. at 786:16 to 786:18.

[81]Tr. at 787:1 to 787:6 (emphasis added).

[82]Tr. at 787:11 to 787:12.

[83]Tr. at 754:21 to 755:8.

[84]Tr. at 769:23 to 770:11.

- ○ was one of the primary reasons why the surgical procedure to give Mrs. Orr a chance was delayed.[85]

- He waited to do surgery until Xarelto cleared but had to guess because no test / no reversal agent existed:

    *To the best of my knowledge at that time, there was no established or proven test that -- or blood test that I could do to test how much of the Xarelto was on board, whether she was truly therapeutic or not. Reversal, so there are certain products that you can give patients to enhance their coagulation when they're on certain types of medications. It was my understanding that for Xarelto that those commonly administered pro-hemostatic agents, which are agents that sort of enhance your clotting ability, was not effective while the drug was still active in the bloodstream"* [86] [87]

- He probably would have done the surgery "*upon admission" rather than waiting until the next morning or the next day"* [88] because earlier treatment equals better chance for outcome by relieving pressure faster and increase pressure means the longer the brain is ischemic and the more cells are likely to be impaired .[89]

Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, as the Court must, Defendants' Rule 50 motion should be denied because there is more than a legally sufficient evidentiary basis for a reasonable jury to find that Defendants' inadequate warning proximately caused Mrs. Orr's injuries.

## III.   DR. BUI IS A LEARNED INTERMEDIARY TO WHOM DEFENDANTS HAD A DUTY TO INSTRUCT UNDER 21 CFR 201.57(C)(6)(III), WHICH REQUIRES DRUG COMPANIES LIKE DEFENDANTS TO IDENTIFY LABORATORY TESTS HELPFUL IN THE WARNING AND PRECAUTIONS OF THE LABEL

---

[85]Tr. at 770:24 to 771:4; 773:21 to 773:24.

[86]Tr. at 776:25 to 777:14.

[87]He further testified that the fact that he had to wait for the Xarelto to clear before he could undertake the procedure was as reflected in his notes: "Now that her Xarelto has had a chance to clear." Tr. at 784:24 to 785:1.

[88]Tr. at 788:18 to 789:12.

[89]Tr. at 792:5-9; 788:18 to 789:12; 791:10 to 791:1.

In product liability claims involving prescription drugs, Louisiana applies the "learned intermediary doctrine," which permits a drug manufacturer to discharge its duty to warn consumers by adequately warning physicians.  "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the **treating physician**."[90] Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[91] Under the learned intermediary doctrine, a failure-to-warn claim requires that the plaintiff meet a two-pronged test:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.  Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.[92]

Under the LPLA, the duty to warn encompasses a duty to provide adequate instruction for the safe use of a product.[93] In the context of learned intermediary, this duty extends to any healthcare provider in the position to make the use of the product safe. In Louisiana, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[94] Accordingly, "[t]he treating physician's knowledge is thus the focus of the inquiry."[95] In this context, the "treating physician" is not limited to the plaintiff's prescribing

---

[90]*Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 268 (5th Cir. 2002) (original emphasis).

[91]*Id.* at 267, *quoting McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 41, 413 (E.D. La. 1999).

[92]*Stahl,* 283 F.3d at 265-66.

[93]La. R.S. § 9:2800.53.

[94]*McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999) (emphasis added), *citing Mikell v. Hoffman-Laroche, Inc.*, 649 So. 2d 75, 79 (La. App. 1st Cir. 1994).

[95]*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 280 (5th Cir. 2002).

physician but extends to non-prescribing healthcare providers "who are in positions to act on such information so as to reduce or prevent injuries to patients."[96] Dr. Bui was most definitely a physician in such a position.

Applying this analysis to the matter at bar, this Court has correctly concluded that Defendants' duty to provide adequate instructions extended to Mrs. Orr's treating physicians, Dr. Bui, who could have reduced the risks associated with Xarelto. As the jury heard during trial, Defendants duty to treating physicians is found at 21 CFR 201.57(c)(6)(iii), which requires drug companies like Defendants, identify laboratory tests **helpful in following the patient's response** in the Warning and Precautions of the label.[97] Under 21 CFR 201.57(c)(6)(iii), the Defendants had a clear duty to identify any helpful laboratory tests, like PT, so that Mrs. Orr's neurosurgeon, Dr. Bui could asses her coagulation status to determine whether he could safely perform surgery as quickly as possible to save her life because as the jury heard "Time is Brain."

