UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| ***Boudreaux v. Bayer Corp., et al.*** | * | JUDGE ELDON E. FALLON |
| **Case No. 2:14-cv-02720** | * | |
| | * | MAGISTRATE JUDGE NORTH |
| * * * * * * * * * * * * * * * * * * * * * * | | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
RULE 59 MOTION FOR A NEW TRIAL**

## I.     INTRODUCTION

Plaintiffs have requested a new trial because prejudicial errors were committed during trial in the evidentiary rulings and instructions to the jury. Material evidence was excluded, while irrelevant and unfairly prejudicial evidence was admitted, and accurate jury instructions were rejected. Additionally, demonstrative materials were submitted to the jury along with the trial exhibits, without the express consent of Plaintiffs' counsel, and in direct contravention of this Court's instructions to the jury and the requirements under the law. Each error, individually, and cumulatively, affected Plaintiffs' substantial rights, and for this reason, Plaintiffs are entitled to a new trial.

## II.     LEGAL STANDARD

After a jury trial, a district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A). "Although Rule 59(a) does not list specific grounds for a new trial, the United States Court of Appeals for the Fifth Circuit has held that a new trial may be granted if 'the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial

1

error was committed in its course.'" *In re Vioxx Prods. Liab. Litig.,* 489 F. Supp. 2d 587, 589 (E.D. La. 2007), *citing Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985).

Consequently, Rule 59(a) governs arguments that a district court committed prejudicial error by preventing the admission of evidence, by allowing the admission of irrelevant and unfairly prejudicial evidence, and/or by committing instructional errors. *See id.* (noting that Rule 59 governs arguments over errors in precluding testimony); *Willitt v. Purvis,* 276 F.2d 129, 132 (5th Cir. 1960) (A district court is "under a duty to grant a new trial" when it has "admitted irrelevant and prejudicial evidence."); *Aero Int'l v. United States Fire Ins. Co.,* 713 F.2d 1106, 1113 (5th Cir. 1983) ("A new trial is the appropriate remedy for prejudicial errors in jury instructions."). Rule 59(a) likewise applies to arguments that extra-record information, such as demonstrative materials, were sent to the jury room. *See Davis v. Velez,* 15 F. Supp. 3d 234 (E.D.N.Y. 2014) (considering effect of extra-record information during evaluation of a Rule 59 motion). To justify a new trial, the error must not have been harmless. *See* Fed. R. Civ. P. 61.

## III.   **ARGUMENT**

### A.   **Plaintiffs are entitled to a new trial because relevant global evidence from medical associations, outlined in a a peer-reviewed publication, was precluded.**

Prior to trial, Defendants sought to exclude evidence of foreign labeling and regulatory actions.[1] Plaintiffs opposed the motion, reasoning that this evidence is relevant in establishing Defendants' notice, scienter, and motives when they failed to provide instructions regarding PT testing.[2] This Court opined that this evidence was likely excludable under Federal Rules of

---

[1] *See* Defendants' Motion in Limine No. 3 to Exclude Evidence of Foreign Labeling and Regulatory Actions [Record Doc. 5954].

[2] *See* Plaintiffs' Response in Opposition to Defendants' Motion in Limine No. 3 to Exclude Evidence of Foreign Labeling and Regulatory Actions [Record Doc. 6169-2]. This memorandum was filed under seal.

Evidence 401 and 403, but reserved its ruling, stating that the evidence might need to be considered for context or rebuttal.[3]

Subsequently, throughout the trial, the jury was repeatedly told by defense experts and defense corporate witnesses that Neoplastin PT was useless and did not work. This false narrative was successfully reprised by defense counsel at summation:

> **Medical associations, you didn't hear them cite a single medical association that says this test should be used, or a peer-reviewed publication that says this test should be used.** Now, why is that? Because in the outside – outside of this courtroom, **nobody thinks this test works.** They don't think it helps. They want you to second-guess all the scientists out there, all the doctors you've heard, all the medical associations, all the medical literature, and they want you to believe that they're the only ones that understand this test and they're the only ones that want it in the label because nobody else understands what the company does. **Well, Dr. Johnson certainly understands.**[4]

Plaintiffs were severely and unfairly prejudiced by this testimony and this summation because they were denied the opportunity to present the exact type of evidence that defense counsel said was lacking. Defense expert Dr. Colleen Johnson repeatedly told the jury that Neoplastin PT was not a helpful test.[5] During Dr. Johnson's cross-examination, Plaintiffs' counsel attempted to question her about her failure to consider a peer-reviewed publication discussing that numerous medical associations have recommended PT in their medical guidelines as a reliable screening test in patients taking an anti-Factor Xa inhibitor, including Xarelto. This Court sustained Defendants' objection and prohibited the presentation of that evidence.[6]

---

[3] *See* 04/18/17 Order and Reasons [Record Doc. 6254], at 13-14.

[4] *See* Exhibit 1, *Boudreaux Trial Transcript*, at 1600:5-17 (emphasis added).

[5] *See, e.g., id.* at 1210:6-24; 1239:22-1240:7; 1255:4-11; 1263:21-1264:1; 1264:16-18.

[6] *See id.* at 1292:8-1294:14; Exhibit 2, Giuseppe Lippi, et al., *Recent Guidelines and recommendations for laboratory assessment of direct oral anticoagulants (DOACs): is there a consensus?*, Clinical Chemistry and Laboratory Medicine (2014) ("the precluded Lippi article").