---

[96]Restatement (Third) of Torts: Product Liability § 6(d) (1997); *see also Stahl*, 283 F.3d at 267, 269-70, *citing* Restatement (Third) of Tort §§ 6(b), 6(d) (applying learned intermediary doctrine); *Georges v. Novartis Pharm. Corp.*, No. CV 06-05207, 2013 WL 5217198, at *9 (C.D. Cal. Apr. 4, 2013) (finding that dentist "may be in the class of learned intermediaries 'in a position to reduce the risks of harm' to whom Defendant owed a duty to warn"); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 307-308 (W.D. Ky. 2011) (extending learned intermediary status to plaintiff's non-prescribing physicians noting that "[i]t is impossible to read the learned intermediary rule through [defendant's] proposed lens given the interplay between multiple physicians, numerous procedures, and countless drugs to which cancer patients are subjected."); *Stevens v. Novartis Pharm. Corp.*, 247 P.3d 244, 260 (Mont. 2010) (describing scope of learned intermediary doctrine as applying to any healthcare professional responsible for making decisions regarding the patient's case); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Ore. 1974) ("Although the ethical drug manufacturer's duty to warn has been discussed most often with reference to the prescribing physician, the [doctrine's] reasoning applies with equal force to the treating physician … [who] may be more likely to observe the actual symptoms of the drug's untoward consequences.").

[97]Tr. at 1540:11 to 1542:21, Plaintiff's regulatory expert Dr. Parisian testified that Defendants' duty under 21 CFR 201.57(c)(6)(iii) which states:

> Monitoring: Laboratory tests. This section must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions.

23

In denying Defendants' Motion *in Limine* to exclude Dr. Bui's testimony,[98] this Court ruled "that the duty to warn under the LPLA contemplates both prescribers and treaters, particularly in the situation in which the treater takes or fails to take action because of a failure to properly warn."[99] The Court was correct in ruling that Defendants' duty to provide adequate instructions extended to Mrs. Orr's treating physicians, including Dr. Bui, who could have reduced the risks associated with Xarelto.

Defendants' argument that they are entitled to judgment as a matter of law under the learned intermediary doctrine because Dr. Bui testified that he did not read the Xarelto label should be rejected.

*First,* the Defendants made this same argument in their *in limine* motion regarding Dr. Bui.[100] The court denied the motion and specifically noted the Defendants' argument in this regard: "Separately Defendants argue that even if the duty to warn extends beyond prescribing physicians, any testimony from Dr. Bui about the Xarelto label, and thus any changes to the label would not have affected his treatment of Sharyn Orr."[101]

*Second,* in *Boudreaux*, this Court charged the jury that:

> The manufacturer may communicate a warning or instruction through a label or package insert, **or other communications or literature**.[102]

Dr.  Bui is not Mrs. Orr's prescribing physician but was her treating neurosurgeon. As such Dr. Bui testified that he has sought to familiarize himself with Xarelto, and to understand at some

---

[98]Rec. Doc 6482.

[99]Rec. Doc. 6645.

[100]*See* Defendants' Motion in Limine to Exclude Dr. Cuong Bui from testifying regarding Xarelto's Label (Rec. Doc. 6482).

[101]Rec. Doc. No. 6645 at 13-14.

[102]Rec. Doc. No. 6393, at 20; *see also Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 857 (10th Cir.2003).

basic level about a drug that may increase or decrease bleeding.  Dr. Bui requires such information

because, in a potentially high bleeding risk situation including brain and spinal cord surgery, <u>not</u>

having all needed information could have catastrophic consequences.[103] It makes eminent sense

that as a non-prescribing physician like Dr. Bui would have educated himself about Xarelto

through communications with colleagues, reading the literature, general medical training, medical

conferences as a participant in the neurological community, as he testified he did at trial.[104] [105]

Unlike the physician in *Whitener v. PLIVA, In*c., Civ. No. 10-1552, 2014 WL 1276489, at *6 (E.D.

La. Mar. 27, 2014 (Fallon, J.) cited by Defendants, Dr. Bui looked-up papers about testing related

to anticoagulants and their application to neurosurgical procedures as the program director for the

neurosurgery residency training program.[106] He testified as follows:

> Q.    So is it fair to say, though, even though you yourself had not looked at the
> label, you had availed yourself or gotten a lot of information about Xarelto
> without looking at the label?

> A.    Yes.  That's fair to say.[107]

Notwithstanding all of the many  sources of information that Dr. Bui utilized to learn how

to treat neurosurgical patients like Mrs. Orr who may have taken Xarelto, it was his belief when

he was treating Mrs. Orr and need to know if Xarelto was "on board" that there was no test that

---

[103]Tr. at 772:11 to 772:19.

[104]Tr. at 772:20-773:1.

[105]Tr. at 1533:13 to 1535:6 (Plaintiff's regulatory expert, Dr. Suzanne Parisian testified that drug companies have a responsibility to not only communicate about how to safely use their drugs in not just the label but "labeling" which includes anything written that comes from the manufacturer like marketing information, Dear Doctor letters, medical seminars put on by the drug company).

[106]Tr. at 782:23 to 783:5.

[107]Tr. at 772:20-773:1.

provided helpful or useful information.[108] He testified that he never received any information about the usefulness of PT from either Bayer or Janssen.[109]

Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, as the Court must, Defendants Rule 50 motion should be denied because as to learned intermediary causation in the case of Dr. Bui. There is more than a legally sufficient evidentiary basis for a reasonable jury to conclude that adequate information about the meaning of a PT test, would have made a difference in avoiding the delay in surgically addressing Mr. Orr's condition on arrival in the Ochsner Main emergency room.