As a direct result of this ruling, the jury was left with the misimpression that no medical associations, and no peer-reviewed publications, say that PT testing should be used. The jury also was left with the misimpression that nobody – not one scientist, not one doctor, not one medical association, and not one author of medical literature – thinks PT testing works. Finally, the jury was left with the misimpression that Dr. Johnson's understanding about the value (or non-value) of PT testing was superior, because her testimony was not challenged. All of this was intentional, and, clearly, thought to be material by defense counsel, or defense counsel would not have focused on it during her summation.

This Court precluded this evidence because it happened to involve foreign medical associations, reasoning that the jury might be confused by evidence involving foreign regulatory standards. This ruling was error because it was based on a false premise, since no foreign regulatory standards were addressed in the peer-reviewed publication. The publication instead addressed science-based global testing recommendations from independent medical associations.

Table 3 of the precluded Lippi article showed that the following six medical associations determined that PT was a reliable screening test for patients taking anti-FXa inhibitors, including Xarelto: (1) the International Society on Thrombosis and Haemostasis ("ISTH"); (2) the European Society of Cardiology ("ESC"); (3) the European Heart Rhythm Association ("EHRA"); (4) the Australasian Society of Thrombosis and Haemostasis ("ASTH"); (5) the Federation of Centers for Surveillance of Anticoagulation, the Italian Society of Laboratory Medicine, the Italian Society of Clinical Biochemistry and Laboratory Medicine, and the Italian Committee for Standardization of Hematological and Laboratory Methods ("FCSA, SiMeL, SiBioC, and CISMEL"); and (6) the

British Committee for Standards in Haematology ("BCSH").[7] Similar statements from some of these medical associations about the usefulness of PT testing have been referenced in additional peer-reviewed publications.[8]

Each of these six medical associations are independent, non-profit, membership organizations. Their stated goals are not to analyze the regulatory requirements of particular jurisdictions and outline what should or should not be submitted to the regulatory agencies in those jurisdictions. Their goals instead are to assess the best clinical treatments for patients, regardless of where those patients are treated. For example, the ISTH's Mission Statement states:

> The International Society on Thrombosis and Haemostasis (ISTH) is a **global not-for-profit membership organization** advancing the understanding, prevention, diagnosis and treatment of thrombotic bleeding disorders.
>
> The Society is dedicated to transformative scientific discoveries and clinical practices, the development of young professionals and the education of physicians, scientists and applied health professionals **wherever they may live.**
>
> At the ISTH, we initiate and promote education and outreach initiatives, research activities, scientific meetings, peer-reviewed publications, expert committees and **the development of standards**

---

[7] *See* Exhibit 2, at 8. One additional medical association (the American College of Chest Physicians, or "ACCP") assessed screening and concluded that none were reliable.

[8] *See, e.g.,* Exhibit 3, Trevor Baglin, et al., *Effects on routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology,* 159 British Journal of Haematology 427, 429 (2012) (The British Committee for Standards in Haematology found that "**PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**, if a reagent with known sensitivity is used.") (emphasis added); Exhibit 4, Trevor Baglin, et al., *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific and Standardization Committee of the International Society on Thrombosis and Haemostasis,* 11 Journal of Thrombosis and Haemostasis 756, 758 (2013) (International Society on Thrombosis and Haemostasis found that "[w]hen a Quick-type PT reagent with known sensitivity is used, **the PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban.**") (emphasis added).

> **allowing a common language and approach to basic and clinical science all over the world**."[9]

The ISTH has over 100 related societies, including three medical associations on the list of six medical associations that believe PT is a reliable screening test for Xarelto users: the ESC; the ASTH; and the BCSH.[10]

One of those societies which is related to the ISTH, and which is included on the list of six medical associations that believe PT is a reliable screening test for Xarelto users, says it is "**a world leader** in the discovery and dissemination of best practices in cardiovascular medicine," and highlights its global focus:

> We are a **not-for-profit medical society led by expert volunteers**. We unite Member National Cardiac Societies, cardiovascular ESC sub-specialty communities, Affiliated Cardiac Societies, distinguished Fellows of the ESC and individual members **from around the world**. This network allows us to reach out to **the global cardiology community** and keep our finger on the pulse of cardiology. **Diversity is our strength**.[11]

Lest there be any doubt, the ESC webpage also provides this clarification: "The ESC has European roots, **but a global scope**."[12]

Given the independent, non-profit, nature of these membership organizations, and their global focus, it cannot be said that their opinions with regard to the reliability of PT testing are based on foreign regulatory standards or foreign labels that have no applicability to patients in the United States. Their statements instead have applicability to patients throughout the world, in every country, including the United States.

---

[9] *See* Exhibit 5, ISTH Webpage, at 1 (emphasis added).

[10] *See* Exhibit 6, ISTH Resources and Partners, at 6, 7, 10.

[11] *See* Exhibit 7, ESC Webpage, at 1 (emphasis added).

[12] *See id.* at 3 (emphasis added). The EHRA (another of the six medical associations that believes PT is a reliable screening test for Xarelto users) is a branch of the ESC. *See* Exhibit 8, EHRA Constitution, at 1.

It was error to preclude this evidence, and to instead leave the jury with the misimpression from defense counsel's closing statement that no medical associations, no peer-reviewed publications, and absolutely nobody outside of this courtroom, thinks PT testing works. This was intended to have a material effect on the jury, as evidenced by the inclusion of this argument in defense counsel's summation. This error was far from harmless, and instead affected the substantial rights of Plaintiffs. For this reason alone, a new trial should be granted.