## IV. DEFENDANTS ARE NOT ENTITLED TO JUDGEMENT AS A MATER OF LAW BECAUSE PLAINTIFF'S FAILURE-TO-WARN CLAIMS ARE PREEMPTED BY FEDERAL LAW

Defendants basically repeat the same arguments this Court earlier denied by Orders dated April 13, 2017.[110] Defendants again incorrectly assert that they could not change their label to recommend use of a PT test because that would suggest an "off-label" use contrary to FDA Regulations and guidance. Similarly, they also repeat their flawed contentions that: (1) there is no "newly acquired information" supporting any proposed instruction regarding use of PT; (2) "clear evidence" exists that FDA would not have permitted reference to PT testing for the Atrial Fibrillation indication based on the ROCKET study because a proposed label in which Janssen recognized the beneficial use of PT testing for a different orthopedic indication based on a different study (RECORD) for a separate indication was redlined by the FDA without any challenge whatsoever; (3) a one-time PT test still constitutes "monitoring" and is therefore prohibited by FDA regulations; and (4) they could not have unilaterally changed their label to identify a helpful

---

[108]Tr. at 783:6 to 783:14.

[109]*Id.*

[110]Rec. Doc. Nos. 6196 and 6197.

test despite their obligation to do so under federal regulations. None of these contentions has improved by their repetition. They remain as unfounded as they were when they were first presented.

For the reasons set forth in Plaintiffs response in opposition to Defendants' Further Memorandum (Regarding Preemption) in Support of their Motion for Judgment as a Matter of Law at the Close of Plaintiffs' Case (Rec. Doc. 6771) being filed separately, and for all the reasons set both in Plaintiff's responsive briefing on Defendants' original dispositive motion about preemption (i.e., Rec. Doc. Nos. 5532-2, 5966, and 6050) and this Court's Orders of April 13, 2017, the Defendants are not entitled to judgment as a matter of law under Fed. R. Civ. P. 50(a). There is more than a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff on the defense of preemption, an affirmative defense which was not even sought to be supported by the evidence at trial.

## V.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER RULE 50 UNDER THE DOCTRINE OF LOST CHANCE

Plaintiff incorporates herein *Plaintiffs' Bench Memorandum Regarding Loss of Chance of Survival.*[111] "Louisiana law regards the loss of a less-than-even chance of survival as a distinct, compensable injury, separate from wrongful death."[112]

"Under Louisiana law, a plaintiff must show by the customary preponderance of the evidence that the defendant's negligence resulted in the loss of some chance of survival, however minimal."[113] "The Louisiana plaintiff need not show that 'but for' the defendant's actions the victim would have been cured, only that the defendant's actions deprived the victim of *some*

---

[111]R. Doc. 6701.

[112]*Pelas v. Golden Rule Ins. Co.,* No. 97-cv-3779, 1999 WL 438478, at *1 (E.D. La. June 28, 1999) (Judge Lemmon), *citing Smith v. State Dep't of Health & Hosp.,* 676 So. 2d 543, 547 (La. 1996).

[113]*Id., citing Smith,* 676 So.2d at 547

*chance* of a better outcome."[114] "It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Destruction of a two percent chance of survival has been held to present a jury question as to causation."[115]

As to damages for a lost chance of survival, the jury considers the same evidence considered by a jury in a survival and wrongful death action, and reaches its general damages award based on that evidence, along with any other relevant evidence on the record, such as expert testimony regarding the percentage chances of survival.[116]

As set forth above, Dr. Bui testified that Mrs. Orr's surgery was delayed because her neurosurgical team was unable to "test" or "reverse" the anticoagulant effect of Xarelto.[117] Once Dr. Bui thought that enough time had passed so that Xarelto was no longer on board, Dr. Bui performed an External Venticulostomy inserting two catheters into her brain through bore holes in her skull ("Surgery" or "EVD"). Dr. Bui testified that the surgery was intended to relieve intracranial pressure to accomplish "*some neurological improvement*," specifically to have Mrs. Orr wake-up and follow commands.[118] While it true that Mrs. Orr's condition was serious and an "uphill battle," Dr. Bui testified that the surgery was both medically indicated and necessary.[119] As a neurosurgeon Dr. Bui explained that he deals in the world of chance where surgical

---

[114]*Id., citing Smith,* 676 So.2d at 547 (emphasis in original).

[115]*Hastings v. Baton Rouge Gen. Hosp.,* 498 So. 2d 713, 720 (La. 1986).

[116]*Smith,* 676 So. 2d at 549.

[117]Tr. 767:17 to 768:12; 769:23 to 770:11; 776:25 to 777:14; 770:24 to 771:4; 773:21 to 773:24.