**B.** **Plaintiffs are entitled to a new trial because relevant statements from foreign labels was precluded.**

Information from Xarelto labels in other countries likewise should have been admitted, not to show what a foreign regulatory agency might or might not have required for inclusion in its label, but, again, to rebut testimony and statements from Defendants and their witnesses that "nobody" outside of the courtroom thinks PT testing works. To the contrary, not only the independent medical associations referenced above, but also foreign regulatory authorities, think PT testing is useful in assessing the anticoagulation status of a Xarelto user.

For example, the New Zealand Medicines and Medical Devices Safety Authority provides in its Data Sheet that "Xarelto at recommended doses prolongs the global clotting tests **prothrombin time (PT)** … **PT is influenced by Xarelto in a dose-dependent manner if Neoplastin is used for the assay.** The 5/95 percentiles of PT (Neoplastin) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) is described in Table 1 (see Pharmacodynamic effects). In case of excessive doses, the PT is expected to be outside this range."[13]

Similarly, Health Canada provides the following in its label: "The prothrombin time (PT), measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation

---

[13] *See* Exhibit 9, New Zealand Data Sheet, at 7 (emphasis added).

to plasma concentration if the Neoplastin reagent is used. In patients who are bleeding, **measuring the PT using the Neoplastin reagent may be useful to assist in determining an excess of anticoagulant activity."**[14] Janssen considered adding similar language to its label for the orthopedic indication being sought in the United States, but decided against it, after assessing its competitive position and noting that the language was not in the label of its primary competitor (Pradaxa). Janssen decided that if, and only if, the FDA requested language, it would add a PT statement, but only after "modifying significantly" the language.[15]

Additionally, the European Medicines Agency's Committee for Medicinal Products for Human Use ("CHMP") included laboratory testing information within the European Union label to be used by physicians to help with the management and monitoring of patients' rivaroxaban plasma concentration when clinically indicated, with the goal of reducing bleeding risk and improving anticoagulation efficacy.[16] All of this information is pertinent, as evidenced by the fact that even the FDA found the European label germane to its own investigation, requesting a copy of the European label on August 7, 2008, receiving the European Final Summary Product Characteristics on August 11, 2008, and addressing foreign labeling questions on November 9, 2010.[17]

---

[14] *See* Exhibit 10, Canadian Monograph, at 9 (emphasis added).

[15] *See* Exhibit 11, 06/01/11 Email of Sanjay Jalota with attached Xarelto (rivaroxaban) USPI Labeling Contingency Document – From LRC 23-Apr-09, at 15; *see also* Exhibit 12, 04/23/09 Email of Judy Kinaszczuk ("The second thing we needed to do, was to offer more pointed guidance to the physician about correlation (or lack) of PT measurements with bleeding risks and dosing. But, we were not to be as specific as the Canadian label. I have a draft suggestion, but obviously need your edits on that topic as well.").

[16] *See* Exhibit 13, CHMP Assessment Report for the Post-Authorisation Measure LEG 036, at 15.

[17] *See* Exhibit 14, Brief Description of Significant Activities Undertaken by Applicant during the Regulatory Review Period, at M6, M12.

None of this evidence would have been presented to show that other foreign regulatory agencies thought it necessary to include this specific language in their labels. It instead would have been presented to rebut the claim that "outside of this courtroom, **nobody thinks this test works.**"[18] This evidence likewise would have been pertinent to show that Defendants knew about the use of PT testing, and knew how to instruct prescribers about using PT testing in evaluating the anticoagulant effect of Xarelto in patients.

Defendants themselves made statements to foreign regulatory agencies, recognizing the potential utility of PT testing. For example, Defendants told the Canadian authorities: "Although there is no need to monitor clinical practice, in certain infrequent situations such as overdosage, acute bleeding, urgent surgery, in cases of suspected non-compliance, or in other unusual circumstances, assessment of the anticoagulant effect of rivaroxaban may be appropriate. Accordingly, measuring PT using the Neoplastin reagent . . . may be useful to inform clinical decisions in these circumstances."[19]

After the *Boudreaux* trial was completed, this Court appears to have realized the importance of this evidence, because in the context of ruling on a motion *in limine* in the second bellwether case (*Orr*), it broadened the scope of permitted foreign evidence as follows: "This Court finds that anything the Defendants have said to anyone, even foreign regulatory bodies, should be admissible. What is not admissible, however, is what the Defendants did or what they put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies."[20] When the issue was raised again during the *Orr* trial, this Court ruled that the above statements

---

[18] *See* Exhibit 1 at 1600:10 (emphasis added).

[19] *See* Exhibit 15, Response to Clarification Request dated 03 Oct 2014, at 2, 4-6, 8. *See also* Exhibit 16, *Orr* Trial Transcript, at 1220:6-13.

[20] *See* 05/26/17 Order in *Orr* [Record Doc. 6645], at 11-13.

from Defendants to the Canadian authorities was admissible both as a prior inconsistent statement under Federal Rule of Evidence 801(d)(2), and as a witness's prior statement under Federal Rule of Evidence 613, to show Defendants' knowledge.[21]

District courts routinely permit the admission into evidence of foreign regulatory materials. For example, Judge Herndon in *Yaz* denied a motion *in limine* filed by Bayer to preclude foreign regulatory materials, explaining that:

> While the regulatory actions of European Medical regulators are not binding on the FDA . . . the full body of knowledge including the foreign regulatory process that came to bear on the drugs at issue and which were well within the notice and knowledge of Bayer is admissible as part of the fabric of how these drugs came to the United States market and whether all the information which should have been utilized in doing so was utilized. Such evidence is clearly probative and that value outweighs the prejudice to Bayer.