[118]Tr. 759:24 to 760:4; 760:24 to 761:2 (the hope then was that by doing that, you were going to reduce intracranial pressure, lead to neurologic improvement, and hopefully get her to wake up).

[119]Tr. at 761:1 to 14; 1007:8 to 1007:11.

procedures are an attempt to preserve chance even if an uphill race because some people do prevail and come through.[120] Dr. Bui explained:

> So let's be clear.  I felt that the procedure was indicated.  As for whether I thought that there was a really good chance of neurologic recovery is different.  **I thought there was a chance**, but I just want to be clear that we were going in this uphill, and that this was an aggressive intervention.

Defendants want to characterize the delayed EVD surgery as a "Hail Mary" pass but upon further examination, what was clear was that at the time, Dr. Bui referred to a follow-up procedure, a Craniotomy, which he discussed with the family after Mrs. Orr's condition did not improve following the EVD.[121] Moreover, Dr. Bui testified that there <u>was</u> a realistic expectation that the EVD alone was going to be able to evacuate and remove that entire clot and that he had sometimes been able to clear out entire ventricles with one catheter.[122] Following the surgery, Dr. Bui administered a blood clot busting drug TPA to break up the clot in the cavity and bring down the pressure.  "In certain cases "the patient may do better."[123] Dr. Bui testified that even though he thought her prognosis was poor, he thought that there was **some potential reasonable benefit** from the intervention meaning that there was "some potential" or "some reasonable  benefit to be expected from the procedure," and that he thought it might work.[124]

Dr. Bui told the jury that that he probably would have done the surgery "*upon admission*" *rather than waiting until the next morning or the next day*"[125] because earlier treatment means a

---

[120]Tr. at 762.9 to 762:12; 762:18 to 762:23.

[121]Tr. at 784:10-24 (conceding that there was no reference in the consult that that he wrote to the EVD being a Hail Mary); 792:10-796:15 (conceding after impeachment with medical records and his prior deposition that the Hail Mary was a reference to the Craniotomy not the EVD).

[122]Tr. at 808:6 to 808:9.

[123]Tr. at 767:17 to 768:12.

[124]Tr. at 798:5 to 798:13.

[125]Tr. at 788:18 to 789:12.

better chance for outcome by relieving pressure faster and increase pressure means the longer the brain is ischemic and the more cells are likely to be impaired.[126] In other words, time is brain.[127] He explained that he delayed the surgery because Mrs. Orr may have been on Xarelto that could not be readily reversed increased the risk of the surgery.[128] He explained that since he could not test or reverse, like he could with Warfarin, he did not want to risk creating more bleeding particularly since the prognosis was not so great to start with.[129] [130]

Moreover, Mrs. Orr's daughter, Kimberly Orr DeAgano, testified about her conversation with Dr. Bui's neurosurgical resident when they arrived at Ochsner Main on April 25, 2015 at about 1:00 a.m." "*Dr. Riffle placed an option on the table to treat mom.*" He said, "*We feel like this is the best option for her to have a chance to survive*." She explained that "*They were going to drill a hole in the skull and try to relieve the pressure and try to remove the fluid that had -- that was sitting there.*" Ms. DeAgano testified that Dr. Riffel sounded hopeful ... "*like this was a viable option and that if they were able to do this, there was a good chance for Mom.*"[131] Mrs. Orr's son, Joseph Orr, Jr. testified that "*Actually, as we were in the room, there was a doctor that came into*

---

[126]Tr. at 792:5-9; 788:18 to 789:12; 791:10 to 791:1.

[127]Tr. at 791:10 to 791:14.

[128]Tr. at 767:17 to 768:12.

[129]Tr. at 767:17 to 768:12.

[130]Tr. at 816:18 to 817:9; 816:18 to 817:9 (Dr. Bui would not concede for the defense that a reversal agent is a helpful thing to have for you in a setting like this, but when we're talking about Mrs. Orr and when we talk about her and the size of her bleed and its location, you cannot state that a reversal agent for her, had she been on warfarin, would have made any difference. He explained "*I don't know, because if she was on warfarin, I would have given her a reversal agent, and we likely would have had compensation for intervention invasive earlier. I don't know if it would be at 2:00 A.M. I probably would have still given some medical time for trial, but we would have given anticoagulation once she hit the door and likely have had an earlier compensation. But from a prognostic indication, I've seen it go both ways. I've seen it not make any difference and I've seen it make a difference, and for large hemorrhages,* it's more often than not it doesn't make a difference, but it's not zero.)

[131]Tr. at 189:22 to 190:12.

*the room and basically was giving us what seemed like an option that we could possibly look into, to perform some form of medical procedure or surgery that could possibly move forward to save my mom's life at that time."*[132]

Additionally, the jury heard from both Mrs. Orr's son and daughter who testified that at Ochsner Main, when Dr. Bui was waiting for the Xarelto to clear so that he could safely perform the surgery, while unconscious Mrs. Orr was exhibiting signs of life and communicating with the family by squeezing their hands.[133]

Dr. Liechty, plaintiff's expert neurosurgeon, testified that Mrs. Orr had a 60% chance of a reasonably functional outcome with earlier intervention.[134] However, in the event the jury concludes Mrs. Orr would have died even with such intervention, Dr. Liechty also testified as to

---

[132]Tr. at 716:16 to 716:20.