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prods. Liab. Litig.,* No. 3:09-md-2100, 2011 WL 6740391, at *2 (S.D. Ill. Dec. 22, 2011). *See also In re Levaquin Prods. Liab. Litig.,* No. 08-cv-1943, 2010 WL 145282, at *5 (D. Minn. Nov. 9, 2010) (holding foreign regulatory materials are relevant to demonstrate the drug manufacturer's notice and motive); *Mahaney v. Novartis Pharms. Corp.,* 835 F. Supp. 2d 299, 318 (W.D. Ky. 2011) (same); *Rheinfrank v. Abbott Labs., Inc.,* No. 13-cv-144, 2015 WL 5258858, at *4 (S.D. Ohio Sept. 10, 2015) (holding evidence of a foreign label is relevant to a drug manufacturer's notice and knowledge of risks); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.,* 181 F. Supp. 3d 278, 307 (E.D. Pa. 2016) (agreeing that warnings on foreign labels are evidence of the defendants' notice and knowledge of potential risks related to their products).

---

[21] *See* Exhibit 16 at 1220:1-1221:7. The Court, however, continued to preclude the presentation of any evidence about the actual label.

Most recently, after this trial was concluded, similar evidence was permitted in *In re Testosterone Replacement Therapy Prods. Liab. Litig.,* No. 14-cv-1748, 2017 U.S. Dist. LEXIS 69402 (N.D. Ill. May 8, 2017). More specifically, the district court refused to disregard an analysis by Health Canada, rejecting AbbVie's argument that the analysis was based on "a different label, under a different regulatory regimen, in a different country." *Id.* at *1010. The court recognized that "the analysis is not being used to dispute the adequacy of AbbVie's FDA-approved labels. Plaintiffs offer the analysis to show only that the scientific community agreed that more testing was required to determine whether drugs such as AndroGel increased the risk of cardiovascular injury." *Id.*

It was error for this Court to preclude this foreign regulatory evidence in this case, whether originating from the agencies themselves or from Defendants, and to instead leave the jury with the misimpression from defense counsel's closing statement that nobody outside of the courtroom thinks PT testing works. Similar to above, this error was far from harmless, and instead affected the substantial rights of Plaintiffs. For this reason alone, a new trial should be granted.

**C.**     **Plaintiffs are entitled to a new trial because irrelevant and unduly prejudicial evidence about the personal use of Xarelto was admitted.**

Prior to trial, Plaintiffs sought to exclude evidence regarding the personal use of Xarelto, on grounds of irrelevance and undue prejudice.[22] This Court sustained the motion, but reserved its ruling as to witnesses and experts, saying the issue might go to credibility.[23] At trial, this Court allowed the following testimony from a defense witness, Dr. Gary Peters, about his wife's use of Xarelto, reasoning that Dr. Peters' credibility had been put at issue:

> Q. Dr. Peters, do you think that Xarelto is a safe and effective medicine?

---

[22] *See* Plaintiffs' Motion in Limine No. 11 Regarding Personal Use of Xarelto [Record Doc. 5924].

[23] *See* 04/18/17 Order and Reasons [Record Doc. 6254], at 4.

A. Yes, I do.

Q. Is it effective at preventing strokes?

A. Yes, it's very effective. As we mentioned, versus warfarin, it's very effective, and we were at least equal if not better. So it's a very effective medicine for preventing strokes.

Q. And you told us about your wife early on. You've been married 39 years. I assume you like her.

>    MR. BARR: Your Honor, if this is going where I think it's going, I have an objection.

>    MR. SARVER: Well, it is. Let's go up to the bench.

>    (WHEREUPON, the following proceedings were held at the bench.)

>    THE COURT: I assume she had –

>    MR. SARVER: She took it and she did fine and all that stuff.

>    MR. MEUNIER: Your Honor, this was the subject of a motion in limine as to which you reserved a ruling, and you said it would depend on credibility and other issues that may arise at the trial. There is no need to enhance this man's credibility by saying that his wife took Xarelto, and I think it has a prejudicial effect that outweighs the probative value and so we'd ask that it not be allowed.

>    MR. SARVER: This testimony has already come in through another witness, Your Honor, not for Dr. Peters' wife, but I believe it was a witness that was by deposition.

>    MR. MEUNIER: We were not able to properly screen that. It should have been objected to.

>    MR. SARVER: Okay. I thought this was resolved. That's fine.

>    THE COURT: It may not have been resolved. The issue really is only significant insofar as credibility is concerned. It has no relevance other than that, but it does have some relevance of credibility. This witness is testifying as the

company representative. The plaintiffs take the position that the company did something – did not do something that they should have done, and there's also a suggestion that they did it for commercial reasons. This witness has been involved with the Xarelto, the development and design of Xarelto. So his credibility is significant to the whole case, it seems to me. The plaintiffs have attempted to take him on cross and to show that his credibility is a problem. That's obvious. Certainly, they take the position that the company's credibility is at issue. So I weigh the advantages, disadvantages, and it seems to me that the 403 analysis tips in favor of allowing it.

MR. SARVER: Thank you, Your Honor.

THE COURT: That's my ruling.

MR. SARVER: Yes, sir.

(WHEREUPON, the following proceedings were held in open court.)

MR. SARVER:
Q. We're back, Dr. Peters. Are you ready for us?

THE WITNESS: Okay.

BY MR. SARVER:
Q. Okay. So, Dr. Peters, you told us earlier that you've been married for 39 years.