[133]Tr. at 718:5 to 718:17, Joseph Orr, Jr. testified:

> And she was squeezing my hand. She was moving her shoulders and her arms, and her legs kicking back and forth a little bit, and gave me every indication that she was there, that she was being responsive. And I also told her, But if you don't want to fight anymore because it's too hard and you want to go, that's okay.  You have to let us know. But she held on. She held on to my hand.  She squeezed my hand. She moved, like I said, with her legs and her arms. And I felt at that moment that she was being responsive, she was alive. You know, I couldn't understand why we couldn't do anything, why no one could do anything to help her. She was helping people her whole career, her whole life, and I didn't understand that.

Kimberly Orr DeAgano testified:

> But Mom, we felt she was still at times responsive on Sunday. So, of course, it happened Friday. They did the first shunt on Saturday. On Sunday the whole family was there, and there was a Tulane baseball game. So we put the game on the radio for her. Her friends came in to visit, and they are big LSU fans, so it was a thing between them. They would kind of razz Mom and Dad about Tulane back and forth. When they were doing that, even when she was there in the bed, she started moving. Then Tulane won, and we were like, Look at that, Mom. They pulled it out for you. They won the game.

Tr. at 193:11 to 193:20.

[134]Tr. at 1031:19 to 1032:2.

the impact of delayed treatment on her chances of surviving:  That she was a candidate for early

surgical intervention is uncontradicted.[135] Dr. Liechty then testified as follows:

> Q.   Is there a difference in performing a procedure like the EVDs on a new GCS 6T patient versus one now that has been a CS 6T for many hours?
>
> A.   Absolutely.
>
> Q.   Can you explain that?
>
> A.   So first of all, we're talking about a non-dominant hemisphere, so, in theory, speech centers are intact on the left side of the brain.  In addition, you have intact brain stem reflexes and you have the exam that's just freshly declined.
>
> That is the time to intervene if there is to be any meaningful hope.
>
> Q.   Do you feel, however, it was still reasonable and there was some hope when Dr. Bui performed the procedure at 2:30 p.m. on the 25th?
>
> A.   Yes.
>
> Q.   Do you have an opinion as to whether her chances at that point were significantly worse than they were closely after her time of arrival at Ochsner main?
>
> A.   Yes.  I feel they were much worse.
>
> Q.   Do you have an opinion, during that interval time from 1:15 a.m. on the early morning hours of the 25th until 2:30, some 13 hours later -- 13 and a quarter hours later on the afternoon of April 25th, whether Mrs. Orr, in that interim, **lost a significant and meaningful chance** of recovery and survival as a result of this delay?
>
> A.   Yes.
>
> Q.   What's your opinion in that regard?
>
> A. My opinion is that **she definitely lost a chance for a meaningful recovery by not being able to intervene in that early window.** [136]

---

[135]Tr. at 1034:4 to 1034:17.

[136]Tr. at 1033:24 to 1035:3.

He explained:

> So it's a timeline issue.  It's also the fact that the surrounding brain around the hemorrhage was intact, that the blood was contained in a fluid-filled space, but yet the patient then went from a GCS 15 at 10:10 p.m. with a slight decrease at 1:15 to a fairly marked decline at the time she hit Ochsner main. It was this window where emergent intervention had to take place to achieve that. But even at this GCS of 6T, she had a fully functioning brain stem. She had intact pupillary response and no evidence that she had herniated. And that was the window to intervene. So from a neurosurgeon standpoint, that's basically what I look for, is when you can intervene as fast as possible at the time of the decline, that's the time to save something. And that's what was lost here.[137]

Dr. Liechty further explained:

> So first of all, we're talking about a non-dominant hemisphere, so, in theory, speech centers are intact on the left side of the brain.  In addition, you have intact brain stem reflexes and you have the exam that's just freshly declined.
>
> That is the time to intervene if there is to **be any meaningful hope**.[138]

Dr. Liechty also testified that:

- "…..[s]o from a neurosurgeon standpoint, that's basically what I look for, is when you can intervene as fast as possible at the time of the decline, that's the time to save something.  And that's what was lost here." [139]

- "the surrounding brain around the hemorrhage was intact, that the blood was contained in a fluid-filled space" and that the stroke did not destroy brain in areas that he explained was "**very high-priced real estate**," based on his review of Mrs. Orr's Cat-Scan.[140]

---

[137]Tr. at 1032:18 to 1033:6.

[138]Tr. at 1034:4 to 1034:9.

[139]Tr. at 10:33:1-6.

[140]Tr. at 992:16 to 992:22 "[t][hrough the internal capsule here (indicating), it's this sort of V-shaped, dark area, all of the motor and sensory fibers from the cortex of the brain coalesce there in basically one pathway down to the spinal cord. So it's very **high-priced real estate,** as they would say. If there's damage in this (indicating), it's basically cutting off a power cord, essentially, so...")