A. Yes.

Q. I'm assuming you like your wife.

A. I didn't hear that –

Q. I don't know that I've ever asked this question in 35 years, but do you like your wife?

A. Yes. Yes, I do.

Q. And you want nothing but good things for her?

A. Her birthday is tomorrow, actually.

13

Q. All right. Do something good for her. So knowing that you like your wife, does your wife take Xarelto?

A. Yes, she did. She had her right knee replaced a couple of months ago. Her orthopedic surgeon wanted us to use aspirin, and I asked him to use Xarelto. And he agreed to that.

Q. How has she done?

A. She's done very well. She actually had maybe her last therapy session this morning for rehabilitation.[24]

This Court allowed the evidence on credibility grounds, but Plaintiffs contend that this was error. Evidence of a family member's use of the drug at issue does not go to the credibility of the party-employee witness. It instead reflects upon the interface between a non-party family member and that non-party family member's physician. Additionally, even if this evidence would go to credibility – and it should not – Plaintiffs were not in a position to explore or challenge Dr. Peters' testimony about his wife's use of Xarelto.

Unexamined, personal choices to take a prescription drug, despite the risks posed, should not be seen as probative unless the medical circumstances of that personal use are comparable to the circumstances of use at issue in the trial. The relevance of testimony by anecdotal relatives of witnesses with different illnesses, and different prescribing physicians faced with different prescribing decisions, is much too attenuated to have any meaningful value to a jury. Because of the lack of any demonstrated link to the factual circumstances of the case on trial, this testimony was nothing more than evidence of a "sporadic and isolated occurrence" that was irrelevant to the trial proceedings. *See Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1221 (5th Cir. 1995). *See also Pfeiffer v. C.I.A.,* 60 F.3d 861, 865 (D.C. Cir. 1995) ("Suffice it to say that anecdotal evidence

---

[24] *See* Exhibit 1 at 1119:13-1122:14. There was also testimony about personal use by a family member from another Janssen employee, Dr. Nauman Shah, but that consisted of only one sentence: "My own mother, you know, took it once, so I would 100 percent agree with that." *Id.* at 890:1-2.

about what other former employees of other government agencies have done is irrelevant to Pfeiffer's case."); *BASF Corp. v. Old World Trading Co., Inc.,* 86-cv-5602, 1992 WL 232078, at *4 (N.D. Ill. Sept. 9, 1992) ("[A]necdotal evidence, unless accompanied by testimony that such evidence was statistically significant, was irrelevant and would consume too much time."

To the extent there could be some marginal bearing on credibility – and that is unlikely – that would be far outweighed by the dangers of unfair prejudice. The jury likely viewed this evidence as probative of Xarelto's safety, and not just Dr. Peters' credibility. Indeed, defense counsel counted on that, and played up to that, in her summation:

> Plaintiffs said to you at the beginning that this was a safety test. Again, why did he say that? Because he wanted you to think we were terrible people. We're actually the big pharmaceutical companies I think he called us, and we don't want to do a simple safety test. Think about what that said. **That all of the doctors who work on our companies who told you they were on Xarelto themselves or prescribe it for their mother, that they don't care about safety.** They don't care. That's what he wants you to believe.[25]

Defense counsel invited the jury to construe this evidence as indicative of Defendants' emphasis on safety. The prejudicial impact was intended, and it was not only significant, but incurable. Allowing the admission of this testimony was comparable to having allowed a Janssen executive to testify that Xarelto was not unreasonably dangerous because his wife took the drug.

When faced this issue during the *Vioxx* litigation, this Court either precluded the evidence or stated it was generally inadmissible. *See, e.g., Dedrick v. Merck & Co., Inc.,* No. 05-cv-2524, slip op., at ¶ 5 (E.D. La. Nov. 22, 2006) (excluding "any evidence, discussion, or argument that Merck employees, former employees, or family members of Merck employees took Vioxx prior

---

[25] *See* Exhibit 1 at 1596:14-22 (emphasis added).

to the drug's withdrawal from the market.");[26] *Barnett v. Merck & Co., Inc.,* No. 06-cv-485, slip op., at ¶ 7 (E.D. La. Nov. 18, 2011) (reserving ruling, but saying this evidence "generally will not be admissible since it is of no relevance since it depends on dosage, time taken, age, prior condition of party, risk factors, etc., which may be different [and] result in a trial w/in a trial [and] . . . confuse the jury.").[27]

State courts in other *Vioxx* litigation have precluded the evidence, explaining its irrelevance and prejudicial effect:

> Merck is essentially arguing that their employees' actions spoke louder than their words because they would not have consumed the drug, or let their family, if they believed it had the cardiovascular risks the plaintiff claims it had. The individual decision made by a person in consultation with their doctor to take a drug is a personal decision which can be made for many reasons. People are willing to take different risks. Some people, depending on their medical condition, may have been willing to gamble on the cardiovascular risks even if they knew of the risk. The exploration at trial of each employee's personal decision would be prejudicial, confusing and time consuming.

> The court finds that evidence that Merck employees or their family members took VIOXX is substantially more prejudicial than probative and must be excluded during trial. Such evidence does not have any probative value in answering the ultimate issues in the failure to warn aspect of the litigation. Allowing Merck employees to testify that they or their family members took VIOXX would be highly prejudicial to plaintiffs' claims and would not demonstrate with any reliability that VIOXX was more or less safer than was being represented by Merck to the public.

---

[26] Exhibit 17. But in that same order, the ruling was deferred on a motion to preclude "[a]ny comment, inference, or personal anecdote from any Merck witnesses or lawyer that they or their family members used Vioxx." *Id.* at ¶ 3(m).

[27] Exhibit 18. But in that same order, the ruling was deferred on a motion to preclude "[a]ny comment or personal anecdote from any witness or lawyer for the Defendant that they have or a family member has used Xarelto. *Id.* at ¶ 3(m).