- at 2:30 on April 25, it was still reasonable and there was some hope when Dr. Bui performed the procedure that was both medically indicated and necessary;[141]

- Mrs. Orr's chances at 2:30 when Dr. Bui was finally able to surgically intervene were much worse than they were closely after her time of arrival at Ochsner Main[142] but even with a GCS of 6T, she had a fully functioning brain stem, intact pupillary response there no evidence that Mrs. Orr had herniated.[143]

On pages 24 and 25 of Defendants' brief they attack the credibility of Dr. Liechty's testimony arguing that his 60% calculation is "inconsistent with the facts in evidence" that his "time line is therefore flawed" and that his "opinion does not fit the facts." Such arguments are not only incorrect but merely raise questions credibility which are matters for the jury.[144] They also go to the claim of wrongful death, rather than loss of a chance. In any event, Defendants are not entitled to judgment as a matter of law.

Defendants claim that they were prejudiced by Plaintiff's late-asserted claim for lost chance is meritless. "Loss of chance" is not a separate cause of action under Louisiana law and therefore does not have to be specifically pled. Additionally, there was no additional evidence that had to be developed in order to support or defend against this form of recoverable damages, thus Defendants suffered no undue prejudice or surprise. At the time that Plaintiffs sought leave to amend the Complaint, Defendants had been in possession of Dr. Liechty's expert report, produced on in October, 2016, for almost 7 months. Dr. Liechty's report included his opinion that Mrs. Orr

---

[141]

[142]Tr. at 1032:18 to 1033:6.

[143]

[144]*Boudreaux* Tr. at 1135:15-1136:5 citing *Brennan's Inc. v. Dickie Brennan & Co. Inc.,* 376 F.3d 356 (5th Cir. 2004).

suffered a 60% chance of a reasonably functional outcome.[145] Additionally, approximately 160 days before trial, with Dr. Liechty's report in hand, the Defendants deposed him on December 3, 2016. During his deposition defense counsel questioned Dr. Liechty extensively about his 60% probability opinion.[146]  There was no surprise or prejudice.

Moreover, the primary focus of the testimony of Defendants' own expert, Dr. Najeeb Thomas, has always been the chance of Mrs. Orr surviving the brain bleed with which she presented in the Ochsner Main emergency room.

Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, as the Court must, Defendants' Rule 50 motion should be denied because there is more than a legally sufficient evidentiary basis for a reasonable jury to find that Defendants caused Mrs. Orr a loss of a less-than-even chance of survival.

## VI.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' FAILURE TO WARN CLAIM UNDER *DAUBERT*

Defendants have renewed various *Daubert* motions, which should be denied for exactly the same reasons that this Court previously denied them.[147]

Under the "failure to warn or instruct" theory of LPLA liability, Plaintiffs must first establish by a preponderance of the evidence that, when Xarelto came on the market, it possessed one or more characteristics that "may cause damage."[148] There has been ample proof in this regard,

---

[145]Exhibit 1 is a copy of Dr. Liechty's report dated October 14, 2016 which states on the last page 13 that Prompt surgical intervention in Mrs. Orr's case would have resulted in a 60% probability of her survival with functional neurologic outcome. If Mrs. Orr had experienced a similar IVH while on Warfarin, earlier surgical intervention could have been accomplished and would have most probably saved Mrs. Orr's life."

[146]Exhibit 2, Liechty dep. at 308 to 310.

[147]Rec. doc. 6198; Plaintiff incorporates herein their arguments in response all of the Defendants' *Daubert* motions cited in footnote 10 and 11of Defendants' motion. Accordingly, there is more than a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiffs.

[148]*See* LSA-R.5.9:2800.57A.

including proof of Xarelto's once-daily dosing risk,[149] the exposure of patients to excessive bleeding risk without any commensurate stroke-protection benefit,[150] the interpatient variability of exposure amount patients on the same dose, [151]and the lack of reversal agent. [152]

Such characteristics combine to inform both duty and risk foreseeability. To the extent Defendants are, or should be, cognizant of Xarelto's characteristics that may cause harm to patients in clinical use settings, they had a heightened duty to warn or instruct physicians, and specifically, "learned intermediaries" who are placed in a situations where they must make (or withhold) medical decisions in response to the potential dangers and risks associated with Xarelto.