*Humeston v. Merck & Co., Inc.,* No. ATL-L-2772-03, slip op., at 2 (N.J. Super. Ct. Sept.2, 2005).[28]
*See also Messerschmidt v. Merck & Co., Inc.,* No. ATL-L-5520-05, slip op. (N.J. Super. Ct. Jan.
18, 2007);[29] *Doherty v. Merck & Co., Inc.,* No. ATL-L-638-05, slip op., at ¶¶ x, bb (N.J. Super.
Ct. June 1, 2006);[30] *Cona v. Merck & Co., Inc.,* No. ATL-L-3553-05, slip op., at ¶¶ x, bb (N.J.
Super. Ct. Mar. 28, 2006).[31]

Here, the probative value of the use of Xarelto by Dr. Peters' wife to bolster the credibility
of Dr. Peters was non-existent, or, at best, insufficient to outweigh the unfairly prejudicial impact
of the jury taking the evidence to mean the drug must be safe. The potential for prejudice was
made even greater when defense counsel's summation invited the jury to consider the sincerity of
the company's "personal users" as proof that the company takes drug safety seriously. This error
was far from harmless, and instead affected the substantial rights of Plaintiffs. For this reason
alone, a new trial should be granted.[32]

**D.     Plaintiffs are entitled to a new trial because of instructional errors.**

Plaintiffs asked this Court to provide the following two instructions to the jury:

    1.  Plaintiffs' Proposed Instruction No. 19: "You are instructed that
       certain federal regulations applicable to this case provide that the
       warnings section of a prescription drug label: … must identify

---

[28] Exhibit 19.

[29] Exhibit 20.

[30] Exhibit 21.

[31] Exhibit 22.

[32] Perhaps this Court subsequently realized the error, because when faced with the issue in a motion *in limine* filed in *Orr*, a different ruling was entered. This Court sustained the motion and explained: "If one of Defendants' witnesses intends to discuss or refer to a family member's use of Xarelto, he or she must first produce all of the medical records of that family member to allow for cross examination. Each person who takes Xarelto is different, and the circumstances are different. In fairness, there ought to be some testing of the specific circumstances of *that* person if the Defendants wish to bring up this issue at trial. Accordingly, Defendants will not be permitted to elicit information about a witness' family member taking Xarelto without producing their medical records." *See* 05/26/17 Order in *Orr* [Record Doc. 6645], at 3 (emphasis in original).

any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy."

2. Plaintiffs' Proposed Instruction No. 20: "While a manufacturer's violation of one or more FDA regulations designed to protect consumers is not conclusive evidence that a product is unreasonably dangerous, violation of such standards may be considered as evidence of the appropriate standard when determining whether the instructions provided to the treating physician were inadequate."[33]

These instructions were intended to work in tandem. The first instruction would have advised the jury that if a laboratory test might help a physician to follow a patient's response to the drug or to identify possible reactions to the drug, federal regulations require the manufacturer to identify in the warning section of the label the test, the range of values expected with the test, and the frequency with which the test should be performed. The second instruction would have advised the jury that if a regulation is violated – such as the regulation to advise of helpful tests – the violation can be considered as evidence of a failure to warn.

This Court declined to provide these instructions, not because they were improper, but because its preference was to run with the more general language from the following instruction:[34]

AS I PREVIOUSLY MENTIONED, XARELTO IS A BRAND-NAME DRUG. THE FDA APPROVED BOTH XARELTO AND ITS LABEL. YOU MAY CONSIDER THIS FACT IN WEIGHING

---

[33] See Plaintiffs' Proposed Jury Instructions [Record No. 6348], at 25-26. See also Exhibit 1 at 1536:18-1537:12.

[34] See Exhibit 1 at 1537:13-23. ("I've taken that up. 22 and 23 of the charge deal with the fact that the FDA approval may be relevant, but it's not, in itself, dispositive of liability. I also take up the fact that whether the FDA did or did not do anything, that that's not sufficient and it's not conclusive. With regard to dealing with specific items of evidence that should be in, I don't think the jury charge should focus on specific items of evidence. I chose not to do that, but instead speak the law generally and let the jury decide on it. So I'll deny that motion.")

THE EVIDENCE IN THIS CASE IN DETERMINING THE LIABILITY OF THE DEFENDANTS.

HOWEVER, FDA APPROVAL, ALTHOUGH RELEVANT, DOES NOT IN AND OF ITSELF ABSOLVE THE DEFENDANTS OF ALL LIABILITY, NOR DOES IT ESTABLISH THAT THE WARNINGS OR INSTRUCTIONS PROVIDED WITH THE DRUG WERE ADEQUATE UNDER THE STANDARDS OF LOUISIANA LAW. IN FACT, ANY ACTION OR INACTION ON THE PART OF THE FDA, THOUGH RELEVANT, DOES NOT FORECLOSE A CLAIM UNDER LOUISIANA LAW. THEREFORE, EVEN IF THE DEFENDANTS HAVE MET ALL THE APPROPRIATE MINIMUM STANDARDS FOR FDA APPROVAL AND GOVERNMENTAL REGULATIONS AND REQUIREMENTS TO OBTAIN FDA APPROVAL, THIS COMPLIANCE AND APPROVAL, THOUGH RELEVANT, IS NOT SUFFICIENT TO CONCLUSIVELY ESTABLISH THAT THE DEFENDANTS HAVE TAKEN THE STEPS NECESSARY UNDER THE LAW WHICH APPLIES IN THIS CASE. MORE SPECIFICALLY, **IF YOU FIND THAT THE DEFENDANTS FAILED TO APPRISE TREATING PHYSICIANS OF APPROPRIATE TESTING TO ADDRESS RISKS THAT THEY KNEW OR SHOULD HAVE KNOWN PRIOR TO FDA APPROVAL OR BECAME KNOWN OR SHOULD HAVE BECOME KNOWN AFTER THE FDA APPROVAL XARELTO'S LABEL, THEN FDA APPROVAL OF THE DRUG IS NOT CONCLUSIVE.**[35]