---

[149]Tr. 334:11 to 334:21 (testifying that when he discovered that the pharmacokinetic, pharmacodynamic properties of Xarelto suggest the drug should be administered twice a day, that "what was eye-opening … was that the [FDA] clinical reviewers concluded the same thing that I did … they arrived at the same conclusion, that this drug would be better administered twice a day); Tr. at 339:18 to 339:23 (testifying that Dr. Califf's recommendation that Defendants undertake a Rocket 2 dose finding study was based on "the pharmacokinetics and pharmacodynamics that we've already discussed, anybody with an eye for those types of scientific studies will quickly conclude that the drug should be administered twice a day"); Tr. at 452:1 to 467:5; 467:22-498:22; Tr. at 449:18 to 450:15) (Janssen's Dr. Peters and Vice President of Marketing Patty Torr testifying that testifying that the lead Rocket investigator Dr. Califf was so concerned that Defendants had not found the best dose that he recommended they undertake a Rocket 2 dose finding study because it "was the right thing to do" -- never completed, angering Dr. Califf, who called this "corporate BS," and said that "[e]very single person involved has told me that privately they agree that there is probably a better dose!!!!! ).

[150]Tr. at 327:15 to 330:25 (Dr. Smart testifying based on the Kim article that Xarelto patients experience drug once a day, you expose excessive bleeding risk with no added stroke risk compared to Pradaxa and Eliquis).

[151]Tr. at 1250:17 to 1262:1 (Janssen regulatory employee Sanjay Jalota testifying about the various decisions not to proceed with the development of an antidote based because the clinical need was limited and that there was a limited potential for incremental sales of the antidote or Xarelto with an antidote).

[152]Tr. at 834:24-835:7 (Bayer scientist Horvat-Broecker admits that Xarelto you can give the same dose to different patients and that same dose can have a different result or impact upon different patient); Tr. at 835:14-835:24 (She has been aware for several years that inter-patient variability exists when Xarelto is given to a large population of patients. She states that different exposure levels of Xarelto in different patients' bloodstream could place those patients at different risks of bleeding and thrombotic events between the two patients.

**A.      The opinions of Plaintiffs' experts, including Dr. Liechty, that PT may be used to measure a patients' Xarelto concentration are admissible under _Daubert_**

Plaintiffs have introduced reliable expert testimony based on an abundance of testimony at trial demonstrating that PT is a helpful test in measuring a patients' Xarelto concentration which Plaintiff's experts including Dr. Liechty rely.[153] Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, as the Court must, Defendants' Rule 50 motion should be denied because there is more than a legally sufficient evidentiary basis for a reasonable jury on the issue of whether Defendant failed to adequately warn and instruct.

**B.      Plaintiff has not abandoned any claim regarding dosing**

Over the course of this trial as it did in the _Boudreaux_ trial, the Court consistently overruled Defendants' objections relating to the introduction of evidence on matters involving Plaintiffs' so-called "abandoned claims" of dosing and reversal agents, etc. In _Boudreaux,_ after Plaintiffs' case-in-chief, the Court denied Defendants' Motion for judgment as a matter of law based on the same "abandoned claim" contention.[154] The Court should deny the same motion here.

**VII.    THERE IS A LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR A REASONABLE JURY TO FIND THAT DEFENDANTS FAILED TO USE REASONABLE CARE ON THE GROUNDS THAT THERE IS NO ANTIDOTE OR REVERSAL AGENT**

**A.      Plaintiff is not making a claim for lack of a Black Box Warning**

Plaintiffs did not offer any mention of a black box warning in Plaintiff's proposed jury charges; and this Court already has instructed the jury to disregard any reference made by Dr.

---

[153]_See supra._at II, at _____.
[154]_See_ May 1, 2017 Order (Rec. Doc. 6362).

Smart to a black box warning.[155] There is simply nothing to dismiss in this regard, because there is no claim regarding a black box.

**B.    The lack of a reversal agent is relevant to plaintiff's failure to warn claim**

Plaintiffs do not make a "lack or reversal agent" claim.  Rather, the lack of an antidote is a product characteristic of Xarelto that makes it unreasonably dangerous. Far from being abandoned, Plaintiffs have continually alleged that the absence of a reversal agent heightens the need for manufacturers to instruct physicians with special care because without such agent there is no other means to avoid or ameliorate a patient's bleeding injury. Testimony about Xarelto's lack of an antidote is relevant and necessary to Plaintiffs' failure to warn claims.

The LPLA necessitates an analysis that the product possessed an unreasonably dangerous characteristic to determine the manufacturer's reasonableness in warning of such characteristic.[156] Dr. Liechty's opinions about a lack of reversal agent are directly related to the unreasonably dangerous characteristics of Xarelto. Dr. Liechty specifically testified that there was a need for a heightened warning because the lack of an identified laboratory test to measure anticoagulation status and reversal agent represented a significant hazard and danger with Xarelto use, particularly in patients like Sharon Orr.[157]  Dr. Bui testified that waited to do surgery until Xarelto cleared but had to guess because no test / no reversal agent existed:

> *To the best of my knowledge at that time, there was no established or proven test that -- or blood test that I could do to test how much of the Xarelto was on board, whether she was truly therapeutic or not. Reversal, so there are certain products that you can give patients to enhance their coagulation when they're on certain types of medications. It was my understanding that for Xarelto that those commonly*

---

[155]Tr. at 526:8 to 526:14 (You are to disregard any reference to any black box.  A black box or testimony about a black box has no part and should play no part in this trial or your deliberations.  So please disregard anything about a black box).