Plaintiffs contend that this Court's instructions were too general to assist the jury. In terms of tests, all the jury was told was that if Defendants failed to apprise treating physicians of "appropriate testing to address risks," FDA approval of the drug would not conclusively establish compliance with the laws applicable to this case. This Court's instructions provided no guidance with regard to what constituted "appropriate testing to address risks." The jury needed Plaintiffs' Proposed Instruction No. 19 to define that phrase. Without Instruction No. 19, the jury could have concluded that Defendants only had to apprise treating physicians of FDA-approved tests, and

---

[35] Jury Instructions [Record No. 6393], at 22-23 (emphasis added). *See also* Exhibit 1 at 1646:20-1647:17 (providing instructions consistent with the instructions outlined on pages 22-23 of Record No. 6393).

could have reasoned that because the FDA had not specifically approved a PT test to screen Xarelto users, no test had to be disclosed. Additionally, this Court's instructions were not sufficiently clear with regard to what import the jury could attach to any failure to comply with federal regulations. They were not told that they could affirmatively use evidence of a federal regulatory violation to conclude that instructions to treating physicians were inadequate.

There was no good reason to refuse to include the two requested instructions, comprised of a total of only three sentences which were not challenged as inadequate or confusing in any way. It would have taken less than a minute to provide the instructions, and the only possible effect would have been to clear up potential confusion. Additionally, these errors were not harmless. They resulted in the jury lacking any clear understanding of the standards required for a warning to be deemed inadequate under the law. Unfair prejudice is unavoidable in a situation such as this, when a party is required to meet an unclear burden of proof. For this reason alone, a new trial should be granted.

**E.     Plaintiffs are entitled to a new trial because demonstrative materials were sent to the jury room.**

At the conclusion of the presentation of evidence, this Court provided instructions to the jury, advising that in their deliberations, the jury could consider only the evidence that had been admitted into the record:

> As I stated earlier, it is your duty to determine the facts, and in so doing, you must consider only the evidence I have admitted in the case. Now, the term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted into the record.
>
> Remember that any statements, objections or arguments made by the lawyers are not evidence in the case. The function of the lawyer is to point out those things that the lawyer feels are most significant and most helpful to their side of the case, and, in so doing, to call your attention to certain facts or inferences that they are particularly concerned that you recall. But, in the final analysis, it is your own

recollection and interpretation of the evidence that controls. What the lawyers have said is not binding upon you.[36]

This Court further clarified that demonstrative evidence is not actual proof or admitted evidence of proof, and cautioned that the jury should not rely on it, and should instead determine the facts based only on admitted evidence of proof:

> Finally, certain materials have been shown to you solely as an aid to help explain the facts disclosed by evidence, testimony, records and other documents in this case. We sometimes refer to it as "demonstrative evidence" because it is offered merely to demonstrate or illustrate a point, rather than an actual proof of that point. Demonstrative evidence is not admitted evidence or proof of any fact. You should determine the facts from the evidence that is admitted.
>
> Remember, demonstrative evidence is only as good as the underlying testimony, data, assumptions, and opinions that serve the basis for it, and the maxim, "garbage in, garbage out," applies. Like all other evidence in this case, you may accept it or reject it in whole or in part.[37]

Counsel for both parties were aware that these instructions would be given, because they were outlined in the Jury Instructions that had been provided in advance of the jury charge.[38] No objections were made to these particular instructions.

Additionally, in practice, the parties had engaged in discussions when they believed a particular piece of demonstrative material should be sent to the jury room. If both parties consented, the demonstrative material was cleared for submission to the jury room. If one party objected, however, the demonstrative material did not go to the jury room. At least that is what Plaintiffs' counsel understood to be the case, until this afternoon.

---

[36] *See* Exhibit 1 at 1632:3-16.

[37] *Id.* at 1637:23-1638:10.

[38] *See* Jury Instructions [Record No. 6393, at 3, 11.

This afternoon, defense counsel attempted to submit a binder of demonstrative materials to the jury in the *Orr* trial. After Plaintiffs' counsel objected to the submission of that binder, they were told that a similar binder of demonstrative materials from the direct examination of Defendants' expert, Dr. Colleen Johnson, had been submitted to the jury in the *Boudreaux* trial. Plaintiffs' counsel would have objected at that time, and would have prevented the submission of that binder to the jury in the *Boudreaux* trial, just as they objected to and prevented the submission of the binder of demonstrative materials to the jury in the *Orr* trial; but they did not realize that these demonstrative materials had been submitted to the jury in *Boudreaux* until today. Defense counsel knew that Plaintiffs' counsel was opposed to the submission of those demonstrative materials, because when defense counsel asked during the course of the *Boudreaux* trial for consent to submit to the jury these specific demonstrative materials associated with Dr. Johnson, Plaintiffs' counsel unequivocally declared that they would not consent.