[156] La. Rev. Stat. Ann. § 9:2800.57.

[157]Tr. at _____-

*administered pro-hemostatic agents, which are agents that sort of enhance your clotting ability, was not effective while the drug was still active in the bloodstream"*[158] [159]

Defendants argue that Plaintiffs have "abandoned" any claim regarding Xarelto's lack of a reversal agent because their design defect claim has been dismissed. In doing so, they fail, once again, to understand Plaintiffs' failure to warn claim and that Dr. Liechty's opinions fit squarely within them. In denying Defendants' motion for partial summary judgment on the grounds of preemption, this Court correctly summarized Plaintiffs' claims as follows:

> Xarelto markets itself as a one-size-fits-all anticoagulant. Patients take one 20-milligram dose of Xarelto once a day and do not need to undergo routine monitoring. Plaintiffs contend that, because each person processes and metabolizes Xarelto at a highly-individualized rate, each patient's reaction to the drug is decidedly variable, causing some patients to experience major bleeding events. Plaintiffs acknowledge that the Food and Drug Administration (the "FDA") approved Xarelto's dosing and monitoring scheme. However, they claim that, given the high inter-patient variability, Xarelto is unreasonably dangerous in design because (1) Defendants should have designed, but failed to design, a Xarelto-specific Anti-Factor Xa assay so doctors could monitor Xarelto's anticoagulation effect on each patient and could, along with the patient, weigh the risks and determine whether to continue taking Xarelto; (2) because Defendants have not designed and marketed an antidote to counteract a major bleeding event; and (3) in the absence of a Xarelto-specific Anti-Factor Xa assay, Xarelto's label should have warned doctors about the availability of the Neoplastin PT test to measure patient's anticoagulation. Because Defendants did not take any of the above three actions, Plaintiffs claim Xarelto is unreasonably dangerous under the LPLA.

The design of Xarelto is inextricably intertwined with its warning because the absence of a reversal agent significantly affects the risk profile of this drug and thus intensifies the need to instruct physicians that Neoplastin PT is a helpful test measure the anticoagulant effect of Xarelto, particularly in an emergency situation like Mrs. Orr was in in April, 2015. The testimony that Dr.

---

[158]Tr. at 776:25 to 777:14.

[159]He further testified that the fact that he had to wait for the Xarelto to clear before he could undertake the procedure was as reflected in his notes: "Now that her Xarelto has had a chance to clear." Tr. at 784:24 to 785:1.

Liechty and Dr. Bui at trial, including about Xarelto's lack of a reversal agent which exposes a broad spectrum of patients, particularly those with advancing age and declining renal function, to excessive bleeding risk, is just one piece of the overall evidence that Plaintiffs have addressed in their failure to warn case.

At trial Defendants repeatedly stated that Mrs. Orr's outcome would have been the same if she had been on warfarin. Indeed, during their cross-examination of Plaintiffs' treating physician Dr. Bui, Defendants specifically asked:

- "But insofar as Mrs. Orr's condition is concerned, you can't say that her event or its outcome would have been any different had she been on warfarin; is that correct?"[160]
- "So a reversal agent is a helpful thing to have for you in a setting like this, but when we're talking about Mrs. Orr and when we talk about her and the size of her bleed and its location, you cannot state that a reversal agent for her, had she been on warfarin, would have made any difference; is that correct?"[161]

By asking Dr. Bui questions about Ms. Orr's chances had a reversal agent been available, Defendants opened the door to testimony about a reversal agent. Clearly, notwithstanding Defendants' argument to the contrary, the lack of a reversal agent is relevant to Plaintiff's failure to warn/instruct claim.

Drawing all reasonable inferences in favor of the Plaintiff as the non-moving party, as the Court must, Defendants' Rule 50 motion should be denied because there is more than a legally sufficient evidentiary basis for a reasonable jury to find on Plaintiff's failure to warn claim.

---

[160] Tr. at 816:14 to 816:16.

[161]

**VIII.  DEFENDANTS' LAST-CATCH ALL ARGUMENT ABOUT ALLEGED ABANDONED THEORIES IS NOTHING SHORT OF A MOTION TO STRIKE TESTIMONY SINCE IT DOES NOT ADDRESS CLAIMS BUT EVIDENCE**

*See* Plaintiff's argument *supra.* at VI(B).

## CONCLUSION

For the reasons set forth above and Plaintiff's opposition to Defendants' Further Memorandum (Regarding Preemption) in Support of their Motion for Judgment as a Matter of Law at the Close of Plaintiffs' Case (Rec. Doc. 6771), the Defendants are not entitled to judgment as a matter of law under Fed. R. Civ. P. 50(a) because there is more than a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff. Defendants' motion should be denied and this case should be submitted to the jury.

Dated: June 9, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

*/s/ Gerald E. Meunier*
Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 9, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ Gerald E. Meunier*
**GERALD E. MEUNIER**