It appears that when the binders were subsequently presented for submission to the jury, however, defense counsel added these same demonstrative materials, without calling attention to them or again seeking the express consent of Plaintiffs' counsel.[39] Indeed, counsel for both sides signed a "Certificate of Trial Exhibits," confirming that they had reviewed "all of the exhibits in the possession of the Court," and that "these comprise all of the exhibits admitted into evidence

---

[39] Plaintiffs' counsel is investigating more detailed facts surrounding these demonstrative materials, but given that they did not discover this issue until this afternoon (during the *Orr* trial), that investigation cannot be completed before this brief is due today. Plaintiffs' counsel thus respectfully requests an opportunity to submit a supplemental memorandum and appropriate declarations once their investigation is complete. Whether Plaintiffs' counsel inadvertently overlooked these materials in one of Defendants' binders of exhibits, or failed to see the demonstrative materials identified on an index associated with those binders, two essential truths already are clear: (1) Defendants chose not to bring the materials up for discussion, even after being specifically told that Plaintiffs' counsel objected to their submission to the jury; and (2) Plaintiffs never gave affirmative consent to submit these demonstrative materials to the jury.

by the Court during the course of trial."[40] This signed Certificate of Trial Exhibits said nothing about demonstrative materials which had not been admitted into evidence, and which the parties had been obliged to review and discuss before submission to the jury. The submission of those demonstrative materials to the jury in the *Boudreaux* trial, without the express consent of Plaintiffs' counsel, directly circumvented what had been outlined in this Court's jury charge, the understanding of the parties, and the requirements under the law.

"The general rule is that materials not admitted into evidence simply should not be sent to the jury for use in its deliberations." *Baugh v. Cuprum S.A. De C.V.,* 730 F.3d 701, 705 (7th Cir. 2013) (citations omitted). "Without the consent of all parties, a deliberating jury may not consider exhibits not actually admitted into evidence." *Id.* at 706.  This is because of the nature of demonstrative materials, which are intended to be argumentative, and not persuasive. More specifically:

> [D]emonstrative exhibits are meant to illustrate or clarify a party's position, and they are by definition less neutral in [their] presentation and thus are not properly considered evidence…. They instead aim to clarify, color, or organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence to persuade the jury to see the evidence in a certain light favorable to the advocate's client…. Thus, when considering the admissibility of exhibits of this nature, it is critical to distinguish between charts or summaries *as evidence* and charts of summaries *as pedagogical devices….*
>
> . . . .
>
> [W]hen an exhibit is allowed to be used for only demonstrative purposes, the judge and the parties understand that the exhibit is argumentative and persuasive in nature. [S]uch pedagogical devices should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used by the jury during deliberations….

---

[40] *See* Exhibit 23, Certification of Trial Exhibits [Record Doc. 6391].

> Demonstrative exhibits that are not admitted into evidence should not go to the jury during deliberation, at least not without consent of all parties. We would not allow a lawyer to accompany the jury into the deliberation room to help the jurors best view and understand the evidence in the light most favorable to her client. The same goes for objects or documents used only as demonstrative exhibits at trial.

*Id.* at 707-708 (internal quotations and citations omitted) (emphasis in original).

The submission of extra-record evidence, such as demonstrative materials, to the jury, without the knowledge and consent of all parties, is "presumptively prejudicial." *See United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir. 1983), *citing Remmer v. United States,* 347 U.S. 227, 229 (1954); *Davis v. Velez,* 15 F. Supp. 3d 234, 243 (E.D.N.Y. 2014) (citation omitted). This presumption may be rebutted only by an affirmative showing by the party submitting the evidence that the submission was harmless. *Hillard,* 701 F.2d at 1063 (citation omitted); *Davis,* 15 F. Supp. 3d at 243 (citation omitted). The burden is <u>not</u> on the moving party to establish prejudice. *Baugh,* 730 F.3d at 708.

The admission of demonstrative materials, without the express consent of all parties, can and has been deemed as reversible error which warrants a new trial. *See, e.g., Baugh,* 701 F.2d at 706, 711 (reversing judgment, and remanding for a new trial, based on the admission of demonstrative evidence without the consent of the opposing party). This is particularly true in a situation such as this, where the non-admitting party "never had an opportunity to plan for, mitigate, or rebut the effects of the [demonstrative evidence's] introduction into jury deliberations and was prejudiced by his inability to respond to the [demonstrative evidence] as substantive evidence." *See id.* at 711.

Defense counsel's submission of its demonstrative materials to the jury in the *Boudreaux* trial, without the express consent of Plaintiffs' counsel, was presumptively prejudicial, particularly given the fact that Plaintiffs' counsel did not have an opportunity to plan for, mitigate, or rebut the

effects of those demonstrative materials as substantive evidence. Indeed, the jury likely believed the demonstrative materials to be substantive evidence, given that they had been told by this Court that only substantive exhibits would be submitted to them for their consideration in their deliberations. Unfair prejudice is unavoidable in a situation such as this, and for this reason alone, a new trial should be granted.[41]

## IV.   **CONCLUSION**

Each error listed above, on its own, and certainly when considered cumulatively, affected the substantial rights of Plaintiffs. As a result of the significant and unfair prejudice caused by each error, and the cumulative effect of all errors, Plaintiffs are entitled to a new trial.

Respectfully submitted,

Dated: June 12, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
*HERMAN, HERMAN & KATZ, LLC*
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
*GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC*
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

---

[41] Defendants no doubt would acknowledge that Dr. Johnson's testimony about the unreliability of the PT test may have been a major contributor to the defense verdict in *Boudreaux*. This is all the more reason why allowing the jury to review numerous demonstrative aids prepared to make Dr. Johnson's testimony more convincing signifies a very real prejudicial impact on Plaintiffs' case.